1        IN THE UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF CALIFORNIA
2

   Ralph Coleman, et al.,
3      Plaintiffs,       Sacramento, California
   vs.                 No. 2:90-cv-00520
4   Edmund G. Brown, Jr., et   Thu., Sep. 28, 2017
   al.,                 9:12 a.m.
5      Defendants.
   _____/
6
                TRANSCRIPT OF HEARING
7    BEFORE THE HONORABLE KIMBERLY J. MUELLER, DISTRICT JUDGE
                   ---oOo---
8   APPEARANCES:

9    For the Plaintiffs:       Rosen, Bien, Galvan and
                         Grunfeld, LLP
10                       50 Fremont Street, 19th Floor
                        San Francisco, CA  94105
11                       By:  Lisa Adrienne Ells
                       Michael Bien
12                       Jessica Winter
                       Jenny Yellin
13                       Attorneys at Law

14    For the Defendants:       Office of the Attorney
                         General
15                       1300 I Street, Suite 125
                       Sacramento, CA  94244
16                       By: Elise Owens Thorn
                       Christine Ciccotti
17                       Tyler Vance Heath
                       Deputies Attorney General
18
                       Office of the Attorney
19                       General
                       455 Golden Gate Ave.
20                       Suite 11000
                       San Francisco, CA 94102
21                       By:  Danielle Felice O'Bannon
                       Chad A. Stegeman
22                       Deputies Attorney General

23    Official Court Reporter:     Kimberly M. Bennett,
                       CSR, RPR, RMR, CRR
24                       501 I Street
                       Sacramento, CA 95814
25   Proceedings recorded by mechanical stenography, transcript
   produced by computer-aided transcription

1                                     <u>INDEX</u>

2      <u>WITNESSES:</u>                                      <u>PAGE:</u>

3      KATHERINE TEBROCK

       DIRECT EXAMINATION BY MS. THORN.....................54
4      CROSS-EXAMINATION BY MS. ELLS.......................69
       REDIRECT EXAMINATION BY MS. THORN...................88
5      RECROSS EXAMINATION BY MS. ELLS.....................90
       REDIRECT EXAMINATION BY MS. THORN...................91

6

       BRITTANY BRIZENDINE
7      DIRECT EXAMINATION BY MS. THORN.....................93
       CROSS-EXAMINATION BY MR. BIEN.......................99
8      REDIRECT EXAMINATION BY MS. THORN..................108

9

10                  <u>PLAINTIFF EXHIBITS RECEIVED IN EVIDENCE</u>

11        <u>NO.:</u>                                          <u>PAGE:</u>

A..............................................114

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to order of the court, 9:12 a.m.)

 2                   THE CLERK:  Calling Civil Case 90-520; Coleman, et

 3      al. versus Brown, et al.  This is on for a status conference,

 4      possible evidentiary hearing.

 5                   THE COURT:  All right.  Good morning.  Appearances,

 6      please.

 7                   MS. THORN:  Good morning, Your Honor.  Elise Thorn

 8      appearing on behalf of defendants, along with some colleagues

 9      from my office:

10          Deputy Attorney General Christine Ciccotti.

11          Deputy Attorney General Chad Stegeman.

12          Deputy Attorney General Tyler Heath.

13                   THE COURT REPORTER:  I'm sorry, slow down, please.

14                   MS. THORN:  Senior Deputy Attorney General Danielle

15      O'Bannon.

16                   THE COURT:  All right.  Good morning to you all.

17          And for the plaintiffs?

18                   MS. ELLS:  Good morning, Your Honor.  Lisa Ells,

19      Michael Bien, to my left, Jenny Yellin, and Jessica Winter,

20      appearing for plaintiffs.

21                   THE COURT:  All right.  Good morning to you all.

22          Here is what I'd like to do.  I have an outline of what I

23      think needs to be covered.

24          This is set as a status.  And at this point, having

25      reviewed what you've provided in some depth, and I had not
```

1    completed my review when I issued the order on September 22nd,

2    so I'm going to clarify what I'm looking for there.  I think

3    this is primarily a status, with the opportunity for some

4    focused presentation of evidence, really, as the Court's way of

5    making certain you all are hearing what you're saying and

6    reflecting on it in this forum.

7        I'm remembering what we've said about bed space.  I think

8    the area of the evidentiary hearing, what that would cover

9    would be bed space, and is that a critical impediment to

10   compliance, while recognizing all the other pieces of the

11   puzzle.

12       So my proposal is to work through a series of issues based

13   on the topics the joint status report raised, and the parties'

14   briefing has raised, and then take a break, you can reflect on

15   whether or not you want to present evidence on any other issue,

16   and then we'll come back and have a focused evidentiary

17   proceeding.

18       Based on what I know, I think we could be done by noon, but

19   if we need to go into the afternoon we will.

20       So I just want to -- everyone in this room knows it, but I

21   just want to note that the backdrop here is -- particularly

22   with the critical issues that appear to be impediments to

23   compliance, is the requirement of MHCB placement within 24

24   hours of referral.  That is not exactly a new requirement.

25   It's been court approved since 1997; provisional approval,

1    1997.  There has been reporting since at least 2003, as the

2    briefing explores a bit.  So that's a backdrop.  20 years that

3    requirement has been out there.

4        So the threshold questions I have -- I just want to make

5    clear, I don't see any question of enforcement ripe at this

6    point; we'll consider that in November.  I'm not revisiting the

7    April 19th order to the extent it signaled an intent to enforce

8    based on one hundred percent compliance.  There is an appeal

9    pending, for one thing.

10       One question I have for the parties, it appears that the

11   parties are seeking guidance from the Court with respect to

12   whether or not the possibility of clearly-defined exceptions to

13   the 24-hour rule is the correct approach to refine the current

14   requirements.

15       Do the parties agree the Court can provide that guidance in

16   light of the appeal?  For the defense?

17            MS. CICCOTTI:  One moment, Your Honor.

18            THE COURT:  Um-hum.

19       (Pause in proceedings.)

20            MS. THORN:  Your Honor, I believe the Court can

21   provide some guidance, but in all fairness, the parties are

22   continuing to work in the Special Master workgroups on many of

23   the issues, including especially the exceptions to the transfer

24   timelines.  And I know that we -- we did file the stipulation,

25   and the Court gave the parties leave to take that time, I

1    believe, until -- through the end of October.

2              THE COURT:  All right.

3              MS. THORN:  I don't know if that answers your

4    question.

5              THE COURT:  But no objection to discussing it today?

6              MS. THORN:  Certainly not.

7              THE COURT:  All right.  Then we'll discuss it.

8         I would note the defense initially sets forth a series of

9    measures the parties have essentially agreed upon, and that are

10   being deployed.  I approve of those.  Not that you need my

11   approval, I approve generally, and I note the plan to provide a

12   full report on the status of those efforts and how they're

13   affecting compliance in November.

14        In terms of evidentiary objections, let me just note that

15   I've reviewed those.  The declarations provided are essentially

16   in the form of direct testimony, without fully developing the

17   credentials of the persons who have signed those declarations.

18        At this point, my understanding is the parties were

19   prepared to essentially submit on those declarations.  I don't

20   know that I need to reach all the objections.  If I were to

21   rely on anything in a declaration, then I would, but I don't

22   know that I need to at this point, given the stage of the

23   parties' efforts.

24        Again, I'm primarily seeing this, given the briefing, as a

25   status, a chance to provide some feedback, and a chance for the

 1   Court to obtain some clarification, while clarifying, perhaps,

 2   one or two critical issues.

 3       So there are three areas the Court wants to discuss, the

 4   first being whether or not there needs to be in-person

 5   assessment before the 24-hour MHCB placement clock starts to

 6   run.

 7       How to calculate the 24-hour timeline, particularly when it

 8   applies to transfer from one institution to another.

 9       And then a reliable system for reporting.

10       Those are the three areas raised by the briefing.

11       And, again, I have a series of questions I'd like to review

12   first.  Each side can have whomever the right person is speak.

13   If you can restate your name, so the court reporter has that

14   clearly in the record.  I realize you may have divided up

15   responsibilities here.

16       So on the question of whether or not there needs to be an

17   in-person assessment before the 24-hour clock starts to run, my

18   review of the record suggests to me that there is no data, as

19   the plaintiffs argue, to show the effect of an in-person

20   assessment compared to a telephone assessment.  Nothing allows

21   the Court to really understand if there is a meaningful

22   difference there.

23       Does the defense disagree with that characterization of the

24   data before me?  I understand there is lots of argument, I'm

25   looking at the data.

1          MS. THORN:  Your Honor, we don't disagree that --

2          THE COURT:  Again, state your name for the court

3   reporter.

4          MS. THORN:  Elise Thorn.

5      We don't disagree that there is not that specific data as

6   to the difference between, rather, looking at the number of

7   recisions of after-hour referrals created by the on-call

8   clinicians' work versus the number of recisions created by an

9   assessment done by a peak-hours clinician, for example.

10     So we did provide data that shows the referrals that

11  took -- that took place between a period of time, a six-month

12  period of time, between 5:00 p.m. and 5:00 a.m., and so that

13  data does, in fact, provide the number of referrals, the number

14  of referrals that were done after hours.

15     And so from that data I think you can extrapolate and come

16  to a conclusion, based on the testimony -- or the declarations

17  that have been submitted, and the statements in those

18  declarations by clinicians and by CDCR that, in fact, one of

19  the issues that CDCR needs to tackle with the movement of

20  patients is to reduce the number of recisions, because it

21  impacts --

22         THE COURT:  We'll talk about recisions.

23     So you're saying that I can conclude, based on the record

24  before me, that the during-work-hours -- which to me is, the

25  more I think about it, not the right way to think about this --

 1   but the during-work-hours and after-work-hours, I can assume

 2   that the bulk, if not all, of the during-work-hours referrals

 3   are in person, and those after-hours -- if that really is a

 4   term that makes sense, I realize it's been used for years --

 5   that after-hours are not?

 6       (Discussion held off the record.)

 7       The court reporter is actually asking that you sit and use

 8   the mike.

 9               MS. THORN:  Certainly.

10               THE COURT:  Use of the mike is the most important.

11               MS. THORN:  So there is evidence that defendants

12   submitted, they are attached, that -- evidence of the -- the

13   hours that clinicians are available to make the assessments at

14   all of the facilities.

15               THE COURT:  Are available.  I'm drilling down --

16               MS. THORN:  That's correct.

17               THE COURT:  So I'm -- you're saying that I can -- I

18   can deduce --

19               MS. THORN:  That's correct.

20               THE COURT:  -- that most of the during-the-day

21   referrals are in person?

22               MS. THORN:  That there are clinicians available to

23   make those assessments.  And while at some of the facilities --

24   institutions, the hours that clinicians are available seven

25   days a week has been -- is in dispute a little bit, we do have

1    some updated data for the Court that we were going to submit by

2    way of testimony today.  And we have -- want to clarify and

3    confirm that, in fact, all but at two of the institutions there

4    are clinicians available seven days a week, including on

5    weekends, and --

6              THE COURT:  24 hours?

7              MS. THORN:  But not 24 hours a day.

8         So if you look at Exhibit 4 to the Weber declaration, the

9    beginning of that is a letter from defendants to the Special

10   Master and plaintiffs that was discussed within the workgroups,

11   and we've gone -- gone through that data and discussed the

12   impact.

13        But I want to make clear that the data on the referrals and

14   the recisions of after-hours referrals, we put together data to

15   have a discussion and to illustrate the point that, in fact,

16   the issue of referrals that are made after hours by an on-call

17   clinician result in a higher incident of recisions and impact

18   the number -- the rate of recisions to crisis -- recisions of

19   referrals to crisis beds.  And so it was --

20             THE COURT:  I understand that position.  But don't

21   the charts that you've provided show that most of the recisions

22   are actually where MHCBs are located?

23             MS. THORN:  I don't know that to be the case.  So

24   I -- I'm not --

25             THE COURT:  What I'm trying to figure out is, so,

1   okay, there are a lot of recisions, and maybe you really

2   believe that one of the ways to deal with the -- the timing

3   issue is to reduce those, but where is the evidence that shows

4   that the recisions are really getting in the way of timely

5   transfers?

6      And it seems relevant to the Court that many, many of those

7   recisions are actually in institutions where the MHCBs are

8   located, suggesting not a lot of inefficiency there.

9           MS. THORN:  Right.  Well, the idea of looking at, you

10  know, the -- to respond to the April 19th order, and in the

11  course of the workgroups, defendants wanted to -- were tasked

12  at looking at the entire system, and looking at all the

13  potential obstacles to compliance.

14     And the fact of the matter is that recisions -- we know

15  that recisions cause an increased workload for the management

16  of the system, the assignment of crisis beds that happens every

17  day, seven days a week.  Those beds have to be managed.  There

18  are many beds.  There are a high number of referrals.  And what

19  happens with the recisions, and this is reflected in the

20  Tebrock declaration, the recisions impact the time it takes to

21  process all of the referrals each day.  So --

22          THE COURT:  I understand that position.

23     So help me -- you've -- there is one footnote that's a

24  little jab at the plaintiffs, but I would think the defendants

25  would embrace an approach that sanctioned the use of telephone

 1  assessments.

 2          MS. THORN:  Well, Your Honor --

 3          THE COURT:  If it can be as effective, then the

 4  question is, what does the -- what do the data show?

 5          MS. THORN:  Actually, telephone -- a telephone

 6  assessment -- and we were actually also going to put on some

 7  testimony today to clarify that, and what the difference is,

 8  from a clinical standpoint, between a telephone -- on-call

 9  telephone assessment that enables the nurse, after hours, to

10  place a patient in alternative housing pending crisis bed

11  admission.  And so there are certain things that a clinician

12  must do in order to complete a crisis bed referral.  Those

13  things are laid out in the Program Guide.  They're not in

14  dispute.  A referral requires a suicide risk evaluation, it

15  requires a mental health assessment, and those are things that

16  cannot be done over the phone.

17      So while you have an on-call clinician who is able to tell

18  the nurse, yes, I -- the nurse presents the case to the on-call

19  clinician, say, at midnight, the clinician listens to the nurse

20  and says, okay, let's -- let's place this patient in housing

21  and we will refer to crisis bed.  And the next morning we still

22  have to come in and do the suicide risk evaluation and the

23  mental health assessment and complete the rest of the paperwork

24  necessary for the crisis bed referral to proceed.

25          THE COURT:  So that's never, ever being done

1    remotely?

2            MS. THORN:  That's correct, Your Honor.

3            THE COURT:  And, actually, Tebrock -- one of the

4    Tebrock declarations says they're on-call clinicians, I gather

5    within close proximity of every institution?

6            MS. THORN:  I believe they are, but I don't actually

7    have -- I don't know how close these clinicians live, so I

8    don't know whether they're --

9            THE COURT:  But they can be there by the next

10   morning?

11           MS. THORN:  That's correct.  And, in fact, CDCR has

12   in their contract with their clinicians the ability to call

13   back the clinicians to, in fact, make sure that they are

14   available to come in and complete paperwork and documentation

15   and follow up on patient care.  And that happens the next

16   morning, typically.

17           THE COURT:  So let me ask this:  Where there are

18   MHCBs, can I assume that there are -- there is shift work, so

19   there is some licensed healthcare professional on duty at all

20   times?

21           MS. THORN:  That's correct.

22           THE COURT:  But it's not a clinician?

23      One person has to speak into a microphone.

24           MS. THORN:  So I can have Dr. Brizendine come up and

25   answer that question if you'd like, Your Honor.

1          THE COURT:  Well, we'll hold that thought.

2          MS. THORN:  Okay.

3          THE COURT:  So, for the plaintiffs?

4          MS. ELLS:  Good morning, Your Honor.

5          THE COURT:  Is it -- so assuming -- so I understand

6     your characterization of the record, but why can't I draw the

7     inference that the defendants are suggesting, from the data

8     provided, that there is a meaningful difference between

9     in-person assessment during the day and remote -- remote

10    initial assessment, after hours, when it may be that most of

11    the problems arise at least until 1:00 a.m.?

12         MS. ELLS:  Thank you, Your Honor.  This is Lisa Ells

13    for the record.

14        Your Honor, the data that they've shown you doesn't

15    approximate even the work hours that they list for most of the

16    institutions that they have.  No institution has staffing at

17    5:00 a.m., and yet they're choosing a 5:00 a.m. to 5:00 p.m.

18    cutoff.  So that necessarily includes in-person assessments at

19    some institutions, you know, for three or more hours before a

20    clinician shows up.  Many institutions have after 5:00 p.m.

21    coverage.  Again, that necessarily includes a lot of on-call

22    assessments.  And that's obvious just from the chart that

23    opposing counsel just referenced.

24        But I think the other significant point is, if you look at

25    how their data actually maps, it shows that the correlation

1    doesn't necessarily make sense.

2        If you look at Mule Creek on their -- the same charts that

3    I think that you were referencing, which is on page 7 of

4    Exhibit 3 of the Weber declaration, it shows that Mule Creek

5    has the fourth highest recision rate for nighttime referrals,

6    and yet it has among the best staffing in the system; they have

7    staffing until midnight four days a week.  So that is one

8    indication that the data doesn't map.

9        Another one is that CMC, which has no coverage after 5:00

10   p.m., has a high number of referrals but a relatively low

11   recision rate at 35 percent.

12       So the recisions vary widely.  And if you look at the same

13   chart that we've just referenced, you'll see, for instance --

14   actually, a different chart, this is Weber Exhibit 3 on page

15   13 -- let me -- that's not it.  I'll get you the correct page

16   for that.  But CCWF has a 75 percent recision rate, 777 people

17   referred, 583 rescinded.  CIW, the other women's institution,

18   has 17 percent recision rate.  Mule Creek has a 35 percent

19   recision rate, even though it has approximately the same number

20   of referrals as CCWF, and has roughly the same clinical

21   staffing hours at CCWF.

22       So I think, you know, there is something obvious going on

23   at some of these institutions that is causing the recision

24   rates to be significantly higher and out of whack.  And the

25   on-call -- you know, the assumption that it's related to an

 1    on-call versus an in-person assessment is not a reasonable way

 2    to explain away those differences.

 3        I think if you look at the recently-filed second audit by

 4    the suicide prevention expert, Mr. Hayes, you'll see there are

 5    some instances where there is an obvious problem that can be

 6    dealt with at a local level that relates to recisions.

 7        For instance, at DVI, 48 percent of MHCB referrals were

 8    rescinded from alt housing due to, quote, a high threshold for

 9    MHCB referrals.

10        And Mr. Hayes actually links this to a 2016 suicide,

11    because at DVI clinicians were telling people in mental health

12    crisis that their reception center time would restart if they

13    went to the MHCB, so people routinely recanted that they had

14    suicidal ideation.  And this 1/20/16 suicide repeatedly went to

15    alt housing, was sitting in alt housing, and then recanted

16    because he didn't want his reception center time to restart.

17    This is a local training issue that can explain a high rate.

18        So there are a lot of things that can cause the large

19    differentials that we're seeing in the record between recision

20    rates among institutions.  I don't think that there is any

21    reason to assume that it's related to on-call versus in-person

22    staffing when there is no data actually showing that link.

23            THE COURT:  Do plaintiffs agree that the recisions

24    are a problem where they exist?

25            MS. ELLS:  I think that they are a problem, yes.  But

1    I -- I think it's an outsized -- an outsized response to a

2    problem that even during -- even during the daytime there is a

3    significant number of recisions.  Right.  So there is -- to

4    some degree it is built into the system.

5        So, it causes administrative delays, but, again, these are

6    not people that are in an MHCB bed, these are people that are

7    in alternative housing.  And not only does that mean it doesn't

8    directly affect the number of available beds, but it also means

9    that they are in places that this Court has already indicated

10   are totally inappropriate for people in mental health crisis.

11           THE COURT:  We'll go there in just --

12           MS. ELLS:  Um-hum.  And I'd like to just make one

13   point about the point about the fact that clinicians can be

14   called in the next morning to do an in-person evaluation and

15   fill out this paperwork.

16       So, first of all, that doesn't mean that the -- the time

17   for the referral should be delayed until that paperwork can be

18   conducted.

19       And second of all, that same contract that defendants just

20   referenced appears to also allow CDCR to have the people -- the

21   on-call clinicians come in at night to do those assessments if

22   there is any concern that the nursing evaluation wasn't

23   complete in consultation with the telephone clinician.

24       So the plaintiff class is going to bear the brunt of this

25   problem, and every single person is going to spend, you know,

 1   potentially a dozen or more hours in alternative housing,

 2   beyond the well over 24 hours that people are already spending

 3   there waiting for a mental health crisis bed in a mental health

 4   emergency, receiving no treatment.

 5           THE COURT:  So, Ms. Thorn, or whoever on your team

 6   would respond to this, is it the case that on-call clinicians

 7   can be summoned in at any time under the contract?

 8           MS. THORN:  I believe that is the case, Your Honor.

 9   That's not the practice.

10       And as the Court is well aware, CDCR has significant

11   challenges in retaining staffing -- clinical staffing at many

12   of its institutions.  So, obviously, that's -- there are some

13   challenges with -- with that -- with a practice that would

14   mandate a clinician to come in at midnight or 2:00 a.m. to do

15   an assessment.

16       And it's especially important to note that even if the

17   clinician comes in, that patient is not going to, at 2:00 a.m.,

18   be transferred to the crisis -- to a crisis bed.  That patient

19   is going to stay in the alternative housing bed, which

20   defendants take great exception with the characterization that

21   those beds in those units are unsafe --

22           THE COURT:  We'll go there in just a minute.

23           MS. THORN:  So, also --

24           THE COURT:  Just help me understand, if you look at

25   when -- has there been any fine-grained analysis of when

1    referrals are occurring, and any effort to redefine shifts to

2    match up with when referrals -- I mentioned this -- this notion

3    of after hours is such a civil service bureaucratic notion that

4    doesn't really match up with the need here.

5              MS. THORN:  So, Your Honor, I want to make sure that

6    the Court is clear that the charts and the data that defendants

7    put together for the purposes of a discussion at the

8    workgroups, in the Special Master workgroups, we cut the data

9    at 5:00 p.m. to 5:00 a.m., 5:00 a.m. to 5:00 p.m., for purposes

10   of illustrating that there is a difference in the -- in the

11   recisions.  We believe that if you cut the data differently,

12   say 8:00 a.m. to 10:00 p.m., that there -- you can look at the

13   recisions differently that way, but the recisions would still

14   take place.

15        And CDCR has made a sensible proposal to look at what's a

16   way to reduce the recisions as a means to address the obstacle

17   to meeting the 24-hour timeline.  And it's a systemic approach.

18   So we're looking at not in the individual patients, we're

19   looking at, as the system as a whole, we know that all

20   recisions -- whether they happen from daytime referrals or

21   nighttime referrals, any recision that happens does clog up the

22   system.  So what can we do to unclog the system?  Well, let's

23   look at when -- you know, when referrals are made that might

24   not -- that maybe we can eliminate those recisions of referrals

25   that are made at some point in time.

1          And it is CDCR's experience that referrals made on the

2     basis of an on-call telephone call clinician contact with a

3     nurse, the next morning, many, many, many times, those -- those

4     referrals are rescinded.  The patient is -- has -- has had a

5     cooling off period.  Lots of things happen clinically.  The

6     clinician comes in the next morning, and many times it is that

7     patient's own clinician, talks to the patient about the crisis

8     that brought him or her to the place where they needed to get

9     out of their house and get to a new environment, and sometimes

10    that's enough.  And clinically, CDCR does have that experience.

11    And --

12          THE COURT:  How much is better training for whoever

13    is having to make the initial decision a factor?

14          MS. THORN:  When you say "the initial decision,"

15    you're talking for the after-hours, the on-call clinician?

16          THE COURT:  Um-hum.

17          MS. THORN:  Well, it could be some -- it could be

18    some factor, but that -- that's not the entire picture.

19          One of the reasons CDCR proposed to wait for the

20    after-hours -- you know, this is to address, again, the

21    after-hours, middle-of-the-night-type of referral, where you

22    don't have your clinician right there with the patient, they

23    come in the next morning and they're able to do that full,

24    face-to-face assessment, which needs to be done anyway, and

25    it -- it will result in -- in better referrals.

