XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
MISHA D. IGRA
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
CHRISTINE M. CICCOTTI, State Bar No. 238695
CHAD STEGEMAN, State Bar No. 225745
KEVIN A. VOTH, State Bar No. 257227
Deputy Attorneys General
   1300 I Street, Suite 125
   P.O. Box 944255
   Sacramento, CA 94244-2550
   Telephone: (916) 324-4921
   Fax: (916) 324-5205
   E-mail: Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | Case No. 2:90-cv-00520 KJM-DB (PC)<br><br>**NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT**<br><br>Judge:      The Honorable Kimberly J. Mueller |

Defendants appeal to the U.S. Court of Appeals for the Ninth Circuit from this Court's Order of October 10, 2017 (ECF No. 5710).

/ / /

/ / /

/ / /

1

1    Defendants also appeal from all earlier, non-final orders that produced the Order and are

2  thereby merged with it.  *See Am. Ironworks & Erectors Inc. v. N. Am. Const. Corp.*, 248 F.3d

3  892, 897 (9th Cir. 2001).

4  Dated:  November 9, 2017                    Respectfully submitted,

5                                              XAVIER BECERRA
                                               Attorney General of California
6                                              MONICA N. ANDERSON
                                               Senior Assistant Attorney General
7                                              JAY C. RUSSELL
                                               Supervising Deputy Attorneys General
8

9                                              */s/ Elise Owens Thorn*

10                                             ELISE OWENS THORN
                                               Deputy Attorney General
11                                             *Attorneys for Defendants*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27   CF1997CS0003
     33128386.docx
28

2

# ATTACHMENT
# ECF NO. 5710
# ORDER

1
2
3
4
5
6
7
8                   UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                    No.  2:90-cv-0520 KJM DB P

12                  Plaintiffs,

13        v.                                   ORDER

14   EDMUND G. BROWN, JR., et al.,

15                  Defendants.

16

17            As required by the court's April 19, 2017 order, ECF No. 5610, this matter came

18   on for status conference and evidentiary hearing on September 28, 2017 at 9:00 a.m. to address

19   and "take evidence on obstacles to full compliance" with respect to the twenty-four hour timeline

20   set in defendants' remedial plan, the Revised Program Guide, for transfer to mental health crisis

21   beds (MHCBs).  ECF No. 5610 at 13.[1]  Before hearing the parties submitted a joint status report,

22   ECF No. 5669.  Subsequently, the parties filed opening briefs and evidence, ECF Nos. 5677-

23   5680, and reply briefs, ECF Nos. 5686 & 5688.  Plaintiffs also filed evidentiary objections and

24   supplemental evidentiary objections, ECF Nos. 5687 & 5691, to which defendants responded,

25   ECF No. 5696.  On September 22, 2017, the court issued an order requiring defendants to be

26

27         [1] The hearing was initially set for August 29, 2017 and continued to September 28, 2017.
     *See* ECF Nos. 5656, 5660.

28
                                                1

1   prepared to explain at the hearing "why they have not activated the number of mental health crisis

2   beds and acute inpatient care beds projected by their Bed Need Studies" and to "explain whether

3   they can accelerate the building of some or all" of the 100 mental health crisis beds for which

4   approval was recently acquired.  ECF No. 5689 at 4.

5           The parties' joint status report outlines several initiatives defendants have

6   undertaken "to increase efficiencies in transferring patients into open crisis beds more quickly."

7   ECF No. 5669 at 3-5.  At the start of the hearing, the court signaled its approval of these measures

8   and "the plan to provide a full report on the status of those efforts and how they're affecting

9   compliance" at the upcoming November 3, 2017 hearing.  Transcript of Hearing (RT) at 6:8-13.

10  Counsel discussed with the court several issues raised by the joint status report, the parties' briefs

11  and the court's September 22, 2017 order.  The court also heard testimony from two defense

12  witnesses:  Katherine Tebrock, Deputy Director of the Statewide Mental Health Program for the

13  California Department of Corrections and Rehabilitation (CDCR), and Brittany Brizendine,

14  Psy.D., Acting Assistant Deputy Director of the Statewide Mental Health Program for CDCR.

15  After hearing, the court granted both plaintiff and defendants leave to file supplemental data.

16  Defendants were granted until October 10, 2017 to file their supplement; plaintiffs filed theirs on

17  October 2, 2017.  ECF No. 5703.  The additional data, which was described generally at hearing,

18  does not affect the substance of this order and a delay in its issuance is unwarranted.

19  Accordingly, the court will not wait for defendants' supplemental data and has not considered the

20  document filed by plaintiffs on October 2, 2017.

21          The parties seek guidance from the court on three issues.  First, whether

22  defendants may change their current policy so that the twenty-four hour timeline for transfer to an

23  MHCB commences only after a clinician completes an in-person assessment of a patient

24  identified as needing MHCB placement, and, relatedly, if this identification happens "after-

25  hours"[2] when no clinician is on site to conduct an in-person evaluation of whether defendants

26  _____

27      [2] While there is a long history of use of the term "after-hours" in this case, this court notes
    the oddity of that term when applied to mentally ill inmates housed 24 hours per day, 7 days a
    week.

28

                                    2

1    may place that individual in alternative housing before the in-person clinical assessment.  ECF

2    No. 5669 at 7-8.  Second, whether, when MHCB placement requires a transfer to another

3    institution, that transfer should be deemed complete upon the patient's placement in a transport

4    vehicle or only once placed in the MHCB.  *Id.* at 8-9.  Finally, to assist with compliance,

5    plaintiffs request relief related to defendants' tracking and reporting of MHCB referrals.  *Id.* at

6    9-10.  Defendants contend their tracking system is adequate but have agreed to review their

7    reporting systems.  *Id.* at 10.

8    I.    BACKGROUND

9         This order incorporates by reference discussions from prior orders that detailed the

10   background and history of defendants' remedial plan, the Revised Program Guide.[3]  *See*, *e.g.*,

11   ECF Nos. 4361, 5583.  In relevant part, the Revised Program Guide requires that any inmate

12   referred to an MHCB be transferred "within 24 hours of referral."  Revised Program Guide at

13   12-1-16.

