DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:   (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:   (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
JANE E. KAHN – 112239
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:   (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>        Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**JOINT STATUS REPORT RE: FEBRUARY 14, 2018 STATUS CONFERENCE RE: STAFFING**<br><br>Judge:   Hon. Kimberly J. Mueller<br>Date:    February 14, 2018<br>Time:    2 p.m.<br>Crtrm.:  3, 15th Floor |

## INTRODUCTION

This Court's February 5, 2018 order, ECF No. 5774 ("Order"), addressing recent disputes between the parties related to staffing issues, ordered the parties to file a joint status report regarding three topics: (1) "Why defendants should not be required to schedule new joint tours, conducted with the attendance of the Special Master and plaintiffs' counsel, for any staffing consultant retained to address outstanding issues related to fulfillment of staffing ratios for prison psychiatrists in lieu of an order precluding

1  defendants from relying on any opinion obtained during a prison tour conducted

2  unilaterally;" (2) "A process, including specific timelines, for resolution of any outstanding

3  issue related to fulfillment of staffing ratios for prison psychiatrists," with specified

4  parameters; and (3) "Why the court should not issue the case management order governing

5  any future termination motions as requested by plaintiffs in their January 26, 2018

6  motion."  Order at 3.  Although the parties meaningfully met and conferred following the

7  Court's order, including twice by phone and with exchanges of email proposals and further

8  information, the parties were unable to reach agreement on the matters set forth in the

9  Court's order.  The parties hereby submit their joint respective positions on each issue.

10  **I.    STAFFING EXPERT TOURS ISSUES**

11      **A.    Plaintiffs' Position**

12      After ignoring the February 9 deadline for filing their response to Plaintiffs' January

13  26, 2018 Motion regarding the staffing experts and related topics, Defendants sent a

14  fourteen-page narrative arguing the merits of the Motion to Plaintiffs at 3:09 P.M. today,

15  just prior to this Court's 4 P.M. deadline for filing this Joint Statement.  Plaintiffs cannot

16  meaningfully respond to Defendants' lengthy position within those time constraints, but

17  make the following general observations, which were included in a draft of this statement

18  that Plaintiffs sent to Defendants on Thursday, February 8, and to which Defendants did

19  not respond.  Plaintiffs further note that Defendants' position, as set forth below, relies on

20  a declaration from counsel that Plaintiffs have never seen.

21      While the parties have agreed in principle to conduct at least five joint revisits,

22  Plaintiffs' agreement to that subset of expert tours was conditional on Defendants'

23  agreement to provide certain discovery regarding the past tours.  Defendants have not so

24  agreed, and so it is not accurate to state at this time that the parties have reached an

25  agreement on the subject of the expert tours.  Plaintiffs are willing to continue to meet and

26  confer and will update the Court if there is a resolution prior to the February 14 status

27  hearing.  Plaintiffs also object to Defendants' characterization that there was any

28  agreement regarding "up to" five joint tours, as the parties discussed at length that a subset

[3224705.1]

of five tours may prove to be insufficient to establish the common factual baseline necessary to resolve any upcoming motion about staffing, and that more tours may be warranted.  In the absence of an agreement regarding discovery, and as no joint expert revisits have yet been conducted, Plaintiffs do not agree that the dispute regarding the expert tours has been resolved in any degree.

Plaintiffs' January 26, 2018 Motion set forth the recent history regarding Defendants' staffing expert tours.  Pls.' Mot. for Case Management Orders and Sanctions, ECF No. 5764-1, at 9-12 ("Plaintiffs' Motion").  In the context of the staffing experts, who were clearly retained in anticipation of litigation and whose work will be used in the impending litigation about staffing ratios, joint tours are both necessary and appropriate. *See id*.  Moreover, new joint tours would be beneficial to the parties as they discuss any recommendations that Defendants intend to propose in the upcoming staffing workgroups. As the Court noted, joint tours are necessary to "'create the common factual baseline' necessary to proper assessment of any recommendations proffered by" the staffing experts. Order at 3 (citing ECF No. 2495 at 4).

Defendants make general arguments about "consultants" versus "experts" that are untethered from the facts of this case and the present issue.  As discussed in Plaintiffs' Motion, a general case management order regarding expert tours would resolve this issue as a general matter consistent with the prior orders on this topic that this Court has identified.  Plaintiffs will respond to Defendants' arguments to the contrary in accordance with the briefing schedule on Plaintiffs' Motion, or as otherwise directed by the Court, but cannot do so within the time constraints imposed by Defendants' untimely presentation of their position.  In any event, prompt resolution of the staffing issues currently before the Court requires a common baseline of information that cannot be gained through unilateral tours.  Plaintiffs have proposed below a schedule that would allow time to revisit at least five of the prisons previously visited by the experts during the first two weeks of March, and if necessary, to revisit all nine of those prisons.

Plaintiffs have also requested written discovery regarding all of the tours previously

[3224705.1]

conducted by the experts.  *See* Decl. of Michael Bien ISO Pls.' Mot., ECF No. 5765, at 47-48.  Defendants have provided some information regarding the nine ex parte tours, but have not yet provided any responses to Plaintiffs' documentary requests.  Defendants have also not agreed to provide this discovery by any date certain, or even to preserve documentary evidence related to the ex parte tours.

**B.     Defendants' Statement Regarding Staffing Consultant Issues**

**1.     The Court Need Not Issue an Order Because the Parties Have Reached an Agreement.**

Defendants and Plaintiffs have agreed that Defendants will schedule up to five joint prison visits with Defendants' staffing consultants and Plaintiffs' counsel and a member of the Special Master's team.  The parties are meeting to discuss the timing and location of the joint visits and will update the Court on February 14.

Defendants' agreement to schedule joint prison visits resolves the first issue in the February 5, 2018 order.  Contrary to that order, however, Plaintiffs continue to assert that the Court should issue a sanctions order barring Defendants from presenting evidence from their consultants for a possible future motion.  Accordingly, Defendants address below why an order precluding such evidence would be improper.

