# Exhibit B


PANNONE
LOPES &
DEVEREAUX LLC

July 12, 2008

Robin Dezember
Chief Deputy Secretary
Division of Correctional Health
Care Services
501 J Street, Suite 530
Sacramento, CA 95814-0001

Lisa A. Tillman, Esquire
Deputy Attorney General
Office of the Attorney General
1300 I Street
P.O. Box 944255
Sacramento, CA 95814

RE:   Workload Study

Dear Robin and Lisa:

I have reviewed the workload-based staffing model for which the California Department of Corrections and Rehabilitation (CDCR) is currently seeking legislative approval. This letter is a summary of how the staffing model would be implemented. At the outset, I would like to state that Business Advantage Consulting and Phase 2 Consulting (consultants) produced a thorough and detailed analysis of the mental health staffing needs. However, given the dynamic nature of mental health care within CDCR institutions and the resulting ongoing evolution of staffing needs, it is important to keep in mind that, of necessity, a meaningful Workload Study must be a work in progress. With that in mind, certain issues should be addressed in order to avoid any underestimation of actual staffing needs. This letter details my concerns and recommendations in that regard.

Background:

Beginning in 2002 and continuing for approximately the next four years, the parties to the Coleman case were engaged in negotiating the content of an updated set of standards for mental health care in CDCR institutions that were later collectively given the more formal title of the Coleman Revised Program Guide.[1] It was within that context in 2004 that the CDCR undertook a field study to determine the levels of staffing necessary to implement the Program Guide revisions. In response to that study, the CDCR submitted a Budget Change Proposal (BCP) that provided input on staffing needs to the Department of Finance (DOF) in the May 2005 revise process for the fiscal year (FY) 2005-06 budget. In it, CDCR sought $4.1 million for 51.25 mental health positions to implement the revised Program Guide in the administrative segregation and secure

---

[1] The Coleman court entered an order dated March 2, 2006 approving the undisputed provisions of the January 2006 Revised Program Guide and ordering defendants to implement them immediately.

housing units at California State Prison, Corcoran (CSP/Corcoran). In addition, the BCP provided for the allocation of 822.1 permanent mental health staff field positions and 21.2 limited term field positions to implement the revised Program Guide system-wide.

This 2005 BCP offered four strategies for the allocation of the recommended staffing. The first proposal called for the allocation of all the required positions in FY 2005-06 and the second proposal would spread the allocations over a two-year period. The third proposal would allocate just the staffing required to implement the revised Program Guide in the administrative segregation and segregated housing units at CSP/Corcoran. The fourth proposal would allocate no resources to implement the revised Program Guide.

The DOF approved only the staffing required to implement the revised Program Guide in the administrative segregation and segregated housing units at CSP/Corcoran which was specifically mandated by the Court. No explanation was offered as to why pending Program Guide revisions were not taken into consideration.

In the following year (FY 2006-07), the CDCR reduced by 40 percent its proposal for mental health staffing to implement the revised Program Guide. The CDCR justified this new request for staffing by highlighting areas already troubled by inadequate services and subject to the Court's scrutiny and remedial orders. The DOF allocated two percent of the staffing requested by the CDCR for administrative segregation and reduced by one-third CDCR's already reduced request for staffing to implement the revised Program Guide. The DOF promised to fund a workload study to corroborate and ensure appropriate staffing levels.

During a status conference held on May 19, 2006 to address the short list of unresolved issues with the revised Program Guide, the Court was informed that the DOF had rejected some portion of CDCR's request for mental health staffing necessary to implement the revised Program Guide. On May 25, 2006 the Court directed then Coleman Special Master J. Michael Keating to submit a report on the status and sufficiency of the defendants' budget requests for the staffing. On July 28, 2006, Special Master Keating filed his report, and on that same day the Court issued an amended order, paragraph two of which states:

> "Defendants shall prepare and present to the special session of the Legislature, scheduled to occur in August 2006, a budget proposal for the allocation of no less that 530.65 permanent and 21.2 limited term positions recommended by the Department of Finance's Unit Review in 2005, together with an allocation of sufficient funding to execute and complete a workload study in time to include its findings and recommendations in the FY 2007/08 budget. The 530.65 permanent positions should be in addition to the 208 permanent positions already allocated to implement the revised Program Guide."

In response to that order, Senate Bill 1134 was introduced to make appropriations for the 551.8 positions necessary to implement the revised Program Guide, and for $750,000 to conduct an extensive workload study to be incorporated into the budget process for the 2007-08 fiscal year. The legislation also mandated that the CDCR complete the workload study and submit it to the California State Legislature (Legislature) no later than April 1, 2007. Senate Bill 1134 was approved by the Governor on September 27, 2006 and Chaptered by the Secretary of State on September 27, 2006.

