# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.,
    **Plaintiffs**

    **v.**                        No. CIV S-90-0520 KJM DB P

EDMUND G. BROWN, JR., et al.,
    **Defendants**

## TWENTY-SEVENTH ROUND MONITORING REPORT OF THE SPECIAL MASTER ON THE DEFENDANTS' COMPLIANCE WITH PROVISIONALLY APPROVED PLANS, POLICIES, AND PROTOCOLS

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
February 13, 2018

## ACRONYMS AND ABBREVIATIONS

3CMS:              Correctional Clinical Case Management System

ADHD:              Attention Deficit Hyperactivity Disorder

ADLs:              Activities of Daily Living

AGPA:              Associate Governmental Program Analyst

AIMS:              Abnormal Involuntary Movement Scale

APP:               Acute Psychiatric Program

ASH:               Atascadero State Hospital

ASP:               Avenal State Prison

ASU:               Administrative Segregation Unit

BIP:               Behavioral Incentive Program

BLS:               Basic Life Support

C-file:            Case File

C&PR:              Classification and Parole Representative

Calipatria:        Calipatria State Prison

CAP:               Corrective Action Plan

CBT:               Cognitive Behavioral Therapy

CC I:              Correctional Counselor I

CC II:             Correctional Counselor II

CCAT:              Correctional Clinical Assessment Team

CCC:               California Correctional Center

i

| | |
|---|---|
| CCI: | California Correctional Institution |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| Centinela: | Centinela State Prison |
| CEO: | Chief Executive Officer |
| CHCF: | California Health Care Facility |
| CHSA: | Correctional Health Services Administrator |
| CIM: | California Institution for Men |
| CIW: | California Institution for Women |
| CMC: | California Men's Colony |
| CME: | Chief Medical Executive |
| CMF: | California Medical Facility |
| CNA: | Certified Nursing Assistant |
| CO: | Correctional Officer |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CRC: | California Rehabilitation Center |
| CSATF: | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |

| | |
|---|---|
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CSR: | Classification Staff Representative |
| CTC: | Correctional Treatment Center |
| CTF: | Correctional Training Facility |
| CVSP: | Chuckawalla Valley State Prison |
| DCHCS: | Division of Correctional Health Care Services |
| DDP: | Developmental Disability Program |
| DSH: | Department of State Hospitals |
| DOT: | Direct Observation Therapy |
| DVI: | Deuel Vocational Institution |
| EHRS: | Electronic Health Records System |
| EKG: | Electrocardiogram |
| EOP: | Enhanced Outpatient Program |
| EPRD: | Estimated Parole/Release Date |
| ERRC: | Emergency Response Review Committee |
| EMRRC: | Emergency Medical Response Review Committee |
| EMS: | Emergency Medical System |
| eUHR: | Electronic Unit Health Record |
| FIT: | Focused Improvement Team |

Folsom:              Folsom State Prison

FWF:                 Folsom Women's Facility

FTE:                 Full-Time Equivalent

GACH:                General Acute Care Hospital

GP:                  General Population

HCFIP:               Health Care Facilities Improvement Program

HCPOP:               Health Care Placement Oversight Program

HDSP:                High Desert State Prison

HPS I:               Health Program Specialist I

HR:                  High Refuser

HS:                  *Hora Somni*/Hour of Sleep

ICC:                 Institutional Classification Committee

ICF:                 Intermediate Care Facility

IDTT:                Interdisciplinary Treatment Team

IERC:                Institution Executive Review Committee

IEX:                 Indecent Exposure

IP:                  Inmate Patient

ISP:                 Ironwood State Prison

KVSP:                Kern Valley State Prison

LOP:                 Local Operating Procedure

LOC:                  Level of Care

LRH:                  Least Restrictive Housing

LTRH:                 Long-Term Restricted Housing

LVN:                  Licensed Vocational Nurse

MAPIP:                Medication Administration Process Improvement Program

MCSP:                 Mule Creek State Prison

MDO:                  Mentally Disordered Offender

MHCB:                 Mental Health Crisis Bed

MHCBU:                Mental Health Crisis Bed Unit

MHOHU:                Mental Health Outpatient Housing Unit

MHSDS:                Mental Health Services Delivery System

MHTS.net:             Mental Health Tracking System

MERD:                 Minimum Eligible Release Date

MRSA:                 Methicillin Resistant Staphylococcus Aureus

MSF:                  Minimum Support Facility

NA:                   Nurse-Administered

NDS:                  Non-Disciplinary Segregation

NKSP:                 North Kern State Prison

NOS:                  Not Otherwise Specified

OHU:                  Outpatient Housing Unit

OP:                      Operational Procedure

OSS:                     Office Services Supervisor

PIWP:                    Performance Improvement Work Plan

PBSP:                    Pelican Bay State Prison

PC:                      Primary Clinician

PIA:                     Prison Industries Authority

PIP:                     Psychiatric Inpatient Program

PREA:                    Prison Rape Elimination Act

PSH:                     Patton State Hospital

PSU:                     Psychiatric Services Unit

PTSD:                    Post-Traumatic Stress Disorder

PVSP:                    Pleasant Valley State Prison

QIP:                     Quality Improvement Plan

QIT:                     Quality Improvement Team

QMC:                     Quality Management Committee

R&R:                     Receiving and Release

RAP:                     Reasonable Accommodation Panel

REMS:                    Risk Evaluation and Mitigation Strategies

RJD:                     Richard J. Donovan Correctional Facility

RVR:                     Rules Violation Report

SCC:                    Sierra Conservation Center

SCU:                    Supportive Care Unit

SHU:                    Security Housing Unit

SI:                     Suicidal Ideation

SIB:                    Self-Injurious Behavior

SNF:                    Skilled Nursing Facility

SNY:                    Sensitive Needs Yard

SOMS:                   Strategic Offender Management System

SPHU:                   Special Program Housing Unit

SPMW:                   Suicide Prevention Management Workgroup

SPRFIT:                 Suicide Prevention and Response Focused Improvement Team

SSRI:                   Selective Serotonin Reuptake Inhibitor

SQ:                     San Quentin State Prison

SRE:                    Suicide Risk Evaluation

SSI:                    Supplemental Security Income

STEP:                   System to Encourage Progress

STRH:                   Short-Term Restricted Housing

SVPP:                   Salinas Valley Psychiatric Program

SVSP:                   Salinas Valley State Prison

TABE:                   Test of Adult Basic Education

TCMP:                  Transitional Case Management Program

TTA:                   Triage and Treatment Area

VAC:                   Vacuum-Assisted Closure

VSP:                   Valley State Prison

W&IC:                  Welfare & Institutions Code

WSP:                   Wasco State Prison

**TABLE OF CONTENTS**

**ACRONYMS and ABBREVIATIONS** .......... i

**THE COLEMAN SPECIAL MASTER'S TWENTY-SEVENTH ROUND MONITORING REPORT** .......... 1

**I.   INTRODUCTION** .......... 1

    **Activities of the All-Parties Workgroup and the Special Master: June 2016 to the Present** .......... 4

    **The Sizeable MHSDS Population and Staffing Vacancies—Notably Psychiatry Vacancies—Remain Primary Obstacles to Defendants' Compliance with this Court's Orders and Program Guide Requirements** .......... 24

**II.   SUMMARY OF THE SPECIAL MASTER'S FINDINGS** .......... 29

    A.   Mental Health Staffing in CDCR Prisons .......... 29

        1.   Status of Mental Health Staffing .......... 29

        2.   Mental Health Staffing Vacancy Rates Overall and by Discipline During the Twenty-Seventh Monitoring Round .......... 31

    B.   Quality Management .......... 37

    C.   CDCR's Continuous Quality Improvement Process and Quality of Care in CDCR's Mental Health Programs .......... 41

        1.   CQI Process Trial Implementation .......... 41

        2.   CQI Reports/Reporting Process .......... 45

        3.   The Quality of Care Delivered during the Twenty-Seventh Monitoring Round Continues to Substantiate the Need for a Sound and Durable Quality Improvement Process in CDCR's Mental Health Program .......... 50

            a.   Issues with Use of the Interdisciplinary Treatment Team Process .......... 50

            b.   Treatment Planning Concerns .......... 53

                i.   Documentation Issues .......... 53

                ii.   Inadequacies of Treatment Plans .......... 54

                iii.   Lack of Needed Modifications and Updating of Treatment Plans to Respond to Inmates' Current Mental Health Issues .......... 56

                iv.   Care Was Not Sufficiently Individualized to Address

Inmates' Clinical Needs 57
(1) Records Reflected a Lack of and/or Poor
Case Conceptualization 57
(2) Diagnoses in Inmates' Records Were
Insufficiently Documented, Conflicting, and
Lacked Sufficient Rationale 57
(3) Treatment Plan Goals Were Not Adequately
Developed 58
c. Inmates Were Not Considered and/or Referred to a Higher
Level of Care When Indicated—Issues with IDTTs' Use of
Form 7388-B in Consideration of Referrals of Inmates to
Higher Levels of Care 60

D. Medication Management 63

E. Access to Higher Levels of Care 73

1. Form 7388-B 74
a. Interdisciplinary Treatment Teams and the Use of the
Form 7388-B Process 74
b. The Quality of Form 7388-B Varied Across
Institutions 77

2. Transfers to Inpatient Care 78
a. Adequacy of Referral/Non-Referral Logs 78
b. Transfers to Acute Inpatient Care 79
c. Transfers to Intermediate Inpatient Care 79
d. Transfers Following Inpatient Bed Assignment 79

3. MHCBs 80
a. Transfers to MHCBs and Bed Availability 80
b. MHCB Lengths of Stay 80

4. Alternative Housing Lengths of Stay 81

5. Transfers to Psychiatric Services Units 81

6. Transfers to Administrative Segregation EOP Hubs 82

7. Transfers to EOP 82

8. Transfers to Short-Term Restricted Housing 82

9. Transfers to Long-Term Restricted Housing 82

F. Mental Health/Custody Relations 83

1.  Twenty-Seventh Monitoring Round Findings on Mental Health/ Custody Relations                                    83

2.  Cultural Collaboration:  Background                   87

3.  Cultural Collaboration Workgroup and Activities       87

4.  Custody and Mental Health Partnership Plan:  Trial Implementation                                             90

G.    Rules Violation Reports                             92

H.    Use of Force                                        102

I.    Program Access                                      106

J.    Construction and Renovation of Mental Health Treatment Space and Bed Activations at Various Levels of Care        112

K.    MHSDS Inmates in Segregated Housing                119

1.  Psychiatric Services Units                          120

2.  Administrative Segregation EOP Hubs                 121

3.  Short-Term Restricted Housing                       122

4.  Long-Term Restricted Housing                        124

5.  3CMS Inmates in Administrative Segregation          125

6.  Non-Disciplinary Segregation                        127

7.  Privilege Group C and/or Work Group C ("C" Status)  127

III.   CONCLUSION                                         129

APPENDIX A - INSTITUTIONAL SUMMARIES                      136

California State Prison/Sacramento (CSP/Sac)         136

Folsom State Prison (Folsom)                        191

Pelican Bay State Prison (PBSP)                     202

Mule Creek State Prison (MCSP)                      219

Sierra Conservation Center (SCC)                    240

xi

California Medical Facility (CMF)                                    250

California State Prison/Solano (CSP/Solano)                         269

San Quentin State Prison (SQ)                                       284

Deuel Vocational Institution (DVI)                                  302

California State Prison/Corcoran (CSP/Corcoran)                     317

California Substance Abuse Treatment Facility (CSATF)               333

Pleasant Valley State Prison (PVSP)                                 352

Avenal State Prison (ASP)                                           365

Correctional Training Facility (CTF)                               375

California Men's Colony (CMC)                                       387

Wasco State Prison (WSP)                                           406

Kern Valley State Prison (KVSP)                                    419

California Correctional Institution (CCI)                          434

California Institution for Men (CIM)                               447

California Rehabilitation Center (CRC)                             467

California Institution for Women (CIW)                             476

Central California Women's Facility (CCWF)                         494

Valley State Prison (VSP)                                          507

California Health Care Facility (CHCF)                             521

**APPENDIX B – CLINICAL CASE REVIEWS**                             539

California State Prison/Sacramento (CSP/Sac)                       540

Folsom State Prison (Folsom)                                       552

Pelican Bay State Prison (PBSP)                                    563

Mule Creek State Prison (MCSP)                                     575

Sierra Conservation Center (SCC)                                   582

California Medical Facility (CMF)                                  587

California State Prison/Solano (CSP/Solano)                        598

San Quentin State Prison (SQ)                                      610

Deuel Vocational Institution (DVI)                                    619

California State Prison/Corcoran (CSP/Corcoran)                       627

California Substance Abuse Treatment Facility (CSATF)                 635

Pleasant Valley State Prison (PVSP)                                   643

Avenal State Prison (ASP)                                             647

Correctional Training Facility (CTF)                                  653

California Men's Colony (CMC)                                         663

Wasco State Prison (WSP)                                              673

Kern Valley State Prison (KVSP)                                       684

California Correctional Institution (CCI)                            692

California Institution for Men (CIM)                                 700

California Rehabilitation Center (CRC)                               708

California Institution for Women (CIW)                               713

Central California Women's Facility (CCWF)                          724

Valley State Prison (VSP)                                            737

California Health Care Facility (CHCF)                              741

THE COLEMAN SPECIAL MASTER'S
TWENTY-SEVENTH ROUND MONITORING REPORT

## I.  INTRODUCTION

Since the time of the filing of the Twenty-Sixth Round Monitoring Report, there has been a significant amount of activity surrounding *Coleman* remedial efforts—activity which continues as of the writing of this report.  Although the time span between the Twenty-Sixth Round Monitoring Report and the Twenty-Seventh Round Monitoring Report has been extended, this has proven to be a uniquely productive period in the *Coleman* case.  The parties, working with the Special Master, made significant progress in addressing some core focus areas required for the remediation of the case, and the California Department of Corrections and Rehabilitation (CDCR)—marking a major milestone in the case—began test monitoring its own activities through the Continuous Quality Improvement (CQI) process.

In June 2016, the Special Master began to conduct a series of All-Parties Workgroup meetings to address ongoing issues related to the delivery of mental health care, and to otherwise further progress on various court-ordered projects.  The All-Parties Workgroup is comprised of representatives of both plaintiffs and defendants and members of the Special Master's team of experts and monitors.  The efforts of the All-Parties Workgroup has resulted in great success, with accomplishments to include seeing some projects to completion, the resolution of certain issues, and substantial progress toward the resolution of yet still others. Continued collaboration between the parties, working together with the Special Master, to enforce the orders of this Court will advance the goal of ending federal oversight in this case. The progress made by the All-Parties Workgroup is outlined below.  Several of the subject matters covered in the workgroup process are also presented in detail in various parts of this report.

The Special Master's Twenty-Seventh Monitoring Round review covers the defendants' compliance with the plans, policies, and protocols provisionally approved by this Court in mid-1997 that were subsequently revised and re-approved by this Court on March 3, 2006 (Order, ECF No. 1773[1]), known as the Mental Health Services Delivery System (MHSDS) Program Guide.  The MHSDS Program Guide, 2009 Revision, is the operative remedial plan in this matter.  The Special Master's monitor's and expert's[2] institutional site visits for the Twenty-Seventh Monitoring Round began on May 3, 2016 and ended on January 26, 2017.  As with prior rounds, headquarters and institutional mental health staff and administrators of the CDCR fully cooperated with the Special Master's monitoring staff during the institutional site visits.

The monitor conducted full on-site visits at 24 CDCR adult institutions.[3]  The remaining ten institutions were reviewed by CDCR with a test implementation of its Continuous Quality Improvement Tool (CQIT)[4]  as part of a comprehensive CQI process in development by CDCR.  This is an ongoing process at the time of the writing of this report.  *See*, Order, filed August 9, 2016, ECF No. 5477; Special Master's Twenty-Sixth Round

---

[1] All Electronic Case Filing (ECF) citations are to the page number assigned by the court's ECF system.

[2] Although the collected data and findings discussed in this Report are the product of members of different monitoring teams, the various monitors are referred to collectively as "the monitor." Members of the Special Master's staff who are mental health experts are referred to collectively as "the Special Master's expert."

[3] Avenal State Prison (ASP), California Correctional Institution (CCI), California Health Care Facility (CHCF), California Institution for Men (CIM), California Institution for Women (CIW), California Medical Facility (CMF), California Men's Colony (CMC), California Rehabilitation Center (CRC), California State Prison/Corcoran (CSP/Corcoran), California State Prison/Sacramento (CSP/Sac), California State Prison/Solano (CSP/Solano), California Substance Abuse Treatment Facility (CSATF), Central California Women's Facility (CCWF), Correctional Training Facility (CTF), Deuel Vocational Institution (DVI), Folsom State Prison (Folsom), Kern Valley State Prison (KVSP), Mule Creek State Prison (MCSP), Pelican Bay State Prison (PBSP), Pleasant Valley State Prison (PVSP), San Quentin State Prison (SQ), Sierra Conservation Center (SCC), Wasco State Prison (WSP), and Valley State Prison (VSP).

[4] California Correctional Center (CCC), California State Prison/Los Angeles County (CSP/LAC), Calipatria State Prison (Calipatria), Centinela State Prison (Centinela), Chuckawalla Valley State Prison (CVSP), High Desert State Prison (HDSP), Ironwood State Prison (ISP), North Kern State Prison (NKSP), Richard J. Donovan Correctional Facility (RJD), and Salinas Valley State Prison (SVSP).

Monitoring Report, filed May 6, 2016, ECF No. 5439, at. 104 – 113; Order, filed August 30, 2012, ECF No. 4232.

CDCR's test implementation of its CQIT began on June 6, 2016 and ended on November 18, 2016.  The Special Master's experts and monitors, and representatives from the parties, were present at all CDCR CQIT tours.  Salinas Valley State Prison (SVSP) was the first prison monitored using the CQIT.  CDCR mental health leadership determined that SVSP would serve as an instructive initial site for the implementation of the test due to its large mental health mission and the challenges the program had faced over time.  Developments in this area during the monitoring round were promising, and it remains hopeful that a fully developed CQI process will prove to be a durable remedy for *Coleman* remediation.  At the time of this writing, CDCR is working with the Special Master, with plaintiffs' input, to finalize the report template and format.  A detailed discussion of the test implementation of the CQIT is set forth in Part II, Section C of this report.

The Twenty-Seventh Round core areas of monitoring included institutional mental health staffing levels, quality management, medication management, and transfers to higher levels of care.  Similar to the Twenty-Sixth Round, the monitor did not examine suicide prevention practices at the institutions, as the Special Master's expert, Lindsay Hayes, was simultaneously conducting a follow-up audit of suicide prevention policies, practices, and procedures in 23 selected CDCR prisons.

The summaries of the focus areas appear below in Part II, as Sections A through K. Appendix A is comprised of institution-by-institution summaries of the monitor's findings during the Twenty-Seventh Round.  The Special Master's expert's clinical reviews of individual inmate cases appear in Appendix B.

On December 4, 2017, the Special Master provided the *Coleman* parties with a draft version of this report ("Draft Report").  In accordance with the regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the Draft Report.  On January 3, 2018, plaintiffs' counsel submitted their comments to the draft report, including a request to include additional topics for the All-Parties Workgroup.  Those requests are addressed in Part III below.  Defendants submitted a 13-page letter containing their "objections and responses" to the Draft Report on January 3, 2018.  On January 11, 2018, plaintiffs submitted a reply to defendants' objections and responses to the Draft Report.  The Special Master held a meeting with defendants to discuss their objections and responses on January 17, 2018.  On February 2, 2018, defendants submitted a significantly reduced, four-page letter memorializing their revised positions regarding objections and responses to the Draft Report.

Defendants' objections primarily relate to the Special Master's reporting on defendants' CQI reports and mental health staffing.[5]  Those objections are addressed below, within the relevant sections in Part II of this report.  Defendants' additional responses to the Draft Report concern changes requested for clarity and/or to ensure accuracy.  After careful review and consideration, the Special Master has incorporated defendants' requested changes where applicable.

## Activities of the All-Parties Workgroup and the Special Master:  June 2016 to the Present

As reported above, shortly after the filing of the Twenty-Sixth Round Monitoring Report, the Special Master convened the All-Parties Workgroup in June of 2016.  In addition

---

[5] It is not entirely clear from defendants' February 2, 2018 letter which of the issues defendants consider objections and which are considered responses.  For the purposes of this report, the Special Master labels the two items defendants directly refer to in their letter as objections as such, and treats all other items as responses.

to attending to his monitoring and other related court-ordered duties, the Special Master, working with the parties, achieved a great deal of progress through the All-Parties Workgroup. This process is ongoing.  A discussion of the Special Master's activities both within and outside of the workgroup process is presented below.

<u>Suicide Prevention Efforts</u>

The establishment and implementation of effective suicide prevention policies and practices was one of the goals the court found must be achieved in order for defendants to end federal court oversight.  ECF No. 5477 at 2.  As stated above, the Special Master's suicide prevention expert, Lindsay Hayes, conducted a follow-up audit in 23 CDCR prisons during the Twenty-Seventh Monitoring Round.  Mr. Hayes' report on the results of his re-audit—"Second Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation"—and the Special Master's accompanying report, were filed on September 7, 2017.  ECF Nos. 5672, 5671.

In the Suicide Prevention Management Workgroup (SPMW), the parties successfully agreed to the withdrawal of Recommendations 14, 15, and 16 from Mr. Hayes' earlier report, "An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation."  ECF No. 5259.  In the "Special Master's Report on His Expert's Second Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," (ECF No. 5671), the Special Master informed the court that his expert had determined that the three recommendations were no longer warranted, and recommended their withdrawal, which the Special Master endorsed. The Special Master requested that the court adopt the recommendation of his suicide prevention expert and modify the court order of February 3, 2016 (ECF No. 5271) "to reflect

their withdrawal from the 32 recommendations contained" in the initial report of his expert. On January 25, 2018, the court issued an order adopting the Special Master's report in full. ECF No. 5762.

In addition, the SPMW, with input from plaintiffs, developed an annual Suicide Report template and established a process for death reviews. The Special Master's experts are nonvoting participants in the death review process. Other suicide prevention issues that were addressed by the parties and the Special Master included CDCR's response to suicide attempts by hanging or asphyxiation, and a replacement cut-down tool. The Special Master and the parties also attended to the revision of CDCR's Interdisciplinary Progress Note Five-Day Follow-Up (CDCR MH-7230 B) that was released to MHSDS staff on May 25, 2016. The revised form requires evaluations of patients who were referred to a Mental Health Crisis Bed (MHCB), or Alternative Housing, a Department of State Hospital facility, or a Psychiatric Inpatient Program (PIP) for suicidal ideation (SI) or behavior, and have been discharged.

As a suicide prevention action, the workgroup addressed a proposed change to CDCR's MHCB discharge custody checks policy to effect 30-minute custody checks when clinically indicated for inmates discharged from Alternative Housing. CDCR implemented the revised policy on September 1, 2017, which will be monitored by the Special Master.

The issue of the timeliness of calling "911" during a medical emergency when the Emergency Medical System (EMS) was activated was also addressed in the All-Parties Workgroup process. During the second suicide audit process, the Special Master's suicide expert raised concerns about circumstances where prison emergency staff had responded appropriately, but there had been significant delays in activating 911 emergency calls. Agreement was reached in the All-Parties Workgroup, and CDCR issued a memo dated August

28, 2017 reiterating the policy regulating activation of 911 emergency calls.

<u>Activities Related to Inpatient Care</u>

Another goal on the road map to the end of federal court oversight that defendants must meet is to identify, refer, and timely transfer inmates to the higher levels of mental health care. ECF No. 5477 at 2.  To assist defendants in meeting this goal, the court ordered the parties to "meet and confer under the supervision of the Special Master to develop an addendum to the Program Guide" regarding access and timely transfers to inpatient programs, specifically, the development of exceptions to Program Guide timeframes for inpatient transfers, and the timelines required to complete referrals when exceptions exist.  The addendum was required to be submitted to the court within 45 days of the order for review and final approval.  ECF No. 5610 at 13-14.

On June 8, 2017 the court approved the stipulation of the parties, with the concurrence of the Special Master, that there were three categories that warranted exceptions to the Program Guide transfer timelines for inpatient mental health care:

    1)  An inmate-patient is physically unavailable for transfer to a psychiatric inpatient program (acute and intermediate care facility) due to being ordered to appear in state or federal courts, necessitating transfer either out of the institution or to an institution nearest the court;

    2)  An inmate has a medical issue that cannot be treated at a psychiatric inpatient program and that is more urgent than his or her need for inpatient mental health treatment, which then causes a delay in the transfer to an inpatient bed; and

    3)  Circumstances outside of Defendants' control, and other than the preceding-enumerated exceptions, which cause a delay in transfer to a psychiatric inpatient program beyond the Program Guide timelines.

ECF No. 5631 at 2.

The court also approved the agreement of the parties that the defendants would track all

patients who exceeded timeframes, and report admissions and exceptions activity for the

previous calendar month by the fifteenth of the succeeding month.  Defendants were ordered to

develop a template for the reports with input from the Special Master and plaintiffs prior to

finalizing it.  The monthly report was required to include specific details for each inmate to

support any exceptions to the Program Guide transfer timeframes.  ECF No. 5631 at 3.

The parties were ordered to meet and confer monthly under the supervision of the

Special Master by teleconference from June through October 2017 "to review exceptions to

inpatient transfer time frames reported for the prior month."  *Id*.  The purpose of the monthly

call was twofold: (1) to review the individual exceptions and "refine the precise contours" of

the enumerated three exceptions, and (2) to "develop timelines for the completion of the

referral process following resolution of the reason for the delay in transfer to inpatient care."

Before each monthly call, defendants were directed to provide details in writing for each

inmate indicated as an exception that explained "the circumstances of the claimed exceptions

to the extent that such detail is not provided in Defendants' monthly filing."  The court also

approved the parties' agreement to jointly submit the proposed addendum to the Program

Guide consistent with the court's April 19, 2017 Order, "including timelines for completion of

the referral process when the relevant exceptions are present."  ECF No. 5631 at 3.

The parties, with the concurrence of the Special Master, filed a stipulation and

proposed order on July 27, 2017, requesting the court to continue the deadline to file an

addendum identifying the exceptions to the Program Guide transfer timelines for MHCBs until

January 31, 2018.  ECF No. 5653.  This request was subsequently modified to request an

extension until November 30, 2017 (ECF No. 5657), which was approved by the court on

August 14, 2017.  ECF No. 5660.  The court ordered the parties to continue to meet and confer

8

weekly either in person or by teleconferences, under the guidance of the Special Master, to:

    1) Review and discuss data presented by Defendants regarding potential obstacles to compliance with the 24-hour transfer timeframe;

    2) Review Defendants' application of the individual inmate exceptions and to refine the precise contours of the three (or more) enumerated exceptions to the 24-hour timeframe; and

    3) Develop solutions to address issues related to referral, treatment, and discharge of inmate patients to Mental Health Crisis Bed level of care.

*Id*. at 2.

The parties were further directed by the court, under the Special Master's guidance, to develop a process "to exchange written materials, including individual patient-level data, to discuss on a monthly basis any mental health crisis bed transfer that may qualify for an exception to Program Guide timelines." *Id*. At the time of this report's writing, the process outlined and directed by the court is occurring in the All-Parties Workgroup.

Following the implementation of the updated Memorandum of Understanding between Department of State Hospitals (DSH) and CDCR on May 1, 2016, working with the Special Master and plaintiffs, CDCR revised the format/templates of its report to the court to include a new procedure for the referral of inmates for inpatient mental health treatment. The parties, with the Special Master's concurrence, stipulated that beginning June 15, 2016, defendants would file the revised referral/waitlist and monthly trends report with the court. Order, filed June 24, 2016, ECF No. 5458.

In late 2016, defendants contacted the Special Master and asked for his assistance with modifying the monthly reports filed with the court concerning the census, waitlist, and trends for inpatient mental health care, which request was ratified by the court. Order, filed December 20, 2016, ECF No. 5537. The final revised templates were approved by court order

dated June 8, 2017 (ECF No. 5631), and the first report utilizing the approved revised format

was filed on June 15, 2017.  ECF No. 5636.[6]

The California State Budget 2017/2018 allocated funds to CDCR's budget for, among

other items, the transfer of 1,156 inpatient mental health treatment beds at CDCR prisons[7]

operated by DSH to the responsibility of CDCR effective July 1, 2017.  The budget also

transferred 1,977.6 positions from DSH to CDCR.  The purpose of the transfer as announced in

the budget was to streamline processes, reduce review periods, improve referral transfer

timelines, and improve service delivery in acute and intermediate care provided by these

facilities.[8]

From February to June 2017, the Special Master worked with both CDCR and DSH

defendants on their joint "Lift and Shift" project that transferred responsibility and control

from DSH to CDCR over those acute and intermediate inpatient care facilities located within

CDCR institutions.  The Special Master fully participated in revising existing DSH policies

and procedures related to inpatient care as well as pertinent parts of the Memorandum of

Understanding between CDCR and DSH.  The Special Master also assisted in developing new

policies and procedures and training materials to implement Lift and Shift; his experts and

monitors observed the training in several facilities.  Plaintiffs provided input into all aspects of

the Lift and Shift process.  Responsibility for providing acute and intermediate inpatient care in

facilities located in CDCR's prisons formally passed from DSH to CDCR on July 1, 2017.  The

---

[6] Prior to submitting the approved formats, working with the Special Master, the parties concluded and submitted revised reporting formats to the court on March 15, 2017, ECF No. 5577, which was modified by the Court in its April 19, 2017 Order, ECF No. 5610.

[7] California Health Care Facility, California Medical Facility and Salinas Valley State Prison.

[8] 2017-18 California State Budget - State of California - June 27, 2017.

Special Master will monitor the PIPs as part of his regular monitoring process.

In order to monitor the implementation and application of the Least Restrictive Housing (LRH) designation after Lift and Shift, and to consult with CDCR regarding how the application of LRH in the PIPs impacted bed availability for acute and intermediate inpatient care throughout the system, the Special Master, accompanied by the parties, conducted focused LRH tours of the facilities.[9]

The Special Master and the CDCR defendants have discussed the initial findings of the LRH focused tours, and consulted with defendants regarding the application of the LRH, including on October 19, 2017, when defendants and the Special Master's workgroup held a follow-up meeting to discuss LRH cases that they had identified since the focused tours. At the time of the writing of this report the Special Master had begun conducting his first full monitoring of the PIP since Lift and Shift occurred on July 1, 2017.

Pursuant to the order of the court dated March 7, 2017 (ECF No. 5573 at 3), the Special Master, with input from plaintiffs, initially worked with DSH to develop "a consistent uniform patient level system" for utilization in both its acute and intermediate care inpatient programs. Following Lift and Shift, under the Special Master's guidance and supervision, CDCR commenced drafting its "System to Encourage Progress (STEP)." STEP is envisioned to be an integral part of the treatment process for both acute and intermediate care patients in the PIP. It encompasses a treatment progression model that supports and encourages patients as they advance through a PIP's treatment program. Once fully developed, it will be shared with plaintiffs for their input, and finalized through the All-Parties Workgroup process.

---

[9] Salinas Valley State Prison-PIP (August 15-17, 2017), the California Healthcare Facility-PIP (August 22-24, 2017), California Medical Facility-PIP (September 6-8, 2017), and California Institution for Women-PIP (September 11-12, 2017).

MHSDS Bed Availability

CIW-PIP

The lack of available beds at the CIW-PIP is a longstanding and ongoing problem for CDCR. This problem was exacerbated by the failure to refer and admit female patients to Patton State Hospital (PSH) for no discernible reasons. On September 12, 2017, defendants informed the Special Master during the LRH focused site visit at the CIW-PIP, that between July 27, 2017 and August 8, 2017, 11 female inmates with the requisite LRH had been admitted to PSH. Defendants have further informed the Special Master and plaintiffs that female inmates with the required LRH may be referred directly from CDCR institutions to PSH without first being admitted into the CIW-PIP, and that inmates already in the CIW-PIP with an LRH designation of "unlocked dorms" may be transferred to PSH. The Special Master conducted a regular monitoring tour of the CIW-PIP during November 1 – November 2, 2017—the findings will be presented in the Special Master's upcoming report on inpatient care.

CMF L-1 Unit

As an interim measure to expand intermediate care beds available to inmates requiring inpatient care, the parties and the Special Master worked together once again to provide access to the L-1 unit at CMF for patients needing an intermediate level of care. The Special Master's expert, accompanied by the parties, conducted pre-and post-activation tours of L-1. In addition to examining the suitability of the housing area, the tours focused on access to adequate treatment space, mental health and custody staffing allocations, and out-of-cell time due to the size of the cells and the plan to double cell patients. After reaching agreement on the program structure, with the concurrence of the Special Master, the parties stipulated and requested the

12

court to issue an order waiving state licensing requirements to enable the establishment of 70

temporary intermediate care beds, and two observation and restraint rooms in the L-1 unit at

CMF for 18 months from the date of the order.  The parties agreed to consider the need for an

extension of the waiver 12 months after the establishment of the program and that defendants

will inform the court of any delays that prevented the conversion of L-1 to be completed within

60 days of the order.

      In approving the parties' stipulation to use the L-1 unit for inpatient care, the court

directed that in order to facilitate the Special Master's monitoring of L-1, the defendants were

required to report to the Special Master why every patient placed in L-1 had not been placed in

a "DSH facility consistent with the patient's Least Restrictive Housing designation or other

appropriate DSH facility."  ECF No. 5605 at 5.  In addition, the court directed the parties "to

work with the Special Master to bring the plans for the L-1 Wing unit into compliance, as

necessary and as expeditiously as possible, with the requirements of the October 18, 2007

order."  *Id*.  Following the issuance of the waiver order, the L-1 program was activated on June

1, 2017.  The Special Master's expert toured L-1 with defendants on June 21, 2017 before any

patients were admitted into the unit, and then toured the unit with the parties on August 22,

2017, after patients had been placed in the unit.  The Special Master is using both the All-

Parties Workgroup and his monitoring responsibilities to carry out the orders of the court

related to the L-1 unit at CMF.

DSH-Stockton Isolation Rooms[10]

      In 2015, DSH advised the Special Master it was considering modifying several medical

isolation rooms for use as permanent inpatient care beds to increase the number of available

---

[10] Following Lift and Shift, this facility is now called the California Health Care Facility-Psychiatric Inpatient Program (CHCF-PIP).

13

beds at DSH-Stockton.  DSH indicated it would retain the minimum number of isolation rooms

required by state licensing regulations.  At the request of DSH, on July 30, 2015,

representatives of the Special Master's team and defendants inspected the isolation rooms at

DSH-Stockton to generally discuss how defendants proposed to modify the rooms.  DSH did

not provide any further information to the Special Master regarding this proposal until January

13, 2017.  This was ten days before the January 23, 2017 scheduled hearing when DSH

informed the Special Master it had begun using medical isolation rooms at DSH-Stockton to

house patients.  DSH was using the isolation rooms because they had redlined beds at Salinas

Valley Psychiatric Program (SVPP) that were damaged by weather conditions, an occurrence

they did not report to the Special Master.

   Representatives of the Special Master's team visited DSH-Stockton on May 9, 2017

with defendants and their construction experts.  Construction plans were presented and

discussed, and each of the 16 medical isolation rooms scheduled to be modified was toured.

The Special Master's team also toured DSH-Stockton on June 14, 2017 following the

renovations of the first two medical isolation rooms to inspect the modified rooms; both rooms

were found to be suicide resistant.  All units containing these modified rooms were transferred

to CDCR during Lift and Shift.  At the time of the writing of this report, the 16 former medical

isolation rooms were available as permanent inpatient care beds at CHCF-PIP and will be

monitored by the Special Master.

   In part, because of DSH's actions regarding the utilization of the isolation rooms, the

court directed "defendants to meet and confer with the Special Master prior to implementation

of any further changes, additions, or reductions in the number and/or use of any inpatient beds

or mental health crisis beds."  ECF No. 5573 at 3.  Compliance with this order will be

monitored in the All-Parties Workgroup.

MHCBs

In January 2017, CDCR submitted proposed MHCB clustering procedures to the Special Master and plaintiffs to be discussed in the All-Parties Workgroup. The procedures outlined three regions where MHCB clustering would be implemented, northern (131 beds), central (236 beds), and southern (60 beds). The parties discussed the proposal in detail, after which the Special Master suggested that CDCR take more time to develop a workable plan for a full-scale MHCB clustering proposal and present it to the All-Parties Workgroup at a later time. At the time of the writing of this report, the proposed MHCB clustering procedures were still under consideration by the All-Parties Workgroup.

The revision of CDCR's policy regarding "Housing of Patients Pending Mental Health Crisis Bed" relating to "the priority, handling, documentation, and timeliness regarding alternative housing" was also addressed by the All-Parties Workgroup. The revised policy emphasized which temporary housing an inmate can be placed in for four hours or less. It also provided information that specified suicide resistant features for housing where it was not already standard, and removed licensed medical beds as Alternative Housing options. Implementation of this policy will be monitored by the Special Master.

MHCB Privileges

The Special Master and the parties addressed the issue of inmate privileges in the MHCB in the All-Parties Workgroup, and reached an agreement regarding the revised "Mental Health Crisis Bed Privileges" policy, which CDCR implemented on February 14, 2017. The new policy addressed out-of-cell activity, telephone access, visiting privileges and documentation of all privileges received by inmates in the MHCB. This will be monitored by

15

the Special Master during his regular site visits.

CCWF Double-Cells

The All-Parties Workgroup also discussed how to double-cell female inmates determined to be suitable by mental health and cleared by custody for the two double-cell crisis beds at CCWF.

EOP Beds

The All-Parties Workgroup also examined CDCR's Enhanced Outpatient Program (EOP) bed activation plans.  Since June 2016, the defendants have regularly provided EOP and Intermediate Care Facility (ICF) bed activation reports, including a table of the scheduled or proposed EOP bed changes and notification of future proposed mission changes.  These reports were provided to the Special Master and plaintiffs, where the parties and the Special Master then discussed the plans and addressed any areas of concern.  EOP bed activations will be monitored by the Special Master.

The activation of the first EOP beds in RJD's Level II Dorm Complex was another matter addressed by the All-Parties Workgroup.  The parties and the Special Master discussed the stages of construction, CDCR's plans for admitting inmates into the six-person dorms, and the nature of the programming that would be offered to inmates in the new program.  CDCR reported that inmates would have access to education and vocational programs, substance use treatment programs, cognitive behavior treatment, transition programs, arts programs, and other similar programs currently offered in existing EOP programs.  The RJD EOP program will be monitored by the Special Master in the Twenty-Eighth Monitoring Round.

As part of its efforts to increase the number of EOP beds in the system, CDCR submitted a proposal to convert a 100-person general population (GP) dormitory at SQ into an

16

EOP housing unit together with treatment space.  On September 15, 2017, the Special Master

conducted a site visit of the proposed EOP yard at SQ.  During the site visit, the Special Master

consulted with CDCR headquarters and institutional staff, and toured the housing unit, as well

as treatment, vocational, educational, and recreation spaces.  The parties, accompanied by the

Special Master's expert and monitor toured the facility on November 16, 2017.  At the time of

the writing of this report, the proposal was under consideration by the parties through the

workgroup process.

      On April 14, 2017, CDCR issued a policy directive entitled "expanding the transition

away from designated General Population (GP) and Sensitive Needs Yard (SNY) Enhanced

Outpatient Programs (EOP),"[11] and classified the CSP/LAC Facility D as a "non-designated"

Level IV EOP program effective April 24, 2017. In a September 7, 2017 letter to defendants,

plaintiffs raised concerns regarding the non-designated Level IV EOP program at CSP/LAC,

specifically, that there was increased violence between inmates, more suicide attempts, and

possibly homicides in Facility D since the activation of the non-designated program at

CSP/LAC.  Plaintiffs also alleged custody staff misconduct in Facility D that they indicated

was reported by class members and clinical staff. This issue was initially addressed by the All-

Parties Workgroup at a meeting on September 14, 2017.  Defendants then responded to

plaintiffs' September 7, 2017 letter on October 6, 2017, to which plaintiffs submitted a follow-

up letter dated October 9, 2017.

      In order to assess the program, the Special Master's staff undertook a focused visit to

Facility D at CSP/LAC on October 10-11, 2017.  The team identified several matters regarding

the non-designated program at CSP/LAC that will be addressed in future All-Parties

---

[11] Under the policy directive, CDCR will no longer recognize or utilize Sensitive Needs Yard (SNY) and General Population (GP) designations for housing purposes in its EOP and inpatient programs.

Workgroup meetings.  These issues include the non-designated program, death review reports, QIPs, and autopsy reports related to three deaths at CSP/LAC, orientation material available to inmates prior to transfer to a non-designated facility, specialized training of correctional officers, available inmates' jobs in CSP/LAC's Facility D, outcomes tracking following transfers out of a non-designated program, allegations of staff misconduct and other issues specific to Facility D.  The program in Facility D will be monitored by the Special Master.

Additional EOP Care Areas

Other EOP care areas that were considered by the All-Parties Workgroup included the EOP hub certification process, long lengths of stay in segregation for EOP inmates, transfer delays, tracking and reporting of 150-day case-by-case reviews, retention of EOP inmates in segregation including those referred to inpatient care, and how CDCR proposed to address these issues.  EOP program issues such as modified programming and treatment refusals were also discussed, along with remediation plans.  Providing privileges to EOP inmates held beyond transfer timelines in reception centers was agreed to by the parties and implemented by CDCR.  Each of these areas will be monitored by the Special Master.

EOP and 3CMS Level of Care Reviews

CDCR developed and implemented the new policies and procedures to review all current EOP and Correctional Clinical Case Management System (3CMS) inmates in cooperation with the Special Master, with input from plaintiffs.  The EOP and 3CMS review processes were developed to determine the extent to which all MHSDS inmates were at the appropriate level of care and receiving adequate treatment, and that inmates who were no longer clinically indicated for a particular level of care were placed in the clinically appropriate level of care or discharged from the MHSDS if clinically indicated.  The Special Master and

18

plaintiffs observed the training and testing of the EOP and 3CMS review instrument and participated in revising it following its initial testing.  The EOP review processes were underway at the time of this writing, which the court took note of in its order of October 10, 2017.  ECF No. 5711 at 8.  The 3CMS review process is also underway at this time.  The processes will continue to be evaluated in the All-Parties Workgroup and monitored by the Special Master.

Mental Health Staffing

The court has clearly stated that adequate staffing is "necessary to remedy the Eighth Amendment violation in this action," (ECF No. 4539 at 24), and is critical to the "road map to end federal court oversight."  ECF No. 5477 at 2.  As previously ordered by the court, CDCR developed a staffing plan to address vacancies in mental health staffing.  On February 6, 2017, the Special Master filed his report on CDCR's staffing plan and the status of mental health staffing.  ECF No. 5564.  The court issued its order on the Special Master's report on October 10, 2017.  ECF No. 5711.  The Special Master's report and the court's related order are discussed in further detail in Part II, Section A below.

On March 7, 2017, the court ordered DSH to continue to work on its staffing plan in the workgroup process under the guidance of the Special Master, with input from plaintiffs.  ECF No. 5573.  The court required DSH to develop its staffing plan in coordination with CDCR's development of its own staffing plan; DSH was directed to provide monthly updates on implementation of the staffing plan to the Special Master.  *Id.* at 3.  The Special Master will work with DSH to fully implement its staffing plan within one year from the date of the court's October 10, 2017 order.  ECF No. 5711.

Also related to DSH staffing, on September 12, 2017, the Special Master and the

parties observed the use of telepsychiatry in a DSH program at PSH.

Cultural Collaboration Efforts

Working with the Special Master, with input from plaintiffs, CDCR developed a plan for cultural collaboration and accompanying training modules.  The activities in this area are described in further detail in Part II, Section F of this report.

Program Access for *Coleman* Class Members

Using the workgroup process, the parties and the Special Master revised and updated CDCR's program access policy for MHSDS inmates.  The parties agreed to revise CDCR's minimum support facility's (MSF) policy regarding the placement of MHSDS inmates in MSFs.  To qualify, a 3CMS inmate must have been at that level of care for at least three months, must not have been prescribed any psychotropic medications for at least six months, and must not have been admitted to an MHCB in the last six months.  In addition, the revision permitted 3CMS inmates prescribed SSRI (selective serotonin reuptake inhibitor) agents for depression for at least three months to be placed in MSFs.  The revised policy took effect September 2017.

Other revisions to the program access policy for MHSDS inmates agreed to in the All-Parties Workgroup included increasing the privileges of EOP inmates who have extended stays in reception centers, and providing milestone credits for inmates in non-disciplinary segregation (NDS status).  The Special Master's ongoing monitoring of program access for *Coleman* class members will include a review of the implementation of MSF policy requirements.

Working with the Special Master, the parties reached agreement on revising CDCR's

Work Group C and Privilege Group C Program.[12]  The revised policy standardized the requirements for out-of-cell activities for inmates assigned to Privilege Group C and/or Work Group C ("C" Status).  EOP inmates assigned to Work Group/Privilege Group C as a result of disciplinary action or program failure will automatically be referred to the IDTT as a routine referral.  The revised policy was implemented on February 16, 2017, and will be monitored by the Special Master.[13]

<u>CSP/Sac Focused Monitoring Tours</u>

During the Twenty-Sixth Monitoring Round, plaintiffs brought to the attention of the Special Master and defendants grave concerns involving allegations of staff abuse and interference with access to care at CSP/Sac, particularly in the indecent exposure (IEX) and segregated units.  As a result, in addition to the regularly scheduled Twenty-Seventh Round monitoring visit to CSP/Sac, the Special Master's staff participated in three focused re-visits to the institution to investigate and/or address these concerns.  A detailed discussion of the issues related to CSP/Sac is set forth in Appendix A of this report.

<u>CSP/Corcoran Indecent Exposure Pilot Program</u>

CDCR advised the All-Parties Workgroup of its plan to establish an IEX Pilot Program at

---

[12] An inmate may be placed in Work Group C, which is a non-credit earning status, for refusing a work assignment, or by an institutional classification committee (ICC) for frequent work/training violations due to serious disciplinary infractions. Title 15, Section 3044 (1)(A)(B)(C), updated through January 1, 2017. An inmate may be placed in Privilege Group C if he or she refuses to accept assigned housing twice, or refuses to accept or perform in an assignment, or is deemed a program failure. The ICC or a hearing officer may also place an inmate in Privilege Group C. *Id*. Section 3043.4, updated through January 1, 2017.

[13] Assignment of an inmate to Work Group C and/or Privilege Group C, which are restrictive, impacts their access to non-treatment programing and work, as well as to their personal property. The revision standardized out-of-cell activities for inmates placed in Group C, and in addition, for MHSDS inmates, permits the IDTT to recommend on a case-by-case basis that certain privileges not be suspended if it would be detrimental to an inmate's mental health status to suspend them. The policy directive also indicated that CDCR would begin the process of amending the regulations governing Work Group C and Privilege Group C in Title 15 and the Department Operations Manual to be consistent with the revisions in the policy directive.

CSP/Corcoran, with its stated goal to determine if modification of some of the functions for those offenses led to reduction in IEX behavior in a non-segregated environment. The 24-month pilot program was activated on December 4, 2017, included EOP, 3CMS and general population inmates, and was considered non-designated (housing SNY and non-SNY inmates together). Under the proposed plan, EOP inmates would not be housed in the same sections of the 180-design housing unit as the 3CMS/GP inmates.

On October 12, 2017, the Special Master conducted a focused site visit to CSP/Corcoran and toured the housing and treatment spaces for the program. The Special Master's team toured the 64-bed housing unit, 4B4R, and the adjoining unit, 4B4L, which will be used as an overflow unit. The team identified several matters regarding the CSP/Corcoran pilot, including capacity of treatment space, treatment resources, specialized treatment planning, staff allocation and training, orientation, and remodeling/renovation of the housing and treatment areas, which will all be addressed in the All-Parties Workgroup.

Inmate Discipline for Treatment Refusal

Plaintiffs brought to the attention of the All-Parties Workgroup reports that MHSDS inmates were being disciplined for refusing treatment, which greatly concerned the Special Master and plaintiffs because of the potential adverse impact on inmates' disposition to seek mental health care. The issue was resolved in the workgroup, and CDCR issued a clarifying memorandum to its staff stating that the Rules Violation Report (RVR) process does not apply to mental health appointments and prohibits staff from writing RVRs or Counseling Only Rules Violation Reports (previously, CDCR 128A) to inmates who refuse mental health appointments in person. This issue will be monitored by the Special Master as part of the ongoing monitoring of the RVR process.

RVR Assessment Project

During the Twenty-Seventh Monitoring Round, the Special Master undertook a special project related to CDCR's compliance with the court's May 4, 2015 order regarding the implementation of policies and procedures on Rules Violations Reports (RVRs).  ECF No. 5305.  The special RVR project assessed CDCR's compliance with mental health and custody staff training requirements, as well as the implementation and documentation of the mental health assessments process at 17 institutions.  Findings from the RVR assessment project are outlined in Part II, Section G of this report.

Use of Force Assessment Project

The Special Master also undertook a special assessment of CDCR's implementation of policies and practices in response to the court order of April 10, 2014 (ECF No. 5131) regarding use of force at 15 institutions.  The assessment documented the frequency of use of force in the institution, examined compliance with the required training of mental health and custody staff and monitored the application of the revised controlled and immediate use of force policies and regulations.  Findings from the use of force assessment project are outlined in Part II, Section H of this report.

PBSP SHU Custody Welfare Checks:  Assessment and Parties' Stipulation

During and following the Twenty-Sixth Monitoring Round, the Special Master attended to the concerns related to potential sleep deprivation resulting from the noise levels during First Watch security/welfare checks in the PBSP Security Housing Unit (SHU).  Due to concerns that security/welfare checks might be disturbing inmates' sleep, the parties agreed to perform an assessment of the noise levels within the SHU.  With the concurrence of the Special Master, the parties stipulated that security/welfare checks during First Watch would be conducted once

23

per hour for 60 days to permit defendants time to determine how to possibly reduce the noise levels.  This modification was approved by the court on December 28, 2015.  ECF No. 5393.

The stipulation expired by its terms on May 1, 2016, and was extended by further stipulations of the parties, with concurrence of the Special Master, and approved by the court. ECF Nos. 5438, 5467.  CDCR completed its assessment and submitted a report to the Special Master and plaintiffs on July 1, 2016.  During the All-Parties Workgroup process, the parties and the Special Master considered the various measures that CDCR undertook to reduce the noise generated by the security/welfare checks.  Without agreeing that the security/welfare checks created excessive noise levels or caused any harm to inmates, CDCR agreed to permanently conduct security/welfare checks in the PBSP SHU only once per hour on First Watch.  This was approved by the court on September 1, 2016.  ECF No. 5487.  Compliance with security/welfare checks will continue to be monitored by the Special Master during the Twenty-Eighth Monitoring Round.

**The Sizeable MHSDS Population and Staffing Vacancies—Notably Psychiatry Vacancies— Remain Primary Obstacles to Defendants' Compliance with this Court's Orders and Program Guide Requirements**

As described above, there has been a substantial amount of progress related to *Coleman* remedial efforts since the filing of the Twenty-Sixth Round Monitoring Report.  It cannot be understated how encouraging this progress is, and the parties should be acknowledged for their collaborative efforts in that regard.  However, there remains work to be done to reach the end goal of bringing defendants into compliance with the court's orders and subsequently ending federal court oversight.  As observed during the Twenty-Seventh Monitoring Round, the weight of the MHSDS population and psychiatry shortages continued to present serious challenges to defendants' efforts to achieve compliance in many areas.

24

In his Twenty-Sixth Round Monitoring Report, the Special Master observed that the mental health caseload population had surged while the total in-custody population had fallen. Specifically, during the time period of April 2013 through February 2016, CDCR's mental health caseload population rose by approximately 4,275 while its total inmate population fell by 5,230.  ECF No. 5439 at 13-14.  As of February 24, 2016, the *Coleman* class comprised 28.9 percent of the total inmate population, whereas in April 2013 the *Coleman* class comprised only 24.5 percent of the population.  *Id*. at 13.  While this trend in divergence of populations has slowed—the total in-custody population has experienced a small increase over the past year—the percentage of the mental health population that comprises the total population has remained steady at the elevated level.

On May 16, 2016[14], shortly after the start of the Twenty-Seventh Monitoring Round, CDCR's total mental health caseload population was 37,669.  On May 4, 2016[15], CDCR's total in-custody population was 128,200, making the mental health caseload population comprise 29.4 percent of the total population.  By January 30, 2017[16], shortly after the end of the Twenty-Seventh Monitoring Round, CDCR's total mental health caseload population was 38,228.  On January 25, 2017[17], CDCR's total in-custody population was 129,092, making the mental health caseload population comprise 29.6 percent of the total population.  On October

---

[14] Closest date to the beginning of the Twenty-Seventh Monitoring Round, which began on May 3, 2016, for which CDCR's total mental health caseload population was reported; source: CDCR Secure Website, posting covering May 2016.

[15] Closest date to May 3, 2016 for which CDCR's total in-custody population was reported; source: CDCR Public Website, Population Reports.

[16] Closest date to the end of the Twenty-Seventh Monitoring Round, which ended on January 26, 2017, for which CDCR's total mental health caseload population was reported; source: CDCR Secure Website, posting covering January 2017.

[17] Closest date to January 26, 2017 for which CDCR's total in-custody population was reported; source: CDCR Public Website, Population Reports.

16, 2017[18] (the most recent date for which data was available), CDCR's total mental health caseload population was 38,852; CDCR's total in-custody population on October 31, 2017,[19] was 131,057, making the mental health caseload population comprise 29.6 percent of the total population.



**MHSDS Inmates in CDCR—Population**
**April 2013, May 2016, January 2017, and October 2017**

| Date | Total In-Custody Population | Total Mental Health Population | Percentage of Mental Health Population to Total In-Custody Population |
|---|---|---|---|
| **April 2013** | 132,533 | 32,525 | **24.5** |
| **May 2016** | 128,200 | 37,669 | **29.4** |

<hr/>

[18] As of this writing, the most recent date for which CDCR's current mental health caseload population has been reported; source: CDCR Secure Website, posting covering September 2017 (the population data was current as of October 16, 2017).

[19] As of this writing, the most recent date for which CDCR total in-custody population has been reported; source: CDCR Public Website, Population Reports.

| | | | |
|---|---|---|---|
| **January 2017** | 129,092 | 38,228 | **29.6** |
| **October 2017** | 131,057 | 38,852 | **29.6** |

The data shows that the mental health population has yet to experience a population decrease in relation and/or in comparison to the decrease of the total population, which drives many of the issues attended to in the All-Parties Workgroup, one example of which is bed availability. Despite their ongoing efforts surrounding construction and program activations, defendants have been unable to keep pace with the bed needs of the *Coleman* class. Population size also clearly correlates with caseload ratios, thus driving staffing needs. The population data above lends continued credence to the suggestion that a study of the reasons behind it, and whether it is likely to continue, may be in order.[20]

Statewide vacancies, particularly psychiatry, also continued to prove a major obstacle in providing class members with adequate mental health care, affecting compliance with Program Guide requirements related to IDTTs, clinical contacts and medication management. A review of an annual sample of psychiatry vacancies between November 2011 and September 2017[21] (the most recent date for which data was available), demonstrated—with limited exceptions—a steady increase in the overall functional vacancy rate since the time the Twenty-

---

[20] In his Twenty-Sixth Round Monitoring Report filed with this Court on May 6, 2017, the Special Master stated that the "divergence of population suggests that a study of the reasons behind it, and whether it is likely to continue, may be in order." ECF No. 5439 at 14. The Special Master also pointed out that while a "population study may be indicated, there is no compelling reason why the *Coleman* court should order defendants to commission and facilitate a population study." *Id.* At 135.

[21] Source: CDCR Secure Website for Monthly Reports, covering the periods of November 2011, November 2012, November 2013, November 2014, November 2015, November 2016, and September 2017.

Third Round Monitoring Report was filed.[22]   In November 2011, the overall psychiatry

functional vacancy rate reported by CDCR was 16.27 percent.  By November 2014, the

psychiatry functional vacancy rate had decreased from 26.82 percent in November 2013, to 18

percent; however, by November 2015 it had risen almost 13 percent to 30.81 percent.



| | 11/2011 | 11/2012 | 11/2013 | 11/2014 | 11/2015 | 11/2016 | 9/2017 |
|---|---|---|---|---|---|---|---|
| Authorized Positions | 306.95 | 299.5 | 334.1 | 343.9 | 358.3 | 368.9 | 357.3 |
| Adjusted Vacancies | 49.96 | 75.23 | 89.62 | 61.95 | 110.41 | 121.61 | 108.93 |
| Functional Vacancy Rate | 16.27% | 25.11% | 26.82% | 18% | 30.81% | 32.96% | 30.48% |

As evidenced by the chart, since November 2015, the overall psychiatry functional vacancy rate

has not decreased below 30 percent.  A comprehensive discussion of mental health staffing in

CDCR is presented in Part II, Section A below.

Although the time between the Twenty-Sixth and Twenty-Seventh Monitoring Round

reports saw an unprecedented amount of productivity and a number of successes, the work of

the Special Master and that of the All-Parties Workgroup remains ongoing.  While working

with defendants through the workgroup process to assist them in complying with the court's

---

[22] Twenty-Third Round Monitoring Report of the Special Master on Defendants' Compliance With Provisionally Approved Plans, Policies and Protocols  ECF No. 4124, filed December 1, 2011.

orders and reducing overall staffing vacancies statewide, the Special Master will focus

particular attention to remedying the years-long problem of psychiatry vacancies.  A list of

projects/activities that will be the focus of the continued efforts of the Special Master and the

All-Parties Workgroup is presented in the Conclusion of this report.

The Special Master's findings regarding the focus areas are presented below.

## II.    SUMMARY OF THE SPECIAL MASTER'S FINDINGS

### A.    Mental Health Staffing in CDCR Prisons:

#### 1.    Status of Mental Health Staffing

Pursuant to a court order dated May 18, 2015 (ECF No. 5307), CDCR defendants were

ordered to move forward with four proposals set forth in their most recent staffing plan (ECF No.

5269), the genesis of which was found in a plan filed on September 30, 2009 (ECF No. 3693)

and approved by the Special Master on March 4, 2010.  ECF No. 5564 at 31-32.  One provision

of the May 2015 order directed "the Special Master to report to the court on the status of

defendants' implementation of their four proposals."  ECF No. 5307 at 6.  Pursuant to that court

order, the Special Master reported on the status of defendants' staffing plan in his Twenty-Sixth

Round Monitoring Report.  ECF No. 5439.[23]

On August 9, 2016, the court issued an order adopting the recommendations contained in

the Special Master's Twenty-Sixth Round Monitoring Report and directed him to issue a stand-

alone report on mental health staffing and defendants' staffing plan.  ECF No. 5477 at 9.  The

Special Master's Report on the Status of Mental Health Staffing and the Implementation of

Defendants' Staffing Plan was filed on February 6, 2017.  ECF No. 5564.  The Special Master

---

[23] A long and detailed history of the staffing shortages that have plagued CDCR since the inception of the case and the remedial measures taken by defendants are contained in both the Special Master's Twenty-Sixth Round Monitoring Report (ECF No. 5439) and the Special Master's Report on the Status of Mental Health Staffing and Implementation of Defendants' Staffing Plan.  ECF No. 5564.

found that although defendants' updated staffing plan included some promising elements, others were deficient and therefore could not be recommended for adoption by the court.

The staffing plan proposals recommended for adoption included those related to medical assistants, internship and fellowship programs, increased rates for contract psychiatrists, telepsychiatry, cash for on-call compensation, dual appointments, psychiatric nurse practitioners, utilization management relating to 3CMS inmates, Proposition 57, and the mental health academy.  The Special Master recommended that the court decline to adopt the proposals on utilization management related to EOP inmates, salary increases for psychiatrists, and clustering.

On October 10, 2017, the court issued an order adopting the Special Master's staffing report recommendations with modifications.  ECF No. 5711 at 29.  In relevant part, the court ordered:

1) Defendants to report to the Special Master, at regular intervals set by him, on the implementation of the staffing proposals recommended for adoption as outlined above;

2) Defendants and the Special Master to meet and confer, including plaintiffs as appropriate, every 90 days for the next year to discuss the status of defendants' compliance with the Court's order;

3) Defendants to take all steps to come into complete compliance with their 2009 Staffing Plan staffing ratios and the maximum ten percent vacancy rate required by the Court's June 13, 2002 order;

4) Defendants to develop a MHSDS Program Guide addendum governing the use of telepsychiatry including the extent to which telepsychiatrists may be used in place of on-site psychiatrists.  *Id*. at 29-30.

Further, the court set two status conferences.  An April 12, 2018 status conference, to address defendants' progress towards compliance with the court's order, and an October 11,

2018 status conference, to address enforcement of the court's order and the durability of the staffing remedy. *Id*. at 30-31.[24]

There is no ambiguity regarding the court's frustration with defendants' struggle to comply with its previous staffing orders, and the court has once again signaled its intention to use its powers of enforcement to ensure compliance. *Id*. at 2. Working with the Special Master, and with input from the plaintiffs, it is expected that defendants will reach full compliance with orders to remedy the decades old staffing deficiencies and remediate this component of the case within the next twelve months. In that regard, this issue will assume a regular place on the agenda of future All-Parties Workgroup meetings to ensure that it receives the concentrated focus required to comply with the court's order.

### 2.   <u>Mental Health Vacancy Rates Overall and by Discipline During the Twenty-Seventh Monitoring Round</u>[25]

As of May 2017, the total number of all established mental health positions for chief, senior and staff psychiatrists; chief, senior, staff and intern psychologists; social workers; psych techs; and recreation therapists was 2,840.54.[26] Of these established positions, 2,250.45 were

---

[24] On February 5, 2018, the court issued an order setting a status conference for February 14, 2018 and vacating the April 12, 2018 status conference, to be reset later, as appropriate. ECF No. 5774.

[25] In their February 2, 2018 letter memorializing their objections and responses to the Draft Report, defendants noted their objection "that the 27th Round Report seems to improperly apply the June 13, 2002 Order's ten-percent vacancy maximum to mental health administrative, clerical, and support positions." Defendants do not point to a particular report passage, or otherwise cite any basis for their objection. In this report, the Special Master reviews and reports on all staffing in the mental health delivery system, as has been the standard procedure with his past compliance reports. Defendants' objection—of which even they appear unclear about, as evidenced by their use of the term "seems"—only serves an attempt to create an argument where one does not exist. As such, no further discussion of it is warranted. As the court stated in its August 30, 2012 Order adopting the Special Master's Twenty-Fourth Round Monitoring Report, "[w]hile the parties are required to raise before the Special Master any objection they intend to raise here, the Special Master is not required to respond to any objections that are frivolous…" ECF No. 4232 at 4.

[26] Source: (excluding for psych techs): CDCR Secure Website for Monthly Reports, posted July 2017, covering the period of May 2017. Because staffing data for psych techs was not included in the monthly posting, the data reported herein on psych tech staffing was obtained from the individual institutional reports for the Twenty-Seventh Monitoring Period.

filled by full-time employees.  The collective vacancy rate among all these positions was 21 percent, which was unchanged from the Twenty-Sixth Monitoring Round.  The use of contractors reduced the functional vacancy rate among all mental health positions to 17 percent, which was also unchanged from the preceding monitoring report.

Chief Psychiatrists

The vacancy rate among the 18 allocated chief psychiatrist positions increased from 16 percent to 22 percent from the preceding monitoring report.  Registry was not used for any of the vacant positions.  Four institutions operated without chief psychiatrists – CHCF, MCSP, PBSP and RJD.

Senior Psychiatrists

The vacancy rate for senior psychiatrists continued to decline and decreased to 22 percent from a rate of 26 percent in the preceding monitoring round.  Sixteen of the 20.5 established senior psychiatrist positions were filled.  Of the 17 institutions with allocated positions, 13 filled all of them.  The four institutions with 100 percent vacancy rates were ASP, CIW, RJD and VSP. No contractors were used to fill any vacancies.

Staff Psychiatrists

The vacancy rate for staff psychiatrists saw a three-percent increase from the preceding monitoring period, with a rise from 44 to 47 percent, while the functional vacancy rate increased eight percent, rising from 32 to 40 percent.

Of the 318.8 allocated positions, 169.25 were filled resulting in a vacancy rate of 47 percent.  The use of 22.2 contractors reduced the functional vacancy rate to 40 percent.  The seven institutions with vacancy rates of ten percent or less were Calipatria, Centinela, CIW, CRC, CSATF, Folsom, and SQ.  Eleven institutions – CCI, CCWF, CIM, CMC, CSP/Sac,

CSP/Solano, CTF, DVI, MCSP, PBSP, RJD and SCC – had vacancy rates ranging from 11 percent to 50 percent.  Eleven institutions – ASP, CHCF, CMF, CSATF, CSP/Corcoran, CSP/LAC, KVSP, NKSP, PVSP, SVSP, VSP and WSP – had vacancy rates ranging from 51 percent to 75 percent.  HDSP, with two allocated positions, and ISP with one allocated position, both had 100-percent vacancy rates.

Chief Psychologists

Of the 60 allocated chief psychologist positions, 38 were filled, resulting in a vacancy rate of 37 percent.  No contractual coverage was used.  Calipatria, CCC and CVSP had no allocations for chief psychologist positions.  Of the remaining 31 institutions, 11 had zero vacancies – Centinela, CIW, CMF, CSATF, CSP/Sac, DVI, ISP, MCSP, PBSP, RJD and SVSP. Sixteen institutions had a 50-percent vacancy rate – ASP, CCI, CCWF, CHCF, CIM, CMC, CSP/Corcoran, CSP/LAC, CSP/Solano, CTF, Folsom, KVSP, NKSP, PVSP, VSP and WSP.  SQ had a 33-percent vacancy rate, with CRC, HDSP and SCC each with a 100-percent vacancy rate.

Senior Psychologists

The vacancy rate among senior psychologists continued to decline from 12 percent to six percent since the preceding monitoring round.  Of the 210 allocated positions, 205.5 were filled with 20 institutions having a zero percent vacancy rate – Calipatria, CCI, CCWF, CHCF, CIM, CIW, CRC, CSATF, CSP/Sac, CSP/Solano, CTF, CVSP, DVI, HDSP, NKSP, PVSP, RJD, SCC, VSP and WSP.

Another three institutions, CMC, CSP/LAC and MCSP had vacancy rates under ten percent.  Of the remaining nine institutions that had allocated senior psychologist positions, vacancy rates ranged from 14 to 33 percent.  Centinela and ISP had no allocated positions.

<u>Staff Psychologists</u>

The vacancy rate for staff psychologists decreased slightly since the preceding monitoring round, with a one-percent decrease from 19 percent to 18 percent.  Of the 811 total allocated positions, 661.6 were filled with full-time psychologists for a vacancy rate of 18 percent.  The use of 35.55 contractors reduced the functional vacancy rate to 14 percent, down from 15 percent during the preceding monitoring round.

ASP, CCWF, Centinela, CIM, CIW, CSP/LAC, DVI, ISP, RJD and SCC filled all of their staff psychology positions and another ten institutions – CMC, CMF, CSATF, CSP/Solano, CTF, Folsom, PBSP, PVSP, SQ and VSP had vacancy rates of ten percent or less.  There were six institutions with vacancy rates ranging from 11 percent to 25 percent – Calipatria, CCC, CRC, CSP/Corcoran, CSP/Sac and MCSP.  The remaining eight institutions – CCI, CHCF, CVSP, HDSP, KVSP, NKSP, SVSP and WSP had vacancy rates ranging from 26 percent to 48 percent.

<u>Intern Psychologists</u>

The number of allocated intern psychologists increased from 27 to 35 since the preceding monitoring round.  There were 35 intern psychologist positions allocated for 11 institutions. Seven of the institutions – CCWF, CIM, CIW, CSP/Sac, CSP/Solano, SQ and VSP filled all of their allocated positions.  CMC and RJD filled three of their four allocated positions while CHCF and CMF each filled two of their four allocated positions.

<u>Social Workers</u>

The overall vacancy rate among social workers increased from ten percent to 18 percent since the preceding monitoring round with 400 of the 487.5 allocated positions filled by full-time

employees.  Contractors further reduced the vacancy rate to 14 percent, representing an increase from six percent reported in the preceding monitoring round.

Eleven institutions filled all of the allocated positions – Calipatria, CCC, CCI, Centinela, CMF, CSP/LAC, CVSP, KVSP, NKSP, PBSP and PVSP.  Another seven institutions had vacancy rates of less than ten percent – CIM, CIW, CMC, CSATF, HDSP, RJD and WSP.  ISP, ASP and Folsom had vacancy rates of 100 percent, 83 percent and 67 percent respectively, while the remaining institutions had vacancy rates ranging from 11 percent to 35 percent.

<u>Psych Techs</u>

Of the 19 institutions where data was provided for psych tech positions,[27] there were 600 allocated psych tech positions of which 494.1 were filled with full-time employees for a vacancy rate of 18 percent.  Another 20 positions were filled by contractors and reduced the functional vacancy rate to 14 percent.  This was a slight decrease from the 17-percent functional vacancy rate reported in the preceding monitoring round.

Vacancy rates were ten percent or less at ten institutions – CIM, CIW, CMC, CMF, CSP/Sac, CTF, DVI, Folsom, MCSP and SCC.  Five institutions – CSP/Solano, PBSP, PVSP, SQ and VSP had vacancy rates ranging from 11 percent to 34 percent.  CCI and CCWF had vacancy rates of 62 percent and 53 percent, respectively.

<u>Recreation Therapists</u>

There were 270.5 allocated recreation therapist positions spread across 23 institutions.  Of those 270.5 positions, 222 were filled with full-time employees.  Another 21.78 positions were covered by contractors, which reduced the functional vacancy rate to ten percent.

---

[27] Ten institutions were reviewed through the CQI process and WSP did not provide sufficient data to determine vacancy rates.

Twelve institutions – CCWF, CHCF, CIW, CMF, CSP/LAC, CSP/Sac, CSP/Solano, DVI, HDSP, MCSP, RJD and SQ had vacancy rates of ten percent or less.  Another six institutions had vacancy rates ranging from 17 percent to 25 percent – CIM, CMC, CSP/Corcoran, PBSP, SVSP and VSP.  KVSP, WSP and CSATF had vacancy rates of 40 percent, 33 percent and 50 percent respectively and both NKSP and PVSP had 100 percent vacancy rates.

Office Techs

Of the 428.09 allocated office tech positions, 385 were filled, for a vacancy rate of ten percent.  No contractors were employed to fill any vacant positions.  Calipatria, CCWF, Centinela, CIM, CIW, CRC, CVSP, Folsom, ISP, KVSP, NKSP, PVSP, SCC and VSP filled all of their positions with full-time employees.  ASP, CHCF, CSATF, RJD, SVSP and WSP had vacancy rates of ten percent or less.  Twelve institutions – CCI, CMC, CMF, CSP/Corcoran, CSP/LAC, CSP/Sac, CSP/Solano, CTF, DVI, HDSP, MCSP and PBSP had vacancy rates ranging from 11 percent to 25 percent.  CCC and SQ had vacancy rates of 33 percent and 47 percent, respectively.

## Summary – Mental Health Staffing

As reported above, the overall statewide mental health staffing vacancy rate remained stagnant during the Twenty-Seventh Monitoring Round.  Although the senior psychiatrist, staff psychologist, psych tech and recreation therapist positions saw vacancy rate decreases ranging from one to 12 percent, and the number of intern psychologists increased by eight, those staffing gains were not sufficient to counterbalance the positions that saw an increase in vacancy rates— chief psychiatrist, staff psychiatrist and chief psychologist—ranging from six to eight percent.

36

As previously stated, to advance the goal of eliminating long-standing staffing vacancies and assist defendants in achieving compliance with this Court's orders, the Special Master will include staffing as a regular item on the All-Parties Workgroup meeting agenda.

## B.  Quality Management:

The Twenty-Seventh Monitoring Round revealed that a statewide quality management structure and process remained in place.  It included sustainability reviews conducted by regional mental health teams.  Some institutions reported having operational or mature quality management organization, but they had yet to reach a state of a continuous quality improvement system that is structured to identify problems on an ongoing basis, and develop remedial plans to address them, which is one of the primary objectives of the CQI process presently under development by CDCR.  The CQI process is reported separately in Part II, Section C below.

Institutional local quality management bodies continued to regularly meet and address relevant mental health program matters.  Most institutions chartered QITs, and some also utilized FITs and audits, as part of their quality management process.  Moreover, the standardized statewide peer review process that defendants began implementing during the Twenty-Sixth Monitoring Round was in place and reported on by most institutions.

During the Twenty-Seventh Monitoring Round, regional mental health teams conducted sustainability reviews at CHCF, CIW, CSP/Corcoran, CSATF, CCWF, KVSP and PBSP.  CSP/Corcoran and CCWF reported developing corrective action plans (CAP) as a result.  CHCF's CAPs had specific implementation deadlines, however the deadlines were not met.

ASP and CMC had operational quality management systems, while CCI's continued to improve.  CIM, CSP/Sac, CSP/Solano and SQ had mature quality management structures, and DVI's had improved, but none had yet reached a state of continuous quality improvement.

Quality management at CRC also did not operate as a system of continuous quality improvement designed to systemically identify problems, develop remedial plans, and monitor the resulting outcomes.

Fifteen institutions, namely, CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, CCWF, KVSP, MCSP, PBSP, PVSP, SQ and WSP, reported active local governing bodies; each typically met several times during the review period.  Local governing bodies at least met monthly at CMC, CSP/Corcoran, KVSP and SQ.  They met three times at CIW and WSP and held quarterly meetings or met twice at CHCF, CMF, CSP/Sac, CCWF, MCSP, PBSP and PVSP.  However, CSATF's local governing body only met once.  CIW, CMC, CSATF, CCWF, MCSP, PBSP and PVSP reported that their local governing bodies attained quorums.  SQ reported a quorum for all but one meeting.  Meeting minutes for CMF and KVSP did not document the presence of quorums.

Institutional quality management committees overwhelmingly reported meeting frequently.  CTF's quality management committee at least met semimonthly and frequently met weekly, while CIM's typically met twice monthly.  Quality management committees met monthly at ASP, CCI, CHCF, CMC, CRC, CSP/Corcoran, CSP/Sac, CSATF, CCWF, MCSP, SQ, SCC, VSP and WSP.  They met for five of six months at DVI and Folsom; CMF provided meeting minutes for five months.  Quality management committees at CIW, CSP/Solano, KVSP and PBSP regularly met.  PVSP did not provide minutes or other documentation as to its quality management committee.

Most institutions reported that their quality management committee achieved a quorum, which were regularly attained at CCI, CIW, CMC, CRC, CSP/Corcoran, CSATF, CCWF, CTF, Folsom, MCSP, PBSP, SQ and VSP.  WSP had quorums for five of six meetings.  ASP reported

good attendance, but CSP/Solano had difficulty achieving satisfactory attendance.  At CIM, DVI and KVSP it was not clear whether quorums were achieved although CIM typically reported good attendance.  CMF meeting minutes did not indicate whether quorums were attained.

Most institutions' mental health subcommittee met monthly, with some meeting more often.  The mental health subcommittee met at least monthly at CCI, CIM, CMF, CMC, CRC, CCWF, CTF, Folsom, KVSP, MCSP, PBSP, PVSP, SQ, SCC, VSP and WSP.  It typically met twice monthly at CHCF, CSP/Corcoran and CSP/Sac; at DVI it met twice monthly for four of six months.  CIW, CSATF and CSP/Solano's mental health subcommittee regularly met.  At ASP, the lack of a quorum resulted in only four of six scheduled meetings occurring.

Mental health subcommittees at most institutions regularly achieved quorums; they were consistently attained at ASP, CIM, CIW, CMC, CSP/Corcoran, CSP/Solano, CSATF, CCWF, CTF, DVI, Folsom, KVSP, MCSP, PVSP, SQ, SCC, VSP and WSP.  CMF had quorums for five of six monthly meetings, CSP/Sac achieved quorums two-thirds of the time and CRC had quorums for four of six meetings.  PBSP typically did not have quorums.

Most institutions utilized QITs as part of their quality management process.  There were active QITs at CCI, CIM, CMF, CMC, CSP/Corcoran, CSP/Sac, CSATF, CCWF, CTF, Folsom, MCSP, PBSP, PVSP, SQ, SCC and WSP.  FITs occurred at ASP, CMF, CMC, CSP/Sac, MCSP, PVSP and SQ.  CMF also had ongoing quality improvement studies as part of its quality management process.  CRC did not charter QITs or FITs.  There were no active QITs or FITs at KVSP.

CCI, CHCF, CIW, CMF, CMC, CSP/Sac, CTF, Folsom and MCSP reported conducting audits for mental health-related matters.

In his Twenty-Sixth Round Monitoring Report, the Special Master reported that defendants were in the process of implementing a standardized peer review process to be used at all CDCR institutions.  As a result, peer review activities had varied greatly due to the transition to the new process.  During the Twenty-Seventh Monitoring Round, the Special Master reviewed the implementation of the new standardized peer review process at all toured institutions.

Sixteen institutions - CCI, CHCF, CIM, CMF, CMC, CRC, CSP/Sac, CSP/Solano, CSATF, CTF, KVSP, MCSP, PBSP, SQ, SCC and WSP - reviewed during the Twenty-Seventh Monitoring Round reported peer review results utilizing the new process.   Assessment of the peer review process for psychiatrists, psychologists and social workers at these institutions did not reveal significant concerns, nor identify systemic peer review issues.  CSP/Corcoran reported the peer review process functioned adequately, but did not specify whether it had implemented the new process, and did not provide results from its peer reviews.  ASP reported that the new process was in place, and it had completed peer reviews for psychiatrists and social workers, but not for psychologists.  ASP did not provide the results of its peer reviews.  Folsom, which had also implemented the new process, had peer reviews for psychiatrists and psychologists, but not for social workers.  The two reviewed disciplines met or exceeded requirements.

CCWF, DVI, and PVSP did not report the status of, or results from, their peer review processes.  CIW did not conduct peer review.  VSP, used the new process, but reported it had not finalized the results of its peer review at the time of the site visit.

### Summary – Quality Management

During the Twenty-Seventh Monitoring Round, CDCR's quality management system remained in place with required institutional bodies functioning at most institutions.  Regular sustainability reviews occurred at all institutions; most institutions chartered QITs and some

utilized FITs.  The peer review process was in place at all institutions, although not all

institutions provided reports regarding peer review.  None of the institutions reviewed had a

quality management structure in place in the nature of a system that monitored mental health

activities, analyzed the results, identified areas that needed improvement, and developed and

implemented remedies with the objective of preventing future adverse outcomes.  These are the

issues that the CQI system presently under development by CDCR are designed to address.

    C.  **CDCR's Continuous Quality Improvement Process and Quality of Care in CDCR's Mental Health Programs**:

        1.  **CQI Process Trial Implementation**

In the original *Coleman* decision, the court found that defendants did "not have any form

of quality assurance that reaches all institutions covered by this class action."  *Coleman v.

Wilson*, 912 F. Supp 1282, 1308.  The court concluded that a "quality assurance program" is

required as "an appropriate remedy for constitutional deficiencies in the delivery of prison health

care."  *Id*.  Since the original decision over 22 years ago, CDCR has come a long way toward

instituting an integrated quality improvement system that "reaches all institutions" by developing

a CQI process, completing its initial testing, and beginning the process of developing a reporting

format that will enable it to monitor its own institutions.

Progress towards the development of an enduring quality improvement process that

would allow for CDCR's eventual assumption of self-monitoring the delivery of mental health

care to *Coleman* class members continued during the Twenty-Seventh Monitoring Round.  As

reported in the Twenty-Sixth Round Monitoring Report, in December 2015, the parties agreed to

a trial implementation of CDCR's CQI process at ten institutions during the Twenty-Seventh

Monitoring Round.  The plan was for the CQI audit to be performed at an initial test site with a

report distributed to the Special Master and plaintiffs prior to its implementation at the remaining

nine institutions.  The ten institutions selected for the CQI trial implementation were CCC, CSP/LAC, Calipatria, Centinela, CVSP, HDSP, ISP, NKSP, RJD, and SVSP.

CDCR's test implementation of the CQI process began at SVSP.  The four-day audit occurred on June 6, 2016 through June 9, 2016.  The Special Master and plaintiffs' counsel were in attendance to observe.  Upon conclusion of the trial implementation at SVSP, the Special Master's experts and monitors had three significant initial concerns.  The first was that the CQI audit as performed did not allow for a comprehensive review of the entire institution.  Although previous discussions regarding the CQI trial implementation had included monitoring the different mental health programs on a rotating basis, observation of the actual application at SVSP showed that the rotating format did not allow for a comprehensive review of an entire institution, which was the goal of the monitoring process.

The second concern was related to the use of the CQIT in performing the audit.  The CQIT instrument was generally used appropriately to collect information about institutions' performance in the specific areas delineated in the tool; it was observed that strict adherence to the confines of the tool without drawing connections between discrete findings to arrive at a comprehensive assessment of the institutions' functioning in a particular area, or the failure to examine problematic issues which arose during the course of the visit but were not directly covered by the CQIT instrument, could result in important systemic issues being missed.  The third concern related to the quality of the exit meetings held at the conclusion of an assessment and ensuring an accurate presentation of audit findings by CDCR auditors.  As a result, the Special Master recommended that defendants (1) modify the CQI process to include a review of all programs, (2) ensure that the use of the CQIT did not narrow the focus of the audit, and (3) provide clear instruction to CDCR auditors regarding the appropriate conduct of an exit meeting.

Defendants provided a status update on the CQI process at a June 10, 2016 All-Parties Workgroup meeting, reporting that they were planning to revise the CQI process to encompass a review of all mental health programs at an institution.  Defendants further reported that additional "tips" would be added to the CQIT to allow for the capture of any important issues not included in the tool.  Finally, defendants reported that although the SVSP CQI trial implementation generally went well, the exit meeting held at the conclusion of the audit required improvement.  As a result, defendants intended to develop a guide for exit meetings to include a checklist of items to be covered during an exit.

In October of 2016, defendants' continued their trial implementation of the CQI process. Plaintiffs were present at all remaining CQI audit tours with the exception of Centinela, where they instead participated in the exit conference.  The CQI trial was implemented at the remaining nine institutions in the following order.

- RJD – October 10, 2016 – October 14, 2016

- NKSP – October 12, 2016 – October 14, 2016

- CSP/LAC – October 17, 2016 – October 21, 2016

- ISP – November 1, 2016 – November 2, 2016

- CVSP – November 3, 2016 – November 4, 2016

- CCC – November 7, 2016 – November 8, 2016

- HDSP – November 8, 2016 – November 10, 2016

- Centinela – November 15, 2016 – November 16, 2016

- Calipatria – November 17, 2016 – November 18, 2016

As agreed by the parties, and with the consent of the Special Master, on March 2, 2017, plaintiffs submitted their written comments on the test CQI tours to defendants and the Special

43

Master.  Plaintiffs outlined a number of concerns related to the conduct of the CQI audits and offered some suggestions to remedy those concerns.  Certain of plaintiffs' concerns were shared by the Special Master and had already been addressed by defendants.  Those included revising the scope of the CQI assessments to include the monitoring of all programs at an institution, taking steps to ensure that use of the CQIT did not impede an auditor's identification of important larger issues, developing action items to remediate any identified issues, and developing guidelines for the conduct of exit meetings to ensure that they accurately reflected the findings of the assessment.

Plaintiffs' outlined several additional concerns.  One related to ensuring the proper balance between flexibility and efficiency in the CQI audit schedule, as plaintiffs had observed that the schedule did not allow auditors any time for organization, consultation, or to respond to scheduling challenges as they arose.  Another related to ensuring CQI auditors' adherence to the instructions for conducting the audits, e.g., ensuring that inmate interviews were composed of a random sample of class members and that the script established for custody officers to explain the purpose of those interviews was used.  Plaintiffs' remaining concerns related to ensuring the investigation of any "big picture" issues identified beyond specific CQI indicators, a lack of on-site communication between the CQI mental health and custody audit teams, and CQI auditors' failure to address inmate-specific concerns uncovered during the course of a site visit.

Plaintiffs suggested that defendants consider allotting additional time in the CQI site visit schedules for de-briefings between the mental health and custody audit teams and the completion of any necessary investigations into any issues which may arise.  Plaintiffs also expressed a need for defendants' development of a mechanism to respond to inmate-specific concerns uncovered during the course of an audit.

2.  **CQI Reports/Reporting Process**

Defendants submitted their first draft of the SVSP CQI report to the Special Master on September 30, 2016.  The Special Master's experts and monitors provided defendants with a series of comments and recommendations for consideration.  Among those recommendations was that defendants include detailed case reviews similar to those included in the Special Master's monitoring reports.  The SVSP report included what could be best described as case vignettes that did not provide any substantive meaning in the greater context of the report.  After a number of subsequent revisions of the draft report related to implementing feedback received from the Special Master, on November 1, 2016, defendants submitted their revised draft of the SVSP CQI report to plaintiffs for review and comment.

On December 14, 2016, plaintiffs submitted their comments on the SVSP CQI draft report to defendants.  In their letter, plaintiffs stated that the draft report represented "a major positive step towards transparent self-monitoring of the [MHSDS]" and remarked upon its acknowledgement of deficiencies in the mental health program at SVSP, as well as the presentation of important action items for improvement.  Plaintiffs raised two general concerns about the draft report.  Foremost, plaintiffs indicated that the draft report significantly deviated from the draft reporting template that had been negotiated by the parties, due to a number of agreed upon indicators having been omitted from the report.  Plaintiffs stated that defendants' presentation of topics by general subject matter, rather than reporting on each program area separately, made it challenging to determine how a specific program was performing and "impossible to determine the true cause of a number of significant problems."  The Special Master echoed this concern.  Plaintiffs were also concerned that sources had not been provided

45

for a number of the conclusions reached in the report, making it difficult in many cases to analyze the accuracy or appropriateness of those conclusions.

During an All-Parties Workgroup meeting on February 16, 2017, defendants provided an update on the status of the CQI reports.  For CQI audits performed going forward, the CQI reports would be formatted to reflect reporting by program area, rather than by general subject matter area across programs.  Defendants reported that because work on the remaining CQI reports was already underway, the planned revisions would not be reflected in those reports, however the SVSP report would be redrafted and submitted as an example of the planned changes.

On April 24 and April 26, 2017, defendants submitted revised drafts of the SVSP CQI report to the Special Master and plaintiffs.  The April 24, 2017 draft had been revised to reflect the feedback defendants received, but did not contain institution performance data from the CDCR MHSDS electronic database.  The draft provided on April 26, 2017 contained mock performance data, embedded as an example of the proposed format for use going forward.

On May 24, 2017, defendants submitted draft CQI reports for CCC, Calipatria, Centinela, CVSP, and ISP to the Special Master and plaintiffs.

In June of 2017, the Special Master selected several of his experts and monitors to comprise a workgroup tasked to perform a review of each of defendants' CQI reports and provide feedback and recommendations for further improvements to the reporting format.

Plaintiffs submitted their comments on the draft CQI reports for CCC, Calipatria, Centinela, CVSP, ISP, and SVSP to defendants and the Special Master on June 29, 2017.  In their submission, plaintiffs noted the significant improvements made to the SVSP CQI report since the prior draft.  In consideration of further report improvements, plaintiffs suggested a

46

further breakdown of certain of the performance data numbers by program area to assist in identifying problematic areas within the different programs.

Plaintiffs included amongst their concerns items missing from the report (documentation of completed suicides during the review period and a review of the quality of treatment provided to EOP inmates housed in the SVSP non-hub administrative segregation unit) and items they thought should be explored or explained in further depth (the DSH referrals section of the report—described as "cursory and incomplete" and the unclear selection criteria for the case examples, which made it difficult to determine their meaning within the greater context of the report).  Plaintiffs also stated concerns regarding the review and handling of existing cultural issues at the institution.

With regard to the draft CQI reports for CCC, Calipatria, Centinela, CVSP, and ISP, plaintiffs noted amongst their positive observations what they termed an appropriate focus on key problem areas.  Among their stated concerns, plaintiffs noted the lack of a separate section of case examples in the Calipatria, CVSP, Centinela, and ISP reports, and, as they had with the SVSP report, advocated for the development of clear and consistent criteria for the selection of case examples provided in CQI reports.

Plaintiffs also included four suggestions for further improvement of the audit process and as a result, the reports.  Those suggestions included (1) that CQI auditors review all possible contributing factors in cases where compliance in a particular indicator was consistently poor throughout a review period; (2) that CQI auditors identify and investigate "problems that go beyond particular CQI indicators but that relate to key areas necessary for the provision of adequate mental health care;" (3) that CQI auditors avoid assertions not substantiated by any data; and (4) to "include clearer avenues to achieve [defendants'] stated purpose of '[i]dentifying

47

persistent weak areas that surface in multiple institutions that may be the focus of statewide initiatives.'"[28]

On August 30, 2017, defendants submitted draft CQI reports for the remaining institutions—CSP/LAC, HDSP, NKSP, and RJD—to the Special Master and plaintiffs. There was a stark contrast between these reports and those previously prepared—it appeared that defendants had made a unilateral decision to depart from the court-approved Program Guide compliance standard of 90 percent and instead use an 85-percent compliance standard for self-monitoring. No reasoning for this change was offered beyond a statement from defendants that the 85-percent compliance standard was the same as that used in other CDCR quality management dashboards. Subsequently and without delay, the Special Master reminded defendants of (1) their requirement to use the court-approved 90-percent compliance standard,[29] and (2) the prerequisite to seek court approval to replace existing court-ordered and/or court-approved requirements.[30]

Plaintiffs submitted comments on the draft CQI reports for CSP/LAC, HDSP, NKSP, and RJD to defendants and the Special Master on September 12, 2017. In addition to reiterating their comments, concerns and suggestions regarding the CQI process and reporting format as previously outlined above, plaintiffs also expressed strong objections to defendants' use of an 85-percent compliance standard for self-monitoring.

---

[28] Quoting the CCC CQI draft report at page 1.

[29] Amended Defendants' Objections and Motion to Strike or Modify Portions of the Twenty-Fifth Round Monitoring Report of the Special Master, filed February 19, 2013, ECF No. 4347 at 15; Order, filed February 28, 2013, ECF No. 4361 at 9.

[30] In their February 2, 2018 letter memorializing their objections and responses to the Draft Report, defendants made clear their position that they have not been court-ordered to apply a 90-percent compliance standard in their CQI reports. While the Special Master believes that this matter is well-settled, the final determination lies with the Court. As defendants have yet to file their first CQI report with the Court, a discussion of the issue is premature at this time.

The Special Master's workgroup of experts and monitors met with defendants on September 14, 2017. Despite some significant concerns, overall, the workgroup found the reports to be comprehensive and to have improved over time in many respects. In the course of their discussions, the Special Master's experts and monitors presented defendants with further suggestions for improvement of the CQI reporting format and content. The workgroup's overarching concerns were that the draft did not address systemic issues that had impact across institutions or connect findings to present a full picture of a facility. The workgroup further found that while suicide prevention was covered, it was not complete, and multiple topical areas that were typically covered in the Special Master's monitoring report to the court were not included. Also, the draft report did not fully develop action items to address critical findings, or a path to follow-up on the proposed remedial actions.

Defendants requested a meeting with the Special Master's workgroup to consult with the Special Master and his experts on developing a process for the selection and documentation of case reviews for the CQI reports; that meeting occurred on October 19, 2017.

On November 6, 2017, the Special Master's workgroup met with defendants to discuss the updated draft CQI report. The report had been revised to address the areas of concern raised by the workgroup at the September 14, 2017 meeting.

In its order of August 16, 2016, the court emphasized that "the successful implementation of CQIT is a key marker of success on the road to ultimate termination of this court's oversight." ECF No. 5477 at 8. A successfully implemented CQI system measures the quality of care provided, monitors and evaluates health care delivery processes and outcomes, has the capacity to identify opportunities for improvement, and then develops and implements required changes.

**Summary – CQI Process**

The current stage of development of CDCR's CQI process reported above is a major achievement by defendants that furthers the objective of ending federal court supervision in the case.  Moreover, it presents another substantial example of what the parties have been able to achieve in this case working cooperatively with the Special Master.  In the course of giving feedback to defendants as discussed above, the specific issues regarding the CQI process that need to be addressed to improve it have been identified.  Utilizing the All-Parties Workgroup, the Special Master, with input from plaintiffs, will work with defendants to address each of the specific items that require corrective action, assist defendants to take the necessary corrective actions, and when completed, agree on the next steps needed to further the implementation of the CQI process in CDCR.

### 3.  The Quality of Care Delivered during the Twenty-Seventh Monitoring Round Continues to Substantiate the Need for a Sound and Durable Quality Improvement Process in CDCR's Mental Health Program

#### a.  Issues with Use of the Interdisciplinary Treatment Team Process

During the Twenty-Seventh Monitoring Round, the quality of IDTTs varied, both across and within institutions.  Observations of the Interdisciplinary Treatment Team (IDTT) process revealed several areas for improvement, notably similar to findings during the Twenty-Sixth Monitoring Round.  Common deficiencies found across institutions were related to a lack of meaningful team discussions on core clinical issues such as inmates' diagnoses, case factors, case conceptualization and formulation, treatment plans with measurable treatment goals, and consideration of referral to a higher level of care.  There were also issues found at several institutions with ensuring inmate participation in the IDTT process.

50

Inmates' mental health symptoms were discussed either generally or not at all during observed IDTT meetings in CIM's administrative segregation unit (ASU) and the Short-Term Restricted Housing (STRH) unit at CSATF.

There were several institutions where treatment teams were observed not to function cohesively. IDTTs in CCWF's administrative segregation EOP hub needed improved interaction among disciplines. The IDTT processes in the administrative segregation unit at CIM and in DVI's STRH unit were not collaborative. IDTTs for 3CMS inmates at KVSP served more as an individual "check-in" session rather than a collaborative process. During an IDTT for a 3CMS inmate at MCSP, rather than providing information that was available through the Strategic Offender Management System (SOMS) as part of the IDTT process, the Correctional Counselor I (CC I) referred him to his counselor. While the IDTT process in the STRH unit at CSATF was collaborative, staff was observed completing paperwork rather than actively participating in treatment team discussions throughout the IDTT meetings.

IDTTs in CHCF's MHCB had minimal discussion regarding treatment plan formulation and did not review inmates' prior MHCB admissions. Level of care changes were discussed only generally in IDTTs for 3CMS inmates at CIW. During an administrative segregation unit IDTT at CSP/Solano, treatment team members agreed to add a particular treatment goal to an inmate's treatment plan, but concluded the meeting and distributed the treatment plan for signature without amendment. During an administrative segregation unit IDTT at SCC, the IDTT documents were signed *prior to the beginning of the meeting* and there was no discussion about the reason for maintaining or changing the level of care. Psychiatrists had not evaluated inmates prior to IDTT meetings in the Psychiatric Services Unit (PSU) at PBSP and in the PVSP STRH unit, thus limiting psychiatry participation in the meetings. At PVSP, this resulted in

51

IDTT meetings sometimes serving as a substitute for confidential clinical contacts by psychiatrists.  During a 3CMS IDTT at VSP, clinicians did not incorporate new information from the inmate into the treatment plan.

At some institutions, IDTTs were being conducted in distracting and/or unsuitable environments.  An IDTT meeting for STRH inmates at CSP/Corcoran was interrupted by custody officers entering the room to retrieve property and supplies.  At KVSP, the room in which MHCB IDTTs were held was so cold staff wore jackets.  In the area where IDTTs were held for administrative segregation 3CMS inmates at CSP/Solano, ambient noise made it difficult to hear clearly.

There were times when treatment team members did not give proper consideration to the confidential nature of the information being presented.  During an IDTT for an EOP inmate in administrative segregation at WSP, the clinician presented highly sensitive information not relevant to final treatment plan targets in the presence of staff who appeared to have no need to be privy to such information.  There was a similar issue observed during IDTTs in the administrative segregation EOP hub at CSP/Sac, where custody staff who were not part of the treatment team were present in IDTT meetings where sensitive, confidential information they had no treatment-related reason to have knowledge of was being discussed.

Contrary to policy and the important goal of making mental health treatment a collaborative effort, observation of IDTTs revealed a variety of ways in which inmates were being excluded from serving as an integral part of the IDTT process.  Treatment teams at a number of institutions demonstrated difficulty establishing effective communication with inmates.  Technical clinical jargon, rather than layman's terms were used during IDTTs at CSATF, KVSP, and VSP, limiting inmates' ability to fully participate in their treatment.  During

52

IDTTs at CIM and KVSP, inmates were treated like passive observers and spoken about in an indirect manner, rather than being addressed directly.  At CMF, instead of clinically relevant summaries, some clinicians focused on custodial history or detrimental psychosocial events.  In one case, this resulted in the IDTT ending prematurely due to the inmate's discomfort with the tone of the presentation and the clinician's failure to respond accordingly.  A similar situation was observed during an MHCB IDTT at CCWF—the clinician focused on custodial rather than clinical history, the inmate was largely unengaged and staff's attempts to solicit information from the inmate resulted in the inmate disengaging from the process entirely.

Background information and case factors were presented outside the inmate's presence in IDTTs at CIW, CSP/Corcoran, Folsom and SCC.  Treatment teams spent minimal to zero time discussing treatment plans, treatment goals and/or level of care changes with inmates during IDTTs at CMF, CSP/Sac, CSATF, DVI, and KVSP.

Compliance with attendance of required disciplines at IDTT meetings was found to be an issue at CIM, CMF, CSP/Corcoran, CSP/Sac, DVI, KVSP, MCSP, PBSP, and WSP.  Attendance compliance issues were found to primarily stem from the absence of a psychiatrist at IDTT meetings.  However, at CMF there was a CAP in place to increase CC I attendance at MHCB IDTTs.

### b.   Treatment Planning Concerns

### i.    Documentation Issues

The Special Master's expert found numerous issues with documentation in treatment plans and health records across institutions.  A review of inmate health records found documentation to be poor, inaccurate and/or incomplete at CHCF, CSP/Sac, DVI, Folsom, KVSP, MCSP, and WSP.  In the case of [CSP/Sac Inmate A], treatment planning documentation

was inaccurate (failed to identify pertinent information) and incomplete (failed to fully complete 7388-B or update add-a-page).  For [Folsom Inmate C], the validity of the treatment team's consideration of factors that might indicate the need for a higher level of care was questionable, due to conflicting documentation regarding the inmate's current functioning and mental health care needs.  For [MCSP Inmate D], documentation of distinct treatment goals, interventions per treatment goal, and consistency of documentation of goal progress was needed.

At DVI, documentation issues were of particular concern, with problems noted in multiple cases, e.g., [DVI Inmate A] (7388-B improperly completed); [DVI Inmate B] (minimal documentation and limited progress notes), and [DVI Inmate E] (conflicting and poorly written documentation).  Multiple documentation issues were present in the case of [WSP Inmate B], where the expert found no documentation indicating daily clinical contacts had occurred during an alternative housing stay; insufficient clinical documentation to support the rescinding of a MHCB referral, and inadequate documentation regarding restraint and seclusion placement, which did not meet Program Guide requirements.  [KVSP Inmate B]'s care was problematic due to unclear and contradictory documentation regarding DSH referral, MHCB placement and alternative housing.  Documentation of [KVSP Inmate C]'s history of mental health treatment was lacking, and his treatment plan lacked documentation of his functioning and progress during treatment.  For [CHCF Inmate B], documentation of care and tracking was problematic and required improvement.

## ii.    Inadequacies of Treatment Plans

Consistent with findings from the Twenty-Sixth Monitoring Round, record reviews revealed numerous instances of inadequate treatment planning which failed to address inmates' mental health issues and/or treatment needs.  For example, the treatment plan for [CSP/Sac

Inmate C] contained little specificity and it was thus unclear as to which of the several identified therapeutic techniques might be effectively implemented.  Further, treatment targets were found to be too broad, rendering it difficult to target treatment effectively.  The treatment plan for [MCSP Inmate D] lacked documentation of distinct treatment goals and interventions per treatment goal.  The treatment plans for both [CMF Inmate A] and [CMF Inmate D] were found to be inadequate.  [CSP/Solano Inmate B]'s initial treatment plan suffered from a lack of appropriate goals, and interventions required greater specification.  [DVI Inmate B]'s treatment plan did not adequately address his symptoms, functional level and repeated crises.

In light of the severity of his symptoms and functional level, the specified interventions contained in [CSATF Inmate D]'s treatment plan were insufficient.  There was no treatment plan located at all in the record for [CSATF Inmate E].  For [CSATF Inmate G], the treatment plan did not include any relevant information indicating the inmate's treatment needs or how those needs would be addressed.  [ASP Inmate C]'s treatment plan was incomplete and did not address identified symptoms.  [ASP Inmate E]'s treatment plan was poorly constructed and required revision.

There were a number of reviewed cases where substance use and pre-release planning were not addressed in the treatment plan when indicated.  For example, despite documentation of substance dependence diagnoses, a history of substance abuse, and/or positive drug test results, treatment plans for [CIM Inmate B], [CRC Inmate C], [CSATF Inmate F], [CSATF Inmate H], [DVI Inmate D] and [MCSP Inmate E] did not address substance use.  Pre-release planning was not adequately addressed in treatment plans for [ASP Inmate A], [ASP Inmate C], and [DVI Inmate B], while, for [DVI Inmate C] although the Primary Clinician (PC) had begun pre-release planning with the inmate, the treatment plan was not updated to reflect it as an additional

treatment goal.  Although the treatment received by [PBSP Inmate E] was assessed as minimally

adequate, it would have benefited from initiation of pre-release planning, an identified source of

the inmate's anxiety.

### iii.  Lack of Needed Modifications and Updating of Treatment Plans to Respond to Inmates' Current Mental Health Issues

As during the preceding monitoring round, the Special Master's expert found that

treatment plans had not been appropriately revised to address changes in inmates' mental health

conditions, inmates' failure to engage in treatment, or when the treatment plan proved

ineffective.

For example, although [CSP/Sac Inmate A] demonstrated ongoing poor participation and

failure to engage in treatment, his treatment plan was not updated to properly target these

behaviors using appropriate treatment goals and interventions.  [CSP/Sac Inmate B]'s treatment

plan was not properly modified when treatment was ineffective at reducing symptoms and

improving functioning.  For [MCSP Inmate C], ongoing treatment plans were completed on a

Form 7388-D add-a-page and did not include modification to the actual treatment plan, despite

the inmate continuing to decompensate.  [CSP/Solano Inmate C]'s treatment plans required

revision to include appropriate goals and treatment modifications when the inmate did not

improve.  There was no modification of [DVI Inmate C]'s treatment plan to address the profound

deficits in functioning she continued to experience due to her mental illness.  Although [CSATF

Inmate A] exhibited significant decompensation indicating treatment failure, his treatment plan

was not modified accordingly.  [ASP Inmate A]'s treatment plan required revision to include

goals that addressed his immediate and short-term needs.

### iv.   Care Was Not Sufficiently Individualized to Address Inmates' Clinical Needs

Record reviews revealed numerous instances of problems with case conceptualization and/or diagnostic issues—either in the treatment plan itself, or which, as a result, negatively affected the treatment plan. Record reviews also revealed issues related to the development of effective treatment goals as part of the treatment planning process.

### (1)   Records Reflected a Lack of and/or Poor Case Conceptualization

Case conceptualization was an area in need of improvement across institutions. The treatment plan for [CSP/Sac Inmate A] did not properly document case conceptualization. Case conceptualization was lacking in [CSATF Inmate G]'s treatment plan. For [KVSP Inmate A], case conceptualization was lacking in the treatment plan and the rationale for psychiatric conceptualization was needed. [CIM Inmate C]'s care could have been improved with a case conceptualization and full recognition of the relationship between physical pain and mental status. Documentation of case formulation was one of several important elements missing from [CIM Inmate G]'s annual treatment plan.

While the mental health care provided to [CSATF Inmate F] was clinically adequate, clear case conceptualization in the treatment plan was a noted area in need of improvement. Similarly, in the case of [CIM Inmate F], although treatment was found to be in accordance with program requirements, the expert found that treatment planning could be improved with a fuller, more targeted case conceptualization.

### (2)   Diagnoses in Inmates' Records Were Insufficiently Documented, Conflicting, and Lacked Sufficient Rationale

Diagnostic issues related to documentation, rationale and discrepancies were present in a number of cases. Insufficient documentation of diagnosis—coupled with other deficiencies—

was found to be of significant concern in the case of [CIM Inmate I].  In the case of [KVSP

Inmate D], although the quality of treatment was assessed as adequate, the Special Master's

expert found it could be improved with diagnostic documentation and utilization of treatment

interventions during clinical contacts.

In some cases, both case conceptualization and diagnostic issues were present.  For

[CSP/Sac Inmate E], both comprehensive documentation of case conceptualization and clinical

rationale for diagnoses was lacking.  Case formulation and rationale for diagnosis were found to

be poor in the case of [CMC Inmate D].  The record for [KVSP Inmate C] lacked important

details related to case conceptualization and diagnoses.  Case conceptualization for [DVI Inmate

D]'s treatment was lacking and diagnostic clarification with the rationale for diagnoses was

indicated.  Lack of case conceptualization and pertinent psychosocial data negatively impacted

treatment planning for [CSATF Inmate H]; diagnostic discrepancy and the lack of documentation

of symptoms supporting diagnoses were also problematic.

(3)      <b><u>Treatment Plan Goals Were Not Adequately Developed</u></b>

The development of specific, targeted, and measurable treatment goals is an integral part

of effective treatment planning for *Coleman* class members.  Record reviews during the Twenty-

Seventh Monitoring Round revealed several issues related to this process.  In some cases,

treatment goals were vague and/or not targeted to address inmates' specific clinical needs.  There

were also cases in which treatment goals were not appropriately updated when indicated.  In still

other cases, treatment goals were absent when the inmate could have benefited from specific,

measurable goals to address mental health care needs.  Of great concern, were the cases in which

treatment plans contained inappropriate treatment goals that were not only contrary to the

delivery of adequate mental health care, but had the potential to prove harmful to the inmate.

58

For [CSP/Sac Inmate D], treatment goals were not measurable in comparison to his level of functioning, nor were they connected to his treatment needs.  Treatment goals for [CSATF Inmate D] were vague and were not described in behaviorally objective terms.  Treatment goals for [ASP Inmate C] were vague and inadequate.   Treatment goals for [SQ Inmate C] should have been related to his poor participation and failure to adequately engage in treatment, however his treatment plan contained only minor and inadequate treatment goals.  Although treatment goals developed for [CIM Inmate A] were measurable, they were not individualized and did not target specific symptoms. Treatment goals were not updated for [KVSP Inmate A] despite a one-week stay in the MHCB.  Similarly, despite several incidents of serious and escalating self-injurious behaviors (SIB) that required outside hospital visits, treatment goals for [KVSP Inmate B] remained unchanged.

Despite a recent Prison Rape Elimination Act (PREA) incident in which [MCSP Inmate E] was allegedly assaulted, there was no goal in the treatment plan consistent with trauma.  A treatment goal related to [CIM Inmate C]'s suicidal ideation should have been included in his treatment plan.  [CSP/Solano Inmate A] was given a treatment goal to report no suicidal ideation for a period of three consecutive days.  This goal was wholly inappropriate as it was not conclusive evidence that he was not suicidal and it taught him not to verbalize his suicidality. Based upon this, his treatment was found to be minimally adequate, bordering on inadequate.  He required treatment goals that were achievable and more appropriate to his clinical situation. [DVI Inmate D] was given a treatment goal of no thoughts of self-harm.  In addition to this goal being inappropriate, as the inmate's disclosure of thoughts of self-harm was essentially a failure, the goal was unclear because self-harm had not been highlighted as a presenting problem. Further, treatment goals for this inmate did not address all of his symptoms.

    **c.** **Inmates Were Not Considered and/or Referred to a Higher Level of Care When Indicated—Issues With IDTTs' Use of Form 7388-B in Consideration of Referrals of Inmates to Higher Levels of Care**

MHSDS policies and procedures outline the parameters under which the IDTT shall consider an inmate for referral to a higher level of care utilizing Form 7388-B.  Record reviews found that policies and procedures requiring IDTTs to consider and/or refer inmates to higher levels of care using the Form 7388-B process were not consistently followed across institutions.[31]  This resulted in cases where inmates were not considered for referral to a higher level of care when indicated.  Equally concerning were the cases in which referral was unnecessarily delayed, due to either the actions or inaction of the IDTT.

The Form 7388-B process for [CSP/Sac Inmate A] was not properly completed; the inmate's poor participation was not noted, nor were any subjective criteria that the inmate met.  [CSP/Sac Inmate C] should have been considered for referral to a higher level of care; however, neither his multiple RVRs nor crisis placements were identified by the treatment team.  [Folsom Inmate A] appeared appropriate for consideration for referral to EOP to treat active symptoms of a serious mental illness; however, consideration of higher level of care referral was not discussed in the IDTT.  [CSP/Corcoran Inmate B] was not appropriately considered for a higher level of care.  Discrepancies in the record were of concern, as three of four reviewed 7388-B forms documented positive criteria.  In the case of [CSATF Inmate C], not only did the treatment team fail to identify an objective, positive DSH referral indicator, a sufficient rationale for DSH non-referral was not provided.  Further, the DSH coordinator failed to properly evaluate the Form 7388-B and identify the treatment team's failure to identify the objective criterion.

---

[31] This section is focused on quality of care in referrals to higher levels of care from the vantage point of individual inmate cases.  For a related discussion of Form 7388-B from the vantage point of the IDTT's workings, see also Part V, "Access to Higher Levels of Care" below.

[CMF Inmate B] required a DSH intermediate care referral to address his chronic, serious psychiatric symptoms.  His reviewed treatment plans either did not include the Form 7388-B, or the treatment plan and associated Form 7388-B was not sufficiently detailed to justify non-referral.  Although clinically indicated, there was inadequate and inappropriate higher level of care referral consideration for [CMF Inmate F].  [CSP/Solano Inmate K] would have benefitted from a referral to the EOP for diagnostic clarification and treatment planning.  [DVI Inmate A] experienced significant functional impairment due to his mental illness and had not responded to treatment.  One Form 7388-B required greater clarification of the non-referral rationale, while a subsequent Form 7388-B was not properly completed, with clinicians failing to note that the inmate met criteria for higher level of care referral consideration.  A review of available documentation indicated that he appeared to have been an appropriate candidate for referral to DSH intermediate care.

The non-referral rationale provided by [WSP Inmate D]'s treatment team was inadequate. He was not benefitting from treatment, continued to exhibit significant dysfunctional behavior that was attributed to his mental illness, and required referral to a higher level of care.  The treatment team did not properly address positive criterion on the Form 7388-B.  [CCI Inmate E] was not appropriately referred to a higher level of care.  Based on his extensive and continued history of resisting mental health program interventions, and his multiple MHCB admissions and RVRs, he should have been referred to DSH.  [CHCF Inmate A] met criteria for referral to a higher level of care for months; however, he was not referred and the non-referral rationale was inadequate and inaccurate.

Although [CSATF Inmate A] was appropriately referred to DSH eventually, he should have been referred earlier during his admission.  Documentation on the Form 7388-B of the

61

IDTT's earlier decision not to refer was inadequate, as it simply stated that further assessment was needed, despite sufficient information in the healthcare record supporting referral. The treatment team should have requested an expedited transfer to the DSH acute care program once he was referred.

Additional examples of deviation from policy requirements in this area included the case of [CSP/Solano Inmate B]; there were no specific treatment modifications noted in the Form 7388-B as a result of non-referral, merely a list of MHCB Program Guide requirements, which did not constitute modifications of his treatment. The initial Form 7388-B for [WSP Inmate E] did not include an adequate rationale for DSH non-referral. It indicated that the inmate required medication to stabilize and that referral would be reconsidered following medication, without addressing the significant fact that the inmate was refusing psychotropic medication.

There were two cases where because of missing or incomplete 7388-B forms in the health record, the appropriateness of a referral to a higher level of care could not be assessed. A Form 7388-B was not filed with [DVI Inmate B]'s treatment plan and was not located in other areas of the healthcare record; documentation was minimal, making it difficult to assess the appropriateness of a DSH referral. In the case of [WSP Inmate C], Form 7388-B was blank for criterion seven and had not been properly completed. Despite this, the DSH coordinator indicated that criterion seven on the Form 7388-B was positive and that the non-referral rationale and treatment modifications were adequate. Based on available documentation, it was unclear whether the inmate should have been considered for referral to DSH level of care.

**Summary – Quality of Care Delivered During the Twenty-Seventh Monitoring Round**

During the Twenty-Seventh Monitoring Round, while there were noted improvements in multiple areas of care delivery to MHSDS inmates, the Special Master's expert also observed

many of the same trends related to quality of care as were observed during the preceding round. IDTTs continued to require improvement, with quality varying not just across institutions, but across programs within institutions.  Treatment teams were not always functioning cohesively. At some institutions, IDTTs were still being conducted in unsuitable environments. Confidential, sensitive information was not always treated accordingly.  Statewide psychiatry vacancies continued to have a negative effect on compliance with the attendance of required disciplines at IDTT meetings.  Of great concern was that inmates were not always being included as part of the treatment team process.

Record reviews revealed continued problems with proper documentation in treatment plans and health records, case conceptualization, development of treatment goals, and diagnostic issues related to documentation, rationale and discrepancies.  Treatment planning continued to be an area in need of improvement, as inmates' mental health needs were not consistently being addressed through the process.  Finally, and also of great concern, there was continued inconsistent compliance with IDTT policy requirements related to discussion of Form 7388-B criteria and consideration of referral to a higher level of care.

As reported above, the Special Master, with input from plaintiffs, will continue to work with defendants to develop their CQI process into an effective mechanism for identifying and resolving quality of care issues—such as those summarized above—which continue to plague CDCR's MHSDS, as well as any others that should arise over time.

> **D.     Medication Management:**

The *Coleman* court declared in its original decision that medication management in CDCR violated the Eighth Amendment.[32] After years of struggles and difficulties as reported by

---

[32] *Coleman v. Wilson*, 912 F. Supp. 1282, 1311 (E.D. Cal 1995).

the Special Master in several monitoring reports over the years, by the time of the Twenty-Sixth

Monitoring Round, the Medication Administration Process Improvement Program (MAPIP), the

audit tool developed through the coordinated efforts of the *Coleman* Special Master and the

*Plata* receiver, had been implemented at all CDCR institutions, except CHCF.  At the time of the

Twenty-Seventh Monitoring Round, MAPIP had been implemented at all CDCR institutions,

and was being utilized with varying degrees of success.

The medication management functions of MAPIP regarding mental health care focuses

on specific medication compliance measures that report performance in each area, and identifies

problematic medication management administration issues requiring attention by an institution.

For the psychiatric measures, MAPIP covers diagnostic monitoring for antipsychotic, mood

stabilizing and antidepressant medications, and for nursing audits, MAPIP measures continuity

of care, medication compliance, and medication administration of psychotropic medications.

On January 15, 2016, CDCR issued "Medication Administration Process Improvement

Program Audit Modifications During EHRS Implementation," a statewide memorandum

providing information about the parameters of MAPIP audits during Electronic Health Records

System (EHRS) implementation. CIW, CCWF, and Folsom did not audit continuity, compliance

and administration measures because EHRS was at the "Go-Live" stage at those institutions

during relevant periods addressed by the January 15, 2016 memorandum.

Findings from the institutional site visits are reported below.

Psychiatry Measures

For psychiatry audits, institutions were directed to continue to conduct quarterly audits,

except during the time of the EHRS rollout.  Psychiatry measures evaluated compliance with

laboratory tests and other tasks related to inmates on psychotropic medications.  The

psychotropic medications assessed for compliance included atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine and antidepressants.

Various institutions reported compliance with psychiatry measures including CHCF, CIM, CMC, CRC, CSATF, CSP/Solano, MCSP, PVSP, SCC, VSP, and WSP. Two institutions - CTF and KVSP - reported near compliance for all psychiatry measures. ASP was compliant with all applicable psychiatry measures except lithium and atypical antipsychotics. CCI achieved compliance with all psychiatric measures, with the exception of one quarterly audit of carbamazepine. CSP/Corcoran reported compliance with Lamictal, clozapine and antidepressants, and noncompliance for atypical antipsychotics, Depakote, lithium and carbamazepine.

CMF was compliant with psychiatric medication measures for diagnostic monitoring of mood stabilizers and antidepressants, and noncompliant for atypical antipsychotics and Lamictal. Staff reported that CMF's noncompliance was due to inmates refusing lab draws and missing consent forms for inmates who were prescribed Lamictal.

DVI reported zero compliance for all applicable psychiatry measures, but also reported plans to correct the deficiencies. PBSP reported noncompliance with psychiatry measures, citing psychiatric staff shortages as the reason. SQ reported varied compliance with MAPIP psychiatry measures for laboratory testing, electrocardiograms (EKG) and other matters related to laboratory studies for inmates on psychotropic medications. Data was limited because the institution was simultaneously undergoing the roll out of EHRS.

CSP/Sac reported near compliance with psychiatry measures related to antipsychotics, Depakote, clozapine, and antidepressants, as well as, non-compliance with measures related to lithium, carbamazepine, Lamictal and clozapine. CSP/Sac's performance improvement plans for

each MAPIP measure below 90 percent were reviewed; the planned corrective actions were appropriate.

Clozaril/Clozapine Institutions

CDCR has identified five institutions as both initiation and maintenance facilities for Clozaril/clozapine:  CCWF, CIW, CMF, CSP/Sac and SQ.  Additionally, CSP/Corcoran, MCSP, NKSP and VSP were identified as Clozaril maintenance institutions.  The protocol for the initiation and maintenance of Clozaril/clozapine in CDCR institutions included the entry of an inmate's information into the national Risk Evaluation and Mitigation Strategies (REMS) system.  REMS notified the pharmacy when an inmate prescribed Clozaril/clozapine arrived at an institution.  In addition, the system alerts appropriate staff of necessary laboratory tests as part of monitoring and treatment.

There were no reports of Clozaril use at CIW, CMF, MCSP or SQ during the period under review.

CCWF reported no Clozaril initiations during the review period but reported maintenance of one inmate.  VSP reported five inmates were on clozapine at the time of the visit.  Non-compliance for lack of consent for the use of clozapine was reported at CSP/Sac.

CHCF was not a Clozaril/clozapine institution, but the Health Care Placement Oversight Program (HCPOP) permitted overrides for inmates prescribed Clozaril at the facility.

Continuity, Compliance, and Administration Measures

Continuity of medications was measured within the following categories: inter-institutional transfer at Receiving and Release (R&R); Nurse-Administered (NA)/Direct Observation Therapy (DOT) medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and

66

discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications and urgent medication referrals for no-shows and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

DVI and SCC reported compliance for continuity with all applicable measures. CRC and WSP reported compliance with all applicable measures except for MHCB transfers and discharges from community hospital/DSH.  CSP/Corcoran reported noncompliance with all applicable measures, except PC 2602 involuntary medications and urgent medication referrals for no-shows and refusals.

CMC reported that methodological problems with MAPIP resulted in significant under-reporting of compliance for continuity, compliance and administration measures, and established a medication management Quality Improvement Team (QIT) to address the issue in January 2015; however, it had yielded little change by the time of the site visit.  Training was provided to nurses regarding how to complete MAPIP audits; however, compliance rates remained low, which was attributed to inmates' no-shows.

CSP/Sac reported that requiring all interruptions of medications, including inmate refusals, to be counted as noncompliance skewed its data.   For example, the compliance rate for continuity of medications for MHCB transfers could average about 55 percent because of a single "no-show" by an inmate during the 30 days following discharge from the MHCB, which was counted as zero-percent compliance for that specific inmate, even if he had received his medication for 29 out of 30 days.  CSP/Sac indicated that this skewed its medication management metrics because of the large number of inmate medication refusals at the institution.

<u>Continuity of Medication for Inter-Institutional Transfers</u>

ASP, CCI, CIM, CMF, CRC, CSP/Solano, CSATF, CTF, DVI, KVSP, PBSP, PVSP, SCC, SQ, VSP and WSP all reported compliance at 90 percent or above with continuity of medications for inter-institutional transfers at R&R.  The remaining institutions, CHCF, CIW, CSP/Corcoran, CCWF, and MCSP, presented either varied rates of noncompliance or no information.

<u>Continuity of Medications with Intra-Institutional Transfers</u>

Compliance with continuity of NA/DOT medications during intra-institutional transfers to R&R was reported by CIM, PVSP, and SQ for all audited months.  ASP and VSP reported compliance for three months. CTF reported compliance for five months and near compliance for the sixth month.  CHCF reported near compliance for the months audited.  CCI, CSP/Solano, CSATF, and PBSP reported noncompliance.  CCI reported having a performance improvement plan to address its compliance issues.

Compliance with continuity of medications upon intra-institutional transfer to ASU/SHU/PSU was achieved by the following institutions—CHCF, CSP/Solano, CTF, PBSP, PVSP, and VSP.  Compliance for all but one month was reported by CIM.   Noncompliance was reported by CCI, CSATF, KVSP, and MCSP.  Noncompliance for all but one month was reported by CSP/Solano and CSATF.  The measure was not applicable to ASP.

<u>Continuity of Medication following MHCB, Community Hospital or DSH Transfer</u>

Five institutions – CRC, CSP/Sac, CSP/Solano, DVI and PVSP, reported compliance with continuity of medications following transfer from the MHCB.  CIM and CTF reported compliance for all but one month. VSP reported compliance for two months and non-compliance for two other months; ASP was compliant for two of five months.  Seven institutions—CHCF,

68

CMC, CSP/Corcoran, CSATF, KVSP, MCSP and PBSP, also reported varying compliance rates. CCI did not achieve compliance at any point during the monitoring period.

Compliance with continuity of medication upon discharge/transfer from a community hospital and/or DSH was recorded at PVSP and SQ.  Three institutions—CMF, CSATF and CTF, reported compliance for all but one month.  CRC and CSP/Solano were compliant for three out of five months.  ASP, CIM, and VSP were compliant for two months and near compliant for the remaining months audited.  Five institutions—CCI, CSP/Corcoran, KVSP, MCSP, and WSP, reported noncompliance.  Other institutions—CHCF, CMC, CSP/Sac, and PBSP, had either limited information or had mixed reports of compliance.

<u>Medication Compliance Measures</u>

Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications and urgent medication referrals for no-shows and refusals.  The results follow.

<u>Compliance with Psychiatrist / MH Mid-Level Prescribed Medications</u>

CMF, CSATF, CTF, MCSP, PBSP, and VSP were compliant with psychiatric/MH mid-level prescribed medications.  CSP/Solano reported 90 percent or higher for four months and 69 percent for one month.  CCI, CSP/Corcoran, and KVSP were noncompliant.  ASP reported that this measure was not applicable.

<u>Medication Compliance for PC 2602 Involuntary Medication</u>

CSP/Sac, CCWF, CHCF, CMC, CSP/Corcoran, CSP/Solano, KVSP, MCSP, PBSP, VSP, and WSP reported compliance with PC 2602 requirements.  CMF reported compliance for four of the six months reviewed.  CIM reported compliance in one quarter, but not the other.  MCSP was near compliant at 86 percent.  CSATF reported compliance for five or six months and was

close to compliance in one month.  SCC had one inmate on involuntary medications pending a

transfer.  SQ had 14 inmates prescribed involuntary medications; three were non-compliant.

PVSP reported noncompliance with PC 2602 medications.  DVI did not track compliance with

PC 2602 medications.  ASP, CCI, CRC, and CTF did not have any PC 2602 patients during the

reporting period.

Compliance with Urgent Medication Referrals for No-Shows and Refusals

ASP, CCI, DVI, CMF, CRC, PBSP, SCC and SQ reported at least 90-percent compliance

with urgent medication referrals and no-shows and refusals.  CIM, VSP and WSP provided

varied reports of compliance.  CSP/Corcoran and MCSP reported noncompliance.  Eleven

institutions - CHCF, CIW, CMC, CSP/Sac, CSP/Solano, CSATF, CCWF, CTF, Folsom, KVSP,

and PVSP - provided no information regarding this compliance measure.

Medication Administration

Psychiatrists prescribed outpatient provider new medication orders were compliant at 90

percent or above at CTF, CRC, DVI, MCSP, PBSP, PVSP, SCC, SQ and VSP.  Varying monthly

rates of compliance were reported by CIM, CMF and WSP.  CSP/Solano reported

noncompliance throughout the monitoring period.  Medication administration record audits

revealed nursing documentation issues at CHCF.  Ten institutions - ASP, CCI, CSATF, CCWF,

CSP/Corcoran, CSP/Sac, CIW, CMC, Folsom, and KVSP - provided limited information or none

with regards to this medication administration

PC 2602 Petitions

ASP, CCI, CIM, CRC, CSP/Solano, CTF, and Folsom reported there were no PC 2602

involuntary medication petitions initiated, renewed, denied or withdrawn.  DVI reported it did

not initiate any new petitions, but also reported that they do not track the results of petitions.  At

70

CCWF there were 14 inmates receiving PC 2602 involuntary medications, of which seven were initial and seven were renewals.  At CHCF there were 25 renewals, three non-renewals, 14 initial emergencies and ten initial non-emergency petitions.  CIW reported one untimely PC 2602 petition, resulting in the need to refile.  At the time of the site visit, CHCF indicated there were 187 inmates, including 73 3CMS inmates receiving medications through the involuntary medication process.  CMF reported that 21 inmates were on PC 2602 medications, of which six were emergencies and 15 were non-emergencies.

Of the 21 inmates at CIW on PC 2602 involuntary medication, eight were discharged from CIW, ten were initial petitions and one was not initiated timely.  CSATF reported nine PC 2602 petitions, with an additional four initiated and three granted.  CSP/Corcoran reported nine new petitions and 23 renewed petitions.  CSP/Sac reported 14 initial involuntary medication petitions and 131 renewed during the review period.  KVSP initiated 35 PC 2602 petitions. Of this number, two involved a controlled use of force.  At MCSP there were three initial PC 2602 orders and 21 renewal orders.  At PBSP there was one initial PC 2602 petition and 21 renewals.  At PVSP there were five initial PC 2602 involuntary medication petitions, of which four were approved.  SQ had 14 inmates on PC 2602 medications, including eight renewals and two pending renewal.  At VSP there were four initial involuntary medication petitions and four renewals.  WSP reported the initiation of one PC 2602 petition and two renewals during the time of review.

Pill Lines

Sixteen of the 24 CDCR institutions toured reported no problems with lengthy pill lines, indicating that inmates generally moved through the lines in thirty minutes or less.  There was no report on pill lines at CMF.  PVSP reported compliance in the timeliness of pill lines during

the day, but acknowledged evenings often had longer wait times.  CTF, KVSP, MCSP and Folsom each reported ongoing issues with pill lines.  CTF indicated they were working on decreasing the wait time.  Folsom reported adding extra staff for distribution and continued exploration of other solutions.  KVSP reported most pill line problems were in their EOP units.

Hora Somni/ Hour of Sleep (HS) Medications

ASP, CCI, CCWF, CHCF, CIM, CMC, CMF, CSATF, CSP/Corcoran, CTF, CSP/Sac, MCSP, PBSP, PVSP, SCC, SQ, VSP, and WSP reported compliance for HS medications, including distribution no earlier than 8 p.m.  CMF did not report time of distribution of HS medications.

CIW, CSP/Solano, CRC, DVI, KVSP and Folsom provided no useful data regarding the distribution of HS medications. DVI was noncompliant with HS medications.

**Summary – Medication Management**

CDCR's medication management audit tool, MAPIP, is now firmly embedded in its system.  For the most part, institutions routinely perform psychiatry and nursing audits as required with varying degrees of success; however, not all institutions performed every measure within the timeframe mandated by policy, which remains an issue that needs to be resolved.

The findings from the Twenty-Seventh Round Monitoring tours also indicated a need for additional training regarding documentation, and notably, appropriate application of the methodology, particularly how to factor in incidents, such as refusals and no-shows that may skew the data and impact compliance reports.  In addition, particular continuity, compliance and medication administration issues identified at specific institutions require focused attention.

Because MAPIP is a function of the court coordination process, and is managed by the *Plata* receiver, the Special Master will address the necessary remediation of the problems outlined above in that forum.

      E.      **Access to Higher Levels of Care**:

In his Twenty-Sixth Round Monitoring Report, the Special Master found that CDCR institutions struggled to provide *Coleman* class members with timely access to higher levels of care, pointing out that "there were issues with implementation of the process for identifying and referring inmates in need of higher levels of care [Form 7388-B process] and with compliance with applicable timeframes for transferring inmates from CDCR prisons into beds within appropriate inpatient mental health programs."  ECF No. 5439 at 83.

The 7388-B process and timely admission to higher levels of care continued to challenge CDCR during the Twenty-Seventh Round Monitoring period.  Multiple institutions were not compliant with the Form 7388-B process, and when inmates were referred, some institutions were not compliant with applicable timeframes for transferring inmates to appropriate inpatient beds.  Moreover, audits and document reviews also demonstrated that the quality of the Form 7388-B across several institutions did not meet required standards.

All CDCR clinicians still did not fully understand the entire Form 7388-B process.  Appropriate application of the Form 7388-B process was a major problem at multiple institutions, many with large mental health populations.  The process was not completely integrated into all IDTTs, which resulted in circumstances where some inmates requiring inpatient care were not referred.  IDTTs simply failed to identify inmates for consideration for referral in multiple cases.

Where the Form 7388-B process was appropriately employed, treatment teams did not consistently incorporate the results into case formulations for treatment planning or into the treatment planning of inmates not referred.  Some treatment teams did not modify the treatment plans of inmates who were not referred to address issues identified through the 7388-B process. Documentation of Form 7388-B was found to be problematic at several institutions.

The referral/non-referral logs, part of the Form 7388-B process, were not always fully completed, notably, some did not provide rationales for non-referrals.  Inmates with positive indicators for consideration for referral to inpatient care who were not referred were not consistently identified on non-referral logs.

The majority of the institutions reviewed during the monitoring round were not compliant with transfer timelines to acute and intermediate care.  Likewise, for MHCB referrals, the majority of institutions reviewed were noncompliant with meeting transfer timelines.

The details of the Special Master's findings regarding access to higher levels of care during the Twenty-Seventh Monitoring Round are presented below.

   1. **Form 7388-B**

      a. **Interdisciplinary Treatment Teams and the Use of the Form 7388-B Process**

Utilization of Form 7388-B in IDTTs is integral to the process of referrals to higher levels of care in CDCR.  Although some institutions and programs have integrated the Form 7388-B into their IDTTs, full compliance continued to be a major problem at multiple institutions, as discussed below.

Although some institutions met the required standards regarding the Form 7338-B process, appropriate application of Form 7388-B continued to pose a major problem for a

74

number of institutions, a factor in appropriately referring and timely transferring inmates to higher levels of care at those institutions during the Twenty-Seventh Round.

At CMC, CSP/Corcoran, and CSP/Solano, Form 7388-B criteria were reviewed as regular components of the IDTT process in the MHCB.  Form 7388-B was part of the IDTT process at CIW and KVSP.  Across programs at CMF, the Form 7388-B process was found to be appropriate.  Presenting clinicians at CMF provided the necessary information to the treatment team and inmates, who were observed to be engaged, and offered input into the discussion.

At ASP, while documentation of the indicators on the Form 7388-B had improved since the Twenty-Sixth Monitoring Round, the indicators were not comprehensively incorporated into the IDTT process because there was little input by team members other than the inmate's PC presenting the case.  Mental health record reviews at MCSP, including Form 7388-B, showed that the rationale and referral for higher levels of care decisions were problematic and required further staff training and supervision.

Typically, treatment teams observed at CHCF rarely addressed Form 7388-B in a manner that was thoughtfully integrated into overall treatment planning, and often did not effectively utilize the subjective indicators, resulting in circumstances where inmates requiring inpatient treatment were not referred at all.

IDTTs at CIM did not consistently discuss Form 7388-B.  There also were multiple instances of inmates with three or more crisis bed placements who were not properly identified in IDTTs, as part of the Form 7388-B process.  In addition, CIM experienced ongoing difficulty providing adequate treatment modification for those inmates who met one or more Form 7388-B criteria, but had not been referred.

During the June 2016 tour of CSP/Sac, many observed IDTTs showed that Form 7388-B was not regularly discussed. During the January 2017, re-visit, in the EOP hub, Form 7388-B criteria was discussed in all IDTTs attended, including with the inmates. During the June 2017 re-visit, in PSU Facility A, Form 7388-B criteria were discussed, including the level of care of each inmate in the observed IDTTs.

IDTTs at CCWF did not consistently address Form 7388-B criteria. IDTTs at DVI simply failed to identify inmates through the Form 7388-B process for consideration to a higher level of care. Likewise, at PVSP, IDTT meetings did not reliably review Form 7388-B criteria, nor discuss consideration for referral to a higher level. Also, some information on Form 7388-B at PVSP were inaccurate. In addition, IDTTs at PVSP did not consistently discuss Form 7388-B or consider higher levels of care for inmates meeting criteria.

Treatment teams at SQ did not consistently discuss Form 7388-B in IDTTs, and did not incorporate Form 7388-B results into case formulation or treatment plans. Record reviews at SQ indicated that some clinicians did not fully understand the Form 7388-B process; numerous forms were not completed correctly. In the EOP reception center at WSP, treatment teams discussed the appropriate level of care of inmates as part of the Form 7388-B process; however, record reviews showed that multiple clinicians across WSP struggled with developing adequate treatment plan modifications that addressed positive Form 7388-B criteria.

Observed IDTTs at VSP in C-Yard revealed that all Form 7388-B criteria were not discussed during the meetings. In those instances when they were discussed, some clinicians used technical jargon, creating the risk that the inmate and members of treatment team who were not mental health clinicians might not understand what was being discussed. In administrative

segregation at VSP, the Form 7388-B was mentioned during IDTTs, but was not fully discussed as a team.

### b.  The Quality of Form 7388-B Varied Across Institutions

The sustainability review at CSATF found the institution to be compliant with the quality of its Form 7388-B, and found that CIW was close to compliance with meeting all required Form 7388-B standards.

CDCR's major sustainable process review at SQ indicated ongoing problems with the adequacy of Form 7388-B documentation, which often did not support non-referral decisions. The regional team also identified substantial differences with the DSH coordinator regarding the quality of Form 7388-B, indicating concerns with notations of inaccurate criteria and failure to note a specific criterion.  In addition, the regional team also found that in some instances the DSH coordinator at SQ reviewed the wrong Form 7388-B data.

Record reviews at WSP indicated that some clinicians did not understand the entire Form 7388-B process; numerous Form 7388-B's were completed incorrectly.

Although CIM's local DSH audits consistently found 7388-B forms to be satisfactory or "good," in numerous cases, however, there was significant concern regarding the accuracy of those audits.  Records reviews revealed there were multiple examples of inmates who had three or more crisis placements but were not properly identified on the 7388-B at CIM.

A follow-up action plan developed by the regional team from a sustainably review at CSP/Corcoran included the need to conduct audits of Form 7388-Bs where the inmate was not referred.  The regional team also indicated that there was a need to follow-up on improving consistency between Form 7388-B and clinical notes.

The Special Master's expert's review of randomly selected Form 7388-Bs at CHCF demonstrated that the quality was inadequate because of failure to note objective indicators, insufficient use of subjective indicators, and inadequate rationales for non-referrals.  Moreover, during sustainability reviews, CDCR's regional teams found significant disagreement with the DSH coordinator's assessment of the quality of Form 7388-B that had been deemed to meet required standards.

### 2.  Transfers to Inpatient Care

#### a.  Adequacy of Referral/Non-Referral Logs

As with the application and utilization of the Form 7388-B process, several of the same institutions that struggled with Form 7388-B, also had difficulties with appropriately documenting their referral/non-referral logs.

Staff at CCI reported that they did not know how to document Form 7388-B data in the Mental Health Tracking System (MHTS.net) to auto-populate the DSH non-referral log.  CIM experienced ongoing difficulties with providing adequate rationales for not referring inmates to DSH level of care documented in the non-referral log.  The non-referral log at DVI was incomplete.  At WSP, review of the non-referral log demonstrated that several clinicians struggled with substantiating the rationales for non-referral.  There were some cases on the non-referral logs at WSP where review of the medical records did not clinically justify non-referral.

Evaluation of referral/non-referral logs at CHCF showed that inmates who met positive indicators and were not referred, were not consistently identified on the non-referral logs.  The referral logs were also missing data and contained meaningful errors.

### b.   Transfers to Acute Inpatient Care

DVI and VSP were compliant with timely patient transfers to acute care within ten days of referral as required by the Program Guide.   Fourteen other institutions that reported transfers to acute care - CHCF, CIM, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, CCWF, KVSP, MCSP, PBSP, PVSP, and WSP – were non-compliant with the ten-day time frame.  The average compliance rate among these fourteen noncompliant institutions was 52 percent, with outliers PVSP at 24 percent and KVSP at 87 percent.  ASP, CRC, CTF, DVI, Folsom and SCC did not refer patients to acute care during the review period.  SQ did not refer non-condemned inmates to acute care during the review period.

### c.   Transfers to Intermediate Inpatient Care

ASP, CHCF, CCI, CSP/Sac, DVI and VSP were compliant with the Program Guide requirement for transfer of inmates to intermediate inpatient care within 30 days of referral. ASP, CCI, and DVI transferred one patient each.

Eleven institutions were noncompliant with a 30-day timeframe for intermediate care transfers. They were CMF, CIM, CIW, CMC, CSP/Corcoran, CSP/Solano, CSATF, CCWF, MCSP, PBSP, and WSP.  These institutions' average rate of compliance was 69 percent, with outliers CIM at 40 percent and CSP/Corcoran at 89 percent.

CRC, CTF, Folsom, KVSP, PVSP and SCC did not refer patients to intermediate care during the review period.  SQ did not did not refer non-condemned patients to intermediate care during the review period.

### d.   Transfers Following Inpatient Bed Assignment

CMC, CSP/Sac, KVSP, and MCSP were in compliance with the Program Guide requirement for transfers to acute inpatient beds within three days of bed assignment.

CSP/Corcoran, CSP/Solano, CSATF, CCWF and WSP were noncompliant with an average compliance rate of 69 percent. CSP/Corcoran was an outlier with a 35-percent compliance rate.

CCI, CMC, and WSP were compliant with transfers to intermediate inpatient beds within three days of bed assignment.  CSP/Corcoran, CSP/Sac, CSATF, and CCWF were noncompliant with the requirement of transferring to intermediate inpatient beds within three days of bed assignment, meeting this requirement at an average rate of 74-percent compliance.  Transfers from CSP/Solano took an average of 4.7 days.

### 3.   MHCBs

#### a.   Transfers to MHCBs and Bed Availability

The Program Guide requires transfers to MHCBs within 24 hours of referral; DVI and SQ were compliant.  Transfers from ASP, CCI, CHCF, CIM, CIW, CRC, CMC, CSP/Corcoran, CSP/Sac, CSP/Solano, CSATF, CCWF, CTF, MCSP, PBSP, PVSP, SCC, VSP, and WSP were noncompliant at varying rates, averaging a 48-percent compliance rate for transfers to MHCBs within 24 hours of referral.  CCWF, CSP/Corcoran, and CIW, with compliance rates of seven percent, 14 percent and 17 percent respectively, were outliers, as were PBSP and PVSP with compliance rates of 88 percent each.  CMF was 84 percent compliant with transfers to its internal MHCB, and noncompliant for all transfers to external MHCBs.

Noncompliance was attributed to lack of MHCB availability by CIM, CIW, CMC, CRC, CTF, MCSP, PBSP, PVSP, SCC, VSP, and WSP.

#### b.   MHCB Lengths of Stay

The Program Guide states that the MHCB has a length of stay of up to ten days.  For the following institutions – CIW, CCWF, KVSP, MCSP, and SQ - the average length of stay in the MHCB was less than ten days.  The average length of stay at CSP/Solano was 10.3 days.  The

average length of stay for the following institutions were: CMC: 11.3 days, CHCF: 13 days, CIM: 13.5 days, CSATF: 14.6 days, PVSP: 15.4 days, and CMF: 18.1 days.  The majority of inmates in PBSP's crisis beds exceeded ten days.

Lengths of stay exceeding ten days were attributed to the unavailability of beds at the acute and/or intermediate levels of care, delays in referring inmates to DSH until the tenth day of MHCB stay, retention in MHCB pending transfer to intermediate care at DSH, physically retaining inmates in MHCB beyond the date of clinical discharge, and an apparent reluctance at several institution to discharge inmates who were admitted related to suicidal ideation even when discharge appeared to be clinically justified.  At CSATF, the practice was only the admitting psychiatrist was authorized to discharge the inmate, and inmates were retained in crisis beds until the admitting psychiatrist could discharge them.

### 4.   Alternative Housing Lengths of Stay

CSP/Sac and CRC were found compliant with the 24-hour time limitation on stays in alternative housing under the Program Guide.  ASP, CMF, CSP/Corcoran, CSATF, SQ, VSP and WSP were noncompliant with the 24-hour time limitation with an average compliance rate of 52 percent.  KVSP averaged 1.14 days in alternative housing and MCSP attributed transfer delays from alternative housing to the lack of availability of crisis beds.

### 5.   Transfers to Psychiatric Services Units (PSU)

The following institutions - CCI, CHCF, CMF, CMC, CSP/Corcoran, CSP/Sac, DVI, KVSP, MCSP, and PVSP – were found compliant with the Program Guide 60-day timeframe after endorsement for transfer to a PSU.  Following endorsement, CSP/Solano redirected one inmate to an administrative segregation EOP hub because no PSU bed was available.  ASP, CRC, CTF, Folsom, and VSP did not endorse any inmates to PSU.

81

### 6.   Transfers to Administrative Segregation EOP Hubs

Nine institutions were found compliant with the 30-day timeframe for transfer to an EOP hub after placement in an administrative segregation unit.  These institutions were CIM, CMC, CRC, CSATF, CTF, MCSP, SCC, and VSP.  Six institutions - CCI, DVI, KVSP, PBSP, SQ, and WSP – were found noncompliant with the 30-day timeframe.  The average rate of compliance was 76 percent.  CHCF and PVSP did not transfer any inmate to an EOP hub.

### 7.   Transfers to EOP

ASP, CMC, and Folsom were found compliant with the EOP transfer timeframes of 21 days following an inappropriate transfer, 60 days following referral to the EOP level of care, or 30 days after referral to the EOP level of care if clinically indicated.  CCI, CIM, CRC, CTF, DVI, PVSP, SCC, SQ, and WSP were found noncompliant with the transfer timeframes.  The compliance rate of these nine institutions averaged 66 percent.  MCSP, which was also noncompliant, first placed those inmates slated for EOP transfers in an overflow unit; there were significant delays transferring them to appropriate EOP housing from the overflow unit.  PBSP averaged one-day overdue for transfers to EOP housing.

### 8.   Transfers to Short-Term Restricted Housing

Transfers to STRH were required within 30 days of endorsement.  ASP and CCI were found compliant with timely transfers to STRH; SQ was noncompliant with an average of 83 percent compliance.  CHCF, CIM and CMC did not transfer any inmates to STRHs.

### 9.   Transfers to Long-Term Restricted Housing

Transfers to Long-Term Restricted Housing (LTRH) were required within 30 days of endorsement.  CRC was noncompliant with timely transfers, averaging a rate of 55 percent

compliance.  No inmate at Folsom who was endorsed to LTRH was transferred within timelines.

ASP, CHCF, CIM, CMF, MCSP, PVSP and SCC did not transfer any inmates to LTRH.

<b><u>Summary – Access to Higher Levels of Care</u></b>

The Form 7388-B process, including the referral/non-referral logs, is the system CDCR

developed and put in place to consider and refer clinically indicated inmates to higher levels of

care.  For the higher level of care consideration and referral system to work, the Form 7388-B

process must be appropriately applied.  Inmates meeting the objective and/or subjective criteria

must be consistently identified and the correct criteria indicated.  The Form 7388-B must be fully

completed.  The IDTT must include a presentation by the treating clinician, and discussion by

the treatment team of all relevant factors needed to consider the level of care through a

collaborative process, that also allows for inmates' input.  Staff training and supervision, auditing

and corrective actions to remedy problems are necessary to rooting the Form 7388-B process in

CDCR.  Noncompliance with timely transfer of inmates for placement in appropriate beds

occurred within and across institutions in CDCR and remained a major obstacle to providing

constitutional care across the system in CDCR.  Both the application of the Form 7388-B and

transfer delays will continued to be monitored by the Special Master, and will also be addressed

through the All-Parties Workgroup.

**F.** **Mental Health/Custody Relations:**

**1.** **Twenty-Seventh Monitoring Round Findings on Mental Health/Custody Relations**

During the Twenty-Seventh Monitoring Round, as with previous rounds, the Special

Master assessed the nature of the relationships between custody and mental health staff at the

various institutions and its impact on access to mental health care and the treatment environment.

At each institution, the Special Master's experts and monitors interviewed mental health,

83

medical, and custody staff, and inmates during each monitoring visit.  While in some instances
the information about the state of the relationship of mental health and custody staff garnered
from interviews was corroborative between and among interviewees, in others, it was
conflicting. Generally, however, document reviews supported the predominant theme expressed
in interviews about the state of the relationship at the institution.  During the Twenty-Seventh
Monitoring Round, custody and mental health collaboration and the primary issues associated
with the partnership often echoed concerns or lack thereof identified in the Twenty-Sixth
Monitoring Round.

Complaints of poor treatment of class members by custody staff, including disrespect,
negative comments, name calling, intimidation, threats, and assaults were regular grievances
again during the monitoring round.  Complaints mirroring similar concerns were repeated in
various iterations at CCI, CMC, CRC, CSP/Corcoran, CCWF, KVSP, and MCSP.  At PBSP,
staff and inmates reported a continued need for improved communication between inmates,
mental health and custody, but acknowledged an evolving cooperative culture.

Some institutions reported good relationships between the custody and mental health
staff.  For instance, at CIM, the leadership reported a deliberate focus on ensuring relationships
at all programs were collaborative.  As an example, it was reported that mental health staff in the
3CMS program were quickly alerted to changes in an inmate's behavior by custody and mental
health referrals were timely and appropriate.  At CSP/Solano, custody and mental health staff
reported working cooperatively to ensure inmates receive appropriate mental health care.
Collaborative relations were reported at ASP, CTF, SCC, and WSP.

In some instances, staff reported good relationships, yet inmates indicated differently.  At
CSATF, for example, staff indicated good relationships, but statements from inmate interviews

84

conveyed strained relations between the two.  Interviewed inmates reported that some custody staff mocked or were intimidating toward mental health staff.

At CSP/Corcoran, staff reported cooperation, but acknowledged it was sometimes difficult to establish good relationships with a rotating custody staff.  Additionally, inmates reported that housing officers often required them to choose between group, yard, and showers, which is inconsistent with MHSDS requirements.  The Special Master's expert observed custody staff interrupting an IDTT to obtain property and supplies during the site visit.

DVI staff members reported collaborative relations; however, the Special Master's expert observed officers interrupting groups, talking and joking loudly near treatment areas causing distractions, and failing to return inmates to groups after bathroom breaks.  At SQ, while mental health and custody leadership reported staff to be collaborative, inmates reported feeling rushed by custody officers whenever clinicians spoke to them at cell-front.

At CIW there were reports from inmates that custody staff turned a 'blind eye' to some inmate-on-inmate violence if staff believed the inmates had an on ongoing relationship, substance abuse and on occasion to the mental health concerns of inmates.  It was reported that some inmates with significant mental health issues were left untreated, as long as they did not create an issue on the unit.  However, inmates also conveyed and staff confirmed constructive changes were ongoing at CIW, the result of significant management changes in the past year.

Inmates at CSATF reported that a particular custody staff member "goes out of his way" to wake inmates by banging on their doors.  It was also reported that inmates were not routinely offered the opportunity to leave their cells for clinician contacts.

Of significance, at MCSP, mental health staff and inmates described custody staff as impeding access to mental health care.  Custody staff were reported to be an obstacle for inmates

85

trying to access their clinicians.  Mental health staff disclosed incidents of custody harassing, teasing, antagonizing and provoking inmates.  Clinical staff reported failing to report inappropriate behavior to their supervisor out of fear of retaliation.  A cohort of transgender caseload inmates expressed concerns about the lack of a provider who understood their needs, and about insensitive and abusive behaviors by custody staff.

At CHCF and CMF the nature of the relationship between custody and mental health was not addressed.

At CSP/Sac, custody issues proved increasingly challenging during the Twenty-Seventh Monitoring Round.  Significant issues pertaining to the treatment of class members were reported at CSP/Sac, which has a substantial mental health mission.  Concerns regarding custodial interactions with inmates, particularly those in the PSU and EOP hub, resulted in repeated visits by the Special Master's team.  The Special Master initiated several visits in response to allegations of retaliatory behaviors by staff towards inmates, targeted racial abuse, excessive use of force, custodial interference with mental health care, interference with food and mail, concerns for inmates in the IEX program, and tampering with inmate appeals, amongst others.  These issues are presented fully in the institutional summary for CSP/Sac in Appendix A of this report.

Mental health and custody relations at the ten CQIT institutions where CDCR tested its CQIT will be presented in those reports.

The state of mental health and custody relations, institutional culture, and the sustainability of the custody and mental health partnership, and their effect on access and adequacy of mental health care in CDCR will be closely monitored by the Special Master during the Twenty-Eighth Monitoring Round.

## 2.   **Cultural Collaboration:  Background**

As illustrated in the Special Master's Twenty-Sixth Round Monitoring Report, ongoing challenges in the relationships between custody and mental health staff have had a negative impact on the delivery of mental health care to *Coleman* class members.  ECF No. 5439 at 60-67. In its order adopting the Twenty-Sixth Round Monitoring Report, the court instructed defendants and the Special Master to meet and confer to develop strategies and initiatives to improve custody and mental health staff collaboration at all CDCR institutions that housed *Coleman* class members, including plaintiffs in the meetings as appropriate.  ECF No. 5477 at 9.  The court made clear its expectation that a comprehensive strategy be identified and implemented at the institutions where it was required within six months from the date of the order, and noted that, "[a] successful culture must be established at all institutions where defendants' house seriously mentally ill inmates."  ECF No. 5477 at 7.

## 3.   **Cultural Collaboration Workgroup and Activities**

In response to the court's order, the Special Master convened a workgroup comprised of defendants and certain of his experts and monitors.  The workgroup was tasked with developing a plan to improve cultural collaboration in CDCR institutions that would facilitate access to care, and develop and maintain a supportive environment in the mental health care setting to enable staff to provide adequate care.  The workgroup began meeting in August of 2016, providing periodic updates to the All-Parties Workgroup for comments and direction during its monthly meetings.

Between January and July of 2017, the workgroup developed the Custody and Mental Health Partnership Plan ("Partnership Plan").[33]  The multi-faceted partnership strategy was

---

[33] After the primary components of the Partnership Plan were approved by the All-Parties Workgroup, the plan continued to undergo revisions based in part upon feedback received from the All-Parties Workgroup.  Each revised

designed to advance cultural collaboration between mental health and custody staff, with the goals of facilitating access, and delivering adequate mental health care to *Coleman* class members, with an ultimate goal of accomplishing sustained cultural change.  The Partnership Plan included three central components: (1) Executive Leadership Rounding; (2) Quarterly Partnership Round Tables and Staff Training; and (3) Jointly-Led EOP Orientation Groups.

The Executive Leadership Rounding component requires joint "rounding"—a tour of programs and clinics to interview staff and inmates in order to assess the functioning of each mental health program.  Rounds are to be conducted by the institution's leadership, which includes the Warden, Chief Deputy Warden, Chief Executive Officer (CEO), Chief of Mental Health, and the Chief Nurse Executive.  Rounds are unannounced and must include at least one custody and one health care representative.  The Partnership Plan requires executive leadership to conduct, at minimum, monthly rounds in any mental health program which information suggests needs particular attention, with at least an annual round conducted in the EOP, administrative segregation EOP hub, PSU, MHCB, STRH and LTRH programs.  The findings of the joint rounding must be shared at the meetings of the institution's executive staff, quality management committee, and mental health subcommittee.

The Quarterly Partnership Round Tables and Staff Training component is designed for supervisors, managers, and line staff.  The goals of these round tables include providing a framework for communicating and exchanging information for the purpose of establishing a joint and visible custody and mental health partnership in each mental health program.  The central goal is to improve patient outcomes by planning and coordinating activities for patient care and clinical operations, to prevent lapses in care.  The two key elements to the Quarterly Partnership

---

draft was provided to the All-Parties Workgroup for review and comment.  A finalized draft of the Partnership Plan was provided to the All-Parties Workgroup for discussion at its meeting on September 14, 2017.

Round Tables and Staff Training component are huddles—multi-disciplinary staff meetings comprised of custody, mental health, and nursing staff—and on-the-job training.

As part of the Partnership Plan, existing huddles that occurred in the administrative segregation EOP and MHCB programs were expanded to the mainline EOP, PSU, STRH and LTRH programs.  Daily huddles occurred on housing units and addressed high-level and urgent inmate issues.  Two hours of on-the-job training was scheduled quarterly for custody, mental health and nursing staff working Second Watch and Third Watch in each mental health program.  Eight lesson plans were developed that targeted areas of concern in the development, facilitation, and maintenance of a collaborative working relationship between custody and mental health staff.  The round table format allowed facilitators to impart key information and facilitate discussion between staff that allowed for real-time resolution at the program level of impediments to access to care.

The Jointly-Led EOP Orientation Groups component had two purposes; 1) assist new inmates to better adjust to the EOP program, and 2) help them with coping skills regarding issues commonly experienced in the EOP program.  It was anticipated that the orientation group would also help participants to establish initial connections they could turn to in order to address any difficult experiences they may have soon after placement in the program.  EOP Orientation Groups for all inmates newly placed in EOP programs would be led by a custody sergeant, mental health clinician and an inmate.

One of the central elements of the Partnership Plan is to promote and ensure that staff can report any misconduct, or unethical or illegal activity, harassment or discrimination without fear of retaliation.  As part of the strategy to sustain the Partnership Plan, staff would be trained regarding all regulations and policies related to safe reporting, including CDCR's Code of

89

Conduct and "whistleblower" laws; also, copies of the different policies and regulations would be distributed to staff as a package.

### 4. <u>Custody and Mental Health Partnership Plan:  Trial Implementation</u>

The Partnership Plan was initially developed to include a trial implementation of the plan at six institutions to "determine the efficacy of the model and identify barriers to its full implementation"[34] with a plan to expand to additional institutions in 2018.  The institutions selected were CIW, CSP/Corcoran, CSP/LAC, CCWF, MCSP and SVSP.  However, defendants later determined that the trial implementation would occur at the following four institutions, CIW, CSP/LAC, CSP/Sac, and CCWF.  The reported reasoning behind this change was that the EHRS was being rolled out at MCSP and SVSP, and defendants did not want to overburden staff.  As an alternative, the plan would instead be implemented at CSP/Sac.  Defendants reported that CSP/Corcoran had been dropped from the trial implementation because they decided to concentrate their initial focus to just four institutions.  However, defendants subsequently informed the Special Master's expert that they would not be implementing the plan at CSP/Sac either.  The reason given for this was that staff was burned out due to the challenges of working at the institution and defendants were not confident training would be effective there. Implementation at CSP/Sac was put on hold with no plan in place for future implementation. This resulted in the Partnership Plan being scheduled for initial implementation at just three institutions.

These developments are very concerning to the Special Master.  Although defendants' explanation for making changes in the institutions initially scheduled for the trial roll-out appeared reasonable, that number has now been reduced to three, which is of great concern

---

[34] From February 2017 draft of the Partnership Plan.

considering the nature of the cultural issues permeating CDCR institutions and the detrimental

effect this continues to have on *Coleman* class members.  CSP/Sac is an institution that has been

found to have very serious culture problems and therefore firmly fits within the category of

required institutions for plan implementation as outlined in the court's order.  The same is true,

albeit to different degrees, for CSP/Corcoran, MCSP, and SVSP.  This is partly why those

institutions were originally chosen for trial implementation of the plan.  This topic remains a

central focus of the Special Master; the All-Parties Workgroup will provide a forum to monitor

the progress of the implementation of the Partnership Plan and address any further issues that

may arise.  Defendants have a responsibility to create a custody and mental health alliance that

improves access to care and the adequacy of treatment to the mentally ill in CDCR.

On June 30, 2017, the partnership lesson plans were completed and submitted to the All-

Parties Workgroup for comment and were subsequently approved.  CDCR introduced and

reviewed the Partnership Plan and its components with CDCR executive leadership staff on July

12, 2017.  CDCR commenced "training for trainers" (T4T) for the Partnership Plan pilot

institutions beginning with CCWF on July 26 – 27, 2017.  Subsequent training was completed at

CIW on August 8 – 9, 2017, CSP/Sac on September 19 – 20, 2017[35] and CSP/LAC on October 3

– 4, 2017.  Members of the Special Master's team and plaintiffs attended and observed each of

the T4T training and provided feedback to CDCR.  Training at the institutional level at CIW,

CSP/LAC, and CCWF was anticipated to begin during the last quarter of 2017.

## Summary – Mental Health/Custody Relations

Relations between custody and mental health staff in CDCR, and how they impact access

to care and the treatment provided to members of the *Coleman* class is central to the remediation

---

[35] As reported above, full implementation at CSP/Sac was postponed.

process in the case.  The need for collaborative efforts between custody and mental health staff cannot be overstated.  As reported above, the Special Master is very concerned about the reduction in the number of institutions scheduled for trial implementation of the Custody and Mental Health Partnership Plan from four to three, and particularly that no large complex institution such as CSP/LAC or CSP/Sac, has been designated as a trial institution.  The Special Master will utilize the All-Parties Workgroup to resolve this issue and complete the implementation of the plan.

> **G.**   **Rules Violation Reports:**

In his Twenty-Sixth Round Monitoring Report, the Special Master outlined the history concerning mental health input into the inmate disciplinary process within CDCR prisons—a history dating back to the 1995 *Coleman* remedial order.  ECF No. 5439 at 60-66.  As previously reported, the years of activity surrounding efforts to bring the disciplinary process into constitutional compliance included monitoring and consultation by the Special Master, several revisions of the RVR system by CDCR, and the filing of plaintiffs' motion seeking affirmative relief on May 29, 2013 (ECF No. 4638).  In response to this motion, the court entered an order dated April 10, 2014 directing the Special Master to report whether defendants had implemented the RVR policies and procedures agreed to in 2011.  ECF No. 5131.  In response to the April 10, 2014 order, the Special Master filed his "Special Master's Report on the Implementation of the California Department of Correctional and Rehabilitation's Rules Violation Report Policies and Procedures" on January 30, 2015.  ECF No. 5266.  In the report, the Special Master asked the court to enter an order directing:

> 1) CDCR to immediately end the practice of using inmate clerks in any part of the RVR process;

2) CDCR to develop an RVR quality improvement process for incorporation into its CQIT, and conduct regular quality improvement reviews of the RVR process, to include staff training, at all CDCR prisons;

3) CDCR to implement—within 243 days—mandatory initial and ongoing RVR training/retraining of all staff who participate in the RVR process; and

4) the Special Master—following the 243-day implementation period—to conduct a review of staff training at all CDCR prisons and report to the court no later than 90 days following his review.

After a series of subsequent meet and confer sessions between the parties and the Special Master's team, in which the RVR process and the Special Master's recommendations were discussed,[36] on May 4, 2015, the court entered a Stipulated Response and Order on the Special Master's Report on CDCR's Implementation of Policies and Procedures on Rules Violations Reports. ECF No. 5305. The Stipulation adopted the Special Master's recommendations noted above.

CDCR developed mandatory training on the revised policies and procedures for clinical and custody staff involved in the RVR process, and during May and June of 2015, conducted the training at seven designated training sites. Upon the completion of that training, staff returned to their institutions to train the remaining required staff. Training was to be completed by July 7, 2015. Because the implementation of RVR staff training was underway during the Twenty-Sixth Round site tours, it was not yet ripe for reporting in the Twenty-Sixth Monitoring Round Report.[37] As such, the Special Master indicated his intention to evaluate and report on RVR staff training during the Twenty-Seventh Monitoring Round. ECF No. 5439 at 60. What follows is

---

[36] The parties met-and-conferred with the Special Master's team from February 19, 2015 through April 2, 2015. During that time, on February 5, 2015 and March 2, 2015, the court entered two stipulations between the parties, in agreement with the Special Master, extending the time for the parties to respond to his report until April 3, 2015. ECF Nos. 5273, 5285.

[37] The institutional site visits for the Twenty-Sixth Monitoring Round began on February 3, 2015 and ended on July 23, 2015.

the Special Master's evaluation of RVR policies and procedures, including mandatory staff

training for custody and mental health staff.

Scope of the Monitor's Review

For the focused RVR assessment, the Special Master's team assessed CDCR's

compliance with this Court's order relative to training and implementation of their policies and

procedures on RVRs.  Seventeen institutions were selected.[38]  Except for training information

(which was gathered for all 34 CDCR institutions), due to the low numbers of mental health

caseload inmates at the desert institutions, which would skew the data if included, those

institutions are addressed separately throughout the report.

Methodology

CDCR provided reports and memoranda of compliance with training requirements

regarding mental health input into the RVR process for the institutions.  Additionally, with the

assistance of CDCR in gathering the requisite documents, the Special Master's team analyzed

approximately ten percent of the RVRs issued to MHSDS inmates at these institutions during the

months of July, August and September 2016 ("review period").  Further, CDCR provided copies

of classification committee actions for identified mental health caseload inmates who were

assessed a SHU term resulting from a guilty finding after a hearing.

Compliance with Staff Training Requirements

In his Twenty-Sixth Round Monitoring Report, the Special Master stated that he expected

that "RVR training will have taken root by the Twenty-Seventh Round monitoring tour, at which

---

[38] California Correctional Center (CCC), California Health Care Facility (CHCF); California Institution for Women (CIW), California Men's Colony (CMC), California State Prison/Corcoran, (CSP/Corcoran), California State Prison/Los Angeles County (CSP/LAC), California State Prison/Sacramento (CSP/Sac), Calipatria State Prison (Calipatria), Centinela State Prison (Centinela), Central California Women's Facility (CCWF); Chuckawalla Valley State Prison (CVSP), High Desert State Prison (HDSP), Ironwood State Prison (ISP), North Kern State Prison (NKSP), Richard J. Donovan Correctional Facility (RJD), Salinas Valley State Prison (SVSP), and San Quentin State Prison (SQ).

time it will be evaluated." ECF No. 5439 at 60. This section covers compliance with required training for mental health and custody staff at all 34 CDCR institutions.

<u>Custody Staff</u>

Training of custody staff was compliant at multiple institutions. Fifteen institutions— CCC, CMC, CSP/Corcoran, CSP/LAC, CSP/Sac, Calipatria, Centinela, CCWF, CVSP, ISP, NKSP, RJD, SVSP, SQ and WSP —indicated that 100 percent of associate wardens were trained. Two other institutions—CHCF and HDSP—reported that 80 percent of associate wardens were trained, and at CIW, 75 percent of associate wardens had been trained on the updated RVR process. ASP reported training the chief deputy warden.

At 15 institutions— ASP, CCC, CIW, CMC, CSP/LAC, CSP/Sac, Calipatria, Centinela, HDSP, RJD, ISP, NKSP, SVSP, SQ, and WSP —100 percent of captains were trained. The remaining four institutions—CHCF, CSP/Corcoran, CCWF, and CVSP—indicated that between 70 and 80 percent of captains received the training. CTF reported that 57 percent of captains completed required training.

Compliance rates for lieutenants receiving the training was lower than associate wardens and captains. Only ten institutions—CCC, CHCF, CMC, CSP/LAC, Calipatria, ISP, NKSP, RJD, SVSP, and SQ—achieved 100-percent compliance. Three institutions—CIW, CSP/Sac, and Centinela, indicated 90 to 99 percent of lieutenants were trained. CVSP reported that 89 percent of lieutenants satisfied the training requirement, and at CSP/Corcoran, CCWF and HDSP, 70 to 79 percent of lieutenants were trained.

PVSP and Folsom reported 100- and 87-percent compliance respectively for custody staff training, without distinguishing the various custody staff levels.

95

CCI, CIM, CRC, CSATF, CSP/Solano, CTF, DVI, KVSP, MCSP, PBSP, SCC and VSP reported the number of custody staff trained; none reported rates of compliance for the various custody staff levels.

CIW and CMF did not provide information regarding custody training.

Mental Health Staff

Institutional data revealed that mental health staff training compliance varied.

Seven institutions—ASP, CRC, CTF, DVI, FOL, PVSP, and SCC reported 100 percent of mental health staff received required training, but did not distinguish the classes of mental health staff trained.

Nine institutions—CCC, Calipatria, CCWF, CVSP, NKSP, RJD, SVSP, SQ and WSP— indicated 100 percent of the program supervisors were trained.  Two institutions—CSP/Corcoran and CSP/LAC—reported between 75 and 85 percent of their program supervisors were trained. Three other institutions—CHCF, CMF and CSP/Sac—reported between 60 and 69 percent trained.  Centinela and ISP did not have supervisors.

Data relative to compliance of training completion of mental health clinicians responsible for completing the RVR mental health assessments garnered the lowest rates of training compliance.  Seven institutions—CCC, CMC, Calipatria, Centinela, CCWF, SVSP, and SQ — reported 100-percent compliance.  CHCF indicated 96-percent compliance and RJD reported 83-percent compliance.  CVSP, ISP and NKSP were from 70 to 79 percent compliant, and CSP/Sac indicated 64-percent compliance with completion of the training.  Data at two institutions— CSP/Corcoran and CSP/LAC—revealed 50-percent compliance.

WSP reported training 100 percent of social workers and 85 percent of psychologists; PVSP reported 80 percent of social workers and 58 percent of psychologists completed the training.

CIM, CMF, CTF, PBSP, SCC, CSP/Solano and VSP provided a list of mental health clinicians trained but did not provide rates of compliance for the various classes of mental health staff required to be trained.  KVSP reported five healthcare workers were trained; none was a mental health clinician.

CIW and HDSP reported zero compliance for training of both mental health program supervisors and clinicians responsible for completing the assessments.

ASP, CCI CRC, CSATF and MCSP did not provide information regarding training for mental health clinicians.

Review of the RVR Process

There were 19,983 RVRs issued at the 12 reviewed non-desert institutions during the review period.  Of those, 8,444 or 42 percent were issued to MHSDS inmates.  There were 5,963 RVRs issued to 3CMS inmates, 1,993 RVRs issued to EOP inmates, 292 RVRs issued to MHCB inmates, 87 RVRs issued to intermediate level of care inmates, and 109 RVRs issued to acute level of care inmates.  Fifty-two percent, or 10,332 of the 19,983 RVRs were issued to non-MHSDS inmates, and the mental health status of 1,207 inmates, or six percent of issued RVRs was unknown by CDCR.

None of the institutions demonstrated compliance with timely requests for mental health assessments.  HDSP and NKSP indicated from 50- to 59-percent compliance with timely referral to mental health.  CSP/Sac reported 35-percent compliance, and two other institutions — CHCF and RJD — revealed compliance between 20 to 29 percent of the time.  CSP/LAC and SVSP

97

requested assessments in a timely fashion from ten to 19 percent of the time, and CIW, CMC, and CSP/Corcoran noted a compliance rate of only one to nine percent.  CCWF and SQ reported zero compliance.

Document review indicated that mental health clinicians were not routinely completing and returning mental health assessments to custody staff within required timeframes.  CSP/Sac reported a 93-percent compliance rate, and three institutions — CCWF, NKSP, and RJD— indicated compliance from 80 to 89 percent of the time.  Data revealed 73-percent compliance for SVSP.  CIW timely completed and returned mental health assessments only 67 percent of the time.  CSP/Corcoran and CSP/LAC reported from 40- to 49-percent compliance.  CHCF was 39-percent compliant, and SQ indicated a compliance rate of only 14 percent.

Documentation of consideration of the mental health assessment by the senior hearing officer was often missing from the RVRs reviewed.  HDSP reported 100-percent compliance; however, two institutions—CMC and RJD--noted 70- to 79-percent compliance.  Further, three institutions— CIW, CSP/Corcoran, and CCWF—indicated compliance 50 to 59 percent of the time.  The remaining institutions, CHCF, CSP/LAC, CSP/Sac, NKSP, and SVSP all fell below 50-percent compliance.  SQ reported zero compliance.

Still lower rates of compliance rates were reported for documentation of mitigation by the senior hearing officers.  While CMC and HDSP reported 100-percent and 78-percent compliance rates respectively, the remaining institutions failed to reach even 50-percent compliance with documentation of mitigation.  CHCF, CIW and RJD, reported compliance rates between 30 and 39 percent.  CSP/Sac, CCWF, NKSP and SVSP indicated from 20 to 29 percent.  CSP/Corcoran and CSP/LAC were compliant from one to ten percent of the time.  SQ again reported zero compliance.

The new alternative discipline recommendation policy was not adhered to on a consistent basis.  There were five RVRs where the mental health assessment recommended alternate disciplinary measures as the inmates' behavior was strongly influenced by their mental illness.  Two cases—CSP/Corcoran and SVSP—were not referred to the captain for review as required.  At CCWF, three cases were appropriately referred; the captain disagreed with the clinical recommendation in two cases.  In the one case with which the captain agreed, the RVR was reduced to a Counseling Only RVR (previously, CDCR 128 A).

In the reviewed sample, there were only three RVRs issued to mental health caseload inmates from the desert institutions—Calipatria, CVSP and ISP.  None of the institutions demonstrated compliance with timely requests for mental health assessments.  Data indicated that mental health assessments were completed and returned to custody within required timeframes by mental health clinicians 100 percent of the time at CVSP and ISP.  Calipatria, however, was not complaint.  CVSP and ISP were also compliant with documentation of consideration of the mental health assessment by the senior hearing officer, whereas, Calipatria was not.  Calipatria, CVSP and ISP were 100-percent compliant with documentation of mitigation by the senior hearing officers.

Eighteen of 22, or 81 percent of reviewed classification committee actions included consideration of mental health factors when assessing SHU terms.  Mental health factors, however, were not noted as the reason for mitigation in any case.

The lack of completion of training of clinicians across institutions was evidenced in many of the reviewed mental health assessments.  Longstanding confusion remained around recommendations relative to factors for consideration regarding assessment of penalties when completing the mental health assessment.  Clinicians often recommended continued participation

in mental health programming, revealing a lack of understanding that disruption in mental health programming is not an available penalty.  Further, at CIW and SQ, two inmates were issued RVRs for behavior connected to the administration of their involuntary medication in violation of the new policy and procedures.

Areas Related to Special Master's RVR Report Recommendations

Use of Inmate Clerks

In accordance with this Court's order, CDCR ceased the use of inmate clerks in any aspect of the RVR process across all institutions.

Documentation of RVRs in the Strategic Offender Management System (SOMS)

CDCR updated SOMS to document all RVRs.  On the custody side, RVRs were processed entirely electronically with a time and date stamp, as well as the names of the employees responsible for processing the RVR.  Original RVRs were entered into SOMS and then sent electronically to a custody supervisor for review, classification and processing.  For any staff member who did not have a SOMS log in, the RVR was documented on paper and forwarded to custody staff, who then entered it into SOMS, noting the RVR was entered on behalf of the employee without access to SOMS.  As mental health staff did not have access to SOMS, in order to complete the mental health assessment, a hard copy of Form 115-MHA, was hand-carried to mental health or at some institutions, a PDF copy was emailed to the mental health staff.

However, during this review, the monitor discovered a glitch in the SOMS automated system relative to inmate mental health level of care.  The SOMS automated system identified an inmate's level of care as of the day the draft RVR was reviewed by a supervisor as opposed to

the date the alleged violation was committed, potentially reporting the wrong level of care at the time of the violation.

<u>Incorporation into CDCR CQI Process</u>

CDCR included review of RVRs and mental health assessments into the CQI process, which it is expected will be reported in the CQI report.

**<u>Summary – Rules Violation Reports</u>**

As reported above, CDCR needed to fix a glitch in SOMS that designates an inmate's level of care on the date the RVR is entered into the system, rather than the date of the RVR. While the institutions reviewed were generally compliant with custody RVR training, for mental health staff, multiple institutions reported noncompliance with the training requirement.  It was very troubling that training of mental health clinicians responsible for completing the RVR mental health assessments had the lowest rate of compliance for training at the reviewed institutions.  One result of this is that recommendations of multiple clinicians did not conform to policy.

No reviewed institutions demonstrated compliance with timely requests for mental health assessments; when requested, across institutions, mental health assessments were not routinely completed and returned to custody within required timeframes by mental health clinicians. Consideration of the mental health assessment and mitigation by the senior hearing officers were not consistently documented.  Moreover, the alternative discipline recommendation policy was not consistently adhered to.  While classification committee actions generally included consideration of mental health factors when assessing SHU terms, mental health factors were not noted as the reason for mitigation in any reviewed case.  The Special Master will continue to monitor the RVR process, and work with CDCR to address the deficiencies.

### H.   <u>Use of Force</u>:

As outlined in the Twenty-Sixth Monitoring Round Report, following the denial of defendants' termination motion on April 5, 2013, plaintiffs filed motions for additional orders including the use of force against mentally ill inmates.  ECF No. 5439 at 97.  The court issued its ruling on April 10, 2014 acknowledging the continuing constitutional violation in defendants' use of force against *Coleman* class members.  ECF No. 5131 at 13.  The court ordered defendants to work under the guidance of the Special Master to revise their use of force policies and procedures.  *Id*. at 72.  Defendants filed their revised use of force plans, policies and procedures on August 1, 2014 (ECF No. 5190), which the Court approved on August 11, 2014.  ECF No. 5196.

During the Twenty-Sixth Monitoring Round, CDCR trained mental health and custody staff regarding the revised use of force policy.  This report presents the first comprehensive review of use of force in CDCR since the implementation of the revised policy and training of staff.  The Special Master selected 15 institutions for focused use of force reviews to assess the implementation and application of the revised use of force policy.  The findings are reported below.

<u>Training</u>

To ensure that both custody staff and clinical staff were made aware of and complied with these revised policies and regulations, CDCR required training to be completed by all identified staff.  Training on the new controlled use of force polices and regulations for managerial, supervisory, executive custody staff, mental health and nursing staff began in September 2014 and concluded in November 2014.  Training on general use of force commenced on January 5, 2015 and concluded on June 12, 2015.

102

The Special Master's team undertook a focused assessment of CDCR's compliance with the training and implementation of the revised policies and regulations regarding use of force at 15 institutions—CCC, CHCF, CIW, CMC, CSP/Corcoran, CSP/LAC, Calipatria, Centinela, CVSP, HDSP, ISP, NKSP, RJD, SVSP and SQ.  Only immediate use of force incidents involving inmates at the EOP level of care and higher were examined using a random sample of the incidents.  All controlled use of force incidents that involved MHSDS inmates were reviewed for compliance.  The Special Master requested specific information to facilitate the review:

1)      Reports of training received by custody staff and mental health staff on the revised policies and regulations during the preceding 12 months.

2)      Copies of all controlled use of force incidents that occurred in July, August and September 2016 involving MHSDS inmates including Institution Executive Review Committee (IERC) documents.

3)      Copies of all immediate use of force incidents occurring in a MHCB, DSH or PIP location including IERC documents that occurred during July, August and September 2016.

4)      For all immediate use of force incidents involving EOP inmates that occurred in July, August and September 2016 and were reviewed by IERC, CDCR was to provide a sample of 20 incidents or all incidents if less than 20 occurred during that time period.

CDCR provided reports regarding use of force training provided to custody and clinical staff within the preceding 12 months to determine compliance with this training requirement. The monitor was unable to determine whether CIW was in compliance due to insufficient data.

Of the remaining 14 institutions, ten, or 71.4 percent, were compliant in training custody staff.  Four institutions reported 100-percent compliance, CCC, CMC, NKSP and RJD.  Six institutions—CHCF, CSP/LAC, Calipatria, CVSP, SVSP and SQ—reported compliance rates of 93 percent, 99 percent, 98 percent, 94 percent 99 percent and 96 percent, respectively.  Centinela

reported a compliance rate of 84 percent and HDSP reported a compliance rate of 24 percent. CSP/Corcoran and ISP had zero percent compliance rates for custody staff training.

With regard to the training of mental health staff on the revised policies and regulations, the reported results were not so encouraging. The overall compliance rate for those institutions that provided the requested data was 15 percent. For CIW and SVSP, there was insufficient data to determine a compliance rate. Of the remaining 13 institutions, only NKSP and SQ reported compliance in training mental health staff. CMC, CSP/Corcoran, ISP and RJD had compliance rates of 75 percent, 87 percent, 84 percent and 70 percent respectively. CHCF was 11 percent compliant and CVSP reported a 14-percent compliance rate. Four institutions, CCC, Calipatria, Centinela, and HDSP reported zero compliance.

Controlled Use of Force

Of the 15 institutions examined, CCC, Calipatria, Centinela, CVSP, HDSP, ISP, and NKSP reported that no controlled use of force incidents had occurred during the review period. There were 18 incidents of controlled use of force reported by the remaining eight institutions; CHCF (three); CIW (three); CMC (one); CSP/Corcoran (one); CSP/LAC (three); RJD (two); SVSP (four) and; SQ (one). The monitor's review determined that seven of those eight institutions, or 88 percent, were compliant with the policies and regulations when an incident called for a controlled use of force. SQ was the only institution that did not achieve compliance.

The one incident of controlled use of force at SQ was found not to be compliant due to the institution's failure to address a baton strike to the head of an inmate which was not addressed in the IERC review process.

<u>Immediate Use of Force</u>

The overall rate for complying with the policies and regulations for incidents that required immediate use of force was 78 percent.  CCC, Calipatria, Centinela, CVSP, HDSP, and ISP reported no incidents of immediate use of force.  Of the remaining nine institutions reviewed, five, or 78 percent, were compliant.  The four institutions which reported non-compliance were CHCF, CIW, CMC, and CSP/Corcoran.

The monitor analyzed the provided reports to determine, among other things, if staff interaction escalated or de-escalated the incident and if the reports reflected that immediate use of force was used when time, distance and/or circumstances could have allowed for utilization of controlled use of force protocols.

At CHCF, one immediate use of force incident was designated as an emergency cell extraction from the MHCB which lasted approximately eight minutes with no secondary level supervisory or management response, as required by policy.

Two incidents of cell extractions of inmates at the DSH level of care involved the use of fists and knees to gain compliance which was not addressed in the institution's review process.

At CIW, the monitor reviewed 19 immediate use of force incidents, eight of which did not contain an IERC review and two incidents that did not contain a supervisory, management or IERC review.  One use of force incident involving medication administration was conducted as an immediate use of force rather than a controlled use of force, even though supervisory staff provided advance notice that force might be required to administer the medications.

105

## Summary – Use of Force

Fourteen of the 15 institutions were compliant with the custody training requirements for the revised use of force policy.  Training required for mental health staff remained a major problem for nearly all the institutions.

Incidents of controlled uses of force did not occur during the review period for nearly half of the reviewed institutions.  Of the eight institutions where controlled use of force had occurred, seven were found compliant with controlled use of force policies and procedures.  For immediate uses of force, six institutions reported no incidents of immediate use of force.  Of the nine institutions where immediate use of force incidents had occurred, four institutions reported noncompliance.  The Special Master will continue to assess compliance with the training and use of force policy as part of his regular monitoring responsibilities.

I.   **Program Access:**

In its order of March 2, 2015, approving the final settlement agreement in the *Hecker* case,[39] giving it the full effect of an order, this Court incorporated the program access issues from that case into the *Coleman* remedial process, and directed the Special Master to monitor and enforce the parties' agreements on these issues.  ECF No. 5284 at 4.  The Court further ordered the Special Master to oversee the amendment of the Program Guide to incorporate the changes required by the settlement agreement.  *Id.*

The Special Master's findings regarding program access available to MHSDS inmates during the Twenty-Seventh Monitoring Round follow below.

---

[39] *Hecker v. CDCR*, No. 2:05-CV-02441 (E.D. Cal.)

<u>Full-Time Job Assignments</u>

Although improved, when compared to the Twenty-Sixth Monitoring Round, non-caseload inmates continued to be more likely to have full-time job assignments, while 3CMS inmates were more likely than EOP inmates to have such positions.

As to full-time employment positions for EOP inmates, CMC reported that 49 percent of inmates held such positions; at CCWF the percentage was 20 percent.  Seven institutions -- CHCF, CSP/Corcoran, CSP/Sac, CSATF, KVSP, MCSP, PBSP, and VSP indicated that from ten to 19 percent of EOP inmates were fully employed.   At CMF and CIW, one to nine percent of EOP inmates held full-time positions.  The remaining 12 institutions did not have EOP programs.

A higher percentage of 3CMS inmates held full-time job assignments than during the preceding monitoring round.  ASP, CMC, CRC and MCSP reported that between 50 to 55 percent of 3CMS inmates held such positions.  Six institutions – CMF, CIM, CSP/Solano, CCWF, PVSP and SCC – indicated that between 40 and 49 percent of 3CMS inmates held full-time positions.  Six other institutions – CIW, CSP/Corcoran, CSATF, CTF, Folsom and VSP – reported that between 30 and 39 percent of 3CMS inmates had full-time jobs.  Data from six other institutions – CCI, CHCF, CSP/Sac, KVSP, PBSP and SQ – revealed that between 20 and 29 percent of 3CMS inmates held full-time positions, and DVI and WSP indicated between ten and 19 percent of 3CMS inmates held such positions.

As for non-mental health inmates, four institutions – ASP, CIW, CMC and MCSP – reported that 50 to 60 percent of non-mental health inmates had full-time job assignments.  At nine other institutions – CIM, CRC, CSP/Corcoran, CSP/Sac, CSP/Solano, CCWF, CTF, Folsom, and PVSP – 40 to 49 percent of non-mental health inmates were fully employed.  Six other institutions – CCI, CHCF, CMF, CSATF, KVSP and VSP – reported that between 30 and

107

39 percent of non-mental health inmates had full time job assignments. At DVI, PBSP, and SQ, from 20 to 29 percent of non-mental health inmates were fully employed, and between ten to 19 percent of non-mental health inmates at SCC and WSP held full-time job assignments.

Milestone Credits

When an inmate actively participates in and completes components of in-prison rehabilitation programs, such as academic or vocational training or substance abuse programming, the inmate may qualify for a reduction in their incarceration time. "Milestones" are completed as the inmate progresses through components of the program. "Credits" are awarded to inmates in varying amounts upon completion of specific milestones.

At PBSP and SCC, between 50 and 75 percent of eligible EOP inmates received milestone credits. At VSP, 44 percent of eligible EOP inmates received milestone credits. Four institutions – CHCF, CMF, CMC and PVSP reported that between 30 and 39 percent of eligible EOP inmates earned these credits and at CSATF and CSP/Corcoran between 20 to 29 percent of eligible EOP inmates earned milestone credits. Five other institutions, CIW, CSP/Sac, CCWF, KVSP, and MCSP reported that ten to 19 percent of eligible EOP inmates received milestone credits. CIM and WSP reported less than ten percent of eligible EOP inmates received milestone credits. There were no eligible EOP inmates at three institutions – ASP, CRC, and CTF.

As for 3CMS inmates, VSP reported that approximately 41 percent of eligible 3CMS inmates received milestone credits. Three institutions – ASP, Folsom, and PBSP reported that between 30 and 39 percent of eligible 3CMS inmates earned milestone credits. Another seven institutions – CCI, CMF, CIM, CMC, CRC, CSATF, and PVSP reported that between 20 and 29 percent of eligible 3CMS inmates earned milestone credits. Nine other institutions – CHCF, CIW, CSP/Corcoran, CSP/Sac, CCWF, CTF, KVSP, MCSP, and SCC reported that between ten

108

and 19 percent of eligible 3CMS inmates earned milestone credits.  DVI, SQ and WSP reported

under ten percent of eligible 3CMS inmates earned milestone credits, and CSP/Solano reported

that less than one percent of eligible 3CMS inmates earned milestone credits.

As for non-mental health inmates, ASP and VSP reported that between 40 and 49 percent

of eligible non-mental health caseload inmates received milestone credits.  Three institutions –

CCI, CMC, and MCSP – reported that from 30 to 39 percent of non-mental health inmates

earned milestone credits.  Seven more institutions – CIW, CRC, CSP/Sac, CTF, Folsom, PVSP,

and SCC reported that 20 to 29 percent of eligible non-mental health caseload inmates received

milestone credits.  Another seven institutions – CCWF, CIM, CMF, CSP/Corcoran, CSATF,

KVSP, and PBSP reported that ten to 19 percent of eligible non-mental health inmates earned

milestone credits, and five institutions – CHCF, CSP/Solano, DVI, SQ and WSP reported that

less than ten percent of eligible non-mental health inmates earned milestone credits.

<u>Out-of-Level Housing</u>

There remain vast differences as to the percentage of inmates who are housed out-of-

level at the respective institutions.  As for EOP inmates, CMC and CMF reported between 60

and 69 percent of inmates were housed out-of-level.  Three institutions – CHCF, Folsom, and

MCSP reported that from 20 to 29 percent of EOP inmates were housed out-of-level.  Another

two institutions – CSP/Corcoran and VSP from ten to 19 percent of EOP inmates were housed

out-of-level, while at CSP/Sac, CSATF, and KVSP, less than five percent of EOP inmates were

housed out-of-level.  There were no EOP inmates housed out-of-level at the remaining 11

institutions – ASP, CCI, CIM, CRC, CSP/Solano, CTF, DVI, PBSP, SCC, SQ, and WSP.

As for 3CMS inmates, CIM reported that nearly 60 percent of 3CMS inmates were

housed out-of-level.  At CHCF and CMF, between 30 to 39 percent of 3CMS inmates were

housed out-of-level.  Four institutions – CMC, MCSP, PVSP, and SCC – indicated that from 20 to 29 percent of 3CMS inmates were so housed.    Another four institutions – CSP/Corcoran, CSP/Solano, CSATF, and WSP reported that between ten to 19 percent of 3CMS inmates were housed out of level.  Eleven institutions – ASP, CCI, CRC, CSP/Sac, CTF, DVI, Folsom, KVSP, PBSP, SQ, and VSP reported that less than ten percent of 3CMS inmates were housed out-of-level.

As for non-mental health inmates, SCC reported that 42 percent of inmates were housed out-of-level.  CMF and WSP reported that approximately 30 percent of non-mental health inmates were housed out-of-level.  Three institutions – CMC, MCSP, and WSP – indicated that 20 to 29 percent of non-mental health inmates were housed out-of-level.  Another seven institutions – CHCF, CRC, CSP/Corcoran, CSP/Solano, CSP/Sac, DVI, and PVSP reported that ten to 19 percent of non-mental health inmates were housed out-of-level, and the remaining nine institutions – ASP, CCI, CSATF, CTF, Folsom, KVSP, PBSP, SQ, and VSP – indicated that less than ten percent of non-mental health inmates were housed out-of-level.  CIW and CCWF reported that inmates at custody levels I to IV were housed together.

ADA Reasonable Accommodation and Grievance Procedures

Eighteen institutions – ASP, CIM, CIW, CMF, CMC, CRC, CSP/Sac, CSATF, CCWF, CTF, Folsom, KVSP, MCSP, PBSP, PVSP, SCC, SQ, and VSP confirmed full implementation of the ADA reasonable accommodation and grievance procedures.  DVI reported conducting training.  WSP provided documentation only regarding Developmental Disability Program (DDP) annual refresher training.  Two institutions – CHCF and CSP/Corcoran – did not provide information as to the procedures.

Periodic Classification Score Reductions:  EOP Inmates

Review of CDCR 840s from five institutions – CHCF, CIW, CSP/Sac, Folsom, and VSP – indicated that EOP inmates were granted the same semi-annual classification score reductions as non-EOP inmates for successful programming.  Two institutions – CSP/Corcoran and PBSP -- reported that CDCR 840 documentation was completed annually, not semi-annually.

CMC, CCWF, and KVSP did not provide information regarding periodic classification score reductions. CSATF provided raw classification scores of several inmates, but did not report whether theses inmates had been granted classification score reductions or the frequency of the reductions. Eleven institutions – ASP, CCI, CIM, CRC, CSP/Solano, CTF, DVI, PVSP, SCC, SQ and WSP – reported not having an EOP program or typically not housing EOP inmates.

The monitor did not review completed CDCR 840 documentation for CMF and MCSP.

## Summary – Program Access

Meeting all the requirements for program access by MHSDS inmates remained an ongoing challenge for CDCR.  Although improved from the preceding monitoring round, access to inmate jobs continued to lag for MHSDS inmates, particularly EOP inmates.  Large percentages of eligible MHSDS inmates did not receive milestone credits, an enduring problem. The percentages of MHSDS inmates housed out-of-level varied significantly at the various institutions; however, many were housed at lower levels than their classification.  Most institutions had fully implemented the ADA reasonable accommodation and grievance procedures.  Most reporting institutions indicated that EOP inmates were granted the same classification score reductions as non-EOP inmates when they successfully programmed. Program access will continue to be monitored by the Special Master; problems discovered during this round will be addressed through the workgroup process.

111

J.     **Construction and Renovation of Mental Health Treatment Space and Bed Activations at Various Levels of Care:**

As persistent issues throughout the history of this case, mental health beds and treatment space were highlighted by the *Coleman* court in denying defendants termination motion in April of 2013.  Specifically, the court noted, "Shortages in treatment space and access to beds at all levels of mental health care have plagued the entire remedial phase of this action."  ECF No. 4539 at 53.  Access to mental health beds at all levels and the availability of appropriate mental health treatment space remain formidable challenges for defendants, and are prominent agenda topics for the Special Master and the parties in the All-Parties' Workgroup.

Problems with the availability of mental health beds and treatment space throughout the remediation phase, which are also offshoots of the ongoing MHSDS population challenge CDCR faces, has led to the court's expressed frustration about the prolonged period of time it has taken to achieve constitutionally adequate care.  ECF No. 4539 at 53. While many construction projects were completed in 2015, some outstanding for nearly ten years, other infill projects, program activations and Health Care Facilities Improvement Program (HCFIP) projects outlined in CDCR's Blueprint[40] remain ongoing as is discussed in detail below.  Adequate mental health beds and treatment space continue to be essential components of the remedial process leading to the end of federal court supervision in the *Coleman* case.

The two CDCR Capital Outlay projects funded in the FY 2017-18 budget were 50 crisis beds at CIM and 50 beds at RJD to help mitigate the inpatient waitlist, which is a major obstacle to compliance in the case.  These projects will introduce a new concept in CDCR, because the proposed facilities will be constructed as flexible housing, designed to be used for MHCB,

---

[40] CDCR's April 2012 bed plan, "The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Oversight and Improve the Prison System."

intermediate or acute levels of care as needed.  The projects are projected to be completed by summer 2021.

In its FY 2017-18 budget[41], CDCR was granted funding to address several mental health care infrastructure and service needs.  Funding was provided to support Proposition 57's objectives of reducing the adult inmate population, to support prison mental health care services programs, to transfer the psychiatric programs at DSH to CDCR, to activate 70 intermediate care beds, and two observation and restraint rooms at CMF, and for two Capital Outlay projects to provide 100 additional MHCBs in the system by 2021.  Urgent needs in CDCR included repairing significant damage caused by record rainfall and severe storms at several institutions and taking preventive actions against similar failings in the future, were also funded.  Funds for infrastructural improvements at CCI, PVSP, and SVSP were provided in the FY 2017-18 budget.

With the support of the Special Master, and input from plaintiffs, CDCR completed the transfer of responsibility, commonly referred to as "Lift and Shift," for the psychiatric programs from DSH to CDCR, which took effect on July 1, 2017.  The transfer of responsibility is intended to streamline referral and admission processes and improve timelines for placing inmates referred for psychiatric inpatient treatment in appropriate beds.  "Lift and Shift" resulted in the transfer of 1,156 inpatient mental health treatment beds from DSH to CDCR.

There were no reports of construction and/or renovation of mental health treatment space at ASP, CRC, CTF, MCSP, PBSP, SQ, SCC, VSP, and WSP during the round.  Information regarding construction, treatment space and/or renovation of mental health treatment space at the ten institutions where CDCR tested its CQIT will be covered in those reports by CDCR.

---

[41] California State Budget – 2017 – 18, Public Safety, p. 29 – 33.

Defendants continued to be diligent in their efforts to complete construction projects and program activations.  Since the Special Master's Twenty-Sixth Round Monitoring Report, multiple projects have been completed and activated.  In October 2016, an R&R exam room renovation was completed and activated at CMC.  At MCSP, a new administrative segregation primary care unit and an EOP administrative segregation mental health clinic were completed and activated in November of 2016.  At RJD, a Level II dormitory was completed in December 2016, and in February 2017, an administrative segregation primary care facility and an EOP administrative segregation mental health clinic were completed and activated.

As of July 31, 2017, CDCR had several ongoing renovations and new construction HCFIP projects, many outstanding since 2015.  These included a general population primary care clinic at CIW, an administrative segregation primary care facility and an EOP mental health clinic at CMC, and reception center health care processing units at CIM, CCWF, DVI, NKSP and WSP.  All have projected completion dates later this year or later in 2018.  (*Coleman Construction Report, July 31, 2017*)

Additions to reception centers are being constructed by CDCR at CIM, CCWF, and DVI, and renovations of reception centers are in progress at CSP/Solano, NKSP, and WSP.  CDCR is building a new administrative segregation primary care and EOP mental health clinic at CMC, and a general population primary care clinic addition and renovation are occurring at CIW.

While the projects discussed above have helped to ameliorate the serious treatment space problems CDCR faces, CDCR institutions continue to struggle from the lack of sufficient adequate treatment space.  For instance, at CCI, staff without permanent office space reported several relocations of their offices within the last months leading up to the site visit.  They further reported that treatment space in the LTRH was not confidential; it was located in the

114

hallway of the dining area, which also doubled as the law library.  Staff also reported that because there was no confidential treatment space, group treatment was not offered.[42]

At CIM, space was so limited for the 3CMS program, it was reported that IDTTs were held in a staff member's office, an area much too small to accommodate the necessary participants.  In addition, the 3CMS program had no confidential space for groups.  Mental health staff met with inmates in private offices to protect confidentiality; however, staff had grave safety concerns because the rooms have solid doors meaning they could not be observed by custody staff when meeting with inmates.

Staff at CIW reported that construction underway at CIW was expected to provide only limited additional mental health treatment space.  Similarly, staff at CSATF reported a significant mental health treatment space problems, but that there was no current or planned construction projects to remedy the shortfall.  They stated that an area in the chapel had recently been approved for use as treatment space, but they had not yet begun using it at the time of the site visit.

The MHCB at CSP/Solano lacked sufficient confidential treatment space.  Confidential treatment space at DVI remained an ongoing challenge impacting EOP and 3CMS care.  Due to poor ventilation, windows and doors in treatment areas remained opened at DVI, allowing non-treating staff and inmates outside a room to hear group discussions.  In addition, noise from outside the room created an ongoing distraction for the group, severely compromising the therapeutic milieu.  Construction at DVI was reported to have caused the displacement of some mental health staff.  Demolition associated with construction elevated the health and safety concerns of some staff, who reported problems with pests, mold, water leaks and sewage.

---

[42] The Special Master's Twenty-Seventh Monitoring Round site visit to CCI occurred in August of 2016; the LTRH unit at the institution has since been closed.

The lack of mental health treatment space was also identified as problematic by Folsom staff.  At SCC, staff raised safety concerns regarding the limited or shared confidential treatment space available for individual or group contacts.  Groups were held in the chapel during weekdays.  Staff expressed serious safety concerns because they reported there was no custody staff available during these groups.  In addition, multiple clinicians shared clinical office space creating logistical challenges related to office use for confidential meetings with inmates. Notably, no new construction or renovations for Folsom or SCC are reported in the monthly construction updates for *Coleman* class members.

CMC staff reported clinically appropriate mental health space in the EOP unit, but inadequate mental health treatment space was a problem in the 3CMS program.  IDTTs were held in a staff member's office in the 3CMS program, a space much too small to accommodate the necessary participants.  Mental health staff reported that although there were individual confidential spaces for meetings with inmates, they had serious safety concerns that the private offices available for individual treatment were in isolated areas, had solid doors, and intermittent custody coverage.

During the monitoring round, CDCR developed ambitious plans of bed activations and program alignments to combat its upward trending bed needs at the different levels of care, which were presented in All-Parties Workgroup meetings to the Special Master and plaintiffs. CDCR provides regular updates, and generally keeps the Special Master and plaintiffs informed of activations and modifications to the physical plants.  While these plans have placed many inmates in the right beds, the growing bed needs continue to pose major difficulties to CDCR at this stage in the remedial phase of the case.

116

Over the course of this past year, the Special Master and the parties reached agreement regarding CDCR's proposal to activate 70 beds and two observation and restraint rooms in the L-Wing of CMF as temporary intermediate care beds.  With the concurrence of the Special Master, the parties jointly requested a waiver of applicable state laws, which was granted by the *Coleman* court on April 6, 2017.  The court approved the waiver for a period of 18 months and directed the parties to seek an extension if the need should arise within 12 months from the entry of the order.  ECF No. 5592 at 4.

The lack of appropriate EOP beds for a steadily growing population continues to present major hurdles and obstacles to CDCR.  EOP bed needs have been, and remain, a reoccurring topic on the All-Parties Workgroup agenda.  To meet the EOP bed shortfalls, CDCR has proposed and activated multiple program realignments and mission changes.  In addition, CDCR proposed a review of the entire EOP population to ensure all inmates continue to meet the criteria required for EOP placement, which was agreed to by the workgroup, and is in progress at the time of the writing of this report.

CDCR reported that under its EOP bed plan, it has activated a net of 1,986 EOP beds since June 2016.  (CDCR, Department of Adult Institutions, Population Management Unit, October 19, 2017.)  While this is a major accomplishment, for which CDCR must be commended, the availability of sufficient EOP beds continue to pose major problems for CDCR in its efforts to come into compliance with providing constitutionally adequate care.  Moreover, the activation of these beds in some cases have apparently put more pressure on available MHCBs, and relatedly, expanded the use of alternative housing in some institutions. EOP activations have also compounded already troubling staffing problems existing at some institutions including the ability to recruit and retain staff consistent with the court ordered

117

maximum vacancy rate of ten percent, and CDCR's own staff-to-patient ratios. Other issues, some of them unforeseen, that have risen with new bed activations include the use of inappropriate places as EOP housing overflow units and the unavailability of sufficient confidential treatment space.

Over the last several years, with the approval of the court, under the guidance and supervision of the Special Master, the parties reached multiple agreements leading to the implementation of new, even innovative, policies and procedures that resulted in significant reductions in the need for segregated housing across the system.  One salutary effect of these changes is the creation of non-segregated bed spaces that are now available to CDCR to use when developing program changes and realignments.  Working through the All-Parties Workgroup, CDCR outlined plans to convert former segregated housing at PBSP and CSP/Corcoran to Level II GP housing and Level IV GP housing respectively.  It is anticipated that similar proposals are likely to be brought to the attention of the workgroup by CDCR.

### <u>Summary – Construction and Renovation of MH Treatment Space and Bed Activations</u>

Over the last several years, with the approval of the court, the parties have worked collaboratively with the Special Master and reached multiple agreements leading to the implementation of new, even innovative, policies and procedures, which have resulted in significant reductions in the need for segregated housing across the system.  One beneficial effect of these changes is the creation of non-segregated bed spaces that are now available to CDCR to use when developing program changes and realignments.  In addition, CDCR is developing a series of bed proposals that are at various stages, for discussion with the Special Master and plaintiffs.  CDCR has outlined plans to convert former segregated housing at PBSP and CSP/Corcoran to Level II GP housing and Level IV GP housing respectively.  CDCR has

also submitted a proposal to convert a 100-bed general population facility at SQ into an EOP housing and treatment unit.  These plans are under review by the All-Parties Workgroup.  It is anticipated that similar proposals are likely to be brought to the attention of the workgroup going forward.  This Court will continue to be apprised of these developments through the reporting formats already in place in the case.

### K.   MHSDS Inmates in Segregated Housing:

Compliance with the requirements for the treatment of MHSDS inmates in administrative segregation is one of the general goals on the road map to the end of federal court oversight identified by the Special Master in 2011.  Following the court's denial of defendants' motion to terminate the case, (Order, April 5, 2013, ECF No. 4539), plaintiffs filed a motion for relief on May 6, 2013.  ECF No. 4580.  On April 10, 2014, the court granted plaintiffs' motions in part and ordered numerous actions in response to plaintiffs' requested relief concerning the segregated housing of *Coleman* class members.  ECF No. 5131.  Pursuant to the April 10, 2014 court order, working in cooperation with the Special Master, the parties agreed on a number of plans, policies and procedures related to *Coleman* class members' placement in segregated housing and providing adequate care to EOP inmates in administrative segregation.

In August 2014, defendants submitted their report and related policies to the court for review, which the court ordered CDCR to implement under the Special Master's guidance.  Order, filed August 11, 2014, ECF No. 5196; Order, filed August 29, 2014, ECF No. 5212.

Defendants' compliance with the policies and procedures for MHSDS inmates in segregated housing is reported below, as is compliance with providing care in the psychiatric services units (PSU).  During the Twenty-Sixth Monitoring Round, CDCR operated a PSU at PBSP, which was closed at the time of the writing of this report.

119

1.  **Psychiatric Services Units (PSU)**

CIW and PBSP met psychiatry and PC caseload staffing ratios in the PSU.  For CSP/Sac, adequate staffing by psychiatrists presented an ongoing staffing difficulty.

CSP/Sac was noncompliant with providing confidential clinical contacts for both psychiatry and PCs; CIW was compliant.

CIW was compliant with providing brief mental health assessments on arrival; CSP/Sac was noncompliant.  CIW and PBSP were noncompliant with initial comprehensive mental health evaluations prior to the IDTT.  CSP/Sac did not provide data regarding completion of initial comprehensive mental health evaluations prior to the IDTT.  CIW reported compliance with psychiatric intake evaluations prior to initial IDTTs.

PBSP was compliant with initial PC contacts, as was CIW.  CSP/Sac was noncompliant with initial psychiatry contacts.

Routine PC contacts were compliant at CIW, CSP/Sac and PBSP.  CIW was compliant with routine psychiatric contacts; PBSP also reported near compliance and CSP/Sac reported noncompliance.

Both CIW and PBSP were compliant with completion of initial IDTT meetings; CSP/Sac was noncompliant.  CIW, CSP/Sac and PBSP were compliant with completing routine IDTTs.  CSP/Sac combined some ICCs with IDTTs, which was deemed to be problematic because of the potential for compromising clinical confidentiality.

CIW, CSP/Sac and PBSP were all noncompliant regarding required attendees at IDTTs.

Regarding compliance with providing structured therapeutic activities, CIW and CSP/Sac were compliant with offering the minimum required hours for all inmates, both those assigned to normal programming and those on modified programming.  PBSP met the standard regarding

120

offering structured treatment activities for regular programming, but was not compliant regarding modified programming.

### 2.   Administrative Segregation EOP Hubs

CMC reported compliance for psychiatry and PC caseloads with CDCR's established ratios for administrative segregation EOP hubs.  CHCF, CMF, CSP/Corcoran and MCSP indicated that psychiatry caseloads exceeded established ratios and were noncompliant.  CMF and MCSP reported compliance for PC caseloads; CHCF, CSP/Corcoran and CSP/Sac slightly exceeded established caseloads.

Regarding initial intake assessments, CMF, CSP/Sac and CCWF reported compliance.  CIW just missed compliance at 89 percent.  CSP/Corcoran was noncompliant.

CMF and CMC reported compliance with initial mental health evaluations occurring prior to IDTTs; CHCF and CSP/Corcoran just missed compliance at 89 and 87 percent, respectively.  CSP/Sac and CCWF reported noncompliance.

CHCF reported compliance for psychiatry contacts.  CMF, CMC, CSP/Corcoran, CCWF, and MCSP reported compliance with initial and routine psychiatry contacts.  CSP/Sac and CIW reported noncompliance with initial psychiatry contacts, but compliance for routine contacts.

CMF and CCWF reported that more than 90 percent of psychiatry contacts were confidential.  CMC and CSP/Corcoran indicated that less than 90 percent were confidential.  For two different site visits, CSP/Sac reported that 95 and 19 percent of psychiatry contacts were not confidential.

CHCF reported compliance with PC contacts.  CIW, CMF, CMC, CSP/Sac, CCWF and MCSP reported compliance for initial and routine PC contacts.  CSP/Corcoran reported noncompliance for initial contacts but compliance for follow-up contacts.  CHCF, CMC and

121

CSP/Corcoran indicated compliance for treatment refusal appointments, while CIW reported noncompliance.

CSP/Corcoran reported that 99 percent of PC contacts were confidential.  CHCF, CMF, CMC, and CCWF found that less than 90 percent were confidential.  For two different site visits, CSP/Sac determined that 72 and 40 percent of PC contacts were not confidential.

CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac, CCWF, and MCSP reported compliance for initial and routine IDTT meetings and for the attendance of required disciplines.

CHCF, CIW, CMF, CMC, CSP/Corcoran, CSP/Sac and CCWF offered inmates a weekly average of more than ten hours of structured therapeutic activities.  However, CIW, CMF, CMC, CSP/Corcoran and CCWF all reported that inmates attended less than ten weekly hours.

CIW, CMF, CMC and CSP/Corcoran offered more than at least eight weekly hours of structured therapeutic activities to inmates on modified programming, exceeding the five hours required by policy.  CSP/Corcoran indicated that modified programming inmates attended five weekly hours of group; inmates at CIW, CMF and CMC all attended a weekly average of less than five hours.

CMF reported that the PC saw inmates who refused more than 50 percent of treatment daily, while CHCF offered high refusers an average of slightly more than three weekly hours of group.

### 3.  Short-Term Restricted Housing

The PBSP psychiatrist, who covered both the STRH and 3CMS programs, had a caseload of 156 inmates.  During the site visit, the CSP/Corcoran psychiatrist had a 102-inmate caseload, exceeding established ratios by one.  KVSP's data was insufficiently detailed to determine compliance with established psychiatry ratios.  CSP/Sac, CSATF, KVSP, PBSP and PVSP

reported that PC caseloads were within established ratios; during the site visit, CSP/Corcoran clinicians' caseloads complied with established ratios.

CSP/Corcoran reported compliance with requirements for psychiatry contacts. CIW, DVI and WSP reported compliance with initial and routine psychiatry contacts; PBSP reported compliance for three months. CSP/Sac, KVSP and PVSP reported noncompliance with initial psychiatry contacts but compliance with routine contacts. CCWF inmates reported typically seeing psychiatrists for both their required initial and routine contacts. CSATF's data regarding psychiatry contacts was not presented in a useful format, making compliance unascertainable; CSATF inmates also reported delays of several weeks to meet with psychiatry. As for confidentiality, CSP/Sac and PBSP reported that all contacts were confidential, while CIW and DVI reported 87 percent compliance.

CIW, CSP/Sac, KVSP, PBSP, PVSP and WSP reported compliance with initial and routine PC contacts. CCWF inmates reported typically seeing PCs for both their required initial and routine contacts. DVI reported compliance for initial PC contacts but noncompliance for routine contacts. CSP/Corcoran reported noncompliance with initial and follow-up PC contacts. CIM reported noncompliance with weekly PC contacts. Compliance could not be determined from CSATF's data. CSP/Sac and DVI reported that more than 90 percent of PC contacts were confidential, and PBSP indicated that most were confidential. However, only 28 percent of PC contacts at CIW were confidential

The following five institutions - CIW, KVSP, PBSP, PVSP, and WSP - reported compliance with initial and routine IDTT meetings. CSP/Corcoran, CSP/Sac, and DVI reported noncompliance with initial IDTTs but compliance with routine IDTT meetings. CIW, DVI, and PVSP reported compliance with required disciplines' attendance at IDTT meetings. PBSP just

123

missed compliance.  CSP/Corcoran, CSP/Sac, KVSP, and WSP indicated noncompliance for the attendance of required disciplines at IDTTs; CSP/Corcoran and CSP/Sac determined that attendance by required disciplines was five percent or less.  CSATF did not present supporting data regarding IDTTs to ascertain compliance.

PVSP reported compliance with out-of-cell activities including yard.  At CSP/Corcoran, document review and inmate interviews reflected that inmates received sufficient yard.  CSATF reported compliance for three months and just missed compliance for the other three.

CIW reported compliance with structured therapeutic groups; PBSP reported compliance for three months.  KVSP reported noncompliance.  CSP/Corcoran inmates reported being offered weekly groups.  CCWF inmates refused to attend two-thirds of offered groups.  CIM data indicated that between four hours and 42 minutes and five hours and 42 minutes of recreation therapy groups were offered weekly.  DVI did not track group attendance.

### 4.  Long-Term Restricted Housing

CIW reported compliance with caseloads for the psychiatrist who provided services in LTRH and other units.  CSP/Corcoran reported noncompliance for psychiatry caseloads.  PC caseloads were within established ratios at CIW and CSP/Corcoran.

CSP/Corcoran indicated compliance with psychiatry contacts; CIW reported compliance with initial and routine psychiatry contacts.  CCI just missed compliance for initial psychiatry contacts but indicated compliance with follow-up contacts; CCI further reported that 98 percent of contacts were confidential.

CSP/Corcoran reported compliance with PC contacts.  CCI and CIW reported compliance with both initial and follow-up contacts. CCI reported compliance with PC contacts that occurred in a confidential setting at 93 percent.

124

CSP/Corcoran reported compliance with timeliness for required IDTT meetings; CCI also indicated compliance with initial and follow-up meetings.  CIW reported noncompliance for timeliness of initial IDTTs, but compliance with routine IDTT meetings.  CIW reported compliance with required disciplines IDTT meeting attendance, CCI just missed compliance and CSP/Corcoran indicated noncompliance.

CIW reported compliance for inmates receiving 15 hours of weekly out-of-cell activities.  CSP/Corcoran reported that inmates routinely received ten weekly hours of yard.

### 5.  3CMS Inmates in Administrative Segregation

Seven institutions - CCI, CSATF, Folsom, MCSP, SQ, VSP and WSP - reported that psychiatry caseloads were within established ratios.  At CTF, the psychiatrist's caseload exceeded the established ratio.  CCI, CIM, CSP/Solano, CSATF, DVI, Folsom, MCSP, SQ, SCC and WSP reported that caseloads for PCs were within established ratios.

Six institutions - CHCF, CMF, CMC, CSP/Corcoran, CTF and Folsom - reported compliance for psychiatry contacts.  CIM, MCSP, PBSP, SQ, SCC and VSP reported compliance with initial and routine psychiatry contacts.  CSP/Solano reported compliance with initial psychiatry contacts, but DVI indicated noncompliance.  CCI indicated compliance with routine psychiatry contacts but did not provide data on the timeliness of initial psychiatry contacts.  CSP/Solano and DVI reported that 100 percent of inmates who were prescribed psychotropic medications were seen by psychiatry at least every 90 days.  CSATF reported noncompliance for initial and routine psychiatry contacts.  PVSP did not provide clinical data regarding treatment.

CCI, CSP/Solano and SCC reported that all psychiatry contacts were confidential.  CMF and CSP/Corcoran reported 99 percent were confidential.  There were no significant issues with

non-confidential psychiatric contacts at CTF.  Less than 90 percent of psychiatry contacts were
confidential at CIM, CMC, DVI, MCSP and VSP.

Twelve institutions - CCI, CHCF, CIM, CMF, CMC, CSP/Solano, CTF, MCSP, PBSP,
SQ, SCC and VSP - reported compliance with initial and routine contacts PC contacts.  Folsom
reported compliance with PC contacts.  DVI reported compliance with initial PC contacts but
noncompliance with routine contacts.  CSATF reported noncompliance with initial psychiatry
contacts but compliance with routine contacts.  CSP/Corcoran indicated noncompliance for
initial and routine PC contacts, reporting noncompliance rates of 20 and 50 percent, respectively.
PVSP did not provide clinical data regarding treatment.

CCI, CMF, CSP/Corcoran, DVI, Folsom and VSP reported 98 percent or more of PC
contacts were confidential.  At CSP/Solano, less than 90 percent were confidential.  At CIM,
CMC and SCC, only approximately two-thirds of PC contacts were confidential.

CHCF, CIM, CMF, CMC, CSP/Corcoran, CSP/Solano, CTF, PBSP, SQ, SCC and VSP
reported compliance with initial and ongoing IDTT meetings.  CCI reported compliance with
IDTT meetings.  CSATF reported noncompliance with initial and routine psychiatry contacts.
CCI, CMF, CMC, CSP/Solano, CTF, PBSP, SQ, SCC and VSP reported compliance for required
members' attendance at IDTTs; CHCF, CIM and Folsom just missed compliance.  CSP/Corcoran
reported noncompliance with the attendance of required disciplines at IDTTs.  PVSP did not
provide data.

CIM and SQ offered groups to MHSDS inmates.  CMC 3CMS administrative segregation
inmates were provided with one weekly two-hour group.  CSP/Solano, CTF and VSP did not
provide group treatment.

126

### 6.  **Non-Disciplinary Segregation**

CSP/Solano, CCWF and Folsom reported compliance for the timely transfer of designated NDS inmates.  CHCF, CIM, CIW, CMF, CMC, CSP/Sac, CSATF, CTF, KVSP, MCSP, PVSP, SCC, VSP and WSP all indicated noncompliance with the timely transfer of NDS inmates.  At some institutions, noncompliance was particularly low; compliance rates were 25 percent or less at CHCF, CMC, CSATF and MCSP.  CCI, DVI and SQ did not provide data on whether accelerated transfers were compliant.

CMF, CTF, DVI, Folsom, CSP/Solano, and VSP reported that NDS inmates were provided with appropriate privileges and property.  CSP/Sac did not provide information regarding property and privileges and CIM did not provide it as to most NDS inmates.  KVSP logs reflected that inmates received telephone and property and privileges one to two days following NDS designation.  MCSP reported that inmates who did not require expedited transfer were provided with property within two to 19 days if they had not already received it prior to NDS designation.  At CSP/Corcoran and SQ, NDS inmates' property was not received timely.

### 7.  **Privilege Group C and/or Work Group C ("C" Status)**

Numerous institutions reported that a significant percentage of inmates who were designated as "C" Status were on the mental health caseload.  During the review period or at the time of the site visit, between 50 and 77 percent of "C" Status inmates were on the mental health caseload at ASP, CCI, CIW, CCWF, MCSP and VSP.  However, other institutions reported a lower percentage of "C" Status MHSDS inmates.  During the review period or at the time of the site visit, less than 50 percent of "C" Status inmates were on the mental health caseload at DVI, Folsom, PVSP, SCC and WSP.  CTF reported that "C" Status inmates included both MHSDS

127

and non-MHSDS inmates.  During the reporting period, CHCF did not designate any inmates as "C" Status.

CTF, Folsom, PVSP, SCC, VSP and WSP reported that review of inmates' case factors revealed that inmates' "C" Status placement followed the ICC's determination that they were program failures following the receipt of multiple RVRs over a 90- or 180-day time period.  In accordance with CDCR policy, all "C" Status designations were for a set period of time at CTF, Folsom, SCC and VSP.

### Summary – MHSDS Inmates in Segregated Housing

As reported above, during the Twenty-Seventh Monitoring Round, CDCR was generally compliant with meeting requirements for MHSDS inmates in segregated housing.  Where there was noncompliance, the findings were not surprising, noting the staffing issues at those institutions.  Compliance regarding psychiatry services related to their caseloads and Program Guide contact requirements remained problematic in multiple institutions.  Attendance by required staff at IDTTs in these MHSDS units also continued to pose problems across institutions.  The staffing plan likely holds the key to remediating these issues, and they will be addressed as part of the plan.

Meeting all of CDCR's standards regarding NDS inmates was another area that was problematic for institutions.  While most institutions were compliant with providing property and privileges, meeting transfer timelines remained a major obstacle for many institutions, and for some, the transfer delays were significant.  The development of new MHSDS beds will be helpful in alleviating this issue, and will be attended to in the All-Parties Workgroup.

**III**.    **CONCLUSION**

As outlined in detail above, after filing his Twenty-Sixth Round Monitoring Report, the Special Master conducted the Twenty-Seventh Round Monitoring tours at 24 institutions, directed and supervised his expert's re-audit of suicide prevention practices at 23 institutions, and filed his report accompanying the expert's report on the findings of the re-audit and the status of suicide prevention practices in CDCR prisons.  The Special Master also filed his report on CDCR's staffing plan and the status of mental health staffing in CDCR.

In addition, working with the parties through the workgroup process, the Special Master addressed a large number of issues—listed below—which advanced the remediation process in the case.  In each instance, the project/activity is a component of one of the areas on the roadmap to ending federal court oversight in this case that has been endorsed by this Court.  In many respects, the time period since the filing of the Twenty-Sixth Round Monitoring Report in May 2016, until the writing of this Twenty-Seventh Round Monitoring Report in November 2017—an 18-month time span—is quite likely the most productive 18 months we have experienced in the course of the *Coleman* case.  This period of productivity and the work from which it resulted continues.

The projects/activities that were completed during this period are:

1.  Tested CDCR's CQIT at ten institutions.

2.  Developed CDCR's staffing plan to address vacancies in mental health staffing.

3.  Resolved the issue of timely calling "911" emergency following activation of the EMS at prisons.

4.  Reached agreement to withdraw Recommendations 14, 15, and 16 from the Special Master's expert's initial suicide prevention practices report, "First Audit and Update on Suicide Prevention Practices in the Prisons of the

California Department of Corrections and Rehabilitation (CDCR)."  ECF No. 5259.

5.  Developed the annual Suicide Report template.

6.  Revised CDCR's response to suicide attempts by asphyxiation and hanging, and replacement of the cut-down tool.

7.  Revised CDCR's Interdisciplinary Progress Note 5-day Follow-Up (CDCR MH 7230-B).

8.  Revised CDCR's MHCB Discharge Custody Check Policy.

9.  Revised the format/templates of defendants' census, waitlist, and trends reports to the court.

10. Revised and updated CDCR/DSH Memorandum of Understanding (MOU).

11. Revised/developed policies and procedures related to Lift and Shift prior to July 1, 2017.

12. Developed training material for Lift and Shift.

13. Attended Lift and Shift training at PIPs and provided feedback to CDCR.

14. Conducted focused monitoring tours regarding the application of LRH in the PIPs after Lift and Shift

15. Assessed DSH telepsychiatry at PSH.

16. Activated temporary intermediate care beds in L-1 at CMF.

17. Modified and activated medical isolation rooms into safe intermediate beds at CHCF-PIP.

18. Revised "Mental Health Crisis Beds Privileges" policy.

19. Revised CDCR's policy regarding "Housing of Patients Pending Mental Health Crisis Bed."

20. Activated RJD's Level II Dorm Complex.

21. Revised disciplinary policy regarding MHSDS treatment refusals.

22. Revised Work Group C and Privilege Group C policy.

23. Finalized and implemented CDCR's peer review process.

24. Developed and implemented the EOP and 3CMS review studies.

25. Developed the Custody and Mental Health Partnership Plan including training materials.

26. Revised policy regarding program access for MHSDS inmates.

27. Conducted three focused site visits at CSP/Sac.

28. Conducted focused RVR compliance assessment of 17 prisons.

29. Conducted focused Use of Force compliance assessment of 15 prisons.

30. Resolved issues regarding PBSP Welfare/Security Checks.

31. Activated a non-designated Level IV EOP facility at CSP/LAC.

32. Implemented MHCB regionalization cluster plan

Each of the projects/activities reported above, and/or their outcomes, will be monitored and reported on by the Special Master as part of his regular monitoring responsibilities.

In addition to the above projects/activities, there are a number of other projects/activities that are ongoing, and in various stages of progress, including the following:

1. Insert "pocket parts" into the Program Guide.

2. Reach agreement regarding exceptions to Program Guide timelines for transfers to inpatient program and develop proposed addendum to the Program Guide.

3. Reach agreement regarding exceptions to Program Guide timelines for transfers to MHCB and develop proposed addendum to the Program Guide.

4. Finalize CDCR's CQI report writing template and format.

5. Complete development and implementation of uniform level systems for DSH/CDCR.

6. Evaluate and provide feedback regarding the ongoing EOP review study and its outcomes; attend and provide feedback at scheduled institutional implementation and training.

7. Evaluate and provide feedback regarding the ongoing 3CMS study and its outcomes; attend and provide feedback at scheduled institutional implementation and training.

8. Attend to ongoing MHSDS bed activations.

9. Attend to CDCR's proposal to activate 100-person EOP dormitory at San Quentin.

10. Attend to EOP Program issues: lengths of stay in segregation, transfer delays, tracking and reporting of 150-day case-by-case reviews, modified programming, and treatment refusals.

11. Complete CDCR and DSH staffing plans pursuant to court orders.

12. Complete and implement DSH's CQI process.

13. Implement Custody and Mental Health Partnership Plan in CDCR's institutions.

14. Attend scheduled collaborative culture training and provide feedback.

15. Attend to ongoing cultural issues and MHSDS delivery problems at CSP/Sac.

16. Attend to CDCR's proposal to activate an IEX Pilot Program at CSP/Corcoran.

17. Develop and implement targeted remedies to the treatment planning issues identified in Part II, Section C(3)(b) of this report.

18. Develop and implement processes for auditing and correcting failures in the 7388-B process.

As previously stated, on January 3, 2018, plaintiffs submitted a written response requesting that the Special Master include seven additional items to the list of ongoing projects/activities to be addressed by the All-Parties Workgroup outlined above.  The Special Master agrees with plaintiffs' request in part—two of the items have been included in the above

list as numbers 17 and 18—however, he believes there is a different, perhaps more appropriate forum to address the remaining five items, as explained below.

Two items were related to suicide prevention efforts.  There currently exists a separate process for issues and remedial efforts related to suicide prevention.  The first of plaintiffs' two suicide prevention-related items was:

- **Implement current and ongoing efforts to remedy safety-planning deficiencies noted in the September 7, 2017 Hayes report (ECF No. 5672) and as identified during the current Hayes auditing tours.**

On January 25, 2018, the court issued its order adopting Mr. Hayes' September 7, 2017 report in full.  ECF No. 5762.  The order—issued after the Draft Report had been distributed to the parties—directed defendants to develop corrective action plans based upon the deficiencies found in Mr. Hayes' most recent assessment.  The court order directly addresses plaintiffs' above suggested item.

The second of plaintiffs' two suicide prevention-related items was:

- **Review trends and concerns with respect to completed suicides in 2016 and 2017, particularly the dramatic increase in Reception Center suicides, and discuss corrective measures.**

It is expected that this item will be covered in the report(s) on CDCR suicides, to-date authored by the Special Master's expert, Dr. Hughes, the responsibility for which could be assumed by defendants in the near future.  Additionally, discussion of this topic is most appropriate for the Special Master's SPMW, led by Mr. Hayes, and in which plaintiffs take part.

Two items are already the focus of the Special Master—set to be addressed through his monitoring process—and are therefore premature for the All-Parties Workgroup to address at this time.  The first of those items was:

- **Review the results of the Special Master's audit of RVRs issued this monitoring period, and develop and implement targeted strategies to remedy**

133

**the violations identified on pages 91-100 of the Draft Report.**

The Special Master will conduct a follow-up review of the RVR process and prepare a focused report of his findings as part of the Twenty-Eighth Round of Monitoring.

The second item was:

- **Review the overall functioning of the NDS designation, including whether the agreed criteria are being applied appropriately and whether the systemic transfer timeline problems noted on Page 127 of the Draft Report can be remedied.**

As part of the Twenty-Eighth Round of Monitoring, the Special Master will conduct a more targeted review of the NDS designation, which will specifically address the issues outlined in plaintiffs' above suggested item.

The last of plaintiffs' five remaining items was:

- **Continue to discuss Program Access and related concerns, particularly those that arise in connection with the implementation of Proposition 57, and begin discussions around re-entry and pre-release planning issues.**

This item will be discussed as part of the quarterly *Coleman* all-parties policy meetings.

The All-Parties Workgroup process has proven to be quite effective in addressing a spectrum of issues, including some that are longstanding and others that have evolved throughout the course of the remediation process.  It is the intention of the Special Master to continue to use the workgroup process to address and resolve the ongoing projects/activities that were not yet completed at the time of the writing of this report.  The size of that task, the significant work it requires of defendants, and the enormity of the improvements it promises, signifies that the focus of the parties and the Special Master should be fully concentrated on that effort, without any additional layer of responsibility for defendants that would divert their circumscribed resources from the work already underway.

134

In view of all of the foregoing, the Special Master does not submit formal recommendations for further orders at this time.

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

February 13, 2018

# APPENDIX A

## INSTITUTIONAL SUMMARIES

### California State Prison/Sacramento (CSP/Sac)
June 7, 2016 – June 9, 2016
September 29, 2016 – September 30, 2016
January 9, 2017 – January 11, 2017
June 27, 2017 – June 28, 2017

Introduction:

During the Twenty-Seventh Monitoring Round, conditions at CSP/Sac necessitated four separate site visits. The initial site visit, conducted June 7, 2016 – June 9, 2016, was a standard comprehensive *Coleman* monitoring tour encompassing a review period of November 2015 to April 2016.[43]

In August 2016, following the regular monitoring tour, correspondence from plaintiffs' counsel raised serious concerns regarding the delivery of mental health care and the treatment of *Coleman* class members at CSP/Sac. It included a request that the Special Master conduct a special investigation into the allegations and draft a report and recommendations concerning the same. After a discussion of plaintiffs' concerns during an all-parties workgroup meeting, the Special Master scheduled a re-visit of CSP/Sac for September 29, 2016 – September 30, 2016. This two-day site visit was conducted as a focused site visit centering primarily on the IEX, PSU and administrative segregation programs. The site visit was attended by representatives from the parties and included observations of treatment groups, interviews of inmates, treatment staff,

---

[43] For the purposes of this institutional summary report, all references to the "review period" are related to the report from the June 2016 *Coleman* monitoring tour and refer to the time period of November 2015 to April 2016. The areas exclusively reported on as part of the June 2016 regular *Coleman* monitoring tour include: Census; Staffing; Quality Management; Medication Management; Transfers; Seclusion/Restraints; SHU; STRH; 3CMS; NDS; Referrals; Heat Plan; Lockdowns/Modified Programming; Pre-Release Planning; Access to Care; Program Access; and *Coleman* Postings. All site visits following the June 2016 monitoring tour were focused site visits centered on reviews of targeted areas as outlined in this report.

136

custody staff and supervisory staff, review of documents and data, and review of treatment records.

After the September 2016 site visit, CDCR developed a CAP to address the problems reported at CSP/Sac and distributed it to the all-parties workgroup, including plaintiffs' counsel, on October 25, 2016.  On the same day, the Special Master and Defendants received correspondence from plaintiffs' counsel indicating that they had received "at least 25" letters from class members alleging staff misconduct and reporting issues related to access to care and custody interference with the delivery of mental health care that occurred since the September 2016 site visit.  That correspondence was followed by letters dated December 13, 2016 and December 22, 2016 raising additional concerns, some related to the efficacy of the CSP/Sac CAP.  These events, in addition to the findings from the September 2016 site visit, led to a follow-up visit to the institution.

CSP/Sac was visited for a third time during January 9, 2017 – January 11, 2017.  As indicated above, the purpose of the January 2017 site visit was to obtain follow-up information relevant to the September 2016 site visit and issues raised by plaintiffs' counsel in their correspondence.  The areas reviewed during the January 2017 site visit were limited to PSU, administrative segregation EOP, MHCB and IEX.  Counsel for the parties were not in attendance during the January 2017 site visit.

The fourth and final site visit took place during June 27, 2017 – June 28, 2017.  This site visit was led by CDCR regional mental health staff with the monitor's staff working alongside the regional team as they conducted the review.  Representatives from the parties were also in attendance.

The institutional summary report below reflects a reporting on all four site visits.

Census:

On June 6, 2016, the total inmate population at CSP/Sac was 2,407 inmates, an 11-percent increase since the preceding monitoring round.  The mental health caseload population of 1,383 inmates had increased by two percent.  MHSDS inmates accounted for 57 percent of the total inmate population.

There were 44 MHCB inmates and 13 inmates in alternative housing pending MHCB placement.

There were 107 EOP inmates in the administrative segregation hub, and 447 mainline EOP inmates.  The mainline EOP population had increased by 44, or eleven percent, since the preceding monitoring round.

The 3CMS population included 363 mainline inmates and 94 inmates housed in STRH.  The 3CMS mainline population had decreased by 42 or ten percent since the preceding monitoring round.  One 3CMS inmate was in administrative segregation.

There were 38 inmates in the SHU, including 23 3CMS inmates.
The PSU population was 288 inmates, and two inmates were pending PSU placement.

There was one MHSDS inmate with "reception center" status at the institution.

Staffing:

The chief psychiatrist position, senior psychiatrist position and two chief psychologist positions were filled.

Of 19.5 senior psychologist positions comprising both supervisors and specialists, 18.5 were filled resulting in a five-percent vacancy rate.

Of the 23 allocated psychiatry positions, 11 or 55 percent of 20 on-site positions were filled, along with two telepsychiatry FTEs and a 0.9 registry position, resulting in a functional vacancy rate of 40 percent for psychiatrists.

There were 55 of 70.5 staff psychologist positions filled for a 22-percent vacancy rate. The use of 3.85 contractors reduced the functional vacancy rate to 17 percent. There were 21 unlicensed psychologists. CSP/Sac had two psychology interns and two psychology practicum students; these categories were not included in caseload ratios.

The two supervising social worker positions were filled. Of the 30 social worker positions, 23 were filled for a vacancy rate of 23 percent. The use of 4.5 contractors reduced the functional vacancy rate to eight percent. There were seven unlicensed social workers. CSP/Sac also had four "cohort" social workers that were similar to interns; they were full-time employees with small caseloads and intensive supervision.

Of the four senior psych tech positions, three were filled for a 25-percent vacancy rate. Of the 103.6 psych tech positions, 83 were filled for a 20-percent vacancy rate; the use of 16 contractors reduced the functional vacancy rate to four percent. Staff reported that the remaining four positions were covered through overtime.

Of the 31.50 recreation therapist positions, 24.5 were filled for a 22-percent vacancy rate. Use of four contractors reduced the functional vacancy rate to 10 percent. The three unfilled positions were covered through overtime by recreation therapists and psych techs.

Twenty-three of 26 office technician positions were filled for an 11.5-percent vacancy rate. The two Health Program Specialist I (HPS I) positions were filled. The 1.5 Associate Governmental Program Analyst (AGPA) positions were filled with full-time staff and an

additional .5 position was approved.  Of the two Office Services Supervisor II (OSS) positions, one was filled, resulting in a 50-percent vacancy rate.

CSP/Sac was a participant in the medical assistant pilot and had seven contractors and one Certified Nursing Assistant (CNA).

Quality Management:

The quality management program at CSP/Sac was a fairly robust program that was good at identifying problems and was beginning to show significant improvements in remedying problems, but had not yet reached the level of a continuous quality improvement system.  The mental health subcommittee reported to the quality management committee, which in turn reported to the local governing body.

The monitor reviewed local governing body minutes from the March and April 2016 meetings.  The minutes provided a useful summary.  The frequency of the meetings was reported to be at least quarterly.

The quality management committee met monthly.  Reviewed minutes provided a useful summary of the discussion relevant to agenda items.

The mental health subcommittee generally met twice per month.  A review of the meeting minutes revealed that a quorum was not achieved for the November and December 2015 meetings.  Issues covered were wide-ranging, and included, but were not limited to: psychiatric staffing, nursing coverage, EOP administrative segregation hub certification, weekly data sheets, completed audits, QITs, FITs, etc. and medical record issues.

Generally, relevant information from the mental health subcommittee was disseminated to line staff via trainings or program supervisors.  A wide range of mental health audits were

140

performed on a regular basis.  The methodology, including sample size, for the audits was designed and/or approved by the mental health central office.

The institution utilized the QIT and Focused Improvement Team (FIT) processes as intended.  During the review period, QIT/FITs on the following issues were chartered and/or operational with appropriate staff:  agreement audits; group therapy quality; administrative segregation EOP hub treatment improvement; mental health referral process; 5/8 day follow-ups post discharge; and suicide prevention and response.

CSP/Sac was paired with CMC for peer review.  The psychiatrist peer review committee met during the second quarter of 2016.  All the state employed psychiatrists were reviewed.  The psychology peer review committee met monthly during the review period.  Eight psychologists were assessed.  All met or exceeded standards in documentation.  A memorandum used to provide feedback included the reviewer's comments and noted whether the reviewed clinician had met or exceeded standards for that document.   The social worker peer review committee met three times during the review period; nine social workers were reviewed.  All met or exceeded standards in documentation.  As with the psychology peer review, a memorandum used to provide feedback included the reviewer's comments and noted whether the reviewed clinician had met or exceeded standards for that document.

CSP/Sac was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

MAPIP was the current statewide audit tool to measure the institution's compliance with medication management processes in place at CSP/Sac at the time of the site visit.  MAPIP psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic

141

medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine and antidepressants.

During the time period of November 2015 through March 2016, compliant MAPIP psychiatry measures were in the range of 90 to 100 percent.

The institution was near compliance in the range of 86 to 89 percent regarding psychiatrists' MAPIP Measure 1A (Antipsychotics - Lipid monitoring) and (Antipsychotics - CBC with Platelets); MAPIP Measure 1B (Depakote - Medication Consents); MAPIP Measure 1F (clozapine – Abnormal Involuntary Movement Scale-AIMS); and MAPIP Measure 1G (Antidepressants - Medication Consents).

Psychiatric MAPIP Measures that were non-compliant in the range of 60 to 80 percent were MAPIP Measure 1A (Antipsychotics - EKG); MAPIP Measure 1C (lithium – EKG); MAPIP Measure 1D (carbamazepine - Medication Consent); MAPIP Measure 1E (Lamictal – Thyroid) and (Lamictal – Laboratory Tests Initialed and Signed); and MAPIP Measure 1F (clozapine - Medication Consent).

CSP/Sac's performance improvement plans for each MAPIP measure below 90 percent were reviewed; the planned corrective actions were found to be appropriate.

A review of pre-site visit information indicated that the protocol for initiation and maintenance of Clozaril was adequate.  It involved entry of inmates' information into the national REMS system that notified pharmacy when an inmate prescribed Clozaril arrived at an institution, and alerted appropriate staff regarding laboratory tests as part of the monitoring and treatment of those inmates.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications

142

was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications and urgent medication referrals for no-shows, and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

Under MAPIP, any interruption in medication administration, including inmate refusals were required to be counted as non-compliant, which had a tendency to skew the metric in the medication management process due to the large number of inmate medication refusals at CSP/Sac.

At the time of the site visit, continuity of medication issues related to discharges from the MHCB appeared to have been remedied.  A remedy was being implemented regarding similar issues concerning intra-institutional transfers.

During February and March 2016, the compliance rate for medications received in a timely manner following MHCB discharge was 93 percent.  During November 2015 to March 2016, compliance rates for other intra-institutional transfers ranged from 75 to 95 percent.  A Performance Improvement Work Plan (PIWP) was developed and implemented, resulting in improvement in the other intra-institutional transfer measures.  This PIWP included implementation of movement forms at the time of transfer that required both custody and nursing to verify that medications moved with the inmates at the time of transfer, as well as a reconciliation process at the time of morning huddles.

The mental health central office developed a non-formulary request process that was used at CSP/Sac. From November 1, 2015 through February 29, 2016, four percent of CSP/Sac's psychiatry prescribing was non-formulary.

All psychotropic medications ordered by psychiatrists at CSP/Sac were administered on a DOT basis. During the review period, there were 907 inmates prescribed psychotropic medications via DOT.

There were 14 PC 2602 involuntary medications petitions initiated during the reporting period and 131 orders renewed. Two PC 2602 petitions were withdrawn for clinical reasons, as the treating psychiatrist believed the inmates had gained sufficient insight to come off involuntary medications. None were denied.

A total of 1,126 patients were prescribed HS medications during the review period. HS medications were administered no earlier than 8:00 p.m.

Transfers:

During the review period, 34 inmates were referred to acute care with four referrals rescinded. Of the 30 transfers, 19 were timely for a 63-percent compliance rate. Of the 11 untimely transfers, the average transfer time was 23 days, ranging from 12 to 37 days. Twenty-eight of the 30 transfers occurred within 72 hours of bed assignment for a compliance rate of 93 percent. There were five *Vitek* hearings conducted; all resulted in referrals to a DSH program.

There were 50 inmates referred to intermediate care; four referrals were rescinded. Of the 46 transfers, 45 were timely, resulting in a 98-percent compliance rate. Thirty-eight of the 46 transfers occurred within 72 hours of bed assignment for a compliance rate of 83 percent. There were 15 *Vitek* hearings conducted; all resulted in referrals to a DSH program.

At the time of the site visit, there were five acute care referrals and seven intermediate care referrals pending transfer.  Three of the acute care referrals were pending for more than 30 days.  The DSH coordinator explained that all three were for "bizarre behavior", which was the third priority for transfer.  The three inmates were reportedly 42nd, 44th and 50th on the wait list.

There were 468 admissions to the MHCB during the review period.  The average length of stay was 14.1 days with a range of 0.1 days to 64.3 days.  Of those admissions, 225 or 48 percent, had stays of ten days or less.  Lengths of stay in excess of ten days were due to lack of beds at DSH and involuntary medication issues.

There were 52 transfers to outside MHCBs.  Of the 52 transfers, 18 or 35 percent, were not transferred within 24 hours.  The average length of time to transfer inmates to an outside MHCB was 22.9 hours with a range of 3.4 hours to 71.17 hours.  For those inmates who were transferred beyond 24 hours, the average amount of time for transfer was 37.5 hours with a range of 24.35 hours to 71.17 hours.

There were 367 placements in alternative housing, 333 or 91 percent were timely removed.  The longest stay totaled 2.4 days.  The vast majority of referrals to alternative housing were for "danger to self."

There were four transfers to the PSU; two inmates were transferred within Program Guide timelines and the remaining two inmates transferred within 11 and 17 days of endorsement.  According to data produced by custody staff, the average length of stay in the PSU was 278 days.

Other Issues:

Administrative Segregation EOP:

The institution's administrative segregation unit was certified as an EOP hub during the review period and was a focus of all four site visits to the institution. The caseload ratio for psychologists and social workers was 1:13.

At the time of the June 2016 site visit, there were 98 administrative segregation EOP inmates, 44 of whom were in overflow housing.

Initial psychiatry contacts were noncompliant at 74 percent, ranging from one to 21 days overdue. This was attributed to the staffing shortage for psychiatrists. Routine psychiatry contacts were at 98-percent compliance.

Initial and routine PC contacts were in compliance with rates of 92 percent and 99 percent respectively.

CSP/Sac reported 92-percent compliance with timely completion of the PC's brief evaluation of EOP inmates upon administrative segregation placement.

Completion of the comprehensive mental health evaluations prior to the initial IDTT were at 77-percent compliance. Compliance rates for initial IDTTs and routine IDTTs were 96 percent and 100 percent respectively. Attendance by the required disciplines was at 99-percent compliance.

Confidential Clinical Contacts:

Confidential clinical contacts were a significant issue in the administrative segregation EOP hub. During the June 2016 site visit, the institution reported that 48.8 percent of all PC contacts were cell front and 23.6 percent occurred in non-confidential settings other than cell front during the review period. Most cell-front PC contacts, 54.6 percent, were due to staff

decision, and 14.7 percent were due to inmate refusals.  Ninety-five percent of psychiatry contacts were non-confidential.

At the time of the September 2016 site visit, CSP/Sac reported that 81 percent of psychiatry and 60 percent of PC contacts were held in a confidential setting.  Inmates had the greatest complaints about the lack of confidentiality in their psychiatry appointments.  Despite the reported data, inmates consistently reported that they were rarely seen by psychiatrists in a confidential space.  Inmates reported they were most frequently seen on the tier, though they were also seen at yard and in other non-confidential spaces.  Further, these same inmates stated that these non-confidential contacts were not typically due to inmate refusal, which seemed to be supported by the data.  The medical records were reviewed and showed that psychiatry did not typically document whether the contact was held in a confidential space, leaving this issue unresolved.

IDTTs:

The monitor's expert observed five IDTTs during the June 2016 site visit.  Overall, the IDTT process was not collaborative.  Discussions were disjointed and did not consistently address inmates' treatment needs.  Inmates were not an integral part of their treatment and it was more often the case that goals were chosen for them.  Further, some goals were likely unattainable for inmates.  Discussion of indicators on the Form 7388-B were lacking.

During the September 2016 site visit, combined IDTT/ICC meetings were observed.  The inmates scheduled for both were seen first, and once their meetings concluded, custody staff who were not treatment team members did not leave the IDTT room, even when there was no treatment-related reason for them to stay, but instead, all staff remained for the entire process

147

which included sensitive, confidential information about the inmates' past and present situations and symptoms.

During one IDTT/ICC which had been in progress and was therefore only partially observed, the mental health staff appeared to defer to custody staff creating the perception that mental health was subservient to custody or in collusion with custody staff.  This perception was shared by inmates during the IDTT and during inmate interviews.

During the IDTT process the treatment plan was discussed to varying degrees, and sometimes not at all.  The lack of effective discussion regarding the inmate's treatment progress and current or updated treatment plan was concerning.  When reviewing the records of multiple administrative segregation EOP hub inmates, the treatment plans were of significant concern, because they did not consistently demonstrate a comprehensive conceptualization of the case. The treatment goals were not stated in objective, measurable terms; did not address the most pertinent clinical symptoms; and did not always indicate the intervention.  When interventions were indicated, they were often too broad or inappropriate in light of the inmate's current functioning.

During November 2016, CSP/Sac separated IDTT/ICC joint sessions.  In addition, the institution began providing a mental health clinician either on-site, or available 24 hours per day, seven days per week, to ensure patient care needs were being met.

During the January 2017 site visit, eight EOP hub IDTTs were observed.  The clinical supervisor articulated well the reason for the IDTT and the benefits of the inmate working on their mental health needs while waiting for the transfer and prior to their ICC.  The IDTTs were well-run and informative.  Participation in group activities were discussed, along with the reasons groups were missed, and the importance of one-to-one contacts.  Reasons provided for

148

missed groups included medical issues and being housed in overflow buildings.  Appropriate

inmate input was observed.  The 7388-B criteria was discussed in all eight IDTTs by

incorporating the discussion in the clinical summary and/or during the conversation with the

inmate.

<u>Structured Treatment Activities</u>:

According to the data provided for the June 2016 site visit, 98 percent of administrative

segregation EOP inmates were offered more than five hours, and 96 percent were offered more

than ten hours of weekly structured treatment, for an average of 12.62 hours.  Refusal of

treatment hours averaged 7.96 hours per week, with 93 inmates refusing 50 percent of treatment

during the review period.  At the time of the June 2016 site visit, 21 of 98, or 21 percent of the

administrative segregation EOP population were on modified treatment plans.

For the September 2016 site visit, CSP/Sac provided data for inmates housed in the

administrative segregation EOP hub unit during the period of June 24, 2016 through September

23, 2016, but the accuracy of the data was limited by a three- to four-week lag in data entry.  In

the data provided, there were 13 inmates identified as on a modified program.  Those inmates

had a refusal rate of 28 percent.  CSP/Sac management reported an overall refusal rate of 39

percent for inmates in the administrative segregation EOP hub.  High refusal rates were

confirmed during group observations.  For example, 38 inmates were scheduled for one observed

group and fewer than 50 percent attended.  Interviewed custody officers indicated that was

common.

CSP/Sac provided data that allowed for an examination of refusal rates by specific

treatment activity.  Less than one percent of psychiatry appointments were refused.  Seven

percent were canceled; the remainder were completed.  Most PC contacts were completed, with

149

less than one percent refused and 2.8 percent canceled.  No scheduled IDTTs were refused according to reported data.  Approximately 24 percent of IDTTs were canceled while the remaining IDTTs were completed.  Of administrative segregation EOP hub treatment groups scheduled, 67 percent were refused, three percent were canceled, and 30 percent were completed.

Management staff indicated that they maintained two lists of "high refusers," those inmates who had been refusing groups over the prior week and those inmates who had been refusing more than 50 percent of structured treatment over the last 90 days.  It appeared only those inmates who had been refusing treatment for the shorter time period were scheduled for treatment groups identified as "HR" or "high refuser" treatment compliance and facilitated by a clinician.

By the time of the January 2017 site visit, the refusal rate had remained constant over the preceding six months.  Data provided by the institution covering June 2016 through December 2016 showed refusal rates ranging from 46 to 61 percent.  Staff reported that as of November 22, 2016, tier walks had been initiated to determine reasons for refusals to attend a group and start times were documented on group attendance lists along with reasons for any delayed start times.

Group Treatment Observations:

A review of the yard schedules during the June 2016 site visit indicated that yard time conflicted with group schedules.  Groups were available to inmates on a daily basis.  Each weekday, between four to five groups were facilitated each morning and afternoon.

During the September 2016 site visit, observations of the Treatment Center activities and interviews of treatment staff revealed that the assigned facilitators were often not available to provide the scheduled group and another facilitator would be assigned.  The substitute facilitator did not always have sufficient lead time to prepare for the group and was rarely provided with a

group curriculum, both of which greatly impacted the quality and continuity of the treatment groups, and had the potential to negatively impact attendance rates.

An observed treatment group did not begin at the scheduled time. The health care access to care report form that was required to be completed by custody had not been completed for that group or the treatment groups that had been scheduled earlier that morning. The custody officer present at the group reported that there was insufficient custody officer staffing to allow for adherence to group schedules. The delay in beginning treatment groups was consistent across the two days of the site visit except for the first groups in the morning, which were sometimes briefly delayed.

The monitor's expert also reviewed attendance sheets for the scheduled groups. None of the forms had been completed when reviewed for a second time upon departing the Treatment Center, including for those groups that had been scheduled earlier in the day. It is incumbent upon the group facilitator to track each participant's arrival and departure time from group to ensure accurate group participation time since no inmate was actually receiving two hours of treatment per group as the schedule implied for the reasons discussed above.

One of the groups observed was a music appreciation group. Thirty minutes after the scheduled beginning of group, custody staff were still bringing inmates into the group. The facilitator had been debriefed prior to the observation, so he knew to run the group as he normally would. The facilitator did not engage the inmates with the music, nor discuss music as a coping method or stress reduction tool. There was nothing therapeutic about the group and the purpose of the group was not apparent based on observation.

Following the group, the inmates were interviewed and they confirmed that the group was consistent with what they experienced on a regular basis. They found the treatment groups

151

to have little value beyond the provision of magazines and menus, as well as providing out-of-cell time.

The matter of a clinician-led group for high refusers, which regularly was not occurring as scheduled, was discussed with the chief of mental health.  Prior to the end of the site visit, it was reported that the groups would cease or be reconfigured.  The regional mental health supervisory team would follow up regarding documentation issues regarding this group, as would mental health headquarters' clinical staff.

A stress management group was observed.  While group facilitation was generally better than other observed groups, the facilitator still engaged in multiple errors such as interrupting group participants, failing to engage participants, and failing to capitalize on the dynamics of the group to further group process.

Two inmates who had been originally scheduled for the clinician group that had not occurred were interviewed and they indicated that they had no idea they were considered "high refusers" as they typically attended group when given the chance.  Both inmates indicated that they were frequently not asked to attend group or not escorted by custody staff.  Both disputed they were high refusers and expressed a desire to have more out-of-cell time.

Based on observations of treatment groups during the September 2016 site visit, consolidation of groups was an extremely common practice.  Rarely was the group schedule adhered to, in part because of the lack of inmates attending group.  Instead, the inmates who did appear would be consolidated into one or two groups.  This resulted in groups that were not based on clinical assignment, had constantly changing dynamics, and no continuity.  Inmates complained that they never knew who would be in their groups and sometimes did not attend for that reason.  Consolidation of groups increased the possibility of numerous clinical challenges

with limited clinical reward.  At times, it may be impossible to avoid (e.g., only one inmate is present for group), but facilitators were not provided with guidelines for when it is appropriate to consolidate groups.

As of December 12, 2016, all full-time clinicians were required to facilitate groups; prior to that, clinicians only led groups for high refusers.  As of December 2016, 19 additional EOP hub groups had been added and four of the 19 groups were led by clinicians.  Facilitation training (as outlined in item 26 of the CSP/Sac CAP) was not mandatory for all facilitators and there was no documented tracking of staff who had completed the training.

Other interventions initiated after the September 2016 site visit included more in depth discussions in IDTT about groups and the types of group requested by the inmates, printed schedules of groups provided to all administrative segregation EOP inmates and the revising of group schedules to ensure inmates were able to attend.

No groups were observed during the January 2017 site visit.  The groups scheduled for observation were canceled due to lack of inmate participation related to inclement weather.

Inmate Interviews:

In interviews conducted during the September 2016 site visit, inmates reported that correctional staff would not inform them of group, would refuse to tell mental health staff when the inmates requested to be seen or expressed an urgent or emergent need for mental health services, and would interfere with level of care decisions by pressuring mental health providers to reduce the inmate's level of care by repeatedly stating things like, "he doesn't act EOP."

In addition, due to what inmates perceived as custody's refusal to inform mental health staff of inmates' needs to be seen, inmates believed that they must escalate non-emergent matters and claim that they were suicidal just to speak to a mental health provider.  The inmates

153

expressed clearly that they preferred to not do this and understood that it could undermine the credibility of all claims of suicidality and urgency of responses and were extremely frustrated that they saw no other options.  This was a consistent theme across all inmate groups interviewed.  All inmates felt that custody staff attempted to inappropriately triage their requests to be seen by mental health and that officers would inappropriately request detailed information from them regarding their requests.  Inmates reported that they have been left for extended periods of time (e.g., three hours of time) in holding cells while waiting for a mental health clinician to conduct a suicide risk assessment during regular business hours.

Inmates also expressed concerns regarding mental health staff.  In addition to repeated complaints about group treatment itself, inmates strongly believed that mental health staff were either subservient to custody, or actively colluding with custody in a manner that negatively impacted mental health care.

Inmates also reported that if they were removed from treatment group for their behavior during session, they were then automatically suspended from treatment groups for five days. While each situation must be assessed on a case-by-case basis, a blanket exclusion from treatment for five days risks denying access to decompensating inmates when they most need treatment.  The denial of treatment should not be a form of punishment, particularly when inmates frequently express behavior in group that is symptomatic of their diagnoses and limited coping skills.

MHCB:

CSP/Sac had two licensed Correctional Treatment Centers (CTC) that were located in Facility B.  CTC I had a capacity of 17 beds, including two medical beds and CTC II had a capacity of 12 beds.  The Mental Health Crisis Bed Unit (MHCBU) was an unlicensed 20-bed

unit that was located in Facility B.  Inmates with walking limitations, in need of significant nursing care, or receiving clozapine were not admitted to the MHCBU.

CTC I had a ratio of 1:12 for psychiatry and CTC II had a ratio of 1:13.  The MHCBU had a psychiatry ratio of 1:10.  The psychology and social worker caseloads in CTC I, CTC II and the MHCBU averaged 1:6.

According to the data provided for the June 2016 site visit, initial psychiatric contacts had a compliance rate of 93 percent, with the MHTS reporting a compliance rate of 74 percent for routine psychiatric contacts.  Although the business rules used for the MHTS relevant to MHCB routine contacts with a psychiatrist resulted in an inaccurate tabulation that did not credit all the clinical contacts by the psychiatrist, a review of a very limited number of MHCB records did indicate problems with timely clinical contacts with a psychiatrist.

There was a 93-percent compliance rate for routine PC contacts occurring within Program Guide timeframes.

The CTCs and the MHCBU all had confidential interview space.  Thirty-one percent of clinical contacts were done in a confidential manner with 30 percent done in a standard non-confidential manner, which meant that interviews were done in a potentially non-confidential manner such as in the dayroom.  Twenty-five percent of the non-confidential interviews were due to inmate refusal and another five percent were due to staff decision.

The compliance rate for an initial IDTT review occurring within 72 hours was 92 percent with routine IDTTs occurring with a compliance rate of 98 percent.

At the time of the June 2016 site visit, recreation yards were underutilized in the MHCBs.  Out-of-cell activities offered to MHCB inmates were very limited.  A recreation therapist provided limited services.  Inmates in CTC II, in practice, did not have access to the outdoor

155

recreation yard that was located adjacent to CTC I.  MHCBU inmates had very limited access to an outdoor recreation yard.  CSP/Sac did not provide dayroom activities for inmates housed in the unlicensed MHCB or CTC I and CTC II.

Legible and clinically meaningful discharge summaries were completed timely based on a limited Electronic Unit Health Record (eUHR) review.

The monitor's expert observed IDTTs in CTC II and in the MHCBU.  Both IDTTs were attended by all the required disciplines and were done in an appropriate manner.

At the time of the January 2017 site visit, out-of-cell time was provided in both the CTC and the MHCBU, where both had access to a recreation therapist working 20 hours in each unit.  All out-of-cell time was individual and most inmates took advantage of the program.

Seclusion and Restraint:

There were 17 restraint episodes during the review period involving eight different inmates.  The duration in restraints ranged from two hours to 20.6 days, with most inmates being restrained between four to 18 hours.  There were no formal audits done regarding compliance with the relevant restraint policy.

Alternative Housing:

As reported during the June 2016 site visit, in January 2016, the 4 Block of Facility B (which had been an empty housing unit previously designated as a SHU) was allocated for alternative housing.  Pursuant to policy dated March 2016, alternative housing was located in the following locations, by order of preference: designated Alternative Safe Housing Management cells in 4 Block of Facility B, CTC medical and Outpatient Housing Unit (OHU) beds, two ZZ cells in Facility A, two ZZ-cells in Facility B, Facility B contraband cells, Facility C contraband cells and housing block cells.

All inmates placed in alternative housing pending crisis bed admission were placed on 1:1 constant direct visual observation.  Inmates placed in CTC medical beds or OHU beds were placed on 1:1 suicide constant direct visual observation until a face-to-face suicide risk assessment was completed.  Treatment services available to inmates placed in alternative housing units were reported to include daily evaluations by a psychologist or clinical social worker and medications although it did not appear that a psychiatrist evaluated inmates while they were in alternative housing areas.

At the time of the September 2016 site visit, only the lower level of the B-4 housing unit, which included eight cells, was utilized and housed inmates in alternative housing.  The cells had been modified to reduce suicide risk.  Due to the entire upper tier being empty, there was discussion regarding movement of inmates from the ZZ cells to this unit, and by the end of the visit, there were no inmates monitored for suicide watch in the ZZ cells.

At the time of the September 2016 site visit, there were four inmates housed in alternative housing.  All four were on 1:1 suicide watch or precaution which was appropriately documented. Interviewed nursing staff could answer most questions about their mental health status except for the reasons the inmates were on 1:1 watch.

At the time of the January 2017 site visit, there were four inmates in alternative housing, all of whom were on 1:1 suicide watch.  One inmate had been in alternative housing since November 26, 2016, and two others arrived on November 28, 2016.  The suicide watch documentation was appropriate for all inmates.  One nursing staff member who was observed conducting a 1:1 watch was able to respond to all of the monitor's expert's questions regarding what had occurred during the watch, but could not state the reason the inmate was on 1:1 watch.

Before the end of the site visit, staff reported that three of the inmates had been placed in CSP/Sac's MHCB and the fourth inmate was returned to his PSU housing unit.

By the time of the January 2017 site visit, CSP/Sac had not housed suicidal class members in ZZ and CC cells since September 30, 2016. Although defendants agreed to end the practice of using ZZ and CC cells for alternative housing (CAP item 20), the revised Local Operating Procedure (LOP) 25 did not prohibit such use.

SHU:

At the time of the June 2016 site visit, 58 percent of the SHU population were 3CMS inmates. One part-time clinician was assigned as the PC to the SHU. The ratio for psychologists and social workers was 1:46.

During the review period, CSP/Sac was non-compliant with initial and routine psychiatry and PC contacts at 80 percent and 76 percent compliance respectively for both disciplines.

For psychiatry contacts, nine percent occurred at cell front, with two percent due to inmate refusal and seven percent due to staff decision. CSP/Sac reported that 39 percent of PC contacts occurred cell front, and 11 percent were held in non-confidential settings other than cell front. Of the cell-front PC contacts, 23 percent were due to inmate refusal and 57 percent were a result of staff decision.

The institution was deficient in conducting timely initial IDTT meetings at 40-percent compliance. CSP/Sac met routine IDTT requirements with 97-percent compliance; however, the compliance rate for attendance of required staff at IDTTs was 27 percent.

Structured out-of-cell activities were not provided to 3CMS SHU inmates during the review period. Data indicated that inmates who required group treatment were referred to the

PSU.  In-cell activities (crosswords, word searches, meditation activities, etc.) were provided by the recreation therapist on a weekly basis.

The information provided for access to yard for 3CMS SHU inmates was not presented in a format that was useful in determining compliance with yard requirements.

STRH:

The caseload ratio for psychologists and social workers was 1:19.  Staff reported that caseloads ranged between 16 and 23.

Compliance rates for initial and routine psychiatry contacts were 69 and 91 percent.  All psychiatric contacts were confidential.

For initial and routine PC contacts, compliance was at 95 and 98 percent; 90 percent of PC contacts occurred in confidential spaces.  Of the non-confidential PC contacts, 80 percent were routine.

Initial and routine IDTTs were at 78- and 99-percent compliance; attendance by required disciplines was at five percent.

All groups were facilitated by the psych tech.  In-cell activities were provided daily by the recreation therapist.

Review of the monthly certification report for November 2015 through April 2016 indicated that CSP/Sac was not consistently compliant with providing yard and showers in STRH.  During the review period, compliance for yard was 61 to 100 percent and for showers 77 percent to 98 percent.

PSU:

Significant problems existed in the PSU, related, in part, to the clinical vacancies and shortage of EOP beds.  These problems included the following: 1) a very high rate of PSU

inmates placed on a modified treatment program; 2) a very high rate of inmate refusals relevant to out-of-cell structured therapeutic activities; 3) many inmates remained in the PSU for months after completion of their SHU term due to shortage of EOP beds; and 4) IDTTs not consisting of core members due primarily to psychiatrist vacancies.

Following the September 2016 site visit, and before the January 2017 site visit, the PSU at CSP/Sac was established as three distinct units:  PSU I (128 inmate capacity in Facility A, Blocks 1 & 2); PSU II (64 inmate capacity in Facility A, Blocks 3 & 4); and PSU III (122 inmate capacity in Facility B, Blocks 7 & 8).  Effective January 9th, 2017, PSU II was merged into PSU I (PSU Facility A).  PSU III (PSU Facility B) remained intact.

At the time of the June 2016 site visit, two psychiatrists, one state employee and one contractor were assigned to the PSUs.  For psychologists and social workers, the ratios for PSU I, PSU II and PSU III were 1:16, 1:9, and 1:15 respectively.

At the time of the January 2017 site visit, adequate staffing by psychiatrists remained a difficulty in the PSU, with the functional vacancy rate of psychiatrists at 50 percent for PSU full-time civil service psychiatrists, specifically.  PSU I had not had a psychiatrist attend IDTTs for about six months before the visit.  Each PSU had a 1.0 Full-Time Equivalent (FTE) psychiatrist vacancy.  The ratio for PSU inmates to PC ranged from five to 19 inmates per clinician.  Interns and new employees accounted for the lower inmate to staff ratios.

The maximum overall capacity was 314.  At the time of the June 2016 site visit, 72 PSU inmates had completed their SHU terms but were still in the PSU ranging from weeks to months, primarily due to waiting for an EOP bed in another institution.

The PSU population on January 9, 2017 was 218.  In general, PSU Facility A had an average daily census of about 120 inmates and PSU Facility B had an average daily census of

about 100 inmates. Overall, there were 36 inmates who remained in the PSU subsequent to the expiration of their SHU terms. These inmates were pending Classification Staff Representative (CSR) review/endorsement or were endorsed and awaiting transfer.

The "date of placement" and "length of stay" data was tracked differently across the three PSU programs. Date of placement varied from the date the inmate arrived at CSP/Sac, to the date of placement in PSU, to the most recent housing move into PSU.

During the period between June 6, 2016 and September 29, 2016, there were a total of 460 inmates housed in the PSU. The average length of stay during that timeframe was almost 40 days, and the average length of stay for those who arrived prior to June 6, 2016 was 98.5 days.

The PSU used a Behavioral Incentive Program (BIP), a four-step system designed to assist the inmate in making positive changes, resulting in increased privileges and property.

During the review period, the compliance rate for initial and routine contacts with the psychiatrist was approximately 60 percent, which was related to the psychiatry vacancies.

According to the data provided, 76 percent of brief intake assessments were completed within five working days of placement in PSU. Ninety percent of routine PC contacts occurred on a weekly basis.

Overall between June 6, 2016 and September 29, 2016, inmates in all PSU programs attended 54 percent of appointments and refused 46 percent.

Confidential Clinical Contacts:

For psychiatry contacts during the review period, 53 percent were done in a confidential setting as compared to 44 percent of PC contacts. Inmates refused clinical contacts in a confidential setting approximately 13 percent of the time. Non-confidential contacts were the result of a staff decision approximately 11 percent of the time.

161

Since the time of the June 2016 site visit, the trend for confidential psychiatry contacts demonstrated an increase from 50 percent during June 2016, to 76 percent during November 2016.  In contrast, the trend for PC clinical contacts being conducted in a confidential setting demonstrated a decrease from 62 percent during June 2016, to 44 percent during November 2016.

For the period of February 1, 2017 to May 31, 2017, 31 percent of PSU Facility A psychiatry contacts were confidential and 44 percent of PSU Facility B psychiatry contacts were confidential.  A total of 37 percent of PSU Facility A PC contacts and 45 percent of PSU Facility B PC contacts were confidential.  This data was consistent with staff reports that during training and implementation of EHRS, more clinical contacts were occurring cell-front as a result of staff shortages and the initial decrease in productivity associated with learning a new system.

IDTTs:

During the June 2016 site visit, there was no data provided regarding the percentage of initial comprehensive mental health evaluations that were completed prior to the initial IDTT.

For initial IDTT meetings during the review period, 79 percent were timely held. Compliance rates for routine IDTTs exceeded 90 percent.  IDTT meetings attended by all required disciplines occurred 60 percent of the time due to psychiatrist vacancies.

The IDTT observed during the June 2016 site visit, at which multiple inmates were seen, was clinically meaningful.  Not all of the inmates seen during the observed IDTT had previously been seen by the psychiatrist due to the shortage of psychiatrists.

Combined IDTT/ICC meetings of several inmates were also observed during the September 2016 site visit.  The IDTT/ICC included the necessary clinical participants and included discussion regarding consideration of referral to higher levels of care as well as

treatment planning.  The IDTT/ICC meeting was attended by the warden, associate warden, captain, and other custody staff, as well as by clinical staff.  Sensitive clinical information was conveyed and discussed.  Inmates who were interviewed during the site visit reported reluctance to participate in these meetings due to the presence and involvement of custody staff, and they reported that some of the information conveyed during the meeting was later used to embarrass and to humiliate them.  In light of the previously noted custody related concerns, the combined ICC/IDTT resulted in decreased inmate participation and might have resulted in unnecessary confidential treatment information conveyed which carried the potential for being used in nontherapeutic ways.

During the IDTT/ICC, there was discussion of decreasing one inmate's level of care from EOP to 3CMS.  This was concerning as the inmate was on modified programming and had just begun to show some improvement with increased program participation.  Discussion of a decrease in his level of care appeared to be premature and possibly detrimental to the progress that this inmate had achieved.  Of greater concern was the observation of and report by inmates that the threat of downgrade to 3CMS was consistent and pervasive throughout program areas.  Several inmates who were interviewed reported this occurrence.  Consistent with this concern was the perception by inmates that some mental health clinicians had been unduly influenced by custody, resulting in pressure to remove difficult inmates from the EOP.

The monitor's expert observed a PSU Facility A IDTT during the January 2017 site visit that attended to several inmates.  There was very good multi-disciplinary participation during the treatment team meeting and a well-conceptualized case presentation and formulation.  The working relationship between custody and mental health staff appeared to be very good.  The clinical progress made by two very difficult inmates was very impressive.

163

During the June 2017 site visit, five IDTTs were observed; all required staff were in attendance. In all cases, 7388-B criteria was discussed, as well as level of care. However, in two of the cases, level of care was discussed outside the inmate's presence.

Group Treatment:

During the September 2016 site visit, the monitor's expert toured the PSU treatment facility. A review of the group attendance roster indicated a high level of treatment refusals for group therapy.

One of the groups observed by the monitor's expert was entitled Communications Skills Group and it was the initial session of the group cycle. This group included seven participants and was led by a recreation therapist. The group consisted of the facilitator asking various participants to read portions of pre-printed course materials with little actual discussion, interaction, or group process. In fact, when several participants attempted to discuss their perceived mistreatment by custody staff, the facilitator essentially ignored or dismissed these complaints instead of using this information to engage the participants in the group process.

The monitor's expert attempted to observe groups for PSU I inmates, seven of which were scheduled to begin at 8:00 a.m., and whose topics ranged from film appreciation to a group that focused on high refusal rates. Of the seven groups scheduled, only one occurred. The group consisted of four inmates, three of whom were part of another group that had previously met, and one who was placed in the group after no other inmates appeared for his assigned group. The group was well-conducted given the circumstances. Seven more groups were scheduled to begin at 10:45 a.m., and like the 8:00 a.m. timeslot, many of them were not held. A total of ten inmates arrived, participating in two groups. A meditation group was observed in the afternoon. The group was well-conducted and clearly appreciated by the inmates who attended.

164

By the time of the January 2017 site visit, a significant change had occurred regarding the out-of-cell structured therapeutic activities.  Prior to December 12, 2016 very few (less than one percent) of group therapies offered to PSU inmates were conducted by nurses, psychologists or social workers.  Since December 12, 2016, 11 percent of the 180 groups offered on a weekly basis were conducted by mental health clinicians.

Of concern was the group restriction policy included in the BIP that indicated that inmates who "demonstrate disruptive, destructive, or threatening behavior, or attempted assault (i.e. two or more incidents in any week) will be assessed to determine whether a Treatment Center restriction is appropriate.  An inmate who demonstrates a pattern of disruptive, destructive, or assaultive behavior in the Treatment Center will generally be placed on a one-week (i.e., 5-program days) Treatment Center restriction."  This policy appeared to punitively address what may be manifestations of mental illness by providing less treatment when more treatment may be actually indicated.

During interviews, inmates consistently indicated that custody staff had undue influence in their mental health care and in level of care decisions.  Inmates also reported long delays to see the psychiatrist.

During the January 2017 site visit, the monitor's expert observed brief portions of seven different PSU Facility A groups involving 14 inmates.  Most of these groups had only two inmates present.  The weather was very rainy.  Review of the refusal logs indicated that the most predominant reason for not coming to group was bad weather and just not wanting to go to group.  The quality of the groups appeared to be reasonably good.  Inmates attending the groups all indicated that they generally found such treatment to be very helpful.  Inmates continued to complain of interactions with correctional officers and some inmates reported feeling unsafe

165

from other inmates during the transport process to the Treatment Center.  These inmates reported reasonable access to the psychiatrist and primary mental health clinicians and stated that their clinical contacts were generally done in a private setting.

The problem with low group attendance appeared to be multi-faceted and complex. Some factors appeared to relate to the challenging clinical and custodial nature of the PSU population, some to the culture of CSP/Sac, and others to the nature of mental health programming.  The opinion was expressed to institution leadership that the other factors of this complex problem could not be adequately addressed in the absence of the effective handling of the custody issues.

In sum, programming-related concerns largely centered around group treatment included reports of:

- having almost no clinician led groups;
- having overlapping or clinically irrelevant programing;
- having two groups scheduled "back to back;" and
- because of low attendance, mixing groups so that a sufficient number of inmates are in attendance, and relatedly, cancelation of groups because of insufficient attendance.

Structured Therapeutic Activities:

During the review period, the average number of out-of-cell structured therapeutic activities offered to inmates who were not on a modified program was 11.71 hours; 90 percent of such inmates were offered more than ten hours per week.  The average number of out-of-cell structured therapeutic activities received per inmate was 6.8 hours per week.

Structured Therapeutic Activities – Modified Programming:

At the time of the June 2016 site visit there were 108 of 304 inmates or 35.5 percent on modified programing.  Of those, 66 percent were offered more than five hours of weekly out-of-

166

cell structured therapeutic activities and 17 percent were offered more than ten hours per week. While the June data was not broken down by separate PSU, there had been a decrease in the proportion of inmates placed on modified programing.  Staff reported that PSU inmates on a modified program were not receiving monthly IDTTs.  It was very unusual for a PSU inmate on a modified treatment program to graduate from the PSU program.

Daily psych tech rounds were occurring and were tracked via monthly audits.

At the time of the September 2016 site visit, the population by PSU programs and the proportion of inmates on modified treatment programs was distributed as follows.  PSU I had a total of 103 inmates with 20 or 19.4 percent of the unit population on modified treatment.  PSU II had a total population of 25 inmates with seven or 28 percent on modified program.  Eighty-eight inmates were housed in PSU III where 11 patients or 12.5 percent were on modified program.

Across all PSU programs from June 6, 2016 to September 29, 2016, inmates on modified treatment programs were offered an average of 7.12 hours per week of structured therapeutic activities.  Of those, they attended an average of 2.78 hours weekly and refused an average of 4.34 hours per week.  One inmate attended an average of five or more structured treatment hours per week between June 6, 2016 and September 29, 2016.  The range of average weekly hours attended was 0.42 to 5.53, with seven inmates attending an average of less than one hour weekly.

Attendance of structured out-of-cell therapeutic activities had improved since the September 2016 site assessment.  Refusal rates from June 2016 through December 2016 ranged from 45.71 to 54.89 percent, with an average monthly refusal rate of 50.88 percent.

Since the September 2016 site visit, the proportion of inmates on modified treatment programs had significantly decreased.  On January 10, 2017, a total of 34 PSU inmates, or 16

167

percent of the PSU population, were on a modified treatment program.  This decreased

percentage of inmates on modified program was attributed to implementation of the Program

Guide requirement regarding at least monthly IDTTs being conducted for all inmates on

modified programs.

At the time of the June 2017 site visit, there were five inmates in PSU Facility A and six

inmates in PSU Facility B on a modified treatment program, five percent of the total PSU

population.

Inmate Interviews:

During September 2016, group therapy participants were interviewed over the two-day

site visit.  The inmates reported numerous issues of significant concern.  Inmates reported that

they were either ignored when reporting suicidal ideation or punished for it.  They said they were

held for long periods of time in holding cells and inmates returned to their cells after observation

found that their cells had been searched by custody staff.  Inmates alleged that they were

routinely retaliated against if they filed 602s against custody staff, with threats of or actual

violence, withholding of food and name-calling.  Inmates stated that they were, at times, afraid to

attend group due to fears of conflict with custody staff.  Inmates reported that they were

sometimes bribed to not attend group with extra food.  There were also multiple complaints

regarding property issues and allegations of removal of personal items from inmate property.

A common complaint of inmates who were interviewed was the poor quality of group

therapy provided.  They reported that the information was repetitive and poorly presented.  The

limited review of group therapy that occurred during the September 2016 site visit was consistent

with those reports.

The monitor's expert conducted tier walks on Facility A (A-1, A-2, and A-3), and interviewed inmates at cell-front.  In unit A-1, one inmate reported that custody assaulted him and broke his ribs.  He named specific officers who engaged in assaultive and demeaning behavior toward EOP inmates.  Another reported that he did not attend treatment because an officer twisted his arm during transport and endorsed being offered extra food to forego treatment activities.  Another noted that he had to choose between yard and groups and often chose yard.

In unit A-2 various inmates reported that officers did not remove them from their cells for activities and "tossed" their cells if they did attend, indicating that cell searches were routinely conducted when inmates were receiving treatment, which was a disincentive to attending treatment for some inmates.

In unit A-3, one inmate reported that he had just "come from suicide watch" because the day before he felt suicidal.  He reported that he was brought to a "ZZ" cell where his clinician told him that he would be transferred to the MHCB but that a second clinician countermanded that direction.  This inmate said that he had "busted" his head open and was bleeding, but that the third watch had ignored this and he was not brought for clinical attention until the following shift.  He noted that he was depressed, felt isolated and provoked by custody, and had not attended groups for the previous three months.  Because the inmate stated that he currently felt suicidal, he was referred to the CDCR regional representative.  After interviewing the inmate and reviewing his chart, the regional representative informed the monitor's expert that the inmate was being transferred to DSH by way of the MHCB.

PSU inmates housed on Facility B were also interviewed during the September 2016 site visit.  Several issues of concern were noted.  Inmates reported that they were placed into leg

irons when removed from their cells for any clinical contacts, which had resulted in altercations between inmates and feelings of humiliation that adversely affected treatment participation. There were consistent reports of excessive force from custody officers.  Inmates reported observing other inmates being beaten and mistreated by custody staff.  There were also consistent reports of the use of derogatory language directed toward mentally ill inmates.  The PSU BIP, which allowed for the provision of a television only after achievement of Step 4, was also viewed as a disincentive and a punitive measure rather than the desired motivation that was intended.

During the January 2017 site visit, interviewed group attendees all indicated that they generally found treatment to be very helpful.  Inmates continued to complain of interactions with correctional officers and some inmates reported feeling unsafe from other inmates during the transport process to the Treatment Center.  These inmates reported reasonable access to the psychiatrist and primary mental health clinicians and stated that their clinical contacts were generally done in a private setting.

During the June 2017 site visit, interviews of PSU Facility B inmates were observed. These interviews were conducted in the PSU treatment building by one of the CDCR regional administrators.  There were eight inmates present for the interview; all were placed into therapeutic modules.  Several of the inmates exhibited significant psychotic symptoms, including paranoia, delusional and disorganized thinking and responding to auditory hallucinations.  Two inmates left the interview prior to completion.

Interviewed inmates reported spending long periods of time in holding cells handcuffed with their hands behind their backs while waiting to see a mental health staff person in response to an emergency.  They also reported that the staff was not timely responsive to any emergency,

including reports of suicidality. They indicated the need for more available mental health staff to respond to emergencies. There were also significant problems seeing the psychiatrist reported, including delays and brief contacts.

As demonstrated above, inmate reports were variable across the programs and concerning different shifts but there were persistent reports of difficulties with custody behavior as disincentives for attending mental health treatment.

Custody-related concerns included reports of:

- being physically assaulted when reporting suicidal ideation;
- being held for extended periods of time in "ZZ" cells after reporting suicidal ideation;
- not being called for groups;
- conflicts between yard and group schedules;
- being offered food to not attend groups;
- being shackled during transport to groups; and
- being brought to groups a significant amount of time prior to the group's start.

<u>Staff Interviews</u>:

During the June 2017 site visit, staff interviews were conducted in PSU Facility A and PSU Facility B. The monitor's expert attended an interview of staff assigned to PSU Facility A conducted by one of the CDCR regional administrators. Approximately ten staff members attended representing various disciplines. Staff expressed highly positive views of custody staff; however, overall, staff were generally negative in their views of inmates. Some staff noted that when confronted with different versions of events by custody staff and their patients, they would accept the version of the custody staff in all instances. There were heightened concerns expressed regarding the risk of "gassing" and observing IEX behavior on the tiers.

With regard to the class members they treated, staff expressed the view that 90 percent of the caseload did not require EOP level of care, but that 65 percent who had their level of care

reduced returned to EOP, without sufficiently accounting for the disparity—indicating simply that the inmates manipulated the system to be placed in the EOP.

Other concerns noted by staff included the disruption related to the change to the electronic medical system.

Staff reported that the atmosphere in PSU Facility B was different and considerably better than in PSU Facility A.  They noted minor differences such as PSU Facility B having the IEX population and fewer inmates, but overall could not account for this significant difference.

The monitor's expert attended interviews of staff assigned to PSU Facility B.  Twelve staff members of various disciplines were in attendance.  Staff viewed the ducat system as cumbersome.  Staff also discussed the difficulty of getting inmates ducated to attend groups because the master schedule custody staff had did not match the clinicians' schedule.  Staff indicated that the only way for them to see inmates outside of a scheduled visit was for inmates to say they were suicidal.  Staff reported they were short-staffed.

Staff in PSU Facility B reported a good working relationship with custody staff in PSU Facility B, but not with custody staff in PSU Facility A.

Staff reported that they liked and felt respected and supported by their immediate supervisor.  None of the staff felt supported by upper management, whom they described as rigid, punitive, non-supportive, and unconcerned with low morale amongst staff.

PSU Step-Down Unit:

During the September 2016 site visit, the monitor's expert toured the PSU step-down unit which was housed in the B-8 housing unit.  This unit housed ten inmates.  Several of the inmates in this program were interviewed, and many of their concerns were consistent with those voiced by other PSU inmates.  Despite the concerns that had been reported regarding the PSU, the step-

down program appeared to be a good mechanism to help to transition PSU inmates to a less restrictive setting.  It would be beneficent to expand this program to include more inmates for whom step-down would be beneficial.

During the June 2017 site visit, discussions with custody staff indicated that the PSU step-down program was on hold.  Inmates continued to be housed on the unit; however, the program was essentially not in existence as they were no longer allowed additional privileges nor out-of-cell time as was previously allowed.  Custody staff reported that the program had been discontinued several months prior, after an incident in which an officer was stabbed by an inmate in the program who was out of cell for a shower; he reportedly was able to enter another adjacent housing unit (B-8) where he assaulted the officer.

The discontinuation of the program was discussed with the warden.  He confirmed that the program had been suspended and indicated that they were reviewing the procedures which allowed the assault.  Although it was requested that the warden consider continuing the program after necessary changes had been implemented, no firm commitment for resuming the program was provided.

EOP:

Significant issues were present within the EOP program that were directly related to staffing vacancies, especially the psychiatric vacancies and interface issues between the MHTS and SOMS, which resulted in scheduling issues for weekly structured therapeutic activities.  As a result, Program Guide requirements for timely clinical contacts with a psychiatrist, weekly structured therapeutic activities, and composition of the IDTTs were not being met.  A very high refusal rate concerning weekly structured therapeutic activities was also present.  Clinical contacts frequently did not occur in a confidential setting.

173

There were significant clinical staffing vacancies.  EOP II was allocated 2.0 FTE psychiatrists, although it functioned during the review period generally with 1.0 FTE psychiatrist.  EOP I was staffed with 2.0 FTE telepsychiatrists.  Both EOPs had significant PC vacancies.  At the time of the site visit, there were 18 PCs assigned to the EOP programs.

Data indicated that 54 percent of contacts with psychiatrists were on a frequency consistent with Program Guide requirements due to the significant psychiatrist vacancies.  Psychiatric contacts occurred in a confidential setting about 30 percent of the time.  Forty-two percent of the psychiatric contacts with EOP inmates occurred via telemedicine.  Of the non-confidential contacts, 14 percent occurred due to inmate refusal.

During the review period, 90 percent of inmates were seen at least weekly by their PC.  PC contacts were done in a confidential setting 54 percent of the time; ten percent of the time, the non-confidential interviews occurred due to either a staff decision or inmate refusal.  Standard non-confidential interviews occurred almost 30 percent of the time.

Initial IDTTs were completed in a timely manner 93 percent of the time and routine IDTTs had a compliance rate of 100 percent.  Due to psychiatrist vacancies, IDTTs were attended by all the core staff 77 percent of the time.

The average out-of-cell structured therapeutic activities offered per inmate on a weekly basis was 12.19 hours.  The average weekly structured therapeutic activities attended by an EOP inmate was 5.23 hours, with 23 percent of EOP inmates receiving greater than ten hours.  Thirty-two percent of EOP inmates refused more than ten hours per week and 66 percent refused more than five hours per week.

There were no EOP inmates placed on a modified treatment program.

EOP Changes in Level of Care:

Regarding concerns that class members were being inappropriately removed from an EOP level of care, according to the data provided, from June 2016 through November 2016, 105 inmates at CSP/Sac had their level of care changed from EOP to 3CMS.  Of those 105 inmates, 22 were from administrative segregation EOP, 31 inmates were from mainline EOP, one inmate was from OHU, and 51 inmates were from PSU.

3CMS:

Staff reported that one psychiatrist was assigned to all 3CMS inmates, including SHU, mainline and STRH, resulting in a ratio of 1:121.  Consequently, the psychiatrist did not attend any IDTTs.

Compliance with Program Guide requirements for psychiatry and PC initial and routine contacts, initial IDTTs and IDTT staffing were problematic.

Initial psychiatry and routine psychiatry contacts were 49-percent and 62-percent compliant, respectively.  Initial PC contacts were timely 46 percent of the time.  Routine PC contacts were timely 78 percent of the time.

Initial IDTTs were 70-percent compliant; routine IDTTs were 96-percent compliant. Attendance of required disciplines at IDTTs was at 30-percent compliance.

Non-confidential psychiatry and PC contacts were at one-percent and five-percent compliance respectively.  Cell-front PC contacts occurred 12 percent of the time.  Of the non-confidential PC contacts, 46 percent were for crisis contacts and 38 percent were for routine contacts.

There were ten groups offered to 3CMS inmates.

<u>Non-Disciplinary Segregation</u>:

During the review period, CSP/Sac reported that 62 MHSDS inmates had been

designated NDS, of which 51 or 82 percent were transferred.  Of the 51 inmates transferred, 11

or 22 percent were transferred beyond 30 days.  CSP/Sac did not provide information regarding

property and privileges.

At the time of the site visit, there were 46 inmates on NDS status; 27 were at the EOP

level of care, 17 were 3CMS inmates and two were general population inmates.

<u>Indecent Exposure Housing Unit</u>:

CSP/Sac's IEX Housing Unit was toured during the regular monitoring tour of CSP/Sac

during June 2016 and during the subsequent focused site visits in September 2016, January 2017,

and June 2017.

The IEX Housing Unit was created to house "the most frequent offenders engaging in

IEX behavior," and had a maximum capacity of 18 inmates.  The housing unit, situated in

Facility B of the PSU, was designated for inmates already in the PSU, and was initiated as a pilot

program beginning in September 2015.  The pilot was subsequently terminated in 2016.

According to CSP/Sac's Operational Procedure (OP) 30, initially issued in October 2016

and updated in January 2017, the purpose of the IEX Housing Unit was to subject the inmates "to

a variety of security measures in an attempt to identify, prevent, reduce, and eliminate repeating

this behavior."  The unit did not provide sex offender specific treatment; inmates received EOP

treatment similar to the treatment provided in any PSU in CDCR.

<u>Admission and Discharge</u>:

According to the institution's policy, inmates diagnosed with exhibitionism were not

automatically placed in the IEX Housing Unit, but could qualify for placement "by virtue of

excessive IEX behavior."  On April 13, 2016, CSP/Sac issued a memorandum that updated and revised a July 20, 2015 memorandum regarding the criteria for inclusion and exit from the pilot program.  The April 2016 revision provided that inmates with two or more IEX incidents in the preceding six months were eligible for inclusion in the pilot program.  In order to be eligible for removal, and re-housing in a regular PSU, an inmate was required to go six months with no IEX RVR.  An inmate who engaged in IEX while in the unit was eligible for removal from the program six months from the date he re-offended.  Inmates who were removed from the housing unit could be returned if they committed an IEX offense after removal.

During the site visits of June 2016 and September 2016, staff and inmates reported, and documentation revealed that in multiple cases, the April 2016 discharge criteria were apparently not adhered to; several inmates were discharged before six months were concluded.

In the OP 30 (January 2017), placement and removal from the IEX Housing Unit was changed from repeated IEXs to be "at the discretion of the captain and with consideration of the IP's [inmate-patient] disciplinary history, current packet status, and institutional need."

As indicated above, since January 2017, placing inmates in or releasing them from the IEX Housing Unit was discretional to the captain, making the admission and discharge criteria unclear to staff and inmates.  It was observed that it was important for inmates to understand what behaviors could result in their placement in such a unit and, once there, what exactly they needed to do to be removed from the unit.  With clear discharge requirements, once those behavioral criteria have been achieved, the inmate must be moved immediately.  It may be beneficial for the discharge criteria to be viewed as a contract with that inmate: if the inmate achieved these goals, he would get out, thereby creating effective positive reinforcers for inmates in the IEX Housing Unit.

177

Treatment Planning:

As stated above, the IEX Housing Unit was not intended to provide exhibitionism-specific treatment; inmates were receiving regular PSU EOP treatment.

None of the treatment plans of inmates in the IEX Housing Unit that were reviewed during the site visits addressed precipitants' maintaining and/or lowering risk factors for IEX behavior. For all treatment plans reviewed, case conceptualization, which is the foundation necessary for effective treatment planning, was poor. Case conceptualization was similarly lacking for mental health symptoms and diagnoses for multiple inmates placed in the IEX Housing Unit. The impact of IEX and/or integration with mental health needs as treatment was not addressed, and reviewed treatment plans lacked a baseline or quantification of the IEX, making it difficult to determine if a goal of abstaining from IEX for any meaningful period was realistic. Where inmates specifically attributed their IEX behavior to substance use, substance use was not addressed as a treatment goal. For all reviewed treatment plans, rationale for group referral or treatment hours attended/refused was missing. Further, rationale for treatment refusals and interventions to increase group participation was not discussed in any of the treatment plans reviewed during the site visits.

Of thirteen mental health records of inmates in the IEX unit reviewed during the September 2016 site visit, addressing IEX was clearly identified as a short-term goal on the treatment plans of eight inmates. IEX was not identified at all in two treatment plans, and three records did not have treatment plans available for review. Goals typically indicated that there would be no IEX in a specified timeframe, but as discussed above, there was no basis for determining if this was realistic given the lack of baseline and frequency data. In general, given the lack of case conceptualization, it was not possible to assess if the interventions offered to

178

inmates whose treatment plans were reviewed were appropriate and individualized for the inmate's specific treatment needs.

During the June 2017 site visit, discussions with supervisory staff indicated that it was their expectation that IEX behavior would be addressed in treatment plans (e.g., impulsivity, anger management, emotional self-regulation, etc.).  The staff reported that they were very receptive to how they could address the behavior clinically, and indicated a willingness to utilize CSP/Sac's Positive Behavioral Support Team to assist treatment teams in developing more responsive treatment plans with the goal of increasing the probability of success for inmates placed in the IEX Housing Unit.

Structured Therapeutic Activities:

As reported above, inmates in IEX Housing Unit were required to receive treatment consistent with the EOP level of care in the PSU.  Treatment hours for 11 inmates in the IEX Housing Unit were provided during the September 2016 site visit.  Data was provided with a timeframe that began in mid-April 2016 through August 2016 and ended on September 25, 2016. The range of treatment hours that was attended was between 0.55 to 12.6 hours with an average of 6.2 hours.  The range for refusal of treatment hours was 0.25 to 9.57 with an average of 4.02 hours.

During the June 2016 site visit, staff reported that CSP/Sac had ended conducting group treatment in the dayroom in the IEX Housing Unit in April 2016.  Inmates in the unit were escorted to the PSU Treatment Center for their groups during the site visits.  Groups offered in the IEX Housing Unit covered multiple topics including impulse control, anger management, problem-solving, criminal thinking, life skills, and coping skills that were said to be tailored to IEX inmates.  It was observed that group topics and discussions did not target sexually deviant

behavior, thus failing to address one of the central reasons that inmates were placed in the housing unit.

Groups in the IEX Housing Unit were primarily conducted by male recreation therapists and psych techs, with a limited number of groups facilitated by PCs. Supervisory staff reported that female staff were not assigned to facilitate groups in the unit because of the concern that inmates would expose themselves to the female staff. It was observed that a clinical objective of treatment planning in the IEX Housing Unit, particularly as part of a behavioral plan, would be to set goals on appropriate interactions with females, including female staff.

At the time of the September 2016 site visit, part of a Life Skills group, facilitated by a recreation therapist, was observed; four inmates attended. The recreation therapist apparently had a good rapport with the inmates and inmates shared positive feedback about the group leader. The group was focused on communication, generally on how one's emotions can impact communication while incarcerated, addressing alternative coping skills to use under such circumstances. The group facilitator validated inmates' experiences, facilitated peer-to-peer interactions, and appropriately redirected inmates who were off topic. Group members participated openly. This group offered an excellent example of group process, addressing inmate treatment concerns within the context of the subject of the group.

Staff Interviews:

During the several site visits, custody staff assigned to the IEX Housing Unit were interviewed. Custody staff reported that there had been significant improvement in the IEX Housing Unit as a result of the April 2016 changes. They stated that escorting inmates to the Treatment Center had reduced noise levels in the unit and lowered the number of IEX offenses and other disruptive incidents in the housing unit, resulting in improved job satisfaction.

180

Custody staff also indicated that they believed that the changes had had an overall positive

impact on inmates housed in the unit.  Several of the interviewed custody staff expressed concern

that they had not had any training on how to respond to IEX behavior (i.e. ignore the behavior,

tell the inmate to stop, etc.).  It was observed that without appropriate training, staff would likely

intercede variably and inconsistently, which could unwittingly reinforce, or reward the behavior,

or unintentionally result in an increase in the behavior.

       Inmate Interviews:

      During the various site visits, interviews were conducted with inmates in the IEX

Housing Unit.  Interviewed inmates reported that they attended groups which they believed

generally met their needs when escorted by custody, but unanimously indicated that they wanted

more groups.  The inmates expressed a concern that groups offered in the IEX Housing Unit did

not specifically address IEX behavior.

      In an interview with five inmates attending an EOP group, all of them rated the mental

health program overall as "poor."  Four of the five inmates reported that they knew who their PC

was, but believed the clinicians did not advocate for them or answer their questions when they

asked.  While all the inmates generally supported the efforts of the clinical staff, uniformly, they

felt that custody rather than mental health staff, ran the mental health program.  Inmates

indicated that they believed some of the clinicians wanted to do more in respect to the treatment

but were afraid of the custody staff.

      In interviews across the various site visits, several inmates expressed the view that there

was some "good" custody staff who did the "right thing" when other custody officers were not

present.  They reported that some custody officers "labeled" IEX and all mentally ill inmates,

sexually harassed inmates, failed to submit sick call slips, denied inmates contacts with their

families, denied access to mental health treatment, particularly to disabled inmates, engaged in unprovoked violence against the inmates, and generally denied inmates basic respect and decency.

Several inmates reported that they did not feel safe participating in IDTT because of the presence of custody staff.  Some inmates also indicated that they were not able to access MHCBs even after disclosing suicidality, and in some instances, were provoked by custody staff and told "kill yourself."  There were reports of missing property which inmates believed involved a specific custody officer.  Several inmates alleged that a use of force occurred where there was no RVR or incident report generated.  Inmates stated that while a CDCR Form 602 had been filed, the custody officer allegedly involved in the incident was still in the housing unit.  Inmates indicated that there were other reports of excessive force by the same custody officer.  Multiple inmates reported that inmates were provided with food in exchange for not disclosing alleged staff misconduct.  Some inmates expressed the view that the goal of the IEX Housing Unit was to lower their level of care to 3CMS.

During the June 2017 site visit, interviewed inmates acknowledged that they represented a difficult population and that the PSU/IEX Housing Unit was a difficult place for any staff to work.  They generally requested individualized treatment plans, stating that they did not feel that their specific issues were being properly addressed in treatment.  Further, they requested staff who worked in the IEX Housing Unit receive additional enhanced training to work with not only inmates who had mental illnesses but also engaged in IEX behaviors.  The inmates requested meaningful treatment that did not rely on movies and videos, but which helped them learn about themselves and develop skills to change their behaviors to prevent them from placement in the PSU and the IEX Housing Unit.

Many interviewed inmates reported significant concerns related to their placement in the IEX Housing Unit, including feelings of stigmatization, mistreatment and safety concerns because of the placement. The inmates reported that they felt disrespected by both custody and mental health staff, and that mental health staff did not take their mental health concerns seriously. The majority of inmates expressed distrust of their clinician and psychiatrist and believed that it was due to upper management, although it was unclear if they were referring to previous mental health management. Inmates reported that they were not getting to mental health appointments timely, and that they had often been brought out for appointments, and then left to wait in holding cells which resulted in their missing other activities such as yard. Consequently, a number of inmates reported that they would refuse mental health appointments out of fear that they might miss yard or other programming events, and yet not see their clinician.

Interviewed inmates during the June 2017 tour also reported that custody officers were currently escorting the psych techs on rounds, which made many inmates unwilling to discuss anything sensitive or meaningful with psych techs. This was said to be true even during crisis responses as well. Multiple inmates reported that when they have been in a state of crisis or feeling suicidal they would frequently be seen first on the tier, often by the psych tech, and that while the psych tech would be attempting to elicit information, the custody officer would be standing behind the psych tech shaking his/her head discouraging the inmate from reporting suicidal information or any additional information regarding the crisis situation.

Multiple inmates interviewed also reported that since March 2017 they have had to wait for hours before seeing mental health staff after they had told custody that they were suicidal. They also described a situation where an inmate had been calling out that he was not feeling well, needed to see someone, was feeling suicidal, and no one came to see him nor was he

removed from his cell.  After approximately five hours by the inmates' estimation, he lit property in his cell on fire and they reported that the custody officers never hit their alarms.  The inmates reported that the entire unit was filled with smoke, negatively impacting all inmates.  Another situation was described where an inmate had been calling out in the same manner.  The inmates had gone out to yard or group and when they returned the inmate had been discovered hanging in his cell.  The inmates reported that this inmate had been placed in the MHCB previously.  All inmates reported feeling unsafe and worried as to whether anyone would save them if they were in similar situations.  They specifically asked why suicide watch for them was held in a housing unit rather than the MHCB.

During the interviews in June 2017, several inmates complained that they had not engaged in IEX behavior for an extended period, which should have resulted in their movement from the unit, but this had not happened.  There was no available documented reason identified for continuing to maintain these inmates in the IEX Housing Unit.

Tier Walks:

During the site visits, tier walks were conducted to engage inmates who did not attend the treatment group.

Inmates were questioned regarding group treatment refusals and they offered varying reasons.  Some were attributed to personal stressors/reasons (e.g., preferred to isolate, personal loss, did not like PC, wanted a single escort) and there were multiple custody-related reasons.  One inmate reported that he was placed on "restriction" by custody for either two or four weeks and was unable to attend groups.  Another inmate reported that custody staff stated he refused to attend group, which the inmate denied.  During inmate interviews, inmates reported that they

were not asked to sign refusal forms when they refused to come out for group, which resulted in the lack of complete documentation regarding the widespread refusal in the PSU.

During tier walks one inmate reported that he had told both the psych tech and custody officer that he was suicidal earlier that day and he was still waiting to be evaluated by mental health staff.  Custody staff was informed shortly after the interview and they initiated a 1:1 observation.  However, while on the unit it was noticed that the 1:1 observation officer left this post to complete Guard One checks, leaving the inmate unobserved during that time.

This inmate had recently returned to CDCR from DSH and his primary stressor was the unknown whereabouts and perceived loss of his property.  This had been an ongoing issue for the inmate resulting in multiple brief admissions to alternative housing in the previous two weeks.  It was recommended that custody and mental health staff jointly address such issues in cases where inmates' distress regarding property, a custodial issue, resulted in increased mental health distress and utilization of mental health resources.

Referrals:

The institution processed 2,448 mental health referrals during the review period.  Data indicated that 99 percent of emergent referrals drew a response within the same day.  However, 72 percent of urgent referrals were seen within 24 hours and 82 percent of routine referrals were followed up timely.

Mental Health/Custody Relations:

 "Culture" issues at CSP/Sac were examined during each of the site visits and are discussed above in the Administrative Segregation EOP (Inmate Interviews; IDTTs), PSU (Group Treatment; Inmate Interviews; Staff Interviews), and IEX (Inmate Interviews) sections of this report.  Most notable were the multiple allegations against some custody officers made by

inmates across programs, self-reported negative attitudes towards caseload inmates by some

mental health staff, and allegations regarding the perception that mental health staff were either

subservient to custody staff, or actively colluding with custody staff to the detriment of inmates'

mental health care.

    <u>602 Appeals Process</u>:

    In response to the multiple allegations regarding custody staff that were gathered during

group and individual inmate interviews, the monitor examined a sampling of inmate appeals.

During the September 2016 site visit, the monitor requested information on all inmate appeals

filed for the months of June and July 2015 and June and July 2016 to allow for a comparison

during the same time frames for two consecutive years.  The institution provided the

Inmate/Parolee Tracking System COMPSTAT[44] report for the requested timeframes.  The review

revealed an overall 148-percent increase in staff complaint appeals over the compared

timeframes (from 25 in 2015 to 62 in 2016).  Specifically, a review of the provided data revealed

that the number of appeals filed for staff complaints were 14 and 11 in June and July 2015, and

21 and 41 in June and July 2016.

    The monitor subsequently requested copies of the June and July 2016 Inmate/Parolee

Appeals Tracking System report on peace officer complaints to allow for a more focused review.

The report reflected that in June 2016 there were 22 appeals filed under the category of peace

officer complaints, of which five or 23 percent were for use of force, and three of those five were

from inmates housed in PSU Facility A Unit 2.  In July 2016, there were a total of 40 appeals

filed that were categorized as a peace officer complaint, of which eight or 20 percent were filed

---

[44] Short for COMParative STATistics, a department organizational management tool.

for use of force.  The July 2016 peace officer complaints came from various units at the institution, and only two came from a PSU (one each from A-1 and B-7).

While this information does not specifically identify the circumstances surrounding the complaints, there is an opportunity for management to evaluate the information and determine whether additional oversight, training, procedural changes, or resources are needed to ensure there is a safe working and living environment.

Racial Discrimination:

A number of class members reported to plaintiffs' counsel that they believed custody staff harassed African-American prisoners and interfered with their access to mental health care at a higher rate than other prisoners.

CSP/Sac reported that In-Service Training had implemented a Cultural Diversity training effective January 2017, to be provided to all personnel during annual training.  This training was a two-hour class designed for all staff.  It was reported to provide the participant with the knowledge, skills, and abilities to value the differences of CDCR's diverse population, respect the individuality of all staff, offenders, and members of the public, and maintain a climate in which everyone is treated with dignity.

CSP/Sac leadership reported that staff were monitoring inmate appeals for trends related to racial discrimination complaints.  Leadership further reported that increased staff awareness concerning this issue and the recent custody staff changes, including line staff as well as leadership, were expected to address any complaints in this area.

The monitor's experts discussed with staff a prospective study looking at the frequency of use of force incidents involving inmates who had been referred to mental health related to suicide risk issues.  The monitor's expert suggested that the denominator should be all inmates

187

referred to mental health for suicide risk issues and the numerator should be those inmates who subsequently are involved in the use of force immediately surrounding the suicide risk assessment.  Such inmates should be separated statistically by race and appropriate statistical analysis conducted to see if there are racial disparities.

Heat Plan:

CSP/Sac was compliant with sending monthly reports to headquarters, but data indicated multiple instances of missed temperature readings in various units.  The institution reported that weekly lists of heat-risk inmates were generated by the pharmacy and distributed to the units. Affected inmates were issued heat cards indicating they were prescribed heat-sensitive medications.  Thermometers were observed in all toured units and the wire sensors were placed in the exit air register at the top of each unit which would provide the warmest readings from each unit.

Lockdown/Modified Programming:

There was one incident requiring a modified program during the review period.  Modified programming was in place from April 22, 2016 – April 25, 2016.  During this period, inmates were fed in their cells.  There was no visiting, canteen privileges, dayroom privileges, packages, recreation or inmate work allowed and rounds were conducted on the units.

Pre-Release Planning:

Paroling inmates were screened by the Transitional Case Management Program (TCMP) social worker.  The institution provided pre-release groups to those inmates who had six months or less before being released.  Groups met once per week for two hours over the course of 12 weeks.  Group topics included, housing, transportation, obtaining an ID, obtaining mental and

physical health services, education, job opportunities, community support, finances and other relevant subject matter.

Inmates who were scheduled to parole within 30 days had their medications adjusted by a psychiatrist, if necessary, and were also provided with a 30-day supply of prescribed medications on the day of parole.

Access to Care:

A review of CSP/Sac's monthly Health Care Access Quality Reports from November 2015 through April 2016 indicated that zero percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 14.13 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.  Job and Program Assignments:

Institutional data indicated that of the 711 available jobs, 145 EOP inmates, or 17 percent of the EOP population held job assignments.  For 3CMS inmates, 137 or 28 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 429 or 40 percent of the non-MHSDS population held job assignments.

Of the 250 part-time academic assignments, 27 EOP inmates, or three percent of the EOP population held assignments.  For 3CMS inmates, 77 or 16 percent of the 3CMS population held assignments and for non-MHSDS inmates, 146 or 14 percent of the non-MHSDS population held assignments.

There were 860 voluntary academic assignments; 318 EOP inmates, or 37 percent of the EOP population held assignments.  Of the 3CMS population, 185 inmates, or 37 percent held

assignments.  For non-MHSDS inmates, 357 inmates, or 33 percent of the population held assignments.

Of the available 129 full-time and part-time vocational education positions, 26 EOP inmates, or three percent of the population held assignments.  For 3CMS inmates, 28 or six percent of the population held assignments.  For non-MHSDS inmates, 75 or seven percent of the population held assignments.

The institution reported that there were 16 voluntary education positions which were all held by EOP inmates.

b.   Milestone Credits:

A report dated May 2, 2016, showed that of 870 EOP inmates, 171 or 20 percent, were eligible to earn milestone credits and 17.54 percent earned credits.  For 3CMS inmates, 65 of 495 or 13 percent, were eligible to earn milestone credits.  Of the eligible 3CMS inmates, 12.31 percent actually earned milestone credits.

The data indicated that of the 1,077 non-MHSDS inmates, 289 or 27 percent, were eligible to earn milestone credits; 19 percent earned credits.

c.   Out-of-Level Housing:

For out-of-level housing of caseload inmates, institutional data indicated that three Level I EOP inmates were placed in Level IV housing; three Level II EOP and four Level II 3CMS inmates were placed in Level IV housing, and 12 Level III EOP Inmates and 9 Level III 3CMS inmates were placed in Level IV housing.

d.   ADA Reasonable Accommodation and Grievance Procedures:

Information and a small sample of RAP responses provided by the institution indicated that the policies and procedures had been implemented and were being adhered to.

190

e.   Periodic Classification Score Reductions:   EOP Inmates:

A review of a sample of ten classification scoresheets found that seven inmates had received classification score reductions due to the completion of work, school or vocational programs.

*Coleman* Postings:

*Coleman* posters were observed in all toured housing units.  All observed postings were placed in common areas accessible to class members.

**Folsom State Prison (Folsom)**
June 14, 2016 - June 16, 2016

Census:

On June 14, 2016, the institution housed a total population of 2,979 inmates.  Folsom's total inmate population included 2481 male inmates and 498 female inmates in the Folsom Women's Facility (FWF).  The MHSDS census was 533 males and 188 females for a total of 721 inmates, or 24 percent of the total population.

There were six male inmates and two female inmates at the EOP level of care and 527 male inmates and 186 female inmates at the 3CMS level of care.

The total number of inmates in administrative segregation was 80 males, four of which were at the 3CMS level of care.  Six inmates were on NDS status.

Staffing:

At the time of the site visit, Folsom did not have an established chief psychiatrist position.  One of the two chief psychologist positions was filled, with no plans to hire into the second position for cost-saving reasons.

The one senior psychiatrist supervisor position was filled, as were all three staff psychiatrist positions.

191

The one established senior psychologist supervisor position was vacant; at the time of the site visit, staff reported that interviews to fill the position were being conducted.  One of the two established senior psychologist specialist positions was filled, for a 50-percent vacancy rate.

The institution had seven established staff psychologist positions, five of which were filled for a 29-percent vacancy rate.  Staff reported at the time of the site visit that interviews were being conducted to fill one of the two vacant positions.

There was no established supervising social worker position.  There were six established clinical social worker positions, three or 50 percent were vacant.  Staff reported that there was no current plan to hire social workers to fill the vacancies.

The senior psych tech position was filled; there were four psych techs on staff, which exceeded the 3.5 established positions.

There were no recreation therapist positions established at Folsom.  The one established HPS I position and all five established office technician positions were filled.

Folsom did not utilize telepsychiatry.

<u>Medication Management</u>:

The institution reported that the healthcare services dashboard was unable to provide reliable data for the review period due to the piloting of the EHRS.

Folsom was not designated to initiate or maintain inmates on Clozaril.

There were no PC 2602 petitions initiated or renewed during the review period.

The institutional resource management subcommittee evaluated the problem of long pill lines at FWF.  In February 2016, an extra Licensed Vocational Nurse (LVN) was assigned to Third Watch on weekdays.  The institution was looking at other solutions to alleviate the problems on Second Watch and weekends.

Folsom reported it did not have access to generate a HS medication list since starting the EHRS on October 27, 2015.

<u>Transfers</u>:

There were no DSH transfers during the review period or at the time of the site visit. The institution considered 75 inmates for referral to inpatient programs during the review period; none were referred.

During the same time period, 36 inmates were referred to MHCBs; 31 inmates were transferred and five referrals were rescinded.  At the time of the site visit, the institution reported that during May 1, 2016 through June 14, 2015, nine inmates were referred to MHCBs; seven were transferred and two referrals were rescinded.  No inmates were awaiting transfer to a MHCB at the time of the site visit.

There were no PSU referrals during the review period.

The institution reported that all five required transfers to EOP administrative segregation hub institutions during the review period occurred timely.  At the time of the site visit, none of the pending EOP administrative segregation hub transfers were overdue.

According to the data provided, four STRH 3CMS inmates were in administrative segregation for longer than 30 days during the review period; all had been transferred by the time of the site visit.  At the time of the site visit, four STRH 3CMS inmates were in administrative segregation beyond timelines.

The institution reported that 26 inmates met Program Guide requirements for EOP transfer, of which 24 or 92 percent were transferred timely.  At the time of the site visit, Folsom reported that all eight inmates at the EOP level of care were within transfer timelines.

Other Issues:

MHSDS Inmates in Administrative Segregation:

At the time of the site visit, the caseloads for the PC and psychiatrist in administrative segregation was three to six inmates.  One clinical psychologist who provided services in administrative segregation as an additional assignment, also carried a caseload of 14 females in general population.

The institution reported that during the review period, no inmates at the EOP level of care were held in administrative segregation for longer than 30 or 90 days.

Provided data indicated that PC and psychiatric contacts for 3CMS inmates were timely during the review period.

IDTT staffing data indicated that required staff attendance at IDTTs was at 86 percent for the review period, which was near compliance.  Staff reported that a supervisor's IDTT staff attendance audit indicated that that the non-compliance was due to incorrect documentation rather than absences.

In administrative segregation, PC contacts occurred in confidential settings unless the inmate refused.  There were five cell-front contacts during the review period due to refusals. Similarly, psychiatric contacts occurred cell front except in the case of refusal; one psychiatric contact was reported to have occurred cell front due to inmate refusal during the review period.

Alternative Housing:

There were eight intake cells in the Folsom administrative segregation unit which were used for alternative housing.  At FWF, there were five cells designated as alternative housing in the front of the facility.  The alternative housing cells were the same cells designated for new-intake inmates at both facilities.

194

There were 34 alternative housing placements during the review period.  Of the 34 inmates placed in alternative housing, 30 were deemed to need MHCB services and referred to MHCBs.  Of those 30 transfers, 27 or 90 percent were transferred within 24 hours.

Of the 34 total alternative housing placements, three or nine percent lasted longer than 24 hours.

Folsom used HCPOP to place inmates in MHCB units.

3CMS:

Four psychiatrists providing care in the 3CMS mainline program had caseloads of 51, 91, 160 and 213 male inmates respectively, with one of the psychiatrists also carrying a caseload of 140 female inmates.

In the mainline 3CMS program, the clinical caseloads for three staff psychologists was 93 to 111 male inmates, and for two clinical social workers, the caseloads were 104 and 111 male inmates respectively.  One clinical psychologist had a caseload of 65 female 3CMS inmates.  A clinical social worker in the mainline 3CMS program had a caseload of 61 female inmates.

As discussed in further detail in the EHRS section below, Folsom reported a number of issues related to compliance data for the 3CMS program.

Folsom reported that it offered several topical groups varying in length from one hour to 90 minutes and scheduled Monday through Friday.  The maximum capacity ranged from seven to 12 inmates with an average of ten inmates per group.  Most of the groups were open-ended with no time-specific stop date.  Others ran for 12 weeks or six months, and one group was limited to eight weeks.  All groups had a waiting list ranging from seven to 68 inmates.  The average number of inmates on a waiting list was twelve.

The monitor's expert observed a Lifers group on June 14, 2016.  The group was held in the confidential IDTT room which provided ample seating for the 12 participants and group facilitator.  The monitor's expert interviewed the group attendees.  Many of the inmates said they participated in the 3CMS program because it was the only way they could get the help the parole board required.  Half of them had been enrolled in the 3CMS program for five to 20 years.  Two were taking psychiatric medication.  All knew their PCs and psychiatrist and knew how to request an unscheduled contact.  They said staff response time was reasonable if the request was made directly in person to a staff member.  If the health care request system was used, they claimed the wait would be too long.  Those who took medication said pill line wait times could take up to 45 minutes.  Overall, the inmates were satisfied with the group treatment, but felt strongly that more was needed.

Interviews were held with approximately eight female inmates at the FWF.  The majority had recently arrived and did not understand much about the workings of the mental health program.  Only two inmates were familiar with their diagnoses and understood what medications they were prescribed and the purpose of treatment.  Those on medications reported long pill lines in the morning and after dinner.

The monitor's expert observed three initial IDTTs for male 3CMS inmates.  The IDTTs were held in a confidential room with a conference table, chairs sufficient to seat each participant, and computers.  All required staff were present.  The team discussed the inmates' cases outside their presence.  The treatment team considered factors that might indicate a need for a higher level of care in all three cases, but the purpose of the review was not explained to inmates.

196

Case-by-Case Reviews:

There were no case-by-case reviews completed during the review period.

Non-Disciplinary Segregation:

During the review period, there were 19 inmates who were designated NDS.  Each inmate was timely designated by the IDTT, received privileges and was appropriately transferred within timeframes.

There were six inmates designated NDS at the time of the site visit.  No information regarding their privileges or transfer was obtained during the site visit.

"C" Status:

At the time of the site visit, there were a total of 20 inmates on "C" Status, including eight MHSDS and 12 non-MHSDS inmates.  A review of seven of the MHSDS inmates' case factors found all seven were placed on "C" Status as a result of being determined by a classification committee to be a program failure due to multiple RVRs over a 90-day or 180-day period of time.  All "C" Status designations were for a set period of time according to CDCR policy.

Referrals:

Folsom reported issues with tracking mental health referrals through the EHRS.  Staff reported a "system error" had cancelled several orders, and a SOMS mismatch of data had led to cancellation of appointments.  Folsom also reported that clinicians sometime neglected to open and close appointments, but retraining had been provided.

According to the data provided, there were 44 emergent referrals generated during the review period.  Of those, 31 or 70 percent were noted as timely.  However, due to the reported issues tracking mental health referrals in the system, staff checked the local data on referrals and

reported that there were actually three untimely emergent referral responses, elevating the compliance rate to 93 percent.

According to the data provided, there were 188 urgent referrals generated during the review period.  Of those, 114 or 61 percent received a timely response.  Seventy-four were noted as incomplete or untimely.  There appeared to be some serious issues with data entry as several referrals were documented as not completed and numerous others were entered as completed days, weeks or months after the referral response time had passed.

There were 865 routine referrals generated during the review period.  Of those, 825 or 95 percent received a timely response.  Forty were noted as incomplete or untimely.  The same data entry issues mentioned above seemed to be a problem with routine referrals as well, although the overall compliance rate was high.

EHRS/MHTS.net:

The EHRS was launched on October 27, 2015.  The review period began three days after the implementation of EHRS, which impacted the reliability and validity of the data according to staff.

During the site visit, Folsom reported a number of issues related to its data as reported through EHRS.  Regarding required attendance at IDTTs in administrative segregation, Folsom reported that its review of EHRS case information showed that the PC had incorrectly documented staff attendance at the IDTT and the data was found to be inconsistent with the IDTT chair's IDTT staff attendance audits.

Folsom also reported that its "hand count" had found the data for the total number of PC and psychiatry contacts that occurred in a confidential setting during the review period in administrative segregation and mainline 3CMS were "incorrect."  The institution reported that

there was a teleconference on May 26, 2016 with "statewide EHRS and statewide mental health staff" where it was reported that "the EHRS data is incorrect."

Folsom reported that its local audits found errors in the EHRS data regarding timeliness of initial and subsequent IDTTs, as well as attendance of required disciplines in the mainline 3CMS program. Folsom also reported problems accurately tracking mental health referral data in EHRS.

Space:

Mental health staff reported insufficient treatment space at FWF, which was neither confidential nor private. FWF group treatment took place in a non-confidential, multi-purpose room that lacked privacy.

Folsom reported that the HCFIP construction of a new two-story health care building was scheduled for completion in December 2017. As part of the new building, one observation room in the Triage and Treatment Area (TTA) may be used by mental health staff for placement of an inmate requiring observation. No other office or treatment space in the new building was identified for mental health services.

Heat Plan:

The monitor's on-site review included all Folsom housing units and the FWF. The monitor found all housing units had the thermometer located on the highest tier where heat-risk inmates were located. The inside temperature was being logged every three hours. The inmate heat-risk list was updated daily. Housing unit staff were consistently familiar with the heat plan policy. There were three Stage I heat alerts during the review period, but no Stage II or III heat alerts. The time of heat alert activation and deactivation were properly recorded.

199

<u>Lockdowns/Modified Programming</u>:

Folsom reported there were no modified programs effecting mental health services during the review period.

<u>Pre-Release Planning</u>:

Folsom's pre-release planning activities included a Community Transition group offered twice weekly.  The group was facilitated by a social worker and offered on Tuesdays and Thursdays.  The institution also reported that TCMP staff assisted inmates with benefit application assistance prior to release, and mental health staff worked with inmates on release planning during routine appointments.

<u>Access to Care</u>:

A review of Folsom's monthly Health Care Access Quality Reports from November 2015 through April 2016 indicated that zero percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 7.65 percent were not completed due to non-custodial reasons, excluding inmate refusals.

<u>Program Access</u>:

a.   <u>Job and Academic Assignments</u>:

As of May 3, 2016, institutional data indicated that of the 1,402 available jobs, none were assigned to EOP inmates.  For 3CMS inmates, 245 or 35 percent of the population held job assignments, and for non-MHSDS inmates, 1,157 or 49 percent of the population held job assignments.

Of the 441 academic assignments, two EOP inmates or 22 percent of the EOP population held academic assignments.  Eighteen percent of the 3CMS population, or 123 inmates, held

academic assignments.  For non-MHSDS inmates, 316 or 13 percent of the population held academic assignments.

There were 132 substance abuse treatment program assignments; none were held by EOP inmates.  Of the 3CMS population, 63 inmates, or nine percent held assignments.  For non-MHSDS inmates, 69 inmates, or three percent of the MHSDS population held assignments.

There were 366 vocational education assignments, none were held by EOP inmates.  Of the 3CMS population, 13 percent, or 90 inmates held assignments; 12 percent of the non-MHSDS population, or 276 inmates held assignments.

Of the 802 voluntary education assignments, one EOP inmate, or 11 percent of the EOP population held an assignment.  For 3CMS inmates, 159 or 23 percent of the population held assignments, and for non-MHSDS inmates 642 or 27 percent of the population held assignments.

b.  Milestone Credits:

As of April 30, 2016, Folsom reported six of nine EOP inmates were eligible for milestone credits; zero percent earned the credits.  For the 700 3CMS inmates, 239 were eligible to earn milestone credits; 33 percent earned the credits.

Of the 2,363 non-MHSDS inmates, 662 were eligible to earn milestone credits; 28 percent earned the credits.

c.  Out-of-Level Housing:

Institution data indicated that, as of May 10, 2016, there were seven Level I 3CMS inmates and one EOP inmate in Level II housing at Folsom.  There were five Level III 3CMS inmates and one EOP inmate in Level II housing at Folsom.

d.   ADA Reasonable Accommodation and Grievance Procedure:

The institution provided 13 reasonable accommodation panel meeting sign-in sheets documenting the occurrence of these meetings.  According to mental health staff, there were no reasonable accommodation requests related to psychiatric disabilities.

e.   Periodic Classification Score Reductions:  EOP Inmates:

During the review period, there were 12 EOP inmates who had their classification points reduced.  Seven of the inmates had their points reduced at twelve months and five inmates had their points reduced at six months.

Placement of 3CMS inmates in Minimum Support Facility:

There were no 3CMS inmates housed in the MSF at Folsom.

*Coleman* Postings:

*Coleman* postings in English and Spanish were found in all housing units toured by the monitor, including the FWF.  All postings were placed in common areas accessible to *Coleman* class members.

**Pelican Bay State Prison (PBSP)**
May 17, 2016 – May 19, 2016

Census:

On May 16, 2016, PBSP housed 2,137 inmates, for a 19-percent decrease from the census reported during the preceding site visit.  The mental health caseload population of 313 represented 15 percent of the total inmate population.

Ten inmates were in the MHCB.

There were 79 EOP inmates, including one pending transfer to an administrative segregation hub, and seven housed in STRH.  The 215 3CMS inmates included 35 housed in STRH.

202

The administrative segregation population totaled 98.

The SHU housed 478 non-mental health caseload inmates.  Nine inmates were in the PSU.

Staffing:

The chief psychiatrist position was vacant.  Positions for both chief psychologists and all four senior psychologists were filled.

PBSP had five established psychiatry positions, comprised of three on-site positions and two FTE telepsychiatry positions.  In May 2016, one psychiatrist was on staff, a 0.5 positon was filled through registry and 1.5 FTE telepsychiatry services were provided, leaving two psychiatry vacancies, resulting in a functional vacancy rate of 40 percent for psychiatry.

Eleven of 16 psychology positions were filled, for a 31-percent vacancy rate.  One psychology contractor reduced the number of psychology vacancies to four and decreased the psychology functional vacancy rate to 25 percent.

All five social worker positions were filled.

Although all five recreation therapist positions were filled, two recreation therapists were on long-term sick leave during the review period.

All three senior psych tech positions were filled.  Twenty-one of 24.8 psych tech positions were filled, for a 15-percent vacancy rate.  The use of one contract psych tech decreased psych tech vacancies to 2.8 and reduced the functional vacancy rate to 11 percent. Five of six MHSDS registered nurse (RN) positions were filled, for a 17-percent vacancy rate.

The HPS I position was filled, but the Correctional Health Services Administrator II (CHSA) position was vacant.

Five of six MHSDS clerical positions were filled, for a 17-percent vacancy rate.

Quality Management:

      The regional mental health team conducted a major sustainability review during December 1, 2015 – December 3, 2015 and a minor sustainability review during March 16, 2016 – March 17, 2016.

      The major sustainability review included an examination of case reviews.  It indicated concerns with how subjective findings and inconsistencies adversely affected the process, disagreements as to what constituted acceptable documentation, and the accuracy of the run dates for data.  The minor sustainability review included trainings for treatment planning and IDTT meetings.

      The CEO chaired the local governing body, which met quarterly and attained quorums. Addressed issues included health care-related operations and staffing.

      The quality management committee met regularly, kept minutes, and achieved quorums. It reviewed mental health dashboard data and matters forwarded by the mental health subcommittee.

      The chief of mental health chaired the mental health subcommittee, which met monthly, but typically did not have a quorum.  Addressed items included key indicators, 3CMS inmate group waitlists, EOP inmate treatment compliance, and a telepsychiatry QIT.

      Three QITs operated during the review period.  Two focused on EOP inmates, including treatment hours, groups, and yard; the third addressed telepsychiatry.

      The statewide peer review process was implemented for psychiatrists, psychologists, and social workers, and met the timeframes as indicated.  PBSP was paired with SCC for peer review.  According to the data provided, peer review findings for all three disciplines ranged

from acceptable practices to met/exceeded standards.  Peer review assessments did not reveal any problematic practices/trends.

PBSP was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine and antidepressants.

PBSP reported noncompliance for all psychiatry measures during the review period. PBSP's psychiatry shortage was cited as the reason for noncompliance.  Clozapine was not authorized for use at PBSP.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

PBSP reported compliance with continuity of medications for inter-institutional transfer at R&R and intra-institutional transfers to ASU/SHU/PSU.  Continuity of medications for

discharge/transfer from a community hospital and/or DSH was measured for two months, with zero-percent compliance reported for October 2015 and 100-percent compliance reported for December 2015. Continuity of NA/DOT medications with intra-institutional transfers was noncompliant throughout the review period, with monthly scores ranging from 52 to 70 percent. Compliance scores for continuity of medications for MHCB transfers ranged from 62 to 88 percent, and averaged 79 percent for the review period. Staff attributed low compliance scores to high inmate refusal rates and/or small sample sizes.

Compliance averaged 92 percent for psychiatrist/MH mid-level prescribed medication; PBSP reported scores of 80 and 85 percent for January and February 2016. PBSP reported compliance with PC 2602 involuntary medications and urgent medication referrals for no-shows and refusals and medication administration for psychiatrist-prescribed outpatient provider new medication orders.

During the review period, one inmate was initiated on PC 2602 involuntary medications; there were 21 renewals; one inmate's medications were allowed to expire and there were no petitions denied or withdrawn.

The chief nurse executive reported that pill lines were not long and had no impact upon patient care.

There were 582 inmates who received HS medications. The medications were administered after 8:00 pm.

Transfers:

PBSP referred 29 inmates to DSH during the review period. Three referrals were rescinded; the remaining 26 were accepted by DSH. There were 164 instances of IDTTs considering but not referring inmates to a higher level of care. The DSH referral log was

generally up-to-date and contained required information.  The DSH coordinator received email notifications of DSH discharges.  Discharge summaries were posted on SharePoint, were legible and contained useful information.

There were 20 referrals to acute care; two were rescinded.  Nine of 18 or 50 percent of acute care transfers were timely.  At the time of the site visit, there were two inmates awaiting transfer to acute care; both were within transfer timelines.

There were nine intermediate care referrals; one was rescinded.  Seven of eight or 88 percent of intermediate care transfers were timely.  At the time of the site visit, there were three inmates awaiting transfer to intermediate care; one was beyond transfer timelines.

There were five *Vitek* hearings; none of the inmates prevailed.

There were 150 MHCB referrals during the review period; 35 were rescinded.  The institution did not provide complete information regarding bed assignments and transfer timelines for all non-rescinded referrals.  Staff reported that the institution did not meet transfer timelines for MHCBs primarily due to bed unavailability.

There was 79-percent compliance for timely transferring inmates to administrative segregation EOP hubs.  Transfers averaged 2.3 days overdue.

There were 21 inmates transferred to mainline EOP programs during the reporting period. Transfers averaged one day overdue.

Other Issues:

MHSDS Inmates in Administrative Segregation:

The same PBSP unit housed administrative segregation, non-disciplinary segregation, and STRH inmates.  Custody staff reported that the mixing of these three populations made it a challenge to track the requirements of each population's treatment.

There were 20 administrative segregation 3CMS inmates whose segregation stays began after October 2, 2015 but before March 31, 2016.  Their stays ranged from 39 to 129 days.  Six stays exceeded 100 days.

Between October 1, 2015 and December 31, 2015, there was 100- and 92-percent compliance for initial and routine psychiatry appointments, respectively.  For PC contacts, PBSP reported 91-percent compliance for initial contacts and a compliance rate of 98 percent for routine contacts.  There was 100-percent compliance for initial and routine IDTT meetings and IDTT meeting attendance of required staff.

MHCB:

PBSP had ten MHCBs.  At the time of the site visit, all ten beds were occupied and seven inmates' stays exceeded ten days.

The chief of mental health supervised the MHCB, which also had a full-time senior psychologist supervisor.  Two PCs were assigned to the unit.

During the review period, ten inmates had three or more MHCB admissions; nine were housed in administrative segregation or the PSU prior to MHCB admission.

For psychiatry contacts, there was 95-percent compliance for initial contacts and 83-percent compliance for routine contacts.  For PC contacts, there was a compliance rate of 82 percent for initial contacts and 94-percent compliance for routine contacts.  The MHCB contained confidential space for clinical contacts.

There was 80-percent compliance for initial IDTT meetings and 96-percent compliance for routine IDTT meetings.

Logs indicated that MHCB inmates were given daily recreation and television time.

208

Seclusion and Restraint:

There were no incidents of seclusion or restraint during the review period.

Alternative Housing:

The institution reported 31 alternative housing placements during the review period; all were timely removed.  PBSP used the observation cell, the seclusion cell, and nine medical beds for alternative housing; as a last resort, five cells in the specialty clinic were also available.  All alternative housing inmates had one-to-one observation.  During the week, clinical staff managing alternative housing inmates were inmates' PCs; MHCB staff oversaw these inmates on weekends.

Short-Term Restricted Housing:

PBSP initiated a STRH program on December 28, 2015.  Overall, the unit appeared to have had a difficult initial implementation, but by the time of the site visit was demonstrating signs of improvement.  Leadership was advised to focus on ensuring and maintaining buy-in from the inmates as well as staff concerning the potential benefits of the program and improving communication between staff and inmates and mental health and custody.

At the time of the site visit, three clinicians were assigned to STRH, as was one part-time psychiatrist who provided services via telemedicine.  The three PCs assigned to STRH had caseloads of 13 to 14 inmates each.  The psychiatrist covered both the STRH and 3CMS programs and had a caseload of 156 inmates.  It was reported that once a new psychiatrist was oriented, he would assist in providing in-person treatment for inmates who were high refusers of services and/or required assessment for possible PC 2602 involuntary medications proceedings. A senior psychologist was temporarily overseeing the program.

209

Staff reported that higher level management had planned the STRH program's opening, but that planning had not filtered down to direct supervisors or line staff, resulting in disjointed implementation.  Custody staff were also unaccustomed to having mental health caseload inmates in the stand-alone administrative segregation unit.  Moreover, prior to the STRH program's implementation, there was no need for group space in the unit; custody officers previously used the current group room as a break room.  The initial lack of escort officers resulted in inmates typically having prolonged waits to return to their cells after mental health appointments.  There were also periods during program implementation when STRH inmates were not offered daily yard and inmate property was not timely distributed.

Since the commencement of the STRH program, the average length of stay had been 88.2 days.

For the period of January 1, 2016 to March 31, 2016, PBSP reported compliance for both initial and routine psychiatry contacts.  All psychiatric appointments took place in a confidential setting.

There was 98- and 97-percent compliance for initial and routine PC contacts, respectively.  Most PC appointments were reported as having occurred in a confidential setting.

There was 91-percent compliance for initial IDTT meetings and a compliance rate of 100 percent for routine IDTTs.  There was 87-percent compliance for required staff attendance at IDTT meetings.  For IDTTs that did not meet compliance for required staff attendance, a psychiatrist was not present.

With regard to treatment space, there was one large group room with eight security desks, one of which was wheelchair accessible, a large conference room with a treatment module, and three offices with treatment modules.

For the time period of December 28, 2015 to January 31, 2016, STRH inmates were offered a total of 215 hours of structured treatment activities with an average of 2.56 weekly hours. They attended 184 hours for a weekly average of 2.19 hours. The weekly average number of group hours attended per STRH inmate averaged 1.5 in January 2016, 2.1 in February 2016, and 3.1 in March 2016. An observed clinician-led group revealed the group leader facilitating good discussion and interaction among group members.

Interviewed inmates expressed mixed reactions about the STRH program. They were positive as to the extra out-of-cell time, but reported difficulty adjusting to the STRH unit's configuration and to their cells. They also reported that property transfer had initially been slow and that telepsychiatry sessions were brief and rushed. The inmates also noted some issues concerning clinical-custody relations which were echoed by at least some staff as initially being of concern, although these frictions were reported by staff to have improved somewhat.

PSU:

The PSU was located in the B-2 housing unit, section C. Three PCs with caseloads of 15, 16, and 17 inmates respectively, provided services in the PSU as well as to EOP inmates. One psychiatrist covered the PSU in addition to the MHCB and EOP.

The average census during the review period ranged from seven in October 2015 to 15 in March 2016, with nine inmates housed in the unit at the time of the site visit. For inmates housed in the PSU at the time pre-site visit data was reported, lengths of stay ranged from 14 to 701 days.

PBSP reported noncompliance with initial psychiatry contacts at 82 percent and near compliance at 89 percent for routine contacts. However, data updated as of April 24, 2016

211

indicated that only half of initial and 79 percent of routine psychiatric contacts for inmates on modified programing were reported as timely.

There was 94-percent compliance for initial PC contacts and a compliance rate of 99 percent for routine PC contacts.

Overall, 83 percent of combined psychiatry and PC contacts were confidential.

Eighteen of 26 or 69 percent of comprehensive evaluations occurred prior to IDTTs. There was 95-percent compliance for initial IDTT meetings, and 100-percent compliance for routine IDTTs. Required staff attended IDTTs 83 percent of the time.

An observed IDTT meeting was held in an adequate room that contained two computers for staff use. Required staff were in attendance. There was generally sufficient clinical staff discussion and active custody participation. However, psychiatry participation was limited and hampered by the psychiatrist not having evaluated the inmate prior to the IDTT.

PBSP offered a weekly average of 10.86 hours of structured treatment; inmates attended a weekly average of 9.4 hours. For inmates on modified programming, a weekly average of 4.84 hours of structured treatment was offered, with inmates attending a weekly average of three hours. During the review period, none of the inmates on modified programing transitioned to full PSU programming.

PBSP reported in pre-site visit material that it had what was described as a "robust" process in place for reviewing inmates placed on modified treatment plans and that the modified plans incorporated suggestions from interdisciplinary discussions which included custody staff and attempted to understand factors which contributed to inmates' refusal to engage in mental health treatment. The facility recognized that this practice was "not compliant with current departmental policy and [was] an area that need[ed] improvement." The report that no inmates

212

transitioned to full programming indicated that this was an area which should be examined by the facility.

PSU groups addressed relevant topics.  They were led by psych techs, recreation therapists, and a RN, but not by clinicians.  Observation of a group for two inmates revealed the group leader making excellent use of a movie to stimulate participants' reactions and to reinforce therapeutic goals and objectives.

Significant changes to the PSU's BIP included more prompt delivery of inmate property, improving inmate access to personal entertainment appliances, and changing the way that RVRs affected inmates' level status.

Overall, PSU treatment space was more than adequate, particularly given the low census during the review period.

EOP:

EOP inmates were housed in Facility B3.  The EOP program had a capacity of 96 and housed an average of 90 inmates during the review period.  When the EOP census exceeded 100 inmates, Facility A was used for overflow, but there were no groups for these inmates.

The EOP psychiatrist had a caseload of 86.  Four PCs had caseloads of 13 to 16 inmates each.

There was 96-percent compliance for initial assessments.  For psychiatry contacts, there was 83-percent compliance for initial contacts and 84-percent compliance for routine contacts.  Ninety-nine percent of psychiatry contacts were confidential

For PC contacts, there was 99-percent compliance for initial contacts and 96-percent compliance for routine contacts.  Ninety-one percent of PC contacts were confidential.

Initial IDTT meetings were conducted timely 89 percent of the time.  There was 99-percent compliance for routine IDTT meetings.  Staff attended IDTT meetings 92 percent of the time; psychiatry had the highest absenteeism rate.

EOP inmates were offered 12.92 weekly hours of treatment and attended 10.35 weekly hours.  For EOP inmates on modified programming, an average of 7.91 weekly hours were offered and 3.68 weekly hours were attended.

EOP inmates were offered groups six days weekly.  Clinician and registered nurse-led groups addressed anger management, the human body, parole and release, and other issues.  Recreation therapists facilitated other groups.

 A parole and release group was observed during the site visit.  Inmates engaged in discussing the group's advantages and the benefits of changing cultures and thought processes.  All group participants were scheduled to parole within 18 months and were provided with individual resource packets.  Group participants reported benefiting from the mental health program and indicated that they knew their clinician, had good relationships with their psychiatrist and clinicians, and knew how to access services.  They also reported that their relationship with custody staff was between fair and poor, but did not elaborate.

Inmates reported that morning yard time was reduced due to custody not permitting inmates to go to yard until after EOP inmates were escorted to groups and that the EOP yard lacked urinals, water, and workout equipment.  They stated that they were only permitted to go to the law library on Sunday, which conflicted with religious services.  They further indicated not being allowed to use the library's restroom.

3CMS:

A clinician assigned to the 3CMS program on Facility A had a caseload of 121 inmates. A psychiatrist who covered Facilities A, B, and the STRH had a caseload of 156 inmates. Two PCs with caseloads of 26 and 33 inmates provided services to 3CMS inmates on Facility B.

For psychiatry contacts, PBSP reported 94-percent compliance with initial contacts and 77-percent compliance with routine contacts. Staff reported that noncompliance was due to a large number of trainings during the review period and limited psychiatry staff, including telepsychiatry.

There was 90-percent compliance with initial PC contacts and 100-percent compliance with routine PC contacts.

Ninety-seven percent of all appointments scheduled in the 3CMS program during the review period were confidential.

For IDTTs, there was a compliance rate of 77 percent for initial IDTT meetings and 97 percent for routine meetings. There was 82-percent compliance for required staff attending IDTT meetings; psychiatrists had the highest rate of absenteeism.

There had been no group treatment for 3CMS inmates at PBSP since May 2014. PBSP reported that groups for 3CMS inmates were scheduled to begin no later than August of 2016.

Interviewed 3CMS inmates reported a positive relationship with clinicians. They reported that telepsychiatry was impersonal and there often were technical problems with the television screen. Many indicated not understanding the role of the medical assistant. The inmates reported that if they felt a need to speak with a clinician the same day, they were told they had to put in a sick slip and wait a week or longer, or say they were suicidal.

215

Case-by-Case Reviews:

Three 150-day case-by-case reviews were conducted during the review period, resulting in two inmates being released from segregation.  A review of documentation provided by the institution reflected that PBSP conducted case-by-case reviews within policy.  The institution tracked cases due for review and reviews were conducted timely.

Non-Disciplinary Segregation:

On May 17, 2016, PBSP housed 21 NDS inmates, of which two were EOP, seven were 3CMS, and 12 were general population inmates.  At the time of the site visit, reviewed documentation confirmed that NDS inmates received approved property and privileges.

Referrals:

PBSP reported 96-percent compliance for timely responding to 1,238 mental health referrals.  There was 100-percent compliance for timely responding to emergent referrals, 97-percent compliance for timely responding to urgent referrals, and 97-percent compliance for timely responding to routine referrals.

EHRS/MHTS.net:

PBSP staff attended training for EHRS implementation in October and November 2015.

Mental Health/Custody Relations:

Overall, the relationship between mental health and custody staff was evolving into a cooperative one.  However, STRH implementation had been disjointed, impacting mental health and custody staff, and their interactions.

Heat Plan:

PBSP reported that there were no days during the review period that required activation of the heat plan.  Document review revealed that the institution generated a weekly list of

216

inmates who were prescribed heat risk medications and also maintained heat logs, which were forwarded to headquarters.

Lockdowns/Modified Programming:

Two program lockdowns occurred during the reporting period. The lockdowns did not interrupt mental health operations.

Pre-Release Planning:

PBSP reported that paroling inmates were identified through SOMS based on their Estimated Parole/Release Date (EPRD) 120 days prior to release; a TCMP contractor subsequently identified inmates for benefit assistance eligibility. However, unless an inmate received his benefit card prior to prison release, the outcomes of benefits' applications were typically unknown. A RN assigned to the EOP program also conducted a weekly parole planning group.

Access to Care:

A review of PBSP's monthly Health Care Access Quality Reports from October 1, 2015 through March 30, 2016 indicated that one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while ten percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

On April 4, 2016, PBSP reported that of 530 available employment positions, 12 or ten percent of EOP inmates held them, as did 51 or 24 percent of 3CMS inmates, and 467 or 25 percent of non-mental health inmates.

217

Of 62 vocational education assignments, 11 or five percent of 3CMS inmates had such assignments, as did 51 or three percent of non-MHSDS inmates.

Of 636 voluntary education assignments, 22 or 19 percent of EOP inmates had them, as did 40 or 19 percent of 3CMS inmates, and 574 or 30 percent of non-mental health inmates.

     b.   Milestone Credits:

On April 22, 2016, 20 of 96 EOP inmates were eligible to earn milestone credits, of which 75 percent earned them.  Thirty-one of 250 3CMS inmates were eligible to earn milestone credits, of which 32 percent earned them.

Of 1,549 non-MHSDS inmates, 1,035 were eligible to earn milestone credits, with 14 percent earning them.

     c.   Out-of-Level Housing:

On May 3, 2016, PBSP did not house Level I or Level II MHSDS inmates.  There were three 3CMS Level III inmates in Level IV housing.

     d.   ADA Reasonable Accommodation and Grievance Procedures:

PBSP provided confirmation of implementation of revised ADA accommodation and grievance procedures in the form of appeals documentation.  Documentation indicated that training had been conducted in June 2015.

     e.   Periodic Classification Score Reductions: EOP Inmates:

Review of a sample of completed CDCR 840s confirmed that EOP inmates were granted classification score reductions for successful programming.  However, some of the reviews were only conducted annually.

*Coleman* Postings:

All toured housing units contained the current *Coleman* posting.

**Mule Creek State Prison (MCSP)**
November 15, 2016 – November 17, 2016

Census:

On November 14, 2016, MCSP housed 3,535 inmates, for a 20-percent increase from the census reported during the preceding monitoring period. There were 2,085 inmates on the mental health caseload, which had increased by 19 percent since the preceding monitoring period and comprised 59 percent of the total inmate population.

The MHCB unit housed eight inmates and there were two inmates in alternative housing.

There were 732 mainline EOP inmates, and 64 EOP inmates housed in the administrative segregation EOP hub, including four inmates who were designated NDS status.

There were 1,238 3CMS inmates in mainline, and 41 3CMS inmates in administrative segregation, including two who were designated NDS status.

During February 2016, MCSP opened two new level II SNY yards with a capacity of 1,584 inmates, including 400 3CMS inmates and 264 EOP inmates. At the time of reporting, there were 253 3CMS inmates and 173 EOP inmates housed in the additional yards.

Staffing:

The one chief psychiatrist position, and two chief psychologist positions were filled. There were nine senior psychologist supervisors at MCSP; the institution was allocated 7.5 positions. All eight senior psychologist specialist positions were filled.

MCSP had 18 established psychiatry positions – 15 on-site and three telepsychiatry. Of the 15 on-site positions, seven were filled by state staff and 7.3 by registry staff. All three telepsychiatry positions were filled, resulting in a four-percent functional vacancy rate for psychiatry.

There were 50 established staff psychologist positions. Of those, 36.5 positions were

219

filled for a 27-percent vacancy rate.  An additional 2.3 registry staff reduced the psychology functional vacancy rate to 22 percent.

The one supervising social worker position remained filled.  There were 23 established social worker positions; all positions were filled and an additional three registry staff was utilized.

Both senior psych tech positions remained filled.  There were 49.54 established psych tech positions; of those, 45 were filled, for a nine-percent vacancy rate.  Three registry staff reduced the functional vacancy rate to three percent.

There were 25 established recreation therapist positions, of which 22 were filled for a 12-percent vacancy rate.  With the use of a 0.8 FTE contractor, the functional vacancy rate reduced to nine percent.

The one supervising RN II position remained filled.  There were 13 established RN positions.  Of those, ten positions were filled for a vacancy rate of 23 percent.  Of the 26 established mental health clerical positions, 22 were filled, resulting in a vacancy rate of 15 percent.

Quality Management:

MCSP had an active quality management in place during the review period.  Minutes from quarterly local governing body meetings indicated a quorum was met at each, and the focus was on the CTC, including reviewing and approving the CTC's policies and procedures and attending to capital and fiscal matters.

The quality management committee met monthly and minutes indicated that a quorum was always met.  The quality management committee addressed all areas of health care including reviewing minutes and reports of the mental health subcommittee.

220

The mental health subcommittee met once or twice a month during the review period, and quorums were achieved each time.  Agenda topics covered all areas of mental health care, and minutes indicated the meetings were informational with appropriate and thoughtful discussion.

A review of MCSP's self-audit reports from May and September 2016 revealed that both reviews resulted in 14 distinct CAPs.  The September report failed to include any follow-up or status reports regarding areas that were identified as needing a CAP in May or explain why they were excluded.  For CAPs that were consistent in both reports, the sole solution to address minimal improvement, no improvement, or reduced performance was to train staff.

MCSP had one QIT, Quality Management Compliance, which was activated on July 20, 2016 and remained active during the site visit.  It was chartered to ensure sustainability of performance report measures (mental health referrals, EOP treatment hours scheduled, SREs, and discharge follow-ups).  Minutes reflected identification of factors that contributed to noncompliance and identified action items were usually resolved in a timely manner.

An administrative segregation EOP FIT was active at the time of the site visit. Membership was multidisciplinary and included custody and mental health staff, although custody staff was not routinely present, which would have been useful in resolving issues.

Joint peer review committee meetings for psychologists and social workers occurred during the review period.  MCSP was paired with CSP/LAC for peer review.  Although MCSP's local operating procedure indicated that each discipline should be separate, reviewed peer review reports revealed this was not the case.  Documentation indicated that peer reviews were completed for 12 psychiatrists, 15 psychologists, and nine social workers, all of which met or exceeded expectations.  Psychiatrist peer reviews were conducted by the statewide psychiatry

221

peer review coordinators and communicated to a MCSP staff psychiatrist who then communicated results to staff.   Psychologists and social workers received results by email. MCSP reported that peer reviews were not completed for the remaining staff, 14 psychologists and seven social workers, as they were not licensed.

MCSP was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

Diagnostic monitoring for treatment with psychotropic medications showed 97 percent compliance.  MCSP was authorized as a Clorazil (clozapine) maintenance institution.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

MCSP was noncompliant with continuity of medications for all categories of transfers

during the review period, ranging from 39- to 80-percent compliance.  Medication compliance

for the psychiatrist prescribed medications was at 98 percent.  Compliance for PC 2602

involuntary medications was at 86 percent.  Medication compliance for urgent medication

referrals for no-shows and refusals was at 62 percent.

During the review period, there were three initial PC 2602 orders, 21 renewal orders,

three orders that were not pursued by staff, and five orders in which the inmate transferred or

paroled prior to his PC 2602 court date; no cases were not pursued by advice of counsel.  There

were no use of force incidents related to medication noncompliance during the review period.

There were reports of long pill lines, at times lasting for at least one hour on all yards.

During the review period, there were approximately 555 HS medications administered

per policy.  The HS medications were administered after 8:00 p.m.

<u>Transfers</u>:

During the review period, MCSP considered 654 inmates for DSH placement, of which

19 or three percent transferred to DSH.  Of the ten inmates transferred to acute care, three or 30

percent transferred within ten days of referral.  Nine or 90 percent transferred within 72 hours of

bed assignment.  During the site visit, there were two inmates awaiting transfer to acute care; one

had been waiting for five days due to lack of an available bed, and the other for one day.

Of the nine intermediate care referrals, six or 67 percent transferred within 30 days.  At

the time of the site visit, there were five inmates awaiting transfer to intermediate care beds.  The

inmates had been on the wait list for 12, 14, 41, 55 and 59 days due to a lack of available beds.

Three *Vitek* hearings were held; for all, the outcome was to continue with the referral.

All but one of the inmates transferred to DSH were designated complex medical cases.

MCSP referred 434 inmates to MHCBs during the review period; 50 percent transferred

223

to a MHCB within 24 hours. The remaining 50 percent were placed in alternative housing; transfer delays beyond the 24-hour timeframe ranged from hours to seven days. Delays were attributed to a lack of available MHCBs.

Five inmates transferred to a PSU during the review period; each transferred timely.

There were no delays in placing EOP inmates in MCSP's EOP administrative segregation hub.

There were no inmates transferred to LTRH or STRH during the review period. At the time of the site visit, one inmate was awaiting transfer to STRH; none were awaiting LTRH placement.

Inmates whose level of care increased to EOP while at MCSP were not immediately moved to the EOP housing unit. During the site visit, 39 EOP inmates were housed in a GP unit, as an overflow, awaiting an EOP bed. While housed in the overflow GP unit, the inmates received the full complement of EOP services, however, they had to attend yard, pill call, etc. with GP inmates. There were significant delays in transferring overflow inmates to overflow beds.

Other Issues:

Administrative Segregation EOP:

The assigned psychiatrist also carried 3CMS inmates on her caseload, and had a caseload of 66 inmates, which exceeded CDCR's clinical ratio for an EOP hub. The eight assigned PCs had caseloads of six to 12 inmates, which was compliant with CDCR's clinical ratio.

During the review period, the average length of stay for EOP inmates housed in administrative segregation was 31.4 days with a range of one to 184 days. Reviewed data revealed 67 or 24 percent of administrative segregation EOP inmates remained in segregation for

224

longer than 90 days during the review period.

Initial and routine psychiatry contacts were 99- and 100-percent compliant, respectively. PC contacts were also compliant with Program Guide timelines.  IDTT staffing and initial IDTTs were 100-percent compliant, while routine IDTTs were 99-percent compliant.

The monitor's expert observed IDTTs for four inmates, two of which were completed in absentia because of refusals.  The space was adequate.  The PC led the presentation of clinical data and treatment planning; the presentation varied by PC, ranging from excellent to adequate. A strength of the treatment team was the rapport staff had with the inmates.  The unit supervisor provided prompts for necessary information such as measurable goals, diagnosis, and level of care.

Treatment planning was an area in need of improvement.  The treatment team did not appear to adequately prepare for the IDTTs, for example, by failing to consult with one another on diagnosis prior to the IDTT in one case, and failing to routinely review eUHRs prior to IDTTs so that treatment planning was not based solely on the inmate interview and their present clinical impressions.  In some instances, staff did not address or even consider the clinical indications underlying a behavior.  The treatment team repeatedly discussed goals of decreasing inappropriate use of MHCB admissions by inmates for non-clinical reasons, however, they did not discuss or consider treatment goals such as distress tolerance or coping skills to address the problem.  In addition, discussion of group referrals was minimal considering that groups are the predominant mode for providing mental health care in the unit.

Negative observations for one inmate included inadequate treatment and pre-release planning despite his upcoming release date, a failure to consider risk of harm when it was clearly warranted, inadequate review of Form 7388-B criteria, and failure to provide clear rationale for

225

the change in level of care.  In another case, the IDTT failed to refer an inmate to intermediate

care despite the presence of sufficient clinical factors; the referral was ultimately completed after

intervention.

It was clear from observing the IDTTs and subsequent reviews of mental health records,

including Form 7388-B, that case conceptualization, identification of measurable treatment goals

for the inmate's needs, coordinated diagnostic formulation, rationale for level of care decisions

and referrals to higher levels of care required ongoing training, supervision and attention as areas

for quality improvement.

As to the provision of ten hours of weekly group therapy for EOP hub inmates and five

hours of weekly group therapy for the 57 EOP hub inmates on modified programming during the

review period, an average of 13.1 weekly hours were offered, of which 6.6 hours on average

were attended, and an average of 6.5 hours were refused.  Cancellations were at four percent.

During the review period, 57 inmates were on modified programming.  A review of

treatment plans in five randomly selected health care records indicated that reducing treatment

refusals and restoration to full programming were rarely included in the clinical summary or

identified as treatment goals with a corresponding intervention.  At the time of the site visit, nine

inmates were on modified programming.

MCSP facilitated six groups per weekday.  During the site visit, two morning groups

were canceled.  Discussions with staff indicated that groups were cancelled due to low

attendance.  Staff reported that refusals were typical in the morning, due to cooler weather which

was the case on the day of the site visit.  Another challenge was that yard conflicted with group.

The Cognitive Behavioral Therapy (CBT) for Emotional Difficulties group was observed.

Initially two inmates were in attendance; two inmates arrived late and one left, resulting in a total

of three inmates present for the group.  Two of the inmates arrived late from yard.  While it was a positive practice that inmates did not have to choose between yard and group, late arrivals and early departures were very disruptive to the discussion, as was the distribution of medication by the nurse.

At the urging of the attendees, a portion of the group's time was used to conduct inmate interviews.  Generally, the inmates reported being satisfied with the groups, contingent on the group leader, and specifically liked recreation groups.  All three inmates disclosed very negative experiences about other aspects of the program, including poor or improper responses to self-injurious behaviors, failure to escort inmates back to group after they used the restroom, custody staff talking negatively and unprofessionally about or directly to inmates, and psych techs telling inmates to submit written requests if they wanted to see mental health clinicians.

MHCB:

MCSP maintained a full-capacity eight-bed MHCB.  One psychiatrist and one PC were assigned with caseloads of eight inmates, which was within established clinical ratios.  During the review period, there were 77 admissions for 74 inmates.  The average length of stay was 9.7 days with a range of two to 33.7 days.  Nearly 25 percent of admissions had lengths of stay longer than ten days (18.5 days on average).  Delays were largely due to a lack of available DSH beds, medication adjustments, and stabilization.

There were 50 inmates who had three or more MHCB admissions during the review period.

Readmission rates were reported at 87.6 percent.  MCSP began a pilot program where they implemented a Third Watch clinician for crisis intervention and evaluation, in part to determine if Third Watch admissions to the MHCB could be reduced through the provision of

227

crisis services.  Data provided from this pilot program indicated that 79 percent of Third Watch referrals did not require MHCB admission.  Without the Third Watch clinician those inmates would have otherwise been admitted to the MHCB.

There was 100-percent compliance for initial psychiatry contacts and 98-percent compliance for routine psychiatry contacts.  There was 97-percent compliance for initial PC contacts and 98-percent compliance for routine PC contacts.

Initial and routine IDTTs were timely at 91 percent and 100 percent, respectively. Multiple IDTTs were observed and all required members were present.  The treatment team interacted as a cohesive clinical unit, providing case conceptualization and addressing privileges. Overall, the treatment team functioned well and were generally meeting the treatment needs of their inmates.

The outdoor inner yard of the MHCB could be utilized for recreation therapy or individual clinical contacts.  There was no dayroom in the unit, and no yard log was maintained to document inmate outside yard use.

Seclusion and Restraint:

There were no incidents of seclusion or restraint during the review period.

Alternative Housing:

MCSP utilized eight alternative housing beds in unit C-13.  Five mental health staff were regularly assigned to alternative housing.  Staff reported that all clinical interviews were conducted in confidential treatment modules located in the unit.

During the review period, there were 434 alternative housing placements.  MCSP did not track the average daily census.  All inmates placed in alternative housing were awaiting MHCB transfer; 217 or 50 percent transferred within 24 hours of placement.  Delays were due to lack of

available MHCBs.

EOP:

MCSP had mainline EOP programs on three yards in addition to an overflow building. Staff reported that this use of inappropriate EOP housing was due to difficulties in placing Level IV EOP inmates. EOP inmates in overflow housing on A and B yards received full EOP programming.

Some MCSP psychiatrists exceeded CDCR's established clinical ratio of 1:97—two on-site psychiatrists had caseloads of 122 and 126 inmates and two telepsychiatrists had caseloads of 120 and 123 inmates. A third telepsychiatrist had a caseload of 88 inmates. A FTE on-site psychiatrist had a caseload of 81 inmates and a part-time on-site psychiatrist had a caseload of 40 inmates. The 32 PCs had caseloads of 17 to 27 inmates, which were within CDCR clinical ratios.

Initial and routine psychiatry contacts were at 91- and 73-percent compliance, respectively. Initial and routine PC contacts were compliant at 98 and 92 percent, respectively.

Seventy-eight percent of on-site psychiatric contacts occurred in a confidential setting, as did 83 percent of PC contacts.

Initial IDTT meetings were timely 98 percent of the time and routine meetings were timely 99 percent of the time. Audits on IDTT meeting attendance indicated noncompliance with the participation of the necessary disciplines at the meetings at 68 percent.

An observed EOP IDTT meeting on B yard included all necessary participants. The IDTT room was appropriate with sufficient space and privacy. The IDTT included discussion regarding consideration of referral to higher levels of care, appropriate treatment planning, and participation from most of the meeting participants.

Group therapy was conducted in EOP treatment facilities on the A, B, and D yards. The A and B yard EOP programs changed the length of groups from one hour to two hours to improve group participation. Regarding the provision of ten weekly hours of group therapy, an average of 12.4 weekly hours were scheduled, 11.4 hours per week were offered, 6.7 hours were attended, 4.6 hours were refused, and 1.0 hours were cancelled. Approximately 89 percent of inmates were scheduled, 78 percent were offered at least ten hours per week, 19 percent attended ten hours, six percent refused, and zero percent cancelled.

Regarding the provision of five hours of group treatment for EOP inmates on modified programming, approximately 79 percent were scheduled for at least five hours per week, 76 percent were offered, 42 percent attended, 35 percent refused, and one percent cancelled. EOP inmates on modified programming were on average scheduled for 8.7 hours per week, were offered 8.1 hours, attended 4.4 hours, refused 3.7 hours, and 0.7 hours were cancelled.

The monitor's expert interviewed attendees of the "EOP Meta-Cognition" and "Positive Psychology" groups on D yard. The groups had 12 and seven participants respectively. Although generally satisfied with their mental health care, the inmates expressed concern regarding their inability to re-enter their housing unit after group during days of excessive heat and inclement weather. This was reported to be a disincentive for group participation.

Inmates attending recreation therapy groups on A and B yards were interviewed. They reported favorable comments regarding their mental health treatment, and generally found staff to be helpful. Some higher functioning inmates expressed the desire to have more core group offerings, but in general, inmates spoke favorably about lengthy out-of-cell time (6:00 a.m. – 9:00 p.m.) which reportedly minimized conflicts and provided structure. Inmates offered consistent and troubling reports of some officers' behavior toward EOP inmates, including

housing officers who were disrespectful and threatening; officers who used abusive language; incidents of retaliation, such as unwarranted cell searches and excessive force; failure to respond to inmates' emergent and urgent mental health requests, even when provided in writing, unless inmates reported suicidal ideation; ducating issues that resulted in long waits in the rain; and scheduling conflicts with yard, canteen, showers, and group treatment.

The monitor's expert toured the new in-fill facility.  This facility was separate from the main facility with its own security perimeter, and it was comprised of D and E yards.  The D facility housed the D Yard EOP; EOP inmates were housed in Building 18.  The facility also included an EOP treatment building; this building included five group rooms, two IDTT rooms, offices for individual clinical contacts and numerous offices for staff.

Building 18 was also toured, and several EOP inmates were interviewed.  The building included four pods; each pod included two rooms for individual contacts and two large group rooms.  Interviews with housing officers and EOP inmates indicated that there were few complaints resulting from the housing of EOP inmates in the six man dormitories.  Although the unit had not yet reached full capacity, staff and inmates alike indicated that problems were dealt with quickly by staff.  Additionally, they indicated that a large number of activities and programming with out-of-cell time (cells opened at 6 a.m. and locked at 9 p.m.) minimized conflicts and provided structure for EOP participants.  Most of the EOP inmates interviewed expressed satisfaction with the treatment that they were receiving. They indicated that staff was generally helpful, with the exception of one officer on the third watch who they reported used abusive and derogatory language toward inmates.

3CMS:

MCSP activated a 3CMS Level II SNY in February 2016.  This yard had not fully

231

activated at the time of the site visit, and was at approximately 63 percent of the 3CMS capacity for the yard.  Staff reported that the activation of the yard generated an intense workload for mental health staff during the initial stage and resulted in reduced compliance rates for initial contacts and IDTT meetings.

Three psychiatrists assigned to the 3CMS program had caseloads of 293, 271, and 234, which exceeded CDCR's clinical ratio of 1:225.  Three other psychiatrists had caseloads of 155, 155 and 150 inmates.  The 13 PCs had caseloads with a range from 16 to 129 inmates, which were within CDCR's clinical ratio of 1:157.

Initial and routine psychiatry contacts were 84-percent and 91-percent compliant, respectively.  Initial and routine PC contacts were at 88 percent and 95 percent, respectively. Less than one percent of psychiatric contacts and five percent of PC contacts occurred in a non-confidential setting.  The primary reason for non-confidential PC contacts was staff decision. There was no further information provided as to what would cause the staff to make such a decision.

Initial and routine IDTTs were held timely 96 and 100 percent of the time, respectively. Due to staffing vacancies, attendance by psychiatrists was non-compliant at 70 percent.  MCSP reported that clerical data entry issues had resulted in the PC and CC I being incorrectly marked as absent.  MCSP management implemented a validation process to correct data entry errors; it was implemented in October 2016, just before the site visit.

Observed IDTTs varied in strength, but there were common threads observed in each of them.  Case conceptualizations were not all fully developed and complete.  Treatment plans were typically vague and/or incomplete, leaving ambiguity as to what the IDTT would be working on clinically with the inmate, what interventions would be utilized, and how the treatment team

would know when a clinical goal had been achieved.  There was also a lack of pre-release planning when indicated.  The CC I did not fully participate and referred one inmate to his assigned counselor rather than providing information that was available through SOMS.

Per the group schedule, at the time of the site visit, nine treatment groups were offered. There was one group on B yard, four on D yard and four on C yard, with no treatment groups offered on A yard.  Per staff report, six groups were facilitated by social workers and three by psychologists.  Topics included guided imagery, coping skills, transition, and moral recognition. An observed group was cohesive and well-facilitated.  Group members were extremely engaged and invested, and they found it to be meaningful and beneficial.

Access to mental health arose as an issue during inmate interviews and was confirmed by staff.  Inmates saw custody staff as an obstacle to accessing their clinicians.  Several inmates reported that they would not tell someone if they were in crisis because they felt that the "suicidal" process was degrading and punitive.  Inmates requested more treatment groups and increased frequency of PC contacts.  All inmates agreed that if clinicians held "open line" or posted walk-in hours when inmates could "drop in" without an appointment, it would eliminate these problems.  Staff reported feeling overwhelmed, understaffed, and unable to meet with their caseload based on clinical need, which they offered to inmates as the reasons they could not meet more frequently than 90 days when needed.

A cohort of transgender caseload inmates expressed several concerns regarding their care at MCSP and the lack of a provider who understood their individual needs.  Discussion with mental health management about those concerns, the validity of those concerns, and the recommendation for training occurred on-site.  These same inmates complained of insensitive and abusive behaviors toward them by custody staff, and requested additional training for

custody staff on working with transgendered inmates and issues specific to them.

Medical records indicated that there were issues with expired medications in 3CMS.

3CMS Inmates in Administrative Segregation:

The average length of stay in administrative segregation during the review period was 25.7 days for 3CMS inmates with a range from one to 127 days. The psychiatrist assigned to administrative segregation (including EOP and 3CMS) had a caseload of 66 inmates. The two assigned PCs had caseloads of 21 and seven inmates.

Initial and routine psychiatrist contacts were 100-percent compliant. Initial and routine PC contacts were 99-percent compliant.

Due to physical plant limitations, confidential clinical contacts were lacking; clinical contacts occurred at cell-front or in therapeutic modules on the unit. Of the 167 psychiatric contacts, 60 or 36 percent were standard non-confidential and 101 or 60 percent were cell-front. Ninety-five percent of non-confidential psychiatry contacts were due to refusals. Of the 814 PC contacts, 399 or 49 percent were standard non-confidential and 388 or 48 percent were cell-front; 80 percent of cell-front contacts were attributed to refusals.

The data provided by the institution indicated that between April and September 2016, 23 EOP and 12 3CMS inmates were in administrative segregation pending bed placement, and at the time of the site visit, seven inmates without a designated level of care were also in administrative segregation awaiting a bed. The institution was unable to provide complete data in this area because staff were unable to determine whether inmates were in administrative segregation solely awaiting bed placement, or if the inmate had been admitted to administrative segregation following a RVR, their time had expired, and they were awaiting a bed. Staff also reported that bed placement was also complicated by inmates who required specific bed

234

locations (i.e. lower bunk and/or tier).  Placing MHSDS inmates who were not designated administrative segregation status in administrative segregation housing pending bed placement was brought to the attention of the institution as a very serious problem that required remedy.

Case-by-Case Reviews:

MCSP conducted seven case-by-case reviews on EOP inmates during the review period, releasing one inmate and retaining the remaining six.  There were a few cases where the review exceeded 150 days by a few days.  EOP inmates housed in administrative segregation over 150 days were also reviewed by the Long Term Segregated Case Conference every 90 days or less per policy.  Reasons for retention were properly documented.

Non-Disciplinary Segregation:

MCSP reported there were 74 MHSDS inmates designated NDS status during the review period; 57 of the 74 inmates required expedited transfer.  Reviewed logs indicated only two inmates transferred timely.

The 17 inmates who did not require accelerated transfer were provided with property within two to 19 days if they had not already received it prior to NDS designation.  Property and privileges were being tracked in a custody logbook and on an electronic spreadsheet that was constantly updated by custody.

"C" Status:

During the site visit, there were 20 EOP inmates, 17 3CMS inmates, and eight non-MHSDS inmates on "C" Status.

Referrals:

MCSP reported 91-percent compliance for timely responding to 2,397 routine mental health referrals, 98-percent compliance for timely responding to 124 urgent referrals, and 100-

235

percent compliance for timely responding to 755 emergent referrals.

EHRS/MHTS.net:

MCSP was not expected to go live with EHRS until October, 2017; however, MHCB clinicians had been trained in EHRS at the time of the site visit.

Space:

There were significant space issues at MCSP that impacted access to treatment and confidentiality.  In the MHCB, there was one room available to hold IDTTs, individual clinical contacts and mental health office space.  Supervisory staff reported a floor-to-ceiling retractable partition had been approved and ordered to improve confidentiality.  Confidential space in EOP administrative segregation was lacking.  Moreover, inmates' refusals resulted in nearly all clinical contacts occurring in a non-confidential manner.  Staff reported that new treatment space in these areas was due to come online by the end of 2016 that would resolve these various space issues, and these reports were confirmed by observation of the new space.

Mental Health/Custody Relations:

During interviews, clinical staff from administrative segregation, EOP and 3CMS programs provided alarming information regarding cultural issues at MCSP.  A major area of concern was the disclosure of incidents that indicated a dangerous culture at MCSP, which was a reversal from the past when MCSP historically had a positive culture.  Staff disclosed incidents of custody staff harassing, teasing, antagonizing, and provoking inmates; clinical staff failing to consistently report inappropriate behaviors to their supervisors out of fear of retaliation; a lack of collaboration with custody staff, particularly with respect to facilitating groups on the new in-fill yard; and incidents of staff hazing.  Staff reported that some custody staff had been removed from posts and those that remained no longer engaged in inappropriate behavior in the presence

236

of mental health staff.  Staff also expressed a need for custody-mental health collaboration training.

Heat Plan:

There were 105 Stage I heat alerts during the review period, one Stage II alert, and no Stage III heat alerts.  Operable, accurate, and appropriately placed thermometers were observed in multiple toured housing units.  The monthly heat plan reports were provided for review. Temperatures were being appropriately documented.

The heat season was not in effect at the time of the site visit.

Lockdowns/Modified Programming:

A review of MCSP's program status reports revealed that one modified program occurred during the review period.

Pre-Release Planning:

MCSP provided pre-release planning, including screening and coordinating with community clinicians in the respective counties where the inmates were being released. Clinicians reported receiving pending release dates.  Psychiatrists involved in pre-release planning ordered a month's supply of the inmate's prescribed psychiatric medications and delivered it to the inmate on his parole date.  Pre-release planning groups were provided weekly for one hour to EOP inmates that were within twelve months of their release date.  There were three different groups, one occurring in each EOP yard.  The institution reported that inmates requiring TCMP services were appropriately identified and provided services.

Access to Care:

A review of MCSP's monthly Health Care Access Quality Reports from April 2016 through September 2016 indicated that on average 1.77 percent of issued mental health ducats

and add-on appointments were not completed due to custody factors, while 7.46 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a. Job and Program Assignments:

On October 25, 2016 MCSP reported that of 1,662 available jobs, 119 or 15 percent of EOP inmates held positions, as did 667 or 53 percent of 3CMS inmates and 876 or 60 percent of non-MHSDS inmates.

Of 650 academic assignments, 219 or 27 percent of EOP inmates held assignments, as did 210 or 17 percent of 3CMS inmates and 221 or 15 percent of non-MHSDS inmates.

Of 109 vocational education assignments, six or one percent of EOP inmates held assignments, as did 54 or four percent of 3CMS and 49 or three percent of non-MHSDS inmates.

Of 668 voluntary education assignments, 53 or seven percent of EOP inmates held assignments, as did 264 or 21 percent of 3CMS and 351 or 24 percent of non-MHSDS inmates.

b. Milestone Credits:

As of October 13, 2016, MCSP reported that 165 of 805 EOP inmates were eligible for milestone credits.  Among those 165 inmates, 18 percent earned milestone credits.  For the 1,264 3CMS inmates, 143 were eligible to earn milestone credits; 14 percent earned them.

Of the 1,464 non-mental health caseload inmates, 180 were eligible to earn milestone credits; 32 percent of these inmates earned the credits.

c. Out-of-Level Housing:

On October 28, 2016, there were 11 EOP and 18 3CMS Level II inmates in Level I housing, as well as one 3CMS Level III inmate.  There were seven 3CMS Level I inmates in Level II housing, along with 94 EOP and 180 3CMS Level III inmates.  There were three EOP

and one 3CMS Level II inmate in Level III housing, along with 16 EOP and 19 3CMS Level IV inmates.  There were also 35 EOP and 47 3CMS Level III inmates in Level IV housing.

     d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

MCSP provided copies of training materials, attendance sheets, and completed appeals as confirmation of implementation of revised ADA accommodation and grievance procedures.

<u>Placement of 3CMS Inmates into Minimum Support Facilities</u>:

During the reporting period, seven 3CMS inmates transferred to MCSP from other institutions for placement in its minimum support facility; MCSP referred one of its 3CMS inmates for placement in a minimum support facility; and one GP inmate's level of care was increased to 3CMS while housed in MCSP's minimum support facility.

<u>Compliance with In-Cell/Private Unclothed Body Search Policy</u>:

MCSP was not compliant with conducting private, unclothed body searches.  Staff reported that such searches do not typically occur in-cell, and that they regularly conducted these searches in non-confidential/transparent holding cells when the surrounding cells were occupied.

<u>Elimination of Management Cell Status</u>:

Institutional staff reported that Management Cell Status was no longer in use at MCSP, and had been discontinued a year before the site visit.

<u>*Coleman* Postings</u>:

In general, MCSP was compliant with display of inmate-accessible *Coleman* posters in both English and Spanish in the various housing units observed during the site visit.

## Sierra Conservation Center (SCC)
July 26, 2016 – July 27, 2016

Census:

On July 26, 2016, SCC's total inmate population was 4,325, largely unchanged since the preceding monitoring period.  The mental health population of 481 inmates decreased by 25 percent, accounting for 11 percent of the total inmate population.

There were four mainline EOP inmates awaiting transfer.  The 3CMS population included three inmates housed in administrative segregation and 474 mainline inmates.

The administrative segregation unit census was 57, including the 3CMS inmates reported above.

There were 18 inmates designated NDS; two were 3CMS inmates.

Staffing:

The senior psychiatrist position was filled.  One of the two chief psychologist positions was filled but the other was kept open pursuant to a cost-saving directive from mental health headquarters.  The three senior psychologist positions were filled.

Two of three staff psychiatrist positions were filled, leaving a 33-percent vacancy rate.

Four of five staff psychologist positions were filled, resulting in a 20-percent vacancy rate.

Three of five social worker positions were filled for a 40-percent vacancy rate; one contractor was used, reducing the functional vacancy rate to 20 percent.

The five psych tech positions and one recreation therapist position were filled.

Four office technician positions and a 0.5 HPS I position were filled.

SCC utilized four unlicensed social workers.

240

Quality Management:

The quality management committee met monthly during the review period; the CEO served as chairperson.  Minutes were maintained.  Documented discussions included, but were not limited to:  the monthly mental health subcommittee report, mental health census, performance measures, mandatory and elective mental health trainings, administrative segregation pre-screens and reports from regional executive staff.

The mental health subcommittee also met monthly during the review period.  The subcommittee was chaired by the chief of mental health or designee and a quorum was regularly achieved.  Minutes were maintained and approved monthly.  Topics discussed included:  mental health trainings and percentage of completion, RVR mental health assessments, chart audit tool, SREs, five-day follow-ups, peer review process (when applicable) and Suicide Prevention and Response Focused Improvement Team (SPRFIT) meeting reports, among others.

According to the chief of mental health, information from the quality management committee, mental health subcommittee and SPRFIT meetings were disseminated to line staff during the weekly mental health staff meeting.

There was one QIT that was chartered in April 2013 and completed February 2016.  The QIT looked at low compliance with the administrative segregation pre-screening tool.

The statewide peer review process was implemented and three psychiatrists, four psychologists and one social worker participated.  SCC was paired with PBSP for peer review. The review period was June 2015 through June 2016.  The psychiatrist peer review covered timeliness of appointments, formulary prescribing practices, clinical documentation and medication side effects.  Psychologist peer review areas included, documentation, legibility and

treatment plans.  One of the four psychologists failed to meet the standard of care in the category

of legibility.  The social worker peer review results were not available at the time of the site visit.

SCC was not a test prison for CDCR's CQIT during the monitoring period.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were

effected through a statewide memorandum.  Psychiatry measures evaluated compliance of

laboratory testing and other tasks related to inmates on psychotropic medications and were

audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics,

Depakote, lithium, carbamazepine, Lamictal, clozapine and antidepressants.

SCC reported 100-percent compliance with all applicable psychiatry measures.

Clozapine was not authorized for use at SCC.

The remaining measures were audited monthly and were related to continuity of

medications, medication compliance, and medication administration.  Continuity of medications

was measured within the following categories:  inter-institutional transfer at R&R; NA/DOT

medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-

institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital

and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed

medications, PC 2602 involuntary medications, and urgent medication referrals for no-shows and

refusals (Clozaril).  Medication administration was measured for outpatient provider new

medication orders for psychiatrist-prescribed medications.

SCC reported compliance of 90 percent and above for all applicable continuity,

compliance, and administration measures.

242

SCC reported that no PC 2602 involuntary medications petitions were initiated or renewed during the review period.  At the time of the site visit, there was one inmate with a PC 2602 involuntary medications order pending transfer to an EOP program.

There were no reported problems with long pill lines.

There were 13 inmates who received HS medications.  Inmates prescribed HS medications received them after 8:00 p.m.

Transfers:

There were no referrals to DSH during the review period.

There were 49 referrals to outside MHCBs, seven or 14 percent were rescinded.  Of the 42 remaining referrals, 23 or 55 percent were not timely transferred due to a lack of available beds.

Five EOP inmates, or 100 percent were timely transferred to an administrative segregation EOP hub.

There were 12 inmates referred to mainline EOP programs.  Of those, seven or 58 percent were transferred during the review period.  There were four pending transfers at the time of the site visit; three or 75 percent were within the transfer timeframe.

There were no transfers to STRH, LTRH or the PSU during the review period.

Other Issues:

MHSDS Inmates in Administrative Segregation:

SCC's administrative segregation unit remained in C-2 and had a capacity for 200 inmates.  At the time of the site visit, two PCs assigned to the Facility C 3CMS program with caseloads of 25 inmates each, also covered administrative segregation.

243

On July 26, 2016, there were 57 inmates housed in administrative segregation, including 54 general population inmates and three 3CMS inmates.  From December 2015 through June 25, 2016, the average length of stay for general population inmates was 76 days, for 3CMS inmates 18 days (with a range of two to 59 days) and for EOP inmates seven days (with a range of one to 25 days).  There were no EOP inmates held in administrative segregation longer than 90 days.

Initial and monthly psychiatry contacts were 100-percent compliant.  All psychiatry contacts were conducted in confidential settings.

SCC was compliant with initial and weekly PC contacts at 100 percent and 96 percent, respectively.  Sixty-six percent, or 112 of 169 contacts occurred in confidential settings.  The remaining 34 percent occurred at cell front.

Audits indicated 92-percent compliance for timely completion of initial IDTTs and 99-percent compliance for follow-up IDTTs.  Required attendance at IDTTs was 100-percent compliant.

Administrative segregation IDTTs were observed.  All required team members were present.  The inmate history was presented to the team without the inmate present.  Once the inmate arrived, clinically relevant information was discussed and included goals and treatment plans.  The Form 7388-B level of care criteria was not discussed nor was the reason for maintaining or changing the level of care.  The IDTT documents were signed prior to the beginning of the meeting and the meeting served more as a clinical summary than an IDTT.  The team dynamic was supportive and all intervened when needed.

Alternative Housing:

SCC used a ten-bed medical OHU for alternative housing.  One psychiatrist and one PC were assigned to provide services to alternative housing.

244

Three beds in the administrative segregation unit were used for alternative housing overflow.  There were no alternative housing stays in administrative segregation during the site visit.  During the review period, there were 43 inmates housed in alternative housing pending MHCB transfer.  Of those, 28 or 65 percent were transferred within transfer timelines.

Staff reported all inmates were on mandatory 1:1 watch due to the lack of suicide-resistant cells.

3CMS:

In the Facility B 3CMS program, the psychiatrist's caseload was 1:64; he also covered alternative housing.  Three PCs carried caseloads of 1:14 – 1:32 inmates each.  In the Facility C 3CMS program, the psychiatrist's caseload was 1:134.  Five PCs carried caseloads of 1:53 – 1:84.  Another two PCs in Facility C with caseloads of 1:25 also provided services in administrative segregation.

Psychiatrist contacts were 100-percent compliant for both initial and follow-up contacts.

SCC was 86-percent compliant with initial PC contacts and 100-percent compliant with follow-up contacts.

Initial IDTTs were conducted timely 87 percent of the time; follow-up IDTTs were timely 100 percent of the time.  Staff attendance at IDTTs was at 97-percent compliance.

For psychiatry, 98.8 percent of contacts were confidential.  Confidential PC contacts were at 99.6-percent compliance.

Groups were available for 3CMS inmates; the 12-week sessions ended just prior to the site visit.

Group interviews were conducted with 3CMS inmates.  All of the inmates were familiar with their PC and psychiatrist, understood their treatment plan, attended 80 to 100 percent of their assigned groups and understood how to access mental health care services.

Case-by-Case Reviews:

There were no case-by-case reviews during the review period.

Non-Disciplinary Segregation:

Ten MHSDS inmates were designated NDS during the review period.  Eight of the ten inmates were timely transferred.  At the time of the site visit, two MHSDS inmates were designated NDS; both received their property and privileges pursuant to CDCR policy.

"C" Status:

There were 19 inmates on "C" Status, including two 3CMS inmates.  A random review of seven of the inmates' case factors, including the two 3CMS inmates, found all were placed on "C" Status as a result of being determined by a classification committee to be a program failure due to multiple RVRs over a 90-day or 180-day period of time.  All "C" Status designations were for a specific period of time according to CDCR policy.

Referrals:

During the review period, there were 26 emergent referrals; 89 percent received a timely response.  There were 43 urgent referrals; 91 percent received a timely response.  Timely responses for the 705 routine referrals were at 97-percent compliance.

EHRS/MHTS.net:

Staff reported SCC had not converted to EHRS.  SCC was scheduled for training for trainers the second week of September 2016 and staff training was scheduled for September 26, 2016.  SCC was given a "go-live" date of November 15, 2016.

246

Space:

Staff reported multiple issues regarding clinical and treatment space at SCC.  In the main medical/OHU unit, four mental health clinicians shared clinical space designed for two.  Mental health clinicians also had access to a medical doctor's office when available.  Staff reported that mental health clinicians would be allocated an additional two offices in this area upon completion of the proposed construction set to start in December 2016.

In B Yard, two clinicians shared a corner cubicle.  In C Yard, five confidential treatment areas served eight clinicians.

Mental health staff used a group room in the chapel for self-help programs scheduled during the day and evening Mondays through Fridays.  Staff expressed concern that there was no custody supervision during those programs.

Mental health staff used a conference room shared with custody staff as a treatment area in administrative segregation.  The treatment modules were in the dayroom and subject to ambient noises.  Acoustical barriers and rolling tables were available to clinicians for noise abatement.

Mental Health/Custody Relations:

The relationship between mental health and custody staff was reported to be cooperative.

Heat Plan:

SCC was in compliance with the heat plan.  During the site visit, the heat plan was in operation.  Interviews with staff and inmates indicated knowledge of the heat plan.  Thermometers were properly positioned and working in all units toured.  Ice water was accessible to inmates.  Temperature logs were completed and forwarded to CDCR headquarters per policy.

Lockdowns/Modified Programming:

There was one lockdown during the review period.  A riot on January 8, 2016 resulted in a lockdown until January 12, 2016.  As a result, escort and clothed searches were required for all movement.  Visiting, recreation activities, canteen, packages and phone calls were also impacted.

Pre-Release Planning:

SCC did not provide any pre-release groups during the review period.

The institution reported that PCs began parole planning with inmates within six months of their release date being determined.  As part of the process, the PC completed required forms and forwarded them to the inmate's parole representative.

Access to Care:

A review of SCC's monthly Health Care Access Quality Reports from December 2015 through May 2016, indicated that 0.11 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 8.47 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Construction:

As reported above, re-modeling of the main medical clinic set to start in December 2016 would allow for additional mental health clinical space in the existing medical area once construction was completed.

During the review period, construction projects included spaces for pharmacy labs and pill lines.  The pill line on C yard was awaiting the fire marshal's approval.  At the time of the site visit, construction for pill lines on A and B yards was complete.  Staff reported there had been no interference with mental health programs during construction.

248

Program Access:

a.      Job and Program Assignments:

Institutional data indicated that of the 927 available jobs, two EOP inmates, or 67 percent of the EOP population held job assignments.  For 3CMS inmates, 243 or 49 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 682 or 18 percent of the non-MHSDS population held job assignments.

Of the 327 academic assignments, 66 3CMS inmates, or 13 percent of the 3CMS population, and 261 non-MHSDS inmates, or seven percent of the non-MHSDS population held assignments.

The 59 substance abuse treatment assignments were held by one EOP inmate, or 33 percent of the EOP population, 30 3CMS inmates, or six percent of the 3CMS population and 28 non-MHSDS inmates, or one percent of the non-MHSDS population.

Of the 515 voluntary education assignments, one EOP inmate, or 33 percent of the EOP population held an assignment.  For 3CMS inmates, 145 inmates, or 29 percent of the 3CMS population held assignments, and 369 non-MHSDS inmates, or ten percent of the non-MHSDS population held assignments.

For the 158 vocational education assignments, 37 3CMS inmates, or seven percent of the 3CMS population and 121 non-MHSDS inmates, or three percent of the non-MHSDS population held assignments.

b.      Milestone Credits:

As of May 31, 2016, SCC reported that two of three EOP inmates were eligible for milestone credits.  Among those eligible inmates, 50 percent earned the credit.  For the 494 3CMS inmates, 78 were eligible to earn the credits; 19 percent earned the credits.

Of the 3,882 non-MHSDS inmates, 2,195 were eligible to earn milestone credits; 26 percent of these inmates earned the credits.

c.      Out-of-Level Housing:

On July 5, 2016, there were eight Level II and one Level III 3CMS inmates housed in Level I housing.  There were 85 Level III 3CMS inmates housed in Level II housing.  There were 11 Level III 3CMS inmates housed in Level IV housing.  No EOP inmates were housed out of level.

d.      ADA Reasonable Accommodation and Grievance Procedures:

The institution reported that it completed training regarding the procedures in March 2015 and had commenced implementation and use of CDCR Form 1824.

e.      Periodic Classification Score Reductions:  EOP Inmates:

SCC did not have an EOP program.

*Coleman* Postings:

*Coleman* postings were found in all buildings toured by the monitor.  All postings were placed in areas commonly accessible to *Coleman* class members.

**California Medical Facility (CMF)**
September 20, 2016 – September 22, 2016

Census:

On September 19, 2016, CMF housed 2,545 inmates, for a 41-percent increase from the census reported during the preceding site visit.  The mental health caseload population of 1,188 represented 47 percent of the total inmate population and had increased by 18 percent since the preceding review period.

Forty-seven inmates were in the MHCB and three inmates were in alternative housing.

There were 489 mainline EOP and 592 mainline 3CMS inmates.

250

The administrative segregation population of 112 included 52 inmates in the EOP hub, of whom four were pending transfer to the PSU, and five 3CMS inmates.

Staffing:

Positions for the chief psychiatrist and senior psychiatrist were filled.

One of the two chief psychologist positions remained open, per a headquarters' cost-saving directive. The five senior psychologist supervisor and six senior psychologist specialist positions were filled.

Twelve of 17 staff psychiatry positions were filled, for a 29-percent vacancy rate. The use of 1.75 FTE psychiatry contractors reduced the psychiatry functional vacancy rate to 19 percent. CMF did not use telepsychiatry during the review period.

Of 40.5 psychology positions, 32 were filled, for a 21-percent vacancy rate. The use of four psychology contractors reduced the number of psychology vacancies to 4.5, and decreased the psychology functional vacancy rate to 11 percent.

The one supervising social worker position was filled. All 16 social worker positions were filled, and there were two additional clinical social workers, for a total of 18.

The senior psych tech position was filled. All 42.5 psych tech positions were filled, and there were an additional 1.5 psych techs, for a total of 44 psych techs.

Of 21 recreation therapist positions, 14 were filled, for a 33-percent vacancy rate. Four contractors reduced the number of recreation therapist positions to three, and decreased this functional vacancy rate to 14 percent. Only 0.5 of the one occupational therapist position was filled.

Twenty-four of 28 RN positions were filled, for a 14-percent vacancy rate.

Both HPS positions were filled and there was one additional HPS position.

Nineteen of 21 office technician positions were filled, for a ten-percent vacancy rate, as were one of two analyst positions.

Quality Management:

The local governing body met in April and August 2016, but meeting minutes did not document the presence of a quorum.  Reviewed meeting minutes indicated that the local governing body addressed the delivery of mental health services.

CMF provided minutes from five months of quality management committee meetings. None reflected whether or not quorums were achieved.  Specific to mental health, the quality management committee addressed EOP inmate treatment hours, correctional counselors' attendance at IDTTs, access to care issues, and other matters.

Reviewed mental health subcommittee meeting minutes documented quorums for five of six monthly meetings.  The mental health subcommittee addressed mental health-related issues including performance reports, suicide prevention, medication management, staff training, custody matters, peer review, and higher level of care consideration and referrals.

CMF reported during the site visit that as part of its regular quality management process it had seven ongoing mental health quality improvement studies.  These studies included MHTS/eUHRs concordance, IDTT quality improvement, mental health referrals, consideration and referrals to higher levels of care, peer review, and medication management.  Other active quality improvement activities included an RVR mental health assessment QIT, the SPRFIT, an administrative segregation FIT, and workgroups that addressed mental health referrals and follow-ups after DSH and MHCB care.

There was active peer review at CMF.  The institution was paired with CHCF for peer review for psychiatry, psychology and social work, as well as for the MHCB.  Peer review was

252

conducted in March and April 2016; all psychologists and social workers reviewed were deemed to have met expectations. For psychiatrists, 95 percent of notes reviewed met expectations. No report regarding MHCB peer review was provided.

CMF regularly conducted self-audits of multiple areas that impacted mental health services. These areas included individual and group treatment space, group treatment, IDTT meetings, morning meetings and ICCs. As part of this process, CMF implemented CAPs.

CMF also conducted quarterly chart audits that examined specific areas of mental health care. These audits examined SREs, clinical follow-ups, treatment planning documentation, treatment planning for high refusers, interventions for high utilizers, clinician-to-clinician contacts following DSH discharges, and clinical reviews of discharge summaries following MHCB discharges. The audits required supervisors to discuss their results with staff, and when necessary, to meet individually with clinicians whose documentation did not satisfy audit criteria.

CMF was not a test prison for the CQIT during the monitoring round.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum. Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis. Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

During the review period, CMF was compliant with psychiatry measures that looked at diagnostics testing psychotropic medication, mood stabilizers and antidepressants, achieving 90-percent or higher compliance with two exceptions. In March 2016, CMF achieved 88-percent

compliance for atypical psychotics, and in June of 2016, CMF reported 69-percent compliance for Lamictal.  Staff reported that noncompliance was due to inmates refusing lab draws and missing consent forms for inmates who were prescribed Lamictal.  CMF was designated as an initiation and maintenance facility for inmates who were prescribed clozapine.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

CMF provided data for continuity, compliance, and administration measures for March through July 2016.  The institution reported 90-percent or better compliance with medication continuity following inter-institutional and intra-institutional transfers excluding ASU/SHU/PSU.  CMF was compliant with medication continuity following MHCB discharge except in April 2016, when it reported 83-percent compliance.  The institution was noncompliant with medication continuity with intra-institutional transfers to ASU/SHU/PSU in April and May 2016, at 54 and 75 percent respectfully, and in June 2016, when it reported 87-percent compliance.  With one exception, CMF reported compliance at 90 percent or greater for medication continuity following discharge from community hospitals and/or DSH.  In March 2016, CMF reported near compliance at 89.7 percent.

Medication compliance for psychiatrist/MH mid-level prescribed medication was reported at 90 percent or higher for March through July 2016. There was compliance with PC 2602 involuntary medications for four of five months, but noncompliance for May 2016, at 87 percent. For medication compliance for no-shows and refusals, there was 100-percent compliance for all five months.

For psychiatric prescribed outpatient provider new medication orders, CMF achieved compliance at 90 percent or higher for March, April and July 2016, but compliance rates of 82 and 88 percent for May and June 2016.

Reviewed medication management documentation indicated an ongoing problem with medication continuity for some inmates who were transferred from DSH to CMF. These inmates were not being processed through R&R, resulting in medications not being timely ordered. CMF reported interest in resolving this problem, but there were no specific strategies or timeframes.

Staff reported that 21 inmates were on PC 2602 involuntary medications, of which six were emergency orders and 15 were non-emergency orders.

During the review period, CMF reported that 417 inmates received HS medications.

<u>Transfers</u>:

CMF's DSH coordinator managed all DSH referrals. There were 87 referrals to acute care during the review period, of which six were rescinded. There were 28 *Vitek* hearings, of which 27 were timely. No inmates prevailed in their *Vitek* hearing. Forty-one of 81 or 51 percent of acute care transfers to DSH were timely. For the 40 untimely transfers, transfer times averaged 23 days.

There were 138 inmates who were referred to an intermediate care program, of which 13 referrals were rescinded. Eleven of 12 *Vitek* hearings were timely. No inmates prevailed in their

*Vitek* hearing.  Ninety-two of 125 or 74-percent of inmates timely transferred to intermediate care.  For the 33 untimely transfers, transfers averaged 42 days.

Five inmates with complex medical needs were transferred to DSH, of whom four were transferred to acute care.  None of these inmates transferred timely.  The one inmate referred to intermediate care transferred within program timelines.

There were 593 inmates who met the criteria for DSH referral consideration but were not referred.

There were 220 transfers from CMF to MHCBs during the review period.  Of these, 122 or 55 percent were admitted to CMF's MHCB, 68 or 31 percent were transferred to an MHCB at another institution, and 30 or 14 percent were rescinded.  Ninety-seven of the 122 or 80 percent of the internal MHCB admissions transferred timely.  All transfers to outside MHCBs exceeded 24 hours.

Of 230 alternative housing placements during the review period, 128 or 56 percent timely transferred to an MHCB.

Four inmates timely transferred to a PSU during the reporting period.

No inmates were transferred to LTRH during the review period.  Of 15 inmates who were designated for transfer to STRH, 11 transferred timely, one did not transfer due to medical complications, and one transfer was rescinded.  CMF did not provide complete information as to the remaining two inmates.

Other Issues:

    Administrative Segregation EOP:

    CMF's EOP hub program was housed in M-3 and I-3.  It contained confidential treatment space for clinical contacts and adequate group space.  The CMF EOP hub was certified at the time of the site visit.

    The psychiatrist assigned to the EOP hub had a caseload of 63 inmates.  Six PCs had caseloads of 10 to 11 inmates each.

    CMF reported 96-percent compliance for initial intake assessments and 95-percent compliance for initial mental health evaluations occurring prior to IDTTs.  There was 90-percent compliance with initial psychiatry contacts and 99-percent compliance with routine psychiatry contacts.  Initial and routine PC contacts were compliant at 96 and 99 percent, respectively.  Four percent of psychiatry contacts were non-confidential, as were 12 percent of PC contacts.

    Initial IDTTs were 97-percent compliant, while routine IDTT meetings were 99-percent compliant.  There was 99-percent compliance for attendance of required staff at IDTT meetings.

    Observed IDTTs started on time, with appropriate staff in attendance.  Three clinicians presented.  Form 7388-B criteria were presented to the treatment team and inmates in a manner that engaged inmates and solicited their input and understanding.  Each clinician discussed inmate strengths and encouraged the inmate to discuss his treatment plan.  The decision as to the inmate's level of care was presented to the treatment team and team members had an opportunity to deliberate and consent or dissent.

    However, only one of the three clinicians presented clinically relevant summaries while the others focused on custodial history or detrimental psychosocial events.  During one presentation the inmate voiced concern that the clinician was only focused on the negative

aspects of his life.  The clinician acknowledged the inmate's displeasure, but continued the presentation, and elected not to focus on clinically relevant aspects of the treatment plan.  Due to the inmate's increased agitation, this IDTT ended prematurely.

Inmates were offered a weekly average of 13 hours of treatment and attended an average of nine hours.  Inmates on modified treatment programs were offered a weekly average of eight hours and attended a weekly average of four hours.

There were 16 high refusers in the EOP hub during the review period.  Staff reported the PC saw them on a daily basis to assess functioning and adherence to treatment plan changes.

A group of six interviewed EOP hub inmates reported that overall the mental health program was fair to good.  Inmates were aware of their psychiatrist and PC and reported timely receiving daily medications.  They also reported that they would benefit from medication administration that did not interfere with mental health programming and from additional clinical groups.

All inmates interviewed expressed concerns as to negative custody behaviors, violence, and not receiving appropriate paperwork after a cell search.  Inmates also reported they did not believe that mental health staff appropriately advocated for them during ICCs.

MHCB:

Seven psychiatrists and 11 PCs with varying inmate caseloads were assigned to the MHCB.  Staff reported adequate MHCB treatment space, but no common area due to physical plant limitations.

There were 458 MHCB admissions involving 407 inmates during the review period. Eight inmates had three or more admissions.  Clinical lengths of stay averaged 18.1 days and

19.1 days for physical discharge.  Clozaril initiation was a primary driver for the length of the clinical stay.

There was 100-percent compliance for both initial and routine psychiatry contacts.  PC contacts were timely 98 percent of the time for both initial and routine contacts.

There was 98-percent compliance for initial and routine IDTTs.  IDTTs had all required staff present 54 percent of the time.  CMF had a CAP in place to increase CC I attendance at IDTT meetings.

The MHCB readmission rate after DSH discharge was 80 percent.  Eighteen inmates were readmitted to the MHCB within 30 days of DSH discharge and 51 inmates were readmitted during the review period.

Procedurally, staff had implemented headquarters' memorandum on mechanical restraints although the LOP had not been updated at the time of the site visit.

The availability of MHCB privileges had increased during the review period.  Inmates had access to yard according to their security level and as approved by the IDTT.  They also had telephone access and non-contact visits.

Seclusion and Restraint:

There were three incidents each of seclusion and restraint during the review period.  The seclusion incidents ranged from 0.5 to 4.5 hours, while the restraint incidents ranged from four to 22 hours.  Audits demonstrated compliance with seclusion and restraint policies and procedures.  However, documentation of less restrictive alternatives to restraint was not always adequate and in one instance there was no physician's order, indicating the need for improvement in required documentation.  Seclusion documentation was appropriate; the medical record contained required orders and progress notes.

259

Alternative Housing:

CMF used three areas for alternative housing, which were designated by priority.  MHCB staff and other staff provided mental health services for alternative housing inmates.  These inmates were provided the same services as MHCB inmates, and were assessed daily for precaution level, property and privileges.  All inmates placed in alternative housing had constant 1:1 supervision by nursing or custody staff.  Lengths of stay beyond transfer guidelines ranged from 0.04 to 57.25 hours for the review period.

EOP:

Four psychiatrists carried caseloads of 100 to 106 inmates each.  An additional psychiatrist had a caseload of 49 inmates.  There were 18 PCs with caseloads of 21 to 29 inmates each.  One psychologist intern assigned to the EOP program had a caseload of ten inmates.

Clinicians saw EOP inmates timely.  For psychiatry contacts, there was 95-percent compliance with initial contacts and 92-percent compliance with routine contacts.  PCs were compliant with initial and routine contacts 98 and 94 percent of the time, respectively.

There was 90-percent compliance with the timeliness of initial IDTTs and 99-percent compliance with routine IDTTs.  Required personnel attended IDTT meetings 94 percent of the time.

Three EOP inmate IDTTs were observed.  The treatment team knew the inmates and positively interacted with them, but spent minimal time discussing actual treatment plans with inmates.  The treatment team also did not review inmate problem areas, groups or the treatment targets that each group addressed.  Greater treatment planning specificity would be beneficial.

On-site data provided by CMF indicated an average of ten hours of weekly group offered. The average number of hours attended was 7.7.  However, CMF identified problems regarding

260

its structured therapeutic activities offered due to ducating and over scheduling inmates for treatment groups.  CMF reported that based on the refusal rate, EOP treatment teams had begun to over schedule inmates for treatment groups to increase their average number of hours offered. In other words, CMF would typically schedule more inmates than could fit into a treatment room to be able to "offer" the number of hours possible, relying on inmates refusing.  However, at times during the review period, inmates had to be turned away from their treatment groups when more inmates showed up than there were spaces for.  This allowed CMF to continue to report an average number of hours scheduled during the review period of 15 despite the rise in population. It was positive to note that CMF had stopped scheduling beyond room capacity by the time of the site visit.

Some group treatment observed did not appear to have been focused on skill acquisition or any other identifiable goal, and typically involved a series of facilitator-to-individual inmate interactions rather than group facilitation.  Many inmates in the observed treatment groups appeared completely disengaged, which may account for the high refusal rates seen in the EOP program.  CMF reported that a supervisor had begun a "quality improvement peer group" for PCs to share group facilitation skills.  It was unclear if this was a formal QIT or an informal peer study group.  Regardless, additional training and clinical supervision to include actual observation would be beneficial to improve facilitator skills.

Interviewed inmates reported canceled groups and treatment groups being combined, resulting in larger group sizes.  Numerous inmates reported that they felt very uncomfortable during some of their treatment groups due to the number of inmates in the group.

There were a number of inmates who reported that they were assigned work duties, including porter duties, but were not assigned a pay number.  Staff indicated that there were only

a certain number of pay numbers available to assign to inmates, but that there were still tasks that needed to be completed and mental health and custody staff would try to provide an informal system of reward to those inmates. The informal system of reward was not being tracked or monitored in any way; making it unclear how it was actually operated. Numerous inmates complained about other inmates as unit favorites, raising questions about the implementation of the informal rewards system. Moreover, staff could not articulate what role the reward system held in the treatment of EOP inmates. The issue regarding pay numbers and assignment to unpaid positions was confirmed by both mental health and custodial management. This situation was very concerning.

EOP inmates from multiple interview groups also reported consistent concerns regarding their interactions with custody staff. While acknowledging that some custody staff were respectful and appropriate, inmates from different units reported that both housing unit officers and some treatment area officers were disrespectful and provocative. They indicated that this worsened on the weekends and evenings, whenever mental health and management staff were not present, though they felt that mental health staff were timid and deferred to custody. Inmates across groups reported that some officers would intentionally provoke specific inmates by mocking their mental illness and getting in their faces. Inmates also reported that custody staff was disrespectful toward mental health staff at times.

There were pervasive complaints across units that custody staff interfered with inmates' access to mental health providers. Inmates reported requesting to speak with their clinicians but not hearing from them until their next scheduled contact, and they were told by their clinicians that the clinician had not been told of the request for contact. Inmates stated that they did not believe custody staff were passing on their requests for contact and expressed the belief that they

262

had to "go suicidal" to be seen by their clinicians when experiencing difficulties.  Inmates described situations when custody staff discouraged them from seeking mental health services or appeared to inappropriately "triage" the inmate's situation and then determine whether to refer the inmate to mental health or not.

3CMS Mainline/SNY Program:

CMF housed 3CMS inmates in multiple units.  Two psychiatrists assigned to the 3CMS program had caseloads of 243 and 321 inmates, which exceeded established ratios.  Six PCs carried caseloads of 41 to 118 inmates; two other PCs with additional assignments had caseloads of 39 and 51 inmates.

There was 100-percent compliance with initial psychiatry contacts and 97-percent compliance with routine psychiatry contacts.  As for PC contacts, 86 percent of initial contacts and 99 percent of routine contacts were timely.

One hundred percent of psychiatry contacts and 99 percent of PC contacts were confidential.

As for IDTTs, there was 91-percent compliance with initial meetings and 97-percent compliance with follow-up meetings.  Psychiatrists and PCs were present for 98 and 100 percent of scheduled IDTT meetings, respectively.  Data on correctional counselor attendance at IDTTs was not available.

Several observed 3CMS IDTT meetings began on time, with appropriate staff present and contributing.  Inmates' DDP status and other impairments were considered prior to and during the IDTT.  Overall, the IDTTs were conducted appropriately including the use of Form 7388-B.

Groups were provided to 3CMS inmates and there was a waitlist.

3CMS inmates with co-existing mental health and medical problems that impacted their overall functioning complained about the lack of alternative pain management, including relief as simple as ice for muscle aches.  They also expressed concern with long waitlists impacting their ability to participate in mental health groups.  Inmates reported being comfortable with their psychiatrist and clinicians, but stated that custody staff was not supportive of the mental health program or of clinical or medical staff.  Inmates further stated that mental health staff did not advocate for them due to fear of custody officers.

Administrative Segregation 3CMS:

CMF's administrative segregation 3CMS program was housed in the EOP hub; EOP hub staff provided services to these inmates.

Psychiatry contacts were conducted timely 100 percent of the time.  For PC contacts, initial contacts were timely 100 percent of the time and routine contacts were timely 98 percent of the time.  More than 99 percent of contacts were confidential.

There was 95-percent compliance for initial IDTTs and 100-percent compliance for routine IDTTs.  Appropriate staff attended administrative segregation 3CMS IDTT meetings 94 percent of the time.

Case-by-Case Reviews:

CMF conducted eleven case-by-case reviews.  Of these, three inmates were seen by the Associate Director for long-term case conferences; one inmate was retained pending prosecution and two inmates were released pending transfer to other institutions.  The remaining eight reviews resulted in endorsements to other facilities.  All reviews were conducted within policy guidelines.

Non-Disciplinary Segregation:

CMF documented five inmates identified as NDS during the review period. Of those, two were designated for expedited transfer but did not transfer timely. At the time of the site visit, CMF reported 24 NDS inmates. Transfer timelines were not provided for these inmates. CMF used an updated operational procedure for NDS and confirmed appropriate property distribution.

Referrals:

There were 99 emergent mental health referrals during the review period; 97 percent received a timely response. There were 212 urgent mental health referrals; 93 percent received a timely response. Of 644 routine mental health referrals, 95 percent received a timely response.

EHRS/MHTS.net:

CMF reported that EHRS training was on hold with an anticipated implementation in September 2017.

Space:

CMF overscheduled for some EOP structured therapeutic activities to compensate for inmate refusals, resulting in inadequate treatment space when all scheduled inmates attended. Inmates housed in the SNY EOP (N-1) reported limited access to full dayroom and the dining hall and had to share space with inmates from another unit. Inmates, some with physical limitations, complained about having to stand for long periods of time waiting during transitions and escorts.

Mental Health/Custody Relations:

Overall, a collaborative relationship between mental health and custody appeared to be challenging at CMF in certain respects. Mental health management staff indicated they were

committed to working together, and line staff appeared to be open and forthright in their interactions with each other in the presence of the monitoring team.  It was positive that in the EOP program, CMF held a weekly clinical-custody meeting.  One project that had recently been addressed by that group involved ducating for groups in O-wing, the EOP treatment tower, and improving inmate compliance with appointments.

However, during interviews, EOP inmates reported that their mental health treatment team members were not fully responsive to the inmates' concerns regarding security practices that impeded access to care or other complaints about custody staff in the unit.  Inmates perceived their clinicians as primarily timid when it came to custody staff, and reported that staff indicated understanding inmates' concerns, but typically stated that there was nothing that could be done, which, if correct, raised questions regarding a functioning collaborative relationship and team approach to managing the EOP program.

Heat Plan:

CMF did not properly implement the heat plan.  Lists of inmates on heat risk medications were unavailable in toured housing units, including the two administrative segregation EOP units.  There were concerns as to the locations where temperatures were recorded.  The thermometer was broken in administrative segregation EOP unit I-3.  The officer reported that it had been broken for a few days and stated that the heat plan was no longer in effect.  However, CDCR policy maintained the heat plan through October 31.  Another unit officer reported that she checked unit temperatures every 30 minutes, but logs showed temperatures were documented every three hours.

266

Lockdowns/Modified Programming:

CMF reported one lockdown during the reporting period, from February 8 to 16, 2016. All ducats were cancelled on February 8, 2016.  Medical appointments, and EOP and DSH programs resumed on the following day.  CMF returned to normal programming on February 16, 2016.

Pre-Release Planning:

CMF's pre-release planning activities were limited.  The institution reported that the TCMP was expected to screen all inmates once SOMS identified them.  CMF reported providing three weekly one-hour pre-release groups for EOP inmates, but there was no supporting documentation on behalf of paroled inmates.  Observed EOP IDTTs did not address pre-release planning.

Access to Care:

A review of CMF's monthly Health Care Access Quality Reports from February through June 2016 indicated that five percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 26 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

Institutional data showed that of 759 job assignments, 41 EOP inmates or seven percent of the EOP population held assignments.  For 3CMS inmates, 271 or 44 percent of the 3CMS population held assignments.  For non-MHSDS inmates, 489 inmates or 34 percent of the non-MHSDS population held assignments.

There were no full-time academic assignments at CMF.  Of the 150 part-time academic positions, eight EOP inmates or one percent of the EOP population held assignments; 65 3CMS inmates or 11 percent of the 3CMS populations held assignments; and 77 non-MHSDS inmates or five percent of the non-MHSDS population held assignments.

Of the 81 vocational education assignments, ten EOP inmates or two percent of the EOP population held assignments.  For 3CMS inmates, 31 or five percent of the population held assignments.  For non-MHSDS inmates, 40 or three percent of the non-MHSDS population held assignments.

Of the 435 voluntary education assignments, 85 EOP inmates or 15 percent of the EOP population held assignments.  For 3CMS inmates, 141 or 23 percent of the 3CMS population held assignments.  For non-MHSDS inmates, 209 or 15 percent of the non-MHSDS population held assignments.

There was no substance abuse program at CMF.

b.   Milestone Credits:

As of August 15, 2016, CMF reported that 116 of 553 EOP inmates were eligible for milestone credits.  Of the 116 inmates, 38 percent earned milestone credits.  For the 613 3CMS, 119 inmates were eligible to earn milestone credits, with 25 percent earning the credits.

Of the 1,431 non-MHSDS inmates, 358 inmates were eligible, with 17 percent earning milestone credits.

c.   Out-of-Level Housing:

There were seven Level I 3CMS inmates housed in Level II housing; 20 Level I EOP and five Level I 3CMS inmates were housed in Level III housing.  A total of 258 Level II EOP inmates and 141 Level II 3CMS inmates were housed in Level III housing.  One Level III 3CMS

inmate was in Level I housing, and 45 Level IV EOP and 18 Level IV 3CMS inmates were housed at Level III.

        d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CMF provided confirmation of implementation of revised ADA accommodation and grievance procedures in the form of appeals documentation.

        e.  <u>Periodic Classification Score Reductions: EOP Inmates</u>:

The periodic classification score reductions were not reviewed at the time of the site visit.

<u>*Coleman* Postings</u>:

The January 2015 revised *Coleman* posters, in both English and Spanish, were found in all toured housing units.  The posters were placed in common areas accessible to class members.

**California State Prison/Solano (CSP/Solano)**
May 10, 2016 – May 12, 2016

<u>Census</u>:

On May 9, 2016, CSP/Solano's census was 3,802, including 1,163 inmates or 31 percent of the total inmate population who were in the MHSDS.  Since the preceding monitoring period, the institution's overall census had fallen by one percent, and the MHSDS census had decreased by eight percent.

The MHCB held nine patients.  There was one EOP inmate in administrative segregation pending transfer to a hub, and five mainline EOP inmates.  There were 14 3CMS inmates in administrative segregation, two STRH 3CMS inmates and 1,132 mainline 3CMS inmates.

<u>Staffing</u>:

Positions for the chief of mental health, chief psychiatrist, chief psychologist, 3.5 senior psychologist supervisors, and one senior social worker were filled.

269

Four of six staff psychiatrist positions were filled, for a 33-percent vacancy rate. The use of one contractor resulted in a functional vacancy rate of 17 percent.

Thirteen of 14 staff psychologist positions were filled, for a seven-percent vacancy rate. The use of 0.5 contractor resulted in a four-percent functional vacancy rate. CSP/Solano had two positions for pre-doctoral psychology interns added to their staffing model. Interviews were completed and two interns were scheduled to begin employment in August 2016.

There were ten of 13 clinical social worker positions filled, leaving a 23-percent vacancy rate. The use of 1.5 contractors resulted in a functional vacancy rate of 12 percent. Three social workers were unlicensed and one social worker was on long-term leave.

CSP/Solano had two recreation therapist positions, one was filled, resulting in a 50-percent vacancy rate. A contractor filled the remaining position, leaving a functional vacancy rate of zero percent.

The senior psych tech position was filled. Of the eight psych tech positions, six were filled for a 25-percent vacancy rate.

All six RN positions were filled.

Of eight mental health clerical positions, six were filled, for a 25-percent vacancy rate.

The HPS position was filled.

Quality Management:

While the quality management system was clearly mature and functioning reasonably well, it had not yet reached the level of a full quality management/quality improvement system.

The local governing body was the highest local level committee and received reports from the quality management committee. The local governing body minutes more closely resembled agendas, making it difficult to determine what occurred during those meetings. The

270

local governing body appeared to primarily address policy and procedure matters, approving or disapproving policy updates and/or new policies.

The quality management committee had some difficulty with achieving satisfactory attendance.  There was at least one month when a quorum was not met and two other meetings when key members were missing (CEO, chief medical executive (CME), chief nurse executive and the associate warden of healthcare).  It was unclear whether there were appropriate designees in their places.  When the quality management committee convened, members appeared to utilize the committee to identify and share challenges or obstacles to the delivery of care.

The mental health subcommittee appeared to be the primary mode of operational assessment for mental health, though it did not appear that all aspects of quality management were utilized as effectively as possible.  For example, there were identified problems or obstacles with service delivery that would have been ideal for a QIT that were not addressed in that manner.  The mental health subcommittee reported to the quality management committee.  A review of meeting minutes revealed that a quorum was achieved at all meetings.  The subcommittee addressed appropriate issues including, but not limited to MHTS.net, eUHR, mental health related CAPs, IEX, SPRFIT, alternative housing, RVRs, group therapy, MHCB, and medications.

When asked about the quality management improvement systems in place at CSP/Solano, mental health staff tended to know Program Guide compliance data, but not the full scope of the mental health subcommittee or the quality management committee.  Greater communication with line staff regarding quality management/quality improvement activities and an openness to communication directly from staff to the committees would be beneficial to CSP/Solano.

The peer review process was established at CSP/Solano for psychiatrists, psychologists and social workers; at CSP/Solano is paired with CCI for peer review purposes. Peer review was conducted in January and March 2016. No trends or patterns were noted other than deficiencies regarding clinical documentation for some psychiatrists; this was addressed during the discipline's regularly scheduled bi-weekly meetings.

Prompted by regional mental health staff, the mental health management team at CSP/Solano undertook the task of reviewing its mental health service delivery system informally through the use of the CQIT during April 2016.  CSP/Solano completed the entire CQIT and found it beneficial.

CSP/Solano was not a test prison for CDCR's CQIT during the monitoring period.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Modifications were permitted for a two-month period prior to CSP/Solano's anticipated EHRS "go live" date of January 2016.  The data provided on MAPIP audits covered the timeframe of September 2015 to January 2016. Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine and antidepressants.

CSP/Solano reported compliance rates of 90 percent or above for all applicable psychiatry measures.  Clozapine was not authorized for use at CSP/Solano.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications

was measured within the following categories:  inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications and urgent medication referrals for no-shows and refusals (Clozaril).  Medication administration was measured for outpatient provider new medication orders for psychiatrist-prescribed medications.

CSP/Solano reported compliance rates of 100 percent upon inter-institutional transfer at R&R.  For continuity with NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU, the institution reported rates of 85 percent, 82 percent, 56 percent, 50 percent, and 75 percent.  Compliance with continuity of medications for MHCB transfers was at 100-percent compliance for each month.  Intra-institutional transfers to ASU/SHU/PSU was at 100-percent compliance for one month, and 40 percent, 75 percent, 78 percent, and 89 percent for the other four months.  For continuity of medications upon discharge/transfer from a community hospital and/or DSH, CSP/Solano reported a compliance rate of 90 percent and above for three months and 50 percent and 83 percent for the other two months.

Regarding medication compliance with psychiatrist/MH mid-level prescribed medications, the facility reported 90 percent or higher for four months and 69 percent for one month.  PC 2602 involuntary medications was measured for the three months during which CSP/Solano had inmates receiving them; compliance was at 100 percent.  Compliance rates for medication administration for psychiatrist-prescribed outpatient provider new medication orders was reported at 100 percent for one month, and 61 percent, 80 percent, 81 percent, and 86 percent for the remaining months.

The institution initiated two PC 2602 involuntary medications petitions during the review period.  There were no renewals and no petitions were denied nor withdrawn.

Audits of pill lines and wait times showed that lines were not excessive in length and individual wait times did not exceed 30 minutes.

CSP/Solano did not provide the number of inmates on HS medications and the data related to HS medications prescriptions was not presented in a useful format.  The institution did not track whether such medications were administered after 8:00 p.m.

Transfers:

CSP/Solano referred 31 inmates and transferred 28 inmates to DSH during the review period, all from the MHCB.  Eighteen referrals were to acute care and ten were to intermediate care.

Of the 18 transferred to acute care, four were transferred beyond timelines.  Regarding timelines from date of bed assignment, two inmates had incomplete data.  Of the remaining 16 inmates transferred to acute care, three were transferred beyond 72 hours of bed assignment, with a range of four to five days.

Of the ten cases transferred to intermediate care, five cases exceeded timelines for transfers and five cases had inaccurate data regarding bed assignment and transfer.  For those cases that exceeded transfer timelines, transfer averaged 4.7 days from bed assignment, which was beyond the 72 hours required by the Program Guide.

Ten *Vitek* hearings were held and the outcome in all cases was to continue with the referral.  None of the *Vitek* hearings were reported to have affected transfer timelines.

The Form 7388-B criteria was reviewed as a regular component of the IDTT process in MHCB unit IDTT meetings.  That was not true for IDTTs for 3CMS inmates where the criteria for consideration to a higher level of care was often not spoken about or addressed by the IDTT.

274

The institution reported that it transferred 16 inmates to outside MHCBs, of which five inmates or 31 percent were transferred timely.  The remaining 11 inmates or 69 percent were transferred beyond timelines in a range of 0.53 days to three days.

CSP/Solano reported 100-percent compliance for administrative segregation EOP transfers.  There were 34 inmates transferred to STRH.  Data regarding timeliness of transfers was not provided.

One inmate was referred to the PSU at CSP/Sac but was redirected to the administrative segregation EOP hub at CMF due to lack of space in the PSU.

The data provided showed that 21 inmates were transferred to mainline EOP, with 90 percent of transfers occurring within Program Guide timelines.  For those inmates who were not transferred timely, days over timeframes ranged from a few hours to 16 days.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Clinical staffing ratios for mental health staff in administrative segregation included three PCs with caseloads of six to nine inmates, in addition to a fourth clinician whose caseload was described as "variable."  One psychiatrist with additional duty in the 3CMS program was assigned to administrative segregation.

During the reporting period, 131 inmates or 41 percent of the 317 inmates in administrative segregation were participants in the 3CMS program.  The average length of stay was 27.73 days, with a range of one to 120 days.

Ten or three percent of inmates in administrative segregation were EOP inmates, with an average length of stay of 15.3 days ranging from one to 42 days.

According to the data provided, 100 percent of initial psychiatry contacts were timely, and 100 percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.  All were conducted in a confidential setting and there were no cell-front contacts.

According to the data provided, 96 percent of initial PC contacts were timely and 97 percent of inmates received at least weekly individual PC contacts.  The data indicated that 16 percent of PC contacts were conducted in a non-confidential setting and 24 percent were conducted at cell-front.  Inmate refusal was the primary reason given for the conduct of cell-front contacts.

Ninety-six percent of initial IDTTs were completed timely and subsequent IDTTs took place at least every ninety days 100 percent of the time.  Staff attendance at IDTTs met Program Guide requirements 100 percent of the time.

During the site visit, the monitor's expert observed IDTTs for inmates in the administrative segregation 3CMS program.  Some sight and sound confidentiality by way of partitions was provided, but ambient noise made it difficult to hear the proceedings clearly.  All required staff were present and necessary documents were available to them.  The correctional counselor had access to a computer.  The cases were presented with the inmate present.  There was minimal input from nursing staff.  Treatment goals were often expressed in broad terms which could not be measured (i.e. "keep up your coping skills" or "make better choices").  There was little natural discussion among attendees during the meeting.  In one case, near the end of the meeting, a suggestion was made by a team member to add a particular treatment goal for the inmate.  Other members voiced agreement, but the meeting concluded with the treatment plan

276

passed around for signatures without amendment.  The observed IDTTs did not systematically

consider factors for possible transfers to higher levels of care.

Group treatment was not provided to 3CMS inmates in administrative segregation.

The institution reported that there continued to be three *Coleman*-approved treatment

modules for individual treatment at the time of the site visit, although during the preceding

monitoring period, staff had reported there were additional approved modules ordered.  A new

initiative had been enacted within the administrative segregation unit that allowed inmates to

have educational materials while there.  Inmates were also permitted to take the GED exam.

MHCB:

CSP/Solano maintained a 15-bed CTC with nine MHCBs that were active throughout the

reporting period.  During that time there were 126 admissions of 113 different inmates.  The data

provided indicated one inmate had three or more MHCB admissions during the reporting period.

A registry psychiatrist was assigned to the MHCB.  Staff reported that there was also a

part-time psychiatrist in the MHCB who provided services one day per week.  There were two

psychologists assigned to the MHCB providing services.  Mental health staff in the MHCB

carried caseloads within CDCR's clinical ratios.

Treatment in the MHCB consisted of daily contacts with a clinician (i.e., psychologist

and/or the psychiatrist) and often one-to-one sessions with the recreation therapist.  Both initial

and follow-up psychiatric contacts were in compliance.  Follow-up PC contacts were in

compliance, but initial PC contacts were just below compliance at 89 percent.

Treatment team meetings were held daily in the MHCB to allow for quick development

and implementation of treatment plans for new arrivals.  Objective data indicated compliance

with timely IDTTs.  There were also daily team meetings with clinical, nursing and custody staff

to discuss each inmate and ensure that the entire team was informed of any behaviors of note or treatment changes.

Treatment plans varied from very good quality with objective measurable goals with specific interventions, to plans with vague goals and interventions, depending on the clinician who completed the plan.  One of the common treatment goals that was particularly problematic was a treatment goal requiring suicidal inmates not to verbalize any suicidal ideation for a specified period of time.  This was a problem because the inmate was being taught not to verbalize his suicidality and the lack of verbalization was no guarantee that the inmate was not suicidal.

The average length of stay in the MHCB was 10.3 days for clinical discharge and 11.1 days for actual physical discharge.  There were 31 inmates discharged to CSP/Solano during the reporting period.  Of those, 29 were seen for the following five consecutive days as required by policy.  CSP/Solano was 94-percent compliant with timely MHCB discharge follow-up.

There was no confidential place in the MHCB to see inmates for individual sessions. Treatment activities were limited by the lack of treatment space.  There was no group treatment space.  There was an individual treatment module in the common area outside the nursing station that the recreation therapist was observed to use for individual recreation therapy sessions; it was not confidential.  Recreation therapy could also occur on the outside yard, but there was no tracking of that setting to determine if it was occurring and how often.  Mental health staff indicated that there was no regular yard; inmates only received yard when the recreation therapist would take them out.  This was reportedly the same for medical and MHCB inmates.

278

All inmates were cuffed upon admission to the MHCB, regardless of their custody level or status.  The initial IDTT evaluated the need for cuffs for those who were not SHU or administrative segregation inmates.

Seclusion and Restraint:

There was one incident of restraint and two incidents of seclusion, all less than 24 hours in length.

Alternative Housing:

Alternative housing when the MHCB was full remained in administrative segregation at the time of the site visit.  The institution used cells numbered 123 through 128 in the administrative segregation unit as alternative housing.  These cells were also used for new intakes in administrative segregation.  They were located in front of the control booth, which made for ease of continuous direct observation, as required.

One psychiatrist and three psychologists provided care within alternative housing.

There was a QIT chartered on February 3, 2016 to identify alternative housing space outside of administrative segregation.  However, the QIT did not meet for five months.  An initial report indicated that medical beds would be the preferred location for alternative housing. There had been no policy or placement change as of the site visit.

A total of 41 inmates were placed in alternative housing, 32 or 78 percent were transferred in less than 24 hours.  Nine inmates or 22 percent were untimely transferred, days overdue ranged from zero to 1.88 days with an average of 0.2 days overdue.

3CMS:

There were two dedicated psychiatrists with "variable" caseloads assigned to the 3CMS program and one psychiatrist that provided services in the 3CMS GP program and in

administrative segregation. There were eight PCs in the 3CMS program with caseloads of 42 to 59 inmates. Another eight PCs carried caseloads of 64 to 97 inmates, and one clinician had a caseload of 116 inmates. A part-time PC had a caseload of 29 inmates and two clinicians were classified with "variable" caseloads, one of whom was registry staff. The institution was in compliance with CDCR's staffing ratios for 3CMS inmates.

Case management services were provided to 3CMS Level III inmates on A and B Yards and to Level II inmates on C and D Yards.

Initial psychiatric contacts were timely 99 percent of the time. Timely follow-up psychiatrist contacts were at 97-percent compliance. All were conducted in standard confidential settings.

Timely initial PC contacts were at 86-percent compliance. Follow-up PC contacts were reported as 100-percent compliant. All but three individual contacts were conducted in a standard confidential setting. Reasons for the non-confidential contacts were other therapy, routine contact, and unscheduled activity.

CSP/Solano was 91-percent compliant with timely initial IDTTs and 100-percent compliant with subsequent IDTTs occurring at least every ninety days. Required staff attended 100 percent of the time.

Fifteen groups were made available to Levels II and III inmates on the mainline. All groups were conducted Monday through Friday and facilitated by a licensed social worker or psychologist. The groups were composed of 3CMS inmates as well as non-MHSDS individuals. The groups included a variety of topics such as addictions, stress management, criminal thinking, addiction recovery, pain management, depression, veterans' issues, personal transformation, self-understanding, and personal support.

280

Non-Disciplinary Segregation:

CSP/Solano reported that a total of 25 inmates had been placed on NDS status during the reporting period. The data showed that NDS inmates were housed and/or transferred within the appropriate timeframes and provided with allowable property. The institution had a tracking system in place to ensure designations were timely reviewed and completed by the captain and cases appropriately referred to the ICC.

Referrals:

CSP/Solano reported that no emergent referrals were generated during the reporting period. There was one urgent referral, it did not receive a timely response. A total of 1,289 routine mental health referrals were generated during the reporting period, 1,234 or 96 percent received a timely response.

EHRS/MHTS.net:

Documentation indicated that CSP/Solano provided training in November and December 2015 to go live for EHRS on Jan 12, 2016. That go live date was cancelled and CSP/Solano was rescheduled for go live July 19, 2016. The change would require all staff to be retrained.

CSP/Solano continued to use MHTS.net for mental health referrals. Staff reported the mental health staff and clinicians and clerical staff had easy access to the MHTS.net.

Space:

As reported above, there was inadequate confidential treatment space within the MHCB. CSP/Solano was also actively involved in the construction of the healthcare access building. While mental health was expected to only have one space in that building, completion of the building would open up space on the yards for mental health as medical providers moved into that new building. This new building was not expected to be activated for another year. The

281

administrative segregation unit was awaiting the arrival of an individual treatment module so that mental health could share an office with medical and have confidential individual sessions. Mental health management reported that the treatment module was expected "any day."

The treatment space in administrative segregation continued to be inadequate.

Mental Health/Custody Relations:

The relationships between mental health and custody staff were reported to be cooperative. Staff in both disciplines indicated that they were all committed to ensure that inmates received appropriate care.

Heat Plan:

CSP/Solano was in compliance with the heat plan.

Lockdown/Modified Programming:

Information regarding lockdowns was not provided in a usable format.

Access to Care:

A review of CSP/Solano's monthly Health Care Access Quality Reports from September 2015 through March 2016 indicated that 0.66 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 9.37 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

 a.   Job and Program Assignments:

Institutional data indicated that of the 1,673 available jobs, one EOP inmate, or 17 percent of the EOP population held a job assignment. For 3CMS inmates, 473 or 40.12 percent of the population held job assignments, and for non-MHSDS inmates 1,199 or 45 percent of the population held job assignments.

Of the 1,325 academic assignments, one EOP inmate, or 17 percent of the EOP population held an academic assignment.  Of the 3CMS population, 456 or 38.68 percent held academic assignments, and for non-MHSDS inmates, 868 or 33 percent of the population held academic assignments.

With regard to the 394 available substance abuse treatment program assignments, 58 or 4.92 percent of 3CMS inmates were in substance abuse treatment programs, and 336 or 13 percent of non-MHSDS inmates were in substance abuse treatment programs.

Of the available 209 vocational education assignments, 54 or 4.58 percent of 3CMS inmates held vocational education assignments, and 155 or six percent of non-MHSDS inmates held vocational education assignments.

Of the 23 available voluntary education assignments, four or 0.34 percent of 3CMS inmates held voluntary education assignments, and 19 or one percent of non-MHSDS inmates held voluntary education assignments.

   b.  <u>Milestone Credits</u>:

As of March 31, 2016, CSP/Solano reported that the one of six EOP inmates housed at the institution eligible for milestone credits did not earn the credit.  For the 1,179 3CMS inmates, 234 were eligible to earn milestone credits; 27 percent earned the credits.

Of the 2,662 non-MHSDS inmates, 482 were eligible to earn milestone credits; 21 percent earned the credits.

   c.  <u>Out-of-Level Housing</u>:

On March 28, 2016, there were 13 Level II 3CMS and two Level III 3CMS inmates housed in Level I housing.  Eighty-seven Level III 3CMS inmate were housed in Level II

housing.  There were 13 Level II 3CMS inmates in Level III housing and one Level II and 59

Level III 3CMS inmates in Level IV housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSP/Solano did not provide information regarding its ADA Reasonable Accommodation

and Grievance Procedures.

    e.  <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

CSP/Solano did not have an EOP program.

<u>*Coleman* Postings</u>:

*Coleman* posters were accessible to inmates in the various housing units.

**<u>San Quentin State Prison (SQ)</u>**
May 24, 2016 – May 26, 2016

<u>Census</u>:

On May 24, 2016, San Quentin housed 4,007 inmates, which was a three-percent increase

from the census reported during the preceding site visit.  The mental health caseload population

of 1,097, representing 27 percent of the total inmate population, had decreased by two percent.

There were a total of 33 mainline EOP and 720 mainline 3CMS inmates.

The administrative segregation population included five EOP and 55 3CMS inmates.

The reception center population totaled 1,008 inmates and included 22 EOP and 224

3CMS inmates.

SQ housed 720 condemned inmates, of which 32 were EOP and 159 were 3CMS.  The

SQ PIP housed 38 condemned inmates.

There were 29 NDS status inmates, including three EOP and eight 3CMS inmates.

284

Staffing:

Positions for the chief psychiatrist and two of three chief psychologists were filled; the remaining chief psychologist position was left vacant as a cost savings.

Two of three senior psychiatrist positions were filled, resulting in a 33-percent vacancy rate. The ten psychiatrist positions were filled. SQ did not use telepsychiatry.

All three senior psychologist positions were filled, as were seven of eight senior psychologist specialist positions, for a 13-percent vacancy rate. All 27.5 staff psychologist positions were filled.

Positions for the supervising social worker and 15 of 19 social workers were filled, for a 21-percent social worker vacancy rate.

Twenty of 22 mental health RN positions were filled, reflecting a nine-percent vacancy rate.

Six of seven senior psych tech positions were filled, for a 14-percent vacancy rate. Of 42.1 psych tech positions, 34.1 were filled, for a 19-percent vacancy rate. Six of seven recreation therapist positions were filled, for a 14-percent vacancy rate.

Fifteen of 17 mental health clerical positions were filled, for a 12-percent vacancy rate.

SQ utilized medical assistants as part of a CDCR pilot project; the first medical assistants were hired in April 2016 and SQ employed five at the time of the site visit. The chief psychiatrist reported that medical assistants saved psychiatrists time and their availability was an effective recruitment tool for psychiatry.

Quality Management:

The quality management process at San Quentin continued to be an effective process, but had not yet reached a state of continuous quality improvement.  There was a solid foundation in place upon which a functional continuous quality improvement system could be laid.

The local governing body met monthly and attained a quorum for all but one meeting during the review period.  The CEO served as chairperson.  A review of meeting minutes highlighted that the focus of agenda items was on the review and subsequent approval or deletion of policies and procedures and the approval of temporary and permanent clinical privileges for clinical staff.

A review of monthly quality management committee meeting minutes indicated that a quorum was met for each meeting during the review period.  Meetings were chaired by the CEO. Overall, the minutes documented discussions that covered standard committee reports as indicated by the agenda topics.  Agenda topics included, but were not limited to, action item tracking log, status of improvement projects, quality management committee subcommittee reports, quality assurance reports and other management issues/new business.  Other management issues/new business items included a review of implementation of the Flu Policy, including the appointment of a point person for the Flu Mask Policy.

A review of mental health subcommittee meeting minutes indicated that meetings occurred at least monthly, but were frequently held twice a month during the review period.  This was a decrease in frequency since the preceding site visit when meetings were held on a weekly basis.  The chief of mental health and chief psychiatrist chaired the meetings; a quorum was met for each meeting during the review period.  Standing agenda items included, but were not limited to, nursing for mental health inmates, IEX RVRs, reception center and mainline inmate transfers,

286

alternative housing, DSH referral and transfer timelines, use of force, medication errors, suicide prevention, potential condemned treatment space, and peer review.

Discussions in the subcommittee typically focused on the monitoring of agenda items from month to month.  There were instances in which agenda items were not consecutively addressed.  For example, during the January 16, 2016 meeting, the agenda item on potential condemned treatment space was not addressed due to the absence of the staff member who was responsible for that agenda item.  It was documented that this issue was postponed until the next committee meeting.  However, despite this staff member's presence at several subsequent meetings (January 27, 2016, February 24, 2016, March 16, 2016), the item was not on the agenda.  Documentation indicated monitoring, discussion and information sharing regarding agenda items, but actions were rarely undertaken and when there was documentation, it indicated progress was minimal.

Several QITs/FITs were in operation during the review period, including a QIT on inclement weather and outdoor therapeutic activities, and a FIT on suicide prevention and response.  Another QIT addressed increasing condemned inmate group attendance, with staff identifying barriers to group participation and surveying inmates to identify group activities and topics of interest.  A QIT/FIT on effective communication was closed in October 2015, after six months at 90-percent compliance.

SQ's peer review process indicated that each discipline (psychiatrists, psychologists and social workers) met once during the review period.  Committee membership for each discipline and designation of a chair was in accordance with the local operating procedure.  SQ was paired with CIM for peer review.  During the review period, seven psychiatrists, 23 psychologists and

287

seven social workers were reviewed.  There were no performance concerns documented regarding these reviews.

The institution was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

Due to plans for implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

From October through December 2015, SQ was typically compliant with MAPIP psychiatry measures for labs, EKGs and other matters related to laboratory studies for inmates on psychotropic medications.  However, SQ reported noncompliance with EKGs for inmates on antipsychotic medications during November and December 2015, with thyroid monitoring for inmates on lithium during November 2015, with CBC with platelets during October 2015, with AIMS testing in December 2015, and for inmates prescribed lithium, as to lithium levels and thyroid monitoring in December 2015.  SQ was not required to report on MAPIP psychiatry measures for January and February 2016, as these were the two months before SQ went live with EHRS.  SQ was a clozapine-designated institution.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital

288

and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications and urgent medication referrals for no-shows and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

Nursing reported compliance with all MAPIP measures from October through December 2015, and for March 2016.  SQ also did not report on MAPIP measures for January and February 2016 due to EHRS going live in March 2016.

At the time of the site visit, 14 inmates were prescribed PC 2602 involuntary medications, including eight whose medications had been renewed and two who were pending renewal.  One PC 2602 involuntary medications order was denied renewal during the review period.  Three inmates were noncompliant with medications.

Some SQ pill lines exceeded one hour, but staff reported that inmates typically waited in pill lines for less time.  Inmates did not report long pill lines.

During the preceding monitoring round, there were several concerns related to HS medications (prescribed at bedtime).  Specifically, few inmates were prescribed HS medications. During the current site visit, SQ reported 306 inmates were prescribed HS medications, an approximately seven-fold increase.  There had apparently been some confusion on the part of psychiatrists regarding the process for prescribing medications to be administered at bedtime around the time of the preceding monitoring round; this confusion had since been resolved.

Inmates did not report difficulty with the administration of prescribed psychotropic medications or with timely medication renewals.

<u>Transfers</u>:

There were three acute care and three intermediate care referrals to inpatient care at the SQ PIP during the review period.  There were no referrals to DSH during the review period.  Sixty-one other inmates met Form 7388-B indicators, but were not referred.

One inmate returned from DSH to SQ during the review period.  Staff reported timely clinician-to-clinician contact.

The regional mental health team conducted one major and one minor sustainability review during the review period.  The minor review was completed in November 2015.  It reported improved congruency between the regional team and the DSH coordinator as to the adequacy of Form 7388-B documentation.

The major sustainability review was completed in March 2016.  It confirmed the negative findings of the prior major sustainability review and represented a distinct decline from the progress indicated by the November 2015 minor review.  This major review identified substantial differences between the regional team and the DSH coordinator on the completion of the Form 7388-B as to incorrect criteria noted, the failure to note a specific criterion, and/or the wrong Form 7388-B having been reviewed by the DSH coordinator.  It also indicated continuing problems with the adequacy of Form 7388-B documentation, which often did not support non-referral; there was insufficient documentation of treatment modifications and the DSH coordinator did not accurately note inadequate documentation.

Review of a sample of eUHRs to determine whether the non-referral decision was clinically sound indicated that overall, referrals to inpatient care occurred as clinically appropriate.  However, treatment teams did not consistently incorporate Form 7388-B findings into case formulations or treatment plans.  Record review also indicated that some clinicians did

not understand the entire Form 7388-B process; numerous Form 7388-B's were completed incorrectly.

Of 30 inmates transferred to outside MHCBs, 21 or 70 percent transferred on the referral date; the remaining nine or 30 percent of inmates transferred the following day.

Forty-nine inmates were placed in alternative housing, of which 35 or 71 percent were transferred to an MHCB within 24 hours of referral.

There were 31 of 39 EOP inmates or 79 percent, timely transferred to an EOP hub.

Five of seven or 71 percent of inmates timely transferred to mainline EOP programs.

There were 56 EOP inmates transferred from the reception center to mainline EOP programs, of which 36 or 64 percent transferred timely. During the site visit, ten EOP inmates were housed in the reception center for more than 60 days. Staff reported that delays were due to EOP bed unavailability.

A total of 504 3CMS inmates transferred from the reception center to mainline 3CMS programs, of which 393 or 78 percent transferred timely. At the time of the site visit, there were 164 3CMS inmates who were housed in the reception center for more than 90 days.

Ten of 12 or 83 percent of 3CMS inmates timely transferred to STRH.

Other Issues:

Reception Center:

Staff reported that there were approximately 150 weekly admissions to the reception center. Two psychiatrists assigned to the reception center had caseloads of 113 and 155, respectively; the caseloads of two psychologists and three social workers ranged from two to 125 inmates. Two recreation therapists were also assigned to the reception center.

Audits reported conflicting data as to the average lengths of stay for reception center inmates.  One indicated an average length of stay of 38 days for 86 reception center EOP inmates and 49 days for 787 reception center 3CMS inmates.  Another reported an average length of stay of 62 days for reception center EOP inmates and 72 days for reception center 3CMS inmates.

For the reception center EOP program, there was 95-percent compliance with initial psychiatry contacts and 98-percent compliance with routine psychiatry contacts.  For PC contacts, there was a compliance rate of 95 percent with initial contacts and 98 percent with routine contacts.  For IDTTs, there was 93-percent compliance with initial meetings and 100-percent compliance with routine meetings.  Required disciplines attended 99 percent of IDTT meetings.

Observed reception center EOP IDTT meetings revealed the presence of required staff.  The IDTT meeting room was confidential and staff had access to computers.  Staff reviewed inmates' relevant psycho-social history, interactions with inmates were empathic, and the correctional counselor provided useful input.  However, there was room for improvement as to treatment planning, as the IDTT did not review inmate functioning, symptoms or treatment progress since the prior IDTT and groups were not discussed as part of the treatment plan.  IDTT meetings also lacked discussion of Form 7388-B indicators.

For the reception center 3CMS program, SQ reported 100-percent compliance with initial and routine psychiatry contacts.  For PC contacts, there was 99-percent compliance with initial contacts and 100-percent compliance with routine contacts.

An observed reception center 3CMS group on re-entry found open discussion focusing on the impact of anger and substance abuse following re-entry.  A dynamic group leader facilitated active group participation and healthy inmate-to-inmate interactions.  Interviewed group

members expressed satisfaction with the mental health program, but reported delays in transfers from the reception center.

MHSDS Inmates in Administrative Segregation:

Administrative segregation staff included a psychiatrist, two psychologists and three social workers.  The psychiatrist had a caseload of 68.  Clinicians' caseloads ranged from nine to sixteen inmates.

Pre-placement screenings were completed in confidential settings.  There was 100-percent compliance with initial and routine psychiatry contacts and 98-percent compliance with initial and routine PC contacts.  For IDTTs, there was 98-percent compliance with initial meetings and a compliance rate of 99 percent with routine meetings.  Required disciplines attended IDTT meetings 93 percent of the time.

Staff estimated that between ten and 14 hours of structured therapeutic activities were provided to administrative segregation EOP inmates pending transfer to an EOP hub.

Groups provided to administrative segregation EOP and 3CMS inmates addressed emotional regulation, social justice, stress management and substance abuse, among other issues.  An excellent observed group consisting of EOP and 3CMS inmates on the connection between thoughts, behavior and mood began with an overview of the group's purpose and a review of previously-covered content.  Clinically relevant handouts were provided.  The group facilitator engaged inmates and facilitated discussion.  Interviewed group participants expressed satisfaction with provided mental health services.

MHCB:

The MHCB was located in the SQ PIP and was only accessible to condemned inmates.  There were, however, occasions when a condemned inmate was transferred to the CMF MHCB

due to co-existing medical conditions or the lack of MHCB bed space in the SQ PIP.  All other

SQ inmates received MHCB care at other institutions.

In August 2015, SQ modified its MHCB treatment so that the clinical providers for the

condemned program also provided MHCB care.  This decision was made at least in part to

facilitate continuity of care.  Two psychiatrists and two psychologists were primarily tasked with

providing MHCB care.

During the review period, there were 24 MHCB admissions involving 17 inmates.

MHCB stays averaged 6.5 days, with the stays of five or 21 percent of inmates exceeding ten

days.  One inmate had three or more admissions within a six-month period.

For psychiatry contacts, there was 95-percent compliance with initial contacts and 100-

percent compliance with routine contacts.  For PC contacts, there was 100-percent compliance

with initial contacts and 94-percent compliance with routine contacts.

There was 95-percent compliance with initial IDTT meetings and 100-percent

compliance with routine IDTT meetings.  Data was not provided for required disciplines'

attendance at IDTTs.

MHCB inmates were provided yard.

Seclusion and Restraint:

There were no incidents of seclusion or restraint during the review period.

Alternative Housing:

Alternative housing was located on the first, second, third, and fourth floors of the

Central Health Services Building.  SQ's High Risk Team (HRT) oversaw alternative housing.

The assigned clinician of the day assessed referrals; inmates were assessed within a four-hour

period.  In those instances when MHCB placement was not clinically indicated, an HRT member followed the inmate for the five-day follow-up.

Reviewed records indicated that condemned inmates were housed in alternative housing prior to placement in the SQ PIP for MHCB care; since only condemned inmates were placed in SQ PIP MHCB beds, the purpose of this procedure was unclear.

The sole programming for alternative housing inmates was a daily confidential clinical contact.  Alternative housing inmates were placed on 1:1 observation.

Condemned Care:

Two psychiatrists, six psychologists, two social workers, and one recreation therapist were assigned to the condemned care program that was housed in the Adjustment Center, North Segregation, East Block and Donner.

Overall, physical plant and staffing issues substantially limited the delivery of mental health services to the condemned; these issues included minimal space for therapeutic groups and staff's reported need of another recreation therapist to provide additional services.  In the Adjustment Center, neither the IDTT room nor group treatment space were confidential; poor ventilation in the IDTT room resulted in the opening of windows, and noise from the recreation yard made it difficult to hear treatment team members.

The condemned program would benefit from greater use of a behavioral specialist.  Many inmates exhibited behaviors that were either resistant to medications or the inmate refused prescribed medications and was either unresponsive to or inappropriate for traditional "talk therapy;" there were numerous difficult cases where behavioral treatment was indicated, but was not used.

There were also an insufficient number of escort officers for the condemned program. During the site visit, a total of three escort officers handled mental health ducats for the condemned; two officers escorted mental health caseload inmates to group treatment and yard, and the other officer escorted inmates to individual appointments. Staff and inmates reported that start times for treatment groups were often delayed due to the lack of a sufficient number of escort officers. However, escorts were not problematic in the Adjustment Center, where unit staff escorted inmates.

Donner and East Block inmates also reported that custody officers behaved impatiently and stood too closely to clinicians when inmates were spoken to at cell front. Inmates indicated feeling rushed and reported often telling clinicians that they were fine even if this was not true.

Condemned EOP inmates were housed in the Adjustment Center or were grouped together in East Block's lower tiers, which permitted greater inmate access to staff and inmate monitoring.

For the condemned EOP programming, there was 100-percent compliance with initial psychiatry contacts and 99-percent compliance with routine psychiatry contacts. For PC contacts, there was 100-percent compliance with initial contacts and 98-percent compliance with routine contacts. SQ reported noncompliance with initial IDTT meetings, but 100-percent compliance with routine IDTTs. There was 97-percent compliance for required disciplines attendance at IDTT meetings.

In the EOP condemned program, psychiatrists and PCs had significant contacts with inmates on the tiers, using a type of wellness check to monitor inmates' status and encourage them to fully participate in treatment. Inmates reported regularly being seen confidentially when they chose to come out for appointments.

296

Provided data did not reflect any EOP inmates on modified treatment plans, although many inmates refused more than 50 percent of treatment.  It was unclear whether this was a coding/tracking matter or a reporting issue.  Review of treatment plans indicated that some clinicians did not understand the role of modified treatment plans.  Treatment plans also did not incorporate treatment modifications to increase inmate participation above 50 percent.  In other cases, inmates who had been placed on modified treatment plans did not have that appropriately documented on their CDCR Form 7388 treatment plans.

SQ staffed the 3CMS condemned program at the same ratio as an administrative segregation unit.  Overall, the 3CMS condemned mental health program functioned adequately.  Treatment was client-centered and incorporated the inmate's functional level.  Since the preceding site visit, there had been an increase in the offering of therapeutic groups.  Many 3CMS condemned inmates were also seen more frequently than quarterly.  However, review of treatment plans revealed that clinical contacts with condemned 3CMS inmates did not consider the unique stressors which they faced that did not confront mainline 3CMS inmates.

Based on mainline 3CMS standards, for the condemned 3CMS program there was 99-percent compliance with initial and routine psychiatry contacts, and 100-percent compliance with initial and routine PC contacts.  There was 94-percent compliance with initial and routine IDTT meetings.

Observed IDTT meetings for condemned inmates were meaningful.  Treatment team members were cohesive, respectful and engaged with inmates and reviewed their progress since their prior IDTT meeting.  Treatment team meetings began with the PC making a thorough yet succinct case summary.  IDTT members were very knowledgeable of inmates as evidenced by

their extensive discussion of experienced inmate behaviors and symptoms.  All clinical treatment team members and the CC I fully participated in observed IDTT meetings.

However, observed IDTTs typically did not specifically discuss treatment plans beyond medication; they addressed general treatment goals, but not specific treatment interventions. IDTT meetings also did not consistently discuss higher level of care referral consideration or inpatient care.  The treatment team also did not review objective and subjective factors for consideration of referral and when the decision was not to refer an inmate who met referral criteria, treatment modifications were not always developed as part of the treatment team meeting.

Treatment plan quality also varied; some were well-constructed with behaviorally based, well-operationalized and measurable treatment goals and included specific interventions with identified staff members.  Other treatment plans were vague with overly broad, unmeasurable treatment goals, nonspecific interventions and no treatment updates.

SQ reported offering an average of 11.9 weekly hours of structured therapeutic activity to EOP condemned inmates; inmates attended an average of 6.1 weekly hours.

Inmates reported that groups were typically positive experiences that allowed them to develop skills that would assist in the management of their symptoms and cope with prison stressors.  They reported enjoying recreation therapy groups.  An observed recreation therapy group was appropriately therapeutic; the facilitator skillfully used stress-reducing activities to explore problem-solving and coping skill acquisition with inmates.

There were six treatment groups available to 3CMS condemned inmates.  Interviewed inmates were enthusiastic about them and were eager for more groups.  They reported that

groups were beneficial and helped them cope with their symptoms and with the prison and condemned environment.

Case-by-Case Reviews:

SQ processed eight cases during the review period; two inmates were released and six were retained. Three of the six retained inmates had a scheduled date for a case conference with the associate director in April 2016, but the case conference results were not available during the site visit. The three remaining cases were pending case-by-case review at the time of the site visit.

Non-Disciplinary Segregation:

SQ reported that 19 inmates were on NDS status during the review period, eight of whom were designated for expedited transfer. SQ did not provide information on transfer timelines. Interviewed NDS inmates confirmed having received their property but reported that it had not been delivered timely.

Referrals:

SQ reported there were 61 emergent referrals during the review period; 98 percent received a timely response. For the 43 urgent referrals, 91 percent received a timely response. There were 1,054 routine mental health referrals generated during the review period; 96 percent received a timely response.

MHTS.net/EHRS:

The institution reported that five SQ staff attended the "train the trainers" EHRS program, which was completed in January 2016. Eleven SQ super users participated in a super users training in February 2016.

Mental Health/Custody Relations:

The relationship between mental health and custody leadership was reported to be collaborative.  Custody staff was reported to be cooperative with line clinical staff generally, however, there were reports of custody staff walking into treatment groups while in session, standing too close to clinical staff during cell-front contacts, and walking in and out of IDTTs.

Heat Plan:

There were no heat alerts during the review period.  Operable thermometers were observed in toured housing units.  Staff reported the recording of housing unit temperatures at the third tier or higher; inmates who were prescribed heat sensitive medications were not housed above the third tier.  Document review indicated that indoor and outdoor temperatures were logged and forwarded to the litigation coordinator.  However, some interviewed staff needed remedial training as to required heat plan protocols.

Lockdowns/Modified Programming:

SQ reported that an October 5, 2015 riot led to activation of an isolated, modified program for the reception center, but that no mental health care appointments or other treatment was missed or rescheduled.  Full services in the reception center were resumed on December 8, 2016.

On March 4, 2016, SQ activated an isolated, modified program for the H-Unit dormitory housing due to a medical quarantine.  No mental health care appointments or treatment was missed or rescheduled and full programming services was resumed on March l0, 2016.

Pre-Release Planning:

SQ reported that SOMS identified inmates who required TCMP services based on their EPRD 120-days prior to release.  The TCMP contractor screened inmates for eligibility and

300

provided assistance with applications for benefits.  SQ further reported that it was working on a data sharing agreement with DHCS and all 58 California counties that would allow CDCR to receive approval/disapproval of benefits application decisions on a quarterly basis.

A staffing shortage resulted in SQ not offering pre-release planning groups from October 1, 2015 to April 30, 2016.  Following the hiring of a recreation therapist, weekly pre-release planning groups resumed on May 3, 2016.

Access to Care:

A review of SQ's monthly Health Care Access Quality Reports from October 2015 through March 2016 indicated that 0.1 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while nine percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

On May 3, 2016, three EOP inmates, representing five percent of the EOP population, were enrolled in SQ's voluntary education program.  There were no EOP inmates who were enrolled in academic, employment, or vocational education programs.

Of 974 available employment positions, 234 or 23 percent of the total 3CMS population held them, as did 740 or 25 percent of the total non-MHSDS population.

 Of 317 academic assignments, 92 or nine percent of the total 3CMS population held such assignments, as did 225 or eight percent of the total non-MHSDS population.

Of 138 vocational education assignments, 36 or four percent of the total 3CMS population held such positions, as did 102 or three percent of the total non-MHSDS population.

Of 323 voluntary education positions, 89 or nine percent of the total 3CMS population held such positions, as did 234 or eight percent of the total non-MHSDS population.

    b.  <u>Milestone Credits</u>:

As of May 3, 2016, SQ reported that 18 of 63 EOP inmates were eligible for milestone credits; none earned the credit.  For the 1,016 3CMS inmates, 246 were eligible to earn milestone credits; six percent earned the credits.  Of the 2,961 non-MHSDS inmates, 803 were eligible to earn milestone credits; three percent of inmates earned the credits.

    c.  <u>Out-of-Level Housing</u>:

On May 3, 2016, there were 21 3CMS and 58 non-MHSDS Level I inmates in Level II housing.  There were nine 3CMS and 56 non-MHSDS Level III inmates in Level II housing. There was one 3CMS Level IV inmate in Level II housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

SQ had implemented the ADA reasonable accommodation and grievance procedures, with nine of 11 staff members having received training.

    e.  <u>Periodic Classification Score Reductions: EOP Inmates</u>:

SQ did not have an EOP program.

*Coleman* <u>Postings</u>:

*Coleman* postings were accessible to inmates in toured housing units.

**<u>Deuel Vocational Institution (DVI)</u>**
August 30, 2016 –September 1, 2016

<u>Census</u>:

On September 1, 2016, DVI's census was 2,287, including 466 MHSDS inmates or 20 percent of the total inmate population.  Since the preceding monitoring period, the institution's

overall census had fallen by three percent, and the MHSDS census had decreased by nine percent.

There were two inmates in alternative housing pending transfer to an MHCB and five 3CMS inmates in the OHU for medical reasons. There was one EOP inmate in administrative segregation pending transfer to a hub, 18 reception center EOP inmates and two mainline EOP inmates. There were 13 3CMS inmates in administrative segregation, 18 STRH 3CMS inmates, 282 reception center 3CMS inmates, and 125 mainline 3CMS inmates.

Staffing:

There was not an allocated chief psychiatrist position at DVI. One of the two chief psychologist positions was filled, the other was kept vacant for cost savings per a directive from headquarters. Positions for the senior psychiatrist and three senior psychologist supervisors were filled.

The four staff psychiatrist positions were filled, as were the 12 staff psychologist positions.

There were 5.5 of 6.5 clinical social worker positions filled, leaving a 15-percent vacancy rate.

The recreation therapist position was filled.

The senior psych tech position was filled. Of the 14.2 psych tech positions, 13 were filled for a nine-percent vacancy rate.

Two of the three RN positions were filled for a 33-percent vacancy rate.

The 4.5 mental health clerical positions were filled. The HPS position was filled, and the CHSA position was vacant.

303

Quality Management:

      While the quality management system at DVI had improved, it was not yet a functional quality management/improvement program.

      With the exception of one month, the quality management committee met monthly during the review period.  While attendance was noted, it was unclear whether a quorum was achieved during any month.  The quality management committee reviewed mental health dashboard data, audits, and subcommittee reports; however, meeting minutes were lacking in substance. Although problems were identified, minimal information was documented regarding corrective action.

      The mental health subcommittee met twice per month during the review period, with the exception of two months.  Required members were present at all meetings.  The associate warden for healthcare was the only custody representative on the mental health subcommittee. While significant issues were discussed and documented in the mental health subcommittee minutes, they were not covered in the minutes of the quality management committee related to the mental health subcommittee report.

      While it was apparent that the quality management process at DVI had continued to mature since the preceding review period, the need for ongoing training, supervision and further improvement was necessary for it to become a functional, self-sustaining CQI program.

      DVI did not report the status of, nor any results from, its peer review process.

      DVI was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

      Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of

laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis. Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

DVI reported zero compliance for all applicable psychiatry measures. No corrective action measures were provided. Clozapine was not authorized for use at DVI.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration. Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA /DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH. Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals. Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

All applicable remaining measures were compliant except for intra-institutional transfers to ASU/SHU, and PSU, which was at 88-percent compliance.

DVI did not initiate any PC 2602 involuntary medications petitions during the review period. DVI did not track whether PC 2602 petitions were renewed timely, denied, or withdrawn.

Pill lines and wait times at DVI were manageable and did not exceed 30 minutes.

HS medications were not administered prior to 8:00 p.m. DVI did not provide the number of inmates on HS medications.

Transfers:

DVI referred four inmates and transferred three inmates to DSH inpatient care during the review period.  There were two referrals to acute care, both transfers were timely.  There were two referrals to intermediate care, one was rescinded and the other resulted in transfer.  The transfer to intermediate care did not timely occur.

The non-referral DSH log was incomplete.  Further, IDTTs failed to identify inmates through Form 7388-B for consideration to a higher level of care.

The institution referred 264 inmates to MHCBs, of which 152 inmates or 58 percent transferred; the remaining 112 referrals were rescinded.  Of the 152 inmates transferred to MHCBs, 136 or 90 percent were transferred timely.

The data showed that 26 of 42 administrative segregation EOP inmates or 62 percent were transferred to an EOP hub within program timeframes.

The one inmate referred to PSU transferred timely, as did the two inmates transferred to mainline EOP.

Of the 67 reception center EOP inmates, 61 percent were timely transferred to mainline EOPs.  The average length of stay for EOP inmates in the reception center was 33.7 days.  For the 670 reception center 3CMS inmates, 64 percent transferred to mainline facilities within program timeframes.  The average length of stay in the reception center for 3CMS inmates was 60.4 days.

Other Issues:

Reception Center:

DVI housed EOP and 3CMS inmates in the reception center, as well as a special program unit that housed inmates awaiting endorsement to a SNY.  These inmates programmed separately from the rest of the reception center population.

Due to movement issues, reception center inmates reported waiting an average of two hours for mental health treatment, often discouraging participation.   Staff confirmed reception center EOP treatment groups were delayed due to movement logistics at DVI, yet group tracking sheets did not reflect the late start times.  Reception center inmates reported hesitation in reporting suicidality due to a belief that they would be required to restart the reception center process, ultimately delaying transfer.  Further, inmates reported threats of RVRs or removal from the MHSDS if they did not appear for ducats, despite having to wait for hours.

Clinical staffing ratios for reception center EOP mental health staff included two PCs with caseloads of eight to nine inmates each and two psychiatrists.  Both psychiatrists provided services to EOP and 3CMS inmates in the reception center.

According to the data provided, 98 percent of initial psychiatric contacts were timely, and 99 percent of inmates prescribed psychotropic medications were seen by a psychiatrist pursuant to program guidelines.  All psychiatric contacts were conducted in a confidential setting.

Data reflected 97 percent of initial PC contacts were timely and 94 percent of routine visits were timely.  Nearly 100 percent of PC contacts occurred in a confidential setting.

The data provided did not distinguish initial screenings, mental health screenings, initial evaluations (psychological and psychiatric) or initial contacts (PC and psychiatric).

Ninety percent of initial IDTTs were completed timely and subsequent IDTTs occurred timely 99 percent of the time.  Required staff attendance at IDTTs was compliant only 60 percent of the time due to the absence of a psychiatrist.

During the site visit, the monitor's expert observed IDTTs for reception center EOP inmates.  Team member participation, development of the treatment plan, considerations of

307

levels of care and pre-release matters were improved.  Throughout the review period, a workgroup focused on IDTT treatment planning resulting in a positive impact in the program.

Reception center EOP inmates were offered an average of 6.06 hours of treatment and attended an average of 6.04 hours per week during the review period.  For inmates on modified treatment plans, DVI offered an average of 5.71 hours and inmates attended an average of 5.67 hours per week.

Inmates housed in the special program unit were often required to choose between attending yard or group.

Interruption of treatment activity was a problem area identified in the facility CAP provided in pre-site documents, and DVI reported that the issue was resolved.  However, the monitor's expert observed two treatment groups during the site visit and custody staff interrupted both groups multiple times to remove inmates for other appointments.  While the issue of bathroom breaks for inmates during treatment groups was also reported as resolved, an inmate left the group for a bathroom break but did not return.

The facilitation of the treatment groups themselves was also problematic with inadequately trained facilitators and lack of sufficient resources.  Mental health RNs recently began facilitating groups; however, they often reverted to discussing medical issues during mental health groups.  The observed groups were didactic in nature with little therapeutic interaction and facilitators struggled to maintain control over the groups.  Group size ranged from eight to 22 inmates.  Based on record review, there was a dearth of clinically meaningful groups.  Most groups focused on social skills through current events or art and therapeutic cinema.  DVI did not have an evidence-based treatment group library for treatment group facilitators.

308

The mental health staffing for reception center 3CMS inmates included four full-time PCs and one part-time PC with caseloads of approximately 53 inmates each.  Two psychiatrists provided services to the EOP and 3CMS reception center populations.

Ninety percent of initial and routine psychiatric contacts were timely and were completed in confidential settings.  According to the data provided, 97 percent of initial PC contacts were timely, as were 98 percent of routine PC contacts.  PC contacts occurred in confidential settings 99 percent of the time.  DVI did not provide separate data regarding timely completion of comprehensive psychological evaluations, initial screenings, mental health screenings, or treatment plans.

MHSDS Inmates in Administrative Segregation:

Clinical staffing ratios for mental health staff in administrative segregation included four PCs with caseloads of approximately eight inmates each.  The PCs also provided services to reception center STRH inmates.  One psychiatrist with additional duties in alternative housing was assigned to administrative segregation.

Fifty percent of initial psychiatry contacts were not timely completed; however, 100 percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.  Eighty-seven percent of psychiatric contacts were conducted in confidential settings.  Cell-front contacts were attributed to inmate refusals.

According to the data provided, 94 percent of initial PC contacts were timely; however, only 83 percent of inmates received at least weekly individual PC contacts.  The data indicated that 99 percent of PC contacts were conducted in a confidential setting.

309

Sixty-four percent of initial IDTTs were completed timely and subsequent IDTTs took place at least every ninety days 100 percent of the time.  Staff attendance at IDTTs met Program Guide requirements 94 percent of the time.

Group therapy was not offered to 3CMS inmates in administrative segregation.

Data indicated yard offering to eligible inmates was between 96- and 100-percent compliance.

<u>Short-Term Restricted Housing</u>:

Reception center STRH was located within the administrative segregation unit and utilized the clinical staff assigned to the unit described above.  DVI supervisory and clinical staff were unable to clearly verbalize the difference between reception center STRH and mainline STRH, with some believing it was a pilot program.

According to the data provided, 100 percent of initial psychiatry contacts were timely, and 100 percent of inmates prescribed psychotropic medications were seen by a psychiatrist at least every 90 days.  Eighty-seven percent of psychiatric contacts were conducted in a confidential setting.

Ninety-seven percent of initial PC contacts were timely and 85 percent of inmates received at least weekly individual PC contacts.  The data indicated that 99 percent of PC contacts were conducted in a confidential setting.

Timely completion of initial IDTTs was at 62-percent compliance.  Subsequent IDTTs took place at least every ninety days 96 percent of the time.  Staff attendance at IDTTs met Program Guide requirements 100 percent of the time.

During the site visit, the monitor's expert observed IDTTs for inmates in the reception center STRH and administrative segregation.  Reception center STRH inmates were not

310

identified as such during case presentations and additional services including group programming were not discussed for those inmates.  All required staff were present and necessary documents were available to them.  The correctional counselor had access to a computer.  The PC facilitated the IDTT and while all staff participated, the process was not collaborative.  Case presentations varied according to the facilitating PC and presentation of psycho-social histories ranged from minimal to good.  Clear discussion of goals, progress toward goals, and current functioning was minimal.  Diagnoses were not discussed nor were specific identified symptoms, and identified issues were not included as treatment goals.  Treatment goals were often vague and not measurable.  Staff provided in-cell therapeutic activities such as crossword puzzles; however, they were not included in treatment planning during IDTTs.

Group treatment was provided to reception center STRH inmates.  The sole group topic offered was Criminal Lifestyles.  The group was scheduled for 1.5 hours two days per week. Group attendance was not tracked by the institution.  Group cancellation was an issue and inmates refused an average of 37 percent of the time.  Based upon the sole topic, how group participants were scheduled, and observations during IDTT, inmates were not referred to groups predicated on clinical rationale.

During the site visit, the monitor's expert observed a Criminal Lifestyles group for inmates in reception center STRH.  The group check-in process was disorganized and while the group material was potentially useful, there was no clear goal or direction for the group.  Group dynamics were problematic with one inmate monopolizing the discussion, and peers talking over each other and passing notes.  The facilitator failed to connect inmate disclosures to each other or the group content.  Inmates reported a lack of awareness of when they were scheduled for groups

311

and being notified by custody staff only five to ten minutes prior to a group's start time.  They further complained of being routinely scheduled for groups with different peers.

DVI provided more than 13.5 hours of yard access to reception center STRH inmates.

Reception center STRH inmates had crank radios in their cells.

Alternative Housing:

There were seven alternative housing beds in the medical OHU designated for mental health inmates.  During the site visit, two 3CMS inmates were housed in the OHU pending transfer to an MHCB.  Five additional 3CMS inmates were also housed in the OHU; however, they were receiving medical treatment.  Staff indicated that the medical OHU would be remodeled and offline for five weeks.  During that time, alternative housing would occur on other units in identified beds.

The institution reported that three PCs with other duties provided services in alternative housing seven days a week.  The senior psychiatrist and a staff psychiatrist with other duties provided psychiatric services in alternative housing.

3CMS:

The senior psychiatrist provided services in the 3CMS program as well as in alternative housing.  There were two PCs in the 3CMS program with caseloads of 64 inmates.  The institution was in compliance with CDCR's staffing ratios for 3CMS inmates.

Initial psychiatric contacts were timely 100 percent of the time.  Timely follow-up psychiatrist contacts were at 99-percent compliance.  All were conducted in standard confidential settings.

Timely initial PC contacts were at 95-percent compliance.  Follow-up PC contacts were reported as 97-percent compliant.  All individual contacts were conducted in a standard confidential setting.

DVI was 94-percent compliant with timely initial IDTTs and 100-percent compliant with subsequent IDTTs occurring at least every ninety days.  Required staff attended 84 percent of the time due to lack of attendance by psychiatry.

During the site visit, the monitor's expert observed IDTTs for inmates in the 3CMS program.  Treatment planning was not collaborative.  Further, treatment goals and progress towards treatment goals were not addressed.   Rationale for level of care changes were not discussed and in one case, a level of care was changed after the inmate left the room.  Inmates were asked to sign their treatment plans.  Improvement was needed in discussion of pertinent psycho-social factors relevant to the inmate's current mental health status as well as the inmate's functioning since the last IDTT.

DVI offered one psycho-educational group for 3CMS inmates with 15 group members and no waitlist.  Given the substantially low caseloads at DVI, consideration should be given to increasing psycho-educational skills groups.

Case-by-Case Reviews:

DVI conducted two case-by-case reviews during the review period.

Non-Disciplinary Segregation:

DVI reported that a total of 75 inmates had been placed on NDS status during the reporting period; however, the institution did not have data on transfer timeframes of these inmates.  At the time of the site visit, 18 inmates were on NDS status at DVI.  Four inmates on

313

NDS status were included in the MHSDS.  All four inmates exceeded transfer timelines.  The inmates were provided with appropriate privileges and property.

"C" Status:

At the time of the site visit, one of the nine "C" Status designated inmates was a 3CMS inmate.

Referrals:

DVI reported that 97 percent of the 237 emergent referrals generated during the review period received a timely response.  Of the 124 urgent referrals, 92 percent were responded to timely.  A total of 2,030 routine mental health referrals were generated during the reporting period; 97 percent received a timely response.

EHRS/MHTS.net:

DVI was scheduled for its EHRS training in December 2016 with implementation planned in January and February 2017.  The go-live date was scheduled for March 7, 2017.

Space:

While the group treatment areas in reception center EOP were confidential when their doors and windows were closed, due to poor ventilation, staff were required to open windows which allowed staff and inmates outside of the room to hear the group discussions.  Further, noise from outside of the group room created significant distractions from the group process.

In the 3CMS program, the long-standing challenge of lack of office space was exacerbated by recent construction.  At the time of the site visit, two PCs and two part-time psychiatrists shared one office, with additional intermittent access to a medical office.  The construction also displaced several mental health staff who relocated to a building in the reception center.  Staff reported that the space posed several sanitary and safety issues as it was

plagued with problems that included mold, water leaks, sewage overflows, and pests. Anticipated completion of construction was October 31, 2017.

Mental Health/Custody Relations:

The relationships between mental health and custody staff were reported to be cooperative.  However, during the site visit, custody staff was observed interrupting mental health treatment (e.g., group, IDTT) without excusing themselves, suggesting that they were lacking an understanding of the impact their interruption had on treatment.  Additionally, officers were observed talking and joking loudly outside of treatment areas which was extremely distracting and had a negative impact on treatment.  Mental health staff did not report addressing these issues with custody staff.

Heat Plan:

DVI was in compliance with documenting temperatures throughout heat plan months, however, inappropriate thermometer locations, as well as fans directly blowing on the thermometers, remained an issue.

Lockdowns/Modified Programming:

There were three program modifications during the review period.  During each instance, mental health services and health care ducats were not disrupted.

Access to Care:

A review of DVI's monthly Health Care Access Quality Reports from January 2016 through March 2016 and May 2016 through June 2016, indicated that 8.82 percent of issued mental health ducats and add-on appointments were not completed due to non-custodial factors, excluding inmate refusals.  None of the issued mental health ducats and add-on appointments failed to occur due to custody factors.

Program Access:

   a.  Job and Program Assignments:

DVI reported that as a reception center, no EOP inmates held job or program assignments.  Institutional data indicated that of the 450 available jobs, 62 3CMS inmates, or 13 percent of the 3CMS population held job assignments, and for non-MHSDS inmates 388 or 20 percent of the population held job assignments.

Of the 45 academic assignments, three 3CMS inmates, or one percent of the 3CMS population held academic assignments, and for non-MHSDS inmates, 42 or two percent of the population held academic assignments.

There were no substance abuse treatment program assignments at DVI.

Of the available 108 vocational education assignments, 14 or three percent of 3CMS inmates held vocational education assignments, and 94 or five percent of non-MHSDS inmates held vocational education assignments.

Of the 64 available voluntary education assignments, seven or one percent of 3CMS inmates held voluntary education assignments, and 57 or three percent of non-MHSDS inmates held voluntary education assignments.

   b.  Milestone Credits:

Data for July 31, 2016 indicated that of the 28 EOP inmates, 12 were eligible for milestone credits; none earned the credits.  For the 471 3CMS inmates, 233 were eligible; three percent earned milestone credits.

Of the 1,932 non-MHSDS inmates, 1,088 were eligible to earn milestone credits; eight percent earned milestone credits.

   c.  <u>Out-of-Level Housing</u>:

On July 29, 2016, there were four Level I 3CMS inmates, two Level III 3CMS inmates, and one Level IV 3CMS inmate housed in Level II housing.

   d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

DVI had begun training on and implemented its ADA Reasonable Accommodation and Grievance policy and procedures.

<u>*Coleman* Postings</u>:

*Coleman* postings were accessible to inmates in the various housing units.

**<u>California State Prison/Corcoran (CSP/Corcoran)</u>**
June 21, 2016 – June 23, 2016

<u>Census</u>:

On June 20, 2016, CSP/Corcoran housed 3,693 inmates, for a nine-percent decrease from the census reported during the preceding site visit in February 2015.  There were 1,670 inmates on the mental health caseload, which had increased by one percent since the preceding site visit and comprised 45 percent of the total inmate population.

The MHCB unit housed 16 inmates and there were 11 inmates in alternative housing.

There were 232 mainline EOP inmates, including those housed in the overflow unit.

There were 230 inmates in administrative segregation and 99 EOP inmates in the administrative segregation EOP hub.

There were 1,021 3CMS inmates in mainline.  The 192 inmates housed in the SHU included 99 3CMS inmates.  The LTRH housed 93 3CMS inmates, and there were 99 3CMS inmates in the STRH.

Staffing:

The one chief psychiatrist and two chief psychologist positions were filled.  Ten of 10.5 senior psychologist positions were filled, for a five-percent vacancy rate.  The supervising social worker position was filled.

There were 10.5 established psychiatry positions and 4.0 FTE telepsychiatry positions, for a total of 14.5 psychiatry positions.  Of these, 2.5 state staff, 6.4 registry psychiatrists, and 3.5 telepsychiatry positions were filled; 12.4 of 14.5 psychiatrist positons were thus filled, for a 14-percent functional vacancy rate in psychiatry.

Forty-two of 47.5 psychologist positions were filled, for a twelve percent vacancy rate. An additional 2.93 contractors decreased the number of psychology vacancies to 2.57, and reduced the psychology functional vacancy rate to five percent.

All 19 social worker positions were filled; in addition, CSP/Corcoran had an additional 4.3 FTE social workers.

Four of 15 recreation therapist positions were filled, for a 73-percent vacancy rate.  There were 19 MHSDS clerical staff for 18.5 clerical positions.

All four senior psych tech positions were filled, as were 60 of 71.3 psych tech positions, for a 16-percent psych tech functional vacancy rate.  Twenty-eight of 30.9 MHSDS-registered nursing positions were filled, for a nine-percent vacancy rate.

Quality Management:

CSP/Corcoran underwent a minor sustainability review in December 2015 and a major sustainability review on March 23 – 24, 2016.  After the major sustainability review, the regional team's follow-up action plan was to provide training and/or mentoring to mental health staff on documenting acceptable narratives and identifying positive considerations.  A follow-up plan

where clinical staff reviewed the prior six months to determine whether or not inmates had made significant progress with treatment goals was developed to address issues related to the referral and non-referral logs.

Follow-up action plans regarding DSH referrals included, additional training on requirements for DSH returnees, ongoing IDTT meeting attendance by the DSH coordinator to observe the higher level of care referral consideration process, and audits of negative Form 7388-Bs.

The regional team also developed a follow-up action plan to increase consistency between the Form 7388-B and clinical documentation.  For the MHCB, an action plan was developed to address clinical, restraint log, and restraint checklist documentation, and inmates' participation in IDTT meetings, among other issues.

The action plan for the administrative segregation EOP program addressed clinicians' behavior, Form 7388-B discussion, and the nature and adequacy of clinical presentations during IDTT meetings, as well as the completeness of clinical notes and treatment plans.

For the mainline SNY EOP program, the follow-up action plan was to inform inmates about the IDTT meeting's purpose at the beginning of the meeting.  The LTRH's follow-up plan addressed supervisory attendance at IDTT meetings and CCI participation.  The regional team also developed a plan to ensure that the custody supervisor printed, reviewed, and signed welfare check logs at the end of each shift.

During the review period, the local governing body met at least monthly and maintained minutes.

The quality management committee also met monthly and always achieved a quorum.  A quality management committee patient care meeting also met monthly; minutes reflected that a

quorum was achieved and indicated pertinent mental health input.  The patient care meeting also developed performance improvement work plans.

The mental health subcommittee met bimonthly, kept meeting minutes, and regularly attained a quorum.  It addressed numerous issues, including audit findings related to the mental health program.

Chartered QITs addressed the administrative segregation EOP hub, non-dictated scanned documents, work groups regarding the TTA/alternative housing, and five-day follow-up.

The institution's peer review process functioned adequately.  It paired psychiatrists, psychologists, and social workers with like clinicians at RJD.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

CSP/Corcoran reported noncompliance with psychiatry measures related to atypical antipsychotics, Depakote, lithium, and carbamazepine.  The institution reported 100-percent compliance with psychiatry measures related to Lamictal, clozapine, and antidepressants.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital

and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

The nursing audit report reflected data for January through April 2016.  For these four months, CSP/Corcoran reported noncompliance for all applicable measures with two exceptions.  Data for January through April 2016 showed 100-percent compliance with PC 2602 involuntary medications.  Data for April 2016 indicated noncompliance with urgent medication referrals for no-shows and refusals; compliance scores were not provided for other months.

During the review period, nine new PC 2602 petitions were initiated and 23 were renewed.  One renewal was denied and one PC 2602 involuntary medications order expired and renewal was not sought.

There were no concerns reported with pill lines during the review period.

During the reporting period, the number of inmates on HS medications monthly ranged from 679 to 718.  The medications were administered after 8:00 p.m.

Transfers:

During the review period, CSP/Corcoran considered but did not refer 522 inmates to DSH.  During this same period, 18 inmates were referred to acute inpatient care; one acute care referral was rescinded.  Of the remaining 17 acute care referrals, five or 29 percent of referral packets were completed within Program Guide timeframes.  Ten of 17 or 59 percent of inmates timely transferred to DSH acute care, with five transferring within 72 hours of a bed assignment, nine transferring beyond 72 hours, and the institution did not provide data on the remaining three transfers.

During the review period, ten inmates were referred to intermediate care.  DSH rejected one intermediate care referral.  Five of nine or 56 percent of intermediate care referral packages were completed within Program Guide timeframes.  Eight of nine or 89 percent of inmates timely transferred to intermediate care, with five of nine or 56 percent transferring within 72 hours of a bed assignment.

During the site visit, two inmates who DSH had accepted for acute care and two who had been accepted for intermediate care were awaiting transfer.  All were within Program Guide transfer timeframes.  A fifth inmate was awaiting acceptance to the DSH acute care program.

During the review period, CSP/Corcoran transferred 206 inmates to MHCBs, of which 177 or 86 percent transferred beyond timeframes due to MHCB bed unavailability.  Delays ranged from slightly over 24 hours to 99.4 hours, or 4.1 days.  Fifty-two inmates had three or more MHCB stays.

During the review period, 55 percent of inmates timely transferred from alternative housing; untimely transfers were due to HCPOP delays, obtaining medical clearances, custody and safety concerns, and suicidal threats.  At the time of the site visit, 14 inmates in alternative housing were awaiting MHCB placement; seven were within transfer timeframes and seven were beyond, with a range of up to seven days overdue.

Between October 27, 2015 and February 16, 2016, CSP/Corcoran transferred 17 inmates to the PSU.  During the site visit, two EOP inmates with SHU terms awaited PSU transfer; both were within transfer timeframes.

During the site visit, 99 SHU 3CMS inmates were awaiting LTRH placement.  CDCR had developed a proposal for them to receive full LTRH programming beginning July 27, 2016.  No inmates housed at CSP/Corcoran during the site visit were awaiting STRH placement.

Other Issues:

Administrative Segregation EOP:

Administrative segregation programming took place in a building adjacent to the administrative segregation hub housing unit.  This building provided adequate programming space for individual and group therapy and for IDTT meetings.  The assigned psychiatrist had a caseload of 105 inmates, which exceeded CDCR's established 1:52 ratio for psychiatry.  PC caseloads in the EOP hub ranged from nine to 12 inmates.

Audits indicated 87-percent compliance for PC completion of the comprehensive clinical assessment before the IDTT meeting.  There was 78-percent compliance for completion of the initial intake assessment and 94-percent compliance for weekly PC contacts.  The IDTT meeting occurred prior to the ICC meeting 97 percent of the time for initial meetings and 98 percent of the time for follow-up meetings.

Initial psychiatry contacts were 97-percent compliant and follow-up psychiatry contacts were 99-percent compliant.  PC contacts were timely 79 percent of the time for initial contacts, 98 percent of the time for follow-up contacts, and 91 percent of the time for treatment refusal appointments.  Twenty-eight percent of psychiatry contacts and one percent of PC contacts occurred in non-confidential settings.

There was 97-percent compliance with initial IDTT meetings and 98-percent compliance with timely follow-up IDTT meetings.  Audits indicated 100-percent compliance with required members' attendance at IDTT meetings.

An observed administrative segregation IDTT meeting revealed the attendance of all necessary participants, as well as a psych tech and recreation therapist.  There was good

interdisciplinary discussion and higher level of care referral consideration, and treatment goals were outlined.

As to the provision of ten hours of weekly group therapy for administrative segregation EOP inmates, an average of 12.4 weekly hours were offered, of which 7.2 hours were attended. As to providing five hours of weekly group therapy for administrative segregation EOP inmates on modified programming, an average of 12.3 weekly hours were offered and 8.5 hours were attended.

MHCB:

There were 25 MHCBs in the institution's licensed CTC unit.  Two psychiatrists covered the unit, while PC caseloads varied; one clinician had a caseload of ten inmates, one had a caseload of 16 inmates, one had a caseload of six inmates, and three had one inmate each.  A recreation therapist was also part of the MHCB clinical team.

Initial SREs were completed timely 85 percent of the time, as were 100 percent of follow-up SREs.

Eighty-four percent of initial psychiatry contacts and 82 percent of follow-up psychiatry contacts were timely.

There was 83-percent compliance for initial PC contacts and 88-percent compliance for follow-up contacts.

The institution was compliant 67 percent of the time for five-day follow-ups, indicating noncompliance.

All required staff attended an observed IDTT meeting and contributed appropriately.  The treatment team discussed and agreed on the inmate's cuff status.  The team also discussed Form 7388-B criteria and developed a plan for the inmate as he awaited DSH acceptance.  Another

inmate was presented in absentia.  The clinician's presentation was clear and concise, and the inmate was kept at the forefront of the IDTT presentation.

Clinical space for confidential contacts in the MHCB was reported to be problematic.  It was also reported that MHCB inmates did not receive yard.

Seclusion and Restraint:

Ten inmates were placed in five-point restraints during the review period; all had appropriate doctors' orders and were documented as danger-to-self, danger-to-others, or both.

Alternative Housing:

Six PCs covered alternative housing.  Staff reported that all inmates were on 1:1 observation.

Long-Term Restricted Housing:

For 3CMS inmates housed in LTRH, PC caseloads ranged from 11 to 17 inmates.  For 3CMS inmates with LTRH status who were not housed in LTRH, two PCs had caseloads of 28 inmates each, two others had 14 and 18 inmates on their caseloads, and one had three inmates. The assigned psychiatrist had a caseload of 193 inmates, which was noncompliant with the established CDCR ratio of 1:161 for the program.

Psychiatry contacts were timely 94 percent of the time and there was 99-percent compliance with PC contacts.  There was 98-percent compliance for timely IDTT meetings; required participants were present 61 percent of the time.  Review of documentation indicated that inmates routinely received ten hours of weekly yard and were offered three weekly showers.

Short-Term Restricted Housing:

CSP/Corcoran activated a STRH program for administrative segregation inmates who received 3CMS level of care in December 2015 in the stand-alone administrative segregation

unit.  During the site visit, the assigned psychiatrist had a caseload of 102 inmates.  Six clinicians assigned to the program had caseloads ranging from 15 to 19 inmates.

STRH staff reported initial difficulties with group assignments as some inmates were general population while others assigned to groups were SNY inmates.  However, clinical and custody staff had worked cooperatively to resolve the issue and groups were being provided.  The STRH unit included one group therapy room and four rooms for individual therapy.

Psychiatry contacts for STRH 3CMS inmates were timely 99 percent of the time.  There was 63-percent compliance with initial PC contacts and 75-percent compliance with follow-up PC contacts.  Supervisory staff reported a high refusal rate by STRH inmates.

There was 38-percent compliance with initial IDTT meetings and 100-percent compliance with follow-up IDTT meetings.  There was three-percent compliance for all required participants' attendance at IDTT meetings; psychiatry was typically absent.

An observed IDTT meeting indicated all necessary participants in attendance, but several areas in need of improvement.  Among them, presentations required better organization, and there were problems with treatment plans.  The IDTT meeting was also interrupted by custody officers who entered the room to obtain property and supplies.

Document review indicated that inmates received adequate yard, which inmates confirmed.

STRH staff and inmates reported continuing problems and significant delays with the timely distribution of property, which was attributed to staff shortages.  Inmates also complained of long waits for release and transfer from the STRH.  They reported being offered weekly groups and confirmed that prior group assignment problems had been resolved; group sessions were separated based on general population or SNY status.

Mainline SNY EOP:

The mainline EOP program was housed in the 3B01 housing unit.  At the time of the site visit, there were also 19 EOP inmates housed in unit 3C awaiting transfer to another institution. The institution was non-compliant with MHSDS requirements, as these inmates did not receive EOP programming and were housed in general population housing.  3CMS clinicians saw these inmates weekly, the IDTT treatment team saw them monthly, and they received three weekly hours of recreation groups.

In the mainline EOP program, one psychiatrist had a caseload of 197 inmates, which exceeded CDCR's clinical ratio of 1:97; the other psychiatrist's caseload was not reported.  Nine PCs had caseloads of between 18 and 21 inmates, one had 14 inmates, and another had seven inmates.

There was 93-percent compliance for completion of inmate initial assessments within 14 days of arrival in the EOP program.  There was 88-percent compliance with initial psychiatry contacts and 98-percent compliance with follow-up psychiatry contacts.  Initial PC contacts were 88-percent compliant and follow-up PC contacts were 93-percent compliant.

There was 77-percent compliance with timely initial IDTT meetings.  Follow-up IDTT meetings were timely 100 percent of the time.  There was 88-percent compliance for the attendance of required disciplines at IDTT meetings.

There was clinically appropriate space for group therapy.  With regard to providing ten weekly hours of group therapy, an average of 11.2 weekly hours were offered, of which 8.4 hours were attended.  Approximately 65 percent of inmates were offered ten weekly hours of group, with 33 percent attending ten hours.

327

Two observed EOP group therapy sessions were each led by a psych tech.  One had good discussion, which benefitted inmates.  The other group, on medication management, was problematic.  The group facilitator provided a handout on medication side effects and the entire "group" process consisted of reading the extremely complicated handout.  Inmates did not appear to benefit from this group.

Some EOP inmates reported that housing officers required them to choose between groups, yard, and showers, inconsistent with MHSDS program requirements.

Supervisory staff reported that all inmates housed in 3A02 and 3C were on modified programming as the institution was unable to provide full programming in non-EOP housing.  As to the provision of five hours of group therapy for these inmates, an average of 4.4 weekly hours were offered; inmates attended 3.2 weekly hours.

Mainline SNY 3CMS:

Caseloads for PCs in the 3CMS program included three clinicians with caseloads of 91 to 97 inmates, two with caseloads of 142 and 143 inmates, two others with caseloads of 118 and 129 inmates, and three with caseloads of 47, 66, and 80 inmates, respectively.  Caseloads for the telepsychiatrists assigned to the 3CMS program were 147, 398, and 476 inmates, respectively.  CDCR's established clinical ratio for a psychiatrist in a mainline 3CMS program was 1:225.  A part-time telepsychiatrist and two part-time psychiatrists also provided services in the 3CMS program.

Psychiatry contacts were 98-percent compliant for initial contacts and 92-percent compliant for follow-up contacts.  Primary care clinician contacts in the 3CMS program were non-compliant at 12 percent for initial contacts and 70 percent for follow-up contacts.  There was 61- and 81-percent compliance for initial and follow-up IDTT meetings, respectively.

Observed IDTT meetings for 3CMS inmates included appropriate staff.  Inmate case histories were pre-presented to the telepsychiatrist without the inmate being present.  Thereafter, with the inmate present, clinicians reviewed the IDTT meeting's purpose, and the treatment team, with inmate participation, discussed treatment plans.  Although four different clinicians presented, all clinicians and the psychiatrist provided specific perspectives on each inmate based on the clinical presentation.  The CC I also contributed appropriately.

Due to the lack of group space, there were no groups for 3CMS inmates.  Office space and confidential treatment space was also problematic.

A group of interviewed 3CMS inmates all knew their psychiatrist and most knew their PC.  However, none were familiar with their treatment plan and none reported seeing their clinician more than every 90 days.  Interviewed inmates did not indicate problems with prescribed psychotropic medications.  Multiple inmates reported not being able to access mental health services on the same or following day without having an altercation with custody or stating that they were suicidal.

3CMS Inmates in Administrative Segregation:

There was 97-percent compliance for timely psychiatry contacts.  Initial PC contacts were 20-percent compliant and follow-up contacts were 50-percent compliant.  The institution reported less than one percent of psychiatry and PC contacts occurred in non-confidential settings.

There was 100-percent compliance for both timely initial and follow-up IDTT meetings.  There was 77-percent compliance with required participants attending IDTT meetings.

Case-by-Case Reviews:

CSP/Corcoran indicated the timely conduct of case-by-case reviews, but was unable to report the total number of cases reviewed. The institution did not retain records of cases that the ICC considered where the inmate subsequently transferred. Staff reported that another difficult issue related to cases reviewed by the ICC where inmates were released but did not transfer due to the statewide lack of appropriate beds.

Non-Disciplinary Segregation:

CSP/Corcoran reported 125 inmates on NDS status during the site visit, of which 15 were designated for expedited transfer and 110 had property and privileges, but were not considered for expedited transfer. Staff and inmate interviews revealed that NDS inmates had not received property in a timely manner. Staff further reported that all inmates had yard assignments and phone privileges, which was confirmed by a review of the documentation.

Referrals:

CSP/Corcoran reported 97-percent compliance for timely responding to emergent mental health referrals, 96-percent compliance for timely responses to urgent referrals, and 68-percent compliance for timely routine referral responses.

Mental Health/Custody Relations:

The relationship between mental health and custody management staff was reported to be cooperative. Staff nonetheless reported that at times the institutional policy of periodically rotating custody managers made the establishment of working relationships and problem solving difficult.

330

Heat Plan:

There were no heat alerts at CSP/Corcoran during the reporting period. Operable and accurate thermometers were observed in housing units. Document review indicated that indoor and outdoor temperatures were logged and forwarded to the litigation coordinator. An updated list of inmates on heat sensitive medications was provided to staff members daily. Interviewed staff were knowledgeable regarding heat protocols.

Lockdowns/Modified Programming:

CSP/Corcoran did not provide data on the number of lockdowns or whether any such lockdowns had impacted services.

Access to Care:

A review of CSP/Corcoran's monthly Health Care Access Quality Reports from November 2015 through April 2016, indicated that one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 15 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a. Job and Program Assignments:

On June 22, 2016, CSP/Corcoran reported that of 1,291 available job assignments, 41 or 12 percent of EOP inmates held positions, as did 429 or 32 percent of 3CMS inmates, and 821 or 41 percent of non-MHSDS inmates.

CSP/Corcoran data indicated that of 502 academic assignments, 55 or 16 percent of EOP inmates held academic assignments, as did 217 or 16 percent of 3CMS inmates, and 230 or 11 percent of non-mental health caseload inmates.

Of 43 substance abuse treatment assignments, 35 or three percent of 3CMS inmates held assignments, as did eight or less than one percent of non-MHSDS inmates.

Of 103 vocational education assignments, 61 or five percent of 3CMS inmates held assignments, as did 41 or two percent of non-mental health caseload inmates.

Of 186 voluntary education positions, five or one percent of EOP inmates held positions, as did 181 or 14 percent of 3CMS inmates.

    b.  <u>Milestone Credits</u>:

As of April 30, 2016, CSP/Corcoran reported that 51 of 336 EOP inmates were eligible for milestone credits; 20 percent earned the credits.  Of the 1,379 3CMS inmates, 242 were eligible to earn milestone credits; 16 percent earned them.

Of the 2,174 non-MHSDS inmates, 377 were eligible to earn milestone credits; 19 percent earned the credits.

    c.  <u>Out-of-Level Housing</u>:

On May 31, 2016, there was one 3CMS Level I inmate in Level IV housing.  Three EOP, 72 3CMS, and 152 non-mental health Level II inmates were in Level III housing, and one 3CMS and six non-MHSDS Level II inmates were in Level IV housing.  Additionally, 22 EOP, 29 3CMS, and 71 non-mental health Level III inmates were in Level IV housing, and five EOP, 24 3CMS, and 12 non-MHSDS Level IV inmates were housed in Level III housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSP/Corcoran staff did not provide information regarding its ADA reasonable accommodation and grievance procedures.

e.   Periodic Classification Score Reductions:  EOP Inmates:

Review of a sample of completed CDCR 840s confirmed that EOP inmates were granted classification score reductions for successful programming.  Some of the CDCR 840s were only conducted annually.

*Coleman* Postings:

With one exception, all toured housing units contained *Coleman* postings.

**California Substance Abuse Treatment Facility (CSATF)**
September 13, 2016 – September 15, 2016

Census:

On September 14, 2016, CSATF housed 5,275 inmates; 2,350 or 45 percent were in the MHSDS program.

The MHCB unit housed five inmates and there were eight inmates in alternative housing.

There were 366 mainline EOP and 1,859 mainline 3CMS inmates.

The administrative segregation population of 85 included six EOP inmates pending transfer to an EOP hub.  There were 106 inmates in STRH.

Staffing:

The chief psychiatrist and two chief psychologist positions were filled.

There were no senior psychiatrist positions established at CSATF.

Four of 4.5 senior psychologist supervisor positions were filled, for an 11-percent vacancy rate.  All five senior psychologist specialist positions were filled.

There were nine established on-site psychiatry positions and seven telepsychiatry positions.  One on-site position was filled, 1.7 positions were filled by registry staff and five telepsychiatry positions were filled, for a 52-percent functional vacancy rate.  CSATF also had five medical assistants on staff assisting psychiatrists.

333

Of the 37 established staff psychologist positions, 28.5 were filled, for a 23-percent vacancy rate. One FTE position was filled by registry staff, decreasing the number of psychology vacancies to 7.5 and reducing the psychology functional vacancy rate to 20 percent.

The one supervising social worker position was filled, as were 20.5 of the 22 established social worker positions, for a seven-percent vacancy rate. An additional 0.5 position was filled by registry staff, resulting in a functional vacancy rate of five percent.

Four of 13 recreation therapist positions were filled, for a 69-percent vacancy rate.

CSATF had 22 mental health clerical positions established and hired 23 staff. The AGPA position, three HPS I positions, and two office supervisor positions were all filled.

Quality Management:

There was one minor and one major sustainability review during the review period. The minor sustainability tour found 92 percent or 38 of 41 7388-B forms to be of good quality or having met acceptable quality levels on each of the performance indicators. By achieving 92 percent, CSATF would have its 7388-B forms reviewed bi-annually instead of quarterly.

During the review period, the local governing body met once and achieved a quorum. Minutes reflected that the local governing body reviewed and approved several mental health-related operating procedures that affected various programs and housing units throughout the institution.

The quality management committee held monthly meetings and always achieved a quorum. The quality management committee examined various mental health issues, including those related to compliance, corrective actions, and ongoing QITs.

The mental health subcommittee met regularly to address various dashboard performance and program issues, and it reported monthly to the quality management committee. Minutes

334

reflected a quorum at each meeting, but did not demonstrate if and how staff were informed of decisions or actions of the mental health subcommittee.  Interviewed staff reported that quality management issues were not formally provided to staff, but did occur as part of supervision in the mental health program.

Chartered QITs addressed non-dictated scanned documents, SREs, cancelled ducats due to custody, discharges from inpatient care, mental health referrals, administrative segregation unit prescreens, and medication noncompliance.  Seven QITs were completed during the review period.

CSATF was paired with SVSP for the peer review process.  The institution reported that all eligible CSATF clinicians had been reviewed using the new process at the time of the site visit.  Peer reviews were reported to occur monthly.  No significant concerns or systemic issues were identified during peer review.

CSATF was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

The quarterly audits of psychiatric measures during the review period for atypical antipsychotics were completed in March and June 2016.  CSATF reported compliance in March 2016 in the range of 96 to 100 percent and in June 2016 in the range of 95 to 100 percent. Clozapine was not authorized for use at CSATF.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration. Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH. Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals. Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

CSATF was compliant with continuity of medications with inter-institutional transfers at R&R during each month of the review period. For continuity of medications with intra-institutional transfers excluding ASU/SHU/PSU, CSATF reported noncompliance ranging from 50 to 82 percent for each month of the review period. For continuity of medications for MHCB transfers, CSATF reported noncompliance for each month of the review period with a range of 64 to 82 percent. For continuity of medications with intra-institutional transfers including ASU/SHU/PSU, CSATF was noncompliant for five of six reviewed months ranging from 56 to 83 percent, and 95-percent compliant for one month. For discharge/transfer from a community hospital and/or DSH, CSATF reported compliance during five of the six months, and near compliance during one month. CSATF reported compliance throughout the review period with psychiatrist/mental health mid-level prescribed medications.

Medication compliance for PC 2602 involuntary medications during the review period ranged from 91 to 96 percent for five months, and was at 89 percent for the remaining month. During the review period, CSATF renewed nine PC 2602 involuntary medication petitions and

submitted four new petitions.  Three of the new petitions were granted and one was denied.  Two PC 2602 inmates refused medications in April 2016; no use of force was associated with the administration of involuntary medications.

Staff reported that there were no pill line problems at CSATF.

CSATF reported 700 inmates were prescribed HS medications at the time of the site visit, and received their medications at 8:00 p.m. or later.

Transfers:

During the review period, 82 inmates were referred for acute care; five referrals were rescinded and two inmates prevailed in *Vitek* hearings.  Of the 74 inmates for whom the necessary data was provided who transferred to DSH, 41 or 55 percent transferred timely.  For the 33 untimely transfers, the average time for transfer was 18.8 days.  The data indicated that 73 percent of transfers occurred within 72 hours of bed assignment.  Three inmates with complex medical needs were referred to acute care.  At the time of the site visit, there were four inmates awaiting transfer to acute care; none were beyond timelines.

During the review period, 32 inmates were referred to intermediate care.  Two referrals were rescinded; two inmates transferred to other facilities prior to endorsement to DSH; two inmates were deferred to acute care; and one inmate prevailed in his *Vitek* hearing.  Of the 25 inmates who transferred to DSH, six or 24 percent did not transfer timely.  For the six untimely transfers, the average time for transfer was 44 days.  The data indicated that 22 or 88 percent of transfers occurred within 72 hours of bed assignment.  One inmate with complex medical needs was referred to intermediate care.  At the time of the site visit, there were two inmates awaiting transfer to intermediate care; neither was beyond timelines.

During the review period, there were 420 MHCB referrals, of which 147 or 35 percent were rescinded.  Of the remaining 273 inmates, 125 transferred internally to CSATF's MHCB unit and 148 transferred to MHCBs at other institutions.  Fifty percent or 137 of the transferred inmates were transferred beyond timelines in a range of 24.40 hours to five days.

At the time of the site visit, there were 13 inmates in alternative housing; nine or 69 percent were beyond transfer timelines.

No inmates transferred to PSUs during the review period.

During the review period, 78 inmates were timely transferred to an EOP hub at a compliance rate of 92 percent.  At the time of the site visit, there were six EOP inmates awaiting transfer to an EOP hub; none were beyond transfer timelines.

Other Issues:

MHSDS Inmates in Administrative Segregation:

Administrative segregation was located in E1.  At the time of the site visit, the unit housed EOP inmates awaiting transfer to an EOP hub and non-MHSDS inmates.  Staff reported that E1 was expected to undergo a mission change from administrative segregation to alternative housing, effective October 2016.

A psychiatrist was assigned to provide services to segregated EOP and STRH inmates and had a caseload of 58 inmates, which met the established clinical ratio.  The PC assigned to segregated EOP inmates had a caseload of 13 inmates.

For EOP inmates in administrative segregation pending transfer to an EOP hub, initial psychiatric contacts were at 58-percent compliance; routine psychiatric contacts were at 88-percent compliance.  Initial and routine PC contacts were at 60- and 96-percent compliance,

338

respectively.  Staff reported that it was unclear when inmates were due for PC contacts, suggesting the need for improved tracking and monitoring.

Initial and routine IDTTs were at 35- and 79-percent compliance, respectively.

Documentation for March through August 2016 for monthly certification of yard access were reviewed.  Between March and May 2016, compliance was reported as "compliance for documentation of inmates receiving minimally required yard time," and ranged from 88 to 95 percent.  Documentation for June through August 2016 indicated a variation in descriptive language from the preceding time period to: "documentation of inmates offered and received or offered and refused the minimally required yard time."  Compliance was reported to be 100 percent for June through August 2016.

MHCB:

CSATF maintained a 20-bed MHCB.  At the time of the site visit, one psychiatrist was assigned to the MHCB, which was noncompliant with CDCR clinical ratios for psychiatry in MHCBs.  The four assigned PCs carried caseloads of three to six inmates which were within clinical ratios.  On September 14, 2016, 14 beds were taken offline for retrofitting.  Once completed, the remaining six cells would be taken offline and retrofitted.  The entire process was expected to be completed by October 25, 2016.

CSATF had 221 admissions during the review period involving 203 inmates.  Timely psychiatry contacts were 78-percent compliant for initial and 85-percent compliant for routine. Timely PC contacts were compliant at 75 percent for initial and 87 percent for routine.

IDTTs were completed timely 79 percent of the time for initial meetings and 99 percent of the time for routine meetings.  MHCB staff required inmates who were not maximum custody status to sit in the individual treatment modules rather than on a chair during IDTT.

The average length of stay during the review period was 14.6 days.  The rationale provided for extended lengths of stay in the MHCB was the reported need to maintain continuity of care and reduce the risk of readmission, as well as inmates awaiting a DSH bed.  A review of multiple records suggested that inmates were being held until the admitting psychiatrist returned. This was clearly a problem with the insufficient staffing model for the MHCB and directly contributed to the length of stay, although inmates awaiting DSH bed assignments were a larger group.

While inmates were individually evaluated for the clinical appropriateness of visits, telephone calls, and outside yard, yard was restricted to when a recreation therapist was available and dayroom was only available to medical patients, despite the room having a module.  The unit sergeant was agreeable to allowing equal access to mental health inmates.  It appeared that it was the mental health staff who had some reservations, but they indicated that they would implement equal access for mental health inmates once the dayroom was determined to be safe.

Seclusion and Restraint:

There were two incidents of restraint during the review period, the longest of which was 90 minutes.  However, when reviewing the medical records for these inmates it was discovered that while checklists were completed saying that Program Guide requirements had been met, no such documents were found in the medical record.  This called into question the accuracy of the checklist itself.  While incidents of restraint might be rare, they are significant and must meet the standards set forth by the Program Guide.  Physician's orders, nursing notes, and all other required documentation must still be completed.

The staff in the MHCB had implemented the mechanical restraint memo for handcuffs but had not fully implemented all parts of that memo regarding access to care.

Alternative Housing:

The CTC psychiatrist and three PCs provided clinical services in alternative housing.

There were OHU or Mental Health Outpatient Housing Unit (MHOHU) cells in use at CSATF at the time of the site visit.  Designated alternative housing cells at CSATF were BPH cells, cells in C3, D3, E1, STRH, and the CTC.  CSATF had discontinued use of the TTA as an alternative housing area, although confidential clinical interviews were held in the TTA for alternative housing inmates.

According to the data provided, there were 409 alternative housing placements during the review period; 214 inmates or 52 percent were timely removed.  Lengths of stay beyond policy transfer timeframes ranged from 0.04 hours to 8.2 days.

Short-Term Restricted Housing:

Three PCs providing services in STRH had caseloads of 27 inmates each.  As reported above, a psychiatrist assigned to EOP inmates in administrative segregation also provided services in STRH.  Staff reported that for much of the reporting period, the average length of stay in the STRH was 39 days with a range of one to 289 days.

The institution did not present supporting data regarding required psychiatry contacts, PC contacts, or IDTTs in a useful format.  Compliance in these areas of the Program Guide was not ascertainable based on the data provided, which in some instances were not consistent with or even contradicted narrative statements.

Observed IDTTs for four inmates were attended by both required and non-required staff, including supervisory and regional staff.  Case presentations varied by PC and ranged from excellent to below average.  A positive finding was the willingness of the psychiatrist to consult with medical staff regarding an inmate who had pressing medical needs that interfered with his

ability to program.  Treatment team members participated overall, and the discussions were generally collaborative; however, it was noted that when staff were not participating in IDTT discussions, they were doing paperwork, which was inappropriate.

Other negative observations included symptoms being discussed in general rather than inmate-specific terms; diagnoses not being routinely identified; treatment goals not being clearly defined or tailored to inmates' needs; clinical jargon being used rather than layman's terms; failing to consistently establish effective communication; and failing to discuss all aspects of treatment participation and progress—treatment refusals, rationale for level of care, and review of the 7388-B were lacking.  These areas needed improvement.

A review of treatment plans for inmates discussed in IDTT supported the findings noted during observation.  In several cases, goals were not routinely connected to presenting problems. In addition, in multiple instances, goals and interventions were not distinct statements.  Further, at times, there was confusion regarding goals and interventions which suggested a need for training.  However, for many inmates observed in IDTTs, treatment plans revealed thoughtful interventions grounded in theory and appropriate for the short-term nature of STRH.

A review of the group schedule indicated that groups were offered two days a week for SNY inmates and one day a week for GP inmates.  Groups lasted two hours; topics included Anger Management and Coping Skills.  The group room was confidential.  Staff reported that although there was only enough space for seven inmates, ten inmates were routinely scheduled. This process ensured that typically half of the inmates attended.  Refusals were reportedly attributed to not wanting to be around other people; conflicts with yard; time was too early; and uncomfortable chairs.  At the time of the site visit, one clinician facilitated all STRH groups.

A Coping Skills group was partially observed during the site visit; there were seven participants. The group leader showed a movie and facilitated discussion which pertained to cognitive distortions and the development of one's identity. The group leader was skilled at facilitating good discussion between inmates and could redirect inmates as necessary. Inmates were attentive and actively engaged. The discussion was useful, but there was no clear connection to coping skills.

Interviewed group participants identified group and yard access as positives about STRH. They reported that groups tended to utilize media (movies) and addressed depression and mental health issues, but they did not believe there were groups to address anger management. The discrepancy between the inmates' report and the group schedule likely related to the observation that groups did not necessarily reflect the designated group topic. Inmates also voiced that the variability of group times and unpredictability of their schedule was a challenge.

It was reported that custody staff on First Watch "goes out of their way" to wake inmates by banging on the door, a certain named officer in particular. Inmates reported that they were not routinely offered to come out of their cells for PC contacts and one inmate reported that despite being in STRH for two weeks he had not seen his PC. The inmates reported two- to four-week delays in meeting with the psychiatrist. They also reported disliking the re-start chairs. Inmates who were interviewed at cell front attributed group refusals to the use of "chains" on the restart chairs and to the groups being "boring."

Memorandums dated March through August 2016 for monthly certification of yard access were reviewed. Inmates were offered 21 hours of yard per week, and received a minimum of 18.5 hours a week. Between March and May 2016, compliance was reviewed as "compliance for documentation of inmates receiving minimally required yard time."

Compliance ranged between 85 to 88 percent.  When inmates who had been in the STRH for less than a week were removed from the data, compliance increased from 99 to 100 percent.

Documentation for certification changed in June 2016.  Documentation between June through August indicated a change to "documentation of inmates offered and received" or "refused the minimally required yard time."  Compliance was 100 percent for June through August.

EOP:

There were 88 SNY Level II beds on F Yard set aside for EOP inmates who had been identified for the co-occurring disorders program facilitated by mental health and the substance abuse program staff.  They were previously reserved for mainline EOP inmates but the entire yard had converted to a SNY, requiring the change in admissions.  There continued to be another SNY EOP on Yard G in housing units G1 and G3.  G1 had a capacity of 176 beds and G3 housed up to 88 inmates.  The average census during the review period was 256 for G Yard and 48 for F Yard or the co-occurring program.

In the SNY EOP program in F3, one telepsychiatrist and one registry psychiatrist had caseloads of 35 and 36 inmates, respectively, and three PCs had caseloads of 28 inmates.  For the SNY EOP program in G1, one telepsychiatrist and one registry psychiatrist had caseloads of 55 and 89 inmates, respectively and nine assigned PCs had caseloads of 12 to 24 inmates.  In G3, a telepsychiatrist had a caseload of 80 inmates, and three PCs carried caseloads of 26 to 27 inmates, while a fourth PC had a caseload of nine inmates.

Except for initial psychiatry contacts, which were at 85 percent, psychiatry and PC contacts were in compliance at 90 percent or greater.  Less than one percent of psychiatry

contacts and approximately six percent of PC contacts were conducted at cell front or non-confidentially.

Compliance with initial IDTT meetings was problematic, with 68 percent occurring timely. Routine IDTTs were timely at 98-percent compliance. There was 95-percent compliance for required IDTT attendance.

Due to a mandatory training that involved some EOP staff, one observed IDTT had substitute clinicians; they had met with the inmates and were extremely well-prepared. The senior supervisor suggested changes to the treatment plans, reflecting a team process. Weaknesses included that the Form 7388-B indicators were not covered and/or were not integrated into the overall process; pre-release planning was not adequately addressed; and the ducat list was inaccurate by as much as four hours. This was also a complaint from inmates during interviews, that ducats were not for the correct time and that they would have to wait around for hours, unable to leave for yard or other activities.

EOP inmates were offered a weekly average of 14.5 hours of structured therapeutic activity and attended an average of 11.7 hours. At the time of the site visit, there were reportedly no inmates on a modified treatment plan. Quality management data reported that at times, as many as one in four inmates was refusing treatment and receiving less than the required ten hours without indicating that clinical efforts to increase participation had occurred.

Interviewed inmates reported therapeutic yard was chaotic and mainly unstructured and that custody yard time was insufficient, the latter a complaint supported by staff. Inmates reported most therapeutic groups were boring and meaningless; DVDs were frequently played, but not used clinically. They requested treatment groups that facilitated knowledge and coping with their diagnoses and reduction of suicidality; less education-like groups and more process-

type groups; and groups with practical information.  They also wanted more pre-release planning services.

One observed group had both doors open the entire time even though the room was in the housing unit, leaving no confidentiality for group participants.  The group was entitled "Cultural Awareness," but the content was addiction.   It was unclear how those two concepts were related as the facilitator did not link the two.  Inmates reported that they never knew what their groups were supposed to be about since the facilitators just "taught" the same things all the time.

3CMS Mainline/SNY Programming:

CSATF had a large 3CMS population housed in yards A through G.  Two supervisors were assigned to oversee one yard each, and a third supervisor was assigned to the other five yards.  Staff did not offer the reasons underlying the distribution of labor.

Telepsychiatry was the primary mode of providing psychiatric services in the program.  Seven telepsychiatrists were assigned to 3CMS with caseloads of 40 to 175 inmates, which were within established clinical ratios.  In D yard, one on-site staff psychiatrist had a caseload of 87 inmates and a registry psychiatrist had a caseload of 67 inmates.

Sixteen PCs were assigned to 3CMS with caseloads in a range of 40 to 193 inmates, which were within established clinical ratios.  However, staff reported that PCs were redirected to assist with the provision of EOP services.

Psychiatry contacts were 93-percent compliant for initial and 94-percent compliant for routine.  PC contacts were deficient at 65-percent compliance for initial contacts.  Supervisory staff attributed this to the mission change on F yard during the review period.  Routine PC contacts were at 86-percent compliance.

346

Initial IDTTs were 62-percent compliant; this was also attributed to the mission change on F yard.  Routine IDTTs were 96-percent compliant.  Required staff attendance at IDTTs was at 99 percent.

Observed initial IDTTs included required staff as well as the supervising psychologist. While psycho-social factors were discussed, case conceptualization, symptoms and diagnoses were not discussed; treatment goals were not clearly identified in multiple cases; and issues were discussed using clinical jargon instead of layman's terms.  Even when indicated, substance abuse, discharge planning, and treatment refusals were not consistently included as treatment goals, and treatment refusals were not adequately explored.

At the time of the site visit, there were no 3CMS groups, but staff reported that CSATF had a goal of implementing group programming during the fourth quarter of 2016.

Case-by-Case Reviews:

The institution reported that there were two 150-day case reviews that were not resolved during the review period.  Subsequent IDTTs for the two cases were scheduled, one of which was held three days after it was scheduled to occur.

Non-Disciplinary Segregation:

During the review period, CSATF reported that 61 inmates were designated NDS requiring expedited transfer.  The transfer dates for two inmates were not provided.  Of the 59 inmates transferred, 15 or 25 percent were transferred within the required 72 hours.

At the time of the site visit, CSATF had 11 inmates on NDS status; all had received their property and privileges.  One inmate was designated for expedited transfer and was within transfer timelines.

Behavioral Modification Unit:

CSATF reported that it operated a behavioral modification unit; approximately 50 percent of inmates in the unit were on "C" status.  The institution reported that it was compliant with requirements regarding out-of-cell time, and initial and subsequent placements.

"C" Status:

There were 58 MHSDS inmates on "C" Status at the time of the site visit – one MHCB, five EOP, and 52 3CMS inmates.  A small sample of treatment plans were reviewed for MHSDS inmates and it was clear that there was a lack of communication between custody and mental health staff regarding the inmates' status.   For example, an inmate who had been placed on "C" Status on the day prior to IDTT was described in IDTT documentation as "programming well" based on custody input in the treatment plan documentation.  It was apparent that mental health staff was not informed of the inmate's placement on "C" Status and therefore could not contribute helpful information to decision-making regarding such placement.  This impacted mental health staff's ability to form appropriate treatment plans to work on the behaviors underlying the reasons for "C" Status placement.

Referrals:

CSATF reported 98-percent compliance for timely responding to 378 emergent mental health referrals, 96-percent compliance for timely responding to 179 urgent referrals, and 90-percent compliance for timely responding to 3,892 routine referrals.

EHRS/MHTS.net:

At the time of the site visit, CSATF had not yet activated EHRS.  Staff reported that a clinician was scheduled to participate in T4T training in August and September, 2016.

348

Space:

CSATF reported that there was no significant mental health treatment space, and no current or planned construction or infill projects as of the date of the site visit. Newly identified treatment space in Chapel Clerk office room 172 had been approved by the chaplain, but mental health staff had not yet begun using the space at the time of the tour.

Mental Health/Custody Relations:

While clinical staff generally reported no significant problems with their custody partners, inmates reported numerous examples of strained relationships, including reports of intimidation and mocking mental health staff to inmates in their absence. It was noted that inmates spontaneously provided this information when asked how staff treated them.

Heat Plan:

CSATF was in compliance with heat plan protocols during the review period. CSATF reported a total of 68 Stage I heat alerts during the review period. There was only one Stage II alert reported during the review period. Proper cooling measures – ice, showers, water, etc., were instituted. There were no Stage III alerts reported during the review period.

Operable and appropriately placed thermometers were observed in all toured housing units. Housing units received weekly lists of inmates taking heat sensitive medications; staff also knew how to retrieve the list electronically. In general, custody staff were knowledgeable about the heat plan procedures and were appropriately logging the inside temperatures and forwarding them to the litigation coordinator.

Lockdowns/Modified Programming:

CSATF reported six modified programs and zero lockdowns during the review period.

349

Pre-Release Planning:

The institution's July 2016 chart audit showed noncompliance with documentation of pre-release planning. As a result, supervisory staff were given notice on August 11, 2016, to train their staff by August 31, 2016. A memorandum giving instructions for inclusion of pre-release planning in IDTTs was to be provided to all clinicians, with a signed training form serving as proof of practice that training was completed. This item was closed as completed; however, pre-release planning was not consistently addressed in IDTTs observed during the site visit when it was indicated.

Access to Care:

A review of CSATF's monthly Health Care Access Quality Reports from February through July 2016, indicated that less than one percent (0.24) of issued mental health ducats and add-on appointments were not completed due to custody factors, while 11 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

On August 2, 2016, CSATF reported that of 1,978 available jobs, 68 or 19 percent of EOP inmates held positions, as did 719 or 37 percent of 3CMS inmates, and 1,191 or 39 percent of non-MHSDS inmates.

Of 1,621 academic assignments, 55 or 15 percent of EOP inmates held assignments, as did 385 or 20 percent of 3CMS inmates, and 397 or 13 percent of non-MHSDS inmates.

Of 381 substance abuse treatment program assignments, 45 or 12 percent of EOP inmates held assignments, as did 196 or ten percent of 3CMS inmates, and 140 or five percent of non-MHSDS inmates.

Of 456 vocational education assignments, 19 or five percent of EOP inmates held assignments, as did 162 or eight percent of 3CMS inmates, and 275 or nine percent of non-MHSDS inmates.

Of 1,369 voluntary education assignments, 29 or eight percent of EOP inmates held them, as did 451 or 23 percent of 3CMS inmates, and 889 or 29 percent of non-MHSDS inmates.

    b.  <u>Milestone Credits</u>:

As of July 31, 2016, CSATF reported that 123 of 362 EOP inmates were eligible for milestone credits.  Among those 123 inmates, 21 percent earned milestone credits.  For the 1,959 3CMS inmates, 348 were eligible to earn milestone credits; 20 percent earned the credits.

Of the 3,063 non-MHSDS inmates, 479 were eligible to earn milestone credits; 19 percent of these inmates earned the credits.

    c.  <u>Out-of-Level Housing</u>:

On August 29, 2016, there were 29 EOP and 26 3CMS Level I inmates in Level II housing.  Four EOP and 43 3CMS Level II inmates were in Level III housing.  There were six EOP and 82 3CMS Level III inmates in Level II housing, and two EOP and 77 3CMS Level III inmates in Level IV housing.  Twenty-five 3CMS Level IV inmates were in Level III housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CSATF provided policies, procedures, a desk manual, and several completed CDCR-Form 1824s (Reasonable Accommodations) and 602s (Inmate/Parolee Appeal Form) to confirm its continued compliance with ADA Reasonable Accommodation and Grievance Procedures.

<u>Placement of 3CMS into Minimum Support Facilities</u>:

Two 3CMS inmates transferred and one was endorsed and awaiting transfer to MCSP's MSF/SNY during the review period.

351

*Coleman* Postings:

*Coleman* postings were accessible in all toured housing units.

**Pleasant Valley State Prison (PVSP)**
September 13, 2016 – September 15, 2016

Census:

On September 13, 2016, PVSP housed 3,219 inmates, a seven-percent increase since the preceding monitoring period. The mental health caseload population was 937 or 29 percent of the total inmate population.

The MHCB housed six inmates.

There were four mainline EOP inmates and 879 mainline 3CMS inmates.

The total administrative segregation population was 65; all were non-MHSDS inmates. There were 48 3CMS inmates in STRH.

Staffing:

The chief psychiatrist position was filled. One of the two chief psychologist positions was filled; the other position was held by mental health headquarters for salary savings.

The one established senior psychologist supervisor position was filled and PVSP also had an additional senior psychologist supervisor. The two established senior psychologist specialist positions were filled.

Of the four established psychiatry positions, two were filled, for a 50-percent vacancy rate. PVSP also used 2.05 FTE contract psychiatrists, resulting in a functional vacancy rate of zero. PVSP did not use telepsychiatry.

Of the 12 staff psychology positions, 6.5 were filled, for a 46-percent vacancy rate. The use of a 0.46 FTE psychology contractor reduced vacancies to 5.04 and decreased the functional

vacancy rate to 42 percent.  There were three psychology interns at PVSP for part of the review period.

The supervising social worker position was filled.  All nine established social worker positions were filled.

The recreation therapist position was vacant.

Of the 10.6 psych tech positions, seven positions were filled, for a 34-percent vacancy rate.

The OSS II position and both HPS I positions were filled; the CHSA II position was vacant.  Six of 6.5 MHSDS clerical positions were filled, for an eight-percent functional vacancy rate.

Quality Management:

The local governing body met twice during the review period and achieved a quorum for both meetings.  Mental health-related agenda items included revisions to the local operating procedure for peer review and the STRH unit, and access to yard for MHCB inmates.

PVSP did not provide minutes or other relevant documents regarding the quality management committee.

The mental health subcommittee met six times during the review period and regularly achieved a quorum.  Minutes were kept.  Agenda items included, but were not limited to, groups in STRH, MHCB admissions, untimely mental health appointments and mental health staffing. In response to concerns noted during the preceding review period, a QIT convened in May 2015 addressed concerns about treatment planning adequacy related to incomplete case histories, interventions that were inconsistent with documented diagnoses, and inadequate case conceptualizations.  This QIT transitioned to a FIT in April 2016 and was observed during the

353

site visit.  Constructively, the FIT also focused on assisting clinicians in improving the quality of their assessments, obtaining accurate information upon which to base level of care decisions, and formulating treatment goals and objectives that were better tied to clinical formulations.

PVSP did not report the status of, nor any results from, its peer review process.

PVSP was not a test prison for CDCR's CQIT during the monitoring period.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

PVSP reported 100-percent compliance with all applicable psychiatry measures. Clozapine was not authorized for use at PVSP.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories:  inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602/involuntary medications, and urgent medication referrals for no-shows and refusals (Clozaril).  Medication administration was measured for outpatient provider new medication orders for psychiatrist-prescribed medications.

354

PVSP reported 100-percent compliance for continuity of medications with inter-institutional transfers at R&R, continuity with NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU, continuity of medications with intra-institutional transfers to ASU/SHU/PSU, continuity of medications upon discharge/transfers from a community hospital and/or DSH, and medication administration for outpatient provider new medication orders for psychiatrist prescribed medications.  PVSP also reported 100-percent compliance with medication continuity for transfers from MHCBs for April and May 2016.  There were no transfers from MHCBs during June and July 2016.  PC 2602 involuntary medications were measured for the three months during which PVSP had inmates on PC 2602 involuntary medications; compliance was at 100 percent.

There were five PC 2602 involuntary medications petitions initiated during the review period, of which four were approved.  The declined petition was due to required timeframes not being met.

SNY 3CMS inmates reported short pill line waits during the morning and afternoon, but waits of up to 45 minutes for evening medications.

According to the data provided, there were 2,191 inmates who received HS medications.  Inmates housed in STRH and SNY 3CMS inmates reported that HS medications were administered after 8:00 p.m.

Transfers:

During the review period, PVSP referred and transferred 21 inmates to acute inpatient care.  One inmate required a *Vitek* hearing that was not timely completed.  Five of 21, or 24 percent of acute care transfers were timely.

There were no referrals to intermediate care during the review period.

355

Twenty inmates were considered but not referred to a higher level of care.  A review of the logs for inmates who met higher level of care referral consideration criteria but were not referred, indicated that the DSH coordinator considered non-referral rationales to be acceptable. The decision not to refer typically reflected a treatment team determination that the inmate was at the appropriate level of care.  Supervisory staff reported that on-demand reports were available to staff, but some staff members did not routinely access them, therefore some information on the Form 7388-Bs was inaccurate.  Relatedly, observed IDTT meetings did not reliably review Form 7388-B criteria, nor discuss consideration for referral to a higher level of care.

There were 31 MHCB referrals during the review period; six or 19 percent were rescinded.  Of the remaining 25 referrals, 22 or 88 percent timely transferred to MHCBs at PVSP or another institution.

All 25 inmates referred to MHCBs were placed in alternative housing pending MHCB transfer.  Nine or 36 percent of these placements were for less than 24 hours; the remaining 16 or 64 percent exceeded 24 hours.

There were two transfers to a PSU during the review period; both were timely.

One inmate transferred to an administrative segregation EOP hub.  PVSP did not report whether the transfer was timely.

There were ten inmates transferred to mainline EOP programs; seven transfers were timely.  Unavailability of EOP beds was cited as the reason for untimely transfers.

<u>Other Issues</u>:

<u>MHSDS Inmates in Administrative Segregation</u>:

At the time of the site visit, there were no MHSDS inmates in administrative segregation at PVSP.

356

During the review period, the average length of stay for EOP and 3CMS inmates in administrative segregation was 58 days, with a range of one to 172 days.  There were 13 inmates housed in administrative segregation for more than 150 days.

PVSP did not provide clinical data regarding treatment of MHSDS inmates held in administrative segregation during the review period.

MHCB:

Two social workers and two psychologists were assigned to the MHCB, as well as alternative housing.  Staff did not have specific caseloads.

There were 65 admissions to the six-bed MHCB at PVSP during the review period.  Of those, 55 percent of admissions exceeded ten days; the average length of stay was 15.4 days.  Six inmates had multiple MHCB admissions.

All six MHCB beds were occupied at the time of the site visit.  Three inmates had been housed in the MHCB for less than ten days, two were there for 11 days, and one was there for 27 days.

Mental health supervisors reported that the assignment of a second full-time clinician to the MHCB benefited the quality of provided treatment and permitted regular weekend coverage of the unit.

There was 100-percent compliance with initial and follow-up psychiatry contacts, representing significant improvement from the preceding review period.

There was 100-percent compliance with initial and follow-up PC contacts.

Initial IDTT meetings were 88-percent compliant; follow-up meetings were 100-percent compliant.  Observed IDTT meetings indicated appropriate interaction among team members.  All disciplines, including the CC I, participated.  The overall clinical appropriateness of observed

357

IDTT meetings had improved since the preceding site visit.  Staff attributed this improvement to training that focused on case formulation and treatment planning, as well as the additional clinician.

However, some practices used in the MHCB were inappropriately applied to all inmates. For example, regardless of their status, all inmates were cuffed for IDTT meetings, while staff reported that treatment teams did not discuss cuff status at initial or follow-up IDTT meetings. There were also problems with access to recreation/outdoor yard for MHCB inmates.  Although the IDTT meeting assessed inmates housed in the MHCB for suitability for yard use, in practice MHCB inmates were not allowed to go to yard for recreation therapy or other outside activities. These issues were discussed with supervisory staff and representatives of the regional office, who reported that this would be promptly remedied.

While the treatment team assessed inmates for out-of-cell activities, the ability to provide them was limited.  The unit's one assigned recreation therapist position was vacant, which significantly limited the amount and variety of available out-of-cell activities.  Due to security concerns, Level IV inmates were not provided with out-of-cell activities.  However, PVSP reported ordering therapeutic modules in August 2016 to facilitate Level IV inmates having access to out-of-cell activities during MHCB treatment.

PVSP reported that during the review period, there was 88-percent compliance for discharge follow-ups after MHCB placement; 15 of 17 were completed as required.

Seclusion and Restraint:

Two inmates were subject to restraint during the reporting period; one incident lasted 2.25 hours and the other lasted approximately four hours.  The medical record did not contain an order for one of the restraint episodes.  One seclusion incident lasted approximately 1.5 hours.

Alternative Housing:

PVSP reported that there were 30 placements in alternative housing during the review period, of which 21 or 70 percent timely transferred from alternative housing to MHCBs or back to their housing units.

Short-Term Restricted Housing:

Since the preceding site visit, PVSP had opened a STRH unit in what was formerly the stand-alone administrative segregation unit.  The staff psychologist assigned to the STRH had a caseload of 11, which was within the established ratio of 1:29.  Three social workers assigned to the STRH had caseloads of one, 11, and 15, all of which were within the established ratio of 1:68.  One social worker provided groups.

There were 106 3CMS inmates housed in STRH during the review period; 48 inmates were housed there during the site visit.

PVSP reported 71-percent compliance for initial psychiatry contacts and 95-percent compliance for follow-up psychiatry contacts.

Initial PC contacts were at 97-percent compliance and follow-up PC contacts were at 99-percent compliance.  Although compliant with respect to timeliness of PC contacts, staff reported and inmate interviews confirmed, that staff turnover had a negative impact on continuity of care.

There was 100-percent compliance with initial and follow-up IDTT meetings and for composition of the treatment team.  Observed IDTT meetings were generally adequately conducted, but were also consistent with reported data that the psychiatrist had not seen several inmates prior to the IDTT meeting.  As such, the IDTT meetings were at times a substitute for confidential clinical contacts.

Observed IDTT meetings indicated good interaction among staff, including custody.  The IDTT meetings positively emphasized supporting inmate strengths, but other areas required improvement.  Among them, IDTT meetings would benefit from greater emphasis on treatment goals.  The IDTT meetings also lacked discussion of the Form 7388-B and higher level of care consideration or treatment plan modifications for inmates with multiple RVRs.  Staff treatment planning also did not sufficiently consider the aspects of STRH which differed from more traditional administrative segregation units, such as group participation, assignment of in-cell activities by the IDTT, and yard use.  Some inmates who were observed in IDTT meetings or reviewed in charts requested more group treatment.

Each STRH cell had a radio assigned to it, and this radio was in the cell when a new inmate was placed in the cell.  If the inmate owned a television, custody staff would issue it. PVSP staff further reported that computer tablets had been ordered and it was expected that they would be issued to inmates within 60 days.

The unit log recorded daily morning meetings between mental health and custody staff. Mental health and custody staff were observed to have a good working relationship.  Daily psych tech rounds were also documented in the log.

STRH program out-of-cell activities and yard time were compliant.  The STRH yard schedule provided for 19.25 weekly hours of yard for each STRH inmate.  Yard times were assigned daily for each cell and the schedule rotated so that inmates were offered different times to go to yard.  The STRH sergeant conducted weekly audits of 114-A segregation records to review offered and recorded yard times; the results were sent to CDCR headquarters.

The STRH's group therapy room contained eight restart chairs arranged in a semi-circle. Between five and six groups were offered weekly, but only one was a process group.  An

observed group conducted by a psychology intern was well-run.  Interviewed inmate group participants were appreciative of out-of-cell opportunities, such as yard and provided treatment, but expressed the desire for more groups, particularly process groups.

A review of a sample of 114-A segregation records indicated that clothing and linen were consistently documented as being exchanged on a weekly basis.  A review of a sample of inmate 114-A segregation records and the property-issued log also revealed that allowable property had been issued.  Inmate property was documented as having been issued ranging from one to 15 days after the ICC.  Interviewed inmates reported occasional delays in issuing property of 30 days or more.  Staff further reported that occasionally inmates received from other institutions did not arrive with their property.  When this occurred, there was a delay in issuing property as PVSP staff had to contact the sending institution and have their staff locate, package, and transfer the inmate's property.

SNY 3CMS Mainline:

Two staff psychologists were assigned to the 3CMS program.  They had caseloads of 69 and 111, which were within the established caseload ratio of 1:130.  One psychologist provided one group.  There were seven assigned social workers with caseloads of 1:29, 1:96, 1:98, 1:104, 1:124, 1:128 and 1:135, respectively; all but one was within the established ratio of 1:130.

PVSP reported 100-percent compliance with initial psychiatry contacts and 99-percent compliance with routine psychiatry contacts.  All psychiatry contacts occurred in a confidential setting.

Initial PC contacts were 94-percent compliant.  There was 100-percent compliance with follow-up PC contacts.

361

PVSP reported 86-percent compliance with initial IDTT meetings and 100-percent compliance with follow-up IDTT meetings.  There was 97-percent compliance for required staff attendance at IDTT meetings.

During the review period, there were nine groups available to mainline SNY 3CMS inmates.  The groups covered subjects that were relevant regardless of an inmate's mental health designation.  However, staff turnover had since resulted in a marked decrease in group offerings.  At the time of the site visit, only twenty 3CMS inmates from all 3CMS yards, including SNY, participated in any type of group treatment.

Interviewed SNY 3CMS inmates reported an overall appreciation for clinical services.  Inmates were knowledgeable of the purpose of treatment team meetings; some reported that they were especially useful as they afforded inmates the opportunity to review their treatment and talk to the treatment team at length.  However, inmates also expressed concerns about feeling rushed during PC contacts, a lack of continuity of care due to staff turnover, limited group treatment, and not being able to see their PC more frequently than every 90 days even when they felt it was clinically indicated.  These concerns were consistent with reports made by mental health supervisory staff.

Non-Disciplinary Segregation:

There were ten mental health caseload inmates designated as NDS during the review period.  Of the two inmates approved for expedited transfer, one was timely transferred. At the time of the site visit, four of six inmates on NDS status were at the 3CMS level of care. One of these inmates was approved for accelerated transfer and did not transfer within transfer guidelines.  The other three were approved for property and privileges.

Referrals:

PVSP reported 100-percent compliance for timely responding to 22 emergent referrals and 35 urgent referrals, and 99-percent compliance for timely responding to 624 routine referrals.

Heat Plan:

PVSP was in compliance with heat plan protocols during the review period.  There were 30 Stage I heat alerts during the review period and no Stage II or Stage III heat alerts.  Housing unit staff were knowledgeable of the heat plan policy and procedures.  The list of inmates on heat risk medications was distributed daily.  Temperature logs were completed and forwarded monthly to CDCR headquarters.

"C" Status:

PVSP reported that 75 inmates were on "C" Status; 34 or 45 percent were MHSDS inmates.  A records review indicated that the ICC typically placed these mental health inmates on "C" Status due to their receipt of multiple RVRs within a six-month period.  Reviewed ICC actions did not document consideration of the inmate's mental health as part of the decision-making process that placed them on "C" Status.

Lockdowns/Modified Programming:

There were seven program lockdowns during the review period, lasting from five to 14 days.  During lockdowns, inmates were escorted for health care priority ducats.  Nursing staff, with a custody escort, distributed medications at cell front.

Access to Care:

A review of PVSP's monthly Health Care Access Quality Reports from February 2016 through July 2016 indicated that zero mental health ducats or add-on appointments were not

completed due to custody factors, while 11.5 percent of issued mental health ducats or add-on appointments were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

As of August 2, 2016, PVSP reported that of 1,335 available employment positions, 409 or 44 percent of 3CMS inmates held them, as did 926 or 40 percent of non-MHSDS inmates.

Of the available 580 academic assignments, five or 63 percent of EOP inmates held them, as did 152 or 16 percent of 3CMS inmates, and 423 or 18 percent of non-MHSDS inmates.

With regard to the 56 available substance abuse treatment assignments, one 3CMS inmate held an assignment, as did 55 or two percent of non-mental health caseload inmates.

Of the 160 vocational education assignments, 48 or five percent of 3CMS inmates held assignments, as did 112 or five percent of non-MHSDS inmates.

Of the 680 voluntary education assignments, 176 or 19 percent of 3CMS inmates held such positions, as did 504 or 22 percent of non-MHSDS inmates.

b.   Milestone Credits:

As of July 31, 2016, PVSP reported that three of ten EOP inmates were eligible for milestone credits; 33 percent earned the credits.  Of the 940 3CMS inmates, 174 were eligible to earn milestone credits; 24 percent earned them.

Of the 2,307 non-MHSDS inmates, 799 were eligible to earn milestone credits; 23 percent earned the credits.

c.   Out-of-Level Housing:

On August 29, 2016, there were 21 non-MHSDS Level I inmates in Level III housing. There were 54 non-MHSDS Level II inmates in Level I housing, and 135 3CMS and 246 non-

364

MHSDS Level II inmates in Level III housing.  There were two EOP, 43 3CMS, and 31 non-MHSDS Level IV inmates in Level III housing.

      d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

PVSP provided confirmation of implementation of revised ADA accommodation and grievance procedures in the form of training materials and rosters for ADA training provided to staff.

      *Coleman* Postings:

There were *Coleman* postings in English and Spanish in all nine housing units toured by the monitor.  All postings were found in common areas accessible to class members.

**Avenal State Prison (ASP)**
August 9, 2016 – August 11, 2016

<u>Census</u>:

On August 8, 2016, ASP housed 3,233 inmates, which was a 24-percent increase from the census reported during the preceding site visit in July 2015.  ASP's mental health population had grown by six percent since the preceding site visit and constituted 30 percent of the total inmate population.

There were 973 MHSDS inmates, two were mainline EOP and 971 were mainline 3CMS inmates.  Five mainline 3CMS inmates were housed in the OHU for medical reasons.

<u>Staffing</u>:

The senior psychiatrist position was vacant and was covered by a contractor.  One of two chief psychologist positions was filled.  The vacant position was held for cost savings, per a directive from mental health headquarters.  ASP had 3.5 established senior psychologist positions.  Four senior psychologists provided services at the institution, giving ASP an additional 0.5 position.

All five psychiatry positions were vacant.  Contractors covered four of the positions, leaving a 20-percent functional vacancy rate.

All eight psychology positions were filled; in addition, ASP had another three FTE psychologists on staff.

Five of 9.5 social worker positions were filled, for a 47-percent vacancy rate.  Two contractors decreased the number of social worker vacancies to 2.5, and reduced the functional vacancy rate to 26 percent.

The recreation therapist position was filled, as were all 6.5 mental health clerical positions, and the one OSS II position.

ASP did not employ psych techs and did not use telepsychiatry.

Quality Management:

ASP's quality management system was fully operational.  The quality management committee (QMC) met six times and typically met monthly, with good attendance.  QMC meeting minutes were detailed and demonstrated review of significant matters.

The mental health subcommittee met four times during the review period.  It was scheduled to meet monthly, but did not meet twice due to lack of a quorum.  Mental health subcommittee minutes were well-organized and indicated the presence of required members and designees.  Meeting minutes were detailed and identified problems and their disposition, with target resolution dates.

Three active FITs addressed IDTT meetings, referrals, and SPRFIT meetings.  The IDTT meeting FIT was chartered in December 2013 to improve the IDTT process and met monthly. This FIT was overly broad and review of its minutes indicated a lack of clear problem

identification and that it addressed issues that were not central to its primary goal.  It nonetheless accomplished important objectives, including improving IDTT meeting structure.

The referral FIT was chartered in April 2014 and met twice.  Meeting minutes identified minimal agenda items.

ASP often used work groups instead of QITs or FITs.  Interviewed staff did not clearly explain this use of work groups other than to state they were less formal.  While permitting greater flexibility, work groups required less documentation and verification than a QIT or FIT.  QITs and FITs typically required problem definition and goal identification – concepts not necessarily a part of work groups.

ASP utilized the new peer review process.  During the review period, ASP's internal peer review team met on five occasions; a mental health clinician presented inmate cases and other clinical information and clinicians provided feedback.  Mental health headquarters conducted psychiatry peer review, as ASP had no staff psychiatrists.  ASP was partnered with HDSP for peer review.  There was no psychology peer review between ASP and its partner institution during the review period.  The social worker peer review committee met once.

ASP was not a test prison for CDCR's CQIT during the monitoring period.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

ASP was compliant with all applicable psychiatry measures except those for lithium and antidepressants, where it was noncompliant at 74.19 percent and 63.51 percent respectively. Clozapine was not authorized for use at ASP.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories:  inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals (Clozaril).  Medication administration was measured for outpatient provider new medication orders for psychiatrist-prescribed medications.

ASP provided data for January - May 2016, and was compliant at 90 percent or above with continuity of medications for inter-institutional transfers and urgent referrals for no-shows and refusals.  ASP was compliant with continuity of medications for intra-institutional transfers excluding ASU/SHU/PSU for three of the five months; for the remaining two months, compliance rates were 78.57 and 88.89 percent.  ASP was compliant with continuity of medications upon discharge/transfer from a community hospital and/or DSH for two of the five months; for the remaining three months, compliance rates were at 85.71 percent, 87.50 percent and 82.35 percent.  During the months of March - May 2016, when ASP had inmates who had been prescribed PC 2602 involuntary medications, it reported 100-percent compliance for each month.  The institution reported that the remaining measures were not applicable.

368

During the review period, no PC 2602 involuntary medications petitions were initiated, renewed, denied or withdrawn at ASP.

Inmates reported waiting no more than 30 minutes in pill lines for medications.

There were 546 inmates who received HS medications.  ASP reported that the medications were administered after 8:00 p.m.

Transfers:

There was only one DSH intermediate care referral during the review period.  The referral packet was completed timely and the inmate timely transferred to DSH.  DSH did not discharge any inmates back to ASP during the review period.  During the site visit, no inmates were pending DSH transfer.

Since the preceding site visit, there was improvement in Form 7388-B completion.  PCs more consistently obtained the objective indicator report prior to IDTT meetings and used it in Form 7388-B completion.  However, these indicators were not comprehensively incorporated into the IDTT process.  It remained a PC process that was at times referenced during IDTT meetings, but with little input from other treatment team members.

Thirteen inmates were considered but not referred to DSH.  All had their level of care increased to 3CMS.

Forty-one inmates were referred and transferred to MHCBs at outside institutions.  Nineteen or 46 percent left ASP within 24 hours of MHCB referral.  Late transfers averaged 36.8 hours beyond the 24-hour timeline required by the Program Guide.  No MHCB referrals were rescinded.

All 41 inmates referred to MHCBs were in alternative housing pending MHCB transfer; 18 or 44 percent were housed there for less than 24 hours. The 23 extended alternative housing placements averaged 35.9 hours beyond the 24-hour timeline.

No inmates transferred to a PSU during the reporting period.

Eight of nine EOP inmates were transferred timely to EOP programs. The one late transfer was overdue by two hours. During the site visit, two inmates had been awaiting transfer to an EOP program for 14 days.

No 3CMS inmates transferred to LTRH. Ten 3CMS inmates who were transferred to STRH all transferred within 24 hours of placement on segregation status.

Other Issues:

Alternative Housing:

The institution used the 13 medical OHU cells as alternative housing. Three psychologists were assigned to alternative housing. Psychiatry services were "on-call" only.

None of the alternative housing cells had been retrofitted to be suicide resistant. With one exception, all had removable beds that were either EZ bunks or metal-framed beds. Inmates placed in alternative housing were on 1:1 observation. The type of bed (EZ or metal) and inmate personal property were provided as approved by the treating mental health clinician. During the site visit, no MHSDS inmates were in alternative housing for mental health reasons.

3CMS:

ASP's 3CMS program was generally well-staffed. Psychiatrists did not have specific caseloads; scheduling was based on psychiatrists' availability. Psychology caseloads averaged 67 and ranged from 37 to 85 inmates. Social worker caseloads averaged 75 and ranged from 63 to 90 inmates.

370

Psychiatry was compliant with initial and follow-up contacts.  Both initial and follow-up PC contacts were 99-percent compliant.  There was 99-percent compliance for timely initial and follow-up IDTT meetings.  There was improved attendance for all required disciplines at IDTT meetings, with a reported 96-percent compliance rate.

Psychiatry reported six non-confidential contacts due to inmate refusals.  Non-confidential contact data for PC contacts was inconsistent.  Further review revealed that two clinicians had logged all contacts as a "PC contact," even if the contact was to inform the inmate of an appointment cancellation.

The mental health management team had a goal of increasing the number of treatment groups.  There were eight treatment groups at the time of the site visit; 124 or 13 percent of mental health caseload inmates were assigned to groups.  Interviewed inmates reported wanting a greater variety of groups and a lack of groups dealing with specific disorders or symptom management.  Others who reported being told they were on a group wait list were not on the current wait list.  Still others were unaware of groups and expressed an interest in them; they reported not being offered groups by their PCs.

The majority of interviewed 3CMS inmates did not know their PC's name, but could describe their appearance.  They were unaware of their treatment plans.  The one-half of interviewed inmates who were prescribed mental health medications reported that psychiatrists' prescribed them after a quick diagnosis.  Inmates further stated wanting more education as to their diagnosis, medication side effects, and symptom management.

"C" Status:

Ten of 16 inmates on "C" Status during the review period were on the mental health caseload.

371

Referrals:

ASP reported 100-percent compliance for timely responding to 65 emergent referrals, 57 urgent referrals, and 867 routine referrals.

EHRS/MHTS.net:

Mental health staff reported that MHTS.net typically worked well.  ASP was scheduled to go live with EHRS in February 2017.

Mental Health/Custody Relations:

Both mental health and custody staff reported that relations between them were typically very good.  A tour of housing units and clinical areas revealed a positive working relationship.

Heat Plan:

There were 28 stage I heat alerts during the review period, in May and June 2016, but no stage II or stage III heat alerts.  A tour of five buildings that housed mental health inmates revealed that all had current lists of inmates who were prescribed heat sensitive medications. Interviewed custody officers were familiar with protocol following activation of a heat alert.  All toured housing units had thermometers and officers timely recorded housing unit temperatures.

Lockdowns/Modified Programming:

There were no lockdowns at ASP during the review period.

Pre-Release Planning:

ASP indicated 85 pre-release planning appointments during the review period, but did not report the number of released inmates.  Some inmates reported not being offered pre-release services.  Inmates generally received pre-release services through the TCMP program.

ASP had also implemented one pre-release treatment group on one yard that had just begun at the time of the site visit.  It was co-facilitated by two clinicians who appeared to have

372

some difficulty with co-facilitation, which interfered with the functioning and goals of the group, resulting in decreased clinical gains for inmate participants.  It was apparent from observing the group that it would be beneficial for clinicians co-facilitating groups to receive additional training in group co-facilitation, as well as how to independently facilitate groups, which would increase pre-release services resources available at ASP.

Access to Care:

There were 10,714 ducats and add-on appointments for mental health services, of which 9,808 or 92 percent were completed and 906 or eight percent were not completed.  Of the non-completed ducats and add-on appointments, 29 or three percent were due to inmate refusal, one or zero percent were due to custody, and 876 or 97 percent were due to non-custody reasons.

Program Access:

a.   Job and Program Assignments:

On July 5, 2016, there was one EOP inmate at ASP.  He was not enrolled in any academic, employment, substance abuse treatment, vocational education, or voluntary education programs.

On this date, ASP data indicated that of 1,681 available jobs, 519 or 52 percent of 3CMS inmates held a job assignment.  For non-MHSDS inmates, 1,162 or 52 percent held a job assignment.

Of 689 academic assignments, 166 or 17 percent of 3CMS inmates held such an assignment, as did 523 or 23 percent of non-MHSDS inmates.

As to the 444 substance abuse treatment assignments, 148 or 15 percent of 3CMS inmates had such assignments, as did 296 or 13 percent of non-MHSDS inmates.

Of 311 vocational education assignments, 96 or ten percent of 3CMS inmates held such positions, as did 215 or ten percent of non-MHSDS inmates.

Lastly, of 982 voluntary education positions, 269 or 27 percent of 3CMS inmates held such positions, as did 713 or 32 percent of non-MHSDS inmates.

      b.   <u>Milestone Credits</u>:

As of June 30, 2016, ASP reported that the sole EOP inmate at the institution was ineligible to earn milestone credits.  For the 1,002 3CMS inmates, 278 were eligible to earn milestone credits; 33 percent earned the credits.  Of the 2,249 non-MHSDS inmates, 450 were eligible to earn milestone credits; 43 percent earned the credits.

      c.   <u>Out-of-Level Housing</u>:

On July 18, 2016, there were 33 Level I 3CMS and 42 Level I non-MHSDS inmates in Level II housing.  There were four Level III 3CMS and four Level III non-mental health caseload inmates in Level II housing.  No Level II or Level IV inmates were housed out-of-level.

      d.   <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

ASP reported that training for the revised ADA accommodation and grievance procedures had occurred in May 2015.  Review of reasonable accommodation panel responses indicated instances of inmate accommodation.

      e.   <u>Periodic Classification Score Reduction:  EOP Inmates</u>:

Although ASP did not have an EOP program, during the review period nine inmates were designated EOP, of which three received classification score reductions.

*Coleman* Postings:

A tour of 16 housing units and one clinical area revealed that all contained *Coleman* postings in an area accessible to the inmate population.  In three units, the *Coleman* posting was the 2010 version and not the updated 2015 version.

## Correctional Training Facility (CTF)
May 24, 2016 – May 26, 2016

Census:

As of May 24, 2016, CTF housed a total of 5,128 inmates, for an increase of five percent since the preceding monitoring period.  The mental health caseload population was 1,547 or 30 percent of the total population.  There were five EOP inmates awaiting transfer to an EOP institution.  There were 1,535 mainline 3CMS inmates.  There were two 3CMS inmates housed in the medical OHU for medical reasons.

There were 70 inmates in administrative segregation; one was designated NDS status. There were five 3CMS inmates in administrative segregation.

Staffing:

There was no chief psychiatrist position.  One of the two chief psychologist positions was filled; the other position was held by mental health headquarters for salary savings.

The senior psychiatrist position and four senior psychologist positions were filled.

CTF had six allocated staff psychiatry positions and one telepsychiatry position.  Three of the six psychiatry positions and the telepsychiatry position were filled, leaving a 43-percent vacancy rate.  The use of a 0.2 contractor position reduced the functional vacancy rate to 40 percent.  Telepsychiatry was used for both individualized appointments, as well as IDTT meetings.

375

For staff psychologist positions, 11 of the 13 were filled, for a 15-percent vacancy rate. The use of 1.5 contractors reduced psychologist vacancies to 0.5, and decreased the functional vacancy rate to four percent.

The supervising social worker position was vacant; nine of the 12 social worker positions were filled, for a 25-percent vacancy rate.

The one senior psych tech position and four psych tech positions were filled. One psych tech was out on medical leave, resulting in a functional vacancy rate of 25 percent.

Of the ten clerical positions, nine were filled, leaving a ten-percent vacancy rate. The HPS, and OSS II positions were filled. The CHSA II position was vacant; it was being held by mental health headquarters for salary savings.

Quality Management:

Several issues were identified by audits that required corrective action, and CAPs were provided.

The quality management committee met at least semimonthly, and frequently met weekly during the review period. Mental health staff was present at the meetings. Minutes were maintained; a quorum was achieved regularly. The quality management committee received reports on mental health matters such as staffing, access to care, SREs, MHCB referrals, QITs, and SPRFIT issues.

During the six-month review period, the mental health subcommittee met monthly for three months and met semimonthly for the remaining three months. Minutes were maintained, and a quorum was regularly achieved. The mental health subcommittee appeared to be active and involved in important mental health issues at the facility. Various topics were addressed,

including audit findings, EHRS roll-out, staffing, peer review, administrative segregation pre-placement screens and other pertinent issues.

A QIT was chartered regarding mental health and health information scanning.  The QIT met consistently during the review period.

CTF had implemented the new peer review process.  This included peer review of psychiatrists, psychologists and social workers.  CTF was paired with CRC for peer review.  The process appeared to be functioning adequately; all disciplines met or exceeded peer review standards.

CTF was not a test prison for CDCR's CQIT during the monitoring period.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

For applicable psychiatry measures, CTF reported compliance of 90 percent or above for atypical antipsychotics for six months, as well as for the four months for which carbamazepine was reported.  Regarding the Depakote measure, CTF reported rates of compliance of 90 percent or higher for four out of six months, and compliance rates of 88 percent and 89 percent for the other two months.  Data for the lithium measure showed 90 percent or above for four months and a compliance rate of 89 percent each for the remaining two months.  The psychiatric measure for antidepressants showed compliance of 90 percent or above for each of the six months audited.  Clozapine was not authorized for use at CTF.

377

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration. Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH. Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals (Clozaril). Medication administration was measured for outpatient provider new medication orders for psychiatrist-prescribed medications.

CTF reported compliance of 90 percent and above with continuity of medications upon inter-institutional transfer at R&R for each of the six months. There were five months of compliance at 90 percent or above reported for NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU, and one month in which a compliance rate of 87 percent was achieved. For intra-institutional transfers to ASU/SHU/PSU, CTF reported data for five months during which compliance of 90 percent or higher was achieved each month. For continuity of medications upon discharge/transfer from a community hospital and/or DSH, compliance was at 90 percent and above for five months and at 83 percent for one month. For psychiatrist/MH mid-level prescribed medications, compliance was at 90 percent and above for all six months. For psychiatrist-prescribed outpatient provider new medication orders, compliance rates of 90 percent or above were reported for each of the six months.

There were no PC 2602 involuntary medications petitions initiated or renewed during the review period.

There were problems with long pill lines during the review period.  The issue appeared to be primarily on the North Facility, but there were some complaints in the Central Facility as well.  Staff reported that psychiatrists worked with inmates to change administration times to assist in better compliance.

There were 497 inmates who received HS medications, and those medications were administered after 8:00 p.m.

<u>Transfers</u>:

There were no referrals to DSH during the review period.  A sustainability audit was not conducted during the review period.

CTF transferred 43 inmates to outside MHCBs during the review period.  Seventeen of those transfers, or 40 percent, were timely.  Seventy-seven percent of delays were attributed to lack of available beds.  The remaining 23 percent of delays were for "unknown" reasons.

There were no referrals to a PSU during the review period.

CTF reported 94-percent compliance (17 of 18 inmates) for the timely transfer of administrative segregation EOP inmates to EOP hub facilities.

CTF began transferring inmates to the STRH at SVSP on January 13, 2016.  From January 13 through April 17, 2016, CTF transferred 27 inmates to SVSP STRH.  Transfers took an average of 5.8 days from the date of ICC action with a range of three to six days.

Nine of 13 mainline EOP inmates, or 69 percent, transferred within 60 days of identification of EOP level of care.  EOP inmates awaiting transfer were provided weekly PC contacts.

Other Issues:

MHSDS Inmates in Administrative Segregation:

The psychiatrist who provided services in administrative segregation also covered both the North and Central facilities and carried a total caseload of 162 inmates. One social worker was assigned to cover the administrative segregation unit. A psychologist with other assignments provided backup services in administrative segregation when needed.

The administrative segregation unit was located in the O Wing in the Central Facility. Clinical space was limited. The rooms in the unit that were used for treatment had single therapeutic modules that were consistent with *Coleman* recommendations.

Audits regarding timely completion of quarterly psychiatric contacts indicated 100-percent compliance. There were no significant issues with non-confidential psychiatric contacts.

Audits regarding timely completion of weekly 3CMS contacts by the PC indicated overall compliance of 97 percent with 94-percent compliance with initial and 97-percent compliance with follow-up PC contacts.

Inmates were offered the opportunity for confidential clinical contacts, and custody escort issues were not a significant reason for non-confidential contacts. The primary reason cited for non-confidential clinical contacts was inmate refusal.

There was no group therapy offered to 3CMS inmates in administrative segregation due to physical plant limitations.

IDTT meetings were timely at 98-percent compliance or greater for overall, initial and follow-up IDTTs. The meetings included the necessary participants 92 percent of the time.

The monitor's expert observed 3CMS administrative segregation IDTT meetings. The meetings were inclusive of the necessary participants, and participants utilized computers.

Although the PC and psychiatrist were knowledgeable about and had good interactions with the inmates, there was little adequate treatment planning and discussion regarding consideration of higher levels of care noted during the meeting prior to prompting from the monitor's expert.

Psych tech rounds were observed in the administrative segregation unit. The rounds were well-conducted. The psych tech asked pertinent clinical questions and offered the inmates puzzles and word games, which many accepted.

Seclusion and Restraint:

There were no episodes of restraint or seclusion use during the review period. The facility was providing training to the nursing staff regarding restraint and seclusion usage.

Alternative Housing:

The OHU at CTF was used primarily for medical purposes, and the only mental health related function for the OHU was alternative housing. Four cells within an enclosed space and separate from the remainder of the OHU were designated solely for alternative housing. The cells were not retrofitted for suicide prevention and contained many points of ligature tie-off, including the large bore vents. Inmates who were placed into alternative housing were observed by an individual seated outside the area of the cells, and provided only with a suicide smock and mattress. Observation of the area revealed that there was difficulty in clear observation of the two end rooms, and the two central rooms were easily visualized. The staff indicated that one sitter would observe the two central cells; conversely one sitter would observe each of the rooms on the ends.

There were 49 total alternative housing placements during the review period. The alternative housing cells had toilets and sinks. Staff coverage was provided by a senior psychologist specialist and a staff psychologist also assigned other duties. A part-time

381

psychologist provided backup services and a social worker covered weekends. The senior psychiatrist as well as other psychiatrists covered alternative housing.

The staff reported that no additional alternative housing areas were utilized during the review period. A weekly cleaning schedule was in place for the alternative housing cells.

One issue of concern was the use of alternative housing after MHCB discharge and return to CTF. The facility routinely placed returning inmates in alternative housing if they arrived overnight or after hours until they could be evaluated by a clinician the following morning. These placements were not logged and HCPOP was not notified. It did appear that HCPOP was contacted regarding other alternative housing placements. The regional staff was made aware of this issue, and they discussed it with the senior mental health leadership for correction.

3CMS:

For psychiatrists, caseloads in the North Facility were 1:203-1:217, in the South Facility 1:219 and in the Central Facility psychiatrist caseloads were 1:162. PC caseloads in the North Facility were 1:54-1:112. In the Central Facility PC caseloads were 1:67-1:91. The South Facility PC caseloads were 1:85-1:107.

Audits indicated that psychiatric initial and follow-up contacts were timely at 99 percent or greater.

Inmates were seen by the PC timely 86 percent of the time for initial assessments and 96 percent of the time for follow-up contacts.

PC and psychiatrist interviews occurred in private settings for the vast majority of contacts, with few exceptions.

Initial IDTT meetings were timely 82 percent of the time; follow-up IDTTs were timely 98 percent of the time.  IDTT meetings included the necessary participants 99 percent of the time.

3CMS IDTT meetings were observed across facilities; the quality varied.  IDTTs in the Central Facility would benefit from more structure and organization to ensure that treatment planning and consideration of higher levels of care were adequately discussed.  Improvement was also necessary to ensure cohesiveness and cooperation between team members in the development of treatment plans and diagnostic considerations.

3CMS groups were offered in the South and Central Facilities only.  Four groups were offered in the South Facility and three groups were offered in the Central Facility.  Interviews with inmates revealed that they would like to have access to more group therapy, especially in the North Facility.  Staff were in the process of identifying additional treatment space with plans to begin groups on the North Facility and to increase group therapy provision on the other facilities.

Case-by-Case Reviews:

CTF reported there were no case-by-case reviews completed during the review period.

Non-Disciplinary Segregation:

There was one 3CMS inmate with NDS designation during the review period. Documentation confirmed the inmate received approved property and privileges pursuant to CDCR policy.  He was designated for transfer on May 12, 2016 but did not transfer until May 20, 2016, beyond the 72-hour timeframe requirement.

"C" Status:

There was a total of 32 inmates on "C" Status, including MHSDS and non-MHSDS inmates. A random review of five of the inmates' case factors found all five were placed on "C" Status as a result of being determined by a classification committee to be a program failure due to multiple RVRs over a 90-day or 180-day period of time. All "C" Status designations were for a specific period of time according to CDCR policy.

Referrals:

There was a total of 2,882 referrals, including 2,419 routine, 88 emergent and 82 urgent. All referrals were completed in a timely manner. Urgent mental health referrals were 99-percent compliant. Routine mental health referrals were 94-percent compliant.

Space:

The institution reported a plan to increase the number of mental health treatment spaces/offices for Facilities A and B (North Facility) from ten to 13. The planned increase included the displacement of custody staff. After all of the staff moves, mental health staff would gain three additional treatment spaces/offices. Institution staff indicated that the relocations would be completed by fall 2016.

Mental Health/Custody Relations:

The relationship between mental health and custody staff was reported to be cooperative.

Heat Plan:

CTF was in compliance with the heat plan.

The institution submitted the required heat plan activity monthly report to headquarters per CDCR policy. There were two Stage I heat alerts during the review period and no Stage II or III heat alerts.

Lockdowns/Modified Programming:

CTF reported there was one modified program affecting one housing unit from December 8, 2015 through December 11, 2015. The modified program was the result of an inmate battery. According to the institution program status report, mental health services were not interrupted as a result.

Access to Care:

A review of CTF's monthly Health Care Access Quality Reports from October 2015 through March 2016 indicated that zero percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 9.95 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

Institutional data indicated that of the 2,217 available jobs, two EOP inmates, or 100 percent of the EOP population held a job assignment. For 3CMS inmates, 595 or 39 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 1,620 or 45 percent of the non-MHSDS population held job assignments.

Of the 1,136 academic assignments, 325 3CMS inmates, or 21 percent of the 3CMS population held assignments; 811 non-MHSDS inmates, or 23 percent of the non-MHSDS population held assignments.

Of the 285 substance abuse treatment assignments, 133 3CMS inmates, or nine percent of the 3CMS population and 152 non-MHSDS inmates, or four percent of the non-MHSDS population held assignments.

For the 400 vocational education assignments, 135 3CMS inmates, or nine percent of the 3CMS population held assignments, and 265 non-MHSDS inmates, or seven percent of the non-MHSDS population held assignments.

There were 355 voluntary education assignments; 94 3CMS inmates, or six percent of the 3CMS population, and 261 non-MHSDS inmates, or seven percent of the non-MHSDS population held assignments.

      b.  <u>Milestone Credits</u>:

As of March 31, 2016, the two EOP inmates housed at CTF were not eligible for milestone credits.  Of the 1,542 3CMS inmates, 370 were eligible for milestone credits; 19 percent earned the credits.  Of the 3,592 non-MHSDS inmates, 480 were eligible to earn milestone credits; 29 percent earned the credits.

      c.  <u>Out-of-Level Housing</u>:

As of May 3, 2016, there were 29 Level I 3CMS inmates and 23 Level III 3CMS inmates in Level II housing at CTF.

      d.  <u>ADA Reasonable Accommodation and Grievance Procedure</u>:

CTF implemented the ADA Reasonable Accommodation and Grievance Procedure and utilized CDCR Form 1824 during the review period to address accommodations and grievances of inmates.

    <u>*Coleman* Postings</u>:

*Coleman* postings in both English and Spanish languages were found in all 13 housing units toured by the monitor, including Facilities A, B, C, and D.  All postings were placed in common areas accessible to *Coleman* class members.

**California Men's Colony (CMC)**
May 10, 2016 – May 12, 2016

Census:

On May 9, 2016, CMC's total inmate population was 4,150 inmates.  There were 1,447 inmates or 35 percent of the census on the mental health caseload, an increase of 114 inmates since the preceding site visit.

There were 50 inmates in the MHCB; four inmates were in alternative housing.  The EOP mainline population was 467.  The 3CMS mainline population was 832, an increase of 153 inmates since the preceding site visit.

There were 85 EOP inmates in the administrative segregation hub and nine 3CMS inmates in administrative segregation.

Staffing:

The chief psychiatrist position was filled; however, the staff member was redirected to complete Mentally Disordered Offender (MDO) evaluations.  The senior psychiatrist served as the acting chief psychiatrist.  One chief psychologist position was filled while the other one was kept vacant for cost savings per a directive from headquarters.

The senior psychiatrist position was filled.  Of the 20.3 psychiatry positions, 18.3 were filled, for a ten-percent vacancy rate.  The use of two FTE contract psychiatrists reduced the functional vacancy rate to zero.

CMC had 12.5 established senior psychologist positions and 13 FTE senior psychologist positions filled.  Of the 47 psychologist positions, 46 were filled, for a two-percent vacancy rate.  CMC used 1.75 contract psychologists, decreasing the functional vacancy rate to zero.  Unlicensed staff filled two of the psychologist positions.

The supervising psychiatric social worker position was filled.  Seventeen of the 19 social worker positions were filled, leaving an 11-percent vacancy rate.  The institution used one contract social worker, decreasing the functional vacancy rate to five percent.  Two of the social worker positions were filled with unlicensed staff.

The three senior psych tech positions were filled.  All 47 psych tech positions were filled.

Seventeen of the 22 recreation therapist positions were filled, for a 23-percent vacancy rate.  Use of 1.5 contract recreation therapists decreased the functional vacancy rate to 16 percent.

Of the 23 MHSDS clerical positions, 19 were filled for a 17-percent vacancy rate.

Quality Management:

The quality management process at CMC was operational during the review period.  As reported below, QITs were used appropriately.

The local governing body and quality management committee met monthly with the appropriate staff in attendance.  Meeting minutes reflected appropriate documentation regarding the issues covered and the actions taken.

Similar to the local governing body meeting, various subcommittees reported regularly to the quality management committee, which attended to issues regarding the mental health program.

Mental health subcommittee meetings were held monthly, with the appropriate staff in attendance.  Agenda topics covered all aspects of the mental health program.  Audits were performed on a monthly basis and were methodologically sound.  Information was disseminated via monthly staff meetings and a monthly newsletter.  The mental health subcommittee minutes also included the various action plans developed based on audit results.

388

QITs chartered and/or in progress during the review period included the eUHR activation QIT (established locally) and the administrative segregation hub QIT (established by headquarters).  The administrative segregation hub QIT had been in existence for seven years.  A review of QIT meeting minutes showed they met weekly to about monthly, and were helpful in summarizing issues and progress.  A suicide prevention FIT was active during the review period as well.

CMC's peer review process was compliant with the statewide peer review process.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

For the first quarter of 2016, CMC reported compliance rates of 90 percent or above for all applicable psychiatry measures.  Clozapine was not authorized for use at CMC.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and

refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

CMC reported that the compliance rates for applicable measures were significantly underestimated due to the manner of reporting compliance based on instructions received from headquarters.  For example, the compliance rate for continuity of medications for MHCB transfers averaged about 55 percent because one "no-show" by an inmate during the 30 days following discharge from the MHCB was counted as zero-percent compliance for that specific inmate even if he had received his medication for 29 out of 30 days.

Related to similar issues, compliance rates were problematic for five key MAPIP measures: 1) continuity of NA/DOT medications with intra-institutional transfers (excluding ASU/SHU/PSU; 2) continuity of medications with MHCB transfers; 3) continuity of medications with intra-institutional transfers to ASU/SHU/PSU; 4) continuity of medications with discharge/transfer from a community hospital and/or DSH; and 5) medication administration for psychiatrist-prescribed outpatient provider new medication orders.  Consequently, a medication management QIT was established at CMC for these measures to track, trend and improve during the year.  Despite a QIT closely monitoring these measures since January 2015, there were no significant improvements during the review period.  Training was provided to nurses relevant to documentation requirements.  However, the compliance rate had remained low related to inmate no-shows.

During the review period, there were five initial petitions and 26 renewal petitions processed for PC 2602 involuntary medications.  There were no petitions denied for non-clinical reasons and one petition was withdrawn due to a release date change.

Since January 2016, the time for each pill line at CMC had increased to about four hours. The time extension helped to spread the medication administration process so that each inmate had a shorter wait time in the pill line.

There were 142 inmates who received HS medications. CMC reported that the medications were administered between 8:00 p.m. and 9:00 p.m.

Transfers:

CMC continued to have a full-time DSH coordinator. The DSH referral and non-referral logs were generally complete and contained all necessary data. The comments column on the non-referral log was rarely completed, but when it was completed the information was more informative, clinically useful and individualized than the disposition categories.

Of the 805 inmates identified as meeting one or more indicators for consideration for DSH referral, 181 or 22 percent were referred to DSH inpatient acute or intermediate care programs. There were no rejections for acute or intermediate level of care.

CMC referred and transferred 135 inmates to acute inpatient care. The average time from referral to transfer was 15.5 days, for 40-percent compliance with the ten-day transfer timeline. Late transfers ranged from 11 to 53 days. Six inmates or four percent were not transferred within 72 hours of bed assignment.

During the review period, CMC referred 46 or 25 percent of inmates considered for DSH referral, to intermediate care. Eight or 17 percent of inmates were transferred beyond the 30-day timeframe. Two percent of intermediate care transfers were not completed within 72 hours of bed assignment.

At the time of the site visit, 18 inmates were awaiting transfer to DSH.  Ten or 55.5 percent were awaiting an acute care bed.  Eight or 44.4 percent were awaiting an intermediate care bed.

There were 64 inmates transferred from CMC to an outside MHCB during the review period.  This was a significant increase since the preceding review period at which time the number of transfers to outside MHCBs was 24.  During the review period, CMC did not consistently transfer inmates within 24 hours.  The average transfer time was 22.15 hours with a range of zero to 81.97 hours; 28 or 44 percent of transfers took longer than 24 hours.  Staff attributed the delays to the statewide shortage of open beds.

CMC reported it referred one inmate with complex medical conditions to DSH.

There were 39 EOP inmates transferred to a PSU during the review period; all were reported to be timely.

CMC transferred 16 inmates to STRH.  The average time between ICC designation for transfer and the transfer date was 55 days with a range of 34 to 137 days.

The institution reported that there were no transfers to LTRH during the review period.

Other Areas:

Administrative Segregation EOP:

In administrative segregation, six PCs had caseloads of 12 to 18 inmates, two had caseloads of eight and nine inmates respectively, and one clinician had a caseload of four inmates.  The two psychiatrists had 52 and 59 inmates on their caseloads respectively.  These caseloads were within the clinical ratios for mental health established by CDCR for EOP and 3CMS administrative segregation programs.

Administrative segregation inmates, both EOP and 3CMS were housed on the B Facility. Audits indicated that PCs completed the comprehensive evaluation of the inmate before the IDTT, with a compliance rate of 99 percent.  Compliance with PC contacts within five days of administrative segregation placement was greater than 90 percent.

Psychiatric contacts were timely 99 percent of the time; initial psychiatric contacts occurred timely 96 percent of the time and routine contacts occurred timely 100 percent of the time.  PC contacts were timely 96 percent of the time, with 93-percent compliance for treatment refusal appointments, 94-percent compliance for initial contacts and 99-percent compliance for routine contacts.  Confidential clinical contacts occurred 83.3 percent of the time for both psychiatrists and PCs.

Regarding IDTT composition, audits indicated 99-percent compliance with the appropriate composition of participants at the meeting.  IDTT meetings were timely 99 percent of the time, with 98-percent compliance with initial and 99-percent compliance with routine IDTT contacts.

An administrative segregation IDTT meeting was observed.  The meeting was attended by the necessary participants, and also included a mental health RN, psych tech and recreation therapist.  There was good interdisciplinary discussion during the meeting as well as consideration of referral to higher levels of care.  Treatment goals were outlined.  Inmates were seen cuffed with an officer present, but inmates were not placed into therapeutic modules during the treatment team meeting.

Regarding the provision of ten hours of group therapy for administrative segregation EOP inmates, 14.82 hours were scheduled, an average of 14.37 hours per week were offered, 4.15 hours were attended, 10.22 hours were refused and 0.45 hours were cancelled.  Approximately

99 percent of inmates were offered at least ten hours per week, zero percent attended ten hours, 100 percent were scheduled, 59 percent refused and zero percent cancelled.  The reason provided for the low group participation was lack of interest.

Regarding the provision of five hours of group therapy for administrative segregation EOP inmates on modified program, it appeared that an average of 10.41 hours were scheduled, 10.05 hours per week were offered, 4.51 hours were attended, 5.54 hours were refused and 0.36 hours were cancelled.  Approximately 79 percent of inmates were offered at least five hours per week, 44 percent attended five hours, 79 percent were scheduled, 55 percent refused and zero percent cancelled.

Group therapy was provided in group rooms that were located on each level of the three level administrative segregation building.  The rooms were not optimal for group therapy due to the small configuration of the rooms and the ambient noise level on the unit.  A review of the group therapies provided indicated that there was a range of therapy topics, including a high risk management group which included those on the DSH wait list and other inmates who had been identified as high risk.

MHCB:

In the MHCB unit, eight PCs had caseloads ranging from of five to ten inmates, and five clinicians had caseloads of two to four inmates.  The seven psychiatrists had caseloads of two to ten inmates.  The assignments were within the established mental health clinical ratios.  The total number of MHCBs allocated at CMC was 50; all were operable during the review period.  The average daily MHCB census was 47 during the review period.  The MHCBs had appropriate/approved beds with "no tear" mattresses.  There were eight ADA-compliant cells.

394

The MHCB at CMC was generally a well-functioning unit with implementation of policies and procedures relevant to Program Guide requirements.  Issues identified included the need for training and clarification relevant to the cuffing policy.  In addition, there were clear issues identified in developing and implementing treatment plans specific to inmates with self-harming behaviors that appeared to be directly related to dissatisfaction with their housing placements.

The average length of stay during the review period was 11.3 days.  Taking into account inmates who were clinically discharged but physically remained in the MHCB, the average length of stay rose to 12.1 days.  Approximately 45 percent of the MHCB admissions had lengths of stay greater than ten days.  The clinical reasons provided all appeared to be reasonable.

Initial and routine IDTTs were completed within Program Guide timeframes over 98 percent of the time as were initial and routine PC contacts.  Monthly audits demonstrated 95-percent compliance with newly admitted inmates receiving a history and physical within 24 hours following admission.

Audits indicated that inmates were generally seen daily by a psychologist or psychiatrist, but no less than twice a week by a psychiatrist.  The individual daily clinical contacts occurred in a private setting about 50 percent of the time.  Barriers to clinical contacts in a private setting included inmate refusals and clinicians frequently having limited time.  All initial mental health evaluations occurred in a private setting as did the IDTTs.  Audits also demonstrated that treatment plans were reviewed in the IDTT and CDCR 7388-B forms were completed.

MHCB inmates were offered at least one hour of group activity (three inmates per group-using therapeutic modules) every other day and at least two hours of outdoor recreation time in a recreation module every other day.

395

Audit results showed that legible and clinically meaningful discharge summaries were completed on a timely basis.

While 27 of the current MHCB inmates were on non-administrative segregation status, only seven inmates were on non-cuff status within the MHCB.  Issues relevant to the custody staff review specific to cuffing were discussed with the MHCB lieutenant.  Non-disciplinary segregation inmates in the MHCB were generally handled from a cuffing perspective similar to administrative segregation inmates, as were SNY inmates.  Training was recommended relevant to the custody staff's reviews of cuffing in the MHCB.

CMC had identified issues regarding inmates being re-admitted to the MHCB within 30 days of discharge from either a MHCB or DSH.  This was also a statewide issue.  A quality improvement study was generated from the CMC performance report for February 2016 data.  One of the recommended actions included providing enhanced transitional planning with the outpatient team such as with a case conference, when clinically indicated.

Seclusion and Restraint:

There was one inmate placed in restraints on two occasions during October 2015.  The first restraint episode lasted less than three hours and the second restraint episode lasted for about 28 hours.  Nursing staff performed an audit relevant to the use of restraints.  A review of the restraint log appeared to indicate compliance with the restraint policy.  One inmate was placed in seclusion during March 2016, which lasted for four days and ten hours.  A review of the seclusion log appeared to indicate compliance with the seclusion policy.

Alternative Housing:

CMC did not use a MHOHU or OHU.  Alternative housing was located primarily on the first floor of Building 7, Facility D.  Six single room cells had been designated for alternative

396

housing use.  If the designated cells were filled, alternative housing could be expanded to the other 38 cells in the unit.  Such use had not yet been required at the time of the site visit.

The total number of alternative housing placements for the review period was 356. Seventy-six percent of inmates placed in alternative housing were referred to a MHCB.  The average daily census for alternative housing for the review period was four inmates.  The percentage of alternative housing placements that were transferred to a MHCB within 24 hours was 79 percent (280 of 356); 21 percent (76 of 356) were not transferred within 24 hours primarily due to lack of an open MHCB.

Inmates in alternative housing received a safety smock, a strong blanket and a safety mattress that was placed upon a bed frame in a wet cell.  A cleaning schedule was established for the alternative housing cells.

Daily out-of-cell clinical contacts were offered to inmates in alternative housing via the use of a treatment module.  Other reported clinical interventions were medication management and coordination with nursing staff.  Custody staff provided welfare checks, custody counts and security rounds.

The most recent sustainability audit indicated that it was not uncommon for HCPOP not to be contacted within an hour after the inmate was placed in alternative housing.  This issue was remedied by having the nursing staff notify HCPOP whenever an inmate was admitted to alternative housing.

EOP:

In the EOP program, the 17 PCs' caseloads ranged from 25 to 30 inmates.  For the four psychiatrists assigned to the EOP program, the caseload range was 112 to 123 inmates.  These were within CDCR's clinical ratio requirements.

All mainline EOP participants were housed on Facility D.  Recent changes that occurred in the EOP included the addition of four RNs whose primary function was providing group therapy, acting as a liaison with medical and acting as case manager regarding medical/mental health concerns.  These nurses attended the medical huddle and represented mental health concerns.

CMC continued to provide Activities of Daily Living (ADLs) groups for lower-functioning inmates.  In addition, they also continued the Gold Coat program.  This program was supervised by the recreation therapist and the participants assisted lower-functioning inmates (those assigned to the ADLs group and DD3 inmates) in ADLs, recreation, and other activities. The Gold Coat program and the ADLs groups continued to provide a needed service for the EOP and other lower-functioning inmates housed at CMC.

Compliance with timely routine psychiatric contacts was at 94 percent, and 100 percent for initial psychiatric contacts.  Timely PC contacts were compliant at 99 percent for initial contacts and 97 percent for routine contacts.  The information provided regarding confidential clinical contacts included both psychiatric and PC contacts.  For mainline EOP, 96 percent of contacts occurred in a confidential setting.

Group therapy was primarily provided in the mental health building in clinically appropriate space.  Regarding the provision of ten hours of group therapy for mainline EOP inmates, it appeared that an average of 21.19 hours were scheduled, 19.80 hours per week were offered, 10.33 hours were attended, 9.47 hours were refused and 1.39 hours were cancelled.

EOP inmates on modified programming were on average scheduled for 17.59 hours per week, were offered 16.45 hours, attended 5.71 hours, refused 10.74 hours and 1.14 hours were

cancelled.  CMC did not track the number of inmates who had been on modified programming and graduated to full programming.

Initial IDTT meetings were timely 88 percent of the time and routine meetings were timely 99 percent of the time.  Audits regarding IDTT meeting attendance indicated 90-percent compliance with the participation of the necessary disciplines at the meetings.

An EOP IDTT meeting was observed during the site visit.  The meeting included the necessary participants.  The space utilized for IDTT meetings was appropriate with sufficient space and privacy.  The meeting included discussion regarding consideration of referral to higher levels of care, appropriate treatment planning and included participation from most of the meeting participants.

An EOP group therapy session which was entitled Linkages Group, was also observed. This group was moderated by a social worker and was very interactive with full participation from the majority of the participants.  This group appeared to be very beneficial for the inmates involved.

In group interviews with EOP inmates, they reported that specific custody officers were disrespectful and used abusive language to EOP inmates.  The allegations were brought to the attention of the warden during the site visit.

3CMS:

In the 3CMS program, there were eight PCs with caseloads of 87 to 116 inmates.  The three psychiatrists had caseloads of 159 to 221 inmates.  The caseloads for both disciplines were within CDCR's established mental health clinical ratios.

Reviewed audits indicated that psychiatry contacts, PC contacts and routine IDTTs were completed timely.  CMC reported that initial psychiatry contacts were 100-percent compliant and

routine psychiatry contacts were 99-percent compliant.  CMC reported 91-percent compliance

for initial PC contacts.  Routine PC contacts were 100-percent compliant.

CMC reported that a total of 364 mental health evaluations were completed during the

review period.  Monthly audits for mental health evaluations showed compliance ranged from 64

percent to 98 percent with an average of 87 percent.

Staff reported that inmates were seen as clinically indicated and thus more often than the

every 90 days minimum required by Program Guide timelines.  This was confirmed by inmate

reports and observed in an IDTT during the site visit.  Staff estimated that about 50 percent of

inmates were seen by their PC more frequently than quarterly.

Consistent with the data, staff reported difficulty meeting Program Guide timelines in the

3CMS program on the West Facility primarily due to the documentation required as a result of

high intakes and high paroles from the program.  At the time of the site visit, there were 226

inmates in the program.  Staff had recently been told that there was no cap to the number of

inmates that would be admitted to the West Facility and remained concerned about the staffing

level and ability to comply with Program Guide timeframes.

Psychiatry and PC contacts occurred in private settings.

Audit data provided in advance of the site visit indicated that 100 percent of routine

IDTTs were compliant.  In contrast, the compliance rate for initial IDTTs was 26 percent.  For

the overdue initial IDTTs, the average was three to 39 days.  IDTTs were attended by all

required staff 97 percent of the time.

Four IDTT meetings were observed during the site visit.  All required members were

present and contributed to the discussion.  The CC I provided useful information.  Inmates

participated and it appeared they found the process helpful.  However, there was no focused

discussion of the inmate's functioning since the last IDTT and limited discussion of progress toward treatment goals.

A strength of the 3CMS program was the active and clinically rich group program. Data provided during the site visit indicated that there were 40 groups available to inmates.

The main challenge in the 3CMS program on the West Facility reported by staff and observed during the site visit was proximity of the program office to custody staff. While there were custody staff posted on the yard, which was adjacent to the program office, custody staff were not posted in the program building.

Interviews were conducted with inmates on the C Yard in the East Facility where the majority of 3CMS inmates resided. Overall, inmates were satisfied with the 3CMS program and knew how to access mental health services and their assigned provider. There were some complaints that custody officers were "demanding," "unprofessional," "talk to you like a child" and used loud voices or yelled, which was "triggering." The majority of inmates reported quarterly contact with their PC and two inmates reported monthly contact with their PCs. The 5:00 p.m. pill line coincided with dinner. Consequently, some inmates had chosen to skip medication to eat.

<u>3CMS Inmates in Administrative Segregation</u>:

At the time of the site visit, there were nine 3CMS inmates housed in administrative segregation. Psychiatry contacts for 3CMS administrative segregation inmates were timely at 100 percent. PC contacts were timely for routine contacts at 98 percent and for initial contacts at 100 percent.

Confidential clinical contacts occurred 67.3 percent of the time for both psychiatrists and PCs. The reason provided for the low compliance with the provision of confidential clinical contacts was inmate refusals to come out of the cell for a confidential interview.

Audits indicated that the initial IDTT was performed prior to the ICC 99 percent of the time. There was 99-percent compliance with the appropriate composition of IDTT participants in attendance at the meeting. IDTT meetings were timely 100 percent of the time, for both initial and routine IDTT contacts.

3CMS administrative segregation inmates were provided with one two-hour group per week. The group primarily consisted of watching a movie; however, this activity was valued by the inmates as they had no other out-of-cell activity provided and due to rapid transfer to STRH, 3CMS inmates did not remain at CMC for prolonged periods of time.

Case-by-Case Reviews:

During the review period there were 38 inmates who required a case-by-case review. Thirteen inmates transferred after their 150-day case review and before their long-term segregated case conference. Additionally, fourteen inmates were transferred to mainline EOP after their long-term segregated case conference, three were transferred to the CSP/Sac PSU and one inmate was retained in administrative segregation pending a disciplinary hearing. There were seven inmates scheduled for review.

Non-Disciplinary Segregation:

During the review period there were 17 inmates designated for expedited transfer. Of those 17 inmates three or 18 percent transferred within 72 hours. For those inmates overdue for expedited transfer, actual transfer dates ranged from four days to 32 days. There were 28 inmates on NDS status at the time of the site visit.

402

Referrals:

There were 205 emergent referrals; 100 percent received a timely response.  Of the 142 urgent referrals issued during the review period, 90 percent received a timely response.  There were 1,629 routine referrals issued during the review period; 95 percent received a timely response.

EHRS/MHTS.net:

EHRS training was initiated on November 23, 2015 and continued through February 22, 2016.  At the time of the site visit, 11 clinicians remained to be trained, primarily employees hired after the first of the year.  The EHRS at CMC was awaiting implementation at a date yet to be determined by the time of the site visit.

Space:

Mental health treatment space was not an issue at CMC.  The use of the dining hall on Facility C had recently been approved for treatment groups in order to maximize group treatment space.

Mental Health/Custody Relations:

Mental health staff reported that the relationship between mental health and custody staff was good and cooperative.

Heat Plan:

The institution's monthly report for October 2015 indicated that during the review period there were nine Stage I heat alerts and no Stage II or III alerts.  The institution heat plan operational procedure was up-to-date.

Twelve housing units were reviewed for thermometer location, temperature log completion, current inmate heat risk list, and staff knowledge of the institution heat plan

requirements.  In five of the 12 units reviewed, the on-duty correctional officer had already signed their name for each of the hourly temperature checks for the remainder of their work hours.

All staff questioned regarding heat plan stages and alerts were knowledgeable of the policy and procedure.

Lockdowns/Modified Programming:

There were two lockdowns resulting in modified programming during the review period, both of which were on the West facility.  All priority health care ducats were honored.

Pre-Release Planning:

CMC reported that six pre-release groups were held during the review period.  CMC also reported that during the review period it provided required pre-release services to inmates.  There were 903 pre-release program appointments closed during the review period.

Access to Care:

A review of CMC's monthly Health Care Access Quality Reports from October 2015 through March 2016, indicated that seven percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 63 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

Institutional data showed that of the 2,196 available jobs, 279 EOP inmates, or 49 percent of the EOP population held job assignments.  For 3CMS inmates, 420 or 53 percent of the population held job assignments, and for non-MHSDS inmates 1,497 or 55 percent of the population held job assignments.

Of the 512 academic assignments, 51 EOP inmates or nine percent of the population held assignments. For 3CMS inmates, 111 or 14 percent of the population held assignments. For non-MHSDS inmates, 350 or 13 percent of the population held assignments.

There were 375 substance abuse treatment program assignments; seven EOP inmates, or one percent of the population held assignments. Of the 3CMS population, 90 inmates, or 11 percent of the population held assignments. For non-MHSDS inmates, 278 or ten percent of the population held assignments.

Of the 240 vocational education assignments, three EOP inmates, or one percent of the population held assignments. Of the 3CMS population, 36 inmates, or five percent of the population held assignments, and for non-MHSDS inmates, 201 or seven percent of the population held assignments.

Of the 1,021 voluntary education assignments, 76 EOP inmates, or 13 percent of the population held assignments. For 3CMS inmates, 218 or 27 percent of the population held assignments. For non-MHSDS inmates, 727 or 27 percent of the population held assignments.

b. Milestone Credits:

As of April 4, 2016, CMC reported that 126 of 567 EOP inmates were eligible for milestone credits. Among those 126 inmates, 33 percent earned milestone credits. For the 798 3CMS inmates, 232 were eligible to earn milestone credits; 27 percent earned the credits.

Of the 2,740 non-MHSDS inmates, 687 were eligible to earn milestone credits; 39 percent earned the credits.

c. Out-of-Level Housing:

There were 21 Level I EOP inmates in Level III housing and five Level I 3CMS inmates in Level II housing. There were two Level II 3CMS inmates in Level I housing. There were 282

405

EOP and 195 3CMS Level II inmates in Level III housing.  There were three Level III 3CMS

inmates in Level II housing.  There were 13 EOP and ten 3CMS Level IV inmates in Level III

housing.

      d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CMC provided a copy of the Request for Accommodation Process Desk Reference

Manual, which CMC used as its local procedure.  CMC did not provide any training records for

review.  Reasonable Accommodation Panels were convened as needed.

      e.  <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

The periodic classification score reductions were not reviewed at the time of the site visit.

<u>*Coleman* Postings</u>:

All toured housing units had current *Coleman* postings.

**<u>Wasco State Prison (WSP)</u>**
November 29, 2016 - December 1, 2016

<u>Census</u>:

On December 1, 2016, WSP housed 4,883 inmates, a two-percent decrease from the

census reported during the preceding monitoring period.  WSP's mental health population of

1,220 had decreased by three percent and comprised 25 percent of the inmate population.

Six inmates were in the MHCB.

There were 325 mainline 3CMS inmates.

The STRH unit housed 24 3CMS inmates and there were six EOP inmates awaiting

transfer to an EOP hub.

The reception center population included 755 3CMS and 104 EOP inmates.

<u>Staffing</u>:

The chief psychiatrist and chief psychologist positions were filled.  The two senior

406

psychologist supervisor positions and the two senior psychologist specialist positions were filled

Of 11 psychiatry positions, 3.5 were filled; of those, a telepsychiatrist filled a 0.5 position, for a 68-percent psychiatry vacancy rate.  Registry staff covered 2.5 positions, reducing the number of vacancies to five and decreasing the functional vacancy rate to 46 percent.

Of the 33 psychologist positions, 23 were filled for a 30-percent vacancy rate.

The supervising social worker position was filled, as were 13 of 15 social worker positions, for a 13-percent vacancy rate.  Registry staff covered a 0.75 position, reducing social worker vacancies to 1.25 and decreasing the functional vacancy rate to eight percent.

WSP provided information indicating that one senior psych tech and 13 psych tech positions were filled, but data on allocated positions, contractor use, and functional vacancies was not provided.

Two of three recreation therapist positions were filled, for a 33-percent vacancy rate. Registry staff covered a 0.25 position, decreasing recreation therapist vacancies to 0.75 and reducing the functional vacancy rate to 25 percent.

The OSS II position was filled.  Nine of eleven MHSDS clerical positions were filled for an 18-percent vacancy rate.  One office technician was on long-term medical leave, increasing the number of functional vacancies to three and the functional vacancy rate to 27 percent.

Quality Management:

The quality management process at WSP was operational during the review period.  The local governing body met three times and routinely addressed approval of operational procedures for the mental health, dental, and medical programs, among other matters.

A review of quality management committee meeting minutes indicated that a quorum was achieved for five of six meetings held during the review period.  The quality management

407

committee routinely reviewed minutes and received reports from numerous committees, including the mental health subcommittee.  The quality management committee also reviewed the status of various mental health QITs and CAPs.

The mental health subcommittee met six times during the review period and always achieved a quorum.  QITs in operation during the review period addressed barriers to inmate enrollment in the MHSDS, routine mental health referral responses, excessive MHCB clinical lengths of stay, implementation of 30-minute discharge custody checks, and administrative segregation pre-screenings.

WSP was paired with DVI for peer review.  All licensed eligible staff were reviewed within policy timeframes, but 13 unlicensed psychologists and seven unlicensed social workers were not reviewed.  All reviewed staff met or exceeded standards.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance with laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

WSP reported overall compliance for all seven MAPIP psychiatry measures.  All individual quarterly audit results exceeded 90 percent, and no overall mental health measures were below 93 percent.  Clozapine was not authorized for use at WSP.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT

408

medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

WSP reported compliance for all individual transfer measures except for MHCB transfers and discharge from a community hospital and/or DSH.  Overall, however, the institution reported 81-percent compliance for measures reflecting medication continuity; new staff and staffing deficits were reported to be contributing factors to noncompliance.  WSP indicated overall compliance for medication compliance measures, although there was noncompliance for some measures for some months.  There was also overall compliance for medication administration, but noncompliance for two months for the administration of outpatient psychiatrist-prescribed new medications.  Effective use of morning interdisciplinary huddles and increased staffing contributed to improvement in this area.

One PC 2602 involuntary medication petition was initiated during the review period; two were renewed.  None of the petitions were withdrawn or denied and one involved the use of force.

Inmates did not complain about the length of pill lines.

There were 714 inmates who received HS medications.  WSP staff reported that these medications were not administered earlier than 8:00 p.m.

Transfers:

A senior psychologist supervisor filled the DSH coordinator position.  She reported that

transfer delays were typically due to incomplete paperwork, unavailable beds, or DSH inaction or policy of not accepting weekend transfers.

A review of the non-referral log and 7388-B forms for approximately 25 cases revealed that clinicians struggled with the adequacy of non-referral rationales and treatment modifications that targeted positive Form 7388-B criteria.  A review of five cases from the non-referral log indicated two where medical records did not clinically justify inmate non-referral.

The referral log contained incomplete information concerning inmates returning from DSH, but the DSH coordinator maintained a separate log of DSH discharges.  An audit reported clinician-to-clinician contact within five days of DSH discharge only 47 percent of the time. DSH discharge summaries were not routinely incorporated into treatment plans.

WSP generated 21 DSH referrals during the review period.  There were 17 acute care referrals; none were rejected or rescinded.  Nine of 17 or 53 percent timely transferred. Transfers averaged 14 days and ranged from six to 63 days.  Fourteen of 17 or 82 percent of inmates transferred to acute care within 72 hours of a bed assignment.

There were four intermediate care referrals.  WSP rescinded one referral, but none were rejected by DSH.  The three referrals that were not rescinded were deferred to acute care.  All three transfers were untimely, with these inmates transferring to DSH after 58, 65, and 70 days of being referred to DSH.  However, all were transferred within 72 hours of a bed assignment.

There were three Vitek hearings held during the review period; none of the inmates prevailed.

At the time of the site visit, no inmates were awaiting DSH transfer.

WSP generated 538 MHCB referrals during the review period, resulting in 260 transfers; 46 were to the MHCB at WSP and 214 were to outside MHCBs.  Of the 260 MHCB transfers, 40

410

or 15 percent were timely; bed unavailability was the major reason for MHCB transfer delays.

WSP reported that 41 percent of alternative housing placements timely transferred to an MHCB.

No EOP inmates were endorsed for PSU transfer during the review period.

There were 64 EOP inmates transferred to an EOP hub; 52 or 81 percent of transfers were timely.  At the time of the site visit, two of the inmates awaiting transfer to an EOP hub were beyond transfer timelines.

A total of 293 reception center EOP inmates transferred to mainline EOP programs during the review period; 88 or 30 percent were transferred timely.  At the time of the site visit, 17 reception center EOP inmates had been waiting beyond the 60-day transfer timeline, with a range from hours to 27 days.  WSP reported that untimely transfers were typically due to bed unavailability.

A total of 988 of 1,865 or 53 percent of reception center 3CMS inmates timely transferred to mainline 3CMS programs.  At the time of the site visit, 138 reception center 3CMS inmates had been waiting beyond the 90-day transfer timeline, with a range from one to 27 days.

Other Issues:

Reception Center:

One telepsychiatrist and a registry on-site psychiatrist were assigned to treat reception center EOP inmates; they had a shared caseload of 109 inmates.  Eight PCs were assigned to reception center EOP, seven of whom had caseloads of 1:15-1:19.  The remaining PC was assigned to pre-parole planning and MHCB discharges, and carried a caseload of four EOP inmates and 18 3CMS inmates.

411

For reception center EOP inmates there was 89-percent compliance with initial psychiatry contacts and 79-percent compliance with ongoing psychiatry contacts, of which 97 percent were confidential.  There was 93-percent compliance for initial IDTT meetings and a compliance rate of 99 percent for routine IDTTs.  Required staff attended IDTT meetings 82 percent of the time; psychiatry non-attendance was the reason for noncompliance.

Observed IDTT meetings for reception center EOP inmates began on time with all required staff in attendance.  Treatment team members discussed inmates' appropriate level of care through Form 7388-B consideration.  Although PCs typically solicited input from all IDTT members, their case formulations varied in quality.  Inmates were given the opportunity to ask questions and sign the treatment plan, but otherwise, did not fully understand the IDTT's purpose.

A recreation therapist facilitated an observed reception center EOP inmate treatment group.  The group addressed problem-solving and separated inmates into subgroups; some floundered, while others accomplished the task.  The group facilitator, though capable, did not effectively assist lower functioning inmates.  Interviewed group participants expressed satisfaction with mental health treatment.

Five psychiatrists and ten PCs were assigned to the reception center 3CMS program. There was 99- and 100-percent compliance for initial and routine psychiatry contacts, respectively, of which 98 percent were confidential.  Initial and ongoing PC contacts were compliant 96- and 99-percent of the time; 92 percent were confidential.

During the review period, inmate stays in the reception center averaged 47 days for EOP inmates, 62 days for 3CMS inmates, and 64 days for non-MHSDS inmates.

MHSDS in Administrative Segregation:

One part-time psychiatrist was assigned to administrative segregation and had a caseload of nine EOP and 25 3CMS inmates. Three assigned PCs had respective caseloads of 1:1 for EOP inmates and 1:10 for 3CMS inmates, 1:2 for EOP inmates and 1:10 for 3CMS inmates, and 1:2 for EOP inmates and 1:6 for 3CMS inmates.

WSP reported greater than 90-percent compliance with all clinical contacts for EOP inmates in administrative segregation. Daily treatment groups for EOP inmates were provided in the day room area with inmates confined in therapeutic modules. This provided no sight or sound confidentiality.

IDTT meetings for four administrative segregation EOP inmates were observed during the site visit. The PC was inclined to present historical factors that contained highly personal and sensitive information which was ultimately not relevant to treatment plan targets contained in the final treatment plan. It was not readily apparent that non-clinically trained treatment team members had a need to know such information, particularly since it did not impact the inmate's daily living nor result in targets of mental health treatment.

In April 2016, STRH for 3CMS inmates was activated at WSP. While the institution was not designated as a primary STRH site, it nonetheless provided STRH services to reception center and mainline 3CMS inmates. At the time of the site visit, WSP was providing STRH services to 3CMS inmates. These inmates received one weekly PC contact, one 90-minute PC group treatment, and one 60-minute reception center group treatment.

A dedicated confidential group treatment space was available for 3CMS groups. There was 100-percent compliance for initial and routine psychiatry contacts and greater than 90-percent compliance for initial and routine PC contacts. Timely initial and routine IDTTs were

413

also in compliance at greater than 90 percent.  However, staffing shortages in psychiatry resulted in compliance rates below 90 percent for required staff attendance.

MHCB:

WSP operated a six-bed MHCB.  Clinical staff included 0.75 FTE psychiatrist, who was also the chief psychiatrist, 1.75 FTE psychologists, and a 0.50 FTE clinical social worker. Although the MHCB was small, there was concern about the chief psychiatrist's MHCB workload in light of his many other duties.

The MHCB had an IDTT room and a multi-purpose room, both with single treatment modules, and had adequate space.  There was also a fairly large outside patio area with a table and benches that was covered to provide shade and protection from inclement weather.

MHCB operational procedure provided that all inmates were subject to an unclothed body search and metal detector scan prior to participation in out-of-cell activities.  This created a barrier to care by discouraging some inmates from attending treatment activities if they did not want to undergo this search.

For psychiatry contacts, there was 98-percent compliance for initial contacts and 77-percent compliance for routine contacts.  For PC contacts, there was 98-percent compliance for initial contacts and 89-percent compliance for routine contacts.  The institution reported 94- and 93-percent compliance for initial and routine IDTT meetings, respectively.

Observed MHCB IDTT meetings were well-facilitated.  Treatment team members were typically cohesive and naturally interacted with one another.  Observed IDTTs contained lengthy discussions of inmate symptoms and challenges, with all disciplines working together to develop an effective treatment plan.

414

Seclusion and Restraint:

There were seven episodes of seclusion and nine of restraint in the MHCB, and 23 seclusion episodes and two of restraint for inmates housed in alternative housing. There was concern that clinical documentation did not always support inmate seclusion or restraint, and a lack of adequate documentation of alternative, less restrictive methods to avoid them. Most inmates were in seclusion or restraint for brief periods of time, but were there longer than necessary.

3CMS:

Facility A housed all mainline 3CMS inmates. There were 0.5 psychiatrist, 0.5 senior psychologist supervisor, 1.0 psychologist, and 1.0 clinical social worker positions assigned to the mainline 3CMS program. The psychiatrist had a caseload of 236 inmates; two PCs had caseloads of 1:125-147.

There was compliance for initial and routine contacts for both psychiatrists and PCs. There was also compliance for initial and routine IDTT meetings, but only 34-percent compliance for the attendance of required participants at IDTTs; psychiatrists were most frequently absent.

At the time of the site visit, there were five treatment groups available to 3CMS inmates. All had waitlists. Topics included anger management and mindfulness, while three lifer groups addressed multiple issues and based group participation on where an inmate was in his sentence. Observed groups revealed well-engaged inmates, with group participants highly valuing them. However, the large size of the groups made it difficult to achieve clinical tasks.

Case-by-Case Reviews:

WSP reported that there were no 150-day case-by-case reviews performed during the review period.

Non-Disciplinary Segregation:

WSP's local operating procedure for administrative segregation contained a section that addressed the tracking of NDS inmates and the provision of property and telephone calls. There was one inmate designated NDS during the review period. Although approved for expedited transfer, his transfer was untimely by 11 days. The inmate was, however, approved for property and telephone calls while awaiting transfer, which were provided.

"C" Status:

During the site visit, 21 WSP inmates were on "C" Status; seven were at the 3CMS level of care. Five of the seven were on "C" Status for receiving multiple RVRs during a 180-day time period. The other two were placed on "C" Status while housed at another institution and remained on "C" Status following their arrival at WSP.

Referrals:

There were 503 emergent referrals generated during the review period; 97 percent received a timely response. There were 75 urgent referrals; 85 percent received a timely response. Timely responses for the 7,089 routine referrals were at 63-percent compliance.

EHRS/MHTS.net:

MHTS.net was one of several electronic databases that WSP staff used to track numerous matters, such as inmate arrival dates, level of care changes, PC contacts, and IDTT meetings. The EHRS was not yet activated; activation was scheduled for October 2017.

Mental Health/Custody Relations:

Clinical and custody line staff reported positive working relationships. WSP management and supervisory staff reported the same.

Heat Plan:

Housing units were toured for compliance with heat plan protocols. Interviewed housing unit officers effectively answered questions and demonstrated knowledge of local heat plan procedures. The local operating procedure was current.

There were 129 Stage I heat alerts during the review period, but no Stage II or Stage III heat alerts. A review of 17 daily activity reports revealed that none recorded yard accommodations for inmates on the heat risk list during Stage I heat alerts.

Lockdowns/Modified Programming:

During the review period, there were five modified programs, ranging from two to four days. All modified programs were isolated to D Yard; none affected access to mental health services.

Pre-Release Planning:

Staff reported that pre-release coordinators tracked inmates who were within 120 days of release and informed clinicians. PCs subsequently arranged for the TCMP case manager to assist inmates. A WSP pre-release log indicated that 46 inmates were scheduled for release between April and October 2016. The log reported whether inmates needed urgent mental health follow-up and were cleared for public transportation. Other than this log, there was no documentation as to how mental health information was conveyed to parole and probation staff.

Access to Care:

A review of WSP's monthly Health Care Access Quality Reports from April 2016

417

through October 2016, indicated that 0.17 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while six percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

Job and program assignments data provided by the institution indicated that assignments for EOP inmates included one job assignment and one voluntary education assignment.

For 3CMS inmates, 172 or 14 percent of the population held job assignments.  Ten 3CMS inmates held academic assignments, accounting for less than one percent of the 3CMS population.  There were 41 or three percent of 3CMS inmates assigned to substance abuse programs.  Nine 3CMS inmates held vocational education assignments, reflecting less than one percent of the population.  For voluntary education, 144 or 12 percent of 3CMS inmates held an assignment.

For non-MHSDS inmates, 432 or 12 percent of the population held job assignments. There were 30 non-MHSDS inmates with academic assignments, accounting for less than one percent of the population.   For substance abuse treatment programs, 46 or less than one percent of non-MHSDS inmates held an assignment.  Eighteen non-MHSDS inmates held vocational education assignments, reflecting less than one percent of the population.  For voluntary education, 418 or 11 percent of non-MHSDS inmates held an assignment.

b.   Milestone Credits:

On October 13, 2016, WSP reported that 76 of 137 EOP inmates were eligible for milestone credits.  Among those 76 inmates, slightly more than one percent earned them.  For the 1,203 3CMS inmates, 647 were eligible to earn milestone credits; six percent earned them.  Of

418

3,642 non-mental health caseload inmates, 2,426 were eligible to earn milestone credits; six

percent earned the credits.

    c.  <u>Out-of-Level Housing</u>:

On November 2, 2016, there were eight non-MHSDS Level I inmates in Level III

housing.  There were 73 non-MHSDS Level II inmates in Level I housing and 21 3CMS and 74

non-MHSDS Level II inmates in Level III housing.  Ten 3CMS and 42 non-MHSDS Level IV

inmates were housed at Level III.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

Information provided by WSP indicated that as of October 12, 2016, 241 staff members

had been trained on the DDP annual refresher.

*Coleman* Postings:

All toured housing units contained current *Coleman* postings in both English and

Spanish.  These postings were located in common areas that were accessible to the mental health

population.

**<u>Kern Valley State Prison (KVSP)</u>**
November 28, 2016 – December 1, 2016

<u>Census</u>:

On November 28, 2016, KVSP housed 3,796 inmates, a two-percent increase since the

preceding monitoring period.  There were 1,296 inmates in the MHSDS, which had decreased by

seven percent since the preceding monitoring period and represented 34 percent of KVSP's total

inmate population.

The 1,296 MHSDS inmates included four inmates in the MHCB, five inmates in

alternative housing, 187 EOP inmates, of which ten were in administrative segregation, and

1,100 3CMS inmates, including 96 in STRH.

419

Staffing:

The chief psychiatrist, and one of two chief psychologist positions were filled.  One chief psychologist position remained vacant per direction from headquarters.

The three established senior psychologist specialist positions were filled.  For senior psychologist supervisors, 1.5 of 2.5 positions were filled for a 40-percent vacancy rate.

All nine on-site psychiatry positions were vacant for a 100-percent vacancy rate.  There was no telepsychiatry position established at KVSP.  Registry services provided 4.1 FTE psychiatry positions and 1.0 FTE telepsychiatry coverage for a functional vacancy rate of 43 percent.

Of 23 established staff psychologist positions, 18 were filled for a vacancy rate of 22 percent.  Three new hires were in the credentialing process at the time of the site visit.

The one established supervising social worker position remained filled, and all twelve social worker positions were filled.  Four of the social workers were unlicensed.

KVSP established and filled one FTE unit supervisor position to supervise psych techs. The senior psych tech position remained filled.  Of 25.7 psychiatric technician positions, 24 were filled and all vacancies were covered by three registry staff.

Three of five recreation therapist positions were filled for a 40-percent vacancy rate.

The CHSA II position remained vacant, per headquarters' directive, and the three HPS I positions were filled.  All 13 mental health clerical positons were filled.

Quality Management:

A review of minutes from quarterly local governing body meetings for April through September 2016 indicated that monthly meetings occurred, but did not indicate that a quorum was met for each meeting.  The local governing body focused on approval of minutes from

420

various committees and operational procedures.  Custody issues and new business was generally sparse and in bulleted format.

Reviewed minutes from the quality management committee for April through September 2016 did not indicate a quorum.  The quality management committee addressed all areas of health care including review of all subcommittee reports and improvement projects.  The quality management committee's documentation did not demonstrate routine follow-up of action items from month to month.

Mental health subcommittee minutes for April through September 2016 indicated there were eight meetings during that timeframe; each had a quorum.  Agenda items covered all areas of mental health care.  Documentation of the content of the meetings primarily focused on agenda topic updates with limited discussion.  Identification of factors contributing to problematic areas varied monthly with no formal quality improvement study to fully understand the issue.

CAPs were not consistently documented as implemented by the mental health subcommittee.  Issues with CAPs included: lack of plans to resolve identified issues, references to non-problematic issues, lack of CAPs to address all identified deficiencies, identifying potential causes for issues in CAPs without clearly documenting rationale, and failure to regularly update CAPs.

A review of monthly mental health performance reports revealed consistent trends of non-compliance in several areas, yet there were no QITs or FITs active during the review period.

Despite KVSP's large EOP program, there were a low number of acute care referrals and no referrals to intermediate care during the review period, a documented area of concern during the Minor and Major Sustainability Tours in April 2016 and July 2016, respectively.  Problems

with documentation of clinical rationale for non-referral to DSH were evident in chart reviews. These issues were not addressed in the quality management structure of KVSP.

KVSP was paired with PVSP for peer review.  Documentation indicated that peer reviews were completed for two psychologists and three social workers.  No significant concerns or systemic issues were noted.  Social workers completed the annual peer "mentoring" process. During the review period, KVSP had no state psychiatrists, and did not conduct psychiatry peer review.

KVSP was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a January 15, 2016 statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants. Diagnostic monitoring for treatment with psychotropic medications showed 89.3-percent compliance.  KVSP was not a clozapine (Clozaril) initiation or maintenance institution.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and

422

refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider new medication orders.

Medication continuity with transfers was noncompliant at 82 percent.  Continuity upon intra-institutional transfers was noncompliant overall at 78 percent; however, was 90-percent compliant for the month of August 2016.  Continuity with inter-institutional transfers was compliant at 100 percent.  Continuity of medications with MHCB transfers showed an upward trend during the review period with 83-percent compliance for the month of August; prior to that, compliance was low at 69 percent.  Continuity of medications with inter-institutional transfers to ASU was 78-percent compliant.  Continuity of medications with discharge from a community hospital or DSH was improved with an overall compliance rate of 84 percent; however, compliance was low in August 2016 at 60 percent.

Medication non-adherence for psychiatrist-prescribed medications was at 85-percent compliance.  Medication non-adherence with PC 2602 involuntary medications was compliant at 90 percent.

There were 35 PC 2602 hearings during the review period.  Of those, two involved a controlled use of force incident.  There were no PC 2602 involuntary medications petitions denied or withdrawn for non-clinical reasons.

Pill lines were problematic in EOP units C8 and C7 because of competing activities and/or demands in those units.

The facility did not audit the provision of HS medications.

Transfers:

During the review period, KVSP considered 366 inmates for placement in a higher level of care via the 7388-B process; 23 or 6.2 percent were placed in a DSH inpatient bed.  Reasons

423

for non-referral included MHCB assessment in progress, current level of care clinically indicated, medical complications, or placement in EOP or 3CMS level of care.

There were 23 referrals to acute care during the review period, of which 20 or 87 percent transferred within timeframes, and 22 or 95.7 percent transferred within 72 hours of bed assignment.

There were no referrals to intermediate care and no DSH referrals for inmates with complex medical needs during the review period.

Two *Vitek* hearings were held and the inmates did not prevail; one hearing was untimely.

During the review period, KVSP referred 340 inmates to MHCBs.  Of those, 169 were rescinded.  Of the 171 that were placed, 44.5 percent transferred within 24 hours.  Delays were largely attributed to the lack of available MHCBs.

For inmates awaiting transfer to MHCBs from alternative housing, the average number of days to transfer was 1.14 days, with a range of zero to 4.875 days.

The one PSU transfer that occurred during the review period was timely.

During the review period, 162 inmates transferred to EOP hubs.  Eighty percent of the transfers were timely.  No EOP inmates were held in administrative segregation over 90 days.

The one non-SNY mainline EOP transfer that occurred during the review period was timely.

Thirteen of 14 or 93 percent of inmates transferred to LTRH were timely transferred.

Other Issues:

    MHCB:

    KVSP maintained a 12-bed MHCB; however, during the site visit, eight cells were offline due to the retrofit project.  Three PCs and one psychiatrist were assigned to the MHCB.

Due to staffing shortages, the chief psychiatrist provided the psychiatry coverage in the MHCB. A recreation therapist and an unlicensed social worker also provided services there.

During the review period, there were 177 admissions to KVSP MHCBs.  The average length of stay was 9.7 days, with a range of one to 37.7 days.  Nearly 37 percent of admissions had lengths of stay exceeding ten days with an average length of stay of 15.5 days.  There were 20 inmates who had three or more MHCB admissions during the review period, accounting for 72 admissions.  The MHCB referral process at KVSP was overly complex, resulting in further delay.

Initial and routine psychiatry contacts were 99-percent and 100-percent compliant, respectively.  Initial and routine PC contacts were 98-percent and 96-percent compliant, respectively.

Ninety-eight percent of initial IDTTs were completed timely, as were 94 percent of routine IDTTs.  An MHCB IDTT was observed and all required members were present, as well as the DSH coordinator who attended bi-weekly.  The discussion was collaborative.  The inmate remained cuffed; the reason was not discussed.  The temperature in the IDTT room and the unit was so cold that staff wore jackets.  Inmates were provided blankets in their cells, which seemed insufficient.

Seclusion and Restraint:

There were no incidents of restraints during the review period.  There were six incidents of seclusion involving four inmates.  Seclusion times lasted from just under two hours to 12 hours.

Alternative Housing:

Clinicians assigned to the MHCB also provided services in alternative housing.

425

Alternative housing occurred in several locations throughout the institution, including C7, the EOP overflow housing unit. Staff and inmates reported that all out-of-cell programming was discontinued whenever an inmate was placed on suicide watch within the housing pod. This was problematic in light of the lack of out-of-cell time and programming provided to EOP overflow inmates.

Of additional concern were reports that inmates on suicide watch were not provided with mattresses and blankets. Interviewed mental health staff confirmed these reports. Mental health supervisory staff reported that this issue was directed to the attention of custody supervisory staff for remedy. SPRFIT meeting minutes from July 26, 2016 noted the absence of mattresses in alternative housing and indicated that the associate warden for health care would have mattresses delivered to C7 and that sleigh beds were housed in the warehouse. No evidence was observed that this was an ongoing problem at the time of the site visit.

There were 349 alternative housing placements during the review period; 130 inmates or 37 percent were timely removed. Lengths of stay beyond policy transfer timeframes ranged from 0.04 hours to 4.8 days.

Documentation in a treatment plan of an inmate held in alternative housing in the hallway of the TTA indicated that the lack of confidentiality hindered inmate disclosures to clinicians. While in alternative housing in this area, treatment was provided in the TTA, which necessitated escort to the TTA daily while still wearing his smock. If the inmate refused, MHCB staff were directed to go to the unit where he was housed. Documentation of daily contacts was available.

During the site visit, one inmate was observed under suicide watch in a non-designated alternative housing cell while there were approved alternative housing cells available, in contravention of KVSP's LOP.

426

Short-Term Restricted Housing:

STRH was activated at the time of the site visit.  A psychiatrist assigned to STRH also provided services in the MHCB.  The data provided was insufficiently detailed to determine compliance with established clinical ratios.  Five PCs provided services in STRH with caseloads of 18 to 21 inmates each.  An additional PC providing services in STRH also covered EOP inmates in administrative segregation awaiting transfer to an EOP hub.

Initial psychiatry contacts were noncompliant at 79 percent.  Routine psychiatric contacts were 95-percent compliant.  Initial and routine PC contacts were compliant.

Initial and routine IDTTs were compliant; however, IDTT meetings with the necessary participants were compliant 37 percent of the time.

The monitor's expert attended an STRH IDTT.  Consistent discussion regarding consideration of referral to higher levels of care did not occur.

The STRH unit included one room used for group therapy.  STRH inmates were offered groups weekly.  Group sessions lasted for approximately 90 minutes.  During the review period, 42 percent of inmates were compliant with group therapy.

SNY EOP:

SNY EOP inmates were housed in Facility C, including in an overflow unit.  A proposed February 2017 mission change would convert C7 to accommodate 96 Level IV SNY EOP inmates.

During the site visit, one telepsychiatrist was assigned to the SNY EOP with a caseload of 177 inmates, significantly exceeding the established EOP clinical ratio of 1:97.  Seven PCs carried appropriate caseloads of 20 to 22 inmates each.  Two additional PCs carried varying caseloads.  Two recreation therapists were assigned to the EOP program.

427

Initial and routine psychiatric contacts were not compliant at 69 percent and 56 percent, respectively.  Initial PC contacts were compliant at 98 percent; routine contacts were 71-percent compliant.

SNY EOP mainline inmates were offered an average of 15.19 hours of group per week; 15.91 hours were scheduled, 10.65 hours were attended, 4.54 hours were refused, and 0.71 hours were cancelled.  Approximately 93 percent of inmates were offered at least ten hours of group therapy per week; 56 percent attended ten hours, 94 percent were scheduled, 13 percent refused, and zero percent cancelled.  Observed SNY EOP groups appeared to be clinically beneficial to inmates.

During the review period, inmates were housed in the overflow unit from seven to 116 days and received modified treatment programming while there.  For those EOP inmates on modified programming, 90 percent were offered at least five hours of group therapy per week; 64 percent attended five hours, 90 percent were scheduled, 32 percent refused, and two percent cancelled.  EOP inmates on modified programming were on average scheduled for 10.51 hours per week; were offered 10.09 hours, attended 6.56 hours, refused 3.53 hours, and 0.42 hours were cancelled.

EOP overflow inmates were seen weekly by PCs either individually or in a PC group; they received yard recreation therapy mornings Monday through Friday.  No other group therapy was provided comparable to inmates housed in the overflow unit.  When inmates were placed on suicide watch within one of the EOP overflow housing pods, all out-of-cell programming was discontinued for the entire unit.  This meaningfully impacted the capacity of KVSP to provide adequate programming to EOP overflow inmates.

Initial and routine IDTT meetings were timely 94 percent of the time and 99 percent of the time, respectively.  Eighty-nine percent of the IDTTs had the necessary participants in attendance.

The monitor's expert attended an EOP IDTT meeting.  Approximately 30 inmates were seen by the IDTT.  All necessary participants were present.  The room had sufficient space and privacy.  Most of the observed inmates were housed in the C7 overflow housing unit and were receiving modified programming.  Consideration of referral to higher levels of care was not consistently discussed.  The IDTT did not discuss specific treatment interventions for modified programming status, instead, they discussed plans for full programming after the inmate was either transferred to C8 or when the programming in C7 was fully operational.

Major complaints of EOP inmates in the overflow unit included significant lack of out-of-cell time and limited dayroom due to conduct of suicide watches in the unit's alternative housing cells and evening pill pass.  EOP inmates reported allegations of inappropriate behavior by housing officers, including yelling at EOP inmates, using abusive language, and at times, using excessive force against inmates, as well as fears of retaliation for reporting or complaining about the behavior.

During the review period, there were one to four EOP inmates in the newly implemented Transition Housing Unit, a six-month program for gang drop-outs and the only such program in the state.

3CMS:

Three psychiatrists with varying caseloads and eight PCs with caseloads ranging from 93 to 153 inmates were assigned to the 3CMS program.  The data provided was insufficiently detailed to determine compliance with established clinical ratios.

Timeliness of psychiatric contacts was deficient with initial psychiatric contacts at 68-percent compliance and routine contacts at 84-percent compliance. Initial and routine PC contacts were 90-percent and 98-percent compliant, respectively.

Initial IDTTs were at 96-percent compliance and routine IDTTs met full compliance. Required attendance at IDTTs was noncompliant at 35 percent due to psychiatric staffing shortages.

Two percent of psychiatric contacts and 24 percent of PC contacts occurred in non-confidential settings. Sixty-eight percent of PC cell-front contacts were due to refusals. High cell-front contacts were due to refusal rates and gang-related lockdowns.

All required parties were not present at the observed IDTTs on B yard. Rather than collaborative discussion, the IDTT was more akin to an individual "check-in" session. Psycho-social history was minimal and case conceptualization was lacking. Diagnoses sometimes conflicted with discussion and written treatment plans. Other notable issues included talking *about* rather than *to* the inmate; using overly complex clinical language; failing to discuss current functioning, current symptoms, trauma history, and treatment goals for substance abuse; and not considering discharge planning when clinically indicated. Discussion of clear rationale for level of care other than citing indicators on the 7388-B were also observed.

Documentation on treatment plans was consistent with observations from IDTTs. A review of treatment plans (CDCR Form 7388 and accompanying documentation) showed that a clinical summary/case conceptualization and pertinent psycho-social data including current mental health symptoms/functioning was lacking. In several cases, when symptoms were documented, consistency and/or support for diagnoses were not present. All clinically relevant

430

treatment goals were not included on all reviewed treatment plans, and in multiple instances where treatment goals were present, they were not measurable.

KVSP offered six different groups to 3CMS inmates including one on transition for inmates who have transitioned from EOP to 3CMS level of care.

Non-Disciplinary Segregation:

Twenty inmates were designated NDS status during the review period and considered for accelerated transfer. Eight or 40 percent, transferred within 72 hours. Logs reflected that inmates received telephone and property privileges about one to two days following NDS designation by ICC. There were no inmates designated NDS at the time of the site visit.

Referrals:

There were 374 emergent mental health referrals generated during the review period; 99 percent received a timely response. There were 108 urgent mental health referrals; 96 percent received a timely response. For the 2,269 routine referrals generated during the review period, KVSP reported a 65-percent compliance rate with timely responses.

EHRS/MHTS.net:

KVSP was scheduled to go live with EHRS on April 4, 2017, with training beginning during January 2017.

Space:

Significant space issues impacted programming for SNY EOP overflow inmates on C yard. An additional group therapy room was made available in the mental health building and at least three offices for individual therapy were available for use by December 9, 2016. KVSP was exploring extending treatment hours to evenings and weekends to better utilize existing space.

431

Mental Health/Custody Relations:

There were no reports of problems between custody and mental health staff.  There were reports of correctional staff using abusive, derogatory language towards inmates in EOP buildings.

Heat Plan:

KVSP monitored and logged temperatures during the entire year.  Second Watch custody staff were familiar with the stages of the heat plan and weekly heat sensitive medication lists; however, custody staff on Third Watch were not adequately familiar.

Lockdowns/Modified Programming:

KVSP reported three modified programs that occurred between April and October 2016, none of which disrupted the delivery of mental health services.

Pre-Release Planning:

KVSP provided several pre-release planning basic services related to community care, medication, transportation, housing, and employment, among other things.  TCMP assisted with Medi-Cal and initiation of Supplemental Security Income (SSI) applications.  KVSP held one group per week for any EOP inmate scheduled to be released within three years.

Access to Care:

A review of KVSP's monthly Health Care Access Quality Reports from May through November 2016, indicated that less than one percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 14 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

KVSP reported that of 1,103 available jobs, 21 or 13 percent of EOP inmates held positions, as did 280 or 25 percent of 3CMS inmates, and 802 or 31 percent of non-MHSDS inmates.

Of the 537 academic assignments, one or less than one percent of EOP inmates held an academic assignment, as did 140 or 12 percent of 3CMS inmates, and 396 or 15 percent of non-MHSDS inmates.

Of five substance abuse treatment assignments, none were held by MHSDS inmates, and five or less than one percent were held by non-MHSDS inmates.

Of 131 vocational education assignments, no EOP inmates held assignments, 44 or four percent of 3CMS inmates held assignments, and 87 or three percent of non-MHSDS inmates held assignments.

Of 1,001 voluntary education assignments, five or three percent of EOP inmates held assignments, as did 255 or 22 percent of 3CMS inmates, and 741 or 29 percent of non-MHSDS inmates.

b.   Milestone Credits:

As of October 13, 2016, KVSP reported that 35 of 168 EOP inmates were eligible for milestone credits.  Among those 35 inmates, zero percent earned the credits.  For the 1,135 3CMS inmates, 174 were eligible to earn milestone credits; 14 percent earned the credits.

Of the 2,604 non-MHSDS inmates, 465 were eligible to earn milestone credits; 19 percent of these inmates earned the credits.

433

c.  Out-of-Level Housing:

On November 2, 2016, two Level II 3CMS inmates, 19 Level III 3CMS inmates and five EOP Level III inmates were housed in Level IV housing.

d.  ADA Reasonable Accommodation and Grievance Procedures:

KVSP provided for review a draft copy of the Request for Accommodation Process Desk Reference Manual and documentation of completed staff training for 21 staff members.

e.  Periodic Classification Score Reductions:  EOP Inmates:

KVSP did not provide information related to its Periodic Classification Score Reductions for EOP Inmates.

Placement of 3CMS Inmates into Minimum Support Facilities:

KVSP reported that they were not designated on the program matrix to house 3CMS inmates in MSFs.

*Coleman* Postings:

*Coleman* postings were accessible in all toured units in Facilities B and D; however, posters were not observed in all toured units in Facilities A and C.

**California Correctional Institution (CCI)**
August 23, 2016 – August 25, 2016

Census:

As of August 22, 2016, CCI housed 3,367 inmates, an 18-percent decline since the preceding monitoring period.  CCI's mental health population of 1,357 had increased by 22 percent and represented 40 percent of the total inmate population.

The administrative segregation population of 52 included two EOP inmates pending transfer to an administrative segregation EOP hub and 18 3CMS inmates.  The SHU population of 67 did not include any MHSDS inmates.

434

The LTRH unit, which was not yet officially open at the time of the site visit, housed 56 3CMS inmates.

Five 3CMS inmates were in alternative housing.

The MHSDS census included seven mainline EOP inmates.  There were 1,269 mainline 3CMS inmates, an increase of 36 percent since the preceding monitoring period.

Staffing:

The senior psychiatrist position was vacant.  One of the two chief psychologist positions was filled and the other was held open per a cost-savings directive from headquarters. The three senior psychologist positions were filled.  One of the two senior psychologist specialist positions and the supervising social worker position were filled.

CCI had four on-site psychiatry positions and three telepsychiatry positions, for a total of seven psychiatry positions.  All four on-site psychiatry positions were vacant; contract psychiatrists covered 1.5 positions.  For telepsychiatry, 2.5 of the three positions were filled, resulting in an overall 43-percent functional vacancy rate for psychiatry.

Of the 21.5 psychologist positions, 11 were filled; a 0.25 position was covered by a contractor, resulting in a functional vacancy rate of 48 percent.

Of the 16 social worker positions, 13 were filled.  A contractor filled one position, resulting in a 13-percent functional vacancy rate.

The two senior psych tech positions were filled.  Of the 46 psych tech positions, 17.6 were filled, resulting in a 62-percent vacancy rate.

The two recreation therapist positions were vacant.

All nine MHSDS clerical positions were filled.

435

The CHSA II position and both HPS I positions were vacant.  The OSS II position was filled.

There was no established medical assistant position, but one contractor provided coverage.

Quality Management:

CCI's quality management process continued to improve and was significant in establishing a more efficient mental health management system.  Clinical leadership regularly accessed the dashboard and performance improvement reports for quality improvement and management purposes.

The quality management committee met monthly and regularly achieved a quorum. Meeting minutes provided a good summary of the issues covered and actions taken.  Agenda items included review of the statewide dashboard, QIT progress reports, OIG indicators, appeals, MAPIP results, updates of local operating procedures and medication errors.

The mental health subcommittee met monthly and produced extensive meeting minutes. Agenda items included MAPIP results, OHU/alternative housing/MHCB use, administrative segregation and SHU issues, inmate self-harm, transfer timeline compliance, referral timelines, mental health performance reports, and other areas relevant to the delivery of mental health care services.

Quarterly audits addressed IEX reports, peer review, MAPIP and psych tech rounds, among other matters.  There were also audits on effective communication, MHCB discharge custody checks, medication hoarding, MHTS-eUHR agreement, and DSH referral issues.  Audit results were clearly presented; a review of completed audits indicated sound methodology.

QITs that addressed the mental health triage and MH-7 compliance made their final recommendations in May 2016. Both were effective, included appropriate members and produced findings based on clear methodology.

CCI used the statewide peer review process for psychiatrists, psychologists, and social workers. There were no significant deficiencies or systemic peer review issues identified.

The institution was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum. Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis. Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine and antidepressants.

CCI reported compliance rates of 90 percent or above for laboratory testing and other tasks related to inmates on Depakote, lithium, Lamictal, and antidepressants for the two quarters during the review period. CCI achieved compliance regarding carbamazepine in one quarter and did not achieve compliance in the other quarter. Clozapine was not authorized for use at CCI.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration. Continuity of medications was measured within the following categories: inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital

and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602/involuntary medications, and urgent medication referrals for no-shows and refusals (Clozaril).  Medication administration was measured for outpatient provider new medication orders for psychiatrist-prescribed medications.

There was at least 90-percent compliance with continuity of medications for inter-institutional transfers, for PC 2602/involuntary medications, and for urgent medication referrals for no-shows and refusals.  CCI was noncompliant throughout the review period with continuity of medications for intra-institutional transfers, for discharge/transfer from a community hospital and/or DSH, and for compliance with psychiatrist/MH mid-level prescribed medications.  The institution reported that medication noncompliance was largely due to methodology that counted inmate no-shows or refusals as noncompliance.  There were performance improvement plans for all measures not in compliance.

No PC 2602/involuntary medications petitions were initiated during the review period.

Staff did not indicate problems with long pill lines or with medication administration interfering with mental health programming.

A total of 528 inmates were prescribed HS medications.  Staff confirmed that HS medications were administered after 8:00 p.m.

Transfers:

CCI did not report the number of inmates considered but not referred to DSH.  Staff reported being unaware of how to document Form 7388-B data in MHTS.net to auto-populate the DSH non-referral log.

The institution did not track inmates who transferred from CCI to DSH but were initially referred to DSH from another institution.  One CCI inmate was referred to DSH intermediate

care during the review period.  The inmate transferred timely and within 72 hours of a bed
assignment.  One inmate transferred from DSH back to CCI.

No inmates were pending DSH transfer during the site visit.

During the review period, 174 inmates were referred and transferred to MHCBs at
outside institutions.  Seventy-five or 43 percent left CCI within 24 hours of MHCB referral; on
average, MHCB transfers left CCI 35.3 hours after referral.  Ninety-six or 55 percent of MHCB
transfers occurred within 24 hours of bed assignment.  No referrals were rescinded.

There were no placements in alternative housing overflow during the review period.

Three inmates were timely transferred to a PSU during the review period.

For administrative segregation EOP inmates, seven of nine, or 78 percent timely
transferred to an administrative segregation EOP hub.  The two untimely transfers were 19 and
16 days overdue.  At the time of the site visit, two administrative segregation EOP inmates
pending transfer to a hub each had length of stays of 15 days.

Twenty of 26 or 77 percent of EOP inmates timely transferred to EOP programs at other
institutions.  The six overdue EOP transfers averaged 26 days beyond transfer timelines.

Fourteen 3CMS inmates transferred from administrative segregation to STRH at other
institutions during the review period.

Other Issues:

MHSDS Inmates in Administrative Segregation:

In July 2016, the administrative segregation program moved from Facility A to Facility
B, where it was housed in buildings 7 and 8.  The telepsychiatrist's caseload of 52 included
non-segregation inmates.  The caseloads of the psychologist and social worker were each
approximately 20 inmates.

During the review period, administrative segregation lengths of stay averaged 27 days for five EOP inmates, 18 days for 94 3CMS inmates, and 45 days for 79 non-MHSDS inmates.

CCI did not provide data on the timeliness of initial psychiatry contacts. Follow-up psychiatry contacts were 98-percent compliant. Initial and follow-up PC contacts were 93-percent compliant.

For the review period, which was largely before the administrative segregation program moved, CCI reported that 100 percent of psychiatry contacts were confidential, as were 98 percent of PC contacts.

There was 100-percent compliance for timely IDTT meetings and the attendance of required staff. Observed administrative segregation IDTT meetings began late due to a lack of escort officers. All required staff were in attendance. The psychiatrist appropriately interacted with inmates. The clinician was knowledgeable and had reviewed charts prior to the IDTT meetings. There was a lack of consistent discussion about MHCB admissions and RVRs.

Clinical staff reported that SOMS coded all administrative segregation inmates in building 7 as SHU inmates. This resulted in inmate tracking problems and forced clinicians to have to contact custody counselors to identify administrative segregation inmates.

Interviewed inmates were aware of their psychiatrists and PCs. Many complained about a lack of reading materials, property, appliances, groups, and other activities. None reported problems with the prescription or administration of medications.

Review of 114-A segregation logs revealed that inmates were consistently offered ten weekly hours of yard and three weekly showers. Clothing and linen exchange were documented approximately 40 and 25 percent of the time, respectively.

Alternative Housing:

There were 11 cells in the Facility B medical unit used for alternative housing. During the site visit, five inmates were on 1:1 suicide watch awaiting MHCB transfer; none were housed in alternative housing for more than 24 hours. Psych techs conducting suicide watch faced the inmates and documentation was up-to-date. Interviewed psych techs were aware of the requirements for suicide watch.

Long-Term Restricted Housing:

In July, 2016, buildings 7 and 8 on Facility A were designated as a LTRH. Seven clinical psychologists were allocated to the unit. At the time of the site visit, the LTRH was awaiting fire marshal approval and officially had not opened, but inmates were housed in the building and mental health services were being offered.

During the review period, there was 88-percent compliance with initial psychiatry contacts and 100-percent compliance with follow-up psychiatry contacts. There was 99-percent compliance with both initial and follow-up PC contacts.

The compliance rate with initial and follow-up IDTT meetings was 93 and 100 percent, respectively. Appropriate staff were in attendance 89 percent of the time; psychiatry had the highest non-attendance rate.

Ninety-eight percent of psychiatry contacts were confidential, as were 93 percent of PC contacts.

CCI had started groups in the LTRH at the time of the site visit. Two therapists each conducted anger management groups of six inmates. Two observed groups were well-facilitated and actively engaged all participants. Both buildings contained restart chairs for groups.

Staff reported continuing problems with office space.  Staff also reported having moved three times during the past three months, yet permanent office space had yet to be obtained.

Overall, inmates expressed a positive view of the mental health program.  However, they also reported frequent changes without explanation, which was problematic.  Most knew their psychiatrist and PC, but approximately half expressed concerns with having had multiple clinicians.  All indicated concerns with the lack of property, appliances, books, and other activities.  Inmates also reported excessive force, and threats in the unit.

Mainline SNY 3CMS:

For the mainline SNY 3CMS program, psychiatry caseloads ranged from 244 to almost 300 inmates.  Psychologists' caseloads typically ranged from 76 to 84, while social worker caseloads ranged from 101 to 121.

Initial psychiatry contacts were 100-percent compliant.  There was 99-percent compliance with follow-up psychiatry contacts.  For PC contacts, there was 95- and 100-percent compliance with initial and follow-up contacts, respectively.  CCI did not track the percentage of timely initial intake assessments.

Seventy-six percent of psychiatry contacts were through telepsychiatry; the remainder occurred in a typical confidential setting.  PCs saw 88 percent of inmates in a confidential setting.  Inmate refusals were cited as the main reason for non-confidential contacts.

Initial IDTT meetings were 93-percent compliant and there was 100-percent compliance with follow-up IDTT meetings.  Required clinicians attended IDTT meetings 99 percent of the time; psychiatry attended by way of telepsychiatry.

Observation of 3CMS inmate IDTT meetings indicated a thoughtful, useful, and clinically meaningful process.  All required disciplines attended.

442

A social worker provided groups on Facilities C, D, and E.  There were five drama groups and one on creative expression.  Group size ranged from 12 to 22 inmates.  Groups were open to mainline 3CMS and general population inmates.

Twelve Level IV SNY 3CMS inmates housed in Facility B were interviewed in a group setting.  The inmates reported numerous problems, including delays in receiving property and prescribed medications, and insufficient yard time.  Some reported being ducated for sick call requests but not having been contacted for the appointments.  Inmates also complained about infrequent PC sessions and the lack of privacy during telepsychiatry.

Ten Level III SNY 3CMS inmates housed on Facility C were also interviewed in a group setting.  The inmates reported that the frequency of PC contacts ranged from monthly to quarterly and were typically helpful and confidential.  Psychiatry contacts were conducted via telepsychiatry and were not confidential because the door to the room remained open; the inmates also reported a lack of continuity with the same telepsychiatrist.  Some inmates reported that correctional officers were hostile.  Inmates were neither aware of available groups nor discharge planning services.

At a group interview with 14 Level II 3CMS inmates housed on Facility D, inmates reported that the frequency of PC contacts ranged from monthly to quarterly and indicated reasonable response times to mental health requests.  There were no reports of medication continuity problems.  The inmates reported confidential clinical encounters, but complained about frequent changes in telepsychiatrists.  There was no group therapy.  There were also reports about limited shower access and frequent problems with lack of hot water, various plumbing issues, and defective televisions.

Ten interviewed Level I 3CMS inmates housed on Facility E reported concerns with the lack of groups and the lack of continuity with telepsychiatrists and primary care clinicians. There were no reports of problems with medication continuity.  The inmates reported the availability of discharge planning through non-mental health counselors.  A significant number of these inmates had jobs or participated in vocational training.

Non-Disciplinary Segregation:

CCI reported 41 NDS mental health inmates during the review period; 24 were for accelerated transfer and 17 were for property and privileges.  The institution was unable to report the length of NDS stays and whether accelerated transfers were compliant.

Referrals:

CCI reported 99-percent compliance for timely responding to 207 emergent referrals, 100-percent compliance for timely responding to 158 urgent referrals, and 91-percent compliance for timely responses to 2,819 routine referrals.

Space:

Treatment space in the relocated administrative segregation unit was located in the dining hallway and was not confidential.  The law library was also located there and it further interfered with confidentiality when the law library was in use.  Staff reported that this lack of space led to the inability to conduct groups.  Therapeutic modules were not *Coleman*-approved.

Heat Plan:

CCI did not document compliance with all heat plan protocols during the review period. There were three Stage II heat alerts during the review period; however, there was no documentation of reasonable accommodations for inmates.  There were no Stage III heat alerts during the review period.  Interviewed housing unit officers were knowledgeable of the heat plan

policy.  The pharmacy prepared and distributed a weekly list of heat-risk inmates to mental health and custody staff; it was also available on the CCI shared drive.

"C" Status:

At the time of the site visit, CCI reported that 43 inmates were on "C" Status, of which 23 or 53 percent were on the mental health caseload.

Lockdowns/Modified Programming:

CCI reported six program lockdowns during the review period, lasting from one to 17 days.

Pre-Release Planning:

Approximately one year prior to release, MHSDS inmates were scheduled for pre-release planning.  At these appointments, the PC assisted the inmate with goal setting, problem solving, and referrals to relevant community resources; 90 percent of inmates had pre-release planning. CCI further reported that the TCMP contractor screened eligible inmates for benefits assistance and there was coordination with the Parole Outpatient Clinic for inmates released to parole. There were no pre-release groups at CCI.  Inmates who were prescribed psychiatric medications were provided with a 30-day supply upon release.

Access to Care:

A review of CCI's monthly Health Care Access Quality Reports from January 2016 through June 2016, indicated that 0.23 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 52.7 percent were not completed due to non-custodial reasons, excluding inmate refusals.

<u>Program Access</u>:

a.   <u>Job and Program Assignments</u>:

On August 2, 2016, there were no EOP inmates at CCI.  Institutional data indicated that of the 1,068 available jobs, 324 3CMS inmates or 24 percent of the 3CMS population held a job assignment.  For non-MHSDS inmates, 747 inmates or 38 percent of the non-MHSDS population held job assignments.

Of the 452 academic assignments, 172 3CMS inmates or 13 percent of the 3CMS population held academic assignments; for non-MHSDS inmates, 280 or 14 percent of the non-MHSDS population held academic assignments.

There were 23 substance abuse treatment program assignments.  Of those, 14 3CMS inmates or one percent of the 3CMS population held assignments.  For non-MHSDS inmates, nine held substance abuse treatment program assignments.

Of the 233 available vocational education assignments, 73 3CMS inmates or six percent of the 3CMS population held vocational education assignments, and 160 non-MHSDS inmates or eight percent of the non-MHSDS population held assignments.

Of the 417 available voluntary education assignments, 119 or nine percent of 3CMS inmates held assignments, and 298 or 15 percent of non-MHSDS inmates held voluntary education assignments.

b.   <u>Milestone Credits</u>:

Data for July 31, 2016 indicated that of the 12 EOP inmates, four were eligible to earn milestone credits; none earned the credit.  For the 1,320 3CMS inmates, of the 383 eligible 3CMS inmates, 23 percent earned milestone credits.

Of the 1,985 non-MHSDS inmates, 411 were eligible; 34 percent earned milestone credits.

    c.  <u>Out-of-Level Housing</u>:

On July 29, 2016, there were 14 3CMS and 18 non-MHSDS Level I inmates in Level II housing, and one non-MHSDS Level I inmate in Level III housing.  There were eight 3CMS and 33 non-MHSDS Level II inmates in Level I housing, and 63 3CMS and 92 non-MHSDS Level II inmates in Level III housing.  There were six 3CMS and three non-MHSDS Level III inmates in Level II housing, and 11 3CMS and eight non-MHSDS Level III inmates in Level IV housing. There were also five 3CMS and two non-MHSDS Level IV inmates in Level III housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CCI provided a copy of its local operating procedure regarding the ADA reasonable accommodation and grievance procedures.

    *Coleman* <u>Postings</u>:

*Coleman* postings in both English and Spanish were observed in all 14 housing units toured.  The *Coleman* postings were located in common areas that were accessible to *Coleman* class members.

**<u>California Institution for Men (CIM)</u>**
June 27, 2016 – June 29, 2016

<u>Census</u>:

On June 24, 2016, CIM housed 3,632 inmates, for a 12-percent decrease from the census reported during the preceding site visit.  There were 1,242 inmates on the mental health caseload, which had decreased by 11 percent since the preceding site visit and comprised 34 percent of the total inmate population.

The MHCB unit housed 34 inmates and there were ten inmates in alternative housing.

447

There were seven EOP inmates in the general population, one EOP inmate in administrative segregation, four EOP inmates pending transfer to an administrative segregation EOP hub, and 44 EOP inmates in the reception center.

There were 1,005 mainline 3CMS inmates, 105 3CMS inmates in the reception center, 14 3CMS inmates in administrative segregation, and 18 3CMS inmates housed in the OHU, none of whom were there for mental health reasons.

Staffing:

The chief psychiatrist position was filled.  One of the two chief psychologist positions was filled; the other remained vacant to save costs at the direction of mental health headquarters.

CIM had three FTE senior psychologist supervisors to fill two allocated positions.  The two senior psychologist specialist positions were filled.

All 11 psychiatrist positions were filled; however, one staff psychiatrist had been on long-term leave for more than 18 months.  CIM did not use telepsychiatry.

Of the 31 allocated psychologist positions, 27 positions were filled for a 13-percent vacancy rate.  CIM had four psychology interns on staff at the time of the site visit.

The one supervising social worker position was filled.  Of 19 allocated social worker positions, 18 were filled for a five-percent vacancy rate.

The two senior psych tech positions were filled.  All 29.7 psych tech positions were filled.  CIM also had an additional 2.1 FTE psych tech positions filled at the time of the site visit.

All six recreation therapist positions were filled.

The one allocated OSS position and one of two HPS positions were filled, as were the one allocated CHSA II and unit supervisor positions.  All 14 mental health clerical positions were filled.

Quality Management:

The formal quality management structure was generally well-established at CIM, but had not yet reached a state of continuous quality improvement.

With one exception, the quality management committee met twice per month during the review period; it appeared to be functioning well.  Attendance was typically good; however, the minutes did not indicate required members to establish whether a quorum was achieved.  The quality management committee addressed a broad range of service areas, including mental health.

The mental health subcommittee met six times during the review period, kept meeting minutes, and regularly attained a quorum.  It addressed a variety of topics that were essential areas of quality management.  The minutes were sparse, making it difficult to determine precisely what was discussed and the nature of the deliberations.  There were numerous issues identified through the data presented; however, the minutes did not indicate a plan for resolution or the plan was unclear from the available documents.  There was also an apparent underutilization of QITs and/or FITs to address the areas that were identified as in need of attention.

There were four QITs chartered during the review period; two had concluded.  The continuous quality improvement plan QIT and the development of a mental health emergency response team QIT both remained open.  The continuous quality management improvement plan QIT met once since it was chartered in December 2015, and had not yet completed its tasks. There was no charter or minutes provided for the development of a mental health emergency response team QIT.

CIM was paired with SQ for peer review.  The institution reported that 27 psychologists,

449

ten psychiatrists and nine social workers were assessed during the review period.  The

psychiatrists' and social workers' peer reviews found no concerns.  Psychologists who

underwent peer review were generally found to have met overall standards, with minor concerns

noted for a small number of them.

CIM was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were

effected through a statewide memorandum.  Psychiatry measures evaluated compliance of

laboratory testing and other tasks related to inmates on psychotropic medications and were

audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics,

Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

Data for two quarters (December 2015 and March 2016) was reported at 100 percent for

each quarter.  Clozapine was not authorized for use at CIM.

The remaining measures were audited monthly and were related to continuity of

medications, medication compliance, and medication administration.  Continuity of medications

was measured within the following categories: inter-institutional transfer at R&R; NA/DOT

medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-

institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital

and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed

medication, PC 2602 involuntary medications, and urgent medication referrals for no-shows and

refusals.  Medication administration was measured for psychiatrist-prescribed outpatient provider

new medication orders.

The nursing report reflected data for October 2015 through March 2016.  CIM reported

full compliance for all six months for continuity of medications upon inter-institutional transfer and with intra-institutional transfers excluding ASU/SHU/PSU.  CIM was compliant for all but one month for continuity of medications after discharge from MHCB (86 percent in March 2016) and for continuity of medication when transferred to a locked unit (85 percent in January 2016). CIM was close to compliance with continuity of medications after discharge from a community hospital and/or DSH at 89 percent in October 2015, compliant at 90 percent in November 2015, and noncompliant during December 2015 through February 2016.

Compliance with PC 2602 involuntary medications was at 50 percent in January 2016 and at 100 percent in March 2016.  Urgent medication referrals for no-shows and refusals was 100-percent compliant in February 2016 and 50-percent compliant in March 2016.  Psychiatrist-prescribed outpatient provider new medication orders was at 86-percent compliance in November 2015 and at 90-percent compliance in December 2015, the two months for which data was provided.

CIM reported that its pill lines did not have extended wait times.

CIM did not have the number of inmates on HS medications; it estimated that there were 250 inmates receiving HS medications at the time of the site visit, reporting that they received HS medications at the appropriate time.

Overall, mental health medication management was generally doing well; however, medication continuity requirements were not consistently met.

Transfers:

During the review period, CIM referred 58 inmates to acute care; four were rescinded. Of the 54 inmates that transferred to acute care, 23 or 43 percent transferred timely.

There were 65 inmates referred to intermediate care; eight of those referrals were

rescinded.  Of the 57 inmates that transferred to intermediate care, 23 or 40 percent transferred timely.  The primary reason offered for untimely transfers was unavailability of crisis beds at DSH.

All DSH referrals were generated by MHCB clinical staff.  Despite the number of DSH referrals generated, there remained problems with identifying inmates who met criteria for consideration of referral to DSH.  CIM's local DSH audits consistently found 7388-B forms to be satisfactory or "good" in numerous cases, however, there was significant concern regarding the accuracy of those audits.  There were multiple examples of inmates who had three or more crisis placements but were not properly identified in the IDTT and on the 7388-B.

There were also ongoing difficulties with providing adequate rationales for non-referrals and adequate treatment modifications for those not referred.  There were inmates who had been referred to DSH who appeared to have been referred to the wrong level of care, who were referred for inappropriate reasons because the case had not been appropriately conceptualized, or who had not received appropriate MHCB or outpatient care and subsequently were not stabilized and required a higher level of care.  There were inmates not referred because they were still being assessed after ten days in the MHCB, beyond the maximum length of stay per the Program Guide.

During the review period, CIM referred 215 inmates to MHCBs; seven of those referrals were rescinded.  Of the 208 remaining inmates, 134 or 64 percent transferred timely; 167 or 80 percent were internal admissions to CIM's MHCB.  The primary reason offered for noncompliance was unavailability of beds.

CIM reported that 96 percent of the 24 EOP inmates referred to EOP hubs were timely transferred.

No inmates were transferred to LTRH during the review period.  At the time of the site visit, there were nine inmates awaiting transfer, with lengths of stay ranging from 12 to 95 days.

There were no inmates transferred to STRH during the review period.  At the time of the site visit, there were nine inmates awaiting transfer, with lengths of stay ranging from 18 to 65 days.

For the 12 inmates transferred to EOP programs during the review period, six or 50 percent were transferred timely.

For the 157 EOP inmates transferred from the reception center, 64 percent were timely. Of the 305 3CMS inmates transferred from the reception center, 86 percent were timely transferred.

Other Issues:

Reception Center:

The reception center was housed in Facility B.  The assigned psychiatrist had a caseload of 40 inmates.  In the reception center EOP program, three psychologists carried caseloads of ten inmates and two psychologist interns working under the supervision of licensed psychologists carried caseloads of three inmates.  One social worker and four recreation therapists also served the reception center EOP program.  One psychologist served the reception center 3CMS program.

For the reception center EOP program, initial psychiatry contacts were at 99-percent compliance and routine psychiatry contacts were at 97-percent compliance.  Psychiatric confidential contacts were reported at 97-percent compliance.  For PC contacts, compliance was reported at 95 percent for initial and 98 percent for routine.  PC contacts were held in confidential settings 90 percent of the time.

453

Initial and routine IDTTs were compliant at 92 percent and 96 percent, respectively. IDTT staff attendance was compliant at 97 percent.

CIM offered 6.6 weekly hours of structured therapeutic treatment during the review period; attendance was reported at 5.9 hours weekly. For reception center EOP inmates on modified programing, CIM offered 4.9 hours of structured therapeutic treatment weekly; attendance was reported at 4.7 hours weekly.

A treatment group of eight inmates was observed. The inmates appeared to enjoy the group, but the focus or task was unclear. Inmates became tangential and the facilitator could not refocus them. Not all of the inmates interacted with each other; the facilitator did not encourage group interaction or take advantage of the dynamics of the group to further therapeutic processes. The group appeared to be more of a meeting place where the inmates could talk and possibly get materials to review or work on in their cells.

Interviewed inmates were generally positive about the reception center EOP mental health program. They reported enjoying their treatment groups, getting out of their cells, and participating in the book exchange, which often took place during or after groups. The greatest complaints were the length of time that it took for inmates to transfer from the reception center (at least two inmates were beyond 90 days), and the administration of medications. Numerous inmates reported that if they were out to group, yard, or a ducat when medication was delivered, they would not receive that dose of medication. Staff likewise reported that treatment activities had been delayed due to medication administration delays.

Inmates also reported that custody staff were not rotating through the tiers for limited activities, such as religious services, and were not tracking these offerings. As a result, the same people were attending those activities while others were repeatedly denied the opportunity

454

simply because of where their cells were located.

For the reception center 3CMS program, initial psychiatry contacts were at 95-percent compliance and routine psychiatry contacts were 100-percent compliant.  Psychiatry contacts were held in confidential settings 97 percent of the time.  PC contacts were timely 91 percent of the time for initial contacts and 100 percent of the time for routine contacts.  PC contacts were confidential 98 percent of the time.

CIM did not provide data regarding IDTTs in its reception center 3CMS program.

MHSDS Inmates in Administrative Segregation:

The administrative segregation unit was located at Palm Hall on Facility B.  Two assigned psychologists had caseloads of eight and nine inmates.  Two psychologist interns working under the supervision of licensed psychologists were assigned two inmates each.

All initial and routine psychiatric contacts were timely.  Initial and routine PC contacts were 95-percent and 98-percent timely, respectively.  Non-confidential cell-front contacts were significant for psychiatrists at 26 percent and PCs at 30 percent.  Staff reported that 92 percent of cell-front contacts were due to inmate refusals.

During daily psych tech rounds, the psych tech alerted inmates of upcoming appointments, a good practice.  It was reported that when inmates refused PC contacts, the PC followed up with the inmate to encourage attendance.  If the inmate continued to refuse, he was seen at cell front.  Staff reported that incentives were used to encourage inmates to attend PC contacts.

Initial IDTTs were 98-percent compliant.  Routine IDTTs were 99-percent compliant.  Staff attendance at IDTTs was 87-percent compliant.  CIM did not routinely track timeframe proximity between ICC and IDTT; when tracked, it appeared that ICC frequently occurred

455

before IDTT.

An observed initial IDTT had all required staff in attendance.  The room was spacious and there was computer access.  The PC facilitated the IDTT.  All staff participated, but the process was not collaborative.  The PC did an excellent job anticipating potential inmate needs and subsequently facilitated discussion between the correctional counselor and inmate. Diagnosis was not discussed nor were specific symptoms identified; instead, diagnosis and symptoms were discussed in general terms, i.e. depression.  Discussion of treatment goals was vague and goals were not regularly measurable.  Discussion of 7388-B indicators did not occur. Inmates were provided with a written summary of the treatment goals, a positive finding.

One strength of the mental health program in administrative segregation was the active group schedule.  Groups were offered to all inmates in the MHSDS regardless of the inmate's level of care.  Recreation therapy groups were facilitated four days a week; four topics were offered and it was reported that refusals were rare.  Psych techs facilitated groups on weekends and two weekdays; group topics were Skills and Leisure.

The monitor's expert observed an excellent News and Views group facilitated by a recreation therapist.  This was a semi-structured group that covered recent news events and dedicated time to trivia.  There were two 3CMS inmates, one reception center STRH inmate, and one EOP inmate in attendance.  All participants were attentive and actively engaged; the inmate interaction allowed for positive socialization.  The group leader had a good rapport with the inmates, addressed inmates by name, and appropriately redirected inmates who were off topic.

The recreation therapist saw each mental health inmate in administrative segregation once a week, a practice that exceeded Program Guide requirements.

Three administrative segregation inmates were interviewed during the site visit.  Inmates

were generally satisfied with mental health programming.  They reported that radios and word games provided during psych tech rounds were helpful.  Inmates expressed concerns about the grievance process, explaining that when they gave appeals forms to custody staff, the forms were "crumpled up."

MHCB:

CIM had a 34-bed MHCB; all beds were operable and in use at the time of the site visit.

There were three supervisors listed as assigned to the MHCB.  Each supervisor was assigned part-time to the MHCB; one was a recent promotion.  CIM reported that each supervisor reported to their discipline-specific supervisor.  However, when staff and supervisors were asked about policy implementation and other matters, it appeared that there was little coordination amongst the three.

There were four psychiatrists assigned to the MHCB; each could have a maximum caseload of 44 inmates.  Three psychologists had caseloads of six inmates, and three social workers had caseloads of five inmates.  Two additional social workers without specific caseloads were also assigned to the MHCB.  One recreation therapist was assigned to the MHCB.

Staff reported that there were generally three clinical teams working at any given time with one psychiatrist, one psychologist, and one social worker.  CIM had part-time as well as full-time clinicians assigned to the MHCB to manage weekend coverage.  There were clinicians scheduled to be present in the unit seven days per week, allowing the MHCB to have clinical staff available daily.  Records review showed however, that numerous inmates were not seen daily as required.

The MHCB at CIM had 408 admissions involving 346 different inmates during the review period, with an average clinical length of stay of 13.5 days.  There were seven inmates

457

who remained at CIM during the site visit who had three or more MHCB admissions during the review period.

CIM reported compliance with initial psychiatry contacts. There was 94-percent compliance for routine psychiatry contacts.

CIM reported compliance with initial PC contacts. There was 96-percent compliance for routine PC contacts.

Initial and ongoing IDTTs were compliant at 91 percent and 95 percent, respectively. The MHCB had implemented treatment groups and yard at the time of the site visit. There were misters installed to help cool the MHCB yards during the hottest hours of the day. Treatment plans did not properly identify the role of the specific group in treating MHCB inmates.

Reviewed treatment plans in the MHCB were frequently problematic. Multiple treatment plans were unrealistic, vague, or inadequate considering the acuity of symptomatology. Many treatment goals did not identify objective, observable, positive behaviors that were incompatible with the negative, dysfunctional behaviors that resulted in the crisis placement.

An examination of lengths of stay in the MHCB during the review period, which exceeded the maximum of ten days on average, identified potential contributing factors. First, there were a significant number of cases where the inmate was not referred to DSH until the tenth day or later. Another factor influencing length of stay was the number of inmates retained in the MHCB pending DSH intermediate care admission. Finally, there was an apparent reluctance to release inmates admitted for anything related to suicidal ideation, even when such a release appeared to be clinically justifiable. When queried, staff reported that they received a supervisory directive not to release such inmates and did not feel supported to use their clinical expertise in those cases.

458

Treatment planning in the MHCB was a definite weakness that required ongoing supervision and training.  There was also an apparent need for clinical staff to receive appropriate training and supervision supportive of their clinical decision-making regarding discharging inmates clinically ready for discharge.  Retaining inmates who were appropriate for discharge was not therapeutic for those inmates, led to delays in admissions for inmates needing crisis beds, and kept many inmates waiting in alternative housing for MHCB placements.

Seclusion and Restraint:

There were no incidents of seclusion and one incident of restraint during the review period.  In January 2016, an inmate was restrained for approximately three hours.  Based on a review of barely legible documentation, the justification for restraints was inadequate and the inmate was maintained in restraints beyond the period necessary.  It appeared that the inmate was placed in restraints because he was kicking his cell door and not following instructions.  This was not a valid clinical reason for placement into restraints.  At 9:20 a.m., a nursing note indicated that the inmate was "calm" and "cooperative," criteria that typically result in release.  The inmate was maintained in restraints for more than two more hours following those notations.

Alternative Housing:

Locations used for alternative housing at CIM in order of priority were: cell 175 in the MHCB (capacity of one); vacant medical beds in the OHU (capacity/availability varied with medical census); and vacant cells in Cypress Hall located in Facility B (capacity up to three).

There were 195 alternative housing placements during the review period; 61 percent were timely removed.

A PC was assigned to coordinate and provide treatment to inmates in alternative housing. After hours and on holidays, the physician on call was responsible for the coordination and care

of alternative housing inmates. During weekends, clinicians assigned to the MHCB were responsible for the care and coordination of alternative housing inmates.

Reception Center Short-Term Restricted Housing

Reception center STRH was located on Facility B in CIM's existing administrative segregation unit. The program provided clinical services to 3CMS inmates placed in STRH, which was activated on April 29, 2016. Since activation, up until the time of the site visit, two inmates had participated in the STRH program; however, they were not in the program at the same time.

During the site visit, a single inmate was in the STRH program. A PC facilitated a "weekly group" with the one inmate; this practice was discussed with staff. The inmate's initial IDTT was observed; it was combined with the administrative segregation IDTT. The PC led the IDTT. While members' participation was useful, it was not necessarily collaborative. Discussion of current diagnosis and symptoms was lacking. Given the inmate's substance abuse history, the treatment goal of substance abuse was beneficial, but it was not well-defined. Discussion of indicators on the Form 7388-B did not occur.

CIM reported noncompliance with weekly PC contacts at 80 percent (four of five contacts occurred). Data indicated that between four hours and 42 minutes and five hours and 42 minutes of recreation therapy groups were offered weekly. Data did not distinguish between the required 3.5 hours of recreation activity and the required 90 minutes of structured therapeutic activity, and did not separate offerings to reception center STRH inmates from administrative segregation inmates. More than ten hours of yard were offered to each of the reception center STRH inmates weekly.

There was a need for improved monitoring and tracking of treatment scheduled, offered,

and provided to reception center STRH inmates, as the program was very likely to grow.  A major area of concern was that supervisory and clinical staff were unclear on the identification process of and programming time requirements for STRH inmates.  Training on STRH needs and development of policy/procedure for identification of inmates in the STRH program was necessary.

3CMS:

Inmates in the 3CMS program were housed on Facilities A, C, and D.  Facility A housed Level II High Medical Risk SNY 3CMS inmates; Facility C housed Level II SNY 3CMS inmates; and Facility D housed Secure Level I 3CMS inmates.  Each of the 3CMS programs had a supervisor with other duties serving as program directors.

Psychiatric caseloads were Facility A: 380 inmates and Facility C: 370 inmates.  Two psychiatrists in Facility D were assigned 172 inmates each.

There were ten 3CMS psychologists with caseloads of 47 to 88 inmates and five clinical social workers with caseloads of 57 to 73 inmates assigned to the various 3CMS programs.  Another clinical social worker carried a caseload of 17 inmates, and four psychologist interns, supervised by licensed psychologists, carried caseloads of six to seven inmates.

Compliance was achieved for all clinical contacts, timeliness of initial and routine IDTTs, and required staff attendance at IDTTs in the 3CMS programs.  All psychiatry contacts were confidential, while 99 percent of PC contacts were confidential.

Observed IDTTs on Facility D included all required participants.  All inmates attended.  The PC led IDTTs and was the primary participant.  During IDTT, inmates were consistently referred to in the third person (i.e. "he") as opposed to using the term "you."  This gave the impression that the inmate was perceived as a passive observer rather than an active participant

461

as required by the Program Guide.

One strength of the 3CMS program was an active group schedule. One psychologist facilitated a variety of therapy groups which were praised by inmates and staff. For Facilities A and D, therapy groups were available three days a week and included nine different topics, and recreation therapy groups were available between one and three days a week. For Facility C inmates, groups were scheduled three days a week, and included Life Skills, Anger Management, and Transgender. A review of the waitlist for Facility D indicated a need for improved tracking. The length of time for many of the inmates that were on the waitlist was unable to be determined as the date of referral was not listed. It also appeared that some inmates were prioritized before others who had been on the waitlist longer. Lastly, the outcome of referrals to group treatment was not logged.

Case-by-Case Reviews:

CIM conducted one case-by-case review during the review period; it was timely. CIM retained the inmate, conducted a long-term case conference, and subsequently received approval for retention.

Non-Disciplinary Segregation:

CIM reported there were 14 inmates designated NDS during the review period, including two who required expedited transfer. Neither inmate was transferred within 72 hours of NDS designation as per policy. One inmate transferred within six days. The other inmate had been endorsed to an appropriate institution, but had been retained in administrative segregation for 24 days at the time of the site visit. Per documentation, he had received his property and privileges. The institution did not provide information regarding property and privileges extended to the remaining 12 inmates.

Referrals:

CIM reported 100-percent compliance for timely responding to 71 emergent referrals, 96-percent compliance for timely responding to 76 urgent referrals, and 95-percent compliance for timely responding to 2,264 routine referrals during the review period.

EHRS/MHTS.net:

The institution reported that EHRS "Train the Trainers", Super User and End User Trainings for CIM health care staff was initiated on November 15, 2015 and continued through January 2016. CIM's "go live" date was January 26, 2016, but due to complications with the new system, the date was postponed. CIM had been recently informed of a new tentative "go live" date for November 2016, and additional trainings were underway.

Space:

At CIM, clinicians had office space on the administrative segregation unit. There was a therapeutic module in the office that allowed for full confidentially during individual contacts. Groups were held in Cypress. Therapeutic modules that were used for groups were located at the end of a hallway; at the opposite end of the hallway there was an open area where officers were sitting. Consequently, the space was not fully confidential as officers were within earshot.

Space was an issue for the 3CMS program on C Facility. IDTTs were held in a staff member's office. The room was warm and the space was too small to accommodate the required staff. In addition to the lack of space for IDTT, staff reported that they did not believe the area where groups were held was confidential. Regarding individual contacts, staff met with inmates in a private office, but the office was isolated in the clinic area, and there was no window on the door—a safety concern.

<u>Mental Health/Custody Relations</u>:

The relationship between mental health and custody appeared to be good; no issues were identified during the site visit.  CIM leadership reported that it was focused on continuing to ensure that relationships at all levels and programs were collaborative.  Staff on Facility C (3CMS program) reported that custody staff quickly alerted mental health staff to changes in inmate behaviors and referrals were timely and appropriate.

<u>Heat Plan</u>:

The heat plan operational procedure was updated in April 2016.  The heat plan was in effect for one month during the review period.  The institution reported there were three days that required the activation of the heat plan during the review period.   Document review indicated that heat logs were completed and forwarded to headquarters per policy.  An updated list of heat risk inmates was provided to staff weekly.

While on-site, all facilities were toured, and staff were interviewed and also observed while they were in the process of implementing a Stage I heat alert.  The institution provided water, ice and showers in the units observed.  Aside from the MHCB, it was noted that the institution did not have any misters.  Headquarters staff was present during the tour and reported that after discussions with site leadership, there was a plan to order misters for the yards.

Staff at CIM acknowledged that heat negatively impacted access to program services.  While staff worked to reschedule group treatment and individual therapy, inmates were unable to attend all scheduled activities such as education, comparable yard, and sometimes even mental health treatment programs.

Staff reported that the MHCB cooling system stopped working the week prior to the site visit.  Temperatures had surged during that week.  The MHCB sergeant reported that custody

staff had monitored temperatures in the unit, including room temperatures, but no log of those readings was maintained.  There appeared to be some confusion as to the necessity of maintaining a log, as the associate warden of health care reported to the regional lieutenant that it was not required as the MHCB was not a housing unit.  It was ultimately determined that a log would be a meaningful document to maintain.  CIM staff reported that they had to move inmates into alternative housing during this time because the unit was too hot due to the loss of its cooling system.  A tour of the unit with the lieutenant revealed staff and inmates to be quite warm.  Staff were all sitting in one area directly in front of large industrial fans.  MHCB inmates universally reported that they were hot, had no ventilation and could not feel the fan that staff used.

Reception center EOP inmates expressed concern over the implementation of cooling measures.  Inmates reported that they had sought out ice on their own, particularly during the week prior to the site visit, when temperatures were as high as 115 degrees.  Inmates reported that the heat plan was generally adhered to otherwise.  During the site visit it was observed that administrative segregation inmates were not provided cups for water due to concerns the cups would be used for gassing.  When asked, staff provided varying responses about whether inmates were allowed inside before yard ended due to the heat.

Lockdowns/Modified Programming:

CIM documented three program modifications during the review period.  In each instance, priority ducats were honored and mental health services were not disrupted.

Access to Care:

A review of CIM's monthly Health Care Access Quality Reports from November 2015 through April 2016 indicated that 0.29 percent of issued mental health ducats and add-on

465

appointments were not completed due to custody factors, while 6.56 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Construction:

There were several non-mental health related building projects planned or under way at the time of the site visit, and it was anticipated that they would result in relocation of medical operations and consequently, vacant space that could potentially be used for mental health.

Program Access:

a.   Job and Program Assignments:

CIM reported that of 1,571 available job assignments, one EOP inmate held a position, as did 483 or 41 percent of 3CMS inmates, and 1,087 or 42 percent of non-MHSDS inmates.

Of 429 academic assignments, three or five percent of EOP inmates held assignments, as did 153 or 13 percent of 3CMS inmates, and 273 or ten percent of non-MHSDS inmates.

Of 374 substance abuse treatment assignments, one EOP inmate held a position, as did 189 or 16 percent of 3CMS inmates, and 184 or seven percent of non-MHSDS inmates.

Of 138 vocational education assignments, 51 or four percent of 3CMS inmates held assignments, as did 87 or three percent of non-MHSDS inmates.

Of 316 voluntary education assignments, 103 or 11 percent of 3CMS inmates held assignments, as did 213 or eight percent of non-MHSDS inmates.

b.   Milestone Credits:

 As of June 3, 2016, CIM reported that 32 of 60 EOP inmates were eligible for milestone credits.  Among those 32 inmates, six percent earned milestone credits.  For the 1,152 3CMS inmates, 460 were eligible to earn milestone credits; 29 percent earned the credits.

Of 2,510 non-MHSDS inmates, 873 were eligible to earn milestone credits; 19 percent

earned the credits.

    c.  <u>Out-of-Level Housing</u>:

There were eight 3CMS Level II inmates housed in Level I housing.  There were 38

3CMS Level I inmates, 14 3CMS Level III inmates, and two Level IV inmates housed in Level

II housing.

    d.  <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CIM provided confirmation of training and implementation of ADA Reasonable

Accommodation and Grievance Procedures.

<u>*Coleman* Postings</u>:

*Coleman* posters were accessible to inmates in the various housing units

## California Rehabilitation Center (CRC)
### May 3, 2016 - May 5, 2016

<u>Census</u>:

On April 30, 2016, the total population was 3,141, a 31-percent increase since the

preceding monitoring period.  The mental health caseload population was 1,236 inmates, an

increase of 100 inmates, or nine percent.

There were 1,231 mainline 3CMS inmates.  Five mainline EOP inmates were pending

transfer.

<u>Staffing</u>:

The chief psychologist position was filled.

The senior psychiatrist position was filled.  Of the six staff psychiatrist positions, 2.5

were filled.  A contractor filled an additional 0.25 position, leaving a functional vacancy rate of

54 percent.  CRC did not use telemedicine for psychiatry.

467

The two senior psychologist positions were filled.  Of the ten staff psychologist positions, eight were filled.  In April 2016, one psychologist promoted to senior psychologist and another was redirected to CIW, resulting in a functional vacancy rate of 40 percent for psychologists.

Nine of the ten social worker positions were filled.  Three social worker positions were later redirected to CIW, leaving a functional vacancy rate of 40 percent.

A recreation therapist positon was filled.

Of the eight clerical positions, five were filled.  A contractor filled one additional position, resulting in a 25-percent functional vacancy rate.  One OT position was later redirected to CIW, resulting in a functional vacancy rate of 37 percent for clerical positions.

The two HPS positions were both filled.

Quality Management:

The quality management committee was chaired by the CEO and met monthly during the review period.  Minutes were maintained and a quorum was achieved at all meetings.  Pertinent topics discussed included, changes to local operating procedures, training and reports from the mental health subcommittee and the SPRFIT.

The mental health subcommittee met monthly during the review period.  A quorum was achieved at four of six meetings.  Regular agenda items included, review of mental health performance measures, IDTT attendance, alternative housing discharges, training and SPRFIT issues.

There were no QITs or FITs chartered during the review period.

The chief of mental health reported that the statewide peer review process had been implemented at CRC.  CRC was paired with CTF for peer review.  Psychiatrists, psychologists and social workers were in compliance with the peer review process and met the May 1, 2016

deadline for completion of chart reviews.  The final reports from each institution outlining efficiencies and deficiencies in the reviewed cases were not available for review at the time of the site visit.  CRC did not have an internal case review process, however, supervisors conducted chart audits and reported the findings to the mental health subcommittee.

At the time of the site visit, CRC's quality management processes were not operating in the nature of a CQI system.

CRC was not a test prison for CDCR's CQIT during the monitoring period.

Medication Management:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum.  Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis.  Those psychotropic medications included, atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine, and antidepressants.

CRC reported compliance rates of 100 percent for all applicable psychiatry measures. Clozapine was not authorized for use at CRC.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories:  inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications, and urgent medication referrals for no-shows and

refusals (Clozaril).  Medication administration was measured for outpatient provider new medication orders for psychiatrist-prescribed medications.

CRC reported compliance rates of 90 percent or above for all applicable measures except continuity of medications upon discharge/transfer from a community hospital and/or DSH. Compliance rates for that measure were 100 percent in October 2015, 82.35 percent in November 2015, 100 percent in December 2015, 77.78 percent in January 2016 and 100 percent during February and March 2016.  Inmate refusals were cited as the reason for noncompliance. No inmates were administered PC 2602 involuntary medications during the review period.

During the review period, no PC 2602 involuntary medications petitions were initiated, renewed, denied or withdrawn at CRC.

Pill lines were not reported to impede mental health services.

CRC did not provide the number of inmates on HS medications and the data related to HS medication prescriptions was not presented in a useful format.  CRC did not report whether HS medications were administered after 8:00 p.m.

Transfers:

There were no DSH referrals or transfers during the review period.

There were 33 alternative housing placements; all inmates were timely removed.

There were 25 MHCB transfers; 18 or 72 percent were timely.  Lack of available beds was cited as the primary reason for transfer delays.

There were no PSU transfers.

During the review period, there was one EOP transfer to an administrative segregation hub, the transfer was timely.

Thirteen inmates transferred to mainline EOP programs; eight or 61 percent of transfers were timely.

Other Issues:

Alternative Housing:

The medical OHU was the primary alternative housing area for inmates awaiting evaluation or MHCB placement.

Inmates placed in alternative housing were single-celled.  In the event all cells were occupied, the chief medical executive and the chief psychiatrist determined appropriate movement of the inmate, if applicable, to accommodate the inmates needing mental health care. If additional alternative housing areas were needed, the two TTAs were used along with any other appropriate space within the medical OHU building.

None of the cells were suicide-resistant and staff reported all inmates were on 1:1 suicide watch.

There were no seclusion and restraint rooms or padded cells.

According to the data provided, all clinical contacts were conducted in confidential settings inside the cells or in a staff office.

3CMS:

Psychiatry caseloads were 1:252 - 1:298, which exceeded the established clinical ratio. A part-time psychiatrist had a caseload of eight inmates.  Among psychologists, the caseloads ranged from 1:121 - 1:140.  Social workers carried caseloads of 1:118 - 1:125.  One psychologist and one social worker each had a caseload of 86 inmates.

The institution was divided into four facilities and each facility housed inmates at the 3CMS level of care. Facility C contained a "C" status dorm for inmates from Facilities A, B, and C. Facility D was designated as a SNY.

Initial psychiatric contacts were at 98-percent compliance. Follow-up psychiatric contacts were conducted timely 99 percent of the time.

There were no non-confidential psychiatric contacts or psychiatric contacts conducted at cell-front.

3CMS initial PC contacts were at 92-percent compliance. Follow-up PC contacts were at 99-percent compliance.

CRC reported that there were no non-confidential PC contacts or PC contacts conducted at cell-front.

The compliance rate for timely initial IDTTs was 92 percent. For timely follow-up IDTTs, the compliance rate was 99 percent. According to the data provided, the appropriate staff attended IDTTs 98 percent of the time.

During the site visit, the monitor's expert observed initial and follow-up IDTTs for 3CMS inmates in Building 460. The IDTTs began on time and the appropriate staff attended. All scheduled inmates attended and participated. Treatment plans, goals, strategies and team decisions for appropriate level of care were covered. All inmates were scheduled for clinical appointments based on the individual's needs and all were scheduled two weeks to one month following the IDTT. The psychiatrist and correctional counselor provided individualized information without prompting.

CRC offered several groups for 3CMS inmates. Clinician-led groups were offered on Tuesday and Wednesday and groups led by the recreation therapist were offered Tuesday

through Friday.  Groups offered included, parole planning, anxiety management and coping

skills, healthy relationships, social skills, leisure tasks and support of inmates with self-injurious

behaviors.

The monitor's expert interviewed inmates who were attendees of the healthy

relationships and anxiety management groups.  All of the inmates were familiar with their PC

and psychiatrist and knew how to obtain mental health services.  The inmates all indicated that

group participation and the mental health treatment they received improved their coping skills

and ability to adjust.  Multiple inmates reported problems with custody staff when attending

mental health appointments or in need of crisis intervention.

Interviewed inmates suggested that CRC increase group offerings and develop a

pamphlet for custody officers about the management of inmates with mental illnesses.

Referrals:

CRC was in compliance with timely responding to mental health referrals.  According to

data provided by the institution, there were two emergent referrals generated during the review

period; both received a timely response.  There were 14 urgent referrals generated during the

review period; all received a timely response.  Of the 1,242 routine referrals generated, 96

percent received a timely response.

Heat Plan:

CRC was in compliance with the heat plan.  Housing unit staff had access to a weekly

updated list of inmates on the heat risk list via a computer located within each housing unit.

Interviewed housing unit staff were well-versed on the heat plan policy.  Inmates on the heat risk

list were issued a pass, which identified them as a heat risk inmate and allowed them to return to

their housing unit when the outside temperature reached 90 degrees.

473

There were 11 Stage I, six Stage II and three Stage III heat alerts during the review period.  The heat alerts were reported on the institution daily activity report and included documentation of reasonable accommodations.

Lockdowns/Modified Programming:

CRC reported there were no program lockdowns or modified programs during the review period.

Pre-Release Planning:

CRC ran a pre-release planning program facilitated by a recreation therapist.  The policy provided that inmates who were 90 to 120 days away from parole or discharge would be interviewed by their PC to assess the inmate's plans upon release and provide "intensive counseling" when the inmate was emotionally unprepared for the transition back to the community.  CRC offered two pre-release planning groups.  Participants were capped at seven inmates per group, resulting in a small waitlist.  Inmates needing assistance in applying for social security disability income and/or obtaining health care coverage post-release could be referred to the TCMP by a PC or recreation therapist.

Access to Care:

A review of CRC's monthly Health Care Access Quality Reports from October 2015 through March 2016 indicated that 0.31 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 7.82 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

    a.  Job and Program Assignments:

Institutional data indicated that of the 1,593 available jobs, the one EOP inmate at the institution held a job assignment.  For 3CMS inmates, 679 or 54 percent of the population held job assignments, and for non-MHSDS inmates, 913 or 49 percent of the population held job assignments.

Of the 547 academic assignments, 238 3CMS inmates, or 19 percent of the population held assignments; 309 non-MHSDS inmates, or 17 percent of the population held academic assignments.

Of the 113 substance abuse treatment assignments, 44 3CMS inmates, or four percent of the population held assignments; 69 non-MHSDS inmates, or four percent of the population held assignments.

With regard to the 724 voluntary education assignments, the one EOP inmate held an assignment.  Of the 3CMS population, 323 inmates or 26 percent of the population held assignments; for non-MHSDS inmates, 400 or 22 percent of the population held voluntary education assignments.

Of the 185 vocational education assignments, 63 3CMS inmates, or five percent of the population held assignments; 122 non-MHSDS inmates, or seven percent of the population held assignments.

    b.  Milestone Credits:

Data for April 4, 2016 indicated that 25.84 percent of eligible 3CMS inmates and 26.3 percent of eligible non-MHSDS inmates earned milestone credits.

475

c.  Out-of-Level Housing:

On April 20, 2016, there were 28 Level I 3CMS inmates and 32 Level III 3CMS inmates in Level II housing at CRC.

d.  ADA Reasonable Accommodation and Grievance Procedures

CRC reported that the new CDCR 1824 Reasonable Accommodation Request Process and Reasonable Accommodation Panel, which was implemented effective March 9, 2015 continued to be utilized during the review period.

*Coleman* Postings:

*Coleman* postings in both English and Spanish were found in all 24 housing units toured. All postings were placed in common areas accessible to class members.

**California Institution for Women (CIW)**
January 24, 2017 – January 26, 2017

Census:

On January 26, 2017, CIW housed 1,877 inmates, not including the PIP, a two-percent increase over the preceding site visit.  The MHSDS population was 797, or 42 percent of the inmate population.  There were 91 EOP inmates, including 83 in the mainline, two in the EOP administrative segregation hub, and six in the PSU.  There were 701 3CMS inmates, including 655 in the mainline, 34 in STRH, and 12 in LTRH.  Five inmates were in the MHCB.  Five non-MHSDS inmates were in administrative segregation.

Staffing:

The chief psychiatrist and senior psychiatrist positions were vacant.

The two chief psychologist positions were filled.  All three senior psychologist supervisor and all four senior psychologist specialist positions were filled.

476

Of the nine on-site and one telepsychiatry positions allocated to CIW, the total FTE psychiatry positions filled was 8.6, resulting in a 14-percent vacancy rate.  The 8.6 filled positions included six on-site, two telepsychiatry and a 0.6 registry position.

All 21.5 staff psychologist positions were filled.

The one supervising social worker position was filled.  Eleven of the 13 allocated social worker positions were filled for a 15-percent vacancy rate.

Four of the five allocated senior psych tech positions were filled for a 20-percent vacancy rate.  All 18 psych tech positions were filled.

All six recreation therapist positions were filled.

There were two established HPS I positions; one was filled.  All clerical positions were filled.

Quality Management:

CIW underwent two minor and one major sustainability reviews during the review period (June 14-16, 2016, November 29-30, 2016, and September 20-22, 2016, respectively).  Results from the major sustainability review found that 59 of 69 or 86 percent of 7388-B forms met required standards on each of the performance indicators.

During the review period, the institution completed quarterly and semi-annual chart review audits related to suicide prevention, level of care changes, continuity of care, conflicting diagnoses, RVRs, and use of force.

The local governing body met in September, October, and December of 2016 and always attained a quorum.  Agenda items included issues related to mental health care, peer and death reviews and issues raised by the quality management committee.

477

Quality management committee minutes documented meetings held June through October 2016, at which quorums were present.  The quality management committee attended to mental health issues covered by the mental health subcommittee, including suicide prevention, CQI and compliance with Program Guide requirements.

Meeting minutes of the mental health subcommittee documented meetings for June through November of 2016, at which quorums were present.  The mental health subcommittee addressed multiple mental health care concerns including suicide prevention, EOP and MHCB beds, higher levels of care consideration, EOP hub certification, management information systems, Program Guide compliance, and CQI, among others.

CIW, an EHRS institution, did not conduct any peer reviews during the review period because it's paired institution, VSP, had not gone live with EHRS.

CIW was not a test prison for CDCR's CQIT during the monitoring round.

Medication Management:

At the time of the site visit, CDCR headquarters was in the process of converting all MAPIP measures from hand audits to electronic data collection and analysis.  On January 15, 2016, CIW was directed to only report on Dental Measures 2 and 2A until further notice.

The EHRS rolled out at CIW as a pilot program on October 27, 2015.  Since that time, staff at CIW had been working with headquarters staff to establish the process of validating the data relevant to medication management issues.  The reported goal was to eventually roll out MAPIP, version 5.0.

Staff reported that CIW used the daily huddle to assist in dealing with medication management issues that arose in the interim.

Interviewed staff and EOP inmates indicated no medication problems.

478

Of the 21 inmates placed on PC 2602 involuntary medication orders during the review period, eight were discharged from CIW.  Ten PC 2602 petitions were initial petitions.  One PC 2602 involuntary medications petition was not initiated in a timely manner, which led to discontinuation of involuntary medications.  However, staff reported that an initiation of a PC 2602 petition with regard to the same inmate had occurred subsequently.

Transfers:

During the review period, 20 inmates were referred to acute care.  Two referrals were rescinded, and one inmate paroled.  Of the 17 placed inmates, nine or 53 percent transferred timely.  At the time of the site visit, two acute referrals were pending; both were beyond transfer timelines.

During the review period, 13 inmates were referred to intermediate care; three referrals were rescinded.  Of the nine intermediate referrals for which complete data was provided, six or 67 percent transferred timely.

The DSH non-referral log was mostly complete, but in several cases, the "Disposition" column was left blank, did not document the specific reason for not referring, and/or gave an insufficient reason for non-referral that did not provide clinically useful information and data.

Of the two inmates with complex medical needs admitted to the PIP during the review period, one transferred timely and the other was not transferred until 35 days after IDTT.  There were 273 referrals to the MHCB during the review period, of which 227 or 83 percent were transferred beyond timelines due to lack of beds.  CIW reported that transfers to the MHCB had improved marginally since a statewide memorandum issued on November 17, 2016 instructing CCWF and CIW to only internally admit inmates to their respective crisis bed units.

Other Issues:

    Administrative Segregation EOP:

The EOP hub was located in the Special Program Housing Unit (SPHU), which also housed STRH, LTRH, and non-MHSDS administrative segregation inmates.  The SPHU had adequate yard space and a review of the yard schedule reflected that yard was offered two hours a day, seven days a week, for a total of 14 hours—the minimum number of hours required.  The SPHU also offered three hours of dayroom during Third Watch.  A review of CDCR 114As revealed the SPHU was providing yard access and programs as appropriate.

Program Guide compliance was variable in the EOP hub.  There was 89-percent compliance for completion of the initial intake assessment.

Initial and routine psychiatric contacts were 84-percent and 99-percent compliant, respectively.

Initial and routine PC contacts were compliant at 99 percent.  PC contacts for treatment refusals were 85-percent compliant.

Initial and routine IDTTs were compliant at 94 and 100 percent, respectively.  Attendance at IDTT meetings was also compliant at 100 percent.

CIW offered an average of 13.6 weekly hours of structured therapeutic activity to EOP hub inmates, of which seven hours were attended and 4.8 hours were refused.  Cancellations averaged 7.6 percent during the review period.  For EOP inmates on modified programming, an average of 12.9 hours of structured therapeutic activity was offered, of which 4.6 hours were attended, 6.6 hours were refused, and 3.8 hours were cancelled.  Groups (seven modules) and individual contacts were held on the dayroom floor, which was not therapeutic or confidential.

<u>MHCB</u>:

The MHCB consisted of ten of the 18 CTC beds.  The remaining eight beds were primarily used for medical patients but also served as "swing beds" available for MHCB patients.  There was a protocol in place to open medical CTC beds for MHCB use if needed. There were four ADA-compliant cells.  One psychiatrist, six PCs, and one recreation therapist were assigned to the MHCB.  Three additional PCs provided services in both the MHCB and CIW-PIP.

Eighteen inmates had three or more admissions during the review period, which represented 26 percent of all admissions.  The clinical length of stay in the MHCB during the review period was 5.9 days and 6.2 days for actual discharge.

There was 98-percent compliance for initial psychiatry contacts and 80-percent compliance for routine psychiatry contacts.

 There was 86-percent compliance for initial PC contacts and 63-percent compliance for routine PC contacts.  Administrative staff indicated that these percentages had significantly increased since November 2016 related to the reorganization of the MHCB.

Individual contacts occurred in a confidential setting unless the inmate refused to leave her cell.

Initial IDTTs were 89-percent compliant and routine IDTTs were 85-percent compliant. All required staff attended IDTT meetings 91 percent of the time.  The one observed IDTT was clinically meaningful and had appropriate multidisciplinary input.

Staff reported that out-of-cell rehabilitation therapy and/or yard time was offered daily.

481

Staff reported that since November 2016, CIW and CCWF had begun managing their own MHCB referrals, which had improved continuity of care and had resulted in decreased use of alternative housing beds at both institutions.  The MHCB teams were restructured during October 2016 to improve intake and discharge planning.  Staff reported that MHCB inmates were also seen daily by either the PC or the psychiatrist.

Overall, staff reported that there had been a consistent reduction in crisis bed referrals and admissions, which they attributed to managerial changes in the MHSDS program and a reduction in illicit drug usage at CIW.

Seclusion and Restraint:

During the review period, seclusion was used on eight occasions and restraints were used on nine.  The amount of time per seclusion episode ranged from 25 minutes to 7.7 hours.  The length of restraint episodes ranged from 23 minutes to 3.5 days.  Three inmates were restrained for over 24 hours—two inmates for almost two days and one for 3.5 days.  Nursing audits demonstrated compliance with the seclusion and restraint policies and procedures.

Long-Term Restricted Housing:

A psychiatrist carrying a caseload of 66 inmates provided services in the LTRH, STRH, SHU, and administrative segregation units.  Five PCs assigned to provide services to these same units carried caseloads of eight to 11 inmates.  One additional PC with other duties, was also assigned to these units and carried a caseload of two inmates.

A total of 38 inmates were placed in LTRH during the review period.  CIW reported that LTRH inmates received weekly individual PC contacts, 90 minutes of structured therapeutic group, ten hours of yard, and 3.5 hours of dayroom, in addition to the standard provision of daily psych tech rounds, psychiatric care, and initial and routine IDTT treatment planning.

Initial and routine psychiatry contacts were timely 100 percent of the time.  Initial and routine PC contacts were 100-percent compliant and 98-percent compliant, respectively.

There was 85-percent compliance for timely initial IDTTs and 100-percent compliance for timely routine IDTTs; required participants were present 92 percent of the time.

Structured therapeutic groups offered in LTRH were held in a partitioned area in the dayroom of the SPHU, adjacent to ten custody desks and a high-traffic escort area which negatively impacted sight confidentiality.

Inmates in LTRH were supplied with therapeutic treatment materials to complete in their cells.  The materials covered topics such as anger management, goal setting, depression, coping, and anxiety, among others.  The institution maintained a log documenting the date and type of material distributed to each inmate.

Short-Term Restricted Housing:

CIW's STRH was activated on April 27, 2015.  The institution reported that inmates in STRH received weekly individual PC contacts, 90 minutes of structured therapeutic group, ten hours of recreation yard, and 3.5 hours of dayroom activity.  This was in addition to the standard provision of daily psych tech rounds, psychiatric care, and initial and routine IDTT treatment planning.

The average length of stay in the STRH during the review period was 49 days with a range of two to 201 days.

Initial and routine psychiatry contacts were compliant at 100-percent and 99-percent, respectively.  Overall, 87 percent of psychiatry contacts occurred in a confidential setting.

Initial and routine PC contacts were compliant at 100-percent and 99-percent, respectively.  Overall, 28 percent of PC contacts occurred in a confidential setting.

There was 96-percent compliance for timely initial IDTTs and 100-percent compliance for timely routine IDTTs; required participants were present 97 percent of the time.

STRH groups were held in the same location as those of the LTRH described above. During the site visit, the monitor's expert observed a structured therapeutic group conducted by a PC in the STRH. The space was small, but adequate to seat approximately ten people. Ten participants were scheduled, but only two showed up. It was reported that the ten scheduled inmates had been advised that the monitor's expert requested to interview them following the group; however, eight of the ten refused not only the group but also the interview for unknown reasons.

The group was competently facilitated by a psychologist using a CDCR-issued treatment manual. The inmates participated fully, and utilized personal examples to relate to the material. There were occasional disruptions due to passers-by and other background noise in the area.

PSU:

CIW operated a 20-bed PSU. Two psychiatrists with other duties provided services to the PSU. One PC with a caseload of 14 inmates served the PSU. During the review period, the monthly PSU census ranged from three to 9.75 with an average of six inmates.

In 100 percent of cases, inmates received brief mental health assessments within five working days of placement. The institution was non-compliant with initial comprehensive mental health evaluations prior to the initial IDTT at 67 percent. In 100 percent of cases, inmates received a psychiatric intake evaluation prior to the initial IDTT.

Routine psychiatric and PC contacts were at 99-percent and 94-percent compliance, respectively.

Compliance with completion of initial IDTT meetings within 14 days of arrival was at 83 percent.  There was 99-percent compliance for routine IDTTs and 100-percent compliance for completion of IDTTs at 60 and 120 days after PSU admission.  Required staff attendees were present 65 percent of the time.  Development of a mental health treatment plan within 14 days of arrival in the PSU was at 100-percent compliance.

PSU inmates were offered an average of 12.4 hours of therapeutic activities, received an average of 9.1 hours, and refused an average of 1.6 hours; an average of 3.8 hours were cancelled.  Inmates on modified programming were offered an average of 7.7 hours of weekly therapeutic activity, received an average of 5.4 hours, and refused an average of 1.4 hours; an average of 1.9 hours were cancelled.

During the site visit, the monitor's expert observed two IDTTs for inmates housed in the PSU and listened to a full presentation for two others, but did not observe those inmates in the IDTT process.  All required staff were in attendance.  The PC did not have a laptop; staff said CIW was in the process of acquiring additional laptops.  IDTT members followed a procedure of providing background information while the inmate was out of the room.  This was attributed to the inmate's preference and sensitivity.  The quality of treatment plans was adequate.  Form 7388-B was addressed in the IDTTs.

EOP:

One psychiatrist provided services to the EOP mainline with a maximum of 88 inmates. Six PCs carried caseloads of 11 to 13 inmates.  Staff reported the switch from telepsychiatry to on-site psychiatry in EOP had been extremely beneficial, especially with respect to milieu management.

485

At the time of the site visit, the EOP program had been temporarily relocated to the reception center while retrofitting/renovations were occurring in the EOP housing units within the Supportive Care Unit (SCU).  Staff reported that it was not uncommon to have a waitlist for EOP due to holding beds when an EOP inmate had been transferred to a crisis bed.  A plan to provide mental health treatment to inmates who were temporarily placed on the yard while waiting for bed placement in the SCU had been implemented at the time of the site visit that included such inmates being offered five hours per week of out-of-cell structured therapeutic activities.

CIW reported 97-percent compliance with timely initial and routine psychiatry contacts and 99-percent compliance with timely initial and routine PC contacts.

Documentation indicated an initial IDTT was held within 14 calendar days of arrival in 93 percent of cases.  Routine IDTTs were completed timely 99 percent of the time.  All required disciplines attended IDTTs 95 percent of the time.  CIW reported that generally about seven percent of EOP inmates were on a modified program, which generally lasted several months to a year.  Inmates on modified program were seen at least monthly by the IDTT.

An observed IDTT meeting revealed appropriate multidisciplinary input and clear discussion of treatment planning.

During the review period, an average of 14.26 weekly hours of structured therapeutic activities were offered, of which an average of 8.64 hours were attended, an average of 5.09 hours were refused, and 3.04 hours were canceled.  Ninety-seven percent of EOP inmates were offered at least ten weekly hours of structured therapeutic activities.  A variety of EOP groups were offered on weekdays between 9:00 a.m. and 2:30 p.m. and ran in eight-week cycles.

The temporary relocation of the EOP program resulted in a loss of group rooms appropriate for EOP treatment purposes.  Group space in the temporary housing unit was noisy and not confidential.  Staff indicated these problems would be resolved once EOP inmates were returned to the SCU following the retro-fit.

An observed EOP group facilitated by two psych techs revealed a need for additional training, supervision, and mentoring.  The group began 15 minutes late due to inmates' late arrivals.  The practice of allowing inmates to come and go throughout groups was disruptive for many reasons.  The group was remarkably disorganized, reportedly due to a lack of sufficient notice given to the facilitators and consequently insufficient preparation time.  However, the psych techs were positive, encouraging, and supportive, and established good rapport with the inmates.

EOP inmates reported PC contacts occurred at least weekly; individual clinical contacts were conducted in a private and confidential setting; psychiatrists and PCs were accessible; and structured therapeutic activities were beneficial.

EOP inmates had appropriate access to the EOP yard.

3CMS:

One on-site psychiatrist assigned to 3CMS had a caseload of 176 inmates.  Caseloads for the two telepsychiatrists were 176 and 183 inmates.  Two psychiatrists with duties in the PSU also provided services to 3CMS inmates and carried caseloads of 126 and 163 inmates.  Six PCs carried caseloads of 79 to 129 inmates, and a PC with other duties had a caseload of four.

There was 96-percent compliance for initial psychiatry contacts and 93-percent compliance for follow-up contacts; 99.86 percent of psychiatry contacts occurred in a confidential setting

There was 89-percent compliance for initial PC contacts and 96-percent compliance for follow-up PC contacts; 98 percent of PC contacts occurred in a confidential setting.

There was 84- and 99-percent compliance for initial and follow-up IDTT meetings, respectively, and 95-percent compliance for staff attendance at IDTTs.

3CMS inmates were offered structured therapeutic groups three days per week. Topics included coping with trauma, self-esteem, anger management, socialization, and EOP to 3CMS transition. However, assigned treatment groups were not routinely ordered in treatment plans.

Four IDTT meetings were observed; they were held in a confidential room with a conference table and ample space. Generally, the observed IDTTs did not include a complete discussion of change in level of care, except in the most general sense. However, a subsequent review of medical records indicated that the items from the Form 7388-B had been considered. Team members spontaneously participated in the discussion, with the exception of the psychiatrist who later stated that he preferred to discuss medication issues privately with patients.

In one IDTT, the PC initiated and led a discussion with one inmate on the risks of discontinuing medications that had been prescribed for her specific psychiatry condition without first discussing it with the psychiatrist. While this conveyed a spirit of interdisciplinary teamwork, the discussion was more appropriate for the psychiatrist and was of particular concern because the psychiatrist remained silent during the discussion. In another case, the psychiatrist had not prepared an initial psychiatry interview of an inmate who was scheduled to be seen in the IDTT. The PC requested that the psychiatrist leave the room to conduct the initial evaluation before the inmate's treatment plan was addressed. The sequence requested by the PC was in keeping with program policy.

Case-by-Case Reviews:

Data reflected that CIW conducted four case-by-case reviews during the review period. The reviews appeared to have been conducted within policy guidelines. Of the four cases reviewed, one inmate was subsequently seen by the Associate Director for a long-term case conference and transferred; two inmates were released after the case-by-case review; and the remaining inmate was retained for possible prosecution.

Non-Disciplinary Segregation:

The institution reported two inmates were designated NDS status during the review period, both of whom were designated for expedited transfer and timely transferred. No inmates were designated NDS status at the time of the site visit.

"C" Status:

At the time of the site visit, CIW had four inmates on "C" Status; three were class members at the 3CMS level of care.

Referrals:

CIW reported 68-percent compliance for timely responding to 176 emergent mental health referrals and 87-percent compliance for timely responding to 577 urgent and 1,705 routine mental health referrals. Mental health staff reported that untimely delivery of routine referrals by Second and Third Watch custody staff resulted in untimely responses to routine referrals for a portion of the review period until the issue was corrected.

EHRS/MHTS.net:

CIW was a pilot institution for EHRS and went live with the program in October 2015. The transition to EHRS led to many data errors during the review period for mental health appointments, but they decreased over time, going from 220 reported errors in July 2016 down to

only two in December 2016.  CIW provided regular annual training for new employees on the EHRS system and refresher training for all staff.

Benefits of the EHRS system identified by staff included efficiency, flexibility, elimination of paper documents, accountability and compliance, but staff also reported data entry issues, a lack of understanding the role of EHRS, and difficulty learning how different elements of the system worked in real time.

Space:

Mental health treatment space was observed in the administrative segregation unit and the new Infill for administrative segregation.   In administrative segregation, there were two areas set aside for group treatment in the common area.  In one area, they used restart chairs and in another area treatment modules were used.

The tour of the Infill space intended for administrative segregation treatment revealed it was on the opposite side of the campus from the population it was anticipated to serve. Therefore, immediately upon activation, the institution would likely be addressing a custody staff shortage and transport issue.  The mental health component of the new medical facility, still under construction, was a compressed portion of the larger facility, which was primarily designed for medical patients.  The mental health portion consisted of a holding area, one group area, expected to have a capacity for ten inmates, and one individual interview room.  It was anticipated that transporting inmates back and forth to the facility would be a challenge.

Mental Health/Custody Relations:

Mental health and custody staff reported no concerns about their relationships, reporting that they worked collaboratively in addressing the concerns of inmates.

However, in an interview with the Women's Advisory Committee, inmates revealed concerns regarding custody staff turning a blind eye to substance abuse and domestic violence issues, as well as, on occasion, significant mental health concerns with inmates. They expressed concern that domestic violence and substance abuse did not resonate with the custody staff as a mental health issue. In addition, they shared concerns regarding inmates with significant mental health issues going untreated as long as they did not create a disruption on the unit.

Heat Plan:

There were no heat-related incidents during the review period.

Reviews of temperature logs and tours of housing units revealed that custody staff were recording both building and cell temperatures regularly with use of mounted and handheld thermometers. Most custody staff were aware of the heat plan, but not all staff were sufficiently familiar with the protocols that accompanied the various stages.

According to data provided for June through September 2016, there were 80 days when the outside temperatures exceeded 90 degrees, indicating a Stage I heat alert and 71 days when the inside temperatures exceeded 90 degrees, indicating a Stage II heat alert. Documentation indicated that appropriate cooling measures were taken. There were 21 days when inside temperatures exceeded 95 degrees, indicating a Stage III heat alert. Appropriate medical rounds were documented as conducted.

Monthly heat reports that were submitted to headquarters each month followed the required statewide format, a noted improvement from the preceding site visit when an outdated template was in use.

Lockdowns/Modified Programming:

CIW reported three modified programs due to lockdowns which impacted GP inmates on

491

yards A and B, but the delivery of mental health services was not impacted.

Pre-Release Planning:

The chief of mental health reported very limited pre-release planning, acknowledging it as an area of weakness that required improvement. The institution occasionally offered groups, but they were often cancelled due to a lack of enrollment and when they were held, they were frequently poorly attended. Staff reported that TCMP provided assistance to inmates prior to discharge with obtaining Medi-Cal and applying for SSI benefits.

Access to Care:

A review of CIW's monthly Health Care Access Quality Reports from June through November 2016 indicated that three percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 37 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Construction:

Construction for a GP primary care clinic addition and renovation began on June 22, 2015, with an August 30, 2017 expected completion date. It was primarily a primary care facility intended to treat the medical needs of the inmates at CIW. As reported above, a small, compact area of the facility had been set aside for mental health. That part of the building included a waiting area, group room and individual treatment room. It was unclear how much of a resource it would be to the mental health population.

Program Access:

    a.  Job and Program Assignments:

As of January 3, 2017, CIW reported that of 569 available employment positions, nine or 1.5 percent were held by EOP inmates, 221 or 39 percent were held by 3CMS inmates, and 339 or 59 percent were held by non-MHSDS inmates.

Of the available 358 academic assignments, 163 or 46 percent of 3CMS inmates held assignments, as did 195 or 54 percent of non-MHSDS inmates.

With regards to the 225 available substance abuse treatment placements available, 111 or 49 percent of 3CMS inmates and 114 or 51 percent of non-MHSDS inmates held them.

Of the 523 voluntary education assignments available, nine or two percent were held by EOP inmates, 212 or 40 percent were held by 3CMS inmates, and 302 or 58 percent were held by non-MHSDS inmates.

Of the 116 vocational education assignments, 56 or 48 percent were held by 3CMS inmates, and 60 or 52 percent were held by non-MHSDS inmates.

    b.  Milestone Credits:

CIW reported that from June 1 through November 30, 2016, 26 of 98 EOP inmates were eligible for milestone credits.  Among those 26 inmates, 15 percent earned the credits.  For the 701 3CMS inmates, 235 were eligible to earn milestone credits; 15 percent earned the credits.

 Of the 1,150 non-MHSDS inmates, 512 were eligible to earn milestone credits; 25 percent earned the credits.

    c.  Out-of-Level Housing:

Inmates at custody Levels I through IV were housed together at CIW.

d.   <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CIW provided confirmation of implementation of revised ADA accommodation and grievance procedures in the form of training materials and staff training rosters and a copy of the institution's local operating procedure, dated November 2016.

e.   <u>Periodic Classification Score Reductions:  EOP Inmates</u>:

EOP inmates were being granted the same semi-annual classification score reductions as non-EOP inmates, which was confirmed by a review of completed EOP re-classification sheets.

<u>*Coleman* Postings</u>:

With two exceptions, all toured housing units contained current *Coleman* postings in English and Spanish, accessible to inmates in common areas.

**<u>Central California Women's Facility (CCWF)</u>**
January 24, 2017 – January 26, 2017

<u>Census</u>:

On January 25, 2017, the total population at CCWF was 2,895, including 1,365 MHSDS inmates.  The mental health caseload population had increased by nine percent since the preceding monitoring period, accounting for 47 percent of the total inmate population.  There were seven inmates in the MHCB.  The EOP mainline population was 99 and the mainline 3CMS population was 980.

The administrative segregation population of 103 included 16 EOP inmates.  There were 78 3CMS inmates in STRH.  The total reception center population of 402 included 11 EOP inmates and 174 3CMS inmates.

<u>Staffing</u>:

The senior psychiatrist position was filled.  One of two chief psychologist positions was filled.  Of 6.5 senior psychologist positions, 5.5 were filled, for a vacancy rate of 15 percent.

494

Seven of nine on-site psychiatry positions were filled, as were 0.5 of two telepsychiatry positions, for an overall 32-percent psychiatry vacancy rate.

Twenty-three of 29 staff psychologist positions were filled, for a 21-percent vacancy rate.

The supervising social worker position was filled, as were 14 of 16.5 social worker positions, for a 15-percent vacancy rate.

Four of 8.5 recreation therapist positions were filled, for a 53-percent vacancy rate.

The senior psych tech position was filled.  Of 33.5 psych tech positions, 15.6 were filled, for a vacancy rate of 53 percent.

Three of four RN positions for mental health inmates were filled, for a 25-percent vacancy rate.

Fourteen of 17 mental health clerical positions were filled, for an 18-percent vacancy rate.  Positions for two clinical psychology interns were both filled.

CCWF did not use contractors to fill vacant positions.

Quality Management:

The regional mental health team conducted a major sustainability review at CCWF on August 9 – August 10, 2016.  Among other issues, this review identified problematic IDTT meetings and non-compliant psych tech rounds.  A subsequent sustainability review on November 8 – November 9, 2016 indicated data entry problems that negatively affected referral and non-referral data inputted into EHRS.  CAPs were developed to address these issues.

There were no CQIT site visits during the review period.

CCWF's local governing body met quarterly, achieved a quorum, and maintained meeting minutes.  It addressed concerns with EHRS, scheduling, and disruptions to mental health programming.

The quality management committee met monthly, with a quorum reported at all meetings. Meeting minutes documented EHRS and training issues that affected mental health care and programming.

The mental health subcommittee met monthly, regularly attained a quorum, and kept meeting minutes.  Issues addressed included low SRE percentages, medication management compliance reporting through EHRS, mental health local operating procedures, training, staffing, SPRFIT meetings, alternative housing and MHCB admissions, DSH referrals and non-referrals, PC 2602 inmates, and IDTT meetings and treatment hours for EOP and 3CMS inmates, and for STRH inmates.

There were two active QITs during the review period.  One QIT addressed the administrative segregation EOP program and sought to improve inmates' treatment hour attendance and out-of-cell time.  Meeting minutes reflected a heavy custody and minimal clinical focus.  Staff reported that this QIT yielded minimal results due to inmate politics and high refusal rates.  A second QIT addressed the safety concerns of suicide watch/precaution observers due to the large number of "C" status inmates in the alternative housing area.

CCWF did not report peer review data.

Medication Management:

CCWF had suspended MAPIP use due to the implementation of EHRS, which began in October 2015; since then, there had been multiple iterations of EHRS.  It was reported that MAPIP's use would again begin in January 2017.

CCWF was a clozapine (Clozaril) initiation and maintenance institution.  During the review period, the institution did not initiate any inmates on clozapine, but CCWF did maintain one inmate on this medication; she had previously been housed in the CIW PIP for three years.

496

On December 28, 2016, 14 inmates received PC 2602 involuntary medications, of which seven were initial orders and seven were renewals.

There were no reported or documented concerns with pill lines.

There were 374 inmates who received HS medications. The medications were administered after 8:00 p.m.

Transfers:

During the review period, CCWF referred and transferred 12 inmates to acute inpatient care. There was a *Vitek* hearing for one inmate, but the inmate did not prevail. Eleven of 12 or 92 percent of acute care referrals were timely. Four of 12 or 33 percent of acute care transfers were timely. Nine of 12 or 75 percent were within 72 hours of a bed assignment.

There were ten timely referrals to intermediate care, of which three were rescinded, six were accepted, and one was initially rejected but subsequently accepted following a Correctional Clinical Assessment Team (CCAT) meeting. One inmate had a *Vitek* hearing, but did not prevail. Three of seven or 43 percent of intermediate care transfers were timely. All seven transferred within 72 hours of a bed assignment.

The CIW PIP discharged 24 inmates back to CCWF during the review period.

Between June and December 2016, 465 CCWF inmates were referred to MHCBs, of which 120 were transferred. There were 74 internal admissions to CCWF's MHCB and 46 to CIW's MHCB. Of these MHCB transfers, 111 or 93 percent were untimely. Notably, a statewide memorandum dated November 17, 2016 instructed CCWF and CIW to only internally admit inmates to their respective MHCBs.

During the review period, two CCWF inmates transferred to LTRH.

497

Thirteen of 14 or 93 percent of EOP inmates who transferred from the reception center to a mainline EOP program transferred timely.  There were 641 3CMS inmates who transferred to a mainline 3CMS program from the reception center, of which 560 or 87 percent transferred timely.

Other Issues:

Reception Center:

During the review period, reception center stays averaged 7.6 days for EOP inmates, 39.7 days for 3CMS inmates, and 51.9 days for non-MHSDS inmates.

Initial psychiatry contacts for reception center EOP inmates were timely; routine contacts were not reported.  There was 100-percent compliance for initial PC contacts and 93-percent compliance for routine contacts.  Initial IDTT meetings were 100-percent compliant; there was 49-percent compliance for routine IDTT meetings.  Staff reported that required staff regularly attended IDTT meetings.

Reception center EOP inmates were scheduled for an average of 15.3 weekly hours of structured treatment hours, were offered an average of 12.2 weekly hours, and attended 7.3 weekly hours.

As for high treatment refusers, ten reception center EOP inmates refused a total of 219 appointments during the reporting period.  No reception center EOP inmates were placed on modified treatment programs.

For reception center 3CMS inmates, CCWF reported compliance for initial and routine psychiatry contacts, 94-percent compliance for initial PC contacts, and 99-percent compliance for routine PC contacts.

<u>Administrative Segregation EOP</u>:

Administrative segregation EOP inmates were housed in a building that was also used for the STRH program, and for condemned and administrative segregation general population inmates.  Staff indicated attempting to cluster these populations to separate them, but reported this to be very challenging.

There was 90-percent compliance for performing initial pre-screens.  Twenty of 27 or 74 percent of mental health screenings were compliant.

There was 100-percent compliance for initial and routine psychiatry contacts.  Two of 157 psychiatry contacts were non-confidential.

For PC contacts, there was 93-percent compliance for initial contacts and 94-percent compliance for routine contacts; 39 percent of PC contacts were non-confidential.

The institution reported 97- and 99-percent compliance for initial and routine IDTT meetings, respectively.  There was 100-percent compliance for required disciplines' attendance at IDTT meetings.

Observed IDTT meetings were conducted in a clean, well-lit room, with required staff in attendance.  However, IDTT meetings needed improved interaction among disciplines, clarification of diagnoses, and better alignment of diagnoses with treatment goals.  The IDTTs that were observed did not consistently discuss Form 7388-B as part of the process.

Excluding inmates on modified treatment plans, administrative segregation EOP inmates were offered an average of 13 weekly hours of structured treatment activities, but only attended a weekly average of 2.2 hours.  Mental health leadership reported that inmates expressed many reasons for refusing to attend groups.  These reasons included enemy concerns, being coerced by

499

other inmates not to attend, lack of interest in group offerings, being too tired to attend early groups, and other comfort and safety concerns.

Observed psych tech rounds were thoroughly conducted and demonstrated excellent inmate rapport, attention to inmate concerns, and encouragement of inmate treatment participation.

MHCB:

CCWF had 12 MHCBs; four of the cells had two beds.  However, because MHCB inmates were not double-celled, four of the beds were not in use, and a fifth isolation cell also was not used.  During the site visit, all seven usable MHCBs were occupied.

CCWF reported that compliance percentages for psychiatry contacts, PC contacts and IDTT meetings, were erroneous due to a faulty EHRS interface.  There was a compliance rate of 89 percent for the conduct of SREs and 94-percent compliance for five-day follow-ups, indicating non-compliance.

MHCB stays averaged 9.5 days.  During the review period, 42 stays exceeded ten days. Thirty inmates had three or more MHCB admissions.  One inmate had seven MHCB stays.

Observed MHCB IDTT meetings were cohesive and revealed knowledgeable treatment teams, but were otherwise problematic.  One observed IDTT meeting began timely with appropriate staff and the chief psychiatrist in attendance.  Two clinicians presented.  The first clinician provided a succinct clinical summary and appropriately discussed Form 7388-B criteria. However, the IDTT became problematic when multiple staff questioned the inmate about her goals and the inmate became confrontational.  At another observed IDTT meeting, the clinician focused on custodial rather than clinical history, the inmate was largely non-verbal, and staff's

attempt to solicit information from the inmate caused her to shut down.  This IDTT treatment

team had sound knowledge, but did not develop a good treatment plan, nor discuss Form 7388-B.

      A recreation therapist reported that individual treatment sessions were only conducted for

MHCB inmates on maximum custody status or who refused group sessions.  The recreation

therapist was observed going cell to cell to ask inmates whether they wanted to attend group

therapy; the requests were pleasant and interactive.

      <u>Seclusion and Restraint</u>:

      There were no incidents of seclusion or restraint during the review period.

      <u>Alternative Housing</u>:

      Alternative housing cells for inmates awaiting MHCB placement were located in the

TTA, in building 503, and in administrative segregation building 504.

      CCWF reported only six alternative housing stays during the review period; headquarters

representatives and CCWF leadership admitted that this number was incorrect and was due to an

improper EHRS interface.  Four inmates were in alternative housing during the site visit.

      <u>Short-Term Restricted Housing</u>:

      CCWF activated a STRH program for 60 inmates in early 2016.  STRH inmates were

housed in the administrative segregation unit along with administrative segregation EOP

inmates, condemned inmates, and administrative segregation general population inmates.

      Group treatment was provided to STRH inmates in the same building where

administrative segregation EOP and mainline EOP inmates attended group.  STRH inmates

shared a group treatment room with administrative segregation EOP inmates.  CCWF staff

admitted that providing group treatment to both groups sharing this treatment room had proved

challenging, and that inmate group refusals was a significant problem.  During the review period, STRH inmates attended group 563 times, but refused 1,144 times.

Interviewed group participants reported typically timely seeing psychiatrists and clinicians, but expressed concern with not having radios.

EOP:

CCWF's EOP population had been steadily increasing.  The institution reported a capacity of 60 EOP inmates, but an average review period census of 100.

There was 97-percent compliance for the timely completion of initial assessments.

There was 100-percent compliance for initial and routine psychiatry contacts.  For PC contacts, there was 100-percent compliance with initial contacts, and 97-percent compliance with follow-up contacts.

Initial IDTT meetings were 97-percent compliant and there was 100-percent compliance with routine IDTT meetings.  Required staff attended IDTT meetings 98 percent of the time.

Observed mainline EOP IDTT meetings were adequately conducted and demonstrated adequate participation by treatment team members.  All required disciplines were in attendance.

CCWF reported compliance with structured therapeutic activities for four months and non-compliance for two.  The institution scheduled a weekly average of 18.4 structured treatment hours and offered a weekly average of 13.9 hours.

Interviewed EOP group participants reported regularly meeting with psychiatry and PCs and timely receiving prescribed medications.  Expressed concerns included a decrease in available services, custody staff's insensitivity toward mental health caseload inmates, and being ducated for appointments that did not occur.

502

3CMS:

For psychiatry contacts, there was 88-percent compliance with initial contacts and 95-percent compliance with routine contacts.  There was 79-percent compliance with initial PC contacts and 97-percent compliance with routine PC contacts.  Notably, 99.6 percent of clinical contacts were confidential.

Sixty-nine percent of initial IDTT meetings were compliant, as were 98 percent of routine IDTT meetings.  Required disciplines attended IDTT meetings 94 percent of the time.

Observed IDTT meetings began timely.  The strengths of IDTTs included attendance by required staff and the knowledge of respective disciplines, participation of treatment team members without prompts, and relevant supervisory input.  IDTT meeting weaknesses included inappropriate comments in front of inmates, lack of treatment planning and clinical summaries, and clinicians' failure to discuss Form 7388-B criteria.  All six inmates' treatment plans were the same.

A recreation therapist facilitated a 3CMS group with 11 participants; two of the inmates were not class members.  All inmates spoke positively about the group.  Interviewed group members reported that the mental health program was fair and expressed the need for additional mental health treatment.  All reported disrespectful treatment by custody, including negative comments, name-calling, intimidation, threats, and assaults.

Case-by-Case Reviews:

During the review period, CCWF conducted 22 150-day case-by-case reviews.  These reviews led to seven inmates' release from segregation, six inmates' approval for transfer, and nine inmates' retention to complete an investigation or pending action.

<u>Non-Disciplinary Segregation</u>:

During the review period, two NDS inmates approved for expedited transfer were both timely transferred.  During the site visit, 13 inmates were on NDS status.

Administrative segregation staff maintained a list of NDS inmates.  NDS inmates designated as privilege group 1A were allowed four monthly weekend telephone calls; NDS privilege group 1B inmates were allowed one monthly weekend call.

<u>"C" Status</u>:

During the site visit, CCWF reported 68 inmates on "C" status, of which 48 were at the 3CMS level of care, two were EOP, and 18 were non-MHSDS inmates.

<u>Management Cell Status</u>:

CCWF provided conflicting information as to the use of management cell status.  The administrative segregation sergeant reported that CCWF had not used management cells during the past year.  However, officers assigned to administrative segregation reported placing inmates in management cells during the past year.  Staff also reported not maintaining a log of inmates who were placed in management cells.

<u>Referrals</u>:

CCWF reported 76-percent compliance for timely responding to 649 emergent referrals, 88-percent compliance for timely responding to 434 urgent referrals, and 91-percent compliance for timely responding to 2,385 routine referrals.

<u>EHRS/MHTS.net</u>:

CCWF activated EHRS on October 27, 2015.  All mental health staff employed during the roll out were given 40 hours of training.  There were subsequent trainings for new staff or for staff returning from long-term leave.  Staff reported that the advantages of EHRS included

504

access to dated, signed, and legible documents, and the ability to accurately transfer information from one document to another.

Heat Plan:

All 16 toured housing units had working thermometers.  Interviewed officers' demonstrated knowledge of the heat plan.  The heat plan local operating procedure had been revised in June 2016 and was current.

During the review period, there were 80 Stage I heat alerts, but no Stage II or Stage III heat alerts.  CCWF did not document reasonable accommodations that were made during Stage I heat alerts.  The institution also reported that it did not offer evening yard as an accommodation for inmates who lost yard time due to heat alerts.

Lockdowns/Modified Programming:

There were nine program lockdowns during the review period, but only one impacted the entire institution.  During each lockdown, ducats for mental health services that were not completed ranged from one to 197.  Staff reported that all ducats were rescheduled.

Pre-Release Planning:

During the review period, CCWF released approximately 40 inmates to parole/post-release community supervision.  The parole/post-release community supervision coordinator worked with PCs to assist with pre-release planning.  CCWF staff used SOMS to identify inmates 120 days prior to their release who required TCMP pre-release assistance.

CCWF conducted a weekly clinical pre-release group for EOP inmates with approaching release dates; a review of the schedule indicated that the group met less frequently.  The EOP social worker individually met with EOP inmates to discuss other aspects of pre-release planning.

Access to Care:

A review of CCWF's monthly Health Care Access Quality Reports from June 1, 2016 through December 31, 2016 indicated that 0.8 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 14.1 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

As of January 3, 2017, CCWF reported that of 1,279 available employment positions, 20 or 14.4 percent of EOP inmates held them, as did 531 or 42.9 percent of 3CMS inmates, and 728 or 45.8 percent of non-MHSDS inmates.

Of the available 405 academic assignments, one or 0.7 percent of EOP inmates held them, as did 203 or 16.4 percent of 3CMS inmates, and 201 or 12.7 percent of non-MHSDS inmates.

With regard to the 360 available substance abuse treatment assignments, none were held by EOP inmates, 193 or 15.6 percent of 3CMS inmates held assignments, as did 167 or 10.5 percent of non-mental health caseload inmates.

Of the 178 vocational education assignments, none were held by EOP inmates, 93 or 7.5 percent of 3CMS inmates held assignments, as did 85 or 5.4 percent of non-MHSDS inmates.

Of the 608 voluntary education assignments, one or 0.7 percent of EOP inmates held them, as did 221 or 17.9 percent of 3CMS inmates, and 386 or 24.3 percent of non-MHSDS inmates.

    b.    <u>Milestone Credits</u>:

As of January 3, 2017, CCWF reported that 70 of the 137 EOP inmates were eligible for milestone credits; among those, 17 percent earned the credits   For the 1,232 3CMS inmates, 380 were eligible for milestone credits; 19 percent earned the credits.  Of the 1,575 non-MHSDS inmates, 515 were eligible to earn milestone credits; 15 percent earned the credits.

    c.    <u>Out-of-Level Housing</u>:

CCWF did not house inmates by level; all levels were mixed.

    d.    <u>ADA Reasonable Accommodation and Grievance Procedures</u>:

CCWF provided confirmation of implementation of its ADA accommodation and grievance procedures through production of five completed reasonable accommodation forms.

    e.    <u>Periodic Classification Scores:  EOP Inmates</u>:

Review of a sample of completed CDCR 840s confirmed that EOP inmates were granted classification score reductions for successful programming.

    <u>*Coleman* Postings</u>:

There were current *Coleman* postings in English and Spanish in all 16 housing units toured by the monitor.  The postings were located in common areas that were accessible to *Coleman* class members.

**<u>Valley State Prison (VSP)</u>**
June 1, 2016 – June 3, 2016

<u>Census</u>:

On May 31, 2016, the total population at VSP was 3,402, including 1,725 inmates on the mental health caseload.  The mental health caseload population had increased 25 percent since the preceding monitoring period, accounting for 51 percent of the total inmate population.  There were 362 EOP inmates and 1,344 3CMS inmates.  There were 12 EOP inmates pending transfer

507

to an EOP administrative segregation hub and four 3CMS inmates housed in administrative segregation.  Three inmates were housed in alternative housing pending transfer to a MHCB.

Staffing:

In August 2015, VSP hired additional staff to provide treatment due to the addition of 180 EOP beds.  Further, due to an increased 3CMS population, in January 2016, VSP's staffing allocation increased by another 12.5 positions.  While VSP made efforts to fill the positions, significant vacancies remained in psychiatry and psychology.

There was no chief psychiatrist position.  The senior psychiatrist position remained filled. One chief psychologist position was filled and an additional established chief psychologist position was held for cost savings.  The 6.5 senior psychologist positions were filled.

VSP was allocated nine on-site psychiatrist positions, two were filled.  VSP was allocated one telepsychiatry position, which was filled.  In addition to the allocated position, VSP had one additional telepsychiatry position filled, resulting in an overall 60-percent vacancy rate for psychiatry.  The use of a 0.3 contractor position, slightly decreased the functional vacancy rate for psychiatry to 59.7 percent.

Of 23 psychologist positions, 16 were filled for a 30-percent vacancy rate.  Seven psychologists were unlicensed.

The supervising social worker position was filled, as were 14 of 16 social worker positions, for a 12.5-percent vacancy rate.  With the coverage provided by two contractors, the functional vacancy rate for social workers was zero.  Four of the social workers were unlicensed.

The senior psych tech position was filled, as were 14 of 21.2 psych tech positions, resulting in a 34-percent vacancy rate for psych techs.

Six of ten recreation therapist positions were filled, leaving a 40-percent vacancy rate.

508

There was a 17-percent vacancy rate for clerical positions with 17.5 of the 21 mental health clerical positions filled.  Both HPS I positions and the OSS II positions were filled.  The CHSA II position was vacant and designated as a "Do Not Fill" position per mental health headquarters.

VSP continued to participate in the psychology intern program (a year-long program) and utilized two interns during the review period.  There were three intern positions.  There were three candidates for the next class which was scheduled to begin the first week of August 2016.

Quality Management:

The QMC met monthly during the review period.  A quorum was present at all meetings and minutes were maintained.   The CEO served as chair and the chief of mental health was present at all meetings.  Meeting minutes documented discussions that included mental health local operating procedures, medical records, MHCB referrals, EOP overcrowding, medications and preparations for upcoming site visits to VSP.

The mental health subcommittee met monthly during the review period.  Mental health subcommittee meetings were chaired by the chief of mental health.  A quorum was achieved at all meetings.  Meeting minutes were comprehensive and covered the various mental health program areas.  Regional site visits, compliance, and topics affecting the mental health department were also discussed.

Data problems were reported and discussed with mental health headquarters.  For example, in March 2016, VSP's performance report showed a compliance rate of zero for timely completion of SREs, when, according to staff, compliance was at 100 percent.  Weekly meetings were held with mental health headquarters to fix data glitches.  These meetings assisted staff

509

with a better understanding of the data and provided fixes for discrepancies in reporting of institutional data.

An alternative housing unit QIT established in 2015 was functioning as a work group. The work group reviewed MHCB admissions, monitoring of inmates in alternative housing and medical clearance delays.

The formal statewide peer review process at VSP for psychiatrists, psychologists and social workers was reported to be in operation at the time of the site visit. VSP was partnered with CIW for purposes of peer review. The institution began the process in January 2016 with training. Staff reported that peer review results had been expected to be provided to VSP by mental health headquarters by May 2016; they had not been released to the institution at the time of the site visit.

VSP was not a test prison for CDCR's CQIT during the monitoring period.

<u>Medication Management</u>:

Due to plans for the implementation of the EHRS, changes to the MAPIP measures were effected through a statewide memorandum. As a result, this report reflects data from January 2016 through April 2016. Psychiatry measures evaluated compliance of laboratory testing and other tasks related to inmates on psychotropic medications and were audited on a quarterly basis. The psychotropic medications were atypical antipsychotics, Depakote, lithium, carbamazepine, Lamictal, clozapine and antidepressants.

VSP reported compliance rates of 90 percent or above for all applicable psychiatry measures. The facility was authorized as a clozapine maintenance institution in 2015. During the site visit, five inmates were on clozapine.

The remaining measures were audited monthly and were related to continuity of medications, medication compliance, and medication administration.  Continuity of medications was measured within the following categories:  inter-institutional transfer at R&R; NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU; MHCB transfers; intra-institutional transfers to ASU/SHU/PSU; and discharge/transfer from a community hospital and/or DSH.  Medication compliance was measured for psychiatrist/MH mid-level prescribed medications, PC 2602 involuntary medications, and urgent medication referrals for no-shows and refusals (Clozaril).  Medication administration was measured for outpatient provider new medication orders for psychiatrist-prescribed medications.

VSP reported compliance rates of 90 percent and above upon inter-institutional transfer at R&R, intra-institutional transfers to ASU/SHU/PSU, psychiatrist/MH mid-level prescribed medications, and PC 2602 involuntary medications for all four audited months.  VSP also reported compliance rates of 90 percent and above for NA/DOT medications with intra-institutional transfers excluding ASU/SHU/PSU for three of the four audited months and 85.71 compliance for one.  The data also showed VSP was 100-percent compliant for two months regarding continuity of medications upon discharge/transfer from a community hospital and/or DSH, and achieved compliance rates of 85.71 and 83.39 percent for the other two months.  For urgent medication referrals for no-shows and refusals (Clozaril), VSP reported compliance rates of 90 percent and above for three months and a compliance rate of 75 percent for one month.

During the review period, four new PC 2602 involuntary medications petitions were considered and granted.  Four existing PC 2602 involuntary medications orders were renewed; one PC 2602 involuntary medications order expired and renewal was not sought, and another PC 2602 involuntary medications order was withdrawn.  No petitions were denied.

The problem of long pill lines interfering with group start times reported during the preceding monitoring period appeared to have been corrected.

According to the VSP pharmacy data, there were 397 inmates who received HS medications.  The medications were administered after 8:00 p.m.

Transfers:

There were five acute care and six intermediate care transfers during the review period. All were timely.

According to the data provided, between October 1, 2015 and April 24, 2016, there were 221 alternative housing placements, 137 or 62 percent were timely removed.

Also between October 1, 2015 and April 24, 2016, there were 204 MHCB transfers, 54 percent were timely.  Lack of available beds was the primary reason cited for transfer delays.

There were no PSU transfers during the review period.

There were 130 inmates transferred to EOP hubs, 123 or 95 percent were transferred timely.

According to the data provided, there were 13 inmates transferred to STRH between January 15, 2015 and May 4, 2016.  All transfers were timely.

There were no LTRH transfers during the review period.

Other Issues:

MHSDS Inmates in Administrative Segregation:

VSP's administrative segregation unit was housed in A-4 and had a capacity for 176 inmates.  During the review period, the average length of stay for general population inmates was 43.5 days, for 3CMS inmates 27.9 days and for EOP inmates 8.4 days.

512

At the time of the site visit, one psychiatrist was assigned to administrative segregation, which met the clinical ratio of 1:52 for psychiatrists, of 1:52 for EOP inmates and 1:101 for 3CMS inmates in administrative segregation.  There was one psychologist PC assigned to administrative segregation.  VSP was not compliant with CDCR's established ratio of 1:10.5 for EOP administrative segregation inmates for this discipline, but well-within the required ratio of 1:29 for psychologists serving 3CMS administrative segregation inmates.

VSP remained in compliance with monthly psychiatry contacts, weekly PC contacts and daily psych tech rounds.  There continued to be no group therapy offered.

Psychiatry initial and follow-up contacts were in compliance at 100 and 98 percent.  Of the reported 61 psychiatry contacts, 16 or 26 percent, were conducted at cell front (three refusals and 13 unspecified).

Initial and follow-up PC contacts were compliant at 90 and 94 percent respectively.  Only two of the 312 PC contacts were conducted in non-confidential settings due to an unscheduled contact and a crisis contact.

Institution audits indicated 100-percent compliance for timely completion of initial IDTTs and 99-percent compliance for follow-up IDTTs.  Required attendance at IDTTs remained in compliance.

The monitor's expert observed IDTT meetings in administrative segregation.  The clinicians presented the EOP inmate's history, goals and objectives.  The Form 7388-B criteria were touched upon during the IDTTs, but not fully discussed as required.

<u>Alternative Housing</u>:

The primary alternative housing beds were located in the Central Health Unit Building. Staff reported that none of the ten cells were suicide-resistant, therefore, 1:1 watches were

mandatory.  The secondary alternative housing location, A-3, had eight cells with bunk beds, sinks and toilets.

Inmates were only housed in administrative segregation in A-4 when an administrative segregation inmate required a MHCB and there were no other options.  This was a change from the preceding monitoring period when administrative segregation was used as the primary alternative housing for inmates waiting for MHCBs.  The alternative housing local operating procedure was revised in January 2016 and implemented in March 2016.

During the review period, there were a total of 221 placements in alternative housing.  Of the 221 total placements, 31 or 14 percent were housed in the Central Health Unit beds and 20 or 65 percent of those inmates were transferred timely.  The remaining 190 inmates were housed in other alternative housing beds and 117 or 62 percent transferred timely.  Of those 190 inmates, 138 or 73 percent were from administrative segregation.

During the site visit, there were two EOP inmates housed in alternative housing.  One inmate was released within 24 hours and the other inmate was sent to the PBSP MHCB after three days.

EOP:

The EOP capacity was increased by 180 beds in 2015.  The increase in EOP beds directly impacted 3CMS staffing and planned group activities until additional staff allocations were given in January 2016.

Two psychiatrists assigned to the EOP program carried caseloads of 164 and 159 respectively, which were not compliant with the established clinical ratio of 1:97 for psychiatrists in general population EOP.  One psychiatrist had a caseload of 42 inmates.  The caseloads for all

24 PCs met CDCR's established clinical ratio of 1:30 for psychologists and 1:70 for social workers, with no caseload exceeding 1:29.  The one intern had a caseload of 11 inmates.

EOP inmates were housed on Yard A in units A-1 (capacity 192) and A-2 (capacity 180).  Unit A-3 was used as the EOP overflow housing unit.  According to staff, the average EOP census during the reporting period was 380.

VSP reported that 100 percent of psychiatry contacts and 67 percent of PC contacts were confidential.

VSP reported 59-percent compliance with timely initial psychiatry contacts and 67-percent compliance with timely follow-up psychiatry contacts.  Initial PC contacts were timely 92 percent of the time and follow-up PC contacts were at 89-percent compliance.

Initial IDTTs were timely 57 percent of the time; timely follow-up IDTTs were at 100-percent compliance.  IDTTs included the necessary participants 100 percent of the time.

Ninety-two percent of initial IDTTs occurred prior to the ICC.

According to the data provided, EOP inmates were offered an average of 14.14 treatment hours per week and attended an average of 11.34 hours per week.  For EOP inmates on modified program, 10.09 hours of treatment was offered per week and 6.77 hours per week were attended.

VSP reported the establishment of a new group track system based on the inmate's diagnosis.  The group tracks were separated into four categories: depression, anxiety, perceptual differences and substance abuse.  Staff reported that in IDTTs the group tracks assisted staff and inmates in determining the most effective means of addressing disease symptomology and aided the inmate in a better understanding of his disease process.

Space problems continued to plague VSP.  Most staff shared office space and most areas available for structured treatment were not appropriately confidential.

515

Interviewed inmates reported that custody staff were disrespectful and did not understand what it was like to be mentally ill and incarcerated. All of the inmates interviewed believed that custody staff needed sensitivity training. Some of the inmates reported that custody staff called class members names, made jokes about mentally ill and ADA patients and harassed them. These findings were brought to the attention of the warden during the site visit.

3CMS:

Two psychiatrists in the 3CMS program carried caseloads of 853 and 423 patients respectively, which were significantly out of compliance with CDCR's established clinical ratio of 1:225 for psychiatrists. One psychiatrist in the 3CMS program carried a caseload of 55 inmates. All PC caseloads were within CDCR's established clinical ratio of 1:157 for psychologists and social workers.

According to data provided by the institution, initial psychiatry contacts were timely 65 percent of the time and follow-up contacts were timely 62 percent of the time. VSP reported that low compliance scores were due to the loss of staff and the inability to hire qualified clinical staff. Initial PC contacts were timely 48 percent of the time and follow-up PC contacts were timely 89 percent of the time.

Confidential PC contacts were at 99.9-percent compliance and all psychiatry contacts were confidential.

According to data provided by the institution, initial IDTT meetings were timely 47 percent of the time and follow-up IDTTs were timely 94 percent of the time. VSP was 100-percent compliant with required staff IDTT attendance.

VSP reported that 3CMS groups would start in September 2016 and staff would work collaboratively to identify an appropriate space.

The monitor's expert observed IDTTs on C Yard.  Appropriate staff were in attendance, however, the IDTT did not begin on time.  There was scheduling, location and presenting clinician confusion.  Clinicians provided appropriate information, but did not incorporate new information reported by the inmate into the treatment plan.  All Form 7388-B criteria was not discussed during the IDTTs, and when discussed, clinicians used technical jargon that was not likely to be understood by inmates.  The Correctional Counselor II (CC II) adequately presented the custodial factors and was engaged as an IDTT team member.  The monitor's expert also observed IDTTs on D Yard.  The IDTT was attended by appropriate staff and began on time.  The clinician was knowledgeable, engaging, and empathetic.  Discussion of the Form 7388-B criteria was not comprehensive.

Inmates from various yards were interviewed about the 3CMS mental health program.  All knew their PCs and psychiatrist.  The inmates did not view the program as beneficial to them.  None of the inmates interviewed felt they were able to see a clinician the same or next day without stating they were suicidal or threatening to hurt someone.  The inmates stated that if groups were provided they would attend.  A few inmates did not like when their assigned clinicians were changed and several did not feel a request to see the clinician more frequently than every 90 days would be granted.  Most felt the clinical sessions were short and not about them.

Non-Disciplinary Segregation:

From November 2015 through April 2016, 17 class members were designated NDS.  Placement into administrative segregation from the date of ICC action took an average of ten days.  ICCs for five inmates were held beyond the ten-day timeframe with a range of 13 to 18 days.  All but three inmates transferred within 72 hours of NDS designation.  Three outliers took

517

five days, 18 days and 43 days due to bed unavailability.  A review of inmate property inventory sheets and telephone logs revealed that NDS inmates were afforded their property and privileges pursuant to policy.

"C" Status:

There were a total of nine inmates on "C" Status, including six 3CMS inmates, one EOP inmate and two general population inmates.  A random review of the inmates' case factors found all inmates were placed on "C" Status as a result of being determined by a classification committee to be a program failure due to multiple RVRs over a 90-day or 180-day period of time.  All "C" Status designations were for a specific period of time according to CDCR policy.

Referrals:

According to the data provided by the institution, there were 41 emergent referrals generated during the review period, and all received a timely response.  There were 71 urgent referrals; 97 percent received a timely response.  Of the 2,708 routine referrals generated, 76 percent received a timely response.  Staff cited psychiatry vacancies as the primary obstacle in timely responding to routine mental health referrals.

Heat Plan:

The heat plan was not in effect during the review period.

Lockdowns/Modified Programming:

VSP reported there were no program lockdowns during the review period.

Pre-Release Planning:

VSP reported that EOP inmates and certain 3CMS inmates had access to individual pre-release planning with their clinicians.  To gain access to individual pre-release planning, 3CMS inmates had to be identified by their clinicians as likely to have difficulty meeting their relevant

518

needs upon release.  TCMP services were also provided.  VSP offered a 12-week pre-release planning group for EOP inmates.  The group was for EOP inmates within six to nine months of release and was divided into two parts.  The first half of the group was related to educating inmates on resources available to them upon release.  The second half of the group covered how to obtain those resources, as well as other topics relevant to a successful transition from prison to the community.  The monitor observed a pre-release planning group during the site visit.  The group was facilitated by a clinician; all scheduled participants attended and were engaged in the discussion.

Access to Care:

A review of VSP's monthly Health Care Access Quality Reports from November 2015 through April 2016, indicated that 0.95 percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 5.22 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

a.   Job and Program Assignments:

Institutional data indicated that of the 1,110 available jobs, 48 EOP inmates, or 13 percent of the EOP population held job assignments.  For 3CMS inmates, 430 or 32 percent of the 3CMS population held job assignments, and for non-MHSDS inmates, 632 or 37 percent of the non-MHSDS population held job assignments.

Of the 324 academic assignments, none were assigned to EOP inmates.  Nine percent of the 3CMS population, or 122 inmates, held academic assignments.  For non-MHSDS inmates, 202 or 12 percent of the non-MHSDS population held academic assignments.

There were 590 substance abuse treatment program assignments; none were held by EOP inmates.  Of the 3CMS population, 312 inmates, or 23 percent held assignments.  For non-MHSDS inmates, 278 inmates, or 16 percent of the non-MHSDS population held assignments.

There were 293 vocational education assignments, none were held by EOP inmates.  Of the 3CMS population, 12 percent, or 160 inmates held assignments; eight percent of the non-MHSDS population, or 133 inmates held assignments.

Of the 1,034 voluntary education assignments, 92 EOP inmates, or 25 percent of the EOP population held assignments.  For 3CMS inmates, 417 or 31 percent of the 3CMS population held assignments, and for non-MHSDS inmates 525 or 31 percent held assignments.

b.  Milestone Credits:

As of April 30, 2016, VSP reported that 98 of 373 EOP inmates were eligible for milestone credits.  Among those 98 inmates, 44 percent earned milestone credits.  For the 1,355 3CMS inmates, 284 were eligible to earn milestone credits; 41 percent earned the credits.

Of the 1,718 non-mental health caseload inmates, 209 were eligible to earn milestone credits; 48 percent of these inmates earned the credits.

c.  Out-of-Level Housing:

There were 36 EOP, 37 3CMS, and 53 non-mental health Level I inmates housed in Level II housing.  There were nine EOP, 28 3CMS, and 42 non-mental health Level III inmates housed in Level II housing.

d.  ADA Reasonable Accommodations and Grievance Procedure:

VSP provided confirmation of implementation of revised ADA accommodation and grievance procedures in the form of training sign-in sheets, the desk reference manual and examples of completed forms.

520

e.   Periodic Classification Score Reductions:  EOP Inmates:

Review of periodic classification score reductions indicated that EOP inmates continued to be granted semi-annual classification score reductions for successful programming.

*Coleman* Postings:

Housing units on yards A, B, C and D were observed.  *Coleman* postings were up-to-date and posted in areas easily accessible to inmates.

## California Health Care Facility (CHCF)
July 6, 2016 – July 8, 2016

Census:

On July 8, 2016, CHCF housed 2,254 inmates, a 45-percent increase since the preceding site visit.  There were 1,086 inmates on the mental health caseload, which had increased by 29 percent since the preceding site visit and constituted 48 percent of the total inmate population.

The MHCB housed 81 inmates and two inmates were in alternative housing.

There were 520 mainline EOP inmates, including six with SHU terms pending transfer to the PSU.  There were 437 mainline 3CMS inmates.

The administrative segregation unit was an EOP hub; it housed 46 inmates, including one 3CMS inmate.

Staffing:

Positions for the chief psychiatrist and one of two senior psychiatrists were filled.   One senior and one staff psychiatrist were scheduled to begin working at CHCF on July 18 and 15, respectively.

The 24 allocated staff psychiatry positions had been reduced by four.  Funding for those positions was being reserved to pay for psychiatrists assigned to provide Psychiatrist Physician On Call and MDO services, as well as other mental health care services.  Taking into account

staff psychiatrists, tele-psychiatry and contractual psychiatrists, the functional vacancy rate in psychiatry was 24 percent and was expected to reduce to 20 percent with hiring in process at the time of the site visit.

Both chief psychologist positions were filled.  Five of six senior psychologist positions, and five of six senior psychologist specialist positions were filled, for a 17-percent vacancy rate in each discipline.  Thirty-seven of 46 staff psychologist positions were filled, for a 20-percent functional vacancy rate.

The supervising social worker position was filled.  Twelve of 13 social worker positions were filled, for an eight-percent functional vacancy rate.

Twenty-two of 26 recreation therapist positions were filled, reflecting a 15-percent functional vacancy rate.

Quality Management:

During the review period, the regional mental health team conducted one major and two minor sustainability reviews and multiple less formal site visits to address deficiencies in the sustainability and DSH referral processes at CHCF.  Although CAPs with specific implementation deadlines were developed, CHCF did not timely complete them; there were also deficits in these areas during previous *Coleman* visits.

During the sustainability reviews, the regional team found significant disagreement with the DSH coordinator as to Form 7388-B quality, which was poor.  There were also concerns as to the reliability of the DSH referral and non-referral logs; regional mental health staff found that the logs were not accurately maintained, lacked necessary information, and contained erroneous data.  For example, the non-referral log did not reflect numerous instances when the Form 7388-B was marked positive but the inmate was not referred.

522

Staff observations, including tier walks, were an important part of the sustainable review process, and it was expected that some inmates might require subsequent follow-up.  However, the sustainable process found a significant number of inmates requiring follow-up; six inmates were identified in December 2015, and another 21 and 20 were identified in January and April 2016, respectively.  A significant number were identified by custody staff in each instance as well as by regional staff themselves.  It is important that clinicians utilize the resources available to them (e.g., staff with knowledge of their inmates, databases, reports) to maintain an accurate current clinical picture of the inmates on their caseload to ensure that the current treatment plan is appropriate and adequate.  Clinical supervision is an important component to ensuring proper clinical care and seemed to be missing.

CHCF institutional quality management included a functioning local governing body, quality management committee, and mental health subcommittee.  The local governing body met quarterly and addressed substantive matters including privileging of mental health staff, but the meetings were brief; the March 2016 meeting lasted approximately five minutes.

The quality management committee met monthly.  Meetings averaged two hours, and addressed issues including the mental health dashboard and DSH referrals.  Quality management committee minutes were comprehensive and the mental health subcommittee was a standing quality management committee report.

The chief of mental health typically chaired the mental health subcommittee, which met every other week and maintained meeting minutes.  At an observed mental health subcommittee meeting, mental health staff were well-prepared and presented comprehensive verbal reports that were accompanied by lengthy written reports.

The mental health subcommittee generally met every two weeks during the round. The format of the minutes changed in May 2016. A mental health subcommittee meeting was observed during the site visit. While the chief of mental health usually chaired the meeting, there was a designee during the observed meeting. Neither the mental health subcommittee members, nor the chairperson, knew what constituted a quorum. The revised minutes format included a space noting the required members to achieve a quorum. This would have been very helpful to the chairperson.

Staff who reported data to the mental health subcommittee indicated that there were data errors in the reporting system though they did not elaborate on the specific errors.

Peer review was conducted for all three disciplines during March and April 2016. CHCF reported that there were no significant concerns noted for psychiatrists, psychologists, or social workers during the process. The institution was paired with CMF for peer review.

A chart audit was completed during the review period. Improvement was noted from the fourth quarter of 2015 to the first quarter of 2016. Continued areas of deficiency included important items clustered under suicide prevention (e.g., SRE, five-day follow-up documentation). The audit also produced an informative report for the clinician that showed how they scored on an item or items relative to others at their facility and the state average.

CHCF had utilized the CQIT to review their own internal processes prior to the site visit; however the facility was not a test prison for the CQIT during the monitoring round.

Medication Management:

Several issues, including delay in implementing the new eUHR, resulted in the delay of MAPIP's formal initiation at CHCF. CHCF nonetheless performed partial MAPIP and pill line

audits, but they were not validated and would change when the eUHR was implemented, and automated results were available. A MAPIP dashboard had yet to be developed.

MAPIP results for March, April, and May 2016 indicated noncompliance for medication continuity after inter-institutional transfers at R&R and following MHCB discharge. There was between 85- and 90-percent compliance for medication continuity on the receiving yard following intra-institutional moves. Compliance ranged from zero to 100 percent for medication continuity at the receiving institution following inmate discharge from a community hospital and/or DSH. CHCF had not developed Performance Improvement Plans for measures below 90 percent. CHCF also had a useful audit process specific to psychiatry medication management practices. It included monitoring of various indicators for antipsychotic medications, Depakote, lithium, and antidepressants. During the review period, compliance rates were generally very good.

CHCF was not a Clozaril initiation or maintenance institution, but at times had HCPOP overrides for inmates prescribed Clozaril.

Medication administration record audits revealed nursing documentation issues as to missed medication, and documentation issues related to medication noncompliance and PC 2602 involuntary medication orders.

Overall, the PC 2602 involuntary medications process worked well at CHCF. At the time of the site visit, 187 inmates, including 73 at the 3CMS level of care, received medications through this process. From December 2015 to May 2016, there were 25 renewals, three non-renewals, one medical parole, 14 initial emergencies, and ten initial non-emergencies. No PC 2602 involuntary medications orders were withdrawn for failure to meet deadlines. No use of force incidents involved PC 2602 inmates.

525

CHCF did not report long pill lines or medication administration interfering with mental health programming.

A total of 1,150 inmates were prescribed HS medications.  Nursing audits indicated that HS medications were administered after 8:00 p.m.

Transfers:

CHCF had experienced staffing instability for the DSH coordinator and related support staff positions.  The DSH coordinator was a full-time position, whose assigned staff member had been in the position for ten months.  In April 2016, an associate government program analyst was assigned to provide full-time support, and in June 2016, a part-time clinician was also assigned to assist the DSH coordinator.

The DSH coordinator oversaw DSH referrals.  He maintained a DSH log separate from MHTS.net but that included some of the same information, and additional information, including the inmate's psychiatrist and PC.  The program analyst's multiple duties included collecting the Form 7388-B, data entry to maintain the DSH logs, tracking referrals, and uploading documents to SharePoint.

During the site visit, continuing problems with the referral and non-referral logs were identified.  Among them, inmates who met positive indicators but were not referred were not identified on the non-referral log, and the referral logs were missing data and contained errors.

A review of randomly selected records utilizing the non-referral log indicated that Form 7388-B quality was also inadequate.  Problems included failing to note objective indicators, insufficient use of subjective indicators, inadequate non-referral rationales, documentation that did not address positive criteria, and inadequate documentation of implemented treatment modifications.

Site visit observations revealed that IDTT meetings were often problematic.  IDTT treatment teams typically did not effectively utilize subjective indicators and rarely addressed Form 7388-B data using a process that was thoughtfully integrated into overall treatment planning.  Inmates also were not timely referred to DSH and in some instances, inmates requiring inpatient treatment were not referred at all.

Clinician-to-clinician contact typically did not occur following inmate discharge from DSH.  Information concerning the treating DSH clinician was available in the discharge packet, but was not scanned into the eUHR.

During the review period, 163 of 288 or 57 percent of inmates who transferred to an acute care program transferred beyond Program Guide timeframes.  However, 138 of 142 or 97 percent of inmates timely transferred to an intermediate care program.

There were 1,182 admissions, involving 968 inmates, to the MHCB at CHCF.  Fifty-two percent were admitted within 24 hours of MHCB referral.  Eleven percent of MHCB admissions were of inmates who had three or more admissions during the prior six months.  Twelve percent of MHCB admissions were referred to DSH.  Ten of 14 or 71 percent of inmates who were referred to MHCBs at other institutions transferred untimely.

During the site visit, two inmates in alternative housing awaiting MHCB transfer each exceeded transfer timelines by three days.

Seven inmates timely transferred to a PSU during the review period.

At the time of the site visit, no inmates were awaiting transfer to an EOP program or to an administrative segregation EOP hub.

There were no 3CMS inmates transferred to STRH or LTRH during the review period.

Other Issues:

Administrative Segregation EOP:

The 50-bed administrative segregation EOP was housed in E-1.  It had two tiers, abundant natural lighting, three televisions, and electricity for electrical appliances.  There was adequate programming space for individual treatment and group therapy and for ICC and IDTT meetings.  The recreation yard consisted of ten individual areas that were covered to protect inmates from the weather.

 The psychiatrist had a caseload of 1:110, four PCs each had caseloads of 1:11-1:13, and one social worker had a caseload of 1:71 inmates.

CHCF reported that from December 1, 2015 to June 13, 2016, the administrative segregation EOP unit housed 116 EOP inmates, but this number typically only included inmates who were initially housed in the unit *after* December 1, 2015.  Stays averaged 53 days and ranged from one to 313 days.

An audit of clinical contacts indicated that 20 percent of pre-placement screenings occurred at cell front.  During the review period, comprehensive mental health clinical assessments were completed prior to the initial IDTT meeting 89 percent of the time.

There was 98-percent compliance for psychiatry and PC contacts; 72 percent of PC contacts were confidential.  Ninety percent of treatment refusal contacts were timely.

There was 100-percent compliance for initial and routine IDTT meetings.  Required disciplines attended IDTT meetings 99 percent of the time.

Observed IDTT meetings demonstrated the attendance of required participants.  There was good interdisciplinary discussion of treatment planning and goals and higher level of care

referral consideration, as well as inmate involvement.  Clinical staff and the correctional counselor used computers during IDTTs.

An average of 13.07 weekly hours of group therapy were scheduled and 12.74 weekly hours were offered.  Ninety-three percent of inmates were scheduled for at least ten weekly group hours and 92 percent were offered ten weekly hours.

For administrative segregation EOP hub inmates who refused more than 50 percent of treatment, audit information indicated that an average of 3.22 weekly group hours were scheduled and 3.04 weekly group hours were offered.  Thirty percent of inmates were scheduled for and offered at least five weekly hours of groups, with 15 percent attending at least five weekly hours.

Two EOP hub inmates whom staff reported repeatedly exposed themselves had yellow IEX signs on their doors and yellow placards covering their cell windows; however, one inmate's entire cell window was covered, preventing visualization into the cell.  Staff reported that he would stand on the sink and expose himself above the yellow placard.  Although it was understandable that staff wanted to prevent him from exposing himself, covering the entire window was problematic.

Supervisory staff reported problems with having a sufficient number of escort officers, which was more pronounced during periods of high inmate activity, such as ICC and IDTT meetings.

MHCB:

CHCF had three MHCB units, A1A, A1B, and A2B.  The first two units each contained 30 beds, two of which were respiratory isolation rooms for inmates who had been clinically

discharged and were awaiting transport.  Unit A2B had 38 beds, including two respiratory isolation rooms.  There were ample ADA beds.

Caseloads for the eight psychiatrists and 20 clinicians, including registry, ranged from 1:8-1:12.  Either 1.0 FTE CC I or CC II was allocated to each unit.

CHCF had an institutional cultural problem with MHCB inmates being viewed as inherently dangerous.  Staff was typically unaware of the March 1, 2016 memorandum as to MHCB restraint use.  This resulted in CHCF operating the MHCB more like an administrative segregation unit, which was particularly apparent as to inmate cuffing practices and limited out-of-cell time.

The average MHCB clinical length of stay was 13 days, excluding inmates awaiting DSH placement.  During the review period, 57 percent of MHCB clinical discharges took place within ten days.  Ninety percent of the time, clinically discharged inmates were timely removed from the MHCB within 72 hours of discharge.  A QIT that tracked the reasons for extended clinical stays indicated that medication and symptom management were the most frequent reasons for stays exceeding ten days.

Audits indicated that newly-admitted inmates were given a history and physical within 24 hours 90 percent of the time.  However, an updated or new mental health assessment (Form 7386) was only completed within 24 hours of admission 68 percent of the time.  Psychiatrists saw MHCB inmates at least twice weekly.  PCs completed initial assessments of MHCB inmates in a timely manner 96 percent of the time, and there was 92-percent compliance for routine contacts.

There was 94- and 98-percent compliance for initial and routine IDTT meetings, respectively.  There was 91-percent compliance for required staff attending IDTT meetings.

530

MHCB IDTT meetings were observed during the site visit.  While some were reasonable, others indicated minimal treatment plan formulation or discussion and no discussion of the Form 7388-B.  Staff also did not review records of inmates' prior MHCB admissions nor assess the cause of inmates' inappropriate behavior, among other matters.

All inmates observed during three different IDTTs were cuffed, which was reportedly related to their reception center status and the assumption that they presented maximum security risks.  However, provided data indicated that 22 of 93 MHCB inmates housed at CHCF during the site visit were classified as maximum security.  Another 21 were unclassified, but all 43 were on cuff status.  Only 14 of the remaining 50 inmates were not on cuff status.

The rehabilitation therapy and/or out-of-cell activities offered to MHCB inmates were limited and consisted of recreation therapy that was typically conducted in-cell.  Correctional officers reported that MHCB inmates were generally offered daily outdoor yard, but this yard time was less than the dayroom and yard time provided to CTC medical patients.

A review of five randomly selected medical records indicated legible and clinically meaningful discharge summaries that were completed timely.

Seclusion and Restraint:

CHCF reported that no inmates were restrained during the review period.  The one seclusion incident lasted four hours.

Alternative Housing:

CHCF used alternative housing for inmates awaiting MHCB placement.  Inmates awaiting such placement could be housed for up to 24 hours in a vacant single cell medical bed on either Facility C or Facility D.  During alternative housing placement, inmates received 1:1

observation and, when they received mental health services, were met in a confidential clinical room; a psychologist or social worker met daily with alternative housing inmates.

EOP:

Facility E housed the mainline EOP program, except for EOP inmates with significant medical issues, who were housed on Facility C or D.  In the Facility E EOP program, one psychiatrist had a caseload of 1:125, with telepsychiatry providing services to another 120 inmates.  Seven psychologists had caseloads of 1:30-1:33, and another psychologist had a 1:22 caseload.  The six Facility E social workers had caseloads ranging from 1:27-1:32.

In the EOP programs on Facilities C and D, the psychiatrist and psychiatric nurse practitioner had caseloads of 1:93 and 1:259, respectively.  The assigned psychologist and social worker each had caseloads of 1:31.

There was adequate clinical office space and space for individual and group therapy for mainline EOP inmates.

Psychiatry contacts had significantly decreased since the preceding site visit.  There was 38-percent compliance with initial psychiatry contacts and 62-percent compliance with ongoing psychiatry contacts.  Sixty-two percent of psychiatry contacts were confidential.  There was 94-percent compliance with PC contacts, of which 84 percent were confidential.

Initial IDTT meetings were timely 89 percent of the time and routine IDTT meetings were timely 100 percent of the time.  There was 94-percent compliance for required disciplines attendance at IDTT meetings.

Required participants were in attendance at observed IDTT meetings.  The IDTTs had good interdisciplinary discussion, as well as discussion of treatment goals and objective criteria for higher level of care referral consideration.

With regard to the provision of ten hours of group therapy, inmates were scheduled for an average of 12.99 weekly hours and were offered an average of 12.37 weekly hours.  For EOP inmates on modified programming and the provision of at least five hours of weekly group treatment, audits indicated that 39 percent of inmates were scheduled for at least five weekly hours and 36 percent were offered five weekly hours.  Observation of two mainline EOP groups, both of which were facilitated by a psychologist, revealed active inmate participation.  The groups appeared to benefit the participants.

Staff and inmates reported that yard was provided for Facility E EOP inmates in a smaller dedicated yard that was adjacent to the housing unit seven days weekly from approximately 8:00 a.m. to 3:00 p.m.  There was no night yard.  Access to Facility E's larger yard was limited to some weekends.  However, there was a lack of shade or covering for inmates using the smaller yard and thus a concern as to its potential effect on inmates who were prescribed heat risk medications.  Recreation groups were also provided on the smaller EOP yard.

EOP inmates had access to educational services, including high school equivalency classes and exams, college courses, a computer laboratory, and a library.

Interviewed inmates expressed concerns with group quality, the need for more core groups, and ducating issues.

3CMS:

 Caseloads for 3CMS inmates ranged from 1:121-1:123 for the one psychologist and two social workers assigned to the 3CMS program on Facilities C and D.

 There was 83-percent compliance with initial psychiatry contacts and 94-percent compliance with routine psychiatry contacts.  There was 87- and 98-percent compliance with initial and ongoing PC contacts, respectively.

Initial and routine IDTT meetings were 88- and 99-percent compliant, respectively. Treatment plan review indicated inconsistencies with diagnoses and that treatment plans were typically too vague to permit implementation of treatment interventions.

CHCF had adequate treatment groups for 3CMS inmates, but needed more clinician-facilitated groups. Recreation therapists provided most treatment groups. No interviewed inmates reported attending groups facilitated by a clinician.

3CMS Inmates in Administrative Segregation:

CHCF did not have an administrative segregation program for 3CMS inmates. During the site visit, CHCF housed one administrative segregation 3CMS inmate who had recently changed level of care, from EOP to 3CMS, and was awaiting transfer to another facility.

There was 100-percent compliance for psychiatry contacts, and for initial and ongoing PC contacts. There was 100-percent compliance with initial and ongoing IDTT meetings and 89-percent compliance with required disciplines attendance at IDTT meetings.

Case-by-Case Reviews:

During the review period, CHCF conducted four 150-day case-by-case reviews for mental health caseload inmates. These reviews led to the retention of one inmate in administrative segregation pending adjudication of an RVR; three other inmates were retained in segregation pending transfer to an appropriate institution. A CC II reported that the case-by-case review process for administrative segregation EOP inmates typically worked well. He indicated personally reviewing all cases on a weekly basis, while a group of custody and mental health representatives also met every other week to review the cases.

534

Non-Disciplinary Segregation:

During the review period, 40 or 34 percent of administrative segregation EOP inmates were designated as NDS, of which 20 were approved for expedited transfer and 20 were approved for property and privileges.  Of the 20 inmates approved for expedited transfer, four or 20 percent transferred within 72 hours of NDS designation.  Overall, transfers averaged 18 days.

"C" Status:

No CHCF inmates were designated "C" Status during the review period.

Referrals:

CHCF reported 98-percent compliance for 56 emergent referrals, 97-percent compliance for 100 urgent referrals, and 91-percent compliance for 1,291 routine referrals.

EHRS/MHTS.net:

CHCF reported that the earliest it anticipated implementing EHRS was in March 2017.

Heat Plan:

There were six stage I heat alerts during May 2016, but no stage II or stage III heat alerts. There were no reports of inmate heat-related illnesses during May 2016.  A tour of six units that housed EOP inmates and two whose inmates included 3CMS inmates found that all had lists identifying inmates who were prescribed heat sensitive medications, but some lists were not current.

Numerous interviewed custody officers reported that on days when the outside temperature exceeded 90 degrees, inmates who were prescribed heat sensitive medications were brought indoors and typically watched television, played board games or cards, or engaged in similar activities.  However, in response to questioning, none reported that inmates who were scheduled to attend EOP yard groups were redirected by recreation therapists to housing unit

535

groups on days when outside temperatures exceeded 90 degrees.  In this regard, it was reported that the new policy dated February 2016, entitled "Inclement Weather Back-Up Plan for Facility E EOP Yard Group Programming" (MHLOP 02-002) had yet to be implemented.

Lockdowns/Modified Programming:

There were no lockdowns at CHCF during the reporting period.

Pre-Release Planning:

Pre-release planning groups met two days weekly and for one hour each, and were geared towards inmates who were within six months of release.  Pre-release group discussion focused on providing tools and information needed to assist inmates with the transition from prison to the community.  Group topics included adjusting to family life, job seeking and coping skills, and self-reflection, among others, as well as obtaining vital documents.

CHCF reported that it identified inmates for the TCMP; the inmate's PC interacted with the TCMP contract social worker, who screened inmates for eligibility.

Prior to inmate release, psychiatrists ordered one month's supply of prescribed psychiatric medications, which were given to the inmate on his parole day.

Access to Care:

A review of CHCF's monthly Health Care Access Quality Reports from December 2015 to May 2016, indicated that three percent of issued mental health ducats and add-on appointments were not completed due to custody factors, while 15 percent were not completed due to non-custodial reasons, excluding inmate refusals.

Program Access:

    a.  Job and Program Assignments:

On June 3, 2016, CHCF reported that of 637 available employment positions, 100 or 17 percent of EOP inmates held them, as did 112 or 26 percent of 3CMS inmates, and 425 or 34 percent of non-mental health inmates.

Of 120 academic assignments, 25 or four percent of EOP inmates held them, as did 26 or six percent of the 3CMS inmates, and 69 or six percent of non-MHSDS inmates.

Of 85 vocational education assignments, 22 or four percent of EOP inmates had such part-time positions, as did 21 or five percent of 3CMS inmates, and 42 or three percent of non-MHSDS inmates.

Of 182 voluntary education assignments, 27 or five percent of EOP inmates held such positions, as did 40 or nine percent of 3CMS inmates, and 115 or nine percent of non-MHSDS inmates.

    b.  Milestone Credits:

As of May 31, 2016, CHCF reported that 159 of 574 EOP inmates were eligible to earn milestone credits; 33 percent earned the credits.  For 3CMS inmates, 38 of 439 3CMS inmates were eligible to earn milestone credits; 11 percent earned the credits.

Of the 1,241 non-MHSDS inmates, 204 were eligible to earn milestone credits; six percent earned the credits.

    c.  Out-of-Level Housing:

On June 13, 2016, there were 65 EOP, 16 3CMS, and 38 non-MHSDS Level I inmates in Level II housing.  There were 37 EOP, 69 3CMS and 59 non-MHSDS Level III inmates in Level

II housing.  There were 45 EOP, 62 3CMS and 42 non-MHSDS Level IV inmates in Level II housing.

CHCF also reported inmates in an "other" category that did not specify their levels of mental health care.  In the "other" category, CHCF reported that there were 14 Level I inmates in Level II housing, 78 Level III inmates in Level II housing, and 256 Level IV inmates in Level II housing.

      d.  <u>ADA Reasonable Accommodations and Grievance Procedure</u>

Information provided by the institution indicated that the policies and procedures had been implemented and were being adhered to.

      e.  <u>Periodic Classification Score Reduction:  EOP Inmates</u>:

Reviewed documentation indicated that EOP and non-EOP inmates were given semi-annual classification score reductions and that EOP inmates were given the same classification score reductions as non-EOP inmates.

      *<u>Coleman</u> Postings*:

A tour of six units that housed EOP inmates and two units whose population included 3CMS inmates revealed that all had *Coleman* postings in English and Spanish.

## **APPENDIX B**

## **CLINICAL CASE REVIEWS**

EXHIBIT A
California State Prison/Sacramento (CSP/Sac)
June 7, 2016 – June 9, 2016
September 29, 2016 – September 30, 2016
January 9, 2017 – January 11, 2017
June 27, 2017 – June 28, 2017

**Inmate A**

This case was selected for review because the inmate was seen briefly during part of his combined IDTT-ICC; as it was in progress, the expert was unable to observe the entire process. However, observed interactions revealed the inmate becoming increasingly agitated, with custody staff escalating him. The large mental health staff in attendance remained silent and did not attempt to intervene or de-escalate the situation; the inmate had made allegations against staff. Specific custody staff argued unnecessarily with the inmate as to whether some of his statements were true, which further angered him and escalated the situation. As this matter grew increasingly tense, the acting Chief Deputy Warden eventually tried to convince the inmate that staff wanted him to succeed and would be releasing him from administrative segregation to a mainline CSP/Sac yard.

Multiple RVR assessments completed at CSP/Sac during June and August 2016 indicated that the inmate's mental health had nothing to do with the behavior underlying the RVRs. The inmate had been on a modified treatment plan and was seen monthly since May 2016. He was provided with diagnoses of Bipolar Disorder, most recent episode manic, in full remission and Antisocial Personality Disorder. He was prescribed Oxcarbazepine 750 mg per day.

Due to the inmate's modified treatment plan, the treatment team saw this 55-year-old inmate monthly. Presumably, he was placed on a modified treatment plan due to his poor participation. However, the actual treatment plan did not note this and it was not a focus of treatment; treatment groups also were not mentioned as part of treatment. It should also be noted that the Form 7388-D add-a-page was used; this one-page document was normally used to update a treatment plan and would not be expected for regular treatment team meetings as it does not allow for the required information in the treatment plan. Use of the add-a-page appeared to negate some of the purpose of holding monthly treatment team meetings. There was also insufficient space on the Form 7388-D to conceptualize the case, to properly indicate the inmate's lack of progress and to articulate the treatment plan and modifications as the inmate progressed or failed to progress. The Form 7388-B was not properly completed; the inmate's poor participation (criterion seven) was not noted, nor were any subjective criteria that the inmate met (e.g., criterion one). The inmate was a high refuser and was thus seen monthly, but this was not indicated on treatment plan documentation until 9/8/16. Although there was ultimately documentation as to the inmate's poor treatment participation, he was not referred to a higher level of care and the treatment team did not provide a rationale for non-referral. The treatment team also failed to summarize specific treatment modifications to address the inmate's poor participation and to improve his functioning. Considering the inmate's poor ongoing participation and the treatment team's failure to identify this on the Form 7388-B and to complete a full Form 7388 or update an add-a-page, this case's documentation was extremely poor.

Review of progress notes suggested that the inmate's treatment consisted of cell-front contacts to "assess for mood fluctuations" and daily contacts due to poor treatment adherence. It did not appear that he was given the option of private clinical contacts, while possibly confidential and sensitive information was conveyed during the cell-front contacts. This inmate required sound therapeutic intervention based on a well-conceptualized treatment plan, but this did not occur.

Findings

This inmate was not adequately treated.  Treatment planning documentation was inaccurate and poor and did not properly reflect the inmate's lack of treatment engagement and poor participation.  The treatment plan also was not properly updated to target the inmate's failure to engage with his treatment providers and utilize effective and appropriate therapeutic interventions.  The only apparent implemented treatment was inappropriate, non-confidential cell-front contacts and it did not appear that the inmate was provided the option of confidential clinical contacts.  He also was not properly identified for higher level of care referral consideration until 9/8/16; at that time he was not referred but there was not a proper non-referral rationale.

There were no documented adequate interventions to address the inmate's ongoing poor participation and failure to engage in treatment.  The treatment plan also did not properly document case conceptualization and treatment goals and interventions, particularly in light of the inmate's failure to progress.  The observed combined IDTT-ICC process was also problematic as the inmate made serious staff allegations that were not directly addressed; custody staff also escalated the situation and the inmate during the process without any efforts to de-escalate it for an extended time period.

**Inmate B**

This case was selected for review because the inmate was observed during a therapeutic group and was interviewed during inmate interviews.  He reported being transferred to CSP/Sac under Welfare & Institutions Code (W&IC) 7301, which permitted DSH patients to be transferred to CDCR custody for treatment.  He had been discipline- and problem-free for 23 months and was ready to return to DSH.  Unfortunately, he reported being involved in a fight or another incident on the yard and was informed that he needed another 24 months "clean" before he could be considered for return.  The inmate was disappointed and depressed and stated he believed that the system wanted him to fail.

This 42-year-old inmate received his psychotropic medications by a PC 2602 order due to danger-to-self and others.  He was provided with diagnoses of Schizoaffective Disorder and Antisocial Personality Disorder.  He was housed in administrative segregation due to his conspiracy to distribute a controlled substance.  He had also received a prior RVR for fighting. A treatment plan dated 8/18/16 was completed on a Form 7388 add-a-page, instead of there being an actual treatment plan.  It indicated that the administrative segregation clinician contacted the prior mainline clinician who reported that the inmate was programming well as demonstrated by his attendance at yard, treatment groups and individual contacts, and his medication adherence.

The mainline EOP add-a-page dated 5/18/16 confirmed that the inmate participated in treatment and was adherent with medications.  The inmate nonetheless continued to report depressive symptoms, passive suicidal ideation, auditory hallucinations, paranoia and persecutory delusions. The treatment plan indicated that his psychotic symptoms were triggers for his assaultive

behaviors and his depression was a trigger for his suicidal ideation.  The treatment plan also confirmed that the inmate had to be RVR-free for 24 months, and his last RVR occurred in January 2016 for fighting.  Given this inmate's clinical symptoms and length of time in the treatment program, the treatment plan was inadequate as an initial treatment plan.  Interventions were vague and not well-articulated, while treatment goals were not described in objective, measurable, behavioral terms.  The treatment plan also was not properly modified over time during which the inmate continued to report serious symptoms that did not abate, despite ongoing treatment.  The continued use of the Form 7388 add-a-page, even after the inmate received an RVR and had a housing change to a more restrictive setting and treatment team, may have contributed to the treatment plan's inadequacy.

Findings

This inmate was not adequately treated.  His treatment plan was not properly modified when treatment was ineffective at reducing symptoms and improving functioning so that he could adequately function while incarcerated.  The treatment plan also was not updated following significant events, such as a change in the inmate's treatment team, his movement to a more restrictive setting or receipt of a RVR.  On a positive note, the administrative segregation clinician contacted the mainline clinician for information about the inmate to enhance continuity of care.

The actual treatment plans as documented on the Form 7388 add-a-page did not sufficiently specify treatment or its goals.  This may have been in part due to the use of the add-a-page itself.  There was insufficient room to adequately explain treatment goals in objective, behaviorally-based language and the specific interventions in sufficient detail and treatment progress.  All the elements of an adequate treatment plan were not present.  Considering this inmate's continued report of serious symptoms, his areas of progress and lack of progress and each element of the treatment plan were important elements to document.

In addition, the criteria for return to the state hospital for those deemed too violent to be housed there should be connected to the reason that they were excluded from placement there.  It did not appear appropriate to require that the inmate be disciplinary-free for 24 months.  First, it was unclear that there was evidence that the 24-month period resulted in an individual being less likely to engage in violence upon return.  This appeared to be an arbitrary period of time rather than a period of sustained stability.  Second, the focus was on all disciplinary activity rather than disciplinary activity that was related to aggressive or violent behavior toward others.  While this inmate may have appropriately not been returned to DSH, the documentation did not elucidate clear reasoning for this, nor did it provide a defensible path for his return.

**Inmate C**

This case was selected for review as this 24-year-old EOP hub inmate was observed during a stress management treatment group and interviewed during the site visit.  He indicated frustrations as to his interactions with psychiatry.  He also reported that his psychotropic medications were "getting jacked up" and that the psychiatrist was unwilling to discuss his medications with him at length.  It also appeared that the inmate was not provided with actual

informed consent regarding recommended psychotropic medications.  The group facilitator, a psych tech, was very passive in problem-solving and finally indicated that he would speak to the PC instead of the psychiatrist.

This inmate received his psychotropic medications by a PC 2602 order, due to danger-to-others, which expired in October 2016; according to his most recent treatment plan dated 8/10/16, he historically exhibited danger-to-self.  Staff indicated that they planned to pursue renewal of the PC 2602 order.  The inmate was provided with diagnoses of Schizophrenia and Antisocial Personality Disorder.  He was prescribed hydroxyzine on an as-needed basis, Cogentin 2 mg per day, Abilify 25 mg per day, Depakote 1250 mg per day, and intramuscular injections in the event of medication refusal.  The inmate's medication adherence was further complicated by his religious beliefs that did not support taking medication for any illness.

The inmate reported upon further questioning that when he attempted to speak with his psychiatrist, the psychiatrist responded in ways that the inmate interpreted as rushed or not open to discussion, and the inmate became agitated.  The inmate further stated that as he became agitated, the psychiatrist became agitated and the contact then ended, which left the inmate even more frustrated.  Reviewed psychiatric progress notes did not indicate whether the contacts were confidential.  Telepsychiatry also saw the inmate and there were changes in his psychiatric providers over time and with his psychiatric medications.  The inmate experienced galactorrhea and gynecomastia as side effects of his psychotropic medications, which resulted in ongoing medication review and change to find an effective medication regimen for him.  Medication nonadherence and ineffective medication regimens resulted in increased symptoms that included aggressive behaviors and violence, as the healthcare record documented.  Clinical notes did not reflect the problems that the inmate described during interactions with his current psychiatrist; the psychiatrist repeatedly described the inmate as superficially cooperative when seen in person, but this statement's meaning was unclear.  Psychiatric notes also did not reflect the inmate's religious beliefs, which interfered with medication adherence, or other relevant factors in the progress notes' objective or education sections.

This inmate received three RVR assessments within a one-month period.  The same social worker completed all three assessments and this social worker used the same language, as though the information was cut and pasted, in each assessment.  No alternative sanctions were recommended and the inmate's mental illness was not found to be a factor in the RVRs.  Conversely, another mental health assessment completed during the same time frame noted the inmate experienced command auditory hallucinations during the period surrounding the RVR behavior.  As mentioned above, this assessment and the healthcare record documented a link between the command auditory hallucinations and other psychotic symptoms and his aggressive behaviors, underscoring the need for effective treatment of those hallucinations.

Unfortunately, the treatment team failed to identify that the inmate had three or more completed RVR assessments within the past three months to ensure that he was appropriately evaluated for a higher level of care.  There was a Form 7388-D add-a-page dated 8/10/16 that indicated two MHCB placements during the last six months, but no mention of RVRs or RVR mental health assessments and two prior DSH admissions.  There was also a crisis placement in alternative housing or another non-MHCB suicide precaution observation status that occurred in August

544

2016 that was not noted on the Form 7388-D. This inmate was clearly unstable and required a comprehensive treatment plan review. The Form 7388-D provided a clinical summary, but failed to provide a comprehensive case formulation.

There appeared to be a diagnostic disagreement within the treatment team as psychiatry notes indicated diagnoses of Schizophrenia or Persistent Amphetamine-induced Psychosis, while the treatment team diagnosis was Psychotic Disorder not otherwise specified (NOS) and Polysubstance Dependence in a controlled environment. The only diagnosis of agreement was Antisocial Personality Disorder. The treatment plan included little specificity; it appeared that several therapeutic techniques were identified as possibilities, but it was unclear which might be effectively implemented. The problem behaviors or treatment targets were too vague and broad, making it difficult to effectively target treatment. Again, the use of a Form 7388-D add-a-page may have contributed to this problem as it did not provide sufficient space or appropriate sections to adequately complete an appropriate treatment plan; this was particularly true for the initial treatment plan for a new environment.

<u>Findings</u>

This inmate was not adequately treated within the EOP hub. His treatment plan was inadequate. Neither his multiple RVRs nor crisis placements were identified. The inmate should have been considered for referral to a higher level of care. There were also specific cultural aspects to the case that directly impacted care that treatment providers did not adequately consider. Specifically, while the treatment team and the PC acknowledged the role of the inmate's religious beliefs in his medication adherence, psychiatry notes did not document this issue and it was not a point of discussion between treating psychiatrists and the inmate; the treatment plan should have specifically included this important cultural aspect.

**Inmate D**

This 36-year-old inmate was housed in administrative segregation. He was provided with diagnoses of Schizoaffective Disorder, bipolar type and Polysubstance Dependence. He was prescribed Effexor, Zyprexa and Trileptal and received his psychotropic medications by a PC 2602 order. His most recent treatment plan was reviewed to assess the provision of services for EOP inmates who refused more than 50 percent of treatment.

The inmate had an extensive history of mental health treatment since childhood with multiple suicide attempts since age 14. He was transferred to the administrative segregation unit on 2/8/14 after allegedly murdering another inmate. Shortly thereafter, he was admitted to DSH and was discharged on 5/26/15. An SRE assessed him with moderate acute risk and chronic high risk of self-harm. It was noted that he had a history of rapid psychiatric decompensation without warning.

Treatment plan goals and interventions were disjointed; for example, one goal was to "verbalize a positive mood and hopeful mood as evidenced by future oriented statements and no RVR in 90 days." Interventions for this goal were "reality testing and learn to identify triggers and symptoms of anger and state 5 coping skills." Another goal was to have an absence of self-

injurious behavior and MHCB admissions in 90 days. Interventions for this goal were reality testing, medication and supportive therapy. The plan was to offer the inmate six weekly groups. Specific groups were not documented in his treatment plan. Despite PC notes that indicated that he planned to attend groups, documentation as to group participation was not readily located in the healthcare record.

An initial psychiatric evaluation was poorly written with typographical and grammatical errors. The psychosocial history was cursory and insufficient. A diagnosis of Bipolar Disorder was provided, but rationale to support this diagnosis was absent. The subsequent psychiatry note with a different provider was significantly improved and included clinically relevant documentation.

<u>Findings</u>

The mental health care provided to this inmate was poor. Treatment planning, goals, interventions and PC contacts were disjointed and not clinically appropriate. Goals were not connected to the inmate's treatment needs; they were not measurable in comparison to his level of functioning at the time that they were implemented. Additionally, interventions were not connected to treatment goals.

**Inmate E**

This 43-year-old inmate's healthcare record was reviewed to assess the provision of mental health services during MHCB and administrative segregation EOP levels of care. During tier walks, the inmate disclosed that he had been discharged from the MHCB despite telling staff that he felt suicidal and had sustained a broken foot during a cell extraction. The inmate reported current suicidality and then proceeded to ingest what appeared to be broken pieces of white pills. Custody staff was immediately notified.

This inmate was serving a 45-year sentence. He was transferred to administrative segregation due to a charge of assault on a peace officer by means not likely to cause grave bodily injury. He was provided with diagnoses of Mood Disorder NOS, Polysubstance Dependence and Antisocial Personality Disorder; he had also previously been provided with diagnoses that included Bipolar Disorder, most recent episode depressed, severe with psychotic features and Schizoaffective Disorder.

This inmate had five MHCB admissions during the previous six months. Documentation indicated that his behavior had escalated with the goal of returning to DSH. He had received psychotropic medications by PC 2602 order since 1/20/16. He was prescribed Navane, fluphenazine and Cogentin.

The inmate was transferred to alternative housing due to suicidal ideation on 5/15/16. While in alternative housing, he ingested 20 Tylenol and threatened staff. A cell extraction resulted in a broken toe. Consultation with staff indicated that the use of force had been reviewed by leadership and was assessed as appropriate.

The inmate was admitted to the MHCB from the administrative segregation EOP on 5/17/16 and was discharged on 6/4/16 to return to the administrative segregation EOP.  It was reported that laboratory testing was within normal limits; this questioned the validity of the possible Tylenol ingestion on 5/15/16.  Early during this MHCB admission, it was documented that the inmate may have fashioned a noose with a towel while simultaneously requesting MHCB discharge. Treatment goals were to eliminate suicidality.  His mental status continued to vary.  On 5/26/16, he again requested discharge.  In contrast, on 6/2/16 he reported increased suicidal ideation and depression; it was documented that his symptoms were attributed to his desire for a DSH referral. Documentation indicated that he was agreeable with plans for his MHCB discharge on 6/6/16.

Findings

This inmate's mental health care was insufficient.  Comprehensive documentation of case conceptualization was lacking.  While imminent symptoms of suicidality were addressed, broader treatment planning to assist the inmate in coping with administrative segregation placement was needed.  The timeframe and rationale for the cell extraction were unclear. Clinical rationale for diagnoses was lacking and the change in diagnoses within a short period of time was concerning.

**Inmate F**

This 41-year-old inmate was provided with a diagnosis of Bipolar Disorder.  He transferred from CMF to the CSP/Sac CTC in January 2016 due to psychotic behaviors.  He had been treated with a variety of psychotropic medications that included Clozaril.  He had been awaiting transfer to a DSH acute care program since 4/25/16.

His most recent treatment plan, dated 6/6/16, made it clear that the inmate required DSH transfer but did not reference an expedited transfer, which was certainly clinically indicated.  The most recent psychiatric progress note dated 6/7/16 also did not reference an expedited transfer.

Findings

This inmate was unable to receive adequate treatment in the MHCB for his clinical condition, regardless of the individualized treatment plan developed.  He was in need of inpatient psychiatric care.

**Inmate G**

This inmate's healthcare record was reviewed at the request of plaintiffs' attorneys, who indicated that the inmate, despite alerting clinicians about his suicidal thoughts and engaging in several acts of self-harm, had not been placed on suicide watch or referred to a crisis bed for over one year.

Information from CSP/Sac revealed that during the preceding year, the inmate had six crisis evaluations, 52 routine appointments and three unscheduled PC appointments.

During the afternoon of 1/10/17, the expert discussed this case with the PSU III supervisor at the time that the inmate was housed in the PSU III.

The inmate was a 40-year-old man who was initially transferred to PSU I on 11/4/14. Due to a staff separation issue, he was subsequently transferred to PSU III on 10/24/16. The inmate initially refused to program, which was related in part to his report that he needed to work with a female clinician due to having issues with males. His request for a female clinician was initially refused, but was later granted; however, he continued not to leave his cell for structured therapeutic hours. Additionally, he consistently refused individual clinical contacts.

The inmate was provided with a diagnosis of Mood Disorder NOS. During his last psychiatric appointment that occurred on 11/20/16, he was reported to be nonadherent with mood stabilizing medications that were prescribed for him.

Since November 2016, the inmate received five SREs due to self-reported suicidal ideation and superficial self-harming behaviors. Assessments indicated that he was attempting to return to PSU I.

On 12/21/16, his level of care was changed to 3CMS.

Findings

Appropriate medical judgment was exercised regarding the inmate's reported suicidal thinking. His level of care appeared to be appropriate.

**Inmate H**

This inmate's healthcare record was reviewed at the request of plaintiffs' attorneys, who indicated that he reported an incident in which he was removed from his B-7 cell after expressing suicidal ideation on 6/13/16. (The correct date appeared to be 5/13/16.) The inmate was taken to alternative housing in B-4. When mental health staff came to see him, the clinician did not believe that he was suicidal and he was returned to B-7, despite his continuing reports of suicidal ideation. The inmate reported that as soon as he returned to his cell, he made a noose and hung himself. He said that a correctional officer saw him hanging, but instead of responding, the officer finished his rounds. Only then did the officer sound his alarm and cut the inmate down. The inmate was then taken to UC Davis, where he spent four days recovering from the suicide attempt; he then spent 17 days in the MHCB at CSP/Sac before being discharged back to the PSU.

According to mental health documentation, the inmate reported suicidal ideation and engaged in parasuicidal behaviors quite often, utilizing those behaviors as a method of situational escape in response to dissatisfaction with housing, custody staff or his PC. He had a long history of inconsistent relationships and unhealthy conflict resolution. Typically, MHCB placement was generally contraindicated in order to avoid reinforcing maladaptive coping strategies. However, the inmate had engaged in potentially lethal behaviors; therefore, each incident should be evaluated independently and mindfully of his potential for accidental suicide.

548

The following information was included in the self-harm review that was conducted following the incident cited: on 5/12/16 at an unknown time, the inmate was seen for his five-day discharge follow-up by a covering PC.  Following that, the inmate's PC was contacted for crisis evaluation due to the inmate being observed braiding material in a noose-like fashion.  During this follow-up, the inmate was angry with his PC.  He was overheard talking about attempting to get referred to DSH, telling custody, "I'm going to keep doing this until they get tired."  His cell was searched and no hanging devices were found; however, the inmate was evaluated with plans by his PC to admit him to an MHCB.  He was placed in alternative housing pending MHCB placement.  On 5/12/16, at 1830 hours, a crisis triage clinician assessed the inmate again and wrote orders to retain him in alternative housing pending MHCB placement.  On 5/13/16, at 0700 hours, a crisis triage clinician reassessed and released the inmate from alternative housing after making the clinical decision that he no longer warranted a crisis bed admission.  An SRE was completed per protocol.

During the afternoon of 1/10/17, the expert discussed this case with the PSU III supervisor at the time that the inmate was housed in PSU III.

An eight-page basic self-harm review report was reviewed.  This comprehensive review summary included the following information:

> Inmate is a 33-year-old male who has had over 37 mental health crisis admission since 2013.  An attempt to interview [inmate] was made for purposes of the self-harm review, but he declined. … Throughout his medical record, it is well documented that [inmate] utilizes MHCB's for reasons other than to treat his mental illness.  Just prior to the suicide attempt, he had been evaluated several times, and returned to his regular housing.  He had been overheard telling other inmates that he desired to be transferred to DSH, and that he was not going to give up until he got what he wanted.  It is impossible to decipher what the lure of DSH is for [inmate] at this time.  Other clinicians have hypothesized that prior admissions from the MHCB have been attempts to gain additional access to female staff.

> Other than a reported hanging and overdose in 2007, there been no other documented incidents of serious self-injury.  There are reports of [inmate] engaging in superficial self-injury for the purpose of coping and stress relief, but these incidents were not found in the records reviewed.

> Based on review of the medical, mental health, and custodial records, on May 13, 2016, [inmate] engaged in a medically serious suicide attempt.  He was semiconscious, foaming at the mouth, became incontinent, and needed to be intubated at an outside hospital.  Prior to this attempt, [inmate] had been evaluated and sent back to regular housing numerous times.  It is likely that he felt as if he was not being heard by anyone, and that no one was paying attention to what he really wanted. … . Based on his history of non-serious suicide attempts in his use

of MHCBs for secondary gain, it is also likely that the seriousness of this gesture was a mistake, and that he did not intend to cause the extent of his injuries.

Going forward, the way to [inmate] is willing to go in order to be heard, seen, or validated should be considered in all of his future risk assessments.

Findings

This inmate had five consecutive SREs performed by different clinicians prior to his serious suicide attempt related to the five-day post MHCB discharge protocol.  It appeared that he was admitted and released from alternative housing on 5/8/16.  However, subsequent SREs provided a somewhat confusing chronology.  Regardless of the exact chronology, this inmate had a very complicated history and presentation that made SRE assessments very difficult.  Appropriate professional judgment was exercised in the context of the numerous SREs performed by multiple clinicians.

**Inmate I**

This inmate's healthcare record was reviewed at the request of plaintiffs' attorneys who reported that, since February 2016, the inmate had expressed suicidal thoughts and/or attempted suicide approximately 19 times and "usually mental health would clear me and return me back to my housing unit within 24 hours even if I informed them that I was still suicidal."

Healthcare documentation indicated that since 2/23/16, the inmate was evaluated for the need for MHCB admission on 12 occasions.  He was admitted to an MHCB on three occasions.  In the past, he acknowledged that he enjoyed his adversarial relationship with custody staff and that he often refused to attend group therapy in order to frustrate staff.  He was also open about his intention to build a legal case against the state regarding his access to care and he utilized refusals to that end.  In his clinical work, the focus was on managing his chronic pain symptoms and increasing his prosocial behaviors in response to frustration.  He was referred to the Positive Behavior Support Team due to his continued complaints of chronic pain and suicidality.  It was determined that his Antisocial Personality Disorder and his desire to benefit financially drove his current behaviors; however, he was at risk for accidental suicide and he had psychic stressors and inadequate coping strategies.  For this reason, he required occasional MHCB admission based on clinical evaluation of the specific stressors and situations.

On the morning of 1/11/17, the expert discussed this case with the PSU I supervisor at the time that the inmate was housed on that unit.

The inmate was a 52-year-old man who was transferred to the CSP/Sac PSU on 8/1/16.  Prior to his arrival at CSP/Sac, he had several MHCB admissions during the previous six months related to not being able to obtain pain medication, not being taken to group and not getting the property he felt he was entitled to.  Other relevant history was summarized in the CSP/Sac response above.  The inmate's problem list included chronic pain issues, poor frustration tolerance and poor interpersonal skills.

550

The inmate's level of care was reduced to 3CMS during his 12/20/16 IDTT meeting, which he was in the process of appealing.  At the time of the IDTT, he demonstrated an 82-percent refusal rate for participation in structured treatment hours.

Provided diagnoses included Mood Disorder NOS, Antisocial Personality Disorder, chronic pain and hepatitis C.

<u>Findings</u>

This inmate had multiple SREs performed since his transfer to CSP/Sac in response to his suicidal thinking and behaviors.  They appeared to have appropriately assessed his risk.  However, the 12/29/16 assessment indicated that he was still receiving mental health services at the EOP level of care, despite the change in his level of care as documented during the 12/20/16 IDTT meeting.  The clinical responses to his suicidal thinking were appropriate.

551

EXHIBIT B
Folsom State Prison (Folsom)
June 14, 2016 – June 16, 2016

**Inmate A**

The inmate's healthcare record was reviewed as the inmate's IDTT was observed during the site visit.  The inmate exhibited disorganized thinking and repeatedly expressed a desire to be removed from the MHSDS program.

Her history included a pre-trial evaluation pursuant to the Form 1370 (Incompetency to Stand Trial).  She arrived at CDCR from the county jail on a regimen of psychiatric medication to treat auditory hallucinations.  She was twice admitted to the MHCB in 2014 and her level of care was changed to EOP following discharge.  She was physically and verbally aggressive during her brief treatment at the EOP level of care.  The rationale for her discharge to 3CMS was not apparent in the reviewed records.  This reviewer also found no evidence of a referral or admission to DSH pursuant to the Form 2684.

The inmate received a diagnosis within the Schizophrenia spectrum.  She was prescribed Zyprexa and Cogentin to target auditory hallucinations.  She was variably adherent with psychiatric medication recommendations.  During periods of medication nonadherence, she typically became violent and made bizarre claims of being molested by demons.  The inmate said she was gratified by the sexualized nature of her delusions.

On 2/3/16, the inmate told the PC that she was no longer taking her medications and no longer required mental health assistance.  The PC described the inmate as agitated and opined that this may have been due to poor treatment adherence.  On 2/8/16, the inmate was issued a disciplinary report for possession of inmate manufactured alcohol.  On 2/21/16, the psychiatrist discontinued psychoactive medications without a progress note to provide a rationale for this action.  Furthermore, neither the inmate's diagnosis nor treatment plan was changed to reflect these developments.

On 6/13/16, the inmate was described as not in distress; however, her process of thought was described as tangential and content of thought was described as bizarre.  The inmate was worried that she might be forced to take medications by court order.

IDTT observation indicated that the inmate was preoccupied with the issue of court-ordered medication even though this topic had not been raised.  Her thinking was contradictory and illogical (e.g., she expressed her wish for removal from the MHSDS but simultaneously agreed to PC visits).  She said she wanted to work on issues by herself and without mental health assistance.  She then contradicted herself by saying that quarterly psychiatric contacts were insufficient to meet her treatment needs.  The PC and nurse spent considerable time reassuring her that they would support the inmate's goals within the context of continued treatment.

The treatment plan was not specifically discussed with the inmate.  Factors which might lead to consideration of a higher level of care were not explicitly discussed among treatment team members or with the inmate.

553

Findings

The mental health care provided to this inmate was inadequate.

The inmate was appropriately enrolled in the MHSDS, but did not benefit from offered treatment because of poor psychiatric treatment adherence. Record review and observations during the IDTT indicated that the inmate had disordered thinking and lacked insight into her psychiatric disorder. Based on her statement to the treatment team, it appeared that psychotic reasoning may have interfered with her ability to consent to treatment. The discontinuation of psychiatric medications absent details in a progress note and revision to the treatment plan was inconsistent with Program Guide requirements.

The inmate appeared appropriate for referral to a higher level of care, to the EOP, to treat active symptoms of a serious mental illness; however, consideration of higher level of care referral was not discussed in the IDTT.

## Inmate B

This healthcare record was randomly selected from eight cases that the IDTT had identified as requiring a higher level of care in the EOP program, but not in DSH. The review's purpose was to assess whether the IDTT followed program guidelines in its decision-making process.

The inmate arrived at FWF on 5/6/16 with considerations already underway by the sending institution to increase her level of care to EOP. The inmate had been treated for a major mental disorder in the community. She reported worsening of depressed mood and psychosis when not on psychiatric medications.

The inmate was seen following custody referral to evaluate bizarre behavior. An SRE estimated a low acute risk of suicide/self-harm and a moderate chronic risk.
Two weeks later, the inmate met with the PC and stated that she did not want to transfer to the EOP because she was getting used to FWF. She was no longer walking around aimlessly due to boredom. She had a prison job that filled her time. The clinical plan was to provide routine 3CMS monitoring.

The psychiatrist saw the inmate on 6/9/16. The inmate was described as rocking in place and showing mildly activated emotional expression, limited attention and concentration and mild thought derailment. There was conflicting information about whether she had or had not adhered to psychiatric treatment with risperidone over the last three months. Problematic lab results prompted the psychiatrist to recommend a lower dosage of risperidone at 1 mg bid.

The IDTT issued a diagnosis of Schizophrenia with problem areas identified as depressed mood, hallucinations, and grandiose delusions. The treatment team determined the inmate was unable to function at the 3CMS level of care because she exhibited active symptoms of a major mental disorder that required more intensive treatment. She was enrolled in the EOP with weekly contacts to be provided until transfer.

Findings

The inmate was appropriately enrolled in the MHSDS for treatment of a qualifying mental disorder. She was properly monitored by mental health staff, who concluded that she required treatment at a higher level of care in the EOP. In assessing factors relevant to the increased level of care, the treatment team considered factors as per program guidelines. Based on the team's assessment, the inmate did not require 24-hour nursing supervision. Effectiveness of psychiatric treatment was still under review. The inmate did not have multiple MHCB admissions or 115 mental health evaluations. The care provided to this inmate was adequate.

**Inmate C**

This 3CMS inmate's healthcare record was randomly selected from cases that were identified by the IDTT as requiring a higher level of care. The purpose of the review was to assess whether the IDTT followed Program Guide requirements in the decision to elevate the inmate's level of care.

The inmate was newly arrived to FWP, and within one week was the subject of several urgent mental health referrals for bizarre and suicidal statements. When seen by the PC, the inmate denied suicidal thoughts or intent. However, when interviewed, she appeared to be responding to internal stimuli. The inmate also presented with poverty of speech, disorganization and paranoid thinking about the FBI. An SRE was not performed.

The IDTT provided a diagnosis of Schizoaffective Disorder, bipolar type. The primary problems were identified as worsening of auditory hallucinations, paranoia, and delusions. The inmate was not taking psychotropic medication.

Treatment team members considered factors that might indicate the need for treatment at a higher level of care. However, the validity of the documentation was questionable. For example, to the statement of whether the inmate was unable to function at the current level of care, the answer was marked "no." All other factors were marked "yes," including number two, which asked whether the inmate required highly structured inpatient psychiatric care with 24-hour nursing supervision, and number four, which stated that the inmate was in the MHCB.

The treatment team documented that the inmate would be elevated to the EOP level of care and would be seen on a weekly basis until transferred. The rationale was that the inmate's intensive treatment needs would best be served through the Parole Outpatient Clinic following her release in two months.

Findings

This inmate was appropriately placed in the 3CMS program based on a qualifying mental disorder. She was an unreliable informant about her mental state and appeared to be experiencing acute psychotic symptoms that were not controlled by psychiatric medications. The treatment team considered factors that might indicate the need for an increase in the level of care. However, the validity of those considerations was questionable due to problematic

documentation.  An SRE should have been performed.  The need for or results of psychiatric consultation was not considered.  For these reasons, the mental health care that was provided to this inmate was inadequate.

**Inmate D**

The healthcare record was reviewed as the inmate was referred to the MHCB; however, the admission was rescinded before the inmate was physically placed there.  The purpose of the review was to evaluate the adequacy of mental health care.

This general population inmate was transferred from the HDSP administrative segregation unit to the administrative segregation unit at Folsom on 1/21/16.  On arrival, the inmate was cleared for placement, but refused procedural screening for non-MHSDS inmates.

Mental health staff saw the inmate several times during the next four months for complaints of depressive experiences and poor sleep due to his lockdown status.  Staff described him as either withdrawn or increasingly hostile with poor self-control.  He agreed to treatment in the 3CMS program, but then declined the initial assessment on 5/2/16.  Later the same day, the inmate told the psych tech that he was going to harm himself.  He was referred to an MHCB and placed on suicide watch in alternative housing while awaiting placement.

In an SRE dated 5/3/16, the inmate retracted his statement about suicidal intentions.  Results indicated that he posed a low acute risk and a moderate chronic risk; the latter was based on a suicide attempt at age 13, history of substance abuse, and this being his first prison term.

The psychiatrist saw the inmate on 5/3/16 and recorded a history of depression and mood swings complicated by substance abuse.  Noted was a history of trauma and impulsivity, current sleep disturbance and anger.  On that basis, the primary problem was classified as Bipolar Affective Disorder.  The inmate was receptive to placement in the 3CMS program and was prescribed hydroxyzine as needed for anxiety with a routine dosage at night for sleep.

On 5/3/16, referral to the MHCB was rescinded with notice to HCPOP and an order for five-day follow-up.  The inmate had been placed in alternative housing for less than 15 hours.

On 5/13/16, the IDTT placed the inmate in the 3CMS program.  He was seen for weekly PC contacts until transferred to STRH.  A psychiatric contact prior to transfer noted that treatment with lithium had been added to the medication regimen.  The inmate transferred to STRH at CSP/Sac on 6/6/16.

Findings

This case was reviewed because the inmate was referred to the MHCB but the referral was rescinded in less than 15 hours.  This non-MHSDS administrative segregation inmate had difficulty adjusting to lockdown and showed a pattern of requesting, then rejecting, mental health services when offered.  He was appropriately referred to the MHCB following claims to harm

556

himself.  In less than 24 hours, he retracted his suicidal claim and accepted treatment in the 3CMS program, including psychiatric medications.

The MHCB referral was appropriately rescinded with SRE's indicating a low acute risk of suicide/self-harm.  The inmate was properly placed in the 3CMS program.  The mental health care that was provided to him was clinically appropriate.

**Inmate E**

This healthcare record was randomly selected from eight cases that the IDTT had identified as requiring a higher level of care in the EOP program, but not at the acute or intermediate level of care.  The review's purpose was to assess whether the IDTT followed program guidelines in its decision-making process.

Psychiatric documentation revealed that the inmate had been placed on "C" status for three RVRs.  The inmate followed psychiatric recommendations which included two mirtazapine 30 mg Tab to target sleep associated symptoms of depression.  There was no history of suicide attempts or MHCB admission.  The inmate had a history of attention problems during adolescence and self-reported having been placed in special education classes.

A mental health assessment on 5/24/16 indicated the inmate experienced ongoing adjustment problems including difficulty getting along with others, disinterest in prison programs, repeated RVRs, thoughts that custody staff was trying to get him in trouble and disturbed sleep with frequent awakening and panic attacks.

The IDTT assigned a diagnosis of Adjustment Disorder with Anxiety.  On 5/25/16, the IDTT changed the inmate's level of care to EOP.  In its decision, the treatment team determined that the inmate was unable to function in the 3CMS but that he did not suffer from a major mental disorder.  There was no evidence of repetitive suicidal behavior, MHCB placement, or at least three 115 mental health evaluations.

Findings

The inmate was appropriately placed in the 3CMS based on medical necessity and treated with psychoactive medication.  He was appropriately monitored by clinicians during his "C" status placement.  However, symptoms and functional impairment worsened, leading to a recommendation for transfer to a higher level of care.  The inmate did not evidence any of the factors which would have made him a suitable candidate for DSH referral.  The care provided to the inmate was adequate.

**Inmate F**

The healthcare record was selected as an example of an inmate whose MHCB placement was rescinded before he was physically placed there.  The review's purpose was to assess the adequacy of provided care.

The inmate arrived at Folsom from the SQ reception center where he had been enrolled in the 3CMS due to a qualifying mental disorder.  The inmate refused an initial health screening.  He said he had been enrolled in the MHSDS by accident and furthermore, required a special religious diet due to his ethnic background.

Within one day of arrival, there were three staff referrals for bizarre behavior, poor hygiene and unusual demands.  The inmate was moved to administrative segregation due to making odd statements about race that put his safety in danger.  He requested special clothing and sundries and refused to be seen by a particular nurse.

The IDTT retained the diagnosis of record, namely, Delusional Disorder.  However, the inmate did not participate and he veered off the topic of conversation with irrelevant topics.  He declined psychiatric medication.  His level of care was elevated to EOP based on a diagnosis of Major Mental Disorder and an inability to function at the current level of care.

After refusing nine meals, the psych tech reported a hunger strike.  The inmate refused to exit the cell for a psychiatric interview and kept the covers over his head.  He said he had no desire to die and became angry with further questioning.  A reliable SRE could not be completed due to the inmate's hostility and lack of cooperation.  However, he was referred for MHCB placement due to mental illness and grave disability.  HCPOP was notified.  Nursing staff provided nutritional counseling.

The next day, on 5/8/16, the inmate began accepting nutrition and it appeared that he wanted to avoid MHCB placement.  He left the cell to shower.  Although he continued to show no insight as to his mental illness, he was more cooperative, followed directions and showed improvement in self-care despite his belief system.  The MHCB referral was rescinded and HCPOP was notified.  The inmate was placed back at the EOP level of care awaiting transfer.  Five-day follow-ups were ordered.

<u>Findings</u>

The inmate was appropriately enrolled in the MHSDS based on a qualifying mental disorder.  His care was properly upgraded to the EOP level of care based on his inability to function in the 3CMS due to bizarre thoughts and behaviors that jeopardized his safety.  He was timely and appropriately monitored for refusing nutrition.  He was appropriately referred to the MHCB for further evaluation of his mental health and for food refusal due to grave disability.  The MHCB referral was appropriately rescinded when the inmate's behavior improved and he demonstrated the ability to care for himself.  Five-day follow-ups were ordered according to program policy.  The inmate received adequate care.

**Inmate G**

The inmate's healthcare record was reviewed as he was housed in Folsom's administrative segregation unit.  The purpose of the review was to assess the adequacy of provided mental health care.

558

The inmate was placed in administrative segregation pending investigation of an RVR. The initial SRE was timely completed and estimated a low acute and chronic risk of self-harm. Protective factors included no history of suicide attempts, good family support, religious beliefs, and participation in a regular exercise program.

The inmate was previously included in the 3CMS program based on screening results suggestive of a depressive disorder that coincided with initiation of treatment for a chronic medical illness. By the annual IDTT on 6/12/15, the initial problem was resolved. The inmate was returned to the 3CMS program for medical necessity based on a diagnosis of Anxiety Disorder NOS. The treatment plan appropriately included interventions to reduce anxiety primarily through psychiatric medication and psychoeducation. The inmate was treated with paroxetine and hydroxyzine to target symptoms associated with the mental health diagnosis.

In the initial IDTT, the treatment team reviewed progress, noting the inmate had not fully developed the coping skills needed to manage his anxiety. Treatment goals were adjusted, while outcomes were appropriate, reasonable, and described in measurable terms. The inmate participated in the treatment planning process and signed the treatment plan. Documentation showed that the treatment team reviewed higher level of care considerations and found no factors to warrant referral to a higher level of care.

Findings

The inmate was appropriately included in the 3CMS program for treatment of a mental health disorder. Continuity of treatment planning was maintained upon his transfer to administrative segregation. All required contacts and risk assessments were timely completed. The IDTT fulfilled policy requirements according to the Program Guide. The mental health care provided to this inmate was adequate.

**Inmate H**

This healthcare record was randomly selected from eight cases that the IDTT had identified as requiring a higher level of care in the EOP program, but not in DSH. The review's purpose was to assess whether the IDTT followed program guidelines in its decision-making process.

The inmate received mental health treatment for racing thoughts, depression and auditory hallucinations for two years prior to his incarceration. He was evaluated for trial competency before coming to prison. He was admitted to the 3CMS with a diagnosis of Mood Disorder NOS. He was prescribed 2 mirtazapine 15 mg Tab once a day at bedtime and risperidone 0.5 mg Tab once a day at bedtime. He was described as not functioning well on the mainline in that he was withdrawn, appeared depressed and lacked emotional expression.

The treatment plan was updated on 5/27/16 and the IDTT upgraded the inmate's level of care to EOP. All required staff attended the meeting and the inmate contributed to the treatment goals and signed the treatment plan. In reaching the decision to elevate the inmate's level of care, the treatment team considered that he required more intensive treatment than was available in the 3CMS but noted that he had not been diagnosed with a major mental disorder and did not require

24-hour nursing supervision.  The team found that the inmate experienced chronic psychiatric symptoms that had not sufficiently responded to treatment.  He had no MHCB admissions and had not had three or more 115 mental health evaluations.

Findings

The inmate was appropriately enrolled in the MHSDS based on a psychiatric diagnosis and treatment with psychiatric medications.  The IDTT considered factors that might indicate he would be better treated at a higher level of care.  The IDTT followed program guidelines in reaching its decision to elevate care.  Clinical judgment was appropriately exercised in the decision to increase level of care.  However, the team did not document the reason for not making a DSH referral based on the chronicity and lack of treatment response.  Notwithstanding, the overall level of care that this inmate received was adequate.

**Inmate I**

The healthcare record was reviewed because Plaintiffs' counsel requested a review of the extent to which staff followed program guidelines when removing inmates from the 3CMS caseload. Five cases of 3CMS removals were randomly selected; this case was one of two whose healthcare record was reviewed.

According to the Offender Placement History, this inmate's inclusion in the 3CMS extended back to 11/25/02 based on a qualifying mental disorder.  His enrollment was reaffirmed through 12/2/06, a period that included three parole revocations with returns to custody.  From 12/19/06 to 5/14/09, the inmate returned to prison with placement in the general population for not meeting MHSDS eligibility requirements.

On 8/24/15, the inmate returned to prison at the DVI reception center.  The IDTT reaffirmed his enrollment in the 3CMS based on a qualifying mental disorder.  The psychiatrist prescribed an antidepressant medication to target sleep disturbance associated with his mental health disorder. The inmate refused a follow-up psychiatry contact on 10/27/15 because he was irritated about having to wait a long time due to circumstances that were beyond the provider's control. Although planned to be rescheduled, this reviewer found no other psychiatric note in the record, other than documentation indicating that medications were discontinued on 1/27/16.

An SRE performed on 9/15/15 at the reception center indicated that the inmate posed a low acute risk and a moderate chronic risk of suicide/self-harm.  The level of chronic risk was predicated on the presence of eight out of 16 factors, including a family history of suicide, chronic pain, and two suicide attempts at 12 years of age (by drinking bleach and hanging).

The inmate transferred to Folsom on 2/1/16.  When the PC saw him on 2/16/16, he said that he had been depressed for most of his life but had outgrown the issues of his youth.  He reported doing fine without psychiatric treatment.  He asked to be removed from the 3CMS.  The PC documented that he was eligible to be removed but rightly expressed concern about the history of depression and the recent discontinuation of medication.  When the inmate agreed to a 90-day

follow-up visit while in the general population, the PC proceeded to remove him from the 3CMS level of care effective 2/4/16, which was three days after his arrival.

Findings

The Program Guide provides three circumstances in which inmates may be removed from the 3CMS program.  The first circumstance is when there is disagreement between the evaluator at the reception center and the receiving institution IDTT about the need for 3CMS services (12-3-7). This circumstance does not apply here because the inmate was enrolled in the treatment program by the reception center IDTT based on a qualifying mental disorder and was prescribed psychiatric treatment for that disorder for a period of five months and three days.  Thus, his treatment at the reception center had lasted far beyond the initial mental health evaluation and he was endorsed by the reception center IDTT.

The second circumstance concerns clinical discharge from the 3CMS program when an inmate has been in continuous remission and is functioning adequately in the mainline without medication for six months.  This circumstance requires that the inmate be seen for 90-day clinical contacts throughout the six-month period (12-3-13).

The third circumstance concerns inmates who were admitted to the treatment program on medical necessity (12-3-14).  This inmate was not admitted under medical necessity and therefore this circumstance is inapplicable.

It is the finding of this reviewer and based on documents reviewed, that this inmate's removal from the 3CMS under the circumstances described above was inappropriate.  Prescribed psychiatric treatment was discontinued on 1/27/16 and he transferred to Folsom on 2/1/16. According to program policy, the inmate should have received ongoing contacts at Folsom for six months to determine whether he was functioning adequately without medication in the Folsom mainline.  However, in this inmate's case, he was removed from the caseload prematurely after being in the Folsom mainline for three days.

The inmate did not receive adequate mental health care due to his premature removal from the MHSDS treatment program.

**Inmate J**

The healthcare record was reviewed because Plaintiffs' counsel requested a review of the extent to which staff followed program guidelines when removing inmates from the 3CMS caseload. Five cases of 3CMS removal were randomly selected; this case was the second of two cases whose healthcare record was reviewed.

Available records indicated that the inmate was enrolled in the 3CMS for medical necessity based on a mental health evaluation at the DVI reception center on 12/22/15.  The evaluation indicated that the inmate was diagnosed with Mood Disorder NOS.  His eligibility for 3CMS enrollment was predicated on the current diagnosis and the significant history of suicide attempts as a teenager.  This reviewer was unable to locate an IDTT approved treatment plan from the

561

DVI reception center.  The inmate refused a routine PC contact on 2/2/16 in the reception center, stating that his mood was fine and that he did not need mental health services. There was no documentation indicating that he had been prescribed psychiatric medication at the reception center.

The inmate met with the PC as a new Folsom arrival on 3/14/16.  He reported a history of multiple suicide attempts between early to late adolescence and had been hospitalized for these attempts.  He did not stick with psychiatric treatment and used street drugs to cope.  He had neither made a suicide attempt nor received psychiatric treatment for eight years before coming to prison for the current term.  He stated that he would seek out substance abuse services in prison through NA or AA and did not feel that he needed mental health treatment.  A mental status examination found no evidence of disturbance in mood, thought process or content.  The inmate denied recent or current thoughts of self-harm.

IDTT members removed the inmate from the 3CMS on 3/16/16.

<u>Findings</u>

The Program Guide provides a circumstance where newly arrived inmates from a reception center may be removed from the 3CMS.  This pertains to a disagreement between the reception center evaluator and the receiving institution IDTT about the need for 3CMS services (12-3-7).  This circumstance applied to this case because there was no evidence that the inmate's initial enrollment extended beyond the initial mental health evaluation in the reception center as this reviewer found no evidence of an IDTT-approved treatment plan from the reception center.  The inmate was not psychiatrically treated in the reception center and declined mental health contact with the reception center PC.  In reviewing this case, it appeared that the inmate's enrollment in the treatment program was based on historical factors that had not been relevant for the past eight years.

From the above vantage point, the Folsom IDTT made a reasonable clinical judgment in removing the inmate from the MHSDS due to disagreement with the reception center evaluator based on program guidelines.

The inmate received adequate care relative to the IDTT decision to remove him from the 3CMS program.

EXHIBIT C
Pelican Bay State Prison (PBSP)
May 17, 2016 – May 19, 2016

**Inmate A**

This EOP inmate's healthcare record was reviewed as he was a participant in an observed group during the site visit. He was provided with a diagnosis of Schizoaffective Disorder. The inmate's last reported decompensation was in November 2015. He was prescribed olanzapine, Trileptal and venlafaxine. He received his psychotropic medication by a PC 2602 court order that would expire on 8/5/16.

The most recent treatment plan noted the following: "(t)o maintain mood stability as exhibited by increased use of affect modulation and prosocial skills within the next 60 days. Abstain from the use of un-prescribed meds and illegal substances as exhibited by increased participation in groups, absence RVRs and negative drug test. Reduce isolation as exhibited by increase in EOP program and 1:1."

According to the Form 7277, the inmate transferred to PBSP on 10/29/15 from CSP/Sac. The accommodation section noted inmate medical equipment. A progress note dated 11/2/15 indicated that the inmate required a knee brace, ankle foot orthoses, cane and lower bunk, but did not indicate the need for accommodation.

The inmate's mental health history was significant for an overdose of Seroquel in 1996; he was transported to the emergency department for medical treatment. There were no reports of self-injurious cutting behaviors since 1995. As a child, he was involved in an accident in which he lost consciousness and was in a medically induced coma for two weeks. He began experiencing auditory and visual hallucinations at age 15 and used illegal substances prior to the onset of hallucinations. He had a long history of substance abuse, including heroin, methamphetamine, and cocaine. He contracted Hepatitis C from intravenous drug use. The inmate was married with two children.

The inmate reported feeling remorseful about his incarceration, its effect on his family relationships and how he thought of himself. He was admitted to ASH on 10/19/15, due to exhibiting bizarre behavior for several days, which included pacing in his cell naked, laughing, and talking to "white people." Illicit drug use was suspected, but a cell search did not reveal anything incriminating. He was discharged from ASH on 10/20/15.

The inmate stated that custody staff had lied about his behavior. He also reported feeling frustrated that his property was missing as a result of the MHCB placement. He eventually reported that he was very depressed and missed his mother. He was housed in the PSU during the previous two months.

The inmate had a history of decreased treatment participation, with only 70-percent attendance in all activities. However, he had good participation in individual sessions. Progress notes reflected that he talked extensively about pain issues and problems with medical providers. Clinical notes indicated that over 50 percent of agitation/assault behaviors were addressed, that there was no report of psychosis and no RVRs during the past 90 days. On 2/19/16, the inmate reported pain and inability to walk; he indicated that the medical provider did not want to help

him. He exhibited mild dysphoria secondary to pain. His medical history was significant for chronic knee pain, a previous wrist fracture and surgery and back pain.

<u>Findings</u>

The mental health care provided to this inmate was adequate. The inmate would also benefit from the clinician requesting a medical consult and inclusion of pain management as part of the treatment plan.

**Inmate B**

This EOP inmate's healthcare record was reviewed from a list of inmate's interviewed during the site visit. The inmate arrived at PBSP from SQ on 5/5/16. He was provided with diagnoses of Major Depressive Disorder, recurrent and Adjustment Disorder with mixed anxiety and depressed mood. He was prescribed Zoloft.

The bus screen (Form 7277) noted that the inmate arrived with appliances and a chrono for a bottom bunk, ankle brace, and gel insole with arch support. His last MHCB admission was on 12/29/15.

A SRE completed on 5/9/16 assessed the inmate with moderate chronic and low acute risk of suicide. Documentation indicated that he presented as insightful, but with poor judgement. His depression was rated as six on a scale of one to ten. His triggers were identified as not having support, being away from his family and having stress about his parole in 2017.

According to the Form 7386 B, the inmate was raised in the San Francisco Bay area; his mother was incarcerated for drug-related offenses and was being released in 2016. His father was also recently released from prison and had been incarcerated for the majority of the inmate's childhood. The inmate had recently begun a relationship with both his father and brother. The inmate reported four siblings; one sibling died in a car accident, which resulted in the inmate's transfer to the MHCB in December 2015.

<u>Findings</u>

The mental health care provided to this inmate was adequate. There was an interesting note from a CSP/LAC clinician to the PBSP clinician opining that the inmate was entitled and was using the mental health system. No note was found indicating clinician-to-clinician contact from SQ.

**Inmate C**

This inmate's healthcare record was reviewed as a follow-up to a previous site visit. The inmate was also interviewed as part of a group during this site visit. He was serving a life sentence. He was provided with a diagnosis of Major Depressive Disorder, recurrent, moderate without psychotic features. He was prescribed prazosin, Effexor and Vistaril.

The inmate was transferred to PBSP after a cell phone and knife were found in his cell.  He had been incarcerated for 23 years and requested a hardship transfer due to the death of his father, sister, cousin and nephew within the past eight months.  He had a history of nightmares and auditory hallucinations.  However, the clinician indicated that these experiences were not hallucinations, but rather negative ruminating thoughts from his abusive childhood.

Clinical contacts generally occurred weekly.  The sessions typically lasted from 20 to 50 minutes.  Their content was individualized and clinically relevant to the specific concerns of the week's session.  Over the six-month period reviewed, the inmate remained depressed and became more depressed due to the rainy weather, holidays and continued deaths of family members.

The inmate was also stressed about missing law library and it was unclear why he was not ducated to go to the law library.  He attended yard less frequently, because he needed to go to the restroom often and was not timely taken there.

The clinician listened to the inmate and suggested changes to his daily activities, such as changing from playing chess to Scrabble, making personal Christmas cards for loved ones and talking to the education principal about hardship paperwork when the inmate was not able to go to the law library.  The psychiatry contacts also appeared to be clinically beneficial, as the inmate was allowed to verbalize his concerns and discuss medication-related issues; he was also provided with psychoeducational information.  The psychiatry and PC contacts occurred timely.

The inmate did not attend IDTT meetings conducted during the review period; the reasons for his absence were not documented.  Upon further review of the healthcare record, it was noted that the inmate was sick when the IDTT meetings occurred.  Form 7388-B documentation was relevant and accurate based on clinical contact documentation.  The inmate attended 80 to 90 percent of his groups and individual clinical contacts.  However, short- and long-term goals were not met.  The inmate's depression also had not decreased, despite clinician and psychiatry contacts, medication adherence, meditation and other completed assignments and activities of daily living.

The inmate's hard work and diligence for over six months in contacting the CC I, which included writing letters and working with the PC and psychiatrist, was rewarded when he went to the ICC hearing in May 2016.  At that time, he was removed from Close A status and was scheduled for transfer to Folsom.  This would allow for closer proximity to his family, as he had not had a family visit for 23 years.

Findings

The mental health care provided to this inmate was adequate.

**Inmate D**

This 42-year-old inmate's healthcare record was reviewed to assess the mental health care provided in the STRH program where he was transferred in April 2016. A targeted review of documentation from 3/1/16 to the date of the site visit was performed.

The inmate was provided with various diagnoses including Adjustment Disorder, Psychotic Disorder NOS and possible Paranoid Personality Disorder. He received mental health services at the 3CMS level of care until he admitted to an assault on the yard. Following a subsequent transfer to administrative segregation, staff elevated his level of care to EOP. He transferred to the EOP mainline at PBSP in October 2015, but returned to administrative segregation in November 2015. At the time of the site visit, he was receiving mental health services at the EOP level of care.

The inmate had been generally reluctant to participate in treatment and had engaged in indecent exposure and other rules violations. His immediate history was significant for an MHCB admission in February 2015 related to suicidal ideation although he was noted to be resistant to treatment. He reported psychotic symptoms, but staff indicated that his accounts were atypical for an actual psychotic presentation. He was seen at cell front because he refused a confidential interview. The inmate noted that he did not leave his cell for individual sessions and stated that he soon would be transferring to another institution. He did, however, inquire about groups. Although he was prescribed Risperdal during 2001, during the review period he was only prescribed hydroxyzine, which was discontinued for nonadherence. His most recent SRE assessed a low acute, but moderate chronic suicide risk.

A psychiatric examination on 3/11/16 indicated that the inmate was variously cooperative, but quick to anger with an overly inclusive and circumstantial thought process. Although he denied significant psychiatric symptoms, he demonstrated some suspiciousness, limited insight, low motivation, poor judgment and impaired impulse control. Provided diagnoses included Adjustment Disorder and Substance Use Disorder. Provisional diagnostic considerations included the presence of a psychotic or bipolar disorder, treatment nonadherence was also noted.

The psychologist noted on 3/15/16 that the inmate had not been moved to the mainline EOP due to space constraints. At that time, the inmate did not want to engage in exploration of mental health concerns or treatment goals. There was no documentation regarding the psychiatrist's additional provisional diagnosis of a bipolar spectrum illness. A 3/24/16 psychology note indicated that the inmate was seen at cell front as his weekly EOP session was cancelled by custody because he did not have his state identification card. At that time, he was nonresponsive with a blanket pulled over his head. A psych tech note on the next day showed that the inmate responded to inquiries with anger and vulgar utterances. He refused a 3/29/16 telepsychiatry appointment. On the following day, he was seen at cell front by the psychologist. A recent sustainable process visit generated the following request for follow-up: "Please have PC consult with the correctional counselor regarding the patient's options for transfer to prison closer to his family in Los Angeles. Document care factors discussed and/or any barriers to his eventual move closer to home." His endorsement at that time was found to be appropriate and the inmate had not shown that he could remain disciplinary free. A psychology note dated 4/4/16 related to

the inmate's RVR found that he had not been diagnosed with a severe mental health disorder but that he had been determined to require mental health services at the EOP level of care and his stability might be compromised if his activities or access to items were restricted for an extended time period. No recommendations for altering his treatment plan were made. On 4/7/16, the inmate refused an individual session. His administrative segregation screening on 4/11/16 was negative.

On 4/15/16, the inmate again refused to speak with the administrative segregation clinician. The same provisional diagnosis of Psychotic Disorder NOS continued. A social work note dated 4/15/16 indicated that the inmate refused an individual session; this also occurred on 4/19/16. A psych tech summary from that time period indicated that the inmate remained mute. An updated mental health evaluation dated 4/18/16 showed that the inmate was seen at cell front, when he refused to speak with the clinician. A social work note dated 4/19/16 indicated that the inmate, who was housed in administrative segregation, refused an individual session. A social work note dated 4/26/16 documented that he refused an individual session, but requested another book and was less irritable. A 5/2/16 group note indicated that the inmate actively participated in a movie group. Subsequent notes documented numerous psychiatrist visit refusals. On 5/6/16 the inmate was admitted to the CTC due to suicidal ideation.

<u>Findings</u>

This inmate was difficult to engage in treatment. His treatment in the STRH was characterized by a continued lack of engagement in individual treatment but he attended groups on occasion. There was a lack of diagnostic clarity which may have contributed to a lack of clear focus to improved treatment engagement. Overall, his treatment was minimally adequate. However, it would have benefited from diagnostic clarity and a sharper focus on engagement strategies aimed at building on his involvement with group treatment. The inmate's treatment was also at times disrupted by space limitations and by the inmate not having his state identification card and the need to transfer him to an appropriate housing setting.

**Inmate E**

This inmate's healthcare record was reviewed to assess the treatment he received in the STRH program. He arrived at PBSP on 3/1/16. This 32-year-old male was not prescribed psychotropic medications.

The inmate had an EPRD of 4/18/17. He had participated in the MHSDS at the 3CMS level of care since 2009. His history was significant for a one day MHCB admission in 2009. He was alternately provided with diagnoses of Mood Disorder NOS, Adjustment Disorder and Depressive Disorder. His family was noted to be his primary motivation for not participating in gang activity. The most recent SRE was conducted on 3/8/16, when he was assessed with low chronic and acute suicide risk. His most recent diagnosis was Major Depressive Disorder, recurrent in partial remission. His most recently identified problems included poor sleep and anger. Interventions included journaling and cognitive behavioral interventions. He did not meet any criteria for higher level of care referral consideration.

568

A 3/8/16 PC progress note indicated that the inmate experienced stress upon transfer.  A 3/15/16 PC note documented that the inmate still did not have a television and had anxiety related to thoughts of parole.  A 3/28/16 psychiatry note again mentioned that he was scheduled for parole in the coming year.  At that time, he was not prescribed psychotropic medications but he had previously been prescribed them.  On 4/1/16, his PC described him with dysthymic mood.  Treatment goals included reducing his psychological impairment using CBT mood management tools.  On 4/8/16, the inmate reported that he had been attending groups and receiving mail from his family.  He also indicated boredom and had some complaints concerning his custody situation.  He was provided with a Sudoku worksheet and psychoeducation on the importance of self-care, making medical appointments and exercise.

The social worker saw the inmate on 4/14/16 on the yard, as he had refused an individual, confidential appointment.  The inmate was seen by the social worker on 4/21/16, when he noted some good news concerning his restitution and that he would be transferred soon to be closer to family.  He continued to participate in groups.  However, on 5/3/16 he expressed frustration about his delayed transfer and not having received his property.  The inmate noted that he saw the property in the hall, but it had yet to be issued.

On 5/27/16, the inmate was seen by the social worker when he discussed frustration related to his classification and housing situation.  He believed he should be NDS by that date and thought that he should have been transferred out of STRH.  The inmate also indicated that he did not find his contacts with the CC1 satisfactory in resolving these issues.

The plan was to continue treatment while the inmate remained in the STRH and to prepare for his 90-day IDTT the following week.

<u>Findings</u>

This inmate received minimally adequate treatment.  His treatment would have benefited from the commencement of pre-release planning, which was an identified source of anxiety, and from greater clarity concerning his custody situation.

**Inmate F**

This inmate's healthcare record was reviewed to assess his treatment while housed in STRH.  This 52-year-old man had been treated at the EOP level of care since 3/30/16.  He was provided with a diagnosis of Bipolar Disorder.  He was prescribed Abilify and Geodon, which he received due to a PC 2602 order.  His most recent SRE was completed on 5/3/15 following admission to the STRH, where he was transferred pending investigation for possession of a controlled substance.  This evaluation noted several acute risk factors, including current or recent depressive, psychotic and anxiety symptoms, mood disturbance, hopelessness, increasing interpersonal isolation, single-cell placement, recent disciplinary actions and recent change in housing.  A number of noted protective factors included family support, belief system, future orientation, having children at home, being active in treatment and having a sense of optimism.

569

The inmate's history was significant for an MHCB admission following a suicide attempt following his mother's death, which then led to an ICF admission, short-term memory decline related to a gunshot wound to the head and multiple medical problems, including obesity and diabetes.  More recently, his sleep was disturbed secondary to trauma issues.  A mental health evaluation on 5/3/16 described him as hopeless, lonely and depressed.  On the same day, he was noted to have a high level of depression, anxiety, ruminating thoughts and heart palpitations.  The most recent IDTT described a plan to refer him to psychiatry, but the psychiatrist did not see him timely.  Additional plans included weekly CBT with his PC with the goal of learning to enhance his self-soothing skills and emotional regulation to incorporate protective factors of his spiritual commitment in developing his stress management program.  On 5/9/16, the social worker saw the inmate, when he reported high levels of depression related to being upset about being in STRH, although medications had somewhat alleviated these symptoms.  The inmate was awaiting his property.  On 5/12/16 the office technician referred him to mental health as a routine referral secondary to a self-rating of depression at nine and anxiety at eight of ten, as well as significant complaints of auditory hallucinations.  He was seen the same day in response to this referral.  He reported depressed mood and anxiety due to being moved farther from his family and remaining in his cell without property.  He reported that he was supposed to go to an EOP hub but did not know when this would occur.  He occupied his time with puzzles and reading the Bible.

At the inmate's IDTT on 5/12/16, no indicators for higher level of care referral consideration were identified.  Chronic risk factors for suicide were rated as moderate considering his history of suicidal behavior, substance abuse, violence, and having a life sentence.  His acute risk factors for suicide were assessed as low.  His depression was significant at nine of ten, as he was still grieving the death of his parents four months apart in 2007.  He also reported racing thoughts and anxiety, episodic panic attacks, sweating and nightmares about his past trauma when he was shot in the head.  He reported episodic auditory hallucinations talking about the death of his loved ones.  His problems were noted to be severe anhedonia, severe anxiety, labile mood, manic episodes and auditory hallucinations.  There were measurable, albeit general goals, concerning reducing his depression and anxiety, but subsequent treatment did not clearly focus on these issues.

On 5/17/16, the inmate rated his depression as ten on a one to ten scale.  He was upset because although he received his property, it did not include snack food which he used when his blood sugar was low.  During ICC, the chief deputy warden promised him that he would receive his food from his property.  A 5/24/16 social work note indicated that the inmate was not adherent with his diabetic medication and was still upset about not being allowed food in his property.  When confronted about not taking his medication, the inmate indicated that he did not want to live.  He was encouraged to eat healthy.  It was noted that he was anticipating his upcoming transfer.

Findings

Overall, this inmate's treatment was inadequate while he was housed in the STRH awaiting transfer to an EOP hub.  The treatment that he received did not clearly follow the outlined treatment plan.  Property issues and delays in transfer exacerbated his situation.  Signals of

potentially increased suicide risk, such as high reported levels of depression, feelings of helplessness and statements about not wanting to live, did not result in reassessments of his suicide risk or lead to clear safety planning.

## Inmate G

This 41-year-old inmate's healthcare record was reviewed as he was housed in the PSU and was included in the pre-site visit materials as having low participation in structured treatment activities. He had been receiving his psychotropic medications by a PC 2602 court order issued on 12/15/15 due to posing a danger to himself and others. The inmate received mental health services at the EOP level of care. He was variably provided with diagnoses of Schizoaffective Disorder, Depressive Disorder, Adjustment Disorder and Antisocial Personality Disorder. Differential diagnoses of Bipolar Disorder NOS and Mood Disorder NOS were also contemplated. He was prescribed lithium and olanzapine.

An information chrono written by custody on 11/4/15 indicated that the inmate's case was reviewed in committee related to a possible SHU term; the inmate stated that he was engaging in a hunger strike because he had not received his property in a month. A PC note dated 11/6/15 documenting a cell-front interview reported that the inmate was unhappy with his level and therefore, was refusing groups. The inmate agreed to return to groups the following week and again voiced concern with not receiving his property. The plan was to continue his treatment plan and as to a possible crisis referral, consider "return to housing unless secondary gain cannot be determined."

A PC note dated 11/12/15 indicated that the inmate was happy that he had received his property, but some of the items were missing. He assured the clinician that he would "come out" the following week. On 11/17/15, he again refused a confidential interview with his PC, as he did the following day when the psychiatrist attempted to interview him about a renewal of his PC 2602 order.

An initial treatment plan dated 11/23/15 was conducted in the MHCB following the inmate's admission from the PSU related to suicidal ideation. Staff documented their belief that he was possibly attempting to escape ongoing conflict with custody or environmental stressors. He was described as feeling stressed and not having seen his family in 12 years; he was encouraged to return to the unit to write to his family and attend groups. He said that he would go on a hunger strike to force a DSH referral. It was noted that the instant MHCB admission was the inmate's fourth and that he had 19 OHU admissions during the preceding six months. The rationale for not referring him to DSH was the expectation that a medication adjustment would have a positive impact on his mood and that the use of CBT to identify distorted thoughts and reduce suicidal ideation would be useful. It was also noted that the inmate was refusing more than 50 percent of his scheduled treatment hours and up to 97 percent during some recent time periods.

An SRE dated 11/23/15 documented various chronic risk factors such as a history of depressive or psychotic disorders, chronic medication conditions, perception of loss of social support, a history of poor impulse control, being a male older than 35 years of age, a history of violence and substance abuse, serving a long sentence and being a sex offender. Acute factors included

suicidal ideation, being agitated or angry, mood disturbance, single-cell placement and a recent change in housing. Protective factors included interpersonal social support, regular exercise, having children at home and a sense of optimism. His chronic risk was assessed as moderate and his acute risk was assessed as low. He was described as fixated on what he wanted and hearing only what he wanted. A lack of "serious" suicide attempts was noted. A psychiatric discharge summary dated 11/25/15 noted that he experienced manic symptoms upon admission, but these symptoms had resolved after treatment with olanzapine.

Following return to the PSU, an IDTT on 12/9/15 documented continued positive indicators for higher level of care referral consideration; the inmate had multiple MHCB admissions and had only attended 11 percent of his groups during the preceding three months. The rationale for not referring him to DSH was the medication change, which resulted in increased stability. Additionally, although he refused confidential interviews, he was cooperative with cell-front meetings. The next day the inmate refused a confidential interview although other notes in December 2015 for both psychology and the psychiatrist indicated that he accepted it. A 12/22/15 psychology note stated that the program changes requested on 12/9/15 were "finally" initiated. Notes also reflected that the inmate found staff to be more supportive than previously. However, the inmate's group attendance was erratic.

A 1/6/16 IDTT meeting, which the inmate did not attend, noted that the "sustainable process" figures regarding treatment attendance were incorrect due a scheduling error. In January 2016, the inmate began attending more individual sessions, but he attended mostly to "check in." His diagnoses were again changed, this time to Adjustment Disorder NOS and Mood Disorder NOS. The inmate also began attending groups twice weekly. However, by 1/21/16 he was again placed on suicide watch due to suicidal ideation. A SRE on the following day assessed him with moderate acute and chronic risk for suicide. He was released from the MHCB in early February 2016, but was quickly readmitted. An SRE on 2/4/16 assessed him with moderate chronic and low acute suicide risk. At the time of discharge, his diagnosis was again changed to Schizoaffective Disorder. A 2/5/16 administrative segregation unit pre-placement chrono did not indicate any positive findings. A January 2016 group note revealed that the inmate believed that groups were useless and he did not need them. He remained on a modified program and his attendance improved.

A treatment plan dated 2/5/16 indicated a current diagnosis of Adjustment Disorder; the treatment plan also noted the inmate's poor insight and described him as manipulative. Diagnoses of Depressive Disorder NOS and Schizoaffective Disorder, bipolar type were later provided. An SRE dated 2/8/16 related to his MHCB discharge to the PSU assessed him with high chronic and low acute suicide risk.

An SRE dated 2/12/16 noted additional risk factors including recent bad news or anniversary date of loss and assessed the inmate with moderate chronic and acute suicide risk. A treatment plan five days later noted multiple MCHB admissions, but stated that a referral to a higher level of care was not made because the inmate had been placed on modified programing and had been upset about his recent case by case review, which did not end his SHU term. The inmate did not attend this treatment team meeting. On 3/11/16 he was noted to be refusing office visits and had refused all groups that week. He requested a change to the 3CMS level of care. An IDTT on

3/15/16 indicated that he continued to be treated with Zyprexa and noted his improved group attendance. However, the inmate continued to be concerned about missing property. Subsequent notes indicated that custody reported that he had difficulty resolving this issue because of problems reading and writing; however, a cell-front *Clark* evaluation conducted on 4/8/16 found that he did not meet criteria for inclusion in the DDP. The inmate continued to request a change in level of care to 3CMS or DSH.

On 4/14/16 the inmate was again admitted to alternative housing related to suicidal ideation. A SRE conducted in the MHCB assessed him with high chronic suicide risk and moderate acute risk. The psychiatric discharge summary dated 4/18/16 again changed the diagnosis, noted that the inmate missed his family and indicated that he had not received his property in seven months. On 5/12/16, the PC described the inmate as angry and questioning why the staff did not transfer him to DSH. At that time, his diagnosis was returned to Adjustment Disorder.

The requests for a level of care change continued through May 2016. An IDTT meeting on 5/25/16 determined that the inmate had been refractory to treatment while hospitalized at DSH; this information had not previously been mentioned. His attendance rate of 33 percent for his modified treatment plan was noted. On 5/28/16, he was again admitted to the MHCB as he reported an intent to hang himself. He continued to miss family and reported waiting nine months for his property. The assessment noted his discomfort discussing childhood abuse and noted his easily triggered mood instability. An ICF and dialectical behavioral therapy were recommended.

Findings

This inmate's course of treatment was characterized by regular periods of easily triggered emotional instability, poor treatment attendance, multiple MHCB admissions, various unreconciled diagnoses and inconsistent assessments of the degree of suicide risk, with insufficiently clear plans to reduce this suicide risk. Ongoing difficulties with obtaining his property, which lasted many months, appeared to contribute to his difficulties maintaining stability. Although a DSH referral was eventually effectuated, this likely should have occurred earlier in treatment. Overall, this inmate's treatment was insufficient.

**Inmate H**

This inmate's healthcare record was reviewed to assess his treatment in the PSU, where he arrived in January 2016 from the CHCF administrative segregation unit. This 39-year-old man had an EPRD of 7/15/19.

The inmate was provided with diagnoses that included Bipolar Disorder NOS and Major Depressive Disorder, recurrent. He also had a history of Amphetamine Dependence and was described with Borderline Traits. He was prescribed Effexor, Trileptal and Zyprexa. His history was significant for a suicide attempt at age 17 following his mother's death, a history of head trauma leading to a coma at age seven, and sexual abuse by his uncle who was subsequently killed by the inmate's father, who was then incarcerated.

573

The inmate's more recent history included two MHCB admissions and treatment at the EOP and 3CMS levels of care.  Overall, his presentation was characterized by anxiety, emotional dysregulation, depression, agitation, and paranoid and homicidal ideation in varying degrees over time.

An IDTT on 2/3/16, attended by a cross-covering telepsychiatrist, noted that the inmate met all chronic risk factors on his SRE; his acute factors were assessed as moderate to low.  Although he denied suicidal ideation, his single-cell status was noted, as was his vigilance to abandonment issues.  His next IDTT was conducted on 3/3/16, when his lability and depression were improved.  An SRE dated 12/1/15 was referenced, although a more recent SRE was completed on 1/25/16.  The inmate's character structure was described as his main barrier to more progress and his irritability was to be addressed with CBT.  The subsequent IDTT occurred in May 2016, when it was noted that the inmate was anticipating suspension of his SHU term in August 2016 and was making progress toward treatment goals.  The plan again referenced a December 2015 SRE rather than the more recent January 2016 SRE.  The January 2016 SRE indicated that the inmate met most chronic risk factors for suicide and nine acute factors; however, this SRE was conducted while the inmate was lying in bed in his cell refusing to lift his head.  It documented his acute and chronic risk for suicide to be high in one location on the form; however, later the acute risk was assessed as moderate to low.

PC and psychiatry notes from February to May 2016 documented consistent contact with the psychologist and psychiatrist although telepsychiatry was utilized for some of the IDTTs.  The inmate generally accepted confidential sessions but he periodically refused.  His group attendance had been good but his attendance declined during April 2016 when he attended 18 sessions and refused 11.  Art therapy was useful in helping him manage his anxiety.  The inmate believed that stimulants would be helpful to him, but the psychiatrist did not believe that they were indicated.  Instead, the inmate apparently drank large quantities of coffee, which he found helpful.

Findings

This inmate was seen regularly by psychiatry and his PC during the period that was reviewed.  IDTT meetings reviewed different SREs with different assessments of suicide risk without adequately harmonizing the different assessments.  The inmate was stable, however, and he improved over time.  This inmate received adequate mental health treatment.

EXHIBIT D
Mule Creek State Prison (MCSP)
November 15, 2016 – November 17, 2016

**Inmate A**

This inmate's case was reviewed to evaluate the mental health care provided to him. The inmate's IDTT was observed during the site visit. This 28-year-old 3CMS DD1 inmate reportedly had a Test of Adult Basic Education (TABE) score of 4.8. He had mobility issues due to nerve damage to the left side of his body following a car accident (the date of the accident was not provided) that included traumatic brain injury. He reportedly received services through a regional center. He was provided with diagnoses of Mood Disorder NOS and Antisocial Personality Disorder. He was not prescribed psychotropic medications at the time of the site visit.

A prior treatment plan noted treatment targets of mood instability and impulsivity while the inmate was housed in administrative segregation. The DDP psychologist reportedly saw him weekly for wellness checks while he was housed in administrative segregation. Since his placement in the general population, the inmate agreed to participate in treatment designed to reduce the occurrence of masturbation at inappropriate times, such as in the presence of staff. An actual treatment plan was not completed.

The mainline psychiatrist saw the inmate on 10/19/16, which was one week after his release from administrative segregation. The inmate was reluctant to tell the psychiatrist why he had been placed in segregation. He was not prescribed psychotropic medications. He was, however, prescribed Depakote for a seizure disorder and was aware that it had a positive impact on his mood stability. The healthcare record did not document other mental health clinical contacts.

A CDCR mental health add-a-page dated 10/24/16 documented a plan to complete a functional assessment of the inmate's inappropriate sexual behavior of masturbating in front of staff. This development was clinically appropriate; however, the PC appeared to confuse the meaning of negative reinforcement as defined in operant conditioning. The case conceptualization appeared problematic as well, in light of the inmate's ongoing reinforcement through sexual gratification.

The treatment plan dated 11/15/16 provided a comprehensive case conceptualization and was oriented toward continued assessment. This was reasonable in light of the utilized treatment model, but it would require a return to the IDTT once the assessment portion was completed. If the treatment team did not reconvene to develop a treatment-oriented plan once assessment was completed, this inmate would not have a proper treatment structure in place to guide his caregivers.

<u>Findings</u>

The plan to complete a functional assessment prior to initiating treatment for this inmate's problematic sexual behavior was clinically appropriate. The behavioral conceptualization and planned intervention were also appropriate, given the complexities of the case such as the inmate's cognitive impairment (history of head trauma and developmental disability). The overall treatment plan was also clinically appropriate, but would require an update following conclusion of the assessment. This inmate received adequate mental health care.

**Inmate B**

This case was selected for review as the inmate appeared on the DSH non-referral log on three occasions (6/21/16, 7/19/16 and 8/16/16) due to positive referral criterion seven and a question regarding symptom validity during the July 2016 IDTT.  This 26-year-old first-term EOP transgender (male to female) inmate had been housed at MCSP since 2014.

The inmate had not received an RVR since April 2015, nor had she been admitted to the MHCB since November 2014.  However, she had a history of two reported suicide attempts.  She also had a significant substance abuse history.  According to the treatment plan dated 8/16/16, the inmate reported abusing another inmate's Trileptal while incarcerated.  Her hormone medications had been discontinued, allegedly because she abused psychotropic medications; however, the actual progress note from the endocrinologist indicated that estradiol was stopped simply due to elevated prolactin levels secondary to olanzapine.  There was a plan for the endocrinologist and psychiatrist to coordinate the inmate's medication management.

The inmate's treatment plan dated 6/21/16 indicated that she experienced significant anxiety regarding discontinuation of the estradiol.  Hormone therapy was resumed on 6/29/16.

The inmate reported high anxiety, fear regarding her inability to complete her transition prior to release, intermittent delusional thinking, paranoia and auditory hallucinations related to gender dysphoria.  Despite this, the PC indicated that she presented with goal-directed thought processes and no evidence of response to internal stimuli.  Despite the PC documenting what appeared to be a lack of credibility in the inmate's self-report, psychosis was still listed as a treatment target.

The inmate was provided with diagnoses of Schizoaffective Disorder, bipolar type, Gender Identity Disorder NOS, Anxiety Disorder NOS and a provisional diagnosis of Borderline Personality Disorder.  Appropriate treatment targets were identified in the June 2016 treatment plan, but were not properly described.  Treatment goals were too basic and were inadequate for a 90-day period, but the interventions were appropriate.  The Form 7388-B was appropriately completed with a clinically sound non-referral rationale and appropriate treatment modifications given the inmate's functional level.  The inmate was being reviewed by the IDTT for discharge to the 3CMS level of care.

On 7/19/16, the next treatment team appropriately updated the treatment plan.  While short-term goals were still basic, the overall plan was comprehensive and clinically appropriate.  The Form 7388-B completed at this treatment team meeting was comprehensive and appropriately completed. The treatment team next saw the inmate on 8/16/16.  She continued to be identified as meeting criterion seven (attending less than 50 percent of treatment) for higher level of care referral consideration.  This treatment plan was not updated and it was unclear why the inmate was not discharged from the EOP to 3CMS level of care given prior treatment plans.  The treatment plan's discharge section noted that the inmate appeared appropriate for the EOP level of care.  However, this appeared to be a standard paragraph with little individualization.  The rationale for the DSH non-referral was appropriate, as were treatment modifications.

<u>Findings</u>

This inmate received appropriate mental health care.

**Inmate C**

This case was selected for review because the inmate had been housed in the MHCB for 26 days at the time of the site visit, but had not been referred to DSH based on MHCB census data. This 63-year-old inmate transferred from the CSATF 3CMS program. He was admitted due to grave disability with rapid speech and poor activities of daily living. His admission diagnosis was Schizophrenia. The initial psychiatric evaluation, nursing assessment and history and physical were all completed timely. Upon review of the healthcare record, it became clear that the inmate had, in fact, been referred to DSH acute inpatient care, although not until 11/7/16. He was not referred until after 17 days of MHCB treatment.

The inmate had a long history of mental illness, including a prior ASH admission. His criminal history was significant in that the DSH referral packet indicated that he was repeatedly found not guilty by reason of insanity. Mental health documentation indicated that he required a highly structured environment and consistent medication treatment; absent that, he became violent or sexually inappropriate.

Following placement in the MCSP MHCB for grave disability and vague threats toward others, the inmate continued to decompensate. An involuntary medication order was finally pursued on 10/14/16, although nursing documentation indicated that the inmate met criteria for involuntary medication at least 14 days prior. The inmate was described as disheveled with a foul odor and had food and waste littered around his room. He also wore his clothing backwards, was observed responding to internal stimuli and exhibited overt psychosis with delusional and disorganized thinking and behavior, incoherence, and refusal to participate in treatment or to shower. He also appeared to have met DSH referral criteria prior to the actual referral. It was unclear why staff waited so long to make the DSH referral or to pursue an involuntary medication order.

The inmate was victimized prior to his MHCB admission and had an injury over his left eye. He reported falling out of bed, but other inmates reported that he was victimized. The injury required sutures.

The initial treatment plan dated 10/24/16 was inadequate given the severity of the inmate's symptoms. The treatment plan confused interventions and treatment goals. The Form 7388 was also not properly completed, as the inmate clearly met subjective criteria (e.g., criterion two). The inmate continued to deteriorate, yet his next IDTT meeting on 10/31/16 did not include a revised treatment plan and did not note positive criteria for higher level of care consideration on the Form 7388-B. The inmate clearly met criteria one, two and four. These criteria were finally marked positive on 11/7/16 and a referral to DSH acute care was initiated.

It appeared that an involuntary medication order was never actually pursued, despite documentation that a PC 2602 was considered. The ongoing treatment plans were completed on

a Form 7388-D add-a-page and did not include modification to the actual treatment plan, despite the inmate continuing to decompensate.

Findings

This inmate was inadequately treated. He was not timely referred to DSH, nor was an involuntary medication order (PC 2602) timely sought, though it was clearly indicated.

**Inmate D**

This 26-year-old inmate was housed in administrative segregation. He was serving an eight year, eight month sentence following a conviction for evading a police officer, while driving recklessly, and theft of a vehicle. His EPRD was 2/28/21. He was provided with diagnoses of Mood Disorder NOS and Antisocial Personality Disorder. He was nonadherent with prescribed Remeron and Trileptal. His healthcare record was reviewed to assess emergency response and the provision of mental health services to administrative segregation EOP inmates.

During the site visit, the inmate reported a significant delay in access to care after he ingested two razor blades while in administrative segregation. He reported that despite disclosing the ingestion to the psych tech and custody being informed, he was not removed from his cell for three hours. He reported that custody staff intervened, because other inmates on the tier were "going off." He reported that he considered filing a 602 but was fearful of retaliation.

There was no documentation from the psych tech regarding this incident. According to his healthcare record, he was admitted to the TTA on 8/6/16 at 8:12 p.m. and the incident occurred at 7:55 p.m. He was transferred to an outside hospital where a foreign body was confirmed. Upon return to MCSP, he was referred to the MHCB and was then transferred to CHCF. He was discharged from the MHCB at the EOP level of care and returned to MCSP's administrative segregation unit.

SRE documentation that prompted the MHCB referral was concerning. This documentation suggested that the clinician had a negative reaction to the inmate. Specifically, "this SIB of swallowing razor blades appears to be a step up in desperation/acting out behavior," but there was no reference to a pattern of 'acting out behavior.' Additionally, documentation regarding the referral could have been improved with a focus on clinical presentation instead of indicating that the "pt would benefit from time off from his current housing unit (ASU)."

During the site visit, mental health leadership discussed emergency response protocols with administrative segregation staff. It was reported that no log documented when an inmate made a report of self-injurious behavior and there was subsequent intervention. However, it was reported that upon learning of self-injurious behavior, policy and procedure were to remove the inmate to a safe environment and provide observation consistent with policy.

The clinical summaries on the treatment plan were brief, in part due to the use of the add-a-page form. It was documented that "records indicate he engages in escape avoidance behavior to avoid situations and conflicts." However, the only example was documentation of the razor

blade's ingestion, reportedly to avoid a transfer.  This was another example of a negative reaction to the inmate, and of more concern, was in direct conflict with SRE documentation at the time of the MHCB referral.  Specifically, SRE documentation indicated that the inmate wanted to transfer from MCSP.  Furthermore, prior to the incident, his clinician had considered a referral to EOP, but this change in level of care was not performed as it would delay the transfer from MCSP.

Treatment planning needed improvement.  Multiple goals and interventions were combined, which made it difficult to discern which interventions corresponded to each goal.  Goals were measurable, but baseline data for two of the goals was lacking, making assessment of change impossible.  Furthermore, the assessment method changed between subsequent treatment plans. For example, one goal was to reduce the subjective report of mood lability and/or anger to a four of ten (on a one to ten scale); however, at the treatment plan review, progress was documented as "fair progress, no mood instability, SI, SIB."  There was no reference to the rating scale established in the previous treatment plan.

Documentation of PC contacts indicated that treatment was supportive in nature, but these contacts did not clearly address the goals and interventions outlined in the treatment plan.  This inmate also refused groups, but there was no documentation of problem solving to determine the reason for the refusals or interventions to assist with increased attendance.

Findings

The mental health care provided to this inmate was inadequate. Of significant concern was the inmate's allegations as to the lack of timely response from staff regarding ingestion of razor blades and lack of documentation from the psych tech.  Documentation of distinct treatment goals, interventions per treatment goal, consistency of documentation of goal progress and utilization of goals in clinical contacts was needed.  Documentation indicated that clinical staff experienced negative countertransference or a negative reaction to the inmate.  An assessment that this inmate engaged in escape avoidance behavior was based on one incident, which was inconsistent with previous documentation, suggesting that clinical staff did not adequately complete a record review for the inmate.

**Inmate E**

This 39-year-old EOP inmate was transferred to administrative segregation on 10/19/16 for safety concerns.  He was provided with diagnoses of Mood Disorder, Polysubstance Dependence and Antisocial Personality Disorder.  He was prescribed lithium and Effexor.  His healthcare record was reviewed to assess emergency response and the provision of mental health services in administrative segregation.

The inmate had no history of DSH admissions.  He was admitted to the MHCB in May 2015 due to passive suicidal ideation.  In July 2016, he was assessed with high chronic risk of suicide and moderate acute risk.  He had a history of several suicide attempts, auditory and visual hallucinations, delusions, hyperactivity, mania, depression, impulse control and poor coping

skills.  His substance abuse history began at age ten and included methamphetamine, marijuana, alcohol and cocaine.

During inmate interviews, he reported that on 11/16/16 he made a noose, attached it to the light and put it around his neck.  He stated that he removed it when he "realized" the officer would call for assistance.  He reported that he was not seen by mental health staff.  There was no documentation of this incident dated 11/16/16; however, there was documentation of two separate incidents (on 11/11/16 and 11/12/16) in which the inmate wrapped a sheet around his neck, conveying the image that he planned to hang himself.  It was also documented that custody staff was aware "he has been doing this to everyone."  After the incident on 11/12/16, the torn sheet was removed from his cell, but further assessment was not completed.

The inmate also reported to this reviewer that in August 2016 he was sexually assaulted by a peer on A Yard and custody staff was aware of the incident.  However, the PREA protocol was not followed and there was no assessment by medical or mental health staff.  He reported a second assault in October 2016 when the PREA protocol was followed but was delayed by one and one-half days.  The chief of mental health addressed these incidents.  Institutional staff reported being unaware of the August 2016 allegation, but they were aware of two separate allegations in October and November 2016, and thus opined that the inmate was confused about the dates.  It was noted that he had a history of PREA allegations, including three in the previous year.  Following consultation with mental health leadership, mental health staff evaluated him as to the allegation of the lack of follow-up from the August 2016 PREA incident and recent suicidal behaviors.  He was subsequently referred to the MHCB.

Findings

The mental health care provided to this inmate was inadequate.  The lack of response regarding suicidal behavior and alleged lack of response regarding a PREA incident was very problematic.  Treatment planning needed improvement.  Despite a diagnosis of Polysubstance Dependence, there was no goal in the treatment plan to address substance use.  Despite a recent PREA incident in which the inmate was allegedly assaulted, there was no goal consistent with trauma or consideration of a Post-Traumatic Stress Disorder (PTSD) diagnosis.  Furthermore, in spite of documentation that the inmate had a history of PREA allegations, this was not addressed by treatment planning.

EXHIBIT E
Sierra Conservation Center (SCC)
July 26, 2016 – July 27, 2016

**Inmate A**

This 37-year-old EOP inmate's healthcare record was reviewed to evaluate the mental health care provided at SCC.

The inmate was provided with a diagnosis of Dysthymic Disorder; an alternative diagnosis of Depressive Disorder was also under consideration.  He was prescribed Zoloft and Vistaril.

The inmate's mental health history included chronic, low-grade depression since childhood, anxiety, feelings of neglect by family members, bulimia and sexual abuse.  He also had a history of alcohol, cocaine and methamphetamine abuse.  His medical history was significant for urinary concerns and hypothyroidism.  The inmate had a phobia of using public restrooms.  He did not go to the bathroom for over nineteen hours due to the anxiety of using a public bathroom.  He also reportedly purposely incurred RVRs to avoid transfers due to layovers and having to stop for bathroom breaks.

The inmate entered CDCR on 11/16/07.  He was placed at the EOP level of care on 2/4/16 after a suicide attempt on 1/25/16.  The inmate became anxious after being notified of his transfer to another prison due to a change in his security level.  He attempted suicide on 1/25/16 by severely lacerating his left arm.  The injury resulted in tendon damage; 17 sutures were required.  The inmate was initially discovered after this attempt at 7:55 a.m., but the order for transport occurred two hours later.

Mental health staff consistently followed the inmate.  He was transferred to CHCF on 1/26/16 and then to VSP on 2/8/16.

Findings

The mental health care provided to this inmate was adequate.  However, there appeared to be a delay in his transport for medical treatment.

**Inmate B**

This 26-year-old 3CMS inmate's healthcare record was reviewed to evaluate the mental health care provided at SCC.

The inmate was placed in the 3CMS program after he was transferred to administrative segregation due to a charge of conspiracy to bring a controlled substance (alcohol) into the prison.  He was provided with a diagnosis of Depressive Disorder NOS.  He was prescribed Remeron and Vistaril.

The inmate's history was significant for alcohol use since age 12; he subsequently lived on his own after age 15.  The inmate received an additional four years to serve due to his sentence for conspiracy to introduce a controlled substance into the institution after his CDCR incarceration.

On 12/21/15, the inmate fell while using his crutches and complained of back, neck and hip pain. A physician ordered that he be transferred to an outside hospital by ambulance due to a possible seizure. The EMRRC reported a problem with the timelines as the ambulance did not arrive until four hours after the incident. It was unclear based on documentation when the ambulance was called. The inmate had previously fractured his fibula and was scheduled for follow-up surgery on 12/23/15.

During the review period, mental health staff saw the inmate more frequently than every ninety days. After the fall and second surgery, the inmate acquired methicillin resistant staphylococcus aureus (MRSA). A wound Vacuum-Assisted Closure (VAC) was required to assist in the healing of the open wound on his leg. The inmate was treated with morphine for over one month and was frustrated with the slow healing of the wound and his incarceration and additional sentencing. Additional stressors included the deaths of three family members in less than one year; one family member died from suicide, another by shooting and the aunt who raised him died of cancer. The inmate was admitted to the CHCF MHCB on 3/5/16 and was discharged to return to SCC on 3/11/16. Documentation dated 3/14/16 stated "but for his legal process would have been made EOP status," even though CHCF MHCB staff and the SCC PC agreed that EOP level of care would benefit him. For the remaining three months, mental health staff followed the inmate every three to six weeks.

Findings

The mental health care provided to this inmate was adequate. However, it was unclear why the SCC PC and CHCF MHCB clinician both indicated that he would benefit from EOP level of care, yet this level of care was not pursued. It nonetheless appeared that the inmate was stable at his current level of care at the time of review.

**Inmate C**

This 25-year-old SNY EOP inmate's healthcare record was reviewed as the inmate received his psychotropic medications by PC 2602 involuntary medication order at SCC. It appeared that the PC 2602 order was expiring when the inmate was transferred to SCC on 12/18/15. Blood testing indicated that his Haldol level dropped below therapeutic levels and he began to decompensate. The inmate never refused medications and was reported as medication adherent throughout the review period.

A SRE conducted on 12/30/15 assessed the inmate with low acute and chronic suicide risk.

The inmate's history was significant for decompensation and paranoid delusions when not taking prescribed medications or when his medication levels decreased below therapeutic levels. He had poor insight regarding his mental illness.

He was provided with a diagnosis of Schizophrenia paranoid type and was prescribed Invega Sustena.

584

The inmate received mental health services at all of the levels of care within the CDCR MHSDS. He had a significant history of MHCB and DSH hospitalizations dating from 2012. He was released from prison on 4/27/15 and upon his return to CDCR on 8/4/15 his PC 2602 order continued. The inmate's healthcare record revealed a history of religious and paranoid delusional thinking, believing he was a prophet and that custodial staff was involved in homosexual behavior and was poisoning and spitting in his food. He also exhibited ideas of reference, thinking that the television and radio were narrating his life. Despite these severe psychotic symptoms, the inmate remained with poor insight regarding his mental illness.

Between December 2015 and June 2016, the inmate was medication adherent. He worked in the kitchen, but received two RVRs for theft of state property (butter from culinary) on 3/17/16 and 4/16/16. Custody staff reported that he appeared to be responding to internal stimuli, with confusion and withdrawn behavior. His work supervisor also indicated that he stared out of the window for long periods of time. The inmate was recommended for EOP level of care on 5/19/16 and was on the list for transfer to an EOP Hub.

Findings

Documentation indicated that clinical staff saw the inmate timely. The inmate was appropriately recommended for a higher level of care due to decompensation. The mental health care that was provided appeared to be clinically appropriate.

**Inmate D**

This 40-year-old 3CMS inmate's case was reviewed as he reportedly refused prescribed psychotropic medications upon transfer to SCC.

The inmate arrived at SCC from SQ on 5/13/16 and went out to court two days later. He was provided with a diagnosis of Psychotic Disorder NOS. He was prescribed Cogentin, Haldol and Vistaril.

The inmate reported being in Juvenile Hall during childhood; during that time he was on suicide watch on multiple occasions. He had a history of mental health and substance abuse treatment in the community. He began using drugs and alcohol at age twelve; his drug use included PCP, LSD, alcohol and marijuana. He reported that he had been abstinent for three years. He had a history of auditory hallucinations and five MHCB stays during 2015. His suicide history was also significant for ingesting cleaning products and multiple wrist cutting incidents.

The inmate refused his Haldol upon arrival at SCC. Nursing staff discussed this issue with the PC. The PC and the nurse worked with the inmate and he ultimately agreed to take his medication. He transferred to RJD on 5/18/16. Based upon healthcare record documentation from RJD, it appeared that he received mental health services at the EOP level of care at that facility.

585

<u>Findings</u>

The mental health care provided to this inmate appeared to be clinically appropriate.

EXHIBIT F
California Medical Facility (CMF)
September 20, 2016 – September 22, 2016

**Inmate A**

This inmate's case was reviewed to assess the mental health care provided.  The inmate reported receiving multiple RVRs that he claimed were "nuisance" disciplinary actions because he filed complaints against custody and healthcare staff.  This 36-year-old inmate also noted a specific RVR in July 2016, but review of SOMS did not locate this RVR.  The most recent RVRs occurred on 5/10/16 and 5/29/16.

An RVR assessment progress note dated 5/31/16 as to an incident that occurred on 5/10/16 indicated that the inmate had multiple RVRs and 128As during the past 17 months, but did not indicate the exact number.  The assessment portion of the progress note was confusing, as was the analysis and rationale for determining whether the inmate's mental health contributed to the behavior contributing to the RVR.  The mental health assessments and underlying documentation were problematic.  For example, a second RVR assessment dated 6/16/16 for an RVR that occurred on 5/29/16 indicated very clearly that progress notes by the inmate's treatment team suspected that he was not a valid historian as to his history of mental illness nor current symptomatology.  The evaluator noted that the treatment team suspected the inmate reported psychotic symptoms for secondary gain.  The inmate had been highly focused on obtaining a single-cell chrono and remained focused on that task during his interview with this reviewer.  The evaluator identified that the inmate was a poor historian and inappropriately reported symptoms for secondary gain and cited three clinicians who did not believe that his mental disorder contributed to the RVR behavior; the evaluator nonetheless concluded that the mental disorder contributed to the RVR behavior.  However, the documentation of this mental health assessment was poor.  The progress note corresponding to the assessment appeared to contradict it as noted by documentation that the inmate was "manipulative" and exhibited antisocial behavior.  It did not appear to support the assessment conclusion in compliance with CDCR policy on RVR mental health assessments and training.

The inmate's treatment plan following these RVRs was an addendum to the treatment plan completed in June 2015, when the inmate was placed at the EOP level of care.  He was provided with a diagnosis of Mood Disorder NOS and was described as exhibiting cluster B personality traits.  He was prescribed Effexor for depression.  This addendum indicated that the inmate demonstrated little motivation to engage in treatment and instead focused on controlling his environment through housing changes, filing grievances and lawsuits and working on his legal appeal.  The inmate reportedly demonstrated cognitive inflexibility when unable to immediately have his wishes met.

Findings

This inmate did not appear to have been adequately treated as evidenced by an inadequate treatment plan.  His mental health assessments also appeared to have not been completed in accordance with applicable policy given that progress notes did not support assessment findings.

**Inmate B**

This case was initially selected as an example of MHCB care; it was the inmate's third MHCB admission over a six-month period. This 26-year-old inmate was housed in the MHCB during the site visit; he was admitted on 8/24/16. He had multiple previous MHCB admissions. Nursing discharge documentation indicated that the prior MHCB admission was from 5/19/16 to 7/17/16, although the inmate may have been clinically discharged on 7/6/16. The rationale for this length of stay was Clozaril retitration. The inmate's level of functioning was carefully achieved through complex medication management during that MHCB admission over the course of six weeks and prior to the inmate returning to the CMF EOP. The inmate also reportedly had one prior admission each to DSH Acute Psychiatric Program (APP) and ICF level of care.

At the time of the inmate's August 2016 MHCB admission, initial assessments were completed timely. However, the history and physical was only partially legible. Admission paperwork indicated that the inmate had decompensated after refusing Clozaril secondary to believing that staff had provided him with the wrong medication, which was inaccurate. Progress notes revealed that he had refused his regular bloodwork and had been urgently seen by the on-call psychiatrist. That psychiatrist explained to the inmate that his Clozaril prescription would be discontinued if he did not agree to participate in necessary lab work. The inmate presumably continued to refuse, as Clozaril was discontinued on 7/27/16. Available documentation indicated that issuance of a Clozaril prescription was not addressed again in either individual contacts or during the next treatment team meeting. In light of this inmate's chronic and complex history of illness and functional impairment combined with documented improvement when prescribed Clozaril, the EOP treatment team's failure to repeatedly address and work with this inmate on Clozaril adherence was unacceptable. In addition, EOP progress notes during this time period indicated the treatment plan did not include evidence-based interventions beyond medications, while individual contacts were unfocused.

The most recent MHCB admission from 8/24/16 to 9/23/16 included an extensive mental health evaluation that indicated the inmate's willingness to restart Clozaril. The treatment team repeatedly provided a diagnosis of Schizoaffective Disorder, bipolar type. However, it should be noted that psychiatric progress notes indicated Schizophrenia as a diagnosis, suggesting diagnostic disagreement among treatment team members. Additional diagnoses included Alcohol Dependence and Antisocial Personality Disorder with provisional diagnoses of Polysubstance Dependence, Borderline Intellectual Functioning and Borderline Personality Disorder.

The initial treatment plan dated 8/27/16 included an extremely comprehensive and well-written narrative. However, the actual treatment plan portion was marked by a paucity of information, although problem areas were actually addressed once identified and the connection between treatment targets, goals and interventions was listed. While the sole intervention of reinitiation of Clozaril made a great degree of sense, it should not have been the only intervention in light of the inmate's history of erratic adherence and overall difficulty engaging in treatment. In addition, in light of these considerations, the inmate appeared to be a strong candidate for DSH ICF treatment. Subsequent treatment plans dated 9/3/16 and 9/10/16 did not include the Form

589

7388-B, although the treatment team updated treatment plans.  The treatment plan and associated Form 7388-B completed on 9/17/16 was not sufficiently detailed to justify non-referral.  The inmate continued to be an appropriate referral to ICF once stabilized on Clozaril or to a DSH facility, such as CMF, that could continue to titrate the Clozaril dosage.  In addition, all treatment plans during this MHCB admission were limited with minimal information and no evidence-based interventions beyond medication management.

Findings

This inmate appeared to receive adequate care during his MHCB admission that ended in July 2016.  However, once discharged to the EOP and returned to the MHCB on 8/24/16, the inmate did not receive adequate care in light of the complex and chronic nature of his symptoms and functional deficits.  He continued to move between the EOP and MHCB levels of care without reaching a functional level in either.  When admitted to the MHCB, he remained there far beyond the ten-day limit.  This inmate required a DSH ICF referral to address his chronic, serious psychiatric symptoms.  The treatment team should have implemented CBT for psychosis in individual sessions.

**Inmate C**

This case was selected to assess MHCB care and because the inmate had been quickly readmitted to MHCB care, spending only seven days in the general population.  This 35-year-old 3CMS inmate was discharged from the MHCB on 4/21/16 and readmitted on 4/28/16.  He had been treated at the CMF MHCB from 4/16/16 to 4/21/16.  He was discharged to PVSP with a diagnosis of Psychotic Disorder NOS, Depressive Disorder NOS and Polysubstance Dependence.  He was admitted due to suicidal ideation with a plan and hearing voices telling him to kill himself.  He was readmitted to the MHCB at CSP/Solano from alternative housing due to suicidal ideation with a plan on 4/28/16.

The inmate's readmission did not appear to have been the result of inadequate treatment during the CMF MHCB admission.  During the hospitalization from 4/16/16 to 4/21/16, he was prescribed Zydis and Vistaril as needed and Remeron.  Progress notes indicated that he stabilized reasonably quickly, which may have been due in part to his lessened concerns regarding transfer.  The treatment team accepted the inmate's reported improvement in symptoms, but documented the possible existence of secondary gain.  The inmate was noted to be an inconsistent historian as to his history of suicide attempts.

In conjunction with the inmate, it was determined during the treatment team meeting on 4/18/16 to maintain him at the 3CMS level of care to allow for greater speed of transfer to address his RVR and safety concerns although he may have been appropriate for EOP level of care.  The treatment team recommended that level of care be reviewed in a less acute setting.  The treatment plan developed as part of this treatment team was comprehensive, appropriately targeted the salient precipitating and perpetuating factors relative to the MHCB admission and included evidence-based interventions.

590

Findings

This inmate was adequately treated.

## Inmate D

This case was selected to review the provision of EOP level of care. This 30-year-old EOP inmate was admitted to the EOP level of care during an IDTT on 8/25/16. He had an extensive mental health history prior to incarceration and beginning in childhood with symptoms that his PC described as indicative of either Bipolar Disorder or Attention Deficit Hyperactivity Disorder (ADHD) that was ineffectively treated due to erratic treatment. The inmate ceased his psychotropic medication while at PVSP and decompensated to the point of requiring MHCB inpatient care. He was subsequently discharged at the EOP level of care and transferred to CMF.

The initial treatment plan dated 8/25/16 indicated diagnoses of Bipolar I Disorder, Heroin Dependence, Hallucinogen Abuse, Antisocial Personality Disorder and a provisional diagnosis of Borderline Personality Disorder. The inmate also had Hepatitis C, but it was unclear whether he was receiving treatment for this disease. Identified problem areas included depressed mood, behavioral and emotional volatility and substance abuse. Unfortunately, the treatment plan combined these problem areas into one treatment target and established one very high level, vague, long-term treatment goal. Short-term treatment goals were not clearly linked to problem areas and were inadequate in light of the severity of the inmate's symptoms and functional level. Interventions were not obviously applicable to treatment goals although some may have been clinically meaningful for more appropriate short-term treatment goals. Overall, the initial treatment plan was neither adequate nor clinically meaningful despite a comprehensive narrative and strong case conceptualization.

The subsequent treatment plan dated 9/22/16 resulted from a special treatment team meeting that was conducted because the inmate wanted a job assignment. The only changes to the treatment plan were some minor ones to reflect this fact and an update to indicate the progress made by the inmate in seeking a job assignment despite this not being an identified goal.

The inmate was prescribed Zyprexa, Depakote, and Celexa. Progress notes indicated that his PC saw him every two weeks, but there were no group notes. The PC thus did not see the inmate in accordance with Program Guide requirements. Based on documentation of those contacts, no actual treatment occurred during them as they were more like check-ins to see how the inmate was doing at identifying a long-term life goal for his prison stay. The inmate was highly impulsive, engaged in self-injurious behaviors, and was described as emotionally and behaviorally volatile; treatment sessions thus should have involved empirically-based interventions targeted to those problem areas that resulted in his EOP placement, such as CBT for psychosis or dialectical behavior therapy.

The inmate also reported to the psychiatrist during an individual session that he had experienced bed-wetting on several nights. He was seen by his primary care physician who told him that his psychiatric medication was the most probable cause, as no physical factors were responsible. The psychiatrist indicated that the psychotropic medication was not the cause, because there had

been no recent medication changes.  The psychiatrist failed to note that the inmate's medication had been changed during his recent MHCB stay prior to EOP placement.  The decision was made to maintain the medication unchanged.  The inmate subsequently reported to his PC that he had not been taking his psychotropic medication as the bed-wetting had continued, and, as a result, he did not like the medication.  The inmate had been noted to have increased psychomotor agitation during that contact and reported that he had engaged in self-injurious behavior requiring surgical intervention.

<u>Findings</u>

This inmate was not adequately treated due to an inadequate treatment plan, insufficient frequency of clinical contacts and inadequate clinical intervention during these contacts.

**Inmate E**

This 49-year-old administrative segregation EOP inmate's healthcare record was reviewed to evaluate the care he received.  The inmate was provided with diagnoses of Major Depressive Disorder and Psychotic Disorder.  Prescribed mental health medications were fluoxetine, buspirone, carbamazepine and olanzapine.

The inmate had significant medical problems, including hypertension, a seizure disorder, a brain injury at age 18 (he was in a coma for three days), partial paralysis, and use of a wheelchair.

The inmate's history included sexual abuse by his stepfather from age seven to twelve.  He participated in special education classes and had behavioral problems, with juvenile hall placement for petty theft during childhood.  He received mental health treatment in the community due to auditory hallucinations, depression, anxiety and mood swings.

His past suicide attempts included stabbing himself following his mother's death, jumping in front of traffic in 1998 and swallowing ammonia pills in 1992.  There were no reported DSH admissions, but he had one MHCB admission; he was subsequently placed at the EOP level of care.

The inmate was transferred to CMF on 3/29/16, where he was seen weekly.  A mental health non-confidential interview assessment was conducted on 4/20/16 for an RVR that he received at a previous institution.  The RVR alleged that the inmate spun his wheelchair around, striking an officer, and then cursed him and tried to strike the officer with his right arm.  The RVR was heard and adjudicated and subsequently reduced to a Division F offense.  Clinical documentation indicated that, due to paralysis, the inmate did not have use of his right arm.

The inmate was placed on NDS status in April 2016.  He was endorsed to RJD in June 2016, but had not transferred at the time of the site visit.  During the September 2016 IDTT meeting, staff and the inmate reported that he had experienced at least two seizures, when was found on the floor of his cell.

The psych tech reported that the inmate was medication adherent.

592

In response to the psychiatrist's question as to whether medications were helping, the inmate replied "no." The psychiatrist's response was "good, keep the medication as is." The psychiatrist did not inquire as to possible medication side effects.

IDTT staff was questioned after the IDTT, when they were asked why the inmate had not transferred to RJD. The CC I replied that the inmate had not transferred because there were not enough transport vehicles. The *Coleman* expert discussed this matter with the chief of mental health, who discussed it with the Classification and Parole Representative (C&PR) and associate warden. The C&PR reported that the transfer had not occurred due to a lack of appropriate beds. The inmate transferred two days later.

Findings

This inmate was appropriately considered for referral to a higher level of care during the IDTT meeting. Of concern was the delay in the timely transfer of this medically challenged and mentally ill inmate. The psychiatrist also did not ask about medication side effects or advocate for the inmate with a healthcare consult regarding his reported seizures.

**Inmate F**

The 30-year-old administrative segregation EOP inmate's healthcare record was reviewed from a list of administrative segregation EOP inmates having a follow-up IDTT meeting.

The inmate was provided with a diagnosis of Schizoaffective Disorder. He was prescribed aripiprazole, Cogentin, Trileptal and Zyprexa. He received his psychotropic medications through a PC 2602 order.

The inmate arrived at CMF in December 2015. Timely contacts were conducted during the review period. The following comments will cover behaviors prior to an MHCB admission, subsequent RVR and IDTT meeting.

On 8/19/16, healthcare record documentation described the inmate as paranoid and delusional. The inmate referred to himself as an officer, saw witches and was admitted to the MHCB. While in the MHCB, he threatened to kill a psychologist. Prior to the MHCB admission, the inmate refused his oral medication and did not receive PC 2602 injectable medications.

On 8/24/16, the inmate was seen for an RVR evaluation. The clinician stated "inmate presented smiling energetic and somewhat jovial mood remain elevated and somewhat odd." The evaluation indicated that the officer described the inmate as "not quite right. Patient appears to be less manic though remains elevated and somewhat odd."

A psychiatry note stated the following: "Patient identified psychologist as a fellow CIA agent then made threats." The psychiatrist discussed the case with two clinicians and the decision was to refer him to the MHCB. A five-day follow up clinician note dated 8/25/16 indicated that the

inmate had delusional thinking about religion and "being a savior." His insight and judgment was assessed as fair and his impulse control was determined to be low.

The following day, the psychiatrist reported that the inmate was having racing thoughts. Two days later, the inmate told the psychiatrist that he had fathered 8,000 kids.

On 9/8/16, the inmate was described as manic with psychotic thinking. The clinician informed him that he was being discharged from the CTC to administrative segregation after threatening a psychologist. Documentation also indicated that the inmate was still exhibiting impulsive behavior.

On 9/15/16, the clinician wrote in the progress note's assessment portion "a mental disorder did contribute to the RVR behavior. On the day he threatened to harm the psychologist, he recently missed oral and injectable doses of psych meds. He was delusional and went to MHCB, However, when questioned the day of the 115 he said he knew he was making a threat. Consultation with staff indicate he has a history of violence even when he is not mentally ill. So although the mental disorder contributed to the 115, the total context does not warrant documenting this behavior in an alternate manner."

Prior to the IDTT, the psych tech reported that the inmate was hearing voices and was acting strangely during the past two days. During the IDTT meeting, the inmate became agitated and frustrated with his clinician. He stated that the clinician was focused on the negative aspects of his life and not on his accomplishments. He reported being in the healthcare field as a caregiver, CPR and first aid certified, in the military and with the FBI and other agencies. The inmate also reported having PTSD from being shot in the head, as well as having had blunt force trauma to his head multiple times prior to incarceration. As the session progressed the inmate became more agitated. As such, regional staff asked the supervising psychologist to have the clinician end the session. Although the supervisor intervened, the clinician continued to discuss the inmate's mental health history, current RVRs and other mental health criteria. The inmate demanded to go back to his cell. After the IDTT, the clinician talked about the inmate's bizarre behavior during the past couple of weeks and wanted to discuss a higher level of care, but subsequently chose to terminate this discussion.

Findings

The inmate's mental health clinical care was inadequate. The clinician did not adequately assess the situation and terminate the interview, resulting in the inmate becoming increasingly more agitated. There was also inadequate and inappropriate higher level of care referral consideration, as was clinically indicated. The inmate did not receive PC 2602 medication as ordered. The mental health 115 clinical documentation indicated that the clinician did not adequately consider the inmate's mental status and symptomatology in the assessment, even though clinical staff was aware and documented that the inmate did not receive medication prior to the MHCB admission and with the threats to staff. The ICC meeting also did not discuss missed medications.

**Inmate G**

This 49-year-old administrative segregation EOP inmate's healthcare record was reviewed from a list of administrative segregation IDTT meetings that occurred during the review period. The inmate's diagnosis was Schizoaffective Disorder, depressive type. He was also diagnosed with dyslexia. He was prescribed Cogentin, Zyprexa and Celexa.

The inmate was transferred to administrative segregation at CMF on 9/11/16 due to battery on a peace officer.

The inmate had seven prior suicide attempts; the last occurred in 2013 in county jail. He also had two psychiatric hospitalizations in the community. He was placed at the EOP level of care on 2/25/14 due to delusional thinking and auditory hallucinations. He had two MHCB admissions during 2004 and 2008 and reported an ASH hospitalization ten years prior.

The inmate was severely abused early in his childhood, resulting in foster care placement. He also had a history of self-injurious behavior and closed head injury with loss of consciousness. The supervising psychologist conducted the IDTT meeting because the inmate's PC was away from the institution. The supervising psychologist read verbatim the PC's Form 7388 documentation. The psychiatrist called the inmate the wrong name twice. The psych tech exchanged keys and loudly whispered with other staff during the IDTT and the CC I ate a protein bar.

After the supervisor finished reading the clinical summary, the inmate discussed his recent RVR. He voiced his disappointment with himself for being baited by another inmate into a fight; he had also stopped taking medication for approximately two weeks. The discussion turned to education because the RVR and the inmate's subsequent transfer to administrative segregation had disrupted his education. The supervisor stated that the inmate could continue to receive education by going to groups. The inmate replied that he attended groups. Goals and objectives were measurable; they included not receiving RVRs during the next 90 days, adhering to medication administration 100 percent of the time over the ensuing 90 days and decreasing depression and anxiety to below a five (on a one to ten scale) within the next 90 days by using deep breathing techniques positive imagery.

Findings

The Form 7388-B criteria were appropriately discussed and considered. However, the clinical summary was read verbatim and the inmate was not asked if he understood the purpose of the IDTT, his treatment goals or whether he had any questions. Other team members also exhibited distractive behaviors during the IDTT meeting.

**Inmate H**

This 38-year-old administrative segregation 3CMS inmate's healthcare record was reviewed from a list of inmates who were scheduled for an administrative segregation IDTT meeting during the site visit.

The inmate was provided with a diagnosis of Major Depressive Disorder and ADHD.  He was prescribed Buspar and Zoloft.

The inmate was transferred to administrative segregation at CMF on 9/14/16, after custody received a note that indicated that he was abusing an older inmate.

The documented psychosocial history noted the following: "The inmate shot himself in his left foot because he was depressed.  Raised by both parents in a dysfunctional family which led to multiple group home and foster homes.  The inmate was physically abused, shot many times.  Received MH treatment at the San Francisco Bay View Health Center.  History of hopelessness.  Divorced times 2 and has 7 children.  Work history includes warehouse, clothing store, construction and landscaping work."

The inmate received an RVR for a drug test which was positive for methamphetamine.  Treatment goals included in the treatment plan were to improve "coping skills with ASU/prison life and sobriety and transition back to GP."  The inmate refused to attend the IDTT meeting due to his possible release on the following day.

Findings

The mental health treatment provided to this inmate appeared to be adequate.  The in absentia IDTT meeting was appropriate.

**Inmate I**

This administrative segregation EOP inmate's healthcare record was reviewed from a list of inmates attending an initial IDTT meeting during the site visit.

The inmate was provided with a diagnosis of Major Depressive Disorder, recurrent.  He was prescribed Zoloft and was treated for a thyroid abnormality and asthma.

The inmate arrived at CMF from PBSP on 9/16/16 due to safety concerns.  He had received his third strike and moved between the EOP and 3CMS levels of care.  The inmate's history was significant for his father's previous incarcerations and current incarceration at PBSP, the death of a son, estrangement from other family members and violence and aggressive behavior since childhood.  There were no reported DSH admissions; he was admitted to the MHCB in June 2016 due to problems adjusting to his environment.

The inmate was concerned about his property.  The CC I told him to be patient.  The inmate responded that he had nothing to do and wanted to know where his property was.  The IDTT progressed on to goals of reducing the inmate's depression to four or less (on a scale of one to ten) and learning two coping skills in the next 90 days.  The inmate agreed with the plans and indicated he had no questions.  He was reportedly adherent with his prescribed psychotropic medications.  The inmate was also able to restate the purpose of the IDTT and the goals of his treatment plan over the next 90 days.  All Form 7388 criteria were appropriately discussed.

596

<u>Findings</u>

The mental health care provided to this inmate appeared to be appropriate and the inmate was seen timely.  However, staff incorrectly utilized the wrong forms in documenting the IDTT meeting.

EXHIBIT G
California State Prison/Solano (CSP/Solano)
May 10, 2016 – May 12, 2016

**Inmate A**

This case was reviewed to evaluate the care provided in the CSP/Solano MHCB. This 30-year-old inmate was admitted to the MHCB at CSP/Solano from HDSP on 5/3/16 due to suicidality. All admissions paperwork was timely completed. The inmate had self-inflicted wounds on his wrists, having attempted hanging and starvation secondary to suicidality. He was provided with a diagnosis of Adjustment Disorder with depressed mood. He was prescribed Prozac. The treatment plan dated 5/5/16 also included a provisional diagnosis of Major Depression, single episode. The inmate was discharged from the MHCB on 5/5/16 to an outside hospital due to unspecified medical complications, which the healthcare record indicated were presumably due to his refusal to eat, although this was unclear. He returned to CSP/Solano on 5/10/16.

The inmate had a chronic medical illness; he reported chronic pain and had a history of poor impulse control. He was also a convicted sex offender who was serving his first state prison term of 25-years-to-life and had safety concerns. The inmate reported that he had been threatened by other inmates and wanted to be moved to another facility for housing, but did not want to return to HDSP. It appeared that the inmate had initially been told that this would be possible, but was then told that he would have to return to HDSP. The inmate also reported to MHCB staff that apparently since beginning the hunger strike he had lost between twenty and thirty pounds.

The inmate was described as appearing very depressed and withdrawn and maintained little eye contact with staff. He had the protective factors of family support, religious and cultural beliefs and an exercise program. The most recent treatment plan of 5/5/16 did not include the inmate, as he was sent to an outside hospital on that date. Short-term treatment goals included some inappropriate goals, but interventions were adequate for the setting. One goal was that the inmate would report no suicidal ideation for a period of three consecutive days; however, this was not conclusive evidence that he was not suicidal and staff was mistakenly teaching him not to verbalize his suicidality. Since staff believed that the inmate was committing suicide by starvation, a more appropriate goal would have been for the inmate to eat 50 percent of his lunch and dinner meals, or something similar. There were also problems which were combined into one, when they should have been divided into separate treatment goals.

The inmate was to be referred to the acute care inpatient program at DSH at that time, but his transfer to the general hospital for medical treatment precluded this referral.

This inmate was interviewed on 5/11/16 in the MHCB. He reported general satisfaction with his mental health care in the MHCB. He had been cleared to receive reading materials on the previous day, but had not received reading materials at the time of interview.

<u>Findings</u>

This inmate required treatment goals that were achievable and more appropriate to his clinical situation. Based on the interventions, his treatment was minimally adequate and bordered on inadequate, given the goal for the inmate not to verbalize suicidality. That goal must be revised to a more appropriate goal. This was a significant problem with the reviewed treatment plan.

**Inmate B**

This case was reviewed to evaluate provided care in the CSP/Solano MHCB. The inmate was interviewed during the site visit; he appeared to be in a hypomanic state, with perseveration regarding somatic issues.

This 36-year-old inmate was admitted to the MHCB at CSP/Solano from Folsom due to suicidality on 5/7/16. He had a history of multiple suicide attempts by cutting, hanging and head banging. He received his psychotropic medications involuntarily from 2013 to 2014 due to a court order due to danger to self. He also had a history of admissions to DSH (ASH and SVPP). When he arrived at the CSP/Solano MHCB, he was described as using loud, pressured speech that was incomprehensible and included the use of profanity. Except for the required SRE, admission documentation was completed.

The most recent treatment plan dated 5/9/16 indicated that the inmate had been diagnosed with Schizoaffective Disorder, bipolar type, and Polysubstance Dependence, with a possible diagnosis of Antisocial Personality Disorder. He was prescribed Abilify and Cogentin. He had received three RVRs for assault, gassing, arson and exhibitionism, and exhibited decompensation after the discontinuation of medications earlier in the year. The Form 7388-B was marked positive for criteria one and two, but it recommended non-referral due to the need for continued assessment for DSH necessity as the inmate was newly-admitted. There were no specific modifications noted in the Form 7388-B as a result of non-referral. The team merely listed the MHCB Program Guide requirements; this indicated noncompliance with policy requirements for that section.

The treatment plan did not operationalize short-term goals in quantifiable ways and interventions required greater specification. Treatment goals should be appropriate to the treatment target. However, this treatment plan focused more on the inmate not reporting symptoms as a sign of improvement, even when that may have only been a sign of his failure to disclose. Progress notes indicated the more appropriate treatment strategy of building rapport and continued assessment of the inmate. He was repeatedly described among clinicians and other MHCB staff as difficult to redirect due to his pressured speech, poor insight and unwillingness to pause and listen to others.

<u>Findings</u>

While most admission requirements were completed for this inmate, the SRE was not completed. The initial treatment plan did not include appropriate goals and interventions required greater specification. Given his manic presentation, the inmate would benefit from behavioral interventions at this stage of treatment, until medication began to have a positive effect, allowing him to participate in and benefit from "talk therapy." The treatment plan should be modified to utilize an individual behavioral plan that included recreation therapy and time out of cell. The inmate should also be considered for DSH referral. This inmate was not receiving adequate treatment.

**Inmate C**

This case was reviewed to evaluate the care provided in the CSP/Solano MHCB and because the inmate was identified on the DSH non-referral log.  This 24-year-old inmate was housed in the MHCB and was identified on three separate occasions as having met criteria for higher level of care referral consideration.  This occurred on 2/5/16, 2/12/16 and 2/19/16.

The inmate was transferred to the MHCB on 1/28/16 from VSP due to suicidal ideation.  He was provided with diagnoses of Psychotic Disorder NOS, Mood Disorder NOS and Amphetamine Dependence.  He was prescribed Depakote ER and Vistaril.  He had a previous hospitalization due to psychosis, but his symptoms reportedly did not begin until after his drug use.  The inmate reported alcohol, marijuana, LSD and methamphetamine use beginning in his adolescence.

The initial weekly treatment plan dated 2/5/16 required greater operationalization of treatment goals and better organization.  The Form 7388-B indicated that the inmate met criteria one and two, but he was not referred to DSH as his medications were being adjusted, and he had shown some progress.  No treatment modifications beyond Program Guide requirements and medication stabilization were included.  He remained in the MHCB on 2/12/16, when he was seen by the IDTT.  There were some changes to the treatment plan, but medication remained the same.  The Form 7388-B of this date indicated that the inmate met criteria two and four (in the MHCB for more than ten days).  The reason for non-referral was "IP retained for medication management" with no further explanation.  For treatment modifications, the staff simply copied sections of the treatment plan.  It was unclear how these goals could be considered as treatment modifications in the spirit of section 1-6 B of the Form 7388-B.  The inmate was an MHCB patient on 2/19/16 when the IDTT again saw him.  His medications had been changed to Thorazine, Geodon and Cogentin.  He improved significantly with no suicidal ideation for more than one week and decreased psychotic symptoms.  He was to be discharged to the EOP level of care.  The Form 7388-B of that date noted that he met criterion four (MHCB for more than ten days), but he was not referred due to his current stability and pending discharge.

Findings

This inmate should have been referred to DSH, as required in accordance with initial time frames and his functional level.  Had the inmate stabilized sufficiently prior to transfer as to not benefit from inpatient treatment, his referral could have been rescinded.  In addition, his treatment plans required revision to include appropriate goals and treatment modifications when the inmate did not improve.  This inmate was not adequately treated, but he eventually improved enough for discharge.

**Inmate D**

This case was reviewed to evaluate the care provided in the CSP/Solano MHCB.  This inmate was also identified twice for consideration of referral to a higher level of care, but was not referred.  This 60-year-old inmate was admitted on 10/18/16 to the CSP/Solano MHCB from RJD due to suicidal ideation with multiple plans.  While the DSH non-referral log indicated that he was from RJD, some MHCB documentation reported that he was from CSP/Corcoran.

Regardless, the inmate believed that he would be transferred to CSP/Corcoran and was fearful of going there.  This SNY inmate was receiving mental health services at the 3CMS level of care prior to his MHCB admission.

While housed in the CSP/Solano MHCB, the inmate was provided with diagnoses of Adjustment Disorder with depressed mood, PTSD, Polysubstance Abuse and Major Depressive Disorder, severe without psychotic features.  While Axis II was deferred, a provisional diagnosis of Antisocial Personality Disorder was also mentioned.  The inmate reportedly had a history of "5150" commitments (involuntary inpatient commitments) in the community, but it was unclear how this information was obtained or whether it was verified.  The inmate reported multiple incidents of self-injurious behavior, an "accidental" suicide attempt and actual past suicide attempts, as well as a history of substance abuse (alcohol, marijuana and ecstasy).

The treatment plan dated 10/18/16 was adequate regarding included goals and interventions.  The Form 7388-B indicated that the inmate met criterion five (three or more MHCB admissions in the last six months), but was not referred to a higher level of care because the inmate's suicidal ideation had resolved.  The inmate was stable and ready for discharge.  The subsequent treatment plan of 11/2/16 was completed because the inmate had remained in the CSP/Solano MHCB despite clinical discharge while awaiting transfer to his home facility.  Appropriately, the Form 7388-B noted that while the inmate had technically been housed in the MHCB beyond ten days (and had more than three placements), he had actually been clinically discharged and was stable.

<u>Findings</u>

This inmate was appropriately not referred to DSH and received adequate mental health treatment.

**Inmate E**

This case was selected for review as the inmate was placed in seclusion while housed in the MHCB.  This 32-year-old inmate was admitted to the CSP/Solano MHCB from MCSP due to self-injurious behavior and suicidal ideation on 2/14/15.  Except for the SRE, his admission assessments were completed timely.  The inmate reported anxiety, helplessness and fear as to his upcoming parole.  He had a plan for suicide if returned to MCSP and told staff that he wanted help and believed that he belonged in a hospital.  He had previously been housed at CHCF, but the progress note did not clarify whether that was a DSH admission.  The inmate reported auditory hallucinations, paranoia, anger and impulsiveness with a history of suicide attempts.  He reportedly was admitted to DSH eleven times; it was unclear whether he was hospitalized in the acute or intermediate programs or in a combination of both.

The inmate was provided with diagnoses of Anxiety Disorder NOS, Polysubstance Dependence, in a controlled environment, Borderline Personality Disorder and Antisocial Personality Disorder.  He received his psychotropic medications by a PC 2602 involuntary medication order.  He was prescribed Zyprexa, mirtazapine, Vistaril and benztropine, as well as diphenhydramine and haloperidol intramuscular injection in the event of medication refusal.

602

The inmate also had a seizure disorder.  He was taken to an outside hospital on 2/25/15, which psychiatric documentation of the following day indicated was due to two falls.  The psychiatrist noted that it was unclear whether the falls were due to the inmate's seizure disorder or for other reasons.

During the evening of 2/26/15, the on-call psychiatrist was contacted by MHCB staff, who reported that the inmate had been banging his head on the wall and was bleeding from the forehead.  The inmate was highly agitated and was yelling that he wanted to hurt himself.  The psychiatrist issued a verbal order for seclusion.  The inmate was evaluated face-to-face on the following morning by a psychologist and was determined to be stable and no longer in need of seclusion.

The order placing the inmate in seclusion, and particularly the exit criteria, was not fully legible.  There were also continuation orders, but they were similarly deficient as there was no justification provided, duration or exit criteria included.  Subsequent documentation indicated that the inmate no longer engaged in self-injurious behavior, but he was not released at that time.  It appeared that he may have remained in the seclusion cell longer than necessary.  Treatment plans were well-constructed and appropriate.

Findings

This inmate received appropriate mental health treatment.  The only recommendation would be to empower nursing staff to remove inmates from seclusion prior to expiration of the order when clinically indicated.

**Inmate F**

This case was selected for review as the inmate was placed in restraints while housed in the MHCB.  This was the sole documented incident of restraint usage during the review period.  This 23-year-old inmate was admitted to the CSP/Solano MHCB on 12/23/15 from SQ due to suicidal ideation and superficial self-inflicted wounds on his arms.  Initial documentation, including the SRE and psychiatric admission evaluation, were not completed.  The inmate was provided with diagnoses of Bipolar Disorder NOS, Intermittent Explosive Disorder and Panic Disorder without agoraphobia.

The inmate was placed in restraints on 12/29/15 due to self-injurious behavior.  He was previously placed in restraints at a county jail due to banging his head.  The CSP/Solano MHCB order for restraint was extremely detailed and indicated that the inmate had reopened a wound on his right arm and was intentionally squirting blood on the walls.  He was extremely agitated, pacing in the cell, yelling and shouting profanities.  Multiple staff had attempted to de-escalate the inmate without success prior to his restraint placement.  Clear exit criteria were provided.

603

<u>Findings</u>

This inmate was appropriately placed in restraints.  However, his treatment plans required some revision, as some treatment goals were too broad and were not objective and measurable.  The inmate, otherwise, received adequate mental health care.

**Inmate G**

This inmate's healthcare record was reviewed as he received 3CMS level of care while housed in administrative segregation.  The purpose of the review was to assess the quality of the summaries of psych tech weekly rounds.  The inmate arrived in prison in 2013.  He was initially cleared for the general population, as the mental health evaluation concluded that he did not meet enrollment criteria for inclusion in the MHSDS.

This 22-year-old inmate was placed in administrative segregation on 1/21/16, with pending RVRs for fighting and participation in a riot.  He was subsequently placed in the 3CMS program due to medical necessity on 2/11/16.  His inclusion was predicated on his symptoms of sleep difficulty and stress due to fear of placement in administrative segregation.  He was provided with diagnoses of Adjustment Disorder, with mixed anxiety and depressed mood and Antisocial Personality Disorder.  He was prescribed Paxil to treat anxiety symptoms.

A mental health treatment plan could not be located in the healthcare record.  The mental health evaluation of 2/19/16 recommended that the treatment plan focus on anger management, relaxation skills for anxiety reduction, parole planning and adherence with recommended psychiatric medication.

The psych tech saw the inmate during daily rounds in February and March 2016.  Weekly summaries composed between 2/11/16 and 3/6/16 did not document mental health concerns or motivation towards suicide.  Objective observations by the psych tech routinely noted no signs of decompensation, good activities of daily living, a clean cell, cooperative demeanor and adherence to psychiatric medication.  Near the end of February 2016, the psych tech evaluated the inmate's activities of daily living as fair and documented that he complained that his medication was ineffective.

A PC contact occurred on 3/3/16.  The inmate denied sleep problems and continued to present as calm and cooperative.  The PC explored triggers of anger and anxiety which were related to missing his family.  The inmate did not raise and the PC did not explore issues of medication effectiveness and the cell condition documented in the psych tech contacts.

<u>Findings</u>

This inmate was appropriately placed in the 3CMS program.  The psych tech documented the inmate's self-report that medications had become ineffective and activities of daily living were fair.  The inmate subsequently saw the PC where neither medication nor activities of daily living issues were mentioned.  It was incumbent for the PC to attend to the inmate's report of medication ineffectiveness; no further referral to the psychiatrist was located in the healthcare

604

record.  As to the treatment goal of medication adherence, the quality of mental health care provided to the inmate was inadequate.

## Inmate H

This inmate's healthcare record was reviewed from a list of inmates scheduled for an IDTT on 5/2/15 during the site visit.  This 36-year-old inmate was housed on Facility A.  He arrived in CDCR in 2013.  Transfer records indicated that he was not prescribed psychotropic medications in the county jail.

The inmate met eligibility criteria for inclusion in the MHSDS on 9/17/15.  He was placed in the 3CMS program due to multiple factors including prior treatment in the MHSDS and current reported symptoms of depressed mood, hyperactivity, argumentativeness, isolation, guilt and withdrawal from usual activities.  He was provided with a diagnosis of Major Depressive Disorder.

The inmate declined treatment with psychotropic medication.  He had previously been treated with Divalproex, which was discontinued due to medical problems.  Medical diagnoses included hypertension, obesity and an unspecified vitamin D deficiency.  On 3/9/16, he was admitted to an outside hospital with a diagnosis of nephrotic syndrome and underwent a kidney biopsy.

The mental health treatment plan identified problems that included anger and depression.  Long-term goals for both problems were specific and measurable.  Interventions included quarterly PC contacts and participation in topic-specific therapeutic groups relevant to both problem areas.  The IDTT reviewed factors that might prompt consideration of referral to a higher level of care and, based on the healthcare record, the inmate was appropriately not referred.

The healthcare record indicated that timely 90-day contacts occurred with the PC. The inmate participated in and reported benefit from group treatment.  However, his self-reported level of depressive symptoms was unchanged due to the absence of family contact.  The PC guided the inmate toward alternatives, such as letter writing to foster relationships and alleviate depression.  The inmate remained without psychotropic medications and expressed no motivation for self-harm.

<u>Findings</u>

The inmate was appropriately placed in the 3CMS program.  He was seen every 90 days by his PC and participated in several relevant groups to his treatment needs.  Progress was assessed and he was provided with alternative strategies to reach goals when needed.  The quality of provided mental health care was adequate.

## Inmate I

This inmate's healthcare record was chosen at random from a list of those scheduled for an IDTT meeting during the site visit.  The purpose of the review was to assess the treatment provided at the 3CMS level of care.

605

This 55-year-old inmate entered CDCR on 8/13/10 where he met eligibility criteria for MHSDS inclusion following a reception center evaluation.  He was placed in the 3CMS program based on his symptoms of dysphoria, poor sleep, and psychomotor retardation.  He endorsed a history of psychiatric treatment since age 35, complicated by substance abuse since age 13.  He was provided with an initial diagnosis of Unspecified Mood Disorder and Polysubstance Dependence, in institutional remission.  He was prescribed Paxil; however, he was not fully engaged in either psychiatric or psychosocial treatment during the initial years.

According to the treatment plan of 5/14/15, the inmate's diagnoses were Dysthymic Disorder and Amphetamine Abuse, remitted in a controlled environment.  The problem area was noted as depression, resulting from a long sentence and separation from family.  The long-term goal was documented as getting out of prison, reestablishing ties with family, remaining in individual and group therapy and continuing to be a devout Christian.  Short-term goals entailed maintaining his current level of adjustment in group and individual therapy and adhering to psychiatric recommendations.  The inmate expressed the belief that he would be released from prison and wanted to be prepared when this happened.

During the review period, timely PC contacts occurred.  Except for the inmate's subjective complaints, PC progress notes consisted of two typed pages which were duplicative in a cut-and-paste fashion.

Routine psychiatry contacts were provided.  Progress notes indicated that symptoms of depression had decreased significantly.  The inmate reported taking medications as prescribed and reported full involvement in several groups available to him in the housing unit.  The psychiatrist gradually tapered the medication dosage and medications were eventually discontinued.

Findings

The inmate was appropriately receiving mental health services at the 3CMS level of care.  Treatment was provided according to Program Guide requirements as to timeliness of contacts and treatment planning.  However, PC notes were lengthy, non-substantive and duplicative in content.  A good description and assessment of the inmate's overall progress was found in the psychiatric documentation.  Overall, the inmate received adequate mental health care.

**Inmate J**

This case was randomly selected from a list of inmates receiving care in the 3CMS program.  The inmate was a 57-year-old male who had served 39 years of a life term that began in 1977.  He had no history of mental health treatment prior to incarceration and was not previously a MHSDS participant.

The inmate met eligibility criteria for inclusion in the 3CMS program on 10/7/15.  His placement was predicated on his symptoms of anxiety and depression associated with uncertainty of his parole date and a prior date rescinded by the governor.  He was provided with a diagnosis of

606

Adjustment Disorder, unspecified.  He was not prescribed psychotropic medications.  Treatment goals consisted of reducing overall intensity and frequency of anxiety symptoms through 90-day contacts with the PC.  The plan did not identify how treatment goals would be measured.  The inmate was described as high functioning and motivated to learn new ways of dealing with the uncertainty of his release date.

A review of interdisciplinary progress notes composed on 1/4/16 and 3/17/16 indicated that the inmate's affect had changed substantially in a positive direction.  He was described as more direct and informative with his answers and less guarded.  He continued to focus on accepting past experiences with the parole board and determining what he could do differently in the future.

Findings

The inmate was appropriately placed in the 3CMS program to ameliorate experiences of anxiety and depression resulting from recent parole board decisions.  He demonstrated stable functioning in the general population in that his symptoms were under control and did not significantly impair functioning.  He did not meet criteria for referral to a higher level of care as evidenced by review of the Form 7388-B.  Treatment timelines were met.  The mental health care provided was adequate although treatment goals were not stated in measurable terms.

**Inmate K**

This healthcare record was randomly selected for review among a list of inmates receiving treatment in the 3CMS program.  The inmate submitted a healthcare services request on 10/25/15 indicating that he had been removed from the 3CMS program in the reception center but was experiencing thought problems.  A routine referral was sent to the PC, who met with him on 11/3/15.  The inmate expressed the belief that he was the focus of negativity in the housing unit and believed others were staring at him and moving when he moved.  He reported seeing a light in the periphery and felt depressed and wanted to escape.

The inmate's history included an attempt to burn his eye with a magnifying glass to clear himself of sin when he was 16 years old.  He suffered a traumatic brain injury with loss of consciousness following a beating with a bat at the same age and a firecracker explosion in his face when he was younger.  He was enrolled in special education classes.  He reportedly earned a GED and received a grade equivalent score of 1.9 on the TABE.  A hospitalization for trial competency at ASH in 2003 was the only prior psychiatric history.

The inmate was returned to the 3CMS program on 11/18/15.  He was provided diagnoses of Mental Disorder secondary to traumatic brain injury, seizure disorder and extensive alcohol and methamphetamine use beginning at age 14.  Identified problems included visual hallucinations, paranoia and depression, each of which was believed to stem from the traumatic brain injury, substance use or both.  The long-term goal consisted of educating the inmate about the effects of traumatic brain injury and long-term substance use, so that he could manage his emotions and sensations in a manner that did not interfere with daily functioning.

607

The treatment team reviewed the inmate to determine whether he should be considered for treatment at a higher level of care.  The team concluded that he could be appropriately treated in the 3CMS program with a focus on release planning.  He was referred for a psychiatric medication evaluation.

The psychiatrist met with him on 11/23/15.  The psychiatrist provided diagnoses of Unspecified Psychotic Disorder with a history of head trauma and Amphetamine Dependence.  The inmate declined medication but was agreeable to consider it in the future.

The inmate was seen for routine PC contacts during January and February 2016. During meetings, he focused on release issues and spoke in generalities.  He reported intermittent sleep problems which were improving.  He continued to decline psychiatric treatment.

A mental health treatment plan was developed on 4/27/16, related to possible transfer to "MCRP."  The inmate's symptoms had cleared with the exception of seeing a bright light.  He was not prescribed psychotropic medication.  Problem areas were unchanged.  The PC indicated that depression was present, which was attributed to the inmate attempting to separate from his family.  The recommended interventions included continued mental health contacts with drug and alcohol counseling.  A diagnosis of Unspecified Psychotic Disorder was added.

Findings

The inmate was appropriately placed in the 3CMS program to treat symptoms associated with his psychiatric diagnosis.  He received conflicting diagnoses and there was no documentation that the treatment team attempted to reconcile this matter.  The team recommended a co-occurring disorders program; albeit, it was unclear if this would be available to him in his next placement. The inmate would have benefitted from a referral to the EOP for diagnostic clarification and treatment planning.  The use of initials (MCRP) without reference to meaning led to unnecessary vagueness in the treatment plan.  The inmate did not receive adequate mental health care.

**Inmate L**

This healthcare record was reviewed because the inmate was a participant in a Lifer's group that was observed during the site visit.  The inmate began his prison term in 1978 and met eligibility criteria for inclusion in the 3CMS program in 1981 following the death of a family member.  He transferred to CSP/Solano in 2012.  He was placed in the 3CMS program.  He was provided with a diagnosis of Major Depressive Disorder, recurrent, moderate.  He was prescribed Remeron and Effexor.  His medical history was significant for left arm and elbow pain, hypertension, diabetes type two and hypothyroidism.

In a mental health treatment plan developed on 10/1/15, the clinical summary indicated that the depression experienced by the inmate during the past year was due to dairy intolerance.  The treatment plan noted that, as such, the primary psychiatric diagnosis should be revised; the diagnosis was neither revised, nor was it discussed by the treatment team since that time.

The PC saw the inmate on 12/15/16.  He was described as stable and doing well. The psychiatrist saw him on 4/21/16.  The inmate complained of increased nerve pain and Effexor was increased by the psychiatrist.  Sleep, appetite, energy and concentration were not problematic.  The inmate had applied for a prison job and participated in the Lifer's group.

Findings

This inmate appropriately received mental health services at the 3CMS level of care.  He adhered to psychiatric treatment recommendations, from which he appeared to benefit.  He was routinely seen by the PC and psychiatrist and availed himself of job and therapeutic opportunities in the institution.  He received adequate care; however, the treatment team should have reconciled the inmate's primary diagnosis.

609

EXHIBIT H
San Quentin State Prison (SQ)
May 24, 2016 – May 26, 2016

**Inmate A**

This 53-year-old inmate was one of the original patients in the SQ PIP before he was discharged on 4/28/15. He was not discharged as a treatment success, but was discharged at his request. His case was reviewed because he was included on the non-referral to higher level of care logs multiple times and to evaluate the care provided to EOP inmates in the condemned program.

The inmate's treatment plan dated 10/13/15 documented an estimated six to seven suicide attempts between 2012 and 2014 by overdose (methamphetamines and amphetamines), self-strangulation and cutting. His mental health treatment began when he was twelve years of age and was placed in a community mental health residential facility. He was also treated at ASH as a young adult. His level of care was increased from 3CMS to EOP in June 2010 after his first reported suicide attempt. Staff expressed suspicion that the suicide attempts were an effort to avoid disciplinary action; the attempts were always self-reported, apparently days or weeks after the incidents with no medical intervention sought.

The inmate was described as exhibiting labile mood, impulsive behavior, chronic suicidality with vague plans, and an inability to appropriately engage mental health services. He was provided with diagnoses of Bipolar Disorder NOS (provisional), Amphetamine Dependence in a controlled environment, Narcissistic Personality Disorder (primary) and Borderline Personality Disorder.

The 10/13/15 treatment plan listed all of the inmate's problems as inactive, making it unclear what issues treatment planning would target. Goals were not operationalized with measurable objective behaviors as treatment targets. Interventions were appropriate if the inmate was engaged with the treatment team. As the inmate had a long history of minimal treatment engagement, as exhibited by his request for discharge from inpatient treatment, the treatment plan should have included treatment goals that targeted this issue. The inmate was not participating in at least 50 percent of treatment offerings (item seven on the Form 7388-B). He was not referred to a higher level of care because he was viewed as having a positive clinical presentation; this conclusion was reached despite his recent MHCB stay reportedly due to methamphetamine consumption. In addition, the non-referral was justified by the inmate's view that group therapy was distasteful and that the PIP had an overwhelming and inappropriate regimen of group activities. There were no treatment modifications listed, but only the typical program for treatment refusers.

The inmate next appeared on the non-referral log in January 2016; he also met referral criteria and was identified, but not referred, in November 2015 and December 2015. The rationale and treatment modifications were much improved in the December 2015 documentation. The November 2015 treatment plan referenced enemies in treatment groups, as did the October 2015 treatment plan, without indicating a plan to change the inmate's groups to improve participation and address the enemy concerns. The January 2016 treatment plan did not address the inmate's poor participation and failure to engage with mental health as a direct treatment target. While interventions were generally appropriate, many could not be implemented at cell front; the documentation indicated that the inmate chose to commonly conduct his clinical contacts at this location. The rationale for higher level of care non-referral continued to note the enemy issue in

treatment groups and other issues such as the group not being intellectually stimulating and conflicting with yard time.  A plan was documented in treatment modifications to address the group enemy issue.

The 2/2/16 Form 7388-B and full treatment plan noted improvement, as the inmate agreed to confidential PC contacts more often.  However, this improvement was short-lived; by March 2016, the inmate had refused 78 percent of therapeutic groups and only had intermittent contact with the PC.  Although the treatment team indicated that this level of participation was acceptable, it was clearly inadequate.  The inmate required an individualized behavioral plan to address his treatment resistance and inability to function appropriately in the housing unit due to very poor stress management, inability to manage anger with lability and his proclivity to blame others.

Findings

This inmate did not receive adequate mental health treatment.  Although he presented as a complex and difficult challenge for clinical staff, all treatment options were not exhausted.  Until those options were pursued, an assessment that the inmate was functioning at baseline or that this level of functioning was "acceptable" was premature and inappropriate.  If treating staff was unable to appropriately modify treatment planning, the inmate should have been referred back to the PIP for inpatient care.

**Inmate B**

This 67-year-old inmate was selected for review to evaluate the provision of mental health care for 3CMS inmates.  The IDTT saw this inmate on 5/24/16 for an annual review; the mental health program used mainline IDTT standards for condemned inmates, despite their segregated status.

The inmate was provided with a diagnosis of Delusional Disorder, persecutory type.  He was prescribed risperidone and hydroxyzine.  He had no history of community mental health treatment or of self-injurious behaviors.  He had not been a participant in the MHSDS since his placement in the condemned unit in 1992.  During 2011, he began to exhibit persecutory delusions and possibly olfactory hallucinations that others were fanning foul odors into his cell and increasing the heat in his cell with their hot pots.  He also reported auditory hallucinations in which he could hear others talking about his flatulence.  The treatment team noted the possible presence of medical and/or organic contributing factors (severe gastroesophageal reflux disease), but concluded that late onset delusional disorder remained the most appropriate diagnosis.

The inmate reportedly functioned well in other areas of his daily living.  However, due to his delusional thinking, he at times became agitated.  His insight regarding his mental illness was poor.  He was a yard cleaner for the unit.

The most recent treatment plan dated 5/24/16 indicated that the inmate had not responded well to CBT and was erratically adherent with prescribed medications.  While treatment goals were measurable, none focused on eliminating medical and/or organic causes for his behavior or

determining the extent to which those factors might be responsible for it (e.g., dementia). The inmate was maintained at the 3CMS level of care.

Review of progress notes suggested that the inmate's symptoms were worsening. During March 2016, the psychiatrist changed the inmate's medication to a rapidly dissolving preparation; to assist with treatment adherence, the dosage was also decreased. The inmate subsequently expressed increasing paranoia, fearing that his food trays were tainted. On or about 5/23/16, he reported that he vomited as a result of these tainted food trays over the previous two to three weeks. Staff indicated that the inmate's paranoia appeared to be somewhat influenced by his environment and social relationships.

Findings

Mental health staff frequently saw this inmate. It would be beneficial for the treatment team to work with the inmate's medical team to rule out medical causes for his behaviors and to determine the degree to which medical issues contributed to his paranoid beliefs and olfactory hallucinations. In light of the inmate's condemned status, psychological testing would probably not be an option, despite its potential benefits. Finally, given staff's observation of the environmental influence on the inmate's level of paranoia, the PC should work with the inmate to develop insight into this pattern and develop coping strategies. The determination of the adequacy of care provided to this inmate was contingent on whether he received a medical evaluation to eliminate medical causes for his symptoms; if no medical evaluation was completed, the care provided was inadequate.

**Inmate C**

This case was selected for review as the inmate was on a modified treatment plan and was identified as attending less than 50 percent of scheduled structured therapeutic activities. However, it appeared from review of the most recent treatment plan that the inmate was not on a modified treatment plan, but clinical indicators suggested that such a plan was indicated. There was no explicit statement located in the healthcare record that the inmate was placed on a modified treatment plan. There was also a comment on the Form 7388 suggesting that the treatment team and/or PC did not understand the purpose of a modified treatment plan. Specifically, the treatment team said "…an acceptable level of stability may make it feasible to lower his level of care to modified EOP to reduce his frequency of scheduled activities." This inmate was not attending treatment due to his depression. He required a treatment plan that addressed his depressive symptoms and his lack of treatment participation.

Findings

It could not be determined from available documentation whether this inmate was on a modified treatment plan. The only treatment goals that were included in treatment planning were minor and inadequate. There was also no goal related to the inmate's poor participation and failure to adequately engage in treatment. This inmate did not receive appropriate mental health care.

**Inmate D**

This 26-year-old inmate was transferred to SQ on 1/21/16.  This was his second prison commitment term.  He was sentenced to two years for second degree robbery and the use of a deadly weapon.  According to a February 2016 treatment plan, he was provided with diagnoses of Bipolar I Disorder, most recent episode unspecified, Alcohol Dependence and Antisocial Personality Disorder.  His healthcare record was reviewed as he was a high EOP refuser at the time of the site visit.

At the initial psychiatric evaluation, olanzapine was continued from admission; the inmate remained on this medication at the time of this review.  The mental health evaluation and SRE were completed on 2/3/16, coinciding with his IDTT.

This inmate had a history of psychiatric hospitalizations.  During periods of mood instability, he became violent and aggressive.  He experienced grandiose delusions in which he believed he was a successful rap artist and professional basketball player.  During his previous CDCR commitment, he was treated at the 3CMS, EOP, MHCB and DSH (SVPP) levels of care.  He required a PC 2602 involuntary medication order to adhere to prescribed psychotropic medications.  There was no history of suicide attempts or suicidal ideation.  He had a history of methamphetamine, marijuana, opioid, and benzodiazepine abuse.

Soon after admission, the inmate was briefly transferred to administrative segregation; he was housed in administrative segregation at the time of release from his prior CDCR term.  The administrative segregation psychiatric note was comprehensive and provided a good overview of his psychosocial history and symptoms.  Documentation provided basic support for the diagnoses, but could have been more thorough.  The inmate was placed at the EOP level of care, as he had previously been released from CDCR at this level of care.  He requested transfer to the 3CMS level of care and it was decided to downgrade him to the modified 3CMS program at the next IDTT; however, the provision of services under the modified 3CMS program was unclear.  At the IDTT, the problem list identified aggressive behavior, but the earlier referenced precipitant of mood instability was not included.

While in the modified 3CMS program, weekly PC contacts occurred.  An update of current stressors and mental status was also documented, but targeted treatment interventions were lacking.  On 2/23/16, following consultation with the treating psychiatrist, the PC changed the inmate's level of care from modified 3CMS to 3CMS.  The next PC contact was on 3/22/16.  At that time, his level of care was documented as modified 3CMS, but in a different section of the note, it was documented as 3CMS, with a plan for monthly rather than previous weekly contacts.

On 3/23/16, the inmate transferred to SVSP.

Findings

The mental health care provided to this inmate was appropriate.  Contacts with mental health occurred as clinically indicated and, at times, exceeded Program Guide minimums.  However,

treatment could have been improved with targeted interventions to address specific skill deficits and emotional distress.

There were other areas of concern.  The use of 'modified 3CMS' as a level of care was not officially sanctioned; discussions with leadership indicated that this terminology's use was rare and no longer used.  It was not clear what the differentiation between 'modified 3CMS' and 3CMS was, including the frequency of clinical contacts and what the provision of services included.  Lastly, given that the inmate was designated at the 3CMS level of care, it was unclear why he was identified as an EOP treatment refuser.

**Inmate E**

This 45-year-old SNY inmate was sentenced to serve two years for burglary.  He had an EPRD of 9/21/16.  He transferred to SQ's reception center on 1/25/16, prior to his transfer to CSATF.  His healthcare record was reviewed to assess the provision of mental health services for reception center inmates on modified EOP programming.

Record review indicated diagnostic discrepancies (Schizoaffective Disorder, depressive type or Bipolar I Disorder, most recent episode depressed with psychotic features) between treating providers and IDTT documentation.  However, across providers, the inmate was consistently provided with a diagnosis of Cognitive Disorder NOS.  There was no documentation regarding a change in diagnoses or the discrepancy between providers.  The rationale for the diagnosis of Cognitive Disorder NOS was unclear.  At the time of transfer to SQ, the inmate was prescribed Haldol, Cogentin and Remeron.

The inmate had a history of mental health treatment for auditory hallucinations.  There was no history of inpatient treatment and there was discrepant documentation as to prior suicide attempts.  He had a long history of alcohol, heroin and methamphetamine use.

The initial psychiatric contact was thorough; it covered pertinent areas and was well-written.  Monthly subsequent contacts with a new provider were virtually unchanged from the initial note; there was minimal focus on current symptomatology.  Medication adjustments occurred later but there was a lack of clear documentation as to rationale.  Psychiatric contacts consistently referenced the need for anger management, but this was not included in treatment planning.

PC contacts were timely, but treatment interventions were insufficient.  The inmate disclosed that he did not want to attend group treatment due to paranoia.  As a result, his level of care was changed to modified EOP, resulting in twice weekly PC contacts. PC contacts did not document attempts to encourage the inmate to attend group, provide reality testing to address his paranoia or develop strategies to assist him cope with groups or depression.  There was documentation of symptom improvement, but factors (behaviors, skills) that may have impacted the positive change were minimally documented.  For example, during a 2/23/16 PC contact, it was documented that the inmate was using meditation for depression.  However, it was unclear whether this was an intervention that his PC taught him or if he had previously learned it.  The plan section of PC notes was essentially unchanged and thus not individualized to the inmate's

615

current mental status.  Furthermore, the plan to provide education on sleep hygiene and CBT was not apparent in PC notes.

Routine IDTT meetings on 2/24/16 and 3/23/16 were both labeled as initial.  More importantly, there was no update on symptoms, change in functioning or treatment goals or plan to fully understand and address the inmate's reluctance to attend groups.

At the time of the site visit, the inmate had been transferred to CSATF.

Findings

This inmate's care was timely, but the quality of ongoing treatment was insufficient.  There was also a lack of coordination of care among treatment providers.

**Inmate F**

This transgender (male to female) inmate was transferred from the NKSP reception center on 5/12/16 due to valley fever precautions.  Documentation in the healthcare record referred to the inmate using feminine pronouns.  She was in CDCR to serve a two year, eight month term for burglary.  Her healthcare record was reviewed after observing her initial IDTT during the site visit.  She received mental health services at the EOP level of care.

There was conflicting documentation as to the inmate's age (48 or 52).  She was provided with diagnoses of Mood Disorder NOS, Psychotic Disorder NOS, Polysubstance Dependence and Borderline Personality Disorder.  There was a change in diagnosis between the mental health evaluation and the treatment plan that reviewed documentation did not address.  Rationale supporting diagnostic conclusions was also lacking.  The inmate was not prescribed psychotropic medication in the community, but at SQ was prescribed Remeron, Zyprexa and Effexor.

The inmate had an extensive history of mental health treatment that began in childhood.  She had numerous inpatient hospitalizations, twenty to thirty suicide attempts and chronic passive suicidal ideation.  During a prior CDCR term, she was assessed as DD2 and received mental health services at the 3CMS, EOP and DSH levels of care.  She also received her psychotropic medications by PC 2602 involuntary medication order.  She had a history of alcohol, cocaine and marijuana use.

There were multiple major medical concerns, including a low T cell count, Hepatitis C, asthma, epilepsy and polyneuropathy.  After a developmental disability review, the evaluator contacted the CME/CEO regarding medical issues and it was determined that a multidisciplinary case conference was indicated to address her concerns.

The mental health evaluation was not located in the healthcare record.  Staff attributed this to a clerical error and a paper copy was provided for review.  Upon review, there were grammatical errors and incomplete sentences.  An SRE assessed the inmate with high chronic and moderate acute suicide risk.

The inmate presented with apparent distress during the IDTT. Goals were not discussed in the IDTT, but were documented as identifying triggers for self-injurious behaviors and coping skills. There was a thorough overview of skills that the inmate used to assist with risk reduction, but these skills were not reviewed in the IDTT, despite the inmate's obvious distress. Her suicide history also was not reviewed, nor was her current suicidality assessed despite her distress and statements alluding to self-harm. Near the end of the IDTT, this reviewer discussed with IDTT staff the lack of a suicide risk assessment and the inmate was then questioned as to current suicidality.

Findings

This inmate's clinical contacts with mental health were timely, but inadequate. Documentation in the mental health evaluation was poor. Diagnostic rationale was lacking. Although staff appeared empathic and compassionate toward the inmate during the IDTT, her self-harm risk was not assessed, despite clinical indication. Emotional regulation, which was a primary treatment need, was not included as a goal. It was, however, encouraging to learn of the multi-disciplinary case conference, given the inmate's multiple treatment concerns.

**Inmate G**

This 59-year-old inmate was housed in the Adjustment Center. He was not a participant in the MHSDS. His healthcare record was reviewed after he disclosed to this reviewer during tier walks that his confidentiality had been violated following an RVR mental health assessment that was conducted on 5/10/16. He received this RVR due to charges of threatening to kill a public official, threatening to cause significant bodily injury to a public official, threatening to cause significant bodily injury to a public official's family, harassment of another person and willfully delaying a police officer in the performance of duty. If found guilty, he faced the possibility of a SHU term.

Documentation confirmed that the inmate had been informed of the non-confidential nature of the evaluation. It was documented that while he did not understand the meaning of non-confidential, he appeared to understand that his participation in the evaluation was voluntary; he thus could decline to participate. The inmate participated minimally before terminating the evaluation.

Findings

Documentation supported that the inmate was aware that the evaluation was not confidential and he exercised his right to discontinue the evaluation.

**Inmate H**

This 57-year-old inmate was provided with a diagnosis of Depressive Disorder NOS. He was not prescribed psychotropic medication. His healthcare record was randomly chosen to assess the provision of mental health services at the 3CMS level of care.

617

The inmate entered CDCR on 3/5/10 to serve a life sentence for a third strike offense.  He had not previously received mental health treatment and had no history of suicide attempts or suicidal ideation.  His inclusion in the 3CMS level of care was attributed to hopelessness, sadness and anxiety that originated from situational stressors shortly after his incarceration.

The inmate's IDTTs occurred timely.  Documentation from the most recent IDTT on 5/19/16 indicated that while the inmate's mood had improved, he continued to experience depression and anxiety, was "less hopeful" and had less energy to program.  The treatment goal was to maintain a stable mood.

PC contacts occurred as clinically indicated and exceeded the 90-day minimum contacts that the Program Guide required.  Interventions were generally supportive; documentation focused on status updates of the inmate's life, but this was not routinely connected to goals.

Findings

This inmate's care was clinically appropriate.  The quality of treatment could have been strengthened with treatment goals and interventions that targeted his current treatment needs.  Of note, the goal of maintaining stability did not clearly address documentation of ongoing depression, anxiety and low energy.

618

EXHIBIT I
Deuel Vocational Institution (DVI)
August 30, 2016 – September 1, 2016

**Inmate A**

This case was selected for review because the inmate was identified on the DSH non-referral log and the DSH coordinator audit log.  It was also selected as an example of reception center EOP inmate care.  This 52-year-old inmate provided with diagnoses of Bipolar Disorder, most recent episode manic, Delusional Disorder and Polysubstance Dependence in a controlled environment for alcohol, methamphetamine and marijuana.  He was also being considered for a possible diagnosis of Factitious Disorder.  He was prescribed a paliperidone palmitate injection every four weeks and oral hydroxyzine.

The treatment team indicated on 3/29/16 that the inmate had reported safety concerns once admitted to the MHCB during each of his prior admissions.  When seen by the reception center EOP treatment team on that date, he reported that he had decided to cell with a "tougher" EOP inmate in an effort to feel safer.  The treatment team indicated that the inmate's anxiety and safety concerns were being addressed on a daily basis through treatment and custody interventions and that he would be moved to a cell closer to custody to allow custody to observe him on a more consistent basis.

The treatment plan was well-developed and clinically relevant.  However, the Form 7388-B's non-referral rationale was incomplete and required improved documentation.  Progress notes suggested that treatment modifications were not fully implemented and were not appropriate given the inmate's level of impairment, psychotic thought process and delusional state.

Subsequent treatment team documentation dated 4/28/16 failed to provide appropriate documentation on the Form 7388-B.  It did not note positive criterion five and did not consider the inmate for higher level of care referral.  The team had marked criterion seven as not applicable despite the inmate remaining at the EOP level of care.  However, the treatment plan appeared to be clinically appropriate.  Nonetheless, progress note documentation indicated the inmate was not improving or functioning well as the treatment plan suggested.

Group treatment notes suggested that the inmate was quiet and only minimally and superficially participated in group treatment.  However, other interactions with mental health staff indicated significant impairments.  On 4/18/16, the psychiatrist described the inmate as bizarre, difficult to engage and tangential in his speech and thinking.  The inmate had reported to the PC that there was a snake in his cell, which neither the correctional officer nor the clinician saw, suggesting that the inmate was experiencing visual hallucinations in addition to delusional thinking.  It did not appear that psychotropic medications improved these symptoms.  As mental health staff developed greater clinical insight into this inmate, documentation indicated they had greater awareness that his safety concerns were related to delusional thinking regarding his brother.  It was unclear whether this delusional thinking might have been responsive to appropriate treatment at that time.  The inmate had a history of DSH acute care treatment in late 2015 and January 2016 with a positive response to treatment.

Findings

Available documentation indicated that this inmate appeared to have been an appropriate candidate for referral to DSH intermediate care. He experienced significant functional impairment due to his mental illness and had not responded to treatment. There were also problems with appropriate documentation. The March 2016 Form 7388-B required greater clarification of the non-referral rationale, while the April 2016 Form 7388-B was not properly completed with clinicians failing to note that the inmate met criteria for higher level of care referral consideration. The inmate's treatment plans were well-developed but did not properly reflect his level of impairment and lack of response to treatment. This inmate did not receive adequate mental health treatment.

## Inmate B

This case was selected for review as the inmate was identified on the DSH non-referral log and the DSH coordinator audit log. It was also selected as an example of reception center EOP inmate treatment. The treatment team saw this 29-year-old first term male reception center EOP inmate on 3/17/16 for an update; however, a prior treatment plan was not located in the healthcare record. The inmate reportedly arrived at the reception center on 11/30/15. He had three MHCB referrals/admissions (one each month since arrival) and had returned to DVI from a MHCB on 2/25/16, where he was treated due to suicidal ideation. The SRE indicated moderate acute and chronic suicide risk. He was provided with a diagnosis of Psychotic Disorder NOS. He was prescribed fluphenazine, Cogentin and Vistaril.

The inmate's treatment plan included inappropriate treatment goals such as the denial of suicidality, which could result in the inmate not conveying his suicidal thoughts to treatment staff, elevating suicide risk and impairing actual treatment. In addition, immediate functional deficits were not addressed and treatment was instead focused on target behavior that was not a current problem for the inmate (e.g., substance abuse). Target dates for successful completion of goals also were inappropriate at times, as some of those dates had already occurred. For example, the inmate was to utilize several coping skills by 3/2/16 despite the treatment team having been held two weeks after that date, on 3/17/16. Treatment goals also were not measurable or the attempt to make them measurable was not comprehensible. For example, impulsive behaviors were to be decreased from "10/10 to 5/10." Although this appeared to be a type of severity measure, a context was not provided and there was no way to judge what was intended. A better method would have been to use the number of disciplinary-type chronos written in a week or outbursts toward others or another type of objective measurement. The treatment plan noted the inmate would be released soon and was anxious about this release and needed pre-release planning assistance. Otherwise, the treatment plan did not meet the inmate's functional and symptom needs. A Form 7388-B was not filed with the treatment plan and was not located in other areas of the healthcare record, suggesting it was not filed after the DSH coordinator audit; therefore, it could not be reviewed.

Review of clinical progress notes revealed that the only pre-release planning that occurred had been conducted by the correctional counselor. Documentation indicated only minimal pre-release planning discussions with the PC. According to the PC, this appeared to have been in

621

part due to the fact that the inmate was paroling to ASH; however, the inmate had not been told of this disposition. No rationale, clinical or otherwise, was provided for the PC knowing that the inmate was to be released to ASH but not discussing this with the inmate as part of pre-release planning. Progress notes from group treatment, psychiatry and the PC were limited and did not contain much information, making it difficult to assess the need for DSH referral.

Findings

This inmate was not adequately treated. His treatment plan did not adequately address his symptoms, functional level and repeated crises. It also did not effectively address pre-release planning, including his impending transfer to a state hospital rather than to the community as the inmate believed. The Form 7388-B was not located in the healthcare record and documentation was minimal, which made it difficult to assess the appropriateness of a DSH referral.

**Inmate C**

This case was selected for review as the inmate had been identified multiple times on the non-referral log and the DSH coordinator audit log. It was also selected as an example of reception center EOP inmate treatment. This 29-year-old transgender inmate was transferred to DVI from NKSP due to concerns as to the risk of valley fever. She had three or more MHCB admissions prior to arrival at DVI.

The treatment team saw the inmate on 4/7/16; however, this treatment team did not include a psychiatrist or the inmate's PC. Despite being an initial IDTT, the documentation was completed on an update form. Treatment goals were to establish rapport with the inmate's actual PC and to develop treatment goals; such a treatment plan was clearly inadequate. The Form 7388-B completed on that date failed to note that the inmate met objective criterion five (three or more MHCB admissions) although it was later corrected to reflect positive for this item. The rationale for not considering referral to a higher level of care was due to the inmate appearing stable during a brief interview; this despite the clinician repeatedly reporting in documentation that the inmate was evasive, would not make eye contact and was a poor historian. This very subjective rationale was given greater consideration than the more objective indicators of multiple crisis placements and documented poor functioning over time. This rationale was inadequate to justify non-referral. However, treatment modifications appeared clinically adequate.

The treatment team next saw the inmate on 5/5/16, when diagnoses of Psychotic Disorder NOS and Mood Disorder NOS were provided; a possible diagnosis of Gender Identity Disorder NOS was under consideration. The inmate refused psychotropic medications but was interested in hormone treatments to begin transitioning from male to female. This treatment plan described the inmate's treatment progress and increased stability. The plan was well-developed and included appropriate goals and interventions targeted to the inmate's most immediate needs. However, the plan's weakness was that it did not include the inmate's concerns related to being transgender, transitioning and/or current challenges in receiving treatment. A Form 7388-B was completed on this date that properly identified the inmate as meeting criterion five and documented an appropriate rationale for non-referral to a higher level of care. The treatment

modifications were only minimally adequate and should have better addressed the positive criterion.

The treatment team met again on 6/2/16, when it was noted that the inmate appeared stable. At that time, the medical doctor questioned the inmate's competence to consent to medical care, as the inmate had been refusing antiviral and antipsychotic medications. When interviewed by mental health staff, the inmate agreed to take both classes of medications. However, her compliance with psychotropic medications remained erratic. She was not scheduled for follow-up with the physician for antiviral medications until July 2016. She was prescribed olanzapine. She attended groups, but rarely participated, and would not stay in them for the entire time, which was reportedly due to her short attention span. The exact amount of time that the inmate spent in structured treatment was not recorded. In light of these issues, the non-referral rationale on the Form 7388-B and the treatment modifications were inadequate because they did not address these impairments; treatment modifications focused exclusively on the inmate's erratic medication adherence.

Group treatment notes repeatedly described the inmate as guarded, withdrawn and avoidant. Individual progress notes documented internal preoccupation, objective evidence of psychotic processing that the inmate denied, mild problems with activities of daily living as evidenced by body odor and a disheveled appearance, excessive sleep and "negative symptoms of psychosis." Mental health staff documented repeatedly that the inmate had no insight into her mental illness and poor judgment and was a poor historian. Due to transfer delays and a pending release date, the PC began pre-release planning with the inmate, but the treatment plan was not updated to reflect that additional treatment goal. The inmate did not appear to be progressing in treatment beyond the initial stabilization that occurred at the time of transfer from NKSP. Consequently, the treatment plan required modification, which did not occur. The treatment team should also have considered higher level of care referral.

Findings

This inmate initially had been adequately treated upon arrival at DVI. However, as she continued to experience profound deficits in functioning due to her mental illness, which seriously impacted her ability to function and her well-being (e.g., refusal to take necessary antiviral medications), her treatment team failed to update her treatment plan, consider a higher level of care referral or implement other meaningful interventions. The PC, however, provided significant pre-release planning for this inmate.

**Inmate D**

This 31-year-old inmate was serving a two year sentence for burglary. His healthcare record was reviewed to assess clinical aspects of the RVR process. He was diagnosed with Major Depressive Disorder, recurrent, Schizoaffective Disorder, bipolar type, Opioid Dependence in a controlled environment, Bipolar Disorder and Borderline Personality Disorder NOS. He had a history of trauma, but there was no documentation to indicate that his trauma symptoms had been assessed. He was prescribed Effexor, Zyprexa and Cogentin.

On 2/18/16, the inmate received an RVR at CHCF for indecent exposure. The RVR indicated that he "intentionally" exposed his buttocks to an officer to "annoy" him. When questioned the inmate stated, "Maybe I should apologize my pants fell down." It was indicated that the inmate was "upset" due to a recent cell change.

At the time of the incident, the inmate was receiving mental health services at the EOP level of care. At some point, his level of care was changed to 3CMS. The mental health assessment was completed one month later, on 3/17/16, at DVI; the behavior was considered bizarre, unusual or uncharacteristic. The assessment form required that the clinician check "yes" or "no" as to whether 1) the inmate's behavior was strongly influenced by a mental illness or developmental disability/cognitive or adaptive functioning deficits, and 2) there was evidence to suggest that the mental illness or developmental disability/cognitive or adaptive functioning deficits contributed to the behavior that led to the RVR. Both items were checked "no." The form required the clinician to provide the rationale for the decision, but no rationale was provided.

During an IDTT at DVI on 4/13/16, the inmate's level of care was changed from 3CMS to EOP. Documentation of the rationale for this level of care change was "does not qualify for a lower level of care due to severity of symptoms and circumstances." This documentation required improvement.

At that time, the inmate reportedly exhibited the following behaviors: an outburst in administrative segregation after custody removed his radio following expiration of the 21-day period and agitation when a physician appointment was delayed and the inmate "boarded up" and became "disruptive" on the tier (additional details were not provided). The inmate also presented with hopelessness, self-doubt, anger, anxiety, and an auditory hallucination of a male voice which at times he believed was his father's voice.

Treatment goals included fully abstaining from violent outbursts or disturbances for 30 days, lowering depression from an eight to a four (on a one to ten scale) and having no thoughts of self-harm for 30 days.

Findings

The mental health care provided to this inmate was inadequate. Case conceptualization for the inmate's treatment was lacking. Diagnostic clarification with the rationale for diagnoses, including symptom specification, was indicated. Treatment goals did not address all symptoms. His history of substance abuse was not addressed other than as a diagnosis on the treatment plan; furthermore, it was not considered as a possible contributor to his behavior. A treatment goal of no thoughts of self-harm was unclear, as self-harm had not been highlighted as a presenting problem. A goal of this nature was inappropriate as the inmate's disclosure of thoughts of self-harm was essentially a failure. Of concern was that this goal was not supportive of the inmate disclosing thoughts of self-harm or in addressing the precipitant(s).

As to the RVR, the lack of a rationale to support the clinician's decision that the inmate's mental illness did not influence the behavior was problematic. There was no indication that the behavior

had been discussed with the inmate or that his mental status and functioning at the time of the incident were considered.

**Inmate E**

This 53-year-old inmate was serving time for robbery, burglary, assault with a firearm, and assault with a dangerous weapon.  He had received mental health services at the 3CMS level of care since being transferred to DVI on 12/24/13.  The diagnosis included in his December 2015 treatment plan was Major Depressive Disorder, recurrent, mild; however, all reviewed PC progress notes between January and August 2016 provided a diagnosis of Adjustment Disorder NOS.  The inmate was not prescribed psychotropic medications.

Treatment plan goals were to rate the inmate's depression at a five or lower (out of ten) with an intervention of using coping skills twice weekly.  Goals were to be achieved through PC contact every 60 to 90 days; a review of progress notes indicated that PC contacts occurred approximately every 60 days.  However, clinical indication for the increase in clinical contact was not provided in reviewed documentation.

Documentation of PC contacts indicated that contacts were primarily supportive in nature with a vague connection to the treatment plan.  For example, the 1/4/16 contact indicated that the inmate was provided with an assignment to look at his emotional triggers, to track the frequency and response, and to work on coping skills.  This was a potentially useful intervention, but the lack of detail made it difficult to evaluate.  There was also no follow-up documentation of the inmate's response to this assignment in the subsequent session.

There was also conflicting documentation.  In one note the inmate indicated he was sleeping seven to eight hours nightly, but documentation later in the same note indicated that the inmate "reports poor sleep."  In another note, the inmate reported poor sleep, but the note later indicated "no issues at the present time."  Documentation of interventions to address sleep disturbances was lacking.

Lastly, PC notes were also problematic as much of the content across sessions remained unchanged.  There also were multiple grammatical errors, incomplete sentences, and at times information was written in capital letters.

Findings

Documentation indicated that this inmate's mental health care was timely.  However, the quality of care and documentation was inadequate.  There was also an inconsistency in the diagnosis between the treatment plan and subsequent PC notes.  While treatment goals were measurable, goals were not addressed during PC contacts.  As for the quality of documentation, conflicting and poorly written documentation was a significant area of concern.

**Inmate F**

This 52-year-old inmate was admitted to DVI on 6/24/16.  He was incarcerated in 1997 for burglary (third strike) and was serving a life sentence.  His healthcare record was reviewed to assess the provision of services at the 3CMS level of care.  He was provided with diagnoses of Major Depressive Disorder, severe with psychotic features and Polysubstance Dependence, in remission in a controlled environment.

According to IDTT documentation dated 7/12/16, the inmate had a history of mental health treatment at the EOP and MHCB levels of care.  His most recent suicide attempt occurred in 2009.  He had not experienced auditory hallucinations in approximately one year.  His depression was rated as a five out of ten. Treatment goals were to: 1) identify two coping skills to reduce depression to a four out of ten by utilizing CBT and psycho-education, 2) identify triggers that contribute to hallucinations by using CBT to identify triggers, and 3) report maintenance of sobriety and exhibit behavior consistent with sobriety.

A PC progress note dated 8/18/16 was reviewed.  Documentation indicated psycho-education for symptoms of depression, psychosis, relapse prevention, and education regarding medication adherence.  Documentation regarding the current status of depression or auditory hallucinations was not provided.

Treatment plan documentation and a subsequent PC note provided contradictory information regarding psychiatric medications.

<u>Findings</u>

Although the mental health care provided to this inmate appeared to be improving, reviewed documentation indicated that the care had been inadequate.  Discrepant documentation and a lack of clarity regarding the use of psychiatric medications were areas of concern.  For the treatment goal of "identify(ing) triggers that contribute to hallucinations by using CBT to identify triggers," it would have been better for interventions to be documented as "identify" precipitants to hallucinations rather than use CBT to identify triggers.  While PC contacts were scheduled for every thirty days, which may have been clinically indicated and consistent with Program Guide requirements, documentation to support the rationale for the increase in the frequency of clinical contacts was warranted.

EXHIBIT J
California State Prison/Corcoran (CSP/Corcoran)
June 21, 2016 – June 23, 2016

**Inmate A**

This inmate was housed in the CTC. His healthcare record was reviewed as he was included on the DSH non-referral list.

The inmate was provided with a diagnosis of Bipolar I Disorder, most recent episode depressed, severe, with psychotic features and Polysubstance Dependence. He was prescribed Abilify, Cogentin, Vistaril and Effexor. He was a participant in the MHSDS since 2007 and moved between the EOP, 3CMS and MHCB levels of care. He had 15 MHCB admissions during the past year which were attributed to custody-related stressors. The inmate had a significant history of suicidal behavior, including attempted suffocation, overdosing and cutting. He also reported a history of auditory hallucinations. He was hospitalized at DSH during 2015 (discharged 2/28/15) and from 1/26/16 to 2/26/16.

The inmate was transferred to the MHCB at CHCF due to swallowing a piece of metal. He was subsequently transferred to the CSP/Corcoran MHCB, with plans for transfer to the EOP; however, he placed a noose around his neck and his MHCB stay was continued. Later, the inmate cut his arm by a vertical cut in a suicide attempt. While on suicide watch, he continued to make threats of self-harm and it was reported that he masturbated in front of female nurses, and threatened to harm himself if he was observed on individual watch by a male staff person.

Although the inmate initially reported that he did not wish to return to DSH, subsequent progress notes indicated that he agreed to DSH referral. He was referred to APP for further treatment.

<u>Findings</u>

This very difficult to treat inmate was appropriately referred again to DSH due to recurrent self-harm. Although he was on the DSH non-referral list, it appeared that he was subsequently referred.

**Inmate B**

This EOP inmate was housed in the EOP housing unit. His healthcare record was reviewed as he was included on a list of inmates who were not referred to a higher level of care. He was provided with a diagnosis of Schizophrenia, paranoid type. He was prescribed Abilify, Vistaril and Zoloft.

The inmate was previously receiving mental health services at the 3CMS level of care. He was initially admitted to the CTC medical unit due to water intoxication; in addition, he presented with suicidal ideation, depression, paranoia and auditory hallucinations. Mental health followed him while he was on the medical unit. He was transferred to the MHCB from the medical unit on 5/18/16. While treated in the CTC, he was placed on water restriction. He was discharged on 5/26/16 to the EOP level of care after he showed improvement in the previously mentioned symptoms.

After the inmate was discharged to EOP, progress notes indicated that the PC saw him weekly and he was stable.  An EOP treatment plan dated 6/15/16 noted that the inmate did not meet any criteria for higher level of care referral consideration, although the non-referral log indicated that he met criteria two and five.

Findings

There was documentation that the inmate was seen weekly in the EOP.  There was also documentation of five-day follow-up after MHCB discharge.  The 6/15/16 Form 7388-B did not include positive referral indicators.  However, other Form 7388-B's included positive criteria: a Form 7388-B dated 6/26/16 included criterion five, one dated 6/19/16 included criteria two and five and one dated 6/12/16 included criterion two.  These discrepancies in the consideration of a higher level of care were of concern.  At the time of the site visit, documentation indicated that the inmate was stable; however, he was not appropriately considered for a higher level of care.

**Inmate C**

This EOP inmate's healthcare record was reviewed from a list of inmates' names that was generated from late responses to emergency referrals.

This inmate was provided with diagnoses of Schizoaffective Disorder and Polysubstance Dependence, in a controlled environment.  He was prescribed Depakote, Cogentin, Remeron and Zyprexa.

The initial IDTT meeting during the review period was conducted on 11/4/15.  The inmate verbalized delusions of being extremely wealthy and in the military.  Goals were to reduce his anxiety, anger and psychotic thinking through relaxation techniques and identifying stressors that evoked anger responses.

The inmate was also seen on 11/4/15 and 12/8/15 for an RVR evaluation for fighting.  Documentation indicated that the clinician asked him if his mental health had anything to do with the incident; the inmate replied negatively and the clinician determined that the inmate's mental health did not play a factor in the RVR.

The inmate was seen on 11/30/15, 12/2/15 and 12/3/15 for an RVR evaluation for refusing assigned education.  His stated reason for refusing the education assignment was that education would not count towards his military university.  The clinician's assessment stated that the inmate's refusal was related to his delusional beliefs and his mental illness significantly impacted his behavior.

On 1/7/16 the inmate was upset regarding his canteen and property.  The inmate also complained when someone outside his door was laughing at him.  He continued to state that he was in the military.  At the IDTT on 1/20/16, he continued to exhibit delusional thinking.

On 2/10/16, an RVR evaluation was conducted as the inmate refused his assigned education.  The inmate stated that he refused education because he had stomach problems.  The clinician

noted the inmate's mental illness did not play a role in his RVR behavior. On 2/17/16 a progress note stated "Behavior which could lead to violence. On 2/26/16 the inmate made the statement 'If it isn't dangerous I'm not going to worry.'" However, there was no explanation for the previous statement noted in the healthcare record. Another clinician saw the inmate on 2/26/16 and stated that he had decompensated from the previous week. The clinician noted that the inmate believed the government owed him money and he planned to go to Washington, D.C. to talk with the president in order to alter his sentence and obtain his money. The clinician consulted with the psychiatrist who indicated that the inmate had not received his prescribed Depakote dosage during the past ten days.

On 3/4/16, during an individual PC session, the inmate continued to exhibit grandiose delusional thinking. At another PC session in March 2016, the clinician noted that the inmate remained delusional, but was improved after an adjustment in his medication. He remained with grandiose delusional thinking, believing he was in the military. The inmate continued to exhibit bizarre behaviors and was admitted to alternative housing in March 2016; he was released after a few days, but the clinician noted that he continued to exhibit evidence of decompensation.

The inmate received another RVR for assault on a peace officer and for refusing a urine sample on 3/28/16. The clinician asked the inmate about refusing the urine sample and he responded irrationally.

IDTT documentation indicated that on 4/6/16 the inmate received three RVRs within three months. The documentation also indicated that the RVRs occurred during a period when due to a medication error, the inmate was not receiving his medication for a lengthy period of time. Clinical progress notes indicated that the inmate continued to exhibit delusional thinking for the remainder of the month.

Findings

The mental health care provided to this inmate was inadequate. The majority of PC contacts were not confidential and clinical statements were contradictory. The mental health 115 assessment documented that the clinician questioned the inmate regarding whether he believed that his behavior was affected by mental illness without appropriate clinical evaluation or judgment.

The IDTT did not assist the inmate in identifying factors to assist in reducing the number of RVRs received and employed interventions did not assist the inmate in reducing delusional thinking.

IDTT meetings conducted in April and June 2016 both stated that the inmate received three and then four RVRs, and the RVRs were attributable to a medication error that resulted in the inmate not receiving his medication for a lengthy period of time. There was no mention of a higher level of care referral consideration, even though the inmate's delusion thinking persisted. This information was not discussed in the mental health assessment and the inmate was penalized.

New treatment modalities were not documented.  Although care was timely, it was clinically inadequate.  The PC's objective findings consistently included a committed offense and RVRs from 2013, without a correlation to the inmate's existing mental illness.

**Inmate D**

This 3CMS inmate's healthcare record was reviewed from a group of inmates interviewed during the site visit.

The inmate was provided with a diagnosis of Depressive Disorder NOS.  He was not prescribed psychotropic medications at the time of the site visit.  Clinicians timely saw the inmate and documentation of these contacts was clinically relevant and pertinent to established goals.

The inmate requested discontinuation of antidepressant medication treatment due to medication side effects and his desire to function without medication.  The inmate used other coping skills to assist in dealing with his depression and incarceration.  He indicated the beneficial effects of the therapy that he received.

Findings

The mental health care provided to this inmate was adequate and timely.

**Inmate E**

This EOP inmate's healthcare record was reviewed from a list of observed EOP inmate IDTT meetings during the site visit.

This inmate was provided with a diagnosis of Major Depressive Disorder and PTSD.  He was prescribed Trileptal and Zoloft.

The inmate's history was significant for entering the foster care system at age three, being violently sexually abused by an uncle at age five, being sexually abused by someone at age twelve and entering the juvenile justice system, and later kidnapping, sexually abusing and killing someone.  The inmate entered CDCR in 1993.  He stated that he was never involved in a sex offenders' program.  His EPRD was in 2021.

The inmate reported suicide attempts by hanging and cutting of his wrist in 2008.  His last MHCB admission was in October 2014, when he attempted to hang himself.  This resulted in hospitalization and eventual transfer to CHCF.  He was placed in the EOP upon his MHCB release.

The inmate worked for Prison Industries Authority (PIA) in the cookie factory.

The PC worked with the inmate regarding his depressive symptoms.  Clinical contacts did not consistently occur weekly during January 2016; however, subsequent PC contacts occurred at least weekly and often more frequently.  The clinician provided weekly clinical assignments and

encouragement.  The inmate gradually showed more involvement in therapy, although progress notes indicated that progress was slow.

Another stressor for this inmate was the televised trial of a high profile criminal; the inmate's sister was one of the victims and the inmate felt responsible for her death because he committed the same crime.

The inmate's mood was labile over the subsequent weeks and he requested to transfer to the 3CMS level of care.  The clinician explained the difficulty of facing issues that the inmate had not faced for over 40 years and the inmate's tendency to give up.  The PC continued to work with the inmate during the trial.  At the end of the trial, the inmate no longer felt responsible for his sister's murder and began to focus more on his recovery.

On 12/29/15, the inmate arrived at his therapy session upset.  He stated that custody officers had conducted a cell search, broke his CD player and did not give him a cell search receipt after multiple requests.  He also reported that the officers turned off one of the phones on weekends, which made it difficult to receive calls.  The officers were also accused of calling the inmate derogatory names.

On 1/19/16, the clinician scheduled the inmate's individual clinical contact at 7:00 a.m. to accommodate the inmate's work schedule.  The clinician went to the housing unit at 7:00 a.m. to ensure the inmate's attendance.  However, the custody officer did not bring the inmate for the appointment until 8:20 a.m., stating that he would not be released until everyone finished eating.  The inmate was angry and was also late for work, so the session was rescheduled.

The remaining clinical sessions were productive and the inmate's IDTT was conducted in June 2016.  The inmate was extremely emotional and exhibited uncontrollable crying during the IDTT.  He conveyed the difficulty of his work with his PC and the benefits of the therapy.  He also discussed the difficulty of living in an SNY yard, as compared to being housed in the general population, due to the aggressive gang activity on the SNY yard, which frequently targeted mentally ill inmates.

<u>Findings</u>

The clinical care provided to this inmate was very good.  He had very good clinical rapport with his PC, who worked with the inmate to address very difficult issues, as well as his treatment goals.  Of concern were the reports of predatory behavior of gangs against MHSDS inmates on the SNY yard.

**Inmate F**

This inmate's healthcare record was reviewed from a list of inmates having three or more MHCB admissions during the review period.

The inmate was provided with a diagnosis of Schizoaffective Disorder, bipolar type.  He was prescribed Zyprexa and Trileptal.

This 22-year-old entered CDCR on 4/24/13 following a conviction for carjacking.  His EPRD was in 2021.  The inmate had 16 MHCB admissions from 5/31/15 through May 2016.  He had three additional MHCB admissions thereafter and a referral to DSH APP on 6/6/16.  The inmate returned to CSP/Corcoran on 6/23/16, when he was immediately referred to the MHCB; this was the most recent MHCB admission, which occurred during the site visit due to danger-to-self.

The inmate had multiple pending disciplinary offenses.  These offenses included a 12/1/15 possession of a weapon, a 10/27/15 assault on a peace officer, a 10/25/15 aggravated battery on a peace officer and a 5/28/15 battery on an inmate with resulting serious bodily injury.

During April and May 2016, the inmate was at CSP/Sac and in the MHCB at CMF.  He was transferred to DSH APP on 5/5/16 and was discharged on 5/18/16.

The inmate had numerous episodes of self-injurious behavior in April 2016.  On 4/7/16, he reportedly swallowed a zipper from a jumpsuit and an insert from a ballpoint pen.  He was transferred to an outside hospital, but testing did not find a foreign body and the inmate was returned to CMF.  On the following day, he made superficial cuts to his left forearm.  On 4/9/16, he inserted a pen filler into his penis; he was transferred to an outside hospital where the object was removed and he was returned to the prison.  Three days later, he began cutting himself after returning from court and receiving an additional twelve years for assault.

In May 2016, the inmate cut his neck and both forearms and required sutures.  Upon returning to prison, he immediately covered the window of his cell.  When custody staff uncovered the window, the inmate had three new, deep cuts; he also reportedly had swallowed the razor blade. The inmate also sustained self-inflicted abrasions to the second and third digits of his right hand after hitting a wall.

Findings

It was difficult to determine whether adequate care was provided, as the inmate did not remain at any institution long enough for required IDTTs or follow-up assessments to occur.  This inmate required stabilization at DSH to address his significant psychiatric symptomatology.

**Inmate G**

This inmate's healthcare record was reviewed from a list of inmates who had three or more MHCB admissions during the review period.  The inmate was provided with a diagnosis of Bipolar Disorder.

The inmate's pre-incarceration history consisted of being suspended from elementary school and evaluation by mental health for fighting and other behaviors.  His self-reported use of alcohol began at age seven.  He reportedly was shot in the head by a shotgun at age 14; he began experiencing seizures and was prescribed Dilantin.  The inmate was sent to juvenile hall for assault and his criminal and mental health difficulties continued.

This 43-year-old male had 13 MHCB hospitalizations during the review period.

On 8/16/14, the inmate allegedly threatened a peace officer, kicking the cell door and screaming threats for over two hours.  After this incident, he was placed in the 3CMS program.

On 8/9/15, the inmate was evaluated for competency and was deemed incompetent to stand trial.

The inmate was admitted to DSH on 2/22/16 and was discharged on 4/22/16 to CSP/Corcoran. He was admitted to the MHCB on 5/4/16 and again on 5/18/16.  Documentation of the required five-day follow-up after the 5/4/16 hospitalization was only located for two of the five days. SREs were completed on 5/18/16 and 5/20/16; both assessed the inmate with moderate chronic and low acute suicide risk.  He was transferred to the MCSP MHCB on 5/25/16 and returned to CSP/Corcoran on 6/1/16.

Findings

The inmate's multiple MHCB movements made it difficult to determine adequate care and five-day follow-ups were not documented daily.  It was recommended that care be coordinated between DSH and CDCR through a CCAT.

**Inmate H**

This 3CMS inmate's healthcare record was reviewed from a random list of inmates who were interviewed during the site visit.  This 28-year-old inmate was provided with a diagnosis of Anxiety Disorder NOS.  He was not prescribed psychotropic medications at the time of the site visit.

The inmate was transferred to the CSP/Corcoran STRH on 2/2/16, pending a district attorney referral for battery on an inmate with serious bodily injury.  He was evaluated by mental health on 2/25/16.  He reported anxiety due to his mother dying in his arms after his CPR efforts failed. He also experienced panic attacks consisting of sweaty palms and racing thoughts and pulse.

Upon his return from court in April 2016, the inmate received a bus screening, when he was questioned whether he had received bad news.  He responded "same – I'm good."  The PC saw him for an individual contact on 5/27/16, when the PC noted his lack of suicidal ideation or MHCB stays over the prior six months.  The clinician indicated planned removal from the 3CMS level of care.

Findings

The mental health care provided to this inmate was clinically appropriate.

EXHIBIT K
California Substance Abuse Treatment Facility (CSATF)
September 13, 2016 – September 15, 2016

**Inmate A**

This 26-year-old inmate's case was reviewed to evaluate MHCB care and restraint usage. Based on information in the healthcare record and the lack of obvious admissions' evaluations, the inmate's MHCB admission date was unclear; however, it appeared that he was admitted in late February 2016. On 3/2/16, he was seen by a psychiatrist, who noted that he had cuts to the neck and left forearm, requiring sutures. While the psychiatric note was scanned and filed as a standard psychiatric note, it appeared to have been the initial evaluation and indicated that the inmate had been hospitalized for three days.

The psychiatric evaluation reported that the inmate had a broken leg in a cast and urinary incontinence. He had been prescribed Celexa, but was medication nonadherent. A social worker progress note indicated that he had received an RVR for fighting on the yard and was transferred to the CTC. While housed in the CTC, he had a dispute with a correctional officer that resulted in another RVR. It appeared that the inmate then felt overwhelmed, as he had been scheduled for parole on 4/15/16 and reacted by trying to kill himself. No explanation was provided regarding the inmate's broken leg.

The initial treatment plan indicated a diagnosis of Major Depressive Disorder, severe, with psychotic features. The narrative section also noted anxiety and panic attacks secondary to concerns over urinary incontinence, but the symptoms of panic attacks were not included in the determination of his diagnosis. The suicide attempt was considered severe on the IDTT Form 7388 and it indicated that the team was considering DSH referral. However, the treatment plan was poorly written and grouped multiple problem areas and short-term goals together. The interventions and assigned staff were not realistic to MHCB staffing, the acuity of the inmate's mental health status or the short-term nature of an MHCB admission. The Form 7388-B noted positive criteria two and five. The non-referral rationale was inadequate, as it simply stated that further assessment was needed, despite sufficient information in the healthcare record supporting referral given the severity of the attempt as described in the treatment plan. The treatment modifications section did not address the specific indicators.

At the time of the subsequent IDTT that occurred on 3/10/16, the treatment team decided to refer the inmate to DSH, as he had deteriorated. He exhibited increased argumentativeness and anger, was religiously preoccupied and was medication and treatment nonadherent. Despite these conditions, the treatment plan remained unchanged and was clinically inadequate.

The subsequent treatment plan dated 3/14/16 noted that the inmate continued to decompensate. Nursing staff reported that he stopped eating and was flushing his food down the toilet. By 3/23/16, the treatment plan noted that he had lost over 25 pounds and remained on a hunger strike. Emergency forced medication (Zyprexa) was finally initiated on 3/22/16, which angered the inmate and precipitated a use of force.

The psychiatrist's order for restraints simply indicated that the inmate had become combative with officers when receiving involuntary psychotropic medication and he was placed in five-point restraints to prevent serious bodily harm to self or others at 1310 hours on 3/22/16. No release criteria were provided in the order, but it limited the duration of restraints to four hours,

which was consistent with policy. No nursing notes were located in the inpatient record related to the restraint incident. There was a checklist that indicated that all checks for circulation and range of motion were addressed by nursing; all other requirements were also addressed. The psychiatric note, however, did not address what interventions were attempted prior to restraint placement and the release criteria.

The treatment plan update completed immediately following the restraint incident was not modified at all, despite the significance of a 25-pound weight loss due to a hunger strike, lack of treatment engagement and restraint placement. These were noted as obstacles, but not areas of foci in treatment.

A progress note dated 3/16/16 indicated that the treatment team believed the inmate did not meet criteria for grave disability and a PC 2602 order because he agreed to consume Ensure. This determination was made despite the inmate having had significant weight loss. It was also documented that staff indicated they believed that the inmate was attempting to manipulate staff as he wanted to be discharged to the general population rather than DSH. It should be noted that the inmate wanted to return to the yard to preach about God and to behave in a manner consistent with his religious preoccupation and delusional thinking. Conversely, the treatment team attributed the inmate's failure to eat to depressive symptomatology; the *Coleman* expert suggests that the symptom was consistent with a determination of grave disability.

<u>Findings</u>

This inmate did not receive adequate mental health treatment. Psychiatry staff did not initiate involuntary medication when it was clearly indicated and waited too long to initiate medication. Although the inmate exhibited significant decompensation indicating treatment failure, the treatment plan was not modified. The inmate was appropriately referred to DSH, but he clearly should have been referred earlier during his admission. The treatment team should have requested an expedited transfer for this inmate to the DSH acute care program. Although release criteria were not included in the restraint order, he was timely released. However, appropriate documentation of the restraint incident was not located in the healthcare record.

**Inmate B**

This 26-year-old inmate's case was reviewed to evaluate MHCB care and restraint usage. MHCB staff determined that the inmate used suicidality and MHCB stays as a way of manipulating his housing situation. They thus appeared to question the veracity of his claims of suicidality and homicidality. Despite this determination, the inmate had been receiving his psychotropic medications by a PC 2602 order for three years due to danger to self.

A restraint checklist indicated that restraint use was performed in accordance with Program Guide requirements. However, documentation was not located in the healthcare record except for a brief note that was written sideways on a nursing note that stated "still in restraints." Physicians' orders or nursing notes were not located. Based on the restraint log, it appeared that the inmate only remained in restraints for 90 minutes, but this could not be verified in the healthcare record.

<u>Findings</u>

Based on Program Guide requirements, this inmate did not receive appropriate mental health care.

**Inmate C**

This inmate was included on the DSH non-referral list and the Form 7388-B audit log and his case was reviewed to evaluate provided care.  This 53-year-old 3CMS inmate was admitted to the MHCB on 3/8/16.  Two days later, the IDTT determined that he met DSH referral criterion two (requiring highly structured, inpatient 24-hour care), but he was not referred to DSH.  The inmate had been discharged from the MHCB on 3/7/16, which was the day prior to this admission to the 3CMS level of care; however, he was readmitted following an incident with custody.  The inmate also met DSH referral criterion five, but this positive indicator was not identified by the treatment team or the DSH coordinator.

This inmate was provided with diagnoses of Mood Disorder NOS by history, PTSD by history and Antisocial Personality Disorder.  He was prescribed Zoloft, Haldol and Cogentin as needed and prazosin.

The rationale for DSH non-referral did not adequately address the multiple positive indicators.  The only change in the treatment modification section from the inmate's prior admission was for the treatment team to communicate with the inmate's yard clinician about a possible change in level of care to EOP.  The treatment modifications were minimally adequate in light of the inmate's inability to function in the mainline yard and the lack of individualization in the documentation.  The inmate may not have required a referral to DSH, particularly in light of possible referral to a higher level of care.  However, the treatment team did not adequately document their rationale.

The treatment plan itself focused on the inmate not reporting suicidal ideation while in the MHCB.  This was not an appropriate treatment goal as a suicidal inmate could simply not express suicidality and be considered a treatment success.  Treatment interventions also were not well-written, included goals in the intervention sections and did not properly target what should have been the true foci of treatment, namely, the inmate's poor coping skills and MHCB over-utilization.

<u>Findings</u>

The treatment team failed to identify an objective, positive DSH referral indicator.  The team also did not provide a sufficient rationale for DSH non-referral.  The DSH coordinator failed to properly evaluate the Form 7388-B and identify the treatment team's failure to identify the objective criterion that this inmate met.  The inmate also was not adequately treated based on a poorly written treatment plan and lack of actual implemented interventions other than elements of medication management and isolation in the MHCB.

**Inmate D**

This inmate was included on the DSH non-referral list and the Form 7388-B audit log.  His case
was reviewed to evaluate provided care.  This 39-year-old EOP inmate was seen by the treatment
team on 4/14/16, when it was noted that he met DSH referral criterion seven (participating in less
than 50 percent of treatment) based on an amended Form 7388-B.  The inmate was provided
with diagnoses of Major Depression, recurrent, severe with psychotic features and Alcohol
Abuse in a controlled environment.  He was prescribed Zyprexa and Cogentin.

The treatment team did not refer the inmate to DSH.  The non-referral rationale was adequate, as
were treatment modifications to improve the inmate's functioning.  However, the treatment plan
was not as well-developed as the treatment modifications on the Form 7388-B; treatment goals
were vague and were not described in behaviorally objective terms.  The specified interventions
were insufficient in light of the severity of the inmate's symptoms and functional level.  Despite
the treatment plan's limitations, the inmate did not appear to warrant a DSH referral at the time
of the IDTT.  Despite the inclusion of appropriate treatment interventions on the Form 7388-B,
review of progress notes indicated that the inmate experienced multiple PC changes and no
actual implementation of treatment.  Clinical contacts consisted of check-ins when the inmate
agreed to participate in clinical contacts.

Findings

The inmate was appropriately not referred to DSH.  His treatment plan required modification.
He did not receive adequate mental health treatment.

**Inmate E**

This 33-year-old inmate was housed in the STRH.  He was provided with a diagnosis of Mood
Disorder NOS.  He was not prescribed psychotropic medication.  His healthcare record was
reviewed to assess the provision of mental health services in the STRH.  During tier walks, he
reported that all contacts with his PC occurred at cell front and that he had not been asked to
meet in a confidential setting.

He was transferred to the STRH at CSATF from WSP on 8/24/16.  PC contacts occurred on
8/31/16 (unknown whether they were out of cell or at cell front) and 9/1/16 (at cell front but the
reason was not provided).  During the 9/1/16 contact, the inmate reported auditory hallucinations
but further details were not provided.  Symptoms of anxiety and depression included in the
8/1/16 treatment plan developed at WSP were not addressed during PC contacts.  The inmate
attended an anger management/coping skills group on 9/6/16.

No treatment plan was located in the healthcare record from the time of the inmate's transfer to
CSATF.

Findings

Available documentation indicated that PC contacts were timely, but provided mental health care was inadequate.  The lack of confidential contacts, current treatment plan and treatment planning were areas of concern.  Furthermore, despite placement in a high risk setting, documentation was brief and suggested that contacts consisted of "check-ins" rather than therapeutic interventions that addressed the inmate's previously documented symptoms of anxiety and depression; these symptoms could be exacerbated by transfer to another facility and segregation placement.

**Inmate F**

This 33-year-old inmate was serving life without parole for first degree murder.  He was provided with a diagnosis of Depressive Disorder NOS.  He was not prescribed psychotropic medication.  His healthcare record was randomly selected to assess the provision of STRH services.  He was transferred to the STRH for safety reasons and a positive drug test.  There was conflicting data regarding his STRH transfer.  There was a notation in the healthcare record that he was transferred on 12/29/15.  Data provided in advance of the site visit indicated that he transferred to the STRH on 4/26/16.

An initial treatment plan dated 6/1/16 indicated that the inmate experienced anxiety and depression which was loosely attributed to his father's death one year prior.  Clear case conceptualization was lacking.  Anxiety was rated as an eight of ten (on a one to ten rating scale) and depression was rated as a five of ten.  Treatment goals were to reduce symptoms to a range of zero to three.

At the time of the next IDTT, the inmate's anxiety decreased to a three of ten and depression was reduced to a two of ten.  No diagnosis was provided.  The treatment team decided to continue mental health services at the 3CMS level of care, but no rationale was documented.  The goal was to report any relapses to mental health and to discontinue 3CMS level of care once the inmate was released from the STRH.

A review of PC notes from 6/4/16 to 8/13/16 indicated that PC contacts occurred weekly.  All but three of the weekly contacts occurred out of cell; two informal contacts occurred at the inmate's request.  Treatment which focused on depression was supportive in nature, but these supportive interventions clearly did not utilize cognitive behavioral techniques that were identified in the treatment plan.

Groups were offered on a weekly basis.  The inmate attended all but one group between 6/1/16 and 8/11/16.

Findings

The mental health care provided to this inmate was clinically adequate, but areas of needed improvement were noted.  Solid case conceptualization was lacking and utilization of interventions identified in the treatment plan were not evident in PC contact documentation.  Despite a positive drug test, substance use was not addressed or considered as a treatment goal in

the treatment plan or during clinical contacts.  Relapse prevention should have been addressed as part of the termination process.  Lastly, rationale for continuation at the 3CMS level of care, despite resolution of symptoms and diagnosis, was not documented; nor was this practice consistent with the Program Guide.

## Inmate G

This 25-year-old inmate was housed on A Yard.  He was provided with a diagnosis of Major Depressive Disorder.  He was not prescribed psychotropic medication.  His healthcare record was reviewed to assess the provision of mental health services at the 3CMS level of care. The most recent treatment plan, dated 6/14/16, was written in bullet format and was insufficient; symptoms, psychosocial information and case conceptualization were lacking.  Specifically, treatment plan documentation was as follows:

Inmate is a 25-year-old male serving 2 years for Grand Theft Auto.  Key factors:  being away from family.  Clinical issues:  focus on decreasing depression.  SNY due to safety concerns. Predisposing factors:  Has had services since childhood.  Precipitating factor: girlfriend died. Maintaining factors: dorm living.  Previous treatment states current treatment meets his needs.

The provided short-term goal was for the inmate to attend his treatment appointments.  The intervention was to identify and replace thoughts and beliefs that support depression.

Findings

The mental health treatment provided to this inmate was inadequate.  The treatment plan did not provide any relevant information indicating the inmate's treatment needs or how his treatment needs would be addressed.

## Inmate H

This 24-year-old inmate was housed on D yard.  He was serving his first prison term for home invasion robbery with weapons with an ERPD of 8/21/21.  There was a discrepancy in the diagnoses provided.  According to the treatment plan, the inmate was provided with diagnoses of Anxiety Disorder NOS, Polysubstance Dependence by history and Personality Disorder NOS due to criminal behavior.  In contrast, a psychiatric note provided a diagnosis of Depressive Disorder NOS.  He was prescribed venlafaxine and Trileptal.  His healthcare record was reviewed to assess the provision of services to inmates at the 3CMS level of care and treatment for inmates on "C" Status.

This inmate began mental health treatment at the 3CMS level of care during 2013 for anxiety and irritability.  There was no reported history of DSH or MHCB hospitalizations.  He was transferred from PVSP to CSATF on 5/9/16 and was placed on "C" Status on 5/18/16.  The treatment plan was completed on 5/26/16.  Documentation of psychosocial factors was sparse but noted a history of substance abuse since childhood.  It was documented that anxiety impacted the inmate's sleep and that he experienced chronic pain.

Two treatment goals were identified.  One addressed mood instability and the other addressed medication adherence.  Baseline data for the mood instability was not included, making it difficult to evaluate treatment progress.  Identified interventions were not evident in subsequent PC notes.  Furthermore, there was a reference to the utilization of group treatment, but groups were not available at CSATF.  Of concern, documentation noted that if the inmate decompensated, he would be referred to DSH.  There was no documentation of consideration of less restrictive interventions, such as increased PC or psychiatric contacts or referral to the EOP or MHCB.

Other than noting that the inmate was on "C" Status, there was no reference to the impact of the restriction on the inmate's mental status or functioning.

<u>Findings</u>

The mental health care provided to this inmate was insufficient.  Lack of case conceptualization and pertinent psychosocial data negatively impacted treatment planning.  Diagnostic discrepancy and the lack of documentation of symptoms supporting diagnoses were also problematic.  Treatment planning was generic and there were missed opportunities to address disturbed sleep, pain management and substance abuse.  The lack of a goal to address substance abuse was particularly concerning given that substance abuse was identified as a diagnosis and the inmate had received an RVR for alcohol possession.

EXHIBIT L
Pleasant Valley State Prison (PVSP)
September 13, 2016 – September 15, 2016

**Inmate A**

This inmate's healthcare record was reviewed as he was housed in the STRH unit at the time of the site visit. His IDTT was observed. He was noted to have refused participation in treatment planning in the context of having a significant history of staff assaults, EOP and MHCB placement and mood instability.

The inmate was a 50-year-old male. He was provided with a diagnosis of Adjustment Disorder, with mood disturbance of emotions and conduct. He alternately was provided with other diagnoses, including Mood Disorder NOS, Psychotic Disorder NOS, Explosive Disorder and Depressive Disorder NOS. He was prescribed Zoloft, but had previously been treated with Trileptal, Remeron, Prozac, Haldol and Effexor. He received mental health treatment at the 3MCS level of care. He also reported an unconfirmed history of an involuntary medication order from 2000 to 2003.

The inmate had two MHCB admissions in 2007, within one month of each another. In March 2004, he was placed at the EOP level of care for one month. In June 2006, he was placed at the 3CMS level of care.

In January 2016, the inmate was placed in administrative segregation. The administrative segregation pre-placement chrono conducted at KVSP showed no emergency mental health issues. The RVR mental health assessment conducted in connection with an RVR in November 2015 indicated that the inmate was not forthcoming during the evaluation and that mental illness did not contribute to the behavior that led to the RVR. An SRE dated 1/29/16 found several chronic risk factors including a history of abuse and depressive or psychotic disorders, a chronic medical condition with associated pain (although subsequent evaluations noted his only medication condition being Hepatitis C), a history of violence, poor impulse control and substance abuse and a long sentence. Acute factors included a recent change in housing, single-cell placement, depressive episode and being agitated or angry. Numerous protective factors were noted including support, future orientation and what was described as active engagement in and motivated for psychiatric treatment. He was assessed as having a low chronic and acute suicide risk. After an altercation, which led to TTA treatment, an SRE dated 8/9/16 assessed a moderate chronic but low acute risk of suicide.

In February 2016, the inmate was transferred to the STRH, where his primary concerns were anger and aggression. He was relatively stable, although he periodically refused psychiatry appointments. Following transfer to CCI, the inmate was again assessed with low chronic and acute suicide risk, with impulse control listed as the predominate issue. Ongoing issues focused on impulse control and complaints of boredom and depression. The clinician expressed the opinion that the inmate was using mental health for an undescribed secondary gain. The clinician would have removed the inmate from the 3CMS caseload, but he was receiving psychotropic medication. Following transfer to PVSP in September 2016, the inmate was found to be cooperative with rapid, tangential speech.

At PVSP, the inmate expressed an interest in participating in group treatment. When seen in preparation for his IDTT, he expressed an interest in educational groups, but was informed that

only recreational movie groups were available at that time.  He refused, however, to participate in his IDTT on the following day.  Subsequent notes showed no acute distress, although the inmate reported increased depression to psychiatry since administrative segregation placement and having his property confiscated.  Subsequent notes indicated anxiety and irritability with some impairment in concentration and paranoia.

Findings

This inmate's primary issue was poor impulse control.  He was partially engaged in mental health treatment.  He expressed interest in educational groups while in the PVSP STRH, but not in the recreational movie groups which were available to him.  His treatment was adequate, but engagement efforts might have benefited from a more clinically relevant set of group offerings.

**Inmate B**

This 29-year-old inmate's healthcare record was reviewed because he had been treated at the 3CMS level of care on C yard, which was a 3CMS yard at PVSP.  He was subsequently admitted to the MHCB and was then referred to DSH.  He was provided with a diagnosis of Schizoaffective Disorder.  However, other diagnoses were present in the record, including Psychotic Disorder NOS, Depressive Disorder NOS and Bipolar Disorder.  He was mostly treated at the 3CMS level of care over time, but documentation preceding his arrival at PVSP questioned whether he met criteria for inclusion in the MHSDS.  Apparently, prior to his transfer to PVSP, he was in the general population without medication treatment.

The inmate transferred to PVSP in February 2016; his healthcare records just preceding and following this admission were reviewed in only a targeted manner.  An SRE was conducted for routine reasons on 2/4/16 at NKSP, when the inmate refused to cooperate with the evaluation. He was assessed with low chronic and acute suicide risk.  A note updating the Form 7386 on 2/11/16 from PVSP documented that the inmate previously had not been well-engaged with mental health treatment, although there was a history of two MHCB admissions.  Some assessments also noted a suicide attempt at age 14 and community psychiatric treatment.  A note dated 2/11/16 after the inmate's arrival at PVSP stated that he presented as "ill."  A psychiatry note of the same date indicated the inmate's unclear psychiatric history, but he was described as guarded, disheveled, and anxious with disorganized thinking.  He reported a history of community mental health treatment.  Subsequent clinician notes of that same day found that the inmate might be gravely disabled.  That same day, the inmate was transferred to the MHCB and placed on suicide watch, as he was assessed as having a high acute suicide risk.

Subsequent notes described the inmate as mumbling and responding to internal stimuli and shaking his head in a random pattern.  During observations, he was noted to be making what were described as crying sounds.  By 2/26/16, he was highly agitated, with head banging on the cell door.  Later that week, it was noted that he was not flushing his toilet.  The inmate continued his stay in the MHCB in an unstable highly disorganized state into early March 2016.  A PC 2602 involuntary medication hearing was scheduled for 3/8/16; the petition was granted.  Two days later, after several days of receiving involuntary medications, the inmate remained malodorous, and the decision was made to refer him to DSH for acute care.

<u>Findings</u>

PVSP assessed this inmate's acute psychiatric needs following his arrival from another institution, where he was not engaged in treatment and was not assessed as needing regular mental health care.  He was appropriately transferred to the MHCB and referred to DSH APP. The initiation of the PC 2602 order for involuntary medication was also clinically indicated.

EXHIBIT M
Avenal State Prison (ASP)
August 9, 2016 – August 11, 2016

**Inmate A**

This case was selected for review because the inmate was observed in group and had been interviewed. This 27-year-old 3CMS inmate arrived at ASP on 6/16/16. A mental health evaluation dated 6/27/16 indicated that he had been placed at the 3CMS level of care due to depression and suicidal thoughts while housed in the reception center. Upon arrival at ASP, he was assigned the diagnoses of Dysthymic Disorder and Polysubstance Dependence. The inmate expressed significant stress and anxiety while housed in the reception center, which he further reported had decreased following arrival at ASP.

The IDTT saw the inmate on 6/28/16. The only area of focus identified by the treatment plan was parole. While the inmate's release date was imminent and should have been addressed as a part of treatment, it was not the only treatment area requiring attention. Goals, interventions and responsible discipline areas of the treatment plan were confusing, with items not properly located in each section. The treatment plan was minimal and contained very little pre-release planning treatment efforts; however, the inmate appeared to be functioning at a reasonable level and advocated for himself. The treatment plan also did not indicate any group treatment opportunities, although the inmate had been placed in a pre-release group that had begun on his yard. He was also seen by TCMP staff on 7/18/16 for an evaluation for Medi-Cal benefits. The treatment plan was not well-constructed and the inmate was receiving only minimally adequate pre-release planning services. The inmate was not prescribed psychotropic medications.

Other than the contact that occurred on 6/27/16, the inmate was not seen by his PC and there was no documentation that pre-release planning was discussed during that contact. There were no subsequent PC contacts that addressed pre-release planning, despite supervisory expectations conveyed prior to the site visit.

Findings

This inmate was not adequately treated as his pre-release needs were only minimally met through the pre-release treatment group and TCMP. The inmate expressed multiple concerns and stressors in his interview that were not addressed by his ASP clinician or treatment team. A number of these pre-release and mental health needs were identified during the reception center process and should have been a component of his treatment plan. The inmate's treatment plan required revision to include goals that addressed his immediate and short-term needs. It was unclear whether staff had fully reviewed his healthcare record and documentation from the reception center, where the inmate was frequently monitored due to the acuity of his anxiety and depressive symptoms.

**Inmate B**

This case was identified for review during an RVR audit. The mental health evaluation related to the RVR contained minimal information and indicated that the inmate's mental health was unrelated to the disciplinary action. Of note, the RVR was issued to the inmate for refusing to report to work on the same day that he reported having mental health issues. The inmate

repeatedly stated to staff that his mental health status had been negatively impacted by his work assignment. The RVR was written on 1/4/16.

The psychiatrist saw the inmate several days before the incident on 12/28/15, when the inmate explained that he was experiencing difficulties with his thoughts and with family. However, the inmate also stated that he did not want to discuss anything in detail. He told the psychiatrist that he worked "outside the gate" and that he had been having some issues; the inmate then asked the psychiatrist about his gate pass. When the psychiatrist referred the inmate to custody as to the gate pass, the inmate informed the psychiatrist that the appointment was not going to be helpful and that he wanted to refuse the appointment. Notably, the psychiatry appointment was the result of a referral due to the inmate's self-reported anxiety.

There was a mental health assessment on 1/7/16. While the evaluator referenced the psychiatry note dated 12/28/16, the inmate's report of problems with his work assignment and his "thoughts" were not referenced; the note only referenced that he had refused medication. The evaluator stated that the inmate was over-endorsing symptoms, which was not included in the psychiatric evaluation, nor was it a conclusion of the psychiatrist. There was no indication that the RVR evaluator asked the inmate why he had not wanted to go to work or what he was referring to during the psychiatric appointment when he stated that he was having problems at his job site. The evaluator also did not ask the inmate about the psychiatric appointment which was the result of a referral due to anxiety and other reported issues that the inmate had been reluctant to speak of in detail with the psychiatrist. While red flags had been raised as to what may have been occurring at the time of the RVR, the evaluator failed to engage in what was considered standard clinical interview questions to elicit necessary information from the inmate to form the basis for completing RVR assessment documentation.

The inmate was provided with a primary diagnosis of Mood Disorder NOS. His last treatment plan was dated 11/5/15 and indicated that he had requested removal from the MHSDS. The treatment plan was to monitor him for six months and, if stable, to remove him from the mental health caseload. The PC saw him every one to three months, with treatment focused on monitoring and mood stabilization techniques, which were consistent with his treatment plan.

Findings

Based on available documentation, this inmate did not have a proper RVR assessment. The evaluator did not consider all available information and did not attempt to collect additional significant information. The inmate's mental health treatment was otherwise adequate.

**Inmate C**

This case was selected for review because the inmate had been identified on the DSH non-referral list. The IDTT saw him on 1/28/16 for inclusion in the MHSDS. He was a non-MHSDS inmate who a clinician saw and determined was unable to function at that level of care, which was criterion one on the Form 7388-B. The inmate had reported symptoms of anxiety, including sleeplessness. The psychiatrist initially saw the inmate on 12/31/15, due to his inability to sleep,

and at that time prescribed the inmate Vistaril. For unclear reasons, he was not seen by the treatment team for one month following the prescribing of medication.

The inmate was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood with a provisional diagnosis of Anxiety Disorder. He was not prescribed psychotropic medication at the time of the site visit, but previously had been prescribed Remeron. The SRE was appropriately completed on 1/19/16 and assessed the inmate's acute and chronic risk as low. The treatment plan dated 1/28/16 did not adequately describe the inmate's symptoms of anxiety and sleep disturbance. The short-term and long-term goals were identical with only the time frame changed. The inmate had an imminent release date in December 2016, but the treatment plan did not include pre-release planning. The treatment plan included a reference to treatment groups as an intervention.

The inmate was not seen every 90 days as the Program Guide required. There was a lapse in PC contact between 3/8/16 and 7/25/16. Although the inmate reported improvement and was assessed as stable during the March 2016 psychiatry and PC appointments, he remained a MHSDS participant.

Findings

This inmate was appropriately not referred to DSH, but the mental health care that he received at ASP was inadequate. His treatment plan was incomplete and did not address identified symptoms. These symptoms also were not well-described. As a result, treatment goals were vague and inadequate.

## Inmate D

This case was selected to evaluate the 3CMS level of care. This 26-year-old "C" status inmate had been on "C" status since 4/6/16. He was not scheduled for removal from "C" status until 9/2/16. The IDTT had last seen him on 4/7/16. He was diagnosed with Major Depressive Disorder, recurrent, moderate, Amphetamine Dependence and Cannabis Dependence. He was prescribed Effexor.

The IDTT document indicated that custody staff contributed to the treatment team meeting, but the document did not inform mental health staff that the inmate had been placed on "C" status on the previous day. Treatment documents also did not address "C" status. The treatment plan focused on depression and anxiety symptoms and substance dependency. While mental health symptoms were the focus of treatment to the exclusion of behavioral issues, there was a reference that the inmate had been disciplinary free, which his "C" status placement contradicted.

Interventions focused on relieving reported panic attacks that were not included in the diagnosis and symptoms of depression and anxiety. The treatment plan included group treatment as an intervention and also indicated that the inmate had been placed on a group wait list. Treatment goals required that the inmate be seen more frequently than every 90 days, but review of the healthcare record indicated this did not occur.

650

The psychiatrist saw the inmate frequently, with monthly contacts.  However, the PC only saw him once since his IDTT.  The contact referenced the symptoms that the treatment plan identified, but suggested that the PC was unaware of empirically-based treatment for panic attacks.  The frequency of PC contacts was insufficient to implement treatment plan interventions or to achieve identified goals.  The frequency of contact also was not consistent with the degree of symptomatology described in the documentation.  There was no documentation of any treatment groups, which suggested that the inmate remained on a wait list.  However, review of the active wait list did not include this inmate, which suggested a problem with his assignment to treatment groups.  At a minimum, this should have been reflected in a progress note.  Ideally, it should have been in an updated treatment plan.

Findings

The inmate was not adequately treated.  Presuming that he experienced daily panic attacks as the healthcare record indicated, there should have been more frequent clinical contacts with adherence to standard treatment for individuals with panic disorders.  Consideration also should have been given to increasing the inmate's level of care or there should have been an explanation why a level of care increase was unwarranted.  The inmate's diagnoses also required an update to reflect the presence of panic attacks.

**Inmate E**

This case was selected as an example of 3CMS inmate care.  This inmate was also included on the DSH non-referral log.  The IDTT initially saw this 49-year-old 3CMS inmate on 3/10/16, when he was included at the 3CMS level of care.  The treatment team indicated that he could not function outside of the MHSDS by marking as positive criterion one on the Form 7388-B.  At that time, the inmate was diagnosed with Major Depression, recurrent, severe and Alcohol Dependence.  The inmate declined medication, stating to the psychiatrist and his treatment team that he first preferred to participate in therapy to address his symptoms.  The initial treatment plan was poorly written with ill-defined goals and interventions that did not meet the acuity of the inmate's diagnosis.

The PC initially saw the inmate every two to three weeks, which was clinically indicated based on his mental health symptom acuity and initial MHSDS placement.  Unfortunately, documentation indicated that PC contacts were unfocused and the clinical plan simply involved inmate "monitoring" with occasional review of coping strategies, such as letter writing, for depression.  However, the inmate reported severe symptoms and required actual treatment as opposed to "check-in" contacts.

Findings

This inmate was appropriately not referred to DSH and appropriately included in the MHSDS.  However, he did not receive adequate treatment at ASP as evidenced by unfocused clinical contacts that did not include necessary treatment; this despite the PC and treatment team having

identified serious symptoms of depression.  The inmate's treatment plan was also poorly constructed and required revision.

EXHIBIT N
Correctional Training Facility (CTF)
May 24, 2016 – May 26, 2016

**Inmate A**

This case was reviewed as plaintiffs' counsel conveyed the inmate's reported difficulty accessing mental health care at CTF. The following information was based on a review of the inmate's healthcare records and Form 837-A crime incident report. The inmate transferred from VSP to CTF on 12/24/15.

Pertinent background information indicated that this inmate received 3CMS treatment for an Unspecified Mood Disorder. He had been offered, but declined, psychiatric treatment. On 12/11/15, the inmate reported suicidal thoughts to the psychiatrist and stated he had been raped by another inmate in dormitory housing. Healthcare documents showed that he had previously reported the rape to the TTA on 12/8/15, but his report was viewed as neither credible by custody staff nor by the clinician. The inmate was placed in administrative segregation pending investigation of the alleged sexual assault. He was placed on five-day follow-up based on the self-reported traumatic event. It was reported that a Prison Rape Elimination Act (PREA) protocol was implemented before he arrived at CTF.

Noteworthy was the result of a SRE on 12/14/15, which was conducted ten days before the inmate arrived at CTF. The evaluator wrote that the inmate's acute suicide risk was moderate to high, given the recent traumatic event he reported. However, the SRE Form 7447 itself contained a checkmark that noted the acute suicide risk as low. Communication by way of the inmate history form thus contained flawed data. There was no way to know what information was relied on by the receiving CTF clinicians, because there was a lack of documentation regarding this issue in the healthcare record.

The healthcare record did not document evidence of a clinician-to-clinician handoff. It appeared that CTF clinical staff were introduced to the matter after they were contacted by the CTF TTA two days after the inmate's arrival. Records indicated that the inmate was seen in the TTA on 12/25/16 for unspecified medical complaints. He was cleared for return with no underlying medical condition indicated. MHTS.net indicated that the clinician saw the inmate for a crisis appointment on 12/26/16; however, an interdisciplinary progress note for that date was not located in the healthcare record.

On 12/27/16, the inmate presented to the TTA for similar complaints, including his experience of pain in the abdomen and testicle. The on-call physician ordered an evaluation to rule out PTSD. The PC responded to the TTA, where he was informed by medical staff that the inmate was the victim of alleged sexual assault and a PREA protocol had been established at VSP. The PC performed a brief interview of the inmate while he was on intravenous fluid and documented that he would see him later the same day when he returned to the North facility. However, the inmate did not return to the yard by the end of the workday. The PC initiated an urgent referral, noting the inmate exhibited bizarre behavior, ostensibly referring to the inmate's somatic complaints. The inmate was subsequently seen by that same PC on 12/28/16.

The inmate had contacts with a PC on 12/27/16 and 12/28/16, where he reported not needing mental health services. He stated further that his problems were medical and consisted of pain in the stomach, and previously in the rectum, and that he had been raped by another inmate before

coming to CTF.  The inmate told the PC he did not like CTF and did not feel safe there.  He said that despite assurances to the contrary, he did not believe he was medically stable.  The clinician documented that the inmate did not appear to be in acute crisis. The diagnosis of record was retained and the inmate was encouraged to request clinical contact as needed before the upcoming IDTT.

Appointment data indicated that the inmate was scheduled to see the PC on 1/7/16.  However, on 1/6/16, as the housing unit was preparing for release to the yard, the inmate jumped from the third tier in a head-first dive.

The inmate survived the dive.  He was medically evaluated and sent to a rehabilitation facility in San Diego.  He never returned to CTF.  He arrived at the CTC at RJD on 5/9/16.

Findings

The inmate was appropriately placed in the 3CMS program prior to arrival at CTF.  There was no formal handoff to CTF clinical staff from the prior institution.  CTF clinicians became involved in the case only because the inmate was seen in the TTA and concerns were expressed about PTSD.  The inmate did not undergo a mental health evaluation before he jumped from the tier, notwithstanding an order by the attending physician in the CTF TTA.  The PC noted the inmate's bizarre behavior on a referral form, presumably related to ongoing somatic complaints in the absence of organic findings.  The inmate's incoming acute suicide risk was erroneously noted to be low.  There was no evidence in the healthcare record concerning coordination with the institutional PREA coordinator.  There appeared to be enough red flags in this case to suggest that the inmate should have been swiftly evaluated for a mental disorder resulting from the recent alleged sexual assault.  This could have been accomplished by placement in a MHCB, even in the face of the inmate's resistance.  Mental health services at CTF were timely provided, but inadequate in terms of initial triage.

**Inmate B**

The healthcare record was reviewed because the inmate reported in a group interview that he had not seen the PC since his initial placement in the 3CMS program.

The inmate had a history of mild to moderate depressive episodes and was previously placed in the 3CMS program from 2009 to 2011.  During a psychiatric contact on 11/8/15, he declined psychiatric treatment but requested talk therapy.

A SRE dated 12/8/15 assessed the inmate's chronic suicide risk as moderate.  This was predicated on personal demographics and an incident of wrist cutting when he was unable to secure mental health treatment as a teenager.  The current acute suicide risk was deemed low based on his denial of current suicidal motivation and the observed ability to think clearly and communicate meaningfully about personal issues.

The inmate returned to the 3CMS level of care on 12/17/16.  He was provided a diagnosis of Depressive Disorder NOS, with a notation that he did not meet diagnostic criteria for Major

Depressive Disorder.  The treatment plan included relevant goals, some of which were not clearly defined and none of which were stated in measurable terms.  Interventions included quarterly PC contacts.  The inmate's strength was described as the ability to ask for help.

The inmate submitted a healthcare request for mental health services on 2/16/16.  The request was received by nursing staff on 2/22/16.  This resulted in a routine referral to mental health, which timely occurred on 3/2/16.

The inmate complained of unremitting depressive experiences due to chronic pain and lack of family contact.  He reported poor appetite and disturbed sleep, but denied motivation towards harming himself.  The PC discussed with him a higher level of care referral, but the inmate instead wanted more frequent clinical contacts in the 3CMS program.  The PC indicated that the inmate would receive a ducat for the following week.  There was no discussion about referring the inmate for a medication consultation.

Before the next contact occurred, the LVN made a routine referral on behalf of the inmate on 3/6/16.  The referral noted "hostile/assaultive/poor self-control and poor attention span/difficulty following directions."  No elaboration was provided.

On 3/9/16, the inmate told the PC about concerns of racial bias (i.e. whites got assigned jobs sooner than him).  He complained that the primary physician dismissed his pain complaints, even though he had been recently prescribed amitriptyline for diabetic neuropathy. He reported feeling bored, useless and emotionally pained and hoped that prayer would help him. The PC described him as having lost interest in things and began a discussion about referral to a higher level of care.  The inmate resisted institutional placement that was far from his family and again requested increased frequency of PC contacts.  There was no psychiatric referral.  The PC told the inmate that he would be ducated in two weeks.

As noted, the inmate participated in a group interview on 5/25/16.  He reported not receiving a PC contact since his initial MHSDS placement in December 2015, but healthcare record review indicated that this was inaccurate.

The healthcare record also provided no evidence that a two-week follow-up contact occurred as indicated by the PC on 3/9/16.  There was also no evidence that a special IDTT meeting was scheduled to address the recommended increase to a higher level of care.

Findings

The inmate was appropriately placed in the 3CMS for treatment of his depressive symptoms. During the initial 90-day contact, the PC appropriately discussed with the inmate a referral to a higher level of care, but acceded to his request for increased PC contacts instead.  During a second contact, these discussions continued based on the inmate's report of worsening symptoms.  The PC indicated that the inmate would be seen in two weeks for follow-up, but this did not occur.  At the time of the site visit, further contact with the PC had not occurred, nor was a special IDTT scheduled to consider a level of care increase.

Absent other information to explain the lapse in care, this inmate did not receive adequate treatment in the 3CMS.

**Inmate C**

This healthcare record was reviewed because plaintiffs' counsel conveyed the inmate's report that he had been sexually assaulted and was having difficulty reporting the assault at CTF.

A review of pertinent history revealed that the inmate began psychiatric treatment at age five; the treatment consisted of multiple inpatient admissions and psychiatric treatment for depression, auditory hallucinations and substance abuse. He was classified as emotionally disturbed in school and placed in special education classes for that reason. He was previously enrolled in the 3CMS program during prior prison terms. Prior to arriving at CTF, he was provided with a diagnosis of Major Depressive Disorder, recurrent and was treated with an antidepressant medication.

The inmate requested mental health care on 11/2/15 and was seen by the PC three days later. He reported experiencing high anxiety due to an upcoming disciplinary hearing. He stated that he had received an RVR on 10/30/15 for striking an inmate who had hit him in the stomach with a folded magazine.

The psychiatrist saw the inmate on 11/7/15, when he stated that he had been placed on "C" Status due to several recent disciplinary reports. He complained of an inability to sleep more than three hours, excessive worry, and paranoid thoughts. The psychiatrist assessed him as experiencing hypnogogic hallucinations and Vistaril was prescribed to target insomnia. The psychiatrist scheduled follow-up in four weeks and noted the inmate had no questions at that time.

The PC saw the inmate on 12/30/15 on a referral from CDCR headquarters' staff. The PC documented that the inmate "wrote Sacramento reporting mental health crisis." The inmate was seen in a confidential office and denied ever writing to Sacramento about mental health issues. The inmate denied immediate problems and told the PC that there were no mental health problems to address.

On 1/11/16, the inmate submitted a healthcare request stating that he experienced difficulty programming and could not sleep. The PC saw him on 1/27/16 when the inmate reported he was doing fine. He stated that he had obtained a job as a porter, which kept him busy. He also stated that he had had a nice holiday with family. He denied immediate problems or mental health issues.

On 2/16/16, the inmate submitted a healthcare request stating that he needed mental health to get the violent voices out of his head. He reported that the voices were saying someone was trying to get him. He was unable to sleep because he had to "keep an eye out."

During a PC contact on 2/22/16, the inmate stated that he was having a hard time due to "C" Status, as his headphones, television, radio and other privileges were removed. The PC did not

provide an assessment of his reported auditory hallucinations other than to indicate that they were well-managed.  The clinician indicated that no serious psychiatric distress was noted.

A psychiatrist saw the inmate on 3/6/16 and 3/14/16 for medication nonadherence.  The inmate reported that he was not taking prescribed medications because he had been placed on "C" Status.  The psychiatric opinion was that the inmate had the capacity to understand the risks and benefits of his decision.  He was educated about how to see the psychiatrist again if he changed his mind.

Findings

The purpose of this review was to shed light on the inmate's allegation that he had been sexually assaulted and encountered difficulty reporting it at CTF.  A review of healthcare documents provided no evidence that the inmate had told CTF clinical staff that he had been sexually assaulted.  This conclusion was based on a review of healthcare record.

**Inmate D**

This healthcare record was randomly selected for review from a list of 3CMS inmates who were referred to a higher level of care.

The inmate was previously treated in the EOP and was discharged to the 3CMS in 2013.  He experienced worsening signs of depression following the death of his sister and placement in administrative segregation for inappropriate sexual conduct.  He was seen more frequently by the PC to address intermittent suicidal ideation without intent, loss of interest, loss of appetite, difficulty sleeping, and heightened anxiety manifested by sexual self-stimulation.  The most recent SRE assessed a moderate chronic and acute suicide risk.

On 2/25/16, the inmate's institutional treatment team elevated his level of care to the EOP.  The PC documented that the inmate showed steady deterioration over recent months, with the clearest deterioration occurring during the prior month.  The treatment team considered factors that could indicate that referral to DSH was needed, but opined that no further elevation of care beyond the EOP was warranted.

The IDTT provided a diagnosis of Major Depressive Disorder, single episode without psychotic features.  The inmate was referred to the psychiatrist and was prescribed antianxiety and antidepressant medications.  A provisional diagnosis of Unspecified Bipolar Disorder was added based on the inmate's compulsive sexual behavior.

The approved treatment plan identified problems of ruminative depression, anxiety, incapacity to self-regulate, inability to find meaning, and passive suicidal thoughts.  Healthcare records indicated that the inmate received weekly PC contacts pending transfer to the EOP as required by the Program Guide.  The inmate transferred to an EOP institution on 5/23/16.

Findings

The inmate was appropriately treated in the 3CMS program.  The PC adequately identified symptoms of worsening depression and followed the inmate more frequently within the 3CMS. The institutional treatment team concurred that the inmate's deterioration required treatment at a higher level of care in the EOP.  The inmate was enrolled in the EOP and received weekly clinical contacts and psychiatric follow-up until his transfer on 5/23/16.  The inmate received adequate mental health care.

**Inmate E**

This inmate's healthcare record was reviewed because his level of care was elevated to the EOP. The purpose of the review was to assess the overall adequacy of care.

Documentation showed that this 3CMS participant was placed in the EOP on 12/31/15 due to continued decompensation including irritability, anxiety interfering with his train of thought and self-report of a specific plan to kill himself on release if he were unable to secure housing and a means to support himself.  He had pursued and exhausted all avenues for potential housing and employment and was described as envisioning the worst case scenario.  The inmate had been diagnosed with bladder cancer and was refusing treatment.  He reported being in pain and awakening eight times nightly to urinate, thus disrupting his sleep.

The institutional treatment team developed a well-detailed treatment plan; the plan noted that the inmate would be retained on the high risk list.  He was provided diagnoses of Bipolar 1 Disorder, most recent episode manic, in partial remission and Polysubstance Dependence, in institutional remission.  He was prescribed Lamictal, lithium and Zyprexa and reported benefit from the Zyprexa treatment.  The treatment plan reflected relevant problem areas.  Short-term goals addressed risk reduction and pre-release planning in behavioral and measurable terms using everyday language.

The inmate worked with the same psychiatrist and they met at increased intervals up to the intended release date.  Likewise, PC contacts increased in frequency to at least weekly and the PC documented tireless efforts to work with the probation and parole office to assist in securing housing and other resources for the inmate.

Over the course of six weeks, the inmate continued to experience anxiety and expressed emotions effusively.  He adhered to psychiatric treatment recommendations and worked with the PC to solidify release plans to a degree acceptable to him.  Prior to his release, the inmate said that he felt better than average even though his housing was not securely finalized. Documentation indicated that catastrophic thinking was minimal and the inmate did not endorse suicide ideation with intent or plan upon release.

Findings

The treatment team effectively monitored the inmate's progress and when he deteriorated, a modified plan was developed and implemented.  Treatment targets were relevant and members

of the team continued to monitor the inmate according to Program Guide requirements. The PC took exemplary actions in pre-release planning, with good documentation. Although the inmate's anxiety had not subsided, it was reduced to a manageable level. The inmate was able to express reasonable optimism even in the face of uncertainty. The inmate received adequate mental health care.

**Inmate F**

The healthcare record was reviewed because the SPRFIT committee identified the inmate as engaging in self-harm behavior on 9/3/15. Available information indicated that the inmate ingested a razor blade that was reportedly used to sharpen colored pencils to avoid being caught for possessing dangerous contraband. The inmate denied suicidal intention. He was sent to an outside medical facility and was eventually medically cleared for return to CTF. He was seen for full five-day follow-up on return to the North facility.

A psychiatric note dated 9/3/15 indicated that the inmate was receiving mental health services at the 3CMS level of care. He was provided with a diagnosis of Adjustment Disorder, with disturbance of conduct. Cluster B antisocial personality traits were also noted. He was prescribed Vistaril to treat tension and sleep-related problems.

The SRE dated 11/23/15 concluded that the inmate posed a moderate chronic risk of self-harm and a low acute risk. Risk rating was predicated on his history of depression, childhood abuse, poor impulse control and substance abuse history.

On 12/16/15 the inmate was placed in administrative segregation pending a disciplinary report for submitting a positive urine drug screen. A pre-placement chrono documented the absence of suicidal thoughts or plans. An SRE was attempted on 12/22/15, but the inmate refused to participate. Cell-front observation noted that he was sitting on the bed and reading a book, and described his mood as fine. Noteworthy was a history of many RVRs related to drug use. This inmate was transgender and the inmate previously told the PC that a custody officer stared inappropriately at his genitals and made derogatory comments admonishing him to "act like a man."

The inmate transferred to HDSP on or around 2/25/16.

Findings

The inmate was appropriately placed and treated in the 3CMS program. He received timely five-day follow-up after ingesting a razor blade. This was appropriately categorized as a self-harm incident without suicidal intent. The inmate was provided appropriate follow-up care. He received adequate mental health care in the 3CMS program.

**Inmate G**

The healthcare record was randomly selected for review from among inmates enrolled in the 3CMS. The purpose of the review was to assess the inmate's overall care.

660

The inmate did not receive mental health treatment prior to his first prison term in 1990. He met enrollment criteria to participate in the 3CMS program in 2003. He was treated for a depressive disorder for six months to deal with adjustment issues related to his life term. He returned to the MHSDS on 1/25/16 predicated on his experiences of sadness, irritability, and disturbed sleep, triggered by frequent cellmate changes. As per the Form 7388-B, treatment at a higher level of care was not indicated. The institutional treatment team provided a diagnosis of Unspecified Depressive Disorder. The inmate was not prescribed psychotropic medications.

The inmate's SRE assessed low chronic suicide risk. His acute risk was assessed as moderate based on depression and situational anxiety and recent passive suicidal ideation without intent or plan. The safety plan was delineated in generalized terms that merely echoed Program Guide requirements.

Short-term treatment plan goals did not directly address the inmate's presenting symptoms. In very general terms, the short-term goals were to learn three coping skills to manage mood symptoms and to gain insight into his depression by learning three symptoms. This was to be accomplished by quarterly PC contacts. The inmate was placed in the MHSDS due to medical necessity; the role of medication in the treatment of his depression was not documented.

The PC met with the inmate on 3/22/16. The inmate reported that things were the same. For example, he stated that he continued "battling with reality" of a life sentence. The PC provided a handout on cognitive behavioral techniques ostensibly to help "process his emotional reactions more productively." The inmate was informed that the PC was leaving and that his care would be provided by another clinician.

Findings

The inmate appeared to be appropriately placed in the 3CMS program to treat an episode of sadness and irritability brought on by changes in the prison environment that were beyond his control. Timeliness of service delivery met Program Guide requirements. However, the content of the treatment plan was unaligned with the inmate's presenting complaints. For example, sleep disturbance was identified as a complaint, but there was no discussion of whether to refer the inmate for a medical evaluation or whether sleep hygiene materials might be used. The safety plan developed for this inmate, who posed a moderate acute risk of self-harm, simply reiterated Program Guide requirements. Finally, the treatment plan did not target his unsettled adjustment to his life term. The inmate required treatment goals that were practical and appropriate to his situation as a prisoner serving a life term. The mental health treatment provided to this inmate was minimally adequate.

**Inmate H**

This inmate's healthcare record was reviewed because the inmate was placed on a high risk list and elevated to the EOP on 3/10/16.

The inmate was angry as to an RVR that he had recently received and which had been committed several months prior. On 3/1/16, the psychiatrist described the inmate as agitated, with poor eye

contact and expressions of hopelessness.  Earlier, he had been placed on a five-day follow-up program after he made aggressive threats during a mental health evaluation related to the RVR.

A SRE was completed on 3/9/16, in anticipation of the inmate's move to the EOP level of care. While he denied a history or current thoughts of suicide attempts, he stated that his uncle had committed suicide in another CDCR institution in 2012.  The inmate had a significant history of substance use as well as numerous controlled substance violations in prison.  He was determined to pose a moderate risk of suicide both on a chronic and acute basis.

The institutional treatment team increased his level of care to the EOP based on signs of gradual decompensation due to mounting stressors over the past few months.  His diagnosis was changed from Unspecified Mood Disorder to Major Depressive Disorder, moderate.  Other diagnoses included Alcohol Dependence, in institutional remission and Opioid Dependence, current.  He was prescribed psychotropic medications to target the symptoms of his primary diagnosis.

The Form 7388-B indicated that the inmate was not functioning adequately at the current 3CMS level of care.  Furthermore, he exhibited chronic symptoms that had not responded sufficiently to treatment to enable adequate functioning.  The Form 7388-B provided modifications to the treatment plan with increased frequency of contact.  There was documentation that in the event of further decompensation prior to transfer, the inmate would be placed in the OHU for increased support.

Healthcare record review documented PC contacts that were provided weekly through 4/25/16. The inmate received another RVR on 3/21/16 for a drug-related infraction.  He attributed this to the discontinuation of morphine by his primary physician.

<u>Findings</u>

The inmate was placed on the high risk list and moved to the EOP level of care on 3/10/16. Program policies were followed in terms of identifying increased risk, providing timely risk assessments, modifying the treatment plan and providing timely contacts pending transfer to the EOP.  However, the treatment plan stated that the OHU would be utilized in the event of further decompensation.  This was not in compliance with the institution's updated policy on the use of the OHU.  The inmate was appropriately placed at a higher level of care.  The mental health care that was provided was adequate and the inmate was safely transferred to MCSP for his appropriate level of care.

EXHIBIT O
California Men's Colony (CMC)
May 10, 2016 – May 12, 2016

**Inmate A**

This inmate was housed in the CMC MSF.  It was the inmate's first prison term and he was sentenced to 12 years with an ERPD of 6/27/17.  He was provided with diagnoses of Depressive Disorder NOS and Personality Disorder NOS with antisocial features.  He was not prescribed psychiatric medication.  His healthcare record was reviewed to assess the provision of mental health services at the MSF.

Prior to admission to CDCR, the inmate had not received mental health services.  He began mental health treatment in CDCR at the 3CMS level of care after witnessing a peer's suicide.  A review of his healthcare record since transfer to the CMC MSF indicated that the initial and routine contacts with his psychiatrist, PC and IDTT were timely.  Documentation indicated that he presented as asymptomatic and he had requested removal from the 3CMS level of care.  The plan outlined in the healthcare record was to monitor the inmate for the six months required by the Program Guide and subsequently to terminate services as clinically indicated.

Findings

The mental health care provided to this inmate was appropriate and adequate.  Contacts were timely and clinically beneficial.

**Inmate B**

This inmate was housed in the CMC MSF.  He was not prescribed psychotropic medications.  His healthcare record was reviewed to assess the provision of mental health services at the MSF.

A review of the inmate's healthcare record since his transfer to the CMC MSF indicated that the initial contact with the psychiatrist was timely, as were initial and routine IDTTs.  PC contacts were timely and occurred more frequently than every 90 days.  Individual PC contacts addressed the inmate's symptoms that were exacerbated by situational stressors.  He also attended a meditation group that his PC facilitated.  Healthcare record documentation indicated that the inmate believed that he was restricted from participating in the fire camp program due to inclusion in the MHSDS; however, consultation with regional headquarters staff indicated that the restriction was due to pending RVRs.

Findings

The mental health care provided to this inmate was appropriate and adequate.  Clinical contacts with the PC were clinically appropriate and exceeded quarterly intervals.  The inmate's treatment was amended as was clinically indicated and was targeted for his specific symptoms.

**Inmate C**

This inmate's healthcare record was reviewed to review the provision of EOP services in the administrative segregation unit.

664

This inmate had a long history of mental health treatment for auditory hallucinations and paranoia that included six psychiatric hospitalizations. There was no history of suicide attempts or suicidal ideation. There was a history of childhood physical, sexual, and emotional abuse. His substance use history, which began at age 15, was significant for marijuana, methamphetamine, cocaine, heroin, mushrooms, angel dust and alcohol use.

The inmate entered the MHSDS at the 3CMS level of care soon after his admission to CDCR in August 2014. His level of care was advanced to EOP in May 2015. He was provided with diagnoses of Schizoaffective Disorder, Polysubstance Dependence and Personality Disorder NOS. He was prescribed Zyprexa, Depakote and Buspar. Treatment goals included medication adherence, at least 50-percent participation in group therapy, at least 75-percent adherence with PC contacts and maintenance of ADLs. The treatment objectives included in the healthcare record were clinically appropriate.

The inmate was seen for his initial PC contact within 24 hours of transfer to the administrative segregation unit on 12/4/15. Subsequent PC contacts were timely. Psychiatric contacts were also timely. However, the psychiatric contact that occurred on 4/6/16 was documented as having occurred in the context of the IDTT meeting. Initial and routine IDTT meetings were timely. IDTT documentation from 3/9/16 provided a clinically beneficial overview of the inmate's treatment participation and progress toward goals since his last IDTT. Further, he met his goal for group attendance, attending 51 percent of group programming.

PC progress notes following the 3/9/16 IDTT described the worsening of psychiatric symptoms. During his PC contact on 3/17/16, he presented with agitation and paranoia. He was evaluated on 3/22/16 in response to an urgent referral due to an increase in auditory hallucinations. Documentation indicated that an ICF referral was discussed and the inmate was agreeable to the referral. The PC consulted with the supervisor and it was agreed that an ICF referral would be submitted at the next IDTT scheduled for 3/29/16.

IDTT meetings on 3/29/16 and 4/6/16 were documented on the Form 7320D. The documentation included no narrative of the inmate's functioning or mental status since the previous IDTT on 3/9/16. Documentation regarding the decision to refer the inmate to the ICF level of care for both IDTT meetings was unclear. Documentation from 4/6/16 noted that the 3/29/16 documentation was completed in error with no explanation. All of this information conflicted with a 3/22/16 PC note that indicated that an ICF referral would be completed during the IDTT meeting on 3/29/16.

Findings

The mental health care provided to this inmate appeared to be adequate and proactive, as a DSH referral was discussed at the onset of psychiatric decompensation. Of concern was the process in which the referral occurred. Specific factors and clear rationale that warranted a DSH referral were minimal and confusing. Additionally, the timing of the DSH referral, in close proximity to a stable review during the previous IDTT, was unclear. The apparent delay in the ICF referral was also an area of concern.

665

The psychiatric contact within the context of an IDTT was an inappropriate treatment contact. Consultation with regional mental health staff indicated that the Form 7320D used for the 3/29/16 and 4/6/16 IDTT meetings was outdated.

## Inmate D

This inmate's healthcare record was reviewed to assess the provision of EOP services in the administrative segregation unit.  He was transferred from SVSP and placed in the administrative segregation unit at CMC on 12/29/15.  He was provided with diagnoses of Major Depressive Disorder, recurrent, moderate, Bipolar Disorder NOS, Alcohol Dependence and Antisocial Personality Disorder.  He was prescribed Effexor.

This inmate entered the MHSDS during 2010 at the 3CMS level of care.  His level of care was increased to EOP in 2014 due to worsening mood instability while he was serving a lengthy administrative segregation unit term.  At that time, he had requested a transfer to DSH.  This inmate had a history of mental health treatment in the community for "mood problems."  He had a history of four suicide attempts; these included cutting, hanging, suicide by police officer, and lighting a fire in his cell.

Treatment planning at CMC focused on depression with goals of medication adherence, prosocial engagement and learning two coping skills for depressed mood.  He attributed his depressed mood to his placement at CMC.

Since his admission to the administrative segregation unit at CMC, PC contacts occurred timely with the exception of one missed contact between 4/7/16 and 4/21/16.  The inmate typically refused private PC contacts and he was seen weekly by his PC at cell front.  Documentation of PC contacts noted the inmate's focus on his dissatisfaction with his transfer to CMC.  He requested mental health staff to assist with a transfer to another prison to be closer to his family. On 1/13/16, he was described as having "strong antisocial features."  Two weeks later on 1/28/16, he reported auditory hallucinations.  On 2/4/16, the healthcare record indicated that the inmate continued to report auditory hallucinations and panic attacks, but he would not elaborate regarding details of his symptoms.  Despite this report, the inmate reportedly did not appear to be responding to internal stimuli.  Similarly, he complained of poor sleep, but further details were not provided.  In contrast to his self-report of distress during several PC contacts, his overall presentation was not consistent with the level of distress that he reported.

During PC contacts between February and April 2016, the inmate presented as stable with an improved social adjustment and mood.  On March 1, 2016 he asked his psychiatrist to discontinue his medications.  Despite this stable presentation, the inmate continued to request that his PC transfer him to DSH; for example, on 3/30/16 the healthcare record documented that the inmate wanted to go to DSH because he was "stressed, depressed, tired of all of this."

At an IDTT on 3/29/16, it was documented that the inmate continued to experience anger and depression; however, specific treatment progress or lack thereof was not documented.  Group treatment attendance was reported at 41 percent despite daily encouragement from his PC.  Two

666

weeks later, on 4/13/16, another IDTT was held and was documented on the Form 7230D. At that time, the inmate had refused 62 percent of his treatment groups.

The documentation indicated that psychiatric contacts were timely. The inmate was provided with a diagnosis of Major Depression with psychosis. Although this diagnosis appeared to be in response to the inmate's past report of symptoms, supporting details for this diagnosis were not provided. A 4/13/16 psychiatric note conflicted with the IDTT summary on the same date. Specifically, it was documented that "recommended today in IDDT [sic] that he is good [sic] candidate for DSH referral and he is agreed." In contrast, the IDTT recommended continuation at the EOP level of care.

Another IDTT was conducted on 4/20/16 and the plan indicated plans for DSH referral for ICF level of care. However, the documentation lacked clear clinical rationales for referral.

Findings

The mental health care provided to this inmate was inadequate. Treatment planning was not individualized and treatment did not focus on teaching coping skills to manage situational stressors. Further, with the exception of increasing PC contacts to engage in programming, alternative attempts to engage the inmate in treatment were not documented.

Case formulation and rationale for diagnosis were poor. Documentation suggested that this inmate's request for DSH level of care was likely tied to dissatisfaction with housing and a desire to be closer to his family rather than due to the need for a higher level of care. However, this was not conceptualized and consequently addressed in documentation or treatment planning. Further, there was no evidence that an institutional transfer, which would have likely alleviated his distress, was discussed.

Psychiatric contacts and IDTT meetings were timely. Although the majority of PC contacts were timely, the missed PC contact in April 2016 was concerning given that it occurred when the inmate was persistent about his need for DSH level of care. Consultation with regional mental health staff indicated that the Form 7320D used for the 4/13/16 IDTT meeting was outdated.

**Inmate E**

This inmate was housed on Facility D. This was his third prison term for which he was serving a 25-years-to-life sentence. The inmate was provided with diagnoses of Hallucinogen Persisting Perception Disorder and Bipolar I Disorder. He was prescribed lithium and Thorazine. His healthcare record was reviewed to assess the provision of EOP services.

The inmate had a history of substance use, including marijuana, alcohol, crack, and angel dust. Visual hallucinations and a psychiatric hospitalization coincided with his use of angel dust. He had a history of suicidal ideation in his twenties, and he engaged in self-injurious behavior when incarcerated. Visual hallucinations included seeing dots and "dogs barking with red eyes with a skeleton stick." Medically, he was diagnosed with high blood pressure.

667

IDTT meetings occurred timely (9/1/15, 11/3/15, 2/2/16).  Documentation of treatment goals, progress toward treatment goals, and updates to treatment goals included minimal information.

The IDTT consistently indicated that the inmate had not had any CTC admissions or RVRs, suggesting general psychiatric stability; however, on 9/1/15 it was noted that he continued to experience passive suicidal ideation (frequency unknown).  During the next IDTT on 11/3/15, there was no reference to suicidal ideation and the documentation noted that the inmate continued to report atypical auditory hallucinations, disturbed sleep and manic symptoms, but specific details were not provided.

Although psychiatric contacts occurred timely, the documentation of those contacts was cursory.  PC contacts were timely, but there was one instance of two consecutive PC contacts in a group format (12/7/15 and 12/17/15) instead of alternating a group contact with an individual contact.  PC progress notes provided a clinically beneficial assessment of the inmate's mental state, but treatment interventions were limited.

Findings

The mental health treatment provided to this inmate could have been significantly improved with individualized treatment planning and measurable goals.  The documentation of PC contacts lacked clinical interventions.  Although IDTT meetings occurred timely, updates on symptomatology between treatment plans were lacking, treatment progress between IDTTs was not documented, and interventions were not updated to address the inmate's current treatment needs.  For example, there was no documentation to indicate that the team addressed ways to increase the inmate's group participation, ongoing suicidal ideation, disturbed sleep or manic symptoms.

**Inmate F**

This inmate was admitted to DSH-Vacaville on 10/29/15.  His discharge summary was typed on 12/30/15.  He was discharged from DSH to KVSP on 1/12/16.  He was subsequently transferred to CMC on 2/9/16.  Alerts included a history of suicide gestures, assaults and IEX.  Follow-up with a psychiatrist for medication management was recommended.  Discharge medications included Thorazine, Haldol Decanoate, Zyprexa, and valproic acid.  The inmate reportedly refused to participate in his modified programming.

Discharge diagnoses include Schizoaffective Disorder, bipolar type, Antisocial Personality Disorder and Cannabis Use Disorder, mild, in a controlled environment.

The social worker's discharge summary indicated that this inmate was receiving medications on an involuntary basis.  Recommendations for continuing care included that the inmate learn reality testing, attend anger management, learn ways to increase his socialization and stress management.

A 1/13/16 treatment plan developed at KVSP was reviewed.  The inmate was housed in administrative segregation following his transfer from DSH.  The treatment plan included the

following statement: "He is currently housed in ASU due to returning from DSH." Information in SOMS indicated that the inmate had been placed in administrative segregation due to an RVR following an assault on a police officer, which appeared to have occurred upon his arrival at KVSP.

This inmate was transferred to CMC-East on 2/9/16. A routine initial psychiatric evaluation was completed on 2/16/16. The inmate was described as a 35-year-old male with a history of psychosis and aggression. His PC 2602 was scheduled to expire on 6/11/16. He arrived at CMC's administrative segregation EOP hub, but the progress note did not identify the reason for administrative segregation placement or whether the DSH discharge summary or treatment plan had been reviewed.

The first treatment plan at CMC was dated 2/17/16. This treatment plan indicated that the inmate was transferred from KVSP for EOP hub placement due to an RVR for fighting and enemy concerns. He was noted to have a severe chronically debilitating psychotic disorder with auditory hallucinations and paranoid delusional thinking, low frustration tolerance and severe assaultive impulsive behavioral dyscontrol with psychotic agitation. The staff assault was also noted.

Findings

Issues of concern were noted regarding the care provided to this inmate. Continuity of care was problematic in the context of information in the DSH discharge packet and information obtained from KVSP; however, it appeared that clinician-to-clinician contact had occurred. Of particular concern was the lack of specific information related to the inmate's RVR that resulted in his placement in administrative segregation after DSH discharge; this made the reason for direct placement in administrative segregation after DSH discharge indeterminable from available records.

**Inmate G**

This 61-year-old inmate was admitted to DSH-Vacaville on 11/6/15 and was discharged back to CMC on 2/10/16. Discharge diagnoses included Major Depressive Disorder, recurrent, mild, Anxiety Disorder NOS, Cocaine Dependence in a controlled environment, Methamphetamine Dependence in a control environment, and Antisocial Personality Disorder. He was recommended to be placed at the EOP level of care upon discharge. Alerts included multiple suicide attempts. Follow-up with a primary care physician regarding his liver disease, testicular hydrocele, gastroesophageal reflux disease (GERD), left eye blindness and cerebral aneurysm-status post shunt was recommended. It was also recommended that he be transferred to CHCF as was the plan prior to his decompensation at CMC. It was noted that transfers to multiple facilities only served as an added stressor and would likely cause further decompensation.

Discharge medications included Prozac, Remeron, Vistaril and Zyprexa.

The transfer/discharge summary included the following: "encourage patient to attend all groups offered to him and utilize coping skills to deal with his mental illness. Patient encouraged to

verbalize needs and concerns to staff.  Encourage medication compliance and to maintain adequate hygiene and grooming."

A 2/18/16 treatment plan developed at CMC was reviewed.  This treatment plan included excerpts from the DSH-Vacaville records, including the recommendation for transfer to CHCF.  The treatment plan also included recommendations that were summarized in the DSH discharge note.

A 2/12/16 progress note indicated that the inmate wanted to remain at CMC.

Findings

Although it was unclear why this inmate was returned to CMC in contrast to the recommended placement at CHCF, it was clear that continuity of care occurred in the context of his discharge from DSH-Vacaville.  This inmate received adequate mental health care.

**Inmate H**

This inmate was admitted to DSH-Atascadero on 12/10/15 and was discharged back to CMC on 1/13/16.  Discharge diagnoses included Cannabis Use Disorder, moderate, in a controlled environment, Amphetamine Type Substance Use Disorder, moderate, in a controlled environment and Antisocial Personality Disorder.  His violence and agitation was assessed to be triggered and continued by his global antisocial criminal outlook in contrast to a psychotic illness.  EOP level of care was recommended.  It was also recommended that he not be prescribed benzodiazepines or opiates.  Discharge medications included hydroxyzine, Remeron, melatonin, Xopenex inhaler and Tylenol.

A 1/26/16 treatment plan developed at WSP was reviewed.  It was not clear from reading it whether DSH healthcare records had been reviewed.  The inmate was placed at the EOP level of care.

The inmate was transferred to CMC-East on 4/13/16.  A 4/27/16 treatment plan was reviewed.  Based on this treatment plan review, with specific reference to the clinical summary and case formulation, it did not appear that the DSH-ASH discharge summary had been reviewed.  Specifically, it was reported that the inmate was discharged from DSH-ASH with diagnoses that included Schizoaffective Disorder, which was inaccurate.  In fact, the discharge plan specifically described why the diagnosis of Schizoaffective Disorder was not clinically appropriate.

Findings

This inmate did not receive appropriate continuity of care.  This was evidenced by the discrepancy regarding diagnoses formulated at DSH-ASH, which stated why the diagnosis of Schizoaffective Disorder was not clinically appropriate, as compared to the CMC treatment plan, which inaccurately stated that the inmate had been discharged from DSH-ASH with diagnoses that included Schizoaffective Disorder.

670

**Inmate I**

This inmate was admitted to DSH-Atascadero on 12/16/15 and was discharged back to CMC on 2/9/16.  His discharge was precipitated by his lack of cooperation and behavioral disturbances, including being disruptive during groups.  His final diagnosis was Major Depressive Disorder, recurrent, with psychosis.  Recommended treatment included transfer to an EOP level of care.  Prescribed medications included Risperdal, mirtazapine and melatonin.

A 2/16/16 treatment plan formulated at CMC was reviewed.  The inmate was described as a 24-year-old man who had been hospitalized due to passive suicidal ideation and severe depression.  The treatment plan documented that his PC had reviewed the DSH-ASH records.

Findings

The mental health care provided to this inmate was appropriate.  CMC adopted treatment plan recommendations made at DSH-ASH.  There was also good continuity of care.

**Inmate J**

This 33-year-old inmate on DD3 status was on the DSH non-referral list.  He had repetitive and long term MHCB admissions/treatment for "long-term housing and mental health care…"  For example, he was treated in the CHCF MHCB for six months beginning on 1/16/14.  He also had multiple DSH admissions in addition to his 14 MHCB placements.  Numerous treatment plans well-documented the inmate's grave disability.  He received medications by way of a PC 2602 order.  He had been discussed at a bioethics committee meeting during September 2015.  A regional center assessment was conducted on 3/10/16 and the plan was for there to be another future assessment, but the date was unclear.  The inmate's healthcare record contained adequate documentation that current treatment at DSH would not be beneficial.

Findings

The decision not to refer this inmate to DSH was clinically appropriate.

**Inmate K**

This inmate was included on the DSH non-referral list.  A 3/29/16 treatment plan was reviewed and indicated that he had been housed in the CTC from 3/11/16 to 3/21/16 after tying a noose around his neck and stepping off of his toilet in front of custody.  He reported that he was not attempting to kill himself, but was trying to show his distress over not having his property.

The inmate's presentation was consistent with diagnoses of Bipolar Disorder and Borderline Personality Disorder.  He was being considered for DSH referral due to three or more MHCB placements within the past six months.  Each of these admissions were precipitated by a suicide gesture meant to draw attention to an issue or need that this inmate felt was not being met.  It was decided not to refer him to DSH due to the belief that the CTC stay along with additional interventions could successfully help him to program at the EOP level of care.

<u>Findings</u>

The decision not to refer this inmate to DSH was clinically appropriate.

EXHIBIT P
Wasco State Prison (WSP)
November 29, 2016 – December 1, 2016

**Inmate A**

This case was reviewed to evaluate the mental health care provided and to evaluate restraint and seclusion practices. This 54-year-old inmate transferred from alternative housing and was placed in restraints on 6/17/16 at 2040 hours. The restraint episode lasted for five hours and 25 minutes. The inmate had previously been placed in the seclusion room for two hours and 32 minutes, but this incident was not included on the restraint and seclusion log. The restraint order was preemptive and was actually written prior to the seclusion order, at 1745 versus 1808 hours. The order did not contain necessary elements, such as the less restrictive interventions taken or release criteria. In addition, preemptive standing restraint orders are inappropriate, as they do not allow for a face-to-face evaluation at the time, implementation of less restrictive alternatives or other policy requirements. The seclusion order described the inmate as highly labile and agitated; he was banging his face and head against metal parts of the bed in alternative housing, resulting in a small laceration to his right upper lid. He was also described as severely psychotic, with delusional thinking.

The inmate was released from restraints and placed in seclusion for a second time, despite being described as calm and resting. The seclusion order was a phone order which did not explain the reason for seclusion. That phone order and multiple renewal orders for seclusion simply stated, "seclusion room for safety" without stating the duration of the order, criteria for release or other necessary information. Ultimately, an order for seclusion twelve hours later provided release criteria for seclusion. The inmate was eventually returned to alternative housing, after he spent approximately 43 hours in seclusion or restraint. Nursing notes, physicians' orders and the restraint and seclusion log were at times contradictory as to whether the inmate was in restraints or seclusion. Documentation was also filed in different sections of the healthcare record, in both the inpatient and outpatient sections.

The inmate was provided with a diagnosis of Bipolar Disorder, mixed with psychotic features. His psychotropic medications were varied and modified during his crisis episode, but they included Buspar, Depakote ER and olanzapine. This inmate was ultimately admitted to the CMC MHCB on 6/21/16.

Findings

This inmate was appropriately placed in seclusion on 6/17/16. However, it was unclear whether the use of restraints and additional seclusion on the following day was clinically indicated. The inmate did not receive adequate treatment as the restraint and subsequent seclusion placement did not comply with CDCR policy. It also did not appear that restraint and seclusion were utilized appropriately on 6/18/16.

**Inmate B**

This case was selected for review as the inmate was identified on the restraint and seclusion outpatient log. The log indicated that this 47-year-old inmate was placed in five-point clinical restraints for ten hours and ten minutes on 6/20/16 from 0600 to 1610 hours. However, healthcare record documentation did not correspond to the times on the restraint log. While

documentation was confusing, it appeared that the inmate had been in restraints for approximately four hours and was then moved to seclusion; however, nursing staff incorrectly continued behavioral observation sheets as though the inmate was on constant restraint status.

Restraint and seclusion orders did not explain the rationale for placement beyond "danger to self and others" for restraints and "downgrade to observation room 135" for seclusion. No release criteria was present, nor was information documented as to less restrictive attempted interventions. The inmate was described as agitated and fighting against his restraints during part of his time in them, which was clearly an indication for continued restraint use and possibly additional interventions. Once the inmate moved to seclusion, he was described as calm for a significant amount of time, yet he was not released. There was no clinical explanation for maintaining the inmate in seclusion for approximately ten hours.

An emergency nursing note indicated that custody reported that the inmate had been running around inside the building and tried to "assault" the housing unit officer. Documentation indicated that the psychiatrist on call ordered the inmate to be placed in restraints. He also ordered an intramuscular injection of Geodon for him. When the inmate arrived at the TTA, he was described as agitated and confused.

The inmate was released from seclusion later in the evening on 6/20/16. He was placed on suicide watch in alternative housing in administrative segregation. While documentation was sparse, it appeared that the inmate was removed from suicide watch and the referral to the MHCB was rescinded on 6/22/16. An SRE of that date indicated that the inmate was placed on suicide watch due to danger to self and others, although he no longer expressed any such concerns. He was reportedly placed at the EOP level of care, but no IDTT meeting occurred. There was no corresponding progress note to address the inmate's bizarre behavior that also contributed to placement in alternative housing or to justify removal from the MHCB transfer list. There was also no progress note documenting that the inmate was seen daily while in alternative housing.

Findings

This inmate was not adequately treated. There was no documentation indicating that he was seen daily while in alternative housing. There was insufficient clinical documentation to support rescinding the MHCB referral. There did not appear to be sufficient information to support the inmate's placement in restraints. Based on available information, medication management and placement in alternative housing may have been sufficient. The inmate appeared to have been maintained in seclusion longer than necessary. Documentation regarding restraint and seclusion placement was inadequate and did not meet Program Guide requirements.

**Inmate C**

This case was selected for review as the inmate was listed on the DSH coordinator Form 7388-B audit log. This 35-year-old reception center EOP inmate was seen by the IDTT on 6/7/16. He was serving his first prison term and had a release date of 12/25/17. The inmate was provided

675

with a provisional diagnosis of Schizophrenia, paranoid type.  He was prescribed buspirone, Haldol and Celexa.

The DSH coordinator indicated that criterion seven on the Form 7388-B was positive and that the non-referral rationale and treatment modifications were adequate.  However, the Form 7388-B located in the healthcare record had nothing completed for criterion seven; the Form 7388-B was blank for this item and had not been properly completed.

Prior Form 7388-Bs were also blank.  There was also an amended Form 7388-B dated 5/26/16 that incorrectly indicated "n/a" or not applicable.  Progress notes documented that the inmate had reported difficulty remaining in groups due to auditory hallucinations.  However, it was impossible to determine the percentage of participation from healthcare record documentation.

Findings

The inmate's case was improperly evaluated by the DSH coordinator.  Based on available documentation, it was unclear whether the inmate should have been considered for referral to DSH level of care.

**Inmate D**

This case was selected from the DSH coordinator Form 7388-B audit log.  This 24-year-old reception center EOP inmate met criterion seven (less than 50 percent participation with treatment) on the Form 7388-B, but the treatment team did not refer him to DSH.  The DSH coordinator judged the documentation of the non-referral rationale and treatment modifications to be good.  However, healthcare record information indicated that the inmate appeared to be severely ill.  He had been receiving mental health services at the 3CMS level of care prior to a MHCB admission for suicidality.  He was discharged from the MHCB to the EOP level of care.

The inmate was provided with diagnoses of Schizoaffective Disorder, bipolar type and Polysubstance Dependence, in institutional remission.  He was not prescribed psychotropic medication at the time of review, but was previously treated with olanzapine.

The inmate had a history of DSH hospitalizations for competency issues as well as other inpatient psychiatric admissions.  He expressed somatic delusions, telling staff "I'm perfect," and had poor insight as to his mental illness.  He was non-adherent with prescribed psychotropic medications and treatment group participation.  Staff described him as exhibiting inappropriate affect, random laughing and smiling, echolalia, bizarre thinking, being easily distractible and appearing to respond to internal stimuli.  The rationale for non-referral for positive criterion seven was inadequate in light of documentation as to the inmate's low level of functioning and questionable self-report.  Treatment modifications included attending daily group therapy sessions, which were clearly not targeted to the positive criterion since the inmate frequently did not attend those groups.  Otherwise, modifications were minimally adequate.  Progress notes indicated that individual clinical contacts were not always confidential and therapeutic; at times, they occurred at cell front or on the yard, making the modifications inadequate.

Progress notes of clinical contacts near the date of the treatment team meeting indicated that the inmate was confused, withdrawn, illogical, laughing at odd times, responding to internal stimuli and easily distractible.  The inmate did not appear to be responding adequately to treatment.  He was not participating fully in group therapy, which was the minimal therapeutic program given his reception center status.  The inmate appeared to meet criteria for DSH referral.

Findings

This inmate required referral to a higher level of care.  He was not benefitting from treatment and continued to exhibit significant dysfunctional behavior that was attributed to his mental illness.  The treatment team provided an inadequate non-referral rationale and inadequate treatment modifications did not properly address the positive criterion on the Form 7388-B.  This inmate did not receive adequate mental health care.

**Inmate E**

This case was selected for review as the inmate's IDTT meeting was observed during the site visit and to evaluate MHCB care.  The inmate was admitted to the MHCB at WSP on 11/9/16 due to suicidality.  He was heard stating loudly that he wanted to kill himself.  Two days prior, he had jumped over the Facility B fence into the courtyard because he thought he was going to be released.  It was reported that other inmates harassed him and he was trying to escape from them.  The inmate experienced delusional thinking that he was sexually assaulted at night by someone entering his cell.  He also believed that the president had hovered over his cell in a helicopter and injected sperm into his mouth and that others were doing the same.  Consequently, the inmate spit frequently.  He also refused to shower, believing that the water was contaminated.  At the time of admission, he reported sleeping only one hour per night and having no appetite.  He was described as oriented to all spheres, but was paranoid and irritable.  He was not prescribed psychotropic medication and stated no desire to resume them.  He was provided with a diagnosis of Schizophrenia, paranoid type.

The inmate was seen timely for his intake assessments and evaluations and initial IDTT.  The initial Form 7388-B did not include an adequate rationale for DSH non-referral.  It indicated that the inmate required medication to stabilize and that DSH referral would be reconsidered following medication, without addressing the fact that the inmate was refusing psychotropic medication.  As such, treatment modifications were also inadequate as they did not properly address the inmate's functional level and positive referral criteria.  This treatment plan of 11/10/16 somewhat confused treatment goals and interventions and did not appropriately address the very low level of functioning that the inmate demonstrated.

The inmate's referral to DSH continued to be deferred pending medication treatment despite the fact that a PC 2602 involuntary medication order had not been initiated until after the subsequent treatment team meeting on 11/17/16.  Emergency medication was not initiated and treatment was not modified.  As of the 11/23/16 IDTT meeting, the PC 2602 hearing still had not occurred, while DSH referral continued to be deferred.  The treatment team appeared to be under the mistaken impression that they had to exhaust all other treatment options before they could refer

677

the inmate. The treatment plan was not significantly modified over time, despite the inmate's deterioration as demonstrated by his decreased food intake and weight loss.

The inmate was eventually referred to DSH. Although the treatment plan was not significantly modified, observation of the IDTT during the site visit revealed that the treatment team was engaged in significant treatment modifications to facilitate the inmate's engagement, to increase his participation with treatment providers and to augment his food and nutritional intake given his significant delusional thinking.

Findings

A DSH referral and PC 2602 petition for this inmate should have been more timely initiated. Documentation did not reflect the extent of individualized clinical work that the treatment team was engaged in with the inmate. Clinical staff were encouraged to fully document their efforts when they engaged in the broad array of interventions utilized, particularly in complex cases such as this one.

**Inmate F**

This case was reviewed after observing this EOP inmate's IDTT in the WSP reception center. The inmate arrived at the WSP administrative segregation unit on 10/21/16 as he had been released directly from administrative segregation during a previous term.

According to healthcare records, the inmate had served three prior terms. He was previously in the EOP, except for two months in 2007 when he was treated at the 3CMS level of care. He was treated for trial competency at PSH in 2005 and 2010. Jail transfer records indicated that he was prescribed antipsychotic and antidepressant medications to restore competency prior to starting his current prison term.

The inmate reported a chronic history of psychosis, homelessness and substance abuse including alcohol, cocaine, and methamphetamine for 30 years up to the time of his current arrest. He was classified as DD1 and received SSI in the community.

During the IDTT, the inmate asked to be removed from the EOP, but the treatment team denied the request. The inmate attended nearly 90 percent of treatment groups and was adherent with prescribed medications. He was provided with a diagnosis of Schizophrenia, paranoid type. He had a history of intrusive auditory hallucinations, incoherent speech and paranoid thoughts about custody staff and inmates. The treatment plan contained relevant goals expressed in measurable terms. The treatment team considered indicators for a higher level of care and determined that continued placement in the EOP was appropriate.

Findings

The inmate was appropriately placed at the EOP level of care and the mental health care that he received was adequate.

678

**Inmate G**

This case was selected for review as an example of 3CMS care in the STRH.  The inmate was housed in the reception center on 8/17/16, where he met inclusion criteria for the 3CMS level of care.  His symptoms included sleep difficulties, racing thoughts and depressed mood.

On 9/10/16, he was placed in the administrative segregation unit for fighting.  A timely SRE was performed and the initial mental health evaluation was updated.  The PC was an unlicensed social worker who responsibly informed the inmate of such.  The inmate's chronic and acute risk of self-harm were assessed as low, an estimate which was not inconsistent with presented data. The updated mental health evaluation portrayed an undereducated individual with a criminal orientation and a history of learning and behavioral problems extending to childhood.  There was no history of mental illness prior to incarceration and an ambiguous history of substance use. The case formulation provided no information about precipitating events leading to the inmate's recent depressive experiences.

The inmate declined to participate in a mental health evaluation associated with his RVR.  Based on a review of healthcare and correctional records and other unspecified collateral information, the evaluator opined that the behavior exhibited in the RVR was not influenced by manifestations of his depressive disorder, but rather by his affiliation with prison gangs.  The evaluator recommended that because the inmate was a mental health patient housed in a segregated setting, he be allowed some yard time in his weekly programming.  This recommendation was nonessential, because the hearing officer had no discretion to reduce yard time based on the inmate's program and housing status.

The IDTT approved a mental health treatment plan on 9/14/16; treatment team members reaffirmed the diagnosis of record without discussion.  The staff psychiatrist attended the IDTT, but the initial psychiatric evaluation, signed by the same psychiatrist, was not completed until one week later on 9/20/16.  The inmate was prescribed Remeron to target sleep impairment. Consideration of referral to a higher level of care was documented on the Form 7388-B and the inmate was deemed appropriate to remain at the current level of care based on the absence of positive indicators.

The treatment plan identified the primary goal as reduction in symptom severity.  This was to be accomplished by treatment with psychiatric medication, medication monitoring by the PC and PC assignment and weekly monitoring of group therapy.  Although the inmate participated in treatment planning and signed the plan, on 10/20/16 he refused a PC contact because he was sleeping.  He shouted profanities and told the PC to get away from the cell door.  The inmate was seen in daily psych tech rounds and documentation consistently indicated that he took medication as prescribed and offered no mental health complaints.  There was no documentation of his attendance or participation in therapeutic groups and no documentation of PC monitoring of medication or of weekly contacts on a progress note.

Findings

The inmate was placed in the 3CMS program due to his depressive symptoms. The case formulation was sufficient to support a diagnosis of criminal personality orientation, but no data was offered to support a clinically treatable mental disorder. The treatment team continued the diagnosis of record without discussion. There was no documentation in progress notes showing that the PC monitored prescribed medications as delineated in the treatment plan. The psychiatrist continued previously prescribed medication without conducting an initial evaluation prior to the IDTT. The mental health care provided to this inmate was inadequate.

**Inmate H**

This case was reviewed as the expert observed the inmate's IDTT on 11/29/16. The inmate arrived at the WSP reception center on 10/20/16 and told the nurse that he felt like harming himself. He was placed on suicide watch in the MHCB. He was agitated, laughed inappropriately and refused antipsychotic medication. An SRE was performed the following morning. The inmate told the evaluator he was angry and wanted to be removed from suicide watch. He was assessed with moderate chronic risk of suicide, noting that some past attempts, such as jumping off of a building and running into traffic, were serious. His acute risk of self-harm was assessed as low and he was discharged to the EOP where five-day follow-up contacts were timely completed.

The inmate's inclusion in the EOP was predicated on numerous symptoms including auditory and visual hallucinations, mood instability, a history of suicide attempts and mental health treatment extending from age seven following his mother's death by a drug overdose. Prior psychiatric medications included lithium and Depakote. The IDTT provided diagnoses of Schizoaffective Disorder, bipolar type and Polysubstance Dependence.

The initial treatment plan was prepared on 10/1/16 and was based on a cogent case formulation prepared by the PC. Active problems were noted as mood lability, psychosis, suicidal ideation and self-harming behaviors. Long-term goals appropriately addressed reduction of elevated mood and impulsive behavior, reduction in psychotic symptoms and absence of crisis bed admissions due to mania and suicidal impulses. Short-term objectives consisted of complete adherence with recommended psychiatric medication and learning and applying safe coping skills. These were to be accomplished by psychiatric treatment with risperidone, medication monitoring by the PC, attendance at daily EOP groups and engagement in CBT through weekly meetings with the clinician.

The inmate actively participated in treatment planning and was able to advocate for himself. The treatment team appropriately considered his level of care and concluded that he had shown ongoing stabilization and should remain at the EOP level of care. Members of the treatment team engaged with the inmate, answered questions and provided information about medication side effects and other health-related conditions.

A follow-up IDTT meeting was timely conducted on 11/29/16. The inmate was noted to have made progress in that there were no crisis bed admissions due to manic symptoms or suicidal

680

ideation.  He also attended all assigned treatment groups.  Psychotic symptoms, suicidal ideation and self-harming behaviors were changed to inactive status, indicating progress.  Short-term treatment goals, including specific interventions, were unchanged.

Findings

The inmate was appropriately receiving mental health treatment at the EOP level of care. Realistic and appropriate treatment goals were developed and the inmate understood them and participated in treatment.  During the first 30 days, he progressed and was no longer experiencing suicidal thoughts or engaging in self-harm behaviors.  Documentation reflected that a meaningful therapeutic holding environment had been established that allowed the inmate to progress in the desired direction.  However, follow-up documentation could have been improved by including summary statements on medication adherence and the quality of group participation.  Overall, the treatment provided was adequate and the care met Program Guide requirements.

**Inmate I**

This case was reviewed as the expert observed the inmate's IDTT meeting on 11/30/16.  The inmate had been a participant in the 3CMS for less than one year when he was placed in the STRH on 10/29/16 following an RVR for indecent exposure.

The inmate's history was remarkable for childhood sexual trauma, polysubstance abuse and criminal behavior, including ten arrests for indecent exposure and assault on a PSH psychiatrist. Although this was noted as the inmate's first CDCR incarceration, he had been evaluated multiple times in California State Hospitals for mental competence, including one immediately prior to the current commitment.

The inmate's inclusion in the 3CMS program was reaffirmed on 11/2/16 by the STRH IDTT. This was predicated on multiple factors including having met enrollment criteria on 9/1/16 with a provisional diagnosis of Schizoaffective Disorder and treatment with mood stabilizers and antipsychotic medication.  The inmate exhibited inappropriate affect, delusional thought content, tangential speech and depressed mood.

Treatment goals were to refrain from acting on delusional beliefs, to reduce psychotic symptoms, to adhere to prescribed medications, to improve hygiene and to learn coping skills.  His prescribed psychotropic medications were mirtazapine and Zyprexa.  The treatment team considered increasing the level of care to EOP, but this was postponed until the follow-up IDTT anticipated on 11/30/16.

During the inmate's first 30 days in the STRH, he submitted two healthcare requests in which he used a confabulated name and complained about gay nurses who were harassing him.  Copies of these requests were found in the healthcare record, but there was no documentation regarding how these requests were triaged.  On 11/9/16, an IEX chrono indicated screening had been completed and a comprehensive evaluation had been recommended.  However, no such evaluation was located in the healthcare record.

681

A follow-up IDTT was conducted on 11/30/16.  The inmate failed to progress in the previous 30 days and wanted to be transferred to the state hospital.  His paranoid and bizarre thoughts about mental health providers prevented him from accepting treatment in the current setting.  The inmate was elevated to the EOP level of care, but there was no discussion why DSH ICF care was not considered.

Findings

The inmate's care and treatment were generally adequate.  However, the treatment team waited longer than necessary to upgrade his level of care when there was ample evidence of psychotic deterioration soon after the initial IDTT.

**Inmate J**

This inmate's healthcare record was reviewed after observing the inmate's IDTT on 11/29/16.  The inmate had been receiving mental health services at the EOP level of care since 2007.  He had a history of depressed mood and auditory hallucinations involving the sound of running water.  His history was also significant for childhood trauma, school behavior problems, drug and alcohol abuse beginning at age eight and extensive periods of homelessness.  Significant medical conditions included a mechanical heart valve, a seizure of unknown etiology and two head injuries with loss of consciousness.  The clinical picture reflected an individual in a gradual and steady state of decline, who despite a tenuous grip on reality, was aware of his limits and able to advocate for himself.  The treatment team provided diagnoses of Schizoaffective Disorder and Polysubstance Dependence.  The inmate was treated with Trileptal and Buspar.

A treatment plan was developed with relevant goals aimed at medication adherence, increasing goal-oriented behavior and strengthening reality testing by improved interpretation of social cues.  A key focus of treatment was improving the inmate's insight regarding the exacerbating effects of illegal substances on his mental health symptoms.

The PC did a good job of redirecting the inmate's elevated, intense and tangential verbalizations during the IDTT.  The inmate was most concerned with expediting his transfer to an EOP program.  The CC I instilled hope by advising the inmate of his imminent transfer.  The PC would see the inmate twice weekly until transfer and he was switched from the telepsychiatrist to an in-house psychiatrist.

Findings

This inmate was generally seen within Program Guide requirements.  His treatment was adequate in addressing his mental health needs pending transfer to the EOP.

**Inmate K**

This case was selected for review after observing the inmate's IDTT on 11/29/16.  This EOP inmate had a 30-year history of homelessness and a 20-year intravenous drug use history.  He

arrived at the WSP reception center on 10/20/16.  He had been provided with multiple diagnoses including Bipolar Disorder, Schizophrenia and Major Depressive Disorder with numerous medication trials and psychiatric hospitalizations.  He endorsed a history of multiple suicide attempts and PTSD, but these were not delineated in the healthcare record.  The IDTT provided diagnoses of Schizoaffective Disorder and Polysubstance Dependence.

At the time of the site visit, the inmate described himself in an "upswing time of life" and was optimistic and reminiscent of better times.  He had a strong religious affiliation.  He did not want to continue psychiatric medications.  He requested an explanation of alternatives to medications, which the psychiatrist did not provide; instead, the psychiatrist referred him to community resources upon release.

A summary of progress showed that the inmate attended almost 90 percent of offered treatment. He continued to experience auditory hallucinations, but preferred to cope without medication and to rely instead on religious practices.

The treatment team considered whether the inmate's current level of care was appropriate for him by way of the Form 7388-B.  All indicators were negative and he was recommended to remain in the EOP.  The inmate was to receive daily therapeutic groups, but the nature of the groups was not specified in the most recent treatment plan.

Findings

The inmate appropriately received mental health services at the EOP level of care.  However, he was not provided with an explanation of alternatives to psychotropic medication as would be required with informed consent.

683

EXHIBIT Q
Kern Valley State Prison (KVSP)
November 29, 2016 – December 1, 2016

**Inmate A**

This 45-year-old inmate was serving a life sentence for torture.  He was provided with diagnoses of Depressive Disorder NOS and Antisocial Personality Disorder with narcissistic and borderline personality traits.  He was prescribed Haldol and Benadryl on an as needed basis.  His healthcare record was randomly chosen from the MHCB high users list to assess the provision of mental health services provided in the MHCB.

The inmate had a history of multiple MHCB and DSH admissions.  The most recent DSH admission occurred from 8/11/16 to 10/13/16 due to depression, suicidal ideation, hopelessness, helplessness, decreased energy and anhedonia.  He was discharged from DSH to the administrative segregation EOP at RJD.  Within days of his DSH discharge, during the five-day follow-up assessment, he disclosed that he had attempted to hang himself three days after he was transferred to RJD by attaching a bed sheet to the handicap rail in his cell; however, the sheet ripped.  The clinician observed a ripped sheet attached to the handrail.  At the time he disclosed this incident, he presented with bright and anxious affect and hyperverbal and pressured speech.  He reported good mood and denied suicidal ideation.  It was also noted that he had been refusing pain medication.  He was subsequently admitted to the KVSP MHCB on 10/18/16, where he remained until 10/24/16.

The initial MHCB treatment plan lacked case conceptualization and an overview of pertinent mental health needs.  Of concern, the above summary of the inmate's history and specific precipitating behavior was not included in the KVSP initial treatment plan.  While not specifically documented, based on a review of subsequent documentation it appeared that the inmate provided discrepant information regarding the suicide attempt.  Specifically, he disclosed that he engaged in a suicide attempt but later stated that he had suicidal thoughts.  This was not clearly documented on the treatment plan, nor were attempts to address inconsistencies documented in the healthcare record.

The sole treatment goal did not address important treatment needs (precipitating factors for the suicide attempt or medication nonadherence).  Instead, the goal was to replace cognitive self-talk to reduce/eliminate relapse and to confront denial of symptoms that led to admission.  Specific incidents of self-talk and what was meant by relapse were not evident in the clinical summary.  Thus, there was no relevant background to understand why this specific goal was chosen.  A review of daily psychiatric contacts indicated that the goal was not incorporated in clinical contacts.

Documentation indicated variable mental status and behavior with poor distress tolerance.  For example, at times the inmate was described as cheerful; conversely, he covered his window and flooded his cell, which was assessed as manipulation to have medical needs met.  He was consistently preoccupied with food.  Psychiatry notes, which were completed daily, conceptualized the inmate as utilizing denial and splitting with a consideration of malingering behavior; however, clear justification for this conceptualization was lacking.

Despite a one-week stay in the MHCB, the treatment plan update did not include relevant updates to the clinical summary or treatment goals (e.g. distress tolerance and emotional lability).

On documentation throughout his stay in the MHCB, including his discharge SRE, the inmate denied that he was suicidal. It was concerning that the reasons for the denial of the suicide attempt were not assessed or documented. Documentation also indicated that his "chronic symptoms" (which were not specified) had stabilized and he was discharged to the administrative segregation EOP. On the day of discharge, he was described as labile, agitated and quickly euthymic. This instability was not addressed.

Documentation referenced an RVR for an alleged homicide of a cellmate. However, there was no further documentation on the impact this may have had on his mental status, nor was the issue included in treatment planning. Furthermore, there was no consideration of the impact that a return to administrative segregation would have on the inmate's mental health.

Findings

This inmate's mental health care was inadequate. While contacts were timely and in accordance with Program Guide time frames, the quality of treatment was insufficient. Case conceptualization in the treatment plan was lacking and the rationale for psychiatric conceptualization was needed. Consequently, there were several missed opportunities for interventions that would have been of significant benefit to this inmate that were not included in treatment planning. Instead, the goal that was identified was not individualized, nor was it utilized during clinical contacts. Lastly, preparation for this inmate to return to administrative segregation, a high risk environment, was needed.

**Inmate B**

At the time of the healthcare record review, this 21-year-old inmate was hospitalized at DSH-Stockton for acute inpatient psychiatric care. His healthcare record was randomly chosen from the MHCB high users list to assess the provision of MHCB services and referral to a higher level of care.

He was provided with a diagnosis of Schizoaffective Disorder, bipolar type. He was prescribed Remeron, Trileptal and Zyprexa. Documentation indicated that he was receiving mental health services at the 3CMS level of care until he was admitted to the MHCB on 8/10/16. There was documentation of six MHCB admissions between 8/10/16 and 10/5/16, but review of the healthcare record reflected only three distinct admissions.

On 9/8/16, the inmate was admitted to the MHCB after a hanging attempt. He was housed in the MHCB between 9/8/16 and 9/21/16. He generally presented with suicidal ideation and hopelessness. At times, he exhibited improvement, but shortly thereafter, was observed eating feces and drinking urine. This sharp change in mental status, as well as his impulsivity and unreliability as a self-reporter, was not unusual for him. A 9/14/16 psychiatry note documented that just prior to the suicide attempt that led to the MHCB admission the inmate had "convinced" a psychologist that he was not suicidal and the inmate was not admitted to the MHCB. Furthermore, the psychiatrist described the hanging attempt which required outside hospitalization as "significant."

686

On 9/21/16, documentation from a psychiatry progress note and the IDTT indicated that the inmate had been referred to DSH. However, the inmate did not want to go to the hospital and he expressed suicidal ideation. A major area of concern was that documentation from 9/22/16 through early October 2016 was inconsistent with the DSH referral discussed on 9/21/16.

Another area of concern was that three different sources of documentation from 9/22/16 provided a different account of what transpired that day. One note indicated that the inmate was cleared by mental health to discharge to alternative housing in administrative segregation for suicidal ideation while awaiting transfer to the MHCB. A discharge/transfer note indicated that the cell was changed after he damaged the cell. Lastly, an admitting note indicated that he was "Discharged to custody for hospitalization." A 10/12/16 treatment plan indicated that he was in alternative housing between 9/22/16 and 10/4/16.

Contrary to documentation of a lengthy alternative housing placement, documentation between 9/23/16 and 10/4/16 indicated a series of suicide watches and rescissions. A 9/23/16 SRE indicated that the suicide watch was rescinded and the inmate was placed at the EOP level of care. A suicide watch was initiated on 9/26/16 due to foreign body ingestion (an earphone jack) that required an outside hospital evaluation, but it was rescinded on 9/27/16. The inmate was admitted on 9/27/16. He was admitted to alternative housing on 9/29/16, but the decision was rescinded the following day after the inmate indicated that he had requested help because he had thoughts of hurting himself. The plan was for five-day follow-up to be conducted. Even more confusing, a treatment plan from the same date noted that the inmate was housed in the MHCB and a weekly IDTT was being completed. It was documented that he was at the appropriate level of care, but further details were not provided. Documentation indicated that the inmate was placed in alternative housing on 10/1/16 after another incident of foreign body ingestion (half a spoon, half a pen filler and thirty beads) that required an outside hospital evaluation. He was admitted to the MHCB on 10/4/16.

A 10/5/16 treatment plan was noted as an initial treatment plan, in conflict with weekly MHCB IDTT documentation from 9/29/16. There was reference to the DSH referral as pending, but a psychiatry note from 10/5/16 indicated that the inmate regretted declining the DSH referral. This was the first documentation of his refusal and there was no documentation of a Vitek hearing. Contrary to the note that the DSH referral was pending, on 10/7/16 there was documentation that the PC was considering a DSH referral; on the following day, the psychiatrist made the referral in the absence of an IDTT. The inmate was transferred to DSH on 10/30/16.

Treatment goals were virtually unchanged since the inmate's MHCB admission in September 2016. Interventions were not utilized during clinical contacts. Contacts were supportive in nature and indicated a plan to continue discharge planning, which was inappropriate for this unstable inmate. Furthermore, between 9/22/16 and 10/4/16, clinical contacts were not conducted daily. Documentation from the 10/5/16 treatment plan indicated that the inmate refused to go to the TTA for daily clinical contacts, but there was no documentation of refusals.

Findings

This inmate's care was grossly inadequate. The initial DSH referral was timely, but the inmate's ultimate delay in transferring to DSH was severely problematic. In addition to the delay in increasing his level of care, his care was very problematic due to unclear and contradictory documentation regarding the DSH referral, MHCB placement and alternative housing. The rationale to transfer him from the MHCB to alternative housing after the team's clinical opinion that he was so decompensated as to warrant a DSH referral was troubling. Moreover, the transfer to alternative housing because he had damaged the cell appeared punitive. While the cell may not have been safe to use, it was unclear why an individual with a DSH referral would be transferred out of the MHCB. An area of significant concern was that this inmate presented as seriously behaviorally and emotionally disturbed. Yet despite several incidents of serious and escalating self-injurious behaviors that required outside hospital visits, his treatment goals remained unchanged.

**Inmate C**

This 43-year-old inmate was housed in the MHCB. His healthcare record was reviewed after observing his IDTT during the site visit to assess the provision of mental health services in the MHCB.

The initial mental health screen on 11/22/16 noted that the inmate stated, "I'm homicidal. I want to kill someone," prompting a referral to the TTA. In contrast, treatment plan documentation indicated that he was admitted to the MHCB on 11/22/16 after making a suicidal statement upon arriving at KVSP from CSP/Corcoran. However, during the site visit observation of his IDTT, staff discussion indicated that in addition to the suicidal statement he also stated that he might hurt someone else. Homicidal ideation or aggressive thoughts were not included in the clinical summary as a treatment goal or anywhere else in the treatment plan.

The inmate had an ERPD of October 2017 after 17 years of incarceration. Except for a reference that he received mental health services at the EOP level of care during the previous six months following an MHCB admission, documentation of the inmate's history of mental health treatment was lacking. The diagnoses that were discussed during IDTT (Bipolar Disorder, with psychosis and a reference to prescribed medication for PTSD) conflicted with the Schizoaffective Disorder, bipolar type diagnosis that was included in the treatment plan. The treatment plan also lacked documentation of the inmate's functioning and progress during treatment and instead focused on his psychosocial history.

A comparison of the initial and discharge treatment plans indicated inconsistencies in treatment goals with no clear explanation for the change. For example, the initial treatment plan goal to "(u)tilize behavior strategies to overcome depression…" was removed and changed to "(d)ecrease eliminate SI and depression by identifying and demonstrate [sic] (2) behavioral coping skills…" with no explanation. Identified interventions were not documented during clinical contacts. Baseline data to assess change was not included. As an example, there was a goal in the initial treatment plan to decrease the inmate's depression by 30 percent by the next IDTT. This was troubling because at the next IDTT he was discharged from the MHCB. While

staff discussed his improvement, there was no clear discussion that the goal of decreasing the depression by 30 percent was met.

The inmate was discharged to the EOP level of care and was transferred to administrative segregation.

Findings

The mental health care that was provided to this inmate was inadequate.  Important details as to the reasons for MHCB admission, case formulation and diagnoses were lacking.  Treatment planning needed improvement.  Preparation for discharge to administrative segregation, a high risk environment, was also lacking.

**Inmate D**

This 51-year-old inmate was housed on Facility A.  His healthcare record was randomly chosen from the housing roster to assess the provision of mental health care at the 3CMS level of care.  He was transferred to KVSP in 2014 and was serving a sentence of life without parole for first degree robbery of a person using an ATM.  Documentation of his diagnosis varied and is discussed below.  He was prescribed Remeron and Risperdal.

The clinical summary in the treatment plan provided an excellent overview of level of care changes and current functioning since the previous treatment plan.  The rationale for the current level of care and changes to goals and interventions were clearly documented, which was a positive finding.

The diagnosis in the treatment plan was Schizoaffective Disorder.  Psychiatry notes provided diagnoses of Major Depressive Disorder with psychosis, Major Depressive Disorder and "SAD," which could serve as an acronym for several diagnoses (Seasonal Affective Disorder, Substance Abuse Disorder, Schizoaffective Disorder).  Symptoms to support these diagnoses were not documented.

Clinical contacts with the PC and psychiatrist occurred every other month.  Contacts were supportive in nature and the documentation indicated that they were more consistent with 'check ins' than therapeutic sessions.  These contacts did not include interventions outlined in the treatment plan.

Findings

While the quality of treatment could have been improved, it was not harmful to the inmate and was therefore assessed as adequate.  The frequency of clinical contacts was consistent with good clinical practice.  However, treatment could be improved with diagnostic documentation and utilization of treatment interventions during clinical contacts.

**Inmate E**

This 36-year-old inmate was housed on Facility C.  He was provided with diagnoses of Pedophilia, Bipolar Disorder and Borderline Personality Disorder.  He was prescribed Buspar and Paxil.  His healthcare record was randomly chosen from the housing roster to assess the provision of services for 3CMS inmates.

The clinical summary in the treatment plan indicated that the inmate was serving a life sentence. He had a history of multiple batteries or attempted batteries on a peace officer.  He had a history of DSH treatment between 2006 and 2007 and between 2010 and 2012.  He had a long history of treatment at the EOP level of care.  He also had a history of inconsistent reporting of symptoms and it was suspected that he was feigning symptoms; however, additional details were not provided.

Previous symptoms included depression, anxiety, auditory hallucinations and "multiple personalities."  He had a history of treatment refusal, and at the time of the March 2016 treatment plan, had refused all out-of-cell contacts for the past few months.  It was documented that the inmate was not making progress in treatment.  It was recommended that the 3CMS level of care be continued for medication support.

Documentation as to symptoms, attempts to engage the inmate in treatment, reasons for refusals, attention to activities of daily living, involvement in other CDCR programs and regular consultation with correctional staff as to his functioning on the housing unit was lacking. Assessment of these areas for any inmate are essential in a correctional environment, but are of vital importance when an inmate is as disengaged and isolative as documentation suggested regarding this inmate.

Goals were measurable, but rationale for goals was unclear.  Goals also were not incorporated into subsequent treatment sessions.  Between April and September 2016, PC contacts were conducted by two different clinicians, but the reason for this occurrence was not explained.  A PC contact in September 2016 discussed the inmate's refusal to attend yard due to an assault which required surgery earlier that year.  This was the first documentation of this serious incident which impacted the inmate's ability to function.

There was documentation in the healthcare record that the inmate would receive an RVR if he did not attend pill line, which was an issue of concern.  It was also documented that he rarely attended yard, dayroom or showers.  A PC contact that occurred shortly thereafter addressed coping skills to attend pill line, but the inmate's activities of daily living were not addressed.

Findings

The mental health care provided to this inmate was inadequate.  There was minimal reference to the assault on the yard, nor consideration of a diagnosis of PTSD.  This was an incident that could either exacerbate his underlying coping deficits or be the impetus for his current impaired mental status and inability to function and participate in treatment.  His mental health history suggested that he had a serious mental illness with significant periods of instability.  Review of

690

documentation in light of his mental health history indicated that he required a higher level of care.  The use of different PCs likely further hindered his treatment progress.

EXHIBIT R
California Correctional Institution (CCI)
August 23, 2016 – August 25, 2016

**Inmate A**

The healthcare record of this 28-year-old inmate who was previously at the 3CMS level of care was reviewed because his SHU anger management group was observed during the site visit.

The inmate arrived at CCI on 7/8/16 from WSP. He was provided with a diagnosis of Mood Disorder NOS and was not prescribed psychotropic medications. He had a history of depression, paranoia and occasional anxiety. He had intermittently received mental health services at the 3CMS level of care since 2010. He had one MHCB admission that occurred from 1/24/15 to 1/27/15.

At an IDTT held on 7/13/16, the inmate requested removal from the 3CMS level of care. He stated that he had only entered the mental health system to obtain extra benefits, such as a radio and activities. The IDTT team decided to observe the inmate before releasing him from the 3CMS program.

There was a PC contact on 7/21/16. Progress notes indicated that the inmate was doing well and he again requested removal from the 3CMS program. The record reiterated the prior reasons for his initial 3CMS placement.

The healthcare record indicated that a second IDTT was held on 7/28/16. At that time, the inmate was reported to be stable and had not received psychiatric medications for over six months. The inmate did not attend the IDTT, but the decision was made to remove him from the MHSDS.

Although the inmate was no longer a 3CMS SHU participant, he remained housed in the SHU/LTRH unit and participated in group on 8/22/16. During group interviews, the inmate reported that he was no longer a 3CMS participant, but wished to continue attending groups.

<u>Findings</u>

The mental health care provided to this inmate appeared to be adequate. Clinicians saw him timely when he was enrolled in the 3CMS program. However, it was unclear why the inmate remained housed in the 3CMS SHU unit for over one month after removal from the MHSDS.

**Inmate B**

This 26-year-old inmate's healthcare record was reviewed from a list of 3CMS SHU inmates who were interviewed during the site visit.

The inmate arrived at CCI on 7/20/16 from DVI and was placed in the SHU on 7/22/16. An SRE was completed and assessed his chronic risk as moderate due to a family history of suicide, history of physical abuse, poor impulse control and violence with substance abuse. His acute suicide risk was assessed as low. The inmate was provided with a diagnosis of Anxiety Disorder. He was prescribed clonidine and trileptal.

693

There was a timely IDTT on 7/26/16.  The clinical summary was comprehensive and the treatment plan was appropriate based on the diagnosis.  The inmate discussed his frustration with not receiving his property with his clinician and also with the *Coleman* expert on 8/22/16 during inmate interviews during the site visit.

A PC progress note dated 8/3/16 indicated that the inmate stated "I would really like to work on some issues while I am in prison so I can have a better life when I get out."  The inmate identified controlling his emotions as a treatment goal.

The PC saw the inmate on 8/15/16, when the inmate again expressed frustration with not receiving his property.  On 8/25/16, the inmate reported that he was doing well as he had received his mail, property and other items.

Findings

The mental health care that was provided to this inmate was clinically appropriate.  Clinicians saw him at least every ten days, which was appropriate as the institution transitioned to a LTRH.

The expert inquired further regarding the inmate's missing property.  According to custody staff, the inmate's property was issued on 8/11/16 and 8/19/16.  It appeared that at least by 8/25/16, this missing property issue had been resolved.

**Inmate C**

The 33-year-old inmate's healthcare record was reviewed because he was interviewed in the SHU during the site visit.  He was provided with a diagnosis of Adjustment Disorder with mixed anxiety and depressed mood.  He was prescribed trileptal (for pain according to the psychiatry notes) and Prozac.  It was also noted that the inmate had a history of head trauma.

The inmate arrived in the SHU on 4/1/16 from CSP/Corcoran due to battery on a non-inmate.  He had no history of mental illness or treatment prior to entering the prison system.  He was placed at the 3CMS level of care on 3/5/07.  He subsequently paroled but was returned to the 3CMS level of care upon re-entry to CDCR.  There was no documented history of suicide attempts, MHCB placement or DSH hospitalizations.

PC contacts conducted during April and May 2016 suggested that the inmate was resistant to discussing stressors or other concerns.  However, he was generally cooperative with questioning.  The July and August 2016 contacts indicated that the inmate first requested removal from the 3CMS level of care in July 2016; however, he expressed a desire to work on anger issues during the August PC contact.

On 8/15/16, the psychiatrist instituted a bridge order for medication continuity.  On 8/19/16, the psychiatrist saw the inmate and referred him to medical due to his chronic pain symptoms.

The inmate attended an anger management group on 8/22/16.  The inmate was actively involved in the group, exhibited good insight and provided feedback to others.

Findings

The inmate was not seen weekly as suggested by clinical staff but was seen timely according to SHU program guidelines. During the review period, diagnostic testing, PC contacts, psychiatry contacts and IDTT meetings occurred as required by the Program Guide. The mental health care provided to this inmate appeared to be appropriate.

## Inmate D

This 34-year-old inmate's healthcare record was reviewed because he had been housed in the SHU during the review period. He was serving an indeterminate SHU term and had transferred from CSP/Corcoran's SHU to CCI's proposed LTRH.

The healthcare record indicated that the inmate reported that his behavioral problems and symptoms were due to his SHU term. He had a history of three MHCB admissions; two were in January 2016 and one was in April 2016. The inmate stated that he requested MHCB placement due to fear of retribution by gang affiliates or opposing gangs.

Contact with the PC on 4/12/16 indicated that the inmate was doing well. However, six days later he was admitted to the OHU following self-injurious behavior; the inmate made bilateral cuts to his wrist, but did not require outside medical treatment. Healthcare documentation indicated that he reported hearing voices telling him to cut his wrist and had feelings of worthlessness and uselessness. The inmate was transferred to the MHCB at KVSP.

The inmate returned to CCI on 4/27/16. The Form 7277 (bus screening) indicated that the inmate transferred from CSP/Corcoran to CCI rather than from KVSP.

On 5/2/16, an SRE assessed the inmate with chronic moderate and acute risk of suicide. The psychiatrist saw him on 5/17/16, but the psychiatry note did not list current psychotropic medications. The psychiatrist also checked the box for medications as unchanged, despite adding Prozac. A 5/31/16 psychiatric note in the healthcare record was signed by the psychiatrist, but was not completed.

On 5/25/16, the PC saw the inmate. The inmate was reported to be doing well and stated that the MHCB admission was in response to gang issues.

The ICC met on 6/16/16, when the inmate was endorsed to another institution. The PC saw him on 6/21/16, when the inmate openly discussed problems with enemies and gang affiliations. The inmate reported being pleased with the impending transfer.

On 7/18/16, the inmate reported that he saw an inmate on the yard who had assaulted him by cutting him three years prior. This sighting caused him to experience paranoia; the inmate stated that he began to hear voices telling him to cut his wrist. The inmate was placed in the OHU for danger-to-self and was referred to the MHCB. On the following day, he continued to report auditory hallucinations and plans for self-harm. On 7/20/16, the inmate told the clinician during

695

an individual session that "I need to go to MHCB again.  I need help again."  He was admitted to the MHCB at CIM on 6/21/16, where he remained during the site visit.

Findings

Even though the inmate had multiple MHCB admissions, it appeared that the mental health care provided to him was appropriate for the reported identified stressors.

**Inmate E**

This 50-year-old EOP inmate's healthcare record was reviewed to assess the mental health services provided, including medication management.  The inmate was provided with a diagnosis of Bipolar Disorder.  He was prescribed lithium, Geodon and Vistaril.  He received his medications by PC 2602 order.

During the reporting period, in April 2016, the inmate was transferred from CSP/Sac to CCI for inclusion in the LTRH program.  The inmate entered the prison system in 1998 and was placed in the SHU on 8/25/05 for murdering a cellmate, attempted murder of staff and other inmates and other violent behaviors.

The healthcare record indicated that the inmate was in the child welfare system since age three due to parental neglect and abuse.  Documentation indicated that he was diagnosed with schizophrenia at age 16 and had a history of five DSH admissions.  The inmate was treated at multiple institutions during the past 15 years with minimal improvement and received mental health care at the various MHSDS levels of care.

The inmate's history of suicide attempts prior to 2007 included shooting himself in the abdomen, jumping from the second tier, hanging himself and swallowing razor blades.  He had more than six MHCB admissions between 2/20/16 and 4/20/16.  The inmate routinely refused mental health clinical contacts when the staff person was male.  The inmate received an RVR on 5/6/16 for attempting to assault a psych tech.

The inmate was placed at the EOP level of care on 6/22/16 and two days later requested admission to the MHCB due to plans to harm himself.  On 6/25/16, he repeatedly told the clinician that he did not plan to be here at the end of the year, as he planned to kill himself.  On that date, he was transferred to the CHCF MHCB, and subsequently to CSP/Sac.

Findings

Based on the inmate's extensive and continued history of resisting mental health program interventions at CCI and previous institutions, and his multiple MHCB admissions and RVRs, the inmate should have been referred to DSH.  The inmate was not appropriately referred to a higher level of care and therefore, did not receive adequate mental health treatment.

**Inmate F**

A mental health screening assessment at WSP dated 4/14/16 was positive from a mental health perspective.  A mental health evaluation (Form 7386 B) was completed on 4/25/16.  The inmate's presentation was consistent with a diagnosis of Mood Disorder NOS.  He was placed in the MHSDS due to medical necessity.  An SRE was also completed at that time and indicated that the inmate had a low suicide risk.  The inmate was transferred to CCI on 7/29/16 and received an initial healthcare screening at that time.

Another Form 7386 B was completed on 8/11/16, with a similar assessment as previously summarized.  The SRE was again consistent with low suicide risk.  The inmate's major issue of concern appeared to be chronic pain.  A useful progress note was also documented that same day.  The inmate's IDTT was completed on 8/17/16 and included a Form 7388-B.  The inmate's treatment plan was reasonable.

Findings

This inmate's treatment was consistent with Program Guide requirements.

**Inmate G**

This inmate was interviewed in a group setting and his healthcare record was reviewed.  The inmate complained that his Risperdal had been discontinued for no apparent reason.

On 4/5/16, the inmate was prescribed Paxil and Risperdal for apparent psychotic symptoms.  He was subsequently followed on a regular basis by a psychiatrist and his primary mental health clinician.  The decision was made to taper him off of the Risperdal due to his atypical presentation.  However, documentation of this rationale by the psychiatrist was not located in the healthcare record, although it was referenced in an IDTT note.

Findings

This inmate was receiving the appropriate level of mental health care.

**Inmate H**

This inmate reported not seeing a psychiatrist since February 2016 and having experienced a two-week delay in receiving his prescribed lithium.  The inmate's healthcare record was reviewed.

On 2/3/16, the inmate was seen at cell front (at his choice) by his PC at KVSP.  A 2/6/16 psychiatry note indicated that the inmate's presentation was consistent with a diagnosis of Mood Disorder NOS.  Prozac and trileptal were continued.  The inmate was scheduled to be seen again in 30 days.

On 2/16/16, the IDTT maintained the inmate's level of care at 3CMS. A psychiatrist saw him at KVSP on 3/27/16. The PC saw the inmate again on 4/14/16 at cell front when the inmate refused to leave his cell. The inmate was to be given an RVR related to a fight with another inmate.

On 5/3/16, a PC referred the inmate to a psychiatrist for medication reassessment. Diagnoses included Major Depressive Disorder and Antisocial Personality Disorder. The inmate refused to participate in his 5/11/16 IDTT. By 5/11/16, the inmate was housed in the STRH. He continued to meet weekly with his PC while housed at KVSP.

The inmate was transferred to the CCI administrative segregation unit on 7/3/16. A 7/5/16 SRE at CCI assessed him to be at moderate chronic and low acute suicide risk. His IDTT was completed the following day. The inmate met with his PC on 7/18/16. Weekly clinical contacts were to continue while the inmate was housed in administrative segregation.

There was a routine initial psychiatric contact by way of telepsychiatry on 8/11/16. The inmate's presentation was consistent with the differential diagnoses of Bipolar Disorder, Intermittent Explosive Disorder, Polysubstance Dependence Disorder and Antisocial Personality Disorder. Lithium was started, and Prozac apparently continued. A lithium blood level was to be obtained in seven days. Psychiatric follow-up was to occur in two weeks.

<u>Findings</u>

The information obtained from this inmate was not reliable. He appeared to be receiving an appropriate level of mental health care.

**Inmate I**

This inmate reported that he had difficulties obtaining his clonidine. The inmate's healthcare record was reviewed.

A 6/7/16 progress note from a prison other than CCI indicated that his clonidine had been discontinued in February 2016. The inmate was apparently transferred to CCI on 6/9/16. He received an emergency mental health evaluation on 6/16/16 related to alleged harassment from correctional officers. He was again seen on an emergency basis by mental health staff on 6/22/16 related to a positive administrative segregation mental health screen. He was provided with a diagnosis of Adjustment Disorder; previous diagnoses included Major Depressive Disorder and Generalized Anxiety Disorder. The inmate was referred to psychiatry for a medication assessment.

A psychiatrist apparently saw the inmate on 7/5/16; the psychiatric progress note was signed but none of the boxes were completed.

A psychiatry note dated 7/19/16 noted diagnoses of Generalized Anxiety Disorder, Cannabis Abuse, Alcohol Abuse and Antisocial Personality Disorder. Clonidine was prescribed.

<u>Findings</u>

The information provided by this inmate was not very reliable.  The inmate was receiving an appropriate level of mental health care.

EXHIBIT S
California Institution for Men (CIM)
June 27, 2016 – June 29, 2016

**Inmate A**

This 34-year-old inmate was housed in administrative segregation.  He was serving an eight year and four months' sentence for evading an officer.  He was transferred to administrative segregation in mid-May 2016 for threatening and attempting to commit battery on a peace officer.  Shortly thereafter, his level of care was changed from 3CMS to EOP.  His longtime diagnosis of PTSD was changed to Delusional Disorder, persecutory type.  His healthcare record was reviewed to assess the provision of mental health services in administrative segregation.

The inmate had a history of depression since adolescence.  Documentation also noted a history of auditory hallucinations, but further details (time, precipitants and content) were not provided.

During the months prior to transfer to administrative segregation, the inmate was seen every three weeks by his PC at the 3CMS level of care due to a decline in his mental health status.  Symptoms included paranoia, racing thoughts and fixed delusions about custody staff.  He was prescribed mirtazapine.

In addition to delusions, documentation indicated moderate anxiety and depression and no insight into his mental illness.  Treatment goals were to reduce delusions to zero within six months.  Objectives were distraction, coping skills and reality checks, which would be accomplished by monitoring and encouraging medication adherence.  Another goal was to reduce depression and anxiety to four on a scale of one to ten in six months (the current rating for anxiety and depression was unknown).  It was documented that a DSH referral was not warranted due to the absence of acute symptoms.

PC contacts occurred twice weekly.  Psychological testing was initiated, but the referral rationale was unclear.  Groups were offered, but he rarely attended them.  There were monthly psychiatry contacts, but the inmate was unwilling to increase or change his psychiatric medication.

At the time of this review, the inmate was awaiting transfer to an EOP hub.

Findings

Timely care was provided, but the quality was inadequate.  Treatment planning was problematic.  While goals were measurable, they were not individualized and did not target specific symptoms.  Furthermore, fixed delusions are typically resistant to treatment, even when the patient is fully adherent with targeted medication therapy.  In this case, the inmate was resistant to taking medication that would better address his symptoms.  This, coupled with his lack of insight, made the goal of an absence of delusions within six months entirely unrealistic.  Lastly, documentation about the lack of acute symptoms precluding a DSH referral suggested a lack of awareness and thoughtfulness as to higher level of care referral.  At the very least, documentation should have indicated consideration of an ICF referral.

**Inmate B**

This 57-year-old inmate was housed on Facility D.  He received mental health services at the 3CMS level of care since his incarceration in 2012.  He was provided with diagnoses of

Adjustment Disorder in remission, Polysubstance Dependence and Antisocial Personality Disorder.  He was not prescribed psychiatric medication.  His healthcare record was randomly selected to assess the provision of services for inmates at the 3CMS level of care.

The inmate was transferred from CSATF on 2/4/16.  The initial PC contact and IDTT were timely.  Initial documentation that the PC completed provided a comprehensive case conceptualization, rationale for diagnosis and initial treatment plan.

Overall, this inmate presented as stable with a plan to discontinue mental health services.  Treatment plan goals were to identify causes for anxiety and depression.  Interventions focused on psychoeducation and identification of precipitants and utilization of coping skills.  Despite an extensive history of drug and alcohol use, the treatment plan did not include substance abuse.

PC contacts occurred every two months.  Documentation of interventions or review of coping skills as discussed in the treatment plan were lacking.

Findings

The quality of this inmate's overall care was inadequate.  While PC contacts were timely, treatment planning did not include a targeted relapse prevention plan given the plan to discontinue mental health services.  Execution of treatment identified in the treatment plan during PC contacts was lacking.

**Inmate C**

This 50-year-old inmate was housed on Facility D.  He was convicted of assault and battery with a deadly weapon.  His release date was 2/25/19.  He was provided with diagnoses of Depressive Disorder NOS, Polysubstance Dependence in a controlled environment and Antisocial Personality Disorder.  He was prescribed Vistaril.  His healthcare record was randomly selected to assess the provision of services to inmates at the 3CMS level of care.

The inmate had a history of methamphetamine, alcohol, heroin, cocaine, and prescription narcotic abuse.  Medically, he was diagnosed with chronic obstructive pulmonary disease, diabetes, lumbar pain, hypothyroidism and a prior stroke.  His primary complaint was chronic pain.

The inmate was transferred to Facility D on 4/6/16.  Contacts with treatment providers and IDTTs were conducted according to Program Guide requirements.  Treatment goals were measurable and focused on substance abuse and negative cognitions.  Interventions were appropriate to goals and included motivational interviewing, relapse prevention, psychoeducation and cognitive behavioral techniques.  The treatment plan referenced suicidal ideation, but this issue was not included as a goal.

PC contacts following IDTTs were supportive in nature, but treatment plan interventions were not utilized.

702

Findings

This inmate's care was inadequate and could have been improved with a case conceptualization and full recognition of the relationship between physical pain and mental status. The use of interventions to address chronic pain was warranted. Furthermore, inclusion of suicidal ideation as a treatment goal and associated symptoms as indicated was necessary.

## Inmate D

This 51-year-old inmate was serving a life sentence for a third strike. He was housed on Facility C and his level of care was 3CMS. He was provided with diagnoses of Mood Disorder NOS and Obsessive Compulsive Disorder. He was prescribed Buspar and Trileptal. His healthcare record was reviewed after staff expressed concern about his care while housed in alternative housing while awaiting transfer to the MHCB.

Prior to his psychiatric decompensation, a psychology intern saw the inmate every three weeks. On 6/3/16, he was seen for an emergent referral due to suicidal ideation with a plan to cut his throat and wrist with a razor blade. This was precipitated by the termination of pain medication and resulted in poor sleep, increased pain and anxiety. There was also a report of visual hallucinations. The inmate was referred to the MHCB and was placed in alternative housing on the same date.

While in alternative housing for five days, PC contacts were timely. However, the inmate was distressed by the protracted alternative housing stay and initiated a hunger strike. He was admitted to the KVSP MHCB on 6/8/16 and was discharged on 6/16/16. Documentation indicated that he disclosed that the MHCB stay had exacerbated his distress and he wanted to return to his job at CIM. He denied suicidal ideation and returned to the CIM reception center on 6/17/16.

The inmate was seen for five-day follow-up. He grew increasingly frustrated by the delay in his transfer to Facility C. After his fourth day, he made a suicidal statement that he would hang himself if his housing unit was not changed. He was subsequently referred to the MHCB and placed in alternative housing in administrative segregation. PC contacts in alternative housing for the next three days occurred timely. Documentation indicated that in addition to mental health status assessments, the PC reviewed coping skills and recreational activities to assist with the inmate's agitation regarding another prolonged stay in alternative housing.

At the time of the healthcare record review, the inmate was housed in the MHCB at CMC.

Findings

This inmate's care was appropriate and in accordance with Program Guide time frames. A positive finding was the use of interventions in addition to clinical assessments during PC contacts when the inmate was in alternative housing. Protracted stays in alternative housing were highlighted by data provided in advance of the site visit and thus not unique to this inmate.

That being said, this case review highlighted the impact of protracted alternative housing stays on one's mental status and the potential risk of the inmate denying or minimizing suicidality to avoid alternative housing's unpleasant environment.

**Inmate E**

This 20-year-old inmate was housed in administrative segregation. He was serving 11 years for voluntary manslaughter. He was provided with diagnoses of Mood Disorder NOS and Cannabis Dependence. He was prescribed mirtazapine. His healthcare record was reviewed to assess the provision of mental health services for inmates at the 3CMS level of care in administrative segregation.

The inmate was transferred from CRC to administrative segregation at CIM on 6/19/16. Clinician to clinician contact was documented. During psych tech rounds on 6/21/16, he asked to speak to mental health and a PC contact occurred the following day. No other documentation was available for review.

Findings

Available documentation indicated adequate and timely treatment. The clinician to clinician contact was also a good practice. Timely PC follow-up in response to the psych tech request indicated good communication and responsiveness between disciplines.

**Inmate F**

This 42-year-old inmate was housed in administrative segregation and received reception center STRH programming. He was serving a four-year sentence for burglary and robbery, vehicle theft and reckless driving/evading police, receiving stolen property and possession of a controlled substance with a firearm. He was provided with the following diagnoses: Major Depressive Disorder, recurrent, mild, in partial remission, Amphetamine Dependence in a controlled environment, and Antisocial Personality Disorder. He was not prescribed psychiatric medications. His healthcare record was reviewed to assess the provision of services for inmates housed in STRH.

As a new reception center inmate, the mental health evaluation was conducted on 6/20/16 after the inmate transferred to STRH. There was no reference to STRH programing on the mental health evaluation. However, PC group documentation indicated that the inmate received mental health services in the STRH at the 3CMS level of care.

Group programming with the psych tech and recreation therapist was offered two to three times weekly since admission, but the inmate rarely attended. PC contacts and in-cell activities (word searches) were provided weekly.

The inmate's IDTT was observed. The treatment plan was not available for review. The PC was knowledgeable about the inmate's psychosocial needs and facilitated beneficial discussions in

the presence of custody staff.  Treatment goals were generally identified as substance abuse, but clear measurable goals and interventions were not discussed.

<u>Findings</u>

Available documentation indicated that the inmate's care was adequate and in accordance with STRH program requirements.  The PC's anticipation of clinical needs related to custodial factors and the subsequent facilitation of discussion was a very positive finding.  However, treatment planning could be improved with case conceptualization that identified the likely relationship between depressive symptoms and substance abuse and subsequently targeted mood symptoms.

**Inmate G**

This 64-year-old inmate had been housed on Facility A since 2012.  He was convicted of lewd and lascivious acts with a child under 14 years of age.  He was provided with diagnoses of Bipolar Disorder, hypomanic in remission and Cannabis Dependence in a controlled environment.  He was prescribed Lamictal and Zoloft.  His healthcare record was reviewed to assess the provision of 3CMS mental health services.

Documentation of psychosocial history and case formulation in the annual treatment plan was scarce; it highlighted current stability and the absence of symptoms.  Goals were to maintain remission of symptoms on a daily basis with interventions focused on CBT and medication.

Psychiatry and PC contacts were timely.  Documentation noted a history of severe depression without medication treatment.  Zoloft was decreased due to complaints that it contributed to fatigue.  One month later, the PC saw the inmate following a request due to the inmate "feeling down" and excessive sedation.  The following month, his sleep was quantified as five hours per night; however, there was no documentation of what appeared to be a change in sleep habits from the previous PC note.

Generally, PC notes were vague and referenced medication adherence, and with the exception of the notes referenced above, lacked symptoms.  When symptoms were noted, precipitants were not explored and interventions to address symptoms were not utilized.

<u>Findings</u>

The care provided to this inmate was inadequate.  The lack of psychosocial history, case formulation, changes in symptoms and functioning since the previous treatment plan were problematic.  While provider contact was timely, the quality of care was insufficient and treatment plan interventions were not utilized.  There was poor continuity of care between disciplines, a lack of awareness and attention to an apparent decline in the inmate's mental status, a lack of interventions and poor continuity between PC contacts.

**Inmate H**

This 52-year-old inmate was transferred to Facility A on 4/20/16.  He was serving a seven-year sentence for attempted premeditated murder, second degree.  He was provided with diagnoses of

705

Polysubstance Dependence in a controlled environment, ADHD, combined type and Antisocial Personality Disorder. He was prescribed Strattera. His healthcare record was reviewed to assess the provision of mental health care to 3CMS inmates.

The initial PC contact occurred on 5/4/16; the IDTT occurred on the following day. Symptoms supporting the diagnosis included hyperactivity, difficulty attending and focusing, trouble sleeping and stuttering. However, the impact on the inmate's functioning was not documented. Goals were to use three coping skills to manage ADHD symptoms. Therapeutic interventions were documented (monitor mood, use CBT, coping skills, problem solving, breathing and psychoeducation), but inclusion of medication/psychiatric services was nonexistent, despite the use of Strattera.

Despite the reference to a history of depressive symptoms, there was no further elaboration in the treatment plan as to specific symptoms or when the symptoms were last experienced. Documentation of psychiatry contacts was not located.

Findings

Case conceptualization, documentation of psychosocial needs and treatment planning were poor and thus the inmate's mental health care was assessed as inadequate. Although interventions initially appeared thoughtful, they were not clearly connected to treatment goals. Diagnostic formulation also was not consistent with the current diagnostic criteria. Furthermore, the rationale for the inmate's inclusion in the MHSDS was unclear, as none of the listed diagnoses were qualifying diagnoses in the Program Guide and documentation of medical necessity was lacking. The prescription of Strattera likely led to the inmate's inclusion in the MHSDS. However, without psychiatric documentation, the clinical justification was unknown.

**Inmate I**

This 60-year-old inmate was housed on Facility C. He was serving a 15-year-to-life sentence for second degree murder. He was provided with diagnoses of Major Depressive Disorder, recurrent and Alcohol Dependence, in institutional remission. He was prescribed Paxil. His healthcare record was reviewed to assess mental health services provided to 3CMS inmates.

The annual review for this inmate was an exact copy of the previous annual review and was incorrectly dated. The clinical summary was barely one sentence and was insufficient and lacked a review of mental status and functioning since the last treatment plan. Documentation indicated that the inmate was stable and without symptoms, but his diagnosis was not updated to reflect that he was in remission.

Goals remained unchanged from the previous treatment plan and were inconsistent with the inmate's denial of symptoms. Specifically, the goal was to maintain depressive symptoms at less than three on a scale of one to ten, with interventions listed as medication management, monitor symptoms and CBT.

706

Findings

This inmate's care was inadequate.  Of significant concern was the lack of a thorough clinical summary coupled with the lack of individualized treatment planning and insufficient documentation of current functioning and diagnosis.

EXHIBIT T
California Rehabilitation Center (CRC)
May 2, 2016 – May 5, 2016

**Inmate A**

This 3CMS inmate's healthcare record was reviewed as his initial IDTT was observed during the twenty-seventh round site visit.

The inmate was transferred to CRC on 4/19/16 and the initial IDTT was held on 5/2/16. The last SRE was completed on 1/26/15; at that time the inmate's suicide risk was assessed as low for acute and chronic risk. He was provided with a diagnosis of Major Depressive Disorder, moderate; an alternative diagnosis of Bipolar II Disorder, hypomanic was also under consideration. Previously prescribed medications included Remeron and Zyprexa, but the inmate was nonadherent with prescribed psychotropic medications. He reportedly had a history of poor sleep, nervous behaviors, and rapid speech. At the time of review, he was not prescribed psychotropic medications.

The inmate's history included treatment at ASH in 1998 following a suicide attempt by cutting both wrists after his wife left him. In 2009, he overdosed after problems with a girlfriend, with resulting coma. He began using methamphetamine as a teen and also had a significant history of alcohol and heroin use. He also reportedly had a history of head trauma.

This reviewer observed the inmate's May 2016 IDTT meeting. The IDTT included discussion of the inmate's threats of legal actions unless he received his desired medications for hand and wrist pain. The inmate would not discuss mental health goals until he received his desired pain medications. He presented with agitation and the use of profanity and was excused from the IDTT meeting. The treatment team then discussed the inmate's pain medication concerns and plans to consult medical staff.

Findings

The mental health care provided to this inmate appeared to be appropriate. The observed IDTT meeting was appropriately conducted with discussion for medical consultation due to the inmate's medical concerns.

**Inmate B**

This 3CMS inmate's healthcare record was reviewed as his initial IDTT was observed during the twenty-seventh round site visit.

The inmate arrived at CRC on 1/13/16 from a reception center. The initial IDTT was conducted timely. The inmate was provided with a provisional diagnosis of Depressive Disorder NOS. He was not prescribed psychotropic medications at the time of review.

The inmate had a history of heroin and alcohol use. There was no known history of suicidal ideation or suicide attempts. The inmate was placed at the 3CMS level of care at Folsom and CVSP after he reported experiencing auditory hallucinations. He requested removal from the MHSDS on multiple occasions, but later rescinded those requests.

During the observed IDTT meeting, the inmate stated that he reported auditory hallucinations to prevent transfer to out-of-state facilities on two different occasions.  He indicated that he did not want his MHSDS placement to impede his release.  The IDTT discussed the inmate's report and determined that it was appropriate to remove him from the MHSDS.  Plans were made for clinician follow-up prior to MHSDS removal.

<u>Findings</u>

The mental health care provided to this inmate appeared to be clinically adequate.  The IDTT decision to remove him from the MHSDS appeared to be clinically appropriate and there was a plan for follow-up with the PC prior to MHSDS removal.

**Inmate C**

This 3CMS inmate's healthcare record was reviewed as he had been placed on "C" status for possessing a cell phone and failing a urine drug screen.  He reportedly lost contact privileges with children and family due to his status.

The inmate was provided with a diagnosis of Major Depressive Disorder, recurrent.  He had been prescribed Remeron in October 2015.  His medical history was remarkable for reported seizures after a car accident at the age of 16 (ten years prior).  He was prescribed Dilantin, but was nonadherent with this medication.

Progress notes indicated that the inmate was seen at least quarterly during the reporting period.  His primary symptoms were described as anger, irritability, depression, and insomnia.  His symptoms were exacerbated after the death of his mother in June 2016.  The inmate had a positive response to Remeron, and his insomnia, irritability, and level of depression were reduced.

An IDTT was conducted on 4/27/16.  Symptoms of insomnia and anger issues had reportedly resolved.  Depression reduction was listed as an active goal.  The clinician documented that the reason for the inmate's placement on "C" status was for the reasons listed above.

A psychiatric progress note dated 2/3/16 indicated that the inmate refused his Remeron for one day.  Remeron was prescribed at 15 mg at night.  The note indicated that the inmate's medication nonadherence was addressed.  The inmate also shared information about his most recent 115.

The psychiatrist saw the inmate on 2/12/16 due to medication refusal.  He was again seen on 3/16/16, when the inmate noted some medication side effects.  At that time, his medication was changed to be administered on an as needed basis with psychiatric follow-up in 90 days.  Medications for ADHD were also suggested, but the inmate declined.

<u>Findings</u>

710

The mental health care provided to this inmate appeared to be generally adequate. However, there were some concerns. Contact time frames were exceeded by psychiatry and PCs. Treatment planning should also have addressed substance abuse in light of the positive urine drug screen.

The psychiatrist changed the inmate's medication to as needed due to drowsiness during his evening call with his family. CRC should review the medication administration policy and ensure that all HS medications were administered after 8:00 p.m.

**Inmate D**

This 3CMS inmate's healthcare record was reviewed from a group of inmates on "C" status.

The inmate was provided with a diagnosis of Major Depressive Disorder, recurrent. He was prescribed Celexa and Vistaril, reportedly with beneficial results.

The inmate was placed on a medical hold due to damage to and surgery for his right ring finger, resulting in his inability to work or to attend school from December 2015 until January 2016. He had a history of use of illegal substances and prior 115s. A March 2016 progress note indicated that the inmate worked in the kitchen and had problems with a custody officer.

The PC consistently followed the inmate, with clinical interventions that included anger management skills building, sobriety maintenance, continuation of psychotropic medications, relaxation techniques, and exercise. Interventions also included assisting the inmate cope with his assigned job.

Findings

The mental health care provided to this inmate appeared to be clinically adequate. The clinician addressed individual issues as presented while continuing to focus on the mutually identified goals of decreasing depression and anxiety.

**Inmate E**

This 3CMS inmate's healthcare record was reviewed from a list of inmates who were observed in group treatment during the site visit.

The inmate was provided with diagnoses of Adjustment Disorder, with mixed anxiety and depressed mood, emotion and conduct. The inmate declined to take psychotropic medications.

During an anxiety management group, the inmate voiced that he personally benefited from group participation. He was incarcerated for spousal abuse and had a second strike offense.

He reported a history of multiple altercations and was a retired biker. He also reported a history of mood swings and substance abuse, but had programmed well while incarcerated.

711

The inmate was raised by his grandparents; however, they died from cancer and he essentially raised himself from the age of 14.

The inmate attended groups to focus on abandonment issues, depression, loss, and grief and anger.  He attended the following groups:  Anxiety Management, Toastmasters, Veterans Groups, Anger Management, and Flag Detail.

<u>Findings</u>

The mental health care provided to this inmate appeared to be clinically appropriate.  Clinicians saw him timely and he was involved in beneficial group therapy.  Treatment planning for this inmate also appeared to be clinically relevant.

EXHIBIT U
California Institution for Women (CIW)
January 24, 2016 – January 26, 2016

**Inmate A**

This case was randomly selected for review from the list of inmates who were not referred to a higher level of care. The inmate's 3CMS level of care had been reviewed by the IDTT on four occasions and there were positive indicators, including multiple MHCB admissions and RVRs. This case review concerned the adequacy of written documentation as to the reason why the inmate was not referred to a higher level of care.

Information in the initial psychiatric assessment presented an individual of lower intellectual functioning who had recently been released from the MHCB. She was admitted due to a suicide attempt by cutting and hanging; she passed out and was found by a custody officer and transferred to an outside hospital for stabilization. She apparently refused treatment there as she was frustrated by how she was treated. Her history was significant for two prior suicide attempts in 2001 and 2002, several hospitalizations in the community and multiple psychiatric diagnoses. She was provided with diagnoses of Schizophrenia, Anxiety Disorder, Antisocial Personality Disorder and Substance Disorder, in institutional remission. She was prescribed Zyprexa and Zoloft, which she reported did not control her anxiety.

The master treatment plan dated 8/11/16 noted the inmate received three RVRs in the past three months and three MHCB admissions. Records indicated that she had received the RVRs to obtain an institutional transfer. Additionally, her anger had been oriented toward medical staff, who she perceived as dismissing her chest pain complaints and request for certain medications. The inmate later indicated receptiveness to discussions with the psychiatrist and PC, which she had previously refused. The PC indicated she would collaborate with medical staff to facilitate the inmate's appropriate communication of her concerns.

The IDTT rejected the inmate's referral to a higher level of care on the belief that retaining her in the 3CMS would permit education on how to manage stressors and allow a new medication regimen to take effect. The inmate was placed on the high-risk list.

A master treatment plan was prepared on 9/21/16 for MHCB discharge back to the 3CMS program. She had been admitted on 9/15/16 due to cutting herself on her thighs, without intent to die, due to peer problems. The discharge treatment plan indicated that the inmate met daily with the PC and received additional mental health services as requested. The MHCB treatment team determined that she had the support needed to assist with these stressors, which was a consideration in discharging her to a lower level of care. The IDTT did not address why referral to a higher level of care in the EOP or PIP was not made.

Findings

The inmate was not enrolled at the appropriate level of care during the reviewed period of 6/1/16 to 9/30/16 given the diagnosis of a major mental disorder, significant psychiatric history in the community and recent, frequent MHCB placements. The psychiatrist's finding of low intellectual functioning should have been followed up by the IDTT, since the inmate was not

714

noted to have cognitive deficits. The 3CMS program did not offer sufficient services to meet the needs of an inmate who required daily clinical contacts, as the healthcare record indicated. Subsequent review of this case revealed that the inmate was ultimately referred to the PIP in December 2016. There was sufficient justification to elevate her level of care to at least the EOP as early as August 2016.

**Inmate B**

This case was selected for review because the inmate was observed in her initial IDTT in the PSU on 1/24/17. The purpose of the review was to assess the appropriateness of her placement and the adequacy of treatment planning in the observed IDTT meeting.

This inmate was continuously enrolled in the 3CMS program during the current and previous prison terms. Records indicated that she was treated at PSH for three weeks in 2012 following an attempt to hang herself after her two-year-old daughter died of heart disease. A second daughter was reportedly killed in an automobile accident in April 2016; the inmate was placed on five-day follow-up at that time. On 7/21/16, she was placed in the SHU; she subsequently was admitted to the MHCB four times for danger to self (from 7/21/16 to 8/2/16, 9/15/16 to 9/26/16, 11/26/16 to 11/30/16 and 12/28/16 to 1/12/17). She was placed in the EOP following discharge and housed in the PSU.

Healthcare records indicated that the first MHCB admission was occasioned by the inmate's suicidal ideation, which was later recanted by a report of distress over the anniversary of a deceased daughter. The second admission occurred after she was found seated in her cell with a non-suspended bed sheet wrapped around her neck. There was no injury and the inmate denied suicidal intention; she attributed the scene to a relationship problem with her prison wife. The third admission followed her report of swallowing a razor, but she refused to cooperate with medical treatment. The inmate stated that she needed a break and wanted to be closer to her wife, who was in the MHCB at the time. The fourth admission was based on her report of swallowing foreign objects. The inmate denied suicidal ideation or intent; the medical exam revealed four foreign objects, but the inmate claimed no recollection. She disavowed a wish to die but expressed a determination to be close to her wife and threatened to escalate self-injurious behavior to accomplish this.

Records indicated that the MHCB treatment team completed an acute care referral to the PIP on 1/6/17 during the inmate's fourth MHCB admission. The referral was made notwithstanding the treatment team's impression that the inmate's behavior may have been manipulative. The team aptly documented the inmate's determination to engage in high risk and potentially lethal means to reach her desired outcome. The referral was rescinded following a clinical consultation with PIP clinicians. However, at the time of the site visit, this PIP referral was still listed as pending. The PIP Referral Review Committee rejected the referral for the following reasons:

> Per chart review, I/P stated on numerous occasions that she had 'relationship problems' with her girlfriend and wanted to 'get out of her environment.' In addition, the record indicates that the I/P's plan (as verbalized to nursing staff in her housing unit) is … 'to manipulate the system in order to maintain a close

715

living arrangement with inmate X', who was recently admitted to the PIP and currently receiving treatment. She stated that she is determined to follow her 'wife' and that she feels compelled to do so at inmate X's wishes. With regards to the self-harm behaviors, the degree of severity of these behaviors appears to have a low lethality (e.g. no serious suicidal or self-injurious behavior).

The PSU IDTT concurred that the inmate had not had a chance to take advantage of clinical services offered in the PSU without the negative influence of inmate X, who was then being treated in the PIP. The inmate demonstrated motivation to work independently on issues of grief and loss, anger and trauma history by her compliance with groups and PC contacts since her MHCB discharge. She also had not engaged in self-injurious behaviors since returning to the PSU and agreed to work collaboratively with the treating psychiatrist.

The treatment plan composed on 1/24/17 focused on the inmate's codependency issues that contributed to self-injurious behaviors and inappropriate MHCB use. The PC would hold biweekly meetings with the inmate. Strategies would be drawn from cognitive and dialectical behavior therapies to target abandonment and grief experiences, and affect regulation, impulse control and judgment.

The inmate was provided with a diagnosis of Major Depressive Disorder, recurrent. She was treated with Oxcarbazepine, prazosin, hydroxyzine as needed for anxiety, and diphenhydramine.

Findings

Considering the rejected referral for PIP acute care, the inmate was appropriately placed on a modified treatment program in the EOP. The immediate treatment plan targeted appropriate problem areas, but should have also included frequent assessments of severity of self-harm thoughts. The inmate should have been placed on the high-risk list to ensure cohesive unit monitoring of maladaptive coping. These modifications, such as increased frequency of contacts, dialectic and CBT interventions, and high-risk clinical monitoring begin to parallel a level of care that would be provided in a 24-hour nursing care environment such as the PIP. Because the inmate lacked an adequate therapeutic response to the PSU and four MHCB admissions, she was a proper candidate for PIP care. This case should have been presented to the CCAT for final resolution.

**Inmate C**

This case was selected for review after observing the inmate's updated IDTT meeting on 1/24/17. The *Coleman* expert was aware of this case due to a review performed during the twenty-sixth round site visit. At that time, this *Coleman* expert opined that the inmate had been appropriately placed in the EOP to treat a chronic and severe mental disorder and, within the limits of the review period, provided care appeared to be adequate. The *Coleman* expert also opined that the treatment team had not considered treatment interventions needed to return the inmate to a lower level of care.

716

Provided data indicated that during the current review period the inmate participated in the 3CMS level of care for five months until she transferred to administrative segregation on 8/3/16 and then to the MHCB for nine days until 8/22/17. She was discharged to the EOP and was subsequently housed in the PSU. Since mid-September 2017, she was treated on an EOP modified program.

Healthcare record information indicated that the inmate's recent administrative segregation placement triggered strong depressive, anxious, and paranoid reactions. Notwithstanding her feeling of safety in the PSU, she continued to experience problems with select PSU staff whom she believed were out to get her and who had a history of inflicting physical and emotional harm on her. Furthermore, despite a history of not following psychiatric recommendations, the inmate reported adherence to recommended treatment with olanzapine. She was provided with a diagnosis of Schizophrenia.

During the IDTT meeting, the inmate stated she was looking forward to her upcoming release in April 2017. She wanted to discontinue psychiatric medication due to her belief that she was not mentally ill, but suffered from anger problems. She feared, however, that she would be involuntarily medicated. Several treatment team members clarified that she was not currently a candidate for court-ordered medication, but pointed out that in the past medications had been effective in curtailing her angry impulses. There ensued a balanced discussion as to how she could be weaned off medication as she desired, with the inmate and psychiatrist agreeing to work together toward this goal. There would be sufficient time while in custody to evaluate the effectiveness of this plan.

The treatment team considered factors that could suggest the need for higher level of care referral consideration. However, all the factors were negative. Furthermore, the inmate had increased her level of treatment participation to 100 percent. Treatment goals were relevant and appropriate.

Findings

The inmate was appropriately placed in the EOP and provided care was adequate.

**Inmate D**

This case was reviewed after observing the initial IDTT meeting on 1/25/17. The inmate arrived at CCWF's reception center on 9/1/16 and was enrolled in the 3CMS program. She continued treatment with antidepressant medication that had been prescribed in the county jail. She transferred to CIW on 12/8/16, where she discontinued psychiatric treatment; on that basis, she was removed from the MHSDS.

On 1/11/17, the inmate requested re-enrollment in the MHSDS due to symptoms of anxiety as manifested by poor concentration, increased heart rate, speeding thoughts, shortness of breath, and the need to move around a lot. She wanted to resume counseling and treatment with psychiatric medication, which had been helpful in the past.

On 1/25/17, the IDTT documented a diagnosis of Major Depressive Disorder, recurrent, moderate with anxious distress. The inmate was noted to have symptoms of panic disorder, but they were not specified. She was prescribed citalopram, buspirone, and hydroxyzine. Treatment goals were written in behavioral terms but most lacked specificity as to frequency and time frame and thus were not measurable. No group treatment was ordered, although it was available to 3CMS inmates. The inmate did not offer her own goals.

Findings

Based on reported symptoms, the inmate was appropriately placed in the 3CMS program. However, her removal from the MHSDS on 12/8/16 was inconsistent with the Program Guide. The inmate was subsequently returned to the MHSDS and treatment resumed. The treatment plan was nonetheless weak as it lacked specificity to measure progress.

**Inmate E**

This case was reviewed after observing the inmate's annual 3CMS IDTT meeting on 1/25/16. The inmate's 3CMS placement had been annually reaffirmed since December 2012. She was provided with a diagnosis of Major Depressive Disorder and was prescribed venlafaxine ER.

The inmate's history was significant for long-term use of methamphetamine, cocaine and cannabis. She had mental health intervention related to infertility forty years' prior. There was no psychiatric inpatient history. The inmate was incarcerated for a high profile case and had slowly integrated herself into the prison culture. She was housed in the prison honor unit and availed herself of several available rehabilitation programs.

IDTT members reviewed the inmate's progress, noting that she adhered to psychiatric recommendations and demonstrated improvement in reducing anxiety as per her most recent treatment plan. Due to the high profile nature of her case, the inmate had been subject to heightened anxiety whenever her identity was recognized and acknowledged on the yard. Consequently, due to her notoriety, she did not feel ready to participate in structured therapeutic groups. Treatment team members did not order therapeutic groups in the treatment plan. While the inmate had a long time to serve, it would have been therapeutically useful to introduce for discussion the topic of group participation as a long term goal.

The inmate participated in the IDTT meeting, but did not contribute other goals. Referral to a higher level of care was not explicitly discussed, but the treatment plan indicated that it had been considered, but no positive indicators were noted. There was no history of suicide attempts or RVRs.

Findings

The inmate was appropriately placed in the 3CMS program and provided mental health care was adequate.

**Inmate F**

718

This case was reviewed after observing the inmate's initial 3CMS IDTT meeting on 1/25/16. The inmate was provided with a diagnosis of Major Depressive Disorder, moderate and Panic Disorder, with agoraphobia, severe. She was treated with fluoxetine and buspirone.

Review of pertinent history indicated that the inmate met 3CMS enrollment criteria on 4/26/16 for anxiety symptoms. She reported a worsening of symptoms on 8/31/16, including sleep and appetite disturbance due to a recent diagnosis of stage three throat cancer and an RVR. She was placed in administrative segregation on 11/16/16 for threatening staff and was elevated to the high-risk list due to her worsening mental status, medical diagnosis, administrative segregation placement and refusal to come out of her cell for PC contacts. She was removed from the high-risk list on 12/28/16 and released to the yard on 1/17/17.

The inmate reportedly functioned well on the yard after release from administrative segregation. She did not attend the initial PC assessment, but attended the initial psychiatric evaluation and participated in the IDTT. The treatment team determined an absence of indicators to suggest higher level of care referral. The treatment team reviewed progress to date on improving depressed mood and specified indicators for the inmate to achieve by the next annual IDTT. PC contacts pursuant to the Program Guide were ordered and medications were continued. Structured therapeutic groups were not assigned but, given current stressors, would have enhanced treatment relevance.

Findings

The inmate was appropriately placed in the 3CMS program for treatment of her depressive symptoms. The provided mental health care was adequate. However, it was unclear whether the inmate's refusal to leave her cell was due to agoraphobia or otherwise explained by fears of conflict with staff, which she thought might lead to another RVR. In the inmate's interest, the treatment team should revisit her diagnosis.

**Inmate G**

This case was selected for review after observing the inmate's initial IDTT meeting on 1/24/17. She was a participant in the EOP PSU program during the review period. She was provided with a diagnosis of Schizophrenia and was classified as DD1. She was not prescribed psychotropic medication. She had delivered a baby seven months prior.

Records reflected that the inmate returned from court two weeks earlier and exhibited paranoia with irritability and inappropriate behavior as evidenced by racist comments to custody staff, yelling at the cell door and refusing treatment contacts. She was dropped in treatment level due to her treatment refusal. She had refused treatment with the PC for the past year because the PC was a social worker. The inmate held social workers' responsible for removing her children to foster care in the community. The PC attempted to interview the inmate at cell front and consulted with the psychiatrist. The inmate was noted to lack insight into her mental illness, exercise poor judgment, and demonstrate poor frustration tolerance.

During the IDTT the treatment team decided to grant the inmate's request to change her PC. There was full and thoughtful discussion of the issue. The treatment plan addressed relevant

goals with important outcomes, such as improving treatment and medication adherence and improving social skills and overall functioning; however, the plan lacked a description of how these goals would be accomplished and how they would be measured.  The team considered factors which might necessitate higher level of care treatment but determined she should remain in the EOP as there were no positive indicators.  The treatment team appeared to place high hopes that the inmate's treatment response would improve with a new PC.

Findings

The inmate was appropriately placed in the EOP for treatment of a major mental disorder.  However, provided care was inadequate in that the inmate consistently presented with symptoms of a chronic and severe mental disorder for one year and refused treatment with the PC for reasons that may have stemmed from symptoms of her diagnosed psychiatric disorder or were attributed to an impaired intellectual capacity.  The inmate's capacity to consent to treatment appeared to be compromised.

**Inmate H**

This case was reviewed after observing the inmate's initial IDTT meeting where she was returned to the 3CMS program after returning from court.  Review of healthcare records indicated pertinent environmental factors with a potential impact on psychological adjustment including recent removal from two months' placement on "C" Status, single-cell housing in administrative segregation for allegations of participation in a riot and the threat of institutional transfer.  Mental health factors that impacted the inmate's adjustment included depressed mood, increased anxiety due to lack of a cellmate, and unresolved grief due to the death of her prison wife.

The inmate was provided with diagnoses of Mixed Anxiety and Depressive Disorder and Psychoactive Substance Dependence, uncomplicated.  She was prescribed venlafaxine, mirtazapine and hydroxyzine.  Recently, the inmate had not been medication adherent.

The inmate received no psychiatric treatment in the community before coming to prison.  She contributed to the treatment plan by stating that she needed someone to talk to and needed to continue psychiatric treatment and have relapse prevention strategies.  The case formulation appeared adequate.  The IDTT considered factors relevant to higher level of care referral and deemed the current 3CMS placement to be appropriate.

Findings

The inmate was appropriately placed in the 3CMS to treat her psychiatric symptoms.  The provided mental health care was adequate, but the inmate did not fully adhere to treatment recommendations.

**Inmate I**

720

The *Coleman* expert observed the IDTT's discussion of the inmate's initial treatment plan on 1/24/17.  The purpose of the review was to assess the adequacy of provided care.

Reviewed healthcare records indicated that the inmate had a long history of aggressive behavioral problems since childhood and that manifested themselves throughout school years.  She had been psychiatrically hospitalized in early adolescence.  She had been housed in the PSU for more than one year.  Since her placement, she had increased the length of her prison term fivefold due to staff batteries.  At the time of the IDTT, she had recently returned from court and required an initial IDTT to re-enter the PSU.

Since July 2016, the inmate was provided with a diagnosis of Bipolar Affective Disorder, manic, severe with psychotic features.  She was prescribed quetiapine and olanzapine as needed for refusal of antipsychotic medication.  The inmate received her psychotropic medications by PC 2602, due to danger to others.

During the 13 days following her return from court, the inmate had not received an RVR for aggressive behavior toward custody staff.  Apparently, the IDTT viewed this as a positive change because in the past she had acted out almost immediately upon returning to prison.  The inmate was placed on a modified treatment plan, attending eight weekly groups and approaching full program participation.  Treatment team members thus recommended an increase in the PSU step to level three; however, the team noted that the inmate's progress was short-lived.

The treatment team considered factors which might indicate the need for referral to a higher level of care in the DSH.  All the factors were rated negative and there was no history of MHCB admission except for one in September 2015.  The team opined that the inmate was able to function in her current housing at the current EOP level of care and that she had not demonstrated chronic psychiatric symptoms while on court-ordered medications.  While she had not received three or more RVRs in the last three months, treatment notes indicated a lack of treatment progress for her psychiatric disorder over the past year as evidenced by an accumulation of RVRs that severely impacted her term of confinement.  All of this suggested either that the inmate still remained precariously stable from a mental health perspective or that her aggressiveness was best understood as a manifestation of a longstanding undersocialized aggression.

<u>Findings</u>

The inmate appeared to be appropriately placed at the EOP level of care and housed in the PSU.  Her treatment participation was closely monitored and the decision to retain her at the current level of care was not clinically unreasonable.  Treatment teams should be encouraged to apply clinical judgment when considering referral to a higher level of care, in addition to relying on actuarial data.

**Inmate J**

This case was randomly selected for review because the inmate had been identified on a log as having met one or more criteria for inpatient care, but was not referred.

The inmate was provided with a diagnosis of Bipolar I Disorder, most recent episode hypomanic, in partial remission with catatonia. A diagnosis of extrapyramidal symptoms was also provided. She was treated with haloperidol, venlafaxine, prazosin, buspirone, and diphenhydramine. She had received her psychotropic medications by a PC 2602 court order since August 2016.

This 23-year-old was variably enrolled in the EOP and housed in the PSU or admitted to the MHCB at least five times over the six-month institutional review period, including three times when her name appeared on the non-referral log. She received four RVRs during one MHCB placement when she broke three fire alarms in three cells, swallowed parts and was placed on a PC 2602 order due to danger to self and others.

The inmate had a history of suicide attempts since age 12. In 2014, while in jail, she cut her wrists with intent to die. In 2015 there were six attempts, two of which were with intent to die. Five attempts were made in 2016 without an intent to die. During 2015 and 2016, there were MHCB admissions based on self-injurious behavior such as head banging and ingestion of foreign objects that included deodorant, razors, EKG adhesive patches, coffee grounds, utensils, and detergent, the veracity of which was not addressed in the healthcare record. The inmate grew increasingly hopeless upon repeated MHCB admissions and believed treatment staff did not want her to succeed.

During the three months that she appeared on the non-referral log, the inmate was considered for referral to a higher level of care eleven times, but was not referred. Documentation for non-referral to a higher level of care failed to address the level of therapeutic monitoring necessary to maintain the inmate's safety and relied on her fleeting periods of stability between multiple, subsequent admissions.

The inmate was subsequently referred to the PIP in November 2016, where she remained at the time of the site visit.

Findings

The inmate was appropriately placed in the EOP, but was not promptly considered for referral to a higher level of care. The considerations not to refer her were based on fleeting episodes of cooperation which were not supported by the historical pattern of MHCB admission and danger to self and others. Treatment in the PSU was inadequate.

**Inmate K**

This case was randomly selected from the list of inmates who were not referred to a higher level of care even though they had one or more positive indicators. The inmate was a participant in the EOP. She was provided with a diagnosis of Major Depressive Disorder, recurrent with anxious distress. Other related diagnoses included chronic pain, headache, spondylosis and menopausal syndrome. She was treated with venlafaxine, hydroxyzine, morphine, clonidine, and duloxetine.

722

In the master treatment plan dated 8/9/16, the inmate was noted to have refused 65 percent of treatment available to her.  She reported that she had been experiencing an increase in chronic back pain and depressed mood.  Medications targeting pain and mood had been increased one week prior.  The inmate stated she was motivated to attend treatment and expressed the belief that recent medication changes had been helpful.

Based on the above-noted self-report, the inmate was not referred to a higher level of care during the treatment team meeting.  Furthermore, the team noted that she was in no apparent distress during the team meeting and did not appear to be at risk of decompensation.  Given that she was deemed able to advocate for herself both with treatment and custody staff, attended yard and to her activities of daily living and denied any thoughts of self-harm, the team decided that referral to a higher level of care was not warranted at that time.

<u>Findings</u>

The inmate was appropriately placed in the EOP and provided mental health care was adequate.

EXHIBIT V
Central California Women's Facility (CCWF)
January 24, 2017 – January 26, 2017

**Inmate A**

This inmate's healthcare record was reviewed to assess the treatment she received while housed in administrative segregation at the EOP level of care. This reviewer also observed her IDTT.

This 32-year-old woman was provided with diagnoses of Cannabis Dependence in remission, Amphetamine Dependence in remission, and Opioid Abuse, with provisional diagnoses of PTSD and unspecified psychosis. She was prescribed hydroxyzine, paroxetine, buspirone, Oxcarbazepine and olanzapine. The inmate received individual and group therapy. She entered CDCR on 9/29/15. She was transferred to administrative segregation on 1/15/17 secondary to enemy concerns.

The inmate's remote history was significant for a family history of psychosis and suicide, physical and sexual abuse, longstanding depressive symptoms, auditory hallucinations beginning at age 13, polysubstance abuse, over ten community psychiatric hospitalizations and multiple suicide attempts starting at age 14. A primary strength was her report of five years of sobriety.

The inmate's commitment crime was clinically significant as she was serving an 18-year sentence for the attempted murder of her infant son. This incident was connected to her ongoing safety concerns and periodic auditory hallucinations of hearing her son cry. She reported that her inability to comfort her son at those times triggered increased depression and suicidal ideation.

More recent history was significant for multiple MHCB/TTA admissions, including four in the six months preceding this review; the most recent was prompted by her report on 12/18/16 that she ingested 30 naproxen pills in what she later described as an effort at pain relief. A 10/30/16 MHCB referral was the result of her report of auditory command hallucinations to kill herself, which were assessed as fabricated for secondary gain. In addition to the crisis bed referrals, the inmate was treated alternatively at the 3CMS, mainline EOP and administrative segregation EOP levels of care. The administrative segregation EOP treatment team assessed that the EOP level of care was sufficient and the inmate did not require transfer to DSH despite multiple MHCB admissions.

Clinical notes from the later part of 2016 and early 2017 while the inmate was treated variously at the mainline EOP level of care showed her periodic focus on receiving treatment in the 3CMS program followed by difficulties with treatment adherence. There were also reports that she was being victimized and abused, as well as her decompensation and return to the EOP level of care interspersed with MHCB or alternative housing referrals, and administrative segregation stays.

Findings

This inmate's treatment plan and the initial treatment provided to her since her most recent transfer to the administrative segregation EOP program was adequate. Overall, her course of treatment was characterized by multiple crises and cycling through various levels of care.

**Inmate B**

This inmate's healthcare record was randomly selected to assess the treatment she received while in the STRH program.

The inmate was a 21-year-old women diagnosed with Borderline Schizophrenia, Mood Disorder, and PTSD.  She was prescribed mirtazapine and ziprasidone.  She was serving a nine-month sentence for a probation violation secondary to child endangerment.

Her history was significant for a strong family history of Bipolar Disorder, having been prescribed Geodon from the ages of 14 to 16, violence toward others, substance abuse and a suicide attempt at age 11 followed by parasuicidal behavior at age 13.  The inmate reported mental health treatment since the second grade after witnessing domestic violence and seeing her mother being shot.  More recently, she reported periods of depression and occasional suicidal ideation.  She reported that Geodon had been helpful.  A mental health assessment indicated that the inmate had not received her medication for one week upon arrival at CCWF, which led to agitated behavior.

An SRE dated 10/19/16 noted a family history of attempted suicide; the inmate was assessed with low chronic and acute suicide risk.  A treatment plan dated the same day focused primarily on anxiety symptoms.  The inmate was placed at the 3CMS level of care.  By early January 2017, she was transferred to administrative segregation.  A pre-placement screening conducted on 1/3/17 resulted in a negative screening for mental health concerns.  A PC contact on the following day noted the inmate's increased symptoms related to her first confinement in administrative segregation.  Other complaints included decreased sleep and appetite, lack of family support, auditory and visual hallucinations and unprovoked anger.  She was described as stable and motivated for treatment.  The inmate was inconsistent with taking her medication and was referred to the psychiatrist.

An SRE dated 1/5/17 indicated moderate chronic and acute level of suicide risk.  The safety plan included weekly PC contacts, creating a treatment plan and weekly STRH group. The psychiatrist saw the inmate on the same day; at that time, she reported recent suicidal thoughts, but felt better after receiving a visit from her children.  The inmate reported having auditory hallucinations that encouraged her to seek revenge related to her jealousy toward the father of her children, who recently had a baby with another woman.
The inmate attended a scheduled group on 1/24/17.  A note dated 1/26/17 by her PC indicated that the inmate was using anger management techniques.  She saw the psychiatrist on 1/30/17, when she reported continued anxiety and irritability despite medication adherence. During a PC contact on 2/2/17, the inmate reported utilizing cognitive behavioral techniques.  She was, however, frustrated about issues related to her sentence.  A 2/3/17 session with a different psychiatrist, animated by her complaints of side effects related to Geodon, revealed ongoing hallucinations despite medication adherence.  The psychiatrist discontinued Geodon and increased Remeron to target anxiety and mood symptoms.  The plan was to see the inmate in two

726

weeks.  The inmate did not attend a group scheduled for 2/7/17.  A PC note on the following day indicated that the inmate was having difficulty with her roommate and was preparing to be released from administrative segregation and from prison.

Findings

This inmate was regularly seen by clinicians during the period reviewed.  Despite ongoing difficulties, she was responding positively to cognitive behavioral interventions and, due to clinical intervention, appeared to have acquired rudimentary coping skills.

**Inmate C**

This inmate's healthcare record was reviewed to assess the treatment she received while housed in administrative segregation while at the EOP level of care, where she was eventually placed on modified programming.

This 39-year-old woman was transferred to CCWF on 10/13/16 after having been hospitalized at PSH since 9/20/16.  This hospitalization may have been related to competency restoration, but documentation elsewhere referred to this stay as a "Patton layover."  The inmate's primary diagnosis was Schizoaffective Disorder.  She was consistently nonadherent with treatment for this condition.

The inmate's history was significant for denial of mental health symptoms or previous treatment despite records indicating multiple inpatient hospitalizations related to competency to stand trial evaluations or restoration, periods of isolation and poor treatment adherence.  She was designated as "DD1".  Her committing charge was clinically significant as it related to the death of her infant son and resulted in a 25-year-to-life sentence.  Evaluations following her return from PSH did not describe her course of treatment while hospitalized there.

This inmate continually refused both group treatment and confidential clinical contacts.  She was seen regularly to attempt to improve her treatment engagement, but with little or no effect.  Barriers to improved group attendance were continually noted to include the high number of administrative segregation EOP inmates in relation to the number of available security chairs, which limited the options for providing viable treatment.  The inmate communicated various reasons or concerns for not attending treatment activities.  These included not having been provided clean clothing, being too concerned with upcoming court matters to focus on groups, the hostility directed toward her by other inmates, it being too cold to cross the yard to attend groups, preferring to speak with custody, being confused about group scheduling and having requested to attend groups but being told that it was not her scheduled time.  During cell-front contacts, the inmate was generally described as stable and she denied the need for medication.  At other times the inmate feigned sleep or was noted to present in a paranoid manner.

An SRE was attempted on 1/13/17, but the inmate refused to participate.  Her chronic risk factors included a history of psychiatric disorder and violence and being over 35 years of age.  Acute factors were current or recent psychotic symptoms, increasing interpersonal isolation, negative change in housing, and safety concerns.  No protective factors were noted.

The treatment plan dated 1/17/17, which was created in the absence of the inmate due to her refusal, continued the diagnosis of Schizoaffective Disorder. Goals focused on improving her treatment engagement, but no new approaches were devised beyond attempting to improve rapport and the clinical alliance. It was not thought that the inmate required transfer to an inpatient level of care, but she was changed to a modified treatment program with the expectation of four weekly hours of offered treatment activities and the inmate's attendance at 50 percent of them. She reportedly attended 1.1 hours of weekly group, but there was no indication of group attendance in the reviewed record. The plan was to assess the need for PIP transfer at the next IDTT meeting. It was not thought that the inmate was unable to function at the current level of care, nor was she thought to require a structured inpatient setting.

Review of the inmate's high refusal rate conducted on 1/17/17 indicated that she refused to speak with the clinician and that she had not showered since 1/9/17, which was eight days prior. The PC note dated 1/18/17 indicated the inmate's continued refusal to engage and the modified treatment plan of four offered hours of weekly treatment activities with the expectation that she would attend two.

The treatment team meeting conducted on 2/7/17 again focused on improved treatment engagement and an increased understanding of the benefits of offered treatment; the inmate again refused to attend the treatment team meeting. She was maintained on modified treatment programing. The plan was to continue to monitor the inmate for the need for medication to address any thought disturbances or mood issues; she was to be provided with a weekly group schedule which indicated the groups she was expected to attend and staff would continue to encourage her. The plan remained to continue to observe her for 30 days to evaluate the need for PIP placement or return to the administrative segregation EOP hub. She was not thought to be unable to function at her current level of care, nor was she assessed to require a structured inpatient setting or to demonstrate chronic psychiatric symptoms. It was noted that she showered regularly, without reference to a progress note that stated that she had not showered for over a week in January 2017 or whether that issue had been resolved. It was unknown whether she had a family history of mental illness without reference to collateral information. Her protective factor was noted to be a secure environment where she could sleep all day and isolate herself. She received an RVR on 11/3/16 for refusing housing, but had not received other RVRs.

Findings

The inmate remained in administrative segregation for an extended time period without engaging in group or individual treatment or taking medications. She was seen frequently and regularly during this time and placed on modified programming without any significant effect. No information from PSH, where she had just been hospitalized prior to the period reviewed, was used to inform approaches to her treatment resistance. Her desire for information concerning her court proceedings was not addressed in a way which might have promoted engagement in a stated area of concern. No specific behavioral plan was developed and her possible developmental disability was not comprehensively explored. While IDTTs mentioned plans to monitor her for a possible higher level of care, this should have been considered more promptly and possibly implemented as there was no significant improvement.

728

**Inmate D**

This 55-year-old EOP inmate's healthcare record was reviewed as she was on the DSH return log.

The inmate entered CDCR in August 1984.  She had a history of mental health treatment, including hospitalizations at PSH, the CIW PIP from 2/13 to 7/27/16 and the CCWF MHCB from 11/16/16 to 1/20/17 for grave disability.  The inmate then transferred to CCWF's Skilled Nursing Facility (SNF) on 1/20/17 for dementia.

The inmate was provided with diagnoses of Antisocial Personality Disorder, Borderline Personality Disorder and Schizoaffective Disorder and symptoms of depression and anxiety.  She also had a number of medical concerns including anemia, chronic hypotension, GERD, Hepatitis C, seizure disorder and unintended weight loss.  She was prescribed clozapine, Effexor and hydroxyzine.

CIW PIP discharge documentation noted that the inmate continued to decompensate over a three-year period.  The decompensation behaviors included: "… bizarre delusions, auditory, visual, tactile and somatic delusions involving a series of characters including 2 sisters, dwarf and a man's use of a laptop and other electronic devices to torture and remove body parts."  The inmate exhibited medication seeking behaviors and intermittently exhibited suicidal ideation without a plan.  Positive aspects of the inmate's behavior were described as consistent orientation to person, place and time.  She also maintained monthly phone calls with her son.

The inmate arrived at CCWF on 7/27/16.  At the time of arrival, she was discipline-free and was placed in EOP housing.  The July 2016 five-day follow-up occurred timely along with weekly clinical contacts.

An August 2016 psychiatrist note indicated that the inmate's paranoid and delusional symptoms continued.  She believed that men came out of the walls and out of her hair, sat next to her and tortured her; she also believed that her sister was trying to harm her.  The inmate's depression was assessed as a five to seven on a one to ten scale.  Documentation also indicated that the inmate missed a couple of doses of clozapine and multiple doses of hydroxyzine, which appeared to exacerbate her symptoms.

Documentation from the PC was consistent with that reported by the psychiatrist; the PC also documented the inmate's reports of continued unwitnessed falls and seizures.  The inmate also reported that she had not received her property, which included hearing aids and glasses, along with other personal items, and had not received phone calls with her son.  The PC discussed the inmate's concerns with the custody supervisor, who indicated that a request had been submitted one week prior.

During a September 2016 group, the facilitator documented that custody asked the inmate to leave the group because she did not have the right attire for group attendance in building 705.

The inmate began to exhibit deterioration in September 2016, with continued delusional thinking. She also submitted a sick slip to be seen by mental health on 9/29/16, but she was not seen until 10/3/16; however, the inmate did not remember submitting the sick slip or what her concerns were.

The inmate was transferred from her room in September 2016 for not cleaning, leaving food and not taking her medications. From September 2016 until her MHCB admission on 11/16/16, she continued to have delusions of men emerging and of snakes. She also had urinary incontinence and increased memory problems, which resulted in roommate problems.

The inmate was referred to the MHCB on 11/16/16, but was housed in alternative housing until 11/22/16. The reason provided for the lengthy alternative housing stay was that all of the MHCBs were being retrofitted; subsequently, all inmates were moved to alternative housing and were placed on individual monitoring.

The inmate remained in the MHCB from 11/22/16 to 1/20/17. She was subsequently transferred to the SNF.

The inmate's treatment plan included keeping self-harm behaviors in remission for one year and that she would "make at least one non-delusional, relevant comment in group 2 x per week for 1 month, along with reduced level of anxiety to 4 over by next IDTT."

Findings

The clinical treatment provided to this inmate was appropriate. The inmate had difficulties receiving her property, which has been a chronic issue for CDCR. It was unclear why she was removed from group for inappropriate attire. This inmate would benefit from treatment in a specific dementia program, but this type of treatment was not available for her.

**Inmate E**

This 40-year-old inmate's healthcare record was reviewed to evaluate the mental health treatment that was provided to her at CCWF.

The inmate was provided with diagnoses of Gender Dysphoria, Mood Disorder, Methamphetamine Dependence and PTSD. She was not prescribed psychotropic medications at the time of the site visit. However, medical prescribed hormone replacement therapy for her.

The healthcare record indicated that the inmate began gang involvement at 12 years of age and had continued this gang affiliation at the time of the site visit. She was hospitalized as a teen for behavioral and gender identification problems. Her father was incarcerated and died in prison. The record identified the inmate's family as a wife in Los Angeles. There were no documented suicide attempts, psychotic episodes, and/or MHCB or DSH admissions.

730

The inmate was a third striker and had one RVR for battery in 2003.

The inmate transferred to CDCR from Los Angeles County Jail on 11/3/16.  Mental health evaluated her on 11/9/16; the assessment was negative for mental health concerns.  The inmate was housed in the general population and requested a mental health consult on 12/28/16 for transgender reassignment.  After the consult, the inmate requested to begin the transgender transformation on 12/30/16.  On 12/30/16, the inmate also had a mental health consult due to panic attacks following the death of a friend who the inmate referred to as her daughter, although there was no biological connection.

The initial intake and master treatment plans were conducted timely.  The IDTT occurred on 1/24/16 and the inmate was placed at the 3CMS level of care.  However, the IDTT quickly became stressful for the inmate.  Neither the inmate nor the clinician were aware that the inmate was transferring to CIW; the clinician told the inmate that custody had not shared this information.  The inmate reported having many enemy concerns at CIW and asked what the team could do to help her remain at CCWF.  The CC I advised the inmate to let staff know about these enemy concerns upon arrival at CIW.  The inmate became despondent and the IDTT ended.  After the IDTT, the CC I stated that he had attempted to discuss this case with the clinician prior to the IDTT meeting, but the clinician had not had the time.

Findings

For the limited time the inmate was in the mental health program, clinical contact was adequate.  However, the IDTT was inadequate.  Form 7388-B criteria was not adequately discussed, the clinician did not present as a team member in the inmate's presence and the clinician was visibly frustrated about not having EHRS training prior to the IDTT after the *Coleman* expert asked about MHCB admissions and DSH referrals.

**Inmate F**

This 43-year-old 3CMS inmate's healthcare record was reviewed as she was interviewed in a group setting during the site visit.

The inmate was provided with diagnoses of Major Depressive Disorder, Attention Deficit Hyperactivity Disorder, PTSD and Polysubstance Abuse.  She was prescribed Zoloft, Vistaril, and atomoxetine.  The inmate's mental health history did not include a history of DSH or MHCB admissions.  The healthcare record noted three suicide attempts prior to incarceration. The first occurred by alcohol overdose on 1/19/86.  In the second attempt, the inmate deliberately wrecked her car with the intent to die (no date was provided for this incident).  The third attempt was by an overdose of pills and alcohol in 1998.  The inmate's substance abuse began with alcohol at age 13 and progressed to marijuana, LSD, cocaine, ecstasy and heroin.  The inmate received mental health treatment at age 16 after being raped.  She experienced feelings of helplessness and depressed mood.

During the review period, the inmate submitted a minimum of two sick slips monthly to see the psychiatrist for medication adjustments and to the PC for anxiety.  The inmate indicated that her medications were either too strong, too weak or ineffective.  The psychiatrist saw her and the inmate's medication was changed from Remeron to Zoloft and Vistaril was added.  The PC also saw the inmate timely.

The annual IDTT occurred on 7/26/16.  The treatment plan focused on substance abuse and depressed mood.  The inmate's mental health problems included ADHD, Major Depressive Disorder, PTSD and substance abuse.  The clinical summary and case formulation were succinct and included a consult with the prior PC.  Both clinicians reported that the inmate managed her symptoms well and agreed that she had a good outside support system.  It should be noted, however, that the inmate did not attend the IDTT.  The reason for the missed IDTT was not provided.

Several days prior to the annual IDTT on 7/22/16 the PC saw the inmate for an individual session.  Documentation noted that the inmate continued to exhibit high levels of anxiety, depressed mood and low energy, but the inmate denied suicidal or homicidal ideation. Documentation also noted a discussion about the upcoming annual IDTT.

The PC and/or psychiatrist at least saw the inmate monthly from July 2016 to January 2017 for continued symptoms of depression and anxiety.

Findings

Clinical contacts occurred in accordance with Program Guide requirements.  In light of the diagnosis of Major Depression with over six months of continued reports of depressed mood, feelings of hopelessness, increased anxiety, missed attendance at the annual IDTT meeting and a lack of response to medication changes, this inmate should have been considered for EOP level of care.

**Inmate G**

This 50-year-old inmate's healthcare record was reviewed to evaluate the mental health treatment that was provided at CCWF.  The inmate requested mental health service on 11/5/16, 11/12/16 and 11/15/16 due to anxiety symptoms.  She was seen on 11/17/16, but the mental health progress note was incomplete.  The subjective findings consisted of "IP is a" and there was no documented plan or disposition.  The inmate submitted another sick call request to see a doctor, but noted mental health on the form.

The inmate's mother had a history of psychiatric hospitalizations.  The inmate did not complete high school.  She was involved in a number of altercations in prison that resulted in a SHU term. She also received multiple RVRs.

An administrative segregation pre-screening was completed on 12/23/16.  The inmate had submitted a sick call request to mental health about getting into the wellness program.  The mental health progress note indicated that the inmate was anxious about the upcoming RVR and

wanted to be seen monthly.  The plan and disposition was to talk to the psych tech about the wellness program.

A mental health initial assessment was conducted on 12/20/16, when a diagnosis of Generalized Anxiety Disorder was provided.  An SRE conducted on the same day indicated that the inmate had been assessed with low acute and chronic suicide risk.  The inmate was placed at the 3CMS level of care by the IDTT that was observed during the site visit.

Findings

The three sick call requests in November 2016 were not timely addressed and the 11/17/16 contact was incomplete.  The IDTT was adequate, although it did not address group therapy.  Overall, provided care was inadequate due to the lack of timeliness in addressing the mental health service requests and incomplete documentation.

**Inmate H**

This inmate's healthcare record was reviewed from a list of inmates with three or more MHCB admissions.  The MHCB admissions/referral report indicated that the inmate had seven MHCB admissions between September and December 2016.

The inmate was provided with a diagnosis of Schizoaffective Disorder.  She was prescribed olanzapine, citalopram and perphenazine.  This 28-year-old inmate arrived at CDCR on 8/10/16 and was placed at the EOP level of care on 10/27/16.

The healthcare record indicated that the inmate had a long history of methamphetamine use in the community and also possibly during incarceration.  However, the record's report of drug use was inconsistent.  At times the inmate reported anxiety and suicidal ideation related to drug use while incarcerated and his accumulated drug debt.  The inmate stated "I want to stay in CB (crisis bed) until I am released;" at other times, the inmate denied drug use since prior to her incarceration.

Information as to the inmate's number of MHCB admissions conflicted.  One report noted that the inmate was referred or admitted to the MHCB seven times during the review period, but the MHCB referral report noted six referrals and two admissions.

The MHCB referral report indicated referred and rescinded dates as follows:  referred on 9/7/16 and rescinded on 9/9/16, referred on 9/12/16 and rescinded on 9/14/16, referred on 9/17/16 and rescinded 9/19/16, referred on 10/29/16 and rescinded on 11/1/16, referred on 11/25/16 and rescinded on 11/26/16 and referred on 11/26/16 and rescinded on 12/8/16.  The inmate's MHCB admissions were as follows: referred on 11/2/16 and admitted on 11/9/16 and referred on 12/8/16 and admitted on 12/15/16.

The inmate was transferred to CCWF from FWP on 10/29/16.  She was admitted to the MHCB at CIW on 11/2/16 and returned to CCWF on 11/25/16.

Suicide risk and self-harm evaluations were completed on 11/25/16 and 12/7/16.  The November 2016 score and justification did not correlate.  The risk levels were low for chronic risk and moderate for acute risk, but documentation of risk level justification stated as follows: "Chronic risk is high due to ineffective coping; poor interpersonal skills/adjustment; severe hx of substance abuse with psychosis; impulsivity; use of MH sxs as a form of secondary gain for drug seeking."

The 12/23/16 suicide and self-harm risk determined the acute and chronic suicide risk as low.  The justification of the score was "Given the IP's denial of any history of suicidal ideation or attempt along with factors known to reduce risk for suicide including family contact and future orientation, both chronic and acute risk were determined to be low at this time."

Findings

Documentation of five-day follow-up and contacts were appropriate and in accordance with Program Guide requirements.  Based on completed SREs, multiple referrals, rescinded referrals, MHCB admissions and the multiple moves between the three institutions, it appeared that clinical staff was undecided as to interventions and goals to manage this inmate.  The inmate's EPRD was 7/7/17 and the inconsistency of managing her with an impending release date posed a risk to the inmate and the community.

## Inmate I

This 28-year-old inmate's healthcare record was reviewed to evaluate the mental health care received at CCWF.  She was provided with a diagnosis of PTSD.  She was not prescribed psychotropic medications at the time of the site visit.

The inmate's initial mental health contact took place on 1/10/16.  Custody staff indicated that the inmate wanted to talk with mental health staff.  The inmate requested a cell change because her cellmate was "male" and she was frustrated with custody as nothing was being done.  The initial mental health assessment occurred on 1/18/16.  The inmate was provided with a diagnosis of Attention Deficit Hyperactivity Disorder; she also exhibited mood instability.  The inmate had a history of alcohol and marijuana abuse and PTSD.  She was prescribed psychotropic medications at the time of review.  The inmate was incarcerated for vehicular manslaughter; her sister was killed in the accident and others were seriously injured.  The SRE indicated low acute and chronic suicide and self-harm risk.

An IDTT was conducted on 1/24/16.  The inmate was noted to be on "C" Status, where she would remain until at least April 2016.  Documentation stated that the inmate must complete groups, but the clinician did not discuss groups during the IDTT.  The recreation therapist suggested that the inmate attend a recreation therapist group after the inmate indicated a desire for more activity.

Findings

The mental health care provided to this inmate was clinically adequate.

734

**Inmate J**

This 34-year-old inmate's healthcare record was reviewed to evaluate the mental health care that CCWF provided.

Healthcare record documentation indicated that the inmate immigrated to the United States at age ten. She joined the army and after four years earned an honorable discharge for medical reasons. The inmate reported "a 30-pound weight loss approximately 2 years after her discharge from the army." She moved to New York to live with an aunt and smoked large amounts of marijuana daily. She also received inpatient treatment at a Veterans' Administration Medical Center in New York where she was prescribed olanzapine. This medication was reportedly effective in addressing her symptoms. She subsequently moved to California without a plan and was homeless.

The healthcare record noted that the inmate had problems with staff at a homeless shelter. The inmate started four fires. She was convicted of four counts of arson and was sentenced to four years in prison. She stated that she started the fires to keep warm.

The inmate transferred to CDCR on 9/15/16 from the Los Angeles County Jail. She was referred to the 3CMS level of care on 12/20/16 due to concerns of decompensation based on poor hygiene. She received an RVR in November 2016 for battery on a peace officer. She was then referred to the EOP level of care and placed in the administrative segregation EOP on 12/22/16. She was transferred from the administrative segregation EOP to the mainline EOP on the following day. On 1/19/17, she was placed in alternative housing after a referral was made due grave disability and she was admitted to the MHCB on 1/23/17.

Between December 2016 and January 2017, the inmate continued to refuse mental health services and only spoke minimally with mental health staff. The inmate's hygiene also continued to deteriorate. However, she continued to communicate with medical staff.

The IDTT meeting concluded that the inmate was nonadherent with medical medications for a bladder infection, refused all mental health medications and services and would not interact with inmates or staff. The inmate consistently denied any intent to harm herself.

An MHCB IDTT meeting was observed during the site visit. The IDTT was ineffective due to the inmate's resistance and the clinician's lack of rapport with the inmate. At one point, the clinician stated that the inmate did not meet requirements for higher levels of care and the inmate said "I'll go to a higher level of care." The team did not respond to the comment and a higher level of care was not discussed further.

The IDTT's decisions were to maintain the inmate at the MHCB level of care to try to establish rapport, to track the inmate's hygienic habits, to utilize behavioral techniques to decrease anxiety

and paranoia and for the MHCB nurse practitioner to inform the inmate about the PC 2602 process and the benefit of medication adherence.

Findings

The frequency of clinical care contacts during the inmate's stay were in accordance with Program Guide requirements.  Although there was good IDTT documentation, the IDTT was minimally adequate and IDTT observations indicated the need for more treatment clarity and focus.

736

EXHIBIT W
Valley State Prison (VSP)
June 1, 2016 – June 3, 2016

**Inmate A**

This 3CMS inmate's healthcare record was reviewed as he discharged from an MHCB during the review period.

This 36-year-old inmate was diagnosed with Major Depressive Disorder; he was not prescribed psychotropic medications.  The inmate had a prior history of suicide attempts at the ages of 14 and 15 by hanging and attempting to electrocute himself.  He also attempted suicide by cutting his wrist at age 27.  No other suicide attempts were noted.

Prior to 10/1/15, the inmate was housed at ISP.  On 10/2/15, he was admitted to an MHCB at CIM where he remained until his discharge on 10/16/15.  After his MHCB discharge, he was transferred to VSP.

The five-day follow up after the MHCB discharge began on 10/19/15 and continued through 10/23/15.  Discussions concerning the outcome of the ICC, plans for upcoming parole and to transfer to a yard with a substance abuse program, and appropriate management of coping skills for depression and anger were topics discussed during individual clinical contacts.

There was an IDTT on 1/5/16.  The treatment plan consisted of measurable and time specific goals to reduce depression and anger, along with appropriate interventions and objectives.  A TCMP referral was completed on 3/8/16.  An SRE completed on 3/18/16 documented moderate chronic and low acute suicide risk.  The inmate paroled on 3/18/16.

Findings

The five-day follow-up was not completed as required, as it did not occur on the day after the inmate's arrival at the institution following MHCB discharge.  The SRE and IDTT were completed within timeframes.  The Form 7388-B was completed appropriately with consideration of referral to a higher level of care.  However, completion of the TCMP referral only ten days prior to the inmate's parole was problematic.  Overall, it appeared that the mental health care that was provided to this inmate was clinically adequate.

**Inmate B**

This EOP inmate's healthcare record was reviewed as he had three or more MHCB admissions within six months.

The inmate was provided with diagnoses of Generalized Anxiety Disorder, Panic Disorder without Agoraphobia and possible Bipolar Disorder; these diagnoses were provided by the PC.

The psychiatrist provided a diagnosis of Mood Disorder.  The inmate was prescribed the following psychotropic medications: Remeron, Effexor, Thorazine and trileptal.  The inmate requested a level of care change from EOP to 3CMS in August 2015, but quickly decompensated.  He had ten MHCB admissions from August 2015 through December 2015.

The inmate was transferred from CMF to VSP on 12/18/15.  A PC contact occurred on the date of arrival, and five-day follow-up began on the following day.  This follow- up continued until 12/23/15.

An SRE was completed on 1/4/16 and an IDTT occurred on the following day.  Progress notes indicated that the inmate's panic attacks subsided significantly after two months of clinical and psychiatry contacts, medication adherence and group participation.  He reported feeling very good and attending nine weekly hours of group therapy.  Subsequent clinical contacts occurred timely and treatment goals and objectives were met.

Findings

The mental health care provided to this inmate was appropriate.  He was seen by his PC as was clinically indicated and he showed improvement with the appropriate provision of care.

**Inmate C**

This EOP inmate's administrative segregation IDTT was observed during the visit.  He was provided with diagnoses of Major Depressive Disorder, recurrent and PTSD.  He was prescribed Zoloft and Vistaril.

The inmate had a significant history of suicide attempts, including one in 2000 when he took animal tranquilizers and one in 2012 while at ASP when he attempted to hang himself but the rope broke.  The inmate also reported a third suicide attempt when he went on a hunger strike.

The inmate was placed at the EOP level of care in March 2013.  He had multiple MHCB admissions; the last one occurred on 3/2/16.  He was subsequently transferred to VSP on 3/30/16.

The inmate received an RVR and was placed in administrative segregation due to threats on a non-peace officer in May 2016.  There was an IDTT on 6/1/16 and the ICC took place on the following day.

Required staff attended the IDTT.  The inmate was a very active participant in the session and it appeared that the PC had a good rapport with him.  Pertinent clinical issues were discussed during the IDTT.

The ICC was also observed.  The warden and appropriate disciplines were present, including mental health staff.  The RVR did not identify any mental health factors that contributed to the behavior which resulted in the RVR.  The inmate was originally given nine days without

privileges, but that finding was dropped and the RVR was reduced to a 128 counseling chrono. The inmate was then transferred to CSP/Corcoran.

Findings

The care provided to this inmate was clinically appropriate.  The observed IDTTs and ICCs were appropriately conducted and the RVR was remediated despite the mental health assessment.

740

EXHIBIT X
California Health Care Facility (CHCF)
July 6, 2016 – July 8, 2016

**Inmate A**

This 44-year-old administrative segregation EOP inmate was identified as meeting criteria for higher level of care referral consideration, but was not referred on three separate occasions (3/1/16, 3/29/16 and 4/26/16).  He met criterion seven's failure to participate in at least 50 percent of his treatment program.  The inmate received his psychotropic medications by PC 2602 order due to danger-to-others.  He was prescribed Invega 234 mg intramuscular every four weeks, Cogentin and Depakene.  He was provided with diagnoses of Schizoaffective Disorder, Polysubstance Dependence by history and Antisocial Personality Disorder.

Although the inmate was reportedly not on the objective indicator list for his 5/24/16 IDTT meeting, he appeared to meet criteria as staff documented that he declined to participate in group treatment and preferred to stay in his cell and engage in solitary activity.  The IDTT documented that his group participation had decreased from one group to no group participation.  This treatment plan noted that the inmate experienced significant anxiety and paranoid or anxiety-provoking thoughts when he was around other inmates that resulted in social avoidance including no group participation.  Despite objective measures indicating that this problem still existed (e.g., group participation decrease), the team considered it resolved.  The team documented that the inmate's anxiety and depression were minimal; however, it was unclear how that was determined, especially in light of the continuous documentation that the inmate had no insight.  Improving insight was actually a treatment goal.  The treatment plan did not reflect the inmate's actual situation and functional level at the time based on the team's own documentation; it was unrealistic and did not include appropriate treatment goals or interventions.

The inmate's prior treatment plans were either identical to the May 2016 treatment plan or had only insignificant modifications.  They were all inadequate for the inmate's functional and symptom level.  Interventions were confused with goals and the discharge plan was not clinically relevant.  The Form 7388-B's did not have adequate non-referral rationales and the treatment modifications were not updated over time as the inmate did not improve.

This inmate was not identified as meeting objective criterion seven on the Form 7388-B in March 2016.  He also was not included on the DSH log as a non-referral in December 2015 or January 2016 despite having been identified as positive on criterion seven on the Form 7388-B.

<u>Findings</u>

This inmate did not receive adequate care.  His treatment plans did not adequately address his treatment needs.  He met criteria for referral to a higher level of care for months; however, he was not referred and the non-referral rationale was inadequate and inaccurate.  This inmate

742

required a more behaviorally-based treatment plan and a referral to DSH's intermediate care inpatient unit.

**Inmate B**

This 25-year-old MHCB inmate's case was reviewed because he was identified as meeting criteria for DSH referral on four occasions (4/19/16, 4/28/16, 5/5/16, and 5/12/16), but was not referred. He was ultimately referred from the CHCF MHCB on 5/18/16. The inmate had been admitted to the CHCF MHCB from the PBSP PSU due to suicidal ideation. He had been housed in the PBSP MHCB and was transferred to the CHCF MHCB. It appeared that the inmate may have actually been moved from the PBSP MHCB to alternative housing as punishment for pulling up the floor in the MHCB and then cutting himself with it, reportedly superficially. Interestingly, an interdisciplinary treatment note misfiled as an initial psychological assessment dated 4/19/16 indicated that the inmate had been "discharged" but would be transported to another MHCB. He obviously continued to require MHCB level of care, supporting the hypothesis that he was punitively removed from the PBSP MHCB.

Available documentation indicated that the inmate arrived at CHCF sometime late on 4/19/16. He was provided with a diagnosis of Mood Disorder NOS; a diagnosis on Axis II was deferred. The inmate was prescribed fluoxetine, hydroxyzine as needed for anxiety, Remeron and Zyprexa. CHCF completed a Form 7388-B on that date; however, it was unclear why this was completed as the treatment team did not meet and there was no treatment plan. The inmate met criteria five (three or more MHCB admissions) and six (three or more 115 mental health evaluations completed during the last three months).

The IDTT saw the inmate on 4/22/16 when a treatment plan was completed. However, no Form 7388-B was located from that date. It is likely that the 4/19/16 Form 7388-B was inaccurately dated and was actually from the 4/22/16 IDTT meeting. The non-referral rationale, that the inmate had just arrived and was still being assessed, was inadequate in light of his multiple prior assessments. There was a significant amount of data from those prior admissions that the treatment team could have and should have utilized in their decision-making process. As CDCR admits inmates to MHCBs throughout the state, repeat admissions do not always occur at the same MHCB. Consequently, staff must quickly become familiar with the inmate through review of healthcare records and make clinical decisions based on current information of staff assessments and record review. The treatment modifications listed were generally adequate for suicidal ideation for the initial admission (4/22/16). Unfortunately, the treatment plan itself was not well-constructed; it combined two goals in one section and combined vague interventions, making them difficult to implement and inadequate for the lack of referral to DSH.

The treatment team met again on 4/28/16. The treatment plan remained unchanged, as did the treatment modifications in the Form 7388-B. However, the rationale for non-referral was modified and was adequate. The inmate was clinically discharged on 4/28/16. He returned to PBSP but was quickly returned to alternative housing and readmitted to the CHCF MHCB. The

inmate had reportedly clearly expressed to CHCF MHCB staff during his April 2016 admission that he was trying to avoid PSU placement. He believed that a DSH admission would allow him to indefinitely avoid the PSU.

The 5/5/16 and 5/12/16 treatment plans were much improved and appropriate. On 5/5/16 the treatment team chose not to refer him due to continued assessment, the presence of primarily Axis II traits and the inmate's high functional level. The treatment modifications were adequate. The Form 7388-B from 5/12/16 indicated that the inmate was not referred at that time, though he would be referred in "a few more days." However, the treatment plan indicated that he had been referred. According to the referral log, the inmate was finally referred to ICF level of care on 5/17/16, but the reasons for the referral were not indicated. There was a "0" entered in the referral log's "reason" column and no reason was provided in the treatment plan. The inmate had been documented as experiencing genuine anxiety related to his PSU sentence and impulsivity with poor coping skills was readily apparent. Review of the referral packet suggested that the inmate was referred due to impulsivity, poor coping skills and difficulty managing anger. This appeared to be an appropriate DSH referral.

Findings

While the inmate had not been adequately treated throughout all of his CHCF MHCB placements, he was ultimately appropriately referred to DSH. He was also appropriately *not* referred earlier. Had he received adequate treatment throughout all of his placements, he may have been able to tolerate the PSU environment and avoided the DSH admission. It should be noted that treatment planning did improve at CHCF during subsequent admissions. The documentation of care and tracking for this inmate was problematic and required improvement.

**Inmate C**

This 25-year-old MHCB inmate was selected for review because he had been identified on the non-referral log as meeting criterion five (three or more MHCB admissions in the last six months), but was not referred to DSH. The inmate was admitted to the CHCF MHCB on 5/13/16. He actually should have been identified on the non-referral log twice, on 5/16/16 and 5/23/16, but was only included once. This occurred because staff failed to recognize that the inmate met the objective criterion number five on that occasion despite noting two prior admissions in the body of the treatment plan. The inmate had a diagnosis of Schizoaffective Disorder and a provisional diagnosis of Adjustment Disorder with mixed anxiety and depressed mood.

This was the inmate's first prison term and he reported that he had been feeling very depressed with suicidal thoughts. He had been experiencing feelings of anger and anxiety and was upset because his family had not yet visited him in prison. He also reported a DSH hospitalization at ASH from 1/25/16 to 3/23/16 with family visitation. According to the healthcare record, the inmate was hospitalized at DSH, but there was no DSH discharge documentation in the record and it had not been requested by CHCF. The inmate was referred for ICF level of care, usually resulting in a longer length of stay; for this reason, the treatment records were of great importance for the treating staff in the determination of whether or not a higher level of care

744

would be beneficial.  Interestingly, on 3/30/16, the inmate told a clinician at CIM that he had not liked it at DSH because, "I'm not meant for a hospital."

The inmate's treatment plans dated 5/16/16 and 5/23/16 did not include appropriately written short-term treatment goals or interventions.  They also included a treatment goal for two weeks when the crisis bed length of stay was ten days.  All team members were inappropriately identified as responsible for all interventions.  While the goal for stress and anxiety reduction was the most well-written, it also required modification.  It also appeared from the treatment plan that the treatment team determined that the inmate would remain for another seven days, rather than daily evaluation and holding another treatment team meeting as needed when the inmate was stable enough for discharge.  It was quite problematic that the treatment plan was not changed when the treatment team decided to discharge the inmate on 5/23/16, since he would no longer be in the MHCB and the short-term goals and interventions were no longer appropriate given the discharge.  The rationale for MHCB discharge provided a far better justification for DSH non-referral than was provided on the Form 7388-B.

Findings

This inmate was appropriately not referred to DSH.  Treatment plans were not adequately constructed and available documentation indicated that the inmate was not adequately treated while in the MHCB.

**Inmate D**

This 64-year-old MHCB inmate's case was selected for review because he had been referred to DSH ICF level of care on 5/31/16, but remained in the MHCB as of 7/7/16.  It was unclear if he actually required ICF level of care or, since being in the MHCB, required DSH acute care.  The inmate was originally admitted to the CHCF MHCB on 5/15/16 from RJD after reporting suicidal ideation; he also had an episode of exhibitionism during ecstasy intoxication.  The inmate was experiencing significant depression and felt that he was at the "end of his rope" after 40 years in prison and learning that his mother was expected to die within six months.  He was provided with a diagnosis of Major Depressive Disorder.  He was prescribed sertraline.

Review of the healthcare record indicated that the inmate had actually been discharged from the MHCB and transferred to the RJD EOP hub since at least 6/15/16.  The data that indicated that he remained at the CHCF MHCB was produced from the CHCF DSH coordinator's separate database, not the CDCR referral log.  Treatment records from the CHCF MHCB indicated that the inmate had stabilized during his admission and had improved; he was no longer in crisis and could be maintained at the EOP level of care.  The treatment plans, particularly later plans of 5/24/16 and 5/31/16, were appropriate and indicated that the inmate was responding to treatment.

Findings

This inmate was appropriately referred to DSH ICF level of care and discharged from the CHCF MHCB once he stabilized and no longer required crisis care.  He was incorrectly included in the DSH coordinator's personal log as remaining in the CHCF MHCB.

**Inmate E**

This inmate was admitted to the MHCB on 4/8/16.  He was clinically discharged on 6/2/16 and physically transferred the following day.

This 41-year-old inmate was admitted to the MHCB on 4/8/16 due to suicidal ideation related to receiving bad news about his mother's health.  He reported the presence of chronic auditory hallucinations telling him to kill himself.  Admitting diagnoses were Schizoaffective Disorder and Avoidant Personality Disorder.  Medical problems included chronic glomerulonephritis and hypertension.

The inmate was referred to the APP on 4/28/16 and a discharge summary was written at that time.  However, due to the long wait list, he remained in the MHCB until his transfer on 6/3/16.  Another discharge summary, which was almost exactly the same as the 4/28/16 discharge summary, was written on 5/27/16.

Progress notes written by the inmate's PC and psychiatrist were useful and documented contacts within Program Guide time frames.  Notes by the recreation therapist were also written on a regular basis.

A treatment plan dated 4/9/16 provided a very reasonable case formulation.  Treatment plans were subsequently reviewed and revised on a weekly basis.  By 4/28/16 it was clear that the referral to the APP was appropriate.

Findings

Documentation and clinical contacts were consistent with Program Guide requirements.  However, out-of-cell time was very problematic as summarized in the body of the report entitled "MHCB."

**Inmate F**

This 59-year-old inmate was admitted to the MHCB on 6/14/16 and was clinically discharged on 6/22/16.  He was physically transferred two days later.  The inmate previously had an MHCB admission for five days beginning on 4/29/16.  This admission was precipitated by the inmate threatening others.  Diagnoses included Schizophrenia, paranoid type and dementia.

The initial psychiatric examination was completed within 24 hours of admission.  In addition to the previous diagnoses, Antisocial Personality Disorder was also diagnosed.  This note had a reasonable history, but did not specifically comment on the inmate's most recent admission in April 2016.

A history and physical examination was completed timely.  The Form 7388-B was completed and consideration for DSH transfer was documented.

746

Despite the referring physician diagnosing that the inmate had severe dementia, the 6/16/16 treatment plan did not address this diagnosis.

Subsequent notes by the psychiatrist and psychologist were documented timely, as was the discharge summary. Problems with the inmate's treatment included not addressing his dementia or considering issues related to his earlier MHCB admissions in the context of his current admission. An SRE was completed prior to discharge.

<u>Findings</u>

Program Guide requirements were being followed as to the frequency of clinical contacts. However, the treatment plan was problematic as it did not address the inmate's reported severe dementia or consider dynamics related to his two MHCB admissions within a six-week period.

**Inmate G**

This 30-year-old inmate was admitted to the MHCB on 4/20/16 due to being a danger to self. He was transferred to the DSH APP on 6/7/16. His diagnoses included Schizoaffective Disorder, Polysubstance Abuse and Fetishism.

On 4/26/16, consideration for the APP was documented and on 5/5/16, the inmate was referred to the APP.

The frequency of notes by the psychiatrist, psychologist and recreation therapist were within Program Guide requirements. Multiple Form 7388-Bs were completed. A 6/2/16 psychiatric discharge note was present in the healthcare record.

<u>Findings</u>

The major problem with this inmate's treatment was his prolonged stay in the MHCB due to the wait list for APP.

**Inmate H**

This inmate was admitted to the MHCB on 5/6/16. He was clinically discharged on 5/16/16 and physically transferred on 5/17/16.

On 5/7/16, the inmate initially refused a psychiatric examination, but subsequently participated in one later that same day. There was a history of a very recent MHCB admission. This 27-year-old man was willing to speak to the psychologist, who dictated an admission note. The precipitating factors for admission included the presence of auditory hallucinations and suicidal ideation. His presentation was consistent with a diagnosis of Schizoaffective Disorder.

A history and physical examination was completed timely. Clinical contacts with the psychiatrist and psychologist were also timely and consistent with Program Guide requirements.

The 6/9/16 treatment plan was clinically appropriate and included completion of the Form 7388-B.

Prescribed medications included Buspar, Depakote, Remeron and Geodon.  The inmate's treatment appeared to focus on substance abuse issues and medication management.

Discharge to an EOP was discussed during his 5/11/16 appointment with the psychiatrist.  A 5/15/16 SRE was consistent with a moderate chronic risk related to the inmate's family history of suicide.  The 5/16/16 IDTT plan was to discharge him to the EOP; a discharge summary was completed that same day.

<u>Findings</u>

This inmate benefitted from his treatment in the MHCB.  He appeared to have received appropriate mental health care.