# Exhibit D

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN
GAY C. GRUNFELD

JANE KAHN[2]

**ROSEN, BIEN & GALVAN, LLP**
ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com
www.rbg-law.com

HOLLY BALDWIN
LISA ELLS
ELIZABETH H. ENG
MARK R. FEESER
SHIRLEY HUEY[3]
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
BLAKE THOMPSON
KENNETH WALCZAK[5]
AMY WHELAN
SARAH O. ZIMMERMAN[5]

June 26, 2009

VIA EMAIL AND REGULAR MAIL

Mohamedu F. Jones, Esq.
9900 E. Greenbelt Road, #182
Lanham, MD 20706-2264

Jeffrey L. Metzner, M.D.
3300 East First Avenue, Suite 590
Denver, CO 80206

Re: *Coleman v. Schwarzenegger*
Staffing Allocation Plan Mental Health Care
Our File No. 0489-3

Dear Mohamedu and Jeff:

This letter provides Plaintiffs' counsels' comments regarding the staffing plan ordered by the Court on June 18, 2009 (Docket No. 3613). Specifically, the Court ordered that Defendants shall develop, under the guidance of the Special Master, a staffing plan by August 2009 "following the model that was used to develop activation schedules and the short-term and intermediate plan before the court." *Id.* at 2:24-3:2. Plaintiffs' counsel recommends that the staffing plan developed by Defendants, with the assistance of the Special Master, utilize the Workload Model created by Business Advantage Consulting in June 2007. Defendants worked with the consultant to develop this model over a period of a year and half from January 2007 through June 2008. Although the consultant delivered the model early in that period, in June 2007, Defendants extended the term of their contract specifically for the purpose of allowing the contractor to transfer the knowledge of how to use the tool for future staffing allocations based on changed circumstances or assumptions. That is precisely the task at hand now. It would be irresponsible to throw out the tool, and set the process back a year or more to develop a new one. Plaintiffs received a large volume of information about the Workload Model in discovery in the three-judge panel action, from Defendants and from the consultants. Where pertinent, we attach relevant documents to this letter to demonstrate that the Workload Model was intended for on-going use, and to allow

[1]MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2]OF COUNSEL
[3]MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4]MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5]MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

[302317-6]

Defendants to factor in changed circumstances and assumptions without starting from scratch.

Defendants themselves appear to endorse this Workload Model in the most recent version of the Program Guide, where they state that "[s]taffing for all programs is based on the Mental Health Staffing Workload Study, completed June 2007, which allocates both clinical and clerical support staff whom perform duties related to the provision of mental health services." MHSDS Program Guide, 2009 Revision at 12-1-10.

**1. The Workload Study Model Remains a Viable Tool for Projecting CDCR Mental Health Staffing Needs**

In September 2007, Business Advantage Consultants provided Defendants with the Mental Health Staffing Workload Study Staffing Model Manual ("Workload Manual"), attached hereto as **Exhibit A.** The Workload Manual notes that the Workload Study was based on an Excel model "designed and developed to be as durable and flexible as possible ...." Exhibit A (Workload Manual) at 3. Accordingly, the model includes both "data input interfaces as well as output reporting methods." *Id.* Specifically, the model allows various assumptions and driver metrics to be changed in the model with the flexibility to use both system-wide and institution-specific criteria in a single interface. *Id.* Additionally, the "mathematical calculations performed by the model are clearly shown in the Excel formulas, and can be viewed any time to observe the underlying calculations." *Id.* Finally, it is also possible to adjust the time estimates for tasks and subtasks in the model. *Id.* at 10.

Plaintiffs' counsel received a version of the Workload Model during discovery in the overcrowding trial. Despite the relative complexity of the Workload Model, the Workload Manual is concise and easy to follow. Using the Workload Manual and these spreadsheets, Plaintiffs' counsel were able to operate the version of the Workload Model obtained in discovery and have gained an understanding of how the model works.[1] As described in the Workload Manual, the model functions by utilizing a single Excel spreadsheet which contains the assumptions and drivers (including population counts, number of beds, treatment standards) which are linked to 33 institution-specific

[1] The version of the model provided to Plaintiffs' counsel in discovery was last modified in January 2008, and appears to be a slightly modified version of the Workload Model utilized to prepare the projections cited in the June 2007 Workload Study. A comparison of the standard assumptions described beginning on page 172 of the Appendix to the Workload Study (see Exhibit E attached hereto) reveals that several standard assumptions and drivers had been changed. However, the model itself appeared to function with the various spreadsheets updating as described in the Workload Manual.

spreadsheets.[2] The institution-specific spreadsheets are linked to and incorporate the data in the input spreadsheet and calculate staffing levels at each institution based on the assumptions and drivers in the input spreadsheet. Adjustments to time estimates for tasks and subtasks are entered into the institution specific spreadsheets. Finally an output spreadsheet is linked to each institution specific spreadsheets and provides summary data that is cross-referenced in pivot tables by program module, institution, and position.

