1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   RALPH COLEMAN, et al.,                    No.  2:90-cv-0520 KJM DB P

12              Plaintiffs,

13        v.                                   ORDER

14   EDMUND G. BROWN, JR., et al.,

15              Defendants.

16

17

18          At a special status conference on February 14, 2018, this court issued a bench

19   order requiring defendants to provide six months' notice prior to filing any motion to terminate

20   relief in this action.  ECF No. 5783.  The reasons for that order are explained below.

21   I.     BACKGROUND

22          A.    Prior Termination Motion

23                In January 2013, defendants filed a motion to terminate this action.  ECF No.

24   4275.  The motion was supported by two reports prepared by experts who were hired by

25   defendants "in anticipation of filing" a termination motion.  April 5, 2013 Order, ECF No. 4539

26   at 13.  These defense experts toured the prisons and spoke to class members without notice to

27   plaintiffs' counsel.  *Id.* at 10.  The court found defendants had violated California Rules of

28   Professional Conduct 2-100 "in having [their] experts conduct these ex parte interviews with

represented class members, especially since those interviews were used against plaintiffs in support of defendants' Termination Motion." *Id.* at 20-21.

Moreover, defendants' termination motion was denied in substance in an order that made clear the motion was premature. The court found ongoing constitutional violations in the area of suicide prevention, *id*. at 32-43, mental health treatment for class members in administrative segregation, *id*. at 43-46, access to mental health crisis beds, *id.* at 51-53, available treatment space and mental health treatment beds, *id*. at 53, and mental health staffing levels, *id.* at 54-62. In addition, the court found that although gains in timely transfer to inpatient care had been made, those gains were "new and work remain[ed]." *Id*. at 50. As became evident two years later, those gains were not sustained. *See* August 21, 2015 Order, ECF No. 5343. Only since September 13, 2017, and faced with the prospect of a contempt hearing, *see* April 19, 2017 Order, EFC No. 5610, have defendants consistently had no class members waiting past Program Guide timelines for transfer to inpatient care. *See* ECF No. 5715 at 2; *see also* ECF No. 5789 at 2. It is significant and encouraging that for five straight months all class members in need of inpatient care and not subject to exceptions developed by the parties have been transferred to inpatient care within Program Guide timelines.

B.      October 10, 2017 Staffing Order

On October 10, 2017, the court ordered defendants, within one year, to "take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." October 10, 2017 Order, ECF No. 5711 at 30.[1] The October 10, 2017 order followed years of "extensive remedial efforts undertaken in an effort to address inadequate mental health staffing levels," described in a February 6, 2017 report on staffing filed by the Special Master, ECF No. 5564 (hereafter Special Master's 2017 Staffing Report), *id*. at 2. As the court explained in the October 10, 2017 order,

---

[1] The court issued two orders on October 10, 2017. One, ECF No. 5710, resolved three issues raised by the parties concerning the timeline for transfer to mental health crisis bed (MHCB) care. The other, ECF No. 5711, governs the staffing issues addressed here.

> [s]ince 2010, necessary mental health staffing levels have been
> determined by staffing ratios contained in a staffing plan developed
> by defendants in response to an order filed June 18, 2009, as part of
> a coordinated effort to plan for, develop and activate mental health
> beds sufficient to meet short-term, intermediate and long-range
> need. *See* ECF No. 3613, *passim*. The staffing plan (hereafter
> 2009 Staffing Plan, was filed September 30, 2009, ECF No. 3693,
> and approved by the Special Master on March 4, 2010. *See* ECF
> No. 5564 at 31-32. The plan provides staffing ratios for the
> programs at each level of defendants' Mental Health Services
> Delivery System (MHSDS) and other ancillary programs. *See* ECF
> No. 3693 at 12-33.

ECF No. 5711 at 3.

In objections to the Special Master's 2017 Staffing Report, ECF No. 5591, defendants suggested it was "time to reevaluate the need and feasibility of" what they described as "outdated staffing ratios from the 2009 staffing plan. . . ." ECF No. 5711 at 12 (quoting ECF No. 5591 at 4). In the October 10, 2017 order, the court addressed that objection and, without fully rejecting defendants' proposal to reevaluate staffing ratios, significantly narrowed its scope, based on the following findings.

