# MENTAL HEALTH SERVICES DELIVERY SYSTEM

# PROGRAM GUIDE

## 2018 REVISION

Division of Correctional Health Care Services

Department of Corrections & Rehabilitation

# TABLE OF CONTENTS

CHAPTER 1 ........ Program Guide Overview

CHAPTER 2 ........ Reception Center Mental Health Assessment

CHAPTER 3 ........ Correctional Clinical Case Management System

CHAPTER 4 ........ Enhanced Outpatient Program

CHAPTER 5 ........ Mental Health Crisis Bed

CHAPTER 6 ........ Department of Mental Health Inpatient Program

CHAPTER 7 ........ Administrative Segregation

CHAPTER 8 ........ Security Housing Unit

CHAPTER 9 ........ Psychiatric Services Unit

CHAPTER 10 ........ Suicide Prevention and Response

APPENDIX A ........ Glossary of Terms

# CHAPTER 1
## Program Guide Overview

The California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS) provides inmates access to mental health services. The MHSDS is designed to provide an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both the inmate-patient and the institution.

The intent of the MHSDS is to advance the CDCR's mission to protect the public by providing timely, cost-effective mental health services that optimize the level of individual functioning of seriously mentally disordered inmates and parolees in the least restrictive environment. The MHSDS has been functioning in CDCR since 1994. The MHSDS utilizes a variety of professional clinical, custody, and support staff to provide the best available quality of care to seriously mentally disordered inmates.

Outpatient care is provided in an array of treatment levels and modalities including a day treatment program and an outpatient clinic level of care. The MHSDS is a decentralized, system- wide concept using standardized evaluation and treatment. The MHSDS provides universal screening for all incoming inmates at Reception Centers and direct transfer from the Reception Center to the treatment facility for further evaluation and/or treatment if needed. The MHSDS utilizes case management techniques to manage the majority of mentally disordered inmates in the general population and provides for their access to care as needed. The MHSDS provides a continuum of inpatient care from a contractual relationship with Department of Mental Health (DMH) for acute and intermediate and a short-term crisis inpatient care program within CDCR institutions. The goal is to provide constitutionally appropriate levels of mental health treatment to the incarcerated serious mentally ill inmate in the least restrictive environment. The MHSDS continues to develop a standardized, automated system of records management and case tracking.

Some key concepts are inherent in the design and administration of these services. These concepts are:

1. To deliver services that promote mental health, by developing and reinforcing individual responsibility. A mental disorder does not necessarily excuse individual responsibility and accountability. The inmate-patient's ability to achieve their clinical goals is enhanced by a therapeutic emphasis on responsibility for one's own behavior.

2. To promote understanding that mental health treatment is a sensible administrative approach to managing inmate-patients when behavioral expressions of their mental disorder disrupt their ability to adequately function and program during confinement.

3. To provide all services with strict observance of Utilization Management guidelines, as a reminder to fiscal responsibility regarding the use of taxpayer funds, which are a limited resource.

The MHSDS uses a variety of therapeutic strategies. The goals of treatment in MHSDS are to help inmates adjust to the prison environment, to optimize appropriate personal functioning, and to help inmates accept responsibility for their behavior. An inmate's offense and institutional behavior, rather than the need for treatment, determine the level of custody placement.

At each institution, the MHSDS operates under the management of the Chief of Mental Health or the Clinical Director. This individual is typically the Chief Psychiatrist, Chief Psychologist, or Senior Psychologist. Mental Health staff are under the supervision of the institution's Health Care Manager. Success of the MHSDS requires that the mental health staff work cooperatively with other Health Care units in the institution, including Health Records, Pharmacy, Lab, and Nursing. It also requires that mental health staff work cooperatively with the institution's correctional and institution support staff.

## A. REASONABLE ACCOMMODATIONS FOR INMATES

The CDCR provides access to its programs and services to inmates with disabilities, with or without reasonable accommodation, consistent with legitimate penological interests. No qualified inmate with a disability as defined in Title 42 of the United States Code, Section 12102 shall, because of that disability, be excluded from participation in or denied the benefits of services, programs, or activities of the CDCR or be subjected to discrimination. All institutions housing inmates with disabilities will ensure that housing and programming are reasonable and appropriate in a manner consistent with their mission and CDCR policy.

Reasonable accommodations shall be afforded to inmate-patients with disabilities, e.g., visually impaired, hearing impaired, speech impaired, learning disabled, and developmentally disabled, to ensure equally effective communication during contacts of any kind that occur within the MHSDS. Auxiliary aids that are reasonable, effective, and appropriate to the needs of the inmate-patient shall be provided when simple written or oral communication is not effective. Such aids may include qualified sign language interpreters, readers, sound amplification devices, captioned television/video text displays, Telecommunication Devices for the Deaf (TDD), audio taped texts, Braille materials, large print materials, and signage. For developmentally disabled inmate-patients, equally effective communication may require reviewing the CDCR 128C-2, *Developmental Disability Program Screening Results*, that documents the adaptive support services required by the inmate-patient.

It is the obligation of CDCR staff, including mental health clinicians, to provide effective communication under all circumstances. The degree of accommodation that is required shall be determined on a case-by-case basis.

In any case in which a question may arise as to the inmate's ability to comprehend, staff shall document the determination that the inmate understood the process during all clinical contacts and shall record the basis for that determination and how the determination was made. This shall be recorded on the documentation of the clinical contact, such as the CDCR Form 7230-MH, Interdisciplinary Progress Note. Examples of documentation of effective communication include, "the responsive written notes generated by a hearing impaired inmate indicated that he/she understood the process," "the sign language interpreter appeared to communicate effectively with the hearing impaired inmate as indicated by the inmate's substantive response via sign language," or, "the inmate was able to summarize instructions given to him/her." To the extent that written notes are used to effectively communicate with an inmate-patient, those notes shall be attached to the documentation of that clinical contact and filed in the Unit Health Record (UHR).

## B. PRIMARY COMPONENTS

*Crisis Intervention* A crisis is defined as a sudden or rapid onset or exacerbation of symptoms of mental illness, which may include suicidality or other aberrant behavior which requires immediate intervention. Crisis intervention is provided at all institutions to inmate suffering from a situational crisis or an acute episode of mental disorder. The first step in providing crisis intervention is adequate training for all institutional staff in the recognition of mental health crisis symptoms, a plan for immediate staff response, and procedures for referral to clinical staff. Custody and clinical staff cooperation is critical to ensure that an inmate in a mental health crisis is treated as soon as possible.

*Comprehensive Services* The MHSDS offers comprehensive services and a continuum of treatment for all required levels of care. In addition to standardized screening and evaluation, all levels of care found in a county mental health system are represented in the CDCR MHSDS programs. All levels of care include treatment services provided by multiple clinical disciplines, and development and update of treatment plans by an Interdisciplinary Treatment Team (IDTT), which includes appropriate custody staff involvement.

*Decentralized Services* Mental health services are geographically decentralized by making basic services widely available. All levels of care, except inpatient hospitalization, are available at most geographically-defined Service Areas (see Section E). Case management and crisis intervention are provided at all institutions.

*Clinical and Administrative Oversight* In coordination with each institution, the CDCR Division of Correctional Health Care Services (DCHCS) and Division of Adult Institutions

will continue to update standardized program policy and develop a system for monitoring delivery of program services. The CDCR shall develop an annual review schedule of the MHSDS Program Guideaccording to the Inmate Medical Services Policies and Procedures, *Chapter 8, Implementation and Review of Health Care Policies and Procedures.* A system-wide automated tracking and records system continues to evolve to support administrative and clinical oversight.

*Standardized Screening*Access to mental health services is enhanced for all inmates through standardized screening of all admissions at Reception Centers. Standardized screening ensures that all inmates have equal and reliable access to services. The data generated by standardized screening provides the CDCR with necessary information to improve the assessment of mental health service needs. If screening reveals indicators of mental disorder, such as prior psychiatric hospitalization, current psychotropic medication, suicidality or seriously maladaptive behaviors, follow-up evaluation by a clinician shall determine the immediate treatment needs of the inmate. Early identification of an inmate's mental health needs will provide an appropriate level of treatment and promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both the inmate-patient and the institution. Avoiding the utilization of more expensive services will aid in budget containment.

*Pre-Release Planning*This component of service, in conjunction with the Correctional Counselor's preparation of the CDCR 611, *Release Program Study,* focuses on preparing the seriously mentally disordered inmate-patient for parole. Its objective is to maximize the individual's potential for successful linkage and transition to the Parole Outpatient Clinic, or, if required, to inpatient services in the community or the Mentally Disordered Offender Program operated at the DMH facilities. In the case of paroling inmate-patients, this includes facilitating the work of the Parole and Community Services Division's Transitional Case Management Program.

## C. REFERRALS TO MENTAL HEALTH

Any inmate can be referred for mental health services at any time. Inmates who are not identified at Reception or upon arrival at an institution as needing mental health services, may develop such needs later. Any staff members that have concerns about an inmate's mental stability are encouraged to refer that inmate for evaluation by a qualified mental health clinician (psychiatrist, psychologist, or clinical social worker). Under certain circumstances, referral to mental health may be mandatory. A referral to mental health should be made whenever:

- An inmate demonstrates possible symptoms of mental illness or a worsening of symptoms.

- An inmate verbalizes thoughts of suicide or self-harm behavior.
- Upon return from court when an inmate has received bad news such as a new sentence that may extend their time.
- An inmate has been identified as a possible victim per the Prison Rape Elimination Act.
- An inmate demonstrates sexually inappropriate behavior as per the Exhibitionism policy.
- An inmate who is written up for a disciplinary infraction was demonstrating bizarre, unusual, or uncharacteristic behavior when committing the infraction.
- An inmate placed into Administrative Segregation indicates suicidal potential on the pre-screening, or rates positive on the mental health screening, or gives staff any reason to be concerned about the inmate's mental stability, such as displaying excessive anxiety.
- Upon arrival to an institution when the inmate indicates prior mental health treatment and medications, especially if not previously documented.

Referrals to mental health may be made on an Emergent, Urgent, or Routine Basis. An inmate deemed to require an Emergent (immediate) referral shall be maintained under continuous staff observation until evaluated by a licensed mental health clinician. An Urgent referral is to be seen within 24 hours. A Routine referral should be seen within five working days.

Referrals are made on the CDCR-MH5, *Mental Health Referral Chrono*, and forwarded to the mental health office. Emergent and Urgent referrals should also be made by phone to facilitate a timely response. The referral chronos, when received at the mental health office, are logged, entered into the data tracking system, and scheduled for follow-up with the appropriate clinician.

Inmates may also self-refer for a clinical interview to discuss their mental health needs. Inmate self-referrals shall be collected daily from each housing unit, and processed the same way as staff referrals.

## D. TREATMENT CRITERIA FOR THE LEVELS OF CARE

### *Overall Treatment Criteria*

Overall treatment criteria have been developed for the MHSDS. An inmate must meet the criteria in 1, 2, or 3 below, in order to receive MHSDS treatment at any level of care:

1. Treatment and monitoring are provided to any inmate who has ***current*** symptoms and/or requires treatment for the current Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:

   **Schizophrenia (all subtypes)**
   **Delusional**
   **Disorder Schizophreniform**
   **Disorder Schizoaffective**
   **Disorder Brief Psychotic**
   **Disorder**
   **Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
   **Psychotic Disorder Due To A General Medical Condition**
   **Psychotic Disorder Not Otherwise Specified**
   **Major Depressive Disorders**
   **Bipolar Disorders I and II**

2. Medical NecessityMental health treatment shall be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which:

   **Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

3. ExhibitionismTreatment is required when an inmate has had at least one episode of indecent exposure in the six-month period prior to the IDTT that considers the need for exhibitionism treatment and the inmate patient is either:

   - Diagnosed with Exhibitionism, or
   - Meets the alternate criteria. (*Alternate Criteria:* An inmate who meets all criteria for the diagnosis of Exhibitionism, except that the victim was not an "unsuspecting stranger" but was a staff member or inmate who did not consent to or encourage the behavior.)

   (A diagnosis of Exhibitionism is not required for inmates who meet the alternate criteria.)

***Specific Treatment Criteria***

In addition to the overall treatment criteria above, an inmate must meet the following specific treatment criteria to receive treatment at a specific level of care:

1. Correctional Clinical Case Management System

- Stable functioning in the general population, Administrative Segregation Unit (ASU) or Security Housing Unit (SHU); and
- Criteria not met for higher levels of care; and
- Exhibits symptom control, or is in partial remission as a result of treatment.
- These conditions usually result in Global Assessment of Functioning (GAF) scores of 50 and above.

Correctional Clinical Case Management System (CCCMS) is located at all institutions [except California Conservation Center (CCC), Calipatria State Prison (CAL), Centinela State Prison (CEN), Chuckwalla Valley State Prison (CVSP), and Ironwood State Prison (ISP). These prisons provide necessary care until the inmate-patient can be transferred] to provide care, monitoring and follow-up services to inmate-patients whose condition is relatively stable and whose symptoms are largely controlled. This may include a response to symptoms that require only a brief intervention, such as a psychotherapy session or an adjustment in medications. While mentally disordered, these inmate-patients can function in the general population and do not require a clinically structured, therapeutic environment.

All inmates, including those in SHU or ASU, needing crisis intervention and/or continued treatment also receive services from CCCMS staff. Details for provision of services in ASU and SHU are found in their respective chapters of the Program Guide.

2. Enhanced Outpatient Program

- Acute Onset or Significant Decompensation of a serious mental disorder characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or
- Inability to function in General Population based upon:

  a. A demonstrated inability to program in work or educational assignments, or other correctional activities such as religious services, self-help programming, canteen, recreational activities, visiting, etc. as a consequence of a serious mental disorder; or

b. The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme argumentativeness, inability to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., as a consequence of serious mental disorder; or

c. An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of serious mental disorder.

- These conditions usually result in a GAF of less than 50.

Enhanced Outpatient Program (EOP) provides care to mentally disordered inmate-patients who would benefit from the structure of a therapeutic environment that is less restrictive than inpatient settings. This may include response to crisis symptoms which require extensive treatment, but can be managed as outpatient therapy with several psychotherapy sessions or medication adjustment with follow-up visits.

These inmate-patients do not require continuous nursing care. Often, they are transitioning from inpatient care in a DMH hospital or the Mental Health Crisis Bed (MHCB). They may also have a serious mental illness that is of long duration with moderate to severe and persistent functional impairments. The EOP's structured program of treatment and supportive activities will, in many cases, build on therapeutic improvements made in a hospital program or MHCB. EOP will release cases which have successfully completed treatment to CCCMS. The EOP is located in a designated living unit at the hub institution.

3. Mental Health Crisis Bed Placement

- Marked Impairment and Dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or:

- Dangerousness to others as a consequence of a serious mental disorder, and/or dangerousness to self for any reason.

- These conditions usually result in a GAF score of less than 30.

All inmate-patients admitted to a MHCB are discharged within ten days, with scheduled appropriate clinical follow-up, to outpatient care or the general population or are transferred to DMH inpatient care. Stays of over ten days must be approved by the Chief of Mental Health, or designee. The MHCB also provides short-term inpatient care for seriously mentally disordered inmate-patients awaiting transfer to a hospital program or being stabilized on medication prior to transfer to a less restrictive level of care. The

MHCB is a part of a licensed General Acute Care Hospital (GACH), Skilled Nursing Facility (SNF), or a Correctional Treatment Center (CTC) offering 24-hour basic medical, nursing, and other health services. A Central Health Services building which houses CTC services houses the MHCB beds, staff offices and therapy space. In the CTC, the MHCB runs its short-term crisis care program under the CTC "optional mental health treatment program" regulations. In a GACH or SNF, the MHCB are under the "distinct part Psychiatric" licensing regulations.

4. DMH Inpatient Hospital Care

Referral to inpatient programs provided via contract with the DMH is available for inmate-patients whose conditions cannot be successfully treated in the outpatient setting or in short-term MHCB placements. Both acute and intermediate care programs are offered in facilities for both male and female inmate-patients. Specific criteria are noted in Chapter 6, *Department of Mental Health Inpatient Program.*

The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care. Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate-patient is not benefiting from treatment services available at the current level of care. Consideration of appropriate level of care shall be documented by the IDTT on a CDCR 7230-MH, *Interdisciplinary Progress Notes,* and shall include the justification for maintaining the current level of care or referral to a different level of care.

## E. SERVICE AREAS

The principal infrastructure for service delivery is the Service Area. A mental health Service Area assumes responsibility for mental health services; a medical Service Area, while it generally overlaps with that for mental health, is responsible for medical services. Several Service Areas report to a Regional Administrator.

Each Service Area consists of a group of two or more institutions in relative geographic proximity that share the full complement of services directly provided by CDCR. These services include all levels of care, except the Acute and Intermediate inpatient care provided through DMH. Each mental health Service Area has from one to three MHCB locations and one EOP located at its hub institution. CCCMS completes the delivery system within a Service Area. Staff handling CCCMS caseloads are at every institution.

## F. CLINICAL PROGRAM GUIDE

MHSDS Program Guide chapters have been developed for the MHCB, EOP, and CCCMS levels of care. Each chapter is organized into the following sections: Program Objectives, Population Served, Treatment Modalities, Staffing, and Patient Assessment and Case Review Procedures. Although these chapters define essential program content and delineate system-wide policies, each Service Area is expected to have written policies and specific operational procedures (derived from the Program Guide) articulated in ways that best address the unique needs of the specific Service Area and its institutions. Written policies and procedures are especially necessary for the MHCB to meet health facility licensing requirements.

## G. STANDARD PROGRAM STAFFING

Staffing for all programs is based on the Mental Health Staffing Workload Study, completed June 2007, which allocates both clinical and clerical support staff whom perform duties related to the provision of mental health services. CDCR may utilize contract staff as necessary to fulfill staffing requirements. Use of unlicensed psychologists and clinical social workers during the period they are gaining qualifying experience for licensure is governed by Section 1277 of the Health and Safety Code, and Section 5068.5 of the Penal Code.

Institutions may use pre-doctoral psychology interns who are trained and supervised by a licensed psychologist according to regulations in Sections 1287, 1287.1, and 1287.2 of Title 16, Division 13.1 of the California Code of Regulations. Institutions may also use social work interns who are currently enrolled in a master's program in social work according to regulations in Section 4996.15 of the California Business and Professions Code.

All newly hired psychiatrists must meet minimum credentialing criteria as follows:

1. Current board certification from the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry.

OR

2. Satisfactorily completed specialized training requirements in psychiatry in programs that, for a psychiatrist, are accredited by the Accreditation Council for Graduate Medical Education (ACGME) or Bureau of Osteopathic Education of the American Osteopathic Association (AOA) or certified by the Royal College of Physicians and Surgeons of Canada.

a) Two patterns of training are acceptable:

**(i). Training Pattern One: A Three-Year Psychiatry Residency Program**

- A broad-based clinical year of ACGME or Bureau of Osteopathic Education of the AOA-accredited training in internal medicine, family practice, or pediatrics; or
- An ACGME or Bureau of Osteopathic Education of the AOA-accredited transitional year program that included a minimum of four months of primary care; or
- An AGCME or Bureau of Osteopathic Education of the AOA-accredited residency in a clinical specialty requiring comprehensive and continuous patient care.

AND

Three full years of postgraduate, specialized residency training in a psychiatry program accredited by the ACGME or Bureau of Osteopathic Education of the AOA.

OR

**(ii) Training Pattern Two: A Four-Year Psychiatry Residency Program**

Four years of training in an ACGME or Bureau of Osteopathic Education of the AOA-accredited program in psychiatry is acceptable. A psychiatry PGY-1 must include at least four months of internal medicine, family practice, and/or pediatrics. This training must be in a clinical setting that provides comprehensive and continuous patient care. No more than one month of this requirement may be fulfilled by an emergency medicine rotation, as long as the experience predominantly involves medical evaluation and treatment, rather than surgical procedure. Neurology rotations may NOT be used to fulfill this four-month requirement.

(Exception: Any applicant who completed a residency program in psychiatry that was accredited by the ACGME or Bureau of Osteopathic Education of the AOA or certified by the Royal College of Physicians and Surgeons of Canada at the time the applicant completed the residency will qualify under this pattern of training upon CDCR verification that all residency requirements were successfully completed and if all other requirements are met.)

If the candidate's training program(s) is not currently accredited by the ACGME or the Bureau of Osteopathic Education of the AOA, CDCR shall research the history of the program(s) to determine if it was accredited at the time the candidate attended and completed the training.

All osteopaths hired in the classification of psychiatrist before January, 2006, and presently in that classification must meet the above criteria or must undergo a court-mandated evaluation of their clinical competency for employment in the position of psychiatrist with the CDCR.

## H. PARAMETERS OF CONFIDENTIALITY OF INMATE-PATIENT COMMUNICATIONS AND GUIDELINES FOR DISCLOSURE

CDCR has developed a detailed policy to ensure that confidentiality of inmate-patient communications with mental health clinicians is protected. This policy, issued in a memorandum dated April 18, 2007, is Attachment A to the MHSDS Program Guide. The policy is accompanied by examples for the purpose of staff training. Clinicians, including psychiatrists, physicians, psychologists, clinical social workers, nurse practitioners, registered nurses, licensed vocational nurses, licensed psychiatric technicians, and recreational therapists, shall be trained in this policy. In addition, all staff members who intentionally, accidentally, or inadvertently overhear confidential communications (arising from clinical contacts such as cell front visits) are responsible for maintaining confidentiality of the communication. Custody officers, correctional counselors, and other staff who are members of an IDTT are bound to not discuss health-related inmate-patient information with anyone other than the team members.

Clinicians are responsible for informing inmate-patients of the limits of confidentiality, or ensuring that prior documentation in the UHR indicates that this disclosure has occurred prior to commencement of a clinical encounter. CDCR 7448, *Informed Consent for Mental Health Care*, shall be used for this purpose.

## I. CLINICAL INPUT INTO THE DISCIPLINARY PROCESS

Inmate-patients in the Mental Health program or any inmate showing signs of possible mental illness may require a CDCR 115-MH, *Rules Violation Report – Mental Health Assessment,* when they are charged with a disciplinary action.

All inmates in the EOP, MHCB, and DMH programs who receive a CDCR 115-MH, Rules Violation Report – Mental Health Assessment, shall be referred by the Reviewing Custody Supervisor to Mental Health Services for a Mental Health Assessment. All inmates in CCCMS or non-MHSDS inmates who receive a CDCR 115-MH, *Rules Violation Report* and who exhibit bizarre, unusual, or uncharacteristic behavior shall be referred for a CDCR 115-

MH *Rules Violation Report:* Mental Health Assessment. Inmates who receive a CDCR 115, *Rules Violation Report* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for a CDCR 115-MH *Rules Violation Report: Mental Health Assessment.*

A mental health clinician who is not the inmate's Primary Clinician shall review the relevant portions of the inmate's UHR and any other records deemed appropriate and shall evaluate the inmate in a non-confidential interview in a private setting. The findings shall be reported on a CDCR 115-MH, *Rules Violation Report: Mental Health Assessment*. The report must be returned to the Reviewing Custody Supervisor within 5 working days for non-MHSDS and CCCMS inmates (to allow time to assign a Staff Assistant) and within 15 calendar days for EOP, MHCB and DMH patients. The clinician shall determine the following:

1. Are there any mental health factors that would cause the inmate to experience difficulty in understanding the disciplinary process and representing his/her interests in the hearing that would indicate the need for the assignment of a Staff Assistant? **Note: All inmates in the EOP, MHCB, and DMH programs automatically have a Staff Assistant assigned.**

2. Did the inmate's mental disorder appear to contribute to the behavior that led to the Rules Violation Report?

3. If the inmate is found guilty of the offense, are there any mental health factors that the hearing officer should consider in assessing the penalty?

Refer to the "Inmate Disciplinary Process, Mental Health Assessment" manual (See Attachment B) and CDCR 115-MH, *Rules Violation Report: Mental Health Assessment,* for detailed instructions on completing this assessment and utilizing the information in the hearing process.

## J. AUTOMATED TRACKING SYSTEM

The Inmate Mental Health Identifier System (IMHIS) has been designed to track the movement of all inmate-patients receiving care in the MHSDS. The data entered into the system will be processed daily, so the system will maintain information regarding MHSDS inmate-patients current level of care as well as MHSDS inmate-patients transfers, discharges, and new cases. All institutions are to conduct a reconciliation of the inmate-patients housed in ASUs who require mental health treatment with the IMHIS codes for this specific population. It is very important that IMHIS information be as up to date as possible and daily updates to the IMHIS are mandatory.

## K. MENTAL HEALTH TRACKING SYSTEM

The Mental Health Tracking System (MHTS) is an automated program designed to track and record all pertinent mental health information for inmate-patients from the time they enter the MHSDS until they are released, paroled, or transferred out of the MHSDS and return to the general population. This institutional information management program is capable of tracking an inmate-patient's medication history, level of care changes, mental health staff contacts, current and previous DSM psychiatric diagnoses, latest Abnormal Involuntary Movement Scale score, status and information regarding current or past Keyhea orders, as well as other key data related to an inmate-patient's mental health treatment history. In addition, the MHTS is used to produce the Inmate Profile which documents suicide risk data and accompanies inmates whenever they are transferred between institutions to provide the receiving institution with suicide risk data and other initial MHTS input data. The MHTS is designed to track and aggregate data which serves as a basis for quality assurance and improvement activities at the Institutional and Departmental levels.

## L. MENTAL HEALTH PLACEMENT CHRONO

Each inmate who is assessed as having a serious mental disorder and is accepted into the MHSDS will have a CDCR 128-MH3, *Mental Health Placement Chrono* (MHPC) completed and entered into their UHR and Central File. This chrono indicates the inmate-patient's LOC, medication status, any behavioral alerts, and their GAF score. This information is entered daily into the IMHIS and the MHTS and is a critical component in the overall management of inmate-patients in the MHSDS. As long as an inmate-patient is in the MHSDS, they shall have a MHPC that reflects the inmate-patient's current status.

- At the RC, the MHPC shall be dated within 90 days of the Classification Staff Representative placement action. As inmate-patients usually spend less than 90 days in the RC, updates will not normally be required.

- In all other housing situations, no updates of the MHPC will be required unless there is a change in the level of care, or when the inmate-patient is being referred for transfer to another institution.

## M. LEVEL OF CARE CHANGE /TRANSFER TIMELINES

The following table summarizes the time frames which CDCR must meet for the transfer of MHSDS inmate-patients between levels of care, whether within the same institution or to another institution. More detail on the level of care change/transfer process is provided in the individual level of care sections of the Program Guide.

The following definitions apply to the Transfer Timelines Table:

- "**Identification**:" The date that the inmate-patient is identified as requiring a higher LOC. The IDTT is responsible for identifying inmate-patients who are appropriate for discharge to a lower LOC, an increase from CCCMS to EOP LOC, or DMH intermediate care. An individual clinician may identify an inmate-patient as requiring initial admission into MHSDS at CCCMS or EOP LOC. A credentialed clinician may admit an inmate-patient to MHCB care. An individual clinician may refer an inmate-patient for DMH acute inpatient care.

- "**Referral**" within CDCR: The date the LOC change is documented on a Mental Health Placement Chrono, or the time the physician or clinical psychologist orders admission into a CTC.

- "**Referral**" to DMH: The date the completed referral packet is received by DMH by facsimile or overnight mail.

- "**Acceptance**" at DMH: The date the Clinical Assessment Team at DMH accepts the inmate-patient for placement at a DMH facility. Some inmate-patients may be placed on a waitlist pending bed availability after acceptance.

- "**Transfer**:" The date the inmate-patient is placed into the LOC and program to which s/he was referred.

| From: | To: | |
|---|---|---|
| **Setting/Level of care** | **Setting/Level of Care** | **Timeline for Transfer** |
| RC/CCCMS | Mainline/ CCCMS | Within 90 days of referral; 60 days of referral if clinically indicated |
| RC/EOP | Mainline/EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Any setting/level of care | MHCB | Within 24 hours of referral |
| Any institution/ level of care | Any Acute DMH placement | Within ten days of referral, if accepted to DMH. (Referral must be completed within two working days of identification. Transport must be completed within 72 hours of bed assignment) |
| Any institution/level of care | Any Intermediate Care DMH placement | Within 30 days of referral, if accepted to DMH. (Referral must be completed within five working days of identification by IDTT if inmate-patient consent is obtained, and within ten working days of identification if due process hearing is required. Transport must be completed within 72 hours of bed assignment). |
| Mainline (General Population)/ CCCMS | Mainline (General Population) /EOP | Within 60 days of referral; 30 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/CCCMS | CCCMS | Within 30 days if inappropriately transferred; otherwise 90 days of referral or 60 days of referral if clinically indicated |
| Desert institutions (CAL, CEN, ISP, CVSP, CCC)/EOP | EOP | Within 21 days if inappropriately transferred; otherwise 60 days of referral or 30 days of referral if clinically indicated |
| EOP ASU | EOP ASU Hub | Within 30 days of ASU placement or referral to EOP level of care. |
| EOP ASU/ EOP ASU Hub | PSU | Within 60 days of endorsement to PSU |
| Outpatient Housing Unit | EOP | Within 30 days of endorsement to EOP |

## N. PROGRAM GUIDE REVISION POLICY AND PROCEDURE

The MHSDS Program Guide revisions shall occur annually. The revisions shall be presented to the Mental Health Program Subcommittee (MHPS) by January 31 of each year. The MHPS shall forward revisions to the appropriate authorities for approval.

All proposed revisions to the MHSDS Program Guide shall be submitted to the DCHCS Program Guide Coordinator (PGC). The PGC shall be designated by the DCHCS Chief of the Mental Health Program.

The PGC shall distribute proposed revisions to the Program Guide Focused Improvement Team (PG-FIT). The PG-FIT shall include at minimum:

- Program Guide Coordinator
- Chief Psychiatrist, Clinical Policy and Programs, DCHCS
- Chief Psychologist, Clinical Policy and Programs, DCHCS
- Assistant Deputy Director, or designee, DAI
- Supervising Attorney, or designee, Office of Legal Affairs

The PG-FIT shall be responsible for involving appropriate representatives from other CDCR Divisions and other appropriate consultants (e.g. representatives from field institutions) in decisions regarding any proposed revisions.

Where revisions may impact resources, the PG-FIT shall initiate evaluation of resource impact and/or request submission of a budget change proposal.

The PG-FIT shall meet as needed with the MHPS to make recommendations regarding revisions. The MHPS shall present the proposed revisions to the Quality Management Committee (QMC). The QMC will approve or disapprove each proposed revision. Approvals will be forwarded to the DCHCS Governing Body (GB). The PGC will record all changes approved by the GB.

Memoranda signed by the Deputy Director, DCHCS, shall implement emergent or court-ordered substantive changes to the MHSDS Program Guide throughout the year. These memoranda shall be integrated into the annual revision of the MHSDS Program Guide document.

The PGC shall maintain a project file to include original input submitted by those persons who provided review and or revisions of the MHSDS Program Guide, along with a tracking log of approved revisions of the MHSDS Program Guide. Revised portions of the MHSDS Program Guide shall be marked "SUPERCEDED" with the date it was superceded, and revised portions shall be filed by revision date.

This tracking log of approved revisions, along with revised MHSDS Program Guide pages shall be distributed to the Warden, Health Care Manager, Chief of Mental Health, and Correctional Health Services Administrator and/or Standards Compliance Coordinator at each institution no later than 30 days after final approval. The distribution shall include direction that copies of relevant sections are to be shared with appropriate staff. The Chief of the Mental Health Program at each institution shall ensure that the revisions are integrated into **ALL** existing copies of the MHSDS Program Guide according to Inmate Medical Services Policies and Procedures Chapter 8 "Implementation and Review of Health Care Policies and Procedures" section regarding Proof of Practice Documentation. Current DCHCS Policies and Procedures manuals shall be readily available to all mental health staff in each program and work area. The Chief of Mental Health shall be responsible to ensure that all staff are trained regarding revised Program Guide requirements.

# CHAPTER 2
## Reception Center Mental Health Assessment

### A. INTRODUCTION

The Reception Center (RC) program provides mental health assessment for all inmates committed to the California Department of Corrections and Rehabilitation (CDCR) and basic treatment for those inmates identified as having a serious mental disorder while awaiting transfer.

By enhancing and standardizing screening and evaluation efforts at the entry point into the institution system, the CDCR can best ensure that all inmates in need of mental health treatment are identified and provided necessary services at the earliest possible time. Early and easy access to care has been shown to have both therapeutic as well as fiscal benefits in managing mental illness at its lowest level of acuity. This is particularly true in the high stress environment of an institution setting.

This program utilizes clinical and clerical positions to achieve the following objectives:

1. Provide a standardized system for universal screening of all inmates received in the CDCR for possible symptoms of mental disorder or suicide risk.

2. Conduct in-depth clinical evaluations of individuals identified in the screening process for diagnosis of serious mental disorder, level of functioning, and necessary level of care.

3. Through the Inmate Mental Health Identifier System, CDCR is able to track inmate-patients who have been identified as seriously mentally disordered and enrolled in one of the Mental Health Services Delivery System (MHSDS) levels of care. This information provides a management tool and is utilized in program planning.

It is important to emphasize that the population this program seeks to identify is defined as those inmates who are dysfunctional in the prison environment as a result of a serious mental disorder. Specifically, these are inmates with a Diagnostic and Statistical Manual (DSM) Axis I diagnosis, with current symptoms, or evidence of medical necessity. Inmates who are prescribed psychotropic medications are also included in MHSDS. Inmates suffering suicidal

ideation shall also receive crisis care to protect life. Mental health intervention is also provided to treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder.

Mental health issues which may be identified in the screening process, but which are not included in the treatment services provided by the CDCR's mental health treatment programs, are sexual and substance abuse disorders and personality disorders. However, if these mental health issues are also accompanied by an Axis I serious mental disorder or meet the requirements of medical necessity, treatment is provided by the CDCR's mental health treatment programs. While all inmates are screened in the RC for developmental disabilities, services for inmates with developmental disabilities, although provided by mental health staff in numerous institutions, are not addressed in this Program Guide, as they fall under the oversight of the Clark Remedial Plan. Inmates with developmental disabilities who also have an Axis I serious mental disorder are, of course, included in the MHSDS, and some inmates with developmental disabilities may be included in MHSDS programs under medical necessity criteria.

## B. POLICIES AND PROCEDURES FOR ASSESSMENT OF MENTAL HEALTH NEEDS

### Goal and Target Population

To identify and assign an appropriate level of care to inmates who are suicidal or are experiencing impaired functioning as a result of serious mental disorder.

### Policies to Achieve Goal

1. All inmates shall receive an Initial Health Screening by nursing staff within 24 hours of arrival to determine need for continuation of currently prescribed and used psychotropic medications, need for crisis psychiatric care, or other mental health intervention.

2. All inmates shall receive a Mental Health screening within the first seven calendar days of arrival to identify mental health concerns that may indicate a need for treatment.

3. All inmates with possible mental health treatment needs shall receive a standardized mental health evaluation within 18 calendar days of arrival, and prior to any placement decision.

4. All inmates who request a clinical interview shall receive one.

5. Any RC Staff may refer any inmate for clinical interview at any time.

6. All mental health screening and evaluation interviews shall be conducted in a private setting.

7. All psychological evaluations shall conclude with a provisional diagnosis, level of functioning, and recommended level of care placement, if required.

8. Mental health services shall be provided to inmates while awaiting transfer.

9. In order to facilitate long range planning, each RC shall accumulate and regularly report data on all inmates screened, evaluated, and determined to be in need of particular levels of treatment.

## C. PROCEDURES TO IMPLEMENT POLICIES

1. Initial Health Screening of Inmates at Receiving and Release

All inmates arriving at a RC shall be interviewed utilizing a standard set of questions (CDCR 7277, *Initial Health Screening*) regarding their medication needs or need for immediate referral for crisis care under the supervision of a Registered Nurse (RN). Medical staff or equivalent staff trained in the procedures for the standardized health screening and mental health referrals, shall review available documentation from committing jurisdictions regarding mental health treatment. This includes a review of medications provided at County facilities or observed behavior that may indicate a need for mental health treatment.

This interview shall be conducted in an environment which is sufficiently private and confidential to encourage full disclosure and open, candid responses. Inmates who are unable to speak English shall be provided with necessary interpreters. Where a need for emergency or urgent psychiatric review is identified, a direct referral to a psychiatrist shall take place, utilizing a standard CDCR 128-MH5, *Mental Health Referral Chrono*. The original 128-MH5, *Mental Health Referral Chrono*, shall be sent to the psychiatrist and a copy to the mental health office for data entry and filing. These Chronos should be hand delivered or this information relayed by telephone, if necessary. Emergency referrals shall be made and responded to immediately. Urgent referrals, including medication assessment or review, shall be responded to within 24 hours. Observation of possible mental health symptoms not requiring emergency attention may also be documented on a staff referral chrono and forwarded to the mental health office within the next working day. Clinical evaluation and health transfer information from committing counties relating to a need for medical or mental health care or assessment are to be placed in the inmate's Unit Health Record (UHR).

2. Physical Exam

Within three working days of arrival, all inmates shall undergo a physical examination and evaluation of medical history. Any mental health issues that become apparent in the interviews by the physician, RN, or Licensed Vocational Nurse (LVN) conducting the reviews, shall be documented on staff referral chronos for subsequent mental health evaluation. Emergency or urgent cases requiring crisis care or medication review shall be immediately referred for psychiatric evaluation.

3. Mental Health Screening

Within seven calendar days of arrival at the RC, all inmates (new commitments and parole violators) shall receive a screening for possible mental health needs. They shall be individually interviewed by a psychologist or Clinical Social Worker using the standardized Mental Health Screening questionnaire. The screening clinician shall explain the purpose of the screening process, and assess the inmate's ability to complete the interview. Inmates who are unable to speak English shall be provided with necessary interpreters. Inmates who refuse to participate in the mental health screening interview shall be referred for a psychological evaluation to determine if they have a mental disorder. Individuals who are unable to participate in the screening interview due to possible acute psychiatric distress shall be immediately referred for crisis care. This will normally include a referral for an emergency psychiatric evaluation (see Section 5, *Psychiatric Evaluations*, below).

If a returning Parole Violator identifies himself or herself as a former MHSDS inmate-patient, the file review indicates such designation, or Distributed Data Processing System (DDPS) indicates such designation, he or she shall be automatically referred for further psychological evaluation.

Following completion of the screening interview, the completed screening form shall be forwarded to the mental health data processing station for analysis. The results of this screening shall be documented by mental health staff on a CDCR 128-MH1, *Mental Health Screening Chrono*. Refusals to participate and any need for an interpreter shall also be documented on this Chrono. Each case shall be either cleared for general population placement, scheduled for a full psychological evaluation within 18 calendar days, or immediately referred for crisis care, as needed.

Information from the standardized Mental Health Screening shall be retained in the automated system for future reference and data compilation.

4. Psychological Evaluations

Inmates referred for psychological evaluation who have been identified in the initial mental health screening as having a possible mental health need or who refused the screening, shall be scheduled for a full psychological evaluation to be completed by the 18 calendar day evaluation period after arrival. Preparatory to the evaluation, the inmate's UHR and Central Files shall be reviewed when available, by the clinician. The results of the clinical screening assessment, including working diagnosis, shall be reviewed, as will any information generated from staff or self-referrals to that point.

If the inmate states that he or she had significant prior treatment or the file review indicates history of such treatment, the clinician shall request that the inmate sign a *Release of Information* in an attempt to obtain previous records. The clinician shall immediately forward the signed *Release of Information* form to the Health Record Services staff. Health Record Services staff shall process all requests for information from external sources, and shall monitor the receipt of the requested information. All received health information shall be immediately incorporated into the appropriate UHR with simultaneous notification to the requesting health care personnel, consistent with the Health Record Services Policies and Procedures. If the inmate has been moved to another institution, the Health Record Services staff shall check the Offender Based Information System/DDPS to determine the inmate's current location and forward the information immediately to the Health Record Services supervisor at the current location.

The psychologist or psychiatrist shall conduct an individual interview with the inmate in a private and confidential setting. Where possible, the psychologist or psychiatrist will utilize a computer terminal for reference and input in completing the evaluation. Identifying information already available in the computer will be verified in the file review and inmate interview.

The psychological evaluation shall be recorded on the CDCR 7386, *Mental Health Evaluation.* The psychologist or psychiatrist shall obtain and input a brief narrative of the presenting problem and historical information of relevance from the files and interview. A mental status examination and assessment of level of functioning will be completed, with the results directly entered into the computer on pre-programmed screens (or hard copy forms, where automated systems are not available). A provisional diagnosis shall be noted and, where this includes an Axis I condition, a level of functioning assessment shall also be provided.

After arriving at a diagnosis and functioning assessment, the psychologist or psychiatrist shall determine need for treatment and recommend a level of care, based upon the level of acuity and treatment program criteria. The psychologist's findings shall be documented on a CDCR 128-MH3, *Mental Health Placement Chrono*. Where possible needs for psychotropic medication are present, and no current prescription has been made, a referral to the psychiatrist shall be made, utilizing a standard CDCR 128 MH5, *Mental Health Referral Chrono*. A copy of the completed chrono requesting medication assessment shall be immediately provided to the psychiatrist. The psychiatrist's decision regarding the medication needs shall be documented in CDCR 128-MH6, *Psychiatric Evaluation Chrono* and the CDCR 7230-MH, *Interdisciplinary Progress Notes* in the inmate's UHR. Pending transfer of the inmate-patient to an appropriate level of care, an initial treatment plan shall also be provided by the psychologist or psychiatrist on a CDCR 7386, *Mental Health Evaluation*, and by the psychiatrist where medication or crisis care is necessary. Inmates who are acutely psychotic or suicidal shall be referred for placement in a mental health crisis bed (MHCB) or emergency transfer to the Department of Mental Health facility at the California Medical Facility or to Patton State Hospital for female inmates.

All inmates in a RC who are identified as requiring mental health services shall receive basic treatment as specified in the initial treatment plan. The initial treatment plan is an integral part of the psychological evaluation and formulated to meet individual inmate-patient's clinical needs while housed in the RC. The level of treatment provided during the transition period for these inmate-patients varies depending on the clinical needs and the length of stay in the RC as determined by the commitment status. The initial treatment plan is tailored to meet individual inmate-patient's clinical needs on a short- term basis and specifies the type of services, including orientation, medication needs assessment, or regular monitoring, crisis intervention as needed, and individual contact with a treating clinician as often as necessary.

Inmates who have no diagnosed mental illness, or whose current level of functioning is adequate without need for treatment (including psychotropic medications), shall be cleared for general population placement.

Inmates who are seen by the psychologist as a result of a staff or self-referral after the completed evaluation, shall be assessed for necessary adjustments to the original evaluation or treatment plan. Where such adjustments are indicated, new documentation will be generated.

Following entry of all elements of the psychological evaluation into the automated system, a CDCR 128-MH3, *Mental Health Placement Chrono*, shall be generated for the inmate's UHR. The chrono shall be provided for the Central File with copies to the Correctional Counselor (CC) and inmate. The 128-MH3, *Mental Health Placement*

*Chrono*, shall be completed whether the inmate requires treatment or is cleared for general population placement. The original document shall be dated and signed by the clinician completing the evaluation.

If an inmate refuses to participate in the psychological evaluation interview, the clinician shall review the Central File, UHR, and reports from housing officers and/or other staff, and make clinical observation of the inmate. Clinicians shall make an effort to resolve refusal cases by the end of the 18 calendar day evaluation period. In those rare situations where these cases cannot be resolved during the 18 calendar day evaluation period, the clinician shall document this on the inmate's CDCR 128-MH3, *Mental Health Placement Chrono*. The clinician shall include in a CDCR 7230-MH, *Interdisciplinary Progress Note*, a description of what efforts were made to complete the evaluation (e.g., review Central File and UHR, consult with housing officers, etc.) and a recommendation of how to proceed with the case. The Chief of Mental Health at the institution reviews all refusals and approves the clinician's recommendations. The results of the psychological evaluation shall be documented on a CDCR 128-MH3, *Mental Health Placement Chrono*. If the inmate is not transferred out of the RC within 90 days, a new CDCR 128-MH3, *Mental Health Placement Chrono*, shall be completed.

5. Psychiatric Evaluations

Psychiatric Evaluations will primarily address the issues of need for acute care and initiation or continuation of psychotropic medications. Review of need for continuation of medications prescribed prior to commitment to an institution will normally occur within 24 hours of intake. A medication specific informed consent with signatures of psychiatrist, inmate-patient, and a witness (health care staff) will be completed whenever a new medication is ordered. Psychiatric evaluations will be documented on a CDCR 7230, *Interdisciplinary Progress Note*, or CDCR 7386, *Mental Health Evaluation*, which will be placed in the inmate's UHR, and completion of a 128-MH6, *Psychiatric Evaluation Chrono*, for entry into the Central File. Inmate-patients requiring follow-up psychiatric care while awaiting transfer will be scheduled for that purpose, with documentation of clinical contacts recorded in the inmate-patient's UHR progress notes. Changes in mental status which impact placement decisions will also be documented on CDCR 128-MH6, *Psychiatric Evaluation Chrono*.

Psychiatrists are also responsible to review an inmate-patient's response to and side effects of psychiatric medications and to order and review appropriate laboratory testing. Where staffing permits, psychiatrists may also serve Primary Clinician (PC) functions.

6. Initial Treatment Planning and Treatment

Initial treatment planning must be developed and regular treatment must be provided for all inmate-patients who are identified as requiring mental health services. Mental Health needs of inmate-patients housed in a RC are often greater than those of inmate- patients in a general population setting, due to a variety of problems related to incarceration which often precipitate dysfunctional behavior or exacerbate pre-existing mental conditions. Treatment plans must address basic issues of adjustment, access to care, monitoring of medication continuity, and clinical pre-release or parole planning.

Without exception, mental health services are extended to all MHSDS designated inmate-patients while awaiting transfer to a mainline institution. Services include case management contacts, medication management, and monitoring pertinent to the level of functionality based on clinical judgment. In addition, crisis intervention, clinical pre-release or parole planning, and other case management services shall be provided consistent with the inmate's clinical needs. Services are provided through staff assigned to the RC.

Inmate-patients who require Correctional Clinical Case Management System (CCCMS) level of care shall be seen by the PC within 30 days of placement in CCCMS and at least every 90 days thereafter while at the RC, or more often if clinically indicated. These inmate-patients shall also be evaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues.

Inmate-patients who require Enhanced Outpatient Program (EOP) level of care shall be seen by the PC weekly and shall be evaluated by a psychiatrist at least monthly regarding psychiatric medication issues. Institutions that have both a RC and an established EOP may temporarily house and treat these inmate-patients in their regular EOP housing units until transfer.

Reception Centers housing inmate-patients requiring EOP level of care shall provide structured therapeutic activities. At the five reception centers with the preponderance of inmates (California Institution for Men, Richard J. Donovan Correctional Facility, North Kern State Prison, Wasco State Prison, and San Quentin State Prison), regularly scheduled therapy groups will be held on a daily basis. The remaining seven RCs with smaller populations will provide a less structured treatment array, but **all sites will provide opportunities for a minimum of one hour per day, five days per week, of out-of-cell therapeutic activities.** Inmate-patients will be enrolled into various group activities based upon PC assessment of individual needs, related to both individual symptoms as well as commitment status. The treatment activities delineated in the Program Guide will be augmented with the following options:

- Orientation to institution living – Individuals with impaired mental abilities who are placed into the institution environment require assistance in understanding and adapting to institutional rules and gaining access to available services. These individuals are also susceptible to being preyed upon by more aggressive inmates. This therapy group provides an orientation to prison life, offers coping mechanisms for personal safety, and allows for patients to ask questions and vent frustrations involved in their adaptation to their new environment.

- Assertiveness Training – Teaches ways to communicate assertively but non-aggressively. Didactic teaching techniques and practice sessions are utilized.

In addition to providing the above therapeutic activities (and the current provisions outlined in the EOP Clinical Pre-Release Program in 12-4-13 of the MHSDS Program Guide), additional clinical staff will provide individuals with imminent (60 to 120 days) release dates the following pre-release planning:

- Application for federal and state benefit entitlements, such as: Medi-Cal, Medi- Care, Supplemental Security Income, and Veterans Benefits. This will be accomplished by referring potentially eligible inmates to the Transitional Case Management Program under the rubric of the Division of Adult Parole Operations.

- Initiation of Conservatorship proceedings where the inmate-patient meets criteria.

- Liaison with Parole Outpatient Program staff with reporting instructions and planning for continuity of care.

- Liaison with family members and significant others who may provide living options to the individual upon release.

- Screening for need for inpatient placement per Penal Code 2962 (Mentally Disordered Offender).

7. Transfer Timelines

Once an inmate-patient is evaluated and placed in the MHSDS program, the inmate-patient shall be processed by classification staff on a priority basis to ensure timely transfer to a treatment setting. All EOP designated inmate-patients shall be transferred to a treatment setting within 60 days of level of care designation, or 30 days of such designation, if clinically indicated. All CCCMS designated inmate-patients, with the exception of parole violators with 90 days or fewer to parole, shall be transferred to a

mainline institution within 90 days of level of care designation or 60 days of such designation, if clinically indicated. Inmate-patients with fewer than 30 days to parole shall receive mental health services as described above, consistent with their clinical needs. Refer to transfer timeline table in MHSDS Program Guide, *Chapter 1, Program Guide Overview*.

8. Staff and Self Referrals

At any time during the RC process, an inmate may self-refer, or be referred by any staff member for a review by a mental health clinician. Referrals will be made on standardized forms and forwarded to the mental health office. All referrals will be entered into the data system to ensure responses and facilitate scheduling.

Crisis cases identified by clinical and custody staff will be immediately referred to a psychologist or psychiatrist. Medication issues identified by clinical staff will be immediately referred to the psychiatrist.

a) Staff referral: Any staff member who observes possible signs or symptoms of a serious mental disorder may refer an inmate for clinical evaluation by completing a CDCR 128-MH5, *Mental Health Referral Chrono*, and handle as self-referral process below. Any inmate who is observed to be a suicide risk, or in any other condition that requires crisis care, shall be immediately screened by a PC to assess the potential for suicide and, if appropriate, referral to the Mental Health Crisis Bed (MHCB) for admission. On weekends and holidays, refer to self-referral process below.

b) Self referral: Inmates may request a clinical interview to discuss their mental health needs. These requests are made on a CDCR 7362, *Health Care Services Request*.

Mondays through Fridays, the following shall occur:

a) A health care staff member shall collect all the CDCR 7362, *Health Care Services Request*, and CDCR 128-MH5, *Mental Health Referral Chrono*, each day from the designated areas.

b) Upon receipt of the collected forms, nursing staff shall initial and date each CDCR 7362, *Health Care Services Request*, and CDCR 128-MH5, *Mental Health Referral Chrono*.

c) The CDCR 7362, *Health Care Services Request*, and CDCR 128-MH5, *Mental Health Referral Chrono,* shall be delivered to the designated program representative in mental health services, dental services, or pharmacy services for same-day processing.

On weekends and holidays, the following shall occur:

a) The Triage and Treatment Area RN shall review each mental health staff referral form and CDCR 7362, *Health Care Services Request*, for medical, dental, and mental health services, shall establish priorities on an emergent and non-emergent basis, and shall refer accordingly.

b) If a mental health clinician is not available, the Medical Officer of the Day (MOD), physician on call or psychiatrist on call shall be contacted.

Inmates will be seen by a mental health clinician or on weekends by the MOD, physician or psychiatrist on call within the clinically determined time frame.

a) Emergent – Emergency cases will be seen immediately or escorted to the Triage and Treatment Area

b) Urgent – Urgent cases shall be seen within 24 hours

c) Other cases will be seen within five working days. Copies of staff referral forms shall be placed in both the Central File and UHR for future reference. Staff members initiating referrals may be contacted directly, as necessary. Inmate self- referral forms shall be kept confidential, and the results of these interviews documented as deemed appropriate by the clinician.

9. <u>Classification File Review</u>

Correctional Counselors shall conduct a comprehensive Central File review for all inmates received into the CDCR. This shall include a review of current commitment offense records and parole violation reports. Other documentation (e.g., Mental Health Placement Chronos or Probation Officer's Reports) containing information about prior mental health issues, placement in mental health treatment programs, or criminal history shall also be reviewed for indications of mental health needs, if applicable. A face-to- face interview shall also be conducted. The CC shall complete a staff referral when there are indications of a need for a mental health evaluation. The specific reason(s) for the mental health evaluation shall be noted on the CDCR 128-MH5, *Mental Health*

*Referral Chrono.* Clinical recommendations for treatment shall be utilized in determining institutional placement.

10. Placement Decisions

The completed case file with results of mental health evaluations will be reviewed by Classification Staff Representatives for final placement decisions. Where treatment is required, the decision will necessitate placement in an institution with the availability of the recommended level of care (inpatient, MHCB, EOP, or CCCMS), consistent with the CDCR's policy on placements, based on security requirements.

11. Data Processing

A data processing station within mental health services at each RC will process screenings and assessments, receive all referrals for evaluation, schedule clinicians to conduct evaluations, process (type, record, distribute) completed evaluations, track inmates through the stages of assessment, and submit periodic summaries of required data to institutional administrative staff and headquarters. It is important to emphasize that, in order to ensure the accurate collection of data the system will be utilized by appropriately trained CDCR staff and will provide adequate safeguards to protect the security and confidentiality of the data. Inmate clerks are banned from having access to documents or records containing other inmates' mental health information (California Codes of Regulations, Title 15, Section 3354, (b), (6)).

# CHAPTER 3
## Correctional Clinical Case Management System

A. **INTRODUCTION**

The California Department of Corrections and Rehabilitation's (CDCR) Mental Health Services Delivery System (MHSDS) serves the majority of inmates with serious mental disorders through the Correctional Clinical Case Management System (CCCMS) available at all institutions. For General Population (GP) outpatient services to be effective (e.g., sustain improved functioning and minimize the use of more intensive levels of care), inmates must know what services are available and how to access them. An effective clinical case management system ensures timely access to mental health care. Outpatient services delivered through a well-designed clinical case management system is the most cost-effective means of maintaining adequate institutional functioning among inmates with serious mental disorders.

1. The strength of well-coordinated clinical case management is its ability to systematically monitor the clinical needs and movement of MHSDS inmate-patients within and between CDCR institutions. With this service delivery mode, CDCR provides the best possible means of ensuring continuity of care while optimizing the use of available resources.

2. Clinical case management improves the quality of mental health services offered through timely therapeutic intervention, utilizing the CDCR-approved Mental Health Tracking System (MHTS). The MHTS fosters information sharing among staff who provide service to inmate-patients and the optimal utilization of professional time.

***The Correctional Clinical Case Management System***

Clinical case management facilitates care by linking inmate-patients to needed services and providing sustained support while accessing such services. Clinical case management adds to the usual functions of traditional case management a clinical component based on a therapeutic working relationship between inmate-patient and Primary Clinician (PC). This therapeutic relationship makes the PC a more effective agent in helping the inmate-patient achieve individualized treatment goals. The PC provides therapeutic intervention and coordinates other mental health treatment services required by the inmate-patient. This relationship ensures continuity of care.

The CCCMS services in CDCR are provided as outpatient services within the GP setting to promote inmate-patient integration and normalization. Inmate-patients requiring more

intensive services are referred to a higher level of care and are transferred to an appropriate institution/facility.

1. Through its universal availability and as the least restrictive level of care, CCCMS forms the foundation of the CDCR's MHSDS.

2. Ready access to treatment intervention increases the safety and security of the institution, and may also contribute to lowering the recidivism rate of inmate-patients released on parole or discharged to the community.

The CCCMS within the prison system is a different type of case management than one would find in the community. Within the CDCR, the fact that basic needs of inmate-patients are already provided allows PCs to concentrate on helping resolve mental health problems. Adjunct services which help maintain or improve functioning (e.g., education, substance abuse groups, and work training assignments), are available within the perimeter of the institution and are thus relatively easy for inmate-patients to physically access.

While the structure of correctional settings is conducive to facilitating clinical case management responsibilities, other factors including penological concerns that are inherent in correctional settings pose special problems for clinical practice. Institution inmates represent a specialized clientele in whom treatment of serious mental disorders are often complicated by dual diagnoses and behavior problems. Further, security considerations have to be appropriately considered in treatment plans and service delivery methods.

Psychiatrists, Clinical Social Workers (CSW), and psychologists can function as PCs. All institutions have clinical case management staff available to inmate-patients.

Using Correctional Counselors (CC), CDCR provides case management for institutional programming with which CCCMS shall interface. In effect, each CCCMS inmate-patient shall have both a PC and a CC working within the scope of their designated duties, as members of an Interdisciplinary Treatment Team (IDTT) to coordinate and deliver services.

CCCMS inmate-patients are a highly diversified population representing a broad spectrum of functional abilities. Treatment services must be tailored to adequately meet the clinical needs of each individual inmate-patient considering the functional level, readiness for treatment, insight into mental illness, and motivation for treatment. Individualized treatment plans specify measurable treatment goals and objectives, address problems, prescribe intervention modalities including treatment frequency/duration, and identify the staff member responsible for providing services. The treatment services are individualized by clinical need as described below:

1. For high-functioning inmate-patients, tracking and monitoring is often sufficient to meet this group's clinical needs. They are the most likely group to benefit from active involvement in institutional programming and require minimal contact with the PC. The primary treatment focus is on symptom management and medication monitoring.

2. For inmate-patients with significant psychological impairment, CCCMS provides, in addition to regular monitoring, more focused monitoring contacts with the PC, treating psychiatrist, and custody and correctional counseling staff to promote symptom management and prevent decompensation. Individual and group psychotherapy and other supportive services are provided as clinically indicated.

3. Although scheduled at different intervals according to clinical needs, CCCMS inmate-patient monitoring entails regular assessments and treatment plan updates.

**B. PROGRAM OBJECTIVES**

The goal of the CCCMS is to maintain and/or improve adequate functioning of mentally disordered inmate-patients in the least restrictive treatment setting possible within each correctional setting. Doing so enables CCCMS to prevent the use of more expensive, intensive level of care treatment services. The array of CCCMS services available to GP inmates extends to inmates in segregated housing units [Administrative Segregation Unit (ASU), Security Housing Units (SHU), and Condemned inmates]. The CCCMS also helps maintain adequate functioning among "nonpatients" by providing crisis intervention to those experiencing situational crises. To accomplish this goal the program provides:

1. Prompt access to mental health professionals for diagnostic evaluation and treatment.

2. Continuity of care by tracking inmate-patients' progress and by timely referral to appropriate level of care.

3. Linkage to available adjunct services when clinically and custodially appropriate (e.g., work assignments, academic and vocational education programs).

4. Linkage to existing prerelease programs and parole outpatient treatment services for inmate-patients about to parole.

***Treatment in CCCMS***

1. Ensures that inmate-patients participating in treatment address the following areas:

   a. Orientation and adjustment to the day-to-day requirements of institutional living.

b. The offense or crime itself and what, for the individual inmate, were precursors or contributing factors (including cognitive, behavioral, and emotional indicators).

c. The nature of the diagnosed mental disorder including symptom identification, coping strategies, medication compliance issues, and identification of high-risk situations that may lead to decompensation.

2. Minimizes crisis episodes and inpatient hospitalization through timely therapeutic intervention, regular assessments and treatment plan updates.

3. Helps reduce recidivism upon release from CCCMS by providing clinical pre-release planning and coordinating the follow-up of mental health services with CCs and Parole Outpatient Clinic (POC Clinic) staff.

## C. POPULATION SERVED

***Overall Treatment Criteria***

Overall treatment criteria have been developed for the MHSDS. An inmate must meet the criteria of 1, 2, or 3 below in order to receive MHSDS treatment at any level of care:

1. Treatment and monitoring are provided to any inmate who has ***current*** symptoms and/or requires treatment for the current Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:

   **Schizophrenia (all subtypes)**
   **Delusional Disorder**
   **Schizophreniform Disorder**
   **Schizoaffective Disorder**
   **Brief Psychotic Disorder**
   **Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
   **Psychotic Disorder Due To A General Medical Condition**
   **Psychotic Disorder Not Otherwise Specified**
   **Major Depressive Disorders**
   **Bipolar Disorders I and II**

2. Medical Necessity: Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which:

   **Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a**

**mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

3. Exhibitionism: Treatment is required when an inmate has had at least one episode of indecent exposure in the six month period prior to the IDTT consideration of the need for exhibitionism treatment, and the inmate-patient is either:

   - Diagnosed with Exhibitionism, or

   - Meets the alternate criteria. (*Alternate Criteria*: An inmate who meets all criteria for the diagnosis of Exhibitionism, except that the victim was not an "unsuspecting stranger" but was a staff member or inmate who did not consent to or encourage the behavior.)

   (A diagnosis of Exhibitionism is not required for inmates who meet the alternate criteria.)

***Specific Treatment Criteria for CCCMS***

In addition to the overall treatment criteria above, an inmate must meet the following specific treatment criteria to receive treatment at the CCCMS level of care:

- Stable functioning in the GP, ASU, or SHU

- Criteria not met for higher levels of care

- Exhibits symptom control, or is in partial remission as a result of treatment

- These conditions usually result in Global Assessment Functioning scores of 50 and above.

  All inmates, including those in SHU or ASU, needing crisis intervention and/or continued treatment also receive services from CCCMS staff. Details for provision of services in ASU and SHU are found in their respective chapters of the Program Guide.

  Once entered in CCCMS, inmate-patients are tracked using the MHTS.

## D. TREATMENT AND ASSESSMENT SERVICES

The CDCR's CCCMS relies on both mental health staff and custody staff, as members of an IDTT working within the scope of their credentials and job descriptions, to provide the

prescribed services to an inmate-patient suffering from a serious mental disorder. The basic MHSDS treatment philosophy embraces the concept that mentally disordered inmate-patients need comprehensive services to maintain adequate functioning in the GP, ASU, or SHU. In addition to mental health treatment, institutional services such as academic and vocational education programs are therapeutic and integral elements in a comprehensive treatment plan for GP inmate-patients. For SHU inmate-patients, treatment plans are modified to take into account inmate security concerns and status. As noted, this correctional-clinical model of case management requires custody and clinical staff to work in tandem, from the beginning, to assess the treatment and programming needs of seriously mentally disordered inmate- patients and to ensure they receive the mental health and institutional services specified in their treatment plans.

***Referral to CCCMS***

Inmates are referred to the program from a variety of sources. A large percentage come from Reception Centers (RC), identified as having a serious mental disorder in the routine process of screening and evaluation. Others are referred from Enhanced Outpatient Program (EOP), Mental Health Crisis Beds (MHCB) or, less frequently, Department of Mental Health (DMH) Inpatient Programs. Some may be identified at the time of inter-institutional transfer. Others are referred by institutional staff or through self-referrals. All referrals to CCCMS are processed in a timely manner and entered into the MHTS by clerical staff.

Inmates who receive a CDCR 115, *Rules Violation Report* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

- CDCR 115-MH, *Rules Violation Report: Mental Health Assessment;*
- A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication. The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,
- For inmate-patients included in the MHSDS, to the inmate-patient's PC.

1. Referrals are made on one of several forms, depending on referral source:
    - Inmate Request for Interview
    - CDCR 7362, *Health Care Services Request Form*
    - Staff Referral on CDCR 128-MH5, *Mental Health Referral Chrono*

- From RCs and other levels of care on a CDCR 7386, *Mental Health Evaluation*, and a corresponding CDCR 128-MH3, *Mental Health Placement Chrono*

NOTE: When an IDTT determines that an inmate-patient requires treatment of exhibitionism, that inmate-patient's level of care shall be changed to CCCMS, Medical Necessity (or higher if appropriate), bypassing the standard referral process.

2. The CCCMS Clinical Director shall appoint a staff member to coordinate and track referrals. A Clinical Intake Assessment shall be completed within ten working days of referral/arrival. If there is an adequate CDCR 7386, *Mental Health Evaluation*, available in the Unit Health Record (UHR) the PC may update it with documentation on a CDCR 7230, *Interdisciplinary Progress Note*, or on a CDCR 7389, *Brief Mental Health Evaluation*. If there is no CDCR 7386, *Mental Health Evaluation*, in the UHR, a new CDCR 7386, *Mental Health Evaluation*, must be done. The coordinator shall then arrange for the inmate to be seen immediately by a Staff Psychiatrist if an emergency psychiatric evaluation is needed. When disagreement exists between the evaluator at a reception center and the receiving institution IDTT regarding the need for the CCCMS services, the receiving institution clinician shall document the justification for removal from the program and complete a CDCR 128-MH4, *Mental Health Removal Chrono*, within 90 days of inmate transfer from that reception center. The CDCR 128-MH4, *Mental Health Removal Chrono*, requires approval from the Chief of Mental Health or designee.

3. Inmate-patients are continued on the same medication(s) without interruption pending further evaluation of psychotropic medications by a receiving psychiatrist.

4. Clinical case management staff are available for the initial screening of inmates referred for crisis episodes. In this initial screen the level of required clinical intervention is assessed and proper action taken.

***Clinical Intake Assessment***

While the CDCR's MHSDS provides screening and assessment upon reception, a more comprehensive assessment is critical in formulating a treatment plan after placement in CCCMS. The assessment includes the inmate-patient's personal strengths, achievements and goals, and past responses to intervention. Inmate-patients placed in CCCMS directly from RCs have a psychological evaluation (CDCR 7386, *Mental Health Evaluation*) with at least a provisional diagnosis and an initial treatment plan. In all cases, assessments and treatment plans are updated to include an evaluation of the inmate-patient's current readiness for

institutional programming (e.g., work, substance abuse counseling, school, prerelease transition).

The PC completes a clinical intake assessment within ten working days of referral/arrival. If there is an adequate CDCR 7386, *Mental Health Evaluation*, available in the UHR the PC may update it with using page 13 of CDCR 7386, *Mental Health Evaluation* (Add-A-Page), or documentation on the CDCR 7230, *Progress Note*. If there is no CDCR 7386, *Mental Health Evaluation*, a new CDCR 7386, *Mental Health Evaluation* must be done. The clinical intake assessment shall include:

1. A review of the inmate-patient's Central File and UHR, a face-to-face interview with the inmate-patient, and interviews with other institutional staff when possible.

2. A review of previous mental health records. If the inmate-patient states that he or she had significant prior treatment or if the file review indicates history of such treatment, the clinician shall request that the inmate-patient sign a *Release of Information* form to obtain previous records. The clinician shall forward the signed *Release of Information* form to Health Records for immediate processing, in accordance with Health Record policies and procedures.

3. Evaluation of an inmate-patient's ability to program based on appropriate educational and vocational testing instruments that take into account the degree of psychiatric impairment, physical (medical) limitations, and custody and housing restrictions.
4. Multiaxial diagnoses (Axis I through V) from the current Diagnostic and Statistical Manual.

5. Evaluation of suicide and violence potential.

***Treatment Planning***

**Interdisciplinary Treatment Team**

The responsibilities of overall treatment planning within the CCCMS program rests with an IDTT.

1. These responsibilities include:

    - Admission decisions for individual cases

    - Formulation and approval of individualized treatment plans

- Annual and special case reviews for the continuation or termination of services
- Review of current treatment needs and response to past intervention efforts

2. The IDTT is composed of, at a minimum:

- Assigned Primary Clinician
- Assigned Psychiatrist
- Correctional Counselor
- Inmate-patient

3. Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information:

- Licensed Psychiatric Technicians
- Custody Officers

The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care. Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate- patient is not benefiting from treatment services available at the current level of care. Consideration of appropriate level of care shall be documented by the IDTT on a CDCR 7230-MH, *Interdisciplinary Progress Notes,* and shall include the justification for maintaining the current level of care or referral to a different level of care.

In consultation with the IDTT, the PC develops an individualized treatment plan for all CCCMS inmate-patients. Treatment plans are based on current assessments from all disciplines and with as much participation from the inmate-patient as possible. The inmate-patient shall be included in the IDTT, unless the inmate-patient refuses to participate. If the inmate-patient refuses to participate in the IDTT, the inmate-patient shall indicate the refusal, the reason for the refusal, and shall sign on the backside of the ducat. Inmate-patients shall not be disciplined for not participating in IDTT. If the inmate-patient refuses to participate, the PC documents the reason for refusal in the CDCR 7230, *Interdisciplinary Progress Notes.*

The Treatment Plan specifies mental health and other institutional services that can facilitate the resolution of identified problems listed in the problem list. All activities including work, education, and recreation are potentially therapeutic and must be included in the total treatment plan. When activities are prescribed in the treatment plan, specific target behaviors that are expected to benefit from these activities must also be identified. The individualized treatment plan must be completed within 14 working days of referral/arrival by the PC in consultation with the other IDTT members. CDCR Form 7388, *Mental Health Treatment Plan*, is used for this purpose.

1. Selected information from the intake assessment and the treatment plan are shared with the CCs during IDTT for inclusion in the Classification Committee review.

2. The treatment plan includes:

   a. Basic identifying data about the inmate-patient (age, race, committing county, commitment offense, current Earliest Possible Release Date or Minimum Eligible Parole Date, classification score/custody level, education, and work history);

   b. A diagnosis, identified problems, and treatment objectives measurable in behavioral terms;

   c. Treatment services and other institutional services designed to impact the identified problems and achieve individual treatment objectives;

   d. Frequency and duration of services to be provided;

   e. Documentation regarding the completion of appropriate forms such as a signed *Release of Information* necessary to obtain prior medical/mental health records, signed Medication Informed Consent to medicate, and heat warning forms for those inmate-patients prescribed psychotropic medication; and

   f. Aftercare and clinical pre-release plans.

3. The date of the treatment plan approval shall be entered into the MHTS.

4. At the conclusion of the initial IDTT, if an inmate-patient is determined to be appropriate for inclusion in the CCCMS program, the PC shall send a CDCR-128 MH3, *Mental Health Placement Chrono*, to the appropriate staff to be entered in the Priority Level of Care List for inputting into the MHTS. That staff person forwards the CDCR 128-MH3, *Mental Health Placement Chrono*, to the Classification and Parole Representative.

5. Treatment plans are updated at least annually, whenever a change in level of care occurs, or when clinical judgment indicates the need for an update.

6. All services to inmate-patients shall be reflected in treatment plan updates.

7. All updates shall be entered in the MHTS and a CDCR 128 MH3, *Mental Health Placement Chrono*, shall be produced with every change in level of care (see "Patient Monitoring and Clinical Case Review" in this section for more details).

***Treatment Modalities***

Institutional programming is an essential component of the treatment regimen of most clinical case management participants. The PCs shall make specific recommendations for programs such as education, work, and substance abuse counseling and coordinate with CCs to ensure appropriate linkages to these programs. As noted earlier, a therapeutic working relationship between the inmate-patient and the PC is essential to the success of the treatment outcome.

Based on identified needs, treatment modalities may include:

- Orientation and supportive counseling for institutional adjustment
- Medication review and monitoring
- Individual counseling and crisis intervention
- Group therapy such as anger management and relapse prevention
- Social skills training
- Consultation services, such as to education and work programs
- Clinical discharge or clinical pre-release planning

***Medication Evaluation and Management***

1. Each CCCMS inmate-patient on psychiatric medication shall be reevaluated by a psychiatrist a minimum of every 90 days regarding psychiatric medication issues. The psychiatrist shall respond to inmate requests and staff referrals for medication issues according to the time frames established for inmate and staff responses (i.e., Emergent [immediately], Urgent [within 24 hours], or Routine [5 working days]).

2. Refer to Inmate Medical Services Policies and Procedures, *Medication Management* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy (DOT), and other aspects of medication administration.

3. Refer to Chapter 5, *Mental Health Crisis Bed*, for information on involuntary medication administration.

***Transfer and Clinical Discharge***

Important functions of PC include:

- Making the clinical determination as to when and how to transfer inmate-patients to more intensive levels of care,
- Discharging those inmate–patients who no longer need services, and
- Coordinating pre-release planning for inmate-patients being paroled.

Clear and measurable criteria for both transfer to more intensive levels of care and clinical discharge are important (Chapter 1, Program Guide Overview, Section D). Equally important is coordination with units or programs which shall take over the care and/or monitoring of the inmate-patient and coordination of pre-release planning with correctional counseling staff, Parole and Community Services Division Transitional Case Management staff, and Parole Outpatient Clinic staff.

1. Prior to CCCMS termination (clinical discharge or program transfer), the PC must complete a CDCR 128-MH3, *Mental Health Placement Chrono*, or CDCR 128-MH4, *Mental Health Removal Chrono*, to notify custody.

2. Clinical discharges and/or program transfers shall be documented in the MHTS.

3. The PC shall present a recommendation for transfer to an EOP or clinical discharge in a clinical case review with the IDTT. If, after consultation, the IDTT approves recommendation for transfer to an EOP, the PC shall complete a CDCR 7386, *Mental Health Evaluation,* and a corresponding CDCR 128 MH3, *Mental Health Placement Chrono*. If the team approves recommendation for clinical discharge, the PC shall complete a CDCR 128 MH4, *Mental Health Removal Chrono*.

4. Inmate-patients requiring more intensive outpatient services within a structured setting shall be transferred to an EOP within 60 days of the EOP designation, or within 30 days if clinically indicated.

5. Inmate-patients awaiting EOP transfer shall have updated treatment plans, (CDCR 7388, *Mental Health Treatment Plan*). While awaiting EOP transfer, inmate-patients shall be seen on a weekly basis by the PC.

6. If a transfer occurs within the same institution, immediately before transfer to EOP the CCCMS PC shall contact the EOP Clinical Director or designee to ensure continuity of care and provide the most recent, relevant clinical information regarding the inmate-patient's clinical needs.

7. Inmate-patients shall be transferred to MHCB for crisis episodes requiring 24-hour nursing care. The transfer to a MHCB shall be accomplished within 24 hours of referral. While awaiting transfer, the inmate-patient shall be housed in a medical facility with at least an Outpatient Housing Unit (OHU) level of care. A psychiatrist, psychologist, or CSW shall provide clinically appropriate care, while the inmate-patient is awaiting transfer. This may include suicide observation, one to one counseling, medication management, and/or nursing care.

8. Inmate-patients with multiple admissions to MHCB (three or more within a six month period) shall be evaluated for referral to DMH or EOP.

9. Inmate-patients who:

   - attempt suicide,
   - currently have significant suicidal ideation or potential, or
   - pose a moderate to serious risk for suicide,

   shall be admitted to MHCB and considered for referral to DMH. If an inmate-patient is accepted to DMH, the inmate-patient shall be transferred to DMH within 72 hours of bed assignment.

10. Inmate-patients may be clinically discharged from CCCMS if they have been in continuous remission and are functioning adequately in the mainline without treatment (including medication) for six-months. Inmates shall be seen for 90-day clinical contacts throughout the six-month period.

11. Inmate-patients admitted on the basis of medical necessity shall be discharged when the crisis or problem necessitating treatment is resolved. Discharge of inmate-patients, who were placed in the CCCMS program on a medical necessity, shall be determined by the IDTT and shall be approved by the Chief Psychiatrist, Chief Psychologist, Senior Psychologist or designee.

12. Clinical pre-release plans included as part of the Treatment Plan shall be updated as appropriate but at least at every annual clinical case review.

13. The Discharge/Transfer Summary shall include the diagnoses (current Diagnostic and Statistical Manual version), Axis I through Axis V, a brief summary of the inmate- patient's course of treatment in CCCMS, recommendations for follow-up care, and discharge medications (Pre-release planning).

14. The PC shall coordinate with the CC, staff from the Transitional Case Management program, and clinical staff from the POC Clinic regarding plans for release and follow-up of the inmate-patient to be paroled. Discharge/Transfer Summaries shall be forwarded to the POC Clinic or other pertinent clinical pre-release program providers after signed Releases of Information have been obtained. While necessary for record transactions with other agencies, a signed release is not needed within CDCR. Patients currently receiving medication, upon a physician's order, shall be provided a 30-day supply of essential medications when released on parole or discharged unless clinically contraindicated.

15. CCCMS inmate-patients who are inappropriately transferred to a non-CCCMS mainline institution shall be transferred to a defined treatment setting within 30 days of arrival at the non-CCCMS institution.

16. Inmate-patients who are determined to require CCCMS level of care while in a non-CCCMS institution shall be transferred to a treatment setting within 90 days of the level of care designation or 60 days of the level of care designation, if clinically indicated.

## E. INMATE-PATIENT MONITORING AND CLINICAL CASE REVIEW

### *Monitoring Contacts*

Inmate-patient progress is assessed by the PC during regularly scheduled contacts. The frequency of these contacts shall vary based on clinical needs. The majority of CCCMS inmate-patients who have been stabilized are capable of functioning adequately in the mainline while receiving maintenance care. Usually, they can manage the symptoms of their mental illness and report with little prompting for renewal of medication prescriptions. A

certain percentage of inmate-patients will manifest greater needs and thus require more frequent contact.

1. Face-to-face individual contacts between the PC and the CCCMS inmate-patients in a GP setting shall occur as often as clinical needs dictate but at least once every 90 days.

2. Inmate-patients recently released from more intensive levels of care, admitted directly from RCs, or recently released from segregated housing units may initially require daily to weekly contacts.

3. Inmate-patients who were admitted to the MHCB for a suicide attempt or ideation, upon discharge from that program, shall be seen by the PC, or designee, daily for the first five calendar days following discharge, and as often as required thereafter. Custody staff shall also observe these inmate-patients a minimum of every hour for the first 24 hours after the discharge from the MHCB. At the end of the first 24 hours after discharge, the CCCMS clinical staff shall evaluate an inmate-patient to determine the need for extending the observation period (not to exceed 24 hours at a time). If the recommendation for an extension is justified, the inmate-patient shall be observed every two hours for the following 48 hours and every 4 hours thereafter. If, after a second evaluation, a mental health clinician feels additional hourly checks are required, the inmate-patient shall be returned to the MHCB for further stabilization. Custody staff shall maintain a log of their rounds on inmate-patients. Inmate-patients housed in OHUs for suicide observation, who do not require MHCB level of care and who were discharged from the OHU before 24-hours, may be seen by clinicians and custody staff for follow-up care. The process and timeframes for follow up care may be the same as is described for MHCB suicide dischargees.

4. Monitoring contacts and attendance at treatment activities shall be entered into the inmate-patient contact file of the MHTS.

5. Significant inmate-patient contacts shall be documented on CDCR 7230, *Interdisciplinary Progress Notes,* in the UHR on the same day of occurrence. Group therapy sessions must be recorded in a monthly summary note and include the inmate- patient's attendance, behavior in the group, and the progress toward achieving treatment goals.

***Clinical Case Review***

In consultation with the IDTT, a full review of outpatient progress, which includes clinical status and performance in work, educational and vocational training, social, and daily-living

activities, shall be done to ascertain the appropriateness of current level of care placement. This review may or may not result in modifications of the Treatment Plan.

1. Clinical case reviews shall be done at least annually, prepared prior to, and included as applicable in Classification Committee hearings reviewing inmate-patient status. The first annual clinical review shall be scheduled in the month prior to a classification hearing and annually thereafter.

2. The annual review culminates in a CDCR 7388, *Mental Health Treatment Plan*, rejustification. This report shall include a description of current clinical status, participation in treatment and institutional programming, and reasons for continuation or termination of CCCMS services.

3. Clinical case reviews shall also be done every time placement in more intensive levels of care or change to nonpatient status is indicated. These case reviews are documented in the CDCR 7230, *Interdisciplinary Progress Notes*, CDCR 7386, *Mental Health Evaluation Form*, CDCR 7388, *Mental Health Treatment Plan*, a CDCR 128-MH-3, *Mental Health Placement Chrono*, or a CDCR 128-MH, *Mental Health Removal Chrono*. Clinical case review documentation shall include the printed names and signatures or initials of the clinical and custody staff present in the IDTT. The custody staff who manages the inmate-patient's day-to-day routine shall be included whenever possible in the IDTT. The PCs shall document the presence of the inmate-patient during the review and indicate reasons for the inmate-patient's absence.

## F. STAFFING

Staffing for CCCMS includes psychologists, CSWs, psychiatrists, and clerical support. CDCR may utilize contract staff as necessary to fulfill staffing requirements.
Staff training is crucial to the successful operation of the CCCMS. Training is essential because CCCMS, as a formalized systemwide approach to outpatient treatment in inmate- patients' regularly assigned living units, is relatively new, not only to CDCR, but to correctional settings in general. Many clinical staff hired to work in CCCMS programs are new, not only to the institution setting, but also to forensic mental health. Training facilitates standardizing basic elements of CCCMS service delivery.

### *Clinical Director*

A Clinical Director is critical to the success of CCCMS. In addition to direct care responsibility, the Director takes the lead in developing and implementing local policies and procedures for clinical case management, oversees the MHTS, makes PC assignments, facilitates training, provides clinical and administrative supervision, and coordinates system

monitoring functions contained in quality assessment and improvement activities. The Clinical Director can be any licensed mental health professional with experience running a complex case management system. In the standard staffing pattern, a Senior Psychologist is provided to serve as the CCCMS Clinical Director, although in some institutions this role is performed by the Chief of Mental Health or designee (see description in Chapter 1, *Program Guide Overview*).

***Primary Clinician***

Under the direction of the Clinical Director, the PC performs the necessary case management functions for all outpatients in their caseloads. This includes assessment, treatment planning and treatment, clinical monitoring, and clinical case reviews. They coordinate with institutional services that are considered helpful in maintaining or improving inmate-patient functioning. The PCs shall screen institution referrals to the CCCMS, including those for crisis episodes. If an inmate-patient is referred for evaluation of medication related issues, the referral shall be routed directly to a psychiatrist for evaluation. CSWs, psychologists, and psychiatrists shall be assigned as PCs.

***Clerical Support***

Medical Transcribers or Office Technicians shall provide clerical support to clinicians. Clerical support includes: record keeping; assisting with scheduling; transcribing and typing reports and forms used in referral, assessment, treatment planning, patient contacts, and clinical case reviews. Responsibilities of this position also include computer data entry, e.g. MATS.

## G. MENTAL HEALTH QUALITY MANAGEMENT SYSTEM

Ongoing assessment of the quality of clinical services shall follow the Mental Health Quality Management System procedures.

# CHAPTER 4
## Enhanced Outpatient Program

### A. INTRODUCTION

The Enhanced Outpatient Program (EOP) provides the most intensive level of outpatient mental health care within the Mental Health Services Delivery System (MHSDS). The program is characterized by a separate housing unit and structured activities for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting, yet are not so impaired as to require 24-hour inpatient care. Inmate-patients who, because of a mental disorder, do not function well in EOP may be referred for higher levels of care including: Mental Health Crisis Bed (MHCB); or Department of Mental Health (DMH) Day Treatment Program, Intermediate Care Program, or Acute Psychiatric Program.

Critical components include:

1. A comprehensive array of mental health services delivered within the framework of an Interdisciplinary Treatment Team (IDTT), which is composed of representatives from a cross-section of clinical disciplines as well as prison custodial and counseling staff. Treatment is focused on resolution of institutional adjustment problems which impede functioning within the GP. Services include management of activities of daily living, group and individual psychotherapy, medication management, recreational therapy, and clinical pre-release planning.

2. A designated housing unit with restricted access and alternative educational, work, and recreational opportunities specifically provided for inmate-patients whose mental illness precludes their placement and participation in the GP programs.

3. Active interface with custodial staff, including Correctional Counselors (CC), which enhances the assessment and treatment process and optimizes the inmate-patient functioning within the prison environment.

### B. PROGRAM OBJECTIVES

The goal of the EOP is to provide focused evaluation and treatment of mental health conditions which are limiting an inmate's ability to adjust to a GP placement. The overall objective is to provide clinical intervention to return the individual to the least restrictive clinical and custodial environment.
More specific objectives include:

1. Provide short to intermediate term (a range of 3 to 12 months for most cases) focused care for inmate-patients who do not require 24-hour inpatient care. Short term treatment goals are primarily directed at developing constructive coping mechanisms, achieving treatment compliance, and further stabilization of psychiatric symptoms that are necessary for transition to the Correctional Clinical Case Management System (CCCMS) level of care.

2. Provide longer-term placement for inmate-patients with chronic mental illness whose symptoms have stabilized but whose level of functioning is insufficient to allow GP placement. Supportive care, assistance with activities of daily living, recreational therapy, anger management, reality therapy, and programs related to symptom management and clinical pre-release planning are offered.

3. Provide short-term secure custodial placements with clinical resources which address behavioral problems for mentally ill EOP inmate-patients who are transitioning from Security Housing Units or Psychiatric Services Units (PSU). Treatment for these inmate-patients focuses on achieving behavioral control and the development of socially acceptable behavior within the institution.

## C. POPULATION SERVED

Overall Treatment Criteria

Overall treatment criteria have been developed for the MHSDS. An inmate must meet the criteria in 1, 2, or 3 below in order to receive MHSDS treatment at any level of care:

1. Treatment and monitoring are provided to any inmate-patient who has ***current*** symptoms and/or requires treatment for the current Diagnostic and Statistical Manual diagnosed (may be provisional) Axis I serious mental disorders listed below:

   **Schizophrenia (all subtypes)**
   **Delusional Disorder**
   **Schizophreniform Disorder**
   **Schizoaffective Disorder**
   **Brief Psychotic Disorder**
   **Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
   **Psychotic Disorder Due To A General Medical Condition**
   **Psychotic Disorder Not Otherwise Specified**
   **Major Depressive Disorders**
   **Bipolar Disorders I and II**

2. Medical Necessity: Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by an IDTT, for all cases in which:

   **Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT committee that the significant or life threatening disability/dysfunction continues or regularly recurs.**

3. Exhibitionism: Treatment is required when an inmate has had at least one episode of indecent exposure in the six-month period prior to the IDTT that considers the need for exhibitionism treatment, and the inmate-patient is either:

   - Diagnosed with Exhibitionism, or

   - Meets the alternate criteria (*Alternate Criteria*: An inmate who meets all criteria for the diagnosis of Exhibitionism, except that the victim was not an "unsuspecting stranger" but was a staff member or inmate who did not consent to or encourage the behavior.)

   (A diagnosis of Exhibitionism is not required for inmates who meet the alternate criteria.)

<u>Specific Treatment Criteria for EOP</u>

In addition to the overall treatment criteria above, an inmate must meet the following specific treatment criteria to receive treatment at the EOP level of care:

- Acute Onset or Significant Decompensation of a serious mental disorder characterized by symptoms such as increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment of reality testing and/or judgment; and/or

- Inability to Function in General Population Based Upon:

  a. A demonstrated inability to program in work or educational assignments, or other correctional activities such as religious services, self-help programming, canteen, recreational activities, visiting, etc. as a consequence of a serious mental disorder; or

  b. The presence of dysfunctional or disruptive social interaction including withdrawal, bizarre or disruptive behavior, extreme argumentativeness, inability

to respond to staff directions, provocative behavior toward others, inappropriate sexual behavior, etc., as a consequence of a serious mental disorder; or

c. An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of a serious mental disorder.

- These conditions usually result in Global Assessment Functioning (GAF) Scores of less than 50.

Enhanced Outpatient Care (Designated Housing Unit)

Participants in the MHSDS EOP are placed in designated housing units that provide increased clinical and custodial support and limit contact with members of the institution's GP inmates.

## D. ADMISSION TO PROGRAM

Referral Process

1. Mental Health clinicians may initiate an EOP referral. This referral decision is documented on a CDCR 128-MH3, *Mental Health Placement Chrono*, and clinically supported in an original or updated CDCR 7386, *Mental Health Evaluation*. Both forms are placed in the Unit Health Record (UHR) and the CDCR 128-MH-3, *Mental Health Placement Chrono*, is placed in the Central File.

2. If the referral is generated for an inmate-patient at a GP institution without an EOP, the clinician at the referring institution may consult with the Chief of Mental Health at the closest EOP site regarding the need for EOP level of care, prior to initiating the referral process. In situations where there is a disagreement between the conferring clinicians, the inmate-patient will be referred to an EOP treatment setting for further onsite evaluation.

3. EOP placements do not require prior clinical approval from the receiving institution.

4. Referral documentation is prepared by the referring clinician. The documentation includes the chronological CDCR 7230, *Interdisciplinary Progress Note*, containing circumstances, symptoms, and behaviors justifying the need for EOP level of care. This document is placed in the UHR. The documentation also includes a CDCR 128-MH3, *Mental Health Placement Chrono*, containing a brief description of behavioral alerts. The original of this document is forwarded to classification staff for processing and

Classification Staff Representative (CSR) endorsement for institutional placement. A copy of the CDCR 128-MH3, *Mental Health Placement Chrono,* is placed in the UHR.

5. EOP placements from within the same institution are accomplished with the approval of the IDTT, placed in an available EOP bed, and documented on a CDCR 128-MH3, *Mental Health Placement Chrono*. For inmates not currently participating in the MHSDS program, the classification committee will refer the case to the CSR for EOP endorsement. For those currently participating in the MHSDS program, the classification committee will refer the case to the Classification and Parole Representative (C&PR) for EOP endorsement. Subsequent placements of the same individual into the EOP require only C&PR approval. A weekly count of filled and vacant EOP beds is provided to Division of Correctional Health Care Services (DCHCS) and Division of Adult Institutions to facilitate the use of available beds by population management staff.

6. The classification and transportation systems are designed to ensure placement within 60 days of level of care designation, or 30 days of level of care designation, if clinically indicated. Transfers within the same institution of inmate-patients previously identified and treated as EOP or from the institution's MHCB should occur on the same day, or within 24 hours of referral.

7. EOP inmate-patients who are inappropriately transferred via CSR endorsement action to a non-EOP institution shall be transferred to an EOP institution within 21 days of arrival.

8. Inmate-patients who are determined to require EOP level of care while in a non-EOP institution, shall be transferred to an appropriate EOP treatment setting within 60 days of the EOP designation, or 30 days of the designation, if clinically indicated.

9. Inmates who receive a CDCR 115, *Rules Violation Report* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

   - CDCR 115-MH *Rules Violation Report: Mental Health Assessment;*

   - A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication. The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,

   - For inmate-patients included in the MHSDS, to the inmate-patient's Primary Clinician (PC)

NOTE: When an IDTT determines that an inmate requires treatment of exhibitionism, that inmate's level of care shall be changed to CCCMS, Medical Necessity (or higher if appropriate), bypassing the standard referral process.

Interdisciplinary Treatment Team

The responsibilities for overall treatment planning within the EOP rest with the IDTT. These responsibilities include:

- Program admission decisions for individual case
- Formulation and approval of initial and updated individual treatment plans
- Periodic case reviews and re-justifications of treatment
- Discharge decisions
- Overall utilization review of available beds
- Overall program quality improvement

The IDTT is composed of, at a minimum:

- Assigned Primary Clinician (PC)
- Assigned Psychiatrist
- Correctional Counselor
- Inmate-patient

Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information:

- Licensed Psychiatric Technicians (LPT)
- Custody Officers

Recreation Therapists (RT), Registered Nurses (RN), Licensed Vocational Nurses, LPT, and the housing custody officer will also normally participate. Each member of the team will provide input into the overall treatment plan. Input from additional staff, including vocational and educational personnel, is strongly encouraged. A representative from the IDTT (the assigned PC or designee) should be present in all classification hearings regarding inmate-patients in treatment to provide mental health input into the classification decision-making process. The inmate-patient shall be included in the IDTT, unless the inmate-patient refuses to participate. If the inmate-patient refuses to

participate in the IDTT, the inmate-patient shall indicate the refusal and the reason for the refusal. The PC shall document this information on the treatment plan, CDCR 7388, *Mental Health Treatment Plan*, and in the progress notes, CDCR 7230-MH, *Mental Health Progress Note*. Inmate-patients shall not be disciplined for not participating in IDTT. The PC is responsible for presenting the inmate-patient's concerns to the IDTT.

The Chief of Mental Health shall designate the IDTT leader.

**Initial Evaluation Process**

The initial clinical assessment involves an interview with the inmate-patient and a review of available clinical records, the Central File, the evaluation of the referring clinician, and records from prior institutional placements. A review of these evaluations and an observation period are utilized to establish a functional baseline and working clinical diagnosis. This process shall be completed within 14 calendar days from arrival at the EOP.

If the inmate-patient states that he or she had significant prior treatment or the file review indicates history of such treatment, the clinician shall obtain a signed *Release of Information* and forward it to the Institutional Health Record Services to obtain previous records. The referring clinician, custodial staff, work supervisors, teachers, chaplains, and family members are excellent sources of patient collateral information and should be utilized whenever possible (with appropriate release of information when required).

At the conclusion of the evaluation process and within 14 calendar days from arrival at the EOP, the IDTT will review all relevant clinical, institutional, and criminal history data, interview the inmate-patient and make one of the following determinations:

1. Admit to the program and develop a treatment plan on the CDCR 7388, *Mental Health Treatment Plan*.

2. Decline admission (indicate clinical options).

3. Extend evaluation process for an additional 14 calendar days.

All decisions regarding change of treatment level made by the IDTT shall be documented with a CDCR 128-MH3, *Mental Health Placement Chrono*. This chrono shall be forwarded to classification for review and central file update. One copy of the chrono is placed in the UHR and another copy forwarded for entry into the MHTS. An individualized treatment plan, CDCR 7388, *Mental Health Treatment Plan*, shall include the recommendations of the IDTT and specifics such as type of therapeutic activities (schedule, duration, outcome expectations) and anticipated length of stay. The

prescription of treatment activities should consider the commitment offenses and current institutional maladjustment.

Inmate-patients who are released from Administrative Segregation Unit (ASU) or the PSU to a GP EOP for continuing mental health treatment may require mental health services related to adjustment to the GP environment. The ASU or PSU PC shall document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to GP. The receiving EOP IDTT will consider documentation by the ASU or PSU clinician in developing the inmate-patient's treatment plan. The treatment plan for inmate-patients transferred from ASU or PSU to GP-EOP shall include services provided to aid in the transition to the GP environment. Inmate-patients referred from the ASU or PSU to a GP-EOP Unit shall be retained at EOP level of care for a minimum of 90 days.

**Release after Initial Evaluation**

If, at the conclusion of the initial evaluation process, the IDTT determines that EOP placement is inappropriate, documentation to this effect is placed in the UHR using CDCR 7388, *Mental Health Treatment Plan.* A CDCR 128-MH3, *Mental Health Placement Chrono*, noting the decision and recommending more appropriate placement shall be prepared for classification processing and transfer (if appropriate). If inpatient care is indicated, the assigned PC is responsible for initiating and completing the placement process.

## E. EOP INMATE-PATIENT TREATMENT SERVICES

Each EOP inmate-patient will have an individualized treatment plan that provides for treatment consistent with the inmate-patient's clinical needs. The treatment plan shall be documented on a CDCR 7388, *Mental Health Treatment Plan*. Each inmate-patient shall be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT. It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services. For some inmate-patients, ten hours per week may be clinically contraindicated. For those inmate-patients scheduled for less than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan,* must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities or refer to a higher level of care as clinically indicated.

***Categories of Treatment Services***

REQUIRED TREATMENT

1. Individual Treatment Planning involves a meeting of the IDTT and the inmate-patient at least every 90 days for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in accordance with the inmate-patient's needs and progress.

2. Weekly clinical contact with PC either individually or in group psychotherapy; individual clinical contact at least every other week.

3. Medication Evaluation and Management

   a) A psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues.

   b) Refer to Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, and other aspects of medication administration.

   c) Refer to MHSDS Program Guide, *Chapter 5, Mental Health Crisis Bed*, for information on involuntary medication administration.

4. Ten hours per week of scheduled structured therapeutic activities. See below for list of treatment activities.

OTHER TREATMENT ACTIVITIES

1. Group therapy and psycho-educational groups provide inmate-patients with an opportunity to express, explore, and resolve issues with the assistance of clinical staff and other inmate-patient group participants who have similar problems or experiences. Psycho-educational groups focus on cognitive/behavioral skill building as a means of improving inmate-patient interpersonal skills and problem solving abilities.

2. Individual therapy provides inmate-patients with the opportunity to discuss personal problems that may not be adequately addressed in a group setting.

3. Recreational and occupational therapies provide inmate-patients with supervised recreational activities or exercise programs designed to reduce stress, improve self- esteem and physical health, foster positive interpersonal interactions, and promote the constructive use of leisure time. Occupational or recreational therapy is counted as

structured activity only if an appropriate clinician (an occupational therapist, recreational therapist, LPT, or other qualified professional) is present and supervising the activity. Unsupervised routine exercise is available for all inmate-patients and is not counted as a therapeutic activity.

4. Work and educational programs may provide rehabilitative services through institutional programming designed to help inmate-patients improve vocational and educational functioning. Work and education assignments can constitute up to four hours of structured activity per week if they are identified as such in the inmate-patient's treatment plan. The treatment plan must indicate how it is believed the inmate-patient benefits from particular vocational and/or educational activities.

**Examples of Treatment Activities**

The EOP may offer some or all of the following treatment activities, depending on the needs of the inmate-patient population and the resources available.

1. Daily Living Skills - train and assist inmate-patients in developing or improving skills in maintaining appropriate personal hygiene and grooming habits. These activities include demonstrating and prompting inmate-patients in bathing, dressing, and the maintenance of a clean living environment. These activities promote personal responsibility and initiative for self-care, enhance self-esteem, and provide a predictable daily routine.

2. Medication Education - educate inmate-patients regarding the importance and benefits of regularly taking their prescribed medications. It discusses medication, interaction with alcohol and drugs, and teaches how to correctly take medication. It explains side effects and when they need to be brought to the attention of clinical staff. It stresses the importance of effective doctor/patient communication in obtaining and maintaining medication compliance.

3. Symptom Management - help inmate-patients with chronic mental disorders become more effective in managing their psychiatric symptoms by teaching them how to identify warning signs of relapse, persistent symptoms, and medication side effects. Inmates learn how to cope with symptoms and seek professional help.

4. Specific Mental Health Issues - provides focused clinical support for inmate-patients experiencing specific mental health issues, such as depression, or who have a history of being a victim.

5. Social Skills/Communication - focus on activities which allow inmate-patients to interact in a positive manner with other individuals, both staff and inmates. It promotes the development of communication skills that are appropriate and socially acceptable.

6. Anger Management - teaches inmate-patients the socially acceptable and appropriate ways of handling anger and expressing feelings. This module is geared towards reducing aggressive/assaultive behavior toward self or others or by developing self-control skills. It teaches inmate-patients processes that can be used within the institution setting to resolve conflicts and handle problems appropriately without resorting to violence.

7. Stress Management - teaches inmate-patients how to identify recurring prison stressors and provides specific stress reduction techniques to minimize the negative effects of stress on their behavior and mental health.

8. Substance Abuse Group - teaches inmate-patients about the relationship between substance abuse and criminality and emphasizes the effects of chemical abuse on inmate- patients with mental illness. The group offers supportive interactions and explores issues of chronic abuse and the development of alternatives.

9. Health Issues - provides education regarding basic physical, emotional, and mental health issues, including human sexuality and sexually transmitted diseases.

10. Offense Specific Therapy - provides clinical support for insight-oriented treatment related to causative factors in criminal behavior, emphasizing the development of alternative courses of conduct.

11. Rational Behavior/Reality and Decision-making - emphasizes the assumption of responsibility for one's actions, accepting the reality of their living environment, the development of more productive and pragmatic life scripts, as well as developing strategies to identify and achieve attainable goals.

12. Family Issues - focus on stressful experiences associated with spousal abuse, childhood physical and sexual abuse, separation from offspring and loved ones, dysfunctional relationships, pregnancy issues, etc.

13. Therapeutic Community Meeting - all inmate-patients in the program are involved in regularly scheduled community meetings to discuss issues that commonly affect their treatment and living environment. Inmate-patients learn through active interaction with peers and staff how to build a therapeutic community.

14. Clinical Pre-Release group - inmate-patients nearing parole to the community are seen weekly in group and discuss issues related to community living arrangements, continued outpatient care, financial, educational, and vocational needs. The skills necessary to successfully meet the general conditions of parole in the community are discussed. Clinical Pre-Release groups involve coordination with the Parole and Community

Services Division Transitional Case Management Program (TCMP) staff and Parole Outpatient Clinic (POC) clinical staff.

**Daily Activity Schedules**

Utilizing the above treatment descriptions (and additional optional activities as may be developed at the institutional level), each inmate-patient has a weekly activity schedule incorporated into the individual treatment plan drawn from a schedule of treatment activities available on the unit. Development of, and adherence to, the schedule is the joint responsibility of the inmate-patient and PC. The establishment of additional unit activities, available to all inmate-patients, is the responsibility of EOP staff.

**Nursing and Supportive Care**

Although 24-hour nursing care is not required for inmate-patients within the EOP, services expanded from those offered to GP inmate-patients are provided by RNs and/or LPTs. These services include:

1. Administration of all medications. Refer to the Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management.*

2. Regular monitoring of medication compliance, and notification of medication non-compliance to treating psychiatrist, consistent with DCHCS policy.

3. Provision of nursing services as ordered by a physician.

4. Supervision and assistance in the activities of daily living, including maintenance of living quarters, personal hygiene, and eating habits.

5. Coordination and support of out-of-cell activities with program staff.

**Documentation**

Clinical staff shall document the progress of an inmate-patient on a CDCR 7230, *Interdisciplinary Progress Note*, at least monthly. Additionally, individual clinical contacts and significant changes in the inmate-patient's level of functioning shall be documented. The monthly progress note shall include:

- Record of attendance at treatment activities.

- Description of participation in treatment activities.

- Progress in resolving identified problems and symptoms.
- Current mental status.

**Aftercare Planning and Referral**

Planning for follow-up services is a critical component of care that inmate-patients need upon release from the EOP. The PC or the IDTT leader is responsible for ensuring that this is accomplished prior to an inmate-patient's discharge from the program. Such planning includes referrals to other levels of care, other programs, or other appropriate therapeutic placement to ensure continuity of care. Inmate-patients whose level of functioning has improved shall be referred to the CCCMS. Inmate-patients who require a higher level of care are referred to the MHCB or the DMH Inpatient Program.

Aftercare plans should describe:

1. The inmate-patient's diagnosis and the psychiatric problems continuing to require treatment.
2. Any other pertinent mental health or medical conditions (e.g., allergies, special dietary needs, chronic diseases), criminal and legal history, and cognitive or functional impairment (e.g., developmental problems, insufficient education and/or language barriers) that could affect adjustment and treatment.
3. Recommendations for follow-up treatment, including medications and recommendations for specific scheduled structured therapeutic activities.
4. Referrals to appropriate programs and other institutional services, including chaplain services, substance abuse programs, education, and job programs.

**Clinical Pre-Release Program**

This is designed to provide systematic planning, support and education to inmate-patients who are approaching their date of release/parole to the community and who are not expected to transition to another level of care before departure. This service is designed to maximize the inmate-patient's opportunities for successful transition into community living. The service coordinates its activities with the TCMP and POC staff to facilitate community outpatient care and support services. The PC shall prepare a discharge summary, which includes a diagnosis, current medications, and placement needs. The discharge summary shall be sent to the regional POC office prior to release.

## F. STAFFING AND CASE MANAGEMENT

The EOP staffing structure is based on clinical needs for this level of care and the staffing ratios developed to meet these needs. EOP staff includes psychiatrists, psychologists, clinical social workers (CSW), RNs, LPTs, and RTs. In addition to interdisciplinary clinical staff, the EOP staffing provides enhanced correctional officer support.

**Chief of Mental Health**

The Chief of Mental Health (or designee) assigns the IDTT leaders and PCs, and reviews the overall quality of assessment and treatment plans, including aftercare plans for each inmate-patient.

**Primary Clinician**

One clinical staff member of the team (a psychiatrist, a psychologist, or a CSW) is identified as the PC for each inmate-patient. This individual assumes overall responsibilities for the treatment services provided to inmate-patients by maintaining active therapeutic involvement with the inmate-patient and coordinating services provided by other treatment providers involved in implementing the treatment plan. Specific responsibilities of the PC include:

1. Completion of initial clinical intake assessment (CDCR 7386, *Mental Health Evaluation*).

2. Documentation of:

   - All individual PC contacts;
   - Initial and updated treatment plans (CDCR 7388, *Mental Health Treatment Plan*);
   - Treatment progress or lack thereof, at least monthly (CDCR 7230-MH, *Mental Health Progress Note*);
   - Specific reasons when the inmate-patient is unable to attend or participate in group therapy;
   - Reasons for weekly individual PC contact when indicated;
   - Degree of participation in treatment activities;
   - Contact log for MHTS input.

3. Weekly clinical contacts (either individual or group psychotherapy) with assigned inmate-patients. Individual clinical contacts must occur at least every other week. Individual clinical contacts shall be held in a private setting out of cell, or cell-front if an inmate-patient refuses.

4. Provision of group therapy.

5. Scheduling for regular and special IDTT reviews. (Special IDTT reviews are held for inmate-patients who require a change in level of care or if otherwise clinically indicated.)

6. Response to inquiries regarding clinical status of inmate-patient.

7. When an inmate-patient is discharged to the CCCMS, notification to the PC at the receiving program/institution.

## G. CASE REVIEW

The IDTT is responsible for conducting a structured process of case review. The review occurs quarterly or more often if clinically indicated. The purpose of the review is to ensure optimal progress toward achieving resolution of symptomatology sufficient for placement in the least restrictive clinical and custodial environment. Proper case review maximizes the utilization of the limited beds available for EOP placements.

The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care. Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate- patient is not benefiting from treatment services available at the current level of care. Consideration of appropriate level of care shall be documented by the IDTT on a CDCR 7230-MH, *Interdisciplinary Progress Note,* and shall include the justification for maintaining the current level of care or referral to a different level of care.

The PC for each inmate-patient shall prepare a case summary on a CDCR 7230-MH, *Mental Health Progress Note*, for quarterly IDTT review, which will consist of the following:

1. Clinical diagnosis and brief history of previous clinical interventions with emphasis on interventions implemented since the last team review.

2. Current length of stay in EOP.

3. Assessment of current status and progress or lack of progress in achieving treatment goals.

4. Assessment of willingness and ability to participate in the program and description of attempts to improve treatment participation.

5. Recommendations for modifications to treatment plan, including diagnosis, level of care, problems, medications, and treatment intervention.

6. If applicable, input from the previous CCCMS PC when a reduction in level of care is considered.

7. Discharge planning, including a tentative discharge date, anticipated level of care, specific follow-up recommendations, and perceived impediments to discharge.

Pertinent information from IDTT reviews shall be documented on a CDCR 7230-MH, *Mental Health Progress Note*, and filed in the UHR. Any modifications to the individualized treatment plan shall be documented on an updated CDCR Form 7388, *Mental Health Treatment Plan*, and also filed in the UHR. A full case summary, with a recommendation for either continued placement or transfer to an alternative level of care, shall be completed on an annual basis, for placement in the UHR. If there is a change in the level of care, formal notification will be provided to the inmate-patient's Correctional Counselor via a CDCR 128-MH3, *Mental Health Placement Chrono*.

## H. DISCHARGE

Discharge from the EOP will be based upon a decision utilizing the IDTT process when the inmate-patient satisfies any of the following conditions:

1. Is able to function in a GP setting with CCCMS support.

2. Has clinically decompensated to the extent that placement into 24-hour inpatient care (either MHCB or DMH hospitalization) is required.

3. Has reached his/her parole date, and clinical services will be transferred to a POC.

Note: Inmate-patients who are placed in ASU or SHU and continue to require EOP level of care shall not be discharged, but shall be transferred to the appropriate setting (see Chapters 7 and 9).

## I. ENHANCED OUTPATIENT PROGRAM FOR CONDEMNED INMATE-PATIENTS

### 1. EOP Housing for Condemned Inmate-Patients

Per Penal Code Section 3600, male inmates who have received a death sentence are incarcerated at California State Prison - San Quentin (SQ). Female inmates who have received a death sentence are incarcerated at Central California Women's Facility (CCWF). Therefore, these two institutions are charged with the responsibility to provide mental health treatment services at the EOP level of care to condemned inmate-patients identified as needing this level of care.

Housing for condemned inmates is determined by the inmate's behavioral adaptation to the correctional setting. Upon arrival, each condemned inmate completes an orientation period. At SQ, the orientation period is generally completed in the Adjustment Center housing unit. During the orientation period, inmate-patients are identified as either a Grade A Condemned (housing and program closely related to a GP setting), or Grade B Condemned (housing and program closely related to an administrative segregation setting). Additionally, the initial medical evaluation identifies the inmate-patient's medical needs including any serious mental health needs that require treatment. Therefore, Grade A or Grade B Condemned inmates identified as requiring EOP level of care are housed according to institutional custody determination, and appropriate mental health treatment services are then provided. A condemned inmate's grade level determination is subject to review and change on an annual basis or more often if determined appropriate.

At CCWF, due to the few female inmates sentenced to the death penalty, all female condemned inmates are housed and programmed in a designated housing unit, separate from other GP inmates. The female condemned program at CCWF *does* currently classify condemned inmates into "grades" as referenced above. All programs including any required mental health treatment services for EOP female condemned inmate- patients are provided within this housing unit.

### 2. Condemned EOP Inmate-Patient Treatment Plan

All condemned EOP inmate-patients housed at SQ or CCWF shall have an individual treatment plan documented on a CDCR 7388, *Mental Health Treatment Plan,* that provides for treatment consistent with the inmate-patient's clinical needs.

The development of the individual treatment plan by the assigned IDTT must take into account the unique security operations and procedures necessary to effectively manage this condemned population during a period when the institution is locked down for an execution. At SQ, programs and services (excluding delivery of medication and

emergency services) are curtailed prior to, during, and after the actual execution of a condemned inmate, as determined by the Warden. Out-of-cell activities do not occur during the period that the institution is locked down pending or following an execution; however, LPTs shall continue daily rounds. These procedures are mandatory and are required due to the sensitive and potentially volatile atmosphere at the institution when carrying out an imposed death penalty.

Additionally, the recommended individualized treatment plan for Grade B Condemned EOP inmate-patients at SQ may require modification due to the heightened safety concerns associated with this population's required placement in the Adjustment Center. Out-of-cell activities for this population specifically require intensive staff resources to ensure the safety and security for all involved: inmates, clinical staff, as well as, correctional staff.

The individualized treatment plan for the condemned EOP inmate-patient, as for all EOP inmate-patients, provides the "blue print" for the course of mental health treatment that is intended to address the diagnosed condition. The initial plan provides the treatment foundation by prescribing services, activities, and medication that will be attempted and monitored. Frequent clinical and custody staff involvement provide ongoing assessment of progress and effectiveness of the applied plan. The ongoing assessment provides the impetus for the modification and/or change for the treatment services contained in the individualized treatment plan.

### 3. EOP Condemned Inmate-Patient Treatment Services

The Condemned EOP Inmate-patient will receive treatment services commensurate with their demonstrated ability to safely participate in the offered services. All condemned EOP inmate-patients will be offered ten hours per week of scheduled structured therapeutic activities identified and approved by the IDTT as part of the individualized treatment plan. It is recognized that not all condemned EOP inmate-patients can or will participate in and/or would benefit from this amount of treatment time. The ten hours per week for certain diagnosed condemned EOP inmate-patients may be clinically contraindicated. However, for condemned EOP inmate-patients scheduled for less than ten hours, the PC shall present the case to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan*, shall include a detailed description of the diagnoses, inmate-patient's problem list, level of functioning, medication compliance, and clinical reasons for scheduling less than ten hours. For inmate-patients who are scheduled for less than ten hours of treatment activities per week, the IDTT shall meet at least monthly to review and increase the treatment activities or refer to a higher level of care, as clinically indicated.

REQUIRED TREATMENT ACTIVITIES

The Condemned EOP inmate-patient shall be offered the following treatment services:

1. Individual Treatment Planning involves a meeting of the IDTT and the inmate-patient for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in accordance with the inmate-patient's needs and progress. Refer to *Section D. Admission to Program, Interdisciplinary Treatment Team,* of this document for a complete description of the functions of the EOP IDTT and membership.

2. Weekly PC contact (either individual or group psychotherapy) with assigned inmate-patients. Individual clinical contacts must occur at least every other week.

3. Daily LPT contact for Grade B Condemned EOP inmate-patients.

4. Medication Evaluation and Management

   a) A psychiatrist shall evaluate each Condemned EOP inmate-patient at least monthly to address psychiatric medication issues.

   b) Refer to Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, and other aspects of medication administration.

   c) Refer to MHSDS Program Guides, *Chapter 5, Mental Health Crisis Bed*, for information on involuntary medication administration.

5. Crisis Intervention

6. Ten hours per week of scheduled structured therapeutic activities. See below for list of treatment activities.

TREATMENT ACTIVITIES

Specific treatment services offered include the following:

1. Group Therapy provides inmate-patients with an opportunity to express, explore, and resolve issues with the assistance of clinical staff, as well as supportive interactions with inmate-patients who have similar problems or experiences.

2. Individual Therapy provides inmate-patients with the opportunity to discuss personal problems that may not be adequately addressed in a group setting.

3. Recreational Therapy provides inmate-patients with supervised recreational activities or exercise programs designed to reduce stress, improve self-esteem and physical health, foster positive interpersonal interactions, and promote constructive use of leisure time. Recreational therapy is counted as structured activity only if a recreational therapist is present and supervising the activity. Unsupervised routine exercise is available for all inmate-patients and is not counted as a therapeutic activity. No inmate-patient in SQ's Adjustment Center will be permitted out of his cell for the purposes of recreational therapy, but in-cell treatment activities (therapy) may be permitted, subject to the heightened safety and security concerns present in the Adjustment Center.

4. Monitoring and Assistance with daily living skills.

5. Nursing and Supportive Care: Although 24-hour nursing care is not required for inmate-patients within the EOP, expanded services from those offered to non-EOP Condemned inmate-patients are provided by RN and/or LPTs. These services include:

   a) Administration of all medications. Refer to the Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management.*

   b) Regular monitoring of medication compliance and notification of medication non-compliance to treating psychiatrist, consistent with DCHCS policy.

   c) Provision of nursing procedures as ordered by a physician.

   d) Supervision and assistance of activities of daily living, including maintenance of living quarters, personal hygiene, and eating habits.

   e) Coordination and support of activities with recreational therapy staff.

   f) Provision of clinical escorts, when needed.

6. Aftercare Planning and Referral: Planning for follow-up services is a critical component of care that inmate-patients need upon release from the EOP. The PC or the IDTT Leader is responsible for ensuring that this is accomplished prior to an inmate-patient's discharge from the program. It includes referrals to other levels of care, programs, or other appropriate therapeutic placement to ensure continuity of care. Inmate-patients whose level of functioning has improved significantly to the point where the structure of the EOP therapeutic and housing environment is no longer needed shall be referred to the CCCMS services available in Condemned Housing. Condemned male inmate-patients

who experience decompensation in the form of crisis shall be referred to the DMH Inpatient Program at CMF for a MHCB level of care or DMH inpatient level of care. Female inmate-patients shall be referred to Patton State Hospital.

## J. MENTAL HEALTH QUALITY MANAGEMENT SYSTEM

Ongoing assessment of the quality of clinical services will follow the Mental Health Quality Management System procedures.

## K. TRACKING ATTENDANCE AT TREATMENT ACTIVITIES

Attendance at treatment activities, psychiatrist and PC appointments, and scheduling of IDTTs, among other information, will be tracked by the MHTS.

## L. GROUP/PRIVILEGE GROUP A1A DESIGNATION

All EOP inmate-patients who are actively participating in structured therapeutic activities as determined by the IDTT shall be assigned to work Group/Privilege Group A-1-A.

EOP inmates-patients may be assigned to established work or education programs if participation will be therapeutically beneficial. In these situations, a job description and timekeeping log shall be maintained by the work supervisor.

Inmates-patients not assigned to a credit qualifying work or education assignment, who refuse to participate in therapeutic activities and are returned to CCCMS level of care, shall be reassigned to Work Group/Privilege Group A-2-B.

# CHAPTER 5
## Mental Health Crisis Bed

### A. INTRODUCTION

The goal of the Mental Health Crisis Bed (MHCB) program is to provide services for conditions which require an inpatient setting to ameliorate mental health symptoms in the least restrictive environment. MHCB programs are located in California Department of Corrections and Rehabilitation (CDCR) institutions with facilities licensed as a Correctional Treatment Center (CTC) [California Code of Regulations (CCR), Title XXII, Division 5, Chapter 12, Article 4, Section 79739, Mental Health Treatment Program], General Acute Care Hospital (GACH), or Skilled Nursing Facility (SNF). The MHCB program operates 24 hours a day, 7 days a week. An inmate-patient admitted to the MHCB for mental health treatment may have acute symptoms of a serious mental disorder or may be suffering from a significant or life threatening disability. Refer also to the Correctional Treatment Center Policy and Procedure Manual, Volume VIII, Mental Health, for more detailed procedures.

Many conditions may precipitate a mental health crisis during institution confinement. At reception, the loss of the existing support system the individual had on the outside and/or the stress of initial imprisonment may lead to suicidal behavior, self-harm, or other symptoms. In mainline settings within institutions, stress factors unique to imprisonment may cause a pronounced degree of emotional strain and/or physical and interactive tension, and often compound existing stress factors inherent in everyday life. Such factors as the restrictions of confinement, pressures to conform to the prison lifestyle, and fear of more predatory inmates may disrupt an inmate's coping abilities. An inmate with no known mental health history may suffer acute symptoms, while another with mental illness in remission may have recurring symptoms. Prior to release, fears of delayed release or inability to cope with the outside world or loss of the institution support system of food, shelter, clothing, and structure of time may lead to crisis reactions.

The MHCB has a length of stay of up to ten days. The Chief Psychiatrist or designee, must approve exceptions to the length of stay. Not all crises require admission to the MHCB. Crisis episodes for some inmate-patients may be handled on an outpatient basis. Other inmate-patients, even if stabilized on medications, may require placement in a structured therapeutic environment for ongoing treatment and monitoring. This may necessitate a referral to an Enhanced Outpatient Program (EOP), or if longer-term intensive care is needed, to an inpatient facility operated by the Department of Mental Health (DMH).

Presenting problems may require continuous observation or monitoring before an inmate-patient's treatment needs can be fully assessed or the crisis brought under control. Where 24-

hour care is needed, an inmate-patient shall be placed in a MHCB for continuous nursing care.

## B. PROGRAM OBJECTIVES

The primary objective of the MHCB is to evaluate the symptoms associated with the crisis and provide initial stabilization and recommendations for follow-up care, post discharge. More specific objectives include:

1. To observe, monitor, and provide continuous nursing assistance to inmate-patients whose condition requires 24 hours or more to achieve stabilization.

2. To assess the inmate-patient's symptoms, formulate a provisional or differential diagnosis, and develop an initial treatment plan. This may include a medical/neurological evaluation or an initiation of referral for such.

3. To control symptoms of serious mental illness, using emergency medication when necessary.

4. To alleviate psychiatric distress with appropriate therapy or counseling.

5. To refer the inmate-patient for placement in an appropriate level of care.

6. To provide an alternative to hospitalization for inmate-patients whose condition allows placement within ten calendar days to a less intensive level of care.

## C. POPULATION SERVED

**Overall Treatment Criteria**

Overall treatment criteria have been developed for the Mental Health Services Delivery System (MHSDS). An inmate must meet the criteria in either 1 or 2 below in order to receive MHSDS treatment at any level of care:

1. Treatment and monitoring are provided to any inmate who has ***current*** symptoms and/or requires treatment for the current Diagnostic and Statistical Manual (DSM) diagnosed (may be provisional) Axis I serious mental disorders listed below:

   **Schizophrenia (all subtypes)**
   **Delusional Disorder**
   **Schizophreniform Disorder**
   **Schizoaffective Disorder**

**Brief Psychotic Disorder**
**Substance-Induced Psychotic Disorder (exclude intoxication and withdrawal)**
**Psychotic Disorder Due To A General Medical Condition**
**Psychotic Disorder Not Otherwise Specified**
**Major Depressive Disorders**
**Bipolar Disorders I and II**

2. Medical Necessity: Mental health treatment shall be provided as needed. Treatment is continued as needed, after review by the Interdisciplinary Treatment Team (IDTT), for all cases in which:

   **Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with, or suspected of having, a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.**

**Specific Treatment Criteria for MHCB**

In addition to the overall treatment criteria above, an inmate must meet the following specific criteria to receive treatment at the MHCB level of care:

- Marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour nursing care; and/or

- Dangerousness to Others as a consequence of a serious mental disorder/Dangerousness to Self.

- These conditions usually result in a Global Assessment of Functioning (GAF) score of less than 30.

## D. REFERRAL AND TRANSFER

**Referrals**

An inmate-patient suffering from an acute, serious mental disorder resulting in serious functional disabilities, or who is dangerous to self or others, shall be referred to a MHCB.

**MHCB Transfer**

If the institution does not have a MHCB or there are no MHCB beds available in the institution where the inmate-patient is currently housed, the inmate-patient shall be

transferred to a designated MHCB institution. The inmate-patient shall be transferred within 24 hours of referral.

(See Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 3, Health Care Transfer Process* and *Volume 6, Chapter 18, Transfer of Patient Health Records Within CDCR; Institution to Institution*, for specific requirements concerning transfers and Unit Health Records)

If the MHCB beds are not available at the designated hub institution, the inmate-patient shall be taken to an available MHCB bed that is able to provide MHCB care while simultaneously providing the commensurate level of custody and security. In most cases, movement from an institution to a MHCB bed shall be completed by institutional transportation staff via special transport within 24 hours. On weekends and after normal business hours, the mental health clinician on call or the physician on call at the referring institution shall contact the mental health clinician on call or the physician on call at other institutions to locate a vacant MHCB bed. **The Health Care Placement Oversight Program (HCPOP) may be contacted seven days a week to assist in locating a vacant MHCB bed.**

MHCB transfers shall be done under authority as "Emergency Medical Transfers" (Department Operations Manual [DOM] 62080.17). Since MHCB transfers are typically viewed as emergency moves, they do not require classification committee action or Classification Staff Representative (CSR) endorsement. MHCB transfers shall be done on a "Psychiatric and Return" basis.

Generally, the transfer process shall be initiated by the inmate-patient's psychiatrist, psychologist, or the Chief of Mental Health.

The transferring psychiatrist, psychologist, or Chief of Mental Health shall determine whether the inmate-patient is "medically cleared" to transfer. State law provides that, before a patient may be transferred to a health facility, the patient must be sufficiently stabilized to be safely transported. The transferring physician is responsible for determining whether the inmate-patient's condition will allow transfer. The CCR provides, in part, that a transfer or discharge may not be carried out if, in the opinion of the inmate-patient's physician, such transfer or discharge would create a medical hazard. The transferring physician must initially evaluate the relative benefits and risks associated with transporting the inmate- patient. The determination of whether the transfer creates an unacceptable risk or a "medical hazard" will depend upon the inmate-patient's condition, the expected benefits to the inmate- patient if he or she is transferred, and whether the risks to the inmate-patient's health are outweighed by the benefits.

The receiving facility must consent to the transfer. CCR, Title XXII, licensing standards provide that a patient shall not be transferred unless and until the receiving facility has

consented to accept the patient. Specifically, the CCR provides, in part, that no patient shall be transferred, or discharged for purposes of transferring, unless arrangements have been made in advance for admission to a health facility. Therefore, the transferring clinician must secure the receiving health facility's approval in advance for the inmate-patient's admission. The transferring clinician shall document in the inmate-patient's Unit Health Record (UHR) that approval was obtained and from whom.

Appropriate housing of inmate-patients pending MHCB transfer shall be determined by the sending institution and in the following order of preferred locations:

1. Inpatient beds

2. Outpatient Housing Unit

3. Outpatient Housing Unit overflow cells

4. Large holding cells with water/toilets including, but not limited to, "ZZ cells," "wet cells," and/or "clinic cells." Many CTC buildings have holding cells located outside of the entrance to the licensed bed area. These are typically located in the Specialty Care Clinic area. These cells are permissible for temporary housing pending transfer without violating licensing restrictions of the licensed bed area of the CTC building.

5. Large holding cells without water/toilets such as "Contraband Cells" (not in a CTC licensed area)

6. Triage and Treatment Area or other clinic physical examining room

7. Other unit-housing where complete and constant visibility can be maintained

8. When none of the above are available, small holding cells (not in a CTC licensed bed area) that are designed for the inmate-patient to sit or stand may be used for up to four hours by which time consideration of a rotation to one of the above listed options shall have been considered and the outcome of such consideration documented. Inmate- patients shall be retained in sit/stand cells only with approval of the watch commander and notification of on-call clinical staff.

9. Holding cells within the licensed bed area of the CTC building (notification to Department of Health Services of an unusual occurrence is required)

All inmates-patients housed in one of the above sites while pending transfer to a MHCB shall be provided, at minimum, with a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock. If the inmate-patient subsequently attempts to use any or all of these items

to harm him or herself, a clinician may then order that one or more of these items be removed. Inmate-patients who are subsequently returned to their housing units shall receive appropriate clinical follow-up, which may include five-day custody and clinical wellness checks.

When an inmate-patient, identified as requiring MHCB care, is housed in an Outpatient Housing Unit, Administrative Segregation Unit, or any of the above sites, the HCPOP shall be notified of the need for MHCB placement.

**Procedure**

The Chief of Mental Health or designee at the sending institution shall contact the MHCB Clinical Director or designee at the receiving institution to obtain approval for the transfer.

In cases where the Clinical Director or designee at the receiving institution does not agree to the transfer, and the Chief of Mental Health at the sending institution believes the clinical need for transfer remains, the case shall be referred to the HCPOP and/or Mental Health Services at headquarters central office for assistance. If an agreement cannot be reached, the inmate shall be admitted and evaluated.

Upon receipt of approval to transfer, from the MHCB Clinical Director or designee at the receiving institution, the Chief of Mental Health or designee at the sending institution shall complete a CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, indicating acceptance. Copies of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, shall be forwarded to the MHCB Clinical Director or designee at the receiving institution and the Classification & Parole Representative (C&PR) at the sending institution.

The C&PR at the sending institution shall forward a copy of the completed CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, to the C&PR at the receiving institution.

The Chief of Mental Health or designee, MHCB Clinical Director or designee, and the C&PRs at both the sending and receiving institutions shall communicate to ensure all health care/classification/transportation aspects are addressed. The escort needs for each transport are different given the variation of custody and health care concerns that may arise. At times, the transportation may be accomplished with just custody staff. However, occasions do arise when a combination of custody and clinical staff are needed to accompany an escort. This may occur when the inmate-patient has highly sensitive and varying medication needs or when the presence of a clinical staff member may substantially reduce decompensating or disruptive inmate-patient behavior during transportation.

The C&PR at the receiving institution shall contact the Classification Services Unit (CSU) for teletype transfer approval. The transfer approval shall be obtained from a CSR if available on site.

Documentation and classification of inmate-patients accepted for transfer to another institution shall be consistent with procedures outlined in the DOM. The sending institution shall clearly indicate on CDCR 135, *Inmate Transfer Record*, that the purpose of the transfer is for psychiatric treatment.
The inmate-patient shall be informed of the reasons for and destination of the transfer.

The Receiving and Release sergeant at the receiving institution shall notify the MHCB when the inmate-patient arrives. An inmate-patient who arrives by special transport because of urgent acuity shall be screened by a physician. If immediate admission is not possible, an inmate-patient shall be housed in an appropriate medical setting until a bed is available (CCR, Title XXII, Section 79789).

## E. ADMISSION

**Pre-admission Screening**

All inmate-patients referred to the MHCB shall receive a pre-admission screening for the purpose of determining the appropriateness of the admission to the MHCB program. During regular working hours, the screening shall be performed by a psychiatrist or a licensed psychologist privileged to practice in the MHCB, and documented in the Progress Notes. During weekends, holidays, and after normal business hours, the screening shall be performed by an on-site physician on duty or any other licensed health care staff. The pre- admission screening may be performed via telephone prior to transfer when the inmate- patient is at an institution without an available MHCB. An inmate-patient in crisis may be screened where the crisis occurs (such as in the cell), or in the emergency service area of the CTC/GACH/SNF, prior to admission to the MHCB.

All inmates attempting suicide and those having suicidal ideation or showing signs and symptoms of suicide potential will be evaluated by a mental health clinician (psychiatrist, psychologist, or Clinical Social Worker) on an emergency basis. Inmates referred to health care by custody because of suicide concerns, shall be immediately evaluated for suicide risk by a mental health clinician, which shall include a Suicide Risk Assessment Checklist (SRAC). On weekends, evenings, and holidays, the SRAC shall be performed by the Physician on Call (POC), Medical Officer of the Day (MOD), or Registered Nurse (RN) trained to administer the SRAC if mental health clinicians are not available. It is the responsibility of the Health Care Manager to establish procedures for suicide risk assessment by clinical staff outside of normal work hours. All SRACs shall be filed in the inmate- patient's UHR whether or not the inmate-patient is admitted to the MHCB. An inmate

showing suicidal potential cannot be refused admission until there is a face-to-face evaluation and SRAC completed by a clinician trained to conduct suicide risk assessments.

All inmates who are screened positive for possible admission to the MHCB on a weekend, holiday, or after normal business hours shall be referred to a MHCB psychiatrist or psychologist with admitting privileges (On Call or On Duty) for admission. The clinician facilitates the admission based on the admission criteria indicated in Section C above. The actual admission may be done by the MOD or POC in consultation with the psychiatrist or psychologist (On Call or On Duty). For all inmates not admitted, the psychiatrist or psychologist (On Call or On Duty) shall prepare a detailed Progress Note explaining the reason for the decision. A log shall be kept by the referring institution, and shall include the following information for all inmates referred to the MHCB and evaluated but not admitted:

- Date of referral
- Inmate-patient identification
- Reason for referral
- Reason for not being admitted
- Referring clinician

**Admission/Transfer Log**

Each mental health program with a MHCB unit shall develop and maintain a log of all MHCB admissions/transfers. This log shall include at least the following information:

- Date of referral
- Inmate identification
- Reason for referral to MHCB
- Current level of care
- Date of Admission to MHCB
- Whether a suicide risk assessment (including a SRAC) was performed upon admission (for suicidal inmates)
- Discharge diagnosis

- Whether a suicide risk assessment (including a SRAC) was performed upon discharge (for suicidal inmates)
- Date of clinical discharge from the MHCB
- Date of physical discharge from the MHCB
- Date of referral to new location/program
- Date of transfer to new location/program
- Location/program to which the inmate-patient has been transferred

All inmate-patients who receive a pre-admission evaluation for suicide potential, but who are not admitted, will be tracked in a separate log. The log shall be kept by the MHCB that did not admit the inmate-patient, and will include at least the following information:

- Date of referral
- Inmate-patient identification
- Reason for referral
- Reason for not being admitted
- Deciding clinician

**Procedure**

The MHCB shall accept inmates who meet the criteria for care and treatment and shall continue to house only those inmates for whom care is appropriate. No inmate shall be admitted to the MHCB until a provisional diagnosis or valid reason for admission has been stated and the appropriateness determined. When clinical differences of opinion exist regarding the appropriateness for admission and the clinicians involved cannot reach an agreement at the institutional level, the cases shall be referred to the HCPOP and/or Mental Health Services at headquarters central office for assistance.

Admissions to the MHCB shall be made on a "Psychiatric and Return" basis. A psychiatrist or a psychologist with admitting privileges in the MHCB may admit an inmate to the MHCB. Inmates shall be admitted only upon the written or verbal order of a MHCB psychiatrist or a psychologist.

Occasionally, crisis referrals require emergency and involuntary admission to the MHCB. An inmate-patient may, because of a psychotic episode, be confused, disoriented, disorganized and/or gravely disabled, or because of acute depression, may be dangerously suicidal. An inmate-patient in crisis who is explosive and assaultive may also be admitted involuntarily if a serious mental disorder also exists. Assaultiveness that is assessed by the clinician as resulting from an antisocial behavior, and not as a result of a serious mental disorder, is more appropriately dealt with by custody staff, per general institution policies.

Any inmate-patient admitted to the MHCB program because of suicidal threats or behavior shall receive a suicide risk assessment (including a SRAC) from a clinician, upon admission and prior to discharge.

After hours, weekends, and holidays, the Administrative Officers of the Day, MODs, POCs, and Watch Commanders shall be notified of an inmate who makes a serious suicide attempt or engages in self-injurious behavior requiring medical treatment.

Inmate-patients with multiple admissions to MHCB (three or more within a six-month period) shall be evaluated for referral to DMH.

An admission note shall be completed within 24 hours of admission to the MHCB by the admitting clinician and shall include the inmate-patient's condition at the time of admission, provisional diagnosis, and an initial treatment plan. This shall be documented on a CDCR 7230, *Interdisciplinary Progress Notes*, and filed in the UHR.

**MHCB Nursing Evaluation**

The nurse shall:

a. Interview and give an orientation to the inmate-patient.

b. Assess the inmate-patient and take vital signs.

c. Notify the physician of admission status including any admission problems.

d. Assemble the chart.

e. Initiate the Patient Care Plan.

f. Note and implement any admission orders, such as laboratory tests (for details refer to the Correctional Treatment Center Policy and Procedure Manual, Volume VIII, Mental Health), X-rays, medications, etc.

**Physical Examination**

For immediate care planning, a history and physical examination, including neurological screening, shall be completed, to the extent clinically possible, immediately before or within 24 hours of admission. If the inmate-patient is uncooperative or otherwise cannot be fully examined, a description of all possible observations and findings of the physical examination shall be documented. The complete physical examination shall be conducted as soon as clinically possible and documented in the UHR.

## F. ASSESSMENT AND TREATMENT SERVICES

**Intake Assessment**

Upon admission to the MHCB unit, an assessment shall immediately be made on how best to meet the critical needs of the seriously mentally disordered inmate-patient. This is accomplished by reviewing and updating the CDCR 7386, *Mental Health Evaluation*, completed by the referring clinician at the time of referral. At a minimum, a provisional diagnosis is determined and an initial plan in the "Recommended Follow Up/Initial Treatment Plan" section of the CDCR 7386, *Mental Health Evaluation*, shall be formulated within 24 hours for immediate care planning and to rule out medical conditions that may be a cause of presenting symptoms. Serious medical conditions that are a significant cause of the crisis may warrant acute care medical hospitalization.

**Interdisciplinary Treatment Team and Individualized Treatment Planning**

The IDTT is composed of, at a minimum:

- Assigned MHCB psychiatrist
- Assigned MHCB Primary Clinician (PC)
- Nursing staff
- Correctional Counselor
- Inmate-patient (if clinically and custodially appropriate)

Other staff who have direct knowledge of the inmate-patient are encouraged to attend or provide information, such as:

- Custody officers

- RNs
- Licensed Vocational Nurses (LVN)
- Recreational Therapists

The IDTT is chaired by a licensed mental health clinician. The inmate-patient shall be included in the IDTT, if clinically and custodially appropriate as determined by the IDTT, unless the inmate-patient refuses to participate. If the inmate-patient refuses to participate, the PC shall document the reason for refusal on the CDCR 7230, *Interdisciplinary Progress Notes*. Inmate-patients shall not be disciplined for refusing to participate in IDTT. Attempts shall be made to gather input from the inmate-patient, such as talking to and observing the inmate-patient at the cell door.

The IDTT shall meet within 72 hours of an inmate-patient's admission and at least weekly thereafter. The IDTT shall begin discharge planning at the initial IDTT meeting.

An individual treatment plan shall be developed and implemented at the initial IDTT meeting. The treatment plan, which is to be filed in the inmate-patient's UHR, shall be individualized and based on a comprehensive assessment, including, at a minimum, a mental status exam and the inmate-patient's legal, criminal, psychiatric, medical, and developmental history, and psychosocial evaluations. Psychosocial evaluations shall include personal and family history, inmate-patient's strengths and weaknesses, and evaluation of support system.

The individualized treatment plan shall:

1. Provide a primary diagnosis and identify the main presenting problems targeted for treatment. The diagnosis may be provisional.
2. For every identified target problem, document the goals, interventions, and measurable objectives of treatment.
3. Specify the types, frequencies and providers of prescribed therapies and adjunct activities.
4. Document the success or failure in achieving stated objectives
5. Evaluate the factors contributing to the inmate-patient's progress or lack of progress toward recovery.

6. Document prescribed medication, dosage, and frequency of administration, as well as medication compliance.

7. Be reviewed at each IDTT meeting, at least weekly, and updated accordingly.

8. Designate appropriate medications, therapies, and custody follow-up in an aftercare plan to be followed after the inmate-patient's release from the MHCB. See MHSDS Program Guide, *Chapter 10, Suicide Prevention and Response*, for specific follow-up requirements for inmate-patients admitted for suicide prevention.

**Case Reviews And Treatment Plan Update (CCR, Title XXII, Section 79747)**

An inmate-patient's condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or psychologist. On weekends or holidays, a mental health clinician on call or the MOD shall make daily rounds. The Chief of Mental Health is responsible to ensure that all physicians serving as MOD or POC are trained in the use of the SRAC.

Documentation of daily contacts shall be made within 24 hours in the UHR by the updating clinician.

The IDTT shall review each crisis case as often as necessary, but at least every seven days, and update the treatment plan accordingly. Each treatment plan update shall include the following:

1. Documentation of the inmate-patient's response to treatment and his/her progress or lack of progress towards the goals of treatment.

2. Evaluation of factors that hinder progress and the interventions planned by the team to facilitate progress.

3. The most recent diagnoses and descriptions of the main presenting problems.

4. Evaluation of risk factors.

5. Review of release or discharge plans.

**Treatment Services**

The MHCB Clinical Director or designee shall be responsible for the prompt care and treatment of each inmate-patient admitted to the MHCB, development and implementation of a treatment plan, completeness and accuracy of the UHR, necessary special instructions, and transmitting reports of the inmate-patient's condition. Whenever these responsibilities are

delegated to another staff member, continuity shall be ensured [CCR, Title XXII, Section 79741 (b)] by the MHCB Clinical Director.

An inmate-patient admitted to the MHCB shall be provided the following services and treatment:

Medication Evaluation and Management

The assigned psychiatrist shall evaluate each MHCB inmate-patient individually at least twice weekly to address psychiatric medication issues.

Refer to Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, and other aspects of medication administration.

Nursing Care

Twenty-four hour nursing care is provided in the MHCB to administer and supervise medication, provide assistance for activities of daily living, observe and monitor inmate-patients, obtain all physician-ordered laboratory studies, and provide counseling or inmate-patient supervision as needed.

Therapy and Counseling

One-to-one intervention is often necessary in a crisis case. Usually, brief, intensive therapy is helpful if it focuses on issues that precipitated the admission and explores changes in behaviors, perceptions and expectations that facilitate coping with the crisis. Group therapy may be provided to MHCB inmate-patients, consistent with clinical needs.

Rehabilitation Therapy

Inmate-patients may participate in rehabilitation therapy activities, consistent with clinical needs. Rehabilitation therapy may include activities such as indoor or outdoor recreation. These activities provide a setting for additional observation of inmate-patients, allowing for the evaluation of exaggerated symptoms or severe symptoms that are masked [see CCR, Title XXII, Section 79749 (c) (1) for Rehabilitation Treatment Plan requirements].

Inmate-patients who are awaiting transfer to DMH and remain in a MHCB beyond ten days, shall be offered additional rehabilitation therapy and other treatment activities, as clinically indicated.

**Aftercare Planning and Referral**

Planning for follow-up services is a critical component of the care an inmate-patient needs upon release from the MHCB. This planning may lead to a referral to a program or other appropriate placement to ensure continuity of care. An inmate-patient who clearly requires longer-term hospital care may be referred and transferred to an inpatient hospital program operated by the DMH. Aftercare plans shall include:

1. The diagnosis and psychiatric problems continuing to require treatment.

2. Any other unique mental health or physical conditions that could affect treatment (e.g., allergies, special dietary needs, chronic diseases).

3. Recommendations for follow-up treatment, including medications and specific psychotherapies.

4. Referrals to other treatment programs and institutional services, including vocational or educational programs, substance abuse programs and job programs (CCR, Title XXII, Section 79749 [d]).

5. The aftercare plan shall consider the inmate-patient's potential in-custody housing, proximity to release from incarceration, probable need for community treatment and social services, and the need for continued mental health care. If an inmate-patient requires continued care upon paroling, the Parole Outpatient Clinic shall be contacted.

## G. INVOLUNTARY TREATMENT

An inmate-patient in crisis who does not consent for treatment with medication may be involuntarily treated to control symptoms which constitute:

- A danger to self, or
- A danger to others, or
- Grave disability on the basis of a serious mental disorder.

Involuntary medication administration refers to the administration of any psychotropic or antipsychotic medication or drug by use of force, or restraint.
The reasoning for the determination that an inmate-patient is a danger to self or others, or is gravely disabled, and is incompetent to render an informed consent shall be documented in the inmate-patient's UHR.

If in the clinical judgment of a psychiatrist or other physician, an emergency exists, the physician or psychiatrist may order involuntary medication for a period not to exceed 72 hours. An emergency exists when there is a sudden marked change in the inmate-patient's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate-patient or others and it is impractical to first obtain consent.
An inmate-patient shall be afforded due process rights if involuntary treatment is necessary beyond 72 hours.

Refer to Correctional Treatment Center Policy Manual, Volume VIII, Section 16, Involuntary Treatment, for detailed procedures.

## H. CLINICAL RESTRAINT AND SECLUSION

Restraint and/or seclusion are special treatment procedures used to protect the safety of inmate-patients who pose an immediate danger to themselves or others, by restricting their ability to inflict injury by limiting body movement or by containing them in a safe environment. While utilization of restraint and/or seclusion is clearly effective in saving lives and preventing serious injury, it is also a procedure with inherent risks. In rare cases inmate-patients who have been restrained or secluded have suffered injury or death as a result of improper procedure or monitoring.

Restraints and/or seclusion shall be used only as a last resort and in response to an emergency to protect the inmate-patient and/or others from imminent harm, after less- intrusive and non-physical interventions have been attempted or ruled out. Staff shall strive to minimize or eliminate the use of seclusion or restraint whenever possible, through proper training, thorough assessment, effective treatment planning, and continuous quality improvement efforts. This policy restricts the use of restraints for mental health purposes generally to MHCBs. The use of restraints, for mental health purposes, in areas other than a MHCB unit shall be restricted to the amount of time required for transfer to a MHCB unit. Inmate-patients in need of restraints shall be transferred, in an expedited timeframe, to a MHCB unit.

The form of restraint and/or seclusion selected shall be the least restrictive level necessary to contain the emerging crisis/dangerous behavior. The determination of the presence of an emergent situation rests upon the clinical judgment of staff. It does not require the staff to defer restraint or seclusion until dangerous behavior occurs but may be based upon knowledge of the inmate-patient and its predictive value.

Restraint and/or seclusion shall never be used as punishment or for the convenience of staff. Threatening inmate-patients with restraint and/or seclusion is considered psychological abuse

and is prohibited. It may be appropriate to inform an inmate-patient when behavior may necessitate the use of restraints or placement into seclusion.

This policy expressly prohibits any form of as needed (PRN) or standing order for restraint or seclusion.
For the purpose of this policy, authorized clinician means a psychiatrist, licensed psychologist, (and at Pelican Bay State Prison only, a psychiatric nurse practitioner) or (on weekends or after normal business hours) the POC or psychiatrist on call, or the POD or MOD.

Per Title 22 Regulations, a "qualified RN" is a RN who has received training in the administration of restraints and placement into seclusion, and who has passed a competency examination, which includes assessment of clinical issues relevant to the use of restraint and/or seclusion.

RESTRAINT

**Initial and Subsequent Orders**

Restraints shall only be used on a written or verbal order of an authorized clinician. When an authorized clinician is present, the authorized clinician shall evaluate the need for restraints, and if appropriate, write an order and provide sufficient and adequate justification in the inmate-patient's UHR.

In an emergency circumstance, when no authorized clinician is available, a qualified RN may authorize initiation of restraints. An emergency circumstance exists when there is a sudden marked change in the inmate-patient's behavior so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to self or others, and it is impractical to first obtain an order from an authorized clinician.

When no authorized clinician is present, a qualified RN shall evaluate the need for restraints and implement restraints if appropriate. If a RN is not present, a RN shall be notified immediately and shall respond within 15 minutes of notification to evaluate the need for restraints and initiate restraints, if appropriate. When a RN initiates restraints, an authorized clinician shall immediately be notified. Within one hour of notification, an authorized clinician shall give a verbal or written orders (with justification) to either continue or discontinue restraints.

If the authorized clinician is not available for the initial assessment, a phone order will be secured to cover the restraint use and the nurse will do an initial assessment within one hour.

The initial order for restraint shall not exceed four hours. Subsequent orders for continuation of restraint shall not exceed four hours. Each order must specify the behavioral conduct requiring restraint and the type of restraint used. While a restraint order is valid for four hours, no inmate-patient shall be in restraint for longer than the time necessary to contain the dangerous behavior. Removal from restraints is an authorized clinician or RN determination, and does not require a physician's order unless otherwise specified.

Assessment by Authorized Clinicians and Qualified RNs

Prior to expiration of the initial order, an authorized clinician or qualified RN shall conduct a face-to-face evaluation to determine whether continued placement into restraints is clinically justified. If the clinician performing the initial face-to-face assessment is not a psychiatrist/physician, within four hours of the initial order a psychiatrist/physician shall be contacted/consulted by the RN to review current medications and any contraindications to continued restraint.

An authorized clinician or a qualified RN shall conduct a face-to-face evaluation at least every 8 hours during the period an inmate-patient is in restraints. An authorized clinician shall evaluate the inmate-patient face-to-face at least every 24 after the first four hours. If the authorized clinician is not a physician, the authorized clinician should consult with a physician after the face-to-face assessment. A psychiatrist shall conduct a face-to face evaluation at least every 24 hours while the inmate-patient is in clinical restraint.

A physician or nurse practitioner shall perform a brief physical examination of the inmate-patient as soon as possible but no more than four hours after the initiation of restraint use and document the evaluation on a progress note in the UHR. The physician/nurse practitioner's assessment will include inquiring into any history of physical disability or any other condition which would place the inmate-patient at greater physical or psychological risk during the restraint procedure. If the use of restraints is discontinued prior to the physician's arrival, the physician shall conduct a brief physical examination no more than 24 hours after the episode of restraint use.

**Documentation**

Documentation of an order for the use of restraints shall include the name of the authorized clinician giving the order, the time the order was received, the duration of the order, which is not to exceed four hours, the type of restraint to be used, and the name and signature of the RN receiving the order.

The Initial Telephone orders for restraint shall be received only by licensed nursing staff, who shall record them immediately. The ordering authorized clinician shall sign them within

24 hours. Likewise, subsequent telephone orders for restraint shall be signed within 24 hours of the time the orders were given.

This policy requires the clinician ordering the restraint to provide a written order authorizing the use of restraint even if such use is discontinued prior to the authorized clinician's arrival.

Each time a verbal order for restraint is written, the nurse shall complete a CDCR 7230, *Interdisciplinary Progress Note,* documenting the need for initiation/continuation of restraint and shall specify the elements for the emergency that necessitated the use of restraint and behavior changes that may indicate the inmate-patient no longer presents a danger to self or others. The note shall describe any less restrictive measures that were implemented prior to this order.

Results of face-to-face evaluations shall be documented on CDCR 7316, *Restraints/Seclusion Record.*

When a qualified RN initiates restraint, the RN shall document the need for the initiation of restraint on a CDCR 7316, *Restraint/Seclusion Record.* The documentation shall include a description of the inmate-patient's behavior including any precursor/antecedent behaviors and other relevant factors upon which the inmate-patient was determined to be a danger to self or others, staff actions taken to utilize alternatives to restraint, information given to the inmate-patient about the reasons for restraint, the conditions of release, the inmate-patient's response, and injuries to the inmate-patient.

The use of restraints requires the inmate-patient's treatment plan be modified to include a sufficiently detailed description of the emergency and the rationale for the use of the specific degree of restraint. The inmate-patient's nursing care plan shall be modified to provide for the special needs of the inmate-patient while in restraint and/or seclusion. The criteria for establishing termination should be described in operational, objective terms comprehensible to the inmate-patient.

**Types of Restraint**

- Five-point: All four extremities and waist (note below on use of five-point restraints)
- Four-point: All four extremities
- Two-point: Upper extremities only

**Application**

The inmate-patient shall be protected from injury during restraint application and use. Staff shall use the least physical force necessary to protect inmate-patient and yet exercise sufficient force to control the inmate-patient.

The dignity and well-being of the inmate-patient shall be preserved at all times during the period of restraint.

Inmate-patients shall be placed on their backs when restraints are applied unless clinically contraindicated. When an inmate-patient is medically compromised or disabled, all necessary steps to safeguard the inmate-patient during the procedure need to be taken. Inmate-patients who are considered medically compromised/disabled consist of, but are not limited to, the following: morbidly obese, known history of cardiac or respiratory disease, history of spinal injury, amputee, fractured or injured extremity, recent history of emesis, pregnancy, or seizure disorder. RNs must contact a physician either prior to, or immediately after, the placement of a medically compromised inmate-patient in restraints to notify the physician of the restraint and the inmate-patient's medical condition. Upon notification of the restraint of a medically compromised/disabled inmate-patient, the physician will either order the RN to discontinue the restraint or order the restraint as well as any special measures/treatments that need to be taken to safeguard the inmate-patient's medical condition. If the inmate-patient is an amputee or otherwise lacks one or more limbs, two or three point restraints should be used. Generally, restraints should be applied to the upper extremities first.

Four-, five-, or two-point leather restraints shall be used by clinical staff when ordered by an authorized clinician. Inmate-patients shall only be restrained with the least amount of restraints necessary to contain the unsafe behavior. Each period of restraint must be assessed individually to determine the level of restraint required at the time of the application of the restraint. Five-point restraints will only be used after the inmate-patient has been unsuccessfully restrained in four-point restraints or a determination is made by the RN that a fifth restraint is needed to ensure the safety of the inmate-patient. The physician on-call and the Nursing Supervisor must be notified anytime five-point restraints are utilized. The restraint key shall be carried by nursing staff after restraints have been applied to an inmate- patient until the procedure is discontinued.

Generally, four-point restraints should be used unless there are compelling reasons to the contrary.

A soft cloth or bandage shall be applied to the extremity before applying the leather restraints to protect the skin.

Nursing staff shall notify the watch commander and Chief Psychiatrist or designee of an order to place an inmate-patient in restraints. When restraints are applied to an inmate- patient, CTC staff shall have at least three custody personnel present for the application of these restraints, but the RN shall be in charge of the actual application of restraints. The RN is responsible to ensure that the restraints are applied properly, and are not restricting the inmate-patient's circulation.

In emergency situations, custody staff may use metal restraints (handcuffs) on inmates in order to gain control. Metal restraints shall be replaced with leather restraints by the RN as soon as possible.

**Monitoring and Evaluation by Nursing Staff**

All inmate-patients placed into restraint shall remain under constant direct, in-person visual observation by trained nursing staff (CNA, psychiatric technician, LVN, or RN) until restraint is discontinued.

**Immediate Nursing Evaluation**

A RN shall perform a mental status and physical assessment of the inmate-patient immediately upon the initiation of restraint use. The RN assessment will include the identification of techniques, methods and tools which can help the inmate-patient control their behavior, and will identify pre-existing medical conditions and physical disabilities that place the inmate-patient at greater risk during the restraint procedure.

Assessment at 15 minute Intervals

In order to continue adequate circulation, nursing staff monitoring the inmate-patient shall physically check each extremity every 15 minutes. Each 15 minute assessment period shall be documented on the CDCR 7316, *Restraint/Seclusion Record.*

The nursing staff shall provide fluids and nourishments every 15 minutes as needed and as practicable except during hours of sleep. The inmate-patient's head and shoulders shall be elevated, if needed, while being fed or receiving fluids to reduce the risk of aspiration. The nurse shall document meals and fluids on CDCR 7316, *Restrain/Seclusion Record.*

Hourly Assessments

The RN will conduct hourly assessments of the inmate-patient during the entire period of restraints. Subsequent to the initial assessment conducted by the RN, the hourly assessments will document current physical, mental, and behavioral status of the inmate-patient, any indicated interventions performed, and the inmate-patient's readiness for release from

restraints. The assessment includes noting the condition of skin and circulation, need for toileting, personal hygiene procedures, and proper application of restraint. Documentation of the one hour evaluations shall summarize the inmate-patient's overall physical condition, general behavior, and response to counseling/interviews.

Every hour the nursing staff, with the assistance of custody staff, shall perform 2 minute range of motion exercises on each limb unless the inmate-patient is too agitated or assaultive to safely remove the restraints. For range of motion exercises, restraints on each extremity shall be removed, one at a time. Performance of range of motion exercises shall be clearly documented on the CDCR 7316, *Restraint/Seclusion Record,* and shall include the inmate- patient's behavior, respiration, and responsiveness. If range of motion exercises are not performed, nursing staff shall clearly document the reason on the CDCR 7316, *Restraint/Seclusion Record.*

A RN may suspend restraints for short periods of time in order to transfer inmate-patients from place to place to attend to necessary or personal needs (i.e., feeding, bathing, or other treatment needs as necessary). A RN shall decide whether release from restraint is necessary in order to attend to necessary nursing or personal needs. Custody staff shall provide adequate security to prevent assaults or self-injurious behavior during suspension of restraints. If an inmate-patient has been released from restraints for more than one hour, a new order shall be obtained. Inmate-patients shall not be returned to the previous, or any state of restraint without continuing evidence of dangerousness to self or others.

**Restraint Renewal**

The RN shall contact an authorized clinician and provide a description of current behavior, attitudes, or other indicators of present dangerousness; PRN/emergency medication usage; change in vital signs, including pain assessment; changes in mental or physical status; and side effects (e.g., confusion, akathisia, or extrapyramidal) at least every four hours. The authorized clinician shall then either give an order to discontinue restraint or give an order to continue or modify restraint for a period not to exceed four hours.

Termination

Restraint shall be terminated when:

1. The emergency or dangerous behavior no longer exists based on previously established criteria for release; or

2. The inmate-patient's identified precursor behaviors indicating imminent danger to self or others are not longer present; or

3. Due to the presence of medical contraindications, it would be harmful for the inmate-patient to remain in restraints.

Removal from restraints is an authorized clinician or RN determination that the inmate- patient has reached the behavioral criteria for release and no longer presents an imminent danger. Release does not require a physician's order unless otherwise specified.

Upon termination of the restraint use, an entry shall be made in the CDCR 7230, *Interdisciplinary Progress Note,* describing the condition and response of the inmate-patient.

In accordance with Health and Safety Code 1180, a clinical and quality review shall be conducted for each episode of the use of restraints.

**Seclusion**

Seclusion is a behavioral treatment procedure used to prevent injury to self or others by containment of the inmate-patient in a specially designed room. Seclusion will typically take place in safety cells in a MHCB facility. Seclusion rooms shall be designed or modified to: provide for sufficient space for freedom of movement of staff; be free from hazardous objects or fixtures; have adequate light and ventilation; be maintained at an appropriate temperature; have secure, lockable doors; and have windows that permit visual observation of the inmate-patient by staff. Each MHCB facility shall set aside and equip a specific room to be used for the purpose of seclusion.

Placement of inmate-patients in single cells located in housing units, CTC's, or MHCB's for custodial reasons does not constitute seclusion for the purposes of this section.

**Initial and Subsequent Orders**

Seclusion shall only be used on a written or verbal order of an authorized clinician. When an authorized clinician is present, the authorized clinician shall evaluate the need for seclusion and if appropriate, write an order and provide sufficient and adequate justification in the inmate-patient's UHR. The initial order for seclusion shall not exceed four hours.

In an emergency circumstance when there is no authorized clinician present, a qualified RN may authorize initiation of seclusion after evaluating the need for seclusion. An emergency circumstance exists when there is a sudden marked change in the inmate-patient's behavior so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to self or others, and it is impractical to first obtain an order from an authorized clinician. If a RN is not present, a RN shall be notified immediately and shall respond within 15 minutes of notification to evaluate the need for seclusion and initiate seclusion, if appropriate. When a RN initiates seclusion, an authorized clinician shall

immediately be notified, and within one hour of notification write or give a verbal order with justification to either continue or discontinue seclusion.

Subsequent orders for continuation of seclusion shall not exceed four hours.

Documentation

Documentation of an order for seclusion shall include the name of the authorized clinician giving the order, the time the order was received, the duration of the order, and the name and signature of the RN receiving the order.
Telephone orders for seclusion shall be received only by licensed nursing staff, shall be recorded immediately, and shall be signed within 24 hours. Initial telephone orders for seclusion shall be followed with written orders within 24 hours of the time the seclusion was first ordered. The ordering clinician will follow subsequent telephone orders for seclusion with written orders within 24 hours.

A written order authorizing the use of seclusion is required even if such use is discontinued prior to the authorized clinician's arrival.

Each time an order for seclusion is written, the authorized clinician or RN shall complete a CDCR 7230, *Interdisciplinary Progress Note,* documenting the need for initiation/continuation of seclusion and shall specify the elements of the emergency that necessitated the use of seclusion and behavior changes that may indicate the inmate-patient no longer presents a danger to self or others. The note shall describe what least restrictive measures were tried prior to this order.

Results of face-to-face evaluations shall be documented on CDCR 7316, *Restraint/Seclusion Record.*

When a qualified RN initiates seclusion, the RN shall document the need for the initiation of seclusion on a CDCR 7316, *Restraint/Seclusion Record.* The documentation shall include a description of the inmate-patient's behavior including any precursor/antecedent behaviors and other relevant factors upon which the inmate-patient was determined to be a danger to self or others, staff actions taken to utilize alternatives to seclusion, information given to the inmate-patient about the reasons for seclusion, the conditions of release, the inmate-patient's response, and injuries to the inmate-patient.

The inmate-patient's treatment plan must be modified to include a sufficiently detailed description of the emergency and the rationale for the use of seclusion. The inmate-patient's nursing care plan shall be modified to provide for the special needs of the inmate-patient while in seclusion. The criteria for establishing termination should be described in operational, objective terms comprehensible to the inmate-patient.

**Monitoring and Evaluation by Nursing Staff**

During the entire period of seclusion, the inmate-patient shall remain on direct one on one nursing observation. Nursing staff will document their observations at least every 15 minutes on a CDCR 7316, *Restraints/Seclusion Record*. Nursing staff shall ensure that the inmate-patient is safely secluded. The direct one on one nursing observation shall also include verbal interaction when the inmate-patient is awake.

A RN shall perform a mental status and physical assessment of the inmate-patient within 15 minutes of the initiation of seclusion. A physician or nurse practitioner shall perform a brief physical examination of the inmate-patient as soon as possible but no more than four hours after the initiation of seclusion and document the evaluation in the patient's UHR. If seclusion is discontinued prior to the physician's arrival, the physician shall conduct a brief physical examination no more than 24 hours after the episode of seclusion.

Prior to the expiration of the initial order an authorized clinician or qualified RN shall conduct a face-to-face evaluation to determine whether continued placement in seclusion is clinically justified. If the clinician performing the initial face-to-face assessment is not a psychiatrist/physician, within four hours of the initial order a psychiatrist/physician shall be consulted by the RN to review current medications and any contraindications to continued seclusion. The authorized clinician shall either give an order to discontinue seclusion or give an order to continue seclusion for a period not to exceed four hours.

After the initial face-to-face evaluation, an authorized clinician or a qualified RN shall conduct a face-to-face evaluation at least every eight hours during the period an inmate- patient is in seclusion and evaluated for continued dangerousness by an authorized clinician at least daily. The authorized clinician shall then either give an order to discontinue seclusion or give an order to continue seclusion for a period not to exceed four hours.

An authorized clinician shall evaluate the inmate-patient face-to-face at least every 24 after the first four hours. If the authorized clinician is not a physician, the authorized clinician should consult with a physician after the face-to-face assessment. A psychiatrist shall conduct a face-to-face evaluation at least every 24 hours while the inmate-patient is in clinical seclusion.

Every hour the RN will perform an assessment of the inmate-patient including need for toileting; exercise; personal hygiene procedures; and room environment, temperature, and cleanliness. Fluids and nourishment shall be offered every 15 minutes by the nursing staff assigned to the direct observation of the inmate-patient, except during hours of sleep. In documentation of hourly evaluations, the nurse shall summarize the inmate-patient's overall physical condition, general behavior, and response to counseling/interviews.

A RN may suspend seclusion for short periods of time in order to transfer inmate-patients from place to place to attend to necessary nursing or personal needs (i.e., feeding, bathing, or other treatment needs as necessary). A RN shall decide whether release from seclusion is necessary in order to attend to necessary nursing or personal needs. Custody staff shall provide adequate security to prevent assaults or self-injurious behavior during suspension of seclusion. If an inmate-patient has been released from seclusion for more than one hour, a new order shall be obtained. Inmate-patients shall not be returned to the previous, or any state of seclusion without continuing evidence of dangerousness to self or others.

Termination

Seclusion shall be terminated when:

1. The emergency or dangerous behavior no longer exists based on previously established criteria for release; or

2. The inmate-patient's identified precursor behaviors indicating imminent danger to self or others are no longer present; or

3. Due to the presence of medical contraindications, it would be harmful for the inmate-patient to remain in restraints.

Removal from the seclusion is an authorized clinician or RN determination that the inmate-patient has reached the behavioral criteria for release and no longer presents an imminent danger. Release does not require a physician's order unless otherwise specified.

Upon termination of the seclusion use, an entry shall be made on a CDCR 7230, *Interdisciplinary Progress Note,* describing the condition and response of the inmate-patient.

In accordance with Health and Safety Code 1180, a clinical and quality review shall be conducted for each episode of the use of seclusion.

## I. DISCHARGE

It is the responsibility of the MHCB to provide for continuity of inmate-patient care upon discharge to another level of care, another facility, or self-care.

The inmate-patient has a right to information regarding discharge on an ongoing basis during his or her stay in the MHCB.

**Discharge Plan**

a. The discharge plan is initiated at the time of admission.

b. The IDTT shall assess the inmate-patient's need for further medical, psychiatric, psychological, social work, and rehabilitative services; nursing services; education services; and transportation when developing the discharge plan. The plan ensures that needed services are available at the appropriate level of care.

c. The plan shall include participation by the inmate-patient to facilitate inmate-patient responsibility for his or her care and treatment.

d. The plan reflects appropriate coordination with and utilization of MHCB custody staff.

e. The plan includes documentation of contact with the Chief of Mental Health at the institution where the inmate-patient is being transferred.

f. Once the discharge plan is completed, referrals for appropriate aftercare placement shall be documented by an MHCB clinical staff member in the inmate-patient's treatment plan.

g. The assigned CCM or PC at the institution where the inmate-patient is being transferred is responsible for implementing the discharge plan.

h. Treatment shall continue for all inmate-patients clinically discharged until transferred.

**Discharge Criteria**

Criteria for discharge from the MHCB to an EOP or CCCMS program include:

- stabilization of the crisis behavior; and
- the ability to function in a less clinically structured environment.

Discharge criteria do <u>not</u> necessarily include <u>complete</u> resolution of symptoms but a resolution sufficient to allow continuation of treatment at a less intensive level of care.

Discharge to DMH inpatient care requires the clinical need for inpatient services of a duration greater than ten days.

**Procedure**

a. Upon completion of MHCB inpatient treatment, cases transferred to the MHCB as "Psychiatric and Return" shall be returned to the sending institution, unless the sending institution does not provide the level of care that the inmate-patient currently requires or the inmate-patient has any other case factor(s) that preclude return to the sending

institution. In those cases, the MHCB will transfer the inmate-patient to an institution that provides the appropriate level of care and security.

b. The MHCB discharge summary shall be completed by the attending psychiatrist or psychologist prior to release from the MHCB. This should include specific recommendations regarding follow-up visits with the CCM or PC and custody staff. The discharge summary, either handwritten or dictated, includes, but is not limited to, the MHCB course of treatment, current medications, response to treatment, condition at time of discharge, and detailed information regarding follow-up care needs. The inmate-patient's participation, which supports inmate-patient responsibility, shall also be included.

c. An inmate-patient shall be discharged only on the written order of the MHCB psychiatrist or psychologist.

d. Each institution with an MHCB shall appoint a Discharge Coordinator who is responsible for notifying the Chief of Mental Health or designee at the institution where the inmate-patient is being transferred of the pending discharge. The notification shall occur prior to discharge and shall include the inmate-patient's discharge summary, custody level, treatment needs, and any significant medical conditions. The Discharge Coordinator shall document the notification in the inmate-patient's discharge plan.

e. The Chief of Mental Health or designee at the institution where the inmate-patient is being transferred shall notify the assigned CCM or PC. If the inmate-patient does not have an assigned CCM or PC, one shall be assigned. If the inmate-patient was admitted to the MHCB for Suicide Precaution or Watch, the Chief of Mental Health shall also notify the mental health clerical staff responsible for the tracking system, clinical staff responsible for weekend or holiday coverage, and the Facility Captain of the housing unit to which the inmate-patient is being transferred so that the required clinical and custody evaluation can be scheduled.

f. No inmate-patient shall be discharged from the MHCB without an IDTT review, or in the event a new IDTT cannot be convened, a consultation with an IDTT member, such as a nurse.

g. At the time of discharge, the original inpatient record is retained at the MHCB institution. The inmate-patient's UHR shall be transferred to the receiving institution at the time of discharge. Certain documents from the Inpatient Record are copied and filed in the Inpatient section of the UHR. This includes copies of the Admission Record, History and Physical, Operative Reports, Physician Orders, Discharge Summary, Consultations, Progress Notes, and Diagnostic Reports.

h. Prior to discharge from the MHCB, a nurse shall advise the inmate-patient regarding medications and follow-up visits, and clear the inmate-patient for MHCB discharge.

i. Any inmate-patient admitted to the MHCB program because of suicidal threats or behavior shall not be discharged to their housing unit until a Suicide Risk Assessment Checklist has been completed and a follow-up plan developed.

- The PC shall provide follow-up treatment on an outpatient basis. This shall include daily contact with the inmate-patient for five consecutive days following discharge. On weekends and holidays, a Licensed Psychiatric Technician or mental health clinician other than the PC may conduct the daily contact; however, the PC is responsible for ensuring the contacts occur. The daily contact shall be documented on a CDCR 7230, *Interdisciplinary Progress Note,* or a CDCR 7230B-MH, *Follow Up to MHCB/MH-OHU Discharge for Suicidal Issues* template. The note shall include the inmate-patient's current mental status and suicide risk.

- The contact shall occur in the inmate-patient's regular housing unit.

- Custody staff shall conduct an hourly check of inmate-patients admitted to the MHCB for suicidality for the first 24 hours after discharge. A mental health clinician shall then discuss the inmate-patient's behavior with the custody staff and evaluate the inmate-patient to determine if the custody checks should be continued or discontinued. If the custody checks are retained, the mental health clinician shall determine whether the checks are to be every hour, every 2 hours, or every 4 hours for the next 24 - 48 hours. Custody staff shall maintain a log of checks on inmates.

- If after any evaluation the mental health clinician believes the inmate-patient has not stabilized, the inmate-patient shall be returned to the MHCB for further treatment. Careful consideration by the IDTT should be given to releasing inmates on a Friday, during the weekend, or the day before a holiday. The mental status and stability of the inmate-patient should be documented in detail on a CDCR 7230, *Interdisciplinary Progress Note.* A mental health clinician must be available every day (including weekends and holidays), either on duty or on call, to monitor inmate-patients who are discharged from a MHCB.

**Quality Management for Implementation of Discharge Planning**

Concurrent with the implementation of the discharge plan or within 21 days of the inmate-patient's discharge from the MHCB, the Chief of Mental Health at the institution where the inmate-patient was transferred will audit the implementation of the discharge plan and follow-up care.

For inmate-patients who were admitted to the MHCB for Suicide Precaution or Watch, the Chief of Mental Health shall review the SRAC that was completed prior to discharge from the MHCB to ensure the discharge plan is appropriate. The Chief of Mental Health shall document the review in the UHR and forward a copy of the SRAC to the local Suicide Prevention Committee. A copy will also be retained by the mental health clerical staff.

## J. MENTAL HEALTH PATIENTS IN OUTPATIENT HOUSING UNITS

When an inmate-patient requires observation and evaluation of behaviors that may be indicative of mental illness, a licensed mental health professional may document the need for placement of the inmate-patient into an Outpatient Housing Unit (OHU).

A physician, psychiatrist, or licensed psychologist shall order placement and release of inmate-patients into and out of the OHU for mental health care and shall be in charge of the inmate-patients' care while housed there. The placement into the OHU shall be made using the CDCR 7221, *Physician's Order*.

Psychologists ordering placement of inmate-patients into the OHU shall refer the inmate-patient to a physician for a physical examination and to a psychiatrist for a medication evaluation.

The physician's or psychologist's placement orders may be transmitted verbally or by telephone to the RN or LVN. The ordering physician or psychologist shall sign all verbal placement orders within 24 hours.

A physician or psychologist shall document the need for placement on a CDCR 7230, *Interdisciplinary Progress Note*, within 24 hours of placement. Within 24 hours after placement each inmate-patient shall have an evaluation, including admission history and physical examination, for immediate care planning. The Mental Health Evaluation shall be documented on a CDCR 7386, *Mental Heath Evaluation*.

The patient shall receive an additional face-to-face evaluation by a mental health clinician or other qualified medical staff within 48 hours. This contact shall be documented on a CDCR 7230, *Interdisciplinary Progress Note*. If at any time during this observation/evaluation period it is determined that the inmate-patient requires inpatient care, arrangements shall be made to transfer the inmate-patient within 24 hours of the determination to a MHCB. If evaluation of the inmate-patient's mental health need continues beyond 48 hours, arrangements shall be made to transfer the inmate-patient to a MHCB or inpatient facility. Inmate-patients shall not remain in OHU for more than 72 hours.

The only exception to this 72-hour limit shall occur, on a case-by-case basis, only if both of the following criteria are met:

1. The inmate-patient has been determined to need EOP level of care and is awaiting placement, and

2. An IDTT determines that the inmate-patient may be at risk if returned to any of the housing units available at that institution while awaiting transfer.

When both of the above criteria are met, the inmate-patient may be held in OHU until transferred to an EOP level of care program. The timeline for transfer from OHU to EOP shall not exceed 30 days from EOP endorsement. This timeline for transfer shall include any days that the inmate-patient is in a MHCB following endorsement, and shall not be restarted if the inmate-patient returns to the OHU.
When it is determined that inpatient care is necessary and the institution staff are unable to expeditiously find a MHCB, they will contact the HCPOP for assistance to ensure placement within the required timelines. If it is determined that an order for Suicide Precaution or Watch is necessary, observation by clinical and/or custody staff, consistent with the MHSDS Suicide Prevention policy (see Chapter 10 for details), shall be provided.

When an inmate is placed in the OHU for being potentially suicidal, a mental health clinician shall administer a SRAC at the times of placement and release. On weekends, holidays, or after hours, the SRAC shall be administered by the MOD, POD, or RN trained on administration of the SRAC. Inmate-patients housed in OHU for suicide observation, who do not require MHCB level of care and who were discharged from the OHU before 24-hours, may be seen by clinicians and custody staff for follow-up care utilizing the process and timeframes described for MHCB suicide discharges, if clinically indicated.

When emergency circumstances exist, clinical restraint or clinical seclusion may be applied in OHU, subject to the requirements for clinical restraint or clinical seclusion in the MHCB. Emergency circumstances exist when there is a sudden marked change in the inmate-patient's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate-patient or others, and it is impractical to first transfer the inmate-patient to a MHCB. The MHCB transfer process (See Section D, *Referral and Transfer, MHCB Transfer*) shall be immediately initiated upon determination that an inmate-patient requires clinical restraint or clinical seclusion, and transported when clinically safe to do so.

HCPOP shall be notified when an inmate-patient has been placed in clinical restraint or clinical seclusion. HCPOP shall expedite MHCB placement of inmate-patients in clinical restraint or clinical seclusion.

***Mental Health Conditions Appropriate for Placement into an OHU***

1. Observation for Suicide Precaution or Suicide Watch consistent with the CDCR Suicide Prevention and Response Project.

2. Inmates who engage in behaviors that might be indicative of a mental disorder that interferes with daily living and requires further observation and evaluation.

3. Inmate-patients who have been referred to an EOP or MHCB who are too ill or too vulnerable to be placed in the general population while waiting for transfer.

If at any time the mental health clinician determines that the inmate-patient has improved and does not require a higher level of care, the clinician may discharge the inmate-patient back to the General Population at the appropriate level of care.

## K. STAFFING

The MHCB is designed to provide 24-hour care and is subject to State licensing requirements (CCR, Title XXII, Section 79739). Consequently, it must comply with the staffing standards of the CTC license under which it operates. MHCB staff shall provide acute mental health services for inmate-patients admitted to MHCB. In programs with six or fewer beds, acute mental health services may be provided by the MHCB Clinical Director. Through contracts or temporary reassignment of mental health staff from other program areas, staffing shall be augmented as needed.

The MHCB shall have a Clinical Director who shall direct the clinical program and be responsible for the quality of clinical services (CCR, Title XXII, Section 79741 (b)). The Clinical Director shall be a psychiatrist, licensed clinical psychologist, licensed clinical social worker, or a psychiatric mental health nurse operating within his or her scope of licensure with at least three years of direct clinical experience with seriously mentally disordered individuals after completion of his or her last year of graduate education (CCR, Title XXII, Section 79755 (a)). Each inmate-patient admitted as a patient to the MHCB is under the treatment of Staff Psychiatrists, Psychologists and/or Licensed Clinical Social Workers. Nursing services are provided by RN, LVN, Recreational or Occupational Therapists or Licensed Psychiatric Technicians. Clerical services are provided by an Office Technician and a Medical Transcriber.

**Administrative Staff**

The MHCB is subject to the same medical staff organization, bylaws, and policies and procedures that govern the other licensed beds of the facility (CCR, Title XXII, Sections 79775, 79777). Staff serving in these positions shall meet the minimum

qualifications specified in the CCR, Title XXII. All MHCB staff are responsible to the Clinical Director.

**Clinical Staff**

Individual therapy or counseling, aftercare planning and referral services, and the clinical lead role in treatment plan development and modification shall be performed by the Staff Psychiatrist, Staff Psychologist, or Licensed Clinical Social Worker. A Chief or Senior Psychiatrist or a Chief or Senior Psychologist may also provide these clinical services in addition to his or her other supervisory or management responsibilities, as directed. Supervising clinical staff may assist in these services if required by workload, staffing considerations or unusual complexity of an individual case. Staff Psychiatrists, Staff Psychologists, Licensed Clinical Social Workers, Senior Psychiatrists and Senior Psychologists serve as PCs and report to the Clinical Director.

**Nursing Staff** (CCR, Title XXII, Section 79629)

Two Supervising RNs positions oversee all nursing services delivered in the CTC: one for medical services and one for mental health services (CCR, Title XXII, Section 79755 (d)). Although the latter includes the MHCB, the use of one Supervising RN per shift may mean that MHCB nursing functions may be supervised by the medical Supervising RN for part of each 24-hour day.

Supervising RN are responsible for functional supervision of CTC line nursing staff and nursing administration, which includes the MHCB. Twenty-four hour registered nursing coverage and availability of a Supervising Psychiatric RN forty hours a week are necessary in the MHCB. There are sufficient nurses within a 24-hour period to provide at least 2.5 hours per inmate-patient (CCR, Title XXII, Section 79759). An inmate-patient with higher acuity needs receives additional nursing and professional care as symptoms require. RNs may co-manage selected inmate-patients assisting PCs with group therapies but will not function independently as PCs.

**Mental Health Rehabilitation Services Staff**

Mental health rehabilitation therapy services shall evaluate social, recreational, and vocational needs in accordance with the interests, abilities and needs of the inmate-patient; shall develop and prepare related therapies; and shall include such evaluation, and documentation of therapy development and preparation, in the inmate-patient's treatment plan (CCR, Title XXII, Section 79749).

Mental health rehabilitation therapy services shall be designed by and provided under the direction of a licensed mental health professional, a Recreational Therapist, an Occupational Therapist, or a Licensed Psychiatric Technician (CCR, Title XXII, Section 79749 (c) (2)).

In the Department, appropriately trained Correctional Officers (COs) and Correctional Counselors may be counted to meet licensing ratios. COs also assist in managing, observing and escorting the assaultive or suicidal inmate-patients.

**Clerical Staff**

Clerical support in the MHCB is provided by an Office Technician, who reports to the Clinical Director, and a Medical Transcriber, who is placed in the institutional transcriber pool and reports to the pool's Supervising Medical Transcriber.

## L. UNIT HEALTH RECORDS

1. Confidentiality

   Mental health records generally have a higher standard of confidentiality than other medical records. All staff with possible access to such records shall sign an oath of confidentiality to keep any information they learn from the records strictly confidential (CCR, Title XXII, Section 79807).

2. Access

   All MHCB clinicians and nursing staff must have access to the inmate-patient's records 24 hours per day. Records shall be brought as needed from the records storage area, kept in the MHCB treatment area or clinician offices while needed, and returned to the storage area when no longer needed. If records are required outside the MHCB treatment area or clinician's offices, the records shall be hand carried by escorting staff and returned to the MHCB with escorting staff as soon as the outside business is completed (CCR, Title XXII, Section 79807).

3. The Clinical Director shall:

   a. Ensure the History and Physical is transcribed and delivered to the MHCB as soon as possible.

   b. Ensure that previous medical records are provided to the MHCB [Title XXII, Section 79803 (d)].

Mental Health Crisis Bed | Mental Health Services Delivery System

## M. MENTAL HEALTH QUALITY MANAGEMENT SYSTEM

Ongoing assessment of the quality of clinical services will follow the Mental Health Quality Management System procedures.

2009 REVISION 12-5-35

# CHAPTER 6

## Department of Mental Health Inpatient Program

### A. INTRODUCTION

The California Department of Corrections and Rehabilitation (CDCR) is responsible for providing acute and intermediate inpatient care, in a timely manner, to those CDCR inmates clinically determined to be in need of such care. CDCR currently maintains a contract with the California Department of Mental Health (DMH) to provide acute and long-term intermediate inpatient mental health care to inmate-patients. Referrals to a DMH facility may be made by CDCR clinicians for inmate-patients who are so severely disturbed or suicidal that their treatment needs cannot be met in a CDCR treatment program or who may require a comprehensive psychiatric assessment.

1. Inmate-patients who have had repeated admissions to a CDCR Mental Health Crisis Bed (MHCB) or have been in an MHCB for longer than ten days shall be considered for such a referral.

2. The following DMH institutions are available for referrals for the indicated level of care:

   Acute Psychiatric Care: Vacaville Psychiatric Program (VPP), Acute Psychiatric Program (APP) (males only);

   Emergency Acute Psychiatric care: (Mental Health Crisis Beds) ASH and VPP under the conditions prescribed in the acute Memorandum of Understanding (MOU);

   Intermediate Care: Atascadero State Hospital (ASH) (males only); Coalinga State Hospital (CSH) (males only); Patton State Hospital (PSH), (females only); Salinas Valley Psychiatric Program (SVPP), (high security males only); Vacaville Psychiatric Program (VPP); and

   Day Treatment: Vacaville Psychiatric Program, Day Treatment Program (DTP) (males only).

## B. OVERALL TREATMENT CRITERIA

### *Inpatient Placement General Requirements*

The inmate-patient to be referred must have a Serious Mental Disorder (See Mental Health Services Delivery System [MHSDS] Program Guides, Chapter 1, Program Guide Overview) and:

1. Have marked impairment and dysfunction in most areas (daily living activities, communication and social interaction) requiring 24-hour inpatient care, or
2. Is a danger to self or others as a consequence of a serious mental disorder, or
3. Meets admission criteria for any of the DMH programs.

## C. DMH ACUTE PSYCHIATRIC PROGRAM (APP)

The APP is a short-term, intensive-treatment program with stays usually up to 30 calendar days to 45 calendar days provided. Actual length of stay shall be determined by the Interdisciplinary Treatment Team on a case-by-case basis. Inmate-patients in the APP who are determined to need long-term mental health inpatient care shall be referred to an appropriate DMH intermediate care program.

Referral to the APP is considered when, in the judgment of the CDCR treating clinician, the inmate-patient meets the following DMH admission criteria:

### *Admission Criteria*

1. Any inmate-patient (age 18 or older) who suffers impairment of functioning with signs and symptoms that may be attributed to either an acute major mental disorder or an acute exacerbation of a chronic major mental illness, as defined by the current Diagnostic and Statistical Manual of Mental Disorders (DSM). Such signs and symptoms of illness may render the inmate-patient:

   - Unable to carry out adequately the normal routines of the institution,
   - Unable to provide for his basic needs or use the supportive treatment resources available to him, or
   - A significant risk of harming himself or others.

2. Any inmate-patient who has been assessed as a severe suicidal risk.

3. Additional factors that justify consideration for referring an inmate to the APP include:

   - The inmate-patient has symptoms or secondary conditions that require inpatient mental health treatment.

   - The inmate-patient engages in self-injurious behavior that has not responded to treatment in a CDCR facility. Without mental health treatment, the inmate is likely to develop serious medical complications or present a threat to his life.

4. Each inmate-patient referred from another CDCR institution who is not accepted for direct placement-evaluation to the APP due to lack of an available bed shall be retained at the sending institution until a bed is available.

5. Inmate-patients admitted to the APP shall be inmates anticipated to be stabilized sufficiently for release from DMH within 30 to 45 days.

***Referral Procedure***

1. Each referral to the APP is the responsibility of CDCR clinical staff. Referrals shall be made whenever in the judgment of the treating clinician the inmate-patient's condition warrants inpatient care and meets the admission criteria for APP. Referrals generally are made by a clinician working in a CDCR MHCB Program or Enhanced Outpatient Program (EOP). Referrals must be completed within two working days of identification.

2. CDCR shall transmit standardized referral information to the appropriate DMH program on the DMH Referral Form/Acute Psychiatric Care. The referral packet shall be sent to the APP Admission and Discharge Coordinator.

3. DMH shall review the referral packet within one working day of receipt. DMH staff shall immediately notify the referring institution on the DMH Referral Decision Form by fax of their decision. The decision shall provide the detailed reasons for any rejections.

4. An inmate-patient considered for transfer to the APP must sign a consent to treatment at DMH or is entitled to a hearing in accordance with Title 15, Section 3369.1 (a) unless the inmate waives the hearing. Documentation of the hearing shall be processed in accordance with Department Operations Manual Section 62030.4.2. Written consent shall be obtained, or the hearing shall be conducted by the prison prior to transfer.

5. The referral packet shall be completed fully and include all required information as follows:

- If the inmate-patient is referred from a **Mental Health Crisis Bed (MHCB)**, then the referral packet shall only include the following three items with their sub-components:

  a. Written consent OR documentation of the required due process hearing, or a valid waiver of the due process hearing if the inmate-patient refuses to sign consent to transfer;

  b. Custody Case Factor Sheet; and

  c. Mental Health Crisis Bed Inpatient Record including but not limited to:

     **Admission summary**
     **Progress Notes**
     **Orders and lab orders**
     **Interdisciplinary treatment plan**
     **Interdisciplinary Treatment Team notes**
     **Discharge summary**

- If the inmate-patient is referred from **any other level of care (EOP, Correctional Clinical Case Management System [CCCMS]) or other location,** then the referral packet shall include:

  a. Written consent OR documentation of the required due process hearing (CDCR 128-MH6), or a valid waiver of the due process hearing if the inmate- patient refuses to sign consent to transfer;

  b. Custody Case Factor Sheet;

  c. CDCR suicide risk assessment including a Suicide Risk Assessment Checklist (SRAC);

  d. Current Treatment Plan – CDCR 7388-MH, *Mental Health Treatment Plan*

  e. Transfer Medical Summary or Health and Physical (H&P);

  f. Pharmacy Profile or Medication Administration Record (MAR);

g. Supporting Keyhea documentation or Keyhea Order (when relevant for involuntary medications); and

h. TB chrono from the referring institution.

***Admission Procedure***

1. The APP shall notify the referring institution in writing of the decision on a referral (accept, deny, defer) within one (1) calendar day of the referral including, if accepted, the APP bed number. Inter-institutional endorsements for transfer of inmate-patients accepted into the APP are processed by the Classification and Parole Representative (C&PR) at California Medical Facility (CMF).

2. Inmate-patients who have been accepted shall be moved via special transport to DMH within 72 hours of bed assignment. In any event all transfers shall be accomplished within 10 days of the date of the referral.

3. Referred inmate-patients who are accepted into the APP are transferred from the referring institution as "psych and return" cases (i.e., in most circumstances the inmate-patient will be returned to the referring institution provided that institution can provide appropriate treatment and custody). Inmate-patients referred to the APP, who are accepted but are deferred for lack of bed availability, are retained at the referring institution pending a bed assignment.

4. APP staff and the CMF Chief Deputy, Clinical Services, or designees, shall prioritize, on a daily basis, any inmate-patient awaiting transfer into the APP. Prioritization for admission is based upon the clinical acuity of the inmate-patient, the length of time the inmate-patient has been on the waiting list, and the availability of mental health staff at the referring institution. APP staff shall separately review, on a weekly basis, APP inmate-patients who are clinically ready to be discharged to a CDCR institution.

5. DMH is responsible for completing any referral of an APP inmate-patient to any other DMH program.

***Discharge Procedures***

1. The APP will contact the receiving institution's designated "DMH Contact" and fax the clinical discharge summary with continuing care recommendations to the designated clinician at the institution. The discharging clinician shall also telephone the designated clinician at the receiving institution to notify that institution of the impending discharge of the inmate-patient and describe the inmate-patient's recommended aftercare plan.

2. For each inmate-patient returning to CDCR from the APP the following documents shall be transferred with the inmate-patient to the respective CDCR institution:

   - Psychiatric Discharge Summary or Recommended Continuing Care Plan (RCCP);
   - Nursing Assessment or Discharge Summary;
   - Current physician's orders and/or MAR;
   - Current Treatment Plan; and
   - Keyhea Order (if applicable).

   The inmate-patient shall not be placed in the transport vehicle without the above documents.

   In addition, a discharge packet will be faxed by DMH within two weeks of discharge. The discharge packet shall include:

   - Interdisciplinary Notes for past 15 days;
   - Physician Progress Notes for past 15 days;
   - Relevant Consults; and
   - If applicable, forms specific to psych and return, mental health placement and transfer information for parolees.

   All DMH programs shall provide written copies of the aforementioned cited materials. Due to its proximity to CMF, VPP shall provide the entire Inpatient Medical Record for review by the CMF Chief of Mental Health instead of the materials cited above.

**D. DMH INTERMEDIATE CARE FACILITIES: ASH, CSH, PSH, SVPP, and VPP**

The Intermediate Care Programs (ICF) at ASH, CSH, SVPP and VPP are for male inmate-patients; the program at PSH is for female inmate-patients. These programs provide longer-term mental health intermediate and non-acute inpatient treatment for inmate-patients who have a serious mental disorder requiring treatment that is not available within CDCR. There will not be direct admissions from CDCR to CSH at this time.

Male inmate-patients who require close or high custody shall be referred only to SVPP.

Custody Level IV male inmates that do not require close or high custody may be referred to ASH or VPP.

The ICF programs have a full complement of mental health staff including psychiatrists, psychologists, clinical social workers, rehabilitation therapists, psychiatric technicians, and registered nurses. Most housing is dormitory-type rooms. The inmate-patients have access to the day room, supervised yard access and are fed in a dining room. The inmate-patients receive a multidisciplinary assessment. From this information an individualized treatment program is developed from a wide variety of treatment modalities including group and individual psychotherapy, medication management, depression and crisis management, training in daily living skills and interpersonal skills, substance abuse, management of assaultive behavior, supportive counseling, modification of maladaptive behaviors, and educational and vocational programs.

***Admission Criteria***

Referral to an ICF is considered when in the judgment of the CDCR treating clinician the inmate-patient meets the following DMH admission criteria:

1. An Axis I major (serious) mental disorder with active symptoms and any one of the following:

    - As a result of the major mental disorder, the inmate-patient is unable to adequately function within the structure of the CDCR EOP level of care.

    - The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder, serious to major impairment of functioning in most life areas, stabilization or elimination of ritualistic or repetitive self-injurious/suicidal behavior, or stabilization of refractory psychiatric symptoms.

    - The inmate-patient requires a neurological/neuropsychological consultation.

    - The inmate-patient requires an inpatient diagnostic evaluation.

    - The inmate-patient would benefit from a comprehensive treatment program with an emphasis on skill (i.e., coping, daily living, medication compliance) development with increased programming and structured treatment environment.

    - The inmate-patient's psychiatric medication history indicates that a clozapine trial might be useful.

- Inmate-patients, who are deemed a significant assault risk, have a history of victimizing other inmate-patients (including inciting others to act in a dangerous manner) or present a high escape risk, shall be referred to the SVPP Intermediate Program. CDCR refers to these inmate-patients as high custody inmate-patients.

- The inmate-patient's Global Assessment of Functioning indicates behavior that is considerably influenced by psychotic symptoms; OR serious impairment in communication or judgment; OR inability to function in almost all areas.

- For SVPP only, the inmate-patient is medically appropriate as determined by the receiving prison medical staff. The program psychiatrist will determine mental health suitability. If agreement is not reached refer to the Coordinated Clinical Assessment Team (CCAT) process in Section VI. Any denial for medical reasons will be immediately referred to the, Assistant Deputy Director, CDCR, Division of Correctional Health Care Services (DCHCS).

2. In addition to a primary Axis I disorder, admission to VPP and SVPP shall be considered when:

   - The patient engages in ritualistic or repetitive self-injurious/suicidal behavior that has not responded to treatment in a CDCR facility. Without inpatient mental health treatment, the inmate-patient is likely to develop serious medical complications or present a threat to his life.

   - The patient is chronically suicidal and has had repeated admissions to a Mental Health Crisis Bed (MHCB).

3. Inmate-patient committed to DMH by the courts as being incompetent to stand trial per Penal Code, Section 1370.

   Inmate-patients who commit an offense while in CDCR, are referred to the District Attorney for prosecution, and are found by the court to be incompetent to stand trial per Penal Code, Section 1370 will first be considered for the SVPP. If there are no custodial or clinical reasons for admission to SVPP, they will then be considered for other DMH programs.

4. Whenever the CDCR institution referring clinician is in doubt concerning the appropriateness of referring a particular patient, or the appropriate DMH program to meet the inmate-patient's custody needs, the referring clinician will discuss the case with the

interdisciplinary treatment team (IDTT). If the IDTT does not reach consensus, or does not agree regarding the appropriate DMH program, a case conference shall be scheduled with a clinical facilitator from the headquarters DCHCS office. Case conference calls can be requested by calling the Mental Health Program Specialist at DCHCS headquarters.

5. Inmate-patients shall be eligible for admission to a DMH program regardless of parole date. CDCR will provide all discharge and community planning. CDCR will transfer the inmate-patient from the DMH program to a CDCR institution for release at least one calendar day prior to the release date.

6. Inmate-patients who are serving a Security Housing Unit (SHU) term and are clinically appropriate for placement in an ICF, shall be referred to the sending institution's Institutional Classification Committee (ICC). The IDTT/ICC shall consider suspension of the SHU term.

   - When the sending institution's IDTT/ICC decides to suspended the SHU term, the inmate-patient shall be eligible to participate in the entire ICF program upon arrival at the receiving institution.

   - It is not necessary for the sending institution's ICC to suspend a determinate or indeterminate SHU term prior to transferring the inmate-patient if the ICC is disinclined to take such action due to safety and/or security concerns. The inmate-patient shall be transferred to DMH with the SHU term in place

   - In cases where the sending institution's IDTT/ICC elects not to suspend the SHU term, the inmate-patient may participate in only Phase I of the ICF program. The inmate-patient will be evaluated in Phase I and a decision regarding suspension of the SHU term will be made by the receiving institution's IDTT/ICC.

***Referral Procedure***

Referrals must be completed within five working days of identification by IDTT if inmate-patient consent is obtained and within ten working days of identification if due process hearing is required.

The following CDCR institutions retain Unit Health Records (UHR) for inmate-patients referred to ASH/PSH. California Men's Colony (CMC) shall retain records of inmate- patients referred to ASH. California Institution for Women (CIW) shall retain records for female inmate-patients referred to PSH.

1. All referrals shall be made on the required referral form – Department of Mental Health Referral Form-Intermediate Care Program. The referral packet shall be sent to the DMH Forensic Coordinator or the Admission and Discharge Coordinator. The form shall be fully completed and include all required information as follows:

   - Transfer Medical Summary or History & Physical for Transfer to DMH. The H&P is required for SVPP and must have been completed within the last 30 days;

     **Current Treatment Plan – CDCR 7388-MH, *Mental Health Treatment Plan*;**

   - Due Process documentation of the hearing OR Written consent (Use CDCR 128C until CDCR 128-MH6 is implemented), or a valid waiver of the due process hearing is required for referral if the patient refuses to sign consent to transfer;

     **Pharmacy Profile;**
     **Supporting Keyhea documentation or a Keyhea Order (when relevant);**
     **Interdisciplinary Progress Notes for past 15 days (May be less for new arrival to reception center);**
     **TB chrono from the referring institution;**
     **Abstract of Judgment (For State Hospitals only);**
     **Legal Status Summary (For State Hospitals only);**
     **Chrono History (For State Hospitals only);**
     **Custody Case Factor Sheet;**
     **CDCR Suicide Risk Assessment.**

2. Any CDCR clinical concerns regarding the referral shall be discussed with the Chief of Mental Health, or designee, at DCHCS, prior to completion of the referral form. Questions regarding the transfer process shall be discussed with Health Care Placement Oversight Program (HCPOP), or designated Central Office Staff. (See also CCAT below).

3. DMH shall review the referral packet within three working days of receipt, and shall immediately notify the referring institution by fax of the decision to accept or reject. The decision shall provide detailed reasons for any rejections.

***Transfer Procedure***

1. The CDCR institution shall provide for transportation of a patient between a DMH program and a CDCR institution or DMH psychiatric program. The parole unit or region shall provide for transportation of a parolee between a DMH program and a local

detention facility or community placement. Transfer must take place within 30 days of referral if accepted at DMH.

2. A transfer schedule shall be established by the CDCR referring institution and the respective DMH program.

3. Inmate-patients who have been accepted shall be transported to DMH within 72 hours of bed assignment.

4. Each patient or parolee admitted to a DMH program shall have with him/her, unless already sent, all documentation listed in Section V. B. 4. If, following the patient's admission, it is determined by assessments of the DMH staff that the patient does not meet admission criteria for the inpatient mental health program CDCR will transport the inmate-patient back to an institution on expedited basis but no more than 72 hours.

   If the admission was based on a 5150 evaluation by the state hospital and the patient does not meet criteria for continued hospitalization or conservatorship. CDCR/Parole will transport the patient back to prison or the inmate-patients county of residence within 24 hours. The state hospital cannot retain a patient beyond 24 hours and if the inmate-patient is not picked up within this time period, it may become necessary for the state hospital to discharge the inmate-patient to the street.

5. A patient who has been found to pose an unusual and severe security risk to the DMH program in which he/she is housed shall be transferred by CDCR to a CDCR institution within 24 hours. However, if the security risk is on the basis of mental disorder rather than criminality or personality disorder, DMH shall make every effort to retain and treat the patient or parolee in the DMH hospital.

6. A patient or parolee's personal property and funds are to accompany him/her at the time of delivery to and from the DMH hospital.

   - Property, other than legal materials, shall be limited to no more than can be stored within six cubic feet.

   - The property box from CDCR shall be inventoried and sealed. Any Board of Control Claim resulting from items missing from a patient or parolee's property upon admission to the DMH hospital is the responsibility of CDCR.

   - CDCR shall ensure that items on the DMH Hospital Contraband List (see Attachment # 1-Contraband List) are not transferred to a DMH hospital with the patient or parolee's personal property.

7. Each patient or parolee shall be subject to TB evaluation by DMH upon admittance.

***Utilization Management (UM)***

1. CDCR reserves the right to inspect, monitor, and perform utilization reviews prospectively, concurrently, or retrospectively regarding the courses of treatment or inpatient care provided to CDCR's inmate-patient. Such reviews shall be undertaken to determine whether the course of treatment or services was prior authorized, medically necessary and performed in accordance with CDCR rules and guidelines. DMH agrees to make available, upon request by CDCR, for purposes of utilization review, an individual patient's medical record and any committee reviews and recommendations related to a CDCR patient.

2. DMH acknowledges and agrees that concurrent utilization management review shall not operate to prevent or delay the delivery of emergency treatment.

3. DMH acknowledges that the care of a patient at DMH shall be reviewed by CDCR Utilization Management (UM) nurses or designated party and by a Joint CDCR/DMH Review Process.

4. CDCR UM nurses or designated party will gather data and review cases of CDCR inmate-patients in DMH programs. CDCR UM nurses or designated party will report their findings and make recommendations to the CDCR Health Care Manager and CDCR Chief Psychiatrist or their designee(s). CDCR and DMH managers or their designees will meet monthly to review the data. Each DMH program also will have a joint CDCR/DMH UM process that will review individual cases.

   If there is a disagreement about discharge, the UM nurse will review the patient's record and forward a recommendation to the Joint CDCR/DMH UM Review Process. If there continues to be disagreement, the recommendation will be conveyed to the CCAT.

***Discharge Criteria***

1. The inmate-patient has improved to a degree that further hospitalization is unnecessary, or the primary illness or problem for which hospitalization was required is in substantial remission, and the remaining symptoms are those of a disorder for which continued DMH inpatient care is not necessary, the inmate-patient will be returned to CDCR for ongoing treatment; or

2. Evaluation during hospitalization has resulted in a change of diagnoses such that continued hospitalization is not appropriate or necessary.

3. If requested by DMH, an inmate-patient who has withdrawn informed consent for mental health treatment or psychiatric medication, but for whom continued treatment is otherwise recommended, may be returned to CDCR after all other clinical and legal avenues to obtain authorization to treat have been exhausted, if the following two criteria have been met:

   - Withdrawal of informed consent shall be demonstrated by seven calendar days of continuous refusal to take oral medication or 30 calendar days of continuous refusal to accept scheduled depo-injectable medication, and documentation of discussions between treating DMH psychiatrists and other team members and the patient regarding the risks and benefits of continuing medication.

   - Documentation that the patient has not met criteria for involuntary treatment for at least the last seven calendar days.

***Discharge Procedure***

1. Inmate-patients will be returned to the institution from which they came per the "psych and return" policy provided that institution can meet the level of care and security needs of the inmate-patient. Generally most inmate-patients will be returned to an institution that has an EOP. The EOP IDTT may decide to discharge the inmate-patient to a lower level of care after the initial 14-28 day evaluation period.

2. Inmates who are paroling and require ongoing treatment will be referred to the Parole and Community Services Division (P&CSD) Transition Case Management Program and to a Parole Outpatient Clinic or to a State hospital per Penal Code 2974.

3. DMH shall fax a copy of the Discharge Summary to the designated "DMH contact", of the receiving institution at the time of notification of discharge. DMH shall also call the receiving institution. The inmate-patient shall then be returned to the CDCR institution within five working days after the time of notification, or resolution of any appeal, whichever occurs later.

4. Appeals for denial of return to CDCR will be reviewed by the Coordinated Clinical Assessment Team (CCAT), Part V of this document.

5. Emergency returns to CDCR, shall be accomplished within twenty-four hours. Such returns will be with prior notification and approval by telephone of the CDCR institution's C&PR staff and Mental Health Program Director, or designee. DMH shall call the receiving institution to provide continuity of care including medication.

A dictated, typed discharge summary shall follow as soon as practicable, but not more than fourteen days after return.

6. Discharge Information: For each inmate-patient returning to CDCR from a DMH program, DMH shall ensure that the following documents be shall be transferred with the inmate-patient to the respective CDCR institution:

- Psychiatric Discharge Summary;
- Nursing Assessment or Discharge Summary;
- Current Physicians orders and/or MAR;
- Current Treatment Plan;
- Keyhea Order (if applicable).

The inmate-patient shall not be placed in the transport vehicle without the above documents. For each parolee returning to (P&CSD) supervision, DMH shall ensure that the parolee's documents shall be forwarded to the Chief Psychiatrist of the respective Parole Region.

In addition, a DMH discharge packet will be faxed within two weeks of discharge. The discharge packet shall include but not be limited to (see Attachment #2-DMH Discharge Checklist:

- Interdisciplinary Notes for past 15 days;
- Physician Progress Notes for past 15 days;
- Relevant Consults;
- If applicable, forms specific to psych and return, mental health placement and transfer information for parolees.

The DMH psychiatric programs will include in their discharge packets, the forms specific to psych and return, mental health placement and transfer information for parolees.

All DMH programs shall provide written copies of the aforementioned cited materials. For VPP and SVPP, due to their close proximity to CMF and SVSP, shall provide the

entire UHR for review by the CMF and SVSP Chief of Mental Health instead of the above.

7. When an inmate returns to a prison from DMH, the Receiving & Release nurse shall notify Mental Health Service upon arrival. The inmate shall be evaluated by a mental health clinician within 24 hours of arrival. Medications shall be continued according to Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management.*

**E. DMH DAY TREATMENT PROGRAM (DTP) at CMF**

The DTP is a comprehensive treatment program with an emphasis on skill development. This program provides treatment for inmate-patients who require a higher LEVEL OF CARE than is provided in EOP but do not require 24-hour nursing care. The program includes increased programming and supervision to improve level-of-functioning, reduce further need for inpatient treatment and promote successful adjustment to the EOP, CCCMS, GP or parole environment.

***Admission Criteria***

To be accepted the inmate-patient:

1. Has an Axis I major (serious) mental disorder with active symptoms.

2. Does not require 24-hour nursing supervision.

3. Suffers from mild to moderate impairment of functioning in most life areas that would benefit from focused and comprehensive skill development to improve functioning within the prison setting or in preparation for parole, and/or requires continuing stabilization of psychiatric symptoms in a more structured setting.

4. Is able to function in a structured therapeutic setting with minimal staff prompting.

5. Is able to participate in own treatment planning.

6. Has had no serious suicide attempts in the past 30 days.

7. Has no acute medical issues.

***Referral Process***

All referrals shall include a completed DTP referral form and a referral packet, which consists of:

1. Medical H&P for Transfer to DMH;
2. Current Treatment Plan – CDCR 7388;
3. Due process or written consent;
4. Pharmacy profile;
5. Interdisciplinary Progress Notes for past 15 days;
6. TB chrono from the referring institution;
7. Custody Case Factor Sheet; and
8. CDCR Suicide Risk Assessment (including a SRAC).

DMH psychiatric programs (VPP and SVPP) shall require only a transfer form (see Attachment #3-DMH Referral/Transfer Form) and case factor sheet for DMH-to-DMH transfers.

All male CDCR institutions shall provide written copies of the aforementioned cited materials except for CMF where due to their proximity they shall provide the entire UHR for review by the DTP Admission and Discharge Coordinator or designee.

***Discharge Process***

DTP options for return to CDCR:

1. Return to the sending institution provided that institution can meet the treatment needs.
2. If the inmate-patient requires continued mental health care, transfer to an appropriate LEVEL OF CARE (see Chapter 3, CCCMS, and Chapter 4, EOP, for inclusion criteria).
3. Discharge to parole with a referral to a Parole Outpatient Clinic as needed.

4. The inmate-patient shall be returned to the CDCR institution on an expedited basis but no later than 5 working days after the time of notification.

***Discharge Procedure***

1. For each inmate-patient returning to CDCR from the DTP, the DTP shall ensure that the following documents be shall be transferred with the inmate-patient to the CDCR institution (see Attachment #2-DMH Discharge Checklist):

   - Psychiatric Discharge Summary;
   - Nursing Assessment or Discharge Summary;
   - Current Physicians orders and/or MAR;
   - Current Treatment Plan; and
   - Keyhea Order (if applicable).

   The inmate-patient shall not be placed in the transport vehicle without the above documents. For each parolee returning to P&CSD supervision, the DTP shall ensure that the parolee's documents shall be forwarded to the Chief Psychiatrist of the Parole Region.

   In addition, a discharge packet will be faxed within two weeks of discharge. The discharge packet shall include but not be limited to:

   - Interdisciplinary Notes for past 15 days;
   - Physician Progress Notes for past 15 days;
   - Relevant Consults;
   - If applicable, forms specific to psych and return, mental health placement and transfer information for parolees.

   The DTP shall provide written copies of the aforementioned cited materials except for CMF where due to their proximity; they shall provide the entire UHR for review by the CMF Chief of Mental Health or designee.

## F. PROCESS FOR CENTRALIZED DECISION MAKING FOR REJECTIONS AND INCOMPLETE PACKETS-CCAT

The Coordinated Clinical Assessment Team (CCAT) shall review referrals of CDCR inmate-patients that were rejected by DMH, and referrals where incomplete items were not resolved within two working days. Conducted by members of both the DMH and CDCR DCHCS, CCAT provides a centralized approach to expedite the review and decision making process for inmate-patients referred to DMH.
When any DMH program rejects an inmate-patient for admission, or is unable to resolve incomplete referral items within two days after referral, a designee from DMH Long Term Care shall contact a designee from CDCR DCHCS to initiate the CCAT process. The CDCR, DCHCS designee shall facilitate a telephone or videoconference to discuss the case with involved clinical and custody staff.

The CCAT shall include (but not be limited to):

- Senior mental health clinician(s) from DCHCS
- CDCR HCPOP representative(s)
- CDCR Classifications Services Unit representative(s)
- The referring clinician and supervising clinician(s) from the referring CDCR institution, and
- Senior clinician(s) from the relevant DMH programs.

When reviewing a rejection, a senior clinician from each potentially relevant DMH program shall participate in the review. When reviewing an incomplete packet, only the DMH senior clinician from the affected state hospital or psychiatric program shall be required to participate.

Case Conferences: The CDCR, DCHCS designee shall schedule case conferences upon request by DMH and/or CDCR clinicians regarding a difficult or perplexing inmate-patient case, including repeated admissions of the same inmate-patient in a short time frame.

## G. HEALTH CARE PLACEMENT OVERSIGHT PROGRAM

The HCPOP shall assist institution staff in referring and placing an inmate-patient in a DMH facility in the following ways:

1. Assist field staff with DMH intermediate or acute LEVEL OF CARE referrals

   - Coordinate with mental health staff at DCHCS headquarters for proper determination of appropriate DMH LEVEL OF CARE and subsequent placement determination.

   - Assist field staff concerning the referral process for the different DMH placement settings.
   - Assist field staff regarding Program Guide and MOU placement requirements such as timelines and means of transportation.

2. HCPOP staff shall assist field staff with appeals of referrals denied by DMH for clinical and custody reasons

   - Assist field staff regarding the DMH appeal process as appropriate (e.g., DMH contact persons, obtain written denial).

   - Coordinate with headquarters DCHCS mental health staff for determination of appealing referrals denied by DMH for clinical and/or custody reasons.

# CHAPTER 7
## Administrative Segregation

### A. INTRODUCTION

The Administrative Segregation Unit (ASU) Mental Health Services (MHS) program is part of the California Department of Corrections and Rehabilitation (CDCR) Mental Health Services Delivery System (MHSDS). This Program Guide outlines program policies and provides basic institutional operational procedures to ensure the effective delivery of clinical services to inmates with serious mental disorders who, for custodial reasons, require housing in ASU.

### B. RESPONSIBILITY

1. Overall institutional responsibility for the program shall rest jointly with the Health Care Manager and the Warden.

2. Institutional operational oversight of the ASU MHS shall be the responsibility of the Chief of Mental Health at each institution.

3. Custodial responsibilities, including initial placement, disciplinary actions, correctional counseling services, classification, inmate-patient movement, and daily management shall rest with the Warden or designee. The assigned psychiatrist or Primary Clinician (PC) shall attend all Institutional Classification Committee (ICC) meetings to provide mental health input.

4. Individual clinical case management, including treatment planning, level of care determination and placement recommendations, are performed by the assigned PC and approved by the institution Interdisciplinary Treatment Team (IDTT).

### C. PROGRAM GOALS AND OBJECTIVES

The goal of the ASU MHS program is to provide necessary mental health services for the population of seriously mentally disordered inmates who, for custodial reasons outlined in California Code of Regulations Title 15, Section 3335, require placement in ASU.

*Specific program objectives include:*

1. Continuation of care for inmate-patients with identified mental health treatment needs through regular case management activities and medication monitoring to enable inmate-patients to maintain adequate levels of functioning and avoid decompensation.

2. Daily clinical rounds of ALL inmates.

3. Mental Health screening of inmates who are not currently in the MHSDS caseload to identify mental health needs, and referral for further mental health evaluation as indicated.

4. Referral to a more intensive level of care for inmate-patients whose mental health needs cannot be met in the ASU, including expeditious placement into Mental Health Crisis Beds (MHCB) for inmate-patients requiring inpatient mental health care.

5. Mental health assessments and input into the classification decision-making process during ICC meetings, including the inmate-patient's current participation in treatment, medication compliance, suitability of single celling or double celling, risk assessment of self-injurious or assaultive behavior, status of Activities of Daily Living (ADL), ability to understand Due Process proceedings, likelihood of decompensation if retained in ASU, recommendations for alternative placement, and any other custodial and clinical issues that have impact on inmate-patients' mental health treatment.

6. Mental health assessments and input into the adjudication of Rules Violation Report (RVR) hearing proceedings involving MHSDS inmate-patients. Mental health information includes the quality of the inmate-patients' participation in their current MHSDS treatment plan, mental condition that may have been a contributing factor in the alleged misbehavior, and the ability to comprehend the nature of the charges or participate meaningfully in the disciplinary process. Final housing decisions are made by the ICC after considering all relevant clinical and custody factors.

## D. TREATMENT POPULATION

Refer to the Treatment Criteria for the level of care in the MHSDS, Chapter 1, Overview Program Guide.

*Referral for Mental Health Services*

1. Pre-placement mental health screening: All inmates are screened by medical personnel for possible suicide risk, safety concerns, and mental health problems before placement in ASU (see Inmate Medical Services Policy and Procedure, *Volume 4, Chapter 16: CDCR 7219*). If an inmate screens positive on the CDCR 128-MH7, *ASU Pre-Placement*

*Chrono*, they are referred for a mental health evaluation on an Emergent, Urgent, or Routine basis, depending on their answers to the screening questions. After completion, the CDCR Form 128-MH7, *ASU Pre-Placement Chrono,* shall be placed in the mental health chrono section of the Unit Health Record (UHR). For Urgent and Routine referrals, the medical staff conducting the screening shall complete a CDCR 128-MH5, *Mental Health Referral Chrono,* and follow the referral process below.

2. Current MHSDS inmate-patients: All inmates placed into ASU shall be reviewed for identification of current MHSDS treatment status by the time of the initial CDCR-114D, *Order and Hearing on Segregated Housing*, review. This shall occur on the first work day following an inmate's placement. Current MHSDS inmate-patients are identified by checking the ASU placements reported on the Institutional Daily Movement Sheet with the treatment identifier code in the Distributed Data Processing System (DDPS) or the Mental Health Tracking System (MHTS) for inmate-patient treatment cases. During the initial review, mental health staff will ensure the continuity of mental health care, including the delivery of prescribed medications. Upon inmate's placement into ASU, nursing staff shall transfer the inmate's Medication Administration Record to ASU, consistent with the post orders.

3. Staff referral: Any staff member who observes possible signs or symptoms of a serious mental disorder shall refer an inmate for clinical evaluation by completing a CDCR 128-MH5, *Mental Health Referral Chrono*. The Referral Chrono shall be processed by following the referral process below. Any inmate who is observed to be a suicide risk, or in any other condition that requires crisis care, shall be immediately screened by the PC to assess the potential for suicide and, if appropriate, referral to the MHCB for admission.

4. Inmates who receive a CDCR 115, *Rules Violation Report,* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

   - CDCR 115-MH *Rules Violation Report: Mental Health Assessment;*
   - A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication. The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,
   - For inmate-patients included in the MHSDS, to the inmate-patient's Primary Clinician

5. Self referral: Inmates in ASU may request a clinical interview to discuss their mental health needs. These requests are made on a CDCR 7362, *Health Care Services Request.* Inmates shall receive the attached pamphlet, "*Administrative Segregation Inmate*

*Orientation Mental Health Guide*" (available in Spanish), within 24 hours of placement into ASU.

NOTE: When an IDTT determines that an inmate-patient requires treatment of exhibitionism, that inmate-patient's level of care shall be changed to CCCMS, Medical Necessity (or higher if appropriate), bypassing the standard referral process.

***Referral process***

Mondays through Fridays, the following shall occur:

1. A health care staff member shall collect the CDCR 7362, *Health Care Services Request,* and staff referral forms each day from the designated areas.

2. Upon receipt of the collected forms, a Registered Nurse (RN)/Licensed Vocational Nurse shall initial and date each CDCR 7362, *Health Care Services Request,* and the CDCR 128-MH5, *Mental Health Referral Chrono.*

3. The CDCR 7362, *Health Care Services Request*, and the CDCR 128-MH5, *Mental Health Staff Referral*, shall be delivered to the designated program representative in mental health services, dental services, or pharmacy services for same-day processing.

On weekends and holidays, the following shall occur:

1. The Triage and Treatment Area RN shall review each CDCR 128-MH5, *Mental Health Staff* Referral, and CDCR 7362, *Health Care Services Request*, for medical, dental, and mental health services, shall establish priorities on an emergent and non-emergent basis, and shall refer accordingly.

2. If a mental health clinician is not available, the medical officer of the day (MOD), physician on call or psychiatrist on call shall be contacted.

Inmates will be seen by a mental health clinician, or on weekends, by the MOD, physician, or psychiatrist on-call within the clinically determined time frame.

- Emergent: Emergency cases will be seen immediately or escorted to the Triage and Treatment area

- Urgent: Urgent cases will be seen within 24 hours

- Routine: Other cases will be seen within five working days

## E. CLINICAL ROUNDS AND SCREENING

### *Clinical rounds*

A mental health staff member, usually a Licensed Psychiatric Technician (LPT), shall conduct rounds seven days per week in all ASUs to attend to the mental health needs of all inmates. The LPT shall make initial contact with each inmate placed into ASU within 24 hours of placement.

A morning "check-in" meeting between custody and clinical staff shall be held each day. At minimum, an ASU Sergeant and an assigned ASU Mental Health clinician (psychologist or social worker) shall attend the morning meeting. During the meeting, involved personnel shall identify new arrivals, discuss current behavioral issues and concerns, and share any pertinent information regarding new arrivals and/or at-risk inmates. Pertinent suicide risk information from the MHTS Suicide Tracking Report will be discussed. This meeting shall be documented in the ASU Log book and salient clinical information shall be documented in the UHR and, if necessary, a referral for mental health services shall be made at the appropriate level of urgency.

In order to establish contact and provide information, mental health staff shall attend to developing rapport with new inmates on the first day of mental health rounds.

Each institution is to ensure that effective communication is observed when inmates have limited ability to speak English or are hearing impaired. Interpreter services information shall be posted in all areas where phones may be used for that purpose, and all staff assigned to ASU shall be provided documented training regarding access and use of services and available translation equipment.

Those inmates not previously identified as having mental health treatment needs who exhibit possible signs and symptoms of serious mental disorders are referred, via CDCR 128-MH5, *Mental Health Staff Referral*, for clinical evaluation. Interaction shall be sufficient to ascertain the inmate's mental condition particularly during the first ten days. The LPT shall maintain an individual record of clinical rounds on both MHSDS and non-patients by initialing next to the inmate's name on the CDCR 114, *Isolation Log Book*, each time the inmate is seen. Any unusual findings that may require closer observation by custody shall be documented on the CDCR 114-A, *Daily Log*, on the same day of occurrence. For identified MHSDS inmate-patients, the LPT shall document a summary of daily clinical rounds on a CDCR 7230, *Interdisciplinary Progress Notes*, in the UHR on a weekly basis. Notes will be

clearly labeled as "Weekly Summary of LPT Clinical Rounds." If clinically indicated, the LPT may provide additional documentation.

***Screening Questionnaire***

All inmates who are not in the MHSDS and who are retained in ASU shall receive, within 72 hours of placement in ASU, a mental health screening interview utilizing the 31-question mental health screening questionnaire also used in the Reception Centers. The interview shall be conducted by a mental health clinician or trained nursing staff in private and confidential settings that afford confidentiality of sight and sound from other inmates, and confidentiality of sound from staff. Screening interview appointments shall be announced by custody staff as "health appointments" to avoid stigmatization and possible retribution by other inmates. Every effort shall be made to encourage inmates to attend these appointments.

The results of the questionnaire are evaluated either by hand-scoring or on an approved automated scoring system to determine the need for further evaluation. The scoring sheet shall be filed in the UHR. All inmates scoring positive on the questionnaire shall be referred to a mental health clinician to be seen within the clinically appropriate time frame. Emergent cases shall be seen immediately, Urgent cases shall be seen within 24 hours, all others shall be seen within 5 working days.

All referrals and results of evaluations are documented in individual inmates' UHR on approved forms and entered into the institutional MHTS. Decisions to provide treatment via placement into an outpatient program or MHCB shall be entered into DDPS.

## F. CLINICAL EVALUATION

Referral evaluations will be completed within the time frames listed above and consist of the following:

1. A review of the UHR and, if necessary, the Central File, shall be completed and documented on approved forms as a part of the assessment process. Past treatment needs, medications, and program placements shall be noted.

2. An individual clinical interview to determine the nature of the problem and a full mental status examination. The examination is documented on a CDCR 7386, *Mental Health Evaluation*, and placed into the UHR.

3. When necessary, as determined by the evaluating clinician in consultation with the IDTT, psychological and neuropsychological testing may be conducted as a part of the diagnostic assessment of all cases not previously identified as having mental health treatment needs (testing is discretionary for inmate-patients currently receiving care who have not previously undergone such testing). When suicidality is an issue, a suicide risk assessment shall be conducted using the Suicide Risk Assessment Checklist (SRAC).

4. All assessments shall conclude with a five axis Diagnostic and Statistical Manual clinical diagnosis, be documented on CDCR approved forms, and placed in the inmate's UHR.

5. Inmates who are identified as a result of the above process as meeting the clinical criteria for MHSDS placement may be referred to a psychiatrist for possible medication needs and other interventions as deemed appropriate (including placement into a MHCB for initiation of involuntary medication). These referrals shall be made on a CDCR 128- MH5, *Mental Health Referral.*

## G. CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM (CCCMS) CARE

Inmate-patients who were receiving treatment at the CCCMS level of care prior to ASU placement and those who are newly identified as requiring treatment at this level of care are assigned a PC. The IDTT shall include the inmate-patient's Correctional Counselor who shall present case factors of the ASU placement for consideration in development of the treatment plan and initiation of an aftercare plan.

The treatment intervention shall meet the guidelines set forth in the MHSDS Program Guide, *CCCMS, Chapter 3,* and may include the following:

***Required Treatment***

1. Regular monitoring of symptoms by LPTs through daily rounds.

2. Individual contact every week by the PC, or more frequently as clinically indicated.

3. Medication treatment and monitoring of compliance by psychiatric and nursing staff

***Other Treatment Activities***

1. Group therapy when deemed clinically appropriate

2. Self-help therapeutic activities such as reading and writing

3. When necessary, supportive care for Activities of Daily Living.

## H. ENHANCED OUTPATIENT PROGRAM CARE

1. The Chief of Mental Health or designee, or the Health Care Manager or designee, shall present the IDTT's recommendation for the Enhanced Outpatient Program (EOP) level of care to the ICC and provide clinical input regarding mental health placement options based on the inmate-patient's clinical needs. Placement options include:

a. Referral to an EOP for inmate-patients who are involved in non-violent incidents and determined to not be a risk to others.

b. Transfer to an appropriate ASU EOP hub institution treatment setting within 30 days of placement at the EOP level of care designation. Inmate-patients who are involved in serious rule violations and whose propensity for threat to others and/or the security of the institution is so high that no other alternative placement is considered appropriate shall be retained in ASU. These inmate-patients shall receive the EOP level of care as described below.

c. Referral to a Psychiatric Services Unit for inmate-patients who are serving an established and endorsed SHU term (placement of these cases requires ICC referral and Classification Staff Representative endorsement).

2. Once identified as requiring EOP level of care, an inmate-patient shall be processed through investigations and disciplinary hearings on a priority basis. Where court proceedings are required, staff will make every effort to expeditiously support the Court's adjudicative process. In no event shall a pending CDCR 115, *Rules Violation Report*, impede or delay the transfer of these inmate-patients to a hub ASU institution.

3. <u>Intake Assessment</u>

a. Within a maximum of five calendar days of the time of placement, an ASU Primary Clinician (PC) will be assigned who shall complete a brief evaluation of the inmate-patient including a review of the inmate-patient's mental health history and interview.

b. A comprehensive mental health clinical assessment shall be done by the PC and other IDTT members prior to the initial IDTT. If this evaluation is completed within five days, the brief evaluation referenced above need not be completed. This assessment shall include at minimum:

- Comprehensive review of Central File and UHR of mental health treatment needs, including prior placements and medications.

- Current mental status examination, including diagnosis and level of functioning.

- Daily observation by mental health and custody staff to assess ADL and social interactions.

- Review of medication history and adjustments to current prescriptions (including involuntary medications as necessary) by staff psychiatrist.

- The assigned Correctional Counselor shall be prepared to discuss significant disciplinary history and custodial placements.

- Review with inmate-patient specific risk factors for violence toward self and others.

4. Interdisciplinary Treatment Team

   a. All EOP inmate-patients will appear at the initial IDTT.

   b. All inmate-patients referred for EOP will be seen by the IDTT prior to the initial ICC or within 14 calendar days.

   c. The IDTT will develop a treatment plan on CDCR 7388, *Mental Health Treatment Plan.*

5. Length of Stay More Than 90 Days

   a. Inmate-patients housed in ASU for more than 90 days shall be reviewed every 30 days outside of the ICC process, by the Facility Captain and Correctional Counselor II. The status of each case, with detailed information regarding reasons for delays in the referral, disciplinary, classification, and/or transfer process, shall be compiled and reviewed by the Warden or designee (Chief Deputy Warden, or Associate Warden for Health Care). The Warden shall ensure that reviewers take action to resolve any issues that impact length of stay in ASU.

   b. Inmate-patients housed in ASU for more than 90 days who postpone a RVR hearing pending referral to the District Attorney, shall be reviewed for alternate housing. If the time housed in ASU is equivalent to the projected SHU term (if the inmate-patient has been found guilty of the RVR), the inmate-patient shall be released to a general population setting. The Warden or designee shall contact the District Attorney to discuss expediting pending cases.

6. EOP Treatment in ASU Hubs

   To avoid premature returns of inmate-patients and provide adequate time for observation and evaluation, inmate-patients transferred to EOP ASU hub institutions for treatment shall be held at the hub institution for no less than 60 days from the date of reception. Inmate-patients placed into general population housing during the initial 60-days after transfer to an ASU EOP hub shall be maintained at the EOP level of care for the duration of the 60-day period.

Inmate-patients housed in ASU EOP hubs hall be provided care consistent with their clinical needs. Each inmate-patient shall have an individualized treatment plan for ten hours per week of scheduled structured therapeutic activities, using standardized therapeutic materials, with the following services:

*REQUIRED TREATMENT*

a. Medication Management including a psychiatric evaluation by the psychiatrist at least every 30 days

b. Daily LPT rounds seven days per week

c. Weekly PC contact

d. Crisis intervention

*OTHER TREATMENT ACTIVITIES*

a. Medication Education

b. Group Therapy including Anger Management, Stress Management, Substance Abuse (where clinically appropriate)

c. Monitoring and assistance with daily living skills

d. Recreation therapy both within cell and out of cell; this may include music therapy, art therapy, current events

Inmate-patients who are released from ASU to a general population EOP for continuing mental health treatment may require mental health services related to adjustment to the general population environment. The ASU primary clinician shall document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to general population. The receiving EOP IDTT will consider documentation by the ASU clinician in developing the inmate-patient's treatment plan. The treatment plan for inmate-patients transferred from ASU to general population-EOP shall include services provided to aid in the transition to the general population environment.

7. Treatment Refusals

For inmate-patients who refuse more than 50% of offered treatment during a one-week period, the PC shall:

- Interact with these inmate-patients daily on scheduled work days (instead of weekly)

- Include in the treatment plan efforts to reduce resistance to participation in group therapy

- Discuss these inmate-patients during the ASU morning meeting with custody

- Consider referral of inmate-patients to higher levels of care and document the results of this consideration.

## I. INPATIENT PLACEMENT

Inmates who are found to meet the clinical criteria for referral to the MHCB for inpatient care shall immediately be transferred for such treatment, upon authorization by the Chief of Mental Health of the sending institution. (Refer to Section 5, Mental Health Crisis Bed, for transfer procedure)

If an ASU inmate-patient in an MHCB is determined to meet the clinical criteria for referral to the Department of Mental Health (DMH) program, the Chief of Mental Health or designee, of the sending institution shall initiate the referral process following established procedures to facilitate the admission to a DMH program.

## J. STAND-ALONE ADMINISTRATIVE SEGREGATION UNITS

1. No participant in the MHSDS shall be housed in a stand-alone ASU. Any inmate-patient included in the MHSDS, who is inadvertently placed in a stand-alone ASU, shall be transferred out within 24 hours.

2. LPTs shall make rounds seven days a week.

3. A mental health clinician shall conduct an assessment of any inmate in a stand-alone ASU identified and referred by the LPT or any staff immediately or within 24 hours, depending on urgency of the referral. Any inmate who meets criteria for MHSDS shall be transferred to another ASU as soon as possible but no longer than 24 hours following identification.

## K. PLACEMENT REVIEW AND CLINICAL INPUT IN CLASSIFICATION COMMITTEE

1. The initial IDTT is held prior to the initial ICC and as often as needed thereafter, at a minimum, once every 90 days. The PC and the Correctional Counselor assigned to the case shall present relevant clinical and custody case factors with recommendations

concerning treatment and placement needs. The PC shall document the results of the IDTT reviews and decisions on the CDCR 7388, *Mental Health Treatment Plan.*

A CDCR 128-MH3, *Mental Health Placement Chrono*, shall be completed by the PC and forwarded to correctional counseling staff for necessary classification actions when there is a change in the level of care.

2. The Chief of Mental Health or designee, or in institutions without such a position, the Health Care Manager or designee, shall attend the ICC to provide clinical input at the committee meeting.

## L. INTERDISCIPLINARY TREATMENT TEAM

The responsibilities for overall treatment planning within the ASU rest with the IDTT. These responsibilities include:

1. Placement decisions for individual cases.

2. Review of relevant clinical data for diagnostic formulation.

3. Review of relevant case factors.

4. Formulation and approval of treatment plans.

5. Annual and special reviews for continuation or termination of services

6. Review of treatment response.

7. Discharge planning.

The IDTT shall generally be responsible for developing and updating treatment plans. This process shall include input from the inmate-patient and other pertinent clinical information that may indicate the need for a different level of care. Referrals to higher levels of care shall be considered when the inmate-patient's clinical condition has worsened or the inmate-patient is not benefiting from treatment services available at the current level of care. Consideration of appropriate level of care shall be documented by the IDTT on a CDCR 7230-MH, *Interdisciplinary Progress Note,* and shall include the justification for maintaining the current level of care or referral to a different level of care

The ASU MHS IDTT is composed of, at a minimum:

**The assigned PC**

**The assigned psychiatrist**

**The LPT**

**The assigned Correctional Counselor**

Correctional housing officer or any other mental health and custodial staff members who have specific information or knowledge relevant to cases under review are encouraged to attend. The inmate-patient shall be included in the IDTT, if clinically and custodially appropriate, unless the inmate-patient refuses to participate. If the inmate-patient refuses to participate, the clinician must document the reason for refusal on a CDCR 7230-MH, *Mental Health Progress Notes*.

## M. DUTIES OF CLINICAL CASE MANAGER OR PRIMARY CLINICIAN

Each inmate-patient within the treatment component of the ASU MHS shall be assigned a PC or PC, typically a Clinical Social Worker (CSW) or psychologist. This individual shall maintain clinical involvement with the inmate-patient, as well as performing casework functions, including the following:

1. Documentation of initial and updates to the Mental Health Assessment.

2. In consultation with the IDTT, develop and document initial and updated treatment plans that also address security concerns and status.

3. Weekly individual contact for CCCMS and EOP inmate-patients.

4. Scheduling for regular or special IDTT reviews.

5. Response to inquiries regarding clinical status of the inmate-patient.

6. Attendance at initial IDTT reviews of the inmate-patient, prior to the initial ICC, and at subsequent IDTTs, at least every 90 days.

7. Participation in ICC to provide mental health input.

8. Liaison with custody and correctional counseling staff regarding overall management of inmate-patients.

9. Group therapy as defined in the inmate-patient's treatment plan.

10. Crisis intervention and referral for inpatient care as needed.

11. Review of the weekly summary of clinical rounds and documentation of this review in the UHR.

## N. UNIT HEALTH RECORD

1. A current record of all treatment plans and progress notes shall be maintained on departmentally approved forms within the individual UHR. Only designated staff shall have access to this record. All staff shall adhere to the confidentiality requirements.

2. There are many legitimate exceptions to confidentiality requirements (e.g., institutional security). However, every member of the ASU MHS, including correctional staff, shall treat all clinical information with professional discretion. No information shall be divulged without clinical or correctional necessity.

## O. AUTOMATED TRACKING SYSTEM

The Inmate Mental Health Identifier System (IMHIS) has been designed to track the movement of all inmate-patients receiving care in the MHSDS. The data entered into the system will be processed daily, so the system will maintain current information regarding MHSDS inmate-patients' current level of care, as well as MHSDS transfers, discharges and new cases. All institutions are to conduct a reconciliation of the inmate-patients housed in ASU who require mental health treatment with the IMHIS codes for this specific population. Daily updates to the IMHIS are mandatory for every ASU.

All mental health contacts shall be tracked in the MHTS.

## P. CUSTODIAL OPERATIONS

Inmate-patients within the ASU MHS are subject to all rules, custodial requirements, activities, and privileges of other ASU inmates.

## Q. PHYSICAL PLANT

Interviews of inmates will be held in a private setting unless the security of the institution or the safety of staff will be compromised. Screening and evaluation interviews and treatment activities are accomplished in existing interview rooms and exercise areas within current ASU units. The IDTT interviews may require inmate-patient escorts to classification/interview rooms. Clinical monitoring and routine interviews, including clinical staff daily rounds, may be provided through cell-front contacts as clinically appropriate and depending on the cooperation of the inmate. While some therapeutic activities may take place within the cell, whenever possible treatment activities should take place out of cell.

Mental health treatment in ASU may be provided using mental health programming booths. All mental health programming booths procured after March 2007, shall conform to design

**Administrative Segregation** **Mental Health Services Delivery System**

specifications available through the Prison Industry Authority. Booths are available through the Prison Industry Authority's online product catalog at: http://catalog.pia.ca.gov/ using the search term "Mental Health Programming Booth.".

**2009 REVISION** 12-7-15

# CHAPTER 8
# Security Housing Unit

## A. INTRODUCTION

It is the policy of the Department of Corrections and Rehabilitation (CDCR) to provide inmates in a prison setting with prompt access to mental health services, regardless of their housing designation. Provision of mental health services within a Security Housing Unit (SHU) is part of the Mental Health Services Delivery System (MHSDS). Mental health services within a SHU are provided to all SHU inmate-patients in accordance with the inmate-patient's treatment needs and level of care. Services are designed to achieve symptom management through regular case management activities, medication administration and monitoring, crisis intervention, continuous monitoring for signs or symptoms of a serious mental disorder, and referral to a more intensive as needed.

The CDCR currently has four SHUs located at the institutions listed below. Inmates in the MHSDS receive services as indicated.

- Valley State Prison for Women (females only) – Inmates in this unit receive mental health services in conjunction with inmates in the Administrative Segregation Unit (ASU).

- California Correctional Institution – Inmates are provided Correctional Clinical Case Management Services (CCCMS). Inmates requiring the Enhanced Outpatient Program (EOP) are referred to a Psychiatric Services Unit (PSU) and transferred to an ASU EOP hub while awaiting PSU placement.

- California State Prison, Corcoran – Inmates are provided CCCMS in the SHU. Inmates requiring EOP services are referred to a PSU and transferred to the ASU EOP hub while awaiting PSU placement.

- California State Prison, Sacramento – Inmates are provided CCCMS in the SHU. Inmates requiring EOP services are referred to a PSU.

- Pelican Bay State Prison (PBSP) – Per exclusionary criteria from the federal court, inmates with one of the conditions listed below shall not be admitted to the PBSP SHU.

1. Documented diagnosis or evidence of any of the following Diagnostic and Statistical Manual IV – Axis 1 conditions currently in existence or within the preceding three months:

   **Schizophrenia (all sub-types);**
   **Delusional Disorder;**
   **Schizophreniform Disorder;**
   **Schizoaffective Disorder;**
   **Brief Psychotic Disorder**
   **Substance-Induced Psychotic Disorder (excluding intoxication and withdrawal);**
   **Psychotic Disorder Not Otherwise Specified;**
   **Major Depressive Disorders;**
   **Bipolar Disorder I and II**

2. A diagnosed mental disorder that includes being actively suicidal.

3. A diagnosis of a serious mental illness that is frequently characterized by breaks with reality, or perceptions of reality that leads to significant functional impairment.

4. A diagnosis of "organic brain syndrome" that results in a significant functional impairment if not treated.

5. A diagnosis of a severe personality disorder that is manifested by frequent episodes of psychosis or depression and results in significant functional impairment.

6. A diagnosis of mental retardation.

7. A prior history, which suggests that the inmate will do poorly in the SHU. This includes inmates who have experienced psychotic symptoms that appear to be attributable to incarcerations in a SHU environment. These inmates are those for whom evidence exists of a deterioration in mental health which correlates with placement in SHU or SHU-like environments. Such diagnoses as "Brief Psychotic Episode," "Psychosis NOS," and "Major Depression" which have been assigned during periods of placement in SHU may, for example, be indicative of deterioration of mental health which accompanies SHU placement. Inmates whose history suggests such a causal relationship should be excluded from SHU.

8. A history which includes any of the following within the preceding three months:

   a. Medication prescribed to address any of the "at risk" mental health categories listed above.

b. Therapy and/or supportive services to address any of the "at risk" mental health categories listed above.

c. Frequent (e.g. at least weekly) monitoring for deterioration in mental health condition. This does not include situations in which repeated visits by mental health staff are attributable to repeated referral from the inmate or from custody staff but where no mental health condition is noted.

d. A history which includes a recurrent or "cyclic" mental health condition (e.g. Bipolar Disorder) where the inmate has not currently been symptom free for a period of time that is at least **twice as long** as the longest known period of active symptoms or known to demonstrate recurrent symptoms at intervals of approximately 6 months, would be considered as "positive" on this indicator until they had been symptom free for a continuous period of at least 12 months.

Where the results of the Unit Health Record (UHR) review reveal that any of the above conditions exist, the inmate must be removed from SHU within 96 hours of his arrival on that unit.

Where the results of the UHR review **do not** reveal the existence of any of the above conditions **and** there is evidence that the inmate has been evaluated with the existing 31 item mental health screen or other evaluation (documented on a CDCR 7386, *Mental Health Evaluation*) within the preceding 12 month period, the inmate may be housed in SHU.

Where the results of the UHR are equivocal (as where no clear diagnosis is established but where mental health contact and observations have suggested that symptoms consistent with one or more of the above conditions have been observed) or when no mental health evaluation (a 31 item mental health screen or completion of an evaluation documented on a CDCR 7386, *Mental Health Evaluation*) has occurred the preceding 12 month period, a mental health evaluation shall be conducted.

## B. PURPOSE

This chapter outlines program policies and provides institutional operational procedures to assure the effective delivery of mental health services to inmate-patients with serious mental disorders who, for custodial reasons, require housing in a SHU, according to California Code of Regulations, Title 15.

## C. RESPONSIBILITY

1. Overall institutional responsibility for the program shall rest jointly with the Health Care Manager and the Warden.

2. Institutional operational oversight of the Mental Health Services in a SHU shall be the responsibility of the Chief of Mental Health. The assigned Psychiatrist or Primary Clinician (PC) shall attend all Institutional Classification Committee (ICC) meetings in the SHU to provide mental health input.

3. Custodial responsibilities, including initial placement, correctional counseling services, classification, inmate movement, and daily management shall rest with the Warden or designee.

4. Clinical case management, including treatment planning and placement recommendations, shall be performed by an assigned PC and approved by the SHU Interdisciplinary Treatment Team (IDTT).

## D. PROGRAM GOALS AND OBJECTIVES

The goal of the mental health services in the SHU is to provide evaluation and treatment of serious mental disorders that are limiting the ability of inmates with high security needs to adjust to appropriate institutional placements. Inmate-patients with clinical needs that cannot be met within the SHU mental health program, as determined by the IDTT, shall be referred to the SHU ICC for consideration of alternative treatment programs.

***The program objectives are to:***

1. Provide regular case management, treatment activities, and medication monitoring, to enable inmate-patients to maintain their current level of functioning and avoid decompensation.

2. Ensure that inmate-patients whose clinical mental health needs cannot be met in SHU and require a change in level of care are referred for alternative treatment programs by mental health clinicians.

3. Provide clinical rounds every other week by Licensed Psychiatric Technicians (LPT) or other clinicians to identify mental health needs for all inmates who are not currently in MHSDS. Rounds are provided by PCs at PBSP and by LPTs in other SHUs.

4. Provide weekly clinical rounds by LPTs or other clinicians of inmates in the MHSDS.

5. Conduct mental health assessments to provide input into ICC proceedings concerning the inmate-patients' current participation in the MHSDS program. This includes medication compliance, suitability for single or double celling, risk assessment for self injurious or assaultive behavior, status of Activities of Daily Living (ADL), ability to understand Due Process, likelihood of decompensation if retained in SHU, and recommendations for alternative placement.

6. Conduct mental health assessments to provide input into the adjudication of Rules Violation Reports (RVR) hearing proceedings on MHSDS caseload inmate-patients according to current policy. Mental health information includes the inmate-patient's participation in the current MHSDS level of care, any mental condition that may have been a contributing factor in the alleged behavior, the inmate-patient's ability to comprehend the nature of the charges or the disciplinary process, and any mental health factor that the hearing officer should consider in assessing the penalty. Final decisions are made in ICC meetings or hearings after considering all relevant clinical and custody factors, consistent with Department Operations Manual, Section 62050.13.23 (ICC/Suspension of SHU terms).

## E. TREATMENT POPULATION

Refer to the Treatment Criteria for the levels of care in the MHSDS Program Guide, *Chapter 1, Program Guide Overview* .

## F. SOURCES OF REFERRAL FOR MENTAL HEALTH SERVICES

1. Current MHSDS treatment cases: Current MHSDS inmate-patients are identified by checking the SHU placements reported on the Institutional Daily Movement Sheet to ensure the continuity of mental health care including prescribed medications. Upon an inmate-patient's placement into the SHU, the nursing staff from the originating unit shall transfer the inmate-patient's Medication Administration Record (MAR) to the SHU, consistent with their post orders.

2. Staff referral: Any staff member who observes possible signs or symptoms of a serious mental disorder may refer an inmate for clinical evaluation by completing a CDCR 128-MH5, *Mental Health Referral Chrono*, and follow the self-referral process below. Any inmate who is observed to be a suicide risk, or in any other condition that requires crisis care, shall be immediately screened by a PC to assess their potential for suicide and, if appropriate, referred to the MHCB for admission. On weekends and holidays, follow the self-referral process below.

3. Inmates who receive a CDCR 115, *Rules Violation Report,* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

   - CDCR 115-MH *Rules Violation Report: Mental Health Assessment;*
   - A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication. The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,
   - For inmate-patients included in the MHSDS, to the inmate-patient's PC.

4. Self referral: Inmates in SHU may request a clinical interview to discuss their mental health needs. These requests are made on a CDCR 7362, *Health Care Services Request*. Mondays through Fridays, the following shall occur:

   a. A health care staff member shall collect the CDCR 7362, *Health Care Services Request*, and staff referral forms, 128-MH5, *Mental Health Referral Chrono,* each day from the designated areas.

   b. Upon receipt of the collected forms, an nursing staff shall initial and date each CDCR Form 7362, *Health Care Services Request*, and/or staff referral forms, 128-MH5, *Mental Health Referral Chrono*.

   c. The CDCR Forms 7362, *Health Care Services Request*, and/or mental health staff referrals forms, 128-MH5, *Mental Health Referral Chrono*, shall be delivered to the designated program representative in mental health services for same-day processing.

   On weekends and holidays, the following shall occur:

   a. The Treatment and Triage Area (TTA) registered nurse (RN) shall review each mental health staff referral form, 128-MH5, *Mental Health Referral Chrono*, and each CDCR 7362, *Health Care Services Request*, for the need for medical, dental, and mental health services, establish priorities on an emergent and non-emergent basis, and refer accordingly.

   b. If a mental health clinician is not available, the medical officer of the day (MOD), physician on call or psychiatrist on call shall be contacted.

5. Inmates will be seen by a mental health clinician, or on weekends by the physician or psychiatrist on call within the clinically determined time frame.

   - Emergent: Emergency cases will be seen immediately or escorted to the TTA

- Urgent: Urgent cases will be seen within 24 hours
- Other: Other cases will be seen within five working days

6. Clinical rounds: A mental health staff member, usually a LPT or at PBSP, a PC, shall conduct rounds weekly unless clinically needed more often in the SHU to attend to the mental health needs of all MHSDS inmates. The LPT shall make rounds of non- MHSDS inmates every other week. If an inmate refuses to talk to the LPTs, the LPT will discuss the inmate's functioning with custody staff. The LPT shall maintain an individual record of clinical rounds by making a check mark next to the inmate's name on the SHU Inmate Roster each time they are checked. Those inmates who have not been previously identified as having mental health treatment needs but exhibit possible signs and symptoms of a serious mental disorder shall be referred, via CDCR 128-MH5, *Mental Health Referral Chrono*, to a PC for clinical evaluation. Any unusual findings that may require closer observation by custody shall be documented on the 114-A, *Isolation Log,* on the same day of occurrence. The LPT shall document a summary of the status of MHSDS inmate-patients in a weekly progress note in the UHR.

7. All referrals and evaluations shall be documented on approved forms, filed in individual inmate UHR, and entered into the Mental Health Tracking System.

NOTE: When an IDTT determines that an inmate-patient requires treatment of exhibitionism, that inmate-patient's level of care shall be changed to CCCMS (or higher if appropriate), bypassing the standard referral process.

## G. CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM (CCCMS)

The mental health staff shall continue to provide mental health services to inmate-patients with the CCCMS level of care designation after they are placed in SHU. Inmate-patients who meet the clinical criteria of MHSDS resulting from staff referrals, self-referrals, or clinical rounds shall also receive mental health evaluation and ongoing services, if determined appropriate. Each MHSDS inmate-patient is assigned a PC.

1. Interdisciplinary Treatment Team

   a. The responsibilities for overall treatment planning within the CCCMS program rest with an IDTT. These responsibilities include:

      - Placement decisions for individual cases
      - Review of relevant clinical data for diagnostic formulation

- Review of relevant case factors
- Formulation and approval of treatment plans
- Annual and special reviews for continuation or termination of services
- Review of treatment response
- Discharge planning

b. The IDTT is composed of, at a minimum:

- The assigned PC (either a psychologist or a Clinical Social Worker).
- The LPT
- The SHU Senior Psychologist or designee
- The assigned psychiatrist
- The assigned Correctional Counselor
- The inmate-patient (if clinically and custodially appropriate). The inmate-patient shall be included in the IDTT, unless the inmate-patient refuses to participate. If the inmate-patient refuses to participate, the clinician must document the reason for refusal in the CDCR 7230, *Mental Health Progress Notes*. Inmate-patients shall not be disciplined for not participating in IDTT.
- The housing custody officer or any other staff member who has direct knowledge of the inmate-patient under review is encouraged to attend. As the staff involved in day-to-day interactions with inmate-patients, custody officers can provide input in assessing clinical status and continuing needs, and support in implementing treatment programs.

c. All CCCMS inmate-patients are seen in the initial IDTT that is held prior to the initial ICC hearing (within 14 calendar days of arrival in SHU) and quarterly thereafter. Some inmate-patients may be seen more frequently by the IDTT in special reviews at the request of the assigned PC or psychiatrist whenever changes in the level of care or treatment plans are indicated. The results of the IDTT reviews and decisions shall be documented by the PC in the interdisciplinary progress notes and filed in the UHR. These notes shall include the following:

- Names of all IDTT members present
- Inmate-patient's participation
- Inmate-patient's suitability for single or double celling
- Risk assessment for self injurious or assaultive behavior
- Current medication regimen
- Compliance with treatment, including medication
- Status of ADL
- Treatment goals and objectives, progress or lack of progress in treatment
- Recommendations for placement options
- Need for staff assistance
- ICC action

d. CDCR 128-MH3, *Mental Health Placement Chrono*, shall be completed by the PC and forwarded to correctional counseling staff for necessary classification actions when there is a change in the level of care.

2. Functions of the PC in SHU may include the following:

   a. Complete mental health evaluation on new cases. If an inmate-patient is an active CCCMS case and the Mental Health Assessment has been completed by a previous clinician, the PC shall update the assessment.

   b. In consultation with the IDTT, develop and document initial and updated CDCR 7388, *Treatment Plans*, that also address security concerns and status.

   c. Provide individual monitoring contact once every 30 days at a minimum for CCCMS inmate-patients, or more frequently as clinically indicated.

   d. Participate in IDTT meetings.

   e. Participate in ICC to provide mental health input.

f. Provide crisis intervention and referral for a more intensive level of care as needed.

g. Perform as liaison with custody and correctional counseling staff regarding overall management of inmates.

3. Treatment Modalities: Based on identified needs, the following treatment modalities are available:

*REQUIRED TREATMENT*

- Individual meeting with PC at least every 30 days or more frequently as clinically indicated.
- Quarterly IDTT update of treatment plan.
- Medication evaluation, review, and monitoring of compliance by psychiatric and nursing staff for those inmate-patients receiving medication.
- Regular monitoring of symptoms by LPTs through weekly rounds of all MHSDS inmate-patients and rounds every other week of all non-MHSDS inmates.

*OTHER TREATMENT ACTIVITIES*

- Orientation and supportive counseling for institutional adjustment
- Individual counseling and crisis intervention
- Group therapy such as anger management and relapse prevention
- Social skills training
- Consultation services, such as to education and work programs
- Clinical discharge or clinical pre-release planning

## H. ENHANCED OUTPATIENT PROGRAM

Inmate-patients who are serving an established and approved SHU term and require an EOP level of care shall be referred to a PSU. While awaiting placement for a PSU, these inmate-

patients shall be transferred to an EOP ASU hub within 30 days of being designated as requiring EOP care. EOP mental health services shall be provided in the EOP ASU Hubs.

## I. PLACEMENT REVIEW AND CLINICAL INPUT INTO ICC

1. The appropriateness of an inmate-patient's placement in SHU shall be reviewed in regularly scheduled ICC meetings. The Chief of Mental Health or designee, is a member of the ICC. In that capacity, he/she shall present the IDTT's recommendations regarding placement recommendations, based on the inmate-patient's clinical needs. Designees shall be a psychiatrist, a licensed psychologist, or a Licensed Clinical Social Worker.

2. All identified CCCMS and EOP inmate-patients in SHU shall receive continued mental health services managed by the assigned PC. An exception to this policy will occur at PBSP when an inmate-patient meets the exclusionary criteria at which time the inmate- patient shall be transferred to an appropriate treatment setting such as the PSU for EOPs or a SHU with CCCMS care. Any inmate in the PBSP SHU who is identified as having one of these diagnoses and requiring EOP level of care shall be transferred within 96 hours out of the PBSP SHU to the PSU, EOP or Correctional Treatment Center (CTC).

3. Inmate-patients in the PBSP PSU recommended by the IDTT for CCCMS are scheduled for the next available ICC and referred for transfer to the COR SHU. They are housed in ASU pending transfer.

4. An inmate-patient whose clinical needs cannot be adequately met through regular case management activities shall be referred to ICC for consideration of alternative clinical placement, including placement in a Level IV EOP. Inmate-patients who are determined to meet the clinical criteria for referral to the MHCB shall immediately be transferred to MHCB. Upon approval by the Chief of Mental Health, or designee, the PC shall initiate such referrals, based on the direct observation and assessment.

5. The ICC shall review all referrals for alternative placement and may recommend one of the following placement options, based on the clinician's input and Correctional Counselor review of case factors:

   a. Transfer to the MHCB program. This option is for inmate-patients who require 24-hour crisis care and do not require ICC review.

   b. Transfer to an appropriate inpatient program through Department of Mental Health (DMH).

   c. Transfer to a PSU. This option is for male inmate-patients who require both maximum custodial controls and EOP level of care. Female inmate-patients will

continue to be treated in SHU, consistent with updated individualized treatment plans and LOC, until a PSU for female inmate-patients is established.

d. Suspension of SHU term and placement in the Level IV EOP: This option is for inmate-patients who are determined by the ICC to no longer require the maximum custodial controls of SHU.

e. All inmate-patients requiring EOP care shall be transferred to either a PSU or EOP, as determined by the ICC, within 60 days or 30 days, if clinically indicated.

## J. UNIT HEALTH RECORD

A current record of all CDCR 7386, *Mental Health Evaluations*, CDCR 7388, *Treatment Plans*, and CDCR 7230, *Interdisciplinary Progress Notes,* shall be maintained in the UHR. Records shall include documentation regarding modifications to an inmate-patient's treatment plan for developmental and other disabilities. Only designated staff shall have access to this record. All staff shall adhere to the confidentiality requirements. No information shall be divulged without clinical or correctional necessity.

## K. AUTOMATED TRACKING SYSTEM

The Inmate Mental Health Identifier System (IMHIS) has been designed to track the movement of all inmate-patients receiving care in the MHSDS. The data entered into the system shall be processed daily, so the system will maintain current information regarding MHSDS inmate-patients' current level of care as well as MHSDS inmate-patient transfers, discharges, and new cases. All institutions shall conduct a reconciliation of the inmate- patients housed in ASU and SHU who require mental health treatment with the IMHIS codes for this specific population. Daily updates to the IMHIS are mandatory for every SHU.

Inmate-patients clinical contacts shall be tracked in the Mental Health Tracking System .

## L. CUSTODIAL OPERATIONS

Inmate-patients with a serious mental disorder within the SHU are subject to all rules, custodial requirements, activities, and privileges of other SHU inmates.

## M. PHYSICAL PLANT

Screening and evaluation interviews and treatment of inmates shall be held in a private setting unless the security of the institution or the safety of staff will be compromised. The IDTT interviews may require inmate-patient escorts to classification/interview rooms. Clinical monitoring and routine interviews, including clinical staff rounds, may be provided

through cell-front contacts as clinically appropriate and depending on the cooperation of the inmate. While some therapeutic activities may take place within the cell, whenever possible treatment activities should take place out of cell.

Mental health treatment in SHU may be provided using mental health programming booths. All mental health programming booths procured after March 2007, shall conform to design specifications available through the Prison Industry Authority. Booths are available through the Prison Industry Authority's online product catalog at: http://catalog.pia.ca.gov/ using the search term "Mental Health Programming Booth."

# CHAPTER 9
## Psychiatric Services Unit

### A. INTRODUCTION

The Psychiatric Services Units (PSU) were developed to deliver mental health services to inmates who have been diagnosed as having a serious mental disorder and are serving a Security Housing Unit (SHU) term. The purpose of the PSU is to assure the effective delivery of Enhanced Outpatient Program (EOP) services to inmate-patients in a maximum- security setting. The PSUs are currently located at the Pelican Bay State Prison, California State Prison, Sacramento, and for female inmates at the California Institute for Women.

### B. PROGRAM GOALS AND OBJECTIVES

1. The goal of the PSU is to provide evaluation and treatment of serious mental disorders that are limiting the ability of inmates with high security needs to adjust to appropriate institutional placements. The overall objective is to provide clinical intervention to return the individual to the least restrictive clinical and custodial environment.

2. More specific program objectives for individual cases may include:

   a. Providing comprehensive mental health assessment of inmates to determine their need for treatment and appropriate clinical placement.

   b. Providing alternative housing for inmate-patients whose mental health needs limit their ability to adjust to placement within the SHU.

   c. Providing clinical interventions that reduce the inmate-patients' behavioral problems and allow re-integration into less restrictive clinical and custodial placements, or, for inmate-patients approaching release dates, transition to parole status.

   d. Assisting inmate-patients in acquiring skills to function more appropriately and successfully in an institutional setting.

## C. PROGRAM RESPONSIBILITY

1. The overall institutional responsibility for the program rests jointly with the Health Care Manager (HCM) and the Warden.

2. The coordination of clinical activities within the PSU is the responsibility of the PSU Senior Psychologist. The PSU Senior Psychologist is responsible for ensuring that the PSU Mental Health Program is in compliance with the Mental Health Services Delivery System (MHSDS).

3. The PSU Facility Captain will oversee custodial responsibilities, correctional counseling services, and classification actions.

4. Decisions on inmate-patient treatment plans, individual inmate-patient program activities, and level of care are made by the Interdisciplinary Treatment Team (IDTT).

## D. POPULATION TO BE SERVED

Any California Department of Corrections and Rehabilitation (CDCR) inmate-patient with a SHU classification who requires an EOP level of care will be housed in the PSU. Refer to the Treatment Criteria for the levels of care in the MHSDS Program Guide, Chapter 1, Overview Program Guide.

## E. REFERRAL AND ENDORSEMENT

SHU inmates shall be placed into PSU when a mental health evaluation determines that EOP level of care is indicated or when an EOP inmate receives an established and approved SHU term. Staff shall not postpone a referral to the Classification Services Representative (CSR) for any unresolved disciplinary infractions or District Attorney referral determinations. In cases where restrictions may apply (e.g., parole violators returned to custody who are awaiting a parole revocation extension hearing), the inmate-patient will be referred to the CSR for PSU endorsement and retained at the ASU hub until the revocation process is complete, then transferred to the PSU if still appropriate.

1. When an inmate-patient has both an active SHU Term and EOP level of care, he will be referred for placement in a PSU. The referring source must complete a CDCR 128-MH3, *MHSDS Placement Chrono*, outlining the need for PSU placement. This CDCR 128- MH3, *MHSDS Placement Chrono*, must be signed by the referring institution's Chief of Mental Health or designee.

2. The Institutional Classification Committee (ICC) at the referring institution shall make a referral to the CSR for endorsement.

3. Once endorsement is obtained, the inmate-patient shall be transferred to a PSU.

4. EOP inmate-patients with an established and approved SHU term shall be transferred within 30 days of designation to an EOP ASU hub and will be provided EOP care while awaiting PSU placement.

5. Per exclusionary criteria from the federal court, inmate-patients with one of the diagnoses listed below shall not be admitted to the PBSP SHU. SHU EOP inmate-patients with one of the diagnoses shall be placed in a PSU. Any inmate already in a SHU who is identified as having one of these diagnoses and requiring EOP level of care shall be transferred within 96 hours out of the PBSP SHU to the PSU, EOP or Correctional Treatment Center (CTC).

6. If an inmate in the PBSP SHU is diagnosed with one of the exclusionary diagnoses and requires Correctional Clinical Case Management System (CCCMS) level of care, he shall be moved within 96 hours to ASU, the PSU, or the CTC. The inmate shall be reviewed by the ICC and referred for transfer to the California State Prison, Corcoran SHU. If the inmate-patient's diagnosis does not meet exclusion criteria, he shall be retained in the SHU and reviewed weekly by clinical staff. The exclusionary diagnostic criteria are:

   - Schizophrenia (any subtype)
   - Delusional Disorder
   - Schizophreniform Disorder
   - Schizoaffective Disorder
   - Substance Induced Psychotic Disorder (excluding intoxication and withdrawal)
   - Psychotic Disorder Not Otherwise Specified
   - Any mental illness characterized by breaks with reality or perceptions of reality leading to significant functional impairment
   - Major Depressive Disorder
   - Bipolar Disorder I or II
   - Brief Psychotic Disorder
   - Mental retardation
   - Any mental disorder which includes inmate being actively suicidal
   - Organic Brain Syndrome consistent with significant functional impairment
   - Severe personality disorder manifested by frequent episodes of psychosis or depression and resulting in significant functional impairment

## F. CLINICAL SERVICES

### *Intake Assessment*

1. The Senior Psychologist or designee shall appoint a Primary Clinician (PC) for each inmate-patient admitted to the PSU. The PC shall complete a brief evaluation of the

inmate-patient including a review of the inmate-patient's mental health history and an interview in a timeframe clinically determined appropriate but not more than five calendar days after arrival in the PSU.

2. All inmate-patients will be evaluated by the IDTT prior to the initial ICC but not later than 14 calendar days after arrival in the PSU.

3. A comprehensive mental health clinical assessment shall be done by the PC and other IDTT members prior to the initial IDTT. This assessment shall include at minimum:

   a. Comprehensive review of the central file and unit health record (UHR) of mental health treatment needs, including prior placements and medications.

   b. Current mental status examination, including diagnosis and level of functioning.

   c. Daily observation by mental health and custody staff to assess Activities of Daily Living and social interactions.

   d. Review of medication history and adjustments to current prescriptions (including involuntary medications as necessary) by staff psychiatrist.

   e. Review of disciplinary history and custodial placements by the assigned Correctional Counselor or Lieutenant.

   f. Review specific risk factors for violence toward self and others. This includes a suicide risk assessment if indicated.

4. The IDTT will make a decision regarding appropriate placement. This decision includes the following options:

   a. Retention for an additional 14 calendar days to determine the inmate-patient's appropriateness for PSU placement.

   b. Referral to the Department of Mental Health (DMH) for inpatient care. Inmate-patients shall be referred to the DMH Acute Psychiatric Program (APP) at the California Medical Facility (CMF) for acute care. Inmate-patients requiring intermediate care shall be referred to the DMH Salinas Valley Psychiatric Program. All female inmate-patients requiring Department of Mental Health level of care shall be referred to Patton State Hospital.

   c. Placement in Mental Health Crisis Beds (short term crisis stabilization, including initiation of involuntary medications when required).

d. Retention in the PSU Treatment Program if the inmate-patient requires EOP level of care.

e. Referral to classification committee recommending SHU placement if the inmate qualifies for CCCMS care or has been discharged from the MHSDS. Inmate-patients with any of the exclusionary diagnoses listed in Section E, *Referral and Endorsement*, Paragraph 6 above, shall not be placed in the PBSP SHU.

f. If the SHU term has been served, general population placement at the appropriate level of care including EOP.

***Interdisciplinary Treatment Team***

1. The PSU IDTT shall be chaired by the PSU Senior Psychologist. All clinical decisions regarding intake, treatment planning, re-justification of level of care, and discharge, are made by the PSU IDTT. The IDTT is composed of, at minimum:

- Senior Psychologist
- Assigned Psychiatrist
- PSU Facility Captain
- Correctional Counselor II
- Assigned Primary Clinician
- Inmate-patient

Other PSU staff such as a Recreation Therapist (RT), Nursing staff, Licensed Psychiatric Technician (LPT), Sergeant and Correctional Officers, and/or custody representatives may attend. A representative from the IDTT (the assigned PC or designee) shall be present in all classification hearings regarding inmate-patients to provide mental health input into the classification decision-making process. The inmate-patient shall be included in the IDTT, unless the inmate-patient refuses to participate. Inmate-patients shall not receive a CDCR 115, *Rules Violation Report*, for not participating in IDTT. The PC documents the reason for refusal on the CDCR 7230-MH, *Mental Health Progress Notes*, in the UHR. The PC is responsible for presenting the inmate-patient's concerns to the IDTT.

2. After the initial IDTT, inmate-patients will be evaluated by the IDTT minimally at 60 and 120 days after admission and at least every 90 days thereafter or sooner, whenever there is a significant change in level of functioning. The IDTT will evaluate treatment progress, update the treatment plan and review the discharge goals. The PC assigned to the case will present a case summary with recommendations for continued treatment or discharge. The results of all IDTT reviews, decisions and recommendations will be documented in the UHR. Initial and level of care changes are documented on a CDCR 128-MH-3, *Mental Health Placement Chrono*, and forwarded to the Correctional Counselor II.

3. The responsibility for mental health treatment planning for inmate-patients in the PSU rests with the IDTT. These responsibilities include:

   a. Admission decisions

   b. Treatment planning

   c. Periodic case reviews and re-justifications of treatment at 60, 120 and at least every 90 days thereafter, or whenever there is a significant change in the inmate- patient's functioning that requires a change in the treatment plan.

   d. Discharge recommendations – The initial treatment plan and all subsequent treatment plans shall include a discharge plan and behavioral goals to discharge the inmate-patient from the PSU to a less intensive level of care.

***Primary Clinician***

Each inmate-patient in the PSU shall be assigned a PC, usually a Clinical Social Worker (CSW) or psychologist, although other clinicians may be assigned to cases with special needs. The PC will maintain active clinical involvement with the inmate-patient, as well as performing casework functions, including the following:

- Documentation of initial treatment plan and updates
- Regular clinical contacts with assigned inmate-patients
- Ensuring scheduling of periodic IDTT reviews
- Attendance at IDTT reviews of the inmate-patient
- Referral to, and coordination with, the assigned staff psychiatrist

- Response to CDCR inquiries regarding clinical status of the inmate-patient

## G. TREATMENT PROGRAM

1. Each PSU shall have an Operational Plan that describes its treatment program. Each PSU shall have a behavioral incentive program with criteria for achieving and retaining each level. Every level has certain privileges. See the Operational Plan at each institution for a complete description.

2. Treatment Plan

   a. Each inmate-patient in the PSU shall have a current individual treatment plan on CDCR 7388, *Mental Health Treatment Plan.*

   b. The treatment plan shall be reviewed by the IDTT at 60 and 120 days after admission, at least every 90 days thereafter, or whenever there is a significant change in the inmate-patient's functioning requiring a change in the treatment plan.

   c. There shall be a CDCR 7230-MH, *Mental Health Progress Note,* documenting the IDTT meeting that includes a list of members in attendance.

   d. Each treatment intervention shall be directed to a problem on the inmate-patient's Problem List.

   e. Each treatment intervention shall indicate the provider, type of intervention (e.g. individual or group therapy), frequency of intervention, outcome objectives, and specific measurable behavioral goals.

   f. Discharge from the EOP or transfer to another level of care will be documented on a CDCR 128-MH3, *Mental Health Placement Chrono.*

3. Within the PSU, each inmate-patient shall have an individualized treatment plan that provides for treatment consistent with the inmate-patient's clinical needs. Each inmate-patient will be offered at least ten hours per week of scheduled structured therapeutic activities as approved by the IDTT. It is recognized that not all inmate-patients can participate in and/or benefit from ten hours per week of treatment services. For some inmate-patients, ten hours per week may be clinically contraindicated. For those inmate-patients scheduled for fewer than ten hours per week of treatment services, the PC shall present the case and recommended treatment program to the IDTT for approval. The CDCR 7388, *Mental Health Treatment Plan* ,must include a detailed description of the diagnosis, problems, level of functioning, medication compliance, and rationale for scheduling fewer than ten hours. For inmate-patients who are scheduled for fewer than

ten hours of treatment activities per week, the IDTT shall meet at least monthly and be responsible to review and increase the treatment activities, and consider higher level of care as appropriate.

*REQUIRED TREATMENT*

- Individual treatment planning involves a meeting of the IDTT and the inmate-patient at least every 90 days for the purpose of identifying treatment needs, developing treatment plans, assessing treatment progress, and updating/revising individual treatment plans in accordance with the inmate-patient's needs and progress.

- Weekly PC contact (either individually or in group psychotherapy) with assigned inmate-patients. Individual clinical contacts shall occur at least every other week.

- Medication evaluation and management

- A psychiatrist shall evaluate each EOP inmate-patient at least monthly to address psychiatric medication issues.

- Refer to Inmate Medical Services Policies and Procedures, *Volume 4, Chapter 11, Medication Management,* regarding procedures for administration of medication, medication refusals, Directly Observed Therapy, and other aspects of medication administration.

- Refer to MHSDS Program Guide, Chapter 5, *Mental Health Crisis Bed*, for information on involuntary medication administration (*Keyhea*).

*OTHER TREATMENT ACTIVITIES*

- Individual psychotherapy

- Group therapy such as Anger Management, Stress Management, Offense-related Issues, Current Events

- Medication education

- Crisis intervention

- Pre-release planning

- Monitoring and assistance with daily living skills

- Cognitive Behavioral Therapy directed to specific behaviors or symptoms
- Recreational activities
- Vocational and pre-vocational training as available
- Education as available
- 12-Step Program and other substance abuse treatment

4. CCCMS – Pelican Bay State Prison

PSU inmate-patients identified as requiring CCCMS level of care shall be transferred as soon as possible to a SHU that provides CCCMS care. Inmate-patients with any of the exclusionary diagnoses listed in Section E, *Referral and Endorsement*, Paragraph 6 above, shall not be placed in the PBSP SHU. Pending transfer, inmate-patients will receive the following services within the PSU:

a. Assignment of a PC for the purposes of regular monitoring and program review. The PC shall see the inmate-patient at least every other week or more often if clinically indicated.

b. Monitoring of symptoms by clinical staff

c. Development or review of an individualized treatment plan

d. Medication, treatment and monitoring

e. Monitoring of daily living skills

f. Pre-release planning

g. Consultation regarding behavior deterioration or other contingency management procedures

## H. DOCUMENTATION

1. Clinical documentation will occur as required. This includes but is not limited to:

a. Initial assessment on CDCR 7386, *Mental Health Evaluation*, and initial treatment plan and updates on CDCR 7388, *Mental Health Treatment Plan*, by the PC.

b. CDCR 7230-MH, *Mental Health Progress Notes*, documenting weekly contacts and any other treatment interventions done by all staff. Group therapy shall be documented monthly. This documentation shall include time attended and a description of the inmate-patient's level of participation.

c. Completion of CDCR 128 MH3, *Mental Health Placement Chrono*, whenever there is a change in level of care.

***Documentation on CDCR 114-A, Detention/Segregation Record***

The CDCR 114-A, *Detention/Segregation Record* (commonly referred to as the Isolation Log), is a daily record of the inmate-patient's activities and is used to note the inmate- patient's behavior as well as to document services provided. The activities report shall record the inmate-patient's daily activities such as showers, yard, meals, visits, clothing/linen exchange and supplies. This form shall be used to record attendance at treatment activities such as individual and group therapy, and recreational therapy. The CDCR 114-A, *Detention/Segregation Record*, shall also include a list of approved scheduled structured therapeutic activities. All relevant chronos shall be attached. Staff may also document their observations and comments regarding the inmate-patient and his program. Significant events affecting the inmate-patient's treatment program should be recorded on this form such as those listed below.

1. Unit staff shall initiate a CDCR 114-A, *Detention/Segregation Record,* for all inmate-patients housed in the unit.

2. Unit officers on every shift shall fill out the CDCR 114A, *Detention/Segregation Record*, noting the inmate-patient's activities during their shift. The correct date and time are critical factors. When a CDCR 114-A, *Detention/Segregation Record*, is completely filled out, the last officer making the entry will prepare and begin a new form.

3. A daily chronological report of each PSU inmate-patient will be kept on the CDCR 114A *Detention/Segregation Record*, which will include meals, showers, yard, visits, law library, supplies, clothing and linen issue, or other pertinent information.

4. When an inmate-patient is escorted to a CDCR 115, *Rules Violation Report* disciplinary hearing, the CDCR 114-A, *Detention/Segregation Record*, will be taken to the hearing. The Hearing Officer or Senior Hearing Officer, will note the CDCR 115, *Rules Violation Report* log number, findings, and disposition on the CDCR 114-A, *Detention/Segregation Record*.

5. When an inmate-patient is seen or his/her case is heard by ICC, the CDCR 114-A Form will be taken with the inmate-patient and given to the Committee. The Correctional

Counselor II will note on the CDCR 114-A, *Detention/Segregation Record,* whether the inmate-patient attended or refused to attend the Classification meeting and the action taken.

6. A classification disposition such as "Confined to Quarters", loss of privileges, or a restriction, will be noted on the CDCR 114-A, *Detention/Segregation Record,* and continued on successive CDCR 114-A, *Detention/Segregation Record,* until the action has expired.

7. Other possible entries may include canteen, legal mail, packages, and issuance of property or cell moves/searches.

8. Staff making the entry on the CDCR 114-A, *Detention/Segregation Record,* will clearly and legibly sign their first initial and last name.

9. All of the CDCR 114-A, *Detention/Segregation Record,* are to be kept in a folder(s) that are maintained within the housing unit and are available to all staff who interact with the inmate-patient. On Sunday of each week, First Watch staff will perform an audit of each inmate-patient's CDCR 114-A, *Detention/Segregation Record,* and prepare a unit compliance report. These reports will be forwarded to the PSU Facility Captain for review and retention.

***Unit Activity Log***

Custody staff must record and share with the clinical staff any observations that may impact an inmate-patient's treatment plan or provide insight into the success or ineffectiveness of the current treatment plan. This is particularly critical for First Watch staff. Each housing unit shall maintain a logbook reflecting daily activities and information of interest to all staff. All unusual activities will be recorded in the logbook. Observations of unusual or aberrant behavior shall be recorded via a CDCR 128-B, *Informational Chrono.* Behavior that constitutes an infraction of institutional rules or policies may be recorded via a CDCR 115, *Rules Violation Report.*

## I. CUSTODIAL OPERATIONS

***Classification***

The Operational Plan of each PSU will contain a detailed description of applicable custody procedures. These procedures shall be in compliance with relevant California Code of Regulations, Title 15, and Department Operational Manual requirements.

***Removal from a Cell***

1. Escorts – Inmate-patients housed in the PSU shall be assigned escorts and program status at the ICC review. All inmate-patients shall be escorted at all times when they are outside their respective housing unit sections. Individual escorts shall be performed by a minimum of two custody officers, and the inmate-patient shall be secured with mechanical wrist restraints at all times during the escort.

2. The inmate-patient may be recommended for additional escort status by the IDTT or through the disciplinary process. This shall be approved by the PSU Facility Captain.

***Out-of-Cell Exercise***

All inmate-patients assigned to the PSU shall be offered a minimum of ten hours of out-of-cell exercise each week, which may include supervised recreational therapy. An inmate-patient's yard designation shall be established by the ICC with input from the IDTT as part of the individual treatment plan.

**J. PHYSICAL PLANT**

Mental health treatment in Psychiatric Services Units may be provided using mental health programming booths. All mental health programming booths procured after March 2007, shall conform to design specifications available through the Prison Industry Authority. Booths are available through the Prison Industry Authority's online product catalog at: http://catalog.pia.ca.gov/ using the search term "Mental Health Programming Booth."

**K. SICK AND DENTAL CALL AND MENTAL HEALTHREFERRALS**

1. The PSU shall have mental health staff on duty during Second Watch. Each day, the assigned physician, Registered Nurse (RN) or LPT will tour the unit and assess any inmate-patient with medical/dental needs.

2. During Second Watch, inmate-patients requiring medical attention will be referred to the PSU RN.

3. Staff Referral: Referrals may be made on CDCR 128 MH5, *Mental Health Referral Chrono.*

4. Inmates who receive a CDCR 115, *Rules Violation Report* for Indecent Exposure or Intentionally Sustained Masturbation Without Exposure shall be referred for all of the following:

- CDCR 115-MH *Rules Violation Report: Mental Health Assessment;*
- A mental health assessment shall be completed within 24 hours to rule-out decompensation and/or intoxication. The referral shall be made by telephone to the local Chief of Mental Health who shall arrange this assessment; and,
- To the inmate-patient's PC.

5. Self referral: These requests are made on a CDCR 7362, *Health Care Services Request.* Mondays through Fridays, the following shall occur:

   a. A health care staff member shall collect all the CDCR 7362, *Health Care Services Request*, each day from the designated areas.

   b. Upon receipt of the collected forms, nursing staff shall initial and date each CDCR 7362, *Health Care Services Request.*

   c. The CDCR 7362, *Health Care Services Requests,* shall be delivered to the designated program representative in mental health services, dental services, or pharmacy services for same-day processing.

6. On weekends and holidays, the following shall occur:

   a. The Triage and Treatment Area (TTA) RN shall review each CDCR 7362, *Health Care Services Request*, for medical, dental, and mental health services, shall establish priorities on an emergent and non-emergent basis, and shall refer accordingly.

   b. If a physician, mental health clinician, or dentist is not available, the physician on call or psychiatrist on call shall be contacted.

7. Inmates shall be seen by a mental health clinician or on weekends by the physician or psychiatrist on call within the clinically determined time frame.

   - Emergent: Emergency cases shall be seen immediately or escorted to TTA.
   - Urgent: Urgent cases shall be seen within 24 hours.
   - Routine: Other cases shall be seen within five calendar days.

NOTE: When an IDTT determines that an inmate-patient requires treatment of exhibitionism, that inmate-patient's level of care shall be changed to CCCMS (or higher if appropriate), bypassing the standard referral process.

## L. DISCHARGE PROCEDURES

1. At the time of admission to the PSU, a preliminary discharge plan shall be developed based on the clinical and security needs of the inmate-patient as well as the inmate-patient's SHU term.
2. Inmate-patients admitted to the PSU may be discharged to the SHU to complete their term when they no longer require an EOP level of care. They will be transferred to a CCCMS level of care in a SHU for at least six months if they no longer require EOP level of care. Inmate-patients with one of the exclusionary diagnoses listed in Section E, *Referral and Endorsement*, Paragraph 6 above, shall not be placed in the PBSP SHU. Inmate-patients in the PBSP PSU recommended by the IDTT for CCCMS are scheduled for the next available ICC and referred for transfer to the COR SHU. Pending transfer, inmate-patients are housed in the ASU.

3. Inmate-patients who complete their SHU term and still require EOP care will be discharged to a general population EOP for continuing mental health treatment. The PSU primary clinician will document recommendations regarding the inmate-patient's specific treatment needs, including any concerns about facilitating the inmate-patient's successful transition to general population. The receiving EOP IDTT will consider documentation by the PSU clinician in developing the inmate-patient's treatment plan. The treatment plan for inmate-patients transferred from PSU to GP-EOP shall include services provided to aid in the transition to the general population environment.

4. Inmate-patients may be referred to a DMH program as clinically indicated. Generally, given the security requirements of PSU inmate-patients, this will be to the Salinas Valley Psychiatric Program for intermediate inpatient care for inmate-patients with a history of being highly assaultive, predatory, or a high escape risk. Inmate-patients who do not present these security risks may be referred to Atascadero State Hospital. Inmate- patients requiring acute inpatient care should be referred to the DMH APP at CMF.

5. Treatment recommendations upon discharge from the PSU shall be made by the IDTT and documented on a CDCR 128 MH3, *Mental Health Placement Chrono.*

6. The ICC shall review the discharge recommendations of the IDTT with the PSU Senior Psychologist or designee present considering both the clinical and custody needs of the inmate-patient. The decision of the ICC shall be documented on a CDCR 128-G Chrono.

# CHAPTER 10
## Suicide Prevention and Response

### A. INTRODUCTION

It is the goal of the California Department of Corrections and Rehabilitation (CDCR) Suicide Prevention and Response Focused Improvement Team (SPR FIT) to prevent inmate deaths due to suicide. Suicide is defined as an intentional self-injurious behavior that causes or leads to one's own death. CDCR recognizes that prevention of suicide involves a team effort by every employee regardless of professional discipline or job title.

To accomplish this goal, each institution shall implement CDCR Division of Correctional Health Care Services (DCHCS) policies, described herein, regarding suicide prevention and response, via written operating procedures. The purpose of the policies is to:

- Establish standards of intervention and care
- Establish ongoing education and training for clinical, custodial, and administrative staff.
- Provide instructions and guidance for establishment and maintenance of the SPR FIT.
- Review suicide deaths regarding systems issues, clinical care issues, and custody response.
- Ensure that quality improvement (also known as corrective action) plans are drafted and implemented, when indicated, to reduce the incidence of preventable suicides, improve the delivery of quality care, improve the involvement of non-healthcare staff, and contribute to the ongoing education and training.

This chapter of the Mental Health Services Delivery System (MHSDS) Program Guide is divided into the following subsections:

**B. Suicide Prevention and Response Project**

**C. Training for Staff**

**D. Clinical Care Services**

1. Suicide Risk Assessment

2. Interventions for Suicidal Ideation and Threats, Self-Injurious Behaviors and Suicide Attempts

   a. Procedures for Suicide Precautions

   b. Procedures for Suicide Watch

   c. Response to Self-Injurious Behaviors and Suicide Attempts

**E. Suicide Reporting**

**F. Suicide Death Review**

**G. Mental Health Evaluation Component for a Rules Violation Report**

## B. SUICIDE PREVENTION AND RESPONSE PROJECT

***Policy***

CDCR DCHCS

The CDCR DCHCS Quality Management Committee (QMC) shall maintain a DCHCS Mental Health Program (MHP) Subcommittee that provides oversight to and coordination of the statewide mental health program to achieve statewide strategic objectives. The DCHCS MHP Subcommittee shall plan, develop, manage and improve timely access to and effectiveness of clinical services related to the mental health program. The DCHCS MHP Subcommittee shall also cooperate with, and respond in a timely manner to, any requests from the DCHCS Emergency Response & Death Review (ERDR) Subcommittee following a suicide.

The DCHCS MHP Subcommittee shall establish and maintain a statewide SPR FIT. The DCHCS MHP Subcommittee shall appoint a DCHCS SPR FIT Coordinator. The Coordinator shall be a licensed physician, psychologist, social worker, nurse practitioner, or registered nurse (RN).

Local Institutions

Each Local QMC shall maintain a Local MHP Subcommittee that provides oversight to and coordination of the local mental health program to achieve statewide strategic objectives. Each Local MHP Subcommittee shall plan, develop, manage and improve timely access to and effectiveness of clinical services related to the mental health program. Each Local MHP Subcommittee shall also cooperate with, and respond in a timely manner to, any requests from the Local ERDR Subcommittee following a suicide.

Each Local MHP Subcommittee shall establish and maintain a Local SPR FIT. Each Local MHP Subcommittee shall appoint a Local SPR FIT Coordinator. The Coordinator shall be a licensed physician, psychologist, social worker, nurse practitioner, or RN.

*Purpose*

The DCHCS SPR FIT and each Local SPR FIT shall provide employees with training and guidance with regard to suicide prevention, response, reporting, and review for the purpose of reducing the risk of inmate suicides.

*Procedure*

**1. Reporting Relationships**

The DCHCS SPR FIT shall:

- Send a management report, at least once a month, to the DCHCS MHP Subcommittee.
- Receive formal communication, at least once a month, from the DCHCS MHP Subcommittee.
- Each local SPR FIT shall:
- Send a management report, at least once a month, to the local MHP Subcommittee.
- Receive formal communication, at least once a month, from the local MHP Subcommittee.

**2. Responsibilities**

**a. The DCHCS SPR FIT shall:**

1). Provide oversight and guidance for each Local SPR FIT regarding time sensitive due dates.

2). Monitor implementation and compliance with all CDCR policies and procedures relating to suicide prevention and response.

3). Provide for the planning, development, and implementation of statewide training, in collaboration with the DCHCS Training Department, regarding the issue of suicide prevention and response.

4). Monitor and track all suicides statewide.

5). Provide for the selection and dispatch of a mental health suicide reviewer (MHSR) after a suicide occurs.

6). Provide oversight, assistance, coordination, and supervision of MHSR activities and reports.

7). Track and analyze demographic and clinical information received from the DCHCS ERDR Subcommittee for improving suicide prevention and response processes.

**b. Each Local SPR FIT shall:**

1). Ensure implementation and compliance with all CDCR policies and procedures, relating to suicide prevention and response, at their institution.

2). Be responsible for updating local operating procedures (LOP) to ensure consistency with DCHCS policies regarding suicide prevention and response. The institution's Suicide Prevention and Response LOP shall be updated at least annually and sent to the DCHCS through the standard Quality Management process for review and approval.

3). Implement training, in collaboration with the local In-Service Training (IST) unit, regarding the issue of suicide prevention and response.

4). Review Suicide Watch and precaution procedures, including use of video cameras (used as a supplement to direct visual observation), to ensure they are being carried out consistent with operating procedures.

5). Work with the Local ERDR Subcommittee to review all suicides and those suicide attempts, in which Cardiopulmonary Resuscitation (CPR) and/or other medical procedures were performed, as well as custody cell entry and cut-down procedures.

6). Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths. Monitoring and tracking of suicide attempts should include a review of the appropriateness of treatment plans and five-day follow-ups.

7). Review and track all 5-day clinical follow-up treatment plans and custody wellness check procedures. The Mental Health Tracking System (MHTS) shall be used to track all clinical five-day follow-ups.

8). Ensure all required documentation for suicide death reporting is forwarded to DCHCS in adherence with time-sensitive due dates.

9). Provide assistance for the activities of the visiting MHSR.

10). Provide oversight for the implementation of DCHCS-issued quality improvement plans (QIP) with input and assistance from the Local MHP and Local ERDR Subcommittees.

### 3. SPR FIT Membership

DCHCS shall include:

- SPR FIT Coordinator (Chairperson)
- Chief Psychiatrist
- Chief Psychologist
- Nurse Consultant
- Designated Facility Captain

Local shall include:

- SPR FIT Coordinator (Chairperson)
- Chief Psychiatrist*
- Chief Psychologist*
- Supervising RN
- Sr. Licensed Psychiatric Technician (LPT) or LPT (preferably from Administrative Segregated Unit (ASU)
- Health Program Coordinator
- Correctional Health Services Administrator
- DMH Coordinator

DCHCS may also include, but is not limited to:

- Senior Psychiatrist
- Senior Psychologist
- Administrative/Clerical Support
- Analyst Support

Local may also include, but is not limited to:

- Senior Psychiatrist
- Senior Psychologists
- Staff Psychiatrist: Mental Health Crisis Bed (MHCB)/Outpatient Housing Unit (OHU)
- Staff Psychologist: MHCB/OHU
- Standards and Compliance Coordinator
- Litigation Coordinator
- Facility Captain
- ASU Lieutenant/Sergeant
- Reception Center Lieutenant/Sergeant
- Classification and Parole Representative
- In Service Training Lieutenant
- Administrative/Clerical Support
- Keyhea Coordinator

*Senior Psychiatrist/Senior Psychologist attendance shall meet quorum requirement in institutions without Chief Psychiatrist/Chief Psychologist positions.

### 4. Frequency of Meetings

The DCHCS SPR FIT shall meet at least, but is not limited to, once a month.

Each Local SPR FIT shall meet at least, but is not limited to, once a month.

**5. Attendance Requirements**

A quorum consists of the above listed mandatory members.

**6. Management Reports**

The DCHCS SPR FIT shall submit a complete, standardized management report to the DCHCS MHP Subcommittee by the 5th day of each month.

Each Local SPR FIT shall submit a complete, standardized management report to the Local MHP Subcommittee by the 5th day of each month.

**C. TRAINING FOR STAFF**

***Definitions***

Suicidal ideation: Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing suicide or the passive desire to be dead.

Suicidal intent: The intention to deliberately end one's own life.

Self-injurious behavior: A behavior that causes, or is likely to cause, physical self-injury.

Self-mutilation: An intentional self-injurious behavior without suicidal intent. The purpose of the behavior may be to gain attention, relieve stress, or experience pain. Self-mutilation can result in serious injury or accidental death.

Suicide gesture: An intentional self-injurious behavior, accompanied by suicidal ideation and/or intent, which is unlikely to cause death. The purpose of the behavior may be to gain attention and/or experiment with the possibility of suicide. Suicide gestures may indicate increased suicide risk.

Suicide attempt: An intentional self-injurious behavior, which is apparently designed to deliberately end one's life, and may require medical and/or custody intervention to reduce the likelihood of death or serious injury.

Suicide: An intentional self-injurious behavior that causes or leads to one's own death.

All CDCR health care and custodial employees at the local institutions shall attend updated training on suicide prevention and response at least once annually. Suicide Prevention and

Response training shall be part of the new employee orientation provided by mental health staff in collaboration with the IST unit at each local institution. New correctional officers shall receive this training at the Basic Correctional Officer Academy.

The suicide prevention and response training shall include the following elements:

- Suicide risk assessment
- Suicide methods awareness
- Interventions for suicidal ideation, threats, gestures, and attempts
- Suicide reporting and reviews
- Mental health evaluations for rules violation reports

Clinical and custody staff shall receive specialized training with respect to their particular roles in responding to self-injurious behaviors, suicide attempts, and suicides.

## D. CLINICAL CARE SERVICES

This subsection addresses the various clinical care services for inmates regarding suicide prevention and response. Included are the assessment of risk for suicide, the utilization of a form for documenting the risk factors, and clinical interventions such as procedures for Suicide Precaution and Suicide Watch, and responses to suicide attempts and to suicide.

Education regarding the methods utilized by inmates when attempting suicide shall be taught as part of the suicide prevention and response training.

Employee strategies for maintaining a safe environment, and for ensuring that other policies and procedures relative to suicide prevention and response, such as regarding medication distribution and inmate-patient compliance, are detailed in the relevant chapters and sections of the complete Inmate Medical Services Program Policies & Procedures.

**Any CDCR employee who becomes aware of an inmate's current suicidal ideation, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation.**

### 1. Suicide Risk Assessment

All inmates are observed for suicide risk. Suicide risk assessment is critical to successful suicide prevention. Inmate-patients enrolled in the MHSDS shall be regularly monitored

for risk of suicide as clinically appropriate. When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data. Documentation is achieved by utilizing the CDCR standardized Suicide Risk Assessment Checklist (SRAC) and by clinician notation in the Unit Health Record (UHR). When an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRAC, instead of completing a new SRAC.

**These clinicians shall be trained to perform a suicide risk assessment and complete the SRAC:**

- psychiatrists
- psychologists
- clinical social workers
- primary care physicians
- nurse practitioners
- RNs

This shall occur during the specialized training provided for clinical staff who are receiving either the new employee orientation or completing the required annual training module, or when determined necessary by supervisory and/or management staff.

When a primary clinician is scheduled to be available on-site, he or she shall be responsible for completing a SRAC. When a mental health clinician is not available, any other staff member who has been trained by CDCR in suicide risk assessment may complete the SRAC.

A RN completing the SRAC shall collect data related to suicide risk and protective factors and refer the patient and data collected to a mental health clinician for further evaluation to determine level of risk.

**At a minimum, a written suicide risk assessment using a SRAC shall be completed:**

- Every time an inmate has an initial face-to-face evaluation for suicidal ideation, gestures, threats, or attempts, by a clinician trained to complete the SRAC.
- By the referring clinician prior to placement of an inmate-patient into an OHU for continued suicide risk assessment or into a MHCB for suicidal ideation, threats, or attempt.
- After hours, on weekends and holidays, on call clinicians shall conduct a face-to-face assessment of suicide risk prior to releasing an inmate to any housing without suicide watch or precaution.

- After hours, on weekends and holidays, when the referring clinician has not completed an SRAC, by the clinician providing coverage, by the next day, for those inmate-patients placed into an OHU or MHCB.
- By the associated Interdisciplinary Treatment Team (IDTT) and/or clinician for all inmate-patients placed into an OHU, for mental health reasons, or MHCB, for any reason, upon decision to release or discharge.
- Subsequent to release from an OHU placement that was for the purpose of continued suicide risk assessment, or a MHCB placement for the reason of suicidal ideation, threats, or attempts, at a minimum of every 90 days for a twelve month period, by a mental health clinician.
- Within 72 hours of return from a Department of Mental Health (DMH) facility, or within 24 hours if clinically indicated based on new arrival screening.
- Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.
- Pursuant to Department Operating Manual (DOM), Article 41, Prison Rape Elimination Act Policy, for victims of sexual assault, within four hours after the required sexual assault forensic examination.

**The clinician shall use the SRAC when documenting a suicide risk assessment, in addition to making a notation in the UHR. At a minimum, the following categories shall be used to assess potential risk:**

a. Static Risk Factors (unchanging, historical):

- Ethnicity
- History of lewd and lascivious acts with a child and/or killed a child
- History of violence
- History of substance abuse
- Suicide ideation and/or threats in past (when and method)
- Previous suicide attempts (when and method)
- Family history of suicide
- History of mental illness with Axis I diagnosis
- High profile case

b. Slowly Changing Risk Factors (long-term risk factors):

- First prison term
- Long or life sentence; three strikes
- History of poor impulse control and/or poor coping skills
- Early in prison term
- Known new court proceedings and/or disciplinary actions
- Current term in ASU, Security Housing Unit, or Psychiatric Services Unit
- Level IV custody score
- Chronic, serious or terminal illness

c. Dynamic Risk Factors (short-term risk factors that require ongoing assessment):

- Recent suicidal ideation - acute or chronic
- Recent release from psychiatric hospital
- Sudden calm following ideation or attempt
- Anxious and/or agitated and/or fearful
- Disturbance of mood (depression or mania)
- Unstable or labile affect
- Current insomnia and/or poor appetite
- Lack of perceived support system
- Hopelessness and/or helplessness
- Feelings of guilt and/or worthlessness
- Fearful for safety
- Anniversary of important loss
- Recent rejection and/or loss
- Single-cell placement
- Significant current impulsivity
- Recent suicide attempt or self-injury
- Well-planned, highly lethal, attempt or ideation
- Hoarding and/or cheeking medication
- Poor compliance with treatment and/or medication
- Recent trauma and/or threat to self-esteem
- Recently assaultive or violent
- Pre-death behavior: note, gives things away
- Disclosure of adverse court hearings

d. Protective Factors:

- Family support
- Children at home
- Religious support
- Spousal support
- Supportive friends
- Helping others
- Adequate insight
- Realistic life plan
- Exercises regularly
- Group activities
- Job assignment
- Other noted protective factors

Clinicians shall utilize their best clinical judgment and make a summary of the relative risk for suicide via an appropriate descriptor, such as "No apparent significant risk, Low Risk, Moderate Risk, High Risk, or Conditional Risk" based on a combination of the above factors, an interview of the inmate, and all other relevant information available to them. Peer consultation is encouraged when information collected for making a suicide risk assessment is ambiguous. The clinician shall then make a recommendation regarding the appropriate level of care required. They shall document their summary, recommendations, and plan on the SRAC and with appropriate notation in UHR. Treatment recommendations should be as specific as possible, leaving as little room as possible for misinterpretation or confusion. A brief rationale for each recommendation shall be provided. They shall also address how the treatment plan will be implemented and any required follow-up procedures.

Peer Consultation

Peer consultation can be one of the most important clinical and legal safeguards a practitioner has at his or her disposal, especially when dealing with ambiguous cases.

Sources of peer consultation include, but are not limited to:

- Other clinical members of an IDTT
- Other colleagues working at the institution
- Clinical supervisors

When evaluating for suicide risk, peer consultation is not always necessary. However, in those cases where there is clinical uncertainty about ambiguous issues, it can be of benefit for validating or challenging ideas and assumptions. Another clinician's opinion may also uncover important additional information. Peer consultation does not absolve a clinician of responsibility for any decision that he or she ultimately makes, nor does it require the

clinician to change his or her initial opinion. It is to the clinician's advantage to consult with peers. It demonstrates that the clinician cared enough about the case to seek another opinion and that he or she utilized prudent and reasonable judgment.

Suicide History Tracking

In order to ensure quality and continuity of care for high-risk mental health inmate- patients, all institutions shall track the suicidal history of inmate-patients using MHTS.

**2. Interventions for Suicidal Ideation, Threats, and Attempts**

Any CDCR employee who becomes aware of inmate suicidal ideation, threats, or attempt shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation.

Recommendation for placement or admission

Health care staff who assess a patient as a significant suicide risk shall initiate procedures to admit the patient into a MHCB.

A physician, licensed psychologist, or nurse practitioner may place an inmate-patient into an OHU for continued suicide risk assessment. Custody staff shall inspect the cell to ensure that there are no known or obvious safety hazards present. When an inmate-patient in the OHU is determined to require MHCB level of care, including Suicide Precaution and/or Watch, he or she shall be recommended for admission to that higher level of care. The established timeframe for MHCB transfers is 24 hours from the time a physician or licensed psychologist determines the need for a MHCB.

When an inmate-patient verbalizes suicidal ideation without other signs and symptoms of increased risk of suicide, the mental health clinician is responsible for evaluating any contributing environmental stressors and communicating with custody staff and supervisors regarding any potentially solvable custody issues.

Pending transfer out of the OHU direct observation by clinical and/or custody staff shall be provided, consistent with requirements for Suicide Precaution or Watch, until the inmate-patient is transferred.

If there is a difference of opinion, between the clinician who makes the recommendation and the receiving/admitting clinician, regarding admission into a MHCB or placement into an OHU, then

a. A third opinion and final decision shall be obtained by consultation with a Chief or Senior Psychiatrist, or a Chief or Senior Psychologist.

b. When a Chief or Senior Psychiatrist, or a Chief or Senior Psychologist is not available, the third opinion and final decision shall be obtained from Chief Medical Officer or Chief Physician and Surgeon.

c. The default shall be to place the inmate into the MHCB or OHU in the event that there is not a Chief, Senior, or Chief Medical Officer (CMO) available to supply the third opinion and final decision.

Required Documentation

The clinician who recommends an inmate for placement into an OHU for continued suicide risk assessment or into a MHCB for active suicidal ideation, or suicide threats or attempts, shall provide to the accepting clinician both a completed SRAC, the patient's medication administration record, and a written transfer summary that contains:

- Date and time of referral
- Identifying information: inmate name, CDCR number, date of birth, age, and race
- Current level of care and housing location
- Current diagnosis: all five Diagnostic and Statistical Manual (DSM) axes
- Reason for referral: suicidal ideation and/or threat and/or attempt
- History of present illness
- Mental status examination
- Brief psychiatric history including previous OHU, MHCB, or DMH placements
- History of previous suicidal ideation, threats, and/or attempts
- Treatment recommendations
- Contact information for the referring clinician

After hours and on weekends and holidays, the clinician providing coverage shall complete the required documentation by the next day.

Health Care Cost and Utilization Program

As an integral part of the DCHCS, the Health Care Cost and Utilization Program provides timely and accurate information, and analysis of health care service delivery data to assist in the provision of cost effective, quality health care. To facilitate this effort, the clinician

who admits an inmate-patient to a MHCB shall record two codes for the diagnosis on the CDCR 7388, *Mental Health Treatment Plan*. One code shall be from the most current edition of the Diagnostic and Statistical Manual of Mental Disorders and the other shall to be from the most current edition of the World Health Organization's International Classification of Diseases Code.

Additional Treatment Options

In addition to inpatient care, the clinician may recommend another type of treatment such as daily or weekly contact by a mental health clinician, intensive individual psychotherapy, resolution of a stressful environmental issue or interpersonal conflict, or other clinically appropriate intervention. Other interventions may be considered such as notifying a correctional counselor of the inmate-patient's desire or need to contact a family member. Alternative interventions, such as a housing change, may be considered in consultation with custody staff. Clinical and custody staff shall work together to develop an intervention to address the inmate's concerns and reduce the risk of suicide.

Physical Restraints and Seclusion

Physical restraints or placement in seclusion may be utilized to protect an inmate-patient from imminent self-harm, if clinically indicated, and other treatment measures are ineffective. A staff member shall be assigned to provide one-on-one direct visual observation of all inmate-patients in physical restraints. Refer to MHSDS Program Guide, Chapter 5, *Mental Health Crisis Bed*, for complete descriptions of procedures. In accordance with Health and Safety Code 1180, a clinical and quality review shall be conducted for each episode of the use of seclusion or restraints.

Inmate and Cell Search

Before placing an inmate-patient in a room for Suicide Precaution or watch, a custody officer shall conduct a complete body search.

Call-light cords, nightstands, bed frames, and sheets shall be removed, by order of a clinician, from the room unless the inmate is in physical restraints. Only a safety (no-tear) mattress, a safety (no-tear) blanket, and a safety (no-tear) smock/gown shall be provided and placed directly on the floor.

Additional inmate-patient clothing and furnishing items, while on Suicide Watch or Precaution, shall be allowable by a clinician's order.

Custody staff shall conduct a complete cell search before placing an inmate in a cell.

Suicide Precaution and Suicide Watch

When clinically indicated, an inmate with active suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide Precaution or Suicide Watch. These are methods used to provide a safe environment and prevent the inmate from harming him or herself or others. Suicide Watch and Suicide Precaution procedures shall be a joint responsibility of custody and health care staff. A close working relationship shall be maintained between custody and health care staff to ensure the safety and security of the inmate.

The preferred location to place an inmate on Suicide Precaution or Watch status is in the MHCB, or in the OHU pending transfer to MHCB. The use of Suicide Precaution or Suicide Watch in any non-medical location shall be a temporary, short-term approach until an inmate can be moved to an OHU or MHCB, and shall require constant direct visual observation.

A psychiatrist, licensed psychologist, physician, or nurse practitioner shall review, modify, and/or renew the order for Suicide Precaution and/or Watch at a minimum of every 24 hours with input from at least one other member of the IDTT, such as the RN on duty.

Inmate-patients that are placed in an OHU for continued assessment of suicide risk, or in an MHCB for active suicidal ideation, threats, or attempt, shall have a note regarding progress toward the treatment plan goals and objectives recorded *daily* by a treating clinician in the Interdisciplinary Progress Notes section of the UHR.

**a. Suicide Precaution**

When an inmate is in an MHCB because of high risk of attempting self-injurious behavior, but is not in immediate danger, he or she shall be placed on Suicide Precaution.

These inmate-patient management procedures require an order from a psychiatrist, licensed psychologist, physician or nurse practitioner. Additional details of requirements and procedures are located in Chapter 5, *Mental Health Crisis Bed.*

**Guidelines for clinician-ordered Suicide Precaution:**

| STATUS | CLOTHING | FURNITURE AND OTHER MATERIALS | BEHAVIORAL CHECKS |
|---|---|---|---|
| SAFE CELL STATUS | Safety (no-tear) smock/gown, no ID band on wrist | Remove all furniture. Safety (no-tear) mattress, safety (no-tear) blanket | Staggered intervals not to exceed 15-minute staff checks |
| PARTIAL ISSUE | Shorts, t-shirt, socks | Remove all furniture. Safety (no-tear) mattress, safety (no-tear) blanket, one book | Staggered intervals not to exceed 15-minute staff checks |
| FULL ISSUE | Shorts, t-shirt, socks | Safety (no-tear) mattress or furniture. Reading and writing materials. Toiletries. | Staggered intervals not to exceed 15-minute staff checks |

A clinician, when writing orders, can utilize these guidelines for furniture and clothing and/or make modifications based on clinical judgment, with documentation of justification. The IDTT shall review all decisions regarding furniture, clothing, and other materials. No modification is allowed for the interval of staff checks for Suicide Precaution.

**b. Suicide Watch**

When an inmate is in an MHCB because of suicide risk *and* is in immediate danger of self-injurious behavior, he or she shall be placed on Suicide Watch.

These inmate-patient management procedures require an order from a psychiatrist, licensed psychologist, physician or nurse practitioner. Additional details of requirements and procedures are located in Chapter 5, *Mental Health Crisis Bed.*

**Guidelines for clinician-ordered Suicide Watch:**

| STATUS | CLOTHING | FURNITURE AND OTHER MATERIALS | BEHAVIORAL CHECKS |
|---|---|---|---|
| SUICIDE WATCH | Safety (no-tear) smock/gown, no ID band on wrist | Remove all furniture. Safety (no-tear) mattress, safety (no-tear) blanket | Continuous observation<br>15 minute nursing checks |

All institutions shall conduct Suicide Watch observation by direct visual observation. The staff member shall be stationed at the cell door with direct line-of-sight from the observer to the patient. One observer may be responsible for observation of two inmate-patients on Suicide Watch when the staff member can maintain direct line-of- sight observation of both inmate-patients. The staff-observer to inmate-patient ratio shall not exceed one-to-two. Video-monitoring shall never be used as the sole method for observation of any inmate-patient housed on Suicide Watch status, but may be used to supplement direct visual observation.

Some institutions have been approved via memoranda signed by the Directors of the Division of Adult Institutions (DAI) and the DCHCS, to provide one-on-two direct cell-front observation of inmate-patients on Suicide Watch, when the staff member can maintain direct line-of-sight observation of both inmate-patients, unless one-on- one monitoring is ordered by the psychiatrist or psychologist. All other institutions shall provide one-on-one direct cell-front observation.

The assigned observer shall assume a position where continuous direct visual contact with the inmate-patient can be maintained, including when the inmate uses the shower, sink, or toilet.

Suicide Watch posts will be filled using the following order of job classifications:

1. Hospital Aide
2. Certified Nursing Assistant
3. Licensed Psychiatric Technician
4. Licensed Vocational Nurse
5. RN
6. Correctional Officer

It is the responsibility of the Health Care Manager and Warden to ensure that all hiring efforts be exhausted, including offering voluntary overtime and assigning

involuntary overtime of the medical classifications on the list above, prior to filling these positions with a Correctional Officer.

The employee assigned to provide direct observation shall be appropriately trained regarding this post and the performance of duties related to Suicide Watch.

Observation Documentation

The custody and/or health care staff employee assigned to provide continuous observation during Suicide Watch shall document such observation every 15 minutes on a log sheet.

Custody and health care staff shall document behaviors and activities on a CDCR 114A, *Detention/Segregation Record.*

Nursing staff shall document behavioral checks and the inmate-patients' affect at least every 15 minutes during both Suicide Precaution and Suicide Watch. Nursing checks shall always include visual observation and, when the inmate-patient is awake, shall also include verbal interaction. Nursing staff shall document using CDCR 7212, *Nursing Care Record* (for non-acute care settings), or CDCR 7212A, *Nursing Care Record-Acute Hospital,* (for acute care settings) in the UHR.

Leaving a Post Assignment

- The observer assigned to Suicide Watch shall only vacate the post if immediate attention or assistance is needed in a life-threatening situation, and no other alternative exists.

- A life-threatening situation is defined as a situation in which staff's failure to immediately respond will likely result in serious morbidity or mortality.

- In the event of a life-threatening situation, the staff shall activate a personal alarm in order to summon additional staff to the MHCB area.

- If it becomes necessary for staff assigned to Suicide Watch to leave their post due to a life-threatening situation, they shall request other staff in the vicinity, whenever possible, to provide direct observation coverage of the inmate-patients while away. If no other staff is available, and there is sufficient time, the officer shall contact the Watch Office before responding to the life-threatening situation.

- Any vacating of the post under these circumstances shall be for the minimal time necessary. Once the life-threatening situation has been contained, or there is sufficient staff at the scene to handle the situation, the officer shall immediately return to the Suicide Watch post.

- Upon return to post, the staff shall document his or her departure and return on the CDCR 114A, *Detention/Segregation Record.* The officer shall also ensure that the staff that covered the post in his or her absence also documents that on the CDCR 114A, *Detention/Segregation Record.*
- For the purpose of this procedure, a minimum of one custody officer and one health care professional shall respond to a life-threatening situation involving a general population or reception center inmate.
- For the purpose of this procedure, a minimum of one peace officer and one nursing staff member shall respond to a life-threatening situation involving an ASU inmate. Responding staff shall obtain and wear a protective vest while responding in the ASU areas. The ASU Sergeant shall also be notified as soon as possible.
- Staff will use universal precautions when responding to medical emergencies and utilize Personal Protective Equipment kits, available in the MHCB unit.

Discharge or Return

Inmates sent to a MHCB because of active suicidal ideation, threats, or attempt shall be returned to their housing unit only after the IDTT and/or a clinician has completed a SRAC and has determined that the inmate-patient is no longer at imminent risk. The inmate-patient shall be placed on the 5-day clinical follow-up treatment plan and custody wellness check procedure as detailed below.

Inmates sent to an OHU for continued suicide risk assessment shall be returned to their housing unit only after the IDTT and/or a clinician has completed a SRAC and has determined that the inmate-patient is not at significant risk. The inmate-patient may, depending on clinical determination, be placed on the 5-day clinical follow-up treatment plan and custody wellness check procedure as detailed below.

MHCB Discharge

- A psychiatrist or licensed psychologist, in consultation with the IDTT, shall write the order to discontinue an inmate-patient from Suicide Precaution or Suicide Watch when the inmate is no longer in imminent danger of self-harm. After hours, on weekends and holidays, the Medical Officer of the Day (MOD) or psychiatrist, licensed psychologist, or primary care physician on call may write an order to discontinue Suicide Precaution or Suicide Watch.
- A psychiatrist or licensed psychologist shall complete the MHCB discharge summary.

- Before discharge, the IDTT shall develop a detailed and complete follow-up treatment plan, which shall be documented in the inmate's UHR on CDCR 7221, *Physician's Orders*. The plan shall include prescribed housing, medication, type and frequency of outpatient therapy, and an explicit recommendation on 5-day clinical follow-up treatment plan and custody wellness check procedure.
- The primary clinician (PC) (or in their absence, the senior mental health clinician) shall be notified person-to-person of the pending discharge of the inmate-patient and the discharge plan.
- Inmates with multiple MHCB admissions (three or more within a six-month period) shall be evaluated by the IDTT for referral to the DMH. The results of this evaluation, decision of the IDTT, and outcome of the referral shall be documented on a CDCR 7230-MH, *Mental Health Progress Note*, in the UHR.
- Careful consideration should be given by the IDTT when discharging from an MHCB an inmate-patient who was admitted for reasons of suicidal ideation, threats, or attempt, on a Friday, over the weekend, or the day before a holiday. Inmate-patients will only be released over a weekend if the IDTT has determined such and only after an updated face-to-face evaluation by a mental health clinician. That clinician will establish the 5-day clinical follow-up treatment plan and custody wellness check procedure. The mental status, stability, and risk factors of the inmate-patient should be documented in detail on a CDCR 7230-MH, *Mental Health Progress Note*. A mental health clinician must be available on weekends and holidays, either on duty or on call. **In the event that there is no mental health clinician on call in an institution, no discharges shall be accepted by that institution on, or the day before, a weekend or holiday.**
- A mental health clinician, usually the inmate-patient's PC, shall provide follow up treatment on an outpatient basis. This shall include daily contact with the inmate in their housing unit for five consecutive days following discharge. A psychiatric technician or other mental health clinician may conduct the contacts on weekends and holidays. The PC is responsible for ensuring that the contacts occur. The frequency of visits may then be reassessed. Housing unit custody officers and mental health staff shall communicate regarding the inmate-patient's status.
- Custody shall conduct an hourly check of inmate-patients discharged from the MHCB (admitted for suicidal ideations, threats, or attempt) for the first 24 hours after discharge. A mental health clinician shall then discuss the inmate-patient's behavior with the custody staff and evaluate the inmate-patient to determine if the custody checks should be continued or discontinued. If the custody checks are continued, the mental health clinician shall determine whether the checks are to be every hour, every two hours, or every four hours for the next 24-48 hours. If

after a second evaluation, mental health clinical staff feel additional hourly checks are required, the inmate shall be readmitted to the MHCB for further stabilization. Custody staff shall maintain a log on CDCR 114A, *Detention/Segregation Record,* of rounds on inmate-patients.

- The local SPR FIT shall regularly audit compliance with the 5-day clinical follow-up and custody wellness check procedure. Audit findings shall be forwarded monthly to the Local MHP Subcommittee.

c. **Response to Self-Injurious Behaviors and Suicide Attempts**

Self-injurious behaviors cause, or are likely to cause, physical self-injury. A suicide attempt is an intentional act that is deliberately designed to end one's own life. Both are medical emergencies that require immediate and appropriate responses.

Custody Protocol

**In medical emergencies, the primary objective is to preserve life.** All peace officers who respond to a medical emergency are mandated, pursuant to court order, to provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures. All peace officers must carry a personal CPR mouth shield at all times.

The officer must assess and ensure it is reasonably safe to perform life support by effecting the following actions:

- Sound an alarm (a personal alarm or, if one is not issued, an alarm based on local procedures must be used) to summon necessary personnel and/or additional custody personnel.
- Determine and respond appropriately to any exposed bloodborne pathogens.
- Determine and neutralize any significant security threats to self or others including any circumstances causing harm to the involved inmate.
- Initiate life saving measures consistent with training.

The responding peace officer will be required to articulate the decision made regarding immediate life support and actions taken or not taken, including cases where life support is not initiated consistent with training and/or situations which pose a significant threat to the officer or others.

Clinical and Custody Combined Efforts

**Upon arrival, responding medical personnel shall relieve the correctional peace officer and assume primary responsibility for the provision of medical attention and life saving efforts. Custody and medical personnel together are responsible for the continuance of life saving efforts for as long as necessary.**

---

**Preservation of life shall take priority over preservation of a crime scene.**

---

Emergency Response

The following first aid procedures shall be implemented when an inmate attempts suicide by hanging, laceration, or other methods:

Hanging

Medical and custodial staff shall be informed of the nature of the emergency by the most expedient method available. The cut-down kit shall be transported to the location immediately by custody staff. Clearing the obstruction to the airway as quickly as possible is critical to saving the life of the inmate who has attempted suicide by hanging. When it appears safe, a minimum of two staff shall enter the area where the inmate is located, relieve pressure on the airway by using a stable object for support of the inmate's body or by physically lifting the inmate's weight off the noose. The inmate shall be cut down by cutting above the knot and then loosening the noose. Custody staff shall preserve any item of evidentiary value.

Once the inmate is cut down, custody staff shall provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures.

Medical staff, upon arrival, shall assume responsibility for medical care, as outlined in the institution's local operating procedures for emergencies, including any decisions regarding initiating or continuing CPR.

If possible, the inmate shall also be transported to a triage and treatment area.

Laceration

General guidelines:

- Use impervious latex gloves and/or appropriate, personal protective equipment

- Utilize whatever clean material is available to apply pressure to the wound site
- Elevate extremities if they are bleeding
- Transport to a triage and treatment area or an emergency room

Other Methods (overdosing, trauma, swallowing dangerous objects):

- Provide assistance to medical staff and obtain as much information as possible.
- Staff shall perform the Heimlich maneuver if choking is evident.

Cut-down Kit Availability

Each warden shall ensure that cut-down kits:

- Are maintained within each housing unit
- Are inventoried and inspected on a daily basis with problems immediately reported to a supervisor
- Consist of a lockable metal box containing:
  a. One inventory list affixed to the inside of the box door
  b. One emergency cut-down tool
  c. One single-patient-use resuscitator (e.g., AMBU Single-Patient-Use Resuscitator)
  d. One CPR mask (e.g., Lardell CPR Mask, for use by CPR-certified staff only)
  e. Minimum of ten latex gloves
  f. Disposable oral airway

## E. SUICIDE REPORTING

All reports of death shall be in accordance with DOM, Section 51070, Deaths.

If at any point during the review of the case, questions arise regarding any circumstances surrounding or leading up to the suicide that may be attributed to employee misconduct, the MHSR, the Health Care Manager (HCM), or other responsible individuals may request a misconduct investigation. In this event, the MHSR shall immediately consult with the DCHCS SPR FIT Coordinator to determine further action. Requests for further misconduct inquiry and/or investigation shall be referred in accordance with DOM, Chapter 3, Article 14, Employee Misconduct Investigations/Inquiries. Even if the matter is referred, all other aspects of the suicide review shall continue.

Local Institution Responsibilities

- In the case of an inmate suicide death, the watch commander or senior custody officer shall be notified immediately, and shall subsequently notify the Warden, or evenings, weekends and holidays, the Administrative Officer of the Day. Upon notification of a possible death, the senior custody officer or the watch commander shall determine the need to secure the death scene and initiate investigation or other custody measures as indicated in accordance with DOM, Section 51070.7.
- The institution's CMO or physician designee shall have primary responsibility for reporting the death within eight hours to the DCHCS Death Notification Coordinator (DNC).
- The initial reporting procedures and submission of the CDCR 7229 A, *Initial Inmate Death Report*, shall be completed and submitted in accordance with the procedures set forth in DOM, 51070.9, Deaths. The CDCR 7229 B, *Initial Inmate Suicide Report*, shall be completed by the Local SPR FIT Coordinator or designee, and shall be reviewed, signed and dated by the HCM/CMO. It shall be submitted to the DNC at Central Office by the close of the second business day following the date of death. This form shall contain relevant information including the method of suicide, mental health level of care, psychiatric diagnoses (if applicable), behavioral problems observed, recent history of suicidal ideations or attempts, medication, and recent stressors.

## F. SUICIDE DEATH REVIEW

- Within one business day of receipt of the initial data including CDCR 7229 A, *Initial Inmate Death Report*, and 7229 B, *Initial Inmate Suicide Report*, the DCHCS Death Notification Coordinator (DNC) shall forward the death review folder to the DCHCS SPR FIT Coordinator.
- Within two business days of receipt of the death review folder, the DCHCS SPR FIT Coordinator shall appoint a MHSR from a pool of qualified mental health staff at DCHCS, or regionally from an institution other than where the suicide occurred.
- Within one week, seven calendar days, of being appointed, the MHSR shall begin reviewing the suicide case for compliance with the CDCR SPR FIT policies and procedures. The MHSR shall also review all related documentation including the UHR; Central File; Inmate Death Reports, CDCR 7229 A, *Initial Inmate Death Report*, 7229 B, *Initial Inmate Suicide Report*; CDCR 837 A and B, *Crime/Incident Report*; and any other appropriate documentation. The MHSR shall have access to the inmate's cell, visiting log, recorded telephone conversations, and other information as required. The institution's SPR FIT Coordinator may assist the MHSR in his or her efforts. The assistance may include making available the UHR, the Central File, and any other appropriate information as well as arranging interviews if required. The MHSR may conduct interviews with clinical staff, custody staff, and inmates. However, should there

be any indication an employee misconduct investigation may be warranted, the MHSR shall immediately consult with the DCHCS SPR FIT Coordinator, who shall provide guidance in proceeding with the review. Generally, the MHSR shall discontinue interviews with any employees who may be associated with or implicated in the employee misconduct investigation, but shall continue with all other aspects of the suicide review process.

- In cases where there are concerns with clinical care, the case shall be referred to the local Clinical Performance Enhancement and Review Subcommittee.
- Within 30 calendar days of the inmate suicide, the MHSR shall complete a preliminary Suicide Report containing the following information: Inmate name, CDCR number, age, date and time of discovery, time of death, institution, housing, mental health level of care (if applicable), method, cause of death, findings of coroner (if available), brief summary and preliminary findings including recommendations for quality improvement. The report shall also indicate whether further investigation/inquiry is recommended (if one has not already been initiated). This report shall be immediately forwarded to the DCHCS SPR FIT Coordinator who will then schedule discussion of the report at the DCHCS Suicide Case Review (SCR) Subcommittee. The MHSR will present the case to the SCR Subcommittee.
- The DCHCS SCR Subcommittee is the body that reviews the documentation and reports submitted by the institution and MHSR, determines compliance with the statewide SPR FIT policies and procedures, reviews the QIP (also known as corrective action), and continues its review, in collaboration with the DCHCS MHP Subcommittee, until the QIPs are completed and the cases are closed.
- Within 45 days from the date of death, the DCHCS ERDR Subcommittee shall complete its review of the preliminary suicide report, review the QIP on the preliminary suicide report, and forward the report to the MHSR for completion of the Suicide Report and the accompanying Executive Summary.

Quality Improvement Plan

When warranted, the MHSR shall recommend a QIP (also known as corrective action), based on the findings from the review of the case, which shall address and make recommendations to improve identified problems with clinical care and compliance with policy and procedure. The QIP shall address problems identified, recommended actions, due dates for recommended actions, and supporting documents required from the institution.
The DCHCS SCR Subcommittee shall review the QIP and may take the following actions:

- Ensure consistency with policy and procedure
- Recommend remedial action, documentation, and monitoring

- Refer for further action in accordance with DOM, Chapter 3, Article 14, Employee Misconduct Investigations/Inquiries, when appropriate. When individual conduct of custody staff requires further investigation, a memorandum shall be forwarded to the Director, Adult Institutions Division, who shall initiate a CDCR 989, *Request for Investigation*, to the Office of Internal Affairs.
- Prepare a memorandum to refer the case to the DCHCS Professional Practice Executive Committee (PPEC) for review of individual practice of licensed psychologists, psychiatrist, and/or physicians when appropriate. The DCHCS PPEC shall report to the appropriate professional licensing board for investigation, when appropriate

When approved by the DCHCS SCR Subcommittee, the Suicide Report shall be signed by the Director, DCHCS, or designee.

The Suicide Report by the MHSR shall incorporate the QIP approved by the DCHCS SCR Subcommittee. The DCHCS SPR FIT Coordinator shall include with this report the Inmate Death Reports, CDCR 7229 A, *Initial Inmate Death Report*, and CDCR 7229 B, *Initial Inmate Suicide Report*, CDCR 837 A and B, *Crime/Incident Report* , Movement History and Offense History, and the Executive Summary serving as the cover page to complete the Final Suicide Report. The report shall then be forwarded to the Director of the CDCR DCHCS and the Director, DAI. The report shall be signed by both Directors, and copied to Regional Administrators of DCHCS and DAI; Legal Affairs Division; and to the reporting institutions' Warden; Health Care Manager/Chief Medical Officer; Mental Health Program Manager, Chief/Senior Psychiatrist and Chief/Senior Psychologist; and, other appropriate interested and legally designated persons within 60 days of date of death.

When an investigation is required, the Office of Internal Affairs (OIA) shall track progress until the investigation is complete. The OIA shall forward a memorandum with a summary description of the methods and outcome of the investigation to the DCHCS SPR FIT Coordinator, who shall forward the results to the *Coleman* Special Master through DCHCS routing procedures.

For QIP items focused on institutional compliance, the Warden and HCM/CMO are responsible for ensuring the implementation of the QIP within the specified time frame, which is not greater than 60 days of receipt of the finalized Executive Summary of the Suicide Report with signature approval from the Director, DCHCS (120 days following the date of death). QIP items focused on system-wide policy or training shall be referred to the SPR FIT at DCHCS. The SPR FIT Coordinator shall maintain a master list of QIP problems, corrective action, supporting documentation required, and completion dates. A proof-of-practice binder shall be maintained by the SPR FIT coordinator in order to track and record the progress of policy revisions and system-wide training.

The QIP shall be monitored by the Warden, HCM/CMO, Mental Health Program Manager, Chief Psychiatrist, Chief Psychologist, and SPR FIT Coordinator at the institution of occurrence. DCHCS may require ongoing documentation of compliance.

The Local SPR FIT Coordinator shall prepare a follow up report of implementation addressing action taken on the recommendations of the QIP. All appropriate supporting documentation confirming that these actions have been taken shall be attached to this report. See table below for list of suggested supporting documentation. The Warden and HCM/CMO, or institution Mental Health Program Manager shall sign this report. The institution shall retain a copy of the report and forward the original to the DCHCS ERDR for review. The report is due within 30 days following the implementation of the QIP (90 days following receipt of the Executive Suicide Report). Additional follow up monitoring shall occur as necessary as dictated in the QIP.

**Action, Documentation, & Monitoring for Suicide Quality Improvement Plans**

| ACTION | DOCUMENTATION/MONITORING |
| --- | --- |
| Training | Copy of training agenda and sign-in sheet |
| Required appointments with clinicians are held | List of appointments from MHTS |
| Changes in operating procedure | Copy of procedure or memos |
| Develop Quality Improvement Team | Copy of recommendations or change in procedures |
| Missing medication due to transfer to a different housing unit | Ongoing monitoring of Medication Administration Records in the UHR Provide sample audit |
| Proper Documentation | Provide plan to audit UHR and a sample audit |
| Five Day Follow-up of suicidal inmates released from MHCB | Audit of documentation in UHR; provide a sample audit |
| Rounds and evaluations done in ASU by psychiatric technicians | Audit UHR, CDCR 114 Isolation log and CDCR 114-A, *Daily Log*; provide sample audit |
| Inmates on Keyhea are identified | Review UHR |
| Conduct suicide risk assessment | Review UHR |
| Statewide policy issues | Review new policy |
| Investigation of individual practitioners | Provide status or completion date of investigation |
| Audit of records per specified length of time to be sure that quality improvement is being consistently followed | Periodic reports of audit findings to DCHCS SPR FIT and DCHCS MHP |

The DCHCS SCR Subcommittee shall continue to review all open suicide cases until the QIP is approved and each case is closed. The QIP shall be incorporated into the final Suicide Report. All decisions made by the DCHCS SPR FIT regarding compliance and quality improvement shall be documented in the final Suicide Report.

The follow-up report on implementation of the QIP shall be reviewed by the DCHCS SPR FIT Coordinator. In cases where the QIP is not sufficiently completed by the institution within the required time frame, the SPR FIT coordinator shall send a memorandum indicating non-compliance to the institution and to the Regional Administrator at DCHCS and DAI. Appropriate follow-up shall be conducted by the Regional Administrator in order to ensure the completion of the QIP item. In cases where a system-wide QIP is not sufficiently completed by the SPR FIT within the required time frame, a report of progress and any barriers to completion shall be forwarded from the SPR FIT to the Director of the appropriate CDCR division. The CDCR Division Director shall take appropriate action to ensure completion of the QIP. When complete, the QIP shall be distributed by the SPR FIT Coordinator according to legal mandates.

If, during the suicide review process, other death related information arrives, such as CDCR 837 C, CDCR 7229 C, or Coroner's report, the DNC will locate the death review folder and place these documents inside. The DNC shall update the routing sheet and notify the SPR FIT Coordinator of the new information. Upon completion of the suicide review, the death review folder containing the Suicide Report and other related information shall be returned to the DNC for final data entry. The DNC shall ensure that all documentation is complete and then return the folder for final storage in a designated locked cabinet at DCHCS.

The DCHCS SPR FIT Coordinator appointed to oversee suicide-related activities shall coordinate analysis and review of each suicide, and compile and forward annual suicide statistics to: Secretary, Youth and Adult Correctional Agency; Director, DAI; Director, DCHCS; Deputy Director, DCHCS; Chief of Clinical Policies and Programs, DCHCS; Institution Wardens; Institution HCM/CMOs; and, other appropriate senior DCHCS staff.

## G. MENTAL HEALTH EVALUATION COMPONENT FOR A RULES VIOLATION REPORT

Per California Code of Regulations, Title 15, Section 3317 "An inmate shall be referred for a mental health evaluation prior to documenting misbehavior on a CDCR 115, in any case where the inmate is suspected of self-mutilation or attempted suicide."

Staff are to utilize the Request for CDCR 128B, when requesting this mental health evaluation.

Subsequent to the mental health evaluation, the mental health clinician's determination will be documented on a CDCR 128C. A copy of this CDCR 128C shall be forwarded to the custody staff who requested the mental health evaluation.

In order to preserve an inmate's due process rights, any decision that a suicide attempt was not genuine must be supported by the following:

1. A thorough review of the UHR and Central File
2. A complete mental health evaluation including a complete history, current mental status examination, and current Diagnostic and Statistical Manual diagnosis
3. Appropriate psychological testing to include both objective and projective testing
4. A detailed summary supporting the conclusion that the suicide attempt was not genuine
5. The clinician's summary must be approved and co-signed by the institution's Chief of Mental Health before issuance of a CDCR 115.

If the mental health clinician determines the inmate's actions were an attempt to manipulate staff, the inmate may be charged under CCR Section 3005(a) for the specific act of "Attempted Manipulation of Staff." The specific act of "Attempted Suicide" or "Self Mutilation" is not an appropriate charge for a CDCR 115 and shall not be used. In cases where a self-injurious behavior is found to be intended to manipulate staff, a copy of the completed mental health evaluation shall be sent to the local SPR FIT coordinator and the mental health program director.

If a mental health clinician determines that, the inmate's action was an "actual suicide attempt," or cannot make a clear determination that the inmate's action was an actual suicide attempt, a CDCR 115 shall not be written. In both these instances the behavior and/or the inability of mental health staff to make a clear determination shall be documented by custody staff on a CDCR 128B, *Mental Health Services Staff Referral*, *General Chrono*, for inclusion in the inmate's Central File and UHR.

# Appendix A
## Glossary of Terms

**ADL** – Activities of daily living

**AMBU bag** – Ambulatory bag, used for Cardiopulmonary Resuscitation -

**APP** – Acute Psychiatric Program

**ASH** – Atascadero State Hospital

**ASU** – Administrative Segregation Unit

**AS MHS** – Administrative Segregation Mental Health Services

**C&PR** – Classification and Parole Representative

**CC** – Correctional Counselor

**CCCMS - Correctional Clinical Case Management System**- The system utilized by the California Department of Corrections and Rehabilitation (CDCR) that facilitates mental health care by linking inmates to needed services. The system provides care through a Clinical Case Manager (CCM), Correctional Counselor (CC), Psychiatrist, and a Psychiatric Technician (in Ad Seg and SHU) by monitoring CDCR's mentally disordered population, assessing their needs and providing medically necessary mental health care.

**CCM – Clinical Case Manager** - A mental health clinician, typically a psychologist or Psychiatric Social Worker, who provides functions such as assessment, intervention, treatment planning, treatment, and case review.

**CCWF** – Central California Women's Facility

**CDC** – California Department of Corrections, (organizational name change to California Department of Corrections and Rehabilitation on July 1, 2005)

**CDCR** – California Department of Corrections and Rehabilitation, (organization's name effective beginning July 1, 2005. Prior to July 1, 2005, organization's name was the California Department of Corrections)

**Chief of Mental Health** – The lead management position in an institution's mental health program. The individual in this position may be a Chief Psychiatrist, Chief Psychologist, or Senior Psychologist.

**CIW** – California Institution for Women

**CMC** – California Men's Colony

**CMF** – California Medical Facility

**CMO** – Chief Medical Officer

**COR** – California State Prison, Corcoran

**C&PP** – Clinical Policy and Programs

**CPER** – Clinical Performance Enhancement and Review Subcommittee

**CPR** – Cardiopulmonary Resuscitation

**Crisis**- A term to describe a sudden onset or worsening of psychiatric symptoms including suicidality or other abnormal behavior necessitating immediate intervention.

**Crisis Intervention**- A term to describe the process of recognizing a mental health emergency and initiating steps to immediately treat the symptoms.

**CTC** – Correctional Treatment Center

**CTQ** – Confined to Quarters

**DCHCS** – Division of Correctional Health Care Services, (division's name effective beginning July 1, 2005. Prior to July 1, 2005, division's name was Health Care Services Division)

**DDPS** – Distributed Data Processing System

**DMH** – Department of Mental Health

**DNC** – Death Notification Coordinator

**DOT** – Directly Observed Therapy

**DSM** – Diagnostic and Statistical Manual

**Emergency-** For the purpose of this document, an emergency is defined as a mental health condition for which evaluation is immediately necessary.

**EOP** – Enhanced Outpatient Program

**ERDR** – Emergency Response and Death Review Committee

**GACH** – General Acute Care Hospital

**GAF - Global Assessment of Functioning -** A system by which mental health staff can measure the functioning of inmates using a standardized clinical ranking system as outlined in the DSM.

**GP** – General Population

**HCCUP** – Health Care Cost and Utilization Program

**HCM** – Health Care Manager

**HCPU** – Health Care Placement Unit

**HCSD** – Health Care Services Division, (division's name changed to Division of Correctional Health Care Services on 7/1/2005)

**HS** – hora somni; hour of sleep

**ICC - Institutional Classification Committee-** A committee made up of custody and health care staff whose primary function is to review the housing, custody, or classification issues of an inmate receiving mental health care within the Department.

**ICD** – World Health Organization's International Classification of Diseases

**IDTT** – Interdisciplinary Treatment Team

**IMHIS** – Inmate Mental Health Identifier System

**IST** – In-service Training

**Level of Care (LOC)-** The designated placement of an inmate into the clinically appropriate mental health program.

**LPT** - Licensed Psychiatric Technician

**LTCS** – Long-Term Care Services

**LVN** - Licensed Vocational Nurse

**MAR** – Medication Administration Record

**Medical Necessity**- Mental health intervention is necessary to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having a mental disorder. Treatment is continued for these cases only upon reassessment and determination by the IDTT that the significant or life threatening disability/dysfunction continues or regularly recurs.

**Mental Health Clinician**- An individual who is a psychiatrist, psychologist, or a psychiatric social worker.

**MHCB** – Mental Health Crisis Bed

**MHP** – Mental Health Program

**MHQMS** – Mental Health Quality Management System

**MHSDS** – Mental Health Services Delivery System

**MHSR** – Mental Health Suicide Reviewer

**MHTS** – Mental Health Tracking System - A standardized, automated system of record management and case tracking. The data collected by the MHTS includes historical heat medication, LOC changes, mental health staff contacts, mental health statistics such as Global Assessment Functioning (GAF) scores, current diagnosis, and transfer history.

**MOD** – Medical Officer of the Day

**MOU - Memorandum of Understanding** - An agreement between the Department of Corrections and the Department of Mental Health to provide acute and intermediate inpatient care to SMD inmates who may exhibit marked impairment and dysfunction or are believed to be a danger to him or herself and/or to others.

**MTA - Medical Technical Assistant** - An individual who possesses a valid license from the State of California to practice as a Licensed Vocational Nurse or Registered Nurse, and who is a peace officer pursuant to Penal Code Section 830.5 (b).

**OHU** – Outpatient Housing Unit

**OP** – Operating procedure

**Parole Outpatient Clinic (POC)** A clinic that provides psychiatric diagnosis, evaluation, and treatment for parolees referred by staff. Many parolees receive medication from POCs.

**PBSP – Pelican Bay State Prison**

**POC** – Physician or Psychiatrist on call (see also POD)

**POC Clinic** – Parole Outpatient Clinic

**Primary Clinician (PC)**- A psychiatrist, a psychologist, or a psychiatric social worker, assigned to each patient, who assumes overall responsibilities for the treatment services provided to a patient by maintaining active therapeutic involvement with the patient and coordinating services provided according to the treatment plan.

**PRN** – as needed

**PSH** – Patton State Hospital

**PSU** – Psychiatric Services Unit

**PT** - Psychiatric Technician

**PSW** - Psychiatric Social Worker

**Psychiatrist on Duty (POD)**- A psychiatrist who is available to provide emergency assessment to inmate/patients who may require immediate psychiatric intervention including admission into an acute psychiatric program.

**QIP** – Quality Improvement Plan

**QMT** – Quality Management Team

**RT** – Recreational Therapist

**RN** - Registered Nurse

**RVR** – Rules Violation Report

**SAC** – California State Prison, Sacramento

**SHU** – Security Housing Unit

**SNF** – Skilled Nursing Facility

**SPR FIT** – Suicide Prevention and Response Focused Improvement Team

**SQ** – San Quentin State Prison

**SRAC** – Suicide Risk Assessment Checklist

**SVPP** – Salinas Valley Psychiatric Program

**TB** - Tuberculosis

**Treatment Plan** - A set of individualized recommendations based upon clinical and custody staff input for an inmate with identified mental health care needs.

**UM** – Utilization Management

**Unit Health Record (UHR)** - A hard cover, multi-sectioned record that contains essential medical and mental health data collected and generated during the inmate's stay at CDCR.

**Urgent**- For the purpose of this document, urgent is defined as a mental health condition for which evaluation is necessary within 24 hours.

**VSP** – Valley State Prison

# Appendix B

*Coleman v. Brown*

POLICY UPDATES TO THE MHSDS PROGRAM GUIDE 2009 REVISION

| Memo Name | Page (PDF) |
|---|---|
| **16-0115 Memo-Mental Health (MH) Referrals From Board of Parole Hearings (BPHs) Staff** | P.7 (12-1-5) |
| **14-0707 Memo- New Procedure Regarding Mental Health (MH) Referral Chrono Form** | P.7 (12-1-5)<br>P.23 (12-2-3)<br>P.30 (12-2-10)<br>P.53 (12-4-4)<br>P.127 (12-7-3)<br>P.144 (12-8-5)<br>P.145 (12-8-6) |
| **14-0128 Procedure- Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200P1** | P.11 (12-1-9)<br>P.136 (12-7-12) |
| **15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601** | P.14 (12-1-12)<br>P.38 (12-3-6)<br>P.54 (12-4-5)<br>P.127 (12-7-3)<br>P.144 (12-8-5)<br>P.145 (12-8-6)<br>P.165 (12-9-13) |
| **17-0705 Memo- Mental Health Appointment Refusals** | P.14 (12-1-12) |
| **15-1021 Procedure- Rules Violation Report (RVR) Mental Health (MH) Assessment 12.07.601.P1** | P.15 (12-1-13)<br>P.54 (12-4-5)<br>P.127 (12-7-2)<br>P.144 (12-8-5)<br>P.165 (12-9-13) |
| **13-0723 Memo- Mental Health (MH) Program Subcommittee** | P.19 (12-1-17)<br>P.168 (12-10-2) |
| **15-0508 Memo- Consulting Staff Name Documentation in Health Care Records** | P.27 (12-2-7)<br>P.56 (12-4-7) |
| **17-0404 Policy- Treatment for Reception Center (RC) Patients at Enhanced Outpatient Program (EOP) Level of Care (LOC) in the ASU 12.06.402** | P.28 (12-2-8) |
| **11-0421 Memo- Structured Therapeutic Activity** | P.28 (12-2-8)<br>P.58 (12-4-9)<br>P.149 (12-8-10) |

| Memo Name | Page (PDF) |
|---|---|
| 10-0311 Memo- Release Planning for Inmates Participating in the Institutions Mental Health Services Delivery System (MHSDS) | P.29 (12-2-9)<br>P.36 (12-3-4)<br>P.43 (12-3-11)<br>P. 62 (12-4-13)<br>P.160 (12-9-8) |
| 16-0125 Memo- Correctional Clinical Case Management System (CCCMS) Level of Care (LOC) and Minimum Support Facilities (MSF) | P.32 (12-2-12) |
| 14-08 MH HQ Policy- Correctional Treatment Center - Inmate-Patient Access to Mental Health Services 12.01.400 | P.35 (12-3-3)<br>P.58 (12-4-9) |
| 15-0512 Memo- Documentation of Mental Health (MH) Evaluations and Treatment (Tx) Plans | P.40 (12-3-8)<br>P.53 (12-4-4)<br>P.57 (12-4-8)<br>P.63 (12-4-14)<br>P.161 (12-9-9) |
| 14-0128 Policy- Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200 | P.41 (12-3-9)<br>P.64 (12-4-15)<br>P.156 (12-9-4) |
| 17-0227 Memo- Release of Revised Statewide Psychotropic Medication Consent Form | P.42 (12-3-10) |
| 16-1115 Memo - Correctional Clinical Case Management System (CCCMS) Patient Review | P.44 (12-3-12) |
| 14-1222 Memo- Accurate Tracking of Mental Health Treatment Hours | P.58 (12-4-9)<br>P.70 (12-4-21)<br>P.138 (12-7-14) |
| 14-0303 Memo- Interdisciplinary Treatment Team (IDTT) Review of Inmate-Patients Ability to Participate in Program Assignments | P.56 (12-4-7) |
| 17-0721 Memo- Dialetical Behavior Therapy (DBT) Enhanced Outpatient Program (EOP) Policy and Procedure Final | P.68 (12-4-19) |
| 14-1117 Policy- Documentation Required for Referral to Mental Health Crisis Bed (MHCB) 12.05.601 | P.73 (12-5-3) |
| 15-0904 Memo- Mental Health Crisis Bed (MHCB) Referral Notification | P.74 (12-5-4) |
| 15-1015 Policy- Housing of Patients Pending Mental Health Crisis Bed (MHCB) Transfer  12.05.301 | P.75 (12-5-5) |
| 16-0729 Memo- Mental Health Crisis Bed Hotline | P.76 (12-5-6) |
| 17-0214 Memo- Mental Health Crisis Bed (MHCB) Privileges Revision | P.81 (12-5-11) |
| 15-0409 Policy- Clinical Follow Up Requirements for IP Discharge & Transfer from MHCB, Alternative Housing, or Mental Health-OHU 12.05.501 | P.99 (12-5-29)<br>P.185 (12-10-19) |

| | |
|---|---|
| 16-0531 Memo- Release of Revised 5 Day Follow-Up Form | P.85 (12-5-15)<br>P.99 (12-5-29)<br>P. 110 (12-6-5)<br>P.118 (12-6-13)<br>P.122 (12-6-17)<br>P.185 (12-10-19) |
| 12-0509 Memo & Policy- Intermediate and Acute Discharge Follow-Up 12.06.501 | P.99 (12-5-29)<br>P. 110 (12-6-5)<br>P.118 (12-6-13)<br>P.122 (12-6-17) |
| 16-0301 Memo- Use of Mechanical Restraints in a Mental Health Crisis Bed Unit (MHCB) | P.86 (12-5-16) |
| 17-0901 Memo – Addendum Revision of Mental Health Crisis Bed Discharge Custody Checks Policy | P.96 (12-5-26)<br>p.186 (12-10-20) |
| 16-0104 Memo- Reiteration of Expectations Relative to Mental Health Crisis Beds (MHCBs) and Return Cases | P.97 (12-5-27) |
| 12-1212 Memo- Use of Outpatient Housing Units (OHUs) Directive | P.100 (12-5-30) |
| 15-0215 Policy- Security Housing Unit (SHU)- Department of State Hospitals (DSH) -Psychiatric Inpatient Program (PIP) Case Conference 12.06.100 | P. 110 (12-6-5)<br>P.118 (12-6-13)<br>P.122 (12-6-17) |
| 14-0117 Policy- Intermediate and Acute Mental Health Hospital Returns - Records Review  12.05.400 | P. 110 (12-6-5)<br>P.118 (12-6-13) |
| 13-0419 Memo- Level of Care (LOC) Changes for Inmate-Patients (IPs) Returning from Department of State Hospital (DSH) Facilities | P. 110 (12-6-5)<br>P.118 (12-6-13) |
| 15-0225 Procedure- Security Housing Unit (SHU) Dep. of State Hospitals (DSH)-PIP Required Case Conference - Referral 12.06.100.P1 | P.114 (12-6-9) |
| 16-0208 Policy- Short Term Restricted Housing (STRH) Mental Health (MH) Requirements 12 06 801 | P.131 (12-7-7) |
| 16-0204 Memo- Short Term and Long Term Restricted Housing  (STRH & LTRH) Policies | P.131 (12-7-7)<br>P.140 (12-8-1) |
| 15-0115 Memo- Creation of Correctional Clinical Case Management System (CCCMS) Short & Long Term Restricted Housing (STRH) & (LTRH) | P.131 (12-7-7)<br>P.140 (12-8-1) |
| 16-0303 Memo- Transfer of Correctional Clinical Case Management System (CCCMS) Inmate-Patients to Male Short Term Restricted Housing (STRH) Units | P.131 (12-7-7)<br>P.18 (12-1-16) |

| | |
|---|---|
| 16-0607 Memo- Release of New Mental Health (MH) Post-Placement Screening Form for Administrative Segregation Units (ASU) Units | P.130 (12-7-6) |
| 15-0225 Memo- Review of Refusal to Attend MH Tx by Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) HUB & PSU Inmates | P.134 (12-7-10) |
| 16-0208 Policy- Long Term Restricted Housing (LTRH) Mental Health (MH) Requirements 12.06.802 | P.140 (12-8-1) |
| 15-0225 Procedure- Security Housing Unit (SHU) Dep. of State Hospitals (DSH)-PIP Required Case Conference - Discharge 12.06.100.P2 | P.141 (12-8-2)<br>P. 118 (12-6-13) |
| 13-0117 Policy- Suicide Risk Evaluation (SRE) Mentor Program | P.170 (12-10-4) |
| 13-0117 Procedure- Suicide Risk Evaluation (SRE) Mentor Program | P.170 (12-10-4) |
| 13-0205 Memo- Implementation of the Suicide Risk Evaluation (SRE) Mentor Program | P.170 (12-10-4) |
| 13-0813 Memo- Suicide Prevention & Response (SPR) Focused Improvement Team (FIT) Coordinator Attendance at Inmate Advisory & Family Councils | P.170 (12-10-4) |
| 16-0315 Memo- Revision to the Suicide Risk Evaluation (SRE) Mentoring Program | P.170 (12-10-4) |
| 16-0324 Memo- Clarification of Suicide Risk Evaluation (SRE) Training Requirements | P. 170 (12-10-4) |
| 16-0315 Memo- Level of Observation and Property For Patients in Mental Health Crisis Beds (MHCBs) | P. 100 ( 12-5-30) |
| 14-0303 Memo- Annual Suicide Prevention Training | P.172 (12-10-6) |
| 15-1023 Memo- Completed Contacts Associated With Suicide Risk Evaluations | P.173 (12-10-7) |
| 16-1214 Memo- No Requirement For an Interdisciplinary Progress Note To Accompany a Suicide Risk Evaluation or Assessment (SRE or SRASHE) | P.174 (12-10-7)<br>P.175 (12-10-9) |
| 11-0517 Housing of EOP Inmates in RC Institutions | P.28 (12-2-8) |
| 14-0509 Implementation of the Security-Welfare Check (Guard One System) | P.125 (12-7-1) |
| 14-0814 NDS Processing Procedure for MHSDS Inmates | P.125 (12-7-1) |
| 14-0902 Implementation of NDS for MHSDS IMs Processing | P.125 (12-7-1) |
| 14-0915 Priority Case-by-Case Review of MHDS Long- Term Segregated Inmates | P.126 (12-7-2) |
| 14-1223 Transfer of Inmates To & From MHCBs | P.73 (12-5-3) |
| | |

| | |
|---|---|
| **15-0911 Implementation of Revised RVR Processes Involving IM Participants in the MHSDS & DDP** | P.14 (12-1-12)<br>P.38 (12-3-6)<br>P.54 (12-4-5)<br>P.127 (12-7-2)<br>P.144 (12-8-5)<br>P.165 (12-9-13) |
| **15-1030 Revised Administrative Segregation Unit Intake Cell Procedure** | P.132 (12-7-8)<br>P.127 (12-7-2) |
| **14-0418 Requirement for the Presence of Mental Health Clinician During all Controlled UOF Incidents** | P.85 (12-5-15) |
| **14-0605 RVRs Issued Relative to Involuntary Medication of Inmates** | P.85 (12-5-15) |
| **14-1017 Use of Force Revisions** | P.85 (12-5-15) |
| **15-0924 Memo- Enhanced Outpatient Program (EOP) Milestone Credit Group Therapy-Required Materials** | P.196<br>P.58 (12-4-9) |
| **03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System** | p.16 (12-1-14)<br>p.33 (12-3-1)<br>p.37 (12-3-5)<br>p.38 (12-3-6)<br>p.42 (12-3-10)<br>p.43 (12-3-11)<br>p.44 (12-3-12)<br>p.47 (12-3-15)<br>p.48 (12-3-16)<br>p.56 (12-4-7)<br>p.63 (12-4-14)<br>p.70 (12-4-21)<br>p.127 (12-7-3)<br>p.129 (12-7-5)<br>p.130 (12-7-6)<br>p.138 (12-7-14)<br>p.146 (12-8-7)<br>p.151 (12-8-12)<br>p.170 (12-10-4)<br>p.178 (12-10-12)<br>p.193 (12-10-27)<br>Appendix A-4 |

| | |
|---|---|
| **02.02.18 Enhancements to the Suicide Prevention and Response Focused Improvement Teams** | p.167 (12-10-1)<br>p.168 (12-10-2)<br>p.169 (12-10-3)<br>p.170 (12-10-4)<br>p.171 (12-10-5)<br>p.172 (12-10-6) |
| | |

# Appendix C

# Program Guide Crosswalk Index

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| 12-1-5 | 16-0115 Memo – Mental Health (MH) Referrals From Board of Parole Hearings (BPHs) Staff<br><br>14-0707 Memo – New Procedure Regarding Mental Health (MH) Referral Chrono Form | Page 1<br><br>Page 6 |
| 12-1-9 | 14-0128 Procedure-Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200P1 | Page 8 |
| 12-1-12 | 15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601<br><br>15-0911 Implementation of Revised RVR Processes Involving IM Participants in the MHSDS & DDP<br><br>17-0705 Memo- Mental Health Appointment Refusals | Page 11<br><br>Page 306<br><br>Page 14 |
| 12-1-13 | 15-1021 Procedure- Rules Violation Report (RVR) Mental Health (MH) Assessment 12.07.601.P1 | Page 35 |
| 12-1-14 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-1-16 | 16-0303 Memo- Transfer of Correctional Clinical Case Management System (CCCMS) Inmate-Patients to Male Short Term Restricted Housing (STRH) Units | Page 199 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| 12-1-17 | 13-0723 Memo- Mental Health (MH) Program Subcommittee | Page 38 |
| 12-2-3 | 14-0707 Memo- New Procedure Regarding Mental Health (MH) Referral Chrono Form | Page 6 |
| 12-2-7 | 15-0508 Memo- Consulting Staff Name Documentation in Health Care Records | Page 43 |
| 12-2-8 | 11-0421 Memo- Structured Therapeutic Activity<br><br>17-0404 Policy- Treatment for Reception Center (RC) Patients at Enhanced Outpatient Program (EOP) Level of Care (LOC) in the ASU 12.06.402<br><br>11-0517 Housing of EOP Inmates in RC Institutions | Page 47<br><br>Page 45<br><br>Page 256 |
| 12-2-9 | 10-0311 Memo- Release Planning for Inmates Participating in the Institutions Mental Health Services Delivery System (MHSDS) | Page 49 |
| 12-2-10 | 14-0707 Memo- New Procedure Regarding Mental Health (MH) Referral Chrono Form | Page 6 |
| 12-2-12 | 16-0125 Memo- Correctional Clinical Case Management System (CCCMS) Level of Care (LOC) and Minimum Support Facilities (MSF) | Page 57 |
| 12-3-1 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-3-3 | 14-08 MH HQ Policy- Correctional Treatment Center - Inmate-Patient Access to Mental Health Services 12.01.400 | Page 72 |
| 12-3-4 | 10-0311 Memo- Release Planning for Inmates Participating in the | Page 49 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | Institutions Mental Health Services Delivery System (MHSDS) | |
| 12-3-5 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-3-6 | 15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601<br><br>15-0911 Implementation of Revised RVR Processes Involving IM Participants in the MHSDS & DDP<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 11<br><br>Page 306<br><br>Page 349 |
| 12-3-8 | 15-0512 Memo- Documentation of Mental Health (MH) Evaluations and Treatment (Tx) Plans | Page 74 |
| 12-3-9 | 14-0128 Policy- Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200 | Page 77 |
| 12-3-10 | 17-0227 Memo- Release of Revised Statewide Psychotropic Medication Consent Form<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 84<br><br>Page 349 |
| 12-3-11 . | 10-0311 Memo- Release Planning for Inmates Participating in the | Page 49 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | Institutions Mental Health Services Delivery System (MHSDS)<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | <br><br>Page 349 |
| 12-3-12 | 16-1115 Memo - Correctional Clinical Case Management System (CCCMS) Patient Review<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 87<br><br>Page 349 |
| 12-3-15 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-3-16 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-4-4 | 14-0707 Memo- New Procedure Regarding Mental Health (MH) Referral Chrono Form<br><br>15-0512 Memo- Documentation of Mental Health (MH) Evaluations and Treatment (Tx) Plans | Page 6<br><br>Page 74 |
| 12-4-5 | 15-0911 Implementation of Revised RVR Processes Involving IM Participants in the MHSDS & DDP | Page 306 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | 15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601<br><br>15-1021 Procedure- Rules Violation Report (RVR) Mental Health (MH) Assessment 12.07.601.P1 | Page 11<br><br>Page 35 |
| 12-4-7 | 15-0508 Memo- Consulting Staff Name Documentation in Health Care Records<br><br>14-0303 Memo- Interdisciplinary Treatment Team (IDTT) Review of Inmate-Patients Ability to Participate in Program Assignments<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 43<br><br>Page 92<br><br>Page 349 |
| 12-4-8 | 15-0512 Memo- Documentation of Mental Health (MH) Evaluations and Treatment (Tx) Plans | Page 74 |
| 12-4-9 | 11-0421 Memo- Structured Therapeutic Activity<br><br>14-1222 Memo- Accurate Tracking of Mental Health Treatment Hours<br><br>14-08 MH HQ Policy- Correctional Treatment Center - Inmate-Patient Access to Mental Health Services 12.01.400 | Page 47<br><br>Page 90<br><br>Page 72 |
| 12-4-13 | 10-0311 Memo- Release Planning for Inmates Participating in the | Page 49 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | Institutions Mental Health Services Delivery System (MHSDS) | |
| 12-4-14 | 15-0512 Memo- Documentation of Mental Health (MH) Evaluations and Treatment (Tx) Plans<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 74<br><br>Page 349 |
| 12-4-15 | 14-0128 Policy- Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200 | Page 77 |
| 12-4-19 | 17-0721 Memo- Dialetical Behavior Therapy (DBT) Enhanced Outpatient Program (EOP) Policy and Procedure Final | Page 98 |
| 12-4-21 | 14-1222 Memo- Accurate Tracking of Mental Health Treatment Hours<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 90<br><br>Page 349 |
| 12-5-3 | 14-1117 Policy- Documentation Required for Referral to Mental Health Crisis Bed (MHCB) 12.05.601<br><br>14-1223 Transfer of Inmates To & From MHCBs | Page 109<br><br>Page 284 |
| 12-5-4 | 15-0904 Memo- Mental Health Crisis Bed (MHCB) Referral Notification | Page 112 |
| 12-5-5 | 15-1015 Policy- Housing of Patients Pending Mental Health | Page 115 |

| **Program Guide Page** | **Policy/Memo Number and Name** | **Appendix C Page Number** |
|---|---|---|
| | Crisis Bed (MHCB) Transfer 12.05.301 | |
| 12-5-6 | 16-0729 Memo- Mental Health Crisis Bed Hotline | Page 119 |
| 12-5-11 | 17-0214 Memo- Mental Health Crisis Bed (MHCB) Privileges Revision | Page 122 |
| 12-5-15 | 16-0531 Memo – Release of Revised 5 Day Follow-Up Form<br><br>14-0418 Requirement for the Presence of Mental Health Clinician During all Controlled UOF Incidents<br><br>14-0605 RVRs Issued Relative to Involuntary Medication of Inmates<br><br>14-1017 Use of Force Revisions | Page 133<br><br>Page 316<br><br>Page 338<br><br>Page 341 |
| 12-5-16 | 16-0301 Memo- Use of Mechanical Restraints in a Mental Health Crisis Bed Unit (MHCB) | Page 145 |
| 12-5-26 | 17-0901 Memo – Addendum Revision of Mental Health Crisis Bed Discharge Custody Checks Policy | Page 150 |
| 12-5-27 | 16-0104 Memo- Reiteration of Expectations Relative to Mental Health Crisis Beds (MHCBs) and Return Cases | Page 159 |
| 12-5-29 | 15-0409 Policy- Clinical Follow Up Requirements for IP Discharge & Transfer from MHCB, Alternative Housing, or Mental Health-OHU 12.05.501<br><br>16-0531 Memo – Release of Revised 5 Day Follow-Up Form<br><br>12-0509 Memo & Policy – Intermediate and Acute Discharge Follow-Up 12.06.501 | Page 129<br><br>Page133<br><br>Page 140 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| 12-5-30 | 12-1212 Memo- Use of Outpatient Housing Units (OHUs) Directive<br><br>16-0315 Memo- Level of Observation and Property For Patients in Mental Health Crisis Beds (MHCBs) | Page 175<br><br>Page 239 |
| 12-6-5 | 16-0531 Memo – Release of Revised 5 Day Follow-Up Form<br><br>12-0509 Memo & Policy – Intermediate and Acute Discharge Follow-Up 12.06.501<br><br>15-0215 Policy – Security Housing Unit (SHU)- Department of State Hospitals (DSH) – Psychiatric Inpatient Program (PIP) Case Conference 12.06.100<br><br>14-0117 Policy – Intermediate and Acute Mental Health Hospital Returns – Records Review 12.05.400<br><br>13-0419 Memo – Level of Care (LOC) Changes for Inmate-Patients (IPs) Returning from Department of State Hospital (DSH) Facilities | Page 133<br><br>Page 140<br><br>Page 178<br><br>Page 180<br><br>Page 183 |
| 12-6-9 | 15-0225 Procedure – Security Housing Unit (SHU) Dep. Of State Hospitals (DSH) – PIP Required Case Conference - Referral 12.06.100.P1 | Page 185 |
| 12-6-13 | 16-0531 Memo – Release of Revised 5 Day Follow-Up Form<br><br>12-0509 Memo & Policy – Intermediate and Acute Discharge Follow-Up 12.06.501 | Page 133<br><br>Page 140 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | 15-0215 Policy – Security Housing Unit (SHU)-Department of State Hospitals (DSH) – Psychiatric Inpatient Program (PIP) Case Conference 12.06.100<br><br>14-0117 Policy – Intermediate and Acute Mental Health Hospital Returns – Records Review 12.05.400<br><br>13-0419 Memo – Level of Care (LOC) Changes for Inmate-Patients (IPs) Returning from Department of State Hospital (DSH Facilities<br><br>15-0225 Procedure – Security Housing Unit (SHU) Dep. Of State Hospitals (DSH) – PIP Required Case Conference - Referral 12.06.100.P1 | Page 178<br><br>Page 180<br><br>Page 183<br><br>Page 185 |
| 12-6-17 | 16-0531 Memo – Release of Revised 5 Day Follow-Up Form<br><br>12-0509 Memo & Policy – Intermediate and Acute Discharge Follow-Up 12.06.501<br><br>15-0215 Policy – Security Housing Unit (SHU)-Department of State Hospitals (DSH) – Psychiatric Inpatient Program (PIP) Case Conference 12.06.100<br><br>13-0419 Memo – Level of Care (LOC) Changes for Inmate-Patients (IPs) Returning from Department of State Hospital (DSH) Facilities | Page 133<br><br>Page 140<br><br>Page 178<br><br>Page 183 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | 15-0225 Procedure – Security Housing Unit (SHU) Dep. Of State Hospitals (DSH) – PIP Required Case Conference - Referral 12.06.100.P1 | Page 185 |
| 12-7-1 | 14-0509 Implementation of the Security-Welfare Check (Guard One System)<br><br>14-0814 NDS Processing Procedure for MHSDS Inmates<br><br>14-0902 Implementation of NDS for MHSDS IMs Processing | Page 258<br><br>Page 268<br><br>Page 273 |
| 12-7-2 | 15-1021 Procedure- Rules Violation Report (RVR) Mental Health (MH) Assessment 12.07.601.P1<br><br>14-0915 Priority Case-by-Case Review of MHDS Long- Term Segregated Inmates<br><br>15-0911 Implementation of Revised RVR Processes Involving IM Participants in the MHSDS & DDP | Page 35<br><br>Page 278<br><br>Page 306 |
| 12-7-3 | 14-0707 Memo- New Procedure Regarding Mental Health (MH) Referral Chrono Form<br><br>15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 6<br><br>Page 11<br><br>Page 349 |
| 12-7-5 | 03.26.18 MH HQ Memo – MHTS References in MHSDS | Page 349 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | |
| 12-7-6 | 16-0607 Memo- Release of New Mental Health (MH) Post-Placement Screening Form for Administrative Segregation Units (ASU) Units<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 204<br><br>Page 349 |
| 12-7-7 | 16-0208 Policy- Short Term Restricted Housing (STRH) Mental Health (MH) Requirements 12 06 801<br><br>16-0204 Memo – Short Term and Long Term Restricted Housing (STRH & LTRH) Policies<br><br>15-0115 Memo – Creation of Correctional Clinical Case Management System (CCCMS) Short & Long Term Restricted Housing (STRH) & (LTRH) | Page 187<br><br>Page 190<br><br>Page 193 |
| 12-7-8 | 15-1030 Revised Administrative Segregation Unit Intake Cell Procedure | Page 312 |
| 12-7-10 | 15-0225 Memo- Review of Refusal to Attend MH Tx by Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) HUB & PSU Inmates | Page 210 |
| 12-7-12 | 14-0128 Procedure- Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200P1 | Page 8 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
| --- | --- | --- |
| 12-7-14 | 14-1222 Memo- Accurate Tracking of Mental Health Treatment Hours<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 90<br><br>Page 349 |
| 12-8-1 | 16-0204 Memo – Short Term and Long Term Restricted Housing (STRH & LTRH) Policies<br><br>15-0115 Memo – Creation of Correctional Clinical Case Management System (CCCMS) Short & Long Term Restricted Housing (STRH) & (LTRH)<br><br>16-0208 Policy- Long Term Restricted Housing (LTRH) Mental Health (MH) Requirements 12.06.802 | Page 190<br><br>Page 193<br><br>Page 213 |
| 12-8-2 | 15-0225 Procedure- Security Housing Unit (SHU) Dep. of State Hospitals (DSH)-PIP Required Case Conference - Discharge 12.06.100.P2 | Page 216 |
| 12-8-5 | 14-0707 Memo- New Procedure Regarding Mental Health (MH) Referral Chrono Form<br><br>15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601<br><br>15-1021 Procedure- Rules Violation Report (RVR) Mental Health (MH) Assessment 12.07.601.P1<br><br>15-0911 Implementation of Revised RVR Processes | Page 6<br><br>Page 11<br><br>Page 35<br><br>Page 306 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | Involving IM Participants in the MHSDS & DDP | |
| 12-8-6 | 14-0707 Memo- New Procedure Regarding Mental Health (MH) Referral Chrono Form<br><br>15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601 | Page 6<br><br>Page 11 |
| 12-8-7 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-8-10 | 11-0421 Memo- Structured Therapeutic Activity | Page 47 |
| 12-8-12 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-9-4 | 14-0128 Policy- Interdisciplinary Treatment Team (IDTT)- Level of Care (LOC) Decision 12.01.200 | Page 77 |
| 12-9-8 | 10-0311 Memo- Release Planning for Inmates Participating in the Institutions Mental Health Services Delivery System (MHSDS) | Page 49 |
| 12-9-9 | 15-0512 Memo- Documentation of Mental Health (MH) Evaluations and Treatment (Tx) Plans | Page 74 |
| 12-9-13 | 15-1021 Policy- Rules Violation Report Mental Health (MH) Assessment 12.07.601<br><br>15-1021 Procedure- Rules Violation Report (RVR) Mental Health (MH) Assessment 12.07.601.P1 | Page 11<br><br>Page 35 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | 15-0911 Implementation of Revised RVR Processes Involving IM Participants in the MHSDS & DDP | Page 306 |
| 12-10-1 | 02.02.18 Enhancements to the Suicide Prevention and Response Focused Improvement Teams | Page 354 |
| 12-10-2 | 13-0723 Memo- Mental Health (MH) Program Subcommittee<br><br>02.02.18 Enhancements to the Suicide Prevention and Response Focused Improvement Teams | Page 38<br><br>Page 354 |
| 12-10-3 | 02.02.18 Enhancements to the Suicide Prevention and Response Focused Improvement Teams | Page 354 |
| 12-10-4 | 13-0117 Policy- Suicide Risk Evaluation (SRE) Mentor Program<br><br>13-0205 Memo- Implementation of the Suicide Risk Evaluation (SRE) Mentor Program<br><br>13-0813 Memo- Suicide Prevention & Response (SPR) Focused Improvement Team (FIT) Coordinator Attendance at Inmate Advisory & Family Councils<br><br>16-0315 Memo- Revision to the Suicide Risk Evaluation (SRE) Mentoring Program<br><br>16-0324 Memo- Clarification of Suicide Risk Evaluation (SRE) Training Requirements<br><br>03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now | Page 223<br><br>Page 228<br><br>Page 231<br><br>Page 234<br><br>Page 237<br><br>Page 349 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | Reference the Electronic Health Record System<br><br>02.02.18 Enhancements to the Suicide Prevention and Response Focused Improvement Teams | <br><br>Page 354 |
| 12-10-5 | 02.02.18 Enhancements to the Suicide Prevention and Response Focused Improvement Teams | Page 354 |
| 12-10-6 | 14-0303 Memo- Annual Suicide Prevention Training<br><br>02.02.18 Enhancements to the Suicide Prevention and Response Focused Improvement Teams | Page 247<br><br>Page 354 |
| 12-10-7 | 15-1023 Memo- Completed Contacts Associated With Suicide Risk Evaluations<br><br>16-1214 Memo- No Requirement For an Interdisciplinary Progress Note To Accompany a Suicide Risk Evaluation or Assessment (SRE or SRASHE) | Page 250<br><br>Page 254 |
| 12-10-9 | 16-1214 Memo- No Requirement For an Interdisciplinary Progress Note To Accompany a Suicide Risk Evaluation or Assessment (SRE or SRASHE) | Page 254 |
| 12-10-12 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |
| 12-10-19 | 15-0409 Policy- Clinical Follow Up Requirements for IP Discharge & Transfer from MHCB, Alternative Housing, or Mental Health-OHU 12.05.501<br><br>16-0531 Memo – Release of Revised 5 Day Follow-Up Form | Page 129<br><br>Page 133 |
| 12-10-20 | 17-0901 Memo – Addendum | Page 150 |

| Program Guide Page | Policy/Memo Number and Name | Appendix C Page Number |
|---|---|---|
| | Revision of Mental Health Crisis Bed Discharge Custody Checks Policy | |
| 12-10-27 | 03.26.18 MH HQ Memo – MHTS References in MHSDS Program Guide 2009 and Associated Memorandum Now Reference the Electronic Health Record System | Page 349 |

# 16-0115

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 1/15/2016 |
| To: | Jennifer Shaffer, Executive Officer<br>Board Commissioners and Deputy Commissioners<br>Chief Executive Officers<br>Chiefs of Mental Health<br>Suicide Prevention Coordinators |
| From: | Katherine Tebrock, Esq.<br>Deputy Director, Statewide Mental Health Program<br>California Department of Corrections and Rehabilitation |
| Subject: | **MENTAL HEALTH REFERRALS FROM BOARD OF PAROLE HEARINGS STAFF** |

The Suicide Prevention and Response Focused Improvement Team (SPR FIT), Statewide Mental Health Program (SMHP), Division of Health Care Services (DHCS), California Department of Corrections and Rehabilitation (CDCR) is involved in ongoing efforts to improve suicide prevention strategies and enhance the mental health treatment of patients. This includes providing information to the Board of Parole Hearings (BPH) that allows staff to make direct mental health referrals to the SMHP.

When a BPH staff member identifies an inmate who may require mental health services, a Mental Health Referral Chrono (CDCR 128-MH5) may be completed (see attached), scanned, and emailed to the following mailbox: UrgentResponse@cdcr.ca.gov.

The Urgent Response mailbox is monitored Monday through Friday from 800 to 1600 hours. The referrals are received by DHCS headquarters mental health staff and immediately forwarded to the institution to complete.

<u>Reasons for mental health services referrals may include:</u>

- An inmate exhibiting signs or symptoms of mental illness that warrant further evaluation.
- An inmate experiencing negative reactions or significant distress.
- Any other concerns about an inmate's mental health or emotional stability.

P.O. Box 588500
Elk Grove, CA 95758

# MEMORANDUM

The CDCR 128-MHS distinguishes between three areas of response as follows:

- **Emergency:** These referrals are completed when there is any indication that an inmate may be a danger to self or others. Upon receipt of this referral at the institution, the inmate will be seen immediately.

- **Urgent:** These referrals are completed when there is significant concern about an inmate's mental health that do not involve inmate or staff safety. Upon receipt of this referral at the institution, the inmate will be seen within 24 hours.

- **Routine:** These referrals are for inmates who may present with mental health symptoms or distress but who do not require immediate services. Upon receipt of this referral at the institution, the inmate will be seen within five working days.

If you have any additional questions please contact Robert Horon, Senior Psychologist, Specialist, Clinical Support, SMHP, DHCS via phone 916-691-6858 or via email: Robert.Horon@cdcr.ca.gov.

Attachment

cc: Diana Toche
Cliff Kusaj
Russa Boyd
Angela Ponciano
Laura Ceballos, Ph.D.
Amy Eargle, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D
James Vess, Ph.D
Jennifer Johnson
Thomas Gilevich
Nicholas Weber
Regional Mental Health Administrators
Regional Health Care Executives

P.O. Box 4038
Sacramento, CA 95812-4038

State of California
**Mental Health Referral Chrono**
CDCR 128-MH5 (Rev. 05/14)

Department of Corrections and Rehabilitation
Form: Page 1 of 1
Instructions: Page 2

Inmate-Patient Name: ________ CDCR Number: ________ Housing: ________ Institution: ________

☐ Routine (Within 5 working days) ☐ Urgent (Within 24 hours) ☐ Emergency (Contact Mental Health Services immediately)

☐ Non English-speaking language: ________

REASON FOR REFERRAL: (Check the **primary reason(s)** and give an example or describe below under "Other.")

☐ History of psychiatric care need re-assessment
☐ Expresses suicidal ideation or recent attempts (Emergency)
☐ Incapable of caring for self / poor grooming
☐ Confused / disoriented / withdrawn
☐ Hostile / assaultive / poor self-control
☐ Taken advantage of by other inmates
☐ Poor attention span / difficulty following directions
☐ Needs psychotropic medication review
☐ Exhibits bizarre behavior (Describe below)
☐ Poor appetite / sad / fearful / nervous
☐ Unpredictable / bothers others
☐ Hears things / sees things / imagines things
☐ Insomnia / sleeps too much
☐ DDP Consult / re evaluation

☐ Other/Additional (Describe): ________

| REFERRED BY (Print Name) | TITLE | PHONE / EXTENSION | TIME | DATE |
|---|---|---|---|---|
| | | | | |

Received in Mental Health Services by: ________ (Print Name) Time: ________ Date: ________ Assigned to: ________ (Print Name)

For clinician only -- this was a referral for ☐ MHSDS ☐ DDP Inmate-Patient seen: Time: ________ Date: ________

Once complete, submit to mental health services.
Distribution: Scan into the eUHR, copy in C-file, copy to inmate.

State of California
**Mental Health Referral Chrono**
CDCR 128-MH5 (Rev. 05/14)

Department of Corrections and Rehabilitation

**Instructions**

**Purpose of Chrono:** This chrono is to be used by any custody, clinical, or nursing staff to refer and inmate-patient for a Mental Health Evaluation. Blank chronos should be available in all clinics and housing units. Once Complete, submit to mental health services.

1. Complete the identifying information at the top of the chrono. If applicable, enter the inmate-patient's Non-English language.
2. Check box for level of urgency: Routine – see within five working days; Urgent – see within one working day; Emergency – see immediately. Danger to self and/or others.
   **Contact Mental Health Services immediately for and emergency evaluation if**
   **1) the inmate-patient is currently a danger to self or**
   **2) the inmate-patient is a danger to others and you suspect a mental illness is involved. In all cases, immediately initiate safety precaution.**
3. Describe the observed behavior or problem.
4. Print name, title, and phone extension of the staff member making referral.
5. Enter time and date referral was made; **indicate the date and time contact was made with the Mental Health Services as well as the name of the staff person contacted.**
6. Mental Health Services shall enter the referral into the tracking system indicating time and date referral was made.
7. The clinician should indicate whether the referral was for MHSDS and/or DDP, and the time and the date the inmate-patient was seen.
8. A copy shall be filed in the Mental Health section of the electronic Unit Health Record, a copy filed in the central file, and a copy is provided to the inmate. Copies distributed according to local operating procedure.

# 14-0707



# HEALTH CARE SERVICES

## MEMORANDUM

Date: July 7, 2014

To: Chiefs of Mental Health
Chief Executive Officers

From: [signature] FOR:
Timothy G. Belavich, PH.D., MSHCA, CCHP
Director (A), Division of Health Care Services and
Deputy Director, Statewide Mental Health Program

Subject: **NEW PROCEDURE REGARDING MENTAL HEALTH REFFERAL CHRONO FORM**

When clinical staff receive mental health referrals via phone or in person and a Mental Health Referral Chrono (CDCR 128-MH5) form has not been received, the clinician must complete the CDCR 128-MH5 and submit it for entry into the Mental Health Tracking System (MHTS.net). The clinician should complete all sections of the CDCR 128-MH5, including:

1. Document the date and time the referral was received.
2. Briefly note the reason for referral.
3. Document the date and time the inmate-patient was seen.

This information must be entered into MHTS.net accurately and the record should be complete, as it is necessary to track and review:

1. The number of urgent and emergent referrals in order to accurately capture workload.
2. Timelines related to compliance with referrals.
3. Response to urgent and emergent referrals.

If you have questions or need additional information related to this policy, you may contact the Policy Unit by email: CDCR MHPolicyUnit@cdcr.

cc: Angela Ponciano, Associate Director, Policy and Clinical Support, Statewide Mental Health Program, Division of Health Care Services (DHCS)
Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS
Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health Program, DHCS
Edward Kaftarian, M.D., Chief of Telepsychiatry, Statewide Mental Health Program, DHCS
Regional Mental Health Administrators, Field Operations, Statewide Mental Health Program, DHCS

14-0128

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | January 2014 |
|---|---|---|
| CHAPTER 01: ACCESS TO CARE | Revision Date(s): | NA |
| PROCEDURE 12.01.200P1 INTERDISCIPLINARY TREATMENT TEAM – LEVEL OF CARE DECISION | Attachments: | Yes ☒ No ☐ |

Mental Health Staff shall complete a **CDCR MH-7388-B, Interdisciplinary Treatment Team – Level of Care Decision** (attached), at all Interdisciplinary Treatment Team (IDTT) meetings required by the Mental Health Services Delivery System (MHSDS) Program Guide (2009 Revision).

| *Step* | *Procedure* |
|---|---|
| 1. | Prior to IDTTs each day, the supervisor of the program or designee obtains the following information from MHTS.net:<br>A) A list of inmate-patients (IPs) scheduled for IDTT (*Appointments Pending Report*, filter for IDTT Appointments) or the IDTT Daily Log.<br>B) A record of the IPs who have had three or more Mental Health Crisis Bed (MHCB) placement requests initiated in MHTS.net during the last six months, including all MHCB placements regardless of where the IP was housed when the request was initiated, e.g., Outpatient Housing Unit (OHU), alternative housing, or overflow beds (*DMH Indicators-Management Report*).<br>C) Documentation of IPs who have had three or more CDCR 115-MH evaluations completed during the last three months (*DMH Indicators-Management Report*).<br>D) A list of the Enhanced Outpatient Program (EOP) IPs on a modified treatment plan who participated on average in less than 50% of their scheduled weekly structured treatment in the last three months [*Weekly Tx Hours Summary (High Refusers)*].<br>E) For EOPs, a list of the IPs who participated on average in less than five hours of structured treatment per week within the last three months [*Weekly Tx Hours Summary (High Refusers)*].<br>F) For Reception Center EOPs, a list of the IPs who participated on average in less than two and one-half hours of structured treatment per week within the last three months (*Weekly Treatment Hours Summary Report – Management Report*). |
| 2. | The treatment team discusses each IP seen during the IDTT process and decides, using the CDCR MH-7388-B as a tool, if the IP is being treated at the appropriate level of care or if the IP requires a referral to a higher level of care.<br>A) If an IP meets any one of the considerations from the CDCR MH-7388-B and the IDTT decides to refer the IP to a higher level of care:<br>i. The primary clinician (PC) or designee is responsible for notifying the Department of State Hospitals (DSH) Coordinator or designee of all IPs who are positive on any consideration.<br>ii. The staff responsible for closing out IDTT appointments will close out the appointment and on the "*Update/Complete*" screen will check the "7388-B" box. |

| | |
|---|---|
| | MHTS.net will create an electronic "*7388-B*" screen in the forms/chronos section of MHTS.net. The value for the "Meets Consideration" will be automatically defaulted to "No."<br>iii. The DSH Coordinator or designee will update the MHTS.net 7388-B as follows:<br>a) In the field "Meets Consideration" change the value from "No" to "Yes."<br>b) In the field "Considerations," check all of the considerations met by the IP.<br>c) In the field "Disposition," make the appropriate selection from the drop down menu.<br>iv. The DSH Coordinator or designee follows current CDCR referral procedures for IPs who are referred to higher level of care.<br>B) If an IP meets any one of the considerations from the CDCR MH-7388-B and the IDTT decides not to refer the IP to a higher level of care:<br>i. The IDTT representative is responsible for notifying the DSH Coordinator or designee of all IPs who are positive on any consideration.<br>ii. The PC or designee shall document and provide justification for not making a referral on the CDCR MH-7388-B, section 1-6A.<br>iii. Treatment modifications shall be summarized on the CDCR MH-7388-B.<br>iv. The staff responsible for closing out IDTT appointments will close out the appointment and on the "*Update/Complete*" screen will check the "7388-B" box. MHTS.net will create an electronic "*7388-B*" screen in the forms/chronos section of MHTS.net. The value for the "Meets Consideration" will be automatically defaulted to "No."<br>v. The DSH Coordinator or designee updates the MHTS.net electronic "7388-B" form as follows:<br>a) In the field "Meets Consideration," change the "No" to a "Yes."<br>b) In the field "Considerations," check all considerations met by the IP.<br>c) In the field "Disposition," make the appropriate selection from the drop down menu.<br>C) If an IP did not meet any of the considerations, and the IDTT does not refer to a higher level of care:<br>i. The PC or designee documents on the CDCR MH-7388-B that no considerations were met.<br>ii. The PC updates the IDTT paperwork according to the MHSDS Program Guide (2009 Revision) requirements.<br>iii. The staff responsible for closing out IDTT appointments will close out the appointment and on the "*Update/Complete*" screen will check the "7388-B" box. MHTS.net will create the electronic "*7388-B*" screen. The value for the "Meets Consideration" will be automatically defaulted to "No." |

**Forms:**
CDCR MH-7388, Mental Health Treatment Plan
CDCR MH-7388-B, Interdisciplinary Treatment Team – Level of Care Decision

15-1021

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | 10/21/2015 |
|---|---|---|
| CHAPTER 7: SPECIAL MENTAL HEALTH NEEDS AND SERVICES | Revision Date(s): | NA |
| | Supersedes: | |
| 12.07.601 RULES VIOLATION REPORT MENTAL HEALTH ASSESSMENT | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

**Policy**

California Department of Corrections and Rehabilitation (CDCR) mental health providers shall conduct an assessment and complete the Rules Violation Report: Mental Health Assessment (CDCR 115-MH-A) for a patient or inmate who receives a Rules Violation Report (RVR) (CDC 115) and meet the following criteria:

1. Placed in the following levels of mental health care:
   - Enhanced Outpatient Program
   - Mental Health Crisis Bed
2. Participants in the Developmental Disability Program.
3. Participants in the CCCMS program with Division A, B or C offenses or any offense that may result in a Security Housing Unit term.
4. Inmates that display bizarre or unusual behavior which is uncharacteristic for the inmate.
5. Inmates who engaged in indecent exposure or sexual disorderly conduct.

The assessing clinician shall obtain informed consent from the patient prior to completing the assessment and advise the patient of the purpose and non-confidential nature of the assessment process. If the patient declines the interview, the assessment will take place based on record review. The clinician's responses to each of the questions on the CDCR 115-MH-A shall be based on a review of relevant records, staff consultations, and interview with the patient. Mental health staff shall consult with custody throughout the assessment and ensure that all relevant mental health issues, cognitive and adaptive functioning deficits are considered in the adjudication of the RVR. When clinically indicated, adjustments to the patient's mental health treatment shall be made by the clinician to ensure behavioral issues related to the issuance of the RVR are addressed. Mental Health staff shall return the completed CDCR 115-MH-A to custody within eight (8) calendar days.

**Responsibilities**

The Chief of Mental Health or designee at each institution is responsible for the implementation of this policy.

**Purpose**

To promote compliance with the Rules Violation Report: Mental Health Assessment process and provide guidance to mental health staff in completing the revised CDCR 115-MH-A.

**Compliance Indicators**

To be in compliance with this policy, clinicians shall:

- Return the completed the CDCR 115-MH-A to custody within eight (8) calendar

days for all inmates who meet criteria for a mental health assessment.

- Rely on multiple sources of information, including appropriate staff consultations, when completing the CDCR 115-MH-A.
- Obtain informed consent from the inmate prior to conducting the assessment.
- Consult with custody throughout the adjudication process.
- Provide appropriate follow-up care as indicated by the assessment.

**References**

- Department Operations Manual
- *California Code of Regulations (CCR), Title 15, Division 3*
- Memorandum dated May 13, 2015, titled, "*Training Announcement for Custody and Clinical Staff Regarding The Revised Rules Violation Report Mental Health Assessment Process.*"

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

# 17-0705

 # HEALTH CARE SERVICES

MEMORANDUM

| | |
|---|---|
| **Date:** | 7/5/2017 |
| **To:** | Wardens<br>Chief Executive Officers<br>Chiefs of Mental Health |
| **From:** | |

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program

JEFF MACOMBER
Deputy Director, Facility Support
Division of Adult Institutions

VINCE CULLEN
Director
Corrections Services

**Subject:** **MENTAL HEALTH APPOINTMENT REFUSALS**

This memo clarifies the Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapter 1.3, Scheduling and Access to Care Procedure, Section VI, C, 3, b, 5 and 6 (Attached) which states, "The reason for the failure to report shall be documented by health care staff on an Interdisciplinary Progress Note and filed in the health record. Custody staff shall be responsible to document the patient's refusal to report to the priority health care ducat on a CDC 115, Rules Violation Report (RVR)," does not apply to mental health appointments. Patients in the Mental Health Services Delivery System shall not be written an RVR or a Counseling Only Rules Violation Report (formerly known as a CDCR 128A, Custodial Counseling Chrono), for refusing a mental health appointment in person.

The priority ducat process must be used for all mental health appointments and mental health patients shall be encouraged to refuse in person.

All mental health clinical staff are reminded that it is a clinical responsibility to inform mental health patients regarding the risks of refusing treatment. When a patient does not refuse a mental health appointment in person, it is preferred that the mental health clinician:

1. Go to the patient to encourage the patient to participate in a confidential contact.
2. Confirm the refusal.
3. Discuss risks associated with refusing treatment.
4. Discuss reasons for the refusal.

P.O. Box 588500
Elk Grove, CA 95758

# MEMORANDUM

This contact shall not interfere with any scheduled groups. All Mental Health Services Delivery System Program Guide (2009 Revision) requirements regarding refusals and timely appointments must be followed.

If a visit with the patient is not feasible, at the next scheduled appointment the mental health clinician shall:

1. Confirm the refusal with the patient.
2. Discuss risks associated with refusing treatment.
3. Discuss reasons for the refusal.

Per current policy, when any staff observe decreased program participation, behaviors that are not typical of the patient, or other concerns are noted, this information shall be documented on a CDCR 128-MH-5, Mental Health Referral Chrono, and submitted to Mental Health per local operating procedure.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.

Attachment

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives
Kathleen Allison
Connie Gipson
Dawn Lorey
Associate Directors, Division of Adult Institutions

P.O. Box 588500
Elk Grove, CA 95758

 HEALTH CARE SERVICES

| VOLUME 4: MEDICAL SERVICES | Effective Date: 06/2016 |
|---|---|
| CHAPTER 1.3 | Revision Date: 06/2017 |
| 4.1.3 SCHEDULING AND ACCESS TO CARE PROCEDURE | Attachments: Yes ☒ No ☐ |

## I. PROCEDURE OVERVIEW

This procedure describes the systems and processes which California Correctional Health Care Services (CCHCS) staff shall utilize to optimize access to care and maintain an effective and efficient scheduling system to reduce wait-times. This includes a flexible appointment system that accommodates various encounter appointment types, visit lengths, same-day visits, and scheduled follow-ups as well as strategies to increase efficiency, such as consolidated appointments. This procedure also specifies roles and responsibilities for key staff involved in the scheduling system.

## II. DEFINITIONS

**Backlog:** An undesirable condition that occurs when today's work (both the planned work and work that is unplanned, but needs to be accomplished by today) is not completed today.

**Bundling:** When a patient has multiple pending appointments, setting appointments sequentially on the same day so that a patient need only be seen in one encounter for multiple purposes. Bundling helps increase clinic efficiency, meet mandated timeframes, and limit the need for custody escorts, lessening redundant work for custody and health care staff as well as making appointments more convenient for the patient.

**Care Team:** An interdisciplinary group of health care professionals who combine their expertise and resources to provide care for a panel of patients.

**Ducat:** A common term for a CDC 129, Inmate Pass. There are two types of ducats, "Priority" and "Non-Priority." Priority ducats are embossed with the word "Priority" and are used for scheduled health care appointments. Non-Priority ducats are printed on plain white paper and are used for unscheduled appointments and/or unescorted movement from one location to another.

**Interventions:** Centers on the execution of the specific care management activities that are necessary for accomplishing the goals set forth in the patient's treatment plan, linking the patient to the services needed to optimize health.

**Non-Business Days:** Saturdays, Sundays and State holidays.

**Normal Business Hours:** A minimum of eight hours per business day. These hours may vary by institution, but are generally between the hours of 0700 and 1800.

**Open Access:** A scheduling strategy that involves "doing today's work today" and seeing patients as soon as possible after they request care, and on the same day if appropriate. Open access slots are appointment times or blocks that are left open and unscheduled until one to two days prior to that date, allowing the Care Team to accommodate walk-in patients, patients with urgent health needs, and patients with routine health needs that would benefit from expedited services.

**Scheduling Support Staff:** The member of the Care Team who ensures that all patients are appropriately scheduled and that Care Team members have the information they need for planned patient encounters. This is usually administrative support staff.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

**Superusers:** Individuals designated as superusers in the scheduling system have additional permissions within the system, including the ability to add or change providers or locations.

## III. RESPONSIBILITIES

**A. Statewide**

California Department of Corrections and Rehabilitation (CDCR) and CCHCS departmental leadership at all levels of the organization, within the scope of their authority, shall ensure administrative, custodial, and clinical systems are in place and appropriate tools, training, technical assistance, and levels of resources are available to ensure the scheduling system is successfully implemented and maintained.

**B. Regional**

Regional Health Care Executives are responsible for implementation of this procedure at the subset of institutions within an assigned region.

**C. Institutional**

1. The Chief Executive Officer (CEO) has overall responsibility for implementation and ongoing oversight of the scheduling system at the institution and patient panel level. The CEO delegates decision-making authority to the Chief Nurse Executive (CNE) for daily operations of the scheduling system and ensures adequate resources are deployed to support the system including, but not limited to the following:
   a. Ensuring access to and utilization of equipment, supplies, health information systems, Master Registries, Patient Summaries, and evidence-based guidelines.
   b. Assigning patients to a Care Team.
   c. Maintaining a list of the core members of each Care Team, which shall be available to all institutional staff. Patients shall be informed of their assigned Care Team members at intake and/or upon request.
   d. Ensuring consistent Care Team staffing with a back-up system for core members.
   e. Providing Care Team members with the information they need during huddles (e.g., communication of on-call information).
   f. Ensuring protected time for Care Teams to hold daily huddles.
   g. Documenting and tracking huddle actions and attendance.
   h. Ensuring that at least monthly, each Care Team conducts a Population Management Working Session utilizing tools such as Dashboards, Master Registries, and Patient Summaries to address concerns related to potential gaps in care and improved patient outcomes including, but not limited to:
      - High risk patients.
      - Contract Management.
      - Patient safety alert.
      - Trends in access to care.
      - Surveillance of communicable disease.
      - Patient risk stratification.
   i. Adequately preparing new Care Team members to assume team roles and responsibilities.
   j. Assessing competence of existing Care Team members.
   k. Updating procedures, roles and responsibilities as new tools and technology become available.

l. Reviewing/comparing institution Care Team performance, including the overall quality of services, health outcomes, assignment of consistent and adequate resources, utilization of Dashboards, Master Registries, Patient Summaries, and decision support tools and address issues as necessary.
m. Providing Care Team members with adequate resources, including protected time, staffing, physical plant, information technology, and equipment/supplies to accomplish daily tasks.
n. Working with custody staff to minimize unnecessary patient movement that results in changes to a patient's panel assignment.
o. Ensuring, in collaboration with the Warden, that the institution establishes a Local Operating Procedure by which priority health care ducats are issued and delivery by custody staff is verified and documented.
p. Requiring institution leadership to establish a back-up system to ensure that scheduling queues are managed when Scheduling Support staff are on leave or otherwise unable to meet daily monitoring requirements.

2. The CEO and all members of the institution leadership team are responsible for establishing an organizational culture that promotes teamwork across disciplines.
3. The CNE is responsible for:
   a. The overall daily operations of the scheduling system for medical care.
   b. The coordination of health care between health care scheduling systems.
   c. Oversight and management of the scheduling processes and resources, including personnel.
   d. Ensuring that the institution has a designated lead scheduling supervisor to monitor scheduling processes on a daily basis and identify and address or elevate barriers to access.
   e. Ensuring that Scheduling Support staff is available for all clinical areas.
4. The Chief Medical Executive (CME) is responsible for the overall medical management of patients and ensures resources are available to meet the needs of the population.
5. The Supervising Registered Nurse and Chief Physician and Surgeon shall meet to review the Care Teams' performance, including the overall quality of services, health outcomes, level of care utilization and shall utilize Dashboards, Master Registries, Patient Summaries, and decision support tools to address or elevate issues as necessary.

## IV. GENERAL SCHEDULING CONCEPTS

**A. Standardized Scheduling System**

All institutions shall use the standardized statewide scheduling system.

**B. Scope of the Scheduling Process**

The scheduling process shall begin upon a patient's arrival at CDCR and continue throughout the patient's stay.

**C. Scheduling System User Designations and Accessibility**

Institutions shall designate two to three staff members as superusers in the scheduling system. During clinic hours, at least one superuser shall be available to assist the scheduler to add a provider or location.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

V. **ACCESS TO HEALTH CARE SERVICES**

A. **Hours of Access**

1. All CDCR inmates shall have access to medically necessary health care services seven days per week, 24 hours per day.
   a. RNs shall be onsite at the institution seven days per week, 24 hours per day.
   b. Medical, mental health, and dental services shall be available at any time.
2. Each institution shall establish hours of operation for Primary Care Clinics, generally at least eight hours per day, Monday through Friday, excluding State holidays.

B. **Methods of Access**

1. Licensed Health Care Initiated Appointments.
   a. Access to care includes planned health care encounters, scheduled over time at appropriate intervals and initiated by licensed health care staff as part of ongoing treatment planning and care management to address health care needs.
2. Patient Request for Services:
   a. Access to care also includes episodic encounters requested by patients either through written request or verbal report or demonstration of urgent/emergent health care needs.
   b. At any time, patients with health care needs may submit a CDC 7362, Health Care Services Request Form. Patients with urgent health care needs may complete a CDC 7362 or notify any correctional staff or any other institutional staff member for assistance. Patients with life-threatening conditions shall receive immediate medical attention.
   c. If a patient is unable to complete a CDC 7362, health care staff shall complete the form on behalf of the patient. Health care staff shall document the complaint and the reason the patient did not personally complete the CDC 7362 and shall sign and date the CDC 7362.
   d. Institutions shall ensure the CDC 7362 is available to patients in the housing units, clinics and Reception Centers. Housing unit staff and health care staff shall make the CDC 7362 available upon request. Each institution shall have at least one locked box on each yard/facility designated for depositing the CDC 7362 by patients.
3. Initial Review and Triage of a CDC 7362
   a. On normal business days:
      1) A designated health care staff member shall collect the CDC 7362s from the designated areas, document the date and time of pickup and deliver the forms to the Primary Care RN for review.
      2) The Primary Care RN shall review each CDC 7362 and identify those that describe symptoms of a medical, mental health, or dental condition. The Primary Care RN shall determine whether the patient requires urgent/emergent or routine care. The RN shall immediately refer urgent/emergent medical, mental health, and dental needs to the appropriate clinician for evaluation consistent with established program guidelines.
      3) All CDC 7362s that describe symptoms shall be seen by the Primary Care RN within one business day.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

    4) The Primary Care RN shall separately address CDC 7362s that do not include symptoms, such as requests for eyeglasses or medication renewals, routing them to appropriate health care staff for follow up.

    5) CDC 7362s that do not describe symptoms shall be delivered the same day to the designated program representative on normal business days. A CDC 7362 requesting services from more than one area (e.g., medical and dental) shall be copied and delivered to the requested service area by the RN reviewing the CDC 7362.

  b. On non-business days:

    1) All CDC 7362s shall be sent to the Triage and Treatment Area (TTA) RN for triage. Upon receipt of the collected forms, the TTA RN shall review, initial and date each CDC 7362. The TTA RN shall ensure that the routine CDC 7362s are delivered to the Primary Care RN that is assigned to that patient by the beginning of the next business day.

    2) The TTA RN shall determine whether the patient requires urgent/emergent or routine care, and shall take direct action to coordinate care for patients with emergency or urgent conditions. The TTA RN shall immediately refer urgent/emergent medical, mental health, and dental needs to the appropriate clinician for evaluation consistent with established program guidelines.

4. Emergency Care Required

  a. Patients with life-threatening medical symptoms shall receive immediate medical attention (Refer to Inmate Medical Services Policies and Procedures [IMSP&P], Volume 4, Chapter 12.1, Emergency Medical Response System Policy).

  b. For patients with a potential mental health and/or dental urgent/emergent condition, during normal business hours, the Primary Care RN shall immediately assess the patient and communicate findings directly with designated mental health and/or dental staff.

  c. The Primary Care RN shall ensure immediate transportation of the patients to the designated area for evaluation and treatment. When a patient is referred to the mental health program, the CDC 7362 shall be accompanied by a CDCR 128-MH5, Mental Health Referral Chrono.

  d. Patients with a potential mental health emergency must remain under continuous observation until the patient is evaluated by a mental health clinician or by TTA medical staff.

5. Urgent Care Required

  a. Patients with urgent medical symptoms shall be scheduled for a same day face-to-face visit with the Primary Care RN and other members of the Care Team as indicated by symptoms.

  b. For patients with urgent symptoms involving more than one clinical discipline, the Primary Care RN shall ensure any urgent medical, dental, and/or mental health conditions are evaluated as described above.

  c. When the patient requests services from more than one clinical discipline (e.g., medical and dental) on the CDC 7362, health care staff shall copy and forward the request to the other clinical discipline as soon as possible. The original shall be forwarded to the first requested service area.

**VI. SCHEDULING STRATEGIES**

CCHCS staff shall use strategies such as open access, bundling, co-consultation, and collaborative planning of the clinic schedule to optimize access to services.

A. **Services that Require Appointments**

1. All health care encounters shall be considered appointments and shall be entered into the Scheduling System including, but not limited to, the following:
    - Receiving and Release screenings and assessments.
    - Episodic care encounters, including Primary Care RN visit and provider referrals.
    - Well patient visits.
    - Chronic care encounters.
    - TTA encounters.
    - Laboratory and radiology services.
    - High priority Specialty services.
    - Other Specialty services as indicated.
    - Care management encounters.
    - Inter-disciplinary treatment planning sessions.
    - Recurring patient monitoring or follow-up appointments, such as dressing changes and blood pressure checks.
    - Injection appointments.
    - Public health screening and treatments.
    - Patient education and non-adherence counseling.
    - Special situations, such as hunger strike evaluations and monitoring.
    - Follow up after return from higher level of care.
    - Health care appeals.
2. The Care Team shall ensure that existing health care appointments, including specialty referrals, are rescheduled at the receiving institution, as indicated. All members of the Care Team shall ensure that follow-up appointments are entered into the "To Be Scheduled" queue within the Scheduling System including, but not limited to, the following:
    - TTA encounters.
    - Receiving and Release intake.
    - Discharge from a higher level of care.

B. **Translation Services**

Translation services (including sign language) shall be made available to patients as necessary, via certified bilingual health care staff, certified bilingual CDCR staff, or by utilizing a certified interpretation service. Each institution shall maintain a contract for certified interpretation services. (Refer to IMSP&P, Volume 1, Chapters 28.1 and 28.2, Effective Communication Policy and Procedure).

C. **Scheduling**

1. General Requirements
    a. Health care staff shall ensure that lists for scheduled appointments are communicated to custody staff no later than one business day prior to the scheduled visit.

b. Each institution shall establish a procedure by which health care ducats shall be issued as priority ducats and delivery by custody is verified/documented. This procedure shall include the following:
   - The method by which priority health care ducats are delivered to each patient.
   - The individual responsible for issuing priority health care ducats.
   - Verification by custody staff that the priority health care ducats were issued to the patient.
   - A method of re-routing priority health care ducats to patients.

c. The patient is responsible to report to the health care appointment at the time indicated on the priority health care ducat.

d. Developmental Disability Program/Disability Placement Program designated patients shall be provided specific instruction regarding the time and location of their scheduled appointment. The custody staff delivering the priority health care ducats shall communicate effectively and appropriately based upon the patient's ability to understand to ensure that the patient(s) arrives at the designated appointment location.

2. Custody staff shall ensure delivery of priority health care ducats to patients prior to his/her scheduled appointment.

3. Failure to Report for a Medical and/or Dental Appointment

a. If the patient (including patients who are in the Mental Health Services Delivery System) fails to report to a scheduled Medical and/or Dental appointment, the assigned health care access clinic officer shall immediately contact the designated housing unit or work/program assignment to locate the patient and have him/her escorted or have the patient report to the scheduled Medical and/or Dental appointment.

b. Custody staff shall locate the patient and escort the patient to the appointment or direct the patient to report to the scheduled Medical and/or Dental appointment. If necessary, custody staff shall order the patient to comply with the instructions on the priority ducat.

1) If the patient continues to refuse, custody staff shall advise the patient that he/she is in violation of Title 15, Section 3014, Calls and Passes, which states "Inmates must respond promptly to notices given in writing, announced over the public address system, or by any other authorized means."

2) If the reason the patient did not report as ducated was beyond the patient's control (e.g., out to court), custody staff shall advise health care staff of this fact.

3) If the reason the patient did not report as ducated was due to the patient refusing to report as directed, custody staff shall escort the patient to the health care area for health care staff to discuss the implications of refusing health care treatment. Licensed health care staff shall counsel the patient and have the patient sign the CDC 7225, Refusal of Examination and/or Treatment, if he/she continues to refuse treatment after the counseling. The CDC 7225 shall be filed in the health record.

4) Patients who are insistent in their refusing to report shall not be subject to cell extraction or use of force to gain compliance with the priority health care ducat. In these instances, licensed health care staff must respond to the patient's

housing unit to provide the necessary patient education regarding the refusal. Custody staff cannot accept refusals on behalf of the patient, nor can refusals be taken over the phone.

5) The reason for the failure to report shall be documented by health care staff on an Interdisciplinary Progress Note and filed in the health record.

6) Custody staff shall be responsible to document the patient's refusal to report to the priority health care ducat on a CDC 115, Rules Violation Report.

c. Medical and/or Dental appointments shall be rescheduled as clinically indicated.

4. Failure to Report for a Mental Health Appointment

a. If a patient in the Mental Health Services Delivery System refuses to report for a Mental Health appointment in person, custody staff shall not complete a CDC 115 or a Counseling Only Rules Violation Report (formerly known as a CDCR 128A, Custodial Counseling Chrono).

b. Refer to the CDCR Mental Health Services Delivery Systems Program Guide, 2009 Revision, for additional procedures regarding Mental Health appointment refusals.

**D. Lockdown and Other Security Concerns**

1. Health care services shall continue to be provided during alarms/incidents not occurring on the clinic yard. For alarms/incidents occurring on the clinic yard, clinic services shall resume as soon as safely possible during and following the alarms/incidents.

2. During a facility or prison lockdown, health care staff shall coordinate with custody staff to facilitate continuity of care. Custody personnel shall escort patients to scheduled clinic appointments; lockdown shall not prevent the completion of scheduled medical appointments.

3. In restricted housing units and facilities/housing units on lockdown status, a system shall be maintained to provide patient access to health care services. Access to health care services shall be accomplished via daily cell front rounds by health care staff for the collection of the CDC 7362. The rounds and collection of the CDC 7362 shall be documented by nursing staff in the housing unit logbook.

**E. Clinic Closure / Cancellation of Scheduled Appointments**

Any modification of clinic hours, clinic closure, and cancellation or rescheduling of scheduled appointments requires the approval of the CEO or a designated clinical executive.

**F. Timeframes**

1. Under the Complete Care Model, the goal of all Care Teams is to provide timely access to care and whenever possible "complete today's work today" to allow immediate access to necessary services.

a. To ensure that patients are not exceeding acceptable thresholds for timely care, the timeframes should be viewed as the latest possible time that a patient may be seen and not as a guideline for scheduling.

b. Scheduling Support staff shall set appointments several days in advance of the acceptable threshold.

2. Attachment B, Access Timeframes, provides a list of all applicable scheduling timeframes as well as suggested scheduling windows to ensure that appointments are within the applicable timeframes.

**G. Duration of Appointments**

Attachment C, Appointment Time Duration Template, shall be used as a guideline for appointment durations. Appointments shall be created with differing appointment lengths (in five minute increments) to accommodate the needs of the patient. A "one size fits all" schedule where each patient is given the same 15, 20, or 30-minute appointment duration is not appropriate.

**H. Scheduling Queues and Building the Clinic Schedule**

Health care staff shall place appointments that need to be scheduled in the "to be scheduled" queue in the scheduling system. Scheduling Support staff are responsible for monitoring the "to be scheduled" queue for each Care Team and clinic location daily with particular focus on scheduling appointments for patients within several days of the relevant threshold date.

**I. Increasing Patient Show Rates and Clinic Efficiency**

When scheduling patients, health care staff shall consider patient preferences regarding access, such as providing appointment times that do not interfere with the patient's work shifts or classes.

**J. Recurring Appointments**

Scheduling Support staff shall use the recurring appointment function when a provider or clinician's order will result in a series of appointments with a specified frequency.

**K. Rescheduling**

Scheduled appointments must be rescheduled if the appointment date or priority of the appointment changes.

**L. Cancelling Appointments**

Health care staff are prohibited from deleting appointments from the scheduling system.

**M. Tracking "Reasons Not Seen"**

Health care staff shall record and track reasons that patients are not seen as scheduled. Health care staff shall use the standard "Reasons Not Seen" as listed in the scheduling system.

**N. Closing Appointments**

Scheduling Support Staff shall obtain the required information from the Care Team to close out appointments. The Primary Care Scheduler, or designee, is responsible to contact members of the Care Team to obtain any missing information or address discrepancies. Required information may include, but is not limited to, the following:

- Clinic Log.
- CDC 7362 review.
- Physician's Orders Form.
- TTA Log.
- Ducat List.

**O. Open Access**

1. Institutions shall use open access slots to ensure that patients are seen in an efficient manner, in a clinically appropriate setting, and within all mandated timeframes. Approximately 20 percent of Primary Care Clinic appointment slots shall remain open and available for same-day or next-day urgent clinical issues or appointments with short mandated timeframes.
2. Primary Care Clinics shall designate specific times each day as open access times for the Care Team.

3. During daily huddles, the Care Team shall identify patients that need to be scheduled into the same-day or next-day open access times and ensure that this information is communicated to the Scheduling Support staff if he or she is not present at the huddle.
4. Appointments that may be appropriate for open access slots include, but are not limited to, the following:
   - Follow-up on abnormal diagnostic results or other critical abnormal clinical findings.
   - Community hospital discharges.
   - Urgent TTA follow-up.
   - High priority specialty referral follow-up.
   - High-risk/complex patients new to the Care Team.
   - Patients whose condition has become clinically complex.
   - Other urgent referrals.
5. If open access slots remain available even after all urgent follow-ups are addressed, these slots may be used to schedule other routine appointments.
6. With the exception of certain clinics (e.g., Administrative Segregation) where need and coverage may vary, clinic schedules shall be booked at least three to seven calendar days ahead of time (except for "Open Access" slots).

**P. Bundling Appointments**

To increase clinic efficiency and timely access, the Scheduling Support staff shall review all pending appointments for possible bundling and discuss with the Care Team at the daily huddle to determine the total time required for the patient.

**Q. Co-Consultation**

Throughout the day, the Care Team shall look for opportunities to collaborate using co-consultation strategies to resolve in one visit issues that would likely result in a referral to another member of the Care Team, eliminating the need for the patient to return to the clinic for a second time.

**R. Chaperones**

Chaperones shall be present during all examinations of patients involving genitalia, rectal, or breast examinations.

## VII. MANAGEMENT AND SUSTAINABILITY

**A. Care Team**

1. At least monthly, the Care Team shall evaluate the effectiveness and efficiency of scheduling processes and overall access to care. The Care Team shall consider trends in the following:
   a. Adherence to access timeframes.
   b. Proportion of appointments seen as scheduled and reasons patients were not seen as scheduled.
   c. Episodic Care referral rates to the Primary Care Provider (PCP).
   d. Effectiveness of scheduling strategies, such as bundling and co-consultation.
   e. Design of clinic schedules (e.g., number of open access slots, allotting certain time blocks for different appointment types).
   f. Productivity.
   g. Demand management, including episodic care, chronic care, chronos, medication refusals and other types of non-adherence counseling, appeals, etc.

h. Allocation of work across team members.
i. Clinic closures.
j. Specialty provider network issues.
k. Accuracy of scheduling data.
l. Security and construction impacts to access.
m. Population management health care alerts.

2. Institution leadership shall designate a standing committee reporting to the local Quality Management Committee for oversight of the scheduling monitoring activities.
3. The Care Team shall take corrective action to resolve and/or elevate concerns identified in the review. The Care Team shall review and corrective action shall be documented and forwarded to the designated committee.

**B. The Scheduling Supervisor**

1. The Scheduling Supervisor shall review select information daily to identify and immediately address scheduling system problems.
2. The Scheduling Supervisor shall determine whether all Scheduling Support staff, Primary Care RNs, and PCPs are in attendance at their respective clinics that day, and shall verify that appropriate back-up has been provided if any of these staff are unavailable.
3. The Scheduling Supervisor shall review available scheduling management reports on a daily basis, including, but not limited to, the following:
   - Scheduling system data to identify data entry errors.
   - Scheduling queues not managed properly.
   - Duplicate appointments.
   - Unorthodox clinic scheduling practices and other scheduling system problems.
4. The Scheduling Supervisor shall review clinic scheduling strategies to ensure that clinics are optimizing strategies such as open access, bundling, and co-consultation.
5. The Scheduling Supervisor shall work with the CNE to improve communication processes within the Care Team and across health care settings that impact scheduling and access, including daily huddles.
6. The CNE and Scheduling Supervisor are responsible for providing frequent feedback to health care staff involved in the scheduling system on their individual performance based upon findings from daily observation of scheduling processes.

**C. System Monitoring**

1. The CEO and leadership team shall review institution-wide scheduling and access to care data monthly in the context of Quality Management Committee and subcommittee meetings.
2. To ensure accuracy of scheduling system data, the institutional leadership shall:
   a. Periodically evaluate the reliability of scheduling system data through methods such as comparison with independent data sources, like movement or ducat reports and progress notes, or audits for abnormal or incomplete entries.
   b. Take effective action to remedy unreliable data, including creating or revising decision support, updating desk procedures, and redesigning orientation and training strategies.
   c. Re-validate problematic data monthly until the data reliability issue is resolved.
3. Quality committees shall take action as appropriate to investigate quality problems and develop interventions to improve access.

**D. Training and Decision Support**

1. All institution health care staff shall be trained in scheduling and access to care. A system for the orientation, mentoring, and cross-training of all critical positions in the scheduling system shall be maintained.
2. Institutions shall provide all Scheduling Support staff with a desk procedure with guidance on how to accurately and effectively employ the scheduling system, with information tailored to different work locations and scheduling functions. The desk procedure shall be updated as scheduling processes change.
3. Institutions shall develop or adopt decision support tools (e.g., forms, checklists, cards that can be taped to a computer monitor) to prompt health care staff in different roles in the scheduling system to fulfill their roles and responsibilities (Refer to Attachment A, Detailed Scheduling Roles and Responsibilities) including, but not limited to, the following:
   a. Prompting clinic staff to communicate clearly to Scheduling Support staff.
   b. Giving tips on how to enter data in a way that is recognized by the scheduling system.
   c. Reminding Scheduling Support staff and clinic staff of new scheduling procedures.
4. Ongoing Staff Development
   a. Staff involved in the scheduling system shall receive training on changes to scheduling processes and tools as they evolve and periodic refresher training on their particular roles and responsibilities.
   b. At least monthly, the CME and CNE shall review each Primary Care Clinic's schedule plan, utilization of open access time, and the number of additional "add-on" appointments to determine if adjustment needs to be made to the overall clinic schedule plan to meet patient care needs.

## VIII. ATTACHMENTS

- Attachment A, Detailed Scheduling Roles and Responsibilities
- Attachment B, Access Timeframes
- Attachment C, Appointment Time Duration Template

## IX. REFERENCES

- California Code of Regulations, Title 15, Division 3, Chapter 1, Article 1, Section 3014, Calls and Passes
- California Correctional Health Care Services, Inmate Medical Services Policies and Procedures, Volume 1, Chapters 28.1 and 28.2, Effective Communication Policy and Procedure
- California Correctional Health Care Services, Inmate Medical Services Policies and Procedures, Volume 4, Chapter 1.4, Population and Care Management Services Procedure
- California Correctional Health Care Services, Inmate Medical Services Policies and Procedures, Volume 4, Chapter 12.1, Emergency Medical Response System Policy
- California Department of Corrections and Rehabilitation, Mental Health Services Delivery System Program Guide, 2009 Revision
- Agency for Healthcare Research and Quality – Patient Centered Medical Home Resource Center, http://www.ahrq.gov/

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

- The Joint Commission Primary Care Medical Home Certification, http://www.jointcommission.org/accreditation/pchi.aspx
- National Committee for Quality Assurance – Patient-Centered Medical Home Recognition, http://www.ncqa.org/Programs/Recognition/Practices/PatientCenteredMedicalHomePCMH.aspx

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## ATTACHMENT A
## Detailed Scheduling Roles and Responsibilities

| ROLE | RESPONSIBILITIES |
|---|---|
| CEO | 1. Coordinate with the Warden to ensure all scheduled health care appointments are considered a priority ducat. Priority health care ducats shall take priority over all other scheduled institution appointments.<br>2. Identify access and scheduling as a priority for the institution and communicate that on every level.<br>3. Monitor scheduling performance on a regular basis through the local Quality Management Committee to help keep the focus on this area and sustain improvements.<br>4. Ensure that clinic schedules are determined at least 14 days in advance, or more, if possible.<br>5. Define each primary care clinic's operating hours.<br>6. Define the number of appointment slots on any given business day, in any given primary care clinic, for each primary care member.<br>7. Ensure primary care clinics on main yards have consistent providers with reliable schedules.<br>8. Ensure an "Open Access" scheduling model and that there are mechanisms in place to monitor supply and demand, and adjust short-term appointment supply as needed (i.e., more on Mondays and Fridays or after holidays).<br>9. Ensure sufficient resources to accomplish the scheduling of care, including training, designated and protected space, staffing, and proper equipment.<br>10. Ensure that the scheduling system data input is occurring as designed in every location and for all intended processes.<br>11. Set the expectation that all staff will work to update institution processes as needed to utilize the scheduling system as it was designed.<br>12. Utilize performance reports produced by the scheduling system for quality evaluation and improvement activities. |
| CNE | 1. Be responsible for the overall daily operations of the scheduling system for medical care.<br>2. Be responsible for the overall coordination of health care between health care scheduling systems.<br>3. Be responsible for the oversight and management of the scheduling personnel.<br>4. Ensure there is an institution contact list for each scheduler.<br>5. Ensure there is a problem resolution process in place to identify and resolve any problems that occur in the scheduling function.<br>6. Ensure patients are scheduled efficiently without redundancies (i.e., bundling appointments as indicated).<br>7. Ensure stratification of appointments (allowing sufficient time for certain types of patients, e.g., high risk intake versus episodic care).<br>8. Work with the Primary Care Team to schedule appointments, anticipate the patient's needs in advance, and schedule to prevent lapses in care.<br>9. Ensure appointments are closed out daily. |
| CLINICAL LEADERS | 1. Ensure that all Care Teams participate in daily huddles, and that scheduling issues are included in every huddle discussion.<br>2. Work with Clinical Staff to develop workable scheduling "rules" and "templates" that are used consistently throughout the institution.<br>3. Ensure ALL staff demonstrate understanding of scheduling systems and are engaged in closing appointments correctly.<br>4. Require all clinical providers to work with schedulers to avoid duplicate or redundant appointments (PCP, PCRN, LVN, onsite specialists, etc.)<br>5. Review scheduling reports on a regular basis to identify and address scheduling system inefficiencies.<br>6. *For more details see* <u>*Scheduling Process Responsibilities – Clinical Leaders*</u> |
| SCHEDULING SUPERVISOR | 1. Ensure appointments are closed within 24 hours.<br>2. Ensure schedulers look at each patient's upcoming "Scheduled" or "To Be Scheduled" appointments before creating a new appointment of the same type.<br>3. Ensure schedulers are entering appropriate and useful information in the Problem/Symptom field and are editing this field when needed for follow-up appointments spawned.<br>4. Ensure staff understand and use the correct "Reason Not Seen" when closing an appointment as "NOT Seen as Scheduled."<br>5. Review scheduling reports on a regular basis to identify and address scheduling system inefficiencies.<br>6. *For more details see* <u>*Scheduling Process Responsibilities – Scheduling Supervisor*</u> |

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## ATTACHMENT A
## Detailed Scheduling Roles and Responsibilities

| ROLE | RESPONSIBILITIES |
| --- | --- |
| SCHEDULER | 1. "Hard" schedule patients as much as possible. (i.e., Do not leave an appointment "To Be Scheduled" for a long period of time.)<br>2. Schedule patients prior to the compliance date.<br>3. Close appointments within 24 hours.<br>4. Review the "To Be Scheduled" and "Past Due" report several times a week.<br>5. Maintain a single appointment "String/Tree" for each appointment type. |

June 2017

ATTACHMENT A
Volume 4. Chapter 1.3
SCHEDULING AND ACCESS TO CARE PROCEDURE

Page 2 of 2

APPENDIX PG. - 31

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## ATTACHMENT B
### Access Timeframes

| Appointment Type | Timeframe for Completion | Suggested Scheduling Window |
|---|---|---|
| New Arrivals (Reception) – *Initial Health Screening* | Seven calendar days | Suggested scheduling window: Three business days before compliance. |
| Interfacility Transfers | 30 calendar days of arrival | Suggested scheduling window: Three business days before compliance. Clinically high risk within seven calendar days. MHSDS patients within timeframes listed in program guide. |
| Registered Nurse (RN) face-to-face triage *(California Department of Corrections and Rehabilitation (CDC) 7362, Health Care Services Request Form)* | The next business day | Same day if possible. |
| PCP Urgent Referrals *(from RN FTF triage)* | Within 24 hours | Same day if possible (add-on). |
| PCP Routine Referrals *(from RN FTF triage)* | 14 calendar days | Four business days before compliance. |
| Chronic Care Follow-Up | Per provider orders, or at least every 180 days | Seven business days before compliance. |
| High Priority/ Urgent Specialty Returns | Three business days | On day two. |
| Routine Specialty Returns | 14 calendar days | Four business days before compliance. |
| Return from Higher Level of Care *(Hospitalization, ED Returns, and TTA Follow-Up)* | Five calendar days | On day three or sooner if clinically indicated. |
| Lab Timeframes – *Lab ordered "Stat"* | Same date ordered | |

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## ATTACHMENT B

Access Timeframes

| Appointment Type | Timeframe for Completion | Suggested Scheduling Window |
|---|---|---|
| **Lab Timeframes** – *Lab ordered "Urgent"* | Next day | Same day if possible. |
| **Lab Timeframes** – *Lab ordered "Routine"* | 14 days from date ordered | Four days before compliance. |

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## Attachment C
## Appointment Time Duration Template

| Appointment Type | Patient Characteristic: Minutes |
| --- | --- |
| **Chronic Care Patient New Arrival** | • High Risk: 45 Minutes<br>• Medium Risk: 30 Minutes<br>• Low Risk: 15 minutes |
| **Chronic Care Patient Follow-Up** | • High Risk: 30 minutes<br>• Medium Risk: 20 minutes<br>• Low Risk: 15 minutes |
| **CDCR 7362 Episodic Care PCP Follow-Up** | • Free-standing appointment with simple issue: 15 minutes (longer as requested by PCRN for more complex patient)<br>• If added to related CCP appointment same day: five minutes |
| **High Priority Specialty Follow-Up** | • Free-standing appointment: 25 minutes<br>• If added to related CCP appointment same day: ten minutes |
| **Routine Specialty Follow-Up** | • Free-standing appointment: 15 minutes<br>• If added to related CCP appointment same day: ten minutes |

# 15-1021

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | 10/21/2015 |
|---|---|---|
| CHAPTER 7: SPECIAL MENTAL HEALTH NEEDS AND SERVICES | Revision Date(s): | NA |
| | Supersedes: | |
| 12.07.601(P1) RULES VIOLATION REPORT MENTAL HEALTH ASSESSMENT | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

This Mental Health Assessment (MHA) procedure outlines the role of California Department of Corrections and Rehabilitation (CDCR) mental health providers in the Rules Violation Report (RVR) process.

| | ***Procedure*** |
|---|---|
| **1.** | *Notifications*<br>Once the Rules Violation Report: Mental Health Assessment (CDCR 115-MH-A) is received from custody, mental health staff will:<br>1. Complete the CDCR 115-MH-A in its entirety, including any required consultations.<br>2. Return the completed CDCR 115-MH-A to custody within eight (8) calendar days. |
| **2.** | *Role of Assessing Clinician*<br>After receiving the CDCR 115-MH-A from custody the assessing clinician will:<br>• Review multiple sources of information, including, but not limited to:<br>o SOMS<br>o ERMS<br>o The health care record<br>o The identified adaptive supports if the patient is in the Developmental Disability Program (DDP).<br>• Document all consultations with relevant clinical and custodial staff.<br>• Inform the patient of the nature and purpose of the assessment and the information shared during the interview is <u>not</u> confidential and will be used in adjudicating the RVR.<br>• Interview the patient who is the subject of the RVR in a private setting.<br>o If patient declines the interview the assessment will be based on record review.<br>• Consult with custody throughout the adjudication process.<br>• Provide appropriate follow up care as indicated by the assessment.<br><br>If the clinician determines that the patient's behavior was so strongly influenced by symptoms of a mental illness and/or deficits in cognitive or adaptive functioning, a recommendation will be made to document the behavior in an alternative manner. The assessing clinician will:<br>• Provide a rationale.<br>• Complete all sections of the CDCR 115-MH-A and forward to the Program Supervisor and, if indicated, the Chief of Mental Health (CMH) for consultation.<br><br>If the Program Supervisor agrees with the assessing clinician, the Program Supervisor will:<br>• Document the rationale on the CDCR 115-MH-A.<br>• Forward the completed CDCR 115-MH-A to custody. |

| | |
|---|---|
| | If the Program Supervisor disagrees with the accessing clinician, the Program Supervisor will:<br>• Document the rationale on the CDCR 115-MH-A.<br>• Forward the completed CDCR 115-MH-A to the CMH or designee for a final decision.<br><br>The CMH will make the final determination for mental health regarding the recommendation to document the behavior in an alternative manner. The rationale of this determination will be documented on the CDCR 115-MH-A and will be forwarded to custody. |
| 3. | *Developmental Disability Program Participants*<br>If the clinician determines the patient exhibits on-going behavior leading to disciplinary infractions that appears related to developmental disability and/or cognitive or adaptive functioning deficits, the assessing clinician will:<br>• Consult with the DDP clinician.<br>• Provide a rationale on the CDCR 115-MH-A.<br>• Refer to DDP clinician for a consult.<br>• Ensure the CDCR 115-MH-A is completed and returned to custody within eight (8) calendar days |
| 4. | *Custody Response*<br>Within 30 calendar days the Facility Captain will:<br>• Determine and document whether the behavior will be considered a rules violation.<br>• Inform the Mental Health Program via memorandum. |
| 5. | *Post Adjudication Mental Health Processes*<br>1) CMH or designee ensures the primary clinician is notified of the outcome of the RVR (CDC 115).<br>2) The primary clinician incorporates and documents any clinically relevant behavioral issues into the patient's current treatment plan. |

# 13-0723

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | July 23, 2013 |
|---|---|---|
| CHAPTER 1: GOVERNANCE AND LEADERSHIP | Revision Date(s): | NA |
| 12.01.100 MENTAL HEALTH PROGRAM SUBCOMMITTEE | Attachments: | Yes ☐ No ☒ |

**Policy**

The statewide Mental Health Program (MHP) shall maintain a Mental Health Program Subcommittee (MHPS) to monitor and direct quality improvement activities, clinically by:

- reviewing data integral to the management of each program's mission, goals, and objectives;
- maintaining and reviewing adherence to MHP policies and procedures as well as laws and regulations;
- establishing annual plans for priority areas of improvement;
- providing training and clinical guidelines; and
- communicating and coordinating with internal and external committees, administrators and governing bodies.

The statewide MHPS shall plan, develop, and manage appropriate mental health services.

Each California Department of Corrections and Rehabilitation (CDCR) institution shall maintain a MHPS to provide oversight and direction at the institutional level consistent with MHP policies and procedures.

---

**Purpose**

To ensure that CDCR continues to provide quality mental health services consistent with all applicable laws, regulations, policies, and procedures.

---

**Definitions**

*Program management reports:* Reports that summarize program adherence to current policies and that may be formatted as graphs, tables, charts, dashboard, or other means of summarizing information.

*Quorum*: The minimum number of members to satisfy attendance requirements. For the statewide MHPS, a quorum is met when 50% of the required members are in attendance. For the institution MHPS, a quorum is met when the Chief of Mental Health or designee, and 50% of the required members are in attendance.

---

**Policy Requirements:**

**I. Responsibilities**

A. The statewide MHPS:

1. Reviews data integral to the management of each of the mental health missions (levels of care).

---

2. Maintains program's goals and objectives.
3. Reviews and monitors the MHP policies and procedures.
4. Reviews and acts on program management reports.
5. Establishes annual plans that include priority areas for improvement of services.
6. Monitors adherence to applicable laws and regulations.
7. Approves training curricula, plans, and clinical guidelines.
8. Communicates and coordinates with other subcommittees, executive approval committees, regional administrators, and other administrative and/or governing bodies as needed.

B. The institutional MHPS:
1. Establishes annual plans that include priority areas for improvement of services.
2. Evaluates the timeliness, appropriateness, and quality of mental health services in accordance with statewide and institution priority plans.
3. Develops, reviews, and implements current local operating procedures for the MHP.
4. Monitors and analyzes relevant data trends and patterns related to the Institution's MHP.
5. Charters Quality Improvement Teams to review, study, and/or audit specific program performance issues, and to provide findings and make recommendations for improvement of mental health services.
6. Ensures that statewide MHP mandated training is completed and tracks all training activities.
7. Identifies any additional local resource needs related to mental health services.
8. Reviews and recommends development or modification of statewide mental health policies, protocols, training, and data management.
9. Communicates and coordinates with other subcommittees, executive approval committees, regional administrators, and other administrative and/or governing bodies as needed.

## II. Membership

A. The statewide MHPS:
1. The members of the statewide MHPS shall represent the program and functional areas of the statewide MHP that are necessary for the appropriate and coordinated delivery of mental health services.
2. The Deputy Director of the Statewide MHP, or designee, serves as chairperson of the statewide MHPS.
3. The statewide MHPS shall include the following members:
   a. Statewide MHP Deputy Director
   b. Statewide MHP Associate Director
   c. Statewide MHP Regional Administrators
   d. Statewide MHP Chief Psychologist, Clinical Support
   e. Statewide MHP Chief of Quality Management

    f. Statewide MHP Chief of Coleman Compliance
g. Statewide Nursing representative
h. Statewide Chief Quality Officer
i. Statewide MHP Chief Psychiatrist

B. The institutional MHPS:

1. The members of the institutional MHPS shall represent the program and functional areas of the institution that are necessary for the appropriate and coordinated delivery of mental health services.
2. The Chief of Mental Health, or designee, serves as chairperson of the institutional MHPS.
3. The institutional MHPS includes, at a minimum, the following members:
   a. Associate Warden of Healthcare, or informed designee
   b. Chief Psychiatrist (if different from the Chief of Mental Health), or informed designee
   c. Chief Psychologist (if different from the Chief of Mental Health), or informed designee
   d. Chief Nurse Executive, or informed designee
   e. Standards and Compliance Coordinator
   f. Suicide Prevention Response Focus Improvement Team (SPRFIT) coordinator
   g. Health Records Technician II, Supervisor
   h. Department of State Hospitals (formerly Department of Mental Health) Coordinator

   Other suggested attendees include but are not limited to:
   a. Senior Psychiatrist for all program areas
   b. Senior Psychologist for all major program areas
   c. Health Program Specialist
   d. Senior Psychiatric Technician

## III. Schedule, Quorum and Reporting Requirements

A. The statewide MHPS:

1. The statewide MHPS meets a minimum of once monthly.
2. A quorum is 50% of the members.
3. Each member has one vote.
4. Meeting minutes are recorded in writing and a draft is distributed to all attendees within one week of the meeting for review and revision.
5. Meeting minutes are maintained for a period of at least three (3) years by designated statewide headquarters staff.
6. The Deputy Director of Mental Health, or designee, reports quality improvement and patient-inmate safety activities to the statewide Quality Management Committee (QMC) annually or more often as appropriate.

B. The institutional MHPS:

1. The institutional MHPS shall meet once monthly.
2. A quorum consists of the Chief of Mental Health or designee and 50% of the members.
3. Each member has one vote.
4. The chairperson or designee issues a written agenda and distributes it to all attendees prior to each meeting. Requests to add items to the agenda must be submitted to the chairperson or designee before the regularly scheduled committee meeting.
5. Each action item is reviewed as part of old business at subsequent meetings and is monitored until resolved.
6. The chairperson or designee reports on the institution's MHPS meetings to the institutional QMC quarterly, through meeting minutes and verbal reporting.
7. A designated attendee shall record written minutes of all committee meetings. A draft of the minutes is distributed by the designated recorder to all attendees following each meeting and prior to the next meeting.
8. Meeting minutes are maintained for a period of at least three (3) years by the Chief of Mental Health or designee.

**References** Inmate Medical Services Policies and Procedures. Quality Management System Policy and Procedure, Volume 3.

**Acronym Key** The table below lists all acronyms included in the above policy.

| Acronym | Complete Spelling |
|---|---|
| CDCR | California Department of Corrections and Rehabilitation |
| MHP | Mental Health Program |
| MHPS | Mental Health Program Subcommittee |
| QMC | Quality Management Committee |

15-0508



# HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 5/8/15 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Timothy G. Belavich, Ph.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| Subject: | **CONSULTING STAFF NAME DOCUMENTATION IN HEALTH CARE RECORDS** |

All clinical and non-clinical staff (custody, educational, etc.) who are consulted regarding an inmate-patient's behavior, functioning, or health care status, shall be documented in health care records. Documentation of these consultations shall include the name and the title of the consulting staff, date, and time of consultation.

*This memorandum supersedes any previous directives on this topic.*

If you have any questions, please contact Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, at (916) 691-0279 or email: Amy.Eargle@cdcr.ca.gov

cc: Angela Ponciano
Nathan Stanley
Laura Ceballos, Ph.D.
Amy Eargle, Ph.D
Michael Golding, M.D.
Edward Kaftarian, M.D.
Jennifer Johnson
Mental Health Regional Administrators

17-0404

| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | 4/4/2017 |
|---|---|---|
| **CHAPTER 06:** SEGREGATED INMATES | Revision Date(s): | NA |
| | Supersedes: | NA |
| **12.06.402** TREATMENT FOR RECEPTION CENTER PATIENTS AT ENHANCED OUTPATIENT PROGRAM LEVEL OF CARE IN THE ADMINISTRATIVE SEGREGATION UNIT | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

**Policy**

The California Department of Corrections and Rehabilitation, Statewide Mental Health Program, shall provide a minimum of five hours of structured treatment to Reception Center (RC) patients at the Enhanced Outpatient Program (EOP) level of care who are placed in an Administrative Segregation Unit (ASU) non-hub while awaiting release from ASU or transfer to an ASU EOP hub.

**Responsibilities**

Responsibility for review: The Chief of Mental Health or designee at each institution is responsible for implementation, monitoring and evaluation of this policy.

**Purpose**

To ensure patients in the RC at the EOP level of care, who are placed in an ASU non-hub, receive mental health services appropriate with their level of care treatment requirements while awaiting release or transfer.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution... | then... |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. |
| does not have a LOP | ensure an LOP is completed within 30 days of the effective date that meets the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

Division of Correctional Health Care Services. (2009 Revision). *Mental Health Services Delivery System Program Guide.* Reception Center Mental Health Assesment, Chapter 5

Memorandum dated August 17, 2000, titled, *Mental Health Services in Administrative Segregation*

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.

# 11-0421

State of California

California Department of Corrections and Rehabilitation

# Memorandum

Date : APR 2 1 2011

To : Chiefs of Mental Health

Subject : **STRUCTURED THERAPEUTIC ACTIVITY**

The purpose of this memorandum is to clearly define treatment that meets criteria for scheduled structured therapeutic activities according to the Mental Health Services Delivery System Program Guide, 2009 Revision.

Currently, mental health staff count only prescheduled therapeutic activities towards treatment requirements. Effective immediately, in addition to scheduled treatment appointment, any documented treatment shall be counted toward weekly treatment requirements for structured therapeutic activities.

Examples of structured therapeutic activities may include but are not limited to the following activities. These must be documented in the Unit Health Record.

- Cell front interactions
- Recreational interactions
- Daily living skills instructions
- Pre-release planning
- Self-advocacy instructions
- Social skills instructions

If you have any questions or need any additional information, you may contact Lorraine Donnelly, Staff Services Analyst, Quality Management, via e-mail at lorraine.donnelly@cdcr.ca.gov.

JAMES SCARAMOZZINO, PH.D.
Director (A), Statewide Mental Health Program
Division of Correctional Health Care Services

cc: Chief Executive Officer's
Judy Burleson
Laura Ceballos, Ph.D.
Regional Chiefs of Mental Health
Lorraine Donnelly

CDC 1617 (3/89)

# 10-0311

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : March 11, 2010

To : Wardens
Regional Parole Administrators
Chiefs of Mental Health
Parole Outpatient Clinic Chiefs

Subject : **RELEASE PLANNING FOR INMATES PARTICIPATING IN THE INSTITUTION'S MENTAL HEALTH SERVICES DELIVERY SYSTEM**

Planning and preparation for the release of inmates participating in the institution's Mental Health Services Delivery System (MHSDS) is an essential part of successful transition to the community. With the recent passage of California Senate Bill 18 (3X), Provisions in the Budget Act, & Administrative Reforms, and adding of Penal Code section 3000.03 as a result of this legislation, the California Department of Corrections and Rehabilitation has instituted the non revocable parole (NRP) designation. In an effort to ensure coordination of community-based care for all mentally ill inmates, with immediate emphasis on inmates releasing to NRP and discharging from prison, this memorandum requires all institutions and parole regions to develop Local Operating Procedures (LOP) that comply with the processes outlined forthwith. LOP's must be developed and submitted to the respective Associate Directors for review by March 18, 2010 with a phased in implementation date beginning April 1, 2010 for inmates releasing to NRP and discharging, and implementation date of September 1, 2010 for inmates releasing to supervised parole. The transportation upon release, Welfare and Institutions Code section 5150 needed at time of release, and the resolution process for determination of release destination and transportation portions of this memorandum are to be implemented all release categories on April 1, 2010. Challenges to implement due to limited staffing are to be addressed on a memorandum with the submitted LOP's.

**MHSDS Levels of Care**

Inmates participating in the institution's MHSDS are designated into four categories, dependent on their diagnosis and/or symptoms related to mental illness. The four designations are:

1. CCCMS - This acronym represents the Correctional Clinical Case Management System. Inmates designated as CCCMS require a lower level of mental health care and are typically housed within the institution's general population.
2. EOP - This acronym represents the Enhanced Outpatient Program. Inmates designated as EOP require increased mental health care and are typically housed separately from the institution's general population.
3. MHCB - This acronym represents Mental Health Crisis Bed. MHCB is an acute level of care that provides stabilization and treatment of inmates who are experiencing a severe exacerbation or acute onset of symptoms. These symptoms may result in grave disability, danger to self or others, or other psychiatric issues that require psychiatric observation and initial stabilization for a brief time period.

4. DMH – This acronym represents California Department of Mental Health level of care and is available for inmates requiring acute or intermediate inpatient mental health care.

**Parole Status upon Release**

Inmates releasing to the community are released under three categories:

1. Supervised Parole – Inmates released to supervised parole are assigned and required to report to a determined parole location, and abide by set conditions of parole under the supervision of a Parole Agent (PA).
2. Non Revocable Parole - Inmates released to non revocable parole (NRP) are not assigned or required to report to a determined parole location, are not under the supervision of a PA, and are subject to search and seizure by a peace officer without a warrant. NRP offenders cannot be returned to prison for a parole violation. Some NRP offenders may be required to complete a batterer's program pursuant to California Penal Code (PC) Section 3053.2.
3. Discharge – Inmates discharged from the jurisdiction of the California Department of Corrections and Rehabilitation (CDCR) and no longer subject to CDCR oversight.

Inmates discharging or placed on NRP at time of release from prison do not fall under the PC Section 3060.7 guidelines, and shall not have their release date modified.

**Pre-Release Planning Roles and Responsibilities**

**Correctional Counselor and Institution Case Records Duties** – Ensure that mental health staff are provided projected release dates. Additionally, the institution's Chief of Mental Health shall be provided a listing of inmates approved by the Board of Parole Hearings for placement on to NRP within two business days of receipt by institutional Case Records.

**Chief of Mental Health Duties** – Upon receipt of information that an inmate has been approved by the BPH for NRP placement, the Chief of Mental Health shall advise the inmate's primary clinician of the release status.

**Mental Health Clinician Duties** – Additional positions have been requested to specifically address pre-release planning functions. Until these positions are established and filled, mental health program staff are expected to assist inmate-patients in planning for release as current resources permit, and to set priorities as clinically indicated.

In consultation with the Interdisciplinary Treatment Team (IDTT), the mental health clinician has the primary role in the pre-release planning process and referral for community-based continuity of care. Specific duties include:

1. Determine and document expected level of care upon release.
2. Determine and document expected needs upon release such as shelter, food, income.
3. Refer to Transitional Case Management Program (TCMP) for public benefits entitlement application submittal as applicable. TCMP provides pre-release public benefits application assistance regardless of the parole status at time of release.
4. Obtain information regarding county of release and release date.
5. When the inmate is discharging or placed onto NRP, communicate with county liaison in an attempt to arrange care and address needs. Contact with county mental health should be made 30 days prior to release date. In cases in which, due to unforeseen circumstances, mental health staff becomes aware of the need to contact county mental health for transitional planning less than 30 days prior to release date, notification should be made as soon as possible.
6. Request a Parole Outpatient Clinic (POC) appointment when an inmate is releasing to supervised parole. Also request a POC appointment in order to provide bridge services when an inmate is releasing as NRP and either: 1) Care could not be arranged in the community due to no available services, 2) The wait time for an appointment with county mental health exceeds 21 days after release and/or 3) There is insufficient time to arrange alternate care prior to release due to unforeseen circumstances.
7. Work with county mental health to identify location of release when inmates discharging or releasing to NRP require continued inpatient care or California Welfare and Institutions Code (WIC) Section 5150 evaluation at time of release.
8. Work with POC to identify location of release when inmates releasing to supervised parole require continued inpatient care or WIC Section 5150 evaluation at time of release.
9. When conservatorship is recommended for an inmate, notify the county mental health department 90 days prior to release to allow the county mental health department to review the documentation and initiate the conservatorship process. If the inmate is discharging or releasing to NRP, contact should be made directly with the county mental health department in the county of last known residence. If the inmate is releasing to supervised parole, this process should occur in conjunction with the regional POC. If, due to unforeseen factors such as changes in release date, transfer of an inmate or abrupt changes in an inmate's clinical status, the need for a conservatorship becomes known less than 90 days prior to release date, notify the county mental health department and/or the regional POC office as soon as possible.

When mental health staff believes that a conservatorship is indicated, scheduling a Coordinated Clinical Assessment Team (CCAT) teleconference with the Statewide Mental Health Program is strongly recommended. The CCAT process will allow representatives from county mental health, the Department of Mental Health, the Division of Adult Parole Operations, Parole Outpatient Clinic, institutional mental health and the Statewide Mental Health Program to discuss the specifics of the case and to develop a feasible and appropriate release plan.

10. Determine mode of transportation for return to the community upon release from prison, such as public transportation or special transport if the inmate lacks the ability to navigate public transportation as a result of mental illness, and/or need for other assistance.
11. Provide Mainline Classification and Parole Representative (C&PR) or Reception Center Correctional Counselor III (CCIII) with determined mode of transportation and point of delivery when arranged by clinician. When the institution's mental health staff determine that an inmate releasing from prison is unable to utilize public transportation at time of release due to mental illness and/or a releasing inmate requires a WIC 5150 evaluation upon release, the requirement shall be recorded on a CDCR 128-C and provided to the institution's C&PR/CCIII no less than 14 days prior to release or as soon as possible for cases in which, due to unforeseen factors such as changes in release date, transfer of an inmate, or abrupt changes in an inmate's clinical status, the need is identified less then 14 days prior to release. The CDCR 128-C must be signed by no less than two clinicians.

**Parole Outpatient Clinic Staff Duties** – The POC chief for each Parole Region shall establish and provide a centralized regional contact for the purpose of pre-release, to include:

1. Phone, fax, and e-mail for pre-release planning unit.
2. Pre-release case conferencing with institution mental health staff as requested.
3. Appointment scheduling for releasing inmates. NRP eligible inmates in need of POC treatment shall be scheduled to be seen for a POC appointment within 14 days of release from prison when requested by institution mental health staff.
4. If the parolee fails to report to the scheduled appointment, the POC clinician will document the inability to evaluate the NRP offender in the Parole Automated Tracking System and close the POC case.
5. The POC appointment shall be utilized to assess the NRP offender's current status, treatment needs, develop a transition plan, and to prescribe necessary medications.

6. Once the NRP offender's ongoing treatment needs are evaluated, a transition plan developed, and medications prescribed, POC staff will contact County Mental Health, and/or other community-based mental health providers and attempt to secure continuity of care.
7. If County Mental Health, and/or other community-based mental health services are not immediately available and the POC clinician determines that it is necessary to maintain continuity of care, follow-up POC appointments/care may be provided during the first 90 days of assignment to NRP status.
8. Upon request, inform institution staff of locations certified to conduct WIC 5150 evaluations, and other county/community mental health services resources.

**Transportation upon Release**

Institution and Parole transportation teams shall be comprised in accordance with existing operating procedures as it relates to inmates/parolees released back to the community.

**Released to Supervised Parole** - When an inmate is releasing to supervised parole, and it has been determined by institution mental health staff that an inmate is unable to utilize public transportation at time of release due to mental illness, institution staff shall coordinate with the Division of Adult Parole Operations to accomplish transportation plan. The assigned Parole Unit Supervisor (US) or designee shall be contacted by C&PR/CCIII or designee.

When time permits, attempts shall be made to transfer inmates to institutions closer to the inmate's county of last legal residence if the inmate is housed in a distant location. If a transfer to a closer institution is not an option and the distance to travel for pickup is substantial (two or more hours driving time), the C&PR/CCIII or designee and US or designee shall work together to coordinate a halfway point at which an institution transport brings the parolee to meet a PA.

**Placed on NRP at Time of Release** – When an inmate is placed on NRP at time of release, and it has been deemed by institution mental health staff that, due to mental illness, an inmate is unable to utilize public transportation at time of release, institution staff shall coordinate and provide transportation for the releasing inmate when in need of caged transport due to danger to self or others. If the inmate does not require a caged transport, a PA shall provide transportation by way of the resolution process described at the conclusion of this memorandum.

**Discharged at Time of Release** – When an inmate is discharged at time of release, and it has been deemed by institution mental health staff that, due to mental illness, an inmate is unable to utilize public transportation at time of release, institution staff shall coordinate and provide transportation for the releasing inmate.

**WIC Section 5150 Needed at Time of Release**

When an inmate releases from prison and mental health staff determine the inmate requires further inpatient mental health care, and/or a WIC 5150 evaluation, institution staff shall provide transportation.

If the inmate is assigned to NRP or discharging at time of release, institution staff shall identify the location of the evaluation within the last legal county of residence, and institution peace officer staff shall transport the inmate to the evaluation location and ensure the safe and orderly transfer of the inmate to hospital staff or local law enforcement. It is advisable to contact local law enforcement to meet at location of delivery for transfer of resident to their custody for the WIC 5150.

If the inmate is releasing to supervised parole, institution staff shall provide transportation to the evaluation location, and coordinate with parole staff to identify the location. A PA shall meet the institution transport team at the evaluation site and ensure the safe and orderly transfer of the inmate to parole.

The releasing institution shall ensure that the inmate is delivered with a mental health evaluation indicating grave disability and/or danger to self or others relevant to serve as probable cause for the WIC 5150 placement. This evaluation should include the historical course of the inmate's mental disorder (WIC 5150.05). The documents shall be placed in a sealed envelope and provided to the community facility evaluation staff at time of delivery. The inmate shall be provided a plan for discharge from MHSDS and required supply of medications.

Peace officer staff are not required to remain at the hospital once the initial contact and any necessary documentation is completed, per WIC sections 5150.1 and 5150.2. Dependent on potential risk to public safety, it is advised that CDCR peace officer staff remain at facility until released inmate is involuntarily detained or is cooperative and the risk to public safety is diminished.

Wardens
Regional Parole Administrators
Chiefs of Mental Health
Parole Outpatient Clinic Chiefs
Page 7

**Resolution Process for Determination of Release Destination and Transportation**

When a releasing institution is unable to determine a safe location to transport a mentally ill inmate to at time of release as necessary, or is unable to transport upon release; contact to the respective Division of Adult Institution's (DAI) Associate Director (AD) shall be accomplished at the earliest opportunity. Upon notice from the institution, the DAI-AD shall contact a Division of Adult Parole Operations' AD for case conference and resolution.

SHARON AUNGST
Chief Deputy Secretary
Division of Correctional Health Care Services

TERRI MCDONALD
Chief Deputy Secretary
Adult Operations

APPENDIX PG. - 56

16-0125

State of California Department of Corrections and Rehabilitation

# Memorandum

Date : January 25, 2016

To : SEE DISTRIBUTION LIST

Subject: **CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM LEVEL OF CARE AND MINIMUM SUPPORT FACILITIES**

The purpose of this memorandum is to announce the new policy to allow the placement of Correctional Clinical Case Management System (CCCMS) Level of Care (LOC) inmate-patients (IPs) participating in the Mental Health Services Delivery System (MHSDS) into a Minimum Support Facility (MSF). The Wardens and Chiefs of Mental Health shall ensure training is provided to all Classification staff, Records staff, and Mental Health (MH) staff as determined necessary to ensure understanding and implementation of the policy.

## POLICY

Effective immediately, IPs established at the CCCMS LOC for 6 months or more shall be considered for placement in MSFs and may be referred and endorsed to an appropriate MSF consistent with the MH clearance process identified herein. All other existing eligibility and exclusionary criteria regarding MSF eligibility remains in force and shall be applied to the review of these cases. CCCMS IPs shall not be referred for endorsement, endorsed, or transferred to institutions where their mental health treatment needs cannot be addressed.

***Correctional Counselor Review and Referral***

**Reception Centers Housing**

During the regular correctional counselor (CC) assessment to determine appropriate housing/placement for IPs at Reception Centers (RCs), IPs undergoing intake processing will be reviewed for endorsement according to current policy and procedure. To determine an IP's eligibility for Minimum Custody and MSF placement, the assigned CC shall verify the IP's current status in the MHSDS from within the Strategic Offender Management System (SOMS).

A CCCMS IP will be referred to the appropriate level facility based on their current case factors. In the event the RC IP is identified as eligible for Minimum Custody/MSF placement and has been at the CCCMS LOC for 5.5 months or more at the time of referral, the assigned CC will review and update the documents noted on the following page to ensure accuracy and note the need for casework follow-up as needed by the

receiving institution per current policy. If, at the time of Classification Staff Representative (CSR) review, the IP has been at the CCCMS LOC at the RC for 5.5 months or more, with or without being identified by the CC in the Institution Staff Recommendation Summary (ISRS) or Reception Center Readmission Summary (RCRS), the CSR shall endorse the IP for MSF placement, if otherwise eligible. Within the endorsement chrono, the CSR shall direct that the IP be immediately referred for evaluation of MSF eligibility by MH staff at the receiving institution upon arrival to ensure a determination is made regarding the IP's MSF eligibility at the receiving institution. In the event a CCCMS IP has been at the CCCMS LOC for 6 months and is eligible for Minimum Custody/MSF placement, a referral is made for mental health clearance via California Department of Corrections and Rehabilitation (CDCR) *Mental Health Referral Chrono*, CDCR 128-MH5 (Attachment A).

The CC will also ensure the IP's eligibility for MSF placement is accurately reflected on the ***Special Programs Screening*** screen within SOMS. In these cases, the IP will remain ineligible for MSF on the ***Special Programs Screening*** *screen*, due to CCCMS status, unless/until cleared by MH staff for MSF placement, as recorded on CDCR 128-MH8, *Mental Health Interdisciplinary Treatment Team Housing/Program Recommendation* (Attachment B).

**General Population Housing**

IPs at the CCCMS level of care assigned to General Population (GP) housing (including Sensitive Needs Yard) will be considered for MSF placement in accordance with the following directions.

Prior to the annual Unit Classification (UCC) review, and no later than the actual established recurring annual review date, the assigned CC will review each CCCMS IP for MSF eligibility, to allow for timely referral to MH staff for evaluation as required and completion of the annual review. The annual review may be conducted by an Institution Classification Committee (ICC) if other case factors require this level of review. Additionally, an IP established at the CCCMS level of care for 5.5 months or more at the time of arrival from the RC, determined otherwise eligible for MSF placement as described below, whether endorsed for MSF placement by the CSR or not, shall be referred to MH staff for evaluation of MSF eligibility. In all cases, where determined eligible by Interdisciplinary Treatment Team (IDTT), the IP shall be reviewed for MSF placement by the classification committee. An IP received from the RC may have to be reviewed by UCC after the Initial Classification Committee, if the IDTT results are not received prior to the Initial Review. Where committee determines the IP is eligible for MSF placement, he/she shall be assigned Minimum B Custody and be referred to the CSR or Classification and Parole Representative (C&PR) for endorsement, unless already appropriately endorsed.

**Eligibility Review by the Correctional Counselor and Classification Committee**

Eligibility for MSF in all cases will be based upon:

- Custody case factors - An IP determined ineligible for Minimum Custody based on custodial case factors will not require referral to MH.
- Medical clearance per the ***Medical Classification Chronos*** screen within SOMS.
- IPs previously discharged from the MHSDS remain eligible for MSF placement and do not require referral to MH.
- MH LOC (GP or CCCMS, including CCCMS due to "Medical Necessity").
- Cocci Risk/Custody Classification Registry (Attachment C) to establish further medical and mental health eligibility and placement factors.
  - **This automated report will have a "Y" marked in the box if the IP meets initial mental health and medical criteria for MSF and may be referred to MH for further review, per section II below.**
  - **Where "N" is marked in the box, the IP will not require referral to MH for review of eligibility for MSF.**

If the IP does not meet all criteria for placement in the MSF, the CC will ensure this is accurately documented on the ***Special Programs Screening*** screen within SOMS. An IP at the CCCMS LOC determined eligible for MSF placement will require the CC to manually update the MSF eligibility within the ***Special Programs Screening*** screen.

**Referral for Mental Health Clearance**

When an IP housed in the GP meets all criteria for placement in the MSF and has been at the CCCMS LOC for 6 months or more by the anticipated annual review date, or 5.5 months for an IP received from the RC as described previously, the assigned CC will complete a CDCR 128-MH5, requesting MH clinical review.

- In the description area at the bottom of the CDCR 128-MH5, the CC shall indicate the IP is at the CCCMS LOC and is MSF eligible, and request the MH clinical review.
- The original CDCR 128-MH5 is submitted to Case Records to be scanned into the IP's Electronic Records Management System (ERMS) file, and a copy submitted to the MH Program within one working day.

**Mental Health Review**

**Reception Centers Housing**

If an additional referral is requested by staff at the RC for an IP at the CCCMS LOC for over 6 months, the MH Primary Clinician (PC) shall conduct the review within five working days. This review includes the following:

- IP Interview.
- Review of the health record.
- Review of ERMS.
- Review of any disability placement.
- Consultation with other staff as necessary.
- A written progress note that details purpose of the evaluation, findings, and rationale for the decision. (NOTE: Progress note must ba co-signed for unlicensed staff.)
- Completion of a CDCR 128-MH8, Indicating if IP meets criteria for placement in MSF.

Normally, the RC CC staff will refer the IP established at the CCCMS LOC for 5.5 months or more, who is otherwise eligble for MSF placement, to the CSR for endorsement to the MSF, with follow-up mental health evaluation to occur at the receiving institution.

**General Population Housing**

The IDTT shall be held within 14 calendar days of receipt of the CDCR 128-MH5 requesting an evaluation of MSF eligibility. This review includes the following:

- IP Interview.
- Review of the health record.
- Review of ERMS.
- Review of any disability placement.
- Consultation with other staff as necessary.
- An updated treatment plan that clearly states the purpose for the treatment team discussion and includes the decision, rationale, and changes to the treatment plan.
- Completion of a CDCR 128-MH8, Indicating if IP meets criteria for placement in MSF.

**Mental Health Placement Criteria – All Housing Programs**

The MH Clinical staff will assess whether an IP's mental health treatment needs can be met in a minimum security housing program in which MH providers are not on site. In addition, the clinical review must consider that features of the MSF differ from programs within the secure perimeter. Specifically, MSF IPs will be housed in dormitories outside the secure perimeter, and most will have assignments and activities outside of the secure perimeter. These IPs have a minimal level of custodial supervision/oversight.

IPs must be able to function adequately in the MSF with minimum services provided in accordance with the MHSDS Program Guide (2009 Revision). The potential for victimization of an MH IP in a less structured setting must always be considered. Whether the IP may require more structured supervision and increased oversight than is typically afforded at an MSF, or to an IP who is assigned minimum custody, must also be considered.

At a minimum, the evaluation includes:

- A review of past behaviors and factors that have triggered symptom exacerbation in the past.
- Notation of any past instances of victimization, and assessment of current vulnerability, if the IP was functioning in an environment with limited supervision.
- Determination of current mental health status.
- A review of his/her ability to engage in safe behaviors.
- Determination of his/her ability to make decisions and follow directions.
- Information provided to the IP regarding consideration for minimum security facility placement, which will likely include minimum custody work assignment, and input from the IP regarding his/her current mental state and functioning.
- A determination regarding the IP's capacities and limitations, which may be provided to the CC (reception center) or classification committee (general population), as it impacts the IP's placement and/or job.

**Decision Documentation**

After the MH clinical decision, the MH PC completes the CDCR 128-MH8 and forwards it to the C&PR within two working days for distribution to the assigned CC and Case Records. The CDCR 128-MH8 shall be completed as follows:

- Eligible - The "eligible" box will be marked to indicate the MH Clinician/IDTT determined an IP's mental health needs can be met at an MSF.

- Temporarily Ineligible - The box "temporarily ineligible" will be marked to indicate the MH Clinician/IDTT determined an IP's mental health needs cannot be met at an MSF at the current time. These IPs shall be reassessed prior to their next UCC annual review. If the IP's case factors indicate continued eligibility for MSF, he/she will be referred to IDTT by the assigned CC within the 45 days prior to the annual review date for a follow-up evaluation and determination of eligibility.

**Process if the Existing Mental Health Approval for MSF Placement is No Longer Valid**

When MH staff determines an IP at the CCCMS LOC who is housed at MSF or pending MSF placement is determined inappropriate for MSF placement, the MH staff must ensure the Custody staff at the MSF and the Institution's C&PR and/or Watch Commander is immediately notified by telephone of the need to re-house the IP or prevent the IP being moved to the MSF. The MH staff notifying the C&PR and/or Watch Commander shall complete a CDC Form 128-C, *Chrono–Medical, Psych, Dental,* and ensure it is delivered to the C&PR's office within 24 hours of contact for inclusion in ERMS. An IP determined to require removal from the MSF based on mental health concerns shall not be left unattended at any time prior to being re-housed within the secure perimeter.

**Classification Review**

- The C&PR, or designee, will ensure a completed copy of the CDCR 128-MH8 received from the MH Program is delivered to the assigned CC within one business day, and the original is submitted to Case Records to be scanned into ERMS.
- Upon receipt of a completed CDCR 128-MH8, the assigned CC shall review the determination by the PC/IDTT for MSF eligibility.
- MSF eligibility determination by classification committee.

**Reception Centers Housing**

If an IP is referred by the RC CC staff for an MSF evaluation by MH staff and is determined to be MSF eligible by the PC, the CC and CC II will make a recommendation for placement through the ISRS or RCRS after receipt of MH clearance.

**General Population Housing**

If an IP is determined to be MSF eligible by the PC/IDTT, and there are no exclusionary case factors for MSF, the IP will be taken to committee for the annual review.

An IP received with 5.5 months or more at the CCCMS LOC upon the date of arrival from the RC who is determined eligible by Classification and MH staff will be reviewed by the Initial Classification Committee where possible, or at a subsequent UCC action within 14 days of the return of CDCR 128-MH8 to the assigned CC. This review may be delayed only if additional information, police reports, District Attorney comments, clearance of a potential detainer, or other information is required. This review process shall be completed within 60 days of the Initial Classification Committee. Where an IP is determined eligible for MSF placement, he/she shall be assigned Minimum B Custody consistent with current policy. Where not already endorsed for MSF placement, the IP shall be referred to the CSR for transfer to a designated MSF. If MSF placement is available locally and the recommendation is for placement at the current institution, the case shall be referred to the C&PR.

**Ineligible per IDTT**

If the PC/IDTT determines the IP is temporarily ineligible for MSF, the assigned CC shall make no further referrals to IDTT until prior to the next scheduled UCC annual review (if the IP continues to meet custodial MSF eligibility criteria).

**MSF Eligibility in SOMS**

A case being referred for endorsement will require the CC to take action within SOMS if the IP is otherwise eligible for MSF placement and determined eligible for MSF placement by the PC/IDTT.

If the IP is approved by MH for placement in MSF, the CC will remove the "MH Level of Care" from the ***Exclusionary Factor*** field of the **Special Programs Evaluation** screen to reflect eligibility for MSF placement. Otherwise, SOMS will automatically default to "ineligible for MSF" based on an established LOC within the MHSDS.

For the purpose of clarification only, the previous coding on the Minimum Custody Screening Form, whether "eligible" ("E" code) or "temporarily ineligible" ("L" code), was based on the criteria in place at the time, and the IP's eligibility within each of the categories referenced. The IP must be evaluated based on the current eligibility criteria.

***C&PR Responsibilities***

The C&PR at both the RCs and at the receiving institutions will be responsible for ensuring staff is adequately trained to identify, document and, where appropriate, refer IPs at the CCCMS LOC who may be eligible for MSF placement based on custody case factors. Copies of the policy and procedure and structured training shall be

provided to staff. The C&PR shall be responsible to complete the endorsement of cases appropriately referred for placement at the local MSF within SOMS, consistent with current policy and procedure.

Additionally, the C&PR and/or Watch Commander shall ensure a CCCMS IP approved for and placed at the MSF, who is later determined ineligible for placement based on mental health concerns, is re-housed within the institution's secure perimeter immediately. The following actions are taken by staff when this occurs:

- The IP shall remain under direct observation by staff prior to being re-housed within the secure perimeter.
- The C&PR and/or Watch Commander shall ensure the IP's gate pass is pulled and consideration of whether or not the IP's custody level must be raised, pending committee.
- Subsequent to being re-housed within the secure perimeter, the IP shall be reviewed by a classification committee to determine appropriate custody, placement, and program consistent with current policy.
- CCCMS IPs housed in an MSF and subsequently removed from the MSF due to mental health concerns must be referred to IDTT for evaluation by the assigned CC prior to review by the classification committee for consideration of return to the MSF. This is only required where the IP remains otherwise eligible for MSF placement. Eligibility must be documented on a new CDCR 128-MH8 prior to returning to an MSF.
- An IP removed from the MSF for any other case factor, including, but not limited to, death or serious illness or injury to a family member, or serious disciplinary action, <u>may</u> be referred to IDTT if Classification staff determine it is necessary.
  - Any IP who requires or is referred to IDTT for review shall be reviewed by classification committee once the CDCR 128-MH8 is complete, to determine whether return to the MSF is appropriate.
- Where not approved by IDTT for return to the MSF, committee shall refer the IP for transfer to an appropriate level facility.
- Prior to each subsequent annual review, where the IP is otherwise eligible for MSF placement, the assigned CC shall refer the CCCMS LOC IP to IDTT for evaluation of MSF eligibility within the 45 days prior to the annual review date.
- IDTT's determination of MSF eligibility must be documented on a new CDCR 128-MH8.

***<u>CSR Responsibilities</u>***

Consistent with current policy and procedure, the CSR will complete the endorsement of IPs appropriately referred for transfer to an MSF at another institution within SOMS. Additionally, when an IP at the RC is noted as being eligible for Minimum Custody/MSF and has been established at the CCCMS LOC for 5.5 months or more, the CSR shall

endorse the IP to an appropriate MSF and include the following statement within the "*Comments*" section of the endorsement chrono: "IP appears eligible for Minimum Custody/MSF. The receiving institution shall review and, where appropriate, refer to MH staff for evaluation of MSF eligibility prior to the Initial Classification Committee."

***Forms Used In This Process***

| | |
|---|---|
| CDCR 128-MH5 *Mental Health Referral Chrono* | Currently used by any custody, clinical, or nursing staff to refer an IP for mental health evaluation. |
| CDCR 128-MH8 *Mental Health IDTT Housing/Program Recommendation* | Used by the PC and/or IDTT to determine clinical appropriateness of MSF for IPs participating in the MHSDS at the CCCMS LOC, as well as housing recommendations for all MHSDS participants. |
| *Institutional Staff Recommendation Summary (ISRS):*<br><br>New commitments<br><br>OR<br><br>*Reception Center Readmission Summary (RCRS):*<br><br>Returned on the same CDCR number WITH A NEW TERM | The **Psychiatric/Psychological** section of the ISRS will automatically include the current LOC within the MHSDS.<br>The CC shall ensure the ***Special Programs Screenings*** screen is updated to reflect the IP's eligibility. Where an IP at the CCCMS LOC appears to be otherwise eligible for consideration of MSF placement, the CC shall note in the **"Comments"** of the **Casework Follow-up** section that the IP shall be reviewed for consideration of MSF placement during the annual review process.<br>• If an IP at the CCCMS LOC is being referred for MSF placement, the **"Comments"** section of the **Casework Follow-up** section shall document the IP's potential eligibility for MSF placement based on IP being CCCMS for over 6 months while housed at the RC.<br>  o The ***Special Programs Screenings*** screen in this case shall continue to reflect "ineligible" until the review process is completed at the receiving institution.<br>**Where an RCRS is being completed, the CC shall place the comments within the "*Action*" Summary of the CC section.** |
| *Classification Chrono* | Includes specific reference to a CCCMS IP's MSF eligibility status and, where applicable, the IDTT's MSF eligibility determination. |

**Additional Information**

This memorandum and the related attachments will be available on the Classification Services Unit (CSU) web page within the Mini Manual webpage, http://intranet/ops/AO/ins/Pages/Minimanual.aspx, under the topics, "Mental Health Delivery System" and "Minimum."

If you have any questions or require additional information regarding classification processes, please contact Jonathan Stubbs, CC III, CSU, at (916) 322-0561 or Jonathan.Stubbs@cdcr.ca.gov. If you have any questions or require additional information regarding the mental health policy issues, please contact Laura Ceballos, Chief Psychologist, Quality Management, at (916) 691-0308 or Laura.Ceballos@cdcr.ca.gov.

KELLY HARRINGTON
Director
Division of Adult Institutions

KATHERINE TEBROCK
Deputy Director
Statewide Mental Health Program

Attachments

DISTRIBUTION LIST:

Associate Directors, Division of Adult Institutions
Associate Directors, Statewide Mental Health Program
Wardens
Chiefs of Mental Health
Chief Executive Officers
Institutions Chief Executive Officers
Institutions Chief Medical Officers
Classification and Parole Representatives
Correctional Counselors III, Division of Rehabilitative Programs
Classification Staff Representatives

cc: Ralph M. Diaz
Kathleen Allison
Brantley Choate
Vincent S. Cullen
James Robertson
Laura Ceballos
Jonathan Stubbs

State of California
**Mental Health Referral Chrono**
CDCR 128-MH5 (Rev. 05/14)

Attachment A

Department of Corrections and Rehabilitation
Form: Page 1 of 1
Instructions: Page 2

Inmate-Patient Name: ______________ CDCR Number: ________ Housing: ________ Institution: ________

☐ Routine (Within 5 working days) ☐ Urgent (Within 24 hours) ☐ Emergency (Contact Mental Health Services Immediately)

☐ Non English-speaking language: ______________

REASON FOR REFERRAL: (Check the primary reason(s) and give an example or describe below under "Other.")

☐ History of psychiatric care need re-assessment
☐ Expresses suicidal ideation or recent attempts (Emergency)
☐ Incapable of caring for self / poor grooming
☐ Confused / disoriented / withdrawn
☐ Hostile / assaultive / poor self-control
☐ Taken advantage of by other inmates
☐ Poor attention span / difficulty following directions
☐ Needs psychotropic medication review
☐ Exhibits bizarre behavior (Describe below)
☐ Poor appetite / sad / fearful / nervous
☐ Unpredictable / bothers others
☐ Hears things / sees things / imagines things
☐ Insomnia / sleeps too much
☐ DDP Consult / re-evaluation

☐ Other/Additional (Describe): ______________

| REFERRED BY (Print Name) | TITLE | PHONE / EXTENSION | TIME | DATE |
|---|---|---|---|---|
| | | | | |

Received in Mental Health Services by: ______________ (Print Name) Time: ______ Date: ______ Assigned to: ______________ (Print Name)

For clinician only – this was a referral for ☐ MHSDS ☐ DDP Inmate-Patient seen: Time: ______ Date: ______

Once complete, submit to mental health services.
Distribution: Scan into the eUHR, copy in C-file, copy to inmate.

Attachment B

STATE OF CALIFORNIA
**Mental Health Interdisciplinary Treatment Team Housing/Program Recommendation**
CDCR 128-MH8 (Rev. 11/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATIO

Form: Page 1 of
Instructions: Page :

I. This inmate-patient (IP) is currently included in the following mental health level of care:
☐ CCCMS ☐ EOP ☐ MHCB ☐ ICF ☐ Acute Date: ______ Institution: ______ Housing: ______

II. Determination by Primary Clinician (for RC only) or Interdisciplinary Treatment Team for clinical appropriateness for placemen in a Minimum Support Facility:
☐ Eligible ☐ Temporarily Ineligible

III. Work and Housing Considerations for Minimum Support Facility:

| IV. | Print Name and Title | Signature | Date |
|---|---|---|---|
| Clinician's Name/ Title | | | |
| Chief of Mental Health or Designee | | | |
| IDTT Leader/Title | | | |

1. Disability Code:
☐ TABE score ≤ 4.0
☐ DPH ☐ DPV ☐ LD
☐ DPS ☐ DNH
☐ DNS ☐ DDP
☐ Not Applicable

2. Accommodations:
☐ Additional Time
☐ Equipment ☐ SLI
☐ Louder ☐ Slower
☐ Basic ☐ Transcribe
☐ Other*

3. Effective Communication:
☐ P/I asked questions
☐ P/I summed information
Please check one:
☐ Not Reached* ☐ Reached
*See chrono/notes

4. Comments:

CDCR #:
Last Name: MI:
First Name:
DOB:

SCANNING LOCATION - OUTPATIENT: MHChrono/Misc- Chronos/Screening

## Instructions

**Purpose of form:** The Mental Health Interdisciplinary Treatment Team Housing/Program Recommendation shall be used to document the determination for Minimum Support Facility (MSF) by a Primary Clinician (in reception centers only) or Interdisciplinary Treatment Team (IDTT) (general population housing). This form is not required for routine inclusion in a Mental Health Services Delivery System level of care and shall be used in accordance with mental health screening criteria set forth in mental health policy and procedure.

I. Check the applicable box to document the patient's mental health level of care. Enter the Institution, and Current Housing.

II. If the patient is CCCMS level of care, symptoms have been stable for 6 months or the patient is CCCMS medical necessity, and the patient meets criteria according to clinical evaluation as detailed in policy and procedure, mark **"Eligible."** If any of the criteria are not met, check the box marked **"Temporarily Ineligible."**

III. Enter all work and housing considerations that custody staff should consider for Minimum Support Facility placement in the space provided.

IV. If conducted in a reception center, the Primary Clinician only may sign. If conducted in a general population housing facility, the IDTT leader shall sign.

The following acronym definitions are provided for reference:

**Minimum Support Facility (MSF)**
A Minimum Support Facility is a sub-facility of an institution that is normally located on the institutional grounds and which may or may not have a secure perimeter. IPs housed at an MSF generally are assigned to jobs that support the institution. Some work assignments are on institutional grounds and other work assignments are off grounds. IPs shall be seen by mainline CCCMS clinicians (e.g., for their 90-day appointments, annual review and other needs).

**Effective Communication:** The Effective Communication section must be completed any time there is a clinically relevant encounter in which meaningful information is exchanged between the licensed clinician and the IP. For further information and examples of some encounters in which effective communication is required, see IMSP&P, Volume 2, Ch. 4.

| 1. Disability: | 2. Accommodation: | 3. Effective Communication: |
|---|---|---|
| a. Check all boxes that apply regarding the inmate-patient's disability.<br>Disability Codes:<br>TABE score ≤ 4.0<br>DPH – Permanent Hearing Impaired<br>DPV – Permanent Vision Impaired<br>LD – Learning Disability<br>DPS – Permanent Speech Impaired<br>DNH – Permanent Hearing Impaired; improved with hearing aids.<br>DNS – Permanent Speech Impaired; can communicate in writing.<br>DDP – Developmental Disability Program<br>N/A – Not applicable | a. Check all boxes that apply to the special accommodations made to facilitate effective communication:<br>Additional time – P/I (inmate-patient) was given additional time to respond or complete a task.<br>Equipment – Special equipment was used to facilitate effective communication. Notate the type of equipment used in the comments section.<br>SLI – Sign Language Interpreter.<br>Louder – The provider spoke louder.<br>Slower – The provider spoke slower.<br>Basic – The provider used basic language.<br>Transcribe – Communication was written down.<br>Other – Any other tool that was used to facilitate effective communication. | a. Check all boxes that apply that summarize how it was verified that effective communication was reached.<br>P/I asked questions – The inmate-patient asked questions regarding the interaction.<br>P/I summed information – The inmate-patient summarized information regarding the interaction.<br>b. Check one box to indicate if effective communication was or was not reached. ONE of these boxes must be checked. |
| 4. Comments:<br>Provide any additional information regarding effective communication. | | |

Attachment C

**Cocci Risk/Custody Classification Registry**

1. Access: Request access by making a solution center request or directly emailing Anthony DelGavio at Anthony.Delgavio@cdcr.ca.gov.

2. Follow the below link to access the registry. For convenience, save to your Internet favorites.
   rg Cocci Risk - Report Manager

3. Select your institution.

4. For MSF eligibility, view the "Potentially MSF Eligible" column.

5. All IPs with a "Y" in the "Potentially MSF Eligible" column meet medical and mental health criteria for eligibility.

# 14-08

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | August 2014 |
|---|---|---|
| CHAPTER 01: ACCESS TO CARE | Revision Date(s): | NA |
| | Supersedes: | |
| 12.01.400 CORRECTIONAL TREATMENT CENTER – INMATE-PATIENT ACCESS TO MENTAL HEALTH SERVICES | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

**Policy**

Administrative Segregation, Security Housing, Outpatient Housing, and Psychiatric Services Unit inmate-patients (IPs) housed in long-term California Department of Corrections and Rehabilitation (CDCR), Correctional Treatment Centers due to chronic medical conditions and who are placed at the Correctional Clinical Case Management System (CCCMS) or Enhanced Outpatient Program (EOP) level of care shall receive mental health treatment consistent with the mainline treatment requirements corresponding to the IPs level of care outlined in the Mental Health Delivery System (MHSDS) Program Guide, chapters three and four.

Individual clinical contacts shall occur in the Correctional Treatment Center or in clinic areas per the IP's physical requirements and available space. IPs who are unable to participate in out-of-cell structured therapeutic acitivites shall receive a modified treatment plan and increased frequency of Interdisciplinary Treatment Team meetings, per current policy.

**Responsibilities**

Responsibility for review: Associate Director, Statewide Mental Health Program

**Purpose**

To ensure IPs housed in long term CDCR medical care facilities receive mental health services appropriate with their level of care treatment requirements.

**References**

Mental Health Services Delivery System Program Guide (2009), Chapters 3: 12-3-1 through 12-3-17, Chapter 4: 12-4-1 through 12-4-21

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.

# 15-0512

 # HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| Date: | 5/12/15 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Timothy G. Belavich, PH.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| Subject: | **DOCUMENTATION OF MENTAL HEALTH EVALUATIONS AND TREATMENT PLANS** |

This memorandum summarizes and clarifies documentation requirements for completing Mental Health Evaluations and Treatment Plans.

## Mental Health Evaluation

The Mental Health Services Delivery System (MHSDS) Program Guide, 2009 edition, notes that if an adequate California Department of Corrections and Rehabilitation (CDCR) Form MH-7386, Mental Health Evaluation is contained in the health record, a CDCR MH-7386-B, Mental Health Evaluation Add-a-Page, may be used in lieu of a CDCR MH-7386. This memorandum clarifies that in order to substitute a CDCR MH-7386-B for a CDCR MH-7386, the full mental health evaluation must be less than three years old.

## Exception to the Three-Year Time Frame

If an inmate-patient (IP) was discharged from the MHSDS, has been re-referred, and is receiving a new mental health evaluation, a full CDCR MH-7386 shall be completed even if there is an existing adequate CDCR MH-7386 that is less than three years old on record. This situation is considered a new intake and should be treated as such.

## Evaluation of Inmate-Patients in Crisis

IPs who are in crisis may not have the ability to tolerate the full evaluation demanded by the CDCR MH-7386 and clinical needs may be better served by attending to crisis issues. In these cases, the CDCR MH-7389 may be completed for the initial intake. However, the CDCR MH-7386 must be completed within 72 hours.

# MEMORANDUM

Under the Evaluation and Formulation section of the CDCR MH-7389, a recommended initial treatment plan and follow-up must be documented.

Mental Health Treatment Plan

It is not necessary for staff in Enhanced Outpatient Programs to complete a full Mental Health Treatment Plan CDCR MH-7388 at each quarterly review. Per the MHSDS Program Guide, 2009 edition, "The Primary Clinician for each inmate-patient shall prepare a case summary on a CDCR MH-7230, Mental Health Progress Note, for quarterly Interdisciplinary Treatment Team (IDTT) review."[1]

Effective immediately, all quarterly reviews shall be completed on a CDCR MH-7388 D, Mental Health Treatment Plan Addendum Add-A-Page rather than on a CDCR MH-7230. Use of the CDCR MH-7388 D, Mental Health Treatment Plan Addendum Add-A-Page will ensure all treatment planning documents are more easily accessible in the health record. A full CDCR MH-7388 may be used for a quarterly review if there are substantial changes to the treatment plan, but is not required.

If you have questions or need additional information related to this policy, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@CDCR.

cc: Nathan Stanley
Angela Ponciano
Laura Ceballos, Ph.D.
Amy Eargle, Ph.D.
Michael Golding, Ph.D.
Jennifer Johnson
Edward Kaftarian, M.D.
Laurie Mazzola
Andrew Greene
Regional Mental Health Administrators

[1] The criteria for completing the quarterly review may be found in Chapter 4 pages 12-4-15 and 12-4-16 of the Mental Health Services Delivery System (MHSDS) Program Guide.

# 14-0128

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | January 2014 |
|---|---|---|
| CHAPTER 1: ACCESS TO CARE | Revision Date(s): | NA |
| 12.01.200 INTERDISCIPLINARY TREATMENT TEAM – LEVEL OF CARE DECISION | Attachments: | Yes ☒ No ☐ |
| | Director Approval: | [signature] |

**Policy**

Mental Health Staff shall complete a **CDCR MH-7388-B, *Interdisciplinary Treatment Team – Level of Care Decision*** (attached), at all Interdisciplinary Treatment Team (IDTT) meetings required by the Mental Health Services Delivery System (MHSDS) Program Guide (2009 Revision).

**Definitions**

**CDCR MH-7388-B, *Interdisciplinary Treatment Team - Level of Care Decision*:** A tool utilized by the IDTT to guide the IDTT in determining an inmate-patient's (IP's) level of care (LOC) based on an assessment of the IP's behaviors and symptoms, and to determine whether the IP could benefit from a different LOC.

**IDTT:** Composed of (at a minimum) the attending primary clinician (PC), the attending psychiatrist, the correctional counselor, and the IP. It should be noted, as per the MHSDS Program Guide (2009 Revision), the IP has a right to refuse participation in the IDTT. Administrative Segregation Unit (ASU) IDTTs shall include a Psychiatric Technician. Mental Health Crisis Bed (MHCB) IDTTs shall include a member of the nursing staff. The IDTT has responsibility of overall treatment planning within the MHSDS.

**Primary Clinician:** A psychiatrist, licensed psychologist, licensed clinical social worker, or psychiatric nurse practitioner who assumes overall responsibilities for the management and coordination of mental health treatment services provided to an IP by maintaining active therapeutic involvement with an IP. Unlicensed psychologists or clinical social workers supervised and gaining qualifying experience for licensure as governed by California Health and Safety Code Section 1277 and California Penal Code Section 5058.5 are also included in this definition.

**Purpose**

To ensure that IPs are placed and treated at the appropriate LOC or, if deemed clinically necessary, referred to the least restrictive LOC that provides the most benefit to the IP.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met:

1. The CDCR MH-7388-B shall be completed during each IDTT required by the MHSDS Program Guide (2009 Revision).
2. If a referral to a higher LOC is indicated, the Department of State Hospitals (DSH) Coordinator or designee shall be notified and a referral made.
3. If the IP meets any of the seven considerations listed on the CDCR MH-7388-B, but a referral to a higher LOC is NOT made, the PC shall document the reason the referral was not made on the CDCR MH-7388-B (Item 1-6A).
4. If the IP meets any of the considerations listed on the CDCR MH-7388-B and a referral to a higher LOC was NOT made *or* if the IP was referred to an acute or intermediate care program and is on a pending-admission list, the PC shall summarize the specific treatment modifications on the CDCR MH-7388-B (Item 1-6B).
5. **For Enhanced Outpatient Program (EOP) and MHCB LOC ONLY**: If the IP meets consideration number seven on the CDCR MH-7388-B, the PC shall document the reason the referral was not made and summarize treatment modifications on CDCR MH-7388-B (item 7A and 7B).
6. For all IPs meeting any of the seven considerations listed on the CDCR MH-7388-B, the following information shall be entered into MHTS.net on the "*7388-B*" screen:
   - Completion date and time.
   - "YES" will be selected next to "Meets Considerations"
   - Each of the considerations met by the IP must be checked.
   - Status must be selected from the "Disposition" drop down screen.
7. If none of the seven considerations listed on the CDCR MH-7388-B are met, and the IP was NOT referred, confirm that "No" is selected next to "Meets Considerations" on the "*7388-B*" screen (MHTS.net automatically creates the 7388-B data summary and defaults the "Meets Considerations" to a "No").

**References**

1. CDCR MH-7388-B, *Interdisciplinary Treatment Team – Level of Care Decision* (Form and Instructions).
2. Division of Health Care Services. *Mental Health Delivery System Program Guide* (2009 Revision). Ch.6: "Department of Mental Health Inpatient Program," pp.12-3-9, 12-6-1, 12-6-4, 12-6-5, and 12-6-6.

Attachment

State of California
INTERDISCIPLINARY TREATMENT TEAM - LEVEL OF CARE DECISION
CDCR MH-7388-B (Rev. 2/13)

Department of Corrections and Rehabilitation

**PART I: IDTT INFORMATION**

| | | |
|---|---|---|
| CDCR Institution: | Current Housing: | Date of IDTT: |
| Type of IDTT: | If other, reason for IDTT: | LOC before IDTT: |
| LOC after IDTT: | Inmate referred to ICF/Acute LOC? ☐ Yes ☐ No | If yes, level referred to: |
| Date of ICF/Acute LOC Referral: | If referred to DSH, is the inmate-patient clinically suitable for dormitory housing? ☐ Yes ☐ No | |

**PART II: LEVEL OF CARE CONSIDERATIONS**

**SECTION A: Complete for all levels of care**

| | |
|---|---|
| 1. As a result of a major mental disorder, the inmate-patient is unable to adequately function at the current level of care. | ☐ Yes ☐ No |
| 2. The inmate-patient requires highly structured inpatient psychiatric care with 24-hour nursing supervision due to a major mental disorder; serious to major impairment of functioning in most life areas; ritualistic or repetitive self-injurious/suicidal behavior; or refractory psychiatric symptoms. | ☐ Yes ☐ No |
| 3. The inmate-patient demonstrates chronic psychiatric symptoms (e.g., disturbed emotions, perceptions, thought processes, and/or impaired cognitions) that have not responded sufficiently to at least 6 months of treatment to a degree that facilitates adequate levels of functioning. | ☐ Yes ☐ No |
| 4. The inmate-patient is currently in a MHCB and has been in a MHCB for at least 10 days. | ☐ Yes ☐ No |
| 5. The inmate-patient has had 3 or more MHCB placement requests initiated during the last 6 months (includes all MHCB placement requests regardless of where the inmate-patient was housed when the request was initiated, e.g., OHU, alternative housing or overflow beds). | ☐ Yes ☐ No |
| 6. The inmate-patient has had 3 or more CDCR 115-MH evaluations completed during the last 3 months. | ☐ Yes ☐ No |

*Reason for Non-Referral to a Higher Level of Care:*

1-6 A. If "Yes" was selected for any of the 1-6 considerations AND a referral to a higher level of care is NOT made, explain why the referral was NOT made.

1-6 B. If "Yes" was selected for any of the 1-6 considerations AND a referral to a higher level of care is NOT made OR if the inmate-patient was referred to a DSH program and is on the DSH pending-admission list, summarize the specific treatment modifications that are documented in the treatment plan to improve the inmate-patient's ability to function.

| | |
|---|---|
| **INTERDISCIPLINARY TREATMENT TEAM - LEVEL OF CARE DECISION**<br><br>Confidential Inmate-Patient Information | Last Name:<br>First Name: MI:<br>CDCR #:<br>DOB: |

State of California
INTERDISCIPLINARY TREATMENT TEAM - LEVEL OF CARE DECISION
CDCR MH-7388-B (Rev. 2/13)

Department of Corrections and Rehabilitation

SECTION B: Complete only if the current level of care is EOP or MHCB

| | |
|---|---|
| 7. On average and in the last 3 months, has the inmate-patient participated in less than the minimum number of structured treatment hours per week (minimums per week are 5 hours for EOP inmate-patients, 2.5 hours for RC-EOP inmate-patients, and 50% of scheduled hours for inmate-patients on modified treatment plans)? | ☐ Yes ☐ No ☐ NA |

7-A. If "Yes" was selected for consideration 7 AND a referral to a higher level of care is NOT made, explain why the referral was NOT made.

7-B. If "Yes" was selected for consideration 7 AND a referral to a higher level of care is NOT made OR if the inmate-patient has been referred to a DSH program and is on the DSH pending-admission list, summarize the specific treatment modifications that are documented in the treatment plan to improve the inmate-patient's ability to function.

PART III: SIGNATURES

| Treatment Team Members | Name (Print) | Signature |
|---|---|---|
| Primary Clinician | | |
| Psychiatrist | | |
| Correctional Counselor | | |
| Other: | | |
| Other: | | |
| Date of IDTT: | | |
| Inmate-patient attended IDTT: ☐ Yes ☐ No | If no, enter reason for not attending: | |

| | |
|---|---|
| INTERDISCIPLINARY TREATMENT TEAM - LEVEL OF CARE DECISION<br><br>Confidential Inmate-Patient Information | Last Name:<br>First Name: MI:<br>CDCR #:<br>DOB: |

State of California
INTERDISCIPLINARY TREATMENT TEAM – LEVEL OF CARE DECISION
CDCR MH-7388-B (Rev.2/13)

Attachment

Department of Corrections and Rehabilitation

## INSTRUCTIONS

**I. General:**

The CDCR MH-7388-B, **INTERDISCIPLINARY TREATMENT PLAN – LEVEL OF CARE DECISION**, is a component of the CDCR MH-7388, Mental Health Treatment Plan.

The MH-7388-B is:

- Used to guide the IDTT in determining an inmate-patient's level of care based on an assessment of the inmate-patient's behaviors and symptoms, and the potential benefit to the inmate-patient of a different level of care.
- Completed electronically.
- Completed at a frequency consistent with the Mental Health Services Delivery System (MHSDS) Program Guide (2009 Revision) requirements.
- Discussed during the IDTT process.

**II. Form Completion:**

Check all boxes that apply by entering a "Yes," "No" or "NA" response; and, as indicated, an explanation.
Enter the inmate-patient's demographics in the bottom right hand corner of the form.

**III. References:**

Mental Health Services Delivery System Program Guide (2009 Revision).

**IV. PART I: IDTT INFORMATION:**

- Enter the CDCR Institution.
- Enter the inmate-patient's current housing.
- Enter the date and type of IDTT (initial, weekly, etc.). If "Other" is selected, enter the reason for the "Other" IDTT.
- Enter the inmate-patient's level of care before and after the IDTT.
- Enter "Yes" or "No" if the inmate-patient was referred to an Intermediate Care Facility (ICF) or Acute level of care.
- If "Yes," enter the level referred to (ICF or Acute).
- If referred to ICF or Acute, enter the date of the referral. This date should always be the initial referral date for the current open referral.
- If the inmate-patient is referred to the Department of State Hospitals (DSH), state whether the inmate-patient is clinically suitable for dormitory housing. Enter "Yes" or "No".

  Indications for stating that the inmate-patient is not clinically suitable for dormitory housing may include, but are not limited to:
  - Tendency toward violence as a perpetrator.
  - Inability to advocate for self resulting in victimization.
  - Severe mental health symptoms (e.g., delusions, hallucinations) that grossly interfere with social functioning.
  - Cannot function amongst other inmates without undue distress.
  - Cannot cope with strong affect without resorting to aggression either toward self or others.

  If dormitory housing is not clinically indicated, provide the rationale for this decision. Document the rationale on the CDCR MH-7388 or on a progress note.

**V. PART II: LEVEL OF CARE CONSIDERATIONS**

Complete Sections A and B

**SECTION A: Complete for all levels of care.**

Select "Yes" or "No" for considerations 1-6.

**Reason for Non-Referral to a Higher Level of Care:**

1-6 A. If "Yes" was selected for any of the 1-6 considerations AND a referral to a higher level of care is NOT made, explain why the referral was NOT made.

- For consideration 1, the operational definition of "*...unable to adequately function...*" may be, but is not limited to:
  - The severity of the inmate-patient's symptoms and/or level of functioning suggest that the current level of care is insufficient to meet the inmate-patient's treatment needs.
  - The inmate-patient is unable to attend or meaningfully participate in structured activities at the current level of care.
- For consideration 5, the term, "The inmate-patient has had 3 or more MHCB placement requests initiated during the last 6 months," means:
  - A clinical determination has been made that the inmate-patient needs to be referred to a MHCB.
  - Includes all MHCB placement requests regardless of where the inmate-patient was housed when the request was initiated, e.g., OHU, alternative housing or overflow beds.

State of California
INTERDISCIPLINARY TREATMENT TEAM – LEVEL OF CARE DECISION
CDCR MH-7388-B (Rev.2/13)

Department of Corrections and Rehabilitation

INSTRUCTIONS (Cont.)

Examples of reasons for non-referral may include but are not limited to:

- Existing Acute referral
- Existing ICF referral
- Inmate-patient level of care changed to a higher level of care, e.g., from CCCMS to EOP
- Initiation of Clozaril trial
- Medication change
- Modified Treatment Plan
- Recent initiation of Keyhea
- Recent return from DSH
- Recent arrival to current level of care
- Inmate-patient won Vitek Hearing
- Inmate-patient moved to a lower level of care, e.g., EOP to CCCMS or General Population
- Referred for diagnostic psychological evaluation

**Reason for Non-Referral to a Higher Level of Care:**
1-6 B. If "Yes" was selected for any of the 1- 6 considerations AND a referral to a higher level of care is NOT made OR if the inmate-patient was referred to a DSH program and is on a DSH pending-admission list, summarize the specific treatment modifications that are documented in the treatment plan to improve the inmate-patient's ability to function.

**SECTION B: Complete only if current level of care is EOP or MHCB.**
Select "Yes" or "No" for consideration 7.

7-A. If "Yes" was selected for consideration 7 AND a referral to a higher level of care is NOT made, explain why the referral was NOT made. Any EOP inmate-patient, who on average and in the last 3 months, has participated in less than the minimum number of structured treatment hours per week (e.g., minimums per week are 5 hours for EOP inmate patients, 2.5 hours for RC-EOP inmate-patients, and 50% of scheduled hours for inmate-patients on modified treatment plans), will trigger a "Yes" response. For an EOP inmate-patient who is currently in a MHCB, consider the inmate-patient's participation in structured treatment hours in the last 3 months.

Examples of reasons for non-referral may include but are not limited to:

- Existing Acute referral
- Existing ICF referral
- Inmate-patient level of care changed to a higher level of care, e.g., from CCCMS to EOP
- Initiation of Clozaril trial
- Medication change
- Modified Treatment Plan
- Recent Initiation of Keyhea
- Recent return from DSH
- Recent arrival to current level of care
- Inmate-patient won Vitek Hearing
- Inmate-patient moved to a lower level of care, e.g., EOP to CCCMS or General Population
- Referred for diagnostic psychological evaluation

7-B. If "Yes" was selected for consideration 7 AND a referral to a higher level of care is NOT made OR if the inmate-patient has been referred to a DSH program and is on the DSH pending admission list, summarize the specific treatment modifications that are documented in the treatment plan to improve the inmate-patient's ability to function.

**VI. PART III: SIGNATURES:**

- Signatures from all IDTT members are required.
- The Primary Clinician will print, sign, and date the MH-7388-B prior to submitting for scanning and filing into the eUHR.
- If a clinician is participating in the IDTT by telemedicine/psychiatry, type in the name and title of the clinician and note "tele-psychiatry".

Indicate whether the inmate-patient attended the IDTT and, if not, select the reason for non-attendance.

**VII: Distribution:** File in the CDCR eUHR Mental Health Treatment Plan section.

**VIII: Reports for objective consideration numbers 5-7.**

- Consideration 5
  Use the MHTS.net report that is in the On Demand Folder: DSH Indicators.
  Use the column labeled "# of MHCB Requests/Admits in prior 180 days".
- Consideration 6: CDCR 115-MH Evaluation.
  Use the same report as above.
  Use the column labeled "# of 115 MH Evals in prior 90 days".
- Consideration 7: Program Participation:
  Use the On Demand report: Weekly Treatment Hours Summary (High Refuser) report.

# 17-0227

 # HEALTH CARE SERVICES

# MEMORANDUM

Date: 2/27/2017

To: Chief Executive Officers
Chiefs of Mental Health

From:

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program

Subject: RELEASE OF REVISED STATEWIDE PSYCHOTROPIC MEDICATION CONSENT FORM

This memorandum informs staff of the revised CDCR MH-7450 Statewide Psychotropic Medication Consent Form (Attached), released on December 19, 2016.

Effective immediately, the following medication specific consent forms shall no longer be used as the consent information is now incorporated in the CDCR MH-7450:

- CDCR 7454 (07/08) Consent to Take Heat Medication
- CDC 7276 (06/93) Statement of Informed Consent: Anti-Psychotic Agents
- CDC 7279 (06/93) Statement of Informed Consent: Anti-Anxiety Agents
- CDC 7280 (06/93) Statement of Informed Consent: Antidepressants
- CDC 7280 (06/93) Statement of Informed Consent: Lithium

The revised CDCR MH-7450 also includes the text box "Other" in the "Rare Significant Side Effects" section of the form for entering additional side effects not listed. Relevant side effects such as breast enlargement, possible with many antipsychotic medications, shall be listed in this section.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@CDCR.

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives

P.O. Box 588500
Elk Grove, CA 95758

STATE OF CALIFORNIA
**STATEWIDE PSYCHOTROPIC MEDICATION CONSENT FORM**
CDCR MH-7450 (Rev. 12/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Page 1 of 1

Interpreter: ☐Yes ☐No Language: ____________

My doctor has met with me and discussed my mental health condition(s) ____________
and has prescribed the following medication(s) ____________

My doctor has also discussed with me: 1. The reasons why the medication(s) may be helpful, 2. The likelihood of my improving or not improving both with the medication(s) and without the medication(s), 3. Alternative medication choices and/or non-medication treatments such as psychotherapy, 4. That I have the right to discuss discontinuing the medication I am being offered, and the starting dose and dosing range of the medication(s). As with any medication there may be side effects, and the possibility of side affects was discussed with me, along with the fact that I should report any symptoms to staff members. I understand that all possible side effects cannot be predicted, and exactly which side effects will occur cannot be predicted. Any laboratory or other monitoring that may be needed for my medication(s), and that the following are the most important side effects which might occur, either because they are frequent or because they are serious:

| COMMON SIDE EFFECTS (Check for general category, then circle individual side effects) | RARE SIGNIFICANT SIDE EFFECTS (Check for general category, then circle individual side effects) |
|---|---|
| **Metabolic/General:** Increased likelihood of developing diabetes, increased lipids, increased sweating, weight loss, weight gain, acne, changes in body temperature. | **Metabolic/General:** Severe rash, pulmonary embolism, thyroid dysfunction, reduction in white blood cell count, hair loss, decreased blood sodium, bone marrow damage, cataracts, allergic reactions, death. |
| **Cognitive/Neurological/Psychiatric:** Insomnia, restlessness/anxiety, fatigue, drowsiness/sedation, tingling of arms and legs, slowed reflexes, light-headedness/dizziness, headaches, "Fuzzy Thinking," confusion, blurred vision, mania or psychosis. | **Cognitive/Neurological/Psychiatric:** Seizures, increased risk of suicidal thinking and/or behavior. |
| **Musculoskeletal:** Abnormal muscle movements, tremors, muscle stiffness. | **Gastrointestinal:** Liver damage, acute pancreatitis, severe life-threatening constipation. |
| **Gastrointestinal:** Nausea, vomiting, constipation, dry mouth, drooling, heart burn, thirst, diarrhea. | **Genitourinary:** Priapism, birth defects, kidney damage or failure, diabetes insipidus. |
| **Genitourinary:** Increased urination, trouble urinating, sexual dysfunction, breast discharge. | **Cardiovascular:** Increased heart size, decreased platelet count, decreased red blood cell count, arrhythmia, stroke. |
| **Cardiovascular:** Increased heart rate, elevated blood pressure, decreased blood pressure. | Other: ____________ |

☐ (IF PATIENT IS ON A HEAT RISK MEDICATION) I have been told that I am on a medication that is considered a 'heat risk' medication. This means that the medication places me at risk during hot weather. MY DOCTOR DISCUSSED THE FOLLOWING POSSIBLE IMPORTANT HOT WEATHER SYMPTOMS. Seeing spots before your eyes, blurred vision, muscle cramps, stomach cramps, weakness, nausea, vomiting, headache, poor condition, the feeling of losing your balance, dizziness, light-headedness, things spinning around you, feeling like you are burning up, and/or remaining thirsty even after drinking. My doctor has also DISCUSSED WHAT I NEED TO DO OR SHOULD NOT DO WHEN IT IS HOT OUTSIDE. Drink more liquid like water, avoid caffeine, don't drink coffee, tea, or caffeinated sodas, wash from the sink often and take cooling showers when offered, do not run or exercise hard, stay out of the sun as much as possible, wear light colored clothing, keep your head covered, stay away from areas with poor air flow, find a breeze if you can, and stay in contact with others. Some outdoor activities, including sweat lodge participation may be restricted when the temperature is high. By signing at the bottom of this page, I acknowledge that I understand these hot weather symptoms and what I must do when taking "heat risk" medication when significantly hot weather occurs.

☐ (IF PATIENT IS ON ANTIPSYCHOTIC MEDICATIONS) I have also been told that this medication may produce persistent involuntary movement of the face or mouth and at times similar movements in other parts of the body. This condition is called Tardive Dyskinesia and in certain cases these symptoms may be irreversible and/or may appear after the medication has been stopped. By signing below, I acknowledge that I am taking medication that carries these risks listed above.

☐ I understand that I may change my decision regarding the use of the medication(s) at any time by telling any member of my treatment team, though discontinuance of the medication will need to be discussed with my doctor. Should I decide to stop or decrease my psychiatric medication(s), I have been informed to do this under the guidance of staff and absolutely not stop or decrease medication(s) suddenly or on my own.

☐ I am aware that this original CONSENT will be in my electronic health record. I will be given a copy of this CONSENT for my own records.

Patient Name (Print and Sign): ____________ Date: ____________

Doctor Name (Print and Sign): ____________ Date: ____________

1. Disability Code:
☐TABE score ≤ 4.0
☐DPH ☐DPV ☐LD
☐DPS ☐DNH
☐DNS ☐DDP
☐Not Applicable

2. Accommodations:
☐Additional Time ☐SLI
☐Equipment ☐Slower
☐Louder ☐Transcribe
☐Basic
☐Other*

3. Effective Communication:
☐Patient asked questions
☐Patient summed information
Please check one:
☐Not Reached* ☐Reached
*See chronological notes

4. Comments:

CDCR #:
Last Name: MI:
First Name:
DOB:

Unauthorized collection, creation, use, disclosure, modification, or destruction of personally identifiable information and/or protected health information may subject individuals to civil liability under applicable federal and state laws.

DISTRIBUTION: Original: Health Records Copies: Patient
eUHR SCANNING LOCATION: Outpatient, PO/MC-Medication Consents/Refusals; 7450 Statewide Psychotropic Medication Consent Form
EHRS LOCATION: Mental Health Documentation - Consents; Statewide Psychotropic Medication Consent

# 16-1115

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 11/15/2016 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | KATHERINE TEBROCK, ESQ.<br>Deputy Director<br>Statewide Mental Health Program |
| Subject: | CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM PATIENT REVIEW |

As of September 12, 2016, the California Department of Corrections and Rehabilitation (CDCR) had 36,238 patients in the mental health delivery system, 29,090 of whom are in the Correctional Clinical Case Management System (CCCMS). Of those CCCMS patients, the mental health (MH) program has identified 4,690 patients who have not been prescribed psychiatric medications for at least six months. Many of these patients may meet the CCCMS caseload discharge criteria per the Mental Health Services Delivery System Program Guide, which indicates "Inmate-patients may be clinically discharged from CCCMS if they have been in continuous remission and are functioning adequately in the mainline without treatment (including medication) for six-months." (MHPG 12-3-13). If patients are not considered clinically appropriate for discharge, documentation should reflect meaningful psychosocial interventions targeting treatment goals are occurring. The treatment plan and progress shall be clearly noted.

The Chief of Mental Health shall ensure a complete review of each CCCMS patient on the attached list occurs within 90 calendar days of this memorandum. These reviews shall occur at the patient's next scheduled appointment.

If the review is completed during the Primary Clinician (PC) clinical encounter and the PC determines the discharge criteria have been met, the PC shall immediately schedule an IDTT to discuss discharge from the program. If the patient is scheduled for an IDTT before the next appointment, the PC shall meet with the patient prior to the IDTT; if the PC determines discharge criteria have been met, the IDTT will discuss the recommendation for discharge and discharge as appropriate. Justification and an individualized treatment plan for continued placement at the CCCMS level of care continues to be required for all patients retained in

P.O. Box 588500
Elk Grove, CA 95758

# MEMORANDUM

CCCMS. Patients who are adequately functioning in mainline programs and who are not receiving medication or individualized treatment may be removed from MHSDS. Discharge is not required for patients receiving and benefitting from individualized treatment. However, if retained in MHSDS, treatment progress is expected and must be documented such that higher functioning patients are moved toward eventual discharge from CCCMS.

A list of patients who have not been prescribed psychiatric medication for six months or longer will be distributed each quarter. Any patient who appears on the quarterly list and has not been reviewed for continued retention or discharge from CCCMS, shall be reviewed at the patient's next scheduled appointment.

The Chief of Mental Health will ensure reviews are completed and provide a summary of the results to the respective Mental Health Regional Administrator upon completion. The summary will include the justification for retaining I patients on the list as CCCMS. This should be accomplished by adding columns on the attached excel spreadsheet that indicate 1) if the patient was retained or removed and, 2) a brief clinical justification.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@CDCR.

Attachment

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Jennifer Johnson
Kathleen Allison
Jeff Macomber
Regional Mental Health Administrators
Regional Health Care Executives

# 14-1222



# HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 12/22/2014 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Timothy G. Belavich, Ph.D., MSHCA, CCHP-MH, Director (A), Division of Health Care Services and Deputy Director, Statewide Mental Health Program |
| Subject: | **ACCURATE TRACKING OF MENTAL HEALTH TREATMENT HOURS** |

Mental health treatment hours offered and received must be accurately recorded and tracked in the Mental Health Tracking System (MHTS.net). All clinicians, coordinators, schedulers, and support staff must be informed of the MHTS.net data entry requirement. When group appointments do not last the full amount of time scheduled, the actual length of the group appointment must be recorded in the primary clinician's documentation and added correctly in MHTS.net.

Group appointments must not conflict with other mental health appointments. In addition, to the extent possible, group treatment hours should not conflict with other inmate-patient activities, such as yard time. When such conflict does occur, a refusal must be entered with the proper reason code, and close monitoring must occur to make sure that all major and ongoing scheduling conflicts are resolved.

If you have any questions, or need additional information related to this directive, please contact the Mental Health Policy Unit via email: CDCR MHPolicyUnit@CDCR.

cc: Angela Ponciano
Nathan Stanley
Laura Ceballos, Ph.D.
Amy Eargle, Ph.D.
Edward Kaftarian, MD.
Jennifer Johnson
Utilization Management Unit
Mental Health Regional Administrators
Regional Healthcare Executives

P.O. Box 588500
Elk Grove, CA 95758

14-0303

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | March 3, 2014 |
| To: | Chief Executive Officers<br>Wardens<br>Chiefs of Mental Health |
| From: | M.D. Stainer, Director<br>Division of Adult Institutions<br><br>Timothy G. Belavich, Ph.D., MSHCA, CCHP, Director (A), Division of Health Care Services and Deputy Director, Statewide Mental Health Program |
| Subject: | **INTERDISCIPLINARY TREATMENT TEAM REVIEW OF INMATE-PATIENT'S ABILITY TO PARTICIPATE IN PROGRAM ASSIGNMENTS** |

This memorandum clarifies the "EOP Accessibility to General Population Prison Programs" policy dated March 30, 2007, and directs the roles of the Interdisciplinary Treatment Team (IDTT) and the Initial/Unit Classification Committee in assignment of Enhanced Outpatient Program (EOP) Inmate-Patients (IPs) into the appropriate educational, vocational, and employment programs. IPs shall not be excluded from any program solely on the basis of their mental health level of care. **Both the 2007 memorandum and this memorandum provide specific direction on the CDCR policy that permits EOP inmates to be placed into assignments alongside non-EOP inmates.**

Interdisciplinary Treatment Team Responsibilities

The IDTT shall complete a review of the IP's ability to participate in a program assignment, identify any functional limitations, and document any required reasonable accommodations. All EOP IPs are assumed to be eligible for appropriate assignment unless they are determined to be medically disabled (psychiatrically disabled) by the IDTT and have been reviewed by a Classification Committee. The Initial/Unit Classification Committee has the sole responsibility for making program assignment and work group designations. Classification Committees determine the IP's work group based on information on the form Chrono-Medical, Psychiatric, Dental (CDC 128-C), provided by the IDTT and feedback from staff from the affected work area, academic, vocational program, and the inmate assignment office.

Frequency of Reviews

- The IDTT shall evaluate all IPs for program assignment eligibility at the initial IDTT.
- If an IP has already been accepted into the EOP program and has not been evaluated, evaluation shall occur at the next scheduled IDTT.

# MEMORANDUM

- Following the initial evaluation of eligibility, IPs who do not yet have a program assignment shall continue to be evaluated at every subsequent IDTT.
- IPs who have been determined, through review by the IDTT and a Classification Committee, to be medically disabled (psychiatrically disabled), shall be re-evaluated by a mental health clinician and reviewed by the IDTT at intervals of no less than six months for changes to program eligibility.
- IDTT shall review the functional limitations of an IP at least every six months.

Reasonable Accommodations

When evaluating the IP's ability to perform an assignment, the IDTT must review the IP's history, current functioning, level of impairment, and performance in previous assignments. When an IP has been removed from an assignment, if the IP was removed due to performance issues, the IP's Primary Clinician shall review any available documentation (i.e., CDC 128-B Informational Chrono, CDC 128-G Classification Chrono, CDC 128-A Custodial Counseling Chrono, CDC 115 Rules Violation Report) resulting in removal from the assignment. The Primary Clinician will consult with the IP's supervisor/instructor prior to the IP's next IDTT, whenever possible. This consultation shall also include a discussion of the specific behaviors that led to the IP's removal from the assignment and the supervisor/instructor's overall evaluation of the IP's abilities.

The IDTT shall specify if any reasonable accommodations may be needed. Some examples of work related activities or IP characteristics the IDTT may consider when evaluating the IP's functional limitations and need for reasonable accommodations are:

- Ability to work around machinery.
- Ability to work around sharp objects.
- Heat related pathologies, such as medications or health conditions.
- The IP's capacity to tolerate social interaction.
- The IP's ability to handle stress, particularly high stress assignments.
- The IP's level of restlessness.
- The IP's attention span.
- The IP's ability to work a half-time or full-time assignment.

Light Duty Assignments

When it is believed an inmate has a long-term psychiatric work limitation, he/she shall be evaluated by a mental health clinician to delineate the IP's capacity to perform work and/or training programs for either a full or partial workday. The results of this evaluation shall be reviewed by IDTT and a Classification Committee for a final determination.

If the Classification Committee concurs with IDTT's recommendation:

1. The case shall be referred to the Inmate Assignment Lieutenant who shall make an effort to provide the IP an assignment within the institution's resources and the IP's capabilities.

# MEMORANDUM

2. The Classification Committee and IDTT shall review such cases every six months for changes to program eligibility.

If the Classification Committee disagrees with the evaluation conducted by IDTT:

1. The case will be referred back to IDTT with the difference of opinion articulated on a CDC 128-G, Classification Chrono.
2. Upon receipt of IDTT's second evaluation, the Classification Committee shall review the case again.
3. If the Classification Committee still disagrees with the second IDTT evaluation, it shall refer the matter to the Institutional Classification Committee for a final determination of the IP's work group/credit earning status.

Medical (Psychiatric) Disabilities Status Determination

If the IDTT concludes that an IP cannot participate in a work, academic, or vocational program even with reasonable accommodations, then this conclusion shall be documented on the form CDC 128-C, Chrono-Medical, Psychiatric, Dental. The CDC 128-C, Chrono-Medical, Psychiatric, Dental shall be forwarded to the IP's assigned correctional counselor to schedule a Classification Committee review.

Should the documented limitations prevent the IP from performing the essential functions of any work, academic, or vocational program even if reasonable accommodation(s) are provided; then he/she will be temporarily psychiatrically unassigned or considered medically disabled. Placement into one of these categories shall be approved by the appropriate Classification Committee.

For custody questions regarding this memorandum, please contact Thomas Tyler, Captain, Adult Institutions, Audits and Litigation Unit, Division of Adult Institutions (DAI), at (916) 324-7956. For clinical questions regarding this memorandum, please contact Amy Eargle, Chief Psychologist, Clinical Support, Statewide Mental Health Program, Division of Health Care Services (DHCS), at (916) 691-0279.

Attachment

cc: Kelly Harrington, Deputy Director, Facility Operations, DAI
Kathleen Dickinson, Deputy Director (A), Facility Support, DAI
Kathleen Allison, Deputy Director, Special Project Liaison, DAI
Associate Directors, DAI
Natalie Fransham, Chief, Office of Policy Standardization, DAI
Thomas Tyler, Correctional Captain, Audit and Litigation Unit, DAI
Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS
Angela Ponciano, Associate Director, Policy and Clinical Support, Statewide Mental Health Program, DHCS
Amy Eargle, Chief Psychologist, Clinical Support, Statewide Mental Health Program, DHCS
Laura Ceballos, Chief Psychologist, Quality Management, Field Operations, Statewide Mental Health Program, DHCS
Regional Mental Health Administrators, Field Operations, Statewide Mental Health Program, DHCS

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : March 30, 2007

To : Associate Directors, Division of Adult Institutions
Wardens
Health Care Managers
Chiefs of Mental Health
Classification and Parole Representatives
Correctional Counselor IIs, Reception Centers
Classification Staff Representatives

Subject: **EOP ACCESSIBILITY TO GENERAL POPULATION PRISON PROGRAMS**

The purpose of the memorandum is to clarify the availability of prison programs to Inmate-patients (IPs) in Enhanced Outpatient (EOP) Level of Care. If otherwise qualified, EOP IPs are eligible for all prison programs and activities so long as the Interdisciplinary Treatment Team (IDTT) individually determines that the program or activity is consistent with the Inmate-patient's overall mental health treatment and the Mental Health Services Delivery System Program Guide. During the course of treatment planning, the IDTT shall assess the inmate-patient's mental health needs to decide the relative priority of activities included in the treatment plan. Appropriate activities may include not only direct mental health treatment, but also educational, vocational, employment, and religious programs available to general population inmates. Inmate-patients prescribed heat-sensitive medications shall be excluded from Native-American sweat lodge activities that involve exposure to heat.

Individualized assessment of IPs must occur, as no inmate may be excluded from a program because of his or her placement in EOP. In making their individualized assessment, each facility and the IDTT must continue to consider correctional concerns, including IPs and staff safety.

If you have questions regarding this policy and procedure, please contact Sharon Chaiken, Ph.D., Chief Psychologist, Mental Health Program, Division of Correctional Health Care Services (DCHCS) at (916) 445-4114.

BRIGID HANSON
Director (A)
Division of Correctional Health Care Services

LEA ANN CHRONES
Director (A)
Division of Adult Institutions

12884182

cc: Shama Chalken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
Doug McKeever, Director (A), Mental Health Program, DCHCS
Andrew Swanson, M.D., Chief Psychiatrist, Mental Health Program, DCHCS
Margaret McAloon, Ph.D., Chief Psychologist, Clinical Operations and Forensic Unit, Mental Health Program, DCHCS
Christine Martin, Deputy Director (A), Strategic Development, DCHCS
Brigid Hanson, Deputy Director, DCHCS
Supervising and Senior Psychologists, Mental Health Program, DCHCS
Michael Stone, Staff Counsel, Office of Legal Affairs
Lisa Tillman, Deputy Attorney General, Department of Justice

1238418.2

17-0721



# HEALTH CARE SERVICES

## MEMORANDUM

Date: 7/21/2017

To: Chief Executive Officers
Chiefs of Mental Health

From:

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program

JEFF MACOMBER
Deputy Director
Facility Support
Division of Adult Institutions

Subject: **DIALECTICAL BEHAVIOR THERAPY ENHANCED OUTPATIENT PROGRAM POLICY AND PROCEDURE**

This memorandum announces the release of the Dialectical Behavior Therapy (DBT) Enhanced Outpatient Program (EOP) policy (12.04.100) and procedure (12.04.100P1) (attached).

Patients placed in the EOP level of care shall be considered for placement in the DBT EOP as outlined in the attached policy. The DBT EOP is first being implemented at the California Medical Facility. Headquarters will notify institutions when additional units are activated.

If you have questions or require additional information related to this memorandum, please contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@CDCR.

Attachments

cc: Kathleen Allison
Connie Gipson
Brittany Brizendine
Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Jennifer Johnson
Associate Directors, Division of Adult Institutions
Regional Mental Health Administrators
Regional Health Care Executives

P.O. Box 588500
Elk Grove, CA 95758

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | 7/21/2017 |
|---|---|---|
| CHAPTER 4: ENHANCED OUTPATIENT PROGRAM | Revision Date(s): | NA |
| | Supersedes: | |
| 12.04.100 DIALECTICAL BEHAVIOR THERAPY ENHANCED OUTPATIENT PROGRAM | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | For Katherine Tebrock |

**Policy**

Patients at the Enhanced Outpatient Program (EOP) level of care (LOC) shall be considered for placement in the Dialectical Behavior Therapy (DBT) EOP which provides intensive outpatient mental health treatment to the EOP population in a designated housing unit.

For patients at the EOP LOC to be accepted in the DBT EOP, all of the following criteria are required. The patients:

1) Have at least one year left to serve in the California Department of Corrections and Rehabilitation (CDCR) in order to allow sufficient time to reap benefits from the program.
2) Are amendable to treatment.
3) Are voluntarily seeking admission into the DBT program.
4) Are committed to DBT and complies with the following Six Patient Agreements:
   a. To enter and stay in therapy
   b. To attend therapy
   c. To work on reducing suicidal behavior
   d. To work on reducing therapy-interfering behaviors
   e. To attend DBT skills training separate from therapy
   f. To abide by research agreements
5) Agree to measurably decrease one of the following treatment targets:
   a. Suicidal behavior
   b. Para-suicidal behavior
   c. Life-threatening behavior
   d. Therapy interfering behavior

Patients exhibiting the following criteria are *preferred:*

1) Chronically suicidal patients
2) Patients engaging in self-harm behavior
3) Patients with readmissions to Mental Health Crisis Bed (MHCB), Acute or Intermediate inpatient care
4) Recent discharges from Psychiatric Services Unit and Administrative Segregation Unit

*Exclusion Criteria:*

Patients who have a severe mental illness that interferes with the patient's ability to participate actively in treatment.

**Compliance Indicators**

To be in compliance with this policy, the following indicators will be collected and provided to the Mental Health Quality Management Committee, monthly, by the DBT Program Supervisor for review, discussion, and action:

1) Percentage of patients attending one hour of individual DBT psychotherapy per week
2) Percentage of patients attending required hours of the following:
   a. Two hours DBT skills group
   b. Two hours DBT skills implementation groups
3) Percentage of patients attending at least 80% of all other scheduled structured therapeutic activities
4) Percentage or number of MHCB admissions

To be in compliance with this policy, the following requirements shall be met:

1) The Interdisciplinary Treatment Team (IDTT) refers patients meeting the initial custodial, medical, and mental health screens for DBT.
2) A Primary Clinician (PC) from the DBT IDTT reviews the referral and contacts the referring PC for a clinical case discussion.
3) Patients agree and commit to DBT treatment for a period of one year.
4) The DBT IDTT makes the final acceptance decision and documents the decision on a CDCR MH-7230D Interdisciplinary Progress Notes-IDTT Summary.
5) If patients are determined by the DBT IDTT to not qualify for the program based on the acceptance criteria, the justification shall be documented in the patients' medical records.
6) Patients accepted into the DBT EOP shall be offered:
   a. A minimum of one hour of individual DBT psychotherapy per week.
   b. 10 hours of structured therapeutic activities per week.
   c. Monthly psychiatry individual treatment for medication evaluation and management.
   d. Face-to-face consultation by members of the treatment team in between individual psychotherapy sessions.
   e. A scheduled IDTT every 90 days or sooner if needed.
   f. Nursing and supportive care as provided in the MHSDS Program Guide.
   g. A monthly progress note by the PC to document DBT group therapy progress.
   h. Aftercare Planning.
7) If patients have four consecutive unexcused absences from scheduled DBT individual psychotherapy sessions or DBT skills groups, the patient shall be terminated from and transferred out of the DBT program.

**Responsibilities**

The Chief of Mental Health or designee at each institution is responsible for the implementation of this policy.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution... | then... |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date of this policy valid until the next LOP revision date. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date of this policy that meets the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

- Linehan, M. (2014). *DBT Skills Training Manual, 2nd Edition*. Guilford Press
- Linehan, M. (1993). *Cognitive Behavioral Treatment of Borderline Personality Disorder*. Guilford Press
- *DBT Skills Training Handouts and worksheets, 2nd Edition*. Guilford Press

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | 7/21/2017 |
|---|---|---|
| CHAPTER4: ENHANCED OUTPATIENT PROGRAM | Revision Date(s): | NA |
| | Supersedes: | |
| 12.04.100.P1 DIALECTICAL BEHAVIOR THERAPY ENHANCED OUTPATENT PROGRAM | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] For Katherine Tebrock |

| | Procedure |
|---|---|
| 1. | *Program Collaboration*<br>1) The Dialectical Behavior Therapy (DBT) Enhanced Outpatient Program (EOP) shall be jointly managed by the Senior Psychologist, Supervisor, Supervising Registered Nurse, and the Unit Sergeant.<br>2) A morning "check-in" meeting between custody and clinical staff shall be held each business day. The meeting will include representatives from custody, nursing and mental health. During the meeting, involved personnel shall identify new arrivals, discuss current behavioral issues and concerns, and share any pertinent information regarding new arrivals and/or at-risk inmates. This meeting shall be documented in the DBT Meeting Minutes Log by the DBT Supervisor and salient clinical information shall be documented in the patient's medical record. If necessary, any referrals for additional mental health services shall be identified and addressed.<br>3) The program managers (Senior Psychologist, Supervisor, Supervising Registered Nurse, and the Unit Sergeant) shall conduct joint weekly leadership rounding of both staff and patients.<br>4) The Chief of Mental Health (CMH), Chief Nurse Executive and the Healthcare Access Associate Warden shall conduct joint DBT EOP rounds monthly. |
| 2. | *Admission to Program and Referral Process*<br>1) Mental Health Interdisciplinary Treatment Teams (IDTT) may initiate a referral to the DBT EOP. When a patient potentially meets the admission criteria, the IDTT shall complete a mental health assessment substantiating the referral.<br>2) A Primary Clinician (PC) from the DBT IDTT shall review the referral and contact the referring PC for clinical case discussion.<br>3) The DBT Supervisor will provide patient's identifying information to assigned counselor to ensure the inmate's case factors allow referral to the receiving institution. Classification score in and of itself shall not make an inmate ineligible for a DBT program.<br>4) If the patient meets preliminary criteria for the program, the DBT PC shall meet with the patient and the patient's referring PC either through video conference or telephonically to determine appropriateness for program.<br>5) The DBT PC shall review the components of the DBT program with the prospective patient, including the required treatment and patient and PC agreements, and the patient must agree to the required treatment prior to consideration for acceptance into the program.<br>6) If the patient is determined by the DBT IDTT to not be appropriate for the program, the justification shall be documented in the patient's medical record and notification sent to the referring PC. |

| | |
|---|---|
| | 1) After a patient is accepted into DBT, the DBT Program Supervisor, or designee, will generate an acceptance chrono to forward to the referring Institution's Classification and Parole Representative (C&PR).<br>a. If the referring institution has not gone live with Electronic Health Records System (EHRS), the chrono will be completed and faxed or emailed to the referring institution's C&PR.<br>b. If the referring institution has gone live with EHRS, the acceptance chrono will be completed by the Program Supervisor or designee. The chrono will then be forwarded to the referring institutions Classification & Parole Representative (C&PR) via the EHRS system.<br>2) A Unit Classification Committee (UCC) at the referring institution will convene after receiving the acceptance chrono from the DBT EOP. If the UCC determines the patient meets the custodial criteria for placement at the institution's EOP, the inmate shall be referred and the case shall be presented to the Classification Staff Representative (CSR) for endorsement and transfer purposes. The CSR shall endorse the patient to the EOP with an override for "PSY", if appropriate. The CSR will indicate in the endorsement that placement is for the DBT EOP.<br>3) If the UCC determines the patient is inappropriate for transfer consistent with existing policy, the CDCR Form 128-G, Classification Chrono, shall clearly document the decision/rational for denial.<br>4) The DBT Program Supervisor, or designee, will maintain a list of endorsed patients and will notify the sending institution's C&PR when a bed is available.<br>5) The C&PR at the sending institution will be responsible for including "Accepted to DBT Program" on the weekly bus request to track patients accepted and transferring into the DBT program. |
| **4.** | *Required Agreements*<br>**Patient Agreements**<br>1) The patient must agree and commit to DBT treatment for a period of one year.<br>a. This one year period is renewable when indicated but must be justified, reviewed, and approved by the Utilization Management Committee.<br>2) Circumstances of Unilateral Termination<br>a. If the patient has four consecutive unexcused absences from scheduled DBT individual psychotherapy sessions or DBT skills groups, the patient shall be terminated from the DBT program.<br>i. This is a non-negotiable requirement of DBT, and under no circumstances shall this patient agreement be broken.<br>ii. PCs may not provide approved reasons for patient absence.<br>iii. The Senior Psychologist, Supervisor shall be responsible for validating attendance data.<br>3) Attendance Agreement<br>a. The patient must agree to attend all scheduled DBT therapy.<br>b. The patient must agree to attend at least 80% of all *other scheduled structured therapeutic activities.*<br>4) Suicidal Behaviors Agreement<br>a. The patient must agree to reduce suicidal and self-injurious behavior as a primary treatment goal.<br>5) Therapy-Interfering Behaviors Agreement |

| | |
|---|---|
| | a. The patient must agree to reduce non-compliant behaviors that interfere with the DBT therapy.<br>6) DBT Skills Training Agreement<br>a. The patient must agree to attend every DBT Skills Training group.<br>7) Program Evaluation<br>a. The patient must agree to allow aggregate data to be used for the purposes of program evaluation.<br><br>**Primary Clinician Agreements**<br>1) "Every Reasonable Effort" Agreement<br>a. The PC shall review common misconceptions of therapy, and agree to make every reasonable effort to provide competent and ethical treatment.<br>2) Personal Contact Agreement<br>a. The PC agrees to attend every scheduled session, provide in advance backup coverage when indicated and reschedule if needed.<br>3) Respect-for-Patient Agreement<br>a. The PC shall agree to respect the rights of the patient.<br>4) Confidentiality Agreement<br>a. The PC shall review the limits of confidentiality, including those specific to a correctional environment, and describe the treatment team approach utilized in the program with the patient.<br>5) Consultation Agreement<br>a. The PC shall agree and notify the patient that he/she will be participating in a weekly case consultation meeting that is standard in all DBT programs. If additional clinical consultation is needed, the PC shall consult with a supervisor or peer. |
| **5.** | ***Required Treatment***<br>If the patient is accepted into the DBT EOP, the following required treatment shall be provided:<br>1) Individualized DBT oriented treatment plan.<br>2) A minimum of one (1) hour of individual DBT psychotherapy per week.<br>3) 10 hours of structured therapeutic activities per week.<br>a. Four (4) hours of co-facilitated DBT group treatment per week consisting of:<br>i. Two hours of DBT skills group<br>ii. Two hours of DBT skills implementation groups<br>b. Six (6) hours of other scheduled structured therapeutic activities such as, but not limited to:<br>i. Music therapy<br>ii. Art therapy<br>iii. Recreation therapy<br>iv. Therapeutic Community Meeting<br>v. Clinical Pre-Release group<br>vi. Substance Abuse Group<br>vii. Daily Living Skills<br>viii. Educational programs<br>4) Monthly psychiatry individual treatment for medication evaluation and management. |

| | |
|---|---|
| | a. For patients with psychotic symptoms in the context of a severe Borderline Personality Disorder, the psychiatrist shall review for a history of two (2) different failed trials of antipsychotic medications.<br>b. If the patient has had two different failed trials and no has contraindications, the DBT IDTT shall consult with the local Clozapine team.<br>5) Face-to-face consultation (e.g., coaching) in between individual psychotherapy sessions by members of the treatment team.<br>6) Weekly Case Consultation meeting with PCs.<br>7) IDTT will be scheduled every 90 days, or sooner if clinically indicated.<br>8) Nursing and supportive care as outlined in the MHSDS Program Guide.<br>9) The PC will complete a monthly progress note to document DBT group therapy progress and all notes shall be reviewed in IDTT.<br>10) Aftercare Planning |
| 6. | *Utilization Management*<br>1) The DBT EOP shall establish a local Utilization Management (UM) monthly meeting.<br>2) The DBT UM meeting shall include leadership from custody, nursing, and mental health consisting of the following:<br>a. Institution Chief of Mental Health (Chairperson)<br>b. Chief or Senior Psychiatrist<br>c. DBT program Senior Psychologist, Supervisor<br>d. Supervising Registered Nurse<br>e. Healthcare Access Warden<br>f. PC to present the case<br>g. DBT psychiatrist as necessary<br>3) Each patient who is anticipated to be retained by the DBT IDTT beyond one year in the program shall be presented at the DBT UM meeting for a concurrent review.<br>4) If the IDTT retains the patient in the program beyond one year, a quarterly DBT UM committee concurrent review shall occur.<br>5) The DBT UM committee shall make a recommendation to the IDTT to retain the patient in the treatment or refer to another program as indicated.<br>6) If the IDTT does not agree with the DBT UM committee's recommendation, the IDTT shall appeal the decision in the following month's UM committee.<br>a. The DBT UM committee shall review and either accept or deny the IDTT's appeal.<br>i. If the DBT UM committee denies the IDTT's appeal, the CMH or designee shall document the reason in the health record.<br>ii. The DBT IDTT must provide the patient with alternate treatment plan strategies during an IDTT.<br>7) The local DBT UM Chairperson will identify a DBT UM Committee member to document DBT UM Committee meetings and track of continued stay reviews. |
| 7. | *Hospitalization Protocol*<br>1) A hospitalization protocol shall be developed for each patient.<br>a. This protocol shall be discussed with the patient.<br>b. The patient must agree to the individualized protocol in order to be accepted into the program.<br>2) The patient should not be automatically admitted for self-harm without intent unless the behavior demonstrates a danger to the health and life of the patient. |

     a. A comprehensive team approach is required for urgent SREs and inpatient admission determination.

     b. The clinician should presume an intent to die (despite denial of intent by the patient) if the self-harm is likely to or would have caused death if not for intervention, result in significant medical consequences, or significant planning and preparation is noted in the incident.

3) A comprehensive Suicide Risk Evaluation (SRE) must be completed on each patient prior to the patient's Initial IDTT.

     a. The SRE must outline the patient's history of self-harm with intent to die versus self-harm without intent to die.

4) Brief Mental Health Crisis Bed (MHCB) admissions shall be considered for DBT EOP patients in the following circumstances:

     a. Acutely psychotic or in an acute mood episode (e.g., manic or mixed episode).

     b. The patient either indicates increased suicidal desire or objective indications of heightened suicidality are present.

     c. The risk of suicide is higher than the risk of an inappropriate hospitalization.

     d. The patient's current crisis is of such severity that it is not safe for the patient to remain in an outpatient setting.

5) Inpatient hospitalization is avoided when patient is DBT qualified. If the patient requires MHCB admission, then the following requirements shall be met:

     a. The patient shall be admitted to a MHCB at the same institution where the DBT program is located after receiving authorization from HCPOP. The PC will notify HCPOP per the current procedure identifying the patient as currently in the DBT program.

     b. A MHCB referral to the Health Care Placement Oversight Program shall be made in accordance with the current MHCB referral process and procedure via email.

     c. The MHCB referral to HCPOP shall include language informing HCPOP that the patient is a participant in the DBT and retention at the current institution is necessary.

     d. The Mental Health Regional shall be included in the HCPOP MHCB referral email.

     e. The DBT IDTT shall be responsible for the patient's treatment while in the MHCB.

         i. Required clinical staff shall have privileges as required by the license of the MHCB.

         ii. The DBT PC and DBT psychiatrist who are credentialed and privileged to provide treatment in MHCBs are responsible for providing the 1:1 daily treatment on normal business days, to reduce the amount of needed inpatient days for the patient.

     f. If the patient is admitted overnight and determined to be no longer in need of inpatient treatment upon evaluation, the patient shall be discharged back to the DBT program immediately.

         iii. The DBT IDTT shall not be required to wait 72 hours for the Initial IDTT.

         iv. The DBT IDTT shall conduct both an Initial IDTT and Discharge IDTT as soon as possible.

     g. If the patient is not able to be admitted to the MHCB at the same institution as the DBT program HCPOP will notify the DBT PC of any alternate placement, and will consult with the receiving IDTT for continuity of care.

|   |   |
|---|---|
|   | 6) All medication changes shall be made by the DBT psychiatrist, or designee, regardless of level of care if admitted to the same institution's MHCB. The DBT psychiatrist, or designee, shall be consulted regarding medication changes if the patient is admitted to another institution's MHCB. |
| 8. | *Discharge Process*<br>1) If the DBT IDTT determines that a patient no longer is clinically appropriate for the program or has met treatment goals, a discharge chrono will be completed by the DBT Program Supervisor, or designee, and forwarded to the Correctional Counselor on the same day as IDTT.<br>2) The Correctional Counselor will convene the Unit Classification Committee to refer to CSR for transfer. |

14-1117

| **VOLUME 12:** MENTAL HEALTH SERVICES | Effective Date: | November 2014 |
|---|---|---|
| **CHAPTER 05:** INPATIENT SERVICES | Revision Date(s): | November 2014 |
| | Supersedes Policy: | August 2014 |
| **POLICY 12.05.601** DOCUMENTATION REQUIRED FOR REFERRAL TO MENTAL HEALTH CRISIS BED | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

**Policy**

For all inmate-patient (IP) referrals to a Mental Health Crisis Bed (MHCB), referring/sending institutions shall complete and submit a referral packet as described in this policy.

**Purpose**

To standardize MHCB referral documentation; clarify the expectations between the sending and receiving institutions; improve the efficiency in generating the documentation to provide timely access to care; and ensure that the receiving MHCB staff has the necessary paperwork to admit the IP.

**Discussion**

When IPs are referred for and prior to acceptance into an MHCB, the referring/sending institution's mental health staff shall complete and make the referral packet available to the receiving MHCB staff. While the receiving MHCB staff may request additional documentation beyond what is required, the only documentation required for the referral and acceptance into the MHCB is listed in this policy. Each document shall be dated within the specified period of time indicated below for the purpose of the MHCB referral documentation.

**Compliance Indicators**

To be in compliance with this policy, the following documentation is required:

1. CDCR 128C Transfer Chrono – Dated within two (2) days of the documented date of referral.
2. CDCR 128-C3 Medical Classification Chrono – The most current per the medical classification policy (Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure).
3. CDCR 7221 Physician Order Form (written by a psychiatrist, who has competence in performing medical assessments, or primary care physician), must state on the form: "Medically cleared for transfer" with a corresponding progress note – SOAPE format – Dated within 48 hours of the documented date of referral.
4. CDCR MH-7230A Interdisciplinary Progress Notes – General (Including but not limited to PC 2602 history) – All CDCR MH-7230A's dated within seven (7) days of the documented date of referral.
5. CDCR 7371 Confidential Medical/MH Information Transfer – Dated within seven (7) days of the documented date of referral.
6. CDCR 7386 Mental Health Evaluation (or CDCR 7386 Mental Health Evaluation

Add-a-Page)

- If a CDCR 7386 or a CDCR 7386 Add-a-Page was completed more than seven (7) days prior to referral, a CDCR 7389 (Rev.06/06) Brief Mental Health Evaluation is to be completed by the referring clinician at the time of referral.
- If a CDCR 7386 or a CDCR 7386 Add-a-Page is not available or the most recent document is available but is not complete or accurate, a full CDCR 7386 must be completed by the referring clinician or the Primary Clinician at the time of referral.

7. CDCR MH-7447 Suicide Risk Evaluation – Dated within seven (7) days of the documented date of referral.
   - The referring clinician is to complete the CDCR MH-7447 if the IP is referred for suicidal ideation a suicide attempt, or any type of self-harm.
   - The receiving team may, upon clinical discretion, complete the CDCR MH-7447 if the IP is referred for any other reason.
8. Medication Profile (within last 30 days of the documented date of referral.) – Current medication reconciliation.
9. CDCR 128C Acceptance Chrono.

**References**

Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure

Division of Health Care Services (DHCS), Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision, Chapter 5, Mental Health Crisis Bed, p. 12-5-11.

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

15-0904

 CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

**Date:** 9/4/2015

**To:** Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health

**From:**

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services, and
Deputy Director, Statewide Mental Health Program
California Department of Corrections and Rehabilitation

KELLY HARRINGTON
Director
Division of Adult Institutions
California Department of Corrections and Rehabilitation

**Subject:** MENTAL HEALTH CRISIS BED REFERRAL NOTIFICATION

In preparation for the launch of the Electronic Health Record System, the Health Care Placement Oversight Program (HCPOP) is transitioning from Mental Health Crisis Bed (MHCB) placement requests which are currently made via telephone to one which will use email. The use of email is more efficient, dates and times are more easily tracked, and the information is clearer.

Effective September 18, 2015, request(s) for MHCB placements made to HCPOP and notification from HCPOP that an MHCB has been reserved shall be communicated via email, and will replace telephonic requests. This directive does not supersede the Mental Health Program Guide clinical-to-clinical contact requirements and is in conjunction with the December 23, 2014 memorandum "TRANSFER OF INMATES TO AND FROM MENTAL HEALTH CRISIS BEDS."

**MHCB Request**

Contact with HCPOP via email shall be made within one hour of clinical determination an MHCB is required, pursuant to policy (December 23, 2014). Effective September 18, 2015, any request for an MHCB shall be emailed to the following address: mhcb.hcpop@cdcr.ca.gov. Please limit the emails sent to this address to only those directly pertaining to HCPOP, and do not include when engaging in institution specific conversation via "reply to all." The sender of the email shall request an email "Read Receipt" to be used as confirmation the request was received by HCPOP. The sender shall also copy the

# MEMORANDUM

requesting institution's Chief of Mental Health and Classification and Parole Representative on the email request.

The subject line of the email shall include:

- Inmate's Name
- Inmate's Number
- Referring Institution's acronym

*Example: Smith A10101 SAC*

The following information shall be contained within the body of the email:

- Reason for MHCB placement.
  - Danger to self (DS)
  - Danger to others (DO)
  - Suicidal Ideations (SI)
  - Gravely Disabled (GD)
- Mental health level of care prior to requiring an MHCB, i.e., CCCMS, EOP, or GP.
- Name, title, and contact information of the clinical staff making the MHCB determination.

In the event the email system is temporarily down or unavailable, the following phone number can be used: (916) 204-0321.

**MHCB Reservation Notifications**

Once HCPOP secures and reserves an MHCB, the sending and receiving institution shall be notified via email, using each institution's new MHCB global distribution list as described below. Notification will include the clinician-to-clinician contact information. Telephonic contact from HCPOP shall no longer be required, however may be used to verify an MHCB is vacant.

**Institution MHCB Email Distribution List**

All institution Chiefs of Mental Health (CMH) shall have a distribution list created in the global address book by September 11, 2015. The distribution list shall include all pertinent clinical and custody staff involved in a MHCB placement, reservation, admittance, or transfer process. HCPOP shall "reply to all" when making the bed assignment to ensure all necessary staff are made aware. The CMH shall ensure the distribution list remains current and up to date. The name of the distribution list shall contain the institutions' acronym and MHCB, e.g., ***SAC-MHCB***. Provide the distribution list name and information to HCPOP once created.

If you have any questions, please contact Judy Burleson, Chief, HCPOP, at (916) 691-0312 or via email at Judy.Burleson@cdcr.ca.gov.

cc: Judy Burleson
Jay Powell
Angela Ponciano
Amy Eargle
Laura Ceballos
Ralph M. Diaz
Kathleen Allison
Regional Mental Health Administrators
Regional Health Care Executives

# 15-1015

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | 10/15/2015 |
|---|---|---|
| CHAPTER 05: PROVISION OF CARE, TREATMENT, OR SERVICES | Revision Date(s): | 2/18/2015, 4/9/2015 |
| | Supersedes: | |
| POLICY 12.05.301: HOUSING OF PATIENTS PENDING MENTAL HEALTH CRISIS BED TRANSFER | Attachments: | Yes☐ No☒ |
| | Directors Approval: | [signature] |

**12.05.301** Housing of Patients Pending Mental Health Crisis Bed (MHCB) Transfer

**Policy**

Patients pending MHCB transfer shall be housed following the order of preferred locations as listed below. Alternative housing shall only be used for patients referred to a MHCB.

**Order of Preferred Locations**

Housing of patients pending transfer to an MHCB shall be determined based on the needs of the patient and bed availability in the following order of preferred locations:

1. Correctional Treatment Center (CTC) licensed medical beds
2. Outpatient Housing Unit (OHU)
3. OHU overflow cells
4. Large holding cells with toilets
5. Large holding cells without toilets
6. Triage and Treatment Area (TTA) or other clinic physical exam room
7. Other unit-housing where complete and constant visibility can be maintained
8. CTC holding cells

The following locations are considered alternative housing pending transfer to an MHCB and shall be logged/tracked as such:

- CTC licensed medical beds
- OHU beds and overflow cells
- Large holding cells with toilets
- Large holding cells without toilets
- TTA or other clinic physical exam room
- Other unit-housing where complete and constant visibility can be maintained
- CTC holding cells

**Discussion**

The Mental Health Services Delivery System Program Guide (2009 Revision) clearly lists the order of priority for housing patients awaiting transfer to an MHCB. This policy serves as a clarification and shall be considered the current directive. A licensed inpatient bed is the preferred location for housing patients pending transfer to an MHCB.

Staff shall ensure that patients housed in alternative housing have reasonable access to water and toilets. While in alternative housing pending transfer, patients shall be provided at minimum, with a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock. Only when a patient attempts to use any or all of the issued items to harm him or herself, may a clinician order that one or more of the items be removed.

Use of licensed medical CTC beds for MHCB overflow shall be considered alternative housing. OHU beds are considered alternative housing when a patient, pending MHCB placement, is temporarily placed within them. Patients shall not be placed in the OHU or CTC beds for mental health issues unless a referral to the MHCB has been made. The alternative housing requirements as set forth in this policy shall be followed when patients are placed into these beds.

Utilizing holding cells within the licensed bed area of the CTC for housing patients shall be logged on the *Alternative/Temporary Housing Log*.

Small holding cells that are designed for the patient to sit or stand shall be used as infrequently as possible and only as a last option for temporarily housing patients in crisis. These placements are not considered alternative housing, and use of these cells shall be documented on the custody log for small holding cells. Patients shall be transferred out of these cells as soon as possible and their placement is **never to exceed four hours**.

**Compliance Indicators**

1. Prior to placement in alternative housing, the patient receives continuous and direct visual observation while pending a mental health evaluation. Once placed, all patients in alternative housing shall remain on continuous direct visual observation until the patient is transferred to an MHCB.
2. Prior to placement in alternative housing, patients shall have a referral to an MHCB.
3. Alternative housing length of stay shall not exceed 24 hours.
4. Alternative housing placements shall be tracked in the *Alternative/ Temporary Housing Log*.
5. When determining alternative housing placement, the order of preferred locations (as listed) is followed.
6. Patient has reasonable access to water and toilets.
7. Patients are provided, at minimum, a safety (no-tear) mattress, safety (no-tear) blanket, and safety (no-tear) smock.
8. Health Care Placement Oversight Program is contacted immediately when a patient is referred to an MHCB and before being placed in alternative housing.

**Action required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution ... | then ... |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP within 30 days of the effective date. Ensure the LOP is reviewed annually. |
| does not have an LOP | develop one within 30 days of the effective date that meets the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

*Coleman* v. *Brown* (E.D. Cal. Oct. 7, 2008, No. CIV S-90-0520 LKK JFM P)

Division of Correctional Health Care Services. (2009 Revision). *Mental Health Services Delivery System Program Guide*. Mental Health Crisis Bed, Chapter 5

**Questions**

If you have any questions or need any additional information related to this Policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.

# 16-0729

 

AL FOR O RECT
HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| Date: | July 29, 2016 |
| To: | Chief Executive Officers<br>Statewide Mental Health Program Staff<br>Institution Wardens |
| From: | DONALD MEIER, Deputy Director<br>Field Operations<br>Corrections Services |
| Subject: | **MENTAL HEALTH CRISIS BED HOTLINE** |

In an effort to provide to better customer service to our stakeholders the Health Care Placement Oversight Program (HCPOP) will be de-activating the MHCB "Hotline" number (916) 204-0321 effective August 1, 2016. We understand how frustrating it can be to leave a message and not have anyone acknowledge your message has been received

Please remember to submit all MHCB correspondence, referrals, rescissions, general inquires, etc., to mhcb.hcpop@cdcr.ca.gov. This email address is monitored by a dedicated staff member during normal business hours, (0800–1630 hrs. 7 days a week). If there is an imminent issue that requires immediate attention, please contact one of the staff listed below and they will ensure that your call is directed to the appropriate staff member.

The following phone lines are monitored Monday through Friday during the hours indicated:

- Rick McPhearson, (Office Technician) at (916) 691-0339 from 0800-1700 hrs. (primary)
- Kellianne Westbrook, (AGPA) at (916) 691-0341 from 0730-1600 hrs. (secondary)
- Elizabeth De Silva, Classification Staff Representative at (916) 691-0329 on Saturday and Sunday between the hours of: 0800-1630
- Jay Powell, Captain, at (916) 691-0336 from 0730-1600 hrs.
- Joseph Williams, Chief, at (916) 691-2109 from 0830-1700 hrs.

After normal work hours, holidays, etc., should an emergency situation require HCPOPs assistance, institution staff should utilize the established escalation and notification protocols available through the Administrative Officer of the Day. Should you have any questions regarding this announcement, please contact Joseph Williams at (916) 691-2109.

# MEMORANDUM

cc: Ralph Diaz
Diana Toche
John Dovey
Kathleen Allison
Katherine Tebrock
Connie Gipson
Jeff Macomber
Vincent Cullen
Kelly Santoro
Sandra Alfaro
Felix Vasquez
Amy Miller
Chris Podratz
Robert Herrick
Michael Hutchinson
Eureka Daye
Ricki Barnett
Cheryl Schutt
Laura Ceballos
Joseph Williams
Jay Powell

17-0214

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date    :    February 14, 2017

To    :    Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
In-Service Training Managers

Subject:    **MENTAL HEALTH CRISIS BED PRIVILEGES REVISION**

This memorandum supersedes the memorandum dated June 23, 2016, titled "Mental Health Crisis Bed Privileges" (attached). The purpose of this memorandum is to ensure privileges are provided to all inmate-patients (IPs) admitted to the Mental Health Crisis Bed (MHCB) units only. Privileges shall not apply to Alternative Housing settings. Effective immediately, all MHCB units shall provide the privileges, as documented below, to IPs admitted to the MHCB unit. The Interdisciplinary Treatment Team (IDTT) shall review and update privileges at every IDTT meeting. Following the initial IDTT, the primary clinician in conjunction with the psychiatrist and recreational therapist may consider additional privileges or removal of privileges based on changes to the IPs treatment goals and mental health status. Any restrictions of privileges shall be specifically noted by the MHCB IDTT and the rationale for restriction shall be documented on the treatment plan. Within one business day of the decision, restrictions shall be communicated to custody and nursing staff. For institutions not yet using the Electronic Health Records System (EHRS), mental health staff shall complete a CDC Form 128-C, *Chrono Medical, Psych., Dental,* also known as an "Informational Chrono." For institutions using the EHRS, staff will complete the Mental Health Inpatient Issue Order which is configured to print a requisition in the MHCB for custody and nursing review.

**Out-of-Cell Activity**

IPs admitted to the MHCB shall attend out-of-cell activities consistent with their custody designation unless specifically restricted by the MHCB IDTT. Any restrictions of out-of-cell activities shall be determined by the MHCB IDTT, ordered in the healthcare record, and the rationale for restriction documented on the treatment plan. Restrictions shall be communicated to custody and nursing staff via a CDC Form 128-C or a printed requisition from the EHRS within one business day of the decision.

The recreational therapist will assess each IP and develop therapeutic recreational goals involving out-of-cell activity as part of the treatment plan. Out-of-cell activity may include access to dayroom, recreational activities, yard, and any additional recreational therapy deemed appropriate by the MHCB IDTT.

Due to variances between each institution's physical plant and mission, each Warden and Chief Executive Officer (CEO) shall be responsible for amending or creating a Local Operating Procedure (LOP) for his/her particular institution. All LOPs should also specify the maximum number of inmates who can participate in out-of-cell activities at one time in a group setting, ensure periodic checks by custody staff during out-of-cell activities, and allowable equipment and therapeutic materials for out-of-cell activities.

Out-of-cell activity shall be assigned according to the IP's designated custody level. Maximum custody IPs admitted to the MHCB program shall be allowed to participate in recreational activities outside of their cell while secured in a Therapeutic Treatment Module. All maximum custody IPs approved for yard privileges shall be assigned Walk-Alone status or to a Small Management Yard if the MHCB has access. The recreational therapist shall be responsible for facilitating all structured out-of-cell activity, and is expected to remain with the IP during these activities. Custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom.

Each area used to provide out-of-cell activity shall be searched by custody staff, both before and after the activity takes place. Unclothed body searches are to be conducted for maximum custody inmates. IPs returning to the unit who have been under constant staff supervision shall not be subject to an unclothed body search, but shall be subject to a clothed body search and scanned with a metal detector.

**Telephone Access**

IPs housed in the MHCB Program shall be entitled to utilize the IP telephone, in accordance with his/her assigned privilege group unless specifically restricted by the MHCB IDTT. Any restrictions on phone calls shall be determined by the MHCB IDTT, ordered in the healthcare record, and the rationale for restriction documented on the treatment plan. Restrictions shall be communicated to custody and nursing staff via a CDC Form 128-C or a printed requisition from the EHRS within one business day of the decision. Otherwise, pursuant to regulations in the California Code of Regulations, Title 15, Sections 3044 (g)(3)(C), (h)(2)(C), and (i)(2)(A)4, telephone calls shall only be allowed on an emergency basis as determined by institution/facility staff. All phone calls and their offerings shall be documented on the CDC Form 114-A, *Inmate Segregation Record* (Rev.10/99).

**Visiting Privileges**

IPs assigned to the MHCB Program shall be eligible for non-contact visits, unless specifically restricted by the MHCB IDTT. If non-contact visiting cannot be accommodated because of physical plant limitations, the Warden shall take such limitations into account in establishing an alternative visiting plan. Non-contact visits shall be scheduled in one-hour increments, and may be extended based on space availability.

For those inmates not on suicide watch/precaution or maximum custody, contact visits shall be considered by the IDTT on a case-by-case basis. The Correctional Counselor shall review custody level, enemy concerns, whether the inmate is general population on a sensitive need yard facility or vice versa, and existing visiting exclusions based on commitment offense and present case factors during the IDTT.

Inmates who are terminally ill shall receive visits in the MHCB unit consistent with the institution's existing visiting protocols and any existing visiting exclusions based on commitment offense.

Any restrictions on visiting shall be determined by the MHCB IDTT, ordered in the healthcare record, and the rationale for restriction documented on the treatment plan. Restrictions shall be communicated to custody and nursing staff via a CDC Form 128-C or a printed requisition from the EHRS within one business day of the decision.

**Documentation of Privileges Received**

Each time an IP receives or participates in out-of-cell activities and/or receives an identified privilege, custody staff shall be responsible for notating the occurrence on the CDC Form 114-A, *Inmate Segregation Record* to provide proof of practice. All offerings of out-of-cell activities and/or privileges refused by an IP shall be notated on the CDC Form 114-A as well.

To ensure consistency, Wardens and CEO's or designees shall provide training for applicable staff and shall update their institution's LOP to reflect these changes. The Business Event Type training code is 11053757. Each institution shall provide a proof of practice memorandum to their respective Mission Associate Director within 30 days of the date of this memorandum.

If you have any custody questions, please contact the Mental Health Compliance Team, Division of Adult Institutions, at DAI-MHCompliance@cdcr.ca.gov. If you have any clinical questions, please contact the Statewide Mental Health Program, Division of Health Care Services, at m_MHPolicyUnit@cdcr.ca.gov.

JEFF MACOMBER
Deputy Director
Facility Support
Division of Adult Institutions

KATHERINE TEBROCK, Esq.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services

Attachment

cc: Kathleen Allison
Connie Gipson
Dawn Lorey
Angela Ponciano
Laura Ceballos
Michael Golding
Amy Eargle
Regional Mental Health Administrators
Regional Health Care Executives

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : June 23, 2016

To : Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
In-Service Training Managers

Subject : **MENTAL HEALTH CRISIS BED PRIVILEGES**

The purpose of this memorandum is to ensure privileges are provided to all inmate-patients (IPs) admitted to the Mental Health Crisis Bed (MHCB) Program. Effective immediately, all MHCB facilities shall provide the following privileges to IPs admitted to the MHCB Program when approved and ordered by the MHCB Interdisciplinary Treatment Team (IDTT).

**Out-of-Cell Activity**

IPs admitted to the MHCB may be authorized for out-of-cell activities when specifically approved by the MHCB IDTT. The Recreational Therapist will assess each IP and develop rehabilitation goals involving out-of-cell activity as part of the treatment plan. Out-of-cell activity may include access to dayroom, recreational activities, yard, and any additional rehabilitation therapy deemed appropriate by the MHCB IDTT. The severity of the mental health crisis causing the IP to be admitted to the MHCB Program should be carefully considered when determining the type and length of time for each out-of-cell activity.

Due to variances between each institution's physical plant and mission, each Warden shall be responsible for amending or creating a Local Operating Procedure (LOP) for his/her particular institution.

Out-of-cell activity shall be assigned according to the IP's designated custody level. Maximum level custody IPs admitted to the MHCB program shall not be allowed to participate in dayroom activities, due to safety and security concerns. However, they will be allowed to participate in recreational activities outside of their cell while secured in a Therapeutic Treatment Module. All maximum level custody IPs approved for yard privileges shall be assigned Walk-Alone status or to a Small Management Yard, when available.

The Recreational Therapist shall be responsible for facilitating all out-of-cell activity, and is expected to remain with the IP during these activities.

Each area used to provide out-of-cell activity shall be searched by custody staff, both before and after the activity takes place. Additionally, custody staff shall conduct an unclothed body search and metal detector scan of each IP prior to all

out-of-cell activities. IPs returning to the unit who have been under constant staff supervision shall not be subject to an unclothed body search, but shall be subject to a clothed body search and scanned with a metal detector.

**Telephone Access**

IPs housed in the MHCB Program may be entitled to utilize the IP telephone, in accordance with his/her assigned privilege group, when approved by the MHCB IDTT.

**Visiting Privileges**

IPs assigned to the MHCB Program may be eligible for non-contact visits, when approved by the MHCB IDTT. If non-contact visiting cannot be accommodated because of physical plant limitations, the Warden shall take such limitations into account in establishing an alternative visiting plan. Non-contact visits shall be scheduled in one-hour increments, and may be extended based on space availability. When overcrowding occurs, those who have visited at least one hour and have been visiting for the longest time may have their visits terminated, as outlined in California Code of Regulations, Title 15, Sections 3176(a)(9) and (10), Denial, Restriction, Suspension, Termination or Revocation of Visits and Exclusion of a Person.

**IDTT Clinical Criteria**

The IDTT shall consider the risk for symptom exacerbation directly related to the activity when making the determination regarding clinical appropriateness for MHCB privileges. For example, visits from family members may be destabilizing if the IP has tumultuous familial relationships.

Clinical reviews shall be conducted at every IDTT meeting. Decisions shall be ordered in the health record and communicated to custody via CDC Form 128-C, *Mental Health Placement Chrono* (paper process prior to Electronic Health Records System [EHRS]), or printed requisition from the EHRS, within one business day of the decision.

To ensure consistency, Wardens and Chief Executive Officers or designees shall provide training for applicable staff and shall update their institution's LOP to reflect these changes. The Business Event Type training code is 11053757. Each institution shall provide a proof of practice memorandum to their respective Mission Associate Director within 30 days of the date of this memorandum.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
In-Service Training Managers
Page 3

If you have any custody-related questions, please contact the Mental Health Compliance Team, Division of Adult Institutions, via email: DAI-MHCompliance@cdcr.ca.gov.

If you have any clinical questions, please contact the Statewide Mental Health Program, Division of Health Care Services, via email: m_MHPolicyUnit@cdcr.ca.gov.

JEFF MACOMBER
Deputy Director
Facility Support
Division of Adult Institutions

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services

cc: Kathleen Allison
Connie Gipson
Dawn Lorey
Angela Ponciano
Michael Golding
Amy Eargle
Laura Ceballos
Regional Mental Health Administrators

APPENDIX PG. - 128

15-0409

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | April 9, 2015 |
|---|---|---|
| CHAPTER 05: PROVISION OF CARE, TREATMENT, OR SERVICES | Revision Date(s): | February 13, 2015 |
| POLICY 12.05.501: CLINICAL FOLLOW-UP REQUIREMENTS FOR INMATE-PATIENT DISCHARGE AND TRANSFER FROM MENTAL HEALTH CRISIS BED, ALTERNATIVE HOUSING, OR MENTAL HEALTH-OUTPATIENT HOUSING UNIT (MENTAL HEALTH CRISIS FOLLOW-UP) | Supersedes Policy: | 12.05.501 (2/26/2014) |
| | Attachments: | Yes☐ No☒ |
| | Director Approval: | [signature] |

**Policy**

When an inmate-patient (IP) who was admitted or placed for danger to self is discharged or released from a Mental Health Crisis Bed (MHCB), alternative housing, or a Mental Health-Outpatient Housing Unit (OHU), a mental health clinician shall conduct daily clinical follow-up for five consecutive days following physical discharge. Clinical follow-up shall be initiated within 24 hours of the new placement. If a mental health clinician is unavailable, a psychiatric technician or other qualified clinical staff may provide clinical follow-up on weekends or holidays (Mental Health Services Delivery System Program Guide [MHSDS], 2009 Revision, Suicide Prevention and Response, Chapter 10, p. 20). The final day of a clinical follow-up shall be completed by a mental health clinician. When the final day is on a weekend or holiday, and there is no mental health clinician on site to conduct the follow-up, the follow-up shall be extended until the next business day.

**Definitions**

A **mental health crisis clinical follow-up** is defined as daily contact with an IP for a minimum of five consecutive days following his or her physical discharge from intermediate or acute level of care, MHCB, or MH-OHU.

**Mental Health Clinician**: A psychiatrist, licensed psychologist, licensed clinical social worker, or psychiatric nurse practitioner who assumes overall responsibilities for the mental health treatment services provided to an IP by maintaining active therapeutic involvement with an IP. Unlicensed psychologists or clinical social workers supervised and gaining qualifying experience for licensure as governed by California Health and Safety Code are also included in this definition.

**Purpose**

The purpose of the mental health crisis clinical follow-up is to monitor the IP in his or her new level of care, document any significant clinical information, and ensure that immediate and appropriate care is provided if the IP's condition deteriorates.

Every IP who was admitted or placed for danger to self, and subsequently discharged from a MHCB, alternative housing, or transferred from a MH-OHU, shall be seen by a mental health clinician within 24 hours of arrival to their new

program. Follow up shall occur for a minimum of five consecutive days.

Discharged IPs awaiting transfer out of the MHCB or MH-OHU shall continue to receive mental health services pending transfer. Once the IP has transferred to the new level of care, clinical follow-up shall be conducted for at least five consecutive days after arrival.

**Compliance Indicators**

1. Every IP admitted/placed in MHCB, OHU, or alternative housing for danger to self and arriving to any level of care from an MHCB, alternative housing, or MH-OHU, , is seen daily for five consecutive days.
2. Monthly monitoring for implementation of this policy is conducted.
3. Findings from the monitoring of this policy are submitted to the institution SPR-FIT committee monthly.
4. Clinical contacts are documented on a CDCR MH-7230-B, *Interdisciplinary Progress Note – 5-Day Follow-Up.*

**Additional Information**

**Weekends and Holidays**

The mental health crisis clinical follow-up contacts on weekends and holidays shall be conducted consistent with MHSDS Program Guide, 2009 Revision, p. 12-10-20 requirements for mental health crisis clinical follow-ups.

**Custody Welfare Checks**

This policy does not address or change custody welfare checks.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| **If your institution ...** | **then ...** |
|---|---|
| has a local operating procedure (LOP) that is reviewed annually | amend what you currently have in place to meet the new policy via an addendum until the next LOP revision date. |
| does not have a LOP for IP mental health crisis follow ups | ensure that one is completed within 30 days and create an LOP to meet the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

Division of Correctional Health Care Services, *Mental Health Services Delivery System Program Guide* (2009 Revision), Chap. 10, "Suicide Prevention and Response," p. 20.

California Health and Safety Code Section 1277 and California Penal Code

12.05.501: Clinical Follow-Up Requirements for Inmate-Patient Discharge and Transfer from MHCB or MH-OHU (5-Day Follow-Up) Page 2 of 3

APPENDIX PG. - 131

Section 5058.5.

Division of Correctional Health Care Services, *Mental Health Services Delivery System Program Guide*. (2009 Revision). Chap. 5, "Mental Health Crisis Bed," pp. 1-35.

*Coleman* v. *Brown* (E.D. Cal. Oct. 7, 2008, No. CIV S-90-0520 LKK JFM P, Dkt. 3072).

Division of Correctional Health Care Services, "Implementation of Alternative/Temporary Housing Logs," Memorandum, February 2, 2010.

**Questions**

If you have any questions or need any additional information related to this Policy, you may contact the policy unit by email:
CDCR MHPolicyUnit@cdcr.ca.gov.

16-0531

 

# HEALTH CARE SERVICES

## MEMORANDUM

Date: 5/31/16

To: Chief Executive Officers
Chiefs of Mental Health
Chief Nurse Executives

From:

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program

CHERYL SCHUTT, RN, BSN
Statewide Chief Nurse Executive
Nursing Services

Subject: RELEASE OF REVISED 5-DAY FOLLOW-UP FORM

This memorandum informs staff of the revised Interdisciplinary Progress Note 5-Day Follow-Up (CDCR MH-7230-B) (Attached) released on May 25, 2016. Implementation of the revised CDCR MH-7230-B shall occur no later than June 10, 2016.

Five-Day Follow-Up evaluations are required for any patient who was referred to a Mental Health Crisis Bed, a Department of State Hospital facility, a Psychiatric Inpatient Program, an Outpatient Housing Unit, or Alternative Housing for suicidal ideation or behavior.

Once discharged from any of these settings, the CDCR MH-7230-B shall be used to document the required daily contact with the patient. The form shall be completed by a primary mental health clinician, a covering clinician, or by a licensed psychiatric technician when a clinician is not available.

The revised CDCR MH-7230-B reflects the prioritization of suicide prevention efforts within the California Correctional Health Care Services and the Division of Health Care Services (DHCS) Statewide Mental Health Program and contains a narrative text box for recording the patient's safety plan. Mental health clinicians shall complete the safety planning section on each day of the follow-up.

Specific form requirements are included on the instruction page of the form.

P.O. Box 588500
Elk Grove, CA 95758

# MEMORANDUM

If you have any questions, or require additional information related to this memorandum, you may contact Robert Horon, Ph.D., Senior Psychologist, Specialist, Clinical Support, Statewide Mental Health Program, DHCS, via email: Robert.Horon@cdcr.ca.gov.

Attachments

cc: Angela Ponciano
    Amy Eargle, Ph.D.
    Laura Ceballos, Ph.D.
    Robert Horon, Ph.D.
    Amber Carda, Ph.D.
    Michael Golding, M.D.
    Edward Kaftarian, M.D.
    John Rekart, Ph.D.
    James Vess, Ph.D.
    Marcie Flores
    Jennifer Johnson
    Regional Mental Health Administrators
    Regional Health Care Executives
    Regional Nurse Executives

STATE OF CALIFORNIA
**INTERDISCIPLINARY PROGRESS NOTE - 5 DAY FOLLOW-UP**
CDCR MH-7230-B (Rev. 03/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Form: Page 1 of 2
Instructions: Page 3 - 4

## I. Status and Current Condition

**If this is the last day of follow-up, this form must be completed by a mental health clinician.**

A. Staff completing follow-up:
☐ Mental Health
☐ Nursing

B. Day

C. Are any warning signs of imminent suicide present? (Circle/mark all that apply) I S P A T H W A R M

D. Since we saw you last, have you had any thoughts of killing yourself?
☐ 1 (not at all) ☐ 2 (rarely) ☐ 3 (sometimes) ☐ 4 (frequently) ☐ 5 (constantly)

E. If you have had thoughts of killing yourself, how strong were they?
☐ 1 (not strong at all) ☐ 2 (mild, not very strong) ☐ 3 (moderate, somewhat strong ☐ 4 (severe, quite strong) ☐ 5 (worst possible, very strong) ☐ N/A

F. How long did the thoughts last?
☐ 1 (briefly) ☐ 2 (up to a few minutes at a time) ☐ 3 (up to a half hour at a time) ☐ 4 (up to an hour at a time) ☐ 5 (constant) ☐ N/A

G. Can you stop thinking about killing yourself if you want to?
☐ Yes ☐ No

H. How likely is it that you will harm yourself in the next week?
☐ 1 (not at all) ☐ 2 (very unlikely) ☐ 3 (somewhat likely) ☐ 4 (very likely) ☐ 5 (extremely likely)

I. What is your main reason(s) for not harming yourself in the future?

## II. Observations

A. Include condition of cell, mood, overall behavior, level of consciousness, assessment of ADL's, etc.

| 1. Disability Code: | 2. Accommodations: | 3. Effective Communication: | |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional Time | ☐ Patient asked questions | CDCR #: |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ Patient summed information | Last Name: MI: |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | First Name: |
| ☐ DNS ☐ DDP | ☐ Basic ☐ Transcribe | ☐ Not Reached* ☐ Reached | DOB: |
| ☐ Not Applicable | ☐ Other* | *See chrono/notes | |
| 4. Comments: | | | |

**Distribution of Copies:** Health Records
**eUHR Scanning Location:** Outpatient; MHNt/TxPln - Progress Note; 7230B Interdisciplinary Progress Note-5 Day Follow-up
**EHRS Location:** Mental Health Documentation - 5 Day Follow-up

STATE OF CALIFORNIA
**INTERDISCIPLINARY PROGRESS NOTE - 5 DAY FOLLOW-UP**
CDCR MH-7230-B (Rev. 03/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Form: Page 2 of 2
Instructions: Page 3 - 4

A. Safety Plan: (This section is completed by a mental health clinician only).

B. Plan:

Nursing (If nursing is completing form):

- ☐ No action required, 5-day follow-up will continue
- ☐ Forward information to On-Call mental health provider
- ☐ Referred for emergent mental health consult
- ☐ Other: ______________________

Mental Health (if mental health provider is completing form):

- ☐ No action required, 5-day follow-up will continue or, if last day, is discontinued
- ☐ Referred to MHCB
- ☐ Other: ______________________

C. Did the interview take place in a private setting? ☐ Yes ☐ No
If no, note efforts to encourage the patient to be seen in a private setting.

D. Has custody staff been consulted? ☐ Yes ☐ No If no, provide an explanation why this consultation did not occur.

E. Additional Comments:

Print name of person filling out form ______________________ Classification ______________

Signature of person filling out form ______________________ Date/Time ______________

| Interdisciplinary Progress Note - 5 Day Follow-up<br>CDCR MH-7230-B (Rev. 03/16)<br><br>Confidential Patient Information | CDCR #:<br>Last Name: MI:<br>First Name:<br>DOB: |
|---|---|

**Distribution of Copies:** Health Records
**eUHR Scanning Location:** Outpatient; MHNt/TxPln - Progress Note; 7230B Interdisciplinary Progress Note-5 Day Follow-up
**EHRS Location:** Mental Health Documentation - 5 Day Follow-up

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION

**INTERDISCIPLINARY PROGRESS NOTE - 5 DAY FOLLOW-UP**
CDCR MH-7230-B (Rev. 03/16)

**Instructions**

**Purpose of the CDCR MH-7230-B (Rev. 03/16) Interdisciplinary Progress Note-5 Day Follow-Up:** Document the required daily contact for any patient who has been discharged from a Mental Health Crisis Bed or released from an Outpatient Housing Unit or alternative housing after receiving evaluation and/or treatment for suicidal ideation or behavior. Patients should be offered a confidential out of cell contact each day of the follow-up period. **This note is used each day of the 5-Day Follow-Up period. Complete all areas.** If the primary clinician is not available, such as on weekends or holidays, a licensed psychiatric technician may conduct and document these daily contacts.

1. Print or type if necessary. Handwritten notes must be **legible.**
2. All notes should be timely. Delayed entries should be documented by noting "late entry."
3. Enter the patient's CDCR number, name, and date of birth in the bottom right.
4. Indicate the day of follow-up at the top of the form. Complete the Effective Communication area in the bottom left of the first page as described below.

**Effective Communication:** The Effective Communication section must be completed any time there is a clinically relevant encounter in which meaningful information is exchanged between the licensed clinician and the patient. For further information and examples of some encounters in which effective communication is required, see IMSP&P, Volume 2, Ch. 4.

| 1. Disability: | 2. Accommodation: | 3. Effective Communication: |
|---|---|---|
| a. Check all boxes that apply regarding the patient's disability.<br>Disability Codes:<br>TABE score ≤ 4.0<br>DPH – Permanent Hearing Impaired<br>DPV – Permanent Vision Impaired<br>LD – Learning Disability<br>DPS – Permanent Speech Impaired<br>DNH – Permanent Hearing Impaired; improved with hearing aids.<br>DNS – Permanent Speech Impaired; can communicate in writing.<br>DDP – Developmental Disability Program<br>N/A – Not applicable | a. Check all boxes that apply to the special accommodations made to facilitate effective communication:<br>Additional time – Patient was given additional time to respond or complete a task.<br>Equipment – Special equipment was used to facilitate effective communication. Note the type of equipment used in the comments section.<br>SLI – Sign Language Interpreter.<br>Louder – The provider spoke louder.<br>Slower – The provider spoke slower.<br>Basic – The provider used basic language.<br>Transcribe – Communication was written down.<br>Other – Any other tool that was used to facilitate effective communication. | a. Check all boxes that apply that summarize how it was verified that effective communication was reached.<br>Patient asked questions – The patient asked questions regarding the interaction.<br>Patient summed information – The patient summarized information regarding the interaction.<br>b. Check one box to indicate if effective communication was or was not reached. ONE of these boxes must be checked. |
| 4. Comments:<br>Provide any additional information regarding effective communication. | | |

5-Day Follow-up Form:

**Be sure to indicate which day of the follow-up period is being documented**

I. **STATUS AND CURRENT CONDITION**

A. Indicate discipline completing the form (Mental Health Clinician or Psychiatric Technician). As noted on the form, only a mental health clinician can complete the last day of follow-up. If the fifth day falls on a weekend or holiday, a psychiatric technician is to complete the clinical contact and the follow-up period is extended until the clinician can see the patient.
B. Indicate the day of the 5-day follow up from the drop down.
C. Indicate if any warning signs for imminent suicide present by circling or marking the corresponding letter for Ideation, Substance Abuse, Purposelessness, Anxiety, Trapped, Hopelessness, Withdrawal, Anger, Recklessness, or Mood Change (IS PATH WARM).

STATE OF CALIFORNIA
INTERDISCIPLINARY PROGRESS NOTE - 5 DAY FOLLOW-UP
CDCR MH-7230-B (Rev. 03/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

D-I Ask the patient:

D. Since we saw you last, have you had any thoughts of killing yourself? Record the rating best matching the response, using the checkboxes, from 1 (not at all) to 5 (constantly).
E. If you have had thoughts of killing yourself, how strong were they? Record the rating best matching the response, using the checkboxes, from 1 (not strong at all) to 5 (worst possible, very strong).
F. How long did the thoughts last? Record the rating best matching the response, using the checkboxes, from 1 (briefly) to 5 (constant).
G. Can you stop thinking about killing yourself if you want to? Record yes or no in the provided check-box.
H. How likely is it that you will harm yourself in the next week? Record the rating using the checkboxes, from 1 (not at all) to 5 (extremely likely).
I. What is your main reason(s) for not harming yourself in the future? Encourage the patient to describe how strong (or weak) each reason is. *In the text box, record a brief summary of the patient's response.*

II. OBSERVATIONS

Use the provided text box to record observations

A. Observations: *( Indicate in the text box)*

- Level of consciousness.
- Assessment of ADLs.
- Describe the patient's mood.
- Describe speech.
- Indicate the patient's cell condition (e.g., clean, messy, dirty, etc).
- What other concerns or issues did the patient raise?
- Describe overall behavior (cooperative, slumped and barely responsive, etc.)

III. SAFETY PLAN

A. Safety plan summary: Safety plans are completed by mental health clinicians. Write a summary of the patient's safety plan. If the patient is currently suicidal or exhibiting serious mental health symptoms, the plan to manage this status is written in sufficient detail with corresponding boxes in section B checked (e.g., refer for an emergency mental health consult, refer for a higher level of care placement or to phone the on-call mental health provider). Discuss/review with the patient the efficacy of various strategies. Note what strategies the patient has used over the past 24 hours, if any, and indicate if new strategies are needed. If the safety plan is no longer appropriate or unavailable, formulate and document an updated safety plan. Articulate specific coping strategies for the patient and review with the patient. If the first day of the follow-up period falls on a weekend or holiday, a psychiatric technician can complete all sections of the follow-up form but should not complete the safety plan.
B. Safety Plan actions: Nursing/psychiatric technicians and mental health clinicians should check the appropriate boxes as to actions taken in service of protecting the patient's welfare.
C. Indicate if the patient was seen in a private setting (yes/no).
D. Note efforts to encourage the patient to be seen in a private setting.
E. Indicate if custody staff was consulted about the patient (yes/no). If custody was not consulted, provide an explanation of why this consultation did not occur in the text box provided.
F. Use the text box to indicate any additional findings or comments on the case.

Conclude with:

- Signature/Title: Sign and include professional credentials or job title.
- Enter the date and time of the note. **This is required for each entry.**

12-0509

State of California                          California Department of Corrections and Rehabilitation

# Memorandum

Date    :  MAY   9 2012

To      :  Chiefs of Mental Health
           Department of Mental Health Coordinators
           Local SPR-FIT Committee Chairs

Subject :  **POLICY 12.06.501: INTERMEDIATE AND ACUTE DISCHARGE FOLLOW-UP**

The purpose of this memorandum is to announce Policy 12.06.501, Intermediate and
Acute Discharge Five-Day Follow-up.

Effective 30 calendar days from the date of this memorandum, each institution's
Mental Health Program shall institute the attached Mental Health Policy. This policy
requires a five-day follow-up to be initiated for all inmate-patients returning from
Acute and Intermediate Care. The policy also requires that each institution generate
a Local Operating Procedure relevant to this policy.

This policy is part of the Mental Health Program's ongoing suicide prevention efforts.
As described in the Mental Health Services Delivery System Program Guide, 2009
Revision, the Mental Health Program continues to actively address the issue of
suicide prevention.

If you have questions or need additional information or assistance, you may contact

| VOLUME 12: | Effective Date: May 1, 2012 |
| --- | --- |
| CHAPTER 06: PROVISION OF CARE, TREATMENT, OR SERVICES | Revision Date(s): N/A |
| POLICY 12.06.501: CLINICAL FOLLOW-UP REQUIREMENTS FOR INMATE-PATIENT DISCHARGE AND TRANSFER FROM INTERMEDIATE AND ACUTE CARE (5-DAY FOLLOW-UP) | Attachments: Yes☐ No☒ |

**12.06.501** Clinical Follow-Up Requirements for Inmate-Patient Discharge and Transfer from Intermediate and Acute Care.

**Policy**

When an inmate-patient arrives from an intermediate or acute hospital, a mental health clinician shall issue a consecutive five-day clinical follow-up order within 24 hours of their arrival at the institution.

Every inmate-patient discharged from an intermediate or acute hospital shall be seen by a mental health clinician or designee (in accordance with Mental Health Services Delivery System [MHSDS] Program Guide, 2009 Revision, requirements for five day follow-ups) within 24 hours of arrival and for a minimum of five consecutive days unless the order was discontinued as indicated below.

The Primary Clinician may determine that the five-day clinical follow up is no longer clinically indicated and can be discontinued sooner than five days.

**Definition**

A **five-day clinical follow-up** is defined as daily contact with an inmate-patient for five consecutive days following his or her discharge from intermediate or acute level of care, or discharge from MHCB or OHU if the placement was for suicidality.

**Compliance Indicators**

1. Every inmate-patient arriving from Acute and Intermediate beds are seen daily for five consecutive days.
2. A monthly audit is performed to monitor implementation of this policy.
3. Findings from the audit of this policy are submitted to the institution SPR-FIT committee monthly.
4. Clinical contacts are documented on a CDCR MH-7230-B, *Interdisciplinary Progress Note – Follow-Up to MHCB/MH-OHU discharge for Suicidal Issues.*
5. The decision to discontinue the five-day clinical follow-up contact is documented on a CDCR MH-7230, *Interdisciplinary Progress Note.*

**Weekends and holidays**

The five-day clinical follow-up contacts on weekends and holidays shall be conducted consistent with MHSDS Program Guide, 2009 Revision, requirements for MHCB five-day clinical follow-ups.

**Custody Welfare Checks**

This Policy is independent of and does not affect current Custody Welfare Check requirements.

**Action required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution... | Then... |
|---|---|
| has a local operating procedure (LOP) for inmate-patient discharge requirements for Intermediate and Acute Care that is reviewed annually. | amend what you currently have in place to meet the new policy via an addendum until the next LOP revision date. |
| does not have a LOP for inmate-patient discharged from Intermediate and Acute Care. | ensure that one is completed promptly and create a LOP to meet the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

California Prison Health Care Services, *Inmate Medical Services Policies and Procedures*. Volume 4, Chapter 3.

Division of Correctional Health Care Services. (2009 Revision). *Mental Health Services Delivery System Program Guide.* Mental Health Crisi Bed, Chap. 5, p. 12-5-29.

Division of Correctional Health Care Services. (2009 Revision). *Mental Health Services Delivery System Program Guide.* Suicide Prevention and Response, Chap. 10, p. 12-10-3.

National Commission on Correctional Health Care. (2008). *Standards for Mental Health Services in Correctional Facilities.* Policies and Procedures (MH-A-05), p. 8

National Commission on Correctional Health Care. (2008). *Standards for Mental Health Services in Correctional Facilities.* Nonemergrncy Mental Health Care Requests an Services (MH-E-05), p. 57

**Questions**

If you have any questions or need any additional information related to this Policy, you may contact Kim Cornish, Ph.D., Senior Psychologist, Specialist, Policy Development, Statewide Mental Health Program, at (916) 323-6146 or via e-mail at Kim.Cornish@cdcr.ca.gov.

12.06.501: Clinical Follow-Up Requirements for Inmate-Patient Discharge and Transfer from Intermediate and Acute Care (5-Day Follow-Up) Page 2 of 2

APPENDIX PG. - 143

If you have questions or need additional information or assistance, you may contact Kim Cornish, Ph.D., Senior Psychologist, Specialist, Statewide Mental Health Program (MHP) at (916) 323-6146 or e-mail at Kim.Cornish@CDCR.ca.gov.


TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP
Deputy Director (A), Statewide Mental Health Program
Division of Correctional Health Care Services

Attachments

cc:    Chief Executive Officers
       Steven Tharratt, M.D., Statewide Chief Medical Executive
       Karen Rea, PHN, MSN, FNP, Statewide Chief Nurse Executive
       Diana Toche, D.D.S., Deputy Director, Dental Services
       Judy Burleson, Associate Director, MHP
       Regional Directors of Mental Health
       Kim Cornish, Ph.D., Senior Psychologist

CDC 1617 (3/89)

# 16-0301

State of California | Department of Corrections and Rehabilitation

# Memorandum

Date : March 1, 2016

To : Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health

Subject: **USE OF MECHANICAL RESTRAINTS IN A MENTAL HEALTH CRISIS BED UNIT**

The purpose of this memorandum is to clarify guidelines regarding the use of mechanical restraints within a Mental Health Crisis Bed (MHCB) unit. Inmate-patients (IPs) shall not be placed in mechanical restraints as part of routine practice in MHCBs. Unless other custodial factors are present (i.e., the IP was designated as Max Custody prior to being housed in the MHCB or as outlined in California Code of Regulations (CCR), Title 15, Section 3268.2, Subdivisions [b][2] or [b][3]), IPs who are placed in MHCBs shall not be placed in mechanical restraints.

Any IP who is not designated Max Custody may be placed in mechanical restraints while in the MHCB if they meet the criteria in CCR, Title 15, Section 3268.2(b)(2), which states, "When a person's history, present behavior, apparent emotional state, or other conditions present a reasonable likelihood that he or she may become violent or attempt to escape."

IPs not designated Max Custody may also be placed in mechanical restraints while in the MHCB pursuant to CCR, Title 15, Section 3268.2(b)(3), which states, "When directed by licensed health care clinicians, to prevent a person from attempting suicide or inflicting injury to himself or herself." The MHCB clinician may initiate a request for use of mechanical restraints to the MHCB custody supervisor when, in the MHCB clinician's opinion, an emergent situation exists, and the use of mechanical restraints is the most efficient and effective means to prevent the IP from causing immediate injury to self. This request may be initiated verbally or in writing on a CDCR Form 128-B, *General Chrono*, to the custody supervisor. Verbal requests shall be subsequently memorialized on a CDCR Form 128-B by the custody supervisor, noting the date, time, and reason for the emergent request. The authorization to place an IP in mechanical restraints pursuant to Section 3268.2(b)(3) may only be made by direction from an MHCB custody supervisor. This request shall not be misconstrued as a long term request for use of mechanical restraints.

To ensure consistency, Wardens and Chief Executive Officers or designees shall provide training for MHCB and Correctional Treatment Center custody supervisors and Mental Health clinicians, and shall update their institution's Local Operating

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Page 2

Procedures to reflect these changes. Training code (BET) information will be provided on distribution of this memorandum. Each institution shall provide proof of practice to their respective Mission Associate Director within 30 days of the date of this memorandum.

If you have any questions, please contact Trent Allen, Captain, Mental Health Compliance Team, Division of Adult Institutions, at (916) 324-7956 or DAI-MHCompliance@cdcr.ca.gov.

KATHERINE TEBROCK, Esq.
Deputy Director
Statewide Mental Health Program
Division of Health Care Services

KATHLEEN ALLISON
Deputy Director
Facility Support
Division of Adult Institutions

cc: Kelly Harrington
Ralph M. Diaz
Mental Health Regional Administrators
Chief Medical Executives
Health Care Managers
Angela Ponciano
Amy Eargle
Laura Ceballos
Edward Kaftarian
Robert L. Davis
Trent Allen
Jennifer Johnson
Classification and Parole Representatives
Correctional Counselors III, Reception Centers

APPENDIX PG. - 147

**Gaines, Thomas@CDCR**

**Subject:** FW: Use of Mechanical Restraints in a Mental Health Crisis Bed Unit
**Attachments:** USE OF MECHANICAL RESTRAINTS IN A MENTAL HEALTH CRISIS BED UNIT.pdf

**From:** Andersson, Dyann@CDCR
**Sent:** Tuesday, March 01, 2016 11:09 AM
**To:** CDCR Institutions DAI Associate Directors; CDCR Institutions Wardens; CDCR CCHCS CEOs; CDCR DL-DCHCS-Chiefs of Mental Health
**Cc:** Allison, Kathleen@CDCR; Tebrock, Katherine@CDCR; Harrington, Kelly@CDCR; Diaz, Ralph M.@CDCR; O'Meara, Kathleen@CDCR; Force, Elaine@CDCR; Cornell, Christopher@CDCR; McAloon, Margaret@CDCR; CDCR CCHCS Chief Medical Executives; Ponciano, Angela@CDCR; Eargle, Amy@CDCR; Ceballos, Laura@CDCR; Kaftarian, Edward@CDCR; Allen, Trent G@CDCR; CDCR Institutions DAI CSU C and PRs
**Subject:** Use of Mechanical Restraints in a Mental Health Crisis Bed Unit

*On behalf of:*

***Kathleen Allison***
***Deputy Director***
***Facility Support***
***Division of Adult Institutions***

***and***

***Katherine Tebrock, Esq.***
***Deputy Director***
***Statewide Mental Health Program***
***Division of Health Care Services***

The following Business Event ID has been provided to track training through the Business Information Systems (BIS) Training and Events (T&E) system:

**Business Event Type: 11053757 – Training by Memorandum**

When entering the completed training in BIS T&E, the In-Service Training Manager shall ensure the following information is included in the "Notes" portion of the Business Event as depicted below. This will identify training specific to this memorandum has been completed.

***USE OF MECHANICAL RESTRAINTS IN A MENTAL HEALTH CRISIS BED UNIT***
*Authored by: Kathleen Allison, Deputy Director, Division of Adult Institutions*
*Date of Issuance: March 1, 2016*
*Date Due: April 1, 2016*

If you have any questions regarding the attached memorandum, please contact Captain Trent Allen at (916) 324-7956 or DAI-MHCompliance@cdcr.ca.gov.

Kindest regards,

*Dyann Andersson*
Executive Assistant to the
Deputy Director, Facility Support
Division of Adult Institutions
California Department of Corrections and Rehabilitation
(916) 445-7688
(916) 327-2877 Fax
dyann.andersson@cdcr.ca.gov

17-0901

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : September 1, 2017

To : Associate Directors, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Executive Officers
Chiefs of Mental Health

Subject: **ADDENDUM - REVISION OF MENTAL HEALTH CRISIS BED DISCHARGE CUSTODY CHECKS POLICY**

The memorandum titled, "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy," dated January 27, 2016, revised the Mental Health Services Delivery System (MHSDS) Program Guide, 2009 revision, and required 30-minute custody checks be conducted on inmate-patients discharged from a Mental Health Crisis Bed (MHCB) who were admitted for suicidal ideation, threats, or attempts.

Effective immediately, 30-minute custody checks shall be completed on all inmate-patients discharged from Alternative Housing when clinically indicated. This is consistent with the MHSDS Program Guide, 2009 revision, which authorizes custody checks on inmate-patients returned from Outpatient Housing Units (now identified as Alternative Housing).

If you have any custody-related questions, please contact Eric Hobbs, Captain, Mental Health Compliance Team, at (916) 324-7956 or Eric.Hobbs@cdcr.ca.gov. If you have any questions regarding mental health policies, please contact Robert Horon, Senior Psychologist, Specialist, Clinical Support, Division of Health Care Services, at (916) 691-6858 or Robert.Horon@cdcr.ca.gov.

KATHLEEN ALLISON
Director
Division of Adult Institutions

KATHERINE TEBROCK, Esq.
Deputy Director
Statewide Mental Health Program

JANE ROBINSON
Deputy Director (A)
Statewide Chief Nurse Executive (A)
Nursing Services Branch

Attachments

cc: Jeff Macomber
Connie Gipson
Kelly Mitchell
Dawn Lorey
Eric Hobbs
Laura Ceballos
Amy Eargle
Angela Ponciano
Michael Golding
Robert Horon
Marcie Flores
Mental Health Regional Administrators

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : January 27, 2016

To : Associate Directors, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Executive Officers
Chiefs of Mental Health

Subject: REVISION OF MENTAL HEALTH CRISIS BED DISCHARGE CUSTODY CHECKS POLICY

In an effort to improve the continuity of clinical care for inmate-patients (IPs) discharged from a Mental Health Crisis Bed (MHCB), several revisions to the MHCB discharge process as outlined in the Mental Health Services Delivery System (MHSDS) Program Guide (2009 Revision) are being implemented. The following are staff responsibilities regarding IPs who have been discharged from a MHCB to a general population housing or segregated housing unit:

## IP MHCB DISCHARGE TO GENERAL POPULATION HOUSING UNITS

Upon the discharge of an IP admitted to the MHCB for suicidality, the MHCB discharging clinician shall initiate the newly created California Department of Corrections and Rehabilitation (CDCR) MH-7497, *Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet* prior to physical discharge. The discharging clinician shall ensure the form is provided to transporting/escorting staff who will deliver the form to the receiving institution's Central Control staff. Central Control staff at the receiving institution shall document the IP's new housing information on the form and ensure the form is sent with the IP to the housing unit.

Once the IP has physically arrived at the receiving housing unit, staff shall conduct a personal observation within the housing unit on the IP every 30 minutes during the initial 24 hours of placement. Housing unit staff shall document all custody checks on the MHCB Discharge Custody Check Sheet using the observations legend listed on the CDCR MH-7497. When IPs are released from the housing unit to participate in programs outside of the housing unit, staff shall note the IP is "Out to Program" on the MHCB Discharge Custody Check Sheet until his/her return to the housing unit. Housing unit staff is not required to have the IP return to the housing unit to conduct the MHCB discharge custody checks. When an IP returns to the housing unit from program activities, housing unit staff shall note the arrival time on the MHCB Discharge Custody Check Sheet, and continue the MHCB discharge custody checks as directed above.

Upon completion of the initial 24 hours after arriving to the unit, a mental health clinician shall report to the IP's housing unit, discuss the IP's observed behavior with custody staff; and conduct a confidential clinical evaluation with the IP. The evaluation will determine whether to continue or discontinue the MHCB discharge custody checks or refer the IP for admission back to an MHCB based upon suicide risk. The mental health clinician shall document this decision on the MHCB Discharge Custody Check Sheet. Should the checks be continued, a mental health clinician is required to reevaluate the IP every 24 hours until checks are discontinued. The custody checks shall not be extended beyond 72 hours after discharge from a MHCB. If an IP requires checks beyond 72 hours, the IP shall be readmitted to the MHCB. Institutions shall retain all original MHCB Discharge Custody Check Sheets for a minimum of three years at the institution, and additional four years in departmental records retention.

Weekends and Holidays

When MHCB discharge custody checks end on a weekend or holiday, a designated mental health clinician shall conduct the evaluation when available. If a mental health clinician is unavailable, the evaluation may be conducted by a psychiatric technician. The psychiatric technician will see the patient and contact the on call use of force mental health clinician for a decision regarding continuation of checks. The on call provider shall determine if the MHCB discharge custody checks may be discontinued and is responsible for documenting the basis of this decision on a progress note. The psychiatric technician shall document the continuation or discontinuation of checks on the MHCB Discharge Custody Check Sheet, noting the date, time, and name of on call provider consulted.

IP MHCB DISCHARGE TO SEGREGATED HOUSING UNITS

On May 9, 2014, the California Department Corrections and Rehabilitation implemented the Security/Welfare Check Procedure in all Administrative Segregation, Condemned, Psychiatric Services, and Security Housing Units. This procedure directs staff to conduct a security/welfare check at staggered intervals on all inmates assigned to segregated housing units twice an hour (not to exceed 35 minutes between checks) during their entire length of stay. The implementation of the Security/Welfare Check Procedure has rendered the MHCB discharge custody checks redundant when the IP is discharged to a segregated housing unit.

With this revision to the MHCB discharge policy, segregated housing units that have implemented the Security/Welfare Check Procedure shall no longer conduct MHCB discharge custody checks of IPs solely due to discharge from an MHCB.

The Security/Welfare Check by definition ensures custody staff is accounting for IPs at established intervals. However, this revision does not apply to Segregated Housing Units that do not conduct Security/Welfare Checks on all three watches. Housing units meeting these criteria shall be required to log the MHCB discharge custody checks as indicated above during times when the security/welfare checks are not required per existing policy.

Please ensure all impacted Post Orders and local operating procedures (LOP) are immediately updated to reflect these changes. The revision(s) may be included as a supplement to be included in the next scheduled revision of the impacted document. Additionally, each institution shall provide verification of completion to your institution's LOP via memorandum to your respective Mission Associate Director and a copy to Eric Hobbs, Correctional Lieutenant, Division of Adult Institutions, Mental Health Compliance Team within 30 calendar days from issuance of this memorandum.

If you have any custody related questions regarding this directive, please contact Lieutenant Hobbs at (916) 322-1725.

KELLY HARRINGTON
Director
Division of Adult Institutions

KATHERINE TEBROCK
Deputy Director
Statewide Mental Health Program

CHERYL SCHUTT, RN, BSN
Statewide Chief Nurse Executive
Nursing Services
California Correctional Health Care Services

Attachments

cc: Kathleen Allison
Ralph M. Diaz
Eric Hobbs
Laura Ceballos
Amy Eargle
Marcie Flores

STATE OF CALIFORNIA
**Mental Health Crisis Bed (MHCB)**
**Discharge Custody Check Sheet**
CDCR MH-7497 (01/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Form: Page 1 of 2
Instructions: Page 3 and 4

**I. Discharging Information**

Inmate Name: CDCR #: Date of Discharge from MHCB:

Discharging LOC: MHCB Discharging Institution:

MHCB Discharging Clinician:

**II. Receiving Institution Information**

Receiving Institution: Assigned Housing Unit:

Date/Time of Arrival to Housing Unit:

**III. Clinical Evaluation**

*When MHCB discharge custody checks end on a weekend or holiday, a designated mental health clinician shall conduct the evaluation when available. If a mental health clinician is unavailable, the evaluation may be conducted by a psychiatric technician. The psychiatric technician will see the patient and contact the on call use of force mental health clinician for a decision regarding continuation of checks. The on call provider shall determine if the MHCB discharge custody checks may be discontinued and is responsible for documenting the basis of this decision on a progress note.

**Day 1 (Initial 24 Hours after Discharge from MHCB)**

Mental Health Clinician: Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician: Date/Time of Evaluation:

Consulting MH Clinician: Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Continue Custody Checks

☐ Refer to MHCB Date and Time of Referral:

**Day 2**

Mental Health Clinician: Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician: Date/Time of Evaluation:

Consulting MH Clinician: Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Continue Custody Checks

☐ Refer to MHCB Date and Time of Referral:

**Day 3**

Mental Health Clinician: Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician: Date/Time of Evaluation:

Consulting MH Clinician: Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Refer to MHCB Date and Time of Referral:

DISTRIBUTION - Copies: Health Records, Health Care Access Unit Captain
SCANNING LOCATION - Outpatient; MHNt/TxPln - Progress Note

STATE OF CALIFORNIA
**Mental Health Crisis Bed (MHCB)**
**Discharge Custody Check Sheet**
CDCR MH-7497 (01/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Form: Page 2 of 2
Instructions: Page 3 and 4

IV. Custody Checks

Inmate Name: CDCR #: Assigned Housing Unit:

**Observation Legend:**

1 - Arrival to Unit
2 - In Cell-Sleeping/Laying Down
3 - In Cell Misc.
4 - In Cell-Watching TV/Reading
5 - In Cell - Talking to Cell Mate
6 - In Cell-Eating
7 - Day Room-Activities
8 - Showering
9 - Out to Program
10 - Return from Program
11 - Supervisor Review of MHCB Custody Discharge Checks
12 - Emergency

| Date | Time | Observation | Print Name | Comments |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DISTRIBUTION - Copies: Health Records, Health Care Access Unit Captain
SCANNING LOCATION - Outpatient; MHNt/TxPln - Progress Note

STATE OF CALIFORNIA
MENTAL HEALTH CRISIS BED (MHCB)
DISCHARGE CUSTODY CHECK SHEET
CDCR MH-7497 (01/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

## Instructions

**Purpose of Form:** The **CDCR MH-7497 (8/15),** Mental Health Crisis Bed (MHCB) Discharge Custody Check is used for patients who were admitted to a MHCB for suicidality and have subsequently been discharged. It is used to document the following:

1. All custody checks are being conducted at least every 30 minutes, ensuring the patient is not engaging in any self-injurious behavior.
2. Clinical evaluations should determine if the patient requires continued 30 minute checks or if custody checks can be discontinued. If it is determined the patient cannot be safely removed from custody checks 72 hours after being discharged, he/she will be referred back to MHCB.

**I. Discharging Information**
**This section is to be completed by a mental health clinician.**

1. Enter the patient's name
2. Enter the patient's CDCR number.
3. Enter the date of discharge from MHCB.
4. Enter the patients discharging level of care using the dropdown box.
5. Enter the institution from which the patient is being discharged.
6. Enter the name of the discharging clinician.

**II. Receiving Institution Information**

1. Receiving Institution Section: The discharging clinician shall enter the institution location to which the patient is being discharged.
   a) Once the receiving institution section is complete and the name of the receiving institution is entered, MHCB staff shall print the CDCR MH-7497 Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet and provide to transporting/escorting custody staff. The CDCR MH-7497 Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet shall accompany the patient to the receiving institution and housing unit.
   b) Transporting/escorting staff shall provide the form to Central Control at the receiving institution wherein the assigned housing portion shall be completed by Central Control staff.
   c) Assigned Housing Unit: Central Control staff at the receiving institution shall write the patient's housing unit and cell number.
   d) Upon the patient's arrival into the unit, housing unit staff will write in the date and time.

**III. Clinical Evaluation**
**This section is to be completed by Mental Health Clinician or Psychiatric Technician.**

1. On each day, check the relevant box that establishes if checks shall be discontinued, continued, or if the patient shall be referred to the MHCB.
2. Date, time, and sign in the section for each day.
3. Document clinical information regarding the patient encounter on the CDCR MH-7230-B, Interdisciplinary Progress Note - Five Day Follow-Up form. Supplemental information may be documented on a mental health progress note.
4. On day 3, if the clinician believes ongoing custody checks are required, the "refer to MHCB" box shall be checked and the patient referred to MHCB.

**IV. Custody Checks**
**To be completed by custody staff conducting checks. One entry per check is required.**

1. Enter the patient's name
2. Enter the patient's CDCR #
3. Enter the patient's assigned housing unit
4. Date: Write date of each check conducted
5. Time: Write the time the check was conducted and do not write times in advance.
6. Observation: Write the number(s) from the legend best describing the behavior or activity that was observed during the check.

STATE OF CALIFORNIA
**MENTAL HEALTH CRISIS BED (MHCB) DISCHARGE CUSTODY CHECK SHEET**
CDCR MH-7497 (01/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

7. Print Name: Once the information is written in, the staff member conducting the custody check shall print his/her name legibly.

8. Comments: Complete this section to provide any additional information that needs to be communicated to the mental health clinician or psychiatric technician. If based on what staff observes during the custody check, he/she believes the patient is a danger to self or others or is exhibiting unusual and/or bizarre behavior, custody staff shall immediately contact Mental Health Services and submit a CDCR 128-MH5 Mental Health Referral Chrono. This section shall be utilized to document the date and time the patient was referred to Mental Health Services. In the event an emergency occurs within or outside of the housing unit requiring custody staff to respond that prevents them from conducting the custody check, the date, time and nature of the emergency shall be documented in the comment section at the bottom of page two. In the event this occurs, custody staff shall resume the custody checks as soon as possible.

V. **Additional Information**

1. When custody supervisors are conducting reviews of the form during tours of the unit, the custody supervisor shall fill in the date and time, and note the appropriate observation code. Once the information is filled in, the custody supervisor reviewing the form shall print and sign his/her name legibly.
2. If at any time custody staff discovers the patient has not been evaluated by Mental Health Services within established timeframes, staff shall notify their custody supervisor, who will contact Mental Health Services.
3. If the patients housing assignment changes, print the new housing unit information on page two of the form.
4. When all the custody check information on page two has been filled in, initiate an additional page two of the form, print the patient's current information and continue documenting the custody checks. All additional pages printed to document the custody checks shall be kept together with page one of the form.

16-0104

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : January 4, 2016

To : SEE DISTRIBUTION LIST

Subject: **REITERATION OF EXPECTATIONS RELATIVE TO MENTAL HEALTH CRISIS BEDS AND RETURN CASES**

The purpose of this memorandum is to reiterate expectations set forth in the December 23, 2014, memorandum titled, *Transfer of Inmates To and From Mental Health Crisis Beds* (Attachment A), and to provide step-by-step instructions to assist with the process necessary for retention of vacant beds utilizing the Strategic Offender Management System (SOMS).

Specifically, upon an Inmate-patient's (IP's) transfer to a Mental Health Crisis Bed (MHCB), the sending institution is required to retain the IP's bed for a minimum of ten days. The sending institution's Control Sergeant is responsible for ensuring the vacated bed is reserved, and shall not house any inmate in that bed unless directed to do so by the Warden or his/her designee. This directive applies to internal placement made by an institution with a vacant MHCB, as well as an IP that is transferred to an alternative institution for the purpose of MHCB treatment and return.

Due to the limited amount of MHCBs statewide and to ensure timely access to care, effective management of MHCBs is vital. Therefore, upon an IP's discharge from an MHCB and return to the originating institution, there **must** be an appropriate bed retained to facilitate return within the allotted 72-hour time frame. The following attachments are provided as a guide to assist with the process of reserving a bed via SOMS:

- Reserving a Bed in SOMS (Attachment B)
- Assigning a Bed Without Using a Batch (Attachment C)

Wardens are directed to provide training to their Control Sergeants and Officers. Please provide a proof of practice memorandum to your Associate Director within 30 days of the date of this memorandum.

SEE DISTRIBUTION LIST
Reiteration of Expectations Relative to Mental Health Crisis Beds and Return Cases
Page 2

If you have any questions or require additional information, please contact Robert L. Davis, Correctional Administrator, Mental Health Compliance Team, Division of Adult Institutions, at (916) 323-2450 or Robert.Davis@cdcr.ca.gov.

KELLY HARRINGTON
Director
Division of Adult Institutions

Attachments

DISTRIBUTION LIST:

✓Associate Directors, Division of Adult Institutions
Associate Directors, Statewide Mental Health Program
✓Wardens
✓Chiefs of Mental Health
✓Chief Executive Officers
✓Classification Staff Representatives
✓Correctional Counselors III, Reception Centers

cc: ✓Katherine Tebrock
✓Kathleen Allison
✓Ralph M. Diaz
✓Judy Burleson
✓Amy Eargle
✓Vincent S. Cullen
✓John Herrera
✓James Robertson
✓Robert L. Davis

APPENDIX PG. - 161

ATTACHMENT A

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : 12/23/2014

To : See Distribution List

Subject: TRANSFER OF INMATES TO AND FROM MENTAL HEALTH CRISIS BEDS

The purpose of this memorandum is to provide clarification of the interdisciplinary coordinated actions necessary, especially as it relates to custody staff, for transfer of inmate-patients (IP) who are clinically accepted to and discharged from a Mental Health Crisis Bed (MHCB) and to emphasize the importance of pre-discharge planning. This memorandum both supersedes specific prior California Department of Corrections and Rehabilitation's (CDCR) memorandums and should be implemented in conjunction with other departmental policies (Attachment A). This memorandum is an accompaniment to the Mental Health Services Policy 12.05.200 et al (Attachment B).

## MHCB Admissions

The Division of Correctional Health Care Services, Health Care Placement Oversight Program (HCPOP), is responsible for managing the utilization of designated specialized health care beds, including MHCBs. All IP placements into a MHCB require authorization from HCPOP.

The 24 hour MHCB transfer timeline begins upon clinical determination a MHCB is required.

Within one hour of clinical determination that an IP requires placement in a MHCB and/or prior to placement into alternative housing, the referring clinician shall contact both HCPOP and the Classification and Parole Representative (C&PR), or during non-business days/hours, the Watch Commander (WC).

- HCPOP can be contacted 24 hours per day, seven days per week at (916) 204-0321, or via e-mail at hcpop.mhcb@cdcr.ca.gov or on global as MHCB-HCPOP@CDCR.
- Provide IP name, CDCR number, mental health Level of Care (LOC) prior to MHCB, criteria for placement, referring institution, and contact name with callback number.

HCPOP monitors the Strategic Offender Management System (SOMS) for vacant MHCBs and determines bed availability. Once a vacant MHCB is identified HCPOP:

- Notifies the referring clinician of the bed assignment and if not internally admitted to a MHCB, furnishes receiving clinician contact information.
- If not internally admitted to a MHCB, directs the MHCB Clinical Director or designee (receiving clinician) to hold the available MHCB and furnishes IP information and referring clinician contact information to the receiving clinician.

Within two hours of bed availability notification by HCPOP and if not internally admitted the referring clinician, sends the completed referral packet and calls the receiving clinician.

Within one hour of receipt, the receiving clinician reviews the completed referral packet, conducts the pre-admission screening for placement, and notifies the referring clinician of acceptance. Missing paperwork shall not be a cause for non-acceptance. The receiving and referring clinician will work together to ensure all required paperwork has been provided/received.

Within one hour of acceptance from the receiving clinician, the referring clinician shall complete a CDCR Form 128-C, Medical/Psychiatric/Dental Chrono, indicating acceptance and the IP's bed number and forward the form to the receiving clinician and the C&PR or WC at the sending institution.

Immediately upon receipt of the 128-C, the Chief of Mental Health or designee at the receiving institution ensures the C&PR or WC at the receiving institution receives the 128-C, Medical/Psychiatric/Dental Chrono indicating acceptance.

MHCB transfers shall be done under authority of the Department Operations Manual, Section 62080.17 "Emergency Medical Transfers" and shall be done via the Classification Services Unit (CSU) teletype process on a "Psychiatric and Return" basis. The C&PR at the receiving institution shall contact CSU for teletype transfer approval. Emergency medical transfer to MHCB shall not be delayed pending teletype approval.

The 24 hour MHCB transfer timeline begins upon clinical determination a MHCB is required. A transfer is the day/time the IP leaves the institution for transport to/from a MHCB according to SOMS.

The C&PR at the sending institution shall notify Statewide Transportation of the request to transport. If Statewide Transportation is unable to complete transport within the required timelines, the institution transportation team shall complete the transport.

It is the responsibility of the sending institution, Clinical staff, HCPOP, CSU, and transportation to ensure transport within 24 hours of MHCB referral. Collaboration between all involved disciplines, divisions, and units is essential in order to achieve the 24 hour transfer requirement.

In the event HCPOP is unable to secure a MHCB placement immediately, the institution shall refer to the Alternative Housing Prioritization procedures as outlined in the Mental Health Services Policy 12.05.301, "Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer," dated October 2013, pending a MHCB bed placement.

In keeping with current policy, the sending institution shall retain an IP bed/cell for a minimum of ten days if the IP is transferred to a MHCB.

Rescinding a MHCB Referral

If HCPOP and the C&PR or WC were notified of the need for transfer, the referring clinician or designee immediately, and not to exceed one hour, notifies HCPOP and C&PR or WC of the rescission.

MHCB Intake

Upon transfer to the assigned MHCB, the receiving clinician will admit the IP to the MHCB and provide MHCB services for an anticipated length of stay duration up to 10 days. The MHCB Inter-Disciplinary Treatment Team (IDTT) shall meet within 72 hours of an IP admission and at least weekly thereafter. The Chief Psychiatrist or designee must approve exceptions to this length of stay.

Pre-Discharge Planning

The IDTT shall begin discharge planning at the initial IDTT meeting. An assessment shall be conducted at the initial IDTT relative to the likelihood of the IP's ability to return to the sending (referring) institution, should the IP's MHSDS LOC change from the LOC prior to MHCB placement.

Rules regarding return to original institution

- IPs discharged at the Correctional Clinical Case Management or Enhanced Outpatient Program (EOP) LOC shall not be returned to institutions that do not provide the discharged LOC.
- IPs with incomplete reception center (RC) processing shall be returned to the originating RC. For this purpose, Classification Staff Representative transfer endorsements shall not be considered part of the RC processing.
- IPs with completed RC processing shall not be returned to the RC. Contact HCPOP for placement assistance.
- IPs referred to an Intermediate Care Facility (ICF) or APP may remain in the MHCB until an ICF or APP bed becomes available.
- IPs requiring Administrative Segregation Unit (ASU) EOP hub placement consistent with California Code of Regulations, Title 15, Section 3335 shall be referred to HCPOP for placement assistance.

It is the expectation all cases determined during the initial IDTT to be highly unlikely to return to the originating institution be referred to the C&PR for *pre-discharge planning* with HCPOP to include, when appropriate, a Case Factor Sheet (CFS), completed by a Correctional Counselor. No CFS is required for IPs housed in ASU, Security Housing Unit (SHU), or Psychiatric Services Unit (PSU).

Pre-Discharge Planning (continued)

The IDTT shall determine when an IP is *pending clinical discharge* and recommend a LOC that is appropriate. The mental health Primary Clinician (PC) shall immediately notify HCPOP and the C&PR of the *pending clinical discharge* and LOC to ensure transfer can be expedited.

The MHCB Institution C&PR shall review the aforementioned rules regarding return to original institution, the IP case factors and/or prior completed CFS and determine which institution the IP should be returned to after clinical discharge from the MHCB.

If the IP is able to return to their originating referring institution the MHCB institution C&PR will notify the originating referring C&PR of the *pending clinical discharge.* The referring C&PR is to arrange for transportation so that transfer of the IP, once clinically discharged, occurs within 72 hours. The referring C&PR shall notify Statewide Transportation of the *pending clinical discharge* and request for transfer.

If the IP is unable to return to their originating institution, the case *pending clinical discharge* shall be referred to HCPOP for re-direction.

- Within four hours of PC notification of *pending clinical discharge* the MHCB Institution C&PR or designee will notify HCPOP and provide the relevant CFS, if necessary. No CFS is required for ASU/SHU/PSU IPs.

- Within four business hours of C&PR or designee notification of *pending clinical discharge*, HCPOP will review the IP case factors and make a re-direction placement recommendation via case notes in the SOMS and notify the MHCB Institution C&PR.

- As soon as possible, but no later than one business day, of HCPOP notification, the MHCB Institution C&PR or designee shall notify the MHCB Clinical Director that a receiving CDCR institution has been determined for placement *pending clinical discharge.*

- The MHCB Clinical Director or designee shall expeditiously notify the discharging clinician and institution to receive the IP once clinically discharged.

MHCB Discharges

The clinician discharging the IP shall complete the clinical discharge on the CDCR Form 128-MH3, and contact the Chief of Mental Health or designee at the institution to receive the discharged IP. The mental health identifier (MHI) of the discharged IP shall then be entered into SOMS prior to physical discharge.

The clinician discharging the IP shall immediately notify HCPOP and the discharging institution's C&PR of the clinical discharge and shall provide a copy of the current CDCR Form 128-MH3, Mental Health Placement Chrono, to the C&PR or WC receiving the discharged IP in order to expedite the transfer.

If the IP is able to return to their originating referring institution the MHCB Institution C&PR will notify the originating referring C&PR of the clinical discharge. Transfer of the discharged IP shall proceed according to pre-discharge plan.

If the IP is unable to return to their originating institution, pursuant to the aforementioned pre-discharge plan, the MHCB Institution C&PR will have already received re-direction notification from HCPOP and a HCPOP re-direction placement recommendation will be present via the case notes in SOMS.

- Immediately upon notification by the clinician discharging the IP of clinical discharge, the MHCB Institution C&PR shall present the case to the institution's assigned Classification Staff Representative (CSR) for an emergency transfer endorsement. If a CSR is not currently assigned to the MHCB institution at the time of the re-direct, the MHCB Institution C&PR shall contact the Classification Staff Representative scheduler.

- Within four hours of notification by the MHCB Institution C&PR, the CSR shall review the case for an emergency transfer endorsement. On difficult to place cases, the CSR shall coordinate with the CSU and Population Management Unit to ensure placement into the least restrictive housing.

  - If no CSR is available, the MHCB Institution C&PR shall provide case factors to the re-direct Institution's C&PR. The re-direct C&PR shall contact CSU for teletype endorsement if applicable and arrange IP transportation.

- The MHCB Institution C&PR or designee shall additionally ensure a confirmed contact is made with the receiving C&PR or designee.

- Within 72 hours of clinical discharge, transfer of the discharged IP shall proceed according to pre-discharge plan. It is the responsibility of the institution receiving the discharged IP to make all transfer arrangements. Statewide Transportation may be used if they are able to meet the 72 hour time frame.

IPs clinically discharged from MHCB can be housed in general population, if placement is consistent with clinical needs, case factors, and appropriate program availability. This placement shall be coordinated and approved through the institution's Warden or designee.

For your convenience, please see the provided flowchart (Attachment C).

If you have any questions or require additional information, please contact James Robertson, Chief, CSU, at (916) 322-2544 or Judy Burleson, Chief, HCPOP, at (916) 691-0312.

M. D. STAINER
Director
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Service
Deputy Director, Statewide Mental Health

Attachments

Distribution List:

Deputy Director(s), Division of Adult Institutions
Associate Directors, Division of Adult Institutions
Associate Directors, Statewide Mental Health Program
Regional Chiefs of Mental Health
Healthcare Executive Regionals
Wardens
Chiefs of Mental Health
Chief Executive Officers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselors III, Reception Centers
Chief, Transportation Unit
Chief, Classification Services Unit
Chief Psychologist, Clinical Policy and Program Development, DCHCS

cc: Judy Burleson
Vincent S. Cullen

Attachment B

# Reserving a Bed in SOMS

SOMS allows you to reserve a bed for an offender. This procedure is done rarely, typically prior to a transfer and only for inmates with special needs.

> If you reserve a bed for an offender, the reserved bed appears on the *Bed Assignment* and *Bed Batch Request* screens when a **request** is made for the offender.

**To reserve a bed:**

1. Navigate to **Support > Correctional Facility Information > Bed Search Within Institution.**

   The *Bed Search Within Institution* screen appears.

2. From the **Institution Name** list, select the institution name.

   Or

   From the **Institution ID** list, select the institution identifier.

| You can also type an institution name or ID in the appropriate box. |
|---|

3. Click the arrow to proceed to the next step.

   Additional search boxes appear on the *Bed Search Within Institution* screen.

4. From the **Bed Status** list, select **Vacant.**
5. (Optional) Complete additional fields on this screen to narrow the search.



6. Click **Search.**

   The *Matching Beds in Institution* screen appears with the results of your search.

> You can view details of each of the beds that matched your search by clicking the link in the *Area/Bed ID* column. On that detail page, you can fill the bed or see its history.

2. Click the link in the **Area/Bed ID** column for the bed you want to reserve.

   SOMS displays details about the selected bed on the *Bed Description* screen.

3. Click **Prepare to Add.**

   The *Bed Reservation* screen appears with fields for the bed reservation.

4. In the **CDC#** box, type the offender's CDC number.

5. Click the arrow to load the offender information.

> If there are conflicts between the offender characteristics and the room--such as an inappropriate security level or ADA status--SOMS displays the *Inmate Conflicts* screen in a pop-up window. You can click **Retry** to return to the bed reservation screen to reserve the room for another offender, or you can click **Override** to acknowledge the conflicts and proceed with the reservation.

6. In the **Reserved by Staff** box, type or select the name of the staff person reserving the bed for the offender.

7. In the **Assignment Reason** box, type or select the reason for the bed assignment.

8. In the **Expiration Date** box, enter a date the reservation expires.
9. In the **As of Date** box, enter the current date.
10. (Optional) In the **Bed Assignment Comments** box, type comments about the bed reservation.
11. Click **Add** to save the bed reservation.

| If you select a bed that has a lower custody or security level than the inmate you want to assign to the bed, SOMS generates a Mismatch error and gives you a choice to Retry or Override. Retry for a bed with the appropriate custody level or click Override to assign the bed. An Override requires a comment. |
|---|

**Concept Information**

About Individual Bed Moves and Bed Exchanges

**Related Tasks**

Assigning a Bed Without Using a Batch

Exchanging Beds Between Inmates

Filling a Vacant Bed

Viewing an Offender's Bed Assignment

Viewing Available Beds

**Related Business Process**

About the Bed Request Process

The Bed Reservation Process

Attachment C

# Assigning a Bed Without Using a Batch

You can assign an offender to a bed without going through the bed request batch process.

---

**Before You Begin**

To assign a bed without using the bed request batch process, you must first retrieve the information for the offender you are assigning to a bed.

---

### To assign a bed without using the bed request batch process:

1. Navigate to **Prison > Population Tracking (Internal) > Bed Assignments.**

   The *Bed Assignment* screen appears.

2. Click **Prepare to Add.**

   The second page of the *Bed Assignment* screen appears and displays a note to choose one of the bed assignment methods.



3. In the *New Bed Assignment* area, select the destination bed by using one of the three choices:

   Click **Bed(s) Reserved/Held for Inmate** and select the bed that has been reserved for the offender by the Population Management/Designee.

   > The **Area/Cell/Bed #** list will be blank if the Population Management/Designee has not reserved a bed for the offender.

   Or

   Click **Vacant Beds that match Inmate** to choose a **Facility/Housing Area** and an **Area/Cell/Bed #**.

   Or

   Click the last option and in the **Housing Area** list, select the destination housing area, and in the **Vacant Cell/Bed #** list, select an available cell and bed.

   > If the bed you chose conflicts with the offender characteristics, SOMS presents a warning and gives you the option to retry or to override the warning. If you click **Retry**, you can select an appropriate bed using the same instructions in this step. If the new bed has no conflicts, you may proceed to the next step.
   > If you click **Override**, SOMS warns that you must enter comments for your decision to override the conflict, and you may proceed to the next step.

4. Click **Click to Proceed.**

   The second page of the *Bed Assignment* screen appears and displays a note to choose one of the bed assignment methods.

5. In the **Assignment Date** box, enter the date the offender was transferred.
6. In the **Time** box, enter the time of the transfer.
7. In the **Assignment Reason** list, select a reason you are assigning the offender this bed.
8. In the **Approved by Staff** list, select your name or the name of the person approving the bed assignment.
9. In the **Status** box, select **Moved.**

   > You can instead enter a different status, such as *Requested* if another staff member must manually approve the bed assignment or notify Control that the offender has been received in the housing area.,

10. In the **As of Date** box, enter the same date as the bed assignment date you entered in Step 5.
11. In the **Time** box, enter the time of the transfer.
12. In the **Comments** box, type comments about the bed assignment.

| If you chose to override any conflicts that SOMS presented earlier, enter the reasons here. |
|---|

13. Click **Add** to save the bed assignment in SOMS.

**Concept Information**

About Individual Bed Moves and Bed Exchanges

**Related Tasks**

Exchanging Beds Between Inmates

Filling a Vacant Bed

Reserving a Bed in SOMS

Viewing an Offender's Bed Assignment

Viewing Available Beds

**Related Business Process**

About the Bed Request Process

The Bed Reservation Process

12-1212

 CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

Date : December 12, 2012

To : Chief Executive Officers
Chiefs of Mental Health

From : K. Allison
Kathleen Allison, Deputy Director
Facility Support, Division of Adult Institutions

T. Belavich PhD
Timothy G. Belavich, Ph.D., MSHCA, CCHP, Deputy Director (A)
Statewide Mental Health Program, Division of Health Care Services

Subject : USE OF OUTPATIENT HOUSING UNITS DIRECTIVE

This memorandum supersedes the previous *"Use of Outpatient Housing Units"* memorandum dated May 9, 2012 (attached).

The California Department of Corrections and Rehabilitation currently has a sufficient number of Mental Health Crisis Beds (MHCB). Although inmate-patients may have previously been housed in Outpatient Housing Units (OHU) rather than be referred to MHCB due to an insufficient number of MHCBs, this practice is no longer necessary and is not permitted.

Placement in an OHU is permitted when a crisis assessment is necessary. A physician, psychiatrist, licensed psychologist, or nurse practitioner may order placement of an inmate-patient into OHU when an assessment is clinically warranted. If an inmate-patient is placed in OHU when a clinician is not available to do a face-to-face evaluation, such as after hours or on weekends, the inmate-patient may be placed on suicide observation until seen by the clinician. The initial intake evaluation shall occur and be documented within 24 hours and a face-to-face evaluation shall occur at the earliest practicable time and within no more than 48 hours of the verbal OHU placement order (*MHSDS Program Guide, 2009*, p. 12-5-30).

Only when circumstances prevent the clinician from making a clinical decision regarding admission to a higher level of care or release from the OHU during the first evaluation (within 24 hours) shall the full 48-hour evaluation period permitted by the MHSDS Program Guide (2009) be used. At any time, "when an inmate-patient in the OHU is [clinically] determined to require MHCB level of care, including Suicide Precaution and/or Watch," he or she shall be immediately referred to a MHCB (*Mental Health Services Delivery System (MHSDS) Program Guide, 2009*, p. 12-10-12). Inmate-patients may not be kept in OHU for higher level of care treatment, including MHCB level of care.

# MEMORANDUM

OHU length of stay shall not exceed 48 hours unless one of the following two conditions is met:

1. *The inmate-patient is referred to the MHCB. Inmate-patients must be transferred to the MHCB within 24 hours of the clinical decision to refer to MHCB. OHU length of stay shall not exceed 72 hours for inmate-patients referred to MHCB.* (MHSDS Program Guide, 2009, p. 12-5-30)

2. *The inmate-patient is awaiting Enhanced Outpatient Program (EOP) level of care placement and an "IDTT determines that the inmate-patient may be at risk if returned to any of the housing units available at that institution while awaiting transfer."* (MHSDS Program Guide, 2009, p. 12-5-31)

Additionally, OHU lengths of stay for EOP inmate-patients meeting item # 2 of the exceptions above shall not exceed 30 days from endorsement. Clinical staff shall ensure the EOP level of care change is immediately completed upon evaluation and is promptly communicated to the correctional counselor to ensure transfer is initiated.

All mental health inmate-patients housed in OHU for an extended time beyond 72 hours shall receive mental health treatment according to the following guidelines:

| | | |
|---|---|---|
| Inmates transferring from mainline General Population or Correctional Clinical Case Management System | ⟶ | Shall receive enhanced mental health treatment as determined by a treatment team. |
| Inmates transferring from Reception Center, mainline, or Administrative Services Unit who were at the EOP level of care upon arrival to the OHU | ⟶ | Shall receive Enhanced Outpatient Treatment in accordance with applicable MHSDS Program Guide (2009) requirements. |

If you have questions concerning this memorandum, you may contact Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health Program, at (916) 691-0308 or via email at Laura.Ceballos@cdcr.ca.gov.

Attachment

cc: Judy Burleson, Associate Director, Program and Clinical Support
Statewide Mental Health Program, Division of Health Care Services
Nathan Stanley, Chief, Coleman Compliance
Statewide Mental Health Program, Division of Health Care Services
Rick Johnson, Chief, Health Care Placement Oversight Program
Statewide Mental Health Program, Division of Health Care Services
Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
Statewide Mental Health Program, Division of Health Care Services
Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
Statewide Mental Health Program, Division of Health Care Services
Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
Statewide Mental Health Program, Division of Health Care Services
Richard Kendall, Ph.D., Southern Mental Health Regional Administrator (A),
Statewide Mental Health Program, Division of Health Care Services

# 15-0215

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | February 25, 2015 |
|---|---|---|
| CHAPTER 6: SEGREGATED INMATES | Revision Date(s): | |
| | Supersedes Policy: | |
| 12.06.100 SECURITY HOUSING UNIT – DEPARTMENT OF STATE HOSPITALS/PSYCHIATRIC INPATIENT PROGRAM CASE CONFERENCE - POLICY | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

**Policy**

For selected inmate-patients (IPs), a formal clinical case conference shall be conducted prior to being discharged from a Department of State Hospitals (DSH) or a California Department of Corrections and Rehabilitation (CDCR) Psychiatric Inpatient Program (PIP). Selected IPs are those who were both:

1. Serving a Security Housing Unit (SHU) term, are placed in a SHU AND
2. Are one of the following:
   a) In the Correctional Clinical Case Management System (CCCMS).
   b) Not a participant in the Mental Health Services Delivery System prior to admission to the DSH/PIP.
   c) Placed in a Mental Health Crisis Bed prior to DSH/PIP.

If CDCR clinicians believe that the segregated environment has had an impact on the mental health of the IP, that information, as well as the inmate's housing information, shall be included in the initial referral packet for DSH/PIP placement. This information shall provide the basis for housing and treatment decisions upon discharge from DSH/PIP.

**Purpose**

To prevent further decompensation in IP's who were placed in inpatient programs while serving SHU terms.

To identify appropriate housing that will minimize the risk of decompensation upon discharge from DSH/PIP.

**Compliance Indicators**

To be in compliance with this policy:

1. The clinical case conference shall:
   a. Address the continuity of care.
   b. Use clinical information to determine appropriate housing.

2. Under no circumstances shall an IP who is serving a SHU term and who was admitted to DSH/PIP be discharged from inpatient care to a SHU.

3. The initial referral packet for DSH/PIP placement shall include a statement as to whether the CDCR clinician believes that segregated housing had an impact on the mental health of the IP.

# 14-0117

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: January 2014 |
|---|---|
| CHAPTER 5: INPATIENT SERVICES | Revision Date(s): |
| POLICY 12.05.400: Intermediate and Acute Hospital Returns – Records Review | Attachments: Yes☐ No☒ |
| | Director Approval: [signature] |

**12.05.400** **Intermediate and Acute Mental Health Hospital Returns – Records Review**

**Policy**

To ensure continuity of care between settings, a California Department of Corrections and Rehabilitation (CDCR) mental health clinician shall:

1. Within 24 hours of an inmate's return from an intermediate or acute inpatient stay, conduct a mental health evaluation.

2. As soon as possible, but not to exceed five working days, review discharge records or make clinician to clinician contact with the treating intermediate or acute facility clinician.

3. Document the evaluation, review of discharge documents, and clinician to clinician contact on a CDCR MH-7230-A.

**Compliance Indicators**

1. Inmates discharged and transferred from an intermediate or acute inpatient facility receive an evaluation within 24 hours of arrival by a CDCR mental health clinician at the receiving institution or program.
2. The receiving CDCR mental health clinician reviews each inmate's intermediate or acute inpatient Pre-Discharge Summary/Discharge Summary health record as soon as possible but not to exceed five working days of the inmate's arrival to ensure continuity of care.
3. If additional information is required, the receiving CDCR mental health clinician contacts the intermediate or acute facility treating clinician for clinical information and consultation as soon as possible, but not to exceed five working days of the inmate's arrival.
4. The mental health evaluation, clinician to clinician contact, and the review of records are documented on a CDCR MH-7230-A, *Interdisciplinary Progress Note – General.*
5. When contact with the intermediate or acute inpatient facility treating clinician is not successful, the receiving mental health clinician contacts the DSH Coordinator who then contacts the Statewide Mental Health Program for assistance via email at:
CDCR DHCS DSH Referral Updates@CDCR

**Additional information**

This policy integrates the current practice for completion of the inter-agency document: *Topic Guidelines for Telephonic Contact for Inmate-Patient Transition from DMH to California Department of Corrections and Rehabilitation (also referred to as "DMH transition form").*

The "DMH transition form" shall continue to be used as a guideline during the clinician to clinician conversation.

The "DMH transition form" does not need to be forwarded to the Statewide Mental Health Program.

**Action required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution ... | then ... |
|---|---|
| has a local operating procedure (LOP) that is reviewed annually | amend the current LOP to meet the new policy via an addendum until the next LOP revision date. |
| does not have a LOP | ensure that a LOP is completed within 60 days of the release of this policy to meet the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

Division of Health Care Services. *Mental Health Services Delivery System Program Guide (2009 Revision).* p. 12-6-15

**Questions**

If you have any questions or need any additional information related to this Policy, you may contact the Statewide Mental Health Program via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov

13-0419



# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| Date: | April 19, 2013 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Timothy G. Belavich, PH.D., MSHCA, CCHP, Director (A), Division of Health Care Services and Deputy Director (A), Statewide Mental Health Program |
| Subject: | LEVEL OF CARE CHANGES FOR INMATE-PATIENTS RETURNING FROM DEPARTMENT OF STATE HOSPITAL FACILITIES |

The purpose of this memorandum is to provide a headquarters directive on Level of Care (LOC) changes for inmate-patients returning from Department of State Hospitals (DSH) facilities. Please be advised the following shall be implemented effective immediately and in conjunction with the already existing directives contained in the Mental Health Services Delivery System Program Guide, 2009 Revision, page 12-6-15, _Discharge Procedures_, Section 7.

The LOC evaluation for inmate-patients returning from DSH facilities shall be conducted at the time of the initial evaluation, which shall occur within 24 hours of arrival. The LOC change shall be documented on the form CDCR 128-MH3 by the evaluating clinician and entered in to the Strategic Offender Management System (SOMS) by data entry staff.

For further information, please contact Laura Ceballos, Ph.D., Chief, *Coleman* Compliance/Quality Management, Statewide Mental Health Program, Division of Health Care Services (DHCS), at (916) 691-0308.

cc: Judy Burleson, Associate Director, Policy and Clinical Support, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Chief, *Coleman* Compliance/Quality Management, Statewide Mental Health Program, DHCS
Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS
Jennifer Johnson, Chief, Policy Support, Statewide Mental Health Program, DHCS
Terri Layton, RRT/RN, Ph.D., Nurse Consultant Program Review, Statewide Mental Health Program, DHCS
Mental Health Tracking System Designees

# 15-0225

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | February 25, 2015 |
| --- | --- | --- |
| CHAPTER 6: SEGREGATED INMATES | Revision Date(s): | |
| | Supersedes Policy: | |
| PROCEDURE 12.06.100.P1 SECURITY HOUSING UNIT – DEPARTMENT OF STATE HOSPITALS/PSYCHIATRIC INPATIENT PROGRAM CASE CONFERENCE - REFERRAL | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

| | ***Procedure*** |
| --- | --- |
| **1.** | California Department of Corrections and Rehabilitation (CDCR) mental health staff identifies selected inmate-patients (IPs) upon referral to Department of State Hospitals (DSH)/CDCR Psychiatric Inpatient Program (PIP) based upon policy criteria. |
| **2.** | The Interdisciplinary Treatment Team (IDTT) determines if the segregated environment has had an impact on the mental health condition of the IP and, if so, the nature of the impact. This information is documented on the referral form, Inpatient Mental Health Services (CDCR 7482) and in a corresponding IDTT progress note. |
| **3.** | CDCR Form 7482, with documentation regarding the impact of segregation on the IP's mental health condition, is included in the DSH/PIP referral packet. |

**Forms:**
CDCR 7482 Referral: Inpatient Mental Health Services

# 16-0208

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | February 8, 2016 |
|---|---|---|
| CHAPTER 6: SEGREGATED INMATES | Revision Date(s): | |
| | Supersedes Policy: | N/A |
| 12.06.801 SHORT-TERM RESTRICTED HOUSING MENTAL HEALTH REQUIREMENTS | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

**Policy**

Short-Term Restricted Housing (STRH) units have been developed for patients at the Correctional Clinical Case Management System (CCCMS) Level of Care (LOC) who require short term restricted housing. The STRH units offer enhanced mental health treatment and additional out-of-cell custody supervised activities for patients at the CCCMS LOC until they can either be released back to general population or transfer to a unit to serve an imposed Security Housing Unit term. The STRH units shall be collaboratively administered between custody and mental health staff.

**Purpose**

To provide enhanced mental health services and prevent decompensation in patients who were placed in restricted housing programs while awaiting disposition of their rules violation charges.

**Compliance Indicators**

To be in compliance with this policy, the following must occur in the STRH:

1. Mental Health staff shall attend daily morning meetings with custody staff to discuss high risk patients, new arrivals, and any behavior issues or ongoing concerns of individual patients.
2. Mental Health staff shall continue to attend and participate in Interdisciplinary Treatment Teams (IDTTs) and Institutional Classification Committees in accordance with Mental Health Services Delivery System Program Guide (2009 Revision) Administrative Segregation Unit requirements.
3. All patients shall be offered 90 minutes of confidential structured group therapeutic activity weekly.
4. All patients shall be offered a weekly clinical contact with their primary clinician.
5. All patients shall be offered in-cell therapeutic activities, such as self-help materials and/or recreational activities, as determined by the IDTT.
6. Psychiatric Technicians shall provide daily rounds to all patients in the STRH.
7. When indicated, patients shall be offered a psychiatric contact every 90 days.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution has STRH units and... | then... |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. |
| does not have a LOP | ensure that one is completed within 30 days of the effective date that meets the new policy requirements. Ensure the LOP is reviewed annually. |

**References**

Coleman v. Brown (E.D. Cal. Oct. 7, 2008, No.CIV S-90-0520 LKK JFM P)
Coleman v. Brown (April 10, 2014, 202:90-cv-00520-LKK- DAD)
Coleman v. Brown (August 29,2014 2:90-cv-00520-LKK-DAD)
Memorandum, "Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing," dated January 15, 2015

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

# 16-0204

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 2/4/2016 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Katherine Tebrock<br>Deputy Director, Statewide Mental Health Program<br>California Department of Corrections and Rehabilitation |
| Subject: | **SHORT-TERM AND LONG-TERM RESTRICTED HOUSING POLICIES** |

This memorandum announces the release of the Short-Term Restricted Housing (STRH) policy (12.06.801) and Long-Term Restricted Housing (LTRH) policy (12.06.802)(attached).

Effective immediately, patients placed in the Correctional Case Management System (CCCMS) Level of Care (LOC) who require short term restricted housing will housed in STRH units rather than Administrative Segregation Units (ASU). Patients at the CCCMS LOC and who are serving a Security Housing Unit (SHU) term shall be housed in LTRH units.

Patients housed in an institution without STRH units shall be placed in an Administrative Segregation Unit until transferred to an institution with STRH units, per DAI memo dated January 15, 2015, *Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing* (attached).

STRH and LTRH are being implemented on a staggered schedule and headquarters will notify the remaining institutions when further deployments will occur.

Institutions with STRH and LTRH units shall update local operating procedures to reflect these changes no later than March 1, 2016.

If you have questions or need additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.ca.gov.

Attachments

cc: Angela Ponciano
Laura Ceballos, Ph.D
Amy Eargle, Ph.D

# MEMORANDUM

Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives

# 15-0115

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : January 15, 2015

To : Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives

Subject : CREATION OF CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM SHORT TERM AND LONG TERM RESTRICTED HOUSING

The purpose of this memorandum is to announce the creation of the Correctional Clinical Case Management System-Short Term Restricted Housing (CCCMS-STRH) and the Correctional Clinical Case Management System-Long Term Restricted Housing (CCCMS-LTRH). The Division of Adult Institutions, in collaboration with the Division of Health Care Services, has developed a series of alternative Administrative Segregated Units (ASU) and Segregated Housing Units (SHUs) for CCCMS inmates requiring short term and long term segregated housing.

The CCCMS-STRH will offer enhanced treatment and additional out-of-cell activities for CCCMS inmates until they can be released back to the general population or transferred to an appropriate CCCMS-LTRH for long term segregated housing. The CCCMS-LTRH will offer enhanced treatment and additional out-of-cell activities for CCCMS inmates serving an imposed SHU term. Due to the increased out-of-cell activities offered in the CCCMS-STRH and CCCMS-LTRH, it is imperative staff are vigilant with documenting all programs, activities, and services afforded to segregated inmates on the CDC 114-A, Inmate Segregation Record. It is expected institutions will audit the CDC 114-A, Inmate Segregation Record, on a weekly basis to ensure compliance with departmental mandates.

## IMPLEMENTATION OF CCCMS-STRH AND CCCMS-LTRH

On January 19, 2015, the CCCMS-STRH and CCCMS-LTRH units will be activated, beginning with California State Prison, Sacramento (CCCMS-STRH) and California State Prison, Corcoran (CCCMS-LTRH) with the Institution's current CCCMS population. Further activations of CCCMS-STRH/LTRH will be on the Institution Activation Schedule (IAS).

## CCCMS-STRH OVERVIEW

The CCCMS-STRHs will be located within the Stand-Alone Administrative Segregation Unit (ASU) at California State Prison, Sacramento and in Stand-Alone ASUs at future designated institutions.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 2

The following institutions will have a CCCMS-STRH Program within their existing ASUs for CCCMS inmates undergoing Reception Center (RC) processing and will be activated as indicated on the IAS:

- California Institution for Men
- Deuel Vocational Institution
- North Kern State Prison
- San Quentin State Prison
- Wasco State Prison

The following institutions will have a CCCMS-STRH Program within their existing ASUs for female CCCMS inmates and will be activated as indicated on the IAS:

- California Institution for Women
- Central California Women's Facility

CCCMS-STRH units will offer enhanced out-of-cell activity and weekly structured group treatment in addition to existing Program Guide requirements, such as daily Psychiatric Technician rounding and weekly clinical contacts. The CCCMS-STRH will be run collaboratively between Custody and Mental Health staff. Custody and Mental Health staff will participate jointly in morning meetings to discuss high risk inmates, new arrivals, and any behavior issues or ongoing concerns of individual inmates. Custody and Mental Health staff will also work together in Interdisciplinary Treatment Team (IDTT) meetings and Institutional Classification Committees (ICCs). These collaborative activities ensure strong communication within the unit so staff can monitor the inmates' mental health, prevent decompensation by utilizing higher levels of care, and offer a robust mental health program.

**TIME FRAMES FOR TRANSFER TO CCCMS-STRH**

Upon implementation and full activation of the CCCMS-STRH Units in the designated institution as indicated on the IAS, institutions without a designated CCCMS-STRH or CCCMS-STRH RC Program shall transfer all CCCMS inmates retained by the ICCs to a designated CCCMS-STRH within 30 days of ASU placement.. In the event an inmate is included in the CCCMS after ASU placement, the time frame will begin the date of the Mental Health Chrono, CDCR Form 128 MH-3, indicating the inmate has been placed at the CCCMS level of care.

The sending institution shall retain responsibility for bringing to completion any pending CDC 115, Rules Violation Report, or closure documentation resulting in the inmate's need for CCCMS-STRH placement.

APPENDIX PG. - 195

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 3

**ENHANCED PROGRAMMING FOR NON-RECEPTION CENTER MALE INMATES**

OUT-OF-CELL ACTIVITIES:

In an effort to improve the conditions of confinement for female and male CCCMS inmates placed in segregated housing, the CCCMS-STRH will offer 20 hours of out-of-cell activities per week. Inmates placed into a designated CCCMS-STRH will be offered 18.5 hours per week of exercise outside of their cell. The exercise program within this unit will consist of various recreational activities and the ability to utilize exercise equipment, such as exercise balls and pull-up bars. In addition, inmates placed into the CCCMS-STRH will be offered 90 minutes of confidential structured therapeutic activity.

IN-CELL AND THERAPEUTIC TREATMENT ACTIVITIES:

Upon arrival in the CCCMS-STRH, inmates will receive their standard property and orientation package. CCCMS inmates will be offered a weekly clinical contact with their primary clinician and daily rounds will be completed by a Psychiatric Technician. Additionally, CCCMS inmates will be offered in-cell therapeutic activities, such as self-help materials and/or recreational activities, as determined by the IDTT. CCCMS-STRH inmates in Stand-Alone units will be permitted one electrical appliance, such as a radio or television.

**FEMALE INMATES AND RECEPTION CENTER PROGRAMS**

Female CCCMS inmates or CCCMS inmates undergoing RC processing who require short term segregated housing will be placed in the ASU at their respective female institution or Reception Center. Due to physical plant limitations at these locations, CCCMS-STRH Female or RC programs will offer 15 hours of out-of-cell activities per week. The exercise program within this unit will consist of various recreational activities and exercise equipment. The programs will offer 10 hours per week of exercise outside of the cell and 3.5 additional hours of recreational activity in a secure treatment module. The additional 3.5 hours will be offered on the dayroom floor of the housing unit or other designated area where the physical structure permits. In addition, CCCMS female inmates or CCCMS inmates undergoing RC processing will be offered 90 minutes of out-of-cell activity consisting of confidential structured therapeutic activity.

Female CCCMS inmates or CCCMS inmates undergoing RC processing will also be offered daily Psychiatric Technician rounding, weekly clinical contact with their primary clinician and in-cell therapeutic activities, such as self-help materials and/or recreational activities, as determined by the IDTT. Female CCCMS inmates or CCCMS inmates undergoing RC processing may have one electrical appliance where existing physical plant allows. Where existing physical plant does not allow, inmates will be offered a radio.

APPENDIX PG. - 196

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 4

## CCCMS-LTRH OVERVIEW (MALE AND FEMALE INMATES)

The CCCMS-LTRH will be located at the following designated institution:

- California State Prison, Corcoran
- California Institution for Women

CCCMS-LTRHs will offer enhanced out-of-cell activity, weekly structured group treatment, daily rounding, and weekly clinical contacts. The CCCMS-LTRH will be run collaboratively between Custody and Mental Health staff. Custody and Mental Health staff will work together in IDTT meetings and ICCs. These collaborative activities ensure strong communication within the unit so staff can monitor the inmates' mental health, prevent decompensation by utilizing higher levels of care, and offer a robust mental health program.

## ENHANCED PROGRAMMING (OUT-OF-CELL ACTIVITIES)

In an effort to improve the conditions of confinement for CCCMS inmates imposed a SHU term by an ICC, the CCCMS-LTRH will offer 15 hours of out-of-cell activities per week. Inmates placed into a designated CCCMS-LTRH will be offered 10 hours per week of exercise outside of their cell and 3.5 additional hours of recreational activity in a secure treatment module. The exercise program within this unit will consist of various recreational games and exercise equipment. In addition, inmates placed into the CCCMS-LTRH will be offered 90 minutes of confidential structured therapeutic activity.

## ENHANCED PROGRAMMING (IN-CELL ACTIVITIES AND DAILY ROUNDS)

To further enhance the conditions of confinement, the CCCMS-LTRH will offer in-cell therapeutic activities, such as self-help materials and recreational activities. These in-cell activities will be offered as determined by each inmate's IDTT. Additionally, daily rounds will be completed by a Psychiatric Technician within the CCCMS-LTRH, and inmates will be offered weekly clinical contact with their primary clinician.

## TIME FRAMES FOR TRANSFER TO CCCMS-LTRH

Upon implementation and full activation of the CCCMS-LTRH Units in the designated institution as indicated on the IAS, Institutions without a designated CCCMS-LTRH program shall transfer all CCCMS inmates retained by the ICC to a designated CCCMS-LTRH within 30 days. In the event an inmate is included in the CCCMS after SHU placement, the time frame will begin on the date of Mental Health Chrono, CDCR Form 128 MH-3, indicating the inmate has been placed at the CCCMS level of care.

APPENDIX PG. - 197

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 5

If you have any questions regarding these alternative SHUs and programs, please contact your respective Associate Director or Regional Mental Health Administrator.

KELLY HARRINGTON
Director (A)
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP-H
Director (A), Division of Health Care Service and
Deputy Director, Statewide Mental Health Program

cc: Kathleen Allison
Ralph Diaz
Timothy Virga
Thomas Tyler

APPENDIX PG. - 198

16-0303

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : March 3, 2016

To : Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives

Subject: **TRANSFER OF CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM INMATE-PATIENTS TO MALE SHORT TERM RESTRICTED HOUSING UNITS**

The purpose of this memorandum is to provide direction regarding the process for transferring inmate-patients (IPs) participating in the Mental Health Services Delivery System (MHSDS) at the Correctional Clinical Case Management System (CCCMS) level of care (LOC) who meet the criteria for placement into a Short Term Restricted Housing (STRH) unit. The STRH unit was created as part of the California Department of Corrections and Rehabilitation's (CDCR's) plan to comply with the *Coleman v. Brown*, April 10, 2014, court order.

CRITERIA FOR STRH PLACEMENT

Pursuant to existing policy, CDCR has created STRH units designated for housing CCCMS IPs who are removed from the general population for disciplinary/safety reasons. These units provide additional out-of-cell activities and increased mental health treatment.

TIME FRAMES FOR TRANSFER OF CCCMS IPs TO AN STRH

Institutions without a designated STRH shall transfer CCCMS IPs retained in administrative segregation by the Institution Classification Committee (ICC) to a designated STRH within 30 days of Administrative Segregation Unit (ASU) placement. In the event an IP is included in the MHSDS at the CCCMS LOC after ASU placement, the time frame will begin on the date of the Mental Health Placement Chrono indicating the IP has been designated at the CCCMS LOC.

The Classification and Parole Representative (C&PR) or designee shall contact the Population Management Unit (PMU), via email, no later than the next working day following the ICC decision for retention. The email notification shall include the IP name, CDCR number, and pertinent transfer information impacting placement.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 2

The C&PR shall then ensure a bus seat request is submitted for STRH placement on the designated day. All seat requests shall include applicable transfer codes impacting placement. Upon transfer approval, the C&PR or designee shall document the STRH movement prior to transfer by utilizing the non-committee endorsement process in the Strategic Offender Management System (SOMS).

The sending institution shall retain responsibility for bringing to completion any pending Rules Violation Report(s) or closure documentation resulting in the IP's need for STRH placement.

IPs NOT TRANSFERRED TO AN STRH WITHIN ALLOTTED TIME FRAME

In order to avoid adversely impacting the IP's other custodial or medical needs, there may be situations where an IP will not be transferred to an STRH within 30 days. Some examples of situations include, but are not limited to, an imminent Board of Parole Hearing date, medical hold, scheduled transfer to a mainline placement, scheduled court hearing, pending release to parole within 60 days of CCCMS ASU placement, and scheduled mental health evaluations for Mentally Disordered Offender or Sexually Violent Predator screenings.

In these instances, the Warden or designee, in coordination with the treating Mental Health staff, may elect to temporarily retain the IP in their existing ASU.

The Warden or designee shall ensure a collaborative approach between Custody and Mental Health staff is employed to ensure the wellbeing of IPs housed in non-STRH administrative segregation.

Custody and Mental Health staff shall meet daily, during ASU morning meetings, to discuss any ongoing behavioral issues or concerns, and shall participate jointly in scheduled Interdisciplinary Treatment Teams and ICCs to ensure information is shared. When retention of an IP that would otherwise meet criteria for placement in an STRH will cause transfer timeframe to exceed the 30-day mandate, institution classification staff shall specify the exceptional reason for retention (including mental health considerations) in the Classification Committee Chrono. A case note shall be placed in SOMS articulating the case-by-case reason for retention under the "STRH Retention Note Type."

APPENDIX PG. - 201

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 3

If you have any questions, please contact Trent Allen, Captain, Mental Health Compliance Team, Division of Adult Institutions, at (916) 324-7956 or DAI-MHCompliance@cdcr.ca.gov, or Angella DeBusk, Correctional Counselor III, PMU, at (916) 445-0373, or Rosa Estrada, Correctional Counselor III, PMU, at (916) 327-4818.

KATHERINE TEBROCK
Deputy Director
Statewide Mental Health Program
Division of Health Care Services

KATHLEEN ALLISON
Deputy Director
Facility Support
Division of Adult Institutions

cc: Kelly Harrington
Ralph M. Diaz
Vincent S. Cullen
Amy Eargle
Laura Ceballos
Michael Golding
James Robertson
Dennis Halverson
Robert L. Davis
Angella DeBusk
Rosa Estrada

APPENDIX PG. - 202

**Subject:** FW: Transfer of CCCMS Inmate-Patients to Male STRH Units
**Attachments:** TRANSFER OF CORRECTIONAL CLINICAL CASE MANAGEMENT SYSTEM INMATE-PATIENTS TO MALE SHORT TERM RESTRICTED HOUSING UNITS.pdf

---

**From:** Andersson, Dyann@CDCR
**Sent:** Thursday, March 03, 2016 4:38 PM
**To:** CDCR Institutions DAI Associate Directors; CDCR Institutions Wardens; CDCR CCHCS CEOs; CDCR DL-DCHCS-Chiefs of Mental Health; CDCR Institutions DAI CSU CSRs & In-House CC IIIs; CDCR Institutions DAI CSU C and PRs
**Cc:** Allison, Kathleen@CDCR; Tebrock, Katherine@CDCR; Harrington, Kelly@CDCR; Diaz, Ralph M.@CDCR; Cullen, Vincent@CDCR; Eargle, Amy@CDCR; Ceballos, Laura@CDCR; Golding, Michael@CDCR; Robertson, James@CDCR; Halverson, Dennis@CDCR; DeBusk, Angella@CDCR; Estrada, Rosa@CDCR; Allen, Trent G@CDCR
**Subject:** Transfer of CCCMS Inmate-Patients to Male STRH Units

*On behalf of:*

***Kathleen Allison***
***Deputy Director***
***Facility Support***
***Division of Adult Institutions***

*and*

***Katherine Tebrock***
***Deputy Director***
***Statewide Mental Health Program***
***Division of Health Care Services***

If you have any questions, please refer to memorandum for contact information.

Kindest regards,

*Dyann Andersson*
Executive Assistant to the
Deputy Director, Facility Support
Division of Adult Institutions
California Department of Corrections and Rehabilitation
(916) 445-7688
(916) 327-2877 Fax
dyann.andersson@cdcr.ca.gov

16-0607

  

# MEMORANDUM

Date: 6/7/2016

To: Chief Executive Officers
Chiefs of Mental Health
Chief Nurse Executives

From:

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program

CHERYL SCHUTT, RN, BSN
Statewide Chief Nurse Executive
Nursing Services

Subject: RELEASE OF NEW MENTAL HEALTH POST-PLACEMENT SCREENING FORM FOR ADMINISTRATIVE SEGREGATION UNITS

This memorandum informs staff of the new post-placement Administrative Segregation Unit Screening Questionnaire (CDCR MH-7709) (Attached) released on May 19, 2016. This form shall be used in Administrative Segregation Units (ASUs) and replaces the former Mental Health Screening form (commonly referred to as the "31-Item") in ASU settings only. The 31-Item form shall continue to be used in Reception Centers. Implementation of the CDCR MH-7709 shall occur no later than June 10, 2016.

Administration requirements of the form are unchanged. Post-placement screening shall be administered to all non-Mental Health System Delivery Services patients within 72 hours of placement in ASU. Nursing staff shall administer the screen in a confidential setting. Refusals of the screening result in Mental Health Referrals on an Urgent basis.

Although the form contains scoring rules, professional judgment should be used when performing the screen. If the individual performing the screen believes a referral is needed despite negative answers, a referral should be sent to Mental Health.

If you have any questions, or require additional information related to this memorandum, you may contact Robert Horon, Ph.D., Senior Psychologist, Specialist, Clinical Support, Statewide Mental Health Program, Division of Health Care Services, via email: Robert.Horon@cdcr.ca.gov.

# MEMORANDUM

Attachments

cc: Angela Ponciano
   Amy Eargle, Ph.D.
   Laura Ceballos, Ph.D.
   Robert Horon, Ph.D.
   Amber Carda, Ph.D.
   Michael Golding, M.D.
   Edward Kaftarian, M.D.
   John Rekart, Ph.D.
   James Vess, Ph.D.
   Marcie Flores
   Jennifer Johnson
   Regional Mental Health Administrators
   Regional Health Care Executives
   Regional Nurse Executives

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

# ADMINISTRATIVE SEGREGATION UNIT SCREENING QUESTIONNAIRE

CDCR MH-7709 (04/16)

Form: Page 1 of 2
Instructions: Page 3

The following six questions ask about how you have been feeling. For each question tell me if you have felt this way NONE of the time, A LITTLE of the time, SOME of the time, MOST of the time, or ALL of the time.

| In the past 30 days about how often did you feel... | None | A Little | Some | Most | All |
|---|---|---|---|---|---|
| 1. ....nervous? | 0 | 1 | 2 | 3 | 4 |
| 2. ....hopeless? | 0 | 1 | 2 | 3 | 4 |
| 3. ....restless or fidgety? | 0 | 1 | 2 | 3 | 4 |
| 4. ....so depressed that nothing could cheer you up? | 0 | 1 | 2 | 3 | 4 |
| 5. ....that everything was an effort? | 0 | 1 | 2 | 3 | 4 |
| 6. ....worthless? | 0 | 1 | 2 | 3 | 4 |

| In the past 30 days : | Yes | No |
|---|---|---|
| 7. ....have you wished you were dead or wished you could go to sleep and not wake up? | ☐ | ☐ |
| 8. ....have you *actually* had any thoughts of killing yourself? | ☐ | ☐ |
| If NO to Question 8, SKIP to Question 12 | | |
| 9. ...have you been thinking about how you might do this? | ☐ | ☐ |
| 10. ...have you had these thoughts and had some intention of acting on them? | ☐ | ☐ |
| 11a. ...have you started to work out or have you worked out the details of how to kill yourself? | ☐ | ☐ |
| 11b. Do you intend to carry out this plan? | ☐ | ☐ |
| 12. ...If "YES", have you ever done anything, started to do anything, or prepared to do anything based on your intent to die? (For example collected pills or razor blades, made a noose, given things away, or written a goodbye or suicide note.) | ☐ | ☐ |

If "YES," ask: How long ago did you do any of these things?

- ☐ More than a year ago?
- ☐ Between three months and one year ago?
- ☐ Within the past 3 months?

13. If "YES," ask: How many times have you done any of these things? ☐ Once ☐ Twice or more

Comments - Include, if the inmate refuses this screen, that a referral was made to Mental Health on an Urgent basis.

Clinician Name/Title (Print) ______ Clinician Signature ______ Date/Time ______

1. Disability Code:
☐ TABE score ≤ 4.0
☐ DPH ☐ DPV ☐ LD
☐ DPS ☐ DNH
☐ DNS ☐ DDP
☐ Not Applicable

2. Accommodations:
☐ Additional Time
☐ Equipment
☐ Louder
☐ Basic
☐ Other*
☐ SLI
☐ Slower
☐ Transcribe

3. Effective Communication:
☐ Patient asked questions
☐ Patient summed information
Please check one:
☐ Not Reached* ☐ Reached
*See chrono/notes

4. Comments:

CDCR #:
Last Name: MI:
First Name:
DOB:

**Distribution of Copies:** Health Records
**eUHR Scanning Location:** Outpatient; MHChrono/Misc-Chronos/Screening; Other
**EHRS Location:** Mental Health Documentation - ASU Screening Questionnaire

STATE OF CALIFORNIA
**ADMINISTRATIVE SEGREGATION UNIT SCREENING QUESTIONNAIRE**
CDCR MH-7709 (04/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Form: Page 2 of 2**
**Instructions: Page 3**

**Scoring Rules**

- If the total score for questions 1 thru 6 is:
  - 8 to 12 points make a ROUTINE REFERRAL
  - 13 to 17 points make an URGENT REFERRAL
  - 18 or more make an EMERGENT REFERRAL
- If item 7 is **YES** make a ROUTINE REFERRAL
- If item 8 or 9 is **YES** make an URGENT REFERRAL
- If item 10 or 11a is **YES** make an EMERGENT REFERRAL
- If item 11a is **More than a year ago** make a ROUTINE REFERRAL
- If item 11b is **Between three months and one year ago** make an URGENT REFERRAL
- If item 12 is **Within the past 3 months** make an EMERGENT REFERRAL
- If item 13 is **Twice or more** make an URGENT REFERRAL

If the patient refuses, note in the Comments section and refer to Mental Health on an Urgent basis.

| **Administrative Segregation Unit**<br>**Screening Questionnaire**<br>CDCR MH-7709 (04/16)<br><br>Confidential Patient Information | CDCR #:<br>Last Name: MI:<br>First Name:<br>DOB: |
|---|---|

**Distribution of Copies:** Health Records
**eUHR Scanning Location:** Outpatient; MHChrono/Misc-Chronos/Screening; Other
**EHRS Location:** Mental Health Documentation - ASU Screening Questionnaire

STATE OF CALIFORNIA
**ADMINISTRATIVE SEGREGATION UNIT SCREENING QUESTIONNAIRE**
CDCR MH-7709 (04/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

## Instructions

**Purpose of the CDCR MH-7709 (04/16) Administrative Segregation Unit Screening Questionnaire:** This form is used to screen non-MHSDS inmates for elevated distress and suicidal thoughts or behavior. It is administered within the first 72 hours of placement into Administrative Segregation. The questionnaire should be administered in a confidential setting that affords confidentiality of sight and sound from other inmates, and confidantiality of sound from staff. It can be administered by a mental health clinician or nursing staff.

Complete the form as follows:

1. Ask ONLY non-MHSDS inmates
2. Ask all questions just as they are written.
3. All questions (except 12 & 13) apply to the last 30 days.
4. Score questions 1-6 by totaling the numbers in the boxes (scoring rules provided on the second page of the form).
5. Questions 7-12 are YES/NO questions.
6. Use the scoring rules to determine the need for and timeframe for referral for further evaluation.
7. If the inmate refuses, note in the Comments section and refer to Mental Health on an Urgent basis.
8. If you believe a referral is needed despite negative answers, send a referral to Mental Health.

**Scoring Rules**

- If the total score for questions 1 thru 6 is:
  - 8 to 12 points make a ROUTINE REFERRAL
  - 13 to 17 points make an URGENT REFERRAL
  - 18 or more make an EMERGENT REFERRAL
- If item 7 is **YES** make a ROUTINE REFERRAL
- If item 8 or 9 is **YES** make an URGENT REFERRAL
- If item 10 or 11a is **YES** make an EMERGENT REFERRAL
- If item 11a is **More than a year ago** make a ROUTINE REFERRAL
- If item 11b is **Between three months and one year ago** make an URGENT REFERRAL
- If item 12 is **Within the past 3 months** make an EMERGENT REFERRAL
- If item 13 is **Twice or more** make an URGENT REFERRAL

**Effective Communication:** The Effective Communication section must be completed any time there is a clinically relevant encounter in which meaningful information is exchanged between the licensed clinician and the inmate-patient. For further information and examples of some encounters in which effective communication is required, see IMSP&P, Volume 2, Ch. 4.

| 1. Disability: | 2. Accommodation: | 3. Effective Communication: |
|---|---|---|
| a. Check all boxes that apply regarding the inmate-patient's disability.<br>Disability Codes:<br>TABE score ≤ 4.0<br>DPH – Permanent Hearing Impaired<br>DPV – Permanent Vision Impaired<br>LD – Learning Disability<br>DPS – Permanent Speech Impaired<br>DNH – Permanent Hearing Impaired; improved with hearing aids.<br>DNS – Permanent Speech Impaired; can communicate in writing.<br>DDP – Developmental Disability Program<br>N/A – Not applicable | a. Check all boxes that apply to the special accommodations made to facilitate effective communication:<br>Additional time – Patient was given additional time to respond or complete a task.<br>Equipment – Special equipment was used to facilitate effective communication. Note the type of equipment used in the comments section.<br>SLI – Sign Language Interpreter.<br>Louder – The provider spoke louder.<br>Slower – The provider spoke slower.<br>Basic – The provider used basic language.<br>Transcribe – Communication was written down.<br>Other – Any other tool that was used to facilitate effective communication. | a. Check all boxes that apply that summarize how it was verified that effective communication was reached.<br>Patient asked questions – The patient asked questions regarding the interaction.<br>Patient summed information – The patient summarized information regarding the interaction.<br>b. Check one box to indicate if effective communication was or was not reached. ONE of these boxes must be checked. |
| 4. Comments:<br>Provide any additional information regarding effective communication. | | |

# 15-0225

State of California | Department of Corrections and Rehabilitation

# Memorandum

Date : February 25, 2015

To : Associate Directors, Division of Adult Institutions
Wardens – Institutions with ASU EOP Hub or PSU
Chief Executive Officers – Institutions with ASU EOP Hub or PSU
Regional Directors, Mental Health

Subject: **REVIEW OF REFUSAL TO ATTEND MENTAL HEALTH TREATMENT BY ADMINISTRATIVE SEGREGATION UNIT ENHANCED OUTPATIENT PROGRAM HUB AND PSYCHIATRIC SERVICES UNIT INMATES**

Program access in Enhanced Outpatient Program (EOP) Administrative Segregation Unit (ASU) Hubs and the Psychiatric Services Unit (PSU) is important to the safety and mental health of EOP inmates. Therefore, if an EOP inmate repeatedly refuses to attend offered scheduled mental health treatment sessions, including groups and individually scheduled sessions, it is incumbent on staff to take steps to identify why the inmate is not willing to attend such treatment, and to work toward remedying the problem, as described below.

Within one week of the identification of an inmate who has refused more than 50 percent of structured therapeutic treatment hours offered and attended an average of less than five hours per week of offered structured treatment hours in a two month period, Interdisciplinary Treatment Team (IDTT), clinical staff, or other custody staff must work together to determine the reason for treatment refusal. For inmates on a modified treatment program, attendance at 50 percent or less of the required treatment hours specified in the modified treatment plan shall trigger the review. The Correctional Lieutenant responsible for the ASU EOP Hub or PSU and the primary clinician shall work collaboratively to evaluate the circumstances underlying the inmate's refusal to attend offered scheduled treatment sessions.

In order to evaluate the circumstances of the inmate's refusal to attend offered scheduled mental health treatment sessions, the Correctional Lieutenant and the primary clinician shall review the CDC Form 114-A, Inmate Segregation Record, to determine if the inmate is refusing other services and programs including, but not limited to, showers, yard, medical, visiting, etc. Additionally, custody and mental health staff shall jointly interview both the inmate and staff assigned to the unit to better understand causal factors that may be impacting the inmate's refusal to attend offered treatment. Mental health staff shall complete a review of the central file and health record to determine whether there are relevant facts that may inform as to the cause of the inmate's refusal. If a specific cause for the inmate's refusal can be identified and can be reasonably resolved, custody and mental health staff shall work together with the inmate to attempt to resolve such issues. Indication that the review was completed shall be documented on CDC Form 128-B, General Chrono. Details regarding findings from the review shall be documented on Form MH-7230, Mental Health Progress Note.

Associate Directors, Division of Adult Institutions
Wardens – Institutions with ASU EOP Hub or PSU
Chief Executive Officers – Institutions with ASU EOP Hub or PSU
Regional Directors, Mental Health
Page 2

If the inmate identifies barriers related to security policies as a cause for his or her refusal to attend treatment, custody and mental health staff shall jointly document their findings on a CDC Form 128-B, General Chrono, and submit the completed form to both the Chief Deputy Warden and the Chief of Mental Health. The Chief Deputy Warden and the Chief of Mental Health shall confer and consider various methods to encourage the inmate to attend treatment, including viable alternatives to the identified security policies that do not jeopardize the security of the unit or the safety of staff or inmates. Should the Chief of Mental Health and the Chief Deputy Warden disagree on the proper resolution of the matter, the issue shall be elevated to the Warden and the Chief Executive Officer (CEO) for their review and resolution.

Within 30 days of the date of this memorandum, Wardens, Chiefs of Mental Health, and CEOs at each institution with an ASU EOP Hub or PSU shall develop a jointly signed local operating procedure consistent with this directive. Wardens and CEOs shall also ensure their managers and supervisors are provided on-the-job training regarding this directive. Mental Health Program clinicians are required to complete an additional training session offered by the Statewide Mental Health Program.

If you have any questions or concerns, please contact your respective Associate Director or Mental Health Regional Administrator.

KELLY HARRINGTON
Director (A)
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services
Deputy Director, Statewide Mental Health Program

cc: Kathleen Allison
Ralph Diaz
Tim Virga
Amy Eargle
Laura Ceballos

APPENDIX PG. - 212

# 16-0208

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | February 8, 2016 |
|---|---|---|
| CHAPTER 6: SEGREGATED INMATES | Revision Date(s): | |
| | Supersedes Policy: | N/A |
| 12.06.802 LONG TERM RESTRICTED HOUSING MENTAL HEALTH REQUIREMENTS | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [signature] |

**Policy**

Patients at the Correctional Case Management System (CCCMS) level of care and who are serving a Security Housing Unit (SHU) term shall be housed in Long-Term Restricted Housing (LTRH) units. The LTRH units shall offer enhanced mental health treatment and additional out-of-cell custody supervised activities. The LTRH units shall be collaboratively administered between custody and mental health staff.

**Purpose**

To provide enhanced mental health services and prevent decompensation of patient's requiring long-term restricted housing while serving SHU terms.

**Compliance Indicators**

To be in compliance with this policy, the following must occur in the LTRH:

1. Mental Health staff shall continue to attend and participate in Interdisciplinary Treatment Teams (IDTTs) and Institutional Classification Committees in accordance with Mental Health Services Delivery System Program Guide (2009 Revision) requirements.
2. All patients shall be offered 90 minutes of confidential structured group therapeutic activity weekly.
3. All patients shall be offered a weekly clinical contact with their primary clinician.
4. All patients shall be offered in-cell therapeutic activities per week, such as self-help materials and/or recreational activities, as determined by the IDTT.
5. Psychiatric Technicians shall provide daily rounds to all patients in the LTRH.
6. When indicated, patients shall be offered a psychiatric contact every 90 days.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution has LTRH units and... | then... |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. |
| does not have a LOP | ensure that one is completed within 30 days of the effective date that meets the new policy requirements. Ensure the LOP is reviewed annually. |

| | |
|---|---|
| **References** | Coleman v. Brown (E.D. Cal. Oct. 7, 2008, No.CIV S-90-0520 LKK JFM P)<br>Coleman v. Brown (April 10, 2014, 202:90-cv-00520-LKK- DAD)<br>Coleman v. Brown (August 29,2014 2:90-cv-00520-LKK-DAD)<br>Memorandum, "Creation of Correctional Clinical Case Management System Short Term and Long Term Restricted Housing," dated January 15, 2015 |
| **Questions** | If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov. |

15-0225

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | February 25, 2015 |
|---|---|---|
| CHAPTER 6: SEGREGATED INMATES | Revision Date(s): | |
| | Supersedes Policy: | |
| PROCEDURE 12.06.100.P2 SECURITY HOUSING UNIT - DEPARTMENT OF STATE HOSPITALS/PSYCHIATRIC INPATIENT PROGRAM CASE CONFERENCE - DISCHARGE | Attachments: | Yes ☐ No ☐ |
| | Director Approval: | [signature] |

| | ***Procedure*** |
|---|---|
| **1.** | *Notifications*<br>At least 21 calendar days prior to an inmate-patient's (IP's) discharge from a Department of State Hospitals (DSH)/CDCR Psychiatric Inpatient Program (PIP), the following will occur:<br>The DSH Patient Management Unit (PMU) or PIP program will:<br>• Notify the Classification and Parole Representative (C&PR) at the institution where the IP is housed.<br>• Notify the Utilization Management (UM) unit at the Mental Health Program headquarters of the impending discharge.<br>• Complete a CDCR 128-MH3 Mental Health Discharge Chrono and forward to the assigned Correctional Counselor. |
| **2.** | *Institutional Classification Committee*<br>Prior to the Institutional Classification Committee (ICC) meeting, correctional counseling staff and a clinical representative of the DSH or CDCR PIP treatment team will work together to make a recommendation to the ICC regarding appropriate housing. The treatment team representative will provide information regarding the level of mental health care at discharge if placement in segregated housing was related to the reason for admission, and if there is a substantial risk of decompensation in segregated/restricted housing. The review will be documented on a CDCR Form 128-B.[1]<br><br>The C&PR will:<br>1. Determine the status of the IP's Security Housing Unit (SHU) term.<br>2. Ensure an ICC is scheduled within seven (7) calendar days of notification.<br>3. Address and resolve safety concerns or disciplinary issues, with special consideration of reassessment and suspension of SHU terms in order to avoid segregated housing placement upon discharge, if appropriate, in accordance with established procedures. |
| **3.** | *Notifications*<br>1. The C&PR notifies the DSH Admission and Discharge Unit (ADU) or CDCR PIP discharge coordinator of the endorsement within one business day.<br>2. If the IP is in a DSH program, the DSH ADU notifies the DSH treatment team, the DSH PMU and the headquarters Mental Health Program UM unit of the endorsement within |

[1] Until the Long Term Restricted Housing (LTRH) is open to intake, IPs must be temporarily placed in PSU. The PSU will be responsible for tracking which IPs were placed due to lack of availability of the LTRH and will re-evaluate appropriate placement upon activation of the LTRH unit.

| | |
|---|---|
| | one business day.<br>3. If the IP is in a CDCR PIP, the PIP discharge coordinator notifies the PIP treatment team and the headquarters Mental Health Program UM unit of the endorsement within one business day.<br>4. If the IP is to be released to an institution other than the sending institution, CDCR Mental Health Program UM notifies the DSH coordinator at the new receiving institution within one business day. |
| **4.** | *Scheduling the Case Conference*<br>Mental Health Program UM schedules a case conference between the CDCR and DSH clinical staff within seven (7) calendar days of notification that the IP has been endorsed. Efforts will be made to schedule the case conference during existing case conference times whenever possible. However, exceptional circumstances may require flexible scheduling. |
| **5.** | *The Clinical Case Conference*<br>Issues to be considered during the case conference include, but are not limited to, the following:<br>1. Treatment modalities and therapeutic strategies that were successful in reducing and alleviating symptoms in the inpatient setting.<br>2. The IP's adjustment in the inpatient environment.<br>3. Strategies CDCR may consider implementing to minimize the likelihood of decompensation.<br>4. Confirmation of the IP's level of care.<br>5. The Clinical Case Conference will not be used to prevent discharge from an inpatient setting.<br><br>The Clinical Case Conference will include the following participants:<br><br>The DSH coordinator at the sending institution<br>The DSH coordinator at the receiving institution (if different than the sending institution)<br>CDCR Mental Health treatment team staff at the receiving and sending institutions<br>DSH/PIP treatment team staff<br>DSH headquarters staff (if the IP is in a DSH program)<br>DSH PMU (if the IP is in a DSH program)<br>CDCR Mental Health Program headquarters staff<br><br>The DSH Coordinator at the receiving institution documents the occurrence of the case conference on a CDCR MH-7230-A, Interdisciplinary Progress Note – General. If the IP's level of care changes as a result of the discussion in the Clinical Case Conference, the DSH/PIP treatment team staff notifies DSH PMU or CDCR PIP, who completes a new CDCR 128-MH3 Mental Health Discharge Chrono and forwards to the assigned Correctional Counselor. |
| **6.** | *CDCR Placement*<br>Discharged IPs will be returned to the sending institution unless the institution does not provide the appropriate mental health level of care and/or health care or custodial case-factors prevent return. If the IP cannot return to the sending institution, the C&PR at the institution where the IP is housed shall contact HCPOP for placement assistance. |

# 13-0117

SRE Mentor Program Policy

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 04: PESONNEL AND TRAINING | Revision Date(s): | 1/17/2013 |
| POLICY 12.04.201 SUICIDE RISK EVALUATION MENTORNG PROGRAM | Attachments: | Yes ☒ No ☐ |

**Policy**

Each institution shall institute the standardized CDCR mental health Mentor Program for suicide risk evaluations.

The program shall include the use of the "Suicide Risk Evaluation Quality of Care" standardized tool that:

- Provides mentors with specific areas of focus for providing guidance; and
- Allows the tracking of progress and measurement of improvement

**Definitions**

*Suicide Risk Evaluation (SRE) Mentoring Program:* A program, established by this policy, which includes mentoring for mental health clinicians on appropriate techniques for suicide risk evaluation

*Mental health clinician:* Practitioners including psychologists, psychiatrists, and clinical social workers. Clinicians may be probationary, permanent, contract employees, or others designated and trained to complete suicide risk evaluations on CDCR patient-inmates.

*CDCR 7447 Suicide Risk Evaluation:* The form used to guide the focused clinical evaluation performed by a mental health professional when a patient-inmate is identified (by thought, speech, or behavior) to be at elevated risk of suicide or self-harm.

*Mentor:* The mental health clinician designated to provide mentoring to assigned mental health clinicians as part of the SRE Mentoring Program. This clinician will also provide training to the mentee, as needed. The Mentor may be either line staff or a supervisory-level clinician.

*Mentee:* Mental health clinician participating in the SRE Mentoring Program for enhancement of clinical skills.

*Suicide Risk Evaluation Mentoring Program Director.* Designated HQ psychologist with oversight for training, consultation, data collection, and interpretation for the Mentor Program.

**Purpose**

- To assist clinicians in adapting to the unique, challenging circumstances of the correctional setting.

- Improve and maintain the quality of suicide risk evaluations.
- Ensure that clinicians possess the knowledge and skill to adequately evaluate inmate-patients who may be at an elevated risk of suicide.
- Support newly hired mental health clinicians by having experienced clinicians provide relevant training.
- Preserve standards of clinical practice by providing a process to systematically evaluate CDCR mental health clinicians' knowledge and ability to complete an adequate suicide risk evaluation.
- Contribute to the creation of a cooperative and collegial mental health care team.

**Applicability**

This policy applies to all CDCR mental health clinicians who perform suicide risk evaluations.

**Compliance Indicators**

- Every institution has initiated the mentor program according to statewide and local operating procedures within 60 days of receipt of this policy.
- All persons who have completed or are participating in the SRE Mentor Program are tracked according to LOP.
- The SRE Quality of Care tool (attached) is used to evaluate clinical competence.
- Within six months of the implementation of this policy, and every six months thereafter, the aggregated SRE Quality of Care results, which are tracked in the HQ-based "Quality of Care Data Collection Tool," are reviewed by the SRE Mentoring Program Director.
- Confidentiality - All persons participating in the mentor program adhere to provisions regarding confidentiality in accordance with applicable state law governing confidentiality of provider-level documents. Compliance is measured by the following:
    - All provider-level documents related to the mentor, including but not limited to SRE Quality of Care reviews are maintained as confidential and are not available to unauthorized persons.
    - Documentation of mentee progress provided solely to the mentees may be shared with the mentees' regular clinical supervisors or other management staff.

**References**

1. Defendants' August 25, 2010 Updated Report on Activities Taken Following the Court's April 14, 2010 Order.
2. Department of Correctional Health Care Services. Mental Health Services Delivery System Program Guide (2009 revision), Chapter 10: Suicide Prevention and Response.

This acronym key defines all acronyms utilized in the above quality standard.

| Acronym Key | |
|---|---|
| Acronym | Definition |
| CDCR | California Department of Corrections Rehabilitation |
| HQ | Headquarters |
| LOP | Local Operating Procedures |
| SRE | Suicide Risk Evaluation |

# 13-0117

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 4: PERSONNEL AND TRAINING | Revision Date(s): | 01/17/2013 |
| PROCEDURE 12.04.201P SUICIDE RISK EVALUATION PROCEDURE | Attachments: | Yes ☒ No ☐ |

**Introduction**

The Suicide Risk Evaluation (SRE) Mentoring Program pairs clinical mentors with mental health providers in order to promote adherence to the highest standards of suicide risk assessment. The program, which can be incorporated into Peer Review, is intended to provide collegial feedback, training, and support for all staff members who perform suicide risk evaluations.

**Roles and responsibilities**

The following defines the responsibilities of the mentor and mentee involved in the SRE Mentoring Program.

**MENTOR**

1. There is no formal requirement for the number of mentees a mentor can oversee, but it is recommended that a mentor have no more than three mentees under his/her guidance at any given time.
2. The mentor will observe the mentee conduct one or more suicide risk evaluations.
3. Use of the statewide approved SRE Quality of Care Tool (attached) will guide the mentor in assessing the mentee's skill in: 1) interviewing; 2) gathering relevant information; 3) formulating risk factors; 4) developing a treatment plan; and, 5) documenting findings.
4. When indicated, training will be provided to the mentee by the mentor. The training may include, but is not limited to, the following:
   - Effective techniques for conducting interviews and establishing rapport with inmate-patients.
   - Brief, focused interventions for inmate-patients in crisis.
   - Development of individualized treatment plans.
   - Appropriate treatment focused interventions for all inmate-patients, including those suspected of malingering, threatening suicide for secondary gain, or manipulating staff.
   - Directed readings.

5. Under the direction of the Chief of Mental Health, conduct routine chart reviews of all mental health clinicians' SREs to assess the overall quality of suicide risk assessment and crisis intervention at the institution.
6. The mentor may use the information gathered during routine chart reviews to:
   - Identify opportunities for improvement in overall clinical practice
   - Design and facilitate staff development exercises to improve practice
   - Identify best practices
   - Identify clinical staff who may have the skills and abilities to serve as a mentor to other staff
7. The mentor will provide written feedback to the mentee about their SRE performance and crisis intervention skills, any methods for improvement, and progress made in performing SREs. This can be completed via providing a copy of the completed SRE Quality of Care tool or other written document created as part of local operating procedures.
8. If administrative intervention is required related to the mentee's participation in the program, the mentor reports the concerns to the mentees' supervisor. Status reports to the supervisor are not required unless administrative concerns are identified.

**MENTEE**

1. Mentees will include all mental health clinicians whose job duties include the administration of the SRE. The following listing suggests a prioritization strategy:
   - Current mental health clinicians employed in the MHCB or Mainline EOP programs.
   - Mental health clinicians referred to the SRE Mentoring Program by their supervisors, either for cause or for routine staff development purposes.
   - Mental health clinicians referred to the SRE Mentoring Program by the Professional Practice Executive Committee or the Mental Health Peer Review Subcommittee.
   - Newly hired, or unlicensed mental health clinicians, including psychologists, psychiatrists, and clinical social workers.
   - Self-referred employees.
   - All mental health clinicians employed in other (non EOP and MHCB) programs.
2. A score of at least 80% on the SRE Quality of Care tool must be achieved before the mentoring program is completed.

**Process**

The SRE Mentoring Program is designed to allow flexibility for mentors to address the mentee's specific needs, but must include at least the following stages and

activities.

| STAGE | DESCRIPTION |
|---|---|
| 1 | Institutional Chiefs of Mental Health shall designate at least one mental health clinician as the primary mentor. The primary mentor will have the responsibility of: maintaining up to date records of staff participating in the mentoring process and ensuring that Quality of Care Tool results are filed in a confidential location.<br><br>Staff designated to serve as mentors shall have strong clinical skills and leadership abilities and may be either senior clinicians or line staff.<br><br>More than one clinician may serve as a mentor depending on institutional staffing levels and clinical need. |
| 2 | The mentee may observe the mentor perform one or more SREs. This is not a requirement and may be conducted if the mentee elects to do so. |
| 3 | The mentee may perform a self-audit of a SRE that he/she has performed using the *Suicide Risk Evaluation Quality of Care Review Tool*. This is not a requirement and may be conducted if the mentee elects to do so. |
| 4 | The mentor will observe the mentee performing one or more SREs and offer guidance, techniques, and strategies that may improve SRE quality. |
| 5 | The mentee and mentor will work collaboratively in assessing the mentee's SRE performance and any identified areas for improvement. |
| 6 | The timeframe for completion of these activities is contingent upon the mentor's assessment that the mentee can competently and independently perform a suicide risk evaluation. |
| 7 | If the above activities cannot be successfully completed within three months, continued mentoring must be approved by the mentee's supervisor. |
| 8 | The SRE Mentoring Program operates on a cyclical basis. Each clinician will be mentored once every two years. When a clinician transfers from one institution to another, the SRE mentor at the new institution shall contact the Chief of Mental Health at the previous institution, who will facilitate getting the clinician's last mentoring date to the mentor. |

| | |
|---|---|
| 9 | • When the SRE Quality of Care tool is used for peer review, the primary mentor will ensure that completed SRE Quality of Care tools are filed in a confidential location accessible only to the primary mentor. Records shall be kept for at least two years, or until the mentee completes a second cycle of mentoring, at which point the previous completed SRE Quality of Care Tool can be destroyed.<br>• If the SRE Quality of Care tool is not used as part of the formal peer review program, the completed tool may be destroyed after the mentee completes the mentoring cycle. |

**Program evaluation, tracking, and reports**

The LOP for the SRE Mentoring Program shall include a method to track participation in and completion of each cycle of the SRE Mentoring Program. Tracking shall include, at a minimum, the name and position of each clinician mentored.

**Confidentiality**

In accordance with applicable state law governing confidentiality of provider-level documents, it is essential that all provider-level documents related to the SRE Mentoring Program, including but not limited to Quality of Care Reviews and mentoring feedback, be maintained as confidential and not be available to unauthorized persons.

This acronym key defines all acronyms utilized in the above quality standard.

| Acronym Key | |
|---|---|
| Acronym | Definition |
| SRE | Suicide Risk Evaluation |
| LOP | Local Operating Procedures |

# 13-0205

 CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| Date: | 2-5-2013 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Timothy G. Belavich, Ph.D., MSHCA, CCHP, Deputy Director (A),<br>Statewide Mental Health Program, Division of Health Care Services |
| Subject: | IMPLEMENTATION OF THE SUICIDE RISK EVALUATION MENTOR PROGRAM |

The purpose of this memorandum is to notify institutions of the following requirement to have all clinicians complete the ***Suicide Risk Evaluation (SRE) Mentor Program.***

The program involves mentoring ***all*** Mental Health clinical staff in the administration of a SRE. Mentoring will be provided, individually, by a trained SRE mentor. The length of time required to complete the SRE Mentor Program varies.

To fully implement the SRE Mentor Program, each institution must complete two things:

- Clinicians who are regularly assigned to work in the Enhanced Outpatient Programs and Mental Health Crisis Bed units must complete the SRE Mentor Program by **April 30, 2013**.
- All other mental health clinicians must complete the SRE Mentor Program by **June 30, 2013**.

Each institution currently has SRE mentors who have been trained by Statewide Mental Health Program headquarters staff. If your institution requires additional trained SRE mentors to complete this program, please send an email to the Suicide Prevention Unit mailbox at CDCR MHProgramSuicidePreventionandResponse@CDCR. Headquarters will then schedule additional SRE mentor training, as needed. Please note that clinicians must be mentored by a ***trained SRE mentor***. The SRE Mentor Program Policy and Procedures are attached.

If you have any questions or require additional information, please contact the Suicide Prevention and Response Unit at CDCR MHProgramSuicidePreventionandResponse@CDCR, or Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, Division of Health Care Services (DHCS), at (916) 691-0279 or via email at amy.eargle@cdcr.ca.gov.

Attachments

# MEMORANDUM

cc: Diana L. Toche, D.D.S., Director (A), Division of Health Care Services
    Judy Burleson, Associate Director, Program and Clinical Support,
        Statewide Mental Health Program, DHCS
    Kathleen O'Meara, Ph.D., Northern Mental Health Regional Administrator (A),
        Statewide Mental Health Program, DHCS
    Steven Bylund, Ph.D., Central Mental Health Regional Co-Administrator (A),
        Statewide Mental Health Program, DHCS
    Elaine Force, Ph.D., Central Mental Health Regional Co-Administrator (A),
        Statewide Mental Health Program, DHCS
    Margaret McAloon, Ph.D., Southern Mental Health Regional Administrator (A),
        Statewide Mental Health Program, DHCS
    Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, DHCS

# 13-0813

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | AUG 1 3 2013 |
| To: | Chief Executive Officers<br>Wardens<br>Chiefs of Mental Health |
| From: | K. Allison<br>Kathleen Allison, Deputy Director<br>Special Project Liaison, Division of Adult Institutions<br><br>Timothy G. Belavich, PH.D., MSHCA, CCHP<br>Director (A), Division of Health Care Services and<br>Deputy Director (A), Statewide Mental Health Program |
| Subject: | **SUICIDE PREVENTION AND RESPONSE FOCUSED IMPROVEMENT TEAM COORDINATOR ATTENDANCE AT INMATE ADVISORY COUNCILS AND INMATE FAMILY COUNCILS** |

No later than September 9, 2013, all institutions shall update their local suicide prevention procedures to include Mental Health Program consultation with, and periodic attendance at, meetings of their institution's Inmate Advisory Council (IAC) and Inmate Family Council (IFC). This contact is designed to provide information regarding suicide prevention resources, highlight the importance of inmate peers and families to suicide prevention efforts and to answer questions about suicide prevention in the California Department of Corrections and Rehabilitation (CDCR).

At least every six months, if held, or upon request, each institution's Suicide Prevention and Response Focused Improvement Team (SPR FIT) Coordinator, or designee, shall attend meetings and provide the IAC and IFC with information regarding suicide prevention and available mental health services. Materials may include, but are not limited to, the following:

- Approved suicide prevention pamphlets
- Information on suicide prevention and Mental Health Program services in CDCR
- Information on how to make a mental health referral (inmate self-referral and referral from a family member)

Local procedures shall be updated to reflect these changes no later than September 9, 2013. Copies of the amended procedures should be forwarded to Byron Russell, HPSI, Policy Support, Statewide Mental Health Program, Division of Health Care Services (DHCS), at Byron.Russell@cdcr.ca.gov.

# MEMORANDUM

cc: Judy Burleson, Associate Director, Policy and Clinical Support, Statewide Mental Health Program, DHCS
Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Chief, *Coleman* Compliance/Quality Management Unit, Statewide Mental Health Program, DHCS
Nathan Stanley, Chief, Field Operations Unit, Statewide Mental Health Program, DHCS
Mental Health Regional Administrators
Byron Russell, HPSI, Policy Support, Statewide Mental Health Program, DHCS

16-0315

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 3/15/2016 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Katherine Tebrock, Esq.<br>Deputy Director<br>Statewide Mental Health Program |
| Subject: | **REVISION TO THE SUICIDE RISK EVALUATION MENTORING PROGRAM** |

In order to continue to enhance the quality of the Suicide Risk Evaluations (SREs) performed by California Department of Corrections and Rehabilitation clinicians, several changes to the SRE Mentoring Program are being implemented.

I. <u>Frequency of Mentoring</u>

<u>Mental Health Crisis Bed</u>

Because of the acuity of the patient population served in the Mental Health Crisis Bed (MHCB) units, clinicians who are regularly assigned to work in a MHCB shall complete the mentoring program on an annual basis.

II. <u>SRE Audit Corrective Action Plans</u>

SRE quality is monitored by two audits; the Chart Audit Tool (CAT) conducted by institution program supervisors and the SRE Audit conducted by headquarters staff.

When an SRE audited by headquarters staff is determined to not meet standards, the institution Mental Health Program shall be notified.

When an SRE is determined, by either audit process, to not meet standards (defined as "no" on two or more items), the following shall occur:

- The supervisor audits an additional SRE by the clinician.
- If the second SRE audited also does not meet standards, then the clinician is referred to repeat the mentoring program.
- If the second SRE audited meets standards, a third SRE is audited.
- If the third SRE does not meet standards, the clinician is referred to repeat the mentoring program.
- If the third SRE meets standards, no further action is taken.

At least one SRE from each clinician shall be audited every six months.

P.O. Box 588500
Elk Grove, CA 95758

# MEMORANDUM

III. **SRE Mentors**

SRE Mentors shall be clinicians who have demonstrated clinical acumen, expertise in addressing crisis issues, and superior clinical performance.

All SRE mentors shall receive annual "booster" training. Training may be delivered directly by webinar, or may consist of Training for Trainer (T4T) sessions held regionally. T4T will be conducted by headquarters Suicide Prevention and Response Focused Improvement Team or Mental Health Training Unit staff.

If you have questions or need additional information or assistance, you may contact Robert Horon, Ph.D., Senior Psychologist, Specialist, Clinical Support, Statewide Mental Health Program, Division of Health Care Services at (916) 691-6858 or via email at Robert.Horon@CDCR.ca.gov.

cc: Angela Ponciano
Laura Ceballos, Ph.D.
Amy Eargle, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
James Vess, Ph.D.
John Rekart, Ph.D.
Jennifer Johnson
Mental Health Regional Administrators
Regional Health Care Executives

16-0324

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 3/24/16 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Katherine Tebrock, Esq.<br>Deputy Director<br>Statewide Mental Health Program |
| Subject: | **CLARIFICATION OF SUICIDE RISK EVALUATION TRAINING REQUIREMENTS** |

Per the memorandum dated February 15, 2013, "Suicide Risk Evaluation Training," all clinical staff hired at institutions must complete a seven-hour Suicide Risk Evaluation training (consisting of two, 3.5-hour training sessions) within 180 days of hire. This requirement includes clinicians hired through a registry and clinicians who provide telepsychiatry mental health services.

All clinicians must re-take the seven-hour Suicide Risk Evaluation training once every two years. The training is updated on a regular basis to integrate new information and clinical processes. The training may only be provided by clinicians who have completed the Suicide Risk Evaluation Training for Trainers, which is offered by the Statewide Mental Health Program (SMHP) on an annual basis.

If you have questions, or require additional information related to this memorandum, you may contact Robert Horon, Ph.D., Senior Psychologist, Specialist, Clinical Support, SMHP, DHCS, via email: Robert.Horon@cdcr.ca.gov.

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
James Vess, Ph.D.
John Rekart, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives

16-0315

 

# HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| Date: | 03/15/16 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health<br>Chief Nurse Executives |
| From: | Cheryl Schutt, RN, BSN<br>Statewide Chief Nurse Executive<br>Deputy Director, Nursing Services<br><br>Katherine Tebrock, Esq.<br>Deputy Director<br>Statewide Mental Health Program |
| Subject: | **LEVEL OF OBSERVATION AND PROPERTY FOR PATIENTS IN MENTAL HEALTH CRISIS BEDS** |

This memorandum provides direction regarding observation orders for patients requiring Suicide Watch or Suicide Precaution and those who do not meet the criteria for Suicide Watch or Suicide Precaution, but still require observation.

**OBSERVATION REQUIREMENTS**

Patients Requiring Suicide Watch and/or Suicide Precaution

Per the Mental Health Services Delivery System Program Guide (2009 Revision) there are only two levels of observation that can be ordered for patients at elevated risk of suicide and/or self-harm: Suicide Watch and Suicide Precaution.

Patients Requiring Observation Other Than Suicide Watch or Suicide Precaution

Less frequent observation may be ordered if, in the clinical judgment of the ordering psychiatrist or psychologist, the patient:

- Does not meet criteria for either Suicide Watch or Suicide Precaution.
- Has been under Suicide Watch or Suicide Precaution, and is considered no longer suicidal.

In these cases, orders shall:

P.O. Box 4038
Sacramento, CA 95812-4038

# MEMORANDUM

- Be written specifying the frequency and timeframe for observation and include the items the patient may or may not have.
- Not be written for a frequency of more than twice an hour (30 minutes).
- Not be written with vague observation schedules such as Psychiatric Observation or Behavioral Observation. Use of these terms is not permitted under any circumstances.

**Determination and Documentation of Level of Observation**

The rationale for the decision to place a patient at a particular level or frequency of observation shall be documented on a progress note at least every 24 hours. The level of observation shall be discussed at every Interdisciplinary Treatment Team (IDTT) meeting. The psychiatrist or psychologist shall ensure that any change in level of observation resulting from the IDTT discussion is documented on an updated order during or immediately after the IDTT.

In addition to general observations of current safety, any specific observed behaviors that signify risk shall be specified in the order for observation. Those behaviors include but are not limited to: crying, rocking, mutism, illogical verbal responses, deviations from the patient's typical presentation, deterioration in activities of daily living or personal hygiene, etc. If any of these behaviors are observed by mental health or nursing staff, a referral for a mental health evaluation shall be made.

**State Issued Clothing, Bedding and Allowable Items**

All orders shall detail what specific items may be issued to a patient. Staff shall ensure all patients are provided with the clothing, bedding and allowable items permitted at the patient's level of observation. These items are outlined in the memorandum, *State-Issued Clothing and Bedding for Mental Health Inmate-Patients in the Mental Health Crisis Bed and Outpatient Housing Unit*, dated October 29, 2013 (Attached).

If fewer items are granted than specified in this memorandum, a rationale shall be provided detailing the patient's unique risk factors and clinical need, and updated at least every 24 hours while allowable items are limited. General statements of risk and/or providing minimal items without justification are not acceptable. As the level of observation or individual risk decreases, clothing, bedding, and other allowable items must be restored and provided as soon as possible after the determination has been made that the level of risk has decreased.

**MHCB Units Observation - Exception**

Some Mental Health Crisis Bed (MHCB) units that do not have call buttons have an approved program flex specifying frequency of rounding. If an MHCB unit has an existing approved

P.O. Box 4038
Sacramento, CA 95812-4038

# MEMORANDUM

program flex, an order specifying frequency of observation may not be written for observation periods that exceed those as specified by the accrediting or licensing body.

If you have questions or need additional information related to this policy, you may contact Robert Horon, Ph.D., Senior Psychologist Specialist, Clinical Support, SMHP, by phone at (916) 691-6858 or email at: Robert.Horon@cdcr.ca.gov.

Attachment

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives

 

# HEALTH CARE SERVICES

MEMORANDUM

Date: October 29, 2013

To: Chief Executive Officers
Wardens
Chiefs of Mental Health

From:
M. D. Stainer, Director (A)
Division of Adult Institutions

Timothy G. Belavich, Ph.D., MSHCA, CCHP, Director (A), Division of Health Care Services and Deputy Director (A), Statewide Mental Health Program

Subject: STATE-ISSUED CLOTHING AND BEDDING FOR MENTAL HEALTH INMATE-PATIENTS IN THE MENTAL HEALTH CRISIS BED AND OUTPATIENT HOUSING UNIT

The purpose of this memorandum is to:

1. Provide staff guidelines regarding issuance of state-owned clothing and bedding for all inmates housed in the Mental Health Crisis Bed (MHCB) or Outpatient Housing Unit (OHU) for mental health crisis.
2. Restate documentation requirements when inmate-patients receive less than full complement as listed below.

Effective immediately:

I. **Inmate-patients not on suicide precautions or watch.**

**Complement of state-owned clothing, bedding, and hygiene items is as follows:**
Inmate-patients placed in the MHCB or OHU for a mental health crisis shall be issued, at a minimum, the following items unless a clinical determination is made and documented by a licensed psychologist or psychiatrist, or other admitting physician, that there is a clinical reason these items should not be issued:

- Socks (one pair – to be exchanged as needed)
- Clothing (to be exchanged as needed)
  - Male Inmates: one pair blue denim jeans and one blue chambray shirt, or one jumpsuit, or one reception center shirt and pants.
  - Female Inmates: one blouse or T-shirt, one pair slacks, or one dress, muumuu, robe, or duster, one nightgown.

# MEMORANDUM

- Underclothes (to be exchanged as needed)
  - Male Inmates: 1 pair white undershorts, 1 undershirt
  - Female Inmates: 1 brassiere, 1 pair panties
  - Transgendered Inmates, upon request: 1 brassiere or 1 pair white boxer shorts.
- Reading material (1 book or psychoeducational articles)
- Hygiene items (1 toothbrush, tooth powder, soap)
- One blanket
- A bed (cement bed with mattress on top acceptable)
  - For OHUs a cement bed with mattress on top is acceptable.
  - For MHCBs, a cement bed with mattress on top is acceptable; however there are additional Title 22 requirements. According to Title 22, section 79829, all licensed beds shall include the following:

    "(a) A clean, comfortable bed with a mattress, pillow, blankets, bed linen...All furnishings will be in good repair and suitable for special inmate-patient needs.

    (b) Adjustable beds, side rails and overbed tables shall be provided as required by the inmate-patient's condition."
- Prescribed Health Care Appliance

II. **Inmate-patients on suicide precaution.**

**Complement of state–owned clothing, bedding, and hygiene items is as follows:**
According to the mental health Program Guide (p. 12-10-16, 2009), "full issue" for inmate-patients in the MHCB or OHU on suicide precaution is the provision of shorts, t-shirt, socks, a safety no tear mattress or furniture, reading and writing materials, and toiletries. Staff is reminded that these items are considered "full issue" *only* for inmate-patients on suicide precaution, and shall not be considered the standard for inmate-patients who are not on suicide precaution.

III. **Inmate-patients on suicide watch.**

**Complement of state–owned clothing, bedding, and hygiene items is as follows:**
As a reminder, according to the mental health Program Guide (p. 12-10-17, 2009), inmate-patients on suicide watch shall only be provided with a safety smock/gown, a safety mattress, and a safety blanket.

# MEMORANDUM

IV. **Documentation Requirements.**

Whenever an inmate-patient receives less than all items as detailed above in part I of this memorandum (this includes inmate-patients on suicide watch and precaution, as they receive less than what is outlined in part I), a psychiatrist or licensed psychologist shall:

1. Ensure issuance of property is individualized based upon the inmate-patient's clinical needs. Do not default to providing minimal items.
2. Clearly state on the physician's order which items the inmate-patient may have or which specific items the inmate-patient may not have.
   - Avoid using general terms such as "suicide precaution" on the order.
   - Clearly document how supplies are given and returned if applicable. For example, if an inmate-patient may have a pen filler and paper for five minutes, and then the items shall be collected by staff, the order shall specify this requirement.
3. Re-evaluate the inmate-patient and status of issued items every 24 hours. Limitations may continue as long as clinically indicated.
   - Note any changes in the items the inmate-patient may have every 24 hours, for the duration of limited issue.
4. Document the clinical rationale for issuance of less than the full complement of state-owned property as detailed in part I of the memorandum on a mental health progress note (CDCR 7230A) every 24 hours, for the duration of limited issuance. It is not acceptable for rationale to only include general statements such as "suicide precaution."
5. Establish a communication log and update local operating procedures to ensure all staff, including custody, is aware of the orders that detail allowable state issue.

For any questions contact Laura Ceballos, Ph.D., Chief of Quality Management, Statewide Mental Health Program, Division of Health Care Services (DHCS) via email at Laura.Ceballos@cdcr.ca.gov.

cc: Judy Burleson, Associate Director, Policy and Clinical Support, Statewide Mental Health Program, DHCS
Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS
Laura Ceballos, Ph.D., Chief, Quality Management Unit, Statewide Mental Health Program, DHCS
Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, DHCS

**Gaines, Thomas@CDCR**

**From:** Morrison, Michael@CDCR
**Sent:** Thursday, October 31, 2013 10:02 AM
**Cc:** Belavich, Tim@CDCR; Stainer, Michael@CDCR; Ceballos, Laura@CDCR; Burleson, Judy@CDCR; Eargle, Amy@CDCR; Stanley, Nathan@CDCR
**Subject:** HQ Memorandum_State-Issued Clothing and Bedding for Mental Health Inmate-Patients in the MHCB and OHU
**Attachments:** HQ Memorandum_State Issued Clothing and Bedding for Mental Health Inmates in MHCB and OHU_10-29-13.pdf

**Importance:** High

Please see the attached memorandum and disseminate as appropriate.

(Sent to CEOs, Warden's and Chiefs of Mental Health)

***Michael Morrison***
Special Assistant to T. Belavich, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Services and
Deputy Director (A), Statewide Mental Health Program
California Department of Corrections and Rehabilitation
**Office:** 916-691-0293
**Mobile:** 916-764-4996
**Email:** michael.morrison@cdcr.ca.gov

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

14-0303

 

CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

# MEMORANDUM

**Date:** March 3, 2014

**To:** Chief Executive Officers
Chiefs of Mental Health

**From:**

Timothy G. Belavich, PH.D., MSHCA, CCHP,
Director (A), Division of Health Care Services
and Deputy Director, Statewide Mental
Health Program

Stephen Ritter, D.O,
Deputy Director, Medical
Services, California Correctional
Health Care Services

Karen Rea, P.H.N., M.S.N., F.N.P.,
Statewide Chief Nurse Executive
California Correctional Health
Care Services

Morton Rosenberg, DDS,
Deputy Director,
Statewide Dental Program
Division of Health Care Services

**Subject:** **ANNUAL SUICIDE PREVENTION TRAINING**

Suicide prevention is a top priority for the California Correctional Health Care Services (CCHCS) and the Division of Health Care Services (DHCS) Statewide Mental Health Program. Improved screening, diagnosis, and treatment of suicidal individuals will contribute to lowering the number of suicide attempts and suicides in the department.

The Mental Health Services Delivery System Program Guide (2009 Revision) requires standardized training of all health care staff on an annual basis (Chapter 10, page 6). Annual training shall provide information about warning signs of suicide, the mental health referral process, how to respond to suicidal statements, and basic information about treatment for suicidal individuals. Lesson plans titled "Suicide Prevention" are available from the institution In-Service Training office for annual staff training.

The annual suicide prevention training must be completed on a calendar year basis and be delivered by an institution mental health clinician in a live training format. For 2014, all health care staff (including mental health staff) shall receive training no later than December 31, 2014.

Questions concerning suicide prevention training can be directed to Robert Canning, Ph.D., Suicide Prevention Coordinator, Clinical Support, Statewide Mental Health Program, Division of Health Care Services (DHCS) at (916) 691-0276 or by email at robert.canning@cdcr.ca.gov.

# MEMORANDUM

cc:   Angela Ponciano, Associate Director, Program and Clinical Support, Statewide Mental
         Health Program, DHCS
      Amy Eargle, Ph.D., Chief, Clinical Support, Statewide Mental Health Program, DHCS
      Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health Program,
         DHCS
      Nathan Stanley, Chief, Field Operations, Statewide Mental Health Program, DHCS
      Robert D. Canning, Ph.D., Senior Psychologist, Specialist, Statewide Mental Health
         Program, DHCS
      Eureka Daye, Chief Executive Officer (CEO), Region I, California Correctional Health Care
      Services (CCHCS)
      Charles Young, CEO, Region II, CCHCS
      Chris Podratz, CEO, Region III, CCHCS
      Robert Herrick, CEO, Region IV, CCHCS
      Regional Mental Health Administrators
      Regional Chief Nurse Executives
      Regional Deputy Medical Executives
      Regional Dental Directors

# 15-1023

 # HEALTH CARE SERVICES

# MEMORANDUM

| | |
|---|---|
| Date: | 10/23/2015 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | Timothy Belavich, Ph.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| Subject: | **COMPLETED CONTACTS ASSOCIATED WITH SUICIDE RISK EVALUATIONS** |

Effective immediately, when a Suicide Risk Evaluation (SRE) Assessment (CDCR MH-7447) is completed by a clinician, the appointment scheduler shall simultaneously enter the SRE and a completed contact into the patient record in the Mental Health Tracking System (MHTS). Please refer to the Suicide Risk Evaluation Completed Contact Entry Process (attached) for instructions.

Additionally, clinicians shall enter their scheduled and un-scheduled SRE appointments on their daily log. The un-scheduled SRE appointments (i.e., MHCB assessment/placement) shall be entered retroactively and include start and stop times.

If you have questions or need additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.ca.gov.

Attachment

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
Jennifer Johnson
Mental Health Regional Administrators
Regional Health Care Executives

P.O. Box 4038
Sacramento, CA 95812-4038

## Suicide Risk Evaluation Completed Contact Entry Process

When an SRE is completed by a clinician, the appointment scheduler shall simultaneously enter the SRE and a completed contact into the patient record in MHTS.

1. Receive completed SRE form from clinician.
2. Enter information from the SRE into MHTS.
   a. Complete the 7447-MH: Suicide Risk Assessment portion at the bottom of the screen from the information provided on the SRE, including unscheduled SRE's.



3. Create a contact to correspond with SRE.
    a. Complete the left sections of the screen to correspond with the information provided on the SRE. Include the following:
        i. Appointment date
        ii. Start and stop time
        iii. Clinician name and classification who conducted SRE
        iv. Reason for visit (choose from the drop down menu)

4. Close the created contact corresponding with the SRE.

16-1214



# HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 12/14/2016 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | KATHERINE TEBROCK, ESQ.<br>Deputy Director<br>Statewide Mental Health Program |
| Subject: | **NO REQUIREMENT FOR AN INTERDISCIPLINARY PROGRESS NOTE TO ACCOMPANY A SUICIDE RISK EVALUATION OR SUICIDE RISK ASSESSMENT AND SELF-HARM EVALUATION** |

Effective immediately, there is no longer a requirement for an Interdisciplinary Progress Note to accompany a Suicide Risk Evaluation as had been specified within the Mental Health Tracking System.

Similarly, no progress note is required when a Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) is conducted within the Electronic Health Record System (EHRS).

Any questions regarding the new process may be directed to Robert Horon, Ph.D., Senior Psychologist, Specialist, Clinical Support, Statewide Mental Health Program, Department of Health Care Services, via email: Robert.Horon@cdcr.ca.gov.

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives

# 11-0517

State of California                                                    Department of Corrections and Rehabilitation

# Memorandum

Date    :   May 17, 2011

To      :   Associate Directors-Division of Adult Institutions
            Wardens

Subject :   **HOUSING OF ENHANCED OUTPATIENT PROGRAM INMATES IN RECEPTION
            CENTER INSTITUTIONS**

Following the most recent round of monitoring tours by the Special Master's
team in *Coleman v. Wilson*, the Department was requested to ensure that Reception
Center (RC) staff are aware of the specialized housing needs of Enhanced Outpatient
Program (EOP) inmates in the RCs.

The concerns of the Special Master's team were generated by observation of the
Coleman Monitors and/or anecdotal reports that EOP inmates are being housed in the
same cells as Correctional Clinical Case Management System (CCCMS) or non-Mental
Health Services Delivery System (non-MHSDS) inmates in RC prisons. In addition,
there have been reports of EOP inmates housed throughout RC prisons, with no
consideration of "clustering" the inmates in a specific building or facility, to improve
clinical access to the inmate-patients.

In response to these concerns, upon identification of an inmate as requiring the EOP
level of care within an RC, the following guidelines should be followed when determining
housing:

1.  EOP inmates may only be housed in the same cell as another inmate at the EOP
    level of care, when otherwise approved for double-celled housing.
2.  EOP inmates must be assigned housing that meets all of the requirements of their
    classification case factors, unless exempted through regular classification processes.
3.  EOP inmates in the RCs should be "clustered" in specific housing units with other
    EOP inmates requiring the same type of housing. This requirement is to ensure the
    greatest utilization of existing clinical resources. Non-EOP inmates may be housed
    in the same housing unit(s), but staff shall be watchful for any signs that EOP
    inmates may be victimized by other EOP inmates or non-EOP inmates.

If you have any questions, please contact Stephen Peck, Correctional Administrator,
Reception Center Housing, Division of Adult Institutions, at (916) 324-6808.

GEORGE J. GIURBINO
Director
Division of Adult Institutions

cc: Terri McDonald, Chief Deputy Secretary, Adult Operations
    Sharon Aungst, Chief Deputy Secretary, Division of Correctional Health Care
      Services
    R. J. Subia, Deputy Director, Division of Adult Institutions (DAI)
    Stephen Peck, Correctional Administrator, Reception Center Housing, DAI

# 14-0509

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : May 9, 2014

To : Associate Directors, Division of Adult Institutions
Wardens

Subject : **IMPLEMENTATION OF THE SECURITY/WELFARE CHECK PROCEDURE UTILIZING THE GUARD ONE SYSTEM**

The purpose of this memorandum is to provide direction regarding the implementation of the Security/Welfare Check Procedure utilizing the Guard One electronic monitoring system. The Guard One System is currently being expanded to all Psychiatric Services Units (PSU), Security Housing Units (SHU), and Condemned Housing Units throughout the State. Due to the ongoing installation of the Guard One System at various institutions, the Security/Welfare Check Procedure will be implemented in three phases. Institutions will not begin utilizing the modified Security/Welfare Check Procedure until the initiation of their designated phase.

Upon receipt of this memorandum, all institutions with an Administrative Segregation Unit (ASU), PSU, SHU or Condemned Housing Unit will begin to provide training to all correctional officers assigned to the abovementioned areas on the Security/Welfare Check Procedure utilizing the Guard One electronic monitoring system. The Division of Adult Institutions has developed an on-the-job training aide to assist institutions with providing training to staff. This training should be conducted in areas where the Guard One System is installed so that staff can familiarize themselves with the equipment and the Security/Welfare Check Procedure. Institutions shall ensure correctional officers assigned to each phase's identified areas have been trained prior to that phase's activation date.

**PHASE 1**

Phase 1 will begin on May 19, 2014, with all ASU's that have the Guard One System currently installed.

**PHASE 2**

Phase 2 will begin on June 16, 2014, consisting of Kern Valley State Prison's ASU overflow, all PSU, SHU (excluding Pelican Bay State Prison's Facilities C and D), and Condemned Housing Units.

**PHASE 3**

Phase 3 will consist of Pelican Bay State Prison's Facilities C and D along with the California Health Care Facility-Stockton. Phase 3's activation date has yet to be determined and will be announced in a subsequent directive.

Associate Director, Division of Adult Institutions
Wardens
Page 2

If you have any questions regarding the implementation of the Security/Welfare Check Procedure and/or the Guard One System, please contact Thomas Tyler, Captain, Audits and Litigation Unit, Division of Adult Institutions, at (916) 324-7956.

M. D. STAINER
Director
Division of Adult Institutions

Attachment

cc: Kathleen Allison
Kelly Harrington
Tim Virga
Thomas Tyler

APPENDIX PG. - 260

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : May 9, 2014

To : Associate Directors, Division of Adult Institutions
Wardens

Subject : **SECURITY/WELFARE CHECK PROCEDURE UTILIZING THE GUARD ONE SYSTEM TO SUPERSEDE ADMINISTRATIVE SEGREGATION UNIT WELFARE CHECK AND SECURITY/CUSTODY ROUNDS IN SPECIALIZED HOUSING PROCEDURES**

The purpose of this memorandum is to modify current Security/Welfare Check procedures for all inmates housed in Administrative Segregation Units (ASU), Psychiatric Services Units (PSU), Security Housing Units (SHU), and Condemned Housing Units, which utilize or will be utilizing the Guard One electronic monitoring system. In furtherance of the California Department of Corrections and Rehabilitation's continued efforts to reduce inmate suicides, the Department has determined both the ASU Welfare Check and Security/Custody Rounds will be combined into one Security/Welfare Check Procedure.

The Security/Welfare Check procedures presented herein will supersede ASU Welfare Check and Security/Custody Rounds in Specialized Housing Procedures as directed in memorandums dated: May 28, 2013, titled, "Revised Administrative Segregation Unit Welfare Check Procedure and Implementation of Security Inspections in Specialized Housing" and July 3, 2013, titled, "Implementation of the Administrative Segregation Unit Welfare Check Procedures Utilizing the Guard One System."

A "Security/Welfare Check" shall be defined as a personal observation by a correctional officer of the welfare of the inmate and the security of the cell in which an inmate is housed in an ASU, PSU, SHU, and Condemned Housing Unit. The Security/Welfare Check shall include a visual/physical observation of a living, breathing inmate, free from obvious injury ensuring there is a clear and unobstructed view into the cell looking for damage to the cell and/or signs of any misconduct or self-injurious behavior. The Security/Welfare Check shall be conducted on all inmates housed in ASU, PSU, SHU, and Condemned Housing Units.

The following are custody staff responsibilities for conducting Security/Welfare Checks utilizing the Guard One System:

1. Correctional officers shall use the Guard One PIPE to record all Security/Welfare Checks conducted on all inmates housed in ASU, PSU, SHU, and Condemned Housing. This will be accomplished by touching the PIPE to each cell front button. This will capture the time and location that the Security/Welfare Check was conducted. **Note: Staff shall no longer capture the inmates' in-cell activity via the wallet and activity buttons under this modified procedure.**

2. Correctional officers shall conduct Security/Welfare Checks on all inmates in the aforementioned housing units at staggered intervals twice an hour, not to exceed 35 minutes between checks. Staggered means checks are to be conducted at unannounced and irregular intervals so that they are unpredictable to the inmate population. Disruptions of Security/Welfare Checks shall be documented in the ASU, PSU, SHU, and Condemned Housing Unit Isolation log book.

3. During First Watch hours, correctional officers shall conduct all Security/Welfare Checks using a pre-programmed silenced First Watch PIPE. The First Watch PIPE does not omit an audible beep during use only flashing a red Light Omitting Diode (LED). The First Watch PIPE shall be marked identifying it as equipment for First Watch use only.

4. During times when inmates housed in ASU, PSU, SHU, and Condemned Housing Units are out of their assigned cell for (yard, classification committee, appointments, visiting, etc.), correctional officers are required to conduct a Security/Welfare Check looking for damage and potential security concerns to that inmate(s) cell. Under this procedure correctional officers are not expected to conduct Security/Welfare Checks on ASU, PSU, SHU, and Condemned cells that have no inmates assigned to them.

5. At the completion of each shift the correctional officer(s) tasked with completing the Security/Welfare Check shall insert the PIPE into the Internet Protocol (IP) Downloader. Once the IP download has been completed, the unit supervisor shall review all the Security/Welfare Checks made during their shift using the Guard One Rounds Tracker Software installed on their designated work station. This review shall ensure all Security/Welfare Checks have been completed at least two times an hour at staggered intervals not to exceed 35 minutes between checks.

6. As part of the review, the unit supervisor will print the Guard One Rounds Tracker Report and provide their signature and date of review. Should there be any discrepancies during this review the housing unit supervisor shall provide appropriate corrective action with staff prior to the end of the shift.

7. Institutions shall retain the original, signed, Guard One Rounds Tracker Report for a minimum of three years at the institution, and an additional four years in departmental records retention.

8. In the event the Guard One electronic monitoring system is inoperable, staff shall use the Security/Welfare Check Manual Tracking Sheet (Attachment A) to document the required checks. Once the Guard One System is fully operational staff shall resume the methods as described above for the Guard One System. The records retention schedule for the Security/Welfare Check Form will be the same as for the Guard One Rounds Tracker Reports.

9. Based on their unique design and programs, California State Prison, San Quentin's North Segregation and Central California Women's Facility Condemned Housing Units shall only conduct Security/Welfare Checks during First Watch.

All custody staff tasked with conducting and reviewing Security/Welfare Checks shall receive documented on-the-job training regarding the implementation of the Security/Welfare Check procedure utilizing the Guard One System. An In-Service Training Code will be provided in a subsequent email. An updated sample Operating Procedure (OP) is attached for your convenience to assist with incorporating the revised Security/Welfare Check Procedure utilizing the Guard One System into your local OP. This revision(s) may be a supplement to be included in the next scheduled revision of the impacted document. Please provide verification of completion of training and the update to your institution OP via memorandum to your respective Mission Associate Director and a copy to Thomas Tyler, Captain, Audits and Litigation Unit, Division of Adult Institutions within 30 calendar days from the date of issuance of this memorandum.

If you have any questions regarding this procedure, please contact Captain Thomas Tyler at (916) 324-7956.

M. D. STAINER
Director
Division of Adult Institutions

Attachments

cc: Kathleen Allison
Kelly Harrington
Tim Virga
Thomas Tyler

SECURITY/WELFARE CHECK PROCEDURE GUIDELINE

**Operating Procedure**

I. **PLAN TITLE AND NUMBER:**

A. Security/Welfare Check Procedure

II. **PURPOSE AND OBJECTIVE:**

The purpose of this procedure is to establish specific security and operational guidelines for Security/Welfare Checks, to ensure operational compliance with the Department Operations Manual (DOM), the California Code of Regulations, Title 15 and Coleman court mandates.

The objective of this procedure is to set the guidelines for the Security/Welfare Checks of all inmates placed in Administrative Segregation Housing Units (ASU), Security Housing Units (SHU), Psychiatric Services Housing Units (PSU) and Condemned Housing Units.

A Security/Welfare Check is defined as a personal observation by a correctional officer of the welfare of the inmate and the security of the cell in which an inmate is housed in an ASU, PSU, SHU, or Condemned Housing Unit to include a visual/physical observation of a living, breathing inmate, free from obvious injury ensuring there is a clear and unobstructed view into the cell looking for damage to the cell and/or signs of any misconduct or self-injurious behavior.

The overall focus of this procedure is to outline the requirement of the Security/Welfare Checks System utilizing the Guard One Rounds Tracker "PIPE" System.

III. **REFERENCES:**

A. DOM Section 52080.24 - Administrative Segregation

B. May 9, 2014, Memorandum, "Security/Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures", signed by Michael Stainer, Director, Division of Adult Institutions.

IV. **APPROVAL AND REVIEW:**

This procedure will be reviewed annually and will be submitted to the Warden for final approval.

Date of last revision:

**RESPONSIBILITY:**

A. The Warden has the overall managerial responsibility for the operation of this procedure.

B. The Chief Deputy Warden has the overall functional responsibility for the operation of this procedure.

C. The Associate Warden of Housing is responsible for the application of this procedure in the ASU, PSU, SHU and Condemned Housing Unit.

D. The Captain(s) in charge of any ASU, PSU, SHU and Condemned Housing Unit Units are responsible for ensuring procedural adherence.

E. The Litigation Coordinator is responsible for monitoring this procedure for compliance with Coleman Court Mandates.

V. **METHODS:**

Use of the Guard One Rounds Tracker

Officers will use the Guard One Rounds Tracker "PIPE" to record all Security/Welfare Checks. The assigned officer shall conduct a Security/Welfare Check on each cell, twice an hour not to exceed 35 minutes between checks. The "PIPE" captures two levels of information, the time the Security/Welfare Check was made and the location where the Security/Welfare Check was conducted. The officer will touch the "PIPE" to each button which is affixed to each cell in their unit. This will electronically validate the officer was at a specific cell, at a specific time.

Disruptions to the Security/Welfare Checks shall be documented in the housing unit isolation log book.

First Watch PIPE

During First Watch hours, officers shall conduct all Security/Welfare Checks using a pre-programmed silenced "First Watch PIPE". The "First Watch PIPE" does not omit an audible beep during use and only flashes a red Light Omitting Diode (LED). Officers conducting Security/Welfare Checks using the "First Watch PIPE" must ensure they observe the flashing red LED when conducting their Security/Welfare Checks. The "First Watch PIPE" shall be marked identifying it as equipment for First Watch use only.

Inmate Removal from Cell

During times when an inmate is out of his/her assigned cell for (yard, classification committee, appointments, visiting, etc.), the assigned correctional officer will continue to conduct Security/Welfare Checks looking for damage and potential security concerns to that inmate(s) cell.

Vacant Cells

Under this procedure officers are not required to conduct Security/Welfare Checks on cells where there are no inmate(s) assigned.

Internet Protocol Download and Unit Supervisor Review:

At the completion of each shift the officer conducting the Security/Welfare Check will insert the "PIPE" into the Internet Protocol (IP) Downloader located in the Unit/Program Office for the unit supervisor's review. Once the IP download has been completed, the unit supervisor shall review all Security/Welfare Checks made during their shift using the Guard One Rounds Tracker Software installed on their designated work station. This review will ensure all Security/Welfare Checks have been completed at least twice an hour at staggered intervals not to exceed 35 minutes between checks.

After the review, the unit supervisor shall print the Guard One Rounds Tracker Report and provide their signature and date of review. Should there be any discrepancies during this review the custody supervisor shall appropriately address any deficiencies with staff prior to the end of shift.

Training

The unit supervisor shall ensure all officers tasked with conducting Security/Welfare Checks are provided training regarding this procedure and the Guard One System equipment.

Equipment Malfunction:

In the event the Guard One Rounds Tracker software or equipment is not functioning properly staff will immediately notify the custody supervisor for follow up. For any technical assistance regarding the Guard One Rounds Tracker System staff will contact Enterprise Information Services staff. If staff cannot return the Guard One Rounds Tracker software or equipment to service in a timely manner, staff will utilize the manual methods detailed on the Security/Welfare Check Manual Tracking Sheet (Attachment-A).

Warden                                        Date

## ATTACHMENT A

### SECURITY/WELFARE CHECK MANUAL TRACKING SHEET

INSTITUTION:____________________ FACILITY:______________________________

HOUSING UNIT:____________________ DATE:__________ WATCH: 1ST 2ND 3RD

LOWER BED:____________________ UPPER BED:______________________________

**INSTRUCTIONS: COMPLETE TWO SECURITY/WELFARE CHECKS PER HOUR AT STAGGERED INTERVALS NOT TO EXCEED 35 MINUTES A CHECK**

A Security/Welfare Check shall be defined as a personal observation by a correctional officer of the welfare of the inmate and the security of the cell in which an inmate is housed in an ASU, PSU, SHU or Condemned Housing Unit. The Security/Welfare Check shall include a visual/physical observation of a living, breathing inmate, free from obvious injury ensuring there is a clear and unobstructed view into the cell looking for damage to the cell and/or signs of any misconduct or self-injurious behavior. The Security/Welfare Check shall be conducted on all inmates housed in ASU, PSU, SHU and Condemned Housing Units.

| TIME | ASSIGNED STAFF PRINT NAME | ASSIGNED STAFF SIGNATURE | COMMENTS |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Supervisor Name (print) (signature) (date)

14-0814

State of California Department of Corrections and Rehabilitation

# Memorandum

Date : August 14, 2014

To : Associate Directors, Division of Adult Institutions
Wardens
Classification Staff Representatives
Classification and Parole Representatives

Subject : **NON-DISCIPLINARY SEGREGATION PROCESSING PROCEDURE FOR MENTAL HEALTH SERVICES DELIVERY SYSTEM INMATES**

The purpose of this memorandum is to provide direction regarding the placement of Mental Health Services Delivery System (MHSDS) participants into Administrative Segregation Units (ASU) for possible non-disciplinary reasons. Due to the significant risks to the health and safety of MHSDS inmates who are placed in ASUs for non-disciplinary reasons, it is critical to expedite the processing and transfer of these inmates. The April 10, 2014, *Coleman v. Brown*, court order requires inmates in the MHSDS who are placed into ASU for non-disciplinary reasons to be removed within 72 hours of Non-Disciplinary Segregation (NDS) designation by the Institution Classification Committee (ICC). To ensure compliance with the April 10, 2014, court order and to address the increased risk of suicide among MHSDS inmates in segregation, the following procedure shall be adhered to effective immediately:

<u>Non-Disciplinary Segregation Definition</u>

Non-Disciplinary Segregation (NDS) is defined as any inmate who is placed in administrative segregation for: safety concerns not resulting from misconduct warranting a Rules Violation Report, investigations not related to misconduct or criminal activity, or being a relative or an associate of a prison staff member who works at the institution where the inmate is currently housed.

The following are examples of what **would not** be considered appropriate criteria for placement on Non-Disciplinary Segregation status:

- Out to court and return for criminal proceedings.
- Safety concerns as a result of drug debts, gambling debts or bartering with other inmates as documented on a Rules Violation Report.
- Failure to cooperate with an investigation into the inmates alleged safety concerns by not providing pertinent information to staff about the nature of the safety concerns.
- Cases requiring a Departmental Review Board action.

(1261914-1)

The following are examples of what would be considered appropriate criteria for placement on NDS status for privileges and property but not be considered for the accelerated transfer process.

- Inmates placed into segregation units upon transfer to their endorsed institution due to lack of an appropriate bed will retain NDS privileges and property but not be considered for the accelerated transfer process.
- Out to court and return for non-criminal proceedings that cannot be released to the General Population due to case factors will retain NDS status for privileges and property but not be considered for the accelerated transfer process.
- Post MERDS will retain NDS status for privileges and property but not be considered for the accelerated transfer process.
- Inmates who are being processed at the Reception Centers will retain NDS status for privileges and property but not be considered for the accelerated transfer process. Such class members remain subject to the transfer timelines set forth in the Program Guide.

Processing NDS with MHSDS Level of Care

When a Correctional Lieutenant is determining if an inmate in the MHSDS requires ASU placement and is likely to be designated as NDS by ICC, the staff member authorizing placement shall consider all less restrictive housing alternatives prior to ordering ASU placement. If it is determined ASU placement is the only available option, he/she shall ensure all documentation required to bring closure to the issues is completed prior to the inmates initial ICC review.

The Captain shall conduct an administrative review of the inmate's case the next business day following ASU placement. During the review, the Captain shall consider all reasonable alternative housing options prior to determining whether retention in ASU is necessary. If the determination is made to retain the inmate in ASU pending review by the ICC and it is likely there are no issues which will result in disciplinary sanctions, the Captain shall clear the inmate for privileges and property at this review. NDS inmates shall be granted privileges (*e.g.*, yard, canteen) and access to personal property for the duration of their placement in NDS. The Captain may only authorize *"Walk Alone Yard for Small Management Yards (SMY)/ Individual Exercise Yards (IEM)"* for these potential NDS inmates. While these inmates will be permitted privileges and property as potential NDS, if at any point in the future it is determined the inmate no longer meets the criteria to be designated as NDS, he/she will no longer be granted NDS property/privileges

The Captain shall ensure all closure documentation is completed prior to the inmate's initial appearance before the ICC. The Captain will case conference with the Correctional Lieutenant who authorized ASU placement along with the assigned caseworker. The case conference shall consist of a review of all closure

documentation, case factors and transfer recommendations that will be presented to the ICC.

The initial ICC committee will be held as soon as possible upon completion of all the appropriate casework but no later than 10 calendar days from the initial placement into Administrative Segregation. MHSDS inmates who are likely to be classified as NDS will be granted first priority with respect to the scheduling of ICC committee.

During the initial ICC review, the ICC shall review the circumstances of the inmate's placement inclusive of the closure documentation submitted by the sending facility, relevant case factors and consider all less restrictive housing options (release to original facility, placement in alternative facility within institution, etc.). If the ICC concludes the inmate requires continued ASU placement and an NDS designation has been determined, the inmate will be recommended for transfer to an alternate institution commensurate with the inmate's existing case factors.

The Classification and Parole Representative (C&PR) on behalf of the Warden or designee shall ensure the CDC Form 128-G, Classification Chrono is completed, signed and scanned into the Electronic Records Management System file by the close of business on the day the initial ICC was held.

The next business day the C&PR shall make contact with the Classification Services Unit (CSU) to schedule a Classification Staff Representative (CSR) review of the transfer recommendation in collaboration with the Population Management Unit (PMU). The C&PR shall attend the review via teleconference with the CSR and note the CSR review results. Should any deficiencies be noted by the CSR during this review, the C&PR shall take whatever course of action is necessary to remedy the deficiencies and reconvene the review with the CSR to obtain an endorsement to transfer. Upon completion of the CDCR Form 128-G endorsement chrono, the CSR shall provide electronic notification of the endorsement to PMU.

Upon transfer endorsement by the CSR, the PMU shall coordinate with the Statewide Transportation Unit (STU) and the sending and receiving institutions to determine availability of transportation to the designated institution for the next business day. If transportation cannot be made available through the STU, the C&PR shall arrange for the inmate to be transferred utilizing existing institutional resources the next business day. This will ensure the inmate has been transferred within the 72 hour time frames.

In the rare case where it is not possible to resolve the issues preventing the inmate from transferring out of ASU by the initial ICC, the Warden shall notify their respective Mission, Associate Director. The Associate Director and the Warden shall case conference the remaining issues and collaborate with any existing stakeholders (e.g., Health Care Oversight Placement Program) with consideration for placement at

the alternative to ASU housing at California State Prison, Sacramento (SAC) to ensure transfer of the inmate within mandated time frames.

NDS Tracking

Information regarding the use of NDS status for all inmates including MHSDS participants shall be tracked in the COMPSTAT ASU Tracking system. To that end the COMPSTAT ASU Tracking system will be modified to include the following additional ASU Placement Codes for use by September 1, 2014:

- NDS:200 – NDS status for accelerated transfer process.
- NDS:201 – NDS status for accelerated transfer process to alternative ASU housing at SAC.
- NDS:102 – NDS status for privileges and property but not considered for accelerated transfer process.

If you have any questions regarding these expectations, please contact your respective Mission, Associate Director.

M. D. STAINER
Director
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services and
Deputy Director, Statewide Mental Health Program
California Department of Corrections and Rehabilitation

cc: Kathleen Allison
Kelly Harrington
Tim Virga
Dennis Halverson
Kevin Ormand
Thomas Tyler

[7261814-1]

14-0902

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : September 2, 2014

To : Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives

Subject : **IMPLEMENTATION OF NON-DISCIPLINARY SEGREGATION FOR MENTAL HEALTH SERVICES DELIVERY SYSTEM INMATES PROCESSING, PROCEDURES, AND REQUIRED TRAINING**

The purpose of this memorandum is to provide procedures as it applies to those cases designated as Non-Disciplinary Segregation (NDS) by the Institution Classification Committee (ICC) **prior to** implementation of memorandum dated August 14, 2014, titled *Non Disciplinary Segregation for Mental Health Services Delivery System Inmates*, and to outline associated training requirements.

As noted in the memorandum and in order to comply with the April 10, 2014, *Coleman v. Brown*, court order, inmates in the Mental Health Services Delivery System (MHSDS) who are placed into an Administrative Segregation Unit (ASU) for non-disciplinary reasons are to be removed within 72 hours of NDS designation by the ICC.

**Training Completed by September 15, 2014**

The institutions are herein required to complete on-the-job training to staff affected to include but not be limited to: ASU line staff, all managers; all custody supervisors, and all counseling series, by September 15, 2014. It is essential that key counseling series staff receive training immediately to comply with implementation requirements. Confirmation of completion of requisite training will be submitted to your respective Mission Associate Director. The On-the-Job training code assigned for tracking this training is:

8428 Non-Discipline Seg MHSDS I/M 1.0 Hour

**Pre-Screening MHSDS NDS Cases by September 15, 2014**

Upon completion of training, but no later than September 15, 2014, counselor series staff will conduct a pre-screening of each current MHSDS NDS case for appropriate criteria for NDS placement and accelerated transfer process. These cases are identified in COMPSTAT ASU tracking under the previous "Reason for Placement" codes NDS: 100 and NDS: 101.

[12519'4-t]

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 2

- For those MHSDS NDS cases that are pre-screened **appropriate** for accelerated transfer which **do not** have a current or pending Classification Staff Representative (CSR) transfer endorsement, the Correctional Counselor (CC) shall schedule the inmate for the next available ICC. Those cases pre-screened appropriate shall have priority scheduling for ICC. Utilizing the NDS processing procedure for MHSDS inmates, these inmates shall be transferred within 72 hours of ICC.

- For those MHSDS NDS cases that are pre-screened with the recommendation of **appropriate** for accelerated transfer that do have a current CSR transfer endorsement, the CC shall refer the case to the Classification and Parole Representative (C&PR)/Reception Center (RC) CC III. Utilizing the NDS processing procedure for MHSDS inmates, these inmates shall be transferred within 72 hours.

- For those MHSDS NDS cases that are pre-screened with the recommendation of **appropriate** for accelerated transfer which are pending CSR review for transfer, the CC shall refer the case to the C&PR/RC CC III. Utilizing the NDS processing procedure for MHSDS inmates, these inmates shall be transferred within 72 hours.

- For those MHSDS NDS cases that are pre-screened with the recommendation of does not meet NDS criteria, not appropriate for accelerated transfer, the CC shall refer the case to the next available ICC.

- For those MHSDS NDS cases that are pre-screened with the recommendation of **meets NDS criteria, not appropriate** for accelerated transfer, the CC shall change the ASU Placement Code to "NDS:102" (NDS status for privileges and property but not considered for accelerated transfer process) and the case will be reviewed during the next scheduled subsequent ICC.

Pre-Screening Tracking

All pre-screening of MHSDS NDS cases will be entered into COMPSTAT ASU Tracking Log in the "Case Comments" section [previously titled "Other"] under the "Placement" tab. The entry shall be at the very beginning of the section and shall have the date of the review, the recommendation of appropriate criteria for NDS placement and accelerated transfer process, and the initials of the screener.

Examples (may use case note shorthand):

- "August 15, 2014 MHSDS NDS pre-screening, recommend **appropriate** for accelerated transfer, no current or pending transfer endorsement, refer ICC (CP)."

APPENDIX PG. - 275

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 3

- "August 15, 2014 MHSDS NDS pre-screening, recommend appropriate for accelerated transfer, bus seat requested August 11, 2014 (CP)."
- August 15, 2014 MHSDS NDS pre-screening, recommend appropriate for accelerated transfer, pending CSR transfer endorsement (CP)."
- "August 15, 2014 MHSDS NDS pre-screening, recommend NDS:102 not appropriate for accelerated transfer (CP)."
- "August 15, 2014 MHSDS NDS pre-screening recommend does not meet NDS criteria, refer ICC."

**COMPSTAT ASU NDS Tracking Modifications**

Information regarding the use of NDS status for all inmates including MHSDS participants shall be tracked in the COMPSTAT ASU Tracking system. To that end the COMPSTAT ASU Tracking system will have the following modifications:

- New NDS ASU Placement Codes for use following ICC **effective August 14, 2014.**
  - NDS: 200 – NDS status for accelerated transfer process.
  - NDS: 201 – NDS status for accelerated transfer process to alternative ASU housing at SAC.
- New NDS ASU Placement Codes for use during pre-screening by CC **effective August 14, 2014.**
  - NDS: 102 – NDS status for privileges and property but not considered for accelerated transfer process.
- Reason for Placement codes NDS: 100 and NDS: 101 should no longer be used after **September 1, 2014.**
- A new field for "Date of ICC NDS Placement" has been added between Date of Initial ASU ICC and Date of Last ASU ICC.
  - If any NDS placement code is entered than the new Date of ICC NDS Placement must be entered.
  - If the new Date of ICC NDS Placement is entered than a NDS ASU Placement Code must be entered.

APPENDIX PG. - 276

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 4

Training on the COMPSTAT ASU NDS Tracking modifications was provided by Population Management Unit via email attached Power Point presentation on August 20, 2014. This training is also available on the COMPSTAT ASU Tracking Center Homepage under Reference Library (User Manual). For questions relative to COMPSTAT ASU tracking, please contact CCIII Angella DeBusk, at (916) 445-0373 or CCII (Specialist) Christina Phillips at (916) 322-2283.

For other questions regarding these expectations, please contact your respective Mission Associate Director.

M. D. STAINER
Director
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services and
Deputy Director, Statewide Mental Health Program

cc: Kathleen Allison
Kevin Ormand
Kelly Harrington
Thomas Tyler
Tim Virga
Christina Phillips
Dennis Halvarson
Angella DeBusk

APPENDIX PG. - 277

# 14-0915

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : September 15, 2014

To : Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives

Subject : **PRIORITY CASE-BY-CASE REVIEW OF MENTAL HEALTH DELIVERY SYSTEM LONG-TERM SEGREGATED INMATES**

The purpose of this memorandum is to set forth a process by which the retention of inmates identified as participants in the Mental Health Services Delivery System (MHSDS) in Administrative Segregation Units (ASU), Psychiatric Services Units (PSU), and Security Housing Units (SHU) will be reviewed and assessed.

The placement of inmates into ASU is intended as temporary housing, for use when an inmate's presence in an institution's general population presents an immediate threat to the safety of the inmate or others, endangers institution security or jeopardizes the integrity of an investigation of an alleged serious misconduct or criminal activity. Inmates determined to no longer present such a threat to themselves or others, endanger the security of the institution, or jeopardize the integrity of an investigation if released to the general population should not be housed in segregation.

To most efficiently implement identified changes to the housing of MHSDS participants housed in ASU, SHU, and PSU as directed in memoranda:

- Non-Disciplinary Segregation Processing Procedure for Mental Health Services Delivery System Inmates dated August 14, 2014.
- Implementation of Non-Disciplinary Segregation for Mental Health Services Delivery System Inmates Processing, Procedures, and Required Training dated September 2, 2014.

Priority case-by-case reviews shall be conducted of all MHSDS inmates housed in ASU over 150 days and specific Determinate and Indeterminate SHU/PSU MHSDS inmates, beginning with those inmates with the greatest lengths of stay. Prior to the priority case-by-case review, training regarding the identified changes and expectations will need to be provided to all committee members to facilitate consistent desired outcomes. Those training requirements are articulated in the listed memoranda. Training will also be augmented with the use of mandatory teleconferences.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 2

The specific MHSDS Determinate and Indeterminate SHU/PSU cases that shall have a priority case-by-case review are:

- Any inmate with a determinate SHU term with segregated housing for 30 or more continuous months and a controlling Minimum Eligible Release Date (MERD) beyond 12 months.
- Any inmate with an indeterminate SHU term due to disciplinary behavior with SHU/PSU housing for two or more continuous years.

The following MHSDS SHU/PSU cases will not receive a priority case-by-case review by the Institution or through Case Conference, but rather will be reviewed by the Departmental Review Board (DRB) or Security Threat Group (STG) process, respectively:

- Any inmate with an indeterminate SHU term due to DRB will be reviewed in accordance with current policy, i.e., DRB determined time frames specific to deliberated case factors.
- Any inmate with an indeterminate SHU term due to Validated STG Affiliate will be reviewed in accordance with current standards, i.e., STG Identification, Prevention, and Management Pilot Project.

**Institution Review of MHSDS ASU/SHU/PSU**

Once training is complete, the institution will be given:

- 90 days to complete a review of all MHSDS ASU inmates housed in segregation for over 150 days on September 22, 2014.
- 180 days to complete a review of above specified MHSDS SHU/PSU inmates housed in segregation on September 22, 2014.
- Wardens of institutions housing inmates designated as Department of State Hospitals outpatient level of care shall be responsible for identifying and reviewing any inmate within their program meeting the timeframes for review.

Institutions will begin their review with those inmates with the greatest lengths of stay. The Institutional Classification Committee (ICC) shall conduct a priority case-by-case review of all available case factors, disciplinary history, and Mental Health Treatment Plan. All relevant documentation shall be reviewed including but not limited to: CDCR Form 115-MH, Rules Violation Report Mental Health Assessment Request, CDCR Form 837, Crime/Incident Report, CDCR Form 7219, Medical Report of Injury or Unusual Occurrence, and recent Interdisciplinary Treatment Team (IDTT) progress notes, to the extent available.

APPENDIX PG. - 280

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 3

In addition, the stability of the inmate's mental status and efficacy of the treatment plan are reviewed. Further, whether the inmate had the ability to understand and comply with instructions and the role the inmate's mental health symptoms played in any CDC Form 115, Rules Violation Report, if issued, is reviewed. The mental health team shall provide input regarding if the current treatment plan is successful in controlling or decreasing similar behaviors, or whether the treatment plan requires modifications and ultimately to determine if the inmate demonstrates an ongoing security risk that potentially threatens institution safety and security, thereby warranting continued segregated housing placement.

For any inmate in segregated housing who, at the most recent ICC, the clinician found that continued segregation placement is likely to cause his or her mental health condition to decompensate as documented on the CDC Form 128-G, Chrono Classification, the inmate shall be considered for transfer to an alternative placement appropriate to address such risk to the inmate's mental health.

The ICC shall determine if the inmate demonstrates an ongoing security risk that threatens institution safety and security, thereby warranting continued segregated housing placement. If the inmate does not demonstrate an ongoing security risk, he or she shall be considered for release to appropriate housing.

For any MHSDS inmate not recommended for release from segregated housing during the Institution Review process, the ICC shall discuss with the inmate, and document, specific behavioral goals for the inmate to be released from segregated housing.

This Institution Priority Case-By-Case Review process will allow all institutions to simultaneously begin the review process thus affording the greatest number of case reviews to be conducted in the shortest amount of time. If additional time is required to complete the case work due to volume, the Warden shall submit a written request to their Associate Director.

Overtime is to be authorized for Correctional Counselor (CC) I and CC II (Specialists) to prepare cases for ICC as determined by the Warden. Allocation of overtime is to be reviewed by the Program Support Unit based on identified institutional caseload. Please use the Business Information System telestaff paycode "COLCW-CC Coleman Casework" to track this overtime.

<u>Long-Term Segregated Case Conference</u>

All MHSDS cases retained in segregated housing following the Institution Priority Case-By-Case Review shall be referred for a Long-Term Segregated Case Conference within 30 days of completing the institutional case reviews.

APPENDIX PG. - 281

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 4

Thereafter, all MHSDS ASU inmates retained in ASU over 150 days and those specified MHSDS SHU/PSU cases also retained in segregated housing shall be referred for a Long Term Segregated Case Conference. Long-Term Segregated Case Conferences shall be scheduled giving priority equitably to ASU and SHU/PSU cases based on length of stay in segregated housing. In no case shall a MHSDS participant's Case Conference take place more than 30 days after an institution's decision to retain beyond the delineated lengths of stay.

The Long-Term Segregated Case Conference will conduct a case-by-case review of all available case factors, disciplinary history, and Mental Health Treatment Plan. All relevant documentation shall be reviewed including but not limited to: CDCR Form 115-MH, CDC Form 837, CDCR Form 7219, and recent IDTT progress notes, to the extent available. In addition, the stability of the inmate's mental status and efficacy of the treatment plan shall be reviewed. During the review, the current treatment plan shall be assessed to determine whether it is successful in controlled or decreasing problematic behaviors or whether the treatment plan should be modified. Further, the role the inmate's mental health symptoms played in any CDC form 115, Rules Violation Report, if issued, is reviewed.

The Long-Term Segregated Case Conference team shall determine if the inmate demonstrates an ongoing security risk that threatens institution safety and security, thereby warranting continued segregated housing placement. If the inmate does not demonstrate an ongoing security risk, he or she shall be considered for release to the General Population.

Long-Term Segregated Case Conference members will consist of:

- Mission Associate Director
- Warden
- Senior Psychologist, Supervisor or Supervising Social Worker of the mental health program
- Treating Psychiatrist
- Captain, Adult Institutions
- CC III, CC II
- Other staff as required

Any MHSDS participant who is not released to General Population by the Long-Term Segregated Case Conference will be periodically re-reviewed for release through the Long-Term Segregated Case Conference process. The Associate Director shall determine the time frames for the next review; however, such reviews will take place at

APPENDIX PG. - 282

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Classification Staff Representatives
Classification and Parole Representatives
Page 5

intervals not to exceed 180 days for class members in the SHU/PSU, and not to exceed 90 days for class members in the ASU.

The Long-Term Segregated Case Conference with recommendations regarding if continued segregated housing placement is warranted or not warranted shall be entered into the Strategic Offender Management System. Cases with a recommendation for placement in non-segregated housing shall by referred to the next scheduled ICC, in accordance with all due process requirements or, if appropriate, referred to Mental Health utilizing the existing Mental Health referral process.

If you have any questions please contact Melanie Scott, CC III, Classification Services Unit (CSU), at (916) 322-4730 or Kurt Luther, Captain, CSU, at (916) 324-3598.

M. D. STAINER
Director
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Service
Deputy Director, Statewide Mental Health

cc: Kathleen Allison
Kelly Harrington
Tim Virga
Dennis Halverson
Kevin Ormand
Thomas Tyler
Melanie Scott
Gena Jones
Christina Phillips

APPENDIX PG. - 283

14-1223

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : 12/23/2014

To : See Distribution List

Subject: **TRANSFER OF INMATES TO AND FROM MENTAL HEALTH CRISIS BEDS**

The purpose of this memorandum is to provide clarification of the interdisciplinary coordinated actions necessary, especially as it relates to custody staff, for transfer of inmate-patients (IP) who are clinically accepted to and discharged from a Mental Health Crisis Bed (MHCB) and to emphasize the importance of pre-discharge planning. This memorandum both supersedes specific prior California Department of Corrections and Rehabilitation's (CDCR) memorandums and should be implemented in conjunction with other departmental policies (Attachment A). This memorandum is an accompaniment to the Mental Health Services Policy 12.05.200 et al (Attachment B).

**MHCB Admissions**

The Division of Correctional Health Care Services, Health Care Placement Oversight Program (HCPOP), is responsible for managing the utilization of designated specialized health care beds, including MHCBs. All IP placements into a MHCB require authorization from HCPOP.

The 24 hour MHCB transfer timeline begins upon clinical determination a MHCB is required.

Within one hour of clinical determination that an IP requires placement in a MHCB and/or prior to placement into alternative housing, the **referring clinician** shall contact both HCPOP and the Classification and Parole Representative (C&PR), or during non-business days/hours, the Watch Commander (WC).

- HCPOP can be contacted 24 hours per day, seven days per week at (916) 204-0321, or via e-mail at hcpop.mhcb@cdcr.ca.gov or on global as MHCB-HCPOP@CDCR.
- Provide IP name, CDCR number, mental health Level of Care (LOC) prior to MHCB, criteria for placement, referring institution, and contact name with callback number.

**HCPOP** monitors the Strategic Offender Management System (SOMS) for vacant MHCBs and determines bed availability. Once a vacant MHCB is identified HCPOP:

- Notifies the referring clinician of the bed assignment and if not internally admitted to a MHCB, furnishes receiving clinician contact information.
- If not internally admitted to a MHCB, directs the MHCB Clinical Director or designee (receiving clinician) to hold the available MHCB and furnishes IP information and referring clinician contact information to the receiving clinician.

Within two hours of bed availability notification by HCPOP and if not internally admitted the **referring clinician**, sends the completed referral packet and calls the receiving clinician.

Within one hour of receipt, the **receiving clinician** reviews the completed referral packet, conducts the pre-admission screening for placement, and notifies the referring clinician of acceptance. Missing paperwork shall not be a cause for non-acceptance. The receiving and referring clinician will work together to ensure all required paperwork has been provided/received.

Within one hour of acceptance from the receiving clinician, the **referring clinician** shall complete a CDCR Form 128-C, Medical/Psychiatric/Dental Chrono, indicating acceptance and the IP's bed number and forward the form to the receiving clinician and the C&PR or WC at the sending institution.

Immediately upon receipt of the 128-C, the Chief of Mental Health or designee at the receiving institution ensures the C&PR or WC at the receiving institution receives the 128-C, Medical/Psychiatric/Dental Chrono indicating acceptance.

MHCB transfers shall be done under authority of the Department Operations Manual, Section 62080.17 "Emergency Medical Transfers" and shall be done via the Classification Services Unit (CSU) teletype process on a "Psychiatric and Return" basis. The **C&PR at the receiving institution** shall contact CSU for teletype transfer approval. Emergency medical transfer to MHCB shall not be delayed pending teletype approval.

The 24 hour MHCB transfer timeline begins upon clinical determination a MHCB is required. A transfer is the day/time the IP leaves the institution for transport to/from a MHCB according to SOMS.

The C&PR at the sending institution shall notify Statewide Transportation of the request to transport. If Statewide Transportation is unable to complete transport within the required timelines, the institution transportation team shall complete the transport.

It is the responsibility of the sending institution, Clinical staff, HCPOP, CSU, and transportation to ensure transport within 24 hours of MHCB referral. Collaboration between all involved disciplines, divisions, and units is essential in order to achieve the 24 hour transfer requirement.

In the event HCPOP is unable to secure a MHCB placement immediately, the institution shall refer to the Alternative Housing Prioritization procedures as outlined in the Mental Health Services Policy 12.05.301, "Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer," dated October 2013, pending a MHCB bed placement.

In keeping with current policy, the sending institution shall retain an IP bed/cell for a minimum of ten days if the IP is transferred to a MHCB.

**Rescinding a MHCB Referral**

If HCPOP and the C&PR or WC were notified of the need for transfer, the **referring clinician** or designee immediately, and not to exceed one hour, notifies HCPOP and C&PR or WC of the rescission.

**MHCB Intake**

Upon transfer to the assigned MHCB, the **receiving clinician** will admit the IP to the MHCB and provide MHCB services for an anticipated length of stay duration up to 10 days. The MHCB **Inter-Disciplinary Treatment Team (IDTT)** shall meet within 72 hours of an IP admission and at least weekly thereafter. The Chief Psychiatrist or designee must approve exceptions to this length of stay.

**Pre-Discharge Planning**

The **IDTT** shall begin discharge planning at the initial IDTT meeting. An assessment shall be conducted at the initial IDTT relative to the likelihood of the IP's ability to return to the sending (referring) institution, should the IP's MHSDS LOC change from the LOC prior to MHCB placement.

Rules regarding return to original institution

- IPs discharged at the Correctional Clinical Case Management or Enhanced Outpatient Program (EOP) LOC shall not be returned to institutions that do not provide the discharged LOC.
- IPs with incomplete reception center (RC) processing shall be returned to the originating RC. For this purpose, Classification Staff Representative transfer endorsements shall not be considered part of the RC processing.
- IPs with completed RC processing shall not be returned to the RC. Contact HCPOP for placement assistance.
- IPs referred to an Intermediate Care Facility (ICF) or APP may remain in the MHCB until an ICF or APP bed becomes available.
- IPs requiring Administrative Segregation Unit (ASU) EOP hub placement consistent with California Code of Regulations, Title 15, Section 3335 shall be referred to HCPOP for placement assistance.

It is the expectation all cases determined during the **initial IDTT** to be highly unlikely to return to the originating institution be referred to the **C&PR** for *pre-discharge planning* with **HCPOP** to include, when appropriate, a Case Factor Sheet (CFS), completed by a **Correctional Counselor**. No CFS is required for IPs housed in ASU, Security Housing Unit (SHU), or Psychiatric Services Unit (PSU).

**Pre-Discharge Planning (continued)**

The **IDTT** shall determine when an IP is *pending clinical discharge* and recommend a LOC that is appropriate. The mental health **Primary Clinician (PC)** shall immediately notify HCPOP and the C&PR of the *pending clinical discharge* and LOC to ensure transfer can be expedited.

The **MHCB institution C&PR** shall review the aforementioned rules regarding return to original institution, the IP case factors and/or prior completed CFS and determine which institution the IP should be returned to after clinical discharge from the MHCB.

If the IP is able to return to their originating referring institution the **MHCB institution C&PR** will notify the originating referring C&PR of the *pending clinical discharge*. The **referring C&PR** is to arrange for transportation so that transfer of the IP, once clinically discharged, occurs within 72 hours. The **referring C&PR** shall notify Statewide Transportation of the *pending clinical discharge* and request for transfer.

If the IP is unable to return to their originating institution, the case *pending clinical discharge* shall be referred to HCPOP for re-direction.

- Within four hours of PC notification of *pending clinical discharge* the **MHCB institution C&PR or designee** will notify HCPOP and provide the relevant CFS, if necessary. No CFS is required for ASU/SHU/PSU IPs.

- Within four business hours of C&PR or designee notification of *pending clinical discharge*, **HCPOP** will review the IP case factors and make a re-direction placement recommendation via case notes in the SOMS and notify the MHCB institution C&PR.

- As soon as possible, but no later than one business day, of HCPOP notification, the **MHCB institution C&PR or designee** shall notify the MHCB Clinical Director that a receiving CDCR Institution has been determined for placement *pending clinical discharge*.

- The **MHCB Clinical Director** or designee shall expeditiously notify the discharging clinician and institution to receive the IP once clinically discharged.

**MHCB Discharges**

The **clinician discharging the IP** shall complete the clinical discharge on the CDCR Form 128-MH3, and contact the Chief of Mental Health or designee at the institution to receive the discharged IP. The mental health identifier (MHI) of the discharged IP shall then be entered into SOMS prior to physical discharge.

The **clinician discharging the IP** shall immediately notify HCPOP and the discharging institution's C&PR of the clinical discharge and shall provide a copy of the current CDCR Form 128-MH3, Mental Health Placement Chrono, to the C&PR or WC receiving the discharged IP in order to expedite the transfer.

If the IP is able to return to their originating referring institution the **MHCB institution C&PR** will notify the originating referring C&PR of the clinical discharge. Transfer of the discharged IP shall proceed according to pre-discharge plan.

If the IP is unable to return to their originating institution, **pursuant to the aforementioned pre-discharge plan**, the MHCB institution C&PR will have already received re-direction notification from HCPOP and a HCPOP re-direction placement recommendation will be present via the case notes in SOMS.

- Immediately upon notification by the clinician discharging the IP of clinical discharge, the **MHCB institution C&PR** shall present the case to the institution's assigned Classification Staff Representative (CSR) for an emergency transfer endorsement. If a CSR is not currently assigned to the MHCB institution at the time of the re-direct, the MHCB institution C&PR shall contact the Classification Staff Representative scheduler.

- Within four hours of notification by the MHCB institution C&PR, the **CSR** shall review the case for an emergency transfer endorsement. On difficult to place cases, the CSR shall coordinate with the CSU and Population Management Unit to ensure placement into the least restrictive housing.

  - If no CSR is available, the **MHCB institution C&PR** shall provide case factors to the re-direct institution's C&PR. The **re-direct C&PR** shall contact CSU for teletype endorsement if applicable and arrange IP transportation.

- The **MHCB institution C&PR or designee** shall additionally ensure a confirmed contact is made with the receiving C&PR or designee.

- Within 72 hours of clinical discharge, transfer of the discharged IP shall proceed according to **pre-discharge plan**. It is the responsibility of the institution receiving the discharged IP to make all transfer arrangements. Statewide Transportation may be used if they are able to meet the 72 hour time frame.

IPs clinically discharged from MHCB can be housed in general population, if placement is consistent with clinical needs, case factors, and appropriate program availability. This placement shall be coordinated and approved through the institution's Warden or designee.

For your convenience, please see the provided flowchart (Attachment C).

If you have any questions or require additional information, please contact James Robertson, Chief, CSU, at (916) 322-2544 or Judy Burleson, Chief, HCPOP, at (916) 691-0312.

M. D. STAINER
Director
Division of Adult Institutions

TIMOTHY BELAVICH, Ph.D., MSHCA, CCHP
Director (A), Division of Health Care Service
Deputy Director, Statewide Mental Health

Attachments

Distribution List:

Deputy Director(s), Division of Adult Institutions
Associate Directors, Division of Adult Institutions
Associate Directors, Statewide Mental Health Program
Regional Chiefs of Mental Health
Healthcare Executive Regionals
Wardens
Chiefs of Mental Health
Chief Executive Officers
Classification Staff Representatives
Classification and Parole Representatives
Correctional Counselors III, Reception Centers
Chief, Transportation Unit
Chief, Classification Services Unit
Chief Psychologist, Clinical Policy and. Program Development, DCHCS

cc: Judy Burleson
Vincent S. Cullen

# ATTACHMENT A

Policies outlined herein are to be **implemented in conjunction** with existing departmental policies outlined in the following memoranda, policies, and procedures:

1. *Mental Health Policy 12.05.200; Mental Health Crisis Bed Referral, Rescission, and Discharge Policy.*
2. *Mental Health Procedures; 12.05.200.P1 Mental Health Crisis Bed Referral Procedure, 12.05.200.P2 Mental Health Crisis Bed Rescinding a Referral, 12.05.200P3 Mental Health Crisis Bed Discharge Procedure.*
3. *Mental Health Policy 12.05.601; Documentation Required for Referral to Mental Health Crisis Bed.*
4. *Mental Health Services Delivery System, Program Guide*, 2009 revision.
5. *CDCR and DSH Acute and Intermediate Care Facility (ICF) Memorandum of Understanding* (MOU) dated August 11, 2006, and August 18, 2010.
6. *Mental Health Crisis Bed/Department of Mental Health Transports* dated March 30, 2012.
7. *Case-Work Expectations, Clessification Tima Frames, and Psychiatric and Retum Policy for Department of State Hospitals Acute and Intermediate Facility Inmate-Patients* dated March 21, 2013.
8. *Implementation of Altemative /Temporary Housing* dated February 4, 2010
9. *Altemetive Housing Cell Prioritization* and December 12, 2012
10. *Use of Alternative Housing* dated May 16, 2012

Policies outlined herein **supersede and integrate** within existing departmental policies outlined in the following memoranda:

1. *Procedures for Transfer of Inmate-Patients after Discharge from Mental Health Crisis Bed Treatment*, memorandum dated September 8, 2009.
2. *Procedures for Transfer of Inmate-Patients after Discharge from Mental Health Crisis Bed Treatment* memorandum dated August 11, 2008.
3. *Transfer of Inmates being Discharged from Mental Health Crisis Treatment*, memorandum dated May 23, 2002
4. *Amended November: 17, 2004, Memorandum*, dated November 2, 2005.
5. *Approval of Psychiatric and Return Process for Transfers to the California Medical Facility/Department of Mental Health*, memorandum dated April 10, 2000.
6. *Primary and Alternate Hub Designations for Placement of Inmates who require Administration Segregation Placement and Mental Health Services*, memorandum dated June 17, 2008.
7. *Retaining Beds for Mental Health Crisis Bed and Outpatient Housing Unit Cases*, memorandum dated December 20, 2002.
8. Psychiatric and Return Policy, dated November 17, 2004.
9. *Health Care Placement Unit Hours for Mental Health Crisis Bed Referrals*, memorandum dated September 16, 2003.

ATTACHMENT B

# HEALTH CARE SERVICES

## MEMORANDUM

Date: 12/23/2014

To: Chief Executive Officers
Chiefs of Mental Health

From:

TIMOTHY G. BELAVICH, PH.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services
and Deputy Director, Statewide Mental Health Program

M. D. STAINER
Director
Division of Adult Institutions

Subject: **MENTAL HEALTH CRISIS BED - REFERRAL, REFERRAL RESCISSION, AND DISCHARGE POLICY**

The purpose of this memorandum is to announce the release of the Mental Health Crisis Bed (MHCB) - Referral, Referral Rescission, and Discharge policy (12.05.200) and procedures (12.05.200.P1, 12.05.200.P2 and 12.05.200.P3) (Attached).

Effective immediately the attached MHCB referral and discharge policy and procedures will supersede the following memoranda:

1. *Procedures for Transfer of Inmate-Patients After Discharge from Mental Health Crisis Bed and Department of Mental Health Treatment* dated September 8, 2009.
2. *Criteria for Prioritizing Mental Health Crisis Bed Admissions* dated October 3, 2008.
3. *Tracking and Transfer of Inmate-Patients Requiring Mental Health Crisis Bed Care* dated March 26, 2007.
4. *Standardization of Mental Health Crisis Bed Admission Procedures* dated September 6, 2005.
5. *Health Care Placement Unit Hours for Mental Health Crisis Bed Referrals* dated September 16, 2003.
6. *Retaining Beds for Mental Health Crisis Bed and Outpatient Housing Unit* Cases dated December 20, 2002.

Local operating procedures shall be updated to reflect these changes no later than January 15, 2015. Copies of the amended procedures should be forwarded to the following email address: CDCR MHPolicyUnit@CDCR. If you have clinical questions or need additional information contact Laura Ceballos, Ph.D., Chief, Quality Management, Statewide Mental Health Program, Division of Health Care Services, at (916) 691-0308 or email at Laura.Ceballos@CDCR.ca.gov. For custody, transfer, or other operational questions, contact James Robertson, Chief, CSU, at (916) 322-2544 or Judy Burleson, Correctional Administrator, HCPOP, Field Operations, Statewide Mental Health Program by telephone at (916) 691-0312 or email at Judy.Burleson@CDCR.ca.gov.

# MEMORANDUM

Attachments

cc: Angela Ponciano
Nathan Stanley
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Edward Kaftarian, M.D.
Judy Burleson
Kathleen Allison
Kelly Harrington
Jay Virbel
Ralph Diaz
Amy Miller
Connie Gipson
James Robertson
John Herrera
Regional Mental Health Administrators
Regional Healthcare Executives

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
|---|---|---|
| CHAPTER 05: INPATIENT SERVICES | Revision Date(s): | NA |
| | Supersedes Memoranda dated: (See Attachments) | 9/8/2009; 5/23/02; 9/06/05;12/20/02 |
| 12.05.200 MENTAL HEALTH CRISIS BED- REFERRAL, REFERRAL RESCISSION, AND DISCHARGE POLICY | Attachments: | Yes ☒ No ☐ |
| | Director Approval: | [signature] |

**Policy**

An inmate-patient (IP) suffering from an acute, serious mental disorder resulting in serious functional disabilities or who is a danger to self or others as a consequence of a serious mental disorder shall be referred to a mental health crisis bed (MHCB). All IP placements into an MHCB shall require authorization from the Health Care Placement Oversight Program (HCPOP) prior to placement. This includes internal placements made by institutions with vacant MHCBs. All MHCB referrals are to be transferred (see definition) to an MHCB within 24 hours of referral. If an MHCB is not available and a bed is occupied by an IP for medical reasons, HCPOP, in consultation with Utilization Management, may direct the movement of the medical placement to an outside hospital or other appropriate medical placement. All IPs discharged from an MHCB must be transferred within 72 hours of clinical discharge from an MHCB.

**Purpose**

To ensure the effective management of statewide MHCB resources; bring equity to IPs currently housed at institutions that do not have MHCBs; and ensure timely and equal access to care.

**Definition**

**Transfer** – The day/time the IP leaves the institution for transport to/from an MHCB according to the Strategic Offender Management System (SOMS) departure date/time.

**Compliance Indicators**

MHCBs operate 24 hours a day, seven days a week. To be in compliance with this policy, the following requirements shall be met:

1. HCPOP shall be contacted within one hour of clinical determination that an IP requires placement in an MHCB and/or prior to an IP's placement into alternative housing (MH Policy 12.05.301 Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer).

2. HCPOP determines bed availability and notifies the referring clinician of the bed assignment.

3. HCPOP monitors the SOMS for vacant MHCBs. IP movement out of an MHCB shall be entered into SOMS immediately and reflect actual physical transfer date and time.

4. Upon receipt of the Clinical Director or designee's approval to transfer the IP to the receiving institution's MHCB, the Chief of Mental Health or designee at the sending institution shall complete a CDCR 128-C Chrono – Medical/Psychiatric/Dental, indicating acceptance. Within one hour of acceptance, copies of the CDCR 128-C Chrono shall to be forwarded to:

- the MHCB Clinical Director or designee at the receiving institution
- the Classification and Parole Representative (C&PR)/Watch Commander at the sending institution (MHSDS Program Guide Rev. 2009, p. 12-5-6).

**Compliance Indicators continued**

5. The C&PR/Watch Commander at the receiving institution are verbally notified within one hour by the referring clinician's or designee's acceptance of an IP to the MHCB.
6. HCPOP and respective custodial staff (i.e., C&PR/Watch Commander) are notified within one hour by the referring clinician or designee when a referral is rescinded. (See *Procedure* 12.05.200.P2 Mental Health Crisis Bed: Rescinding a Referral)
7. All MHCB IP's are transferred within 24 hours of referral to an MHCB unless the MHCB referral is rescinded.
8. All failures to complete an MHCB transfer within 24 hours of the MHCB referral are reported by HCPOP to the Deputy Director, Statewide Mental Health Program.
9. The treating clinician or designee shall immediately notify HCPOP of any MHCB clinical discharges that occur throughout the day. The treating clinician or designee shall immediately notify the respective C&PR or designee for placement determination of an IP discharged from MHCB.
10. IPs who have been clinically discharged from MHCB are transferred as soon as possible and within 72 hours. Pending transfer, the IP shall not be retained in the MHCB. IPs discharged from MHCB treatment can be housed in general population, if placement is consistent with clinical needs, case factors, and appropriate program availability. If the inmate has clinical case factors relating to interim placement, then the MHCB clinician shall inform HCPOP immediately.
11. IPs are returned to the sending institution unless the sending institution is not designated to provide for their mental health, custodial, or medical needs.
12. No IP's are transferred, upon clinical discharge, to an institution that is not designated to provide for their mental health level of care.
13. A local operating procedure, consistent with all requirements of the statewide MHCB Referral, Referral Rescission, and Discharge policy and procedure, is developed.

**Transportation**

It is the responsibility of the sending institution to ensure transport within 24 hours of MHCB referral and within 72 hours of clinical discharge. The C&PR at the sending institution shall notify Statewide Transportation of the requested transport. If Statewide Transportation is unable to complete the transport within the required timelines the institution transportation team shall complete the transport. The institution shall contact HCPOP immediately when there are transportation delays.

**Retaining Beds for MHCB Cases**

Staff shall retain an IP bed/cell for a minimum of ten (10) days if the IP is moved/transferred to an MHCB. This applies to intra-institutional moves as well as inter-institutional transfers.

**References**

California Code of Regulations (CCR) Title 22, Section 79789. Patient Transfers, licensing standards provide that a patient shall not be transferred unless and until the receiving facility has consented to accept the IP. Specifically, the CCR provides, in part, that no patient shall be transferred, or discharged for purposes of transferring, unless

arrangements have been made in advance for admission to a health facility.

Division of Correctional Health Care Services, *Mental Health Services Delivery System Program Guide*, Rev, 2009, Chapter 5, "Mental Health Crisis Bed."

Department Operations Manual, Section 62080.17. Emergency Medical Transfers.

September 8, 2009, *Procedures for Transfer of Inmate-Patients After Discharge from Mental Health Crisis Bed and Department of Mental Health Treatment*

June 17, 2008, *Primary and Alternate Hub Designations for Placement of Inmates who Require Administrative Segregation Placement and Mental Health Services.*

December 20, 2002, *Retaining Beds for Mental Health Crisis Bed and Outpatient Housing Unit Cases,*

October 9, 2013 MH Policy 12.05.301 *Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer*

Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure

**Questions**

If you have any questions or need any additional information related to this policy; you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR.

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
|---|---|---|
| CHAPTER 05: INPATIENT SERVICES | Revision Date(s): | N/A |
| | Supersedes: | |
| PROCEDURE 12.05.200.P1: MENTAL HEALTH CRISIS BED: REFERRAL PROCEDURE | Attachments: | Yes☒ No☐ |

**12.05.200.P1** Mental Health Crisis Bed: Referral Procedure

**Discussion**

This document describes the steps required for submitting a Mental Health Crisis Bed (MHCB) referral for inmate-patients (IPs) requiring MHCB level of care (LOC).

Throughout the referral process, the referring clinician, receiving Clinical Director, and referring and receiving Classification and Parole Representatives (C&PR)/Watch Commanders communicate with each other to ensure all health care, classification, and transportation issues are addressed.

| STEP | PROCESS |
|---|---|
| 1 | A referring clinician or interdisciplinary treatment team determines an IP requires MHCB LOC.<br>- **Referring clinician:** Documents the appointment on Clinician Daily Log (required for all contacts) and completes the Documentation Required for Admission to Mental Health Crisis Bed (Policy 12.05.601) also known as the referral packet (See Attached). For physician on duty (POD) evaluations, the referral packet is completed at the start of the next calendar day.<br>- **Referring Data Entry Staff:** Inputs Daily Contact Log entries into Mental Health Tracking System (MHTS.net). |
| 2 | **The referring clinician:**<br>- Contacts Health Care Placement Oversight Program (HCPOP) within one hour of clinical determination that an IP requires placement in an MHCB.<br>- Contacts HCPOP prior to an IP's placement into alternative housing.<br>- In conjunction with custodial staff, consults policy 12.05.301, *Housing of Inmate-Patients Pending Mental Health Crisis Bed Transfer*, when the IP requires alternative housing pending transfer to an MHCB.<br>**HCPOP**:<br>- Places the IP on the MHCB pending list upon notification of referral from referring clinical staff.<br>- Locates and secures an MHCB for the IP in the order in which the need was determined so that no IP is placed ahead of another with the caveat that HCPOP is |

| | |
|---|---|
| | expected to take time and distance into consideration. HCPOP uses discretion to balance placements in order to use MHCBs as efficiently as possible based on the overall needs of the Department.<br>- Directs the receiving MHCB Clinical Director or designee to hold the available MHCB.<br>- Upon chronological review of the MHCB pending list, immediately contacts the referring clinician or designee with the MHCB bed location and provides the receiving MHCB clinical staff contact information once a vacant MHCB is located. |
| 3 | The following table describes the process for writing the referral order. |
| 4 | Clinician-to-clinician contact is initiated between the referring and receiving institutions.<br>- **Referring Clinician**: Upon notification by HCPOP of bed availability, the referring clinician sends the completed referral packet (See attachment) and calls the receiving Clinical Director or designee within two hours of bed availability notification.<br>- **Receiving Clinical Director or designee**: Within one hour of receipt, the receiving clinician reviews the referral packet (See attachment), conducts the pre-admission screening to determine if the IP is appropriate for MHCB placement, and contacts the sending institution clinician on the status of the pre-admission review. |
| 5 | The following table describes the steps required based on the pre-admission review |

| **If the referring clinician ...** | **then immediately ...** |
|---|---|
| Is privileged to admit to the receiving MHCB. (Note- all placements, including those at the same institution, must be directed by HCPOP.) | 1. Writes the order to admit the IP.<br>2. Writes a CDCR 128-MH3, Mental Health Placement Chrono, indicating MHCB LOC, date, and the time of the referral.<br>3. Forwards the CDCR 128-MH3 to the referring Strategic Offender Management System (SOMS) Data Entry Staff, who enters the information into SOMS. |
| Is **NOT** privileged to admit | 1. Documents "*Refer to MHCB*" on a Physician's Orders CDCR 7221 form and forwards the order according to local operating procedures.<br>2. Completes a CDCR 128-MH3, *Mental Health Placement Chrono*, indicating MHCB LOC, date, and the time of the referral.<br>3. Forwards the CDCR 128-MH3 to referring SOMS Data Entry Staff. |

| | |
|---|---|
| | by the receiving Clinical Director or designee.<br><br>**If the inmate-patient is ...** / **then ...**<br><br>**Accepted*** → **Chief of Mental Health or Designee at the Sending Institution:**<br>1. Completes the CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, indicating acceptance.<br>2. Within one hour of acceptance, forwards completed form with the IP's bed number to the:<br>- **Receiving Chief of Mental Health or designee**, who ensures the CDCR 128-C, *Chrono– Medical/Psychiatric/Dental was received by* the C&PR/Watch Commander.<br>- **Sending C&PR/Watch Commander**<br><br>**Denied; however, the referring clinician believes the clinical need for transfer remains** → The case shall be referred to HCPOP, who immediately contacts the Mental Health Regional Administrator (MHRA) for resolution. If an agreement cannot be reached, the IP shall be admitted and evaluated.<br><br>**Denied and clinician does not believe the need for transfer remains** → IP is not transferred. Referral is rescinded; HCPOP is notified of rescinded referral (refer to Chapter 05: Inpatient Services, Procedure 12.05.200-P2, *Rescinding a Referral*) immediately, but not to exceed one hour after the decision to rescind.<br><br>***Note:** Before the IP can be transferred, the receiving facility agrees to the transfer (California Code of Regulations (CCR) Title 22, Section 79789) or provides just cause for the denial. |
| **6** | The IP is transferred to an MHCB within 24 hours of referral. Please note: a transfer is the day/time the IP leaves the institution for transport to/from an MHCB according to the Strategic Offender Management System (SOMS) departure date/time.<br>- **Referring Clinical staff**: Contacts HCPOP immediately if any barriers to the transfer process are identified.<br>- **Receiving Clinical staff**: Completes the required evaluations according to the *Mental Health Services Delivery System Program Guide.*<br>- **Referring Clinical staff**: If applicable, notifies HCPOP and MHRA as soon as possible, but no later than the next business day, of the specific reason(s) which delayed the transfer of an IP to the MHCB institution within 24 hours of referral. |

| If the inmate-patient is ... | then ... |
|---|---|
| Accepted* | **Chief of Mental Health or Designee at the Sending Institution:**<br>1. Completes the CDCR 128-C, *Chrono – Medical/Psychiatric/Dental*, indicating acceptance.<br>2. Within one hour of acceptance, forwards completed form with the IP's bed number to the:<br>- **Receiving Chief of Mental Health or designee**, who ensures the CDCR 128-C, *Chrono– Medical/Psychiatric/Dental was received by* the C&PR/Watch Commander.<br>- **Sending C&PR/Watch Commander** |
| Denied; however, the referring clinician believes the clinical need for transfer remains | The case shall be referred to HCPOP, who immediately contacts the Mental Health Regional Administrator (MHRA) for resolution. If an agreement cannot be reached, the IP shall be admitted and evaluated. |
| Denied and clinician does not believe the need for transfer remains | IP is not transferred. Referral is rescinded; HCPOP is notified of rescinded referral (refer to Chapter 05: Inpatient Services, Procedure 12.05.200-P2, *Rescinding a Referral*) immediately, but not to exceed one hour after the decision to rescind. |

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
|---|---|---|
| CHAPTER 05: INPATIENT SERVICES | Revision Date(s): | N/A |
| PROCEDURE 12.05.200.P2: MENTAL HEALTH CRISIS BED: RESCINDING A REFERRAL | Attachments: | Yes☐ No☒ |
| | Directors Approval: | [signature] |

**12.05.200.P2** Mental Health Crisis Bed: Rescinding a Referral

**Discussion**

This document describes the process for rescinding a Mental Health Crisis Bed (MHCB) referral for inmate-patients (IPs) previously determined to require MHCB level of care (LOC).

After an MHCB referral has been initiated/submitted, it may be withdrawn at any time during the referral process by rescinding the referral.

| STEP | PROCESS |
|---|---|
| 1 | If Health Care Placement Oversight Program (HCPOP) and custodial staff (i.e., Classification and Parole Representative [C&PR]/Watch Commander) were notified of the need for transfer, the referring clinician or designee immediately, and not to exceed one hour, notifies HCPOP and respective custodial staff of the rescission. |
| 2 | The clinician documents the rationale for rescinding the referral on a progress note (CDCR MH-7230). |
| 3 | If the clinician had already completed a placement chrono (CDCR 128-MH3), then he or she writes a new chrono to remove the MHCB LOC documenting the IP's level of care upon return to his/her cell and submits it to data entry staff. If no CDCR 128-MH3 was written, then no action is required. |
| | a. The clinician notes the rescission date, time, and reason for rescission on the clinician daily log. |
| | b. The MHTS.net data entry staff enters the reason for rescission into the opened MHCB level of care event/Mental Health Identifier (MHI) change screen (in the patient record) in MHTS.net. |
| | c. The data entry staff enters the new mental health identifier, documented on the CDCR 128-MH3 into SOMS. |
| | d. If a bed has already been assigned by HCPOP, then the clinician notifies the receiving institution and respective custodial staff (i.e., C&PR/Watch Commander) regarding the rescission and cancellation of the MHCB transfer. |

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | December 2014 |
|---|---|---|
| CHAPTER 05: INPATIENT SERVICES | Revision Date(s): | N/A |
| | Supersedes: | |
| PROCEDURE 12.05.200.P3: MENTAL HEALTH CRISIS BED: DISCHARGE PROCEDURE | Attachments: | Yes☐ No☒ |
| | Directors Approval: | [signature] |

**12.05.200.P3** Mental Health Crisis Bed: Discharge Procedure

**Discussion**

This document describes the steps required for discharging an IP from the Mental Health Crisis Bed (MHCB) level of care (LOC).

Throughout the discharge process, the primary MHCB clinician or designee, receiving Clinical Director, and MHCB institution and designated receiving Classification and Parole Representatives (C&PR)/Watch Commanders will communicate with each other to ensure all health care, classification, and transportation issues are addressed.

| STEP | PROCESS |
|---|---|
| 1 | **Upon clinical discharge:**<br>• The primary MHCB clinician or designee immediately notifies Health Care Placement Oversight Program (HCPOP) and the C&PR or designee of IP clinical discharge and documents the date and time of discharge on the clinician daily log and the 128 MH-3 Mental Health Placement Chrono.<br>• HCPOP will track administrative MHCB days.<br>• The primary MHCB clinician forwards the daily log and 128 MH-3 Mental Health Placement Chrono to the designated Mental Health Tracking System (MHTS.net) and Strategic Offender Management System (SOMS) data entry staff.<br>• Designated data entry staff enter the clinical discharge date and time into MHTS.net and enter the new LOC, and new LOC designation date and time (from the 128 MH-3 Mental Health Placement Chrono) into SOMS.<br>• Upon review of the IP's case factors, the C&PR, or designee will determine whether the IP can return to the original sending institution.<br>  o If the IP requires Administrative Segregation Unit (ASU) Enhanced Outpatient Program (EOP) hub placement, HCPOP will be contacted for placement assistance.<br>  o If the original sending institution cannot provide the necessary LOC, HCPOP will be contacted for placement assistance.<br>• When contacted by the respective MHCB institution's C&PR for placement assistance, HCPOP staff reviews the LOC bed availability and in accordance with the IP's case factors, provides the MHCB institution with a placement recommendation, within four (4) business hours (Monday through Friday 7:00 am to 5:00 pm), on a CDCR Form 128-B, General Chrono. |

| | |
|---|---|
| | • If IP is to be redirected, the C&PR at the MHCB institution presents the case to the institution's assigned Classification Staff Representative (CSR) for an emergency transfer endorsement. If a CSR is not currently assigned to the MHCB institution at the time of the redirect, the C&PR will contact the Classification Services Unit or the CSR Scheduler to request a CSR be assigned to conduct a remote emergency transfer endorsement. |
| 2 | **Special Housing Returns**<br><br>IPs who have been clinically discharged from MHCB are to be transferred as soon as possible and within 72 hours. The IP shall not be retained in the MHCB nor alternative housing pending transfer. If transitional placement is needed, it must be consistent with clinical needs, case factors, and appropriate program availability with the following provisions:<br><br>• IPs discharged from MHCB treatment who have a Security Housing Unit (SHU) term or are on ASU status will be placed in the ASU at the originating institution's primary or alternate ASU EOP Hub. If both the primary or alternate ASU EOP Hubs are unable to accept the IP due to having exceeded their capacity, then HCPOP will be contacted for placement assistance. Inmates on non disciplinary segregation (NDS) shall be handled according to current policy.<br><br>• IPs discharged from MHCB treatment who have general population status are placed into a general population unit, if placement is consistent with clinical needs, case factors, and appropriate program availability.<br><br>• IP's discharged from MHCB shall not be retained in an ASU unless they are MAX custody.<br><br>It is the responsibility of the designated receiving institution to make all transfer arrangements and remove the IP within 72 hours of clinical discharge. The C&PR at the receiving institution shall notify Statewide Transportation of the requested transport. If Statewide Transportation is unable to complete the transport within the required timelines the institution transportation team shall complete the transport. |

| VOLUME 12: MENTAL HEALTH SERVICES | Effective Date: | November 2014 |
|---|---|---|
| CHAPTER 05: INPATIENT SERVICES | Revision Date(s): | November 2014 |
| | Supersedes Policy: | August 2014 |
| POLICY 12.05.601 DOCUMENTATION REQUIRED FOR REFERRAL TO MENTAL HEALTH CRISIS BED | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | [illegible] |

**Policy**

For all inmate-patient (IP) referrals to a Mental Health Crisis Bed (MHCB), referring/sending institutions shall complete and submit a referral packet as described in this policy.

**Purpose**

To standardize MHCB referral documentation; clarify the expectations between the sending and receiving institutions; improve the efficiency in generating the documentation to provide timely access to care; and ensure that the receiving MHCB staff has the necessary paperwork to admit the IP.

**Discussion**

When IPs are referred for and prior to acceptance into an MHCB, the referring/sending institution's mental health staff shall complete and make the referral packet available to the receiving MHCB staff. While the receiving MHCB staff may request additional documentation beyond what is required, the only documentation required for the referral and acceptance into the MHCB is listed in this policy. Each document shall be dated within the specified period of time indicated below for the purpose of the MHCB referral documentation.

**Compliance Indicators**

To be in compliance with this policy, the following documentation is required:

1. CDCR 128C Transfer Chrono – Dated within two (2) days of the documented date of referral.
2. CDCR 128-C3 Medical Classification Chrono – The most current per the medical classification policy (Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure).
3. CDCR 7221 Physician Order Form (written by a psychiatrist, who has competence in performing medical assessments, or primary care physician), must state on the form: "Medically cleared for transfer" with a corresponding progress note – SOAPE format – Dated within 48 hours of the documented date of referral.
4. CDCR MH-7230A Interdisciplinary Progress Notes – General (Including but not limited to PC 2602 history) – All CDCR MH-7230A's dated within seven (7) days of the documented date of referral.
5. CDCR 7371 Confidential Medical/MH Information Transfer – Dated within seven (7) days of the documented date of referral.
6. CDCR 7386 Mental Health Evaluation (or CDCR 7386 Mental Health Evaluation

Add-a-Page)

- If a CDCR 7386 or a CDCR 7386 Add-a-Page was completed more than seven (7) days prior to referral, a CDCR 7389 (Rev.06/06) Brief Mental Health Evaluation is to be completed by the referring clinician at the time of referral.

- If a CDCR 7386 or a CDCR 7386 Add-a-Page is not available or the most recent document is available but is not complete or accurate, a full CDCR 7386 must be completed by the referring clinician or the Primary Clinician at the time of referral.

7. CDCR MH-7447 Suicide Risk Evaluation – Dated within seven (7) days of the documented date of referral.

- The referring clinician is to complete the CDCR MH-7447 if the IP is referred for suicidal ideation a suicide attempt, or any type of self-harm.

- The receiving team may, upon clinical discretion, complete the CDCR MH-7447 if the IP is referred for any other reason.

8. Medication Profile (within last 30 days of the documented date of referral.) – Current medication reconciliation.

9. CDCR 128C Acceptance Chrono.

**References**   Inmate Medical Services Policies and Procedures (IMSP&P), Volume 4, Chapters 29, Medical Classification System Policy, and 29.1, Medical Classification System Procedure

Division of Health Care Services (DHCS), Mental Health Services Delivery System (MHSDS) Program Guide, 2009 Revision, Chapter 5, Mental Health Crisis Bed, p. 12-5-11.

**Questions**   If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@CDCR

ATTACHMENT C

MHCB Referral Process for All Institutions



15-0911

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : September 11, 2015

To : Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health

Subject: **IMPLEMENTATION OF REVISED RULES VIOLATION REPORT PROCESSES INVOLVING INMATE PARTICIPANTS IN THE MENTAL HEALTH SERVICES DELIVERY SYSTEM AND DEVELOPMENTAL DISABILITY PROGRAM**

The purpose of this memorandum is to address and implement revised policies and procedures relevant to the Rules Violation Report (RVR) process for inmate participants in the Mental Health Services Delivery System (MHSDS) and Developmental Disability Program (DDP).

On May 4, 2015, the Eastern District Court approved an order requiring the California Department of Corrections and Rehabilitation (CDCR) to revise the 2011 RVR policies, procedures, and staff training that was the subject of the *Coleman v. Brown* Special Master's report filed with the Court on January 30, 2015. As a result, the Division of Adult Institutions (DAI), Division of Health Care Services, and Office of Legal Affairs, in collaboration with the *Coleman v. Brown* Special Master, developed comprehensive policy, regulation, and staff training revisions meant to provide a meaningful RVR process at all institutions.

The Department is currently revising the California Code of Regulations (CCR), Title 15, Section 3310, Definitions; Section 3315, Serious Rules Violations; and Section 3317, Mental Health Assessments for Disciplinary Proceedings, to adopt these revisions.

To ensure CDCR's compliance with the May 4, 2015 court order, the following revised RVR policies and procedures shall be implemented immediately:

<u>**Inmate Disciplinary Mental Health Assessment Training**</u>

CDCR has mandated all Correctional Sergeants, Correctional Lieutenants, Captains, Correctional Administrators, and Mental Health Clinicians who currently participate in the RVR process attend "Inmate Disciplinary Mental Health Assessment Training" (BET 11054429). Additionally, all new staff hired into these classifications shall receive the mandatory training prior to participating in the inmate disciplinary process.

To ensure mandated training has been provided appropriately, the *Coleman v. Brown* Special Master has been directed by the Court to conduct a review of training provided at each institution and report on his findings.

**Requirements for Becoming a Certified Senior Hearing Officer or Hearing Officer**

Prior to serving or continuing to serve as a Senior Hearing Officer or Hearing Officer, the Chief Disciplinary Officer shall ensure staff has received the mandatory "Inmate Disciplinary Mental Health Assessment Training." This is in addition to any in-service or on-the-job training required prior to being certified to serve in this capacity, as defined in CCR, Title 15, Section 3310.

**Mitigation of Disposition due to Mental Illness, Developmental Disability, Cognitive, or Adaptive Functioning Deficits**

In accordance with the addition of CCR, Title 15, Section 3315(i), if an inmate is found guilty of a charge, the official shall consider the mental health assessment and any dispositional recommendations provided by mental health staff, as documented on CDCR Form 115-MH-A, Rules Violation Report: Mental Health Assessment. Additionally, any other relevant information regarding the relationship between the inmate's mental illness, developmental disability, cognitive or adaptive functioning deficits, and his/her misconduct, shall be considered when assessing penalties.

**Reasons for Completing a Mental Health Assessment and Processes for Documenting Self-Mutilation or Attempted Suicide**

Revisions to CCR, Title 15, Section 3317 state, "Inmates who are alleged to have committed a rules violation shall receive a mental health assessment, via completion of the CDCR Form 115-MH-A, Rules Violation Report: Mental Health Assessment, for any of the following reasons:

- Inmate is a participant in the MHSDS at the Enhanced Outpatient level of care.
- Inmate is a participant in the MHSDS at the Mental Health Crisis Bed level of care.
- Inmate is a participant in the MHSDS at the Psychiatric Inpatient Program, Acute Psychiatric Program, or Intermediate Care Facility levels of care.
- Inmate is a participant in the MHSDS at the Correctional Clinical Case Management System level of care and has been charged with a Division A, B, or C offense or any other rules violation which may result in the assessment of a Segregated Housing Unit term as defined in CCR, Title 15, Section 3341.9(e), Security Housing Unit Term Calculation and Assessment.
- Inmate engaged in Indecent Exposure or Sexual Disorderly Conduct.
- Inmate displayed bizarre, unusual, or uncharacteristic behavior at the time of the offense.
- Inmate is a participant in the DDP, designated as DD1, DD2, or DD3."

Mental Health Services shall be contacted immediately for any inmate who is suspected of committing the act of self-mutilation or attempted suicide. The emergency referral shall be documented via CDCR Form 128-MH5, Mental Health Referral Chrono, identifying the

specific reason(s) for the referral. If Mental Health Services determines the behavior was an act of self-mutilation or attempted suicide or a clear determination could not be made, a CDC Form 115, Rules Violation Report, shall not be issued. Instead, the behavior shall be documented on a CDC 128-B, General Chrono, for inclusion in the inmate's Central File.

If the Mental Health Clinician determines the inmate's actions were an attempt to manipulate staff, a CDC Form 115 shall be issued, pursuant to CCR, Title 15, Section 3315(a)(3)(W).

Additionally, a CDCR Form 128-MH5 shall be completed for any inmate who displays bizarre, unusual, or uncharacteristic behavior at the time of the offense.

**Reviewing and Documenting Rules Violation Reports in an Alternate Manner**

In accordance with the addition of CCR, Title 15, Section 3317.1, the assessing Mental Health Clinician may recommend documenting an inmate's behavior in an alternate manner when the behavior was determined to be strongly influenced by mental illness, developmental disability, or cognitive or adaptive functioning deficits at the time of the offense. The assessing Mental Health Clinician will be required to consult with their Program Supervisor each time documentation of behavior in an alternate manner is recommended. The Program Supervisor shall identify whether they agree or disagree with the recommendation made by the assessing clinician, and document their rationale on CDCR Form 115-MH-A. In the event the assessing Mental Health Clinician and Program Supervisor disagree, the CDCR Form 115-MH-A shall be forwarded to the Chief of Mental Health, or designee, who will make the final determination.

When recommendation for documenting an inmate's behavior in an alternate manner has been made, the Hearing Official shall forward the CDC Form 115, along with all supporting documentation, to the Captain for review. The Captain must provide the Hearing Official with his/her determination as soon as possible, but no later than five calendar days from the date of receipt.

Following his/her review, the Captain will direct the Hearing Official to proceed in any of the following manners:

- Proceed with hearing the RVR as serious or administrative, based on the nature of the specific charge(s).
- Void the RVR and document the behavior via CDC Form 128-A, Custodial Correctional Counseling Chrono, for minor misconduct.
- Void the RVR and document the behavior via CDC Form 128-B.

If the Captain agrees with Mental Health's recommendation and elects to void the CDC Form 115, the Hearing Official shall document the decision via memorandum and attach it to CDCR Form 1154, Disciplinary Action Log, to provide proof of practice. A copy

of the memorandum shall be forwarded to Case Records to facilitate removal of CDC Form 804, Notice of Pending CDC 115, from the inmate's Central File within the Electronic Records Management System (ERMS). An additional copy of the memorandum shall be forwarded to the Chief of Mental Health, or designee.

If the Captain disagrees with Mental Health's recommendation, he/she shall document his/her rationale for proceeding with the hearing on CDC Form 128-B. A copy of the CDC Form 128-B shall be attached to the RVR package and forwarded to the Hearing Official for adjudication. The inmate shall be issued a copy of the CDC Form 128-B no less than 24 hours prior to the hearing. An additional copy of the CDC Form 128-B shall be forwarded to the Program Supervisor listed on the CDCR Form 115-MH-A.

<u>Categories Excluded From Rules Violation Report Process</u>

In accordance with the addition of CCR, Title 15, Section 3317.2, inmates shall not be issued an RVR under the following circumstances:

- If the behavior occurred in connection with a cell extraction for the administration of involuntary medication, as defined in California Penal Code, Section 2602, or involuntary medical treatment, as defined in Probate Code, Section 3200, et seq.;
- If the behavior occurred in connection with a cell extraction for transfer of the inmate to a mental health inpatient unit or between mental health inpatient units;
- If the behavior occurred in connection with being placed in mental health restraints and/or seclusion;
- If the behavior is determined to be an act of self-mutilation or attempted suicide.

When any of these circumstances are met, the inmate's conduct shall be documented on CDC Form 128-B, for inclusion in the inmate's Central File within ERMS. Any incident requiring the use of force shall be documented appropriately on CDCR Form 837, Crime/Incident Report.

However, if the inmate commits a Serious Rules Violation, pursuant to CCR, Title 15, Section 3315, while participating in the behavior noted above, which constitutes a Division A-1 offense as defined in CCR, Title 15, Section 3323(b), Disciplinary Credit Forfeiture Schedule, an assault or battery as defined in CCR, Title 15, Sections 3323(d)(1), 3323(d)(2), or 3323(d)(3), or an assault on a peace officer or non-prisoner as defined in CCR, Title 15, Sections 3323(f)(11) and 3323(f)(12), a CDC Form 115 shall be completed and processed in accordance with current regulations and policy.

For custody questions regarding these processes, please contact Eric Hobbs, Correctional Lieutenant, DAI, Coleman Team, at (916) 322-1725 or Eric.Hobbs@cdcr.ca.gov.

Associate Directors, Division of Adult Institutions
Wardens
Chief Executive Officers
Chiefs of Mental Health
Page 5

For clinical questions regarding these changes, please contact Corey Scheidegger, Senior Psychologist Specialist, at (916) 691-0310 or Corey.Scheidegger@cdcr.ca.gov.

KELLY HARRINGTON
Director
Division of Adult Institutions

TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP-MH
Director (A), Division of Health Care Services
Deputy Director, Statewide Mental Health

cc: Kathleen Allison
Ralph M. Diaz
Laura Ceballos
Amy Eargle
Corey Scheidegger
Thomas Tyler
Eric Hobbs

APPENDIX PG. - 311

# 15-1030

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : October 30, 2015

To : Associate Directors, Division of Adult Institutions
Wardens

Subject: **REVISED ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL PROCEDURE**

The purpose of this memorandum is to provide direction regarding the inmate housing procedure for Administrative Segregation Unit (ASU) intake cells. This procedure was originally detailed in a September 29, 2010 memorandum, titled "Administrative Segregation Unit Intake Cell Procedure," and is being revised to further enhance this existing policy.

The double-celling of inmates continues to be a critical protective factor against potential suicides inside the Department's ASUs. However, all ASU inmates cannot be double-celled upon initial placement into the unit. In order to address this issue, the Department previously retrofitted a number of ASU intake cells throughout the state. These ASU intake cells were designed to reduce the opportunity for inmates to commit suicide; therefore, it is imperative institutional staff appropriately manage the use of these ASU intake cells. Any inmate that cannot be double-celled upon initial placement in ASU must be housed in an ASU intake cell for the first 72 hours of ASU placement; this includes both single-cell restricted inmates and double-cell approved inmates for whom an appropriate cell partner is unavailable upon initial ASU placement. After 72 hours, inmates may be housed in alternate ASU housing consistent with their case factors.

Inmates approved for double-cell housing who can be safely double-celled upon intake, and for whom an appropriate cell partner is available, shall be celled where the vacancy exists and will not require housing in a designated ASU intake cell. Under this revised policy, when inmates are in their initial 72 hours of ASU placement and their cell partner subsequently moves out of the cell, ASU staff shall immediately make every effort to identify another compatible cellmate. If the inmate cannot be double-celled with a compatible cellmate, ASU staff shall place the inmate into an available retrofitted intake cell as soon as possible, but no later than eight hours after the cell partner has been moved from the cell.

To assist institutions with monitoring the use of ASU intake cells, the Division of Adult Institutions (DAI) has developed a SharePoint custom list, titled "ASU Intake Cell Management Tracking Log." This custom list can be accessed using the following intranet link:

http://teamsite/team/Ops/AO/DAI/SitePages/ASU%20Intake%20Cell%20Management%20Tracking%20Log.aspx.

Each institution shall designate an ASU supervisor to enter all applicable information into SharePoint for all inmates initially placed into ASU. This SharePoint information will provide institutions the ability to capture and track valuable data regarding the appropriate usage of ASU intake cells, as well as assist the Department with identifying any future needs for additional ASU intake cells. Please ensure your institution's Local Operating Procedure (LOP) is immediately updated to include this revised policy. This revision may be an addendum to be included in the next scheduled revision of the impacted LOP. Futhermore, institutions are directed to provide updated LOPs or addendums to their respective Mission Associate Director within 30 calendar days from the date of issuance of this memorandum. It is expected custody management will review with their staff this revised policy, along with the SharePoint custom list, to ensure proper management of their institution's ASU intake cells.

If you have any questions regarding this directive, please contact Ronald Hadrava, Correctional Lieutenant, DAI Mental Health Compliance Team, at (916) 327-1855 or Ronald.Hadrava@cdcr.ca.gov.

KELLY HARRINGTON
Director
Division of Adult Institutions

Attachment

cc: Kathleen Allison
Ralph M. Diaz
Robert L. Davis
Ronald Hadrava

State of California | Department of Corrections and Rehabilitation

# Memorandum

Date : September 29, 2010

To : Associate Directors – Division of Adult Institutions
Wardens

Subject : **ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL PROCEDURE**

The purpose of this memorandum is to clarify the inmate housing procedure for Administrative Segregation Unit (ASU) Intake Cells, and the October 2, 2006, ASU Suicide Reduction Plan. The ASU Suicide Reduction Plan was developed in an effort to preserve life and improve emergency response to suicide attempts by inmates during the difficult transition to a more restrictive housing environment.

A protective factor against suicide risk in ASU is to double-cell inmates. As a result of the inability to double-cell some inmates upon initial placement in ASU, a number of "Intake Cells" in each budgeted ASU statewide have been retrofitted to reduce the opportunity for inmates to commit suicide. Any inmate that cannot be double-celled upon initial placement in ASU must be housed in an Intake Cell for the first 72 hours of ASU placement. This includes both single-cell restricted inmates and double-cell approved inmates for whom an appropriate cell partner is unavailable upon initial ASU placement. After 72 hours, inmates may be housed in alternate ASU housing consistent with their case factors.

Inmates approved for double-cell housing who can be safely doubled-celled upon intake and for whom an appropriate cell partner is available shall be celled where the vacancy exists and will not require housing in a designated Intake Cell.

Please review your institution's procedures and practices to ensure compliance with this directive. Please ensure any corrective action required to comply with this directive is implemented immediately.

If you have any questions regarding these expectations, please contact J. W. Moss, Associate Warden, General Population Levels III/IV, at (916) 323-3578.

GEORGE J. GIURBINO
Director
Division of Adult Institutions

cc: Terri McDonald, Chief Deputy Secretary, Adult Operations
J. W. Moss, Associate Warden, General Population Levels III/IV

14-0418

 # HEALTH CARE SERVICES

## MEMORANDUM

Date: April 18, 2014

To: Chief Executive Officers
Wardens
Chiefs of Mental Health

From:
M. D. STAINER
Director
Division of Adult Institutions

TIMOTHY G. BELAVICH, Ph.D., MSHCA, CCHP, Director (A), Division of Health Care Services, and Deputy Director, Statewide Mental Health Program

Subject: **REQUIREMENT FOR THE PRESENCE OF A MENTAL HEALTH CLINICIAN DURING ALL CONTROLLED USE OF FORCE INCIDENTS**

As of Monday, April 21, 2014, the Department is implementing new Use of Force policies for all institutions (see Department Operations Manual, Section 51020, attached). Sections of the policy require consultation with and/or interventions by mental health clinicians at different points during controlled use of force incidents. Given these requirements, as of April 21, 2014, every institution mental health program shall ensure a mental health clinician (Psychologist, Psychiatrist, or Clinical Social Worker) is present during all controlled use of force incidents (cell extractions). Mental health programs shall include provisions for a clinical psychologist or clinical social worker to be present during these incidents outside of regular business hours.

Each institution shall amend their local policies and procedures to implement this requirement no later than May 5, 2014. The amended local policies and procedures for controlled use of force incidents shall include voluntary call-back for psychologists and clinical social workers. These clinicians may be required to return to the institution to consult and provide clinical interventions during the controlled use of force incidents. Provisions for voluntary call-back are contained in Section 6.2 of the Bargaining Unit 19, Memorandum of Understanding. Between April 21, 2014 and May 5, 2014, each institution shall have in place temporary measures to ensure the presence of a mental health clinician during controlled use of force incidents.

A teleconference to discuss these requirements will be held on Monday, April 21, 2014 from 9:30 to10:10 a.m. Call-in information will be sent via Outlook invitation.

# MEMORANDUM

Questions concerning these requirements and their implementation can be referred to Amy Eargle, Ph.D., Chief, Clinical Support, at (916) 691-0279 or via email at amy.eargle@cdcr.ca.gov.

cc: Kathleen Allison, Deputy Director, Special Project Liaison , Division of Adult Institutions
Dr. R. Steven Tharratt, Director of Health Care Operations, Statewide Chief Medical Executive
Nathan Stanley, Chief, Field Operations
Angela Ponciano, Associate Director, Policy and Clinical Support
Amy Eargle, Chief, Clinical Support
Laura Ceballos, Chief, Quality Management
Regional Health Care Executives
Regional Mental Health Administrators
Division of Adult Institutions Associate Directors

P.O. Box 588500
Elk Grove, CA 95758

# ARTICLE 2 – USE OF FORCE

*Revised March 7, 2014*

**Sections 51020.1 through 51020.3 are unchanged**

**51020.4 Definitions**

The following shall define language usage in this Article:

**Reasonable Force**

Reasonable force is the force that an objective, trained, and competent correctional employee faced with similar facts and circumstances, would consider necessary and reasonable to subdue an attacker, overcome resistance, effect custody, or gain compliance with a lawful order.

**Unnecessary Force**

Unnecessary force is the use of force when none is required or appropriate.

**Excessive Force**

Excessive force is the use of more force than is objectively reasonable to accomplish a lawful purpose.

**Immediate Use of Force**

Immediate use of force is the force used to respond without delay to inmate behavior that constitutes an imminent threat to institution/facility security or the safety of persons. Employees may use immediate force without prior authorization from a higher official.

**Controlled Use of Force**

A controlled use of force is the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the immediate threat to loss of life or immediate threat to institution security. All controlled use of force situations require the authorization and the presence of a First or Second Level Manager, or Administrative Officer of the Day (AOD) during non-business hours. Staff shall make every effort to identify disabilities, to include mental health concerns, and note any accommodations that may need to be considered.

**Non-conventional Force**

Non-conventional Force is force that utilizes techniques or instruments that are not specifically authorized in policy, procedures, or training. Depending on the circumstances, non-conventional force can be necessary and reasonable; it can also be unnecessary or excessive.

**Non-deadly Force**

Non-deadly force is any use of force that is not likely to result in death.

**Deadly Force**

Deadly force is any use of force that is likely to result in death. Any discharge of a firearm is deadly force.

**Great Bodily Injury (GBI)**

Great bodily injury is any bodily injury that creates a substantial risk of death.

**Serious Bodily Injury**

Serious bodily injury means a serious impairment of physical condition, including, but not limited to the following:

- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of any bodily member or organ;
- A wound requiring extensive suturing, or
- Serious disfigurement.

**Response Supervisor**
The Response Supervisor is the first line supervisor responsible for the area where an incident occurs.

**Incident Commander**
The Incident Commander is the second line supervisor responsible for the area where an incident occurs or an allegation of excessive or unnecessary force is received.

**First Level Manager**
A First Level Manager is a Captain, or the AOD.

**Second Level Manager**
A Second Level Manager is an Associate Warden.

**Institution Head**
The Institution Head is a Warden or designee.

**Institutional Executive Review Committee (IERC)**
The IERC is a committee of institution staff chaired by the respective Institution Head tasked with reviewing all uses of force and every allegation of excessive or unnecessary force.

**Department Executive Review Committee (DERC)**
The DERC is a committee of staff selected by, and including, the Associate Director who oversees the respective Mission-based group. The DERC has oversight responsibility and final review authority over the IERC. The DERC shall review every use of deadly force and every serious injury, great bodily injury or death that could have been caused by a staff use of force. The DERC shall also review those incidents referred to the DERC by the IERC Chairperson or otherwise requested by the DERC.

**Deadly Force Investigation Teams (DFIT)**
DFIT conducts criminal and administrative investigations into every use of deadly force and every death or great bodily injury that could have been caused by a staff use of force. Based on certain local Memoranda of Understanding, criminal investigations may instead be conducted by an outside police department or sheriff's office. DFIT need not investigate the discharge of deadly force inside an institution/facility if a member of an Investigative Services Unit, or an uninvolved supervisor, confirms that the discharge of deadly force was a warning shot and that no injuries were caused by the shot.

**Deadly Force Review Board (DFRB)**
The DFRB conducts a full and complete review of all incidents involving a use of deadly force (except warning shots) and every death or great bodily injury that could have been caused by a staff use of force, regardless of whether the incident occurs in an institutional or community setting.

**Joint Use Committee (JUC)**
The JUC is a committee of field staff from the DAI tasked with reviewing and evaluating recommended revisions to the Division's Use of Force Policy and Procedures.

**Holding Cells**
All holding cells shall be located within buildings. A holding cell shall not be used as a means of punishment. If clothing is taken from an inmate when he/she is placed in a holding cell, alternate clothing shall immediately be provided.


**Section 51020.5 is unchanged.**


**51020.6 Use of Restraints**
The unresisted application of authorized restraint equipment is not a use of force. When mechanical restraint is required, handcuffs, alone or attached to a waist chain, will be the means of restraint normally used. However, additional mechanical restraints, including leg irons, additional chains, straight jackets, leather cuffs, or other specialized restraint equipment may be

used when the circumstances indicate the need for the level of control that such devices will provide. Restrained inmates shall never be left unsupervised in an unsecured area.

Use of mechanical restraints on persons confirmed, or suspected by health care staff to be pregnant shall be subject to the following requirements found in California Code of Regulations (CCR) Title 15 section 3268.2 (d) and (e):

- No leg restraints or waist chains shall be applied.
- If handcuffs are applied, the person's arms shall be brought to the front of her body for application.

Mechanical restraints shall not be placed on an inmate during labor, including during transport to a hospital, during delivery, and while in recovery after giving birth, unless circumstances exist that require the immediate application of mechanical restraints to avoid the imminent threat of death, escape, or great bodily injury. In this case, mechanical restraints may be used only for the period during which such threat exists.

The following state-issued restraints and equipment are authorized for use at the discretion of on-duty staff:

- Handcuffs
- Waist Chain
- Leg Irons
- Escort Chains
- Padlocks
- Security Chain
- Spit Hood
- Martin Chain

The following restraints may be used as specified below:

- Safety Triangle: This device is a handcuff retention device, used to prevent inmates from pulling restraint equipment into their cell and may be used at the discretion of on duty staff. The safety triangle may remain attached to the handcuffs if the inmate is being relocated in the housing unit and if attaching and detaching the safety triangle to and from the handcuffs presents a safety concern. (Such as an irate inmate who has threatened violence or an inmate upon whom force has just been used.) The safety triangle is not intended to control the inmate outside of the cell. The officer controlling the safety triangle must be vigilant and efforts should be directed to prevent the inmate from pulling his hands inside the cell while the door is being closed.

   In the event that an inmate who is attached to a triangle refuses to place their hands in the food/security port to allow the handcuffs to be removed, it may be necessary to pull the safety triangle to retrieve the handcuffs. When it is necessary to pull the safety triangle, a single staff member shall slowly move away from the door while holding onto the safety triangle, in order to bring the inmate's hands through the port. This will be conducted with extreme caution in order to minimize the risk of injury to the inmate. Additional staff may be needed to assist with the safety triangle in the event that the one staff member is insufficient to get the inmate's hands through the food port. Once the inmate's hands, wrists, and forearms are through the port, staff will grasp the inmate's forearms, the tension on the safety triangle shall be released, and the handcuffs removed.

   Prior to using a safety triangle on an inmate confirmed or suspected by health care staff to be pregnant, a physician must be consulted and any potential risks fully discussed.

   The final decision to place the device on the pregnant inmate will rest with the Warden or Chief Deputy Warden (CDW) and the reviewing physician. The consultation and its outcome must be documented for inclusion in the inmate's health care record and central file.

- Leather Restraints: Leather restraints are used for four/five point restraint in a Correctional Treatment Center, Outpatient Housing Unit, General Acute Care Hospital, or community hospital when authorized by a physician or psychiatrist. Use of restraint equipment at the direction of medical staff shall be fully documented in the institution Health Care Services record of the restrained inmate.
- Soft Restraints: Soft restraints consist of towel or sheets used to temporarily secure an inmate's ankles and/or arms together. After the application of soft restraints, mechanical restraints are removed and staff are to exit the cell before the inmate has time to release himself from the soft restraints. Soft restraints are used on inmates who try to resist entering their cell and were developed in an effort to avoid using physical force on inmates. The Response Supervisor may authorize the use of soft restraints. If force is used, it must be appropriately documented. Soft restraints shall not be used on inmates confirmed, or suspected by health care staff to be pregnant.
- Hand Isolation Devices (HID): These devices (e.g., hand mittens, etc) are used as an additional measure to restrict an inmate's ability to use his/her hands. HIDs may only be purchased from an approved vendor and used at an institution when authorized, in writing, by the Warden or CDW. Inmates in HIDs must have constant and direct visual supervision at all times. In instances where HIDs are used for Contraband Surveillance Watch (CSW), staff must maintain a log (CDCR Form 114A) which reflects usage times and correlating actions (e.g., 1200 hrs - One HID was removed so the inmate could eat lunch). Prior to placing a HID on an inmate confirmed, or suspected by health care staff to be pregnant, a physician must be consulted and any potential risks fully discussed. The final decision to place the device on the pregnant inmate will rest with the Warden or CDW and the reviewing physician. The consultation and its outcome must be documented for inclusion in the inmate's health care record and central file. Equipment Hygiene - HIDs must be cleaned and sanitized on an ongoing basis (e.g., if soiled after a bowel movement, after termination of the CSW, etc.).

Mechanical restraint equipment shall not be used in any manner described in CCR, Title 15, Section 3268.2(c), Use of Restraints. The use of restraint equipment not identified in this section must be preapproved at the level of Associate Director or higher. As part of the mechanical restraint maintenance process, restraints should be routinely cleaned and sanitized to adhere to an acceptable equipment hygiene standard.

**Subsections 51020.7 through 51020.11.1 remains unchanged.**

**51020.11.2 Food/Security Ports**

If during routine duties, correctional officers encounter an inmate who refuses to allow staff to close and lock the food/security port:

The officer shall verbally order the inmate to relinquish control of the food port and allow staff to secure it.

If the inmate relinquishes control of the food/security port, it will be secured.

In the event the inmate does not relinquish control of the food port, the officer shall back away from the cell and contact and advise the custody supervisor of the situation. Controlled force will be initiated while custody staff continue to monitor the inmate.

**51020.12 Controlled Use of Force General Requirements**

Use of Force can be controlled when time and circumstances permit advance planning, staffing and organization. A controlled use of force requires authorization and the presence of a First or Second Level Manager, or an AOD during non-business hours.

Once a situation exists that may result in a controlled use of force, a custody staff member shall remain at the cell door to monitor the inmate and continue to attempt to gain compliance from the inmate through verbal prompts until the extraction team arrives and the staff member is relieved by the incident commander to resume their regular duties. The custody staff member will be positioned as close as possible to the affected cell/area, without jeopardizing to their own safety.

The Incident Commander shall personally supervise the controlled use of force.

Incident Commanders and on-site Managers shall utilize their knowledge, training, and experience, as well as an evaluation of the totality of circumstances, when determining the appropriate force options to be utilized during controlled use of force situations.

The following information shall be taken into account prior to any controlled use of force:

- Physical health, mental health, and/or developmental disability concerns.
- Effective communication needs as identified by the Disability and Effective Communications System (DECS).
- Inmate's current demeanor (verbal aggression as opposed to physical aggression, prior history of violence, physical threat to the safety of others, etc.).
- History of inmate's actions during any prior cell extractions.

All controlled uses of force shall be preceded by a cool down period of reasonable length to allow the inmate an opportunity to comply with staff orders. During the cool down period, clinical intervention by a licensed practitioner shall be attempted, regardless of the mental health status of the inmate. The length of the cool down period can vary depending upon the circumstances. In situations involving participants in the mental health program, Incident Commanders, on-site Managers, and licensed health care practitioner shall discuss concerns that may affect the length of the cool down period.

The First or Second Level Manager, or the AOD, shall determine the length of the cool down period and communicate this to the Incident Commander. The Incident Commander shall document the start time and duration of the cool down period on the CDCR 837-A/A1.

A controlled use of force shall not be accomplished without the physical presence of a licensed health care practitioner.

All controlled uses of force shall be video recorded. A verbal warning shall be issued prior to a controlled use of force. The verbal warning shall contain the following five elements:

- Address the inmate by name.
- Advise the inmate that he/she is being video recorded.
- Order the inmate to voluntarily comply.
- Advise the inmate of the intent to use chemical agents and physical force if he/she does not comply.
- Advise the inmate that sufficient force will be used to remove him/her from the area.

### 51020.12.1 Controlled Uses of Force-Video Recording Requirements

Each controlled use of force shall be video recorded. The camera operator shall procure the camera, videotape or disc, backup videotape or disc, and backup battery. Prior to initiating video recording, the Incident Commander shall ensure the staff member operating the camera is familiar with the operation of the camera, and the expectations of the camera operator while recording the introductions and extraction in accordance with 51020.12.1 Controlled Uses of Force-Video Recording Requirements.

A briefing, including possible tactics to be used, shall be given to the controlled use of force team by the Response Supervisor and/or Incident Commander. This briefing does not need to be video recorded and should be completed away from the presence of any inmates.

Only one incident shall be recorded on each video recording (videotape or video disc will not include multiple incidents).

If the proposed controlled force involves an extraction of two inmates, two camera operators shall be used. Each camera operator will be designated an inmate prior to the application of the controlled use of force and concentrate on that inmate during the recording. The camera operator(s) will be positioned as close as possible to the immediate area to record as much of the incident as possible, yet at a sufficient distance so as to ensure no interference with the extraction team or jeopardy to their own safety.

The camera operator shall ensure that an accurate date and time is displayed on the recording. Filming shall begin with the camera operator stating their name, rank, date, time, and location of the controlled use of force.

The Incident Commander shall identify the inmate involved and state the circumstances of the proposed controlled use of force and/or extraction. The circumstances shall include a summary of the events leading up to the controlled use of force and what efforts have been made toward mitigation, to include the duration of the cooling off period, as well as custody, supervisory, medical, and mental health intervention, as applicable. The Incident Commander shall consider factors including the inmate's demeanor, (verbal or physical aggression / passive vs. active resistance) history of violence/cell extractions, safety of others, possession of a weapon, physical design of the area where the inmate is contained, barricades, use of barriers or a personal barrier (cloth or plastic placed about the inmates face and head), and apparent mental state when determining what force options shall be used and the order in which they will be applied. The Incident Commander shall summarize this when stating the intended use of force.

The First or Second Level Manager/AOD shall identify themselves on camera and confirm they are authorizing the controlled use of force, including the force options as stated by the Incident Commander. The First or Second Level Manager/AOD shall also ensure the video introduction includes all required information.

The licensed health care practitioner shall identify themselves on camera and indicate if the inmate's medical file was reviewed for medical contraindications to the use of chemical agents and if the inmate has any known disabilities that will require any accommodation during the controlled use of force.

The licensed health care practitioner who attempts clinical intervention shall identify themselves on camera and provide a detailed timeline of their efforts made to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force. This narrative shall include a description of the inmate's reaction. The actual clinical intervention shall not be video recorded.

The Response Supervisor and members of the controlled use of force team shall identify themselves on camera and state their roles in the controlled use of force.

Following the introduction, the camera operator shall continue filming enroute to the scene of the proposed controlled use of force and record the events. Prior to the application of force, the camera operator should videotape the interior of the cell/area and the inmate's actions. Periodically, after the introductions of chemical agents or use of a barricade removal device, the camera operator should again video record the inmate and the interior of the cell/area.

If the video recording is interrupted for any reason once the incident/extraction has begun, the camera operator will give an explanation verbally of the interruption once recording has resumed. The entire incident must be video recorded in one segment or scene. The video recording shall continue as long as the inmate is resistive of staff or combative.

Once the inmate has been extracted, video recording shall continue as the licensed health care practitioner conducts an initial medical assessment of the inmate. If chemical agents were used and the inmate is allowed to decontaminate, ensure the decontamination is filmed.
The Incident Commander shall determine when the incident has concluded and videotaping shall end. This is typically when the inmate is placed in a holding cell/area or re-housed.

**51020.12.2 Controlled Use of Force Involving the Seriously Mentally Ill**
When inmates are housed in departmental hospitals, infirmaries, Correctional Treatment Centers (CTC), Enhanced Outpatient Program Units (EOP), or Psychiatric Services Units (PSU), or has an EOP level of care designation, or any inmate who is acting in a bizarre, unusual, uncharacteristic manner, the controlled use of force shall occur as follows:

- A licensed health care practitioner designated by the Chief Executive Officer (CEO) shall be consulted prior to the use of chemical agents (see Chemical Agents Restrictions).
- Clinical intervention by a licensed practitioner shall be attempted. Clinical intervention shall also precede the extraction of any inmate who is being extracted upon the written order of a medical doctor, psychiatrist, or psychologist to facilitate a change in housing for treatment purposes.
- The clinician shall attempt to verbally counsel the inmate and persuade the inmate to voluntarily come out of the area without force. These efforts shall continue during the cool down period.
- Whenever circumstances permit, the clinician shall be a mental health provider; i.e., Psychiatric Technician, Licensed Clinical Social Worker, Psychologist, or Psychiatrist.

**51020.12.3 Extractions**
Extractions are the most common form of the controlled use of force and usually occur when the inmate is in a confined area such as a cell, holding cell, section, pod, or small exercise yard.
If an extraction becomes necessary, extraction team members shall be issued extraction equipment:

- Riot helmet, with protective face shield, protective vest, respirator, elbow and shin protectors, gloves, and bloodborne pathogen protective suit.
- Protective shield, approximately 22" wide and 48" long.
- Expandable baton(s), handcuffs, and leg restraints.
- Video camera(s) with a backup videotape or disc and back up batteries.

Prior to an extraction, the Response Supervisor or Incident Commander shall ensure that the members of the extraction team do not include any staff member who was directly involved in the incident precipitating the need for extracting the inmate.
The Incident Commander will ensure the Response Supervisor and extraction team members clearly understand their role, appropriate signals, and are familiar with the departmental use of force policy.
If time permits prior to the actual extraction, a mock extraction may be conducted in a vacated area with participating staff in order to ensure that custodial staff are familiar with their roles during the extraction. Several simulated operations will ensure smoothness, and timing during the actual extraction.
Prior to the extraction, the Incident Commander will communicate with the officer responsible/assigned to open/close cell doors and establish verbal/non-verbal signals specific to the controlled use of force.
The Incident Commander shall ensure the control officer understands that only the Incident Commander shall authorize the opening and closing of affected doors.
For the safety of staff, prior to being removed from a cell, it is preferred that the inmate submit to a (visual) search. The inmate should remove all clothing, except their underwear, and move back

far enough from the cell door to allow a visual inspection. The inmate shall be visually inspected from head to toe, front and back. The inmate will run their fingers around the inside waistband of their underwear. The inmate shall be allowed to retain their underwear while being restrained and removed from the cell.

If the inmate refuses to cooperate with the (visual) search, but is willing to submit to restraints, the inmate shall be placed in restraints and removed from the cell. The application of restraints shall not be delayed due to the inmate's refusal to submit to being searched, or to have the inmate remove any clothing. Upon removal from the cell, the inmate should be subjected to search for staff safety.

Placement of an inmate on the stomach for a short period of time to restrain an inmate is authorized; however once the inmate is exposed to chemical agents and/or if a spit hood/mask is placed on the inmate, staff shall not place the inmate on his stomach, or in a position that allows the inmate to end up on his stomach, for any period longer than necessary to gain or maintain control.

The inmate will be afforded an opportunity to decontaminate from the effects of the chemical agent. If the inmate is wearing a spit hood/mask the contaminated hood/mask shall be replaced with a clean one as soon as practical.

The procedure for cell extractions where two inmates are in the cell remains the same as for a single celled inmate with the following additions:

- Additional team members shall be assigned as determined by the Incident Commander.
- In the event one of the inmates is compliant with staff's instructions, and if in the judgment of the Incident Commander it is safe to open the cell door, the inmate shall be removed. If it is unsafe to remove the compliant inmate, he shall be required to remain in the cell and appropriate instructions shall be issued for the duration of the incident.

The procedures for an extraction from an exercise yard, pod, or dayroom whether in a segregated housing unit or general population remain the same as cell extractions except as follows:

- Additional extraction team members or an additional extraction team may be assigned as determined by the Incident Commander.
- In the event two or more inmates are to be extracted from the same area, at least one additional supervisor shall be assigned.

**51020.12.4 Health Care Issues**

When an immediate threat does not exist, controlled use of force procedures shall be followed for the following situations:

Involuntary Medication: on-duty Health Care Services staff shall ensure medical authorization for the involuntary medication exists, and shall advise the Incident Commander of such prior to the application of controlled use of force procedures.

Only departmentally approved four/five point restraints shall be applied by authorized medical/mental health staff in an infirmary, CTC, or other CDCR medical facility upon the authorization of a physician, psychologist or psychiatrist. On duty Health Care Services staff shall ensure authorization exists, and shall advise the Incident Commander of such prior to the controlled use of force under these circumstances.

Inmates who have a disability that prevents application of restraint equipment in the prescribed manner shall be afforded reasonable accommodation under the direction of the supervisor in charge. Mechanical restraints shall be applied to ensure effective application while reasonably accommodating the inmate's disability.

Inmates who have a disability that prevents the employment of standard search methods shall be afforded reasonable accommodation under the direction of the supervisor in charge. Such

searches shall be thorough and professional, with safety and security being the paramount concern.

Admission into an Infirmary, CTC or Hospital: When a physician or psychiatrist has determined it is necessary to admit the inmate into an infirmary, CTC, or hospital, on duty Health Care Services staff shall ensure that medical authorization for the admission exists, and shall advise the Incident Commander of such, prior to the controlled use of force. Refer to Sections 51020.14.1 and 51020.15.1 for additional information.

**Subsection 51020.12.5 through 51020.13 unchanged.**

**51020.14 Use of Less Lethal Weapons**

The 37mm and 40mm launchers are weapons designed to discharge less lethal impact munitions or chemical agents. They are authorized for use in all areas including segregated housing units, general population housing units, cells, dayrooms, dining halls, concrete yards, exercise yards and work areas. It is recommended a Response Supervisor be assigned the duties of discharging less lethal impact munitions during controlled use of force-cell extraction.

**Subsection 51020.14.1 is unchanged.**

**51020.14.2 Use of Less Lethal Weapons During Controlled Uses of Force**

The First or Second Level Manager may authorize the use of less lethal impact munitions during controlled use of force situations in a cell, for inmates not identified as a participant in the Mental Health Services Delivery System (MHSDS), if the inmate is barricaded, or if circumstances are serious in nature calling for extreme measures to protect staff or inmates (the inmate is armed with a deadly weapon). If the Incident Commander determines the inmate is acting in a bizarre, unusual, uncharacteristic manner, but is not identified as a participant in the MHSDS, a licensed health care practitioner shall be consulted prior to the use of less lethal impact munitions.

**51020.15 Chemical Agents**

Departmentally approved chemical agents include, but are not limited to the following: Oleoresin Capsicum (OC), Chloroacetophenone (CN), and Orthochlorobenzalmalononitrile (CS). OC may be issued to all on-duty departmentally trained peace officers, certified in the use of chemical agents. Employees shall only administer the amount of chemical agents necessary and reasonable to accomplish the control objective.

During a controlled use of force – cell extraction, only the chemical agent products listed may be deployed. Any future *additional* products authorized by the Office of Correctional Safety, Emergency Operations Unit, and approved by the Director, Division of Adult Institutions must be specifically authorized for controlled use of force – cell extraction in order to be utilized during an extraction.

- MK-9 OC Vapor - limited to a single burst of no more than 3 seconds in duration per application with a maximum of two applications.
- MK-9 OC Fogger – limited to a single burst of no more than 5 seconds in duration per application with a maximum of four applications.
- MK-9 OC Foam – limited to a single burst of no more than 5 seconds in duration per application with a maximum of four applications.
- OC Vapor Grenade – limited to 2 devices
- OC Flameless Expulsion Grenade – limited to 2 devices
- X-10 Barrier Removal Device – limited to a single burst of no more than 5 seconds in duration per application with a maximum of four applications. Chemical agents may only

be deployed from the X-10 during the removal of a barricade. The X-10 is not to be used solely as a delivery device for chemical agents.

Regardless of which chemical agents are deployed, or in what combination, no more than a total of four (4) chemical agent applications shall be administered. In exigent or unusual circumstances, it may be necessary to exceed the 4 allowed applications. In this event, the Incident Commander shall consult with the First or Second Level Manager/AOD, who can authorize additional chemical agent applications. For each *additional* chemical agent application authorized, the on-site Manager shall verbalize to the camera, the chemical agent application being authorized and the rationale for the decision.

Upon arrival at the extraction site, and prior to the use of any chemical agent, the Incident Commander and Response Supervisor shall consider the totality of circumstances to determine the best course of action. This evaluation shall include, but is not limited to, the physical environment and space, barriers, and the inmate's behavior. Consideration shall also be given as to the design and location of cell with regard to cross contamination (i.e., OHU/CTC, open cell front, etc.) when choosing whether to disperse OC or the type of OC. The size of the space shall also be considered when determining how much, and what type of chemical agent shall initially be applied. It may not be necessary to use the allowed 3 second maximum of a chemical agent, or an expulsion grenade, if the inmate is in a single person shower as opposed to a larger space such as a cell or holding cell.

- Once the evaluation has been completed, a determination can be made regarding the most effective and safe force option to be utilized, e.g., large open area versus contained cell; expulsion grenade versus fogger product. If the inmate is using a personal barrier to defeat the use of chemical agents, it may be necessary to directly strike the personal barrier with liquid chemical agent products in order to saturate it.

- If the inmate is a participant in the mental health program and has not responded to staff for an extended period of time, including during the cool down period, laying motionless on bunk or floor, sitting on edge of bunk head down, no eye contact, and it appears that the inmate does not present an imminent physical threat, additional consideration and evaluation should occur before the use of chemical agents is authorized. This additional evaluation should include input from the assigned housing unit staff and licensed health care practitioners regarding the inmates recent behavior, file review for recent history of violence, previous cell extractions, etc. The rationale shall be explained on camera by the on-site Manager.

- A decision to use chemical agents for the extraction should be based on more than passive resistance to placement in restraints or refusal to follow orders.

It is recommended a Response Supervisor is assigned the duties of administering chemical agents during controlled use of force-cell extraction. Prior to each use of a chemical agent, the staff member applying it shall display the device in view of the camera. The Incident Commander or Response Supervisor shall state out loud for the camera the time of application and the type of device being applied.

The amount of time needed for the chemical agents to become effective will vary based upon the delivery method, individual tolerance levels, and environment. A minimum of (3) three minutes shall lapse between each application of chemical agents before additional chemical agents may be applied.

After each application of a chemical agent, the Incident Commander and Response Supervisor shall assess the effectiveness or lack thereof. In the event chemical agents have not proven effective, the Incident Commander and Response Supervisor should carefully weigh the continued use of chemical agents versus use of physical force to complete the extraction. If a decision is made to apply additional chemical agents, the Incident Commander shall verbalize to the camera the rationale for the decision. Example; a vapor grenade was deployed, it has been

three minutes, the inmate is not showing any visible reaction, is using a personal barrier, and is shouting. We will now attempt to strike the personal barrier with a fogger product.

Staff shall make every reasonable effort to maintain visual contact with an inmate when administering chemical agents and until the inmate is decontaminated.

**51020.15.1 Chemical Agents Restrictions**

While in the community, non-uniformed peace officers that are issued OC products shall carry the product in a concealed manner, unless the peace officer has a badge clearly displayed.

In institutions/facilities where inmates are housed:

- During a controlled use of force, CN/CS, muzzle blast OC, and the MK-46 projector shall not be administered in one/two person celled housing, single person expanded metal holding cells, showers, or any other small space.
- During a controlled use of force, CN/CS, muzzle blast OC, and the MK-46 projector are authorized for use in large areas such as rotundas, small management yards, large holding cells, exercise yards, etc.

For controlled use of force incidents involving inmates housed in departmental hospitals, infirmaries, CTCs, EOPs, and PSUs, or who have an EOP level of care designation, a licensed health care employee designated by the Chief Executive Officer (CEO) shall be consulted prior to the use of chemical agents:

- The licensed health care practitioners shall document his/her recommendation regarding whether or not there is a contraindication for the use of chemical agents on a Medical Chrono (CDC 128C). This document shall be included in the incident package.
- If, during the consultation, the licensed health care practitioners express concerns regarding the use of chemical agents, the First/Second Level Manager authorizing the use of force and licensed health care practitioners shall discuss the matter to determine the best course of action. The licensed health care practitioner shall consider in providing their consultation, the potential for injury during the use of physical force, as well as the medical implication of exposure to chemical agents. After the consultation, the decision to use chemical agents or physical force shall rest with the First or Second Level Manager authorizing the use of force.
- If a decision is made to use chemical agents in spite of any contraindications, the decision shall be articulated and written justification provided. The written justification must include specific determinations and considerations to justify the need to over-ride the contraindications, beyond the statement of safety to staff or security of the institution. Consideration shall be given to the inmate's mental health status and current mental state.

If the decision is made to go forward with the use of chemical agents, the licensed health care practitioners is responsible for ensuring proper medical equipment and trained health care staff are available during and after the application of the agent to treat the inmate for any adverse reaction due to exposure. The Incident Commander and First or Second Line Manager/AOD shall ensure adequate health care staff are present. The Incident Commander shall query the licensed health care practitioner and receive confirmation appropriate medical supplies and equipment are at the extraction site to treat a medical emergency prior to commencing the controlled use of force.

- The Incident Commander shall document the results of the consultation and the basis for the First/Second Level Manager's final decision in the Crime/Incident Report (CDCR 837-A/A1).
- Staff shall provide assistance to disabled inmates on a case-by-case basis who are exposed to CS/CN or OC and would otherwise have a difficult time evacuating a contaminated area and/or to reasonably accommodate those disabled inmates during decontamination procedures.

**51020.15.2 Decontamination from Chemical Agents - General**

Any inmate exposed to a chemical agent shall be afforded an opportunity to decontaminate as soon as practical.

If an inmate refuses to decontaminate, no other action is necessary, unless the inmate was exposed in a cell and not removed from the cell where the exposure occurred. In these instances, refer to Section 51020.15.4.

Inmates who are in an adjacent cell or in the general area where chemical agents are used are presumed not to be exposed or requiring decontamination unless determined otherwise.

Decontamination of those inmates not directly exposed to chemical agents will be at the supervisor's discretion based upon obvious, physical effects of the chemical agent.

The need to medically treat an inmate for serious injury may supersede the need to decontaminate from the effects of exposure to chemical agents.

Inmates exposed to chemical agents shall be allowed to change their clothes as soon as practical.

If an inmate has been exposed to chemical agents subsequent to a spit hood being applied, the spit hood shall be removed and replaced with a new hood if it is safe to do so.

When an inmate is in a litter or gurney and needs to be decontaminated, and is cooperative, caution should be exercised if water is used to decontaminate to ensure the inmate's airway is clear. If the inmate is not cooperative and it presents a danger to either staff or the inmate to decontaminate with water in a litter/gurney, then fresh air is an acceptable decontamination method. The Incident Commander in conjunction with the licensed health care practitioner shall evaluate the situation and utilize an appropriate decontamination method.

**51020.15.3 Decontamination from Oleoresin Capsicum**

Decontamination from OC may be accomplished by exposing the individual to fresh moving air, or flushing the affected body area with cool water, e.g., shower, sink water, or wet cloths and providing clean clothing.

Force shall not be used to decontaminate inmates/parolee from the effects of OC unless a serious threat to the inmate's health is present and a licensed health care practitioner determines the inmate must be decontaminated.

No other decontamination is necessary for inmates who have been medically treated and a licensed health care practitioner has determined the inmate has been decontaminated.

As soon as it is practical and safe to do so, decontamination of the affected cell and housing unit shall be accomplished by ventilating the area to remove the airborne agent. Open doors and windows as permitted, or use portable fans to speed up the process. If applicable manually turn the air exchange system to high. A fan and the use of the air exchange system is not recommended for any dry agent that is utilized (i.e., expulsion grenades or muzzle blast). Wiping the area down with damp cloths or mopping is only necessary if a noticeable amount of residue is visible.

After decontamination, the inmate should not be returned to a contaminated cell until sufficient time has elapsed to allow for dissipation of the OC or until the cell has been cleaned.

**51020.15.4 In-Cell Decontamination from Oleoresin Capsicum**

In-cell decontamination may be used for inmates housed in an institution/facility when the Incident Commander determines that allowing an inmate to decontaminate in a shower is a safety concern. An example would be an inmate who is extremely agitated, or an inmate on whom force was used to insert him/her into the cell or secure the food/security port. The circumstances leading to the order for in-cell decontamination shall be clearly explained in the Response Supervisor's/Incident Commander's report.

If an inmate refuses to decontaminate, no other action is necessary, unless the inmate was not removed from the cell where the exposure occurred. In these instances, in-cell decontamination procedures described below will be followed:

A licensed health care practitioner shall advise the inmate how to self-decontaminate in his cell using water from the sink. A licensed health care practitioner shall monitor the inmate approximately every 15 minutes for a period of not less than 45 minutes starting from the last application of chemical agent.

A licensed health care practitioner shall document the fact the inmate was given instructions and the approximate times of the 15 minute observations on a CDC 7219, Medical Report of Injury or Unusual Occurrence.

If the inmate is under medical supervision, the documented 15-minute observations are not necessary.

As soon as it is practical and safe to do so, decontamination of affected housing units shall be accomplished by ventilating the area to remove the airborne agent. Open doors and windows as permitted, or use portable fans to speed the process.

**Subsections 51020.16 and 51020.17 are unchanged.**

**51020.17.1 Involved Staff-Reporting Requirements**

Written reports regarding staff uses force shall be documented on a CDCR 837-C. This requirement includes a First or Second Level Manager/AOD authorizing the use of controlled force.

Reports shall be prepared by any employee who uses or observes the use of force. The reports shall be submitted to, and reviewed by, the Response Supervisor prior to being relieved from duty. Staff shall not collaborate with each other in the preparation of reports.

If possible, identify important information in the contents of the report as follows:

Identities of staff that observed and/or participated in the use of force.

Description of the actions of the inmate and circumstances leading to the use of force.

Description of the specific force used or observed.

If chemical agents were used, identify the type of projector used, and from what distance, e.g., a burst of OC from an MK- 9, from six feet.

Description of the inmate's level of resistance.

Description of why force was used and description of the threat perceived.

Description of any identified disabilities ascertained through any tracking system and what form of reasonable accommodation and/or assistance was provided during and after the controlled use of force.

Description and observations of staff or inmate injuries and the cause of the injury, if known.

Description of observations of decontamination of chemical agents or medical attention given.

Description of observations or knowledge of the steps taken to decontaminate the housing unit, and those inmates not directly exposed to chemical agents.

Documentation of any inmate allegation of an unnecessary or excessive use of force.

**Subsection 51020.17.2 is unchanged.**

**51020.17.3 Video Records Made After Uses of Force That Cause Serious Bodily Injury, Great Bodily Injury, or Result in Allegations of Unnecessary or Excessive Force**

A video recording of an inmate shall be made under the following circumstances:

- The inmate has sustained a serious bodily injury or great bodily injury that could have been caused by a staff use of force.
- The inmate has made an allegation of an unnecessary or excessive use of force.

Any visible or alleged injuries shall be video recorded. The video recording shall be conducted by custodial supervisors (sergeants or lieutenants) who did not use, or observe the force used, in the incident.

The video recording should be made as soon as possible, but no later than 48 hours from discovery of the injury or allegation.

The video recording shall also include a request of the inmate to be interviewed regarding the circumstances of the incident. If the inmate refuses to be video recorded, such refusal shall be recorded.

**Subsection 51020.17.4 is unchanged.**

**51020.17.5 Response Supervisor-Additional Reporting Requirements for Deadly Force**

When there has been a use of deadly force, the on-duty supervisor shall ensure that the chain of command is notified and all necessary health and safety, medical, and security measures are initiated. The supervisor shall go to the location and ensure that the scene is protected.

For incidents occurring in an institutional setting, the Watch Commander shall contact the institution's ISU.

For incidents occurring in a community setting, the on-duty supervisor shall ensure local law enforcement is contacted.

The supervisor shall ask the employee who used deadly force to provide a public safety statement immediately after the incident. This is the employee's oral statement. This statement helps determine the general circumstances of the incident, assess the need for resources, set the perimeter, locate injured persons, and determine the nature of the evidence to be sought. It shall provide basic information such as the number of persons involved in the incident, the number not yet in custody and number and direction of shots fired. The statement shall not include, and the employee should not be asked to provide, a step-by-step narrative of the incident or a motive for his/her actions.

The supervisor shall capture the essence of the oral statement in writing and submit it to the Incident Commander.

In circumstances where the use of deadly force results in death or GBI, the staff using the force will be placed on administrative time off (ATO) for 72 hours in order to facilitate department interviews and staff wellness. These 72 hours will be paid contiguous time off, unless they are scheduled regular days off (RDO). RDOs will count toward the contiguous 72 hours but will not be paid unless the employee is called to work. If the 72 hours ATO overlap with a period of pre-scheduled time off (i.e. vacation, holiday, sick leave, etc.) the ATO will be used in lieu of, not in addition to the affected employee's leave credits.

As soon after the incident as is practical, the response supervisor must also initiate Peer Support Program (PSP) protocols as delineated in DOM Section 31040.3.2

**51020.17.6 Health Care Staff Use of Force-Reporting Requirements**

Health Care Services staff shall complete and submit a CDCR 837-C whenever a Health Care Services staff member:

Observes use of force.

Uses force on an inmate.

Provides clinical intervention prior to a use of force.

Hears an inmate allegation of an unnecessary or excessive use of force during a reportable incident. (If not already reported on a CDC 7219).

In addition to the requirements noted above, Health Care Services practitioners shall complete and submit a CDC 7219 when assigned as a member of a controlled use of force team. The CDC 7219 shall be completed and submitted to the Response Supervisor prior to the health care staff leaving the institution and shall:

Include a quote of the inmate's own words in the patient comment section.
Document observations of the area on the inmate where force was applied, after specific examination.
Include comments or information garnered from custody staff regarding the type and amount of force used.
Document the injuries sustained and the medical treatment rendered.
Document if the inmate refuses medical examination and/or treatment.
Document any alternative assistive device provided and any medical recommendation / accommodation suggested during and after the use of force.
Document in-cell decontamination instructions and times of 15-minute checks, if applicable.
In controlled use of force cases when consultation regarding the use of chemical agents is warranted, the Health Care Services employee providing the consultation shall complete and submit a Medical Chrono (CDC 128C) documenting whether or not there is a contraindication to the use of chemical agents.
Physical efforts used to restrain appendages of an uncooperative inmate into four/five point restraints during Range of Motion shall be documented on the inmate's Health Record.
In addition to the above requirements, licensed health care practitioners shall be responsible for providing custody staff and the Use of Force Coordinator, with notification and updated information in the event that the aftercare treatment process reveals new facts about the severity of a force related injury.

**51020.17.7 Incident Commander-Reporting Requirements**

It is the responsibility of the Incident Commander to notify the Office of Internal Affairs (OIA) and the Office of Inspector General (OIG) as soon as possible, but no later than one hour from the time the incident is discovered, of any use of deadly force and every death, great bodily injury or serious bodily injury that could have been caused by a staff use of force. Depending on the specific MOU and the nature of the incident, a call to the county sheriff or police department may also occur.
Prior to being relieved from duty the Incident Commander or designee shall:
Complete the CDCR 837-A/A1 and CDCR 837-B. This shall be an accurate summary of the events as described in the written reports submitted by all employees.
Prepare the initial incident report package. This includes the CDCR 837-A/A1, B and C forms; any applicable medical forms; and the Manager/AOD Report of the Controlled Use of Force, if applicable.
Review all incident reports for quality, accuracy and content.
Clarify incomplete reports with involved staff by completing a CDCR 837-C-2/3.
In controlled use of force cases in institutions/facilities involving involuntary medication, placement into four/five point restraints, or admission into an infirmary, CTC or hospital, the Incident Commander shall include in the CDCR 837-A/A1, the name and title of the on duty licensed health care practitioner that verified the appropriate medical authorization existed prior to the use of force.
Prepare and submit a separate CDCR 837-C if he/she actually used force during an incident, or observed the immediate use of force.
Ensure the initial incident package is submitted to DAI / Identification and Warrants Unit, and the respective Associate Director over the institution's Mission Based Region.
Ensure the initial incident package is submitted to the Warden's Office, the Use of Force Coordinator, and, if requested, to the OIA and OIG.
Ensure all force related video recordings of inmate injuries or interviews and recordings of controlled force are forwarded to the appropriate location, as set forth in Section 51020.13.
Initiate the Use of Force Review process as set forth in Section 51020.19.1. However, should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside

investigating agency, the Incident Commander shall suspend all review of that incident until the investigation is complete. In the event the Manager believes an investigation may be necessary, the Manager shall recommend that the case be referred for investigation.

**51020.17.8 First/Second Level Manager-Reporting Requirements for Controlled Uses of Force**

The First or Second Level Manager authorizing the use of controlled force is required to be present during the use of force. After the use of controlled force, the First/Second Level Manager shall complete a CDCR Form 3037 Manager's/AOD Report of Controlled Use of Force. This form shall be included as part of the incident package.

In controlled use of force cases when licensed health care practitioner clinical staff expresses concerns regarding the use of chemical agents, and the decision to go forward is made by the First/Second Level Manager/AOD, the First/Second Level Manager/AOD shall document the results of the consultation and the basis for his/her final decision on a General Chrono (CDC 128B) for the health care record and the incident package.

**Subsections 51020.18 through 51020.18.1 are unchanged.**

**51020.18.2 Allegations of Excessive or Unnecessary Force-Incident Commander and Appeals Coordinator Reporting Requirements**

When informed of allegations of the use of unnecessary or excessive force, the Incident Commander and/or the Appeals Coordinator shall make an initial assessment of the information received and notify the appropriate First or Second Level Manager as soon as practical. The Incident Commander and/or the Appeals Coordinator shall determine whether the seriousness of the allegations and/or extent of the reported injuries warrant immediate notification of the First or Second Level Manager. Additionally, the Incident Commander and/or the Appeals Coordinator shall:

Ensure a licensed health care practitioner has evaluated the inmate and a medical report has been completed.

Review written reports of witnesses and obtain statements from inmate witnesses, if any.

Ensure that the inmate's injuries are video recorded and the inmate is interviewed within 48 hours in accordance with the requirements set forth in 51020.17.3. This shall be done as soon as possible upon receiving verbal notification of the allegation.

When an allegation is received, whether verbally or through the appeals process, the Appeals Coordinator or Incident Commander shall contact ISU or the Watch Commander and determine if the related incident report exists. The respective Appeals Coordinator or Incident Commander shall note the existence of the incident report by log number in their submittal prior to forwarding the allegation for administrative review.

If the inmate has suffered serious bodily injury or great bodily injury, the Incident Commander shall notify the OIA and the OIG as soon as possible, but no later than one hour from the time the incident is discovered. In instances where the allegation was submitted through the inmate appeal process and there is no corresponding incident report, the Appeals Coordinator shall, in consultation with the hiring authority, notify the OIA and OIG.

If, at any point in the review, the Incident Commander and/or the Appeals Coordinator discovers information that leads him/her to reasonably believe or suspect an employee has committed any serious misconduct, the Incident Commander and/or Appeals Coordinator shall immediately forward all information to the Institution Head via the chain of command, recommending an internal affairs investigation if appropriate.

Prepare a Report of Findings (CDCR Form 3014) and/or Appeal Inquiry. The report shall contain the allegations made, an explanation of the incident, the written or verbal statements of the witnesses, the health care information, and a conclusion and recommendation.

Submit the Report of Findings and/or Appeal Inquiry and evidence through the chain of command to the Institution Head. The evidence shall include copies of the medical reports, and any other documentation that is deemed significant to further document the incident/allegation. If the Incident Commander learns that the verbal allegation is part of a reported incident, the incident package shall be included with the Report of Findings. Correspondingly, if the Appeals Coordinator learns that the written allegation is part of a reported incident, the incident package shall be included with the appeal for administrative review.

**Subsections 51020.19 through 51020.19.3 are unchanged**

**51020.19.4 Use of Force Coordinator Responsibility**

The Use of Force Coordinator shall log and track all use of force incidents and all allegations of excessive or unnecessary force (including those set forth in inmate appeals) to ensure thorough and timely review by the IERC.

For incidents involving a reported use of force, the Use of Force Coordinator shall prepare an IERC Use of Force Review form. The form provides for the brief review of all aspects of a use of force incident, including whether or not all actions were consistent with policy, and a means for the Use of Force Coordinator to recommend additional clarification or revision to policy, procedure or training for the IERC's consideration.

For allegations of excessive or unnecessary force that do not involve a reported use of force set forth in an incident package, the Use of Force Coordinator shall prepare an Allegation Review package.

The Use of Force Coordinator shall normally schedule all logged use of force cases for review within 30 days of their logged occurrence. Any use of force incident or allegation review that is over 31 days old, and has not received an initial review, shall be scheduled for review at the next scheduled IERC meeting. Unless there are outstanding issues or a corresponding investigation, this review will be both an initial/final review.

Any logged use of force occurrence that included allegations of unnecessary or excessive force, serious bodily injury, GBI or death shall be prioritized after 30 days for final review, upon receipt of any corresponding investigations or final documents. In any event, the IERC Chairperson shall review the status of all pending UOF cases during each IERC Meeting, and assess the status for final review of these cases.

If a completed package has not been received by the Use of Force Coordinator within 31 days of the incident, the Use of Force Coordinator shall conduct a preliminary review of the case, and present it to the IERC for initial review. Once the Use of Force Coordinator has received and analyzed the completed package, the case will be rescheduled for final review by the IERC.

The initial review of the uncompleted package (initial incident package) is intended for the IERC to preliminarily review and document the incident for obvious procedural concerns and does not require an IERC Critique and Qualitative Evaluation form to be completed. The IERC Critique and Qualitative Evaluation form will be completed following the review and analysis of the completed incident package.

The Use of Force Coordinator is responsible for preparing the completed use of force incident package for review by the IERC as follows:

The Use of Force Coordinator shall regularly schedule IERC meetings. The OIG shall be provided reasonable notice and copies of the complete incident packages to be reviewed in advance of the meetings.

The Use of Force Coordinator shall conduct an in-depth analysis of the documentation of each use of force case, including the conclusions of the supervisor/managers, on the IERC Use of Force Review form.

The Use of Force Coordinator shall prepare complete copies of the incident packages to be reviewed by the IERC, which shall include a written recommendation on the IERC Use of Force

Review form regarding whether the force used was in compliance with policy, procedure, training and applicable law. This format addresses critical review areas.

After the IERC's final review all documentation of staff training or discipline will be removed from the incident package and routed to the appropriate Manager for placement into the appropriate file, i.e., employee's training or supervisory files.

The Use of Force Coordinator may recommend that additional clarification or information is necessary. If the IERC determines additional information or clarification is required, the Use of Force Coordinator will forward a request for this information to the responsible Manager and track the assignment. The Use of Force Coordinator will maintain a copy of the completed incident package until the information/clarification is received. The Use of Force Coordinator will then complete the analysis and resubmit the case to the IERC.

The Use of Force Coordinator may also identify and recommend revision to policy, procedure or training for the IERC's consideration on the IERC Further Action form. The Use of Force Coordinator will submit the IERC Further Action form to the IERC for review.

If an investigation has been requested for a use of force incident, the Use of Force Coordinator will track and maintain the completed incident package until completion of the investigation. Upon the completion of the investigation, the IERC Chairperson will be provided a copy of the investigation report and then complete the analysis and present the case to the IERC. During the IERC, the Use of Force Coordinator will verbally present his/her recommendation regarding completed cases. Investigative reports will be returned to the Investigative Services Unit Office upon completion of the final IERC review of the incident

The Use of Force Coordinator will ensure the IERC findings are documented on the IERC Critique and Qualitative Evaluation form.

In cases involving allegations of excessive or unnecessary force in which an Incident Commander or an Appeals Coordinator has forwarded a Report of Findings or an Appeal Inquiry, the Use of Force Coordinator shall prepare an Allegation Review form for review by the IERC and signature by the IERC Chairperson.

After each IERC, the Use of Force Coordinator shall forward a memorandum to the respective Associate Director Office that provides the date of the meeting, a listing of incidents and allegations reviewed, and notation of the disposition.

**51020.19.5 Institution Executive Review Committee Monitoring Responsibility**

The IERC is a committee of executive staff tasked with reviewing reported use of force incidents and allegations of excessive or unnecessary force. The IERC is the final level of review for most non-deadly use of force incidents. Normally, the IERC is comprised of the following institutional staff:

Institution Head or Chief Deputy Warden, as chairperson and final decision maker,

At least one other manager assigned on a rotational basis,

In-Service Training Manager,

One health care employee, and

A Use of Force Coordinator.

Other designated supervisors and rank and file staff may also attend, as determined by the appointing authority. A representative of the OIG may also attend and monitor IERC meetings.

The IERC shall meet to review its cases on at least a monthly basis, or on a schedule to ensure all cases are reviewed within 30 days. Unless there are outstanding issues or a corresponding investigation, this review will be both an initial/final review.

During the IERC, the Chairperson shall personally view a minimum of 30 percent of all video recordings arising from controlled use of force incidents.

The IERC shall determine if the use of force was reasonable and in compliance with policy, procedures and training. The IERC shall also examine the critique and conclusions of

subordinate managers and supervisors, and ensure the appropriateness of completed documentation.

The IERC shall complete an Allegation Review of all allegations of excessive or unnecessary force.

The IERC may initiate requests for additional information or clarification (clarification requests will be routed to the responsible Manager and tracked by the Use of Force Coordinator). The final review will determine whether the use of force was reasonable.

The IERC may recommend changes to procedure or training. The IERC is also responsible for identifying possible employee misconduct and recommending the initiation of training, corrective action or disciplinary action in such cases. However, only IERC members in supervisory or management roles (including the Use of Force Coordinator) and the OIG may participate in discussions involving the initiation of corrective or disciplinary action.

The hiring authority may initiate changes to local procedure or training based on the findings or recommendations of the IERC, or forward a recommendation of change to the CDCR policy or procedure via the Associate Director. The Institution Head may also initiate corrective or adverse employee action based upon the findings or recommendations of the IERC.

Should an incident or allegation warrant investigation by the DFIT, the OIA, or any other outside investigating agency, the IERC shall suspend all review of that incident until the investigation is complete. The IERC shall consider the completed investigative report, and any report by the DFRB, as part of its own review.

**Subsections 51020.19.6 through 51020.22 are unchanged.**

**51020.23 Revisions - Use of Force Joint Use Committee (JUC)**

The Use of Force JUC is a committee of field staff tasked with reviewing and evaluating recommended revisions to the CDCR's Use of Force Policy and Procedures.

The JUC shall be comprised of the following field staff:

At least one Institution Head, as chairperson

At least one staff member from each DAI, mission based region, at the level of Lieutenant or Captain

At least one Use of Force Coordinator,

At least three representatives from the CCPOA, as designated by the CCPOA

The Chief of OIG or designee, and

Others as needed and assigned by the Deputy Director, DAI,

The JUC shall meet quarterly as necessary, but not less than annually, to review recommended revisions

**Subsections 51020.23.1 through 51020.25 are unchanged.**

14-0605

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : June 5, 2014

To Associate Directors, Division of Adult Institutions
Wardens

Subject: **RULES VIOLATION REPORTS ISSUED RELATIVE TO INVOLUNTARY MEDICATION OF INMATES**

The purpose of this memorandum is to provide direction regarding the issuance of Rules Violation Reports (RVR) to Inmate-Patients (IP) who are involuntarily medicated under emergency orders or under a Penal Code Section 2602 (Keyhea) court order. Involuntary medication is a clinical intervention and by definition "involuntary" means acting or done without or against one's will. Therefore, the California Department of Corrections and Rehabilitation (CDCR) has determined effective immediately, when Use of Force (UOF) is required to effect involuntary medication of an IP, the IP will not be issued a RVR for California Code of Regulations (CCR), Title 15, Section 3005 (b), Conduct, Obeying Orders; or for Section 3323 (f) (7), Willfully Resisting, Delaying, or Obstructing any Peace Officer in the Performance of Duty. However, if during the UOF incident the inmate commits any other acts of misconduct outside of obeying orders, or willfully resisting, delaying, or obstructing any peace officer, he/she will be appropriately charged in accordance with CCR, Title 15.

Institution Chief Disciplinary Officers shall ensure any RVR reviewed after the date of this memorandum which meet the above criteria are dismissed in the interest of justice.

There is nothing in this directive intended to replace current policy or override CDCR's UOF policy as defined in the CCR, Title 15, Section 3268.

The UOF to effect involuntary medication of an inmate will continue to be documented on a CDCR Form 837, Incident Report.

If you have any questions or concerns in this matter, please contact Thomas Tyler, Captain Coleman Class Action Management Unit, at (916) 324-7956 or by email at Thomas.Tyler@cdcr.ca.gov.

M. D. STAINER
Director
Division of Adult Institutions

cc: Kelly Harrington
Kathleen Allison
Tim Virga
Thomas Tyler

**Gaines, Thomas@CDCR**

**From:** Katavich, John@CDCR
**Sent:** Friday, June 06, 2014 7:49 AM
**To:** Gaines, Thomas@CDCR
**Subject:** FW: Rules Violation Reports Issued Relative to Involuntary Medication of Inmates
**Attachments:** Rules Violation Reports Issued Relative to Involuntary Medication of Inmates.pdf

*JOHN N. KATAVICH*
Warden
Wasco State Prison - Reception Center
(661) 758-7000

**From:** Yamada, Karen@CDCR
**Sent:** Thursday, June 05, 2014 5:17 PM
**To:** CDCR Institutions Wardens; CDCR Institutions DAI Associate Directors
**Cc:** Stainer, Michael@CDCR; Harrington, Kelly@CDCR; Allison, Kathleen@CDCR; Shimozaki, Donna@CDCR; Shirley, Coyt C@CDCR; Weathersbee, Christopher@CDCR; Virga, Timothy V.@CDCR; Tyler, Thomas@CDCR
**Subject:** Rules Violation Reports Issued Relative to Involuntary Medication of Inmates

**SENT ON BEHALF**
**OF**
**MICHAEL D. STAINER, DIRECTOR**
**DIVISION OF ADULT INSTITUTIONS**

Thank you,

***Karen Yamada***
***Executive Assistant to the Deputy Director of Facility Operations and Deputy Director of Facility Support***
***Division of Adult Institutions***
***(916) 445-6597***
***(916) 322-2877 Fax***

***CONFIDENTIALITY NOTICE:*** *This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication*

# 14-1017

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : October 17, 2014

To : Associate Directors, Division of Adult Institutions
Wardens
In-Service Training Managers

Subject: **USE OF FORCE REVISIONS**

The purpose of this memorandum is to provide direction regarding recent revisions to the Department's Use of Force policy which will effect all California Department of Corrections and Rehabilitation (CDCR) staff. (Note: the language underlined in this memorandum reflects revisions to the Department Operations Manual (DOM) effective November 17, 2014). The changes specifically relate to the use of non-deadly force in immediate and controlled use of force situations.

As a reminder, the definitions for immediate use of force and controlled use of force (DOM Section 51020.4) are as follows:

> *Immediate use of force is the force used to respond without delay to a situation or circumstance that constitutes an imminent threat to security or the safety of persons. Employees may use immediate force without prior authorization from a higher official.*
>
> *A controlled use of force is the force used in an institution/facility setting, when an inmate's presence or conduct poses a threat to safety or security and the inmate is located in an area that can be controlled or isolated. These situations do not normally involve the immediate threat to loss of life or immediate threat to institution security. All controlled use of force situations require the authorization and the presence of a First or Second Level Manager, or Administrative Officer of the Day (AOD) during non-business hours. Staff shall make every effort to identify disabilities, to include mental health issues, and note any accommodations that may need to be considered.*

It is critical that all staff understand that immediate force should only be used to respond without delay to a situation or circumstance that constitutes an imminent threat to security or the safety of persons. In the DOM revision effective November 17, 2014, the following definition for imminent threat has been added:

> *An imminent threat is any situation or circumstance that jeopardizes the safety of persons or compromises the security of the institution, requiring immediate action to stop the threat. Some examples include, but are not limited to: an attempt to escape, on-going physical harm or active physical resistance.*

In addition to the above noted definitions, DOM Section 51020.8 has been revised and states the following regarding non-deadly force:

*Non-deadly force will only be used when reasonably necessary to:*
*Subdue an attacker.*
*Overcome resistance.*
*Effect Custody or to*
*Gain compliance with a lawful order.*

*Immediate force may be necessary to subdue an attacker, overcome resistance, or effect custody. If it is necessary to use force solely to gain compliance with a lawful order, controlled force shall be used.*

Although refusing a direct order may create a potential threat, it does not always present an imminent threat. When an inmate is refusing to comply with a lawful order, but there is no imminent threat and time and circumstances are such that advanced planning, staffing and organization can be implemented to gain compliance without jeopardizing institutional security or the safety of persons, staff shall contact the custody supervisor responsible for that area and the controlled use of force process shall be followed. It is essential that staff understand when an inmate is located in an area that can be isolated and contained (cell, small management yard, etc.), then the use of force will almost always be controlled unless there is an imminent threat of great or serious bodily injury. In addition, staff should not intentionally remove a barrier that exists (by opening a cell door or entering a fenced yard area) and risk confrontation with an inmate when, based on the totality of circumstances, a controlled use of force is appropriate.

Custody supervisors and managers will receive this training during the Controlled Use of Force Training scheduled in October and November 2014. To ensure all other institutional staff are aware of this revision, training in the form of On-the-Job Training shall be accomplished by conducting unit meetings wherein the unit manager and supervisors will advise staff of the revision and ensure all staff have a clear understanding of the change and expectations of how staff are to respond when faced with a possible use of force situation.

Wardens shall ensure this training is completed for all institution staff no later than November 16, 2014. Training shall be recorded using the IST Code B2670, titled DOM Chapter 5, Article 2, Use of Force Revisions 11/17/14.

If you have any questions with regard to the information presented in this memorandum, please contact your respective Associate Director.

M. D. STAINER
Director
Division of Adult Institutions

Attachments

cc: Chief Executive Officers Regional Administrators

## Controlled Use of Force (UOF) Cell Extractions

# Staff Training Matrix

| [illegible] | [illegible] | [illegible] |
|---|---|---|
| Controlled UOF, Cell Extraction [illegible] and Mental [illegible] Supervisors and MH Staff [illegible] Class Code [illegible] | All Health Care Managers, All Custody Supervisors, All Nursing Supervisors, All Mental Health Staff | Class will be taught [illegible] Minimum of 1 [illegible] from each discipline |
| [illegible] Memorandum, [illegible] 2014 [illegible] Class Code [illegible] | All Custody Staff | Class will be taught [illegible] during staff meetings |
| Controlled UOF, Cell Extraction: Licensed Nursing Staff Responsibilities (1 hr.) Class Code TBD | All Licensed Nursing Staff | Class will be taught by Licensed Nursing Instructors or Licensed Nursing Supervisors. |
| Mental Health UOF Clinician Training (1 hr.) Class Code TBD | All Licensed Mental Health Staff | Class will be taught by Licensed Mental Health Supervisors. |

GENERAL CHANGES:

Throughout the lesson plan, repeated information has been removed unless repeating the information was considered necessary to make a point or complete a thought.

During the first few weeks of training, in several parts of the lesson plan, it stated that the Incident Commander, On-Site Manager, Licensed Nursing Staff (LNS), and Licensed Mental Health Practitioners (LMHP) will work together collaboratively to develop the tactical plan. In order to ensure staff do not work outside of their scope, the wording now reads, "...the Incident Commander and On-Site Manager, with input from the Licensed Nursing Staff (LNS), and the Licensed Mental Health Practitioner (LMHP)..." The LNS and LMHP will not recommend force options or recommend use of force. Instead, they will provide input regarding risk factors that would impact the type of force options are being considered.

During the resolution process, if the LMHP, LNS and/or On-Site manager cannot agree on the termination of the cool down period or the use of force options, the decision is elevated to the Chief of Mental Health, Chief Medical Executive and Warden/CDW for resolution. In addition, the Chief Nursing Executive should also be contacted during the resolution process. As a reminder, anyone contacted shall submit an CDCR 837-C regarding their involvement. In addition, if agreement still cannot be reached and the issue is elevated to the Regional Administrators and/or Associate Director, these staff are also required to complete a CDCR 837-C for submission with the incident package.

| LESSON PLAN PAGE | POWER POINT SLIDE | DOM SECTION | INFORMATION |
|---|---|---|---|
| PAGE #7 | 2.21 | 51020.8 | Language has been added to DOM Section 51020.8 regarding the use of force solely to gain compliance with a lawfully order. For that reason, the information has been added to the Lesson Plan and a slide has been added to the power point. |
| PAGE #7 | 2.22 | 51020.11 | Language has been added to DOM Section 51020.11. Specifically, the section now states if time and resources allow, immediate uses of force should be video recorded. This information has been added to the Lesson Plan and a slide in the power point. |
| PAGE #9<br>PAGE #10<br>PAGE #11<br>PAGE #57 | 2.29<br>2.32<br>2.35<br>8.4 | 51020.11.2 | The Lesson Plan and Power Point originally had conflicting statements about how many staff are required to be present for an Immediate Use of Force. In accordance with DOM Section 51020.11.2, at least 2 officers shall be present before a cell door is opened in an Immediate Use of Force situation (staff are reminded repeatedly to never go in a cell by themselves). Of course, 2 officers may not be sufficient depending on the situation; staff shall evaluate the totality of circumstances when determining when sufficient staff are present to enter a cell in an emergency situation when an imminent threat exists. |

| | | | |
|---|---|---|---|
| PAGE #16 | 3.6<br>3.7<br>3.8<br>3.9 | 51020.12 | Several slides were added to this section (previously they were in a later section) to help introduce/explain the Licensed Mental Health Practitioner's role during the controlled use of force. Specifically, the LMHP is required to determine if the inmate has the ability to understand orders, if the inmate's mental health condition is making it difficult to comply with orders, or if the use of force could create a serious risk of decompensation. (ADD) The LMHP then provides the information regarding the assessment to the Incident Commander. |
| PAGE #18 | 3.15<br>3.16<br>3.17 | 51020.12 | A new scenario was added to give training participants an opportunity to work through the collaborative process of reviewing the mental health, medical, and custody concerns and determine what use of force options should be employed during the extraction of the inmate. |
| PAGE #44 | 5.24 | 51020.15.1 | The X-10 is intended to be used to move a barricade out of the way in order to deploy chemical agents. In the original power point presentation, it included sheets, mattresses and inmates as examples of things that could be blocking the food/security port and that the X-10 could be used to move. The power point slide has been corrected removing the word "inmates." The X-10 cannot be used to push an inmate's body out of the way if he/she is using his/her body to block the food/security port. |
| | | | |
| | | | |

# 15-0924

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 9/24/2015 |
| To: | Chief Executive Officers at EOP Institutions<br>Chiefs of Mental Health at EOP Institutions |
| From: | Timothy Belavich, Ph.D., MSHCA, CCHP-MH<br>Director (A), Division of Health Care Services and<br>Deputy Director, Statewide Mental Health Program |
| Subject: | **ENHANCED OUTPATIENT PROGRAM MILESTONE CREDIT GROUP THERAPY – REQUIRED MATERIALS** |

In order to successfully implement the court ordered Enhanced Outpatient Program milestone credit group therapy programs "Aggression Replacement Training" and "Thinking for a Change," each institution shall purchase the following materials:

1. Flipcharts (minimum of 24, with 1 easel)
2. Flipchart Markers (minimum of 24)
3. 4 Small Handheld Dry-Erase Boards
4. Dry-Erase Markers
5. Pencils or pens for inmate use in group
6. Paper
7. Manila folders (or equivalent) for inmate use to maintain homework assignments

Facilitators will also need access to a television with DVD player (or suitable alternative) to show required videos during group therapy sessions.

These items shall be available prior to implementation. Please note that in order to maintain these groups, additional supplies will need to be ordered over time.

If you have questions or need additional information related to this memorandum, you may contact the Mental Health Training Unit by email: CDCR MHProgramTraining@CDCR.

cc: Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Edward Kaftarian, M.D.
Amber Carda, Psy.D.
Rachel Latter, Ph.D.
Jennifer Johnson
Regional Mental Health Administrators
Regional Health Care Executives

P.O. Box 588500
Grove, CA 95758

# 03.26.18

 # HEALTH CARE SERVICES

## MEMORANDUM

| | |
|---|---|
| Date: | 3/26/2018 |
| To: | Chief Executive Officers<br>Chiefs of Mental Health |
| From: | [signature]<br>KATHERINE TEBROCK, ESQ.<br>Deputy Director<br>Statewide Mental Health Program |
| Subject: | **MENTAL HEALTH TRACKING SYSTEM REFERENCES IN MENTAL HEALTH SERVICES DELIVERY SYSTEM PROGRAM GUIDE 2009 AND ASSOCIATED MEMORANDUM NOW REFERENCE THE ELECTRONIC HEALTH RECORD SYSTEM** |

This memorandum clarifies that all references to the Mental Health Tracking System (MHTS) in the Mental Health Services Delivery System Program Guide 2009 shall now be referenced as the Electronic Health Record System (EHRS) due to the statewide completion of the EHRS implementation. Program Guide 2009 MHTS references (Attachment A) and a list of MHTS memorandum references to the Program Guide 2009 (Attachment B) are attached.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.

Attachments

cc: Brittany Brizendine, Psy.D.
Angela Ponciano
Amy Eargle, Ph.D.
Laura Ceballos, Ph.D.
Michael Golding, M.D.
Kelvin Kuich, M.D.
John Rekart, Ph.D.
James Vess, Ph.D.
Travis Williams, Psy. D.
Shama Chaiken, Ph.D.
Jennifer Johnson
Regional Health Care Executives
Regional Mental Health Administrators

## Attachment A

## Mental Health Services Delivery System Program Guide 2009 Mental Health Tracking System References

| Chapter | Page (PDF) |
|---|---|
| Program Guide Overview | P. 16 |
| CCCMS | P.33 |
| | P.37 |
| | P.38 |
| | P.42 |
| | P.43 |
| | P.44 |
| | P.47 |
| | P. 48 |
| EOP | P.56 |
| | P.63 |
| | P.70 |
| ASU | P.127 |
| | P.129 |
| | P.130 |
| | P.138 |
| Suicide Prevention and Response | P.170 |
| | P.178 |
| | P.193 |

**Attachment B**

**Mental Health Tracking System Memorandum References to Mental Health Services Delivery System Program Guide 2009**

| Memo Title | Date |
|---|---|
| Implementation of Inmate Profile Local Operating Procedure (LOP) | 4/3/2008 |
| Inmate Refusals of MH Screening For Out-of-State Transfer | 6/17/2008 |
| Activation of the Substance Abuse Treatment Facility (SATF) Co-occurring Disorders (COD) Enhanced Outpatient Program (EOP) | 6/25/2010 |
| Revised Process for MH Inmates Approved for Non-Revocable Parole | 7/10/2010 |
| MH-B-001 Quality Standard: Timeframes for Interdisciplinary Treatment Team (IDTT) Meetings for Administrative Segregation Unit (ASU) and Security Housing Unit (SHU) Returns to Correctional Clinical Case Management System (CCCMS) | 7/28/2010 |
| MH-D-001 Quality Standard: Five Day Follow-up For Inmate-Patient (IP) Discharges and Transfers | 7/28/2010 |
| Standardization of the Service Location of Each Mental Health Services Delivery System (MHSDS) Appointment in Mental Health Tracking System (MHTS) | 3/17/2011 |
| Version 3 of the MHTS-UHR Agreement Audit | 10/12/2011 |
| Entry of Intermediate Care Facility (ICF) and Acute Care Facility Levels of Care (LOC) into Strategic Offender Management System (SOMS) | 10/29/2012 |
| Alternative Housing Cell Prioritization | 12/12/2012 |
| Data Entry of Administrative Segregation Unit (ASU) Screening Encounters | 5/21/2013 |
| Administrative Segregation Unit (ASU) Screening Encounters | 5/21/2013 |
| Entering Mental Health Identifier (MHI) Changes for Unassigned Inmates in the Strategic Offender Management System (SOMS) | 9/9/2013 |
| Implementation of Chart Audit Tool | 9/9/2013 |
| Clinician to Clinician Contact Data Entry and Compliance Rules | 10/24/2013 |
| Correction to Memorandum-Cease Entry of all Level of Care (LOC) Placement Requests (Effective Immediately) | 6/24/2014 |

| | |
|---|---|
| New MH Tracking System Code Required for Large Recreational Therapy Groups not Requiring Effective Communication | 7/7/2014 |
| New Procedure Regarding Mental Health (MH) Referral Chrono Form | 7/7/2014 |
| Data Entry Change in MHTS.net for Date Submitted to HQ for All Referrals to Department of State Hospitals (DSH) and Psychiatric Inpatient Programs (PIP) | 9/8/2014 |
| Data Entry of Reason for Admission to Mental Health Crisis Bed (MHCB) | 9/26/2014 |
| Accurate Tracking of Mental Health (MH) Treatment (Tx) Hours | 12/22/2014 |
| Mental Health 31-Item Screen Process | 3/24/2015 |
| Documenting Medication Refusals | 5/12/2015 |
| Entering Mental Health Identifiers (MHI) in Strategic Offender Management System (SOMS) for Inmate-Patients (IPs) with "Unidentified" MHI | 7/27/2015 |
| Completed Contacts Associated with Suicide Risk Evaluations | 10/23/2015 |
| Suicide Profile for Transfers | 3/3/2016 |
| No Requirement for Progress Note to Accompany a Suicide Risk Evaluation (SRE) or Suicide Risk Assessment and Self-Harm Evaluation (SRASHE) | 12/14/2016 |
| Required Override for Administrative Segregation Unit (ASU) Beds Utilized as Short Term Restricted Housing (STRH) | 2/2/2017 |
| Tracking Completion of the Administrative Segregation Unit (ASU) 12-Item Screen in MHTS.net | 7/6/2017 |

02.02.18

 # HEALTH CARE SERVICES

# MEMORANDUM

**Date:** 2/2/2018

**To:** Wardens
Chief Executive Officers
Chiefs of Mental Health
Chief Nurse Executives
Suicide Prevention and Response Focused Improvement Team Coordinators

**From:**

KATHERINE TEBROCK, ESQ.
Deputy Director
Statewide Mental Health Program

JEFF MACOMBER
Deputy Director, Facility Operations
Division of Adult Institutions

JANE ROBINSON
Statewide Chief Nurse Executive
California Correctional Health Care Services

**Subject:** **ENHANCEMENTS TO THE SUICIDE PREVENTION AND RESPONSE FOCUSED IMPROVEMENT TEAMS**

This memorandum clarifies, modifies, and establishes requirements and responsibilities of the Suicide Prevention and Response Focused Improvement Team (SPRFIT). Each SPRFIT shall provide employees with training and guidance on suicide prevention, response, reporting, and review for the purpose of reducing the risk of suicide. Some existing SPRFIT requirements have been clarified or modified to promote optimal functioning of institution SPRFITs. Other responsibilities have been newly established in response to systemic concerns noted in Suicide Case Reviews and reviews of the California Department of Corrections and Rehabilitation (CDCR) Suicide Prevention and Response Program.

<u>SPRFIT Membership and Meeting Attendance Requirements</u>

The SPRFIT shall include members or designees listed in the SPRFIT Membership (Attached).

<u>Frequency of Meetings</u>

Each SPRFIT shall meet at least monthly.

P.O Box 588500
Elk Grove, CA 95758

# MEMORANDUM

Attendance Requirements

A SPRFIT meeting shall include mandatory members or designees to establish a quorum. Designees are only allowed if the mandatory member is absent or must attend to an emergency or other critical situation.

SPRFIT Reporting

Each SPRFIT shall submit to the Mental Health Program (MHP) Subcommittee and the Division of Health Care Services (DHCS) MHP Subcommittee by the 5th of each month:

- A complete, standardized management report.
- Meeting minutes.
- A log of suicide prevention activities.

Responsibilities

To comply with all CDCR policies and procedures relating to suicide prevention each SPRFIT shall:

1. Monitor compliance with required suicide prevention related training for custody and health care staff. Training shall be coordinated with the local In-Service Training unit as appropriate. Implement training regarding suicide prevention and response by ensuring:

    - All custody and health care staff receive the in-person Suicide Prevention training.
    - All new employees receive the in-person Suicide Prevention module during New Employee Orientation.
    - All mental health clinicians receive the 7-hour Suicide Risk Assessment training every two years.
    - An adequate number of trained Suicide Risk Evaluation (SRE) mentors are available to mentor other clinicians in need of SRE mentoring.
    - SRE mentoring occurs for new employees within 90 days from the date of hire, and every two years thereafter, except for clinicians regularly assigned to work in a Mental Health Crisis Bed Unit (MHCB), who receive mentoring annually.
    - Annual review and training updates are provided to SRE mentors.

2. Review Suicide Watch and Precaution procedures to ensure they are being implemented.

3. Collaborate with the institution Emergency Medical Response Committee (EMRC) to:

    - Review all suicides and suicide attempts requiring cardiopulmonary resuscitation and/or other medical procedures.

# MEMORANDUM

- Review custody cell entry and cut-down procedures for all suicides and suicide attempts.
- Provide data on self-harm incidents with or without intent to die.

4. Monitor and track all self-harm incidents, unknown deaths, and deaths by suicide using self-harm definitions and classification including a review of the appropriateness of treatment plans and five-day follow-ups. The SPRFIT shall:

   - Accurately enter all self-harm incidents in the Electronic Health Record System within ten calendar days after the incident occurred.
   - Aggregate institution data to present to the institution MHP Subcommittee.
   - Analyze trends in institution self-harm data.
   - Notify relevant staff of all self-harm incidents.
   - Consult with mental health clinicians, Division of Adult Institutions (DAI) staff and Nursing as indicated.
   - Ensure all serious self-harm incidents are accurately reported on a CDCR 837 Crime/Incident Report.

5. Review and track all custody wellness check procedures as stated in the memorandums Revision of Mental Health Crisis Bed Discharge Custody Checks Policy dated January 27, 2016 and Addendum – Revision of Mental Health Crisis Bed Discharge Custody Checks Policy, dated September 1, 2017 (Attached).

6. Ensure all required documentation for suicide death reporting is forwarded to the DHCS SPRFIT in adherence with timeframes specified in the Mental Health Services Delivery Program Guide, 2009 Revision, pages 12-10-24 to 12-10-25.

7. Provide oversight for the implementation of DHCS issued Quality Improvement Plans (QIPs) with input and assistance from the institution Mental Health Program and EMRC subcommittees. Responses to QIPs shall be:

   - Reviewed and approved by the Chief Executive Officer and Warden prior to submission to the DHCS SPRFIT.
   - Completed and submitted to the DHCS SPRFIT within the specified timeframes.

8. Conduct institution self-assessments related to compliance with suicide prevention items using the audit items developed by the Statewide Mental Health Program (SMHP) Quality Improvement Unit. The SMHP regional teams shall conduct periodic reviews of each institution's compliance with these items. In addition, each institution SPRFIT shall conduct a semi-annual self-assessment to ensure compliance with suicide prevention practices, review the results, and develop remedies during the SPRFIT meeting.

# MEMORANDUM

9. During each SPRFIT meeting, review institution suicide prevention practices, issues, and changes in operations that require special attention and response to determine areas for improvement. Reviews shall include, but are not limited to, responding to proposed and enacted legislation, changing institution conditions (such as changes in yards or missions), changes in inmate demographics, or institution challenges.

10. Monitor and address issues that may impact suicide prevention, including physical plant issues. Some examples may include use and location of Alternative Housing, intake cells in Administrative Segregation Units and MHCB cells. The SPRFIT, in conjunction with Facilities Management, shall monitor the progress of any needed retrofits. The SPRFIT shall collect data, monitor trends and identify areas where suicide prevention efforts need strengthening.

11. Monitor compliance and review quality of five-day follow-ups and Suicide Risk Assessments and Self-Harm Evaluations (SRASHEs). The SPRFIT shall develop Performance Improvement Plans to address poor compliance with the five-day follow-ups and SRASHEs. Chart Audit Tool results of five-day follow-ups and SRASHEs shall be reviewed to ensure they are clinically appropriate and safety plans are adequate. The SPRFIT shall develop Performance Improvement Plans as needed.

12. Conduct semi-annual aggregate Root Cause Analyses (RCA) of serious suicide attempts[1], supplemented by a mental health clinical review. Serious suicide attempts do not include those incidents in which the self-reported injury is determined to be unfounded.

    Every six months, the institution shall select the five most serious incidents during the prior six months, defined by degree of injury, to develop the semi-annual aggregate RCA. If there are fewer than five, the aggregate RCA must include all incidents from that time period. The RCA shall be presented at the next SPRFIT meeting for discussion and review. The RCA and mental health clinical review discussion shall include:

    - Mental health history and course, if applicable.
    - A discussion of the unique factors that influenced the inmate's decision to take his or her life.
    - Identification of risk factors.
    - Relevant clinical issues.
    - Process and systems issues to include the functioning, interaction and integration of various organizational components.
    - Adequacy of emergency response (in conjunction with the EMRC).
    - Contributing findings and plan of action.

[1] Defined as self-harm incidents in which the severity is classified as "3" using the Center for Disease Control, Self-Directed Violence Surveillance classification system (Injury is severe, requiring intensive medical/surgical management coupled with intent to die).

P.O. Box 588500
Elk Grove, CA 95758

13. Provide assistance and coordination for the activities of the visiting SMHP and DAI Suicide Case Reviewers. The SPRFIT coordinator shall:

    - Share information and work closely with the SMHP and DAI Suicide Case Reviewers to ensure completeness and accuracy of reviews.
    - Facilitate on-site reviews, including review of property, site and interview with staff members.
    - Forward a written internal review to the SMHP and DAI assigned Suicide Case Reviewer no later than ten business days from the date of death.
    - Provide support and coordinate review requests for the SMHP and DAI suicide case review process (reporting, gathering data, etc.).
    - Coordinate the response to the suicide case review.

14. Maintain a High-Risk Management Program consistent with the Department's suicide prevention and risk evaluation policies and practices. It is intended to assist in identifying patients who may be at an increased risk for self-harm or death by suicide and to ensure mental health clinicians receive critical clinical information to adequately evaluate patients and provide additional interventions to address high-risk factors. The institution Suicide Prevention and Response LOP shall include a description of the High Risk Management Program that includes the following:

    - Criteria for identifying high-risk patients.
    - Procedures for monitoring high-risk patients.
    - Procedures for distribution of the high-risk list, including to health care and custody staff.
    - Procedures for managing patients who are high utilizers of higher levels of care.
    - Additional clinical services provided to high-risk patients.
    - Procedures for reviews of high-risk patients.
    - Criteria and procedure for removal from the high-risk list.

15. Implement procedures to address potential risk for inmates who return from court after receiving verdicts or judgments or information concerning parole grants from the Board of Parole Hearings that could be distressing. The institution Suicide Prevention and Response LOP shall include procedures for:

    - Identification of inmates who received "bad news."
    - Screening and assessment of these inmates.
    - Crisis intervention services to be provided, if needed.
    - Clinical follow-up.

16. Provide inmates access to mental health services to obtain bereavement counseling and/or peer support to process grief and stress in the aftermath of a serious suicide attempt, or loss of a family member/significant other/peer. Services shall be available to

# MEMORANDUM

all inmates, regardless of participation in the Mental Health Services Delivery System (MHSDS). Services should be time-limited and focused on providing support to inmates who report experiencing grief over the loss. Services may include:

- Support groups.
- Individualized counseling.
- Enhanced clinician monitoring for elevated risk.
- Conjoint sessions with a chaplain.
- Placement into MHSDS or a higher level of care.

17. Ensure the SPRFIT coordinator attends the Inmate Advisory Council (IAC) and Inmate Family Council (IFC) meetings at least once every six months. The SPRFIT coordinator shall provide the IAC and the IFC with the following:

    - Information on suicide prevention and Mental Health Program services and resources.
    - Information regarding mental health referrals (inmate self-referral or family member referral).
    - Information regarding warning signs for suicide.
    - Suicide prevention pamphlets and posters for distribution.

18. Ensure suicide prevention related materials (e.g. pamphlets for inmates and families and posters) are disseminated on an ongoing basis.

19. Develop institution performance improvement plans when deficiencies or opportunities for improvement with regard to suicide prevention are identified. Performance improvement plans shall include specific action items, assigned responsible parties and due dates. Outcomes of performance improvement plans shall be monitored and tracked, and revisions made as needed.

Local Operating Procedures

Institutions shall revise their SPRFIT LOP to include the above requirements and responsibilities and ensure consistency with DHCS policies regarding suicide prevention and response by March 1, 2018. The institution's Suicide Prevention and Response LOP shall be updated at least annually and sent to the DHCS through the standard Quality Management process for review and approval.

If you have questions or require additional information related to this memorandum, you may contact the Mental Health Policy Unit by email: CDCR MHPolicyUnit@cdcr.

Any custody related questions should be directed to the Mental Health Compliance Team, Division of Adult Institutions by email: DAI-MHCompliance@cdcr.ca.gov.

Any health care questions should be directed to the SMHP SPRFIT via email:

# MEMORANDUM

CDCR MHProgramSuicidePreventionandResponse@cdcr.

Attachments

cc: Brittany Brizendine, Psy.D.
   Angela Ponciano
   Amy Eargle, Ph.D.
   Laura Ceballos, Ph.D.
   Michael Golding, M.D.
   Edward Kaftarian, M.D.
   Kevin Kulch, M.D.
   John Rekart, Ph.D.
   James Vess, Ph.D.
   Shama Chaiken, Ph.D.
   Travis Williams, Psy.D.
   Jennifer Johnson
   Kathleen Allison
   Kelly Mitchell
   Dawn Lorey
   Marcie Flores
   Regional Mental Health Administrators
   Regional Health Care Executives
   Associate Directors, Division of Adult Institutions
   Regional Nurse Executives

Suicide Prevention and Response Focused Improvement Teams Membership

The institution SPRFT membership shall include:

- SPRFIT Coordinator (Chairperson) or designee[1]
- Chief Psychiatrist or designee[2]
- Chief Psychologist or designee[2]
- Supervising Registered Nurse
- Senior Psychiatric Technician or Psychiatric Technician (preferably from the Administrative Segregation Unit, [ASU], Short-Term Restricted Housing Unit or the ASU Enhanced Outpatient Program Hub, if the institution has one)
- Correctional Health Services Administrator or designee[3]
- Inpatient Coordinator or designee
- Associate Warden Health Care Access or designee[4]

Additional SPRFIT membership may be included as appropriate and in accordance with the institution needs and mission. SPRFIT membership may also include, but is not limited to, the following classifications:

- Chief of Mental Health [5]
- Senior Psychiatrist
- Senior Psychologist
- Staff Psychiatrist (assigned to Mental Health Crisis Bed)
- Staff Psychologist (assigned to Mental Health Crisis Bed)
- Standards and Compliance Coordinator
- Litigation Coordinator
- Associate Warden
- Facility Captain
- ASU Lieutenant/Sergeant
- Reception Center Lieutenant/Sergeant
- Classification and Parole Representative
- Administrative/Clerical Support
- PC 2602 Coordinator

---

[1] Must be a Senior Psychologist, Specialist except at institutions without a Senior Psychologist, Specialist position. Designee's classification shall not be lower than a Senior Psychologist, Specialist except at institutions without a Senior Psychologist, Specialist position.

[2] Senior Psychiatrist/Senior Psychologist attendance shall meet quorum requirement in institutions without Chief Psychiatrist/Chief Psychologist positions. Designees shall not be at a level below a Senior Psychiatrist, Specialist or a Senior Psychologist, Specialist except at institutions without those positions. Attendance by the Chief of Mental Health shall satisfy the requirement for the Chief Psychologist or Chief Psychiatrist attendance, depending on classification of the CMH at the institution.

[3] As applicable.

[4] Designee must be a classification no lower than a Captain.

[5] If the Chief Psychologist or Chief Psychiatrist in attendance is not the Chief of Mental Health, the Chief of Mental Health is an optional member.

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : September 1, 2017

To : Associate Directors, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Executive Officers
Chiefs of Mental Health

Subject: **ADDENDUM - REVISION OF MENTAL HEALTH CRISIS BED DISCHARGE CUSTODY CHECKS POLICY**

The memorandum titled, "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy," dated January 27, 2016, revised the Mental Health Services Delivery System (MHSDS) Program Guide, 2009 revision, and required 30-minute custody checks be conducted on inmate-patients discharged from a Mental Health Crisis Bed (MHCB) who were admitted for suicidal ideation, threats, or attempts.

Effective immediately, 30-minute custody checks shall be completed on all inmate-patients discharged from Alternative Housing when clinically indicated. This is consistent with the MHSDS Program Guide, 2009 revision, which authorizes custody checks on inmate-patients returned from Outpatient Housing Units (now identified as Alternative Housing).

If you have any custody-related questions, please contact Eric Hobbs, Captain, Mental Health Compliance Team, at (916) 324-7956 or Eric.Hobbs@cdcr.ca.gov. If you have any questions regarding mental health policies, please contact Robert Horon, Senior Psychologist, Specialist, Clinical Support, Division of Health Care Services, at (916) 691-6858 or Robert.Horon@cdcr.ca.gov.

KATHLEEN ALLISON
Director
Division of Adult Institutions

KATHERINE TEBROCK, Esq.
Deputy Director
Statewide Mental Health Program

JANE ROBINSON
Deputy Director (A)
Statewide Chief Nurse Executive (A)
Nursing Services Branch

Attachments

cc: Jeff Macomber
Connie Gipson
Kelly Mitchell
Dawn Lorey
Eric Hobbs
Laura Ceballos
Amy Eargle
Angela Ponciano
Michael Golding
Robert Horon
Marcie Flores
Mental Health Regional Administrators

State of California

Department of Corrections and Rehabilitation

# Memorandum

Date : January 27, 2016

To : Associate Directors, Division of Adult Institutions
Wardens
Regional Health Care Executives
Chief Executive Officers
Chiefs of Mental Health

Subject : REVISION OF MENTAL HEALTH CRISIS BED DISCHARGE CUSTODY CHECKS POLICY

In an effort to improve the continuity of clinical care for inmate-patients (IPs) discharged from a Mental Health Crisis Bed (MHCB), several revisions to the MHCB discharge process as outlined in the Mental Health Services Delivery System (MHSDS) Program Guide (2009 Revision) are being implemented. The following are staff responsibilities regarding IPs who have been discharged from a MHCB to a general population housing or segregated housing unit:

IP MHCB DISCHARGE TO GENERAL POPULATION HOUSING UNITS

Upon the discharge of an IP admitted to the MHCB for suicidality, the MHCB discharging clinician shall initiate the newly created California Department of Corrections and Rehabilitation (CDCR) MH-7497, *Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet* prior to physical discharge. The discharging clinician shall ensure the form is provided to transporting/escorting staff who will deliver the form to the receiving institution's Central Control staff. Central Control staff at the receiving institution shall document the IP's new housing information on the form and ensure the form is sent with the IP to the housing unit.

Once the IP has physically arrived at the receiving housing unit, staff shall conduct a personal observation within the housing unit on the IP every 30 minutes during the initial 24 hours of placement. Housing unit staff shall document all custody checks on the MHCB Discharge Custody Check Sheet using the observations legend listed on the CDCR MH-7497. When IPs are released from the housing unit to participate in programs outside of the housing unit, staff shall note the IP is "Out to Program" on the MHCB Discharge Custody Check Sheet until his/her return to the housing unit. Housing unit staff is not required to have the IP return to the housing unit to conduct the MHCB discharge custody checks. When an IP returns to the housing unit from program activities, housing unit staff shall note the arrival time on the MHCB Discharge Custody Check Sheet, and continue the MHCB discharge custody checks as directed above.

Upon completion of the initial 24 hours after arriving to the unit, a mental health clinician shall report to the IP's housing unit, discuss the IP's observed behavior with custody staff, and conduct a confidential clinical evaluation with the IP. The evaluation will determine whether to continue or discontinue the MHCB discharge custody checks or refer the IP for admission back to an MHCB based upon suicide risk. The mental health clinician shall document this decision on the MHCB Discharge Custody Check Sheet. Should the checks be continued, a mental health clinician is required to reevaluate the IP every 24 hours until checks are discontinued. The custody checks shall not be extended beyond 72 hours after discharge from a MHCB. If an IP requires checks beyond 72 hours, the IP shall be readmitted to the MHCB. Institutions shall retain all original MHCB Discharge Custody Check Sheets for a minimum of three years at the institution, and additional four years in departmental records retention.

Weekends and Holidays

When MHCB discharge custody checks end on a weekend or holiday, a designated mental health clinician shall conduct the evaluation when available. If a mental health clinician is unavailable, the evaluation may be conducted by a psychiatric technician. The psychiatric technician will see the patient and contact the on call use of force mental health clinician for a decision regarding continuation of checks. The on call provider shall determine if the MHCB discharge custody checks may be discontinued and is responsible for documenting the basis of this decision on a progress note. The psychiatric technician shall document the continuation or discontinuation of checks on the MHCB Discharge Custody Check Sheet, noting the date, time, and name of on call provider consulted.

IP MHCB DISCHARGE TO SEGREGATED HOUSING UNITS

On May 9, 2014, the California Department Corrections and Rehabilitation implemented the Security/Welfare Check Procedure in all Administrative Segregation, Condemned, Psychiatric Services, and Security Housing Units. This procedure directs staff to conduct a security/welfare check at staggered intervals on all inmates assigned to segregated housing units twice an hour (not to exceed 35 minutes between checks) during their entire length of stay. The implementation of the Security/Welfare Check Procedure has rendered the MHCB discharge custody checks redundant when the IP is discharged to a segregated housing unit.

With this revision to the MHCB discharge policy, segregated housing units that have implemented the Security/Welfare Check Procedure shall no longer conduct MHCB discharge custody checks of IPs solely due to discharge from an MHCB.

The Security/Welfare Check by definition ensures custody staff is accounting for IPs at established intervals. However, this revision does not apply to Segregated Housing Units that do not conduct Security/Welfare Checks on all three watches. Housing units meeting these criteria shall be required to log the MHCB discharge custody checks as indicated above during times when the security/welfare checks are not required per existing policy.

Please ensure all impacted Post Orders and local operating procedures (LOP) are immediately updated to reflect these changes. The revision(s) may be included as a supplement to be included in the next scheduled revision of the impacted document. Additionally, each institution shall provide verification of completion to your institution's LOP via memorandum to your respective Mission Associate Director and a copy to Eric Hobbs, Correctional Lieutenant, Division of Adult Institutions, Mental Health Compliance Team within 30 calendar days from issuance of this memorandum.

If you have any custody related questions regarding this directive, please contact Lieutenant Hobbs at (916) 322-1726.

KELLY HARRINGTON
Director
Division of Adult Institutions

KATHERINE TEBROCK
Deputy Director
Statewide Mental Health Program

CHERYL SCHUTT, RN, BSN
Statewide Chief Nurse Executive
Nursing Services
California Correctional Health Care Services

Attachments

cc: Kathleen Allison
Ralph M. Diaz
Eric Hobbs
Laura Ceballos
Amy Eargle
Marcie Flores

STATE OF CALIFORNIA
**Mental Health Crisis Bed (MHCB)**
**Discharge Custody Check Sheet**
**CDCR MH-7497 (01/18)**

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Form: Page 1 of 2
Instructions: Page 3 and 4

**I. Discharging Information**

Inmate Name: CDCR #: Date of Discharge from MHCB:

Discharging LOC: MHCB Discharging Institution:

MHCB Discharging Clinician:

**II. Receiving Institution Information**

Receiving Institution: Assigned Housing Unit:

Date/Time of Arrival to Housing Unit:

**III. Clinical Evaluation**

*When MHCB discharge custody checks end on a weekend or holiday, a designated mental health clinician shall conduct the evaluation when available. If a mental health clinician is unavailable, the evaluation may be conducted by a psychiatric technician. The psychiatric technician will see the patient and contact the on call use of force mental health clinician for a decision regarding continuation of checks. The on call provider shall determine if the MHCB discharge custody checks may be discontinued and is responsible for documenting the basis of this decision on a progress note.

**Day 1 (Initial 24 Hours after Discharge from MHCB)**

Mental Health Clinician: Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician: Date/Time of Evaluation:

Consulting MH Clinician: Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Continue Custody Checks

☐ Refer to MHCB Date and Time of Referral:

**Day 2**

Mental Health Clinician: Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician: Date/Time of Evaluation:

Consulting MH Clinician: Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Continue Custody Checks

☐ Refer to MHCB Date and Time of Referral:

**Day 3**

Mental Health Clinician: Date/Time of Evaluation:

Weekend/Holiday:

Psychiatric Technician: Date/Time of Evaluation:

Consulting MH Clinician: Date/Time of Consult:

☐ Discontinue Custody Checks

☐ Refer to MHCB Date and Time of Referral:

DISTRIBUTION - Copies: Health Records, Health Care Access Unit Captain
SCANNING LOCATION - Outpatient; MHNt/TxPln - Progress Note

STATE OF CALIFORNIA

**Mental Health Crisis Bed (MHCB)**
**Discharge Custody Check Sheet**
**CDCR MH-7497 (01/16)**

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Form: Page 2 of 2
Instructions: Page 3 and 4

## IV. Custody Checks

Inmate Name: CDCR #: Assigned Housing Unit:

**Observation Legend:**

1 - Arrival to Unit
2 - In Cell-Sleeping/Laying Down
3 - In Cell Misc.
4 - In Cell-Watching TV/Reading
5 - In Cell - Talking to Cell Mate
6 - In Cell-Eating
7 - Day Room-Activities
8 - Showering
9 - Out to Program
10 - Return from Program
11 - Supervisor Review of MHCB Custody Discharge Checks
12 - Emergency

| Date | Time | Observation | Print Name | Comments |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

DISTRIBUTION - Copies: Health Records, Health Care Access Unit Captain
SCANNING LOCATION - Outpatient; MHNI/TxPln - Progress Note

STATE OF CALIFORNIA
MENTAL HEALTH CRISIS BED (MHCB)
DISCHARGE CUSTODY CHECK SHEET
CDCR MH-7497 (01/16)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

## Instructions

**Purpose of Form:** The CDCR MH-7497 (8/15), Mental Health Crisis Bed (MHCB) Discharge Custody Check is used for patients who were admitted to a MHCB for suicidality and have subsequently been discharged. It is used to document the following:

1. All custody checks are being conducted at least every 30 minutes, ensuring the patient is not engaging in any self-injurious behavior.
2. Clinical evaluations should determine if the patient requires continued 30 minute checks or if custody checks can be discontinued. If it is determined the patient cannot be safely removed from custody checks 72 hours after being discharged, he/she will be referred back to MHCB.

**I. Discharging Information**
**This section is to be completed by a mental health clinician.**

1. Enter the patient's name
2. Enter the patient's CDCR number.
3. Enter the date of discharge from MHCB.
4. Enter the patients discharging level of care using the dropdown box.
5. Enter the institution from which the patient is being discharged.
6. Enter the name of the discharging clinician.

**II. Receiving Institution Information**

1. Receiving Institution Section: The discharging clinician shall enter the institution location to which the patient is being discharged.
   a) Once the receiving institution section is complete and the name of the receiving institution is entered, MHCB staff shall print the CDCR MH-7497 Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet and provide to transporting/escorting custody staff. The CDCR MH-7497 Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet shall accompany the patient to the receiving institution and housing unit.
   b) Transporting/escorting staff shall provide the form to Central Control at the receiving institution wherein the assigned housing portion shall be completed by Central Control staff.
   c) Assigned Housing Unit: Central Control staff at the receiving institution shall write the patient's housing unit and cell number.
   d) Upon the patient's arrival into the unit, housing unit staff will write in the date and time.

**III. Clinical Evaluation**
**This section is to be completed by Mental Health Clinician or Psychiatric Technician.**

1. On each day, check the relevant box that establishes if checks shall be discontinued, continued, or if the patient shall be referred to the MHCB.
2. Date, time, and sign in the section for each day.
3. Document clinical information regarding the patient encounter on the CDCR MH-7230-B, Interdisciplinary Progress Note - Five Day Follow-Up form. Supplemental information may be documented on a mental health progress note.
4. On day 3, if the clinician believes ongoing custody checks are required, the "refer to MHCB" box shall be checked and the patient referred to MHCB.

**IV. Custody Checks**
**To be completed by custody staff conducting checks. One entry per check is required.**

1. Enter the patient's name
2. Enter the patient's CDCR #
3. Enter the patient's assigned housing unit
4. Date: Write date of each check conducted
5. Time: Write the time the check was conducted and do not write times in advance.
6. Observation: Write the number(s) from the legend best describing the behavior or activity that was observed during the check.

STATE OF CALIFORNIA
**MENTAL HEALTH CRISIS BED (MHCB)**
**DISCHARGE CUSTODY CHECK SHEET**
**CDCR MH-7497 (01/16)**

DEPARTMENT OF CORRECTIONS AND REHABILITATION

7. Print Name: Once the information is written in, the staff member conducting the custody check shall print his/her name legibly.

8. Comments: Complete this section to provide any additional information that needs to be communicated to the mental health clinician or psychiatric technician. If based on what staff observes during the custody check, he/she believes the patient is a danger to self or others or is exhibiting unusual and/or bizarre behavior, custody staff shall immediately contact Mental Health Services and submit a CDCR 128-MH5 Mental Health Referral Chrono. This section shall be utilized to document the date and time the patient was referred to Mental Health Services. In the event an emergency occurs within or outside of the housing unit requiring custody staff to respond that prevents them from conducting the custody check, the date, time and nature of the emergency shall be documented in the comment section at the bottom of page two. In the event this occurs, custody staff shall resume the custody checks as soon as possible.

**V. Additional Information**

1. When custody supervisors are conducting reviews of the form during tours of the unit, the custody supervisor shall fill in the date and time, and note the appropriate observation code. Once the information is filled in, the custody supervisor reviewing the form shall print and sign his/her name legibly.
2. If at any time custody staff discovers the patient has not been evaluated by Mental Health Services within established timeframes, staff shall notify their custody supervisor, who will contact Mental Health Services.
3. If the patients housing assignment changes, print the new housing unit information on page two of the form.
4. When all the custody check information on page two has been filled in, initiate an additional page two of the form, print the patient's current information and continue documenting the custody checks. All additional pages printed to document the custody checks shall be kept together with page one of the form.



| DEPARTMENT OF CORRECTIONS AND REHABILITATION<br><br>INFORMATIONAL BULLETIN<br><br>SUBJECT: ANNOUNCING THE RELEASE OF CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION FORM; CDCR MH-7497 (01/16), MENTAL HEALTH CRISIS BED (MHCB) DISCHARGE CUSTODY CHECK SHEET. | Number: 16-02<br><br>Date Issued: 1/26/16 |
|---|---|

The purpose of this Informational Bulletin (IB) is to announce the release of a California Department of Corrections and Rehabilitation (CDCR) form CDCR MH-7497 (01/16), Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet, by the Division of Health Care Services (DHCS) Mental Health Program. The form shall be used as directed, by DHCS staff to document the various requirements of the program.

Effective immediately, the form is available electronically in "fill and print" version accessible via the CDCR intranet at: http://intranet/Pro/dhcs/mentalhealth/Pages/New-QMforms.aspx If intranet access is not available, the form can be ordered in print from California Prison Industry Authority (CALPIA), on Form CDCR 1853 (Rev. 07/07) Reproduction Order.

New Form

- **CDCR MH-7497 (01/16), Mental Health Crisis Bed (MHCB) Discharge Custody Check Sheet.** A four pages, single-sided form, on 8½"X11" white bond paper, with instructions at the back of the form, in sets of 167.

Please inform all persons concerned as to the contents of this IB and direct any inquiries to Christina Gritsch, Staff Services Analyst, Policy Support, Statewide Mental Health Program, Division of Health Care Services, at 916-691-0311 or via e-mail at Christina.Gritsch@cdcr.ca.gov.

*Original signed by:*

TIMOTHY M. LOCKWOOD, Chief
Regulation and Policy Management Branch
Division of Administrative Services

# Appendix D

This memorandum clarifies several changes to Chapter 6 of the Program Guide (2009 Revision), concerning inpatient care. References to the Department of Mental Health or DMH shall now mean the Department of State Hospitals (DSH) or CDCR's Psychiatric Inpatient Programs (PIP).

Additionally, patients must be treated, when clinically appropriate, in their least restrictive housing within the inpatient system. For patients outside of their least restrictive housing designation, as determined by Healthcare Placement Oversight Program, treatment plans should also be focused on helping the patient reach that less restrictive environment.

Chapter 6 of the Program Guide is also updated to reflect the following changes to the cited pages:

- Acute care is provided at the following institutions: For males, California Medical Facility (CMF-PIP) and California Healthcare Facility (CHCF-PIP); for females, California Institution for Women (CIW-PIP) and DSH-Patton. (Program Guide at 12-6-1.)
- Intermediate care is provided at the following institutions or state hospitals: For males, CMF-PIP, CHCF-PIP, Salinas Valley State Prison, San Quentin State Prison (for condemned males), DSH-Atascadero, and DSH-Coalinga. Intermediate care for females is provided at CIW-PIP and DSH-Patton. (Program Guide at 12-6-1.)
- The Day Treatment Program is no longer active. (Program Guide at 12-6-1 and 12-6-15 through 12-6-17.)
- While it remains the expectation that clinicians consider patients who have multiple crisis bed admissions for inpatient care (see Program Guide at 12-6-1), the Acute and Intermediate admission criteria is modified to permit admission for patients who have a documented pattern of repeated admissions to the Mental Health Crisis Bed for suicidal ideation or, for admissions to intermediate care, for self-injurious behavior. (Program Guide at 12-6-1, 12-6-2, and 12-6-7.)
- Treating clinicians generally are responsible for the initial evaluation as to whether a patient may be appropriate for referral to inpatient care. (Program Guide at 12-6-3, 12-6-7.)
- Documentation for referrals to and discharges from inpatient programs is now governed by the Electronic Health Record System (EHRS) referral documentation workflows. These workflows supersede the lists of documents for referrals and discharges at 12-6-4, 12-6-6, 12-6-10, and 12-6-14. In addition, references to the "SRAC", "128C" or "128-MH6" due process documentation, and RVR documentation are also governed by their EHRS counterparts.
- Under acute admission procedure, on 12-6-5, the sentence "Inter-institutional endorsements for transfer of inmate-patients accepted into the APP are processed by the Classification and Parole Representatives (C&PR) at California Medical Facility (CMF)"

is struck. Additionally, the reference to the "CMF Chief Deputy, Clinical Services, or designee" is also struck.

- The sentence on 12-6-6, "[t]here will not be direct admissions from CDCR to CSH at this time," is struck.

- Language at 12-6-6 and 12-6-8 limiting placement of "high custody" patients to only Salinas Valley's intermediate program are struck.

- The last paragraph of page 12-6-9, concerning California Men's Colony and CIW retaining the unit health record for patients transferred to DSH-Atascadero or DSH-Patton is struck.

- Intermediate admission criteria number five on page 12-6-9 is modified to clarify that for patients treated at a DSH program and approaching their institutional release date, pre-release planning shall be provided by *both* CDCR and DSH. Additionally, the section is modified to clarify that patients can be institutionally released directly from a DSH program or a PIP. When a patient is unsuitable for public transit or is considered high control, pursuant to Penal Code 3060.7, the patient may be transferred to a CDCR institution closer to the county of release one calendar day prior to release date. In addition to parole, patients may discharge directly to a community hospital for 5150 holds or to an appropriate facility for those paroling as mentally disordered offenders.

- References to the "Parole and Community Services Division" or "P&CSD" now mean Division of Adult Parole Operations or DAPO. (Program Guide at 12-6-13, 12-6-14, 12-6-17.)

- Intermediate discharge criteria are modified to strike the third criterion at 12-6-13 for inmates who withdraw informed consent. Discharge decisions are made by the patient's Interdisciplinary Treatment Team. Patients may be discharged only if they can be satisfactorily treated at a lower level of care.

- In addition to duties outlined at 12-6-18, Coordinated Clinical Assessment Teams may hold case conference to discuss complex patients referred to or about to discharge from a PIP.

# Appendix E

| Policy Memo | Title 15 Provision(s) |
|---|---|
| Discontinuance of the "Four Points" Assessment (September 5, 2008) | § 3375.3(a)(5) |
| Classification Score Sheet—MHSDS Assessment Points (June 26, 2012) | § 3375.3(a)(5) |
| Placement Criteria for Substance Abuse Treatment Programs (April 16, 2013) | §§ 3040.1(a), (b) |
| Milestone Completion Credits for Participants in the MHSDS at EOP LOC (July 7, 2014) | § 3043.3(f)(2) |
| Minimum Custody and 2 for 1 Credits (June 5, 2015) | §§ 3043.2(b)(5)(A), 3044(b)(8)(B) |
| Televisions in Segregation Units (Mar. 12, 2007); Classification re Entertainment Appliances in ASU (Apr. 27, 2007); Entertainment Appliances in Administrative Segregation (Dec. 14, 2010); ASU Requirements re Clustering and Entertainment Appliances (Mar. 20, 2013); Multi Powered Radio Loaner Program in ASU (Jan. 22, 2014) | § 3190(k)(3) & DOM, Appendix A, Property Matrix for Segregation |
| NDS EOP and CCCMS Release or Transfer Timeline (Dec. 3, 2013) | § 3335(a) |
| NDS Property Matrix (Dec. 30, 2013) | § 3190(c) & DOM, Appendix D, NDS Personal Property Matrix |
| 120-Day Pre-MERD (Sep. 12, 2014) | § 3341.8(b) |

| **Policy Memo** | **Title 15 Provision(s)** |
|---|---|
| Revised Segregation Housing Units Regulations (June 5, 2015) | § 3340, *et seq.* |
| Instructions for Awarding Favorable Behavior Points for Inmate-Patients Assigned to an Enhanced Outpatient Program in General Population (May 18, 2006) | § 3375.4(a) |
| Utilization of Administrative Determinants Based Upon Positive and Negative Behavior and Increased Access to Rehabilitation Programs (July 5, 2016) | §§ 3375, 3375.2 |
| Reasons for Retaining Inmates in Segregated Housing (Sep. 22, 2016) | § 3335 |