IN THE UNITED STATES DISTRICT COURT
                  FOR THE EASTERN DISTRICT OF CALIFORNIA


     RALPH COLEMAN, et al.,

                    Plaintiffs,
                                          Case No. 2:90-cv-00520
              vs.
                                          Sacramento, California
     EDMUND G. BROWN, JR., et             June 28, 2018
     al,                                  10:00 a.m.

                    Defendants.
     _____  /


                           STATUS CONFERENCE
                BEFORE THE HONORABLE KIMBERLY J. MUELLER
                     UNITED STATES DISTRICT JUDGE


     APPEARANCES:

     For the Plaintiffs:       ROSEN BIEN GALVAN & GRUNFELD LLP
                               BY:  MICHAEL BIEN
                                    CARA E. TRAPANI
                                    THOMAS B. NOLAN
                               50 Fremont Street, 19th Floor
                               San Francisco, California 94105


     For the Defendants:       OFFICE OF THE
                                CALIFORNIA ATTORNEY GENERAL
                               BY:  ANDREW GIBSON
                                    JAY C. RUSSELL
                                    ELISE O. THORN
                                    TYLER V. HEATH
                                    Deputy Attorneys General
                               1300 I Street, Suite 125
                               Sacramento, California 94244


     Court Reporter:           DIANE J. SHEPARD, CSR 6331, RPR
                               Official Court Reporter
                               501 I Street, Rm 4-200
                               Sacramento, California 95814
                               (916) 554-7460

     Proceedings reported by mechanical stenography, transcript
     produced by computer-aided transcription.

1          THE CLERK:  Calling civil case 90-520, Coleman, et

2    al., versus Brown, et al.  This is on for a status conference.

3          THE COURT:  Good morning.  Appearances, please.

4          MR. BIEN:  Good morning, Your Honor.  Michael Bien,

5    Cara Trapani and Tom Nolan for plaintiffs.

6          THE COURT:  All right.  Good morning to each of you.

7          MR. GIBSON:  Good morning, Your Honor.  Andrew Gibson,

8    Elise Thorn, Jay Russell and Tyler Heath for the defendants.

9          THE COURT:  All right.  Good morning to each of you.

10      That microphone keeps ending up right so it blocks my view,

11    potentially, of the lead counsel on this side of the courtroom.

12    Ms. Schultz, if you can just push that down.

13      All right.  This is on for a status as ordered by the Court.

14    I have just a few questions.  I've reviewed the record and the

15    parties' joint status report.  I have a few questions and

16    thoughts.  I would like to work through the questions.  I'll

17    share with you what I plan to do and give you an opportunity to

18    comment on those plans.

19      First, with respect to telepsychiatry, where there's been

20    significant progress -- some remaining issues but significant

21    progress with a draft policy that I've reviewed and compared it

22    to my prior order.

23      And I guess I should also make clear for those of you in the

24    know, you may notice that the Special Master is not in the

25    courtroom.  He has not been relieved.  Dr. Metzner is sitting at

1    the side table representing the Special Master.  The Special

2    Master is listening in by phone.  He is in the building.  His

3    bag did not leave Boston yesterday, and he was unable to find

4    court attire this morning before the hearing started, and so I

5    granted his request to listen in only.

6        So with respect to telepsychiatry, I just wanted to clarify.

7    I don't think there is any dispute here.  There is no dispute,

8    really, that reliance on telepsychiatry in the CCCMS context is

9    likely within the national standard of care.  That's my

10   understanding.  I wanted to make certain there is no

11   disagreement.  Despite the fact there may not be peer-reviewed

12   literature in the correctional setting.

13       Do I have that right, Mr. Bien?

14           MR. BIEN:  Yes, Your Honor.  We agree to its use in

15   CCCMS.

16           THE COURT:  And for the defense, anything to say on

17   that?  Who is the point person on this issue?

18           MR. GIBSON:  That's me, Your Honor.  No.

19           THE COURT:  So my thought would be from that point,

20   from the bench, to authorize that use immediately, make clear

21   that issue has been presented to the Court, I've considered it,

22   it's use is authorized immediately pending approval of the whole

23   policy.

24       Any problem with that, Mr. Bien?

25           MR. BIEN:  No, Your Honor.

 1          THE COURT:  So that's the Court's order.

 2      In terms of what I understand is a core dispute about

 3  whether EOP is quote, unquote, outpatient, as a term of art, my

 4  question for the defense, really, is looking at the revised

 5  program guide it seems to me outpatient has to be understood

 6  within the MHSDS context.  Why is it not fair to clarify that

 7  EOP is residential, again, as a term of art?

 8      You're looking at the revised program guide, and I can give

 9  you specific cites, 12-4-1, 12-3-16 and 12-1-7.  Why is

10  residential not the right label?

