IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

RALPH COLEMAN, et al.
    Plaintiffs,

    vs.                        No. 2:90-cv-0520  KJM DB (PC)

EDMUND G. BROWN JR, et al.,
    Defendants.

**SPECIAL MASTER'S REPORT ON THE PROPOSED TELEPSYCHIATRY POLICY ADDENDUM TO THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION MENTAL HEALTH SERVICES DELIVERY SYSTEM PROGRAM GUIDE**

## I. INTRODUCTION

Subsequent to a June 28, 2018 status conference dedicated to staffing and telepsychiatry, on July 3, 2018, the court issued an order directing that within 30 days, the Special Master finalize a proposed telepsychiatry policy that was in his view consistent with the provisions of the court's October 10, 2017 order (ECF No. 5711) and the recommendations of his experts. ECF No. 5850 at 6, 8.[1]  Specifically, the court directed the Special Master to propose resolutions to two outstanding policy disputes – the use of cell-front telepsychiatry and the use of psychiatric nurse practitioners to perform telepsychiatry.  *Id*. at 6.  The court was clear in its intention that "[t]he recommendations of the Special Master concerning the use of telepsychiatry, as clarified by the October 11, 2017 order, shall – or should, in the obligatory sense – form the basis of the telepsychiatry addendum to the Revised Program Guide."  *Id*. at 5.

---

[1] All Electronic Case Filing (ECF) citations are to the page number assigned by the court's ECF system.

1

## II.  BACKGROUND

### A. History of Telepsychiatry Policy Development and Subsequent Revisions

Telepsychiatry was proposed for use as a method of providing mental health treatment to CDCR inmates nearly two decades ago.  ECF No. 974 at 2-3.  By October 1998, it was already in use in 12 institutions.  *Id*. at 3.  In response to persisting staffing vacancies, defendants proposed the continuance of the telepsychiatry program in their February 2, 2015 "Report on Review of Mental Health Staffing."  ECF No. 5269 at 9-10.  At the time, the statewide telepsychiatry program employed 28 staff psychiatrists working out of three offices.  *Id*. at 9.  On May 18, 2015, the court ordered defendants to proceed with the proposals in their February 2, 2015 report.  ECF No. 5307 at 6.

On May 6, 2016, the Special Master filed his Twenty-Sixth Round Monitoring Report, in which he found that defendants had "demonstrated no sense of the required urgency for a meaningful implementation" of the February 2, 2015 revised staffing plan, resulting in little to no change in mental health staffing throughout the department.  ECF No. 5439 at 31.  In an August 9, 2016 order adopting the Special Master's Twenty-Sixth Round Monitoring Report recommendations, defendants were directed to provide the Special Master with monthly updates on their implementation of their staffing plan.  ECF No. 5477 at 8.

The parties discussed the modification and expansion of the existing telepsychiatry policy during All-Parties Workgroup meetings held over a period of several months, beginning in July 2016.  By January 2017, CDCR telepsychiatry staff had grown to 48 providing services to 18 institutions.  On February 6, 2017, the Special Master filed his Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan, in which he recommended

2

the continued expansion of the telepsychiatry program, with certain caveats. ECF No. 5564 at 17.

Specifically, the Special Master found that: (1) telepsychiatry should serve as a supplement for on-site psychiatry and should only be utilized when institutions were unable to recruit psychiatrists to work on-site; (2) defendants should be required to continue their efforts of recruiting full-time psychiatrists to work on-site at the facilities; (3) on-site psychiatrists should not be allowed to migrate to remote off-site offices for the sake of convenience; (4) telepsychiatry was not clinically desirable as a frontline approach to providing psychiatric services for inmates with the most intensive or emergent needs; (5) telepsychiatry was an appropriate option for 3CMS inmates with the requirement that the telepsychiatrist work on-site at least twice per year at the designated institutions and more frequently if feasible; (6) the efficacy of telepsychiatry for EOP inmates was not clear or recommended as a permanent solution; however, where used it was recommended that a psychiatrist be on-site at least quarterly to treat EOP inmates, given the frequency of psychiatric contacts required by the Program Guide; and (7) telepsychiatry was not an appropriate method of treatment to be used regularly for inmates at the MHCB level of care[2] and should only be used as a last resort or in emergency situations when an on-site psychiatrist was not available. *Id*. at 15-17.

