2:90-cv-0520-KJM-DB

# EXHIBIT A



**ROSEN BIEN GALVAN & GRUNFELD** LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

July 12, 2018

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Ave., Suite 215 N
Johnston, RI 02919
MLopes@pldlaw.com

> Re:   *Coleman v. Brown*:  Plaintiffs' Final Position on Defendants' Draft
> Telepsychiatry Policy in Light of the Court's July 3, 2018 Order
> <u>Our File No. 0489-03</u>

Dear Special Master Lopes:

This letter memorializes Plaintiffs' final positions on the remaining telepsychiatry disputes to assist the Special Master's development of a final draft of the telepsychiatry policy, due to the Court by August 2, 2018.  *See* Order, ECF No. 5850 at 8 (July 3, 2018). In support of Plaintiffs' positions, we attach an Expert Report by Dr. Pablo Stewart on telepsychiatry issues as Attachment 1 to this letter.  In addition, Attachment 3 to this letter is a compilation of 29 scholarly articles on telemedicine and telepsychiatry, including a number of studies that are critical of the use of telepsychiatry for certain high-risk or otherwise inappropriate patient populations.

Plaintiffs' final positions on telepsychiatry remain substantially similar to those outlined in our May 21, 2018 letter, attached hereto as Attachment 2, with the exception that Plaintiffs are now able to confirm their opposition to the use of cell-front telepsychiatry and to allowing psychiatric nurse practitioners (PNPs) to provide telepsychiatric services.  Our observation of the cell-front telepsychiatry technology this week at CHCF only strengthened our opposition to this method of treatment.  The policy should therefore:  (1) clearly state that telepsychiatry should be used as a supplement, rather than a substitute, for on-site psychiatry, and include a preference for on-site

[3275730.4]

Matthew A. Lopes, Jr.
July 12, 2018
Page 2

psychiatry at all levels of care[1]; (2) clearly state that telepsychiatry is not appropriate at
the MHCB or inpatient levels of care, and not appropriate for emergency care; (3)
expressly prohibit the use of cell-front telepsychiatry; and (4) ban PNPs from providing
any telepsychiatry services.  Each position is discussed below.

I.    **Plaintiffs' Positions as to the First and Second Disputes Remain the Same:
      Telepsychiatry May Supplement, But Not Replace, On-Site Psychiatry and
      Telepsychiatry Is Not Appropriate at the Highest Levels of Care or for
      Emergency Care**

         Plaintiffs' positions as to the parties' disagreement over interpretation of the
Court's October 10, 2017 Order, ECF No. 5711, remain the same as set forth in our May
21, 2018 letter, attached hereto as Attachment 2.  In short, Plaintiffs' position is that the
telepsychiatry policy must include a preference for on-site psychiatry at all levels of care
and should reflect the Court's Order that "telepsychiatry should be used as a supplement,
rather than a substitute, for on-site psychiatry and should only be used when institutions
are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by
contract psychiatrists."  Order, ECF No. 5711 at 30 (Oct. 10, 2017).  The policy must also
state that telepsychiatry is not appropriate at the MHCB or PIP (intermediate and acute)
levels of care or for emergency care.  *See id.* at 21 ("Telepsychiatry should not be a
frontline approach for psychiatric services for inmates with the most intensive or
emergent needs … Telepsychiatry is not appropriate for the MHCB level of care except
as a last resort or in emergency situations when an on-site psychiatrist is not available."
(internal quotation marks omitted)).  The evidence provided in Dr. Stewart's Expert
Report further supports these positions.  *See generally* Stewart Expert Report.  In
addition, Plaintiffs are in agreement with the cautionary language and preference for in-
person care that the Court and the Special Master have expressed regarding the use of
telepsychiatry for EOP patient care.  *See* Order, ECF No. 5850 at 5 (July 3, 2018)
("Telepsychiatry may supplement on-site psychiatry at the Enhanced Outpatient (EOP)
level of care but it should not replace on-site psychiatry.").

---

[1] Plaintiffs acknowledge and do not contest the Court's holding that Defendants may use
telepsychiatry for routine CCCMS care without limitation so long as they continue to
make good faith efforts to hire on-site psychiatrists for such care and so long as the
telepsychiatrists visit their institutions twice a year.  *See* Order, ECF No. 5850 at 5 (July
3, 2018) (allowing CCCMS use of telepsychiatry so long as clinicians visit their
institutions twice a year and so long as "defendants continue a good faith effort to recruit
on-site psychiatrists for all institutions providing CCCMS level of care").

Matthew A. Lopes, Jr.
July 12, 2018
Page 3

## II.  Plaintiffs' Final Position as to the Third Dispute Is that Cell-Front Telepsychiatry Is Not an Appropriate Modality of Mental Health Treatment

Plaintiffs strongly object to Defendants' proposal to employ telepsychiatry cell-front.  As Plaintiffs' expert, Dr. Stewart, attests, even in-person cell-front psychiatry is fundamentally clinically inappropriate, with very limited exceptions, because cell-front interactions are by their very nature non-confidential.  *See* Stewart Report at ¶¶ 57, 69-60.  The Program Guide recognizes the critical importance of confidential communications between patients and their mental health clinicians.  *See* Program Guide at 12-1-12, 12-2-3, 12-2-5, 12-7-6.  The Special Master and his suicide prevention expert, Lindsay Hayes, both routinely monitor the sufficiency of confidentiality in clinical contacts.  *See, e.g.*, Special Master's 27th Round Monitoring Report, ECF No. 5779 at 114-18 (Feb. 13, 2018); Second Re-Audit and Update of Suicide Prevention Practices, ECF No. 5672 at 3-4, 25, 37, 56, 86, 117, 122 (Sept. 7, 2017).  In the 27th Round Monitoring Report, the Special Master concluded that numerous patients who received "non-confidential cell-front [mental health] contact" had not received adequate mental health care.  *See* ECF No. 5779 at 542, 630, 640, 676.  Similarly, in the Second Re-Audit of Suicide Prevention Practices, Lindsay Hayes reviewed two suicide reports of inmates who were not seen by a mental health clinician in a confidential setting in the time leading up to their deaths.  Unsurprisingly, each suicide report recommended the corrective action that patients "be seen in a confidential setting out of cell."  *See* ECF No. 5672 at 64, 69.  Moreover, cell-front clinical interactions heighten the risk of custody interference with treatment.  *See, e.g.*, Special Master's 27th Round Monitoring Report, ECF No. 5779 at 296 (Feb. 13, 2018).

Telepsychiatry exacerbates the deficiencies that already render in-person cell-front psychiatry inadequate.  As Dr. Stewart explains in his Expert Report, cell-front telepsychiatry is deficient for a number of reasons, including that telepsychiatrists "cannot sufficiently identify the signs of medical and mental illness during cell front interactions" and "are also inherently less capable than on-site providers of developing effective patient-provider relationships."  Stewart Expert Report ¶¶ 56-61.  To allow cell-front telepsychiatry would only further degrade the dignity and well-being of the Plaintiff class, whose contacts with mental health clinicians have become increasingly removed from traditional face-to-face interactions via increased use of cages and other punitive measures.

Perhaps most concerning, Defendants' policy contains no apparent limits on the use of telepsychiatry in cell-front settings and in fact requires all institutions to have cell-front telepsychiatry equipment so that cell-front telepsychiatry contacts can occur ad hoc.  *See* Joint Status Report, ECF 5841, Ex. A at 1, 6 (June 21, 2018) (copy of Defs.' May 10, 2018 final draft telepsychiatry policy, hereinafter "Final Draft Telepsychiatry Policy").

[3275730.4]

Matthew A. Lopes, Jr.
July 12, 2018
Page 4

The lack of any limitations whatsoever raises the distinct risk that cell-front telepsychiatry will become the norm, either due to staffing shortages or for the convenience of clinical and custodial staff. Cell-front clinical interactions already are too often driven by custodial officer shortages or refusals to escort patients to a confidential treatment setting, and clinicians already routinely opt to conduct mental health contacts cell-front. *See, e.g.*, Special Master's 27th Round Monitoring Report, ECF No. 5779 at 158 (Feb. 13, 2018) (finding that 57% of cell-front primary clinician contacts at SAC during the monitoring period were "due to staff decision"). Cell-front telepsychiatry represents a slippery slope that Defendants' policy does nothing to prevent; if allowed as Defendants' envision, this method of care risks becoming the default.

Indeed, as part of Defendants' anticipated unrestricted use of cell-front telepsychiatry, and as demonstrated during the July 11, 2018 site visit to CHCF discussed further below, the policy expressly contemplates cell-front telepsychiatry for patients in an MHCB or PIP setting. Final Draft Telepsychiatry Policy at 3. However, the Court has expressly prohibited Defendants from using telepsychiatry at the MHCB level of care, even in confidential settings, much less cell-front, *see* Order, ECF No. 5850 at 6 (July 3, 2018), and has clearly instructed that "[t]elepsychiatry should not be a frontline approach for psychiatric services for inmates with the most intensive or emergent needs," Order, ECF No. 5711 at 21 (Oct. 10, 2017). Simply put, telepsychiatry, and especially cell-front telepsychiatry, is not appropriate at the highest levels of care. The telepsychiatry policy must reflect these prohibitions, which are both Court-ordered and clinically appropriate.

Plaintiffs' visit to CHCF on July 11, 2018 to view cell-front telepsychiatry only reinforces the above positions. The nascent technology, which only exists at CHCF to date and is not yet being used to treat patients, uses a cart with a wireless access point, monitor, and camera attached, and a separate speaker and microphone contained inside a large metal box that can be positioned on the outside of a prison cell up against the food port. After witnessing the technology, Plaintiffs remain opposed to cell-front psychiatric treatment—in-person or via telepsychiatry—for the reasons set forth above and in Dr. Stewart's Expert Report. And even if cell-front telepsychiatry was appropriate in theory—it is not—Plaintiffs witnessed significant problems with the proposed technology during the July 11, 2018 demonstration at CHCF. For example, and consistent with Dr. Stewart's articulated concern, the echo inside the prison cell made it very difficult to hear what the simulated patient was saying. *See* Stewart Expert Report ¶ 62. It was also difficult to see the patient given the structure of the cell doors and the angle of the camera. In addition, Plaintiffs question whether the technology that currently exists only at CHCF (CDCR's newest prison) could even function in a sufficiently reliable manner at older prisons, rendering the possibility of technical interruptions that further impede patient care entirely to be expected. *See also* Stewart Expert Report ¶ 63. Lastly,

Matthew A. Lopes, Jr.
July 12, 2018
Page 5


Plaintiffs were informed during the demonstration that the telepsychiatry carts cost up to $15,000, making this a costly *and* inadequate method of mental health treatment.

For these reasons, and those articulated by Dr. Stewart, Defendants' telepsychiatry policy should expressly prohibit use of cell-front telepsychiatry.

**III.    Plaintiffs' Final Position as to the Fourth Dispute Remains the Same: Defendants' Policy Should Prohibit Psychiatric Nurse Practitioners from Providing Any Telepsychiatric Services**

Plaintiffs' position as to whether psychiatric nurse practitioners (PNPs) should be authorized to provide telepsychiatry services remains the same as set forth in our May 21, 2018 letter. *See* Attachment 2 at 4-5. In sum, use of medical "extenders" like PNPs is risky because they do not have the same training or experience as psychiatrists, and these problems would only be exacerbated if PNPs were allowed to provide direct patient care via telepsychiatry. *See id.* The evidence provided in Dr. Stewart's Expert Report further supports Plaintiffs' position. *See* Stewart Expert Report at ¶¶ 83-89. In addition, although California law requires strict supervision of PNPs, *see* Cal. Bus. & Prof. Code § 2836.1, and despite Plaintiffs' many requests, Defendants still do not have a written policy governing the appropriate scope and supervision of PNPs' provision of treatment in the MHSDS, and apparently never have. Accordingly, the telepsychiatry policy must be revised to authorize only psychiatrists, not psychiatrists and PNPs, to provide telepsychiatric services.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:    Cara E. Trapani

CET:CET
Enclosures
cc:    Coleman Special Master Team          Elise Thorn
       Co-Counsel                           Andrew Gibson
       Jerome Hessick                       Tyler Heath
       Nick Weber                           Christine Ciccotti
       Melissa Bentz                        Sean Rashkis
       Andrea Moon                          Elaine Ekpo
       Jay Russell                          Joanna Mupanduki
       Adriano Hrvatin                      George Maynard

[3275730.4]

# Attachment 1

1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
6  FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
7  39 Drumm Street
   San Francisco, California  94111-4805
8  Telephone:   (415) 621-2493

   MICHAEL W. BIEN – 096891
   JEFFREY L. BORNSTEIN – 099358
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LISA ELLS – 243657
   KRISTA STONE-MANISTA – 269083
   JENNY S. YELIN – 273601
   MICHAEL S. NUNEZ – 280535
   JESSICA WINTER – 294237
   MARC J. SHINN-KRANTZ – 312968
   CARA E. TRAPANI – 313411
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   50 Fremont Street, 19th Floor
   San Francisco, California  94105-2235
   Telephone:   (415) 433-6830

9
10 Attorneys for Plaintiffs

11                  UNITED STATES DISTRICT COURT

12               EASTERN DISTRICT OF CALIFORNIA

13

14  RALPH COLEMAN, et al.,                Case No. 2:90-CV-00520-KJM-DB

15          Plaintiffs,                   **EXPERT REPORT OF PABLO
                                          STEWART, M.D. REGARDING
16      v.                               DEFENDANTS' TELEPSYCHIATRY
                                          POLICY**
17  EDMUND G. BROWN, JR., et al.,
                                          Judge:   Hon. Kimberly J. Mueller
18          Defendants.

19

20

21

22

23

24

25

26

27

28

1                                **INTRODUCTION**

2          1.       I am a board-certified psychiatrist and Clinical Professor in the Department

3    of Psychiatry at the University of California, San Francisco.  My curriculum vitae is

4    attached hereto as **Exhibit A**.

5          2.       I have over 30 years of experience in correctional mental health care,

6    including serving as the court's expert in class action cases challenging the provision of

7    mental health care to prisoners.  After medical school, I completed my psychiatric

8    residency at the University of California, San Francisco in part as Primary Therapist and

9    Medical Consultant for the adult inpatient units at San Francisco General Hospital and the

10   San Francisco Veterans Affairs Medical Center, including service at the VA's Substance

11   Abuse Inpatient Unit.  During my residency, I also practiced at several community health

12   programs.  Between 1986 and 1990, I was the Senior Attending Psychiatrist for the

13   Forensic Unit of UCSF, which was located at San Francisco General Hospital.  In that

14   capacity, I had administrative and clinical responsibility for a 12-bed maximum-security

15   psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City

16   and County of San Francisco.  Between August 1988 and December 1989, I was the

17   Director of Forensic Psychiatric Services for the City and County of San Francisco.  In that

18   capacity, I had administrative and clinical oversight responsibility for the psychiatric care

19   provided to the inmate population in San Francisco at both the county jails and in the

20   locked inpatient treatment unit at San Francisco General Hospital.

21         3.       From 1990 through 1996, I served in various medical leadership posts at the

22   Department of Veterans Affairs Medical Center, San Francisco, including as Chief of the

23   Substance Abuse Inpatient Unit, Chief of the Intensive Psychiatric Community Care

24   Program, focusing on services for homeless veterans, and Medical Director of the VA's

25   Comprehensive Homeless Center.

26         4.       From 1996 to the present, I have served as a psychiatric consultant to

27   governmental and private agencies on a variety of psychiatric, forensic, substance abuse

28   and organizational issues, with a focus on correctional psychiatry.  I have served as a

1   psychiatric expert or consultant to various federal courts, the United States Department of

2   Justice, and other organizations evaluating the provision of mental health treatment and

3   implementing remedial decrees covering the provision of mental health care in correctional

4   institutions.  Beginning in May 2016, and continuing in the present, I am serving as the

5   court-appointed monitor in *Rasho v. Baldwin*, No. 1:07-CV-1298 (C.D. Ill.).

6       5.      I estimate that I have observed over 100 telepsychiatry sessions in

7   correctional intuitions, primarily at jails and prisons in California, Arizona, and Illinois, in

8   connection with my duties as an expert medical and mental health monitor to the Special

9   Master in *Gates v. Deukmejian*, No. 2:87-cv-01636 (E.D. Cal.), as well as my monitoring

10  work in *Rasho*.  On December 19, 2017, I testified at an evidentiary hearing in *Rasho* as to

11  my opinion of the use of telepsychiatry in correctional intuitions.  Specifically, I opined

12  that:

13      •       Telepsychiatry is most properly used in the case of what we would describe

14              as routine, follow-up visits.

15      •       Telepsychiatry is not indicated for emergency assessment, which includes

16              assessment for suicide or homicide.  It would not be appropriate for use in

17              people in the residential treatment unit level of care or the inpatient level of

18              care.

19      •       Telepsychiatry is best used after a relationship has been established with a

20              patient, so the first visit during the psychiatric evaluation should be a face-to-

21              face visit.

22      6.      I have submitted a number of declarations in connection with this case that

23  opine on the adequacy of the mental health care in the CDCR.  I have conducted numerous

24  tours of CDCR prisons in the last 25 years.  My first experience with the CDCR was in the

25  mid-1990s, when I spent several years monitoring mental health care at the California

26  Medical Facility, a CDCR prison in Vacaville, California, as a court expert in the *Gates v.*

27  *Deukmejian* case.  Most recently, in 2013, I toured six prisons as Plaintiffs' expert witness

28  in opposing the termination motion filed by Defendants in this matter.  I also provided

[3274360.3]

several declarations and gave testimony in several live hearings before Judge Karlton in support of subsequent enforcement motions filed by Plaintiffs later in 2013, after the termination motion was denied. I also testified on behalf of Plaintiffs in the overcrowding proceedings that took place in this case starting in around 2007. In the overcrowding and termination phases of this case alone, I have spoken with well over 150 CDCR inmate patients, toured numerous prisons, and reviewed scores of inmate patient medical and custody records in the CDCR.

7. My publications and presentations address a broad range of treatment and assessment problems for mentally ill patients in both community and institutional settings. In compliance with Rule 26(a)(2)(B), my CV at Exhibit A lists my publications authored at pages 22 through 24.

8. Attached hereto as **Exhibit B** is a list of cases in which I have testified at trial or deposition during the previous 4 years.

9. My compensation to be paid for study and testimony in this case is $350 per hour.

10. In preparing this report I have reviewed the documents and policies listed in **Exhibit C**. In addition to the long list of scholarly articles on telepsychiatry listed in Exhibit C, I reviewed the following (also listed in Exhibit C):

- Defendants' Final Telepsychiatry Policy, which was filed with the Court on June 21, 2018. *See* Joint Status Report Re: June 28, 2018 Status Conference Re: Staffing, ECF No. 5841, at Ex. 1.

- Two CDCR Suicide Reports where telepsychiatry-related care issues were discussed in the findings. One Report, dated October 9, 2017, concerned the 15th suicide in the CDCR in 2017, which took place at a reception center. I also reviewed some subsequent reports on that institution's quality improvement plan relating to the telepsychiatry problems documented in the Suicide Report. The second Suicide Report is dated June 9, 2016 and concerns the 5th CDCR suicide in 2016.

[3274360.3]

1     •     Excerpts from the Special Master's 27th Round Monitoring Report, ECF No.

2           5779, relating to a decision to stop using telepsychiatry for EOP care at the

3           California Institute for Women.

4     •     The March 30, 2017 Declaration of Michael Golding, M.D., in Support of

5           Defendants' Response to the Special Master's Report on the Status of Mental

6           Health Staffing, ECF No. 5591-1.

7     •     Letters dated May 21, 2018 from Plaintiffs and dated May 25, 2018 from

8           Defendants setting forth their final positions on telepsychiatry after

9           negotiations on this issue.

10     •     The Special Master's Report on the Status of Mental Health Staffing filed on

11           February 6, 2017, ECF No. 5564.

12     •     The Court's October 10, 2017 Order, ECF No. 5711.

13     •     The Court's July 3, 2018 Order, ECF No. 5850.

14 My findings and conclusions regarding these documents are discussed below.

15        **DEFENDANTS' FINAL NEGOTIATED TELEPSYCHIATRY POLICY**

16       11.     I have reviewed the CDCR's final negotiated telepsychiatry policy, which

17 was filed with the Court as part of the most recent status conference statement on June 21,

18 2018. *See* Joint Status Report Re June 28, 2018 Status Conference Re: Staffing, ECF No.

19 5841, at Ex. 1. Based on my review, I have the following concerns about the policy.

20       12.     First, I am concerned that the policy has an open-ended endorsement of

21 telepsychiatry at virtually all levels of care. The policy *does* include a preference for on-

22 site clinical providers in the MHCB and inpatient settings, but even in those settings, in my

23 view the policy is too permissive, and not fully compliant with the Court's directions on

24 the issue. It may be acceptable in certain limited circumstances to cover some psychiatrist

25 functions in MHCB and inpatient care units with telepsychiatry. For example, with

26 appropriate safeguards, I would consider approving a policy like the one recommended by

27 the Special Master and adopted by the Court, allowing telepsychiatrists to cover short-term

28 emergencies in inpatient units caused by unexpected staff illness or other unexpected

1  staffing vacancies. *See* 10/10/17 Order, ECF No. 5711 at 21 ("Telepsychiatry is not

2  appropriate for MHCB level of care except as a last resort or in emergency situations when

3  an on-site psychiatrist is not available ... Telepsychiatry should not be a frontline approach

4  for psychiatric services for inmates with the most intensive or emergent needs." (internal

5  quotation marks omitted)).  Even in such exigent circumstances, however, telepsychiatry

6  should ideally only be permitted when it is being used for treating individuals who have

7  stabilized and moved past any initial crisis phase.  Unfortunately, Defendants' final policy

8  seems very permissive of telepsychiatrists working with patients in crisis in MHCB units,

9  which in my opinion is extraordinarily high risk.  For example, the Final Telepsychiatry

10  Policy speaks of telepsychiatrists having cell-front encounters with patients in crisis in

11  MHCB and PIP units. *See* Final Telepsychiatry Policy at 3 ("Patients housed in a MHCB

12  or PIP are often unable to leave their room due to presenting as a danger to self, a danger

13  to others, or being gravely disabled.  Therefore, clinical staff at the receiving institution

14  shall assist telepsychiatrists with facilitating cell-side interactions as needed.").  As I

15  explain in greater detail below, I believe cell-front telepsychiatry visits are clinically risky

16  and contraindicated for many reasons, but cell-front telepsychiatry visits for gravely ill

17  patients in MHCB and PIP units are particularly unacceptable.

18      13.    Second, I agree with the Court and the Special Master's finding in 2017 that

19  "telepsychiatry should serve as a supplement for on-site psychiatry, not as a substitute and

20  should only be utilized when institutions are unable to recruit psychiatrists on site." *See*

21  10/10/17 Order, ECF 5711, at 21.  My understanding is that the Court has indicated that it

22  will only approve a telepsychiatry policy that will allow the use of telepsychiatry for

23  routine care at the CCCMS and EOP levels of care, if there is with a strong preference for

24  on-site clinicians providing treatment at the EOP and higher levels of care. *See* 7/3/18

25  Order at 5:18-19 ("Telepsychiatry may supplement on-site psychiatry at the EOP level of

26  care but it should not replace on-site psychiatrists for these programs."), 6:7-9

27  ("Telepsychiatry may not be used at the MHCB level of care except 'as a last resort or in

28  emergency situations when the on-site psychiatrist is not available."); *see also* 10/10/17

[3274360.3]

1   Order at 21:12-13 ("Telepsychiatry should not be a 'frontline approach' for psychiatric

2   services 'for inmates with the most intensive or urgent needs.'").  I understand the parties

3   also negotiated and the Court has approved requirements whereby telepsychiatrists: (1)

4   manage a discrete caseload at a particular prison, and (2) are required to visit the institution

5   where they are assigned at least two times a year for CCCMS telepsychiatrists, and at least

6   four times a year for EOP telepsychiatrists.  I also understand and approve of the Court's

7   instruction in its July 2, 2018 Order that "telepsychiatry should not replace on-site

8   psychiatry for any level of care above CCCMS," and that even at the CCCMS level of

9   care, the use of telepsychiatry should be contingent upon the fact that Defendants will

10  "continue a good faith effort to recruit on-site psychiatrists for all institutions providing a

11  CCCMS level of care."  *See* 7/3/18 Order, ECF No. 5850, at 5:5-11.  Given the risks and

12  uncertainties associated with the use of telepsychiatry in a correctional context, which I

13  discuss below, these are appropriate and prudent limitations on this form of treatment.  If

14  anything, I would be in favor of a more restrictive approach to this form of treatment.

15          14.     Third, as noted above in connection with MHCB and PIP units, I also

16  strongly disagree with the Defendants' final telepsychiatry policy's allowance of cell-front

17  use of telepsychiatry in general.

18          15.     Fourth, I am very opposed to allowing Psychiatric Nurse Practitioners

19  operating under the supervision of a psychiatrist to provide direct patient care using

20  telepsychiatry.  Although in my work in Illinois I have encouraged the use of mid-level

21  practitioners, including Psychiatric Nurse Practitioners, to provide direct face-to-face care

22  under appropriate supervision, I have serious concerns about such practitioners using

23  telepsychiatry.  In my view, the care provided by such an arrangement would be twice

24  removed from what is most appropriate for providing care—direct in-person psychiatry

25  care.  Under the best of circumstances, I have serious reservations about psychiatrists

26  themselves using this form of treatment.  Given the added restrictions on the delivery of

27  care by Psychiatric Nurse Practitioners and the supervisory requirements under which they

28  must practice, my view is that remote telepsychiatry by Psychiatric Nurse Practitioners

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1   places patients at risk.  Such an arrangement would heighten the risk of mistakes.

2       16.    Finally, I agree with the Court's concerns about the Defendants'

3   telepsychiatry policy.  I have reviewed the Court's July 3, 2018 Order reiterating the

4   meaning of its October 10, 2017 Order for Defendants, in order to stress several key

5   principles with respect to the use of telepsychiatry in the CDCR.  I strongly support the

6   Court's restrictions on the use of telepsychiatry, and those the parties have developed.  I

7   also agree with the conclusions of the Special Master and the Court in its October 10, 2017

8   Order, that "telepsychiatry should serve as a supplement for on-site psychiatry, not as a

9   substitute, and should only be used when institutions are unable to recruit psychiatrists to

10  work on site." *See* 10/10/17 Order, EFC No. 5711, at 21:4-7.

11  **SUMMARY OF KEY OPINIONS IN THIS MATTER**

12      17.    I have been asked to give my opinion of the materials I have reviewed

13  relating to telepsychiatry in the CDCR.  I offer the following opinions:

14  •    Academic studies suggest caution in using telepsychiatry within correctional
15      settings, particularly large, spread out systems like the CDCR's MHSDS.

16  •    Appropriate cautions include severely limiting or banning the use of
17      telepsychiatry at higher levels of care, banning cell-front telepsychiatry, and
18      banning Psychiatric Nurse Practitioners from treating patients by way of
19      telepsychiatry.

20  •    The CDCR's Enhanced Outpatient Program (EOP) is a sheltered residential
21      treatment program.  Given its residential nature, the acuity of EOP patients,
22      as well as the intensity of treatment in EOP units, I do not believe
23      telepsychiatrists should provide treatment to EOP patients.

24  •    Consistent with the current policy as clarified by the Court, Defendants
25      should not be permitted to use telepsychiatry except to supplement on site
26      psychiatric staff at the EOP level of care, and should not be permitted to use
27      telepsychiatry at the MHCB, Acute Inpatient, or Intermediate Inpatient Care
28      programs in the CDCR except to cover in emergency situations where there

7

1    are short-term staff absences.

2    • Consistent with, but perhaps not adequately delineated in the Defendants'
3    current policy, Defendants' use of telepsychiatry is not appropriate for
4    emergency evaluations or with patients who are in crisis (including those
5    who are suicidal, homicidal, and/or gravely disabled).

6    • Telepsychiatry may be appropriately and safely used for non-initiating,
7    routine, low-risk appointments—such as medication renewals for stable
8    patients.

9    **OPINIONS**

10   **I.    Academic Studies Suggest Caution in Using Telepsychiatry within**
         **Correctional Settings**
11
         **A.    The Use of Telepsychiatry with Prisoner Patients Has Not Been**
12           **Rigorously Studied**

13   18.    Academic literature tends to be supportive of the practice of telepsychiatry in
14   general.  The patient populations studied, however, are different from the patient
15   populations found in prison.  For example, the evaluation of patient satisfaction using
16   telepsychiatry for rural outpatients who would otherwise have to drive four hours round-
17   trip for a routine psychiatric session is not pertinent to whether prisoner patients in crises
18   should receive psychiatric care in-person or remotely.  The literature neither specifically
19   addresses nor supports the use of telepsychiatry without limitation for all patient groups in
20   correctional institutions.  A large body of professional literature and guidance on
21   telepsychiatry also emphasizes that it is a helpful tool for filling positions at rural
22   institutions where staffing is difficult.  *See, e.g.*, American Psychiatric Association,
23   *Psychiatric Services in Correctional Facilities*, at **68** ("Correctional Facilities lend
24   themselves well to telepsychiatry use.  Often these facilities are in rural communities
25   where access to psychiatric services is limited or absent.").  However, the fact that in-
26   person staffing can be difficult in rural areas is not, in my opinion, an argument for the
27   clinical appropriateness of the use of telepsychiatry.  Particularly in California, where there
28   are many prisons close to large urban centers, such difficulty is better addressed by

8

1  clustering programs in areas where in-person psychiatrists can be hired.

2      19.    A large body of literature emphasizes the overall lack of rigorous scientific

3  knowledge regarding the comparison of telepsychiatry to in-person care (Acierno et al.,

4  2016; Deslich et al., 2013; Farabee et al., 2016; Sharp et al., 2011; Garcia-Lizana &

5  Munoz-Mayorga, 2010; Salmoiraghi & Hussain, 2015).  Several authors have specifically

6  acknowledged an even greater lack of studies analyzing the appropriateness of

7  telepsychiatry for correctional and/or forensic populations, as well as for care in

8  emergencies (Nelson et al., 2004; Antonacci et al., 2008; Magaletta et al., 2000;

9  Salmoiraghi & Hussain, 2015; Sharp et al., 2011).

10      20.    Indeed, in his 2017 declaration on this issue, CDCR Statewide Chief of

11  Psychiatry Dr. Golding emphasized the same issue regarding the dearth of adequate studies

12  in the correctional context, noting that he and his staff conducted literature searches on

13  telepsychiatry and they "were unable to locate any well-controlled studies evaluating

14  telepsychiatry vs. on-site psychiatry within a prison setting."  3/30/17 Decl. of Michael

15  Golding, M.D., in Supp. of Defs.' Response to the Special Master's Report on the Status of

16  Mental Health Staffing, ECF 5591-1, at 2:2-3.  I agree with this evaluation of the state of

17  the literature.

18      21.    Similarly, the literature I have reviewed on telepsychiatry recognizes the

19  absence of evidence-based studies specific to prison populations or comparable population

20  groups.  For instance, in his 2015 literature review of studies of telepsychiatry, Chakrabarti

21  noted that "the evidence for [clinical] outcomes and for the clinical effectiveness of

22  videoconferencing based interventions in forensic settings is almost always derived from

23  case reports, descriptive studies, and uncontrolled trials" (Chakrabarti (2015) at 294).

24  Other researchers advise that "studies need to be focused on areas where there is currently

25  a relative paucity of information, such as anxiety, substance abuse, and *psychotic and other*

26  *disorders* [emphasis added]" (Hilty et al. (2013) at 451).

27      22.    To the extent that rigorous controlled trials have compared telepsychiatry

28  and in-person care in relation to patient outcomes, the studies have generally focused on

1    outpatient, non-correctional populations (Acierno et al., 2016; Singh et al., 2007; Shore et

2    al., 2007; O'Reilly et al., 2007). Such studies have shown limitations in the scope of

3    telepsychiatric practice. For instance, a controlled trial on the diagnostic reliability of

4    telepsychiatry conducted by Singh et al. (2007) excluded cases requiring urgent assessment

5    and yet still found that telepsychiatry assessments were somewhat inferior to face-to-face

6    interviews for new *routine outpatient* referrals.

7       23.    In one study outside the correctional context concerning the use of

8    telepsychiatry for inpatient psychiatric care, Grady and Singleton (2011) raised questions

9    about telepsychiatry's effectiveness and its effect on rapport with the patients, noted

10    problems in using it with psychotic patients, and emphasized that there is limited literature

11    "describing or quantifying the clinical, administration, or technical challenges and

12    outcomes for inpatient telepsychiatric care." Similarly, Salmoiraghi et al.(2015) note that

13    "the literature on the use of telepsychiatry in emergencies is remarkably limited... current

14    evidence is almost entirely based on surveys or opinions" (Salmoiraghi et al.(2015), at

15    392).

16       **B.**     **Prisoner Patients Are Not Comparable to Community-Based Patients,**
               **and Existing Studies of Prisoner Patients Are All Essentially Patient or**

17                **Administrator Surveys that Fail to Assess Treatment Outcomes**

18       24.    Inmate patients experience higher rates of medical disease, mental illness,

19    comorbid medical disease and mental illness, and long-term chronic illness than their

20    community-dwelling counterparts. One study by the Bureau of Justice Statistics observed

21    that more than half of all prison and jail inmates had a mental health problem (James &

22    Glaze 2006). In part because of their lower socioeconomic status and higher rates of

23    substance abuse, inmate patients' mental illness and chronic medical conditions are often

24    untreated prior to incarceration. Indeed, these very untreated and/or worsening conditions

25    are what frequently bring them into contact with the criminal justice system.

26       25.    Patients in correctional settings not only have substantially higher acuity of

27    medical and mental illness than community-based patients, but also are subjected to non-

28    comparable conditions. The objective stressors that inmates in prison experience are both

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1  profound and singular; they cannot be overemphasized.  Many have recently entered

2  prison, and are coping with adjustment to a harsh and frightening new environment.  For

3  the duration of their incarceration, prison patients experience the harshness of a total

4  institution where movements are restricted, choices are limited, and concrete, steel, and

5  clanging doors define the physical surrounding.  Incarceration itself leads to further

6  psychiatric decompensation.  Whereas suicide is around the tenth most common cause of

7  death in the country, it is the fifth most common cause of death in prisons.  According to

8  Bureau of Justice Statistics for the years 2001-2014, suicide was the fourth most common

9  cause of death among prisoners in California, behind only cancer, heart disease, and liver

10  disease. *See* Mortality in State Prisons, 2001-2014 – Statistical Tables, at Table 13 on

11  page 12, downloaded from BJS on 7/6/18 at

12  https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5866.

13      26.    Long-term prisoners also experience unique stressors that are not present for

14  patients in the community, frequently including loss of regular contact with loved ones on

15  the outside, and the difficulties of making peace with an extended period of incarceration

16  and aging in a correctional context.

17      27.    I am not aware of any controlled trial that has compared prison patient

18  outcomes using telepsychiatry and in-person evaluations for residential, inpatient or crisis

19  care.  Nor am I aware of any study examining the use of telepsychiatry for cell-front care.

20      28.    To the extent that studies of correctional telepsychiatry exist, they lack

21  comparisons to in-person care and/or structured analyses of patient outcomes (*see, e.g.*,

22  Barrera-Valencia et al., 2017; Batastini et al., 2016; Brodey et al., 2000; Leonard 2004;

23  Magaletta & Fagan 2000; Zaylor et al., 2000; Zaylor et al., 2001).  Antonacci et al. (2008)

24  note in their review of the literature on the use of telepsychiatry in forensic and

25  correctional populations that "[a]ll studies had significant methodological limitations,

26  making confident conclusions difficult" (265).  Rather than rely on rigorous

27  methodologies, some such studies instead tend to report anecdotal evidence of patient

28  satisfaction by inmates or providers (Manfredi et al., 2008; Glaser et al., 2010).  In

1 | addition, studies of correctional populations tend to exclude those in need of emergent
2 | mental health care or otherwise note that their study populations did not include the
3 | seriously mentally ill (Manfredi et al., 2008; Nelson et al., 2004).

4 | 29.    I am informed that Defendants have identified a total of five studies that are
5 | specific to correctional or forensic populations (Brodey et al., 2000, Glaser et al., 2010,
6 | Larsen et al., 2004, Morgan et al., 2008, Zollo et al., 1999). Three are essentially patient or
7 | provider satisfaction surveys (Brodey et al., 2000, Glaser et al., 2010, Morgan et al., 2008).
8 | The fourth study, Larsen et al., 2004, is a survey of correctional systems seeking to
9 | understand the extent to which telemedicine was deployed across correctional systems in
10 | the United States. The fifth study, Zollo et al., 1999, is a survey mostly about the use of
11 | tele-medicine in general, and only 2 out 274 patient encounters covered involved
12 | evaluations for reasons related to mental health problems.

13 | 30.    The Morgan study is based on patient satisfaction surveys of 186 patients,
14 | 100 of whom received a psychiatric session. Fifty patients were non-randomly assigned to
15 | a single 20-minute face-to-face psychiatry session and the other fifty were non-randomly
16 | assigned to a 20-minute telepsychiatry session. The prisoner patients were asked about
17 | their satisfaction with their therapeutic relationship, their perception of their post-treatment
18 | session mood, and their general satisfaction with services. Although this is valuable
19 | information about patient perceptions about telepsychiatry, it is not a study that measures
20 | clinical outcomes or clinical progress and compares clinical outcomes of telepsychiatry to
21 | those of in-person care. Indeed, the authors noted the need for patient outcome research to
22 | begin investigating the effectiveness of telepsychiatry as compared with face-to-face
23 | services, as well as the need to explore whether telepsychiatry creates barriers to treatment
24 | in the correctional context.

25 | 31.    Similarly, the Glaser study (2010) is based on provider satisfaction surveys
26 | after a telemedicine trial in the Louisiana prison system. Although a total of 371 mental
27 | health encounters through telemedicine were reviewed in the course of the study, the study
28 | suffers from several serious problems. First, the study did not compare the care provided

1  in these encounters to in-person care. Second, the study does not review clinical outcomes

2  except to simplistically ask whether the clinician felt it was a helpful visit. Third, although

3  the study reports a total number of encounters, it does not include the number of different

4  patients these encounters involved. Finally, the study does not detail any of the diagnostic

5  characteristics of the patients seen.

6      32.    The Brodey study (2000) reports on patient satisfaction with telepsychiatry

7  versus in-person care at a large urban jail. One psychiatrist evaluated 20 patients in person

8  and 23 patients through telepsychiatry. The authors note that the severity of the study

9  population was roughly comparable to the average psychiatric outpatient population, and

10  that "both groups [i.e., in-person and telepsychiatric] indicated that they would not highly

11  recommend the psychiatrist to a family member or friend" (1305). Lastly, the authors

12  noted that "the results may not be generalizable to other psychiatric inmate patient

13  populations *or to those who exhibit more severe psychiatric disturbances* [emphasis

14  added]" (1305).

15      33.    Larsen et al., 2004, was a state-by-state survey of state and federal

16  correctional facilities to assess whether they were using tele-medicine (not specifically

17  telepsychiatry). The results showed that in 2004, 52% of state departments of correction

18  were using tele-medicine at some facilities. This information is out of date and not really

19  relevant to the efficacy of tele-medicine, or to the specific issues in dispute between the

20  parties here.

21      34.    Finally, as noted above, Zollo et al., 1999, is a survey about the use of tele-

22  medicine in general where only 2 out of 274 patient encounters reviewed were related to

23  mental health problems.

24      35.    Thus, none of these studies in the correctional context provide an objective,

25  well-controlled trial or assessment where clinical outcomes using telepsychiatry are

26  compared to outcomes and clinical progress made with in-person psychiatric care. These

27  studies do not change or alleviate my concerns about the use of telepsychiatry with higher

28  level of care patients (including for EOP patients), with patients in crisis, and with cell-

13

1 | front visits.

2 | **C.    The Literature Cautions Against Using Telepsychiatry With High-Needs**
**Populations**

3 |

4 | 36.    A large body of literature points to problems in diagnostic reliability and

5 | patient outcomes with telepsychiatry that are of special concern in a correctional setting.

6 | Shore et al. (2007) note that the use of telepsychiatry resulted in diminished rates of

7 | reliability in diagnosing outpatients with long-term substance or alcohol abuse issues.

8 | Similarly, Chakrabarti (2015) notes that telepsychiatric interventions are inferior to in-

9 | person psychiatry for populations with substance abuse problems.  In a recent study of

10 | California state parolees, Farabee et al. (2016) highlighted poorer therapeutic alliances in

11 | patients treated through telepsychiatry, and O'Reilly et al. (2007) note that "there appears

12 | to be a group of individuals who are averse to the use of telepsychiatry.  Administrators

13 | developing telepsychiatry programs may need to maintain some parallel face-to-face

14 | service to meet the needs of this group" (842).

15 | 37.    Some scholars have also raised concerns about the use of telepsychiatry to

16 | treat psychotic patients who have ideas of reference that incorporate technology (*e.g.*, a

17 | psychotic delusion in which the patient believes she receives messages from the television

18 | or computer).  These concerns are warranted.  Magaletta & Fagan (2000) note that one

19 | inmate-patient "did not want to return [to the telepsychiatry clinic] after he had a

20 | nightmare about the psychiatrist chasing him with a video camera," and further note that

21 | another patient, when presented with the psychiatrist's videoconferencing feed, said "see, I

22 | told you the TV talks to me" (499-500).  Other studies have shown differences between

23 | telepsychiatry and in-person care in recognizing patient self-neglect—a very critical aspect

24 | in the recognition and adequate treatment of many psychotic disorders (Sharp et al., 2011,

25 | citing Salzman et al., 1996).

26 | 38.    One of the reports that I am informed Defendants relied upon actually

27 | cautions against using telepsychiatry for acutely psychotic or paranoid patients, and

28 | underscores the difficult problem of informed consent for telepsychiatry.  *See* Trestman,

1  R.L, Metzner, JL, Penn JV, *et al.*, Workgroup Report, *Psychiatric Services in Correctional*
2  *Facilities, Third Edition.* APA 2016.  Specifically, it states that "Psychiatrists and other
3  mental health staff need selection criteria to ensure the appropriateness of patients for
4  videoconferencing (telepsychiatry) services.  Patients who are acutely psychotic or
5  paranoid may have difficulty being seen remotely and may be unable to give consent to
6  participate in this treatment modality."  *Id.* at 68.  I share this concern.

7      39.    In general, there is not sufficient evidence to support the use of
8  telepsychiatry without limitation in correctional settings.  As Chakrabarti (2015) notes in
9  his systematic review of scholarly literature on telepsychiatry, "at present telepsychiatric
10  services can only serve as an adjunct to the more traditional modes of service-delivery, but
11  can never replace them" (298).  This view is in accord with that of other scholarly authors
12  writing specifically about correctional care; for instance, Leonard (2004) writes following
13  her pilot of a prison telepsychiatry project that "[i]t is not anticipated that telepsychiatry
14  will replace existing services or reduce the need for face-to-face contact" (466).

15  **II.**   **The Limitations on the Use of Telepsychiatry in the Current Policy and in The**
16           **Court's Orders on Telepsychiatry are Appropriate, and Would Be Enhanced**
              **by Additional Restrictions on Cell-Front Telepsychiatry and Nurse**
17           **Practitioner Telepsychiatry**

18      **A.**    **Two Recent CDCR Suicide Reports Support the Court's and the Special**
                  **Master's Restrictions on Telepsychiatry**

19      40.    The restrictions and protective measures set forth in the current policy on
20  the use of telepsychiatry, as enhanced by the Court's orders on telepsychiatry, are
21  appropriate limitations given the risks and limitations of this form of treatment.

22      41.    I agree with the Court's analysis in its May 18, 2015 Order explaining that
23  "there may be class members not susceptible to this method of care."  *See* 5/18/15 Order,
24  ECF No. 5307, at 5 (cited and quoted by the Court in its 10/10/17 Order at 10:15-17).  For
25  example, some patients who suffer schizophrenia and/or paranoid delusions could
26  incorporate the disembodied telepsychiatrist into their paranoid delusions, thereby
27  amplifying their psychosis.  An "idea of reference" is the phenomenon of an individual
28  experiencing innocuous events or mere coincidences and believing that those events or

[3274360.3]

1 coincidences have strong personal significance. For example, a patient who believes that

2 he receives instructions to engage in self-harm from the television may incorporate the

3 telepsychiatrist into his idea of reference and conflate the telepsychiatrist with the source

4 of self-harm. This could exacerbate a pre-existing illness, and heighten the potential for

5 self-harm.

6     42. Moreover, there is evidence that telepsychiatry may be less effective for

7 patients with psychosis. In a study of telepsychiatry in a rural inpatient unit in Maryland,

8 Grady & Singleton (2011) found that psychotic patients reported more difficulty hearing

9 the doctor than patients without psychosis and that the psychotic patients incorporated

10 videoconferencing equipment into their delusions in a congruent manner. The doctors in

11 the study also had concerns about the impact of telepsychiatry on treatment effectiveness

12 and on the development of rapport with the psychotic patients and believed telepsychiatry

13 would be more effective with higher functioning patients.

14     43. The Court's prudent restrictions on this form of treatment limitations are

15 supported by much of the CDCR-specific evidence I reviewed. In particular, the two

16 suicide reports I reviewed that raised issues about telepsychiatry highlight the risks of this

17 method of treatment and illustrate the need for a strong policy limiting the use of

18 telepsychiatry and requiring extra safeguards where it is used, such as the ones the Court

19 has ordered.

20     **1.    The 2017 Suicide Report regarding Prisoner A Illustrates The**

                 **Risks Of Using Telepsychiatry, Especially for EOP Patients and**

21                  **for Reception Center Patients**

22     44. The first CDCR Suicide Report I reviewed involved a patient housed in one

23 of the CDCRs Reception Center prisons near Bakersfield who took his life in 2017. To

24 protect the confidentiality of the CDCR Suicide Review Process, I will refer to this

25 individual as Prisoner A. The Suicide of Prisoner A was the 15th CDCR Suicide in 2017

26 out of a total of 31 CDCR suicides during that calendar year. According to the CDCR

27 Suicide Report for Prisoner A, which is dated October 9, 2017, Prisoner A was a 30-year-

28 old white male EOP patient who, in the months before his death, began refusing

16

telepsychiatry appointments. Unfortunately, these refusals did not result in any assessment by the prison of the suitability of this individual for telepsychiatry as a method of treatment. While such an assessment would be required under my reading of the Defendants' current final telepsychiatry policy, it also appears that such an assessment of the patient's suitability for telepsychiatry was also required by the policy CDCR had in place at the time of this suicide. *Compare* Final Policy at 2 (requiring that "If a patient refuses treatment via telepsychiatry, the patient's telepsychiatry provider shall meet with other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient"), *with* Suicide Report for Prisoner A at 19 (mandating as a quality improvement plan for Problem 5 that clinical leadership and telepsychiatry leadership provide training "on the importance and requirements of assessing the appropriateness of telepsychiatry for patients that are refusing care.").

45.    More broadly, the Suicide Report illustrates the substantial risks involved in using telepsychiatry to treat patients in crisis, particularly at cell-front, and particularly in higher levels of care (including the EOP level of care). The Report also underscores the need to use caution in employing telepsychiatry in Reception Centers and other higher risk CDCR settings.

46.    The Suicide Report for Prisoner A reflects that he was high risk and struggling in many respects during the months before his death. He was a new Reception Center prisoner serving his first prison term. Suicide Report for Prisoner A at 1. He had a family history of mental illness and a history of substance abuse. *Id.* at 4. Within a day of his arrival at his Reception Center prison in March of 2017, he was referred to an MHCB at another prison where he remained for nearly two weeks. *Id* at 5. He had a history of multiple hospitalizations in the community for psychosis. *Id.* at 6. Of note, during his MHCB stay he was psychotic for much of the period, and all of his psychiatric interviews took place cell-front. *Id.* at 7. The day before his discharge from the MHCB unit, during a

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

[3274360.3]

1  cell-front interview with his psychiatrist, he told his psychiatrist "you're not the real
2  psychiatrist," indicating that he likely remained paranoid and psychotic when discharged
3  from the MHCB. *Id.* at 8.  He returned to the Reception Center on April 4, 2017.  *Id.*
4  During the month of April 2017 he refused two telepsychiatry appointments and 9 out of 9
5  therapeutic group sessions.  *Id.* at 8.  In May of 2017, Prisoner A refused a telepsychiatry
6  appointment, refused to attend his treatment team meeting, and refused 18 out of 19 group
7  therapy sessions.  *Id.* at 9.

8         47.    During a mental health evaluation in connection with a Rules Violation
9  Report related to a fight between Prisoner A and another prisoner on May 13, 2017,
10  Prisoner A told the evaluator that his medications were not working.  *Id.*  He was referred
11  to psychiatry for refusing medications on May 24, 2017.  *Id.*  On June 5, 2017, he refused a
12  telepsychiatry appointment related to this referral for non-compliance with medication.  *Id.*
13  He met with a psychiatrist in person on July 3, 2017 and reported paranoia, hearing voices,
14  anxiety and depression.  *Id.* at 12.  He died a few days later.  Prisoner A's release date was
15  slated to be in January of 2018, less than six months later.  *Id.*

16         48.    The Suicide Report for Prisoner A found that "[t]he extent of his symptoms
17  throughout his incarceration was difficult to assess because he withdrew, isolated, and
18  refused mental health appointments."  *Id.* at 13.  The Report identified problems with
19  Prisoner A's mental health care including incomplete mental health evaluations, poor
20  suicide risk assessments, incomplete and inadequate mental health treatment plans, missing
21  progress notes, and, of particular note here, problems with the response to Prisoner A's
22  refusal of telepsychiatry appointments, and a failure to note and respond to those refusals
23  in his treatment plans.  *Id.* at 13-17.

24         49.    With respect to Prisoner A's refusals of telepsychiatry appointments, the first
25  major problem appears to have been the failure to respond to these refusals by conducting
26  an assessment as to whether or not telepsychiatry was an appropriate method of treatment
27  for this patient.  *Id.* at 19.  Particularly given his medication refusals, the report also found
28  it was problematic that his Zoloft was stopped by the prison following the medication

18

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

[3274360.3]

1 │ refusals, without any contact with the patient or consultation with a psychiatrist.  There

2 │ was also a failure to discuss his telepsychiatry refusals in his treatment plan and respond to

3 │ this problem.  *Id.* at 19.

4 │        50.    Unfortunately, I do not find these kinds of problems with telepsychiatry

5 │ surprising or uncommon.  Given the remote location of the telepsychiatrists, there is

6 │ always a risk that there will be less robust communication with the on-site clinical team

7 │ about telepsychiatry issues.  In this case, it appears that the telepsychiatrist and other

8 │ treatment team members needed to discuss the telepsychiatry refusals and assess

9 │ alternative methods of treating the patient.  *See* Suicide Report Recommendation 5 Quality

10 │ Improvement Plan, at page 19 ("The CMH/Chief Psychiatrist or designee at [the prison]

11 │ shall provide training to mental health staff and [prison] telepsychiatry on the importance

12 │ and requirements of assessing the appropriateness of telepsychiatry for patients that are

13 │ refusing treatment.  In this training it is important to understand the critical role of

14 │ communication between providers on patient refusal patterns to ensure continuity of

15 │ case.").

16 │        51.    In my experience and in my view, live on site psychiatrists also contribute

17 │ more positively to the working environment for on-site clinicians, and to the treatment

18 │ environment in general.  On-site psychiatrists are better able to contribute informally to the

19 │ overall treatment plan through more frequent formal and informal interactions with other

20 │ treating staff.

21 │        52.    My opinion on this issue is supported by a section from the 27th Round

22 │ Special Master's Report that clinical staff at the California Institution for Women (CIW),

23 │ reported the following upon switching from using telepsychiatrists to live, in-person

24 │ psychiatry for their EOP:  "Staff reported the switch from telepsychiatry to on-site

25 │ psychiatry in EOP had been extremely beneficial, especially with respect to milieu

26 │ management."  *See* 2/13/18 Twenty Seventh Monitoring Report of the Special Master,

27 │ ECF No. 5779, at 485.

28 │        53.    In response to these concerns in the Suicide Report for Prisoner A, the

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1   mental health leadership at the Reception Center in question issued a memo on August 17,

2   2017 explaining that an on site psychiatrist would take over EOP care and that the

3   telepsychiatrist would be redirected to other care with CCCMS patients.  In a memo dated

4   August 30, 2017, the Chief Psychiatrist at the institution wrote that "effective September 5,

5   2017, [the institution] will no longer be using Tele-psychiatry services for EOP patients.

6   Tele-psychiatry will only be utilized to see CCCMS patients."

7        54.     In my view this is an appropriate restriction on telepsychiatry, particularly in

8   a Reception Center.  Reception Centers are high risk for prisoners with mental health

9   issues for several reasons.  First, prisoners in the Reception Centers in the CDCR have just

10  arrived in prison and are making difficult adjustments to prison life.  Also Reception

11  Center prisoners have little programming and spend most of their time isolated in their

12  cells, which tends to make existing mental illness worse.  Also, one cannot underestimate

13  the significant stress associated with the transfer from county jail to state prison and its

14  impact on mental health.

15              **2.     The 2016 Suicide Report Regarding Prisoner B Illustrates How**
                **Documentation Errors and Omissions Become More Serious and**
16              **Dangerous When Using Telepsychiatry**

17       55.     The second Suicide Report that I reviewed was dated June 9, 2016 and

18  concerned a suicide that took place in a mainline, high-security prison in the Spring of

19  2016.  To protect the confidentiality of the CDCR suicide review process I will refer to this

20  as the Suicide Report for Prisoner B.  This suicide was the 5th CDCR suicide of 2016 out

21  of 28 total for that year.  The Suicide Report for Prisoner B found that shortly after

22  Prisoner B arrived at the prison in December of 2015 "[a] telepsychiatrist renewed the

23  inmate's psychotropic medication prescriptions on December 14, 2015, but there was no

24  documentation found that a psychiatric interview took place at that time."  Suicide Report

25  for Prisoner B at 9.  In addition, three days later on December 17, 2015, there was a

26  treatment team meeting to plan treatment for Prisoner B.  *Id.*  However, despite the

27  presence of the telepsychiatrist on the treatment team, the treatment plan neglected to note

28  that Prisoner B was prescribed two psychotropic medications.  *Id.*  The Suicide Report

1   noted these problems with a lack of documentation as two separate problems each

2   requiring a corrective action plan. *Id.* at 21. The Suicide Report also noted "ongoing

3   problems with documentation produced by telepsychiatrists being entered into" the

4   electronic health records by the prison in question. *Id.* at 17.

5         56.    In my opinion, the Suicide of Prisoner B illustrates one of the main risks of

6   using telepsychiatry with high-risk patients. Because the telepsychiatrist is not physically

7   present at the institution, there is less informal discussion of each patient's treatment. The

8   lack of this type of ancillary contact and discussion makes documentation errors and

9   omissions potentially much more harmful to patients. In my opinion, these errors would

10   have been much less likely to occur with an in-person psychiatrist treating the patient and

11   would more likely have been identified and corrected by treatment staff working with an

12   in-person psychiatrist.

13         57.    Both of these suicides illustrate the high risks of treatment by telepsychiatry,

14   and both caution against using telepsychiatry for patients in crisis especially to the extent

15   those patients are seen cell-front which only amplifies the problems. As noted above,

16   Prisoner A was seen cell-front by a face-to-face psychiatrist for many of his clinical

17   interactions when he was in the MHCB at CHCF, including for Suicide Risk Assessments

18   and for his initial clinical examination. *See* Suicide Report for Prisoner A at 16, item 6

19   (noting the initial psychiatric evaluation in the MHCB reflected that Prisoner A refused to

20   leave his cell and "was briefly seen cell-side" and that as a result the initial evaluation

21   contained very little information), and *id.* at 15, item 7 (noting "there was no indication in

22   his [Suicide Risk Evaluation] that his evaluation occurred out of cell and in a confidential

23   space). Like the CDCR Suicide Report author in this instance, I have concerns about all

24   cell-front clinical interactions, even when face-to-face, and I find it alarming that

25   Defendants now want to use telepsychiatry for cell-front contacts.

26         58.    Similarly, although no treatment by Nurse Practitioners was involved, the

27   communication problems with telepsychiatry in connection with these suicides illustrate

28   the high risks involved in allowing Psychiatric Nurse Practitioners to practice using

[3274360.3]

1  telepsychiatry. In cases with seriously mentally ill individuals, communication with the

2  supervising psychiatrist is critical to ensuring good treatment by Psychiatric Nurse

3  Practitioners, so when a Nurse Practitioner uses telepsychiatry, the risks of

4  miscommunication are very likely to be amplified.

5  **III.    Defendants' Proposed Use of Telepsychiatry for Cell-Front Evaluations Is Not Appropriate**

6

7        59.    A psychiatric evaluation is the process of gathering information about a

8  person for the purpose of making a diagnosis and prescribing treatment. The minimum

9  standard for such an evaluation is an in-person confidential interview in a private setting.

10  Cell-front evaluations in a prison context generally take place because the patient in

11  question is refusing to leave their cell. As a clinical matter, this type of refusal can be for a

12  variety of reasons, but almost all of them tend to reflect some type of clinical

13  deterioration—some worsening of existing mental health issues or the development of

14  new, more serious mental health concerns that increase the risks of using off-site

15  telepsychiatry. In my experience, cell-front consultations are also commonly driven by

16  custody considerations, including a long lock-down where prisoners are not permitted to

17  leave their cells, even for clinical appointments, or where insufficient numbers of custody

18  staff exist to escort patients to appointments.

19        60.    Setting aside custody-driven reasons, one of the most common reasons for a

20  prisoner's refusal to leave their cell, in my experience, is that there has been some sort of

21  mental health decompensation. Not infrequently, for example, vulnerable mentally ill

22  individuals will decompensate under the stress of living in a locked-down, punitive

23  administrative segregation setting. When these prisoners decompensate, they often

24  become "cell dwellers" who refuse to leave their cells to go to yard, showers, or mental

25  health appointments. Cell-front clinical contacts with such patients are critical to attempt

26  to convince the patient to leave the cell, or to assess the degree to which the patient is a

27  danger to him or herself or to others, or gravely disabled. Such cell-front interactions may

28  be needed to assess whether a patient's situation is so dire that he or she needs to be cell-

1  extracted by custody staff in order to be provided urgent mental health treatment, assuming
2  the patient cannot be convinced by the clinician to voluntarily leave the cell for treatment.
3  While I do not agree that conducting clinical treatment is ever appropriate cell-front due to
4  the lack of confidentiality and the difficulty of communicating effectively with the patient
5  in this setting, cell-front assessments may sometimes be necessary to ensure that mentally
6  ill inmates do not harm themselves, staff, or other inmates; suffer harm from an
7  undiagnosed medical illness; become victimized; or engage in problematic behavior that
8  causes or exacerbates operational difficulties.  The remote nature of telepsychiatry inhibits
9  such assessments.

10      61.    Because they are not physically present in the prison with the patient,
11  telepsychiatrists, by themselves, cannot sufficiently identify the signs of medical and
12  mental illness during cell front interactions.  Telepsychiatrists are also inherently less
13  capable than on-site providers of developing effective patient-provider relationships.
14  These problems would be particularly harmful in cell-front settings, with a patient
15  exhibiting severe symptoms and possibly experiencing suicidal ideation or grave disability
16  because, as the Special Master found in his 2017 Staffing Report, "on site psychiatrists are
17  better able to discern nonverbal behavior demonstrated by inmates."  *See* Special Master's
18  Report on the Status of Mental Health Staffing, ECF No. 5564, at 17.

19      62.    I would also be concerned about the efficacy of any cell-front telepsychiatry
20  technology.  Many housing units in the CDCR are extremely noisy, and even with a
21  microphone inserted into the cell, my belief is that a human being present at the doorway,
22  able to look at the patient and speak through the door, would be better able to
23  communicate and certainly more able to engage in a therapeutic conversation about what
24  problems the patient is experiencing.  As I explain above, such use of a microphone would
25  also be particularly unacceptable for individuals whose mental health condition includes
26  ideas of reference, as such individuals would likely incorporate the technology into their
27  delusions.  Similarly, it would be particularly inappropriate for patients who display other
28  types of psychotic symptoms.

23

63.     My belief is also that a mental health provider who is physically present will be better able to connect to and treat the patient in this setting.  Even in the best of conditions, my experience with telepsychiatry is that the connection quality can often be a problem and detract from the quality of the clinical interaction.  I would be even more concerned about any mobile technology that would be dependent on wireless internet coverage in old CDCR prisons.  Moreover, even when there is good connectivity, the quality of the clinical connection between the doctor and patient is significantly impaired by the technology.  I also have serious concerns about confidentiality in using cell-front technology.  That is also a problem with in-person cell-front visits, but in-person clinicians may be able to minimize any privacy problems.

64.     This highlights one of my main misgivings about telepsychiatry in general.  Psychiatry and psychology both rely on a trusting relationship with the mental health care provider as a key to successful treatment.  As I describe in greater detail below in Paragraph 77 this is referred to as a "therapeutic alliance" between the patient and the practitioner, and it is critical to good treatment.  Telepsychiatry makes building a therapeutic alliance more difficult, to the detriment of patient care.

65.     Accordingly, cell-front meetings and evaluations with mental health patients should be done in-person rather than by a remotely-based provider.

66.     Finally, I note that the telepsychiatry policy proffered by the CDCR does not appear to contain any limits or restrictions on the use of cell-front telepsychiatry, including in what circumstances it will be utilized.  This runs the risk that telepsychiatry at the cell front, rather than in a private setting, will become the norm.  As discussed, while it may be appropriate for a psychiatrist to conduct a cell-front assessment of a patient who will not leave the cell in certain very limited circumstances, it is my view that psychiatric treatment should never be conducted cell front and should instead always be provided in a confidential, appropriate setting.

**IV. Telepsychiatry Limits Providers' Ability to Identify the Signs of Medical Disorders with Psychiatry Implications, and the Signs and Symptoms of Mental Illness**

**A.    On-Site Providers Are More Capable of Identifying the Signs of Medical Disorders With Psychiatric Implications**

67.    Medical illnesses can cause and exacerbate psychiatric symptoms.  One early study underscored the need for more careful medical evaluation of psychiatric patients. The study showed that in 658 consecutive psychiatric outpatient encounters, medical disorders presented as psychiatric symptoms in almost ten percent (9.1%) of cases (Hall et al., 1978).  The most frequent presentations were of depression, confusion, anxiety, and speech or memory disorders; illnesses causing these presentations included infectious, pulmonary, thyroid, diabetic, hematopoietic, hepatic, and CNS diseases.  *Id.*  Notably, forty-six percent (46%) of these patients had medical illnesses that were previously unknown to either them or their physician.  *Id.*  The dilemma of medical illness presenting as psychiatric illness is substantially heightened in the context of a prison, where the prevalence of medical disorders and psychiatric disorders are both substantially greater than in the community.

68.    Specific medical illnesses frequently present as specific psychiatric illness. For example, there is a strong association between major depressive disorder and medical conditions such as myocardial infarction, stroke, type 2 diabetes, and endocrine disorders. Anxiety and panic attacks are associated with many medical conditions, including hyperthyroidism, asthma, congestive heart failure, traumatic brain injury, and Parkinson's disease.  Hallucinations are associated with diseases often found among elder patients, including Alzheimer's and Huntington's diseases.  Metabolic and endocrine abnormalities at times present with mania and psychosis.  HIV and pneumonia can present as agitation, cognitive impairment, and psychosis.  Medication side effects can also present as mental illness; for example, dopamine agonists used to treat Parkinson's disease can lead to hallucinations and paranoia.

69.    Psychiatrists are trained to identify signs of medical illness that may be

25

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1 causing or exacerbating a patient's psychiatric symptoms, and are obligated to conduct a
2 focused medical evaluation to rule out medical illness in a psychiatric presentation.
3 Psychiatrists use their senses of sight, hearing, smell, and touch to identify these signs.  For
4 example, during in-person evaluations, psychiatrists use their sense of smell to gather
5 information about the patient.  A patient presenting with major depression may actually be
6 suffering from diabetic ketoacidosis, which is associated with a sweet, fruity odor on one's
7 breath.  Similarly, the smell of alcohol on a patient's breath may be an indication of
8 intoxication or withdrawal, which can be associated with somnolence.  Pungent body odors
9 including the smell of urine and/or feces signal that a medical or mental illness is
10 interfering with the patient's Activities of Daily Living (ADLs).

11       70.     Psychiatrists frequently use their sense of touch in evaluating patients.  Even
12 the initial handshake is a potential source of information.  A clammy or sweaty palm may
13 be a sign of an endocrine or metabolic disorder, such as thyroid disease or renal failure.  A
14 fine tremor may be a sign of thyrotoxicosis, whereas a cold tremulous hand may be a sign
15 of an anxiety disorders.  Psychiatrists possess the skills necessary to conduct a focused
16 physical exam using their senses (including touch) to determine whether medical illness
17 may be present or whether additional tests, such as laboratory or imaging work, are
18 indicated.

19       71.     Psychiatrists also require the use of their sense of touch to perform
20 neurological examinations.  In conducting neurological examinations, psychiatrists may
21 evaluate extrapyramidal motor functioning to determine a patient's motor tone and
22 involuntary motor activity, as well as the changes in the amount and velocity of movement.
23 Extrapyramidal disorders are common in psychiatric patients, and psychiatric syndromes
24 are also common in patients with extrapyramidal disorders.  Antipsychotic drugs are
25 associated with a wide range of side effects, including movement disorders such as
26 akathisia and pseudo-Parkinsonian symptoms.  In order to determine whether antipsychotic
27 medications are causing extrapyramidal side effects, psychiatrists physically touch the
28 patient's limbs and test resistance associated with muscle movements.  Patients not on

[3274360.3]

1  medication but exhibiting asymmetric signs may be suffering from Parkinson's disease,

2  which is commonly associated with depressive disorder.

3      72.    By the nature of their remote practice, telepsychiatrists cannot themselves

4  use their senses of smell and touch as part of their evaluation of a patient.  This is

5  exacerbated in the cell-front setting.  Even in a scheduled telepsychiatry setting with a

6  medical assistant present to facilitate the interview, it is problematic that the medical

7  assistant does not have the medical training to perform physical evaluations upon the

8  patient at the telepsychiatrist's instruction.  In order to be capable of conducting the

9  physical examination and diagnostic evaluation as if the psychiatric evaluation was

10  conducted in-person, the telepsychiatrist would require the assistance of at least a mid-

11  level medical provider, such as a physician's assistant or a registered nurse with

12  specialized training to participate in this level of assessment.  An examination in which the

13  telepsychiatrist instructs another provider to conduct physical examinations of the patient

14  and report back may lead to missed or inaccurate diagnoses due to communication

15  difficulties as well as inhibit or harm the patient-provider relationship.

16  **B.    On-Site Providers Are More Capable of Identifying the *Signs* of Mental
17         Illness**

18      73.    Psychiatrists who conduct in-person initial evaluations have access to more

19  information—and more opportunities to observe signs of mental illness—than

20  telepsychiatrists.  The on-site psychiatrist observes the patient's interactions with other

21  staff who may be present, other inmates who may be waiting outside, and the correctional

22  officers who escort the patient into the evaluation room.  If an altercation or dispute arises,

23  the on-site psychiatrist is aware.  The on-site psychiatrist observes the patient's gait as he

24  walks into the room, watching for indications that a neurological examination should be

25  performed.  The on-site psychiatrist observes the patient's reaction upon entering the room,

26  discerning whether there the patient is fearful or relaxed by the atmosphere.  The on-site

27  psychiatrist observes subtle behavioral cues of mental illness as the patient approaches:

28  she hears the almost inaudible whispers made by the patient; she notes how the patient

[3274360.3]

1  slightly turns his head away and mumbles to himself; she catches a subtle eye glance by
2  the patient. By being present in the same physical space, the on-site provider observes
3  numerous nuanced signs of illness or side effects that cannot be observed by the
4  telepsychiatrist whose frame of view is limited and fixed.

5       74.    Telepsychiatrists are limited to direct observations of the patient only to the
6  extent the patient is observable by the screen's camera and integrated microphone.
7  Typically, only the patient's head and shoulders are seen by the telepsychiatrist. The
8  telepsychiatrist cannot see the slight shuffle of a patient's walk. The telepsychiatrist
9  cannot observe a patient's pill rolling tremor—one of the earliest symptoms of Parkinson's
10 disease—in which the patient "rolls" a non-existent pill between his thumb and index
11 finger. The telepsychiatrist will miss other hand tremors, such as those that may
12 accompany other symptoms of tardive dyskinesia, which is a serious side effect of
13 antipsychotic medication that can result in life-long harm if not recognized and treated
14 early. The telepsychiatrist cannot observe the patient's reaction to the telepsychiatry
15 machine as he walks into the room. The telepsychiatrist cannot see or a hear a patient
16 mumbling or whispering to himself as he approaches.

17      75.    Having another person in the room to identify and report the above
18 observations to the telepsychiatrist presents its own problems. First, the additional person
19 would have to have the requisite mental health training to adequately identify these subtle
20 cues as signs of mental illness (or psychiatric symptoms caused or exacerbated by medical
21 illness). The medical assistant who chaperones patients during telepsychiatry sessions
22 does not possess sufficient education and training. A telepsychiatrist would need to rely
23 on a more highly trained medical staff member, such as a registered nurse or a nurse
24 practitioner, for necessary diagnostic assistance. Social workers and psychologists do not
25 have adequate education and training to identify the medical and neurological signs of
26 mental illness. Such skills are especially important in the context of prisons, where the
27 incidence of medical-neurological problems caused by mental illness and its treatment is
28 substantially higher than in the more stable community population.

76.     Second, the on-site mid-level provider (or above) would, in many instances, have to provide her observations to the telepsychiatrist after the conclusion of the telepsychiatry session so as not to interfere with the patient-provider relationship.  For example, if the patient told the telepsychiatrist that he did not hear voices but was then contradicted by the mid-level provider's stated observations during the session, the patient may feel contradicted and become argumentative or withdrawn.  Were the mid-level provider to tell the psychiatrist during the session that the patient was whispering expletives to himself as he approached the telepsychiatry machine, the patient may become defensive.  At the same time, it may be that the assistant's observation proves to be the most important piece of information from the entire evaluation.  However, it is necessary to consider all of the information about the patient before the assessment is completed in order to make the most informed diagnosis and treatment plan.  Waiting until after the session to obtain additional information is impractical, especially given that if the information would lead to a different diagnosis and treatment, the provider would have to obtain the patient's informed consent as to the new treatment plan at a later time.  Treatment would thus be delayed.

C.     **On-Site Providers Are More Capable of Identifying the *Symptoms* of Mental Illness**

77.     During each psychiatric evaluation of a patient, the psychiatrist seeks to obtain an accurate assessment as well as engage the patient's cooperation in treatment.  Doing so requires a working therapeutic relationship—a therapeutic alliance—between the patient and provider.  In a therapeutic alliance, the patient trusts the provider such that he is willing to open up and honestly describe the symptoms of his mental illness.  It can be difficult to establish a therapeutic alliance for any given patient, but it is especially hard to do so in a prison setting.  Psychiatric symptoms are the type of thing that people are reluctant to talk about even on a good day.  People in general are exceedingly unwilling to talk about deeply personal issues such as suicide, depression, trauma, and psychosis.  Given the reluctance of many mentally ill patients to take medication, especially

1  antipsychotic medication, anything that impairs the patient-provider relationship could
2  prevent the patient's cooperation with the treatment plan.

3      78.    I have performed tens of thousands of in-person patient evaluations. I have
4  experienced the difficulty of establishing a therapeutic alliance with patients. I have
5  observed that certain actions help effectuate the therapeutic alliance. For example, at the
6  outset of the meeting, I will stand up, look the patient in the eyes, perhaps shake the
7  patient's hand or touch him on the shoulder, and guide him to a chair that I believe to be
8  the proper distance between myself and the patient. All of these actions are integral to
9  establishing the relationship. By standing up, I acknowledge and signal respect for the
10 patient. I do the same in shaking his hand, and in so doing, I collect information about the
11 patient—his grip, his temperature, his perspiration, his motor skills, his hesitation, etc. In
12 meeting the patient's eyes, I can make an initial evaluation of his willingness to engage. I
13 was taught as a psychiatric resident where to position the patient within the examination
14 room. For example, patients exhibiting symptoms of paranoia should be seated close to a
15 door, so that they feel that they can exit quickly if needed. These are not parlor games;
16 rather, I must make the best of my interpersonal resources in order to maximize my
17 chances of establishing a therapeutic alliance. This is extremely important in the context
18 of the prison, where inmate patients commonly distrust the correctional and medical staff
19 responsible for ensuring their physical security and care.

20      79.    At times, it is appropriate for the psychiatrist to offer the patient a reassuring
21 touch during consultation. Doing so establishes human contact, literally. In my
22 experience, this allows patients to divulge critical aspects of their psychiatric history that
23 they otherwise would keep to themselves. In contrast, I have observed how distance
24 inhibits the formation of a therapeutic alliance. During my tours of California and Illinois
25 prisons as a court-appointed monitor, I have observed prison doctors conduct their
26 evaluation of mentally ill patients through cell-doors, from afar. During these tours, I
27 often subsequently interview the same patients in private settings to evaluate the care that
28 they received. In this private setting, patients are often quick to report the feelings,

1   including suicidal feelings, that they kept to themselves when interviewed from a distance

2   by the prison physician, blaming the distance itself and the lack of confidentiality as the

3   reason for not being forthcoming about their suicidality and other psychic distress.

4        80.    Given the chaotic and harsh nature of the prison setting, it is even more

5   important to have a calming presence with the patient to establish a therapeutic alliance.

6   The on-site psychiatrist knows how A-yard dorm is different than a C-yard cell block. She

7   understands the guards' culture, through her own observations of and interactions with

8   specific individuals. Both the telepsychiatrist and patient are limited in their individual

9   ability to move freely throughout the institution. When the psychiatrist is in the same

10  room as the patient, they share the same environment: the same smells, noises, physical

11  space, and potential threats. In that shared environment, the psychiatrist is more capable of

12  communicating that "I am concerned about you," "I empathize with your situation," and "I

13  want to help you." This calming presence helps establish situations in which patients can

14  talk about things that they do not feel comfortable sharing with anyone else.

15       81.    In my observations of over 100 telepsychiatry sessions, I have never seen the

16  modality itself contribute to or improve the therapeutic alliance. Instead, I have observed

17  that most psychiatrists and patients have difficulty forming a therapeutic alliance when

18  using telepsychiatry. It is hard enough to establish a therapeutic alliance with incarcerated

19  individuals, especially if they are severely mentally ill. Trying to do so using a television

20  with a chaperone in the room only makes it that much more difficult to form a therapeutic

21  alliance.

22       82.    My experience in correctional settings is that even during face-to-face

23  encounters, psychiatrists sometimes fail to identify a patient's pre-existing medical

24  problem that is confounding a patient's psychiatric presentation. Similarly, psychiatrists

25  sometimes fail to identify medication-induced problems in their patients. These chances of

26  these types of lapses in clinical care are increased when using telepsychiatry.

27

28

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

**V.    The Use of Telepsychiatry Is Not Appropriate for Psychiatric Nurse Practitioners**

83.    In California, Psychiatric Nurse Practitioners who furnish medication must practice under physician supervision, with a ratio of no more than four Nurse Practitioners supervised by one physician.  Cal. Bus. & Prof. Code § 2836.1(e).  Further, Nurse Practitioners may only furnish medication under standardized procedures or protocols (and with such supervision).  *Id.* § 2836.1(a).

84.    Given the current shortage of psychiatrists in many communities, one way that mental health administrators commonly think about Nurse Practitioners is as "extenders" of the psychiatric services provided by individual psychiatrists.  Thus, a psychiatrist supervising a Psychiatric Nurse Practitioner would work closely with that person, and might assign to the Psychiatric Nurse Practitioner less difficult, more routine patient care tasks.  Certain clinical activities can also be independently undertaken by Psychiatric Nurse Practitioners.  In a sense, the growing use of Psychiatric Nurse Practitioners is similar to the growing use of telepsychiatry—both are efforts to maximize the impact and service reach of scarce psychiatrists.

85.    Typically, in the course of their supervision of Psychiatric Nurse Practitioners, the supervising psychiatrist would discuss individual cases with the Nurse Practitioner, would review their work, particularly regarding the use of psychotropic medication, and would provide oversight regarding all of their treatment activities, answering questions and educating them about issues in patient care.

86.    In working with Psychiatric Nurse Practitioners, it would be important to have a clear set of policies and procedures for their work and governing their supervision.  Such a policy might include important restrictions, such as not allowing Psychiatric Nurse Practitioners to prescribe or monitor medicines for patients with complex medication regimes.  I have been informed that the CDCR has not yet developed such a set of policies and procedures governing Psychiatric Nurse Practitioner work in the CDCR.

87.    I have worked with Psychiatric Nurse Practitioners and supervised them.

1    When they are matched with patients with the appropriate level of clinical acuity and
2    properly supervised, they can be a very valuable resource for providing psychiatric
3    services.

4        88.    However, in my opinion, there are risks to patient care that come from using
5    Psychiatric Nurse Practitioners instead of psychiatrists. Psychiatric Nurse Practitioners do
6    not have the same medical training and the same ability to identify medical symptomology
7    or side effects. Psychiatric Nurse Practitioners do not have the same ability to diagnose
8    mental health conditions. These risks are mitigated by supervision by psychiatrists and
9    interaction with other physicians, and their impact can be further minimized by assigning
10   Psychiatric Nurse Practitioners only to routine encounters like medication renewals for
11   stable patients.

12       89.    Moreover, in my view, even with a less acutely mentally ill, more stable
13   population of patients like many CCCMS patients in the CDCR, the risks of using
14   Psychiatric Nurse Practitioners would be heightened if the CDCR permitted Psychiatric
15   Nurse Practitioners to practice using telepsychiatry. All of the problems with
16   telepsychiatry described above are just as serious, if not more serious, with Psychiatric
17   Nurse Practitioners. And these risks are, in my view, made more serious when the
18   clinician is less knowledgeable about medical conditions, side-effects and risks, and less
19   well trained than a psychiatrist.

20   **VI.    The Enhanced Outpatient Program, Despite Its Name, Is Actually a**
     **Residential Treatment Program.**
21

22       90.    I am informed that Defendants have argued in connection with the
23   telepsychiatry negotiations between the parties and in court that the EOP program is not a
24   residential treatment program.

25       91.    I have toured many EOP units in the CDCR and am very familiar with these
26   programs and the prisoners in them, who are very acutely ill. I can state confidently and
27   without reservation that, based on my experience, these programs are residential treatment
28   programs, and are in some important respect akin to inpatient programs. My

1   understanding is that throughout the CDCR, EOP patients live in separate, segregated,

2   "sheltered" treatment units.  The purpose of such segregation is to separate EOP prisoners

3   from non-mentally ill prisoners in order to make them safer, and to provide enhanced

4   treatment.  In my experience, EOP prisoners generally also have had their own yard and

5   eat in their own dining halls in many or most CDCR prisons.  I understand that EOP

6   prisoners do sometimes mix in programming with non-EOP prisoners.  I am also informed

7   that, particularly at lower custody levels, EOP prisoners do sometimes share yards, dining

8   halls, and programs with non-EOP prisoners.  However, I understand they are housed

9   separately everywhere and generally have their own dayrooms.

10         92.     The American Psychiatric Association's (APA) Publication *Psychiatric*

11   *Services in Correctional Facilities: Third Edition* (2016), outlines various levels of care

12   and notes that:  "Outpatient treatment is the least intensive level.  Patients live in a general

13   population with other inmates, many of whom do not need psychiatric care."  *See*

14   Trestman, R.L, Metzner, JL, Penn JV, *et al.*, Workgroup Report, *Psychiatric Services in*

15   *Correctional Facilities, Third Edition.*  APA 2016, at 20.  In my opinion, the level of care

16   in the CDCR that matches this description is the CCCMS level of care.

17         93.     The next two sentences of the APA Publication describe residential

18   programs:  "Residential treatment programs are more intensive and usually exist in

19   dedicated housing.  As with similar programs in the community, residential treatment is

20   provided for patients with chronic and serious mental illness who do not require acute care

21   but do need enhanced services."  *Id* at 20-21.  In my opinion, this level of care in the

22   CDCR is EOP level of care.  EOP patients receive enhanced services in the form of 10

23   hours a week of structured therapeutic activities and more frequent case manager contacts.

24   *See* 2009 Program Guide at 12-4-2 (noting EOP is for patients "whose level of functioning

25   is insufficient to allow GP placement"); 12-4-8 (requirement of "at least ten hours per

26   week of scheduled structured therapeutic activities."); 12-4-9 (requirement for enhanced

27   case manager and psychiatrist contact frequency).

28         94.     EOP programs are intensive programs that provide care that is much more

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1  similar to inpatient care programs than to CCCMS. This is a high risk, acutely ill group.

2  Many of the patients in the EOP program decompensate even with the EOP level of care

3  treatment and go back and forth to acute and intermediate inpatient programs. It is very

4  clear to me that the EOP program is a residential treatment program. Moreover, the

5  intensity of treatment in CDCR's EOP program is much closer to inpatient care than to

6  outpatient CCCMS care.

7      95.    In the community, there are residential treatment programs that are called

8  "residential psychiatric hospitals" which provide similar treatment to that provided in the

9  CDCR to patients at the EOP level of care.

10     96.    Given the high level of care and the high acuity of mental illness among the

11 EOP patients I have observed in the CDCR, I would not recommend using telepsychiatry

12 in this setting.

13 **VII.  Defendants' Use of Telepsychiatry Is Not Appropriate for Emergency
14        Evaluations or With Patients Who Are In Crisis**

15     **A.   On-Site Providers Are More Capable of Identifying Signs and
            Symptoms of Illness**

16     97.    I have described above how using the modality of telepsychiatry decreases a

17 provider's ability to observe the signs and symptoms of illness. For all of those reasons,

18 using telepsychiatry for emergency assessments (for severe psychic distress) and patients

19 in crisis (including suicidal, homicidal, and/or gravely disabled) is especially problematic.

20     98.    For example, a patient presenting with suicidal ideation may actually be

21 suffering from diabetic ketoacidosis, an acute and, at times, life-threatening complication

22 of diabetes. Telepsychiatrists are incapable of smelling the ketones on the patient's breath,

23 which can smell like nail polish. The medical assistant who chaperones the session is not

24 trained in recognizing the smell to be an indication of a diabetic emergency, nor are the

25 correctional officers who escort the patient to the telepsychiatry session. Without this

26 crucial information, the telepsychiatrist may order the patient be placed on suicide watch in

27 a safety cell, rather initiating the appropriate fluid and electrolyte replacement and insulin

28 therapy treatment that could save the patient's life.

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

**B.    Patients In Crisis Require More Aggressive, Hands-On Treatment**

99.    The standard of care in the community is that if a patient is in crisis, they are seen in-person by a psychiatrist to evaluate their need for medication or medication adjustments, and to identify and treat any underlying or contributing medical conditions. Thus, psychiatrists play a key role in crisis care.

100.    Patients in crisis are generally less likely to be capable of being evaluated or agreeing to a treatment recommendation. Most often, the nature of the crisis is due to an underlying condition that has resulted in symptoms that prevent the patient from cooperating and being amenable to treatment intervention. The underlying condition has not yet been adequately addressed and has resulted in a crisis that requires a more aggressive type of intervention because of the severity of the condition that led to the crisis in the first place.

101.    I have seen thousands of patients in psychiatric crisis. Behaviors consistent with crisis include thrashing and yelling, sobbing, crying, self-injurious behaviors (cutting, banging, slapping, hitting selves), lack of cooperation, and extreme behavior ranging from catatonia to excessive agitation. The expression of such behaviors make it very difficult to perform an adequate evaluation to identify the underlying reasons for the patient's presentation. When a patient experiences a psychiatric crisis, the provider must deescalate the situation in order to conduct a thorough evaluation and facilitate assessment of the condition. Where a patient finds himself in a situation where taking his own life seems like reasonable action, human intervention is required. Placing that individual in front of a computer screen and telling him to talk to the doctor is inadequate.

102.    The most effective tool I have to address patients in crisis is my presence. Being present, bearing witness, and making oneself available at the patient's choosing has tremendous calming power potential. By being present, I can speak to the patient in a calm, reassuring voice. Depending on the need, I may touch the patient at the appropriate time. I estimate that I have used touch in at least one third of patient crises for the specific purpose of deescalating the situation so that I can begin to assess the reasons behind the

[3274360.3]
EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1   crisis presentation.  There are still other times when my mere presence alone is the most
2   therapeutic thing I can offer, without anything more—such as by just sitting with someone.
3   If a patient is balled up in a corner, the most calming thing may be to gently inform the
4   patient: "just let me know when you're ready to talk."  Studies have shown that the
5   specific psychological approach (Freudian, Jungian, Kleinian) is not what is curative;
6   rather, it is the human connection itself that is curative.  The use of telepsychiatry can, at
7   best, employ only some of these tools and only where the individual patient is open to that
8   modality.

9        103.    Once the patient is calm, an evaluation can be performed.  In order evaluate
10  the patient undergoing crisis and effectively assess the underlying condition, the provider
11  must be physically present to properly observe all aspects of their presentation.  In doing
12  so, the provider has access to all of her senses of seeing, hearing, smelling, and touching.
13  The use of telepsychiatry is inadequate for the task, as it does not allow the provider the
14  full use of her hearing or sight, and necessarily prohibits the use of her smell and touch.

15  **VIII.  Telepsychiatry May Be Appropriately Used for Low Level, Non-Initiating,
        Routine, Low-Risk Appointments**
16

17       104.    Defendants must have on-site and nearby resources to ensure that patients
18  who refuse to leave their cells, patients at higher levels of care, and those patients who are
19  in crises can be seen in-person.  If they are unable to obtain these on-site resources in
20  certain locations, then they should cluster their mental health programs in locations where
21  such services can more readily be obtained.

22       105.    Telepsychiatry may be an adequate supplement to the provision of
23  psychiatric services for CCCMS patients who are stable, but, for the reasons identified
24  above, should never be a complete substitute for on-site care at that level of care.  Limiting
25  the use of telepsychiatry to routine, low-risk appointments—such as medication renewals
26  for stable patients—is consistent with these standards.

27

28

[3274360.3]

1    I declare under penalty of perjury under the laws of the United States of America

2  that the foregoing is true and correct, and that this declaration is executed at San Francisco,

3  California this 12th day of July, 2018.

4  _____

PABLO STEWART, M.D.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

Exhibit A

CURRICULUM VITAE

**PABLO STEWART, M.D.**
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 264-0237; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated March 2017)**


EDUCATION:                 University of California, San Francisco, Teaching Certificate in
                           General Medical Education, 2017

                           University of California, San Francisco, School of Medicine, M.D.,
                           1982

                           United States Naval Academy, Annapolis, MD, B.S. 1973, Major:
                           Chemistry


LICENSURE:                 California Medical License #GO50899
                           Hawai'i Medical License #MD-11784
                           Federal Drug Enforcement Administration #BS0546981
                           Diplomate in Psychiatry, American Board of
                           Psychiatry and Neurology, Certificate #32564


ACADEMIC APPOINTMENTS:

September 2006-            Academic Appointment: Clinical Professor, Department of
Present                    Psychiatry, University of California, San Francisco,
                           School of Medicine.

July 1995 -               Academic Appointment:  Associate Clinical Professor,
August 2006               Department of Psychiatry, University of California, San Francisco,
                          School of Medicine.

August 1989 -             Academic Appointment:  Assistant Clinical Professor,
June 1995                 Department of Psychiatry, University of California, San Francisco,
                          School of Medicine.

August 1986 -             Academic Appointment: Clinical Instructor, Department of
July 1989                 Psychiatry, University of California, San Francisco, School of
                          Medicine.


EMPLOYMENT:

December 1996-            Psychiatric Consultant
Present                   Provide consultation to governmental and private agencies on a
                          variety of psychiatric, forensic, substance abuse and organizational
                          issues; extensive experience in all phases of capital litigation and
                          correctional psychiatry.

1

| January 1997-<br>September 1998 | Director of Clinical Services, San Francisco Target Cities Project.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
|---|---|
| February 1996 -<br>November 1996 | Medical Director, Comprehensive Homeless Center, Department of Veterans Affairs Medical Center, San Francisco. Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | Chief, Intensive Psychiatric Community Care Program, (IPCC) Department of Veterans Affairs Medical Center, San Francisco.  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical Center, San Francisco. Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco.  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | Director, Forensic Psychiatric Services, City and County of San Francisco.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital.  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

2

| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California</u> <u>San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
|---|---|
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry |

Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome."

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |

| | |
|---|---|
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006;<br>February 2017-<br>Present | Member of Human Services Commission, City and County of<br>San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of<br>San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>2017 | President, Human Services Commission, City and County of<br>San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of<br>Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On<br>Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of<br>Nursing, Department of Family Health Care Nursing.  Lecture to<br>the Advanced Practice Nurse Practitioner Students on Alcohol,<br>Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco,<br>School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the<br>Department of Medicine.  Also, provide crisis intervention and<br>psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California<br>San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify,<br>treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions<br>Committee, University of California, San Francisco,<br>School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract<br>and retain minority students and faculty. |

| | |
|---|---|
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic<br>Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the<br>special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of<br>Medicine. Duties included screening applications and interviewing<br>candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California,<br>San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of<br>exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| September 2016-<br>Present | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*,<br>University of California, San Francisco, School of Medicine. |
| August 2014-<br>Present | Small Group Facilitator, Foundations of Patient Care, University of<br>California, San Francisco, School of Medicine. |
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the<br>Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of<br>California, San Francisco, School of Medicine, "Prisoner<br>Health." This is a 1-unit course, which covers the unique<br>health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency<br>Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug<br>Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans<br>Comprehensive Homeless Center. |
| March 1995-<br>December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry,<br>Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of<br>California, San Francisco, School of Medicine. Designed, planned<br>and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse."<br>This is a 1-unit course, which covers the major aspects of drug and<br>alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury<br>Free Clinic, Drug Detoxification and Aftercare Project. Supervise<br>4th Year medical students in the care of dual diagnostic patients. |

| | |
|---|---|
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency<br>Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric<br>Aspects of Medicine," University of California, San Francisco,<br>School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient<br>Clinic, Department of Psychiatry, University of California, San<br>Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of<br>Pharmacy course, "Addictionology and Substance Abuse<br>Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric<br>residents, Substance Abuse Inpatient Unit, San Francisco Veterans<br>Affairs Medical Center. |
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents,<br>Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical<br>Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU),<br>San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans<br>Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight<br>Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant.<br>Extensive experience as a consultant in numerous Tavistock<br>conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of<br>California, San Francisco, School of Medicine. Designed, planned<br>and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-<br>unit course offered to medical students, which covers alcoholism<br>with special emphasis on the health professional. This course is<br>offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco<br>General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |

8

| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |

| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |

| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |

| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| May 2016- Present | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |

| June 2015- May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |

| April 2014- Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |

| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |

| August 2012-Present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |

| October 2007 -Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown*, United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state |

9

|  | prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata*, __U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
|---|---|
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |

| | |
|---|---|
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM. Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA. Advised youth services staff on client management. Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

## SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |

11

| | |
|---|---|
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance<br>Abuse issues to the student body, Hidden Valley Elementary<br>School and Santa Rosa Jr. High School, Santa Rosa, CA. |

## PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12.     Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13.     Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.     Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.     Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.     University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17.     National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.     Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19.     Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20.     San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21.     First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.     Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.     Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.     The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25.     American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

13

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

14

41.  Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.  "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.  Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.  "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.  9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.  Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.  Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.  California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.  California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.  Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.  1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.    "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.    Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.    "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58.    Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59.    American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60.    "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61.    "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62.    "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63.    "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64.    Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66.    "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67.    California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69.    State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70.  "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71.  11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72.  The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.  "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.  15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.  "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.  "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.  "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.  "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.  "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.  "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.  "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.  1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?"

"Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88.    "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89.    "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90.    "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91.    "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92.    "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93.    "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94.    "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95.    "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96.    "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97.    "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98.    "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99.    "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101.    "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102.    National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.    "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105.    "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107.    Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.    "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109.    "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.    "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111.    "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.    "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113.    "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114.    "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115.    Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

19

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131.  "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Pasadena, California.  (4/2/04)

132.  Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.  San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134.  "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.  "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.  Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.  Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.  "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.  Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.  "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.  "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.  "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.  "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon. (5/10/07)

144.  "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California. (8/2/07)

145.  "Capital Punishment," Human Writes 2007 Conference.  London, England. (10/6/07)

146.  "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California. (10/30/07)

147.  "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA. This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court. San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.    2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.    2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.    Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.    Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.    "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.    San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.    Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for

Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.    "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.

PUBLICATIONS:

1)    Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.*  Hospital and Community Psychiatry, 39, 437-439.

2)    Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.*  Group, Volume 13, Number 2, Summer 1989, 67-73.

3)    Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.*  Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)    Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal.* Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)    Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.*  The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)    Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.*  Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)    Stewart, P. (1999).  *New Approaches and Future Strategies Toward Understanding Substance Abuse.*  Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002).  *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)   Stewart, P., Inaba, D.S., and Cohen, W.E.  (2004). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)   James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High*

23

*Risk and Special Management Prisoners, A National Assessment of Current Practices.* <u>National Institute of Corrections</u>, Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as <u>AMICUS CURIAE</u> in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)  Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, <u>*Uppers, Downers, All Arounders, Sixth Edition*</u>, CNS Publications, Inc., Ashland, Oregon.

14)  Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, <u>*Uppers, Downers, All Arounders, Seventh Edition,*</u> CNS Publications, Inc., Ashland, Oregon.

15)  Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C: Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16)  Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17)  Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)*  Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

Exhibit B

*PABLO STEWART, M.D.*
**Psychiatric Consultant**
**824 Ashbury Street**
**San Francisco, CA 94117**
**(415) 264-0237**
**(Fax) 753-5479**
**E Mail pab4emi@aol.com**

---

## TESTIMONY/DEPOSITIONS January 2000 - February 2018

1. People versus Juan Duarte Gonzales (Lincoln County, Washington, January 2000)
2. People versus Jerry Lane Davis (Stanislaus County, California, September 2000)
3. James Andrew Melton versus Arthur Calderon, et al. (United States District Court, Los Angeles, California, December 2000)
4. Fremont Unified School District versus James Parks (Deposition taken in San Francisco, California, April 2001)
5. People versus Pablo Lomeli (Douglas County, Arizona, August 2001)
6. Dunlap versus County of Mendocino (Deposition taken in Oakland California, September 2001)
7. Maxwell Hoffman versus A.J. Arave, Warden, et al. (Deposition taken in San Francisco, October 2001)
8. People versus Michelle Michaud (Alameda County, California, April 2002)
9. People versus David Attias (Santa Barbara County, California, May/June 2002)
10. People versus Larry Christopher Graham (Contra Costa County, California, October 2002)
11. People versus Miguel Enrique Diaz (San Mateo County, California, November/December 2002)
12. United States versus Eugene Frederick Boyce, III (District Court, Honolulu, Hawai'i December 2002)
13. People versus Robert Daniel Weston (Stanislaus County, California, April/July 2003)
14. People versus Vincent Sanchez (Ventura County, California, August 2003)
15. Armstrong Petition JW01-6450 (San Francisco Juvenile Court, December 2003)
16. People versus Daniel Mugnolo (San Francisco City and County, December 2003)
17. Brandon Astor Jones versus Frederick Head, Warden (Deposition taken in San Francisco, January 2004)
18. David Perkins versus Frederick Head, Warden (Deposition taken in San Francisco, March 2004)
19. People versus Marino Hernandez (San Mateo County, California, June 2004)
20. Raphael Camargo versus Larry Norris, Director, Arkansas Department of Correction (Deposition taken in San Francisco, July 2004)
21. People versus Ronald Mathews (King County, Washington, August 2004)
22. People versus Huberto Mendoza (Stanislaus County, California, December 2004)
23. People versus James Essick (San Diego County, California, June 2005)

24. People versus Jesse Ignacio Sanchez Gomez (Ada County, Idaho, July/August 2005)

25. People versus Adrian Camacho (San Diego County, California, October 2005)

26. People versus Huberto Mendoza (Stanislaus County, California, November 2005)

27. People versus Paul Speer (Maricopa County, Arizona, January 2006)

28. People versus Mark Thigpen (San Mateo County, California, January 2006)

29. United States versus Tommy Ray Elam (District Court, Los Angeles, California, February 2006)

30. Enrique Arevalo versus Frederick Head, Warden (Deposition taken in San Francisco, March 2006)

31. United States versus Danny Lee Jones (District Court, Phoenix, Arizona, March 2006)

32. People versus Omar Dent, III (Los Angeles County, California, May 2006)

33. People versus Delaney Marks (Alameda County, California, May 2006)

34. People versus Angel Maturino Resendiz (Harris County, Texas, June 2006)

35. People versus Antonio Nicolosi (San Mateo County, California, July 2006)

36. Gregory Paul Lawler versus Frederick Head, Warden (Deposition taken in San Francisco, July 2006)

37. United States versus Todd Sarver (District Court, San Francisco, California, August 2006)

38. United States versus Eugene Frederick Boyce, III (United States District Court, Honolulu, Hawaii, October 2006)

39. Arthur Torlucci versus W.A. Duncan, (District Court, Santa Ana, California, November 2006)

40. Joaquin Enrique Arevalo versus William Terry, Warden, (Butts County, Georgia, December 2006)

41. People versus Jerry Cabonce, (San Mateo County, California, January 2007)

42. People versus Rodrigo Paniagua, (Santa Clara County, California, February 2007)

43. Gregory Paul Lawler versus William Terry, Warden, (Butts County, Georgia, February 2007)

44. United States versus Francisco Rodriguez, (District Court, Santa Ana, California, April 2007)

45. People versus O'Neal Durgin, (San Mateo County, California, June 2007)

46. Sepulveda versus Beard et al., (Bartonsville, Pennsylvania, June 2007)

47. Webster versus Ayers et al., (District Court, Sacramento, California, September 2007)

48. Ronald Deere versus Jeanne Woodford, et al., (District Court, Los Angeles, California, October 2007)

49. People versus Eric V. Hall (Ada County, Idaho, October 2007)

50. Rickey Dale Newman versus Larry Norris, Director, Arkansas Department of Correction (District Court, Fort Smith, Arkansas, November 2007

51. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, December 2007)

52. People versus Matthew Cunningham (Maricopa County, Arizona, January & February 2008)

53. People versus Alfredo Prieto (Fairfax County, Virginia, February 2008)

54. People versus Edward Gutierrez (Santa Clara County, California, May 2008)
55. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants. (Deposition taken in Phoenix, Arizona, July 2008). A supplemental deposition was also taken in July 2008 approximately 2 weeks after the initial deposition.
56. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, August 2008)
57. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, California, September 2008)
58. United States versus Naeem Williams (District Court, Honolulu, Hawaii, November 2008)
59. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Three Judge Panel, District Court, San Francisco, California, December 2008)
60. United States versus Michael Behenna (United States Army Court Marshall, Fort Campbell, Kentucky, February 2009)
61. United States versus Steven Green (District Court, Paducah, Kentucky, May 2009)
62. People versus Francisco Merino (San Mateo County, California, July 2009)
63. Milton Lewis versus State of California (District Court, Sacramento, California, October 2009)
64. People versus Adrian Sedano (San Mateo County, California, November 2009)
65. United States versus Noshir S. Gowadia (District Court, Honolulu, Hawaii, November 2009)
66. Johnny A. Johnson versus State of Missouri (St. Louis, Missouri, December 2009)
67. Martin Kipp versus State of California (District Court, Los Angeles, California, December 2009)
68. David Welch versus State of California (Martinez, California, September 2010)
69. State of Arizona versus Eddy Rose (Phoenix, Arizona, September 2010)
70. State of Delaware versus Gary Ploof (Dover, Delaware, October 2010)
71. State of Arizona versus Steven Ray Newell (Phoenix, Arizona, March 2011)
72. State of Arkansas versus Ricky Lee Newman (Fort Smith, Arkansas, March 2011)
73. People versus Kerri Livingston (San Mateo County, California, March 2011)
74. People versus Alexander Youshock (San Mateo County, California, April 2011)
75. United States versus Francisco Rodriguez (District Court, Santa Ana, California, May 2011)
76. State of Connecticut versus Robert Breton (Hartford, Connecticut, July 2011)
77. United States versus Billie Allen (St. Louis, Missouri, December 2011)
78. People versus Mohammed Ali (San Mateo County, California, February 2012)
79. Clemency Hearing re: Robert Towery (Florence, Arizona, March 2012)
80. United States versus Danny John, Jr. (Prescott, Arizona, March 2012)
81. State of Ohio versus Abdul H. Awkal (Cleveland, Ohio, June 2012)
82. People versus Monica McCarrick (Solano County, California, June 2012)
83. People versus Robert Hall (Ada County, Idaho, October 2012)
84. People versus Alamoti Finau (San Mateo County, California, November 2012)
85. United States versus Merrell Hobbs (District Court, Philadelphia, Pennsylvania, November 2012)

86. Ex Parte Juan Lizcano, W05-59563-S(A) (Dallas, Texas, November 2012)
87. People versus David Vanalstine (San Mateo County, California, December 2012)
88. Sinisterra versus the United States (District Court, Kansas City, Missouri, January 2013)
89. People versus Jing Hua Wu (San Jose, California, February & March 2013)
90. Coleman versus Brown (Deposition taken in San Francisco, California, March 2013)
91. Coleman versus Brown (District Court, Sacramento, CA, June 2013)
92. Tate versus Humphrey (Deposition taken in San Francisco, California, June 2013)
93. Coleman versus Brown (District Court, Sacramento, CA, October 2013)
94. People versus Alegria (Tucson, Arizona, October 2013)
95. Commonwealth v. Michael Pruitt (Reading, PA, November 2013)
96. Coleman versus Brown (District Court, Sacramento, CA, December 2013)
97. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, March 2014)
98. Deposition taken in Parsons, et al v. Ryan. March 28, 2014, San Francisco, CA.
99. Evidentiary hearing in State of Arizona v. Albert Martinez Carreon. Phoenix Arizona, April 21 & 22, 2014.
100. United States v. Naeem Williams, (District Court, Honolulu, HI, April 29 & 30, and June 3, 2014
101. Deposition taken in Hernandez v. County of Monterey, San Francisco, CA, July 8, 2014
102. United States v. Thomas Steven Sanders, (District Court, Alexandria, LA, September 22 & 23, 2014)
103. Deposition taken in Kurian David, et al., plaintiffs v. Signal International, LLC, defendant, San Francisco, California, October 2014)
104. People v. Dennis McGraw (Vallejo, California, November 2014)
105. People v. Leticia Serna (San Jose, California, December 2014)
106. Wilridge v. Marshall, (District Court, San Francisco, California, February 2015)
107. People v. Hugo Munguia-Hernandez (Redwood City, California, July 2015)
108. Deposition taken in Goddard v. State of California, et al., San Mateo, California, September 2015.
109. People v. Bryan Thomas (Redwood City, California, October 2015)
110. Carlos Gutierrez v. E.K. McDaniel, Warden, et al. (Reno, Nevada, January 2016)
111. State of Arkansas v. Rickey Dale Newman (Fort Smith, Arkansas, January 2016)
112. Deposition taken in Roscoe Walker v. Ford Motor Company, et al., San Mateo, California, February 2016.
113. People v. Philip Law (Boise, Idaho, May 2016)
114. United States v. Joel Manuel Taylor, (District Court, San Francisco, CA, March 18, April 25 & May 25, 2016)
115. United States v. Henry Cervantes, et al, (District Court, Oakland, CA, June 28, 2016)

116. Manual Camacho v. State of Arkansas, (District Court, Fort Smith, Arkansas, November 8, 2016)

117. The People of Guam vs. Mark Anthony Torre, Jr. (Superior Court of Guam, Agana, Guam, February 22, 2017)

118. Kevin Webb, et. al., v. Brad Livingston, et. al. (civil action no. 4:14-cv-03302). Deposition taken in San Francisco, California, June 2, 2017)

119. State of Missouri v. Marvin Rice (11DE-CR00590-2), video deposition taken in Honolulu, HI, July 20, 2017.

120. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, December 18 & 19, 2017)

121. United States v. Nna Alpha Onuoha, (District Court, Riverside, California, January 24, 2018)

122. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, February 27 & 28 and March 1, 2018)

Exhibit C

**Documents and Testimony Reviewed in Preparation of Expert Report**

*Coleman v. Brown* **Case Filings and Documents**

1.    Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan, 02/06/17, Docket 5564

2.    October 10, 2017 Staffing Order, Docket 5711

3.    July 3, 2018 Order Re Staffing and Telepsychiatry, Docket 5850

4.    Defendants' May 25, 2018 Letter Regarding Their Final Negotiated Telepsychiatry Policy and Positions

5.    Plaintiffs' Letter Setting for Final Position on Draft Telepsychiatry Policy, dated May 21, 2018

6.    2017 Suicide Report for Prisoner A and 2017 Quality Improvement Plan documentation for Prisoner A Suicide

7.    2016 Suicide Report for Prisoner B and 2016 Quality Improvement Plan documentation for Prisoner B Suicide

8.    Excerpts from Special Master's 02/13/18 Twenty-Seventh Round Monitoring Report on Mental Healthcare in the CDCR, Docket 5779, pages 490-508

9.    Defendants' Final Telepsychiatry Policy, Docket 5841, Ex. 1

10.   Declaration of Michael Golding in support of Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing, Docket 5591-1

**Scholarly Articles**

1.    Acierno, Ron, Daniel F. Gros, Kenneth J. Ruggiero, Melba A. Hernandez-Tejada, Rebecca G. Knapp, Carl W. Lejuez, Wendy Muzzy, Christopher B. Frueh, Leonard E. Egede, and Peter W. Tuerk 2016. "Behavioral Activation and Therapeutic Exposure for Posttraumatic Stress Disorder: A Noninferiority Trial of Treatment Delivered in Person Versus Home-Based Telehealth." Depression and Anxiety Volume 33: 415-423.

2.    Antonacci, Diana J., Richard M. Bloch, Sy Atezaz Saeed, Yilmaz Yildirim, and Jesse Talley 2008. "Empirical Evidence on the Use and Effectiveness of Telepsychiatry via Videoconferencing: Implications for Forensic and Correctional Psychiatry." Behavioral Sciences and the Law Volume 26: 253-269.

3.    Barrera-Valencia, Camilo, Alexis Vladimir Benit-Deviat, Consuelo Velez- Alvarez, Mario Figueroa-Barrera, and Sandra Milena Franco Idarrago 2017. "Cost-Effectiveness of Synchronous vs. Asynchronous Telepsychiatry in Prison Inmates

with Depression." Revista Colombiana de Psiquiatria Volume 46 (No. 2): 65-73.

4.    Batastini, Ashley B. and Robert D. Morgan 2016. "Connecting the Disconnected: Preliminary Results and Lessons Learned from a Telepsychology Initiative with Special Management Inmates." Psychological Services Volume 13 (No. 13): 282-291.

5.    Brodey, Benjamin B., Keith H. Claypoole, Jeffrey Motto, Robert G. Arias, and Richard Goss 2000. "Satisfaction of Forensic Psychiatric Patients with Remote Telepsychiatric Evaluation." Psychiatric Services Volume 51 (No. 10): 1305- 1307.

6.    Chakrabarti, Subho 2015. "Usefulness of Telepsychiatry: A Critical Evaluation of Videoconferencing-Based Approaches." World Journal of Psychiatry Volume 5 (No. 3): 286-304.

7.    Deslich, Stacie Ann, Timothy Thistlethwaite, and Alberto Coustasse 2013. "Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations." The Permanente Journal Volume 17 (No. 3): 80-86.

8.    DeVido, Jeffrey, Anna Glezer, Linda Branagan, Alvin Lau, and James A. Bourgeois 2016. "Telepsychiatry for Inpatient Consultations at a Separate Campus of an Academic Medical Center." Telemedicine and E-Health Volume 22 (No. 7): 572-576.

9.    Farabee, David, Stacy Calhoun, and Robert Veliz 2016. "An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees." Psychiatric Services Volume 67 (No. 5): 562-565.

10.   Garcia-Lizana, Francisca and Ingrid Munoz-Mayorga 2010. "What About Telepsychiatry? A Systematic Review." The Primary Care Companion to the Journal of Clinical Psychiatry Volume 12 (No. 2): 1-9.

11.   Glaser, Michelle, Tom Winchell, Patty Plant, Wayne Wilbring, Michael Kaiser, Michael K. Butler, Matthew Goldshore, and Manya Magnus 2010. "Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana." Telemedicine and E-Health Volume 16 (No. 4): 472-479.

12.   Grady, Brian, and Mary Singleton 2011.  "Telepsychiatry 'Coverage' to a Rural Inpatient Psychiatric Unit."  Telemedicine and e-Health Voliume 17 (No. 8): 603-697.

13.   Hall, R.C.W., M.K. Popkin, R.A. Devaul, L.A. Faillace, and S.K 1978. Stickney. "Physical Illness Presenting as Psychiatric Disease." Archives of General Psychiatry (35): 1315-1320.

14.   Hilty, Donald M., Daphne C. Ferrer, Michelle B. Parish, Barb Johnston, Edward J. Callahan, and Peter M. Yellowlees 2013. "The Effectiveness of Telemental Health: A 2013 Review." Telemedicine and E-Health Volume 19 (No. 6): 444- 454.

15. James, Doris J. and Lauren E. Glaze 2006. "Mental Health Problems of Prison and Jail Inmates." Bureau of Justice Statistics Special Report (September 2006, NCJ 213600): 1-12.

16. Larsen, Debra, Hudnall Stamm, Kelly Davis, and Phillip R. Magaletta 2004. "Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers." Telemedicine Journal and E-Health Volume 10 (Supplement 2): 82-90.

17. Leonard, Sarah 2004. "The Development and Evaluation of a Telepsychiatry Service for Prisoners." Journal of Psychiatric and Mental Health Nursing Volume 11: 461-468.

18. Magaletta, Philip R. and Thomas J. Fagan 2000. "Telehealth in the Federal Bureau of Prisons: Inmates' Perceptions." Professional Psychology: Research and Practice Volume 31 (No. 5): 497-502.

19. Manfredi, Luisa, Joann Shupe, and Steven L. Batki 2005. "Rural Jail Telepsychiatry: A Pilot Feasibility Study." Telemedicine and E-Health Volume 11 (No. 5): 574-577.

20. Morgan, Robert D., Amber R. Patrick, and Philip R. Magaletta 2008.  "Does the Use of Telemental Health Alter the Treatment Experience?  Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities."  Journal of Consulting and Clinical Psychology Volume 76 (Number 1): 158-162.

21. Nelson, Eve-Lynn, Charles Zaylor, and David Cook 2004. "A Comparison of Psychiatrist Evaluation and Patient Symptom Report in a Jail Telepsychiatry Clinic." Telemedicine Journal and e-Health Volume 10 (Supplement 2): 54-59.

22. O'Reilly, Richard, Joan Bishop, Karen Maddox, Lois Hutchinson, Michael Fisman, and Jatinder Takhar 2007. "Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results from a Randomized Controlled Trial." Psychiatric Services Volume 58 (No. 6): 836-843.

23. Salmoiraghi, Alberto and Shahid Hussain 2015. "A Systematic Review of the Use of Telepsychiatry in Acute Settings." Journal of Psychiatric Practice Volume 21 (No. 5): 389-393.

24. Sharp, Ian R., Kenneth A. Kobak, and Douglas A. Osman 2011. "The Use of Videoconferencing with Patient with Psychosis: A Review of the Literature." Annals of General Psychiatry Volume 10 (No. 14): 1-11.

25. Shore, Jay H., Daniel Savin, Heather Orton, Jan Beals, and Spero M. Manson 2007. "Diagnostic Reliability of Telepsychiatry in American Indian Veterans." American Journal of Psychiatry Volume 164 (No. 1): 115-118.

26. Singh, Surendra P., Dinesh Arya, and Trish Peters 2007. "Accuracy of Telepsychiatric Assessment of New Routine Outpatient Referrals." BMC Psychiatry Volume 7 (No. 55): 1-13.

27.    Trestman, Robert L., Michael K. Champion, Elizabeth Ford, Jeffrey L. Metzner, Cassandra F. Newkirk, Joseph V. Penn, Debra A. Pinals, Charles Scott, Robert E. Stellman, Henry C. Weinstein, Robert Weinstock, Kenneth L. Appelbaum, and John L. Young 2015. *Psychiatric Services in Correctional Facilities: Third Edition.* A Work Group Report of the American Psychiatric Association. American Psychiatric Publishing.

28.    Zaylor, Charles, Eve-Lynn Nelson, and David J. Cook 2001. "A Comparison of Psychiatric Evaluation and Patient Symptom Report in a Jail Telepsychiatry Clinic." Journal of Telemedicine and Telecare Volume 7 (Supplement 1): 47-49.

29.    Zaylor, Charles, Pamela Whitten, and Charles Kingsley 2000. "Telemedicine Services to a County Jail." Journal of Telemedicine and Telecare Volume 6 (Supplement 1): 93-95.

30.    Zollo, Susan, Michael Kienzle, Paul Loeffelholz, and Susan Sebille 1999. 'Telemedicine to Iowa's Correctional Facilities: Initial Clinical Experience and Assessment of Program Costs." Telemedicine Journal and e-Health Volume 5 (Number 3): 291-301.

# Attachment 2



**ROSEN BIEN**
**GALVAN & GRUNFELD** LLP

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email: tnolan@rbgg.com

May 21, 2018

<u>VIA ELECTRONIC MAIL ONLY</u>

Matthew A. Lopes Jr.
Coleman Special Master
Pannone Lopes Deveraux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
MLopes@pldlaw.com
mailto:MLopes@pldlaw.com

Katherine Tebrock
Deputy Director
CDCR Mental Health Program
Katherine.Tebrock@cdcr.ca.gov

Nicholas Weber
CDCR Healthcare Legal Team
Nicholas.Weber@cdcr.ca.gov

Re:    *Coleman v. Brown*:  Plaintiffs' Final Position on Defendants' Draft
Telepsychiatry Policy at Conclusion of Workgroup Process on
Telepsychiatry
<u>Our File No. 0489-03</u>

Dear Matt, Nick, and Katherine:

During the last few months of weekly workgroup meetings on staffing issues, the parties have made considerable progress towards a final agreement on the CDCR's proposed telepsychiatry policy.  We write to set forth our remaining objections to the policy, as well as to describe the areas where progress has taken place and where agreements have been reached.  Attached hereto as **Exhibit A** is Defendants' Final Draft Telepsychiatry Policy ("draft telepsychiatry policy" or "policy").

This progress in negotiating a new policy has taken place notwithstanding our profound concerns about the proposal for virtually unlimited use of telepsychiatry in the CDCR.  Indeed, Plaintiffs have repeatedly set forth our reservations about this method of treatment, particularly for patients at the highest levels of care.

[3256716.2]

Matthew A Lopes, Jr.
May 21, 2018
Page 2

*Coleman* class members often struggle with the isolation, lock downs, and lack of purposeful activity that is endemic inside many CDCR prisons. These conditions tend to worsen existing mental illnesses. Face-to-face, in-person clinical contacts provide a different level of human contact and connection that we contend is more therapeutic in the context of CDCR's prisons than remote treatment by video-phone.

Both the Special Master and the Court have also articulated significant concerns and concrete limitations regarding the appropriate use of telepsychiatry. For example, in the Special Master's Report on Staffing in February of 2017, he detailed the need for limitations on the use of telepsychiatry for MHCB level of care treatment:

> For inmates at the MHCB level of care, telepsychiatry is not an appropriate method of treatment to be used on a regular basis. Telepsychiatry for these higher acuity inmates should only be used as a last resort or in emergency situations when an on-site psychiatrist is not available. On-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing, and other mental health staff. This is just not possible with telepsychiatrists. In addition, on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates. The ease of multidisciplinary interaction on-site is especially important in regards to emergency consultation, which is essential at the higher levels of care and much better accomplished with on-site psychiatrists.

*See* Special Master's Report on the Status of Mental Health Staffing, ECF No. 5564 at 17 (Feb. 6, 2017). In the Special Master's staffing report, he also expressed this concern more generally about higher levels of care, noting that "the higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment." *Id.* at 16.

The Court has also repeatedly expressed concerns about this method of treatment, noting in its May 18, 2015 Order that the unrestricted use of telepsychiatry "is troubling, particularly because there may be class members not susceptible to this method of care." *See* May 18, 2015 Order, Dkt. 5307, at 5:13-14. Moreover, the Court clearly agreed with and adopted the Special Master's concerns described above in its October 10, 2017 Order, along with his recommended limitations on this form of treatment.

A.  <u>**Request for Close Monitoring of Telepsychiatry to Ensure On-Site Clinicians Are Not Permitted to Migrate to Telepsychiatry Offices**</u>

Matthew A Lopes, Jr.
May 21, 2018
Page 3

The Special Master's staffing report also articulated an important concern that we request that the Special Master's team monitor closely in the future: the risk that on-site psychiatrists will migrate to comfortable telepsychiatry jobs rather than deal with the delays and inconvenience of practicing on site at a prison. The Court clearly agreed with this concern and adopted the following explanation of this issue from the Special Master' February 2017 Staffing Report:

> The convenience of telepsychiatry should also not serve as a reason to allow on-site psychiatrists to migrate to the comfort of remote off-site offices. It cannot be emphasized enough that telepsychiatry should not replace on-site psychiatry, a concern shared by plaintiffs' counsel. An example of such a problem would be to allow the use of telepsychiatry at the California Institution for Women and the California Institute for Men by psychiatrists working out of the Rancho Cucamonga offices. The proximity of those two facilities to the Rancho Cucamonga office voids any reason for not providing on-site psychiatrists and would undermine the very purpose of the telepsychiatry program. Similar arguments can be made regarding the use of telepsychiatry at Mule Creek State Prison and the California Health Care Facility given their proximity to Elk Grove, a point raised by plaintiffs. . . .

2/06/17 Special Master's Staffing Report at 16. The Special Master's recommendation in this area was also clearly adopted by the Court. *See* 10/10/17 Order at 23 ("With one clarification, the recommendations of the Special Master [listed by the Court on page 21] will be adopted at this time.").

Although the Court adopted this concern that on-site physicians must not be permitted to migrate to nearby telepsychiatry offices, no similar message is contained in Defendants' draft telepsychiatry policy. Plaintiffs can accept Defendants' position that this requirement need not be in the state-wide telepsychiatry policy, as it does not concern most institutions. We believe this issue can be monitored and if necessary addressed by the Special Master through the routine monitoring process in the future.

**B.    Remaining Areas of Disagreement:**

Plaintiffs have two major disagreements with the draft telepsychiatry policy that are based on the plain prohibitory language of the Court's October 10, 2017 Order, and two additional objections. The draft telepsychiatry policy fails to incorporate the Court's requirements that (1) telepsychiatry may supplement but not replace on-site psychiatry

[3256716.2]

Matthew A Lopes, Jr.
May 21, 2018
Page 4

and should only be used when institutions are unable to recruit on site, and (2) that
telepsychiatry is not appropriate at the highest levels of care, including MHCB and
inpatient care, except in emergencies. We also have two other areas of disagreement,
relating to (3) our objection to the use of telepsychiatry for cell-front visits, and (4) the
allowance of Psychiatric Nurse Practitioners to practice via telepsychiatry. The parties
are still sharing information about these last two issues, and it is possible those processes
of information exchange will alleviate some of Plaintiffs' counsels' concerns.

In its October 10, 2017 Order, the Court ordered several clear and over-arching
limitations on the use of telepsychiatry that Defendants did not appeal. *See* Order, ECF.
No. 5711 at 30 (October 10, 2017).

First, the Court ordered that "telepsychiatry should be used as a supplement, rather
than a substitute, for on-site psychiatry and should only be used when institutions are
unable to recruit psychiatrists or have short-term vacancies that cannot be filled by
contract psychiatrists." *Id.* at 30. Defendants have failed to include this important
principle required by the Court's Order.

Second, the Court ordered that telepsychiatry is not appropriate for use at the
highest levels of care, and particularly in MHCB units: "Telepsychiatry should not be a
frontline approach for psychiatric services for inmates with the most intensive or
emergent needs. . . . Telepsychiatry is not appropriate for the MHCB level of care except
as a last resort or in emergency situations when an on-site psychiatrist is not available."
Order, ECF No. 5711, at 21 (Oct. 10, 2017). Defendants have refused to include this
Court-ordered limitation.

Our third objection is to the policy's provision of a cell-front visit option for
telepsychiatry. We do not agree that cell-front use of telepsychiatry is appropriate,
except in emergency situations where no in-person provider is available. However, we
would appreciate the opportunity to see this technology demonstrated in person and such
a demonstration may cause us to change our position on this point. At Defendants'
request, we have offered dates in the coming weeks when we are available to review the
technology in person.

Fourth, the restriction currently banning Psychiatric Nurse Practitioners ("PNPs")
from telepsychiatry services for MHCB and inpatient patients should instead broadly
prohibit PNPs from providing any telepsychiatric services. Indeed, Plaintiffs object to
Defendants' use of PNPs generally given that Defendants apparently do not have a
written policy governing the appropriate scope of PNPs' provision of treatment in the
MHSDS. Once Defendants have developed and shared their policy on the supervision
and use of PNPs in general, we may be more open to agreeing that PNPs may work with

Matthew A Lopes, Jr.
May 21, 2018
Page 5

some patients at the CCCMS level of care using telepsychiatry, but we remain deeply
concerned that Defendants' draft telepsychiatry policy allows PNPs to treat EOP patients
via telepsychiatry. The staffing plan proposed by Defendants, and approved by the
Special Master and Court, only contemplated utilizing PNPs to treat CCCMS class
members in lieu of psychiatrists, not EOPs, and certainly never contemplated that PNPs
would treat EOPs (or even CCCMS class members) via telepsychiatry. *See* Special
Master's Report on Defs' Staffing Plan (ECF 5564), at 18 ("Defendants proposed to
recruit psychiatric or mental health nurse practitioners to provide psychotropic
medication management to 3CMS inmates in place of psychiatrists."), and 42 (describing
Defendants' January 2017 Staffing Plan, stating "CDCR will begin to recruit Nurse
Practitioners [Psychiatric or Mental Health] to provide psychotropic medication
management in lieu of psychiatrists for the Clinical Correctional Case Management
System (CCCMS) population").

### C.    Plaintiffs Disagree With Defendants' Legal Analysis of Whether Their Telepsychiatry Policy Must Comply With The Requirements of the Court's October 10, 2017 Order:

Defendants have set forth their legal analysis as to why they are not bound by the
key principles for their telepsychiatry policy set forth in the Court's October 10, 2017.
*See* Defendants' May 16, 2018 Letter to Lisa Ells and Thomas Nolan Re: Court's
October 10, 2017 Order and Telepsychiatry.

Boiled down, Defendants' argument is that the Court's directions regarding the
telepsychiatry policy are "not mandatory," and that the Special Master's
recommendations that the Court adopted – at the urging of Plaintiffs and despite
Defendants' vigorously litigated opposition – "are permissive instructions." *See* 5/16/18
Letter at 1.

This argument strains credulity.

Although the Court prudently left room for the telepsychiatry policy to evolve
based on any *future* recommendations of the Special Master made through the normal
monitoring process, the Court's Order is crystal clear that for purposes of the current
Program Guide Addendum drafting process, "The Special Master's recommendations
concerning the use of telepsychiatry, as clarified by this order, **shall** form the basis of that
addendum. . . ." October 10, 2017 Order at 30. The word "shall" is a mandatory
instruction, not a permissive one. *See United Cook Inlet Drift Ass'n v. Nat'l Marine
Fisheries Serv.*, 837 F.3d 1055, 1064 (9th Cir. 2016) (noting that in statutory
interpretation, the general rule is that shall is a mandatory instruction). Defendants agree

Matthew A Lopes, Jr.
May 21, 2018
Page 6

with this interpretation of "shall" in discussing other parts of the Court's Order, but ignore it here.

That sentence making a mandatory direction regarding the Program Guide Addendum on telepsychiatry is, as Defendants point out, modified subsequently by the phrase "subject to modification as appropriate as a result of ongoing monitoring of defendants' telepsychiatry program." *Id.* However, that language is clearly intended to authorize the Special Master to allow fine-tuning of Defendants' policy based on *future* monitoring by the Special Master's team.

Defendants seem to argue that such a departure from the Special Master's prior recommendations, as adopted by the Court, is authorized by a *past* monitoring report, the Special Master's 26th Round Monitor Report, even though that report is not even the most recent one, and was completed in May of 2016 prior to the Special Master's Staffing Report and the resulting Court Order. *See* 5/16/16 Twenty-Sixth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Dkt. 5429.

A report that was published roughly nine months before the Special Master's Staffing Report that forms the basis for the Court's Order cannot serve as a justification for its modification. All of the evidence in that Report was available to the Special Master and the parties, and played a role in the briefing on the telepsychiatry issue leading up to the Special Master's Staffing Report and its recommendation.

We agree that the Court's Order clearly invites the Special Master to recommend modifications to the restrictive requirements of her Order *in the future* if the Special Master's monitoring supports such a modification in the future. The mandatory language of the Order requires compliance by all with its directions in the initial Program Guide Addendum at issue here.

The 26th Round Report did not authorize the broad use of telepsychiatry at every level of care, in any event. Defendants fail to mention the crucial, crystal-clear finding in the Special Master' 26th Monitoring Report that telepsychiatry "is primarily an option for treatment of inmates at the 3CMS level of care, and a less desirable option for inmates at higher levels of care." *See* 5/6/16 Special Master's 26th Report, Dkt. 5439, at 30. Moreover, Defendants' citations to the 26th Report are selective, as they ignore multiple findings of problems with the provision of care relating to the use of telepsychiatry. *See, e.g.,* 26th Report at 318, 323, 370, 461, 673, 674, 676 (docket pagination).

The 27th Monitoring Report, which Defendants did not cite, also included troubling findings with respect to the CDCR's use of telepsychiatry. *See* February 13,

Matthew A Lopes, Jr.
May 21, 2018
Page 7

2018 27th Monitoring Report of the Special Master, Dkt. 5779. For example, at CIW, the 27th Report monitor found that for the EOP program there, "[s]taff reported the switch from telepsychiatry to on-site psychiatry in EOP had been extremely beneficial, especially with respect to milieu management." *Id.* at 499. The 27th Report also found other problems with Defendants' use of telepsychiatry. *See, e.g., id.* at 225, 229, 457, 458 (docket pagination).

Simply put, neither Defendants' legal arguments nor their factual ones support a conclusion that Defendants are permitted or should be permitted to depart from the specific instructions set forth by the Court for critical components of their telepsychiatry policy.

## D.    Areas of Progress and Agreements Reached Through The Workgroup Process:

Despite these major remaining differences over the use of telepsychiatry, we have many areas of agreement about the usefulness of this treatment approach, and we have reached numerous additional agreements through the workgroup process.

Overall, we have three major areas of agreement with Defendants' policy:

1.    We agree with Defendants that telepsychiatry is an appropriate method of treatment for CCCMS prisoners, at prisons where enough on-site psychiatrists cannot be hired, and where there is a core group of on-site psychiatrists available for both handling emergencies and coordinating on-site duties for psychiatry.

2.    We also agree that telepsychiatry can be an important supplementary mode of treatment to cover staff absences and for emergency situations when on-site staff members are not available.

3.    We agree that Defendants may utilize telepsychiatry for EOP patients at prisons in the event that, after good faith efforts, Defendants are unable to hire sufficient on-site psychiatrists, but only if the majority of positions for the EOP program are filled by on-site psychiatrists.   At all levels of care, we think it is critical that there remains a strong preference for on-site psychiatrists.   In agreeing to this limited use of telepsychiatry for EOPs, it is especially important that CDCR clinicians make appropriate use of the provisions in the agreed upon policy for handling cases where telepsychiatry is felt to be clinically contraindicated, and we ask that the Special Master's team monitor this issue closely in the future.

The parties have also reached numerous agreements about the details of their telepsychiatry policy in the workgroup process:

Matthew A Lopes, Jr.
May 21, 2018
Page 8

1.    <u>Enhanced Requirements for Initial Meeting with Telepsychiatry</u>:  Although
Plaintiffs' Counsel sought a more formal informed consent process for individuals being
enrolled in tele-therapy, we appreciate the changes Defendants made to the paragraph on
"Professional and Patient Identity" on the first page of the policy to enhance what must
be explained to the patient during the first meeting.

2.    <u>Broader Language on Telepsychiatrist Participation in All Treatment Team
Activities</u>:  We appreciate the addition of the language in the section headed
"Participation in Interdisciplinary Treatment Team, Meetings and Huddles" stating that
"telepsychiatry providers shall participate to the same extent as onsite psychiatrists in all
meetings and huddles relevant to the clinical care of their patients, in compliance with the
CCM."  *See* Draft Telepsychiatry Policy at 2.  This requirement may require some
technical enhancement of video conferencing or re-location of some meetings to an
appropriate room.  For example, it will be difficult to arrange for telepsychiatrist
participation in an EOP ASU huddle with custody staff that takes place in the housing
unit.

3.    <u>Changes to Section on Refusals</u>:  We agree to and appreciate the changes in
the paragraph on refusals on the second page, eliminating the requirement for a "pattern
of refusals."  As discussed above, we do not agree that cell front use of telepsychiatry is
appropriate, so we are also appreciative of the fact that the policy no longer envisions a
cell-front telepsychiatry visit to address refusals.

4.    <u>Enhancements to Process for Addressing Patients for Whom Telepsychiatry
is Thought to Be Contraindicated</u>:   Plaintiffs' disagree strongly with the statement at the
beginning of this section that "Patients shall not be excluded from participation in the
Telepsychiatry Program based solely on their level of care or their diagnosis."  However,
we agree that  the changes Defendants made in this section at the bottom of Page 2 and
top of Page 3 on Contraindications for Telepsychiatry will empower clinicians and the
IDTT when they believe telepsychiatry is contraindicated for a given patient.  We also
request that the Special Master's team closely monitor this issue in the future to ensure
that patients who are not clinically appropriate for telepsychiatry because of their clinical
condition, disabilities, or because of other issues, are properly excluded from this form of
treatment and instead provided face-to-face treatment.

5.    <u>Emergency Management Section</u>:  The policy could be more robust in
embracing cautionary language in many professional resource materials about the use of
telepsychiatry for managing psychiatric emergencies.  We agree to the changes to the
Emergency Management section on Page 3 made by Defendants and we believe these
changes address many of our concerns about this issue.  Any remaining deficiencies with

Matthew A Lopes, Jr.
May 21, 2018
Page 9

the policy in this area can be addressed in future monitoring by the Special Master's team.

      6.    <u>Crisis Bed and Inpatient Programs Section</u>:  While we appreciate the clarifying change to the heading in the section now headed "Crisis Bed and Psychiatric Inpatient Programs," we do not agree, as discussed above, that the restrictions in this section on the use of telepsychiatry at the highest levels of care are adequate.  However, we do appreciate that the ban included in the policy on PNPs providing telepsychiatry services in inpatient or MHCB settings has been moved to the top of this section.

      7.    <u>On-Site Visit Requirements</u>:  Plaintiffs think that the requirements for routine on-site visits by telepsychiatrists to the prisons they serve is a tremendous improvement over early draft policies that did not include this.  The policy would benefit from more detailed requirements with respect to site visits by telepsychiatrists to the institutions to which they are assigned.  We agree that the content of onsite visits is something that can be addressed in the monitoring process by the Special Master's team.

      7.    <u>Physical Environment Section</u>:  We agree to and appreciate the changes made by Defendants to the section on Physical Environment on page 4 of the policy.  These changes enhance the requirements for a good video and audio connection in a private setting.

      We appreciate the productive exchanges that have taken place between the parties to improve the existing telepsychiatry process, and we look forward to working with the Special Master's team and Defendants further to resolve the remaining differences with respect to this important policy.

                 Sincerely,

                 ROSEN BIEN
                 GALVAN & GRUNFELD LLP

                 */s/ Thomas Nolan*

                 Thomas Nolan
      By:  Of Counsel

Encl.  Defendants Final Draft Telepsychiatry Policy

cc:    *Coleman* Special Master Team    Jerome Hessick

Matthew A Lopes, Jr.
May 21, 2018
Page 10

*Coleman* Co-counsel         Melissa Bentz
Jay Russell                  Andrea Moon
George Maynard               Christine Ciccotti
Andrew Gibson                Sean Rashkis
Elise Thorn                  Elaine Ekpo
Chad Stegeman                Michael Golding
Joanna Mupanduki
Adriano Hrvatin
Tyler Heath

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 8:**<br>PSYCHIATRY SERVICES | Revision<br>Date(s): | NA |
| | Supersedes: | |
| **12.08.100**<br>TELEPSYCHIATRY | Attachments: | Yes ☐ No ☒ |
| | Director<br>Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists and/or psychiatric nurse practitioners (telepsychiatry providers) to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatry provider, the patient, and the patient's treatment team. Telepsychiatric services are part of California Department of Corrections and Rehabilitation's (CDCR's) Complete Care Model (CCM) of treatment that provides integrated medical and mental health provision of services. CCM is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. The Telepsychiatry Program provides mental health services to all levels of care. Telepsychiatric services are a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population. Onsite providers shall remain the preferred method of psychiatric care for Mental Health Crisis Beds (MHCB) and Psychiatric Inpatient Programs (PIP). To ensure continuity of care for patients within the program, telepsychiatry providers will work from CDCR hubs and strong preference will be given to assign telepsychiatry providers to caseloads within the same institution.

**Equipment**

The telepsychiatry providers shall be given the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, scanner/printer (can be individual and/or shared), and phone with access to an outside line.

- A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound-proofed, where possible.

- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists.

- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatry provider can be seen and heard clearly.

Cell front equipment shall be available in all institutions receiving telepsychiatry services.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the providers' and patients' identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telepsychiatry contact, the telepsychiatry provider shall explain the treatment modality, including a description of the role of the telepresenter, a plan for response to interruption in services, conditions under which a referral made to in-person care.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatry provider participation in the Interdisciplinary Treatment Teams (IDTT) is an important part of the provision of psychiatric services. Consistent with the CCM, telepsychiatry providers shall participate in the receiving institutions' IDTT meetings. To facilitate telepsychiatry provider's participation in IDTTs, IDTT meetings that include a telepsychiatry provider shall be held in a location that is appropriately wired to allow for the telepsychiatry provider's full participation. Receiving institutions may be required to modify IDTT schedules to allow telepsychiatry providers to participate in the IDTT.

In addition to IDTT meetings, telepsychiatry providers shall participate to the same extent as onsite psychiatrists in all meetings and huddles relevant to the clinical care of their patients, in compliance with the CCM.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatry provider shall meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telepsychiatry services. A member from the treatment team may utilize brief, focused cell front discussions with the patient to determine the reasons for appointment refusals. The telepsychiatry provider may also request a consultation from an onsite provider if it is clinically determined that the patient must be seen immediately.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatric visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry. If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate onsite psychiatric treatment.

**Contraindications for Telepsychiatry**

Patients shall not be excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. If the telepsychiatry provider and Chief of Telepsychiatry determine that the patient needs to be seen by an onsite psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate onsite psychiatrist assigned. Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an onsite psychiatrist.

**Emergency Management**

If an emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatry provider shall immediately notify Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) as well as his/her direct telepsychiatry supervisor . The telepsychiatry provider shall coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to emergency triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

**Crisis Bed and Psychiatric Inpatient Programs**

No Psychiatric Nurse Practitioners (PNPs) shall be permitted to provide telepsychiatric services to MHCBs or PIPs.

In the event that a telepsychiatrist is needed in an inpatient or crisis bed setting the telepsychiatrist shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings, in case conferences, and in coordinating patient care. Consistent with the CCM, onsite staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Telepsychiatrists shall be involved in treatment and discharge decisions.

Patients housed in a MHCB or PIP are often unable to leave their room due to presenting as a danger to self, a danger to others, or being gravely disabled. Therefore, clinical staff at the receiving institution shall assist telepsychiatrists with facilitating cell-side interactions as needed.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

Telepsychiatrists shall provide sign-out information to an available Institutional Psychiatrist on Duty to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telepsychiatry providers are responsible for maintaining relationships with members of the onsite treatment team by regularly communicating with them and by physically visiting receiving institutions. Telepsychiatry providers shall visit their assigned institution within 30 days of assignment. The frequency of follow-up visits shall be determined by the telepsychiatry provider's assigned level of care.  The telepsychiatry provider will spend at

least one full business day during each site visit at the facility, and attend meetings as described below:

| Level of Care | Frequency of Site visit |
|---------------|------------------------|
| CCCMS | Biannually |
| EOP | Quarterly |
| MHCB | Quarterly* |
| PIP | Monthly |

*For MHCB, the telepsychiatrist shall visit the institution every 2 months for the first 6 months, then every 3 months thereafter

During each visit, the telepsychiatry providers shall participate in the IDTT, meet with necessary health care staff, and see patients face-to-face. In addition, telepsychiatry providers shall attempt to see as many patients face-to-face as possible.

**Physical Environment**

The patients' interview room/environment shall allow for both the telepsychiatry provider and the patient to be seen and heard clearly. The patient's and provider's camera shall be positioned with their faces clearly visible to each other, to the extent possible. The telepsychiatry provider shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatry provider can request assistance from the telepresenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatry provider), who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy, to the extent possible, so that others are not able to enter the provider's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Organizational Structure**

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telepsychiatry providers shall immediately notify their direct telepsychiatry supervisor, Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatry provider shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by onsite provider or rescheduling of appointments). Telepsychiatry providers may also be redirected to another telepsychiatry assignment when this occurs.

**Nonformulary Requests**

Nonformulary requests shall be made directly to the psychiatry leadership of the institutions served by telepsychiatry, unless otherwise determined by leadership. If there is no Chief Psychiatrist or Senior Psychiatrist Supervisor at the institution, nonformulary

requests shall be submitted to the telepsychiatry provider's direct supervisor.

### Jabber Account Login

Operational need requires telepsychiatry providers to log into their Jabber telepsychiatry video accounts as soon as they arrive to work. They shall remain logged into Jabber throughout the day so that supervisors, colleagues, and institutional staff are able to communicate with the telepsychiatry provider via video calls during work hours. Telepsychiatry providers shall log out of Jabber immediately prior to leaving work.

### On-Call Coverage by Telepsychiatry

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Inmate Medical Services Policies and Procedures (IMSP&P), Headquarters' Mental Health Policy and applicable bargaining unit Memorandums of Understanding.

Telepsychiatry providers are not required to travel to the institution where they are providing on-call coverage. Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider). This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

**Responsibilities**   The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatry provider.

- A dedicated and appropriately clinically trained telepresenter who presents the patient from the originating site to the telepsychiatry provider, and is responsible for providing clinical support and coordination. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Telepresenters shall be assigned from position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician, medical technical assistant, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, social worker, psychologist, psychiatrist, or physician. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment.

- A backup telepresenter when the primary telepresenter is on leave or unavailable.

- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.

- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.

- A contact list of important names and numbers for the institution. This includes, but is not limited, to the following:

1. Laboratory
2. Pharmacy
3. Nursing station(s)
4. Housing unit(s)
5. Primary Clinician(s)
6. Medical Provider(s)
7. Mental Health Supervisor(s)
8. Chief of Mental Health
9. Chief Psychiatrist or Senior Psychiatrist Supervisor
10. IT Department
11. Scheduler
12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.

- Caseload assignments and scheduled appointments for the telepsychiatry provider.

- The maintenance of telemedicine connectivity between institutions and providers.

- Ensuring that telepsychiatry providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.

- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.

- Organized tours for the telepsychiatry providers during their initial visits to the institution.

- Developing onsite clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatry providers.

- Onsite staff that may conduct and/or facilitate cell front visits when a telepsychiatry provider or the treatment team expresses a need for a cell front visit.

- A Local Operating Procedures (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.

- Routine system tests to ensure that equipment is safe, operational, and secure

**Purpose**     This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines. Telepsychiatry providers shall conduct care

consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatry providers are provided with the appropriate equipment and resources.
2. Telepsychiatry providers participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their patients.
3. Onsite staff and members of the treatment team communicate with the telepsychiatry provider any important patient issues and concerns related to patient care.
4. Telepsychiatry providers have access to all necessary clinical information via the health record.
5. Patients are not excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
6. Telepsychiatry provider completes all documentation in the health record by the close of each business day.
7. Provider and patient identity are verified at the beginning of a mental health treatment videoconference.
8. Telepsychiatry providers visit their receiving institutions as directed by policy.
9. Nonformulary requests are made directly to the psychiatry leadership of the institutions served by telepsychiatry providers, unless otherwise determined by leadership.
10. Telepsychiatry providers remain logged into Jabber throughout the work day.
11. Ongoing mandatory trainings for all telepsychiatry providers.
12. Telepsychiatry providers are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution... | then... |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is revised as necessary. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements. Ensure the LOP is revised as necessary. |

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

# Attachment 3

DEPRESSION AND ANXIETY 33:415–423 (2016)

# Research Article

## BEHAVIORAL ACTIVATION AND THERAPEUTIC EXPOSURE FOR POSTTRAUMATIC STRESS DISORDER: A NONINFERIORITY TRIAL OF TREATMENT DELIVERED IN PERSON VERSUS HOME-BASED TELEHEALTH

Ron Acierno, Ph.D.,[1,2]* Daniel F. Gros, Ph.D.,[1,3] Kenneth J. Ruggiero, Ph.D.,[1,2]
Melba A. Hernandez-Tejada, DHA,[1,2] Rebecca G. Knapp, Ph.D.,[1,3] Carl W. Lejuez, Ph.D.,[4]
Wendy Muzzy, MRA, MLIS,[1,2] Christopher B. Frueh, Ph.D.,[5] Leonard E. Egede, M.D.,[1,3]
and Peter W. Tuerk, Ph.D.[1,3]

**Objective:** *Combat veterans returning to society with impairing mental health conditions such as PTSD and major depression (MD) report significant barriers to care related to aspects of traditional psychotherapy service delivery (e.g., stigma, travel time, and cost). Hence, alternate treatment delivery methods are needed. Home-based telehealth (HBT) is one such option; however, this delivery mode has not been compared to in person, clinic-based care for PTSD in adequately powered trials. The present study was designed to compare relative noninferiority of evidence-based psychotherapies for PTSD and MD, specifically Behavioral Activation and Therapeutic Exposure (BA-TE), when delivered via HBT versus in person, in clinic delivery.* **Method:** *A repeated measures (i.e., baseline, posttreatment, 3-, 6-month follow-up) randomized controlled design powered for noninferiority analyses was used to compare PTSD and MD symptom improvement in response to BA-TE delivered via HBT versus in person, in clinic conditions. Participants were 232 veterans diagnosed with full criteria or predefined subthreshold PTSD.* **Results:** *PTSD and MD symptom improvement following BA-TE delivered by HBT was comparable to that of BA-TE delivered in person at posttreatment and at 3- and 12-month follow-up.* **Conclusion:** *Evidence-based psychotherapy for PTSD and depression can be safely and effectively delivered via HBT with clinical outcomes paralleling those of clinic-based care delivered in person. HBT, thereby, addresses barriers to care related to both logistics and stigma. Depression and Anxiety 33:415–423, 2016.* © 2016 Wiley Periodicals, Inc.

[1]Mental Health Service, Ralph H. Johnson Veterans Affairs Medical Center, Charleston, South Carolina
[2]College of Nursing, Medical University of South Carolina, Charleston, South Carolina
[3]Department of Psychiatry and Behavioral Sciences, Medical University of South Carolina, Charleston, South Carolina
[4]Center for Addictions, Personality, and Emotion Research, University of Maryland, College Park, Maryland
[5]Department of Psychology, University of Hawai'i, Hilo, Hawaii

Contract grant sponsor: Department of Defense; Contract grant number: W81XWH-07-PTSD-IIRA.

Clinical Trial Registration number: NCT01177488.

© 2016 Wiley Periodicals, Inc.

The article was originally published 10 February 2016. Subsequently, a typo in the fourth author's name was corrected and the article was published on 25 May 2016.

*Correspondence to: Ron Acierno, Mental Health Service 116, Ralph H. Johnson VAMC, 109 Bee Street, Charleston, SC 29401. E-mail: acierno@musc.edu
Received for publication 18 November 2015; Revised 19 January 2016; Accepted 22 January 2016

DOI 10.1002/da.22476
Published online 10 February 2016 in Wiley Online Library (wileyonlinelibrary.com).

Key words: *PTSD; major depression; telehealth; telemedicine; telemental health; psychotherapy; home-based*

As was the case for Vietnam veterans, service members deployed to Operations Enduring Freedom/Iraqi Freedom/New Dawn (OEF/OIF/OND) experienced traumatic events that confer significant risk for a broad range of mental health problems,[1–4] the most common of which are PTSD and major depression (MD).[4] Given the scale of OEF/OIF/OND deployments, the high incidence of trauma exposure, and commensurate high base rates of associated mental health difficulties, access to adequate mental health treatment is a public health issue that extends well beyond the Departments of Defense and Veteran Affairs (VA).

Unfortunately, only a small percentage of service members and veterans with significantly impairing PTSD and MD symptoms receive psychiatric treatments, including evidence-based psychotherapy.[2] The disconnect between symptom burden and effectively delivered treatment may largely be due to barriers associated with stigma and/or traditional service delivery practices, and these barriers may be of particular relevance to veterans.[1,2] Specifically, Hoge et al.[1,3] broadly categorize barriers to mental health care in terms of person and geographically based factors. Person-based barriers center on a tendency to avoid perceived stigma associated with mental health treatment (i.e., when visiting a "mental health clinic"). Indeed, Hoge et al.[1] found that 65% of those service members diagnosed with a mental health disorder endorsed the statement: "I would be seen as weak" and 59% endorsed: "Members of my unit might have less confidence in me" as reasons they did not seek treatment. Geographically based barriers are more directly related to disparity of access associated with physical and personal environmental constraints, such as distance to nearest clinic, travel time, and travel costs.[2] Hoge et al.'s findings suggest that alternative treatment delivery methods are required to address these barriers to care.

One such alternative may be to deliver evidence-based psychotherapy via telehealth.[5] Initial efforts and subsequent effectiveness evaluations of telehealth-delivered psychotherapy followed the "Hub and Spoke" model, wherein a provider at a central clinic used telehealth to deliver services to patients at a remote clinic, closer to their residence or employment. Hub and Spoke approaches to delivering evidence-based psychotherapy via telehealth appear effective across disorders.[5] In addition, this format lowers cost to patients and providers in terms of transportation, travel time, and missed work.[6–8] Nonetheless, under this model of telehealth care, patients must still travel to satellite clinics to receive treatment, and thus continue to face many of the same aforementioned person-based (e.g., stigma) and geography-based (e.g., travel time) barriers to care.

Home-based telehealth (HBT) may address shortcomings of the Hub and Spoke model of telehealth service delivery. The advantages of HBT include reduced stigma (e.g., patients do not need to visit a mental health care facility), reduced cost, and further reduced logistical barriers such as travel time. Of course, these advantages must be balanced by potential shortfalls, such as lack of privacy from family members when televideo sessions are conducted into homes where soundproofing between rooms may not be in place. Other potential limitations of HBT also include potential for limited bandwith or other technical problems with no easily available resources for resolution. Currently, only one noninferiority study of evidence-based psychotherapy delivered via HBT exists,[9] and this study targeted depression, not PTSD. With respect to PTSD, existing studies are preliminary in nature and are characterized by insufficient power for noninferiority comparisons, but nonetheless offer encouraging results.[10–12] suggesting that additional investigation is justified.

Toward this end, the present study compared HBT and in person, clinic-based delivery of Behavioral Activation and Therapeutic Exposure (BA-TE), an evidence-based psychotherapy for PTSD and MD. A repeated measures randomized controlled noninferiority trial design was used to determine whether HBT delivery of treatment was "as good as" traditional, in-person office-based delivery of the identical treatment. We hypothesized that BA-TE delivered via HBT would produce similar reductions in PTSD and MD symptoms. Moreover, we hypothesized that reduced logistical barriers would decrease attrition from treatment in the HBT condition compared to the clinic-based condition.

## METHODS

### PARTICIPANTS AND RECRUITMENT

Participants were recruited from a large Southeastern VA medical center via provider referral to the VA PTSD clinic. The CONSORT diagram in Fig. 1 illustrates the recruitment path and disposition of patient randomization. One thousand two hundred and thirty-seven clinic referrals were screened, 280 both met Clinician-Administered PTSD Scale (CAPS) inclusion criteria (i.e., full criteria PTSD or subthreshold PTSD as defined below) and were willing to be randomized to either in-person or HBT conditions. Of these, 15 did not meet remaining inclusion/exclusion criteria, resulting in a block randomization of 265. Of these, 232 presented for their first treatment session 1 week following randomization, and of these, 201 also provided at least one posttreatment or follow-up assessment (intent to treat sample), with 184 of these completing at least five sessions of treatment (minimum completer sample). This discontinuation rate is consistent with past PTSD treatment outcome studies.[11,13] The CAPS[14] assesses Diagnostic and Statistical Manual Fourth Edition (DSM-IV) criteria and was used to determine PTSD diagnostic status. Subthreshold PTSD was defined as meeting PTSD Criteria A (traumatic event) and



**Figure 1. Consort 2010 Flow Diagram. BA-TE-IP/HBT:** behavioral activation and therapeutic exposure in person/home-based tele-health. The time between randomization and treatment initiation was at least 1 week, and up to 4 weeks for patients requiring medication stabilization. During this interval, 33 participants dropped out before starting treatment, hence the difference in number of randomized (265) and number of initiating treatment (232), the latter of which is the number for whom baseline data were available. The number available for primary analyses was further limited to those who completed any follow-up assessment (201).

B (re-experiencing), and either C (avoidance) or D (hyperarousal).[15] Veterans meeting either this subthreshold definition, or full criteria PTSD were eligible for participation. Individuals who were actively psychotic, acutely suicidal, or met criteria for current substance dependence were excluded from participation. To enhance generalizability of study findings, (1) veterans from each of the major conflicts comprising the majority of those served by the VA were included (i.e., OEF/OIF/OND, Persian Gulf, and Vietnam), and (2) participants receiving psychotropic medication or case management services for PTSD, mental health treatment for other psychiatric disorders, or those who met criteria for substance abuse were not excluded from

participation, pending a period of stabilization (e.g., 4 weeks after new medication).

Specific demographic data are given in Table 1, along with statistical information regarding between group comparisons. Groups did not differ on any demographic variable. Considering the overall randomized sample, participants were predominantly male, Black or White, and married. About half were employed, and the mean age was about 45 years. Vietnam War Veterans accounted for 25.4% of the sample ($n = 59$), Persian Gulf War veterans comprised 23.7% ($n = 55$), and OEF/OIF/OND veterans comprised 50.9% ($N = 118$), with no differences in distribution across

*Acierno et al.*

TABLE 1. Sample characteristics of the intent-to-treat population at baseline

| Characteristics | N/Mean (SD/%) | Home-based telehealth $n$ (%) | Office-based in-person $n$ (%) | $t/\chi^2$, $P$ |
|---|---|---|---|---|
| Mean age (years) | 45.6 (SD = 14.9) | 46.9 (SD = 14.5) | 44.5 (SD = 15.1) | 1.2, .22 |
| Gender (%) | | | | |
|   Male | 219 (94.4) | 105 (94.6) | 114 (94.2) | 0.2, .56 |
|   Female | 13 (5.6) | 7 (5.4) | 7 (5.8) | |
| Race/ethnicity (%) | | | | |
|   White | 117 (50.4) | 58 (52.3) | 59 (48.8) | 2.5, .48 |
|   Black | 110 (47.4) | 51 (45.9) | 59 (48.8) | |
|   Hispanic | 2 (0.9) | 0 (0) | 2 (1.7) | |
|   Others | 3 (1.3) | 2 (1.8) | 1 (0.8) | |
| Marital status (%) | | | | |
|   Never married | 35 (15.6) | 13 (12.0) | 22 (19.0) | 2.9, .41 |
|   Married | 142 (63.4) | 74 (68.5) | 68 (58.6) | |
|   Separated/divorced | 43 (19.2) | 19 (17.6) | 24 (20.7) | |
|   Widowed | 4 (1.8) | 2 (1.9) | 2 (1.7) | |
| Mean years education | 12.4 (SD = 4.4) | 12.0 (SD = 4.8) | 12.7 (SD = 3.9) | 1.2, .23 |
| Employed (%) | | | | |
|   No | 108 (50.7) | 47 (47.5) | 58 (50.9) | 0.3, .36 |
|   Yes | 105 (49.3) | 52 (52.5) | 56 (49.1) | |
| % Service connected | 46.4 (SD = 38.4) | 46.1 (SD = 36.7) | 46.7 (SD = 39.9) | 0.1, .92 |
| Baseline PCL | 58.3 (SD = 13.4) | 57.9 (SD = 12.7) | 58.6(SD = 14.0) | 0.4, .68 |
| Baseline BDI | 25.3 (SD = 11.1) | 26.0 (SD = 9.6) | 24.6 (SD = 12.3) | 0.9, .36 |
| Baseline CAPS PTSD Dx (%) | 179 (77.2) | 86 (77.5) | 93 (76.9) | 0.0, .91 |

$N = 232$ unless otherwise noted due to variable-specific missing data. Statistics are $t$-test for continuous variables (means) and chi-square for categorical (%) variables.

conditions. All participants had either PTSD (77.2%) or subthreshold PTSD (23.7%).

## PROCEDURES

All study procedures were approved by our university institutional review board and the VA Medical Center Research and Development committee. Consented participants were randomly assigned (1:1) to either HBT or office-based in-person delivery (IP) of identical treatments (BA-TE-HBT vs. BA-TE-IP). The randomization sequence was generated by the biostatistician (RGK) using a permuted block randomization scheme with block size varied to minimize the chance that blinding of assignment would be broken. Repeated assessments were conducted at pretreatment, posttreatment, 3-month follow-up, and 12-month follow-up.

Both the IP and HBT treatment conditions followed the identical BA-TE manual, and all therapists provided BA-TE in both delivery formats. BA-TE and the related methods have been outlined in depth elsewhere,[10, 16, 17] and are thus only briefly described here. Treatment was comprised of eight, 1.5 hrs sessions delivered between the hrs of 7:30 a.m. and 6:00 p.m. BA-TE includes weekly behavior activation, situational exposure to avoided, albeit realistically safe conditioned anxiety stimuli, and imaginal exposure to traumatic event memories introduced and practiced throughout the course of therapy. All therapists were master's level counselors who completed an 8-hr workshop-training program and shadowed a senior-level clinician prior to administering the treatment independently. Therapists were supervised weekly by a licensed clinical psychologist with over 15 years of experience with BA-TE and similar treatments (RA/PT). All sessions were audiotaped, and treatment fidelity was assessed through random sampling of 20% of therapy session tapes, rated according to a checklist of session-specific procedures that directly corresponded to the BA-TE treatment manual. Fidelity for all therapists was maintained at or above 90% across and within conditions.

BA-TE-HBT was provided via participants' own equipment when available (e.g., home computer or tablet or even smartphone), or via equipment (videophones or tablets) provided during the treatment phase by the research team. Software and equipment provided contained encrypted internet-based video service similar to "skype" or "facetime," or, at the participant's discretion, an analogue videophone (Viterion 500) that operates via traditional telephone service. Apart from the video screen, the Viterion 500 appears and functions much like a basic touch-tone telephone. Prior to the first session, the assigned therapist and patient "practiced" using the telehealth equipment to address any potential problems. Problems were resolved via telephone, and when solutions were not obtained, participants were asked to bring their equipment to the research offices, where office-to-office equipment training session was held. This was necessary in fewer than 5% of participants, and almost always involved problems with software access to the camera or microphone on a laptop. The safety parameters of these HBT procedures, including management of suicidality, have been presented elsewhere.[18]

**Measures.** Dependent measures were collected by interviewers blind to treatment condition at baseline, posttreatment (1 week), and 3- and 12-month follow-ups. However, PCL and BDI week 2, 4, and 6 data were collected by treating therapists as part of the BA-TE protocol. Thus, these three data points were collected on session days at the start of treatment.

**Clinician-Administered PTSD Scale.** The CAPS is a clinician-rated scale designed to diagnose current and lifetime PTSD.[14] The CAPS has adequate internal consistency ($\alpha$s ranged from .73 to .95), inter-rater reliability on the same interview ($r$'s ranged from .92 to .99), test-retest reliability over a 2- to 3-day period across different interviewers ($r$'s ranged from .77 to .98), and convergent and discriminant validity with measures of PTSD and other constructs, respectively.[14] For this study, CAPS interviewers were required to attain a 90% concordance rate on individual items and 100% concordance rate on overall diagnosis prior to collecting interview data for the study.

**PTSD Checklist—Military (PCL-M).** The PCL-M is a 17-item measure designed to assess DSM-IV PTSD symptom severity.[19] The PCL has excellent internal consistency ($\alpha s > .94$) and excellent test-retest reliability in various populations ($r = .96$) as well as excellent convergent validity with alternative measures of PTSD ($r$'s ranged from .77 to .93).[20]

**Beck Depression Inventory—2nd Edition (BDI-II).** The BDI-II is a 21-item measure designed to assess the cognitive, affective, behavioral, motivational, and somatic symptoms of depression in adults and adolescents.[20] The BDI-II has demonstrated excellent test-retest reliability over a 1-week interval ($r = .93$), excellent internal consistency ($\alpha s < .92$), and convergent and discriminant validity in multiple samples.[21,22]

## DATA ANALYTIC PLAN

Descriptive analyses illustrated demographic and baseline clinical characteristics for the total randomized ($N = 201$) and minimum per protocol (PP) completer ($n = 184$) samples for which any posttreatment or follow-up data were available. A conservative approach was followed in which the primary analysis was carried out using the PP sample (i.e., that which is less conservative in traditional superiority trials is more conservative in noninferiority trials, where lack of significant difference is hypothesized). Our definition of PP was based on the estimated minimum number of sessions that would yield a meaningful effect, operationally defined here as participants who completed more than half the overall number of sessions (i.e., at least 5). The PP sample was comprised of 184 subjects with 93 participants receiving BA-TE-HBT and 91 receiving BA-TE-IP. As advocated by noninferiority trial guidelines,[23] analyses were repeated using an intent-to-treat (ITT) sample comprising all randomized subjects for whom at least one post or follow-up data point was available ($N = 201$; Telepsychology $n = 99$; In-Person $n = 102$). No differences in results were observed between ITT and PP samples, and analyses with PP sample are reported below.

The primary clinical outcomes were continuous measures for PCL (PCL-M) and MD (BDI-II) determined over the longitudinal time trajectory (immediate post and 3- and 12-month follow-up). Effect sizes at each time point were determined as the difference in baseline-adjusted PCL and BDI means for BA-TE-HBT versus BA-TE-IP modes of delivery. The order of subtraction for effect sizes was BA-TE-IP minus BA-TE-HBT, with a positive value (scores lower for HBT) indicating a superior outcome for BA-TE-HBT.

The 90% confidence interval (CI) approach was used to evaluate noninferiority of HBT mode of intervention delivery compared to IP mode of delivery. With this approach, HBT intervention delivery was judged to be "at least as good as" (i.e., noninferior to) the IP delivery (i.e., standard treatment) so long as the outcome for PCL or BDI for IP was not "better than" that of HBT by more than a posited "clinically meaningful amount." The degree to which telehealth was allowed to be "worse than" In-Person and still be considered clinically noninferior (i.e., not "unacceptably worse") was specified by the noninferiority margin, delta ($\Delta$). For the PTSD measure (PCL), we polled 12 well-published PTSD experts (see acknowledgments) to determine the noninferiority margin of 8.8. The commonly accepted clinically important margin for the BDI had previously been determined, and was 5.[24] With the CI approach (assuming order of subtraction is IP minus HBT), the noninferiority of HBT can be declared if the lower bound of the 90% CI is less than $-\Delta$ where $-\Delta$ for PCL and BDI are $-8.8$ and $-5.0$, respectively. Preliminary power estimates for a noninferiority margin on the PCL of 8.8 indicated that a sample of 175 would produce power in 12 of 12 analyses of .91.

A mixed effects repeated measures longitudinal modeling approach (MMRM) was used to estimate the 90% CI of difference in baseline-adjusted least squares means (treatment effect sizes) at each postintervention time point (immediate post, 3-, and 12-month follow-up). The model included treatment, visit, visit-by-treatment (interaction term) as primary independent variables and baseline level of the dependent variable as an adjustment covariable. Visit included all measurement time points (weeks 2, 4, 6, 8, posttreatment, 3-, 12-month follow-up) and was treated as a fixed effect in the model. An unstructured covariance approach was used and analyses were performed using SAS version 9.4. Consistent with noninferiority analysis guidelines, we report CIs rather than $P$-values as determined from classic superiority approaches.[24] For the secondary hypothesis that home-based telehealth would reduce attrition, a chi-square test was applied.

# RESULTS

## BASELINE SCORES AND ATTRITION

Baseline differences between treatment conditions on demographics and symptom measures are presented in Table 1. No significant differences on any baseline variables were evident between conditions. Additionally, attrition was comparable across treatment delivery medium and was calculated by dividing the number of participants who completed at least five sessions of BA-TE and provided any posttreatment or follow-up data by the number of patients who initiated treatment (i.e., the week following random assignment to condition; BA-TE-IP = 93 out of 121 or 23.1%; BA-TE-HBT = 91 out of 111 or 18.0%, $\chi^2 = 0.93$, $P = .212$).

## NONINFERIORITY COMPARISONS

Considering noninferiority analyses at major assessment points, Fig. 2 gives the 90% (95% one-sided) CIs within which conclusions of BA-TE-HBT noninferiority to BA-TE-IP can be made. As can be seen in the upper half of Fig. 2, the lower bound of the CI for the between treatment difference in mean PCL scores for BA-TE-HBT relative to BA-TE-IP scores (effect size) were well within the prespecified range of the meaningful clinical difference ($-\Delta = 8.8$), with $\Delta = -0.11$ at posttreatment, $\Delta = -1.84$ at month 3, and $\Delta = -0.66$ at month 12. Similarly, for mean BDI scores in the lower half of Fig. 2, outcomes of BA-TE-HBT treatment effect sizes were well within the prespecified range ($-\Delta = 5$), with $\Delta = 0.89$ at posttreatment, $\Delta = 1.18$ at 3-month follow-up, and $\Delta = -0.29$ at 12-month follow-up.

Although not the primary focus of study, both treatment modalities evinced improvement in mental health functioning over time, particularly with respect to PTSD symptoms, considering both observed and adjusted scores. Specifically, Figs. 3 and 4 illustrate the observed and MMRM models (i.e., adjusted for baseline scores), for PCL and BDI imputed means, respectively, at each time point in the study (i.e., baseline, 2, 4, 6, 8 week, posttreatment, and 3- and 12-month follow-up) for those who completed five or more sessions. For both PCL and BDI, observed and adjusted models tracked each other closely.

420                                          *Acierno et al.*



**Figure 2.** Noninferiority comparisons in terms of a priori minimum delta within which "as good as" statements can be made. Order of subtraction BA-TE-IP minus BA-TE-HBT; negative difference indicates IP mean higher than HBT mean. Noninferiority of HBT supported if lower limit of CI is not less than (extend beyond) delta.

## DISCUSSION

This study represents the first noninferiority trial using HBT as an evidence-based psychotherapy treatment delivery medium for PTSD. BA-TE delivered via either in person in clinic or HBT modalities was effective, and that comparative effectiveness of the BA-TE-HBT relative to in-person treatment was well within prespecified minimally clinically meaningful range for both PCL and BDI scores corresponding to PTSD and MD symptoms, respectively. These findings build on those of previous investigations indicating noninferiority of Hub and Spoke models of telehealth psychotherapy to in-person treatment delivery,[8] but also extend findings in terms of study design, telehealth format (i.e., HBT vs. satellite clinic telehealth), sample size, and follow-up duration. The secondary hypothesis that HBT would reduce attrition from treatment, ostensibly by minimizing logistical and stigma-related barriers to care were not directly supported, in that rate of dropout from both



Figure 3. PCL scores, observed and baseline-adjusted model. LSM, least squares means obtained from MMRM with PCL as dependent variable and treatment, visit, visit-by-treatment, and PCL baseline in the model.

treatments (i.e., about 20%) was about the same. However, in a related paper[25] we combined data from dropouts from this sample with data from another simultaneous cohort of HBT patients with PTSD who dropped out from a similar exposure-based treatment (Prolonged Exposure Therapy; PE[26]) so as to achieve sufficient statistical power for dropout analyses. In this study, we identified a "dosage" advantage for HBT in terms of number of sessions completed prior to treatment discontinuation. HBT dropouts from either BA-TE or PE completed almost twice as many sessions than those receiving clinic-based BA-TE or PE in person.

Findings in support of the noninferiority hypothesis are important and represent the first major support of the



Figure 4. BDI Scores, observed and baseline-adjusted model. LSM, least squares means obtained from MMRM with BDI as dependent variable and treatment, visit, visit-by-treatment, and BDI baseline in the model.

422                                                                                    *Acierno et al.*

comparative effectiveness of HBT-delivered evidence-based psychotherapy for PTSD. The fact that these results of noninferiority were obtained with a sample of combat veterans currently enrolled for VA healthcare, a significant proportion of whom were receiving disability payments for PTSD-related functional impairment, underscores the utility of HBT in expanding access to care in real-world health care ecologies. Fears of negative clinical outcomes related to the novelty of guided imaginal exposure and in vivo exposure with PTSD patients via HBT expressed by some early critics of the delivery method proved unfounded.[5] Indeed, treatment gains of participants in the HBT condition were on par with those receiving treatment in the IP condition, with no greater number of adverse consequences reported for the duration of the study. These results are consistent with those of Luxton et al.,[12] in their study of 10 active duty combat veterans. The noninferiority of HBT with respect to clinical outcomes, taken together with the encouraging secondary finding of "greater dose received" prior to treatment drop out, offers strong support for incorporating HBT into standard clinical practice. The possibility of treating a patient within their home (or elsewhere) opens a wide range of possibilities across evidence-based psychotherapies. For example, PTSD patients with an exposure hierarchy item of leaving a door unlocked during the daytime could complete this exposure assignment during the session itself, rather than solely as a homework assignment.[26] Clearly, such advantages may translate to other disorders, such as Obsessive Compulsive Disorder, in which HBT may be preferred by the provider in some cases.[27] There are several areas of clinical care that remain understudied, but for which HBT may offer distinct advantages, such as patient satisfaction and attendance in a purely clinical setting (e.g., a setting without research payment for follow-up assessments to encourage participation). There may be some limitations for patients in very low income brackets or in very rural areas who may lack access to televideo devices or high-speed internet connectivity; however, hospital- or grant-purchased devices loaned to patients may be cost-efficient in the long term if HBT increases reach to the extent that overall health and mental health status is improved.

There are several strengths of the present study. Most noteworthy is the sample size insofar as this study is among the largest randomized controlled trials comparing treatments for PTSD, with either civilian or veteran samples. Second, the follow-up period of 1 year allowed clear examination of the long-term differential effects, or lack thereof, associated with treatment delivery mode. Third, this is the first appropriately powered demonstration of noninferiority of HBT delivery of evidence-based therapy for PTSD, and only the second large-scale demonstration of noninferiority of HBT for evidence-based therapy for mental illness.[9] HBT holds tremendous potential advantages over standard Hub and Spoke telehealth delivered mental health treatments where experts in one office location treat patients via telehealth in another office location closer to the patient location, insofar as cost, stigma, travel time, and other logistical obstacles to care are concerned. This advantage appears to have been achieved in this study, and in the HBT depression study.[9] Moreover, we have demonstrated this advantage with two psychiatric conditions (PTSD and MD) associated with significant patient safety concerns, such as suicidality.[18] This demonstration thereby underscores both the safety and utility of the method, and argues for its wider dissemination. Indeed, this is precisely what is currently underway in Department of VA settings and Department of Defense settings.[12]

There are several limitations of the present study. First, the focus of the experimental/HBT condition is on one specific treatment protocol and generalizability of these findings to other treatments for anxiety and depression may be limited. Second, in light of significant depressive symptoms in our clinical population, we chose a hybrid behavioral activation/prolonged exposure protocol. Time course data reveal less than hoped for improvement in PTSD symptoms, and this may well have been a function of departing from the Prolonged Exposure Therapy protocol, and subsequently delivering less than optimal "dose" of imaginal exposure. Indeed, imaginal exposure delivered in this 8-session BA-TE protocol was about half that called for in the standard Prolonged Exposure protocol, and our overall effect size for both PTSD and depression measures is less than that of PE. Indeed, there is a return of depression symptoms in the follow-up period that is of particular concern, and may indicate a need for booster sessions, should this brief protocol be used.

## CONCLUSION

The present study investigated noninferiority of HBT relative to IP delivery of an evidence-based psychotherapy for PTSD. BA-TE-HBT was as good as BA-TE-IP in terms of its impact on PTSD and MD symptoms. This investigation represents the first large-scale study of HBT for PTSD, and only the second large-scale HBT study overall.[9] Although replication is needed, these findings suggest that HBT could be an effective approach to addressing barriers to evidence-based psychotherapy for PTSD and related conditions.

**Acknowledgments.** We also wish to thank the panel of experts who provided their estimates of PCL minimal meaningful difference score: Sudie Back, Ph.D., Anna Birks, Psy.D., B. Christopher Frueh, Ph.D., Daniel Gros, Ph.D., Anouk Grubaugh, Ph.D., Brian Marx, Ph.D., Leslie Morland, Psy.D., Sheila Rauch, Ph.D., Patricia Resnick, Ph.D., Paula Schnurr, Ph.D., Peter Tuerk, Ph.D., and Steven Thorp, Ph.D.

**Conflict of Interest.** Several authors are core and affiliate members of the Ralph H. Johnson VAMC Center of Innovation (CIN 13–418; PI: Egede), the Health Equity and Rural Outreach Innovation Center

(HEROIC). Dr. Gros is funded by Department of Veteran Affairs Clinical Sciences Research and Development Career Development Award CX000845 (PI: Gros). The views expressed in this article are those of the authors and do not necessarily reflect the position or policy of the Department of Veterans Affairs or the United States government. There are no conflicts of interest to disclose. There are no conflicts of interest for any of the authors.

# REFERENCES

1. Hoge CW, Castro CA, Messer SC, et al. Combat duty in Iraq and Afghanistan, mental health problems, and barriers to care. N Eng J Med 2004;351:13–22.

2. Cohen B, Gima K, Bertenthal D, et al. Mental health diagnoses and use of VA non-mental health medical services among returning OIF/OEF veterans. J Gen Intern Med 2010;25:18–24.

3. Hoge CW, Auchterlonie JL, Milliken CS. Mental health problems, use of mental health services, and attrition from military service after returning from deployment to Iraq or Afghanistan. JAMA 2006;295:1023–1032.

4. Fulton JJ, Calhoun PS, Wagner RH, et al. The prevalence of posttraumatic stress disorder in Operation Enduring Freedom/Operation Iraqi Freedom (OEF/OIF) veterans: a meta-analysis. J Anxiety Disord 2015;31:98–107.

5. Gros DF, Morland LA, Greene CJ, et al. Delivery of evidence-based psychotherapy via video telehealth. J Psychopathol Behav Assess 2013;35:506–521.

6. Bose U, McLaren P, Riley A, et al. The use of telepsychiatry in the brief counseling of non- psychotic patients from an inner-London general practice. J Telemed Telecare 2001;7:8–10.

7. Trott P, Blignault I. Cost evaluation of a telepsychiatry service in northern Queensland. J Telemed Telecare 1998;4:66–68.

8. Bolton A, Dorstyn D. Telepsychology for posttraumatic stress disorder: a systematic review. J Telemed Telecare 2015;21:254–267.

9. Egede LE, Acierno R, Knapp RG, et al. Psychotherapy for depression in older veterans via telehealth: a randomised, open-label, non-inferiority trial. Lancet 2015;2:693–701.

10. Strachan M, Gros DF, Ruggiero KJ, et al. An integrated approach to delivering exposure-based treatment for symptoms of PTSD and depression in OIF/OEF Veterans: preliminary findings. Behav Ther 2012;43:560–569.

11. Yuen E, Gros DF, Price M, et al. Randomized controlled trial of home-based telehealth versus in-person prolonged exposure for combat-related PTSD in Veterans: preliminary results. J Clin Psychol 2015;71:500–512.

12. Luxton DD, Pruitt LD, O'Brien K, Kramer G. An evaluation of the feasibility and safety of a home-based telemental health

treatment for posttraumatic stress in the US Military. Telemed E Health 2015;21(11):880–886.

13. Gros DF, Yoder M, Tuerk P, et al. Exposure therapy for PTSD delivered to veterans via telehealth: predictors of treatment completion and outcome. Behav Ther 2011;42:276–283.

14. Blake DD, Weathers FW, Nagy LM, et al. The development of a clinician-administered PTSD scale. J Trauma Stress 1995;8(1):75–90.

15. Blanchard EB, Hickling EJ, Taylor AE, et al. Psychological morbidity associated with motor vehicle accidents. Behav Res Ther 1994;32:283–290.

16. Gros DF, Strachan M, Ruggiero KJ, et al. Innovative service delivery for secondary prevention of PTSD in at-risk OIF-OEF service men and women. Contemp Clin Trial 2011;32:122–128.

17. Gros DF, Price M, Strachan M, et al. Behavioral Activation and Therapeutic Exposure (BA-TE): an investigation of relative symptom changes in PTSD and depression during the course of integrated behavioral activation, situational exposure, and imaginal exposure techniques. Behav Modif 2012;36:580–599.

18. Gros DF, Veronee K, Strachan M, et al. Managing suicidality in home-based telehealth. J Telemed Telecare 2011;17:332–335.

19. Weathers FW, Litz BT, Herman DS, et al. The PTSD Checklist: Reliability, Validity and Diagnostic Utility. San Antonio, TX: Annual meeting of the International Society for Traumatic Stress Studies; 1993.

20. Weathers FW, Litz BT. Psychometric properties of the clinician-administered PTSD scale, CAPS-1. PTSD Res Quart 1994;5:2–6.

21. Beck AT, Steer RA, Brown GK. Beck Depression Inventory-II. San Antonio, TX: Harcourt Assessment; 1996.

22. Steer RA, Clark DA. Psychometric characteristics of the Beck Depression Inventory-II with college students. Meas Eval Couns Dev 1997;30:128–136.

23. Greene CJ, Morland LA, Durkalski VL, et al. Noninferiority and equivalence designs: issues and implications for mental health research. J Traumat Stres 2008;21:433–439.

24. Dworkin RH, Turk DC, Wyrwich KW, et al. Consensus statement: interpreting the clinical importance of treatment outcomes in chronic pain clinical trials: IMMPACT recommendations. J Pain 2008;9:105–121.

25. Hernandez-Tejada MA, Zoller JS, Ruggiero KJ, et al. Early treatment withdrawal from evidence-based psychotherapy for PTSD: telemedicine and in-person parameters. Int J Psychiatry Med 2014;48(1):33–55.

26. Foa EB, Hembree EA, Rothbaum BO. Prolonged Exposure Therapy for PTSD: Emotional Processing of Traumatic Experiences, Therapist Guide. New York: Oxford University Press; 2007.

27. Rowa K, Antony MM, Summerfeldt LJ, et al. Office-based vs. home-based behavioral treatment for obsessive-compulsive disorder: a preliminary study. Behav Res Ther 2007;45:1883–1892.

Behavioral Sciences and the Law
Behav. Sci. Law **26**: 253–269 (2008)
Published online in Wiley InterScience
(www.interscience.wiley.com) DOI: 10.1002/bsl.812

# Empirical Evidence on the Use and Effectiveness of Telepsychiatry via Videoconferencing: Implications for Forensic and Correctional Psychiatry

Diana J. Antonacci, M.D.,[*]
Richard M. Bloch, Ph.D.,[†]
Sy Atezaz Saeed, M.D., M.S.,[†]
Yilmaz Yildirim, M.D.[†] and Jessica Talley, M.D.[†]

A growing body of literature now suggests that use of telepsychiatry to provide mental health services has the potential to solve the workforce shortage problem that directly affects access to care, especially in remote and underserved areas. Live interactive two-way audio–video communication—videoconferencing—is the modality most applicable to psychiatry and has become synonymous with telepsychiatry involving patient care, distance education, and administration. This article reviews empirical evidence on the use and effectiveness of videoconferencing in providing diagnostic and treatment services in mental health settings that serve child, adolescent, and adult populations. Descriptive reports, case studies, research articles, and randomized controlled trials related to clinical outcomes were identified and reviewed independently by two authors. Articles related to cost-effectiveness, technological issues, or legal or ethical aspects of telepsychiatry were excluded. The review of the evidence broadly covers mental health service provision in all settings, including forensic settings. Given the sparse literature on telepsychiatry in forensic settings, we discuss implications for mental health care across settings and populations and comment on future directions and potential uses in forensic or correctional psychiatry. Copyright © 2008 John Wiley & Sons, Ltd.

[*]Correspondence to: Diana J. Antonacci, M.D., Department of Psychiatric Medicine, Brody School of Medicine at East Carolina University, 600 Moye Boulevard, Suite 4E-100, Greenville, NC 27834, U.S.A.
E-mail: antonaccid@ecu.edu
[†]Department of Psychiatric Medicine, The Brody School of Medicine at East Carolina University.

Copyright © 2008 John Wiley & Sons, Ltd.

254    D. J. Antonacci *et al.*

Many states have extreme disparities in population density and resource distribution, with substantial health and human service resources in urban centers and relative scarcity of services in rural areas. Such disparities are particularly evident in the area of mental health services (*New Freedom Commission on Mental Health, Subcommittee on Rural Issues: Background paper*, 2004). Many states have employed telepsychiatry to improve mental health services' cost, quality, and availability. Indeed, a growing body of literature now suggests that use of telepsychiatry to provide mental health services has the potential to mitigate the workforce shortage that directly affects access to care, especially in remote and underserved areas.

Telepsychiatry has been variously defined. The National Library of Medicine defines telemedicine as it applies to psychiatry [telepsychiatry] as the use of electronic communication and information technologies to provide or support clinical psychiatric care at a distance. This definition includes many communication modalities such as phone, Fax, e-mail, the Internet, still imaging, and live interactive two-way audio–video communication (*American Psychiatric Association resource document on telepsychiatry via videoconferencing*, 1998). Live interactive two-way audio–video communication—videoconferencing—is the modality most applicable to psychiatry and has become synonymous with telepsychiatry involving patient care, distance education, and administration. Regardless of how these applications are defined, telepsychiatry and e-mental health comprise one of the largest uses of telehealth nationwide (Grigsby et al., 2002; Krupinski et al., 2002). Videoconferencing primarily involves interactive audiovisual conferencing systems over high-capacity (high-bandwidth) networks. Historically, interactive telepsychiatry applications have used point-to-point network connections, usually as full or fractional T-1 or integrated services digital network (ISDN) circuits. However, the rapid diffusion of Internet and Ethernet networks has led to the development of videoconferencing systems that can work over these types of network, i.e. Internet Protocol (IP) networks. If a telepsychiatry application uses IP networks, then security must be ensured—this can be accomplished by using encrypted codecs or by setting up a virtual private network (VPN) and/or virtual local area networks (VLANs).

This article reviews empirical evidence on the use and effectiveness of videoconferencing in providing diagnostic and treatment services in the area of mental health. Based on our review of the literature, we draw conclusions regarding telepsychiatry in general mental health populations and comment specifically on implications for forensic or correctional psychiatry.

## REVIEW OF THE LITERATURE

We searched the literature for reports about telepsychiatry programs and services. The search focused on the English language literature and identified journal articles and reports. The electronic databases MEDLINE via Ovid, PsycINFO and the Telemedicine Information Exchange were searched from 1950 to June 2007. Approximately 385 citations were identified by using the search terms telemedicine, telepsychiatry, telepsychology, or videoconferencing, along with psychiatry, child and adolescent psychiatry and forensic psychiatry. Abstracts were reviewed for relevance by two authors (D.A. and Y.Y.), who identified all citations pertaining to

Copyright © 2008 John Wiley & Sons, Ltd.    Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

telepsychiatry demonstration projects, program descriptions, empirical evaluations, satisfaction and acceptance, clinical outcome and cost-effectiveness. The initial review identified 121 articles. Articles related to cost-effectiveness, technological issues, and legal or ethical aspects of telepsychiatry were excluded. Descriptive reports, case studies, research reports, and randomized controlled trials related to clinical outcomes were identified and reviewed independently. Forty-five articles fulfilled these criteria.

In our literature review, 34 of 45 articles were related to clinical efficacy of telepsychiatry in general adult psychiatry (Table 1). Most of them were case-studies (Deitsch, Frueh, & Santos, 2000), case-series (Bose, McLaren, Riley, & Mohammedali, 2001; Bouchard et al., 2000; Himle et al., 2006; Cluver et al., 2005; Shepherd et al., 2006; Shore & Manson, 2004; Thomas, Miller, Hartshorn, Speck, & Walker, 2005), or studies of patient or clinician satisfaction (Bishop, O'Reilly, Maddox, & Hutchinson, 2002; Dongier, Tempier, Lalinec-Michaud, & Meunier, 1986; Frueh, Henderson, & Myrick, 2005; Greenwood, Chamberlain, & Parker, 2004; Griffiths, Blignault, & Yellowlees, 2006; Morland, Pierce, & Wong, 2004).

Only five articles could be considered randomized clinical trials (De Las Cuevas, Arredondo, Cabrera, Sulzenbacher, & Meise, 2006; Fortney et al., 2007; O'Reilly et al., 2007; Poon, Hui, Dai, Kwok, & Woo, 2005, Ruskin et al., 2004) related to treatment outcome. In addition to being recognized as markedly few in number (Frueh, Monnier, Elhai, Grubaugh, & Knapp, 2004; O'Reilly et al., 2007), these studies used mixed diagnostic groups, mixed medication and psychotherapy interventions, and a variety of outcome assessment measures to conclude that telepsychiatric intervention outcomes were equivalent to face-to-face outcomes (De Las Cuevas et al., 2006; O'Reilly et al., 2007; Ruskin et al., 2004). Lack of control comparisons and use of superiority designs rather than equivalence designs (McAlister & Sackett, 2001) were additional problems.

Articles without random assignment (Bouchard et al., 2004; Griffiths et al., 2006; Jones, Johnston, Reboussin, & McCall, 2001; Kennedy & Yellowlees, 2000, 2003; Marcin et al., 2005; Modai et al., 2006; Shepherd et al., 2006; Shore, Savin, Orton, Beals, & Manson, 2007; Urness, Wass, Gordon, Tian, & Bulger, 2006) included a single study in a forensic setting (Zaylor, Nelson, & Cook, 2001). All had similar methodological problems, with an even higher risk of bias.

A recent randomized, controlled study by Fortney et al. (2007) compared the usual primary care treatment of depression with primary care treatment plus collaborative psychiatric medication monitoring in 395 patients and demonstrated a strong positive effect of telepsychiatry on measures of treatment compliance, symptom improvement, remission, and satisfaction. This superiority trial shows that, whether or not telepsychiatric care is equivalent to in-person care, it is more effective than a common alternative care, and meets the criterion for an evidence-based treatment for depression. Because a single disorder was treated with a specified treatment via telepsychiatry, it is possible for providers to replicate this process, to recognize patients who are likely to benefit from it, and to compare their outcomes to those reported in the literature. This study suggests that collaborative telepsychiatric care is better than usual non-psychiatric care for depression. Although the Fortney study (Fortney et al., 2007) was conducted in a VA primary care setting, the results should apply to collaborative depression care in other settings as well. Extrapolating from this study, one could infer that

Copyright © 2008 John Wiley & Sons, Ltd.    Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

256    D. J. Antonacci *et al.*

telepsychiatric management of antidepressant medications should produce similar benefits over usual medical care in forensic settings and correctional facilities.

Several articles addressed diagnosis or assessment studies with adult patients, including a meta-analysis (Hyler, Gangure, & Batchelder, 2005). There were four studies in forensic settings (Leonard, 2004; Lexcen, Hawk, Herrick, & Blank, 2006; Nelson, Zaylor, & Cook, 2004; Zaylor, Nelson, & Cook, 2001) (see Table 2). Like studies on treatment outcome, the assessment articles focused on patient or clinician satisfaction (Matsuura et al., 2000) and equivalence of telepsychiatric assessment to in-person assessment (Baer et al., 1995; Cullum, Weiner, Gehrmann, & Hynan, 2006; Hersh et al., 2002; Marcin et al., 2005; Shore et al., 2007; Zarate et al., 1997). The forensic assessment studies compared prisoner self-ratings with telepsychiatric ratings (Nelson et al., 2004; Zaylor et al., 2001) or in-person ratings to telepsychiatric ratings (Leonard, 2004; Lexcen et al., 2006). The presumption is that in-person assessments are the gold standard to be matched by telepsychiatric assessments. This was the assumption underlying the meta-analysis on telepsychiatric assessment (Hyler et al., 2005). Patient selection factors, small study size, variable assessment instruments, varied patient problems, and lack of connection with treatment initiation and outcome are common study problems. However, there is no indication that telepsychiatric assessment, including forensic assessments and assessments in correctional facilities, induces systematic biases.

Application of telepsychiatry to child and adolescent patients has also been tested (see Table 3). In addition to case studies demonstrating feasibility (Alessi, 2003; Savin, Garry, Zuccaro, & Novins, 2006), telepsychiatry programs targeting children and adolescents have been described (Myers, Sulzbacher, & Melzer, 2004; Neufeld, Yellowlees, Hilty, Cobb, & Bourgeois, 2007; Starling, Rosina, Nunn, & Dossetor, 2003). In much the same way as in the adult literature, patient and clinician acceptance is relatively high.

There are only two randomized controlled trials with children, one on treatment efficacy and one on assessment reliability and satisfaction. The efficacy study compared eight weeks of in-person to telepsychiatry CBT treatment for depression (Nelson, Barnard, & Cain, 2003). Both telepsychiatry and in-person treatment produced significant reductions in depression scale scores, although the tele-psychiatry condition produced faster reductions.

The assessment study (Elford et al., 2000) compared telepsychiatric assessments with in-person assessments to see whether they produce the same diagnoses and are acceptable to patients, clinicians, and parents. There was a high degree of agreement between telepsychiatric and in-person diagnoses and general satisfaction with telepsychiatric care.

While not the focus of the current review, it should be noted that there are comparisons of successful telephone-based interventions that show better effects than usual care (Rollman et al., 2005; Simon, Ludman, Tutty, Operskalski, & Von Korff, 2004). There is even a non-inferiority trial of telephone-delivered cognitive–behavior therapy for obsessive–compulsive disorder comparing eight 30 minute telephone sessions with nine 60 minute in-person sessions (Lovell et al., 2006) that suggests that the same outcomes can be achieved with half the therapist time using telephone-delivered care. Some telepsychiatry studies hint at comparable advantages in time savings (Nelson et al., 2003; Zaylor, 1999) or treatment adherence (Modai et al., 2006).

Copyright © 2008 John Wiley & Sons, Ltd.

Table 1. Telepsychiatry studies on treatment feasibility, satisfaction, efficacy or effectiveness in the general adult population

| Author | Study objective | Main study outcomes |
|---|---|---|
| Ruskin et al. (2004) | Compared treatment outcomes of depressed patients treated in person with those treated remotely. To determine whether patients' rates of adherence to and satisfaction with treatment were as high with remote as compared with in-person treatment and to compare costs. | $N = 119$, 8 sessions of 20 minutes each over a 6 month period. Both groups were equally adherent. No between group differences in satisfaction or dropout rates. Telepsychiatry was more expensive until costs of psychiatrist travel were factored in. Telepsychiatry did not increase health care resource consumption. |
| Fortney et al. (2007) | This study evaluated a telemedicine based collaborative care model adapted for small clinics without on site psychiatrists. | $N = 395$ primary care patients in VA community clinics. Depression scores on the PHQ$> 12$. Intervention patients more likely to be adherent at 6 and 12 months. Intervention patients more likely to respond at 6 months and remit at 12 months. They reported larger gains in mental health status, improved health-related quality of life, and higher satisfaction. |
| O'Reilly et al. (2007) | Compared a variety of clinical outcomes after psychiatric consultation and, where needed, brief follow-up for OP referred to a psychiatry clinic with random assignment to telepsych. or F2F. | 495 patients, 254 F2F and 241 telepsych. Consultation and follow-up produced clinical outcomes that were equivalent between the 2 groups. Patient satisfaction levels were similar. Telepsych. was at least 10% less expensive |
| De Las Cuevas et al. (2006) | Evaluated efficacy of telepsych. in the tx of mental disorders by comparing F2F treatment. | RCT of 140 OP. Tx was 8 consultations lasting 30 minutes over 24 weeks. Medications plus CBT were used. 130 completed, 534 teleconsultations, 522 F2F consultation. Both groups improved but no differences were observed between groups. |
| Bishop et al. (2002) | Pilot comparing satisfaction levels between patients seen F2F and those seen via VC. | Random assignment, $N = 24$ with 17 completing. Assessed 4 months after. Although there was a trend in favor of F2F the difference was not significant. |
| Morland et al. (2004) | Investigated the feasibility of using VC to provide coping skills group for veteran pts with PTSD who live in remote locations. | $N = 20$, 3 withdrew. 9 to VC and 8 FTF. At end of 8 wks, 4 left in F2F and 8 left in VC. F2F attended 4.9 sessions and VC 6.3 sessions (not significant). No differences in levels of satisfaction in patients or clinicians. Retention of info. similar in both groups. VC can be used to provide coping skills. |

(*Continues*)

258    D. J. Antonacci *et al.*

Table 1. (Continued)

| Author | Study objective | Main study outcomes |
| --- | --- | --- |
| Poon et al. (2005) | This project examined and compared the feasibility, acceptability, and clinical outcome of a cognitive intervention program for older patients with mild cognitive impairment and mild dementia using TM vs F2F. | $N = 22$. 12 sessions conducted via F2F or VC. Cognitive impairment was significant and comparable across groups. Compliance was 95% overall. Significant improvement in the areas of attention, memory, and language areas were observed following cognitive intervention with no difference in outcomes between the 2 intervention arms. |
| Bouchard et al. (2004) | Compared effectiveness of CBT for panic disorder when delivered F2F or by VC. | $N = 21$. CBT F2F was just as effective as VC. Both groups improved. VC participants reported development of excellent DP relationship as early as the first session. |
| Jones et al. (2001) | Test the hypothesis that VC ratings based on visual observations of behavior would be less reliable that ratings based on patients' verbal reports of symptoms. | $N = 30$ VC assessments. BPRS was used. Reliability of BPRS subjective items was consistently higher than for the observational items (used low band width). |
| Modai et al. (2006) | Compared institutional ambulatory and hospital costs, treatment adherence, patient and physician satisfaction, and treatment safety between VC and F2F treatment. | 1 year of telepsychiatry treatment ($N = 39$) compared to previous year (F2F) and matched comparison group ($N = 42$). Patients and physicians were satisfied and treatment was safe. Telepsychiatry was more expensive and there was a trend toward increased IP. Adherence rates before and during telepsych. were similar but were twice as high as the comparison group. |
| Kennedy and Yellowlees (2003) | Data were collected from 124 patients attending hospital and GP facilities. 32 were using telepsychiatry. Follow-up data were collected a year later. | There was a significant difference between initial assessment and follow-up in both groups but no significant difference between the face-to-face and telepsychiatry groups. Both groups were improved and telepsychiatry was as effective as face to face. |
| Urness et al. (2006) | Evaluated client satisfaction and one month MH outcomes for TP compared with F2F. The SF-12 survey was used. | 48 of the 62 (77%) initial responders were available for f/u one month later. TP pts demonstrated significant improvements on pre and post tests while there was no change for the F2F group. This was a single first time consultation. |

Copyright © 2008 John Wiley & Sons, Ltd.

Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

| | | |
|---|---|---|
| Hyler et al. (2005) | A review and meta-analysis of the literature comparing TP with in-person psychiatric assessments. | 1956 to 2002. $N=380$. 14 with $N>10$ compared TP with IP using objective assessment instruments or satisfaction instruments. 14 studies with 500 patients. TP was similar to IP using objective assessments. Effect sizes were small, suggesting no difference. HB was slightly superior for assessments requiring detailed observation of subjects. Out of a large TP literature published over the last 40+ years, only a handful of studies have attempted to compare TP with IP directly using standardized assessments. |
| Hersh et al. (2002) | Systematic review of the literature to evaluate the efficacy of telemedicine for making dx and management decisions in 3 classes of application: office/hospital based, store and forward, and home based. | The strongest evidence came from psychiatry and dermatology. There was reasonable evidence for general medical history and physical exams. There is some evidence in cardiology and certain areas of ophthalmology. Despite widespread use, there is strong evidence in only a few specialties that dx and tx decisions provided by TM are comparable to F2F. |
| Shore et al. (2007) | Examined the reliability of SCID in the administration of psych. assessments by VC vs F2F. | $N=53$, randomly assigned. Comparisons made with prevalences, the McNemar test and the kappa statistics. Percent agreement b/w modalities was >80% except for lifetime drug abuse (76%), lifetime substance abuse (72%) and lifetime MDD (66%). Externalizing disorders elicited a higher kappa than internalizing disorders. Overall SCID live did not differ from VC statistically. |
| Cullum et al. (2006) | Administered a brief battery of common neuropsych. tests via VC and F2F to 14 patients with mild cognitive impairment and 19 with AD. | Highly similar test scores were obtained for the two groups. The VC group had a partner to decrease anxiety and assist with equipment. |
| Kennedy and Yellowlees (2000) | Evaluated a pilot project that supported visiting psychiatrists and local private/public practitioners through telemedicine. | Data collected over 2 years with 124 patient subjects. Nine additional refused to participate. 32/124 used telemed. No significant improvements in wellbeing or quality of life. Most found moderately or greatly helpful. (98% preferred telemed. in combination with local service) |
| Deitsch et al. (2000) | Case report of a group therapy session with 4 patients. The group had been meeting with variable attendance | There was one 55 minute session. Feedback was by questionnaire and verbal. Patient satisfaction was rated as good to very good. Delay in responses was distracting to the remote therapist. |

(Continues)

260    D. J. Antonacci *et al.*

Table 1. (Continued)

| Author | Study objective | Main study outcomes |
|---|---|---|
| Cluver et al. (2005) | Feasibility study of remote psychotherapy with terminally ill cancer patients with dx of adjustment disorder or major depression. | $N = 10$. 6 sessions of CBT with remote alternating with face to face. 9 patients completed 53 therapy sessions. 21 remote and 32 face to face. Acceptance and perceptions were positive after almost all therapy sessions, regardless of delivery mode. |
| Frueh et al. (2005) | Videoconferencing was used in open sessions for subjects with alcohol use disorders. 8 sessions of group therapy over a 4 week period. | $N = 18$ with 14 attending at least 4 sessions. Patients reported high levels of satisfaction, found intervention to be credible, and had good session attendance and attrition comparable to conventional tx. 82% indicated they would recommend the treatment. |
| Marcin et al. (2005) | Determine if OP telemed. specialist consultation to primary care clinicians resulted in changes in pt dx, tx, management and outcomes. | Retrospective chart review. $N = 223$. Diagnosis changed in 48%, tx changed in 81.6% and clinical improvement was shown in 60.1%. Consistent with literature regarding changes in process of care with F2F. Changes in dx or tx found to be associated with clinical improvement. |
| Bouchard et al. (2000) | Preliminary results of an outcome study on the effectiveness of telepsychiatry for panic disorder with agoraphobia. | 12 sessions of CBT delivered by VC. $N = 8$. Improvements were made on measures of target symptoms and measures of global functioning. A very good therapeutic alliance was built after only the 1st session. |
| Thomas et al. (2005) | Description of a telemed. program that provides psychiatric screening, evaluation, treatment and referral for ongoing care to clients of a rural women's crisis center. | $N = 38$. 35 completed an evaluation and 31 entered treatment. Anxiety and major affective disorders were the most commonly identified disorders followed by substance use disorders. Telepsych. can provide rapid crisis intervention and effective mental health services to victims of domestic violence in rural settings. |
| Griffiths et al. (2006) | To explore the feasibility and acceptability of delivering CBT via TP to patients with depression and/or anxiety. | $N = 15$. CBT delivered to patients (and case managers (CM)). Dx of GAD, MDD, panic disorder. Outcome measures were Mental Health Inventory by pts and Health of the Nation Outcome Scale by CM. Significant improvement in all measures. TP consultations were acceptable to CM and pts. |
| Baer et al. (1995) | Assess reliability of rating scales administered in person and over video to patients with OCD. | Near perfect interrater agreement on rating scale scores. Reliability was excellent in both. |
| Shore et al. (2004) | This article describes a weekly TP clinic treating PTSD in American Indian veterans. | $N = 50$ clinic interactions in 7 months. Consisted of ongoing group tx, individual tx and med. mgmt. Patient satisfaction and comfort were rated highly. |

Copyright © 2008 John Wiley & Sons, Ltd.

| | | |
|---|---|---|
| Himle et al. (2006) | Three cases of OCD treated with CBT via VC. | 12 wk manualized therapy including family members in sessions 1, 6 and 12. ERP was primary intervention, delivered in session and as homework. Measures YBOCs, CGI, Ham D, Working Alliance Inventory and Telepresence and VC Scale. |
| Shepherd et al. (2006) | Studies anxiety, depression and quality of life in rural cancer patients. | 25 patients, average of 3 CBT sessions. Data collected pre, post and 1 month later. Hospital Anxiety and Depression Scale, Functional Assessment of Cancer Therapy—General, patient satisfaction questionnaire. Anxiety decreased and quality of life increased. The service was practical and acceptable. |
| Matsuura et al. (2000) | Assess the reliability of psych. evals via VC. | Interrater reliability measured with BPRS and Interclass Correlation Coefficient. Compared F2F with VC. Reliability showed perfect agreement. $N=17$, 9 were volunteers and 8 were patients |
| Bose et al. (2001) | Evaluated patient satisfaction | $N=13$. Brief counseling of non-psychotic patients, 4 month duration, 11 men and 2 women for 29 total sessions. 93% would like to use it again, 75% said could see well and 86% said they could hear. Overall patients were happy. |
| Dongier et al. (1986) | To carry out a quantified and controlled assessment of patients' and staffs' reactions to TP and to examine feasibility of TP. | 50 telepsych. consultations and 35 F2F consultations compared from among those normally presenting to the 3 psychiatric consultants on staff. Consultant, patient, and consultee slightly preferred F2F bur TP consultation was well accepted. |
| Greenwood et al. (2004) | Evaluate a TP clinical service in rural New South Wales. A retrospective evaluation was done to determine acceptance of TP and F2F. | $N=31$ referred to a specialty mood clinic in a rural setting. 20 completed. A F2F semistructured interview was done on admission and immediately afterward a VC interview was performed. Dx were mood do (80%), anxiety do (20%). High satisfaction with F2F. Differences b/w F2F and TP were difficulty discussing problems, not finding consultation informative, not feeling comfortable on camera. 80% indicated they would use TP again. |
| Zarate et al. (1997) | Assessed reliability of BPRS, SAPS, SANS (1) in person, (2) by VC at low bandwidth, (3) by VC at high bandwidth. | $N=45$ with dx of schizophrenia. 15 in each group. No significant differences existed among the groups. |

(Continues)

262    D. J. Antonacci *et al.*

Table 1. (Continued)

| Author | Study objective | Main study outcomes |
| --- | --- | --- |
| Zaylor et al. (2000) | Retrospective review of charts comparing clinical outcomes of patients seen by TP and F2F. | $N = 49$ with SZA or MDD. GAF was used as measure at initial visit and subsequent visits. Patients seen by TP had a greater attendance rate and follow-up visitstook less than half the time compared to F2F. |

VC = video conferencing.
F2F = face to face.
TP = telepsychiatry.
TM = telemedicine.
tx = treatment.
dx = diagnosis.

Copyright © 2008 John Wiley & Sons, Ltd.

Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing    263

Table 2. Telepsychiatry studies on treatment feasibility, satisfaction, efficacy or effectiveness in the forensic population

| Authors | Objective | Outcomes |
|---|---|---|
| Brodey et al. (2000) | Level of satisfaction with TP evaluations was determined. | $N = 43$. A forensic psychiatrist interviewed 20 in person and 23 by VC. Satisfaction was moderately high in both groups with no difference between the 2 groups. The psychiatrist felt comfortable with his ability to dx remotely. |
| Leonard (2004) | This article reviews the current prison health care system and then describes a research study focused on development and evaluation of a TP service for prisoners. | $N = 80$. Pt assessed by 1 psychiatrist at the local site doing the interview by VC and simultaneously by a 2nd psychiatrist at the remote site in the same room as the prisoner. Satisfaction was measured with 20 prisoners and 2 staff. Only study design is outlined. |
| Nelson et al. (2004) | The effectiveness of a jail telepsychiatry service was evaluated by comparing psychiatrist and inmate report of psychopathology. | $N = 62$ inmates, 107 consultations in a rural county jail. Inmates completed the SCL-90-R and the psychiatrist completed a Psychiatrist Evaluation Form including a CGI. Most inmates were rated as mildly to moderately ill. There was significant high correlation between TP psychiatrist rating on CGI and inmate report on SCL-90-R. The findings support effectiveness of TP evaluation for the jail population. |
| Zaylor et al. (2001) | The effectiveness of a prison telepsychiatry service was evaluated from the user perspective. | $N = 45$. Completed the SCL-90-R three times. The psychiatrist completed the CGI. Mean SCL scores decreased with time. The psychiatrists reported improvement over time on CGI. Telepsychiatry is an effective means of delivering MH services to the prison population. |
| Lexcen et al. (2006) | The authors investigated the quality of results from VC vs F2F with 72 forensic patients. Three administration and observation conditions were used. | Interrater reliability for 2 VC interview conditions were compared to those for F2F using BPRS—Anchored version and MacArthur Competence Assessment Tool—Criminal Application. |

VC = video conferencing.
F2F = face to face.
TP = telepsychiatry.
TM = telemedicine.
tx = treatment.
dx = diagnosis.

Copyright © 2008 John Wiley & Sons, Ltd.

Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

264    D. J. Antonacci *et al.*

Table 3. Telepsychiatry studies on treatment feasibility, satisfaction, efficacy or effectiveness in the child and adolescent population

| Authors | Objective | Outcomes |
|---|---|---|
| Nelson et al. (2003) | This is an evaluation of an 8 week CBT intervention for childhood depression, either F2F or VC. | 28 children were randomized to 2 tx groups. CBT across the 2 conditions was effective. Patients and parents were satisfied with VC and preferred VC over F2F. CBT was effective across both delivery methods. 82% no longer met criteria at the end. VC reported a greater decrease in depressive symptoms over time as compared to F2F. This is a model for RC trials in the future. |
| Elford et al. (2000) | The authors established a TP system for children and conducted an assessment of its utility. | $N = 23$ children with parents. 2 psychiatric assessments completed, one F2F and one VC. Order was randomized. In 22 cases (96%) dx and tx recommendations were same across both groups. Psychiatrists said VC assessment was adequate but F2F was preferred. Satisfaction measured in patients and parents was the same across groups. The majority of children liked TP and preferred it to F2F. Most parents indicated they preferred VC to traveling a long distance. |
| Alessi (2003) | Case report of 15 year old evaluated and treated by telepsychiatry. | Diagnosis was changed, medications discontinued and the patient improved. All scales showed reduced severity of symptoms. |
| Savin et al. (2006) | Description of twice monthly child and adolescent telepsych service. | 21 evaluations in 12 months. 2 cases illustrate issues encountered. Patients and families were receptive. Cost is similar to F2F. |
| Starling et al. (2003) | This article describes the initial evaluation of the child and adolescent psychological telemedicine outreach service in New South Wales and changes made to the service after the initial evaluation. | Emphasizes importance of alcohol abuse in this population. 136 rural families, 20 rural clinicians and 8 psychiatrists. Satisfaction was high, with clinicians and families the most satisfied. Psychiatrists felt that they were usually able to perform an adequate consultation but few felt the consultations were as satisfactory as F2F. Other initiatives included telenursing, professional skills training, sabbaticals for rural clinicians and a clinical skills workshop. |
| Myers et al. (2004) | Examined whether TP patients are representative of those in usual OP care. | $N = 369$, 2 clinics. Youth evaluated were broadly comparable in both. TP appears to serve youth that are representative of those seeking psych. care. Diagnoses were similar and suggest that TP provides adequate technical resolution and doctor–patient rapport to detect psychopathology. |
| Neufield et al. (2007) | Describes the University of CA program. Used for clinical services, consultation and education. | 289 consults in first year. ADHD was most common dx in kids, mood disorders in adults. A convenience sample of 33 adults (SF-12 health status measure) showed improvements in MH status at 3 and 6 months. |

Copyright © 2008 John Wiley & Sons, Ltd.

Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

Comparisons between telepsychiatry via video conferencing and telephone have not been made. Having shown success with specific populations using telephonic interventions, it may be more appropriate to conduct equivalence studies with telepsychiatry via videoconferencing compared with telepsychiatry via telephone rather than comparing videoconferencing to face to face treatment. Likewise, finding that telephone interventions may require less time for an equivalent effect (Lovell et al., 2006) suggests that telepsychiatry interventions should be tested for a similar effect. The growing literature on both telephone-aided and video-conferencing treatments makes the determination of which technology is effective with what types of patient, and the need to match technology with patient values and needs (Ryan, Kobb, & Hilsen, 2003), a possibility. Telephonic interventions may be more feasible in settings where videoconferencing equipment is unavailable or impractical, including forensic and correctional facilities.

This review of the literature covers a time period of over half a century, but efficacy and effectiveness data are still rather sparse. The limited evidence is from 2000 or later and is relatively weak due to the problems discussed above. The literature began with descriptive articles looking at feasibility, acceptance, satisfaction, and cost. There was then movement toward comparing telepsychiatry to services provided face to face. A few studies that provide the same treatment across the two modalities and measure clinical outcomes have emerged. However, the treatment is very limited, usually medication management or a short course of CBT, and if there is therapy it is often paired with some type of face-to-face contact as well. Outcomes appear to be the same. Acceptance is good in general. If there are acceptance problems, it is usually the professional who is reluctant, not the patient or family. Usage is primarily in rural areas or jails, or with underserved subpopulations such as children. The state of the literature is generally weak but there is more in psychiatry than other medical specialty areas, probably because of the greater reliance on the mental status examination and verbal communication and not on a physical examination.

## IMPLICATIONS FOR FORENSIC OR CORRECTIONAL PSYCHIATRY

Our review of the literature yielded 12 articles from forensic settings. Five addressed efficacy and are included in our review. The total number of subjects in these five articles was 345. One article (Leonard, 2004) only outlined study design, one looked at symptom improvement (Zaylor et al., 2001), two examined patient satisfaction (Brodey, Claypoole, Motto, Arias, & Goss, 2000; Myers et al., 2004), one examined interrater reliability in telepsychiatric assessments based on interviews (Lexcen et al., 2006) and one focused on the effectiveness of a jail telepsychiatry service (Nelson et al., 2004). The Myers study (Myers et al., 2004) looked at an adolescent population while the others focused on adults. All studies had significant methodological limitations, making confident conclusions difficult.

The overall view that emerges is that, despite methodological problems, telepsychiatry seems to be an appropriate option to provide services to patients in correctional facilities in order to improve access to psychiatric services. The Zaylor study (Zaylor et al., 2001) showed improvement in symptoms per patient and

Copyright © 2008 John Wiley & Sons, Ltd.

266    D. J. Antonacci *et al.*

psychiatrist report. The Nelson study (Nelson et al., 2004) showed a high correlation between the telepsychiatrist evaluation and inmate report of symptoms. The Brodey study (Brodey et al., 2000) notes that the physician felt comfortable making diagnoses via telepsychiatry and did not find a difference in satisfaction between those who received care via telepsychiatry and those who received care in person.

Telepsychiatric treatment in correctional facilities may differ from telepsychiatric treatment in outpatient clinics in important ways. Because the patients are in correctional facilities, it is most likely they will have at least one staff member present during their telepsychiatry session. This eliminates the privacy usually available in a physician/patient relationship. Indeed, the youths in the Myers article expressed concerns about their lack of privacy. It would be difficult to eliminate this problem completely, as correctional facilities must maintain safety and security at all costs. This lack of privacy may be most noticeable to those patients who have had outpatient experiences with psychiatric providers outside the correctional system.

When initiating a telepsychiatry service within a correctional facility, it will be important to clearly identify the facility's expectations of the psychiatrist and the limits of the physician/patient relationship. It should be understood how the recommendations made will be carried out by correctional facility staff. In addition, a plan would be needed for dealing with patient problems when the psychiatrist is not available. It will also be important to plan ahead and anticipate how potential growth of a telepsychiatry clinic will be handled in order to ensure adequate time for new evaluations and follow-up treatment.

## OPPORTUNITIES FOR CORRECTIONAL AND FORENSIC PSYCHIATRY

Despite the methodological cautions, there are no data that demonstrate that telepsychiatric services are harmful, either to general psychiatric patients, children, or to prisoners. It appears that telepsychiatric assessments are acceptable to individuals in forensic and correctional facilities, and that telepsychiatric services can be used effectively with prisoners with certain psychiatric disorders. More comparisons on specific psychiatric subgroups, using specific treatment interventions, are needed to optimally match the technological medium of intervention with particular prisoner or patient problems.

While telepsychiatry seems to be a viable option for providing psychiatric care to those in correctional facilities, there is still a need for more research in this field. Comparing telephone and telepsychiatry treatments with each other and with usual care would be useful, as telephonic consultation may be more feasible than videoconferencing in some correctional settings. It would also be beneficial to look at efficacy differences for different disorders and for differences related to demographic factors such as age, race, and gender.

In terms of the long-term development of telepsychiatry, we offer the following recommendations for correctional systems.

1. Foster pilot projects in telepsychiatry, particularly utilizing evidence-based approaches.
2. Aggressively pursue tele-training, leveraging existing resources to the greatest practical extent. Extensive high-speed networking and videoconferencing

Copyright © 2008 John Wiley & Sons, Ltd.    Behav. Sci. Law 26: 253–269 (2008)<br>DOI: 10.1002/bsl

resources may already be in place. Additional video-conferencing resources may be available through public and private higher education institutions, Area Health Education Center (AHEC) offices, and Public Health systems.

3. In situations where teleconferencing cannot be implemented, telephone services should be considered.

4. The correctional systems should look to professional societies and other states' telepsychiatry programs to develop guidelines and best practices.

5. The forensic systems should identify technology infrastructure needs, and then implement a plan to meet these needs. There are many Federal programs that can assist with infrastructure, including the FCC Universal Services Fund (communications subsidies) and the U.S. Department of Agriculture/Rural Utility Service's Telemedicine and Distance Learning grant and loan program (equipment purchases).

# REFERENCES

Alessi, N. E. (2003). Quantitative documentation of the therapeutic efficacy of adolescent telepsychiatry. *Telemedicine Journal and E-Health*, *9*(3), 283–289.

American Psychiatric Association resource document on telepsychiatry via videoconferencing. (1998). Retrieved September 13, 2007, from http://www.psych.org/psych_pract/tp_paper.cfm

Baer, L., Cukor, P., Jenike, M. A., Leahy, L., O'Laughlen, J., & Coyle, J. T. (1995). Pilot studies of telemedicine for patients with obsessive–compulsive disorder [see comment]. *American Journal of Psychiatry*, *152*(9), 1383–1385.

Bishop, J. E., O'Reilly, R. L., Maddox, K., & Hutchinson, L. J. (2002). Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *Journal of Telemedicine and Telecare*, *8*(4), 217–221.

Bose, U., McLaren, P., Riley, A., & Mohammedali, A. (2001). The use of telepsychiatry in the brief counseling of non-psychotic patients from an inner-London general practice. *Journal of Telemedicine and Telecare*, *7*(Suppl. 1), 8–10.

Bouchard, S., Paquin, B., Payeur, R., Allard, M., Rivard, V., Fournier, T., et al. (2004). Delivering cognitive–behavior therapy for panic disorder with agoraphobia in videoconference. *Telemedicine Journal and E-Health*, *10*(1), 13–25.

Bouchard, S., Payeur, R., Rivard, V., Allard, M., Paquin, B., Renaud, P., et al. (2000). Cognitive behavior therapy for panic disorder with agoraphobia in videoconference: Preliminary results. *CyberPsychology and Behavior*, *3*(6), 999–1007.

Brodey, B. B., Claypoole, K. H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *Psychiatric Services*, *51*(10), 1305–1307.

Cluver, J. S., Schuyler, D., Frueh, B. C., Brescia, F., & Arana, G. W. (2005). Remote psychotherapy for terminally ill cancer patients. *Journal of Telemedicine and Telecare*, *11*(3), 157–159.

Cullum, C. M., Weiner, M. F., Gehrmann, H. R., & Hynan, L. S. (2006). Feasibility of telecognitive assessment in dementia. *Assessment*, *13*(4), 385–390.

De Las Cuevas, C., Arredondo, M. T., Cabrera, M. F., Sulzenbacher, H., & Meise, U. (2006). Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. *Telemedicine Journal and E-Health*, *12*(3), 341–350.

Deitsch, S. E., Frueh, B. C., & Santos, A. B. (2000). Telepsychiatry for post-traumatic stress disorder. *Journal of Telemedicine and Telecare*, *6*(3), 184–186.

Dongier, M., Tempier, R., Lalinec-Michaud, M., & Meunier, D. (1986). Telepsychiatry: Psychiatric consultation through two-way television. A. controlled study. *Canadian Journal of Psychiatry—Revue Canadienne de Psychiatrie*, *31*(1), 32–34.

Elford, R., White, H., Bowering, R., Ghandi, A., Maddigan, B., St John, K., et al. (2000). A. randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *Journal of Telemedicine and Telecare*, *6*(2), 73–82.

Fortney, J. C., Pyne, J. M., Edlund, M. J., Williams, D. K., Robinson, D. E., Mittal, D., et al. (2007). A. randomized trial of telemedicine-based collaborative care for depression [electronic version]. *Journal of General Internal Medicine*, *22*(8), 1086–1093.

Copyright © 2008 John Wiley & Sons, Ltd.

268    D. J. Antonacci *et al.*

Frueh, B. C., Henderson, S., & Myrick, H. (2005). Telehealth service delivery for persons with alcoholism. *Journal of Telemedicine and Telecare*, *11*(7), 372–375.

Frueh, B. C., Monnier, J., Elhai, J. D., Grubaugh, A. L., & Knapp, R. G. (2004). Telepsychiatry treatment outcome research methodology: Efficacy versus effectiveness. *Telemedicine Journal and E-Health*, *10*(4), 455–458.

Greenwood, J., Chamberlain, C., & Parker, G. (2004). Evaluation of a rural telepsychiatry service. *Australasian Psychiatry*, *12*(3), 268–272.

Griffiths, L., Blignault, I., & Yellowlees, P. (2006). Telemedicine as a means of delivering cognitive–behavioral therapy to rural and remote mental health clients. *Journal of Telemedicine and Telecare*, *12*(3), 136–140.

Grigsby, J., Rigby, M., Hiemstra, A., House, M., Olsson, S., & Whitten, P. (2002). Telemedicine/telehealth: An international perspective. The diffusion of telemedicine. *Telemedicine Journal and E-Health*, *8*(1), 79–94.

Hersh, W., Helfand, M., Wallace, J., Kraemer, D., Patterson, P., Shapiro, S., et al. (2002). A systematic review of the efficacy of telemedicine for making diagnostic and management decisions. *Journal of Telemedicine and Telecare*, *8*(4), 197–209.

Himle, J. A., Fischer, D. J., Muroff, J. R., Van Etten, M. L., Lokers, L. M., Abelson, J. L., et al. (2006). Videoconferencing-based cognitive–behavioral therapy for obsessive–compulsive disorder. *Behaviour Research and Therapy*, *44*(12), 1821–1829.

Hyler, S. E., Gangure, D. P., & Batchelder, S. T. (2005). Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. *CNS Spectrums*, *10*(5), 403–413.

Jones, B. N., III, Johnston, D., Reboussin, B., & McCall, W. V. (2001). Reliability of telepsychiatry assessments: Subjective versus observational ratings. *Journal of Geriatric Psychiatry and Neurology*, *14*(2), 66–71.

Kennedy, C., & Yellowlees, P. (2000). A community-based approach to evaluation of health outcomes and costs for telepsychiatry in a rural population: Preliminary results. *Journal of Telemedicine and Telecare*, *6*(Suppl. 1), S155–S157.

Kennedy, C., & Yellowlees, P. (2003). The effectiveness of telepsychiatry measured using the Health of the Nation Outcome Scale and the Mental Health Inventory. *Journal of Telemedicine and Telecare*, *9*(1), 12–16.

Krupinski, E., Nypaver, M., Poropatich, R., Ellis, D., Safwat, R., & Sapci, H. (2002). Telemedicine/telehealth: An international perspective. Clinical applications in telemedicine/telehealth. *Telemedicine Journal and E-Health*, *8*(1), 13–34.

Leonard, S. (2004). The development and evaluation of a telepsychiatry service for prisoners. *Journal of Psychiatric and Mental Health Nursing*, *11*(4), 461–468.

Lexcen, F. J., Hawk, G. L., Herrick, S., & Blank, M. B. (2006). Use of video conferencing for psychiatric and forensic evaluations. *Psychiatric Services*, *57*(5), 713–715.

Lovell, K., Cox, D., Haddock, G., Jones, C., Raines, D., Garvey, R., et al. (2006). Telephone administered cognitive behaviour therapy for treatment of obsessive compulsive disorder: Randomised controlled non-inferiority trial [electronic version]. *British Medical Journal*, *333*(7574), 883.

Marcin, J. P., Nesbitt, T. S., Cole, S. L., Knuttel, R. M., Hilty, D. M., Prescott, P. T., et al. (2005). Changes in diagnosis, treatment, and clinical improvement among patients receiving telemedicine consultations. *Telemedicine Journal and E-Health*, *11*(1), 36–43.

Matsuura, S., Hosaka, T., Yukiyama, T., Ogushi, Y., Okada, Y., Haruki, Y., et al. (2000). Application of telepsychiatry: A preliminary study. *Psychiatry and Clinical Neurosciences*, *54*(1), 55–58.

McAlister, F. A., & Sackett, D. L. (2001). Active-control equivalence trials and antihypertensive agents. *American Journal of Medicine*, *111*(7), 553–558.

Modai, I., Jabarin, M., Kurs, R., Barak, P., Hanan, I., & Kitain, L. (2006). Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. *Telemedicine Journal and E-Health*, *12*(5), 515–520.

Morland, L. A., Pierce, K., & Wong, M. Y. (2004). Telemedicine and coping skills groups for pacific island veterans with post-traumatic stress disorder: A pilot study. *Journal of Telemedicine and Telecare*, *10*(5), 286–289.

Myers, K. M., Sulzbacher, S., & Melzer, S. M. (2004). Telepsychiatry with children and adolescents: Are patients comparable to those evaluated in usual outpatient care? *Telemedicine Journal and E-Health*, *10*(3), 278–285.

Myers K. M., Valentine, J., Morganthaler, R., & Melzer, S. (2006). Telepsychiatry, with incarcerated youth. *Journal of Adolescent Health*, *38*(6), 643–648.

Nelson, E. L., Barnard, M., & Cain, S. (2003). Treating childhood depression over videoconferencing. *Telemedicine Journal and E-Health*, *9*(1), 49–55.

Nelson, E., Zaylor, C., & Cook, D. (2004). A comparison of psychiatrist evaluation and patient symptom report in a jail telepsychiatry clinic. *Telemedicine Journal and E-Health*, *10*(Suppl. 2), s54–s59.

Copyright © 2008 John Wiley & Sons, Ltd.    Behav. Sci. Law **26**: 253–269 (2008)
DOI: 10.1002/bsl

Neufeld, J. D., Yellowlees, P. M., Hilty, D. M., Cobb, H., & Bourgeois, J. A. (2007). The e-mental health consultation service: Providing enhanced primary-care mental health services through telemedicine. *Psychosomatics, 48*(2), 135–141.

New Freedom Commission on Mental Health, Subcommittee on Rural Issues: Background paper. (2004). DHHS Pub. No. SMA-04-3890. Rockville, MD.

O'Reilly, R., Bishop, J., Maddox, K., Hutchinson, L., Fisman, M., & Takhar, J. (2007). Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. *Psychiatric Services, 58*(6), 836–843.

Poon, P., Hui, E., Dai, D., Kwok, T., & Woo, J. (2005). Cognitive intervention for community-dwelling older persons with memory problems: Telemedicine versus face-to-face treatment. *International Journal of Geriatric Psychiatry, 20*(3), 285–286.

Rollman, B. L., Belnap, B. H., Mazumdar, S., Houck, P. R., Zhu, F., Gardner, W., et al. (2005). A. randomized trial to improve the quality of treatment for panic and generalized anxiety disorders in primary care. *Archives of General Psychiatry, 62*(12), 1332–1341.

Ruskin, P. E., Silver-Aylaian, M., Kling, M. A., Reed, S. A., Bradham, D. D., Hebel, J. R., et al. (2004). Treatment outcomes in depression: Comparison of remote treatment through telepsychiatry to in-person treatment. *American Journal of Psychiatry, 161*(8), 1471–1476.

Ryan, P., Kobb, R., & Hilsen, P. (2003). Making the right connection: Matching patients to technology. *Telemedicine Journal and E-Health, 9*(1), 81–88.

Savin, D., Garry, M. T., Zuccaro, P., & Novins, D. (2006). Telepsychiatry for treating rural American Indian youth. *Journal of the American Academy of Child and Adolescent Psychiatry, 45*(4), 484–488.

Shepherd, L., Goldstein, D., Whitford, H., Thewes, B., Brummell, V., & Hicks, M. (2006). The utility of videoconferencing to provide innovative delivery of psychological treatment for rural cancer patients: Results of a pilot study. *Journal of Pain and Symptom Management, 32*(5), 453–461.

Shore, J. H., & Manson, S. M. (2004). Telepsychiatric care of American Indian veterans with post-traumatic stress disorder: Bridging gaps in geography, organizations, and culture. *Telemedicine Journal and E-Health, 10*(Suppl. 2), s64–s69.

Shore, J. H., Savin, D., Orton, H., Beals, J., & Manson, S. M. (2007). Diagnostic reliability of telepsychiatry in American Indian veterans. *American Journal of Psychiatry, 164*(1), 115–118.

Simon, G. E., Ludman, E. J., Tutty, S., Operskalski, B., & Von Korff, M. (2004). Telephone psychotherapy and telephone care management for primary care patients starting antidepressant treatment: A randomized controlled trial [electronic version]. *Journal of the American Medical Association, 292*(8), 935–942.

Starling, J., Rosina, R., Nunn, K., & Dossetor, D. (2003). Child and adolescent telepsychiatry in New South Wales: Moving beyond clinical consultation. *Australasian Psychiatry, 11*(s1), S117–S121.

Thomas, C. R., Miller, G., Hartshorn, J. C., Speck, N. C., & Walker, G. (2005). Telepsychiatry program for rural victims of domestic violence. *Telemedicine Journal and E-Health, 11*(5), 567–573.

Urness, D., Wass, M., Gordon, A., Tian, E., & Bulger, T. (2006). Client acceptability and quality of life—Telepsychiatry compared to in-person consultation. *Journal of Telemedicine and Telecare, 12*(5), 251–254.

Zarate, C. A., Jr, Weinstock, L., Cukor, P., Morabito, C., Leahy, L., Burns, C., et al. (1997). Applicability of telemedicine for assessing patients with schizophrenia: Acceptance and reliability. *Journal of Clinical Psychiatry, 58*(1), 22–25.

Zaylor, C. (1999). Clinical outcomes in telepsychiatry. *Journal of Telemedicine and Telecare, 5*(Suppl. 1), S59–60.

Zaylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a prison telepsychiatry clinic. *Journal of Telemedicine and Telecare, 7*(Suppl. 1), 47–49.

Zaylor, C., Whitten, P., & Kingsley, C. (2000). Telemedicine services to a county jail. *Journal of Telemedicine and Telecare, 6*(Suppl. 1), S93–S95.

Copyright © 2008 John Wiley & Sons, Ltd.

Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

REV COLOMB PSIQUIAT. 2017;46(2):65–73





REVISTA COLOMBIANA DE

# PSIQUIATRÍA

www.elsevier.es/rcp



## Original article

# Cost-effectiveness of synchronous vs. asynchronous telepsychiatry in prison inmates with depression[☆],[☆☆]


CrossMark

Camilo Barrera-Valencia[a,*], Alexis Vladimir Benito-Devia[b], Consuelo Vélez-Álvarez[c], Mario Figueroa-Barrera[d], Sandra Milena Franco-Idárraga[c]

[a] Grupo Telesalud, Facultad de Ciencias para la Salud, Universidad de Caldas, Manizales, Colombia
[b] Comité de Estudios Médicos CREIMED SAS, Medellín, Colombia
[c] Departamento de Salud Pública, Grupo de Investigación, Promoción de Salud y Prevención de la Enfermedad, Universidad de Caldas, Manizales, Colombia
[d] Departamento de Salud Mental, Facultad de Ciencias para la Salud, Universidad de Caldas, Manizales, Colombia

ARTICLE INFO

Article history:
Received 26 August 2015
Accepted 15 April 2016
Available online 2 June 2017

Keywords:
Telepsychiatry
Synchronous
Asynchronous
Prisons
Cost-effectiveness

ABSTRACT

*Introduction:* Telepsychiatry is defined as the use of information and communication technology (ICT) in providing remote psychiatric services. Telepsychiatry is applied using two types of communication: synchronous (real time) and asynchronous (store and forward).
*Objective:* To determine the cost-effectiveness of a synchronous and an asynchronous telepsychiatric model in prison inmate patients with symptoms of depression.
*Methods:* A cost-effectiveness study was performed on a population consisting of 157 patients from the *Establecimiento Penitenciario y Carcelario de Mediana Seguridad de Manizales*, Colombia. The sample was determined by applying Zung self-administered surveys for depression (1965) and the Hamilton Depression Rating Scale (HDRS), the latter being the tool used for the comparison.
*Results:* Initial Hamilton score, arrival time, duration of system downtime, and clinical effectiveness variables had normal distributions ($p > 0.05$). There were significant differences ($p < 0.001$) between care costs for the different models, showing that the mean cost of the asynchronous model is less than synchronous model, and making the asynchronous model more cost-effective.
*Conclusions:* The asynchronous model is the most cost-effective model of telepsychiatry care for patients with depression admitted to a detention centre, according to the results of clinical effectiveness, cost measurement, and patient satisfaction.

© 2016 Asociación Colombiana de Psiquiatría. Published by Elsevier España, S.L.U. All rights reserved.

---

☆ This article is registered within COLCIENCIAS summons 604-2012, with the research project entitled "Effectiveness of a synchronous vs asynchronous telepsychiatry model on the mental health of prison inmates".
☆☆ Please cite this article as: Barrera-Valencia C, Benito-Devia AV, Vélez-Álvarez C, Figueroa-Barrera M, Franco-Idárraga SM. Costo-efectividad de telepsiquiatría sincrónica frente a asincrónica para personas con depresión privadas de la libertad. Rev Colomb Psiquiat. 2017;46:65–73.
* Corresponding author.
  E-mail addresses: camilobarrera32@gmail.com, consuelo.velez@ucaldas.edu.co (C. Barrera-Valencia).
http://dx.doi.org/10.1016/j.rcpeng.2017.05.005
2530-3120/© 2016 Asociación Colombiana de Psiquiatría. Published by Elsevier España, S.L.U. All rights reserved.

66                     REV COLOMB PSIQUIAT. 2017;46(2):65-73

### Costo-efectividad de telepsiquiatría sincrónica frente a asincrónica para personas con depresión privadas de la libertad

R E S U M E N

*Palabras clave:*
Telepsiquiatría
Sincrónico
Asincrónico
Prisiones
Costo-efectividad

*Introducción:* La telepsiquiatría se define como la utilización de las tecnologías de la información y la comunicación (TIC) en la prestación de servicios de psiquiatría a distancia. La aplicación de la telepsiquiatría está dada por dos tipos diferentes de comunicación: sincrónico (tiempo real) y asincrónico (tiempo diferido).

*Objetivo:* Determinar la costo-efectividad de un modelo de telepsiquiatría sincrónico frente a otro asincrónico en pacientes con síntomas de depresión internados en un centro de privación de libertad.

*Métodos:* Se realizó un estudio de costo-efectividad. Constituyeron la población 157 pacientes del Establecimiento Penitenciario y Carcelario de Mediana Seguridad de Manizales, Colombia. La muestra se determinó con la encuesta autoaplicable Zung para la depresión (1965) y la escala de valoración de Hamilton para la evaluación de la depresión (*Hamilton depression rating scale* [HDRS]), instrumento con que se realizó la comparación.

*Resultados:* Las variables Hamilton inicial, tiempo de llegada, duración de caídas del sistema y efectividad clínica presentaron distribución normal con p > 0,05; entre los diferentes modelos hubo diferencias significativas (p < 0,001) en los costos de atención, y se evidenció que, en promedio, el costo del modelo asincrónico es menor que el del sincrónico; en promedio, la modalidad asincrónica es más costo-efectiva.

*Conclusiones:* El modelo de atención más costo-efectivo en telepsiquiatría para pacientes con trastorno depresivo internados en un centro de privación de libertad es el asincrónico según los resultados de efectividad clínica, medición de costos y satisfacción del paciente.

© 2016 Asociación Colombiana de Psiquiatría. Publicado por Elsevier España, S.L.U. Todos los derechos reservados.

## Introduction

The World Health Organisation (WHO) estimates that in 2020, mental illness will affect 15% of the global population.[1] At present, depression represents 4.3% of the world's disease burden, making it one of the main causes of disability worldwide.[2] This has led to a search for innovative solutions to tackle mental health problems that go beyond any operational capacity of the current health services. According to the WHO, the future of medicine lies in transforming the exercise through communication and getting ahead of the looming crisis in patient care.[3] Telepsychiatry is a clear example of this and constitutes an important tool for solving problems related to accessing health services in remote areas and/or areas that have a limited offering.[4] In general terms, telepsychiatry is defined as the use of information and communication technologies (ICT) in the provision of remote psychiatry services.[5] Telepsychiatry is applied using two different types of communication (synchronous and asynchronous), which are studied in this research.

In the synchronous or real-time modality, the patient and psychiatrist interact within the same temporal framework through live broadcasting systems, including telephone, chat and videoconferencing.[6] The latter is the most widely used technology[7] and the one with which most telepsychiatry sessions have been undertaken.[8] The psychiatrist interviews the patient in real-time and issues a diagnosis and treatment on completing the consultation. It is worth mentioning that, due to regulatory provisions regarding telemedicine in Colombia, the patient must be accompanied by a general practitioner from start to finish, who attends to the patient if necessary and is responsible for completing and delivering the medical prescription to the patient.[9] The second form of communication is the asynchronous or delayed-time modality, also known as store-and-forward. The aim of this technique is to obtain a psychiatrist's second opinion on the diagnosis and management of the patient. A general practitioner gathers and sends all the information (data, audio or video) to the psychiatrist, who responds within 8–24 h (as previously agreed between the parties – there is no standard time frame); the general practitioner then delivers the respective treatment and management plan to the patient.[10]

In Colombia, the application of telepsychiatry forms part of Law 1419 of 2010, which also establishes the guidelines for implementing telehealth. It is likewise provided for in Agreement 029, regulating the use of telemedicine to facilitate timely access to services within the Mandatory Health Plan, and Resolution 2003 of 2014, which sets forth the technical procedures for its implementation. This resolution specifies the privacy and security conditions for patient data through the standard of medical histories and records; thus: "The remitting providers shall adopt the necessary safety measures during the transfer and storage

of data, guaranteeing the privacy of the document and taking into account the guidelines established to that effect by the Ministry of Health and Social Protection" and "the provider shall encrypt the information for its transmission and create mechanisms of access to said information in accordance with institutional policies". Statutory Law 1581 of 2012 also ratifies the privacy of personal data and their protection.

In 1995, researchers from Harvard Medical School presented the results of a research project on 26 patients treated in-person versus virtually, with similar results between the two groups.[11] It should be emphasised that a significant percentage of psychiatric disorders can be diagnosed and treated by means of telepsychiatry, although there are certain situations that require specific considerations, such as patients with suicidal ideation and those who present decompensated borderline personality disorder, among others.[4] In other systematic literature reviews, the benefits of telepsychiatry are presented as an effective alternative for patient care, although this is only in reference to the synchronous modality and thus evinces the need to consider cost-effectiveness studies in greater depth.[12]

Although telepsychiatry is seen to be an important strategy for remote populations,[13,14] there are population groups with special characteristics, such as in prisons and penitentiaries, which make them particularly isolated and difficult-to-access.[7] In Colombia, these detention centres present important limitations in terms of access and availability. In the survey conducted in 2010 by the Colombian Ombudsman's Office, it was found that only 22% of detention centres have a permanent psychiatrist, while the others use outpatient care, with considerable difficulties, according to patients and relatives, regarding the quality of care provided; they also state that the care given by the psychiatrist is slow, cumbersome and, in some cases, non-existent.[15] This clearly demonstrates serious problems in the care model, as confirmed in an interview with healthcare personnel from the Medium-Security Penitentiary and Prison Establishment of Manizales and Pereira, which affirms the following: (a) difficult management of patient emergencies that require a psychiatric assessment due to there being no access to a specialist physician and difficulty transferring them to a care centre due to administrative and safety procedures; (b) short consultation time due to the high number of patients and the little time spent by the psychiatrist at the detention centre, and (c) impossibility of treating the entire population requiring the service, leading to the prioritisation of the most critical cases.

The first use of telepsychiatry in prisons was reported in Miami in 1974 through a microwave link. It was not possible to maintain the system due to its high cost.[16] In the United States, around 2 million adults are detained in prisons, and more than half report some kind of symptom associated with a mental illness.[17] Between 1993 and 1996, videoconferencing increased from 1750 to 18,766 cases in correctional and non-correctional centres.[18] In another study, the use of telepsychiatry in prisons was assessed in seven American states, and it was concluded that this mode of care increases access to mental health services through treatment continuity, thus improving patients' quality of life and prison safety. Similarly, a decrease in care-related costs was also evident.[19]

Moreover, as regards cost-effectiveness studies included in economic healthcare evaluations, these are defined as the comparison of two or more potentially competitive and, in general, mutually exclusive intervention alternatives.[20] In the case of this study, the synchronous and asynchronous telepsychiatry care modalities were compared in prison inmates with depression, in order to determine which is the most cost-effective.

## Material and methods

A cost-effectiveness study was conducted. The population comprised 157 patients from the Medium-Security Penitentiary and Prison Establishment of Manizales (MSPPE). The sample was determined using the Zung Self-Rating Depression Scale (1965).[21] Subsequently, the people within the "mild depression" and "very severe depression" bracket of Zung's scale were selected and informed consent was requested. The people who consented were enrolled in the study. Those who did not give their consent and had assessed themselves as depressed were put in touch with the institution's health service for management. The Hamilton Depression Rating Scale (HDRS)[22] was then applied, which is a 17-question scale used by general practitioners, designed to quantitatively evaluate symptom severity and assess changes in the depressed patient. The scoring range goes from 0 to >23. The sum of all the questions classifies people as: normal 0–7; mild depression 8–13; moderate depression 14–18; severe depression 19–22; and very severe depression >23. The people from the sample with a positive HDRS score, i.e. in the mild-very severe depression bracket, were randomly assigned to a synchronous or asynchronous telepsychiatry care model. The study sample comprised a total of 106 patients in whom depression was eventually reconfirmed. The following inclusion criteria were considered: male over 18 years of age, referred by the general practitioner with a positive HDRS score and signature of the informed consent form. As regards the exclusion criteria, the following aspects were taken into account: visual impairment, hearing impairment, currently undergoing psychiatric treatment and failure to sign the informed consent form. Subsequently, a date for telemedicine care was assigned in accordance with the permits granted by the Colombian Penitentiary and Prison Institute (INPEC) for this activity. The patients in the asynchronous modality were interviewed and assessed in the prison by a general practitioner who, in turn, sent all of the patient's clinical information to a psychiatrist via a telemedicine technology platform for assessment, who then issued a final diagnosis and treatment. The mean response time of the psychiatrist was 8 hours. The general practitioner then logged onto the platform to check the management approach issued by the specialist and to complete the medical prescription, pharmacological treatment, where applicable, and follow-up appointment, as appropriate. The patients in the synchronous modality were directly assessed by the psychiatrist via videoconferencing; in this same consultation the diagnosis was issued and the medical prescription

68    REV COLOMB PSIQUIAT. 2017;**46(2)**:65–73

completed, along with the pharmacological treatment, if required, and the follow-up appointment. During the follow-up appointment, the HDRS was reissued in both models, which enabled assessment from the patient's perspective and determined whether the patient had improved, deteriorated or remained the same with respect to the first HDRS applied.

In the data analysis, the synchronous and asynchronous model was assumed as the independent variable, while the dependent variables were clinical progression, remission, patient satisfaction and costs. The statistical analysis consisted in establishing the relationship between the different variables proposed. Parametric tests (Student's t test, $\chi^2$ and ANOVA, as appropriate) were applied to the normal distribution variables, while non-parametric tests (Fisher's exact test, Mann–Whitney $U$ test, Wilcoxon $W$ test, Wilcoxon $T$ test, McNemar's test and Kruskal–Wallis test) were applied to non-normally distributed variables. For the cost-effectiveness analysis, the direct costs of the study were estimated, which include, among others, the technology platform, connectivity, human resources and consumables.

**Study 1 hypothesis.** The effectiveness on the mental health of prison inmates treated in the synchronous and asynchronous telepsychiatry modalities is the same.

**Study 2 hypothesis.** The consultation costs of the synchronous and asynchronous telepsychiatry models are different, and are higher in the synchronous model since this seemingly involves more of the psychiatrist's time due to the duration of the consultation and a more complex infrastructure.

The informed consent form was approved by the Bioethics Committee of the University of Caldas, Act no. 002 of 2014, based on the Ministry of Health Resolution 008430 of 1993 on scientific, technical and administrative standards for health research, in this case for a vulnerable population/subordinate subjects.

## Results

The Kolmogorov–Smirnov test was applied to establish normality. The results obtained in the test indicate that the baseline Hamilton variables, arrival time, duration of system failures and clinical effectiveness present normal distribution ($p > 0.05$).

### Component: clinical effectiveness

This provides a response to the study 1 hypothesis, which considers the need to establish whether the effectiveness on the mental health of prison inmates treated in the synchronous and asynchronous telepsychiatry modalities is the same. Clinical effectiveness is defined by the progression of the depression symptoms shown by a patient through the baseline and final HDRS score. The following statistical tests were performed to that effect:

**Table 1 – Descriptive statistics of the Hamilton test group.**

| Model | Patients (n) | Mean ± SD | SEM |
|---|---|---|---|
| *Baseline Hamilton score* | | | |
| Asynchronous | 53 | 16.43 ± 5.235 | 0.719 |
| Synchronous | 53 | 14.28 ± 3.666 | 0.504 |

SD: standard deviation; SEM: standard error of the mean.

**Table 2 – Paired means test on baseline versus final Hamilton variables.**

| Model | Subjects (n) | Average range | Sum of ranges | p |
|---|---|---|---|---|
| **Asynchronous** | | | | |
| *Final Hamilton–baseline Hamilton* | | | | |
| Negative ranges | 46[a] | 25.15 | 1157.00 | <0.001 |
| Positive ranges | 2[b] | 9.50 | 19.00 | |
| Ties | 2[c] | | | |
| Total | 50 | | | |
| **Synchronous** | | | | |
| *Final Hamilton–baseline Hamilton* | | | | |
| Negative ranges | 33[a] | 25.64 | 846.00 | 0.003 |
| Positive ranges | 14[b] | 20.14 | 282.00 | |
| Ties | 2[c] | | | |
| Total | 49 | | | |

*Test of means to demonstrate any differences in the baseline Hamilton scores between the synchronous and asynchronous modalities*

Significant differences were found in the means corresponding to the baseline Hamilton score between both models ($p = 0.016$), with a higher level of mean depression in the asynchronous model (16.43 > 14.28) (Table 1), thus demonstrating that, on average, the patients treated with the asynchronous model presented more severe symptoms of depression than those treated with the synchronous model.

*Paired means test on baseline versus final Hamilton variables for the asynchronous versus synchronous models to demonstrate progression in the treatment*

The results of the Wilcoxon test for the progression of paired variables showed that there is a progression in the final versus baseline score of the Hamilton scale in the two models, which demonstrates that both present significant advances in treating depression (asynchronous model, $p < 0.001$, i.e. highly effective; synchronous model, $p = 0.003$, i.e. very effective) (Table 2).

*Means analysis of the final Hamilton variable for the asynchronous versus synchronous modalities to demonstrate differences in the final state of the treatment for each model*

Differences were seen in the average scores of the final Hamilton scale between the two telepsychiatry models, with the average value being better in the asynchronous model ($p = 0.010 < p = 0.05$). This lower result indicates an

**Table 3 – Clinical effectiveness with the asynchronous versus synchronous modalities in the Hamilton scale group.**

| Model | Subjects (n) | Mean ± SD | SEM |
|---|---|---|---|
| Asynchronous | 50 | 7.9200 ± 5.92415 | 0.83780 |
| Synchronous | 49 | 2.8776 ± 6.46669 | 0.92381 |

SD: standard deviation; SEM: standard error of the mean.

improvement in the depressive symptoms suffered by the assessed patients.

*Tests for the equality of the mean progression in the Hamilton scale, with the asynchronous versus synchronous modalities, in order to demonstrate differences in the effectiveness of each model*

There were significant differences ($p < 0.001$) regarding the mean clinical effectiveness of each model, which was greater with the asynchronous model with an average change close to 8 points on the HDRS, compared to 3 points with the synchronous model (Tables 3 and 4).

*Conclusions on study 1 hypothesis:* Although it is certain that both models (asynchronous and synchronous) present proven clinical effectiveness, i.e. progression in the HDRS following treatment, this is not associated with variables such as age, sentence duration, perceived quality of treatment and time employed, which is an excellent result that indicates the significance of telepsychiatry care. Nevertheless, it is worth noting that the clinical effectiveness results obtained with the asynchronous model are higher than those with the synchronous model.

*Component: cost-related care times*

Analysing consultation costs in the synchronous and asynchronous telepsychiatry models is based on the variability of the care times that each modality involves, in the sense that the costing of wage factors of the health professionals involved in treatment may be used to establish the variable costs that influence the cost-effectiveness model through consultation times and poor quality times that affect the total cost. On a preliminary basis, it can be established that a higher cost is expected in the synchronous model, as this seemingly

requires more professional time due to the duration of the consultation as well as a more complex infrastructure.

There are no differences ($p = 0.140$) in the average initial consultation time with each model, which indicates regularity in the time spent by health professionals on comprehensive care processes.

The variables related to consultation time and clinical effectiveness were independent, thus indicating that time is not a determining factor in the patients' progression. Clinical and professional management variables through a specific model (synchronous or asynchronous), which enable the generation of effective telepsychiatry results, on the other hand, are determining factors.

*Equality analysis in average treatment costs and the different modalities in order to establish any significant differences*

On applying the Kruskal–Wallis test, significant differences were found between the different models ($p < 0.001$) for treatment costs: on average, the cost of the asynchronous model is less than half of the synchronous model treatment cost (Fig. 1).

Poor quality costs (time lost due to internet outage, delays in starting the medical consultation for logistical reasons, technology platform failure during the consultation, etc.) for consultations in the synchronous and asynchronous models are statistically equal ($p = 0.108$), which continues to indicate equality among the service provision conditions in treating depressed patients though one telepsychiatry modality or another.

*Conclusions on study 2 hypothesis:* The consultation costs of the synchronous and asynchronous telepsychiatry models are different and were found to be much higher in the synchronous model. Poor quality costs are equal in both modalities.

*Predictive model for the cost of treatment with each modality*

The model that best explains and predicts the cost of care was determined by establishing the following regression model:

$$\text{Cost treated} = \beta_0 + \beta_1 * \text{model} + \beta_2 * \text{duration of consultation}$$
$$+ \beta_3 * \text{Psychiatrist time}$$
$$+ \beta_4 * \text{Average satisfaction} + Ui$$

**Table 4 – Independent sample test.**

| | Levene's test for equality of variances | | T test for equality of means | | | | | |
|---|---|---|---|---|---|---|---|---|
| | F | p | t | df | p (two-tailed) | Mean difference | Standard error difference | 95% CI of the difference |
| *Clinical effectiveness* | | | | | | | | |
| Equal variances assumed | 0.007 | 0.933 | 4.047 | 97 | <0.001 | 5.04245 | 1.24602 | 2.56944–7.51545 |
| Equal variances not assumed | | | 4.043 | 95.887 | <0.001 | 5.04245 | 1.24713 | 2.56697–7.51802 |



Fig. 1 – Box plot of costs by model.

**Table 5 – Descriptive statistics of clinical effectiveness by model.**

| Model | Subjects (n) | Minimum | Maximum | Mean ± SD |
|---|---|---|---|---|
| Asynchronous | 50 | −5.00 | 23.00 | 7.9200 ± 5.92415 |
| Synchronous | 49 | −13.00 | 17.00 | 2.8776 ± 6.46669 |

SD: standard deviation.

It may be established that the cost of care is explained in 93.8% by the variables considered, that the model is correctly specified and that the validations relating to the significance of the coefficients in individual and group tests are significant and different from zero.

*Cost-effectiveness analysis of treatment in the asynchronous and synchronous models using the mean ratio method*

Finally, the cost-effectiveness analysis was performed using the mean ratio method, in which the average treatment cost variables were compared to the clinical effectiveness of treatment with each model (Table 5).

According to the results, the cost-effectiveness analysis of treatment using the mean ratio method for the asynchronous and synchronous modalities allows us to conclude that, on average, the asynchronous modality is most cost-effective.

## Discussion

Telepsychiatry has traditionally been provided in two modalities: synchronous and asynchronous.[23] Effectiveness studies, cost studies and some cost-effectiveness studies can be found in the literature,[7,24] applied to each of these modalities independently, but no research projects involving a comparative cost-effectiveness study on both modalities were discovered after searching the main scientific databases (MEDLINE, PubMed, PsychInfo, EMBASE, Science Citation Index, SciELO, Science Direct, LILACS, OVID, ProQuest and The Cochrane Library) and relevant scientific journals (*Psychiatr Serv, Journal of Telemedicine and Telecare* and *Telemedicine and e-Health*).

The results of this research study showed the effectiveness of the intervention in both telepsychiatry models (synchronous and asynchronous, which is the most effective). Moreover, synchronous telepsychiatry effectiveness studies through videoconferencing have been compared to face-to-face care, and the results demonstrate that telepsychiatry is a more effective alternative for providing mental health services.[25-27] Corroborating the above, a meta-analysis including 500 patients distributed across 14 studies concluded that there was no significant difference in precision and patient satisfaction in the provision of in-person versus virtual psychiatry services.[28] That said, no studies were found that assess the effectiveness of asynchronous telepsychiatry; one retrospective study conducted in India on 94 patients exclusively addressed the feasibility of this email-based care model and found that it could be used to establish a definitive diagnosis and recommend a suitable treatment in 95% of patients.[29] Moreover, the feasibility of the asynchronous model was also measured in a study sponsored by the University of California, this time by means of sending a video recording of the consultation to the

psychiatrist, obtaining a comparable result to the Indian study.[23]

In this research project, although no comparison was made between the in-person and virtual models, a relevant result was obtained in the sense that the effectiveness of the intervention with both telepsychiatry models—synchronous and asynchronous—was determined, the latter being the most effective.

Some studies recommend analysing not only effectiveness, but also the costs associated with telepsychiatry.[30,31] With regard to this variable, one study was identified that compared the synchronous and asynchronous models to face-to-face care. It found asynchronous care to be the most cost-effective due to a reduction in the specialist's intervention time, which is assumed by a general practitioner.[32]

On average, the asynchronous modality was found to be the most cost-effective in this research. Other studies also indicate factors contributing to this conclusion: basic infrastructure, easy management for healthcare personnel (e.g. via email),[25] reduction in the time required by the specialist to conclude consultations and exploiting specialists' downtime.[26]

As regards the synchronous modality, a study conducted in Israel concludes that it is even more costly than in-person care due to the technological infrastructure and human resources required.[33] The aforementioned Indian study adds to the cost analysis of the synchronous modality that, although the specialist's time is similar to face-to-face care, only travel costs are reduced. Moreover, it may even take more time because, on occasions, the logistics of connecting the patient and specialist in real-time is complex.[25]

In contrast, the costs analysed in a prison environment take on another dimension. There are studies in the United States that address the costs of telepsychiatry care in the synchronous modality versus in-person care, which calculate an average consultation cost of $173 compared to $71 when said care is carried out using videoconferencing.[34]

In summary, synchronous telepsychiatry has been shown to be just as effective as face-to-face psychiatric care. In contrast, in the asynchronous modality there are no previous studies that assess effectiveness, though there are some that prove its feasibility, i.e. that the provision of telepsychiatry services is possible in this modality.

That said, with regard to the costs of both modalities, the literature concludes that the asynchronous model is less costly, as opposed to the synchronous model, as the latter requires more time spent by the specialist, as well as a complex logistical and technological infrastructure.

Prison inmates are one of the population groups that could benefit most from telepsychiatry. Previous studies positively assessed the improvement in access to mental health services thanks to the continuity of the service provision, reduced care costs in this field,[20] improved safety of healthcare personnel[20] and the effectiveness of care.[35] Moreover, there are even reports that indicate that telepsychiatry has proven more effective than in-person care in the treatment of diseases such as depression.[36]

With the results obtained in this research, it may be affirmed that both telepsychiatry models were effective in treating depression in prisons. However, the cost-effectiveness analysis, which compared two intervention alternatives,[37] found the asynchronous modality to be superior to the synchronous model for the same condition. The reasons leading to this conclusion are grouped into three main categories: (a) clinical effectiveness; (b) care costs for each model, and (c) degree of satisfaction regarding the care received.

This research opens a new door for future analyses in the field, as, although positive results were obtained, the study was limited to a disease and population group with unique characteristics. The formation of interdisciplinary working teams to prepare the prison environment for a project such as this one is recommended, along with a multidimensional approach to patients that goes beyond purely clinical considerations, given the social, cultural, legal and institutional problems specific to a prison environment.

## Conclusions

The most cost-effective telepsychiatry care model for prison inmates with depression is the asynchronous model, as shown by the clinical effectiveness, cost measurement and patient satisfaction results.

This study has highlighted the need to carry out further research that assesses the synchronous versus asynchronous care models in telepsychiatry, in order to validate other conditions and different population groups with a greater number of experiences.

The novelty of this project stems from its contributions to the generation of new knowledge, as the literature review found no references of other research projects that assessed the cost-effectiveness of the synchronous versus asynchronous modalities in telepsychiatry.

## Ethical disclosures

**Protection of human and animal subjects.** The authors declare that no experiments were performed on humans or animals for this study.

**Confidentiality of data.** The authors declare that no patient data appear in this article.

**Right to privacy and informed consent.** The authors declare that no patient data appear in this article.

## Conflicts of interest

Alexis Vladimir Benito Devia owns shares in CREIMED, a beneficiary of the research project, and states: "We have received an entry from COLCIENCIAS and an offsetting entry from CREIMED. Neither institution has influenced or intervened in the conduct of the research or results, for which we were free to choose the team to perform the research,

**72**          REV COLOMB PSIQUIAT. 2017;**46(2)**:65–73

who were only selected for their technical and professional abilities".

## Acknowledgements

To the Ministry of Information and Communication Technologies (MinTIC) with the Innovation Hub programme; to the COLCIENCIAS Science, Technology and Innovation Department; to the University of Caldas and its Telehealth programme; to IPS CREIMED; to the Penitentiary and Prison Institute (INPEC) of the city of Manizales and the inmates who took part in the research project, for their support and collaboration in its conduct; and, finally, to the healthcare professionals and those from other fields who were involved in and supported the conduct of this study in one way or another to ensure a successful outcome.

REFERENCES

1. Organización Mundial de la Salud. Prevención de los trastornos mentales. Intervenciones efectivas y opciones de política. Informe compendiado Ginebra. 2004. Available in: http://www.who.int/mental_health/evidence/Prevention_of_mental_disorders_spanish_version.pdf.

2. WHO. Mental health action plan 2013–2020. Geneva: World Health Organization; 2013.

3. WHO. A health telematics policy. Geneva: WHO; 1997. Document DGO/98.1.

4. Cuevas G, Artiles J, de la Fuente J, Serrano P. Telepsiquiatría: utopía o realidad asistencial. Med Clin (Barc). 2003;121: 149-52.

5. Hilty DM, Luo JS, Morache C, Marcelo DA, Nesbitt TS. Telepsychiatry: an overview for psychiatrists. CNS Drugs. 2002;16:527–48.

6. Malhotra S, Chakrabarti S, Telepsychiatry Shah R. Promise, potential, and challenges. Indian J Psychiatry. 2013;55:3–11.

7. Garay Fernández JD, Gómez Restrepo C. Telepsiquiatría: Innovación de la atención en salud mental. Una perspectiva general. Rev Colomb Psiquiatr. 2011:40.

8. Antonacci DJ, Bloch RM, Saeed SA, Yildirim Y, Talley J. Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry. Behav Sci Law. 2008;26:253–69.

9. Resolución 2003 de 2014, por la cual se definen los procedimientos y condiciones de inscripción de los Prestadores de Servicios de Salud y de habilitación de servicios de salud. Bogotá: Ministerio de Salud y Protección Social de Colombia; 2014.

10. Wootton R, Liu J, Bonnardot L. Assessing the quality of teleconsultations in a store-and-forward telemedicine network. Frontiers Publ Health. 2014;2:82.

11. Baer L, Cukor P, Jenike MA, Leahy L, O'Laughlen J, Coyle JT. Pilot studies of telemedicine for patients with obsessive–compulsive disorder. Am J Psychiatry. 1995;152:1383–5.

12. Hilty DM, Lui W, Marks S, Callahan EJ. The effectiveness of telepsychiatry: a review. Bull CPA. 2003:2003.

13. Chipps J, Brysiewicz P, Mars M. Effectiveness and feasibility of telepsychiatry in resource constrained environments? A systematic review of the evidence. Afr J Psychiatry (Johannesbg). 2012;15:235–43.

14. Chong J, Moreno F. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. Telemed J E Health. 2012;18:297–304.

15. Situación de los internos con enfermedad mental sobrevenida en los establecimientos de reclusión del país. Informe defensorial. Bogotá: Defensoría del Pueblo; 2010.

16. Doarn CR, Justis D, Chaudhri MS, Merrell RC. Integration of telemedicine practice in correctional medicine: an evolving standard. J Correct Health Care. 2005;11:253–70.

17. Bureau of Justice Statistics. Special Report. September 2006, NCJ 213600. Available in: http://www.bjs.gov/content/pub/pdf/mhppji.pdf.

18. Miller TW, Clark J, Veltkampl J, Burton DC, Swope M. Teleconferencing model for forensic consultation, court testimony, and continuing education. Behav Sci Law. 2008;26:301–13.

19. Deslich SA, Thistlethwaite T, Coustasse A. Telepsychiatry in correctional facilities: using technology to improve access and decrease costs of mental health care in underserved populations. Perm J. 2013;17:80–6.

20. Febrer Carretero L, Iglesias García C, Mercadal Dalmau J, Ribera Pibernat M. Cómo entender un análisis de coste-efectividad. Piel. 2005;20:172–6.

21. Zung WW. A self-rating depression scale. Arch Gen Psychiatry. 1965;12:63–70.

22. Hamilton M. A rating scale for depression. J Neurol Neurosurg Psychiatry. 1960;23:56–62.

23. Yellowlees PM, Odor A, Parish MB, Iosif AM, Haught K, Hilty D. A feasibility study of the use of asynchronous telepsychiatry for psychiatric consultations. Psychiatr Serv. 2010;61:838–40.

24. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: a 2013 review. Telemed J E Health. 2013;19:444–54.

25. De Las Cuevas C, Arredondo MT, Cabrera MF, Sulzenbacher H, Meise U. Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. Telemed J E Health. 2006;12:341–50.

26. Castro A, Larraín A, Fritsch R, Rojas G. Telepsiquiatría: una revisión sistemática cualitativa. Rev Med Chile. 2012;140:789–96.

27. Ruskin PE, Silver-Aylaian M, Kling MA, Reed SA, Bradham DD, Hebel JR, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. Am J Psychiatry. 2004;161:1471-6.

28. Hyler SE, Gangure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. CNS Spectr. 2005;10:403–13.

29. Balasinorwala VP, Shah NB, Chatterjee SD, Kale VP, Matcheswalla YA. Asynchronous telepsychiatry in Maharashtra, India: study of feasibility and referral pattern. Indian J Psychol Med. 2014;36:299–301.

30. García-Lizana F, Muñoz-Mayorga I. What about telepsychiatry? A systematic review. Prim Care Companion J Clin Psychiatry. 2010:12.

31. Hyler SE, Gangure DP. A review of the costs of telepsychiatry. Psychiatr Serv. 2003;54:976–80.

32. Butler TN, Yellowlees P. Cost analysis of store-and-forward telepsychiatry as a consultation model for primary care. Telemed J E Health. 2012;18:74–7.

33. Modai I, Jabarin M, Kurs R, Barak P, Hanan I, Kitain L. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. Telemed J E Health. 2006;12:515–20.

34. Ax RK, Fagan TJ, Magaletta PR, Morgan RD, Nussbaum D, White TW. Innovations in correctional assessment services: Forging new frontiers in psychiatry in Western Australia. Australas Psychiatry. 2006;14:53–6.

REV COLOMB PSIQUIAT. 2017;**46(2)**:65–73

**73**

35. Zaylor C, Nelson EL, Cook DJ. Clinical outcomes in a prison telepsychiatry clinic. J Telemed Telecare. 2001;7 Suppl. 1:47–9.

36. Fortney JC, Pyne JM, Edlund MJ, Williams DK, Robinson DE, Mittal D, et al. A randomized trial of telemedicine-based collaborative care for depression. J Gen Intern Med. 2007;22:1086–93.

37. Zárate V. Evaluaciones económicas en salud: conceptos básicos y clasificación. Rev Med Chile. 2010;138 Suppl. 2:93–7.

Psychological Services
2016, Vol. 13, No. 3, 283–291

© 2016 American Psychological Association
1541-1559/16/$12.00    http://dx.doi.org/10.1037/ser0000078

# Connecting the Disconnected: Preliminary Results and Lessons Learned From a Telepsychology Initiative With Special Management Inmates

Ashley B. Batastini and Robert D. Morgan
Texas Tech University

The use of telepsychology, such as videoconferencing (VC) systems, has been rapidly increasing as a tool for the provision of mental health services to underserved clients in difficult to access settings. Inmates detained in restrictive housing appear to be at an increased risk of experiencing emotional and behavioral disturbances compared to their general population counterparts, yet they are less likely to receive appropriate treatment due to security constraints. The primary purpose of this article is to describe the process of implementing a novel telepsychology intervention specifically designed to offer group therapy to high-security, administratively segregated inmates. In addition, preliminary results on treatment and therapeutic process outcomes in a sample of 49 participants are reported. Although some evidence indicated that telepsychology was less preferred than in-person sessions, group differences on measures of psychological functioning and criminal thinking were not found across 3 conditions (telepsychology, in-person, and a no-treatment control). Furthermore, a number of limitations associated with program implementation and study design suggest that results are interpreted with caution and should not be used to discount the use of telepsychology as a viable treatment delivery option. Recommendations for future development and evaluation of telepsychological programs are discussed within the context of correctional settings and beyond.

*Keywords:* telepsychology, videoconferencing, group therapy, administrative segregation, solitary confinement

The use of special management, or administrative segregation housing, is an increasingly popular correctional practice intended to prevent inmates from inflicting harm on themselves or others, or conversely from being the target of harm by others (Fine & Wingrove, 2014; King, 1999; O'Keefe, 2008). Currently, over 80,000 inmates across the United States are being detained in these units (Stephan, 2008), where they spend approximately 23 to 24 hr a day in their cells. Although there has been some debate over the long-term psychological effects of using special management units to contain behavior (see Morgan et al., 2015 for a review), some negative outcomes have been documented. For example, in their recent meta-analysis, Morgan et al. (2015) found that segregated housing was associated with moderate increases in criminal recidivism and overall mental health impairment. Similarly, despite the intention to reduce incidents of self-harm, segregated inmates have been found to engage in these behaviors (including suicide) at

Ashley B. Batastini and Robert D. Morgan, Department of Psychological Sciences, Texas Tech University.

We thank the Kansas Department of Corrections for their support in this project. The views and opinions expressed herein represent those of the authors and do not necessarily reflect the views and opinions of Texas Tech University or KDOC. Ashley B. Batastini was located at Texas Tech University at the time this project was completed; she is currently affiliated with the Department of Psychology at the University of Southern Mississippi.

Correspondence concerning this article should be addressed to Ashley B. Batastini who is now at Department of Psychology, University of Southern Mississippi, 118 College Drive, #5025 Hattiesburg, MS 39406-5025. E-mail: ashley.batastini@usm.edu

higher rates than those detained in the general population (Kaba et al., 2014; Sánchez, 2013).

Persons with mental illness often have particular difficulty coping with the stressors encountered behind prison walls and may be more likely to spend time in administrative segregation when alternative therapeutic options are absent (Metzner & Fellner, 2010). Unfortunately, mental health services in segregation are especially limited due to security restrictions, and typically consist of psychotropic medications, brief check-ins at the inmate's cell front, and occasional meetings in private with a clinician (Beaven, 2005; Metzner & Fellner, 2010). Group therapy is sometimes offered to segregated inmates by securing them in individual holding cells (known as therapeutic modules) that are placed in a semicircle around the provider. Each module is approximately the size of a telephone booth and can cost upward of about $18,000 (Metzner & Dvoskin, 2006). This set-up not only has the potential to obstruct communication (verbal and nonverbal) between the provider and other treatment participants, but feelings of embarrassment or dehumanization associated with these modules may also distract inmates from fully participating in the therapeutic process. The demand for better quality treatment of inmates in special management is further evident in a number of recent lawsuits (e.g., *Ashker v. Governor of California,* 2014; *Silverstein v. Federal Bureau of Prisons,* 2014). So, as the discussion continues over whether or not restrictive housing is really "that bad" for the health and well-being of those detained there, best practices would suggest that prisons nonetheless strive to prevent possible iatrogenic effects and treat existing problems, especially for those who are high-risk and high-needs (Andrews & Bonta, 2010).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Telepsychology, which refers to "the provision of psychological services using telecommunication technologies" (APA, 2013, p. 1), has been on the rise in criminal justice contexts and elsewhere (Ax et al., 2007; Batastini, McDonald, & Morgan, 2013). In fact, it has been projected that the integration of technology into mental health sectors will be largest expanding initiative over the next decade (Norcross, Pfund, & Prochaska, 2013). Currently, these services are most typically rendered using real-time audiovisual monitors (i.e., videoconferencing programs) that connect agencies requiring services to agencies that can provide such services (Ax et al., 2007; Miller, Clark, Veltkamp, Burton, & Swope, 2008).

Within criminal justice settings, telepsychology has not only demonstrated better cost-effectiveness compared with traditional in-person services (National Institute of Justice, 2002), but it is also associated with high satisfaction among correctional clients and providers (Brodey et al., 2000; Magaletta, Fagan, & Peyrot, 2000; Morgan, Patrick, & Magaletta, 2008), good to excellent interrater reliability across both forensic (Manguno-Mire et al., 2007) and clinical assessment outcomes (Lexcen, Hawk, Herrick, & Blank, 2006; Nelson, Zaylor, Cook, 2004), as well as improvements in mental health functioning over time (Zaylor et al., 2001). Furthermore, while no studies have yet examined the effectiveness of group therapy for inmates via telepsychology, there is evidence of positive clinical and process-related outcomes among noncorrectional samples (Frueh, Henderson, & Myrick, 2005; Greene et al., 2010; Morland et al., 2011). Group psychotherapy in general has also been associated with symptom reduction among incarcerated populations (e.g., Wolff et al., 2015) and court-mandated clients (e.g., Rosenbaum, Gearan, & Ondovic, 2002).

In an effort to improve access to quality mental health care for high-risk individuals detained in an otherwise restricted and largely isolated environment, the Kansas Department of Corrections (KDOC) implemented a pilot telepsychology initiative. To our knowledge, there are no other video-based programs that specifically target the needs of this unique and difficult-to-reach population. Therefore, the purpose of this article is to describe the implementation of the KDOC pilot program, present preliminary outcome data on clinical and process matters across telepsychology and traditional in-person delivery methods, and offer practical recommendations for agencies (correctional and beyond) looking to develop similar therapeutic initiatives. Given the literature to date, we expected that the video-based modality would be at least comparable with treatment-as-usual delivered in-person, and that both groups would evidence improvements at the end of treatment. Telepsychological approaches, particularly those involving videoconferencing, have the potential to foster safer, more intensive, and arguably more humane interactions with treatment providers than what is typically afforded to administratively segregated inmates.

## Method

### Psychotherapy Intervention

Coping skills group (CSG; Gingerich & Mueser, 2005) is an evidence-based, group-formatted intervention that aims to improve the lives of individuals with significant problems related to their mental health functioning. CSG employs cognitive–behavioral strategies to teach participants more adaptive ways of dealing with everyday issues. To conduct CSG sessions in-person, segregated inmates are escorted to a multipurpose room on the cellblock where they meet with a Master's-level mental health provider (MHP). However, security restrictions and spacing capacity only allow for a maximum of two inmates per group when this method of service delivery is used.

To deliver CSG through videoconferencing (VC), up to six inmates can be seen on the video monitor simultaneously. While we recognize that the difference in group size across modalities could be seen as a confound, we would argue that the ability to accommodate more inmates in the group is an inherent benefit to using telepsychology in this setting. Not only is it more efficient to treat a larger number of inmates at one time, but the VC modality also offers participants greater opportunities to practice interpersonal skills and relate to others with similar experiences. In this way, the VC condition is more similar to conventional group psychotherapy approaches than the two-inmate, in-person condition. Further, it should be noted that none of the VC groups exceeded four participants, even though the maximum occupancy was six.

For security purposes, inmates receiving VC treatment are individually escorted to separate multipurpose rooms where they were restricted from physical contact with other group members and the MHP. A Polycom camera and monitor system (protected by transparent Plexiglas) is placed in these rooms to allow group members to view and communicate with each other, as well as the MHP facilitator. The MHP tunes into each group session via a Polycom video-monitoring system located within the on-site mental health department.

On average, participants in both conditions received weekly 1-hr group sessions over the course of 6 weeks. It should also be noted that, although the implementation procedures for CSG initially intended for MHPs to conduct groups through both modalities during the same timeframe so as to reduce potential confounds related to provider characteristics, this was not possible because of staffing limitations. For example, at the time of the telepsychology initiative, other programmatic changes to KDOC policies were taking place, which meant that some providers were assigned to facilitate other types of mental health interventions within the prison. The reallocation of staff also limited the number of segregated inmates who could participate in CSG.

### Program Participants

Inmates recruited for treatment were held in individual cells (with no cellmates) located within one of the three administrative segregation units at the KDOC facility. All evaluation procedures were approved by the Institutional Review Board (IRB) for the Protection of Human Subjects at Texas Tech University (TTU), as well as the research department affiliated with KDOC. Although inmates were initially preselected for treatment by KDOC mental health department staff, the voluntary nature of their participation was explained prior to obtaining informed consent. It was further emphasized that no compensation or external incentives would be provided to program volunteers and that, conversely, no sanctions would be implemented should they refuse participation upfront or choose to withdraw during the course of treatment. Inmates were excluded from the study if they: (a) were sentenced to death, (b) were unable to understand the English language, (c) declined to provide written informed consent, (d) lacked the capacity to pro-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

vide voluntarily consent, or (e) declined to participate in at least one session of the intervention.

In addition to the two treatment conditions, data was also collected on a no-treatment control group. Program data was collected on a total of 49 all-male inmate participants (VC = 24; in-person = 12; no-treatment control = 13). The majority of inmates identified as White (44.9%), had a mean age of 29.8 ($SD$ = 8.2) years with 11.4 ($SD$ = 1.4) years of formal education, were diagnosed with a primary substance-use (38.8%) or mood-related disorder (26.5%), and had spent an average of 5.2 ($SD$ = 1.8) years in prison on their current conviction(s). Time spent in special management housing ranged from less than 1 year to 11.4 years, with an average of 1.3 ($SD$ = 1.8) years.

True random assignment to the three study conditions was not feasible due to unexpected logistical and security constraints. For example, the KDOC facility experienced technical difficulties after installing the Polycom videoconferencing system that rendered it unavailable for use. To avoid delays in treatment provision and data collection, a majority of inmates in the first cohort either received treatment in-person or were not assigned to a group. To create more equal sample sizes across the conditions, a larger proportion of participants in the second cohort were assigned to the video modality than the in-person modality. In other instances, pairs of inmates with a documented history of serious interpersonal conflict were not placed in the same treatment group, as this was seen as a potential barrier to the group's productivity and safety.

Despite nonrandom assignment, no statistically significant differences (using $p < .05$) were found across a number of demographic variables including: age, education level, ethnicity, offense type (i.e., violent vs. nonviolent), primary psychiatric diagnosis, active use of psychotropic medications, prior criminal justice involvement, current sentence length, time served in most recent special management placement, number of disciplinary infractions within the past year, number of sick calls (i.e., written requests for mental health services) placed within the past year, pretreatment assessment scores (including measures of mental health symptomology and criminal thinking styles; see below), and number of treatment sessions completed.

## Data Collection Procedures

Inmate data was collected from the KDOC electronic records database, as well as inmates' self-report. In addition to demographic information, data on the frequency of inmate disciplinary infractions and mental health-related sick call requests was obtained from the KDOC database. The following self-report measures were selected to assess outcomes related to the CSG program and were administered at pre- and posttreatment: (a) the Symptom Checklist 90-Revised (SCL90-R; Derogatis, 1994); (b) the Psychological Screening Inventory of Criminal Thinking Styles (PICTS; Walters, 2013); and (c) the Measure of Criminogenic Thinking Styles (MOCTS; Mandracchia & Morgan, 2011). To examine process-related outcomes, inmates were asked to complete the following measures at the conclusion of their treatment experience: (a) the Client Satisfaction Questionnaire (CSQ-8; Larsen, Attkisson, Hargreaves, & Nguyen, 1979); (b) the Working Alliance Inventory (WAI; Horvath & Greenberg, 1989); and (c) the Intervention Group Environment Scale (I-GES; Wilson et al., 2008). Group process variables were not assessed at pretreatment

because participants were not yet exposed to the CSG program; any pretreatment ratings would likely have reflected some other interpersonal experience that was not of interest in the present study. Treatment completion status (i.e., whether or not the inmate was classified as a "completer" and, if not, the reason for his premature termination) was also included as a measure of group adherence.

**Symptom Checklist-90-Revised.** The SCL90-R is a 90-item self-report inventory that measures psychological symptoms and related distress along nine primary symptom dimensions (i.e., somatization, obsessive-compulsive, interpersonal sensitivity, depression, anxiety, hostility, phobic anxiety, paranoid ideation, and psychoticism). Additionally, the SCL90-R contains three summary, or global, scores (i.e., global severity index [GSI], positive symptom distress index [PSDI], and positive symptom total [PST]). The GSI represents a respondent's average score across the 90 items and is an indicator of overall level of functioning. The PSDI is a measure of intensity that is calculated by averaging all responses above zero. The PST is the total number of symptoms endorsed by the respondent. The SCL90-R has been used extensively in forensic and correctional settings to assess general psychological functioning (e.g., Davison & Taylor, 2001; Nelson, Zaylor, & Cook, 2004). For the present study, only the three summary index scores were included in the analyses. Cronbach's alpha ($\alpha$) was calculated to determine the full-scale internal consistency of the SCL90-R, as all 90 items are used to compute the three indices of interest. Consistency for the pre- and posttreatment SCL90-R was excellent ($\alpha$ = .98 at both assessment time points).

**Psychological Inventory of Criminal Thinking Styles.** The PICTS is an 80-item self-report questionnaire that measures eight thinking patterns (i.e., mollification, cutoff, entitlement, power orientation, sentimentality, superoptimism, cognitive indolence, and discontinuity) that are believed to be instrumental in maintaining a criminal lifestyle (Walters, 1995). In addition to calculating eight scales representing the thinking types proposed by Walters, the PICTS also generates a global measure of the presence or absence of criminal thinking (general criminal thinking), four content scales (proactive, reactive, current, and historical criminal thinking), and five factor and special scales (problem avoidance, interpersonal hostility, self-assertion, denial of harm, and the fear of change). Proactive criminal thinking is a measure of goal-directed, deliberate, and organized forms of aggression or criminal behavior, whereas reactive criminal thinking is a measure of spontaneous, impulsive, and reactionary forms of aggression or criminal behavior. Similar to the SCL90-R, the present study only examined changes across aggregate measures of criminal thinking (i.e., general, proactive, reactive, current, and historical). All five subscales of the PICTS used in this study evidenced good to excellent internal consistency at pre- and posttreatment ($\alpha$ ranging between .80 and .95).

**The Measure of Criminogenic Thinking Styles.** The MOCTS is a 70-item self-report inventory that was developed based on common theories of criminal (i.e., Yochelson and Samenow's thinking errors, Walter's thinking patterns) and noncriminal (i.e., Ellis's irrational beliefs, Beck's automatic thoughts) cognitive styles. It is designed to assess a broader range of dysfunctional thought processes prevalent in offender populations that may be associated with antisocial attitudes and behaviors. The MOCTS measures three cognitive factors: (a) control; (b) cognitive immaturity (i.e.,

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

overreliance on underdeveloped cognitive shortcuts such as self-pity and judging); and (c) egocentrism. In the present study, internal consistency of the three MOCTS subscales at each time point ranged from good to excellent (α between .80 and .95).

**The Client Satisfaction Questionnaire.** The CSQ-8 is an eight-item measure that assesses overall client satisfaction with mental health services—in this case, the CSG intervention. The developing authors reported high internal consistency (Larsen et al., 1979), and factor analyses have consistently yielded only one factor (e.g., Nguyen, Attkisson, & Stegner, 1983). This measure has also been administered in previous treatment outcome studies examining VC modalities (Bishop, O'Reilly, Maddox, & Hutchinson, 2002), including those with correctional populations (Morgan et al., 2008). Internal consistency of the CSQ-8 in the present evaluation was excellent (Cronbach's alpha = .95).

**The Working Alliance Inventory.** The WAI is a 36-item questionnaire that contains three subscales targeting different aspects of the therapeutic alliance: (a) client and therapist agreement on the goals of therapy (Goal); (b) agreement on how to reach those goals (Task); and (c) the degree of confidence and acceptance between client and therapist (Bond). The developing authors reported good internal consistency for the global score (Total), as well as the three subscales (Horvath & Greenberg, 1989). The instrument was also reliably correlated with other measures of therapist and client outcomes (Horvath & Greenberg, 1989). Only the client version was used in the present study. Internal consistency for the three WAI subscales was excellent (α ranged from .91 to .96).

**The Group Environment Scale—Intervention Version.** The I-GES is 25-item measure designed to assess features of the treatment group that may impact its effectiveness. The I-GES is a clinically driven modification of the Group Environment Scale created by Moos (1986). Subscales of the I-GES include: (a) cohesiveness, (b) implementation and preparedness, and (c) counterproductive activity. The original validation study showed statistically robust evidence of internal consistency (α ranging from .80 to .92) and construct validity (examined by comparing I-GES scores to other pertinent group process variables; Wilson et al., 2008). For the current study, internal consistency among the three I-GES subscales was good to excellent (α ranged from .77 to .91).

**Testing for (Non) Significance**

Because this study attempted, in part, to "accept" several null hypotheses, modifications to standard significance testing were warranted. There are theoretical problems that arise when attempting to prove a null hypothesis (Kluger & Tikochinsky, 2001). That is, researchers can only fail to reject a null hypothesis because the absence of evidence cannot be assumed to be evidence of absence (Jaykaran, Saxena, Yadav, & Kantharia, 2011). Consequently, research designs that seek to accept null hypotheses are often viewed as controversial. Some have argued, however, that this view is inconsistent with current practice (Cortina & Folger, 1998; Frick, 1995). Frick (1995) suggests that the null hypothesis can be accepted if: (a) the null is plausible, (b) results are consistent with the null, and (c) a "good [methodological] effort" is made to find an effect (p. 137). Frick specified that one way to achieve good effort is to use a more liberal criterion for rejecting the null hypothesis. The use of a less-restrictive critical p value is appro-

priate for study designs such as this because it reduces the likelihood of a Type II error (Stevens, 1996).

Accordingly, a more rigorous, twofold criterion for accepting the null hypothesis was adopted for this study. Specifically, this criteria involved a critical $p > .20$ with effect sizes below the conventional small threshold (e.g., $d < .20$,[1] $\eta_p^2 < .01$; Cohen, 1992). Conversely, in concluding that the alternative hypothesis was instead supported, the traditional alpha level of $p < .05$ with medium to large effect sizes (e.g., $d \geq .50$; Cohen, 1992) was applied. This approach takes null hypothesis testing to a more confirmatory level than what was previously relied on in other similar studies comparing VC and in-person treatment delivery (e.g., Frueh et al., 2007; Greene et al., 2010; Morgan et al., 2008).

## Results

### Treatment Outcome Variables

After adjusting for deviations in normality and variance, a series of 2 × 3 mixed factorial multivariate analyses of variance (MANOVA) was performed to examine differences in the SCL90-R, PICTS, and MOCTS across conditions (telepsychology, in-person, no-treatment control). The respective subscales of each measure served as the combined dependent variable for each analysis. Pillai's Trace criterion was used as the test statistic because it is a more robust measure of group equivalence. Pillai's Trace is recommended when there are deviations in the assumption of homogeneity of covariances and/or study conditions contain unequal sample sizes (Tabachnick & Fidell, 2007), as was the case in the current analyses. All three MANOVAs failed to reveal statistically significant multivariate interactions of time and condition for the combined dependent variables (SCL90-R: Pillai's Trace = .02, $F(2, 44) = .38$, $p = .69$, $\eta_p^2 = .02$; PICTS: Pillai's Trace = .00, $F(2, 38) = .01$, $p = .99$, $\eta_p^2 = .00$; MOCTS: Pillai's Trace = .01, $F(2, 45) = .02$, $p = .97$, $\eta_p^2 = .00$). Post hoc group comparisons were likewise nonsignificant ($p$ values ranged from .10 to >.99) with low associated effect size estimates. Thus, while the VC and in-person groups appear to be relatively comparable, inmates who participated in CSG regardless of modality did not show improvements when compared with non-CSG inmates. These findings suggest that the intervention of choice was not particularly effective in targeting mental health functioning or criminal thinking for segregated inmates. Means and standard deviations for the SCL90-R, PICTS, and MOCTS are reported in Table 1. Similarly, Kruskal-Wallis tests (a nonparametric equivalent to a univariate analysis of variance [ANOVA] examining the frequency of disciplinary infractions and mental health-related sick call requests placed since the preassessment failed to reveal statistically significant differences across the three groups ($p = .69$ and .64, respectively), with all inmates showing low occurrences of each outcome.

---

[1] Because the sample sizes across video and in-person modalities were unequal, Hedges' $g$ was used as the effect size estimate instead of Cohen's $d$. Hedges' $g$ is a similar calculation, but adjusts the pooled standard deviation with appropriate weights for the sample sizes. The magnitude of this effect is interpreted in the same manner as Cohen's $d$.

Table 1

*Means and Standard Deviations of SCL90-R, PICTS, and MOCTS Subscales by Measurement Time Point*

| Measure | Condition | | |
|---|---|---|---|
| | Telepsych M (SD) | In-Person M (SD) | Control M (SD) |
| Pre-SCL90-R | — | — | — |
| Global Severity Index | 1.23 (.56) | 1.18 (.83) | 1.26 (.94) |
| Positive Symptom Distress Index | 2.10 (.55) | 2.01 (.53) | 2.00 (.66) |
| Positive Symptom Total | 51.25 (19.35) | 48.70 (29.19) | 51.85 (25.44) |
| Post-SCL90-R | — | — | — |
| Global Severity Index | 1.24 (.69) | 1.01 (.80) | 1.11 (.85) |
| Positive Symptom Distress Index | 2.07 (.62) | 1.88 (.62) | 2.09 (.66) |
| Positive Symptom Total | 49.92 (21.70) | 44.80 (29.46) | 45.08 (26.69) |
| Pre-PICTS | — | — | — |
| Current | 30.47 (8.19) | 29.03 (6.67) | 30.18 (11.93) |
| Historical | 27.99 (5.50) | 24.15 (7.66) | 26.25 (10.32) |
| Proactive | 66.67 (10.66) | 55.14 (11.76) | 65.61 (20.50) |
| Reactive | 56.20 (10.65) | 54.91 (12.57) | 57.91 (19.62) |
| General[a] | 123.37 (21.80) | 109.55 (18.67) | 119.89 (38.16) |
| General (log) | 2.09 (.08) | 2.04 (.076) | 2.06 (.14) |
| Post-PICTS | — | — | — |
| Current | 29.29 (8.86) | 23.11 (8.78) | 26.30 (10.15) |
| Historical | 24.95 (6.34) | 24.00 (7.79) | 25.00 (9.43) |
| Proactive | 58.89 (12.52) | 56.33 (21.79) | 61.45 (17.99) |
| Reactive | 54.19 (13.91) | 44.46 (13.37) | 44.56 (13.37) |
| General[a] | 113.85 (23.67) | 97.91 (29.81) | 114.44 (32.29) |
| General (log) | 2.05 (.09) | 1.98 (.12) | 2.05 (.12) |
| Pre-MOCTS | 190.02 (28.77) | 168.92 (39.90) | 186.75 (28.36) |
| Control | 65.46 (11.53) | 56.67 (15.46) | 61.58 (13.15) |
| Cognitive immaturity | 82.84 (19.09) | 71.17 (25.11) | 87.00 (27.28) |
| Ego | 42.32 (6.41) | 41.08 (6.36) | 41.75 (7.61) |
| Post-MOCTS | 179.60 (23.08) | 156.65 (27.64) | 179.08 (34.63) |
| Control | 61.56 (12.65) | 54.15 (13.32) | 60.08 (11.83) |
| Cognitive immaturity | 77.29 (17.04) | 61.25 (19.67) | 77.75 (27.12) |
| Ego | 40.76 (5.68) | 41.25 (7.81) | 41.25 (8.64) |

*Note.* SCL90-R = Symptom Checklist 90-Revised; PICTS = Psychological Inventory of Criminal Thinking Styles; MOCTS = Measure of Criminogenic Thinking Styles.
[a] Values reported are based on nontransformed data.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## Group Process Variables

Because inmates in the no-treatment control condition were not exposed to CSG, only the VC and in-person treatment conditions ($N = 34$) were compared on group process outcomes. There were no statistically significant differences between VC and in-person conditions with regard to treatment completion status (i.e., successfully completed = 82.6% vs. 72.7%, respectively; kicked out for disciplinary reasons = 4.3% vs. 9.1%, respectively; voluntarily withdrew = 13.0% vs. 18.2%, respectively), $\chi^2(2) = 0.51$, $p = .77$, $\phi = .12$.

Results of a one-way univariate ANOVA procedure showed no statistically significant differences at the 0.05 level across treatment conditions on service satisfaction as measured by the CSQ-8, $F(1, 34) = 3.13$, $p = .09$. However, the alpha level can be said to be approaching significance. Further, the magnitude of this effect was in the medium to large range (Hedge's $g = 0.65$; 95% CI [−0.04, 1.34]). An examination of means indicated that participants who received treatment via telepsychology were generally less satisfied overall ($M = 21.43$, $SD = 5.23$) than participants who received treatment in-person ($M = 25.09$; $SD = 6.46$).

Separate one-way MANOVA procedures were conducted on the WAI and I-GES, again using their respective subscales serving as the combined dependent variables. Results for the WAI failed to reveal a statistically significant multivariate effect of condition, Pillai's Trace = .16, $F(3, 30) = 1.9$, $p = .15$. The between-subjects effect of condition was also nonsignificant for the bond and goal subscales though these findings trended toward significance with medium to large accompanying effect sizes, bond: $F(1, 32) = 4.08$, $p = .05$, $g = 0.75$ (95% CI [0.05, 1.45]); goal: $F(1, 32) = 3.50$, $p = .07$, $g = 0.66$ (95% CI [−0.03, 1.36]). The task subscale, however, did reach statistical significance and the associated effect size estimate was large, $F(1, 32) = 5.57$, $p = .03$, $g = 0.84$ (95% CI [0.13, 1.54]). An examination of means showed that participants who received treatment via telepsychology were less trusting and accepting of their MHP facilitator, and agreed less on the tasks and goals related to the CSG intervention than participants who received treatment in-person. Means and standard deviations for the WAI subscales are presented in Table 2.

Results for the I-GES also revealed no statistically significant multivariate effect of condition on the combined dependent variable, Pillai's Trace = .10, $F(3, 30) = 1.11$, $p = .36$. The between-subjects effect of condition on each of the three subscales was also not statistically significant; however, all effect size estimates were in the medium range, Co: $F(1, 32) = 2.16$, $p = .15$, $g = 0.52$ (95%

BATASTINI AND MORGAN

Table 2
*Means and Standard Deviations of CSQ-8, WAI, and I-GES Total and Subscales*

| | Condition | |
|---|---|---|
| Measure | Telepsych $M$ ($SD$) | In-Person $M$ ($SD$) |
| WAI total score | 178.91 (38.84) | 212.10 (36.46) |
| Task[a] | 63.16 (14.45) | 76.17 (8.73) |
| Task ($\checkmark$) | 2.75 (2.19) | 4.53 (1.74) |
| Bond | 55.23 (12.40) | 65.84 (17.86) |
| Goal | 60.52 (14.68) | 70.09 (12.22) |
| I-GES total score | 18.78 (5.34) | 22.18 (4.50) |
| Cohesiveness | 5.43 (2.76) | 6.82 (2.09) |
| Implementation and preparedness | 8.78 (2.32) | 9.91 (1.81) |
| Counterproductive activity | 4.57 (1.67) | 5.45 (1.51) |

*Note.* WAI = Working Alliance Inventory; I-GES = Group Environment Scale, Intervention Version.
[a] Values reported are based on nontransformed data.

CI [−0.17, 1.21]); IP: $F(1, 32) = 2.00$, $p = .17$, $g = 0.50$ (95% CI [−0.19, 1.19]); CA: $F(1, 32) = 2.23$, $p = .15$, $g = 0.53$ (95% CI [−0.16, 1.22]). re An examination of means suggested that participants who received treatment via telepsychology felt less cohesiveness within the group, perceived the intervention as less organized and the facilitator as less prepared, and experienced more counterproductive activity in the group than those receiving treatment in-person. Means and standard deviations by I-GES subscale are also reported in Table 2.

## Discussion

The current evaluation sought to describe a novel telepsychology initiative specifically for segregated inmates—a high-risk, high-needs subgroup of inmates who are often restricted from adequate treatments due to security and confidentiality concerns (Metzner & Fellner, 2010). In addition, preliminarily data on treatment outcome and process related variables were reported. This evaluation represents the first attempt to compare VC and in-person modalities in the delivery of group treatment for an inmate population. Overall, the CSG intervention was not associated with meaningful improvements in psychological functioning or reductions in criminal thinking. However, there were some noteworthy group differences across measures of therapeutic process. Although the designated treatment modality did not appear to impact whether or not inmates successfully completed the CSG program, most other comparisons at least trended toward statistical significance. Furthermore, and arguably more revealing, were the associated magnitudes of the effect size estimates. For measures of treatment satisfaction, working alliance, and group-specific processes, all effect size estimates fell within the medium to large range as described by Cohen (1992). From these findings, it appears that participants who received in-person sessions had a more favorable treatment experience than those who received VC sessions, even though this did not impact their willingness or ability to complete treatment.

The results of this pilot program are consistent with previous research suggesting that telehealth-based interventions are often perceived as somewhat less favorable than traditional in-person

interventions (e.g., Greene et al., 2010). However, it is worth noting that overall attitudes reported by participants in this study were higher than what was found in previous research with inmate populations (i.e., Morgan et al., 2008). Further, the extent to which this discrepancy was clinically meaningful remains questionable because the intervention itself did not produce measurable changes regardless of modality. Even though prior research (Fruch et al., 2007; Greene et al., 2010) has suggested that telepsychological approaches can yield positive therapeutic outcomes even when client ratings of some process elements (e.g., working alliance) are lower than ratings for in-person, it remains relevant to consider how this relationship might apply to an inmate population. For example, special management inmates may be especially resistant to services not provided in the traditional in-person format because of their already limited social contact; that is, they may be less motivated to engage in treatment when the expectation of in-person treatment is denied. Accordingly, additional time at the beginning of treatment to explain the process (e.g., how the technology works, why it is being used) and methods of interacting/communicating that will increase interpersonal effectiveness (e.g., where to look into the camera so as to maintain eye contact) may help ease any frustrations or misunderstanding.

## Limitations of Current Program Evaluation

Observed findings of both the treatment outcome and therapeutic process comparisons were likely impacted by several limitations. The most concerning was the achieved sample size. Despite statistical efforts to account for both small and unequal sample sizes across conditions, the precision of results reported here, as well as the stability of any conclusions drawn from them, are nonetheless reduced. A second problem was the lack of random assignment. Therefore, causal effects (or lack thereof) could have been confounded by other extraneous variables that were not measured in this evaluation. For example, differences in inmates' perceptions of the treatment may have been influenced by preexisting characteristics (e.g., general attitudes toward treatment or the specific facilitator, readiness for change, insight into current problems) that were unrelated to the modality itself. Additionally, even though group equivalency was tested across several potentially confounding demographic variables, the achieved sample size may again have limited the ability to detect true differences. Related to the issue of nonequivalence, the larger number of inmates permitted in the video format (despite being a possible advantage compared with the two-inmate, in-person format) could have further muddied the results.

Similar to the issue of nonrandom participant assignment was the manner in which group facilitators were assigned to each treatment condition. Due to limited staff availability, MHP's could not facilitate both an in-person and a videoconferencing group. Thus, any group differences that existed could be attributed to therapist characteristics (e.g., fatigue/burnout, attitudes toward participants or the program, treatment adherence, other personality factors) rather than the treatment modality. Furthermore, technological complications (e.g., delays in setting up the VC equipment that prolonged the start of treatment) may have caused negative reactions among inmates that influenced their perceptions of the overall treatment experience. Therefore, lower ratings of satisfaction, alliance, and group cohesion among telepsychology partici-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

pants may be better explained by frustration and disorganization associated with its implementation rather than the virtual nature of service delivery.

With regard to the selected intervention, CSG was not specifically designed to target criminal thinking errors or severe psychopathology in a population of high-risk segregated male inmates. Although coping skills interventions (i.e., those that teach patients techniques for managing stress and/or dealing with persistent mental illness) are generally found to be effective in reducing symptom severity (Mueser et al., 2002), it is likely that segregated inmates with mental health problems present with unique issues that need to be incorporated into the treatment design. Thus, it appears that the first step is to develop a program tailored not only to their complex psychological and behavioral needs, but also to their unique prison environment. For example, inmates detained in segregation units are largely isolated from other peers and have limited access to activities. It could be beneficial for a treatment program to teach coping skills geared toward alleviating these concerns (e.g., techniques to reduce sensory deprivation, encouraged use of all offered recreation time and creative outlets). Segregated inmates also have higher rates of suicidal and self-injurious behavior (Andrews & Bonta, 2010; Gendreau & Goggin, 2013; Morgan, Kroner, Mills, & Batastini, 2013). Establishing a program that works with this subpopulation in a traditional in-person format will lend itself to a more clinically meaningful comparison with a nontraditional telepsychology format. Largely as a result of the KDOC initiative, one such program (Escaping the Cage; Batastini, Morgan, Kroner, & Mills, 2014) was recently developed and is currently undergoing pilot investigation. Escaping the Cage is intended to address issues specific to segregated inmates as outlined above and to accommodate the high-security institutional restrictions of this setting.

## Lessons Learned: Recommendations for Policy, Practice, and Research

Although the expected benefits of telepsychology, such as lower costs, easier access to services, and increased institutional safety are of substantial interest to correctional systems (Ax et al., 2007), it is possible that these benefits may not outweigh potential costs, such as loss of therapeutic connectedness and possibly poorer treatment outcomes as a result. However, in the context of its limitations and evidence from other available research (see Batastini, King, Morgan, & McDaniel, 2015), we do not conclude that this evaluation should be used to support the discontinued application of telepsychology as a treatment modality in correctional practice, especially when in-person treatments are less available, or are more difficult to implement (e.g., group therapy for high-risk segregated inmates).

Given the lack of clarity regarding the implementation of telepsychology, we offer a number of recommendations for any agency or organization, including correctional facilities, planning to initiate such a program. It should be noted that these recommendations are subject to change as new evidence on the effectiveness of telepsychology emerges. First, consideration should be given to the risks and benefits within the context of the agency's needs (e.g., safety, rehabilitation goals, allocation of staff) and logistical constraints. Doing so will likely prevent resources from being wasted on programs that cannot be systematically or effectively conducted. For example, prisons with more financial freedom may be better off making other institutional changes (e.g., hiring more staff, designating structured therapeutic housing blocks for severely mentally ill inmates) to facilitate greater access to in-person treatment rather than attempting to install video-monitoring equipment that may or may not be as effective. Second, mental health providers are advised to consider other factors that could impact the usefulness of a VC intervention. That is, will the intended intervention translate successfully from in-person to video? If not, can adaptations be made without compromising the integrity of the intervention?

As indicated above, there were some technological problems in the current study that, if prevented, may have led to more positive experiences in treatment. Thus, we recommend that agencies electing to implement a telepsychology program first establish systematic guidelines for its use, and then adequately train all staff on policies and strategies for troubleshooting technical difficulties as well as dealing with client-related emergencies. As previously suggested, providing clients with a thorough explanation of the equipment and/or a tailored informed consent form may reduce anxiety about the process. In addition, clients should be screened for their appropriateness to participate in a telepsychology intervention. For example, clients who express extreme discomfort with technology or who have acutely psychotic thoughts involving technology may not be suitable for this type of programming.

Lastly, it is important for agencies, research consultants, and mainline staff to spend time establishing a working partnership (Apa et al., 2012). Achieving buy-in from all key personnel and stakeholders will likely create a sense of excitement about and commitment to the program that may improve compliance with implementation and evaluation. In turn, it is expected that provider adherence to established protocols will foster a more positive and productive therapeutic experience. Telepsychology programs, like any other intervention or policy, should be continually monitored using the highest level of scientific rigor possible. This would include, but is not limited to, recruiting an adequate sample size, using a randomized control design, eliminating confounds related to provider characteristics, conducting integrity checks for quality assurance, and assessing maintenance of treatment gains over longer follow-up periods. Additionally, future process evaluations should consider measuring other potentially relevant variables such as provider satisfaction, frequency of and response to in-session technological difficulties (e.g., loss of connection), clinician experience with videoconferencing programs, and attitudes specific to the service delivery modality (e.g., perceptions about ease of use, audio/visual quality, comfort level with equipment). Cost-benefit analyses may also be of interest to agencies and their stakeholders. The failure to achieve desired psychological, behav-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

ioral, or financial markers would suggest the need for programmatic adjustments.

## Conclusion

Although this process evaluation provided some evidence that telepsychology is less preferable than in-person services, the degree to which this preference impacts treatment progress is unknown. In addition, given the noted limitations, it is more likely that these differences were related to problems in treatment delivery rather than the delivery method itself. The rapid expansion of telepsychology (Norcross et al., 2013) within the mental health profession suggests that this modality is unlikely to fall out of demand in the foreseeable future. Therefore, to improve its effectiveness and better justify its use, policymakers, researchers, and clinicians should collaboratively strive to understand the nuances of technology-based interventions across clinical populations and settings—perhaps with the greatest urgency toward those most likely to be at the forefront of this expansion.

## References

American Psychological Association. (2013). *Guidelines for the practice of telepsychology.* Retrieved from http://www.apapracticecentral.org/ce/guidelines/telepsychology-guidelines.pdf

Andrews, D. A., & Bonta, J. (2010). *The psychology of criminal conduct* (5th ed.). New Providence, NJ: Matthew Bender & Company Inc.

Apa, Z. L., Bai, R., Mukherejee, D. V., Herzig, C. T. A., Koenigsmann, C., Lowy, F. D., & Larson, E. L. (2012). Challenges and strategies for research in prisons. *Public Health Nursing, 29,* 467–472. http://dx.doi.org/10.1111/j.1525-1446.2012.01027.x

Ashker v. Governor of California, NC C 09–5796 (N. D. Cal. June 2, 2014).

Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment. *Criminal Justice and Behavior, 34,* 893–905. http://dx.doi.org/10.1177/0093854807301555

Batastini, A. B., King, C. M., Morgan, R. D., & McDaniel, B. (2016). Telepsychological services with criminal justice and substance abusing clients: A systematic review and meta-analysis. *Psychological Services, 13,* 20–30.

Batastini, A. B., McDonald, B., & Morgan, R. D. (2013). Videoteleconferencing in forensic and correctional practice. In K. Myers & C. Turvey (Eds.), *Telemental health: Clinical, technological, and administrative foundations of evidence-based practice* (pp. 251–271). Waltham, MA: Elsevier. http://dx.doi.org/10.1016/B978-0-12-416048-4.00013-0

Batastini, A. B., Morgan, R. D., Kroner, D. G., & Mills, J. F. (2014). *Escaping the cage: A mental health treatment program for inmates detained in restrictive housing.* Unpublished manual.

Beaven, G. (2005). Offenders with mental illnesses in maximum and supermaximum security settings. In S. L. Charles & J. B. Gerbasi (Eds.), *Handbook of correctional mental health* (pp. 209–228). Arlington, VA: American Psychiatric Publishing, Inc.

Bishop, J. E., O'Reilly, R. L., Maddox, K., & Hutchinson, L. J. (2002). Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *Journal of Telemedicine and Telecare, 8,* 217–221. http://dx.doi.org/10.1258/13576330232207185

Brodey, B. B., Claypoole, K. H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *Psychiatric Services, 51,* 1305–1307. http://dx.doi.org/10.1176/appi.ps.51.10.1305

Cohen, J. (1992). A power primer. *Psychological Bulletin, 112,* 155–159. http://dx.doi.org/10.1037/0033-2909.112.1.155

Cortina, J. M., & Folger, R. G. (1998). When is it acceptable to accept a null hypothesis: No way, Jose? *Organizational Research Methods, 1,* 334–350. http://dx.doi.org/10.1177/109442819813004

Davison, S., & Taylor, P. J. (2001). Psychological distress and severity of personality disorder symptomology in prisoners convicted of violent and sexual offences. *Psychology, Crime & Law, 7,* 263–273. http://dx.doi.org/10.1080/10683160108401797

Derogatis, L. R. (1994). *Symptom checklist-90-R (SCL90-R): Administration, scoring, and procedures manual* (3rd ed.). Minneapolis, MN: National Computer Systems.

Fine, S., & Wingrove, J. (2014, December 16). Retired Supreme Court justice Arbour slams practice of solitary confinement. *The Globe and Mail.* Retrieved from http://www.theglobeandmail.com

Frick, R. W. (1995). Accepting the null hypothesis. *Memory & Cognition, 23,* 132–138. http://dx.doi.org/10.3758/BF03210562

Frueh, B. C., Henderson, S., & Myrick, H. (2005). Telehealth service delivery for persons with alcoholism. *Journal of Telemedicine and Telecare, 11,* 372–375.

Frueh, B. C., Monnier, J., Yim, E., Grubaugh, A. L., Hamner, M. B., & Knapp, R. G. (2007). A randomized trial of telepsychiatry for posttraumatic stress disorder. *Journal of Telemedicine and Telecare, 13,* 142–147. http://dx.doi.org/10.1258/135763307780677604

Gendreau, P., & Goggin, C. (2013). Practicing psychology in correctional settings. In I. B. Weiner & R. K. Otto (Eds.), *Handbook of forensic psychology* (4th ed., pp. 759–794). Hoboken, NJ: John Wiley & Sons, Inc.

Gingerich, S., & Mueser, K. (2005). *Coping skills group: A session-by-session guide* (1st ed.). Plainview, NY: Wellness Reproductions and Publishing, Inc.

Greene, C. J., Morland, L. A., Macdonald, A., Frueh, B. C., Grubbs, K. M., & Rosen, C. J. (2010). How does tele-mental health affect group therapy process? Secondary analysis of a noninferiority trial. *Journal of Consulting and Clinical Psychology, 78,* 746–750. http://dx.doi.org/10.1037/a0020158

Horvath, A. O., & Greenberg, L. S. (1989). Development and validation of the Working Alliance Inventory. *Journal of Counseling Psychology, 36,* 223–233. http://dx.doi.org/10.1037/0022-0167.36.2.223

Jaykaran, Saxena, D., Yadav, P., & Kantharia, N. D. (2011). Nonsignificant P values cannot prove null hypothesis: Absence of evidence is not evidence of absence. *Journal of Pharmacy and Bioallied Sciences, 3,* 465–466. http://dx.doi.org/10.4103/0975-7406.84470

Kaba, F., Lewis, A., Glowa-Kollisch, S., Hadler, J., Lee, D, Alper, H., . . . Venters, H. (2014). Solitary confinement and risk of self-harm among jail inmates. *American Journal of Public Health, 104,* 442–447. http://dx.doi.org/10.2105/AJPH.2013.301742

King, R. D. (1999). The rise and rise of supermax. *Punishment and Society, 1,* 163–186. http://dx.doi.org/10.1177/14624749922227766

Kluger, A. N., & Tikochinsky, J. (2001). The error of accepting the "theoretical" null hypothesis: The rise, fall, and resurrection of commonsense hypotheses in psychology. *Psychological Bulletin, 127,* 408–423.

Larsen, D. L., Attkisson, C. C., Hargreaves, W. A., & Nguyen, T. D. (1979). Assessment of client/patient satisfaction: Development of a general scale. *Evaluation and Program Planning, 2,* 197–207. http://dx.doi.org/10.1016/0149-7189(79)90094-6

Lexcen, F. J., Hawk, G. L., Herrick, S., & Blank, M. B. (2006). Use of video conferencing for psychiatric and forensic evaluations. *Psychiatric Services, 57,* 713–715. http://dx.doi.org/10.1176/ps.2006.57.5.713

Magaletta, P. R., Fagan, T. J., & Peyrot, M. F. (2000). Telehealth in the federal bureau of prisons: Inmates' perceptions. *Professional Psychology: Research and Practice, 31,* 497–502. http://dx.doi.org/10.1037/0735-7028.31.5.497

Mandracchia, J. T., & Morgan, R. D. (2011). Understanding criminals' thinking: Further examination of the measure of offender thinking

styles-revised. *Assessment, 18,* 442–452. http://dx.doi.org/10.1177/1073191110377595

Manguno-Mire, G. M., Thompson, J. W., Jr., Shore, J. H., Croy, C. D., Artecona, J. F., & Pickering, J. W. (2007). The use of telemedicine to evaluate competency to stand trial: A preliminary randomized controlled study. *The Journal of the American Academy of Psychiatry and the Law, 35,* 481–489.

Metzner, J., & Dvoskin, J. (2006). An overview of correctional psychiatry. *Psychiatric Clinics of North America, 29,* 761–772. http://dx.doi.org/10.1016/j.psc.2006.04.012

Metzner, J. L., & Fellner, J. (2010). Solitary confinement and mental illness in U.S. prisons: A challenge for medical ethics. *The Journal of the American Academy of Psychiatry and the Law, 38,* 104–108.

Miller, T. W., Clark, J., Veltkamp, L. J., Burton, D. C., & Swope, M. (2008). Teleconferencing model for forensic consultation, court testimony, and continuing education. *Behavioral Sciences & the Law, 26,* 301–313. http://dx.doi.org/10.1002/bsl.809

Moos, R. (1986). *Group environment scale manual* (2nd ed.). Palo Alto, CA: Consulting Psychologists Press.

Morgan, R. D., Gendreau, P., Smith, P., Gray, A., Labrecque, R. M., MacLean, N., . . . Mills, J. F. (2015). Quantitative syntheses on the effects of administrative segregation on prisoners' well-being. *Psychology, Public Policy, and Law.* Manuscript under review.

Morgan, R. D., Kroner, D. G., Mills, J. F., & Batastini, A. B. (2013). Treating criminal offenders. In I. B. Weiner & R. K. Otto (Eds.), *Handbook of forensic psychology.* (4th ed., pp. 795–838). Hoboken, NJ: John Wiley & Sons, Inc.

Morgan, R. D., Patrick, A. R., & Magaletta, P. R. (2008). Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities. *Journal of Consulting and Clinical Psychology, 76,* 158–162. http://dx.doi.org/10.1037/0022-006X.76.1.158

Morland, L. A., Hynes, A. K., Mackintosh, M. A., Resick, P. A., & Chard, K. M. (2011). Group cognitive processing therapy delivered to veterans via telehealth: A pilot cohort. *Journal of Traumatic Stress, 24,* 465–469. http://dx.doi.org/10.1002/jts.20661

Mueser, K. T., Corrigan, P. W., Hilton, D. W., Tanzman, B., Schaub, A., Gingerich, S., . . . Herz, M. I. (2002). Illness management and recovery: A review of the research. *Psychiatric Services, 53,* 1272–1284. http://dx.doi.org/10.1176/appi.ps.53.10.1272

National Institute of Justice. (2002, May). *Implementing telemedicine in correctional facilities.* Retrieved February 2, 2011 from www.ncjrs.gov/pdffiles1/nij/190310.pdf

Nelson, E. L., Zaylor, C., & Cook, D. (2004). A comparison of psychiatrist evaluation and patient symptom report in a jail telepsychiatry clinic. *Telemedicine Journal and e-Health, 10,* S-54–S-59. http://dx.doi.org/10.1089/tmj.2004.10.S-54

Nguyen, T. D., Attkisson, C. C., & Stegner, B. L. (1983). Assessment of patient satisfaction: Development and refinement of a service evaluation questionnaire. *Evaluation and Program Planning, 6,* 299–313. http://dx.doi.org/10.1016/0149-7189(83)90010-1

Norcross, J. C., Pfund, R. A., & Prochaska, J. O. (2013). Psychotherapy in 2022: A Delphi poll on its future. *Professional Psychology: Research and Practice, 44,* 363–370. http://dx.doi.org/10.1037/a0034633

O'Keefe, M. (2008). Administrative segregation from within: A corrections perspective. *The Prison Journal, 88,* 123–143. http://dx.doi.org/10.1177/0032885507310999

Rosenbaum, A., Gearan, P. J., & Ondovic, C. (2002). Completion and recidivism among court- and self-referred batterers in a psychoeducational group treatment program: Implications for intervention and public policy. *Journal of Aggression, Maltreatment, & Trauma, 5,* 199–220. http://dx.doi.org/10.1300/J146v05n02_12

Sánchez, H. G. (2013). Suicide prevention in administrative segregation units: What is missing? *Journal of Correctional Health Care, 19,* 93–100. http://dx.doi.org/10.1177/1078345812474638

Silverstein v. Federal Bureau of Prisons, No. 12–1450 (10th Cir. March 22, 2014).

Stephan, J. J. (2008). *Census of state and federal correctional facilities, 2005* (NCJ 222182). Retrieved from http://www.bjs.gov/content/pub/pdf/csfcf05.pdf

Stevens, J. (1996). *Applied multivariate statistics for the social sciences* (3rd ed.). Mahwah, NJ: Erlbaum, Inc.

Tabachnick, B. G., & Fidell, L. S. (2007). *Using multivariate statistics* (5th ed.). Boston, MA: Pearson Education, Inc.

Walters, G. D. (1995). The psychological inventory of criminal thinking styles (PICTS), Part I: Reliability and preliminary validity. *Criminal Justice and Behavior, 22,* 307–325. http://dx.doi.org/10.1177/0093854895022003008

Walters, G. D. (2013). *The psychological inventory of criminal thinking styles (PICTS), user's manual.* Allentown, PA: Center for Lifestyle Studies.

Wilson, P. A., Hansen, N. B., Tarakeshwar, N., Neufeld, S., Kochman, A., & Sikkema, K. J. (2008). Scale development of a measure to assess community-based and clinical intervention group environments. *Journal of Community Psychology, 36,* 271–288. http://dx.doi.org/10.1002/jcop.20193

Wolff, N., Huening, J., Shi, J., Frueh, C. B., Hoover, D. R., & McHugo, G. (2015). Implementation and effectiveness of integrated trauma and addiction treatment for incarcerated men. *Journal of Anxiety Disorders, 30,* 66–80. http://dx.doi.org/10.1016/j.janxdis.2014.10.009

Zaylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a prison telepsychiatry clinic. *Journal of Telemedicine and Telecare, 7,* 47–49. http://dx.doi.org/10.1177/1357633X010070S119

Received September 18, 2015
Revision received January 14, 2016
Accepted January 20, 2016 ∎

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

## Brief Reports

# Satisfaction of Forensic Psychiatric Patients With Remote Telepsychiatric Evaluation

Benjamin B. Brodey, M.D., M.P.H.
Keith H. Claypoole, Ph.D.
Jeffrey Motto, R.N., M.A.
Robert G. Arias, Ph.D.
Richard Goss, M.D., M.P.H.

**The level of satisfaction with telepsychiatry evaluations was determined in a sample of 43 forensic psychiatric patient inmates in a large urban jail. A forensic psychiatrist interviewed 20 patients in person, the other 23 remotely via interactive video. Demographic characteristics, physical health status, and psychiatric symptom severity on the Global Severity Index of the Brief Symptom Inventory were comparable in the two groups. Patient satisfaction with the evaluations was moderately high for patients in both groups, with no significant differences between them.** (*Psychiatric Services* 51:1305–1307, 2000)

According to a recent publication from the U.S. Department of Justice, more than 10 percent of the total prison population are mentally ill [1]. Correctional facilities find it difficult either to arrange for clinicians to visit mentally ill inmates or to transport inmates for routine mental health care [2]. Telepsychiatry—the use of telemedicine technology for delivering psychiatric services—potentially eliminates these obstacles.

Recent investigations have strongly supported telepsychiatry's efficiency, cost-effectiveness, and high diagnostic reliability [3–5]. It offers a possible solution to the problem of the "grossly unequal geographic distribution of health care manpower and resources" [6]. However, less is known about patients' perceptions of the telepsychiatric approach compared with traditional, in-person psychiatric consultations.

The primary objective of this study was to compare satisfaction levels of forensic psychiatric patients receiving remotely conducted psychiatric evaluations with those of forensic psychiatric patients receiving similar but in-person evaluations.

## Methods

The study was conducted during June, July, and August 1997 with 43 forensic psychiatric patient inmates from the general population of the King County Correctional Facility, a large urban jail in Seattle. The patients ranged in age from 20 to 57. Medications had not been prescribed for 12 patients (28 percent). Of those who were on medications, 15 (48 percent) were taking antidepressants, 12 (39 percent) mood stabilizers, seven (23 percent) antipsychotics, and four (13 percent) anxiolytics. Some patients were taking more than one medication.

On alternating weeks over a ten-week period, evaluations were performed either by remote interactive video or in person. Twenty patients participated in an in-person evaluation; the other 23 underwent a remote evaluation. The same psychiatrist interviewed all subjects to minimize variance between treatment conditions. One additional patient, who declined the remote evaluation, preferred to be evaluated in person; the results of this evaluation were excluded from the study.

The remote evaluations were conducted using a V-Tel work station running on a personal computer. This real-time interactive audio and video system was transmitted at 384 kilobytes per second. Patients viewed the evaluating psychiatrist on a 13-inch color monitor. At the remote hospital site, Virginia Mason Medical Center in Seattle, the evaluating psychiatrist viewed each patient on a 27-inch monitor with a picture-in-a-picture feature, which provided a full-body image of the patient.

As a measure of comparability of cases and severity of psychiatric symptomatology, the Brief Symptom Inventory was administered to each patient in written format before the evaluation. This survey instrument contains 53 psychiatric symptom–related questions rated on a scale of 0 to 4. From these scores, a Global Sever-

*Dr. Brodey is clinical assistant professor in the department of psychiatry and behavioral sciences and Dr. Goss is clinical assistant professor in the department of medicine at the University of Washington Medical School. Dr. Claypoole is with the University of Hawaii and the Hawaii Department of Health in Kuaii. Mr. Motto is telemedicine coordinator at the Virginia Mason Medical Center in Seattle. Dr. Arias is a postdoctoral fellow in neuropsychology in the department of behavioral medicine and psychiatry at West Virginia University School of Medicine. Address correspondences to Dr. Brodey at 4558 Fourth Avenue, N.E., Seattle, Washington 98105-4813 (e-mail, brodey @u.washington.edu).*

*Table 1*

Characteristics and satisfaction ratings of 43 forensic psychiatric patients evaluated by telepsychiatry or in-person interviews

| Characteristic or rating[1] | Telepsychiatry evaluation (N=23) | | In-person evaluation (N=20) | |
|---|---|---|---|---|
| | Mean | SD | Mean | SD |
| Age in years | 36.3 | 9.3 | 31.8 | 9.6 |
| Global Severity Index | 1 | .3 | .9 | .2 |
| General rating of physical health[2] | 3.3 | 1.2 | 2.8 | .9 |
| Satisfaction | | | | |
|   Time spent with evaluator | 3.4 | 1.3 | 3.4 | 1.1 |
|   Explanation of evaluation | 3.3 | 1.2 | 3.8 | 1.1 |
|   Technical skill of evaluator | 3.7 | 1.1 | 3.8 | 1.2 |
|   Interpersonal skill of evaluator | 3.9 | 1.2 | 3.8 | 1.2 |
|   Would recommend evaluator | | | | |
|     to others | 3.0 | .8 | 2.9 | .9 |
|   Overall satisfaction | 3.5 | 1.9 | 3.5 | 1.1 |

[1] No significant differences between the two groups were found.
[2] This item and the subsequent six satisfaction questions are based on the Health Outcomes Institute Treatment Satisfaction Rating Scale; ratings range from 1, poor, to 5, excellent.

ity Index (GSI), a measure that has demonstrated high reliability in classifying overall psychiatric symptom severity (7), was calculated.

Immediately after either a remote or an in-person evaluation, each subject completed a visit-specific patient satisfaction survey called the Group Health Association of America Consumer Satisfaction Survey (8). This structured outpatient questionnaire examines a subject's perception of the evaluator and overall satisfaction level with the evaluation. It includes one question rating general health.

Two-way analysis of variance was used to evaluate differences between the two groups in age, general physical health ratings, the GSI, and the scores on the six patient-acceptance and patient-satisfaction questions. Data were presented as means and standard deviations, and comparisons with a probability level of less than .05 were considered statistically significant.

**Results**

As Table 1 shows, GSI scores, gender, age, and ratings of self-reported general physical health were all comparable for the two groups. The range of GSI scores was .67 to 1.47 for the remote group and .67 to 1.28 for the in-person group. Neither set of GSI scores contained outliers or indicated severe psychiatric symptoms. The mean GSI scores of the patients eval-

uated remotely (1.01±.26) and those evaluated in person (.93±.19) were comparable to published norms of the average psychiatric outpatient population (mean for males=1.15; mean for females=1.35) (7). Furthermore, they were well above the average GSI for nonpatients (mean for males =.18; mean for females =.24).

The two groups rated their overall level of satisfaction with the psychiatric evaluation nearly identically; ratings averaged midway between good and very good. The overall mean group differences in responses to the questions were uniformly less than .5 on a 1-to-5 scale. The in-person group tended to rate the psychiatrist's explanation as better than the remote group did, although the difference was not significant. The question "Would you recommend this evaluator to your family and friends?" received the lowest rating (least satisfaction) of all six satisfaction questions for both groups.

**Discussion**

The results indicate that the remote interviews were generally acceptable to patients. Of the 24 patients asked to participate in the study, only one declined. This is important because patients were offered the remote interviews in the course of routine care without any incentives. They were told that they had the opportunity to receive an in-person interview if they

did not wish to participate in the remote interview. It is possible that the novelty of being on television increased patient interest, but whether such feelings will have lasting effects on acceptability cannot be predicted.

Satisfaction rates did not differ significantly between the two types of evaluation. Compared with the in-person group, the group interviewed remotely tended to rate the psychiatrist's explanation of the evaluation somewhat lower, although the two groups showed no differences in their perception of the psychiatrist's professional or technical skill. Despite relatively high satisfaction scores, both groups indicated that they would not highly recommend the psychiatrist to a family member or friend. It is possible that this result is due to their status as incarcerated inmates.

An additional finding of the study is that despite the relatively slow transmission speed of the remote interviews, the interviewing psychiatrist felt comfortable with his ability to diagnose remotely. This result suggests that clinicians who gain expertise in telepsychiatry will be able to use the medium to diagnose patients effectively. It also suggests that the utility of telepsychiatry may be applicable to large groups of patients who are underserved by mental health specialists, particularly psychiatrists.

With the increasing size of the inmate population, including the large proportion of inmates with mental illness, our findings may help to support the integration of telepsychiatry into underserved jail and prison populations. Continued evaluation of the reliability and suitability of telepsychiatry in psychiatric evaluation is needed, along with a determination of the circumstances and populations in which it can be used most effectively without compromising the quality of psychiatric care.

The study results should be interpreted with caution. Although particular care was taken in maintaining a natural sample selection, it was not practically possible to obtain a perfectly randomized match between the two groups. The results may not be generalizable to other psychiatric inmate patient populations or to those who exhibit more severe psychiatric disturbances. ◆

## Acknowledgments

This project was made possible by the support of the King County Department of Health and the Virginia Mason Medical Center. The authors thank Wayne Katon, M.D., who provided advice on methodologic issues.

## References

1. Ditton P: Mental Health and Treatment of Inmates and Probationers. Edited by Dorsey T, Hester T. Washington, DC, Bureau of Justice Statistics, July 1999

2. Baer L, Cukor P, Coyle JT: Telepsychiatry: application of telemedicine to psychiatry, in Telemedicine: Theory and Practice. Edited by Bashshur RL, Sanders JH, Shannon GW. Springfield, Ill, Thomas, 1997

3. Ruskin PE, Reed S, Kumar R, et al: Reliability and acceptability of psychiatric diagnoses via telecommunication and audiovisual technology. Psychiatric Services 49:1086–1088, 1998

4. Baigent MF, Lloyd CJ, Kavanagh SJ, et al: Telepsychiatry: "tele" yes, but what about the "psychiatry"? Journal of Telemedicine and Telecare 3:3–5, 1997

5. Baer L, Cukor P, Jenike MA, et al: Pilot study of telemedicine for patients with obsessive-compulsive disorder. American Journal of Psychiatry 152:1383–1385, 1995

6. Preston J, Brown FW, Hartley B: Using telemedicine to improve health care in distant areas. Hospital and Community Psychiatry 43:25–32, 1992

7. Boulet J, Boss MW: Reliability and validity of the Brief Symptom Inventory. Psychological Assessment 3:433–437, 1991

8. Davies AR, Ware JE: GHAA Consumer Satisfaction Survey and User's Manual. Washington, DC, Group Health Association of America, 1991

9. Rubin HR, Gandek B, Rogers W, et al: Patients' ratings of outpatient visits in different practice settings. JAMA 270:835–840, 1993

10. Ware JE, Hays RD: Methods for measuring patient satisfaction. Medical Care 26:393–402, 1988

# *WJP* *World Journal of* *Psychiatry*

Submit a Manuscript: http://www.wjgnet.com/esps/
Help Desk: http://www.wjgnet.com/esps/helpdesk.aspx
DOI: 10.5498/wjp.v5.i3.286

*World J Psychiatr* 2015 September 22; 5(3): 286-304
ISSN 2220-3206 (online)
© 2015 Baishideng Publishing Group Inc. All rights reserved.

*REVIEW*

# Usefulness of telepsychiatry: A critical evaluation of videoconferencing-based approaches

Subho Chakrabarti

Subho Chakrabarti, Department of Psychiatry, Postgraduate Institute of Medical Education and Research, Chandigarh 160012, India

Author contributions: Chakrabarti S solely contributed to this paper.

Conflict-of-interest statement: No conflict of interest.

Open-Access: This article is an open-access article which was selected by an in-house editor and fully peer-reviewed by external reviewers. It is distributed in accordance with the Creative Commons Attribution Non Commercial (CC BY-NC 4.0) license, which permits others to distribute, remix, adapt, build upon this work non-commercially, and license their derivative works on different terms, provided the original work is properly cited and the use is non-commercial. See: http://creativecommons.org/licenses/by-nc/4.0/

Correspondence to: Subho Chakrabarti, MD, MAMS, FRCPsych, Professor, Department of Psychiatry, Postgraduate Institute of Medical Education and Research, Sector 12, Chandigarh 160012, India. subhochd@yahoo.com
Telephone: +91-172-2756808
Fax: +91-172-2744401

Received: November 21, 2014
Peer-review started: December 1, 2014
First decision: January 8, 2015
Revised: May 7, 2015
Accepted: June 9, 2015
Article in press: June 11, 2015
Published online: September 22, 2015

## Abstract

Telepsychiatry, *i.e.*, the use of information and communication technologies to provide psychiatric services from a distance, has been around for more than half a century now. Research over this period has shown that videoconferencing-based telepsychiatry is an enabling and empowering form of service delivery, which promotes equality of access, and high levels of satisfaction among patients. The range of services offered by videoconferencing-based telepsychiatry, potential users and points of delivery of such services are theoretically limitless. Telepsychiatry has both clinical utility and non-clinical uses such as administrative, learning and research applications. A large body of accumulated evidence indicates that videoconferencing-based telepsychiatric assessments are reliable, and clinical outcomes of telepsychiatric interventions are comparable to conventional treatment among diverse patient populations, ages and diagnostic groups, and on a wide range of measures. However, on many aspects of effectiveness, the evidence base is still relatively limited and often compromised by methodological problems. The lack of cost-effectiveness data in particular, is a major hindrance, raising doubts about the continued viability of telepsychiatric services. Added to this are the vagaries of technology, negative views among clinicians, poor uptake by providers, and several legal, ethical and administrative barriers. These hamper the widespread implementation of telepsychiatry and its integration into routine care. Though further advances in technology and research are expected to solve many of these problems, the way forward would be to promote telepsychiatry as an adjunct to conventional care, and to develop hybrid models, which incorporate both traditional and telepsychiatric forms of mental health-care.

Key words: Videoconferencing; Telepsychiatry; Tele-mental-health; Assessment; Management; Reliability; Efficacy; Effectiveness; Outcome

© The Author(s) 2015. Published by Baishideng Publishing Group Inc. All rights reserved.

Core tip: Telepsychiatry refers to the use of information and communication technologies to provide psychiatric services from a distance. Evidence accumulated over six decades shows that videoconferencing-based telepsychiatry is an acceptable and feasible form of providing mental health-care. Additionally, videoconferencing-based assessments are reliable, and clinical outcomes



of telepsychiatric interventions are comparable to conventional treatment among diverse patient populations on several measures of outcome. However, problematic study-designs, uncertainty about cost-effectiveness, and poor uptake have hindered the progress of telepsychiatric services. Conducting further research to address these problems, and developing hybrid models incorporating traditional and telepsychiatric forms of care, would be the way forward.

Chakrabarti S. Usefulness of telepsychiatry: A critical evaluation of videoconferencing-based approaches. *World J Psychiatr* 2015; 5(3): 286-304  Available from: URL: http://www.wjg-net.com/2220-3206/full/v5/i3/286.htm  DOI: http://dx.doi.org/10.5498/wjp.v5.i3.286

## INTRODUCTION

Mental health surveys indicate that about a-fifth of the world population suffers from mental disorders, which require treatment[1]. Mental illnesses are not only a source of disability and great distress for those afflicted, but also impose a heavy burden on families of the mentally ill and the society. Despite their high prevalence and potentially disabling consequences, inadequate treatment of mental disorders is rife. Unavailability of accessible and affordable mental health-care is a major hindrance to obtaining treatment[1]. Moreover, treatment resources are not distributed uniformly; consequently, rural and geographically isolated areas remain largely underserved. Traditional systems of mental health-care delivery are not always able to meet the demands of people in these remote areas. Therefore, alternatives to the traditional modes of service delivery for mental health-care have been explored from time to time. One such alternative has been the use of information and communication technologies (ICTs) for delivering mental health care. Advancements in ICTs have been successfully utilized in the field of health-care over the last few decades. The most promising of these is the use of ICTs to deliver mental health-care from a distance, referred to as telepsychiatry. Telepsychiatry was originally conceived to enhance access of remote and rural populations to specialized mental health services. Over the last six decades or so, a growing body of evidence and increasing implementation has demonstrated telepsychiatry's ability to provide mental health services, which are accessible, wide-ranging and of high quality. However, concerns about the applicability and usefulness of this mode of service-delivery still remain. Despite being somewhat of a success story in developed countries, telepsychiatry is yet to make its mark in low- and middle- income countries of the developing world[2]. This is unfortunate because the need for such services is probably greater in these countries. This review seeks to evaluate the usefulness of telepsychiatry as a mode of service-

delivery based on the current evidence. In addition to the evidence for telepsychiatry's efficacy or effectiveness, the evolution of telepsychiatry, the terms used to describe this technology, the limitations of this form of service-delivery and its potential role in low-and middle-income countries have also been elaborated upon. The focus of this review is restricted to the utility of videoconferencing-based approaches in delivering mental health-care. Although other modes such as telephones or internet-based care, which form a part of the broader array of telemental health or e-health services, have been mentioned, these modalities have not been reviewed in detail. Finally, while considering the evidence, greater emphasis has been placed on randomized-controlled trials (RCTs), these being highest level of research-evidence on the usefulness of any treatment-modality.

## SEARCH STRATEGY

To review the evidence on telepsychiatry and videoconferencing, a comprehensive search of the following databases was undertaken: MEDLINE, PubMed, Psyc-INFO, EMBASE, Cochrane Database of Systematic Reviews, Cochrane Controlled Trial Registry, Database of Abstracts of Reviews of Effectiveness, and Google. Search terms included telepsychiatry, telemental health, telecare, telemedicine, e-health, videoconferencing, effectiveness, efficacy, access, outcomes, satisfaction, quality of care, and controlled trials. Articles extracted were of three main types: Reviews, guidelines and original research articles. All articles about videoconferencing were manually searched to locate cross-references relevant to the topic. Articles about other modes of telemental health were examined when they provided information relevant to the subject under review.

## THE EVOLUTION OF TELEPSYCHIATRY

Telepsychiatry is one of the oldest applications of telemedicine. The earliest documentation of telemedicine in psychiatry was from the University of Nebraska, where in 1956 a two-way closed-circuit television system was used for educational and medical purposes[3]. In 1961, videoconferencing was used to conduct adult group psychotherapy[4]. In 1973, the term telepsychiatry was first used by Dwyer[5] to describe consultation services provided from the Massachusetts General Hospital to a medical site in Boston. Shortly thereafter, telepsychiatry was used among children and adolescents, when a child guidance clinic in New York City was connected to the Mount Sinai School of Medicine[6]. Despite this initial success and subsequent reports of its usefulness and acceptance, telepsychiatry was used only sporadically in the 1960s and 1970s. Advances in technology in the late 1980s and early 1990s, which reduced equipment costs, coupled with increased funding from government agencies led to a

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

burgeoning of programmes in north-America, Europe and Australia[7-14]. Currently telepsychiatry is one of the most rapidly developing fields of telemedicine, and, after teleradiology, the most practiced form of telemedicine in the world[15]. Additionally, from the late 1990s there has been a proliferation of research interest in telepsychiatry, which is reflected in the growing number of reports and reviews of the subject in the past decade and a half. Initial research was focused on descriptions of programmes, and feasibility and acceptability of telepsychiatry[7-14]. This has been supplemented over the last decade by controlled trials on outcome, research on other issues such as cost-effectiveness, ethical and legal implications, and by several guidelines on telepsychiatry[7-14]. The emphasis of research on telepsychiatry has also undergone a subtle change of focus; earlier attempts to prove its usefulness are now being replaced by attempts to identify specific situations in which telepsychiatry might be useful, and by evaluation of the strengths and weaknesses of this method of service-provision[13,14].

## TERMS AND CONCEPTS USED

Although there are no universally agreed definitions of terms used to describe telepsychiatry, several partially overlapping labels and concepts have been used to refer to the entire spectrum of services, which are delivered remotely, that is from a distance and a separate location[7,8]. This lack of consistency in definitions may create difficulties in evaluation of the utility of telepsychiatry[16,17]. Hence, an attempt has been made here to provide clearer definitions of four commonly used terms including telepsychiatry, telemental health care, telemental health, and e-mental health. Three of these terms use the prefix "tele", which means at or over a distance, as in telegram, telephone, or television.

The oldest term used to describe this form of service-delivery is telepsychiatry[7,18]. It is derived from the definition of telemedicine, and is a specific term designating psychiatric applications of telemedicine[7,8,19]. The National Library of Medicine defines telemedicine as "the use of electronic communication and information technologies to provide or support clinical care at a distance"[19]. Accordingly, telepsychiatry has been defined as the "use of electronic communication and information technologies to provide or support clinical psychiatric care at a distance"[20,21]. Though this term is intended to include all modalities of communication such as telephone, fax, e-mail, the internet, still imaging, and live two-way audio-visual communication, in effect the term is often equated with the provision of psychiatric services *via* tele-communication systems, which enable two-way interactive "real-time" communication between patients and providers[20]. Consequently, telepsychiatry is almost synonymously used with videoconferencing, which is a common form of this service-modality[7,22]. Nevertheless, broader definitions of telepsychiatry have also been proposed, in which it is defined as the

"electronic transmission of psychiatric consultations, advice or services in digital form, from one location to another using a data communication link provided by a third party carrier, or carriers, (and is) used to provide psychiatric services from a distance"[21].

The terms tele care or telehealth care and its derivative telemental health care are of more recent origin. They are used to refer to "the provision of personalized health-care over a distance"[7,8,23]. Thus, tele-care is the remote or enhanced delivery of care to people in their own homes or community settings, by means of telecommunications and computerized services. It includes the use of sensors and alerts, which provide continuous, automatic and remote monitoring of care-needs, emergencies and lifestyle changes, and the use of ICTs to trigger human responses, or to prevent hazards. Telecare has historically been associated with social care, as distinct from telemedicine or telepsychiatry, which is more about medical care. Tele-care is, therefore, social care services delivered at home through remotely connected computerized medical devices[8,23].

The term telemental health is a broader term, which includes all mental health applications including telepsychiatry and telemental health-care[7,8,21,22]. Though, telemental health also refers to the use of ICTs to provide mental health services from a distance, it incorporates the provision of a variety of mental health services from a wider range of professionals, and not just psychiatrists. Moreover, it refers to all forms of technology utilized in the practice of mental health-care from a distance. Such technology may be synchronous (real-time), as in video-conferencing or telephone-based systems, or asynchronous, as with e-mail, and other store-and-forward methods. Store-and-forward modes of communication involve acquiring medical data, and then transmitting this clinical information *via* e-mail or web-applications for later review by a specialist. Unlike synchronous forms of communication, asynchronous communication does not require the presence of both parties at the same time. The information can be transferred in the form of data, audio/video clips, or recordings. E-mail is the most commonly used form of asynchronous communication in telemedicine, and has the advantages of being relatively inexpensive, and not requiring any extra or special hardware support[24]. Finally, tele-mental-health also encompasses all forms of service, including both preventive and curative care, and educational and administrative services[7,8,10,21-23,25-27].

The newest designation of telemental health is e-health or e-mental health. It also refers to the provision of health services to patients or to the lay public through any electronic medium, including the internet, telephone, or fax[7]. However, it is a more user-centred term, and refers not only to the use of a broad range of ICTs, but also a new way of service-provision, which involves a commitment to networked ways of improving health-care. A standard definition of e-health would, thus, include "the application of ICTs across the whole range of functions, which affect health-care, from

diagnosis to follow-up". Additionally, it is a method of delivering "responsive care, which is personalized and tailored to the needs of the user"[28,29].

In this article, the term telepsychiatry has been used to refer to videoconferencing, while telemental health and e-health have been used interchangeably, in keeping with the broadest concept of this form of service-delivery.

## THE PURPOSE AND POTENTIAL APPLICATIONS OF TELEPSYCHIATRY

Telepsychiatry was originally devised to meet the mental health needs of users in remote, rural and inaccessible locations[2,10-19,21,22,25-27,26]. The use of telepsychiatry for remote communities helped overcome many of the disadvantages of traditional modes of service-delivery. Moreover, telepsychiatry could deliver a wide range of high-quality services, which were usually available only at specialist centres. Consequently, it created an equality of access, and a sense of empowerment among users from remote areas. Additionally, it diminished the cost of provision of services in isolated areas by saving on time and travel, not only for clinicians involved in the provision of care, but also for health-care professionals, and health-care users. Finally, it provided the means of supporting mental health professionals working in such remote environments.

With expansion of telepsychiatric services, they are also being increasingly used in urban areas, for the same reasons, *i.e.*, decreasing costs of care and enhancing access to high-quality care[10,13,14]. In recent years the number of patients who could benefit from telemental health services at home has also been growing. Moreover, with the development of a broader array of ICTs, telemental health services are being used to help those who are only mildly to moderately ill, and who may not require specialist care[8,23].

Therefore, telepsychiatry can be as flexible as the practitioner, or the patient may need it to be. The range of services offered, the users of such services, and the points of delivery of such services is theoretically limitless. Tele-mental-health has both clinical or patient-care uses, and non-clinical applications such as administrative, learning and research activities[8,12,17,25-27,29]. The whole range of patient-care services, from assessment and diagnosis, to pharmacological and psychosocial interventions, and to follow-up and home-based care, is included in this mode of service-delivery. Telepsychiatry can also offer other services, such as development of clinical care plans, case management, crisis intervention, neuropsychological testing, legal aid, forensic evaluations, liaison services for other medical specialties, and nursing care. The settings, in which these services can be delivered, are equally diverse. They include inpatients, outpatients, emergency services, forensic settings, community settings, nursing homes, assisted living facilities, prisons, schools, and the homes of users. The patient population can vary from children, to adults, to the elderly, and to special populations such as prison inmates or military personnel. Professional users can include all manner of mental health professionals such as local psychiatrists, trainee psychiatrists at distant sites, nurses, health workers and educators[2,8,10-14,17,19,22,25-27,29]. Telemental health is used routinely to give people access to educational events from remote locations. It can serve as a platform for net-based distant learning sources such as web-casting. Supervision of clinical management and psychotherapy is a major component of the educational uses of telemental health. Finally, a variety of administrative and managerial functions can be supported by telepsychiatry, helping in reducing the costs, time and travel involved in carrying out these tasks[8,26].

## THE EVIDENCE FOR CLINICAL USEFULNESS OF VIDEOCONFERENCING-BASED TELEPSYCHIATRY

### The size and quality of the evidence

From somewhere around the year 2000, the evidence-base for telepsychiatry has begun to grow rapidly. It is instructive to follow the progress of some research groups around the world to get an idea of this growth. For example, researchers associated with the Medical University of South Carolina, Charleston, South Carolina, United States have published three reviews on the subject[17,30,31]. The first one, published in 2000[30], covered the period from 1970 to 2000, and could locate only 63 publications, mainly pertaining to programme descriptions, reliability of videoconferencing assessments, and satisfaction and acceptance among users. The second review[31], covering the period from 2000 to 2003 included 68 new publications in this three-year period. In addition to studies on novel programmes, research on reliability and satisfaction, clinical outcomes, cost-effectiveness, and legal, regulatory, and ethical issues had already begun to appear. The third review[17] covering the period from 2003 to 2008 came up with 148 new publications. This review noted that RCTs had demonstrated that videoconferencing was as efficacious as face-to-face patient-care in a variety of clinical settings, and with specific patient populations, although the number of such trials was still small. All three reviews and several others concluded that methodologically flawed studies were the norm, which was hampering the progress of research on telepsychiatry[16-18,30,31-34]. The experience of reviewers, post-2008 to date appears to be somewhat similar[2,8-10,12-14,35,36]. Although the number of research reports has continued to increase, RCTs are still very few. Videoconferencing-based approaches used to be the most common form of telemental health service till about ten years ago. With the development and proliferation of other ICTs, there is now a growing body of research on telephone, internet, or computer based interventions. Indeed the research-data on these modes of telemental health has outstripped that



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

available for videoconferencing[2,8-10,12,14,23,28,37-39].

### The nature of the evidence on videoconferencing-based telepsychiatry

Methodological difficulties notwithstanding, telepsychiatry has undergone the most comprehensive examination of its utility[11]. Various aspects of efficacy and effectiveness of videoconferencing-based telepsychiatry are briefly reviewed in this section.

**Diagnostic accuracy and reliability of videoconferencing-based assessments:** A large number of studies have compared the accuracy and reliability of videoconferencing-based telepsychiatric assessments with face-to-face evaluations. A list of these studies is included in Table 1[40-79]. The table shows that these studies have been conducted in different disorders, using several different scales or structured interviews, among diverse populations such as children, adults, elderly and ethnic groups, and in different settings such as outpatients, inpatients, emergency services, residential and correctional facilities. They provide substantial evidence that on the whole there seems to be no difference between the reliability and diagnostic accuracy of telepsychiatric assessments, compared to face-to-face assessments. However, as is evident from Table 1, RCTs on this aspect, i.e., studies in which subjects have been randomly assigned to either method of assessment are limited. Moreover, the role of factors such as bandwidth, objective vs subjective aspects of assessments, and reliability in certain populations, e.g., the elderly with sensory deficits, is uncertain.

The reliability of telepsychiatric assessments has been the focus of interest of several reviews on the subject as well[2,7-10,12-14,25,29-34,80-85]. These have generally concluded that despite methodological limitations, videoconferencing-based assessments appear to be comparable to face-to-face evaluations. A meta-analysis on the reliability of telepsychiatric assessments found only 14 studies (with 380 adult patients), which had compared videoconferencing-based assessments with face-to-face evaluations directly using standardized instruments[84]. Despite the limited number of studies, there was no difference in accuracy or satisfaction between the two assessment modalities. Surprisingly, bandwidth did not appear to be a confounder, although there some suggestion that high bandwidth was better for more detailed observation of subjects. A later meta-analysis included studies, which had compared videoconferencing-based diagnosis with a non-telemedicine alternative by reporting a measure of agreement[85]. Most of these were in the field of dermatology, but 10 studies were from psychiatry, geriatrics, minor injuries, neurology and rheumatology. Reliability of diagnosis via videoconferencing was confirmed in all studies, but problems in study-designs were common. Finally, a more recent review, based on eight previous systematic reviews also concluded that diagnostic assessments conducted via videoconferencing were equivalent to face-to-face assessments, but bandwidth and resolution were major factors, affecting the reliability of telepsychiatric assessments[2]. The reliability of tele-mental health assessments using other modalities such as telephones, or web-based tools has also been compared with face-to-face assessments[33,34,83,86]. Most of the evidence suggests that these methods are also as reliable as face-to-face evaluations, but the number of well-designed studies is still meagre (Table 1).

**Clinical outcomes:** Research-data from the initial studies comparing clinical outcomes between videoconferencing-based interventions and conventional treatment found both conditions to be equivalent across diverse populations, across all age groups, and on a wide range of outcome measures[17-19,30-32]. However, these studies lacked randomized-controlled designs; their samples were small and follow-up periods did not extend beyond six months. Moreover, outcomes were inferior for telepsychiatric interventions in certain populations, e.g., those with substance abuse problems. Though later reviews on the subject also indicated positive and equivalent outcomes among patients undergoing telepsychiatric (principally videoconferencing) interventions, the small number of RCTs continued to remain a cause for concern[8-10,16,17,29,33-36]. Fortunately, since then the evidence has been shored up by several, large and well-designed trials, which have demonstrated either equivalent, or even superior outcomes in the groups receiving videoconferencing-based interventions. A list of RCTs of clinical outcomes with these interventions is included in Table 2[87-104]. It is evident from this table that though the number of RCTs is growing, the evidence-base for videoconferencing-based interventions is still a modest one. Moreover, the period of follow-up in these studies has seldom extended beyond one year; statistical methods to test outcome have not always been adequate; and, data on other measures such as service utilization, quality of life, and adherence are limited[2,10-14,22,35,36,39,83]. However, despite these methodological inadequacies, it would not be premature to conclude that the bulk of the evidence consisting of uncontrolled and controlled comparisons, as well as RCTs indicates that videoconferencing-based telepsychiatry is no less effective than traditional face-to-face treatment. More recently, the evidence from clinical trials has been supplemented by large-scale naturalistic studies. In one such study, Godleski et al[105] assessed clinical outcomes of 98609 patients with mental health disorders during six-month periods prior to, and after their enrolment in telemental health services of the United States Department of Veterans Affairs. The results showed a considerable decline in the rates of admissions and hospital stays among patients of both genders and all age groups following enrolment in telepsychiatric services (Table 2).

**Outcomes in specific disorders:** The literature on

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

## Table 1 Reliability of videoconferencing-based assessments: Comparisons with face-to-face evaluations

| Ref. | Patient group | Scale used | Study design | Results |
|---|---|---|---|---|
| Baer et al[40] | 16 adults with OCD | YBOCS, HAM-D, HAM-A | Non-RCT | VC = F2F |
| Montani et al[41] | 10 elderly psychiatric inpatients with no cognitive impairment | MMSE, CFT | Non-RCT | VC inferior to F2F |
| Montani et al[42] | 15 elderly psychiatric inpatients with no cognitive impairment | MMSE, CFT | Non-RCT | VC inferior to F2F in certain aspects |
| Baigent et al[43] | 63 adult inpatients | BPRS | Non-RCT | BPRS ratings similar; differences in ratings of affect |
| Zarate et al[44] | 45 patients with schizophrenia | BPRS, SANS, SAPS | Non-RCT | Global severity and BPRS similar, SANS not reliably rated, higher BW better |
| Montani et al[45] | 25 elderly psychiatric inpatients, 10 with dementia | MMSE, CFT | Non-RCT | VC inferior to F2F in non-cognitively impaired elderly; VC = F2F in those with dementia |
| Ruskin et al[46] | 30 adult inpatients | SCID | Non-RCT | VC = F2F |
| Ball et al[47] | 11 elderly psychiatric patients | CAMCOG | Non-RCT | VC = F2F |
| Ball et al[48] | 99 responses of elderly psychiatric patients | MMSE | Non-RCT | VC = F2F |
| Stevens et al[49] | 40 adult psychiatric patients | SCID | RCT | Similar satisfaction with both methods |
| Kirkwood et al[50] | 27 inpatients with history of alcohol abuse | Neuropsychological battery | Non-RCT | Cognitive assessment by VC = F2F |
| Chae et al[51] | 30 adult patients with schizophrenia | BPRS | Non-RCT | VC = F2F; BW did not matter |
| Elford et al[52] | 23 children referred for psychiatric assessments | Semi-structured interview | RCT | VC = F2F |
| Jones et al[53] | 30 elderly patients | BPRS | Non-RCT | Reliability better for objective than subjective items; BW did not matter |
| Yoshino et al[54] | 42 adult inpatients with chronic schizophrenia | BPRS | Non-RCT | Reliability low with narrow BW |
| Grob et al[55] | 27 elderly nursing home residents | BPRS, MMSE, GDS | Non-RCT | VC = F2F |
| Bishop et al[56] | 24 adult psychiatric patients | CSQ | RCT | VC = F2F on patient satisfaction |
| Guilfoyle et al[57] | 12 elderly nursing home residents | Health assessments | Non-RCT | VC = F2F |
| Loh et al[58] | 20 elderly psychiatric patients | MMSE, GDS | Non-RCT | VC = F2F |
| Kobak[59] | 42 patients with mood disorders | HAM-D | Non-RCT | VC = F2F |
| Poon et al[60] | 22 community-dwelling elderly with mild dementia or mild cognitive impairment | MMSE, RBMT, HDS | RCT | VC = F2F |
| Cullum et al[61] | 33 elderly with mild cognitive impairment or dementia | Neuropsychological battery | Non-RCT | VC = F2F |
| Lexcen et al[62] | 72 adult psychiatric patients in forensic settings | BPRS, Mac CAT-CA | Non-RCT | VC = F2F |
| Loh et al[63] | 20 elderly patients with dementia | MMSE, GDS and other scales | Non-RCT | VC = F2F |
| Martin-Khan et al[64] | 42 patients over 50 yr referred for cognitive assessment | Neuropsychological battery | Non-RCT | VC = F2F |
| Singh et al[65] | 37 adult patients with psychiatric disorders | DSM-IV | RCT | VC = F2F |
| Shore et al[66] | 53 male American Indian veterans with psychiatric disorders | SCID | RCT | VC = F2F |
| Manguno-Mire et al[67] | 21 inpatients from a forensic psychiatric facility | GCCT-MSH | RCT | VC = F2F |
| Kobak et al[68] | 35 adult patients with mood disorders | MADRS | Non-RCT | VC = F2F |
| McEachern et al[69] | 71 elderly patients from a memory clinic | MMSE | RCT | VC = F2F |
| Ciemins et al[70] | 73 elderly patients with diabetes | MMSE | Non-RCT | VC = F2F |
| Porcari et al[71] | 20 male veterans with PTSD | CAPS | Non-RCT | VC = F2F |
| Thompson et al[72] | 138 transplant recipients receiving follow-up | CES-D | RCT | VC = F2F |
| Morgan et al[73] | 169 elderly from a memory clinic | Satisfaction assessment | RCT | Similar satisfaction with both methods |
| Stain et al[74] | 11 adolescents/young adults (14-30 yr) with early psychosis | Diagnosis, quality of life, neurocognition on standardized scales | Non-RCT | VC = F2F |
| Bui[75] | 30 undergraduates with subclinical OC symptoms | YBOCS | Non-RCT | VC = F2F |
| Martin-Khan et al[76] | 205 patients over 50 yr referred for cognitive assessment | Neuropsychological battery | Non-RCT | VC = F2F |
| Wong et al[77] | 42 elderly psychiatric inpatients | RUDAS | Non-RCT | VC = F2F |
| Seidel et al[78] | 73 adult psychiatric patients in emergency settings | Interview | RCT | VC = F2F |
| Litwack et al[79] | 75 veterans with PTSD | CAPS | Non-RCT | VC = F2F |

F2F: Face to face or in-person assessment; VC: Videoconferencing; BW: Bandwidth; RCT: Randomized controlled trial (*i.e.*, a study in which patients were randomly assigned to VC or F2F assessment); OCD: Obsessive compulsive disorder; PTSD: Posttraumatic stress disorder; YBOCS: Yale-Brown Obsessive-Compulsive Scale; HAM-D: Hamilton Rating Scale for Depression; HAM-A: Hamilton Rating Scale for Anxiety; BPRS: Brief Psychiatric Rating Scale; SANS: Scale for the Assessment of Negative Symptoms; SAPS: Scale for the Assessment of Positive Symptoms; SCID: Structured Clinical Interview for DSM-III-R; MMSE: Mini-Mental State Examination; GDS: Geriatric Depression Scale; RBMT: Rivermead Behavioural Memory test; HDS: Hierarchic Dementia Scale; CSQ: Client Satisfaction Questionnaire; CFT: Clock Face Test; RUDAS: Rowland Universal Dementia Assessment Scale; CAPS: Clinician-Administered PTSD Scale; MADRS: Montgomery-Asberg Depression Rating Scale; Mac CAT-CA: MacArthur Competence Assessment Tool-Criminal Adjudication; CES-D: Center for Epidemiologic Studies-Depression; GCCT-MSH: Georgia Court Competency Test-Mississippi State Hospital revision.



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

**Table 2  Outcome of videoconferencing-based interventions: Randomized-controlled trials of comparisons with face-to-face interventions**

| Ref. | Patient group | Treatment details | Outcome measures | Results |
|---|---|---|---|---|
| Day et al[87] | 80 adult clients with a wide range of problems, from weight concerns to personality disorders | 5 sessions of CBT | BSI, GAF, TC and working alliance and satisfaction scales | VC ≈ F2F treatment on outcome and process measures |
| Nelson et al[88] | 28 children 8-14 yr with DSM-IV depression | Eight weekly CBT sessions with child and parent | KSADS-P, CDI, satisfaction questionnaire | VC ≈ F2F treatment on depression scores and satisfaction |
| Ruskin et al[89] | 119 adult patients with depression according to SCID with HAM-D scores greater than 16 | Eight sessions over a 6 mo; medication, psychoeducation, brief supportive counseling | Treatment response, adherence, patient and psychiatrist satisfaction, cost effects | VC ≈ F2F treatment on all aspects; costs same if travel considered |
| Bouchard et al[90] | 21 adult patients with panic disorder and agoraphobia according to SCID | Weekly CBT for 12 wk; follow-up for 6 mo | Self-assessment and ratings on anxiety and disability scales | VC ≈ F2F treatment on symptom reduction, functioning and alliance |
| Poon et al[91] | 22 community-dwelling elderly with mild dementia or mild cognitive impairment | Cognitive intervention programme for older patients | MMSE, RBMT, HDS | VC ≈ F2F treatment in terms of cognitive improvement |
| De Las Cuevas et al[92] | 140 adult psychiatric outpatients; ICD-10 diagnoses as per CIDI | 8 consultations over 24 wk; medication and CBT | CGI-S and CGI-I, SCL-90R | VC ≈ F2F treatment on symptom reduction |
| O'Reilly et al[93] | 495 adult psychiatric patients | Medication management, psychoeducation, supportive counseling, triage to other local services | BSI, CSQ-8, SF-36 , satisfaction | VC ≈ F2F treatment on symptom reduction and satisfaction; VC 10% less expensive per patient |
| Fortney et al[95] | 395 adult primary care patients with PHQ-9 depression severity scores ≥ 12 | Medication management and psychotherapy for 12 mo | Antidepressant prescribing, medication adherence, treatment response and remission health status, quality of life and satisfaction on standardized scales | VC > F2F treatment on mental health status, health-related quality of life, and satisfaction |
| Frueh et al[94] | 97 adult patients with combat-related PTSD | 14 weekly treatment sessions for 3 mo | Self-report, symptom severity, BDI, SCL, satisfaction, adherence and other process measures | VC ≈ F2F treatment on symptom-severity and satisfaction |
| Hilty et al[95] | 121 adult patients with depression according to SCID | Intensive modules using telepsychiatric educational interventions provided by primary-care providers | BDI, SCL, SF-36 | VC ≈ F2F treatment on symptom reduction; VC > F2F on satisfaction and retention |
| Mitchell et al[96] | 128 adults with DSM-IV bulimia nervosa or other eating disorders; binge eating or purging at least once per week | 20 sessions of manual-based, CBT for bulimia over 16 wk | HAM-D, BDI, self-esteem, quality of life, functioning, alliance and symptom-severity | VC ≈ F2F treatment on most measures |
| Thompson et al[72] | 138 adult transplant recipients with depression; CES-D score > 16 | Medications and counseling over 12 mo | CES-D | VC ≈ F2F treatment on symptom reduction |
| Morland et al[97] | 125 adult male veterans with PTSD according to SCID | Anger management therapy - 12 session CBT intervention over 6 wk; follow-up for 6 mo | CAPS, STAXI-2, NAS-T, attrition, adherence, satisfaction and alliance assessments | VC ≈ F2F treatment on anger reduction and process variables; alliance better in F2F treatment |
| Chong et al[98] | 167 adult Hispanic patients with major depression | Monthly telepsychiatry sessions for 6 mo; medications and counselling | Appointment adherence, alliance, satisfaction, antidepressant use, depression and functional outcomes | VC > F2F treatment on adherence, alliance, satisfaction: VC = F2F treatment on depression and functional outcomes |
| Moreno et al[99] | 167 adult Hispanic patients with major depression according to PHQ-9 and  MINI | Medication management and counseling for 6 mo | PHQ-9, MADRS, Q-LES-Q, SDS | VC > F2F treatment on all outcomes |
| Dunstan et al[100] | 6 adults with anxiety or mixed anxiety-depressive disorder | 6-8 sessions of CBT; 1-mo follow-up | Self-reports and symptom-severity | VC ≈ F2F treatment |
| Fortney et al[101] | 364 adult patients with major depression according to PHQ-9 and MINI | Telemedicine-based collaborative care vs practice-based collaborative care for 18 mo; medication management and psychosocial treatment | Depression outcomes module, HSCL, QOL-DTA, DSSS, DHBI | VC > F2F treatment on depression outcomes |
| Stubbings et al[102] | 26 adult patients with mood or anxiety disorder according to SCID | 12 sessions of CBT; 6-wk follow-up | Symptom-severity, self-reports, alliance, quality of life and satisfaction on standardized scales | VC ≈ F2F treatment on all outcome measures |

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

| Choi et al[103] | 158 homebound individuals > 50 yr with depression, HAM-D score > 15 | PST-telehealth problem-solving therapy vs IP-PST; 6 PST sessions over 6 wk; follow-up for 36 wk | HAM-D, WHODAS | VC = F2F treatment, but VC effects more sustained |
| Choi et al[104] | 121 homebound individuals > 50 yr with depression, HAM-D score > 15 | PST-telehealth problem-solving therapy vs IP-PST; 6 PST sessions over 6 wk; follow-up for 24 wk | Acceptability on the TEI, HAM-D | VC = F2F treatment |

VC treatment: Treatment through videoconferencing; F2F treatment: Face-to-face or in-person treatment; CBT: Cognitive behavioral therapy; PTSD: Post-traumatic stress disorder; HAM-D: Hamilton Rating Scale for Depression; SCID: Structured Clinical Interview for DSM-IV; KSADS-P: Schedule for Affective Disorders and Schizophrenia for School Age Children-Present Episode; CDI: Children's Depression Inventory; MMSE: Mini-Mental State Examination; RBMT: Rivermead Behavioural Memory test; HDS: Hierarchic Dementia Scale; CIDI: Composite International Diagnostic Interview; CGI-S and CGI-I: Clinical Global Impressions-Severity of Illness and Improvement; SCL: Symptom Checklist; BSI: Brief Symptom Inventory; CSQ: Client Satisfaction Questionnaire; SF-36: Medical Outcomes Study Short Form; PHQ: Patient Health Questionnaire; BDI: Beck's Depression Inventory; CES-D: Center for Epidemiologic Studies-Depression; MPSS: Modified PTSD Symptom Scale; BAI: Beck Anxiety Inventory; CAPS: Clinican-Administered PTSD Scale; STAXI-2: State-Trait Anger Expression Inventory-2; NAS-T: Novaco Anger Scale total score; MINI: Mini-International Neuropsychiatric Interview; PHQ-9: Patient Health Questionnaire-nine item version; MADRS: Montgomery-Åsberg Depression Rating Scale; Q-LES-Q: Quality of Life Enjoyment and Satisfaction Questionnaire; SDS: Sheehan Disability Scale; HSCL: Hopkins Symptom Checklist; QOL-DTA: Quality Improvement for Depression Treatment Acceptability scale; DSSS: Duke Social Support and Stress Scale; DHBI: Depression Health Beliefs Inventory; WHO: World Health Organization; WHODAS: WHO Disability Assessment Schedule; TEI: Treatment Evaluation Inventory; GAF: Global Assessment of Functioning; TC: Target Complaints method.

the outcome of telepsychiatric interventions in specific psychiatric disorders till around the mid-2000s consisted only of small non-randomised studies; consequently, conclusions about effectiveness of telepsychiatry in these conditions were uncertain[17,18,30,31]. Since then RCTs or controlled trials have been conducted with almost all common disorders including depression, anxiety disorders (panic disorders, phobias, obsessive compulsive disorder, and post-traumatic stress disorder), eating disorders, substance abuse, psychosis, dementia, and suicide prevention.

(1) Depressive disorders. RCTs comparing outcomes among patients with depressive disorders included in Table 2 show that treatment delivered by videoconferencing is equivalent to face-to-face treatment on symptom reduction and a range of other outcomes[72,88,89,95,103,104]. Indeed, in several instances videoconferencing treatment has actually turned out to be superior to face-to-face treatment on depression outcomes[93,98,99,101]. Two literature reviews have provided further support for the utility of videoconferencing-based telepsychiatry in the treatment of depression[106,107]. One of these reviews was based on ten RCTs of different videoconferencing, telephone, internet and computer based treatments of depression[107]. Although the authors noted that there was limited data about the effectiveness of telemental health interventions in depression, they concluded that videoconferencing-based treatments yielded the same results as face-to-face treatment. Despite the more recent large-scale RCTs on videoconferencing-based treatments in depression, the evidence-base is still comparatively smaller than other telemental health interventions for depression, such as telephone, internet, or computer based treatments[33,34,108-112].

(2) Anxiety disorders. A few RCTs have demonstrated the efficacy of videoconferencing-based treatments in anxiety disorders[100,102] including panic disorder and agoraphobia[90], but the numbers involved have usually been small. A meta-analysis of 13 studies, one of which used videoconferencing-based treatment for anxiety and depressive disorders, indicated that such interventions could be more effective in anxiety than depressive disorders[112]. A recent literature review concluded that videoconferencing and telephone-based treatments can be equally effective as face-to-face treatments of obsessive compulsive disorder[113]. As with the literature on depression, the number of RCTs for telephone, internet or computer based therapies for anxiety disorders are much larger than those with videoconferencing-based treatments[33,34,108-112].

(3) Post-traumatic stress disorder. Some RCTs have compared the efficacy of videoconferencing-based interventions with face-to-face treatments in post-traumatic stress disorder (PTSD)[94,97], and have found these to be equally efficacious. RCTs favouring videoconferencing-based treatments of PTSD have been supplemented by non-randomized controlled trials with extended periods of follow-up with similar results[114,115]. Other aspects of treatment such therapeutic alliance, levels of attrition and compliance, patients' satisfaction, clinicians' satisfaction and patients' retention of information have been compared both in RCTs[116] and controlled trials[117], and have been found to be similar in both treatment conditions. The efficacy of videoconferencing-based interventions in PTSD has also been endorsed by literature reviews of the subject[118], and a meta-analysis of telehealth interventions[119].

(4) Eating disorders. A RCT comparing cognitive behaviour therapy (CBT) for bulimia and other eating disorders delivered via videoconferencing with face-to-face treatment found both treatments to be similar on reduction of eating disorder and depression symptoms, self-esteem, quality of life, functioning and therapeutic alliance[96]. Other aspects of treatment such as cost-effectiveness and therapeutic factors affecting treatment were also found to be equivalent between the two treatment-conditions[120,121].

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

(5) Substance abuse. Although several reviews have concluded that videoconferencing-based treatments have considerable potential to be of use in treatment of alcohol and other substance-use problems, there is no RCT on videoconferencing-based treatment of these disorders. Instead, a number of RCTs of telephone, internet, or computer based treatments have been conducted, which have shown that such interventions compare well with face-to-face treatment[33,34,108,122].

(6) Schizophrenia. Video-conferencing-based tele-psychiatric studies of schizophrenia consist of programme descriptions, case reports, and controlled trials[33,34,108,123-125]. These have shown that schizophrenia can be reliably diagnosed and assessed using videoconferencing, and treatment using this modality results in improved clinical outcome and high rates of satisfaction among patients. However, there are no RCTs comparing videoconferencing with face-to-face treatment. On the other hand, a number of telehealth and e-health studies using randomized designs have yielded positive outcomes in terms of clinical improvement, improved adherence, increased awareness, and self-management interventions[124,125].

(7) Suicide prevention. Studies of suicide risk assessment and monitoring have shown that videoconferencing is as effective as face-to-face assessments[78,126,127]. A review of telehealth interventions found these to be effective not only in assessment, but also in interventions to prevent suicide[127]. However, most trials were of telephone or web based interventions, and the number of RCTs was limited. Concerns about safety of remote assessments have also been raised.

**Outcomes in specific populations:** (1) Children and adolescents. The field of telepsychiatry services for children and adolescents is still a developing one. However, several reviews have noted that the results of studies till date are encouraging[81,108,128-136]. Video-conferencing-based approaches among children and adolescents have shown that these are equivalent to face-face methods in diagnosing childhood psychiatric disorders. High satisfaction has been noted among children and their parents, and comparable clinical outcomes have also been demonstrated. Videocon-ferencing-based studies report positive findings for health care practitioners, time and cost savings, and improvement in quality of care. Nevertheless, the bulk of the evidence consists mostly of programme descriptions, case studies and non-randomized trials. Only three RCTs of videoconferencing have been conducted, one of diagnostic reliability, another of treatment of childhood depression with CBT, and the third on the effectiveness of videoconferencing in teaching training skills to parents of children with attention deficit hyperkinetic disorder[52,88,137]. Another ongoing RCT of videoconferencing-based treatment for attention deficit hyperkinetic disorder has yielded promising results[136]. Therefore, although videoconferencing appears to hold great promise as a mode of mental health-care service

for children and adolescents, there is a need for well-designed and properly controlled trials to evaluate its usefulness.

(2) The elderly. Telepsychiatry has a special role in the mental health care of the elderly because they account for a large proportion of patients from rural and remote locations, and often have multiple, chronic conditions, which limits their access to high-quality, specialized care[138]. There is a wealth of literature on videoconferencing-based assessments of mental state and cognitive function, which clearly shows that these assessments are as reliable as face-to-face interviews in elderly patients, even in those with cognitive impairment[82,108,138-140]. However, most studies are not adequately designed, and there are very few RCTs comparing videoconferencing-based with face-to-face assessments[60,69,82,139,140]. Similarly, though several descriptive and uncontrolled studies have demonstrated improved outcome with videoconferencing-based inter-ventions[138-140], there is only one RCT with 22 patients with dementia, which has shown the benefits of a video-conferencing-based cognitive intervention for these patients[60].

(3) Forensic and correctional settings. Telepsychiatry has obvious advantages while delivering mental health-care for inmates of prisons and other correctional settings, a large proportion of who suffer from mental health disorders[10,12,16,17,141-144]. Videoconferencing-based assessments have proved to be as reliable as face-to-face assessments in forensic settings, but much of the evidence for this derives from uncontrolled studies. Similarly, though telepsychiatry appears to increase access for prison inmates, leads to high satisfaction among them, and cost savings for providers, the evidence for these outcomes and for the clinical effectiveness of videoconferencing-based interventions in forensic settings is almost always derived from case reports, descriptive studies and uncontrolled trials[141-144].

(4) Emergency settings. The application of telepsy-chiatry for assessment and treatment of patients attending the emergency department with mental health problems is another emerging area. Till date there are a few descriptions of programmes being run in emergency settings and case reports of patients treated in such settings[108,145,146]. These have indicated that videoconferencing is a safe and effective way of delivering services in this area, and patients and staff express high satisfaction with such services. These findings were endorsed by a recent RCT, which found that videoconferencing-based diagnoses were as reliable as face-to-face ones, and the two modes were similar on recommendations about disposition and ratings of dangerousness or suicidality[78].

(5) Ethnic populations. Telepsychiatry is being increasingly used worldwide to provide services to ethnic minorities including American-Indians and the Hispanic community in the United States, aboriginal communities, and Asian and African people[2,108,147-149]. Providing culturally appropriate care is a particular challenge for



these up-and-coming telepsychiatric programmes, because the cultural background of patients from ethnic minorities influences their perceptions about technology and the patient-provider relationship[108,147,148]. Nevertheless, a number of RCTs have documented the reliability of videoconferencing-based assessments, as well as feasibility, acceptability and effectiveness of telepsychiatric services among American-Indian veterans and Hispanic communities[66,98,99]. Then again, a recent systematic review of provision of counselling for depression in ethnic minorities through telephone, internet or videoconferencing-based services concluded that more methodologically rigorous studies of use among ethnic minorities were required[150].

**Psychotherapy outcomes:** The usefulness of videoconferencing in conducting effective psychological treatment has gained widespread acceptance. A number of psychosocial interventions can be delivered *via* videoconferencing including CBT, psychotherapy, behaviour therapy, psychoeducation, family therapy and rehabilitation. CBT is the best researched modality, and has been used in different psychiatric disorders, as well as different patient populations. CBT may be particularly well suited to videoconferencing, because it is usually brief, more structured, and less dependent on the therapeutic relationship as other insight-oriented therapies. Thus, it is less likely to be affected by the potential technological limitations of videoconferencing[83]. Videoconferencing-based CBT has been compared in a number of RCTs with face-to-face CBT in different disorders, and has proved to be equally effective[87,88,90,91,96,97,100,102-104]. However, the number of such RCTs is still small, and most trials have been conducted with relatively small sample sizes. A meta-analysis identified 13 RCTs, one of which was a trial on videoconferencing-based CBT, and found positive outcomes favouring telephone, internet and videoconferencing-based therapies for anxiety and depressive disorders. Not surprisingly, the lack of RCTs and direct comparisons with face-to-face treatments meant that the evidence was considered to be only preliminary[112]. Psychotherapy other than CBT *via* videoconferencing has also been the focus of several trials[151]. A recent systematic review of videoconferencing-based psychotherapy identified 65 studies in this area[152]. It concluded that such psychotherapy was a feasible option for treatment, lent itself to a variety of therapeutic modalities, was useful in different disorders and patient populations, and was associated with high satisfaction among users. Moreover, it appeared to be as effective as face-to-face psychotherapy, though more large-scale clinical trials were needed to further assess the efficacy and effectiveness of videoconferencing-based psychotherapy. Videoconferencing has also been used to conduct behavioural treatments such as exposure and response prevention[153], family therapy[154], and rehabilitation of patients with chronic conditions[155], but the number of

such trials is fewer. In contrast to the somewhat limited literature on videoconferencing-based psychosocial treatments, a large number of telephone- and internet-based (web-based interventions or online counselling) studies, principally of CBT, have been conducted till date. Several meta-analyses and systematic reviews of this extensive literature have shown that such treatments are equally effective as conventional CBT[110,156-160]. However, direct comparisons with face-to-face CBT are still rare, and not all of these trials are methodologically sound either[160].

**The doctor-patient relationship and therapeutic alliance:** An important variable in telepsychiatric interventions is the impact of telepsychiatry on the doctor-patient relationship, and the ability to establish rapport with patients through videoconferencing links[161]. It has been proposed that the way doctors and patients communicate with one another through telepsychiatric links affects the outcome of the videoconferencing-based treatment[162]. Additionally, in therapeutic settings, one of the primary concerns is about the perceived difficulty of developing an effective therapeutic relationship in the absence of non-verbal cues, particularly since the therapeutic alliance plays a crucial role in the outcome of psychotherapy[161]. Telepsychiatry appears to have both positive and negative effects on communication, with technological standards being a key confounding variable[18]. The two major issues, which have the potential to impact the rapport between the doctor and the patient and the therapeutic alliance, are the difficulty in detecting non-verbal cues, and the lack of physical proximity and physical presence[83].

A preliminary review on the subject of the doctor-patient relationship concluded that though relationship building appeared possible *via* telepsychiatry, it had disadvantages compared to face-to-face care, which were not fully understood[163]. However, another series of reviews concluded otherwise[162,164,165]. The first review of 38 studies compared the nature and content of doctor-patient communication in videoconferencing-based telemedicine in different specialties, with the bulk of studies being from psychiatry, otolaryngology, and dermatology. The findings from each study were coded according to 23 categories, and a positive and negative rating assigned to each of the communication results. Approximately 80% of the findings favoured the doctor-patient interaction *via* telemedicine, with all but two (non-verbal behaviour and lack of touch) of the 23 categories analyzed reporting more positive than negative results[164]. These findings were replicated by subsequent reviews, which included 57 and 61 studies respectively, exclusively in the domain of videoconferencing-based telepsychiatry[162,165].

Several other reviews have also addressed the subject of therapeutic alliance in telepsychiatry, and concluded that despite methodological limitations, the available literature supports the capability of therapists to develop a therapeutic alliance through videoconferencing

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

[18,83,161]. Additionally, several RCTs comparing videoconferencing-based psychosocial interventions (principally CBT) with face-to-face treatment, have found no differences in the quality of the therapeutic alliance between the two conditions[87,96,97,102]. Finally, a recent systematic review of 11 studies examined the therapeutic alliance in e-therapy for mental health, including videoconferencing-based treatment. It concluded that e-therapy seemed equivalent to face-to-face therapy in terms of therapeutic alliance, and that there was a positive association between the therapeutic alliance and e-therapy outcome. However, the authors also noted that because of the limited amount of evidence, definitive conclusions could not be made[166].

**Patient and provider satisfaction:** Patient and provider satisfaction with telepsychiatry are two outcomes of interest, which have attracted the maximum research attention[2,8,10,13,17,18,31,83,108,163,167]. The most consistently reported findings are the high levels of satisfaction and acceptance among patients. These have been found in virtually every study assessing patient satisfaction with telepsychiatric services, with up to 75% to 100% of the users reporting considerable satisfaction with telepsychiatric care. High satisfaction has been noted for all patient populations (children, adults, elderly, ethnic minorities, prison populations) and all kinds of psychiatric diagnoses. Levels of satisfaction with telepsychiatry are comparable to other branches of telemedicine. Systematic reviews of telemedicine studies, which have included telepsychiatric interventions, have endorsed this finding of high levels of satisfaction among patients[168-170]. A number of RCTs of videoconferencing-based assessments or interventions have also reported similar levels of patient satisfaction in telepsychiatric vs face-to-face care[35,49,56,67,87-89,92-94,96-98,104,107].

Despite these overwhelmingly positive responses from patients, a cautious interpretation of the evidence has been recommended, because of several methodological and conceptual problems afflicting research in this area[17,18,31,83,108,167,168-170]. Firstly, satisfaction is not a very robust indicator of outcome, since in certain instances patients may be satisfied with the care provided despite not benefitting from it. Secondly, the lack of good quality evidence in this area has also been a problem, along with conceptual problems in defining satisfaction. Finally, patient satisfaction might not always imply patient preference; other things being equal, most patients may still prefer face-to-face contact and care. Patients opt for telepsychiatry when it reduces travel, waiting times, absence from work, and costs, and when it enhances their sense of autonomy. Moreover, other factors may determine patient satisfaction, including clinical and demographic variables, severity and type of the disorder, and the availability and quality of telepsychiatric services[17,18,31,83].

Provider and consultee satisfaction has been less well evaluated. The results of such studies are usually mixed, but on the whole provider satisfaction appears to be lower than patient satisfaction with telepsychiatry[2,8,10,13,17,18,31,83,108,163,167,170]. This is perhaps reflected in the poor uptake and somewhat negative attitudes concerning telepsychiatry among clinicians. Telepsychiatry might not appeal to some clinicians because of the perceived difficulties in many areas such as communication or rapport building, and uncertainty about legal, regulatory and ethical issues[12,38].

**Cost-effectiveness:** The issue of costs and cost-effectiveness is at the heart of the debate about the viability of telepsychiatric services[31]. However, the assessment of cost-effectiveness of telepsychiatry services has proved to be challenging for several reasons[17,83]. Comprehensive evaluations of cost-effectiveness ideally covering both direct and indirect costs under several heads such as operating costs, costs to patients and providers, as well as societal costs, are difficult to conduct. Consequently, there are considerable differences across studies, both with respect to their designs, and in the methods used for analysis of costs[10,12,14,17,18,83,108]. Moreover, costs are dependent on technology, which evolves much faster than the methods used to estimate cost-effectiveness[17,18,83]. Due to these difficulties the quality of the existing evidence on cost-effectiveness of telepsychiatry is extremely variable. Early reviews of cost-effectiveness of telemedicine services concluded that these methodological flaws and the lack of appropriate outcome measures in existing studies made it difficult to determine cost-effectiveness[171]. In subsequent reviews of videoconferencing-based telepsychiatry, the evidence seemed to favour telepsychiatric services, but the limited number of good quality studies meant that cost-effectiveness of telepsychiatry could not be unequivocally demonstrated[18,31,172,173]. Since then, RCTs of videoconferencing-based interventions have mostly found that telepsychiatric care is either similar, or even better than traditional modes of care in terms of cost-effectiveness[66,89,92,120]. However, certain other RCTs have found videoconferencing to be the more expensive option[93,101,174]. Accordingly, recent reviews on the subject though finding evidence in favour of telepsychiatry services indicate that the results could depend on a number of moderators such as the study-design, the type of service being offered, the population in question, the technology being used, and the kinds of costs being examined[2,10,12,14,17,83,108,167,171,175]. Travel costs and the volume of telepsychiatric consultations have been examined in a number of studies. "Break-even point" analyses have suggested that a weekly volume of 7 to 14 consultations and travel-distances greater than 30 kilometres or so, determine whether a particular telepsychiatric service will prove to be cost-effective or not. One way of reducing set-up and operating costs could be to utilize the telepsychiatric equipment for other clinical, administrative and educational purposes[8,10,12,14,17,18,29,31,83,108,167,171,172].

**Access to care and empowerment:** Much like the evidence on high patient satisfaction, there is unequivocal evidence that telepsychiatry increases access to high-quality mental health-care for several populations, who may have lacked such care in the past[2,8,10,12,14,17,18,63,108]. It effectively removes several barriers to care such as distance, transportation difficulties, time limitations, costs, safety, and stigma. Consequently, it reduces inequities in care faced by many patients, and leads to a sense of empowerment among them. Therefore, videoconferencing for clinical purposes though originally intended to serve patients in remote and inaccessible locations, is being increasingly used nowadays to enhance access for urban patient populations as well.

**Other outcomes:** Other aspects of utility and feasibility of videoconferencing-based telepsychiatry have received much less research attention, though improvements in treatment-adherence, social functioning and quality of life have generally been found to be similar to face-to-face interventions in some RCTs[89,92-99,101-104].

# LIMITATIONS AND CONSTRAINTS OF TELEPSYCHIATRY

Videoconferencing-based telepsychiatry has been around for more than six decades now. During this time an extensive body of evidence has accumulated favouring the usefulness of this mode of service-delivery. However, there appears to be a large gap between the research-evidence and the use of telepsychiatry in routine health-care. A number of studies and reviews have focused their attention on the problem of limited clinical uptake of videoconferencing[9-14,17,18,29,34,83,108,176,177]. Barriers to the routine clinical use of telepsychiatry include methodological problems, technological hindrances, clinician or provider barriers, issues regarding safety, security and confidentiality, regulatory issues, ethical and legal concerns, and the lack of evidence on sustainability and benefits of integrating telepsychiatric services into existing mental health-care systems. Methodological concerns of the research on effectiveness of telepsychiatry, such as the lack of high-quality RCTs have already been alluded to. The lack of cost-effectiveness data is another major hindrance to obtaining funding for establishing new programmes. Although technology has developed rapidly, the equipment needed for starting a service is still expensive, and difficult to maintain. Problems like connectivity, and compatibility of different systems used (referred to as interoperability) are also quite common[12]. Provider skepticism is another major factor limiting acceptance. Studies have found that after controlling for other barriers, e.g., reimbursement and regulatory issues, negative attitudes of clinicians and institutions are the most significant barriers affecting use of telepsychiatric services[34]. Poor satisfaction with telepsychiatry among clinicians may arise from concerns about establishing rapport and a successful therapeutic alliance with patients, discomfort with technology, inadequate training, and the perception that telepsychiatry might add to, rather than alleviate their clinical burden[176-178]. Concerns about safety also predominate, although several reviews have indicated that the telepsychiatry is safe, even in relatively unsupervised settings, and does not have any negative outcomes[108,179,180]. Concerns about security of the systems overlaps with issues of confidentiality, privacy and consent of patients. Other issues such as requirements for licensing and reimbursement are yet to be resolved fully[108,181,182]. Finally, there is hardly any evidence on sustainability and benefits of integrating telepsychiatric services into the conventional systems of mental health care[17,83,176]. This usually means that new programmes survive only till they are promoted by enthusiastic local champions who are able to overcome scepticism among providers and attract funding from health-care authorities[176].

# TELEPSYCHIATRY IN LOW- AND MIDDLE-INCOME COUNTRIES

Despite being largely successful elsewhere, telepsychiatry is yet to make its mark in low- and middle-income countries of the developing world. This is surprising given that telepsychiatric services are ideally suited for delivery of mental health-care in such settings, where traditional means of mental health-care are often unable to cope with the large gap between demand and resources for care, and the inequitable distribution of health-care resources between urban and rural areas[2,15,22,183]. Nevertheless, research in telepsychiatry from these countries has generally consisted of scattered reports of newly established programmes till now[51,184-187]. However, there are a few notable exceptions. There are two reports from Hong Kong describing the provision of telepsychiatric services to elderly psychiatric patients[60,188], one of which is a RCT of a cognitive intervention in community-dwelling elderly with dementia[60]. There are several reports from an ongoing telepsychiatric programme in the University of KwaZulu-Natal in South Africa[2,15,185]. This group has undertaken systematic reviews of the effectiveness of videoconferencing, developed a model for such a service, and adapted guidelines for its use. Another review of studies from the Middle-East located 11 studies, two of which were RCTs[189]. From India there are reports from two ongoing video-conferencing-based projects. The Schizophrenia Research Foundation at Chennai in the south began experimenting with telepsychiatry in 2005, as part of its psychosocial intervention programmes for Tsunami victims[190,191]. From 2010 they have been running a mobile telepsychiatry service covering 156 villages. Over 1200 patients with severe mental illness have been treated by this facility. The telepsychiatry programme at the Department of Psychiatry, Postgraduate Institute of

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

Medical Education and Research (PGIMER), Chandigarh, India, developed in joint collaboration with the Department of Science and Technology, Government of India and the Tata Consultancy Services has also been running for over four years now[22,192]. The nodal centre of this service is at PGIMER, while the three remote sites are in the adjoining hill states of north-India. This programme has several innovative features. Established telepsychiatric programmes usually follow one of the several different models of care, such as direct patient management though video-conferencing, consultation models, or collaborative-care models[14,108]. However, such models may be difficult to implement in countries like India with severe manpower and resource limitations[22,192]. Therefore, right from the onset, the programme at PGIMER has followed a somewhat different model of training and enabling non-specialist personnel at remote sites to diagnose and treat mental illnesses on their own, with minimal consultation, super-vision, or direct care from the nodal centre[193]. To this end, a logically-linked computerized decision support system (CDSS) for diagnosis and management of common psychiatric disorders in adults, and in children and adolescents, has been developed as a part of this project. Computerized decision support systems provide clinicians and/or patients with intelligently filtered information at appropriate times to enhance patient care[194]. They are generally used to reduce errors in drug prescribing and providing information on best practices for managing patients. A systematic review found that though data on patient outcomes is limited, such systems may enhance preventive care and guideline adherence, particularly when they are effectively integrated into clinical workflows[194]. In the novel telepsychiatry application developed by the PGIMER, the CDSS has been used not only to provide standardized ways of diagnosing and managing psychiatric disorders, but also to effectively link the modules of diagnosis, treatment and follow-up care. The diagnostic module has screening and criteria-based diagnostic sub-modules, which enables the user to generate a diagnosis independently. Based on the diagnosis generated, standardized pharmacological and non-pharmacological treatment can be offered and follow-up undertaken. Training in the use of the application is conducted entirely online, following which a non-specialist health professional can diagnose and treat common psychiatric disorders with minimal supervision from psychiatrists at the nodal centre. Preliminary results regarding accuracy and reliability of the diagnoses generated compared to standardized interviews, and the usefulness of treatment modules has been encouraging[193,195,196].

## CONCLUSION

Is telepsychiatry an idea whose time has come? There is no doubt videoconferencing-based telepsychiatry facilitates effective service-provision in a large number of areas, where access to high-quality services is difficult. Consequently, it promotes an equality of access, a sense of empowerment among patients, and high levels of satisfaction among them. The evidence to date is highly suggestive that it is comparable to face-to-face care on several aspects of what is traditionally considered effectiveness. However, by the present stringent standards, the quality of the evidence is, perhaps, not adequate. Additionally, there are several barriers to telepsychiatry's wider implementation such as cost-effectiveness, uncertain ethical and legal implications, and concerns about sustainability of programmes. These continue to thwart its integration into the routine network of mental health services. Accordingly, at present telepsychiatric services can only serve as an adjunct to the more traditional modes of service-delivery, but can never replace them. Therefore, the way forward would be to develop hybrid models, which incorporate both forms of service-delivery[84,172]. If telepsychiatry settles into this niche, it has the potential to enhance the overall efficiency of mental health services by removing the many obstacles, which afflict conventional systems of service-delivery. This model may also work for low- and middle-income countries, provided that effective, needs-based forms of telepsychiatric services are developed in these countries as well.

## REFERENCES

1    **Demyttenaere K**, Bruffaerts R, Posada-Villa J, Gasquet I, Kovess V, Lepine JP, Angermeyer MC, Bernert S, de Girolamo G, Morosini P, Polidori G, Kikkawa T, Kawakami N, Ono Y, Takeshima T, Uda H, Karam EG, Fayyad JA, Karam AN, Mneimneh ZN, Medina-Mora ME, Borges G, Lara C, de Graaf R, Ormel J, Gureje O, Shen Y, Huang Y, Zhang M, Alonso J, Haro JM, Vilagut G, Bromet EJ, Gluzman S, Webb C, Kessler RC, Merikangas KR, Anthony JC, Von Korff MR, Wang PS, Brugha TS, Aguilar-Gaxiola S, Lee S, Heeringa S, Pennell BE, Zaslavsky AM, Ustun TB, Chatterji S. Prevalence, severity, and unmet need for treatment of mental disorders in the World Health Organization World Mental Health Surveys. *JAMA* 2004; **291**: 2581-2590 [PMID: 15173149 DOI: 10.1001/jama.291.21.2581]

2    **Chipps J**, Brysiewicz P, Mars M. Effectiveness and feasibility of telepsychiatry in resource constrained environments? A systematic review of the evidence. *Afr J Psychiatry* (Johannesbg) 2012; **15**: 235-243 [PMID: 22829225 DOI: 10.4314/ajpsy.v15i4.30]

3    **Wittson CL**, Benschoter R. Two-way television: helping the Medical Center reach out. *Am J Psychiatry* 1972; **129**: 624-627 [PMID: 4673018 DOI: 10.1176/ajp.129.5.624]

4    **Wittson CL**, Affleck DC, Johnson V. Two-way television in group therapy. *Ment Hosp* 1961; **12**: 22-23 [PMID: 14007789 DOI: 10.1176/ps.12.11.22]

5    **Dwyer TF**. Telepsychiatry: psychiatric consultation by interactive television. *Am J Psychiatry* 1973; **130**: 865-869 [PMID: 4716685 DOI: 10.1176/ajp.130.8.865]

6    **Straker N**, Mostyn P, Marshall C. The use 0f two-way TV in bringing mental health services to the inner city. *Am J Psychiatry* 1976; **133**: 1202-1205 [PMID: 970494 DOI: 10.1176/ajp.133.10.1202]

7    **Myers K**, Cain S. Practice parameter for telepsychiatry with children and adolescents. *J Am Acad Child Adolesc Psychiatry* 2008; **47**: 1468-1483 [PMID: 19034191 DOI: 10.1097/CHI.0b013e31818b4e13]

8    **Millar HR**. Telemental Health in Scotland. Aberdeen: Scottish Centre for Telehealth, 2009. Available from: URL: http://www.sctt.scot.nhs.uk/pdf/inentalhealth.pdf

9    **Rudolf JN**. Effectiveness of telepsychiatry: an integrative litera-



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

ture review. Thesis, Master of Nursing. Montana State University Bozeman, Montana, 2011. Available from: URL: http://scholarworks.montana.edu/xmlui/bitstream/handle/1/2164/RudolfJ0511.pdf?sequence=1

10  **Vaitheswaran S**, Crockett P, Wilson S, Millar H. Telemental health: videoconferencing in mental health services. *Advances in Psychiatric Treatment* 2012; **18**: 392-398 [DOI: 10.1192/apt.bp.111.008904]

11  **Grady B**. Promises and limitations of telepsychiatry in rural adult mental health care. *World Psychiatry* 2012; **11**: 199-201 [PMID: 23024682]

12  **Deslich S**, Stec B, Tomblin S, Coustasse A. Telepsychiatry in the 21(st) century: transforming healthcare with technology. *Perspect Health Inf Manag* 2013; **10**: 1f [PMID: 23861676]

13  **Shore JH**. Telepsychiatry: videoconferencing in the delivery of psychiatric care. *Am J Psychiatry* 2013; **170**: 256-262 [PMID: 23450286 DOI: 10.1176/appi.ajp.2012.12081064]

14  **Hilty DM**, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: a 2013 review. *Telemed J E Health* 2013; **19**: 444-454 [PMID: 23697504 DOI: 10.1089/tmj.2013.0075]

15  **Chipps J**, Ramlall S, Mars M. Practice guidelines for videoconference-based telepsychiatry in South Africa. *Afr J Psychiatry* (Johannesbg) 2012; **15**: 271-282 [PMID: 22829230 DOI: 10.4314/ajpsy.v15i4.35]

16  **Antonacci DJ**, Bloch RM, Saeed SA, Yildirim Y, Talley J. Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry. *Behav Sci Law* 2008; **26**: 253-269 [PMID: 18548519 DOI: 10.1002/bsl.812]

17  **Richardson LK**, Frueh BC, Grubaugh AL, Egede L, Elhai JD. Current Directions in Videoconferencing Tele-Mental Health Research. *Clin Psychol* (New York) 2009; **16**: 323-338 [PMID: 20161010 DOI: 10.1111/j.1468-2850.2009.01170.x]

18  **Hilty DM**, Marks SL, Urness D, Yellowlees PM, Nesbitt TS. Clinical and educational telepsychiatry applications: a review. *Can J Psychiatry* 2004; **49**: 12-23 [PMID: 14763673]

19  **American Psychiatric Association**. Telepsychiatry via videoconferencing. Available from: URL: http://www.psychiatry.org/File Library/Learn/Archives/199821.pdf

20  **The Royal Australian and New Zealand College of Psychiatrists**. The Royal Australian and New Zealand College of Psychiatrists Position Statement # 44: Telepsychiatry. Available from: URL: https://www.ranzcp.org/Files/Resources/College_Statements/Position_Statements/ps44-pdf.aspx

21  **Tracy J**. Telemedicine technical assistance documents. A guide to getting started in telemecine. Columbia, MO: University of Missouri-School of Medicine, 2004

22  **Malhotra S**, Chakrabarti S, Shah R. Telepsychiatry: Promise, potential, and challenges. *Indian J Psychiatry* 2013; **55**: 3-11 [PMID: 23441027 DOI: 10.4103/0019-5545.105499]

23  **McLean S**, Sheikh A, Cresswell K, Nurmatov U, Mukherjee M, Hemmi A, Pagliari C. The impact of telehealthcare on the quality and safety of care: a systematic overview. *PLoS One* 2013; **8**: e71238 [PMID: 23977001 DOI: 10.1371/journal.pone.0071238]

24  **Gadit AA**. E-psychiatry: uses and limitations. *J Pak Med Assoc* 2006; **56**: 327-332 [PMID: 16900715]

25  **American Telemedicine Association**. Evidence-based practice for telemental health. Available from: URL: http://www.americantelemed.org/files/public/standards/EvidenceBasedTelementalHealth_WithCover.pdf

26  **American Telemedicine Association**. Practice guidelines for videoconferencing-based telemental health. Available from: URL: http://www.americantelemed.org/files/public/standards/PracticeGuidelinesforVideoconferencing-Based TelementalHealth.pdf

27  **American Telemedicine Association**. Practice guidelines for video-based online mental health services. Available from: URL: http://www.americantelemed.org/practice/standards/ata-standards-guidelines/practice-guidelines-for-video-based-online-mental-health-services

28  **Catwell L**, Sheikh A. Evaluating eHealth interventions: the need

for continuous systemic evaluation. *PLoS Med* 2009; **6**: e1000126 [PMID: 19688038 DOI: 10.1371/journal.pmed.1000126]

29  **Pineau G**, Moqadem K, St-Hilaire C, Levac E, Hamel B, Bergeron H, Obadia A, Caron L. Telehealth: clinical guidelines and technological standards for telepsychiatry. Available from: URL: http://www.isfteh.org/files/media/68a2b452fb83e00f41219a6cbd075f27.pdf

30  **Frueh BC**, Deitsch SE, Santos AB, Gold PB, Johnson MR, Meisler N, Magruder KM, Ballenger JC. Procedural and methodological issues in telepsychiatry research and program development. *Psychiatr Serv* 2000; **51**: 1522-1527 [PMID: 11097648]

31  **Monnier J**, Knapp RG, Frueh BC. Recent advances in telepsychiatry: an updated review. *Psychiatr Serv* 2003; **54**: 1604-1609 [PMID: 14645799]

32  **Frueh BC**, Monnier J, Elhai JD, Grubaugh AL, Knapp RG. Telepsychiatry treatment outcome research methodology: efficacy versus effectiveness. *Telemed J E Health* 2004; **10**: 455-458 [PMID: 15689650 DOI: 10.1089/tmj.2004.10.455]

33  **Hailey D**, Roine R, Ohinmaa A. Evidence of benefit from telemental health applications: A systematic review. Alberta, Canada: Institute of Health Economics, 2007: 1-124

34  **Hailey D**, Roine R, Ohinmaa A. The effectiveness of telemental health applications: a review. *Can J Psychiatry* 2008; **53**: 769-778 [PMID: 19087471]

35  **García-Lizana F**, Muñoz-Mayorga I. What about telepsychiatry? A systematic review. *Prim Care Companion J Clin Psychiatry* 2010; **12**: pii: PCC.09m00831 [PMID: 20694116 DOI: 10.4088/PCC.09m00831whi]

36  **Grady B**, Myers KM, Nelson EL, Belz N, Bennett L, Carnahan L, Decker VB, Holden D, Perry G, Rosenthal L, Rowe N, Spaulding R, Turvey CL, White R, Voyles D. Evidence-based practice for telemental health. *Telemed J E Health* 2011; **17**: 131-148 [PMID: 21385026 DOI: 10.1089/tmj.2010.0158]

37  **Black AD**, Car J, Pagliari C, Anandan C, Cresswell K, Bokun T, McKinstry B, Procter R, Majeed A, Sheikh A. The impact of eHealth on the quality and safety of health care: a systematic overview. *PLoS Med* 2011; **8**: e1000387 [PMID: 21267058 DOI: 10.1371/journal.pmed.1000387]

38  **Saeed SA**, Bloch RM, Diamond JL. Telepsychiatry: overcoming barriers to implementation. *Current Psychiatry* 2012; **11**: 28-31

39  **Dattakumar A**, Gray K, Jury S, Biggs BA, Maeder A, Noble D, Borda A, Schulz T, Gasko H. A unified approach for the evaluation of telehealth implementations in Australia. Victoria, Australia: Institute for a Broadband-Enabled Society, The University of Melbourne, 2013. Available from: URL: http://www.broadband.unimelb.edu.au/publications/2013/Evaluation-of-Telehealth-Implementations-in-Australia.pdf

40  **Baer L**, Cukor P, Jenike MA, Leahy L, O'Laughlen J, Coyle JT. Pilot studies of telemedicine for patients with obsessive-compulsive disorder. *Am J Psychiatry* 1995; **152**: 1383-1385 [PMID: 7653700 DOI: 10.1176/ajp.152.9.1383]

41  **Montani C**, Billaud N, Couturier P, Fluchaire I, Lemaire R, Malterre C, Lauvernay N, Piquard JF, Frossard M, Franco A. "Telepsychometry": a remote psychometry consultation in clinical gerontology: preliminary study. *Telemed J* 1996; **2**: 145-150 [PMID: 10165357 DOI: 10.1089/tmj.1.1996.2.145]

42  **Montani C**, Billaud N, Tyrrell J, Fluchaire I, Malterre C, Lauvernay N, Couturier P, Franco A. Psychological impact of a remote psychometric consultation with hospitalized elderly people. *J Telemed Telecare* 1997; **3**: 140-145 [PMID: 9489108 DOI: 10.1258/1357633971931048]

43  **Baigent MF**, Lloyd CJ, Kavanagh SJ, Ben-Tovim DI, Yellowlees PM, Kalucy RS, Bond MJ. Telepsychiatry: 'tele' yes, but what about the 'psychiatry'? *J Telemed Telecare* 1997; **3** Suppl 1: 3-5 [PMID: 9218364 DOI: 10.1258/1357633971930346]

44  **Zarate CA**, Weinstock L, Cukor P, Morabito C, Leahy L, Burns C, Baer L. Applicability of telemedicine for assessing patients with schizophrenia: acceptance and reliability. *J Clin Psychiatry* 1997; **58**: 22-25 [PMID: 9055833 DOI: 10.4088/JCP.v58n0104]

45  **Montani C**, Klientovsky K, Tyrrell J, Ploton L, Couturier P, Franco A. Feasibility of psychological consultation with elderly demented patients. *J Telemed Telecare* 1998; **4** (Suppl 1): 111 [DOI: 10.1258/



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

1357633981931858]

46   **Ruskin PE**, Reed S, Kumar R, Kling MA, Siegel E, Rosen M, Hauser P. Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. *Psychiatr Serv* 1998; **49**: 1086-1088 [PMID: 9712219]

47   **Ball C**, Puffett A. The assessment of cognitive function in the elderly using videoconferencing. *J Telemed Telecare* 1998; **4** Suppl 1: 36-38 [PMID: 9640728 DOI: 10.1258/1357633981931362]

48   **Ball C**, Tyrrell J, Long C. Scoring written material from the Mini-Mental State Examination: a comparison of face-to-face, fax and video-linked scoring. *J Telemed Telecare* 1999; **5**: 253-256 [PMID: 10829378 DOI: 10.1258/1357633991933819]

49   **Stevens A**, Doidge N, Goldbloom D, Voore P, Farewell J. Pilot study of televideo psychiatric assessments in an underserviced community. *Am J Psychiatry* 1999; **156**: 783-785 [PMID: 10327917]

50   **Kirkwood KT**, Peck DF, Bennie L. The consistency of neuropsychological assessments performed via telecommunication and face to face. *J Telemed Telecare* 2000; **6**: 147-151 [PMID: 10912332 DOI: 10.1258/1357633001935239]

51   **Chae YM**, Park HJ, Cho JG, Hong GD, Cheon KA. The reliability and acceptability of telemedicine for patients with schizophrenia in Korea. *J Telemed Telecare* 2000; **6**: 83-90 [PMID: 10824375 DOI: 10.1258/1357633001935095]

52   **Elford R**, White H, Bowering R, Ghandi A, Maddiggan B, St John K, House M, Harnett J, West R, Battcock A. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *J Telemed Telecare* 2000; **6**: 73-82 [PMID: 10824374 DOI: 10.1258/1357633001935086]

53   **Jones BN**, Johnston D, Reboussin B, McCall WV. Reliability of telepsychiatric assessments: subjective versus observational ratings. *J Geriatr Psychiatry Neurol* 2001; **14**: 66-71 [PMID: 11419569 DOI: 10.1177/089198870101400204]

54   **Yoshino A**, Shigemura J, Kobayashi Y, Nomura S, Shishikura K, Den R, Wakisaka H, Kamata S, Ashida H. Telepsychiatry: assessment of televideo psychiatric interview reliability with present- and next-generation internet infrastructures. *Acta Psychiatr Scand* 2001; **104**: 223-226 [PMID: 11531660 DOI: 10.1034/j.1600-0447.2001.00236.x]

55   **Grob P**, Weintraub D, Sayles D, Raskin A, Ruskin P. Psychiatric assessment of a nursing home population using audiovisual telecommunication. *J Geriatr Psychiatry Neurol* 2001; **14**: 63-65 [PMID: 11419568 DOI: 10.1177/089198870101400203]

56   **Bishop JE**, O'Reilly RL, Maddox K, Hutchinson LJ. Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *J Telemed Telecare* 2002; **8**: 217-221 [PMID: 12217104 DOI: 10.1258/135763302320272185]

57   **Guilfoyle C**, Wootton R, Hassall S, Offer J, Warren M, Smith D. Preliminary experience of allied health assessments delivered face to face and by videoconference to a residential facility for elderly people. *J Telemed Telecare* 2003; **9**: 230-233 [PMID: 12952695 DOI: 10.1258/135763303322225571]

58   **Loh PK**, Ramesh P, Maher S, Saligari J, Flicker L, Goldswain P. Can patients with dementia be assessed at a distance? The use of Telehealth and standardised assessments. *Intern Med J* 2004; **34**: 239-242 [PMID: 15151669 DOI: 10.1111/j.1444-0903.2004.00531.x]

59   **Kobak KA**. A comparison of face-to-face and videoconference administration of the Hamilton Depression Rating Scale. *J Telemed Telecare* 2004; **10**: 231-235 [PMID: 15273034 DOI: 10.1258/1357633041424368]

60   **Poon P**, Hui E, Dai D, Kwok T, Woo J. Cognitive intervention for community-dwelling older persons with memory problems: telemedicine versus face-to-face treatment. *Int J Geriatr Psychiatry* 2005; **20**: 285-286 [PMID: 15717335 DOI: 10.1002/gps.1282]

61   **Cullum CM**, Weiner MF, Gehrmann HR, Hynan LS. Feasibility of telecognitive assessment in dementia. *Assessment* 2006; **13**: 385-390 [PMID: 17050908 DOI: 10.1177/1073191106289065]

62   **Lexcen FJ**, Hawk GL, Herrick S, Blank MB. Use of video conferencing for psychiatric and forensic evaluations. *Psychiatr Serv* 2006; **57**: 713-715 [PMID: 16675769 DOI: 10.1176/ps.2006.57.5.713]

63   **Loh PK**, Donaldson M, Flicker L, Maher S, Goldswain P. Development of a telemedicine protocol for the diagnosis of Alzheimer's disease. *J Telemed Telecare* 2007; **13**: 90-94 [PMID: 17359573 DOI: 10.1258/135763307780096159]

64   **Martin-Khan M**, Varghese P, Wootton R, Gray LC. Successes and failures in assessing cognitive function in older adults using video consultation. *J Telemed Telecare* 2007; **13** (Suppl 3): 60-62 [DOI: 10.1258/135763307783247211]

65   **Singh SP**, Arya D, Peters T. Accuracy of telepsychiatric assessment of new routine outpatient referrals. *BMC Psychiatry* 2007; **7**: 55 [PMID: 17919329 DOI: 10.1186/1471-244X-7-55]

66   **Shore JH**, Savin D, Orton H, Beals J, Manson SM. Diagnostic reliability of telepsychiatry in American Indian veterans. *Am J Psychiatry* 2007; **164**: 115-118 [PMID: 17202552 DOI: 10.1176/ajp.2007.164.1.115]

67   **Manguno-Mire GM**, Thompson JW, Shore JH, Croy CD, Artecona JF, Pickering JW. The use of telemedicine to evaluate competency to stand trial: a preliminary randomized controlled study. *J Am Acad Psychiatry Law* 2007; **35**: 481-489 [PMID: 18086740]

68   **Kobak KA**, Williams JB, Jeglic E, Salvucci D, Sharp IR. Face-to-face versus remote administration of the Montgomery-Asberg Depression Rating Scale using videoconference and telephone. *Depress Anxiety* 2008; **25**: 913-919 [PMID: 17941100 DOI: 10.1002/da.20392]

69   **McEachern W**, Kirk A, Morgan DG, Crossley M, Henry C. Reliability of the MMSE administered in-person and by telehealth. *Can J Neurol Sci* 2008; **35**: 643-646 [PMID: 19235450 DOI: 10.1017/S0317167100009458]

70   **Ciemins EL**, Holloway B, Coon PJ, McClosky-Armstrong T, Min SJ. Telemedicine and the mini-mental state examination: assessment from a distance. *Telemed J E Health* 2009; **15**: 476-478 [PMID: 19548827 DOI: 10.1089/tmj.2008.0144]

71   **Porcari CE**, Amdur RL, Koch EI, Richard DC, Favorite T, Martis B, Liberzon I. Assessment of post-traumatic stress disorder in veterans by videoconferencing and by face-to-face methods. *J Telemed Telecare* 2009; **15**: 89-94 [PMID: 19246609 DOI: 10.1258/jtt.2008.080612]

72   **Thompson DA**, Leinig R, Gower G, Winsett RP. Assessment of depressive symptoms during post-transplant follow-up care performed via telehealth. *Telemed J E Health* 2009; **15**: 700-706 [PMID: 19694599 DOI: 10.1089/tmj.2009.0021]

73   **Morgan DG**, Crossley M, Kirk A, McBain L, Stewart NJ, D'Arcy C, Forbes D, Harder S, Dal Bello-Haas V, Basran J. Evaluation of Telehealth for Preclinic Assessment and Follow-Up in an Interprofessional Rural and Remote Memory Clinic. *J Appl Gerontol* 2011; **30**: 304-331 [PMID: 24966449 DOI: 10.1177/0733464810366564]

74   **Stain HJ**, Payne K, Thienel R, Michie P, Carr V, Kelly B. The feasibility of videoconferencing for neuropsychological assessments of rural youth experiencing early psychosis. *J Telemed Telecare* 2011; **17**: 328-331 [PMID: 21844174 DOI: 10.1258/jtt.2011.101015]

75   **Bui TTN**. A comparison of videoconferencing and in-person administration of the Yale-Brown Obsessive Compulsive Scale. PhD thesis. University of Kansas, 2012

76   **Martin-Khan M**, Flicker L, Wootton R, Loh PK, Edwards H, Varghese P, Byrne GJ, Klein K, Gray LC. The diagnostic accuracy of telegeriatrics for the diagnosis of dementia via video conferencing. *J Am Med Dir Assoc* 2012; **13**: 487.e19-487.e24 [PMID: 22572552 DOI: 10.1016/j.jamda.2012.03.004]

77   **Wong L**, Martin-Khan M, Rowland J, Varghese P, Gray LC. The Rowland Universal Dementia Assessment Scale (RUDAS) as a reliable screening tool for dementia when administered via videoconferencing in elderly post-acute hospital patients. *J Telemed Telecare* 2012; **18**: 176-179 [PMID: 22362836 DOI: 10.1258/jtt.2012.SFT113]

78   **Seidel RW**, Kilgus MD. Agreement between telepsychiatry assessment and face-to-face assessment for Emergency Department psychiatry patients. *J Telemed Telecare* 2014; **20**: 59-62 [PMID: 24414395 DOI: 10.1177/1357633X13519902]

79   **Litwack SD**, Jackson CE, Chen M, Sloan DM, Hatgis C, Litz BT, Marx BP. Validation of the use of video teleconferencing technol-



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

ogy in the assessment of PTSD. *Psychol Serv* 2014; **11**: 290-294 [PMID: 24841510 DOI: 10.1037/a0036865]

80  **Hawker F**, Kavanagh S. The evolution of telepsychiatry in South Australia. Adelaide: Rural and Remote Mental Health Service of South Australia, 1988

81  **Alesi N**. Child and adolescent telepsychiatry: reliability studies needed. *Cyberpsychol Behav* 2000; **3**: 1009-1015 [DOI: 10.1089/109493100452273]

82  **Tyrrell J**, Couturier P, Montani C, Franco A. Teleconsultation in psychology: the use of videolinks for interviewing and assessing elderly patients. *Age Ageing* 2001; **30**: 191-195 [PMID: 11443019]

83  **Richardson LK**. "Can you see what I am saying?" An action-research, mixed methods evaluation of telepsychology in rural Western Australia. Murdoch University, 2012. Available from: URL: http://researchrepository.murdoch.edu.au/7023/2/02Whole.pdf

84  **Hyler SE**, Gangure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. *CNS Spectr* 2005; **10**: 403-413 [PMID: 15858458]

85  **Martin-Khan M**, Wootton R, Whited J, Gray LC. A systematic review of studies concerning observer agreement during medical specialist diagnosis using videoconferencing. *J Telemed Telecare* 2011; **17**: 350-357 [PMID: 21983223 DOI: 10.1258/jtt.2011.101113]

86  **Leach LS**, Christensen H. A systematic review of telephone-based interventions for mental disorders. *J Telemed Telecare* 2006; **12**: 122-129 [PMID: 16638233 DOI: 10.1258/135763306776738558]

87  **Day SX**, Schneider PL. Psychotherapy using distance technology: a comparison of face-to-face, video, and audio treatment. *J Couns Psychol* 2002: **49**: 499-503 [DOI: 10.1037//0022-0167.49.4.499]

88  **Nelson EL**, Barnard M, Cain S. Treating childhood depression over videoconferencing. *Telemed J E Health* 2003; **9**: 49-55 [PMID: 12699607 DOI: 10.1089/153056203763317648]

89  **Ruskin PE**, Silver-Aylaian M, Kling MA, Reed SA, Bradham DD, Hebel JR, Barrett D, Knowles F, Hauser P. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. *Am J Psychiatry* 2004; **161**: 1471-1476 [PMID: 15285975 DOI: 10.1176/appi.ajp.161.8.1471]

90  **Bouchard S**, Paquin B, Payeur R, Allard M, Rivard V, Fournier T, Renaud P, Lapierre J. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. *Telemed J E Health* 2004; **10**: 13-25 [PMID: 15104911 DOI: 10.1089/15305620 4773644535]

91  **De Las Cuevas C**, Arredondo MT, Cabrera MF, Sulzenbacher H, Meise U. Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. *Telemed J E Health* 2006; **12**: 341-350 [PMID: 16796502 DOI: 10.1089/tmj.2006.12.341]

92  **O'Reilly R**, Bishop J, Maddox K, Hutchinson L, Fisman M, Takhar J. Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. *Psychiatr Serv* 2007; **58**: 836-843 [PMID: 17535945 DOI: 10.1176/ps.2007.58.6.836]

93  **Fortney JC**, Pyne JM, Edlund MJ, Williams DK, Robinson DE, Mittal D, Henderson KL. A randomized trial of telemedicine-based collaborative care for depression. *J Gen Intern Med* 2007; **22**: 1086-1093 [PMID: 17492326 DOI: 10.1007/s11606-007-0201-9]

94  **Frueh BC**, Monnier J, Yim E, Grubaugh AL, Hamner MB, Knapp RG. A randomized trial of telepsychiatry for post-traumatic stress disorder. *J Telemed Telecare* 2007; **13**: 142-147 [PMID: 17519056 DOI: 10.1258/135763307780 ]

95  **Hilty DM**, Marks S, Wegelin J, Callahan EJ, Nesbitt TS. A randomized, controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. *Psychiatry* (Edgmont) 2007; **4**: 58-65 [PMID: 20805900]

96  **Mitchell JE**, Crosby RD, Wonderlich SA, Crow S, Lancaster K, Simonich H, Swan-Kremeier L, Lysne C, Myers TC. A randomized trial comparing the efficacy of cognitive-behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face. *Behav Res Ther* 2008; **46**: 581-592 [PMID: 18374304 DOI: 10.1016/j.brat.2008.02.004]

97  **Morland LA**, Greene CJ, Rosen CS, Foy D, Reilly P, Shore J, He Q, Frueh BC. Telemedicine for anger management therapy in a rural population of combat veterans with posttraumatic stress disorder: a randomized noninferiority trial. *J Clin Psychiatry* 2010; **71**: 855-863 [PMID: 20122374 DOI: 10.4088/JCP.09m05604blu]

98  **Chong J**, Moreno F. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. *Telemed J E Health* 2012; **18**: 297-304 [PMID: 22424078 DOI: 10.1089/tmj.2011.0126]

99  **Moreno FA**, Chong J, Dumbauld J, Humke M, Byreddy S. Use of standard Webcam and Internet equipment for telepsychiatry treatment of depression among underserved Hispanics. *Psychiatr Serv* 2012; **63**: 1213-1217 [PMID: 23026854 DOI: 10.1176/appi.ps.201100274]

100  **Dunstan DA**, Tooth SM. Treatment via videoconferencing: a pilot study of delivery by clinical psychology trainees. *Aust J Rural Health* 2012; **20**: 88-94 [PMID: 22435769 DOI: 10.1111/j.1440-1584.2012.01260.x]

101  **Fortney JC**, Pyne JM, Mouden SB, Mittal D, Hudson TJ, Schroeder GW, Williams DK, Bynum CA, Mattox R, Rost KM. Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: a pragmatic randomized comparative effectiveness trial. *Am J Psychiatry* 2013; **170**: 414-425 [PMID: 23429924 DOI: 10.1176/appi.ajp.2012.12050696]

102  **Stubbings DR**, Rees CS, Roberts LD, Kane RT. Comparing in-person to videoconference-based cognitive behavioral therapy for mood and anxiety disorders: randomized controlled trial. *J Med Internet Res* 2013; **15**: e258 [PMID: 24252663 DOI: 10.2196/jmir.2564]

103  **Choi NG**, Marti CN, Bruce ML, Hegel MT, Wilson NL, Kunik ME. Six-month postintervention depression and disability outcomes of in-home telehealth problem-solving therapy for depressed, low-income homebound older adults. *Depress Anxiety* 2014; **31**: 653-661 [PMID: 24501015 DOI: 10.1002/da.22242]

104  **Choi NG**, Hegel MT, Marti N, Marinucci ML, Sirrianni L, Bruce ML. Telehealth problem-solving therapy for depressed low-income homebound older adults. *Am J Geriatr Psychiatry* 2014; **22**: 263-271 [PMID: 23567376 DOI: 10.1016/j.jagp.2013.01.037]

105  **Godleski L**, Darkins A, Peters J. Outcomes of 98,609 U.S. Department of Veterans Affairs patients enrolled in telemental health services, 2006-2010. *Psychiatr Serv* 2012; **63**: 383-385 [PMID: 22476305 DOI: 10.1176/appi.ps.201100206]

106  **Meyer F**, Peteet J, Joseph R. Models of care for co-occurring mental and medical disorders. *Harv Rev Psychiatry* 2009; **17**: 353-360 [PMID: 19968450 DOI: 10.3109/10673220903463325]

107  **García-Lizana F**, Muñoz-Mayorga I. Telemedicine for depression: a systematic review. *Perspect Psychiatr Care* 2010; **46**: 119-126 [PMID: 20377799 DOI: 10.1111/j.1744-6163.2010.00247.x]

108  **Kinley A**, Zibrik L, Cordeiro J, Novak Lauscher H, Ho K. Telehealth for mental health and substance use (Literature review). Available from: URL: http://med-fom-ehealth-office.sites.olt.ubc.ca/files/2013/04/TeleMental-Health-Literature-Review-FINAL.pdf

109  **Foroushani PS**, Schneider J, Assareh N. Meta-review of the effectiveness of computerised CBT in treating depression. *BMC Psychiatry* 2011; **11**: 131 [PMID: 21838902 DOI: 10.1186/1471-244X-11-131]

110  **Barak A**, Hen L, Boniel-Nissim M, Shapira N. A comprehensive review and a meta-analysis of the effectiveness of internet-based psychotherapeutic interventions. *Journal of Technology in Human Services* 2008; **26**: 109-160 [DOI: 10.1080/15228830802094429]

111  **Andersson G**, Cuijpers P. Internet-based and other computerized psychological treatments for adult depression: a meta-analysis. *Cogn Behav Ther* 2009; **38**: 196-205 [PMID: 20183695 DOI: 10.1080/16506070903318960]

112  **Bee PE**, Bower P, Lovell K, Gilbody S, Richards D, Gask L, Roach P. Psychotherapy mediated by remote communication technologies: a meta-analytic review. *BMC Psychiatry* 2008; **8**: 60 [PMID: 18647396 DOI: 10.1186/1471-244X-8-60]

113  **Wootton BM**, Titova N. Distance treatment of obsessive-compulsive disorder. *Behaviour Change* 2010; **27**: 112-118 [DOI: 10.1375/]



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

bech.27.2.112]

114 **Germain V**, Marchand A, Bouchard S, Drouin MS, Guay S. Effectiveness of cognitive behavioural therapy administered by videoconference for posttraumatic stress disorder. *Cogn Behav Ther* 2009; **38**: 42-53 [PMID: 19235601 DOI: 10.1080/16506070802473494]

115 **Marchand A**, Beaulieu-Prévost D, Guay S, Bouchard S, Drouin MS, Germain V. Relative Efficacy of Cognitive-Behavioral Therapy Administered by Videoconference for Posttraumatic Stress Disorder: A Six-Month Follow-Up. *J Aggress Maltreat Trauma* 2011; **20**: 304-321 [PMID: 23687441 DOI: 10.1080/10926771.2011.562479]

116 **Morland LA**, Pierce K, Wong MY. Telemedicine and coping skills groups for Pacific Island veterans with post-traumatic stress disorder: a pilot study. *J Telemed Telecare* 2004; **10**: 286-289 [PMID: 15494087]

117 **Germain V**, Marchand A, Bouchard S, Guay S, Drouin MS. Assessment of the therapeutic alliance in face-to-face or videoconference treatment for posttraumatic stress disorder. *Cyberpsychol Behav Soc Netw* 2010; **13**: 29-35 [PMID: 20528290]

118 **Paul LA**, Hassija CM, Clapp JD. Technological advances in the treatment of trauma: a review of promising practices. *Behav Modif* 2012; **36**: 897-923 [PMID: 22956588 DOI: 10.1177/0145445512450733]

119 **Sloan DM**, Gallagher MW, Feinstein BA, Lee DJ, Pruneau GM. Efficacy of telehealth treatments for posttraumatic stress-related symptoms: a meta-analysis. *Cogn Behav Ther* 2011; **40**: 111-125 [PMID: 21547778 DOI: 10.1080/16506073.2010.550058]

120 **Crow SJ**, Mitchell JE, Crosby RD, Swanson SA, Wonderlich S, Lancanster K. The cost effectiveness of cognitive behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face. *Behav Res Ther* 2009; **47**: 451-453 [PMID: 19356743 DOI: 10.1016/j.brat.2009.02.006]

121 **Ertelt TW**, Crosby RD, Marino JM, Mitchell JE, Lancaster K, Crow SJ. Therapeutic factors affecting the cognitive behavioral treatment of bulimia nervosa via telemedicine versus face-to-face delivery. *Int J Eat Disord* 2011; **44**: 687-691 [PMID: 22072405 DOI: 10.1002/eat.20874]

122 **Young LB**. Telemedicine interventions for substance-use disorder: a literature review. *J Telemed Telecare* 2012; **18**: 47-53 [PMID: 22101610 DOI: 10.1258/jtt.2011.110608]

123 **Sharp IR**, Kobak KA, Osman DA. The use of videoconferencing with patients with psychosis: a review of the literature. *Ann Gen Psychiatry* 2011; **10**: 14 [PMID: 21501496 DOI: 10.1186/1744-859X-10-14]

124 **Kasckow J**, Felmet K, Appelt C, Thompson R, Rotondi A, Haas G. Telepsychiatry in the assessment and treatment of schizophrenia. *Clin Schizophr Relat Psychoses* 2014; **8**: 21-27A [PMID: 23428781 DOI: 10.3371/CSRP.KAFE.021513]

125 **van der Krieke L**, Wunderink L, Emerencia AC, de Jonge P, Sytema S. E-mental health self-management for psychotic disorders: state of the art and future perspectives. *Psychiatr Serv* 2014; **65**: 33-49 [PMID: 24129842 DOI: 10.1176/appi.ps.201300050]

126 **Godleski L**, Nieves JE, Darkins A, Lehmann L. VA telemental health: suicide assessment. *Behav Sci Law* 2008; **26**: 271-286 [PMID: 18548515 DOI: 10.1002/bsl.811]

127 **Krysinska KE**, De Leo D. Telecommunication and suicide prevention: hopes and challenges for the new century. *Omega* (Westport) 2007; **55**: 237-253 [PMID: 18214070 DOI: 10.2190/OM.55.3.e]

128 **Diamond JM**, Bloch RM. Telepsychiatry assessments of child or adolescent behavior disorders: a review of evidence and issues. *Telemed J E Health* 2010; **16**: 712-716 [PMID: 20575615 DOI: 10.1089/tmj.2010.0007]

129 **Pesämaa L**, Ebeling H, Kuusimäki ML, Winblad I, Isohanni M, Moilanen I. Videoconferencing in child and adolescent telepsychiatry: a systematic review of the literature. *J Telemed Telecare* 2004; **10**: 187-192 [PMID: 15273027]

130 **Hakak R**, Szeftel R. Clinical use of telemedicine in child psychiatry. *Focus* 2008; **6**: 293-296

131 **Palmer NB**, Myers KM, Vander Stoep A, McCarty CA, Geyer JR, Desalvo A. Attention-deficit/hyperactivity disorder and telemental health. *Curr Psychiatry Rep* 2010; **12**: 409-417 [PMID: 20625857 DOI: 10.1007/s11920-010-0132-8]

132 **Pakyurek M**, Yellowlees P, Hilty D. The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice? *Telemed J E Health* 2010; **16**: 289-292 [PMID: 20406115 DOI: 10.1089/tmj.2009.0130]

133 **Myers KM**, Palmer NB, Geyer JR. Research in child and adolescent telemental health. *Child Adolesc Psychiatr Clin N Am* 2011; **20**: 155-171 [PMID: 21092919 DOI: 10.1016/j.chc.2010.08.007]

134 **Slone NC**, Reese RJ, McClellan MJ. Telepsychology outcome research with children and adolescents: a review of the literature. *Psychol Serv* 2012; **9**: 272-292 [PMID: 22867120 DOI: 10.1037/a0027607]

135 **Boydell KM**, Hodgins M, Pignatiello A, Teshima J, Edwards H, Willis D. Using technology to deliver mental health services to children and youth: a scoping review. *J Can Acad Child Adolesc Psychiatry* 2014; **23**: 87-99 [PMID: 24872824]

136 **Carlisle LL**. Child and adolescent telemental health. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 197-221

137 **Xie Y**, Dixon JF, Yee OM, Zhang J, Chen YA, Deangelo S, Yellowlees P, Hendren R, Schweitzer JB. A study on the effectiveness of videoconferencing on teaching parent training skills to parents of children with ADHD. *Telemed J E Health* 2013; **19**: 192-199 [PMID: 23405952 DOI: 10.1089/tmj.2012.0108]

138 **Innes A**, Morgan D, Kosteniuk J. Dementia care in rural and remote settings: a systematic review of informal/family caregiving. *Maturitas* 2011; **68**: 34-46 [PMID: 21093996 DOI: 10.1016/j.maturitas.2010.10.002]

139 **Ramos-Ríos R**, Mateos R, Lojo D, Conn DK, Patterson T. Telepsychogeriatrics: a new horizon in the care of mental health problems in the elderly. *Int Psychogeriatr* 2012; **24**: 1708-1724 [PMID: 22687259 DOI: 10.1017/S1041610212000981]

140 **Sheerana T**, Dealya J, Rabinowitz T. Geriatric telemental health. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 171-195

141 **Khalifaa N**, Saleem Y, Stankard P. The use of telepsychiatry within forensic practice: a literature review on the use of videolink. *J Forens Psychiatry Psychol* 2008; **19**: 2-13 [DOI: 10.1080/1478994070 1560794]

142 **Mars M**, Ramlall S, Kaliski S. Forensic telepsychiatry: a possible solution for South Africa? *Afr J Psychiatry* (Johannesbg) 2012; **15**: 244-247 [PMID: 22829226 DOI: 10.4314/ajpsy.v15i4.31]

143 **Deslich SA**, Thistlethwaite T, Coustasse A. Telepsychiatry in correctional facilities: using technology to improve access and decrease costs of mental health care in underserved populations. *Perm J* 2013; **17**: 80-86 [PMID: 24355894 DOI: 10.7812/TPP/12-123]

144 **Batastini AB**, McDonald BR, Morgan RD. Videoteleconferencing in forensic and correctional practice. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 251-271

145 **Yellowlees P**, Burke MM, Marks SL, Hilty DM, Shore JH. Emergency telepsychiatry. *J Telemed Telecare* 2008; **14**: 277-281 [PMID: 18776070 DOI: 10.1258/jtt.2008.080419]

146 **Williams M**, Pfeffer M, Boyle J, Hilty DM. Telepsychiatry in the emergency department: Overview and case studies. Sacramento, CA: California HealthCare Foundation, 2009. Available from: URL: http://www.chcf.org/~/media/MEDIA LIBRARY Files/PDF/T/PDF TelepsychiatryProgramsED.pdf

147 **Shore JH**, Savin DM, Novins D, Manson SM. Cultural aspects of telepsychiatry. *J Telemed Telecare* 2006; **12**: 116-121 [PMID: 16638232]

148 **Shore JH**, Brooks E, Savin D, Orton H, Grigsby J, Manson SM. Acceptability of telepsychiatry in American Indians. *Telemed J E Health* 2008; **14**: 461-466 [PMID: 18578681 DOI: 10.1089/tmj.2007.0077]

149 **Maar MA**, Seymour A, Sanderson B, Boesch L. Reaching agreement for an Aboriginal e-health research agenda: the Aboriginal Telehealth Knowledge Circle consensus method. *Rural Remote*



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

*Health* 2010; **10**: 1299 [PMID: 20108996]

150    **Dorstyn DS**, Saniotis A, Sobhanian F. A systematic review of tele-counselling and its effectiveness in managing depression amongst minority ethnic communities. *J Telemed Telecare* 2013; **19**: 338-346 [PMID: 24163298 DOI: 10.1177/1357633X13501767]

151    **Simpson S**. Psychotherapy via videoconferencing: A review. *British Journal of Guidance and Counselling* 2009; **37**: 271-286 [DOI: 10.1080/03069880902957007]

152    **Backhaus A**, Agha Z, Maglione ML, Repp A, Ross B, Zuest D, Rice-Thorp NM, Lohr J, Thorp SR. Videoconferencing psychotherapy: a systematic review. *Psychol Serv* 2012; **9**: 111-131 [PMID: 22662727 DOI: 10.1037/a0027924]

153    **Goetter EM**, Herbert JD, Forman EM, Yuen EK, Thomas JG. An open trial of videoconference-mediated exposure and ritual prevention for obsessive-compulsive disorder. *J Anxiety Disord* 2014; **28**: 460-462 [PMID: 24873883 DOI: 10.1016/j.janxdis.2014.05.004]

154    **Gilkey SL**, Carey J, Wade SL. Families in crisis: considerations for the use of web-based treatment models in family therapy. *Families in Society: J of Contemporary Social Services* 2009; **90**: 37-45 [DOI: 10.1606/1044-3894.3843]

155    **Steel K**, Cox D, Garry H. Therapeutic videoconferencing interventions for the treatment of long-term conditions. *J Telemed Telecare* 2011; **17**: 109-117 [PMID: 21339304 DOI: 10.1258/jtt.2010.100318]

156    **Spek V**, Cuijpers P, Nyklícek I, Riper H, Keyzer J, Pop V. Internet-based cognitive behaviour therapy for symptoms of depression and anxiety: a meta-analysis. *Psychol Med* 2007; **37**: 319-328 [PMID: 17112400]

157    **Smits JA**, Berry AC, Tart CD, Powers MB. The efficacy of cognitive-behavioral interventions for reducing anxiety sensitivity: a meta-analytic review. *Behav Res Ther* 2008; **46**: 1047-1054 [PMID: 18687421 DOI: 10.1016/j.brat.2008.06.010]

158    **Reger MA**, Gahm GA. A meta-analysis of the effects of internet- and computer-based cognitive-behavioral treatments for anxiety. *J Clin Psychol* 2009; **65**: 53-75 [PMID: 19051274 DOI: 10.1002/jclp.20536]

159    **Andersson G**. Using the Internet to provide cognitive behaviour therapy. *Behav Res Ther* 2009; **47**: 175-180 [PMID: 19230862 DOI: 10.1016/j.brat.2009.01.010]

160    **Australian Psychological Society**. Internet supported psychological interventions. A guide to navigating the online world of psychological programs. Victoria: Australian Psychological Society, 2013. Available from: URL: http://www.acpor.ro/files/file/resurse_articole/APS_2012_internet_supported_interventions.pdf

161    **Glueck D**. Establishing therapeutic rapport in telemental health. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 29-46

162    **Miller EA**. Telemedicine and doctor-patient communication: a theoretical framework for evaluation. *J Telemed Telecare* 2002; **8**: 311-318 [PMID: 12537917]

163    **Hilty DM**, Nesbitt TS, Marks SL, Callahan EJ. Effects of telepsychiatry on the doctor-patient relationship: communication, satisfaction, and relevant issues. *Prim Psychiatry* 2002; **9**: 29-34

164    **Miller EA**. Telemedicine and doctor-patient communication: an analytical survey of the literature. *J Telemed Telecare* 2001; **7**: 1-17 [PMID: 11265933]

165    **Miller EA**. Telepsychiatry and doctor-patient communication: an analysis of the empirical literature. In: Wootton R, Yellowlees P, McClaren P, editors. Telepsychiatry and E-Mental Health. London: Royal Society of Medicine Press, 2003: 39-71

166    **Sucala M**, Schnur JB, Constantino MJ, Miller SJ, Brackman EH, Montgomery GH. The therapeutic relationship in e-therapy for mental health: a systematic review. *J Med Internet Res* 2012; **14**: e110 [PMID: 10.2196/jmir.2084]

167    **Turvey CL**, Myers K. Research in telemental health: review and synthesis. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 397-419

168    **Mair F**, Whitten P. Systematic review of studies of patient satisfaction with telemedicine. *BMJ* 2000; **320**: 1517-1520 [PMID: 10834899]

169    **Williams TL**, May CR, Esmail A. Limitations of patient satisfaction studies in telehealthcare: a systematic review of the literature. *Telemed J E Health* 2001; **7**: 293-316 [PMID: 11886667]

170    **Whitten P**, Love B. Patient and provider satisfaction with the use of telemedicine: overview and rationale for cautious enthusiasm. *J Postgrad Med* 2005; **51**: 294-300 [PMID: 16388172]

171    **Wade VA**, Karnon J, Elshaug AG, Hiller JE. A systematic review of economic analyses of telehealth services using real time video communication. *BMC Health Serv Res* 2010; **10**: 233 [PMID: 20696073 DOI: 10.1186/1472-6963-10-233]

172    **Hyler SE**, Gangure DP. A review of the costs of telepsychiatry. *Psychiatr Serv* 2003; **54**: 976-980 [PMID: 12851433]

173    **Norman S**. The use of telemedicine in psychiatry. *J Psychiatr Ment Health Nurs* 2006; **13**: 771-777 [PMID: 17087682]

174    **Pyne JM**, Fortney JC, Tripathi SP, Maciejewski ML, Edlund MJ, Williams DK. Cost-effectiveness analysis of a rural telemedicine collaborative care intervention for depression. *Arch Gen Psychiatry* 2010; **67**: 812-821 [PMID: 20679589 DOI: 10.1001/archgenpsychiatry.2010.82]

175    **Glueck D**. Business aspects of telemental health in private practice. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 111-133

176    **Hailey D**, Ohinmaa A, Roine R. Limitations in the routine use of telepsychiatry. *J Telemed Telecare* 2009; **15**: 28-31 [PMID: 19139217 DOI: 10.1258/jtt.2008.080609]

177    **Brooks E**, Turvey C, Augusterfer EF. Provider barriers to telemental health: obstacles overcome, obstacles remaining. *Telemed J E Health* 2013; **19**: 433-437 [PMID: 23590176 DOI: 10.1089/tmj.2013.0068]

178    **Simms DC**, Gibson K, O'Donnell S. To use or not to use: clinicians' perceptions of telemental health. *Canadian Psychology/Psychologie canadienne* 2011; **52**: 41-51 [DOI: 10.1037/a0022275]

179    **Luxton DD**, Sirotin AP, Mishkind MC. Safety of telemental health-care delivered to clinically unsupervised settings: a systematic review. *Telemed J E Health* 2010; **16**: 705-711 [PMID: 20583951 DOI: 10.1089/tmj.2009.0179]

180    **Kramer GM**, Mishkinda MC, Luxton DD, Shore JH. Managing risk and protecting privacy in telemental health: an overview of legal, regulatory, and risk-management issues. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 83-107

181    **Hyler SE**, Gangure DP. Legal and ethical challenges in telepsychiatry. *J Psychiatr Pract* 2004; **10**: 272-276 [PMID: 15552552]

182    **Nelson EL**, Davis K, Velasquez SE. Ethical considerations in providing mental health services over videoteleconferencing. In: Myers K, Turvey CL, editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 2013: 47-62

183    **Mars M**. Telepsychiatry in Africa -- a way forward? *Afr J Psychiatry (Johannesbg)* 2012; **15**: 215, 217 [PMID: 22829223 DOI: 10.4314/ajpsy.v15i4.27]

184    **Lee O**. Telepsychiatry and cultural barriers in Korea. *Stud Health Technol Inform* 2009; **144**: 145-148 [PMID: 19592752 DOI: 10.3233/978-1-60750-017-9-145]

185    **Minhas FA**, Nizami A. Telepsychiatry: answer to psychiatric rehabilitation of earthquake affected population in Pakistan. *Journal of Pakistan Psychiatric Society* 2005; **2**: 62

186    **Rahman A**, Nizami A, Minhas A, Niazi R, Slatch M, Minhas F. E-mental health in Pakistan: A pilot study of training and supervision in child psychiatry using the internet. *The Psychiatrist* 2006; **30**: 149-152 [DOI: 10.1192/pb.30.4.149]

187    **Balasinorwala VP**, Shah NB, Chatterjee SD, Kale VP, Matcheswalla YA. Asynchronous telepsychiatry in maharashtra, India: study of feasibility and referral pattern. *Indian J Psychol Med* 2014; **36**: 299-301 [PMID: 25035555 DOI: 10.4103/0253-7176.135384]

188    **Tang WK**, Chiu H, Woo J, Hjelm M, Hui E. Telepsychiatry in psychogeriatric service: a pilot study. *Int J Geriatr Psychiatry* 2001;



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

16: 88-93 [PMID: 11180491]

189    **Jefee-Bahloul H**. Telemental health in the middle East: overcoming the barriers. *Front Public Health* 2014; **2**: 86 [PMID: 25101255 DOI: 10.3389/fpubh.2014.00086]

190    **Thara R**, John S, Rao K. Telepsychiatry in Chennai, India: the SCARF experience. *Behav Sci Law* 2008; **26**: 315-322 [PMID: 18548517 DOI: 10.1002/bsl.816]

191    **Thara R**, Sujit J. Mobile telepsychiatry in India. *World Psychiatry* 2013; **12**: 84 [PMID: 23471809 DOI: 10.1002/wps.20025]

192    **Malhotra S**, Chakrabarti S. Telepsychiatry: A new paradigm for mental health care delivery. *JPGIMER* 2012; **46**: 61-62

193    **Malhotra S**, Chakrabarti S, Shah R, Gupta A, Mehta A, Nithya B, Kumar V, Sharma M. Development of a novel diagnostic system for

a telepsychiatric application: a pilot validation study. *BMC Res Notes* 2014; **7**: 508 [PMID: 25106438 DOI: 10.1186/1756-0500-7-508]

194    **Cresswell K**, Majeed A, Bates DW, Sheikh A. Computerised decision support systems for healthcare professionals: an interpretative review. *Inform Prim Care* 2012; **20**: 115-128 [PMID: 23710776]

195    **Malhotra S**, Chakrabarti S, Shah R, Kumar V, Nithya B. Computerised system of diagnosis and treatment in telepsychiatry: development and feasibility study of a pharmacological treatment module. *Indian J Psychiatry* 2013; **55** (Suppl): S129

196    **Malhotra S**, Chakrabarti S, Gupta A, Mehta A, Shah R, Kumar V, Sharma M. A self-guided relaxation module for telepsychiatric services: development, usefulness, and feasibility. *Int J Psychiatry Med* 2013; **46**: 325-337 [PMID: 24922985 DOI: 10.2190/PM.46.4.a]

**P- Reviewer**: Gazdag G, Myers CS    **S- Editor**: Gong XM
**L- Editor**: A    **E- Editor**: Wu HL





Published by **Baishideng Publishing Group Inc**
8226 Regency Drive, Pleasanton, CA 94588, USA
Telephone: +1-925-223-8242
Fax: +1-925-223-8243
E-mail: bpgoffice@wjgnet.com
Help Desk: http://www.wjgnet.com/esps/helpdesk.aspx
http://www.wjgnet.com



© 2015 Baishideng Publishing Group Inc. All rights reserved.