```
1              THE COURT:  Do you know, is it the case that there is
2    -- that most referrals are occurring after hours?
3              MS. THORN:  No, Your Honor.  We believe, and we have
4    shown Exhibit 4 to the Weber declaration at page 18, the ECF
5    number is -- page 19, actually, of 5680-5, that over 50 percent
6    of the referrals are in the -- what we have categorized, for
7    illustration purposes, the 5:00 p.m. to 5:00 a.m. timeframe.
8    So it's a little more than 50 percent for that timeframe, but
9    it's still a significant number.  So for that -- for the period
10   reported, it was over 1800 referrals that were rescinded for
11   that time period.
12             THE COURT:  So let's talk about alternative housing.
13       It is fair to say that what's provided in alternative
14   housing is medications and observation, but no mental health
15   treatment, correct?
16             MS. THORN:  That's correct.
17       (Pause in proceedings.)
18       Actually -- I would like to correct that, actually.
19       Any patient who is placed in alternative housing is seen by
20   a clinician daily, each day.  So to the extent that they have
21   to stay there longer than the 24-hour period, they would be
22   seen -- they are seen by a clinician each day.
23             THE COURT:  Once a day?
24             MS. THORN:  That's correct.
25             THE COURT:  But it's not MHCB level of care?
```

1          MS. THORN:  It is not.  And it is not meant -- it

2     is -- the purpose of alternative housing is not meant to

3     provide treatment.

4          THE COURT:  And the Hayes report, the September 7th

5     report, granted provided while the briefing was coming in, but

6     I didn't see the defense acknowledge that report at all.

7     Mr. Hayes is using a very narrow lens when he looks at

8     alternative housing, but that's -- doesn't that -- that's

9     current information that the defense can't ignore.

10         MS. THORN:  I think we did reference the current --

11    the new -- the updated Hayes re-audit report.

12         THE COURT:  All right.  Maybe I missed that.

13         MS. THORN:  Your Honor, we did reference it.  And we

14    referenced it to acknowledge that Mr. Hayes found that there

15    were some issues at a few institutions that he reported that

16    were troublesome.  But we -- but those issues were reported and

17    did not result in any recommendation from the Special Master

18    suicide prevention expert that alternative housing should not

19    be used to place inmates pending transfer to a crisis bed.  He

20    did not characterize the use of alternative housing as unsafe

21    when done per policy.  Obviously, we will have some situations,

22    some outliers of institutions where the policies may not be

23    followed to the T; that's going to happen in a system as large

24    as CDCR's system.

25         But I think if you look at Mr. Hayes' report, it certainly

1    is not a condemnation of the use of alternative housing for

2    placement of the inmates.

3              THE COURT:  But it's not MHCB level of care.

4              MS. THORN:  It is not.

5              THE COURT:  It's meant to be very temporary.

6              MS. THORN:  That's correct, Your Honor.

7         And I believe if you refer to defendants' brief, we have

8    some -- some tables -- exhibits that show that almost 99

9    percent of all inmates across the board for a certain period --

10   the reporting period were transferred within 48 hours, and the

11   vast majority were transferred much sooner than that.

12             THE COURT:  There is a 24-hour cutoff, isn't there?

13             MS. THORN:  That's correct.  That's correct.

14             THE COURT:  So let's talk about relationship to

15   staffing.  I do have an order coming soon on staffing.  I know

16   that that issue is out there, I know it's a serious issue, a

17   long-standing issue, but it's an issue that has to be solved.

18        I want to make certain I understand what the defense means

19   in its brief, it's ECF 5680 on page 10.  The defendants say

20   that the Program Guide implicitly requires full clinical

21   assessment before crisis bed referral.  So what portion of the

22   program, exactly, is the defense referring the Court to there?

23             MS. THORN:  I'm sorry, can you give me a line, Your

24   Honor?

25             THE COURT:  I think it's line 10 -- page 10, line 24

```
 1    to 25, if I've got that right.  There is no citation.

 2              MS. THORN:  Right.  I understand that, Your Honor.  I

 3    think that -- 12-5-4.  If you look at page 9 of the brief, the

 4    first paragraph there references the Program Guide from that

 5    section, Your Honor.

 6              THE COURT:  So 12-5-3 and 12-5-4?

 7              MS. THORN:  That's correct.

 8              THE COURT:  Do plaintiffs agree with that reading of

 9    those sections?

10              MS. ELLS:  If you'll give me a moment to look at the

11    Program Guide to see?

12              THE COURT:  All right.

13         Just so you -- I'm looking at 12-5-7, Section E on

14    admission.

15              MS. THORN:  I believe, Your Honor, it's in the

16    section on the referral paperwork; the paper required for a

17    crisis bed referral.  And I apologize, I don't have my copy of

18    the Program Guide with me.

19              MS. ELLS:  Your Honor, I'm not seeing anything in the

20    sections of the Program Guide that defendants are citing.

21         But the point is, it's emergency care.  Our position is

22    that a person -- if there were available beds, a person could

23    be taken directly from their cell and put into an MHCB and a

24    full clinical evaluation could occur by the CTC hospital-level

25    staff that are in the MHCB.
```

```
 1        And, you know, the notion that these -- this referral
 2   paperwork that a clinician has to do in person is holding
 3   something up, that paperwork has to occur regardless.  That
 4   clinician has to do that paperwork regardless.  The only
 5   question is, should the time waiting for that paperwork to
 6   occur, under defendants' current system, count against the
 7   24-hour timeline, or should they be allowed to spend even more
 8   time in alternative housing.
 9            THE COURT:  I understand that argument.
10        So there is referral, but there is also preadmission
11   screening.  And so that -- that's the other question that's
12   related to this, I think.
13        Just help me understand.  I gather the parties may have an
14   interpretation of this language.
15        So on preadmission screening, 12-5-7, During regular
16   working hours, the screening shall be performed by a
17   psychiatrist or a licensed psychologist privileged to practice
18   in the MHCB.  During weekends, holidays and after normal
19   business hours, the screening shall be performed by an on-site
20   physician on duty or any other licensed healthcare staff.
21            MS. THORN:  I believe that's the section we were
22   referring Your Honor.
23            THE COURT:  Okay.  That's 12-5-7.
24            MS. THORN:  And the --
25            THE COURT:  But licensed healthcare staff --
```

 1          MS. THORN:  There is actually an assessment that

 2    takes place, a face-to-face clinical assessment evaluation,

 3    to -- to confirm that the patient is qualified -- meets the

 4    criteria for crisis bed placement and is in need of that care.

 5    If it happens, the paperwork is completed, documented, and the

 6    referral is processed.

 7          THE COURT:  The preadmission screening may be

 8    performed via telephone.

 9          MS. THORN:  That's --

10          THE COURT:  That's the -- you're asking for an --

11          MS. THORN:  That's the crux of the problem, Your

12    Honor.

13          THE COURT:  You're asking that that be modified?

14          MS. THORN:  That's correct.

15          THE COURT:  Help me understand the "other licensed

16    healthcare staff."

17       Again, to the extent there are MHCBs in institutions, and

18    there is round -- they're on the clock, at least nursing staff,

19    does nursing staff qualify as licensed healthcare staff?

20          MS. THORN:  No, it does not, Your Honor.  It's a

21    psychologist, psychiatrist and -- that's it.  Psychologists and

22    psychiatrists.

23          THE COURT:  So you're reading that as clinician.

24       Do the plaintiffs agree?  Is that a reading that the

25    plaintiffs have agreed to over time?

1              MS. ELLS:  It's clear, I mean, we -- we say licensed

2   clinical staff when we refer to those three categories.  But

3   the fact that it can be conducted by telephone, with a nurse

4   on-site, it's clear that that's a practice that is already

5   occurring.  Nursing is the person conducting it on-site, and

6   nursing can do that preadmission screening.  There may be

7   additional paperwork that needs to be done later on, but

8   licensed healthcare staff in this context can include a nurse,

9   in consultation over the telephone.

10             MS. THORN:  Your Honor --

11             THE COURT:  Can it be an LVN?  Is it a psych nurse?

12  Is it any -- any healthcare license is sufficient?

13             MS. ELLS:  I'm not certain about that, Your Honor.

14             MS. THORN:  Your Honor, that's absolutely not

15  correct.

16             THE COURT:  Where is -- so how do I know that?  Based

17  on the face of the language --

18             MS. THORN:  That's in Title 22, Your Honor.  The

19  admissions to care must be done by a licensed psychologist or

20  psychiatrist.  A nurse is not qualified and is not -- and

21  licensing precludes that.  So, that's actually not accurate.

22             THE COURT:  I'm looking at the Program Guide.

23             MS. THORN:  Okay.  Your Honor, I --

24             THE COURT:  And this is preadmission screening.

25  Preadmission screening.  So, what section of Title 22?

 1              MS. THORN:  We'll get that for you, Your Honor.

 2              THE COURT:  All right.

 3        Finally, help me understand how the CIT teams are being

 4   deployed.  I understand where they currently are deployed, but

 5   how are they working to fill the gap?

 6              MS. THORN:  The CIT, the crisis intervention teams,

 7   are working at the local levels to try to intervene and provide

 8   some relief to patients who may be at risk to -- for a crisis.

 9   So they are actually on-site, in the units.

10        It's a multidisciplinary team with the custody, nursing and

11   clinician, and they actually go and actually visit the inmates

12   and -- and work to make sure that personal issues, emotional

13   events, things that might trigger a crisis bed referral, or an

14   inmate who needs to get out of his house and is having a

15   problem, they're there to try to prevent the referral in the

16   first place.

17              THE COURT:  So they're trying --

18              MS. THORN:  It's on the local level.

19              THE COURT:  They're trying to address the referral

20   and then recision?

21              MS. THORN:  No, Your Honor, it's before it even takes

22   place.

23              THE COURT:  All right.  But, ultimately, it would

24   prevent recisions?

25              MS. THORN:  That's the whole idea of it, that's

```
1    correct.

2              THE COURT:  All right.  Are any of those persons, the

3    members of those teams, able to conduct preadmission screening

4    or -- or make referrals?

5              MS. THORN:  A clinician would be able to do that,

6    Your Honor, yes.

7              THE COURT:  So every CIT team has a clinician?

8              MS. THORN:  Yes.  That's correct.

9              THE COURT:  And they are -- again, help me understand

10   how they're assigned.

11       I gather they -- there is the potential to deploy them

12   flexibly?  That's the notion?  But how does that work, are

13   they --

14             MS. THORN:  If you could just give me a minute, Your

15   Honor.  I'm actually not sure I have that information.

16       (Pause in proceedings.)

17       Your Honor, Dr. Brizendine could give you better details

18   and answer questions, if you'd like to hear from her, on the

19   CIT teams.

20             THE COURT:  I have no other questions related to the

21   in-person assessment.

22       So is there more that the parties want to bring to my

23   attention?

24       I've read the briefing.  I understand the fundamental issue

25   is do I signal a willingness to lift the "via telephone"
```

1    language and allow placement in an alternative housing prior to

2    the start of the 24-hour clock.  And I am prepared to --

3            MS. THORN:  Your Honor, defendants do want to bring

4    some additional things to the Court's attention.  We'd like a

5    break to discuss what -- what might be best.  I do think the

6    Court has some standing questions that have been posed, and I

7    think that clarification on some of the measures developed to

8    address the recision rates, as well as transfer timelines,

9    would benefit the Court, and we would like to present that.

10            THE COURT:  All right.  We'll come back to that.

11            MS. ELLS:  Your Honor --

12            THE COURT:  For the plaintiffs?

13            MS. ELLS:  There are a couple of rebuttal points to

14    some things that opposing counsel said that I'd like to briefly

15    address.

16       The first of which is that, you know, on your question of

17    CIT staffing, and things like that, we support the CIT model.

18    We don't have significant data about how it's gone.  It's only,

19    you know, been used in two places, and defendants were only

20    able to provide any information about how it's going at one of

21    them when we spoke with them.

22       But at some point in their -- in one of their letters,

23    defendants say, without citation, that most of the recisions

24    occur from referrals between 5:00 p.m. and 1:00 a.m.  And so,

25    you know, there is this notion that they're taking a snapshot

1    of time that is not particularly relevant, and that doesn't

2    necessarily map to the solution that they're offering, even

3    under, sort of, their own analysis.

4        And the other couple of points, I think that defendants

5    have seriously mischaracterized Mr. Hayes' second audit.

6    Mr. Hayes -- his ultimate summary of alternative housing were

7    that there were significant problems, and he found alternative

8    housing locations to be quite problematic at 9 out of 34

9    prisons.

10        And, you know, the list of horrors is long.  It is not

11    limited to the two exception -- to the two outliers that

12    defendants have referenced.  Which, you know, to the extent

13    they are outliers, they are horrifying; people strapped to

14    gurneys with no toilet access, urinating on themselves for

15    three straight days, released on the fourth day back to their

16    housing unit with no treatment.

17            THE COURT:  I've reviewed that report.

18            MS. ELLS:  And, you know, I can list a number of

19    examples at specific prisons where people are not given access

20    to beds, they're not given access to toilets, they're held in

21    standing cages for ten hours or overnight, they're held in

22    special management cells prohibited by the local institution

23    and by defendants' own policies.  They lack beds.  Mr. Hayes

24    called some of these housing conditions horrific and alarming.

25        It is not fair to say that these are outliers, these are 9

1    out of 34 prisons.  And it just happened to be the couple of

2    days that Mr. Hayes showed up at these institutions.  And to

3    say that there is no recommendation that defendants stop using

4    alternative housing, Mr. Hayes specifically recommends that

5    they limit their use of cages and dry cells to less than one

6    hour based on the horrible things that he saw occurring in

7    these institutions.

8        And, similarly, the other point is that it was clear from

9    Mr. Hayes' audit, and from the Salinas Valley tour that counsel

10   from plaintiffs attended, that headquarters didn't even know

11   about the fact that at that institution people were not being

12   observed on one-to-one, they were held in cages and dry cells

13   with no beds and no toilets, and the average length of stay was

14   almost two days.  And for the preceding week prior to his

15   arrival it was 3.2 days on average.

16       So, again, he has a recommendation, essentially, that the

17   local superfit committees identify these problems for

18   themselves, because he is showing up at institutions that are

19   wildly out of compliance with even the extremely generous

20   alternative housing proposal that allows people to be placed in

21   cages and in dry cells.  All of those are permitted under

22   defendants' policies, and they do not have beds --

23              THE COURT:  There is a list of nine alternatives --

24              MS. ELLS:  Exactly.

25              THE COURT:  -- in order of preference, and that's

```
 1    not -- that's accepted --

 2              MS. ELLS:  Right.

 3              THE COURT:  -- but there is a 24-hour cutoff.

 4              MS. ELLS:  Exactly.  And, you know, I just circle

 5    back to this Court's finding in 2013 where it specifically

 6    listed OHUs, which is, I think, the top choice for alternative

 7    housing, as among the list of totally inadequate housing,

 8    totally inappropriate housing, in the -- you know, the April 5,

 9    2013 order.  These are people that should be in emergency

10    rooms.

11        And the final point I'd like to make is that defendants

12    just told you that their data shows that 99 percent of people

13    transfer within 48 hours.  They're citing their June data, but

14    I'd like to tell you about their July data.  Their July data

15    shows that only 34 percent of all transfers were timely, down

16    from 70 percent the month before.

17        The referrals are approximately the same, but the average

18    transfer time was 37 hours, so well over 50 percent longer than

19    the Program Guide allows.  More than double the people waited

20    longer than 72 hours; the average for them was 4.5 days.

21    Quadruple the number of people waited between 48 and 72 hours.

22    170 people waited an average of 56.91 days.  And almost double

23    the number waited between 24 and 48 hours, 318 people that

24    month.

25        So, you know, they're citing old data.  The new data is
```

 1   much, much worse.  And there is no question that people are

 2   already spending time in wildly inappropriate and dangerous

 3   settings, where they receive no treatment, and where they are

 4   in emergency crisis care, and they need help.  And, you know,

 5   delaying some -- delaying their transfer in the hopes that some

 6   of their conditions will clear by the morning, when they could

 7   have their on-call staff arrive and do a clinical evaluation,

 8   or they could continue what they've done for a long time and

 9   allow there to be consultations in order to ensure these people

10   are safe and that they transfer within 24 hours.

11        You know, frankly, 24 hours is an extremely generous amount

12   of time that was, you know -- we negotiated that at a time when

13   there was a massive shortage --

14             THE COURT:  We're going next to the 24 hours.

15             MS. ELLS:  Right.

16             THE COURT:  So let's hold.

17        So the numbers speak for themselves.  Any disagreement with

18   the characterization of the July numbers?

19             MS. THORN:  I do take some exception with the July

20   numbers, but I would like to make a proffer of evidence that --

21   and we will submit the August data, which is actually much

22   improved over July.  There were some issues in July, some

23   specific issues that I'm not prepared to talk about at this

24   point, but we can certainly get that information to the Court.

25        I think the more important point is that, you know,

 1    plaintiffs want to attack conditions of alt housing.  I'll say

 2    again that alternative housing is policy, it's approved, there

 3    is no recommendation that we stop using alternative housing.

 4              THE COURT:  Up to 24 hours.

 5              MS. THORN:  Up to 24 hours.  And also --

 6              THE COURT:  Isn't it enough to know it's not --

 7              MS. THORN:  -- the use of holding --

 8              THE COURT:  Isn't it enough to know it's not MHCB

 9    level of care?  Isn't that the bottom line?

10              MS. THORN:  That -- alternative housing is not

11    supposed to provide crisis bed care.

12              THE COURT:  I understand that.

13              MS. THORN:  Right.

14              THE COURT:  But it's temporary on the way to --

15              MS. THORN:  That's correct.

16              THE COURT:  -- MHCB care.

17              MS. THORN:  That's correct.

18              THE COURT:  That's the point.

19              MS. THORN:  And also important, Your Honor, is that

20    holding cells are not alternative housing.  So any

21    characterization that they must somehow meet the -- the

22    standards for that is incorrect.  They're specifically exempted

23    from the definition of alternative housing under policy.

24        Also, plaintiffs seem to ignore --

25              THE COURT:  So are you telling me that's -- does that

1    contradict 12-5-5?

2           MS. THORN:  The --

3           THE COURT:  What does that tell me about the list of

4    nine?

5           MS. THORN:  There is a list of nine.  And then if you

6    look at Exhibit 1 to the Tebrock declaration, Your Honor, it's

7    5680-2 -- I'm sorry -- 5680-11, there is an updated alternative

8    housing policy.  It offers the -- the list of priorities.  And

9    on the second page of the policy it says, Small holding cells

10   that are designed for a patient to sit or stand shall be used

11   as infrequently as possible.  These placements are not

12   considered alternative housing, and the use of these cells will

13   be documented on the custody log, not to exceed four hours.

14     So we recognize that it's a short-term position.  But

15   plaintiffs have characterized the holding cells as alternative

16   housing, and they are not.

17           THE COURT:  Well, the Court, in a separate, I

18   believe, footnote has noted the need to be clear about the

19   contents of the Program Guide.  And to what extent -- we're not

20   going to go there today, but ultimately we need, I think,

21   annual updates, annual filings, perhaps the defense files, the

22   plaintiff can object, so we're clear on what the Program Guide

23   says, and whether or not policy is amending it along the way.

24   I, frankly, continue to get cross-eyed trying to figure that

25   out.

1          On the 24-hour timeline --

2               MS. THORN:  Your Honor, I --

3               THE COURT:  Let me just go on to my questions.

4          So if I understand correctly, there is no real issue with

5     satisfying the 24-hour timeline, which I've previously been

6     told would not ever be an issue, but there is no issue

7     regarding transfer within an institution; is that fair?  The

8     real issue is transfer from one institution to another?

9               MS. THORN:  That's correct.

10              THE COURT:  Agreed, plaintiffs?

11              MS. ELLS:  Are you talking about the second topic in

12    this --

13              THE COURT:  24-hour -- whether or not the 24 hours

14    can be satisfied -- the -- the issue the parties have raised --

15              MS. ELLS:  Yes.

16              THE COURT:  -- and they're asking for the Court's

17    guidance on is regarding whether or not that 24-hour clock can

18    be satisfied when transferring from one institution to another?

19              MS. ELLS:  That's correct.

20              THE COURT:  All right.  Just an observation, I -- we

21    don't need to spend time on it, it appears that it's water

22    under the bridge in terms of the defense reporting on

23    satisfying the 24-hour timeline going back to 2003.  So, just

24    an observation.

25         If there is going to be any enforcement based on the

1    failure to meet the 24-hour clock, it's a failure to meet the

2    clock as defendants have been calculating it retrospectively.

3    And so that would work to the defendants' benefit.

4        The Court's focus is on prospectively.  So to the extent

5    the Court plans to clarify its reading of the Program Guide, I

6    believe the defense has said it didn't provide all the briefing

7    it could on that point.

8        First of all, isn't this fundamentally an issue of

9    statutory construction, of interpreting, construing the

10   language of the Program Guide?  And why would I need more

11   briefing on that?

12            MS. THORN:  Well, I think our point was that we may

13   need more briefing on -- on, actually, the ability of the

14   defendants to actually collect and provide -- provide that --

15   to make those calculations, Your Honor.

16            THE COURT:  Well, that's the third topic, which is a

17   reliable reporting system.

18       So my -- I look at this again, do I need evidence?  Do I

19   need more briefing?

20       I understand the defense has pointed to a December '14

21   memo.  I don't think that issue has been fully clarified, but I

22   don't think the Court needs it clarified.  Even if the

23   plaintiffs got a copy, and the defendants could argue

24   plaintiffs waived the right to make an argument such as they

25   are now, the Court isn't bound by any December 2014 memo.