14        This requirement dates back to the first set of remedial plans, the May 1997

15   Program Guides, filed with the court on June 6, 1997, accompanied by the Special Master's

16   Report on Plans.  *See* Dkt. No. 850[4]; May 1997 Program Guides at 4-14.  This Report identified

17   transfer timelines as an area of disagreement between the parties.  Dkt. 850 at 8-9 ("The

18   defendants' policy sets a time limit of 24 hours for the transfer of emergency cases to MHCB

19   beds.  Presumably that 24 hours is measured from the clinician's determination of the need to

20   remove the inmate, although the policy does not explicitly so state.")  The Special Master

21   recommended that he be authorized to "collect data over the next six months and, based on his

22   findings of fact, make appropriate recommendations for specific timelines for the defendants'

23   inpatient transfer plan."  *Id.* at 9.  By order filed June 27, 1997, the Special Master's Report was

24

25        [3] Unless otherwise specified, all references to the Revised Program Guide are to the 2009
     version, which is the currently operative remedial plan.

26

27        [4] Citations to the court's docket using the convention "Dkt. No." refer to filings made
     prior to initiation of the court's current electronic filing system; citations to electronic filings use
     the convention "ECF No."

28

1    accepted and the May 1997 remedial plans were provisionally approved.  Dkt. No. 858 at 2-3.

2    The Special Master also was directed to file quarterly compliance reports, including a report on

3    specific timelines as he had recommended.  *See id*. at 3.

4           The Special Master filed his Recommendations for Transfer Timelines to each

5    level of care within the Mental Health Services Delivery System (MHSDS) on January 9, 2001.

6    Dkt. No. 1235.  He recommended inmates in need of an MHCB level of care, "whether in their

7    own or in another facility, should be transferred within 24 hours of their clinical referral."  *Id*. at

8    7.  Of significance here, the Special Master reported that defendants had "recognized and

9    accepted the unavoidability of timelines based on the date of referral, rather than the date of

10    endorsement."  Dkt. No. 1235 at 10.  As explained in the report, "referral" occurs on the date on

11    which a clinician refers "a seriously mentally disordered inmate to a specific level of treatment

12    and care," *id*. at 6, while "endorsement" "occurs when a classification staff representative (CSR)

13    reviews an inmate's central file, including the mental health referral and the institution's

14    recommendation(s) for placement; assesses what facility currently can best meet the inmate's

15    clinical safety and housing needs; and confirms finally where the inmate will go."  *Id*. at 4.  The

16    court adopted the transfer timelines in full and directed they "be implemented forthwith."  Order

17    April 4, 2001, ECF No. 1262 at 4.

18           In the same order, the court directed the Special Master to file revised

19    recommendations on access to MHCBs because these findings had been "based on information

20    supplied by defendants which they subsequently determined was inaccurate."  ECF No. 1262 at

21    4-5.  Remarkably, the Special Master's updated report then resembles reports now on present day

22    remedial issues:  he found access to MHCB care was "limited by a system-wide, overall shortage

23    of MHCB beds[,]" and that "[c]lassification and transportation delays may contribute to the

24    problem, but eliminating the delays will not, based on the corrected data, solve the problem."

25    Dkt. No. 1272 at 15.  Adopting the Special Master's recommendations in full, the court ordered

26    defendants to work with specific institutions "to develop and implement within sixty days an

27    expedited process to transfer inmates referred to a mental health crisis bed level of care to

28    facilities with the required level of care within 24 hours."  ECF No. 1278 at 2, 3.

On November 16, 2001, the Special Master filed a report on defendants' progress in expediting transfers to MHCBs. Dkt. No. 1315.  Unfortunately, foreshadowing this court's April 19, 2017 order, the report begins:  "The genesis for this report was a compilation and description in May of 2001 of obstacles to access for seriously mentally ill inmates in crisis in the California Department of Corrections (CDC) to short-term acute-care inpatient beds in Mental Health Crisis Bed (MHCB) units."  *Id*. at 1.  The report focused in part on prisons that had, "[i]n the absence of a MHCB unit of their own" attempted "to provide a level of inpatient, stabilizing care in local infirmaries or [O]utpatient [H]ousing [U]nits (OHUs) without the staffing and physical resources required for the operation of a MHCB unit."  *Id*. at 1-2.  The report described four prisons' successful efforts to comply with a June 27, 2001 court order requiring development and implementation of "an expedited process to transfer inmates to a mental health crisis bed level of care to facilities with the required level of care within 24 hours."  ECF No. 1278 at 3. Problems remained at California Training Facility (CTF), and the Special Master reported that "[e]lsewhere, vestiges of the historical problem linger."  Dkt. No. 1315 at 5.  As he described it:

> There is a departmental policy, currently in the process of revision and clarification, which permits OHUs to hold for up to 72 hours inmates who require crisis intervention or further observation and evaluation of behavior that may indicate mental illness.  The policy calls for a re-evaluation at 24 and 48 hours and requires that arrangements be made for transfer to a higher level of care, if the inmate's mental health needs continue beyond 48 hours.  The policy is not unreasonable.  Seriously mentally disordered inmates can become briefly agitated or depressed and need some isolation and quiet, which may suffice to restore equanimity relatively quickly. Similarly, inmates with no prior mental health involvement may manifest temporarily symptoms of a mental disorder in the correctional environment, especially during the reception process. A rigid requirement to transfer immediately every agitated inmate who enters an OHU makes no sense.  As long as the OHU transfers an inmate as soon as it becomes clear that he or she needs, for example, a MHCB level of stabilizing care, the 72-hour observation period is acceptable.
>
> Problems occur when a clearly psychotic inmate arrives in an OHU and is "observed" or "evaluated" there for 72 hours, without the supervision, monitoring and treatment that can be provided in CDC only in a MHCB setting.  Such a situation, not a far-fetched scenario, is exacerbated when local clinicians and administrators in an OHU believe they can treat and stabilize inmates as well as, or better than, clinicians in MHCB units.  In practice, severely mentally ill inmates sometimes remain in an OHU for anywhere

5

from three to ten or more days before a referral is made to a MHCB unit elsewhere.  The expedited transfer process, now available and successful, may mean the inmate gets to a MHCB level of care within 24 hours of the referral, an important improvement, but local clinical hubris and/or lack of confidence in the clinical skills of a MHCB unit elsewhere has delayed needed care, diverted local resources, and, perhaps, created a potentially dangerous situation for a psychotic inmate.