**2.     Defendants Have a Right to Engage and Work with Non-Testifying Consultants Outside Opposing Counsel's Presence or Participation, and No Court Order or Federal Rule of Civil Procedure Prohibits Unilateral Prison Visits as Part of Their Consultation.**

**a.     Background**

In October 2017, the Court ordered Defendants to periodically meet and confer with the Special Master and Plaintiffs, over the course of a year, to discuss staffing issues, and further required Defendants to come into full compliance with the current staffing plan by October 10, 2018.  (Order 29-31, ECF No. 5711.)  The order was critical of Defendants' suggestion that the current staffing plan may need to be modified without offering specific proposals for doing so, and it emphasized that any proposed revisions to staffing ratios

[3224705.1]

1    must first be presented to the Special Master before being presented to the Court.  (*Id.* At

2    14.)  The court also noted that the long history of Defendants' inability to hire sufficient

3    numbers of psychiatrists to meet court ordered staffing ratios raised the question whether

4    Defendants can ever come into compliance, and that the time to resolve that question is

5    now.  (*Id.* at 28.)

6          Defendants have serious concerns about the efficacy of the current staffing plan's

7    ratios, given the nationally-recognized dearth of psychiatrists.  (Decl. McClain ¶ 3; ECF

8    No. 5591)  And Defendants believe there may be other ways to improve the current

9    staffing plan, which was developed almost a decade ago.  (*Id.*)  Given these realities and

10   concerns, Defendants retained, through their attorneys, knowledgeable consultants to

11   review the staffing plan, assess the current ratios, compare the ratios applied in this case to

12   other jurisdictions throughout the country, and make recommendations about whether the

13   staffing plan can be improved, consistent with the goal of delivering quality mental health

14   care services. (*Id.*)

15         Mindful of the Court's admonition to present any modification proposals to the

16   Special Master, Defendants planned from the beginning to present in a transparent manner

17   any feasible ideas the consultants generated to the Special Master and Plaintiffs for their

18   consideration at the staffing workgroups.  (*Id.* ¶ 4.)  Defendants remain hopeful that the

19   parties and the Special Master will be able to negotiate commonsense, practical, and fact-

20   based changes to the staffing plan that reflect the reality of the current mental-health-

21   services delivery system and the available pool of clinicians in the marketplace.  (*Id.*)

22         Even though Defendants were under no legal obligation to do so, they advised

23   Plaintiffs' counsel that they had hired consultants who would help evaluate the current

24   staffing plan, and they provided Plaintiffs with the consultants' curricula vitae.  (*Id.* ¶ 5.)

25   Defendants have now also provided Plaintiffs with detailed information regarding each of

26   the prison visits conducted in December and January.  (*Id.* ¶ 5, Ex. A.)  Defendants advised

27   Plaintiffs that, to the extent the consultants developed feasible recommendations, they

28   would be offered to Plaintiffs and the Special Master for consideration at the workgroup

[3224705.1]

meetings.  (*Id.* ¶ 5.)  Defendants also advised that to the extent they shared the consultants' recommendations at the staffing workgroups, they would share the basis for those recommendations and the evidence on which the consultants relied.  (*Id.*)  In fact, Defendants considered having the consultants themselves make presentations at the workgroups if the parties and the Special Master believed that the preliminary findings and recommendations were feasible and should be further explored.  (*Id.*)

Defendants sent their consultants to nine prisons where they met with supervisory staff and clinicians in meeting rooms, and walked through some of the prison treatment areas.  (*Id.* ¶ 6.)  The meetings with supervisors and clinicians could just as easily have been conducted off site, or through a conference call.  (*Id.*)

Defendants gave their consultants strict directives not to speak with inmates, and Defendants sent an attorney on each of the consultants' prison visits to ensure that the consultants did not speak to or question inmates.  (*Id.* ¶ 7.)  Indeed, there was no reason for the consultants to speak to inmates, because the consultants did not visit the prisons to evaluate the constitutionality of the mental health care provided to inmates generally, or to observe and evaluate the care provided to individual inmates.  (*Id.*)  The consultants did not review class members' medical records during their visits or sit in on treatment provided to class members.  (*Id.*)  Nor did they conduct any tests or time-and-motion studies.  (*Id.*)

The only portion of the consultants' prison visits that could reasonably be characterized as a "prison tour" was their walk-through of some of the mental health treatment areas.  (*Id.* ¶ 8.)  The consultants visited some treatment areas to understand the physical plants' general layout and the types of treatment spaces where mental health clinicians work.  (*Id.*)  The consultants did not visit the prisons to evaluate the mental health care being provided or the adequacy of treatment spaces.  (*Id.*)

Defendants did not invite Plaintiffs to attend prison visits with the consultants and Defendants' counsel because Defendants' use of the consultants falls under the attorney-work-product doctrine.  (*Id.* ¶ 9.)  Additionally, Defendants wanted their consultants and

[3224705.1]

1 the staff with whom they spoke to have comfortable, free, and candid exchanges about

2 staffing issues. (*Id.*)

3    As explained below, there is no basis for the Court to sanction Defendants by

4 barring Defendants from using evidence from the consultants if Defendants decide to file a

5 staffing motion.

6       **b.** **Defendants Are Entitled to Confidentially Use Litigation**

7         **Consultants Under Rule 26 and the Attorney-Work-Product Doctrine.**

8       **(1)** **The attorney-work-product doctrine protects**

9         **Defendants' right to work confidentially with retained consultants.**

10    Documents or tangible things prepared for, or in anticipation of, litigation by a

11 party's representatives—including consultants—are not discoverable. Fed. R. Civ. P.

12 26(b)(3)(A); *In re Grand Jury Subpoena (Mark Torf/Torf Envtl. Mgmt.)*, 357 F.3d 900, 906

13 (9th Cir. 2004). The work-product protection also applies to documents prepared or

14 reviewed by the consultants. Fed. R. Civ. P. 26(b)(4)(D); *In re: First Am. Home Buyers*

15 *Prot. Corp. Class Action Litig.*, 313 F.R.D. 578, 613 (S.D. Cal. 2016), *aff'd sub nom.*

16 *Carrera v. First Am. Home Buyers Prot. Co.*, 702 F. App'x 614 (9th Cir. 2017). Under the

17 attorney-work-product doctrine, Defendants have a fundamental right to confidentially

18 work with litigation consultants to evaluate issues in this case.