Workload Study Project:

CDCR engaged the consultants to conduct a statewide mental health staffing workload study. The project was completed in approximately six months. The project team held its first meeting in January 2007 and transmitted a request for information to headquarters. The information obtained by the project team was used to form "key assumptions" to develop the model. Some of this information included Program Guide requirements, the percentage of Mental Health Delivery Services System (MHSDS) inmates taking medication, staff assigned to particular tasks, the frequency of tasks, and the number of inmates per group.

The project team then sent data requests to identified mental health contacts at each institution requesting specific information or reports in the areas of:

- licensed clinician staffing patterns
- support personnel staffing patterns
- organizational/reporting structure
- duty statements
- local operating procedures
- budget financial statements
- management reports (e.g. dashboard or performance measurements)
- mental health activity volumes

After analyzing the data, the project team visited specific institutions designated as "calibration sites" to assess the structure and program deployment at those facilities. Four institutions were visited (Salinas Valley State Prison, California Medical Facility, California State Prison at Sacramento, and California Institution for Men) and the following programs were examined:

- reception center
- security levels I – IV
- DMH licensed inpatient psychiatric care
- 3CMS and EOP level of care in general population and administrative segregation
- mental health crisis beds (MHCB)
- psychiatric services unit (PSU)
- sensitive needs yard (SNY) designation

The project teams that visited these calibration sites were typically comprised of two licensed clinicians and up to five core project team members. The site visits lasted approximately four to five hours per institution and were all concluded during the week of January 22, 2007. The project team collected additional data from the institutions and Division of Correctional Health Care Services (DCHCS) headquarters throughout the month of February.

With this data, the project team began to develop the "activity grids" which provided the method for representing the actual clinical time required, by position, to perform the required services or "tasks" mandated by the revised Program Guide. The estimates of the time required for each task were not derived from actual observations or measurements, but were developed by the consultants and CDCR health care administrative staff prior to the site visits. These estimates were then refined through the site visits by interviewing field staff. By multiplying the number of minutes necessary to perform each task by the number of times the task is supposed to be performed over the course of a year using the Program Guide minimum requirements, the project team arrived at the total amount of time that each task required by position or classification.

The project team then visited twenty five institutions designated as validation sites during the time period of March 5, 2007 through March 27, 2007. These validation site visits lasted approximately three to four hours and involved the institution's participating staff. These visits were used to attempt to validate or correct assumptions about workload estimates, review the space and equipment issues, and refine the activity grids.

On April 2, 2007 the project team sent the reports generated from the collected data to the Chief of Mental Health or designee at each institution. Throughout the month of April and into May 2007, the project team continued to assess the collected data and catalogue the information. From April 3rd though April 12th, key DCHCS headquarters staff were interviewed. From those interviews twenty five persons were asked to participate in confidential discussions. By April 13, 2007 the mental health staffing model was completed in draft form. A "milestone meeting" with mental health leadership, Division of Adult Institutions (DAI) representatives, nursing, and health care licensing staff was held on April 13th and generated additional feedback. A working session was held in early May with mental health clinicians.

The Mental Health Staffing Workload Study (Workload Study or Study) was completed and presented to the CDCR in June of 2007. The DCHCS did not approve these findings until December 2007.

2008-09 Budget:

On April 1, 2008, Vincent Brown, Chief Deputy Director of the DOF, submitted a Finance Letter to the Senate Budget and Fiscal Review Committee. It contained a request for 407.7 new positions in FY 2008-09 that were recommended by the Workload Study and intended for compliance with the court order dated March 2, 2006. It is my understanding, based on representations made by representatives of the DCHCS, that this funding request has stalled in the Legislature. According to these DCHCS

representatives, the two concerns raised by both chambers of the Legislature are the validity of the Study and that 500 positions already authorized within the CDCR are still vacant and therefore more positions should not be approved. DCHCS staff has informed me that CDCR has stated to the Legislature that the Workload Study model should be approved this year for three reasons. First, CDCR may fill all of the vacant positions before the next budget cycle. Second, the Workload Study model provides better distinction for the classifications actually needed. Third, the CDCR wants to replace the current Prevalence Mix method of staffing because the Prevalence Mix method generates the number of necessary staff based only on the population numbers and this could cause the CDCR to lose positions.