The Workload Manual accurately describes the ease with which the assumptions and drivers can be adjusted, noting:

> In most cases, a field of data has to be entered only once. In cases where a field typically has the same value for all institutions, you can enter the value only once – then, for each institution, you can accept the standard assumption, or you can override it with a site-specific value. For example, "Weekly Group Hours" typically is 1.5 within CCCMS GP for all institutions, and 0.75 within CCCMS Ad Seg for all institutions. Instead of entering these values 33 different times, you can simply enter them once. Then if you need to apply a site-specific value for one or more particular institutions, you can easily do this override, without affecting the standard assumption for all other institutions.

Exhibit A (Workload Manual) at 3.

> Standard assumptions can be module-specific. For example, notice that Medication Reevaluation Days (row 25) is set to 90 days as the standard for CCCMS GP modules, and 30 days as the standard for CCCMS AD-SEG modules.

*Id.* at 7.

The Workload Model remains a viable tool that is easily updated to reflect current population levels, program guide requirements, and other assumptions and drivers. Plaintiffs' counsel concurs with the Special Master's prior assessment of July 12, 2008, described in more detail below, that the Workload Model "appears to be completely functional and adaptable to any changes within MHSDS." Accordingly, the majority of

[2] The version of the Workload Model provided to Plaintiffs' counsel incorporates a second staffing input spreadsheet, which is linked to the 33 institutional spreadsheets.

the concerns raised by the Special Master and Plaintiffs' counsel below with regard to the Workload Model can be easily fixed.[3]

While Plaintiffs, Defendants, and the Special Master may have legitimate disputes about the proper assumptions and drivers that serve as the inputs to the Workload Model, these disagreements should not serve as an excuse to disregard the Workload Model and return to the drawing board. This is particularly true given the substantial amount of time and expense that was exerted to develop this model and the urgent need to develop accurate and credible projections in order to quickly obtain necessary funding to achieve constitutional treatment of *Coleman* class members.

**2. Background of Prior 2005 and 2007 Staffing Allocation Studies**

On March 7, 2005, the Court ordered Defendants to "include in the FY 2005-2006 budget a request for sufficient clinical staff at CSP/Corcoran to provide the mental health services required in the revised program guides for MHSDS caseload inmates in the administrative segregation unit and the SHU at said institution." Docket No. 1654 at 3:12-15. In response to this order, Defendants conducted an internal study to assess necessary staffing levels in light of program guide standards. The results of this study indicated that an additional 822 new permanent positions were needed, which was later reduced to a budget request for 547.5 positions. *See* Special Master's Supplemental Report on the Status and Sufficiency of the Defendants' Budget Requests for Staffing to implement the Revised Program Guide, filed 7/28/2006 (Docket No. 1921-1). The Special Master recommended that the Court order funding for 530 positions along with the requirement that Defendants complete a workload study in time for funding the positions as part of the next budget cycle. 7/28/06 Special Master's Report at 15.

On August 1, 2006, the court ordered CDCR to ". . . execute and complete a workload study in time to include its findings and recommendations in the FY 2007/08 budget." Docket No. 1929. In response to these Orders, during the summer of 2006, SB 518 was enacted "mandating that the CDCR execute and complete a workload study of the staffing requirements necessary to deliver the level of care outlined in the MHSDS Revised Program Guide." P-183 at DEFS014448 (CDCR Finance Letter for Fiscal Year 2008/09).

[3] The principal consulting firm, Business Advantage Consulting, is still active. CDCR's Project Manager at Business Advantage Consulting (BAC) is Elizabeth Figueiro-Steinbrueck. Plaintiffs' counsel confirmed today that Ms. Figueiro-Steinbrueck is still consulting for BAC and is available to be contacted. She can be reached through their main number, 916-932-7181. We have additional contact information for her, which we can provide to the Special Master. The principal CDCR contact appears to have been Michael Barks, Health Program Specialist, Clinical Policy, Program, & Project Coordination, 916-445-0832.