First, the court determined the focus of defendants' objection was staffing ratios for psychiatrists, and not, more broadly, all mental health staffing ratios. *Id*. at 12. Second, defendants had not, as required by a prior court order, "presented either the Special Master or this court with a specific proposal for new staffing ratios" nor had they satisfied the necessary prerequisite of obtaining the Special Master's approval for any such revision. *Id*. at 14. Finally, the court made clear that "defendants face a heavy burden in attempting to persuade either the Special Master or this court that the staffing ratios for psychiatrists should be revisited." *Id*. As the court explained, this heavy burden is based largely on findings made in the April 5, 2013 order denying defendants' termination motion, including findings that the mental health staffing levels that preceded implementation of the operative staffing plan were constitutionally inadequate, *id*. at 14 (quoting ECF No. 4539 at 25-26); that in seeking funding to implement the 2009 Staffing Plan defendants represented to the California Legislature that the staffing levels in that plan were "appropriate . . . to meet constitutional standards," *id*. at 15 (quoting ECF No. 4539 at 54-55); and that defendants had not shown how they could achieve constitutional levels of

3

mental health staffing by "retreating" from the staffing levels required by the 2009 Staffing Plan. *Id*. at 15 (quoting ECF No. 4539 at 61 n.47).

The court found defendants had "not even begun to show why" the findings in the April 5, 2013 order should be revisited. *Id*. at 17. Defendants' heavy burden was "compounded by the fact that for most programs the 2009 Staffing Plan increased the caseload for prison psychiatrists," *id*., and by the fact that defendants had not requested a change in psychiatrist staffing ratios in 2014, when the court ordered them to revisit and, if appropriate, revise their 2009 Staffing Plan to come into compliance with the Eighth Amendment. *Id*. at 19. In sum, the court found that defendants' request could "only be construed as a request to increase the existing caseload of prison psychiatrists" and there was "scant evidence in the record to suggest this change would advance remediation of the Eighth Amendment violation in this case; rather, there is strong evidence that such a change would slow progress toward the end of federal court oversight." *Id*. at 19.

In its October 2017 order, the court did leave room for defendants to "rais[e] with the Special Master the issue of whether full implementation of" a new psychiatric medical assistant (PMA) program might support changing psychiatrist staffing ratios, though it was and is "skeptical that full implementation of the PMA program will justify increasing the caseload of prison psychiatrists." *Id*. The court was clear that the issue had to be raised, if at all, so that it could "be resolved by the Special Master and presented to the court within" the one year period set for "resolution of all outstanding issues related to mental health staffing and achievement of adequate mental health staffing levels." *Id*.

C.    Consultant Tours

At some point, defendants retained consultants to "help evaluate the current staffing plan." Decl. of Damon McClain, ECF No. 5781 (McClain Decl.) ¶ 5. The reason defendants provide for hiring the consultants exceeds the scope authorized by the October 10, 2017 order and, indeed, appears to track and maintain their objection to the Special Master's staffing report which the court resolved in that order. Specifically, defendants' counsel avers that "[d]efendants have serious concerns about the efficacy of the current staffing plan's ratios and,

4

given hiring and availability rates, their ability to fully comply with present staffing ratios, despite their tremendous efforts over the past several years to do so.  And Defendants believe there may be other ways to improve the current staffing plan, which was developed almost a decade ago." *Id*. ¶ 3.  *Compare id*. *with* ECF No. 5591 at, *e.g.*, 4.  In any event, defendants took their consultants on tours of nine prisons in late December 2017 and January 2018.  McClain Decl. ¶ 5 & Ex. A.  Neither the Special Master nor plaintiffs' counsel were notified of the tours in advance or in time to raise and resolve the question of whether the tours should be joint tours, and neither the Special Master nor plaintiffs' counsel were present during the tours.  Defendants' counsel avers the consultants were under "strict directives" not to speak to inmates, that attorneys accompanied them to be sure these instructions were followed, and that "[t]he consultants did not review class members' medical records during their visits or sit in on treatment provided to class members." *Id*. ¶ 7.

     D.    <u>Plaintiffs' Motion</u>

        In response to the tours defendants conducted unilaterally, plaintiffs filed a motion for case management orders and sanctions.  *See* ECF No. 5764-1 at 4.  Plaintiffs assert that "[d]efendants' conduct and strategy harkens back to their secret termination expert tours conducted in 2011 and 2012. . . ." *Id*.  Based on the history surrounding defendants' unsuccessful termination motion, plaintiffs have sought a number of orders, including an order requiring defendants to provide notice to plaintiffs' counsel and to the court prior to filing any motion to terminate this action under the Prison Litigation Reform Act (PLRA).  In relevant part, plaintiffs seek an order requiring (1) defendants to provide the court and plaintiffs with at least 170 days' notice of any motion to terminate under the PLRA, to permit discovery to be opened; (2) defense disclosure of expert witnesses at least 150 days prior to filing any motion to terminate; (3) plaintiffs' disclosure of expert witnesses not later than 30 days after defendants' disclosure; (4) joint expert tours to be completed at least 45 days before the filing of any motion to terminate; and (5) exchange of expert reports 45 days after conclusion of any expert tours.  ECF No. 5764-2.