11          MR. GIBSON:  Your Honor, the way the EOP program has

12  been instilled since 2009 and until today it has been operated

13  as an outpatient program.  There has been no inpatient

14  quasi-residential housing for the EOP population.  It operates

15  under the rubric in the program guide as an outpatient program.

16          THE COURT:  Is that semantics?  Is that essentially a

17  semantics argument?  Would another label be minimal inpatient?

18          MR. GIBSON:  Your Honor, I mean, it's enhanced

19  outpatient.  That's what it's called.  And I believe that's what

20  it's envisioned to be is an outpatient program.  I don't know if

21  it's semantics or not.

22          THE COURT:  It is residential.  You're saying that

23  doesn't matter?

24          MR. GIBSON:  No.  I don't say that it doesn't matter,

25  Your Honor.  I'm saying that that's not necessarily accurate.

1    It's an outpatient program.

2        Now, whether or not it's residential, in the terms of

3    telepsychiatry it's our position that telepsychiatry would be

4    applicable to a residential program, even assuming that that's

5    what it's called.  We're not conceding that.  But our position

6    would be even assuming it is residential, that telepsychiatry

7    would be appropriate for that population.

8            THE COURT:  So I want to make certain I understand.

9    Are you saying, in part, that the -- has the revised program

10   guide not caught up with what's happening on the ground in this

11   respect?  Or is it fair for me to refer to the revised program

12   guide for its description of EOP?

13       (Pause in proceedings.)

14           MR. GIBSON:  Thank you, Your Honor.  I apologize for

15   the delay.

16       Our position is that the way that the EOP population has

17   been dealt with, treated in terms of secluding them is for their

18   protection.  It's not necessarily required for their treatment

19   as an inpatient -- akin to an inpatient population.  It's more

20   for their own protection from being victimized by other inmates

21   in the general population.

22           THE COURT:  What does that mean for the revised

23   program guide language?

24           MR. GIBSON:  I'm sorry, Your Honor.  Does the revised

25   program guide refer to it as residential?

1          THE COURT:  Characterized by a separate housing unit.

2     Structured activities.  It's the most intensive level of

3     outpatient mental healthcare.  This is some of the language on

4     12-4-1.  Critical components included a designated housing unit.

5     Sounds residential to me.

6          MR. GIBSON:  Again, Your Honor, as we just explained,

7     that was for their own safety and security.  Not for the

8     purposes of treatment.  It's an outpatient program.  That's our

9     position.

10          THE COURT:  You'll have an opportunity to clarify your

11     position in writing.

12       Mr. Bien, your thoughts on this question?

13          MR. BIEN:  EOP was set up and continues to operate as

14     a residential program, not only for purposes of protection but

15     also primarily for purposes of treatment.  EOP patients' primary

16     job mission is treatment.

17       By clustering them into a residential unit, they have a

18     higher level of supervision.  The staff is able to get to them.

19     They have different requirements for how frequently they see

20     case managers and all sorts of things.

21       Only recently have they been allowed to mix with other

22     prisoners anywhere including, you know, yard or work.  It was

23     always segregated.

24       We have encouraged on an individualized basis for access to

25     programs and activities if a particular patient is ready to go

1    to a class, or go to a job, or outside of the EOP program -- and

2    that's a big deal -- they're going to be able to leave the EOP

3    program -- then the treatment team, working with custody, can

4    approve of that.  Otherwise EOP remains in their residential

5    program.

6        And, again, this is a very high level of care.  Both

7    defendants and plaintiffs have talked about it on the outside as

8    something that would be like a board-and-care in the community

9    or possibly even in a state mental hospital.  It depends,

10    really.  Some of the EOPs are in that range.  So it's definitely

11    a residential program.  It's definitely a very high level of

12    psychiatric care.

13        THE COURT:  All right.  In my order following this

14    hearing, I'll explain my thinking along those lines.  I am

15    inclined to think that residential label makes some sense here.

16        Related to the dispute more broadly about telepsychiatry, at

17    least to the extent there are disputes left, noting, again, the

18    significant progress made, I have reviewed carefully the CDCR's

19    proposal and also my prior order.