On October 10, 2017, the court issued an order indicating that the time was ripe for an "addendum to the Revised Program Guide that will govern the use of telepsychiatry and the extent to which telepsychiatrists may provide mental health services in place of on-site

---

[2] At the time of the writing of the Special Master's Report on the Status of Mental Health Staffing – prior to the July 2017 implementation of Lift and Shift (which transferred authority over the PIPs from DSH to CDCR) – the use of telepsychiatry in the PIPs was not an issue before the Special Master.

psychiatrists going forward." ECF No. 5711 at 23. With one clarification,[3] the court adopted the Special Master's recommendations related to telepsychiatry, ordering that they shall form the basis of the addendum to the Revised Program Guide. *Id*. The court set a deadline of one year from the date of the order for task completion and implementation. *Id*. Neither party filed objections to the court's order.

Subsequent to a February 14, 2018 status conference related to staffing, the court issued an order on February 15, 2018 directing in part, that the parties provide the court with an answer related to the role telepsychiatry does and can play, consistent with the Eighth Amendment, to aid in solving the psychiatrist staffing shortage. ECF No. 5786 at 3-4. The parties were ordered to file a joint status report on or before June 21, 2018 informing the court of their progress in resolving the question, with a further status conference set for June 28, 2018. *Id*. at 4.

In response to the court's order, in March 2018, defendants provided plaintiffs and the Special Master with a copy of the existing telepsychiatry policy to inform discussions scheduled to occur during a series of upcoming All-Parties Workgroup meetings. These discussions resulted in a number of policy revisions, ultimately culminating in a May 10, 2018 revised draft telepsychiatry policy. As ordered by the court, the parties filed their joint status report on June 21, 2018. ECF No. 5841. In it, they informed the court that four major disagreements remained related to the draft telepsychiatry policy: (1) whether the policy required specific language stating that telepsychiatry was not appropriate at the MHCB and PIP levels of care, (2) whether the policy required specific language stating that telepsychiatry should serve as a supplement for

---

[3] "The clarification is to the first recommendation, confirming that telepsychiatry should serve as a supplement, rather than a substitute, for on-site psychiatry and should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists." ECF No. 5477 at 23.

4

on-site psychiatry and should only be utilized when institutions were unable to recruit psychiatrists to work on-site, (3) whether cell-front telepsychiatry should be used, and (4) whether psychiatric nurse practitioners should be able to provide telepsychiatry services. ECF No. 5841 at 7-8.

Pursuant to court order, ECF No. 5786, the court held a status conference on June 28, 2018. As stated previously, subsequent to the status conference, on July 3, 2018, the court issued its order directing the Special Master to finalize a proposed telepsychiatry policy consistent with the provisions of the court's October 10, 2017 order (ECF No. 5711) and the recommendations of his experts. ECF No. 5850 at 6. With regard to the first two areas of disagreement outlined above, the court was clear in its intention that the Special Master's recommendations, as clarified by the October 10, 2017 order (ECF No. 5711), shall form the basis of the telepsychiatry addendum to the Revised Program Guide. ECF No. 5850 at 5. The court further directed the Special Master to propose resolutions to the areas of disagreement related to the use of cell-front telepsychiatry and whether psychiatric nurse practitioners should be permitted to provide telepsychiatry services. *Id*. at 6.

## III. CURRENT TELEPSYCHIATRY POLICY DEVELOPMENT AND REVISION PROCESS

Subsequent to the June 28, 2018 status conference, the Special Master facilitated further communications between the *Coleman* parties, the objective of which was to determine whether the parties could come to any agreements related to the remaining areas of dispute.