```
 1    Right?

 2              MS. THORN:  That's correct, Your Honor.  We're -- we

 3    can submit on our briefing on this topic, Your Honor.

 4              THE COURT:  So then my question is -- this is --

 5    raises the exceptions question.  I didn't see the defense

 6    respond to that at all.  Now, your comments at the beginning

 7    suggest that perhaps the defendants are willing to talk about

 8    the development of definitions of exceptions that would provide

 9    a safety valve based on clearly-defined reasons for not being

10    able to satisfy the 24-hour clock.

11        I read the briefing as not responding to that at all, and

12    so my question was going to be for you, does the defense see

13    that as completely unworkable as an approach?  Or, in fact, are

14    the defendants willing to engage in a process of

15    clearly-defined exceptions that can be that safety valve?

16              MS. THORN:  Defendants are willing to engage to

17    continue to work on whether -- to discuss exceptions to the

18    24-hour timeframe.

19        But we needed to -- we wanted the Court to recognize, and

20    we've tried to make clear to the plaintiffs, that there are

21    reasons why tracking the transfers to crisis bed, it's

22    different than tracking the transfers to inpatient beds because

23    we're working with a 24-hour window, there is a lot of moving

24    parts in the system, and that currently, as the Court has

25    already recognized, you know, we don't have a method in place
```

1    to track that.  But, more importantly, the detail that would be

2    required in order to track a 24-hour clock with patients

3    moving, transferring to outside institutions and whatnot, would

4    really be almost unworkable and would give a level of minutiae

5    and detail that just doesn't help the system.

6            THE COURT:  Why is that?

7            MS. THORN:  It would cause --

8            THE COURT:  I mean, right now you're --

9            MS. THORN:  If -- if I may --

10           THE COURT:  It's transport time.  So why doesn't it

11   work, as plaintiff suggests, to identify the default transport

12   time, maybe even generously?  You can measure the time a

13   vehicle leaves one institution and arrives at another.

14           MS. THORN:  You could do that, Your Honor.  But

15   when -- when an institution has intake, let's say they've got

16   three patients in the -- the van for transport.  The patients

17   arrive at the crisis bed unit, they are on intake.  One patient

18   gets -- has the intake at 10:50 a.m.  The next patient is

19   placed and is waiting intake, and he might not be processed for

20   another 30-40 minutes.  You know, it will vary depending on

21   what's happening at each individual institution.  There are

22   just so many variables that can take place that in order to

23   give an accurate read on a 24-hour clock that, frankly, we're

24   going to come down to minutes, potentially, in order to satisfy

25   the 24 hours, that it -- it -- it would actually slow the

1    system down by creating a significant workload for intake.

2            THE COURT:  But can't exceptions -- exceptions can

3    include, okay, traffic delays, vehicle breakdown.  Assuming

4    that this is the rare instance, if your clustering system is

5    working and the travel distances are short, which I understand

6    is your goal, and that's a good goal, to the extent an

7    institution doesn't have enough beds, and we're getting to the

8    enough beds question --

9            MS. THORN:  But --

10            THE COURT:  -- but why can't intake delays be defined

11    as an exception?

12            MS. THORN:  It could be.  Those could be, Your Honor.

13    We don't have that agreement yet.

14            THE COURT:  But I had understood there wasn't even a

15    willingness to talk about this approach.

16            MS. THORN:  No.  No.  No.  We're willing to talk

17    about the -- continue to talk about the exceptions.  We have

18    indicated some of the obstacles and the reasons why providing

19    an automated reporting system -- that would require input of

20    data by all of the different staff members who actually are

21    involved in the referral processing, that they would have to

22    stop, do some data entry, you know, minute-by-minute,

23    hour-by-hour, it would really be detrimental to the entire

24    system.

25        And we are looking across an enormous system.  The more

```
 1    steps you put in place, the -- the more difficult --

 2            THE COURT:  Without proper technology.  There is,

 3    obviously, not proper technology to easily track.  That's

 4    fundamentally part of the problem.

 5            MS. THORN:  Well, it's actually, you know -- it --

 6    we're processing people.  Right.  So we don't have -- they're

 7    not -- it's -- with a scanner, you can't just scan them when

 8    they come in.  You actually have to bring them in, sit them

 9    down.  There is actually human involvement involved in

10    processing inmates and in the admission of them to a crisis

11    bed.

12            THE COURT:  I understand all of that.  And, I mean,

13    that's why we're here, because of those people.

14            MS. THORN:  Right.

15            THE COURT:  But there are also -- there are modern

16    technologies that appear have not been made available.  We're

17    getting to the reporting.

18       In 2017, if there were the budget for it, you would think

19    there could be -- hasn't the receiver worked on an electronic

20    health record approach?

21       I mean, couldn't there be an electronic health record that

22    allows easy entry of key data points?

23            MS. THORN:  So, I think as we've indicated in the

24    briefing, we're -- you know, we're willing to still look into

25    that.  And I know that CDCR is continually looking to develop
```

1    the best tracking and reporting systems that they can.  But

2    right now it's impossible to commit to what the plaintiffs have

3    demanded.

4         THE COURT:  Well, so, for the plaintiffs, let's

5    assume that I send you back in the workgroup to work on

6    clearly-defined exceptions to see -- to exhaust the possibility

7    of that working.  Based on what I've seen, it sounds to me,

8    while recognizing the complexity, that that could be a workable

9    approach.  It has to be workable, not just aspirational.

10        Anything to say in response to what you've heard?

11        Also assume that I -- I take it on myself to read the

12   Program Guide and tell you what the 24-hour clock means, when

13   it starts and when it ends.

14        MS. ELLS:  I mean, the only thing I'll say is that

15   it's difficult for me to believe that CDCR doesn't know when

16   somebody leaves an institution and arrives at another

17   institution given how closely they track all security-related

18   things.

19        It's also difficult to understand how they wouldn't know,

20   given the electronic health records, when somebody is actually

21   admitted to a crisis unit.  That involves paperwork, it

22   involves admissions, and it's tracked electronically so far as

23   I understand at this point.

24        I understand there is some complexity in pulling that data,

25   but that strikes me as something that is doable.  And, you

1   know, the notion that the entire transport time, even when it's

2   fully predictable, would be excluded from the transfer

3   timelines simply because CDCR has always tracked it that way,

4   it doesn't square, and it doesn't make sense, given the --

5   given the exceptions process that, you know, we've -- we've

6   made this offer in the workgroup session, and, you know, to

7   have the exceptions apply to the things that defendants are

8   concerned about, which are, you know, bad weather, and

9   breakdowns, and things that you literally can't predict.

10          So we think this is a workable solution and that the

11   Program Guide requires these people to actually receive care in

12   24 hours.

13          THE COURT:  All right.  So just briefly on the

14   24-hour timeline, inability to comply, under any definition,

15   but let's just assume it's the shortest period of time, based

16   on a fair reading of the Program Guide, this is where it makes

17   sense to the Court to hear an update, at least, on what I've

18   heard previously about bed space.

19          I am remembering what I've heard in the past, but there is

20   some water under the bridge, there is a budget, there may be

21   waivers, there may be some more urgent plans, as it would

22   appear to the Court there ought to be.

23          So hearing from someone, maybe it's Ms. Tebrock, that would

24   be my thought as a starting point, but do defendants clearly

25   concede at this point there is simply not enough MHCB and acute

1   care bed space that even if there are a hundred new beds

2   approved, four years just doesn't cut it at this point, that

3   the urgency cannot be overstated, one, is that conceded?  If

4   not, why not?

5       And if it is conceded, what are the updated plans?  Are

6   there waivers in place?

7       What's -- what is being done to urgently provide the number

8   of beds to make this work, even if everything else were running

9   like clockwork?

10      It seems clear the absence of enough beds is a fundamental

11  impediment to compliance.

12      So let's go ahead and take a short break.  There is the

13  reporting issue, but perhaps the parties can get clearer on

14  where they really want to provide evidence to the Court, and

15  I'll let you know if I'm willing to hear that.  Again, because

16  I'm seeing this primarily as a status to keep you on track,

17  with some clarification of direction from the Court.

18      So the parties can independently determine, and then if you

19  can meet and confer so that you know what the other is going to

20  request.  I would like to hear at least about bed space in a

21  focused manner.

22      So let's say a 15-minute break.  And if you need more time

23  we'll consider that, but I think 15 minutes will give you

24  enough time to get focused.  And then we'll talk about

25  reporting systems.

1              (Recess taken, 10:19 a.m. - 10:39 a.m.)

2              THE COURT:  All right.  We're back on the record.

3        So what are the parties thinking about any focused evidence

4    they wish to present?  Ms. Thorn?

5              MS. THORN:  Yes, Your Honor.  Defendants want to

6    present evidence through the testimony of Katherine Tebrock to

7    answer the Court's questions regarding bed capacity and the

8    questions posed in the September 22nd order.

9              THE COURT:  All right.  That would be it?

10             MS. THORN:  We also believe that it would be helpful

11   to have Dr. Brizendine talk to the issue of the preadmission

12   screening referenced in the Program Guide, and to clear up some

13   confusion from the argument.

14             THE COURT:  All right.  So how much time do you think

15   you would need, assuming you're eliciting some testimony from

16   Ms. Tebrock?

17             MS. THORN:  Thirty minutes for Ms. Tebrock.

18             THE COURT:  Dr. Brizendine?

19             MS. THORN:  Ten to fifteen minutes.

20             THE COURT:  All right.  For plaintiffs, would you

21   just cross-examine these witnesses?

22             MR. BIEN:  Yes, Your Honor.

23             THE COURT:  For how much time do you think you would

24   need to cross-examine Ms. Tebrock?

25             MR. BIEN:  The same, thirty minutes, and fifteen

1    would be fine for us.

2          THE COURT:  All right.  Before we do that -- I'm

3    prepared to allow that -- on reliable reporting, I don't really

4    have enough information to get to the bottom of what's going

5    on, but it's -- first of all, in terms of whether or not the

6    need for a reliable system for reporting is within the scope of

7    the April 19th order, it would seem to me the lack of a system

8    is an obstacle to compliance, or at least demonstrating

9    compliance.

10      I believe the Tebrock declaration signals an acknowledgment

11   of a need for an integrated information management system.

12   Flowcharts aren't reliable reports.  So my -- my main thought

13   there -- I mean, there just has to be a way, in 2017, for there

14   to be the capacity to prepare a report that addresses the

15   issues raised by the parties' joint report.

16      I don't know, do the parties know how many different

17   databases are involved?  Are information management specialists

18   part of your workgroup?  If not, they probably need to be.

19      I don't know that we need to talk about it much, it just

20   has to be the case that the defense can develop a system, and

21   do it promptly, and it's going to need that to demonstrate to

22   this Court that it's complying.

23          MS. CICCOTTI:  This is Christine Ciccotti on behalf

24   of the defendants, Your Honor, and I'd like to address that

25   point.