*Id.* at 5-6.  The report concludes with the following:

The department and its Health Care Services Division need to clarify and enforce its existing MHSDS structure, while curbing local programmatic deviations by institutional administrators and clinicians.  The issue is fundamentally one of the department's overall management and control of the institutional elements of its service delivery system.

In the meantime, the defendants have fulfilled the requirement to expedite transfers of inmates in need of an MHCB level of care . . . They need to keep that process in place and operating efficiently until such time as additional MHCB beds have been activated in sufficient numbers to provide access to all of the inmates in the system who need them.

*Id.* at 7.

Less than a year later, in September 2002, the Special Master reported on defendants' bed needs study and their plan responsive to that study.  Dkt. No. 1410.  At the time, the Special Master reported "an immediate and significant shortfall of 64 beds, one that, because of the high turnover, condemns, during the course of a year, literally thousands of inmates in need of a MHCB level of care to OHUs that notoriously lack the staffing and physical resources needed to monitor and treat them adequately."  *Id.* at 19.  In terms again relevant to today, the Special Master wrote:

The whole purpose of the bed needs study was to provide accurate data on current bed usage and dependable projections of future beds needs to allow the defendants to plan more effectively for the acquisition of necessary staffing and physical resources to meet the treatment needs of the MHSDS population.  The data from the study on the anticipated need for MHCB beds indicates that the defendants' current capacity of such beds, as well as the currently planned future capacity, is unequal to present and projected needs.

*Id.*  The Special Master recommended, among other things, that defendants be required to submit to him within thirty days "a plan to provide MDSDS [sic] inmates clinically referred to a MHCB

6

1    level of care with both immediate and long-term access to treatment appropriate to that level of

2    care." *Id*. at 25.  On October 8, 2002, the court ordered that plan to be submitted within sixty

3    days.  ECF No. 1431 at 2.  The record is replete with reports and orders that, since then, have

4    been directed at achieving the required number of beds at each level of the MHSDS, including

5    MHCB beds.

6         On February 3, 2006, defendants filed their January 2006 Revised Program Guide.

7    ECF No. 1753, and the Special Master filed his Report and Recommendations thereon.  ECF

8    No. 1749.  Noting the parties had agreed to ninety-five percent of the Guide's provisions and

9    disputed only five percent, the Special Master recommended adopting the undisputed portions

10   and developing a process for resolving the outstanding disputes.  ECF No. 1749 at 5, 11-12.  One

11   such dispute was  plaintiffs' request for "[a] ban on the placement of seriously mentally

12   disordered inmates in unlicensed Outpatient Housing Units for crisis observation or mental health

13   treatment."  ECF No. 1749 at 9-10.

14        On March 3, 2006, the court approved the undisputed provisions of the January

15   2006 Revised Program Guide and ordered defendants to "immediately implement all such

16   provisions."  ECF No. 1773 at 2.  The court set a status conference to discuss procedures for

17   hearing and resolving plaintiffs' outstanding objections, including the use of OHUs.  *Id*. at 2-3.

18        The January 2006 Revised Program Guide requires transfer to an MHCB to be

19   complete "within 24 hours of referral."  ECF No. 1753-1 at 13.  Continuing the focus on clinical

20   findings that started the transfer timelines adopted in April 2001, "referral" is defined as "[t]he

21   date of the level of care change is documented on a Mental Health Placement Chrono, or the time

22   the physician or clinical psychologist orders admission into a CTC."  *Id*. at 11.  These two

23   provisions were among the ninety-five percent approved by the court in March 2006 and they also

24   appear in the 2009 Revision to the Program Guide, the current iteration of defendants' remedial

25   plan.  *See* 2009 Revised Program Guide at 12-1-15, 12-1-16.

26        Chapter 5 of the January 2006 Revised Program Guide and the current 2009

27   Revised Program Guide govern MHCBs.  Section C contains MHCB treatment criteria.  ECF

28

7

No. 1753-2; 2009 Revised Program Guide at 12-5-2 to 12-5-3. Section D governs MHCB

referrals and transfers. That section provides:

> **Referrals**
>
> An inmate-patient suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others, shall be referred to an MHCB.
>
> **MHCB Transfer**
>
> If the institution does not have an MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be transferred to a designated MHCB institution. The inmate-patient shall be transferred within 24 hours of referral.

ECF No. 1753-2 at 3-4; 2009 Revised Program Guide at 12-5-3 to 12-5-4. In relevant part,

Section D goes on:

> If the MHCB beds are not available at the designated hub institution, the inmate-patient shall be taken to an available MHCB bed that is able to provide MHCB care while simultaneously providing the commensurate level of custody and security. In most cases, movement from an institution to a MHCB bed shall be completed by institutional transportation staff via special transport within 24 hours. *On weekends and after normal business hours, the mental health clinician on call or the physician on call at the referring institution shall contact the mental health clinician on call or the physician on call at other institutions to locate a vacant MHCB bed.* The Health Care Placement Unit may be contacted seven days a week to assist in locating a vacant MHCB bed.
>
> . . . .

ECF No. 1753-2 at 4; 2009 Revised Program Guide at 12-5-4 (emphasis added).

The January 2006 Revised Program Guide went on:

> Generally, the transfer process shall be initiated by the inmate-patient's Psychiatrist, Psychologist, or the Mental Health Program Manager.
>
> The transferring Psychiatrist, Psychologist, or Mental Health Program Manager shall determine whether the inmate-patient is "medically cleared" to transfer. State law provides that, before a patient may be transferred to a health facility, the patient must be sufficiently stabilized to be safely transported. The transferring physician is responsible for determining whether the inmate-patient's condition will allow transfer.

8

1    ECF No. 1753-2 at 4.  In the 2009 Revised Program Guide, the "Chief of Mental Health" has

2    replaced "Mental Health Program Manager" in the above paragraphs, which are otherwise the

3    same.  2009 Revised Program Guide at 12-5-4.

4                    The 2009 Revised Program Guide contains a list of nine types of housing where an

5    inmate-patient may be housed pending transfer.  The list is in "order of preferred locations:

6                    1. Inpatient beds

7                    2. Outpatient Housing Unit

8                    3. Outpatient Housing Unit overflow cells

9                    4. Large holding cells with water/toilets including, but not limited
                     to, "ZZ cells," "wet cells," and/or "clinic cells."  Many CTC
10                   buildings have holding cells located outside of the entrance to the
                     licensed bed are.  These are typically located in the Specialty Care
11                   Clinic area.  These cells are permissible for temporary housing
                     pending transfer without violating licensing restrictions of the
12                   licensed bed are of the CTC building.