19    The attorney-work-product doctrine evolved out of the Supreme Court's seminal

20 decision

21   in *Hickman v. Taylor*, 329 U.S. 495 (1947). *See Rep. of Ecuador v. McKay*, 742

22 F.3d 860, 867 (9th Cir. 2014). As stated in *Hickman*, "the general policy against invading

23 the privacy of an attorney's course of preparation is so well recognized and so essential to

24 an orderly working of our system of legal procedure that a burden rests on the one who

25 would invade that privacy to establish adequate reasons to justify production through a

26 subpoena or court order." *Hickman* at 512. The policy protects tangible and intangible

27 work product. *Id.* at 511; *Rep. of Ecuador,* 742 F.3d at 868; *U.S. v. Deloitte LLP*, 610 F.3d

28 129, 136 (D.C. Cir. 2010).

The core purpose of the work-product doctrine is to encourage effective legal representation within the framework of the adversary system by removing counsel's fears that her or his thoughts and information will be invaded by an adversary. *Am. Civil Liberties Union N. Cal. v. U.S. Dept. Just.*, No. 14-17339, 20182018 WL 455857, at *8 (9th Cir. Jan. 18, 2018).  This policy reflects the necessity that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel. *Rep. of Ecuador* at 868.  Cases discussing the doctrine have referred to the need for attorneys to be able to work in a "zone of privacy" when preparing a case for litigation. *Rep. of Ecuador*, 742 F.3d at 871; *United States v. Meyer*, 398 F.2d 66, 74 (9th Cir. 1968); *Jumpsport v. Jumpking*, 213 F.R.D. 329, 334 (N.D. Cal. 2003) (policy objective of doctrine is to free lawyers, their clients, and their clients' other agents to think frankly, critically, and creatively about litigation-related matters).

Rule 26 partially codifies the work-product doctrine and makes it applicable to work performed by a party's agents and non-testifying experts for litigation purposes. *See* Fed. Rule Civ. P. 26(b)(3)(A), 26(b)(4)(D); *Deloitte*, 610 F.3d at 135.  Under the work-product doctrine of Rule 26(b)(3)(A), and the protection afforded non-testifying experts under Rule 26(b)(4)(D), a party is not entitled to discover the facts known or opinions held by a non-testifying expert absent a showing of exceptional circumstances.  *In re First Am. Home Buyers Prot. Corp.*, 313 F.R.D. 578, 614-15 (S.D. Cal. 2016), aff'd sub nom. *Carrera v. First Am. Home Buyers Prot. Co.*, 702 F. App'x 614 (9th Cir. 2017).

Rule 26(b)(4)(D), in particular, creates a safe harbor whereby facts and opinions of non-testifying, consulting experts are shielded from discovery, except upon a showing of exceptional circumstances.  *In re Morning Songbird Food Litigation*, No. 12-cv-1592, 2015 WL 12791470 at *6 (S.D. Cal. Jan. 23, 2015).  Such circumstances must be truly extraordinary.  For example, an assertion that discovery of non-disclosed consultants would result in significant cost savings and greater efficiency is insufficient to demonstrate the "exceptional circumstances" required by Rule 26(b)(4)(D) before allowing a party to conduct discovery of non-testifying experts.  *See FMC Corp.*, 196 F. Supp. 2d at 1046.

[3224705.1]

Important policy considerations advanced by the doctrine, as codified in Rule 26(b)(4)(D), include: (1) encouraging parties to consult with experts to formulate their cases; (2) allowing counsel to obtain necessary expert advice without fear that every expert consultation may yield grist for the adversary's mill; and (3) preventing the unfairness of allowing an opposing party to reap benefits from another party's effort and expense. *FMC Corp.*, 196 F. Supp. 2d at 1043-44.

### (2)   Defendants' use of confidential staffing consultants falls squarely within the attorney-work-product doctrine.

Here, Defendants made a decision to engage consultants to provide advice concerning staffing issues in this case.  (Decl. McClain ¶ 3.)  In addition to placing Defendants' use of staffing consultants squarely within the protections of the attorney-work-product doctrine, that decision demonstrates that Defendants are taking the issues raised by the Court's staffing order seriously.  Defendants should be commended for their decision to hire consultants, not attacked.

Although Defendants were under no obligation to do so, they were transparent regarding their retention and use of consultants.  (Decl. McClain ¶¶ 4-5.)  As Plaintiffs concede, Defendants advised them that they hired consultants, told them why the consultants were hired, and provided Plaintiffs with the consultants' curricula vitae.  (Pls.' Mot. Case Management Orders Sanctions (Pls.' Mot.) 6, ECF No. 5764-1; Decl. Bien Supp. Pls.' Mot. (Decl. Bien), Exs. C, F, ECF No. 5765.)

Defendants stopped short of inviting Plaintiffs' counsel to work directly with Defendants, their attorneys, and their consultants as they evaluated staffing issues.  That is because, under the attorney-work-product doctrine, Plaintiffs' have no right to participate in the work of Defendants' attorneys and their agents as they confidentially evaluate issues in this case.  Plaintiffs' participation would have chilled the free exchange of information and candid discussions about staffing-related issues when the consultants met with Defendants and their attorneys.

Plaintiffs' cannot satisfy their heavy burden to show that exceptional circumstances

[3224705.1]

exist to invade the attorney-work-product doctrine and Federal Rule of Civil Procedure 26. Plaintiffs' counsel is already very familiar with the treatment spaces that the consultants walked through because they have been touring the prisons regularly for decades in this and other class actions. Those spaces will not be destroyed or deteriorated, and they will continue to exist. Plaintiffs have their own independent means of obtaining facts and opinions regarding the California Department of Corrections and Rehabilitation's (CDCR) staffing. And Plaintiffs can, and regularly have, retained their own expert witnesses in this case.