DCHCS representatives have informed my staff that if the Workload Study model is approved, the CDCR would be required by the DOF to run the model twice every year, in the Spring and Fall, to account for any changes in programming or population changes. The new data would be entered into the model and an up to date staffing number would be generated and presented to the Legislature for the appropriate action. Although the consultants' report also addressed the staffing at DCHCS headquarters and custody staffing at all institutions, the experts' analysis of the Workload Study focused on clinical staffing positions.

Special Master's Review:

Copies of the Workload Study were provided to me in early February 2008. However, disk number 2 that was provided by CDCR was unable to be accessed and a new disk was provided. Although the Workload Study provided recommendations for headquarters and support staffing, my experts and monitors (experts) focused their evaluation solely on the mental health clinical staffing. The consultants reported that DAI was conducting a custody staffing study, and they recommended using the same methodology for custody as they had used for the mental health Workload Study to arrive at the custody staffing recommendations. While data concerning the functions of Correctional Counselor I positions appeared in the Workload Study matrix, the Study itself did not examine custody staffing, nor was custody staffing evaluated by my experts.

The voluminous information contained on the three compact disks was reviewed by the experts. The experts immediately began to question certain information within the Study. Although the Study was very comprehensive, it became clear to the experts that the answers they sought could not be found within the pages of the Study.

Meetings with Consultants:

Given the breadth of the information contained in the Study, the complexity of the methodology used by the consultants, and the unanswered questions, the experts determined that a face to face meeting with the consultants would be beneficial to a better understanding of the Workload Study.

The first meeting with my experts was held on April 24, 2008[2]. The consultants were represented by Todd Wilcox, M.D., Betsy Figueiro-Steinbrueck, and Tiffany Rolston. The consultants provided a general overview of how the staffing model was designed. The experts attended subsequent meetings on May 13th and May 23rd [3]. A final meeting was held on June 5th with Jennifer Johnson, CDCR Associate Health Program Advisor, Suzanne Streeter, CDCR Staff Services Manager and Sharon Riegel, CDCR Health Program Specialist I, who demonstrated to the experts how the new staffing spreadsheet worked.

Productive Minutes:

The productive minutes are intended to represent the actual amount of time necessary to perform a task required by the Program Guide (i.e. direct patient care or clinical process). During the course of the meetings it became clear to the experts that some of the data which was used to drive the staffing numbers was unreliable and not based on objective measures. It was determined that the minute values that were assigned to each task were estimates originally provided by DCHCS administrative staff or developed by the consultants and then refined during the site visits. The "validation" of these values was accomplished through interviews with institutional staff to determine whether the values made sense. There was no direct observation of any task or any actual measurement of a task used to arrive at a reasonable representation of the time required to perform each task. Comments by CDCR staff, located in the frequently asked questions section of the Workload Study, indicated that they also had doubts about the accuracy of the estimates for some of the tasks. The consultants openly acknowledged that the time frame imposed by CDCR for the completion of the Workload Study restricted their ability to conduct a more in depth approach.

The tables and comments below provide a sample of the issues and questions regarding the assigned values of productive minutes which have been raised by the experts:

Task: 3CMS Clinical Intake Assessment (case manager duties)

| Sub Task | Minutes Value Assigned |
| --- | --- |
| UHR Review | 15 minutes |
| Face-to-Face Evaluation | 25 minutes |
| Institutional Staff Interview | 6 minutes |
| Review Previous Mental Health Records | 2 minutes |

---

[2] In attendance at this meeting were Dr. Jeffrey Metzner, Dr. Ted Ruggles, Ms. Haunani Henry, and Mr. Kerry F. Walsh (via telephone). My attendance at that meeting was very brief as I also had to attend another meeting.
[3] In attendance at this meeting were Dr. Jeffrey Metzner, Dr. Ted Ruggles, Ms. Haunani Henry, Mr. Mohamedu F. Jones, and Mr. Kerry F. Walsh (via telephone).

| Multiaxial Diagnosis | 5 minutes |
|---|---|
| Progress Note | 5 minutes |

Commentary:

- It is not clear whether time is allotted for filling out the CDCR form which summarizes the evaluation.

- The time allotted for "Institutional Staff Interview" does not appear sufficient to determine adaptive functioning and no time is allocated for additional observation, cell side visits, etc.

- There is no time allocated for Central File Review (required by the Program Guide).

Task: 3CMS Individual Therapy (90-day case management contact)

| Sub Task | Minutes Value Assigned |
|---|---|
| 90-Day Contact, Orientation and Supportive Counseling | 30.6 minutes/90-day cycle |
| Progress Note | 7.2 minutes/90-day cycle |

Commentary:

- There is no provision for case management contact at intervals of less than 90 days.