CDCR subsequently contracted for a Mental Health Staffing Workload Study, which was conducted by Business Advantage Consulting and Phase 2 Consulting ("Workload Study Consultants"). The initial contract with Business Advantage Consulting ran from January 4, 2007 to June 1, 2007, at a maximum cost of $778,952. *See* Business Advantage Consulting, First Contract, attached hereto as **Exhibit G**. The contract provided, *inter alia*, for a one-time assessment of staffing ratios and a report on staffing needs along with a recommendation for a future tracking system and methodology for projecting staffing needs. *Id.* at Bates No. BAC 000005-000010.

On June 21, 2007, the contract was extended for 13 months and added the task of providing a "written instruction guide on how to operate, update and maintain the mental health staffing model," and to provide training and support to DCHCS staff "so that CDCR may operate, update, and maintain the mental health staffing model on a consistent and reliable basis." Amendment to Business Advantage Consulting Contract, attached hereto as **Exhibit H**, at Bates No. BAC 000107. Under the amended contract, Business Advantage Consulting was required to provide support from June 1, 2007 through June 30, 2008, with Business Advantage Consulting making needed model changes for the first 7 months with DCHCS employees shadowing them to learn the model, and with DCHCS employees making the changes for the remaining months with Business Advantage Consulting reviewing and validating the changes. The amended contract provided for an additional $90,000 payment, increasing the total cost to $868,942.00. *Id.* at Bates No. BAC 000099.

In June 2007, the Workload Study Consultants completed development of the Workload Model and submitted the Workload Study to CDCR. In total, the study represented 9,000 hours of work during the first five months of 2007. Mental Health Staffing Workload Study, June 2007, Field Staffing Levels and New Ratio Guidelines Deliverables 1, 2 and 3, at 4 ("Workload Study"). The Workload Study reports that its purpose was to (1) "[a]ssess the impact of staffing needs . . . based on the guidelines set forth in the Revised Program Guide and recommend standardized staffing sufficient to provide timely access to Constitutionally adequate mental health care services;" (2) "[p]rovide an alternative, workload based, staffing model using a transparent and defensible methodology sufficient for evaluating and validating" the then existing staff-to-patient ratio approach; and (3) develop the model in such a way that it could provide a "usable and durable model" to serve DCHCS in the future and take into account population and program volume changes as well as changes to mandated levels of care. *Id.* at 1-2. The Workload Study, however, did not address the corresponding need for custodial staff, including Correctional Counsel and Custody Officer positions, which as

described below, were the subject of a separate workload assessment by a separate contractor. *Id.* at 22-24.

The Workload Study concluded that clinical staffing needed to be increased by over 400 positions for a total of 3,117.66, an increase of 14% over the existing staffing in January 2007. *Id.* at 5. The key recommendations of the Workload Study were the following:

**a.** Base Staffing – the appropriate clinical base staffing was estimated to be 2,402.5 positions. Workload Study at 5. This base staffing level contained a different mix among the various clinical positions as compared to then current staffing allocations. For example, the number of Chief Psychologists and Psychiatrists increased from 45 to 55, the number of Senior Psychiatrists and Psychologists from 139.6 to 199.56, and the number of Psych Techs from 540.56 to 783.71. In contrast, the number of psychologist/case managers decreased from 904.99 to 849.15.

**b.** Relief Factors for Vacations, Training and Sick Leave – In addition to the base staffing level, an additional 532.43 positions, known as "indirect positions" were required to provide coverage for vacations, sick time, training, and other administrative activities.

**c.** Additional Staffing Factor for Custody Issues – A further 182.73 positions were required to account for additional time necessitated by lockdowns, transportation, and security. *Id.* at 5.

**d.** Headquarters Staffing – An additional 9.5 positions needed. *Id.*

**e.** Ancillary Problems – The report identified staffing-related problems that must also be resolved, including "recruitment, technology, and space." *Id.* at 6.