/////

/////

E.      Current Proceedings

Against this backdrop, the court held the status conference on February 14, 2018. The court convened the status conference in an exercise of its case management authority and to keep the parties focused on their constructive problem-solving efforts through which significant progress has been made. *See* Reporter's Transcript of Proceedings (RT), ECF No. 5793 at 6:2-4. At hearing, counsel for defendants stated clearly that "defendants are not contemplating bringing any type of termination motion." *Id*. at 12:23-13:2. Counsel emphasized defendants' commitment "to the problem-solving process in" the Special Master's All-Parties Workgroup and subsets thereof, intention to work on staffing issues through the All-Parties Workgroup, *id*. at 13:17-18, that "defendants do not want to litigate," *id*. at 13:21, and that defendants are "not contemplating any termination motion right now," *id*. at 14:21-23. At the same time, defendants also maintained the position set forth in their portion of the parties' joint status report, ECF No. 5777, that their work with the consultants "is protected under the Work Product doctrine," ECF No. 5793 at 4:7-8. Defendants also argued that the notice requested by plaintiffs could not be reconciled with the requirements of the PLRA, and that defendants would be prejudiced by such an order because "when the defendants reach a conclusion that the case should be terminated and that the evidence and the facts are there to support that, they shouldn't have to wait [ ] 260 days for a hearing [ ] after noticing that they're going to bring a motion." *Id*. at 16:12-16.

II.      STANDARDS

The PLRA provides, in pertinent part, that any party may move to modify or terminate prospective relief two years after the relief is ordered. 18 U.S.C. § 3626(b)(1)(i). The court is required to "promptly rule" on any such motion. 18 U.S.C. § 3626(e)(1). A motion to modify or terminate prospective relief under the PLRA operates as a stay as of the 30th day after the motion is filed, unless the court, for good cause extends the automatic stay for not more than 60 days. 18 U.S.C. § 3626 (e)(2). Good cause does not include "general congestion of the court's calendar." *Id*.

This court has the authority to issue a scheduling order that requires advance notice prior to the filing of a motion under the PLRA to modify or terminate prospective relief.

*See Plata v. Brown*, 754 F.3d 1070 (9th Cir. 2014). In *Plata*, the court affirmed an order requiring defendants to disclose "expert witnesses and their reports at least 120 days before" filing a motion to terminate relief. *Id*. at 1071, 1078. Relying on the "broad authority" of a federal district court to "manage complex litigation" and the Federal Rules of Civil Procedure, including Rules 16 and 26, the *Plata* court held that the district court's order in that case was a "sensible scheduling order" that "does not affect the operation of the automatic stay" provisions of the PLRA. *Id*. at 1077-78.

"[N]othing in the text of the PLRA prevents issuance" of a schedule for expert discovery or the advance notice required to permit issuance of such an order. *Id*. at 1077. The propriety of such an order depends on the circumstances of the particular case. *Id*. In a long and complex case that has included a "'long history of failed remedial orders,'" a schedule for expert disclosures allows both parties "to have an adequate record on which the court may decide the merits" of a termination motion. *Id*. at 1078 (quoting *Brown v. Plata*, 131 S.Ct. 1910, 1939 (2011)). Where the defendants represent that a termination motion is several months away, or not yet planned, the "practical effect" of such an order "is to require the State, while it is preparing its motion, to disclose the experts' reports on which the motion will rely." *Id*. at 1077.

III.     <u>ANALYSIS</u>

Five years after defendants' first termination motion, the record before the court shows both that progress has been made toward full remediation of the Eighth Amendment violations in the delivery of mental health care to California's seriously mentally ill prisoners and that additional work is required before a durable remedy is fully achieved.

The court has charted a clear road map to the end of this litigation. *See* August 9, 2016 Order, ECF No. 5477 at 2-4, *see also* December 9, 2016 Order, ECF No. 5528 at 2-5 (discussing process for ending federal court oversight). One milestone that must be passed is full implementation of defendants' staffing plan; as discussed above, that goal is the focus of recent court orders and efforts of the Special Master in conjunction with the All-Parties Workgroup.

Other milestones also lie ahead: Defendants still do not have enough MHCBs to meet demand. *See* October 10, 2017 Order, ECF No. 5710.[2] In addition, the continuous quality improvement tool (CQIT), the tool defendants will use "'to assume the mantle of ultimate responsibility for diagnosing of its own problems, i.e. conduct its own "qualitative analysis," and create a quality improvement process that it can use to achieve and maintain compliance, and *move on to eventual removal from federal court oversight,"* ECF No. 5477 at 3 (quoting August 30, 2012 Order, ECF No. 4232 at 4-5 (internal citation omitted) (emphasis in August 30, 2012 Order)), is still being rolled out. During the Special Master's most recent twenty-seventh round of monitoring, defendants reviewed ten of the thirty-four prisons "with a test implementation of" CQIT, and the Special Master reports that "[d]evelopments in this area during the monitoring round were promising, and it remains hopeful that a fully developed CQI process will prove to be a durable remedy for *Coleman* remediation." ECF No. 5779 at 16-17.