20        And my impression is that the proposal, in its current form,

21    flips the presumption that I intended to signal with my prior

22    order, that is, in-person sessions is the clear preference for

23    all populations.  There is a strong need to avoid the creation

24    of incentives to use telepsychiatry as the first preference.

25    And I have concerns about the language in the proposal doing

1    that.

2        I think the proposal is close to something the Court could

3    approve that is consistent with its prior order.  And so my

4    tentative plan is this, subject to hearing from you, I would

5    direct the Special Master to file his proposed policy within

6    30 days of today's date.  That is consistent with what I've

7    signalled, again, in my prior order.

8        It would be based on his expert's views, and he would

9    package that proposed policy with the parties' comments.  So he

10   would collect those from the parties.  And that would give the

11   defense a chance to tell me more about why the residential label

12   doesn't fit for EOP and any other comments it has on the Special

13   Master's proposed policy.

14       In the process of proposing a policy, the Special Master

15   would clarify the cell-front consults.  I understand there is

16   another tour that's being planned.  And so that issue identified

17   in the joint status report would be addressed that way, and the

18   policy would also address the outstanding dispute regarding

19   nurse practitioners.

20       So that's my plan.  I believe, given the progress made, this

21   is the best way to move this forward as quickly as possible to

22   clarify the landscape for the staffing issue, and I'll talk more

23   about that in just a moment.  But it would clarify the landscape

24   so that the parties are on track to maximize the chance of

25   reaching the goal posts the Court has set for October.

1      So any reason not to follow that process with regard to

2  telepsychiatry?  Mr. Bien first.

3          MR. BIEN:  We're comfortable with that plan, Your

4  Honor.

5          THE COURT:  Mr. Gibson.

6          MR. GIBSON:  Yes, Your Honor.  This may be something

7  that we would bring up in the event that your suggested plan

8  goes forward and we file objections.  We just want to make clear

9  that we understood that the Court's order was that there would

10  be a meet and confer as to this issue.

11      Defendants have seen no evidence during this meet-and-confer

12  process that telepsychiatry is any less effective than

13  in-person, face-to-face encounters, that there's been any

14  negative outcomes.  We've seen nothing.  No evidence whatsoever.

15      And, in fact, the contrary is true.  All evidence has been

16  in support of telepsychiatry as a means to deliver mental

17  healthcare to both inpatient, outpatient, incarcerated,

18  non-incarcerated.  And so right now any kind of limitation on

19  telepsychiatry other than what's in CDCR's proposed policy is

20  not supported by any of the evidence that defendants have seen

21  to date.

22      And I believe that the Court's February order was at least

23  that there would be a record developed.  And we haven't seen any

24  record that would suggest telepsychiatry is any less effective

25  than in-person, or, that it much less violates anybody's Eighth

1   Amendment constitutional rights.

2          THE COURT:  And you've presented to the -- is it the

3   All-Parties Working Group, you've presented to that group all of

4   the evidence you have that you believe supports your conclusion?

5          MR. GIBSON:  We have supported literature, the APA's

6   policy on telepsychiatry.  We've submitted a staffing proposal

7   which identifies telepsychiatry as a legitimate means of

8   delivering telepsychiatry.  Indeed, the entire state of Texas --

9   the prison system in Texas delivers mental healthcare via

10  telepsychiatry.

11      So the evidence is all in favor and nothing against.  And we

12  feel any kind of limitation just would not be supported by the

13  record as defendants have seen it so far.

14         THE COURT:  Well, I am prepared to review the record

15  more closely.  And so any record you want me to scrutinize in

16  looking at the Special Master's proposal -- I'm not approving

17  his proposed policy in advance -- you can let me know.

18      So that would be the idea.  Rather than taking the time for

19  an extended period of objections, again, my thought is to have

20  the Special Master package up the comments, and anything the

21  parties want me to consider in reviewing and ultimately deciding

22  on his proposed policy, I would review.

23      So you would have a chance to present that to me in the

24  format that is the most useful to educate me about your

25  position.  Telepsychiatry has a role to play.  There is no doubt

1    about that.  All right.

2         MR. GIBSON:  Your Honor, I apologize.  Just by way of

3    asking.  What would be the timeframe for -- you said 30 days for

4    the Special Master's proposed policy.  And what would be the

5    timeframe for our objections?

6         THE COURT:  My thought was 30 days for the entire --

7    I'm not calling them objections, but you can style them as

8    objections.  What I'm saying is he would present to me an entire

9    -- what he files is the proposed policy with your respective

10   comments.