5

### A. Special Master's Development of the Court-Ordered Telepsychiatry Addendum to the Revised Program Guide

#### 1. *Coleman* Parties' Position Letters

In anticipation of the impending court order, during a July 2, 2018 workgroup meeting (on an unrelated subject), the Special Master informed the parties that he wanted to know whether there had been any change in their respective positions on the areas of disagreement since the status conference. He asked them to submit, within ten days, their final positions on the proposed telepsychiatry policy, including any documentation supporting those positions.

##### a. Plaintiffs' July 12, 2018 Submission

In a letter dated July 12, 2018, attached hereto as Exhibit A, plaintiffs informed the Special Master that with limited exception, their final positions on the proposed telepsychiatry policy remained substantially similar as had been represented in the Joint Status Report filed June 21, 2018. ECF No. 5841. The change was that plaintiffs were now "able to confirm their opposition to the use of cell-front telepsychiatry and allowing psychiatric nurse practitioners to provide telepsychiatric services." As a result, plaintiffs stated their final position on the proposed telepsychiatry policy was that it should: "(1) clearly state that telepsychiatry should be used as a supplement, rather than an a substitute, for on-site psychiatry, and include a preference for on-site psychiatry at all levels of care[4]; (2) clearly state that telepsychiatry is not appropriate at the MHCB or inpatient levels of care, and not appropriate for emergency care; (3) expressly

---

[4] "Plaintiffs acknowledge and do not contest the Court's holding that Defendants may use telepsychiatry for routine CCCMS care without limitation so long as they continue to make good faith efforts to hire on-site psychiatrists for such care and so long as the telepsychiatrists visit their institutions twice a year. *See* Order, ECF No. 5850 at 5 (July 3, 2018) (allowing CCCMS use of telepsychiatry so long as clinicians visit their institutions twice a year and so long as 'defendants continue a good faith effort to recruit on-site psychiatrists for all institutions providing CCCMS level of care')."

prohibit the use of cell-front telepsychiatry; and (4) ban PNPs from providing any telepsychiatry services."

In support of their final positions, plaintiffs included a report prepared by Dr. Pablo Stewart, entitled "Expert Report of Pablo Stewart, M.D. Regarding Defendants' Telepsychiatry Policy." Plaintiffs also provided "a compilation of 29 scholarly articles on telemedicine and telepsychiatry, including a number of studies that are critical to the use of telepsychiatry for certain high-risk or otherwise inappropriate patient populations."

### b. Defendants' July 6 and July 12, 2018 Submissions

On July 6, 2018, defendants provided the Special Master with a report prepared by Dr. Joseph Penn, attached hereto as Exhibit B, entitled "Telepsychiatry in Correctional Healthcare." Included were 21 articles and studies Dr. Penn relied upon to produce the report, in addition to cites to three others that were copyrighted and thus unable to be reproduced.

In their July 12, 2018 letter, attached hereto as Exhibit C, defendants informed the Special Master that their position on the scope and use of telepsychiatry remained unchanged from that represented in the parties' June 28, 2018 Joint Status Report (ECF No. 5841). In sum, defendants continued to maintain that telepsychiatry is appropriate for a correctional setting. Defendants further asserted their position that EOP is an outpatient level of care, despite the court's description to the contrary, that "the Revised Program Guide makes clear that EOP is a residential program." ECF No. 5850 at 5.

### 2. Observation of Mock Cell-Front Telepsychiatry Demonstration

The Special Master selected one expert and one monitor from his team to view a mock cell-front telepsychiatry demonstration at the California Health Care Facility on July 11, 2018. Representatives for the *Coleman* parties were also in attendance. Upon conclusion of the

demonstration, the Special Master's team members provided those in attendance with a brief summary of their conclusions on the potential efficacy of cell-front telepsychiatry. The Special Master's team found that: (1) given the technology utilized, the quality of sound was not sufficient for the use of cell-front telepsychiatry at present, (2) sound issues related to cell acoustics were unfavorable for the use of cell-front telepsychiatry, and (3) its use in an administrative segregation setting would likely have additional issues related to the physical plant and nature of the inmate population. They concluded that there were better options available at this time for cell-front encounters, such as having an on-site psychiatrist perform a cell-front assessment.