```
 1        I want to clarify that there are systems in place.  So
 2   right now, every single month, the defendants produce four
 3   reports to the Special Master.  Those include every single
 4   patient, by name and CDCR number, the date they were referred
 5   to a crisis bed, the date they were admitted, the date they
 6   were clinically discharged, the date they were physically
 7   discharged, which can differ, and is one of the obstacles
 8   defendants are working on, the reason they were admitted, the
 9   total number of days they waited for admission, and then we sum
10   all those metrics for every single institution.
11        We also produce --
12             THE COURT:  How are you summing them?
13             MS. CICCOTTI:  So we sum -- this is in the
14   psychiatric aging report at 7A of the monthly report produced
15   to the Special Master.
16        So it lists, for CCWF, every single person referred within
17   a 30-day -- a month time period, and at the end it lists their
18   length of -- the average length of stay, the average physical
19   length of stay.  There is a wealth of data on the crisis beds.
20        We also have a point in time report that we produce, one to
21   the Court and one to the Special Master, that shows all the
22   referrals pending bed assignment that are over 24 hours.  So
23   CDCR well knows, every single day, how many patients are
24   waiting beyond the Program Guide timeframes by name and by
25   patient number.
```

1    And then we also produce --

2         THE COURT:  The question is, does the -- doesn't the

3    defense itself acknowledge the need for better merged

4    reporting?

5         MS. CICCOTTI:  Your Honor, I think what we've

6    acknowledged is that we could better look at patients who go

7    out to court, and are on medical hold, and that those patients,

8    to the extent that those issues may delay their transfer to a

9    crisis bed, those are things where our reporting systems don't

10   necessarily talk to one another.

11    So the mental health program uses a reporting system that

12   doesn't necessarily interact with the SOMS, the Strategic

13   Offender Management System, to know exactly the transport data

14   you're talking about.

15    Actually, kind of going a little bit backwards to

16   plaintiffs' point, we know when a patient gets on a bus, and we

17   know when a patient arrives, it's not that we don't know that.

18   That's in one system.  You would have to go manually, patient

19   by patient, to determine how long that took and then match it

20   back up with the mental health referral system.

21    So I want to be clear that there isn't a lack of data here,

22   there isn't a lack of reporting, it's really just what helps

23   CDCR manage the system the best.

24    And what helps them manage the best is the data we've

25   produced in the workgroups.  This shows that RJD might have a

1    more difficult time transferring patients within 24 hours.

2    What can we do about this --

3            THE COURT:  But there are some holes where you do

4    need automation.

5            MS. CICCOTTI:  Right.  I don't think a place that we

6    need automation, though, is the traffic on the I-5.  I just

7    don't think that that helps CDCR figure out why patients aren't

8    transferring within 24 hours.  I think the holes are looking

9    for delays related to maybe out to court or medical holds.

10       We produce almost six reports on a monthly basis to the

11   Court and the Special Master and the plaintiffs on this issue.

12   And the data is robust.  And so I'm not denying that some

13   additional reporting could benefit, but we want to look at

14   reports that benefit the system as a whole, the management of

15   the system as a whole, and not whether inmate Smith got stuck

16   in a rain delay on the 99 going to Stockton.  That's not

17   helpful.

18           THE COURT:  It's not makework, but it's how do you

19   capture the basis for an exception --

20           MS. THORN:  I don't think --

21           THE COURT:  -- easily, without creating a lot of

22   extra work.  It ought to be possible.

23           MS. CICCOTTI:  I don't think that we should create an

24   exception because there was a rain delay on the 99.  I think --

25   I take exception to the point that traffic in California is

1   predictable.  And I -- I think that we really -- if we're down

2   in the weeds, talking about whether there was traffic, we've

3   lost focus of the bigger picture, which is on average ensuring

4   that, you know, the vast majority of patients are placed within

5   24 hours.

6        THE COURT:  The defense briefing raises traffic

7   pretty regularly as a reason to not have exceptions.

8      I'm going to send that back to the workgroup and you're

9   going to exhaust efforts to clearly define exceptions.  And if

10  that's a workable approach then there will need to be a way to

11  measure.  I don't think it's about making a lot of extra work.

12       MS. CICCOTTI:  And I think it would make a lot of

13  extra work to the extent we have to track every single

14  transportation-related delay.  I think that would be a

15  significant amount of work that we're not sure is -- benefits

16  the overall improvement of access to care and timely transfers.

17       THE COURT:  All right.  Any disagreement from the

18  plaintiffs in terms of identifying where the gaps are

19  currently, even if there is a disagreement about whether

20  traffic delays should be captured --

21       MS. ELLS:  Yeah.

22       THE COURT:  -- electronically?

23       MS. ELLS:  Again, to the point about the traffic

24  delays, which I will not belabor, but, you know, what

25  plaintiffs are proposing is to agree on a specific time that an

1    average transfer between two institutions should take, and then

2    looking at the actual transport time, and, you know, building

3    in the predictable portion of the transport into the Program

4    Guide timeline.

5        Defendants would like to just simply exempt it.  This Court

6    and plaintiffs, and it seems like defendants, don't actually

7    know how long that even takes.  And that is troubling.

8        So we're not talking about looking individually at every

9    single person, we're talking about agreeing upon a baseline and

10   then comparing the actual transport time to that baseline.  And

11   that strikes me as very simple.  It doesn't involve litigation.

12   And it, you know, goes -- it addresses defendants' concern.

13       But I think in terms of the larger picture of what CDCR

14   currently provides, you know, it provides patient level --

15   individual patient level information to plaintiffs, but there

16   is no rollup for this Court to look at that provides them

17   information -- that provides the Court information about what

18   it ultimately cares about.

19       And also, I mean, the defendants, in their own workgroup

20   document, say that they are trying to automate the tracking of

21   crisis bed referral timelines in order to identify reasons for

22   delay.

23       So, you know, we've proposed some metrics here in order to

24   try and figure out if there are certain decision points at

25   certain institutions, perhaps, even where -- where things are

1   getting bogged down.

2       So, you know, to know if somebody -- if the time between a

3   HCPOP endorsement and a referral is a trigger point that is

4   causing an unusual amount of delay that should be addressed,

5   that is posing an obstacle to transferring people on time and

6   admitting them into emergency care, those kind of things where

7   it's just the essential metrics, similar to what we have in

8   the -- excuse me, in the inpatient scenario that this Court

9   currently requires.

10      So that type of high level metric about compliance, and

11  including in that the exceptions, is the kind of information

12  that I think would assist the Court in understanding whether or

13  not defendants are in compliance.

14          THE COURT:  All right.  Well, again, I am going to

15  refer that issue, direct the workgroup to work on better

16  reporting.  And I will, in a focused order following this

17  hearing, just provide some guidance.  Not details, but some

18  performance guidelines that the reporting should strive to

19  satisfy.

20      All right.  Let's have Ms. Tebrock take the stand.

21          THE CLERK:  Please step into the witness stand and

22  remain standing.

23      Raise your right hand.

24      (The Witness, KATHERINE TEBROCK, is sworn.)

25          THE WITNESS:  I do.

 1          THE CLERK:  Thank you.  You may be seated.

 2      Will you please say and spell your first and last name for

 3  the record.

 4          THE WITNESS:  Good morning.  Katherine Tebrock;

 5  K-A-T-H-E-R-I-N-E, last name Tebrock, T-E-B-R-O-C-K.

 6          THE COURT:  All right.  Again, the scope of this,

 7  what is defendants' position on the amount of bed space, is

 8  there a concession that there is not enough, and what new

 9  efforts, since I last heard testimony on this question, are

10  being undertaken, including are any waivers being prepared for

11  submission.

12      You may proceed.

13          MS. THORN:  Thank you, Your Honor.

14                        DIRECT EXAMINATION

15  BY MS. THORN:

16  Q.  Ms. Tebrock, to the Court's most recent questions today,

17  whether or not defendants concede that there is a lack of bed

18  capacity in the system to address the needs of mental health

19  crisis bed referrals, as well as the acute care needs.

20  A.  Yeah.  I -- I would like to give a short answer, I think

21  you're looking for a yes or no answer, but I think the answer

22  may be a little bit more nuanced.

23      We believe that there -- so the crisis bed need is -- it

24  fluctuates over time, and there are times when there are an

25  inadequate number of beds to meet the needs of the patient

1    population.  There are other times when we have excess

2    capacity.  We acknowledge, however, that there -- there is a

3    need for additional beds.  And, in fact, when I took this

4    position, late 2015 appointed and started early 2016, we

5    immediately began working on the -- the long-term plan to add

6    additional beds.  We did that because we acknowledged that

7    there is a need for that long-term solution.

8        In the interim, however, we are working on -- on this

9    through a multifold process.

10   Q.  Can I stop you a minute and maybe we can talk about the

11   long-term planning.  I know that that was part of the Court's

12   September 22nd order.

13       So if we could talk about what CDCR does to plan long-term

14   for bed capacity, and most recently what you've done since

15   taking your position as deputy director.

16   A.  Sure.  So I think I actually testified a little bit about

17   this in January of this year as it relates to what was, at the

18   time, a proposal before the legislature to fund and construct a

19   hundred additional crisis beds.

20       We ultimately were approved by the legislature for those

21   hundred beds, and are now in a design phase, which will take

22   approximately a year to do.  Those beds will be divided, 50

23   beds at CIM and 50 at RJD.  We know that -- we're planning for

24   those locations in no small part because we know the need in

25   that area of the state is high, and we want to minimize the

1    transport timeframe, as we've discussed before, that would meet

2    those expectations.

3    Q.  Does that take into account increased demand by the female

4    population for crisis beds?

5    A.  It does.

6        So what we -- what we are trying to do now, now that we're

7    in the design phase, we're able to look at a design for the

8    facility that would allow us to separate a part of the building

9    so that we can accommodate some of the women.  That would

10   require a short transport from CIW to CIM for that specific

11   need.  But we are taking that into account in this design

12   phase.  I have not yet seen it.  Obviously, it takes a little

13   while to -- to work through.  But that -- we're contemplating

14   that as we go forward.

15   Q.  With the addition of the beds, the hundred additional

16   crisis beds, what would the total capacity be once those are

17   fully activated?

18   A.  So we're at 449 now, adding a hundred, 549.

19   Q.  Is it possible -- first of all, what is the expected

20   completion date?  And if you have any other dates you can

21   update the Court with on the schedule.

22   A.  Sure.  It's a five-year plan, and so we have the -- right

23   now we're in a design phase, it will take approximately a year

24   to get that done.  And then we move into the bid and build

25   phases of the project.  Um -- go ahead.

1   Q.   Is it possible to accelerate the process in any way?

2   A.   So we've examined that to determine whether it's possible

3   to accelerate it at this point.  In order to do that, we would

4   need to go back to the legislature to get a different type of

5   authorization for that construction.  And, in fact, we've

6   determined that it would slow the process down considerably and

7   add additional time to do that.  So the better wisdom, I think,

8   is to allow this to go forward at the current process and pace,

9   and ensure that we don't negatively impact the timeline.

10  Q.   So the Court also asked, in the September 22nd order, why

11  defendants have not activated the number of beds projected by

12  the Misener studies, the most recent one being the May 22,

13  2017, Spring Population, Mental Health Bed Need Study, that was

14  filed on September 22nd as well.

15  A.   Sure.  So, a couple of things happened.  In order to

16  actually construct -- fully, finally construct the beds,

17  it's -- obviously, it takes time to do the design and

18  construction, as we've discussed, but even before you get

19  there, you have to go seek the funding and authorization

20  through the legislature.

21       Immediately upon -- I think that projection that you're

22  referring to came out -- I don't have the date in my head, but

23  shortly after its release we started working on the request to

24  the legislature.  It takes fully a year to eighteen months to

25  get that process through the system.  So we -- we worked

1   with -- as quickly as we could within the budgeting process

2   to -- to effect that change and actually respond in a

3   meaningful, thoughtful way to the projections.  And that's

4   important for long-term planning for sure.

5   Q.  So in the short-term, pending the activation and the -- the

6   building and activation of these additional hundred crisis

7   beds, what is CDCR doing to meet the increased demand for both

8   crisis beds and acute care beds?

9   A.  Well, I'm glad you asked about the acute care beds because

10  I think you have to look at -- in order to look at the -- the

11  crisis beds, and the way we're utilizing them, you also have to

12  take into account the larger system.

13      It is a continuum that we've got.  So as somebody moves

14  through the need from crisis bed to acute care, to ICF, the

15  availability of the acute care beds and the ICF beds has direct

16  impact on how we can use the crisis beds.  And I'll explain

17  that in a moment.

18      When we -- in order to increase the capacity of -- so there

19  are a few ways you can address the crisis bed need.  You can

20  address it through the supply side by increasing the number of

21  beds, and you can also address it through a demand side.  So

22  you can begin to try to address the needs of the population by

23  trying to more immediately address their need.

24      So while we've got the long-term plan going to address the

25  supply, we've also taken some other steps to address the

1    demand.

2        I'll also say that adding crisis bed numbers in the out

3    years is one piece of increasing the ultimate supply.  We've

4    actually also retrofitted some additional cells in -- in our

5    inpatient settings at ICF level out at CHCF.  If I'm not

6    mistaken, it's eighteen cells that we've added.  And those

7    allow -- that increased capacity gives us more ability to take

8    patients into those -- into that environment.  Those are

9    licensed, approved beds, most recently reviewed by the Special

10   Master and his team.

11       So adding capacity both on the crisis bed side and on the

12   inpatient side --

13   Q.  Do you have some details of other increased capacity you've

14   made to acute care facilities or -- or -- to make more acute

15   care beds available?

16   A.  Sure.

17       So we've also -- within the gross number of beds that we

18   have, and -- I should step back for a minute and say, part of

19   why it's difficult to give an absolute yes or no answer to the

20   Court's question is that with the augmentation of the hundred

21   beds, I believe we -- we will have a sufficient number of

22   overall beds.  The question is, really, whether we've got the

23   right beds allocated at the right level of care.

24       We've talked a lot about getting the right patient into the

25   right bed at the right time, and part of that work is really

1    examining whether we have beds at the right level.

2         So what we've done, and DSH did this in the past when they

3    managed the inpatient units within our facilities, and we've

4    done it since July as well, we have flexed a unit from

5    intermediate care to acute care.  We did that recently and

6    added a number of beds, on the order of 29 beds, in a unit at

7    CHCF.  What that has allowed us to do is to move people in a

8    timely way from crisis bed to -- to acute.

9         I have given direction now to staff to flex an additional

10   unit, that's an additional 29 beds, from ICF to acute.  And

11   that will be done at -- at CHCF, and we can do that in a matter

12   of a few weeks.

13        The reason we're able to do that now, though, it's

14   important to really step back and look at how -- why we're able

15   to do this now.

16        The reason we can do that is that we have made efforts to

17   move patients -- this is a multistep process.  So when -- I

18   think the Court is probably interested in understanding whether

19   we've acted quickly and deliberately to move patients to the

20   right level of care.  So, over the course of the last several

21   months, we've been moving folks to DSH, particularly focused on

22   moving patients -- appropriate patients to ASH, Coalinga and

23   Patton State Hospitals.

24   Q.  How have you been able to do that?

25   A.  We've moved a large number of patients.  We've moved over

 1    60 patients to Atascadero.  We've kept the Coalinga State

 2    Hospital beds that we've allocated there essentially full.

 3    We've also sent patients to Patton State Hospital; I think we

 4    have on the order of ten patients there right now.  And that

 5    has affected our system by freeing up an additional set of

 6    beds.

 7        We also, I should note, opened the L Wing unit at CMF,

 8    that's the L1 unit, for inpatient beds.  That was opened late

 9    June.  I want to say June 21st, but the date specifically

10    escapes me at the moment.  But we've got that unit essentially

11    full now, too.  What that does is it allows us to free up

12    some -- some other cells in the system.

13        On the heels of opening L Wing and moving patients to DSH,

14    we've also gone in and done a review, with plaintiffs and with

15    the Special Master team, to look at whether we have patients

16    placed at the right levels of care.

17    Q.  Is that under the least restrictive housing policy?

18    A.  That's right.

19        And so we were -- we were able to go in, and I directed

20    regional staff to stop their other duties and go spend a few

21    weeks at each of our inpatient units, they did that, working to

22    help guide and mentor some of the staff there on the least

23    restrictive housing reviews.  That effected a high number of

24    moves to least restrictive housing locations, effectively --

25    not effectively, in fact, opening up a number of single cells

1    at CHCF.

2         That shift represents a relief valve for us, because now we

3    can go in and really begin looking at whether we need to change

4    and flex those beds in response to the needs of the patients.

5    That's why today I can come in and say we're going to adjust

6    the -- the one unit to acute.

7         How that will affect the crisis beds, which really is what

8    the thrust of this is all about?  It will allow us to move

9    people more quickly into those acute bed settings because we

10   simply will have more beds available.

11        At the same time, we've also been looking at our lengths of

12   stay in our crisis beds.  And we know that the -- when we

13   started having our workgroups, and started talking with

14   plaintiffs and the Special Master, we saw that our lengths of

15   stay in our crisis beds were a bit longer than we would

16   otherwise expect.  The Program Guide suggests that it should

17   be, generally, a ten-day stay; obviously, it's not a hard and

18   fast rule.  But there are a few things that we knew we could

19   adjust to improve the availability of those beds.

20        One of the ways we can do that, and have done that, is by

21   looking at the number of days people were remaining in the beds

22   after they had been clinically discharged and were waiting

23   transport out.  We found that people were staying in those beds

24   about a day or so longer than they should.  And while, in

25   isolation, a single day wasn't -- wasn't a big deal, when you

1    started adding all of those single days throughout the system,

2    it starts to be something that matters.  Adjusting that and

3    putting a -- a renewed emphasis on the movement out of those

4    beds affects the increased utility of those beds, right, so we

5    can move more patients through those beds each year.

6        So while we haven't added crisis beds, we have actually

7    affected the increased utilization of those.  It's simply good

8    utilization management.

9    Q.  So have you already seen some successes as a result of the

10    work you've done recently to address the needs --

11    A.  We have.  And I think that we can -- we can do more, too.

12    We've talked about some other initiatives as well.

13    Q.  Can I ask you just to talk, if you may -- if you can, about

14    whether any efforts have been focused on the female needs for

15    crisis beds.

16    A.  Yeah.  We've done a few things for women with crisis bed

17    needs.

18        One of the things that we have done is we've -- we've gone

19    through and looked at who can move quickly to Patton.  And we

20    have been able to move a number of patients over to Patton.

21    That has affected the ability to move people from crisis beds

22    into our inpatient unit at CIW.

23        At the same time, one of the policies that we had -- had in

24    place was to only directly admit from CCWF and CIW,

25    respectively, into their own crisis beds.  We saw, though, as

1    we were working through some of this, that the lengths of stay

2    ended up being quite long for women, particularly at CCWF, and

3    so we -- I -- I directed that we now can move patients from

4    CCWF or between the institutions to open crisis beds.  That's

5    actually effected a benefit for the patients in reduced wait

6    times.

7    Q.  All of the steps you've just talked about, the work you've

8    done recently, is it sustainable in order to continue to open

9    up beds and keep the system flowing?

10   A.  I believe it is.  One of the things that we have done since

11   the -- in recent months, since we last met in January, is we've

12   created an inpatient referral unit at headquarters.  That unit

13   is staffed with approximately ten staff, with complement

14   between analytical staff and clinical staff, including a chief,

15   who are able to manage the day-to-day process for -- for

16   movement of patients into those inpatient beds.  And that is --

17   it's very detail-oriented work, but it is -- it's important to

18   make sure that people are moving quickly.

19        I'll give you an example of what they do.

20        They're able to track people who are in a crisis bed

21   awaiting movement, for example -- for example, to a -- an acute

22   level bed.  If they know that the person has got ten days to

23   move somebody into that bed, if they know somebody is creeping

24   up on the ten days, they do a good job of reaching out to the

25   individual institution to make sure that they are promptly

 1    moving people into those beds so that we don't go over those

 2    timelines.

 3        By the same token, we've given direction to the clinical

 4    staff in the crisis bed units that if they identify that a

 5    patient is likely to need an acute or inpatient level care,

 6    that they needn't wait until day ten of that stay to -- to make

 7    the referral, they can make it earlier on in that crisis bed

 8    stay.  That actually has also positively impacted that length

 9    of stay.

10    Q.  What about the -- any -- have you taken any efforts to

11    improve the transportation of patients between different levels

12    of care?

13    A.  Yeah, we have.

14        One of the things that we have done, as we were looking at

15    the -- at the timelines and utilization management of those

16    crisis beds, we identified, and I think I mentioned this

17    earlier, that patients were waiting to be discharged and moved

18    back to their outpatient housing.  We actually now have gotten

19    approval for 24 vehicles to be purchased and added to the fleet

20    for the sole purpose of moving people, transporting them

21    quickly.  This effects a -- or will effect a quicker transport

22    back, thus opening the beds, making them available for patients

23    waiting to be placed into the crisis beds.

24        I should also say that there is additional effort and

25    consideration of opening additional beds -- let me rephrase --

1    not additional beds, but flexing additional beds from ICF to

2    crisis bed.  That's not something we've done before, from ICF

3    to crisis bed, but it's something that we are open to doing and

4    can be done.

5        It will take a little bit longer than the flex from ICF to

6    acute.  It's something that I think we can talk through.  But

7    it's certainly something we're -- we're willing to do, and

8    we've identified a location where we can do that.  It would

9    probably take on the order of 90 to 120 days to do.

10   Q.  So for all of these efforts that are underway, how would

11   you characterize the current status of them, whether they're

12   set or need more work?  Could you just give us some description

13   of that, please?

14   A.   Sure.  Each of these initiatives are in, sort of, varying

15   states of process.  I think that -- you know, as we've

16   continued to work through the issues in the workgroups, I think

17   it's a really good opportunity for us to continue to closely

18   monitor and track whether the initiatives are working, and --

19   or whether they need to be refined.

20       We are planning on putting out a directive to folks to

21   memorialize the agreements and initiatives that we've got in

22   place.  We've committed to sharing that policy draft with

23   plaintiffs and the Special Master and his team alike, and

24   making sure that we're all, kind of, going down the road

25   together.

1        I think we've already seen -- I'm sorry.  Go ahead.

2              THE COURT:  Go ahead, finish your thought.

3              THE WITNESS:  I think we've already seen some

4   benefits, but I also believe that as these things are time

5   tested we'll be able to show even increased improvement.

6              MS. THORN:  Thank you.

7        I have nothing further, Your Honor.

8              THE COURT:  Can Ms. Tebrock clarify when she expects

9   the hundred beds to be completed, and if the sustainability

10  measure she's referenced serve as a full stopgap.

11  Q.  BY MS. THORN:  If you just want to go back to the schedule

12  for the completion of the crisis bed.

13  A.  If I'm not mistaken, it's 2021.

14       In terms of whether it's a complete answer to the need,

15  I -- I believe it is, but I will caveat that by saying that one

16  of the things that we need to do is really test to see over

17  time whether the adjustments that we're making to the bed

18  allocations effect the result that I think they will.

19       And what we're looking for is to make sure that we are --

20  are able to place people quickly into the right level of care.

21  The needs of the population are dynamic.  And the beauty of the

22  flex bed is that allows us to be a little bit more nimble in

23  our response to those needs.

24       I think it's important to try this, test it, and respond if

25  we see there is additional need.

 1                THE COURT:  So no way to expedite completion of the

 2     additional hundred beds?

 3                THE WITNESS:  No, not without going back to the

 4     legislature, which, in fact, would slow it down.  So the short

 5     answer is no.

 6                THE COURT:  And no plan to seek waivers from the

 7     Court?

 8                THE WITNESS:  At this time I think that we have a

 9     sufficient number of licensed beds.  As we begin to flex the --

10     the use of those beds, I think that we can -- excuse me --

11     address the needs of the population without further waivers.

12                THE COURT:  All right.

13                MS. THORN:  Thank you.

14                THE COURT:  All right.  Who is asking questions for

15     the plaintiffs?

16                THE WITNESS:  Your Honor, if I may, can I follow-up

17     very quickly with the last thing I said?

18                THE COURT:  Okay.

19                THE WITNESS:  I think to the extent that we identify,

20     however, that waivers are needed, defendants have in the past,

21     and I certainly would in the future, seek waivers where we

22     identify that there is a need.  So certainly not an

23     unwillingness to do it.  At this time I think it's premature

24     for me to say whether they're, in fact, needed.

25                THE COURT:  All right.  Ms. Ells.

                              CROSS-EXAMINATION

1

BY MS. ELLS:

2

Q.  Good morning -- I guess it's still morning.  Good morning,

3

Ms. Tebrock.

4

A.  Good morning.

5

Q.  So in July, your acute referrals were the highest that we

6

have ever seen reported from you.  Do you have sufficient beds

7

to meet that peak demand?

8

A.  Today?

9

Q.  Yes.

10

A.  No.  And that's why we are --

11

Q.  Within that 180 days in which you said you would flex, will

12

you have it by then?

13

A.  I hope the answer is yes.  I believe that what we can do --

14

I'll note, by the way, that we haven't had any -- any patients

15

going beyond timeframes since the -- I'll speak very

16

specifically about men for a moment -- anybody going past

17

timeframes for movement to APP or ICF since the 13th of this

18

month, which is huge progress for us, and it's reflective of

19

the close management and oversight of the system.

20

    What we are doing is identifying that we have a need, and

21

have a plan in place today to flex beds at CHCF to acute in

22

order to accommodate what we believe is a continued need.

23

We've been able to move people through the system, but I think

24

flexing the beds is a responsible, appropriate response --

25

1    response to the needs of the population.

2    Q.  So you've had no one, you said specifically for male acute,

3    in the last two weeks that has been over timeframes; is that

4    correct?

5    A.  That's correct.

6    Q.  But every month prior, since January, you have had people,

7    men specifically, past Program Guide timelines, and in many

8    cases very many of them, haven't you?

9    A.  So, I think that --

10   Q.  I think that's a yes or no.

11   A.  -- goes back to -- well -- so, I'll answer in time.

12       I think the answer -- I can't speak to -- I don't think we

13   were tracking as closely prior to our workgroups, so I'm not

14   sure I can give you a responsible answer --

15   Q.  So since --

16   A.  Prior to --

17   Q.  Can you answer since May?

18   A.  -- that timeframe.

19       I can.

20       So the answer is that certainly we have missed timeframes

21   for a number of -- of folks.

22   Q.  And for female acute --

23   A.  Um-hum.

24   Q.  -- you again specified that you have had no male acute

25   delays in the last two weeks --

1    A.    Um-hum.

2    Q.    -- have you had any female acute delays?

3    A.    So we have had, I think, one, but I think -- I believe we

4    are applying an exception to it.  I want to just make sure that

5    I'm not misstating.  I believe there was one that we had

6    missed, but we may be applying an exception.

7         And I want to be clear, I'm talking about since the 13th of

8    this month.

9    Q.    Thank you.  That's clear.

10         Ms. Tebrock, I'd like to talk to you about defendants' most

11    recent Census and Waitlist Report filed on the 19th of

12    September, ECF 5684.

13         Could you turn to page 10 of this document, please.

14    A.    Sure.

15              MS. THORN:  I'm sorry, what was that page?

16              MR. BIEN:  Page 10, please.

17              MS. THORN:  Thank you.

18    Q.    BY MS. ELLS:  So this chart shows the census and waitlist

19    information for CDCR's psychiatric inpatient programs, or PIPs.

20    So, according to this chart, the CIW PIP is full; is that

21    correct?

22    A.    Yes.

23    Q.    And there are seven women waiting for care, and five of

24    those are past ten days for acute care; is that correct?

25    A.    That's what it reflects.

1    Q.   And could you please turn the prior chart, which is on page

2    8 of the PDF.

3    A.   Yep.

4    Q.   So this chart shows the census and waitlist information for

5    DSH's inpatient programs.  So the only inpatient program

6    available to women right now is Patton State Hospital; is that

7    correct?

8    A.   Well, we have our CIW PIP and --

9    Q.   The only DSH inpatient program.

10   A.   Yeah.

11   Q.   Yes.

12   A.   That's true.

13   Q.   Thank you for clarifying.

14        And the census is ten at Patton, according to this chart.

15   So there are 20 open beds at Patton, correct?

16   A.   Right.

17   Q.   And this chart lists no referrals pending for Patton; is

18   that correct?

19   A.   It looks like -- yes, that says zero.

20   Q.   So none of the five women that are waiting past Program

21   Guide timelines for acute care were referred to Patton?

22   A.   That looks right.

23   Q.   But Patton treats acute care patients, doesn't it?

24   A.   They have taken them, yes.

25   Q.   They have them there right now, don't they?

```
 1    A.   Yeah.

 2    Q.   And before the CIW PIP opened, they treated all women for

 3    both levels of care, correct?

 4    A.   They did.

 5    Q.   But Patton recently rejected a patient that CDCR tried to

 6    refer for acute care in July, didn't it?

 7    A.   I think there was a rejection, yes.

 8    Q.   And so Patton is rejecting women that are referred for

 9    acute care when you have no capacity at the CIW PIP to treat

10    them?

11    A.   I think there may be good reasons for a --

12    Q.   But they are rejecting them, correct?

13    A.   There have been rejections.

14    Q.   Patton also treats mentally disordered offenders, doesn't

15    it?

16    A.   It does.

17    Q.   People that are incompetent to stand trial?

18    A.   Yes.

19    Q.   And it treats LPS patients, doesn't it?

20    A.   Yes.

21    Q.   And it treats men and women, right?

22    A.   Yes.

23    Q.   And CDCR actually provides the security at Patton, doesn't

24    it?