13                   5.  Large holding cells without water/toilets such as "Contraband
                     Cells" (not in a CTC licensed area.
14
                     6. Triage and Treatment Area or other clinical physical examining
15                   room.

16                   7.  Other unit-housing where complete and constant visibility can
                     be maintained.
17
                     8. When none of the above are available, small holding cells (not in
18                   a CTC licensed bed area) that are designed for the inmate-patient to
                     sit or stand may be used for up to four hours by which time
19                   consideration of a rotation to one of the above listed options shall
                     have been considered and the outcome of such consideration
20                   documented.  Inmate-patients shall be retained on sit/stand cells
                     only with approval of the watch commander and notification of on-
21                   call clinical staff.

22                   9.  Holding cells within the licensed bed area of the CTC building
                     (notification to Department of Health Services of an unusual
23                   occurrence is required)[.]

24                   All inmates-patients housed in one of the above sites while pending
                     transfer to a MHCB shall be provided, at minimum, with a safety
25                   (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear)
                     smock. If the inmate-patient subsequently attempts to use any or all
26                   of these items to harm him or herself, a clinician may then order
                     that one or more of these items be removed. Inmate-patients who
27                   are subsequently returned to their housing units shall receive
                     appropriate clinical follow-up, which may include five-day custody
28                   and clinical wellness checks.

9

When an inmate-patient, identified as requiring MHCB care, is housed in an Outpatient Housing Unit, Administrative Segregation Unit, or any of the above sites, the HCPOP[5] shall be notified of the need for MHCB placement.

2009 Revised Program Guide at 12-5-5 to 12-5-6.  These nine locations are referred to as "alternative housing."  The January 2006 Revised Program Guide does not contain a comparable section.  In both versions, Chapter 5 has a separate section J, which governs OHUs.  *See* ECF No. 1753-2 at 26-28; 2009 Revised Program Guide at 12-5-30 to 12-5-32.  Both versions do contain specific provisions for placement of inmate-patients in OHUs when "observation and evaluation of behaviors that are indicative of mental illness" are required.  ECF No. 1753-2 at 26-28; 2009 Revised Program Guide at 12-5-30 to 12-5-32.  These placements also must be ordered by a physician, psychiatrist or licensed psychologist.  ECF No. 1753-2 at 27; 2009 Revised Program Guide at 12-5-30.

"Referral" to an MHCB is followed by "pre-admission screening for the purpose of determining the appropriateness of the admission into the MHCB program."  ECF No. 1753-2 at 6; 2009 Revised Program Guide at 12-5-7.

The pre-admission screening process is as follows:

During the regular working hours, the screening shall be performed by a Psychiatrist or a licensed Psychologist privileged to practice in the MHCB and documented in the Interdisciplinary Progress Notes. During weekends, holidays, and after normal business hours, the screening shall be performed by an on-site physician on duty or any other licensed health care staff.  The pre-admission screening may be performed via telephone prior to transfer when the inmate-patient is at an institution without an available MHCB bed. An inmate-patient in crisis may be screened where the crisis occurs (such as in the cell), or in the emergency service area of the CTC/GACH/SNF, prior to admission to the MHCB.

All inmates attempting suicide and those having suicidal ideation or showing signs and symptoms of suicide potential will be evaluated by a mental health clinician (Psychiatrist, Psychologist, or Psychiatric Social Worker) on an emergency basis. Inmates referred to health care by custody, because of suicide concerns, will be immediately evaluated for suicide risk by a mental health clinician which will include a Suicide Risk Assessment Checklist (SRAC). On weekends, evenings, and holidays, the SRAC will be performed

---

[5] HCPOP is the acronym for CDCR's Health Care Placement Oversight Program.

by the Physician on Call (POC), Medical Officer of the Day (MOD), or Registered Nurse (RN) trained to administer the SRAC if mental health clinicians are not available. It is the responsibility of the Health Care Manager to establish procedures for suicide risk assessment by clinical staff outside of normal work hours. All SRACs will be filed in the inmate-patient's UHR whether or not admitted to the MHCB. An inmate showing suicidal potential cannot be refused admission until there is a face to face evaluation and SRAC by a clinician trained to do SRACs[.]

All inmates who are screened positive for possible admission to the MHCB on a weekend, holiday, or after normal business hours shall be referred to an MHCB Psychiatrist or Psychologist with admitting privileges (On Call or On Duty) for admission. The clinician facilitates the admission based on the admission criteria indicated in Section C above. The actual admission may be done by the MOD or POC in consultation with the Psychiatrist or Psychologist (On Call or On Duty). For all inmates not admitted, the Psychiatrist or Psychologist (On Call or On Duty) shall prepare a detailed Interdisciplinary Progress Note explaining the reason for the decision.

ECF No. 1753-2 at 6-7; 2009 Revised Program Guide at 12-5-7 to 12-5-8.

With this background, the court turns to the three issues raised by the parties in their requests for guidance.

## II.    ISSUES RAISED BY THE PARTIES

### A.    Starting the Twenty-Four Hour Clock

The first issue has two related parts:  First, whether the MHCB referral timeline should start only when an in-person clinical assessment is completed, and second, whether an inmate-patient identified as possibly needing MHCB care may be placed in alternative housing pending completion of that in-person clinical assessment.  The issue arises because, according to defendants, a high percentage of MHCB referrals that are made "after-hours" are rescinded, which in turn hinders defendants' ability to meet the twenty-four hour transfer requirement.

Defendants have presented Dr. Brizendine's declaration saying that "for patients identified as needing crisis care during normal business hours, a face-to-face assessment is completed and a level-of-care decision is made."  Decl. of B. Brizendine, Psy.D., ECF No. 5680-9, ¶ 3.  In contrast, "[f]or patients needing after-hours care or when an on-site clinician is unavailable, the patient is assessed by nursing staff who calls the on-call clinician to present the patient's clinical factors.  Then, the on-call clinician makes a determination to address the

11

1   patient's immediate needs.  If warranted, the patient is then referred to the mental health crisis

2   bed level of care by the on-call clinician and placed in alternative housing pending a crisis bed

3   admission."  *Id.* ¶ 4.