In addition, if Defendants do designate the consultants to testify in support of a motion, Plaintiffs will be able to conduct appropriate discovery, including interrogatories and depositions. Plaintiffs' ability to conduct expert discovery at the appropriate time weighs against a finding of exceptional circumstances. *See U.S. Inspection Services, Inc*., 268 F.R.D. at 624.

There is no basis for the Court to sanction Defendants for confidentially working with consultants given their right to do so under the attorney-work-product doctrine.

### (3) Plaintiffs cite no persuasive authority for their position and their additional arguments are meritless.

Plaintiffs assert that they are entitled to not only shadow Defendants' consultants as they walk through a prison, but that they also must attend and observe confidential meetings with Defendants, their attorneys, and their consultants. Plaintiffs' argument for a rule that would entitle their counsel to sit in on confidential meetings between Defendants, their consultants, and their counsel is immediately suspect because Plaintiffs further argue that any such rule should not apply to them. (Pls.' Mot. 13.) Thus, Plaintiffs argue that Defendants' discovery efforts must comport with the federal rules and not violate the attorney-work-product doctrine, while they demand to be free of those rules themselves. (*Id.*) The position is untenable, and it is not surprising that Plaintiffs present no persuasive authority supporting their position or the notion that an interest in having a

1   common factual baseline somehow trumps the work-product doctrine.

2        Plaintiffs' complete reliance on patent cases, primarily from the 1970s, casts doubt

3   on the validity of their position.  (Pls.' Mot. 10-11.)  Plaintiffs cite *Congoleum Indus., Inc.*

4   *v. Armstrong Cork Co.*, 319 F. Supp. 714 (E.D. Pa. 1970), for the proposition that evidence

5   of experiments conducted by an interested party, in the absence of his adversary, is of

6   negligible probative value.  (Pls.' Mot. 11.)  But *Congoleum*, besides being

7   distinguishable, stands for the opposite proposition, stating: "Since both sides have

8   conducted their own tests and determined what the respective results suggest to them, their

9   next step is to present their findings to the court, and not simply to repeat the same tests in

10  each other's presence."  *Id.* at 716.  *Congoleum* further held that the appropriate way for

11  establishing a common factual baseline is through discovery.  *Id.*  Thus, far from

12  supporting Plaintiffs' position, *Congoleum* disproves it.

13       Plaintiffs' also cite *Nat'l Dairy Prods. Corp. v. L. D. Schreiber & Co., Inc.*, 61

14  F.R.D. 581, 583 (E.D. Wis. 1973) and *Wagoner v. Barger*, 463 F.2d 1377, 1382 (C.C.P.A.

15  1972), both patent cases that involved testifying experts performing complicated testing.

16  *Coleman* is, of course, distinguishable because Defendants consultants are not currently

17  designated as testifying experts, they did not conduct complicated testing or experiments,

18  and *Coleman* is not a patent case.

19       Plaintiffs' reliance on *In re Newman*, 782 F.2d 971, 974 (Fed. Cir. 1986), another

20  patent case, is equally misplaced.  Plaintiffs cite *Newman* to argue that "Rule 34 discovery

21  is a common procedure, as is inter-partes testing in general, arising in actions where there

22  is a need to conduct inspections and tests for evidentiary purposes."  *Id.*  But again,

23  *Coleman* is not a patent case, and Defendants' undisclosed consultants did not conduct any

24  testing or experiments, destructive or otherwise, when they visited prisons.  *Id.*

25       Plaintiffs' other arguments are equally unpersuasive and do not satisfy the

26  exceptional-circumstances showing required under Rule 26.  *See* Fed. R. Civ. P.

27  26(b)(3)(A), 26(b)(4)(D).  Plaintiffs assert that an order requiring Defendants to invite

28  Plaintiffs to shadow consultants any time they visit a prison would save time, money, and

[3224705.1]

1   avoid the need for discovery.  (Pls.' Mot. 9.)  The notion that Plaintiffs would forego

2   conducting expert discovery if their counsel had been permitted to accompany Defendants'

3   consultants on a visit is as ridiculous as it is unbelievable.  But even if it were true,

4   efficiency and cost savings are insufficient to demonstrate the "exceptional circumstances"

5   required by Rule 26(b)(4)(D) before a party may be given leave to conduct discovery of

6   non-testifying experts in contravention of the work-product doctrine.  *See FMC Corp.*, 196

7   F. Supp. 2d at 1046.

8          Plaintiffs argue that mandating their presence at all consultant prison visits is

9   preferable because it would limit the number of preliminary questions that must be asked

10  in deposition or trial.  But again, Plaintiffs cite no authority holding that this consideration

11  justifies nullifying the protections of the work-product doctrine.  Furthermore, litigation

12  proceeds under the Federal Rules of Civil Procedure, which provide a process for

13  conducting expert discovery and establishing a common factual baseline.  Fed. R. Civ. P.

14  26.  Thus, the Court need not resort to depriving Defendants of their rights under the work-

15  product doctrine and Rule 26 to satisfy Plaintiffs' purported need for information, as that

16  need is amply addressed by the law.

17         Plaintiffs' argue that it would only be fair for the Court to grant their request

18  because Defendants observe Plaintiffs' experts' prison tours.  (Pls.' Mot. 11.)  This

19  argument is based on a false comparison and is exceptionally weak because it ignores that

20  the prisons are Defendants' premises, and it would be impossible for Plaintiffs to conduct a

21  prison tour without extensive communications with Defendants and their employees at the

22  prisons.  In fact, Plaintiffs' routinely argue that they must be permitted to interview

23  Defendants' employees who work at the prisons during prison tours, making it even more

24  important for Defendants' counsel to attend those tours.  (*E.g.,* Order 2:8-16, Oct. 30,

25  2007, ECF No. 2495.)  Here, Defendants' consultants did not interview class members and

26  Defendants' confirmed that their consultants would not speak to any inmates.

27         Plaintiffs also argue that Defendants' consultants must have observed class

28  members' treatment because how could the experts "be expected to opine that CDCR is

providing constitutionally adequate care without ever observing the care provided." (Pls.' Mot. 13.) This contention ignores the simple fact that Defendants' consultants are not providing opinions on the constitutionality of the care provided, a fact that Defendants have repeatedly emphasized to Plaintiffs.