Task: 3CMS Medication Evaluation and Management

| Sub Task | Minutes Value Assigned |
|---|---|
| Psychiatrist Face-to-Face for Re-evaluation | 25.2 minutes/90-day cycle |
| Psychiatrist Responding to Medication Requests (probably self referrals regarding medication issues) | 6.3 minutes/patient per 90-day cycle |
| Psychiatrist's Progress Note | 6.3 minutes/90-day cycle |
| LPT Medication Preparation | 2.5 minutes/patient per day |

| LPT Medication Administration | 2.0 minutes/patient per day |

Commentary:

- There does not appear to be time allocated for the psychiatrist to review the UHR.

Task: EOP Intake Assessment

| Sub Task | Minutes Value Assigned |
|---|---|
| UHR Review (by case manager) | 15 minutes |
| Face-to-Face Interview | 25 minutes |
| Interview with Institutional Staff | 6 minutes |
| Multiaxial diagnosis | 5 minutes |
| Progress Note | 10 minutes |

Commentary:

- The time allocated for an EOP intake assessment is the same as that allowed for 3CMS intake assessment. This appears unrealistic in view of the fact that prospective EOP inmates have much more complex presentations.

- There is no provision for Central File Review (required by the Program Guide).

- There is a severe restriction on the time allocated for collection of collateral information. This limitation, in combination with the absence of any provision for observation or cell side visits, limits the extent to which important adaptive information could be incorporated into the evaluation.

- It is not clear whether there is an allocation of time required to complete the Mental Health Intake evaluation form (which incorporates information regarding history, etc.).

The activity grids do not factor in visits by a case manager for any emergencies that might arise. Again, some required tasks were simply omitted (e.g. Central File Reviews). The frequency of a particular task was based on minimal Program Guide requirements. One illustration of this problem is found in the frequency of case manager visits for 3CMS inmates. The Program Guide requires that a 3CMS inmate have contact with a case manager at a *minimum* of every ninety days. The Program Guide itself assumes that visits will take place more frequently than once every ninety days if more frequent visits are clinically indicated. The Program Guide at p. 12-3-14 states "[f]ace to

face individual contacts between the CCM[4] and the 3CMS inmate-patients in a general population setting shall occur as often as clinical needs dictate but at least once every 90 days."

Indirect Time:

The "indirect time" factor was included to reflect time that could not be attributed to direct clinical time with inmates or requirements not specifically documented in the Program Guide, but that were necessarily part of the workday. This indirect time factor is reflected as a percentage and is added to the base total FTE hours (2,080) per year. The consultants arrived at this percentage based on interviews and observations at the prisons as well as discussions with DCHCS representatives. The Workload Study allocated an indirect time factor of 23 percent for licensed clinical positions. Other than the following lists of indirect time classifications, there does not appear to be any empirical evidence of how the allocation of 23 percent was calculated:

- vacation hours
- sick hours
- holidays
- bereavement
- in-service training time
- required meetings
- continuing education

In addition to those factors listed above, indirect time factors may also include the following:

- administrative activities
- training
- quality and professional activities
- other court mandates (e.g. Vitek hearings, Clark evaluations, Keyhea activities)
- other reports (e.g. Board of Prison Term)
- forensic reports (e.g. Mentally Disordered Offenders, Board of Parole Hearing)

Program Guide and Court Ordered Plans:

The Workload Study is a point-in-time study which was based on Program Guide requirements as of January 2007. The Study did not take into account any additional workload requirements for mental health clinicians resulting from contemplated revisions to the Program Guide subsequent to January 2007. These unaccounted for tasks include, but are not limited to, the following:

---

[4] Clinical case manager

- mental health assessment for indecent exposure
- production of MHTS inmate profile which tracks suicide history

The Study also did not include any additional workload requirements for mental health clinicians resulting from portions of court-ordered plans that have been approved. These unaccounted for tasks include the following:

| Program Impacted | Requirement |
|---|---|
| Development of Administrative Segregation Unit (ASU) EOP | Institutions with an EOP HUB should charter a weekly QIT to ensure that out of cell and treatment within the ASU EOP programs is maintained. |
| Reception Center EOP | EOP inmates within Reception Centers are to be seen weekly by case managers. |
| Reception Center EOP | RC EOP inmates with release dates within 60 – 120 days will be identified and a treatment plan will be written to incorporate individualized re-entry needs. |
| Redevelopment of 3CMS RVR | Note that this project is currently a "pilot." If the pilot procedures are adopted for wider use, the workload impact should be evaluated. |

Key Assumptions:

Key assumptions represent data extracted from the Program Guide and on site interviews, or that are based on factors such as percentages of time allocated to clinical positions to perform tasks, percentage of inmates requiring activities of daily living (ADLs), weekly group hours and other assumptions for each level of care. The genesis of the key assumption values were reportedly provided through the mental health tracking system, interviews with administrative staff, and discussions with site clinicians.