In or around September 2007, the Workload Study Consultants provided Defendants with the Workload Manual. Additionally, Defendants were invoiced for over $70,000 between September 2007 and April 2008 for support and "Staffing Model Instruction Guide & Training." Invoices attached hereto as **Exhibit B.**

### 3. Special Master's Comments to Workload Study

On July 12, 2008, Special Master Matthew A. Lopes, Jr. submitted comments to Defendants regarding the Workload Study. P-485, a copy of which is attached hereto as **Exhibit C**. The Special Master credited the Workload Study Consultants for a "thorough and detailed analysis of the mental health staffing needs." *Id.* at 1. However, the Special Master noted that "given the dynamic nature of mental health care within CDCR

institutions and the resulting ongoing evolution of staffing needs, it is important to keep in mind that, of necessity, a meaningful Workload Study must be a work in progress." *Id.* The Special Master reviewed the information and assumptions used in the Workload Study and interviewed the Workload Study Consultants and CDCR staff between April 24, 2008 and June 5, 2008. *Id.* at 5-6. Accordingly the Special Master's letter detailed concerns with the workload study, including:

a. **Productive Minute Values Were Unreliable and Not Based on Objective Measures** *Id.* at 6-9 – The minute values assigned to each task in the model were estimates by DCHCS staff or developed by the Workload Study Consultants and then refined during site visits. However, the validation did not include direct observation of any task or any actual measurement. Further, the Workload Study Consultants acknowledged the time frame imposed by CDCR to complete the Workload Study restricted their ability to conduct a more thorough approach. The Special Master noted the following specific concerns:

   i. Whether time is allocated for filling out CDCR forms summarizing evaluations in CCCMS Clinical Intake Assessments;

   ii. Whether time allocated to Institutional Staff Interview is sufficient to determine adaptive functioning and additional observation or cell side visits. in CCCMS Clinical Intake Assessments;

   iii. No time allocated for C-File review, as required by the Program Guide for CCCMS or EOP Clinical Intake Assessments;

   iv. Frequency of tasks based on minimal Program Guide Requirements and do not account for emergencies that may arise. For example, there are no provisions for CCCMS case management contact at intervals less than 90 days while Program Guide requires "as clinical needs dictate but at least once every 90 days";

   v. Whether time is allocated for UHR review for CCCMS Medication Evaluation and Management;

   vi. The time for EOP intake is the same as for CCCMS, but should be longer;

   vii. Severe restriction on time for collection of collateral information in EOP intake assessment;

   viii. Whether time is allocated for completion of EOP Mental Health Intake evaluation form;

   ix. Whether time included for visits by case managers for emergencies.

---

**b. Indirect Time** – The study includes an indirect factor to account for time not specifically documented in the Program Guide but necessarily part of the workday. *Id.* at 9. The factor used was 23 percent, which is designed to account for vacation, sick, holidays, bereavement, in-service training, meetings, and continuing education. However, there was no empirical evidence as to how the percentage used was calculated. Additional factors that may also impact the indirect time factor are:

i. Administrative activities;

ii. Training;

iii. Quality assurance, peer review and other professional activities;

iv. Other court mandates and reporting requirements;

v. Forensic reports.

**c. Program Guide Revisions and Court Ordered Plans** – The workload study did not take into account any Program Guide revisions or Court Orders after January 2007. *Id.* at 9-10. Unaccounted for tasks include:

i. Program Guide Revisions

1. Mental health assessments for indecent exposure (Program Guide)
2. Production of MHTS inmate profiles which track suicide history (Program Guide);

ii. Court Ordered Plans

1. EOP-ASU HUBs to charter weekly QIT to ensure out of cell time and treatment in EOP-ASU maintained
2. Reception Center EOPs to be seen weekly by case managers and those with release dates within 60-120 days to be identified and treatment plan written for re-entry needs
3. CCCMS RVR process modifications based on pilot procedures
4. Reception Center EOP Program requirement that EOPs be provided with a minimum of one hour per day, five days per week of out-of-cell therapeutic activities and shall be evaluated by a psychiatrist at least monthly.

d. **Key Assumptions** – Key assumptions driving the Workload Study recommendations were developed through the mental health tracking system, interviews with administrative staff, and discussions with site clinicians. *Id.* at 10. The Special Master noted that some of the key assumptions warranted further review, including:

i. CCCMS patients taking medication was assumed to be 30 percent. A survey of four institutions indicates the actual percentage is closer to 80 percent. An increase in this assumption to 85% increased the staffing allocation at one institution by eleven positions;

ii. Tasks being reassigned driven by financial considerations that may not ensure proper care is provided. This has the effect of understating certain positions while overstating others;

iii. Percentages of CCCMS and EOP inmates that discharge to CDCR and DMH programs;

iv. Percentage of time MHCB inmates spend in restraints;

v. Percentage of MHCB inmates requiring psychometric testing.