In addition, as noted above, the court has entered a specific remedial order requiring compliance with transfer timelines to inpatient care, ECF No. 5610, and defendants have now been in compliance with that order for the past five months. Similarly, the court's October 10, 2017 staffing order is directed at finally and durably obtaining constitutionally adequate mental health staffing. *See* ECF No. 5711 at 31.

The issues identified in this order are not an exhaustive list of the remedial efforts that remain before federal oversight can end. Nonetheless, the court is confident that if the parties maintain and continue a full commitment to transparency, *see, e.g.*, McClain Decl. ¶ 4, and the constructive problem-solving supervised by the Special Master in the All-Parties Workgroup and subgroups, the end of federal court oversight will indeed arrive in the foreseeable future.

---

[2] Defendants have appealed this order to the United States Court of Appeals for the Ninth Circuit. ECF No. 5727. While the court hopes the parties continue making progress on achieving timely transfers of inmates in need of this critical level of care, the court has declined to make any additional orders on this issue during the pendency of defendants' appeal. December 15, 2017 Order, ECF No. 5750 at 4.

The history of the prior termination motion, the work that remains to be done, and defendants' repeated representations that they have no plans to bring a termination motion, all informed the court's bench order. Should defendants move for termination rather than follow the road map the court has laid out, with administration by the Special Master, the six months' notice requirement serves the purposes of Federal Rules of Civil Procedure 16 and 26 by permitting an orderly period of discovery and expert disclosures to inform any litigation. As the *Plata* court held, the PLRA does "not repeal the Rules of Civil Procedure that authorize discovery and require disclosure," nor does it "endorse sandbagging." *Plata*, 754 F.3d at 1078. The notice requirement here ensures that any termination motion filed in this extremely complex and long running litigation will be made on a factual record disclosed to all parties through the discovery process. *See id.* (quoting *Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("'Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation.'")).

The order also serves fundamental notions of fairness and equity. The remedial phase of this complex class action has lasted more than twenty years and involves thirty-four prisons and two state hospitals. Notice to plaintiffs that defendants intend to bring a termination motion "will allow both the State and Plaintiffs to have an adequate record" and to prepare "informed briefing" on which this court would have to depend to "decide the merits" of such a motion. *Id.*

Moreover, defendants will not be prejudiced by this order. Several of the remedial tasks that remain will take more than six months to accomplish. For example, as discussed above, compliance with mental health staffing requirements must be accomplished by October of this year, approximately eight months from now, *see* ECF No. 5711, and there is no indication defendants are on track for earlier compliance. A "trial implementation" of the CQIT tool took place at ten institutions during the latest round of monitoring. ECF No. 5779 at 55. The Special Master reports that he is working through the All-Parties Workgroup to "address . . . items that require corrective action" following this trial implementation and then to move to next steps in implementation of this critically important tool. *Id.* at 64. Completion of this work and the full rollout of a fully refined CQIT tool at all thirty-four prison institutions will take more than six

months to accomplish.  With respect to bed space, although the court has signaled a need for greater urgency in developing the necessary number of MHCBs, ECF No. 5710 at 18, the evidence of record suggests defendants have planned to complete the necessary number of beds "within the next four years."  Decl. of Katherine Tebrock, ECF No. 5680-10, ¶ 7.  With respect to all aspects of achieving compliance, defendants have committed themselves to the All-Parties Workgroup process, and have stated repeatedly and in open court they have no plans to bring a termination motion.  Under the circumstances, requiring defendants to give notice if those plans change is not prejudicial.

At this stage, the court will not set a specific schedule for expert discovery in the event defendants do file a notice of intent to file a termination motion.  Such a schedule would be driven by the nature of the termination motion.  For that reason, the court will require defendants to notify plaintiffs and the court six months in advance of any planned termination motion.  In the event such a notice is filed, the court will then set a discovery scheduling conference within one week after the filing of the notice.

In accordance with the above, IT IS HEREBY ORDERED that should defendants decide to file a motion to terminate this action prior to a determination by this court, or by agreement of the parties with the Special Master's approval, that a durable remedy has been achieved, defendants shall file notice of their intention to file such motion not later than six months prior to filing the motion.

DATED:  February 21, 2018.

_____
UNITED STATES DISTRICT JUDGE