11        MR. GIBSON:  Within 30 days.

12        THE COURT:  So you should start working on them now.

13   If it turns out the Special Master, with the parties' input,

14   decides he needs another 15 days, he can let me know.  But the

15   whole notion is given the significant groundwork laid, I think

16   you may be at impasse on certain issues, and I'm prepared to

17   resolve those impasses and clarify the landscape so you can

18   focus the bulk of your attention on staffing.

19        MR. GIBSON:  Your Honor, with that being said, as

20   stated in the joint report, both parties agree that

21   telepsychiatry and the staffing proposals and the staffing

22   issues are inter-related.

23        THE COURT:  Well, I'm aware of that, but I still --

24   why not take telepsychiatry first, again, given that that does

25   -- that clarifies certain assumptions.

1          MR. GIBSON:  Well, Your Honor, because some of the

2    proposals rely heavily on telepsychiatry, and so there may be

3    inconsistent results.

4        If we can take them all at the same time -- if we come to an

5    agreement as to the proposals on telepsychiatry, that can

6    resolve some issues without, you know, without going to the

7    Court for answers.  Maybe the parties can resolve it themselves

8    during the proposals.  Two of the proposals in particular talk

9    about telepsychiatry as use of on-call, after hours on-call

10   duties applying to the desert institutions.

11       Without further discussing those measures, reaching some

12   kind of resolution, there may be some kind of inconsistent

13   results as to what the policy is before the Court in 30 days and

14   what the parties may come to agreement to afterwards.

15          THE COURT:  So you, in good faith, are representing to

16   the Court you believe that there is the chance the parties will

17   reach agreement on all aspects of a telepsychiatry policy even

18   with my clarification regarding what my order meant?

19          MR. GIBSON:  No, Your Honor.  What I'm saying is that

20   the parties may reach agreement as to CDCR's proposals for

21   adjusting the staffing ratios and allocations, and that part of

22   those discussions and agreements involve the use of

23   telepsychiatry in certain avenues.

24       And a policy that is issued before then, before the parties

25   are even able to reach an agreement on those proposals or reach

1   an impasse, one of the two --

2          THE COURT:  You think staffing comes first?  I

3   understand the chicken and egg.  I have thought about this.  And

4   in fact, my conclusion has been -- my tentative coming into this

5   hearing was to the extent that staffing and telepsychiatry are

6   intertwined, it makes sense to clarify telepsychiatry first.

7       Do you think they cannot be unbundled?

8          MR. GIBSON:  I think for consistency and clarity if

9   they are resolved at the same time -- if the parties reach an

10  agreement as to the proposals, then we can address

11  telepsychiatry at that time.  If the parties reach an impasse as

12  to the proposals, then we can talk about telepsychiatry at that

13  time.  I don't understand why there is a rush to do

14  telepsychiatry.  Why can't we do them at the same time?

15         THE COURT:  Let me see what the plaintiffs say about

16  that.  I think my question would be to clarify.  I mean, I've

17  already told you that I've looked back at my order, and I see a

18  disconnect, in part, between what I've said previously about the

19  use of telepsychiatry and the draft policy that was provided

20  with the joint status report.

21      And so, at the very least, it seems to me I should clarify

22  what I meant in my prior order so that there is not a lurking

23  motion for reconsideration embodied in the proposed policy.  So

24  that, at the very least, I need to clarify for you what I meant

25  because there may be a misperception about what I meant

1    previously.

2            MR. GIBSON:  Well, we welcome a clarification, Your

3    Honor.

4            THE COURT:  Mr. Bien, if there's a chance that the

5    parties come together with something that the Court would

6    approve, and it doesn't delay meeting the October deadlines, is

7    that the way I should go?

8            MR. BIEN:  We think that the telepsychiatry issue

9    needs to be resolved independently, and that resolving it will

10   actually help the parties reach agreement on the remaining

11   staffing issues.

12     We've been disputing telepsychiatry, which has been in use

13   for many, many years, and I think we've come a long way.  We've

14   briefed it to Your Honor in depth before, which resulted in your

15   ruling last year.  And we think that the final disputes, though

16   relatively minor compared to where we started out, are

17   significant.

18     Defendant's position remains that they want to reserve their

19   right to do telepsychiatry anywhere and everywhere.  And we

20   think that that flips, as the Court said, what you found before,

21   and we think we've already introduced extensive evidence as to

22   why that is a problem.  And that telepsychiatry is a good

23   supplement, and it's appropriate for certain patients, but it

24   needs to be cabined and limited in an effective mental health

25   system.