### 3. Further Policy Modifications

Subsequent to observation of the mock cell-front telepsychiatry demonstration and review of the parties' position letters, on July 16, 2018, the Special Master provided the draft telepsychiatry policy to his experts to review and provide recommendations as to the necessary modifications. What followed was a series of communications, including the exchange of several drafts, resulting in a modified version of the policy dated July 25, 2018—a copy of which was provided to the parties for review and comment on the same date.[5] Pursuant to the court's order (ECF No. 5850), the modifications were tailored related to the four areas of disagreement as previously outlined in Part II.A above.

<u>Limitations on the Use of Telepsychiatry in Residential and Inpatient Settings</u>

The telepsychiatry policy was modified to include specific directives pertaining to the use of telepsychiatry at the EOP, MHCB, and PIP levels of care.

---

[5] It should be noted for the record, that the May 10, 2018 draft telepsychiatry policy was used as the blueprint for the Special Master's final proposed telepsychiatry policy.

At the EOP level of care, telepsychiatry could supplement, but not replace, on-site psychiatry provided that unsuccessful, good-faith efforts were made to recruit on-site psychiatrists. On-site psychiatrists are required for each program providing EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan. The rationale for this requirement was that in a residential treatment unit, the psychiatrist's role includes attention to the treatment milieu, team building, and other functions, which cannot be adequately accomplished by remote psychiatrists.

At the MHCB and PIP levels of care, the policy was modified to prohibit the use of telepsychiatry except as a last resort or in emergency situations when an on-site psychiatrist is unavailable, predicated on unsuccessful, good-faith efforts to recruit and retain on-site psychiatrists.[6]

<u>Telepsychiatry as a Substitute for On-Site Psychiatry</u>

The telepsychiatry policy was modified to include a section on the permissible use of telepsychiatry at each level of care. For the 3CMS level of care, telepsychiatry may replace on-site psychiatry provided all other conditions pertaining to the 3CMS level of care contained within the policy are adhered to and good faith efforts to recruit on-site psychiatrists continue. At the EOP level of care, telepsychiatry could supplement, but not replace, on-site psychiatry.

---

[6] Interestingly, defendant DSH's July 1, 2012 transition plan entitled, "Transfer of the Department of Mental Health's Community Mental Health Programs to Other State Departments and Organizations" states in pertinent part, "The department's medical leadership reports that in general the role for telepsychiatry in the state hospital system is limited because it does not provide timely enough assessment and intervention for an in-patient population. Telepsychiatry also cannot be used for leadership of a clinical team or nursing staff." p.109 n.53

http://www.dsh.ca.gov/Publications/Transition_and_Reorg.aspx

At the MHCB and PIP levels of care, the use of telepsychiatry was prohibited, except as a last resort or in emergency situations when an on-site psychiatrist is unavailable.

### Use of Cell-Front Telepsychiatry

Consistent with the Special Master's team's assessment of the potential efficacy of cell-front telepsychiatry as outlined in Part III.A.2. above, the telepsychiatry policy was modified to prohibit, at the present time, the use of cell-front telepsychiatry. The qualifying terminology "at present" was added to the policy to indicate that this provision may change based upon subsequent improvements in technology.

### Use of Psychiatric Nurse Practitioners to Provide Telepsychiatry Services

The policy was modified to reflect that the use of psychiatric nurse practitioners to provide telepsychiatry services was restricted to the 3CMS level of care. The rationale for this modification was the elevated level of supervision required of psychiatric nurse practitioners to treat inmates at the higher levels of care.[7] By limiting the use of psychiatric nurse practitioners to the 3CMS level of care, the threshold for the level of supervision is not as high as with the residential and inpatient care programs, making feasible—in that limited capacity—the use of psychiatric nurse practitioners to deliver telepsychiatry services.