25    A.   It has a -- a roving security.
```

1    Q.  So -- which is provided by CDCR?

2    A.  Um-hum.

3    Q.  And there is a secure perimeter?

4    A.  I think there is a fence, but I don't think it is

5    electrified.  I'm not -- I'm not certain.

6    Q.  And when you discussed earlier the possibility of flexing

7    ICF beds to MHCB, were you discussing male or female patients?

8    A.  That's a -- a discussion specific to men.

9    Q.  Okay.  So you're not currently considering flexing any --

10   or using any of the available court-ordered beds at Patton for

11   MHCB patients?

12   A.  At this time, I think the better wisdom is actually to try

13   to address the movement of appropriate patients to Patton

14   through our current systems.  So we are looking daily to ensure

15   that we are making appropriate referrals.  In fact, I believe

16   we've got two pending referrals with Patton today.

17   Q.  Great.  But those five women that are waiting for acute

18   care past Program Guide timelines, they're not on their way to

19   Patton, are they?

20   A.  Well, I don't know where they are, because this --

21   Q.  They were not referred, were they, according to this chart?

22   A.  I don't think this chart actually tells the full story of

23   these individuals, because that's --

24   Q.  Does it tell --

25   A.  -- as of September 28th.  By now --

1    Q.   Right.  I'm asking --

2                THE COURT:  One at a time.

3                MS. ELLS:  Pardon me.

4    Q.   BY MS. ELLS:  I'm asking at this point in time, the five

5    women, on the exact same day that CDCR's chart shows were over

6    Program Guide timelines for acute care, the DSH chart shows

7    they have not been referred?

8    A.   That -- yeah.  That's correct.

9    Q.   And is it your position there are sufficient female MHCB

10   beds to address the peak demand right now?

11   A.   No.

12   Q.   Okay.  And in the short-term, your solution is to start

13   moving women from CIW's -- from CCWF to CIW's MHCB; is that

14   right?

15   A.   That's part of an approach, yes.

16   Q.   In terms of the supply side?

17   A.   That's -- that's one option.

18       I think one of the things that I would like to do with

19   plaintiffs and with the Special Master team is to sit down and

20   talk about whether there are other options we need to pursue.

21   I'm not prepared today to be able to offer additional beds.

22       To my earlier point, Your Honor, when I added that

23   defendants may be willing to seek waivers in the future if we

24   determine that that's appropriate, that is certainly part of

25   that conversation.  So we're open to that, and hoping that we

1    can talk about that as soon as next week, when I think we may

2    have our next meeting.

3    Q.   As early as 2015, or as far back as 2015, every bed plan

4    has projected a need greater than you have for female MHCB

5    beds, hasn't it?

6    A.   Yes.

7    Q.   And the current one projects a significant shortage,

8    doesn't it?

9    A.   It reflects a continued need.

10   Q.   Yes.  And there are seven -- I'm sorry, excuse me.

11        Please turn to page 12 of the same report --

12   A.   Okay.

13   Q.   -- for some context.

14        So this is the CDCR Mental Health Crisis Bed Census and

15   Waitlist Report as of August 28, the most current data that we

16   have.

17   A.   Um-hum.

18   Q.   So there are seventeen women waiting for MHCB beds, and

19   thirteen of them have been waiting over 24 hours, but you show

20   an available census of five beds.  Are all of those beds

21   actually usable for women?

22   A.   Some of those may be the double cell at CCWF.

23   Q.   So how many cells at CCWF would require double celling for

24   you to utilize them to treat a patient?

25   A.   I believe there are two cells that each have two beds in

1    them.  And we have been working with the local institution to

2    ensure that people can be safely double celled in those

3    locations.

4    Q.  And when was the last time you had a census that actually

5    had people in those beds -- in the second bed of those two

6    beds?

7    A.  I think we've had one recently, but I don't -- I'm not sure

8    I can give you a date.

9    Q.  So you don't routinely put people in 2 of the 22 beds that

10   you list as having a --

11   A.  It was a local practice not to, but it certainly isn't

12   policy.  So we've gone back and talked with the local

13   institution staff about how we can refine the approach in a way

14   that is both safe for the patients, as well as comfortable for

15   the staff.

16   Q.  But you don't routinely, and you haven't in a long time,

17   placed women in 2 of the 22 beds that you list as available; is

18   that correct?

19   A.  We are working to -- to do --

20   Q.  It's a yes or no.  Is that correct?

21   A.  Well, I'm not sure it's a yes or no, because you said --

22   rephrase your question again.

23   Q.  You don't routinely place women, and you haven't in a long

24   time, in 2 of the 22 beds that you list as available on your

25   census?

1    A.    Okay.  So, that's compound.  So I'm going to just take it

2    apart.  Right.

3    Q.    I was -- do you know when the last time you actually had a

4    census of 22 in your female beds?

5    A.    I don't offhand.

6    Q.    Okay.  Would it surprise you to know that in the last 8

7    months, since you've been filing this report, that you've never

8    had a census higher than 18, even though every month you have

9    shown women beyond the Program Guide timeline?

10    A.    It doesn't surprise me.

11    Q.    And why is that?

12    A.    Because we have these -- these beds that we haven't always

13    used as double cell.

14        And, again, you know, one of the benefits of this -- this

15    process over the course of the last few months is it's given us

16    the ability to revisit some of the things that -- that we've

17    done that, perhaps, can be refined.  And this is a perfect

18    example of that.  This is one of the times when the workgroup

19    works.  It's given us the latitude to go back and really reopen

20    those things, and look at it with fresh eyes.  And we're doing

21    that now.

22    Q.    What about the other beds that you list as available but

23    that you don't routinely utilize?

24        Again, you've never had a census of higher than 18 in the

25    time that you've been filing this report, but every month you

1  have had women waiting beyond Program Guide timelines.  Do you

2  have an answer for why those full complement of beds that you

3  list here are not utilized?

4  A.  Beyond the double celling, I don't -- I don't have a

5  response.

6  Q.  You testified in January that you didn't believe that there

7  was a shortage of female MHCB beds.

8  A.  Um-hum.

9  Q.  That -- your responses on the demand side, as you referred

10  to it, would be sufficient.  Do you still believe that's the

11  case?

12  A.  I think long-term, one of the things we're doing is -- is

13  planning for those --

14  Q.  In the short-term.

15  A.  -- beds.

16     In the short-term, I don't know is the answer.

17     And part of what we need to do is sit down together and

18  work through that.  And we're open to having that -- that

19  conversation about what the right approach is.

20     I've been hopeful that having access to Patton, and having

21  the increased utilization management efforts at CIW's PIP, that

22  we'll be able to actually effect the proper movement of

23  patients through the system.  I think it's worth another

24  conversation.

25  Q.  In your data in the Nick Weber declaration, you reported

1   that in January through June of 2017, CCWF had 1 out of 66

2   timely transfers.  Does that surprise you?

3   A.  Nope.

4   Q.  And yet you haven't, in those six months, made any

5   additional beds available, have you?

6   A.  Well, I think the -- by virtue of better managing the

7   length of stay in the crisis beds, opening up the crisis beds

8   across the system to the women, and by utilizing Patton the way

9   we have, we have actually effected increased access to beds.

10  We have not added additional crisis beds, true capacity, but

11  we've added -- we've created more ability to use those by

12  making those adjustments.

13  Q.  So is it your testimony that CCWF's compliance with the

14  Program Guide transfer timelines is currently significantly

15  improved from this?

16  A.  I don't know that it is.  I think I'd have to go back and

17  look at the data.  I don't know.

18  Q.  So I'd like to circle back to your testimony about the

19  hundred beds that you're planning for.

20  A.  Um-hum.

21  Q.  CDCR has statutory authority to use the design-build

22  method, doesn't it?

23  A.  It does.

24  Q.  You didn't request that, did you?

25  A.  We requested authority for construction of the beds, did

1    not request it using design-build, that's true.

2    Q.  But CDCR in the past has used design-build in order to

3    build things more quickly, correct?

4    A.  We have used it in the past, yes.

5    Q.  And you have testimony from CDCR in the record that

6    confirms that design-build often increases or expedites the

7    time from design to opening and activating beds, doesn't it?

8    A.  It can, yes.

9    Q.  The governor also has the authority to waive provisions of

10   state law to expedite public works projects, doesn't he?

11   A.  I think he does.

12   Q.  Have you requested any waivers or anything else from the

13   governor to make these beds open faster?

14   A.  We have gone back to examine whether a request -- we -- we

15   would need to go back to the legislature, to be fair.  The

16   governor, himself, I don't think can allocate that.  We would

17   need to go back to the legislature to seek a change in the type

18   of authority that was given.  That process goes through a

19   normal budgetary cycle, and it would take until July of next

20   year before we would be able to get the adjustment.  By that

21   time we've already completed the first design phase.  You

22   actually end up negatively impacting the ultimate construction

23   and final placement of patients in the beds if we go back

24   and -- and seek the design-build authority.

25   Q.  But you could have done that --

1    A.   It doesn't cure anything.

2    Q.   -- from the start, couldn't you?

3    A.   I suppose -- I suppose I could have.

4    Q.   Construction of this nature is often significantly delayed,

5    isn't it?

6    A.   I don't know that that's true.

7    Q.   The CMC 50 bed MHCB was approximately a year late, wasn't

8    it?

9    A.   I don't remember the timing on that.

10   Q.   This is an e-mail from Debbie Vorous, who was formerly

11   counsel for CDCR, correct?

12   A.   She was, yes.

13   Q.   And it's dated November 4, 2013.

14   A.   Okay.  Thanks.

15           MS. ELLS:  I'd like to introduce this as Plaintiff's

16   Exhibit A.

17   Q.   BY MS. ELLS:  Could you please turn to the third page of

18   this -- I'm sorry, the fourth page of this document.

19        At the bottom it says days behind schedule is 348; is that

20   correct?

21   A.   Sorry, at the bottom -- yes.  348.

22   Q.   And this is for the project that is titled, 50 Bed Mental

23   Health Crisis Facility at California Men's Colony, correct?

24   A.   Yep.

25           THE COURT:  When you say fourth page, are you talking

1    about page 4 or page 5?

2            MS. ELLS:  It is literally page 4 of the document,

3    which is, unfortunately, unpaginated -- oh, I'm sorry, it is

4    page 5.  Excuse me.  This is an excerpt from this report.

5    Q.  BY MS. ELLS:  And as to your discussion about moving people

6    through the system, could you turn back again to the

7    September 15th waitlist and patient report -- census report,

8    ECF No. 5684.  Could you please turn to page 14 of that PDF.

9    A.  Yep.

10   Q.  It's fair to say that more than half of the people in your

11   high-custody beds are outside of their LRH, they are above

12   their LRH; is that correct?

13           The PIP at Stockton, 164 out of 293 out of LRH.  Do you see

14   that?

15           The PIP, Vacaville, 74 out of -- 44 out of 79 above their

16   LRH.

17   A.  Yes.

18   Q.  And the PIP, Salinas Valley, 133 out of 197 out of their

19   LRH.

20           And the ASH census right now is 206, according to this

21   document; is that correct?

22   A.  I can actually give you updated census information.  We're

23   actually at, I think it's, 219, if I'm not mistaken, as of

24   yesterday.  So, considerable improvement.

25   Q.  That's great.

1    A.   I also think that while these are filed on 9/15, it's

2    important to remember that we went out with the Special Master

3    team, and with you, to do the LRH reviews, and many of those

4    patients have been moved even in the last few weeks.  So this

5    is a good moment in time, but it's important to understand that

6    the process is actually continuing to work.

7    Q.   And what is the result of that?

8         How many patients, right now, do you have above their LRH

9    in your high-custody units?

10   A.   I don't have that right now, but I'm happy to provide that

11   later.

12   Q.   And the inpatient referrals this month were the highest

13   that you have had recently, almost double the prior month; is

14   that correct?

15   A.   They -- they have been high, yes.

16   Q.   So, Ms. Ahlin testified in January that there were units at

17   ASH and Coalinga that were not being utilized right now.  Have

18   you investigated whether or not CDCR could use any of those

19   beds for treating patients?

20   A.   CDCR currently has 256 beds.

21   Q.   Beyond the 256 beds.  I'm talking about unopened units that

22   Ms. Ahlin testified about.

23   A.   So we've been focused over the course of the last several

24   months to move patients to fill those 256 beds.

25   Q.   Right.  I'm talking about additional capacity.  Have you

1    investigated, at either ASH or Coalinga, the use of the

2    unopened and unutilized beds at those hospitals?

3    A.  So I will say two things to that.

4        I have not talked about additional units.  I am focused,

5    for the moment, on fully utilizing those 256 beds, as well as

6    the 50 at Coalinga, and the beds at Patton as well.

7    Q.  ASH has an acute unit, right?

8    A.  It does.

9    Q.  And I'm not just referring to Coleman patients here, but

10   that acute unit deals with highly unstable people that need

11   medical evaluation for medications, and that need stabilization

12   before they can be treated elsewhere; is that right?

13   A.  I think that DSH is likely in the best position to speak to

14   the environment at DSH.

15   Q.  But you've sent patients there at an acute level of care,

16   haven't you?

17   A.  There have been acute patients at ASH in the past.  And

18   what we've done is actually placed them in the 2684 intake

19   unit.

20   Q.  And that intake unit -- is the purpose of that intake unit

21   to stabilize patients before they move on to other levels of

22   care?

23   A.  Here again, I think the better wisdom is to have DSH speak

24   to how they manage and use their beds.

25   Q.  But these are your patients that you're sending there,

1    correct?

2      Are you saying you don't know what happens when they get

3    there?

4    A.  What I'm saying is that the patients who go to DSH are

5    treated by DSH, and I think DSH is in the best position to

6    speak to how they treat and care for those patients.

7    Q.  At the time of the January hearing, you testified that CHCF

8    had ten isolation beds in acute units that CDCR did not have

9    any plans to renovate to become actual inpatient beds.  Have

10   you reconsidered that?

11   A.  So there are some isolation beds that must remain --

12   Q.  Yes.  How many is that?

13   A.  Oh, gosh, I would have to get that information.  I don't

14   have it off the top of my head.

15   Q.  Sure.  But there are some that you could renovate to be

16   inpatient beds, couldn't you?

17   A.  And we have.

18   Q.  Are there more?

19   A.  I don't know that there are more we can do.  We negotiated

20   with the licensing agencies to ensure their comfort level with

21   the numbers that we had -- have actually renovated.  So I -- I

22   believe we're at a number that is appropriate.

23   Q.  You testified in January that you had not considered

24   looking at the ten isolation beds that were in acute units at

25   that time, that you were focused only on ICF.  Is that

1    accurate?

2    A.  We looked at the -- the number of beds that we could flex,

3    and the number that we proposed was appropriate.  I guess the

4    answer is --

5    Q.  Was that the maximum you could flex?

6    A.  I believe it is, but we can go back and look.

7    Q.  And I should clarify, I don't mean flex, I mean renovate --

8    A.  Um-hum.

9    Q.  -- to become full-time cells.

10       Did you look to see if you had considered the maximum

11   number that you could at CHCF?

12   A.  We're always looking to see --

13   Q.  Have you looked --

14   A.  -- if there are ways -- have I looked personally?

15   Q.  Have you looked today to see if there are additional

16   isolation beds that you could convert at CHCF to be full-time

17   inpatient beds?

18   A.  Today, I have not.

19            THE COURT:  You have a few more minutes of your 30

20   minutes.

21            MS. ELLS:  Okay.  Thank you.

22   Q.  BY MS. ELLS:  In the past, you have had beds at CMF that

23   were converted from acute to MHCB and back again, haven't you,

24   in 2012?

25   A.  We did that, yes.

1    Q.   And you have also had -- you've utilized beds pursuant to

2    court order in the past at ASH to treat acute patients, haven't

3    you?

4    A.   Um-hum.

5    Q.   And -- actually, I already covered that question.

6              MS. ELLS:   I think that's all I have for you today.

7    Thank you.

8              THE COURT:   All right.   Ms. Thorn, any brief --

9              MS. THORN:   Just brief.

10                       REDIRECT EXAMINATION

11   BY MS. THORN:

12   Q.   Ms. Tebrock, with respect to the referral of female

13   patients to Patton State Hospital, are there reasons or are

14   there -- what are the reasons for potential rejection of those

15   referrals?

16   A.   Well, there are a few reasons, but chief among them is that

17   they may not be able to program in the more open environment

18   there, and also some security risk for folks.   But, really,

19   primarily looking at whether they can effectively program in

20   the environment.

21   Q.   And are the defendants applying the least restrictive

22   housing policy to the female patients referred to Patton State

23   Hospital?

24   A.   We are.

25   Q.   And could it be that the patients referred to by

1    plaintiffs' counsel, the five patients, were precluded as a

2    result of the least restrictive housing policy?

3    A.   Absolutely.

4    Q.   With respect to the questions about whether you're able to

5    seek design-build status for the one hundred bed crisis -- one

6    hundred crisis bed project, is that possible right now?

7    A.   No.  I'd have to go back and seek further authority from

8    the legislature.

9    Q.   And do you believe that seeking that authority would, in

10   fact, expedite the completion of that project?

11   A.   No.  In fact, I think it would negatively impact the

12   timeline.

13   Q.   And why is that?

14   A.   Because it would -- the request itself would take time to

15   process and get approved, and then we would start from scratch

16   and -- and go from there, and it, in fact, would result in a

17   delay overall.

18   Q.   Have you actually looked into doing that?

19   A.   We have.

20   Q.   Okay.  So you -- what did you do to see whether or not you

21   could change the status to design-build?

22   A.   Well, we discussed it internally to determine whether it

23   was appropriate, and whether there would be an appreciable gain

24   in the -- the time of completed construction.  And upon

25   learning that it would -- we would not only not be able to

1  expedite it, but that it would be deleterious to the ultimate

2  timeline, it was pretty quickly put to the side.

3          MS. THORN:  Thank you.  Nothing further.

4          THE COURT:  All right.  May Ms. Tebrock step down?

5          MS. ELLS:  I -- do I have enough time for two

6  followup questions?

7          THE COURT:  Two followup questions, yes.

8                    RECROSS EXAMINATION

9  BY MS. ELLS:

10 Q.  Ms. Tebrock, when did you start applying the LRH system to

11 women?

12 A.  It was this year.

13 Q.  Do you have anything more recent than that, or more

14 specific than that?

15 A.  Are you looking for a specific date?

16 Q.  I'm wondering if you can be more specific than that.

17 A.  At the moment, no.

18 Q.  And when your team was at -- at CIW, at the PIP, with the

19 Special Master team, are you aware of whether or not the LRH

20 system was actually being applied to patients there?

21 A.  When we were out most recently?

22 Q.  Yeah.  A few weeks ago, maybe a month ago.

23 A.  Yeah.  They were applying the review.

24 Q.  They were?

25 A.  Um-hum.

1    Q.  And you don't report people outside of LRH on the -- on

2    your patient waitlist report that we've been discussing, do

3    you?

4    A.  You mean the -- I think we report them generally.  Are you

5    talking now just about --

6    Q.  So for men, you report how many people at a given

7    institution are above their LRH, do you report that for women?

8    A.  We don't.

9    Q.  And is that -- have you ever had anybody move from CIW to

10   Patton as part of an LRH movement toward their LRH?

11   A.  You know, I don't know as I sit here.  I don't know.

12             MS. ELLS:  Thank you.

13             THE COURT:  All right.  Any followup?

14             MS. THORN:  Just one, Your Honor.

15                      REDIRECT EXAMINATION

16   BY MS. THORN:

17   Q.  Ms. Tebrock, if you can look at that same exhibit, the --

18   the psychiatric inpatient program census report.

19   A.  What page are you referring to?

20   Q.  I'm on page 15.

21   A.  Yep.

22   Q.  So with respect to the patients who are listed here as out

23   of their LRH --

24   A.  Um-hum.

25   Q.  -- would all those patients actually qualify to be placed

1    in ASH?

2                MS. ELLS:  Beyond the scope of redirect -- recross.

3                THE COURT:  That is correct.  The focus was on women.

4                MS. THORN:  On women.  Okay.  That's fine.

5                THE COURT:  All right.  You may step down,

6    Ms. Tebrock.

7        Let me just ask, we still are going to hear from

8    Dr. Brizendine for up to half an hour.  What is the parties'

9    request following that?  Do you want to make some kind of

10   closing argument?

11               MS. THORN:  Yes, we would like that, Your Honor.

12               THE COURT:  All right.  Ms. Ells, Mr. Bien?

13               MS. ELLS:  Yes, Your Honor.

14               THE COURT:  How much time do you want for that?

15               MS. THORN:  We'd like 15 minutes, Your Honor.

16               THE COURT:  That work for you, Ms. Ells?

17               MS. ELLS:  Yes, Your Honor.

18               THE COURT:  All right.  So we're talking about

19   another hour.  Do you have a preference as to whether or not we

20   take Dr. Brizendine's testimony before or after we take a lunch

21   break, which we will do?

22               MS. THORN:  We'll do Dr. Brizendine before lunch, if

23   that's possible.

24               THE COURT:  Does that work for you, Ms. Ells?

25               MS. ELLS:  Yes, Your Honor.

 1             THE COURT:  Let's call Dr. Brizendine, then, up to

 2    half an hour, then we'll take an hour break.

 3             THE CLERK:  Please step into the witness stand and

 4    remain standing.

 5        Raise your right hand.

 6        (The Witness, BRITTANY BRIZENDINE, is sworn.)

 7             THE WITNESS:  I do.

 8             THE CLERK:  Thank you.  You may be seated.

 9        Will you please say and spell your first and last name for

10    the record.

11             THE WITNESS:  Sure.  Brittany Brizendine;

12    B-R-I-T-T-A-N-Y, last name Brizendine, B-R-I-Z-E-N-D-I-N-E.

13             THE COURT:  You may proceed.  This is focusing on

14    in-person assessment, I assume.

15             MS. THORN:  That's correct, Your Honor, with the --

16    compared to the prescreening that we discussed earlier.

17                         DIRECT EXAMINATION

18    BY MS. THORN:

19    Q.  Dr. Brizendine, with respect to the prescreening

20    requirements set forth in the Program Guide, is this the same

21    screening or face-to-face evaluation that is required to

22    complete a referral package for crisis bed care?

23    A.  It is not.

24        The first thing that happens is the urgent or emergent

25    referral.  So the patient is in crisis and they need to have an

1    assessment.  I can speak specifically for after hours, because

2    that's what we're talking about.

3        The nurse -- the patient is escorted to see the nurse.  The

4    nurse then does his or her assessment and then contacts the

5    on-call clinician, provides the on-call clinician with

6    information, and then the on-call clinician makes a

7    determination.  If a patient reports any suicidality, or there

8    is any objective indication of suicidality, that patient cannot

9    be sent back to the housing unit without a face-to-face

10   evaluation and a suicide risk assessment.

11   Q.  And that's irrespective of what time of the day it takes

12   place?

13   A.  That is correct.

14       So we can go along with the suicidal example.  So then the

15   on-call provider places a patient in alternative housing,

16   pending a crisis bed referral, and then generally in the

17   morning the patient is seen for a face-to-face assessment, and

18   if it is for suicidality, a suicide risk assessment is

19   completed.

20       In addition to the suicide risk assessment for suicidal

21   patients, all patients need a mental health evaluation.  This

22   is, kind of, the referral paperwork.  So you wouldn't send a

23   patient into a hospital without having some sort of assessment,

24   and the -- and, you know, understanding why the patient is

25   being admitted.  So that's really what that is for.  It's a

1    thorough assessment to determine why this patient needs

2    inpatient level of care.

3        And so the preadmission screening is really about a

4    clinician-to-clinician contact that happens prior to admission.

5    And the purpose of that is for the referring clinician to

6    communicate -- to communicate with the admitting clinician to

7    determine appropriateness of admission.  So that can happen

8    over the phone.

9    Q.  And can that requirement impact the time a patient could

10   transfer to, for example, a crisis bed unit within the same

11   institution as the inmate's housing unit?

12   A.  Could it impact the time?

13   Q.  For example, if the receiving clinician isn't available at

14   a certain time because they have to have that face-to-face --

15   that -- that clinician-to-clinician contact before the referral

16   is actually completed.

17   A.  Potentially.

18   Q.  With respect to the on-call clinician's responsibilities

19   for these after-hours referrals, can you describe the context

20   of the on-call connection -- contact between the nurse and the

21   clinician, how that comes about, and -- and the scope of the

22   communication.

23   A.  Sure.

24       The design of the on-call and nurse communication is to,

25   essentially, ensure that that patient is safe.  So if it is a

1  psychiatrist, which I am not a psychiatrist, the psychiatrist

2  will discuss different medical elements and determine if that

3  patient needs any emergency medication.  And they will also

4  determine disposition of that patient.

5      Generally -- and, again, if the patient is suicidal, the

6  patient can't go back to his or her house, so the patient must

7  be placed in alt housing.  And that's the right thing.  The

8  patient needs to be able to be safe until they have a full

9  suicide risk evaluation, and you can't do that over the phone.

10  Q.  And why couldn't that happen over the phone?  Why couldn't

11  a suicide risk evaluation and the mental health assessment take

12  place during that initial on-call contact?

13  A.  So, a suicide risk evaluation is a lengthy process whereby

14  the clinician meets with the patient, conducts a full mental

15  health evaluation where they need to be able to face-to-face

16  see the patient, and determine mental status evaluation, and

17  different nuances that you can't hear over the phone.

18      And oftentimes, after hours, the provider doesn't talk to

19  the patient, they talk to the nurse only, so they don't have

20  the benefit of that.

21      In addition, suicide risk evaluations involve a complicated

22  and detailed safety planning.  And you really can't do that

23  without the benefit of evaluating the patient.  You have to

24  evaluate the patient to do a suicide risk evaluation.  You can

25  do a screening and keep the patient safe, or based upon

1  symptoms that are shared with the provider on the phone they

2  could have the need to order medication, absolutely.  But they

3  can't do a full suicide risk evaluation.  That needs to be done

4  in person.

5  Q.  And the practice is that for the after-hours referrals, the

6  clinician will do that face-to-face the following day?

7  A.  Yes.

8  Q.  And is there any time limit when that usually takes place?