4             Defendants also present data they say suggest MHCB referrals made between

5   5:00 p.m. and 5:00 a.m. are rescinded far more often than referrals made between 5:00 a.m. and

6   5:00  p.m.  ECF Nos. 5680-4, 5680-5, Exs. 3 & 4 to Decl. of N. Weber.  They ask the court to

7   infer that this is because in-person clinical assessments are more reliable and should therefore be

8   a prerequisite to an MHCB referral.  Plaintiffs correctly argue the rescission data vary widely

9   across institutions, that there are other factors that could explain the rescission variance and, of

10  great significance, that defendants' rescission data do not track the in-person versus on-call

11  assessment distinction that drives defendants' request.  Counsel for defendants acknowledged at

12  hearing "there is not that specific data as to the difference between, rather, looking at the number

13  of recisions [sic] of after-hour referrals created by the on-call clinicians' work versus the number

14  of recisions created by an assessment done by a peak-hours clinician, for example."  RT at 8:5-9.

15  Dr. Brizendine testified that the rescissions of overnight referrals could also be explained by

16  patients "kind of re-compensating overnight" even if they needed a crisis bed when they were

17  initially referred.  RT at 98.

18            Little in the record supports a finding that an on-call assessment made based on

19  clinical factors reported to an on-call psychiatrist or psychologist is inherently, or necessarily, less

20  reliable than a face-to-face assessment made by an on-site psychiatrist or psychologist.

21  Defendants acknowledge they have not provided data that would allow this analysis.

22            Moreover, nothing in either the January 2006 Revised Program Guide or the

23  current version requires an in-person clinical assessment to accomplish a referral to an MHCB.

24  The Revised Program Guide plainly authorizes completing pre-admission screening by telephone,

25  *see* 2009 Revised Program Guide at 12-5-7, and nothing in the record suggests the referral

26  assessment is more complex or somehow less susceptible to accurate completion by a telephone

27  than the pre-admission screening.  Additionally, the Revised Program Guide plainly contemplates

28

1   the MHCB referral process for inmates in mental health crisis will be available on weekends,

2   evenings and holidays – "after-hours."  *See, e.g.,* 2009 Revised Program Guide at 12-5-4, 12-5-7.

3          Defendants also request that the court allow inmate-patients identified as needing

4   MHCB level care to be placed in alternative housing until they can be clinically assessed in

5   person.  *See* RT at 125:20-21 ("What we're looking to do is divorce the alt[ernative] housing

6   policy from the crisis bed referral.").  The alternative housing policy is intended to provide a safe

7   and very time-limited placement for patients in mental health crisis to stay pending transfer to an

8   MHCB.  The twenty-four hour referral timeline is a critical part of ensuring that such inmate

9   patients are not housed in these alternative settings for longer than absolutely necessary while

10  transfer arrangements are completed, and for significantly less than twenty-four hours.  The court

11  previously has found that substituting alternative housing for MHCB care or using it to

12  compensate for shortfalls in the required number of MHCBs perpetuates the Eighth Amendment

13  violations in this case.  *See Coleman v. Brown*, 938 F.Supp.2d 955, 983 (E.D. Cal. 2013).  The

14  most recent report from the Special Master's expert on suicide prevention practices, pointed to by

15  plaintiffs, found "[s]ignificant problems" in the use of alternative housing for suicidal inmates at

16  nine facilities.  ECF No. 5672 at 8-9.  Defendants' use of alternative housing must, if anything, be

17  constricted.  It cannot and should not be expanded.

18          Finally, to the extent defendants believe face-to-face clinical assessments are more

19  reliable and the proper way to manage MHCB referrals, the solution lies in staff management, not

20  in delayed assessments.  At hearing, defense counsel acknowledged the clinicians' contracts

21  allow them to be called into the institutions at any time, but that it is "not the practice" to do so.

22  RT at 18:5-9.  Defense counsel suggested enforcing this contractual provision would further

23  hinder clinical staff retention at "many" institutions.  *Id.* at 18:10-15.  Staffing shortages do

24  continue to plague the delivery of constitutionally adequate mental health care to class members

25  and delay the completion of a durable remedy in the case.  To the extent staffing shortages drive

26  this request, the Eighth Amendment does not permit this court to authorize delayed access to

27  necessary mental health care.

28

1    For two decades, the court, the Special Master and the parties all have agreed

2    inmates in mental health crisis who need MHCB care must be transferred to an MHCB within

3    twenty-four hours of referral.  The court finds no support for adjusting the starting point of the

4    twenty-four hour timeline now, and denies defendants' request to do so.

5           B.       <u>Stopping the Twenty-Four Hour Clock</u>

6    The second question is whether the twenty-four hour timeline ends when an

7    inmate-patient who must be transferred to another institution for MHCB care is placed in a

8    transport vehicle.  It has come to light that defendants have been reporting their MHCB transfers

9    this way since at least 2003.  *See* ECF No. 5680-10, Decl. of K. Tebrock, ¶ 19.  Plaintiffs dispute

10   that they were aware of this reporting method prior to July 2017.  *See* ECF No. 5679, Decl. of

11   J. Winter, ¶ 9.  The court need not resolve this specific dispute to determine how and when

12   transportation time should factor into compliance with the twenty-four timeline for MHCB

13   transfers.

14   During closing argument, the court asked defense counsel whether the Program

15   Guide defined "transfer as the date the inmate-patient is placed into the level of care."  RT at

16   142:18-20.  Counsel responded "the date the patient is placed into the level of care is when the

17   clinician makes the referral that says they are -- they should go to crisis bed.  So the clinician at

18   the sending institution actually places the patient in the level of care."  RT at 142:21-25.  This

19   position does not comport with the 2009 Revised Program Guide's plain language.

20   In relevant part, to review, the 2009 Revised Program Guide defines "referral" as

21   "[t]he date the LOC [Level of Care] is documented on a Mental Health Placement Chrono, or the

22   time the physician or clinical psychologist orders admission into a CTC [Correctional Treatment

23   Center]."  2009 Revised Program Guide at 12-1-15.  "Transfer" is defined as "the date the

24   inmate-patient is placed into the LOC and program to which s/he was referred."  *Id*.  At hearing,

25   defense counsel also explained defendants' position that when a clinician refers an inmate-patient

26   to an MHCB "that's when the level of care change happens in defendants' system" and that

27   "when the patient actually arrives, that's a housing assignment."  RT at 143:6-13.