An order prohibiting Defendants from confidentially working with consultants and their attorneys to address tough issues in this case would amount to the most extreme form of micromanagement. Denying Defendants the opportunity to work on solutions to problems independently will only impede progress in this case and chill efforts to tackle the most difficult issues. Accordingly, the Court should not sanction Defendants by eliminating the protections of Rule 26 and the work-product doctrine and prohibiting Defendants from working confidentially with their retained consultants.

> **c.      There Are No Orders Prohibiting Defendants from Sending Consultants to Prisons or that Could Justify the Imposition of Sanctions**

In an apparent attempt to convince the Court that Defendants violated court orders and should be sanctioned for sending consultants to prisons, Plaintiffs cite inapplicable orders and make several dubious contentions. The first is a cite to a footnote in the Court's 1995 ruling after the *Coleman* trial. (Pls.' Mot. 2.) That footnote merely summarized Plaintiffs' contention that the parties' experts worked in teams before the trial. *Coleman v. Wilson*, 912 F. Supp. 1282, 1303 n.22. Under no interpretation did the Court order that the parties would thereafter be free to attend meetings between consultants and opposing counsel and were prohibited from having consultants undertake work with the adverse party's presence. The footnote is certainly not a discovery order intended to apply in perpetuity during a three-decade remedial phase.

On page 2 of their motion, Plaintiffs cite an order issued in the Three-Judge Court proceeding, which issued in response to discovery disputes that the parties jointly submitted, including a dispute concerning whether Plaintiffs' counsel could attend any expert tours conducted by Defendants testifying trial experts in *that* proceeding. (Order 3-

[3224705.1]

1  4, Oct. 30, 2007, ECF No. 2495.)  The Three-Judge Court proceeding is indisputably a

2  separate proceeding that focused on whether a population cap should be imposed on

3  California's prisons.  (Order, July 23, 2007, ECF No. 2320; Order, July 31, 2007, ECF No.

4  2340.)  Thus, the Three-Judge Court order cited by Plaintiffs is not germane to

5  Defendants' recent use of staffing consultants because it was issued in the context of a

6  discrete discovery dispute in a different proceeding.  (Order, ECF No. 2495.)

7    Additionally, the Three-Judge Court order was made in an entirely different

8  context—pretrial expert discovery—and concerned testifying trial experts, not consultants.

9  (*Id.* at 4.)  The primary basis for the Court's ruling was an assumption that Defendants'

10  experts would need to speak to individual inmate-plaintiffs at the prisons, which would

11  require Plaintiffs' counsel's participation.  (*Id.* at 4:12-15.)  As discussed above, there is no

12  issue concerning the potential need for class-member interviews in the current dispute.

13    Plaintiffs also rely on an order issued in the *Plata v. Brown* class action (Pls.' Mot.

14  3), which again was made in a different proceeding and in an entirely different context.

15  *Plata v. Brown,* No. 3:01-cv-01351-TEH, Feb. 21, 2013, ECF No. 2546.  That order is not

16  binding in *Coleman*.  But even if the *Plata* order were relevant, it would not apply to

17  Defendants' staffing consultants because the *Plata* order also concerned a different issue—

18  Defendants' anticipated use of experts to prepare for a termination motion.  (*Id.* at 1.)  The

19  *Plata* order was not a blanket ban on Defendants' use of consultants.  (*Id.*)  Instead, it

20  concerned a specific discovery dispute presented to the court in the context of an

21  anticipated termination motion—circumstances that are not present here.  And again, a

22  primary basis for making the order was the Court's assumption that Defendants' experts

23  would need to interview class members to conduct their tour.  (*Id.* at 4:8-10, 23-25.)  That

24  order does not support Plaintiffs' claim that Defendants were barred by court orders from

25  sending consultants to prisons.

26    Plaintiffs also mischaracterize this Court's order concerning Defendants' use of

27  experts to prepare for the termination motion filed in 2013.  (Pls.' Mot. 3.)  That order,

28  which denied Defendants' termination motion, does not support Plaintiffs' contention that

1  Defendants are banned from sending consultants to prisons.  (Order Den. Defs.' Mot.

2  Terminate, Apr. 5, 2013, ECF No. 4539.)  The order was critical of ex parte

3  communications between Defendants' experts and class members at the prisons.  (*Id.* at 9-

4  23.)  It ruled that those communications constituted misconduct, but the order made no

5  ruling that Defendants were barred from sending consultants to the prisons in the first

6  place, or that by doing so Defendants had engaged in misconduct or violated a court order.

7  (*Id.*)

8      Plaintiffs cite an order to show cause that preceded the Court's termination ruling

9  where the Court expressed initial criticism regarding Defendants' use of experts at the

10  prisons, and asked the parties to be prepared to discuss the matter at the hearing on the

11  termination motion.  (Order Show Cause 2, Mar. 18, 2013, ECF No. 4414.)  This

12  demonstrates that the Court considered whether Defendants violated an order or engaged

13  in misconduct merely by sending consultants to the prisons.  And yet, at that hearing and in

14  the Court's order denying termination, the Court did not rule that Defendants engaged in

15  misconduct by sending consultants to prisons.  (Order Den. Defs.' Mot. Terminate, ECF

16  No. 4539; Tr. Termination Hr'g., ECF No. 4538.)  Given that the Court specifically raised

17  the issue in its order to show cause, it is exceedingly unlikely that this was an oversight by

18  the Court.  Thus, the order to show cause and the order denying termination lend no

19  support to Plaintiffs' argument.  To the contrary, they indicate that the Court considered

20  whether it was improper for Defendants to send consultants to the prisons outside the

21  presence of Plaintiffs' counsel, and properly concluded that it was not.

22

23      **d. Plaintiffs failure to rely on the prior orders during the meet-and-confer casts doubt on Plaintiffs' purported belief that they are applicable.**

24

25      Because there are no orders in *Coleman* barring Defendants from sending

26  consultants to prisons, it is fair to ask whether Plaintiffs had a good faith belief that such an

27  order existed when they made that representation to the Court and requested the imposition

28  of sanctions.  (Pls.' Mot. 1:15-16, 8:6-7, 19:3-7.)