One assumption that was immediately questioned by the experts regarded the percentage of 3CMS inmates who were taking medication. The value that was assigned for that assumption was 30 percent. This value was clearly incorrect. A survey of four institutions by the experts more accurately reflected the percentage of 3CMS inmates on medication was roughly 80 percent. At the demonstration of the staffing model provided by the CDCR on June 5th, the 30 percent value of 3CMS inmates on medication was replaced with a hypothetical value of 85 percent for one institution and this resulted in an increase by eleven staffing positions *for that institution alone*.

There are also instances of tasks being re-assigned to different positions based on assumptions that need to be more closely examined to ensure that the proper care is being provided despite the financial benefits of these re-assignments. While some of the re-

assignments may lead to an overestimate of necessary positions, this may also have the unintended effect of underestimating other positions.

There were other assumptions questioned by the experts for which answers were not provided. The following questions regarding these assumptions were submitted to the consultants by the experts. The questions were derived from information contained on the standard assumption chart provided by the consultants.

- Is it correct to assume that "discharge % to other CDCR programs" refers to the percentage of various populations that discharge to "other" CDCR programs? If this is correct, what are the other programs?

- Is it truly accurate that there is no difference between the percentage of EOP inmates and the percentage of 3CMS inmates who discharge to other CDCR programs?

- The chart indicates that one percent of 3CMS and one percent of EOP inmates discharge to DMH. Intuitively, the percentage for EOP inmates would seem to be higher. What is the basis for these percentages?

- The chart indicates that five percent of the total MHCB inmate stay is spent in restraints and that the average time spent in restraints is ten hours. What is the basis for these numbers, since both appear to be excessive?

- The chart indicates that 34 percent of MHCB inmates require psychometric testing. Based upon the experience of the experts, this appears to be a very high percentage, since psychometric testing seldom occurs in the MHCB programs or elsewhere. What is the basis for this percentage?

The answers to these questions have not been provided. It was indicated that further research needed to be completed in order to provide the answers.

In response to the experts' questions regarding the origin of certain key assumptions, the consultants reported that many of the values for these assumptions were established by a subcontractor in Salt Lake City, Utah who has gone out of business. And the individuals responsible for the establishment of these values are very difficult or impossible to contact.

Recommendations:

The Excel-based spreadsheet that comprises the staffing matrix produced by the Workload Study appears to be completely functional and adaptable to any changes within the MHSDS. This spreadsheet is a working model that can be expanded and adjusted for any changes in staffing, population, and programming within the MHSDS. The staffing matrix is data driven and any new data that is input into the spreadsheet produces immediate staffing changes. This Excel-based spreadsheet appears to function in a manner that allows the CDCR to arrive at accurate projections for staffing needs. However, the Workload Study simply did not go far enough and is incomplete for the reasons that I have stated above.

The following recommendations are offered to address the concerns regarding the ultimate implementation of the workload based staffing model:

- Given the errors which have been discovered and the uncertainty regarding the origin of many assigned values, the key assumptions should be thoroughly reviewed. If it is not possible to determine whether these values are objectively based, an effort should be made to verify their accuracy.

- CDCR should review the clinical activities that are performed by mental health staff and develop activity grids that include all tasks typically assigned to mental health staff and not just those tasks required by the Program Guide. Tasks required in meeting recent Program Guide revisions and court orders should also be included.

- CDCR should review all of the modules to insure that all identified subtasks (e.g. Central File Review) are consistent with Program Guide requirements.

- CDCR should validate the "minutes" values.

- The development of the Program Guide is an ongoing process which will demand that staffing needs be addressed and adjusted on a regular basis. CDCR should conduct reviews of the staffing needs twice a year utilizing the Excel-based spreadsheet, and <u>Coleman</u> experts should be involved in this process.

The completion of these measures will go a long way to ensure that the staffing recommendations generated by the Workload Study are based on data that has been both objectively determined and validated.

If you have any questions or concerns, please do not hesitate to contact me.

Sincerely,

Matthew A. Lopes, Jr.

cc: Michael Stone, Esq.
Michael Bien, Esq.
Donald Specter, Esq.
Jane Kahn, Esq.
Amy Whelan, Esq.
Ivan Trujillo, Esq.
Brenda Epperly-Ellis
Sharon Riegel