*Id.* at 10-11.

Despite the concerns cited above, the Special Master concluded that the Excel based model "appears to be completely functional and adaptable to any changes within MHSDS. This spreadsheet is a working model that can be expanded and adjusted for any changes in staffing, population, and programming within MHSDS . . . . This . . . spreadsheet appears to function in a manner that allows the CDCR to arrive at accurate projections for staffing needs." *Id.* at 11. The letter concluded with a series of recommendations to address the concerns raised, including (1) a thorough review of key assumptions to verify accuracy, (2) a review of clinical activities to develop activity grids encompassing all tasks assigned to mental health staff including recent Program Guide revisions and court orders, (3) a review of the modules to insure identified subtasks are consistent with Program Guide Requirements, (4) validation of minutes values, and (5) that CDCR should conduct reviews of staffing twice per year utilizing the Workload Model with *Coleman* expert involvement in the process. *Id.* at 12.

**4. Additional Points of Consideration to Consider in Assessing Staffing Allocations**

In addition to the concerns raised by the Special Master's July 12, 2008 letter regarding the Workload Study, Plaintiffs identify the following additional considerations

that should be fully incorporated into the Workload Model or any other tool utilized by Defendants to assess staffing allocation levels.

a. **Custody Staffing Positions Not Included in Workload Study** – Staffing allocations must include not only clinical but custody, office, clerical, pharmacy and medical records staff. The Workload Study conceded that Business Advantage Consultants had been unable to validate the current Correctional Counselor (CC) and Custody Officer (CO) staffing numbers supporting mental health program missions. Workload Study at 22. Failure to include custody staffing undermines access to care as custody escorts are usually required to escort prisoners to group therapy, individual treatment, and yard time. For those mentally ill prisoners housed in ASU, CDCR policies require that they be cuffed and escorted to all group and individual therapy sessions, and to outside yard. CCs play a critical role in treatment team meetings, and in unit and classification committee hearings where housing and transfer decisions are made about these prisoners.

The Workload Study indicates that in 2007 CDCR engaged CPS, Inc., an outside contractor, to review, analyze and recommend the appropriate ratio for CCs. *Id.* at 23. While this study was not solely focused on the mental health CC mission, the results of this study, which Plaintiffs have not yet received, should be considered. Similarly, the Workload Study notes that DCHCS had recently presented a BCP regarding CO positions to meet its mission for dental care, requesting an additional 190 CO positions. *Id.* Defendants' 2005/06 budget request provides additional support for needed CC and CO positions, indicating custody staffing ratios for various levels of care including one custody escort for every 60 CCCMS ASU/SHU prisoners. CDCR Spring Finance Letter, Health Care Services Division, FY 2005-06, Coleman Guidelines to the MHSDS, at 20, attached hereto as **Exhibit I.**. Finally, in determining the need for additional CCs and COs, Defendants and the Special Master should coordinate with the *Plata* Receiver's custody access assessment and implementation. *See* Receiver's 11th Tri-Annual Report, 6/1/09 at 18-20 (Docket No. 3595-1).

b. **DMH Staffing Positions Not Included in Workload Study** – DMH staffing for acute and intermediate hospital beds will be a crucial part of achieving constitutional compliance in this case. The June 18, 2009 Order requires that staffing for DMH programs for the *Coleman* class also be addressed at this time. Order, 6/18/09 at 2 (Docket No. 3613). Defendants have previously provided information about DMH staffing ratios to the Court. On April 7,

[302317-6]