1              THE COURT:  If I clarified what my order meant, would

2      that be sufficient to allow the parties then to reach agreement?

3              MR. BIEN:  I think that the remaining disputes, again,

4      which are -- we're focusing on the policy that was attached to

5      the joint statement, which is different than the position that

6      the staffing experts took in their report, which was 100 percent

7      telepsychiatry.  I think it would be very useful to resolve

8      those final disputes so that the program guide section on

9      telepsychiatry can be finished.

10         And telepsychiatry is already in use in the system right

11     now, and we think that these policies need to be finalized and

12     implemented.  And once those are in place, they will guide the

13     parties in terms of the final resolution of the staffing ratios

14     and changes that defendants are requesting.

15             THE COURT:  All right.  Well, let me think about the

16     parties' respective positions.

17         Regardless, once there is clarification on telepsychiatry,

18     it's understood that the Special Master will monitor for at

19     least a year.  That's understood and accepted?

20             MR. GIBSON:  Yes, Your Honor.

21         I don't want to belabor the point, but that there shouldn't

22     be any limitations on it absent evidence to the contrary.  And

23     limiting any level of care other than what is already put in the

24     policy, including EOP, whether residential or not, limiting the

25     use of it and then monitoring it wouldn't provide the full

1    detail that is necessary; rather than letting it go forward as

2    currently contemplated by CDCR's policy, and we welcome the

3    Special Master to monitor for the next year and to determine

4    whether or not it is an adequate system of delivering mental

5    healthcare to the population.

6         THE COURT:  Let me think about that.  In terms of the

7    intertwining of staffing and telepsychiatry, if I understand

8    correctly, the use of telepsychiatry could reduce certain

9    vacancy rates but not allocations.  Right?

10        MR. GIBSON:  No.  No.  Well, it will do a number of

11   things.  It will help with hiring and retention, but it will

12   also help in terms of the adjusting the staffing proposals.

13        THE COURT:  But not allocations?

14        MR. GIBSON:  Yes.  There are ratios that will be

15   adjusted with a reliance on telepsychiatry.  Namely, the desert

16   institutions.  The use of telepsychiatry for mental healthcare

17   at the desert institutions is part of our proposal.

18        THE COURT:  I understand that.

19     So on staffing, here's my general observation, while keeping

20   in mind what the defense has just said, my perception, based on

21   the information provided in the joint status report is, again,

22   that real progress is being made, the parties are actually in

23   the throws of working through a number of issues, with documents

24   exchanged only recently.  There's an All-Parties Workgroup

25   meeting on July 9th.  There are helpful signs.  And so my

1   thought is to let the process take its course, looking towards

2   October.

3        I would note it appears to me that as part of that process

4   the parties have not really exhausted the clustering concept,

5   which the Court has discussed with the parties, has written

6   about, and so my assumption is that clustering remains on the

7   table as part of that All-Parties Workgroup discussion.

8        And I understand there's progress being made on the ratios

9   issue.  And so my thought is to wait on staffing.  Here, I would

10  provide some guidance on the process leading up to the October

11  hearing given the defense reserving its right to file a motion.

12  And so I have thoughts about how to clarify any remaining

13  disputes, once you complete your constructive process, that

14  would defer motion practice until after October.

15       So just before I talk about that, any reason not to leave

16  staffing where it is right now, without the Court providing any

17  further guidance?  Mr. Gibson?

18            MR. GIBSON:  No, Your Honor.

19            THE COURT:  Mr. Bien?

20            MR. BIEN:  I think the Court has identified, and I

21  think we have identified the tension between, you know,

22  negotiation and litigation.  And we are working in good faith to

23  resolve these issues and making good progress on all these

24  issues in this period of time.

25       But as counsel for the plaintiffs, we're concerned with the

1    fact that there is still a bunch of experts that we haven't met,

2    haven't received a lot of materials about.

3        And we were just informed last week the defendants have

4    hired another litigation expert, a labor economist.  I guess to

5    go to salaries and benefits, I assume.  We don't really know who

6    this person is or persons.

7            THE COURT:  I saw the footnote.

8            MR. BIEN:  So I guess as long as -- if and when there

9    is a dispute -- and I think it's certainly possible that there

10   will be some issues that the parties don't reach agreement on --

11   then I think there needs to be an opportunity for defendants to

12   present expert reports or declaration, or something, and then an

13   opportunity to depose.  That can be done in an expedited

14   fashion.