### Additional Policy Modifications/Clarifications

Additional policy modifications and/or clarifications implemented include:

- Added language to ensure access to the Electronic Health Records System (EHRS) for telepsychiatrists.

---

[7] Although it had no bearing on the Special Master's decision to modify the telepsychiatry policy related to the use of psychiatric nurse practitioners, it should be noted for the record that over the course of several workgroup meetings beginning in April 2018, defendants committed to providing plaintiffs and the Special Master with a copy of their policy governing the use of psychiatric nurse practitioners in the MHSDS. As of the time of this writing, defendants had yet to produce a policy for review.

- Added language to ensure treating telepsychiatrists participate in IDTTs.

- Added language to clarify that patients are not entirely excluded from receiving telepsychiatry services based upon their level of care.

- Removed additional language regarding the cell-front provision of telepsychiatry.

- Added language to clarify the role of telepsychiatrists in an EOP setting.

- Added language to clarify the role of telepsychiatrists in treatment and discharge decisions.

- Added language to clarify the role of telepsychiatrists in communicating patient issues to on-site staff and treatment team members.

During a workgroup meeting on July 30, 2018, the parties were provided the opportunity to ask the Special Master and his experts questions related to the latest policy draft. Plaintiffs had no questions. Defendants asked some clarifying questions related to policy provisions for the use of telepsychiatry at the EOP and 3CMS levels of care. Based upon the discussion at the July 30, 2018 workgroup meeting, the policy was further revised.

### 4. *Coleman* Parties' Comments on Modified Telepsychiatry Policy

As previously stated, on July 25, 2018, the Special Master provided the *Coleman* parties with a copy of the modified telepsychiatry policy and on July 30, 2018, the parties were provided the opportunity to discuss the policy modifications with the Special Master and his experts. Plaintiffs submitted their written response on July 31, 2018, attached hereto as Exhibit D, in which they expressed their support for the Special Master's modifications to the telepsychiatry policy. Plaintiffs stated that while their position remained that psychiatric nurse practitioners should not be allowed to provide telepsychiatry services at any level of care, they reserved their objection on the matter subject to the Special Master's close monitoring of the issue. Plaintiffs asserted that the Special Master's close monitoring was particularly justified, given that

11

defendants had yet to develop a policy governing their use of psychiatric nurse practitioners in the MHSDS, despite repeated requests by plaintiffs and the Special Master.

Defendants provided their written response and objection on August 1, 2018, attached hereto as Exhibit E, in which they stated their intention to appeal the court's July 3, 2018 order. Generally, defendants' objections were represented as follows: (1) the Court's delegation of policymaking to the Special Master exceeds the scope of his authority, (2) the Special Master's proposed telepsychiatry policy adds significant changes to CDCR's policy, some of which were never discussed during the workgroup process, and (3) the restrictions the policy places on the use of telepsychiatry are not constitutionally required or supported by evidence. Defendants filed their "Notice of Appeal to the United States Court of Appeals for the Ninth Circuit" the same day. ECF No. 5867.

On August 2, 2018, during a workgroup meeting to address staffing and telepsychiatry, the Special Master provided the parties with a final opportunity to discuss the proposed telepsychiatry policy prior to its filing. The Special Master informed the parties that he had taken their recent submissions under consideration and the policy would undergo limited further modification that would (1) ensure it comported with the provisions of the court's October 10, 2017 order and (2) partially address certain concerns put forth in defendants' August 1, 2018 submission. Specifically, the modifications to the policy were related to the second and fourth items listed on page seven of defendants' August 1, 2018 letter, regarding the use of telepsychiatry at the EOP and 3CMS levels of care.

## IV.  RECOMMENDATION

In accordance with the court's order of July 3, 2018, attached hereto as Exhibit F, is the Special Master's proposed telepsychiatry addendum to the Revised Program Guide.  The Special Master recommends that the court adopts the attached telepsychiatry policy as an addendum to the Revised Program Guide.

Respectfully Submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

August 2, 2018