9  A.  The policy requires that a patient must be seen in alt

10  housing every day.  So exactly what time of the day it happens,

11  it's generally in the morning, but there is no policy

12  requirement about what time of day.

13  Q.  And how did the -- how does the current policy with --

14  permitting the referral to crisis beds by this telephone

15  communication with the nurse, how does that impact the recision

16  rate of the after-hours referrals?

17  A.  When we were working in the workgroups, and we compiled all

18  this data, and there was a lot of data, and we were moving

19  pretty fast, and that's -- let me just back up.  That's why we

20  did 5:00 p.m. to 5:00 a.m., it wasn't because we were trying

21  to -- we didn't really -- we had a sense that that may be what

22  it was, you know, the lack of face-to-face, but we didn't know,

23  we were just trying to look at some data.

24     So when I looked at the data and it showed me that of all

25  the referrals done between 5:00 p.m. and 5:00 a.m., about 52

1    percent of them were rescinded, I was -- I was not shocked.  I

2    was actually very validated because, as a clinician, and as an

3    administrator, I had seen it many, many times where patients go

4    in overnight and then they're fine the next morning.

5         And let me just clarify.  It's not just the face-to-face

6    evaluation -- excuse me -- many patients in our system wrestle

7    with difficulty with coping, and so that's part of what we do

8    in mental health, we help them bolster their coping skills and

9    so forth.

10        So if a patient was seen, let's say, the day before, or the

11   evening before even, and -- with a face-to-face evaluation,

12   they may need a crisis bed at that point, they may need to have

13   that admission, and the next morning they could be okay because

14   there is a bit of that cooling off period.  I kind of think

15   about it like if you've ever been really upset, and you want to

16   shoot off that e-mail, and a few hours later you feel better

17   and you don't do it, it's kind of the same.  So it's not solely

18   based upon the face-to-face and a good quality assessment, it

19   also has to do with the patient kind of re-compensating

20   overnight.

21        But, you know, when I look at the data and I see 52 percent

22   overnight, and many of them are -- from on-call placements are

23   rescinded, and then during the day it was -- I can't remember

24   the numbers, 20 something percent, far less than the 52

25   percent, as an administrator and as a clinician, I have to pay

1    attention to that.  There is an issue there.  And it's my

2    responsibility to try to figure out what is the issue.

3              MS. THORN:  Okay.  Thank you.  Nothing further.

4              THE COURT:  All right.  Is this also Mr. Ells, or

5    Mr. Bien?

6                         CROSS-EXAMINATION

7    BY MR. BIEN:

8    Q.  Good morning, Doctor.

9    A.  Good morning.

10   Q.  I'm looking at Program Guide 12-5-7, preadmission

11   screening.

12       Do you guys have another Program Guide around?  No?  I can

13   show you this one.

14       But isn't it correct that a suicide risk assessment can be

15   performed, according to the Program Guide, I quote from this

16   12-5-7, On weekends, evenings and holidays, the SRAC shall be

17   performed by the physician on call, medical officer of the day,

18   or registered nurse trained to administer the SRAC if mental

19   health clinicians are not available?

20   A.  The SRAC was a previous version of what we use now, which

21   is more comprehensive.  That was, basically, a one-page

22   checklist.

23       And although the Program Guide allows for, I believe, the

24   provision for a nurse to do it, that's never been our practice

25   that I know of, that I'm aware of.  It really requires a

1    clinician with the training to be able to do a full,

2    comprehensive SRE.  We're not in the practice of doing on-call

3    SREs, and I don't think it's the right thing to do.

4    Q.  So you're saying if someone goes into crisis at 5:00 p.m.,

5    and there is no one at the institution, no mental health

6    clinician, and they're put into alt housing, it's okay not to

7    do a suicide risk evaluation until the next morning?

8    A.  That is correct.  The SRE is done face-to-face.  It must be

9    done face-to-face if the patient reported any suicidal ideation

10   or there was any behavior.

11   Q.  So it's better to wait from 5:00 p.m. 'til 8:00 a.m. the

12   next morning to do a suicide risk evaluation --

13   A.  I don't --

14   Q.  -- than to --

15   A.  That's what happens, it's when the provider comes in to be

16   able to do the face-to-face.

17   Q.  And you think that's a good practice?

18   A.  Yes.  We can't do them over the phone.  I do not condone

19   that.

20   Q.  And you don't think it should be done by someone who is --

21   who -- any kind of clinician who is there, who is speaking to

22   somebody on the phone?

23   A.  No.  No.

24   Q.  You talked about emergency medication, is that -- can that

25   be done by the phone -- over the phone?

1    A.   Let me make clear, I'm not a physician, but from my

2    understanding of the system, a physician speaks to a nurse on

3    the phone, the nurse reports varying symptoms or behaviors that

4    she has seen, and then the physician makes a determination if

5    emergency medication is warranted.

6    Q.   And some of those behaviors might be words the person is

7    saying -- the patient, or actions?

8    A.   Potentially.

9    Q.   And some of those could be suicidal gestures?

10   A.   Yes.

11   Q.   So suicidality is something that could be evaluated over

12   the phone by this on-call psychiatrist, for example?

13   A.   To keep the patient immediately safe, absolutely.

14        And let me just clarify.  If there was a gesture or some

15   sort of suicide attempt, there are medical protocols where the

16   patient would be evaluated by medical, which could also

17   potentially lead to a 911 call in an outside hospital emergency

18   room.  So that kind of immediate lethality risk is addressed in

19   conjunction with medical.

20   Q.   Wouldn't it be better if that patient went to the MHCB

21   right away?

22   A.   I think it is our responsibility as clinicians to ensure

23   appropriate referrals.  And an appropriate referral is

24   determined by a complete assessment.  And if there is

25   suicidality, it includes a complete SRE.

1    Q.  So you have a suicidal patient, and you think it's better

2    for that person to wait in a place they're not getting

3    treatment, they're just being observed, in alternative housing,

4    that's better than going to an MHCB?

5    A.  If the patient needs to be admitted, he or she will be

6    admitted, and we have a process for that admission.

7        Let me just clarify.  Suicidal -- we're talking suicidal

8    ideation, that's like suicidal thinking, that can wax and wane.

9    It can happen, for some people, over a period of hours, days,

10   weeks or years.  So this is often not something that is

11   immediately fixed.  So that's why it's oftentimes for our

12   outpatient program, that's a part of the treatment plan.

13   You're working with, kind of, ongoing waxing and waning of

14   suicidal ideation.  So the point is that the patient receives

15   -- if they need immediate medical care, they receive that

16   medical care, and then they're placed in a safe environment.

17       And let me tell you why it's safe.  It's safe, really, for

18   two reasons.  And when we're talking suicide prevention, we're

19   talking about mitigating risk.  So, for two reasons:

20       One, it reduces the needs.  It removes the patient from

21   their environment where they could have a very well -- multiple

22   thick rope that is -- that could definitely, you know, lead to

23   a death, or a laceration device.  So it removes them from the

24   means.  It doesn't mean it completely eliminates it.

25       And the second piece is that it allows for a high rescue

1   probability.  Because they're on a direct observation, if that

2   patient starts engaging in any sort of suicidal behavior, there

3   can be an immediate response -- immediate rescue response, and

4   that's why it helps to mitigate the risk to put them in alt

5   housing.  That's why it's safer than alternatives.

6   Q.  It also may increase the systemic risk because alt housing

7   is not treatment, and it's perceived and is a pretty harsh

8   environment.  Are you aware of -- of that -- those findings

9   about alt housing?

10  A.  I'm aware of some of the findings, not all of them.

11      However, let me say -- let me say this to clarify your

12  response about treatment:  It's not mental health crisis bed

13  treatment, and it's not designed to be, however, the patient

14  could be ordered emergency medication; that's a treatment

15  intervention.  The patient is placed on direct observation;

16  that's a treatment intervention.  And the patient will be seen

17  every day in alt housing and receive a face-to-face and a

18  suicide risk evaluation for suicidal; that's an intervention.

19      It's not -- it's not treatment as in the 24-hour nursing

20  care that you would have, of course, in a mental health crisis

21  bed, and for those patients that are appropriate they do need

22  to go.

23  Q.  The -- isn't it correct, Doctor, that a patient can be

24  taken from their cell, in crisis, and if there was an empty

25  MHCB in that same institution could be brought to the MHCB and

1  evaluated, preadmission screening, in the -- right outside of

2  the MHCB and then admitted?

3  A.   The -- the patient requires an emergency assessment first.

4  That could be by a crisis bed clinician, it could not be by a

5  crisis bed clinician.

6  Q.   Right.  I'm just asking is -- under the Program Guide and

7  under Title 22, isn't it correct that a patient can be brought

8  directly to an MHCB by a nurse, with custody, and then

9  evaluated outside in the TTA, all this preadmission screening

10 can be done right there, and then admitted if they're

11 appropriate?

12 A.   So if they're brought to the TTA, most TTAs are not under

13 the license, so that's not brought to the crisis bed.  Now,

14 they could be, and often are, brought to the TTA, of course,

15 after hours, and that's where the assessment often happens.

16 Q.   That's my point.

17      So a patient doesn't need to go to an OHU; isn't that

18 correct?

19 A.   It -- patients are -- are assessed first for

20 appropriateness of crisis bed admission.  And then if

21 determined to be appropriate, then they're placed in alt

22 housing pending a crisis bed admission.  If there is an open

23 bed and that bed is assigned, it can happen very quickly at the

24 institution.

25 Q.   I'm afraid that you're testifying about what I understand

1   to be the practice, and that's all you're aware of.  My

2   question is different.

3   A.  Okay.

4   Q.  Isn't it correct that -- let's just assume that we actually

5   had enough crisis beds.  So there was actually open crisis

6   beds.  Everyone knows there are open crisis beds.

7   A.  Um-hum.

8   Q.  And there is a patient who is in a crisis in their housing

9   unit, and medical is called, and they said, you need to get

10  this person out of their cell, and -- couldn't they be taken

11  directly to the crisis bed unit, have the preadmission

12  screening done there outside of the crisis bed unit, and then

13  admitted?

14  A.  Can you show me the Program Guide reference that you're

15  referring to?  It could help me understand.  I'm not quite

16  understanding your question.

17  Q.  My question is:  Are you aware of a requirement in the

18  Program Guide that patients go to an OHU or alternative housing

19  before they go to an MHCB?

20  A.  That's the practice.

21  Q.  I understand that's the practice.

22  A.  Yeah.

23  Q.  If you look at --

24  A.  I'm not aware of a requirement; although, it could be

25  there.

1  Q.  Right.

2  A.  But, again, let --

3  Q.  I'll quote from 12-5-7, preadmission screening.  All

4  inmate-patients referred to the MHCB shall receive a

5  preadmission screening for the purpose of determining

6  appropriateness.  During regular working hours, the screening

7  shall be performed by a psychiatrist or a licensed

8  psychologist, privileged to practice in MHCB, and documented in

9  progress notes.  This can be done in the -- in the emergency

10  service area of the CTC/GACH/SNF prior to the admission to the

11  MHCB.

12  A.  Let me clarify, yes, sir.

13      I think there was some confusion as to what the

14  preadmission screening is, in comparison to the emergent

15  evaluation that must occur when determining.

16      First, the provider that sees the patient has to determine

17  if the patient needs crisis bed level of care.  Once they

18  determine such, they do the admission -- the referral

19  paperwork, and then they have, oftentimes, a phone call with

20  the clinician in the crisis bed, discussing the case, and the

21  reason for admission, and then that crisis bed clinician will

22  accept the patient.

23      So that -- that's more of a phone call, and that is

24  appropriate, but that does not take the place of the

25  evaluation.  That's like if you go to the emergency room and

1  you have a medical condition, you wouldn't just be sent to the

2  5th floor to a regular bed prior to being evaluated and that

3  team determining why you need admission.

4  Q.  Right.  But you can go to the emergency room and then get

5  admitted to the hospital?

6  A.  That's right.  Yes.

7  Q.  You don't need to go to some locked closet across the

8  street from the hospital and spend a day there first, right?

9     I'm just saying that -- that the current system has this

10 extra step of the OHU, but it's an unnecessary step if you had

11 a sufficient MHCB capacity.

12 A.  It will take a matter of time for an evaluation to occur,

13 and determination of the need for that -- that inpatient level

14 of care.  So that could be a matter of hours if it were during

15 the day, and so forth.

16    And if there -- if the determination is appropriate for a

17 crisis bed, then the patient should go to crisis bed.  And

18 it -- and in our current system, patients are placed in alt

19 housing pending a bed assignment.

20 Q.  And in the -- and in the more appropriate system, they

21 could go directly to the crisis bed and get in if there was

22 enough capacity.

23         MS. THORN:  Objection.  Argumentative.

24         THE COURT:  I'll allow an answer to that question,

25 and then I think you're closing in on your 15 minutes.

1                MR. BIEN:  Okay.

2                THE WITNESS:  I will say that we've talked about this

3    supply and demand issue, and we've seen it, you know, for years

4    with our crisis bed referrals; they go up, they go down,

5    they're higher often in the summer months.

6        And so in the summer months, I would say when we have a

7    much higher demand, I don't know that we're ever going to be

8    able to have unlimited open beds.  Right.  We have to -- we

9    have to address the demand when it comes.

10        So I think the patient should be assigned a bed and should

11    be transferred as soon as possible, yeah.

12                THE COURT:  Any final questions?

13                MR. BIEN:  I'm finished, Your Honor.

14                THE COURT:  All right.  Anything further, Ms. Thorn?

15                MS. THORN:  Just briefly.

16                        REDIRECT EXAMINATION

17    BY MS. THORN:

18    Q.  Dr. Brizendine, are there some reasons why you wouldn't

19    send every patient, every referral, directly to a crisis bed?

20    A.  Of course.

21    Q.  Can you provide some of those?

22    A.  Sure.  So, as I mentioned before, many patients in our

23    system wrestle with coping skills, which is something that we

24    work to bolster in their -- with their treatment plan.  And so

25    things can happen in the yard, or in their housing block, that

1    can cause them to have -- you know, feel stressed and

2    pressured, and that's one way they can remove themselves from

3    that environment.

4        Actually, let me give you an example.  Let's say a patient

5    reports suicidality in order to effect a housing change, and is

6    looking towards mental health crisis bed admission.  And the

7    patient reports to the clinician a series of reasons related

8    to, you know, mental health, and all of his reasons why he's

9    feeling depressed or whatnot.  But the reality, let's say, for

10   this example, is that that patient actually has a drug debt on

11   the yard, and he or she is trying to avoid dealing with the

12   drug debt situation.  If the clinician never gets to the bottom

13   of why the patient reported suicidal ideation, then you're

14   really treating a fictitious symptom.

15       So, really, that's what we do in this environment as

16   clinicians, we have to get to the bottom of why a patient is

17   reporting suicidality.  It's often used as a coping skill, but

18   underneath that maybe it's -- let's use the drug debt example,

19   maybe we need to loop in custody.  Maybe, you know, there is

20   some sort of safety concerns.  Maybe we need to do substance

21   abuse treatment for that patient.  That is a clinical issue.

22       And, you know, a crisis bed is appropriate for a

23   substance -- you know, if you're intoxicated, or coming off,

24   you know, a substance-induced psychosis or something, but

25   substance abuse treatment really is a long-term type of

1  treatment, and that's best done in the outpatient program.

2      So the clinician needs to know the real reason behind the

3  patient reporting suicidal ideation so we can really help the

4  patient to address what the concerns are.  It may be a custody

5  issue.  It may be a medical issue, physical pain.  Or it could

6  be a substance abuse issue.

7  Q.  Is there any risk of harm to a patient who is -- has an

8  improper referral or a premature referral to a crisis bed?

9  A.  Aside from if everybody went into a crisis bed when they

10  raised their hand we -- I don't know any system that would have

11  unlimited amount of inpatient beds.

12      So aside from that piece, that we'd have too much demand,

13  it deflects from the -- I'll use this example -- it deflects in

14  the patient's ability to actually work on the real issues.  If

15  the real issues are substance abuse treatment, that's best done

16  in their outpatient housing program, in their EOP, where

17  they're receiving group treatment and regular individual

18  treatment and so forth.

19      Crisis bed is really about an emergent crisis, where the

20  patient is acutely decompensated due to their mental illness,

21  and they also have functional impairment and they can't manage

22  on a -- on an outpatient housing unit.

23      Many patients that come in to --

24          THE COURT:  Let's wait for the next question.  Answer

25  the question and then wait for the next question.  We need to

1  be wrapping up.

2          MS. THORN:  Okay, Your Honor.  Thank you.  That's

3  fine.  Thank you, Doctor.

4  Q.  BY MS. THORN:  Isn't it true that alternative housing is

5  used only when there is an -- no availability of a crisis bed,

6  or when -- immediately to transfer the patient to a crisis bed?

7  A.  That's my understanding.

8      We have a system.  You know, years ago, when I started with

9  the department, I think it was, you know, the chief

10 psychiatrist -- chief psychiatrist negotiating, do you have a

11 bed, you know, open, and let's transfer.  We've come a long

12 way, and we've put in systems with our HCPOP system whereby we

13 can look at all of the resources and manage on a bigger and

14 better level so things are streamlined more.  So I believe in

15 the current process.

16 Q.  And as part of the referral process, once the referring

17 clinician decides that a referral to crisis bed is necessary,

18 do they need to contact headquarters, or someone, to actually

19 get that system going?

20 A.  HCPOP.

21 Q.  Do you know who -- can you --

22 A.  They send an e-mail to HCPOP.

23 Q.  And so that has to take place for every referral, correct?

24 A.  Yes.

25 Q.  Now, Mr. Bien was asking you about crisis care, and I was

1  just wondering, for the -- the mental health crisis beds, how

2  does that compare to the level of care of an acute bed?

3  A.  Crisis bed level of care is something that CDCR developed

4  many years ago, and it's -- it's still under the CTC license

5  and considered acute level of care, similar to acute treatment

6  that we have now in the PIPs.  And so it -- the difference,

7  really, is about timing.

8      So, for a crisis bed -- crisis beds are usually the first

9  port where a patient is in immediate distress, and

10  decompensated, and functionally impaired, and they're admitted

11  into a crisis bed.

12      In a crisis bed, they see a clinician every single day,

13  that's the requirement.  So it's -- it's a lot of intensive,

14  one-on-one evaluation, assessment and treatment.  And then

15  they -- the treatment team determines if the patient can be

16  re-compensated to the point of being able to be discharged back

17  to their outpatient housing within about a ten-day timeframe,

18  or if they need to be referred for longer acute level of care.

19  And if they need to be referred for longer acute, then they

20  would be referred to acute level of care, which is about -- is

21  designed for about a 30- to 45-day program.

22  Q.  Is crisis bed level of care a higher level of care than the

23  acute level of care?

24  A.  Crisis bed level of care sees the immediate -- all of our

25  suicide attempts --

1          THE COURT:  Just answer that yes or no.

2          THE WITNESS:  It is the same as acute, but it sees --

3     in my experience, it sees a higher level of acuity.

4     Q.  BY MS. THORN:  And do patients -- are patients subjected to

5     harm by remaining in a crisis bed while pending referral and

6     transfer to an acute care unit?

7     A.  Absolutely not.

8     Q.  And why not?

9     A.  Because they are seeing their clinician every day, they're

10    provided the same level of 24-hour nursing that they would in

11    an acute or an intermediate program.

12    Q.  How often do patients see their clinician in an acute care

13    bed?

14    A.  In an acute care bed, licensing requires a physician note

15    every 72 hours.  As we -- the patient also sees a psychiatrist

16    every 72 hours in a crisis bed, or as indicated.  However, we

17    have program flexes for our PIPs, and -- which I believe

18    requires, with the flex, the physician to be -- to see the

19    patient once a week.

20          MS. THORN:  Thank you.  Nothing further.

21          THE COURT:  Do you need more time, Mr. Bien?  If so,

22    I'm going to say you can do that after lunch.

23          MR. BIEN:  I'm finished, Your Honor.

24          THE COURT:  All right.  Let's be back at 1:30 and

25    I'll hear closing argument.

 1          Was there any objection to A?  I didn't hear an objection

 2    to --

 3              MS. THORN:  No objection.

 4              THE COURT:  So Exhibit A is in the record.

 5          (PLAINTIFFS' EXHIBIT A ADMITTED INTO EVIDENCE.)

 6          (Recess taken, 12:23 p.m. - 1:34 p.m.)

 7              THE COURT:  All right.  We're back on the record,

 8    ready for closing argument.  30 minutes each.

 9        So who is going first?  Did you flip a coin?  Do you want

10    to reserve any time?

11              MS. CICCOTTI:  Yes, Your Honor.

12              THE COURT:  All right.

13              MS. CICCOTTI:  I'll reserve -- I'm sorry, you said 30

14    minutes each side?

15              THE COURT:  Wasn't that what you said?

16              MS. ELLS:  We said 15.

17              THE COURT:  15.  I'm sorry.  15, then.  30 minutes

18    total.

19              MS. CICCOTTI:  I mean, if you want to give me --

20              THE COURT:  No.  I have a 2:30.

21              MS. CICCOTTI:  I'll reserve five minutes.

22              THE COURT:  30 minutes total.  So ten minutes, and

23    then 5.

24              MS. CICCOTTI:  I apologize.  Christine Ciccotti for

25    defendants.

1              THE COURT:  All right.

2              MS. CICCOTTI:  Your Honor, briefly, I think we'd like

3     to discuss the context of the current status of what we're

4     looking at when we look at defendants' ability to transfer

5     patients in a timely fashion to inpatient care.  And I think

6     there is two major transformations that are worth noting when

7     you consider all the change that has happened and all the

8     movement -- patient movement that has happened.

9          The first one that the Court is well aware is that the lift

10    and shift took effect in July.  And this is really a

11    fundamentally different way to manage the transfer of patients

12    from outpatient to inpatient care.  And I think CDCR is already

13    starting to see the efficiencies that we thought that that

14    would bring, along with our partners at the Department of State

15    Hospitals.

16         As of this week, there are over a hundred high custody

17    intermediate care beds available at the Stockton facility, and

18    that's a result of the hard work of CDCR and DSH trying to move

19    patients -- continually move patients to lower levels --

20    custodial levels.

21         The locked dorms are almost full in our facilities.  The

22    multiperson cells are almost full.  Coalinga has 48 of 50

23    patients.  And the ASH has 219 of 256, with 12 pending.

24         And so those changes are really important when you're

25    looking at the system, as Director Tebrock testified to,

1    because this is a continuum of care, and the Special Master has

2    repeatedly, you know, advised defendants, you've got to look at

3    the whole process.  As you clear out those backlogs at various

4    levels of care, it continues to make room for the patients.

5        So as we unclog the system from the top down, you can see

6    more patients getting into acute care beds, which thereby frees

7    up more crisis beds for the patients coming into the system.

8        And, again, that just took effect July 1st, and I think

9    it's worth seeing -- continuing to advise the Court on the

10   progress as a result of that.

11       The second one is the electronic health records system.

12   And that will be rolled out to all institutions by October.

13   But the important point here to note is that the psychiatric

14   inpatient programs, the three CDCR inpatient programs within

15   their -- within the prison walls, just finished that rollout.

16   So Stockton's was in July, and Salinas Valley's and Vacaville's

17   was in September.

18       And this isn't just about how we record how a patient went

19   and saw their doctor, this is actually a complete change in the

20   scheduling process.  So this changes the way crisis bed

21   referrals are even generated.  It changes the next steps that

22   follow upon that; the mental health assessment, the suicide

23   risk evaluation, generating admission orders, discharge orders.

24   It isn't just about the patient came to see me today, it really

25   drives the whole system.

1    So I think what you can anticipate seeing is that there is

2  a learning curve, and the clinicians are struggling, and

3  probably even the Special Master and plaintiffs are struggling,

4  when they look at the new health record system to figure it

5  out.  But over time there will be enormous efficiencies as a

6  result of this rollout.  It automates much of what is a manual

7  process right now.  And it automatically sends orders for much

8  of what right now has to be done on the clinician's own

9  initiative.  It will tell the clinician to do these things.

10    So I think these two factors are important to keep in mind

11  when we're looking at defendants providing timely access to

12  care.

13    The next point I'd like to make is about the workgroups.

14  Defendants have really taken, in good faith, the Court's

15  April 19th order and looked at every single part of the crisis

16  bed referral process and seen where any efficiencies can be

17  drawn, and tried to remove every roadblock or obstacle that's

18  delaying patients throughout that process.

19    And I think, broadly categorized, you can say that we found

20  there were policies that were delaying patients due to just

21  administrative policies, like a clinician has to do a specific

22  form to accept a patient in a crisis bed.  CDCR immediately

23  took steps to remove that roadblock that was delaying patient

24  admission.

25    There were transportation issues that were delaying

1    patients from discharging, and if you can't get a patient out,

2    you can't get any patient in.  So CDCR, as is in our briefing,

3    is bringing on board almost 20 vehicles by the end of December

4    to help expedite the discharge of patients.

5         They also really have focused on utilization management.

6    And I think Director Tebrock testified to this, reducing those

7    administrative days, which are the days that a patient spends

8    in a crisis bed after they are clinically discharged, can speed

9    up the whole system.  If you're looking at a system that's

10    admitted 15,000 patients since 2016, reducing one day for

11    15,000 patients is an enormous efficiency.

12         And we've fully and transparently raised these issues with

13    the Special Master and plaintiffs and explored the solutions to

14    some of these things.