28

14

Counsel's response to the court's question conflates two distinct Program Guide concepts:  Referral and transfer are distinct events, and as relevant here, they happen at different times.  "Referral" requires documentation by a physician or clinical psychologist at the sending institution ordering the inmate-patient's placement into the new level of care, here an MHCB. The relevant "transfer" effects the physical placement of the inmate-patient into the MHCB.  The timeline for completion of that transfer is "[w]ithin 24 hours of referral."  *Id.* at 12-1-16; *see also id.* at 12-5-3 to 12-5-4 (where inmate-patient must be transferred to another institution for MHCB care, "[t]he inmate-patient shall be transferred within 24 hours of referral.").

The only other language in the 2009 Revised Program Guide that discusses the time for moving inmate-patients to another institution for MHCB care is as follows:

> If the MHCB beds are not available at the designated hub institution, the inmate-patient shall be taken to an available MHCB bed that is able to provide MHCB care while simultaneously providing the commensurate level of custody and security. *In most cases, movement from an institution to a MHCB bed shall be completed by institutional transportation staff via special transport within 24 hours.*

*Id.* at 12-5-4 (emphasis added).  The opening clause of the highlighted sentence shows that all stakeholders have accepted the possibility that not every transfer can happen within twenty-four hours.  Defining exceptions to the twenty-four hour timeline, as proposed by plaintiffs, will clarify when exceeding the twenty-four hour timeline does not violate the remedy in this case.

The rest of the highlighted sentence above does not support the conclusion that the twenty-four hour timeline ends when transportation to an MHCB begins, and in fact signals the twenty-four hour timeline ends when placement in an MHCB bed is complete.  At hearing, defense counsel raised the prospect that intake delays at the receiving institution could contribute to non-compliance with the twenty-four hour timeline.  RT at 40:14-41:1.  As the court suggested at the hearing, the workgroup should address this matter in the first instance, as a possible basis for an exception.

No Program Guide language supports defendants' current practice of excluding transportation time from the twenty-four hour transfer timeline.[6]  The parties shall continue to work in the workgroup to identify exceptions to the MHCB transfer timelines, including those caused by unforeseeable delays or obstacles that arise during transportation and intake of an inmate-patient to an MHCB unit.  The court will address how this affects reporting going forward at the November 3, 2017 hearing.

C.      Data Collection

The final issue raised by the parties is whether defendants "have sufficient tracking and reporting capabilities to ensure oversight of and compliance with the Program Guide's twenty-four-hour [sic] MHCB transfer timeline, including time related to external transport, . . . or with any claimed exceptions to that timeline."  ECF No. 5669 at 10.  Plaintiffs challenge the adequacy and accuracy of defendants' data collection for compliance with the MHCB twenty-four hour referral timeline and request the court order defendants "to develop a system that can automatically and accurately generate a report" that contains seven specific data points.  *See* ECF No. 5677 at 25-26.  Defendants contend plaintiffs and the Special Master already receive much of the data plaintiffs seek in several different reports and that creating a new report "would not provide any further meaningful data, and would place pressure on a system that is already overburdened with reports that have questionable utility."  ECF No. 5688 at 14.  Defendants also state they are working on developing a report that will allow oversight and tracking of exceptions to Program Guide timelines and request that details of reporting be left to the workgroups.  *Id.*

As the court noted at hearing, defendants indisputably need a more reliable reporting system that integrates all data necessary to accurate reporting on compliance with the

---

[6] As the court noted at hearing, defense counsel's suggestion that the terminology in defendants' data systems are incongruent with Program Guide terms demonstrates the importance of ensuring congruence, whether through addenda to the Program Guide, updates to defendants' data systems, or both.  In the April 19, 2017 order, the court noted that the parties were "in the preliminary stages of updating the Program Guide to incorporate modifications required by court orders issued since March 2006, . . . ."  ECF No. 5610 at 6 n.3.  The parties shall be prepared at the November 3, 2016 hearing to provide a date by which the Program Guide will be updated and filed with the court.

16

1     MHCB referral timeline, as one aspect of full compliance.  RT at 146:19-22.  The court agrees

2     that the workgroup is the place where the components of such reporting should be specifically

3     developed and addressed.  Defendants should be more interested than any other stakeholder in

4     this litigation in ensuring  they collect accurate, complete and comprehensive data, and that they

5     can report that data in clear and verifiable reports.  The court's requirements should not constrain

6     in any way defendants' efforts to collect comprehensive data and provide integrated reports.  The

7     court will expect, at a minimum, data templates for access to MHCB care that capture for MHCB

8     referrals the data presently provided for inpatient intermediate care facility (ICF) and acute level

9     hospital care in Exhibits B and E of defendants' monthly reports.  This data must be congruent

10    systemwide and capable of substantiation should the court or the Special Master require

11    production of the information underlying the reported data.

12    III.     CONCLUSION

13            This order resolves the three issues raised by the parties.  The court does not

14    address in full here the underlying causes of the systemic delays in access to MHCBs:  too few

15    MHCBs to meet needs and inadequate staff on hand to timely assess inmates who need a crisis

16    bed level of care.  These systemic deficiencies have marked defendants' delivery of mental health

17    care to prison inmates in California since before this case was filed.  In the past twenty-five years,

18    California's population of seriously mentally ill inmates has swelled to greater than 38,000, with

19    nearly 10,000 inmate-patients in need of Enhanced Outpatient, MHCB or inpatient mental health

20    care.  *See* Attachment A.  Until defendants have sufficient mental health beds and sufficient

21    mental health staff to meet this demand, they will not be in compliance with the Eighth

22    Amendment.

23            The astonishing growth in the numbers of seriously mentally ill individuals

24    incarcerated in California's prisons is a significant contribution to the court's need, many years

25    later, to revisit obstacles to MHCB care and confront again defendants' admission to a serious

26    shortage of MHCBs.  The population growth does not make noncompliance tolerable.

27    Defendants' remedial plan, the Revised 2009 Program Guide, established the framework for

28    delivering constitutionally adequate mental health care, and the time to materially alter its

17

1  provisions has passed.  It must be fully implemented and complied with.  Defendants' staffing

2  plan established the ratios for determining the number of mental health staff required to

3  implement the provisions of the Revised Program Guide.  The annual spring and fall population

4  projections inform defendants every year about how many mental health beds they will need in

5  time to plan for and activate the projected number of beds.  It appears to the court defendants

6  must build and activate the required number of mental health crisis beds with an urgency far

7  greater than shown at hearing.  As will be clear in a separate order, staffing shortages must be

8  remedied with similar urgency.  After twenty-two years, the court's attention must necessarily

9  turn to enforcement if defendants will not take the actions required to bring this case to proper

10 closure.