[3224705.1]

Plaintiffs' counsel took several actions that demonstrate their knowledge that there is no order barring Defendants from hiring their own consultants and visiting prisons. First, Plaintiffs acknowledge that they sought a stipulation on this issue in May 2017. (Pls.' Mot. 4; Decl. Bien, Ex. A.)  Second, when meeting and conferring with Defendants regarding the staffing consultants, Plaintiffs did not state their belief that it would be a violation of a Court order if Defendants were to send consultants to the prisons without Plaintiffs' counsel, nor did they cite any orders that would be violated by these visits. Instead, Plaintiffs' counsels' December 11 email asked that Defendants agree that their consultants would not interview class members at the prisons.  (Decl. Bien, Ex. B.) Plaintiffs' counsel's December 21 letter asked whether Defendants would agree to allow Plaintiffs' counsel to accompany the consultants, but again did not assert that court orders prohibited Defendants from sending consultants to prisons without Plaintiffs' counsel. (Decl. Bien, Ex. D.)  And third, if Plaintiffs truly believe that there are already orders barring Defendants from using consultants at the prisons, their current demand is superfluous.  The only plausible answer to these inquiries is that Plaintiffs have no good-faith belief that Defendants violated a Court order.

### e.    There is not a long-standing practice in this case of conducting all consultant prison visits jointly.

The Court and Plaintiffs both cite a "long-standing practice" of joint expert tours, but no order supports this, and it is simply not true.  Plaintiffs identify only two instances where joint expert tours were conducted in relation to this case, both of which are distinguishable.  First, Plaintiffs assert that joint expert tours preceded the trial in this matter in 1993.  And second, Plaintiffs cite the Court ordered tours in the Three Judge Proceeding leading up to the trial of that matter.  At best, Plaintiffs might have a colorable argument that there is a practice of conducting joint expert tours leading up to a trial on the merits concerning the ultimate issue in these proceedings.  But these two examples fall far short of establishing a long-standing practice that would apply to Defendants' recent use of nondisclosed staffing consultants.

1    Plaintiffs' assertion also ignores several instances when Defendants openly sent

2   consultants to prisons, as they did with their staffing consultants, without Plaintiff

3   counsel's participation or objection.  For example, on July 28, 2006, the Court ordered

4   Defendants to allocate sufficient funding to execute and complete a workload study in time

5   to include the study's recommendations in the 2007/2008 budget.  (ECF No. 1922.)  The

6   Legislature passed SB 1134 to appropriate funding for a workload study to determine

7   appropriate staffing levels, and CDCR engaged Business Advantage Consultants to do the

8   study.  These consultants conducted all their work (including tours of twenty-nine

9   institutions) with the presence of Plaintiffs' counsel.  (Decl. McClain, Ex. B at 12-13.)

10   Both Plaintiffs and the Special Master were aware of this study and the consultants' work,

11   but neither objected to not being present.  (*Id.*, Exs. C at 3-4, D at 4.)  In fact, Plaintiff

12   ultimately supported the consultants' findings and asked CDCR to adopt, with some

13   modifications, the proposed staffing model.  (*Id.*, Ex. C at 1, 4, 14.)

14    In 2015, in response to complaints that the Guard One security and welfare checks

15   at San Quentin State Prison were causing sleep deprivation, CDCR retained a consultant to

16   assess the noise levels made during the Guard One checks.  CDCR provided notice to the

17   Special Master and Plaintiffs that it was working with an acoustical consultant to

18   determine whether there were steps that would reduce the noise levels in the housing units.

19   Stipulation and Order Modifying February 3, 2015 Order Regarding First Watch

20   Security/Welfare Checks at Pelican Bay State Prison Security Housing Unit filed on

21   December 28, 2015, ECF No. 5393.  On April 1, 2016, Defendants provided a written

22   report to the Special Master and Plaintiffs confirming the acoustic consultants' work,

23   which included visits to the Pelican Bay Security Housing Unit.  At no time did Plaintiffs

24   assert that they had a right to participate in the consultant's prison visits, nor did they

25   assert that Defendants were barred by court orders from sending a consultant to a prison.

26    Most recently, in December 2017, Defendants contacted a team of consultants and

27   requested that they provide a proposal for a review of the collaboration issues at California

28   State Prison at Sacramento.  Defendants notified both the Special Master and Plaintiffs that

[3224705.1]

the collaboration team needed to visit the prison to interview staff and class members. Plaintiffs did not insist that they attend the collaboration consultants' prison tour, nor did they object to the consultants proceeding with the tour without their attendance.

### 3. Conclusion

Because there were no orders prohibiting Defendants from sending consultants to prisons or working confidentially with consultants on this case, the Court should not sanction Defendants by requiring additional consultant prison visits or barring any future use of the consultants in litigation.

In the spirit of compromise, Defendants have agreed to additional joint tours as contemplated by the Court, and request that the Court take Plaintiffs' motion off calendar. If the Court intends to issue further orders or otherwise entertain Plaintiffs' defective discovery requests, all further proceedings should be conducted consistent with the Federal Rules of Civil Procedure and a full opportunity to brief and argue disputed issues.

## II.    A PROCESS FOR RESOLUTION OF OUTSTANDING ISSUES RELATED TO STAFFING RATIOS

The parties met and conferred regarding the Court's direction to propose a process, with specific timelines, for resolution of outstanding issues regarding staffing, including of any motion regarding the staffing ratios. The parties could not come to an agreement regarding the schedule.

### A.    Plaintiffs' Position re: Scheduling of Discovery and Motion re Staffing Ratios

As discussed above, the parties could not reach agreement regarding the necessity or appropriateness of joint revisits with the staffing experts. The parties have also not reached agreement regarding the extent to which Plaintiffs are entitled to conduct discovery regarding the previous expert tours. Plaintiffs set forth their requested discovery in their proposed order requesting a Case Management Order about the staffing experts.