2006, Defendants submitted to the Special Master, the Fifth Report on Status of Mental Health Bed Plan, a true and correct copy of which is attached hereto as **Exhibit D**. Enclosure II to this report provides estimated costs and positions for various capital outlay projects, which provide a useful baseline of staffing ratios required for DMH staff. Enclosure II indicates that DMH staffing ratios for Acute Beds are approximately 1.77 positions for each bed (350 Acute beds at SAC requires 620.0 DMH clinical positions), and Intermediate care beds require staffing ratios between 1.34 (128 beds at SAC requires 198.0 DMH positions) and 1.5 positions per bed (128 beds at SVSP requires 174 DMH clinical positions).[4] *See* Exhibit D, Enclosure II at 4 (13 of 22 of pdf). Significant additional custody staff were also requested based on then current ratios. *Id.* at 5 (14 of 22 of pdf). These prior staffing plans provide a starting point for the present analysis. Plaintiffs urge that the staffing analysis for DMH programs also take into account the decision by the Receiver to end the use of MTAs in CDCR medical care. *See Plata* Reciever's Third Bi-Monthly Report, 12/5/06, at 3 (*Plata* Docket No. 581). The DMH programs at CMF and SVSP are the only remaining health care programs in CDCR to make use of this classification which is a mixture of custody officer and LVN. DMH hospitals operated outside of the prisons, such as Atascadero, Patton and Coalinga, use psychiatric technicians to perform the functions that MTA's perform at the DMH programs in the prisons.

c. **Indirect Time** – The Workload Model appropriately includes an indirect factor to account for vacation, sick days, and other time not specifically documented in the Program Guide but necessarily part of the workday. Any staffing allocation methodology must incorporate this factor. The factor may need to be increased from the level used in the Workload Study to account for additional duties resulting from both *Coleman* and other legal requirements, including training, evaluations for the Board of Parole Hearings, and pre-release planning.

d. **Program Guide and Court Ordered Standards** – As noted by the Special Master, the Workload Model does not fully incorporate revisions to the Program Guide or Court Orders. Plaintiffs agree that the Workload Model should be changed to reflect current Program Guide Standards and all Court Orders.[5] Further, it should be clarified that most CDCR institutions are not

[4] The difference in staffing ratios for Intermediate care beds described in Enclosure II is partially attributable to staffing existing versus expanded facilities. *See* Transcript of 4/27/06 Bed Plan Hearing at 104.
[5] For example, it is not clear whether the Workload Model fully accounts for the Court's October 24, 2001 Order adopting the Special Master's recommendations in his eighth interim monitoring report, including the recommendation that, "Within ninety days from this order defendants shall meet the staffing ratio of one case

currently able to meet a significant number of key Program Guide Standards. Changes to Program Guide Standards, changes in the designated clinicians responsible to perform certain tasks,. or the introduction of new types of clinicians in to the MHSDS should not be undertaken in this brief period available to develop the staffing plan.

e. **Program Guide Staffing Does Not Mean Staffing to Meet the Minimum** – As noted by the Special Master, staffing allocations must be designed to permit the range of clinical treatment options set forth in the Program Guide, not just the lowest cost option. In addition to the example cited by the Special Master, and described above, nearly every level of care requires case management or other mental health care provider contact at a minimum time frame or more frequently as clinical needs dictate. *See e.g.*, MHSDS Program Guide, 2009 Revision at 12-8-10 (SHU CCCMS); 12-7-10 (EOP-ASU); 12-4-9 (EOP). Accordingly, additional time must be built into the assumptions to provide sufficient staffing to allow clinicians to have more frequent contact with prisoners when clinically indicated. Further, the assumptions must account for the need for clinicians to exceed Program Guide standards where clinically appropriate, such as where the clinician determines it is necessary to continue beyond the 5-day follow up treatment plan and custody wellness check required following MHCB discharge. *Id.* at 12-10-19.

f. **Staffing Must Take Into Account Physical and Custodial Limitations at Each Institution** – This includes shortages of treatment space (which may require use of treatment rooms on nights and weekends), extra time to review medical records stored offsite from reception areas, missed appointments due to lockdowns, and other issues associated with overcrowding. The need to assess actual physical and custodial limitations is particularly necessary where existing facilities are retrofitted for a given level of care as part of Defendants' Short and Intermediate-term bed plan. Retrofitted facilities may not have sufficient access to treatment space, requiring augmented staffing, both custody and clinical, to meet basic program needs.

g. **Allocation of Various Levels of Staff** – As noted by the Special Master, certain tasks are reallocated by the Workload Model based on financial

manger for every nine enhanced outpatient (EOP) inmates in hub administrative segregation units and defendants shall maintain said staffing ratio thereafter." 10/24/01 Order (Docket No. 1309) at 1:21-23. This staffing order was incorporated into the 2006 Program Guide Staffing Table (Attachment A6) with a note that: "The case manager ratio is mandated by a Coleman court order." *See also* MHSDS Program Guide, 2009 Revision, Chapter 10, Suicide Prevention and Response; Chapter 7, Administrative Segregation (describing daily round requirements).