15           THE COURT:  Prior to October?

16           MR. BIEN:  Prior to -- either if you're going to have

17   a hearing -- if you want the people to testify at the hearing,

18   or, if there's going to be a time after the hearing, but I just

19   think that needs to be worked in.

20       Because right now we have not pressed the issue.  We've

21   asked some questions.  We asked a lot of questions of defendants

22   about the expert report.  They provided some answers, and then a

23   lot of things they didn't, which is their right at this point.

24   But we still do not have adequate discovery into the methodology

25   or the background or otherwise of these experts and their

1    recommendations.

2        And I think as to the labor economist, that issue was

3    brought up in the workgroups that there is an issue about the

4    adequacy of compensation and benefits for psychiatrists.  I

5    think we briefed that to you, Your Honor, last year.  And we had

6    hoped that if there was going to be a labor economist, it was

7    going to be a person that we would work jointly with rather than

8    having another set of litigation experts.

9        And, you know, we thought that that would -- again, we would

10   like to suggest that again.  That rather than defendants hiring

11   an expert, we have to hire an expert, and you are presented with

12   two competing narratives to resolve, that we work with somebody

13   together.  And to the extent this person adds some information

14   important to the Court, it would be available to all of us and

15   be developed together, supervised by the Special Master.  So

16   that's what we would suggest.  It would be more cost effective

17   and less adversary.

18           THE COURT:  Well, what about this approach?  The

19   parties could file a further joint status report just focusing

20   primarily on procedure leading up to October, and so that could

21   be filed, for example, by August 3rd.

22       The Court really wants to keep you on the problem-solving

23   track as much as I can while recognizing that there may be some

24   litigation, but, ultimately, if there is litigation, hopefully

25   it's narrowed to the disputes that really need to be litigated.

1      So a status report filed by August 3rd, unless you give me a

2   different date, could propose a schedule leading up to the

3   October hearing date that contemplates any disputes the parties

4   really believe need to be litigated or at least the subject of

5   discovery.

6      And in that status report, if the parties wanted to

7   memorialize any meet and confers at that point in time, just to

8   briefly summarize what's been accomplished and what remains,

9   they could do that.  My thought had been, still, by

10   September 7th to require a full status report that covers the

11   substance of what we would review again in October.

12      And by that time, at least if not by the August status, by

13   the September 7th, what the Court would be looking for is a

14   detailed review of the parties' positions, and the parties

15   hopefully could look to that as an alternative to litigation to

16   the extent possible.

17      But in an August 3rd status report I could leave open the

18   possibility of motion practice on a separate track leading up to

19   October so as to really maintain the focus on October as a

20   critical inflection point.

21      Does that make sense?  Two status reports.  One August 3rd.

22   The parties meet and confer, tell me what they think the right

23   procedure is leading up to October while maintaining the focus

24   on full participation, full open transparent participation in

25   the All-Parties Workgroup.  If the defense hasn't considered a

1    joint labor economist, consider that.  And then September 7th

2    beginning to narrow the focus to the merits.

3         Does that work, Mr. Gibson?

4              MR. GIBSON:  Yes, Your Honor.

5              THE COURT:  Mr. Bien?

6              MR. BIEN:  Yes, Your Honor.

7              THE COURT:  All right.  And then I would promptly

8    review the status report to be filed by August 3rd, and if there

9    is an expedited procedure for depositions, exchange of

10   documents, I would be prepared to approve that promptly by the

11   early part of the next week.

12        All right.  Anything else we should discuss today?

13   Mr. Bien?

14             MR. BIEN:  No, Your Honor.

15             THE COURT:  Mr. Gibson?

16             MR. GIBSON:  No, Your Honor.

17             THE COURT:  All right.  I'll issue a short order

18   memorializing what we covered here and resolving the issue on

19   telepsychiatry, letting you know at least how I'm going proceed.

20   And I will, regardless, clarify what I meant when I last wrote

21   about telepsychiatry.

22        All right.  We're adjourned.

23        (Court adjourned.  10:44 a.m.)

24

25

1                          CERTIFICATION

2

3        I, Diane J. Shepard, certify that the foregoing is a correct

4    transcript from the record of proceedings in the above-entitled

5    matter.

6                              /s/ DIANE J. SHEPARD
                               DIANE J. SHEPARD, CSR #6331, RPR
7                              Official Court Reporter
                               United States District Court
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25