15         Beyond just the solutions, we've also proposed almost ten

16    initiatives that would improve the system.  And those

17    initiatives are outlined in the declaration of Director

18    Tebrock.

19         Those involve training of staff to improve the quality of

20    referrals.  Those also involve the regionalization of the

21    crisis beds.  And I think that that regionalization is one

22    initiative where we can see real improvement.  This is in the

23    exhibit to Nick Weber's declaration, Exhibit 3.  A year ago, in

24    June, it took on average 80 hours to transport a patient, and

25    now it takes 25 hours on average to transport a patient.

1    So I think the point of walking through those solutions and

2    some of those initiatives briefly is just to demonstrate that

3    CDCR is committed to doing things to improve access to care,

4    and we need -- we're requesting some time to allow these things

5    to take hold.  And the workgroups is the best place for that to

6    happen.  Instead of piling on ten more initiatives, or ten more

7    proposals, or additional court orders, I think it would behoove

8    everyone to see if what we've already proposed, and what we've

9    already implemented, can really make the changes necessary.

10    It's also important to note, of the 800 patients admitted

11    to a crisis bed in June, on average patients were admitted

12    within 21 hours, and 90 percent of patients are admitted within

13    48 hours, with the average being 32 hours.

14    Now, I say that not to ignore the Court's requirement that

15    everybody be admitted within 24 hours, I say that to focus on

16    the fact that we're really just dialing in the system to try to

17    get closer and closer to the 24 hours.

18    So if we're at 90 percent within 32 hours, how do we knock

19    off those last 8 hours?  Or how do we knock it off for the

20    entire system for a hundred percent?  And so we're really

21    tinkering around the edges with these solutions to try to make

22    this process as efficient as possible.

23    But as my colleague, Elise Thorn, noted, this is a process.

24    These aren't widgets.  These are humans moving humans, and that

25    invariably injects some instability into a system because

1   humans don't always do exactly what you thought they were going

2   to do when you need to transport them.  But CDCR is committed

3   to moving patients as quickly as they can, as safely as

4   possible.

5       I'd like to turn now to the Court's order from

6   September 22nd addressing questions regarding the capacity.

7       And I think one way to look at this is the short-term,

8   intermediate and long-term solutions to address capacity.

9       And the long-term solution is the building of a hundred

10  crisis beds.  And when we look at the timeline on how that was

11  developed, and the mental health bed need studies, prior to

12  fall 2014, the mental health bed need study projected

13  defendants would need 420 beds for 2017.  Beginning in spring

14  2015 is the first time you see this really big jump to 490

15  beds.  And the budget change proposal process can take up to 18

16  months, so defendants immediately began planning, developed the

17  necessary documents, and sought legislative approval and

18  authority to begin building those beds, because the bed need

19  study is really designed for long-term planning, it's not a

20  short-term document, it's based on trends.

21      I think the other important point to note when you're

22  looking at capacity in the current bed need study is that the

23  average daily census shows an average of 433 patients, and that

24  includes the pending list, and we have 427 beds.  And so many

25  months that could mean that there are actually empty beds, some

1  months it could mean that demand has exceeded capacity.  But

2  this is a cyclical system, just like we've talked about before

3  when we looked at the Department of State Hospital beds.  So

4  there is not always a shortage, and so CDCR must figure out

5  solutions to handle it when capacity -- excuse me, when demand

6  exceeds capacity.

7      One of the most promising solutions we talked about is a

8  short-term solution, and that's CDCR's flexing of units.  So

9  the demand is now for acute care beds, and CDCR can flex units

10  at Stockton, or other facilities, to meet that demand.  And now

11  that CDCR has taken those programs back over, they are all

12  licensed under Title 22 and they can be flexed across the

13  entire continuum.  They could be flexed across crisis bed,

14  acute, intermediate, as long as CDCR is able to get the

15  staffing resources that it needs to do that.

16      And so having a flexible system is the best way to meet the

17  ever-changing demands of the population.  That's one of the

18  short-term solutions that CDCR and the Department of State

19  Hospitals have already done, and are committed to continuing to

20  do.

21      When you look at the intermediate solutions, I think those

22  are in the initiatives that Director Tebrock put in her

23  declaration, and those go back to the training of staff to

24  improve quality crisis bed referrals over time.

25      Finally, the other short-term solutions I'd like to talk

1    about are those that we've identified in the workgroups, and

2    just removing obstacles to timely transfer.  And so we think

3    that we should be allowed to be given the time, excuse me, to

4    have these solutions take effect before we look at trying to

5    build beds somewhere or try to use unlicensed spaces.  The

6    preference is always for licensed spaces.  And that's where

7    CDCR keeps its focus at.

8            THE COURT:  Is there a suggestion that the short and

9    the intermediate -- short-term and intermediate measures will

10   moot the need for the hundred beds?  That's not what you're

11   saying?

12           MS. CICCOTTI:  I don't think that we're going to go

13   that far, Your Honor.  I think that it would be -- we already

14   have the budget authority for the hundred crisis beds.

15   Certainly, these initiatives, as well as Prop. 57, it's a

16   constantly flexing system.  But I think the better wisdom is to

17   plan for the long-term, and that's what CDCR has done.

18           THE COURT:  Isn't it fair to construe what Director

19   Tebrock said as with the hundred then there is the possibility

20   of stability long-term?

21           MS. THORN:  Yes.  Absolutely, Your Honor.  I believe

22   so.

23       And with the hundred, those could be flexed to acute or

24   intermediate also, as long as CDCR has the staffing to be able

25   to do that.  Crisis beds actually require the most intense

 1    level of staffing as compared to acute or intermediate, so if

 2    you're staffed at a crisis bed level, presumably you can meet

 3    the needs for an acute or intermediate level patient.

 4        I'd now like --

 5            THE COURT:  That is ten minutes.  How much longer do

 6    you need?

 7            MS. THORN:  I was just going to go through the two

 8    areas in dispute, which would be the in-person referral --

 9    in-person assessment prior to a crisis bed referral, and

10    stopping the 24-hour timeframe.

11        Am I at my ten minutes, Your Honor?

12            THE COURT:  You are.  Go ahead and wrap up in the

13    next few.

14        Maybe clarify when you -- what do you mean by requesting

15    time?

16            MS. CICCOTTI:  Well, I think the workgroup process as

17    laid out is continuing to move.  And we've got, I believe, a

18    hearing set in -- or status conference set in November to

19    address it.  And I think we can see where we're at at that

20    time, and whether more time would be appropriate.  If we're

21    seeing a lot of change, if we're seeing significant

22    improvements in the number of patients waiting beyond Program

23    Guide timeframes, that shows the initiatives are working and

24    maybe we need just a little more time to see if we can dial it

25    in to 24 hours.

1          THE COURT:  So no specific request for more time

2    today?

3          MS. CICCOTTI:  Not at this moment, Your Honor.  But

4    we'd be happy to get back with my clients and present a

5    proposal for the exact amount of time we believe we would need

6    to see these improvements through.

7          THE COURT:  By November, probably, is the time.

8          MS. CICCOTTI:  Yes, Your Honor.  We can include that

9    in our November briefing.

10          THE COURT:  All right.

11          MS. CICCOTTI:  Then quickly on the two proposals that

12    we have before the Court today, I just wanted to clarify that

13    we're not looking to change the Program Guide when it comes to

14    doing an in-person assessment of a patient prior to a crisis

15    bed referral.  I think, hopefully, Dr. Brizendine's testimony

16    was helpful to the Court to understand the difference between

17    the preadmission screen, which is done by the receiving

18    clinician, and the referral, which is done by the sending

19    clinician.

20      And I want to be clear, also, that every time a referral is

21    rescinded it's a domino effect.  So this isn't a matter of a

22    patient sitting at Sac, and he was supposed to go to a crisis

23    bed down the hall, and now he's not going to a crisis bed down

24    the hall --

25          THE COURT:  The request still is, though, isn't it,

 1  to have the in-person assessment before the referral clock

 2  starts to run?  That's where there is a change being requested?

 3          MS. CICCOTTI:  That's a change to the alt housing

 4  policy.  It's not actually -- we would not view that as a

 5  change to the Program Guide requirements.  So the alt housing

 6  policy is what generates that immediate crisis bed referral.

 7  The two are reflexively linked.

 8          THE COURT:  Have you identified the language that

 9  supports the -- your characterization of the Program Guide as

10  implicitly requiring in-person assessment?

11          MS. CICCOTTI:  I believe that's in our briefing.  I

12  thought it was at --

13          THE COURT REPORTER:  I'm sorry, you've got to slow

14  down.

15          MS. CICCOTTI:  I know I speak fast.

16      I believe that is in 12-5-4.  But if the Court would like,

17  we can provide followup briefing after the status conference on

18  that point.

19          THE COURT:  I don't need more briefing.

20          MS. CICCOTTI:  What we're looking to do is divorce

21  the alt housing policy from the crisis bed referral.

22      Alt housing is to keep a patient safe while they're

23  suicidal, and to make sure that we have a good response time in

24  case they are going to be a danger to themselves.

25      The crisis bed evaluation is an entirely separate process;

1    is this person appropriate under the Program Guide timeframes

2    for crisis bed care.  Just being placed in alt housing doesn't

3    mean that you need crisis bed care.  And so we're trying to

4    clarify those two processes.

5        And the reason we're doing so is because recisions generate

6    waste.  And so a patient who had planned to come to a crisis

7    bed at Sac from Mule Creek, and then in the morning his

8    clinician comes in and it turns out it was just a drug debt

9    issue and rescinds that referral, well, now that bed is free.

10   And that bed should have gone to a patient who was coming from

11   Solano, we've already put him on a van to go to CMC because we

12   thought that bed was full.  So it's a domino effect throughout

13   the system.

14            THE COURT:  But that would only be an issue where

15   there is no MHCB.

16            MS. CICCOTTI:  That is very common.  So, of the 800

17   referrals in June, over 500 patients had to transfer to an

18   outside institution.  So you're looking at quite a few patients

19   who do not get admitted to the institution where the referral

20   was generated from.

21            THE COURT:  Are you suggesting that most of the

22   recisions are because of drug debt issues?

23            MS. CICCOTTI:  No, Your Honor, I would not proffer

24   that.  I gave that as an example.

25       What I'm suggesting is that 50 -- excuse me, 70 percent of

1  the recisions are from those after-hours referrals, from 5:00

2  p.m. until 5:00 a.m., because a clinician has not got a chance

3  to sit down with the patient and walk through what's causing

4  the crisis.

5      And so if 70 percent of total recisions are from the

6  referrals from 5:00 p.m. to 5:00 a.m., that's something to take

7  a look at and see if we can reduce that administrative waste.

8      HCPOP has to back out and redo their work every time that

9  there is a recision.  And the local institution has to back out

10  and redo their work every time there is a recision.  The

11  transport officer, oh, no, you're not taking inmate Smith.  The

12  nurse has to back out.  The classification and parole

13  representative has to back out.  And this is wasteful.  And so

14  we're really looking for a common sense proposal that would

15  triage patients in a better manner to ensure patients in need

16  of crisis bed care arrive there.

17      And then moving on to the 24-hour timeframe, I just want to

18  clarify that this data is not realtime, it still requires a

19  human to enter it.  And so a human has to enter whether there

20  is traffic delays or rain delays.  A human also has to enter if

21  a patient goes beyond the 24-hour timeframe.  You would need to

22  look at every institution and say, why is this patient at 25

23  hours?  Oh, it was a transport officer, it was a nurse, it was

24  a CMPR who wasn't able to complete paperwork, or maybe there

25  was some other issue.  So you're talking about a lot of data

 1    generated for the 800 patients that move each month if we're

 2    looking at individual, case-by-case issues.

 3        We think that we can resolve this in the workgroup with the

 4    plaintiffs, hopefully, and demonstrate the concerns with that

 5    kind of data better in the workgroups.

 6        Same thing with the reporting requirements, Your Honor, I

 7    think the workgroups are a place where, hopefully, we can come

 8    to a solution on that.

 9        And I'll reserve the non-amount of time that I have left.

10    Thank you.

11            THE COURT:  All right.  You're over time, but maybe a

12    few minutes.

13        Ms. Ells.

14            MS. ELLS:  Your Honor, defendants, a year ago, were

15    in here telling you that this is peak season for referrals.

16    And it turns out it is a peak season, and there are a huge

17    quantity of referrals, and it is clear that defendants can't

18    process them in time and get people into the level of care, in

19    an inpatient setting, that they need within Program Guide

20    timelines.

21        CDCR has to be able to account for and adapt to the seasons

22    that are peak, for whatever reason, and that includes now.

23    Defendants keep discussing with you the June data for MHCB

24    transfers.  The July data is dramatically worse.  34 percent of

25    people made it to a MHCB in a timely fashion, 76 percent of

1    people did not.  And, you know, to say that these numbers are

2    the most up-to-date, and to represent that they're fine, is

3    just not accurate according to the data that they provide us.

4    And I'd be happy to provide an exhibit of this to file with the

5    Court, if that's helpful to see the July data, because I know

6    you don't get it.

7        But more than double the amount in July waited for longer

8    than 72 hours.  Their average time was 106 hours in alternative

9    housing.  Quadruple the number waited between 42 and 72 hours.

10   Average length of stay, 57 hours approximately.  And almost

11   double the number made -- waited between 24 and 48 hours.

12   These are dramatically worse.  And defendants need a system

13   that has capacity to deal with that.

14       Similarly, for the acute referrals, what they reported to

15   the Court in their September 15th filing was that they had

16   doubled the number in August that they had in July.  Again,

17   every year they know that this peak season is coming, they have

18   to be able to adapt in a sustainable fashion.

19       There is clearly a need for some short-term capacity.

20   Defendants, you know, have a plan for beds in four or five

21   years.  You know, to the extent that those beds are on time,

22   it's a long time from now, and there are patients that are

23   suffering now, and defendants need a system that can adapt to

24   that.

25       We heard a number of good ideas from defendants.  We

1    explored some additional ideas on cross-examination of

2    possibilities that defendants could look at.  But the point is,

3    is that they need some sort of short-term plan, in writing,

4    that should be submitted to this Court, lining out -- outlining

5    what exactly they are planning to do.

6        We didn't hear any plan about particularly how they were

7    going to deal with the lack of access to inpatient care for

8    women.  I don't think we heard any solution for that in the

9    short-term.  And they've known for at least three years, in

10   every bed plan, that they have a shortage for MHCB beds for

11   women.  And, in fact, the number that they can actually use is

12   lower than what they report to you every month.  They have

13   never had a census of 22 women in those MHCB beds, and yet

14   women are waiting for crisis beds, they are waiting for acute

15   care past Program Guide timelines, and Patton sits unutilized.

16       Similarly, defendants have, in the past, had opportunities

17   to flex beds and increase beds at ASH, there are opportunities

18   for other short-term measures that should be taken, and that

19   defendants are considering.  And there really needs to be an

20   organized plan that's submitted to this Court for approval, and

21   so it's clear what exactly is happening with their bed

22   planning.

23       The fact that there was not a bed plan before this spring,

24   in 2017, suggesting a male acute need does not jive with what

25   they were actually seeing on the ground.  And Ms. Tebrock

 1   actually testified to that in January, that they weren't using

 2   the full 2016 bed plan because it was obvious those numbers

 3   were not tracking with reality.  And that's where we are today,

 4   is that their planning is not tracking with reality.  And they

 5   need to do something to bring it back into focus because

 6   they've gotten to a position where they just tolerate delay.

 7   And until this Court, you know, sits them down and threatens

 8   contempt, these issues just keep recurring because there is no

 9   sustainable plan.

10          THE COURT:  Haven't I already done that --

11          MS. ELLS:  Yes.

12          THE COURT:  -- in a way that would get to the bottom

13   of this?

14          MS. ELLS:  Absolutely.

15          THE COURT:  So I -- as you can -- I like big picture

16   performance standard approaches and not micromanaging.

17          MS. ELLS:  Right.

18          THE COURT:  Which has been going on for almost 30

19   years.

20          MS. ELLS:  Which is why there should be a bed plan,

21   though, because there is no clear plan right now except for

22   beds that are coming in five years.

23          THE COURT:  So is your position, just so I

24   understand, on this same question I asked the defense, do you

25   believe also that the hundred beds are essential to getting to

1    a stable system, with no more construction required, or do you

2    think with proper bed planning those hundred beds would be

3    gravy?

4              MS. ELLS:  I think they absolutely need those hundred

5    beds.  I don't necessarily think that that is sufficient.  And,

6    you know, a lot can happen between now and five years.  We've

7    seen other projects called off completely that were funded by

8    the legislature and in design.  So, you know, five years

9    becomes eight years becomes canceled very quickly in the

10   history of this case.

11        So the -- just switching gears, I'd like to talk a little

12   bit more about the alternative housing proposal.  This Court --

13             THE COURT:  Whether or not that should be divorced

14   from MHCB referral?

15             MS. ELLS:  I'm sorry, could you repeat that.

16             THE COURT:  Whether or not it should be divorced from

17   MHCB referral?

18             MS. ELLS:  Yes, to some extent.  But I do think the

19   two issues are linked.  And I think they're linked also to bed

20   planning.

21        In the order denying termination in 2013, the Court very

22   specifically called currently-acceptable alternative housing

23   locations like OHUs totally inappropriate, and those are the

24   best case scenario for clients today.  OHUs are the best case

25   scenario for clients that are held in alternative housing.

1    And, again, in July, 36 hours was the average time people

2    waited before they transferred to an inpatient bed.  So people

3    are already in there a very long time, and they're not always

4    in these best case scenario beds.  Lindsay Hayes' report filed

5    less than three weeks ago recounts nine institutions that were

6    not following their alternative housing policies.  They're not

7    providing beds routinely, they are holding people in cages

8    overnight, strapping them to gurneys, and, you know, there are

9    multiple institutions where people are not actually being

10   observed on one-to-one status.  So to say that people are safe

11   in these units is, first of all, not accurate.

12   Lindsay Hayes recounts specifically a 2015 suicide, from

13   May 2015 at San Quentin, where the patient was in alternative

14   housing, and he was on one-to-one status, and he killed himself

15   anyway because they were not actually observing him.

16   So, you know, the record is replete with these breakdowns

17   at the practical level of what is happening today.  And --

18           THE COURT:  At the same time, though, the Program

19   Guide does include the list of nine in order of priority

20   starting with inpatient beds before OHUs.

21           MS. ELLS:  Yes.

22           THE COURT:  So it's not -- it can't be the case --

23   despite the Court's observations, it's not the case that there

24   is a clear trend of trying to reduce the amount of usage of

25   alternative housing, is it?

1          MS. ELLS:  Well, I think the same termination order

2     frames it very well, which is that the Court ordered the

3     defendants to incorporate the number of inmates placed in

4     alternative housing areas into their future planning for

5     necessary MHCBs and to meet that need.

6          So I think there is an anticipation that alternative

7     housing will be minimized to the largest extent possible.  It's

8     never going to go away entirely, probably a couple of hours,

9     but if the system had adequate capacity, and defendants have

10    been ordered to work on that issue specifically, then they

11    wouldn't need 36 hours in an alternative housing, they wouldn't

12    even need 24.

13         And to double down on that and request from this Court a

14    change in a long-standing policy that keeps patients safe by

15    starting the referral when they are placed in alternative

16    housing, rather than up to 15-16 hours later, is unreasonable.

17    They've provided no justification for it.  There is no data

18    tracking that on-call versus in-person recision -- in-person

19    evaluations caused recisions, and many people are rescinded

20    anyway.

21         It's not clear from Dr. Brizendine's presentation that the

22    person with a drug debt, that person would have been rescinded

23    whether or not they had an in-person evaluation.  That is

24    something that resolved in the morning on the natural.  And

25    those -- they have no way to distinguish those kinds of cases,

1    where the crisis just resolves, from cases where it does not

2    resolve, or where an in-person evaluation would have made the

3    difference.

4        But the point is, is that the clock shouldn't move in order

5    to allow them to do this in-person evaluation.  There is no

6    question that in-person evaluation is, you know, appropriate

7    and it's a good idea, but that doesn't mean that the time to

8    transfer those patients shouldn't start when the crisis was

9    identified.  And the request --

10           THE COURT:  Is there any need to refine the referral

11   language in the Program Guide at 12-5-3?  It's a two-line.  So,

12   An inmate patient suffering from an acute, serious mental

13   disorder, resulting in serious functional disabilities, or who

14   is dangerous to self or others, shall be referred, that's the

15   referral language.

16           MS. ELLS:  I'm sorry, could you repeat --

17           THE COURT:  Is there -- is that -- it's broad, it's

18   clear, is there any possibility that that language could be

19   refined?

20       Does it ever result in over-referral, or is it necessarily

21   broad to err on the side of caution?

22           MS. ELLS:  I think the reason that defendants

23   currently start the referral process when they do is to err on

24   the side of caution, because many, many of those people do need

25   crisis care, and when morning comes they will still need crisis

1    care.

2        And, you know, we're talking about already delayed access

3    to emergency mental healthcare that people need, and the vast

4    majority of patients still need, and you're compounding the

5    delay in them getting it.  That delay was caused by, you know,

6    a system that couldn't handle the capacity, and it still can't

7    handle the capacity, and instead of addressing those issues

8    head on, defendants are asking for more time.

9        But the more time --

10            THE COURT:  I'm not granting more time today.

11            MS. ELLS:  Right.

12            THE COURT:  I hear that request, but we'll revisit

13    that.

14        On the bed planning, are you saying that that -- the

15    workgroup has not had a chance -- that there is a dispute that

16    stands in the way of the workgroup exploring the bed planning?

17            MS. ELLS:  No.  I'm not saying that there is a

18    dispute about that.

19        I do think that an order from this Court directing

20    submission of a bed plan in writing for the short-term and for

21    the midterm would be appropriate.  I'm not saying that couldn't

22    be discussed in the workgroup before it is actually presented

23    to the Court.  And I'm also not saying that that bed plan

24    couldn't be modified in the future if it was no longer

25    appropriate.

 1                THE COURT:  So that's something for me to hear more

 2    about in November?

 3                MS. ELLS:  Yeah.  Potentially.

 4                THE COURT:  All right.  You're not seeking a specific

 5    order now on that point?

 6        I don't think that was teed up, really, by the briefing.

 7    It may be that solution may arise from the problems identified

 8    in the briefing.

 9                MS. ELLS:  Yeah.  I think, you know, honestly, it was

10    triggered by Your Honor's order which asked us to specifically

11    think about these issues right now.

12                THE COURT:  I have no problem with the workgroup

13    talking about and exhausting bed planning.

14                MS. ELLS:  Yeah.  And I think that's appropriate.

15                THE COURT:  All right.

16                MS. ELLS:  But I do think, ultimately, it needs to be

17    filed with the Court so that everybody understands exactly what

18    we're operating under.

19                THE COURT:  All right.

20                MS. ELLS:  And then, you know, I -- I think, just to

21    circle back again to the proposal for inpatient clinical

22    assessments, again, those assessments are already occurring.

23    They -- that's not changing.  The on-call person, in

24    consultation with the nurse, does an initial evaluation, and

25    then that second, more full evaluation occurs anyway, so there

1   is no efficiency gained in that respect.

2       And, again, you know, these people, as Lindsay Hayes

3   detailed very, very clearly, this is the most recent evidence

4   before this Court of the practices, and the practices are --

5   you know, at points he calls certain prisons' alternative

6   housing policies, you know, grossly inadequate, they are

7   outrageous, sometimes he calls them horrific or alarming.  And,

8   you know, I've discussed some of the particulars of them and

9   they are horrific.  And, furthermore, it's clear from his

10  recommendations that even the local superfit committees don't

11  necessarily know where alternative housing that is not

12  compliant with the policies --

13          THE COURT:  I'm aware of and I will have fully read

14  the Hayes report.

15          MS. ELLS:  So we -- you know, we do think that there

16  has been a lot of good that has come out of the workgroup

17  process.  We support the efforts that defendants are making.

18  We think it's great that the number of beds in use at ASH are

19  going up, and that, you know, strict attention is being paid to

20  the LRH process.

21      And we think there's been some good ideas about MHCB access

22  as well.  We don't think the time is ripe for an enforcement

23  order, and you have signaled that that is not where you're

24  heading right now anyway.  But, you know, we think it's a

25  worthwhile process, but we also think that it's clear there