11          IT IS SO ORDERED.

12  DATED:  October 10, 2017.

13

14                                                    _____

15                                                    UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                    18

1
2
3
4
5
6
7
8
9
10
11
12
# ATTACHMENT A
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS)**
**MANAGEMENT INFORMATION SUMMARY (MIS) REPORT**
7/17/2017

| Level of Care | MALES | | | FEMALES | | |
|---|---|---|---|---|---|---|
| | Capacity | Census[1] | Awaiting Placement[2] | Capacity | Census[1] | Awaiting Placement[2] |
| **Correctional Clinical Case Management System (CCCMS)** | **27,450** | **26,773** | | **2,100** | **2,240** | |
| CCCMS - General Population (GP) | | 23,461 | | | 1,956 | |
| CCCMS - Reception Center (RC) | | 2,323 | | | 145 | |
| CCCMS - Administrative Segregation Unit (ASU) | | 116 | | | 0 | |
| CCCMS - Security Housing Unit (SHU) | | 0 | | | 32 | |
| CCCMS - Restricted Housing Long-Term (LTRH) | | 126 | | | | |
| CCCMS - Restricted Housing Short-Term (STRH)+STRH-RC | | 747 | | | 107 | |
| CCCMS - Non Disciplinary Segregation (NDS) | | | | | | |
| **Enhanced Outpatient Program (EOP)[4]** | **7,493** | **7,433** | | **235** | **251** | |
| EOP - GP | 6,608 | 6,418 | | 195 | 222 | |
| *Sensitive Needs Yard (SNY)* | *3,486* | *3,181* | | | | |
| EOP - RC | | 213 | | | 0 | |
| EOP - ASU[5] | 585 | 625 | 37 | 20 | 18 | 0 |
| EOP - PSU[5] | 300 | 177 | 24 | 20 | 11 | 0 |
| EOP - NDS | | 0 | | | | |
| **Mental Health Crisis Bed (MHCB)** | **427** | **399** | **66** | **22** | **17** | **10** |
| **Psychiatric Inpatient Programs:** | | | | | | |
| **Intermediate Care Facility (ICF)** | **1160** | **934** | **31** | | | |
| Low Custody | 390 | 280 | 4 | | | |
| *Atascadero State Hospital (ASH)* | 256 | 174 | 4 | | | |
| *Coalinga State Hospital (CSH)* | 50 | 49 | 0 | | | |
| *California Medical Facility (CMF)* | 84 | 57 | 0 | | | |
| High Custody | 770 | 654 | 27 | | | |
| *California Health Care Facility (CHCF)* | 360 | 333 | 11 | | | |
| *CMF Single Cells* | 94 | 93 | 1 | | | |
| *CMF Multi Cells* | 70 | 14 | 8 | | | |
| *SVPP Single Cells* | 202 | 189 | 3 | | | |
| *Salinas Valley Psychiatric Program (SVPP) Multi Cells* | 44 | 25 | 4 | | | |
| **Acute Psychiatric Program (APP)** | **372** | **354** | **14** | | | |
| ASH | 0 | 3 | 0 | | | |
| CHCF | 154 | 137 | 7 | | | |
| CMF | 218 | 214 | 7 | | | |
| **Psychiatric Inpatient Program (PIP)** | **40** | **35** | **0** | **75** | **45** | **1** |
| California Institution for Women (CIW) | | | | 45 | 45 | 0 |
| Patton State Hospital (PSH) | | | | 30 | 0 | 1 |
| San Quentin (SQ) | 40 | 35 | 0 | | | |
| **Penal Code 2974s (Parolees)** | | 3 | | | | |
| Metro State Hospital (MSH) | | 0 | | | | |
| Napa State Hospital (NSH) | | 3 | | | | |
| Patton State Hospital (PSH) | | | | | | |
| **TOTALS (excluding Parolees)** | **36,942** | **35,928** | **172** | **2,432** | **2,553** | **11** |

| | Total Capacity | Total Census[1] | Total Awaiting Placement[2] | Total Over Timeframes[3] | CENSUS PERCENTAGES | |
|---|---|---|---|---|---|---|
| | | | | | % MHSDS | % CDCR[6] |
| CCCMS | 29,550 | 29,013 | | | 75.40% | 22.13% |
| EOP | 6,803 | 6,853 | | | 17.81% | 5.23% |
| EOP-ASU | 605 | 643 | 37 | 5 | 1.67% | 0.49% |
| PSU | 320 | 188 | 24 | 0 | 0.49% | 0.14% |
| MHCB | 449 | 416 | 76 | 47 | 1.08% | 0.32% |
| PSYCHIATRIC INPATIENT | 1,647 | 1,368 | 46 | 8 | 3.56% | 1.04% |
| GRAND TOTAL | 39,374 | 38,481 | 183 | 60 | 100.00% | 29.36% |

[1] Census sources: Datamart for CCCMS, EOP; MHTS for MHCB, RIPA reports for ICF, APP, and PIP programs; and DSH reports for Parolee programs.

[2] Awaiting Placement = The sum of inmates waiting to be placed in a bed at a specific level of care. Those awaiting placement to ICF, APP, and PIP include referrals that have been endorsed and are awaiting transfer to the inpatient program, and are based on the Referrals to Inpatient Programs Application (RIPA).

[3] Total Over Timeframes = The number of referrals that are beyond Mental Health Program Guide transfer timeframes: EOP-ASU includes cases in non-hubs waiting > 30 days, PSU includes cases with an original CSR endorsement date > 60 days, MHCB includes referrals > 24 hours, Psychiatric Inpatient includes Intermediate referrals > 30 days and Acute referrals > 10 days.

[4] EOP, EOP-ASU, & PSU may not reflect actual program vacancies because beds can be held vacant for inmate-patients temporarily housed in MHCB and OHU.

[5] The numbers for Awaiting Placement and Total Over Timeframes in EOP-ASU and PSU may include inmates who cannot transfer due to the following reasons: out-to-court, medical holds, safekeeper status.

[6] CDCR pop as-of 7/12/17 (OISB). Based on Total In-State Institution Population and Out of State (COCF).