[3224705.1]

ECF No. 5764-2 at 1-2. If the Court orders Defendants to produce documents and information about the previous expert tours, Plaintiffs have previously requested that the deadline for production of such information be February 28, 2018. *See* Pls.' Mot. at 18. Additionally, if the Court orders that such revisits be conducted, Plaintiffs propose that they occur between March 1 and March 16, 2018.

As to the Court's "process, including specific timelines, for resolution of any outstanding issue related to fulfillment of staffing ratios for prison psychiatrists," see Order at 3, the parties exchanged several proposals regarding schedules but were unable to agree. Plaintiffs propose the following schedule, endeavoring to balance the interests of the parties in obtaining full discovery in connection with any such motion with the Court's clear message that these issues must be resolved well before the October 11, 2018 deadline for compliance.

| Date | Event |
|---|---|
| March 21, 2018 | Defendants shall provide written proposal regarding the ratios with supporting documents and information. |
| March 28, 2018 | First Work Group meeting on staffing, subject to Special Master availability. |
| April 2, 2018 | Plaintiffs shall provide any requests for additional information regarding first meeting. |
| April 5, 2018 | Defendants shall respond to Plaintiffs' requests and provide information. |
| April 9, 2018 | Second Work Group meeting on staffing, subject to Special Master availability. |
| April 12, 2018 | Parties shall notify the Court if "a good faith dispute over [staffing] ratios exists that must be resolved by" the Court. |
| April 30, 2018 | Last day for Defendants to file any motion re staffing ratios. |
| May 2, 2018 | Last day for Plaintiffs to serve discovery and deposition notices. |

[3224705.1]

| Date | Event |
|------|-------|
| May 4, 2018 | Plaintiffs to notify Defendants if they intend to conduct on-site prison inspections. |
| May 7, 2018 | Parties to meet and confer to establish schedule for Plaintiffs' expert inspections. |
| May 11, 2018 | Last day for Defendants to respond and produce discovery. |
| May 14-June 1, 2018 | Plaintiffs' experts to conduct prison inspections. |
| May 21, 2018-June 1, 2018 | Defendants' expert witnesses and fact declarants shall be made available for deposition on mutually-agreed dates. |
| June 11, 2018 | Plaintiffs' Response Filing Date. |
| June 13, 2018 | Defendants to serve discovery and deposition notices. |
| June 22, 2018 | Plaintiffs to respond to Defendants' discovery. |
| July 9-19, 2018 | Plaintiffs' expert witnesses and fact declarants shall be made available for deposition on mutually-agreed dates. |
| July 27, 2018 | Defendants' Reply Filing Date. |
| August 10, 2018 | Hearing. |

This proposed schedule allows for orderly and efficient discovery once a motion regarding the staffing ratios has been filed, without unduly prolonging the timelines for discovery and briefing on such a motion. Plaintiffs object to Defendants' proposed schedule for three main reasons. First, Defendants' proposal sets a hearing on any such motion for October 5, which ignores the Court's message of urgency and would not permit the Court to rule before the October 11, 2018 compliance deadline. Second, Defendants' proposal that a full period of expert discovery, stretched over almost eleven weeks, precede the filing of any motion unduly prolongs the timeline in an entirely unnecessary way, given the finite nature of the dispute over the ratios. Third, Defendants' proposed schedule, which requires simultaneous exchange of opening expert reports, would require

[3224705.1]

1   Plaintiffs to retain experts and produce expert reports in anticipation of a motion that

2   Defendants may choose not to file.  This is inefficient and wasteful; Plaintiffs should not

3   be required to retain experts until or unless Defendants have presented expert reports to

4   which Plaintiffs must respond.

5   **B.    Defendants' Proposed Schedule Regarding Staffing Issues.**

6       The Court asked the parties to propose a process and timeline for resolution of

7   outstanding staffing issues related to fulfillment of staffing ratios for prison psychiatrists,

8   including a deadline for any prison tours, a deadline by which the parties will determine

9   whether there is a good-faith dispute over staffing ratios, and a deadline for a motion

10   concerning staffing ratios if one is necessary.

11       Since the Court's October 10, 2017 staffing order, Defendants have worked

12   diligently to determine whether changes to staffing ratios are needed by finding and

13   retaining knowledgeable staffing consultants who can evaluate the staffing plan and

14   provide Defendants with recommendations.  Defendants have every intention of sharing

15   any feasible recommendations with the Special Master and Plaintiffs in the staffing

16   workgroups, and have proposed a schedule that would allow time for the parties to have

17   good-faith discussions about any recommendations.

18       Defendants' proposed schedule for discovery and motion practice tries to strike a

19   balance between the Court's desire to resolve all staffing issues by October 11, 2018, the

20   need for the parties to have sufficient time to meet and confer at the staffing workgroups to

21   achieve real progress on issues, and the need for a fair discovery and briefing schedule.  As

22   the Court requested, Defendants' proposal also builds in time for joint prison visits with

23   Defendants' consultants and Plaintiffs' counsel.

24       Plaintiffs' proposal does not allow enough time for the staffing workgroups and

25   their proposed discovery and briefing schedules are prejudicial to Defendants in that

26   Plaintiffs' schedule requires Defendants to file a motion long before discovery is closed,

27   and gives Plaintiffs the unfair advantage of a completed discovery process before they

28   must prepare an opposition.