considerations. The assumptions driving the reallocations of staff must be thoroughly reviewed to ensure that the tasks are performed by qualified staff and in compliance with the Program Guide standards. For example, the distribution of group therapy workload among the three position classifications that deliver group therapy (case managers, LPTs, and Recreational Therapists) varies among levels of care and significantly impacts the number of staff at each position. Appendix G – Key Assumptions by Module, Mental Health Staffing Workload Study Final Report Appendices, June 2007, at 171-199, which summarize the operative assumptions used for the projections included in the Workload Study, attached hereto as **Exhibit E**. Note that the assumptions in the workload study indicate that, across the board, the case manager psychologist percentage is assumed to be 0%. This assumption should be closely scrutinized to ensure that the appropriate level of care can be provided in the absence of psychologists participating as case managers. Indeed, even the Program Guide defines the primary clinician as including psychologists. *See* MHSDS Program Guide, 2009 Revision at 12-3-17. In fact, there are no psychologists at all allocated in the EOP programs, including the HUB and PSU programs. Was the decision to remove this clinical category from all of the EOP programs, and as case management for all MHSDS prisoners made by CDCR Clinical Leadership? Do the experts agree with this clinical staffing reallocation? Finally, in all of the mental health programs, 25% of the clinical positions will be "unlicensed" clinical positions. Plaintiffs object to these clinically unsupported changes in PG Standards and existing clinical practice.

h. **Other Key Assumptions** – As noted by the Special Master, the Workload Study assumed that only 30% of CCCMS patients were receiving medication, which underestimates the actual number, which may be closer to 80 or 85%. Similarly, the assumed percentage of EOP patients on medication appears to be understated, showing only 85% of EOP patients on medication. Exhibit E at 183-190. Plaintiffs' counsel request that the Special Master's experts review this assumption at one or two of the EOP programs, as it seems low for this population. As the Special Master demonstrated, adjusting these assumptions can significantly increase the number of staff required.

i. **Projections Developed Should be Assessed Based on Ability to Meet Program Guide Standards** – If the staffing allocation methodology does not indicate additional positions are required or that a reduction in staffing is indicated, yet the institution is currently unable to meet Program Guide Standards, the projections must be reassessed. The Workload Study included an

institution-by-institution gap analysis. The institutional gap analysis for Corcoran, attached hereto as **Exhibit F**, shows a net decrease of 39.95 positions, primarily nursing and case/manager psychologist positions. These projections may be corrected as a result of a review of the key assumptions and staffing mixes as described in g. and h. above. However, if the net reduction in positions is not adjusted by the review of the key assumptions and staffing mixes, Plaintiffs object to any staffing reductions at this time until Defendants have shown an ability to meet Program Guide Standards. What has not been factored into the staffing plan, but which necessarily impacts on the delivery of mental health services is the degree of overcrowding within CDCR prisons. Unless and until the severe level of overcrowding within CDCR is remedied, staffing allocations based upon models that do not factor in severe overcrowding will not realistically remedy the constitutional violations in mental health care.

**5. Conclusion**

Plaintiffs' counsel recommends that the staffing plan developed by Defendants, with the assistance of the Special Master, utilize the Workload Model created by Business Advantage Consulting in June 2007, taking into account concerns raised by the Special Master and Plaintiffs' counsel, described above. The Workload Model remains a viable tool that may be easily updated to reflect current population levels, program guide requirements, and to adjust other key assumptions and drivers. Utilizing the Workload Model and addressing the concerns raised above provides the quickest and clearest path to develop accurate and credible staffing projections in order to achieve constitutional treatment of *Coleman* class members.

Please feel free to contact us if you have any questions regarding these comments on staff allocation planning to be developed by Defendants under the guidance of the Special Master. We appreciate the opportunity to provide this input to the process. In addition, we will provide, upon request, access to any additional information about the

Work Load Study and Workload Model that Defendants or the Special Master requests.

Very truly yours,

ROSEN, BIEN & GALVAN, LLP

Michael W Bien (EG)

By: Michael W. Bien

MWB:mrf
Enclosures
cc: Special Master Matthew A. Lopes, Jr. (via U.S. Mail and email)
Debbie Vorous, DAG (via email only)
Jeff Steele, DAG (via email only)
Coleman Co-counsel (via email only)