```
 1   needs to be some additional focussed attention paid to the

 2   access issues.

 3            THE COURT:  All right.

 4            MS. ELLS:  Thank you, Your Honor.

 5            THE COURT:  Ms. Ciccotti, anything further?  Two more

 6   minutes.

 7            MS. CICCOTTI:  Yes, Your Honor.  Thank you.

 8       Just a couple points.

 9       I think the plaintiffs' counsel pointed out that we focused

10   on the June data, and that's just because that's the data

11   that's in the record.  And I understand that there may have

12   been a dip in July, but we'd be happy to file -- I understand

13   you may not want more briefing, but we can file the August

14   numbers earlier if that assists you in this regard.

15       And I can proffer that --

16            THE COURT:  Just to make you all feel good --

17            MS. CICCOTTI:  -- August will be --

18            THE COURT REPORTER:  I'm sorry.

19            THE COURT:  So that you can all feel better about the

20   record, plaintiffs can file July and you can file August.

21            MS. CICCOTTI:  Yes, Your Honor.  Noted.  Thank you.

22            THE COURT:  Within the next three days.

23            MS. CICCOTTI:  Within three days, yes, Your Honor.

24            THE COURT:  By next Monday.

25            MS. CICCOTTI:  I also want to note that plaintiffs
```

1    argue that we can't process people in time during the peak

2    season, and certainly defendants are working towards that goal

3    for a hundred percent of the patients, but at the same time we

4    encourage a system-wide approach in looking at things on the

5    average for 90 percent, and that's more consistent with a class

6    action that involves 30,000 prisoners and patients, we really

7    need to focus on a system-wide approach to compliance, and

8    defendants, of course, are trying to move everyone as quickly

9    as possible, but that's the way we think that our efforts

10   should be judged.

11        I want to focus also on plaintiffs' statement that if we

12   had adequate capacity we wouldn't need alt housing.  And I

13   think Dr. Brizendine's testimony went a little bit to this

14   point, that no system could do this.  This would be like every

15   person who shows up to the emergency room immediately getting a

16   bed.  This is just not the case.  We all know from our own

17   personal experience that oftentimes you wait in a hallway, you

18   go to a room with a nurse where they do an evaluation --

19             THE COURT:  But do you concede that that's not a

20   necessary stop in every case either?

21             MS. CICCOTTI:  I understand, Your Honor.  But I think

22   it's an important stop when you're looking at a licensed,

23   inpatient bed, that's the most expensive in the system, making

24   sure we have appropriate utilization for those patients who

25   really need that care.  It is what a responsible system does,

1    Your Honor, instead of just admitting everybody who raises

2    their hand and says I'm suicidal for this hour.  That doesn't

3    really make sense.

4         THE COURT:  I'm not resolving that 180-degree dispute

5    that a lot of folks opt out because they don't want to be in

6    the horrific conditions and that everyone raises their hand.

7    You appear to be completely at odds on that one.  I don't know

8    how to sort it through.

9         MS. CICCOTTI:  Yes, Your Honor.  Also on the 24-hour

10   timeframe, I just want to focus on the actual language of the

11   Program Guide, is that most patients should be transferred

12   within 24 hours, and, when appropriate, they should be

13   transferred.  And that's at 12-5-4.

14       And so certainly the Program Guide, which was -- this final

15   version was done in 2009, which was six years after defendants

16   began reporting on their compliance based on when the patient

17   is on the transport vehicle, not when the patient arrives, and

18   we think that's consistent with the language because the

19   language talks about the patient should transfer within 48

20   hours.  Not be admitted, be transferred.

21       And so when we're looking at statutory construction, as you

22   alluded to earlier, we think that the transfer language is

23   consistent with when the patient is placed on the vehicle, it's

24   consistent with the defendants' reporting since 2003, it's

25   consistent with the 2009 Program Guide, and there shouldn't be

1   a Program Guide change to now incorporate transport time into

2   that 24 hours.  We would view that potentially as a Program

3   Guide change.

4       Finally, to address plaintiffs' point regarding the

5   conditions of alt housing in 2013, those conditions have

6   significantly changed.  And I know that plaintiffs take great

7   exception to us calling alt housing safe, but when alt housing

8   is done, in accordance with policy, it can be safe.  There will

9   always be staff who occasionally do not follow the policy and

10  that results in problems.  But the CDCR headquarters saw that

11  problem at Salinas Valley, and within six weeks they had a new

12  CEO out there who was on task and on that problem.  And that

13  was Dr. Brizendine who actually went out there to specifically

14  address that problem at Salinas Valley.  And the results of her

15  efforts were tremendous in terms of the actual number of

16  placements in alt housing.  Sometimes they had no patients in

17  alt housing after she came on board there.

18          THE COURT:  Doesn't the Program Guide define transfer

19  as the date the inmate-patient is placed into the level of

20  care?

21          MS. CICCOTTI:  Well, the date the patient is placed

22  into the level of care is when the clinician makes the referral

23  that says they are -- they should go to crisis bed.  So the

24  clinician at the sending institution actually places the

25  patient in the level of care.  And some of this is probably

 1   muddled because, unfortunately, as Your Honor has pointed out,

 2   policy has somewhat evolved since the Program Guide, and the

 3   two haven't always kept up to make this a clear system.

 4          THE COURT:  So are you saying "placed" is defined in

 5   a policy that's not part of the Program Guide?

 6          MS. CICCOTTI:  No.  I'm saying that when they're

 7   placed in the level of care, that level of care change happens

 8   when the referring clinician says, okay, you're referred to a

 9   crisis bed, that's when the level of care change happens in

10   defendants' system.

11      In any of our data or metrics, that's when the level of

12   care change would occur, not when the patient actually arrives,

13   that's a housing assignment, Your Honor.

14          THE COURT:  That's raising this other -- we need to

15   get clear, sooner rather than later, on what the Program Guide

16   says.

17          MS. CICCOTTI:  Yes, Your Honor.

18          THE COURT:  In this case I'll be looking at the

19   Program Guide.

20          MS. CICCOTTI:  Yes, Your Honor.

21          THE COURT:  All right.

22          MS. CICCOTTI:  Nothing further from defendants.

23   Thank you.

24          THE COURT:  All right.  I don't have time to read a

25   lengthy bench order and I don't have one ready.  I can tell you

1    generally what my -- my initial reactions based on what I've

2    heard today.  And I will issue a fairly short, focused order to

3    give you guidance for your continued work in the workgroup.

4        I do -- I believe the workgroup is making good progress.

5    It's very impressive, once focused by the April 19th order,

6    what you've been able to agree on and the steps that the

7    department is taking.  That is against a backdrop of MHCB

8    placement within 24 hours of referral being approved initially

9    in 1997.

10       I continue to have concerns about how much urgency folks

11   feel.  I realize that the potential enforcement, the potential

12   of sanctions, has people paying attention, and that's -- that's

13   the intent.  The ultimate intent is to get to compliance with

14   the Constitution, which is long overdue.  I think that should

15   be clear from the Court's orders.

16       In terms of the specific issues raised today, I'm not

17   prepared to sanction any modification to the Program Guide as I

18   am reading it, based on what I've heard, based on the data

19   before me.

20       And so I am not seeing -- and I'll explain this in an

21   order, I am not seeing in the Program Guide a basis, or in the

22   data presented a basis, for requiring in-person -- in-person

23   assessment before that 24-hour MHCB placement clock starts to

24   run, even taking into account that there is going to be some

25   kind of in-person assessment at some point pretty promptly.

1    So, bottom line, I'm not persuaded that the alternative

2  housing provision should be divorced from MHCB referral.

3    In terms of the 24-hour timeline, I will go back and look

4  carefully at what I just heard from Ms. Ciccotti in light of

5  the language of the Program Guide.  I am skeptical that it's a

6  proper reading of the Program Guide to have the 24-hour

7  clock -- to have that satisfied once there is placement in a

8  vehicle.  I just think the way the department has been reading

9  that is not consistent with what was intended.  But I will --

10  I'll look carefully at that argument made based on the use of

11  the word "placed," and I'll let you know in my final order if

12  I'm sticking with that.

13    I do think exhausting the exceptions approach is what the

14  workgroup should focus on.  So by November, if the workgroup

15  can tell me what it's done to exhaust that approach, to

16  determine whether or not it is workable to provide a safety

17  valve for when 24-hours from referral to placement in the bed,

18  the actual bed -- provide a safety valve when that is

19  absolutely not possible, recognizing it will not always be

20  possible.

21    In terms of bed space, I -- to test what I think I've heard

22  today, I'd have to say my biggest disappointment is the

23  position of the defendants regarding those hundred beds.  It

24  may be that there is already a hole dug by not seeking

25  design-build combined from the get-go.  It's not clear to me

1  that defendants are taking every step to accelerate that

2  project to obtain completion before 2021.  I've heard no one

3  say that the need for those beds will be mooted by anything

4  else.

5      And there are many impressive efforts.  The efforts

6  Ms. Tebrock has described sound well meaning and very

7  constructive, but no one has said those beds aren't going to be

8  needed.

9      And so I do plan in the order that I hope to issue next

10  week to, as the Court has in the past, in 2010, ask the

11  defendants to identify every step being taken to accelerate the

12  hundred beds.  It's not the first time this kind of unit has

13  been constructed.  Are their waivers?  Is it really the case

14  that any waivers need to work their way all through the

15  legislative process before getting to the governor's desk?  I

16  need to understand that better.  That piece of what I heard

17  today I don't fully understand and at this point is

18  disappointing.

19      There is no real dispute of a need for a more reliable

20  system for reporting that integrates all the key data.  It's on

21  the list of things the parties have agreed is needed.  So I'm

22  going to send that back to the workgroup, without a high level

23  of specific direction, but I'll provide some general

24  description of what this Court will need to see, and what the

25  defendants themselves will need to have designed, so as to be

1    able to demonstrate full compliance.

2       That's a summary of what I'm thinking.  I'll let you know

3    my final thoughts on the 24-hour timeline based on my reading

4    of the Program Guide, and then provide additional explanation.

5    So hopefully that guides the good work of the workgroup.  I

6    do -- I commend you, that is working as long as I'm holding

7    your feet to the fire, and I will keep doing that.  If there is

8    an exhausting of every possible effort by November, and that is

9    laid out in a way that clarifies what the defense is saying

10   today about wanting more time, I at least can consider that in

11   a focused way again at that time.

12      All right.  So this proceeding is concluded.  Look for

13   something in writing by next week.

14      Yes, Ms. Thorn.

15         MS. THORN:  Your Honor, to submit the August data for

16   the crisis bed data that we referenced earlier, if we could

17   have until Friday, October 10, to submit that to the Court?

18         THE COURT:  All right.  That's fine.

19         MS. ELLS:  And, Your Honor, I have the July data here

20   marked as an exhibit.  I could just hand it to the clerk and

21   have it part of the record immediately.

22         THE COURT:  Could you scan that and file it

23   electronically?

24         MS. ELLS:  Absolutely.

25         THE COURT:  That would actually assist the Court.

1          MS. ELLS:  Sure.

2          THE COURT:  All right.  So as soon as possible is

3   fine, but by October 10th at the latest for those two reports.

4          MS. ELLS:  Thank you.

5          THE COURT:  All right.  Thank you.

6             (Proceedings adjourned, 2:20 p.m.)

7                   ---oOo---

8   I certify that the foregoing is a correct transcript from the

9   record of proceedings in the above-entitled matter.

10

11                    /s/ Kimberly M. Bennett
                       KIMBERLY M. BENNETT
12                    CSR No. 8953, RPR, CRR, RMR

13

14

15

16

17

18

19

20

21

22

23

24

25