*CCHCS, Health Care Placement Oversight Program*

# ATTACHMENT
# REPRESENTATION
# STATEMENT

No. _____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**RALPH COLEMAN, et al.,**

                      Plaintiffs-Appellees,

    **v.**

**EDMUND G. BROWN, JR., et al.,**

                  Defendants-Appellants.

On Appeal from the United States District Court
for the Eastern District of California

No. 2:90-cv-00520 LKK DAD PC
The Honorable Kimberly J. Mueller, Judge

**REPRESENTATION STATEMENT**

                  XAVIER BECERRA
                  Attorney General of California
                  MONICA N. ANDERSON
                  Senior Assistant Attorney General
                  MISHA D. IGRA
                  DANIELLE F. O'BANNON
                  JAY C. RUSSELL
                  Supervising Deputy Attorneys General
                  ELISE OWENS THORN
                  KEVIN A. VOTH
                  Deputy Attorneys General
                  State Bar No. 145931
                   1300 I Street, Suite 125
                   P.O. Box 944255
                   Sacramento, CA 94244-2550
                   Telephone:  (916) 210-7318
                   Fax:  (916) 324-5205
                   E-mail:  Elise.Thorn@doj.ca.gov
                  *Attorneys for Defendants-Appellants*

The undersigned represents the State Defendants-Appellants in this case—including Edmund G. Brown Jr., Governor of the State of California; Scott Kernan, Secretary of the California Department of Corrections and Rehabilitation; Michael Cohen, Director of the Department of Finance; and Pam Ahlin, Director of the Department of State Hospitals.  Attached is a service list that shows the other parties that are directly interested in this appeal, along with their lead counsels' names, firms, addresses, telephone numbers, and email addresses.  The party listing in the district court's docket also includes numerous associated counsel for many parties, as well as

///

///

///

additional intervenors, "interested parties," amici curiae, and

"miscellaneous" individuals who are not included on the attached service

list.

Dated:  November 9, 2017          Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
MISHA D. IGRA
DANIELLE F. O'BANNON
JAY C. RUSSELL
Supervising Deputy Attorneys General
KEVIN A. VOTH
Deputy Attorney General


/s/ ELISE OWENS THORN
ELISE OWENS THORN
Deputy Attorney General
Attorneys for Defendants-Appellants

2

Service List

| | |
|---|---|
| Michael Bien<br>   (Email: MBien@rbgg.com)<br>Jane E. Kahn<br>   (Email: jkahn@rbgg.com)<br>Jennifer Stark<br>   (Email: jstark@rbgg.com)<br>Krista Michelle Stone-Manista<br>   (Email: kstone-manista@rbgg.com)<br>Lisa Adrienne Ells<br>   (Email: lells@rbgg.com)<br>Margot Knight Mendelson<br>   (Email: mmendelson@rbgg.com)<br>Thomas Bengt Nolan<br>   (Email: tnolan@rbgg.com)<br>Jessica L. Winter<br>   (Email: jwinter@rbgg.com)<br>Michael S. Nunez<br>   (Email: mnunez@rbgg.com)<br>Rosen Bien Galvan & Grunfeld, LLP<br>50 Fremont Street<br>19th Floor<br>San Francisco, CA 94105<br>Phone: (415) 433-6830<br>Fax: (415) 433-7104<br>Email:<br>(Attorneys for Plaintiffs-Appellees) | Donald Specter<br>Steve Fama<br>Prison Law Office<br>1917 Fifth Street<br>Berkeley, CA 94710-1916<br>Phone: (510) 280-2621<br>Fax: (510) 280-2704<br>Email: dspecter@prisonlaw.com<br>(Attorneys for Plaintiffs-Appellees) |
| Aaron Joseph Fischer<br>Disability Rights California<br>1330 Broadway, Ste. 500<br>Oakland, CA 94612<br>Phone: (510) 267-1200<br>Fax: (510) 267-1201<br>Email:<br>aaron.fischer@disabilityrightsca.org | Kimberly Hall Barlow<br>Jones & Mayer<br>3777 N. Harbor Boulevard<br>Fullerton, CA 92835<br>Phone: (714) 446-1400<br>Fax: (714) 446-1448<br>Email: khb@jones-mayer.com |

| Matthew A. Lopes, Jr. Pannone Lopes & Devereaux LLC 317 Iron Horse Way Suite 301 Providence, RI 02908 Phone: (401) 824-5156 Fax: (401) 824-5123 Email: mlopes@pldw.com (Court Appointed Special Master) | |

No. _____

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**RALPH COLEMAN, et al.,**

                                          Plaintiffs-Appellees,

**v.**

**EDMUND G. BROWN, JR., et al.,**

                                          Defendants-Appellants.

## STATEMENT OF RELATED CASES

The following appeal arises from the same district-court matter and is related:

*Ralph Coleman, et al v. Edmund Brown, Jr., et al.*, Ninth Cir. No. 17-16080

Dated:  November 9, 2017          Respectfully Submitted,
                                          XAVIER BECERRA
                                          Attorney General of California
                                          MONICA N. ANDERSON
                                          Senior Assistant Attorney General
                                          MISHA D. IGRA
                                          DANIELLE F. O'BANNON
                                          JAY C. RUSSELL
                                          Supervising Deputy Attorneys General
                                          KEVIN A. VOTH
                                          Deputy Attorney General

                                          */S/ ELISE OWENS THORN*
                                          ELISE OWENS THORN
                                          Deputy Attorney General
                                          *Attorneys for Defendants-Appellants*

1

## CERTIFICATE OF SERVICE

2   Case Name:    **Coleman v. Brown, et al.**         No.    **2:90-cv-00520 KJM-DB (PC)**

3   I hereby certify that on <u>**November 9, 2017**</u>, I electronically filed the following documents with
    the Clerk of the Court by using the CM/ECF system:

4

5   ●    **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR
         THE NINTH CIRCUIT**

6

7   I certify that all participants in the case are registered CM/ECF users and that service will be
    accomplished by the CM/ECF system.

8

9   I declare under penalty of perjury under the laws of the State of California the foregoing is true
    and correct and that this declaration was executed on **November 9, 2017**, at Sacramento,

10  California.

11           D. Jones                                      */s/ D. Jones*
             Declarant                                       Signature

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27  CF1997CS0003
    33130255.docx

28

1