[3224705.1]

Even if there ultimately is a good-faith dispute regarding staffing ratios that requires motion practice, Defendants intend to continue to take all reasonable steps to comply with the Court's October deadline.  If motion practice is required, Defendants propose the following schedule:

| March | Conduct joint prison visits with Defendants' consultants, Plaintiffs' counsel, and Special Master. |
|---|---|
| April 2 | Defendants shall provide any feasible recommendations from their staffing consultants. |
| April 2 – May 26 | Discuss consultant recommendations, if any, at workgroup meetings, subject to Special Master availability. |
| May 26 | Deadline for the parties to determine whether there is a good faith dispute over staffing ratios that must be resolved by the Court. |
| May 30 | Last day for the parties to designate expert witnesses and produce initial expert reports.  Expert discovery opens. |
| June 25 | Last day for the parties to produce rebuttal expert reports. |
| July 25 | Close of expert discovery and depositions. |
| August 6 | Defendants Motion Filing Date. |
| September 6 | Plaintiffs' Opposition Filing Date. |
| September 20 | Defendants' Reply Filing Date. |
| October 5 | Hearing. |

## III.   CASE MANAGEMENT ORDER RE: TERMINATION

### A.   Plaintiffs' Position

The case management order requested in Plaintiffs' Motion regarding notification and discovery in advance of any motion to terminate is necessary, supported by the law, and in the best interests of the parties and the Court, for all the reasons set forth in the

[3224705.1]

1   Motion.  *See* Pls.' Mot. at 15-18.

2        Defendants oppose entry of the requested case management order solely on the

3   grounds that it is premature and unnecessary, because Defendants represent they do not

4   presently contemplate the filing of a termination motion in the near future.  But the Ninth

5   Circuit has indicated that the time for the entry of a case management order regarding

6   termination motions governed by the PLRA is precisely this – a time in which no such

7   motions have been filed or are imminently expected.  *See Plata v. Brown*, 754 F.3d 1070,

8   1077 (9th Cir. 2014).  Where, as here, there is no pending termination motion, a case

9   management order governing such motions can serve its intended function of allowing the

10  parties and the Court "to be informed and prepared when the State seeks to terminate

11  relief."  *Id.*  A case management order regarding termination, if entered now, would have

12  the desired "practical effect," which is "to require the State, while it is preparing its

13  motion, to disclose the experts' reports upon which the motion will rely" and otherwise

14  "provide the court and parties adequate notice of the evidence and the arguments

15  supporting or opposing termination."  *Id.*

16       The Ninth Circuit has already squarely rejected Defendants' argument that a case

17  management order of this type contravenes the automatic stay provisions of the PLRA:

18  "[T]he stay is triggered only by the district court's failing to decide a termination motion

19  within thirty days. If no motion has been filed, there can have been no decisional delay

20  triggering the stay." *Id.* at 1078.  As soon as the termination motion is filed, but not until

21  that time, the automatic stay provisions of the PLRA are triggered and cannot be avoided.

22  *See id.*  The automatic stay provisions are intended "to provide an incentive for the district

23  court to act promptly when such a motion is filed," but they do not require the Court to

24  wait for a termination motion before the Court may act to manage its docket and calendar

25  in an efficient and orderly way.  *Id.*

26       Moreover, contrary to Defendants' position, the *Plata* court's ruling did not depend

27  on whether a termination motion was imminent.  The Court only observed that a case

28  management order of this type was appropriate where, as here, "[t]he state has not

[3224705.1]

indicated that it is ready to file a termination motion now." *Id.* at 1077. That is, if the Court wishes to enter a case management order serving the practical functions set forth by the Ninth Circuit and in Plaintiffs' Motion, now is precisely the time. Defendants' position to the contrary is illogical and unfounded.

As to Defendants' request that the Court's resolution of this important issue await "a fully briefed motion," Defendants chose not to file a response to Plaintiffs' January 26, 2018 Motion regarding this and related topics. The Court has not granted any extension of time for Defendants' response, which was due on Friday, February 9, 2018 and about which the Court's February 5, 2018 Order was silent.

### B. Defendants' Position Regarding an Order Regarding Termination Motions.

The Prison Litigation Reform Act (PLRA) requires that the "court shall promptly rule on any motion to modify or terminate prospective relief in a civil action with respect to prison conditions." 18 U.S.C. § 3626(e)(1). A court has thirty days to rule on a termination motion before the automatic stay becomes effective. 18 U.S.C. § 3626(e)(2)(A). But for good cause, a Court can wait an additional sixty days before ruling and still avoid the automatic stay. 18 U.S.C. § 3626(e)(3).

Plaintiffs' requested case management order ignores the PLRA's timing requirements. In addition to the PLRA's provision of up to 90 days for a court to rule on a termination motion, Plaintiffs seek almost an additional six-month waiting period before Defendants could even file a motion. (Pls. Mot. 18.) Plaintiffs further request that the Court order Defendants to designate experts 150 days before filing a termination motion. (*Id.*) Thus, under Plaintiffs' requested order, Defendants might not receive a ruling on a termination motion for 260 days after providing notice of the motion. Plaintiffs' request is untenable because Defendants are currently entitled to bring a termination motion at any time under the law. 18 U.S.C. § 3626(b)(1). And Plaintiffs' request, if ordered, would violate Defendants' right to a prompt ruling on a motion to terminate or modify, and undermine Congress's intent that an automatic stay should be imposed if termination rulings are not prompt.

[3224705.1]

1    Furthermore, the Ninth Circuit's *Plata* opinion, on which Plaintiffs rely, is

2  distinguishable because it explicitly found that the district court premised its order on the

3  defendants' representation that they intended to file a termination motion "in a few

4  months"—facts that are not present here.  *Plata v. Brown*, 754 F.3d 1070, 1077 (9th Cir.

5  2014).

6    Plaintiffs' requested order has nothing to do with the staffing issues currently before

7  the Court, and there is no urgency to resolve this issue by the February 14 status

8  conference.  If the Court is willing to entertain the type of order Plaintiffs request, the

9  parties should have the opportunity to present both sides of this important issue through a

10  fully briefed motion.  Regardless, Defendants remain willing to meet and confer with

11  Plaintiffs over the next two weeks to try to reach a compromise on a schedule.

12

13  DATED:  February 12, 2018          Respectfully submitted,

14                                     ROSEN BIEN GALVAN & GRUNFELD LLP

15                                     By:  _____*/s/ Krista Stone-Manista*_____

16                                          Krista Stone-Manista

17                                     Attorneys for Plaintiffs

18

19  DATED:  February 12, 2018          XAVIER BECERRA
                                       Attorney General of California

20

21                                     By:  _____*/s/ Damon McClain*_____

22                                          Damon McClain
                                            Supervising Deputy Attorney General

23                                     Attorneys for Defendants

24

25

26

27

28

[3224705.1]