# EXHIBIT D



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

July 31, 2018

VIA ELECTRONIC MAIL ONLY

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Ave., Suite 215 N
Johnston, RI 02919
MLopes@pldlaw.com

   Re: *Coleman v. Brown*: Plaintiffs' Response to Special Master's July 25, 2018
     Proposed Telepsychiatry Policy
     Our File No. 0489-03

Dear Special Master Lopes:

   Plaintiffs write in response to the Special Master's proposed telepsychiatry policy, which was circulated to the parties on July 25, 2018.

   Plaintiffs support the Special Master's telepsychiatry policy, which largely adopts the version of the policy proffered by Defendants and refined by the workgroup over the last several months. However, the Special Master's proposed policy also provides for reasonable, clinically necessary limitations on the use of telepsychiatry that comport with the Court's orders, *see* ECF No. 5850 at 4-7 (July 3, 2018); ECF No. 5711 at 20-23, 30 (Oct. 10, 2017); ECF No. 5307 at 5:13-14 (May 18, 2015), and with the opinions articulated by Plaintiffs' expert, Dr. Pablo Stewart, in his report. Plaintiffs detailed the reasons for our support of the restrictions in question more fully in our July 12, 2018 and May 21, 2018 letters regarding the remaining telepsychiatry disputes and the record in this case.

   Attached hereto as **Exhibit 1** is the July 12, 2018 letter that Plaintiffs submitted to the Special Master, which incorporates (1) Plaintiffs' May 21 letter; (2) Dr. Stewart's Expert Report; and (3) a compilation of 29 scholarly articles on telemedicine and telepsychiatry. Additionally, attached hereto as **Exhibit 2** is a declaration attesting to my

[3282619.3]

Matthew A. Lopes, Jr.
July 31, 2018
Page 2

observations of the cell-front telepsychiatry technology CDCR proposes to roll-out system-wide, as demonstrated by Defendants on July 11, 2018 at the California Health Care Facility's Psychiatric Inpatient Program.  Observation of that proposed technology only reinforces Plaintiffs' position, as supported and articulated by Dr. Stewart, that cell-front telepsychiatry is clinically inappropriate and should not be permitted in CDCR, and we support the inclusion of this limitation in the Special Master's proposed policy.  *See* Stewart Expert Report ¶¶ 57-66.

Plaintiffs note that the Special Master's proposed telepsychiatry policy allows psychiatric nurse practitioners (PNPs) to provide telepsychiatric services to patients at the CCCMS level of care only.  Plaintiffs support the policy's ban on PNPs providing telepsychiatric care to EOP, MHCB, and PIP patients pursuant to the clinical justifications set forth in Dr. Stewart's Expert Report.  *See* Stewart Expert Report ¶¶ 83-89.  And while Plaintiffs agree with Dr. Stewart's conclusion that telepsychiatry provided by PNPs is not clinically appropriate at any level of care, Plaintiffs reserve their objection to PNPs providing telepsychiatric services to CCCMS patients subject to close monitoring of this issue by the Special Master's team.  Close monitoring is especially justified given that Defendants apparently do not have a written policy governing the appropriate scope of PNPs' provision of treatment in the MHSDS, despite Plaintiffs' and the Special Master team's repeated requests that Defendants develop and share a draft policy on CDCR's use of PNPs with the workgroup.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:  Cara E. Trapani

CET:CET
Enclosures
cc:    *Coleman* Special Master Team
       Co-Counsel                          Andrew Gibson
       Jerome Hessick                      Tobias Snyder
       Nick Weber                          Tyler Heath
       Melissa Bentz                       Christine Ciccotti
       Andrea Moon                         Sean Rashkis
       Jay Russell                         Elaine Ekpo
       Adriano Hrvatin                     Joanna Mupanduki
       Elise Thorn                         George Maynard

[3282619.3]

# E X H I B I T   1



**ROSEN BIEN
GALVAN & GRUNFELD LLP**

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Cara E. Trapani
Email: CTrapani@rbgg.com

July 12, 2018

VIA ELECTRONIC MAIL ONLY

Matthew A. Lopes, Jr.
*Coleman* Special Master
Pannone Lopes Devereaux & O'Gara LLC
Northwoods Office Park
1301 Atwood Ave., Suite 215 N
Johnston, RI 02919
MLopes@pldlaw.com

      Re:    *Coleman v. Brown*: Plaintiffs' Final Position on Defendants' Draft
               Telepsychiatry Policy in Light of the Court's July 3, 2018 Order
               Our File No. 0489-03

Dear Special Master Lopes:

      This letter memorializes Plaintiffs' final positions on the remaining telepsychiatry disputes to assist the Special Master's development of a final draft of the telepsychiatry policy, due to the Court by August 2, 2018. *See* Order, ECF No. 5850 at 8 (July 3, 2018). In support of Plaintiffs' positions, we attach an Expert Report by Dr. Pablo Stewart on telepsychiatry issues as Attachment 1 to this letter. In addition, Attachment 3 to this letter is a compilation of 29 scholarly articles on telemedicine and telepsychiatry, including a number of studies that are critical of the use of telepsychiatry for certain high-risk or otherwise inappropriate patient populations.

      Plaintiffs' final positions on telepsychiatry remain substantially similar to those outlined in our May 21, 2018 letter, attached hereto as Attachment 2, with the exception that Plaintiffs are now able to confirm their opposition to the use of cell-front telepsychiatry and to allowing psychiatric nurse practitioners (PNPs) to provide telepsychiatric services. Our observation of the cell-front telepsychiatry technology this week at CHCF only strengthened our opposition to this method of treatment. The policy should therefore: (1) clearly state that telepsychiatry should be used as a supplement, rather than a substitute, for on-site psychiatry, and include a preference for on-site

[3275730.4]

Matthew A. Lopes, Jr.
July 12, 2018
Page 2

psychiatry at all levels of care[1]; (2) clearly state that telepsychiatry is not appropriate at the MHCB or inpatient levels of care, and not appropriate for emergency care; (3) expressly prohibit the use of cell-front telepsychiatry; and (4) ban PNPs from providing any telepsychiatry services.  Each position is discussed below.

I.      **Plaintiffs' Positions as to the First and Second Disputes Remain the Same: Telepsychiatry May Supplement, But Not Replace, On-Site Psychiatry and Telepsychiatry Is Not Appropriate at the Highest Levels of Care or for Emergency Care**

Plaintiffs' positions as to the parties' disagreement over interpretation of the Court's October 10, 2017 Order, ECF No. 5711, remain the same as set forth in our May 21, 2018 letter, attached hereto as Attachment 2.  In short, Plaintiffs' position is that the telepsychiatry policy must include a preference for on-site psychiatry at all levels of care and should reflect the Court's Order that "telepsychiatry should be used as a supplement, rather than a substitute, for on-site psychiatry and should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists."  Order, ECF No. 5711 at 30 (Oct. 10, 2017).  The policy must also state that telepsychiatry is not appropriate at the MHCB or PIP (intermediate and acute) levels of care or for emergency care.  *See id.* at 21 ("Telepsychiatry should not be a frontline approach for psychiatric services for inmates with the most intensive or emergent needs … Telepsychiatry is not appropriate for the MHCB level of care except as a last resort or in emergency situations when an on-site psychiatrist is not available." (internal quotation marks omitted)).  The evidence provided in Dr. Stewart's Expert Report further supports these positions.  *See generally* Stewart Expert Report.  In addition, Plaintiffs are in agreement with the cautionary language and preference for in-person care that the Court and the Special Master have expressed regarding the use of telepsychiatry for EOP patient care.  *See* Order, ECF No. 5850 at 5 (July 3, 2018) ("Telepsychiatry may supplement on-site psychiatry at the Enhanced Outpatient (EOP) level of care but it should not replace on-site psychiatry.").

---

[1] Plaintiffs acknowledge and do not contest the Court's holding that Defendants may use telepsychiatry for routine CCCMS care without limitation so long as they continue to make good faith efforts to hire on-site psychiatrists for such care and so long as the telepsychiatrists visit their institutions twice a year.  *See* Order, ECF No. 5850 at 5 (July 3, 2018) (allowing CCCMS use of telepsychiatry so long as clinicians visit their institutions twice a year and so long as "defendants continue a good faith effort to recruit on-site psychiatrists for all institutions providing CCCMS level of care").

Matthew A. Lopes, Jr.
July 12, 2018
Page 3


**II.     Plaintiffs' Final Position as to the Third Dispute Is that Cell-Front Telepsychiatry Is Not an Appropriate Modality of Mental Health Treatment**

Plaintiffs strongly object to Defendants' proposal to employ telepsychiatry cell-front.  As Plaintiffs' expert, Dr. Stewart, attests, even in-person cell-front psychiatry is fundamentally clinically inappropriate, with very limited exceptions, because cell-front interactions are by their very nature non-confidential.  *See* Stewart Report at ¶¶ 57, 69-60. The Program Guide recognizes the critical importance of confidential communications between patients and their mental health clinicians.  *See* Program Guide at 12-1-12, 12-2-3, 12-2-5, 12-7-6.  The Special Master and his suicide prevention expert, Lindsay Hayes, both routinely monitor the sufficiency of confidentiality in clinical contacts.  *See, e.g.*, Special Master's 27th Round Monitoring Report, ECF No. 5779 at 114-18 (Feb. 13, 2018); Second Re-Audit and Update of Suicide Prevention Practices, ECF No. 5672 at 3-4, 25, 37, 56, 86, 117, 122 (Sept. 7, 2017).  In the 27th Round Monitoring Report, the Special Master concluded that numerous patients who received "non-confidential cell-front [mental health] contact" had not received adequate mental health care.  *See* ECF No. 5779 at 542, 630, 640, 676.  Similarly, in the Second Re-Audit of Suicide Prevention Practices, Lindsay Hayes reviewed two suicide reports of inmates who were not seen by a mental health clinician in a confidential setting in the time leading up to their deaths. Unsurprisingly, each suicide report recommended the corrective action that patients "be seen in a confidential setting out of cell."  *See* ECF No. 5672 at 64, 69.  Moreover, cell-front clinical interactions heighten the risk of custody interference with treatment.  *See, e.g.*, Special Master's 27th Round Monitoring Report, ECF No. 5779 at 296 (Feb. 13, 2018).

Telepsychiatry exacerbates the deficiencies that already render in-person cell-front psychiatry inadequate.  As Dr. Stewart explains in his Expert Report, cell-front telepsychiatry is deficient for a number of reasons, including that telepsychiatrists "cannot sufficiently identify the signs of medical and mental illness during cell front interactions" and "are also inherently less capable than on-site providers of developing effective patient-provider relationships."  Stewart Expert Report ¶¶ 56-61.  To allow cell-front telepsychiatry would only further degrade the dignity and well-being of the Plaintiff class, whose contacts with mental health clinicians have become increasingly removed from traditional face-to-face interactions via increased use of cages and other punitive measures.

Perhaps most concerning, Defendants' policy contains no apparent limits on the use of telepsychiatry in cell-front settings and in fact requires all institutions to have cell-front telepsychiatry equipment so that cell-front telepsychiatry contacts can occur ad hoc. *See* Joint Status Report, ECF 5841, Ex. A at 1, 6 (June 21, 2018) (copy of Defs.' May 10, 2018 final draft telepsychiatry policy, hereinafter "Final Draft Telepsychiatry Policy").

[3275730.4]

Matthew A. Lopes, Jr.
July 12, 2018
Page 4

The lack of any limitations whatsoever raises the distinct risk that cell-front telepsychiatry will become the norm, either due to staffing shortages or for the convenience of clinical and custodial staff. Cell-front clinical interactions already are too often driven by custodial officer shortages or refusals to escort patients to a confidential treatment setting, and clinicians already routinely opt to conduct mental health contacts cell-front. *See, e.g.*, Special Master's 27th Round Monitoring Report, ECF No. 5779 at 158 (Feb. 13, 2018) (finding that 57% of cell-front primary clinician contacts at SAC during the monitoring period were "due to staff decision"). Cell-front telepsychiatry represents a slippery slope that Defendants' policy does nothing to prevent; if allowed as Defendants' envision, this method of care risks becoming the default.

Indeed, as part of Defendants' anticipated unrestricted use of cell-front telepsychiatry, and as demonstrated during the July 11, 2018 site visit to CHCF discussed further below, the policy expressly contemplates cell-front telepsychiatry for patients in an MHCB or PIP setting. Final Draft Telepsychiatry Policy at 3. However, the Court has expressly prohibited Defendants from using telepsychiatry at the MHCB level of care, even in confidential settings, much less cell-front, *see* Order, ECF No. 5850 at 6 (July 3, 2018), and has clearly instructed that "[t]elepsychiatry should not be a frontline approach for psychiatric services for inmates with the most intensive or emergent needs," Order, ECF No. 5711 at 21 (Oct. 10, 2017). Simply put, telepsychiatry, and especially cell-front telepsychiatry, is not appropriate at the highest levels of care. The telepsychiatry policy must reflect these prohibitions, which are both Court-ordered and clinically appropriate.

Plaintiffs' visit to CHCF on July 11, 2018 to view cell-front telepsychiatry only reinforces the above positions. The nascent technology, which only exists at CHCF to date and is not yet being used to treat patients, uses a cart with a wireless access point, monitor, and camera attached, and a separate speaker and microphone contained inside a large metal box that can be positioned on the outside of a prison cell up against the food port. After witnessing the technology, Plaintiffs remain opposed to cell-front psychiatric treatment—in-person or via telepsychiatry—for the reasons set forth above and in Dr. Stewart's Expert Report. And even if cell-front telepsychiatry was appropriate in theory—it is not—Plaintiffs witnessed significant problems with the proposed technology during the July 11, 2018 demonstration at CHCF. For example, and consistent with Dr. Stewart's articulated concern, the echo inside the prison cell made it very difficult to hear what the simulated patient was saying. *See* Stewart Expert Report ¶ 62. It was also difficult to see the patient given the structure of the cell doors and the angle of the camera. In addition, Plaintiffs question whether the technology that currently exists only at CHCF (CDCR's newest prison) could even function in a sufficiently reliable manner at older prisons, rendering the possibility of technical interruptions that further impede patient care entirely to be expected. *See also* Stewart Expert Report ¶ 63. Lastly,

Matthew A. Lopes, Jr.
July 12, 2018
Page 5

Plaintiffs were informed during the demonstration that the telepsychiatry carts cost up to $15,000, making this a costly *and* inadequate method of mental health treatment.

For these reasons, and those articulated by Dr. Stewart, Defendants' telepsychiatry policy should expressly prohibit use of cell-front telepsychiatry.

## III. Plaintiffs' Final Position as to the Fourth Dispute Remains the Same: Defendants' Policy Should Prohibit Psychiatric Nurse Practitioners from Providing Any Telepsychiatric Services

Plaintiffs' position as to whether psychiatric nurse practitioners (PNPs) should be authorized to provide telepsychiatry services remains the same as set forth in our May 21, 2018 letter.  *See* Attachment 2 at 4-5.  In sum, use of medical "extenders" like PNPs is risky because they do not have the same training or experience as psychiatrists, and these problems would only be exacerbated if PNPs were allowed to provide direct patient care via telepsychiatry.  *See id.*  The evidence provided in Dr. Stewart's Expert Report further supports Plaintiffs' position.  *See* Stewart Expert Report at ¶¶ 83-89.  In addition, although California law requires strict supervision of PNPs, *see* Cal. Bus. & Prof. Code § 2836.1, and despite Plaintiffs' many requests, Defendants still do not have a written policy governing the appropriate scope and supervision of PNPs' provision of treatment in the MHSDS, and apparently never have.  Accordingly, the telepsychiatry policy must be revised to authorize only psychiatrists, not psychiatrists and PNPs, to provide telepsychiatric services.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Cara E. Trapani*

By:   Cara E. Trapani

CET:CET
Enclosures
cc:    Coleman Special Master Team          Elise Thorn
       Co-Counsel                            Andrew Gibson
       Jerome Hessick                        Tyler Heath
       Nick Weber                            Christine Ciccotti
       Melissa Bentz                         Sean Rashkis
       Andrea Moon                           Elaine Ekpo
       Jay Russell                           Joanna Mupanduki
       Adriano Hrvatin                       George Maynard

[3275730.4]

# Attachment 1

DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>          Defendants. | Case No. 2:90-CV-00520-KJM-DB<br><br>**EXPERT REPORT OF PABLO STEWART, M.D. REGARDING DEFENDANTS' TELEPSYCHIATRY POLICY**<br><br>Judge: Hon. Kimberly J. Mueller |

**INTRODUCTION**

1.     I am a board-certified psychiatrist and Clinical Professor in the Department of Psychiatry at the University of California, San Francisco.  My curriculum vitae is attached hereto as **Exhibit A**.

2.     I have over 30 years of experience in correctional mental health care, including serving as the court's expert in class action cases challenging the provision of mental health care to prisoners.  After medical school, I completed my psychiatric residency at the University of California, San Francisco in part as Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and the San Francisco Veterans Affairs Medical Center, including service at the VA's Substance Abuse Inpatient Unit.  During my residency, I also practiced at several community health programs.  Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of UCSF, which was located at San Francisco General Hospital.  In that capacity, I had administrative and clinical responsibility for a 12-bed maximum-security psychiatric ward and worked as the liaison with the Jail Psychiatric Services of the City and County of San Francisco.  Between August 1988 and December 1989, I was the Director of Forensic Psychiatric Services for the City and County of San Francisco.  In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the locked inpatient treatment unit at San Francisco General Hospital.

3.     From 1990 through 1996, I served in various medical leadership posts at the Department of Veterans Affairs Medical Center, San Francisco, including as Chief of the Substance Abuse Inpatient Unit, Chief of the Intensive Psychiatric Community Care Program, focusing on services for homeless veterans, and Medical Director of the VA's Comprehensive Homeless Center.

4.     From 1996 to the present, I have served as a psychiatric consultant to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues, with a focus on correctional psychiatry.  I have served as a

1   psychiatric expert or consultant to various federal courts, the United States Department of

2   Justice, and other organizations evaluating the provision of mental health treatment and

3   implementing remedial decrees covering the provision of mental health care in correctional

4   institutions.  Beginning in May 2016, and continuing in the present, I am serving as the

5   court-appointed monitor in *Rasho v. Baldwin*, No. 1:07-CV-1298 (C.D. Ill.).

6          5.      I estimate that I have observed over 100 telepsychiatry sessions in

7   correctional intuitions, primarily at jails and prisons in California, Arizona, and Illinois, in

8   connection with my duties as an expert medical and mental health monitor to the Special

9   Master in *Gates v. Deukmejian*, No. 2:87-cv-01636 (E.D. Cal.), as well as my monitoring

10  work in *Rasho*.  On December 19, 2017, I testified at an evidentiary hearing in *Rasho* as to

11  my opinion of the use of telepsychiatry in correctional intuitions.  Specifically, I opined

12  that:

13         •       Telepsychiatry is most properly used in the case of what we would describe

14                 as routine, follow-up visits.

15         •       Telepsychiatry is not indicated for emergency assessment, which includes

16                 assessment for suicide or homicide.  It would not be appropriate for use in

17                 people in the residential treatment unit level of care or the inpatient level of

18                 care.

19         •       Telepsychiatry is best used after a relationship has been established with a

20                 patient, so the first visit during the psychiatric evaluation should be a face-to-

21                 face visit.

22         6.      I have submitted a number of declarations in connection with this case that

23  opine on the adequacy of the mental health care in the CDCR.  I have conducted numerous

24  tours of CDCR prisons in the last 25 years.  My first experience with the CDCR was in the

25  mid-1990s, when I spent several years monitoring mental health care at the California

26  Medical Facility, a CDCR prison in Vacaville, California, as a court expert in the *Gates v.*

27  *Deukmejian* case.  Most recently, in 2013, I toured six prisons as Plaintiffs' expert witness

28  in opposing the termination motion filed by Defendants in this matter.  I also provided

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

several declarations and gave testimony in several live hearings before Judge Karlton in support of subsequent enforcement motions filed by Plaintiffs later in 2013, after the termination motion was denied.  I also testified on behalf of Plaintiffs in the overcrowding proceedings that took place in this case starting in around 2007.  In the overcrowding and termination phases of this case alone, I have spoken with well over 150 CDCR inmate patients, toured numerous prisons, and reviewed scores of inmate patient medical and custody records in the CDCR.

7.    My publications and presentations address a broad range of treatment and assessment problems for mentally ill patients in both community and institutional settings. In compliance with Rule 26(a)(2)(B), my CV at Exhibit A lists my publications authored at pages 22 through 24.

8.    Attached hereto as **Exhibit B** is a list of cases in which I have testified at trial or deposition during the previous 4 years.

9.    My compensation to be paid for study and testimony in this case is $350 per hour.

10.    In preparing this report I have reviewed the documents and policies listed in **Exhibit C**.  In addition to the long list of scholarly articles on telepsychiatry listed in Exhibit C, I reviewed the following (also listed in Exhibit C):

- Defendants' Final Telepsychiatry Policy, which was filed with the Court on June 21, 2018. *See* Joint Status Report Re: June 28, 2018 Status Conference Re: Staffing, ECF No. 5841, at Ex. 1.

- Two CDCR Suicide Reports where telepsychiatry-related care issues were discussed in the findings.  One Report, dated October 9, 2017, concerned the 15th suicide in the CDCR in 2017, which took place at a reception center.  I also reviewed some subsequent reports on that institution's quality improvement plan relating to the telepsychiatry problems documented in the Suicide Report.  The second Suicide Report is dated June 9, 2016 and concerns the 5th CDCR suicide in 2016.

1       •    Excerpts from the Special Master's 27th Round Monitoring Report, ECF No.

2              5779, relating to a decision to stop using telepsychiatry for EOP care at the

3              California Institute for Women.

4       •    The March 30, 2017 Declaration of Michael Golding, M.D., in Support of

5              Defendants' Response to the Special Master's Report on the Status of Mental

6              Health Staffing, ECF No. 5591-1.

7       •    Letters dated May 21, 2018 from Plaintiffs and dated May 25, 2018 from

8              Defendants setting forth their final positions on telepsychiatry after

9              negotiations on this issue.

10      •    The Special Master's Report on the Status of Mental Health Staffing filed on

11            February 6, 2017, ECF No. 5564.

12      •    The Court's October 10, 2017 Order, ECF No. 5711.

13      •    The Court's July 3, 2018 Order, ECF No. 5850.

14  My findings and conclusions regarding these documents are discussed below.

15           **DEFENDANTS' FINAL NEGOTIATED TELEPSYCHIATRY POLICY**

16        11.    I have reviewed the CDCR's final negotiated telepsychiatry policy, which

17  was filed with the Court as part of the most recent status conference statement on June 21,

18  2018.  *See* Joint Status Report Re June 28, 2018 Status Conference Re: Staffing, ECF No.

19  5841, at Ex. 1.  Based on my review, I have the following concerns about the policy.

20        12.    First, I am concerned that the policy has an open-ended endorsement of

21  telepsychiatry at virtually all levels of care.  The policy *does* include a preference for on-

22  site clinical providers in the MHCB and inpatient settings, but even in those settings, in my

23  view the policy is too permissive, and not fully compliant with the Court's directions on

24  the issue.  It may be acceptable in certain limited circumstances to cover some psychiatrist

25  functions in MHCB and inpatient care units with telepsychiatry.  For example, with

26  appropriate safeguards, I would consider approving a policy like the one recommended by

27  the Special Master and adopted by the Court, allowing telepsychiatrists to cover short-term

28  emergencies in inpatient units caused by unexpected staff illness or other unexpected

[3274360.3]

1    staffing vacancies.  *See* 10/10/17 Order, ECF No. 5711 at 21 ("Telepsychiatry is not

2    appropriate for MHCB level of care except as a last resort or in emergency situations when

3    an on-site psychiatrist is not available … Telepsychiatry should not be a frontline approach

4    for psychiatric services for inmates with the most intensive or emergent needs." (internal

5    quotation marks omitted)).  Even in such exigent circumstances, however, telepsychiatry

6    should ideally only be permitted when it is being used for treating individuals who have

7    stabilized and moved past any initial crisis phase.  Unfortunately, Defendants' final policy

8    seems very permissive of telepsychiatrists working with patients in crisis in MHCB units,

9    which in my opinion is extraordinarily high risk.  For example, the Final Telepsychiatry

10   Policy speaks of telepsychiatrists having cell-front encounters with patients in crisis in

11   MHCB and PIP units.  *See* Final Telepsychiatry Policy at 3 ("Patients housed in a MHCB

12   or PIP are often unable to leave their room due to presenting as a danger to self, a danger

13   to others, or being gravely disabled.  Therefore, clinical staff at the receiving institution

14   shall assist telepsychiatrists with facilitating cell-side interactions as needed.").  As I

15   explain in greater detail below, I believe cell-front telepsychiatry visits are clinically risky

16   and contraindicated for many reasons, but cell-front telepsychiatry visits for gravely ill

17   patients in MHCB and PIP units are particularly unacceptable.

18       13.    Second, I agree with the Court and the Special Master's finding in 2017 that

19   "telepsychiatry should serve as a supplement for on-site psychiatry, not as a substitute and

20   should only be utilized when institutions are unable to recruit psychiatrists on site."  *See*

21   10/10/17 Order, ECF 5711, at 21.  My understanding is that the Court has indicated that it

22   will only approve a telepsychiatry policy that will allow the use of telepsychiatry for

23   routine care at the CCCMS and EOP levels of care, if there is with a strong preference for

24   on-site clinicians providing treatment at the EOP and higher levels of care.  *See* 7/3/18

25   Order at 5:18-19 ("Telepsychiatry may supplement on-site psychiatry at the EOP level of

26   care but it should not replace on-site psychiatrists for these programs."), 6:7-9

27   ("Telepsychiatry may not be used at the MHCB level of care except 'as a last resort or in

28   emergency situations when the on-site psychiatrist is not available.");  *see also* 10/10/17

[3274360.3]    EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1    Order at 21:12-13 ("Telepsychiatry should not be a 'frontline approach' for psychiatric

2    services 'for inmates with the most intensive or urgent needs.'").  I understand the parties

3    also negotiated and the Court has approved requirements whereby telepsychiatrists: (1)

4    manage a discrete caseload at a particular prison, and (2) are required to visit the institution

5    where they are assigned at least two times a year for CCCMS telepsychiatrists, and at least

6    four times a year for EOP telepsychiatrists.  I also understand and approve of the Court's

7    instruction in its July 2, 2018 Order that "telepsychiatry should not replace on-site

8    psychiatry for any level of care above CCCMS," and that even at the CCCMS level of

9    care, the use of telepsychiatry should be contingent upon the fact that Defendants will

10   "continue a good faith effort to recruit on-site psychiatrists for all institutions providing a

11   CCCMS level of care."  *See* 7/3/18 Order, ECF No. 5850, at 5:5-11.  Given the risks and

12   uncertainties associated with the use of telepsychiatry in a correctional context, which I

13   discuss below, these are appropriate and prudent limitations on this form of treatment.  If

14   anything, I would be in favor of a more restrictive approach to this form of treatment.

15        14.    Third, as noted above in connection with MHCB and PIP units, I also

16   strongly disagree with the Defendants' final telepsychiatry policy's allowance of cell-front

17   use of telepsychiatry in general.

18        15.    Fourth,  I am very opposed to allowing Psychiatric Nurse Practitioners

19   operating under the supervision of a psychiatrist to provide direct patient care using

20   telepsychiatry.  Although in my work in Illinois I have encouraged the use of mid-level

21   practitioners, including Psychiatric Nurse Practitioners, to provide direct face-to-face care

22   under appropriate supervision, I have serious concerns about such practitioners using

23   telepsychiatry.  In my view, the care provided by such an arrangement would be twice

24   removed from what is most appropriate for providing care—direct in-person psychiatry

25   care.  Under the best of circumstances, I have serious reservations about psychiatrists

26   themselves using this form of treatment.  Given the added restrictions on the delivery of

27   care by Psychiatric Nurse Practitioners and the supervisory requirements under which they

28   must practice, my view is that remote telepsychiatry by Psychiatric Nurse Practitioners

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1   places patients at risk.  Such an arrangement would heighten the risk of mistakes.

2       16.    Finally, I agree with the Court's concerns about the Defendants'

3   telepsychiatry policy.  I have reviewed the Court's July 3, 2018 Order reiterating the

4   meaning of its October 10, 2017 Order for Defendants, in order to stress several key

5   principles with respect to the use of telepsychiatry in the CDCR.  I strongly support the

6   Court's restrictions on the use of telepsychiatry, and those the parties have developed.  I

7   also agree with the conclusions of the Special Master and the Court in its October 10, 2017

8   Order, that "telepsychiatry should serve as a supplement for on-site psychiatry, not as a

9   substitute, and should only be used when institutions are unable to recruit psychiatrists to

10  work on site."  *See* 10/10/17 Order, EFC No. 5711, at 21:4-7.

11                  **SUMMARY OF KEY OPINIONS IN THIS MATTER**

12      17.    I have been asked to give my opinion of the materials I have reviewed

13  relating to telepsychiatry in the CDCR.  I offer the following opinions:

14  •   Academic studies suggest caution in using telepsychiatry within correctional

15      settings, particularly large, spread out systems like the CDCR's MHSDS.

16  •   Appropriate cautions include severely limiting or banning the use of

17      telepsychiatry at higher levels of care, banning cell-front telepsychiatry, and

18      banning Psychiatric Nurse Practitioners from treating patients by way of

19      telepsychiatry.

20  •   The CDCR's Enhanced Outpatient Program (EOP) is a sheltered residential

21      treatment program.  Given its residential nature, the acuity of EOP patients,

22      as well as the intensity of treatment in EOP units, I do not believe

23      telepsychiatrists should provide treatment to EOP patients.

24  •   Consistent with the current policy as clarified by the Court, Defendants

25      should not be permitted to use telepsychiatry except to supplement on site

26      psychiatric staff at the EOP level of care, and should not be permitted to use

27      telepsychiatry at the MHCB, Acute Inpatient, or Intermediate Inpatient Care

28      programs in the CDCR except to cover in emergency situations where there

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1    are short-term staff absences.

2    •    Consistent with, but perhaps not adequately delineated in the Defendants'

3         current policy, Defendants' use of telepsychiatry is not appropriate for

4         emergency evaluations or with patients who are in crisis (including those

5         who are suicidal, homicidal, and/or gravely disabled).

6    •    Telepsychiatry may be appropriately and safely used for non-initiating,

7         routine, low-risk appointments—such as medication renewals for stable

8         patients.

9                                **OPINIONS**

10   **I.    Academic Studies Suggest Caution in Using Telepsychiatry within
             Correctional Settings**

11

12        **A.    The Use of Telepsychiatry with Prisoner Patients Has Not Been
                  Rigorously Studied**

13        18.    Academic literature tends to be supportive of the practice of telepsychiatry in

14   general.  The patient populations studied, however, are different from the patient

15   populations found in prison.  For example, the evaluation of patient satisfaction using

16   telepsychiatry for rural outpatients who would otherwise have to drive four hours round-

17   trip for a routine psychiatric session is not pertinent to whether prisoner patients in crises

18   should receive psychiatric care in-person or remotely.  The literature neither specifically

19   addresses nor supports the use of telepsychiatry without limitation for all patient groups in

20   correctional institutions.  A large body of professional literature and guidance on

21   telepsychiatry also emphasizes that it is a helpful tool for filling positions at rural

22   institutions where staffing is difficult.  *See, e.g.*, American Psychiatric Association,

23   *Psychiatric Services in Correctional Facilities*, at 68 ("Correctional Facilities lend

24   themselves well to telepsychiatry use.  Often these facilities are in rural communities

25   where access to psychiatric services is limited or absent.").  However, the fact that in-

26   person staffing can be difficult in rural areas is not, in my opinion, an argument for the

27   clinical appropriateness of the use of telepsychiatry.  Particularly in California, where there

28   are many prisons close to large urban centers, such difficulty is better addressed by

1   clustering programs in areas where in-person psychiatrists can be hired.

2         19.    A large body of literature emphasizes the overall lack of rigorous scientific

3   knowledge regarding the comparison of telepsychiatry to in-person care (Acierno et al.,

4   2016; Deslich et al., 2013; Farabee et al., 2016; Sharp et al., 2011; Garcia-Lizana &

5   Munoz-Mayorga, 2010; Salmoiraghi & Hussain, 2015).  Several authors have specifically

6   acknowledged an even greater lack of studies analyzing the appropriateness of

7   telepsychiatry for correctional and/or forensic populations, as well as for care in

8   emergencies (Nelson et al., 2004; Antonacci et al., 2008; Magaletta et al., 2000;

9   Salmoiraghi & Hussain, 2015; Sharp et al., 2011).

10         20.    Indeed, in his 2017 declaration on this issue, CDCR Statewide Chief of

11   Psychiatry Dr. Golding emphasized the same issue regarding the dearth of adequate studies

12   in the correctional context, noting that he and his staff conducted literature searches on

13   telepsychiatry and they "were unable to locate any well-controlled studies evaluating

14   telepsychiatry vs. on-site psychiatry within a prison setting."  3/30/17 Decl. of Michael

15   Golding, M.D., in Supp. of Defs.' Response to the Special Master's Report on the Status of

16   Mental Health Staffing, ECF 5591-1, at 2:2-3.  I agree with this evaluation of the state of

17   the literature.

18         21.    Similarly, the literature I have reviewed on telepsychiatry recognizes the

19   absence of evidence-based studies specific to prison populations or comparable population

20   groups.  For instance, in his 2015 literature review of studies of telepsychiatry, Chakrabarti

21   noted that "the evidence for [clinical] outcomes and for the clinical effectiveness of

22   videoconferencing based interventions in forensic settings is almost always derived from

23   case reports, descriptive studies, and uncontrolled trials" (Chakrabarti (2015) at 294).

24   Other researchers advise that "studies need to be focused on areas where there is currently

25   a relative paucity of information, such as anxiety, substance abuse, and *psychotic and other*

26   *disorders* [emphasis added]" (Hilty et al. (2013) at 451).

27         22.    To the extent that rigorous controlled trials have compared telepsychiatry

28   and in-person care in relation to patient outcomes, the studies have generally focused on

9

[3274360.3]

1    outpatient, non-correctional populations (Acierno et al., 2016; Singh et al., 2007; Shore et

2    al., 2007; O'Reilly et al., 2007).  Such studies have shown limitations in the scope of

3    telepsychiatric practice.  For instance, a controlled trial on the diagnostic reliability of

4    telepsychiatry conducted by Singh et al. (2007) excluded cases requiring urgent assessment

5    and yet still found that telepsychiatry assessments were somewhat inferior to face-to-face

6    interviews for new *routine outpatient* referrals.

7            23.      In one study outside the correctional context concerning the use of

8    telepsychiatry for inpatient psychiatric care, Grady and Singleton (2011) raised questions

9    about telepsychiatry's effectiveness and its effect on rapport with the patients, noted

10   problems in using it with psychotic patients, and emphasized that there is limited literature

11   "describing or quantifying the clinical, administration, or technical challenges and

12   outcomes for inpatient telepsychiatric care."  Similarly, Salmoiraghi et al.(2015) note that

13   "the literature on the use of telepsychiatry in emergencies is remarkably limited… current

14   evidence is almost entirely based on surveys or opinions" (Salmoiraghi et al.(2015), at

15   392).

16          **B.      Prisoner Patients Are Not Comparable to Community-Based Patients,**

17                **and Existing Studies of Prisoner Patients Are All Essentially Patient or**
             **Administrator Surveys that Fail to Assess Treatment Outcomes**

18          24.      Inmate patients experience higher rates of medical disease, mental illness,

19   comorbid medical disease and mental illness, and long-term chronic illness than their

20   community-dwelling counterparts.  One study by the Bureau of Justice Statistics observed

21   that more than half of all prison and jail inmates had a mental health problem (James &

22   Glaze 2006).  In part because of their lower socioeconomic status and higher rates of

23   substance abuse, inmate patients' mental illness and chronic medical conditions are often

24   untreated prior to incarceration.  Indeed, these very untreated and/or worsening conditions

25   are what frequently bring them into contact with the criminal justice system.

26          25.      Patients in correctional settings not only have substantially higher acuity of

27   medical and mental illness than community-based patients, but also are subjected to non-

28   comparable conditions.  The objective stressors that inmates in prison experience are both

1   profound and singular; they cannot be overemphasized.  Many have recently entered

2   prison, and are coping with adjustment to a harsh and frightening new environment.  For

3   the duration of their incarceration, prison patients experience the harshness of a total

4   institution where movements are restricted, choices are limited, and concrete, steel, and

5   clanging doors define the physical surrounding.  Incarceration itself leads to further

6   psychiatric decompensation.  Whereas suicide is around the tenth most common cause of

7   death in the country, it is the fifth most common cause of death in prisons.  According to

8   Bureau of Justice Statistics for the years 2001-2014, suicide was the fourth most common

9   cause of death among prisoners in California, behind only cancer, heart disease, and liver

10  disease.  *See* Mortality in State Prisons, 2001-2014 – Statistical Tables, at Table 13 on

11  page 12, downloaded from BJS on 7/6/18 at

12  https://www.bjs.gov/index.cfm?ty=pbdetail&iid=5866.

13        26.    Long-term prisoners also experience unique stressors that are not present for

14  patients in the community, frequently including loss of regular contact with loved ones on

15  the outside, and the difficulties of making peace with an extended period of incarceration

16  and aging in a correctional context.

17        27.    I am not aware of any controlled trial that has compared prison patient

18  outcomes using telepsychiatry and in-person evaluations for residential, inpatient or crisis

19  care.  Nor am I aware of any study examining the use of telepsychiatry for cell-front care.

20        28.    To the extent that studies of correctional telepsychiatry exist, they lack

21  comparisons to in-person care and/or structured analyses of patient outcomes (*see, e.g.*,

22  Barrera-Valencia et al., 2017; Batastini et al., 2016; Brodey et al., 2000; Leonard 2004;

23  Magaletta & Fagan 2000; Zaylor et al., 2000; Zaylor et al., 2001).  Antonacci et al. (2008)

24  note in their review of the literature on the use of telepsychiatry in forensic and

25  correctional populations that "[a]ll studies had significant methodological limitations,

26  making confident conclusions difficult" (265).  Rather than rely on rigorous

27  methodologies, some such studies instead tend to report anecdotal evidence of patient

28  satisfaction by inmates or providers (Manfredi et al., 2008; Glaser et al., 2010).  In

1    addition, studies of correctional populations tend to exclude those in need of emergent

2    mental health care or otherwise note that their study populations did not include the

3    seriously mentally ill (Manfredi et al., 2008; Nelson et al., 2004).

4         29.    I am informed that Defendants have identified a total of five studies that are

5    specific to correctional or forensic populations (Brodey et al., 2000, Glaser et al., 2010,

6    Larsen et al., 2004, Morgan et al., 2008, Zollo et al., 1999).  Three are essentially patient or

7    provider satisfaction surveys (Brodey et al., 2000, Glaser et al., 2010, Morgan et al., 2008).

8    The fourth study, Larsen et al., 2004, is a survey of correctional systems seeking to

9    understand the extent to which telemedicine was deployed across correctional systems in

10    the United States.  The fifth study, Zollo et al., 1999, is a survey mostly about the use of

11    tele-medicine in general, and only 2 out 274 patient encounters covered involved

12    evaluations for reasons related to mental health problems.

13         30.    The Morgan study is based on patient satisfaction surveys of 186 patients,

14    100 of whom received a psychiatric session.  Fifty patients were non-randomly assigned to

15    a single 20-minute face-to-face psychiatry session and the other fifty were non-randomly

16    assigned to a 20-minute telepsychiatry session.  The prisoner patients were asked about

17    their satisfaction with their therapeutic relationship, their perception of their post-treatment

18    session mood, and their general satisfaction with services.  Although this is valuable

19    information about patient perceptions about telepsychiatry, it is not a study that measures

20    clinical outcomes or clinical progress and compares clinical outcomes of telepsychiatry to

21    those of in-person care.  Indeed, the authors noted the need for patient outcome research to

22    begin investigating the effectiveness of telepsychiatry as compared with face-to-face

23    services, as well as the need to explore whether telepsychiatry creates barriers to treatment

24    in the correctional context.

25         31.    Similarly, the Glaser study (2010) is based on provider satisfaction surveys

26    after a telemedicine trial in the Louisiana prison system.  Although a total of 371 mental

27    health encounters through telemedicine were reviewed in the course of the study, the study

28    suffers from several serious problems.  First, the study did not compare the care provided

1  in these encounters to in-person care.  Second, the study does not review clinical outcomes

2  except to simplistically ask whether the clinician felt it was a helpful visit.  Third, although

3  the study reports a total number of encounters, it does not include the number of different

4  patients these encounters involved.  Finally, the study does not detail any of the diagnostic

5  characteristics of the patients seen.

6      32.    The Brodey study (2000) reports on patient satisfaction with telepsychiatry

7  versus in-person care at a large urban jail.  One psychiatrist evaluated 20 patients in person

8  and 23 patients through telepsychiatry.  The authors note that the severity of the study

9  population was roughly comparable to the average psychiatric outpatient population, and

10  that "both groups [i.e., in-person and telepsychiatric] indicated that they would not highly

11  recommend the psychiatrist to a family member or friend" (1305).  Lastly, the authors

12  noted that "the results may not be generalizable to other psychiatric inmate patient

13  populations *or to those who exhibit more severe psychiatric disturbances* [emphasis

14  added]" (1305).

15      33.    Larsen et al., 2004, was a state-by-state survey of state and federal

16  correctional facilities to assess whether they were using tele-medicine (not specifically

17  telepsychiatry).  The results showed that in 2004, 52% of state departments of correction

18  were using tele-medicine at some facilities.  This information is out of date and not really

19  relevant to the efficacy of tele-medicine, or to the specific issues in dispute between the

20  parties here.

21      34.    Finally, as noted above, Zollo et al., 1999, is a survey about the use of tele-

22  medicine in general where only 2 out of 274 patient encounters reviewed were related to

23  mental health problems.

24      35.    Thus, none of these studies in the correctional context provide an objective,

25  well-controlled trial or assessment where clinical outcomes using telepsychiatry are

26  compared to outcomes and clinical progress made with in-person psychiatric care.  These

27  studies do not change or alleviate my concerns about the use of telepsychiatry with higher

28  level of care patients (including for EOP patients), with patients in crisis, and with cell-

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

[3274360.3]

1  front visits.

2  **C.    The Literature Cautions Against Using Telepsychiatry With High-Needs
           Populations**

3

4       36.    A large body of literature points to problems in diagnostic reliability and

5  patient outcomes with telepsychiatry that are of special concern in a correctional setting.

6  Shore et al. (2007) note that the use of telepsychiatry resulted in diminished rates of

7  reliability in diagnosing outpatients with long-term substance or alcohol abuse issues.

8  Similarly, Chakrabarti (2015) notes that telepsychiatric interventions are inferior to in-

9  person psychiatry for populations with substance abuse problems.  In a recent study of

10  California state parolees, Farabee et al. (2016) highlighted poorer therapeutic alliances in

11  patients treated through telepsychiatry, and O'Reilly et al. (2007) note that "there appears

12  to be a group of individuals who are averse to the use of telepsychiatry.  Administrators

13  developing telepsychiatry programs may need to maintain some parallel face-to-face

14  service to meet the needs of this group" (842).

15       37.    Some scholars have also raised concerns about the use of telepsychiatry to

16  treat psychotic patients who have ideas of reference that incorporate technology (*e.g.*, a

17  psychotic delusion in which the patient believes she receives messages from the television

18  or computer).  These concerns are warranted.  Magaletta & Fagan (2000) note that one

19  inmate-patient "did not want to return [to the telepsychiatry clinic] after he had a

20  nightmare about the psychiatrist chasing him with a video camera," and further note that

21  another patient, when presented with the psychiatrist's videoconferencing feed, said "see, I

22  told you the TV talks to me" (499-500).  Other studies have shown differences between

23  telepsychiatry and in-person care in recognizing patient self-neglect—a very critical aspect

24  in the recognition and adequate treatment of many psychotic disorders (Sharp et al., 2011,

25  citing Salzman et al., 1996).

26       38.    One of the reports that I am informed Defendants relied upon actually

27  cautions against using telepsychiatry for acutely psychotic or paranoid patients, and

28  underscores the difficult problem of informed consent for telepsychiatry.  *See* Trestman,

14

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

[3274360.3]

1    R.L, Metzner, JL, Penn JV, *et al.*, Workgroup Report, *Psychiatric Services in Correctional*

2    *Facilities, Third Edition.* APA 2016. Specifically, it states that "Psychiatrists and other

3    mental health staff need selection criteria to ensure the appropriateness of patients for

4    videoconferencing (telepsychiatry) services. Patients who are acutely psychotic or

5    paranoid may have difficulty being seen remotely and may be unable to give consent to

6    participate in this treatment modality." *Id.* at 68. I share this concern.

7        39.     In general, there is not sufficient evidence to support the use of

8    telepsychiatry without limitation in correctional settings. As Chakrabarti (2015) notes in

9    his systematic review of scholarly literature on telepsychiatry, "at present telepsychiatric

10    services can only serve as an adjunct to the more traditional modes of service-delivery, but

11    can never replace them" (298). This view is in accord with that of other scholarly authors

12    writing specifically about correctional care; for instance, Leonard (2004) writes following

13    her pilot of a prison telepsychiatry project that "[i]t is not anticipated that telepsychiatry

14    will replace existing services or reduce the need for face-to-face contact" (466).

15   **II.**    **The Limitations on the Use of Telepsychiatry in the Current Policy and in The**
16       **Court's Orders on Telepsychiatry are Appropriate, and Would Be Enhanced**
        **by Additional Restrictions on Cell-Front Telepsychiatry and Nurse**
17        **Practitioner Telepsychiatry**

        **A.**     **Two Recent CDCR Suicide Reports Support the Court's and the Special**
18          **Master's Restrictions on Telepsychiatry**

19        40.     The restrictions and protective measures set forth in the current policy on

20    the use of telepsychiatry, as enhanced by the Court's orders on telepsychiatry, are

21    appropriate limitations given the risks and limitations of this form of treatment.

22        41.     I agree with the Court's analysis in its May 18, 2015 Order explaining that

23    "there may be class members not susceptible to this method of care." *See* 5/18/15 Order,

24    ECF No. 5307, at 5 (cited and quoted by the Court in its 10/10/17 Order at 10:15-17). For

25    example, some patients who suffer schizophrenia and/or paranoid delusions could

26    incorporate the disembodied telepsychiatrist into their paranoid delusions, thereby

27    amplifying their psychosis. An "idea of reference" is the phenomenon of an individual

28    experiencing innocuous events or mere coincidences and believing that those events or

1  coincidences have strong personal significance.  For example, a patient who believes that

2  he receives instructions to engage in self-harm from the television may incorporate the

3  telepsychiatrist into his idea of reference and conflate the telepsychiatrist with the source

4  of self-harm.  This could exacerbate a pre-existing illness, and heighten the potential for

5  self-harm.

6       42.    Moreover, there is evidence that telepsychiatry may be less effective for

7  patients with psychosis.  In a study of telepsychiatry in a rural inpatient unit in Maryland,

8  Grady & Singleton (2011) found that psychotic patients reported more difficulty hearing

9  the doctor than patients without psychosis and that the psychotic patients incorporated

10  videoconferencing equipment into their delusions in a congruent manner.  The doctors in

11  the study also had concerns about the impact of telepsychiatry on treatment effectiveness

12  and on the development of rapport with the psychotic patients and believed telepsychiatry

13  would be more effective with higher functioning patients.

14       43.    The Court's prudent restrictions on this form of treatment limitations are

15  supported by much of the CDCR-specific evidence I reviewed.  In particular, the two

16  suicide reports I reviewed that raised issues about telepsychiatry highlight the risks of this

17  method of treatment and illustrate the need for a strong policy limiting the use of

18  telepsychiatry and requiring extra safeguards where it is used, such as the ones the Court

19  has ordered.

20       **1.    The 2017 Suicide Report regarding Prisoner A Illustrates The
        Risks Of Using Telepsychiatry, Especially for EOP Patients and**
21       **for Reception Center Patients**

22       44.    The first CDCR Suicide Report I reviewed involved a patient housed in one

23  of the CDCRs Reception Center prisons near Bakersfield who took his life in 2017.  To

24  protect the confidentiality of the CDCR Suicide Review Process, I will refer to this

25  individual as Prisoner A.  The Suicide of Prisoner A was the 15th CDCR Suicide in 2017

26  out of a total of 31 CDCR suicides during that calendar year.  According to the CDCR

27  Suicide Report for Prisoner A, which is dated October 9, 2017, Prisoner A was a 30-year-

28  old white male EOP patient who, in the months before his death, began refusing

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

telepsychiatry appointments.  Unfortunately, these refusals did not result in any assessment by the prison of the suitability of this individual for telepsychiatry as a method of treatment.  While such an assessment would be required under my reading of the Defendants' current final telepsychiatry policy, it also appears that such an assessment of the patient's suitability for telepsychiatry was also required by the policy CDCR had in place at the time of this suicide. *Compare* Final Policy at 2 (requiring that "If a patient refuses treatment via telepsychiatry, the patient's telepsychiatry provider shall meet with other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient"), *with* Suicide Report for Prisoner A at 19 (mandating as a quality improvement plan for Problem 5 that clinical leadership and telepsychiatry leadership provide training "on the importance and requirements of assessing the appropriateness of telepsychiatry for patients that are refusing care.").

45.     More broadly, the Suicide Report illustrates the substantial risks involved in using telepsychiatry to treat patients in crisis, particularly at cell-front, and particularly in higher levels of care (including the EOP level of care).  The Report also underscores the need to use caution in employing telepsychiatry in Reception Centers and other higher risk CDCR settings.

46.     The Suicide Report for Prisoner A reflects that he was high risk and struggling in many respects during the months before his death.  He was a new Reception Center prisoner serving his first prison term.  Suicide Report for Prisoner A at 1.  He had a family history of mental illness and a history of substance abuse. *Id*. at 4.  Within a day of his arrival at his Reception Center prison in March of 2017, he was referred to an MHCB at another prison where he remained for nearly two weeks. *Id* at 5.  He had a history of multiple hospitalizations in the community for psychosis. *Id*. at 6.  Of note, during his MHCB stay he was psychotic for much of the period, and all of his psychiatric interviews took place cell-front. *Id*. at 7.  The day before his discharge from the MHCB unit, during a

1  cell-front interview with his psychiatrist, he told his psychiatrist "you're not the real

2  psychiatrist," indicating that he likely remained paranoid and psychotic when discharged

3  from the MHCB. *Id*. at 8. He returned to the Reception Center on April 4, 2017. *Id*.

4  During the month of April 2017 he refused two telepsychiatry appointments and 9 out of 9

5  therapeutic group sessions. *Id*. at 8. In May of 2017, Prisoner A refused a telepsychiatry

6  appointment, refused to attend his treatment team meeting, and refused 18 out of 19 group

7  therapy sessions. *Id*. at 9.

8        47.    During a mental health evaluation in connection with a Rules Violation

9  Report related to a fight between Prisoner A and another prisoner on May 13, 2017,

10  Prisoner A told the evaluator that his medications were not working. *Id*. He was referred

11  to psychiatry for refusing medications on May 24, 2017. *Id*. On June 5, 2017, he refused a

12  telepsychiatry appointment related to this referral for non-compliance with medication. *Id*.

13  He met with a psychiatrist in person on July 3, 2017 and reported paranoia, hearing voices,

14  anxiety and depression. *Id*. at 12. He died a few days later. Prisoner A's release date was

15  slated to be in January of 2018, less than six months later. *Id*.

16        48.    The Suicide Report for Prisoner A found that "[t]he extent of his symptoms

17  throughout his incarceration was difficult to assess because he withdrew, isolated, and

18  refused mental health appointments." *Id*. at 13. The Report identified problems with

19  Prisoner A's mental health care including incomplete mental health evaluations, poor

20  suicide risk assessments, incomplete and inadequate mental health treatment plans, missing

21  progress notes, and, of particular note here, problems with the response to Prisoner A's

22  refusal of telepsychiatry appointments, and a failure to note and respond to those refusals

23  in his treatment plans. *Id*. at 13-17.

24        49.    With respect to Prisoner A's refusals of telepsychiatry appointments, the first

25  major problem appears to have been the failure to respond to these refusals by conducting

26  an assessment as to whether or not telepsychiatry was an appropriate method of treatment

27  for this patient. *Id*. at 19. Particularly given his medication refusals, the report also found

28  it was problematic that his Zoloft was stopped by the prison following the medication

1   refusals, without any contact with the patient or consultation with a psychiatrist.  There

2   was also a failure to discuss his telepsychiatry refusals in his treatment plan and respond to

3   this problem.  *Id.*  at 19.

4         50.   Unfortunately, I do not find these kinds of problems with telepsychiatry

5   surprising or uncommon.  Given the remote location of the telepsychiatrists, there is

6   always a risk that there will be less robust communication with the on-site clinical team

7   about telepsychiatry issues.  In this case, it appears that the telepsychiatrist and other

8   treatment team members needed to discuss the telepsychiatry refusals and assess

9   alternative methods of treating the patient.  *See* Suicide Report Recommendation 5 Quality

10  Improvement Plan, at page 19 ("The CMH/Chief Psychiatrist or designee at [the prison]

11  shall provide training to mental health staff and [prison] telepsychiatry on the importance

12  and requirements of assessing the appropriateness of telepsychiatry for patients that are

13  refusing treatment.  In this training it is important to understand the critical role of

14  communication between providers on patient refusal patterns to ensure continuity of

15  case.").

16        51.   In my experience and in my view, live on site psychiatrists also contribute

17  more positively to the working environment for on-site clinicians, and to the treatment

18  environment in general.  On-site psychiatrists are better able to contribute informally to the

19  overall treatment plan through more frequent formal and informal interactions with other

20  treating staff.

21        52.   My opinion on this issue is supported by a section from the 27th Round

22  Special Master's Report that clinical staff at the California Institution for Women (CIW),

23  reported the following upon switching from using telepsychiatrists to live, in-person

24  psychiatry for their EOP:  "Staff reported the switch from telepsychiatry to on-site

25  psychiatry in EOP had been extremely beneficial, especially with respect to milieu

26  management."  *See* 2/13/18 Twenty Seventh Monitoring Report of the Special Master,

27  ECF No. 5779, at 485.

28        53.   In response to these concerns in the Suicide Report for Prisoner A, the

[3274360.3]

mental health leadership at the Reception Center in question issued a memo on August 17, 2017 explaining that an on site psychiatrist would take over EOP care and that the telepsychiatrist would be redirected to other care with CCCMS patients. In a memo dated August 30, 2017, the Chief Psychiatrist at the institution wrote that "effective September 5, 2017, [the institution] will no longer be using Tele-psychiatry services for EOP patients. Tele-psychiatry will only be utilized to see CCCMS patients."

54.    In my view this is an appropriate restriction on telepsychiatry, particularly in a Reception Center. Reception Centers are high risk for prisoners with mental health issues for several reasons. First, prisoners in the Reception Centers in the CDCR have just arrived in prison and are making difficult adjustments to prison life. Also Reception Center prisoners have little programming and spend most of their time isolated in their cells, which tends to make existing mental illness worse. Also, one cannot underestimate the significant stress associated with the transfer from county jail to state prison and its impact on mental health.

**2.    The 2016 Suicide Report Regarding Prisoner B Illustrates How Documentation Errors and Omissions Become More Serious and Dangerous When Using Telepsychiatry**

55.    The second Suicide Report that I reviewed was dated June 9, 2016 and concerned a suicide that took place in a mainline, high-security prison in the Spring of 2016. To protect the confidentiality of the CDCR suicide review process I will refer to this as the Suicide Report for Prisoner B. This suicide was the 5th CDCR suicide of 2016 out of 28 total for that year. The Suicide Report for Prisoner B found that shortly after Prisoner B arrived at the prison in December of 2015 "[a] telepsychiatrist renewed the inmate's psychotropic medication prescriptions on December 14, 2015, but there was no documentation found that a psychiatric interview took place at that time." Suicide Report for Prisoner B at 9. In addition, three days later on December 17, 2015, there was a treatment team meeting to plan treatment for Prisoner B. *Id.* However, despite the presence of the telepsychiatrist on the treatment team, the treatment plan neglected to note that Prisoner B was prescribed two psychotropic medications. *Id.* The Suicide Report

1   noted these problems with a lack of documentation as two separate problems each

2   requiring a corrective action plan.  *Id*. at 21.  The Suicide Report also noted "ongoing

3   problems with documentation produced by telepsychiatrists being entered into" the

4   electronic health records by the prison in question.  *Id*. at 17.

5          56.    In my opinion, the Suicide of Prisoner B illustrates one of the main risks of

6   using telepsychiatry with high-risk patients.  Because the telepsychiatrist is not physically

7   present at the institution, there is less informal discussion of each patient's treatment.  The

8   lack of this type of ancillary contact and discussion makes documentation errors and

9   omissions potentially much more harmful to patients.  In my opinion, these errors would

10  have been much less likely to occur with an in-person psychiatrist treating the patient and

11  would more likely have been identified and corrected by treatment staff working with an

12  in-person psychiatrist.

13         57.    Both of these suicides illustrate the high risks of treatment by telepsychiatry,

14  and both caution against using telepsychiatry for patients in crisis especially to the extent

15  those patients are seen cell-front which only amplifies the problems.  As noted above,

16  Prisoner A was seen cell-front by a face-to-face psychiatrist for many of his clinical

17  interactions when he was in the MHCB at CHCF, including for Suicide Risk Assessments

18  and for his initial clinical examination.  *See* Suicide Report for Prisoner A at 16, item 6

19  (noting the initial psychiatric evaluation in the MHCB reflected that Prisoner A refused to

20  leave his cell and "was briefly seen cell-side" and that as a result the initial evaluation

21  contained very little information), and *id*. at 15, item 7 (noting "there was no indication in

22  his [Suicide Risk Evaluation] that his evaluation occurred out of cell and in a confidential

23  space).  Like the CDCR Suicide Report author in this instance, I have concerns about all

24  cell-front clinical interactions, even when face-to-face, and I find it alarming that

25  Defendants now want to use telepsychiatry for cell-front contacts.

26         58.    Similarly, although no treatment by Nurse Practitioners was involved, the

27  communication problems with telepsychiatry in connection with these suicides illustrate

28  the high risks involved in allowing Psychiatric Nurse Practitioners to practice using

[3274360.3]         EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

telepsychiatry.  In cases with seriously mentally ill individuals, communication with the supervising psychiatrist is critical to ensuring good treatment by Psychiatric Nurse Practitioners, so when a Nurse Practitioner uses telepsychiatry, the risks of miscommunication are very likely to be amplified.

**III.    Defendants' Proposed Use of Telepsychiatry for Cell-Front Evaluations Is Not Appropriate**

59.    A psychiatric evaluation is the process of gathering information about a person for the purpose of making a diagnosis and prescribing treatment.  The minimum standard for such an evaluation is an in-person confidential interview in a private setting. Cell-front evaluations in a prison context generally take place because the patient in question is refusing to leave their cell.  As a clinical matter, this type of refusal can be for a variety of reasons, but almost all of them tend to reflect some type of clinical deterioration—some worsening of existing mental health issues or the development of new, more serious mental health concerns that increase the risks of using off-site telepsychiatry.  In my experience, cell-front consultations are also commonly driven by custody considerations, including a long lock-down where prisoners are not permitted to leave their cells, even for clinical appointments, or where insufficient numbers of custody staff exist to escort patients to appointments.

60.    Setting aside custody-driven reasons, one of the most common reasons for a prisoner's refusal to leave their cell, in my experience, is that there has been some sort of mental health decompensation.  Not infrequently, for example, vulnerable mentally ill individuals will decompensate under the stress of living in a locked-down, punitive administrative segregation setting.  When these prisoners decompensate, they often become "cell dwellers" who refuse to leave their cells to go to yard, showers, or mental health appointments.  Cell-front clinical contacts with such patients are critical to attempt to convince the patient to leave the cell, or to assess the degree to which the patient is a danger to him or herself or to others, or gravely disabled.  Such cell-front interactions may be needed to assess whether a patient's situation is so dire that he or she needs to be cell-

1  extracted by custody staff in order to be provided urgent mental health treatment, assuming

2  the patient cannot be convinced by the clinician to voluntarily leave the cell for treatment.

3  While I do not agree that conducting clinical treatment is ever appropriate cell-front due to

4  the lack of confidentiality and the difficulty of communicating effectively with the patient

5  in this setting, cell-front assessments may sometimes be necessary to ensure that mentally

6  ill inmates do not harm themselves, staff, or other inmates; suffer harm from an

7  undiagnosed medical illness; become victimized; or engage in problematic behavior that

8  causes or exacerbates operational difficulties.  The remote nature of telepsychiatry inhibits

9  such assessments.

10        61.      Because they are not physically present in the prison with the patient,

11  telepsychiatrists, by themselves, cannot sufficiently identify the signs of medical and

12  mental illness during cell front interactions.  Telepsychiatrists are also inherently less

13  capable than on-site providers of developing effective patient-provider relationships.

14  These problems would be particularly harmful in cell-front settings, with a patient

15  exhibiting severe symptoms and possibly experiencing suicidal ideation or grave disability

16  because, as the Special Master found in his 2017 Staffing Report, "on site psychiatrists are

17  better able to discern nonverbal behavior demonstrated by inmates."  *See* Special Master's

18  Report on the Status of Mental Health Staffing, ECF No. 5564, at 17.

19        62.      I would also be concerned about the efficacy of any cell-front telepsychiatry

20  technology.  Many housing units in the CDCR are extremely noisy, and even with a

21  microphone inserted into the cell, my belief is that a human being present at the doorway,

22  able to look at the patient and speak through the door, would be better able to

23  communicate and certainly more able to engage in a therapeutic conversation about what

24  problems the patient is experiencing.  As I explain above, such use of a microphone would

25  also be particularly unacceptable for individuals whose mental health condition includes

26  ideas of reference, as such individuals would likely incorporate the technology into their

27  delusions.  Similarly, it would be particularly inappropriate for patients who display other

28  types of psychotic symptoms.

63.     My belief is also that a mental health provider who is physically present will be better able to connect to and treat the patient in this setting.  Even in the best of conditions, my experience with telepsychiatry is that the connection quality can often be a problem and detract from the quality of the clinical interaction.  I would be even more concerned about any mobile technology that would be dependent on wireless internet coverage in old CDCR prisons.  Moreover, even when there is good connectivity, the quality of the clinical connection between the doctor and patient is significantly impaired by the technology.  I also have serious concerns about confidentiality in using cell-front technology.  That is also a problem with in-person cell-front visits, but in-person clinicians may be able to minimize any privacy problems.

64.     This highlights one of my main misgivings about telepsychiatry in general. Psychiatry and psychology both rely on a trusting relationship with the mental health care provider as a key to successful treatment.  As I describe in greater detail below in Paragraph 77 this is referred to as a "therapeutic alliance" between the patient and the practitioner, and it is critical to good treatment.  Telepsychiatry makes building a therapeutic alliance more difficult, to the detriment of patient care.

65.     Accordingly, cell-front meetings and evaluations with mental health patients should be done in-person rather than by a remotely-based provider.

66.     Finally, I note that the telepsychiatry policy proffered by the CDCR does not appear to contain any limits or restrictions on the use of cell-front telepsychiatry, including in what circumstances it will be utilized.  This runs the risk that telepsychiatry at the cell front, rather than in a private setting, will become the norm.  As discussed, while it may be appropriate for a psychiatrist to conduct a cell-front assessment of a patient who will not leave the cell in certain very limited circumstances, it is my view that psychiatric treatment should never be conducted cell front and should instead always be provided in a confidential, appropriate setting.

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

**IV.**   **Telepsychiatry Limits Providers' Ability to Identify the Signs of Medical Disorders with Psychiatry Implications, and the Signs and Symptoms of Mental Illness**

    **A.**   **On-Site Providers Are More Capable of Identifying the Signs of Medical Disorders With Psychiatric Implications**

67.    Medical illnesses can cause and exacerbate psychiatric symptoms.  One early study underscored the need for more careful medical evaluation of psychiatric patients. The study showed that in 658 consecutive psychiatric outpatient encounters, medical disorders presented as psychiatric symptoms in almost ten percent (9.1%) of cases (Hall et al., 1978).  The most frequent presentations were of depression, confusion, anxiety, and speech or memory disorders; illnesses causing these presentations included infectious, pulmonary, thyroid, diabetic, hematopoietic, hepatic, and CNS diseases.  *Id.*  Notably, forty-six percent (46%) of these patients had medical illnesses that were previously unknown to either them or their physician.  *Id.*  The dilemma of medical illness presenting as psychiatric illness is substantially heightened in the context of a prison, where the prevalence of medical disorders and psychiatric disorders are both substantially greater than in the community.

68.    Specific medical illnesses frequently present as specific psychiatric illness. For example, there is a strong association between major depressive disorder and medical conditions such as myocardial infarction, stroke, type 2 diabetes, and endocrine disorders. Anxiety and panic attacks are associated with many medical conditions, including hyperthyroidism, asthma, congestive heart failure, traumatic brain injury, and Parkinson's disease.  Hallucinations are associated with diseases often found among elder patients, including Alzheimer's and Huntington's diseases.  Metabolic and endocrine abnormalities at times present with mania and psychosis.  HIV and pneumonia can present as agitation, cognitive impairment, and psychosis.  Medication side effects can also present as mental illness; for example, dopamine agonists used to treat Parkinson's disease can lead to hallucinations and paranoia.

69.    Psychiatrists are trained to identify signs of medical illness that may be

25

1  causing or exacerbating a patient's psychiatric symptoms, and are obligated to conduct a

2  focused medical evaluation to rule out medical illness in a psychiatric presentation.

3  Psychiatrists use their senses of sight, hearing, smell, and touch to identify these signs.  For

4  example, during in-person evaluations, psychiatrists use their sense of smell to gather

5  information about the patient.  A patient presenting with major depression may actually be

6  suffering from diabetic ketoacidosis, which is associated with a sweet, fruity odor on one's

7  breath.  Similarly, the smell of alcohol on a patient's breath may be an indication of

8  intoxication or withdrawal, which can be associated with somnolence.  Pungent body odors

9  including the smell of urine and/or feces signal that a medical or mental illness is

10  interfering with the patient's Activities of Daily Living (ADLs).

11       70.      Psychiatrists frequently use their sense of touch in evaluating patients.  Even

12  the initial handshake is a potential source of information.  A clammy or sweaty palm may

13  be a sign of an endocrine or metabolic disorder, such as thyroid disease or renal failure.  A

14  fine tremor may be a sign of thyrotoxicosis, whereas a cold tremulous hand may be a sign

15  of an anxiety disorders.  Psychiatrists possess the skills necessary to conduct a focused

16  physical exam using their senses (including touch) to determine whether medical illness

17  may be present or whether additional tests, such as laboratory or imaging work, are

18  indicated.

19       71.      Psychiatrists also require the use of their sense of touch to perform

20  neurological examinations.  In conducting neurological examinations, psychiatrists may

21  evaluate extrapyramidal motor functioning to determine a patient's motor tone and

22  involuntary motor activity, as well as the changes in the amount and velocity of movement.

23  Extrapyramidal disorders are common in psychiatric patients, and psychiatric syndromes

24  are also common in patients with extrapyramidal disorders.  Antipsychotic drugs are

25  associated with a wide range of side effects, including movement disorders such as

26  akathisia and pseudo-Parkinsonian symptoms.  In order to determine whether antipsychotic

27  medications are causing extrapyramidal side effects, psychiatrists physically touch the

28  patient's limbs and test resistance associated with muscle movements.  Patients not on

[3274360.3]

1  medication but exhibiting asymmetric signs may be suffering from Parkinson's disease,

2  which is commonly associated with depressive disorder.

3       72.    By the nature of their remote practice, telepsychiatrists cannot themselves

4  use their senses of smell and touch as part of their evaluation of a patient.  This is

5  exacerbated in the cell-front setting.  Even in a scheduled telepsychiatry setting with a

6  medical assistant present to facilitate the interview, it is problematic that the medical

7  assistant does not have the medical training to perform physical evaluations upon the

8  patient at the telepsychiatrist's instruction.  In order to be capable of conducting the

9  physical examination and diagnostic evaluation as if the psychiatric evaluation was

10  conducted in-person, the telepsychiatrist would require the assistance of at least a mid-

11  level medical provider, such as a physician's assistant or a registered nurse with

12  specialized training to participate in this level of assessment.  An examination in which the

13  telepsychiatrist instructs another provider to conduct physical examinations of the patient

14  and report back may lead to missed or inaccurate diagnoses due to communication

15  difficulties as well as inhibit or harm the patient-provider relationship.

16       **B.    On-Site Providers Are More Capable of Identifying the *Signs* of Mental**
              **Illness**

17

18       73.    Psychiatrists who conduct in-person initial evaluations have access to more

19  information—and more opportunities to observe signs of mental illness—than

20  telepsychiatrists.  The on-site psychiatrist observes the patient's interactions with other

21  staff who may be present, other inmates who may be waiting outside, and the correctional

22  officers who escort the patient into the evaluation room.  If an altercation or dispute arises,

23  the on-site psychiatrist is aware.  The on-site psychiatrist observes the patient's gait as he

24  walks into the room, watching for indications that a neurological examination should be

25  performed.  The on-site psychiatrist observes the patient's reaction upon entering the room,

26  discerning whether there the patient is fearful or relaxed by the atmosphere.  The on-site

27  psychiatrist observes subtle behavioral cues of mental illness as the patient approaches:

28  she hears the almost inaudible whispers made by the patient; she notes how the patient

1    slightly turns his head away and mumbles to himself; she catches a subtle eye glance by

2    the patient.  By being present in the same physical space, the on-site provider observes

3    numerous nuanced signs of illness or side effects that cannot be observed by the

4    telepsychiatrist whose frame of view is limited and fixed.

5          74.    Telepsychiatrists are limited to direct observations of the patient only to the

6    extent the patient is observable by the screen's camera and integrated microphone.

7    Typically, only the patient's head and shoulders are seen by the telepsychiatrist.  The

8    telepsychiatrist cannot see the slight shuffle of a patient's walk.  The telepsychiatrist

9    cannot observe a patient's pill rolling tremor—one of the earliest symptoms of Parkinson's

10   disease—in which the patient "rolls" a non-existent pill between his thumb and index

11   finger.  The telepsychiatrist will miss other hand tremors, such as those that may

12   accompany other symptoms of tardive dyskinesia, which is a serious side effect of

13   antipsychotic medication that can result in life-long harm if not recognized and treated

14   early.  The telepsychiatrist cannot observe the patient's reaction to the telepsychiatry

15   machine as he walks into the room.  The telepsychiatrist cannot see or a hear a patient

16   mumbling or whispering to himself as he approaches.

17         75.    Having another person in the room to identify and report the above

18   observations to the telepsychiatrist presents its own problems.  First, the additional person

19   would have to have the requisite mental health training to adequately identify these subtle

20   cues as signs of mental illness (or psychiatric symptoms caused or exacerbated by medical

21   illness).  The medical assistant who chaperones patients during telepsychiatry sessions

22   does not possess sufficient education and training.  A telepsychiatrist would need to rely

23   on a more highly trained medical staff member, such as a registered nurse or a nurse

24   practitioner, for necessary diagnostic assistance.  Social workers and psychologists do not

25   have adequate education and training to identify the medical and neurological signs of

26   mental illness.  Such skills are especially important in the context of prisons, where the

27   incidence of medical-neurological problems caused by mental illness and its treatment is

28   substantially higher than in the more stable community population.

[3274360.3]

76.     Second, the on-site mid-level provider (or above) would, in many instances, have to provide her observations to the telepsychiatrist after the conclusion of the telepsychiatry session so as not to interfere with the patient-provider relationship.  For example, if the patient told the telepsychiatrist that he did not hear voices but was then contradicted by the mid-level provider's stated observations during the session, the patient may feel contradicted and become argumentative or withdrawn.  Were the mid-level provider to tell the psychiatrist during the session that the patient was whispering expletives to himself as he approached the telepsychiatry machine, the patient may become defensive.  At the same time, it may be that the assistant's observation proves to be the most important piece of information from the entire evaluation.  However, it is necessary to consider all of the information about the patient before the assessment is completed in order to make the most informed diagnosis and treatment plan.  Waiting until after the session to obtain additional information is impractical, especially given that if the information would lead to a different diagnosis and treatment, the provider would have to obtain the patient's informed consent as to the new treatment plan at a later time. Treatment would thus be delayed.

**C.     On-Site Providers Are More Capable of Identifying the *Symptoms* of Mental Illness**

77.     During each psychiatric evaluation of a patient, the psychiatrist seeks to obtain an accurate assessment as well as engage the patient's cooperation in treatment. Doing so requires a working therapeutic relationship—a therapeutic alliance—between the patient and provider.  In a therapeutic alliance, the patient trusts the provider such that he is willing to open up and honestly describe the symptoms of his mental illness.  It can be difficult to establish a therapeutic alliance for any given patient, but it is especially hard to do so in a prison setting.  Psychiatric symptoms are the type of thing that people are reluctant to talk about even on a good day.  People in general are exceedingly unwilling to talk about deeply personal issues such as suicide, depression, trauma, and psychosis. Given the reluctance of many mentally ill patients to take medication, especially

1 | antipsychotic medication, anything that impairs the patient-provider relationship could
2 | prevent the patient's cooperation with the treatment plan.

3 | 78.    I have performed tens of thousands of in-person patient evaluations. I have
4 | experienced the difficulty of establishing a therapeutic alliance with patients. I have
5 | observed that certain actions help effectuate the therapeutic alliance. For example, at the
6 | outset of the meeting, I will stand up, look the patient in the eyes, perhaps shake the
7 | patient's hand or touch him on the shoulder, and guide him to a chair that I believe to be
8 | the proper distance between myself and the patient. All of these actions are integral to
9 | establishing the relationship. By standing up, I acknowledge and signal respect for the
10 | patient. I do the same in shaking his hand, and in so doing, I collect information about the
11 | patient—his grip, his temperature, his perspiration, his motor skills, his hesitation, etc. In
12 | meeting the patient's eyes, I can make an initial evaluation of his willingness to engage. I
13 | was taught as a psychiatric resident where to position the patient within the examination
14 | room. For example, patients exhibiting symptoms of paranoia should be seated close to a
15 | door, so that they feel that they can exit quickly if needed. These are not parlor games;
16 | rather, I must make the best of my interpersonal resources in order to maximize my
17 | chances of establishing a therapeutic alliance. This is extremely important in the context
18 | of the prison, where inmate patients commonly distrust the correctional and medical staff
19 | responsible for ensuring their physical security and care.

20 | 79.    At times, it is appropriate for the psychiatrist to offer the patient a reassuring
21 | touch during consultation. Doing so establishes human contact, literally. In my
22 | experience, this allows patients to divulge critical aspects of their psychiatric history that
23 | they otherwise would keep to themselves. In contrast, I have observed how distance
24 | inhibits the formation of a therapeutic alliance. During my tours of California and Illinois
25 | prisons as a court-appointed monitor, I have observed prison doctors conduct their
26 | evaluation of mentally ill patients through cell-doors, from afar. During these tours, I
27 | often subsequently interview the same patients in private settings to evaluate the care that
28 | they received. In this private setting, patients are often quick to report the feelings,

1    including suicidal feelings, that they kept to themselves when interviewed from a distance

2    by the prison physician, blaming the distance itself and the lack of confidentiality as the

3    reason for not being forthcoming about their suicidality and other psychic distress.

4         80.    Given the chaotic and harsh nature of the prison setting, it is even more

5    important to have a calming presence with the patient to establish a therapeutic alliance.

6    The on-site psychiatrist knows how A-yard dorm is different than a C-yard cell block.  She

7    understands the guards' culture, through her own observations of and interactions with

8    specific individuals.  Both the telepsychiatrist and patient are limited in their individual

9    ability to move freely throughout the institution.  When the psychiatrist is in the same

10   room as the patient, they share the same environment:  the same smells, noises, physical

11   space, and potential threats.  In that shared environment, the psychiatrist is more capable of

12   communicating that "I am concerned about you," "I empathize with your situation," and "I

13   want to help you."  This calming presence helps establish situations in which patients can

14   talk about things that they do not feel comfortable sharing with anyone else.

15        81.    In my observations of over 100 telepsychiatry sessions, I have never seen the

16   modality itself contribute to or improve the therapeutic alliance.  Instead, I have observed

17   that most psychiatrists and patients have difficulty forming a therapeutic alliance when

18   using telepsychiatry.  It is hard enough to establish a therapeutic alliance with incarcerated

19   individuals, especially if they are severely mentally ill.  Trying to do so using a television

20   with a chaperone in the room only makes it that much more difficult to form a therapeutic

21   alliance.

22        82.    My experience in correctional settings is that even during face-to-face

23   encounters, psychiatrists sometimes fail to identify a patient's pre-existing medical

24   problem that is confounding a patient's psychiatric presentation.  Similarly, psychiatrists

25   sometimes fail to identify medication-induced problems in their patients.  These chances of

26   these types of lapses in clinical care are increased when using telepsychiatry.

27

28

[3274360.3]    EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

**V.    The Use of Telepsychiatry Is Not Appropriate for Psychiatric Nurse Practitioners**

83.    In California, Psychiatric Nurse Practitioners who furnish medication must practice under physician supervision, with a ratio of no more than four Nurse Practitioners supervised by one physician. Cal. Bus. & Prof. Code § 2836.1(e). Further, Nurse Practitioners may only furnish medication under standardized procedures or protocols (and with such supervision). *Id*. § 2836.1(a).

84.    Given the current shortage of psychiatrists in many communities, one way that mental health administrators commonly think about Nurse Practitioners is as "extenders" of the psychiatric services provided by individual psychiatrists. Thus, a psychiatrist supervising a Psychiatric Nurse Practitioner would work closely with that person, and might assign to the Psychiatric Nurse Practitioner less difficult, more routine patient care tasks. Certain clinical activities can also be independently undertaken by Psychiatric Nurse Practitioners. In a sense, the growing use of Psychiatric Nurse Practitioners is similar to the growing use of telepsychiatry—both are efforts to maximize the impact and service reach of scarce psychiatrists.

85.    Typically, in the course of their supervision of Psychiatric Nurse Practitioners, the supervising psychiatrist would discuss individual cases with the Nurse Practitioner, would review their work, particularly regarding the use of psychotropic medication, and would provide oversight regarding all of their treatment activities, answering questions and educating them about issues in patient care.

86.    In working with Psychiatric Nurse Practitioners, it would be important to have a clear set of policies and procedures for their work and governing their supervision. Such a policy might include important restrictions, such as not allowing Psychiatric Nurse Practitioners to prescribe or monitor medicines for patients with complex medication regimes. I have been informed that the CDCR has not yet developed such a set of policies and procedures governing Psychiatric Nurse Practitioner work in the CDCR.

87.    I have worked with Psychiatric Nurse Practitioners and supervised them.

1    When they are matched with patients with the appropriate level of clinical acuity and

2    properly supervised, they can be a very valuable resource for providing psychiatric

3    services.

4              88.    However, in my opinion, there are risks to patient care that come from using

5    Psychiatric Nurse Practitioners instead of psychiatrists.  Psychiatric Nurse Practitioners do

6    not have the same medical training and the same ability to identify medical symptomology

7    or side effects.  Psychiatric Nurse Practitioners do not have the same ability to diagnose

8    mental health conditions.  These risks are mitigated by supervision by psychiatrists and

9    interaction with other physicians, and their impact can be further minimized by assigning

10   Psychiatric Nurse Practitioners only to routine encounters like medication renewals for

11   stable patients.

12             89.    Moreover, in my view, even with a less acutely mentally ill, more stable

13   population of patients like many CCCMS patients in the CDCR, the risks of using

14   Psychiatric Nurse Practitioners would be heightened if the CDCR permitted Psychiatric

15   Nurse Practitioners to practice using telepsychiatry.  All of the problems with

16   telepsychiatry described above are just as serious, if not more serious, with Psychiatric

17   Nurse Practitioners.  And these risks are, in my view, made more serious when the

18   clinician is less knowledgeable about medical conditions, side-effects and risks, and less

19   well trained than a psychiatrist.

20   **VI.    The Enhanced Outpatient Program, Despite Its Name, Is Actually a
           Residential Treatment Program.**

21

22             90.    I am informed that Defendants have argued in connection with the

23   telepsychiatry negotiations between the parties and in court that the EOP program is not a

24   residential treatment program.

25             91.    I have toured many EOP units in the CDCR and am very familiar with these

26   programs and the prisoners in them, who are very acutely ill.  I can state confidently and

27   without reservation that, based on my experience, these programs are residential treatment

28   programs, and are in some important respect akin to inpatient programs.  My

---

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

[3274360.3]

1    understanding is that throughout the CDCR, EOP patients live in separate, segregated,

2    "sheltered" treatment units.  The purpose of such segregation is to separate EOP prisoners

3    from non-mentally ill prisoners in order to make them safer, and to provide enhanced

4    treatment.  In my experience, EOP prisoners generally also have had their own yard and

5    eat in their own dining halls in many or most CDCR prisons.  I understand that EOP

6    prisoners do sometimes mix in programming with non-EOP prisoners.  I am also informed

7    that, particularly at lower custody levels, EOP prisoners do sometimes share yards, dining

8    halls, and programs with non-EOP prisoners.  However, I understand they are housed

9    separately everywhere and generally have their own dayrooms.

10        92.        The American Psychiatric Association's (APA) Publication *Psychiatric*

11   *Services in Correctional Facilities: Third Edition* (2016), outlines various levels of care

12   and notes that:  "Outpatient treatment is the least intensive level.  Patients live in a general

13   population with other inmates, many of whom do not need psychiatric care."  *See*

14   Trestman, R.L, Metzner, JL, Penn JV, *et al.*, Workgroup Report, *Psychiatric Services in*

15   *Correctional Facilities, Third Edition.*  APA 2016, at 20.  In my opinion, the level of care

16   in the CDCR that matches this description is the CCCMS level of care.

17        93.        The next two sentences of the APA Publication describe residential

18   programs:  "Residential treatment programs are more intensive and usually exist in

19   dedicated housing.  As with similar programs in the community, residential treatment is

20   provided for patients with chronic and serious mental illness who do not require acute care

21   but do need enhanced services."  *Id* at 20-21.  In my opinion, this level of care in the

22   CDCR is EOP level of care.  EOP patients receive enhanced services in the form of 10

23   hours a week of structured therapeutic activities and more frequent case manager contacts.

24   *See* 2009 Program Guide at 12-4-2 (noting EOP is for patients "whose level of functioning

25   is insufficient to allow GP placement"); 12-4-8 (requirement of "at least ten hours per

26   week of scheduled structured therapeutic activities."); 12-4-9 (requirement for enhanced

27   case manager and psychiatrist contact frequency).

28        94.        EOP programs are intensive programs that provide care that is much more

[3274360.3]

1    similar to inpatient care programs than to CCCMS.  This is a high risk, acutely ill group.

2    Many of the patients in the EOP program decompensate even with the EOP level of care

3    treatment and go back and forth to acute and intermediate inpatient programs.  It is very

4    clear to me that the EOP program is a residential treatment program.  Moreover, the

5    intensity of treatment in CDCR's EOP program is much closer to inpatient care than to

6    outpatient CCCMS care.

7        95.    In the community, there are residential treatment programs that are called

8    "residential psychiatric hospitals" which provide similar treatment to that provided in the

9    CDCR to patients at the EOP level of care.

10       96.    Given the high level of care and the high acuity of mental illness among the

11   EOP patients I have observed in the CDCR, I would not recommend using telepsychiatry

12   in this setting.

13   **VII.    Defendants' Use of Telepsychiatry Is Not Appropriate for Emergency**
         **Evaluations or With Patients Who Are In Crisis**
14
         **A.    On-Site Providers Are More Capable of Identifying Signs and**
15           **Symptoms of Illness**

16       97.    I have described above how using the modality of telepsychiatry decreases a

17   provider's ability to observe the signs and symptoms of illness.  For all of those reasons,

18   using telepsychiatry for emergency assessments (for severe psychic distress) and patients

19   in crisis (including suicidal, homicidal, and/or gravely disabled) is especially problematic.

20       98.    For example, a patient presenting with suicidal ideation may actually be

21   suffering from diabetic ketoacidosis, an acute and, at times, life-threatening complication

22   of diabetes.  Telepsychiatrists are incapable of smelling the ketones on the patient's breath,

23   which can smell like nail polish.  The medical assistant who chaperones the session is not

24   trained in recognizing the smell to be an indication of a diabetic emergency, nor are the

25   correctional officers who escort the patient to the telepsychiatry session.  Without this

26   crucial information, the telepsychiatrist may order the patient be placed on suicide watch in

27   a safety cell, rather initiating the appropriate fluid and electrolyte replacement and insulin

28   therapy treatment that could save the patient's life.

[3274360.3]

**B.     Patients In Crisis Require More Aggressive, Hands-On Treatment**

99.    The standard of care in the community is that if a patient is in crisis, they are seen in-person by a psychiatrist to evaluate their need for medication or medication adjustments, and to identify and treat any underlying or contributing medical conditions. Thus, psychiatrists play a key role in crisis care.

100.    Patients in crisis are generally less likely to be capable of being evaluated or agreeing to a treatment recommendation.  Most often, the nature of the crisis is due to an underlying condition that has resulted in symptoms that prevent the patient from cooperating and being amenable to treatment intervention.  The underlying condition has not yet been adequately addressed and has resulted in a crisis that requires a more aggressive type of intervention because of the severity of the condition that led to the crisis in the first place.

101.    I have seen thousands of patients in psychiatric crisis.  Behaviors consistent with crisis include thrashing and yelling, sobbing, crying, self-injurious behaviors (cutting, banging, slapping, hitting selves), lack of cooperation, and extreme behavior ranging from catatonia to excessive agitation.  The expression of such behaviors make it very difficult to perform an adequate evaluation to identify the underlying reasons for the patient's presentation.  When a patient experiences a psychiatric crisis, the provider must deescalate the situation in order to conduct a thorough evaluation and facilitate assessment of the condition.  Where a patient finds himself in a situation where taking his own life seems like reasonable action, human intervention is required.  Placing that individual in front of a computer screen and telling him to talk to the doctor is inadequate.

102.    The most effective tool I have to address patients in crisis is my presence. Being present, bearing witness, and making oneself available at the patient's choosing has tremendous calming power potential.  By being present, I can speak to the patient in a calm, reassuring voice.  Depending on the need, I may touch the patient at the appropriate time.  I estimate that I have used touch in at least one third of patient crises for the specific purpose of deescalating the situation so that I can begin to assess the reasons behind the

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1  crisis presentation.  There are still other times when my mere presence alone is the most

2  therapeutic thing I can offer, without anything more—such as by just sitting with someone.

3  If a patient is balled up in a corner, the most calming thing may be to gently inform the

4  patient: "just let me know when you're ready to talk."  Studies have shown that the

5  specific psychological approach (Freudian, Jungian, Kleinian) is not what is curative;

6  rather, it is the human connection itself that is curative.  The use of telepsychiatry can, at

7  best, employ only some of these tools and only where the individual patient is open to that

8  modality.

9       103.   Once the patient is calm, an evaluation can be performed.  In order evaluate

10  the patient undergoing crisis and effectively assess the underlying condition, the provider

11  must be physically present to properly observe all aspects of their presentation.  In doing

12  so, the provider has access to all of her senses of seeing, hearing, smelling, and touching.

13  The use of telepsychiatry is inadequate for the task, as it does not allow the provider the

14  full use of her hearing or sight, and necessarily prohibits the use of her smell and touch.

15  **VIII.  Telepsychiatry May Be Appropriately Used for Low Level, Non-Initiating, Routine, Low-Risk Appointments**

16

17       104.   Defendants must have on-site and nearby resources to ensure that patients

18  who refuse to leave their cells, patients at higher levels of care, and those patients who are

19  in crises can be seen in-person.  If they are unable to obtain these on-site resources in

20  certain locations, then they should cluster their mental health programs in locations where

21  such services can more readily be obtained.

22       105.   Telepsychiatry may be an adequate supplement to the provision of

23  psychiatric services for CCCMS patients who are stable, but, for the reasons identified

24  above, should never be a complete substitute for on-site care at that level of care.  Limiting

25  the use of telepsychiatry to routine, low-risk appointments—such as medication renewals

26  for stable patients—is consistent with these standards.

27

28

[3274360.3]

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

1      I declare under penalty of perjury under the laws of the United States of America

2 that the foregoing is true and correct, and that this declaration is executed at San Francisco,

3 California this 12th day of July, 2018.

4

                          PABLO STEWART, M.D.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXPERT REPORT OF PABLO STEWART, M.D., RE DEFENDANTS' TELEPSYCHIATRY POLICY

Exhibit A

<u>CURRICULUM VITAE</u>

***PABLO STEWART, M.D.***
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 264-0237; fax (415) 753-5479; e-mail: <span style="color:red">pab4emi@aol.com</span>**
**(Updated March 2017)**

| | |
|---|---|
| <u>EDUCATION:</u> | University of California, San Francisco, Teaching Certificate in General Medical Education, 2017 |
| | University of California, San Francisco, School of Medicine, M.D., 1982 |
| | United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry |
| <u>LICENSURE:</u> | California Medical License #GO50899<br>Hawai'i Medical License #MD-11784<br>Federal Drug Enforcement Administration #BS0546981<br>Diplomate in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

<u>ACADEMIC APPOINTMENTS:</u>

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>August 2006 | <u>Academic Appointment:</u> Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u> Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u> Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

<u>EMPLOYMENT:</u>

| | |
|---|---|
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |

1

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

2

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of</u><br><u>California San Francisco General Hospital.</u>  Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco,</u><br><u>CA.</u>  Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital.  Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u><br>Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center,</u><br><u>San Francisco, CA.</u>  Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u><br>Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u><br>Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp.  Received an Honorable Discharge.  Highest rank attained was Captain. |

3

HONORS AND AWARDS:

| | |
|---|---|
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award for Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry |

Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome."

MEMBERSHIPS:

| | |
|---|---|
| June 2000-May 2008 | California Association of Drug Court Professionals. |
| July 1997-June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |

| | |
|---|---|
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006;<br>February 2017-<br>Present | Member of Human Services Commission, City and County of San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>2017 | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |

| | |
|---|---|
| October 1986 - September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee. Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 - June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |
| October 1978 - December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| September 2016- Present | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014- Present | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003- Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002- January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001- June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999- April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998- June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 - November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995- December 2002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 - June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 - February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |

7

| | |
|---|---|
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency<br>Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric<br>Aspects of Medicine," University of California, San Francisco,<br>School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient<br>Clinic, Department of Psychiatry, University of California, San<br>Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of<br>Pharmacy course, "Addictionology and Substance Abuse<br>Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric<br>residents, Substance Abuse Inpatient Unit, San Francisco Veterans<br>Affairs Medical Center. |
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents,<br>Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical<br>Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU),<br>San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans<br>Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight<br>Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant.<br>Extensive experience as a consultant in numerous Tavistock<br>conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of<br>California, San Francisco, School of Medicine. Designed, planned<br>and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-<br>unit course offered to medical students, which covers alcoholism<br>with special emphasis on the health professional. This course is<br>offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco<br>General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |

| | |
|---|---|
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

## COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| May 2016- Present | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
| June 2015- May 2017 | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014- Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-Present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007 -Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state |

9

prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011).

| | |
|---|---|
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |

| | |
|---|---|
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>June 2002 | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |

| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
|---|---|
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.  San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.  Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.  Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.  24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.  Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.  Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.  First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.  American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.  Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12.     Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13.     Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.     Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.     Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.     University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17.     National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.     Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19.     Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20.     San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21.     First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.     Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.     Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.     The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25.     American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26.     American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

13

27.     Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.     International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.     Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30.     Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31.     Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.     Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.     DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34.     The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35.     The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California.  (2/12/98)

36.     American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.     "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38.     "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.     Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women."  (6/11/1998)

40.     Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient."  (6/17/1998)

41.  Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.  "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.  Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45.  "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46.  9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47.  Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48.  Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51.  California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52.  California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53.  Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54.  1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55.     "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56.     Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57.     "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

58.     Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High-Risk Offender." (2/17/99)

59.     American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60.     "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61.     "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62.     "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63.     "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64.     Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66.     "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67.     California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68.     "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69.     State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70.   "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i.  (4/30/99)

71.   11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Concord, California.  (5/6/99)

72.   The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient."  Escondido, California.  (5/7/99)

73.   "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California.  (5/13/99)

74.   "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association.  Anaheim, California.  (5/21/99)

75.   15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder."  Boise State University, Boise, Idaho.  (5/25/99)

76.   "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California.  (6/3/99)

77.   "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan.  (6/14/99)

78.   "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan.  (6/17/99)

79.   "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan.  (6/22/99)

80.   "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan.  (6/26/99)

81.   "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California.  (7/13/99)

82.   "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California.  (7/15/99)

83.   "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California.  (7/22/99)

84.   1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry.  Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness.  What's Really Happening to your Patient?"

"Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87.     "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88.     "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89.     "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90.     "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91.     "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92.     "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93.     "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94.     "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95.     "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96.     "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97.     "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98.     "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99.     "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100.    "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101.   "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102.   National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.   "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104.   "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105.   "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107.   Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.   "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109.   "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110.   "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111.   "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112.   "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113.   "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114.   "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115.   Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116.     National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice."  I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol.  New Orleans, LA.  (6/1-6/2/01)

117.     Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders."  San Jose, California.  (6/15/01)

118.     Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser."  Olympia, Washington.  (11/15/01)

119.     San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (1/14/02)

120.     First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas."   El Centro, California.  (1/28/02)

121.     The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California.  (4/25/02)

122.     Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123.     3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System."  (6/5/02)

124.     New Mexico Department of Corrections, "Group Psychotherapy Training."  Santa Fe, New Mexico.  (8/5/02)

125.     Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002."  Berkeley, California.  (8/15/02)

126.     California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis."  Sacramento, California.  (8/22/02)

127.     Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient."  (6/6/03)

128.     Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129.     "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.  (10/1/03), (12/3/03)

130.     "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California.  (10/18/03)

131.   "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California.  (4/2/04)

132.   Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134.   "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.   "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.   Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.   Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.   San Francisco, California.  (8/2/07)

145.   "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.   "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.   "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

148.    "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149.    "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150.    "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)

151.    Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.    2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.    Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA. This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.    Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court. San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.    2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.    2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.    Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.    Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.    "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.    San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.

161.    Administrative Office of the United States Courts, Federal Death Penalty Resource Counsel Projects, 2016 Strategy Session: "Ethnocultural Competency Issues in Working with Experts;" "Understanding Drug Use and Abuse by our Clients and Strategies for

Effectively Incorporating this Information into the Mitigation Narrative." Denver, Colorado, November 17-19, 2016.

162.    "Evaluating the mentally ill and substance abusing client." Idaho Association of Criminal Defense Lawyers, Sun Valley, Idaho, March 10, 2017.


PUBLICATIONS:

1)    Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients.* Hospital and Community Psychiatry, 39, 437-439.

2)    Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3)    Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)    Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)    Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)    Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)    Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)    Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)    James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High*

23

*Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)   Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)   Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)   Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

15)   Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of Amici Curiae Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.

16)   Brief of Medical and Other Scientific and Health-Related Professionals as Amici Curiae in Support of Respondents and Affirmance: Ahmer Iqbal Abbasi, et al., Respondents v. James W. Ziglar, John D. Ashcroft, et al., and Dennis Hasty, et al. Petitioners, On Writs of Certiorari to the United States Court of Appeals for the Second Circuit, In the Supreme Court of the United States, Nos. 15-1358, 15-1359 and 15-1363.

17)   Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine as Amici Curiae in Support of Plaintiff-Appellant Eric Joseph Depaola, Denis Rivera & Luis Velazquez, Plaintiffs v. Virginia Department of Corrections, et al., External Review Team, et al., Defendants. On appeal from the United States District Court for the Western District of Virginia, Case No. 7:14-cv-00692 in the United States Court of Appeals for the Fourth Circuit, No. 16-7358.

*18)*   Brief of Professors and Practitioners of Psychiatry, Psychology, and Medicine in support of Petitioner Shawn T. Walker v. Michael A. Farnan, et al., Respondents on petition for Writ of Certiorari to the United States Court of Appeals for the Third Circuit in the Supreme Court of the United States, No. 17-53.

Exhibit B

*PABLO STEWART, M.D.*
**Psychiatric Consultant**
**824 Ashbury Street**
**San Francisco, CA 94117**
**(415) 264-0237**
**(Fax) 753-5479**
**E Mail pab4emi@aol.com**

_____

## TESTIMONY/DEPOSITIONS January 2000 - February 2018

1. People versus Juan Duarte Gonzales (Lincoln County, Washington, January 2000)
2. People versus Jerry Lane Davis (Stanislaus County, California, September 2000)
3. James Andrew Melton versus Arthur Calderon, et al. (United States District Court, Los Angeles, California, December 2000)
4. Fremont Unified School District versus James Parks (Deposition taken in San Francisco, California, April 2001)
5. People versus Pablo Lomeli (Douglas County, Arizona, August 2001)
6. Dunlap versus County of Mendocino (Deposition taken in Oakland California, September 2001)
7. Maxwell Hoffman versus A.J. Arave, Warden, et al. (Deposition taken in San Francisco, October 2001)
8. People versus Michelle Michaud (Alameda County, California, April 2002)
9. People versus David Attias (Santa Barbara County, California, May/June 2002)
10. People versus Larry Christopher Graham (Contra Costa County, California, October 2002)
11. People versus Miguel Enrique Diaz (San Mateo County, California, November/December 2002)
12. United States versus Eugene Frederick Boyce, III (District Court, Honolulu, Hawai'i December 2002)
13. People versus Robert Daniel Weston (Stanislaus County, California, April/July 2003)
14. People versus Vincent Sanchez (Ventura County, California, August 2003)
15. Armstrong Petition JW01-6450 (San Francisco Juvenile Court, December 2003)
16. People versus Daniel Mugnolo (San Francisco City and County, December 2003)
17. Brandon Astor Jones versus Frederick Head, Warden (Deposition taken in San Francisco, January 2004)
18. David Perkins versus Frederick Head, Warden (Deposition taken in San Francisco, March 2004)
19. People versus Marino Hernandez (San Mateo County, California, June 2004)
20. Raphael Camargo versus Larry Norris, Director, Arkansas Department of Correction (Deposition taken in San Francisco, July 2004)
21. People versus Ronald Mathews (King County, Washington, August 2004)
22. People versus Huberto Mendoza (Stanislaus County, California, December 2004)
23. People versus James Essick (San Diego County, California, June 2005)

24. People versus Jesse Ignacio Sanchez Gomez (Ada County, Idaho, July/August 2005)
25. People versus Adrian Camacho (San Diego County, California, October 2005)
26. People versus Huberto Mendoza (Stanislaus County, California, November 2005)
27. People versus Paul Speer (Maricopa County, Arizona, January 2006)
28. People versus Mark Thigpen (San Mateo County, California, January 2006)
29. United States versus Tommy Ray Elam (District Court, Los Angeles, California, February 2006)
30. Enrique Arevalo versus Frederick Head, Warden (Deposition taken in San Francisco, March 2006)
31. United States versus Danny Lee Jones (District Court, Phoenix, Arizona, March 2006)
32. People versus Omar Dent, III (Los Angeles County, California, May 2006)
33. People versus Delaney Marks (Alameda County, California, May 2006)
34. People versus Angel Maturino Resendiz (Harris County, Texas, June 2006)
35. People versus Antonio Nicolosi (San Mateo County, California, July 2006)
36. Gregory Paul Lawler versus Frederick Head, Warden (Deposition taken in San Francisco, July 2006)
37. United States versus Todd Sarver (District Court, San Francisco, California, August 2006)
38. United States versus Eugene Frederick Boyce, III (United States District Court, Honolulu, Hawaii, October 2006)
39. Arthur Torlucci versus W.A. Duncan, (District Court, Santa Ana, California, November 2006)
40. Joaquin Enrique Arevalo versus William Terry, Warden, (Butts County, Georgia, December 2006)
41. People versus Jerry Cabonce, (San Mateo County, California, January 2007)
42. People versus Rodrigo Paniagua, (Santa Clara County, California, February 2007)
43. Gregory Paul Lawler versus William Terry, Warden, (Butts County, Georgia, February 2007)
44. United States versus Francisco Rodriguez, (District Court, Santa Ana, California, April 2007)
45. People versus O'Neal Durgin, (San Mateo County, California, June 2007)
46. Sepulveda versus Beard et al., (Bartonsville, Pennsylvania, June 2007)
47. Webster versus Ayers et al., (District Court, Sacramento, California, September 2007)
48. Ronald Deere versus Jeanne Woodford, et al., (District Court, Los Angeles, California, October 2007)
49. People versus Eric V. Hall (Ada County, Idaho, October 2007)
50. Rickey Dale Newman versus Larry Norris, Director, Arkansas Department of Correction (District Court, Fort Smith, Arkansas, November 2007
51. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, December 2007)
52. People versus Matthew Cunningham (Maricopa County, Arizona, January & February 2008)
53. People versus Alfredo Prieto (Fairfax County, Virginia, February 2008)

54. People versus Edward Gutierrez (Santa Clara County, California, May 2008)

55. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants. (Deposition taken in Phoenix, Arizona, July 2008). A supplemental deposition was also taken in July 2008 approximately 2 weeks after the initial deposition.

56. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, August 2008)

57. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, California, September 2008)

58. United States versus Naeem Williams (District Court, Honolulu, Hawaii, November 2008)

59. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Three Judge Panel, District Court, San Francisco, California, December 2008)

60. United States versus Michael Behenna (United States Army Court Marshall, Fort Campbell, Kentucky, February 2009)

61. United States versus Steven Green (District Court, Paducah, Kentucky, May 2009)

62. People versus Francisco Merino (San Mateo County, California, July 2009)

63. Milton Lewis versus State of California (District Court, Sacramento, California, October 2009)

64. People versus Adrian Sedano (San Mateo County, California, November 2009)

65. United States versus Noshir S. Gowadia (District Court, Honolulu, Hawaii, November 2009)

66. Johnny A. Johnson versus State of Missouri (St. Louis, Missouri, December 2009)

67. Martin Kipp versus State of California (District Court, Los Angeles, California, December 2009)

68. David Welch versus State of California (Martinez, California, September 2010)

69. State of Arizona versus Eddy Rose (Phoenix, Arizona, September 2010)

70. State of Delaware versus Gary Ploof (Dover, Delaware, October 2010)

71. State of Arizona versus Steven Ray Newell (Phoenix, Arizona, March 2011)

72. State of Arkansas versus Ricky Lee Newman (Fort Smith, Arkansas, March 2011)

73. People versus Kerri Livingston (San Mateo County, California, March 2011)

74. People versus Alexander Youshock (San Mateo County, California, April 2011)

75. United States versus Francisco Rodriguez (District Court, Santa Ana, California, May 2011)

76. State of Connecticut versus Robert Breton (Hartford, Connecticut, July 2011)

77. United States versus Billie Allen (St. Louis, Missouri, December 2011)

78. People versus Mohammed Ali (San Mateo County, California, February 2012)

79. Clemency Hearing re: Robert Towery (Florence, Arizona, March 2012)

80. United States versus Danny John, Jr. (Prescott, Arizona, March 2012)

81. State of Ohio versus Abdul H. Awkal (Cleveland, Ohio, June 2012)

82. People versus Monica McCarrick (Solano County, California, June 2012)

83. People versus Robert Hall (Ada County, Idaho, October 2012)

84. People versus Alamoti Finau (San Mateo County, California, November 2012)

85. United States versus Merrell Hobbs (District Court, Philadelphia, Pennsylvania, November 2012)

86. Ex Parte Juan Lizcano, W05-59563-S(A) (Dallas, Texas, November 2012)

87. People versus David Vanalstine (San Mateo County, California, December 2012)

88. Sinisterra versus the United States (District Court, Kansas City, Missouri, January 2013)

89. People versus Jing Hua Wu (San Jose, California, February & March 2013)

90. Coleman versus Brown (Deposition taken in San Francisco, California, March 2013)

91. Coleman versus Brown (District Court, Sacramento, CA, June 2013)

92. Tate versus Humphrey (Deposition taken in San Francisco, California, June 2013)

93. Coleman versus Brown (District Court, Sacramento, CA, October 2013)

94. People versus Alegria (Tucson, Arizona, October 2013)

95. Commonwealth v. Michael Pruitt (Reading, PA, November 2013)

96. Coleman versus Brown (District Court, Sacramento, CA, December 2013)

97. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, March 2014)

98. Deposition taken in Parsons, et al v. Ryan. March 28, 2014, San Francisco, CA.

99. Evidentiary hearing in State of Arizona v. Albert Martinez Carreon. Phoenix Arizona, April 21 & 22, 2014.

100. United States v. Naeem Williams, (District Court, Honolulu, HI, April 29 & 30, and June 3, 2014

101. Deposition taken in Hernandez v. County of Monterey, San Francisco, CA, July 8, 2014

102. United States v. Thomas Steven Sanders, (District Court, Alexandria, LA, September 22 & 23, 2014)

103. Deposition taken in Kurian David, et al., plaintiffs v. Signal International, LLC, defendant, San Francisco, California, October 2014)

104. People v. Dennis McGraw (Vallejo, California, November 2014)

105. People v. Leticia Serna (San Jose, California, December 2014)

106. Wilridge v. Marshall, (District Court, San Francisco, California, February 2015)

107. People v. Hugo Munguia-Hernandez (Redwood City, California, July 2015)

108. Deposition taken in Goddard v. State of California, et al., San Mateo, California, September 2015.

109. People v. Bryan Thomas (Redwood City, California, October 2015)

110. Carlos Gutierrez v. E.K. McDaniel, Warden, et al. (Reno, Nevada, January 2016)

111. State of Arkansas v. Rickey Dale Newman (Fort Smith, Arkansas, January 2016)

112. Deposition taken in Roscoe Walker v. Ford Motor Company, et al., San Mateo, California, February 2016.

113. People v. Philip Law (Boise, Idaho, May 2016)

114. United States v. Joel Manuel Taylor, (District Court, San Francisco, CA, March 18, April 25 & May 25, 2016)

115. United States v. Henry Cervantes, et al, (District Court, Oakland, CA, June 28, 2016)

116. Manual Camacho v. State of Arkansas, (District Court, Fort Smith, Arkansas, November 8, 2016)

117. The People of Guam vs. Mark Anthony Torre, Jr. (Superior Court of Guam, Agana, Guam, February 22, 2017)

118. Kevin Webb, et. al., v. Brad Livingston, et. al. (civil action no. 4:14-cv-03302). Deposition taken in San Francisco, California, June 2, 2017)

119. State of Missouri v. Marvin Rice (11DE-CR00590-2), video deposition taken in Honolulu, HI, July 20, 2017.

120. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, December 18 & 19, 2017)

121. United States v. Nna Alpha Onuoha, (District Court, Riverside, California, January 24, 2018)

122. Ashoor Rasho et al. v. Director John Baldwin, (District Court, Peoria, Illinois, February 27 & 28 and March 1, 2018)

# Exhibit C

## Documents and Testimony Reviewed in Preparation of Expert Report

### *Coleman v. Brown* Case Filings and Documents

1. Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan, 02/06/17, Docket 5564

2. October 10, 2017 Staffing Order, Docket 5711

3. July 3, 2018 Order Re Staffing and Telepsychiatry, Docket 5850

4. Defendants' May 25, 2018 Letter Regarding Their Final Negotiated Telepsychiatry Policy and Positions

5. Plaintiffs' Letter Setting for Final Position on Draft Telepsychiatry Policy, dated May 21, 2018

6. 2017 Suicide Report for Prisoner A and 2017 Quality Improvement Plan documentation for Prisoner A Suicide

7. 2016 Suicide Report for Prisoner B and 2016 Quality Improvement Plan documentation for Prisoner B Suicide

8. Excerpts from Special Master's 02/13/18 Twenty-Seventh Round Monitoring Report on Mental Healthcare in the CDCR, Docket 5779, pages 490-508

9. Defendants' Final Telepsychiatry Policy, Docket 5841, Ex. 1

10. Declaration of Michael Golding in support of Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing, Docket 5591-1


### Scholarly Articles

1. Acierno, Ron, Daniel F. Gros, Kenneth J. Ruggiero, Melba A. Hernandez-Tejada, Rebecca G. Knapp, Carl W. Lejuez, Wendy Muzzy, Christopher B. Frueh, Leonard E. Egede, and Peter W. Tuerk 2016. "Behavioral Activation and Therapeutic Exposure for Posttraumatic Stress Disorder: A Noninferiority Trial of Treatment Delivered in Person Versus Home-Based Telehealth." Depression and Anxiety Volume 33: 415-423.

2. Antonacci, Diana J., Richard M. Bloch, Sy Atezaz Saeed, Yilmaz Yildirim, and Jesse Talley 2008. "Empirical Evidence on the Use and Effectiveness of Telepsychiatry via Videoconferencing: Implications for Forensic and Correctional Psychiatry." Behavioral Sciences and the Law Volume 26: 253-269.

3. Barrera-Valencia, Camilo, Alexis Vladimir Benit-Deviat, Consuelo Velez-Alvarez, Mario Figueroa-Barrera, and Sandra Milena Franco Idarrago 2017. "Cost-Effectiveness of Synchronous vs. Asynchronous Telepsychiatry in Prison Inmates

with Depression." Revista Colombiana de Psiquiatria Volume 46 (No. 2): 65-73.

4.  Batastini, Ashley B. and Robert D. Morgan 2016. "Connecting the Disconnected: Preliminary Results and Lessons Learned from a Telepsychology Initiative with Special Management Inmates." Psychological Services Volume 13 (No. 13): 282-291.

5.  Brodey, Benjamin B., Keith H. Claypoole, Jeffrey Motto, Robert G. Arias, and Richard Goss 2000. "Satisfaction of Forensic Psychiatric Patients with Remote Telepsychiatric Evaluation." Psychiatric Services Volume 51 (No. 10): 1305- 1307.

6.  Chakrabarti, Subho 2015. "Usefulness of Telepsychiatry: A Critical Evaluation of Videoconferencing-Based Approaches." World Journal of Psychiatry Volume 5 (No. 3): 286-304.

7.  Deslich, Stacie Ann, Timothy Thistlethwaite, and Alberto Coustasse 2013. "Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations." The Permanente Journal Volume 17 (No. 3): 80-86.

8.  DeVido, Jeffrey, Anna Glezer, Linda Branagan, Alvin Lau, and James A. Bourgeois 2016. "Telepsychiatry for Inpatient Consultations at a Separate Campus of an Academic Medical Center." Telemedicine and E-Health Volume 22 (No. 7): 572-576.

9.  Farabee, David, Stacy Calhoun, and Robert Veliz 2016. "An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees." Psychiatric Services Volume 67 (No. 5): 562-565.

10. Garcia-Lizana, Francisca and Ingrid Munoz-Mayorga 2010. "What About Telepsychiatry? A Systematic Review." The Primary Care Companion to the Journal of Clinical Psychiatry Volume 12 (No. 2): 1-9.

11. Glaser, Michelle, Tom Winchell, Patty Plant, Wayne Wilbring, Michael Kaiser, Michael K. Butler, Matthew Goldshore, and Manya Magnus 2010. "Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana." Telemedicine and E-Health Volume 16 (No. 4): 472-479.

12. Grady, Brian, and Mary Singleton 2011. "Telepsychiatry 'Coverage' to a Rural Inpatient Psychiatric Unit." Telemedicine and e-Health Voliume 17 (No. 8): 603-697.

13. Hall, R.C.W., M.K. Popkin, R.A. Devaul, L.A. Faillace, and S.K 1978. Stickney. "Physical Illness Presenting as Psychiatric Disease." Archives of General Psychiatry (35): 1315-1320.

14. Hilty, Donald M., Daphne C. Ferrer, Michelle B. Parish, Barb Johnston, Edward J. Callahan, and Peter M. Yellowlees 2013. "The Effectiveness of Telemental Health: A 2013 Review." Telemedicine and E-Health Volume 19 (No. 6): 444- 454.

15.   James, Doris J. and Lauren E. Glaze 2006. "Mental Health Problems of Prison and Jail Inmates." Bureau of Justice Statistics Special Report (September 2006, NCJ 213600): 1-12.

16.   Larsen, Debra, Hudnall Stamm, Kelly Davis, and Phillip R. Magaletta 2004. "Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers." Telemedicine Journal and E-Health Volume 10 (Supplement 2): 82-90.

17.   Leonard, Sarah 2004. "The Development and Evaluation of a Telepsychiatry Service for Prisoners." Journal of Psychiatric and Mental Health Nursing Volume 11: 461-468.

18.   Magaletta, Philip R. and Thomas J. Fagan 2000. "Telehealth in the Federal Bureau of Prisons: Inmates' Perceptions." Professional Psychology: Research and Practice Volume 31 (No. 5): 497-502.

19.   Manfredi, Luisa, Joann Shupe, and Steven L. Batki 2005. "Rural Jail Telepsychiatry: A Pilot Feasibility Study." Telemedicine and E-Health Volume 11 (No. 5): 574-577.

20.   Morgan, Robert D., Amber R. Patrick, and Philip R. Magaletta 2008. "Does the Use of Telemental Health Alter the Treatment Experience? Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities." Journal of Consulting and Clinical Psychology Volume 76 (Number 1): 158-162.

21.   Nelson, Eve-Lynn, Charles Zaylor, and David Cook 2004. "A Comparison of Psychiatrist Evaluation and Patient Symptom Report in a Jail Telepsychiatry Clinic." Telemedicine Journal and e-Health Volume 10 (Supplement 2): 54-59.

22.   O'Reilly, Richard, Joan Bishop, Karen Maddox, Lois Hutchinson, Michael Fisman, and Jatinder Takhar 2007. "Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results from a Randomized Controlled Trial." Psychiatric Services Volume 58 (No. 6): 836-843.

23.   Salmoiraghi, Alberto and Shahid Hussain 2015. "A Systematic Review of the Use of Telepsychiatry in Acute Settings." Journal of Psychiatric Practice Volume 21 (No. 5): 389-393.

24.   Sharp, Ian R., Kenneth A. Kobak, and Douglas A. Osman 2011. "The Use of Videoconferencing with Patient with Psychosis: A Review of the Literature." Annals of General Psychiatry Volume 10 (No. 14): 1-11.

25.   Shore, Jay H., Daniel Savin, Heather Orton, Jan Beals, and Spero M. Manson 2007. "Diagnostic Reliability of Telepsychiatry in American Indian Veterans." American Journal of Psychiatry Volume 164 (No. 1): 115-118.

26.   Singh, Surendra P., Dinesh Arya, and Trish Peters 2007. "Accuracy of Telepsychiatric Assessment of New Routine Outpatient Referrals." BMC Psychiatry Volume 7 (No. 55): 1-13.

27.    Trestman, Robert L., Michael K. Champion, Elizabeth Ford, Jeffrey L. Metzner, Cassandra F. Newkirk, Joseph V. Penn, Debra A. Pinals, Charles Scott, Robert E. Stellman, Henry C. Weinstein, Robert Weinstock, Kenneth L. Appelbaum, and John L. Young 2015.  *Psychiatric Services in Correctional Facilities: Third Edition*.  A Work Group Report of the American Psychiatric Association.  American Psychiatric Publishing.

28.    Zaylor, Charles, Eve-Lynn Nelson, and David J. Cook 2001. "A Comparison of Psychiatric Evaluation and Patient Symptom Report in a Jail Telepsychiatry Clinic." Journal of Telemedicine and Telecare Volume 7 (Supplement 1): 47-49.

29.    Zaylor, Charles, Pamela Whitten, and Charles Kingsley 2000. "Telemedicine Services to a County Jail." Journal of Telemedicine and Telecare Volume 6 (Supplement 1): 93-95.

30.    Zollo, Susan, Michael Kienzle, Paul Loeffelholz, and Susan Sebille 1999. 'Telemedicine to Iowa's Correctional Facilities: Initial Clinical Experience and Assessment of Program Costs." Telemedicine Journal and e-Health Volume 5 (Number 3): 291-301.

# Attachment 2



ROSEN BIEN
GALVAN & GRUNFELD LLP

P.O. Box 390
San Francisco, California 94104-0390
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Thomas Nolan
Email:  tnolan@rbgg.com

May 21, 2018

VIA ELECTRONIC MAIL ONLY

Matthew A. Lopes Jr.                         Katherine Tebrock
Coleman Special Master                       Deputy Director
Pannone Lopes Deveraux & West LLC            CDCR Mental Health Program
317 Iron Horse Way, Suite 301                Katherine.Tebrock@cdcr.ca.gov
Providence, RI 02908
MLopes@pldlaw.com
mailto:MLopes@pldlaw.com

Nicholas Weber
CDCR Healthcare Legal Team
Nicholas.Weber@cdcr.ca.gov

     Re:   *Coleman v. Brown*:  Plaintiffs' Final Position on Defendants' Draft
          Telepsychiatry Policy at Conclusion of Workgroup Process on
          Telepsychiatry
          Our File No. 0489-03

Dear Matt, Nick, and Katherine:

     During the last few months of weekly workgroup meetings on staffing issues, the
parties have made considerable progress towards a final agreement on the CDCR's
proposed telepsychiatry policy.  We write to set forth our remaining objections to the
policy, as well as to describe the areas where progress has taken place and where
agreements have been reached.  Attached hereto as **Exhibit A** is Defendants' Final Draft
Telepsychiatry Policy ("draft telepsychiatry policy" or "policy").

     This progress in negotiating a new policy has taken place notwithstanding our
profound concerns about the proposal for virtually unlimited use of telepsychiatry in the
CDCR.  Indeed, Plaintiffs have repeatedly set forth our reservations about this method of
treatment, particularly for patients at the highest levels of care.

[3256716.2]

Matthew A Lopes, Jr.
May 21, 2018
Page 2

*Coleman* class members often struggle with the isolation, lock downs, and lack of purposeful activity that is endemic inside many CDCR prisons. These conditions tend to worsen existing mental illnesses. Face-to-face, in-person clinical contacts provide a different level of human contact and connection that we contend is more therapeutic in the context of CDCR's prisons than remote treatment by video-phone.

Both the Special Master and the Court have also articulated significant concerns and concrete limitations regarding the appropriate use of telepsychiatry. For example, in the Special Master's Report on Staffing in February of 2017, he detailed the need for limitations on the use of telepsychiatry for MHCB level of care treatment:

> For inmates at the MHCB level of care, telepsychiatry is not an appropriate method of treatment to be used on a regular basis. Telepsychiatry for these higher acuity inmates should only be used as a last resort or in emergency situations when an on-site psychiatrist is not available. On-site psychiatrists are able to more positively impact the therapeutic milieu by regularly interacting with correctional, nursing, and other mental health staff. This is just not possible with telepsychiatrists. In addition, on-site psychiatrists are better able to discern nonverbal behavior demonstrated by inmates. The ease of multidisciplinary interaction on-site is especially important in regards to emergency consultation, which is essential at the higher levels of care and much better accomplished with on-site psychiatrists.

*See* Special Master's Report on the Status of Mental Health Staffing, ECF No. 5564 at 17 (Feb. 6, 2017). In the Special Master's staffing report, he also expressed this concern more generally about higher levels of care, noting that "the higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment." *Id*. at 16.

The Court has also repeatedly expressed concerns about this method of treatment, noting in its May 18, 2015 Order that the unrestricted use of telepsychiatry "is troubling, particularly because there may be class members not susceptible to this method of care." *See* May 18, 2015 Order, Dkt. 5307, at 5:13-14. Moreover, the Court clearly agreed with and adopted the Special Master's concerns described above in its October 10, 2017 Order, along with his recommended limitations on this form of treatment.

A.  **Request for Close Monitoring of Telepsychiatry to Ensure On-Site Clinicians Are Not Permitted to Migrate to Telepsychiatry Offices**

Matthew A Lopes, Jr.
May 21, 2018
Page 3

The Special Master's staffing report also articulated an important concern that we request that the Special Master's team monitor closely in the future: the risk that on-site psychiatrists will migrate to comfortable telepsychiatry jobs rather than deal with the delays and inconvenience of practicing on site at a prison. The Court clearly agreed with this concern and adopted the following explanation of this issue from the Special Master' February 2017 Staffing Report:

> The convenience of telepsychiatry should also not serve as a reason to allow on-site psychiatrists to migrate to the comfort of remote off-site offices. It cannot be emphasized enough that telepsychiatry should not replace on-site psychiatry, a concern shared by plaintiffs' counsel. An example of such a problem would be to allow the use of telepsychiatry at the California Institution for Women and the California Institute for Men by psychiatrists working out of the Rancho Cucamonga offices. The proximity of those two facilities to the Rancho Cucamonga office voids any reason for not providing on-site psychiatrists and would undermine the very purpose of the telepsychiatry program. Similar arguments can be made regarding the use of telepsychiatry at Mule Creek State Prison and the California Health Care Facility given their proximity to Elk Grove, a point raised by plaintiffs. . . .

2/06/17 Special Master's Staffing Report at 16. The Special Master's recommendation in this area was also clearly adopted by the Court. *See* 10/10/17 Order at 23 ("With one clarification, the recommendations of the Special Master [listed by the Court on page 21] will be adopted at this time.").

Although the Court adopted this concern that on-site physicians must not be permitted to migrate to nearby telepsychiatry offices, no similar message is contained in Defendants' draft telepsychiatry policy. Plaintiffs can accept Defendants' position that this requirement need not be in the state-wide telepsychiatry policy, as it does not concern most institutions. We believe this issue can be monitored and if necessary addressed by the Special Master through the routine monitoring process in the future.

B.     **Remaining Areas of Disagreement**:

Plaintiffs have two major disagreements with the draft telepsychiatry policy that are based on the plain prohibitory language of the Court's October 10, 2017 Order, and two additional objections. The draft telepsychiatry policy fails to incorporate the Court's requirements that (1) telepsychiatry may supplement but notreplace on-site psychiatry

Matthew A Lopes, Jr.
May 21, 2018
Page 4

and should only be used when institutions are unable to recruit on site, and (2) that
telepsychiatry is not appropriate at the highest levels of care, including MHCB and
inpatient care, except in emergencies. We also have two other areas of disagreement,
relating to (3) our objection to the use of telepsychiatry for cell-front visits, and (4) the
allowance of Psychiatric Nurse Practitioners to practice via telepsychiatry. The parties
are still sharing information about these last two issues, and it is possible those processes
of information exchange will alleviate some of Plaintiffs' counsels' concerns.

In its October 10, 2017 Order, the Court ordered several clear and over-arching
limitations on the use of telepsychiatry that Defendants did not appeal. *See* Order, ECF.
No. 5711 at 30 (October 10, 2017).

First, the Court ordered that "telepsychiatry should be used as a supplement, rather
than a substitute, for on-site psychiatry and should only be used when institutions are
unable to recruit psychiatrists or have short-term vacancies that cannot be filled by
contract psychiatrists." *Id*. at 30. Defendants have failed to include this important
principle required by the Court's Order.

Second, the Court ordered that telepsychiatry is not appropriate for use at the
highest levels of care, and particularly in MHCB units: "Telepsychiatry should not be a
frontline approach for psychiatric services for inmates with the most intensive or
emergent needs. . . . Telepsychiatry is not appropriate for the MHCB level of care except
as a last resort or in emergency situations when an on-site psychiatrist is not available."
Order, ECF No. 5711, at 21 (Oct. 10, 2017). Defendants have refused to include this
Court-ordered limitation.

Our third objection is to the policy's provision of a cell-front visit option for
telepsychiatry. We do not agree that cell-front use of telepsychiatry is appropriate,
except in emergency situations where no in-person provider is available. However, we
would appreciate the opportunity to see this technology demonstrated in person and such
a demonstration may cause us to change our position on this point. At Defendants'
request, we have offered dates in the coming weeks when we are available to review the
technology in person.

Fourth, the restriction currently banning Psychiatric Nurse Practitioners ("PNPs")
from telepsychiatry services for MHCB and inpatient patients should instead broadly
prohibit PNPs from providing any telepsychiatric services. Indeed, Plaintiffs object to
Defendants' use of PNPs generally given that Defendants apparently do not have a
written policy governing the appropriate scope of PNPs' provision of treatment in the
MHSDS. Once Defendants have developed and shared their policy on the supervision
and use of PNPs in general, we may be more open to agreeing that PNPs may work with

[3256716.2]

Matthew A Lopes, Jr.
May 21, 2018
Page 5

some patients at the CCCMS level of care using telepsychiatry, but we remain deeply concerned that Defendants' draft telepsychiatry policy allows PNPs to treat EOP patients via telepsychiatry. The staffing plan proposed by Defendants, and approved by the Special Master and Court, only contemplated utilizing PNPs to treat CCCMS class members in lieu of psychiatrists, not EOPs, and certainly never contemplated that PNPs would treat EOPs (or even CCCMS class members) via telepsychiatry. *See* Special Master's Report on Defs' Staffing Plan (ECF 5564), at 18 ("Defendants proposed to recruit psychiatric or mental health nurse practitioners to provide psychotropic medication management to 3CMS inmates in place of psychiatrists."), and 42 (describing Defendants' January 2017 Staffing Plan, stating "CDCR will begin to recruit Nurse Practitioners [Psychiatric or Mental Health] to provide psychotropic medication management in lieu of psychiatrists for the Clinical Correctional Case Management System (CCCMS) population").

C.      **Plaintiffs Disagree With Defendants' Legal Analysis of Whether Their Telepsychiatry Policy Must Comply With The Requirements of the Court's October 10, 2017 Order:**

        Defendants have set forth their legal analysis as to why they are not bound by the key principles for their telepsychiatry policy set forth in the Court's October 10, 2017. *See* Defendants' May 16, 2018 Letter to Lisa Ells and Thomas Nolan Re: Court's October 10, 2017 Order and Telepsychiatry.

        Boiled down, Defendants' argument is that the Court's directions regarding the telepsychiatry policy are "not mandatory," and that the Special Master's recommendations that the Court adopted – at the urging of Plaintiffs and despite Defendants' vigorously litigated opposition – "are permissive instructions." *See* 5/16/18 Letter at 1.

        This argument strains credulity.

        Although the Court prudently left room for the telepsychiatry policy to evolve based on any *future* recommendations of the Special Master made through the normal monitoring process, the Court's Order is crystal clear that for purposes of the current Program Guide Addendum drafting process, "The Special Master's recommendations concerning the use of telepsychiatry, as clarified by this order, **shall** form the basis of that addendum. . . ." October 10, 2017 Order at 30. The word "shall" is a mandatory instruction, not a permissive one. *See United Cook Inlet Drift Ass'n v. Nat'l Marine Fisheries Serv.*, 837 F.3d 1055, 1064 (9th Cir. 2016) (noting that in statutory interpretation, the general rule is that shall is a mandatory instruction). Defendants agree

[3256716.2]

Matthew A Lopes, Jr.
May 21, 2018
Page 6

with this interpretation of "shall" in discussing other parts of the Court's Order, but ignore it here.

That sentence making a mandatory direction regarding the Program Guide Addendum on telepsychiatry is, as Defendants point out, modified subsequently by the phrase "subject to modification as appropriate as a result of ongoing monitoring of defendants' telepsychiatry program." *Id.* However, that language is clearly intended to authorize the Special Master to allow fine-tuning of Defendants' policy based on *future* monitoring by the Special Master's team.

Defendants seem to argue that such a departure from the Special Master's prior recommendations, as adopted by the Court, is authorized by a *past* monitoring report, the Special Master's 26th Round Monitor Report, even though that report is not even the most recent one, and was completed in May of 2016 prior to the Special Master's Staffing Report and the resulting Court Order. *See* 5/16/16 Twenty-Sixth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Dkt. 5429.

A report that was published roughly nine months before the Special Master's Staffing Report that forms the basis for the Court's Order cannot serve as a justification for its modification. All of the evidence in that Report was available to the Special Master and the parties, and played a role in the briefing on the telepsychiatry issue leading up to the Special Master's Staffing Report and its recommendation.

We agree that the Court's Order clearly invites the Special Master to recommend modifications to the restrictive requirements of her Order *in the future* if the Special Master's monitoring supports such a modification in the future. The mandatory language of the Order requires compliance by all with its directions in the initial Program Guide Addendum at issue here.

The 26th Round Report did not authorize the broad use of telepsychiatry at every level of care, in any event. Defendants fail to mention the crucial, crystal-clear finding in the Special Master' 26th Monitoring Report that telepsychiatry "is primarily an option for treatment of inmates at the 3CMS level of care, and a less desirable option for inmates at higher levels of care." *See* 5/6/16 Special Master's 26th Report, Dkt. 5439, at 30. Moreover, Defendants' citations to the 26th Report are selective, as they ignore multiple findings of problems with the provision of care relating to the use of telepsychiatry. *See, e.g.,* 26th Report at 318, 323, 370, 461, 673, 674, 676 (docket pagination).

The 27th Monitoring Report, which Defendants did not cite, also included troubling findings with respect to the CDCR's use of telepsychiatry. *See* February 13,

Matthew A Lopes, Jr.
May 21, 2018
Page 7

2018 27th Monitoring Report of the Special Master, Dkt. 5779.  For example, at CIW, the
27th Report monitor found that for the EOP program there, "[s]taff reported the switch
from telepsychiatry to on-site psychiatry in EOP had been extremely beneficial,
especially with respect to milieu management." *Id*. at 499.  The 27th Report also found
other problems with Defendants' use of telepsychiatry.  *See, e.g., id*. at 225, 229, 457,
458 (docket pagination).

Simply put, neither Defendants' legal arguments nor their factual ones support a
conclusion that Defendants are permitted or should be permitted to depart from the
specific instructions set forth by the Court for critical components of their telepsychiatry
policy.

**D.**    **Areas of Progress and Agreements Reached Through The Workgroup**
**Process:**

Despite these major remaining differences over the use of telepsychiatry, we have
many areas of agreement about the usefulness of this treatment approach, and we have
reached numerous additional agreements through the workgroup process.

Overall, we have three major areas of agreement with Defendants' policy:

1.    We agree with Defendants that telepsychiatry is an appropriate method of
treatment for CCCMS prisoners, at prisons where enough on-site psychiatrists cannot be
hired, and where there is a core group of on-site psychiatrists available for both handling
emergencies and coordinating on-site duties for psychiatry.

2.    We also agree that telepsychiatry can be an important supplementary mode
of treatment to cover staff absences and for emergency situations when on-site staff
members are not available.

3.    We agree that Defendants may utilize telepsychiatry for EOP patients at
prisons in the event that, after good faith efforts, Defendants are unable to hire sufficient
on-site psychiatrists, but only if the majority of positions for the EOP program are filled
by on-site psychiatrists.   At all levels of care, we think it is critical that there remains a
strong preference for on-site psychiatrists.  In agreeing to this limited use of
telepsychiatry for EOPs, it is especially important that CDCR clinicians make appropriate
use of the provisions in the agreed upon policy for handling cases where telepsychiatry is
felt to be clinically contraindicated, and we ask that the Special Master's team monitor
this issue closely in the future.

The parties have also reached numerous agreements about the details of their
telepsychiatry policy in the workgroup process:

[3256716.2]

Matthew A Lopes, Jr.
May 21, 2018
Page 8

1.    <u>Enhanced Requirements for Initial Meeting with Telepsychiatry</u>:  Although Plaintiffs' Counsel sought a more formal informed consent process for individuals being enrolled in tele-therapy, we appreciate the changes Defendants made to the paragraph on "Professional and Patient Identity" on the first page of the policy to enhance what must be explained to the patient during the first meeting.

2.    <u>Broader Language on Telepsychiatrist Participation in All Treatment Team Activities</u>:  We appreciate the addition of the language in the section headed "Participation in Interdisciplinary Treatment Team, Meetings and Huddles" stating that "telepsychiatry providers shall participate to the same extent as onsite psychiatrists in all meetings and huddles relevant to the clinical care of their patients, in compliance with the CCM."  *See* Draft Telepsychiatry Policy at 2.  This requirement may require some technical enhancement of video conferencing or re-location of some meetings to an appropriate room.  For example, it will be difficult to arrange for telepsychiatrist participation in an EOP ASU huddle with custody staff that takes place in the housing unit.

3.    <u>Changes to Section on Refusals</u>:  We agree to and appreciate the changes in the paragraph on refusals on the second page, eliminating the requirement for a "pattern of refusals."  As discussed above, we do not agree that cell front use of telepsychiatry is appropriate, so we are also appreciative of the fact that the policy no longer envisions a cell-front telepsychiatry visit to address refusals.

4.    <u>Enhancements to Process for Addressing Patients for Whom Telepsychiatry is Thought to Be Contraindicated</u>:   Plaintiffs' disagree strongly with the statement at the beginning of this section that "Patients shall not be excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis."  However, we agree that  the changes Defendants made in this section at the bottom of Page 2 and top of Page 3 on Contraindications for Telepsychiatry will empower clinicians and the IDTT when they believe telepsychiatry is contraindicated for a given patient.  We also request that the Special Master's team closely monitor this issue in the future to ensure that patients who are not clinically appropriate for telepsychiatry because of their clinical condition, disabilities, or because of other issues, are properly excluded from this form of treatment and instead provided face-to-face treatment.

5.    <u>Emergency Management Section</u>:  The policy could be more robust in embracing cautionary language in many professional resource materials about the use of telepsychiatry for managing psychiatric emergencies.  We agree to the changes to the Emergency Management section on Page 3 made by Defendants and we believe these changes address many of our concerns about this issue.  Any remaining deficiencies with

[3256716.2]

Matthew A Lopes, Jr.
May 21, 2018
Page 9

the policy in this area can be addressed in future monitoring by the Special Master's team.

6.    <u>Crisis Bed and Inpatient Programs Section</u>:  While we appreciate the clarifying change to the heading in the section now headed "Crisis Bed and Psychiatric Inpatient Programs," we do not agree, as discussed above, that the restrictions in this section on the use of telepsychiatry at the highest levels of care are adequate.  However, we do appreciate that the ban included in the policy on PNPs providing telepsychiatry services in inpatient or MHCB settings has been moved to the top of this section.

7.    <u>On-Site Visit Requirements</u>:  Plaintiffs think that the requirements for routine on-site visits by telepsychiatrists to the prisons they serve is a tremendous improvement over early draft policies that did not include this.  The policy would benefit from more detailed requirements with respect to site visits by telepsychiatrists to the institutions to which they are assigned.  We agree that the content of onsite visits is something that can be addressed in the monitoring process by the Special Master's team.

7.    <u>Physical Environment Section</u>:  We agree to and appreciate the changes made by Defendants to the section on Physical Environment on page 4 of the policy.  These changes enhance the requirements for a good video and audio connection in a private setting.

We appreciate the productive exchanges that have taken place between the parties to improve the existing telepsychiatry process, and we look forward to working with the Special Master's team and Defendants further to resolve the remaining differences with respect to this important policy.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Thomas Nolan*

Thomas Nolan
By:    Of Counsel


Encl.  Defendants Final Draft Telepsychiatry Policy

cc:    *Coleman* Special Master Team      Jerome Hessick

Matthew A Lopes, Jr.
May 21, 2018
Page 10

*Coleman* Co-counsel          Melissa Bentz
Jay Russell                   Andrea Moon
George Maynard                Christine Ciccotti
Andrew Gibson                 Sean Rashkis
Elise Thorn                   Elaine Ekpo
Chad Stegeman                 Michael Golding
Joanna Mupanduki
Adriano Hrvatin
Tyler Heath

[3256716.2]

| **VOLUME 12:**<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| **CHAPTER 8:**<br>PSYCHIATRY SERVICES | Revision Date(s): | NA |
| | Supersedes: | |
| **12.08.100**<br>TELEPSYCHIATRY | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists and/or psychiatric nurse practitioners (telepsychiatry providers) to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatry provider, the patient, and the patient's treatment team. Telepsychiatric services are part of California Department of Corrections and Rehabilitation's (CDCR's) Complete Care Model (CCM) of treatment that provides integrated medical and mental health provision of services. CCM is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. The Telepsychiatry Program provides mental health services to all levels of care. Telepsychiatric services are a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population. Onsite providers shall remain the preferred method of psychiatric care for Mental Health Crisis Beds (MHCB) and Psychiatric Inpatient Programs (PIP). To ensure continuity of care for patients within the program, telepsychiatry providers will work from CDCR hubs and strong preference will be given to assign telepsychiatry providers to caseloads within the same institution.

**Equipment**

The telepsychiatry providers shall be given the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, scanner/printer (can be individual and/or shared), and phone with access to an outside line.

- A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound-proofed, where possible.

- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists.

- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatry provider can be seen and heard clearly.

Cell front equipment shall be available in all institutions receiving telepsychiatry services.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the providers' and patients' identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telepsychiatry contact, the telepsychiatry provider shall explain the treatment modality, including a description of the role of the telepresenter, a plan for response to interruption in services, conditions under which a referral made to in-person care.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatry provider participation in the Interdisciplinary Treatment Teams (IDTT) is an important part of the provision of psychiatric services. Consistent with the CCM, telepsychiatry providers shall participate in the receiving institutions' IDTT meetings. To facilitate telepsychiatry provider's participation in IDTTs, IDTT meetings that include a telepsychiatry provider shall be held in a location that is appropriately wired to allow for the telepsychiatry provider's full participation. Receiving institutions may be required to modify IDTT schedules to allow telepsychiatry providers to participate in the IDTT.

In addition to IDTT meetings, telepsychiatry providers shall participate to the same extent as onsite psychiatrists in all meetings and huddles relevant to the clinical care of their patients, in compliance with the CCM.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatry provider shall meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telepsychiatry services. A member from the treatment team may utilize brief, focused cell front discussions with the patient to determine the reasons for appointment refusals. The telepsychiatry provider may also request a consultation from an onsite provider if it is clinically determined that the patient must be seen immediately.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatric visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry. If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate onsite psychiatric treatment.

**Contraindications for Telepsychiatry**

Patients shall not be excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. If the telepsychiatry provider and Chief of Telepsychiatry determine that the patient needs to be seen by an onsite psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate onsite psychiatrist assigned. Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an onsite psychiatrist.

**Emergency Management**

If an emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatry provider shall immediately notify Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) as well as his/her direct telepsychiatry supervisor . The telepsychiatry provider shall coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to emergency triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

**Crisis Bed and Psychiatric Inpatient Programs**

No Psychiatric Nurse Practitioners (PNPs) shall be permitted to provide telepsychiatric services to MHCBs or PIPs.

In the event that a telepscyhiatrist is needed in an inpatient or crisis bed setting the telepsychiatrists shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings, in case conferences, and in coordinating patient care. Consistent with the CCM, onsite staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Telepsychiatrists shall be involved in treatment and discharge decisions.

Patients housed in a MHCB or PIP are often unable to leave their room due to presenting as a danger to self, a danger to others, or being gravely disabled. Therefore, clinical staff at the receiving institution shall assist telepsychiatrists with facilitating cell-side interactions as needed.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

Telepsychiatrists shall provide sign-out information to an available Institutional Psychiatrist on Duty to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telepsychiatry providers are responsible for maintaining relationships with members of the onsite treatment team by regularly communicating with them and by physically visiting receiving institutions. Telepsychiatry providers shall visit their assigned institution within 30 days of assignment. The frequency of follow-up visits shall be determined by the telepsychiatry provider's assigned level of care.  The telepsychiatry provider will spend at

least one full business day during each site visit at the facility, and attend meetings as described below:

| Level of Care | Frequency of Site visit |
|---|---|
| CCCMS | Biannually |
| EOP | Quarterly |
| MHCB | Quarterly* |
| PIP | Monthly |

*For MHCB, the telepsychiatrist shall visit the institution every 2 months for the first 6 months, then every 3 months thereafter

During each visit, the telepsychiatry providers shall participate in the IDTT, meet with necessary health care staff, and see patients face-to-face. In addition, telepsychiatry providers shall attempt to see as many patients face-to-face as possible.

**Physical Environment**

The patients' interview room/environment shall allow for both the telepsychiatry provider and the patient to be seen and heard clearly. The patient's and provider's camera shall be positioned with their faces clearly visible to each other, to the extent possible. The telepsychiatry provider shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatry provider can request assistance from the telepresenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatry provider), who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy, to the extent possible, so that others are not able to enter the provider's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Organizational Structure**

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telepsychiatry providers shall immediately notify their direct telepsychiatry supervisor, Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatry provider shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by onsite provider or rescheduling of appointments). Telepsychiatry providers may also be redirected to another telepsychiatry assignment when this occurs.

**Nonformulary Requests**

Nonformulary requests shall be made directly to the psychiatry leadership of the institutions served by telepsychiatry, unless otherwise determined by leadership. If there is no Chief Psychiatrist or Senior Psychiatrist Supervisor at the institution, nonformulary

requests shall be submitted to the telepsychiatry provider's direct supervisor.

**Jabber Account Login**

Operational need requires telepsychiatry providers to log into their Jabber telepsychiatry video accounts as soon as they arrive to work. They shall remain logged into Jabber throughout the day so that supervisors, colleagues, and institutional staff are able to communicate with the telepsychiatry provider via video calls during work hours. Telepsychiatry providers shall log out of Jabber immediately prior to leaving work.

**On-Call Coverage by Telepsychiatry**

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Inmate Medical Services Policies and Procedures (IMSP&P), Headquarters' Mental Health Policy and applicable bargaining unit Memorandums of Understanding.

Telepsychiatry providers are not required to travel to the institution where they are providing on-call coverage. Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider). This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

**Responsibilities**     The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatry provider.

- A dedicated and appropriately clinically trained telepresenter who presents the patient from the originating site to the telepsychiatry provider, and is responsible for providing clinical support and coordination. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Telepresenters shall be assigned from position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician, medical technical assistant, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, social worker, psychologist, psychiatrist, or physician. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment.

- A backup telepresenter when the primary telepresenter is on leave or unavailable.

- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.

- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.

- A contact list of important names and numbers for the institution. This includes, but is not limited, to the following:

1. Laboratory
2. Pharmacy
3. Nursing station(s)
4. Housing unit(s)
5. Primary Clinician(s)
6. Medical Provider(s)
7. Mental Health Supervisor(s)
8. Chief of Mental Health
9. Chief Psychiatrist or Senior Psychiatrist Supervisor
10. IT Department
11. Scheduler
12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.

- Caseload assignments and scheduled appointments for the telepsychiatry provider.

- The maintenance of telemedicine connectivity between institutions and providers.

- Ensuring that telepsychiatry providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.

- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.

- Organized tours for the telepsychiatry providers during their initial visits to the institution.

- Developing onsite clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatry providers.

- Onsite staff that may conduct and/or facilitate cell front visits when a telepsychiatry provider or the treatment team expresses a need for a cell front visit.

- A Local Operating Procedures (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.

- Routine system tests to ensure that equipment is safe, operational, and secure

| | |
|---|---|
| **Purpose** | This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines. Telepsychiatry providers shall conduct care |

consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatry providers are provided with the appropriate equipment and resources.
2. Telepsychiatry providers participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their patients.
3. Onsite staff and members of the treatment team communicate with the telepsychiatry provider any important patient issues and concerns related to patient care.
4. Telepsychiatry providers have access to all necessary clinical information via the health record.
5. Patients are not excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
6. Telepsychiatry provider completes all documentation in the health record by the close of each business day.
7. Provider and patient identity are verified at the beginning of a mental health treatment videoconference.
8. Telepsychiatry providers visit their receiving institutions as directed by policy.
9. Nonformulary requests are made directly to the psychiatry leadership of the institutions served by telepsychiatry providers, unless otherwise determined by leadership.
10. Telepsychiatry providers remain logged into Jabber throughout the work day.
11. Ongoing mandatory trainings for all telepsychiatry providers.
12. Telepsychiatry providers are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution… | then… |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is revised as necessary. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements. Ensure the LOP is revised as necessary. |

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

# Attachment 3

DEPRESSION AND ANXIETY 33:415–423 (2016)

# Research Article

# BEHAVIORAL ACTIVATION AND THERAPEUTIC EXPOSURE FOR POSTTRAUMATIC STRESS DISORDER: A NONINFERIORITY TRIAL OF TREATMENT DELIVERED IN PERSON VERSUS HOME-BASED TELEHEALTH

Ron Acierno, Ph.D.,[1,2]* Daniel F. Gros, Ph.D.,[1,3] Kenneth J. Ruggiero, Ph.D.,[1,2]
Melba A. Hernandez-Tejada, DHA,[1,2] Rebecca G. Knapp, Ph.D.,[1,3] Carl W. Lejuez, Ph.D.,[4]
Wendy Muzzy, MRA, MLIS,[1,2] Christopher B. Frueh, Ph.D.,[5] Leonard E. Egede, M.D.,[1,3]
and Peter W. Tuerk, Ph.D.[1,3]

**Objective:** *Combat veterans returning to society with impairing mental health conditions such as PTSD and major depression (MD) report significant barriers to care related to aspects of traditional psychotherapy service delivery (e.g., stigma, travel time, and cost). Hence, alternate treatment delivery methods are needed. Home-based telehealth (HBT) is one such option; however, this delivery mode has not been compared to in person, clinic-based care for PTSD in adequately powered trials. The present study was designed to compare relative noninferiority of evidence-based psychotherapies for PTSD and MD, specifically Behavioral Activation and Therapeutic Exposure (BA-TE), when delivered via HBT versus in person, in clinic delivery.* **Method:** *A repeated measures (i.e., baseline, posttreatment, 3-, 6-month follow-up) randomized controlled design powered for noninferiority analyses was used to compare PTSD and MD symptom improvement in response to BA-TE delivered via HBT versus in person, in clinic conditions. Participants were 232 veterans diagnosed with full criteria or predefined subthreshold PTSD.* **Results:** *PTSD and MD symptom improvement following BA-TE delivered by HBT was comparable to that of BA-TE delivered in person at posttreatment and at 3- and 12-month follow-up.* **Conclusion:** *Evidence-based psychotherapy for PTSD and depression can be safely and effectively delivered via HBT with clinical outcomes paralleling those of clinic-based care delivered in person. HBT, thereby, addresses barriers to care related to both logistics and stigma. Depression and Anxiety 33:415–423, 2016.* © *2016 Wiley Periodicals, Inc.*

[1]Mental Health Service, Ralph H. Johnson Veterans Affairs Medical Center, Charleston, South Carolina
[2]College of Nursing, Medical University of South Carolina, Charleston, South Carolina
[3]Department of Psychiatry and Behavioral Sciences, Medical University of South Carolina, Charleston, South Carolina
[4]Center for Addictions, Personality, and Emotion Research, University of Maryland, College Park, Maryland
[5]Department of Psychology, University of Hawai'i, Hilo, Hawaii

Contract grant sponsor: Department of Defense; Contract grant number: W81XWH-07-PTSD-IIRA.

Clinical Trial Registration number: NCT01177488.

© 2016 Wiley Periodicals, Inc.

The article was originally published 10 February 2016. Subsequently, a typo in the fourth author's name was corrected and the article was published on 25 May 2016.

*Correspondence to: Ron Acierno, Mental Health Service 116, Ralph H. Johnson VAMC, 109 Bee Street, Charleston, SC 29401. E-mail: acierno@musc.edu
Received for publication 18 November 2015; Revised 19 January 2016; Accepted 22 January 2016

DOI 10.1002/da.22476
Published online 10 February 2016 in Wiley Online Library (wileyonlinelibrary.com).

**Key words:** *PTSD; major depression; telehealth; telemedicine; telemental health; psychotherapy; home-based*

As was the case for Vietnam veterans, service members deployed to Operations Enduring Freedom/Iraqi Freedom/New Dawn (OEF/OIF/OND) experienced traumatic events that confer significant risk for a broad range of mental health problems,[1–4] the most common of which are PTSD and major depression (MD).[4] Given the scale of OEF/OIF/OND deployments, the high incidence of trauma exposure, and commensurate high base rates of associated mental health difficulties, access to adequate mental health treatment is a public health issue that extends well beyond the Departments of Defense and Veteran Affairs (VA).

Unfortunately, only a small percentage of service members and veterans with significantly impairing PTSD and MD symptoms receive psychiatric treatments, including evidence-based psychotherapy.[2] The disconnect between symptom burden and effectively delivered treatment may largely be due to barriers associated with stigma and/or traditional service delivery practices, and these barriers may be of particular relevance to veterans.[1,2] Specifically, Hoge et al.[1,3] broadly categorize barriers to mental health care in terms of person and geographically based factors. Person-based barriers center on a tendency to avoid perceived stigma associated with mental health treatment (i.e., when visiting a "mental health clinic"). Indeed, Hoge et al.[1] found that 65% of those service members diagnosed with a mental health disorder endorsed the statement: "I would be seen as weak" and 59% endorsed: "Members of my unit might have less confidence in me" as reasons they did not seek treatment. Geographically based barriers are more directly related to disparity of access associated with physical and personal environmental constraints, such as distance to nearest clinic, travel time, and travel costs.[2] Hoge et al.'s findings suggest that alternative treatment delivery methods are required to address these barriers to care.

One such alternative may be to deliver evidence-based psychotherapy via telehealth.[5] Initial efforts and subsequent effectiveness evaluations of telehealth-delivered psychotherapy followed the "Hub and Spoke" model, wherein a provider at a central clinic used telehealth to deliver services to patients at a remote clinic, closer to their residence or employment. Hub and Spoke approaches to delivering evidence-based psychotherapy via telehealth appear effective across disorders.[5] In addition, this format lowers cost to patients and providers in terms of transportation, travel time, and missed work.[6–8] Nonetheless, under this model of telehealth care, patients must still travel to satellite clinics to receive treatment, and thus continue to face many of the same aforementioned person-based (e.g., stigma) and geography-based (e.g., travel time) barriers to care.

Home-based telehealth (HBT) may address shortcomings of the Hub and Spoke model of telehealth service delivery. The advantages of HBT include reduced stigma (e.g., patients do not need to visit a mental health care facility), reduced cost, and further reduced logistical barriers such as travel time. Of course, these advantages must be balanced by potential shortfalls, such as lack of privacy from family members when televideo sessions are conducted into homes where soundproofing between rooms may not be in place. Other potential limitations of HBT also include potential for limited bandwith or other technical problems with no easily available resources for resolution. Currently, only one noninferiority study of evidence-based psychotherapy delivered via HBT exists,[9] and this study targeted depression, not PTSD. With respect to PTSD, existing studies are preliminary in nature and are characterized by insufficient power for noninferiority comparisons, but nonetheless offer encouraging results,[10–12] suggesting that additional investigation is justified.

Toward this end, the present study compared HBT and in person, clinic-based delivery of Behavioral Activation and Therapeutic Exposure (BA-TE), an evidence-based psychotherapy for PTSD and MD. A repeated measures randomized controlled noninferiority trial design was used to determine whether HBT delivery of treatment was "as good as" traditional, in-person office-based delivery of the identical treatment. We hypothesized that BA-TE delivered via HBT would produce similar reductions in PTSD and MD symptoms. Moreover, we hypothesized that reduced logistical barriers would decrease attrition from treatment in the HBT condition compared to the clinic-based condition.

## METHODS

### PARTICIPANTS AND RECRUITMENT

Participants were recruited from a large Southeastern VA medical center via provider referral to the VA PTSD clinic. The CONSORT diagram in Fig. 1 illustrates the recruitment path and disposition of patient randomization. One thousand two hundred and thirty-seven clinic referrals were screened, 280 both met Clinician-Administered PTSD Scale (CAPS) inclusion criteria (i.e., full criteria PTSD or subthreshold PTSD as defined below) and were willing to be randomized to either in-person or HBT conditions. Of these, 15 did not meet remaining inclusion/exclusion criteria, resulting in a block randomization of 265. Of these, 232 presented for their first treatment session 1 week following randomization, and of these, 201 also provided at least one posttreatment or follow-up assessment (intent to treat sample), with 184 of these completing at least five sessions of treatment (minimum complete sample). This discontinuation rate is consistent with past PTSD treatment outcome studies.[11,13] The CAPS[14] assesses Diagnostic and Statistical Manual Fourth Edition (DSM-IV) criteria and was used to determine PTSD diagnostic status. Subthreshold PTSD was defined as meeting PTSD Criteria A (traumatic event) and



**Figure 1. Consort 2010 Flow Diagram. BA-TE-IP/HBT: behavioral activation and therapeutic exposure in person/home-based tele-health. The time between randomization and treatment initiation was at least 1 week, and up to 4 weeks for patients requiring medication stabilization. During this interval, 33 participants dropped out before starting treatment, hence the difference in number of randomized (265) and number of initiating treatment (232), the latter of which is the number for whom baseline data were available. The number available for primary analyses was further limited to those who completed any follow-up assessment (201).**

B (re-experiencing), and either C (avoidance) or D (hyperarousal).[15] Veterans meeting either this subthreshold definition, or full criteria PTSD were eligible for participation. Individuals who were actively psychotic, acutely suicidal, or met criteria for current substance dependence were excluded from participation. To enhance generalizability of study findings, (1) veterans from each of the major conflicts comprising the majority of those served by the VA were included (i.e., OEF/OIF/OND, Persian Gulf, and Vietnam), and (2) participants receiving psychotropic medication or case management services for PTSD, mental health treatment for other psychiatric disorders, or those who met criteria for substance abuse were not excluded from participation, pending a period of stabilization (e.g., 4 weeks after new medication).

Specific demographic data are given in Table 1, along with statistical information regarding between group comparisons. Groups did not differ on any demographic variable. Considering the overall randomized sample, participants were predominantly male, Black or White, and married. About half were employed, and the mean age was about 45 years. Vietnam War Veterans accounted for 25.4% of the sample ($n = 59$), Persian Gulf War veterans comprised 23.7% ($n = 55$), and OEF/OIF/OND veterans comprised 50.9% ($N = 118$), with no differences in distribution across

*Acierno et al.*

**TABLE 1. Sample characteristics of the intent-to-treat population at baseline**

| Characteristics | N/Mean (SD/%) | Home-based telehealth n (%) | Office-based in-person n (%) | $t/\chi^2$, P |
|---|---|---|---|---|
| Mean age (years) | 45.6 (SD = 14.9) | 46.9 (SD = 14.5) | 44.5 (SD = 15.1) | 1.2, .22 |
| Gender (%) | | | | |
|    Male | 219 (94.4) | 105 (94.6) | 114 (94.2) | 0.2, .56 |
|    Female | 13 (5.6) | 7 (5.4) | 7 (5.8) | |
| Race/ethnicity (%) | | | | |
|    White | 117 (50.4) | 58 (52.3) | 59 (48.8) | 2.5, .48 |
|    Black | 110 (47.4) | 51 (45.9) | 59 (48.8) | |
|    Hispanic | 2 (0.9) | 0 (0) | 2 (1.7) | |
|    Others | 3 (1.3) | 2 (1.8) | 1 (0.8) | |
| Marital status (%) | | | | |
|    Never married | 35 (15.6) | 13 (12.0) | 22 (19.0) | 2.9, .41 |
|    Married | 142 (63.4) | 74 (68.5) | 68 (58.6) | |
|    Separated/divorced | 43 (19.2) | 19 (17.6) | 24 (20.7) | |
|    Widowed | 4 (1.8) | 2 (1.9) | 2 (1.7) | |
| Mean years education | 12.4 (SD = 4.4) | 12.0 (SD = 4.8) | 12.7 (SD = 3.9) | 1.2, .23 |
| Employed (%) | | | | |
|    No | 108 (50.7) | 47 (47.5) | 58 (50.9) | 0.3, .36 |
|    Yes | 105 (49.3) | 52 (52.5) | 56 (49.1) | |
| % Service connected | 46.4 (SD = 38.4) | 46.1 (SD = 36.7) | 46.7 (SD = 39.9) | 0.1, .92 |
| Baseline PCL | 58.3 (SD = 13.4) | 57.9 (SD = 12.7) | 58.6(SD = 14.0) | 0.4, .68 |
| Baseline BDI | 25.3 (SD = 11.1) | 26.0 (SD = 9.6) | 24.6 (SD = 12.3) | 0.9, .36 |
| Baseline CAPS PTSD Dx (%) | 179 (77.2) | 86 (77.5) | 93 (76.9) | 0.0, .91 |

$N = 232$ unless otherwise noted due to variable-specific missing data. Statistics are $t$-test for continuous variables (means) and chi-square for categorical (%) variables.

conditions. All participants had either PTSD (77.2%) or subthreshold PTSD (23.7%).

## PROCEDURES

All study procedures were approved by our university institutional review board and the VA Medical Center Research and Development committee. Consented participants were randomly assigned (1:1) to either HBT or office-based in-person delivery (IP) of identical treatments (BA-TE-HBT vs. BA-TE-IP). The randomization sequence was generated by the biostatistician (RGK) using a permuted block randomization scheme with block size varied to minimize the chance that blinding of assignment would be broken. Repeated assessments were conducted at pretreatment, posttreatment, 3-month follow-up, and 12-month follow-up.

Both the IP and HBT treatment conditions followed the identical BA-TE manual, and all therapists provided BA-TE in both delivery formats. BA-TE and the related methods have been outlined in depth elsewhere,[10, 16, 17] and are thus only briefly described here. Treatment was comprised of eight, 1.5 hrs sessions delivered between the hrs of 7:30 a.m. and 6:00 p.m. BA-TE includes weekly behavior activation, situational exposure to avoided, albeit realistically safe conditioned anxiety stimuli, and imaginal exposure to traumatic event memories introduced and practiced throughout the course of therapy. All therapists were master's level counselors who completed an 8-hr workshop-training program and shadowed a senior-level clinician prior to administering the treatment independently. Therapists were supervised weekly by a licensed clinical psychologist with over 15 years of experience with BA-TE and similar treatments (RA/PT). All sessions were audiotaped, and treatment fidelity was assessed through random sampling of 20% of therapy session tapes, rated according to a checklist of session-specific procedures that directly corresponded to the BA-TE treatment manual. Fidelity for all therapists was maintained at or above 90% across and within conditions.

BA-TE-HBT was provided via participants' own equipment when available (e.g., home computer or tablet or even smartphone), or via equipment (videophones or tablets) provided during the treatment phase by the research team. Software and equipment provided contained encrypted internet-based video service similar to "skype" or "facetime," or, at the participant's discretion, an analogue videophone (Viterion 500) that operates via traditional telephone service. Apart from the video screen, the Viterion 500 appears and functions much like a basic touch-tone telephone. Prior to the first session, the assigned therapist and patient "practiced" using the telehealth equipment to address any potential problems. Problems were resolved via telephone, and when solutions were not obtained, participants were asked to bring their equipment to the research offices, where an office-to-office equipment training session was held. This was necessary in fewer than 5% of participants, and almost always involved problems with software access to the camera or microphone on a laptop. The safety parameters of these HBT procedures, including management of suicidality, have been presented elsewhere.[18]

**Measures.** Dependent measures were collected by interviewers blind to treatment condition at baseline, posttreatment (1 week), and 3- and 12-month follow-ups. However, PCL and BDI week 2, 4, and 6 data were collected by treating therapists as part of the BA-TE protocol. Thus, these three data points were collected on session days at the start of treatment.

**Clinician-Administered PTSD Scale.** The CAPS is a clinician-rated scale designed to diagnose current and lifetime PTSD.[14] The CAPS has adequate internal consistency (αs ranged from .73 to .95), inter-rater reliability on the same interview ($r$'s ranged from .92 to .99), test-retest reliability over a 2- to 3-day period across different interviewers ($r$'s ranged from .77 to .98), and convergent and discriminant validity with measures of PTSD and other constructs, respectively.[14] For this study, CAPS interviewers were required to attain a 90% concordance rate on individual items and 100% concordance rate on overall diagnosis prior to collecting interview data for the study.

**PTSD Checklist—Military (PCL-M).** The PCL-M is a 17-item measure designed to assess DSM-IV PTSD symptom severity.[19] The PCL has excellent internal consistency ($\alpha s > .94$) and excellent test-retest reliability in various populations ($r = .96$) as well as excellent convergent validity with alternative measures of PTSD ($r$'s ranged from .77 to .93).[20]

**Beck Depression Inventory—2nd Edition (BDI-II).** The BDI-II is a 21-item measure designed to assess the cognitive, affective, behavioral, motivational, and somatic symptoms of depression in adults and adolescents.[20] The BDI-II has demonstrated excellent test-retest reliability over a 1-week interval ($r = .93$), excellent internal consistency ($\alpha s < .92$), and convergent and discriminant validity in multiple samples.[21,22]

## DATA ANALYTIC PLAN

Descriptive analyses illustrated demographic and baseline clinical characteristics for the total randomized ($N = 201$) and minimum per protocol (PP) completer ($n = 184$) samples for which any posttreatment or follow-up data were available. A conservative approach was followed in which the primary analysis was carried out using the PP sample (i.e., that which is less conservative in traditional superiority trials is more conservative in noninferiority trials, where lack of significant difference is hypothesized). Our definition of PP was based on the estimated minimum number of sessions that would yield a meaningful effect, operationally defined here as participants who completed more than half the overall number of sessions (i.e., at least 5). The PP sample was comprised of 184 subjects with 93 participants receiving BA-TE-HBT and 91 receiving BA-TE-IP. As advocated by noninferiority trial guidelines,[23] analyses were repeated using an intent-to-treat (ITT) sample comprising all randomized subjects for whom at least one post or follow-up data point was available ($N = 201$; Telepsychology $n = 99$; In-Person $n = 102$). No differences in results were observed between ITT and PP samples, and analyses with PP sample are reported below.

The primary clinical outcomes were continuous measures for PTSD (PCL-M) and MD (BDI-II) determined over the longitudinal time trajectory (immediate post and 3- and 12-month follow-up). Effect sizes at each time point were determined as the difference in baseline-adjusted PCL and BDI means for BA-TE-HBT versus BA-TE-IP modes of delivery. The order of subtraction for effect sizes was BA-TE-IP minus BA-TE-HBT, with a positive value (scores lower for HBT) indicating a superior outcome for BA-TE-HBT.

The 90% confidence interval (CI) approach was used to evaluate noninferiority of HBT mode of intervention delivery compared to IP mode of delivery. With this approach, HBT intervention delivery was judged to be "at least as good as" (i.e., noninferior to) the IP delivery (i.e., standard treatment) so long as the outcome for PCL or BDI for IP was not "better than" that of HBT by more than a posited "clinically meaningful amount." The degree to which telehealth was allowed to be "worse than" In-Person and still be considered clinically noninferior (i.e., not "unacceptably worse") was specified by the noninferiority margin, delta ($\Delta$). For the PTSD measure (PCL), we polled 12 well-published PTSD experts (see acknowledgments) to determine the noninferiority margin of 8.8. The commonly accepted clinically important margin for the BDI had previously been determined, and was 5.[24] With the CI approach (assuming order of subtraction is IP minus HBT), the noninferiority of HBT can be declared if the lower bound of the 90% CI is less than $-\Delta$ where $-\Delta$ for PCL and BDI are $-8.8$ and $-5.0$, respectively. Preliminary power estimates for a noninferiority margin on the PCL of 8.8 indicated that a sample of 175 would produce power in PP analyses of .91.

A mixed effects repeated measures longitudinal modeling approach (MMRM) was used to estimate the 90% CI for difference in baseline-adjusted least squares means (treatment effect sizes) at each postintervention time point (immediate post, 3-, and 12-month follow-up). The model included treatment, visit, visit-by-treatment (interaction term) as primary independent variables and baseline level of the dependent variable as an adjustment covariable. Visit included all measurement time points (weeks 2, 4, 6, 8, posttreatment, 3-, 12-month follow-up) and was treated as a fixed effect in the model. An unstructured covariance approach was used and analyses were performed using SAS version 9.4. Consistent with noninferiority analysis guidelines, we report CIs rather than $P$-values as determined from classic superiority approaches.[24] For the secondary hypothesis that home-based telehealth would reduce attrition, a chi-square test was applied.

# RESULTS

## BASELINE SCORES AND ATTRITION

Baseline differences between treatment conditions on demographics and symptom measures are presented in Table 1. No significant differences on any baseline variables were evident between conditions. Additionally, attrition was comparable across treatment delivery medium and was calculated by dividing the number of participants who completed at least five sessions of BA-TE and provided any posttreatment or follow-up data by the number of patients who initiated treatment (i.e., the week following random assignment to condition; BA-TE-IP = 93 out of 121 or 23.1%; BA-TE-HBT = 91 out of 111 or 18.0%, $\chi^2 = 0.93$, $P = .212$).

## NONINFERIORITY COMPARISONS

Considering noninferiority analyses at major assessment points, Fig. 2 gives the 90% (95% one-sided) CIs within which conclusions of BA-TE-HBT noninferiority to BA-TE-IP can be made. As can be seen in the upper half of Fig. 2, the lower bound of the CI for the between treatment difference in mean PCL scores for BA-TE-HBT relative to BA-TE-IP scores (effect size) were well within the prespecified range of the meaningful clinical difference ($-\Delta = 8.8$), with $\Delta = -0.11$ at posttreatment, $\Delta = -1.84$ at month 3, and $\Delta = -0.66$ at month 12. Similarly, for mean BDI scores in the lower half of Fig. 2, outcomes of BA-TE-HBT treatment effect sizes were well within the prespecified range ($-\Delta = 5$), with $\Delta = 0.89$ at posttreatment, $\Delta = 1.18$ at 3-month follow-up, and $\Delta = -0.29$ at 12-month follow-up.

Although not the primary focus of study, both treatment modalities evinced improvement in mental health functioning over time, particularly with respect to PTSD symptoms, considering both observed and adjusted scores. Specifically, Figs. 3 and 4 illustrate the observed and MMRM models (i.e., adjusted for baseline scores), for PCL and BDI imputed means, respectively, at each time point in the study (i.e., baseline, 2, 4, 6, 8 week, posttreatment, and 3- and 12-month follow-up) for those who completed five or more sessions. For both PCL and BDI, observed and adjusted models tracked each other closely.



**Figure 2.** Noninferiority comparisons in terms of a priori minimum delta within which "as good as" statements can be made. Order of subtraction BA-TE-IP minus BA-TE-HBT; negative difference indicates IP mean higher than HBT mean. Noninferiority of HBT supported if lower limit of CI is not less than (extend beyond) delta.

# DISCUSSION

This study represents the first noninferiority trial using HBT as an evidence-based psychotherapy treatment delivery medium for PTSD. BA-TE delivered via either in person in clinic or HBT modalities was effective, and that comparative effectiveness of the BA-TE-HBT relative to in-person treatment was well within prespecified minimally clinically meaningful range for both PCL and BDI scores corresponding to PTSD and MD symptoms, respectively. These findings build on those of previous investigations indicating noninferiority of Hub and Spoke models of telehealth psychotherapy to in-person treatment delivery,[8] but also extend findings in terms of study design, telehealth format (i.e., HBT vs. satellite clinic telehealth), sample size, and follow-up duration. The secondary hypothesis that HBT would reduce attrition from treatment, ostensibly by minimizing logistical and stigma-related barriers to care were not directly supported, in that rate of dropout from both



**Figure 3. PCL scores, observed and baseline-adjusted model. LSM, least squares means obtained from MMRM with PCL as dependent variable and treatment, visit, visit-by-treatment, and PCL baseline in the model.**

treatments (i.e., about 20%) was about the same. However, in a related paper[25] we combined data from dropouts from this sample with data from another simultaneous cohort of HBT patients with PTSD who dropped out from a similar exposure-based treatment (Prolonged Exposure Therapy; PE[26]) so as to achieve sufficient statistical power for dropout analyses. In this study, we identified a "dosage" advantage for HBT in terms of number of sessions completed prior to treatment discontinuation. HBT dropouts from either BA-TE or PE completed almost twice as many sessions than those receiving clinic-based BA-TE or PE in person.

Findings in support of the noninferiority hypothesis are important and represent the first major support of the



**Figure 4. BDI Scores, observed and baseline-adjusted model. LSM, least squares means obtained from MMRM with BDI as dependent variable and treatment, visit, visit-by-treatment, and BDI baseline in the model.**

*Acierno et al.*

comparative effectiveness of HBT-delivered evidence-based psychotherapy for PTSD. The fact that these results of noninferiority were obtained with a sample of combat veterans currently enrolled for VA healthcare, a significant proportion of whom were receiving disability payments for PTSD-related functional impairment, underscores the utility of HBT in expanding access to care in real-world health care ecologies. Fears of negative clinical outcomes related to the novelty of guided imaginal exposure and in vivo exposure with PTSD patients via HBT expressed by some early critics of the delivery method proved unfounded.[5] Indeed, treatment gains of participants in the HBT condition were on par with those receiving treatment in the IP condition, with no greater number of adverse consequences reported for the duration of the study. These results are consistent with those of Luxton et al.,[12] in their study of 10 active duty combat veterans. The noninferiority of HBT with respect to clinical outcomes, taken together with the encouraging secondary finding of "greater dose received" prior to treatment drop out, offers strong support for incorporating HBT into standard clinical practice. The possibility of treating a patient within their home (or elsewhere) opens a wide range of possibilities across evidence-based psychotherapies. For example, PTSD patients with an exposure hierarchy item of leaving a door unlocked during the daytime could complete this exposure assignment during the session itself, rather than solely as a homework assignment.[26] Clearly, such advantages may translate to other disorders, such as Obsessive Compulsive Disorder, in which HBT may be preferred by the provider in some cases.[27] There are several areas of clinical care that remain understudied, but for which HBT may offer distinct advantages, such as patient satisfaction and attendance in a purely clinical setting (e.g., a setting without research payment for follow-up assessments to encourage participation). There may be some limitations for patients in very low income brackets or in very rural areas who may lack access to televideo devices or high-speed internet connectivity; however, hospital- or grant-purchased devices loaned to patients may be cost-efficient in the long term if HBT increases reach to the extent that overall health and mental health status is improved.

There are several strengths of the present study. Most noteworthy is the sample size insofar as this study is among the largest randomized controlled trials comparing treatments for PTSD, with either civilian or veteran samples. Second, the follow-up period of 1 year allowed clear examination of the long-term differential effects, or lack thereof, associated with treatment delivery mode. Third, this is the first appropriately powered demonstration of noninferiority of HBT delivery of evidence-based therapy for PTSD, and only the second large-scale demonstration of noninferiority of HBT for evidence-based therapy for mental illness.[9] HBT holds tremendous potential advantages over standard Hub and Spoke telehealth delivered mental health treatments where experts in one office location treat patients via telehealth in another office location closer to the patient location, insofar as cost, stigma, travel time, and other logistical obstacles to care are concerned. This advantage appears to have been achieved in this study, and in the HBT depression study.[9] Moreover, we have demonstrated this advantage with two psychiatric conditions (PTSD and MD) associated with significant patient safety concerns, such as suicidality.[18] This demonstration thereby underscores both the safety and utility of the method, and argues for its wider dissemination. Indeed, this is precisely what is currently underway in Department of VA settings and Department of Defense settings.[12]

There are several limitations of the present study. First, the focus of the experimental/HBT condition is on one specific treatment protocol and generalizability of these findings to other treatments for anxiety and depression may be limited. Second, in light of significant depressive symptoms in our clinical population, we chose a hybrid behavioral activation/prolonged exposure protocol. Time course data reveal less than hoped for improvement in PTSD symptoms, and this may well have been a function of departing from the Prolonged Exposure Therapy protocol, and subsequently delivering less than optimal "dose" of imaginal exposure. Indeed, imaginal exposure delivered in this 8-session BA-TE protocol was about half that called for in the standard Prolonged Exposure protocol, and our overall effect size for both PTSD and depression measures is less than that of PE. Indeed, there is a return of depression symptoms in the follow-up period that is of particular concern, and may indicate a need for booster sessions, should this brief protocol be used.

# CONCLUSION

The present study investigated noninferiority of HBT relative to IP delivery of an evidence-based psychotherapy for PTSD. BA-TE-HBT was as good as BA-TE-IP in terms of its impact on PTSD and MD symptoms. This investigation represents the first large-scale study of HBT for PTSD, and only the second large-scale HBT study overall.[9] Although replication is needed, these findings suggest that HBT could be an effective approach to addressing barriers to evidence-based psychotherapy for PTSD and related conditions.

**Acknowledgments.** We also wish to thank the panel of experts who provided their estimates of PCL minimal meaningful difference score: Sudie Back, Ph.D., Anna Birks, Psy.D., B. Christopher Frueh, Ph.D., Daniel Gros, Ph.D., Anouk Grubaugh, Ph.D., Brian Marx, Ph.D., Leslie Morland, Psy.D., Sheila Rauch, Ph.D., Patricia Resnick, Ph.D., Paula Schnurr, Ph.D., Peter Tuerk, Ph.D., and Steven Thorp, Ph.D.

**Conflict of Interest.** Several authors are core and affiliate members of the Ralph H. Johnson VAMC Center of Innovation (CIN 13–418; PI: Egede), the Health Equity and Rural Outreach Innovation Center

(HEROIC). Dr. Gros is funded by Department of Veteran Affairs Clinical Sciences Research and Development Career Development Award CX000845 (PI: Gros). The views expressed in this article are those of the authors and do not necessarily reflect the position or policy of the Department of Veterans Affairs or the United States government. There are no conflicts of interest to disclose. There are no conflicts of interest for any of the authors.

# REFERENCES

1. Hoge CW, Castro CA, Messer SC, et al. Combat duty in Iraq and Afghanistan, mental health problems, and barriers to care. N Eng J Med 2004;351:13–22.
2. Cohen B, Gima K, Bertenthal D, et al. Mental health diagnoses and use of VA non-mental health medical services among returning OIF/OEF veterans. J Gen Intern Med 2010;25:18–24.
3. Hoge CW, Auchterlonie JL, Milliken CS. Mental health problems, use of mental health services, and attrition from military service after returning from deployment to Iraq or Afghanistan. JAMA 2006;295:1023–1032.
4. Fulton JJ, Calhoun PS, Wagner RH, et al. The prevalence of posttraumatic stress disorder in Operation Enduring Freedom/Operation Iraqi Freedom (OEF/OIF) veterans: a meta-analysis. J Anxiety Disord 2015;31:98–107.
5. Gros DF, Morland LA, Greene CJ, et al. Delivery of evidence-based psychotherapy via video telehealth. J Psychopathol Behav Assess 2013;35:506–521.
6. Bose U, McLaren P, Riley A, et al. The use of telepsychiatry in the brief counseling of non- psychotic patients from an inner-London general practice. J Telemed Telecare 2001;7:8–10.
7. Trott P, Blignault I. Cost evaluation of a telepsychiatry service in northern Queensland. J Telemed Telecare 1998;4:66–68.
8. Bolton A, Dorstyn D. Telepsychology for posttraumatic stress disorder: a systematic review. J Telemed Telecare 2015;21:254–267.
9. Egede LE, Acierno R, Knapp RG, et al. Psychotherapy for depression in older veterans via telehealth: a randomised, open-label, non-inferiority trial. Lancet 2015;2:693–701.
10. Strachan M, Gros DF, Ruggiero KJ, et al. An integrated approach to delivering exposure-based treatment for symptoms of PTSD and depression in OIF/OEF Veterans: preliminary findings. Behav Ther 2012;43:560–569.
11. Yuen E, Gros DF, Price M, et al. Randomized controlled trial of home-based telehealth versus in-person prolonged exposure for combat-related PTSD in Veterans: preliminary results. J Clin Psychol 2015;71:500–512.
12. Luxton DD, Pruitt LD, O'Brien K, Kramer G. An evaluation of the feasibility and safety of a home-based telemental health

treatment for posttraumatic stress in the US Military. Telemed E Health 2015;21(11):880–886.
13. Gros DF, Yoder M, Tuerk P, et al. Exposure therapy for PTSD delivered to veterans via telehealth: predictors of treatment completion and outcome. Behav Ther 2011;42:276–283.
14. Blake DD, Weathers FW, Nagy LM, et al. The development of a clinician-administered PTSD scale. J Trauma Stress 1995;8(1):75–90.
15. Blanchard EB, Hickling EJ, Taylor AE, et al. Psychological morbidity associated with motor vehicle accidents. Behav Res Ther 1994;32:283–290.
16. Gros DF, Strachan M, Ruggiero KJ, et al. Innovative service delivery for secondary prevention of PTSD in at-risk OIF-OEF service men and women. Contemp Clin Trial 2011;32:122–128.
17. Gros DF, Price M, Strachan M, et al. Behavioral Activation and Therapeutic Exposure (BA-TE): an investigation of relative symptom changes in PTSD and depression during the course of integrated behavioral activation, situational exposure, and imaginal exposure techniques. Behav Modif 2012;36:580–599.
18. Gros DF, Veronee K, Strachan M, et al. Managing suicidality in home-based telehealth. J Telemed Telecare 2011;17:332–335.
19. Weathers FW, Litz BT, Herman DS, et al. The PTSD Checklist: Reliability, Validity and Diagnostic Utility. San Antonio, TX: Annual meeting of the International Society for Traumatic Stress Studies; 1993.
20. Weathers FW, Litz BT. Psychometric properties of the clinician-administered PTSD scale, CAPS-1. PTSD Res Quart 1994;5:2–6.
21. Beck AT, Steer RA, Brown GK. Beck Depression Inventory-II. San Antonio, TX: Harcourt Assessment; 1996.
22. Steer RA, Clark DA. Psychometric characteristics of the Beck Depression Inventory-II with college students. Meas Eval Couns Dev 1997;30:128–136.
23. Greene CJ, Morland LA, Durkalski VL, et al. Noninferiority and equivalence designs: issues and implications for mental health research. J Traumat Stres 2008;21:433–439.
24. Dworkin RH, Turk DC, Wyrwich KW, et al. Consensus statement: interpreting the clinical importance of treatment outcomes in chronic pain clinical trials: IMMPACT recommendations. J Pain 2008;9:105–121.
25. Hernandez-Tejada MA, Zoller JS, Ruggiero KJ, et al. Early treatment withdrawal from evidence-based psychotherapy for PTSD: telemedicine and in-person parameters. Int J Psychiatry Med 2014;48(1):33–55.
26. Foa EB, Hembree EA, Rothbaum BO. Prolonged Exposure Therapy for PTSD: Emotional Processing of Traumatic Experiences, Therapist Guide. New York: Oxford University Press; 2007.
27. Rowa K, Antony MM, Summerfeldt LJ, et al. Office-based vs. home-based behavioral treatment for obsessive-compulsive disorder: a preliminary study. Behav Res Ther 2007;45:1883–1892.

Behavioral Sciences and the Law
Behav. Sci. Law **26**: 253–269 (2008)
Published online in Wiley InterScience
(www.interscience.wiley.com) DOI: 10.1002/bsl.812

# Empirical Evidence on the Use and Effectiveness of Telepsychiatry via Videoconferencing: Implications for Forensic and Correctional Psychiatry

Diana J. Antonacci, M.D.,*
Richard M. Bloch, Ph.D.,[†]
Sy Atezaz Saeed, M.D., M.S.,[†]
Yilmaz Yildirim, M.D.[†] and Jessica Talley, M.D.[†]

A growing body of literature now suggests that use of telepsychiatry to provide mental health services has the potential to solve the workforce shortage problem that directly affects access to care, especially in remote and underserved areas. Live interactive two-way audio–video communication—videoconferencing—is the modality most applicable to psychiatry and has become synonymous with telepsychiatry involving patient care, distance education, and administration. This article reviews empirical evidence on the use and effectiveness of videoconferencing in providing diagnostic and treatment services in mental health settings that serve child, adolescent, and adult populations. Descriptive reports, case studies, research articles, and randomized controlled trials related to clinical outcomes were identified and reviewed independently by two authors. Articles related to cost-effectiveness, technological issues, or legal or ethical aspects of telepsychiatry were excluded. The review of the evidence broadly covers mental health service provision in all settings, including forensic settings. Given the sparse literature on telepsychiatry in forensic settings, we discuss implications for mental health care across settings and populations and comment on future directions and potential uses in forensic or correctional psychiatry. Copyright © 2008 John Wiley & Sons, Ltd.

*Correspondence to: Diana J. Antonacci, M.D., Department of Psychiatric Medicine, Brody School of Medicine at East Carolina University, 600 Moye Boulevard, Suite 4E-100, Greenville, NC 27834, U.S.A. E-mail: antonaccid@ecu.edu
[†]Department of Psychiatric Medicine, The Brody School of Medicine at East Carolina University.

Copyright © 2008 John Wiley & Sons, Ltd.

254    D. J. Antonacci *et al.*

Many states have extreme disparities in population density and resource distribution, with substantial health and human service resources in urban centers and relative scarcity of services in rural areas. Such disparities are particularly evident in the area of mental health services (*New Freedom Commission on Mental Health, Subcommittee on Rural Issues: Background paper*, 2004). Many states have employed telepsychiatry to improve mental health services' cost, quality, and availability. Indeed, a growing body of literature now suggests that use of telepsychiatry to provide mental health services has the potential to mitigate the workforce shortage that directly affects access to care, especially in remote and underserved areas.

Telepsychiatry has been variously defined. The National Library of Medicine defines telemedicine as it applies to psychiatry [telepsychiatry] as the use of electronic communication and information technologies to provide or support clinical psychiatric care at a distance. This definition includes many communication modalities such as phone, Fax, e-mail, the Internet, still imaging, and live interactive two-way audio–video communication (*American Psychiatric Association resource document on telepsychiatry via videoconferencing*, 1998). Live interactive two-way audio–video communication—videoconferencing—is the modality most applicable to psychiatry and has become synonymous with telepsychiatry involving patient care, distance education, and administration. Regardless of how these applications are defined, telepsychiatry and e-mental health comprise one of the largest uses of telehealth nationwide (Grigsby et al., 2002; Krupinski et al., 2002). Videoconferencing primarily involves interactive audiovisual conferencing systems over high-capacity (high-bandwidth) networks. Historically, interactive telepsychiatry applications have used point-to-point network connections, usually as full or fractional T-1 or integrated services digital network (ISDN) circuits. However, the rapid diffusion of Internet and Ethernet networks has led to the development of videoconferencing systems that can work over these types of network, i.e. Internet Protocol (IP) networks. If a telepsychiatry application uses IP networks, then security must be ensured—this can be accomplished by using encrypted codecs or by setting up a virtual private network (VPN) and/or virtual local area networks (VLANs).

This article reviews empirical evidence on the use and effectiveness of videoconferencing in providing diagnostic and treatment services in the area of mental health. Based on our review of the literature, we draw conclusions regarding telepsychiatry in general mental health populations and comment specifically on implications for forensic or correctional psychiatry.

## REVIEW OF THE LITERATURE

We searched the literature for reports about telepsychiatry programs and services. The search focused on the English language literature and identified journal articles and reports. The electronic databases MEDLINE via Ovid, PsycINFO and the Telemedicine Information Exchange were searched from 1950 to June 2007. Approximately 385 citations were identified by using the search terms telemedicine, telepsychiatry, telepsychology, or videoconferencing, along with psychiatry, child and adolescent psychiatry and forensic psychiatry. Abstracts were reviewed for relevance by two authors (D.A. and Y.Y.), who identified all citations pertaining to

Copyright © 2008 John Wiley & Sons, Ltd.          Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

telepsychiatry demonstration projects, program descriptions, empirical evaluations, satisfaction and acceptance, clinical outcome and cost-effectiveness. The initial review identified 121 articles. Articles related to cost-effectiveness, technological issues, and legal or ethical aspects of telepsychiatry were excluded. Descriptive reports, case studies, research reports, and randomized controlled trials related to clinical outcomes were identified and reviewed independently. Forty-five articles fulfilled these criteria.

In our literature review, 34 of 45 articles were related to clinical efficacy of telepsychiatry in general adult psychiatry (Table 1). Most of them were case-studies (Deitsch, Frueh, & Santos, 2000), case-series (Bose, McLaren, Riley, & Mohammedali, 2001; Bouchard et al., 2000; Himle et al., 2006; Cluver et al., 2005; Shepherd et al., 2006; Shore & Manson, 2004; Thomas, Miller, Hartshorn, Speck, & Walker, 2005), or studies of patient or clinician satisfaction (Bishop, O'Reilly, Maddox, & Hutchinson, 2002; Dongier, Tempier, Lalinec-Michaud, & Meunier, 1986; Frueh, Henderson, & Myrick, 2005; Greenwood, Chamberlain, & Parker, 2004; Griffiths, Blignault, & Yellowlees, 2006; Morland, Pierce, & Wong, 2004).

Only five articles could be considered randomized clinical trials (De Las Cuevas, Arredondo, Cabrera, Sulzenbacher, & Meise, 2006; Fortney et al., 2007; O'Reilly et al., 2007; Poon, Hui, Dai, Kwok, & Woo, 2005, Ruskin et al., 2004) related to treatment outcome. In addition to being recognized as markedly few in number (Frueh, Monnier, Elhai, Grubaugh, & Knapp, 2004; O'Reilly et al., 2007), these studies used mixed diagnostic groups, mixed medication and psychotherapy interventions, and a variety of outcome assessment measures to conclude that telepsychiatric intervention outcomes were equivalent to face-to-face outcomes (De Las Cuevas et al., 2006; O'Reilly et al., 2007; Ruskin et al., 2004). Lack of control comparisons and use of superiority designs rather than equivalence designs (McAlister & Sackett, 2001) were additional problems.

Articles without random assignment (Bouchard et al., 2004; Griffiths et al., 2006; Jones, Johnston, Reboussin, & McCall, 2001; Kennedy & Yellowlees, 2000, 2003; Marcin et al., 2005; Modai et al., 2006; Shepherd et al., 2006; Shore, Savin, Orton, Beals, & Manson, 2007; Urness, Wass, Gordon, Tian, & Bulger, 2006) included a single study in a forensic setting (Zaylor, Nelson, & Cook, 2001). All had similar methodological problems, with an even higher risk of bias.

A recent randomized, controlled study by Fortney et al. (2007) compared the usual primary care treatment of depression with primary care treatment plus collaborative psychiatric medication monitoring in 395 patients and demonstrated a strong positive effect of telepsychiatry on measures of treatment compliance, symptom improvement, remission, and satisfaction. This superiority trial shows that, whether or not telepsychiatric care is equivalent to in-person care, it is more effective than a common alternative care, and meets the criterion for an evidence-based treatment for depression. Because a single disorder was treated with a specified treatment via telepsychiatry, it is possible for providers to replicate this process, to recognize patients who are likely to benefit from it, and to compare their outcomes to those reported in the literature. This study suggests that collaborative telepsychiatric care is better than usual non-psychiatric care for depression. Although the Fortney study (Fortney et al., 2007) was conducted in a VA primary care setting, the results should apply to collaborative depression care in other settings as well. Extrapolating from this study, one could infer that

Copyright © 2008 John Wiley & Sons, Ltd.

256    D. J. Antonacci *et al.*

telepsychiatric management of antidepressant medications should produce similar benefits over usual medical care in forensic settings and correctional facilities.

Several articles addressed diagnosis or assessment studies with adult patients, including a meta-analysis (Hyler, Gangure, & Batchelder, 2005). There were four studies in forensic settings (Leonard, 2004; Lexcen, Hawk, Herrick, & Blank, 2006; Nelson, Zaylor, & Cook, 2004; Zaylor, Nelson, & Cook, 2001) (see Table 2). Like studies on treatment outcome, the assessment articles focused on patient or clinician satisfaction (Matsuura et al., 2000) and equivalence of telepsychiatric assessment to in-person assessment (Baer et al., 1995; Cullum, Weiner, Gehrmann, & Hynan, 2006; Hersh et al., 2002; Marcin et al., 2005; Shore et al., 2007; Zarate et al., 1997). The forensic assessment studies compared prisoner self-ratings with telepsychiatric ratings (Nelson et al., 2004; Zaylor et al., 2001) or in-person ratings to telepsychiatric ratings (Leonard, 2004; Lexcen et al., 2006). The presumption is that in-person assessments are the gold standard to be matched by telepsychiatric assessments. This was the assumption underlying the meta-analysis on telepsychiatric assessment (Hyler et al., 2005). Patient selection factors, small study size, variable assessment instruments, varied patient problems, and lack of connection with treatment initiation and outcome are common study problems. However, there is no indication that telepsychiatric assessment, including forensic assessments and assessments in correctional facilities, induces systematic biases.

Application of telepsychiatry to child and adolescent patients has also been tested (see Table 3). In addition to case studies demonstrating feasibility (Alessi, 2003; Savin, Garry, Zuccaro, & Novins, 2006), telepsychiatry programs targeting children and adolescents have been described (Myers, Sulzbacher, & Melzer, 2004; Neufeld, Yellowlees, Hilty, Cobb, & Bourgeois, 2007; Starling, Rosina, Nunn, & Dossetor, 2003). In much the same way as in the adult literature, patient and clinician acceptance is relatively high.

There are only two randomized controlled trials with children, one on treatment efficacy and one on assessment reliability and satisfaction. The efficacy study compared eight weeks of in-person to telepsychiatry CBT treatment for depression (Nelson, Barnard, & Cain, 2003). Both telepsychiatry and in-person treatment produced significant reductions in depression scale scores, although the telepsychiatry condition produced faster reductions.

The assessment study (Elford et al., 2000) compared telepsychiatric assessments with in-person assessments to see whether they produce the same diagnoses and are acceptable to patients, clinicians, and parents. There was a high degree of agreement between telepsychiatric and in-person diagnoses and general satisfaction with telepsychiatric care.

While not the focus of the current review, it should be noted that there are comparisons of successful telephone-based interventions that show better effects than usual care (Rollman et al., 2005; Simon, Ludman, Tutty, Operskalski, & Von Korff, 2004). There is even a non-inferiority trial of telephone-delivered cognitive–behavior therapy for obsessive–compulsive disorder comparing eight 30 minute telephone sessions with nine 60 minute in-person sessions (Lovell et al., 2006) that suggests that the same outcomes can be achieved with half the therapist time using telephone-delivered care. Some telepsychiatry studies hint at comparable advantages in time savings (Nelson et al., 2003; Zaylor, 1999) or treatment adherence (Modai et al., 2006).

Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing    257

Table 1. Telepsychiatry studies on treatment feasibility, satisfaction, efficacy or effectiveness in the general adult population

| Author | Study objective | Main study outcomes |
|---|---|---|
| Ruskin et al. (2004 ) | Compared treatment outcomes of depressed patients treated in person with those treated remotely. To determine whether patients' rates of adherence to and satisfaction with treatment were as high with remote as compared with in-person treatment and to compare costs. | $N = 119$, 8 sessions of 20 minutes each over a 6 month period. Both groups were equally adherent. No between group differences in satisfaction or dropout rates. Telepsychiatry was more expensive until costs of psychiatrist travel were factored in. Telepsychiatry did not increase health care resource consumption. |
| Fortney et al. (2007) | This study evaluated a telemedicine based collaborative care model adapted for small clinics without on site psychiatrists. | $N = 395$ primary care patients in VA community clinics. Depression scores on the PHQ9 > 12. Intervention patients more likely to be adherent at 6 and 12 months. Intervention patients more likely to respond at 6 months and remit at 12 months. They reported larger gains in mental health status, improved health-related quality of life, and higher satisfaction. |
| O'Reilly et al. (2007) | Compared a variety of clinical outcomes after psychiatric consultation and, where needed, brief follow-up for OP referred to a psychiatry clinic with random assignment to telepsych. or F2F. | 495 patients, 254 F2F and 241 telepsych. Consultation and follow-up produced clinical outcomes that were equivalent between the 2 groups. Patient satisfaction levels were similar. Telepsych. was at least 10% less expensive |
| De Las Cuevas et al. (2006) | Evaluated efficacy of telepsych. in the tx of mental disorders by comparing F2F treatment. | RCT of 140 OP. Tx was 8 consultations listing 30 minutes over 24 weeks. Medications plus CBT were used. 130 completed, 534 teleconsultations, 522 F2F consultation. Both groups improved but no differences were observed between groups. |
| Bishop et al. (2002) | Pilot comparing satisfaction levels between patients seen F2F and those seen via VC. | Random assignment, $N = 24$ with 17 completing. Assessed 4 months after. Although there was a trend in favor of F2F the difference was not significant. |
| Morland et al. (2004) | Investigated the feasibility of using VC to provide coping skills group for veteran pts with PTSD who live in remote locations. | $N = 20$, 3 withdrew. 9 to VC and 8 FTF. At end of 8 wks, 4 left in F2F and 8 left in VC. F2F attended 4.9 sessions and VC 6.3 sessions (not significant). No differences in levels of satisfaction in patients or clinicians. Retention of info. similar in both groups. VC can be used to provide coping skills. |

(Continues)

258   D. J. Antonacci et al.

Table 1. (Continued)

| Author | Study objective | Main study outcomes |
|---|---|---|
| Poon et al. (2005) | This project examined and compared the feasibility, acceptability, and clinical outcome of a cognitive intervention program for older patients with mild cognitive impairment and mild dementia using TM vs F2F. | $N = 22$. 12 sessions conducted via F2F or VC. Cognitive impairment was significant and comparable across groups. Compliance was 95% overall. Satisfaction was measured among pts and staff. Significant improvement in the areas of attention, memory, and language areas were observed following cognitive intervention with no difference in outcomes between the 2 intervention arms. |
| Bouchard et al. (2004) | Compared effectiveness of CBT for panic disorder when delivered F2F or by VC. | $N = 21$. CBT F2F was just as effective as VC. Both groups improved. VC participants reported development of excellent DP relationship as early as the first session. |
| Jones et al. (2001) | Test the hypothesis that VC ratings based on visual observations of behavior would be less reliable that ratings based on patients' verbal reports of symptoms. | $N = 30$ VC assessments. BPRS was used. Reliability of BPRS subjective items was consistently higher than for the observational items (used low band width). |
| Modai et al. (2006 ) | Compared institutional ambulatory and hospital costs, treatment adherence, patient and physician satisfaction, and treatment safety between VC and F2F treatment. | 1 year of telepsychiatry treatment ($N = 39$) compared to previous year (F2F) and matched comparison group ($N = 42$). Patients and physicians were satisfied and treatment was safe. Telepsychiatry was more expensive and there was a trend toward increased IP. Adherence rates before and during telepsych. were similar but were twice as high as the comparison group. |
| Kennedy and Yellowlees (2003) | Data were collected from 124 patients attending hospital and GP facilities. 32 were using telepsychiatry. Follow-up data were collected a year later. | There was a significant difference between initial assessment and follow-up in both groups but no significant difference between the face-to-face and telepsychiatry groups. Both groups were improved and telepsychiatry was effective as face to face. |
| Urness et al. (2006) | Evaluated client satisfaction and one month MH outcomes for TP compared with F2F. The SF-12 survey was used. | 48 of the 62 (77%) initial responders were available for f/u one month later. TP pts demonstrated significant improvements on pre and post tests while there was no change for the F2F group. This was a single first time consultation. |

Copyright © 2008 John Wiley & Sons, Ltd.

Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing    259

| | | |
|---|---|---|
| Hyler et al. (2005) | A review and meta-analysis of the literature comparing TP with in-person psychiatric assessments. | 1956 to 2002. $N = 380$. 14 with $N > 10$ compared TP with IP using objective assessment instruments or satisfaction instruments. 14 studies with 500 patients. TP was similar to IP using objective assessments. Effect sizes were small, suggesting no difference. HB was slightly superior for assessments requiring detailed observation of subjects. Out of a large TP literature published over the last 40+ years, only a handful of studies have attempted to compare TP with IP directly using standardized assessments. |
| Hersh et al. (2002) | Systematic review of the literature to evaluate the efficacy of telemedicine for making dx and management decisions in 3 classes of application: office/hospital based, store and forward, and home based. | The strongest evidence came from psychiatry and dermatology. There was reasonable evidence for general medical history and physical exams. There is some evidence in cardiology and certain areas of ophthalmology. Despite widespread use, there is strong evidence in only a few specialties that dx and tx decisions provided by TM are comparable to F2F. |
| Shore et al. (2007) | Examined the reliability of SCID in the administration of psych. assessments by VC vs F2F. | $N = 53$, randomly assigned. Comparisons made with prevalences, the McNemar test and the kappa statistics. Percent agreement b/w modalities was >80% except for lifetime drug abuse (76%), lifetime substance abuse (72%) and lifetime MDD (66%). Externalizing disorders elicited a higher kappa than internalizing disorders. Overall SCID live did not differ from VC statistically. |
| Cullum et al. (2006) | Administered a brief battery of common neuropsych. tests via VC and F2F to 14 patients with mild cognitive impairment and 19 with AD. | Highly similar test scores were obtained for the two groups. The VC group had a partner to decrease anxiety and assist with equipment. |
| Kennedy and Yellowlees (2000) | Evaluated a pilot project that supported visiting psychiatrists and local private/public practitioners through telemedicine. | Data collected over 2 years with 124 patient subjects. Nine additional refused to participate. 32/124 used telemed. No significant improvements in wellbeing or quality of life. Most found moderately or greatly helpful. (98% preferred telemed. in combination with local service) |
| Deitsch et al. (2000) | Case report of a group therapy session with 4 patients. The group had been meeting with variable attendance | There was one 55 minute session. Feedback was by questionnaire and verbal. Patient satisfaction was rated as good to very good. Delay in responses was distracting to the remote therapist. |

(Continues)

260    D. J. Antonacci *et al.*

Table 1. (Continued)

| Author | Study objective | Main study outcomes |
|---|---|---|
| Cluver et al. (2005) | Feasibility study of remote psychotherapy with terminally ill cancer patients with dx of adjustment disorder or major depression. | $N = 10$. 6 sessions of CBT with remote alternating with face to face. 9 patients completed 53 therapy sessions. 21 remote and 32 face to face. Acceptance and perceptions were positive after almost all therapy sessions, regardless of delivery mode. |
| Frueh et al. (2005) | Videoconferencing was used in open sessions for subjects with alcohol use disorders. 8 sessions of group therapy over a 4 week period. | $N = 18$ with 14 attending at least 4 sessions. Patients reported high levels of satisfaction, found intervention to be credible, and had good session attendance and attrition comparable to conventional tx. 82% indicated they would recommend the treatment. |
| Marcin et al. (2005) | Determine if OP telemed. specialist consultation to primary care clinicians resulted in changes in pt dx, tx, management and outcomes. | Retrospective chart review. $N = 223$. Diagnosis changed in 48%, tx changed in 81.6% and clinical improvement was shown in 60.1%. Consistent with literature regarding changes in process of care with F2F. Changes in dx or tx found to be associated with clinical improvement. |
| Bouchard et al. (2000) | Preliminary results of an outcome study on the effectiveness of telepsychiatry for panic disorder with agoraphobia. | 12 sessions of CBT delivered by VC. $N = 8$. Improvements were made on measures of target symptoms and measures of global functioning. A very good therapeutic alliance was built after only the 1st session. |
| Thomas et al. (2005) | Description of a telemed. program that provides psychiatric screening, evaluation, treatment and referral for ongoing care to clients of a rural women's crisis center. | $N = 38$. 35 completed an evaluation and 31 entered treatment. Anxiety and major affective disorders were the most commonly identified disorders followed by substance use disorders. Telepsych. can provide rapid crisis intervention and effective mental health services to victims of domestic violence in rural settings. |
| Griffiths et al. (2006) | To explore the feasibility and acceptability of delivering CBT via TP to patients with depression and/or anxiety. | $N = 15$. CBT delivered to patients (and case managers (CM)). Dx of GAD, MDD, panic disorder. Outcome measures were Mental Health Inventory by pts and Health of the Nation Outcome Scale by CM. Significant improvement in all measures. TP consultations were acceptable to CM and pts. |
| Baer et al. (1995) | Assess reliability of rating scales administered in person and over video to patients with OCD. | Near perfect interrater agreement on rating scale scores. Reliability was excellent in both. |
| Shore et al. (2004) | This article describes a weekly TP clinic treating PTSD in American Indian veterans. | $N = 50$ clinic interactions in 7 months. Consisted of ongoing group tx, individual tx and med. mgmt. Patient satisfaction and comfort were rated highly. |

Copyright © 2008 John Wiley & Sons, Ltd.    Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

| | | |
|---|---|---|
| Himle et al. (2006) | Three cases of OCD treated with CBT via VC. | 12 wk manualized therapy including family members in sessions 1, 6 and 12. ERP was primary intervention, delivered in session and as homework. Measures YBOCs, CGI, Ham D, Working Alliance Inventory and Telepresence and VC Scale. |
| Shepherd et al. (2006) | Studies anxiety, depression and quality of life in rural cancer patients. | 25 patients, average of 3 CBT sessions. Data collected pre, post and 1 month later. Hospital Anxiety and Depression Scale, Functional Assessment of Cancer Therapy—General, patient satisfaction questionnaire. Anxiety decreased and quality of life increased. The service was practical and acceptable. |
| Matsuura et al. (2000) | Assess the reliability of psych. evals via VC. | Interrater reliability measured with BPRS and Interclass Correlation Coefficient. Compared F2F with VC. Reliability showed perfect agreement. $N=17$, 9 were volunteers and 8 were patients |
| Bose et al. (2001) | Evaluated patient satisfaction | $N=13$. Brief counseling of non-psychotic patients, 4 month duration, 11 men and 2 women for 29 total sessions. 93% would like to use it again, 75% said could see well and 86% said they could hear. Overall patients were happy. |
| Dongier et al. (1986) | To carry out a quantified and controlled assessment of patients' and staffs' reactions to TP and to examine feasibility of TP. | 50 telepsych. consultations and 35 F2F consultations compared from among those normally presenting to the 3 psychiatric consultants on staff. Consultant, patient, and consultee slightly preferred F2F but TP consultation was well accepted. |
| Greenwood et al. (2004) | Evaluate a TP clinical service in rural New South Wales. A retrospective evaluation was done to determine acceptance of TP and F2F. | $N=31$ referred to a specialty mood clinic in a rural setting. 20 completed. A F2F semistructured interview was done on admission and immediately afterward a VC interview was performed. Dx were mood do (80%), anxiety do (20%). High satisfaction with F2F. Differences b/w F2F and TP were difficulty discussing problems, not finding consultation informative, not feeling comfortable on camera. 80% indicated they would use TP again. |
| Zarate et al. (1997) | Assessed reliability of BPRS, SAPS, SANS (1) in person, (2) by VC at low bandwidth, (3) by VC at high bandwidth. | $N=45$ with dx of schizophrenia. 15 in each group. No significant differences existed among the groups. |

(*Continues*)

Copyright © 2008 John Wiley & Sons, Ltd.

262    D. J. Antonacci *et al.*

Table 1. (Continued)

| Author | Study objective | Main study outcomes |
|---|---|---|
| Zaylor et al. (2000) | Retrospective review of charts comparing clinical outcomes of patients seen by TP and F2F. | $N = 49$ with SZA or MDD. GAF was used as measure at initial visit and subsequent visits. Patients seen by TP had a greater attendance rate and follow-up visits took less than half the time compared to F2F. |

VC = video conferencing.
F2F = face to face.
TP = telepsychiatry.
TM = telemedicine.
tx = treatment.
dx = diagnosis.

Copyright © 2008 John Wiley & Sons, Ltd.

Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing    263

Table 2. Telepsychiatry studies on treatment feasibility, satisfaction, efficacy or effectiveness in the forensic population

| Authors | Objective | Outcomes |
|---|---|---|
| Brodey et al. (2000) | Level of satisfaction with TP evaluations was determined. | $N = 43$. A forensic psychiatrist interviewed 20 in person and 23 by VC. Satisfaction was moderately high in both groups with no difference between the 2 groups. The psychiatrist felt comfortable with his ability to dx remotely. |
| Leonard (2004) | This article reviews the current prison health care system and then describes a research study focused on development and evaluation of a TP service for prisoners. | $N = 80$. Pt assessed by 1 psychiatrist at the local site doing the interview by VC and simultaneously by a 2nd psychiatrist at the remote site in the same room as the prisoner. Satisfaction was measured with 20 prisoners and 2 staff. Only study design is outlined. |
| Nelson et al. (2004) | The effectiveness of a jail telepsychiatry service was evaluated by comparing psychiatrist and inmate report of psychopathology. | $N = 62$ inmates, 107 consultations in a rural county jail. Inmates completed the SCL–90-R and the psychiatrist completed a Psychiatric Evaluation Form including a CGI. Most inmates were rated as mildly to moderately ill. There was significant high correlation between TP psychiatrist rating on CGI and inmate report on SCL–90-R. The findings support effectiveness of TP evaluation for the jail population. |
| Zaylor et al. (2001) | The effectiveness of a prison telepsychiatry service was evaluated from the user perspective. | $N = 45$. Completed the SCL–90-R three times. The psychiatrist completed the CGI. Mean SCL scores decreased with time. The psychiatrists reported improvement over time on CGI. Telepsychiatry is an effective means of delivering MH services to the prison population. |
| Lexcen et al. (2006) | The authors investigated the quality of results from VC vs F2F with 72 forensic patients. Three administration and observation conditions were used. | Interrater reliability for 2 VC interview conditions were compared to those for F2F using BPRS—Anchored version and MacArthur Competence Assessment Tool—Criminal Application. |

VC = video conferencing.
F2F = face to face.
TP = telepsychiatry.
TM = telemedicine.
tx = treatment.
dx = diagnosis.

Copyright © 2008 John Wiley & Sons, Ltd.

264     D. J. Antonacci *et al.*

Table 3. Telepsychiatry studies on treatment feasibility, satisfaction, efficacy or effectiveness in the child and adolescent population

| Authors | Objective | Outcomes |
|---|---|---|
| Nelson et al. (2003) | This is an evaluation of an 8 week CBT intervention for childhood depression, either F2F or VC. | 28 children were randomized to 2 tx groups. CBT across the 2 conditions was effective. Patients and parents were satisfied with VC and preferred VC over F2F. CBT was effective across both delivery methods. 82% no longer met criteria at the end. VC reported a greater decrease in depressive symptoms over time as compared to F2F. This is a model for RC trials in the future. |
| Elford et al. (2000) | The authors established a TP system for children and conducted an assessment of its utility. | N = 23 children with parents. 2 psychiatric assessments completed, one F2F and one VC. Order was randomized. In 22 cases (96%) dx and tx recommendations were same across both groups. Psychiatrists said VC assessment was adequate but F2F was preferred. Satisfaction measured in patients and parents was the same across groups. The majority of children liked TP and preferred it to F2F. Most parents indicated they preferred VC to traveling a long distance. |
| Alessi (2003) | Case report of 15 year old evaluated and treated by telepsychiatry. | Diagnosis was changed, medications discontinued and the patient improved. All scales showed reduced severity of symptoms. |
| Savin et al. (2006) | Description of twice monthly child and adolescent telepsych service. | 21 evaluations in 12 months. 2 cases illustrate issues encountered. Patients and families were receptive. Cost is similar to F2F. Emphasizes importance of alcohol abuse in this population. |
| Starling et al. (2003) | This article describes the initial evaluation of the child and adolescent psychological telemedicine outreach service in New South Wales and changes made to the service after the initial evaluation. | 136 rural families, 20 rural clinicians and 8 psychiatrists. Satisfaction was high, with clinicians and families the most satisfied. Psychiatrists felt that they were usually able to perform an adequate consultation but few felt the consultations were as satisfactory as F2F. Other initiatives included telenursing, professional skills training, sabbaticals for rural clinicians and a clinical skills workshop. |
| Myers et al. (2004) | Examined whether TP patients are representative of those in usual OP care. | N = 369, 2 clinics. Youth evaluated were broadly comparable in both. TP appears to serve youth that are representative of those seeking psych. care. Diagnoses were similar and suggest that TP provides adequate technical resolution and doctor–patient rapport to detect psychopathology. |
| Neufield et al. (2007) | Describes the University of CA program. Used for clinical services, consultation and education. | 289 consults in first year. ADHD was most common dx in kids, mood disorders in adults. A convenience sample of 33 adults (SF-12 health status measure) showed improvements in MH status at 3 and 6 months. |

Copyright © 2008 John Wiley & Sons, Ltd.

Comparisons between telepsychiatry via video conferencing and telephone have not been made. Having shown success with specific populations using telephonic interventions, it may be more appropriate to conduct equivalence studies with telepsychiatry via videoconferencing compared with telepsychiatry via telephone rather than comparing videoconferencing to face to face treatment. Likewise, finding that telephone interventions may require less time for an equivalent effect (Lovell et al., 2006) suggests that telepsychiatry interventions should be tested for a similar effect. The growing literature on both telephone-aided and video-conferencing treatments makes the determination of which technology is effective with what types of patient, and the need to match technology with patient values and needs (Ryan, Kobb, & Hilsen, 2003), a possibility. Telephonic interventions may be more feasible in settings where videoconferencing equipment is unavailable or impractical, including forensic and correctional facilities.

This review of the literature covers a time period of over half a century, but efficacy and effectiveness data are still rather sparse. The limited evidence is from 2000 or later and is relatively weak due to the problems discussed above. The literature began with descriptive articles looking at feasibility, acceptance, satisfaction, and cost. There was then movement toward comparing telepsychiatry to services provided face to face. A few studies that provide the same treatment across the two modalities and measure clinical outcomes have emerged. However, the treatment is very limited, usually medication management or a short course of CBT, and if there is therapy it is often paired with some type of face-to-face contact as well. Outcomes appear to be the same. Acceptance is good in general. If there are acceptance problems, it is usually the professional who is reluctant, not the patient or family. Usage is primarily in rural areas or jails, or with underserved subpopulations such as children. The state of the literature is generally weak but there is more in psychiatry than other medical specialty areas, probably because of the greater reliance on the mental status examination and verbal communication and not on a physical examination.

## IMPLICATIONS FOR FORENSIC OR CORRECTIONAL PSYCHIATRY

Our review of the literature yielded 12 articles from forensic settings. Five addressed efficacy and are included in our review. The total number of subjects in these five articles was 345. One article (Leonard, 2004) only outlined study design, one looked at symptom improvement (Zaylor et al., 2001), two examined patient satisfaction (Brodey, Claypoole, Motto, Arias, & Goss, 2000; Myers et al., 2004), one examined interrater reliability in telepsychiatric assessments based on interviews (Lexcen et al., 2006) and one focused on the effectiveness of a jail telepsychiatry service (Nelson et al., 2004). The Myers study (Myers et al., 2004) looked at an adolescent population while the others focused on adults. All studies had significant methodological limitations, making confident conclusions difficult.

The overall view that emerges is that, despite methodological problems, telepsychiatry seems to be an appropriate option to provide services to patients in correctional facilities in order to improve access to psychiatric services. The Zaylor study (Zaylor et al., 2001) showed improvement in symptoms per patient and

Copyright © 2008 John Wiley & Sons, Ltd.

Behav. Sci. Law **26**: 253–269 (2008)
DOI: 10.1002/bsl

266     D. J. Antonacci *et al.*

psychiatrist report. The Nelson study (Nelson et al., 2004) showed a high correlation between the telepsychiatrist evaluation and inmate report of symptoms. The Brodey study (Brodey et al., 2000) notes that the physician felt comfortable making diagnoses via telepsychiatry and did not find a difference in satisfaction between those who received care via telepsychiatry and those who received care in person.

Telepsychiatric treatment in correctional facilities may differ from telepsychiatric treatment in outpatient clinics in important ways. Because the patients are in correctional facilities, it is most likely they will have at least one staff member present during their telepsychiatry session. This eliminates the privacy usually available in a physician/patient relationship. Indeed, the youths in the Myers article expressed concerns about their lack of privacy. It would be difficult to eliminate this problem completely, as correctional facilities must maintain safety and security at all costs. This lack of privacy may be most noticeable to those patients who have had outpatient experiences with psychiatric providers outside the correctional system.

When initiating a telepsychiatry service within a correctional facility, it will be important to clearly identify the facility's expectations of the psychiatrist and the limits of the physician/patient relationship. It should be understood how the recommendations made will be carried out by correctional facility staff. In addition, a plan would be needed for dealing with patient problems when the psychiatrist is not available. It will also be important to plan ahead and anticipate how potential growth of a telepsychiatry clinic will be handled in order to ensure adequate time for new evaluations and follow-up treatment.

## OPPORTUNITIES FOR CORRECTIONAL AND FORENSIC PSYCHIATRY

Despite the methodological cautions, there are no data that demonstrate that telepsychiatric services are harmful, either to general psychiatric patients, children, or to prisoners. It appears that telepsychiatric assessments are acceptable to individuals in forensic and correctional facilities, and that telepsychiatric services can be used effectively with prisoners with certain psychiatric disorders. More comparisons on specific psychiatric subgroups, using specific treatment interventions, are needed to optimally match the technological medium of intervention with particular prisoner or patient problems.

While telepsychiatry seems to be a viable option for providing psychiatric care to those in correctional facilities, there is still a need for more research in this field. Comparing telephone and telepsychiatry treatments with each other and with usual care would be useful, as telephonic consultation may be more feasible than videoconferencing in some correctional settings. It would also be beneficial to look at efficacy differences for different disorders and for differences related to demographic factors such as age, race, and gender.

In terms of the long-term development of telepsychiatry, we offer the following recommendations for correctional systems.

1. Foster pilot projects in telepsychiatry, particularly utilizing evidence-based approaches.
2. Aggressively pursue tele-training, leveraging existing resources to the greatest practical extent. Extensive high-speed networking and videoconferencing

Copyright © 2008 John Wiley & Sons, Ltd.

resources may already be in place. Additional video-conferencing resources may be available through public and private higher education institutions, Area Health Education Center (AHEC) offices, and Public Health systems.

3. In situations where teleconferencing cannot be implemented, telephone services should be considered.

4. The correctional systems should look to professional societies and other states' telepsychiatry programs to develop guidelines and best practices.

5. The forensic systems should identify technology infrastructure needs, and then implement a plan to meet these needs. There are many Federal programs that can assist with infrastructure, including the FCC Universal Services Fund (communications subsidies) and the U.S. Department of Agriculture/Rural Utility Service's Telemedicine and Distance Learning grant and loan program (equipment purchases).

# REFERENCES

Alessi, N. E. (2003). Quantitative documentation of the therapeutic efficacy of adolescent telepsychiatry. *Telemedicine Journal and E-Health, 9*(3), 283–289.

American Psychiatric Association resource document on telepsychiatry via videoconferencing. (1998). Retrieved September 13, 2007, from http://www.psych.org/psych_pract/tp_paper.cfm

Baer, L., Cukor, P., Jenike, M. A., Leahy, L., O'Laughlen, J., & Coyle, J. T. (1995). Pilot studies of telemedicine for patients with obsessive–compulsive disorder [see comment]. *American Journal of Psychiatry, 152*(9), 1383–1385.

Bishop, J. E., O'Reilly, R. L., Maddox, K., & Hutchinson, L. J. (2002). Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *Journal of Telemedicine and Telecare, 8*(4), 217–221.

Bose, U., McLaren, P., Riley, A., & Mohammedali, A. (2001). The use of telepsychiatry in the brief counseling of non-psychotic patients from an inner-London general practice. *Journal of Telemedicine and Telecare, 7*(Suppl. 1), 8–10.

Bouchard, S., Paquin, B., Payeur, R., Allard, M., Rivard, V., Fournier, T., et al. (2004). Delivering cognitive–behavior therapy for panic disorder with agoraphobia in videoconference. *Telemedicine Journal and E-Health, 10*(1), 13–25.

Bouchard, S., Payeur, R., Rivard, V., Allard, M., Paquin, B., Renaud, P., et al. (2000). Cognitive behavior therapy for panic disorder with agoraphobia in videoconference: Preliminary results. *CyberPsychology and Behavior, 3*(6), 999–1007.

Brodey, B. B., Claypoole, K. H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *Psychiatric Services, 51*(10), 1305–1307.

Cluver, J. S., Schuyler, D., Frueh, B. C., Brescia, F., & Arana, G. W. (2005). Remote psychotherapy for terminally ill cancer patients. *Journal of Telemedicine and Telecare, 11*(3), 157–159.

Cullum, C. M., Weiner, M. F., Gehrmann, H. R., & Hynan, L. S. (2006). Feasibility of telecognitive assessment in dementia. *Assessment, 13*(4), 385–390.

De Las Cuevas, C., Arredondo, M. T., Cabrera, M. F., Sulzenbacher, H., & Meise, U. (2006). Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. *Telemedicine Journal and E-Health, 12*(3), 341–350.

Deitsch, S. E., Frueh, B. C., & Santos, A. B. (2000). Telepsychiatry for post-traumatic stress disorder. *Journal of Telemedicine and Telecare, 6*(3), 184–186.

Dongier, M., Tempier, R., Lalinec-Michaud, M., & Meunier, D. (1986). Telepsychiatry: Psychiatric consultation through two-way television. A. controlled study. *Canadian Journal of Psychiatry—Revue Canadienne de Psychiatrie, 31*(1), 32–34.

Elford, R., White, H., Bowering, R., Ghandi, A., Maddiggan, B., St John, K., et al. (2000). A. randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *Journal of Telemedicine and Telecare, 6*(2), 73–82.

Fortney, J. C., Pyne, J. M., Edlund, M. J., Williams, D. K., Robinson, D. E., Mittal, D., et al. (2007). A. randomized trial of telemedicine-based collaborative care for depression [electronic version]. *Journal of General Internal Medicine, 22*(8), 1086–1093.

Copyright © 2008 John Wiley & Sons, Ltd.

Frueh, B. C., Henderson, S., & Myrick, H. (2005). Telehealth service delivery for persons with alcoholism. *Journal of Telemedicine and Telecare*, 11(7), 372–375.

Frueh, B. C., Monnier, J., Elhai, J. D., Grubaugh, A. L., & Knapp, R. G. (2004). Telepsychiatry treatment outcome research methodology: Efficacy versus effectiveness. *Telemedicine Journal and E-Health*, 10(4), 455–458.

Greenwood, J., Chamberlain, C., & Parker, G. (2004). Evaluation of a rural telepsychiatry service. *Australasian Psychiatry*, 12(3), 268–272.

Griffiths, L., Blignault, I., & Yellowlees, P. (2006). Telemedicine as a means of delivering cognitive–behavioral therapy to rural and remote mental health clients. *Journal of Telemedicine and Telecare*, 12(3), 136–140.

Grigsby, J., Rigby, M., Hiemstra, A., House, M., Olsson, S., & Whitten, P. (2002). Telemedicine/telehealth: An international perspective. The diffusion of telemedicine. *Telemedicine Journal and E-Health*, 8(1), 79–94.

Hersh, W., Helfand, M., Wallace, J., Kraemer, D., Patterson, P., Shapiro, S., et al. (2002). A. systematic review of the efficacy of telemedicine for making diagnostic and management decisions. *Journal of Telemedicine and Telecare*, 8(4), 197–209.

Himle, J. A., Fischer, D. J., Muroff, J. R., Van Etten, M. L., Lokers, L. M., Abelson, J. L., et al. (2006). Videoconferencing-based cognitive–behavioral therapy for obsessive–compulsive disorder. *Behaviour Research and Therapy*, 44(12), 1821–1829.

Hyler, S. E., Gangure, D. P., & Batchelder, S. T. (2005). Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. *CNS Spectrums*, 10(5), 403–413.

Jones, B. N., III, Johnston, D., Reboussin, B., & McCall, W. V. (2001). Reliability of telepsychiatry assessments: Subjective versus observational ratings. *Journal of Geriatric Psychiatry and Neurology*, 14(2), 66–71.

Kennedy, C., & Yellowlees, P. (2000). A. community-based approach to evaluation of health outcomes and costs for telepsychiatry in a rural population: Preliminary results. *Journal of Telemedicine and Telecare*, 6(Suppl. 1), S155–S157.

Kennedy, C., & Yellowlees, P. (2003). The effectiveness of telepsychiatry measured using the Health of the Nation Outcome Scale and the Mental Health Inventory. *Journal of Telemedicine and Telecare*, 9(1), 12–16.

Krupinski, E., Nypaver, M., Poropatich, R., Ellis, D., Safwat, R., & Sapci, H. (2002). Telemedicine/telehealth: An international perspective. Clinical applications in telemedicine/telehealth. *Telemedicine Journal and E-Health*, 8(1), 13–34.

Leonard, S. (2004). The development and evaluation of a telepsychiatry service for prisoners. *Journal of Psychiatric and Mental Health Nursing*, 11(4), 461–468.

Lexcen, F. J., Hawk, G. L., Herrick, S., & Blank, M. B. (2006). Use of video conferencing for psychiatric and forensic evaluations. *Psychiatric Services*, 57(5), 713–715.

Lovell, K., Cox, D., Haddock, G., Jones, C., Raines, D., Garvey, R., et al. (2006). Telephone administered cognitive behaviour therapy for treatment of obsessive compulsive disorder: Randomised controlled non-inferiority trial [electronic version]. *British Medical Journal*, 333(7574), 883.

Marcin, J. P., Nesbitt, T. S., Cole, S. L., Knuttel, R. M., Hilty, D. M., Prescott, P. T., et al. (2005). Changes in diagnosis, treatment, and clinical improvement among patients receiving telemedicine consultations. *Telemedicine Journal and E-Health*, 11(1), 36–43.

Matsuura, S., Hosaka, T., Yukiyama, T., Ogushi, Y., Okada, Y., Haruki, Y., et al. (2000). Application of telepsychiatry: A preliminary study. *Psychiatry and Clinical Neurosciences*, 54(1), 55–58.

McAlister, F. A., & Sackett, D. L. (2001). Active-control equivalence trials and antihypertensive agents. *American Journal of Medicine*, 111(7), 553–558.

Modai, I., Jabarin, M., Kurs, R., Barak, P., Hanan, I., & Kitain, L. (2006). Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. *Telemedicine Journal and E-Health*, 12(5), 515–520.

Morland, L. A., Pierce, K., & Wong, M. Y. (2004). Telemedicine and coping skills groups for pacific island veterans with post-traumatic stress disorder: A pilot study. *Journal of Telemedicine and Telecare*, 10(5), 286–289.

Myers, K. M., Sulzbacher, S., & Melzer, S. M. (2004). Telepsychiatry with children and adolescents: Are patients comparable to those evaluated in usual outpatient care? *Telemedicine Journal and E-Health*, 10(3), 278–285.

Myers, K. M., Valentine, J., Morganthaler, R., & Melzer, S. (2006). Telepsychiatry, with incarcerated youth. *Journal of Adolescent Health*, 38(6), 643–648.

Nelson, E. L., Barnard, M., & Cain, S. (2003). Treating childhood depression over videoconferencing. *Telemedicine Journal and E-Health*, 9(1), 49–55.

Nelson, E., Zaylor, C., & Cook, D. (2004). A. comparison of psychiatrist evaluation and patient symptom report in a jail telepsychiatry clinic. *Telemedicine Journal and E-Health*, 10(Suppl. 2), s54–s59.

Copyright © 2008 John Wiley & Sons, Ltd.    Behav. Sci. Law 26: 253–269 (2008)
DOI: 10.1002/bsl

Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing     269

Neufeld, J. D., Yellowlees, P. M., Hilty, D. M., Cobb, H., & Bourgeois, J. A. (2007). The e-mental health consultation service: Providing enhanced primary-care mental health services through telemedicine. *Psychosomatics*, 48(2), 135–141.

New Freedom Commission on Mental Health, Subcommittee on Rural Issues: Background paper. (2004). DHHS Pub. No. SMA-04-3890. Rockville, MD.

O'Reilly, R., Bishop, J., Maddox, K., Hutchinson, L., Fisman, M., & Takhar, J. (2007). Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. *Psychiatric Services*, 58(6), 836–843.

Poon, P., Hui, E., Dai, D., Kwok, T., & Woo, J. (2005). Cognitive intervention for community-dwelling older persons with memory problems: Telemedicine versus face-to-face treatment. *International Journal of Geriatric Psychiatry*, 20(3), 285–286.

Rollman, B. L., Belnap, B. H., Mazumdar, S., Houck, P. R., Zhu, F., Gardner, W., et al. (2005). A. randomized trial to improve the quality of treatment for panic and generalized anxiety disorders in primary care. *Archives of General Psychiatry*, 62(12), 1332–1341.

Ruskin, P. E., Silver-Aylaian, M., Kling, M. A., Reed, S. A., Bradham, D. D., Hebel, J. R., et al. (2004). Treatment outcomes in depression: Comparison of remote treatment through telepsychiatry to in-person treatment. *American Journal of Psychiatry*, 161(8), 1471–1476.

Ryan, P., Kobb, R., & Hilsen, P. (2003). Making the right connection: Matching patients to technology. *Telemedicine Journal and E-Health*, 9(1), 81–88.

Savin, D., Garry, M. T., Zuccaro, P., & Novins, D. (2006). Telepsychiatry for treating rural American Indian youth. *Journal of the American Academy of Child and Adolescent Psychiatry*, 45(4), 484–488.

Shepherd, L., Goldstein, D., Whitford, H., Thewes, B., Brummell, V., & Hicks, M. (2006). The utility of videoconferencing to provide innovative delivery of psychological treatment for rural cancer patients: Results of a pilot study. *Journal of Pain and Symptom Management*, 32(5), 453–461.

Shore, J. H., & Manson, S. M. (2004). Telepsychiatric care of American Indian veterans with post-traumatic stress disorder: Bridging gaps in geography, organizations, and culture. *Telemedicine Journal and E-Health*, 10(Suppl. 2), s64–s69.

Shore, J. H., Savin, D., Orton, H., Beals, J., & Manson, S. M. (2007). Diagnostic reliability of telepsychiatry in American Indian veterans. *American Journal of Psychiatry*, 164(1), 115–118.

Simon, G. E., Ludman, E. J., Tutty, S., Operskalski, B., & Von Korff, M. (2004). Telephone psychotherapy and telephone care management for primary care patients starting antidepressant treatment: A randomized controlled trial [electronic version]. *Journal of the American Medical Association*, 292(8), 935–942.

Starling, J., Rosina, R., Nunn, K., & Dossetor, D. (2003). Child and adolescent telepsychiatry in New South Wales: Moving beyond clinical consultation. *Australasian Psychiatry*, 11(s1), S117–S121.

Thomas, C. R., Miller, G., Hartshorn, J. C., Speck, N. C., & Walker, G. (2005). Telepsychiatry program for rural victims of domestic violence. *Telemedicine Journal and E-Health*, 11(5), 567–573.

Urness, D., Wass, M., Gordon, A., Tian, E., & Bulger, T. (2006). Client acceptability and quality of life—Telepsychiatry compared to in-person consultation. *Journal of Telemedicine and Telecare*, 12(5), 251–254.

Zarate, C. A., Jr, Weinstock, L., Cukor, P., Morabito, C., Leahy, L., Burns, C., et al. (1997). Applicability of telemedicine for assessing patients with schizophrenia: Acceptance and reliability. *Journal of Clinical Psychiatry*, 58(1), 22–25.

Zaylor, C. (1999). Clinical outcomes in telepsychiatry. *Journal of Telemedicine and Telecare*, 5(Suppl. 1), S59–60.

Zaylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a prison telepsychiatry clinic. *Journal of Telemedicine and Telecare*, 7(Suppl. 1), 47–49.

Zaylor, C., Whitten, P., & Kingsley, C. (2000). Telemedicine services to a county jail. *Journal of Telemedicine and Telecare*, 6(Suppl. 1), S93–S95.

REV COLOMB PSIQUIAT. 2017;46(2):65–73



# <small>P</small>REVISTA COLOMBIANA DE <small>P</small>SIQUIATRÍA

www.elsevier.es/rcp





Original article

# Cost-effectiveness of synchronous vs. asynchronous telepsychiatry in prison inmates with depression[☆],[☆☆]

Camilo Barrera-Valencia[a],[*], Alexis Vladimir Benito-Devia[b], Consuelo Vélez-Álvarez[c], Mario Figueroa-Barrera[d], Sandra Milena Franco-Idárraga[c]

[a] Grupo Telesalud, Facultad de Ciencias para la Salud, Universidad de Caldas, Manizales, Colombia
[b] Comité de Estudios Médicos CREIMED SAS, Medellín, Colombia
[c] Departamento de Salud Pública, Grupo de Investigación, Promoción de Salud y Prevención de la Enfermedad, Universidad de Caldas, Manizales, Colombia
[d] Departamento de Salud Mental, Facultad de Ciencias para la Salud, Universidad de Caldas, Manizales, Colombia

A R T I C L E   I N F O

Article history:
Received 26 August 2015
Accepted 15 April 2016
Available online 2 June 2017

Keywords:
Telepsychiatry
Synchronous
Asynchronous
Prisons
Cost-effectiveness

A B S T R A C T

Introduction: Telepsychiatry is defined as the use of information and communication technology (ICT) in providing remote psychiatric services. Telepsychiatry is applied using two types of communication: synchronous (real time) and asynchronous (store and forward).
Objective: To determine the cost-effectiveness of a synchronous and an asynchronous telepsychiatric model in prison inmate patients with symptoms of depression.
Methods: A cost-effectiveness study was performed on a population consisting of 157 patients from the Establecimiento Penitenciario y Carcelario de Mediana Seguridad de Manizales, Colombia. The sample was determined by applying Zung self-administered surveys for depression (1965) and the Hamilton Depression Rating Scale (HDRS), the latter being the tool used for the comparison.
Results: Initial Hamilton score, arrival time, duration of system downtime, and clinical effectiveness variables had normal distributions ($p > 0.05$). There were significant differences ($p < 0.001$) between care costs for the different models, showing that the mean cost of the asynchronous model is less than synchronous model, and making the asynchronous model more cost-effective.
Conclusions: The asynchronous model is the most cost-effective model of telepsychiatry care for patients with depression admitted to a detention centre, according to the results of clinical effectiveness, cost measurement, and patient satisfaction.

© 2016 Asociación Colombiana de Psiquiatría. Published by Elsevier España, S.L.U. All rights reserved.

---

☆ This article is registered within COLCIENCIAS summons 604-2012, with the research project entitled "Effectiveness of a synchronous vs asynchronous telepsychiatry model on the mental health of prison inmates".
☆☆ Please cite this article as: Barrera-Valencia C, Benito-Devia AV, Vélez-Álvarez C, Figueroa-Barrera M, Franco-Idárraga SM. Costo-efectividad de telepsiquiatría sincrónica frente a asincrónica para personas con depresión privadas de la libertad. Rev Colomb Psiquiat. 2017;46:65–73.
* Corresponding author.
   E-mail addresses: camilobarrera32@gmail.com, consuelo.velez@ucaldas.edu.co (C. Barrera-Valencia).
http://dx.doi.org/10.1016/j.rcpeng.2017.05.005
2530-3120/© 2016 Asociación Colombiana de Psiquiatría. Published by Elsevier España, S.L.U. All rights reserved.

## Costo-efectividad de telepsiquiatría sincrónica frente a asincrónica para personas con depresión privadas de la libertad

R E S U M E N

*Palabras clave:*
Telepsiquiatría
Sincrónico
Asincrónico
Prisiones
Costo-efectividad

*Introducción:* La telepsiquiatría se define como la utilización de las tecnologías de la información y la comunicación (TIC) en la prestación de servicios de psiquiatría a distancia. La aplicación de la telepsiquiatría está dada por dos tipos diferentes de comunicación: sincrónico (tiempo real) y asincrónico (tiempo diferido).

*Objetivo:* Determinar la costo-efectividad de un modelo de telepsiquiatría sincrónico frente a otro asincrónico en pacientes con síntomas de depresión internados en un centro de privación de libertad.

*Métodos:* Se realizó un estudio de costo-efectividad. Constituyeron la población 157 pacientes del Establecimiento Penitenciario y Carcelario de Mediana Seguridad de Manizales, Colombia. La muestra se determinó con la encuesta autoaplicable Zung para la depresión (1965) y la escala de valoración de Hamilton para la evaluación de la depresión (*Hamilton depression rating scale* [HDRS]), instrumento con que se realizó la comparación.

*Resultados:* Las variables Hamilton inicial, tiempo de llegada, duración de caídas del sistema y efectividad clínica presentaron distribución normal con p > 0,05; entre los diferentes modelos hubo diferencias significativas (p < 0,001) en los costos de atención, y se evidenció que, en promedio, el costo del modelo asincrónico es menor que el del sincrónico; en promedio, la modalidad asincrónica es más costo-efectiva.

*Conclusiones:* El modelo de atención más costo-efectivo en telepsiquiatría para pacientes con trastorno depresivo internados en un centro de privación de libertad es el asincrónico según los resultados de efectividad clínica, medición de costos y satisfacción del paciente.

© 2016 Asociación Colombiana de Psiquiatría. Publicado por Elsevier España, S.L.U. Todos los derechos reservados.

## Introduction

The World Health Organisation (WHO) estimates that in 2020, mental illness will affect 15% of the global population.[1] At present, depression represents 4.3% of the world's disease burden, making it one of the main causes of disability worldwide.[2] This has led to a search for innovative solutions to tackle mental health problems that go beyond any operational capacity of the current health services. According to the WHO, the future of medicine lies in transforming the exercise through communication and getting ahead of the looming crisis in patient care.[3] Telepsychiatry is a clear example of this and constitutes an important tool for solving problems related to accessing health services in remote areas and/or areas that have a limited offering.[4] In general terms, telepsychiatry is defined as the use of information and communication technologies (ICT) in the provision of remote psychiatry services.[5] Telepsychiatry is applied using two different types of communication (synchronous and asynchronous), which are studied in this research.

In the synchronous or real-time modality, the patient and psychiatrist interact within the same temporal framework through live broadcasting systems, including telephone, chat and videoconferencing.[6] The latter is the most widely used technology[7] and the one with which most telepsychiatry sessions have been undertaken.[8] The psychiatrist interviews the patient in real-time and issues a diagnosis and treatment on completing the consultation. It is worth mentioning that, due to regulatory provisions regarding telemedicine in Colombia, the patient must be accompanied by a general practitioner from start to finish, who attends to the patient if necessary and is responsible for completing and delivering the medical prescription to the patient.[9] The second form of communication is the asynchronous or delayed-time modality, also known as store-and-forward. The aim of this technique is to obtain a psychiatrist's second opinion on the diagnosis and management of the patient. A general practitioner gathers and sends all the information (data, audio or video) to the psychiatrist, who responds within 8–24 h (as previously agreed between the parties – there is no standard time frame); the general practitioner then delivers the respective treatment and management plan to the patient.[10]

In Colombia, the application of telepsychiatry forms part of Law 1419 of 2010, which also establishes the guidelines for implementing telehealth. It is likewise provided for in Agreement 029, regulating the use of telemedicine to facilitate timely access to services within the Mandatory Health Plan, and Resolution 2003 of 2014, which sets forth the technical procedures for its implementation. This resolution specifies the privacy and security conditions for patient data through the standard of medical histories and records; thus: "The remitting providers shall adopt the necessary safety measures during the transfer and storage

of data, guaranteeing the privacy of the document and taking into account the guidelines established to that effect by the Ministry of Health and Social Protection" and "the provider shall encrypt the information for its transmission and create mechanisms of access to said information in accordance with institutional policies". Statutory Law 1581 of 2012 also ratifies the privacy of personal data and their protection.

In 1995, researchers from Harvard Medical School presented the results of a research project on 26 patients treated in-person versus virtually, with similar results between the two groups.[11] It should be emphasised that a significant percentage of psychiatric disorders can be diagnosed and treated by means of telepsychiatry, although there are certain situations that require specific considerations, such as patients with suicidal ideation and those who present decompensated borderline personality disorder, among others.[4] In other systematic literature reviews, the benefits of telepsychiatry are presented as an effective alternative for patient care, although this is only in reference to the synchronous modality and thus evinces the need to consider cost-effectiveness studies in greater depth.[12]

Although telepsychiatry is seen to be an important strategy for remote populations,[13,14] there are population groups with special characteristics, such as in prisons and penitentiaries, which make them particularly isolated and difficult-to-access.[7] In Colombia, these detention centres present important limitations in terms of access and availability. In the survey conducted in 2010 by the Colombian Ombudsman's Office, it was found that only 22% of detention centres have a permanent psychiatrist, while the others use outpatient care, with considerable difficulties, according to patients and relatives, regarding the quality of care provided; they also state that the care given by the psychiatrist is slow, cumbersome and, in some cases, non-existent.[15] This clearly demonstrates serious problems in the care model, as confirmed in an interview with healthcare personnel from the Medium-Security Penitentiary and Prison Establishment of Manizales and Pereira, which affirms the following: (a) difficult management of patient emergencies that require a psychiatric assessment due to there being no access to a specialist physician and difficulty transferring them to a care centre due to administrative and safety procedures; (b) short consultation time due to the high number of patients and the little time spent by the psychiatrist at the detention centre, and (c) impossibility of treating the entire population requiring the service, leading to the prioritisation of the most critical cases.

The first use of telepsychiatry in prisons was reported in Miami in 1974 through a microwave link. It was not possible to maintain the system due to its high cost.[16] In the United States, around 2 million adults are detained in prisons, and more than half report some kind of symptom associated with a mental illness.[17] Between 1993 and 1996, videoconferencing increased from 1750 to 18,766 cases in correctional and non-correctional centres.[18] In another study, the use of telepsychiatry in prisons was assessed in seven American states, and it was concluded that this mode of care increases access to mental health services through treatment continuity, thus improving patients' quality of life and prison

safety. Similarly, a decrease in care-related costs was also evident.[19]

Moreover, as regards cost-effectiveness studies included in economic healthcare evaluations, these are defined as the comparison of two or more potentially competitive and, in general, mutually exclusive intervention alternatives.[20] In the case of this study, the synchronous and asynchronous telepsychiatry care modalities were compared in prison inmates with depression, in order to determine which is the most cost-effective.

## Material and methods

A cost-effectiveness study was conducted. The population comprised 157 patients from the Medium-Security Penitentiary and Prison Establishment of Manizales (MSPPE). The sample was determined using the Zung Self-Rating Depression Scale (1965).[21] Subsequently, the people within the "mild depression" and "very severe depression" bracket of Zung's scale were selected and informed consent was requested. The people who consented were enrolled in the study. Those who did not give their consent and had assessed themselves as depressed were put in touch with the institution's health service for management. The Hamilton Depression Rating Scale (HDRS)[22] was then applied, which is a 17-question scale used by general practitioners, designed to quantitatively evaluate symptom severity and assess changes in the depressed patient. The scoring range goes from 0 to >23. The sum of all the questions classifies people as: normal 0–7; mild depression 8–13; moderate depression 14–18; severe depression 19–22; and very severe depression >23. The people from the sample with a positive HDRS score, i.e. in the mild-very severe depression bracket, were randomly assigned to a synchronous or asynchronous telepsychiatry care model. The study sample comprised a total of 106 patients in whom depression was eventually reconfirmed. The following inclusion criteria were considered: male over 18 years of age, referred by the general practitioner with a positive HDRS score and signature of the informed consent form. As regards the exclusion criteria, the following aspects were taken into account: visual impairment, hearing impairment, currently undergoing psychiatric treatment and failure to sign the informed consent form. Subsequently, a date for telemedicine care was assigned in accordance with the permits granted by the Colombian Penitentiary and Prison Institute (INPEC) for this activity. The patients in the asynchronous modality were interviewed and assessed in the prison by a general practitioner who, in turn, sent all of the patient's clinical information to a psychiatrist via a telemedicine technology platform for assessment, who then issued a final diagnosis and treatment. The mean response time of the psychiatrist was 8 hours. The general practitioner then logged into the platform to check the management approach issued by the specialist and to complete the medical prescription, pharmacological treatment, where applicable, and follow-up appointment, as appropriate. The patients in the synchronous modality were directly assessed by the psychiatrist via videoconferencing; in this same consultation the diagnosis was issued and the medical prescription

completed, along with the pharmacological treatment, if required, and the follow-up appointment, as appropriate. During the follow-up appointment, the HDRS was reissued in both models, which enabled assessment from the patient's perspective and determined whether the patient had improved, deteriorated or remained the same with respect to the first HDRS applied.

In the data analysis, the synchronous and asynchronous model was assumed as the independent variable, while the dependent variables were clinical progression, remission, patient satisfaction and costs. The statistical analysis consisted in establishing the relationship between the different variables proposed. Parametric tests (Student's $t$ test, $\chi^2$ and ANOVA, as appropriate) were applied to the normal distribution variables, while non-parametric tests (Fisher's exact test, Mann–Whitney $U$ test, Wilcoxon W test, Wilcoxon $T$ test, McNemar's test and Kruskal–Wallis test) were applied to non-normally distributed variables. For the cost-effectiveness analysis, the direct costs of the study were estimated, which include, among others, the technology platform, connectivity, human resources and consumables.

**Study 1 hypothesis.** The effectiveness on the mental health of prison inmates treated in the synchronous and asynchronous telepsychiatry modalities is the same.

**Study 2 hypothesis.** The consultation costs of the synchronous and asynchronous telepsychiatry models are different, and are higher in the synchronous model since this seemingly involves more of the psychiatrist's time due to the duration of the consultation and a more complex infrastructure.

The informed consent form was approved by the Bioethics Committee of the University of Caldas, Act no. 002 of 2014, based on the Ministry of Health Resolution 008430 of 1993 on scientific, technical and administrative standards for health research, in this case for a vulnerable population/subordinate subjects.

## Results

The Kolmogorov–Smirnov test was applied to establish normality. The results obtained in the test indicate that the baseline Hamilton variables, arrival time, duration of system failures and clinical effectiveness present normal distribution ($p > 0.05$).

### Component: clinical effectiveness

This provides a response to the study 1 hypothesis, which considers the need to establish whether the effectiveness on the mental health of prison inmates treated in the synchronous and asynchronous telepsychiatry modalities is the same. Clinical effectiveness is defined by the progression of the depression symptoms shown by a patient through the baseline and final HDRS score. The following statistical tests were performed to that effect:

**Table 1 – Descriptive statistics of the Hamilton test group.**

| Model | Patients (n) | Mean ± SD | SEM |
|---|---|---|---|
| *Baseline Hamilton score* | | | |
| Asynchronous | 53 | 16.43 ± 5.235 | 0.719 |
| Synchronous | 53 | 14.28 ± 3.666 | 0.504 |

SD: standard deviation; SEM: standard error of the mean.

**Table 2 – Paired means test on baseline versus final Hamilton variables.**

| Model | Subjects (n) | Average range | Sum of ranges | p |
|---|---|---|---|---|
| **Asynchronous** | | | | |
| *Final Hamilton–baseline Hamilton* | | | | |
| Negative ranges | 46[a] | 25.15 | 1157.00 | <0.001 |
| Positive ranges | 2[b] | 9.50 | 19.00 | |
| Ties | 2[c] | | | |
| Total | 50 | | | |
| **Synchronous** | | | | |
| *Final Hamilton–baseline Hamilton* | | | | |
| Negative ranges | 33[a] | 25.64 | 846.00 | 0.003 |
| Positive ranges | 14[b] | 20.14 | 282.00 | |
| Ties | 2[c] | | | |
| Total | 49 | | | |

*Test of means to demonstrate any differences in the baseline Hamilton scores between the synchronous and asynchronous modalities*
Significant differences were found in the means corresponding to the baseline Hamilton score between both models ($p = 0.016$), with a higher level of mean depression in the asynchronous model (16.43 > 14.28) (Table 1), thus demonstrating that, on average, the patients treated with the asynchronous model presented more severe symptoms of depression than those treated with the synchronous model.

*Paired means test on baseline versus final Hamilton variables for the asynchronous versus synchronous models to demonstrate progression in the treatment*
The results of the Wilcoxon test for the progression of paired variables showed that there is a progression in the final versus baseline score of the Hamilton scale in the two models, which demonstrates that both present significant advances in treating depression (asynchronous model, $p < 0.001$, i.e. highly effective; synchronous model, $p = 0.003$, i.e. very effective) (Table 2).

*Means analysis of the final Hamilton variable for the asynchronous versus synchronous modalities to demonstrate differences in the final state of the treatment for each model*
Differences were seen in the average scores of the final Hamilton scale between the two telepsychiatry models, with the average value being better in the asynchronous model ($p = 0.010 < p = 0.05$). This lower result indicates an

| Table 3 – Clinical effectiveness with the asynchronous versus synchronous modalities in the Hamilton scale group. | | | |
|---|---|---|---|
| Model | Subjects (n) | Mean ± SD | SEM |
| Asynchronous | 50 | 7.9200 ± 5.92415 | 0.83780 |
| Synchronous | 49 | 2.8776 ± 6.46669 | 0.92381 |
| SD: standard deviation; SEM: standard error of the mean. | | | |

improvement in the depressive symptoms suffered by the assessed patients.

*Tests for the equality of the mean progression in the Hamilton scale, with the asynchronous versus synchronous modalities, in order to demonstrate differences in the effectiveness of each model*

There were significant differences ($p < 0.001$) regarding the mean clinical effectiveness of each model, which was greater with the asynchronous model with an average change close to 8 points on the HDRS, compared to 3 points with the synchronous model (Tables 3 and 4).

*Conclusions on study 1 hypothesis*: Although it is certain that both models (asynchronous and synchronous) present proven clinical effectiveness, i.e. progression in the HDRS following treatment, this is not associated with variables such as age, sentence duration, perceived quality of treatment and time employed, which is an excellent result that indicates the significance of telepsychiatry care. Nevertheless, it is worth noting that the clinical effectiveness results obtained with the asynchronous model are higher than those with the synchronous model.

**Component: cost-related care times**

Analysing consultation costs in the synchronous and asynchronous telepsychiatry models is based on the variability of the care times that each modality involves, in the sense that the costing of wage factors of the health professionals involved in treatment may be used to establish the variable costs that influence the cost-effectiveness model through consultation times and poor quality times that affect the total cost. On a preliminary basis, it can be established that a higher cost is expected in the synchronous model, as this seemingly requires more professional time due to the duration of the consultation as well as a more complex infrastructure.

There are no differences ($p = 0.140$) in the average initial consultation time with each model, which indicates regularity in the time spent by health professionals on comprehensive care processes.

The variables related to consultation time and clinical effectiveness were independent, thus indicating that time is not a determining factor in the patients' progression. Clinical and professional management variables through a specific model (synchronous or asynchronous), which enable the generation of effective telepsychiatry results, on the other hand, are determining factors.

*Equality analysis in average treatment costs and the different modalities in order to establish any significant differences*

On applying the Kruskal–Wallis test, significant differences were found between the different models ($p < 0.001$) for treatment costs: on average, the cost of the asynchronous model is less than half of the synchronous model treatment cost (Fig. 1).

Poor quality costs (time lost due to internet outage, delays in starting the medical consultation for logistical reasons, technology platform failure during the consultation, etc.) for consultations in the synchronous and asynchronous models are statistically equal ($p = 0.108$), which continues to indicate equality among the service provision conditions in treating depressed patients though one telepsychiatry modality or another.

*Conclusions on study 2 hypothesis*: The consultation costs of the synchronous and asynchronous telepsychiatry models are different and were found to be much higher in the synchronous model. Poor quality costs are equal in both modalities.

*Predictive model for the cost of treatment with each modality*

The model that best explains and predicts the cost of care was determined by establishing the following regression model:

$$\text{Cost treated} = \beta_0 + \beta_1 * \text{model} + \beta_2 * \text{duration of consultation}$$
$$+ \beta_3 + \text{Psychiatrist time}$$
$$+ \beta_4 * \text{Average satisfaction} + \text{Ui}$$

| Table 4 – Independent sample test. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Levene's test for equality of variances | | T test for equality of means | | | | | |
| | F | p | t | df | p (two-tailed) | Mean difference | Standard error difference | 95% CI of the difference |
| *Clinical effectiveness* | | | | | | | | |
| Equal variances assumed | 0.007 | 0.933 | 4.047 | 97 | <0.001 | 5.04245 | 1.24602 | 2.56944–7.51545 |
| Equal variances not assumed | | | 4.043 | 95.887 | <0.001 | 5.04245 | 1.24713 | 2.56697–7.51802 |

REV COLOMB PSIQUIAT. 2017;46(2):85-79



**Fig. 1 – Box plot of costs by model.**

| Table 5 – Descriptive statistics of clinical effectiveness by model. | | | | |
|---|---|---|---|---|
| Model | Subjects (*n*) | Minimum | Maximum | Mean ± SD |
| Asynchronous | 50 | −5.00 | 23.00 | 7.9200 ± 5.92415 |
| Synchronous | 49 | −13.00 | 17.00 | 2.8776 ± 6.46669 |
| SD: standard deviation. | | | | |

It may be established that the cost of care is explained in 93.8% by the variables considered, that the model is correctly specified and that the validations relating to the significance of the coefficients in individual and group tests are significant and different from zero.

*Cost-effectiveness analysis of treatment in the asynchronous and synchronous models using the mean ratio method*

Finally, the cost-effectiveness analysis was performed using the mean ratio method, in which the average treatment cost variables were compared to the clinical effectiveness of treatment with each model (Table 5).

According to the results, the cost-effectiveness analysis of treatment using the mean ratio method for the asynchronous and synchronous modalities allows us to conclude that, on average, the asynchronous modality is most cost-effective.

## Discussion

Telepsychiatry has traditionally been provided in two modalities: synchronous and asynchronous.[23] Effectiveness studies, cost studies and some cost-effectiveness studies can be found in the literature,[7,24] applied to each of these modalities independently, but no research projects involving a comparative cost-effectiveness study on both modalities were discovered after searching the main scientific databases (MEDLINE, PubMed, PsychInfo, EMBASE, Science Citation Index, SciELO, Science Direct, LILACS, OVID, ProQuest and The Cochrane Library) and relevant scientific journals (*Psychiatr Serv, Journal of Telemedicine and Telecare* and *Telemedicine and e-Health*).

The results of this research study showed the effectiveness of the intervention in both telepsychiatry models (synchronous and asynchronous, which is the most effective). Moreover, synchronous telepsychiatry effectiveness studies through videoconferencing have been compared to face-to-face care, and the results demonstrate that telepsychiatry is a more effective alternative for providing mental health services.[25–27] Corroborating the above, a meta-analysis including 500 patients distributed across 14 studies concluded that there was no significant difference in precision and patient satisfaction in the provision of in-person versus virtual psychiatry services.[28] That said, no studies were found that assess the effectiveness of asynchronous telepsychiatry; one retrospective study conducted in India on 94 patients exclusively addressed the feasibility of this email-based care model and found that it could be used to establish a definitive diagnosis and recommend a suitable treatment in 95% of patients.[29] Moreover, the feasibility of the asynchronous model was also measured in a study sponsored by the University of California, this time by means of sending a video recording of the consultation to the

psychiatrist, obtaining a comparable result to the Indian study.[23]

In this research project, although no comparison was made between the in-person and virtual models, a relevant result was obtained in the sense that the effectiveness of the intervention with both telepsychiatry models—synchronous and asynchronous—was determined, the latter being the most effective.

Some studies recommend analysing not only effectiveness, but also the costs associated with telepsychiatry.[30,31] With regard to this variable, one study was identified that compared the synchronous and asynchronous models to face-to-face care. It found asynchronous care to be the most cost-effective due to a reduction in the specialist's intervention time, which is assumed by a general practitioner.[32]

On average, the asynchronous modality was found to be the most cost-effective in this research. Other studies also indicate factors contributing to this conclusion: basic infrastructure, easy management for healthcare personnel (e.g. via email),[25] reduction in the time required by the specialist to conclude consultations and exploiting specialists' downtime.[26]

As regards the synchronous modality, a study conducted in Israel concludes that it is even more costly than in-person care due to the technological infrastructure and human resources required.[33] The aforementioned Indian study adds to the cost analysis of the synchronous modality that, although the specialist's time is similar to face-to-face care, only travel costs are reduced. Moreover, it may even take more time because, on occasions, the logistics of connecting the patient and specialist in real-time is complex.[25]

In contrast, the costs analysed in a prison environment take on another dimension. There are studies in the United States that address the costs of telepsychiatry care in the synchronous modality versus in-person care, which calculate an average consultation cost of $173 compared to $71 when said care is carried out using videoconferencing.[34]

In summary, synchronous telepsychiatry has been shown to be just as effective as face-to-face psychiatric care. In contrast, in the asynchronous modality there are no previous studies that assess effectiveness, though there are some that prove its feasibility, i.e. that the provision of telepsychiatry services is possible in this modality.

That said, with regard to the costs of both modalities, the literature concludes that the asynchronous model is less costly, as opposed to the synchronous model, as the latter requires more time spent by the specialist, as well as a complex logistical and technological infrastructure.

Prison inmates are one of the population groups that could benefit most from telepsychiatry. Previous studies positively assessed the improvement in access to mental health services thanks to the continuity of the service provision, reduced care costs in this field,[20] improved safety of healthcare personnel[20] and the effectiveness of care.[35] Moreover, there are even reports that indicate that telepsychiatry has proven more effective than in-person care in the treatment of diseases such as depression.[36]

With the results obtained in this research, it may be affirmed that both telepsychiatry models were effective in treating depression in prisons. However, the cost-effectiveness analysis, which compared two intervention alternatives,[37] found the asynchronous modality to be superior to the synchronous model for the same condition. The reasons leading to this conclusion are grouped into three main categories: (a) clinical effectiveness; (b) care costs for each model, and (c) degree of satisfaction regarding the care received.

This research opens a new door for future analyses in the field, as, although positive results were obtained, the study was limited to a disease and population group with unique characteristics. The formation of interdisciplinary working teams to prepare the prison environment for a project such as this one is recommended, along with a multidimensional approach to patients that goes beyond purely clinical considerations, given the social, cultural, legal and institutional problems specific to a prison environment.

## Conclusions

The most cost-effective telepsychiatry care model for prison inmates with depression is the asynchronous model, as shown by the clinical effectiveness, cost measurement and patient satisfaction results.

This study has highlighted the need to carry out further research that assesses the synchronous versus asynchronous care models in telepsychiatry, in order to validate other conditions and different population groups with a greater number of experiences.

The novelty of this project stems from its contributions to the generation of new knowledge, as the literature review found no references of other research projects that assessed the cost-effectiveness of the synchronous versus asynchronous modalities in telepsychiatry.

## Ethical disclosures

**Protection of human and animal subjects.** The authors declare that no experiments were performed on humans or animals for this study.

**Confidentiality of data.** The authors declare that no patient data appear in this article.

**Right to privacy and informed consent.** The authors declare that no patient data appear in this article.

## Conflicts of interest

Alexis Vladimir Benito Devia owns shares in CREIMED, a beneficiary of the research project, and states: "We have received an entry from COLCIENCIAS and an offsetting entry from CREIMED. Neither institution has influenced or intervened in the conduct of the research or results, for which we were free to choose the team to perform the research,

who were only selected for their technical and professional abilities".

## Acknowledgements

To the Ministry of Information and Communication Technologies (MinTIC) with the Innovation Hub programme; to the COLCIENCIAS Science, Technology and Innovation Department; to the University of Caldas and its Telehealth programme; to IPS CREIMED; to the Penitentiary and Prison Institute (INPEC) of the city of Manizales and the inmates who took part in the research project, for their support and collaboration in this conduct; and, finally, to the healthcare professionals and those from other fields who were involved in and supported the conduct of this study in one way or another to ensure a successful outcome.

### REFERENCES

1. Organización Mundial de la Salud. Prevención de los trastornos mentales. Intervenciones efectivas y opciones de política. Informe compendiado Ginebra. 2004. Available in: http://www.who.int/mental_health/evidence/Prevention_of_mental_disorders_spanish_version.pdf.
2. WHO. Mental health action plan 2013–2020. Geneva: World Health Organization; 2013.
3. WHO. A health telematics policy. Geneva: WHO; 1997. Document DGO/98.1.
4. Cuevas C, Artiles J, de la Fuente J, Serrano P. Telepsiquiatría: utopía o realidad asistencial. Med Clin (Barc). 2003;121:149–52.
5. Hilty DM, Luo JS, Morache C, Marcelo DA, Nesbitt TS. Telepsychiatry: an overview for psychiatrists. CNS Drugs. 2002;16:527–48.
6. Malhotra S, Chakrabarti S, Telepsychiatry Shah R. Promise, potential, and challenges. Indian J Psychiatry. 2013;55:3–11.
7. Garay Fernández JD, Gómez Restrepo C. Telepsiquiatría: Innovación de la atención en salud mental. Una perspectiva general. Rev Colomb Psiquiatr. 2011:40.
8. Antonacci DJ, Bloch RM, Saeed SA, Yildirim Y, Talley J. Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry. Behav Sci Law. 2008;26:253–69.
9. Resolución 2003 de 2014, por la cual se definen los procedimientos y condiciones de inscripción de los Prestadores de Servicios de Salud y de habilitación de servicios de salud. Bogotá: Ministerio de Salud y Protección Social de Colombia; 2014.
10. Wootton R, Liu J, Bonnardot L. Assessing the quality of teleconsultations in a store-and-forward telemedicine network. Frontiers Publ Health. 2014;2:82.
11. Baer L, Cukor P, Jenike MA, Leahy L, O'Laughlen J, Coyle JT. Pilot studies of telemedicine for patients with obsessive–compulsive disorder. Am J Psychiatry. 1995;152:1383–5.
12. Hilty DM, Lui W, Marks S, Callahan EJ. The effectiveness of telepsychiatry: a review. Bull CPA. 2003:2003.
13. Chipps J, Brysiewicz P, Mars M. Effectiveness and feasibility of telepsychiatry in resource constrained environments? A systematic review of the evidence. Afr J Psychiatry (Johannesbg). 2012;15:235–43.
14. Chong J, Moreno F. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. Telemed J E Health. 2012;18:297–304.
15. Situación de los internos con enfermedad mental sobrevenida en los establecimientos de reclusión del país. Informe defensorial. Bogotá: Defensoría del Pueblo; 2010.
16. Doarn CR, Justis D, Chaudhri MS, Merrell RC. Integration of telemedicine practice in to correctional medicine: an evolving standard. J Correct Health Care. 2005;11:253–70.
17. Bureau of Justice Statistics. Special Report. September 2006, NCJ 213600. Available in: http://www.bjs.gov/content/pub/pdf/mhppji.pdf.
18. Miller TW, Clark J, Veltkampl J, Burton DC, Swope M. Teleconferencing model for forensic consultation, court testimony, and continuing education. Behav Sci Law. 2008;26:301–13.
19. Deslich SA, Thistlethwaite T, Coustasse A. Telepsychiatry in correctional facilities: using technology to improve access and decrease costs of mental health care in underserved populations. Perm J. 2013;17:80–6.
20. Febrer Carretero L, Iglesias García C, Mercadal Dalmau J, Ribera Pibernat M. Cómo entender un análisis de coste-efectividad. Piel. 2005;20:172–6.
21. Zung WW. A self-rating depression scale. Arch Gen Psychiatry. 1965;12:63–70.
22. Hamilton M. A rating scale for depression. J Neurol Neurosurg Psychiatry. 1960;23:56–62.
23. Yellowlees PM, Odor A, Parish MB, Iosif AM, Haught K, Hilty D. A feasibility study of the use of asynchronous telepsychiatry for psychiatric consultations. Psychiatr Serv. 2010;61:838–40.
24. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: a 2013 review. Telemed J E Health. 2013;19:444–54.
25. De Las Cuevas C, Arredondo MT, Cabrera MF, Sulzenbacher H, Meise U. Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. Telemed J E Health. 2006;12:341–50.
26. Castro A, Larraín A, Fritsch R, Rojas G. Telepsiquiatría: una revisión sistemática cualitativa. Rev Med Chile. 2012;140:789–96.
27. Ruskin PE, Silver-Aylaian M, Kling MA, Reed SA, Bradham DD, Hebel JR, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. Am J Psychiatry. 2004;161:1471–6.
28. Hyler SE, Gangure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. CNS Spectr. 2005;10:403–13.
29. Balasinorwala VP, Shah NB, Chatterjee SD, Kale VP, Matcheswalla YA. Asynchronous telepsychiatry in Maharashtra, India: study of feasibility and referral pattern. Indian J Psychol Med. 2014;36:299–301.
30. García-Lizana F, Muñoz-Mayorga I. What about telepsychiatry? A systematic review. Prim Care Companion J Clin Psychiatry. 2010:12.
31. Hyler SE, Gangure DP. A review of the costs of telepsychiatry. Psychiatr Serv. 2003;54:976–80.
32. Butler TN, Yellowlees P. Cost analysis of store-and-forward telepsychiatry as a consultation model for primary care. Telemed J E Health. 2012;18:74–7.
33. Modai I, Jabarin M, Kurs R, Barak P, Hanan I, Kitain L. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. Telemed J E Health. 2006;12:515–20.
34. Ax RK, Fagan TJ, Magaletta PR, Morgan RD, Nussbaum D, White TW. Innovations in correctional assessment services: Forging new frontiers in psychiatry in Western Australia. Australas Psychiatry. 2006;14:53–6.

Rev Colomb Psiquiat. 2017;46(2):85–93

35. Zaylor C, Nelson EL, Cook DJ. Clinical outcomes in a prison telepsychiatry clinic. J Telemed Telecare. 2001;7 Suppl. 1:47–9.

36. Fortney JC, Pyne JM, Edlund MJ, Williams DK, Robinson DE, Mittal D, et al. A randomized trial of telemedicine-based collaborative care for depression. J Gen Intern Med. 2007;22:1086–93.

37. Zárate V. Evaluaciones económicas en salud: conceptos básicos y clasificación. Rev Med Chile. 2010;138 Suppl. 2:93–7.

Psychological Services
2016, Vol. 13, No. 3, 283–291

© 2016 American Psychological Association
1541-1559/16/$12.00    http://dx.doi.org/10.1037/ser0000078

# Connecting the Disconnected: Preliminary Results and Lessons Learned From a Telepsychology Initiative With Special Management Inmates

Ashley B. Batastini and Robert D. Morgan
Texas Tech University

The use of telepsychology, such as videoconferencing (VC) systems, has been rapidly increasing as a tool for the provision of mental health services to underserved clients in difficult to access settings. Inmates detained in restrictive housing appear to be at an increased risk of experiencing emotional and behavioral disturbances compared to their general population counterparts, yet they are less likely to receive appropriate treatment due to security constraints. The primary purpose of this article is to describe the process of implementing a novel telepsychology intervention specifically designed to offer group therapy to high-security, administratively segregated inmates. In addition, preliminary results on treatment and therapeutic process outcomes in a sample of 49 participants are reported. Although some evidence indicated that telepsychology was less preferred than in-person sessions, group differences on measures of psychological functioning and criminal thinking were not found across 3 conditions (telepsychology, in-person, and a no-treatment control). Furthermore, a number of limitations associated with program implementation and study design suggest that results be interpreted with caution and should not be used to discount the use of telepsychology as a viable treatment delivery option. Recommendations for future development and evaluation of telepsychological programs are discussed within the context of correctional settings and beyond.

*Keywords:* telepsychology, videoconferencing, group therapy, administrative segregation, solitary confinement

The use of special management, or administrative segregation housing, is an increasingly popular correctional practice intended to prevent inmates from inflicting harm on themselves or others, or conversely from being the target of harm by others (Fine & Wingrove, 2014; King, 1999; O'Keefe, 2008). Currently, over 80,000 inmates across the United States are being detained in these units (Stephan, 2008), where they spend approximately 23 to 24 hr a day in their cells. Although there has been some debate over the long-term psychological effects of using special management units to contain behavior (see Morgan et al., 2015 for a review), some negative outcomes have been documented. For example, in their recent meta-analysis, Morgan et al. (2015) found that segregated housing was associated with moderate increases in criminal recidivism and overall mental health impairment. Similarly, despite the intention to reduce incidents of self-harm, segregated inmates have been found to engage in these behaviors (including suicide) at

higher rates than those detained in the general population (Kaba et al., 2014; Sánchez, 2013).

Persons with mental illness often have particular difficulty coping with the stressors encountered behind prison walls and may be more likely to spend time in administrative segregation when alternative therapeutic options are absent (Metzner & Fellner, 2010). Unfortunately, mental health services in segregation are especially limited due to security restrictions, and typically consist of psychotropic medications, brief check-ins at the inmate's cell front, and occasional meetings in private with a clinician (Beaven, 2005; Metzner & Fellner, 2010). Group therapy is sometimes offered to segregated inmates by securing them in individual metal holding cells (known as therapeutic modules) that are placed in a semicircle around the provider. Each module is approximately the size of a telephone booth and can cost upward of about $18,000 (Metzner & Dvoskin, 2006). This set-up not only has the potential to obstruct communication (verbal and nonverbal) between the provider and other treatment participants, but feelings of embarrassment or dehumanization associated with these modules may also distract inmates from fully participating in the therapeutic process. The demand for better quality treatment of inmates in special management is further evident in a number of recent lawsuits (e.g., *Ashker v. Governor of California,* 2014; *Silverstein v. Federal Bureau of Prisons,* 2014). So, as the discussion continues over whether or not restrictive housing is really "that bad" for the health and well-being of those detained there, best practices would suggest that prisons nonetheless strive to prevent possible iatrogenic effects and treat existing problems, especially for those who are high-risk and high-needs (Andrews & Bonta, 2010).

Ashley B. Batastini and Robert D. Morgan, Department of Psychological Sciences, Texas Tech University.

We thank the Kansas Department of Corrections for their support in this project. The views and opinions expressed herein represent those of the authors and do not necessarily reflect the views and opinions of Texas Tech University or KDOC. Ashley B. Batastini was located at Texas Tech University at the time this project was completed; she is currently affiliated with the Department of Psychology at the University of Southern Mississippi.

Correspondence concerning this article should be addressed to Ashley B. Batastini who is now at Department of Psychology, University of Southern Mississippi, 118 College Drive, #5025 Hattiesburg, MS 39406-5025. E-mail: ashley.batastini@usm.edu

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

BATASTINI AND MORGAN

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Telepsychology, which refers to "the provision of psychological services using telecommunication technologies" (APA, 2013, p. 1), has been on the rise in criminal justice contexts and elsewhere (Ax et al., 2007; Batastini, McDonald, & Morgan, 2013). In fact, it has been projected that the integration of technology into mental health sectors will be largest expanding initiative over the next decade (Norcross, Pfund, & Prochaska, 2013). Currently, these services are most typically rendered using real-time audiovisual monitors (i.e., videoconferencing programs) that connect agencies requiring services to agencies that can provide such services (Ax et al., 2007; Miller, Clark, Veltkamp, Burton, & Swope, 2008).

Within criminal justice settings, telepsychology has not only demonstrated better cost-effectiveness compared with traditional in-person services (National Institute of Justice, 2002), but it is also associated with high satisfaction among correctional clients and providers (Brodey et al., 2000; Magaletta, Fagan, & Peyrot, 2000; Morgan, Patrick, & Magaletta, 2008), good to excellent interrater reliability across both forensic (Manguno-Mire et al., 2007) and clinical assessment outcomes (Lexcen, Hawk, Herrick, & Blank, 2006; Nelson, Naylor, Cook, 2004), as well as improvements in mental health functioning over time ( aylor et al., 2001). Furthermore, while no studies have yet examined the effectiveness of group therapy for inmates via telepsychology, there is evidence of positive clinical and process-related outcomes among noncorrectional samples (Frueh, Henderson, & Myrick, 2005; Greene et al., 2010; Morland et al., 2011). Group psychotherapy in general has also been associated with symptom reduction among incarcerated populations (e.g., Wolff et al., 2015) and court-mandated clients (e.g., Rosenbaum, Gearan, & Ondovic, 2002).

In an effort to improve access to quality mental health care for high-risk individuals detained in an otherwise restricted and largely isolated environment, the Kansas Department of Corrections (KDOC) implemented a pilot telepsychology initiative. To our knowledge, there are no other video-based programs that specifically target the needs of this unique and difficult-to-reach population. Therefore, the purpose of this article is to describe the implementation of the KDOC pilot program, present preliminary outcome data on clinical and process variables across telepsychology and traditional in-person delivery methods, and offer practical recommendations for agencies (correctional and beyond) looking to develop similar therapeutic initiatives. Given the literature to date, we expected that the video-based modality would be at least comparable with treatment-as-usual delivered in-person, and that both groups would evidence improvements at the end of treatment. Telepsychological approaches, particularly those involving videoconferencing, have the potential to foster safer, more intensive, and arguably more humane interactions with treatment providers than what is typically afforded to administratively segregated inmates.

## Method

### Psychotherapy Intervention

Coping skills group (CSG; Gingerich & Mueser, 2005) is an evidence-based, group-formatted intervention that aims to improve the lives of individuals with significant problems related to their mental health functioning. CSG employs cognitive–behavioral strategies to teach participants more adaptive ways of dealing with everyday issues. To conduct CSG sessions in-person, segregated inmates are escorted to a multipurpose room on the cellblock where they meet with a Master's-level mental health provider (MHP). However, security restrictions and spacing capacity only allow for a maximum of two inmates per group when this method of service delivery is used.

To deliver CSG through videoconferencing (VC), up to six inmates can be seen on the video monitor simultaneously. While we recognize that the difference in group size across modalities could be seen as a confound, we would argue that the ability to accommodate more inmates in the group is an inherent benefit to using telepsychology in this setting. Not only is it more efficient to treat a larger number of inmates at one time, but the VC modality also offers participants greater opportunities to practice interpersonal skills and relate to others with similar experiences. In this way, the VC condition is more similar to conventional group psychotherapy approaches than the two-inmate, in-person condition. Further, it should be noted that none of the VC groups exceeded four participants, even though the maximum occupancy was six.

For security purposes, inmates receiving VC treatment are individually escorted to separate multipurpose rooms where they were restricted from physical contact with other group members and the MHP. A Polycom camera and monitor system (protected by transparent Plexiglas) is placed in these rooms to allow group members to view and communicate with each other, as well as the MHP facilitator. The MHP tunes into each group session via a Polycom video-monitoring system located within the on-site mental health department.

On average, participants in both conditions received weekly 1-hr group sessions over the course of 6 weeks. It should also be noted that, although the implementation procedures for CSG initially intended for MHPs to conduct groups through both modalities during the same timeframe so as to reduce potential confounds related to provider characteristics, this was not possible because of staffing limitations. For example, at the time of the telepsychology initiative, other programmatic changes to KDOC policies were taking place, which meant that some providers were assigned to facilitate other types of mental health interventions within the prison. The reallocation of staff also limited the number of segregated inmates who could participate in CSG.

### Program Participants

Inmates recruited for treatment were held in individual cells (with no cellmates) located within one of the three administrative segregation units at the KDOC facility. All evaluation procedures were approved by the Institutional Review Board (IRB) for the Protection of Human Subjects at Texas Tech University (TTU), as well as the research department affiliated with KDOC. Although inmates were initially preselected for treatment by KDOC mental health department staff, the voluntary nature of their participation was explained prior to obtaining informed consent. It was further emphasized that no compensation or external incentives would be provided to program volunteers and that, conversely, no sanctions would be implemented should they refuse participation upfront or choose to withdraw during the course of treatment. Inmates were excluded from the study if they: (a) were sentenced to death, (b) were unable to understand the English language, (c) declined to provide written informed consent, (d) lacked the capacity to pro-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

vide voluntarily consent, or (e) declined to participate in at least one session of the intervention.

In addition to the two treatment conditions, data was also collected on a no-treatment control group. Program data was collected on a total of 49 all-male inmate participants (VC = 24; in-person = 12; no-treatment control = 13). The majority of inmates identified as White (44.9 ), had a mean age of 29.8 ($S$ = 8.2) years with 11.4 ($S$ = 1.4) years of formal education, were diagnosed with a primary substance-use (38.8 ) or mood-related disorder (26.5 ), and had spent an average of 5.2 ($S$ = 1.8) years in prison on their current conviction(s). Time spent in special management housing ranged from less than 1 year to 11.4 years, with an average of 1.3 ($S$ = 1.8) years.

True random assignment to the three study conditions was not feasible due to unexpected logistical and security constraints. For example, the KDOC facility experienced technical difficulties after installing the Polycom videoconferencing system that rendered it unavailable for use. To avoid delays in treatment provision and data collection, a majority of inmates in the first cohort either received treatment in-person or were not assigned to a group. To create more equal sample sizes across the conditions, a larger proportion of participants in the second cohort were assigned to the video modality than the in-person modality. In other instances, pairs of inmates with a documented history of serious interpersonal conflict were not placed in the same treatment group, as this was seen as a potential barrier to the group's productivity and safety.

Despite nonrandom assignment, no statistically significant differences (using  < .05) were found across a number of demographic variables including: age, education level, ethnicity, offense type (i.e., violent vs. nonviolent), primary psychiatric diagnosis, active use of psychotropic medications, prior criminal justice involvement, current sentence length, time served in most recent special management placement, number of disciplinary infractions within the past year, number of sick calls (i.e., written requests for mental health services) placed within the past year, pretreatment assessment scores (including measures of mental health symptomology and criminal thinking styles; see below), and number of treatment sessions completed.

## ata  o ection Proced  res

Inmate data was collected from the KDOC electronic records database, as well as inmates' self-report. In addition to demographic information, data on the frequency of inmate disciplinary infractions and mental health-related sick call requests was obtained from the KDOC database. The following self-report measures were selected to assess outcomes related to the CSG program and were administered at pre- and posttreatment: (a) the Symptom Checklist 90-Revised (SCL90-R; Derogatis, 1994); (b) the Psychological Screening Inventory of Criminal Thinking Styles (PICTS; Walters, 2013); and (c) the Measure of Criminogenic Thinking Styles (MOCTS; Mandracchia & Morgan, 2011). To examine process-related outcomes, inmates were asked to complete the following measures at the conclusion of their treatment experience: (a) the Client Satisfaction  uestionnaire (CS -8; Larsen, Attkisson, Hargreaves, & Nguyen, 1979); (b) the Working Alliance Inventory (WAI; Horvath & Greenberg, 1989); and (c) the Intervention Group Environment Scale (I-GES; Wilson et al., 2008). Group process variables were not assessed at pretreatment

because participants were not yet exposed to the CSG program; any pretreatment ratings would likely have reflected some other interpersonal experience that was not of interest in the present study. Treatment completion status (i.e., whether or not the inmate was classified as a "completer" and, if not, the reason for his premature termination) was also included as a measure of group adherence.

**ymptom  hec  ist    evised** The SCL90-R is a 90-item self-report inventory that measures psychological symptoms and related distress along nine primary symptom dimensions (i.e., somatization, obsessive-compulsive, interpersonal sensitivity, depression, anxiety, hostility, phobic anxiety, paranoid ideation, and psychoticism). Additionally, the SCL90-R contains three summary, or global, scores (i.e., global severity index  GSI , positive symptom distress index  PSDI , and positive symptom total  PST ). The GSI represents a respondent's average score across the 90 items and is an indicator of overall level of functioning. The PSDI is a measure of intensity that is calculated by averaging all responses above zero. The PST is the total number of symptoms endorsed by the respondent. The SCL90-R has been used extensively in forensic and correctional settings to assess general psychological functioning (e.g., Davison & Taylor, 2001; Nelson, aylor, & Cook, 2004). For the present study, only the three summary index scores were included in the analyses. Cronbach's alpha (α) was calculated to determine the full-scale internal consistency of the SCL90-R, as all 90 items are used to compute the three indices of interest. Consistency for the pre- and posttreatment SCL90-R was excellent (α = .98 at both assessment time points).

**Psycho ogica  Inventory o   rimina   hin ing  ty es** The PICTS is an 80-item self-report questionnaire that measures eight thinking patterns (i.e., mollification, cutoff, entitlement, power orientation, sentimentality, superoptimism, cognitive indolence, and discontinuity) that are believed to be instrumental in maintaining a criminal lifestyle (Walters, 1995). In addition to calculating eight scales representing the thinking types proposed by Walters, the PICTS also generates a global measure of the presence or absence of criminal thinking (general criminal thinking), four content scales (proactive, reactive, current, and historical criminal thinking), and five factor and special scales (problem avoidance, interpersonal hostility, self-assertion, denial of harm, and the fear of change). Proactive criminal thinking is a measure of goal-directed, deliberate, and organized forms of aggression or criminal behavior, whereas reactive criminal thinking is a measure of spontaneous, impulsive, and reactionary forms of aggression or criminal behavior. Similar to the SCL90-R, the present study only examined changes across aggregate measures of criminal thinking (i.e., general, proactive, reactive, current, and historical). All five subscales of the PICTS used in this study evidenced good to excellent internal consistency at pre- and posttreatment (α ranging between .80 and .95).

**he Meas re o   riminogenic  hin ing  ty es** The MOCTS is a 70-item self-report inventory that was developed based on common theories of criminal (i.e.,  ochelson and Samenow's thinking errors, Walter's thinking patterns) and noncriminal (i.e., Ellis's irrational beliefs, Beck's automatic thoughts) cognitive styles. It is designed to assess a broader range of dysfunctional thought processes prevalent in offender populations that may be associated with antisocial attitudes and behaviors. The MOCTS measures three cognitive factors: (a) control; (b) cognitive immaturity (i.e.,

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

overreliance on underdeveloped cognitive shortcuts such as self-pity and judging); and (c) egocentrism. In the present study, internal consistency of the three MOCTS subscales at each time point ranged from good to excellent (α between .80 and .95).

**The Client Satisfaction Questionnaire.** The CSQ-8 is an eight-item measure that assesses overall client satisfaction with mental health services—in this case, the CSG intervention. The developing authors reported high internal consistency (Larsen et al., 1979), and factor analyses have consistently yielded only one factor (e.g., Nguyen, Attkisson, & Stegner, 1983). This measure has also been administered in previous treatment outcome studies examining VC modalities (Bishop, O'Reilly, Maddox, & Hutchinson, 2002), including those with correctional populations (Morgan et al., 2008). Internal consistency of the CSQ-8 in the present evaluation was excellent (Cronbach's alpha = .95).

**The Working Alliance Inventory.** The WAI is a 36-item questionnaire that contains three subscales targeting different aspects of the therapeutic alliance: (a) client and therapist agreement on the goals of therapy (Goal); (b) agreement on how to reach those goals (Task); and (c) the degree of confidence and acceptance between client and therapist (Bond). The developing authors reported good internal consistency for the global score (Total), as well as the three subscales (Horvath & Greenberg, 1989). The instrument was also reliably correlated with other measures of therapist and client outcomes (Horvath & Greenberg, 1989). Only the client version was used in the present study. Internal consistency for the three WAI subscales was excellent (α ranged from .91 to .96).

**The Group Environment Scale—Intervention Version.** The I-GES is 25-item measure designed to assess features of the treatment group that may impact its effectiveness. The I-GES is a clinically driven modification of the Group Environment Scale created by Moos (1986). Subscales of the I-GES include: (a) cohesiveness, (b) implementation and preparedness, and (c) counterproductive activity. The original validation study showed statistically robust evidence of internal consistency (α ranging from .80 to .92) and construct validity (examined by comparing I-GES scores to other pertinent group process variables; Wilson et al., 2008). For the current study, internal consistency among the three I-GES subscales was good to excellent (α ranged from .77 to .91).

**Testing for (Non) Significance**

Because this study attempted, in part, to "accept" several null hypotheses, modifications to standard significance testing were warranted. There are theoretical problems that arise when attempting to prove a null hypothesis (Kluger & Tikochinsky, 2001). That is, researchers can only fail to reject a null hypothesis because the absence of evidence cannot be assumed to be evidence of absence (Jaykaran, Saxena, Yadav, & Kantharia, 2011). Consequently, research designs that seek to accept null hypotheses are often viewed as controversial. Some have argued, however, that this view is inconsistent with current practice (Cortina & Folger, 1998; Frick, 1995). Frick (1995) suggests that the null hypothesis can be accepted if: (a) the null is plausible, (b) results are consistent with the null, and (c) a "good [methodological] effort" is made to find an effect (p. 137). Frick specified that one way to achieve good effort is to use a more liberal criterion for rejecting the null hypothesis. The use of a less-restrictive critical $p$ value is appro-

priate for study designs such as this because it reduces the likelihood of a Type II error (Stevens, 1996).

Accordingly, a more rigorous, twofold criterion for accepting the null hypothesis was adopted for this study. Specifically, this criteria involved a critical $p > .20$ with effect sizes below the conventional small threshold (e.g., $d < .20$,[1] $\eta_p^2 < .01$; Cohen, 1992). Conversely, in concluding that the alternative hypothesis was instead supported, the traditional alpha level of $p < .05$ with medium to large effect sizes (e.g., $d \geq .50$; Cohen, 1992) was applied. This approach takes null hypothesis testing to a more confirmatory level than what was previously relied on in other similar studies comparing VC and in-person treatment delivery (e.g., Frueh et al., 2007; Greene et al., 2010; Morgan et al., 2008).

**Results**

**Treatment Outcome Variables**

After adjusting for deviations in normality and variance, a series of 2 × 3 mixed factorial multivariate analyses of variance (MANOVA) was performed to examine differences on the SCL90-R, PICTS, and MOCTS across conditions (telepsychology, in-person, no-treatment control). The respective subscales of each measure served as the combined dependent variable for each analysis. Pillai's Trace criterion was used as the test statistic because it is a more robust measure of group equivalence. Pillai's Trace is recommended when there are deviations in the assumption of homogeneity of covariances and/or study conditions contain unequal sample sizes (Tabachnick & Fidell, 2007), as was the case in the current analyses. All three MANOVAs failed to reveal statistically significant multivariate interactions of time and condition for the combined dependent variables (SCL90-R: Pillai's Trace = .02, $F(2, 44)$ = .38, $p$ = .69, $\eta_p^2$ = .02; PICTS: Pillai's Trace = .00, $F(2, 38)$ = .01, $p$ = .99, $\eta_p^2$ = .00; MOCTS: Pillai's Trace = .01, $F(2, 45)$ = .02, $p$ = .97, $\eta_p^2$ = .00). Post hoc group comparisons were likewise nonsignificant ($p$ values ranged from .10 to >.99) with low associated effect size estimates. Thus, while the VC and in-person groups appear to be relatively comparable, inmates who participated in CSG regardless of modality did not show improvements when compared with non-CSG inmates. These findings suggest that the intervention of choice was not particularly effective in targeting mental health functioning or criminal thinking among segregated inmates. Means and standard deviations for the SCL90-R, PICTS, and MOCTS are reported in Table 1. Similarly, Kruskal-Wallis tests (a nonparametric equivalent to a univariate analysis of variance [ANOVA]) examining the frequency of disciplinary infractions and mental health-related sick call requests placed since the preassessment failed to reveal statistically significant differences across the three groups ($p$ = .69 and .64, respectively), with all inmates showing low occurrences of each outcome.

---

[1] Because the sample sizes across video and in-person modalities were unequal, Hedges' $g$ was used as the effect size estimate instead of Cohen's $d$. Hedges' $g$ is a similar calculation, but adjusts the pooled standard deviation with appropriate weights for the sample sizes. The magnitude of this effect is interpreted in the same manner as Cohen's $d$.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Table 1

*d    d d                    d*

| Measure | Condition | | |
|---|---|---|---|
| | Telepsych ( ) | In-Person ( ) | Control ( ) |
| Pre-SCL-90-R | — | — | — |
| Global Severity Index | 1.23 (.56) | 1.18 (.83) | 1.26 (.94) |
| Positive Symptom Distress Index | 2.10 (.55) | 2.01 (.53) | 2.00 (.66) |
| Positive Symptom Total | 51.25 (19.35) | 48.70 (29.19) | 51.85 (25.44) |
| Post-SCL90-R | | | |
| Global Severity Index | 1.24 (.69) | 1.01 (.80) | 1.11 (.85) |
| Positive Symptom Distress Index | 2.07 (.62) | 1.88 (.62) | 2.09 (.66) |
| Positive Symptom Total | 49.92 (21.70) | 44.80 (29.46) | 45.08 (26.69) |
| Pre-PICTS | | | |
| Current | 30.47 (8.19) | 29.03 (6.67) | 30.18 (11.93) |
| Historical | 27.99 (5.50) | 24.15 (7.66) | 26.25 (10.32) |
| Proactive | 66.67 (10.66) | 55.14 (11.76) | 65.61 (20.50) |
| Reactive | 56.20 (10.05) | 54.91 (12.57) | 57.91 (19.62) |
| General[a] | 123.37 (21.80) | 109.55 (18.67) | 119.89 (38.16) |
| General (log) | 2.09 (.08) | 2.04 (.076) | 2.06 (.14) |
| Post-PICTS | | | |
| Current | 29.29 (8.86) | 23.11 (8.78) | 26.30 (10.15) |
| Historical | 24.95 (6.34) | 24.00 (7.79) | 25.00 (9.43) |
| Proactive | 58.89 (12.52) | 56.33 (21.79) | 61.45 (17.99) |
| Reactive | 54.19 (13.91) | 44.46 (13.37) | 44.56 (13.37) |
| General[a] | 113.85 (23.67) | 97.91 (29.81) | 114.44 (32.29) |
| General (log) | 2.05 (.09) | 1.98 (.12) | 2.05 (.12) |
| Pre-MOCTS | | | |
| Control | 65.46 (11.53) | 56.67 (15.46) | 61.58 (13.15) |
| Cognitive immaturity | 82.84 (19.09) | 71.17 (25.11) | 87.00 (27.28) |
| Ego | 42.32 (6.41) | 41.08 (6.36) | 41.75 (7.61) |
| Post-MOCTS | | | |
| Control | 61.56 (12.65) | 54.15 (13.32) | 60.08 (11.83) |
| Cognitive immaturity | 77.29 (17.04) | 61.25 (19.67) | 77.75 (27.12) |
| Ego | 40.76 (5.68) | 41.25 (7.81) | 41.25 (8.64) |

SCL90-R = Symptom Checklist 90-Revised; PICTS = Psychological Inventory of Criminal Thinking Styles; MOCTS = Measure of Criminogenic Thinking Styles. [a] Values reported are based on nontransformed data.

## Group Process Variables

Because inmates in the no-treatment control condition were not exposed to CSG, only the VC and in-person treatment conditions ($n = 34$) were compared on group process outcomes. There were no statistically significant differences between VC and in-person conditions with regard to treatment completion status (i.e., successfully completed = 82.6% vs. 72.7%, respectively; kicked out for disciplinary reasons = 4.3% vs. 9.1%, respectively; voluntarily withdrew = 13.0% vs. 18.2%, respectively), $\chi^2(2) = 0.51$, $p = .77$, $\phi = .12$.

Results of a one-way univariate ANOVA procedure showed no statistically significant differences at the 0.05 level across treatment conditions on service satisfaction as measured by the CSQ-8, $F(1, 34) = 3.13$, $p = .09$. However, the alpha level can be said to be approaching significance. Further, the magnitude of this effect was in the medium to large range (Hedge's $g = 0.65$; 95% CI [−0.04, 1.34]). An examination of means indicated that participants who received treatment via telepsychology were generally less satisfied overall ($M = 21.43$, $SD = 5.23$) than participants who received treatment in-person ($M = 25.09$, $SD = 6.46$).

Separate one-way MANOVA procedures were conducted on the WAI and I-GES, again using their respective subscales serving as

the combined dependent variables. Results for the WAI failed to reveal a statistically significant multivariate effect of condition, Pillai's Trace = .16, $F(3, 30) = 1.9$, $p = .15$. The between-subjects effect of condition was also nonsignificant for the bond and goal subscales though these findings trended toward significance with medium to large accompanying effect sizes, bond: $F(1, 32) = 4.08$, $p = .05$, $g = 0.75$ (95% CI [0.05, 1.45]); goal: $F(1, 32) = 3.50$, $p = .07$, $g = 0.66$ (95% CI [−0.03, 1.36]). The task subscale, however, did reach statistical significance and the associated effect size estimate was large, $F(1, 32) = 5.57$, $p = .03$, $g = 0.84$ (95% CI [0.13, 1.54]). An examination of means showed that participants who received treatment via telepsychology were less trusting and accepting of their MHP facilitator, and agreed less on the tasks and goals related to the CSG intervention than participants who received treatment in-person. Means and standard deviations for the WAI subscales are presented in Table 2.

Results for the I-GES also revealed no statistically significant multivariate effect of condition on the combined dependent variable, Pillai's Trace = .10, $F(3, 30) = 1.11$, $p = .36$. The between-subjects effect of condition on each of the three subscales was also not statistically significant; however, all effect size estimates were in the medium range, Co: $F(1, 32) = 2.16$, $p = .15$, $g = 0.52$ (95%

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

288                                                                                             BATASTINI AND MORGAN

Table 2

| | Condition | |
| --- | --- | --- |
| | Telepsych | In-Person |
| Measure | ( ) | ( ) |
| WAI total score | 178.91 (38.84) | 212.10 (36.46) |
| Task[a] | 63.16 (14.45) | 76.17 (8.73) |
| Task ($\sqrt{\ }$) | 2.75 (2.19) | 4.53 (1.74) |
| Bond | 55.23 (12.40) | 65.84 (17.86) |
| Goal | 60.52 (14.68) | 70.09 (12.22) |
| I-GES total score | 18.78 (5.34) | 22.18 (4.50) |
| Cohesiveness | 5.43 (2.76) | 6.82 (2.09) |
| Implementation and preparedness | 8.78 (2.32) | 9.91 (1.81) |
| Counterproductive activity | 4.57 (1.67) | 5.45 (1.51) |

WAI = Working Alliance Inventory; I-GES = Group Environment Scale, Intervention Version.
[a] Values reported are based on nontransformed data.

CI [−0.17, 1.21]); IP: $F(1, 32) = 2.00$, $p = .17$, $g = 0.50$ (95  CI [−0.19, 1.19]); CA: $F(1, 32) = 2.23$, $p = .15$, $g = 0.53$ (95  CI [−0.16, 1.22]). re An examination of means suggested that participants who received treatment via telepsychology felt less cohesiveness within the group, perceived the intervention as less organized and the facilitator as less prepared, and experienced more counterproductive activity in the group than those receiving treatment in-person. Means and standard deviations by I-GES subscale are also reported in Table 2.

### iscussion

The current evaluation sought to describe a novel telepsychology initiative specifically for segregated inmates—a high-risk, high-needs subgroup of inmates who are often restricted from adequate treatments due to security and confidentiality concerns (Metzner & Fellner, 2010). In addition, preliminarily data on treatment outcome and process related variables were reported. This evaluation represents the first attempt to compare VC and in-person modalities in the delivery of group treatment for an inmate population. Overall, the CSG intervention was not associated with meaningful improvements in psychological functioning or reductions in criminal thinking. However, there were some noteworthy group differences across measures of therapeutic process. Although the designated treatment modality did not appear to impact whether or not inmates successfully completed the CSG program, most other comparisons at least trended toward statistical significance. Furthermore, and arguably more revealing, were the associated magnitudes of the effect size estimates. For measures of treatment satisfaction, working alliance, and group-specific processes, all effect size estimates fell within the medium to large range as described by Cohen (1992). From these findings, it appears that participants who received in-person sessions had a more favorable treatment experience than those who received VC sessions, even though this did not impact their willingness or ability to complete treatment.

The results of this pilot program are consistent with previous research suggesting that telehealth-based interventions are often perceived as somewhat less favorable than traditional in-person

interventions (e.g., Greene et al., 2010). However, it is worth noting that overall attitudes reported by participants in this study were higher than what was found in previous research with inmate populations (i.e., Morgan et al., 2008). Further, the extent to which this discrepancy was clinically meaningful remains questionable because the intervention itself did not produce measurable changes regardless of modality. Even though prior research (Frueh et al., 2007; Greene et al., 2010) has suggested that telepsychological approaches can yield positive therapeutic outcomes even when client ratings of some process elements (e.g., working alliance) are lower than ratings for in-person, it remains relevant to consider how this relationship might apply to an inmate population. For example, special management inmates may be especially resistant to services not provided in the traditional in-person format because of their already limited social contact; that is, they may be less motivated to engage in treatment when the expectation of in-person treatment is denied. Accordingly, additional time at the beginning of treatment to explain the process (e.g., how the technology works, why it is being used) and methods of interacting/communicating that will increase interpersonal effectiveness (e.g., where to look into the camera so as to maintain eye contact) may help ease any frustrations or misunderstanding.

### imitations of Current  rogram Evaluation

Observed findings of both the treatment outcome and therapeutic process comparisons were likely impacted by several limitations. The most concerning was the achieved sample size. Despite statistical efforts to account for both small and unequal sample sizes across conditions, the precision of results reported here, as well as the stability of any conclusions drawn from them, are nonetheless reduced. A second problem was the lack of random assignment. Therefore, causal effects (or lack thereof) could have been confounded by other extraneous variables that were not measured in this evaluation. For example, differences in inmates' perceptions of the treatment may have been influenced by preexisting characteristics (e.g., general attitudes toward treatment or the specific facilitator, readiness for change, insight into current problems) that were unrelated to the modality itself. Additionally, even though group equivalency was tested across several potentially confounding demographic variables, the achieved sample size may again have limited the ability to detect true differences. Related to the issue of nonequivalence, the larger number of inmates permitted in the video format (despite being a possible advantage compared with the two-inmate, in-person format) could have further muddied the results.

Similar to the issue of nonrandom participant assignment was the manner in which group facilitators were assigned to each treatment condition. Due to limited staff availability, MHP's could not facilitate both an in-person and a videoconferencing group. Thus, any group differences that existed could be attributed to therapist characteristics (e.g., fatigue/burnout, attitudes toward participants or the program, treatment adherence, other personality factors) rather than the treatment modality. Furthermore, technological complications (e.g., delays in setting up the VC equipment that prolonged the start of treatment) may have caused negative reactions among inmates that influenced their perceptions of the overall treatment experience. Therefore, lower ratings of satisfaction, alliance, and group cohesion among telepsychology partici-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

pants may be better explained by frustration and disorganization associated with its implementation rather than the virtual nature of service delivery.

With regard to the selected intervention, CSG was not specifically designed to target criminal thinking errors or severe psychopathology in a population of high-risk segregated male inmates. Although coping skills interventions (i.e., those that teach patients techniques for managing stress and/or dealing with persistent mental illness) are generally found to be effective in reducing symptom severity (Mueser et al., 2002), it is likely that segregated inmates with mental health problems present with unique issues that need to be incorporated into the treatment design. Thus, it appears that the first step is to develop a program tailored not only to their complex psychological and behavioral needs, but also to their unique prison environment. For example, inmates detained in segregation units are largely isolated from other peers and have limited access to activities. It could be beneficial for a treatment program to teach coping skills geared toward alleviating these concerns (e.g., techniques to reduce sensory deprivation, encouraged use of all offered recreation time and creative outlets). Segregated inmates also have higher rates of suicidal and self-injurious behavior (Kaba et al., 2014; S nchez, 2013), passive-aggressive response styles, and personality diagnoses (e.g., borderline; O'Keefe, 2008) than those in the general prison population. As such, it is important for treatment to focus on reducing the risk of self-injury, as well as improving interpersonal skills and distress tolerance. Lastly, the effectiveness of interventions with any offender population is enhanced when known predictors of antisocial behavior (e.g., criminal thinking) are explicitly targeted (Andrews & Bonta, 2010; Gendreau & Goggin, 2013; Morgan, Kroner, Mills, & Batastini, 2013). Establishing a program that works with this subpopulation in a traditional in-person format will lend itself to a more clinically meaningful comparison with a nontraditional telepsychology format. Largely as a result of the KDOC initiative, one such program (Escaping the Cage; Batastini, Morgan, Kroner, & Mills, 2014) was recently developed and is currently undergoing pilot investigation. Escaping the Cage is intended to address issues specific to segregated inmates as outlined above and to accommodate the high-security institutional restrictions of this setting.

**essons earne Recommen ations for olicy ractice an Research**

Although the expected benefits of telepsychology, such as lower costs, easier access to services, and increased institutional safety are of substantial interest to correctional systems (Ax et al., 2007), it is possible that these benefits may not outweigh potential costs, such as loss of therapeutic connectedness and possibly poorer treatment outcomes as a result. However, in the context of its limitations and evidence from other available research (see Batastini, King, Morgan, & McDaniel, 2015), we do not conclude that this evaluation should be used to support the discontinued application of telepsychology as a treatment modality in correctional practice, especially when in-person treatments are less available, or are more difficult to implement (e.g., group therapy for high-risk segregated inmates).

Given the lack of clarity regarding the implementation of telepsychology, we offer a number of recommendations for any agency or organization, including correctional facilities, planning to initiate such a program. It should be noted that these recommendations are subject to change as new evidence on the effectiveness of telepsychology emerges. First, consideration should be given to the risks and benefits within the context of the agency's needs (e.g., safety, rehabilitation goals, allocation of staff) and logistical constraints. Doing so will likely prevent resources from being wasted on programs that cannot be systematically or effectively conducted. For example, prisons with more financial freedom may be better off making other institutional changes (e.g., hiring more staff, designating structured therapeutic housing blocks for severely mentally ill inmates) to facilitate greater access to in-person treatment rather than attempting to install video-monitoring equipment that may or may not be as effective. Second, mental health providers are advised to consider other factors that could impact the usefulness of a VC intervention. That is, will the intended intervention translate successfully from in-person to video  If not, can adaptations be made without compromising the integrity of the intervention

As indicated above, there were some technological problems in the current study that, if prevented, may have led to more positive experiences in treatment. Thus, we recommend that agencies electing to implement a telepsychology program first establish systematic guidelines for its use, and then adequately train all staff on policies and strategies for troubleshooting technical difficulties as well as dealing with client-related emergencies. As previously suggested, providing clients with a thorough explanation of the equipment and/or a tailored informed consent form may reduce anxiety about the process. In addition, clients should be screened for their appropriateness to participate in a telepsychology intervention. For example, clients who express extreme discomfort with technology or who have acutely psychotic thoughts involving technology may not be suitable for this type of programming.

Lastly, it is important for agencies, research consultants, and mainline staff to spend time establishing a working partnership (Apa et al., 2012). Achieving buy-in from all key personnel and stakeholders will likely create a sense of excitement about and commitment to the program that may improve compliance with implementation and evaluation. In turn, it is expected that provider adherence to established protocols will foster a more positive and productive therapeutic experience. Telepsychology programs, like any other intervention or policy, should be continually monitored using the highest level of scientific rigor possible. This would include, but is not limited to, recruiting an adequate sample size, using a randomized control design, eliminating confounds related to provider characteristics, conducting integrity checks for quality assurance, and assessing maintenance of treatment gains over longer follow-up periods. Additionally, future process evaluations should consider measuring other potentially relevant variables such as provider satisfaction, frequency of and response to in-session technological difficulties (e.g., loss of connection), clinician experience with videoconferencing programs, and attitudes specific to the service delivery modality (e.g., perceptions about ease of use, audio/visual quality, comfort level with equipment). Cost-benefit analyses may also be of interest to agencies and their stakeholders. The failure to achieve desired psychological, behav-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

ioral, or financial markers would suggest the need for programmatic adjustments.

## Conclusion

Although this process evaluation provided some evidence that telepsychology is less preferable than in-person services, the degree to which this preference impacts treatment progress is unknown. In addition, given the noted limitations, it is more likely that these differences were related to problems in treatment delivery rather than the delivery method itself. The rapid expansion of telepsychology (Norcross et al., 2013) within the mental health profession suggests that this modality is unlikely to fall out of demand in the foreseeable future. Therefore, to improve its effectiveness and better justify its use, policymakers, researchers, and clinicians should collaboratively strive to understand the nuances of technology-based interventions across clinical populations and settings—perhaps with the greatest urgency toward those most likely to be at the forefront of this expansion.

## References

American Psychological Association. (2013). *d        p        p        g*. Retrieved from http://www.apapracticecentral.org/ce/guidelines/telepsychology-guidelines.pdf

Andrews, D. A., & Bonta, J. (2010). *d        g        d* (5th ed.). New Providence, NJ: Matthew Bender & Company Inc.

Apa, .L., Bai, R., Mukherjee, D. V., Herzig, C. T. A., Koenigsmann, C., Lowy, F. D., & Larson, E. L. (2012). Challenges and strategies for research in prisons. *g        467        472.* http://dx.doi.org/10.1111/j.1525-1446.2012.01027.x

Ashker v. Governor of California, No. C 09 5796 (N. D. Cal. June 2, 2014).

Ax, R. K., Fagan, T. J., Magaletta, P. R., Morgan, R. D., Nussbaum, D., & White, T. W. (2007). Innovations in correctional assessment and treatment. *d        893        905.* http://dx.doi.org/10.1177/0093854807301555

Batastini, A. B., King, C. M., Morgan, R. D., & McDaniel, B. (2016). Telepsychological services with criminal justice and substance abusing clients: A systematic review and meta-analysis. *g        20        30.*

Batastini, A. B., McDonald, B., & Morgan, R. D. (2013). Videoteleconferencing in forensic and correctional practice. In K. Myers & C. Turvey (Eds.), *d        d        d p* (pp. 251        271).Waltham, MA: Elsevier. http://dx.doi.org/10.1016/B978-0-12-416048-4.00013-0

Batastini, A. B., Morgan, R. D., Kroner, D. G., & Mills, J. F. (2014). *p        g        g        p g        d        d        g*. npublished manual.

Beaven, G. (2005). Offenders with mental illnesses in maximum and supermaximum security settings. In S. L. Charles & J. B. Gerbasi (Eds.), *d* (pp. 209        228).Arlington, VA: American Psychiatric Publishing, Inc.

Bishop, J. E., O'Reilly, R. L., Maddox, K., & Hutchinson, L. J. (2002). Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *d        d* 217        221.http://dx.doi.org/10.1258/135763302320272185

Brodey, B. B., Claypoole, K. H., Motto, J., Arias, R. G., & Goss, R. (2000). Satisfaction of forensic psychiatric patients with remote telepsychiatric evaluation. *1305        1307.* http://dx.doi.org/10.1176/appi.ps.51.10.1305

Cohen, J. (1992). A power primer. *g        155        159.* http://dx.doi.org/10.1037/0033-2909.112.1.155

Cortina, J. M., & Folger, R. G. (1998). When is it acceptable to accept a null hypothesis: No way, Jose *g        d* 334        350.http://dx.doi.org/10.1177/109442819813004

Davison, R. J. (2001). Psychological distress and severity of personality disorder symptomatology in prisoners convicted of violent and sexual offences. *g        263        273.* http://dx.doi.org/10.1080/10683160108401797

Derogatis, L. R. (1994). *p        g        d p        d* (3rd ed.). Minneapolis, MN: National Computer Systems.

Fine, S., & Wingrove, J. (2014, December 16). Retired Supreme Court justice Arbour slams practice of solitary confinement. *d*. Retrieved from http://www.theglobeandmail.com

Frick, R. W. (1995). Accepting the null hypothesis. *g        132        138.*http://dx.doi.org/10.3758/BF03210562

Frueh, B. C., Henderson, S., & Myrick, H. (2005). Telehealth service delivery for persons with alcoholism. *d        d        372        375.*

Frueh, B. C., Monnier, J., Yim, E., Grubaugh, A. L., Hamner, M. B., & Knapp, R. G. (2007). A randomized trial of telepsychiatry for post-traumatic stress disorder. *d        d        142        147.*http://dx.doi.org/10.1258/135763307780677604

Gendreau, P., & Goggin, C. (2013). Practicing psychology in correctional settings. In I. B. Weiner & R. K. Otto (Eds.), *d        p        g* (4th ed., pp. 759        794). Hoboken, NJ: John Wiley & Sons, Inc.

Gingerich, S., & Mueser, K. (2005). *p g        g p        g d* (1st ed.). Plainview, NY: Wellness Reproductions and Publishing, Inc.

Greene, C. J., Morland, L. A., Macdonald, A., Frueh, B. C., Grubbs, K. M., & Rosen, C. S. (2010). How does tele-mental health affect group therapy process  Secondary analysis of a noninferiority trial. *d        g        g        746        750.* http://dx.doi.org/10.1037/a0020158

Horvath, A. O., & Greenberg, L. S. (1989). Development and validation of the Working Alliance Inventory. *g        g        223        233.*http://dx.doi.org/10.1037/0022-0167.36.2.223

Jaykaran, Saxena, D., Yadav, P., & Kantharia, N. D. (2011). Nonsignificant P values cannot prove null hypothesis: Absence of evidence is not evidence of absence. *d        d        465        466.* http://dx.doi.org/10.4103/0975-7406.84470

Kaba, F., Lewis, A., Glowa-Kollisch, S., Hadler, J., Lee, D., Alper, H., . . . Venters, H. (2014). Solitary confinement and risk of self-harm among jail inmates. *442        447.* http://dx.doi.org/10.2105/AJPH.2013.301742

King, R. D. (1999). The rise and rise of supermax. *d        163        186.*http://dx.doi.org/10.1177/1462474922227766

Kluger, A. N., & Tikochinsky, J. (2001). The error of accepting the "theoretical" null hypothesis: The rise, fall, and resurrection of commonsense hypotheses in psychology. *g        408        423.*

Larsen, D. L., Attkisson, C. C., Hargreaves, W. A., & Nguyen, T. D. (1979). Assessment of client/patient satisfaction: Development of a general scale. *d g        g        197        207.*http://dx.doi.org/10.1016/0149-7189(79)90094-6

Lexcen, F. J., Hawk, G. L., Herrick, S., & Blank, M. B. (2006).  se of video conferencing for psychiatric and forensic evaluations. *713        715.*http://dx.doi.org/10.1176/ps.2006.57.5.713

Magaletta, P. R., Fagan, T. J., & Peyrot, M. F. (2000). Telehealth in the federal bureau of prisons: Inmates' perceptions. *g        d        497        502.* http://dx.doi.org/10.1037/0735-7028.31.5.497

Mandracchia, J. T., & Morgan, R. D. (2011).  nderstanding criminals' thinking: Further examination of the measure of offender thinking

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

styles-revised. *    *    442  452.  http://dx.doi.org/10.1177/1073191110377595

Manguno-Mire, G. M., Thompson, J. W., Jr., Shore, J. H., Croy, C. D., Arteicona, J. F., & Pickering, J. W. (2007). The use of telemedicine to evaluate competency to stand trial: A preliminary randomized controlled study. *    d    d*    481  489.

Metzner, J., & Dvoskin, J. (2006). An overview of correctional psychiatry. *    *    761  772.http://dx.doi.org/10.1016/j.psc.2006.04.012

Metzner, J. L., & Fellner, J. (2010). Solitary confinement and mental illness in .S. prisons: A challenge for medical ethics. *    d    d*    104  108.

Miller, T. W., Clark, J., Veltkamp, L. J., Burton, D. C., & Swope, M. (2008). Teleconferencing model for forensic consultation, court testimony, and continuing education. *    *    301  313.http://dx.doi.org/10.1002/bsl.809

Moos, R. (1986). *    p    *    (2nd ed.). Palo Alto, CA: Consulting Psychologists Press.

Morgan, R. D., Gendreau, P., Smith, P., Gray, A., Labrecque, R. M., MacLean, N., . . . Mills, J. F. (2015). Quantitative syntheses on the effects of administrative segregation on prisoners' well-being. *    g    d    *. Manuscript under review.

Morgan, R. D., Kroner, D. G., Mills, J. F., & Batastini, A. B. (2013). Treating criminal offenders. In I. B. Weiner & R. K. Otto (Eds.), *    d    p    d*. (4th ed., pp. 795  838). Hoboken, NJ: John Wiley & Sons, Inc.

Morgan, R. D., Patrick, A. R., & Magaletta, P. R. (2008). Does the use of telemental health alter the treatment experience  Inmates' perceptions of telemental health versus face-to-face treatment modalities. *    g    d    g*    158  162.  http://dx.doi.org/10.1037/0022-006  .76.1.158

Morland, L. A., Hynes, A. K., Mackintosh, M. A., Resick, P. A., & Chard, K. M. (2011). Group cognitive processing therapy delivered to veterans via telehealth: A pilot cohort. *    *    465  469.  http://dx.doi.org/10.1002/jts.20661

Mueser, K. T., Corrigan, P. W., Hilton, D. W., Tanzman, B., Schaub, A., Gingerich, S., . . . Herz, M. I. (2002). Illness management and recovery: A review of the research. *    *    1272  1284.http://dx.doi.org/10.1176/appi.ps.53.10.1272

National Institute of Justice. (2002, May). *    p    g    d    *. Retrieved February 2, 2011 from www.ncjrs.gov/pdffiles1/nij/190310.pdf

Nelson, E. L., aylor, C., & Cook, D. (2004). A comparison of psychiatrist evaluation and patient symptom report in a jail telepsychiatry clinic. *    d    d*    S-54  S-59.  http://dx.doi.org/10.1089/tmj.2004.10.S-54

Nguyen, T. D., Attkisson, C. C., & Stegner, B. L. (1983). Assessment of patient satisfaction: Development and refinement of a service evaluation questionnaire. *    d    g    g*    299  313.http://dx.doi.org/10.1016/0149-7189(83)90010-1

Norcross, J. C., Pfund, R. A., & Prochaska, J. O. (2013). Psychotherapy in 2022: A Delphi poll on its future. *    g    d*    363  370.http://dx.doi.org/10.1037/a0034633

O'Keefe, M. (2008). Administrative segregation from within: A corrections perspective. *    *    123  143.http://dx.doi.org/10.1177/0032885507310999

Rosenbaum, A., Gearan, P. J., & Ondovic, C. (2002). Completion and recidivism among court- and self-referred batterers in a psychoeducational group treatment program: Implications for intervention and public policy. *    gg    *    199  220.http://dx.doi.org/10.1300/J146v05n02  12

S nchez, H. G. (2013). Suicide prevention in administrative segregation units: What is missing *    *    93  100.  http://dx.doi.org/10.1177/1078345812474638

Silverstein v. Federal Bureau of Prisons, No. 12 1450 (10th Cir. March 22, 2014).

Stephan, J. J. (2008). *    d    d*    2005 (NCJ 222182). Retrieved from http://www.bjs.gov/content/pub/pdf/csfcf05.pdf

Stevens, J. (1996). *    pp    d    *    (3rd ed.). Mahwah, NJ: Erlbaum, Inc.

Tabachnick, B. G., & Fidell, L. S. (2007). *    g    *    (5th ed.). Boston, MA: Pearson Education, Inc.

Walters, G. D. (1995). The psychological inventory of criminal thinking styles (PICTS), Part I: Reliability and preliminary validity. *    d    *    307  325.  http://dx.doi.org/10.1177/0093854895022003008

Walters, G. D. (2013). *    p    g    g    *. Allentown, PA: Center for Lifestyle Studies.

Wilson, P. A., Hansen, N. B., Tarakeshwar, N., Neufeld, S., Kochman, A., & Sikkema, K. J. (2008). Scale development of a measure to assess community-based and clinical intervention group environments. *    g    *    271  288.http://dx.doi.org/10.1002/jcop.20193

Wolff, N., Huening, J., Shi, J., Frueh, C. B., Hoover, D. R., & McHugo, G. (2015). Implementation and effectiveness of integrated trauma and addiction treatment for incarcerated men. *    d    *    66  80.  http://dx.doi.org/10.1016/j.janxdis.2014.10.009

aylor, C., Nelson, E. L., & Cook, D. J. (2001). Clinical outcomes in a prison telepsychiatry clinic. *    d    d*    47  49.  http://dx.doi.org/10.1177/1357633  010070S119

Received September 18, 2015
Revision received January 14, 2016
Accepted January 20, 2016 ∎

# Satisfaction of Forensic Psychiatric Patients With Remote Telepsychiatric Evaluation

**Benjamin B. Brodey, M.D., M.P.H.**
**Keith H. Claypoole, Ph.D.**
**Jeffrey Motto, R.N., M.A.**
**Robert G. Arias, Ph.D.**
**Richard Goss, M.D., M.P.H.**

**The level of satisfaction with telepsychiatry evaluations was determined in a sample of 43 forensic psychiatric patient inmates in a large urban jail. A forensic psychiatrist interviewed 20 patients in person, the other 23 remotely via interactive video. Demographic characteristics, physical health status, and psychiatric symptom severity on the Global Severity Index of the Brief Symptom Inventory were comparable in the two groups. Patient satisfaction with the evaluations was moderately high for patients in both groups, with no significant differences between them. (*Psychiatric Services* 51:1305–1307, 2000)**

Accordingto a recent publication from the U.S. Department of Justice, more than 10 percent of the total prison population are mentally ill (1). Correctional facilities find it difficult either to arrange for clinicians to visit mentally ill inmates or to transport inmates for routine mental health care (2). Telepsychiatry—the use of telemedicine technology for delivering psychiatric services—potentially eliminates these obstacles.

Recent investigations have strongly supported telepsychiatry's efficiency, cost-effectiveness, and high diagnostic reliability (3–5). It offers a possible solution to the problem of the "grossly unequal geographic distribution of health care manpower and resources" (6). However, less is known about patients' perceptions of the telepsychiatric approach compared with traditional, in-person psychiatric consultations.

The primary objective of this study was to compare satisfaction levels of forensic psychiatric patients receiving remotely conducted psychiatric evaluations with those of forensic psychiatric patients receiving similar but in-person evaluations.

## Methods

The study was conducted during June, July, and August 1997 with 43 forensic psychiatric patient inmates from the general population of the King County Correctional Facility, a large urban jail in Seattle. The patients ranged in age from 20 to 57. Medications had not been prescribed for 12 patients (28 percent). Of those who were on medications, 15 (48 percent) were taking antidepressants, 12 (39 percent) mood stabilizers, seven (23 percent) antipsychotics, and four (13 percent) anxiolytics. Some patients were taking more than one medication.

On alternating weeks over a ten-week period, evaluations were performed either by remote interactive video or in person. Twenty patients participated in an in-person evaluation; the other 23 underwent a remote evaluation. The same psychiatrist interviewed all subjects to minimize variance between treatment conditions. One additional patient, who declined the remote evaluation, preferred to be evaluated in person; the results of this evaluation were excluded from the study.

The remote evaluations were conducted using a V-Tel work station running on a personal computer. This real-time interactive audio and video system was transmitted at 384 kilobytes per second. Patients viewed the evaluating psychiatrist on a 13-inch color monitor. At the remote hospital site, Virginia Mason Medical Center in Seattle, the evaluating psychiatrist viewed each patient on a 27-inch monitor with a picture-in-a-picture feature, which provided a full-body image of the patient.

As a measure of comparability of cases and severity of psychiatric symptomatology, the Brief Symptom Inventory was administered to each patient in written format before the evaluation. This survey instrument contains 53 psychiatric symptom–related questions rated on a scale of 0 to 4. From these scores, a Global Sever-

*Dr. Brodey is clinical assistant professor in the department of psychiatry and behavioral sciences and Dr. Goss is clinical assistant professor in the department of medicine at the University of Washington Medical School. Dr. Claypoole is with the University of Hawaii and the Hawaii Department of Health in Kuaii. Mr. Motto is telemedicine coordinator at the Virginia Mason Medical Center in Seattle. Dr. Arias is a postdoctoral fellow in neuropsychology in the department of behavioral medicine and psychiatry at West Virginia University School of Medicine. Address correspondences to Dr. Brodey at 4558 Fourth Avenue, N.E., Seattle, Washington 98105-4813 (e-mail, brodey @u.washington.edu).*

*Table 1*

Characteristics and satisfaction ratings of 43 forensic psychiatric patients evaluated by telepsychiatry or in-person interviews

| Characteristic or rating[1] | Telepsychiatry evaluation (N=23) | | In-person evaluation (N=20) | |
|---|---|---|---|---|
| | Mean | SD | Mean | SD |
| Age in years | 36.3 | 9.3 | 31.8 | 9.6 |
| Global Severity Index | 1 | .3 | .9 | .2 |
| General rating of physical health[2] | 3.3 | 1.2 | 2.8 | .9 |
| Satisfaction | | | | |
|   Time spent with evaluator | 3.4 | 1.3 | 3.4 | 1.1 |
|   Explanation of evaluation | 3.3 | 1.2 | 3.8 | 1.1 |
|   Technical skill of evaluator | 3.7 | 1.1 | 3.8 | 1.2 |
|   Interpersonal skill of evaluator | 3.9 | 1.2 | 3.8 | 1.2 |
|   Would recommend evaluator | | | | |
|     to others | 3.0 | .8 | 2.9 | .9 |
|   Overall satisfaction | 3.5 | 1.9 | 3.5 | 1.1 |

[1] No significant differences between the two groups were found.

[2] This item and the subsequent six satisfaction questions are based on the Health Outcomes Institute Treatment Satisfaction Rating Scale; ratings range from 1, poor, to 5, excellent.

ity Index (GSI), a measure that has demonstrated high reliability in classifying overall psychiatric symptom severity (7), was calculated.

Immediately after either a remote or an in-person evaluation, each subject completed a visit-specific patient satisfaction survey called the Group Health Association of America Consumer Satisfaction Survey (8). This structured outpatient questionnaire examines a subject's perception of the evaluator and overall satisfaction level with the evaluation. It includes one question rating general health.

Two-way analysis of variance was used to evaluate differences between the two groups in age, general physical health ratings, the GSI, and the scores on the six patient-acceptance and patient-satisfaction questions. Data were presented as means and standard deviations, and comparisons with a probability level of less than .05 were considered statistically significant.

## Results

As Table 1 shows, GSI scores, gender, age, and ratings of self-reported general physical health were all comparable for the two groups. The range of GSI scores was .67 to 1.47 for the remote group and .67 to 1.28 for the in-person group. Neither set of GSI scores contained outliers or indicated severe psychiatric symptoms. The mean GSI scores of the patients evaluated remotely (1.01±.26) and those evaluated in person (.93±.19) were comparable to published norms of the average psychiatric outpatient population (mean for males=1.15; mean for females=1.35) (7). Furthermore, they were well above the average GSI for nonpatients (mean for males =.18; mean for females =.24).

The two groups rated their overall level of satisfaction with the psychiatric evaluation nearly identically; ratings averaged midway between good and very good. The overall mean group differences in responses to the questions were uniformly less than .5 on a 1-to-5 scale. The in-person group tended to rate the psychiatrist's explanation as better than the remote group did, although the difference was not significant. The question "Would you recommend this evaluator to your family and friends?" received the lowest rating (least satisfaction) of all six satisfaction questions for both groups.

## Discussion

The results indicate that the remote interviews were generally acceptable to patients. Of the 24 patients asked to participate in the study, only one declined. This is important because patients were offered the remote interviews in the course of routine care without any incentives. They were told that they had the opportunity to receive an in-person interview if they did not wish to participate in the remote interview. It is possible that the novelty of being on television increased patient interest, but whether such feelings will have lasting effects on acceptability cannot be predicted.

Satisfaction rates did not differ significantly between the two types of evaluation. Compared with the in-person group, the group interviewed remotely tended to rate the psychiatrist's explanation of the evaluation somewhat lower, although the two groups showed no differences in their perception of the psychiatrist's professional or technical skill. Despite relatively high satisfaction scores, both groups indicated that they would not highly recommend the psychiatrist to a family member or friend. It is possible that this result is due to their status as incarcerated inmates.

An additional finding of the study is that despite the relatively slow transmission speed of the remote interviews, the interviewing psychiatrist felt comfortable with his ability to diagnose remotely. This result suggests that clinicians who gain expertise in telepsychiatry will be able to use the medium to diagnose patients effectively. It also suggests that the utility of telepsychiatry may be applicable to large groups of patients who are underserved by mental health specialists, particularly psychiatrists.

With the increasing size of the inmate population, including the large proportion of inmates with mental illness, our findings may help to support the integration of telepsychiatry into underserved jail and prison populations. Continued evaluation of the reliability and suitability of telepsychiatry in psychiatric evaluation is needed, along with a determination of the circumstances and populations in which it can be used most effectively without compromising the quality of psychiatric care.

The study results should be interpreted with caution. Although particular care was taken in maintaining a natural sample selection, it was not practically possible to obtain a perfectly randomized match between the two groups. The results may not be generalizable to other psychiatric inmate patient populations or to those who exhibit more severe psychiatric disturbances. ♦

## Acknowledgments

This project was made possible by the support of the King County Department of Health and the Virginia Mason Medical Center. The authors thank Wayne Katon, M.D., who provided advice on methodologic issues.

## References

1. Ditton P: Mental Health and Treatment of Inmates and Probationers. Edited by Dorsey T, Hester T. Washington, DC, Bureau of Justice Statistics, July 1999

2. Baer L, Cukor P, Coyle JT: Telepsychiatry: application of telemedicine to psychiatry, in Telemedicine: Theory and Practice. Edited by Bashshur RL, Sanders JH, Shannon GW. Springfield, Ill, Thomas, 1997

3. Ruskin PE, Reed S, Kumar R, et al: Reliability and acceptability of psychiatric diagnoses via telecommunication and audiovisual technology. Psychiatric Services 49:1086–1088, 1998

4. Baigent MF, Lloyd CJ, Kavanagh SJ, et al: Telepsychiatry: "tele" yes, but what about the "psychiatry"? Journal of Telemedicine and Telecare 3:3–5, 1997

5. Baer L, Cukor P, Jenike MA, et al: Pilot study of telemedicine for patients with obsessive-compulsive disorder. American Journal of Psychiatry 152:1383–1385, 1995

6. Preston J, Brown FW, Hartley B: Using telemedicine to improve health care in distant areas. Hospital and Community Psychiatry 43:25–32, 1992

7. Boulet J, Boss MW: Reliability and validity of the Brief Symptom Inventory. Psychological Assessment 3:433–437, 1991

8. Davies AR, Ware JE: GHAA Consumer Satisfaction Survey and User's Manual. Washington, DC, Group Health Association of America, 1991

9. Rubin HR, Gandek B, Rogers W, et al: Patients' ratings of outpatient visits in different practice settings. JAMA 270:835–840, 1993

10. Ware JE, Hays RD: Methods for measuring patient satisfaction. Medical Care 26:393–402, 1988

# World Journal of Psychiatry

Submit a Manuscript: http://www.wjgnet.com/esps/
Help Desk: http://www.wjgnet.com/esps/helpdesk.aspx
DOI: 10.5498/wjp.v5.i3.286

*World J Psychiatr* 2015 September 22; 5(3): 286-304
ISSN 2220-3206 (online)
© 2015 Baishideng Publishing Group Inc. All rights reserved.

*REVIEW*

# Usefulness of telepsychiatry: A critical evaluation of videoconferencing-based approaches

Subho Chakrabarti

Subho Chakrabarti, Department of Psychiatry, Postgraduate Institute of Medical Education and Research, Chandigarh 160012, India

Author contributions: Chakrabarti S solely contributed to this paper.

Conflict-of-interest statement: No conflict of interest.

Open-Access: This article is an open-access article which was selected by an in-house editor and fully peer-reviewed by external reviewers. It is distributed in accordance with the Creative Commons Attribution Non Commercial (CC BY-NC 4.0) license, which permits others to distribute, remix, adapt, build upon this work non-commercially, and license their derivative works on different terms, provided the original work is properly cited and the use is non-commercial. See: http://creativecommons.org/licenses/by-nc/4.0/

Correspondence to: Subho Chakrabarti, MD, MAMS, FRCPsych, Professor, Department of Psychiatry, Postgraduate Institute of Medical Education and Research, Sector 12, Chandigarh 160012, India. subhochd@yahoo.com
Telephone: +91-172-2756808
Fax: +91-172-2744401

Received: November 21, 2014
Peer-review started: December 1, 2014
First decision: January 8, 2015
Revised: May 7, 2015
Accepted: June 9, 2015
Article in press: June 11, 2015
Published online: September 22, 2015

## Abstract

Telepsychiatry, *i.e.*, the use of information and communication technologies to provide psychiatric services from a distance, has been around for more than half a century now. Research over this period has shown that videoconferencing-based telepsychiatry is an enabling and empowering form of service delivery, which promotes equality of access, and high levels of satisfaction among patients. The range of services offered by videoconferencing-based telepsychiatry, potential users and points of delivery of such services are theoretically limitless. Telepsychiatry has both clinical utility and non-clinical uses such as administrative, learning and research applications. A large body of accumulated evidence indicates that videoconferencing-based telepsychiatric assessments are reliable, and clinical outcomes of telepsychiatric interventions are comparable to conventional treatment among diverse patient populations, ages and diagnostic groups, and on a wide range of measures. However, on many aspects of effectiveness, the evidence base is still relatively limited and often compromised by methodological problems. The lack of cost-effectiveness data in particular, is a major hindrance, raising doubts about the continued viability of telepsychiatric services. Added to this are the vagaries of technology, negative views among clinicians, poor uptake by providers, and several legal, ethical and administrative barriers. These hamper the widespread implementation of telepsychiatry and its integration with routine care. Though further advances in technology and research are expected to solve many of these problems, the way forward would be to promote telepsychiatry as an adjunct to conventional care, and to develop hybrid models, which incorporate both traditional and telepsychiatric forms of mental health-care.

Key words: Videoconferencing; Telepsychiatry; Tele-mental-health; Assessment; Management; Reliability; Efficacy; Effectiveness; Outcome

© The Author(s) 2015. Published by Baishideng Publishing Group Inc. All rights reserved.

Core tip: Telepsychiatry refers to the use of information and communication technologies to provide psychiatric services from a distance. Evidence accumulated over six decades shows that videoconferencing-based telepsychiatry is an acceptable and feasible form of providing mental health-care. Additionally, videoconferencing-based assessments are reliable, and clinical outcomes



of telepsychiatric interventions are comparable to conventional treatment among diverse patient populations on several measures of outcome. However, problematic study-designs, uncertainty about cost-effectiveness, and poor uptake have hindered the progress of telepsychiatric services. Conducting further research to address these problems, and developing hybrid models incorporating traditional and telepsychiatric forms of care, would be the way forward.

Chakrabarti S. sefulness of telepsychiatry: A critical evaluation of videoconferencing-based approaches. *World J Psychiatr* 2015 5( ): 286- 04 Available from: R : http://www.w g-net.com/2220- 206/full/v5/i /286.htm D I: http://dx.doi. org/10.5498/w p.v5.i .286

## INTRODUCTION

Mental health surveys indicate that about a-fifth of the world population suffers from mental disorders, which require treatment[1]. Mental illnesses are not only a source of disability and great distress for those afflicted, but also impose a heavy burden on families of the mentally ill and the society. Despite their high prevalence and potentially disabling consequences, inadequate treatment of mental disorders is rife. Unavailability of accessible and affordable mental health-care is a major hindrance to obtaining treatment[1]. Moreover, treatment resources are not distributed uniformly; consequently, rural and geographically isolated areas remain largely underserved. Traditional systems of mental health-care delivery are not always able to meet the demands of people in these remote areas. Therefore, alternatives to the traditional modes of service delivery for mental health-care have been explored from time to time. One such alternative has been the use of information and communication technologies (ICTs) for delivering mental health care. Advancements in ICTs have been successfully utilized in the field of health-care over the last few decades. The most promising of these is the use of ICTs to deliver mental health-care from a distance, referred to as telepsychiatry. Telepsychiatry was originally conceived to enhance access of remote and rural populations to specialized mental health services. Over the last six decades or so, a growing body of evidence and increasing implementation has demonstrated telepsychiatry's ability to provide mental health services, which are accessible, wide-ranging and of high quality. However, concerns about the applicability and usefulness of this mode of service-delivery still remain. Despite being somewhat of a success story in developed countries, telepsychiatry is yet to make its mark in low- and middle- income countries of the developing world[2]. This is unfortunate because the need for such services is probably greater in these countries. This review seeks to evaluate the usefulness of telepsychiatry as a mode of service-

delivery based on the current evidence. In addition to the evidence for telepsychiatry's efficacy or effectiveness, the evolution of telepsychiatry, the terms used to describe this technology, the limitations of this form of service-delivery and its potential role in low- and middle-income countries have also been elaborated upon. The focus of this review is restricted to the utility of videoconferencing-based approaches in delivering mental health-care. Although other modes such as telephones or internet-based care, which form a part of the broader array of telemental health or e-health services, have been mentioned, these modalities have not been reviewed in detail. Finally, while considering the evidence, greater emphasis has been placed on randomized-controlled trials (RCTs), these being highest level of research-evidence on the usefulness of any treatment-modality.

## SEARCH STRATEGY

To review the evidence on telepsychiatry and videoconferencing, a comprehensive search of the following databases was undertaken: MEDLINE, PubMed, PsycINFO, EMBASE, Cochrane Database of Systematic Reviews, Cochrane Controlled Trial Registry, Database of Abstracts of Reviews of Effectiveness, and Google. Search terms included telepsychiatry, telemental health, telecare, telemedicine, e-health, videoconferencing, effectiveness, efficacy, access, outcomes, satisfaction, quality of care, and controlled trials. Articles extracted were of three main types: Reviews, guidelines and original research articles. All articles about videoconferencing were manually searched to locate cross-references relevant to the topic. Articles about other modes of telemental health were examined when they provided information relevant to the subject under review.

## THE EVOLUTION OF TELEPSYCHIATRY

Telepsychiatry is one of the oldest applications of telemedicine. The earliest documentation of telemedicine in psychiatry was from the University of Nebraska, where in 1956 a two-way closed-circuit television system was used for educational and medical purposes[3]. In 1961, videoconferencing was used to conduct adult group psychotherapy[4]. In 1973, the term telepsychiatry was first used by Dwyer[5] to describe consultation services provided from the Massachusetts General Hospital to a medical site in Boston. Shortly thereafter, telepsychiatry was used among children and adolescents, when a child guidance clinic in New York City was connected to the Mount Sinai School of Medicine[6]. Despite this initial success and subsequent reports of its usefulness and acceptance, telepsychiatry was used only sporadically in the 1960s and 1970s. Advances in technology in the late 1980s and early 1990s, which reduced equipment costs, coupled with increased funding from government agencies led to a

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

burgeoning of programmes in north-America, Europe and Australia[7-14]. Currently telepsychiatry is one of the most rapidly developing fields of telemedicine, and, after teleradiology, the most practiced form of telemedicine in the world[15]. Additionally, from the late 1990s there has been a proliferation of research interest in telepsychiatry, which is reflected in the growing number of reports and reviews of the subject in the past decade and a half. Initial research was focused on descriptions of programmes, and feasibility and acceptability of telepsychiatry[7-14]. This has been supplemented over the last decade by controlled trials on outcome, research on other issues such as cost-effectiveness, ethical and legal implications, and by several guidelines on telepsychiatry[7-14]. The emphasis of research on telepsychiatry has also undergone a subtle change of focus: earlier attempts to prove its usefulness are now being replaced by attempts to identify specific situations in which telepsychiatry might be useful, and by evaluation of the strengths and weaknesses of this method of service-provision[13,14].

## TERMS AND CONCEPTS USED

Although there are no universally agreed definitions of terms used to describe telepsychiatry, several partially overlapping labels and concepts have been used to refer to the entire spectrum of services, which are delivered remotely, that is from a distance and a separate location[7,8]. This lack of consistency in definitions may create difficulties in evaluation of the utility of telepsychiatry[16,17]. Hence, an attempt has been made here to provide clearer definitions of four commonly used terms including telepsychiatry, telemental health care, telemental health, and e-mental health. Three of these terms use the prefix "tele", which means at or over a distance, as in telegram, telephone, or television.

The oldest term used to describe this form of service-delivery is telepsychiatry[7,18]. It is derived from the definition of telemedicine, and is a specific term designating psychiatric applications of telemedicine[7,8,19]. The National Library of Medicine defines telemedicine as "the use of electronic communication and information technologies to provide or support clinical care at a distance"[19]. Accordingly, telepsychiatry has been defined as the "use of electronic communication and information technologies to provide or support clinical psychiatric care at a distance"[20,21]. Though this term is intended to include all modalities of communication such as telephone, fax, e-mail, the internet, still imaging, and live two-way audio-visual communication, in effect the term is often equated with the provision of psychiatric services via tele-communication systems, which enable two-way interactive "real-time" communication between patients and providers[20]. Consequently, telepsychiatry is almost synonymously used with videoconferencing, which is a common form of this service-modality[7,22]. Nevertheless, broader definitions of telepsychiatry have also been proposed, in which it is defined as the

"electronic transmission of psychiatric consultations, advice or services in digital form, from one location to another using a data communication link provided by a third party carrier, or carriers, (and is) used to provide psychiatric services from a distance"[21].

The terms tele care or telehealth care and its derivative telemental health care are of more recent origin. They are used to refer to "the provision of personalized health-care over a distance"[7,8,23]. Thus, tele-care is the remote or enhanced delivery of care to people in their own homes or community settings, by means of telecommunications and computerized services. It includes the use of sensors and alerts, which provide continuous, automatic and remote monitoring of care-needs, emergencies and lifestyle changes, and the use of ICTs to trigger human responses, or to prevent hazards. Telecare has historically been associated with social care, as distinct from telemedicine or telepsychiatry, which is more about medical care. Tele-care is, therefore, social care services delivered at home through remotely connected computerized medical devices[8,23].

The term telemental health is a broader term, which includes all mental health applications including telepsychiatry and telemental health-care[7,8,21,22]. Though, telemental health also refers to the use of ICTs to provide mental health services from a distance, it incorporates the provision of a variety of mental health services from a wider range of professionals, and not just psychiatrists. Moreover, it refers to all forms of technology utilized in the practice of mental health-care from a distance. Such technology may be synchronous (real-time), as in video-conferencing or telephone-based systems, or asynchronous, as with e-mail, and other store-and-forward methods. Store-and-forward modes of communication involve acquiring medical data, and then transmitting this clinical information via e-mail or web-applications for later review by a specialist. Unlike synchronous forms of communication, asynchronous communication does not require the presence of both parties at the same time. The information can be transferred in the form of data, audio/video clips, or recordings. E-mail is the most commonly used form of asynchronous communication in telemedicine, and has the advantages of being relatively inexpensive, and not requiring any extra or special hardware support[24]. Finally, tele-mental-health also encompasses all forms of service, including both preventive and curative care, and educational and administrative services[7,8,10,21-23,25-27].

The newest designation of telemental health is e-health or e-mental health. It also refers to the provision of health services to patients or to the lay public through any electronic medium, including the internet, telephone, or fax[7]. However, it is a more user-centred term, and refers not only to the use of a broad range of ICTs, but also a new way of service-provision, which involves a commitment to networked ways of improving health-care. A standard definition of e-health would, thus, include "the application of ICTs across the whole range of functions, which affect health-care, from

diagnosis to follow-up". Additionally, it is a method of delivering "responsive care, which is personalized and tailored to the needs of the user"[28,29].

In this article, the term telepsychiatry has been used to refer to videoconferencing, while telemental health and e-health have been used interchangeably, in keeping with the broadest concept of this form of service-delivery.

## THE PURPOSE AND POTENTIAL APPLICATIONS OF TELEPSYCHIATRY

Telepsychiatry was originally devised to meet the mental health needs of users in remote, rural and inaccessible locations[2,10-19,21,22,25-27,29]. The use of telepsychiatry for remote communities helped overcome many of the disadvantages of traditional modes of service-delivery. Moreover, telepsychiatry could deliver a wide range of high-quality services, which were usually available only at specialist centres. Consequently, it created an equality of access, and a sense of empowerment among users from remote areas. Additionally, it diminished the cost of provision of services in isolated areas by saving on time and travel, not only for clinicians involved in the provision of care, but also for health-care professionals, and health-care users. Finally, it provided the means of supporting mental health professionals working in such remote environments.

With expansion of telepsychiatric services, they are also being increasingly used in urban areas, for the same reasons, i.e., decreasing costs of care and enhancing access to high-quality care[10,13,14]. In recent years the number of patients who could benefit from telemental health services at home has also been growing. Moreover, with the development of a broader array of ICTs, telemental health services are being used to help those who are only mildly to moderately ill, and who may not require specialist care[8,23].

Therefore, telepsychiatry can be as flexible as the practitioner, or the patient may need it to be. The range of services offered, the users of such services, and the points of delivery of such services is theoretically limitless. Tele-mental-health has both clinical or patient-care uses, and non-clinical applications such as administrative, learning and research activities[8,12,17,25-27,29]. The whole range of patient-care services, from assessment and diagnosis, to pharmacological and psychosocial interventions, and to follow-up and home-based care, is included in this mode of service-delivery. Telepsychiatry can also offer other services, such as development of clinical care plans, case management, crisis intervention, neuropsychological testing, legal aid, forensic evaluations, liaison services for other medical specialties, and nursing care. The settings, in which these services can be delivered, are equally diverse. They include inpatients, outpatients, emergency services, forensic settings, community settings, nursing homes, assisted living facilities, prisons, schools, and the homes of users. The patient population can vary from children,

to adults, to the elderly, and to special populations such as prison inmates or military personnel. Professional users can include all manner of mental health professionals such as local psychiatrists, trainee psychiatrists at distant sites, nurses, health workers and educators[2,8,10-14,17,19,22,25-27,29]. Telemental health is used routinely to give people access to educational events from remote locations. It can serve as a platform for net-based distant learning sources such as web-casting. Supervision of clinical management and psychotherapy is a major component of the educational uses of telemental health. Finally, a variety of administrative and managerial functions can be supported by telepsychiatry, helping in reducing the costs, time and travel involved in carrying out these tasks[8,26].

## THE EVIDENCE FOR CLINICAL USEFULNESS OF VIDEOCONFERENCING-BASED TELEPSYCHIATRY

### The size and quality of the evidence
From somewhere around the year 2000, the evidence-base for telepsychiatry has begun to grow rapidly. It is instructive to follow the progress of some research groups around the world to get an idea of this growth. For example, researchers associated with the Medical University of South Carolina, Charleston, South Carolina, United States have published three reviews on the subject[17,30,31]. The first one, published in 2000[30], covered the period from 1970 to 2000, and could locate only 63 publications, mainly pertaining to programme descriptions, reliability of videoconferencing assessments, and satisfaction and acceptance among users. The second review[31], covering the period from 2000 to 2003 included 68 new publications in this three-year period. In addition to studies on novel programmes, research on reliability and satisfaction, clinical outcomes, cost-effectiveness, and legal, regulatory, and ethical issues had already begun to appear. The third review[17] covering the period from 2003 to 2008 came up with 148 new publications. This review noted that RCTs had demonstrated that videoconferencing was as efficacious as face-to-face patient-care in a variety of clinical settings, and with specific patient populations, although the number of such trials was still small. All three reviews and several others concluded that methodologically flawed studies were the norm, which was hampering the progress of research on telepsychiatry[16-18,30,31-34]. The experience of reviewers, post-2008 to date appears to be somewhat similar[2,8-10,12-14,35,36]. Although the number of research reports has continued to increase, RCTs are still very few. Videoconferencing-based approaches used to be the most common form of telemental health service till about ten years ago. With the development and proliferation of other ICTs, there is now a growing body of research on telephone, internet, or computer based interventions. Indeed the research-data on these modes of telemental health has outstripped that

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

available for videoconferencing[2,8-10,12,14,23,28,37-39].

### The nature of the evidence on videoconferencing-based telepsychiatry

Methodological difficulties notwithstanding, telepsychiatry has undergone the most comprehensive examination of its utility[11]. Various aspects of efficacy and effectiveness of videoconferencing-based telepsychiatry are briefly reviewed in this section.

**Diagnostic accuracy and reliability of videoconferencing-based assessments:** A large number of studies have compared the accuracy and reliability of videoconferencing-based telepsychiatric assessments with face-to-face evaluations. A list of these studies is included in Table 1[40-79]. The table shows that these studies have been conducted in different disorders, using several different scales or structured interviews, among diverse populations such as children, adults, elderly and ethnic groups, and in different settings such as outpatients, inpatients, emergency services, residential and correctional facilities. They provide substantial evidence that on the whole there seems to be no difference between the reliability and diagnostic accuracy of telepsychiatric assessments, compared to face-to-face assessments. However, as is evident from Table 1, RCTs on this aspect, i.e., studies in which subjects have been randomly assigned to either method of assessment are limited. Moreover, the role of factors such as bandwidth, objective vs subjective aspects of assessments, and reliability in certain populations, e.g., the elderly with sensory deficits, is uncertain.

The reliability of telepsychiatric assessments has been the focus of interest of several reviews on the subject as well[2,7-10,12-14,25,29-34,80-85]. These have generally concluded that despite methodological limitations, videoconferencing-based assessments appear to be comparable to face-to-face evaluations. A meta-analysis on the reliability of telepsychiatric assessments found only 14 studies (with 380 adult patients), which had compared videoconferencing-based assessments with face-to-face evaluations directly using standardized instruments[84]. Despite the limited number of studies, there was no difference in accuracy or satisfaction between the two assessment modalities. Surprisingly, bandwidth did not appear to be a confounder, although there was some suggestion that high bandwidth was better for more detailed observation of subjects. A later meta-analysis included studies, which had compared videoconferencing-based diagnosis with a non-telemedicine alternative by reporting a measure of agreement[85]. Most of these were in the field of dermatology, but 10 studies were from psychiatry, geriatrics, minor injuries, neurology and rheumatology. Reliability of diagnosis via videoconferencing was confirmed in all studies, but problems in study-designs were common. Finally, a more recent review, based on eight previous systematic reviews also concluded that diagnostic assessments conducted via videoconferencing

were equivalent to face-to-face assessments, but bandwidth and resolution were major factors, affecting the reliability of telepsychiatric assessments[2]. The reliability of tele-mental health assessments using other modalities such as telephones, or web-based tools has also been compared with face-to-face assessments[33,34,83,86]. Most of the evidence suggests that these methods are also as reliable as face-to-face evaluations, but the number of well-designed studies is still meagre (Table 1).

**Clinical outcomes:** Research-data from the initial studies comparing clinical outcomes between videoconferencing-based interventions and conventional treatment found both conditions to be equivalent across diverse populations, across all age groups, and on a wide range of outcome measures[17-19,30-32]. However, these studies lacked randomized-controlled designs; their samples were small and follow-up periods did not extend beyond six months. Moreover, outcomes were inferior for telepsychiatric interventions in certain populations, e.g., those with substance abuse problems. Though later reviews on the subject also indicated positive and equivalent outcomes among patients undergoing telepsychiatry (principally videoconferencing) interventions, the small number of RCTs continued to remain a cause for concern[8-10,16,17,29,33-36]. Fortunately, since then the evidence has been shored up by several, large and well-designed trials, which have demonstrated either equivalent, or even superior outcomes in the groups receiving videoconferencing-based interventions. A list of RCTs of clinical outcomes with these interventions is included in Table 2[87-104]. It is evident from this table that though the number of RCTs is growing, the evidence-base for videoconferencing-based interventions is still a modest one. Moreover, the period of follow-up in these studies has seldom extended beyond one year; statistical methods to test outcome have not always been adequate; and, data on other measures such as service utilization, quality of life, and adherence are limited[2,10-14,22,35,36,39,83]. However, despite these methodological inadequacies, it would not be premature to conclude that the bulk of the evidence consisting of uncontrolled and controlled comparisons, as well as RCTs indicates that videoconferencing-based telepsychiatry is no less effective than traditional face-to-face treatment. More recently, the evidence from clinical trials has been supplemented by large-scale naturalistic studies. In one such study, Godleski et al[105] assessed clinical outcomes of 98609 patients with mental health disorders during six-month periods prior to, and after their enrolment in telemental health services of the United States Department of Veterans Affairs. The results showed a considerable decline in the rates of admissions and hospital stays among patients of both genders and all age groups following enrolment in telepsychiatric services (Table 2).

**Outcomes in specific disorders:** The literature on

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

| Table 1 | Reliability of videoconferencing-based assessments: Comparisons with face-to-face evaluations |

| Ref. | Patient group | Scale used | Study design | Results |
| --- | --- | --- | --- | --- |
| Baer et al[40] | 16 adults with OCD | YBOCS, HAM-D, HAM-A | Non-RCT | |
| Montani et al[41] | 10 elderly psychiatric inpatients with no cognitive impairment | MMSE, CFT | Non-RCT | VC inferior to F2F |
| Montani et al[42] | 15 elderly psychiatric inpatients with no cognitive impairment | MMSE, CFT | Non-RCT | VC inferior to F2F in certain aspects |
| Baigent et al[43] | 63 adult inpatients | BPRS | Non-RCT | BPRS ratings similar; differences in ratings of affect |
| Zarate et al[44] | 45 patients with schizophrenia | BPRS, SANS, SAPS | Non-RCT | Global severity and BPRS similar, SANS not reliably rated, higher BW better |
| Montani et al[45] | 25 elderly psychiatric inpatients, 10 with dementia | MMSE, CFT | Non-RCT | VC inferior to F2F in non-cognitively impaired elderly; VC = F2F in those with dementia |
| Ruskin et al[46] | 30 adult inpatients | SCID | Non-RCT | VC = F2F |
| Ball et al[47] | 11 elderly psychiatric patients | CAMCOG | Non-RCT | VC = F2F |
| Ball et al[48] | 99 responses of elderly psychiatric patients | MMSE | Non-RCT | VC = F2F |
| Stevens et al[49] | 40 adult psychiatric patients | SCID | RCT | Similar satisfaction with both methods |
| Kirkwood et al[50] | 27 inpatients with history of alcohol abuse | Neuropsychological battery | Non-RCT | Cognitive assessment by VC = F2F |
| Chae et al[51] | 30 adult patients with schizophrenia | BPRS | Non-RCT | VC = F2F; BW did not matter |
| Elford et al[52] | 23 children referred for psychiatric assessments | Semi-structured interview | RCT | VC = F2F |
| Jones et al[53] | 30 elderly patients | BPRS | Non-RCT | Reliability better for objective than subjective items; BW did not matter |
| Yoshino et al[54] | 42 adult inpatients with chronic schizophrenia | BPRS | Non-RCT | Reliability low with narrow BW |
| Grob et al[55] | 27 elderly nursing home residents | BPRS, MMSE, GDS | Non-RCT | VC = F2F |
| Bishop et al[56] | 24 adult psychiatric patients | CSQ | RCT | VC = F2F on patient satisfaction |
| Guilfoyle et al[57] | 12 elderly nursing home residents | Health assessments | Non-RCT | VC = F2F |
| Loh et al[58] | 20 elderly psychiatric patients | MMSE, GDS | Non-RCT | VC = F2F |
| Kobak[59] | 42 patients with mood disorders | HAM-D | Non-RCT | VC = F2F |
| Poon et al[60] | 22 community-dwelling elderly with mild dementia or mild cognitive impairment | MMSE, RBMT, HDS | RCT | VC = F2F |
| Cullum et al[61] | 33 elderly with mild cognitive impairment or dementia | Neuropsychological battery | Non-RCT | VC = F2F |
| Lexcen et al[62] | 72 adult psychiartric patients in forensic settings | BPRS, Mac CAT-CA | Non-RCT | VC = F2F |
| Loh et al[63] | 20 elderly patients with dementia | MMSE, GDS and other scales | Non-RCT | VC = F2F |
| Martin-Khan et al[64] | 42 patients over 50 yr referred for cognitive assessment | Neuropsychological battery | Non-RCT | VC = F2F |
| Singh et al[65] | 37 adult patients with psychiatric disorders | DSM-IV | RCT | VC = F2F |
| Shore et al[66] | 53 male American Indian veterans with psychiatric disorders | SCID | RCT | VC = F2F |
| Manguno-Mire et al[67] | 21 inpatients from a forensic psychiatric facility | GCCT-MSH | RCT | VC = F2F |
| Kobak et al[68] | 35 adult patients with mood disorders | MADRS | Non-RCT | VC = F2F |
| McEachern et al[69] | 71 elderly patients from a memory clinic | MMSE | RCT | VC = F2F |
| Ciemins et al[70] | 73 elderly patients with diabetes | MMSE | Non-RCT | VC = F2F |
| Porcari et al[71] | 20 male veterans with PTSD | CAPS | Non-RCT | VC = F2F |
| Thompson et al[72] | 138 transplant recipients receiving follow-up | CES-D | RCT | VC = F2F |
| Morgan et al[73] | 169 elderly from a memory clinic | Satisfaction assessment | RCT | Similar satisfaction with both methods |
| Stain et al[74] | 11 adolescents/young adults (14-30 yr) with early psychosis | Diagnosis, quality of life, neurocognition on standardized scales | Non-RCT | VC = F2F |
| Bui[75] | 30 undergraduates with subclinical OC symptoms | YBOCS | Non-RCT | VC = F2F |
| Martin-Khan et al[76] | 205 patients over 50 yr referred for cognitive assessment | Neuropsychological battery | Non-RCT | VC = F2F |
| Wong et al[77] | 42 elderly psychiatric inpatients | RUDAS | Non-RCT | VC = F2F |
| Seidel et al[78] | 73 adult psychiatric patients in emergency settings | Interview | RCT | VC = F2F |
| Litwack et al[79] | 75 veterans with PTSD | CAPS | Non-RCT | VC = F2F |

F2F: Face to face or in-person assessment; VC: Videoconferencing; BW: Bandwidth; RCT: Randomized controlled trial (*i.e.*, a study in which patients were randomly assigned to VC or F2F assessment); OCD: Obsessive compulsive disorder; PTSD: Posttraumatic stress disorder; YBOCS: Yale-Brown Obsessive-Compulsive Scale; HAM-D: Hamilton Rating Scale for Depression; HAM-A: Hamilton Rating Scale for Anxiety; BPRS: Brief Psychiatric Rating Scale; SANS: Scale for the Assessment of Negative Symptoms; SAPS: Scale for the Assessment of Positive Symptoms; SCID: Structured Clinical Interview for DSM-III-R; MMSE: Mini-Mental State Examination; GDS: Geriatric Depression Scale; RBMT: Rivermead Behavioural Memory test; HDS: Hierarchic Dementia Scale; CSQ: Client Satisfaction Questionnaire; CFT: Clock Face Test; RUDAS: Rowland Universal Dementia Assessment Scale; CAPS: Clinician-Administered PTSD Scale; MADRS: Montgomery-Asberg Depression Rating Scale; Mac CAT-CA: MacArthur Competence Assessment Tool-Criminal Adjudication; CES-D: Center for Epidemiologic Studies-Depression; GCCT-MSH: Georgia Court Competency Test-Mississippi State Hospital revision.



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

| | Table 2 Outcome of videoconferencing-based interventions: Randomized-controlled trials of comparisons with face-to-face interventions | | | |
|---|---|---|---|---|
| **Ref.** | **Patient group** | **Treatment details** | **Outcome measures** | **Results** |
| Day et al[87] | 80 adult clients with a wide range of problems, from weight concerns to personality disorders | 5 sessions of CBT | BSI, GAF, TC and working alliance and satisfaction scales | VC = F2F treatment on outcome and process measures |
| Nelson et al[88] | 28 children 8-14 yr with DSM-IV depression | Eight weekly CBT sessions with child and parent | KSADS-P, CDI, satisfaction questionnaire | VC = F2F treatment on depression scores and satisfaction |
| Ruskin et al[89] | 119 adult patients with depression according to SCID with HAM-D scores greater than 16 | Eight sessions over a 6 mo; medication, psychoeducation, brief supportive counseling | Treatment response, adherence, patient and psychiatrist satisfaction, cost effects | VC = F2F treatment on all aspects; costs same if travel considered |
| Bouchard et al[90] | 21 adult patients with panic disorder and agoraphobia according to SCID | Weekly CBT for 12 wk; follow-up for 6 mo | Self-assessment and ratings on anxiety and disability scales | VC = F2F treatment on symptom reduction, functioning and alliance |
| Poon et al[60] | 22 community-dwelling elderly with mild dementia or mild cognitive impairment | Cognitive intervention programme for older patients | MMSE, RBMT, HDS | VC = F2F treatment in terms of cognitive improvement |
| De Las Cuevas et al[91] | 140 adult psychiatric outpatients; ICD-10 diagnoses as per CIDI | 8 consultations over 24 wk; medication and CBT | CGI-S and CGI-I, SCL-90R | VC = F2F treatment on symptom reduction |
| O'Reilly et al[92] | 495 adult psychiatric patients | Medication management, psychoeducation, supportive counseling, triage to other local services | BSI, CSQ-8, SF-36 , satisfaction | VC = F2F treatment on symptom reduction and satisfaction; VC 10% less expensive per patient |
| Fortney et al[93] | 395 adult primary care patients with PHQ-9 depression severity scores ≥ 12 | Medication management and psychotherapy for 12 mo | Antidepressant prescribing, medication adherence, treatment response and remission health status, quality of life and satisfaction on standardized scales | VC > F2F treatment on mental health status, health-related quality of life, and satisfaction |
| Frueh et al[94] | 97 adult patients with combat-related PTSD | 14 weekly treatment sessions for 3 mo | Self-report, symptom severity, BDI, SCL, satisfaction, adherence and other process measures | VC = F2F treatment on symptom-severity and satisfaction |
| Hilty et al[95] | 121 adult patients with depression according to SCID | Intensive modules using telepsychiatric educational interventions provided by primary-care providers | BDI, SCL, SF-36 | VC = F2F treatment on symptom reduction; VC > F2F on satisfaction and retention |
| Mitchell et al[96] | 128 adults with DSM-IV bulimia nervosa or other eating disorders; binge eating or purging at least once per week | 20 sessions of manual-based, CBT for bulimia over 16 wk | HAM-D, BDI, self-esteem, quality of life, functioning, alliance and symptom-severity | VC = F2F treatment on most measures |
| Thompson et al[72] | 138 adult transplant recipients with depression; CES-D score > 16 | Medications and counseling over 12 mo | CES-D | VC = F2F treatment on symptom reduction |
| Morland et al[97] | 125 adult male veterans with PTSD according to SCID | Anger management therapy - 12 session CBT intervention over 6 wk; follow-up for 6 mo | CAPS, STAXI-2, NAS-T, attrition, adherence, satisfaction and alliance assessments | VC = F2F treatment on anger reduction and process variables; alliance better in F2F treatment |
| Chong et al[98] | 167 adult Hispanic patients with major depression | Monthly telepsychiatry sessions for 6 mo; medications and counselling | Appointment adherence, alliance, satisfaction, antidepressant use, depression and functional outcomes | VC > F2F treatment on adherence, alliance, satisfaction: VC = F2F treatment on depression and functional outcomes |
| Moreno et al[99] | 167 adult Hispanic patients with major depression according to PHQ-9 and  MINI | Medication management and counseling for 6 mo | PHQ-9, MADRS, Q-LES-Q, SDS | VC > F2F treatment on all outcomes |
| Dunstan et al[100] | 6 adults with anxiety or mixed anxiety-depressive disorder | 6-8 sessions of CBT; 1-mo follow-up | Self-reports and symptom-severity | VC = F2F treatment |
| Fortney et al[101] | 364 adult patients with major depression according to PHQ-9 and MINI | Telemedicine-based collaborative care vs practice-based collaborative care for 18 mo; medication management and psychosocial treatment | Depression outcomes module, HSCL, QOL-DTA, DSSS, DHBI | VC > F2F treatment on depression outcomes |
| Stubbings et al[102] | 26 adult patients with mood or anxiety disorder according to SCID | 12 sessions of CBT; 6-wk follow-up | Symptom-severity, self-reports, alliance, quality of life and satisfaction on standardized scales | VC = F2F treatment on all outcome measures |

| Choi et al[103] | 158 homebound individuals > 50 yr with depression, HAM-D score > 15 | PST-telehealth problem-solving therapy vs IP-PST; 6 PST sessions over 6 wk; follow-up for 36 wk | HAM-D, WHODAS | VC = F2F treatment, but VC effects more sustained |
| Choi et al[104] | 121 homebound individuals > 50 yr with depression, HAM-D score > 15 | PST-telehealth problem-solving therapy vs IP-PST; 6 PST sessions over 6 wk; follow-up for 24 wk | Acceptability on the TEI, HAM-D | VC = F2F treatment |

VC treatment: Treatment through videoconferencing; F2F treatment: Face-to-face or in-person treatment; CBT: Cognitive behavioral therapy; PTSD: Post-traumatic stress disorder; HAM-D: Hamilton Rating Scale for Depression; SCID: Structured Clinical Interview for DSM-IV; KSADS-P: Schedule for Affective Disorders and Schizophrenia for School Age Children-Present Episode; CDI: Children's Depression Inventory; MMSE: Mini-Mental State Examination; RBMT: Rivermead Behavioural Memory test; HDS: Hierarchic Dementia Scale; CIDI: Composite International Diagnostic Interview; CGI-S and CGI-I: Clinical Global Impressions-Severity of Illness and Improvement; SCL: Symptom Checklist; BSI: Brief Symptom Inventory; CSQ: Client Satisfaction Questionnaire; SF-36: Medical Outcomes Study Short Form; PHQ: Patient Health Questionnaire; BDI: Beck's Depression Inventory; CES-D: Center for Epidemiologic Studies-Depression; MPSS: Modified PTSD Symptom Scale; BAI: Beck Anxiety Inventory; CAPS: Clinician-Administered PTSD Scale; STAXI-2: State-Trait Anger Expression Inventory-2; NAS-T: Novaco Anger Scale total score; MINI: Mini-International Neuropsychiatric Interview; PHQ-9: Patient Health Questionnaire-nine item version; MADRS: Montgomery-Åsberg Depression Rating Scale; Q-LES-Q: Quality of Life Enjoyment and Satisfaction Questionnaire; SDS: Sheehan Disability Scale; HSCL: Hopkins Symptom Checklist; QOL-DTA: Quality Improvement for Depression Treatment Acceptability scale; DSSS: Duke Social Support and Stress Scale; DHBI: Depression Health Beliefs Inventory; WHO: World Health Organization; WHODAS: WHO Disability Assessment Schedule; TEI: Treatment Evaluation Inventory; GAF: Global Assessment of Functioning; TC: Target Complaints method.

the outcome of telepsychiatric interventions in specific psychiatric disorders till around the mid-2000s consisted only of small non-randomised studies; consequently, conclusions about effectiveness of telepsychiatry in these conditions were uncertain[17,18,30,31]. Since then RCTs or controlled trials have been conducted with almost all common disorders including depression, anxiety disorders (panic disorders, phobias, obsessive compulsive disorder, and post-traumatic stress disorder), eating disorders, substance abuse, psychosis, dementia, and suicide prevention.

(1) Depressive disorders. RCTs comparing outcomes among patients with depressive disorders included in Table 2 show that treatment delivered by videoconferencing is equivalent to face-to-face treatment on symptom reduction and a range of other outcomes[72,88,89,95,103,104]. Indeed, in several instances videoconferencing treatment has actually turned out to be superior to face-to-face treatment on depression outcomes[93,98,99,101]. Two literature reviews have provided further support for the utility of videoconferencing-based telepsychiatry in the treatment of depression[106,107]. One of these reviews was based on ten RCTs of different videoconferencing, telephone, internet and computer based treatments of depression[107]. Although the authors noted that there was limited data about the effectiveness of telemental health interventions in depression, they concluded that videoconferencing-based treatments yielded the same results as face-to-face treatment. Despite the more recent large-scale RCTs on videoconferencing-based treatments in depression, the evidence-base is still comparatively smaller than other telemental health interventions for depression, such as telephone, internet, or computer based treatments[33,34,108-112].

(2) Anxiety disorders. A few RCTs have demonstrated the efficacy of videoconferencing-based treatments in anxiety disorders[100,102] including panic disorder and agoraphobia[90], but the numbers involved

have usually been small. A meta-analysis of 13 studies, one of which used videoconferencing-based treatment for anxiety and depressive disorders, indicated that such interventions could be more effective in anxiety than depressive disorders[112]. A recent literature review concluded that videoconferencing and telephone-based treatments can be equally effective as face-to-face treatments of obsessive compulsive disorder[113]. As with the literature on depression, the number of RCTs for telephone, internet or computer based therapies for anxiety disorders are much larger than those with videoconferencing-based treatments[33,34,108-112].

(3) Post-traumatic stress disorder. Some RCTs have compared the efficacy of videoconferencing-based interventions with face-to-face treatments in post-traumatic stress disorder (PTSD)[94,97], and have found these to be equally efficacious. RCTs favouring videoconferencing-based treatments of PTSD have been supplemented by non-randomized controlled trials with extended periods of follow-up with similar results[114,115]. Other aspects of treatment such as therapeutic alliance, levels of attrition and compliance, patients' satisfaction, clinicians' satisfaction and patients' retention of information have been compared both in RCTs[116] and controlled trials[117], and have been found to be similar in both treatment conditions. The efficacy of videoconferencing-based interventions in PTSD has also been endorsed by literature reviews of the subject[118], and a meta-analysis of telehealth interventions[119].

(4) Eating disorders. A RCT comparing cognitive behaviour therapy (CBT) for bulimia and other eating disorders delivered via videoconferencing with face-to-face treatment found both treatments to be similar on reduction of eating disorder and depression symptoms, self-esteem, quality of life, functioning and therapeutic alliance[96]. Other aspects of treatment such as cost-effectiveness and therapeutic factors affecting treatment were also found to be equivalent between the two treatment-conditions[120,121].

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

(5) Substance abuse. Although several reviews have concluded that videoconferencing-based treatments have considerable potential to be of use in treatment of alcohol and other substance-use problems, there is no RCT on videoconferencing-based treatment of these disorders. Instead, a number of RCTs of telephone, internet, or computer based treatments have been conducted, which have shown that such interventions compare well with face-to-face treatment[33,34,108,122].

(6) Schizophrenia. Video-conferencing-based telepsychiatric studies of schizophrenia consist of programme descriptions, case reports, and controlled trials[33,34,108,123-125]. These have shown that schizophrenia can be reliably diagnosed and assessed using videoconferencing, and treatment using this modality results in improved clinical outcome and high rates of satisfaction among patients. However, there are no RCTs comparing videoconferencing with face-to-face treatment. On the other hand, a number of telehealth and e-health studies using randomized designs have yielded positive outcomes in terms of clinical improvement, improved adherence, increased awareness, and self-management interventions[124,125].

(7) Suicide prevention. Studies of suicide risk assessment and monitoring have shown that videoconferencing is as effective as face-to-face assessments[78,126,127]. A review of telehealth interventions found these to be effective not only in assessment, but also in interventions to prevent suicide[127]. However, most trials were of telephone or web based interventions, and the number of RCTs was limited. Concerns about safety of remote assessments have also been raised.

**Outcomes in specific populations:** (1) Children and adolescents. The field of telepsychiatry services for children and adolescents is still a developing one. However, several reviews have noted that the results of studies till date are encouraging[81,108,128-136]. Video-conferencing-based approaches among children and adolescents have shown that these are equivalent to face-face methods in diagnosing childhood psychiatric disorders. High satisfaction has been noted among children and their parents, and comparable clinical outcomes have also been demonstrated. Videoconferencing-based studies report positive findings for health care practitioners, time and cost savings, and improvement in quality of care. Nevertheless, the bulk of the evidence consists mostly of programme descriptions, case studies and non-randomized trials. Only three RCTs of videoconferencing have been conducted, one of diagnostic reliability, another of treatment of childhood depression with CBT, and the third on the effectiveness of videoconferencing in teaching training skills to parents of children with attention deficit hyperkinetic disorder[52,88,137]. Another ongoing RCT of videoconferencing-based treatment for attention deficit hyperkinetic disorder has yielded promising results[136]. Therefore, although videoconferencing appears to hold great promise as a mode of mental health-care service

for children and adolescents, there is a need for well-designed and properly controlled trials to evaluate its usefulness.

(2) The elderly. Telepsychiatry has a special role in the mental health care of the elderly because they account for a large proportion of patients from rural and remote locations, and often have multiple, chronic conditions, which limits their access to high-quality, specialized care[138]. There is a wealth of literature on videoconferencing-based assessments of mental state and cognitive function, which clearly shows that these assessments are as reliable as face-to-face interviews in elderly patients, even in those with cognitive impairment[82,108,138-140]. However, most studies are not adequately designed, and there are very few RCTs comparing videoconferencing-based with face-to-face assessments[60,69,82,139,140]. Similarly, though several descriptive and uncontrolled studies have demonstrated improved outcome with videoconferencing-based interventions[138-140], there is only one RCT with 22 patients with dementia, which has shown the benefits of a video-conferencing-based cognitive intervention for these patients[60].

(3) Forensic and correctional settings. Telepsychiatry has obvious advantages while delivering mental healthcare for inmates of prisons and other correctional settings, a large proportion of who suffer from mental health disorders[10,12,16,17,141-144]. Videoconferencing-based assessments have proved to be as reliable as face-to-face assessments in forensic settings, but much of the evidence for this derives from uncontrolled studies. Similarly, though telepsychiatry appears to increase access for prison inmates, leads to high satisfaction among them, and cost savings for providers, the evidence for these outcomes and for the clinical effectiveness of videoconferencing-based interventions in forensic settings is almost always derived from case reports, descriptive studies and uncontrolled trials[141-144].

(4) Emergency settings. The application of telepsychiatry for assessment and treatment of patients attending the emergency department with mental health problems is another emerging area. Till date there are a few descriptions of programmes being run in emergency settings and case reports of patients treated in such settings[108,145,146]. These have indicated that videoconferencing is a safe and effective way of delivering services in this area, and patients and staff express high satisfaction with such services. These findings were endorsed by a recent RCT, which found that videoconferencing-based diagnoses were as reliable as face-to-face ones, and the two modes were similar on recommendations about disposition and ratings of dangerousness or suicidality[78].

(5) Ethnic populations. Telepsychiatry is being increasingly used worldwide to provide services to ethnic minorities including American-Indians and the Hispanic community in the United States, aboriginal communities, and Asian and African people[2,108,147-149]. Providing culturally appropriate care is a particular challenge for



these up-and-coming telepsychiatric programmes, because the cultural background of patients from ethnic minorities influences their perceptions about technology and the patient-provider relationship[108,147,148]. Nevertheless, a number of RCTs have documented the reliability of videoconferencing-based assessments, as well as feasibility, acceptability and effectiveness of telepsychiatric services among American-Indian veterans and Hispanic communities[66,98,99]. Then again, a recent systematic review of provision of counselling for depression in ethnic minorities through telephone, internet or videoconferencing-based services concluded that more methodologically rigorous studies of use among ethnic minorities were required[150].

**Psychotherapy outcomes:** The usefulness of video-conferencing in conducting effective psychological treatment has gained widespread acceptance. A number of psychosocial interventions can be delivered *via* videoconferencing including CBT, psychotherapy, behaviour therapy, psychoeducation, family therapy and rehabilitation. CBT is the best researched modality, and has been used in different psychiatric disorders, as well as different patient populations. CBT may be particularly well suited to videoconferencing, because it is usually brief, more structured, and less dependent on the therapeutic relationship as other insight-oriented therapies. Thus, it is less likely to be affected by the potential technological limitations of videoconferencing[83]. Videoconferencing-based CBT has been compared in a number of RCTs with face-to-face CBT in different disorders, and has proved to be equally effective[87,88,90,91,96,97,100,102-104]. However, the number of such RCTs is still small, and most trials have been conducted with relatively small sample sizes. A meta-analysis identified 13 RCTs, one of which was a trial on videoconferencing-based CBT, and found positive outcomes favouring telephone, internet and videoconferencing-based therapies for anxiety and depressive disorders. Not surprisingly, the lack of RCTs and direct comparisons with face-to-face treatments meant that the evidence was considered to be only preliminary[112]. Psychotherapy other than CBT *via* videoconferencing has also been the focus of several trials[151]. A recent systematic review of videoconferencing-based psychotherapy identified 65 studies in this area[152]. It concluded that such psychotherapy was a feasible option for treatment, lent itself to a variety of therapeutic modalities, was useful in different disorders and patient populations, and was associated with high satisfaction among users. Moreover, it appeared to be as effective as face-to-face psychotherapy, though more large-scale clinical trials were needed to further assess the efficacy and effectiveness of videoconferencing-based psychotherapy. Videoconferencing has also been used to conduct behavioural treatments such as exposure and response prevention[153], family therapy[154], and rehabilitation of patients with chronic conditions[155], but the number of

such trials is fewer. In contrast to the somewhat limited literature on videoconferencing-based psychosocial treatments, a large number of telephone- and internet-based (web-based interventions or online counselling) studies, principally of CBT, have been conducted till date. Several meta-analyses and systematic reviews of this extensive literature have shown that such treatments are equally effective as conventional CBT[110,156-160]. However, direct comparisons with face-to-face CBT are still rare, and not all of these trials are methodologically sound either[160].

**The doctor-patient relationship and therapeutic alliance:** An important variable in telepsychiatric interventions is the impact of telepsychiatry on the doctor-patient relationship, and the ability to establish rapport with patients through videoconferencing links[161]. It has been proposed that the way doctors and patients communicate with one another through telepsychiatric links affects the outcome of the videoconferencing-based treatment[162]. Additionally, in therapeutic settings, one of the primary concerns is about the perceived difficulty of developing an effective therapeutic relationship in the absence of non-verbal cues, particularly since the therapeutic alliance plays a crucial role in the outcome of psychotherapy[161]. Telepsychiatry appears to have both positive and negative effects on communication, with technological standards being a key confounding variable[18]. The two major issues, which have the potential to impact the rapport between the doctor and the patient and the therapeutic alliance, are the difficulty in detecting non-verbal cues, and the lack of physical proximity and physical presence[83].

A preliminary review on the subject of the doctor-patient relationship concluded that though relationship building appeared possible *via* telepsychiatry, it had disadvantages compared to face-to-face care, which were not fully understood[163]. However, another series of reviews concluded otherwise[162,164,165]. The first review of 38 studies compared the nature and content of doctor-patient communication in videoconferencing-based telemedicine in different specialties, with the bulk of studies being from psychiatry, otolaryngology, and dermatology. The findings from each study were coded according to 23 categories, and a positive and negative rating assigned to each of the communication results. Approximately 80% of the findings favoured the doctor-patient interaction *via* telemedicine, with all but two (non-verbal behaviour and lack of touch) of the 23 categories analyzed reporting more positive than negative results[164]. These findings were replicated by subsequent reviews, which included 57 and 61 studies respectively, exclusively in the domain of videoconferencing-based telepsychiatry[162,165].

Several other reviews have also addressed the subject of therapeutic alliance in telepsychiatry, and concluded that despite methodological limitations, the available literature supports the capability of therapists to develop a therapeutic alliance through videoconferencing

Chakrabarti S. Usefulness of videoconferencing telepsychiatry

[18,83,161]. Additionally, several RCTs comparing videoconferencing-based psychosocial interventions (principally CBT) with face-to-face treatment, have found no differences in the quality of the therapeutic alliance between the two conditions[87,96,97,102]. Finally, a recent systematic review of 11 studies examined the therapeutic alliance in e-therapy for mental health, including videoconferencing-based treatment. It concluded that e-therapy seemed equivalent to face-to-face therapy in terms of therapeutic alliance, and that there was a positive association between the therapeutic alliance and e-therapy outcome. However, the authors also noted that because of the limited amount of evidence, definitive conclusions could not be made[166].

**Patient and provider satisfaction:** Patient and provider satisfaction with telepsychiatry are two outcomes of interest, which have attracted the maximum research attention[2,8,10,13,17,18,31,83,108,163,167]. The most consistently reported findings are the high levels of satisfaction and acceptance among patients. These have been found in virtually every study assessing patient satisfaction with telepsychiatric services, with up to 75% to 100% of the users reporting considerable satisfaction with telepsychiatric care. High satisfaction has been noted for all patient populations (children, adults, elderly, ethnic minorities, prison populations) and all kinds of psychiatric diagnoses. Levels of satisfaction with telepsychiatry are comparable to other branches of telemedicine. Systematic reviews of telemedicine studies, which have included telepsychiatric interventions, have endorsed this finding of high levels of satisfaction among patients[168-170]. A number of RCTs of videoconferencing-based assessments or interventions have also reported similar levels of patient satisfaction in telepsychiatric *vs* face-to-face care[35,49,56,67,89-92-94,96-98, 104,107].

Despite these overwhelmingly positive responses from patients, a cautious interpretation of the evidence has been recommended, because of several methodological and conceptual problems afflicting research in this area[17,18,31,83,108,168-170]. Firstly, satisfaction is not a very robust indicator of outcome, since in certain instances patients may be satisfied with the care provided despite not benefitting from it. Secondly, the lack of good quality evidence in this area has also been a problem, along with conceptual problems in defining satisfaction. Finally, patient satisfaction might not always imply patient preference; other things being equal, most patients may still prefer face-to-face contact and care. Patients opt for telepsychiatry when it reduces travel, waiting times, absence from work, and costs, and when it enhances their sense of autonomy. Moreover, other factors may determine patient satisfaction, including clinical and demographic variables, severity and type of the disorder, and the availability and quality of telepsychiatric services[17,18,31,83].

Provider and consultee satisfaction has been less well evaluated. The results of such studies are usually mixed, but on the whole provider satisfaction appears to be lower than patient satisfaction with telepsychiatry[2,8,10,13,17,18,31,83,108,163,167,170]. This is perhaps reflected in the poor uptake and somewhat negative attitudes concerning telepsychiatry among clinicians. Telepsychiatry might not appeal to some clinicians because of the perceived difficulties in many areas such as communication or rapport building, and uncertainty about legal, regulatory and ethical issues[12,38].

**Cost-effectiveness:** The issue of costs and cost-effectiveness is at the heart of the debate about the viability of telepsychiatric services[31]. However, the assessment of cost-effectiveness of telepsychiatric services has proved to be challenging for several reasons[17,83]. Comprehensive evaluations of cost-effectiveness ideally covering both direct and indirect costs under several heads such as operating costs, costs to patients and providers, as well as societal costs, are difficult to conduct. Consequently, there are considerable differences across studies, both with respect to their designs, and in the methods used for analysis of costs[10,12,14,17,18,83,108]. Moreover, costs are dependent on technology, which evolves much faster than the methods used to estimate cost-effectiveness[17,18,83]. Due to these difficulties the quality of the existing evidence on cost-effectiveness of telepsychiatry is extremely variable. Early reviews of cost-effectiveness of telemedicine services concluded that these methodological flaws and the lack of appropriate outcome measures in existing studies made it difficult to determine cost-effectiveness[171]. In subsequent reviews of videoconferencing-based telepsychiatry, the evidence seemed to favour telepsychiatric services, but the limited number of good quality studies meant that cost-effectiveness of telepsychiatry could not be unequivocally demonstrated[18,31,172,173]. Since then, RCTs of videoconferencing-based interventions have mostly found that telepsychiatric care is either similar, or even better than traditional modes of care in terms of cost-effectiveness[66,89,92,120]. However, certain other RCTs have found videoconferencing to be the more expensive option[93,101,174]. Accordingly, recent reviews on the subject though finding evidence in favour of telepsychiatry services indicate that the results could depend on a number of moderators such as the study-design, the type of service being offered, the population in question, the technology being used, and the kinds of costs being examined[2,10,12,14,17,83,108,167,171,175]. Travel costs and the volume of telepsychiatric consultations have been examined in a number of studies. "Break-even point" analyses have suggested that a weekly volume of 7 to 14 consultations and travel-distances greater than 30 kilometres or so, determine whether a particular telepsychiatric service will prove to be cost-effective or not. One way of reducing set-up and operating costs could be to utilize the telepsychiatric equipment for other clinical, administrative and educational purposes[8,10,12,14,17,18,29,31,83,108,167,171,172].

**Access to care and empowerment:** Much like the evidence on high patient satisfaction, there is unequivocal evidence that telepsychiatry increases access to high-quality mental health-care for several populations, who may have lacked such care in the past[2,8,10,12,14,17,18,83,108]. It effectively removes several barriers to care such as distance, transportation difficulties, time limitations, costs, safety, and stigma. Consequently, it reduces inequities in care faced by many patients, and leads to a sense of empowerment among them. Therefore, videoconferencing for clinical purposes though originally intended to serve patients in remote and inaccessible locations, is being increasingly used nowadays to enhance access for urban patient populations as well.

**Other outcomes:** Other aspects of utility and feasibility of videoconferencing-based telepsychiatry have received much less research attention, though improvements in treatment-adherence, social functioning and quality of life have generally been found to be similar to face-to-face interventions in some RCTs[89,92-99,101-104].

## LIMITATIONS AND CONSTRAINTS OF TELEPSYCHIATRY

Videoconferencing-based telepsychiatry has been around for more than six decades now. During this time an extensive body of evidence has accumulated favouring the usefulness of this mode of service-delivery. However, there appears to be a large gap between the research-evidence and the use of telepsychiatry in routine health-care. A number of studies and reviews have focused their attention on the problem of limited clinical uptake of videoconferencing[9-14,17,18,29,34,83,108,176,177]. Barriers to the routine clinical use of telepsychiatry include methodological problems, technological hindrances, clinician or provider barriers, issues regarding safety, security and confidentiality, regulatory issues, ethical and legal concerns, and the lack of evidence on sustainability and benefits of integrating telepsychiatric services into existing mental health-care systems. Methodological concerns of the research on effectiveness of telepsychiatry, such as the lack of high-quality RCTs have already been alluded to. The lack of cost-effectiveness data is another major hindrance to obtaining funding for establishing new programmes. Although technology has developed rapidly, the equipment needed for starting a service is still expensive, and difficult to maintain. Problems like connectivity, and compatibility of different systems used (referred to as interoperability) are also quite common[12]. Provider skepticism is another major factor limiting acceptance. Studies have found that after controlling for other barriers, *e.g.*, reimbursement and regulatory issues, negative attitudes of clinicians and institutions are the most significant barriers affecting use of telepsychiatric services[34]. Poor satisfaction with telepsychiatry among clinicians may arise from concerns about establishing rapport

and a successful therapeutic alliance with patients, discomfort with technology, inadequate training, and the perception that telepsychiatry might add to, rather than alleviate their clinical burden[176-178]. Concerns about safety also predominate, although several reviews have indicated that the telepsychiatry is safe, even in relatively unsupervised settings, and does not have any negative outcomes[108,179,180]. Concerns about security of the systems overlaps with issues of confidentiality, privacy and consent of patients. Other issues such as requirements for licensing and reimbursement are yet to be resolved fully[108,181,182]. Finally, there is hardly any evidence on sustainability and benefits of integrating telepsychiatric services into the conventional systems of mental health care[17,83,176]. This usually means that new programmes survive only till they are promoted by enthusiastic local champions who are able to overcome scepticism among providers and attract funding from health-care authorities[176].

## TELEPSYCHIATRY IN LOW- AND MIDDLE-INCOME COUNTRIES

Despite being largely successful elsewhere, telepsy-chiatry is yet to make its mark in low- and middle-income countries of the developing world. This is surprising given that telepsychiatric services are ideally suited for delivery of mental health-care in such settings, where traditional means of mental health-care are often unable to cope with the large gap between demand and resources for care, and the inequitable distribution of health-care resources between urban and rural areas[2,15,22,183]. Nevertheless, research in telepsychiatry from these countries has generally consisted of scattered reports of newly established programmes till now[51,184-187]. However, there are a few notable exceptions. There are two reports from Hong Kong describing the provision of telepsychiatric services to elderly psychiatric patients[60,188], one of which is a RCT of a cognitive intervention in community-dwelling elderly with dementia[60]. There are several reports from an ongoing telepsychiatric programme in the University of KwaZulu-Natal in South Africa[2,15,185]. This group has undertaken systematic reviews of the effectiveness of videoconferencing, developed a model for such a service, and adapted guidelines for its use. Another review of studies from the Middle-East located 11 studies, two of which were RCTs[189]. From India there are reports from two ongoing video-conferencing-based projects. The Schizophrenia Research Foundation at Chennai in the south began experimenting with telepsychiatry in 2005, as part of its psychosocial intervention programmes for Tsunami victims[190,191]. From 2010 they have been running a mobile telepsychiatry service covering 156 villages. Over 1200 patients with severe mental illness have been treated by this facility. The telepsychiatry programme at the Department of Psychiatry, Postgraduate Institute of

Medical Education and Research (PGIMER), Chandigarh, India, developed in joint collaboration with the Department of Science and Technology, Government of India and the Tata Consultancy Services has also been running for over four years now[22,192]. The nodal centre of this service is at PGIMER, while the three remote sites are in the adjoining hill states of north-India. This programme has several innovative features. Established telepsychiatric programmes usually follow one of the several different models of care, such as direct patient management though video-conferencing, consultation models, or collaborative-care models[14,108]. However, such models may be difficult to implement in countries like India with severe manpower and resource limitations[22,192]. Therefore, right from the onset, the programme at PGIMER has followed a somewhat different model of training and enabling non-specialist personnel at remote sites to diagnose and treat mental illnesses on their own, with minimal consultation, super-vision, or direct care from the nodal centre[193]. To this end, a logically-linked computerized decision support system (CDSS) for diagnosis and management of common psychiatric disorders in adults, and in children and adolescents, has been developed as a part of this project. Computerized decision support systems provide clinicians and/or patients with intelligently filtered information at appropriate times to enhance patient care[194]. They are generally used to reduce errors in drug prescribing and providing information on best practices for managing patients. A systematic review found that though data on patient outcomes is limited, such systems may enhance preventive care and guideline adherence, particularly when they are effectively integrated into clinical workflows[194]. In the novel telepsychiatry application developed by the PGIMER, the CDSS has been used not only to provide standardized ways of diagnosing and managing psychiatric disorders, but also to effectively link the modules of diagnosis, treatment and follow-up care. The diagnostic module has screening and criteria-based diagnostic sub-modules, which enables the user to generate a diagnosis independently. Based on the diagnosis generated, standardized pharmacological and non-pharmacological treatment can be offered and follow-up undertaken. Training in the use of the application is conducted entirely online, following which a non-specialist health professional can diagnose and treat common psychiatric disorders with minimal supervision from psychiatrists at the nodal centre. Preliminary results regarding accuracy and reliability of the diagnoses generated compared to standardized interviews, and the usefulness of treatment modules has been encouraging[193,195,196].

## CONCLUSION

Is telepsychiatry an idea whose time has come? There is no doubt videoconferencing-based telepsychiatry facilitates effective service-provision in a large number of areas, where access to high-quality services is difficult. Consequently, it promotes an equality of access, a sense of empowerment among patients, and high levels of satisfaction among them. The evidence to date is highly suggestive that it is comparable to face-to-face care on several aspects of what is traditionally considered effectiveness. However, by the present stringent standards, the quality of the evidence is, perhaps, not adequate. Additionally, there are several barriers to telepsychiatry's wider implementation such as cost-effectiveness, uncertain ethical and legal implications, and concerns about sustainability of programmes. These continue to thwart its integration into the routine network of mental health services. Accordingly, at present telepsychiatric services can only serve as an adjunct to the more traditional modes of service-delivery, but can never replace them. Therefore, the way forward would be to develop hybrid models, which incorporate both forms of service-delivery[84,172]. If telepsychiatry settles into this niche, it has the potential to enhance the overall efficiency of mental health services by removing the many obstacles, which afflict conventional systems of service-delivery. This model may also work for low- and middle-income countries, provided that effective, needs-based forms of telepsychiatric services are developed in these countries as well.

## REFERENCES

1   e ytte ere K, Bruffaerts R, Posada- illa J, as uet I, ovess , epine JP, Angermeyer MC, Bernert S, de irolamo , Morosini P, Polidori , ikkawa T, awakami N, no Y, Takeshima T, da , aram E , ayyad JA, aram AN, Mneimneh N, Medina-Mora ME, Borges , ara C, de raaf R, rmel J, ure e , Shen Y, uang Y, hang M, Alonso J, aro JM, ilagut , Bromet EJ, lu man S, ebb C, essler RC, Merikangas R, Anthony JC, on orff MR, ang PS, Brugha TS, Aguilar- axiola S, ee S, eeringa S, Pennell BE, aslavsky AM, stun TB, Chatter i S. Prevalence, severity, and unmet need for treatment of mental disorders in the orld ealth rgani ation orld Mental ealth Surveys. JAMA 2004 : 2581-2590 PMID: 1517 149 D I: 10.1001/ ama.291.21.2581

2   C ipps , Brysiewic P, Mars M. Effectiveness and feasibility of telepsychiatry in resource constrained environments A systematic review of the evidence. Afr J Psychiatry (Johannesbg) 2012 : 2 5-24 PMID: 22829225 D I: 10.4 14/a psy.v15i4. 0

    ittso C , Benschoter R. Two-way television: helping the medical Center reach out. Am J Psychiatry 1972 : 624-627 PMID: 467 018 D I: 10.1176/a p.129.5.624

4   ittso C , Affleck DC, Johnson V. Two-way television in group therapy. Ment Hosp 1961 : 22-2 PMID: 14007789 D I: 10.1176/ps.12.11.22

5   wyer . Telepsychiatry: psychiatric consultation by interactive television. Am J Psychiatry 1977 : 865-869 PMID: 4716685 D I: 10.1176/a p.1 0.8.865

6   tr er , Mostyn P, Marshall C. The use 0f two-way T in bringing mental health services to the inner city. Am J Psychiatry 1976 : 1202-1205 PMID: 970494 D I: 10.1176/a p.1 .10.1202

7   yers K, Cain S. Practice parameter for telepsychiatry with children and adolescents. J Am Acad Child Adolesc Psychiatry 2008 : 1468-148 PMID: 190 4191 D I: 10.1097/C 1.0b01 e 1818b4e1

8   i r . Telemental ealth in Scotland. Aberdeen: Scottish Centre for Telehealth, 2009. Available from: R : http://www.sctt.scot.nhs.uk/pdf/mentalhealth.pdf

9   do . Effectiveness of telepsychiatry: an integrative litera-



ture review. Thesis, Master of Nursing. Montana State University Bozeman, Montana, 2011. Available from: URL: http://scholarworks.montana.edu/xmlui/bitstream/handle/1/2164/RudolfJ0511.pdf sequence 1

10    Hilty DM, Crockett P, Nilson S, Millar. Telemental health: videoconferencing in mental health services. Advances in Psychiatric Treatment 2012; 92- 98 DOI: 10.1192/apt.bp.111.008904

11    Hardy. Promises and limitations of telepsychiatry in rural adult mental health care. World Psychiatry 2012; 199-201 PMID: 23024682

12    Desai, Stec B, Tomblin S, Coustasse A. Telepsychiatry in the 21(st) century: transforming healthcare with technology. Perspect Health Inf Manag 201 ;1f PMID: 2 861676

1    Moreno. Telepsychiatry: videoconferencing in the delivery of psychiatric care. Am J Psychiatry 201 ; 256-262 PMID: 2 450286 DOI: 10.1176/appi.a p.2012.12081064

14    Hilty, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: a 201 review. Telemed J E Health 201 ; 444-454 PMID: 2 697504 DOI: 10.1089/tm .201 .0075

15    C ipps, Ramlall S, Mars M. Practice guidelines for videoconference-based telepsychiatry in South Africa. Afr J Psychiatry (Johannesbg) 2012 ; 271-282 PMID: 228292 0 DOI: 10.4 14/a jpsy.v15i4. 5

16    Gotoy i, Bloch RM, Saeed SA, Yildirim Y, Talley J. Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry. Behav Sci Law 2008; 25 -269 PMID: 18548519 DOI: 10.1002/bsl.812

17    Richardson K, Brueh BC, Grubaugh A, Egede, Elhai JD. Current Directions in Videoconferencing Tele-Mental Health Research. Clin Psychol (New York) 2009 ; 2- 8 PMID: 20161010 DOI: 10.1111/ .1468-2850.2009.01170.x

18    Hilty, Marks S, Urness D, Yellowlees PM, Nesbitt TS. Clinical and educational telepsychiatry applications: a review. Can J Psychiatry 2004; 12-2 PMID: 1476 67

19    American Psychiatric Association. Telepsychiatry via videoconferencing. Available from: URL: http://www.psychiatry.org/ ilelibrary/ cam/Archives/199821.pdf

20    The Royal Australian and New Zealand College of Psychiatrists Position Statement 44: Telepsychiatry. Available from: URL: https://www.ran cp.org/ iles/Resources/College Statements/ Position Statements/ps44-pdf.aspx

21    urry. Telemedicine technical assistance documents. A guide to getting started in telemecine. Columbia, M : niversity of Missouri-School of Medicine, 2004

22    otra, Chakrabarti S, Shah R. Telepsychiatry: Promise, potential, and challenges. Indian J Psychiatry 201 ; -11 PMID: 2 441027 DOI: 10.410 /0019-5545.105499

2    Dee , Sheikh A, Cresswell , Nurmatov , Mukherjee M, Semmi A, Pagliari C. The impact of telehealthcare on the uality and safety of care: a systematic overview. PLoS One 201 ; e712 8 PMID: 2 977001 DOI: 10.1 71/ ournal.pone.00712 8

24    Edit. E-psychiatry: uses and limitations. J Pak Med Assoc 2006 ; 27- 2 PMID: 16900715

25    American Telemedicine Association. Evidence-based practice for telemental health. Available from: URL: http://www.americantelemed.org/files/public/standards/EvidenceBasedTelementalHealthCover.pdf

26    American Telemedicine Association. Practice guidelines for videoconferencing-based telemental health. Available from: URL: http://www.americantelemed.org/files/standards/Practice-uidelinesfor ideoconferencing-Based Telemental ealth.pdf

27    American Telemedicine Association. Practice guidelines for video-based online mental health services. Available from: URL: http://www.americantelemed.org/practice/standards/ata-standards-guidelines/practice-guidelines-for-video-based-online-mental-health-services

28    C twe , Sheikh A. Evaluating e ealth interventions: the need

for continuous systemic evaluation. PLoS Med 2009 ; e1000126 PMID: 196880 8 DOI: 10.1 71/ ournal.pmed.1000126

29    ie , Moiadem , St- ilaire C, evac E, amel B, Bergeron , badia A, Caron . Telehealth: clinical guidelines and technological standards for telepsychiatry. Available from: URL: http://www. isfteh.org/files/media/68a2b452fb83e00f41219a6cbd075f27.pdf

0    re C, Deitsch SE, Santos AB, old PB, Johnson MR, Meisler N, Magruder M, Ballenger JC. Procedural and methodological issues in telepsychiatry research and program development. Psychiatr Serv 2000 ; 1522-1527 PMID: 11097648

1    oier , napp R , rueh BC. Recent advances in telepsychiatry: an updated review. Psychiatr Serv 200 ; 1604-1609 PMID: 14645799

2    re C, Monnier J, Elhai JD, rubaugh A , napp R . Telepsychiatry treatment outcome research methodology: efficacy versus effectiveness. Telemed J E Health 200 ; 455-458 PMID: 15689650 DOI: 10.1089/tm .2004.10.455

    iey , Roine R, Ohinmaa A. Evidence of benefit from telemental health applications: A systematic review. Alberta, Canada: Institute of ealth Economics, 2007: 1-124

4    iey , Roine R, hinmaa A. The effectiveness of telemental health applications: a review. Can J Psychiatry 2008 ; 769-778 PMID: 19087471

5    ri i , Mu o -Mayorga I. hat about telepsychiatry A systematic review. Prim Care Companion J Clin Psychiatry 2010 ; pii: PCC.09m008 1 PMID: 20694116 DOI: 10.4088/ PCC.09m008 1whi

6    rdy , Myers M, Nelson E , Bel N, Bennett , Carnahan , Decker B, olden D, Perry , Rosenthal , Rowe N, Spaulding R, Turvey C , hite R, oyles D. Evidence-based practice for telemental health. Telemed J E Health 2011 ; 1 1-148 PMID: 21 85026 DOI: 10.1089/tm .2010.0158

7    , Car J, Pagliari C, Anandan C, Cresswell , Bokun T, Mc instry B, Procter R, Ma eed A, Sheikh A. The impact of e ealth on the uality and safety of health care: a systematic overview. PLoS Med 2011 ; e1000 87 PMID: 21267058 DOI: 10.1 71/ ournal.pmed.1000 87

8    eed , Bloch RM, Diamond J . Telepsychiatry: overcoming barriers to implementation. Current Psychiatry 2012 ; 28- 1

9    tt r , ray , Jury S, Biggs BA, Maeder A, Noble D, Borda A, Schulz T, Gasko H. A unified approach for the evaluation of telehealth implementations in Australia. ictoria, Australia: Institute for a Broadband-Enabled Society, The niversity of Melbourne, 201 . Available from: URL: http://www.broadband.unimelb.edu.au/publications/201 /Evaluation-of-Telehealth-Implementations-in-Australia.pdf

40    e , Cukor P, Jenike MA, eahy , aughlen J, Coyle JT. Pilot studies of telemedicine for patients with obsessive-compulsive disorder. Am J Psychiatry 1995 ; 1 8 -1 85 PMID: 765 700 DOI: 10.1176/a p.152.9.1 8

41    o t i C, Billaud N, Couturier P, luchaire I, emaire R, Malterre C, auvernay N, Pi uard J , rossard M, ranco A. Telepsychometry : a remote psychometry consultation in clinical gerontology: preliminary study. Telemed J 1996 ; 145-150 PMID: 10165 57 DOI: 10.1089/tm .1.1996.2.145

42    o t i C, Billaud N, Tyrrell J, luchaire I, Malterre C, auvernay N, Couturier P, ranco A. Psychological impact of a remote psychometric consultation with hospitali ed elderly people. J Telemed Telecare 1997 ; 140-145 PMID: 9489108 DOI: 10.1258/1 576 9719 1048

4    i e t , loyd CJ, avanagh SJ, Ben-Tovim DI, Yellowlees PM, alucy RS, Bond MJ. Telepsychiatry: tele yes, but what about the psychiatry J Telemed Telecare 1997 Suppl 1: -5 PMID: 9218 64 DOI: 10.1258/1 576 9719 0 46

44    re t C , einstock , Cukor P, Morabito C, eahy , Burns C, Baer . Applicability of telemedicine for assessing patients with schi ophrenia: acceptance and reliability. J Clin Psychiatry 1997 ; 22-25 PMID: 90558 DOI: 10.4088/JCP.v58n0104

45    o t i C, lientovsky , Tyrrell J, Ploton , Couturier P, ranco A. easibility of psychological consultation with elderly demented patients. J Telemed Telecare 1998 (Suppl 1): 111 DOI: 10.1258/



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

1 576  9819 1858

46    s i     , Reed S,  umar R,  ling MA, Siegel E, Rosen M,  auser P. Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. *Psychiatr Serv* 1998   : 1086-1088 PMID: 9712219

47    C, Puffett A. The assessment of cognitive function in the elderly using videoconferencing. *J Telemed Telecare* 1998   Suppl 1: 6- 8 PMID: 9640728 D I: 10.1258/1 576  9819 1 62

48    C, Tyrrell J,  ong C. Scoring written material from the Mini-Mental State Examination: a comparison of face-to-face, fax and video-linked scoring. *J Telemed Telecare* 1999   : 25 -256 PMID: 10829 78 D I: 10.1258/1 576  9919  819

49    te e s   , Doidge N,  oldbloom D,  oore P,  arewell J. Pilot study of televideo psychiatric assessments in an underserviced community. *Am J Psychiatry* 1999   : 78 -785 PMID: 10 27917

50    Kir  wood K  , Peck D , Bennie  . The consistency of neuropsychological assessments performed via telecommunication and face to face. *J Telemed Telecare* 2000   : 147-151 PMID: 10912  2 D I: 10.1258/1 576  0019 52 9

51    C e     , Park   J, Cho J ,  ong  D, Cheon  A. The reliability and acceptability of telemedicine for patients with schi ophrenia in orea. *J Telemed Telecare* 2000   : 8 -90 PMID: 10824 75 D I: 10.1258/1 576  0019 5095

52    ord     , hite  , Bowering R,  handi A, Maddiggan B, St John  ,  ouse M,  arnett J,  est R, Battcock A. A randomi ed, controlled trial of child psychiatric assessments conducted using videoconferencing. *J Telemed Telecare* 2000   : 7 -82 PMID: 10824 74 D I: 10.1258/1 576  0019 5086

5    o es     , Johnston D, Reboussin B, McCall    . Reliability of telepsychiatry assessments: sub ective versus observational ratings. *J Geriatr Psychiatry Neurol* 2001   : 66-71 PMID: 11419569 D I: 10.1177/08919887010140 0204

54    os i o   , Shigemura J,  obayashi Y, Nomura S, Shishikura  , Den R,  akisaka  ,  amata S, Ashida  . Telepsychiatry: assessment of televideo psychiatric interview reliability with present- and next-generation internet infrastructures. *Acta Psychiatr Scand* 2001   : 22 -226 PMID: 115 1660 D I: 10.10 4/ .1600-0447.2001.002 6.x

55    ro     , eintraub D, Sayles D, Raskin A, Ruskin P. Psychiatric assessment of a nursing home population using audiovisual telecommunication. *J Geriatr Psychiatry Neurol* 2001   : 6 -65 PMID: 11419568 D I: 10.1177/08919887010140020

56    is ap     , Reilly R , Maddox  ,  utchinson  J. Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. *J Telemed Telecare* 2002   : 217-221 PMID: 12217104 D I: 10.1258/1 576  02 20272185

57    i oy e C,  ootton R,  assall S,  ffer J,  arren M, Smith D. Preliminary experience of allied health assessments delivered face to face and by videoconference to a residential facility for elderly people. *J Telemed Telecare* 200   2 0-2  PMID: 12952695 D I: 10.1258/1 576  0  22225571

58    o  K, Ramesh P, Maher S, Saligari J,  licker  ,  oldswain P. Can patients with dementia be assessed at a distance  The use of Telehealth and standardised assessments. *Intern Med J* 2004   2 9-242 PMID: 15151669 D I: 10.1111/ .1444-090 .2004.005 1.x

59    Ko  K  . A comparison of face-to-face and videoconference administration of the  amilton Depression Rating Scale. *J Telemed Telecare* 2004   : 2 1-2 5 PMID: 1527 0 4 D I: 10.1258/1 576  041424 68

60    oo     , ui E, Chu D,  wok T,  oo J. Cognitive intervention for community-dwelling older persons with memory problems: telemedicine versus face-to-face treatment. *Int J Geriatr Psychiatry* 2005   : 285-286 PMID: 15717  5 D I: 10.1002/gps.1282

61    C     C ,  einer M ,  ehrmann R,  ynan S.  easibility of telecognitive assessment in dementia. *Assessment* 2006   : 85- 90 PMID: 17050908 D I: 10.1177/107 191106289065

62    e e     ,  awk  ,  errick S, Blank MB.  se of video conferencing for psychiatric and forensic evaluations. *Psychiatr Serv* 2006   : 71 -715 PMID: 16675769 D I: 10.1176/ ps.2006.57.5.71

6    o   K, Donaldson M,  licker  , Maher S,  oldswain P. Development of a telemedicine protocol for the diagnosis of Al heimer s disease. *J Telemed Telecare* 2007   : 90-94 PMID: 17 5957 D I: 10.1258/1 576  07780096159

64    rti K  ,  arghese P,  ootton R,  ay  C. Successes and failures in assessing cognitive function in older adults using video consultation. *J Telemed Telecare* 2007   (Suppl ): 60-62 D I: 10.1258/1 576  0778 247211

65    i     , Arya D, Peters T. Accuracy of telepsychiatric assessment of new routine outpatient referrals. *BMC Psychiatry* 2007   : 55 PMID: 17919 29 D I: 10.1186/1471-244 -7-55

66    ore     , Savin D,  rton  , Beals J, Manson SM. Diagnostic reliability of telepsychiatry in American Indian veterans. *Am J Psychiatry* 2007   : 115-118 PMID: 17202552 D I: 10.1176/ a p.2007.164.1.115

67    o ire     , Thompson J  , Shore J , Croy CD, Artecona J , Pickering J  . The use of telemedicine to evaluate competency to stand trial: a preliminary randomi ed controlled study. *J Am Acad Psychiatry Law* 2007   : 481-489 PMID: 18086740

68    Ko  K  ,  illiams JB, Jeglic E, Salvucci D, Sharp IR.  ace-to-face versus remote administration of the Montgomery-Asberg Depression Rating Scale using videoconference and telephone. *Depress Anxiety* 2008   : 91 -919 PMID: 17941100 D I: 10.1002/ da.20 92

69    er     ,  irk A, Morgan D , Crossley M,  enry C. Reliability of the MMSE administered in-person and by telehealth. *Can J Neurol Sci* 2008   : 64 -646 PMID: 192 5450 D I: 10.1017/ S0 17167100009458

70    Cie i s   ,  olloway B, Coon PJ, McClosky-Armstrong T, Min SJ. Telemedicine and the mini-mental state examination: assessment from a distance. *Telemed J E Health* 2009   : 476-478 PMID: 19548827 D I: 10.1089/tm .2008.0144

71    or riC , Amdur R ,  och EI, Richard DC,  avorite T, Martis B,  iber on I. Assessment of post-traumatic stress disorder in veterans by videoconferencing and by face-to-face methods. *J Telemed Telecare* 2009   : 89-94 PMID: 19246609 D I: 10.1258/ tt.2008.080612

72    o pso     ,  eimig R,  ower  ,  insett RP. Assessment of depressive symptoms during post-transplant follow-up care performed via telehealth. *Telemed J E Health* 2009   : 700-706 PMID: 19694599 D I: 10.1089/tm .2009.0021

7    or     , Crossley M,  irk A, McBain  , Stewart NJ, D Arcy C,  orbes D,  ader S, Dal Bello- aas  , Basran J. Evaluation of Telehealth for Preclinic Assessment and  ollow- p in an Interprofessional Rural and Remote Memory Clinic. *J Appl Gerontol* 2011   : 04-   PMID: 24966449 D I: 10.1177/07 464810 66564

74    t i     , Payne  , Thienel R, Michie P, Carr  ,  elly B. The feasibility of videoconferencing for neuropsychological assessments of rural youth experiencing early psychosis. *J Telemed Telecare* 2011   : 28-   PMID: 21844174 D I: 10.1258/ tt.2011.101015

75    i     . A comparison of videoconferencing and in-person administration of the Yale-Brown  bsessive Compulsive Scale. PhD thesis.  niversity of  ansas, 2012

76    rti K  ,  licker  ,  ootton R,  oh P , Edwards  ,  arghese P, Byrne  J,  lein  ,  ray  C. The diagnostic accuracy of telegeriatrics for the diagnosis of dementia via video conferencing. *J Am Med Dir Assoc* 2012   : 487.e19-487.e24 PMID: 22572552 D I: 10.1016/ . amda.2012.0  .004

77    o     , Martin- han M, Rowland J,  arghese P,  ray  C. The Rowland  niversal Dementia Assessment Scale (R  DAS) as a reliable screening tool for dementia when administered via videoconferencing in elderly post-acute hospital patients. *J Telemed Telecare* 2012   : 176-179 PMID: 22 628 6 D I: 10.1258/ tt.2012. S T11

78    eide     ,  ilgus MD. Agreement between telepsychiatry assessment and face-to-face assessment for Emergency Department psychiatry patients. *J Telemed Telecare* 2014   : 59-62 PMID: 24414 95 D I: 10.1177/1 576   1 519902

79    itw     , Jackson CE, Chen M, Sloan DM,  atgis C,  it BT, Marx BP.  alidation of the use of video teleconferencing technol-



ogy in the assessment of PTSD. *Psychol Serv* 2014 : 290-294 PMID: 24841510 D I: 10.10 7/a00 6865

80    w er , avanagh S. The evolution of telepsychiatry in South Australia. Adelaide: Rural and Remote Mental ealth Service of South Australia, 1988

81    esi . Child and adolescent telepsychiatry: reliability studies needed. *Cyberpsychol Behav* 2000 : 1009-1015 D I: 10.1089/10949 10045227

82    yrre , Couturier P, Montani C, ranco A. Teleconsultation in psychology: the use of videolinks for interviewing and assessing elderly patients. *Age Ageing* 2001 : 191-195 PMID: 1144 019

83    i rdso K. Can you see what I am saying An action-research, mixed methods evaluation of telepsychology in rural estern Australia. Murdoch niversity, 2012. Available from: R : http://researchrepository.murdoch.edu.au/702 /2/02 hole.pdf

84    y er , angure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments A review and meta-analysis of comparison studies. *CNS Spectr* 2005 : 40 -41 PMID: 15858458

85    rti K , ootton R, hited J, ray C. A systematic review of studies concerning observer agreement during medical specialist diagnosis using videoconferencing. *J Telemed Telecare* 2011 : 50- 57 PMID: 2198 22 D I: 10.1258/ tt.2011.10111

86    e , Christensen . A systematic review of telephone-based interventions for mental disorders. *J Telemed Telecare* 2006 : 122-129 PMID: 166 82 D I: 10.1258/1 576 067767 8558

87    y , Schneider P . Psychotherapy using distance technology: a comparison of face-to-face, video, and audio treatment. *J Couns Psychol* 2002: : 499-50 D I: 10.10 7//0022-0167.49.4.499

88    e so , Barnard M, Cain S. Treating childhood depression over videoconferencing. *Telemed J E Health* 200 : 49-55 PMID: 12699607 D I: 10.1089/15 05620 76 17648

89    s i , Silver-Aylaian M, ling MA, Reed SA, Bradham DD, ebel JR, Barrett D, nowles , auser P. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. *Am J Psychiatry* 2004 : 1471-1476 PMID: 15285975 D I: 10.1176/appi.a p.161.8.1471

90    o rd , Pa uin B, Payeur R, Allard M, Rivard , ournier T, Renaud P, apierre J. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. *Telemed J E Health* 2004 : 1 -25 PMID: 15104911 D I: 10.1089/15 05620 477 6445 5

91    e s C e s C, Arredondo MT, Cabrera M , Sul enbacher , Meise . Randomi ed clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. *Telemed J E Health* 2006 : 41- 50 PMID: 16796502 D I: 10.1089/tm .2006.12. 41

92    ei y , Bishop J, Maddox , utchinson , isman M, Takhar J. Is telepsychiatry e uivalent to face-to-face psychiatry Results from a randomi ed controlled e uivalence trial. *Psychiatr Serv* 2007 : 8 6-84 PMID: 175 5945 D I: 10.1176/ps.2007.58.6.8 6

93    ort ey C, Pyne JM, Edlund MJ, illiams D , Robinson DE, Mittal D, enderson . A randomi ed trial of telemedicine-based collaborative care for depression. *J Gen Intern Med* 2007 : 1086-109 PMID: 17492 26 D I: 10.1007/s11606-007-0201-9

94    r e C, Monnier J, Yim E, rubaugh A , amner MB, napp R . A randomi ed trial of telepsychiatry for post-traumatic stress disorder. *J Telemed Telecare* 2007 : 142-147 PMID: 17519056 D I: 10.1258/1 576 077

95    i ty , Marks S, egelin J, Callahan EJ, Nesbitt TS. A randomi ed, controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. *Psychiatry (Edgmont)* 2007 : 58-65 PMID: 20805900

96    it e , Crosby RD, onderlich SA, Crow S, ancaster , Simonich , Swan- remeier , ysne C, Myers TC. A randomi ed trial comparing the efficacy of cognitive-behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face. *Behav Res Ther* 2008 : 581-592 PMID: 18 74 04 D I: 10.1016/ .brat.2008.02.004

97    or d , reene CJ, Rosen CS, oy D, Reilly P, Shore J, e , rueh BC. Telemedicine for anger management therapy in a rural population of combat veterans with posttraumatic stress disorder: a randomi ed noninferiority trial. *J Clin Psychiatry* 2010 : 855-86 PMID: 20122 74 D I: 10.4088/JCP.09m05604blu

98    C o , Moreno . easibility and acceptability of clinic-based telepsychiatry for low-income ispanic primary care patients. *Telemed J E Health* 2012 : 297- 04 PMID: 22424078 D I: 10.1089/tm .2011.0126

99    ore o , Chong J, Dumbauld J, umke M, Byreddy S. se of standard ebcam and Internet e uipment for telepsychiatry treatment of depression among underserved ispanics. *Psychiatr Serv* 2012 : 121 -1217 PMID: 2 026854 D I: 10.1176/appi.ps.201100274

100    st , Tooth SM. Treatment via videoconferencing: a pilot study of delivery by clinical psychology trainees. *Aust J Rural Health* 2012 : 88-94 PMID: 224 5769 D I: 10.1111/ .1440-1584.2012.01260.x

101    ort ey C, Pyne JM, Mouden SB, Mittal D, udson TJ, Schroeder , illiams D , Bynum CA, Mattox R, Rost M. Practice-based versus telemedicine-based collaborative care for depression in rural federally ualified health centers: a pragmatic randomi ed comparative effectiveness trial. *Am J Psychiatry* 201 : 414-425 PMID: 2 429924 D I: 10.1176/appi.a p.2012.12050696

102    t i s , Rees CS, Roberts D, ane RT. Comparing in-person to videoconference-based cognitive behavioral therapy for mood and anxiety disorders: randomi ed controlled trial. *J Med Internet Res* 201 : e258 PMID: 2425266 D I: 10.2196/ mir.2564

10    C oi , Marti CN, Bruce M , egel MT, ilson N , unik ME. Six-month postintervention depression and disability outcomes of in-home telehealth problem-solving therapy for depressed, low-income homebound older adults. *Depress Anxiety* 2014 : 65 -661 PMID: 24501015 D I: 10.1002/da.22242

104    C oi , egel MT, Marti N, Marinucci M , Sirrianni , Bruce M . Telehealth problem-solving therapy for depressed low-income homebound older adults. *Am J Geriatr Psychiatry* 2014 : 26 -271 PMID: 2 567 76 D I: 10.1016/ .agp.201 .01.0 7

105    od es i , Darkins A, Peters J. utcomes of 98,609 .S. Department of eterans Affairs patients enrolled in telemental health services, 2006-2010. *Psychiatr Serv* 2012 : 8 - 85 PMID: 22476 05 D I: 10.1176/appi.ps.201100206

106    eyer , Peteet J, Joseph R. Models of care for co-occurring mental and medical disorders. *Harv Rev Psychiatry* 2009 : 5 - 60 PMID: 19968450 D I: 10. 109/1067 22090 46 25

107    r i , Mu o -Mayorga I. Telemedicine for depression: a systematic review. *Perspect Psychiatr Care* 2010 : 119-126 PMID: 20 77799 D I: 10.1111/ .1744-616 .2010.00247.x

108    i ey , ibrik , Cordeiro J, Novak auscher , o . Telehealth for mental health and substance use ( iterature review). Available from: R : http://med-fom-ehealth-office.sites.olt.ubc.ca/files/2013/04/TeleMental-Health-Literature-Review-FINAL.pdf

109    oro s i , Schneider J, Assareh N. Meta-review of the effectiveness of computerised CBT in treating depression. *BMC Psychiatry* 2011 : 1 1 PMID: 218 8902 D I: 10.1186/1471-24 4 -11-1 1

110    r , en , Boniel-Nissim M, Shapira N. A comprehensive review and a meta-analysis of the effectiveness of internet-based psychotherapeutic interventions. *Journal of Technology in Human Services* 2008 : 109-160 D I: 10.1080/152288 0802094429

111    dersso , Cui pers P. Internet-based and other computeri ed psychological treatments for adult depression: a meta-analysis. *Cogn Behav Ther* 2009 : 196-205 PMID: 2018 695 D I: 10.1080/1650607090 18960

112    ee , Bower P, ovell , ilbody S, Richards D, ask , Roach P. Psychotherapy mediated by remote communication technologies: a meta-analytic review. *BMC Psychiatry* 2008 : 60 PMID: 18647 96 D I: 10.1186/1471-244 -8-60

11    ootto , Titova N. Distance treatment of obsessive compulsive disorder. *Behaviour Change* 2010 : 112-118 D I: 10.1 75/



bech.27.2.112

114  er i , Marchand A, Bouchard S, Drouin MS, uay S. Effectiveness of cognitive behavioural therapy administered by videoconference for posttraumatic stress disorder. Cogn Behav Ther 2009 : 42-5  PMID: 192 5601 D I: 10.1080/1650607080247 494

115  r d , Beaulieu-Pr vost D, uay S, Bouchard S, Drouin MS, Germain V. Relative Efficacy of Cognitive-Behavioral Therapy Administered by ideoconference for Posttraumatic Stress Disorder: A Six-Month ollow- p. J Aggress Maltreat Trauma 2011 : 04- 21 PMID: 2 687441 D I: 10.1080/10926771.2011.562479

116  or d , Pierce , ong MY. Telemedicine and coping skills groups for Pacific Island veterans with post-traumatic stress disorder: a pilot study. J Telemed Telecare 2004 : 286-289 PMID: 15494087

117  er i , Marchand A, Bouchard S, uay S, Drouin MS. Assessment of the therapeutic alliance in face-to-face or videoconference treatment for posttraumatic stress disorder. Cyberpsychol Behav Soc Netw 2010 : 29- 5 PMID: 20528290

118  , assi a CM, Clapp JD. Technological advances in the treatment of trauma: a review of promising practices. Behav Modif 2012 : 897-92  PMID: 22956588 D I: 10.1177/014544551245 07

119  o , allagher M , einstein BA, ee DJ, Pruneau M. Efficacy of telehealth treatments for posttraumatic stress-related symptoms: a meta-analysis. Cogn Behav Ther 2011 : 111-125 PMID: 21547778 D I: 10.1080/1650607 .2010.550058

120  Crow , Mitchell JE, Crosby RD, Swanson SA, onderlich S, ancaster . The cost effectiveness of cognitive behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face. Behav Res Ther 2009 : 451-45 PMID: 19 5674 D I: 10.1016/ .brat.2009.02.006

121  rte t , Crosby RD, Marino JM, Mitchell JE, ancaster , Crow SJ. Therapeutic factors affecting the cognitive behavioral treatment of bulimia nervosa via telemedicine versus face-to-face delivery. Int J Eat Disord 2011 : 687-697 PMID: 22072405 D I: 10.1002/eat.20874

122  o . Telemedicine interventions for substance-use disorder: a literature review. J Telemed Telecare 2012 : 47-5 PMID: 22101610 D I: 10.1258/ tt.2011.110608

12  rp , obak A, sman DA. The use of videoconferencing with patients with psychosis: a review of the literature. Ann Gen Psychiatry 2011 : 14 PMID: 21501496 D I: 10.1186/1744-859 -10-14

124  K s ow , elmet , Appelt C, Thompson R, Rotondi A, aas . Telepsychiatry in the assessment and treatment of schi ophrenia. Clin Schizophr Relat Psychoses 2014 : 21-274 PMID: 2 428781 D I: 10. 71/CSRP. A.E02151

125  der Krie e , underink , Emerencia AC, de Jonge P, Sytema S. E-mental health self-management for psychotic disorders: state of the art and future perspectives. Psychiatr Serv 2014 : -49 PMID: 24129842 D I: 10.1176/appi.ps.201 00050

126  od es i , Nieves JE, Darkins A, ehmann . A telemental health: suicide assessment. Behav Sci Law 2008 : 271-286 PMID: 18548515 D I: 10.1002/bsl.811

127  Krysi s K , De eo D. Telecommunication and suicide prevention: hopes and challenges for the new century. Omega ( estport) 2007 : 2 7-25 PMID: 18214070 D I: 10.2190/ M.55. .e

128  i o d , Bloch RM. Telepsychiatry assessments of child or adolescent behavior disorders: a review of evidence and issues. Telemed J E Health 2010 : 712-716 PMID: 20575615 D I: 10.1089/tm .2010.0007

129  es , Ebeling , uusim ki M , inblad I, Isohanni M, Moilanen I. Videoconferencing in child and adolescent telepsychiatry: a systematic review of the literature. J Telemed Telecare 2004 : 187-192 PMID: 1527 027

1 0  , S eftel R. Clinical use of telemedicine in child psychiatry. Focus 2008 : 29 -296

1 1  er , Myers M, ander Stoep A, McCarty CA, eyer JR, Desalvo A. Attention-deficit/hyperactivity disorder and telemental health. Curr Psychiatry Rep 2010 : 409-417 PMID: 20625857 D I: 10.1007/s11920-010-01 2-8

1 2  y re , Yellowlees P, ilty D. The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice Telemed J E Health 2010 : 289-292 PMID: 20406115 D I: 10.1089/tm .2009.01 0

1  yers K , Palmer NB, eyer JR. Research in child and adolescent telemental health. Child Adolesc Psychiatr Clin N Am 2011 : 155-171 PMID: 21092919 D I: 10.1016/ .chc.2010.08.007

1 4  o e C, Reese HJ, McClellan MJ. Telepsychology outcome research with children and adolescents: a review of the literature. Psychol Serv 2012 : 272-292 PMID: 22867120 D I: 10.10 7/a0027607

1 5  oyde K , odgins M, Pignatiello A, Teshima J, Edwards , illis D. sing technology to deliver mental health services to children and youth: a scoping review. J Can Acad Child Adolesc Psychiatry 2014 : 87-99 PMID: 24872824

1 6  C ris e . Child and adolescent telemental health. In: Myers , Turvey C , editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 201 : 197-221

1 7  ie , Dixon J , Yee M, hang J, Chen YA, Deangelo S, Yellowlees P, endren R, Schweit er JB. A study on the effectiveness of videoconferencing on teaching parent training skills to parents of children with AD D. Telemed J E Health 201 : 192-199 PMID: 2 405952 D I: 10.1089/tm .2012.0108

1 8  es , Morgan D, osteniuk J. Dementia care in rural and remote settings: a systematic review of informal/family caregiving. Maturitas 2011 : 4-46 PMID: 2109 996 D I: 10.1016/ .maturitas.2010.10.002

1 9  os os , Mateos R, o o D, Conn D , Patterson T. Telepsychogeriatrics: a new hori on in the care of mental health problems in the elderly. Int Psychogeriatr 2012 : 1708-1724 PMID: 22687259 D I: 10.1017/S1041610212000981

140  eer , Dealya J, Rabinowit T. eriatric telemental health. In: Myers , Turvey C , editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 201 : 171-195

141 K i , Saleem Y, Stankard P. The use of telepsychiatry within forensic practice: A literature review on the use of videolink. J Forens Psychiatry Psychol 2008 : 2-1 D I: 10.1080/1478994070 1560794

142  rs , Ramlall S, aliski S. orensic telepsychiatry: a possible solution for South Africa Afr J Psychiatry (Johannesbg) 2012 : 244-247 PMID: 22829226 D I: 10.4 14/a psy.v15i4. 1

14  es i , Thistlethwaite T, Coustasse A. Telepsychiatry in correctional facilities: using technology to improve access and decrease costs of mental health care in underserved populations. Perm J 201 : 80-86 PMID: 24 55894 D I: 10.7812/TPP/12-12

144  t sti i , McDonald BR, Morgan RD. ideoteleconferencing in forensic and correctional practice. In: Myers , Turvey C , editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 201 : 251-271

145  e ow ees , Burke MM, Marks S , ilty DM, Shore J . Emergency telepsychiatry. J Telemed Telecare 2008 : 277-281 PMID: 18776070 D I: 10.1258/ tt.2008.080419

146  i i s , Pfeffer M, Boyle J, ilty DM. Telepsychiatry in the emergency department: verview and case studies. Sacramento, CA: California ealthCare oundation, 2009. Available from: R : http://www.chcf.org/ /media/MEDIA IBRARY iles/PD /T/PD TelepsychiatryProgramsED.pdf

147  ore , Savin DM, Novins D, Manson SM. Cultural aspects of telepsychiatry. J Telemed Telecare 2006 : 116-121 PMID: 166 82 2

148  ore , Brooks E, Savin D, rton , rigsby J, Manson SM. Acceptability of telepsychiatry in American Indians. Telemed J E Health 2008 : 461-466 PMID: 18578681 D I: 10.1089/tm .2007.0077

149  r , Seymour A, Sanderson B, Boesch . Reaching agreement for an Aboriginal e-health research agenda: the Aboriginal Telehealth nowledge Circle consensus method. Rural Remote



Health 2010    : 1299  PMID: 20108996

150    orsty    , Saniotis A, Sobhanian  . A systematic review of tele-counselling and its effectiveness in managing depression amongst minority ethnic communities. *J Telemed Telecare* 201    :   8- 46  PMID: 2416 298 D I: 10.1177/1 576   1 501767

151    i pso  . Psychotherapy via videoconferencing: A review. *British Journal of Guidance and Counselling* 2009    : 271-286 D I: 10.1080/0 069880902957007

152        s , Agha  , Maglione M , Repp A, Ross B,  uest D, Rice-Thorp NM,  ohr J, Thorp SR.  ideoconferencing psycho-therapy: a systematic review. *Psychol Serv* 2012    : 111-1 1  PMID: 22662727 D I: 10.10 7/a0027924

15    oetter    ,  erbert JD,  orman EM, Yuen E  , Thomas J . An open trial of videoconference-mediated exposure and ritual preven-tion for obsessive-compulsive disorder. *J Anxiety Disord* 2014    : 460-462  PMID: 2487 88  D I: 10.1016/ . anxdis.2014.05.004

154    i ey    , Carey J,  ade S .  amilies in crisis: considerations for the use of web-based treatment models in family therapy. *Families in Society: J of Contemporary Social Services* 2009    :   7-45 D I: 10.1606/1044-  894.  84

155    tee K, Cox D,  arry  . Therapeutic videoconferencing interven-tions for the treatment of long-term conditions. *J Telemed Telecare* 2011    : 109-117  PMID: 21   9  04 D I: 10.1258/ tt.2010.100 18

156    pe    , Cui pers P, Nykl cek I, Riper  ,  ey er J, Pop  . Internet-based cognitive behaviour therapy for symptoms of depression and anxiety: a meta-analysis. *Psychol Med* 2007    : 19- 28  PMID: 17112400

157    its    , Berry AC, Tart CD, Powers MB. The efficacy of cog-nitive-behavioral interventions for reducing anxiety sensitivity: a meta-analytic review. *Behav Res Ther* 2008    : 1047-1054  PMID: 18687421 D I: 10.1016/ .brat.2008.06.010

158    e er    ,  ahm  A. A meta-analysis of the effects of internet-and computer-based cognitive-behavioral treatments for anxiety. *J Clin Psychol* 2009    :   5 - 75  PMID: 19051274 D I: 10.1002/ clp.205 6

159    dersso    .  sing the Internet to provide cognitive behaviour therapy. *Behav Res Ther* 2009    : 175-180  PMID: 192 0862 D I: 10.1016/ .brat.2009.01.010

160    str i  sy  o o i  ociety. Internet supported psychologi-cal interventions. A guide to navigating the online world of psycho-logical programs.  ictoria: Australian Psychological Society, 201 . Available from: URL: http://www.acpor.ro/files/file/resurse_articole/ APS 2012 internet supported interventions.pdf

161    e    . Establishing therapeutic rapport in telemental health. In: Myers  ,  Turvey C  , editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amster-dam: Elsevier Inc., 201    : 29-46

162    i er    . Telemedicine and doctor-patient communication: a theoretical framework for evaluation. *J Telemed Telecare* 2002    : 11- 18  PMID: 125  7917

16    i ty    , Nesbitt TS, Marks S  , Callahan EJ. Effects of telepsy-chiatry on the doctor-patient relationship: communication, satisfac-tion, and relevant issues. *Prim Psychiatry* 2002    : 29- 4

164    i er    . Telemedicine and doctor-patient communication: an analytical survey of the literature. *J Telemed Telecare* 2001    : 1-17  PMID: 112659

165    i er    . Telepsychiatry and doctor-patient communication: an analysis of the empirical literature. In:  ootton R, Yellowlees P, McClaren P, editors. Telepsychiatry and E-Mental  ealth.  ondon: Royal Society of Medicine Press, 200    :   9-71

166        , Schnur JB, Constantino MJ, Miller SJ, Brackman E  , Montgomery  . The therapeutic relationship in e-therapy for mental health: a systematic review. *J Med Internet Res* 2012    : e110 D I: 10.2196/ mir.2084

167    r ey C  , Myers  . Research in telemental health: review and synthesis. In: Myers  ,  Turvey C  , editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 201    : 97-419

168    ir    ,  hitten P. Systematic review of studies of patient sat-isfaction with telemedicine. *BMJ* 2000    : 1517-1520  PMID:

108  4899

169    i i  s    , May CR, Esmail A .  imitations of patient satisfac-tion studies in telehealthcare: a systematic review of the literature. *Telemed J E Health* 2001    : 29 - 16  PMID: 11886667

170    itte    ,  ove B. Patient and provider satisfaction with the use of telemedicine: overview and rationale for cautious enthusiasm. *J Postgrad Med* 2005    : 294- 00  PMID: 16  88172

171    de    ,  arnon J, Elshaug A  ,  iller JE. A systematic review of economic analyses of telehealth services using real time video com-munication. *BMC Health Serv Res* 2010    : 2  PMID: 2069607 D I: 10.1186/1472-696  -10-2

172    y er    ,  angure DP. A review of the costs of telepsychiatry. *Psy-chiatr Serv* 200    :   976-980  PMID: 128514

17    or    . The use of telemedicine in psychiatry. *J Psychiatr Ment Health Nurs* 2006    :  771-777  PMID: 17087682

174    y e    ,  ortney JC, Tripathi SP, Macie ewski M  , Edlund MJ,  illiams D  . Cost-effectiveness analysis of a rural telemedicine collaborative care intervention for depression. *Arch Gen Psychiatry* 2010    : 812-821  PMID: 20679589 D I: 10.1001/archgenpsy-chiatry.2010.82

175    e    . Business aspects of telemental health in private practice. In: Myers  ,  Turvey C  , editors. Telemental health. Clinical, tech-nical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 201    : 111-1

176    i ey    ,  hinmaa A, Roine R.  imitations in the routine use of telepsychiatry. *J Telemed Telecare* 2009    : 28- 1  PMID: 191  9217 D I: 10.1258/ tt.2008.080609

177    roo  s  , Turvey C, Augusterfer E  . Provider barriers to tele-mental health: obstacles overcome, obstacles remaining. *Telemed J E Health* 201    :   4  -4 7  PMID: 2 590176 D I: 10.1089/ tm .201 .0068

178    i  s  C,  ibson  ,  Donnell S. To use or not to use: clini-cians  perceptions of telemental health. *Canadian Psychology/Psy-chologie canadienne* 2011    : 41-51 D I: 10.10  7/a0022275

179    to    , Sirotin AD, Mishkind MC. Safety of telemental health-care delivered to clinically unsupervised settings: a systematic review. *Telemed J E Health* 2010    : 705-711  PMID: 2058  951 D I: 10.1089/tm .2009.0179

180    Kr er    , Mishkinda MC,  uxton DD, Shore J  . Managing risk and protecting privacy in telemental health: an overview of legal, regulatory, and risk-management issues. In: Myers  ,  Turvey C  , editors. Telemental health. Clinical, technical, and administra-tive foundations for evidence-based practice. Amsterdam: Elsevier Inc., 201    : 8  -107

181    y er    ,  angure DP.  egal and ethical challenges in telepsychia-try. *J Psychiatr Pract* 2004    : 272-276  PMID: 15552552

182    e so    ,  Davis  ,  elas ue  SE. Ethical considerations in pro-viding mental health services over videoteleconferencing. In: Myers  ,  Turvey C  , editors. Telemental health. Clinical, technical, and administrative foundations for evidence-based practice. Amsterdam: Elsevier Inc., 201    : 47-62

18    rs    . Telepsychiatry in Africa -- a way forward  *Afr J Psy-chiatry* (Johannesbg) 2012    : 215, 217  PMID: 2282922  D I: 10.4  14/a psy.v15i4.27

184    ee    . Telepsychiatry and cultural barriers in  orea. *Stud Health Technol Inform* 2009    : 145-148  PMID: 19592752 D I: 10. 2 /978-1-60750-017-9-145

185    i  s    , Ni ami A. Telepsychiatry: answer to psychiatric reha-bilitation of  earth uake affected population in Pakistan. *Journal of Pakistan Psychiatric Society* 2005    : 62

186        , Ni ami A, Minhas A, Nia i R, Slatch M, Minhas  . E-mental health in Pakistan: A pilot study of training and supervi-sion in child psychiatry using the internet. *The Psychiatrist* 2006    : 149-152 D I: 10.1192/pb. 0.4.149

187    si orw    , Shah NB, Chatter ee SD,  ale  P, Matcheswal-la YA. Asynchronous telepsychiatry in maharashtra, India: study of feasibility and referral pattern. *Indian J Psychol Med* 2014    : 299- 01  PMID: 250  5555 D I: 10.410 /0253 -7176.1  5 84

188        K, Chiu  ,  oo J,  elm M,  ui E. Telepsychiatry in psy-chogeriatric service: a pilot study. *Int J Geriatr Psychiatry* 2001



Chakrabarti S. Usefulness of videoconferencing telepsychiatry

: 88-9  PMID: 11180491

189    e ee    o  . Telemental health in the middle East: overcoming the barriers. *Front Public Health* 2014  : 86  PMID: 25101255  D  I: 10. 89/fpubh.2014.00086

190    r  , John S, Rao   . Telepsychiatry in Chennai, India: the SCAR  experience. *Behav Sci Law* 2008  : 15- 22  PMID: 18548517 D  I: 10.1002/bsl.816

191    r   , Su it J. Mobile telepsychiatry in India. *World Psychiatry* 201   : 84  PMID: 2 471809 D  I: 10.1002/wps.20025

192    otr  , Chakrabarti S. Telepsychiatry: A new paradigm for mental health care delivery. *JPGIMER* 2012  : 61-62

19    otr  , Chakrabarti S, Shah R,  upta A, Mehta A, Nithya B,  umar  , Sharma M. Development of a novel diagnostic system for a telepsychiatric application: a pilot validation study. *BMC Res Notes* 2014  : 508  PMID: 251064 8 D  I: 10.1186/1756-0500-7-508

194  **Cresswe  K**, Ma eed A, Bates D  , Sheikh A. Computerised decision support systems for healthcare professionals: an interpretative review. *Inform Prim Care* 2012  : 115-128  PMID: 2 710776

195    otr  , Chakrabarti S, Shah R,  umar  , Nithya B. Computerised system of diagnosis and treatment in telepsychiatry: development and feasibility study of a pharmacological treatment module. *Indian J Psychiatry* 201    (Suppl): S129

196    otr  , Chakrabarti S,  upta A, Mehta A, Shah R,  umar  , Sharma M. A self-guided relaxation module for telepsychiatric services: development, usefulness, and feasibility. *Int J Psychiatry Med* 201   : 25- 7  PMID: 24922985 D  I: 10.2190/PM.46.4.a

e iewer:  a dag  , Myers CS    ditor:  ong M   ditor: A    ditor:  u





Published by **Baishideng Publishing Group Inc**
8226 Regency Drive, Pleasanton, CA 94588, USA
Telephone: +1-925-223-8242
Fax: +1-925-223-8243
E-mail: bpgoffice@wjgnet.com
Help Desk: http://www.wjgnet.com/esps/helpdesk.aspx
http://www.wjgnet.com



© 2015 Baishideng Publishing Group Inc. All rights reserved.

■ REVIEW ARTICLE

# Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations

Stacie Anne Deslich, MA, MS; Timothy Thistlethwaite, MD; Alberto Coustasse, DrPH, MD, MBA, MPH

Perm J 2013 Summer;17(3):80-86

http://dx.doi.org/10.7812/TPP/12-123

## Abstract

**Objective:** It is unclear if telepsychiatry, a subset of telemedicine, increases access to mental health care for inmates in correctional facilities or decreases costs for clinicians or facility administrators. The purpose of this investigation was to determine how utilization of telepsychiatry affected access to care and costs of providing mental health care in correctional facilities.

**Methods:** A literature review complemented by a semistructured interview with a telepsychiatry practitioner. Five electronic databases, the National Bureau of Justice, and the American Psychiatric Association Web sites were searched for this research, and 49 sources were referenced. The literature review examined implementation of telepsychiatry in correctional facilities in Arizona, California, Georgia, Kansas, Ohio, Texas, and West Virginia to determine the effect of telepsychiatry on inmate access to mental health services and the costs of providing mental health care in correctional facilities.

**Results:** Telepsychiatry provided improved access to mental health services for inmates, and this increase in access is through the continuum of mental health care, which has been instrumental in increasing quality of care for inmates. Use of telepsychiatry saved correctional facilities from $12,000 to more than $1 million. The semistructured interview with the telepsychiatry practitioner supported utilization of telepsychiatry to increase access and lower costs of providing mental health care in correctional facilities.

**Conclusions:** Increasing access to mental health care for this underserved group through telepsychiatry may improve living conditions and safety inside correctional facilities. Providers, facilities, and state and federal governments can expect increased savings with utilization of telepsychiatry.

## Introduction

Substantial growth in technology has improved the delivery of medical care and increased access for patients seeking care. One area in which technology has made meaningful contributions is telemedicine, the delivery of health care across distance via the use of technology and communication modalities.[1] Telemedicine has been used for medical information interchange and to facilitate diagnosis, referral, monitoring, and interventions to offset higher costs associated with hard-to-access patients.[2] Telepsychiatry has been one area of telemedicine that has continued to grow and improve. Telepsychiatry has been defined as using telecommunication modalities, including teleconferencing software, hardware, and supporting infrastructure, to provide mental health care.[3] Telepsychiatry has the potential to improve patient access to care and lower costs of providing mental health care.[4] This technology has been shown to be used effectively in rural areas, schools, forensic practices, and correctional facilities.[5]

This subspecialty of telemedicine has shown potential for expanded use in correctional settings such as jails and prisons.[6] The nation's correctional facilities in 2007 held approximately 7.1 million inmates, and around half of these inmates had some sort of mental illness.[7] As the number of incarcerated individuals increases, the need for effective and appropriate psychiatric treatment has continued to grow as well. Telepsychiatry has begun to fill this need.[8]

Inmates in correctional facilities have long received substandard health care, including mental health care.[9] Lack of proper psychiatric services has led to untreated mental illnesses such as depression, anxiety, bipolar disorders, and schizophrenia being common in the inmate population.[7] Access to appropriate psychiatric care has been limited in correctional facilities for several reasons. In some cases, such as in West Virginia, Ohio, and Georgia, various providers have been hesitant to provide mental health treatment inside correctional facilities because of safety concerns.[3] In addition, costs for providers traveling to distant facilities have been a deterrent to providing adequate care to inmates. Besides transportation costs, there is an "opportunity cost" of not seeing more patients in the clinic because of the long trip to the prison.[10]

It can be noted, however, that cases do exist in which the practice of psychiatry in the correctional systems in some states, such as California, is lucrative enough to offset such limitations. It has been reported that 1 psychiatrist earned more than $820,000 in 2011 working for 1 prison in California. Also according to the same authors, 14 prison psychiatrists earned more than $400,000 in this state, a level matched by only 12 other states.[11]

Transporting inmates outside correctional facilities for treatment has not been effective, either. The costs of transporting an inmate, in actual transportation costs, person hours, and

**Stacie Anne Deslich, MA, MS,** is a Master of Science in Healthcare Administration, Graduate School of Business at Marshall University in South Charleston, West Virginia. E-mail: deslich1@marshall.edu. **Timothy Thistlethwaite, MD,** is a Psychiatrist and Medical Director of PSYMED Corrections, LLC, in Charleston, West Virginia. E-mail: timmyt114@yahoo.com. **Alberto Coustasse, DrPH, MD, MBA, MPH,** is an Associate Professor of Healthcare Administration in the Graduate School of Management at Marshall University in South Charleston, West Virginia. E-mail: coustassehen@marshall.edu.

Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations

increased risk to public safety and security, have been a major barrier to bringing inmates to providers for treatment. Additionally, prisons usually use two prison staff members to transport inmates, which generates a need to replace those two officers in the prison to avoid a security risk because of understaffing the facility. Furthermore, many providers have been unwilling to provide treatment to inmates in a private practice setting because of increased danger to the providers and the other patients.[12] Telepsychiatry in correctional facilities has been effective in overcoming these barriers.

The National Bureau of Justice has reported that more than 50% of inmates in correctional facilities had a diagnosable mental illness, including substance abuse.[7] Recidivism, or reoffending and reentering the correctional system within 3 years of release, has been high among offenders with mental illness; approximately 25% of those inmates surveyed by the Bureau of Justice who had been incarcerated 3 or more times had diagnosable mental illnesses, specifically mania, depression, or a psychotic disorder.[7] With so many mentally ill inmates being released and reoffending, correctional system administrators and providers have had to examine ways to effectively treat mental illness and to decrease recidivism among the mentally ill. Telepsychiatry has been examined for its potential to do that.[10]

Several studies have examined the efficacy of telemedicine, and telepsychiatry in particular, in correctional settings.[1,9,13,14] Less research has been performed to examine the effect of telepsychiatry on inmate access to mental health treatment or the impact of telepsychiatry on costs of providing mental health treatment in correctional facilities. This may have been because of the difficulty in quantifying access or cost in providing this treatment.[15] The research that has been done, however, has indicated that telepsychiatry may play a pivotal role in providing psychiatric treatment inside correctional facilities.[16]

## Methods

The purpose of this review was to determine the effect of telepsychiatry on inmate access to mental health services and on the cost of providing mental health care in correctional facilities.

The method used was a literature review complemented with a semistructured interview of the second author, Timothy Thistlethwaite, MD, an experienced practitioner of telepsychiatry who has used telepsychiatry in correctional facilities for more than 17 years (see Sidebar: Questions asked in semistructured interview of telepsychiatrist). This interview was tape recorded, and only relevant answers were used to support the information found in the literature review to provide a contextualized and more comprehensive overview of this technology and its utilization in prisons.

Electronic databases of PubMed, Academic Search Premier, ProQuest, PsycARTICLES, and Google Scholar were searched for the terms *telepsychiatry* or *tele mental health* and *prison* or *access* or *cost*. Reputable Web sites of the National Bureau of Justice and the American Psychiatric Association were also mined. Only articles that were written in English were included for review. In an attempt to stay current in research, all articles that were older than 12 years (starting from 2000) were eliminated from

the search. References were reviewed and determined to have satisfied the inclusion criteria if the material provided accurate information about telepsychiatry with a particular focus on prison mental health.

The results presented were extracted from journal articles, case studies, and different Web sites from diverse sources, as well as from the semistructured interview, to illustrate several aspects of telepsychiatry in prisons that should be considered, such as inmate access to mental health care and costs involved with it. Academic articles and practitioner health information technology sources were analyzed, and relevant categories were identified.

## Results

Forty-nine sources were selected for this review. Findings are presented in the categories of access and savings.

### Increased Access

Leonard[17] cited limited access to appropriate mental health care as a difficulty faced by many inmates. Inadequate access to care has often led to prisoners having untreated mental illness, which, in turn, has increased rates of violent behavior in correctional facilities as well as substantially increased recidivism.[18] According to the World Health Organization Mind Project, 24% of inmates with a mental illness have assaulted another inmate in a correctional facility, and those with mental illness are 2 times more likely to be injured in a fight than inmates without mental illness.[19] On the other hand, Hilty et al[20] found that using telepsychiatry as the means for mental health treatment increased access in rural, suburban, and urban settings. Similar results have been supported in a 2005 study of telepsychiatry in a correctional setting in New York as well.[21] Furthermore, telepsychiatry has been shown to increase access to mental health treatment for patients in schools and for veterans.[22,23]

**Questions asked in semistructured interview of telepsychiatrist[a]**

- How have you implemented telepsychiatry into your practice in correctional facilities?

- What method do you use to provide telepsychiatry to your patients in prisons, ie, software, hardware, and Internet connections?

- Who is involved in a typical telepsychiatry session in a correctional facility?

- What services are provided via telepsychiatry?

- How have inmates reacted to the utilization of telepsychiatry?

- How has telepsychiatry benefited your practice?

- How has the utilization of telepsychiatry affected inmate access to mental health care?

- How has the utilization of telepsychiatry affected the cost of providing mental health services to inmates in your practice?

- Are there any other significant advantages or disadvantages to telepsychiatry utilization in correctional facilities that we have not discussed?

[a] Timothy Thistlethwaite, MD, on March 28, 2012.

REVIEW ARTICLE

Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations

Utilization of telepsychiatry has been shown to overcome travel and cost barriers, allowing inmates to meet with a treating psychiatrist via teleconference, thus allowing greater access to treatment for the inmate and continuity of care without compromising public safety and security or incurring increased transportation costs.[24]

> ... use of telepsychiatry in conjunction with electronic medical records that have been implemented in correctional facilities has allowed for more effective provision of health care to inmates.

Mental health treatment teams in correctional settings in the US normally include a psychiatrist, psychologists, therapists, and psychiatric nurses. Access to the team is facilitated by living-unit supervisors and correctional caseworkers who have direct contact with the general population of the prison. The psychiatrist provides telepsychiatric services from a remote setting to inmates in the penitentiary. Services provided include psychiatric consultation, initial treatment evaluations, crisis intervention, medication management, and patient education.[25] Psychotherapy, although available via telecommunications devices, is often provided face to face by a therapist or psychologist in the facility.

Several states have effectively implemented telepsychiatry programs into their correctional facilities and have been able to increase access to appropriate mental health care for inmates. Arizona, California, Georgia, Kansas, Ohio, and West Virginia have begun to use telepsychiatry in their correctional facilities with some success (Table 1).

The Ohio State University Medical Center in Columbus, OH, has partnered with the Ohio Department of Rehabilitation and Correction to provide telepsychiatry services to inmates in Ohio prisons, providing evaluation, patient education, and medication management to more than 4000 inmates each year since 1998.[26] Similarly, as of 1997, St Mary's Hospital and the University of Arizona in Tucson have collaborated with the Arizona Telemedicine Program to provide telemedicine and telepsychiatry to the Arizona Department of Corrections. The University of Arizona Medical Center and Maricopa Medical Center in Phoenix, AZ, provided the base for this program to use telepsychiatry in rural prisons in the state, thus reaching more inmates and encouraging increased access to inmates who otherwise would have had lengthy waits for mental health services and evaluations for treatment.[27]

In 1998, the University of Kansas Center for Telemedicine & Telehealth implemented a telepsychiatry program that has served the state prison system since then and has provided an average of 70 telepsychiatry consultations each month. Telepsychiatrists have provided care and been reimbursed on a fee-for-service basis, and have delivered psychiatric services such as evaluation, treatment planning, medication management, and crisis intervention.[14]

In California, the California Department of Corrections and Rehabilitation Division of Correctional Health Care Services implemented a telepsychiatry program using contracted providers to meet the mental health needs of the inmates in 27 of the prisons in that state, and more than 4000 inmates have received appropriate psychiatric care annually.[28] This program has increased public safety by preventing inmate transports, decreased costs associated with those transports, and increased inmate access to effective psychiatric treatment in the form of psychiatric evaluations, medication management, and crisis intervention.[28] Johnston and Solomon[29] found that the implementation and utilization of this telepsychiatry program saved about $850 in inmate transportation costs, a savings of $4 million in 2004 because of decreased travel and transportation costs, as well as decreased costs for providing correctional officers to facilitate the transport.

The University of Texas Medical Branch at Galveston has a telemedicine program, in service since the early 1990s, providing telepsychiatry services including medication management and crisis intervention to correctional facilities at the county, state, and federal levels in Texas. The program has grown to be one of the largest providers of telepsychiatry worldwide (S Shelton, MBA PA-C, personal communication, June 11, 2012).[a] This program, while providing vital services to the inmate population in Texas, faces funding difficulties. Survival of the program will depend on adequate and appropriate funding (S Shelton, MBA, PA-C, personal communication, June 11, 2012).[a]

In West Virginia, mental health services are provided to inmates housed in the state's prisons by an independent subcontractor, PsiMed Corrections LLC, under the contract of Wexford Health Services with the state of West Virginia.[30] PsiMed has used a telepsychiatry system set up in the state's only maximum security prison to provide telepsychiatric care such as initial treatment evaluation, medication management, crisis interven-

| Table 1. States that implemented telepsychiatry programs in correctional facilities | | |
|---|---|---|
| Author, year | State | Provider | Population treated |
| Nelson et al,[14] 2004 | Kansas | University of Kansas Center for Telemedicine & Telehealth | Treatment provided to 1 jail in a pilot program with all 62 participating inmates |
| Venable,[33] 2005 | Georgia | Augusta Correctional and Medical Institute | Treatment provided to 5 prisons |
| Ohio Department of Rehabilitation and Correction,[26] 2006 | Ohio | Ohio State University Medical Center | Treatment provided to > 5000 inmates annually |
| California Legislative Analyst's Office,[28] 2007 | California | Office of Telemedicine Services, California Department of Corrections and Rehabilitation Division of Correctional Health Care Services | Treatment provided to 4400 inmates annually in 27 prisons |
| Hincapie et al,[27] 2011 | Arizona | Arizona Telemedicine Program | Treatment provided to 11 rural prisons |
| PsiMed Corrections LLC,[31] 2012 | West Virginia | PsiMed Corrections LLC | Treatment provided to 4200 inmates annually in 31 correctional facilities across West Virginia |

Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations

tion, and education about mental health to inmates throughout 31 of West Virginia's correctional facilities.[30] From 2003 to 2007, PsiMed Corrections' telepsychiatry program effectively provided psychiatric treatment to more than 4000 inmates annually, thus increasing inmate access to mental health treatment and decreasing travel costs for the treating psychiatrist.[31]

Gramlich[32] identified that approximately 70% of telemedicine visits provided in the Georgia correctional system were for mental health treatment. Georgia's telepsychiatry program has increased access to psychiatric care in 5 prisons in Georgia since the mid-1990s.[33]

According to Dr Thistlethwaite, the interviewed telepsychiatric practitioner, this technology has provided increased access to mental health services for inmates, and this increased access, in turn, has been instrumental in improving quality of care for inmates by ensuring no disruption in continuity of care. Incarcerated individuals have experienced greater consistency with medication management and have had less delay in receiving appropriate care. As inmates are transferred from facility to facility, psychiatric care and medication management can be disrupted. Telepsychiatry can prevent such disruptions.

Inmates have further experienced greater access to care because practitioners and clinical staff involved in patient care have been able to use the same videoconferencing capabilities to coordinate care. For example, in the central hub, a psychiatrist and an assistant gather information about an inmate, while a counselor, psychologist, or nurse in the facility sits with the inmate to facilitate communication between the treating psychiatrist and the inmate. This increase in communication has been beneficial when more than one provider is involved in inmate care, because the clinicians also have utilized teleconferencing to communicate with each other and to provide better quality and continuity of care. Furthermore, use of telepsychiatry in conjunction with electronic medical records that have been implemented in correctional facilities has allowed for more effective provision of health care to inmates. Not only are two treating mental health care practitioners able to communicate via teleconference, psychiatrists and internists or specialists are also able to utilize this technology to discuss ongoing care of inmates.

PsiMed Corrections uses Polycom Solutions, a high-definition videoconferencing technology package (Polycom, Polycom Inc, San Jose, CA) for each telepsychiatric session, which is encrypted for privacy and for compliance with the Health Insurance Portability and Accountability Act (HIPAA). The contract with the prison system is managed with a private contract that the state bids out for medical care every three years. PsiMed gets its reimbursement as a subcontractor on a capitation basis.

It has been the experience of the psychologist first author of this review (SD) that the telepsychiatric session differs from a face-to-face psychiatric session in only the method of delivery. Most telepsychiatric interactions occur with a mental health practitioner present with the inmate. Only in cases of particularly violent or dangerous inmates are correctional officers present during the session. Inmates have been provided identical treatment via telepsychiatry as they would have in a more traditional setting. Additionally, more prisoners have been able to be seen, as travel time has been decreased. These inmates have been able to discuss medication management as well as ongoing mental health treatment issues with the psychiatrist and the prison medical team. Inmates have been able, via telepsychiatry, to continue to receive psychiatric services from the same provider, regardless of the prison in which they have been incarcerated, thus avoiding a period of adjusting to and developing therapeutic rapport with a different provider after transfer to a different prison.

According to Thistlethwaite, drawbacks to utilization of telepsychiatry in correctional facilities are mostly technical. Many providers who use the correctional facilities' Internet access must gain access past the facilities' firewalls. This demands the ongoing cooperation of the prison administrators, which has not always been offered,[32,34] as well as an adept team in the information technology department. Furthermore, Gramlich[32] notes that the prison servers are not always reliable, and connections may be inadequate for providing telepsychiatric care. Lee[35] noted concerns of some researchers, such as lack of nonverbal communication or confidentiality issues. Thistlethwaite disagreed with this, noting that proper placement of the videoconferencing equipment to adequately capture the movements of the inmate allows for visual identification of clinically significant motor movements and body language, and confidentiality agreements are signed, as well as informed consent to treatment, upon inmates entering a facility.

Thistlethwaite also noted that inmate satisfaction has not appeared to suffer with the use of telepsychiatry. In fact, in his personal experience, many inmates seem to prefer this form of treatment because of increased access to the psychiatrist. The notion that the use of telepsychiatry is supported by inmates has been reinforced by findings in the literature. Lexcen et al[36] found, in a study of 72 patients in a forensic setting, similar scores of satisfaction and outcomes using telepsychiatry as with face-to-face interventions. Similarly, Tucker et al[37] found that inmates were satisfied with telepsychiatry treatment for services including consulting, initial treatment evaluation, medication management, and psychotherapy. In addition, inmates actually preferred telepsychiatry in some situations, such as treatment for sexual abuse and sexual dysfunction.[37] As inmates have little confidentiality or privacy in general, it has been found that patient acceptance of and satisfaction with providers and multiple staff being involved in treatment via telepsychiatry remain high in comparison with face-to-face treatment.[36] Thistlethwaite noted that treatment confidentiality is no more at risk than in face-to-face interactions in mental health care in correctional facilities because secure software and Internet connections are used to provide this service.

Additionally, Ross et al[38] and Morland et al[39] examined patient outcomes of telepsychiatry and found them to be equivalent to those of face-to-face psychiatric treatment. At times, telepsychiatry was found to be more effective in treating mental illnesses such as depression.[40]

**Increased Savings**

Several studies have explored the financial benefits of implementing telepsychiatry programs. Cost-benefit analysis has been recommended as the most efficient and effective economic evaluation used for telepsychiatry implementation[41] (Table 2).

REVIEW ARTICLE

Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations

Although initial costs to start a telepsychiatry practice may reach several thousand dollars to acquire the software, hardware, and required infrastructure, these programs have been shown to cut overall costs by reducing travel for the provider, decreasing overutilization of other medical services such as laboratory work, increasing medication compliance, and speeding diagnosis via reduced waiting or consultation time.[41]

A literature review by Hyler and Gangure[42] identified seven studies that indicated substantial cost savings via the utilization of telepsychiatry. One study found increased costs, and three studies identified situations in which utilization of telepsychiatry had similar costs as face-to-face psychiatric treatment. The seven studies that identified savings with the implementation and use of telepsychiatry prompted these researchers to determine that the utilization of telepsychiatry has led to a decrease in cost for providing psychiatric treatment in some settings.[42]

> ... inmates were satisfied with telepsychiatry treatment for services including consulting, initial treatment evaluation, medication management, and psychotherapy.

Similarly, in a prospective test-retest (pretest-posttest) design study, Shore et al[43] determined that utilization of telepsychiatry for clinical interviews saved more than $12,000 compared with face-to-face clinical interviews over an 11-month period in 2006.

Harley, in 2006, examined the cost of providing tertiary mental health care via telepsychiatry compared with traditional methods.[44] It was found that initial costs to begin a telepsychiatry service were around $6800; however, after providing telepsychiatric care for 6 months, costs remained under $7000 total for providing telepsychiatry services. The author estimated that the costs to provide traditional face-to-face psychiatric services to the same population over the same period would have been more than $25,000, primarily because of travel expenses.[44]

These findings have been supported by actual utilization of telepsychiatry in correctional facilities. For example, the aforementioned Arizona Telemedicine Program reported a savings of more than $1 million in transportation costs since its inception in 1996, and a savings of $106,000 between July 2003 and December 2003 alone.[45] The program identified further savings in administrative costs, as well as an added benefit of government incentives for the utilization of telemedicine. These savings and benefits amounted to approximately $2.6 million.[45]

An examination of the actual costs of providing services—specific and individual costs of sessions—using telepsychiatry vs using traditional face-to-face methods yielded results. Reimbursement for telepsychiatry has been typically on a fee-for-service basis and does not cover maintenance and infrastructure costs. These costs often have been covered by grant funding to the provider's organization.[46] A review of the costs of providing telepsychiatric services have indicated substantial savings, even when hardware costs are figured in. It was found in a randomized controlled trial in 2006 that a face-to-face psychiatric session cost providers $315 per visit, whereas a telepsychiatric visit had a cost of $265, a savings of $50 per visit.[47]

## Discussion

The purpose of this research was to determine the effect of utilization of telepsychiatry on inmate access to mental health services and on the cost of providing mental health care in correctional facilities. The results of this review suggest that telepsychiatry has had a positive impact on mental health care in prisons by increasing access for inmates to effective psychiatric treatment and by maintaining continuity of care. In addition, substantial savings for providers and facilities was noted.

With a high prevalence of mental illness among inmates, adequate psychiatric care is imperative. In fact, appropriate care may have reduced aggressive inmate behavior inside correctional facilities, and well-managed mental illness has been shown to decrease recidivism upon release, as well as decrease victimization inside the facility.[48] Telepsychiatry is a way to provide this much needed care that is cost-effective, easily implemented, and accepted by providers and inmates.

As noted, a number of states, including Arizona, California, Georgia, Kansas, Ohio, Texas, and West Virginia, have implemented telepsychiatry programs in their correctional facilities with much success, both in increasing inmate access to providers and in decreasing costs. Furthermore, New Mexico and Michigan have also begun using telepsychiatry in prisons and have found similar positive results as in the other states.[49] Whereas the literature review identified one study that found increased costs with the implementation of telepsychiatry, the other studies reviewed found either similar costs as with face-to-face treatment or an increase in savings.[42] Studies examining the effect on access to care have all demonstrated substantial increase in inmates' access to care.[26,27,30,32]

| Table 2. Studies of cost-effectiveness of telepsychiatry programs in US correctional facilities | | | |
|---|---|---|---|
| Author, year | Study design | Outcome of utilization of telepsychiatry | Methods by which savings were achieved |
| Hyler & Gangure,[41] 2003 | Literature review | Decrease in costs in some settings | Decreased provider travel, decreased use of other medical services |
| Harley,[43] 2006 | Prospective design | Savings of $18,000 | Decreased provider travel, greater medication management |
| O'Reilly et al,[46] 2007 | Case-control design | Decreased costs from $315 to $265, a savings of $50 per visit | Decreased provider travel |
| Shore et al,[42] 2007 | Prospective test-retest design | Savings of > $12,000 | Decreased provider travel, decreased client travel |
| Johnston & Solomon,[29] 2008 | Review of government documents | Savings of $850 per visit, or $4 million annually | Decreased inmate transportation costs, decreased provider travel |

Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations

The semistructured interview with a telepsychiatric practitioner (TT) supported some of the findings of this review, including the advantages of increased access and decreased costs with the utilization of telepsychiatry, and potential disadvantages of lack of support by prison administration[32,34] and technical difficulties. The involvement of the correctional facilities' administration and their cooperation has been imperative for effective mental health treatment to take place via telepsychiatry. Thistlethwaite contradicted, however, some of the potential drawbacks identified in previous research studies such as lack of nonverbal communication or confidentiality issues.

This study was limited by the restrictions in the search strategy used, such as the number of databases searched, and publication bias may have affected the availability and quality of the research identified during the search. In addition, although much research exists about telepsychiatry in general, and a large number of studies have examined telepsychiatry in prisons, most of those studies have examined efficacy or acceptance of telepsychiatry. Research about the benefits or drawbacks of utilization on inmate access or cost to provide care is sparse. Also, the quality of care received through telepsychiatry was not measured through the reporting of any use of standardized scales or assessments.

Telepsychiatry can be "the wave of the future" in psychiatric care in correctional facilities because it can decrease the cost for facilities and increase access for inmates; however, further research in this area is needed. A prospective case-control examination of the cost to provide care via telepsychiatry in corrections compared with face-to-face telepsychiatry treatment would be beneficial. A comparison of the types and quantity of services provided to inmates through the use of telepsychiatry also would advance this new field of psychiatry.

## Conclusion

Telepsychiatry has been demonstrated to have substantial ability to transform the way psychiatric services are delivered in mental health care. This literature review has revealed that utilization of telepsychiatry in correctional facilities has increased access to effective mental health care for inmates and has decreased the costs of providing such care. ❖

ᵃ S Shelton, MBA, PA-C, Assistant Vice President for Community Outreach Program Director, Texas East Area Health Education Center, Office of the Provost, and Office of Health Policy and Legislative Affairs, University of Texas Medical Branch, 301 University Blvd, Galveston, TX.

**Disclosure Statement**

The author(s) have no conflicts of interest to disclose.

**Acknowledgment**

Kathleen Louden, ELS, of Louden Health Communications provided editorial assistance.

## References

1. Tucker W, Olfson M, Simring S, Goodman W, Bienenfeld S. A pilot survey of inmate preferences for on-site, visiting consultant, and telemedicine psychiatric services. CNS Spectr 2006 Oct;11(10):783-7.
2. Hill R, Luptak M, Rupper RW, et al. Review of Veterans Health Administration telemedicine interventions. Am J Manag Care 2010 Dec;16(12 suppl HIT):e302-10.
3. Saleem Y, Taylor MH, Khalifa N. Forensic telepsychiatry in the United Kingdom. Behav Sci Law 2008;26(3):333-44. DOI: http://dx.doi.org/10.1002/bsl.810
4. Chee JJ. Telepsychiatry and internet prescribing: a legal overview and case investigation [monograph on the Internet]. Washington, DC: Center for Telehealth and e-Health Law; 2012 Aug [cited 2012 Feb 5]. Available from: www.ctel.org/research/Telepsychiatry%20and%20Internet%20Prescribing%20A%20legal%20Overview%20and%20Case%20Investigation.pdf.
5. Melaka A, Edripulige S. Psych-technology: a systematic review of the telepsychiatry literature. Psychiatry On Line, The International Forum for Psychiatry [serial on the Internet]. 2009 [cited 2012 Feb 5]. Available from: http://espace.library.uq.edu.au/view/UQ:196610.
6. Emerson R. Telehealth in corrections [slide show on the Internet]. Presented to the Maine Corrections Alternatives Advisory Committee 2006 Dec; Augusta, ME. Slide Serve; 2006 [cited 2011 Dec 12]. Available from: www.slideserve.com/gwenlilian/telehealth-in-corrections.
7. James DJ, Glaze LE. Bureau of Justice Statistics special report: mental health problems of prison and jail inmates [monograph on the Internet]. Washington, DC: US Department of Justice, Office of Justice Programs; 2006 Sep [cited 2012 Feb 20]. Available from: http://bjs.ojp.usdoj.gov/content/pub/pdf/mhppji.pdf.
8. Raimer BG, Stobo JD. Health care delivery in the Texas prison system: the role of academic medicine. JAMA 2004 Jul 28;292(4):485-9. DOI: http://dx.doi.org/10.1001/jama.292.4.485
9. Leonard S. The successes and challenges of developing a prison telepsychiatry service. J Telemed Telecare 2004;10 Suppl 1:69-71. DOI: http://dx.doi.org/10.1258/1357633042614375
10. Morgan RD, Patrick AR, Magaletta PR. Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities. J Consult Clin Psychol 2008 Feb;76(1):158-62. DOI: http://dx.doi.org/10.1037/0022-006X.76.1.158
11. Klopott F, Yap R, Dopp T. California psychiatrists paid $400,000 shows bidding war [monograph on the Internet]. New York, NY: Bloomberg; 2012 Dec 11 [cited 2012 Feb 14]. Available from: www.bloomberg.com/news/2012-12-12/california-psychiatrists-paid-400-000-shows-bidding-war.html.
12. Magaletta PR, Patry MW, Gross NR, et al. Clinical practice in corrections: providing service, obtaining experience. Psychol Serv 2011;8(4):343-55. DOI: http://dx.doi.org/10.1037/a0025315
13. Larsen D, Stamm BH, Davis K, Magaletta PR. Prison telemedicine and telehealth utilization in the United States: state and federal perceptions of benefits and barriers. Telemed J E Health 2004;10 Suppl 2:S-81-9. DOI: http://dx.doi.org/10.1089/tmj.2004.10.S-81
14. Nelson EL, Zaylor C, Cook D. A comparison of psychiatrist evaluation and patient symptom report in a jail telepsychiatry clinic. Telemed J E Health 2004;10 Suppl 2:S-54-9. DOI: http://dx.doi.org/10.1089/tmj.2004.10.S-54
15. Antonacci DJ, Bloch RM, Saeed SA, Yildirim Y, Talley J. Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry. Behav Sci Law 2008;26(3):253-69. DOI: http://dx.doi.org/10.1002/bsl.812
16. Doarn CR, Justis D, Chaudhri MS, Merrell RC. Integration of telemedicine practice into correctional medicine: an evolving standard. J Correct Health Care 2005 Apr;11(3):253-70. DOI: http://dx.doi.org/10.1177/1078345804011003004
17. Leonard S. The development and evaluation of a telepsychiatry service for prisoners. J Psychiatr Ment Health Nurs 2004 Aug;11(4):461-8. DOI: http://dx.doi.org/10.1111/j.1365-2850.2004.00747.x
18. Myers KM, Valentine JM, Melzer SM. Feasibility, acceptability, and sustainability of telepsychiatry for children and adolescents. Psychiatr Serv 2007 Nov;58(11):1493-6. DOI: http://dx.doi.org/10.1176/appi.ps.58.11.1493
19. Mental health and prisons [monograph on the Internet]. Geneva, Switzerland: World Health Organization; 2007 Sep [cited 2012 Oct 20]. Available from: www.who.int/mental_health/policy/development/MH&PrisonsFactsheet.pdf.
20. Hilty DM, Marks SL, Urness D, Yellowlees PM, Nesbitt TS. Clinical and educational telepsychiatry applications: a review. Can J Psychiatry 2004 Jan;49(1):12-23.
21. Manfredi L, Shupe J, Batki SL. Rural jail telepsychiatry: a pilot feasibility study. Telemed J E Health 2005 Oct;11(5):574-7. DOI: http://dx.doi.org/10.1089/tmj.2005.11.574
22. Morland LA, Hynes AK, Mackintosh MA, Resick PA, Chard KM. Group cognitive processing therapy delivered to veterans via telehealth: a pilot cohort. J Trauma Stress 2011 Aug;24(4):465-9. DOI: http://dx.doi.org/10.1002/jts.20661
23. Shore JH, Bloom JD, Manson SM, Whitener RJ. Telepsychiatry with rural American Indians: issues in civil commitments. Behav Sci Law 2008;26(3):287-300. DOI: http://dx.doi.org/10.1002/bsl.813

REVIEW ARTICLE

Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations

24. Khalifa N, Saleem Y. Stankard P. The use of telepsychiatry within forensic practice: a literature review on the use of videolink. J Forens Psychiatry Psychol 2008 Mar;19(1):2-13. DOI: http://dx.doi.org/10.1080/14789940701560794

25. Vought RG, Grigsby RK, Adams LN, Shevitz SA. Telepsychiatry: addressing mental health needs in Georgia. Community Ment Health J 2000 Oct;36(5);525-36.

26. Telemedicine [Web page on the Internet]. Columbus, OH: Ohio Department of Rehabilitation and Correction; updated 2006 Mar 13 [cited 2012 Feb 5]. Available from: www.drc.ohio.gov/web/telemed.htm.

27. Hincapie A, Warholak TL, Armstrong EP. Socioeconomic impact of mandated health coverage for telemedicine in the state of Arizona [monograph on the Internet]. Tucson, AZ: The University of Arizona, College of Pharmacy; 2011 Nov 1 [cited 2012 Feb 4]. Available from: http://crh.arizona.edu/sites/crh.arizona.edu/files/Telemedicine%20Report%20V12Ana-1.pdf.

28. California Legislative Analyst's Office. Judicial and criminal justice: 2006-07 analysis [monograph on the Internet]. Sacramento, CA: Legislative Analyst's Office; 2006 [cited 2012 Feb 14]. Available from: www.lao.ca.gov/analysis_2006/crim_justice/crimjust_anl06.pdf.

29. Johnston B, Solomon NA. Telemedicine in California: progress, challenges, and opportunities [monograph on the Internet]. Oakland, CA: California Healthcare Foundation; 2008 Jul [cited 2012 Feb 14]. Available from: www.chcf.org/publications/2008/07/telemedicine-in-california-progress-challenges-and-opportunities.

30. Offender Programs [Web page on the Internet]. Charleston, WV: West Virginia Division of Corrections; c2007-13 [cited 2012 Mar 5]. Available from: www.wvdoc.com/wvdoc/OffenderPrograms/tabid/121/Default.aspx.

31. Telemedicine [Web page on the Internet]. South Charleston, WV: PSIMED Inc; c2013 [cited 2012 Mar 5]. Available from: www.psimedinc.com/#!__services/telemedicine.

32. Gramlich J. States expand videoconferencing in prisons [monograph on the Internet]. Washington, DC: Stateline, The Pew Charitable Trusts; 2009 May 12 [cited 2012 Feb 5]. Available from: www.stateline.org/live/details/story?contentId=399298.

33. Venable SS. A call to action: Georgia must adopt new standard of care, licensure, reimbursement, and privacy laws for telemedicine. Emory Law Journal 2005 Spring;54(2):1183-218.

34. Menachemi N, Burke DE, Ayers DJ. Factors affecting the adoption of telemedicine—a multiple adopter perspective. J Med Syst 2004 Dec;28(6):617-32. DOI: http://dx.doi.org/10.1023/B:JOMS.0000044964.49821.df

35. Lee S. Contemporary issues of ethical e-therapy. Journal of Ethics in Mental Health [serial on the Internet]. 2010 Nov;5(1):1-5 [cited 2013 May 1]. Available from: www.jemh.ca/issues/v5n1/documents/JEMH_Vol5_No1_Contemporary_Issues_of_Ethical_E-Therapy.pdf.

36. Lexcen FJ, Hawk GL, Herrick S, Blank MB. Use of video conferencing for psychiatric and forensic evaluations. Psychiatr Serv 2006 May;57(5):713-5. DOI: http://dx.doi.org/10.1176/appi.ps.57.5.713

37. Tucker W, Olfson M, Simring S, Goodman W, Bienenfeld S. A pilot survey of inmate preferences for on-site, visiting consultant, and telemedicine psychiatric services. CNS Spectr 2006 Oct;11(10):783-7.

38. Ross JT, TenHave T, Eakin AC, Difilippo S, Oslin DW. A randomized controlled trial of a close monitoring program for minor depression and distress. J Gen Intern Med 2008 Sep;23(9):1379-85. DOI: http://dx.doi.org/10.1007/s11606-008-0663-4

39. Morland LA, Pierce K, Wong MY. Telemedicine and coping skills groups for Pacific Island veterans with post-traumatic stress disorder: a pilot study. J Telemed Telecare 2004;10(5):286-9. DOI: http://dx.doi.org/10.1258/1357633042026387

40. Fortney JC, Pyne JM, Edlund MJ, et al. A randomized trial of telemedicine-based collaborative care for depression. J Gen Intern Med 2007 Aug;22(8):1086-93. DOI: http://dx.doi.org/10.1007/s11606-007-0201-9

41. Dávalos ME, French MT, Burdick AE, Simmons SC. Economic evaluation of telemedicine: review of the literature and research guidelines for benefit-cost analysis. Telemed J E Health 2009 Dec;15(10):933-48. DOI: http://dx.doi.org/10.1089/tmj.2009.0067

42. Hyler SE, Gangure DP. A review of the costs of telepsychiatry. Psychiatr Serv 2003 Jul;54(7):976-80. DOI: http://dx.doi.org/10.1176/appi.ps.54.7.976

43. Shore JH, Brooks E, Savin DM, Manson SM, Libby AM. An economic evaluation of telehealth data collection with rural populations. Psychiatr Serv 2007 Jun;58(6):830-5. DOI: http://dx.doi.org/10.1176/appi.ps.58.6.830

44. Harley J. Economic evaluation of a tertiary telepsychiatry service to an island. J Telemed Telecare 2006;12(7):354-7. DOI: http://dx.doi.org/10.1258/135763306778682378

45. Arizona telemedicine [monograph on the Internet]. Tucson, AZ: Arizona Telemedicine Program; 2004 Summer [cited 2012 Mar 5]. Available from: www.learningace.com/doc/1547990/bf26fa9b1ede-c0237efbe07824d3d522/telemed_newsltr_smr041#.

46. McGinty KL, Saeed SA, Simmons SC, Yildirim Y. Telepsychiatry and e-mental health services: potential for improving access to mental health care. Psychiatric Q 2006 Winter;77(4):335-42. DOI: http://dx.doi.org/10.1007/s11126-006-9019-6

47. O'Reilly R, Bishop J, Maddox K, Hutchinson L, Fisman M, Takhar J. Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. Psychiatr Serv 2007 Jun;58(6):836-43. DOI: http://dx.doi.org/10.1176/appi.ps.58.6.836

48. Neal TS, Clements CB. Prison rape and psychological sequelae: a call for research. Psychol Public Policy Law 2010;16(3):284-99. DOI: http://dx.doi.org/10.1037/a0019448

49. Michigan department of corrections reduces costs with Polycom Solutions [monograph on the Internet]. Pleasanton, CA: Polycom Inc; 2009 [cited 2012 Apr 1]. Available from: http://docs.polycom.com/global/documents/company/customer_success_stories/government/michigan_corrections_cs.pdf.

## Healing That Can Last

When depression, hopelessness, and lack of help do hurt,
healing that can last may still be achieved by a kindly word.

— Johan Wolfgang von Goethe, 1749-1832, German author, artist, and politician

# Telepsychiatry for Inpatient Consultations at a Separate Campus of an Academic Medical Center

Jeffrey DeVido, MD,[1] Anna Glezer, MD,[1] Linda Branagan, PhD,[2]
Alvin Lau, MD,[1] and James A. Bourgeois, OD, MD[1]

[1]Department of Psychiatry and [2]Telehealth Resource Center,
University of California, San Francisco, San Francisco, California.

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/17/18. For personal use only.

## Abstract

*Background: Many hospitals do not have regular access to psychiatry consult services. This is well understood as a common shortage at nonacademic community hospitals (especially in rural environments, and may also be a problem at noncontiguously located smaller hospitals that are affiliated with academic medical centers in urban settings. The authors sought to deliver timely inpatient psychiatric consultation–liaison services via telemedicine to a local but physically separated hospital affiliated with an academic medical center. Materials and Methods: The authors collaborated with an office dedicated to the advancement of telemedicine technology at their academic medical center. They developed a telemedicine-based care model to deliver inpatient consultation–liaison psychiatry consultations to an affiliated (but physically separate) small academic hospital that did not have its own on-site consultation–liaison psychiatry team. Results: The authors were able to successfully complete 30 consultations, each within 24 h. Only 1 patient was ultimately unwilling to participate in the telemedicine interview. As consultations were accomplished on same day as request, patient length of stay was unaffected. Conclusions: This pilot study suggests that telemedicine is a viable model for inpatient consultation–liaison psychiatry services to hospitals without on-site psychiatry resources and represents a viable alternative model of service delivery.*

*Key words: telepsychiatry, inpatient psychiatry consultations, consultation-liaison psychiatry*

## Introduction

Telemedicine has been an important technical and system advance for the provision of specialty medical care to populations in rural and other low-density communities where there is minimal or no access to local specialty care. Telemedicine for psychiatric care to rural primary care clinics has been embraced by patients and physicians as a solution to this specialty access problem. Advances in security, image and audio integrity, and stability of transmission have led to telemedicine systems that are reliable, secure, and acceptable to all parties as an alternative model of care delivery that is sustainable and in some communities is "the new normal" for rural psychiatric care.[1]

Hilty et al.[1] reviewed the various models for telepsychiatry service to rural primary care. Beyond video-based physician–patient sessions, other technological advances that have been applied to telemedicine to rural primary care include secure messaging (e-mail) linking patients and clinicians, as well as Internet-based technologies. In a more wide-ranging review, Hilty et al.[2] recently reviewed the published literature on telemental health and found it to be effective across an array of populations (child, adult, geriatric, ethnic) and for disorders in many settings (emergency, primary care, home health). The authors further found that telemental health was comparable to in-person care.

With at least 36% of U.S. Veterans Health Administration (VHA)–enrolled veterans residing in rural regions,[3] the VHA has been particularly keen to use telepsychiatry services to expand psychiatric specialists' reach. Deen et al.[4] recently reviewed telepsychiatric services offered by the VHA from 2006 to 2010 and noted a significant increase in all telepsychiatric encounters during this period. The majority of these VHA encounters were for medication management and medication management with psychotherapy; however, the authors also highlighted a significant trend toward increased individual and group psychotherapy encounters.

Diagnostically, interactive video has proven to be applicable to wide range of psychiatric disorders. Grubbs et al.[5] found that in fiscal year 2012, 1.5% ($n$ = approximately 180,000) of all VHA mental health encounters were performed via interactive video and that anxiety, depression, and post-traumatic stress disorder were more commonly evaluated via interactive video than diagnoses of alcohol, drug, or psychotic disorders. Other studies have shown that interactive video can be effectively used in the evaluation and treatment of alcohol use disorders,[6] as well as psychotic disorders.[7] In addition, Godleski et al.[8] demonstrated the viability of interactive video in evaluating suicide risk.

DOI: 10.1089/tmj.2015.0125

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/17/18. For personal use only.

In all of the models of using telepsychiatry described above, interactive video technology was used in support of clinic, not hospital, services. Thus, extension of telemedicine to general hospitals may be especially desirable in rural community hospitals without local psychiatrists for hospital-based psychosomatic medicine services. Thompson et al.,[9] in an article on the advent of managed care systems (in the United States), presciently called for psychosomatic medicine services to actively embrace telemedicine technology as an integral part of expansion of clinical services in a cost-effective manner.

Given the successes in the last 20 years at telemedicine for psychiatric services in rural primary care clinics, an obvious new area of exploration is the use of mature telemedicine technology for consultation–liaison (CL) applications for emergency department patients and for medical and surgical inpatients. Many rural community hospitals do not have CL psychiatry services. Even larger hospitals in nonacademic settings may not have regular access to psychiatric consultation. There may be some access to community psychiatrists for occasional consultations, but irregular access may make these services suboptimal.

Several authors have reported on using telemedicine for psychiatric services in hospital or other healthcare institutional settings in rural environments, as opposed to outpatient clinics. Sorvaniemi et al.[10] studied the use of telepsychiatry in 60 emergency patients in Finland. The patients were initially admitted to the psychiatry inpatient service and had their first inpatient psychiatric interview accomplished by telemedicine. The technical and communication qualities were rated highly. Of note, 55 patients *preferred* the video consultation to in-person care (noting that the video consult could be promptly provided as opposed to waiting for physician travel). A recent study by Seidel and Kilgus[11] in a Roanoke, VA, emergency department demonstrated the feasibility of telepsychiatry in the evaluation of patients presenting with mental health complaints. The patients in the study were evaluated both face-to-face and via telepsychiatry, and the authors importantly showed no significant differences between disposition recommendation, strength of recommendation, or diagnosis between the two evaluation modalities. Johnston and Jones[12] reported on the use of telepsychiatry services to a rural nursing home to 40 patients over a 2-year period. The majority of patients experienced dementia (with behavioral complications) and mood disorders. The authors noted the flexibility and access improvements telepsychiatry provided in this setting. Mielonen et al.,[13] in a study in rural Finland, reported on the successful use of telemedicine for inpatient psychiatry unit care planning with a 90% satisfaction rating for this application with significant cost savings.

There have also been reports on using telemedicine consultation for hospital care in settings that have some overlap with CL psychiatry. Craig et al.[14] studied the use of telemedicine for neurological consultation in Ireland. Specific neurological symptom presentations reported (which overlap significantly with psychiatric consultation symptoms) included altered level of consciousness, confusion, and memory loss. Shorter hospital length of stay was correlated with the availability of video consultation. There were no quality concerns for diagnoses made using the video consultation. Hubble et al.[15] used telemedicine for the neurology exam in Parkinson's disease and found no difference in physical assessment between video and in-person assessment of motor findings, concluding that telemedicine allowed a valid assessment of the motor exam in Parkinson's disease. Menon et al.[16] studied the use of telemedicine to accomplish family conferences to support critical care consultations in a U.S. rural hospital. They reported on 12 consultations to facilitate family communications regarding transfer of critically ill patients to institutions providing a higher level of critical care. A critical item was a goal of care/end-of-life discussion, which sometimes led to patients not being transferred for more intensive care.

The University of California, San Francisco (UCSF) Medical Center CL Psychiatry service is composed of four faculty physicians, psychiatry residents, and medical students. Other participants include psychology interns, neurology residents, and nurse practitioner students. This CL group is responsible for adult CL services at the UCSF Medical Center. The CL team has additionally been responsible for inpatient consultations at two additional UCSF Medical Center sites. The Mount Zion campus operated a small intensive care unit and inpatient medical and surgical wards. In 2015, coincident with the opening of a new campus at Mission Bay, it was converted to a 23-h-stay surgical facility. The Mission Bay campus provides adult clinical services including intensive care unit, obstetrics/gynecology, and cancer inpatient services. These campuses are all within San Francisco and serviced by the UCSF shuttle system; travel between them typically takes 20–40 min.

Before 2013, psychiatry consultation services at Mount Zion were conducted in-person, requiring the assigning of a faculty physician to travel across town to accomplish the consult. As a result, a single consultation required at least an additional hour of physician time just for travel. In the context of a robust and busy CL service at the Parnassus campus, this requirement created inefficiency and access problems. The Mount Zion campus was small, and a separate physician solely assigned to Mount Zion could not be justified. This created, after a fashion, an "urban model" of the problem of obtaining psychiatric CL services to a small hospital without its own local CL service.

**DEVIDO ET AL.**

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/17/18. For personal use only.

## Materials and Methods

In 2013, UCSF embarked on a broader mission of promotion of telemedicine throughout the hospital system, both to support the increased need for inpatient consulting services anticipated with the 2015 opening of Mission Bay and to enhance its relationships with distant referral partners. As part of this greater endeavor and facilitated by one of this author group's prior experience operating telemedicine programs, the Department of Psychiatry and the newly formed UCSF Telehealth Resource Center designed a telemedicine CL model for Mount Zion, whereby the Parnassus campus CL physicians would use telemedicine as the primary method for CL support of Mount Zion. This study was approved by the UCSF Committee on Human Research (equivalent to the Institutional Review Board).

Cameras were located in the offices at the Parnassus campus for the four CL physicians, and an additional camera was installed in the CL residents' office to encourage resident participation in the consultations. The two floors at Mount Zion (one housed each inpatient unit) each were equipped with a mobile telemedicine cart. Each floor had a resource nurse who was trained in the operation of the cart and who managed scheduling and physically moving the cart to the patient's room, preparing the patient, establishing connection to Parnassus, and then terminating the connection at the end of the session. The resource nurse remained available to the CL physician in case of technical or logistical problems.

The carts contained a 12× camera, a wide-area microphone, flat-panel video display, and speakers. They operated on either a wired or wireless network and could be easily switched between the two. Because the cart was also used for teleconsultations in specialties other than psychiatry, it also contained a high-resolution hand-held examination camera and a digital stethoscope.

CL physicians used Cisco (San Jose, CA) Jabber® software from personal computers equipped with high-end consumer-quality Web cameras. In addition to providing standard two-way audio and video communication, Jabber also permitted CL physicians to remotely pan, tilt, or zoom the patient-side camera. This functionality allowed CL physicians to examine the entire patient room, including viewing personal items such as books or magazines located on trays, beds, or shelf tops in the room. Panning would also allow for determining if other persons such as family or friends were in the room and enable interviewing of these persons when collateral was needed.

The method for accessing consultation was similar to that used at the Parnassus campus. The referring physician would ascertain the need for a psychiatric consultation and call the CL service pager to request a consult, simultaneously entering a consult order in the electronic medical record. The physician to see the case would schedule a time and then call the resource nurse to set up the camera care and to prepare the patient as described above. Initially, telepsychiatry was not available to covering physicians on weekends and holidays; hence, in some instances a consultation performed by a covering physician would be in-person, and then the follow-up would be performed via telepsychiatry (*Table 1*).

Patients were advised that the telemedicine method was the routine process for consultation and by this process obtained consent for the telemedicine consult. The patient (per UCSF policy and California law) needed to verbally consent to the telemedicine consult method; a brief note to this effect was included in the chart documentation. This charting facilitated later extraction of data by a search for the term "telemedicine" in the medical record.

## Results

From initial rollout of the project in 2013 through the closure of the Mount Zion inpatient units, in total, 30 patients were seen for initial evaluation using interactive video; 17 patients received follow-up sessions using this technology. The case mix of these cases was as follows:

Consistent with previously published clinic/outpatient data, we found the use of telepsychiatry widely applicable in addressing a diverse range of patients presenting with a variety of consultation questions in the hospital setting. The majority of the consultations were performed on patients admitted to medical and surgical units; however, consultation in the intensive care unit setting, although less commonly requested, was also viable. Most commonly, consultation requests were to evaluate and provide management recommendations for depression, dementia, and anxiety, a distribution that is consistent with our in-person consultation service at the UCSF Parnassus campus, although not formally examined. The vast majority of consultations resulted in recommendations involving medication changes. These changes recommended ranged from clozapine titrations to initiation of antidepressant and antipsychotic medications to discontinuation of medications. A significant number of patients received at least one follow-up telepsychiatry encounter, with patient discharge or no further intervention needed being the two most common reasons for absence of follow-up.

In assessment of dementia and/or delirium patients, we found that we were able to accomplish cognitive test items reliably, by using the camera function for those test items requiring the patient to interpret a physical image or by enlisting the help of the resource nurse to provide standardized images to the patient. Resource nurses also aided in those

© MARY ANN LIEBERT, INC.

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/17/18. For personal use only.

| Table 1. Characteristics of Sample | |
|---|---|
| **CHARACTERISTIC** | **TOTAL SAMPLE ($N=30$)** |
| Age (years) | $54 \pm 19.4$ |
| Oldest (years) | 87 |
| Youngest (years) | 19 |
| Female | 15 (50%) |
| Location | |
| Medical/surgical units | 29 (96.7%) |
| Intensive care units | 1 (3.3%) |
| After initial *telepsychiatry* evaluation, number of patients who received | |
| One or fewer follow-up *telepsychiatry* session | 13 (43.3%) |
| An *in-person* follow-up session | 1 (3.3%) |
| At least *two or more* follow-up *telepsychiatry* sessions | 5 (16.7%) |
| After initial *in-person* evaluation, number of patients who received a follow-up *telepsychiatry* session | 4 (13.3%) |
| Consult issue/diagnosis[a] | |
| Depression | 7 |
| Dementia | 6 |
| Anxiety | 4 |
| Delirium/altered mental status | 3 |
| Bipolar disorder | 2 |
| Adjustment disorder | 2 |
| Psychotic disorder NOS | 2 |
| Safety assessment (suicidal ideation) | 2 |
| Capacity evaluation | 1 |
| Chronic pain | 1 |
| Schizoaffective disorder | 1 |
| Recommendations stemming from consultation[b] | |
| Medication changes | 24 |
| Refer to social work/case management | 4 |
| Inpatient psychiatric admission/placement of involuntary psychiatric hold (5150) | 2 |
| Discontinue psychiatric hold | 1 |

[a]Totals are greater than 30 because in some instances multiple questions were asked by consulting teams; hence, percentages are also not provided.

[b]Totals are greater than 30 because in some instances multiple recommendations were made in response to consulting teams' questions; hence, percentages are also not provided.

NOS, not otherwise specified.

sections of the cognitive exam that required the patient to produce images (e.g., clock drawing, copying of cube) by providing pen and paper while we explained the tasks from our remote location. We used the same protocol in evaluating patients located in the intensive care unit.

In the case of patients needing to be placed on psychiatric commitment orders, we were able to accomplish the legal notification via telemedicine (with communication to the resource nurse and referring physician) and deliver the official document for this later by fax.

## Discussion

The provision of telepsychiatry service in this way can be considered part of an expansion of the CL psychiatry services paradigm.[17] Historically, telemedicine psychiatry consults have often been driven by rural care service needs (where medical specialists are not locally available). Our study demonstrates that the use of telemedicine technology for psychiatric evaluation can be extended to traditional inpatient psychiatry CL services in an analogous fashion, particularly when there are structural and logistical barriers to providing inpatient CL care in an in-person model.

Therefore, the delivery of inpatient psychosomatic services via telemedicine is an obvious "next step" for the use of telemedicine technology in psychiatry. To date, no articles have documented the use of teleconference technology in the context of CL psychiatry to medical surgical units; therefore the boundaries for application of this technology are not well established/documented. In the changing medical landscape there is increasing interest in expanding the reach of specialty psychiatric expertise, with teleconference technology being a potential mechanism for meeting this challenge.

Not surprisingly, there were challenges encountered in this project. Technological challenges included getting reliable operation of the cameras and software at the Parnassus site (this was infrequent). A more substantive and ongoing challenge was the integrity of the image and audio at the Mount Zion site. The Mount Zion hospital is an older structure with less than contemporary Wi-Fi access. As such, in some cases there was signal loss during session, requiring reboot and other work modifications. In 2 cases, the audio feed was compromised by Wi-Fi connectivity problems, and the consult was achieved through a simultaneous combination of bedside telephone and video feed.

There were some professional challenges. Some physicians and social workers at the Mount Zion campus, although aware of the benefit of more prompt consultation by this method, objected to the use of telemedicine for (stated) concerns that "how can you evaluate a psychiatric patient by video?" These

**DEVIDO ET AL.**

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/17/18. For personal use only.

objections were relatively infrequent and not problematic. It is interesting that there were no cases of patients *a priori* objecting to the telemedicine consult. There was 1 patient with paranoid ideation (who had consented initially to the consult) who, during the session, was fearful of communication involving a camera and was then (later) seen face-to-face. However, the paranoia evident in the process of trialing the telemedicine interface nonetheless provided valuable clinical data regarding the extent and severity of the patient's psychotic symptoms. The referring physicians initially questioned if the image quality was adequate to interpret subtle physical findings. In fact, even subtle physical findings (e.g., mild oral tardive dyskinesia) were quite evident, and one consult was called for primarily for the evaluation of tardive dyskinesia, which the consultant was able to do easily.

Telepsychiatry can be used in a range of clinical venues by CL psychiatrists. The current study, although of small scale and preliminary, supports that telemedicine can be used successfully in an inpatient CL context. With solution of administrative, technical, and logistical barriers, telemedicine represents a plausible option to the problem of providing inpatient CL services to hospitals without local and/or immediately accessible CL resources. Paralleling the largely successful and acceptable use of telemedicine for outpatient psychiatry, telemedicine for inpatient CL psychiatry represents a viable model and an additional method to deliver inpatient CL services. This was a method for psychiatry residents and medical students to be introduced to telemedicine technology that may spark their interest in other psychiatric applications of telemedicine. From an institutional perspective, the Department of Psychiatry as an "early adopter" of telemedicine encouraged other consult services to consider telemedicine as well.

## Conclusions

Telemedicine can be a practical means of delivery of CL psychiatry services to general hospital patients. Administrative and policy leaders may consider telemedicine as a viable alternative method for in-hospital consultations in venues where face-to-face encounters face significant logistical barriers.

## Disclosure Statement

No competing financial interests exist.

### REFERENCES

1. Hilty DM, Yellowlees PM, Cobb HC, Bourgeois JA, Neufeld JD, Nesbitt TS. Models of telepsychiatric consultation-liaison service to rural primary care. *Psychosomatics* 2006;47:152–157.

2. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: A 2013 review. *Telemed J E Health* 2013;19:444–454.

3. Office of Rural Health, Department of Veterans Affairs. Fact sheet: Information about the Office of Rural Health and rural veterans. **2013.** Available at www.ruralhealth.va.gov/docs/factsheets/ORH_FactSheet_General_April2013.pdf (last accessed October 10, 2015).

4. Deen TL, Godleski L, Fortney JC. A description of telemental health services provided by the Veterans Health Administration in 2006–2010. *Psychiatr Serv* 2012;63:1131–1133.

5. Grubbs KM, Fortney JC, Dean T, William JS, Godleski L. A comparison of mental health diagnoses treated via interactive video and face to face in the Veterans Healthcare Administration. *Telemed J E Health* 2015;21:564–566.

6. Frueh C, Henderson S, Myrick H. Telehealth service delivery for persons with alcoholism. *J Telemed Telecare* 2005;11:372–375.

7. Stain HJ, Payne K, Thienel R, Michie P, Carr V, Kelly B. The feasibility of videoconferencing for neuropsychological assessments of rural youth experiencing early psychosis. *J Telemed Telecare* 2011;17:328–331.

8. Godleski L, Nieves JE, Darkins A, Lehmann L. VA telemental health: Suicide assessment. *Behav Sci Law* 2008;26:271–286.

9. Thompson TL, Folks DG, Silverman JJ. Challenges and opportunities for consultation-liaison psychiatry in the managed care environment. *Psychosomatics* 1997;38:70–75.

10. Sorvaniemi M, Ojanen E, Amaki O. Telepsychiatry in emergency consultations: A follow-up study of sixty patients. *Telemed J E Health* 2005;11:439–441.

11. Seidel RW, Kilgus MD. Agreement between telepsychiatry assessment and face-to-face assessment for emergency department psychiatry patients. *J Telemed Telecare* 2014;20:59–62.

12. Johnston D, Jones BN 3rd. Telepsychiatry consultation to a rural nursing facility: A 2-year experience. *J Geriatr Psychiatry Neurol* 2001;14:72–75.

13. Mielonen M-L, Ohinmaa A, Moring J, Isohanni M. Psychiatric inpatient care planning via telemedicine. *J Telemed Telecare* 2000;6:152–157.

14. Craig J, Chua R, Russell C, Wootton R, Chant D, Patterson V. A cohort study of early neurological consultation by telemedicine on the care of neurological inpatients. *J Neurol Neurosurg Psychiatry* 2004;75:1031–1035.

15. Hubble JP, Pahwa R, Michalek DK, Thomas C, Koller WC. Interactive videoconferencing: A means of providing interim care to Parkinson's disease patients. *Mov Disord* 1993;8:380–382.

16. Menon PR, Stapleton RD, McVeigh U, Rabinowitz T. Telemedicine as a tool to provide family conferences and palliative care consultations in critically ill patients at rural health care institutions: A pilot study. *Am J Hosp Palliat Care* 2015;32:448–453.

17. Bourgeois JA, Hilty DM, Klein SC, Koike AK, Servis ME, Hales RE. Expansion of the consultation-liaison psychiatry paradigm at a university medical center: Integration of diversified clinical and funding models. *Gen Hosp Psychiatry* 2003;25:262–268.

Address correspondence to:
*James A. Bourgeois, OD, MD*
*Department of Psychiatry*
*University of California, San Francisco*
*401 Parnassus Avenue*
*San Francisco, CA 94143*

*E-mail:* james.bourgeois@ucsf.edu

*Received:* July 9, 2015
*Revised:* October 13, 2015
*Accepted:* October 13, 2015

  © MARY ANN LIEBERT, INC.

BRIEF REPORTS

# An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees

David Farabee, Ph.D., Stacy Calhoun, M.A., Robert Veliz, M.P.H.

**Objective:** Many offenders treated for psychiatric disorders while incarcerated are paroled to counties where psychiatric care is limited, leading some correctional departments to offer psychiatric treatment via videoconferencing ("telepsychiatry"). However, the effectiveness of telepsychiatry for offenders with psychiatric disorders has not been rigorously evaluated.

**Methods:** In this randomized field experiment, the authors compared the effectiveness of telepsychiatry and in-person psychiatric sessions (treatment as usual) among 71 parolees receiving outpatient psychiatric treatment over a six-month period. Satisfaction with treatment, therapeutic alliance, medication adherence, and psychological functioning were measured. Follow-up data were collected from 60 of the 71 (85%) patients (N=20, telepsychiatry; N=40, control condition).

**Results:** Findings revealed high satisfaction with telepsychiatry overall and no significant group differences in medication adherence or psychological functioning. However, tele-psychiatry patients reported lower levels of therapeutic alliance at follow-up.

**Conclusions:** Telepsychiatry appeared to be an acceptable and effective approach for providing psychiatric care for this population.

*Psychiatric Services 2016; 67:562–565; doi: 10.1176/appi.ps.201500025*

The prevalence of psychiatric disorders is significantly higher among jail and prison inmates than among the general population; 40% of Americans with serious mental health problems have been involved with the criminal justice system at some point in their lives (1,2). Rates of serious mental health problems during the past year are two to three times higher among probationers and parolees compared with the general population (3). Treatment for offenders with psychiatric disorders is often unavailable or inconsistent, especially in states with rural populations that are distant from clinical services. One solution to this problem has been to provide such services via telemedicine.

Broadly speaking, telemedicine encompasses all of the health care, education, information, and administrative services that can be transmitted over distances via telecommunication technologies, including Internet-based media and cell phone. (In the context of this study, telepsychiatry specifically refers to the use of videoconferencing with high-bandwidth Internet services.) The use of telepsychiatry has been shown to increase access to care (4,5), and it can be an effective means for diagnosing psychiatric disorders, including disorders among adults and elderly persons being treated in emergency rooms and domiciliary care facilities (6,7). But the appropriateness of this approach for parolees has yet to be established (8).

A recent literature review indicates that although telepsychiatry is effective for assessing psychiatric disorders among certain populations, questions remain about the effectiveness of such treatment with underserved communities because of a paucity of randomized clinical trials (8). Similarly, after conducting a comprehensive review of all telepsychiatry studies published between 1970 and 2000, Monnier and colleagues (7) concluded, "Although these studies appear promising, they are often limited by their lack of methodologically sound approaches. Overall, research is still lacking in this field that includes reliable baseline data gathered before the implementation of programs, evaluation of clinical outcomes, randomized experimental designs with appropriate control groups, cost analyses, and determination of the effectiveness and efficacy of telepsychiatry for specific patient populations."

Experts in forensic treatment have called for randomized controlled trials that evaluate the effectiveness of tele-psychiatry among offenders under community supervision, but our review of the literature revealed that little progress has been made in reaching that goal (8). Consequently, we sought to contribute to this literature by conducting a randomized comparison of clinical outcomes among parolees receiving telepsychiatry or in-person care.

## METHODS

Participants were parolees (N=104) residing in the state of California who were referred to outpatient psychiatric care for the duration of their parole supervision. Participants were recruited from two parole outpatient clinics, and 92% (N=104) of the 114 individuals who were invited to participate agreed to do so. Nearly three-quarters of the participants were male (N=77, 74%), and their mean±SD age was 38.1±10.3 years. The majority (N=40, 38%) described themselves as Hispanic, 30 (29%) as African American, and 29 (28%) as non-Hispanic white.

All procedures for this study were reviewed and approved by the University of California, Los Angeles, Institutional Review Board. Enrollment for this study took place from January 20, 2012, to April 25, 2013. Participants who consented to be a part of the study were asked if they would be willing to be randomly assigned to telepsychiatry or face-to-face treatment, be part of a records-based evaluation to monitor rearrest and custody data, and to subsequently complete a baseline and six-month follow-up interview. Participants were paid $25 for completing the baseline interview and $25 for completing the follow-up interview.

The baseline interview was conducted in person by staff researchers within seven days of initial consent. The follow-up interview, which was conducted six months later over the phone, included assessments of the participants' satisfaction with telemedicine, therapeutic alliance, medication adherence, and psychological functioning. Seventy-one participants completed the baseline questionnaire and, of those, 60 participants (N=20, telepsychiatry; N=40, control condition) (85%) completed the six-month follow-up assessment.

Randomization was based on whether the parolees' identification (ID) number ended in an even or odd digit. Those with even-numbered IDs were assigned to the telepsychiatry condition, and those with odd-numbered IDs received the standard face-to-face sessions provided by the parole outpatient clinics. A social worker was present during telepsychiatry sessions to help participants answer questions and set up the telemedicine equipment. Parolees were not permitted to be alone with the videoconferencing equipment.

All of the clinical measures used in this study (with the exception of the Telemedicine Satisfaction Questionnaire [TSQ]) were administered at baseline and again at the time of the six-month follow-up interview.

Psychological functioning was measured with the five-item Brief Symptom Rating Scale (BSRS-5), a self-administered questionnaire containing a subset of items from the 50-item BSRS (9,10). Each of the five items is rated from 0, not at all, to 4, extremely. The optimal cutoff point is generally considered to be a score of 5, with scores ≤5 indicating normal functioning. The mean BSRS-5 score for this sample was 8.3±5.3.

The project used a seven-item version of the Working Alliance Inventory (WAI) by Horvath and Greenberg (11). Neale and Rosenheck (12) used the WAI to examine outcomes of patients in an intensive treatment program for veterans with serious psychiatric disorders and found it to be predictive of treatment response.

Self-reported medication adherence was measured with the eight-item Morisky Medication Adherence Scale (MMAS), which was developed from a previously validated four-item scale and supplemented with additional items to better capture barriers to adherence behavior (13). The new scale has been determined to have higher reliability compared with the four-item scale ($\alpha$=.83 versus .61). MMAS scores can range from 0 to 8 and have been trichotomized previously into three levels of adherence to facilitate use in clinical practice (high adherence, score of 8; medium adherence, 6–8; and low adherence, <6). Prior research revealed that the new scale is significantly (p<.05) associated with pill counts.

Satisfaction with telepsychiatry was assessed by administering a modified version of the TSQ to all parolees in the telepsychiatry condition (14). Items are rated on a scale from 1, strongly disagree, to 5, strongly agree, with higher scores indicating greater satisfaction. For this sample, both TSQ subscales—quality of care provided and similarity to face-to-face encounters—had high internal consistency (Cronbach's $\alpha$=.80).

## RESULTS

We enrolled 104 participants and randomly assigned 40 to the telepsychiatry condition and 64 to the control condition (face-to-face sessions). Analyses of baseline characteristics showed no group differences in terms of gender, age, race-ethnicity, or commitment offense.

Changes in psychological functioning, therapeutic alliance, and adherence to prescribed psychiatric medications by study condition were assessed. Repeated-measures analyses of variance showed no significant effects on BSRS-5 scores by group or group × time interaction. A similar pattern was observed for medication adherence, indicating no differences in this variable by group or group × time. With regard to changes in working alliance, there was a marginally significant effect for time (F=3.8, df=1 and 41, p=.06), although the group × time interaction was not statistically significant. Still, the pairwise contrast of WAI scores at follow-up was statistically significant (t=2.1, df=1 and 42, p<.05).

Levels of satisfaction were generally high on both subscales of the TSQ (3.7±1.3 for quality of care provided and 4.0±1.3 for similarity to face-to-face encounters). For both scales, average ratings well exceeded the midpoint of 3, indicating that patients had neutral to favorable perceptions of telepsychiatry compared with in-person psychiatric visits.

## DISCUSSION AND CONCLUSIONS

Consistent with studies of telepsychiatry with populations that were not involved with the corrections system, our study showed comparable effects regarding psychological functioning and medication adherence for telepsychiatry

A COMPARISON OF TELEPSYCHIATRY AND CONVENTIONAL PSYCHIATRY FOR PAROLEES

and a control condition over a six-month follow-up period. However, the data also revealed a decline in perceived therapeutic alliance among patients assigned to the telepsychiatry condition.

The disparity in therapeutic alliance was unexpected. Patient preference may have been a contributing factor related to this finding. Although all participants in the study agreed to random assignment, many participants may have preferred one condition over the other. Unfortunately, we did not assess patient preference as part of this study. Another possible factor might be the role of the social worker who accompanied the patient during the session—the presence of this clinician may have affected the patient's ability to engage with the psychiatrist. Future research with this population would benefit by measuring both of these factors directly.

Although this study had several methodological strengths, including random assignment and a high follow-up rate, it also had several important limitations. First, the sample size—104 parolees who were randomly assigned to telepsychiatry or the control condition, including 71 who participated in the interview portion of the study—undermined our ability to detect any small- or moderate-sized effects. As a result, this study was more aptly powered as a superiority—rather than an equivalence—design, although the latter would be more appropriate in light of the findings from previous studies. Moreover, recruitment of potential telemedicine participants was affected by temporary technical difficulties with telepsychiatry equipment and layoffs of clinic personnel in charge of telemedicine devices at study sites. These barriers help explain the difference in the size of the telepsychiatry (N=40) and control (N=64) groups.

Next, all of the clinical outcomes in this study were based on self-reports over a relatively brief (six-month) period. This limitation could be addressed in future research by including measures such as recidivism and reincarceration and tracking these outcomes over a longer time frame. Although we collected rearrest records in this study, only seven participants had been rearrested during the short time frame, making between-group comparisons impossible. Furthermore, satisfaction data were collected only from telemedicine participants, given that most of the TSQ items were particular to the use of videoconferencing. Last, the sample consisted of patients with varied diagnoses who used a variety of medications and psychotherapies, adding more error variance to an already small study sample.

Notwithstanding these important limitations, we believe that this study represents a modest but legitimate contribution to this literature—especially considering that experimental designs accounted for only about 2% of the published evaluations included in a literature review by Garcia-Lizana and Muñoz-Mayorga (15) concerning the clinical efficacy of telepsychiatry. This percentage reflects the subset of papers that were peer reviewed and also met other quality standards consistent with Cochrane guidelines.

The addition of this study to the published literature provides a small, but relatively rigorous, data point for subsequent meta-analyses and structured reviews aimed at establishing the impact of this rapidly growing approach for providing psychiatric treatment to offenders under community supervision.

## AUTHOR AND ARTICLE INFORMATION

Dr. Farabee and Mr. Veliz are with the Department of Psychiatry and Biobehavioral Sciences, University of California, Los Angeles (e-mail: dfarabee@ucla.edu). Ms. Calhoun is with the Department of Criminology, Law, and Society, University of California, Irvine, and was with the Department of Psychiatry and Biobehavioral Sciences, University of California, Los Angeles, at the time of the study.

This study was funded by the National Institute of Justice (NIJ) (2010-DJ-BX-2002). The authors thank Diana Zaragoza, M.S., and Justine Medrano, M.S., for their help with study coordination, data collection, and data entry. They also thank Kris Langabeer for editorial expertise. They are grateful to the California Department of Corrections and Rehabilitation for their support and assistance on this project. Finally, they thank the participants who agreed to the interview and who shared their life experiences. The contents of this report are solely the responsibility of the authors and do not necessarily represent the views of the NIJ.

Dr. Farabee has received study medications from Alkermes plc for a separate study. The other authors report no financial relationships with commercial interests.

Received January 14, 2015; revisions received May 8, June 8, and July 10, 2015; accepted July 30, 2015; published online January 4, 2016.

## REFERENCES

1. Aufderheide D: Mental illness in America's jails and prisons: toward a public safety/public health model. Health Affairs Blog, April 1, 2014. Available at healthaffairs.org/blog/2014/04/01/mental-illness-in-americas-jails-and-prisons-toward-a-public-safetypublic-health-model/
2. Steadman HJ, Osher FC, Robbins PC, et al: Prevalence of serious mental illness among jail inmates. Psychiatric Services 60:761–765, 2009
3. Feucht T, Gfroerer J: Mental and Substance Use Disorders Among Adult Men on Probation or Parole: Some Success Against a Persistent Challenge. Rockville, Md, Substance Abuse and Mental Health Services Administration, 2011. Available at www.nationalafc.com/images/file/SAMHSAMentalSubstanceDisordersAdultMenProbPar.pdf
4. Antonacci DJ, Bloch RM, Saeed SA, et al: Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry. Behavioral Sciences and the Law 26:253–269, 2008
5. Williams M, Pfeffer M, Boyle J, et al: Telepsychiatry in the Emergency Department: Overview and Case Studies. Sacramento, California Healthcare Foundation, 2009
6. Hilty DM, Ferrer DC, Parish MB, et al: The effectiveness of telemental health: a 2013 review. Telemedicine Journal and e-Health 19:444–454, 2013
7. Monnier J, Knapp RG, Frueh BC: Recent advances in telepsychiatry: an updated review. Psychiatric Services 54:1604–1609, 2003
8. Khalifa N, Saleem Y, Stankard P: The use of telepsychiatry within forensic practice: a literature review on the use of videolink. Journal of Forensic Psychiatry and Psychology 19:2–13, 2008
9. Lung FW, Lee MB: The five-item Brief Symptom Rating Scale as a suicide ideation screening instrument for psychiatric inpatients and community residents. BMC Psychiatry 8:53, 2008

10. Chen HC, Wu CH, Lee YJ, et al: Validity of the five-item Brief Symptom Rating Scale among subjects admitted for general health screening. Journal of the Formosan Medical Association 104:824–829, 2005
11. Horvath AO, Greenberg LS: Development and validation of the Working Alliance Inventory. Journal of Counseling Psychology 36:223, 1989
12. Neale MS, Rosenheck RA: Therapeutic alliance and outcome in a VA intensive case management program. Psychiatric Services 46:719–721, 1995
13. Morisky DE, Ang A, Krousel-Wood M, et al: Predictive validity of a medication adherence measure in an outpatient setting. Journal of Clinical Hypertension 10:348–354, 2008
14. Yip MP, Chang AM, Chan J, et al: Development of the Telemedicine Satisfaction Questionnaire to evaluate patient satisfaction with telemedicine: a preliminary study. Journal of Telemedicine and Telecare 9:46–50, 2003
15. García-Lizana F, Muñoz-Mayorga I: What about telepsychiatry? A systematic review. Primary Care Companion to the Journal of Clinical Psychiatry 12:PCC.09m00831, 2010

# Coming in June

- Recovery-oriented practice in inpatient care: a review
- Effects of Housing First on employment and income
- Changes in private plans to support integrated services
- Use of services by firefighters with suicidal thoughts

2/15/2018    What About Telepsychiatry? A Systematic Review

Case 2:90-cv-00520-KJM-SCR    Document 5873-4    Filed 08/03/18    Page 188 of 348



Prim Care Companion J Clin Psychiatry. 2010; 12(2): PCC.09m00831.    PMCID: PMC2911004
doi: 10.4088/PCC.09m00831whi

# What About Telepsychiatry? A Systematic Review

Francisca García-Lizana, MD, PhD[✉] and Ingrid Muñoz-Mayorga, MS

Health Technology Assessment Agency, Instituto de Salud Carlos III, Science and Innovation Ministry, Madrid, Spain (Dr García-Lizana and Ms Muñoz-Mayorga)
[✉]Corresponding author.
**Corresponding author:** Francisca García-Lizana, MD, PhD, C/Sinesio Delgado 4, pab 4, 28029 Madrid, Spain (fglizana@hotmail.com).

Received 2009 Apr 28; Accepted 2009 Jun 18.

Copyright © 2010, Physicians Postgraduate Press, Inc.

## Abstract

### Background:

Mental illness has become a significant worldwide health issue in recent years. There is presently insufficient evidence to definitively determine the clinical effectiveness and cost-effectiveness of different health care models. The objective of this study was to evaluate the effectiveness of videoconferencing in mental illness.

### Data Sources:

Literature searches were performed in Medline, EMBASE, PsycINFO, Centre for Reviews and Dissemination, and The Cochrane Library Controlled Trial Registry databases (1997–May 2008). A search of the following terms was used: *e-health, mental disorders* (MeSH term), *mental health* (MeSH term), *mental health services* (MeSH term), *telecare, teleconsultation, telehome, telemedical, telemedicine, telemental, telepsychiatric, telepsychiatry, televideo, videoconference, and videophone*.

### Study Selection:

Type of disease, interventions, and clinical outcomes or patient satisfaction were identified. Exclusion criteria included studies that did not analyze intervention outcomes and studies with a sample size of fewer than 10 cases. Peer review and quality assessment according to Cochrane recommendations were required for inclusion.

### Data Extraction/Synthesis:

Of 620 identified articles, 10 randomized controlled trials are included (1,054 patients with various mental disorders). There were no statistically significant differences between study groups for symptoms, quality of life, and patient satisfaction.

### Conclusions:

There is insufficient scientific evidence regarding the effectiveness of telepsychiatry in the management of mental illness, and more research is needed to further evaluate its efficiency. However, there is a strong hypothesis that videoconference-based treatment obtains the same results as face-to-face therapy and that telepsychiatry is a useful alternative when face-to-face therapy is not possible.

2/15/2018              What About Telepsychiatry? A Systematic Review

Case 2:90-cv-00520-KJM-SCR     Document 5873-4     Filed 08/03/18     Page 189 of 348

Mental illness has become a significant worldwide health issue in recent years. By 2020, it is projected that the burden of mental and neurologic disorders will have increased to 15%.[1] The widespread and pervasive nature of mental illness, and many nations' limited ability to recognize and treat such conditions, has led the World Health Organization to attempt to increase international awareness of the dangers and prevalence of mental illness. Thus, it is clear that most people with mental disorders remain either untreated or poorly treated.[2] It is therefore critical to develop more effective mental health service delivery systems to enhance treatment access and quality.[3]

There is presently insufficient evidence to definitively determine the clinical effectiveness and cost-effectiveness of different health care models.[4] Nevertheless, there is a trend toward collaborative care models, including those incorporating a case management approach and/or using the services of a care manager or primary mental health care worker, showing some modest benefit, at least in the short term.[4] In addition, telephone care management interventions appear to be of some benefit to patients with mild-to-moderate mental health problems; however, telehealth care may be a more effective model of service delivery if combined with delivering specific interventions of proven effectiveness, such as cognitive-behavioral therapy.[4]

Videoconferencing plays an important role in most telemedicine initiatives.[5] Medical and mental health services often are inadequate in remote geographical areas with few specialist providers. Telepsychiatry provides clinical, consultative, and educational services to populations in remote regions and other isolated groups.[6] Telepsychiatry, in the form of videoconferencing, has been well received in terms of increasing access to care and user satisfaction.[7] Questions persist, however, about its effectiveness, because there are few clinical outcome studies[8] and limited patient populations for whom telepsychiatry is most suitable.[9]

The objective of this review is to evaluate the effectiveness of telepsychiatric services delivered via videoconferencing techniques.

## METHOD

### Literature Search

Computerized literature searches were performed in Medline, EMBASE, PsycINFO, Centre for Reviews and Dissemination, and The Cochrane Library Controlled Trial Registry databases (1997–May 2008), in addition to a manual search of the identified meta-analyses and systematic reviews. A search of the following terms was used: *e-health, mental disorders* (MeSH term), *mental health* (MeSH term), *mental health services* (MeSH term), *telecare, teleconsultation, telehome, telemedical, telemedicine, telemental, telepsychiatric, telepsychiatry, televideo, videoconference, and videophone*.

---

#### Clinical Points

    ♦ Videoconference seems to be a useful tool for diagnosis, treatment, and follow-up of patients in remote areas.
    ♦ Telepsychiatry improves symptoms in various mental disorders.
    ♦ The main barrier to successful telepsychiatry implementation is professional acceptance.

---

Articles included in this review were selected on the basis of the following criteria: (1) design: randomized controlled trial (RCT) assessing any kind of intervention applying videoconferencing to manage mental illness versus face-to-face assessment; (2) participants: patients with mental disorders (according to *DSM-IV* definitions) who directly used the technology; (3) outcomes: studies must have included information on

2/15/2018        What About Telepsychiatry? A Systematic Review

Case 2:90-cv-00520-KJM-SCR   Document 5873-4   Filed 08/03/18   Page 190 of 348

clinical outcomes (symptoms, quality of life, treatment adherence, laboratory data) or patient satisfaction; and (4) technology: use of videoconference or televideo. Exclusion criteria consisted of studies that did not analyze intervention outcomes in patients, studies with a sample size of fewer than 10 cases in each comparison group, and studies in which the intervention was only phone based or preventive.

### Selection of Publications and Extraction of Data

Initial screening of identified articles was based on their abstracts. Articles lacking an electronic abstract were initially excluded. Studies satisfying the inclusion criteria were thoroughly and independently examined by 2 reviewers with experience in data extraction in order to avoid double publication or redundancies as well as to assess the study quality using accepted criteria.[10,11] If disagreements arose, they were resolved by consensus.

## RESULTS

Of the 620 references identified in the systematic search, 11 articles that met the inclusion and study quality criteria were selected, corresponding to 10 RCTs (Figure 1). Five of the trials were from the United States, 4 from Canada, and 1 from Spain. The main characteristics of these trials and their results can be found in Table 1.

The analyzed results originated from a total of 1,054 patients with various mental illnesses. The disorders studied by the 10 RCTs included multiple diseases (4), most often patients from general psychiatric services[5,12–14]; depression (2)[15,16]; panic disorder (1)[17]; posttraumatic stress disorder (1)[18,19]; bulimia nervosa (1)[20]; and schizophrenia (1).[21]

In general, the objective of each RCT was to assess the diagnosis and follow-up using videoconference versus face-to-face assessment. Five RCTs used cognitive-behavioral therapy, while the rest did not specify a psychotherapeutic approach.

Seven studies[5,13,15–18,20] with a total of 969 patients (474 from the telepsychiatry group and 495 from the control group) were considered in the evaluation of symptoms. As can be seen in Table 1, the intervention group's symptoms did not show statistically significant differences compared to those of the control group.

Seven studies[12–16,18,21] directly evaluated patient satisfaction with the conducted programs. There were no differences between the groups, although it is unclear if satisfaction was generated by the program or the technology. Only Nelson et al[15] and Ruskin et al[16] have published data on patient satisfaction with the utilized technology and its quality. In both cases, patients appeared satisfied. Professional satisfaction was evaluated in only 2 RCTs,[14,21] and both found the lowest level of satisfaction to be in the videoconferencing group.

Three studies evaluated quality of life. The interventions analyzed in this study have not produced a significant difference in quality of life between study groups.[13,16,20]

Regarding treatment adherence, Frueh et al[19] reported better outcomes in the control group ($P < .04$), and Ruskin et al[16] showed a statistically insignificant difference from the control group.

## DISCUSSION

Establishing systems for patient care in psychiatry using videoconferencing is feasible, but there is little evidence of clinical benefits. The studies provided positive results for outcomes such as symptoms, quality of life, patient satisfaction, and treatment adherence. However, the evidence regarding cost-effectiveness is poor. Videoconferencing seemed to improve accessibility to services, serve an educational function, and

2/15/2018 What About Telepsychiatry? A Systematic Review

Case 2:90-cv-00520-KJM-SCR   Document 5873-4   Filed 08/03/18   Page 191 of 348

produce savings of time, costs, and travel. However, these findings should be clearly demonstrated in future research.

The results of this review show that the available evidence on the effectiveness of telepsychiatry programs is limited in general. However, in agreement with other authors,[8,9,22–26] we believe all data point toward videoconferencing as feasible and effective. Patients reported high levels of satisfaction with the process. In addition, no RCT showed complications, so we think telepsychiatry is safe. Although these results need to be confirmed over the long term, we believe telepsychiatry should play a main role in redesigning health systems in order to improve the quality of care for patients with mental disorders.

Another aspect to consider in assessment of telepsychiatry effectiveness is the rapid advancement in technology, as image quality and bit rate are improving every day. It is probable that the same interventions with better technologies will improve the results.

In spite of the fact that only 2 RCTs[14,15] studied children, the results indicated that cooperation of both child and parent, clear communication of treatment recommendations, involvement of the school and local health providers, stability of the agencies, and availability of services were key components of successful implementation of recommendations.[22,27]

Telepsychiatry appears to be a reasonable alternative for situations in which it is difficult or impractical to arrange face-to-face assessments. Whether telepsychiatry can replace face-to-face assessment for ongoing therapy requires more study. If telepsychiatry and face-to-face assessments are found to be similar, then there is no a priori reason to dismiss the idea that telepsychiatry may serve as a replacement for face-to-face assessment for ongoing therapy in certain situations. We may see the development of a hybrid model in which continuing treatment might be conducted via telepsychiatry. Rigorous studies are needed to perform complete economic evaluations, to further describe the interventions, to carry out cost calculations, and to establish a sufficient follow-up period to verify treatment results over time. Potential benefits of telepsychiatry in this area are clear: the possibility of permanently providing educational and orientation programs for patients and an obvious improvement in accessibility to health care services.[28]

The limitations of this study are due partly to the quality of the included RCTs, the variability of the interventions, and the heterogeneity of the follow-up periods, including the loss of follow-up in several of the analyzed RCTs.

In conclusion, there is insufficient scientific evidence regarding the effectiveness of telepsychiatry in the management of mental illness, and more research is needed to further evaluate its efficiency. However, health care providers, health care managers, and politicians have a big challenge: provide medical and mental health care in remote geographical areas or without dangerous delays, as per the ethical principle of equality and universal rights for all citizens. In our opinion, there is a strong hypothesis that videoconference-based treatment produces the same results as face-to-face therapy and that telepsychiatry is a useful alternative when face-to-face therapy is not available.

*Author contributions:* Dr García-Lizana was responsible for project conception and design, analysis, and interpretation of data and provided final approval of the article. Ms Muñoz-Mayorga was responsible for analysis and interpretation of data and provided final approval of the article.

*Potential conflicts of interest:* The authors report no financial or other affiliations relevant to the subject of this article.

*Funding/support:* This work was supported by the Quality Plan for National Health Service, Health Ministry of Spain, Madrid.

# Acknowledgments

Case 2:90-cv-00520-KJM-SCB    Document 5873-4    Filed 08/03/18    Page 192 of 348

The authors thank Raimundo Alcázar, BS, for his collaboration in the literature search and Andrew Blakely (medical student and scholarship holder) for English review (both from Health Technology Assessment Agency, Madrid, Spain). Mssr Alcázar and Blakely have no financial or other affiliations relevant to the subject of this article.

## REFERENCES

1. World Health Organization. The World Health Report: Mental Health: New Understanding, New Hope. Geneva, Switzerland: World Health Organization; 2001.

2. Kao SC, Lin CE, Chiu NY. A proposed e-care center for mental health interventions. J Psychiatr Pract. 2006;12(3):180–186. [PubMed: 16732139]

3. Wang PS, Lane M, Olfson M, et al. Twelve-month use of mental health services in the United States: results from the National Comorbidity Survey Replication. Arch Gen Psychiatry. 2005;62(6):629–640. [PubMed: 15939840]

4. Doughty C. Effective models of mental health service provision and workforce configuration in the primary care setting New Zealand Health Technology Assessment (NZHTA) Technical Brief Series. 2006. Available at: http://nzhtachmedsacnz/publications/mental_healthpcpdf.

5. De Las Cuevas C, Arredondo MT, Cabrera MF, et al. Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. Telemed J E Health. 2006;12(3):341–350. [PubMed: 16796502]

6. McLaren P, Ball CJ, Summerfield AB, et al. An evaluation of the use of interactive television in an acute psychiatric service. J Telemed Telecare. 1995;1(2):79–85. [PubMed: 9375124]

7. De Las Cuevas C, Artiles J, De La Fuente J, et al. Telepsychiatry in the Canary Islands: user acceptance and satisfaction. J Telemed Telecare. 2003;9(4):221–224. [PubMed: 12952693]

8. Hilty DM, Marks SL, Urness D, et al. Clinical and educational telepsychiatry applications: a review. Can J Psychiatry. 2004;49(1):12–23. [PubMed: 14763673]

9. Norman S. The use of telemedicine in psychiatry. J Psychiatr Ment Health Nurs. 2006;13(6):771–777. [PubMed: 17087682]

10. Imaz I, González E, Alcaide JF. Guía para la elaboración de Informes de Evaluación de Tecnologías Sanitarias 19. Madrid, Spain: Agencia de Evaluación de Tecnologías Sanitarias, Instituto de Salud Carlos III; 1999.

11. Jadad AR, Moore RA, Carroll D, et al. Assessing the quality of reports of randomized clinical trials: is blinding necessary? Control Clin Trials. 1996;17(1):1–12. [PubMed: 8721797]

12. Bishop JE, O'Reilly RL, Maddox K, et al. Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. J Telemed Telecare. 2002;8(4):217–221. [PubMed: 12217104]

13. O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face-to-face psychiatry? results from a randomized controlled equivalence trial. Psychiatr Serv. 2007;58(6):836–843. [PubMed: 17535945]

14. Stevens A, Doidge N, Goldbloom D, et al. Pilot study of televideo psychiatric assessments in an underserviced community. Am J Psychiatry. 1999;156(5):783–785. [PubMed: 10327917]

15. Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. Telemed J E Health. 2003;9(1):49–55. [PubMed: 12699607]

16. Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. Am J Psychiatry. 2004;161(8):1471–1476.

2/15/2018                          What About Telepsychiatry? A Systematic Review

Case 2:90-cv-00520-KJM-SCR      Document 5873-4      Filed 08/03/18      Page 193 of 348

[PubMed: 15283973]

17. Bouchard S, Paquin B, Payeur R, et al. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. Telemed J E Health. 2004;10(1):13–25. [PubMed: 15104911]

18. Frueh BC, Monnier J, Yim E, et al. A randomized trial of telepsychiatry for post-traumatic stress disorder. J Telemed Telecare. 2007;13(3):142–147. [PubMed: 17519056]

19. Frueh BC, Monnier J, Grubaugh AL, et al. Therapist adherence and competence with manualized cognitive-behavioral therapy for PTSD delivered via videoconferencing technology. Behav Modif. 2007;31(6):856–866. [PubMed: 17932240]

20. Mitchell JE, Crosby RD, Wonderlich SA, et al. A randomized trial comparing the efficacy of cognitive-behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face. Behav Res Ther. 2008;46(5):581–592. [PMCID: PMC2633728] [PubMed: 18374304]

21. Manguno-Mire GM, Thompson J, Jr, Shore JH, et al. The use of telemedicine to evaluate competency to stand trial: a preliminary randomized controlled study. J Am Acad Psychiatry Law. 2007;35(4):481–489. [PubMed: 18086740]

22. Pesämaa L, Ebeling H, Kuusimäki ML, et al. Videoconferencing in child and adolescent telepsychiatry: a systematic review of the literature. J Telemed Telecare. 2004;10(4):187–192. [PubMed: 15273027]

23. Hyler SE, Gangure DP, Batchelder ST. Can telepsychiatry replace in-person psychiatric assessments? a review and meta-analysis of comparison studies. CNS Spectr. 2005;10(5):403–413. [PubMed: 15858458]

24. Frueh BC, Deitsch SE, Santos AB, et al. Procedural and methodological issues in telepsychiatry research and program development. Psychiatr Serv. 2000;51(12):1522–1527. [PubMed: 11097648]

25. Hilty DM, Luo JS, Morache C, et al. Telepsychiatry: an overview for psychiatrists. CNS Drugs. 2002;16(8):527–548. [PubMed: 12096934]

26. Monnier J, Knapp RG, Frueh BC. Recent advances in telepsychiatry: an updated review. Psychiatr Serv. 2003;54(12):1604–1609. [PubMed: 14645799]

27. Boydell KM, Volpe T, Kertes A, et al. A review of the outcomes of the recommendations made during pediatric telepsychiatry consultations. J Telemed Telecare. 2007;13(6):277–281. [PubMed: 17785023]

28. García-Lizana F, Sarría-Santamera A. New technologies for chronic disease management and control: a systematic review. J Telemed Telecare. 2007;13(2):62–68. [PubMed: 17359568]

## Figures and Tables

2/15/2018      What About Telepsychiatry? A Systematic Review

Case 2:90-cv-00520-KJM-SCR     Document 5873-4     Filed 08/03/18     Page 194 of 348

**Figure 1**



Literature Selection for the Systematic Review

Abbreviation: RCT = randomized controlled trial.

2/15/2018      What About Telepsychiatry? A Systematic Review

Case 2:90-cv-00520-KJM-SCR     Document 5873-4     Filed 08/03/18     Page 195 of 348

**Table 1**

Randomized Controlled Trials Included in the Systematic Review

| Study (location) | Kind of Disorder, n (intervention/control) | Quality Assessment | Intervention | Age, y (follow-up) | Results |
|---|---|---|---|---|---|
| Stevens et al, 1999 (Canada)[14] | Multiple, 40 (20/20) | 1 | Objectives: diagnosis and follow-up<br><br>Program: NSp<br><br>Duration: NSp | < 18 (NSp) | Patient satisfaction: NS<br><br>Professional satisfaction: worse in intervention group ($P < .001$) |
| Bishop et al, 2002 (Canada)[12] | Multiple, 24 (11/10) | 3 | Objectives: diagnosis and follow-up<br><br>Program: NSp<br><br>Duration: 4 mo | > 18 (4 mo) | Satisfaction: NS |
| De Las Cuevas et al, 2006 (Spain)[5] | Multiple, 140 (70/70) | 1 | Objectives: diagnosis, treatment, and follow-up<br><br>Program: CBT and prescription<br><br>Duration: >8 sessions of 30 min in 24 wk | All ages (24 wk) | Symptoms: pre/post intervention: improvement in intervention and control groups ($P < .001$); intervention/control: NS<br><br>Treatment: prescription similar in both groups |
| O'Reilly et al, 2007 (Canada)[13] | Multiple, 495 (241/254) | 1 | Objectives: diagnosis and follow-up<br><br>Program: treatment management, psychoeducation, counseling, and short-time consults<br><br>Duration: 4 mo | 18–65 (12 mo) | Symptoms improve in intervention vs control: NS<br><br>Quality of life: NS<br><br>Satisfaction: NS<br><br>Cost: 10% less expensive on average in intervention group<br><br>Hospitalization: during 12 mo, NS |
| Nelson et al, 2003 (United States)[15] | Depression, 28 (14/14) | 3 | Objectives: diagnosis and treatment<br><br>Program: CBT<br><br>Duration: 1 session/wk with children and parents for 8 wk | 8–14 (8 wk) | Symptoms: better in intervention group ($P < .05$)<br><br>Telepsychiatry satisfaction: high |
| Ruskin et al, 2004 (United States)[16] | Depression, 119 (59/60) | 3 | Objectives: education and treatment<br><br>Program: treatment management, | Mean: 49.7 (6 mo) | Symptoms and quality of life: NS<br><br>Adherence: NS |

Case 2:90-cv-00520-KJM-SCR    Document 5873-4    Filed 08/03/18    Page 196 of 348

| Study (location) | Kind of Disorder, n (intervention/control) | Quality Assessment | Intervention Psychotherapy and counseling | Age, y (follow-up) | Results |
|---|---|---|---|---|---|
| | | | | | Telepsychiatry satisfaction: patients, NS; therapist, better in control group ($P < .05$) |
| | | | Duration: 8 sessions of 20 min for 26 wk (wk 1, 3, 7, 11, 15, 19, and 26) | | Cost: lower in control group ($P < .001$) |
| Bouchard et al, 2004 (Canada)[17] | Panic with agoraphobia, 21 (11/10) | 3 | Objectives: treatment | 24–63 (6 mo) | Symptoms: pre/post and 6 mo, NS |
| | | | Program: CBT, psychoeducation | | Panic attack frequency: lower in intervention group ($P < .05$) |
| | | | Duration: 1 session/wk for 12 wk | | |
| Frueh et al, 2007 (United States)[18],[19] | Posttraumatic stress disorder, 38 (17/21) | 2 | Objectives: treatment | Mean: 56 (3 mo) | Symptoms: NS (posttest and follow-up) |
| | | | Program: CBT for war veterans | | Overall satisfaction: NS |
| | | | Duration: sessions of 90 min/wk for 14 wk | | Adherence to treatment: better in control group (P = .04) |
| | | | | | Adherence to sessions: NS |
| | | | | | Competence of treatment: NS |
| Mitchell et al, 2008 (United States)[20] | Bulimia/eating disorder, 128 (62/66) | 3 | Objectives: treatment | ≥ 18 (12 mo) | Symptoms: NS at 3 mo; better in control group at 12 mo |
| | | | Program: CBT | | Quality of life: NS |
| | | | Duration: 20 sessions of 30 min each over 16 wk | | Illness knowledge: better in control group ($P < .001$) |
| | | | | | Depression: lower in control group ($P < .037$) |
| Manguno-Mire et al, 2007 (United States)[21] | Schizophrenia spectrum, 21 (11/10) | 1 | Objectives: mental competency evaluation for trial | Mean: 42(NSp) | Diagnosis capacity: NS |
| | | | Program: application of a competency test | | Satisfaction: patients, NS; therapist, less in intervention group (P = .009) |
| | | | Duration: 30 min | | |

Abbreviations: CBT = cognitive-behavioral therapy, NS = not significant, NSp = not specified.

Articles from Primary Care Companion to The Journal of Clinical Psychiatry are provided here courtesy of

**Physicians Postgraduate Press, Inc.**

ORIGINAL RESEARCH

Downloaded by  uan  i  ni  ersity for  ationalities from online.liebertpub.com at 0  /1  /18. For personal use only.

# Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana

Michelle Glaser, M.P.H.,[1] Tom Winchell, M.P.A.,[2]
Patty Plant, B.S.N., N.P., M.S.N.,[3] Wayne Wilbright, M.D., M.S.,[3]
Michael Kaiser, M.D.,[3] Michael K. Butler, M.D., M.H.A., C.P.E.,[3]
Matthew Goldshore, M.P.H.,[1] and Manya Magnus, Ph.D., M.P.H.[1]

[1]Department of Epidemiology and Biostatistics, The George
Washington University School of Public Health and Health
Services, Washington, DC.
[2]LSU Health Sciences Center, New Orleans, Louisiana.
[3]LSU Health Care Services Division, Baton Rouge, Louisiana.

## Abstract

*Health information technology including telemedicine offers potential to improve patient care outcomes. As part of the response to Hurricanes Katrina and Rita in 2005, the Louisiana State University Health Care Services Division expanded its statewide telemedicine program. The aim of this study was to evaluate provider satisfaction and patient outcomes associated with telemedicine when used for the administration of prisoner medical care. Providers completed a survey following each patient encounter in real-time; questions were adapted from standard satisfaction indices. Statistical methods included uni-, bi-, and multivariable including ordinal regression methods to characterize unadjusted and adjusted factors associated with telemedicine use and provider satisfaction, and patient outcomes. Data were collected between December 2007 and May 2008 and were analyzed using SAS and Stata. Out of 737 patient visits, the majority of patients were African American (68.6%), men (92.9%), seen for either infectious disease or mental health (46.2% and 50.2%), with most surveys completed by a physician (63.1%). Most telemedicine encounters were completed (92.8%), a treatment plan was established (97.0%), the provider perceived that the technology was adequate to conduct visit (93.4%), and a follow-up telemedicine appointment was requested (90.8%). Most providers were satisfied with telemedicine for the visit overall (87.0%), believed that telemedicine improved patient prognosis (88.2%), and perceived that the patient was satisfied (83.0%). This study suggests that telemedicine was an effective and accepted method of healthcare provision.*

**Key words:** *telemedicine, health information technology, outcomes evaluation*

## Introduction

Telemedicine represents a unique opportunity to enhance healthcare delivery in situations where distance or travel challenges present barriers to specialty or other care. Incarcerated individuals represent a specific population where there may be benefits of telemedicine are accentuated; benefits may result from the elimination of need to travel great distances with security measures in place, halt regular clinics to accommodate prison patients, or provide specialty services to prisoners that would otherwise be unavailable.[1–4] Between transportation and extra guards, bringing a prisoner to a doctor's appointment can be expensive and has potential to be dangerous. Telemedicine offers a way to decrease medical costs and improve care among incarcerated populations.[1–4]

The field of telemedicine, also known as telehealth, ranges from systematic phone contact between providers and patients for mental healthcare provision, to complex video visits with technological attachments to provide clinical assessments such as electrocardiogram (ECG) monitoring, otoscopes, dermatologic viewing, and more.[5–7] Uses of telemedicine include connecting prison populations to care as well as facilitating contact between providers and patients in rural

DOI: 10.1089/tmj.2009.0169

## SATISFACTION AND OUTCOMES ASSOCIATED WITH TELEMEDICINE IN PRISONS

Downloaded by Guangxi University for Nationalities from online.liebertpub.com at 02/15/18. For personal use only.

areas where travel is a barrier to care. Multiple evaluations and reviews have been conducted in the use of telemedicine for provision of mental healthcare,[1,2,8–15] prison care,[16] HIV/AIDS care,[17–24] and dermatology,[25–28] among other disciplines. These consistently suggest an increasing acceptance of telemedicine as well as efficacy of the technology toward patient care improvements. Adolescent mental healthcare in detention centers and other settings has been shown to be particularly responsive to the use of telemedicine technology.[2,13,15]

In response to Hurricanes Katrina and Rita in 2005, Louisiana State University (LSU) Health Care Services Division enhanced and expanded its telemedicine program to facilitate continuity of care between clinics as well as respond to the unique needs of prisoner health. Over 48 video endpoints in 8 public medical centers and 13 prisons were created.[17,29] The initial set of services included HIV/AIDS care, mental health including juvenile services from detention centers, otolaryngology (ear, nose, and throat), dermatology, and neurology. At each prison telemedicine unit, self-contained carts were provided to link the prisoner patient with the provider. The equipment includes a primary video conferencing system (Polycom), with a secondary camera (AMD) used for dermatology and wound care appointments as either a hand held or tripod-mounted lens. A video monitor/television screen, with audio capabilities, is used for all clinical, administrative, and educational procedures that are part of the telemedicine encounter. An AMD/Welch Allyn otoscope and laryngoscope is used for the ear, nose, and throat appointments and the AMD 3700 Telephonic Stethoscope is used for the cardiology appointments. Additionally, there is a document camera capable of capturing, analog to digital conversion, and transmitting clinical images, radiographs, ECGs, and videos where digital copies do not exist.

In conjunction with the initial rollout in the prison health centers, an electronic provider survey was developed to capture the provider experiences. The aim of the survey was to obtain real-time satisfaction and outcomes data directly from providers at the time of telemedical care. Although multiple evaluations have supported telemedicine's association with patient and provider satisfaction and positive care outcomes in prison settings and the general population,[1,5,7,8,10,11,13,15,16,20,28,30,31] there remain gaps in telemedicine evaluation research, many stemming from difficulties in adequate response rate and reaching providers to gather data as well as sometimes minimal dissemination of results.

In a systematic review of the literature, one study found that between 1966 and 2005, 47 articles contained information on a complete technical evaluation of a telemedicine program and that only 3 of those used objective methods to complete the evaluation.[5] Challenges in obtaining real-time or near-real-time evaluation data regarding provider perceptions of the system, including information on satisfaction and patient outcomes, have been limited by poor response rates of providers or lengthy delays between point of service and data collection. For example, rural Canada[32] and Alaska[33] have telemedicine programs that reach citizens who are too remote from doctors and hospitals to receive medical treatment; however, the system has not yet published an extensive outcomes-based evaluation of its services. The Alaska Federal Health Care Access Network system has one of the country's oldest telemedicine systems, which was designed to overcome physical geographic barriers to care.[33] Despite the system's ability to generate system-based process evaluation data, satisfaction and outcomes data were collected by paper-based survey, resulting in a response rate of just 40%.[33]

Additional studies are needed to track real-time provider perception of prison system use of telemedicine and provider satisfaction with telemedicine, in conjunction with patient outcomes. Provider satisfaction with health information technology including telemedicine is a central component needed for adoption and implementation of any health information technology (HIT) to be successful.[34–39]

The aim of this study was to evaluate provider satisfaction and patient care outcomes associated with use of telemedicine in Louisiana prison clinics, using a method that captures real-time, electronically collected data.[17,29]

## Materials and Methods

In concert with a multidisciplinary team and based on a review of the existing literature, an electronic survey was developed that would be automatically presented to providers at the closure of each telemedicine visit. The survey contained five Likert questions regarding the provider's satisfaction with the telemedicine visit, perception of prognosis, and patient satisfaction with telemedicine, as well as six questions regarding patient outcome and disposition; questions are displayed in *Table 1*. The questions were adapted from other evaluations and literature, publicly available forms, reports, and publications.[32,33,40–43] Data obtained from all visits prison and nonprison between December 2007 and May 2008 were analyzed.

### ANALYSIS

Univariate and bivariate methods were used to characterize provider satisfaction and perception of telemedicine at each specific visit, and its association with patient disposition and visit outcomes. Responses on the questionnaire were first assessed for global associations with characteristics of the visit (location, clinic, and purpose)

**GLASER ET AL.**

Downloaded by Guangxi University for Nationalities from online.liebertpub.com at 02/15/18. For personal use only.

| Table 1. Evaluation Questions | |
|---|---|
| **QUESTION** | **RESPONSE SET** |
| Was this telemedicine visit completed? | Yes/No |
| If No to question above, why? | Telemed technology did not work |
| | Patient refused visit |
| | Patient no show |
| | Clinician unavailable |
| | Clinic or session cancelled |
| | Clinic or session occurred |
| Was the telemedicine technology adequate to conduct today's visit? | Yes/No |
| What information was not available but was needed to either make a diagnosis and/or treat the patient? | |
| Was a treatment plan established? | |
| What is the patient's disposition? | Inappropriate consultation—requires additional consult by referring clinician |
| | Patient needs to be seen at provider site |
| | Follow-up telemedicine encounter requested by provider |
| | Telemedicine encounter needs to be rescheduled |
| | Other |
| Based on your perception about today's telemedicine visit, clinical decision making was successfully accomplished? | Completely agree/agree/neutral/disagree/completely disagree |
| Based on your perception, today's telemedicine visit may have improved the patient's prognosis? | |
| Based on your perception about today's telemedicine visit, how satisfied are you today's telemedicine outcome? | Completely satisfied/generally satisfied/neutral/generally dissatisfied/completely dissatisfied |
| What is your perception about overall patient satisfaction with today's telemedicine visit? | |
| What is your perception about overall patient satisfaction with today's telemedicine visit? | |

and patients (age, race, and sex). Those found significantly associated were then assessed to ensure assumptions underlying ordinal regression were met; if they were, ordinal regression was used to model characteristics associated with agreement to the Likert statements. Logistic regression was used to model characteristics associated with completion of the visit, perception that technology was adequate for the visit, and whether a treatment plan was established. For all research questions, $\alpha$ was set to 0.05. Stata 9.0se was used for analysis.

All survey protocols and instrumentation were approved by the LSU Health Sciences Center and George Washington University Medical Center Institutional Review Boards.

## Results

As shown in *Table 2*, the majority of patients were men (92.9%), African American (68.6%), and over 18 years of age at the time of the visit (54.1%). Visits were nearly evenly split between mental health/

**SATISFACTION AND OUTCOMES ASSOCIATED WITH TELEMEDICINE IN PRISONS**

Downloaded by Guangxi University for Nationalities from online.liebertpub.com at 02/15/18. For personal use only.

| Table 2. Characteristics of Patients and Visits, December 2007 to May 2008 (*n* = 737) | |
|---|---|
| | **N (%)** |
| **Sex** | |
| Female | 52 (7.1) |
| Male | 685 (92.9) |
| **Race** | |
| Black/African American | 401 (68.6) |
| White | 138 (23.6) |
| Other | 46 (6.2) |
| **Age (years)** | |
| <18 | 338 (45.9) |
| ≥18 | 399 (54.1) |
| **Visit type** | |
| Mental health/psychology | 371 (52.3) |
| HIV/infectious disease | 340 (46.1) |
| Dermatology/other | 26 (3.5) |
| **Degree of person completing survey** | |
| MD | 465 (63.1) |
| NP | 94 (12.8) |
| RN | 119 (16.2) |
| Other | 59 (8.0) |
| **Telemedicine visit completed** | |
| Yes | 684 (92.8) |
| No | 53 (7.2) |
| **If visit was not completed, reason (*n* = 53)** | |
| Patient refused visit | 25 (40.3) |
| Telemedicine technology did not work | 14 (22.6) |
| Patient no show | 13 (21.0) |
| Clinic or session cancelled | 10 (16.1) |
| **Technology adequate to conduct visit** | |
| Yes | 648 (93.4) |
| No | 46 (6.6) |
| **Treatment plan established** | |
| Yes | 715 (97.0) |
| No | 22 (3.0) |
| **Patient disposition** | |
| Follow-up telemedicine encounter requested | 660 (90.8) |
| Patient needs to be seen at provider site | 33 (4.5) |
| Telemedicine encounter needs to be rescheduled | 20 (2.8) |
| Return to referring clinician | 5 (0.7) |
| Other | 9 (1.2) |

psychology (52.3%) and HIV/infectious disease (46.1%). Physicians completed the majority of the survey (63.1%). The telemedicine visits were completed in 92.8% of the surveys, with 93.4% of respondents citing technology as adequate to complete the visits. In addition, 97.0% of respondents cited that they were able to establish a treatment plan during the visit. The vast majority of respondents requested a subsequent telemedicine visit for their patient's follow-up (90.8%).

As shown in *Table 3*, there was substantial agreement with statements indicating satisfaction with the telemedicine system: 88.2% completely agreed or agreed that the telemedicine visit may have improved the patient's prognosis, 89.4% completely agreed or agreed that clinical decision making was successfully accomplished with telemedicine visit, 83.6% were completely or generally satisfied with the telemedicine visit outcome, 82.2% completely or generally satisfied overall with telemedicine visit, and 83.0% perceived that the patient was completely or generally satisfied overall with telemedicine visit. Perception at the negative or far negative side of the spectrum was less than 8% for each of the five statements.

As shown in *Table 4*, after adjustment for all variables in the models, providers reported that they were less likely to complete a visit for patients <18 years (odds ratio [OR] 0.35 [95% confidence interval (CI) 0.13–0.96]), less likely to perceive that technology was adequate for patients <18 years (OR 0.26 [95% CI 0.07–0.09]), and more likely to establish a treatment plan for African American patients (OR 4.64 [95% CI 1.54–13.98]). After adjustment for all variables in the models, male sex was consistently and significantly associated with provider-perceived satisfaction with all facets of the system and achieved positive clinical outcomes, whereas age <18 was consistently and significantly associated with less satisfaction and agreement with the positive statements. For nearly all of the Likert statements, physicians closing out the visits and taking the surveys were more likely to relate dissatisfaction with the system than nonphysicians.

## Discussion

This study suggests that there was an overall high level of satisfaction with patient outcomes associated with the Louisiana statewide telemedicine system. For use in connecting prisoners to specialty care as well as linking locations to care where distance was a challenge to care delivery, telemedicine was an effective and accepted method of healthcare provision. Most visits were completed; telemedicine was requested for follow-up visits for the vast majority of patients when the technology was perceived as

**GLASER ET AL.**

Downloaded by Guangxi University for Nationalities from online.liebertpub.com at 02/15/18. For personal use only.

| Table 3. Provider Perception of Telemedicine and Patient Outcomes, December 2007 to May 2008 ($n = 737$) | |
|---|---|
| | **N (%)** |
| Based on your perception, today's telemedicine visit may have improved the patient's prognosis | |
| Completely agree | 279 (37.9) |
| Agree | 371 (50.3) |
| Neutral | 71 (9.6) |
| Disagree | 3 (0.4) |
| Completely disagree | 13 (1.8) |
| Based on your perception about today's telemedicine visit, clinical decision making was successfully accomplished | |
| Completely agree | 283 (38.8) |
| Agree | 369 (50.6) |
| Neutral | 62 (8.5) |
| Disagree | 2 (0.3) |
| Completely disagree | 13 (1.8) |
| Based on your perception about today's telemedicine visit, how satisfied are you with today's telemedicine outcome? | |
| Completely satisfied | 281 (38.1) |
| Generally satisfied | 335 (45.5) |
| Neutral | 65 (8.8) |
| Generally unsatisfied | 42 (5.7) |
| Completely unsatisfied | 14 (1.9) |
| Based on your perception, what is your overall satisfaction with the telemedicine system for this telemedicine visit? | |
| Completely satisfied | 283 (38.4) |
| Generally satisfied | 323 (43.8) |
| Neutral | 73 (9.9) |
| Generally unsatisfied | 44 (6.0) |
| Completely unsatisfied | 14 (1.9) |
| What is your perception about overall patient satisfaction with today's telemedicine visit? | |
| Completely satisfied | 267 (36.2) |
| Generally satisfied | 345 (46.8) |
| Neutral | 75 (10.2) |
| Generally unsatisfied | 37 (5.0) |
| Completely unsatisfied | 13 (1.8) |

adequate to meet the clinical needs of the patients. These results suggest that the providers are successfully using the telemedicine technology to treat prisoners using these methods in mental health/psychology and HIV/infectious disease. The type of appointment that resulted in the greatest challenges included mental health televisits for residents of juvenile detention centers. These patients were least likely to have their visits completed, and were more likely to have providers perceive that the technology was not adequate for the visit at hand. This may reflect the difficulties in treating this adolescent population in juvenile detention settings more than the telemedicine itself, but suggests that the technology should be carefully monitored for satisfactory outcomes among this population. This is contrary to the findings of other investigators[2,13,15] who found telemedicine to be successful with adolescents, including those in detention centers. Although women composed a very small proportion of the sample, our measures suggest that the providers perceived the use of telemedicine to be more satisfactory and with less satisfactory patient outcomes than that for their male counterparts. Future studies are needed among samples with more women to examine this more fully.

This study has several strengths and limitations. The survey was inserted into the telemedicine electronic interface that sets appointments and contains patient data as a part of the electronic close-out procedures, which ensured maximum participation among the providers; this increases the generalizability of the findings to the population of providers using the telemedicine program. The survey was developed by a multidisciplinary team and was evaluated by sentinel providers before launch, to ensure acceptability of the tool. During that period, however, the length of the survey was found to be too long and the final survey omits several questions that could have lent context or depth to the responses. Other than location, type of clinic, and the type of provider closing out the survey, few characteristics are available regarding the providers. Future studies may examine whether provider characteristics such as comfort with computers or technology are associated with satisfaction; if so, additional training may be provided to those most at risk of dissatisfaction with the system. Of particular interest may be differentiating frequent telemedicine users from occasional users. The relative impact of satisfaction with telemedicine may depend on how frequently the provider uses the technology, as well as how comfortable the patient is with the system. In addition, more information beyond demographic characteristics of the patients, such as diagnosis codes or other clinical information, would enrich our understanding of the relationship between telemedicine use in the prisons and provider satisfaction with evolving technologies. Additional research into the patient perspective of telemedicine and satisfaction with the system are needed. An additional limitation of the current cross-sectional study is the inability to track trends in satisfaction or utilization over a longer time frame. This temporal information would be helpful to see if as the providers become more accustomed to the telemedicine procedures, their levels of utilization or satisfaction

## SATISFACTION AND OUTCOMES ASSOCIATED WITH TELEMEDICINE IN PRISONS

Downloaded by Guangxi University for Nationalities from online.liebertpub.com at 02/15/18. For personal use only.

| | TELEMEDICINE VISIT COMPLETED | TREATMENT PLAN ESTABLISHED | TECHNOLOGY ADEQUATE FOR TODAY'S VISIT | IMPROVED PROGNOSIS[b] | CLINICAL DECISION MAKING FACILITATED[b] | SATISFIED WITH TODAY'S TELEMEDICINE OUTCOME[b] | SATISFIED WITH TELEMEDICINE SYSTEM[b] | PERCEPTION OF PATIENT SATISFACTION[b] |
|---|---|---|---|---|---|---|---|---|
| **Patient sex** | | | | | | | | |
| Male | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Female | 1.09 (0.24–4.97) | 0.34 (0.06–1.94) | 0.82 (0.23–2.94) | 0.41 (0.22–0.75)[c] | 0.49 (0.27–0.89)[d] | 0.38 (0.20–0.71)[c] | 0.35 (0.18–0.66)[c] | 0.40 (0.22–0.75)[c] |
| **Patient race** | | | | | | | | |
| Non–African American | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| African American | 1.27 (0.71–2.25) | 4.64 (1.54–13.98)[c] | 0.95 (0.52–1.75) | 1.10 (0.82–1.46) | 1.12 (0.87–1.56) | 1.08 (0.82–1.44) | 1.05 (0.79–1.39) | 1.25 (0.94–1.66) |
| **Patient age (years)** | | | | | | | | |
| ≥18 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| <18 | 0.35 (0.13–0.96)[d] | 0.15 (0.18–1.34) | 0.26 (0.07–0.90)[d] | 1.59 (1.06–2.39)[d] | 1.56 (1.03–2.35)[d] | 1.73 (1.16–2.59)[c] | 1.54 (1.03–2.29)[d] | 2.14 (1.43–3.20)[e] |
| **Provider type** | | | | | | | | |
| Nonphysician | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Physician | 1.01 (0.34–2.98) | 2.24 (0.27–20.61) | 2.73 (0.79–9.53) | 1.46 (0.97–2.20) | 1.87 (1.24–2.82)[c] | 1.64 (1.10–2.47)[d] | 1.89 (1.27–2.81)[c] | 1.61 (1.08–2.40)[d] |

Table 4. Adjusted[a] Characteristics Associated with Provider Satisfaction and Patient Outcomes, December 2007 to May 2008 (Odds Ratio [95% Confidence Interval]) ($n = 737$)

[a]Adjusted for all other variables listed.
[b]OR > 1.0 indicates increasing disagreement with statement and dissatisfaction with system; OR < 1.0 indicates increasing agreement with statement and satisfaction with system.
[c]$p < 0.01$.
[d]$p < 0.05$.
[e]$p < 0.001$.

change. As the telemedicine system in Louisiana evolves, time-trend analyses can be conducted to see if there are trends in satisfaction and usage over time.

## Conclusions and Recommendations

Telemedicine is an integral part of the growing health information technology field. Telemedicine offers an immediate and real step toward improving the healthcare provided to prisoners in Louisiana as well as individuals needing specialty care between rural and urban locations. Providers are no longer inconvenienced by security measures and work interruptions experienced with face-to-face consultations with the prisoners, offering the potential for realization of cost savings over time as well as improved care for prisoners. Ongoing prospective evaluation of provider satisfaction and association between telemedicine usage and patient outcomes will enable system improvements over time. Future evaluations will explore changes over time and in provider and patient satisfaction with the technology as it broadens and is implemented elsewhere throughout the state.

## Acknowledgments

The authors wish to acknowledge the contribution of all providers, faculty, and staff engaging in this study as well as the patients seen, without whom this study would not have been possible. Michelle Glaser was a student at GWU at the time of her participation in this study. She is currently a CDC/CTSE Applied Epidemiology Fellow.

This study was funded in part by the LSU Health Care Services Division and the LSU Health Sciences Center.

## Disclosure Statement

No competing financial interests exist.

Downloaded by Guangxi University for Nationalities from online.liebertpub.com at 02/15/18. For personal use only.

## REFERENCES

1. Fox KC, Somes GW, Waters TM. Timeliness and access to healthcare services via telemedicine for adolescents in state correctional facilities. *J Adolesc Health* **2007**;41:161–167.

2. Fox KC, Whitt AL. Telemedicine can improve the health of youths in detention. *J Telemed Telecare* **2008**;14:275–276.

3. Goodale J, Menzel D, Hodgson G. High-tech prisons: Latest technologies drive cost savings and staff efficiencies. *Corrections Today* **2005**;67:78–81.

4. Watson W, Stimpson A, Hostick T. Prison health care: A review of the literature. *Int J Nurs Stud* **2004**;41:119–128.

5. Clarke M, Thiyagarajan CA. A systematic review of technical evaluation in telemedicine systems. *Telemed E Health* **2008**;14:170–183.

6. Field MJ. *A guide to assessing telecommunications in health care.* Washington, DC: National Academies Press, **1996**.

7. Mair F, Whitten P. Systematic review of studies of patient satisfaction with telemedicine. *Br Med J* **2000**;320:1517–1520.

8. Godleski L, Nieves JE, Darkins A, Lehmann L. VA telemental health: Suicide assessment. *Behav Sci Law* **2008**;26:271–286.

9. Yellowlees P, Marks S, Hilty D, Shore JH. Using e-health to enable culturally appropriate mental healthcare in rural areas. *Telemed J E Health* **2008**;14:486–492.

10. Mitchell JE, Crosby RD, Wonderlich SA, Crow S, Lancaster K, Simonich H, Swan-Kremeier L, Lysne C, Myers TC. A randomized trial comparing the efficacy of cognitive-behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face therapy. *Behav Res Ther* **2008**;46:581–592.

11. Ross JT, TenHave T, Eakin AC, Difilippo S, Oslin DW. A randomized controlled trial of a close monitoring program for minor depression and distress. *J Gen Intern Med* **2008**;23:1379–1385.

12. Mozer E, Franklin B, Rose J. Psychotherapeutic intervention by telephone. *Clin Interv Aging* **2008**;3:391–396.

13. Cloutier P, Cappelli M, Glennie JE, Keresztes C. Mental health services for children and youth: A survey of physicians' knowledge, attitudes and use of telehealth services. *J Telemed Telecare* **2008**;14:98–101.

14. Yellowlees P, Burke MM, Marks SL, Hilty DM, Shore JH. Emergency telepsychiatry. *J Telemed Telecare* **2008**;14:277–281.

15. Myers KM, Valentine JM, Melzer SM. Child and adolescent telepsychiatry: Utilization and satisfaction. *Telemed J E Health* **2008**;14:131–137.

16. Morgan RD, Patrick AR, Magaletta PR. Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities. *J Consult Clin Psychol* **2008**;76:158–162.

17. Besch CL. Telemedicine improves access to care for HIV-infected prisoners. *HIV Clin* **2007**;19:4–5.

18. Zolfo M, Arnould L, Huyst V, Lynen L. Telemedicine for HIV/AIDS care in low resource settings. *Stud Health Technol Inform* **2005**;114:18–22.

19. Zolfo M, Lynen L, Dierckx J, Colebunders R. Remote consultations and HIV/AIDS continuing education in low-resource settings. *Int J Med Inform* **2006**;75:633–637.

20. Danahar D. Louisiana update. Delta to explore new venues in 1999. *Fac Notes (New Orleans La)* **1999**;11:4.

21. Caceres C, Gomez EJ, Garcia F, Gatell JM, del Pozo F. An integral care telemedicine system for HIV/AIDS patients. *Int J Med Inform* **2006**;75:638–642.

22. Vazquez E. HIV treatment in prison. *Posit Aware* **2001**;12:32–34.

23. Mahoney MR, Khamarko K, Goldschmidt RH. Care of HIV-infected Latinos in the United States: A description of calls to the National HIV/AIDS Clinicians' Consultation Center. *J Assoc Nurses AIDS Care* **2008**;19:302–310.

24. Makulowich JS. AIDS and telemedicine. *AIDS Patient Care STDS* **1996**;10:387–388.

25. Chanussot-Deprez C, Contreras-Ruiz J. Telemedicine in wound care. *Int Wound J* **2008**;5:651–654.

26. Wurm EM, Hofmann-Wellenhof R, Wurm R, Soyer HP. Telemedicine and teledermatology: Past, present and future. *J Dtsch Dermatol Ges* **2008**;6:106–112.

27. Wurm EM, Campbell TM, Soyer HP. Teledermatology: How to start a new teaching and diagnostic era in medicine. *Dermatol Clin* **2008**;26:295–300, vii.

28. Mofid M, Nesbitt T, Knuttel R. The other side of teledermatology: Patient preferences. *J Telemed Telecare* **2007**;13:246–250.

29. The Louisiana State University Health Care Services Division Medical Informatics and Telemedicine Program. Telemedicine Hardware. http://medinfo-telemed.lsuhsc.edu/ (last accessed April 4, 2010).

30. Harrison R, Macfarlane A, Murray E, Wallace P. Patients' perceptions of joint teleconsulations: A qualitative evaluation. *Health Expect* **2006**;9:81–90.

31. Love W. Patient and provider satisfaction with the use of telemedicine: Overview and rationale for cautious enthusiasm. *J Postgrad Med* **2005**;51:294–300.

32. Nova Scotia Department of Health. Remote specialist consultation and continuing medical education pilot project. Halifax: The Department, 1997. Last accessed September 9, 2007.

33. University of Alaska Statewide Health Programs and University of Alaska Anchorage Center for Human Development. Evolution & summative evaluation of the Alaska Federal Health Care Access Network telemedicine project 2004. **2004.** http://www.alaska.edu/health/downloads/Telemed/AFHCAN.pdf (last accessed September 9, 2007).

34. Dagroso D, Williams PD, Chesney JD, Lee MM, Theoharis E, Enberg RN. Implementation of an obstetrics EMR module: Overcoming user dissatisfaction. *IJ Healthc Inf Manag* **2007**;21:87–94.

35. Adler KG, Edsall RL. Electronic health records: A user-satisfaction survey. *Fam Pract Manag* **2005**;12:45–54.

36. Joos D, Chen Q, Jirjis J, Johnson KB. An electronic medical record in primary care: Impact on satisfaction, work efficiency and clinic processes. *AMIA Annu Symp Proc* **2006**;2006:394–398.

37. Likourezos A, Chalfin DB, Murphy DG, Sommer B, Darcy K, Davidson SJ. Physician and nurse satisfaction with an electronic medical record system. *J Emerg Med* **2004**;27:419–424.

38. O'Connell RT, Cho C, Shah N, Brown K, Shiffman RN. Take Note(s): Differential EHR satisfaction with two implementations under one roof. *J Am Med Inform Assoc* **2004**;11:43–49.

Downloaded by Guangxi University for Nationalities from online.liebertpub.com at 02/15/18. For personal use only.

39. Whitten P, Buis L, Mackert M. Factors impacting providers' perceptions regarding a midwestern university-based EMR. *Telemed J E Health* **2007;**13:391–397.

40. McDonald WR. External evaluation of the California telemedicine and eHealth center (CTEC) network development grant: Bi-Annual Progress Report. **2007**.

41. Rose D. Evaluation of the California telehealth and telemedicine center. In: Dennis & Rose Associates DRA Project Reports, June 2002, Vol. 2. http://www.cttconline.org/eval.html (last accessed April 2008).

42. Association AT. Kentucky Telecare, University of Kentucky Chandler Medical Center. Telemedicine Consultant Evaluation Form. http://www.americantelemed.org/news/forms.html (last accessed April 2008).

43. Network MT. Patient questionnaire. **2001**.

Address correspondence to:
*Manya Magnus, Ph.D., M.P.H.*
*Department of Epidemiology and Biostatistics*
*The George Washington University School*
*of Public Health and Health Services*
*2100-W Pennsylvania Avenue, NW, Suite 807*
*Washington, DC 20037*

*E-mail:* sphmdm@gwumc.edu

*Received:* November 21, 2009
*Accepted:* December 24, 2009

# Telepsychiatry "Coverage" to a Rural Inpatient Psychiatric Unit

Brian Grady, M.D.,[1] and Mary Singleton, R.N., B.S.[2]

[1]Department of Psychiatry, University of Maryland, Baltimore, Maryland.

[2]Mental Health Unit, Peninsula Regional Medical Center, Salisbury, Maryland.

## Abstract

*Objective: Rural psychiatrists responsible for inpatient psychiatry units in general hospitals often have trouble getting coverage for training, vacations, and periods of illness. This article describes telepsychiatry "coverage" to a rural general hospital psychiatric unit for 1 week. Materials and Methods: All adult patients meeting criteria for inpatient mental health treatment in the emergency room were offered admission to the general hospital after obtaining informed consent regarding the use of inpatient telepsychiatry. The number of patients on the inpatient psychiatric unit ranged from three to nine, with an average daily census of seven. All psychiatric care was provided via video teleconferencing (VTC) at a bandwidth of 512 kilobits per second using Internet Protocol. Results: Patients with psychosis reported more difficulty hearing the doctor than patients without psychosis and incorporated VTC into delusions in a congruent manner. Patients rated development of rapport and effectiveness of treatment higher than staff ratings. Two staff thought telepsychiatry was either not effective for acutely psychotic patients or more effective with higher functioning patients. Conclusions: Short-term coverage of rural inpatient psychiatric units for purposes of vacation, training, and illness is possible using telepsychiatry. Psychiatrist's efficiency and consistency are enhanced with instantaneous connections possible from hospital, office, or home. Significant increases in staff workload will occur without remote access to electronic medical records, electronic physician ordering, and an adequate physical layout of the inpatient psychiatric unit. Adequate educational preparation of unit staff regarding telepsychiatry and a staff process group during implementation is recommended.*

*Key words: telepsychiatry, telemedicine, medical records, pharmacy, business administration/economics*

## Introduction

Practicing psychiatry in rural areas poses unique challenges.[1–4] Providers are often isolated from the support of colleagues. Obtaining coverage for training, vacations, and unexpected illness or for personal preventative healthcare can be a challenge. Remote hospitals and clinics may face staffing difficulties and experience an increased turnover of providers. Newly trained psychiatrists may initially fill these positions but, as experience and practice direction solidify, may relocate to urban or suburban locations. Urban and suburban practices may require less time on-call and offer more cultural experiences and family time, which make it difficult for remote facilities to retain experienced providers.

Recognizing the turnover of psychiatrists in remote general hospitals, efforts to stabilize remote community hospital care may be welcomed. Telepsychiatry, provided by a core telepsychiatric staff, established standard operating procedures, and consistent treatment philosophy might allow for improved multidisciplinary treatment planning, treatment effectiveness, and outcome. Currently, the literature is limited describing or quantifying the clinical, administration, or technical challenges and outcomes for inpatient telepsychiatric care.[5,6] There is more literature addressing the use of telepsychiatry with nursing home residents.[7–10]

Peninsula Regional Medical Center (PRMC) is a regional hospital located in the central eastern shore of Maryland and maintains a 13-bed inpatient mental health unit. Like several other general hospitals in the Maryland region, PRMC subcontracts its unit manager and psychiatrist. Following the retirement of a local psychiatrist, PRMC sought another full/part time psychiatrist for unit care provision but had to wait a few months before the new provider could assume duties on the unit. Locum tenens and staff from Sheppard Pratt Health System (SEPH) rotated on-site coverage. During this time, PRMC also took the opportunity to employ a telepsychiatrist from SEPH for a 1-week, pilot coverage of its inpatient unit. This article is a description and discussion of a pilot project in providing inpatient telepsychiatric care for short-term coverage. Surveys of patient and staff satisfaction were conducted as part of quality improvement.

## Materials and Methods

Protocols were developed for inpatient telepsychiatric care. Patients in need of admission to a mental health unit were fully informed and consented to the use of telepsychiatry. Patients who did not desire to be treated by telepsychiatry would be admitted to another facility with traditional face-to-face inpatient mental healthcare. Patients could also change their mind at any time and inpatient transfer would be affected as soon as possible. The telepsychiatrist was on call 24/7 during the week of coverage for both inpatient care and supervision of the psychiatric emergency response team (PERT) personnel. PERT personnel are nonindependent, practicing mental health staff who are the initial responders to emergency room physicians requesting mental health consultation. They interview patients and gather other data for emergency room physicians and, as appropriate, will run cases by the duty psychiatrist.

Downloaded by 23.114.97.177 from www.liebertpub.com at 07/06/18. For personal use only.

## GRADY AND SINGLETON

Downloaded by 23.114.97.177 from www.liebertpub.com at 07/06/18. For personal use only.

Interactive video was conducted over Internet Protocol (IP) at 512 kilobits per second via identical Polycom VSX 7000 units, with a single 32-inch diagonal JVC television display at each location. An Epson ELPDC03, self-focusing document reader, Mitsubishi HS-678, VHS video tape player, and an HP Pavilion 8000 series, Windows Media Center™ OS laptop computer were available to transmit still images and full-motion video, as needed from the telepsychiatrist location.

The patient population consisted of all persons who presented or were referred by other providers for inpatient admission. All patients were offered admission at PRMC if they consented to the use of inpatient telepsychiatry care. The unit accepts adult patients aged 18 and over. The mean age was 45 (range: 26–54). There were three patients on the unit at time of turnover and all three consented to the use of telepsychiatric care. The average unit census was seven during the pilot project (range: 3–9).

Patients seen by emergency department (ED) physicians and felt to need admission or seen by the PERT team at the request of the ED physicians were discussed via phone with the telepsychiatrist. The telepsychiatrist then provided initial admission orders and the patients were assessed via video teleconferencing (VTC) by the telepsychiatrist within 24 h. Initial evaluations were often done in conjunction with nursing staff or at the morning treatment team meeting, which is in keeping with normal unit function. One patient who was admitted in the early evening was seen by the evening shift nursing staff. Patients are rarely seen at this time, as unit psychiatrists are usually at their outpatient practice locations or at home and would expect to evaluate the patient during morning rounds.

Initial evaluations were dictated via phone to the remote facility as if they were seen face–to–face. The typed evaluations were faxed to the telepsychiatrist for review and signature and faxed back. All orders were written on facility order sheets and faxed to the nursing station. All laboratory study and consultations reports from other providers were faxed to the telepsychiatrist each morning for review. The telepsychiatrist would be paged for stat lab/procedure results as per routine. All original documents with signatures were mailed to the general hospital at the end of the coverage week to be included in the chart. Convenience charts were maintained at the distant site by the telepsychiatrist for continuity of care.

### Results

During the first several days, the unit manager or staff nurses sat with the patients during the VTC. As staff became more comfortable with telepsychiatry, patients were seen without the presence of nursing staff. At least one patient asked whether the attendant nurse could leave and issues of a sexual nature were discussed with the telepsychiatrist. By the last 2 days, all patients were being seen for ongoing psychiatric care without unit staff present in the room.

Treatment team meetings, usually including the unit manager, head shift nurse, activities therapist, social worker, discharge coordinator, and telepsychiatrist, were conducted each morning. New patients were brought into the meeting for interview and to develop and review their treatment plan. Existing patients' cases were reviewed for new biopsychosocial developments, including any laboratory or consultation reports; their response to treatment goals was discussed and the treatment plan was adjusted as necessary.

Following treatment team meeting, telepsychiatry rounds were conducted with each patient. Adjustments to pharmacological treatment were discussed and changes made as clinically indicated. Various psychoeducational and psychotherapeutic techniques were employed, including coping skills, relaxation techniques, supportive, cognitive-behavioral, solution focused, and dynamic therapies. As indicated, self-help reading material and cognitive worksheets were assigned and reviewed the following day. A document reader was helpful to review DSM IV criteria, point out sections of self-help books, and to collaborate on cognitive worksheet examples.

One patient was evaluated for initial involuntary admission and the telepsychiatrist served as the second evaluator. The patient was prescribed a medication and took it without issue. However, the patient still did not desire voluntary admission status and an involuntary hearing with the administrative judge was scheduled. The administrative judge was contacted prior to the hearing and agreed to its use, pending any argument by the defense attorney. The defense attorney participated in the hearing and did not object to either the testimony of the psychiatrist via video or that all the psychiatrist's testimony was based on record review and interactive video assessment of the patient. The patient was retained on an involuntary status by the administrative judge.

The discharge coordinator was a part of and discussed recommendations with the treatment team. Three of the nine patients were discharged by the telepsychiatrist. Three patients were awaiting transfer to either the state hospital system or to a specialized post-traumatic stress disorder (PTSD) inpatient program. The three discharged patients had follow-up appointments in the community and their prescriptions were phoned-in to the pharmacy of their choice.

The professional fees for patients seen via telepsychiatry were not collected, as acute inpatient psychiatric treatment was not billable at the time of the pilot project. PRMC did pay a daily stipend for the professional coverage.

### SATISFACTION SURVEYS

*Patient experience.* No patients who met criteria for admission declined admission after informed voluntary consent for the use of telepsychiatry on the inpatient unit was described. All nine patients completed a satisfaction survey at the end of their telepsychiatry experience (*Table 1*). The numerical responses on a 5-point Likert scale (1, strongly disagree; 2, disagree; 3, neutral; 4, agree; 5, strongly agree) were noted. Patients 1 and 6 reported lower satisfaction with telepsychiatry. Patient 1 was an involuntary patient. Patient 6 was admitted for safety and acute treatment while awaiting transfer.

INPATIENT TELEPSYCHIATRY COVERAGE

| PATIENT | MY NEEDS WERE MET DURING THIS SESSION | I FELT COMFORTABLE WITH THE EQUIPMENT | I RECEIVED GOOD CARE DURING THE SESSION | I WAS NOT CONCERNED ABOUT MY PRIVACY | I COULD CLEARLY SEE THE DOCTOR | I COULD CLEARLY HEAR THE DOCTOR | I FEEL THE DOCTOR WAS ABLE TO UNDERSTAND MY PROBLEM | I HAVE PARTICIPATED IN VIDEO-CONFERENCING BEFORE | I PREFER THE USE OF TELE-PSYCHIATRY IF IT ALLOWS ME TO STAY AT PRMC | I PREFER THE USE OF TELE-PSYCHIATRY WITH SEPH PROVIDERS OVER THE USE OF CONTRACTED PROVIDERS FTF |
|---|---|---|---|---|---|---|---|---|---|---|
| Patients experiencing psychosis | | | | | | | | | | |
| 1 | 4 | 2 | 4 | 2 | 4 | 2 | 4 | Yes | No | No |
| 3 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | No | No pref. | No pref. |
| 5 | 3 | 3 | 4 | 4 | 5 | 5 | 4 | No | No pref. | No pref. |
| 6 | 3 | 2 | 4 | 3 | 3 | 3 | 3 | No | No pref. | No pref. |
| 9 | 5 | 5 | 5 | | 5 | 5 | 5 | No | Yes | No pref. |
| Mean | 4 | 3.4 | 4.4 | 3.5 | 4.4 | 4 | 4.2 | | | |
| Patients not experiencing psychosis | | | | | | | | | | |
| 2 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | No | Yes | Yes |
| 4 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | No | No | No |
| 7 | 5 | 3 | 5 | 2 | 5 | 5 | 5 | No | Yes | No pref. |
| 8 | 4 | 4 | 4 | 4 | 5 | 5 | 5 | No | Yes | Yes |
| Mean | 4.5 | 4.0 | 4.5 | 3.8 | 5.0 | 5.0 | 4.8 | | | |

Table 1. Patient Satisfaction Survey

PRMC, Peninsula Regional Medical Center; SEPH, Sheppard Pratt Health System.

Downloaded by 23.114.97.177 from www.pub.com at 07/06/18. For personal use only.

*Staff experience.* A staff survey was constructed to assess staff view of patient rapport, clinical assessment, clinical intervention, team participation, effect on unit behavior, and whether they preferred coverage by locum tenens or a health system telepsychiatrist (*Table 2*). The first seven questions were on the same 5-point Likert scale as the patient survey. The mean staff Likert score was 4.0, with three areas scoring lower: developing adequate rapport with patient (3.8), treatment intervention effective (3.8), and patients adapted quickly (3.7).

## Discussion

Three months prior to the project, the telepsychiatrist had provided face-to-face coverage for 5 days at PRMC. Face-to-face coverage also necessitated psychiatrists to be housed in local hotels. The learning curve was steep with administrative processes and who was responsible for what, as each facility/unit's unique culture and alternative communication patterns have to be appreciated and understood. As could be expected, returning for coverage, via VTC in this case, the learning curve was much more manageable and efficient. Although a locum tenens could return face-to-face (FTF), telepsychiatry offers more flexibility in scheduling. The telepsychiatrist may be able to cover two partial full-time equivalents (FTEs) in different locations as quickly as hanging up one location and dialing in the next. Thus, remote facilities may find more consistency for their staff and patient population when utilizing temporary or augmentation telepsychiatry coverage. A telepsychiatrist is also able to take advantages of references and resources located in the familiarity of their own central office and could see patients from their own office or home over an encrypted high-bandwidth IP connection. While the telepsychiatrist in this pilot project provided "coverage," telepsychiatry might be considered for permanent primary attending presence at small facilities or partial FTE needs at any inpatient facility.

Although only limited inference can be made from the small number of patients involved in this pilot study, patient survey results were favorable. The mean Likert score for all question responses by patients experiencing psychosis was 4.0 and by patients experiencing mood and/or anxiety was 4.5, for a combined mean of 4.2. Both subgroups of patients agreed that the doctor could understand their problem, they received good care from the telepsychiatrist, and their needs were met during the sessions. The largest disagreement in responses between the two groups was in "clearly hearing the doctor." As all patients were seen one after another with no changes in IP connection parameters, this must be

**GRADY AND SINGLETON**

Downloaded by 23.114.97.177 from www.liebertpub.com at 07/06/18. For personal use only.

| Table 2. Staff Satisfaction Survey | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| STAFF | RAPPORT | ACCURATE ASSESSMENTS | INTERVENTIONS TIMELY | TREATMENT INTERVENTIONS EFFECTIVE | TREATMENT PLANNING EFFECTIVE | COMFORTABLE WITH TELE-PSYCHIATRIST ON-TEAM | PATIENTS ADAPTED QUICKLY | MANAGEMENT WAS | TELEPSYCH WAS | COVERAGE PREFERENCE |
| 1 | 4 | 5 | 5 | 4 | 5 | 5 | 5 | More difficult | Equivalent | No pref. |
| 2 | 4 | 4 | 4 | 4 | 4 | 5 | 4 | Equivalent | Equivalent | No pref. |
| 3 | 4 | 4 | 5 | 4 | 5 | 5 | 4 | Equivalent | Equivalent | FTF |
| 4 | 3 | 4 | 4 | 2 | 3 | 4 | 3 | More difficult | Less effective | FTF |
| 5 | 4 | 4 | 3 | 4 | 4 | 4 | 4 | More difficult | Equivalent | FTF |
| 6 | 5 | 5 | 5 | 5 | | 5 | 5 | More difficult | Equivalent | FTF |
| 7 | 4 | 4 | 3 | 4 | 4 | 4 | 4 | Equivalent | Equivalent | FTF |
| 8 | 4 | 5 | 4 | 4 | 5 | 4 | 4 | Equivalent | Equivalent | No pref. |
| 9 | 4 | 4 | 4 | 4 | 4 | 4 | 2 | Equivalent | Equivalent | FTF |
| 10 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | Equivalent | Equivalent | FTF |
| 11 | 2 | 4 | 4 | 4 | 4 | 3 | 3 | Equivalent | Less effective | FTF |
| 12 | 4 | 4 | 4 | 4 | 5 | 4 | | | | |
| 13 | 4 | 4 | 3 | 3 | 3 | 4 | 3 | Equivalent | Less effective | No pref. |
| Mean | 3.8 | 4.2 | 4.0 | 3.8 | 4.2 | 4.3 | 3.7 | | | |

due to the patient's internal experience. The survey brought this to our attention, but it may take place during FTF encounters as well. However, telepsychiatry tends to bring more focus between the patient and provider exchange with less environmental distraction[11]; so it may be possible that VTC is actually better than FTF in "clearly hearing the doctor." It is possible that telepsychiatry may provide novel insights into information processing or parameters for diagnosis or intervention response. This should be considered in a future research study design.

Both patients who had experienced manic mood states recorded all 5s on the patient survey. Their survey responses were completed at the end of the week after both patients had experienced a significant response to their treatment. Inpatients with manic symptoms have previously reported a positive experience with VTC and felt the physician better understood them when seen via VTC.[5] Our limited experience supports this prior observation.

One patient reported preference for VTC over FTF. This was a female patient who had been emotionally hurt by a male partner. The patient may have found the physical distance from the male telepsychiatrist to be safer, providing more control or perhaps be more empowering. There has been anecdotal information that telepsychiatry may bring more equality or patient control to the patient–doctor relationship and this may be what was observed in our experience.[12,13]

The overall mean for staff survey results was 4.0. Staff scored below 4.0 on three areas: patient rapport, patient adaptation, and

effectiveness of treatment interventions. A lower staff score regarding patient adaptation issues is supported with the patient's lower survey scores regarding comfort with the equipment and concern about privacy. However, patient favorable responses regarding being understood by the telepsychiatrist, receiving good care, and getting their needs met seem a bit at odds with the staff perceptions of rapport and effectiveness. The author felt that particularly two ill patients might have significantly influenced staff responses in these areas. The first is the patient with mania who had prior PRMC admissions. This patient incorporated the VTC experience into a religious delusion, thinking the telepsychiatrist was God or a religious figure, for the first few days. When more stable later in the week, the patient reported a history of watching televangelism ministries on TV and the religious overtones were resolved.

The second patient suffered from schizoaffective disorder, depressed type, and had been admitted several times before. This patient had a positive transference to the PRMC mental health unit and thought of the "staff as family." The patient was severely depressed and experiencing religious, sexual, and persecutory delusional themes. At the very first session, the patient appeared to be responding to internal stimuli and stated at one point that they "heard" the telepsychiatrist "cast [them] to hell." On the second day the patient asked the attendant to leave the room to talk to the telepsychiatrist alone about a sexual topic. The patient also "wished to be dead." On day 3 the patient reported that prior to coming to

cpub.com at 07/06/18. For personal use only.

Downloaded by 23.114.97.177 from www.

the hospital the patient overheard someone was going to eutha-
nize them and asked the telepsychiatrist if that were true. The pa-
tient also had a very different institutional transference to the
telepsychiatrist's hospital saying we "put people down" [kill them].
This evolved into a belief that the telepsychiatrist was going to "put
her down." On the 7th day the patient reported feeling better and
was worried about statements made to the telepsychiatrist "over the
past week that were not true"; the patient reported feeling more ill
during this episode.

The telepsychiatrist felt great empathy for both of these patients
and it was painful to see their suffering. Transfer of the patient with
depression and delusional themes for ECT was being considered if
response to medication intervention took any longer. The tele-
psychiatrist feels the seeming helplessness of the situation and the
integration of the novel treatment of the patients via VTC may have
led to the discrepancy in rapport and effectiveness of treatment in-
terventions as reported by patient experience and that reported by
staff through observation. The telepsychiatrist hypothesized that
seeing the great suffering of these two patients and the time it took for
medication response, combined with the novel use of VTC and in-
tegration of their delusions into VTC sessions, may have left staff
questioning patient rapport and treatment effectiveness. The tele-
psychiatrist similarly questions the possibility that the patient who
thought the psychiatrist from SEPH was going to "put [the patient]
down" may have had the same transference if the telepsychiatrist had
come to PRMC that week for FTF coverage. The telepsychiatrist felt
that the quality of assessment and care provided via VTC was con-
sistent to that he provides FTF. The telepsychiatrist has always made a
conscious effort to be as objective as possible on the clinical inter-
action with patients cared for via VTC, to first do no harm. The use of
a staff process group would be recommended during the im-
plementation phase of inpatient telepsychiatry to openly discuss the
impact of the service delivery change on the mental health unit staff.

The use of paper records for inpatient telepsychiatry proved not
practical and put undue burden on the telepsychiatrist, adminis-
trative, and nursing staff. Increased difficulty in management and
preference for FTF coverage as reported by staff in the survey
strongly correlated with comments of an increased staff workload.
The telepsychiatrist felt safety concerns necessitating that new order
sheets be used for each new order or order set. This is because the
physician and nurse may not be working on the same order sheet
when the next order is placed; this could result in a prior order
being taken twice. Likewise, verbal orders were not given to avoid
any confusion on execution or duplication of orders. PRMC has
been implementing electronic medical record but, at the time of the
pilot project, it had not been implemented on the psychiatry unit.
Use of EMRs with inpatient telepsychiatry would improve coordi-
nation of care with staff and consultants, prevent medication errors,
and minimize the need for paper record use, transfer, or storage. The
PRMC mental health unit has two large and one smaller patient
common areas. One of the large areas was monopolized by the video
unit, when in use, and made scheduling activities on the unit more
difficult. Appropriate space allocation is needed on inpatient units

when utilizing VTC, so that additional patient and staff stress is not
introduced.

## Conclusions

Inpatient telepsychiatry coverage to a rural general hospital ap-
pears to be acceptable to patients, effective, and flexible. It can
provide consistency in physician presence for temporary coverage.
Staff relationships and facility cultural norms can be maintained and
enriched. IP telepsychiatry is widely available, inexpensive, and
secure. Psychiatrist efficiency is enhanced with instantaneous con-
nections possible from hospital, office, or home. Inpatient tele-
psychiatry was acceptable for involuntary commitment by both the
administrative law judge and the attorney representing the patient.
Significant increases in staff workload will occur without EMR,
electronic physician ordering, and an adequate physical layout
of the mental health unit. Adequate educational preparation of
staff regarding telepsychiatry and a staff process group during
implementation are recommended.

## Acknowledgments

The authors thank Bonnie Katz (Vice President, Business Devel-
opment and Support Operations, Marketing, and Public Affairs),
Robert Roca, M.D. (Vice President, Medical Affairs of SEPH), and the
leadership of PRMC for realizing the potential of telepsychiatry and
ensuring appropriate facility and personnel resources where
available to support this pilot project safely. The authors also thank
Doloras Branch (Program Coordinator, Telebehavioral Services,
SEPH) for her unparallel day-to-day support of Telebehavioral
Services.

## Disclosure Statement

No competing financial interests exist.

REFERENCES

1. Moore NC, Nelson WH. Five papers on psychiatry in rural areas: An
   introduction. Psychiatr Serv 1998;49:957.

2. Levin A. Stress of practicing in rural area takes toll on psychiatrist. Psychiatr
   News 2005;41:4.

3. Wallace AE, Weeks WB, Wang MS, et al. Rural and urban disparities in health-
   related quality of life among veterans with psychiatric disorders. Psychiatr Serv
   2006;57:851–856.

4. Roberts LW, Warner TD, Hammond KG. Ethical challenges of mental health
   clinicians in rural and frontier areas. Psychiatr Serv 2005;56:358–359.

5. Pollard SE, LePage JP. Telepsychiatry in a rural inpatient setting. Psychiatr Serv
   2001;52:1659.

6. Holden D, Dew E. Telemedicine in a rural gero-psychiatric inpatient unit:
   Comparison of perception/satisfaction to onsite psychiatric care. Telemed J E
   Health 2008;14:381–384.

7. Tang WK, Chiu H, Woo J, Hjelm M, Hui E. Telepsychiatry in psychogeriatric
   service: A pilot study. Int J Geriatr Psychiatry 2001;16:88–93.

8. Johnston D, Jones BN 3rd. Telepsychiatry consultations to a rural
   nursing facility: A 2-year experience. J Geriatr Psychiatry Neurol 2001;
   14:72–75.

## GRADY AND SINGLETON

Downloaded by 23.114.97.177 from www.liebertpub.com at 07/06/18. For personal use only.

9. Yeung A, Johnson DP, Trinh NH, Weng WC, Kvedar J, Fava M. Feasibility and effectiveness of telepsychiatry services for Chinese immigrants in a nursing home. *Telemed J E Health* 2009;15:336–341.

10. Rabinowitz T, Murphy KM, Amour JL, Ricci MA, Caputo MP, Newhouse PA. Benefits of a telepsychiatry consultation service for rural nursing home residents. *Telemed J E Health* 2010;16:34–40.

11. Ermer DJ. Experience with a rural telepsychiatry clinic for children and adolescents. *Psychiatr Serv* 1999;50:260–261.

12. Simpson S, Knox J, Mitchell D, et al. A multidisciplinary approach to the treatment of eating disorders via videoconferencing in north-east Scotland. *J Telemed Telecare* 2003;9(Suppl 1):37–38.

13. Thomas CR, Miller G, Hartshorn JC, et al. Telepsychiatry program for rural victims of domestic violence. *Telemed J E Health* 2005;11:567–573.

Address correspondence to:
*Brian Grady, M.D.*
*Department of Psychiatry*
*University of Maryland*
*701 W. Pratt St., Suite 420*
*Baltimore, MD 21201*

*E-mail:* bgrady@telepsychiatrist.com

*Received:* February 9, 2011
*Accepted:* March 7, 2011

Printed and Published in the Archives of General Psychiatry
November 1978, Volume 35
Copyright 1978, American Medical Association

# Physical Illness Presenting as Psychiatric Disease

Richard C. W. Hall, MD; Michael K. Popkin, MD; Richard A. Devaul, MD; Louis A. Faillace, MD; Sondra K. Stickney, RN

● A study of 658 consecutive psychiatric outpatients receiving careful medical and biochemical evaluation, defined an incidence of medical disorders productive of psychiatric symptoms in 9.1% of cases. The most frequent presentations were of depression, confusion, anxiety, and speech or memory disorders. The presence of visual hallucinations was believed to indicate medical etiology until proved otherwise. Major illnesses presenting with psychiatric symptoms in order of frequency were infectious, pulmonary, thyroid, diabetic, hematopoietic, hepatic and CNS diseases. Forty-six percent of these patients suffered from medical illnesses previously unknown to either them or their physician. A plea is made for careful medical evaluation of psychiatric patients.

(Arch Gen Psychiatry 35:1315-1320, 1978)

Psychiatric symptoms are nonspecific and commonly occur in medical as well as psychiatric disease. In addition, there is some evidence that a psychiatric diagnosis is associated with a high risk of medical illness. One approach to the symptom nonspecificity dilemma has been an attempt to relate specific psychiatric symptoms to specific medical disease[1-17] or to define the risk of the development of a particular medical illness by psychiatric syndrome.[18-31]

Comroe,[32] in 1936, demonstrated that in 24 of 100 patients labeled neurotic, significant organic disease developed within eight months after their initial evaluation. He suggested that psychiatric and behavioral symptoms often precede the full-blown development of medical illness. Marshall,[33] in 1949, demonstrated a physical morbidity in 44% of patients admitted to a psychiatric unit. In 1958, Meyer,[34] while investigating the relationship of surgery to psychiatry, cautioned against assigning a functional cause to symptoms simply because they arose in the midst of an emotional crisis.

Herridge,[35] conducting one of the first etiologic classification studies in 1960, found a 50% physical morbidity in 209 consecutive psychiatric patients. In spite of previous medical examination, he found a 5% incidence of medical disorders that were considered "casual" of psychiatric symptoms. Twenty-one percent of his patients had significant medical illness that was considered "concomitant" and "apparently contributing" to the onset of psychological symptoms. In 8% of his population, a "consecutive" physical disorder developed that "apparently" resulted from the psychological illness or its treatment. Of the remaining patients, 34% were found to have physical illnesses that required attention.

Davies,[36] in 1965, studied the incidence of physical illness in psychiatric outpatients. He found a 42% incidence of physical disease causative of initial psychiatric complaints; 58% of all patients attending his psychiatric clinic suffered from some physical illness.

Johnson,[37] in 1968, conducted detailed physical examinations of 250 consecutive admissions to an inpatient service and reported a 12% incidence of cases where physical states were important etiological factors in the presenting psychiatric symptoms. Of these illnesses, 80% were "missed" by physicians prior to the patient's admission and 6.6% were "initially missed" after admission; 60% of all patients admitted demonstrated abnormal physical findings. Maguire and Granville-Grossman,[38] in 1968, found a 33.5% incidence of medical illness in 200 consecutive psychiatric inpatients. Seventy percent of these illnesses

Accepted for publication Sept 2, 1977.
From the Department of Psychiatry, University of Texas Medical School at Houston (Drs Hall, Devaul, and Faillace), the Department of Psychiatry (Dr Hall) and the Clinical Research Unit (Ms Stickney), Texas Research Institute of Mental Sciences, Houston; and the Department of Psychiatry, University of Minnesota Medical School, Minneapolis (Dr Popkin).
Reprint requests to Department of Psychiatry, University of Texas Medical School at Houston, 6400 W Cullen, Houston, TX 77025 (Dr Hall).

| Table 1.—Medical Conditions Considered Definitely Causative of Psychiatric Symptoms* | |
| --- | --- |
| **Psychiatric Diagnosis (No. of Patients)** | **Medical Diagnosis (No. of Patients)** |
| Neurosis (19) | |
| Depression (15) | Hypothyroidism (3) |
| | Pneumonia (2) |
| | Infectious viral hepatitis (2) |
| | Hyperthyroidism |
| | Hyperparathyroidism |
| | Hepatic insufficiency |
| | Mononucleosis |
| | Buncle branch block |
| | Arteriosclerotic cardiovascular disease |
| | Hypertension (essential) |
| | Metastatic carcinoma of the uterus |
| | Hypochromic anemia |
| | Peptic ulcer |
| Anxiety (9) | Hyperthyroidism (2) |
| | Pneumonia (2) |
| | Hyperparathyroidism |
| | Ulcerative colitis |
| | Bundle branch block |
| | Arteriosclerotic cardiovascular disease |
| | Hypothyroidism |
| | Paroxysmal atrial tachycardia |
| | Hypochromic anemia |
| | Scabies |
| Psychosis (15) | |
| Reactive, unspecified (6) | Hypertension (2) |
| | Arteriosclerotic cardiovascular disease (2) |
| | Neurosyphilis |
| | Cirrhosis |
| | Incipient delirium tremens |
| | Diabetes mellitus |
| | Congestive heart failure |
| | Chronic bronchitis |
| | Sphenoidal ridge meningioma |
| | Viral upper respiratory infection |
| | Cerebral insufficiency |
| | Hypothyroidism |
| Major Affective (6) | Viral pneumonia |
| | Rheumatoid arthritis |
| | Aortic stenosis |
| | Cerebral anoxia |
| | Hypothyroidism |
| | Erythremia |
| | Pernicious anemia |
| | Black lung |
| | Congestive heart failure |
| Schizophrenia (3) | Diabetes mellitus (2) |
| | Alzheimer's disease |
| | Hypoglycemia |
| Organic brain syndrome (6) | Pneumonia (2) |
| | Bronchogenic carcinoma |
| | Cirrhosis |
| | Pancreatitis |
| | Hepatoma |
| | Hypochromic microcytic anemia (2) |
| | Emphysema |
| | Congestive heart failure |
| | Metastatic carcinoma of the uterus |
| | Hepatic insufficiency |
| Personality disorder (4) | |
| Unspecified (2) | Cerebrovascular accident |
| | Hypertension |
| | Viral pneumonia |
| | Rhematoid arthritis |
| | Anemia (2) |
| Alcoholism (2) | Cirrhosis |
| | Pancreatitis |
| | Hepatoma |
| Behavior disorder of childhood (1) | Pinworm |

*Conditions were considered causative of psychiatric symptoms if: (1) the psychiatric symptom abated with treatment, or (2) the medical condition clearly caused the initial psychiatric symptoms even though the psychiatric symptoms were not reversed by medical treatment. This table reflects all diagnoses, both medical and psychiatric, made for each patient. Where more than one diagnosis was made, all are shown.

| Table 2.—Medical Conditions Considered Probably Causative of Psychiatric Symptoms* | |
| --- | --- |
| **Psychiatric Diagnosis (No. of Patients)** | **Medical Diagnosis (No. of Patients)** |
| Neurosis (6) | |
| Depression (3) | Pulmonary infarction |
| | Pulmonary emboli |
| | Hypothyroidism |
| | Diabetes mellitus |
| Anxiety (3) | Hyperthyroidism (2) |
| | Hypothyroidism |
| Obsessive compulsive (1) | Diabetes mellitus |
| Psychosis (13) | |
| Reactive, unspecified (5) | Diabetes mellitus (2) |
| | Hepatitis |
| | Bronchitis |
| | Hypochromic microcytic anemia |
| | Rheumatoid arthritis |
| | Viral pneumonia |
| | Mitral stenosis |
| | Congestive heart disease |
| Major affective disorder (4) | Hyperthyroidism |
| | Pulmonary infarction |
| | Pulmonary emboli |
| | Congestive heart failure |
| | Hypertension |
| | Chronic bronchitis |
| | Pulmonary insufficiency |
| | Emphysema |
| Schizophrenia (5) | Neurosyphilis |
| | Diabetes mellitus |
| | Pyelonephritis |
| | Congestive heart failure |
| | Infectious hepatitis |
| Organic brain syndrome (6) | Congestive heart failure (2) |
| | Neurosyphilis |
| | Hypertension |
| | Diabetes mellitus |
| | Bronchitis |
| | Pyelonephritis |
| | Infectious hepatitis |
| Personality disorder (6) | |
| Unspecified (2) | Sickle cell anemia |
| | Mitral stenosis |
| | Congestive heart failure |
| | Rheumatic heart disease |
| Hysterical (1) | Juvenile diabetes mellitus |
| Sociopathic (1) | Viral pneumonia |
| Alcoholism (1) | Hepatitis |
| | Bronchitis |
| | Hypochromic microcytic anemia |
| | Rheumatoid arthritis |
| Drug Dependence (1) | Hyperthyroidism |

*Medical conditions were considered probably causative of psychiatric symptoms if they could explain the particular episode of symptoms in patients with definite psychiatric disorders of long standing (ie, altered the patient's normal behavior pattern, but with treatment of the medical problem, the patient's pattern of behavior reverted to what it was previously).

| Table 3.—Medical Disorders Believed Causative of Presenting Psychiatric Symptoms | | |
|---|---|---|
| System* | Disease | No. of Patients |
| Cardiovascular (22) | Hypertension | 5 |
| | Congestive heart failure | 5 |
| | Arteriosclerotic cardiovascular disease | 3 |
| | Cerebral insufficiency | 2 |
| | Aortic stenosis | 2 |
| | Paroxysmal atrial tachycardia | 1 |
| | Right-sided heart failure | 1 |
| | Mitral stenosis | 1 |
| | Conduction defect | 1 |
| | Rheumatic heart disease | 1 |
| Endocrine (21) | Thyroid disease | 12 |
| |   Hypothyroidism | 7 |
| |   Hyperthyroidism | 5 |
| | Diabetes mellitus | 7 |
| |   Hypoglycemia | 1 |
| | Hyperparathyroidism | 1 |
| Infections and parasitic disease (14) | Pneumonia | 6 |
| | Neurosyphilis | 2 |
| | Infectious hepatitis | 2 |
| | Mononucleosis | 1 |
| | Pyelonephritis | 1 |
| | Scabies | 1 |
| | Pinworms | 1 |
| Pulmonary (12) | Pneumonia | 6 |
| |   Viral | 2 |
| |   Pneumococcal | 2 |
| |   Klebsiella | 1 |
| |   Unspecified | 1 |
| | Emphysema | 2 |
| | Black lung disease | 1 |
| | Pulmonary insufficiency | 1 |
| | Pulmonary embolism | 1 |
| | Pulmonary infarction | 1 |
| Gastrointestinal (9) | Cirrhosis | 2 |
| | Infectious hepatitis | 2 |
| | Hepatic insufficiency | 1 |
| | Alcoholic hepatitis | 1 |
| | Malnutrition | 1 |
| | Ulcerative colitis | 1 |
| | Peptic Ulcer | 1 |
| Hematopoietic (8) | Hypochromic microcytic anemia | 5 |
| | Pernicious anemia | 1 |
| | Erythremia | 1 |
| | Sickle cell anemia | 1 |
| Central nervous system (5) | Neurosyphilis | 2 |
| | Sphenoid ridge meningioma | 1 |
| | Alzheimer's disease | 1 |
| | Cerebrovascular accident | 1 |
| Malignancies (4) | Bronchiogenic carcinoma | 1 |
| | Hepatoma | 1 |
| | Endometrioma of uterus | 1 |
| | Sphenoid ridge meningioma | 1 |

*Numbers in parentheses indicate number of patients.

Table 4.—Psychiatric Diagnosis in Patients With Medical Disorders Believed Causative of Psychiatric Symptoms*

| Diagnosis | No. of Patients |
|---|---|
| Neurosis | 31 |
| Depressive | 18 |
| Anxiety | 12 |
| Obsessive-compulsive | 1 |
| Psychosis | 42 |
| Reactive, unspecified | 16 |
| Depressive reaction | 3 |
| Schizophrenia | 15 |
| Major affective | 8 |
| Organic brain syndrome | 12 |
| Personality Disorder | 13 |
| Unspecified | 6 |
| Inadequate | 1 |
| Hysterical | 1 |
| Antisocial | 1 |
| Alcoholism | 3 |
| Drug dependence | 1 |
| Behavioral disorders of childhood | 1 |

*When a multiple diagnosis was made, all are shown.

Table 5.—Probable Medical Symptoms in Order of Frequency

| Symptom | No. of Patients |
|---|---|
| Sleep disorder | 28 |
| Severe weakness | 22 |
| Extreme fatigue | 22 |
| Inability to concentrate | 19 |
| Memory loss | 19 |
| Change in speech | 19 |
| Auditory hallucinations | 18 |
| Chest pain | 18 |
| Intermittent tachycardia | 18 |
| Recent nocturia | 17 |
| Recent-onset confusion | 17 |
| Tremulousness | 16 |
| Productive sputum | 15 |
| Urinary frequency | 15 |
| Dyspnea on exertion | 15 |
| Recent personality change | 15 |
| Paresthesias | 14 |
| New cough | 13 |
| Polyuria | 12 |
| Pleuritic pain | 12 |
| Visual hallucinations | 12 |
| Lymphadenopathy | 12 |
| Severe anorexia | 12 |
| Dyspnea | 12 |
| Arrhythmia (perceived by patient) | 12 |
| Paroxysmal nocturnal dyspnea | 10 |
| Costal vertebral angle pain | 10 |
| Chest pain | 9 |
| Wheezing | 9 |
| Diminished coordination | 9 |
| Skin has recently become dry | 9 |
| Lost all desire to eat | 9 |
| Recent fragility of hair | 9 |
| Ankle and/or pretibial edema | 9 |
| Diminished sense of touch | 9 |
| New and different headache | 8 |
| Neck pain | 8 |
| Difficulty with mastication | 7 |
| Two-pillow orthopnea | 7 |
| Recent change in menstrual periods | 7 |
| Recent muscular weakness | 6 |
| Dysuria | 5 |

were considered severe, and 49% were previously unknown to either the patient or his physician.

The dilemma of assigning physical or psychological causality to particular psychiatric symptoms remains and is of critical import both for the diagnosis of the individual patient and for the rational design of a mental health care delivery system. This prospective study was undertaken in an attempt to define the significance of physical illness in psychiatric outpatients.

## SUBJECTS AND METHODS

Six hundred fifty-eight consecutive outpatients coming to a surburban community mental health center underwent a detailed initial evaluation consisting of a thorough medical and psychiatric history, mental status examination, physical examination, and physical symptom checklist. The review of systems checklist was adapted from one used on the medical service of the Johns Hopkins Hospital, Baltimore, Md. The study continued until 100 patients showed four or more symptoms on the symptom checklist. These 100 symptom-positive patients and the first 100 symptom-negative controls underwent a biochemical screening. Previous medical records, current illness, and treatment data were requested for all patients.

Patients with laboratory or physical evidence of disease continued to be followed up at the center as well as being referred to appropriate medical specialists for further evaluation and treatment. Data concerning improvement of initial psychiatric symptoms with medical treatment was obtained and analyzed. Patients underwent reevaluation for the presence of initial psychiatric symptoms two weeks after the treating physician believed maximal medical improvement had occurred. Medical disorder was considered causative of psychiatric symptoms if (1) psychiatric symptoms abated significantly with medical treatment; (2) medical symptoms seemed clearly related to the onset of psychiatric symptoms; or (3) the presence of a medical disorder, even though untreatable (ie, progressive arteriosclerotic cardiovascular disease with cerebral impairment), explained the patient's symptom pattern.

Medical and psychiatric symptoms were factor analyzed for frequency of presentation in patients in whom medical conditions were thought to be causative of the initial psychiatric complaint. Data concerning whether the medical illness had been previously known to the family physician were analyzed.

## RESULTS

Of the patients having four or more positive responses on the symptom checklist (9.1% of the total sample of 658) 60% showed significant laboratory evidence of disease, as compared to only 3% (0.4% of the total sample of 658) of those patients who were symptom-negative. Twenty-three percent of the symptom-positive patients with laboratory indication of disease had medical illnesses known to their physician, while 77% of that group had illnesses that were previously unrecognized. Sixty-five percent of the index

a family physician whom they saw regularly; 72% of all patients with a family physician had not been physically examined during the preceding year.

Data were tabulated to depict medical and psychiatric diagnoses of those patients whose medical conditions were considered definitely or probably causative of initial psychiatric symptoms (Tables 1 and 2); the type of medical illness by symptoms or etiologic category (Table 3); the initial psychiatric diagnoses for those patients who were subsequently thought to have psychiatric symptoms caused by an underlying medical illness (Table 4); and the reported medical symptoms, in order of frequency, for the index population (Table 5). If initial diagnostic nomenclature was not precise, patients were placed, by the authors, in the most appropriate specific or general category. Where patients carried multiple diagnoses, all are shown. Where patients suffered from more than one illness, all significant illnesses are shown in their respective categories.

No meaningful sex, race, or age differences were apparent between the index and control groups. The mean age for the control group was 37 years, while that of the index group was 43 years. The average age for patients with multiple medical disorders thought to be definitely or probably causative of psychiatric symptoms was 57 years. Of the patients having a medically induced psychiatric disorder, 26% were under the age of 30. The average age of patients by system or etiologic category was cardiovascular disorders, 56 years old; pulmonary disease, 55 years; CNS disease, 54 years; malignancy, 47 years; gastrointestinal disorders, 47 years; hematologic disease, 44 years; infectious disease, 38 years; and endocrine disorders, 37 years.

The percentage of the patients with a medical condition that was thought to be definitely or probably causal of their psychiatric symptoms was 9.1. Cardiovascular and endocrine disorders were the most frequent causes of psychiatric symptoms, followed by infection, pulmonary disease, gastrointestinal disorders, hemopoietic disease, CNS disease, and malignancy.

The most frequent specific diagnoses made in patients with a medically induced psychiatric disorder were psychoneurotic depression, organic brain syndrome, and anxiety neurosis. It is noteworthy that the condition of 28% of the index group was diagnosed as functionally psychotic. Depression, anxiety, sleep disturbance, appetite disorders, diminished concentration, impaired recent memory, speech difficulty or a recent change of speech pattern, sensory flooding, auditory or visual hallucinations or both, recent personality change, or a sudden intensification of premorbid personality were the most characteristic psychiatric findings in these patients.

Twenty percent of the patients with a medically induced psychiatric disorder experienced visual hallucinations, distortions, or pronounced visual illusions as compared to only 0.5% of the population having psychiatric symptoms that were not thought to be medically related. Recent and extreme weakness, fatigue, agitation, chest pain, intermittent tachycardia or other arrhythmia, tremulousness, pain, changes in micturition, paresthesia, respiratory distress, skin or hair changes, and headaches were the most frequently seen medical symptoms in these patients.

This study supports the concensus of previous investigators[32-38] that the presentation of psychiatric symptoms frequently belies medical illness. Reports of causative incidence range from 5% to 42%,[35-36] reflecting population and selection variables. The 9.1% incidence of medically induced psychiatric symptoms observed in this study indicates that a meaningful population of patients in a self-referred outpatient psychiatric system required detailed medical evaluation and treatment. Of note is the fact that the presence of a physician of record was not helpful in differentiating high- and low-risk patient groups. Demographic variables did not predict, in any meaningful way, risk, with the possible exception of an increased incidence of significant medical illness with advancing age.

Patients placed in high- and low-risk groups by the symptom checklist evidenced a 60% vs a 3% yield of biochemical laboratory abnormality. All of those patients had significant physical disease. A medical review of symptoms checklist thus seems to provide a simple and efficient instrument for defining those patients who are at high risk for underlying medical illness. The tandem use of a symptom checklist and biochemical screening provides a system helpful in defining those patients who require intensive medical investigation. This screening combination has direct applicability in the office practice of psychiatry, student and general mental health clinics, community mental health centers, and industrial psychiatric settings.

Visual hallucinations, distortions, and illusions were the symptoms most discriminative of medically induced psychiatric disorders. This finding strongly suggests that in patients who complain of visual hallucinations or distortions, medical impairment should be considered until proved otherwise.

The 28% diagnostic incidence of functional psychosis should also be noted, as these diagnoses carry with them the implication of long-term drug treatment, potential hospitalization, and possible changes in the patient's legal status. In the majority of the patients whose conditions were diagnosed as functionally psychotic, symptoms cleared rapidly with appropriate medical treatment and the patients remained healthy. Misdiagnosis and the application of psychiatric labels to medically ill patients reduces their chances for improvement and may result in a worsening of their physical health. Adequate medical investigation, on the other hand, is reassuring to both the patient and his physician.

## CONCLUSION

The following conclusions seem to be justified from this study:

1. Medical illness often presents with psychiatric symptoms.

2. It is difficult to distinguish physical disorders from functional psychiatric disorders on the basis of psychiatric symptoms alone.

3. Detailed physical examination and laboratory screening are indicated as a routine procedure in the initial evaluation of psychiatric patients.

4. A review-of-systems checklist is useful in identifying

patients[2,96-cv-00520-KJM-SCR Document 5873-4 Filed 08/03/18 Page 216 of 348

5. Most patients are unaware of the medical illness that is causative of their psychiatric symptoms.

6. The presence of a family physician does not protect either the patient or the treating psychiatrist from unrecognized medical illness.

7. Cardiovascular, endocrine, infectious, and pulmonary disorders are the most frequent medical causes for psychiatric symptoms.

8. The conditions of patients with medically determined

psychoneurotic depression, organic brain syndrome, or anxiety neurosis.

9. The conditions of patients with medically induced symptoms are often initially misdiagnosed as a functional psychosis.

10. Visual hallucinations, distortions, and illusions are the psychiatric symptoms most discriminative of underlying medical disorder. Their occurrence necessitates medical evaluation.

## References

1. Hall RCW, Reading A: Steroid psychosis. *New Physician* 20:20-23, 1971.
2. Hall RCW: Psychiatric complications of chronic renal hemodialysis and renal transplantation. *New Physician* 20:255-258, 1971.
3. Hall RCW, Joffe JR: Hypomangnesemia. *JAMA* 224:1749-1751, 1973.
4. Schwab JJ: Psychiatric illness produced by infections. *Hosp Med* 5:98-108, 1969.
5. Whybrow PC, Prange AJ, Threadway CR: Mental changes accompanying thyroid gland dysfunction. *Arch Gen Psychiatry* 20:48-63, 1969.
6. Dalessio DJ, Benchimol A, Dimond EG: Chronic encephalopathy related to heart block. *Neurology* 15:499-503, 1965.
7. Perlas AP, Faillace LA: Psychiatric manifestations of carcinoma of pancreas. *Am J Psychiatry* 121:182, 1964.
8. Rosenblatt S, Faillace LA: The psychiatric manifestations of hyperparathyroidism. *Tex Med* 73:59-60, 1977.
9. Ullman M, Gruen A: Behavioral changes in patients with strokes. *Am J Psychiatry* 117:1004-1009, 1961.
10. Goldstein NP, Ewert JC, Randall RV, et al: Psychiatric aspects of Wilsons disease. *Am J Psychiatry* 124:1555-1561, 1968.
11. Himmelhoch J, Pincus J, Tucher G, et al: Sub-acute encephalitis: Behavioral and neurological aspects. *Br J Psychiatry* 116:531-538, 1970.
12. Mitchell WM: Etiological factors producing neuropsychiatric syndromes in patients with malignant disease. *Int J Neuropsychiatry* 3:464-468, 1967.
13. Hall RCW, Popkin MK: Psychological symptoms of physical origin. *Female Patient* 2(10):43-47.
14. Korolenko CP, Yevseyeva TA, Volkov PP: Data for a comparative account of toxic psychoses of various aetiologies. *Br J Psychiatry* 115:273-279, 1969.
15. Surridge D: An investigation into some psychiatric aspects of multiple sclerosis. *Br J Psychiatry* 115:749-764, 1969.
16. Ford RG, Siekert RG: Central nervous system manifestation of periarteritis nodosa. *Neurology* 15:114-122, 1965.
17. Glaser GH, Newman RJ, Schafer E: Interictal psychosis in psychomotor temporary lobe epilepsy: An EEG-psychological study, in *EEG and Behavior*. New York Basic Books Inc, 1963, pp 345-365.
18. Bourestom NC, Howard MT: Personality characteristics of three disability groups. *Arch Phys Med Rehabil* 46:626-632, 1965.
19. Moos RH: Personality factors associated with rheumatoid arthritis: A review. *J Chronic Dis* 17:41-55, 1964.
20. Wittkower ED: Studies of the personality of patients suffering from

urticaria. *Psychosom Med* 15:116-126, 1953.
21. Cobb S, Rose RM: Hypertension, peptic ulcer and diabetes in air traffic controllers. *JAMA* 224:489-492, 1973.
22. Engle GL: Studies of ulcerative colitis: III. The nature of the psychological processes. *Am J Med* 19:231-256, 1955.
23. Freeman EH, Gorman FJ, Singer MT, et al: Personality variables and allergic skin reactions: A cross validation study. *Psychosom Med* 29:312-332, 1967.
24. McFadden ER Jr, Kiser R, DeGroot WJ: Acute bronchial asthma. *N Engl J Med* 288:221-235, 1973.
25. Cleveland SE, Johnson DL: Personality patterns in young males with coronary disease. *Psychosom Med* 24:600-610, 1962.
26. Davies M: Blood pressure and personality. *J Psychosom Res* 14:89-104, 1970.
27. Friedman M, Byers SO; Rosenman RH: Coronary-prone individuals (type A behavioral patterns) growth hormone response. *JAMA* 217:929-932, 1971.
28. Friedman M, Rosenman RH, Straus R: The relationship of behavioral pattern 'A' to the state of the coronary vasculature. *Am J Med* 44:525-537, 1968.
29. LaBarba RC: Experiential and environmental factors in cancer: A review of research with animals. *Psychosom Med* 32:259-274, 1970.
30. Hagnell O: The premorbid personality of persons who develop cancer in a total population investigated in 1947 and 1957. *Ann NY Acad Sci* 125:846-855, 1966.
31. Crisp AH: Some psychosomatic aspects of neoplasia *Br J Med Psychol* 13:313-331, 1970.
32. Comroe BI: Follow-up study of a 100 diagnosed as neurosis. *J Nerv Ment Dis* 83:679-684, 1936.
33. Marshall H: Incidence of physical disorders among psychiatric inpatients. *Br Med J* 2:468-470, 1949.
34. Meyer BC: Some psychiatric aspects of surgical practice. *Psychosom Med* 20:203-214, 1958.
35. Herridge CF: Physical disorders in psychiatric illness: A study of 209 consecutive admissions. *Lancet* 2:949-951, 1960.
36. Davies DW: Physical illness in psychiatric out-patients. *Br J Psychiatry* 111:27-33, 1965.
37. Johnson DAW: The evaluation of routine physical examination in psychiatric cases. *Practitioner* 200:686-691, 1968.
38. Maguire GP, Granville-Grossman KL: Physical illness in psychiatric patients. *Br J Psychiatry* 115:1365-1369, 1968.

# The Effectiveness of Telemental Health: A 2013 Review

Donald M. Hilty, MD,[1] Daphne C. Ferrer, MD,[2]
Michelle Burke Parish, MA,[2] Barb Johnston, MSN,[3]
Edward J. Callahan, PhD,[4] and Peter M. Yellowlees, MD, MBBS[1,2]

[1]Department of Psychiatry and Behavioral Sciences, University of
California–Davis, Sacramento, California.
[2]Health Informatics Graduate Program, University of California–
Davis, Sacramento, California.
[3]HealthLinkNow, Sacramento, California.
[4]Department of Family and Community Medicine, University of
California–Davis, Sacramento, California.

## Abstract

*Introduction: The effectiveness of any new technology is typically measured in order to determine whether it successfully achieves equal or superior objectives over what is currently offered. Research in telemental health—in this article mainly referring to telepsychiatry and psychological services—has advanced rapidly since 2003, and a new effectiveness review is needed. Materials and Methods: The authors reviewed the published literature to synthesize information on what is and what is not effective related to telemental health. Terms for the search included, but were not limited to, telepsychiatry, effectiveness, mental health, e-health, videoconferencing, telemedicine, cost, access, and international. Results: Telemental health is effective for diagnosis and assessment across many populations (adult, child, geriatric, and ethnic) and for disorders in many settings (emergency, home health) and appears to be comparable to in-person care. In addition, this review has identified new models of care (i.e., collaborative care, asynchronous, mobile) with equally positive outcomes. Conclusions: Telemental health is effective and increases access to care. Future directions suggest the need for more research on service models, specific disorders, the issues relevant to culture and language, and cost.*

*Key words: telepsychiatry, effectiveness, telemental health, videoconferencing, telemedicine*

## Introduction

Telemental health, a use of telemedicine to provide mental health assessment and treatment at a distance, enters its sixth decade as a well-known practice in the medical field—it has increased access to care, and patients and providers are very satisfied with it for a wide variety of services.[1] In this article, we used the term "telemental health" to refer to telepsychiatry and other psychological services, as the term has been used in social science and other fields as well. The American Telemedicine Association (ATA) has published telemental health practice guidelines,[2] as has the American Association of Child and Adolescent Psychiatry.[3] A new generation of studies on telemedicine has replaced the "primary" view of telemental health as a new and different way of providing health services to a contemporary view that it is a vehicle for providing care that is here to stay. The studies supporting this contemporary view have examined the effectiveness of telemental health to answer the question "Is telemental health 'effective' to do 'what' for 'whom' and 'when' at this point in time, based on its evolution?"

Effectiveness implies that telemental health works. In telemedicine and telemental health, few authors have explicitly addressed effectiveness[4]; however, research appears to be changing this.[5] The underlying premise of being "effective" is the assurance that the chosen technology is specific to the objective of the service being offered.[6]

Effectiveness needs to be considered from the perspective of the patient, provider, program, community, and society as a whole. The only previous review of telemental health's effectiveness considered it effective in terms of providing access, improving basic outcomes, and being well-accepted.[4] Telemental health was judged to have broad utility for clinical disorders, facilitated empowerment of patients, and had good educational outcomes. Today, its effectiveness is better described in terms of the model of telepsychiatry used[7,8] and the population being served (e.g., rural, underserved, children).

This article discusses telemental health's effectiveness related to clinical care. There is a review of diagnostic (reliability/validity) or assessment processes, populations (child, geriatric, and ethnic), new models, settings (e.g., collaborative care, asynchronous, emergency, home health), mental health disorders, and cost-related and other outcomes. Recommendations for further effectiveness studies will be offered, and future directions for telemental health services will be discussed.

## Materials and Methods

A comprehensive review of the telepsychiatric literature was conducted in the MEDLINE, PubMed, PsychInfo, Embase, Science Citation Index, Social Sciences Citation Index, Telemedicine Information Exchange databases, Centre for Reviews and Dissemination, and The Cochrane Library Controlled Trial Registry databases for the period of July 2003 to March 2013. (The previous review[4] covered 1965 to June 2003). The *Journal of Telehealth and Telecare* was also manually searched for those years when it was not on MEDLINE. Key words included telepsychiatry, telemental, health, telecare, telemedicine, e-health, videoconferencing, effectiveness, efficacy, access, outcomes, satisfaction, quality of care, rural, mental health, cost, children/child, cultural/culture, geriatric, population, home health, medical home, emergency, face-to-face, in-person,

DOI: 10.1089/tmj.2013.0075

reliability/validity, and international; the term "in-person" will be used rather than "face-to-face" in this article.

Article titles and abstracts were reviewed by the authors to see if they were applicable to the theme of the effectiveness. Data on effectiveness appear in a wide range of range of case studies, case series, project descriptions, and program evaluations to more formal research trials.[5] Selected articles were pulled, and their references were reviewed to identify additional articles that may have been missed by the keyword search. In total, 755 articles were initially reviewed for this article, with 670 excluded because of little information/data on effectiveness. Although more reviews of the topic or related topics would have been interesting, 15 were chosen as most salient; this left 70 actual studies. Interventions like education, medication management, and most of the therapies were excluded by the words searched.

Effectiveness, overall, was determined on the basis of clinical parameters, the beneficial effects of a program or policy under optimal conditions of delivery, and other data under more real-world conditions.[9] This differs from evidence of efficacy ratings, which is traditionally organized as A (best) to F (least). A key component of effectiveness is feasibility and/or replicability or adaptation to other settings (also known as disseminability). Clinical research trials usually assess effectiveness compared with in-person service, preferably with a design that is randomized. Tips for program effectiveness[4] have been updated and are summarized in *Table 1*; this compilation, however, is not based on research or analysis of studies.

## Measures of Effectiveness
### DIAGNOSIS (VALIDITY AND RELIABILITY) AND ASSESSMENT (*TABLES 2* AND *3*)

Studies of telemental health's reliability and validity started with 128–384 kilobits per second (Kbps) and now occur at 384+Kbps; these of course do not apply to asynchronous and other telephonic options. Diagnoses have been made reliably, with good inter-rater reliability, for a wide range of psychiatric disorders in children, adolescents, and adults; less information is available on geriatric patients, but preliminary results are positive. Limitations have been largely overcome, including patients' difficulties in hearing, concentration, and attention; some rural areas that lack access because of line or satellite technology are more restrictive, but patients often travel to a nearby site.

A wide range of scales has been studied for adults and children/adolescents via videoconferencing, as reviewed by Yellowlees et al.[2] for the ATA and Richardson et al.[5] These include the Brief Psychiatric Rating Scale (BPRS), Scales for the Assessment of Negative and Positive Symptoms (SANS and SAPS, respectively), the Structured Clinical Interview for the Diagnostic and Statistical Manual (DSM) (SCID), Hamilton Depression Rating Scale (HDRS), Diagnostic Interview Schedule (DIS) (initially by telephone), the Abnormal Involuntary Movement Scale (AIMS), and the Yale Brown Obsessive Compulsive Scale (semistructured) (YBOCS). For children/adolescents, the DSM-IV, Schedule for the Assessment of Depression and Schizophrenia (K-SADS), and DIS (DISC) have been used. The Geriatric Depression Scale (GDS) and many neuropsychiatric scales like

the Mini-Mental Status Examination (MMSE), CAMCOG (neuropsychiatric test, computerized), National Adult Reading Test, Quick Test, and Adult Memory and Information Processing Battery are effective. The reliability and validity of asynchronous telepsychiatry has been shown using English and Spanish versions of the SCID and Mini-International Neuropsychiatric Interview (MINI).

### COMPARISON WITH IN-PERSON CARE

Since the last review,[4] studies have compared many parameters using traditional comparison and noninferiority studies.[5,10] Some have noted that with some populations (i.e., children and adolescents), telepsychiatry may be better than in-person services because of the novelty of the interaction, direction of the technology, the psychological and physical distance, and the authenticity of the family interaction.[11] Reports have also included reduced length of hospitalization,[12,13] better medication adherence,[12,14] symptom reduction of disorders,[12–15] and effective therapy such as using evidence-based treatments for posttraumatic stress disorder, including group cognitive processing.[16–18]

### SPECIFIC POPULATIONS: CHILD, GERIATRIC, AND THOSE OF CULTURE

The feasibility, acceptability, and sustainability of telemental health for children and adolescents have now been shown,[19,20] and it has been hypothesized that this approach may be better for some disorders, such as autism-spectrum patients, than in-person care.[11] A qualitative study of young people's perspectives on receiving telepsychiatric services revealed that the sessions were helpful, they felt a sense of personal choice during the consultation, and they generally liked the technology.[21] Attention-deficit hyperactivity disorder treatment by telepsychiatry[3,22–24] has been actively studied, and, once again, satisfaction is high among all parties in a variety of settings.[22,23]

Child research in telemental health has progressed into new areas[20] like randomized trials and Web-based data systems, with work from adults being replicated. Diagnosis appeared to be reliable in early studies,[25,26] demonstration of clinical improvement with the use of cognitive behavioral treatment for depression followed,[27] and then primary care patients treated by telemental health showed improvement in terms of depression and subscales of the Child Behavioral Check List.[28,29] Psychiatric consultation leads to newly diagnosed anxiety or mood disorders in almost one-third of patients seen and a change in the patient's medication for 82% of patients at initial assessment, 41% at Year 1, and 46% at Year 3.[30] Collaborative care for adolescent depression is under evaluation.[31]

In terms of geriatric services, the benefits of telepsychiatry are emerging from neuropsychiatric studies (see above) and a few clinical studies. Preliminary studies in nursing homes have mainly focused on depression or dementia, with telemental health evaluation judged as more facile and efficient in terms of the use of consultant time.[32] Assessment, cognitive intervention, and outcomes appear to be similar to in-person results.[32] Telepsychiatry to a rural geropsychiatric inpatient unit yielded positive results in terms of

**HILTY ET AL.**

| Table 1. How to Evaluate the Effectiveness of Telemental Health |
| --- |
| Measures |
|   Starting points |
|     Case report, series, or mix of patients |
|     Project or program description |
|     Qualitative analysis: impressions, perceptions, or information to form additional questions |
|     Cost, cost comparison, or cost offset, often of "direct" costs |
|     Project or program evaluation, sometimes retrospective |
|     Small(er) total $n$ |
|     Micro- (e.g., one party) analysis |
|     Some control of variance or limited interplay of variables |
|     Cross-sectional analysis |
|   Goals |
|     Prospective, question-based |
|     Comparison group |
|     Study design "same as" or "equal to" |
|     Noninferiority trials |
|     Study design randomized controlled trial |
|     Cost-effectiveness, -benefit analysis with computations of direct and indirect costs |
|     Evaluation that "drives" the objectives and prospectively collected |
|     Generally, large(r) total $n$ (but not always guarantee "good" study) |
|     Micro- (all parties individually) and macro- (system-wide = patient, provider, clinic, health system, community, and other parties) analyses |
|     Analysis of variance |
|     Longitudinal analysis |
|   Access |
|     Increased access to care |
|     Improved level of, or quality of, existing care |
|     Specific to the need (e.g., consultation–liaison rather than management [only] to primary care) |
|     Complements or integrates service delivery (or prevents use of more intensive or costly service) |
|   Quality of care |
|     Reliable/valid |
|     Diagnosis and assessment |
|     Detection of limitations and process to "control" for them is delineated |
|     Improved level of, or quality of, existing care |

| Table 1. *continued* |
| --- |
|     Specific to the need (e.g., consultation–liaison rather than management [onl] to primary care) |
|     Complements or integrates service delivery (or prevents use of more intensive or costly service) |
|   Population |
|   Setting |
|   Satisfaction and related intangibles (e.g., empowerment) |
|   Costs |
| Technology |
|   Adequate description of equipment, bandwidth, frames per second, and other parameters |
|   Data on failures, problems (i.e., reliability) |
|   Time, effort, and other "hidden" costs of "new" technologies (e.g., asynchronous telepsychiatry) |
| Administration |
|   Feasibility |
|   Level of coordination to initiate, maintain, and financially support |

satisfaction compared with in-person care[34] and in a 5-year study of patients referred for evaluation of potential cognitive impairment, 55%, 14%, and 12% had Alzheimer's disease, another psychiatric illness, or mild cognitive impairment, respectively.[35]

Ethnicity, culture, and language issues affect health,[36] and there is often inadequate access to specialists[37]—inroads to patient needs and preferences that can be met by telemental health are progressing. A recent study of nearly 40 rural health clinics compared impressions of 25 primary care providers (PCPs) and 32 staff impressions of factors important to care: using providers who value differences (5.4 and 7.0, respectively), quality of the provider's care (4.9 and 7.0, respectively), access to care in general (4.5 and 7.0, respectively), and availability of trained interpreters for use with patients (4.4 and 7.0, respectively).[38] Others are studying the specific needs of Hispanics/Latinos,[37,39,40] Asians,[41] Native Americans,[35,43,44] Eastern Europeans,[44] and those using sign language[45]—all using telepsychiatry for service provision. With patients of different cultural backgrounds, using the patients' primary language allows for a more comfortable atmosphere where they may express their genuine feelings and emotions.

## SUMMARY OF OUTCOMES FOR AGE/POPULATION AND SPECIFIC DISORDERS *(TABLE 2)*

Results are encouraging, overall. Videoconferencing appears to be as effective as in-person care for most parameters, such as feasibility, outcomes, age, and satisfaction with a single assessment and consultation or follow-up use. Illnesses studied have been depression,[9,15,31] posttraumatic stress disorder,[16–18] substance use,[46] and developmental disabilities.[30]

**Table 2. Summary of Clinical/Outcome Studies by Population (Age)**

| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
|---|---|---|---|---|---|
| Geriatric | | | | | |
| Lyketsos et al. (2001) | NAP | Geriatric outpatients | NS | United States | Video reduced "unneeded" hospitalizations. |
| Poon et al.[33] (2005) | 22 | Geriatric dementia patients | 1.5 Mb | China | Significant, comparable cognitive improvement in video and in-person; high satisfaction; feasible assessment, intervention, and outcomes |
| Rabinowitz et al.[32] (2010) | 106 | Nursing home residents | 384 | United States | Reduced travel time, fuel costs, physician travel time, personnel costs |
| Weiner et al.[35] (2011) | 85 | Adult and geriatric dementia patients | NS | United States | Feasible alternative to face-to-face care in patients with cognitive disorders who live in remote areas |
| Adult | | | | | |
| Graham et al. (1996) | 39 | Adult outpatients | 768 | United States | Video reduced "unneeded" hospitalizations. |
| Zaylor et al. (1999) | 49 | Adult depressed or schizoaffective outpatients | 128 | United States | Video equals in-person in GAF scores at 6-month follow-up. |
| Hunkeler et al. (2000) | 302 | Adult primary care outpatients | NS | United States | Video by nurses improved depressive symptoms and functioning and had high satisfaction versus in-person. |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384 | United States | Depression outcomes video and in-person equal, as were adherence, satisfaction, cost |
| Manfredi et al.[74] (2005) | 15 | Adult inmates | 384 | United States | Feasibility from an urban university to rural jail; less need for inmate transport |
| Sorvaniemi et al.[59] (2005) | 60 | Adult emergency patients | 384 | Finland | Minor technical problems occurred; assessment and satisfaction fine |
| Modai et al.[76] (2006) | 24/15 | Adult outpatients | NS | Israel | Video greater than in-person cost per service and more hospitalization cost (less available per usual care) |
| Urness et al.[75] (2006) | 39 | Adult outpatients | 384 | Canada | Video less than in-person for encouragement; improved outcomes for both |
| O'Reilly et al.[13] (2007) | 495 | Adult outpatients | 384 | Canada | Video equal to in-person in outcomes, satisfaction; 10% less expensive per video |
| Yellowlees et al.[53] (2010) | 60 | Non-emergency adult patients | NAP | United States | First ATP to demonstrate feasibility |
| Pediatric | | | | | |
| Nelson et al.[27] (2003) | 28 | Children | 128 | United States | Video equals in-person in reducing depression over 8 weeks; satisfaction high, but 15/100 consultations had an issue with technology. |
| Greenberg et al.[77] (2006) | NS | Children | NS | Canada | Video experiences positive; family caretakers and service providers frustrated with limitations of the video |
| Myers et al.[78] (2006) | 115 | Adolescents, incarcerated | 384 | United States | 80% of youth successfully prescribed medications, and they expressed confidence with the psychiatrist's recommendations; youth expressed concerns about privacy. |
| Myers et al.[23] (2010) | 172 | Children and adolescents | 384 | United States | Parents' satisfaction higher with school-aged children and lower with adolescents; adherence high for return appointments |
| Pakyurek et al.[12] (2010) | NAV | Children/adolescents in primary care | NS | United States | Video might actually be superior to in-person for consultation. |

(continued)

## Table 2. Summary of Clinical/Outcome Studies by Population (Age) *continued*

| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
|---|---|---|---|---|---|
| Lau et al.[79] (2011) | 45 | Children and adolescents | NS | United States | Video reaches a variety of children, with consultants providing diagnostic clarification and modifying treatment |
| Jacob et al.[80] (2012) | 15 | Child outpatients | NS | United States | Patient satisfaction was high, and PCPs found recommendations helpful; outcomes pending on follow-up |
| **All ages** | | | | | |
| De Las Cuevas et al.[14] (2006) | 130 | All ages—outpatients | 384–768 | Spain | Video equals in-person, including those in remote areas with limited resources |
| **Depression** | | | | | |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384 | United States | Video equals in-person for adherence, patient satisfaction, and cost. |
| Fortney et al.[15] (2007) | 177 | Adult outpatients | NS | United States | Video can help adapt collaborative care model in small PC clinics, and symptoms improved more rapidly in intervention group versus usual-care group. |
| Moreno et al.[37] (2012) | 167 | Adult patients | NS | United States | Video may close gap in access to culturally and linguistically congruent specialists; improves depression severity, functional ability, and quality of life |
| Fortney et al.[9] (2013) | 364 | Adult patients | NS | United States | Video collaborative care group had greater reductions in severity than usual-care group. |
| **PTSD** | | | | | |
| Frueh et al.[18] (2007) | 38 | Adult male Veterans | 384/NS | United States | Video equals in-person in clinical outcomes and satisfaction at 3-month follow-up; video less comfort versus in-person in talking with therapist post-treatment and had worse treatment adherence |
| Morland et al.[17] (2010) | 125 | Adult male Veterans | 384/NS | United States | Video CBGT for PTSD-related anger is feasible for rural/remote Veterans, with reduced anger. |
| Germain et al.[81] (2009) | 48 | Adult patients | NS | Canada | Video equals in-person in reducing PTSD over 16–25 weeks |
| **Substance abuse** | | | | | |
| Frueh et al.[46] (2005) | 14 | Adult male outpatients | 384/NS | United States | Video had good attendance, comparable attrition, and high satisfaction. |
| **Developmental disability** | | | | | |
| Szeftel et al.[30] (2012) | 45 | Adolescents | NS | United States | Video led to changed Axis I psychiatric diagnosis (excluding developmental disorders) 70%, and changed medication 82% of patients initially, 41% at 1 year, and 46% at 3 years; video helped PCPs with recommendations for developmental disabilities. |
| **Panic disorder** | | | | | |
| Bouchard et al.[82] (2004) | 21 | Adults | 384/NS | Canada | Video 81% of patients panic-free post-treatment and 91% at 6-month follow up via CBT |
| **Hispanic** | | | | | |
| Moreno et al.[37] (2012) | 167 | Adult patients | NS | United States | Video lessens depression severity, raises functional ability and quality of life, and improves access to culturally and linguistically congruent specialists. |
| Chong et al.[40] (2012) | 167 | Adult patients | NS | United States | Video is acceptable to low-income depressed Hispanic patients, but its feasibility is questionable. |
| Yellowlees et al.[55] (2013) | 127 | English- and Spanish-speaking patients | NS | United States | ATP equal for English- and Spanish-speaking patients |

*(continued)*

| Table 2. Summary of Clinical/Outcome Studies by Population (Age) continued | | | | | |
|---|---|---|---|---|---|
| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
| American Indian | | | | | |
| Shore et al.[43] (2008) | 53 | Male adult patients | NS | United States | Video equals in-person assessment, interaction, and satisfaction; comfort level high and culturally accepted |
| European | | | | | |
| Mucic[44] (2010) | 61 | Adult outpatients | 2Mbit (Denmark) 10Mbit (Sweden) | Denmark | Video improved access, reduced waiting time, and reduced travel to see bilingual psychiatrists; high satisfaction video preferred via "mother tongue" rather than interpreter-assisted care |
| Asian | | | | | |
| Ye et al.[41] (2012) | 19 | Adult outpatients | NS | United States | Primary language facilitates expression of feelings, emotional discomfort, or social stressors. |
| Sign language | | | | | |
| Lopez et al.[45] (2004) | 1 | Adult female, deaf since birth | NS | United States | Video communication was fine with ASL interpreter, and psychiatric symptoms improved. |

Those studies before 2003 are not referenced in this regular article since it is not a review; name and year of those not referenced are given in Hilty et al.[4] (2003).

ASL, American Sign Language; ATP, asynchronous telepsychiatry; CBT, cognitive behavioral treatment; NAP, not applicable; NAV, not available; NS, not specified; PC, primary care; PCP, primary care provider; PTSD, posttraumatic stress disorder.

## MODELS AND SETTINGS OF TELEMENTAL SERVICES

*Consultation to primary care versus management.* Past studies showed positive outcomes for patients when using a consultation model of care into primary care sites. Specialists changed the diagnosis and medications in 91% and 57% of cases, respectively, with primary care interventions led to clinical improvements in 56% of cases.[1] Provider knowledge, skills, and complexity of questions improve over time,[47] particularly in rural PCPs.[48] The most intensive model of consultation to primary care is collaborative care, which has now been more formally applied to telemedicine[9,15,31] with encouraging results. The virtual collaborative care team was able to produce better outcomes than the traditional "gold standard" methodology of primary care psychiatry.[9]

Models of care have been thoroughly studied and well articulated.[7] Examples are:

1. Randomized controlled trial for depression in adults, using disease management and telepsychiatric consultation versus usual care over 12 months.[49]
2. Phone and e-mail physician-to-provider consultation system for adults and children with developmental disabilities, using a 24-h warm-line.[50]
3. An integrated program of mental health screening, therapy on site, and telepsychiatric consultation (phone, e-mail, or video), with continuing medical education and training on screening questionnaires.[28,29]
4. Cultural consultation to rural primary care using telemedicine.[38]

5. Disaster response to a bioterrorism attack was evaluated as feasible in terms of training and consultations.[51]
6. Collaborative care via telepsychiatry is co-provision of medication for primary care patients by the telepsychiatrist and PCP in rural communities, based on the earlier models of in-person care to achieve national standards of antidepressant prescriptions.[9,52] This model is often integrated with stepped models of care, which, similar to the above, use "less intensive or expensive interventions" first; then if patients fail to improve, "step it up" to more intensive services.
7. Asynchronous telepsychiatry (ATP) to primary care (described below) is feasible and helpful (described below).[53,54]

*ATP.* ATP services, formerly known as store-and-forward services, have been demonstrated to be feasible, valid, and reliable in English- and Spanish-speaking patients in primary care.[53–55] Asynchronous telemedicine is used in radiology, dermatology, ophthalmology, cardiology, and pathology, and it is now available in psychiatry, where it may also facilitate the "medical home," a patient-centered approach that supports the PCP to improve patient care and health.[56]

ATP works at the patient end via taping a videorecording of local providers and patients, use of a basic questionnaire, and uploading of videos and patient histories for a remote psychiatrist for review in a Health Insurance Portability and Accountability Act (HIPAA)-adherent manner.[57] He or she evaluates the information, diagnoses the patient, and makes two or three treatment recommendations in a report. ATP is specifically designed for patients who can be primarily managed in primary care, but could offer the

**HILTY ET AL.**

## Table 3. Summary of Telemental Health Cost Studies: Since 1998

| COST | N | PATIENTS | KBPS/ FRAMES | LOCALE | COMMENTS |
|---|---|---|---|---|---|
| Mielonen (1998) | 14 | Adult inpatients | NS | Finland | Savings in healthcare costs, reduction in travel, and ease and speed of consultation |
| Trott (1998) | 50 | Adult and child outpatients | NS | Australia | Substantial savings in healthcare costs from reduction in traveling and patient transfers |
| Alessi (1999) | NAV | Adult forensic inpatients | NAV/NAV | United States | Video is cost-effective. |
| Doze (1999) | 90 | Adults | 336–384/NS | Alberta | Costs break even at 7.6 consultations. |
| Simpson (2001) | 379 | Adult outpatients | 128–384 | Canada | Costs break even at 224 consultations/year; less if used for administration, too |
| Elford (2001) | 30 | Children and parents | 336 | Newfoundland, Canada | Cost $400 per consultation via video or by patient traveling |
| Hailey (2002) | NAP | Adults | NAP/NAP | United States | Reduced costs to rural patients |
| Edwards et al.[83] (2003) | 518 | Adults and children | | United States | Video saved $400/consultation versus in-person |
| Jong[68] (2004) | 71 | NS | NS | Canada | Video saved $2,000/consultation versus in-person and saved government $140,088 in 2003. |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384/NS | United States | Video greater than in-person unless psychiatrist traveled > 22 miles away, and the productivity (increasing number of patients/day) minimized costs. |
| Cluver et al.[63] (2005) | 10 | Adult outpatients | NS | United States | In-home portable video works but costly for the average person |
| Persaud et al.[69] (2005) | 215 | Adults | NS | Canada | Video versus in-person of equal cost, overall, as patient costs more for in-person literal consultation $240–$1,048 (Canadian $) versus telehealth $17–$70, but from societal perspective, video costs more at $1,736–$28,084 versus in-person $325–$1,133. |
| Harley[84] (2006) | 11 | Adults | 128 | United Kingdom | Video in rural areas costs 4 times less than in-person, once a threshold of 5–6 episodes per year is completed. |
| Modai et al.[76] (2006) | 24/15 | Adult outpatients | NS | Israel | Operational video costs greater than in-person, particularly if resulted in hospitalization (223.7% higher); video costs of sessions 32% higher unless travel included (then only 10.6% higher) |
| O'Reilly et al.[13] (2007) | 495 | Adult outpatients | 384/NS | Canada | Video 10% less expensive per patient than service provided in-person |
| Shore et al.[42] (2007) | 53 | Adults | 384/NAP | United States | Video costs lower than in-person |
| Smith et al.[66] (2007) | 1,499 | Children | NS | Australia | Video cost about $600/consultation versus $1,000+ in-person |
| Spaulding et al.[67] (2010) | 257 | Children/adolescents | 384+? | United States | Video cost $168/consult more but only $31 if travel costs included |
| Rabinowitz et al.[32] (2010) | 106 | Nursing home residents | 384/NS | United States | Reduced travel time, fuel costs, physician travel time, personnel costs |
| Pyne et al.[85] (2010) | 395 | Adult outpatients | NS | United States | Video $85,634/QALY for collaborative care |
| Butler and Yellowlees[54] (2012) | 125 | Adult primary care patients | ATP[5] | United States | ATP and video fixed costs $7,000 and $20,000, respectively, and per consultation ATP was $68.18, video was $107.50, and in-person $96.36; this means ATP is most cost-effective at 249 consultations/year. |

Those studies before 2003 are not referenced in this regular article since it is not a review; name and year of those not referenced are given in Hilty et al.[4] (2003).

ATP, asynchronous telepsychiatry; KBPS, kilobits per second; NAP, not applicable; NAV, not available; NS, not specified; QALY, quality-adjusted life years.

opportunity for PCPs to collaborate with psychiatrists to provide specialized care, and it is less costly than video and usual care.[53]

*Emergency room telepsychiatry.* Telepsychiatry emergency services have been slow to develop in psychiatry compared with neurology (e.g., stroke), obstetrics (e.g., fetal monitoring), and other clinical areas. This is surprising despite the consultation models used and the long delays before mental health evaluation may occur on site. The effectiveness of emergency telepsychiatric consultations has rarely been studied; however, one study of patients with mainly depression, bipolar disorder, and schizophrenia revealed that 65% were discharged, 16% were admitted, and 19% were transferred.[58] This study, which examined eight programs, found that most rated themselves as moderately successful (3/5 or 4/5, with 5 best) and patients and emergency physicians rated services at 4.4/5. The same was found in another study.[59] Guidelines on how to be effective in providing emergency telepsychiatry need to be evaluated.[60,61]

*Medical home, home health, and other mobile technology methods.* These services are in development and need to be better studied, although costs are dramatically decreasing. The patient-centered medical home is a concept founded on the presence of inadequate treatment in primary care and/or an inability to access needed services.[56] The patient-centered medical home allows telepsychiatric input at home, still under the general purview of the PCP, and it has been shown to improve patient care and health.[62] Desk-mounted video systems offer great convenience for therapy to cancer patients to avoid travel, but the cost used to be prohibitive for most consumers.[63] Internet-based video technology via personal computers and mobile devices must be HIPAA-adherent. Use of these technologies is increasingly becoming available and will support the move of telepsychiatry to the home, such as programs that are now being implemented by the Veterans Health Administration.[64]

## ACCESS TO CARE

Access appears to have been greatly increased, based on the recent decade's research—with a few exceptions. Patients may have less travel, absence from work, and time waiting, more clinical choice and control, and better outcomes, as summarized previously.[4] Satisfaction, generally, with services is so high that it *de facto* precludes study. Rarely do patients report a less satisfactory interaction than videoconferencing than in-person. A few access-to-care issues remain unresolved for patients: (1) privacy and confidentiality where some patients prefer services delivered from elsewhere (e.g., living on a reservation or wanting total anonymity for personal reasons), (2) cultural and language nuances related to telemental healthcare, and (3) inadequate payment for indigent, rural, and other underserved patients. PCPs and communities are generally happy to "keep" their patients locally for continuity of care.

## COST ISSUES AND IMPLICATIONS

Ideally, costs should be considered for patients, clinics, providers, and society at large—with both direct and indirect costs accounted for. Direct costs include equipment, installation of lines, and other supplies. Fixed costs also include the rental cost of lines, salary and wages, and administrative expenses. Variable costs include data transmission costs, fees for service, and maintenance and upgrades of equipment. Costs may also include projections for travel, transfers in emergencies, waiting times, and more "appropriate" use of other services or, more globally, by rural towns retaining dollars that would have been otherwise lost to suburban centers upon referral.

With regard to cost, there is benefit to delineate between differing types of cost analyses.[65] The cost-offset model, which implies treating mental conditions may reduce other health costs, is widely used. The cost-minimization analysis implies the same effectiveness model, but different (lower) costs. Cost-effectiveness assesses intervention costs versus alternative expenditures; a subtype is cost-utility analysis, which includes data on health-related quality-of-life measures (i.e., quality-adjusted life-years). Cost-benefit analysis values all outcomes by translating them into economic terms to the degree possible and is particularly important when an intervention appears far too expensive at face value (or cross section) but not longitudinally (e.g., a transplant helps someone live and work an additional 50 years; this calculation gets into quality of life-years analysis).

Cost studies have differences in data sought, their collection, and how they are analyzed (*Table 3*). Videoconferencing may be cost-effective if someone does not have to travel or transfers are "expensive" services are avoided. Savings may be shown versus in-person with high consultation rates (e.g., 1,500 consultations total),[66] "break-even" or other thresholds used (e.g., number of consultations/year), or when the patient's travel, time, and food are included.[66,67] A break-even analysis is highly specific to a program, with a range of consultations needed, from 7 to 774 depending on methods of calculation.[66] A comparison of ATP, video, and in-person showed fixed costs were $7,000 for ATP and $20,000 for regular video, and the cost per consultation was $68.18 for ATP, $107.50 for videoconferencing, and $96.36 in-person; this means ATP is most cost-effective at 249 consultations/year.[54] Governments have been tabulating savings, too,[68,69] and an economic evaluation of telehealth data collection with rural populations has been completed.[70]

## Conclusions, Implications, and Recommendations for Future Research

Today, telemental health services are unquestionably effective in most regards, although more analysis is needed. They are effective for diagnosis and assessment, across many populations (adult, child, geriatric, and ethnic), and in disorders in many settings (emergency, home health), are comparable to in-person care, and complement other services in primary care. Overall, better evaluation with formal measures (i.e., randomized trials, lack of inferiority designs) and analysis of variance to predictors of outcomes are necessary. Studies need to be focused on areas where there is currently a relative paucity of information, such as anxiety, substance use, and psychotic and other disorders.

A key area the integration of telepsychiatric models like collaborative care into services in primary care settings. The fact that it worked better than usual models is a key step—it may change our decision-making about how to best do things in the future. Web-based data management[37,71,72] will facilitate services, as can stepped models of care. For example, a new stepped model might have low tier physician-to-provider phone or e-mail consultation followed by ATP, then therapies, and finally videoconferencing.

A plan for assessment and care for patients with ethnic, cultural, and language issues is essential.[54,73] Scientific and policy questions from this discussion include:

- What tools, methods, and measures are needed to assess the patients, providers, and health systems?
- What are the intersections of culture, sociodemographic, geography, and technology in health?
- Will patients' disorder, racial or ethnic identity, or other factors determine whether e-mental health or in-person care is more effective?
- What is the most cost-effective and feasible way to provide language/interpreting support?

Limitations of this article include that it is not a systematic, fully longitudinal review of the literature. Second, the scope was limited to exclude specifics on medication management, the therapies (largely), and other treatments. Furthermore, not all findings apply to all locales or settings therein. Fourth, the landscape of healthcare is rapidly changing, with consumer/patient use of technology—the field will be hard pressed to keep up. Finally, plans that offer the most "adaptability" or "flexibility" of telemental services—beyond this article's scope—will afford the most opportunities for improvement.

## Acknowledgments

We thank the American Telemedicine Association Mental Health Interest Group; the University of California, Davis Center for Health and Technology, Department of Psychiatry and Behavioral Sciences and Health Informatics Graduate Group; telemedicine and telepsychiatry pioneers, authors, organizational leaders, and innovators; and the American Telemedicine Association.

## Disclosure Statement

No competing financial interests exist.

## REFERENCES

1. Hilty DM, Marks SL, Urness D, et al. Clinical and educational applications of telepsychiatry: A review. *Can J Psychiatry* 2004;49:12–23.

2. Yellowlees PM, Shore J, Roberts L. Practice guidelines for videoconferencing-based telemental health, American Telemedicine Association. *Telemed J E Health* 2010;16:1074–1089.

3. AACAP practice parameter for telepsychiatry with children and adolescents. *J Am Acad Child Adolesc Psychiatry* 2007;47:1468–1483.

4. Hilty DM, Liu W, Marks SL, et al. Effectiveness of telepsychiatry: A brief review. *Can Psychiatry Assoc Bull* 2003;(Oct):10–17.

5. Richardson LK, Frueh BC, Grubaugh AL, et al. Current directions in videoconferencing tele-mental health research. *Clin Psychol (New York)* 2009;16:323–338.

6. Morland LA, Greene CJ, Rosen C, et al. Issues in the design of a randomized noninferiority clinical trial of telemental health psychotherapy for rural combat veterans with PTSD. *Contemp Clin Trials* 2009;30:513–522.

7. World Health Organization. *Telemedicine opportunities and developments in member states. Results of the second global survey on eHealth.* Geneva: WHO Press, 2011.

8. Hilty DM, Yellowlees, PM, Cobb HC, et al. Models of telepsychiatric consultation-liaison service to rural primary care. *Psychosomatics* 2006;47: 152–157.

9. Fortney JC, Pyne JM, Mouden SP, et al. Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: A pragmatic randomized comparative effectiveness trial. *Am J Psychiatry* 2013;170:414–425.

10. Flay BR, Biglan A, Boruch RF, et al. Standards of evidence: Criteria for efficacy, effectiveness and dissemination. *Prev Sci* 2005. Available at www.ebppc .hawaii.edu/Resources/Standards%20of%20Evidence%5B1%5D.pdf (last accessed February 1, 2013).

11. Morland LA, Greene CJ, Rosen C, et al. Issues in the design of a randomized noninferiority clinical trial of telemental health psychotherapy for rural combat veterans with PTSD. *Contemp Clin Trials* 2009;30:513–252.

12. Pakyurek M, Yellowlees PM, Hilty DM. The child and adolescent telepsychiatry consultation: Can it be a more effective clinical process for certain patients than conventional practice? *Telemed J E Health* 2010;16:289–292.

13. O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face to face psychiatry: Results from a randomized controlled equivalence trial. *Psychiatr Serv* 2007;58:836–843.

14. De Las Cuevas C, Arrendondo MT, Cabrera MF, et al. Randomized controlled trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. *Telemed J E Health* 2006;12:341–350.

15. Fortney JC, Pyne JM, Edlund MJ, et al. A randomized trial of telemedicine-based collaborative care for depression. *J Gen Intern Med* 2007;22:1086–1093.

16. Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: Comparison of remote treatment through telepsychiatry to in-person treatment. *Am J Psychiatry* 2004;161:1471–1476.

17. Morland LA, Greene CJ, Rosen CS, et al. Telemedicine for anger management therapy in a rural population of combat veterans with posttraumatic stress disorder: A randomized noninferiority trial. *J Clin Psychiatry* 2010;71: 855–863.

18. Frueh BC, Monnier J, Yim E, et al. Randomized trial for post-traumatic stress disorder. *J Telemed Telecare* 2007;13:142–147.

19. Morland LA, Hynes AK, Mackintosh MA, et al. Group cognitive processing therapy delivered to veterans via telehealth: A pilot cohort. *J Trauma Stress* 2011;24:465–469.

20. Myers KM, Valentine JM, Melzer SM. Feasibility, acceptability, and sustainability of telepsychiatry for children and adolescents. *Psychiatr Serv* 2007;58: 1493–1496.

21. Myers KM, Palmer NB, Geyer JR. Research in child and adolescent telemental health. *Child Adolesc Psychiatr Clin North Am* 2011;20:155–171.

22. Boydell K, Volpe T, Pignatello A. A qualitative study of young people's perspectives on receiving psychiatric services via televideo. *J Can Assoc Child Adolesc Psychiatry* 2010;19:5–11.

23. Myers KM, Vander Stoep A, McCarty CA, et al. Child and adolescent telepsychiatry: Variations in utilization, referral patterns and practice trends. *J Telemed Telecare* 2010;16:128–133.

24. Palmer NB, Myers KM, Vander Stoep A, et al. Attention-deficit/hyperactivity disorder and telemental health. *Curr Psychiatry Rep* 2010;12:409–417.

25. Pesamaa L, Ebeling H, Kuusimaki ML, et al. Videoconferencing in child and adolescent telepsychiatry: A systematic review of the literature. *J Telemed Telecare* 2004;10:187–192.

26. Elford R, White H, Bowering R, et al. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *J Telemed Telecare* 2000;6:73–82.

27. Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. *Telemed J E Health* 2003;9:49–55.

28. Neufeld JD, Bourgeois JA, Hilty DM, et al. The e-mental Health Consult Service: Providing enhanced primary care mental health services through telemedicine. *Psychosomatics* 2007;48:135–141.

29. Yellowlees PM, Hilty DM, Marks SL, et al. A retrospective analysis of child and adolescent e-mental health. *J Am Acad Child Adolesc Psychiatry* 2008;47:1–5.

30. Szeftel R, Federico C, Hakak R, et al. Improved access to mental health evaluation for patients with developmental disabilities using telepsychiatry. *J Telemed Telecare* 2012;18:317–321.

31. Richardson L, McCauley E, Katon W. Collaborative care for adolescent depression: A pilot study. *Gen Hosp Psychiatry* 2009;31:36–45.

32. Rabinowitz T, Murphy K, Amour JL, et al. Benefits of a telepsychiatry consultation service for rural nursing home residents. *Telemed J E Health* 2010;16:34–40.

33. Poon P, Hui E, Dai D, et al. Cognitive intervention for community-dwelling older persons with memory problems: Telemedicine versus face-to-face treatment. *Int J Geriatr Psychiatry* 2005;20:285–286.

34. Holden D, Dew E. Telemedicine in a rural gero-psychiatric inpatient unit: Comparison of perception/satisfaction to onsite psychiatric care. *Telemed J E Health* 2008;14:381–384.

35. Weiner M, Rossetti H, Harrah K. Videoconference diagnosis and management of Choctaw Indian dementia patients. *Alzheimers Dement* 2011;7:562–566.

36. Chapter 4. Mental health care for American Indians and Alaska Natives. In: Office of the Surgeon General (US); Center for Mental Health Services (US); National Institute of Mental Health (US). *Mental Health: Culture, Race, and Ethnicity: A Supplement to Mental Health: A Report of the Surgeon General.* Rockville, MD: Substance Abuse and Mental Health Services Administration (US); 2001. Available at www.ncbi.nlm.nih.gov/books/NBK44242/ (last accessed February 1, 2013).

37. Moreno FA, Chong J, Dumbauld J, et al. Use of standard webcam and internet equipment for telepsychiatry treatment of depression among underserved Hispanics. *Psychiatr Serv* 2012;63:1213–1217.

38. Hilty DM, Lim RF, Koike AK, et al. Planning for telepsychiatric consultation: A needs assessment for cultural and language services at rural sites in California. *J Rural Ment Health* 2013 (submitted for publication).

39. Nieves J, Stack KM. Hispanics and telepsychiatry. *Psychiatr Serv* 2007;58:877–878.

40. Chong J, Moreno FA. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. *Telemed J E Health* 2012;18:297–304.

41. Ye J, Shim R, Lukaszewski T, Yun K, et al. Telepsychiatry services for Korean immigrants. *Telemed J E Health* 2012;18:797–802.

42. Shore JH, Savin D, Orton H, et al. Diagnostic reliability of telepsychiatry in American Indian veterans. *Am J Psychiatry* 2007;164:115–118.

43. Shore JH, Brooks E, Savin D, Orton H, Grigsby J, Manson S. Acceptability of telepsychiatry in American Indians. *Telemed J E Health* 2008;14:461–466.

44. Mucic D. Transcultural telepsychiatry and its impact on patient satisfaction. *J Telemed Telecare* 2010;16:237–242.

45. Lopez AM, Cruz M, Lazarus S, et al. Use of American sign language in telepsychiatry consultation. *Telemed J E Health* 2004;10:389–391.

46. Frueh BC, Henderson S, Myrick H. Telehealth service delivery for persons with alcoholism. *J Telemed Telecare* 2005;11:372–375.

47. Hilty DM, Yellowlees PM, Nesbitt TS. Evolution of telepsychiatry to rural sites: Change over time in types of referral and PCP knowledge, skill, and satisfaction. *Gen Hosp Psychiatry* 2006;28:367–373.

48. Hilty DM, Nesbitt TS, Kuenneth TA, et al. Telepsychiatric consultation to primary care: Rural vs. suburban needs, utilization and provider satisfaction. *J Rural Health* 2007;23:163–165.

49. Hilty DM, Marks SL, Wegeland JE, et al. A randomized controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. *Psychiatry* 2007;4:58–65.

50. Hilty DM, Ingraham RL, Yang RP, et al. Multispecialty phone and email consultation to primary care providers for patients with developmental disabilities in rural California. *Telemed J E Health* 2004;10:413–421.

51. Ayers K, Yellowlees P. Mental health considerations during a pandemic influenza outbreak. *Internet J Rescue Disaster Med* 2009;9(1). doi: 10.5580/1481.

52. Katon W, Von Korff M, Lin E, et al. Collaborative management to achieve depression treatment guidelines. *J Clin Psychiatry* 1997;58(Suppl 1):20–24.

53. Yellowlees PM, Odor A, Burke MM, et al. A feasibility study of asynchronous telepsychiatry for psychiatric consultations. *Psychiatr Serv* 2010;61:838–840.

54. Butler TN, Yellowlees P. Cost analysis of store-and-forward telepsychiatry as a consultation model for primary care. *Telemed J E Health* 2012;18:74–77.

55. Yellowlees PM, Odor A, Patrice K, et al. Transcultural psychiatry made simple—Asynchronous telepsychiatry as an approach to providing culturally relevant care. *Telemed J E Health* 2013;19:259–264.

56. Rosenthal TC. The medical home: Growing evidence to support a new approach to primary care. *J Am Board Fam Med* 2008;21:427–440.

57. Yellowlees PM, Odor A, Patrice K, et al. PsychVACS: A system for asynchronous telepsychiatry. *Telemed J E Health* 2011;17:299–303.

58. Williams M, Pfeffee M, Boyle, et al. Telepsychiatry in the emergency department: Overview and case studies. California HealthCare Foundation. 2010. Available at www.chcf.org/publications/2009/12/telepsychiatry-in-the-emergency-department-overview-and-case-studies (last accessed last February 1, 2013).

59. Sorvaniemi M, Ojanen E, Santamäki O. Telepsychiatry in emergency consultations: A follow-up study of sixty patients. *Telemed J E Health* 2005;11:439–441.

60. Shore JH, Hilty DM, Yellowlees PM. Emergency management guidelines for telepsychiatry. *Gen Hosp Psychiatry* 2007;29:199–206.

61. Yellowlees PM, Burke MM, Marks SL, et al. Emergency telepsychiatry. *J Telemed Telecare* 2008;14:277–281.

62. Hollingsworth JM, Saint S, Hayward RA, et al. Specialty care and the patient-centered medical home. *Med Care* 2011;49:4–9.

63. Cluver JS, Schuyler D, Frueh BC, et al. Remote psychotherapy for terminally ill cancer patients. *J Telemed Telecare* 2005;11:157–159.

64. Shore P. VISN 21 Home Based Telemental Health Pilot Project Program. Veteran's Health Administration. Portland, OR, 2011. Available at http://conference.avapl.org/pubs/2012%20Conference%20Presentations/Home%20Based%20Telemental%20Health.pdf (last accessed February 1, 2013).

65. Weinstein MC, Stason WB. Foundations of cost-effectiveness analysis for health and medical practices. *N Engl J Med* 1977;296:716–721.

66. Smith AC, Scuffham P, Wootten R. The costs and potential savings of a novel telepaediatric service in Queensland. *BMC Health Serv Res* 2007;7:35.

67. Spaulding R, Belz N, DeLurgio S, et al. Cost savings of telemedicine utilization for child psychiatry in a rural Kansas community. *Telemed J E Health* 2010;16:867–871.

68. Jong M. Managing suicides via videoconferencing in a remote northern community in Canada. *Int J Circumpolar Health* 2004;63:422–428.

69. Persaud DD, Jreige S, Skedgel C, et al. An incremental cost analysis of telehealth in Nova Scotia from a societal perspective. *J Telemed Telecare* 2005;11:77–84.

**HILTY ET AL.**

70. Shore JH, Brooks E, Savin DM, et al. An economic evaluation of telehealth data collection with rural populations. *Psychiatr Serv* 2007;58:830–835.

71. Unutzer J, Choi Y, Cook IA, et al. A web-based data management system to improve care for depression in a multicenter clinical trial. *Psychiatr Serv* 2002;53:671–678.

72. Geyer J, Myers K, Vander Stoep A, et al. Implementing a low-cost web-based clinical trial management system for community studies: A case study. *Clin Trials* 2011;8:634–644.

73. Yellowlees PM, Marks SL, Hilty DM, et al. Using e-health to enable culturally appropriate mental health care in rural areas. *Telemed J E Health* 2008;14:486–492.

74. Manfredi L, Shupe J, Batki S. Rural jail telepsychiatry: A pilot feasibility study. *Telemed J E Health* 2005;11:574–577.

75. Urness D, Wass M, Gordon A, et al. Client acceptability and quality of life—Telepsychiatry compared to in-person consultation. *J Telemed Telecare* 2006;12:251–254.

76. Modai I, Jabarin M, Kurs R, et al. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. *Telemed J E Health* 2006;12:515–520.

77. Greenberg N, Boydell K, Volpe T. Pediatric telepsychiatry in Ontario: Caregiver and service provider perspectives. *J Behav Health Sci Res* 2006;33:105–111.

78. Myers K, Valentine J, Morganthaler R, Melzer S. Telepsychiatry with incarcerated youth. *J Adolesc Health* 2006;38:643–648.

79. Lau ME, Way BB, Fremont WP. Assessment of SUNY Upstate Medical University's child telepsychiatry consultation program. *Int J Psychiatry Med* 2011;42:93–104.

80. Jacob MK, Larson JC, Craighead WE. Establishing a telepsychiatry consultation practice in rural Georgia for primary care physicians: A feasibility report. *Clin Pediatr (Phila)* 2012;51:1041–1047.

81. Germain V, Marchand A, Bouchard, et al. Effectiveness of cognitive behavioural therapy administered by videoconference for posttraumatic stress disorder. *Cogn Behav Ther* 2009;38:42–53.

82. Bouchard S, Paquin B, Payeur R, et al. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. *Telemed J E Health* 2004;10:13–25.

83. Edwards MA, Patel AC. Telemedicine in the state of Maine: A model for growth driven by rural needs. *Telemed J E Health* 2003;9:25–39.

84. Harley J. Economic evaluation of a tertiary telepsychiatry service to an island. *J Telemed Telecare* 2006;12:354–357.

85. Pyne JM, Fortney JC, Tripathi SP, Maciejewski ML, Edlund MJ, Williams K. Cost-effectiveness analysis of a rural telemedicine collaborative care intervention for depression. *Arch Gen Psychiatry* 2010;67:812–821.

Address correspondence to:
*Donald M. Hilty, MD*
*Department of Psychiatry and Behavioral Sciences*
*University of California—Davis*
*2230 Stockton Boulevard*
*Sacramento, CA 95817*

*E-mail:* dmhilty@ucdavis.edu

*Received:* March 14, 2013
*Revised:* April 9, 2013
*Accepted:* April 10, 2013

## Bureau of Justice Statistics
# Special Report

September 2006, NCJ 213600

# Mental Health Problems of Prison and Jail Inmates

Doris J. James and
Lauren E. Glaze
*BJS Statisticians*

At midyear 2005 more than half of all prison and jail inmates had a mental health problem, including 705,600 inmates in State prisons, 78,800 in Federal prisons, and 479,900 in local jails. These estimates represented 56% of State prisoners, 45% of Federal prisoners, and 64% of jail inmates. The findings in this report were based on data from personal interviews with State and Federal prisoners in 2004 and local jail inmates in 2002.

Mental health problems were defined by two measures: a recent history or symptoms of a mental health problem. They must have occurred in the 12 months prior to the interview. A recent history of mental health problems included a clinical diagnosis or treatment by a mental health professional. Symptoms of a mental disorder were based on criteria specified in the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV).

| Mental health problem | State prison | Federal prison | Local jail |
|---|---|---|---|
| | Percent of inmates in — | | |
| Any mental problem | 56% | 45% | 64% |
| Recent history | 24 | 14 | 21 |
| Symptoms | 49 | 40 | 60 |

More than two-fifths of State prisoners (43%) and more than half of jail inmates (54%) reported symptoms that met the criteria for mania. About 23% of State prisoners and 30% of jail inmates reported symptoms of major depression. An estimated 15% of State prisoners and 24% of jail inmates reported symptoms that met the criteria for a psychotic disorder.

## Highlights

**High prevalence of mental health problems among prison and jail inmates**

| Selected characteristics | State prison | | Local jail | |
|---|---|---|---|---|
| | With mental problem | Without | With mental problem | Without |
| | Percent of inmates in — | | | |
| **Criminal record** | | | | |
| Current or past violent offense | 61% | 56% | 44% | 36% |
| 3 or more prior incarcerations | 25 | 19 | 26 | 20 |
| **Substance dependence or abuse** | 74% | 56% | 76% | 53% |
| **Drug use in month before arrest** | 63% | 49% | 62% | 42% |
| **Family background** | | | | |
| Homelessness in year before arrest | 13% | 6% | 17% | 9% |
| Past physical or sexual abuse | 27 | 10 | 24 | 8 |
| Parents abused alcohol or drugs | 39 | 25 | 37 | 19 |
| **Charged with violating facility rules*** | 58% | 43% | 19% | 9% |
| Physical or verbal assault | 24 | 14 | 8 | 2 |
| **Injured in a fight since admission** | 20% | 10% | 9% | 3% |

*Includes items not shown.

• Nearly a quarter of both State prisoners and jail inmates who had a mental health problem, compared to a fifth of those without, had served 3 or more prior incarcerations.

• Female inmates had higher rates of mental health problems than male inmates (State prisons: 73% of females and 55% of males; local jails: 75% of females and 63% of males).

• About 74% of State prisoners and 76% of local jail inmates who had a mental health problem met criteria for substance dependence or abuse.

• Nearly 63% of State prisoners who had a mental health problem had used drugs in the month before their arrest, compared to 49% of those without a mental health problem.

• State prisoners who had a mental health problem were twice as likely as those without to have been homeless in the year before their arrest (13% compared to 6%).

• Jail inmates who had a mental health problem (24%) were three times as likely as jail inmates without (8%) to report being physically or sexually abused in the past.

• Over 1 in 3 State prisoners and 1 in 6 jail inmates who had a mental health problem had received treatment since admission.

• State prisoners who had a mental health problem were twice as likely as State prisoners without to have been injured in a fight since admission (20% compared to 10%).

**A quarter of State prisoners had a history of mental health problems**

Among all inmates, State prisoners were most likely to report a recent history of a mental health problem (table 1). About 24% of State prisoners had a recent history of a mental health problem, followed by 21% of jail inmates, and 14% of Federal prisoners.

A recent history of mental health problems was measured by several questions in the BJS' inmate surveys. Offenders were asked about whether in the past 12 months they had been told by a mental health professional that they had a mental disorder or because of a mental health problem had stayed overnight in a hospital, used prescribed medication, or received professional mental health therapy. These items were classified as indicating a recent history of a mental health problem.

State prisoners (18%), Federal prisoners (10%), and jail inmates (14%) most commonly reported that they had used prescribed medication for a mental problem in the year before arrest or since admission. They were least likely to report an overnight stay in a hospital for a mental health problem. Approximately, 5% of inmates in State prisons, 2% in Federal prisons, and 5% in local jails reported an overnight stay in a hospital for a mental health problem.

---

**Prevalence of symptoms of mental disorders among prison and jail inmates**

The Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002, included a modified structured clinical interview for the DSM-IV. The surveys collected information on experiences of inmates in the past 12 months that would indicate symptoms of major depression, mania, or psychotic disorders. The surveys did not assess the severity or duration of the symptoms, and no exclusions were made for symptoms due to medical illness, bereavement, or substance use. Inmates in mental hospitals or otherwise physically or mentally unable to complete the surveys were excluded from the sample.

Estimates of DSM-IV symptoms of mental disorder provide a baseline indication of mental health problems among inmates rather than a clinical diagnosis of mental illness. Major depression or mania symptoms covered a range of feelings and behaviors, such as persistent sadness, loss of interest in activities, insomnia or hypersomnia, psychomotor agitation, and persistent anger or irritability.

Insomnia or hypersomnia and persistent anger were the most frequently reported major depression or mania episodes with nearly half of jail inmates (49%) reporting these symptoms. Attempted suicide was the least reported symptom by State

prisoners (13%), Federal prisoners (6%) and local jail inmates (13%).

A psychotic disorder was indicated by any signs of delusions or hallucinations during the 12-month period. Delusions were characterized by the offenders' belief that other people were controlling their brain or thoughts, could read their mind, or were spying on them. Hallucinations included reports of seeing things others said they did not see or hearing voices others did not hear. Approximately, 24% of jail inmates, 15% of State prisoners, and 10% of Federal prisoners reported at least one symptom of psychotic disorder (table 1).

| Symptoms in past 12 months or since admission | Percent of inmates in — | | |
|---|---|---|---|
| | State prison | Federal prison | Local jail |
| **Major depressive or mania symptoms** | | | |
| Persistent sad, numb or empty mood | 32.9% | 23.7% | 39.6% |
| Loss of interest or pleasure in activities | 35.4 | 30.8 | 36.4 |
| Increased or decreased appetite | 32.4 | 25.1 | 42.8 |
| Insomnia or hypersomnia | 39.8 | 32.8 | 49.2 |
| Psychomotor agitation or retardation | 39.6 | 31.4 | 46.2 |
| Feelings of worthlessness or excessive guilt | 35.0 | 25.3 | 43.0 |
| Diminished ability to concentrate or think | 28.4 | 21.3 | 34.1 |
| Ever attempted suicide | 13.0 | 6.0 | 12.9 |
| Persistent anger or irritability | 37.8 | 30.5 | 49.4 |
| Increased/decreased interest in sexual activities | 34.4 | 29.0 | 29.5 |
| **Psychotic disorder symptoms** | | | |
| Delusions | 11.8% | 7.8% | 17.5% |
| Hallucinations | 7.9 | 4.8 | 13.7 |

| Number of positive responses | Percent of inmates in — | | |
|---|---|---|---|
| | State prison | Federal prison | Local jail |
| **Major depressive disorder symptoms** | | | |
| 0 | 29.5% | 38.8% | 22.8% |
| 1-2 | 26.1 | 27.9 | 23.8 |
| 3-4 | 20.5 | 17.1 | 23.0 |
| 5 or more | 23.9 | 16.2 | 30.4 |
| **Mania disorder symptoms** | | | |
| 0 | 27.3% | 35.6% | 22.5% |
| 1 | 21.5 | 23.3 | 17.0 |
| 2 | 20.5 | 17.7 | 20.1 |
| 3 | 17.7 | 14.0 | 22.0 |
| 4 | 13.1 | 9.4 | 18.4 |
| **Psychotic disorder symptoms** | | | |
| 0 | 84.6% | 89.8% | 76.0% |
| 1 | 11.1 | 7.8 | 16.8 |
| 2 | 4.2 | 2.4 | 7.2 |

Note: Data are based on inmate self-report in the Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002. See *References* for sources on measuring symptoms of mental disorders based on a modified Structured Clinical Interview for the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV).

## Symptoms of mental disorder highest among jail inmates

Jail inmates had the highest rate of symptoms of a mental health disorder (60%), followed by State (49%), and Federal prisoners (40%). Symptoms of a mental health disorder were measured by a series of questions adopted from a structured clinical interview for diagnosing mental disorders based on the DSM-IV (see box on page 2 and *References* for sources on DSM-IV measures). The questions addressed behaviors or symptoms related to major depression, mania, or psychotic disorders that occurred in the 12 months before the interview.

To meet the criteria for major depression, inmates had to report a depressed mood or decreased interest or pleasure in activities, along with 4 additional symptoms of depression. In order to meet the criteria for mania, during the 12-month period inmates had to report 3 symptoms or a persistent angry mood. For a psychotic disorder, 1 symptom of delusions or hallucinations met the criteria.

The high rate of symptoms of mental health disorder among jail inmates may reflect the role of local jails in the criminal justice system. Jails are locally operated correctional facilities that receive offenders after an arrest and hold them for a short period of time, pending arraignment, trial, conviction, or sentencing. Among other functions, local jails hold mentally ill persons pending their movement to appropriate mental health facilities.

While jails hold inmates sentenced to short terms (usually less than 1 year), State and Federal prisons hold offenders who typically are convicted and sentenced to serve more than 1 year. In general, because of the longer period of incarceration, prisons provide a greater opportunity for inmates to receive a clinical mental health assessment, diagnosis, and treatment by a mental health professional.[1]

[1]Persons who have been judged by a court to be *mentally incompetent to stand trial* or *not guilty by reason of insanity* are not held in these correctional facilities and are not covered by this report.

### Table 1. Recent history and symptoms of mental health problems among prison and jail inmates

| | Percent of inmates in — | | |
|---|---|---|---|
| Mental health problem | State prison | Federal prison | Local jail |
| **Any mental health problem** | 56.2% | 44.8% | 64.2% |
| **Recent history of mental health problem[a]** | 24.3% | 13.8% | 20.6% |
| Told had disorder by mental health professional | 9.4 | 5.4 | 10.9 |
| Had overnight hospital stay | 5.4 | 2.1 | 4.9 |
| Used prescribed medications | 18.0 | 10.3 | 14.4 |
| Had professional mental health therapy | 15.1 | 8.3 | 10.3 |
| **Symptoms of mental health disorders[b]** | 49.2% | 39.8% | 60.5% |
| Major depressive disorder | 23.5 | 16.0 | 29.7 |
| Mania disorder | 43.2 | 35.1 | 54.5 |
| Psychotic disorder | 15.4 | 10.2 | 23.9 |

Note: Includes inmates who reported an impairment due to a mental problem. Data are based on the Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002. See *Methodology* for details on survey sample. See *References* for sources on measuring symptoms of mental disorder based on a Structured Clinical Interview for the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV).
[a]In year before arrest or since admission.
[b]In the 12 months prior to the interview.

### Table 2. Prevalence of mental health problems among prison and jail inmates

| | State prison inmates | | Federal prison inmates | | Local jail inmates | |
|---|---|---|---|---|---|---|
| Mental health problem | Number | Percent | Number | Percent | Number | Percent |
| **Any mental health problem\*** | 705,600 | 56.2% | 70,200 | 44.8% | 479,900 | 64.2% |
| History and symptoms | 219,700 | 17.5 | 13,900 | 8.9 | 127,800 | 17.1 |
| History only | 85,400 | 6.8 | 7,500 | 4.8 | 26,200 | 3.5 |
| Symptoms only | 396,700 | 31.6 | 48,100 | 30.7 | 322,900 | 43.2 |
| **No mental health problem** | 549,900 | 43.8% | 86,500 | 55.2% | 267,600 | 35.8% |

Note: Number of inmates was estimated based on the June 30, 2005 custody population in State prisons (1,255,514), Federal prisons (156,643, excluding 19,311 inmates held in private facilities), and local jails (747,529).
\*Details do not add to totals due to rounding. Includes State prisoners, Federal prisoners, and local jail inmates who reported an impairment due to a mental problem.

### High proportion of inmates had symptoms of a mental health disorder without a history

Around 4 in 10 local jail inmates and 3 in 10 State and Federal prisoners were found to have symptoms of a mental disorder without a recent history (table 2). A smaller proportion of inmates had both a recent history and symptoms of mental disorder: 17% in State prisons, 9% in Federal prisons, and 17% in local jails.

An estimated 7% of State prisoners, 5% of Federal prisoners, and 3% of local jail inmates were found to have a recent history of a mental health problem and no symptoms.

### About 1 in 10 persons age 18 or older in the U.S. general population met DSM-IV criteria for symptoms of a mental health disorder

• An estimated 11% of the U.S. population age 18 or older met criteria for mental health disorders, based on data in the National Epidemiologic Survey on Alcohol and Related Conditions, 2001-2002 (NESARC).

• Similar to the prison and jail inmate populations, females in the general population had higher rates of mental disorders than males (12% compared to 9%).

| | Percent of U.S. population age 18 or older with symptoms of a mental disorder | | |
|---|---|---|---|
| | Total | Male | Female |
| Any symptom | 10.6% | 8.7% | 12.4% |
| Major depression[a] | 7.9 | 5.5 | 10.1 |
| Mania disorder[a] | 1.8 | 1.6 | 2.0 |
| Psychotic disorder[b] | 3.1 | 3.2 | 3.1 |

Note: See *Methodology* for sources on mental health disorders in the general population.
[a]In the last 12 months, not excluding symptoms due to bereavement, substance use, or a medical condition.
[b]Based on life-time occurrence.
Source: National Institute on Alcohol Abuse and Alcoholism, NESARC, 2001-2002.

**Table 3. Prison and jail inmates who had a mental health problem, by selected characteristics**

| | Percent of inmates in — | | |
|---|---|---|---|
| Characteristic | State prison | Federal prison | Local jail |
| All inmates | 56.2% | 44.8% | 64.2% |
| **Gender** | | | |
| Male | 55.0% | 43.6% | 62.8% |
| Female | 73.1 | 61.2 | 75.4 |
| **Race** | | | |
| White[a] | 62.2% | 49.6% | 71.2% |
| Black[a] | 54.7 | 45.9 | 63.4 |
| Hispanic | 46.3 | 36.8 | 50.7 |
| Other[a,b] | 61.9 | 50.3 | 69.5 |
| **Age** | | | |
| 24 or younger | 62.6% | 57.8% | 70.3% |
| 25-34 | 57.9 | 48.2 | 64.8 |
| 35-44 | 55.9 | 40.1 | 62.0 |
| 45-54 | 51.3 | 41.6 | 52.5 |
| 55 or older | 39.6 | 36.1 | 52.4 |

[a]Excludes persons of Hispanic origin.
[b]Includes American Indians, Alaska Natives, Asians, Native Hawaiians, other Pacific Islanders, and inmates who specified more than one race.

## Mental health problems more common among female, white, and young inmates

Female inmates had much higher rates of mental health problems than male inmates. An estimated 73% of females in State prisons, compared to 55% of male inmates, had a mental health problem (table 3). In Federal prisons, the rate was 61% of females compared to 44% of males; and in local jails, 75% of females compared to 63% of male inmates.

The same percentage of females in State prisons or local jails (23%) said that in the past 12 months they had been diagnosed with a mental disorder by a mental health professional. This was almost three times the rate of male inmates (around 8%) who had been told they had a mental health problem.

| | Percent of inmates in — | | | |
|---|---|---|---|---|
| | State prison | | Local jail | |
| Mental problem* | Male | Female | Male | Female |
| Recent history | 22% | 48% | 18% | 40% |
| Diagnosed | 8 | 23 | 9 | 23 |
| Overnight stay | 5 | 9 | 4 | 9 |
| Medication | 16 | 39 | 12 | 30 |
| Therapy | 14 | 32 | 9 | 23 |
| Symptoms | 48% | 62% | 59% | 70% |

*See table 1 for detailed description of categories.

**Table 4. Homelessness, employment before arrest, and family background of prison and jail inmates, by mental health status**

| | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| Characteristic | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| Homelessness in past year | 13.2% | 6.3% | 6.6% | 2.6% | 17.2% | 8.8% |
| Employed in month before arrest[a] | 70.1% | 75.6% | 67.7% | 76.2% | 68.7% | 75.9% |
| **Ever physically or sexually abused before admission** | 27.0% | 10.5% | 17.0% | 6.4% | 24.2% | 7.6% |
| Physically abused | 22.4 | 8.3 | 13.7 | 5.4 | 20.4 | 5.7 |
| Sexually abused | 12.5 | 3.8 | 7.3 | 1.7 | 10.2 | 3.2 |
| **While growing up —** | | | | | | |
| Ever received public assistance[b] | 42.5% | 30.6% | 33.3% | 24.9% | 42.6% | 30.3% |
| Ever lived in foster home, agency or institution | 18.5 | 9.5 | 9.8 | 6.3 | 14.5 | 6.0 |
| Lived most of the time with — | | | | | | |
| Both parents | 41.9% | 47.7% | 45.4% | 50.5% | 40.5% | 49.1% |
| One parent | 43.8 | 40.8 | 39.8 | 38.8 | 45.4 | 40.4 |
| Someone else | 11.6 | 10.2 | 13.5 | 10.3 | 12.0 | 9.4 |
| Parents or guardians ever abused — | 39.3 | 25.1 | 33.3 | 20.0 | 37.3 | 18.7 |
| Alcohol | 23.6 | 16.9 | 21.7 | 15.4 | 23.2 | 14.1 |
| Drugs | 3.1 | 1.9 | 2.2 | 1.4 | 2.7 | 1.1 |
| Both alcohol and drugs | 12.7 | 6.2 | 9.4 | 3.2 | 11.5 | 3.4 |
| Neither | 60.7 | 74.9 | 66.7 | 80.0 | 62.7 | 81.3 |
| **Family member ever incarcerated —** | 51.7% | 41.3% | 44.6% | 38.9% | 52.1% | 36.2% |
| Mother | 7.2 | 4.0 | 5.0 | 3.2 | 9.4 | 3.4 |
| Father | 20.1 | 13.4 | 15.3 | 9.9 | 22.1 | 12.6 |
| Brother | 35.5 | 29.4 | 29.4 | 27.0 | 34.8 | 25.8 |
| Sister | 7.0 | 5.1 | 5.5 | 4.2 | 11.3 | 5.1 |
| Child | 2.7 | 2.3 | 3.4 | 2.8 | 4.0 | 2.6 |
| Spouse | 1.7 | 0.9 | 2.6 | 1.8 | 2.4 | 0.9 |

[a]The reference period for jail inmates was in the month before admission.
[b]Public assistance includes public housing, AFDC, food stamps, Medicaid, WIC, and other welfare programs.

The prevalence of mental health problems varied by racial or ethnic group. Among State prisoners, 62% of white inmates, compared to 55% of blacks and 46% of Hispanics, were found to have a mental health problem. Among jail inmates, whites (71%) were also more likely than blacks (63%) or Hispanics (51%) to have a mental health problem.

The rate of mental health problems also varied by the age of inmates. Inmates age 24 or younger had the highest rate of mental health problems and those age 55 or older had the lowest rate. Among State prisoners, an estimated 63% of those age 24 or younger had a mental health problem, compared to 40% of those age 55 or older. An estimated 70% of local jail inmates age 24 or younger had a mental health problem, compared to 52% of those age 55 or older.

## Homelessness, foster care more common among inmates who had mental health problems

State prisoners (13%) and local jail inmates (17%) who had a mental health problem were twice as likely as inmates without a mental health problem (6% in State prisons; 9% in local jails) to have been homeless in the year before their incarceration (table 4).

About 18% of State prisoners who had a mental health problem, compared to 9% of State prisoners who did not have a mental problem, said that they had lived in a foster home, agency, or institution while growing up.

Among jail inmates, about 14% of those who had a mental health problem had lived in a foster home, agency, or institution while growing up, compared to 6% of jail inmates who did not have a mental health problem.

## Low rates of employment, high rates of illegal income among inmates who had mental problems

An estimated 70% of State prisoners who had a mental health problem, compared to 76% of those without, said they were employed in the month before their arrest. Among Federal prisoners, 68% of those who had a mental health problem were employed, compared to 76% of those who did not have a mental problem.

Among jail inmates, 69% of those who had a mental health problem reported that they were employed, while 76% of those without were employed in the month before their arrest.

Of State prisoners who had a mental health problem, 65% had received income from wages or salary in the month before their arrest. This percentage was larger for inmates without a mental health problem (71%). Over a quarter (28%) of State prisoners who had a mental health problem reported income from illegal sources, compared to around a fifth (21%) of State prisoners without a mental problem.

| Sources of income[a] | Percent of State prison inmates | |
|---|---|---|
| | With mental problem | Without |
| Wages, salary | 65% | 71% |
| Welfare | 6 | 4 |
| Assistance from family or friends | 14 | 8 |
| Illegal income | 28 | 21 |
| Compensation payments[b] | 9 | 6 |

[a]Includes personal income in month before arrest, except for compensation which was in the month before admission.
[b]Includes Supplemental Security Income (SSI) payments and pension.

### Table 5. Substance dependence or abuse among prison and jail inmates, by mental health status

| Substance dependence or abuse | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| **Any alcohol or drugs** | 74.1% | 55.6% | 63.6% | 49.5% | 76.4% | 53.2% |
| Dependence | 53.9 | 34.5 | 45.1 | 27.3 | 56.3 | 25.4 |
| Abuse only | 20.2 | 21.1 | 18.5 | 22.2 | 20.1 | 27.8 |
| **Alcohol** | 50.8% | 36.0% | 43.7% | 30.3% | 53.4% | 34.6% |
| Dependence | 30.4 | 17.9 | 25.1 | 12.7 | 29.0 | 11.8 |
| Abuse only | 20.4 | 18.0 | 18.6 | 17.7 | 24.4 | 22.8 |
| **Drugs** | 61.9% | 42.6% | 53.2% | 39.2% | 63.3% | 36.0% |
| Dependence | 43.8 | 26.1 | 37.1 | 22.0 | 46.0 | 17.6 |
| Abuse only | 18.0 | 16.5 | 16.1 | 17.2 | 17.3 | 18.4 |
| **No dependence or abuse** | 25.9% | 44.4% | 36.4% | 50.5% | 23.6% | 46.8% |

Note: Substance dependence or abuse was based on criteria specified in the Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV). For details, see *Substance Dependence, Abuse and Treatment of Jail Inmates, 2002*, <http://www.ojp.usdoj.gov/bjs/abstract/sdatji02.htm>.

## Past physical or sexual abuse more prevalent among inmates who had mental health problems

State prisoners who had a mental health problem (27%) were over two times more likely than those without (10%) to report being physically or sexually abused in the past.

Jail inmates who had a mental health problem were three times more likely than jail inmates without to have been physically or sexually abused in the past (24% compared to 8%).

## Family members of inmates with mental problems had high rates of substance use and incarceration

Inmates who had a mental health problem were more likely than inmates without to have family members who abused drugs or alcohol or both. Among State prisoners, 39% of those who had a mental health problem reported that a parent or guardian had abused alcohol, drugs, or both while they were growing up. In comparison, 25% of State prisoners without a mental problem reported parental abuse of alcohol, drugs, or both.

A third (33%) of Federal prisoners who had a mental health problem, compared to a fifth (20%) of those without, reported that a parent or guardian had abused alcohol, drugs, or both while they were growing up.

An estimated 37% of jail inmates who had a mental health problem said a parent had abused alcohol, drugs, or both while they were growing up. This was almost twice the rate for jail inmates without a mental health problem (19%).

The majority of prison and jail inmates who had a mental health problem (52%) reported that they had a family member who had been incarcerated in the past. Among those without a mental health problem, about 41% of State inmates and 36% of jails inmates reported that a family member had served time.

Over a third of both State prisoners and local jail inmates who had a mental health problem (35%) had a brother who had served time in prison or jail. The rate for inmates without a mental health problem was 29% in State prisons and 26% in local jails.

### High rates of both mental health problems and substance dependence or abuse among State prison and local jail inmates

• An estimated 42% of inmates in State prisons and 49% in local jails were found to have both a mental health problem and substance dependence or abuse.

• Slightly less than a quarter (24%) of State prisoners and a fifth (19%) of local jail inmates met the criteria for substance dependence or abuse only.

| Mental health problems and substance dependence or abuse | Percent of inmates in — | | |
|---|---|---|---|
| | State prison | Federal prison | Local jail |
| Both | 41.7% | 28.5% | 48.7% |
| Dependence or abuse only | 24.4 | 27.3 | 18.9 |
| Mental problems only | 14.5 | 16.3 | 15.0 |
| None | 19.5 | 27.8 | 17.3 |

**Inmates who had mental health problems had high rates of substance dependence or abuse**

Among inmates who had a mental health problem, local jail inmates had the highest rate of dependence or abuse of alcohol or drugs (76%), followed by State prisoners (74%), and Federal prisoners (64%) (table 5). Substance dependence or abuse was measured as defined in the DSM-IV.[2]

Among inmates without a mental health problem, 56% in State prisons, 49% in Federal prisons, and 53% in local jails were dependent on or abused alcohol or drugs.

[2]For a detailed description of the DSM-IV measures, see *Substance Dependence, Abuse and Treatment of Jail Inmates, 2002,* <http://www.ojp.usdoj.gov/bjs/abstract/sdatji02.htm.>

By specific type of substance, inmates who had a mental health problem had higher rates of dependence or abuse of drugs than alcohol. Among State prisoners who had a mental problem, 62% were dependent on or abused drugs and 51% alcohol. An estimated 63% of local jail inmates who had a mental problem were dependent on or abused drugs, while about 53% were dependent on or abused alcohol.

When dependence was estimated separately from abuse only, local jail inmates who had a mental health problem had the highest rate of drug dependence (46%). They were two and a half times more likely to be dependent on drugs than jail inmates without a mental problem (18%).

A larger percentage of State prisoners who had a mental health problem than those without were found to be dependent on drugs (44% compared to 26%). Among Federal prisoners, 37% who had a mental health problem were found to be dependent on drugs, compared to 22% of those without.

State prisoners (30%) and local jail inmates (29%) who had a mental health problem had about the same rate of alcohol dependence. A quarter of Federal prisoners (25%) who had a mental problem were dependent on alcohol.

**Over a third of inmates who had mental health problems had used drugs at the time of the offense**

Over a third (37%) of State prisoners who had a mental health problem said they had used drugs at the time of the offense, compared to over a quarter (26%) of State prisoners without a mental problem (table 6). Also, over a third (34%) of local jail inmates who had a mental health problem said they had used drugs at the time of the offense, compared to a fifth (20%) of jail inmates who did not have a mental problem.

Marijuana or hashish was the most common drug inmates said they had used in the month before the offense (table 7). Among inmates who had a mental health problem, more than two-fifths of those in State prisons (46%), Federal prisons (41%), or local jails (43%) reported they had used marijuana or hashish in the month before the offense.

Almost a quarter of inmates in State prisons or local jails who had a mental health problem (24%) reported they had used cocaine or crack in the month before the offense. A smaller percentage of inmates who had a mental health problem had used methamphetamines in the month before the offense — 13% of State prisoners, 11% of Federal prisoners, and 12% of jail inmates.

**Binge drinking prevalent among inmates who had mental problems**

Inmates who had a mental health problem were more likely than inmates without a mental problem to report a

**Table 6. Substance use among prison inmates and convicted jail inmates, by mental health status**

| | | | | | | |
|---|---|---|---|---|---|---|
| | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| Type of substance | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| **Alcohol or drugs** | | | | | | |
| Regular use[a] | 87.1% | 77.2% | 82.3% | 75.4% | 89.9% | 78.7% |
| In month before offense | 80.3 | 70.4 | 75.8 | 68.1 | 81.6 | 69.6 |
| At time of offense | 53.2 | 42.5 | 41.1 | 30.6 | 53.8 | 42.8 |
| **Drugs** | | | | | | |
| Regular use[a] | 75.5% | 61.2% | 71.0% | 59.2% | 78.1% | 57.5% |
| In month before offense | 62.8 | 49.1 | 57.1 | 45.2 | 62.1 | 41.7 |
| At time of offense | 37.5 | 25.8 | 31.1 | 23.0 | 34.0 | 19.8 |
| **Alcohol** | | | | | | |
| Regular use[a] | 67.9% | 58.3% | 66.0% | 58.2% | 72.6% | 61.8% |
| In month before offense | 61.7 | 52.5 | 59.5 | 53.6 | 80.7 | 74.1 |
| At time of offense | 34.0 | 27.5 | 21.7 | 15.1 | 35.0 | 30.4 |
| Binge drinking[b] | 43.5 | 29.5 | 37.8 | 25.7 | 48.2 | 29.9 |

[a]Regular alcohol use is defined as daily or almost daily or more than once a week for more than a month. Regular drug use is defined as once a week or more for at least one month.
[b]Binge drinking is defined as having consumed a fifth of liquor in a single day, or the equivalent of 20 drinks, 3 bottles of wine, or 3 six-packs of beer.

**Table 7. Drug use in the month before the offense among convicted prison and jail inmates, by mental health status**

| | | | | | | |
|---|---|---|---|---|---|---|
| | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| Types of drug used in month before offense | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| Any drug | 62.8% | 49.1% | 57.1% | 45.2% | 62.1% | 41.7% |
| Marijuana or hashish | 45.7% | 33.3% | 41.2% | 32.0% | 43.4% | 27.1% |
| Cocaine or crack | 24.4 | 17.9 | 21.1 | 15.5 | 24.2 | 14.7 |
| Heroin/opiates | 8.9 | 7.2 | 7.2 | 4.7 | 9.6 | 4.6 |
| Depressants[a] | 7.3 | 3.0 | 6.7 | 2.7 | 8.5 | 2.0 |
| Methamphetamines | 12.6 | 8.8 | 10.9 | 9.6 | 11.7 | 6.2 |
| Other stimulants[b] | 5.8 | 2.8 | 4.5 | 2.5 | 5.2 | 2.4 |
| Hallucinogens[c] | 8.0 | 3.4 | 9.3 | 3.0 | 7.5 | 2.9 |

[a]Include barbiturates, tranquilizers, and quaaludes.
[b]Include amphetamines.
[c]Include LSD, PCP, and ecstasy.

binge drinking experience. Among State prisoners who had a mental health problem, 43% said they had participated in binge drinking in the past, compared to 29% of State prisoners without mental problems.

Similarly, jail inmates who had mental problems (48%) had a much higher rate of binge drinking than jail inmates without mental problems (30%).

Inmates who had a mental problem were more likely than inmates without to have been using alcohol at the time of the offense (State prisoners, 34% compared to 27%; Federal prisoners, 22% compared to 15%; and jail inmates, 35% compared to 30%.)

## Violent offenses common among State prisoners who had a mental health problem

Among State prisoners who had a mental health problem, nearly half (49%) had a violent offense as their most serious offense, followed by property (20%) and drug offenses (19%) (table 8). Among all types of offenses, robbery was the most common offense (14%), followed by drug trafficking (13%) and homicide (12%).

An estimated 46% of State prisoners without a mental health problem were held for a violent offense, including 13% for homicide and 11% for robbery.

About 24% of State prisoners without a mental problem were held for drug offenses, particularly drug trafficking (17%).

Almost an equal percentage of jail inmates who had a mental health problem were held for violent (26%) and property (27%) offenses. About 12% were held for aggravated assault. Jail inmates who had a mental health problem were two times more likely than jail inmates without a mental problem to be held for burglary (8% compared to 4%).

## Use of a weapon did not vary by mental health status

Convicted violent offenders who had a mental health problem were as likely as those without to have used a weapon during the offense (table 9). An estimated 37% of both State prisoners who had a mental problem and those without said they had used a weapon during the offense.

By specific type of weapon, among convicted violent offenders in State prisons who had a mental health problem, slightly less than a quarter (24%) had used a firearm, while a tenth (10%) had used a knife or sharp object.

## Violent criminal record more prevalent among inmates who had a mental health problem

State prisoners who had a mental health problem (61%) were more likely than State prisoners without (56%) to have a current or past violent offense.

### Table 8. Most serious offense among prison and jail inmates, by mental health status

| Most serious offense | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|---|---|
| **Total** | 100% | 100% | 100% | 100% | 100% | 100% |
| **Violent offenses** | 49.0% | 46.5% | 16.0% | 13.2% | 26.5% | 23.7% |
| Homicide | 11.6 | 12.9 | 2.5 | 2.3 | 2.6 | 2.5 |
| Sexual assault* | 11.0 | 10.4 | 1.1 | 0.7 | 3.4 | 3.6 |
| Robbery | 13.6 | 11.3 | 9.6 | 7.6 | 5.7 | 5.1 |
| Assault | 10.5 | 9.7 | 2.0 | 1.9 | 12.5 | 10.5 |
| **Property offenses** | 19.6% | 17.7% | 7.2% | 6.1% | 26.9% | 19.7% |
| Burglary | 8.6 | 7.7 | 0.7 | 0.3 | 7.9 | 4.2 |
| Larceny/theft | 4.2 | 3.5 | 0.5 | 0.4 | 7.7 | 5.6 |
| Fraud | 3.0 | 2.7 | 4.9 | 4.5 | 5.3 | 4.2 |
| **Drug offenses** | 19.3% | 23.8% | 51.3% | 58.3% | 23.4% | 27.0% |
| Possession | 5.7 | 6.3 | 2.0 | 3.8 | 10.1 | 12.3 |
| Trafficking | 12.9 | 17.0 | 47.7 | 52.6 | 11.6 | 12.9 |
| **Public-order offenses** | 11.9% | 11.9% | 22.3% | 19.0% | 22.6% | 29.3% |
| Weapons | 2.6 | 2.4 | 14.0 | 8.5 | 2.3 | 1.4 |
| DWI/DUI | 2.2 | 3.2 | 0.2 | 0.2 | 5.5 | 8.1 |

Note: Summary categories include offenses not shown.
*Includes rape and other sexual assault.

### Table 9. Use of weapon, by mental health status of convicted violent State prison and local jail inmates

| Use of weapons | Percent of inmates in — | | | |
| | State prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|
| **Any weapon** | 37.2% | 36.9% | 20.6% | 21.2% |
| Firearm | 24.4 | 27.5 | 12.3 | 13.1 |
| Knife or sharp object | 10.2 | 7.4 | 6.1 | 5.1 |
| Other weapons* | 3.7 | 2.7 | 2.8 | 4.0 |
| **No weapon** | 62.8% | 63.1% | 79.4% | 78.8% |
| **Number of violent inmates** | 328,670 | 242,524 | 60,787 | 34,305 |

Note: Details do not add to total because inmates may have used more than one weapon.

*Other weapons include blunt objects, stun guns, toy guns, or other specified weapons.

| Violent criminal record | Percent of State prison inmates with violent criminal record | |
| | With mental problem | Without |
|---|---|---|
| Any violent offense | 61% | 56% |
| Current violent offense, no prior | 13 | 17 |
| Violent recidivist | 47 | 39 |

Note: Details may not add to total due to rounding.

Among repeat offenders, an estimated 47% of State prisoners who had a mental health problem were violent recidivists, compared to 39% of State prisoners without a mental problem (table 10).

Nearly a third (32%) of local jail inmates who had a mental health problem were repeat violent offenders, while about a quarter (22%) of jail inmates without a mental problem were violent recidivists.

A larger proportion of inmates who had a mental health problem had served more prior sentences than inmates without a mental problem (table 11). An estimated 47% of State prisoners who had a mental health problem, compared to 39% of those without, had served 3 or more prior sentences to probation or incarceration. Among jail inmates, 42% of those with a mental health problem had served served 3 or more prior sentences to probation or incarceration, compared to 33% of jail inmates without a mental problem.

**State prisoners who had mental health problems had longer sentences than prisoners without**

Overall, State prisoners who had a mental health problem reported a mean maximum sentence that was 5 months longer than State prisoners without a mental problem (146 months compared to 141 months) (table 12). Among jail inmates, the mean sentence for those who had a mental problem was 5 months shorter than that for jail inmates without a mental problem (40 months compared to 45 months).

By most serious offense, excluding offenders sentenced to life or death, both violent State prisoners who had a mental health problem and those without had about the same mean sentence length. Violent State prisoners who had a mental health problem were sentenced to serve a mean maximum sentence length of 212 months and those without, 211 months.

Among prisoners sentenced to life or death, there was little variation in sentence length by mental health status (not shown in table). About 8% of State prisoners who had a mental health problem and 9% of those without were sentenced to life or death. Among Federal prisoners, 3% of both those who had a mental health problem and those without were sentenced to life or death.

### Table 10. Criminal record of prison and jail inmates, by mental health status

| Criminal record | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|---|---|
| **No prior sentence** | 20.5% | 27.0% | 32.2% | 36.9% | 34.9% | 43.3% |
| Current violent offense | 13.4 | 16.9 | 5.1 | 4.9 | 12.1 | 13.8 |
| Current drug offense | 3.1 | 5.1 | 15.2 | 21.6 | 8.8 | 12.6 |
| Current other offense | 4.1 | 5.0 | 11.9 | 10.4 | 14.0 | 16.8 |
| **Violent recidivist** | 47.4% | 39.2% | 27.5% | 23.8% | 31.9% | 22.4% |
| Current and prior violent | 17.2 | 13.4 | 7.4 | 4.4 | 9.9 | 6.8 |
| Current violent only | 17.7 | 15.3 | 4.9 | 4.4 | 11.4 | 6.9 |
| Prior violent only | 12.5 | 10.4 | 15.3 | 15.0 | 10.5 | 8.7 |
| **Nonviolent recidivist** | 32.0% | 33.8% | 40.3% | 39.2% | 33.2% | 34.3% |
| Prior drugs only | 3.0 | 4.0 | 7.1 | 9.5 | 3.0 | 3.4 |
| Other prior offenses | 29.0 | 29.8 | 33.2 | 29.8 | 30.2 | 30.9 |

Note: Excludes inmates for whom offense and prior probation or incarceration sentences were unknown.

### Table 11. Number of prior probation or incarceration sentences among prison and jail inmates, by mental health status

| Number of prior sentences | Percent of inmates in — | | | | | |
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|---|---|
| 0 | 22.1% | 28.5% | 34.1% | 38.3% | 24.5% | 30.6% |
| 1 | 15.3 | 16.1 | 14.9 | 16.5 | 16.8 | 18.9 |
| 2 | 15.5 | 16.8 | 15.6 | 14.9 | 16.7 | 17.2 |
| 3-5 | 26.3 | 24.0 | 21.3 | 20.1 | 22.8 | 20.3 |
| 6-10 | 13.9 | 10.6 | 10.0 | 7.1 | 12.4 | 8.6 |
| 11 or more | 6.9 | 4.0 | 4.0 | 3.1 | 6.7 | 4.4 |

Note: Excludes inmates for whom prior probation or incarceration sentences were unknown.

### Table 12. Mean maximum sentence length and mean total time expected to serve, by mental health status and offense

| Most serious offense | Mean maximum sentence length[a] | | Mean total time expected to serve until release[b] | |
| | With mental problem | Without | With mental problem | Without |
|---|---|---|---|---|
| **State prison inmates** | | | | |
| All offenses[c] | 146 mos | 141 mos | 93 mos | 89 mos |
| Violent | 212 | 211 | 139 | 138 |
| Property | 103 | 96 | 60 | 58 |
| Drug | 84 | 94 | 48 | 50 |
| Public-order | 81 | 66 | 51 | 40 |
| **Federal prison inmates** | | | | |
| All offenses[c] | 128 mos | 135 mos | 99 mos | 106 mos |
| Violent | 174 | 202 | 119 | 131 |
| Property | 70 | 53 | 63 | 58 |
| Drug | 131 | 139 | 103 | 112 |
| Public-order | 102 | 100 | 87 | 83 |
| **Local jail inmates** | | | | |
| All offenses[c] | 40 mos | 45 mos | 14 mos | 18 mos |
| Violent | 67 | 73 | 18 | 31 |
| Property | 41 | 36 | 16 | 14 |
| Drug | 40 | 59 | 18 | 25 |
| Public-order | 16 | 16 | 7 | 8 |

[a]Based on the total maximum sentence for all consecutive sentences. Excludes inmates for whom offense was unknown.
[b]Based on time served when interviewed and time to be served until the expected date of release. Excludes inmates for whom admission date or expected release date were unknown.
[c]Includes other offenses not shown.

## State prisoners who had a mental health problem expected to serve 4 months longer than those without

Overall, the mean time State prisoners who had a mental health problem expected to serve was 4 months longer than State prisoners without a mental problem (93 months compared to 89 months). Among convicted jail inmates who expected to serve their time in a local jail, there was little variation by mental health status in the

### Table 13. Mean time expected to be served by convicted local jail inmates sentenced to jail

|  | Percent of convicted local jail inmates | |
|---|---|---|
| Mean time expected to be served | With mental problem | Without |
| Less than 3 months | 27.4% | 26.8% |
| 3 to 6 months | 27.9 | 27.3 |
| 7 to 12 months | 24.0 | 22.4 |
| 13 to 24 months | 9.7 | 8.7 |
| 25 to 36 months | 3.7 | 3.4 |
| 37 to 60 months | 3.2 | 5.0 |
| More than 5 years | 4.0 | 6.4 |
| Number of inmates | 115,290 | 72,356 |

Note: Excludes inmates for whom admission date or expected release date were unknown.

amount of time expected to be served. About 55% of those who had a mental problem, and 54% of those without, expected to serve 6 months or less (table 13).

## A third of State prisoners who had mental health problems had received treatment since admission

State prisoners who had a mental health problem (34%) had the highest rate of mental health treatment since admission, followed by Federal prisoners (24%) and local jail inmates (17%) (table 14).

All Federal prisons and most State prisons and jail jurisdictions, as a matter of policy, provide mental health services to inmates, including screening inmates at intake for mental health problems, providing therapy or counseling by trained mental health professionals, and distributing psychotropic medication.[3]

[3]See *Mental Health Treatment in State Prisons, 2000*, <http://www.ojp.usdoj.gov/bjs/abstract/mhtsp00.htm> and *Census of Jails, 1999*, <http://www.ojp.usdoj.gov/bjs/abstract/cj99.htm>.

More than a fifth of inmates (22%) in State prison who had a mental health problem had received mental health treatment during the year before their arrest, including 16% who had used prescribed medications, 11% who had professional therapy, and 6% who had stayed overnight in a hospital because of a mental or emotional problem.

Among jail inmates who had a mental health problem, an estimated 23% had received treatment during the year before their arrest: 17% had used medication, 12% had received professional therapy, and 7% had stayed overnight in a hospital because of a mental or emotional problem.

Taking a prescribed medication for a mental health problem was the most common type of treatment inmates who had a mental health problem had received since admission to prison or jail. About 27% of State prisoners, 19% of Federal prisoners, and 15% of jail inmates who had a mental health problem had used prescribed medication for a mental problem since admission.

An overnight stay in a hospital was the least likely method of treatment inmates had received since admission. Among inmates who had a mental problem, about 5% of those in State prisons, 3% in Federal prisons, and 2% in local jails had stayed overnight in a hospital for a mental problem.

## Use of medication for a mental health problem by State prisoners rose between 1997 and 2004

The proportion of State prisoners who had used prescribed medication for a mental health problem since admission to prison rose to 15% in 2004, up from 12% in 1997 (table 15). There was little change in the percentage of inmates who reported an overnight stay in a hospital since admission (around 3%), or in the percentage who had received professional mental health therapy (around 12%).

State prisoners who said they had ever used prescribed medication for a mental or emotional problem in the past rose to 24% in 2004, up from 19% in 1997. Overall, 31% of State prisoners said they had ever received mental health treatment in the past, up from 28% in 1997.

### Table 14. Mental health treatment received by inmates who had a mental health problem

|  | Percent of inmates who had a mental problem in — | | |
|---|---|---|---|
| Type of mental health treatment | State prison | Federal prison | Local jails |
| **Ever received mental health treatment** | **49.3%** | **35.3%** | **42.7%** |
| Had overnight hospital stay | 20.0 | 9.5 | 18.0 |
| Used prescribed medications | 39.5 | 28.0 | 32.7 |
| Had professional mental health therapy | 35.4 | 25.6 | 31.1 |
| **Received treatment during year before arrest** | **22.3%** | **14.9%** | **22.6%** |
| Had overnight hospital stay | 5.8 | 3.2 | 6.6 |
| Used prescribed medications | 15.8 | 10.1 | 16.9 |
| On prescribed medication at time of arrest | 11.3 | 7.3 | 12.3 |
| Had professional mental health therapy | 11.5 | 8.0 | 12.3 |
| **Received treatment after admission** | **33.8%** | **24.0%** | **17.5%** |
| Had overnight hospital stay | 5.4 | 2.7 | 2.2 |
| Used prescribed medications | 26.8 | 19.5 | 14.8 |
| Had professional mental health therapy | 22.6 | 15.1 | 7.3 |

Note: Excludes other mental health treatment.

### Table 15. Mental health treatment received by all State prison inmates, 2004 and 1997

|  | Percent of State prison inmates | |
|---|---|---|
| Type of mental health treatment | 2004 | 1997 |
| **Ever any mental health treatment** | **31.2%** | **28.3%** |
| Had overnight hospital stay | 12.2 | 10.7 |
| Used prescribed medications | 23.9 | 18.9 |
| Had professional mental health therapy | 21.6 | 21.8 |
| Had other mental health treatment | 3.6 | 3.3 |
| **Received treatment after admission** | **19.3%** | **17.4%** |
| Had overnight hospital stay | 3.1 | 3.8 |
| Used prescribed medications | 15.1 | 12.3 |
| Had professional mental health therapy | 12.7 | 12.3 |
| Had other mental health treatment | 1.9 | 1.9 |
| **Number of inmates** | **1,226,171** | **1,059,607** |

Among jail inmates, in 2002 around 30% said they had received treatment for a mental health problem in the past, up from 25% in 1996. The proportion who had received treatment since admission (11%) was unchanged.

| Mental health treatment | Percent of jail inmates 2002 | 1996 |
|---|---|---|
| Ever any treatment | 30% | 25% |
|   Overnight stay | 12 | 10 |
|   Medication | 22 | 17 |
|   Therapy | 22 | 18 |
|   Other treatment | 3 | 3 |
| Since admission | 11% | 11% |
|   Overnight stay | 1 | 1 |
|   Medication | 9 | 9 |
|   Therapy | 5 | 4 |
|   Other treatment | 1 | -- |

--Less than 0.5%.

## Rule violations and injuries from a fight more common among inmates who had a mental health problem

Prison or jail inmates who had a mental health problem were more likely than those without to have been charged with breaking facility rules since admission (table 16). Among State prisoners, 58% of those who had a mental health problem, compared to 43% of those without, had been charged with rule violations.

An estimated 24% of State prisoners who had a mental health problem, compared to 14% of those without, had been charged with a physical or verbal assault on correctional staff or another inmate. Among Federal prisoners who had a mental health problem, 15% had been charged with a physical or verbal assault on correctional staff or another inmate compared to 7% of those without a mental problem.

Jail inmates who had a mental health problem were twice as likely as those without to have been charged with

facility rule violations (19% compared to 9%).

Inmates in local jails who had a mental health problem were also four times as likely as those without to have been charged with a physical or verbal assault on correctional staff or another inmate (8% compared to 2%).

**Three-quarters of female inmates in State prisons who had a mental health problem met criteria for substance dependence or abuse**

Female State prisoners who had a mental health problem were more likely than those without to —

• meet criteria for substance dependence or abuse (74% compared to 54%),

• have a current or past violent offense (40% compared to 32%),

• have used cocaine or crack in the month before arrest (34% compared to 24%),

• have been homeless in the year before arrest (17% compared to 9%).

They were also more likely to report —

• 3 or more prior sentences to probation or incarceration (36% compared to 29%),

• past physical or sexual abuse (68% compared to 44%),

• parental abuse of alcohol or drugs (47% compared to 29%),

• a physical or verbal assault charge since admission (17% compared to 6%).

### Characteristics of females in State prison, by mental health status

| Selected characteristics | Percent of female inmates | |
|---|---|---|
| | With mental problem | Without |
| **Criminal record** | | |
|   Current or past violent offense | 40.4% | 32.2% |
|   3 or more prior probations or incarcerations | 35.9 | 28.7 |
| **Substance dependence or abuse** | 74.5% | 53.6% |
|   Alcohol | 41.7 | 25.8 |
|   Drugs | 65.5 | 45.6 |
| **Drug use in month before arrest\*** | 63.7% | 49.5% |
|   Cocaine or crack | 33.9 | 24.2 |
|   Methamphetamines | 17.1 | 16.3 |
| **Family background** | | |
|   Homeless in year before arrest | 16.6% | 9.5% |
|   Past physical or sexual abuse | 68.4 | 44.0 |
|   Parent abused alcohol or drugs | 46.9 | 29.1 |
| **Charged with violating facility rules\*** | 50.4% | 30.6% |
|   Physical or verbal assault | 16.9 | 5.7 |
| **Injured in a fight since admission** | 10.3% | 3.8% |

\*Includes items not shown.

A larger percentage of inmates who had a mental health problem had been injured in a fight since admission than those without a mental problem (State prisoners, 20% compared to 10%; Federal prisoners, 11% compared to 6%; jail inmates, 9% compared to 3%).

### Table 16. Disciplinary problems among prison and jail inmates since admission, by mental health status

| Type of disciplinary problem since admission | Percent of inmates in — | | | | | |
|---|---|---|---|---|---|---|
| | State prison | | Federal prison | | Local jail | |
| | With mental problem | Without | With mental problem | Without | With mental problem | Without |
| **Charged with rule violations\*** | 57.7% | 43.2% | 40.0% | 27.7% | 19.0% | 9.1% |
|   Assault | 24.1 | 13.8 | 15.4 | 6.9 | 8.2 | 2.4 |
|     Physical assault | 17.6 | 10.4 | 11.0 | 5.4 | 4.7 | 1.6 |
|     Verbal assault | 15.2 | 6.7 | 7.9 | 2.4 | 5.2 | 0.9 |
| **Injured in a fight** | 20.4% | 10.1% | 11.4% | 5.8% | 9.3% | 2.9% |

\*Includes violations not shown (for example: possession of a weapon, stolen property or contraband, drug law violations, work slowdowns, food strikes, setting fires or rioting, being out of place, disobeying orders, abusive language, horseplay, or failing to follow sanitary regulations).

## Methodology

The findings in this report are based on data in the Survey of Inmates in State and Federal Correctional Facilities, 2004, and the Survey of Inmates in Local Jails, 2002. Conducted every 5 to 6 years since 1972, the BJS' inmate surveys are the only national source of detailed information on criminal offenders, particularly special populations such as drug and alcohol users and offenders who have mental health problems.

The survey design included a stratified two-stage sample where facilities were selected in the first stage and inmates to be interviewed in the second stage. In the second sampling stage, interviewers from the Census Bureau visited each selected facility and systematically selected a sample of inmates. Computer-assisted personal interviewing (CAPI) was used to conduct the interviews.

### Survey of Inmates in State and Federal Correctional Facilities, 2004

The State prison sample was selected from a universe of 1,585 facilities. A total of 287 State prisons participated in the survey; 2 refused, 11 were closed or had no inmates to survey, and 1 was erroneously included in the universe. A total of 14,499 inmates in the State facilities were interviewed; 1,653 inmates refused to participate, resulting in a second-stage nonresponse rate of 10.2%.

The Federal prison sample was selected from 148 Federal prisons and satellite facilities. Thirty-nine of the 40 prisons selected participated in the survey. After the initial sample of inmates was drawn, a secondary sam-

ple of 1 in 3 drug offenders was selected. A total of 3,686 inmates in Federal facilities were interviewed and 567 refused to participate, resulting in a second-stage nonresponse rate of 13.3%.

### Survey of Inmates in Local Jails, 2002

The local jail sample was selected from a universe of 3,365. Overall, 465 jails were selected, and interviews were held in 417 jails; 39 jails refused or were excluded for administrative reasons; and 9 were closed or had no inmates. A total of 6,982 inmates were interviewed; 768 inmates refused to participate, resulting in a second-stage nonresponse rate of 9.9%.

### Accuracy of survey estimates

The accuracy of the survey estimates depends on sampling and measurement errors. Sampling errors occur by chance because a sample of inmates rather than all inmates were interviewed. Measurement error can be attributed to many sources, such as nonresponse, recall difficulties, differences in the interpretation of questions among inmates, and processing errors.

The sampling error, as measured by an estimated standard error, varies by the size of the estimate and the size of the base population. These standard errors may be used to construct confidence intervals around percentages. For example, the 95% confidence interval around the percentage of jail inmates in 2002 who had a mental health problem is approximately 64.2% plus or minus 1.96 times .83% (or 62.6% to 65.8%). Standard error tables for data in this report are provided in

the Appendix which is available in the electronic version of the report at <http://www.ojp.usdoj.gov/bjs/abstract/mhppji.htm>.

A detailed description of the methodology for the State and Federal Prison survey, including standard error tables and links to other reports or findings will be available at <http://www.icpsr.umich.edu> in Winter 2007. A detailed description of the methodology for the Survey of Inmates in Local Jails is available at <http://webapp.icpsr.umich.edu/cocoon/NACJD-STUDY/04359.xml>.

### Measures of mental health problems in the general population

Caution should be used when making comparisons between prison and jail inmates and the general population based on the a 12-month DSM-IV structured interview. There are significant variations in the questionnaire design and data analysis. For example, questions on the severity or duration of symptoms and questions about whether symptoms are due to bereavement, substance use, or a medical condition may vary from survey to survey.

For details on the methodology used in the National Epidemiologic Survey on Alcohol and Related Conditions, sponsored by the National Institute on Alcohol Abuse and Alcoholism, see the Data Reference Manual, <http://niaaa.census.gov/>. For additional information on the prevalence of mental disorders in the general population, see the National Survey on Drug Use and Health, sponsored by the Substance Abuse and Mental Health Services Administration, <http://www.oas.samhsa.gov/nsduh.htm>. Also, see the National Comorbidity Survey Replication Study, sponsored primarily by the National Institute of Mental Health, <http://www.nimh.nih.gov/healthinformation/ncs-r.cfm>.

**References**

American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, fourth edition (DSM-IV), 1994.

Michael B. First, Robert, L. Spitzer, Miriam Gibbon, and Janet B.W. Williams, *User's Guide for the Structured Clinical Interview for DSM-IV Axis I Disorders,* American Psychiatric Publishing, Inc. Arlington, Va., March 2002.

U.S. Department of Health and Human Services, National Epidemiologic Survey on Alcohol and Related Conditions, 2002, National Institutes of Health, National Institute on Alcohol Abuse and Alcoholism, Bethesda, Maryland.

U.S. Department of Health and Human Services, National Survey on Drug Use and Health, 2002, Substance Abuse and Mental Health Services Administration, Office of Applied Studies, Rockville, Maryland.

U.S. Department of Justice
Office of Justice Programs
Bureau of Justice Statistics

Washington, DC 20531

Official Business
Penalty for Private Use $300

FIRST-CLASS STANDARD
POSTAGE & FEES PAID
DOJ/BJS
Permit No. G-91

The Bureau of Justice Statistics is the statistical agency of the U.S. Department of Justice. Jeffrey L. Sedgwick is director.

Doris J. James and Lauren E. Glaze wrote this report, under the supervision of Allen J. Beck. Laura M. Maruschak, Todd D. Minton, and Tracy L. Snell verified the report. Rebecca L. Medway provided programming assistance. Tina Dorsey edited the report and Jayne Robinson prepared it for final printing, under the supervision of Marianne Zawitz.

Tracy L. Snell, under the supervision of Allen J. Beck, was project manager for the Survey of Inmates in State and Federal Correctional Facilities.

For the State and Federal prisoners survey, at the U.S. Census Bureau Steven M. Bittner, Colette Heiston, and Kenneth Mayo carried out questionnaire design, data collection and processing, under the supervision of Marilyn M. Monahan, Demographic Surveys Division. Renee Arion programmed the questionnaire and Dave Keating programmed the listing instrument, under the supervision of Rob Wallace, Technologies Management Office. Programming assistance in the Demographic Surveys Division was provided by Chris Alaura, Mildred Ballenger, Bach-Loan Nguyen, and Scott Raudabaugh, under the supervision of David Watt.

Dave Hornick and Danielle N. Castelo, Demographic Surveys Methods Division, under the supervision of Thomas F. Moore, designed the sample and weighting specifications. Sydnee Chattin-Reynolds and Luis Padilla, Field Division, under the supervision of Richard Ning, coordinated the field operations. The affiliations for the Census Bureau date to the time of the survey.

Contributors to the Survey of Inmates in Local Jails are listed in *Profile of Jail Inmates, 2002*, at <http://www.ojp.usdoj.gov/bjs/abstract/pji02.htm>.

September 2006, NCJ 213600

This report in portable document format and in ASCII and its related statistical data and tables— including appendix tables— are available at the BJS World Wide Web Internet site: <http://www.ojp.usdoj.gov/bjs/mhppji.htm>

**Office of Justice Programs**

Partnerships for Safer Communities
http://www.ojp.usdoj.gov

ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/236186611

# Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers

**Article** *in* Telemedicine and e-Health · September 2004

DOI: 10.1089/tmj.2004.10.S-81 · Source: PubMed

CITATIONS
20

READS
170

**4 authors**, including:



Beth Hudnall Stamm
Idaho State University

**55** PUBLICATIONS   **1,067** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

ProQOL Ownership transferred to Center for Victims of Torture View project

All content following this page was uploaded by Beth Hudnall Stamm on 18 July 2014.

The user has requested enhancement of the downloaded file.

TELEMEDICINE JOURNAL AND e-HEALTH
Volume 10, Supplement 2, 2004
© Mary Ann Liebert, Inc.

# Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers

DEBRA LARSEN, Ph.D.,[1] B. HUDNALL STAMM, Ph.D.,[1] KELLY DAVIS, B.S.,[1]
and PHILLIP R. MAGALETTA, Ph.D.[2]

## ABSTRACT

Although national justice and technology associations have endorsed the utilization of telemedicine and telehealth, little is known about the current utilization of this technology across our nation's correctional facilities. Several voluntary registries and state Web sites exist, but only limited information on telemedicine utilization may be gleaned from these. The purpose of the present study was to fill this void by reporting the utilization patterns in telemedicine programs in state and federal correctional facilities throughout the United States. Using telephone-administered interviews, data were collected from all 50 states. Respondents were asked about utilization, benefits, and barriers to the use of technology in healthcare in state and federal correctional facilities. Slightly over half of state correctional institutions and 39% of federal institutions are using some sort of telehealth or telemedicine applications. The most common benefits cited were improved security, personnel safety, costs savings, and access to specialists. The most common barriers cited were costs of technology, resistance from medical personnel, lack of staff technical expertise, and difficulties coordinating services.

## INTRODUCTION

**T**HE USE OF TELEMEDICINE as a source of support for long-distance clinical health-related education, public health, and health administration appears to be a promising way to extend healthcare services to a variety of underserved populations, including correctional populations.

As correctional systems are not typically known for embracing technology or encouraging change, the fact that correctional facilities have successfully sought to apply telemedicine in the service of those who are incarcerated is notable. A growing literature by a number of larger, well-known prison telemedicine programs[1-8] provides results that encourage the use of telemedicine. Beyond these proscribed studies that deal with one or a few locations, the overall status of prison telemedicine in the United States is unclear. National health services utilization data on telemedicine programs within correctional facilities are available on a piecemeal basis (e.g., http://tie.telemed.org/,

[1]Institute of Rural Health at Idaho State University, Pocatello, Idaho.
[2]Federal Bureau of Prisons, Washington, D.C.
The contents of this article are the sole responsibility of the authors and do not necessarily represent the official views or policies of the Department of Health and Human Services, the Federal Bureau of Prisons, or the Department of Justice.

http://www.corrections.com/links/viewlinks), and very few national reviews or statistics are available. The current project was designed to bridge this gap. Data were gathered from state and federal prison systems in an attempt to describe the current utilization level of telemedicine in correctional facilities as well as reported or perceived barriers and benefits that state officials may have observed in their attempts to implement prison telemedicine programs.

There are constellations of unique factors such as geographic remoteness, the volume of significant healthcare needs, high prevalence rates of mental illness, etc., that increase the utility of telemedicine in prisons compared to other settings.[9] As telemedicine technology and applications have developed over the past 4 decades, it has become clear that telemedicine is most useful when physical barriers (i.e., geographic distance, terrain, climate difficulties) make transportation and/or direct contact between patient and clinician difficult.[10] Numerous prisons are subject to these physical barriers because of their remote location, and access to specialist medical care is frequently restricted in terms of timeliness of care and the number of professionals available.[2]

The opportunity to use telehealth as a method to contain healthcare expenses provides another rationale for using it in prison settings. Cost containment for medical consultations is an obvious administrative concern since the medical domain is reported to constitute as much as 15% of state correctional budgets,[2] which translates into an average state corrections medical budget exceeding 74 million dollars annually.[11] A recent National Institute of Justice (NIJ)[7] report indicated that a conventional, face-to-face healthcare consultation for the correctional population has an average cost of $173 in comparison to telemedicine consultations estimated at $71 each.

Beyond the sheer volume of offenders (1,076,343 in state facilities and 124,540 in federal facilities)—who, compared to community estimates, have an above average number of chronic and serious healthcare and mental health needs[9,12–14]—a significant portion of medical expenses results from staffing associated with transporting prisoners into the community for medical consultations. Telemedi-

cine consultations in prison settings would reduce the number of incidents requiring transportation of inmates to tertiary-care sites because of the ability of the consulting physician to screen patients remotely.[6,15] In addition, telemedicine can reduce travel costs by decreasing the need for specialists travel to remote prison locations in order to provide face-to-face consultations.[15]

Beyond the financial advantages, perhaps the most obvious benefits are increased security and safety for the community.[16] Security is increased as transportation of prisoners outside the prison facility's secure perimeter is obviated in telemedicine.[16]

Although barriers to prison telemedicine exist, they are similar to those found in implementing telemedicine in other settings. The obvious initial barrier is the cost of equipment, but this cost has decreased significantly during the past several years.[3,17,18] Many programs have addressed this barrier by seeking grant funding for initial start-up costs.[15] Other barriers include training of staff in the use of this technology, the availability of infrastructure (i.e., line capabilities available in the region), and the availability of physical space for a private consultation area within the prison where telemedicine is practiced.[7,19]

The NIJ report[7] supporting telemedicine as a viable option for many correctional facilities appears to represent the norm for this decade; telemedicine may be the delivery method of choice in correctional facilities.[7] It remains unclear, however, how this enthusiasm in the literature would translate into operational programs.

A 1997 survey reported that of the 50 state correctional systems 18 had active telemedicine programs.[2] That survey also indicated that 15 additional states planned to implement telemedicine programs.[2] Several years later a survey reported by Lowes[20] estimated that prison telemedicine accounted for 20% of all telehealth activities.

## MATERIALS AND METHODS

Telephone structured interviews were completed with personnel in U.S. federal and state departments of correction regarding the status

of telemedicine in adult prison systems. Because the information sought was related to program administration, funding sources, and cost-benefit issues on the state or federal level (e.g., not at individual correction facility sites), the administrative representatives for each state or federal program served as target respondents for the interview. Depending on what each department self-identified as appropriate, one or two employees were interviewed for each program. The respondents were identified by their respective departments as responsible for telecommunications, telemedicine, and/or medical service programs in their state or federal department of corrections. One hundred percent of states and the federal Bureau of Prisons were interviewed.

An eight-question structured interview was developed to assess current utilization of telemedicine, sources of funding, and perceived benefits and barriers (see Appendix). The interviewers, a postdoctoral fellow and a graduate research assistant, were trained to use a standardized procedure in conducting the interviews. This included face-to-face reviews of the specified ordering and wording (as scripted) of the interview and planned strategies for addressing respondents' questions or unsolicited information.

## RESULTS

### Locations

The data indicate that 52% of state department of corrections (26 states) are currently operating 34 telemedicine programs. The programs in these 26 states reach 415 facilities out of the total 1,384 existing adult state correctional facilities in the United States. Table 1 shows the number of facilities currently using telemedicine in each state, based in rural and urban locations. Urban locations are defined according to the U.S. Census Bureau's criterion of 50,000 or more inhabitants for urban/metropolitan designation. Any location with inhabitants of a lesser number was considered rural for the purposes of this interview.

TABLE 1. LOCATIONS OF STATE PRISONS WITH TELEHEALTH PROGRAMS ($n = 26$)

| States with prison telehealth programs (n = 26) | Number of facilities in urban locations | Number of facilities in rural locations |
|---|---|---|
| Alaska | 2 | 5 |
| Arizona | 3 | 5 |
| California | 6 | 19 |
| Colorado | 2 | 5 |
| Georgia | 2 | 9 |
| Illinois | 0 | 1 |
| Iowa | 1 | 7 |
| Kansas | 1 | 5 |
| Kentucky | 1 | 11 |
| Louisiana | 0 | 2 |
| Maine | 1 | 4 |
| Maryland | 2 | 3 |
| Massachusetts | 0 | 1 |
| Michigan | 4 | 12 |
| Mississippi | 0 | 1 |
| New York | 3 | 47 |
| North Carolina | 1 | 5 |
| North Dakota | 0 | 2 |
| Ohio | 21 | 12 |
| Oregon | 0 | 2 |
| Pennsylvania | 8 | 19 |
| Texas | 14 | 79 |
| Utah | 0 | 1 |
| Virginia | 0 | 8 |
| West Virginia | 0 | 1 |
| National totals | 73 | 268 |

Urban = population over 50,000; rural = population of less than 50,000.

LARSEN ET AL.

TABLE 2.  PERCENTAGE OF THE 26 EXISTING
STATE TELEMEDICINE PROGRAMS SERVING
VARIOUS CORRECTIONAL CUSTODY LEVELS

| Correctional custody level | Percentage of 26 state telemedicine programs |
|---|---|
| Maximum security | 88.5 |
| Medium security | 76.9 |
| Minimum security | 69.2 |
| Treatment program | 36.0 |
| Work release | 32.0 |
| Hospital | 32.0 |
| Jail | 30.8 |

### Correctional custody level

There were many correctional custody levels represented across the facilities interviewed. As noted in Table 2, "maximum security" populations are the most frequently targeted correctional custody level for telemedicine use by correctional programs.

### Financial support

Ninety-two percent of the state telemedicine programs are funded through regular, allocated state budgets. One program supplements state budget funding with billed services, and five programs are currently funded through grants. In terms of financial arrangements for technical services, 80.8% ($n = 21$) of state telemedicine programs use in-house services with all the equipment and services operated and maintained by state employees. The remaining 19.2% ($n = 5$) of telemedicine programs rely on private, contracted companies for equipment maintenance and technical services.

### Utilization data

As noted in Figure 1, the 26 states using telemedicine are distributed throughout the nation. Of the remaining 24 states, 20 of these are doing at least one type of non-medical videoconferencing. These videoconferencing data do not include any county level use. Hence, correctional videoconferencing applications may be happening on the county level but not captured by this state and federal interview if these activities are not in connection with state correction facilities. For example, in Idaho, several counties complete judicial proceedings by videoconferencing between jails and county courthouses. However, this current interview identified Idaho as one of the few states with



Telehealth program in use

Videoconferencing for nonmedical activities in use

No telemedicine program and no videoconferencing in use

**FIG. 1.**  Telemedicine and telecommunication utilization reported by state departments of correction. Reprinted with permission from B.H. Stamm, Institute of Rural Health, Idaho State University, Pocatello, ID.

TABLE 3.  NON-MEDICAL USES OF TELECOMMUNICATION IN CORRECTIONAL SETTINGS

| Non-medical telecommunication activity | State (n = 26) telemedicine programs | States (n = 24) without telemedicine programs | Total (n = 50) corrections departments |
|---|---|---|---|
| Administration/staff meetings | 20 (76.9%) | 14 (58.3%) | 34 (68.0%) |
| Judicial proceedings | 19 (73.0%) | 14 (58.3%) | 33 (66.0%) |
| Staff training/continuing education | 18 (69.2%) | 13 (50.0%) | 31 (62.0%) |
| Inmate education | 6 (23.1%) | 3 (12.5%) | 9 (18.0%) |
| Other[a] | 2 (7.7%) | 0 (0%) | 2 (4.0%) |
| 1 or more non-medical activity reported | 26 (100.0%) | 20 (83.3%) | 46 (96.0%) |

Data are number (%).
[a]Other services included inmate visitation programs and work interviews.

no videoconferencing since these activities do not include state correction facilities.

State departments of corrections reported that administrative/staff meetings and judicial proceedings are the most common non-medical remote activities for state programs, regardless of whether or not an active telemedicine program is in place (Table 3). As seen in Table 3, it appears that states with active telemedicine programs use telecommunications more frequently and for a greater variety of non-medical uses (i.e., work interviews, visitation programs), but this difference was not statistically significant.

Telemedicine utilization for the 26 existing programs has a clear pattern of use dominated by specialty-based medical and mental health consultations (Table 4). Consultations with specialized medical professionals were reported by 21 of the 26 programs (81.0%) with medical specialists defined as including all medical specialties (e.g., cardiology, radiology, dermatology, orthopedics, etc.) with the exception of psychiatry. Mental health consultations with a psychiatrist, psychologist, or therapist were reported by 19 of the 26 programs (73.1%). The medical uses reported as "other" included programs such as peer medical consultation (2/26; 7.7%) and human immunodeficiency virus, dialysis treatments, prenatal education, or dietary consultations (1/26; 3.8% each).

## Barriers to telemedicine programs

The most common barrier encountered by state telemedicine programs was the cost of equipment (Table 5). However, personnel factors including resistance from medical providers, staff technical expertise, and coordination of sites and services were mentioned nearly as often as cost.

TABLE 4.  TYPES OF SERVICES PROVIDED BY THE 26 STATE CORRECTIONS TELEMEDICINE PROGRAMS

| Type of service | Programs providing services |
|---|---|
| Medical specialist consultation | 21 (80.8%) |
| Mental healthcare | 19 (73.1%) |
| Primary medical care | 9 (34.6%) |
| Emergency medical triage | 3 (11.5%) |
| Dental | 2 (7.7%) |
| Other[a] | 5 (19.2%) |

Data are number (%).
[a]Other services included transitional care planning/peer consultation, dietary consults, prenatal education, dialysis, and human immunodeficiency virus care.

TABLE 5.  PERCENTAGE OF STATES REPORTING SPECIFIC PERCEIVED BARRIERS TO TELEMEDICINE UTILIZATION

| Barriers | Percentage |
|---|---|
| Cost of equipment | 50.0 |
| Resistance from medical providers | 46.2 |
| Lack of technical expertise for staff | 46.2 |
| Coordination of sites and services | 42.3 |
| Staffing problems | 34.6 |
| Inadequate technical infrastructure | 34.6 |
| Resistance from inmates | 19.2 |
| Cost of equipment maintenance | 15.4 |
| Resistance from security staff | 15.4 |
| Resistance from administrators | 15.4 |
| Other[a] | 15.4 |

[a]Other barriers include government processes that are time consuming; equipment location confidentiality/safety; budget revenues reduced; physician cancellations.

TABLE 6.    PERCENTAGE OF STATES REPORTING SPECIFIC
PERCEIVED BENEFITS TO TELEMEDICINE UTILIZATION

| Benefits | Percentage |
|---|---|
| Improved security for the community | 96.2 |
| Improved safety to security personnel | 88.5 |
| Cost savings | 84.6 |
| Availability of specialist consults | 80.8 |
| Reduced staffing demands | 73.1 |
| Improved medical response time | 69.2 |
| Shorter waiting lists | 69.2 |
| Improved quality of care | 65.4 |
| Reallocation of staff | 46.2 |
| Other benefits[a] | 15.4 |

[a]Other benefits include: increased compliance of inmates to treatment, especially dialysis; improved communication between administration and clinical staff; ability to have remote staff more involved in policy and meet regularly; increased education of staff and inmates; increased competence of staff; peer interaction with other professionals.

### Benefits of telemedicine programs

Of the benefits reported by states operating telemedicine programs, security for the prison staff and the community was reported most frequently (Table 6). However, the majority of programs reported cost savings as a significant advantage in telemedicine. Some programs kept detailed cost savings records specific to the telehealth program. Others estimated cost savings based on broader budgetary allocations required for medical/mental health service provision and inmate transportation costs. Both those who did and those who did not keep these records attributed the greatest cost savings to the reduced transportation of prisoners.

### Federal programs

Currently, 40 of the 102 federal correctional facilities in the United States have active telemedicine programs; all are funded through their regular federal budget allocations. Of these 40 programs, 37 are provided by in-house services, and the remaining three programs are provided by contracted private companies. All federal programs use telecommunications to provide the following services: primary medical care, specialist medical consultations, psychiatric mental healthcare, administrative/staff meetings, staff training/continuing education, and judicial proceedings. Plans are being implemented to provide telemedicine services in all 102 correctional facilities.

## CONCLUSIONS

Our results indicate that over half (26) of state departments of correction and slightly less than half of federal facilities currently have active telemedicine programs, representing an increase compared to previous studies. The fact that the majority of this growth has occurred during a 10-year period is remarkable. All four states reported using videoconferencing technology for non-medical purposes, a trend that points toward increased utilization. Many states, and the correctional facilities therein, have some of the necessary equipment in place for a telehealth system, providing a viable foundation for developing a system able to provide medical services in conjunction with the current non-medical uses.

The survey findings suggest that the cost–benefit equation is weighted more heavily toward safety than monetary costs alone. Although the facilities experience cost savings or "cost avoidance" by reducing the number of offsite inmate transports, the greatest benefit appears to be the increased safety to security personnel and to the community at large.

Consistent with the general trend toward difficulty in hiring and retaining medical personnel[13] in corrections, many states indicated experiencing difficulties with recruiting medical professionals who are willing to participate in telemedicine specifically. Provider resistance has been mentioned as a potential problem in the literature,[16,19,21] and some states offered anecdotal reasons for their own experience. For example, some facilities had problems with older physicians being unwilling to participate while the younger physicians who are more familiar with the technology were more willing to participate. Future research should consider the nature of this resistance as well as effective methods for ameliorating it.

Insufficient infrastructure was reported by a

number of states, a phenomenon specific to prisons located in rural settings. This was not surprising in view of the technological divide in rural areas in a variety of contexts.[10]

Overall, more benefits were reported more frequently than were barriers. In addition, concern with equipment costs may be based more on perception than fact given the declining costs over the last few years. Finally, as broadband becomes more available in rural areas, the ability to use telehealth effectively in rural corrections facilities, as has been seen in health facilities, may increase. If this happens, both inmates and corrections staff are likely to be pleased.[21]

## ACKNOWLEDGMENTS

This project is supported in part by grant 1 D1B TM 00042-01 from the Department of Health and Human Services Health Resources and Services Administration, Office for the Advancement of Telehealth.

## REFERENCES

1. Brunicardi BO. Financial analysis of savings from telemedicine in Ohio's prison system. *Telemed J* **1998;**4:49–54.

2. Gailiun M. Telemedicine takes off. *Corrections Today* **1997;**Feb:68–71.

3. McCue MJ, Hampton CL, Malloy W, Fisk KJ, Dixon L, Neece A. Financial analysis of telecardiology used in a correctional setting. *Telemed J e-Health* **2000;**6:385–391.

4. Mekhijian H, Warisse J, Gailium M, McCain T. An Ohio telemedicine system for prison inmates: A case report. *Telemed J* **1996;**2:17–24.

5. Mekhjian H, Turner JW, Gailiun M, McCain TA. Patient satisfaction with telemedicine in a prison environment. *J Telemed Telecare* **1999;**5:55–61.

6. National Institute of Justice. *Telemedicine can reduce correctional health care costs: an evaluation of a prison telemedicine network.* Report no. NCJ 175040. Washington, DC: U.S. Department of Justice, **1999.**

7. National Institute of Justice. *Implementing telemedicine in correctional facilities.* Report no. NCJ 190310. Washington, DC: U.S. Department of Justice, **2002.**

8. Zollo S, Kienzle M, Loeffelholz P, Sebille S. Telemedicine in Iowa's correctional facilities: initial clinical experience and assessment of program costs. *Telemed J* **1999;**5:291–301.

9. Ax RK, Fagan TJ, Holt SMB. Individuals with serious mental illnesses in prison: rural perspectives and issues. In: Stamm BH, ed. *Rural behavioral health care* Washington, DC: APA Books, **2003:** 203–216.

10. Stamm BH. Bridging the rural-urban divide with telehealth and telemedicine. In: Stamm BH, ed. *Behavioral healthcare in rural and frontier areas.* Washington, DC: APA Books, **2003:** 145–156.

11. Camp CG, Camp GM. *The corrections yearbook 2001: adult systems.* Middletown, CT: Criminal Justice Institute, **2002.**

12. Diamond PM, Wang EW, Holzer CE III, Thomas CR, Cruser DA. The prevalence of mental illness in prison: review and policy implications. *Admin Policy Mental Health* **2001;**29:21–40.

13. McDonald DC. Medical care in prisons. In: Tonry M, Petersilia J, eds. *Prisons.* Chicago: University of Chicago Press, **1999:**427–478.

14. Camp GK, Camp GM. *The 2001 corrections yearbook.* Middletown, CT: Criminal Justice Institute, Inc., **2001:** 12–72.

15. Bashshur RL. Telemedicine and health care. *Telemed J e-Health* **2002;**8:5–12.

16. Magaletta PR, Fagan TJ, Ax RK. Advancing psychology services through telehealth in the Federal Bureau of Prisons. *Profess Psychol Res Pract* **1998;**29:543–548.

17. Caramanis T. Editorial. *Telemedicine Today* **2002;** 8(1):10.

18. Zincone LH Jr, Doty E, Balch DC. Financial analysis of telemedicine in a prison system. *Telemed J* **1997;**3: 247–255.

19. Magaletta PR, Dennery C, Ax R. Telehealth: a future for correctional healthcare. In: S. Stojkovic, ed. *Managing special populations in jails and prisons.* Kingston, NJ: Civic Research Institute, **in press.**

20. Lowes R. Telemedicine. *Med Econ* **2001;**78(3):24.

21. Campbell JD, Harris KD, Hodge R. Introducing telemedicine to rural physicians and settings. *J Fam Pract* **2001;**50:419–424.

Address reprint requests to:
*B. Hudnall Stamm, Ph.D.*
*Institute of Rural Health*
*Idaho State University*
*Campus Box 8174*
*Pocatello, ID 83209*

*E-mail:* bhstamm@isu.edu

S-88                                                                      LARSEN ET AL.

### APPENDIX:

### STRUCTURED INTERVIEW USED WITH DEPARTMENT OF CORRECTIONS REPRESENTATIVES

Do your adult correctional facilities use any type of telemedicine? ___yes ___no
If yes, go to #1. If no, complete only 4e, 4f, 4g, 4h, & 4i.

1. Number of corrections facilities with access to telehealth/telemedicine programs _____
    What types of facilities are these: ____Min. Security Prison    ____Max. Security Prison
    ____Work Release Program    ____Treatment Program    ____Hospital
    ____Jail    ____Other_____
    ____# Urban (pop. 50,000+)    ____Rural (pop<50,000)

2. Telehealth/telemedicine programs provided by: ____in-house/direct ____contracts ____both

3. Number of contracted telehealth/telemedicine providers_____

Would you be willing to tell us what organizations you use as contractors?____yes ____no

(Note: We will find these through other public records if they do not know or will not tell us. The Telemedicine Information Exchange [TIE] has most of them listed.)

| Organization | Contact Person | Phone | Address |
|---|---|---|---|
|  |  |  |  |

4. I am now going to read you a list of activities. I would like you to tell me if these activities are provided by distance delivery or telecommunication in any of your facilities. For example, I will ask if you provide adminstrative/staff meetings by telecommunication or distance delivery. Do you understand?

Use Telehealth/
distance delivery

a. Primary medical care (general practitioner)
b. Specialist medical consults (i.e., cardiology, radiology, orthopedics, etc.)
c. Mental healthcare: psychiatrist, psychologist, and/or therapy
d. Dental care
e. Administrative/staff meetings
f. Inmate educational opportunities (i.e., health ed., GED)
g. Staff training/continuing education
h. Judicial proceedings (i.e., court appearances, competency hearings)
i. Other_____

5. For your correctional facilities using telemedicine, is telemedicine funded by the following: (yes/no)

_____grants    _____regular allocated budget    _____billed services

PRISON TELEMEDICINE AND TELEHEALTH                                    S-89

other_____

6.  Has having a telehealth/telemedicine program been beneficial in any of the following ways:

_____ Improved quality of medical care        _____ Improved quicker medical response time
_____ Shorter waiting lists                   ____ Availability of specialist consults
_____ Improved security for the community     ____ Improved safety to security personnel
_____ Reduced staffing demands (overtime)     ____ Reallocation of staff
_____ Cost savings                            Other_____
                                              _____

7.  Which of the following barriers or difficulties have you encountered with using tele-
health/telemedicine, if any?

_____ Cost of equipment                       _____ Cost of equipment maintenance
_____ Staffing problems                       _____ Lack of technical expertise for staff
_____ Coordination of sites/services          _____ Resistance from inmates
_____ Resistance from administrators          _____ Resistance from security staff
_____ Resistance from medical providers       _____ Insufficient technical infrastructure
_____ Other_____

S-90                                                          LARSEN ET AL.

8.  Is there anything else you would like to tell
us?

Symposium

www.jpgmonline.com

# Patient and Provider Satisfaction with the Use of Telemedicine: Overview and Rationale for Cautious Enthusiasm

Whitten P, Love B[1]

Department of Communication, Beering Hall, Purdue University, West Lafayette, IN, USA
[1]School of Journalism, Michigan State University, East Lansing, MI, USA.

Correspondence:
B Love,
E-mail: lovebrad@msu.edu

## ABSTRACT

Telemedicine research addressing user satisfaction abounds in academic literature. Results from patient satisfaction studies indicate exceptionally high levels of perceived satisfaction, often above the rates of expected satisfaction for traditional forms of health delivery. Results from provider satisfaction studies are also generally quite positive; however, data from providers point to higher concerns with delivery barriers and challenges. Even though data from patient and provider satisfaction research suggests overwhelming optimism for this delivery modality, this paper urges cautious embracement of these results for several reasons. First, many of the studies exhibit serious methodological weaknesses related to design and data collection instruments. In addition, the construct of satisfaction is largely undefined and is not clear. Even recognizing these caveats, the results of the study do offer some evidence that patient satisfaction will not impede the deployment of telemedicine, but provider satisfaction merits additional study.

PubMed ID        : 16388172
J Postgrad Med 2005;51:294-300     **KEY WORDS:** Patient satisfaction, provider satisfaction, telemedicine, patient outcomes, healthcare costs

Telemedicine possesses the ability to bridge gaps and overcome barriers in a way unthinkable to traditional forms of healthcare. For more than 50 years, telecommunications technology has played a role in spreading medical care to previously unreachable populations.[1] Throughout telemedicine's bumpy start and deployment, researchers and practitioners have been concerned with user satisfaction,[2] a key challenge that still remains for today's healthcare organizations.[3] Insights supplied by patients and providers remain essential across the medical fields served by telemedine projects, especially as the number of these projects continues to incease at a dramatic rate. In fact, only four active telemedicine programs existed in 1990, but 10 years later, the number has jumped to an unquantifiable level.[4]

In general, investment in telemedicine by governments around the world spurred – and continues to spur – much of the growth. Infrastructure development and health alert networks in the United States are such a priority that the federal Departments of Agriculture, Commerce, Defense and Health and Human Services all offer government-provided grants to promote telemedicine applications.[5] In addition, varying entities in Norway, Spain, Sweden, Ireland, Greece, Germany and else-where maintain programs to encourage the development of telemedicine.[6-10]

As the dramatic expansion of the last decade continues,[11] a better understanding of how satisfied patients and providers feel will become increasingly important.[12] A rapidly growing number of studies across several medical fields have demonstrated that the attitudes of patients play a significant role in health outcomes,[13,14] further stressing the need to understand satisfaction.

Most of the currently available research on satisfaction describes a situation where patients and providers express pleasure with health care delivered through telemedicine, even if that approval is sometimes offered with reservation. Additionally, the two groups tend to maintain different motivations for their opinions. However, much of the satisfaction that literature reports comes from studies that are not experimental in nature. The publications generally consist of small sample, descriptive feasibility studies or advice to other telemedicine providers.[15,16] Therefore, this body of work may not offer generalizable results.[17,18] Furthermore, the very meaning of satisfaction remains ill-defined at best, lacking the specific

View publication stats



# The development and evaluation of a telepsychiatry service for prisoners

S. LEONARD BSc RN (MM) Dip N Dip B&F Dip PTSD Counselling

*Research Fellow/Forensic Psychiatric Nurse, School of Nursing and Midwifery/Ravenswood House Medium Secure Service, Highfield Campus, University of Southampton, Southampton, Hampshire, UK*

*Correspondence:*
*S. Leonard*
*Research Fellow/Forensic*
*Psychiatric Nurse*
*School of Nursing and Midwifery/*
*Ravenswood House Medium*
*Secure Service*
*Highfield Campus*
*University of Southampton*
*Southampton*
*Hampshire*
*SO17 1BJ*
*UK*
*E-mail: s.leonard@soton.ac.uk*

LEONARD S. (2004) *Journal of Psychiatric and Mental Health Nursing* **11**, 461–468
**The development and evaluation of a telepsychiatry service for prisoners**

The introduction of increasingly sophisticated telecommunication systems seems to offer opportunities to respond to some of the key problems around structural and spatial inequalities in access to health care. There is evidence which suggests that serious mental health problems are common among prisoners and psychiatric comorbidity is the norm. Many prisoners have complex mental health needs, but more often than not these remain unaddressed. Telepsychiatry is one strategy to improve the accessibility and quality of mental health care in the prison setting. This paper firstly reviews the current prison health care system and then describes a research study which is focused on the development and evaluation of a telepsychiatry service for prisoners. This study has investigated what is lost or gained in a psychiatric assessment when it is conducted via telepsychiatry. The researcher compared the inter-rater reliability between two raters interviewing 80 participants in an observer/interviewer split configuration in telepsychiatry and same room settings. The measure used was the Comprehensive Psychopathology Rating Scale. Prisoners and prison staff also took part in semi-structured interviews which focused on their satisfaction and acceptability of the telepsychiatry service. A cost comparison of the telepsychiatry service with the existing visiting service was conducted. This paper outlines the study design and focuses on the potential impact that telepsychiatry may have upon the practice setting.

*Keywords*: Comprehensive Psychopathology Rating Scale, inter-rater reliability, prison health care, prisoner, satisfaction, telepsychiatry

*Accepted for publication*: 18 February 2004

## Background

Recent reforms in prison health care which include the creation of a formal partnership between the Prison Service and the National Health Service (NHS) have significant implications for the future organization and quality of health care delivered to prisoners (Prison Service and NHS Executive Working Group 1999). However, at present the vast majority of prisoners with mental health problems receive a standard of health care far below that afforded to patients in the community or hospital (Smith 1999). Serious mental health problems are common among prisoners

and psychiatric comorbidity is the norm (Gunn *et al*. 1991, Maden *et al*. 1995, Birmingham *et al*. 1996, Brooke *et al*. 1996, Singleton *et al*. 1998). Many prisoners have complex mental health needs, but more often than not these remain unaddressed (Health Advisory Committee for the Prison Service 1997). Because prisons are remote, security-conscious institutions with highly restrictive regimes access to specialist health care is often restricted. In countries such as Australia and the USA where geographical isolation can create similar problems of accessibility, telepsychiatry services have been developed to reduce inequalities in service provision to remote areas.

© 2004 Blackwell Publishing Ltd

## The mental health of prisoners

There have been numerous studies and reports in the UK about the prevalence of mental disorder among prisoners. Research conducted by the Institute of Psychiatry in London found that over one-third of sentenced male prisoners (Gunn *et al.* 1991) and almost two-thirds of unconvicted male remand prisoners (Brooke *et al.* 1996) have a mental illness. A survey of psychiatric morbidity in prison published by the Office of National Statistics indicates an even higher prevalence of mental illness among prisoners, indicating that 90% of all prisoners have a diagnosable mental health problem, substance misuse problem or both (Singleton *et al.* 1998). A more recent systematic review of psychiatric morbidity by Fazel & Danesh (2002) indicates that one in seven prisoners have a psychotic illness or major depression, and about one in two male prisoners and one in five female prisoners have an antisocial personality disorder. The mental health needs of the prison population are well defined, however, the identified needs remain unmet.

## Prisons and prison health care

This century has seen the prison population reach a record high level. The current daily prison population is over 72 950 (Home Office 2002), with approximately 140 000 prisoners passing through the system each year. Historically prison health care has been delivered under the auspices of the Home Office, being set outside the mainstream NHS. The Home Office has been responsible for providing a specialized dedicated service to the prisons of England and Wales. This was supplemented by some contractual arrangements with local general practitioners and local NHS psychiatrists. Prison health care centres, although commonly called hospitals, resemble sickbays with primary care cover. Not all prisons have beds in their health care centres, although all have access to beds by transferring patients to another prison if necessary. Inpatients have diverse clinical needs; about 75% of patients admitted to health care beds have mental health problems (Prison Service 1998, Reed & Lyne 2000). Although prisons have hospitals the provisions of the Mental Health Act (1983) do not apply to inpatient care in prisons and treatment without consent is only possible in emergencies under common law. This service has received many criticisms and questions about equity, standards, professional isolation and whether the prison service has the capacity to adequately carry out its health care function (Smith 1999).

The prison medical service has been subject to many reviews and reforms over recent years. In 1990 the Prison Medical Service was re-organized along the lines of purchaser–provider and it was recommended that the role of the service should be widened to emphasize more strongly the promotion of health (Home Office 1990). Since 1990 the failure of the service to provide appropriate standards of care has been recorded in annual reports and in reports on individual prisons by the prison inspectorate (Prison Service and NHS Executive Working Group 1999).

In 1996 Her Majesty Chief Inspector of prisons produced a discussion paper *Patient or Prisoner*. This paper highlighted weaknesses in current service delivery of health care to prisoners. In 1997 the Health Advisory Committee published *The Provision of Mental Health Care in Prisons*. This report highlighted the unco-ordinated way in which mental health care to prisoners was delivered and the Chief Inspector recommended that the NHS should take over responsibility for prison health care.

Despite these reviews and reforms of the prison health care service there have been continued criticisms, which highlight the continued failure of the service to provide equivalent standards of care to that provided by the NHS (Home Office 1996, Health Advisory Committee for the Prison Service 1997, Smith 1999). In 1999 a working party of officials from the prison service and the NHS jointly endorsed the need for the prison health service to give prisoners access to the same quality and range of health care as the general public receive from the NHS (Prison Service and NHS Executive Working Group 1999). Health authorities and prisons became jointly responsible for identifying the health needs of prisoners. To facilitate this process, the Department of Public Health and Epidemiology at the University of Birmingham developed a tool kit for carrying out health care need assessment of the prison population (Marshall *et al.* 2001). The aims of the health care needs assessment was to gather information to plan, negotiate and change services for the better in order to improve health care. Many of the health care services currently delivered tend to reflect historical development, which include the focus on custodial care rather than health needs.

As a result of the recent reform a new Prison Health Policy Unit and Task Force has been established, which reports both to the Prison Service and to the NHS Executive. In the recent publication of the *Prison Health Handbook* (Department of Health, HM Prison Service, The National Assembly for Wales 2001), it was acknowledged that prisoners are entitled to the same range and quality of health care services that the public receive from the NHS. This was supported much earlier by The European Prison Rules (1987) which states that the prison medical services should be organized in close relation with the health administration of the community or nation. More recently the term 'equivalence of care' has been introduced and examined. In 1997 the Health Advisory Committee to the prison found that national policies for the mentally ill did not apply in

prisons, that commissioning and management standards were lower than in the NHS, and that patients in prison did not have access to a full range of services. The health advisory view is that equivalence means equivalent health policy, equivalent standards and equivalent delivery of health care. The principle of equivalence means that improvement in prison health care services needs to be based on the National Service Framework (NSF) for mental health (Department of Health 1999). The NSF sets out seven standards for provision of effective mental health care for all those who need it, including prisoners. The standards cover mental health promotion, primary care and access to services, effective services for people with severe mental illness, individuals who care for people with mental illness and preventing suicide. The acceptance and incorporation of NHS policy into the prison service will allow the quality of health care to be measured by the fairness of provision in relation to need, health improvement, effective delivery of appropriate health care, efficiency, patient experience and outcomes. Such an approach is outlined in the NHS document *A First Class Service Quality in the New NHS* (Department of Health 1998).

In adopting a collaborative approach to health care delivery in prisons it is clear that there are barriers which will need to be overcome. Prisons have highly restrictive regimes; a highly mobile population and staff are often faced with time restraints (Prison Service and NHS Executive Working Group 1999). There is an inevitable incompatibility between custody and care. The question is whether or not it is possible for a health care ethos to thrive in an environment, which is dominated by other priorities such as control, and discipline (Willmott 1997). There has been much debate surrounding the therapy verses custody dilemma and it must be acknowledged that the inability or failure to detect poor or failing physical/mental health of prisoners may contribute to the increasing rates of morbidity and mortality in the prison population (Willmott 1997).

The constraints resulting from the necessary level of security in the prison setting are a barrier to achieving the goal of equivalence with the NHS but do not make it unattainable. There is a need to look at more imaginative and innovative ways to improve health care. In recent years the NHS has seen a tremendous shift towards the development of new technologies and treatment modalities (May *et al.* 2001). The development of NHS direct and the increasing use of telecommunication technology presents a mode of health care delivery which may offer advantages.

## Telemedicine

Telemedicine has proved attractive to some clinicians and health policy makers in the UK (May *et al.* 2001). Telemed-

icine is often seen as a solution to key problems of modern health care systems which include cost containment and equitable access to health care (Lehoux *et al.* 2002). The continual emergence of new information and communication technologies has been instrumental in forming new ways to deliver health care services to individuals (Norris 2002).

Telemedicine is defined as the delivery of health care with the patient and health care professional at different locations, and is facilitated through the use of information and communication technologies (Ball *et al.* 1993, NHS Executive 1998). Telepsychiatry is that branch of telemedicine that focuses on mental health applications. In the UK the commitment to improve health care delivery, by utilizing information and communication technologies, is being considered by the Department of Health and the National Health Service (NHS Executive 1998). Telemedicine has had a mixed reception in the UK; at a policy level it seems to offer a technological 'fix' to some of the key problems around structural and spatial inequalities in access to health care. For this reason it has attracted the interest and support of government departments and related agencies. In particular, it has achieved a degree of prominence in government policy (May *et al.* 2001).

## Telepsychiatry

Telepsychiatry was thought to be one of the first health specialties to use telemedicine technology. As early as the mid-1950s the delivery of psychotherapy via a video became a reality when the Nebraska Psychiatric Institute in the USA established a video link with one of its satellite hospitals (Wittson *et al.* 1961). The general consensus of this venture was that it was both useful and beneficial. However, there was virtually no empirical examination of outcome to support this application.

More recent advances in technology have supported the use of video conferencing systems which provide effectively real-time, interactive audio and visual communication through the use of ISDN (integrated services digital network) telephone lines. In countries such as Australia and the USA where there are similar barriers to access to health care telemedicine, services have been developed to reduce inequalities in service provision to remote areas (Preston *et al.* 1992, Yellowlees & McCoy 1993, Stamm 1998). Telepsychiatry applications have been used in the US prison system for example, Zaylor *et al.* (2000) established a telepsychiatry pilot project between the Kansas University Medical Center and Lyon County Jail. Their main findings indicate that moderately to severely ill inmates with a broad range of psychiatric illness can be seen and treated effectively using a video conferencing system. Further work

by Zaylor *et al.* (2001) has shown the service to be effective from both the prisoners' and the psychiatrists' perspective in terms of satisfaction. Forensic telepsychiatry services have also been reported to be a cost-effective method of health care delivery in the USA (Zollo *et al.* 1999).

The use of telemedicine continues to expand in all fields (Field 1996). In particular, there seems to be a great number of mental health professionals that are beginning to deliver various types of mental health services over distance (Brown 1998, Stamm 1998, Ermer 1999, Simpson *et al.* 2001). Although telemedicine has been conducted through two-way audio systems for some time, the ease of access to inexpensive new types of asynchronous and synchronous technologies has re-opened questions about the effectiveness of mental health services when delivered through these technologies. Unfortunately the expanding use of this technology has not been matched with a corresponding examination of these issues (Currell *et al.* 2001).

Having reviewed the published research it seems to suggest that health care delivery using a teleconferencing link is acceptable to patients in a variety of circumstances, but, by addressing this issue in a rather superficial manner, most studies have produced more questions than answers. The vast majority of research conducted has focused primarily on technological suitability, and has only explored the reliability of using such methods in a limited way (Baer *et al.* 1995, Baigent *et al.* 1997, Elford *et al.* 2000, Jones *et al.* 2000). Mair & Whitten (2000), who have reviewed the literature on telemedicine, conclude that methodological deficiencies in the published research affect the validity and generalizability of results and future research needs to be more scientifically robust in order to assist policy makers in reaching decisions about the appropriate use of this technology.

Video conferencing offers real opportunities to help reduce the level of health care inequality experienced by prisoners. It has the potential to improve access to a better range and quality of services for a population that is hard to reach by conventional means. However, as telemedicine technologies bring new opportunities, they also bring new risks (Rigby *et al.* 2001). Telemedicine is not a panacea and there still remain many unresolved issues. Unresolved basic questions from the past remain unanswered. There is still uncertainty as to whether clinicians can safely provide health care services through telemedicine, which technology configurations provide more accurate results and whether various technologies are more cost-effective (Moore 1999). Other issues of concern relate to the nature and extent of the clinician–patient relationship in teleconsultations. Wootton (1996) observed there is no consensus as to whether telemedicine enhances or damages the therapeutic relationship. There are a number of reasons why it is essential to understand how telemedicine affects clinician–patient communication. Not only do communication behaviours reflect underlying decision-making roles but they may also have an impact upon the outcome of a clinical consultation (Miller 2001). Further concerns include data security, patient privacy and confidentiality (Stanberry 2000, Conford & Klecun-Dabrowska 2001). At present there are no universal guidelines, standards or regulations which would ensure that telemedicine is practiced legally and ethically.

The use of video conferencing in the deliver of health care to prisoners raises some very important ethical and legal questions. It is not fully understood how assessments and treatment conducted by telepsychiatry resemble conventional psychiatric practice and how it differs. Bearing in mind that conclusions drawn from a psychiatric assessment can have significant implications for a prisoner, questions about the validity and reliability of such assessments are very relevant. I am conducting a research study which seeks to address some of the current gaps in understanding relating to the use of teleconferencing systems within the prison environment. It is hoped that by conducting a methodologically robust, hypothesis-driven research study, this will increase the current evidence base and help inform decisions about the reliability of using this technology.

## Research study

I am currently conducting an evaluative study which aims to compare an innovative telepsychiatry service with an already established visiting service to a prison. This study is being conducted between a medium secure service and a prison situated in the Southeast of England. Currently the medium secure service provides a contractual visiting service to the prison. A psychiatrist travels to the prison once a week and runs a psychiatric clinic which involves the mental health assessment and treatment of prisoners. In June 2001 a telepsychiatry link was established which provides a video conferencing link between the secure unit and the prison. This system consists of a personal computer with H.320 cruiser 75 VCON software, which is a low cost video conferencing desktop system with dual communication capability. The system is linked by one ISDN telephone line which runs at 128 Kbit/s. It was anticipated that this system could be used as a way of supplementing the already existing service. However, no evaluation of this service had been conducted and there was very limited empirical evidence to support its introduction. This led to the design of this evaluative study. This study commenced in December 2001 with three main aims:

1. to establish the validity and reliability of the telepsychiatry interview as an instrument for eliciting and rating psychiatric signs and symptoms

© 2004 Blackwell Publishing Ltd, *Journal of Psychiatric and Mental Health Nursing* 11, 461–468

2. to determine the level of satisfaction with the telepsychiatry service from the perspective of the patient, psychiatrist and prison staff; and
3. to determine the cost of the telepsychiatry service compared to the existing visiting psychiatric service.

The first 6 months of the study was spent establishing the link and forming working relationships with the prison staff that would be assisting me with the recruitment of prisoners. Between July 2002 and April 2003 a random sample of 80 prisoners in contact with the prison mental health service were assessed by a psychiatrist and myself simultaneously. The psychiatrist sat at the local site (medium secure unit) in front of the video conferencing equipment conducting an assessment of the prisoner's psychopathology using the Comprehensive Psychopathology Rating Scale (CPRS) (Asberg *et al.* 1978). The prisoner and I sat together at the remote site (prison health care centre). We both rated the prisoner's responses to the rating scale items.

Following the initial assessment interview I conducted semi-structured interviews with 20 prisoners and two members of health care staff. These interviews lasted approximately 30 minutes and the main focus of the interview was to illicit individual's views relating to satisfaction and acceptability of the telepsychiatry service.

Between October 2002 and May 2003 the researcher spent time observing the work load of the visiting service and the types and length of consultations which were conducted with prisoners. This information is being used to conduct a cost comparison between the telepsychiatry service and the already established visiting service.

The inter-rater reliability interviews generated quantitative data which were analysed using the Statistical Package for Social Sciences (SPSS). Kappa statistics (Altman 1991) were used to assess the reliability of the individual CPRS items for the telepsychiatry service vs. face-to-face interviews. The qualitative data generated from the satisfaction interviews were analysed using thematic analysis (Boyatzis 1998). This was followed by  the final analysis of the cost comparison data, which were analysed by identifying the fixed and the variable costs for each service. Sources of unit costs included those provided by health and social care (Netten & Curtis 2000). Other costs were calculated on the basis of information provided by the relevant local service providers. Data analysis were completed in February 2004 and future papers will report the results of the study.

## The potential application of telepsychiatry in psychiatric settings

Although telepsychiatry is not yet part of the routine mental health service delivery in the UK, a move towards its integration is imminent. A future mental health system has to meet the needs and demands of the population and meet the challenges contained in the recent Department of Health reports. These reports indicate that 'information technology must play a central role in the design of the system and suggest that the UK needs a renewed national commitment to build on information and communication infrastructures to support health care' (NHS Executive 1998). There are a number of currently available technologies and technological developments, which without doubt will radically change the way we provide mental health services during the next century.

Telepsychiatry has a great deal to offer in most psychiatric settings particularly in isolated hard-to-reach areas where patients and staff feel isolated from main stream services, or where patients, because of their particular attitudes or psychopathology, prefer the balance of power, level of intimacy or anonymity offered by digital communication.

When considering the use of communication technologies, there are a number of potential clinical applications in psychiatry. Potential applications include the use of video conferencing to conduct diagnostic assessment, mental state assessment, treatment, aftercare and education. Different forms of therapy could also be delivered using video conferencing including psychotherapy, cognitive behavioural therapy, psychosocial interventions and family therapy. It is also feasible to conduct case conferences and discharge planning.

Telepsychiatry could also offer potential benefits to staff including reduced travel times, increased easier access to support, supervision, and educational opportunities. Access to support and supervision can be difficult for some health care professionals, particularly individuals who work in the community or individuals who work in isolation in specialist posts. Telepsychiatry can offer opportunities for network supervision from peers or senior clinicians enabling real-time supervision, which allows professionals to discuss complex, and sometimes worrying issues. The education and training needs of health care staff working in the field of psychiatry are diverse. Many educational opportunities require significant travel time and release from work. Video conferencing could facilitate access to training and educational sessions for a greater number of professionals in a more flexible manner.

## Impact on practice

The introduction of any new technology will obviously impact upon practice and indeed alter the way practice is delivered. It is essential that the introduction of any new applications is understood and is used to enhance the deliv-

ery of psychiatric services without compromising the quality of care. Telepsychiatry is already being successfully used in the field of psychiatry for a variety of clinical and educational purposes (Hilty *et al.* 2003). Research studies have shown telepsychiatry to be reliable compared with face-to-face encounters in terms of diagnosis for a wide range of disorders in adults and children. Despite this, adoption of telepsychiatry has been slow in the field of psychiatry in the UK for several reasons (May *et al.* 2001). Even though patients appear quite willing to try new technologies and appear satisfied with them, health care professionals remain wary (Hu *et al.* 1999). Psychological resistance to change, lack of experience or training, fear of technology, effects on communication and relationship building and concerns about confidentiality appear to be some of the barriers, which need to be overcome.

The future challenges for adopting telepsychiatry into mainstream practice do seem to be of the human, rather than the technological variety. At present telepsychiatry offers a novel way of working and that requires substantial attitudinal change by the clinician. Clinicians must also recognize that the use and adoption of telepsychiatry may require different clinical skills, for example, the use of specific communication skills, and new approaches to information giving. Telepsychiatry may alter the nature of the clinical encounter and the relationship between the professional and the patient and fundamentally change the way clinicians practice. For these reasons it does not seem surprising that there appears to be some resistance to change. If these factors are to be overcome, significant investment in staff development and training will need to be made. There is little point in installing telepsychiatry systems if clinicians fail to see the advantages to their use. A number of these factors have led to the downfall of previous telepsychiatry programmes. For telepsychiatry, its acceptance and use will depend on how well future programmes address clinicians' concerns and anxieties and deal with potential pitfalls.

## The challenges of establishing a telepsychiatry service in a prison

Establishing a telepsychiatry service within a prison has offered a number of challenges. The very nature of the environment and the culture within prisons can deter innovative practice. All institutions have their own culture and the prisons are no exception. The health care culture is influenced by traditional attitudes, with an emphasis on security and less of a focus on health care practice. The prison service is currently undergoing a period of transition and there remain many uncertainties about the future of prison health care. This period of change has caused increased

anxiety, and there is evidence of fear of change among health care staff (Prison Service and NHS Executive Working Group 1999). This type of culture can make the introduction of a new service difficult, but not impossible. Ensuring adequate provision of accessible and good quality information and training is necessary if video conferencing is to be introduced more widely in the clinical context.

The initial reactions to the telepsychiatry service included ready acceptance by prisoners. Spending time with each individual and familiarizing them with the technology appeared to reduce anxiety levels significantly. Moderately to severely ill prisoners with a broad range of psychiatric symptoms have been interviewed. No prisoner refused to use the equipment, nor has any prisoner walked out of an interview.

At present no other prisons in England and Wales have telepsychiatry services. It is not anticipated that telepsychiatry will replace existing services or reduce the need for face-to-face contact but if the outcomes of the study are positive it will allow greater diversity of services delivered with greater efficiency (Kavanagh & Yellowlees 1995). Telepsychiatry could provide obvious benefits for prisoners including early intervention and improved follow-up, and it could assist in speeding up transfer to hospital. Despite growing enthusiasm for this service telepsychaitry will require the support and vision of the prison service, health service and government departments to survive. Telepsychiatry will need to be embraced as an integral model of service delivery which will require an infrastructure and ongoing funding. There is also a need to formalize policy and standards regarding telepsychiatry use to ensure safe and consistent practices.

## Acknowledgements

The research upon which this publication is based has been supported by funding from the NHS National Programme on Forensic Mental Health R&D. However, the views expressed in this publication are those of the authors and not necessarily those of the Programme or the Department of Health. I would like to offer my thanks to Chris Devonshire, Professor Judith Lathlean, Dr Luke Birmingham and Dr Jerry Warr who are providing me with support and supervision in conducting this research study.

## References

Altman D. (1991) *Practical Medical Statistics for Medical Research*. Chapman and Hall, London.
Asberg M., Montgomery S.A., Perris C., Shalling D. & Sedvall G. (1978) The Comprehensive Psychopathology Rating Scale. *Acta Psychiatrica Scandinavica* 271, 5–27.

Development and evaluation of telepsychiatry service for prisoners

Baer L., Cukor P., Jenike M.A., Leahy L., O'Laughlen J. & Coyle J.T. (1995) Pilot studies of telemedicine for patients with obsessive compulsive disorder. *American Journal of Psychiatry* **152**, 1383–1385.

Baigent M.F.L., Ioyd C.J., Kavanagh S.J., Ben-Tovim D.I., Yellowlees P.M., Kalucy R.S., Bond M.J. & Bond M.J. (1997) Telepsychiatry 'tele' yes, but what about the 'psychiatry'? *Journal of Telemedicine and Telecare* **3** (Suppl. 1), 3–5.

Ball C.J., Scott N., McLaren P.M. & Watson J.P. (1993) Preliminary evaluation of a low-cost videoconferencing system for remote cognitive testing of adult psychiatric patients. *British Journal of Clinical Psychology* **32**, 303–307.

Birmingham L., Mason D. & Grubin D. (1996) Prevalence of mental disorder in remand prisoners: consecutive case study. *British Medical Journal* **313**, 1521–1524.

Boyatzis R. (1998) *Thematic Analysis and Code Development Transforming Qualitative Information*. Sage Publications, Thousand Oaks, CA.

Brooke D., Taylor C. & Gunn J. (1996) Point prevalence of mental disorder in unconvicted male prisoners in England and Wales. *British Medical Journal* **313**, 1524–1527.

Brown F.W. (1998) Rural telepsychiatry. *Psychiatric Services* **49**, 963–964.

Conford T. & Klecun-Dabrowska E. (2001) Ethical perspectives in evaluation of telehealth. *Cambridge Quarterly of Healthcare Ethics* **10**, 161–169.

Currell R., Urquhart C., Wainwright P. & Lewis R. (2001) Telemedicine v face to face patient care: effects on professional practice and health care outcomes. *Cochrane Review, Cochrane Library* issue 3, Oxford.

Department of Health (1998) *A First Class Service: Quality in the New NHS*. HMSO, London.

Department of Health (1999) *National Service Framework for Mental Health Modern Standards and Service Models*. HMSO, London.

Department of Health, HM Prison Service, The National Assembly for Wales (2001) *Prison Health Handbook*. Department of Health, London.

Elford R., White H., Bowering R., Ghandi A., Maddiggan B., St John K., House M., Harnett J., West R. & Battcock A. (2000) A randomized controlled trial of child psychiatric assessments conducted using video-conferencing, *Journal of Telemedicine and Telecare* **6**, 73–82.

Ermer D.J. (1999) Experience with a rural telepsychiatry clinic for children and adolescents. *Psychiatric Services* **50**, 260–261.

Fazel S. & Danesh J. (2002) Serious mental disorder in 23 000 prisoners: a systematic review of 62 surveys. *Lancet* **359**, 545–550.

Field M.J. (1996) *Telemedicine: A Guide to Assessing Telecommunications in Health Care*. National Academy press, Washington DC.

Gunn J., Maden J. & Swindon M. (1991) *Mentally Disordered Prisoners*. Home Office, London.

Health Advisory Committee for the Prison Service (1997) *The Provision of Mental Health Care in Prisons*. HAC, London.

Hilty D., Liu W., Marks S. & Callahan E. (2003) Telepsychiatry the effectiveness of telepsychiatry a review. *CPA Bulletin de l'APC* October 2003, 10–17.

Home Office (1990) *Report of an Efficiency Scrutiny of the Prison Medical Service*. Home Office, London.

Home Office (2002) *Prison Population Brief England and Wales*. Available at http://www.homeoffice.gov.uk/rds/pdfs2/prisnov02.pdf (last checked 4 March 2003).

Home Office. (1996) *Patient or Prisoner?* HMSO, London.

Hu P.J., Liu Sheng O.R., Chau P.Y. & Tam K.Y. (1999) Examining technology acceptance model using physician acceptance of telemedicine technology. *Journal of Management Information Systems* **16**, 91–112.

Jones B.N., Johnston D., Reboussin B. & Vaughn-McCall W. (2000) Reliability of telepsychiatry assessments: subjective versus observational ratings. *Journal of Geriatric Psychiatry and Neurology* **14**, 66–71.

Kavanagh S.J. & Yellowlees P.M. (1995) Telemedicine – clinical applications in mental health. *Australian Family Physician* **24**, 1242–1246.

Lehoux P., Sicotte C., Denis J.-L., Berg M. & Lacroix A. (2002) The theory of use behind telemedicine: how compatible with physicians' clinical routines? *Social Science and Medicine* **54**, 889–904.

Maden A., Taylor C. & Brooke D. (1995) *Mental Disorder in Remand Prisoners*. Home Office, London.

Mair F. & Whitten P. (2000) Systematic review of studies of patient satisfaction with telemedicine. *British Medical Journal* **320**, 1517–1520.

Marshall T., Simpson S. & Stevens A. (2001) Health care needs assessment in prisons: a toolkit. *Journal of Public Health Medicine* **23**, 198–204.

May C., Gask L. & Atkinson T. (2001) Resisting and promoting new technologies in clinical practice: the case of telepsychiatry. *Social Science and Medicine* **52**, 1889–1901.

Miller E. (2001) Telemedicine and doctor-patient communication: an analytical survey of the literature. *Journal of Telemedicine and Telecare* **7**, 1–17.

Moore M. (1999) The evolution of telemedicine. *Future Generation Computer Systems* **15**, 245–254.

Netten A. & Curtis L. (2000) *PSSRU Unit Costs of Health Social Care*. PSSRU, Canterbury.

NHS Executive (1998) *Information for Health: An Information Strategy for the Modern NHS. A National Strategy for Local Implementation*. NHS Executive, London.

Norris A. (2002) *Essentials of Telemedicine and Telecare*. John Wiley and Sons, Chichester, UK.

Preston J., Brown F.W. & Hartley B. (1992) Using telemedicine to improve healthcare in distance areas. *Hospital and Community Psychiatry* **43**, 25–32.

Prison Service (1998) *Report of the director of health care 1996–1997*. Stationery Office, London.

Prison Service and NHS Executive Working Group (1999) *The Future Organisation of Prison Health Care*. Department of Health, London.

Reed J.L. & Lyne M. (2000) Inpatient care of mentally ill people in prison. *British Medical Journal* **320**, 1031–1034.

Rigby M., Forsstrom J., Roberts R. & Wyatt J. (2001) Verifying quality and safety in health informatics services. *British Medical Journal* **323**, 552–556.

Simpson J., Doze S., Urness D., Hailey D. & Jacobs P. (2001) Evaluation of a routine telepsychiatry service. *Journal of Telemedicine and Telecare* **7**, 90–98.

Singleton N., Meltzer H., Gatward R., Coid J. & Derek D. (1998) *Psychiatric Morbidity Among Prisoners in England and Wales*. HMSO, London.

Smith R. (1999) Prisoners: an end to second class health care? *British Medical Journal* **318**, 954–955.

Stamm B.H. (1998) Clinical applications of telehealth in mental health care. *Professional Psychology Research and Practice* **29**, 536–542.

Stanberry B. (2000) Telemedicine: barriers and opportunities in the 21st century. *Journal of International Medicine* **247**, 615–628.

The European Prison Rules (1987) *Recommendation Number Royal 87, 3 of the Committee of Ministers*. Council of Europe.

Willmott Y. (1997) Prison nursing: the tension between custody and care. *British Journal of Nursing* **6**, 3336–3340.

Wittson C.L., Affleck D.C. & Johnson V. (1961) TWO-WAY television in group therapy. *Mental Hospitals* **2**, 22–23.

Wootton R. (1996) Telemedicine: a cautious welcome. *British Medical Journal* **313**, 1375–1377.

Yellowlees P. & McCoy W.T. (1993) A health care system to help Australians. *Medical Journal of Australia* **159**, 437–438.

Zaylor C., Nelson E.L. & Cook D.J. (2001) Clinical outcomes in a prison telepsychiatry clinic. *Journal of Telemedicine and Telecare* **7** (Suppl. 1), 47–49.

Zaylor C., Whitten P. & Kingsley C. (2000) Telemedicine services to a county jail. *Journal of Telemedicine and Telecare* **6**, 93–95.

Zollo S., Kienzle M., Loeffelholz P. & Sebille S. (1999) Telemedicine to IOWA's correctional facilities: initial clinical experience and assessment of program costs. *Telemedcine Journal* **5**, 291–301.

Professional Psychology: Research and Practice
2000, Vol. 31, No. 5, 497–502

In the public domain
DOI: 10.1037/0735-7028.31.5.497

# Telehealth in the Federal Bureau of Prisons: Inmates' Perceptions

Philip R. Magaletta
Federal Bureau of Prisons

Thomas J. Fagan
CorEx Group

Mark F. Peyrot
Loyola College and Johns Hopkins University School of Medicine

Nationally, correctional psychologists are being asked to use behavioral telehealth interventions with mentally ill inmates. Beyond anecdotal stories, no information is available on which inmates might be best suited for such interventions. This article examines inmates' ($N = 75$) satisfaction with telehealth consultations, reporting initial satisfaction with the consultation process, more comfort with the process over time, and a willingness to return for follow-up. Inmates with thought disorders and inmates with mood disorders were satisfied with telehealth, but difficulties were noted when inmates became frustrated and angry. These difficulties may be accommodated by technological upgrades and spending more time preparing inmates for consultation.

Although most psychologists in corrections have heard about behavioral telehealth—the use of telecommunications and information technology to provide behavioral health services (Nickelson, 1998)—few have practiced it. Those who have, however, are beginning to ask for a delineation and refinement of the potential benefits. More specifically, they wish to understand which patients respond best to this mode of service delivery and under what conditions (Rabasca, 1998; Sleek, 1997; Stamm, 1998). Furthermore, although it has been clearly established that telehealth holds significant promise for cost containment in correctional facilities

(Brecht, 1998; Brunicardi, 1998; Grigsby et al., 1998; McCue et al., 1997; National Institute of Justice, 1999; Zincone, Doty, & Balch, 1997), the issue of how inmates will respond to telehealth consultations remains less clear.

Behavioral telehealth offers substantial benefits for inmates, correctional administrators and institutions, and the communities in which the institutions are located. Inmates are afforded greater access to community specialists, thus offering them a quality of care that may not otherwise be available. Telehealth provides the correctional institution with greater predictability and control in scheduling appointments and frequently allows emergency cases to be addressed more quickly. These aspects of telehealth translate into substantial cost savings that benefit the correctional administrators who are charged with operating the correctional institution. Finally, community safety factors are enhanced because inmates are not required to be moved to, through, and from the community for treatment (Magaletta, Fagan, & Ax, 1998). The breadth of such outcomes, in which all levels of the correctional system benefit (i.e., the community, administration, service providers, and inmates), is a rarity. These positive outcomes can be reinvested to yield a more efficient and higher quality correctional product. With almost one quarter of the 1.8 million incarcerated individuals in the United States today (Office of Justice Programs, 1999) being seriously mentally ill, telehealth offers the opportunity to radically alter and enhance the services that can be offered to this underserved population.

## The Federal Bureau of Prisons' Telehealth Pilot Program

Seeking the aforementioned benefits, the Federal Bureau of Prisons' Telehealth Pilot Program emerged from a collaboration between the U.S. Department of Justice and the U.S. Department of Defense. The project was operational from September 1996 through Spring 1999. A recently published report on outcomes of the project (National Institute of Justice, 1999) revealed numerous benefits, including substantial cost savings. On the basis of bene-

PHILIP R. MAGALETTA received his PhD in clinical psychology from Saint Louis University in 1996. He is the clinical training coordinator for psychology services at the Federal Bureau of Prisons in Washington, DC. His clinical and research interests are in systems theories, correctional psychology, and the psychology of religion.

THOMAS J. FAGAN received his PhD in clinical psychology from Virginia Polytechnic Institute and State University in 1977. He is the associate director of the CorEx Group, a private law enforcement training and consultation firm in Fredericksburg, VA.

MARK F. PEYROT received his PhD in sociology from the University of California, Los Angeles and served a postdoctoral fellowship in behavioral science at the University of Kentucky Medical Center. He is professor and chair in the Department of Sociology and director of the Center for Social and Community Research at Loyola College in Baltimore, MD. He is also on the research faculty in the Department of Medicine at Johns Hopkins University School of Medicine. He has published research on correctional psychology services and currently is working on a project to develop interactive computer programs for delivering counseling over the Internet.

AN EARLIER VERSION OF THIS ARTICLE was presented at the 106th Annual Convention of the American Psychological Association, August 1998, San Francisco. The views expressed in this article are those of the authors and do not necessarily represent the official policy or opinions of the Federal Bureau of Prisons or the Department of Justice.

CORRESPONDENCE CONCERNING THIS ARTICLE should be addressed to Philip R. Magaletta, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Electronic mail may be sent to pmagaletta@bop.gov.

fits identified in that report, the Federal Bureau of Prisons' administrative staff decided to expand the use of telehealth within the agency and are now in the process of installing telehealth technology in other correctional facilities around the country (P. Wise, personal communication, August 31, 1999).

During the pilot project, a hub site (Federal Medical Center, Lexington, KY) was connected with two remote sites (U.S. Penitentiary, Lewisburg, PA, and U.S. Penitentiary, Allenwood, PA). Mental health consultations were focused solely on medical management of the inmates. Inmates' attendance at the consultation was voluntary, and there was no consequence for refusing a consultation. Each consultation lasted between 10 and 30 minutes and occurred with the inmate, the referring psychologist, and a telehealth coordinator (i.e., person who operates the telehealth equipment) meeting in a room at the remote site. This site had previously been connected to the hub site where the psychiatrist and their telehealth coordinator were located. All consultations during the assessment period at the remote site were conducted in the same exact room for all inmates. This room was approximately 10 feet by 19 feet, carpeted but not soundproof, and painted powder blue to decrease reflection. Also, the psychiatrists at the hub site conducted all of their consultations from the same exact room during the assessment period.

The telehealth system that connected the two sites operated on 336-kilobits/second bandwidth and produced an audiovisual product with a 1-second delay. Bandwidth is a term that indicates both the speed and the amount of data that can be transferred across the phone lines between the remote and hub sites. It is the interaction of telehealth hardware, phone lines, and bandwidth that determines the amount of delay that is produced during a telehealth consultation.

Before the initial telehealth consultation, inmates were given a brief face-to-face explanation by the psychologist that the consultant was a psychiatrist from the Federal Medical Center in Lexington, KY; that he would appear to them on a TV screen; that the psychologist, the psychiatrist, and two telehealth coordinators would be sitting in during the consultations; and that the consultation was confidential and was not being broadcast or taped. During the consultation, the psychiatrist appeared to the inmate on a TV screen, and the inmate appeared to the psychiatrist on a computer screen. The main camera used for viewing was a single-chip, remote-controlled camera mounted on top of the viewing TV at the remote site and on top of the computer at the hub site. This camera had the ability to move up and down, zoom in and out, and focus near and far from either the remote or the hub site, without making any audible noise. During the consultation, the inmates did not have access to equipment; the image of the consultant was remotely controlled by either the hub or the remote site telehealth coordinators.

## Inmates' Assessment

Psychologists have played a critical consultation–liaison role during each inmate's telehealth consultation with psychiatrists. To date, several psychologists have participated in well over 1,000 mental health consultations. These psychologists have been responsible for interviewing the inmate, determining the inmate's need for service, triaging the case, preparing the inmate for the consultation, forwarding relevant case information to the psychi-

atrist before the consultation, sitting in on the consultation, and disseminating relevant information to appropriate treatment and custody staff after the consultation.

In addition to the consultation–liaison role, psychologists assigned to the U.S. Penitentiary in Allenwood, PA, developed a simple six-item questionnaire (see Table 1). Inmates were asked to voluntarily complete a questionnaire after each telehealth consultation. Questionnaires were distributed for an 18-month period beginning in January 1997. This questionnaire assessed each inmate's general satisfaction with the telehealth medium and process. It also served as a quality assurance and feedback monitoring tool for psychology staff assigned to the telehealth project. Each questionnaire item was scored on a 7-point Likert scale with responses ranging from most positive (3) to most negative (−3). The value of 0 was "neutral" for Items 1 through 4 and Item 6; for Item 5, 0 indicated that telehealth treatment was the same as face-to-face treatment that was received outside the prison. A composite variable for overall satisfaction with the consultation was created by averaging the individual items. The internal consistency reliability for this composite measure was .86.

At the conclusion of the data collection period, the inmates ($N = 75$; all male) rated at least one session. Inmates could rate multiple sessions, with six sessions being the highest number rated. Many inmates ($n = 33$) rated more than one session. The average number of sessions rated was 1.88. Unless otherwise noted, data are reported only for the initial session rated. For 52 of these inmates, their initial session was also the first time that they had been exposed to telehealth.

Throughout the 18-month period, inmates using the telehealth system received diagnoses from both the institution psychologist and the telehealth psychiatrist. On the basis of these diagnoses and for the purposes of statistical comparison, inmates were grouped into one of three diagnostic categories: thought disorder, affective disorder, or "other." Inmates were grouped into the thought disorder category ($n = 17$) when either the psychologist or the psychiatrist provided a diagnosis included in the "Schizophrenia and Other Psychotic Disorders" classification from the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.; *DSM–IV*;

Table 1
*Descriptive Statistics for the Consultation Questionnaire Completed by the Inmates*

| Item | M | SD | $p^a$ |
|------|-----|------|--------|
| 1. Could you see the person on the TV very well? ($N = 75$) | 2.44 | 1.42 | <.001 |
| 2. What did you think about the TV sound? ($N = 75$) | 2.04 | 1.51 | <.001 |
| 3. Did you feel the doctor could give you good treatment over the TV? ($N = 73$) | 2.04 | 1.56 | <.001 |
| 4. How do you feel about coming back to be seen by a doctor on TV? ($N = 75$) | 2.29 | 1.58 | <.001 |
| 5. How does this treatment compare with psychiatric treatment received outside the jail? ($N = 57$) | 0.47 | 1.85 | ns |
| 6. Would you recommend TV treatment to other inmates? ($N = 69$) | 1.58 | 2.09 | <.001 |

*Note.* Responses to the items ranged from most positive (3) to most negative (−3), with 0 as the scale midpoint.
<sup>a</sup> Indicates the probability that the mean was greater than 0.

American Psychiatric Association, 1994). If both the psychologist and the psychiatrist agreed on a diagnosis included in either the "Mood Disorders or Anxiety Disorders" section of *DSM–IV* (or an adjustment disorder with anxiety or depressed mood), then the inmate was placed in the affect disorder group ($n = 26$). Finally, if an inmate was not included in either category, he was then placed in the other category (personality disorders, substance abuse disorders, etc.; $n = 32$).

Using the aforementioned data, this study sought to answer the following four questions: (a) Are inmates generally satisfied with the telehealth medium and process? (b) Do the perceptions of inmates who have seen a psychiatrist in person at any time before or during their incarceration differ from those of inmates who have had *no previous experience* with a psychiatrist prior to their telehealth consultation? (c) Do inmates' perceptions regarding the telehealth process change over time? and (d) Does satisfaction with the telehealth process vary among inmates with differing diagnoses?

This study also attempted to answer a fifth question (i.e., Why do some inmates refuse to be seen through the telehealth medium?) by informally interviewing inmates who were referred but refused to participate in a psychiatric telehealth session. We believe that these inmates might hold important clues as to how telehealth technology might be better used or how resistance to telehealth might be more effectively countered.

*Inmates' Perceptions*

Descriptive data on each of the questionnaire items are presented in Table 1. All of the items had means greater than zero, indicating that inmates endorsed a positive rating of the telehealth program. For five of the six items, the ratings were significantly greater than zero. In terms of the overall quality of treatment that was delivered over telehealth (see Item 3), most inmates (81%) rated treatment positively, and 83% reported that they would come back to be seen by a doctor over telehealth. Also, more than two thirds (71%) stated that they would recommend telehealth to other inmates (Item 6).

A major factor with any telecommunications technology is the "hard variables"—audio and visual quality. Although most inmates in the sample reported positive perceptions along both dimensions, a difference in the distribution of scores for positive response between the audio and the visual questions was noted (see Table 1); a statistically significant difference was found between these two items, $t(73) = 2.43$, $p = .017$. The difference in the distribution of scores for the audio and visual transmission suggests that audio quality was the more sensitive and salient variable in the inmates' overall perceptions of telehealth. The implications of this finding are discussed later in the Implications for Practice section.

Of the inmates who had received face-to-face psychiatric treatment outside of prison and who answered Item 5 ($n = 57$), almost half (46%) felt that being evaluated over telehealth was comparable to the outside treatment they had received. The remaining inmates were divided in their responses, between telehealth treatment being better than face-to-face treatment received outside the prison (35%) and telehealth treatment being worse (19%), a difference that was not statistically significant. It is interesting to note that in most cases in which telehealth treatment was perceived as

being worse than outside treatment, it was not bad enough to generate a future refusal. In terms of group comparisons on the composite satisfaction variable, there was no significant difference in satisfaction between those inmates who had and those who had not previously seen a psychiatrist face-to-face at the U.S. Penitentiary in Allenwood, PA, prior to telehealth.

To determine whether inmates' perceptions of telehealth changed over time, we calculated the correlation between each of the session ratings and the place of the session in the series of ratings (first visit rated through sixth visit rated, coded as 1 through 6). For the composite variable, there was a significant correlation ($r = .20$, $p = .018$). Among the individual questionnaire items, only Item 5, which compared perceptions of telehealth with face-to-face treatment received outside of prison, was separately significant ($r = .36$, $p < .001$). Both of these findings suggest that inmates' perceptions regarding the telehealth program became more positive over time.

It is possible that a practice effect, which increased the inmates' ability to accommodate the speech delay, contributed to the aforementioned finding. It is also probable that the group of professionals who facilitated and participated in the telehealth consultations became more cohesive as a team and more competent in their use of the equipment and their troubleshooting skills over time. Ghosh, McLaren, and Watson (1997) noted in their case study of ongoing psychotherapy via a videolink, that both the patient and the provider displayed an ability to accommodate and adjust to the medium over time.

When inmates were grouped into diagnostic categories (thought disorder, affective disorder, and other), no differences emerged on the composite variable. However, when these diagnostic groups were compared on how telehealth compared with face-to-face treatment received outside the prison, the group with thought disorders reported a higher level of satisfaction with telehealth treatment inside of prison than did the group with affective disorders ($1.35 \pm 1.73$ vs. $-0.02 \pm 1.46$), $t(41) = 2.79$, $p = .008$.

Of the 394 consultations scheduled between August 1996 and June 1998, only 20 inmates (5% of the total scheduled consultations) refused to attend their session. Eleven of these inmates reported that they did not want any consultation with a psychiatrist, either face-to-face or over telehealth. Two inmates indicated that they were angry with the telehealth psychiatrist and therefore refused their follow-up sessions, and 1 inmate did not provide an explanation. The remaining 6 inmates (1.5% of the total scheduled consultations) reported that they did not attend the session because of the medium that was being used. More specifically, 2 of these 6 (and 1 other inmate who was never scheduled and therefore did not have the opportunity to refuse) were suspicious that "the government" would make an audio or video recording of their session and use it against them at some later date. Another inmate did not want to return after he had a nightmare about the psychiatrist chasing him with a video camera. Three other inmates reported that they felt nervous about being evaluated over telehealth and requested to be seen face-to-face. At the time of their refusal, such an option was possible. We should note that the psychologists' primary diagnostic impressions for all 6 inmates who refused because of the telehealth medium were made on Axis II. These men were not believed to have a formal thought disorder. The chronic nature of Axis II disorders, and particularly those found with regularity among samples of high-security inmates (i.e., antisocial, paranoid,

and narcissistic), made these inmates difficult to treat regardless of the mode of service delivery (Joseph, 1997).

Finally, several cautions concerning our instrumentation are in order. There were no controls for response bias, and the items included in the questionnaire were somewhat simplistic. Future endeavors will need to delineate questions that lend conceptual clarity to the "overall satisfaction with telehealth" outcome (see Mekhjian, Turner, Gailiun, & McCain, 1998). Perhaps any "special" or unique experience that occurs to one in prison is magnified in light of the typically self-eroding and downtrodden experience of incarceration. It is also possible that telehealth helps inmates feel as if they are more a part of society by partaking in the "technological revolution" that is occurring outside of prison. As an older inmate said, "Doc, last time I was out, Pac-Man was the latest video game."

## Implications for Practice

Our personal experience with conducting telehealth consultations suggests that audio quality is the most important variable in perceiving telehealth services as beneficial, particularly for inmates who present in a state of high affective arousal and who have a history of acting out. For example, as these patients begin to express anger, rage, and other chaotic emotions, it becomes necessary for the consultant to provide accurate and immediate (i.e., real-time) visual and verbal feedback. It may even become necessary to verbally interrupt the patient to initiate a de-escalation process. With the 1-second delay in transmission, it becomes difficult to implement these objectives.

In terms of the visual delay and the less-than-perfect resolution, the typical nonverbal cues that emerge when anger is experienced may be difficult for the provider to detect. Because the emotion of anger usually involves physiological changes in the person experiencing it, being able to see nonverbal cues is critical for making a quick and accurate assessment (Matsakis, 1998). Covert cues such as a shift in eye gaze or initial flushing of the face may be difficult to detect, and overt behaviors such as clenched fists may simply be out of range on the provider's TV or computer screen (Heath & Luff, 1992).

In terms of the audio delay, Fussell and Benimoff (1995) noted that when there is a delay in transmission, the area of communication most likely to be affected is the "turn-taking" between sender and receiver. Although we did not empirically capture this interaction, we did observe that during heated exchanges the patient and the provider often attempted to talk in real time but actually "walked" on the transmitted speech of one another. In these scenarios, neither patient nor provider hears one another. This further frustrates the patient, escalating emotional turmoil and increasing affective expression. Fueling this escalation is the fact that, as emotion begins to be expressed, the patient loses the ability to concentrate or focus on accommodating the delay in speech. Our hypothesis is that feeling inwardly overwhelmed, the patient becomes less able to outwardly accommodate the medium being used.

There are several ways of working with this problem. First, the health care provider at the hub site should have a greater degree of awareness when working with volatile or angry patients during consultation. Being vigilant in ensuring that these types of patients are done speaking before responding to them, and perhaps limiting

affectively charged topics, is likely to pay dividends. Second, increasing bandwidth can decrease the delay in speech and video and may be worth pursuing for those patients who present with a high degree of affective arousal. Third, extra time and effort can be spent preparing these types of patients for consultation. Coaching them about the delay in speech and separating this out from how the psychiatrist feels about them is worth the effort. Finally, if a last measure is needed, the consulting psychologist can "step in"—live and in person—and begin immediate work to de-escalate the patient.

We should note that in the scant literature and case vignettes that exist regarding behavioral telehealth, there is no mention of the aforementioned phenomena. It is possible that our experiences reflect the reality that high-security inmates have a lower frustration tolerance and more overt anger than a lower security or a nonincarcerated population might have. For high-security correctional institutions, it may be advisable to purchase telehealth equipment and phone lines that favor precision in audio quality.

It is of particular interest that those who can receive the most benefit from psychiatric intervention, those with thought disorders, had such positive perceptions of telehealth. Clinicians often express appropriate hesitation about the possible negative interaction of real technology with delusions or other psychotic processes. Some anecdotal evidence exists to suggest that clinicians should be cautious about using telehealth with those who have a history of delusions of reference from communications technology (McLaren, Ball, Summerfield, Watson, & Lipsedge, 1995). Other literature suggests that no caution is needed—individuals with thought disorders do not experience an exacerbation of delusions when seen over telehealth (Dongier, Tempier, Lalinec-Michaud, & Meunier, 1986). Finally, Zarate et al. (1997) reported that at least half of their sample of patients with schizophrenia actually preferred telehealth interviews to live ones, and similar to our finding, their respondents with schizophrenia reported equal or more positive perceptions of telehealth than did a sample of respondents with obsessive-compulsive disorder.

Two examples of inmates with thought disorders from our sample are worthy of note. One was an inmate who had consistently expressed his delusions of reference from the TV in his housing unit. For this reason, we were particularly hesitant to have him evaluated over telehealth. When the consultation occurred despite this hesitation, the inmate's only comment was "See, I told you the television talks to me!" This was used as an opportunity to discuss the difference between real-time television and television that is broadcast after taping. However, the inmate's delusional system still was not altered. Although telehealth did not exacerbate his delusion, it may have served to reinforce it. In another case, a schizophrenic inmate saw his picture on the screen and believed that it was his imposter (the one he had been telling us about). After this incident, we decided not to use the "picture in picture" option (where the inmate simultaneously sees a full image of the consultant as well as a smaller image of himself in the corner of the screen) as part of our consultation with patients with thought disorders. In both cases it was clear that although there was an interaction between technology and the delusional system of the patient, sound treatment could still be provided.

Several ideas about the reason for thought-disordered patients' positive perceptions have been presented. One is that individuals with thought disorders are overstimulated in social and interper-

sonal relationships, and telehealth gives them enough interpersonal distance to decrease their anxiety. When Zaylor (1998) saw his patients over telehealth, they had control over how close or how far away they wanted him to appear on their TV. He reported that letting the thought-disordered individual have this control of the "interpersonal space" is calming. Stamm (1999) also discussed the idea of telehealth providing restraint in the interpersonal environment and suggested that thought-disordered individuals are less anxious when the environment is structured or constrained. This also lends some credence to our observation that those who present in a high state of affective arousal, for example, those who are angry, do less well over telehealth—they rebel when they perceive constraint; it only serves to fuel their already hot affect.

Although much has been said about the interaction of diagnosis, inmates, and technology, we have yet to discuss the attitudes of the health care providers themselves toward telehealth. As professionals at the core of any telehealth operation, their attitudes can either facilitate or negate the successful implementation of a telehealth system. It is not uncommon to find initial resistance to "distance" treatment approaches among psychologists. Most psychologists were trained in models that inherently assumed that the consumer would receive services face-to-face, in the same room. Many professionals have had repeated exposures to the pairing of interpersonal and physical "space." For most psychologists, the "therapeutic relationship" describes an attachment with a very concrete manifestation—the client physically comes to an office, and the relationship is born there. In some instances, therapists have felt that their clients would not agree to "distance" approaches to treatment. At this time, it seems that for the majority of clients who have been evaluated over telehealth, this belief may simply be more salient for the provider (Dankins, 1997; Magaletta, 1997; McLaren & Ball, 1997; Ruskin et al., 1998; Wheeler, 1998; Zarate et al., 1997).

Another aspect of professional resistance that is rare but that should be noted comes from telehealth's ability to increase access to care. This feature expands the market for other professionals to provide services. In terms of correctional psychology, this is much less of a concern for traditional correctional psychologists who, by the very nature of their duties, must be in the correctional institution. However, psychologists who have correctional "specialties" (e.g., forensic assessments, counseling of HIV-positive inmates, sex offender treatment and assessment, early parole assessments) are likely to experience increased competition in the delivery of services.

In addressing professional resistance, we have several recommendations. First, clinicians should receive standardized training prior to using telehealth. Such training should emphasize the critical element of developing a collaborative team approach if more than one person will be involved in the telehealth consultation process (Magaletta et al., 1998). This can be facilitated by giving the providers ample time to get to know one another. They should also be coached to pay particular attention to the types of information they might need from one another prior to conducting a consultation with a given client. Training should also present information on the limits of telehealth. For example, in correctional work, training might include cautioning clinicians about the use of telehealth with affectively aroused inmates.

Regarding the emergence of a successful therapeutic relationship over telehealth, we have one core recommendation. Consis-

tency is likely to be the key factor lending itself to a successful therapeutic relationship, not the distance between the provider and the consumer. We hypothesize that stability and consistency in the rooms where both the provider and the client are viewed are essential. It may be the case that the stability of rooms, being seen in the same room across sessions, does much to ameliorate the perception of distance and thus helps form the membrane of the therapeutic relationship.

Finally, instead of fearing increased market competition, we encourage clinicians to look toward those they serve and determine in what other ways telehealth might benefit them. Although most studies that currently exist on telehealth in corrections have concerned the medical management of mentally ill inmates, other areas of psychological services are expanding. B. Sutton (personal communication, February 12, 2000), with the California Department of Corrections, has been successful in conducting a psychoeducational anger management group over telehealth. Magaletta et al. (1998) mentioned the potential for more inmates to be seen in speciality services such as neuropsychological, geriatric, and sex offender assessments and treatment. Family visits may also be managed with telehealth technology and may ameliorate the problem of geographically remote prisons. As in any visiting scenario, the issue of who organizes and supervises such visits would have to be explored. A final area that is well-matched for telehealth is prerelease planning and preparation for inmates being released back into the community. To be able to build a technological bridge from behind the wall to the community that will receive the inmate would do much to ensure a smoother transition back to society. Inmates would clearly benefit from having a chance to meet, review, and discuss their release conditions and plans with those who will be helping with this process.

It is clear that telehealth is positioned to be the premier vehicle for health care delivery in corrections. Correctional psychologists are among the first to have access to and to explore the limits and opportunities that such a system can offer those whom they serve. Heeding Stamm's (2000) warning that telehealth is a service delivery mechanism and not a treatment protocol, we urge psychologists to maintain a pioneering spirit and navigate this vehicle toward those we serve.

## References

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.

Brecht, R. M. (1998). Correctional telemedicine. In *Telemedicine sourcebook* (pp. 146–151). New York: Faulkner & Gray.

Brunicardi, B. O. (1998). Financial analysis of savings from telehealth in Ohio's prison system. *Telehealth Journal, 4*(1), 49–54.

Dankins, D. R. (1997, June). Market targets 1997. *Telemedicine and Telehealth Networks,* 25–29.

Dongier, M., Tempier, R., Lalinec-Michaud, M., & Meunier, D. (1986). Telepsychiatry: Psychiatric consultation through two-way television. A controlled study. *Canadian Journal of Psychiatry, 31,* 32–34.

Fussell, S. R., & Benimoff, I. (1995). Social and cognitive processes in interpersonal communication: Implications for advanced telecommunications technologies. *Human Factors, 37,* 228–250.

Ghosh, G. J., McLaren, P. M., & Watson, J. P. (1997). Evaluating the alliance in videolink teletherapy. *Journal of Telemedicine and Telecare, 3*(Suppl. 1), 33–35.

Grigsby, J., Sandberg, E. J., Kaehny, M. M., Kramer, A. M., Schlenker, R. E., & Shaughnessy, P. W. (1998). Analysis of expansion of access to

MAGALETTA, FAGAN, AND PEYROT

care through use of telemedicine and mobile health services. In *Tele-medicine sourcebook* (pp. 173–189). New York: Faulkner & Gray.

Heath, C., & Luff, P. (1992). Media space and communicative asymmetries: Preliminary observations of video-mediated interaction. *Human–Computer Interaction, 7,* 315–346.

Joseph, S. (1997). *Personality disorders: New symptom-focused drug therapy.* New York: Haworth Medical Press.

Magaletta, P. R. (1997, November). Endorsing telehealth [Letter to the editor]. *APA Monitor,* p. 6.

Magaletta, P. R., Fagan, T. J., & Ax, R. K. (1998). Advancing psychology services through telehealth in the Federal Bureau of Prisons. *Professional Psychology: Research and Practice, 29,* 543–548.

Matsakis, A. (1998). *Managing client anger.* Oakland, CA: New Harbinger.

McCue, M. J., Mazmanian, P. E., Hampton, C., Marks, T. K., Fisher, E., Parpart, F., & Krick, R. S. (1997). The case of Powhatan Correctional Center/Virginia Department of Corrections and Virginia Commonwealth University/Medical College of Virginia. *Telehealth Journal, 3*(1), 11–17.

McLaren, P., & Ball, C. J. (1997). Interpersonal communications and telemedicine: Hypotheses and methods. *Journal of Telemedicine and Telecare, 3*(Suppl. 1), 5–7.

McLaren, P., Ball, C., Summerfield, A. B., Watson, J. P., & Lipsedge, M. (1995). An evaluation of the use of interactive television in an acute psychiatric service. *Journal of Telemedicine and Telecare, 1,* 79–85.

Mekhjian, H., Turner, J. W., Gailiun, M., & McCain, T. (1998). Patient satisfaction with telemedicine in a prison environment: A matter of context. *Journal of Telemedicine and Telecare, 5,* 55–61.

National Institute of Justice. (1999). *Telemedicine can reduce correctional health care costs: An evaluation of a prison telemedicine network* (Report No. NCJ 175040). Washington, DC: U.S. Department of Justice.

Nickelson, D. W. (1998). Telehealth and the evolving health care system: Strategic opportunities for professional psychology. *Professional Psychology: Research and Practice, 29,* 527–535.

Office of Justice Programs. (1999). *Mental health and treatment of inmates and probationers* (Report No. NCJ 174463). Washington, DC: U.S. Department of Justice.

Rabasca, L. (1998, August). Study probes how patients are affected by telehealth. *APA Monitor,* p. 31.

Ruskin, P. E., Reed, S., Kumar, R., Kling, M. A., Siegel, E., Rosen, M., & Hauser, P. (1998). Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. *Psychiatric Services, 49*(8), 1086–1088.

Sleek, S. (1997, August). Providing therapy from a distance. *APA Monitor,* pp. 1, 38.

Stamm, B. H. (1998). Clinical applications of telehealth in mental health care. *Professional Psychology: Research and Practice, 29,* 536–542.

Stamm, B. H. (1999, August). Discussant. In M. Mahue & R. Ax (Cochairs), *Telehealth and the legal system—Corrections.* Symposium conducted at the 107th Annual Convention of the American Psychological Association, Boston.

Stamm, B. H. (2000, Winter). Telehealth puts public service caregiving in focus. *Public Service Psychology, 25,* 1, 19.

Wheeler, T. (1998, April). Thoughts from tele-mental health practitioners. *Telemedicine Today,* 38–40.

Zarate, C. A., Weinstock, L., Cukor, P., Morabito, C., Leahy, L., Burns, C., & Baer, L. (1997). Applicability of telemedicine for assessing patients with schizophrenia: Acceptance and reliability. *Journal of Clinical Psychiatry, 58,* 22–25.

Zaylor, C. (1998, August). Planning and implementation of an interactive televideo clinic. In M. Maheu & A. Anker (Cochairs), *Telehealth II—A beginner's blueprint for effective program design.* Symposium conducted at the 106th Annual Convention of the American Psychological Association, San Francisco.

Zincone, L. H., Doty, E., & Balch, D. C. (1997). Financial analysis of telehealth in a prison system. *Telehealth Journal, 3*(4), 247–255.

Received December 1, 1999
Revision received March 22, 2000
Accepted April 12, 2000 ∎

TELEMEDICINE and e-HEALTH
Volume 11, Number 5, 2005
© Mary Ann Liebert, Inc.

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

# Rural Jail Telepsychiatry: A Pilot Feasibility Study

LUISA MANFREDI, J.D., M.P.H.,[1] JOANN SHUPE,[2] and STEVEN L. BATKI, M.D.[1,3]

## ABSTRACT

New York State has a large rural population, and many of the jails in rural areas have minimal or no psychiatric services available on site. Cost of transport to off-site psychiatric services and the safety issues related to moving inmates from a secure building may limit inmate access to appropriate psychiatric services. This feasibility study describes a project that provided telepsychiatric consultation to increase access to psychiatric treatment in an underserved rural jail in upstate New York. Subjects were consenting jail inmates who requested or were found to be in need of psychiatric care. The project provided interactive two-way audio–video communication between the psychiatrist located in an urban university medical center and subjects who were incarcerated 182 miles away. During the project period, 15 inmates were assessed and treated in 37 consultations. Subjects were predominantly young white males with anxiety, mood, and substance use disorders. Services were readily accepted by inmates and staff. Telepsychiatric examination and treatment appears to be a feasible method to increase access to mental health care in rural jails. Future advocacy for increased mental health services in rural areas in criminal justice setting is likely to depend on further evidence of favorable cost benefit.

## INTRODUCTION

RURAL POPULATIONS have significant mental health-care needs, but they face substantial barriers to access to care. Distance, inadequate funding, lack of available providers, and other difficulties frequently pose challenges to the delivery of care in small or isolated communities.[1] Telepsychiatry has been an approach used in rural and frontier areas to provide mental health services.[2] In 1998, the American Psychiatric Association (APA) published a resource document on telepsychiatry via videoconferencing. Approved by APA Board of Trustees, it emphasized the broadening scope of telemedi-

cine in general—and by extension, telepsychiatry—as well as its widespread application and decreasing costs. Rural telepsychiatry has gained a great deal of attention, and generally seems to be well accepted.[3] Debate remains, however, regarding whether telepsychiatry can be both clinically effective and cost effective.[4–8]

In contrast to prisons, jails provide short-term, generally pretrial incarceration for large numbers of inmates in the United States. Some rural jails in New York State have been unable to deliver adequate mental health care, even though they are required by law to provide such services.[9] Inmates may go without appropriate assessments or treatment due to lim-

[1]Department of Psychiatry, and [2]Department of Telemedicine, SUNY Upstate Medical University, Syracuse, New York.
[3]VA Center for Integrated Healthcare, Syracuse VA Medical Center, Syracuse, New York.

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

itations imposed by funding shortages and by security priorities. Jails may be unable to provide consistent or timely mental health care to inmates because they may not always have access to staff adequately trained to assess inmates for mental illness. Most jails do not have psychiatrists on site, leading to the necessity of finding outside providers, such as local mental health clinics, emergency departments, or forensic psychiatric centers. These facilities are often situated at a distance from the jail and require transport of inmates. Other concerns within a jail setting include reduced staffing while corrections officers transport inmates and the increased security risks during the time the inmates are outside of locked facilities. Moreover, delayed or limited access to mental health care in jails is likely to lead to behavioral and other problems because of inadequate treatment of mental disorders.

Little precise data are available regarding either the prevalence of mental illness among jail inmate populations or the exact type of care provided by individual jails. The Conference on Local Mental Hygiene Directors, in its report on forensic mental health in New York State,[9] examined the delivery of jail-based mental health services in each of the counties in New York State. It found that many county jails had no beds dedicated to mentally ill inmates. Mental health services were often provided by local county mental health clinics, usually located at some distance from the jails.

Telepsychiatry projects have been implemented in prison settings as a way of providing greater access to care.[10] There is little published information, however, on the use of telepsychiatry in jail settings. One study that is available found that the monthly demand for mental health consultations was five times greater than projected in a local jail.[11]

In this paper, we describe a pilot feasibility study of telepsychiatric consultation as a method to increase access to mental health services in a rural jail in upstate New York.

## MATERIALS AND METHODS

The Franklin County jail, located in Malone, New York, serves a population of approxi-

mately 46,000 people. Franklin County is one of eight of the most rural counties in New York State. It is 182 miles from SUNY Upstate Medical University in Syracuse. The county jail houses up to 119 inmates and has no dedicated mental health beds. The average length of stay in jail is 4–6 months. Franklin County Mental Health Clinic provides mental health services for the jail inmates. It is located 2 miles from the jail. There is no substance abuse or alcohol treatment available in the jail, although jail staff estimated that 70–80% of the inmates have a coexisting substance abuse problem. The staff at the jail are responsible for screening inmates regarding mental health needs. When an inmate is deemed to be in need of mental health care, the corrections department notifies the Community Mental Health Clinic staff. Inmates are then transported to the mental health clinic to be seen by a psychiatrist. Such transport requires two corrections officers to accompany the inmate, typically for several hours.

Three Integrated Switched Digital Network (ISDN) lines were installed inside the jail for a 384-Kps bandwidth connection. A Polycom Viewstation 512 system (Pleasanton, CA) mounted on a 20-inch television monitor was set up in one of the jail interview rooms. Interviews were conducted during specified weekly telepsychiatric "clinic" hours from SUNY Upstate Medical University, Department of Telemedicine. Video conferencing equipment at both locations allowed for a secured, "real-time" consultation.

Subjects were inmates at the Franklin County jail who had been screened for mental health problems by the local mental health clinic social worker. The social worker obtained informed consent from all subjects. The consent was approved by the SUNY Upstate Medical University Institutional Review Board prior to subject recruitment. Subjects were then scheduled for telepsychiatric consultation during the "clinic" times. Approximately 2 hours per week of telepsychiatry clinic time was made available to the jail. Before each session, the social worker faxed a referral form to the psychiatrist. At each session, the mental health clinic social worker introduced the patient to the psychiatrist and then left the room. The duration of the telepsychiatric consultation de-

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

pended on the clinical needs of the subject, and ranged from 15 to 60 minutes. Consultations covered diagnosis, treatment planning, and medication prescribing and management. All prescriptions were faxed to the jail nurse, and progress notes were maintained at both sites. Inmates were excluded from this service if they needed emergent mental health care.

## RESULTS

Eighteen inmates gave informed consent to participate, of whom 15 were seen by the psychiatrist in 37 sessions between July 1 to December 21, 2001 (3 were transferred out of the facility before they could be seen). Table 1 describes the demographic and inmate characteristics.

The subjects were seen within 5–7 days of being referred for a consultation. Of the 15 subjects, 6 (40.0%) were seen by the psychiatrist for additional telepsychiatry consultation sessions to confirm diagnoses and assess medication response. The most frequent primary diagnoses were mood disorders in 5 patients (33.3%), adjustment disorders in 4 (26.7%), and anxiety disorders in 3 (20.0%). Substance use disorder was present in 13 (86.7%) of patients, but was the primary diagnosis in only 1 patient. Medication was prescribed in 13 (86.7%) of the cases, and most often consisted of antidepressants in 11 (84.6%) of those who were medicated. Nearly half (46.2%) of those medicated were prescribed more than one medication.

Anecdotal reports suggested a high level of acceptance by the participants, as well as the jail staff. The psychiatrist and the social worker were satisfied with the ease of using the telemedicine equipment. To date, the equipment and service continues to be provided for the jail. Inmates currently have the option of scheduling a telepsychiatric appointment with the psychiatrist at the local clinic. Costs are assumed by the county.

## DISCUSSION/CONCLUSION

This pilot project demonstrated the feasibility of providing telepsychiatric consultation from an urban university medical center to a rural jail. The local mental health clinic now provides telepsychiatric services to all inmates who prefer it. This is limited only by the willingness of psychiatrists to use the service, not its cost.

A benefit to the county jail continues to be realized through reduced need for inmate transport. Further potential uses include more specialized telepsychiatric services in areas such as substance abuse, adolescent, and forensic psychiatry. Future research should assess

TABLE 1.   CHARACTERISTICS OF INMATE PARTICIPANTS TREATED THROUGH THE TELEPSYCHIATRY PROJECT ($n = 15$)

| | |
|---|---|
| Gender | |
| Male | 13 (86.7%) |
| Female | 2 (13.3%) |
| Mean age | 21 years |
| Race | |
| White | 14 (93.3%) |
| African-American | 1 (6.7%) |
| Criminal charge | |
| Crimes against person | 7 (47%) |
| Primary diagnoses | |
| Mood disorders | 5 (33.3%) |
| Adjustment disorder with anxiety and depressed mood | 4 (26.7%) |
| Anxiety disorders | 3 (33.3%) |
| Substance use disorder | 1 (6.7%) |
| Sleep disorder | 1 (6.7%) |
| Attention deficit/hyperactivity disorder | 1 (6.7%) |
| Medications prescribed | 13 (87%) |
| Antidepressants | 11 (84.6% of those medicated) |
| Mood stabilizer | 1 (7.7%) |
| Antipsychotic | 1 (7.7%) |
| Prescribed more than one medication | 6 (46.2% of those medicated) |

**RURAL JAIL TELEPSYCHIATRY**

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

cost-effectiveness of telepsychiatric services in rural jails in New York State to determine better the types of jail settings and mental health problems for which such services may be most appropriate. Although some research has already shown positive outcomes of telepsychiatric applications, further careful evaluation of costs and benefits is indicated.[12]

## ACKNOWLEDGMENTS

This research project was supported by an intramural support grant from SUNY Upstate Medical University Hendricks Foundation and a supplemental research support grant from the Department of Psychiatry. All telecommunication support was provided by the Department of Telemedicine.

## REFERENCES

1. Roberts LW, Battaglia J, Epstein RS. Frontier ethics: Mental health care needs and ethical dilemmas in rural communities. *Psychiatr Serv* **1999;**50:497–503.
2. Ryan P, Kobb R, Hilsen P. Making the right connection: matching patients to technology. *Telemed J e-Health* **2003;**9:81–88.
3. Rohland BM, Saleh SS, Rohrer JE, Romitti PA. Acceptability of telepsychiatry to a rural population. *Psychiatr Serv* **2000;**51:672–674.
4. Hilty DM, Luo JS, Morache C, Marcelo DA, Nesbitt TS. Telepsychiatry: an overview for psychiatrists. *CNS Drugs* **2002;**16:527–548.
5. Monnier J, Knapp RG, Frueh BC. Recent advances in telepsychiatry: an updated review. *Psychiar Serv* **2003;**54:1604–1609.
6. Brown FW. Rural telepsychiatry. *Psychiatr Serv* **1998;** 49:963–964.
7. Frueh BC, Deitsch SE, Santos AB, et al. Procedural and methodological issues in telepsychiatry research and program development. *Psychiatr Serv* **2000;**51: 1522–1527.
8. Werner A. Unanswered questions about telepsychiatry. *Psychiatr Serv* **2001;**52:689–690.
9. Conference on Local Mental Hygiene Directors Final Report. "Forensic Mental Health," December, **1999.**
10. Zaylor C, Nelson EL, Cook DJ. Clinical outcomes in prison telepsychiatry clinic. *J Telemed Telecare* **2001;**1(7 Suppl):47–49.
11. Zaylor C, Whitten P, Kingsley C. Telemedicine services to a county jail. *J Telemed Telecare* **2000;**1(6 Suppl):S93–S95.
12. Hyler SE, Gangure DP. A review of the costs of telepsychiatry. *Psychiatr Serv* **2003;**54:976–980.

Address correspondence to:
*Luisa Manfredi, J.D., M.P.H.*
*Department of Psychiatry*
*SUNY Upstate Medical University*
*750 East Adams Street*
*Syracuse, NY 13210*

*E-mail:* manfredl@upstate.edu

ournal of Consultin and Clinical syc olo y      Copyri t 008 by t e merican syc olo ical ssociation
008 Vol.   o. 1 8 1      00 -00 /08/ 1 .00  D 10.10 /00 -00 . .1.1 8

F

# Does t e se of elemental ealt lter t e reatment perience nmates erceptions of elemental ealt Versus Face-to-Face reatment odalities



obert D. or an and mber . atric
e as ec ni ersity

ilip . a aletta
Federal ureau of risons

n corrections w ere staffin limitations ta an o erburdened mental ealt system telemental ealt is an increasin ly common mode of mental ealt ser ice deli ery. lt ou telemental ealt presents an efficient treatment modality for a spectrum of mental ealt ser ices it is imperati e to study ow t is modality influences ey elements of t e treatment e perience. n t is study t e aut ors compared inmates perceptions of t e wor in alliance postsession mood and satisfaction wit psyc iatric and psyc olo ical mental ealt ser ices deli ered t rou different modalities telemental ealt and face-to-face. articipants consisted of 18 inmates w o recei ed mental ealt ser ices ia telepsyc olo y 0 ia face-to-face psyc olo y 0 ia telepsyc iatry and 0 ia face-to-face psyc iatry . esults indicate no si nificant differences in inmates perceptions of t e wor alliance wit t e mental ealt professional postsession mood or o erall satisfaction wit ser ices w en telemental ealt and face-to-face modalities were compared wit in eac type of mental ealt ser ice. mplications of t ese findin s are presented.

Keywords: telemental ealt offender inmate and correctional mental ealt ser ices

*Telemental health* is t e use of a communication de ice for a real-time ser ice pro ision w en t e client and t e pro ider are p ysically separated at t e time t e ser ice is rendered Vanden-os illiams 000 . lt ou t ere as been increased interest in telemental ealt see wansea 00 t ere remains a paucity of researc e aminin t e impact of t is ser ice deli ery modality on t e t erapeutic relations ip. n fact no randomi ed controlled outcome studies e aminin t e effecti eness of t is met od of ser ice deli ery a e been conducted.

i en t e si nificance of t e t erapeutic relations ip to t e process of c an e ambert apiro er in 1 8 t e de ree to w ic t is relations ip is impacted by t e ser ice deli ery modality must be e amined. is necessity is supported by t e findin t at c aracteristics of t e t erapeutic relations ip suc as wor in alliance aston 1 0 positi ely correlate wit treat-

ment ains see or at edi 00 artin ars e Da is 000 and treatment satisfaction a aletta Fa an eyrot 000 . us it is rele ant to uestion t e impact of ser ice deli ery modality on t e t erapeutic relations ip. n ot er words is t e traditional face-to-face ser ice deli ery modality superior to nontraditional and inno ati e modalities aimed at increasin access to care

ne settin t at pro ides ample opportunity to study t ese issues is corrections. e eral concerns salient in t e correctional settin support t e utility and i ili t t e ad anta es of deli er-in mental ealt ser ices t rou telemental ealt . ese concerns include ser ice demands t at c allen e institutional resources a aletta Fa an 1 8 . oreo er inmates e perience a lar er number of psyc olo ical problems t an t e eneral public Diamond an ol er omas Cruser 001 . mportantly telemental ealt offers t ese inmates increased access to mental ealt care as well as increased security for psyc olo ists ip ins 1 . elemental ealt can also reduce t e costs of transportin inmates from correctional to medical facilities and it offers a broader ran e of mental ealt ser ices an important consideration i en t e increasin mentally ill population in criminal ustice settin s wit out concomitant increases in staff resources or ser ices andersc eid ra e-sande oldstrom 00 . y usin telemental ealt to lin mentally ill inmates wit specialty pro iders on a re ular basis t e o erall uality of care is impro ed a aletta et al. 1 8 .

recent re iew of correctional telemental ealt ser ices et al. 00 re ealed essentially two types of studies pro ram e aluation and client satisfaction. ro ram e aluations consistently

obert D. or an and mber . atric Department of syc olo y e as ec ni ersity ilip . a aletta syc olo y er ices ranc Federal ureau of risons as in ton DC.

obert D. or an and mber . atric contributed e ually to t is wor and are listed alp abetically. e researc contained in t is document was coordinated in part by t e as Department of Criminal ustice searc reement 1 - 0 . e contents presented in t is article reflect t e iews of t e aut ors and do not necessarily reflect t e policies or opinions of t e as Department of Criminal ustice t e Department of ustice or t e Federal ureau of risons. e wis to t an Daryl roner for consultation on t e statistical analyses.

Correspondence concernin t is article s ould be addressed to obert D. or an Department of syc olo y 0 1 e as ec ni ersity ubboc 0 - 0 1. -mail robert.mor an ttu.edu

is document is copyri ted by t e merican syc olo ical ssociation or one of its allied publis ers.
is article is intended solely for t e personal use of t e indi idual user and is not to be disseminated broadly.

F                                                                                        1

is document is copyright ed by t e merican syc olo ical ssociation or one of its allied publis ers.
is article is intended solely for t e personal use of t e indi idual user and is not to be disseminated broadly.

re ealed cost containment as a benefit and staff resistance as a drawbac . aluations of client satisfaction re ealed t at most clients are satisfied recei in ser ices t rou t is modality. e ert eless little is nown about t e impact of telemental ealt as a modality for ser ice deli ery. ere remains a paucity of researc on inmates perception of telemental ealt compared wit traditional face-to-face ser ice deli ery and nowled e of ow t e modality of mental ealt ser ice deli ery impacts ey elements of t e treatment e perience is needed rupins i et al. 00 uc er lfson imrin oodman ienefeld 00 .

n t is study we e amined ow telemental ealt impacts aspects of t e t erapeutic relations ip namely t e wor in alliance as well as inmates mood satisfaction and eneral attitudes and perceptions toward mental ealt ser ices deli ered ia telemental ealt . i en pre ious findin s we ypot esi ed t at inmates recei in mental ealt ser ices ia telemental ealt would maintain a comparable wor in alliance wit t e treatment pro ider wit similar possession responses re ardin reactions to t e session and satisfaction wit t eir mental ealt ser ice compared wit a separate roup of inmates w o recei ed mental ealt ser ices in a traditional face-to-face modality.

### et od

#### art ants

articipants consisted of 18 adult male inmates w o recei ed mental ealt ser ices eit er psyc olo y or psyc iatry in an adult correctional institution. f t e 18 participants 0 recei ed face-to-face psyc olo ical ser ices in a eneral population correctional facility recei ed telemental ealt psyc olo ical ser ices in a eneral population correctional facility [1] 0 recei ed face-to-face psyc iatric ser ices in a psyc iatric prison and 0 inmates recei ed telemental ealt psyc iatric ser ices in a eneral population correctional facility. ote t at participants represented independent samples suc t at t ey were not recei in duplicate ser ices i.e. psyc olo y and psyc iatry or telemental ealt and face-to-face . e psyc iatric prison oused mentally or p ysically ill inmates unable to function effecti ely in a eneral population facility. e eneral population facilities oused mentally ill and nonmentally ill offenders ali e.

lt ou inmates reportedly suffered from a ran e of psyc iatric disorders t e ma ority suffered from mood disorders e. . bipolar disorder ma or depressi e disorder and sc i op re-nia or ot er psyc otic disorders 1 . otably inmates recei in telemental ealt ser ices ersus face-to-face ser ices did not differ dia nostically for t ose recei in psyc olo ical ser ices $\chi$ = = 1. = . or psyc iatric ser ices $\chi$ = 1 = . = .

e mean a e of participants was 1.8 years = . e sample was composed of primarily Caucasian 0 frican merican . and ispanic 1. participants. articipants reported an a era e of 10.8 years of education = 1.

ereas 1 . of participants were reportedly married/partnered t e ma ority of inmates 80.1 denied current in ol ement in a romantic relations ip sin le/nonpartnered separated or di-ored . articipants were con icted of a ariety of crimes e. . dru or alco ol offenses murder assault/battery or robbery/t eft wit of inmates con icted of a iolent crime and 8.

con icted of a non iolent crime. articipants were ser in a median sentence of 0 mont s wit years bein t e modal sentence. t t e time of t is study t e inmate participants ad ser ed a median of 8 mont s and mode of mont s of t eir adult life in prison and/or ail.

#### ater als

e Client atisfaction uestionnaire C -8 arsen tt isson ar rea es uyen 1 is an ei t-item self-report measure utili in a -point i ert-type response scale to assess client satisfaction wit mental ealt ser ices. nitial measures of t e C -8 by arsen et al. 1 resulted in an alp a coefficient of . indicatin ood internal consistency. Furt ermore arsen 1 found an alp a coefficient of . a ain indicatin i internal consistency. n addition only one factor as consistently been yielded durin factor analysis of t e C -8 aston abourin 1 .

e or in lliance n entory or at reenber 1 8 1 is a -item uestionnaire wit t ree subscales used to assess different aspects of t e wor in alliance. e t ree subscales assess t e followin a client and t erapist a reement on t e oals of t erapy b client and t erapist a reement on ow to reac t e oals of t erapy and c t e de ree of confidence trust comfort and acceptance between t e t erapist and client. e as bot client and t erapist ersions owe er only t e client ersion was utili ed in t is study. n t e t e client is as ed usin a -point i ert-type scale ran in from 1 *ne er* to *always* b indicate w ic statements best describe is or er e perience of t e t erapeutic alliance. e as i internal consistency wit Cronbac s alp a ran in from .8 to . for t e lobal measure and t e t ree subscales or at reenber 1 8 n addition t e as ood con er ent alidity see or at reenber 1 8 afran allner 1 1 .

e ession aluation uestionnaire tiles 1 80 tiles now 1 8 a 1 8 b was also used in t is study. e measures two basic dimensions of participants postsession mood positi ity and arousal tiles now 1 8 b w ic account for most of t e mood ariability in a ariety of circumstances ussell 1 81 . e consists of 1 opposite ad ecti e scales presented in a -point semantic differential format. e items are di ided into two sections session e aluation and postsession mood. e stem is session was precedes t e first 11 items for session e aluation sample items include bad ood and safe dan erous. e stem i t now feel precedes t e second 10 items for postsession mood sample items include appy sad and an ry pleased. Factor analyses a e supported t e four-subscale structure of t e wit ood internal consistency for t e four dimensions wit coefficient alp as ran in from . 8 to . 1 tiles now 1 8 a 1 8 b .

#### ro ed re

nmtes were sc eduled for a telemental ealt or face-to-face psyc olo ical or psyc iatric mental ealt ser ice session t rou

---

1 e tar eted number of participants in t e telemental ealt psyc olo y roupwas 0 inmates owe er because of an in ury sustained by t e participatin t erapist t e recruitment for t is roup was terminated prematurely.

1 0                                                      F

re ular institutional operational procedures and t ey were re-cruited for participation in t s study at t e conclusion of one of t eir sessions i.e. inmates were recruited followin one of t eir re ularly sc eduled follow-up sessions . nmates were assi ned to t e modality telemental ealt s. face-to-face a ailable at t eir prison and for t e ser ice psyc olo y or psyc iatry t at was considered clinically necessary. For purposes of t is study tele-mental ealt referred to ideoconferencin ia secure satellite connection. ac psyc olo ical ser ices session lasted appro i-mately 0 min and enerally focused on issues of ad ustment and mental ealt stability e. . issues of institutional ad ustment symptom mana ement copin s ills . ac psyc iatric ser ices session lasted appro imately 0 min and focused enerally on issues of symptom mana ement e. . psyc otropic medication re iews . ne psyc olo ist wit a master s of arts de ree and one psyc iatrist facilitated all psyc olo ical and psyc iatric sessions respecti ely. essions were randomly attended t us participants were e aluated at different p ases in t eir treatment.

fter completion of t e mental ealt session re ardless of treatment modality inmates were as ed to olunteer t eir participation in a study t at e aluated t e uality of mental ealt ser ices. e only selection criterion ot er t an partic-ipatin in a mental ealt session was t at t e inmate ad to be able to read and write in n lis . o incenti es were offered and participants were recruited only once. f t ey declined t ere was no subse uent c ance to participate. nmates w o declined participation returned to t eir ousin unit or wor assi nment. nmates w o a reed to participate were pro ided a standard consent form and uestionnaire pac et. articipants were informed of t e purpose and procedures of t e study were pro ided an opportunity to as uestions and were t en instructed to complete t e consent form and all uestion-naires. articipation was limited to one session i.e. inmates completed t e instruments on one occasion . ll procedures

were appro ed t rou t e nstitution e iew oards at t e e as ec ni ersity t e e as ec ni ersity ealt ci-ences Center and t e researc branc of t e e as Department of Criminal ustice.

## esults

### sy holo y er es Telemental ealth s a e to a e

*rel m nary analyses* reliminary analyses assessed t e demo rap ic e ui alence of inmates in t e telemental ealt and face-to-face psyc olo y ser ices conditions. series of independent *t* tests and c i-s uare procedures resulted in no si nificant differences between roups on demo rap ic ariables > .0 .

*r mary analyses* one-way multi ariate analysis of ari-ance procedure resulted in no si nificant differences between inmates recei in telemental ealt or face-to-face psyc olo y ser ices for wor in alliance de elopment of oals reac in o ls or uality of relations ip Λ 8 = 0. = . ere was no si nificant difference between inmates e aluation of t eir psyc olo y session i.e. session dept smoot ness positi ity or arousal as measured by t e Λ 81 = 0. = . re ardless of t e mec anism of ser ice deli ery. Finally inmates recei in psyc olo y ser ices ia telemental ealt were similarly satisfied wit t e ser ice t ey recei ed e. . uality met needs would recommend eneral satisfaction w en compared wit in-mates recei in psyc olo y ser ices ia a traditional face-to-face deli ery met od Λ 8 = 1. = . ee able 1 for descripti e statistics.

### sy h atry er es Telemental ealth s a e to a e

*rel m nary analys s* series of independent *t* tests and c i-s uare procedures e amined roup differences in t e psyc iatric

is document is copyri ted by t e merican syc olo ical ssociation or one of its allied publis ers.
is article is intended solely for t e personal use of t e indi idual user and is not to be disseminated broadly.

able 1

*eans and tandard e at ons or the and or nmates e e n Telehealth or a e to a e ental ealth er es*

| uestionnaire | syc olo ical ser ices | | syc iatric ser ices | |
| --- | --- | --- | --- | --- |
| | ele ealt n = | Face-to-face n = 0 | ele ealt n = 0 | Face-to-face n = 0 |
| otal score | 1. 1 1 . | . 8 1 . | . 1 . | .0 1 . |
| De elopment of oals | 1. . | 1. 8 . | 18. .8 | 1 . . 8 |
| eac in oals | 0. . 1 | 1. . | 18. . | 0. . 8 |
| uality of relations ip | 1 . . | 0. . | 18.18 . | 1 .08 . 8 |
| ession dept | 18.8 . | 0. 8 . 8 | 18. 1 . 1 | 0. . |
| ession smoot ness | 0. .08 | 1.1 . | 1 . . | 1. . |
| ositi ity | 0. . | 0. . 8 | 18.1 . | 1 . .01 |
| rousal | 1 .8 . | 1 . . | 1 .01 .08 | 1 .8 . |
| C -1 uality of ser ices | . 0.8 | . 0.8 | . 8 1.0 | . 0. |
| C - ecei e ser ices you wanted | . 0.8 | .0 0.8 | . 1 0. | .80 0.81 |
| C - ro ram met your needs | . 0. | . 1.01 | . 0.88 | . 0.88 |
| C - ecommend our pro ram | .1 0. | . 8 0.8 | .88 0. | . 0. |
| C - atisfied wit amount of elp you recei ed | .81 0.8 | .0 0. | . 0.8 | . 8 0.8 |
| C - er ices elped you deal wit problems | .0 0.8 | .18 0.8 | . 0.8 | .0 0.81 |
| C - atisfied wit ser ices you recei ed | . 0.8 | .08 0. | .8 0.8 | .8 0.8 |
| C -8 ee elp a ain from our pro ram | . 8 0. 8 | . 0. | . 0.8 | .0 0. 8 |

*ote* = or in lliance n entory = ession aluation uestionnaire C = Client atisfaction uestionnaire.

is document is copyrighted by the American Psychological Association or one of its allied publishers.
is article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

conditions. esults indicate si nificant differences for a e $t =$ . 8 = .00 educational istory $t = − .1$ = .0 years incarcerated $t =$ . < .001 and mont s of mental ealt treatment $t =$ . < .001 . owe er as a e was t e only ariable to be si nificantly correlated < .0 wit t e dependent ariables it was t e only demo rap ic ariable eld as a co ariate in subse uent analyses.

*r mary analys s* one-way multi ariate analysis of co ariance procedure resulted in no si nificant differences between inmates recei in telemental ealt or face-to-face psyc iatric ser ices for wor in alliance de elopment of oals reac in ods or uality of relations ip $\Lambda$ = 1.01 = . imilarly t ere was no si nificant difference between inmates e aluation of t eir psyc iatry session i.e. session dept smoot ness positi ity or arousal $\Lambda$ = 0. = . l re ardless of t e mec anism of ser ice deli ery. Finally inmates recei in psyc iatric ser ices ia telemental ealt were similarly satisfied wit t e ser ice t ey recei ed e. . uality met needs would recommend eneral satisfaction w en compared wit inmates recei in psyc iatric ser ices ia a traditional face-to-face deli ery met od $\Lambda$ 88 = 0. = . ee able 1 for descripti e statistics.

ower analyses were conducted for eac of t e primary analyses. sin te ens s 00 p. 00 table for power of otellin s we found t at power for t e primary analysis was between . 8 and . e cept for t e psyc olo y ser ices satisfaction analysis w ic appro imated .80. te ens interprets power below . 0 as inade uate and .80 as ade uate power.

## Discussion

e purpose of t is study was to assess and compare inmates perceptions of t e t erapeutic relations ip inmates postsession mood and t eir satisfaction wit mental ealt ser ices deli ered t rou two different modalities telemental ealt and face-to-face. s ypot esi ed t ere were no si nificant differences between telemental ealt and face-to-face deli ery modalities for perceptions of t e t erapeutic relations ip in postsession mood or eneral satisfaction wit ser ices. Furt ermore t is lac of a statistically si nificant difference eld re ardless of t e type of mental ealt ser ice recei ed i.e. psyc olo ical or psyc iatric .

Findin s preliminarily su est t at t e modality of treatment does not influence ey elements of t e treatment e perience positi ely or ne ati ely and is con ruent wit emer in literature of telemental ealt outcomes researc elson alsbo 00

eilly et al. 00 . nterestin ly t e neutral relations ip of treatment modality was found re ardless of t e role of t e relations ip for eac type of ser ice deli ered. et er t e relations ip focused upon eneral mental ealt and copin i.e. relations ip as t e c an e a ent or medication mana ement i.e. a biolo ical c an e a ent t e neutral effect was seen.

ese results are encoura in as telemental ealt appears to offer an efficient means of ser ice deli ery wit out a loss in t e uality of t e t erapeutic relations ip. i en t e demand for mental ealt ser ices in criminal ustice settin s ec ar-usc a 001 andersc eid et al. 00 ears 00 and ot er underser ed areas suc as rural locations ol er oldsmit Ciarlo 000 telemental ealt affords opportunities to reac more clients wit out relocatin ser ice pro iders eo rap ically or

importin t em p ysically into t e ser ice settin . us t e option of de elopin t ese staff resources wit out payin for relocation costs bot monetary and personal for t e pro ider is a benefit for administrators ser ice pro iders and t e inmates in need of t e ser ices.

esults of t is study are particularly encoura in for criminal ustice systems. elemental ealt transports information and data not inmates. s suc it offers increased safety for ser ice pro iders as well as increased security and decreased transportation costs for t e criminal ustice system. e use of telemental ealt wit out ne ati e impact on t e t erapeutic relations ip may also broaden t e ran e of mental ealt ser ices a ailable to inmates.

dditionally t e use of telemental ealt offers continuity of care for releasin inmates and represents a si nificant contribution from a public ealt perspecti e.

s wit any naturalistic study limitations of t is study s ould be noted. it statistically nonsi nificant results issues of statistical power are a concern and power for t is study was limited by t e small sample si e and number of ariables. dditionally inmates were not randomly assi ned to conditions w ic may a e introduced selection bias into t e study. mon t e bias suspected inmates oused in t e psyc iatric prison li ely suffered reater mental ealt impairment t an did inmates oused in t e eneral population facilities. mon t e un nown bias ariance in sample c aracteristics suc as prior e posure to mental ealt ser ices and problem se erity all remain possible.

Future studies s ould employ random assi nment to ensure stability of t ese results across inmate samples as well as to offer enerali ability of t ese results to ot er correctional populations rupins i et al. 00 . Future studies s ould also in esti ate t e utility of telemental ealt wit ot er female offenders ail populations yout ful inmates and federally incarcerated inmates. Future studies of t is nature s ould also obtain data from clinicians includin t eir perceptions re ardin t e impact of telemental ealt on t e t erapeutic relations ip.

Future researc s ould also be in in esti atin outcome effecti eness of mental ealt ser ices deli ered ia telemental ealt compared wit face-to-face ser ices. From a correctional perspecti e administrators would want to now w et er telemental ealt ser ices resulted in reduced inmate disciplinary actions decreased incidence of arm to self or ot ers and/or impro ed mental ealt functionin and symptom mana ement compared wit face-to-face ser ices. dditionally issues of ser ice utili ation s ould be e amined. at is does t e a ailability of telemental ealt impro einmate ser ice use or does it create additional barriers f t ere are barriers are t ese differentially related to t e inmates t e correctional system and/or t e treatment pro iders t emsel es.

is study represented an empirical in esti ation from t e field and clearly indicated t at t e modality used for pro idin mental ealt ser ices i.e. telemental ealt s. face-to-face did not ne ati ely impact ey elements of t e treatment e perience. pecifically t e t erapeutic relations ip wit t e mental ealt professional postsession mood or o erall satisfaction wit ser ices recei ed were not different between telemental ealt and face-to-face treatment modalities. mportantly for administrators mental ealt ser ice pro iders and inmates ali e t is neutral effect was obser ed across two different types of mental ealt ser ices.

us t ese results i li t efficient and economical ser ice deli ery options for underser ed populations inmates and possi-

1                                                                                    F

bly to ot er underser ed areas rural eo rap ic re ions wit out
compromise to treatment inte rity from t e consumer s perspec-
ti e.

is document is copyri ted by t e merican sy c olo ical ssociation or one of its allied publis ers.
is article is intended solely for t e personal use of t e indi idual user and is not to be disseminated broadly.

### eferences

. Fa an . a aletta . . or an . D. ussbaum D.
ite . . 00 . nno ations in correctional assessment and treat-
ment pecial issue . r m nal st e and eha or 8 0 .

ec . . arusc a . . 001 . ental health treatment n
r sons ureau of ustice tatistics pecial eport . as in ton
DC . . Department of ustice.

Diamond . . an . . ol er C. . omas C. . Cruser
D. . 001 . e pre alence of mental illness in prison e iew and
policy implications. dm n stra on and ol y n ental ealth
1 0.

aston . 1 0 . e concept of t e alliance and its role in psyc ot er-
apy eoretical and empirical considerations. sy hothera y 1
1 .

aston . abourin . 1 . Client satisfaction and social desirabil-
ity in psyc ot erapy. al at on ro ram lann n .

ip ins . . 1 . elemedicine in correctional systems. n . .
as ur . anders . annon ds. Telemed ne: Theory
and ra t e pp. 8 prin field C arles C. omas.

ol er C. . oldsmit .F. Ciarlo . . 000 . e a ailability
of ealt and mental ealt pro iders by population density. o rnal o
the ash n ton ademy o en es .

or at . . edi . 00 . e alliance. n . C. orcross d.
sy hothera y relat onsh s that wor : Thera sts ontr t ons and
res ons eness to at ents pp. . ew or ford ni ersity
ress.

or at . . reenber . . 1 8 . e de elopment and alida-
tion of t e or in lliance n entory. o rnal o onsel n sy hol
o y .

or at . . reenber . 1 . The or n ll an e: Theory
resear h and ra t e ew or iley.

rupins i . Dimmic . ri sby . o el us in D. peedie .
et al. 00 . esearc recommendations for t e merican elemedicine
ssociation. Telemed ne o rnal o ealth 8 .

ambert . apiro D. . er in . . 1 8 . e effecti eness
of psyc ot erapy. n . arfield . . er in ds. and oo o
sy hothera y and eha or han e r d. pp.1 11 . ew or
iley.

arsen D. . 1 . nhan n l ent t l at on o omm n ty mental
health o t at ent ser es npublis ed doctoral dissertation ni ersity
of ansas.

arsen D. . 1 tt isson C. C. ar rea es . uyen . D.
1 ssessment of client/patient satisfaction De elopment of a
eneral scale. al at on and ro ram lann n 1 0.

a aletta . . Fa an . . . 1 8 . d ancin psyc olo y

ser ices t rou telemental ealt in t e Federal ureau of risons.
ro ess onal sy holo y: esear h ra t e 8 .

a aletta . . Fa an . . eyrot . F. 000 . elemental ealt
in t e Federal ureau of risons nmates perceptions. ro ess onal
sy holo y: esear h ra t e 0 .

andersc eid . ra esande . oldstrom .D. 00 . rowt
of mental ealt ser ices in state and adult correctional facilities 1 88
000. sy h atr er es 8 8 .

artin D. . ars e . . Da is . . 000 . elation of t e
t erapeutic alliance wit outcome and ot er ariables meta-analytic
re iew. o rnal o ons lt n and l n al sy holo y 8 0.

ears D. 00 . ental ealt needs and ser ices in t e criminal ustice
system. o ston o rnal o ealth aw and ol y 8 .

elson . alsbo . 00 . C allen es in telemedicine e ui alence
studies. al at on and ro ram lann n 1 .

eilly . is op . addo . utc inson . Fisman .
a ar . 00 . s telepsyc iatry e ui alent to face-to-face psyc ia-
try esults form a randomi ed controlled e ui alence trial. sy h atr
er es 8 8 .

ussell . 1 8 . idence of con er ent alidity on dimensions of
affect. o rnal o ersonal ty and o al sy holo y 11 11 8.

ussell . 1 . ffecti e space is bipolar. o rnal o ersonal ty and
o al sy holo y .

afran . D. aller . 1 1 . e relati e predicti e alidity of
two t erapeutic alliance measures in co niti e t erapy. sy holo al
ssessment: o rnal o ons lt n and l n al sy holo y 188
1 .

te ens . 00 . l ed m lt ar ate stat st s or the so al s en es
ted. a wa rlbaum.

tiles . . 1 80 . easurement of t e impact of psyc ot erapy ses-
sions. o rnal o ons lt n and l n al sy holo y 1 18 .

tiles . now . 1 8 a . Counselin session impact as iewed
by no ice counselors and t eir clients. o rnal o onsel n sy hol
o y 1 .

tiles . now . 1 8 b . Dimensions of psyc ot erapy session
impact across sessions and across clients. r t sh o rnal o l n al
sy holo y .

wansea . 00 . e use of telemedicine in psyc iatry. o rnal o
sy h atr and ental ealth rs n 1 .

uc er . lfson . imrin . oodman . ienefeld .
00 . pilot sur ey of inmate preferences for on-site isitin con-
sultant and telemedicine psyc iatric ser ices. er ms 10
8 8 .

Vanden os . illiams . 000 . e nternet ersus t e tele-
p one at is telemental ealt anyway ro ess onal sy holo y:
esear h ra t e 0 .

ecei ed pril 1 00
e ision recei ed ctober 1 00
ccepted ctober 1 00 ■

TELEMEDICINE JOURNAL AND e-HEALTH
Volume 10, Supplement 2, 2004
© Mary Ann Liebert, Inc.

# A Comparison of Psychiatrist Evaluation and Patient Symptom Report in a Jail Telepsychiatry Clinic

EVE-LYNN NELSON, Ph.D.,[1] CHARLES ZAYLOR, M.D.,[2] and DAVID COOK, Ph.D.[3]

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

## ABSTRACT

The effectiveness of a jail telepsychiatry service was evaluated by comparing psychiatrist and inmate report of psychopathology. Sixty-two inmates completed a total of 107 consultations at a rural county jail via interactive televideo. The inmates completed the Symptom Rating Checklist-90-Revised (SCL-90-R), and the psychiatrist completed a Psychiatrist Evaluation Form including the Clinical Global Impression Scale—Severity Index (CGI) after each tele-consultation. Most inmates were rated mild to moderately ill on the CGI. There was a significant, high correlation between telepsychiatrist evaluation on the CGI and inmate report of overall symptoms on the SCL-90-R [$r(101) = 0.35$, $p < 0.05$]. The findings support the effectiveness of telepsychiatric evaluation for the jail population. The patterns of telepsychiatric use in the county jail as well as future directions in this setting are described.

## INTRODUCTION

RURAL CORRECTIONAL FACILITIES face a difficult balance in providing mental health services to inmates. On the one hand, there is substantial need within the correctional setting for mental health services. Individuals in the correctional setting have a higher incidence of mental illness than the general population, in addition to history of substance abuse.[1] They also may experience adjustment reactions to the correctional setting such as difficulty in sleeping, anxiety, and depression. In addition to ethical-legal considerations, untreated inmates are also more likely to engage in fights and rule violations.[1] On the other hand, the nation in general and rural areas in particular face severe shortages in mental health resources. For example, 96 of 105 counties in Kansas are

designated Mental Health Professional Shortage areas. Even when care is available in the county, few providers have experience or training in correctional psychiatry.

Correctional facilities are interested in telepsychiatric services as a solution to shortages, in addition to other telemedicine applications within the correctional setting.[2] When available, face-to-face psychiatry still carries the cost of transport and the risk of escape. Psychiatry has offered services using technology for over 40 years,[3] with videoconferencing applications increasing rapidly over the last few years.[4] While patients report satisfaction with telepsychiatric services,[5] providers are also concerned about establishing the effectiveness of diagnosis and treatment in the new context. The majority of literature in telepsychiatry includes accounts of novel clinical demonstra-

---

[1]Center for Telemedicine and Telehealth and [3]Health & Technology Outreach, Kansas University Medical Center, Kansas City, Kansas.
[2]Lansing Correctional Facility, Lansing, Kansas.

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

tions and descriptions of program projects, with a handful of empirical evaluations.[6]

Several studies have compared psychiatric evaluation of the same patient face-to-face and over telemedicine[7–11] and have found high agreement between face-to-face and telemedicine. No such comparison has been reported in the jail setting. Questions related to the clinician's ability to assess symptoms as well as clinical effectiveness in this setting are important as more and more correctional facilities adopt telepsychiatric interventions. The current study addresses agreement between psychiatric evaluation over telemedicine and inmate self-report of symptoms. Previous reports[12] describe symptom improvement from both the psychiatrist and inmate perspectives over time, while the current study compares psychiatrist and inmate ratings in terms of global and specific measures of psychological functioning. It addresses the following research questions:

- Research Question 1 (RQ1): What are the diagnostic characteristics of inmates presenting in a rural jail telemedicine clinic?
- Research Question 2 (RQ2): How do overall psychiatric ratings compare with overall patient ratings of functioning?
- Research Question 3 (RQ3): How does psychiatric evaluation of depressive symptoms compare with inmate self-report of depressive symptoms?

## MATERIALS AND METHODS

### Background

Because of the provider shortages and the high need for mental health services, the University of Kansas Center for TeleMedicine and TeleHealth (KUCTT) was approached by the National Law Enforcement and Corrections Technology Advisory Council–Southeast and its partners (the Joint Program Steering Group, the National Institute of Justice Office of Science and Technology, and the Federal Bureau of Prisons). Their goal was to assist correctional facilities in providing telepsychiatric services. KUCTT solicited participation in the project in jails across the state. A contract with a rural

county jail was negotiated as a pilot for rural jail telepsychiatry. KUCTT and the county jail shared costs in the startup.

KUCTT contacted the psychiatrist in the Kansas University Medical Center (KUMC) Department of Psychiatry and Behavioral Sciences and coordinated the program. Through meeting with the county jail, KUCTT and the KUMC Department of Psychiatry established the jail's telepsychiatry needs and developed a protocol for implementing services.[13]

The county jail is a modern facility with approximately 140 beds. It is staffed by approximately 20 officers and houses both male and female inmates. Some individuals remain in jails for extended periods of time, but most are short-term residents awaiting either temporary or final release or movement to prisons to serve out their sentence. The facility also rents space to urban jails faced with overcrowding, and at times, up to half the jail population is from outside the county.

The jail used to acquire psychiatric consultations from the local mental health center, from the local hospital, and from a distant provider who traveled over 100 miles to the jail. The psychiatrist could only visit the jail at set times, approximately $1/2$ day per month. Thus, telemedicine offered increased access to care for inmates. This provided for early intervention with mild psychopathology and increased follow-up opportunity, as well as solving concerns around transporting inmates to the mental health center and to the hospital in a cost-effective manner.

The telepsychiatrist provides the consultation on a fee-for-service contract with the jail. This was more cost-effective than paying for a distant provider to drive to the jail. The cost of the equipment was paid for through a grant from the Department of Justice, and the jail pays the long distance telephone charges. KUCTT and the jail shared other administrative costs, such as the setup and maintenance of the equipment.

The jail medical officers screen inmates for psychiatric consultation and schedule the sessions. Correctional officers attend the inmate's assessment and follow-up appointments. The psychiatrist provides both emergency consultation for inmates on suicide watch and long-term care for inmates with mental illness. The clinic began in August 1998 as a monthly clinic and as

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

needed. The jail clinic was established with the expectation of five to 10 patients per month, predominately for crisis situations such as suicide watch. As the clinic evolved, the psychiatrist conducted approximately 71 consultations per month, with most patients seen for chronic rather than emergency care. There were no technical difficulties during the initial consultations. The clinic use patterns followed a quadratic trend (Fig. 1), indicating a higher rate of use of the telepsychiatric services over time. Reasons for the increase included: increased referral of new patients, follow-up care for inmates, and re-evaluation in times of crisis. The increase over time reflects the development of a positive working relationship between the psychiatrist and the jail staff as well as an awareness concerning appropriate referral. From November 1999 to May 2000, 62 inmates completed the Symptom Rating Checklist-90-Revised (SCL-90-R) before 107 separate consults. Half of the inmates were under 30 years of age. Most (91%) were male and Caucasian (84%). The psychiatrist completed the psychiatric evaluation form, including Clinical Global Impression Scale—Severity Index (CGI) rating, immediately after each consult.

### Equipment

Both the jail and the Medical Center use PC-based videoconferencing systems. The desktop units transmit digitized images and data over integrated services digital network (ISDN) lines (128 kbps). The psychiatrist's unit is conveniently located in his office. The jail designated a room specifically for telemedicine services, which allows both the inmate and medical officer to be viewed on the screen, and is equipped with a blue background to enhance the video image. A fax machine is used to transmit patient information.

### Instruments

*SCL-90-R.* The SCL-90-R[14] self-report symptom inventory was completed every 2 weeks by the inmates. Each item is rated on a 5-point scale of distress. It contains nine primary symptom scales (Somatization, Obsessive-Compulsive, Interpersonal Sensitivity, Depression, Anxiety, Hostility, Phobic Anxiety, Paranoid Ideation, and Psychoticism). The scale of interest in the current study was the Depression scale. It reflects the range of the manifestations of clinical depression symptoms including dysphoric mood, withdrawal from activities, lack of motivation, and loss of energy. In addition, it addresses feelings of hopelessness, thoughts of suicide, and other cognitive and somatic correlates of depression. The SCL-90-R total score is a measure of current psychological status. The SCL-90-R takes approximately 15 min to complete. It has adequate internal consistency, test–retest reliability, and validity.[15]



**FIG. 1.** Number of telepsychiatry consultations per month.

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

*Psychiatrist evaluation form.* The psychiatrist completed a standard evaluation sheet following each consult. This included: patient history; a checklist concerning inmate mental status, affect, motor, speech, thoughts, hallucinations, delusions, suicidality, and homicidality, and memory; treatment plan; and Clinical Global Impression Scale. The checklist component included the presence or absence of symptoms (e.g., has/does not have hallucinations) as well as descriptors (e.g., mood ratings included a checklist of constricted, euphoric, or dysphoric).

*CGI.* The CGI was completed by the psychiatrist at each consultation as part of the evaluation. It is a clinician-rated scale from 1 ("not at all ill") to 7 ("among the most extremely ill patients") that rates severity. This measure is used in psychopharmacological trials to measure symptom change.[16]

*Protocol*

Before meeting with the psychiatrist, the inmates completed the SCL-90-R, which was administered by the medical officer at the jail and mailed to the psychiatrist. During each session, the psychiatrist completed a Psychiatrist Evaluation Form.

## RESULTS

The results will be reported according to each research question. To address the first question (RQ1), Table 1 presents the psychiatrist's impressions from the Psychiatrist Evaluation Form for the 107 consults. The most common diagnoses were mood disorders (44%) and adjustment reactions (22%). The mean CGI rating was 2.60 (SD = 1.36), with the CGI frequencies presented in Table 2.

In relation to the second question (RQ2), a Pearson correlation coefficient was computed between the CGI and SCL-90-R total score. The correlation was significant: $r(101) = 0.35$, $p < 0.05$.

To address the third question (RQ3), planned comparisons were run to compare specific psychiatrist ratings with inmate self-report. A Bon-

ferroni procedure was used to control for Type II error across multiple comparisons, yielding a significant $p$ value of 0.01 (0.05/4).

An independent samples $t$ test was conducted to evaluate the hypothesis that the psychiatrist's rating of suicidality would correlate with inmate self-report of thoughts of death. The SCL-90-R thoughts of death item was higher in inmates rated suicidal by the psychiatrist. The $t$ test was significant: $t(103) = -6.95$, $p < 0.001$ (mean = 1.24, SD = 1.57) (mean = 3.50, SD = 0.58). The psychiatrist accurately identified all four inmates who expressed frequent suicidal ideation on the SCL-90R item.

Two independent samples $t$ tests were conducted to evaluate the hypothesis that the psychiatrist's rating of dysthymia and hyper-

TABLE 1.   SYMPTOMS AT FIRST TELE-PSYCHIATRIC CONSULTATION

| Symptoms at first psychiatric consultation (n = 62) | Percentage |
|---|---|
| Affect | |
|   Constricted | 33 |
|   Dysphoric | 22 |
|   Euthymic | 63 |
| Motor | |
|   Agitated | 8 |
|   Hyper | 7 |
| Thoughts | |
|   Goal directed | 99 |
|   Tangential | 1 |
| Delusion | 5 |
| Hallucinations | 9 |
| Suicidal | 4 |
| Homicidal | 0 |
| Memory | |
|   Remote intact | 100 |
|   Recent intact | 100 |
|   Immediate intact | 100 |
| Medication prescribed at first visit | 88 |

TABLE 2.   CGI SCALE PER CONSULTATION

| CGI per consultation | Number |
|---|---|
| 1 Normal, not at all ill | 33 |
| 2 Borderline ill | 10 |
| 3 Mildly ill | 32 |
| 4 Moderately ill | 18 |
| 5 Markedly ill | 6 |
| 6 Severely ill | 2 |
| 7 Among the most extremely ill patients | 0 |
|   None recorded | 6 |

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

activity/restlessness would predict inmate self-report of depressive symptoms. The SCL-90-R Depression scale was not significantly higher in inmates rated dysthmic by the psychiatrist (mean = 24.28, SD = 13.88) (mean = 28.87, SD = 14.77). The SCL-90-R Depression scale was significantly higher in inmates rated hyperactive/restless by the psychiatrist: $t(104) = -3.11$, $p < 0.009$ (mean = 24.74, SD = 14.41) (mean = 32.86, SD = 5.73).

## DISCUSSION

The discussion will outline five of the most critical "lessons learned" in the particular telemedicine project.

1. *The rapid rate of increase in clinic utilization over a short time underscores the need to prepare for clinic volume before initiating a telehealth clinic*. The increasing rate of telepsychiatry consults over 20 months was welcomed but not anticipated in initial planning. It reflects the medical officer's comfort in using the technology, his or her increased proficiency at identifying inmates appropriate for telepsychiatry consultation, and the clinic's transition from emergency care to care of inmates with chronic mental illness as well as emergency care. The high utilization (up to 70 consults per month) underscores a need for psychiatric service in rural jail populations. It also points to the likely cost-effectiveness of telejail services. In general the more consults, the more cost-effective is the telehealth consultation. Increased utilization offsets the startup costs.

2. *For this rural jail population, the psychiatrist rated inmates as mild to moderately ill*. This suggests inmates benefit from psychiatric services not only in crisis situations, but also in addressing more chronic mental illness such as the affective disorders, which can be effectively managed through telepsychiatry. These data suggest that more severe reactions are atypical even in a jail setting. Affective symptoms such as constricted and dysthmic mood were not common, nor were motor symptoms such as agitation or hyperactivity. Severe symptoms, such as hallucinations, delusions, suicidal thoughts, homicidal thoughts, and memory impairment, were rare.

3. *The psychiatrist and inmate global ratings highly correlated with each other*. Because the high correlation between the psychiatrist rating and inmate rating the psychiatrist was assured of the accuracy of assessing psychopathology over telemedicine. This supports reimbursement for telepsychiatric services.

4. *Psychiatrist and inmate agreement concerning ratings of depressive symptoms depended on the type of item*. The psychiatrist accurately identified all inmates who expressed frequent suicidal ideation. This is important as psychiatrists are asked to sit on involuntary medication hearings and other evaluations.

   There was less concordance between inmate self-reported depressive symptoms and psychiatrist ratings of mood and motor activity on the Psychiatrist Evaluation Form. Inmates' self-report of depression was based on the multiple-item Depression scale of the SCL-90-R. The psychiatrist's ratings of depressive symptoms were two separate items on the Psychiatrist Evaluation Form: the assessment of mood item and the assessment of activity level item. In this sample, inmates' scores on the SCL-90-R Depression scale were significantly related to psychiatrist's ratings of motor activity, but not the psychiatrist's rating of dysthmic mood. It is difficult to determine whether this is a general challenge in diagnosis or if it relates to telemedicine. The psychiatrist's assessment of the activity level was more predictive than the psychiatrist's assessment of affect. This finding may also have been related to the relatively small sample size and to the low bandwidth utilized.

5. *Future research needs to address the consequence of telepsychiatry services on the overall jail environment.* The medical officers report that the service not only helps alleviate inmates' symptoms (affect distur-

Downloaded by Dylan Verner-Crist from online.liebertpub.com at 01/10/18. For personal use only.

bance, sleep difficulty, etc.), but also leads to decreased inmate–inmate and inmate–staff violence.

## IMPLICATIONS

This study supports the validity of psychiatric evaluation over telemedicine on the basis of the overlap between the psychiatrist's assessment and the inmate's self-report on global measures of psychiatric functioning. Nonetheless, the study had several limitations. One limitation is the reliance on a single instrument rather than a battery of validated self-report measures. Future studies may use a variety of methods (self-report, interview, and observation) as well as more specific questionnaires such as the Beck Depression Inventory to assess affect. Such evaluation will address concerns that the inmate population is not always truthful in self-presentation. A second limitation is use of a single provider. As pilot data support the expansion of telepsychiatric services, multi-site trials may be possible across several providers.

The study provides evidence that correctional telepsychiatry clinics would be well utilized by jails especially as jail officials become more accustomed to the process, just as has been suggested in the prison arena.[17,18]

The value of telepsychiatry services for inmates reaches beyond incarceration. The psychiatrist and jail are also considering how inmates may continue to receive care after their release.

## REFERENCES

1. Ditton PM. *Mental health and treatment of inmates and probationers.* Special Report NCJ 174463. Washington, DC: Bureau of Justice Statistics, **1999.**

2. Ellis DG, Mayrose J, Jehle DV, Moscati DM, Pierluisi GJ. A telemedicine model for emergency care in a short-term correctional facility. *Telemed J e-Health* **2001;**7:87–92.

3. Baer L, Elford R, Cukor P. Telepsychiatry at forty: what have we learned? *Harv Rev Psychiatry* **1997;**5:7–17.

4. Dahlin MP, Watcher G, Engle WM, Henderson J. *Report on US telemedicine activity.* Portland, OR: ATSP, **2001.**

5. Mair F, Whitten P. Systematic review of studies of patient satisfaction with telemedicine. *BMJ* **2000;**320:1517–1520.

6. Frueh BC, Deitsch SE, Santos AB, Gold PB, Johnson MR, Meisler N, Magruder KM, Ballenger JC. Procedural and methodological issues in telepsychiatry research and program development. *Psychiatr Serv* **2000;** 51:1522–1527.

7. Baigent MF, Lloyd CJ, Kavanagh SJ. Telepsychiatry: 'tele'yes, but what about the 'psychiatry'? *J Telemed Telecare* **1997;**3:3–5.

8. Baer L, Cukor P, Jenike MA, Leahy L, O'Laughlen J, Coyle JT. Pilot studies of telemedicine for patients with obsessive-compulsive disorder. *Am J Psychiatry* **1995;**152:1383–1385.

9. Elford DR, White H, St. John K, Maddigan B, Ghandi M, Bowering R. A prospective satisfaction study and cost analysis of a pilot child telepsychiatry service in Newfoundland. *J Telemed Telecare* **2001;**7:73–81.

10. Ruskin PE, Reed S, Kumar R, Kling MA, Siegel E, Rosen M, Hauser P. Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. *Psychiatr Serv* **1998;**49:1086–1088.

11. Zarate CA, Weinstock L, Cukor P, Morabito C, Leahy L, Burns C, Baer L. Applicability of telemedicine for assessing patients with schizophrenia: acceptance and reliability. *J Clin Psychiatry* **1997;**58:22–25.

12. Zaylor C, Nelson E, Cook D. Telepsychiatry in a rural jail population. *J Telemed Telecare* **2001;**7(Suppl 1):47–49.

13. Zaylor C, Whitten P, Kingsley C. Telemedicine services to a county jail. *J Telemed Telecare* **2000;**6(Suppl 1):S93–S95.

14. Derogatis LR. *SCL-90-R administration, scoring, and procedures manual—II.* Towson, MD: Clinical Psychometric Research, Inc., **1992.**

15. Ogles BM, Lambert MJ, Masters KS. *Assessing outcome in clinical practice.* Needham Heights, MA: Allyn & Bacon, **1996.**

16. Guy W. *ECDEU assessment manual for psychopharmacology, revised.* Rockville, MD: U.S. Department of Health and Human Services, **1976.**

17. Zollo S, Kienkle M, Loeffelholz P, Sebille S. Telemedicine to Iowa's correctional facilities: initial clinical experience and assessment of program costs. *Telemed J* **1999;**5:291–301.

18. Zincone LH, Doty E, Balch DC. Financial analysis of telemedicine in a prison system. *Telemed J* **1997;**3:247–255.

Address reprint requests to:
*Eve-Lynn Nelson, Ph.D.*
*Center for Telemedicine and Telehealth*
*Kansas University Medical Center*
*Mail Stop 1048, 2012 Wahl Annex*
*3901 Rainbow*
*Kansas City, KS 66160*

*E-mail:* enelson2@kumc.edu

# Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results From a Randomized Controlled Equivalence Trial

Richard O'Reilly, M.B., F.R.C.P.C.
Joan Bishop, M.D., F.R.C.P.C.
Karen Maddox, R.N., M.A.
Lois Hutchinson, M.D., F.R.C.P.C.
Michael Fisman, M.B., F.R.C.P.C.
Jatinder Takhar, M.D., F.R.C.P.C.

_Objective:_ The use of interactive videoconferencing to provide psychiatric services to geographically remote regions, often referred to as telepsychiatry, has gained wide acceptance. However, it is not known whether clinical outcomes of telepsychiatry are as good as those achieved through face-to-face contact. This study compared a variety of clinical outcomes after psychiatric consultation and, where needed, brief follow-up for outpatients referred to a psychiatric clinic in Canada who were randomly assigned to be examined face to face or by telepsychiatry. _Methods:_ A total of 495 patients in Ontario, Canada, referred by their family physician for psychiatric consultation were randomly assigned to be examined face to face (N=254) or by telepsychiatry (N=241). The treating psychiatrists had the option of providing monthly follow-up appointments for up to four months. The study tested the equivalence of the two forms of service delivery on a variety of outcome measures. _Results:_ Psychiatric consultation and follow-up delivered by telepsychiatry produced clinical outcomes that were equivalent to those achieved when the service was provided face to face. Patients in the two groups expressed similar levels of satisfaction with service. An analysis limited to the cost of providing the clinical service indicated that telepsychiatry was at least 10% less expensive per patient than service provided face to face. _Conclusions:_ Psychiatric consultation and short-term follow-up can be as effective when delivered by telepsychiatry as when provided face to face. These findings do not necessarily mean that other types of mental health services, for example, various types of psychotherapy, are as effective when provided by telepsychiatry. (_Psychiatric Services_ 58:836–843, 2007)

The provision of psychiatric services to rural and geographically isolated regions challenges most health systems (1). Countries with shortages of psychiatrists find it inefficient for psychiatrists to travel long distances to see few patients in remote communities. Conversely, it is expensive and often not feasible for patients from remote regions to travel to urban centers for psychiatric care. Interactive videoconferencing, often called telepsychiatry, is a potential solution to this problem (2). However, the efficacy of telepsychiatry to provide clinical psychiatric services to distant communities has yet to be definitively established (3).

Researchers have established that telepsychiatry can provide a reliable diagnosis of common psychiatric disorders (4,5) and accurate assessments of cognitive (6), depressive (7), anxiety (7), and psychotic symptoms (8). However, the assessment of symptoms, such as emotional affect, that require visual observation of behavior appear less reliable (9), especially when using bandwidths of 128 kilobits per second or less (8,10).

The ultimate test of telepsychiatry is whether it can produce clinical outcomes that are at least equivalent to those achieved through face-to-face service. Two small studies examining clinical outcomes showed no statistically significant differences in outcomes between patients seen via

Dr. O'Reilly, Dr. Fisman, and Dr. Takhar are affiliated with the Department of Psychiatry, Regional Mental Health Care, St. Joseph's Health Care, P.O. Box 5532, Station B, 850 Highbury Ave. N., London, Ontario N6A 4H1, Canada (e-mail: richard.o'reilly@sjhc.london.on.ca). They are also with the Department of Psychiatry, University of Western Ontario, London, Ontario. Dr. Bishop is with the Department of Psychiatry, University of British Columbia, Vancouver, British Columbia. Ms. Maddox and Dr. Hutchinson are affiliated with the Department of Psychiatry, Thunder Bay Regional Health Sciences Centre, Thunder Bay, Ontario.

telepsychiatry and those seen in person (11,12). In the only reported randomized controlled trial of telepsychiatry for adults, 119 U.S. veterans with depression were randomly assigned to six months of outpatient treatment in person or by telepsychiatry (13). They received medications, psychoeducation, and supportive counseling. No between-group differences were observed in depressive symptoms, adherence to appointments, adherence to medication regimens, dropout rates, or satisfaction levels. A second small (N=28) randomized controlled trial of telepsychiatry evaluating an eight-week course of cognitive-behavioral therapy for children reported "decreasing symptoms of childhood depression over videoconferencing at rates comparable to face-to-face" (14).

All published outcome studies, including the randomized controlled trial of adults with depression (13), used comparative methods rather than equivalence methods for the determination of sample size, analysis of data, and interpretation of results. Comparative studies often incorrectly conclude that a failure to detect a statistically significant difference in outcome implies "equivalence." However, the lack of a statistically significant difference does not mean equivalence (15,16). "While non-significant P values from tests of equality indicate that trial results have not conclusively established the superiority of an experimental regimen, these tests do not address the issue of equivalence which requires the use of confidence intervals" (17) and predetermined equivalence margins (15).

We overcame the limitation of previous telepsychiatry research using methods specially designed to test whether two interventions are equivalent. We describe a variety of clinical outcomes among outpatients with mixed psychiatric diagnoses referred by their family physician and randomly assigned to receive psychiatric consultation and short-term follow-up either in person or by telepsychiatry. We predicted that patients referred by their family physician for a psychiatric consultation and, if needed, short-term follow-up would have equivalent clinical outcomes regard-

less of whether they were seen via telepsychiatry or in person. We also predicted that telepsychiatry would be less expensive than in-person care.

## Methods

The research ethics committees of the University of Western Ontario and the Thunder Bay Regional Hospital reviewed and approved this study. All participants were provided with written and verbal information about the nature of the study and consented to take part.

### Study design

Participants were sampled from referrals to the psychiatric consultation clinic of the Thunder Bay Regional Hospital. We used a sample size calculation and analytical methods that are designed for equivalence trials (15). In this process, we start by prespecifying delta ($\Delta$), the absolute value of the difference that could be found between telepsychiatry and face-to-face care and still conclude that the two interventions are equivalent. This is called the equivalence margin and $-\Delta$ to $+\Delta$ is the range within which $\Delta$ can vary and still be of no clinical importance (15). Because our main interest is that telepsychiatry is not inferior to face-to-face care, we are concerned with the lower limit of this range ($-\Delta$), and in our analysis, we check whether the confidence interval (CI) for the difference between the groups on various outcome measures is less than $-\Delta$.

Sample size was determined for our primary outcome, the difference in proportions of patients moving from dysfunctional (case) to functional (noncase) status on the Brief Symptom Inventory (BSI) (18) four months after initial psychiatric consultation. We used expert clinical judgment (15) to choose the lower limit of the difference in proportions, which would still be consistent with clinical equivalence ($-\Delta = -.15$) (17). If the difference in improvement between intervention and control groups is less than this predetermined equivalence margin, the treatments would be considered equally effective or equivalent, even though one can never actually "prove" equivalence (19).

With alpha error of .05 (one sided)

and statistical power of 80%, we used the sample size formula from Jones and colleagues (15) for the one-sided case for comparison of proportions in equivalence trials, indicating a requirement of 138 patients per group, or 276 patients total.

We experienced a high loss to follow-up that required recruitment of more participants to achieve the full sample of completers. The first 42 patients were allocated to groups by flip of a coin, and block randomization (that is, using random numbers generated by computer algorithm in blocks of eight) was subsequently employed to control for any change of referral pattern over the 30-month duration of the study.

### Inclusion criteria

Patients were eligible if they were aged 18 to 65, from the Thunder Bay region (officially designated as an underserviced area for psychiatry), and referred by a family doctor to the psychiatric outpatient department of the local general hospital. Patients were excluded if their family doctor considered them incapable of consenting to the study or if the referral was primarily for a medico-legal or insurance assessment. All eligible patients received a letter explaining the nature of the study. Shortly afterward they were contacted by telephone by a research assistant, who is an experienced registered nurse. The research assistant answered questions about the study and, if the patient was willing to proceed, completed the BSI over the telephone. Only patients who had an initial BSI score in the dysfunctional range were randomly assigned to one of the study groups.

### Equipment

The interactive videoconference equipment consisted of a Polycom 512 View Station and a Sony Trinitron 68.5-centimeter diagonal screen. The connection was made by using three ISDN lines delivering a bandwidth of 384 kilobits per second.

### Clinical services

Participants in each arm of the study attended the Thunder Bay Regional Hospital for service. Four psychiatrists from London, Ontario, located

approximately 1,000 kilometers from Thunder Bay, provided the service. They traveled by air to Thunder Bay to provide in-person service and connected via interactive videoconference from London for the telepsychiatry service. Each psychiatrist was assigned an equal number of participants in each arm of the study.

The clinical service provided in the study was modeled on the outpatient service already in use in Thunder Bay. The psychiatrists sent a handwritten form with recommendations to the family physician by facsimile within 48 hours of the initial assessment, followed by a full typed report. The psychiatrists decided, on the basis of clinical need, whether patients should return for follow-up visits. Patients could be seen within the protocol for up to four months after the initial assessment. When needed, follow-up visits were scheduled at monthly intervals for each group.

Treatment recommendations included medication management, psychoeducation, supportive counseling, and triage to other local services. In the vast majority of cases the prescription of medication, recommended by the psychiatrists, was undertaken by the family physician. This is typical of practice in underserviced areas where telepsychiatry would most often be used. However, the psychiatrists could prescribe directly when the need arose. The psychiatrists frequently referred patients to a short-term psychotherapy program, community-based case-management services, various self-help groups, and recreation programs. The psychiatrists were instructed to provide services in the same manner to participants in each group. As a check on the similarity of services provided to the two groups, the research assistant reviewed the handwritten forms filled out by the psychiatrist and collected data on whether medications or referrals to other community services were recommended.

### Research scales

The BSI is a 53-item self-report psychological symptom inventory with lower scores indicating fewer symptoms [18]. The Global Severity Index (GSI) subscale of the BSI is calculat-ed from the raw scores and is the most sensitive indicator of distress from psychiatric symptoms. Raw scores are converted into standardized T scores. The operational rule for classifying a patient as a "case" is if the respondent has a GSI score greater than or equal to a T score of 63 or if any two of the nine primary dimensions are greater than or equal to a T score of 63. When the individual is classified as a case he or she is in the dysfunctional range [20]. The recommended brief standardized instructions were provided to the participant on the telephone for the screening contact and later in the mail for the four-month follow-up by the same trained research assistant.

On the initial assessment visit participants completed the Medical Outcomes Study Short Form (SF-36), a self-report health survey with 36 questions, which is suitable for self-administration or administration by a trained interviewer in person or by telephone [21]. It yields an eight-scale profile of scores. For this study, the full SF-36 was administered even though we planned to use only the five-item mental health subscale, because this is the usual manner of scale completion. Scores on the mental health subscale range from 0 to 100, with higher scores indicating higher functioning. Because this study was done in Canada, we used the Canadian norm-based scores, which are standardized to 50 by using Canadian weights [22].

The Client Satisfaction Questionnaire (CSQ-8) is an eight-item self-report scale with brief written instructions. Scores range from 8 to 32, with higher scores indicating higher satisfaction [23–26].

At four months, the BSI, SF-36, and CSQ-8 were mailed to all participants with a stamped addressed return envelope. All scales included standardized instructions for self-report. Two further mailings were sent to noncompleters. In a pilot project for measuring outcomes for telepsychiatry, we found that the procedures for administration of the BSI and SF-36 on the telephone, in person, and in the mail yielded baseline and four-month scores with expected values and direction of change [27]. Thus it was deemed to be valid to administer the baseline BSI on the telephone and the four-month BSI via mail for this full study.

### Admissions

Psychiatric admissions to the Thunder Bay general hospital and the regional psychiatric hospital were noted for all participants. It was not possible to determine admissions to psychiatric units outside of the Thunder Bay region. However, the geographical location, 480 kilometers from the nearest alternative psychiatric unit, makes it unlikely that many patients were admitted elsewhere. There is no reason to believe that participants in either group would be more likely to leave the region.

### Costs

Details of fees paid to the psychiatrists and of reimbursement of expenses the psychiatrists incurred (on the basis of receipts) when traveling to and staying in Thunder Bay were collected throughout the study. ISDN line rental charges and per minute connection costs were available from telephone company monthly billing invoices. The capital cost of the videoconference equipment was depreciated over a five-year period. All participants attended the same office in the outpatient department of the distal site for clinical service. However, an additional office was used at the proximal site to house the videoconference equipment, and market rate rental for this office was added to the costs of telepsychiatry.

### Outcome variables

The primary outcome is the proportion of participants whose BSI score moved from dysfunctional to functional range (that is, the patient moved from being classified as a case to being classified as a noncase). The BSI was chosen because it measures overall distress from psychiatric symptoms, and distress is an important reason that patients seek help. Secondary outcome variables were the proportion of participants with any psychiatric admission during the 12 months after the initial assessment, change in scores on the GSI subscale of the BSI, change in scores on the mental health subscale of the SF-36 [21] standard-

ized on a Canadian population (22), score on the CSQ-8 at four months, and cost of providing psychiatric assessment and follow-up.

*Analysis*

The two groups were compared on major baseline variables to check if the randomization worked. We used equivalence methods (15) to analyze outcome data for scores on the BSI, hospital admissions, scores on the GSI subscale of BSI, scores on the mental health subscale of SF-36, and scores on the CSQ-8.

*BSI.* We constructed a CI centered about the observed difference in proportions of participants moving from dysfunctional to functional status on the BSI from baseline to four months. Because the objective was to ensure that telepsychiatry is not inferior to in-person service, a lower one-sided 95% CI was constructed by using the method of Pagano and colleagues (28).

*Admissions.* For comparing proportions of participants in each group with at least one admission during the 12 months after initial consultation, we used methods suitable for testing equivalence of two proportions with the predetermined lower limit of the equivalence margin (–Δ=–.10). Clinical consensus was that a difference of 10% or less was a conservative estimate, as decided by research team members in consultation with psychiatrist colleagues working in both clinical and research practice. We calculated cumulative hospital days for each group to help understand the results. We did not use mean number of admissions or days in the hospital, as we anticipated (and found) skewed data.

*GSI.* We also tested for equivalence of mean improvement in scores on the GSI, the BSI subscale, which is the most sensitive single indicator of distress (20). We used the lower limit of the predetermined equivalence margin (–Δ=–5) to be conservative, because a difference in scores on the GSI of 7 is considered to be clinically significant (18,29).

*Mental health subscale of SF-36.* A 5-point variation in the score on the mental health subscale is considered the smallest clinically significant difference. To detect this, we needed

## Figure 1

Enrollment and follow-up patterns of patients referred for psychiatric consultation



132 participants per group (30), which is compatible with the number for testing the primary outcome. We set the lower limit of the predetermined equivalence margin (–Δ) at –5 and used SPSS to obtain the lower one-sided 95% CI centered around the observed difference in the mean improvement scores on the mental health subscale.

*CSQ-8.* We constructed a lower one-sided CI centered around observed differences in mean four-month scores using SPSS. The lower limit of the equivalence margin (–Δ) was set at –2 by using clinical expertise to extrapolate from literature, such as the study by Gill and colleagues (31), who found a main effect when CSQ-8 scores varied from 3 to 4 points (22.4–26.4).

*Costs.* We calculated the average cost per patient by simply dividing the total cost per group by the number of patients randomly assigned to

that group. Because it was not possible to attribute costs to individual patients, standard deviations are not available. Because participants went to the same hospital for telepsychiatry and face-to-face services, they incurred no differences in expenses in either arm of the study.

## Results

### Disposition and characteristics of patients

The study was conducted between 2001 and 2004. Figure 1 depicts the enrollment, random assignment, and follow-up of study patients. Table 1 shows the baseline demographic and clinical characteristics of the two groups. There were no significant differences between the groups on baseline measures or on the measures of services provided. Completers and noncompleters in the two groups were similar, except that more com-

**Table 1**

Demographic and clinical characteristics of 495 patients referred for psychiatric consultation, by method of consultation

| Characteristic | Face to face (N=254) | | Telepsychiatry (N=241) | |
|---|---|---|---|---|
| | N | % | N | % |
| Age (years) | | | | |
| 18–24 | 47 | 19 | 30 | 12 |
| 25–34 | 55 | 22 | 65 | 27 |
| 35–44 | 88 | 35 | 84 | 35 |
| 45–54 | 48 | 19 | 38 | 16 |
| 55–65 | 16 | 6 | 24 | 10 |
| Sex | | | | |
| Male | 94 | 37 | 89 | 37 |
| Female | 160 | 63 | 152 | 63 |
| Marital status | | | | |
| Married | 88 | 35 | 81 | 34 |
| Widow | 1 | <1 | 2 | 1 |
| Single | 96 | 38 | 77 | 32 |
| Common law | 16 | 6 | 21 | 9 |
| Separated or divorced | 48 | 19 | 48 | 20 |
| Unknown[a] | 5 | 2 | 12 | 5 |
| Primary diagnosis | | | | |
| Depression | 138 | 54 | 138 | 57 |
| Bipolar disorder | 24 | 9 | 22 | 9 |
| Adjustment disorder | 21 | 8 | 12 | 5 |
| Other anxiety disorder | 20 | 8 | 16 | 7 |
| Psychosis | 11 | 4 | 4 | 2 |
| Alcohol or drug abuse or dependence | 8 | 3 | 7 | 3 |
| Posttraumatic stress disorder | 7 | 3 | 4 | 2 |
| Adult attention deficit disorder | 4 | 2 | 7 | 3 |
| Phobic disorder | 3 | 1 | 3 | 1 |
| Personality disorder | 3 | 1 | 1 | <1 |
| Eating disorder | 2 | 1 | 1 | <1 |
| Rule out somatic disorder | 2 | 1 | 2 | 1 |
| Obsessive compulsive disorder | 1 | <1 | 3 | 1 |
| Relationship problems | 1 | <1 | 1 | <1 |
| Other disorders | 1 | <1 | 3 | 1 |
| Missing[a] | 8 | 3 | 17 | 7 |
| Services provided[b] | | | | |
| Medications recommended | 230 | 93 | 210 | 94 |
| Community referral made | 119 | 48 | 119 | 53 |
| Baseline score on the Global Severity Index of the Brief Symptom Inventory (M±SD)[c] | 57.5±9.7 | | 57.6±10.1 | |

[a] When patients did not attend the initial assessment, diagnosis for all and marital status for most could not be assigned.

[b] Data available for 246 patients in the face-to-face group and 224 patients in the telepsychiatry group

[c] Possible scores range from 30 to 80, with higher scores indicating more distress.

pleters in both groups were married and noncompleters in the face-to-face group used more hospital days than completers, whereas in the telepsychiatry group, the opposite was true. These differences would not challenge our hypothesis.

### Clinical outcomes and hospital use

Tables 2 and 3 show the results of equivalence testing for the primary and secondary outcome measures, using the predetermined equivalence margins. All results support the hypothesis that telepsychiatry produces equivalent outcomes to face-to-face care.

As expected, scores on the BSI (GSI subscale) and SF-36 (mental health subscale) showed that patients reported less distress from symptoms and improved mental health after the clinical intervention in both groups.

The levels of improvement were consistent with those considered to be clinically and socially relevant by the authors of these scales (18,29,30) and in the literature in which the BSI has been used to measure outcomes for patients similar to those in our trial (32). The CSQ-8 indicated a moderate degree of satisfaction (33). We conducted an intent-to-treat analysis for the proportion of participants hospitalized within 12 months from initial consultation, and this analysis showed equivalence between the two groups.

### Costs

Table 4 shows that face-to-face services required travel and accommodation expenses for the psychiatrists that were unnecessary when using telepsychiatry. Face-to-face services also required larger fees for psychiatrists to compensate for travel time. These costs were greater than the technical costs of telepsychiatry. The average cost of telepsychiatry was 10% less per patient (16% less per visit) than the cost of in-person service.

### Discussion

Using equivalence methods, we demonstrated that psychiatric consultation and short-term follow-up provided by telepsychiatry can produce clinical outcomes that are equivalent to those achieved when patients are assessed and followed in-person. On the primary outcome, approximately 20% of each group moved from a dysfunctional to functional rating. This is a modest proportion because we used a stringent test of effectiveness: the change from a positive psychiatric diagnosis to functional status, or a patient's moving from being a case to a noncase (20). The GSI baseline, four-month, and improvement scores were similar in magnitude to those found in a study of different types of psychotherapy for major depressive disorder (32). In addition, our finding of clinically significant improvements and equivalence in the primary outcome is supported by the analysis of the other outcomes, as measured by hospitalization and mean improvement in the GSI and mental health subscales.

The clinical service provided via

**Table 2**

Follow-up results of rates of hospitalization and return to functional status among patients referred for psychiatric consultation, by method of consultation

| Measure | N | Proportion | Difference in proportion | Lower one-sided 95% CI for difference | Predetermined equivalence margin (−Δ)[a] |
|---|---|---|---|---|---|
| Return to functional score on the Brief Symptom Inventory by four months | | | | | |
| Face to face (N=148) | 29 | .20 | .02 | −.10 | −.15 |
| Telepsychiatry (N=138) | 30 | .22 | | | |
| Any hospitalization in a psychiatric unit in year after initial assessment | | | | | |
| Face to face (N=246) | 18 | .073 | .01 | −.03 | −.10 |
| Telepsychiatry (N=224) | 15 | .066 | | | |

[a] Δ represents the absolute value of the difference that could be found between telepsychiatry and face-to-face care and still conclude that the two interventions are equivalent. Because we are only interested in whether telepsychiatry is not inferior to face-to-face care, we used the lower limit (−Δ). If the difference in improvement between intervention and control groups is less than this predetermined equivalence margin, the treatments would be considered equally effective or equivalent.

telepsychiatry was less expensive than when it was provided in person. This finding coupled with the equivalent clinical outcomes suggests that telepsychiatry can be a cost-effective method for delivering psychiatric services. Our study provided services to a remote community, which required air travel and overnight stays. As noted elsewhere (34), the relative cost of telepsychiatry and in-person care is influenced by several factors, such as the distance traveled, volume of patients, and the type of technology. Therefore, the cost savings to the service provider in this study, may not

be realized in other settings. Furthermore, the costs in the study presented here were assessed solely from the perspective of the provider. In this study, the patients traveled to the Thunder Bay Regional Hospital irrespective of whether they received service in-person or via telepsychiatry, and therefore there is no reason that patients' travel expenses and time taken from work would differ. Other research has suggested that telepsychiatry, used under certain conditions, can reduce cost to service users (35).

A major strength of our study was

that it was conducted in a remote, underserviced area and thus replicated the conditions in which telepsychiatry is most likely to be used. We minimized exclusion criteria to ensure the inclusion of a broad range of patients, similar to the usual referrals from primary care physicians to psychiatrists.

However, the naturalistic nature of the service also produced limitations. Because of the broad inclusion criteria, we did not limit psychiatric care protocols to a carefully defined, diagnosis-specific, therapeutic intervention. Psychiatrists were instructed to provide the same type and level of

**Table 3**

Follow-up results on various measures among patients referred for psychiatric consultation, by method of consultation

| Measure | Baseline score | | Four-month score | | Improvement | | Difference in means | Lower one-sided 95% CI for difference | Predetermined equivalence margin (−Δ)[a] |
|---|---|---|---|---|---|---|---|---|---|
| | Mean | SD | Mean | SD | Mean | SD | | | |
| GSI[b] | | | | | | | | | |
| Face to face (N=148) | 56.5 | 10.1 | 49.7 | 13.3 | 6.9 | 9.1 | −.3 | −2.6 | −5.0 |
| Telepsychiatry (N=138) | 56.9 | 10.2 | 49.7 | 12.6 | 7.2 | 9.8 | | | |
| MH[c] | | | | | | | | | |
| Face to face (N=148) | 24 | 12.4 | 30.9 | 15.7 | 6.9 | 13.9 | −1.0 | −4.7 | −5.0 |
| Telepsychiatry (N=138) | 23.8 | 12.0 | 31.7 | 14.2 | 7.9 | 13.0 | | | |
| CSQ[d] | | | | | | | | | |
| Face to face (N=129) | — | — | 23.0 | 5.7 | — | — | .3 | −1.2 | −2.0 |
| Telepsychiatry (N=125) | — | — | 22.7 | 6 | — | — | | | |

[a] Δ represents the absolute value of the difference that could be found between telepsychiatry and face-to-face care and still conclude that the two interventions are equivalent. Because we are only interested in whether telepsychiatry is not inferior to face-to-face care, we used the lower limit (−Δ). If the difference in improvement between intervention and control groups is less than this predetermined equivalence margin, the treatments would be considered equally effective or equivalent.

[b] Global Severity Index of the Brief Symptom Inventory. Possible scores range from 30 to 80, with higher scores indicating more distress.

[c] Mental health subscale of the 36-item Medical Outcomes Study Short Form. Possible scores range from 0 to 100, with higher scores indicating higher functioning.

[d] Client Satisfaction Questionnaire. Possible scores range from 8 to 32, with higher scores indicating higher satisfaction.

Table 4

Number of patients and visits and costs in U.S. dollars for psychiatric consultation among patients referred for psychiatric consultation, by method of consultation

| Variable | Face to face | Telepsychiatry |
|---|---|---|
| Payments to psychiatrists | $73,636 | $45,580 |
| Travel and accommodation for psychiatrists | $34,913 | $0 |
| Telephone connection costs for telepsychiatry | $0 | $22,665 |
| Equipment depreciation | $0 | $10,036 |
| Room rental cost for telepsychiatry in proximal site | $0 | $10,030 |
| Total costs | $108,549 | $88,311 |
| Number of patients | 246 | 224 |
| Number of visits | 344 | 333 |
| Average cost per patient | $439 | $394 |
| Average cost per visit | $315 | $265 |

service to patients seen in person and by telepsychiatry. Furthermore, data on services provided (Table 1) suggests that similar care was actually provided to both groups. However, it is still possible that there may have been subtle differences in the way patients in each group were managed.

A second limitation was the high rate of noncompletion of the four-month research scales. Although we continued to recruit patients until we had the required number of participants, only 58% of participants initially randomized to the groups completed these scales. As a result we were able to do only a per-protocol analysis on these outcomes. However, a per-protocol analysis is considered by many to be more important than an intent-to-treat analysis for equivalence trials (15). It is important to note that we were able to perform an intent-to-treat analysis on the risk of hospitalization in the year after consultation, for which we had full data, and this analysis also showed equivalence.

The low completion rate was probably influenced by the fact that consultation was available more quickly through the study than through regular local services and that most participants had ended their clinical contact a number of months before they were required to complete the final research scales. These factors likely contributed to the recruitment of a cohort of participants with low motivation to complete the research component of the intervention.

We did not measure satisfaction with the technical components of telepsychiatry as has been done in other studies. This would have been possible only for the telepsychiatry group. Rather, we used the opportunity provided by the randomized controlled trial to compare satisfaction with the clinical service provided to the two groups using a standard questionnaire, the CSQ-8. The results demonstrated equivalent levels of satisfaction in both face-to-face and telepsychiatry groups.

Ten percent of patients who were initially contacted refused participation in the study because of an unwillingness to use telepsychiatry. This figure is lower than the 33% of residents of a rural area of Iowa who said that they would be unwilling to use telepsychiatry if they needed mental health services (36). The higher rate in the Iowa study may be because the researchers surveyed a general community population rather than individuals referred for psychiatric assessment. Nevertheless, there appears to be a group of individuals who are averse to the use of telepsychiatry. Administrators developing telepsychiatry programs may need to maintain some parallel face-to-face service to meet the needs of this group.

## Conclusions

Our findings indicate that psychiatric consultation and short-term follow up provided by telepsychiatry can produce clinical outcomes that are equivalent to those achievable when patients are seen face to face. In our setting telepsychiatry was less expensive than face-to-face service, although the relative cost of the two modes of service delivery is likely to be influenced by factors such as the distance between sites and service volume. It is important to recognize that we examined a single psychiatric service: psychiatric consultation and short-term follow-up. It is possible that telepsychiatry may not produce equivalent outcomes when used to deliver other mental health services, such as psychotherapy, which is more dependent on the therapist-patient relationship. Nevertheless, the findings are likely to encourage those who advocate a more widespread adoption of telepsychiatry to counter the shortage of psychiatrists in remote regions.

### Acknowledgments and disclosures

This study was supported by grant R2354-A01 from the Ontario Mental Health Foundation and by NORTH Network. The authors thank Emmanuel Persad, M.B., for his helpful advice and assistance and Allan Donner, Ph.D., for his advice on statistics.

The authors report no competing interests.

### References

1. El-Guebaly N, Kingstone E, Rae-Grant Q, et al: The geographical distribution of psychiatrists in Canada: unmet needs and remedial strategies. Canadian Journal of Psychiatry 38:212–216, 1993

2. Brown FW: Rural telepsychiatry. Psychiatric Services 49:963–964, 1998

3. Monnier J, Knapp RG, Frueh BC: Recent advances in telepsychiatry: an updated review. Psychiatric Services 54:1604–1609, 2003

4. Ruskin PE, Reed S, Kumar R, et al: Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. Psychiatric Services 49: 1086–1088, 1998

5. Elford R, White H, Bowering R, et al: A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. Journal of Telemedicine and Telecare 6:73–82, 2000

6. Ball CJ, Scott N, McLaren PM, et al: Preliminary evaluation of a low-cost video conferencing (LCVC) system for remote cognitive testing of adult psychiatric patients. British Journal of Clinical Psychology 32:303–307, 1993

7. Baer L, Cukor P, Jenike MA, et al: Pilot studies of telemedicine for patients with obsessive-compulsive disorder. American Journal of Psychiatry 152:1383–1385, 1995

8. Zarate CA Jr, Weinstock L, Cukor P, et al: Applicability of telemedicine for assessing

patients with schizophrenia: acceptance and reliability. Journal of Clinical Psychiatry 58:22–25, 1997

9. Jones BN 3rd, Johnston D, Reboussin B, et al: Reliability of telepsychiatry assessments: subjective versus observational ratings. Journal of Geriatric Psychiatry and Neurology 14:66–71, 2001

10. Yoshino A, Shigemura J, Kobayashi Y, et al: Telepsychiatry: assessment of televideo psychiatric interview reliability with present- and next-generation internet infrastructures. Acta Psychiatrica Scandinavica 104:223–226, 2001

11. Zaylor C: Clinical outcomes in telepsychiatry. Journal of Telemedicine and Telecare 5(suppl 1):S59–S60, 1999

12. Kennedy C, Yellowlees P: The effectiveness of telepsychiatry measured using the Health of the Nation Outcome Scale and the Mental Health Inventory. Journal of Telemedicine and Telecare 9:12–16, 2003

13. Ruskin PE, Silver-Aylaian M, Kling MA, et al: Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. American Journal of Psychiatry 161:1471–1476, 2004

14. Nelson EL, Barnard M, Cain S: Treating childhood depression over videoconferencing. Telemedicine Journal and E-Health: The Official Journal of the American Telemedicine Association 9:49–55, 2003

15. Jones B, Jarvis P, Lewis JA, et al: Trials to assess equivalence: the importance of rigorous methods. British Medical Journal 313:36–39, 1996

16. Garrett AD: Therapeutic equivalence: fallacies and falsification. Statistics in Medicine 22:741–762, 2003

17. Fleming TR: Design and interpretation of equivalence trials. American Heart Journal 139:S171–S176, 2000

18. Piersma HL, Reaume WM, Boes JL: The

Brief Symptom Inventory (BSI) as an outcome measure for adult psychiatric inpatients. Journal of Clinical Psychology 50:555–563, 1994

19. Hauck WW, Anderson S: Some issues in the design and analysis of equivalence trials. Drug Information Journal 33:109–118, 1999

20. Derogatis LR: BSI Brief Symptom Inventory: Administration, Scoring, and Procedures Manual, 4th ed. Minneapolis, National Computer Systems, 1993

21. Ware JE Jr, Gandek B: Overview of the SF-36 Health Survey and the International Quality of Life Assessment (IQOLA) Project. Journal of Clinical Epidemiology 51:903–912, 1998

22. Hopman WM, Towheed T, Anastassiades T, et al: Canadian normative data for the SF-36 Health Survey: Canadian Multicentre Osteoporosis Study Research Group. Canadian Medical Association Journal 163:265–271, 2000

23. Larsen DL, Attkisson CC, Hargreaves WA, et al: Assessment of client/patient satisfaction: development of a general scale. Evaluation and Program Planning 2:197–207, 1979

24. Attkisson CC, Zwick R: The client satisfaction questionnaire: psychometric properties and correlations with service utilization and psychotherapy outcome. Evaluation and Program Planning 5:233–237, 1982

25. Attkisson CC, Greenfield TK: The UCSF Client Satisfaction Scales: I. the Client Satisfaction Questionnaire-8, in The Use of Psychological Testing for Treatment Planning and Outcomes Assessment, 2nd ed. Edited by Maruish MA. Mahwah, NJ, Lawrence Erlbaum Associates, 1999

26. Nguyen TD, Attkisson CC, Stegner BL: Assessment of patient satisfaction: development and refinement of a service evaluation questionnaire. Evaluation and Program Planning 6:299–313, 1983

27. Bishop JE, O'Reilly RL, Maddox K, et al: Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. Journal of Telemedicine and Telecare 8:217–221, 2002

28. Pagano M, Gavreau K: Principles of Biostatistics. Belmont, Calif, Duxbury Press, 1993

29. Carscaddon DM, George M, Wells G: Rural community mental health consumer satisfaction and psychiatric symptoms. Community Mental Health Journal 26:309–318, 1990

30. Ware JE: SF-36 Health Survey Manual and Interpretation Guide. Boston, Health Institute, New England Medical Centre, 1993

31. Gill KJ, Pratt CW, Librera LA: The effects of consumer vs staff administration on the measurement of consumer satisfaction with psychiatric rehabilitation. Psychiatric Rehabilitation Journal 21:365–370, 1998

32. Beutler LE, Engle D, Mohr D, et al: Predictors of differential response to cognitive, experiential and self directed psychotherapeutic procedures. Journal of Consulting and Clinical Psychology 59:333–340, 1991

33. Greenwood N, Key A, Burns T, et al: Satisfaction with in-patient psychiatric services: relationship to patient and treatment factors. British Journal of Psychiatry 174:159–163, 1999

34. Hyler SE, Gangure DP: A review of the costs of telepsychiatry. Psychiatric Services 54:976–980, 2003

35. Simpson J, Doze S, Urness D, et al: Telepsychiatry as a routine service—the perspective of the patient. Journal of Telemedicine and Telecare 7:155–160, 2001

36. Rohland BM, Saleh SS, Rohrer JE, et al: Acceptability of telepsychiatry to a rural population. Psychiatric Services 51:672–674, 2000

# Practitioner's Corner

## A Systematic Review of the Use of Telepsychiatry in Acute Settings

ALBERTO SALMOIRAGHI,
MBChB, MRCPsych
SHAHID HUSSAIN, MBChB,
MRCPsych

Telepsychiatry is increasingly being used in many parts of the world. We performed a systematic review of the literature on the use of telepsychiatry in acute treatment settings using MEDLINE, EMBASE, and PsycINFO from inception to June 2013 using the following key words: acute telepsychiatry, teleconsultation, teleconferencing, telemedicine, emergency telepsychiatry, and e-mental health. Only articles in English were included. All study abstracts were reviewed by both authors independently to assess whether the topic of the paper was relevant to the review. References were selected independently until no new papers were found. If there was a disagreement, a discussion between the authors took place. A leading expert in this field was contacted to check for gray literature. The review included 23 papers. No meta-analyses or systematic reviews were found. The main results are (1) that patients have a positive attitude toward the technology and show a high level of satisfaction with telepsychiatry, (2) that the use of telepsychiatry is correlated with decreased admissions to psychiatric inpatient units, (3) that the quality of clinical interaction in telepsychiatry is similar to that in face-to-face care, and (4) that telepsychiatry seems to be cost effective. The use of telepsychiatry seems to be a viable and relatively inexpensive option for use in places where access to emergency services is difficult. (*Journal of Psychiatric Practice* 2015;21:389–393)

KEY WORDS: emergency telepsychiatry, acute telepsychiatry, e-mental health, acute treatment settings

Access to emergency services is a priority of service providers in many parts of the world. Psychiatry is not an exception and many locations now offer around-the-clock access to psychiatric assessment and interventions. However, contact is very often limited due to the remoteness of the location, distance from the site where assessment is offered, and limited availability of professionals. Many individuals face significant difficulties accessing transportation (eg, individuals living in rural areas). This problem is especially common in countries such as Australia,[1] where the population is dispersed widely all over the continent. However, rurality is ubiquitous, and even the European continent and the United States have vast territories that are scarcely populated where services are difficult to access.

The use of new technology may offer an answer. Over the past 2 decades, the use of telepsychiatry has gradually increased. According to Yellowlees et al,[2] there are very few psychiatric services that cannot be provided remotely, making telepsychiatry a versatile tool. A range of psychiatric services, including assessment, diagnosis, and management of a variety of mental disorders ranging from mild anxiety to complex psychotic illnesses, can be provided by telepsychiatry.[3,4] Management of psychiatric conditions by videoconferencing can include the prescription of medication, delivery of counseling and psychotherapies, and consideration of admission to inpatient units. No differences in the efficacy of teleconsultations have been observed in populations of different ages, sex, or race.[4] It is envisaged that the next decade will see an expansion of the use of videoconferencing in psychiatric practice.[5]

SALMOIRAGHI: Betsi Cadwaladr University Local Health Board, Ty Derbyn, Maelor Hospital, Wrexham, Wales, UK and University of Liverpool, Liverpool, UK; HUSSAIN: Betsi Cadwaladr University Local Health Board, Ty Derbyn, Maelor Hospital, Wrexham, Wales, UK

Copyright © 2015 Wolters Kluwer Health, Inc. All rights reserved.

Please send correspondence to: Alberto Salmoiraghi, MBChB, MRCPsych, Betsi Cadwaladr University Local Health Board, Ty Derbyn, Maelor Hospital, Croesnewydd Road, Wrexham, Wales LL13 7TD, UK (e-mail: alberto.salmoiraghi@wales.nhs.uk).

The authors declare no conflicts of interest.

DOI: 10.1097/PRA.0000000000000103

Copyright © 2015 Wolters Kluwer Health, Inc. All rights reserved.

## PRACTITIONER'S CORNER

The use of telepsychiatry in emergency settings may improve the quality and quantity of access to mental health services.[6] Emergency telepsychiatry can play a significant role not only in emergency departments but also in managing difficult emerging situations on psychiatric as well as general medical inpatient wards.[3,5] Patients being cared for on general medical wards in hospitals in remote settings may require urgent psychiatric input, which can be provided fairly conveniently and quickly by videoconferencing. Such telepsychiatric interventions could significantly reduce mean inpatient stays of psychiatric patients in remote hospital facilities.[3] Godleski et al[7] conducted a large 4-year study that examined the impact of telemental health services in 98,609 Veterans Affairs mental health patients between 2006 and 2010. They found that both psychiatric admissions and days of hospitalization of telemental health patients decreased by an average of approximately 25%. Interestingly, telemental health interventions have also been found to reduce the stigma associated with mental health care in other specialities.[3] Emergency departments in which videoconferencing is available can access rapid, effective psychiatric services, allowing them to reduce patients' waiting time and the overall costs of bed occupancy.

We conducted a review of the literature to gather evidence concerning the clinical quality of telepsychiatry as used in acute settings (ie, in situations requiring urgent medical consultation). Studies that examined telemental health care in situations not involving emergencies were excluded. We were particularly interested in gathering data concerning safety for patients and staff, accuracy of diagnosis, acceptability, and the range of interventions delivered. We were also interested in data on limitations encountered during the delivery of acute telepsychiatry and potential risks involved in and barriers to the use of acute telepsychiatry.

## METHODS

### Identification and Selection of Papers

We searched MEDLINE, PsycINFO, and EMBASE from inception to June 2013 using the following key words: *acute telepsychiatry*, *teleconsultation*, *teleconferencing*, *telemedicine*, *emergency telepsychiatry*, and *e-mental health*. Each key word was matched with "AND/OR" and duplicates removed. For completeness, we searched for the same terms using Google to identify papers published only on the Internet.

The titles of the publications that were identified were reviewed by each author separately and then the lists were compared. If needed, the authors read the abstracts and the occasional full article to resolve disagreements concerning which papers were appropriate for selection. References of included papers were also reviewed and relevant articles included. This process was repeated until no new papers were found. The authors met 4 times to achieve full consensus on the papers that should be included.

To expand the search for evidence, we also contacted a few private telepsychiatry services (eg, JSA Health Telepsychiatry, InSight Telepsychiatry, Specialists on Call) and the American Telemedicine Association.

### Inclusion and Exclusion Criteria

We did not use any strict inclusion or exclusion criteria, except that only articles in English were included, and studies that addressed the use of telepsychiatry in situations that did not involve acute care were excluded. We used a broad definition of acute settings which included inpatient units, emergency departments, and any services offered in an emergency. We did not place any restrictions on age group or subspecialties.

### RESULTS

The first search produced 15 articles, 2 of which were unavailable. The references of the 13 articles were reviewed to identify additional relevant papers. This process was repeated until no more papers could be found. We eventually located 5 more relevant articles, for a total of 20 papers. The Google search produced a large number of results, from which, after an independent review, we included 3 additional papers that did not appear in the previous search.

We stratified the results according to the hierarchy of evidence, with meta-analyses considered an indicator of the best level of evidence and expert opinion considered the lowest level of evidence. Unfortunately, we did not locate any papers that

Copyright © 2015 Wolters Kluwer Health, Inc. All rights reserved.

## PRACTITIONER'S CORNER

involved a meta-analysis, a systematic review, or a randomized controlled trial. We identified 1 literature review and 1 small controlled study that evaluated interrater reliability (see below for a description of these papers). The remaining papers consisted of descriptions of services, qualitative surveys, and expert opinions. All of the studies were relatively small, with as few as 6 patients included.

Given the nature of the papers that were identified, we decided to cluster the results into clinically relevant themes with the goal of helping clinicians and administrators understand more about the effectiveness and safety of using telepsychiatry in acute settings.

### Impact on Admissions and Outcomes

Saurman et al[1] examined the Mental Health Emergency Care-Rural Access Project in rural and remote New South Wales, Australia and found that the use of telepsychiatry in emergency settings was correlated with a decrease in the overall number of admissions to a distant psychiatric inpatient unit. In a small cohort of patients who were assessed by video, none was admitted to the hospital, but this study did not include a control group for comparison.[1] In a prospective study by D'Souza, patients with a DSM-IV Axis I diagnosis were managed in the local hospital with the support of telemedicine from a psychiatrist.[3] The sample showed statistically significant improvement in outcomes as measured by the 24-item Brief Psychiatric Rating Scale (BPRS-24) and the 32-item Behavior and Symptom Identification Scale (BASIS-32). Brebner et al[8] described a pilot accident and emergency teleconsulting service that was established at the main hospital in Aberdeen Scotland, with 4 peripheral sites in rural areas. During the 15 months of the study, 1998 videoconference calls were made, 402 of which (20%) were made to the accident and emergency department for clinical consultations. The majority of patients (89%) received treatment without transportation to the main center in Aberdeen.

### Satisfaction of Service Users and Service Providers

In a study that followed up 60 patients who had their first contact with a psychiatrist by video link when referred to an open psychiatric ward,[9] Sorvaniemi and colleagues reported that patients had a positive attitude toward and a strong preference for the new technology rather than the alternative of waiting for an inperson consultation or traveling to see a psychiatrist. The authors concluded that telepsychiatry is suitable for the assessment of psychiatric emergency patients. They also reported a quality of clinical interaction in telepsychiatry that was comparable with that of face-to-face assessments.

Several other papers evaluated users' satisfaction with telepsychiatry. In the Saurman et al[1] study discussed above, the authors surveyed 31 patients within 72 hours of a video assessment and found that their response was generally positive. In particular, the service seemed convenient, immediate, and easily accessible from the community. Other papers have confirmed these favorable results using structured patient satisfaction surveys.[10–12] Similar outcomes concerning patient satisfaction were also reported in 4 other papers,[3,13–15] but the tools used to evaluate satisfaction were not described.

### Cost-effectiveness

Two publications support the cost-effectiveness of telepsychiatry. One study reported on the cost-effectiveness of telepsychiatry in Canada in comparison with the costs of having patients transported by airplane for suicide assessment.[14] The overall results concerning cost favored videoconferencing, as would be expected because air transport of patients is particularly expensive. A review prepared for the California HealthCare Foundation by Hilty et al[16] concluded that use of telepsychiatry in the emergency department is financially sustainable.

### Quality of Clinical Interaction

The quality of clinical interaction is discussed in a number of publications. The authors indicate that it seems to be similar to that in face-to-face interventions; however, these results are based on self-report and untested questionnaires.[4,9,17] Bear et al[6] reported on ratings on multiple scales during interviews of 12 patients who were independently evaluated by a psychiatrist in the room and another in a remote site. The kappa coefficient was 0.85, indicating very good interrater reliability.

Copyright © 2015 Wolters Kluwer Health, Inc. All rights reserved.

PRACTITIONER'S CORNER

## Technological Modality

Ball et al[17] compared 4 different modes of communication: face-to-face, telephone, hands-free telephone, and low cost videoconference; 6 patients and 6 doctors took part in the study. They used the following assessment measures: observation, nonverbal behavior, verbal response modes, and a self-report measure. The researchers found no significant differences among these modes of communication, although there was a preference for modes with visual cues.

## Telepsychiatry in Different Emergency Settings

Videoconferencing or conducting initial assessments by videophones has been found to be a very useful alternative tool to save time and, most important, to deal with situations expeditiously by contacting professionals immediately.[4,12,18] In 1997, Yellowlees[19] published case reports concerning the effective use of telemedicine to perform assessments under the Mental Health Act in Australia; the validity of those assessments was not challenged legally. Gros et al[18] reported the case of a suicidal patient who was successfully managed by home-based videoconferencing. In that case, by a series of immediate enhanced communications (ie, by videoconference) between the patient, patient's family, treatment team, and local resources, the patient's symptoms were assessed to identify suicidality and an intervention was successfully carried out, involving the development of a safety plan and eventual transportation to an inpatient unit. Patients can access this technology when it is required on an urgent basis when they are in the community as well as on general medical and psychiatric wards and in intensive care units.[20]

## Initial Treatment Guidelines for Emergency Telepsychiatry

A reasonable amount of work has been done to establish guidelines concerning the use of telepsychiatry, and a number of relevant areas have been addressed. However, this endeavor is understandably in its initial phase and a lot of input is still required. In 2007, Drs. Shore, Hilty, and Yellowlees published an initial set of guidelines for emergency telepsychiatry, with the goal of generating further discussion to assist those who are considering establishing general telepsychiatry and/or emergency telepsychiatry services.[21] They noted that telepsychiatry, "an emerging application for emergency psychiatric assessment and treatment, can improve the quality and quantity of mental health services, particularly for rural, remote, and isolated populations." In their proposed guidelines, the authors took into consideration clinical, administrative, legal, and ethical issues that can arise in providing emergency telepsychiatry, and they discussed issues related to the diverse populations, including rural populations, that are likely to be served. They also noted potential limitations in generalizing from the limited available research in this area. To implement emergency telepsychiatry, it is imperative to know what facilities are available near the patient and to understand issues related to confidentiality, safety, legal regulations, and ethical practices. More frequent use of such services in different settings will hopefully generate more data to expand on these guidelines and recommendations.

## DISCUSSION

Telepsychiatry is becoming a widely accepted method for delivering assessments and interventions, with growing evidence for its safety and clinical quality. Excellent services have been developed in many countries, descriptions of which are regularly published. However, access to psychiatric services in emergency settings, particularly outside the main working hours, is a problem that affects many people. Although psychiatry is a discipline that is well suited for remote delivery, the literature on the use of telepsychiatry in emergencies is remarkably limited. Not one of the studies included in this review used a rigorous methodology, and the current evidence is almost entirely based on surveys or opinions. This is surprising considering that many health care systems are struggling to deliver 24-hour services to people suffering from mental illness or facing a crisis. As a result, a large number of patients do not have access to specialist opinions during periods of high vulnerability and increased risk.

The use of technology is widespread, even in situations in which confidentiality is paramount, such as in the banking system, or when risks to people are significant, such as in the aerospace and

Copyright © 2015 Wolters Kluwer Health, Inc. All rights reserved.

## PRACTITIONER'S CORNER

naval industries. Confidentiality is also critically important in psychiatry, and appropriate safeguards are necessary and could facilitate increased use of psychiatric teleconferencing in acute settings.

The review of the literature presented here adds some evidence in support of the emergency use of telepsychiatry in terms of quality, safety, and costs. The introduction of telepsychiatry in emergency or acute settings has a number of potential advantages, including rapid access to specialists and giving practitioners the opportunity to perform reviews of inpatients without unnecessary traveling. Patients in an acute state or crisis can even be assessed from their own homes, saving time and reducing the need for patients and their families to travel. Use of this type of technological intervention may also be relatively less expensive than inperson assessments that involve distance traveling.

## CONCLUSIONS

Strong ethical factors support the use of telepsychiatry during an emergency in terms of improved access and lower costs, but the implementation of this technology has been limited and the literature on it is scarce. Legal issues involved in the emergency provision of telepsychiatry are not clear, although some aspects depend entirely on local legislation. However, some principles are universal, such as the duty of confidentiality, responsibility for care and outcomes, and intervention if the patient is at immediate risk. Rigorous randomized controlled trials are clearly needed to evaluate the effectiveness of telepsychiatry in delivering assessments and interventions in acute settings and out of regular office hours.

## REFERENCES

1. Saurman E, Perkins D, Roberts R, et al. Responding to mental health emergencies: implementation of an innovative telehealth service in rural and remote New South Wales, Australia. J Emerg Nurs. 2011;37:453–459.
2. Yellowlees P, Burke MM, Marks SL, et al. Emergency telepsychiatry. J Telemed Telecare. 2008;14:277–281.
3. D'Souza R. Telemedicine for intensive support of psychiatric inpatients admitted to local hospitals. J Telemed Telecare. 2000;6(suppl 1):S26–S28.
4. Pollard SE, LePage JP. Telepsychiatry in a rural inpatient setting. Psychiatr Serv. 2001;52:1659.
5. Bhandari G, Tiessen B, Snowdon A. Meeting community needs through leadership and innovation: a case of virtual psychiatric emergency department (ED). Behav Inf Technol. 2011;30:517–523.
6. Bear D, Jacobson G, Aaronson S, et al. Telemedicine in psychiatry: making the dream reality. Am J Psychiatry. 1997;154:884b–885b.
7. Godleski L, Darkins A, Peters J. Outcomes of 98,609 US Department of Veterans' Affairs patients enrolled in telemental health services, 2006–2010. Psychiatr Serv. 2012;63:383–385.
8. Brebner EM, Brebner JA, Ruddick-Bracken H, et al. Evaluation of a pilot telemedicine network for accident and emergency work. J Telemed Telecare. 2002;8(suppl 2):5–6.
9. Sorvaniemi M, Ojanen E, Santamäki O. Telepsychiatry in emergency consultations: a follow-up study of sixty patients. Telemed J E Health. 2005;11:439–441.
10. Grady B, Singleton M. Telepsychiatry "coverage" to a rural inpatient psychiatric unit. Telemed J E Health. 2011;17:603–608.
11. Holden D, Dew E. Telemedicine in a rural geropsychiatric inpatient unit: comparison of perception/satisfaction to onsite psychiatric care. Telemed J E Health. 2008;14:381–384.
12. Nieves JE, Godleski L, Stack KM, et al. Videophones for intensive case management of psychiatric outpatients. J Telemed Telecare. 2009;15:51–54.
13. APA Achievement Awards. 2011. APA Gold Award: a telepsychiatry solution for rural eastern Texas. Burke Center Mental Health Emergency Center, Lufkin, TX. Psychiatr Serv. 2011;62:1384–1386.
14. Jong M. Managing suicides via videoconferencing in a remote northern community in Canada. Int J Circumpolar Health. 2004;63:422–428.
15. Mannion L, Fahy TJ, Duffy C, et al. Telepsychiatry: an island project. J Telemed Telecare. 1998;4:62–63.
16. Hilty DM, Williams M, Pfeffer M, et al. Telepsychiatry in the emergency department: overview and case studies. California Healthcare Foundation; 2009. Available at: http://www.chcf.org/publications/2009/12/telepsychiatry-in-the-emergency-department-overview-and-case-studies. Accessed July 3, 2015.
17. Ball CJ, McLaren PM, Summerfield AB, et al. A comparison of communication modes in adult psychiatry. J Telemed Telecare. 1995;1:22–26.
18. Gros DF, Veronee K, Strachan M, et al. Managing suicidality in home-based telehealth. J Telemed Telecare. 2011;17:332–335.
19. Yellowlees P. The use of telemedicine to perform psychiatric assessments under the Mental Health Act. J Telemed Telecare. 1997;3:224–226.
20. Haslam R, McLaren P. Interactive television for an urban mental health service: the Guy's Psychiatric Intensive Care Unit Telepsychiatry Project. J Telemed Telecare. 2000;6:50–52.
21. Shore JH, Hilty DM, Yellowlees P. Emergency management guidelines for telepsychiatry. Gen Hosp Psychiatry. 2007;29:199–206.

Copyright © 2015 Wolters Kluwer Health, Inc. All rights reserved.

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

ANNALS OF GENERAL
PSYCHIATRY

REVIEW                                                               Open Access

# The use of videoconferencing with patients with psychosis: a review of the literature

Ian R Sharp[1*], Kenneth A Kobak[1,2] and Douglas A Osman[1]

## Abstract

Videoconferencing has become an increasingly viable tool in psychiatry, with a growing body of literature on its use with a range of patient populations. A number of factors make it particularly well suited for patients with psychosis. For example, patients living in remote or underserved areas can be seen by a specialist without need for travel. However, the hallmark symptoms of psychotic disorders might lead one to question the feasibility of videoconferencing with these patients. For example, does videoconferencing exacerbate delusions, such as paranoia or delusions of reference? Are acutely psychotic patients willing to be interviewed remotely by videoconferencing? To address these and other issues, we conducted an extensive review of Medline, PsychINFO, and the Telemedicine Information Exchange databases for literature on videoconferencing and psychosis. Findings generally indicated that assessment and treatment via videoconferencing is equivalent to in person and is tolerated and well accepted. There is little evidence that patients with psychosis have difficulty with videoconferencing or experience any exacerbation of symptoms; in fact, there is some evidence to suggest that the distance afforded can be a positive factor. The results of two large clinical trials support the reliability and effectiveness of centralized remote assessment of patients with schizophrenia.

## Introduction

Technological advances in recent years have made remote psychiatric assessment and treatment significantly more feasible. In particular, the increased availability and affordability of high-speed connections have made the use of videoconferencing (VC) a viable tool for interacting with patients remotely. There is a growing body of literature on telemedicine and the subfield of telepsychiatry. The initial thrust to develop these fields was prompted by attempts to meet demands for mental health services with underserved and difficult-to-serve populations (for example, rural areas, prisons). For instance, extensive telepsychiatry networks in rural Australia and Canada were created to improve access to mental health services. More recently, other VC applications such as the training of mental health professionals and centralized ratings in clinical trials have grown out of this rapidly expanding field. As telepsychiatry evolves, a broader range of patient populations can be served through this medium.

Several factors make the assessment and treatment of psychosis particularly well suited for VC. For one, as psychotic patients are often hospitalized, VC allows patients to be connected with specialists without need for travel. Assessment and treatment using VC is also a potential solution for patients with psychosis living in remote or underserved areas where there is a shortage of specialists. As a tool in clinical research, VC makes it possible to use centralized remote expert raters who are able to remain blind to study design and conditions, therefore decreasing rater bias and improving inter-rater reliability and interview quality [1].

The hallmark symptoms of psychotic disorders might lead one to question the feasibility of using VC with this patient population. For example, are acutely psychotic patients generally willing to be interviewed remotely by videoconference? Does videoconferencing exacerbate delusions, such as delusions of reference? Are scores on symptom severity rating scales and diagnoses obtained remotely by videoconference equivalent to ratings and diagnosis performed face to face, given the complex nature of the disorder and the importance of non-verbal signs, such as negative symptoms? Is treatment conducted remotely by videoconference as effective as

* Correspondence: is@medavante.com
[1]MedAvante Research Institute, Hamilton, NJ, USA
Full list of author information is available at the end of the article



© 2011 Sharp et al; licensee BioMed Central Ltd. This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

treatment conducted in person? Are evaluations conducted over VC sensitive enough to distinguish active drug from placebo in clinical trials?

In the present work we attempted to provide answers to these questions by conducting a thorough review of the literature. For the purposes of this review, videoconferencing refers to an interactive video connection between two sites. This primarily includes two-way videoconferencing using monitors or computers connected over telephone lines (for example, integrated services digital network (ISDN)), public internet connections, or private networks, but may also include the use of closed-circuit televisions, especially in older studies, for example, Dongier *et al.* [2]. An important variable in evaluating VC studies is bandwidth. In videoconferencing, bandwidth refers to the speed of transmission of data between two points, typically expressed in kilobits per second (kbps). The studies reviewed had a range of bandwidths from narrow (for example, 33 kbps) to broad (for example, 384 kbps). As a rule of thumb, the higher the bandwidth, the better the quality of audio and video. The current VC industry standard bandwidth is 384 kbps. A second important variable in understanding the quality of VC is frame rate. Frame rate refers to the number of frames presented on a monitor, typically expressed in frames per second (fps). The higher the frame rate the better motion is presented in video. A speed of 30 fps provides a continuous picture similar to television quality and generally requires 384 kbps transmission [3]. As found in other reviews [4], this variable was frequently not reported.

## Methods

We reviewed the Medline, PsychINFO, and the Telemedicine Information Exchange databases for literature on videoconferencing and psychosis. We used the following key words: telemedicine, telepsychiatry, televideo, videoconferencing, video conferencing, video and schizophren*, schizoaffective, psychotic, and psychosis. No date restrictions were used. Articles relevant to the use of videoconferencing with persons with psychosis were included in this review. We also reviewed reference sections for additional relevant articles. The literature search was completed in September 2010.

We present our findings in the following categories: clinical interventions (7 articles); assessment (12 articles); satisfaction and acceptance (12 articles); and clinical trials (2 articles). The small number of articles precluded quantitative analysis, but careful review allowed for qualitative assessment, which is the approach of the present manuscript. Please see Additional file 1 for a brief description of each of the references included in the review.

## Results

### Clinical interventions

The majority of articles written about the clinical utility of VC with psychotic patients have been retrospective reports of programs that provided services to remote areas. Dwyer [5] described a series of programs and general clinical uses of a closed circuit interactive television (IATV) system set up, a precursor to VC, between Massachusetts General Hospital and a medical station in Boston. Approximately 5% of all those seen on IATV had severe psychiatric disorders. The author admitted that he 'approached the use of television to interview psychiatric patients with considerable negative prejudice, believing that the degree of personal contact with the patient would be limited and that many of the skills that are useful in a psychiatric interview would be diminished or lost. I was delightfully surprised to discover that this was not true'. The author reported that approximately 30 psychiatrists and an equal number of psychiatric residents and medical students used the television system, and all responded positively to their experiences. The author suggested that, for some patients, communication with a psychiatrist by means of IATV was 'easier' than contact in the same room. It was suggested that this is especially true of patients with schizophrenia. The author also reported that a number of patients with delusions were interviewed and none incorporated the television into his or her distorted thinking.

Graham [6] discussed a program designed exclusively for chronically mentally ill individuals. The project was called APPAL-LINK, the Southwestern Virginia Telepsychiatry Project, and provided services by connecting hospital psychiatrists to patients at two rural community mental health centers. The author reported that 39 patients with a wide variety of diagnoses were followed through the initial 6 months of operation. The majority of these patients had a major psychotic illness such as schizophrenia, bipolar disorder, or schizoaffective disorders. The author reported that the availability of telepsychiatry consultation for crisis intervention led to a decrease in hospitalizations and no significant adverse effects were reported. It was also noted that patients and psychiatrists adjusted well to the VC interaction and that the program provided evidence that VC is 'a safe, effective, and useful method for the outpatient treatment of chronically mentally ill patients'.

In a report of a larger program involving the use of telemedicine, Zaylor [7] reviewed the history of VC at the University of Kansas Medical Center. At the time the article was written, Zaylor reported that the Telepsychiatry Service of the Department of Psychiatry and Behavioral Sciences was providing services to 18 locations throughout the state. One of the programs described was

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

a group composed of six patients with either schizoaffective disorder or schizophrenia, which met monthly over VC for nearly 3 years. Anecdotally, Zaylor reported that many of the patients' conditions improved and stabilized over time. Other programs reviewed in the article included the use of VC to provide psychiatric services to inmates in a rural county jail clinic and to residents in a rural group home for the chronically mentally ill. Zaylor stated that patients in each program accepted the technology readily and quality of care was not diminished.

In another study, Zaylor [8] completed a retrospective review of patient records comparing clinical outcomes of patients seen by IATV and those seen in person. The IATV condition consisted of PC-based VC equipment with a bandwidth speed of 128 kbps. A global assessment of functioning (GAF) score was generated for each patient in both groups at the initial visit and at subsequent visits, including at 6 months. A total of 49 patients diagnosed with either major depression or schizoaffective disorder were included. No significant difference was found in the percentage change in GAF scores between the two groups, suggesting that clinical outcomes were not negatively impacted by the use of IATV. The authors noted that patients in the IATV group had a better attendance rate and follow-up visits took less than half the time compared with in-person visits. This was viewed as an indication that IATV was an acceptable and efficient method of providing psychiatric services.

Doze and colleagues [9] reported preliminary results of a 9-month pilot project in Alberta, Canada, which used VC to connect a psychiatric hospital to mental health clinics in five rural hospitals. Patients were most commonly referred for assistance with a diagnosed disorder or to establish a diagnosis, but were also referred for behavior management, medication consultation, patient education, follow-up after discharge, and preadmission screening. A total of 109 telepsychiatry consultations were completed with 90 patients, 8 of whom were diagnosed with schizophrenia. Like many of the studies in this review, the authors focused on the usage of telepsychiatry including cost analysis and opinions about its use rather than measured clinical outcomes. However, the authors noted positive anecdotal results, including indications that the telepsychiatry project led to the avoidance of hospitalization for some patients as well as reduced stigma for patients who visited an acute care facility rather than a mental health clinic.

D'Souza [10] documented a telemedicine service in rural Australia developed to treat acute psychiatric inpatients in their local hospitals in order to reduce the need for these patients to be transferred to a psychiatric facility farther away. In all, 28 patients were included in the report; 31% were diagnosed with schizoaffective disorder, 11% were diagnosed with schizophreniform psychosis, and 4% were diagnosed with delusional disorder. The Brief Psychiatric Rating Scale 24 (BPRS-24) [11] was administered by both a rater familiar with the patient and a naïve rater at intake and 4 weeks after discharge. Results indicated a significant improvement in the mean total BPRS-24 scores from intake to follow-up for both raters and inter-rater reliability for the BPRS-24 was good. The authors conclude that these findings support the use of VC in the evaluation of clinical outcomes in treatment.

Kennedy and Yellowlees [12] examined clinical outcomes in the use of VC with 124 patients entering mental health treatment in rural Queensland, Australia. All patients were offered the option of being treated by a psychiatrist using a VC system at 128 kbps and 32 patients (3 of whom were diagnosed with psychotic disorders) chose the VC option. All patients were assessed when entering treatment and then 12 months later. The authors reported significant improvement from pre-assessment to post-assessment as measured by the Health of the Nation Outcome Scale (HoNOS), a clinical outcome scale [13] and the Mental Health Inventory (MHI), a self-report scale of outcome or progress over time [14], but no significant differences were found between the VC and in-person conditions. The authors concluded that there was no degradation in quality of outcome with the use of VC.

Published reports on clinical interventions delivered using VC have shown that patient care via VC is generally equivalent to in person. Further, the advantages of VC have been outlined and include less need for patients and professionals to travel, reduction in hospitalizations, and improvement in reaching patients in rural and challenging settings. There is virtually no evidence that VC has a negative impact on rapport, especially in more recent reports where technology is less likely to be a barrier. Additionally, there is evidence that some patients with psychosis prefer receiving clinical services via VC to in person. Children especially tend to be more forthcoming with telepsychiatry [15]. Most of the clinical intervention reports reviewed were qualitative accounts of clinical work being performed with patients with psychosis via VC. While these papers provide strong evidence of the feasibility of VC with patients with psychosis, additional empirical research (for example, treatment outcome studies) is needed.

## Assessment
Published reports of assessment of psychosis using VC primarily fell into two broad categories: uncontrolled case reports of clinical evaluations, and reports of systematic evaluations of objective instruments of schizophrenia. We also include a published report evaluating rater training with a psychosis scale using live interviews conducted via VC.

Hyler *et al.* [16] conducted a meta-analysis of studies comparing psychiatric assessment via VC to in person. Although not specific to psychosis, they concluded that objective assessments delivered via VC were equivalent to in person in both accuracy and satisfaction.

One of the earliest studies related to VC and assessment involved using closed circuit television (CCTV), a precursor of modern day VC, to conduct psychiatric evaluations. Dongier and colleagues [2] compared psychiatric interviews conducted using CCTV to a control group in which interviews were conducted in person. The study included inpatients and outpatients from a range of diagnostic categories including schizophrenic psychoses (27%), schizophreniform psychoses (6%), and paranoid states (2%). The authors concluded that 'even schizophrenics with ideas of reference including T.V. (example: being talked about on public programs) accepted the CCTV interaction very well and no exacerbation of their delusions was observed'.

In a later description of psychiatric evaluations using VC, Yellowlees [17] presented two case reports in which urgent psychiatric assessments for two psychotic patients were conducted using VC. Without the use of VC, the patients would have had to travel to a psychiatric hospital 800 km away. The author noted that one of the patients with delusional symptoms reported ideas of reference from the television prior to the interview, but accepted the interview and interaction with the assessor as real.

Ball and colleagues [18] presented data from a more controlled study of the use of VC for assessment of psychiatric patients. The authors administered the Folstein Mini-Mental State Examination (MMSE) [19] to 11 patients from an acute psychiatric ward (6 patients were diagnosed with schizophrenia). Each patient was interviewed both in person and over VC. In person assessments were compared to a computer-based low-cost videoconferencing (LCVC) system. The scores between modalities were highly correlated leading the authors to conclude that the MMSE may be reliably performed with patients using LCVC. However, the authors noted that one patient did not complete the second assessment because he developed a delusional belief that the testing was part of a police plot to incriminate him. This appeared unassociated with the LCVC as he had completed that portion (that is, VC) and refused the in person interview.

Several studies have reported on the use of VC using the BPRS [20]. Salzman *et al.* [21] reported the use of VC in administering this instrument to evaluate severely ill inpatients. After establishing inter-rater reliability on the BPRS (0.93) by using in person interviews with patients in the hospital, six psychotic patients were rated using videoconferencing. Patients were simultaneously rated by a psychiatrist via videoconferencing and a psychiatrist who was on site. The reported inter-rater reliability was 0.92. The authors noted that the only frequent rating disagreement was on a self-neglect item and they concluded that some patients' self-neglect was difficult to observe via VC. However, a limitation of this conclusion is that the authors did not report data on the quality or speed of the VC equipment and connection. The patients reportedly enjoyed using VC. The authors concluded that these results add to previous research suggesting that VC is useful in the evaluation of psychotic patients.

Baigent and colleagues [22] also used the BPRS when comparing VC using ISDN connections at 128 kbps to in person interviews. In addition to the BPRS, the authors used a semi-structured clinical interview to generate *Diagnostic and Statistical Manual of Mental Disorders*, 4th edition (DSM-IV) diagnoses. The 2 psychiatrists conducted the assessments with 63 subjects (51% of whom had a diagnosis of schizophrenia). Interviews were conducted in one of three conditions: the interviewer and observer in the same room as the patient, the interviewer connected to the patient via VC and the observer in the same room as the patient, or both the interviewer and the observer connected to the patient via VC. Inter-rater reliability for BPRS total score in the three conditions was 0.54, 0.51, and 0.80, respectively. The authors reported that reliability of diagnoses was equivalent in the three conditions (0.85, 0.69, 0.70, respectively) and concluded that 'much of the 'psychiatry' is not lost in 'telepsychiatry'.

Zarate and colleagues [23] also assessed the reliability of the BPRS in addition to the Scales for the Assessment of Positive/Negative Symptoms (SAPS/SANS) [24] in a sample of 45 patients with a DSM-IV diagnosis of schizophrenia. Assessments were conducted either in person or via VC (at either 128 kbps or 384 kbps). Assessments in the in person condition were conducted with two raters in the same room as the patient with one conducting the interview and the other rating the patient's responses. In the VC condition, one rater conducted the interview remotely and the other rater scored the patient's responses while sitting in the same room as the patient. Results indicated good overall inter-rater reliability on total BPRS scores with both 384 kbps (intraclass correlation coefficient (ICC) = 0.90) and 128 kbps (ICC = 0.84) connections. Excellent reliabilities were also found on the positive symptoms scale (SAPS ICC = 0.97 for both low and high bandwidths). Higher reliabilities were found with the 384 kbps connection (0.85) vs. the 128 kbps connection (0.67) on the SANS. Given that several specific negative symptoms of schizophrenia rely heavily on non-verbal cues, it is understandable that the higher bandwidth would improve agreement on these symptoms. Both raters and patients had high rates of acceptance of the VC condition with patients in the

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

high bandwidth group being more likely to prefer it to live interviews than those in the low bandwidth group.

In another study examining reliability at different connection speeds, Matsuura and colleagues [25] reported the reliability of the BPRS administered in person or via one of two resolutions of videophone (128 kbps and 384 kbps). In all, 17 subjects were included (9 healthy nursing students and 8 outpatients, 2 of whom had a diagnosis of schizophrenia). The study had three conditions: an in person condition where two raters were in the same room as the patient, a low-resolution VC interview condition where a rater was linked to the patient with a TV phone at 128 kbps and an observer was in the same room as the patient, and a similar condition with a high-resolution TV phone at 384 kbps. Interclass correlation coefficients were very high for all three conditions (0.965, 0.987, 0.996, respectively) and did not differ significantly by condition. Additionally, 80% of the outpatients stated they preferred the VC interview.

Chae and colleagues [26] used a similar methodology to Matsuura and colleagues in a pilot study to evaluate a VC system connected over an ordinary telephone network at 33 kbps. A total of 30 patients with schizophrenia were administered the BPRS (15 using the VC system and 15 in person). Agreement on total BPRS score for the telemedicine group was significantly higher than that of the in person group. However, reliability on the anxiety subscale was very low for the telemedicine group. The authors suggested that the limited image processing capability of the system used may have made it difficult to conduct a detailed analysis of these specific symptoms. Overall, the authors concluded that the low-bandwidth VC system appeared to be as reliable as higher-bandwidth ISDN systems used in previous studies.

Yoshino and colleagues [27] assessed the reliability of the BPRS in 42 patients diagnosed with chronic schizophrenia. Patients were interviewed using videoconferencing with either narrow bandwidth (128 kbps) or broadband (2 Mbps) and compared to an in person interview using test-retest method with no longer than 4 days between the independent interviews. The authors found no significant difference in intraclass correlation coefficients for BPRS total score between the broadband condition (0.88) and the in-person condition (0.87). The ICC was significantly lower in the low bandwidth condition (0.44). It should be noted that the authors reported numerous problems in the narrow bandwidth condition including pauses in audio, problems with patients' speech clarity, highly distorted video images, poor rapport due to lack of eye contact, and almost total inability to observe facial expressions.

Lexcen et al. [28] conducted a study with 72 inpatients from the maximum security forensic unit of Central State Hospital in Petersburg, Virginia. All participants had DSM-IV Axis I diagnoses of severe mental illness; many were diagnosed with schizophrenia or psychotic disorder not otherwise specified (F J Lexcen, personal communication, 5 March 2007, Child Study and Treatment Center, Lakewood, WA). Participants were observed in one of three conditions. The first condition entailed in person administration of the BPRS with observation via video conferencing. The second condition involved administration by VC and observation by an in person rater. In the third condition, both administration and observation occurred in person. Correlations for total scale scores for the BPRS were in the good to excellent range (0.69 to 0.82). The results for the items of the BPRS were consistent with previous studies that found good to excellent reproducibility in experimental conditions using VC. The authors summarized that their results confirmed previous findings of the use of the BPRS for evaluations conducted via VC.

Kobak et al. reported on a National Institute of Mental Health (NIMH)-funded pilot study conducted to evaluate the effectiveness of training raters remotely by VC to administer the Positive and Negative Syndrome Scale (PANSS) [29]. The training involved two components: didactic training delivered via CD-ROM, and applied training delivered through live remote observation of trainees conducting the PANSS via VC. An expert trainer observed the interview and provided individual feedback immediately after the session via VC on the trainees' scoring accuracy and clinical interview skills using the Rater Applied Performance Scale (RAPS) [30]. Pre-training and post-training interviews were videotaped and evaluated by a panel of blinded experts to evaluate whether the training resulted in improvement in the trainees' clinical skills and scoring accuracy. In all, 12 trainees with no prior PANSS experience participated in the study. Results found a significant improvement in trainees' conceptual knowledge and an improvement in trainees' clinical skills (as determined by the RAPS scale). Interestingly, the didactic training (that is, CD-ROM) alone did not improve the trainees' clinical skills; these only improved following the remote video sessions. The agreement in scoring between the trainee and blinded expert (ICC) improved from r = 0.19 prior to training (P = 0.248) to r = 0.52 after training (P = 0.034). The results of this study are promising for the use of VC in the remote training of raters in schizophrenia.

Based on the studies reviewed, patients with psychosis can be reliably interviewed and evaluated via VC, including using symptom severity scales (for example, BPRS) and diagnostic, clinical, and psychiatric interviews. The reviewed findings suggest that higher bandwidth connections improve reliability and the ability to evaluate non-verbal and negative symptoms. At higher bandwidths, inter-rater reliability with VC is generally equivalent to in

Sharp *et al. Annals of General Psychiatry* 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

person. Additionally, VC can be used effectively to train raters in the administration of psychosis scales.

## Safety issues

The issue of patient safety has been raised when using VC for remote assessment and intervention with psychotic patients. The American Telemedicine Association has issued a set of practice guidelines for the emergency management of patients when using VC in telepsychiatry [31,32]. These guidelines require that a protocol be established for dealing with psychiatric emergencies when conducting any telepsychiatry procedure. Recommendations are provided in three main areas: (a) administrative issues, including requiring clinicians to conduct a site assessment to obtain information on local regulations and emergency resources, and having an emergency protocol in place that clearly specifies the procedures, roles, and responsibilities in cases of psychiatric emergencies; (b) legal issues, requiring clinicians to be familiar with local civil commitment regulations and have arrangements in place with local staff to initiate and assist in this regard; and (c) general clinical issues, including being aware of how clinicians' perception of diminished control in the clinical encounter compared to in person interaction might impact their interactions with the patient, and the need to be aware of the impact the telepsychiatry interaction might have on local site staff. With these safeguards in place, patient safety has not been reported as an issue when using VC with psychotic patients. In fact, it has been reported that the physical distance afforded by telepsychiatry has allowed patients to express strong affects that may have led to premature termination of in person sessions [32]. Nonetheless, these guidelines are relatively new and still evolving, and require ongoing examination and refinement.

## Satisfaction and acceptance

Many of the studies mentioned previously looking at the use of telepsychiatry in assessment and clinical outcomes also included measures of patient satisfaction. The overall results have been largely positive. Zarate and colleagues [23] asked patients and raters to complete post-interview evaluation and satisfaction questionnaires comparing their VC interview to in person interviews they have had in the past (from 'much below average' to 'much better than average'). A majority of patients rated the VC experience as 'above average', with patients in the higher bandwidth condition being more likely to prefer them to in person interviews. Raters endorsed comfort, ease of expressing one's self, and usefulness of VC as either 'average' or 'above average' as compared to a typical in person interview. Graham [6] indicated that patient acceptance of VC for healthcare delivery was almost universally positive with more than 90% of patients giving positive ratings on the satisfaction survey as it related to

the VC process and treatment received. Similarly, in the Baigent *et al.* [22] study mentioned earlier, more subjects reportedly found interviews via VC moderately enjoyable to very enjoyable compared to the in person interviews. A majority of participants reported that they would be happy to have VC interviews or would even prefer them to seeing a psychiatrist in their hospital rooms.

Doze *et al.* [9] included data related to patient satisfaction in their telepsychiatry pilot project. The authors noted that patients were satisfied with and accepted the overall experience of using VC for psychiatric services. Perceived benefits noted by patients included reduced travel time; decreased stress from traveling to appointments; decreased absence from work for both patient and family; more immediate access to a psychiatrist; feelings of confidentiality and privacy; more patient choice and control; improvement in quality of life; and potential for clinical improvement without hospitalization. Perceived disadvantages noted by patients included feeling that their interaction with the psychiatrist was impersonal and the potential for less sensitivity in interviews. The authors noted that there was a strong preference for the use of VC rather than waiting for a consultation or traveling to see a psychiatrist, but patients were split as to whether they would rather use telepsychiatry than see a psychiatrist in person. Perceived benefits of VC noted by participating psychiatrists included the ability to see patients before their symptoms became more severe, to educate local providers, and to reduce amount of unproductive time that could now be used in psychiatric consultation.

In the study examining reliability at different connection speeds mentioned previously, Matsuura and colleagues [25] found that 80% of outpatients preferred telepsychiatry to in person interaction. The authors stated that many of the subjects reported that they could easily relate to the consultants and address problems without difficulty. One patient reported that the sound/picture delay was disturbing but no one reported dissatisfaction with the interview. Many patients reported that they would be happier having VC sessions at home to save time and effort.

Using a similar design, Chae and colleagues [26] asked patients to rate comfort level during the interview, ability to express themselves, quality of the interpersonal relationship, and usefulness of the interview. Total acceptance scores were higher in the VC condition than in the in person condition, although this difference was not statistically significant. Patients' acceptance of the VC interview, in terms of comfort, ease of self-expression, quality of interpersonal relationship and usefulness, was good in most cases. The average acceptance score was nearly twice as high in the telemedicine group as in the in person group. Patients tended to feel more comfortable in the in person condition, but more at ease with expressing themselves in the VC condition. The authors concluded

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

that in many cases the VC condition was better accepted by patients and suggested that it might be viewed as less threatening than being in the same room in close proximity.

As part of his clinical outcome study, D'Souza [10] asked patients to rate their satisfaction with the service and the use of VC. The patients reportedly expressed high rates of satisfaction with both. Over 81% of patients said that they would use the service again; 88.8% reported high satisfaction with the VC practitioner; 70% were satisfied with receiving a prescription via VC; and 67% were satisfied with confidentiality. However, it should be noted that 26% of patients expressed some dissatisfaction, but the sources of the dissatisfaction were not specifically elaborated on in the report.

Ball and colleagues [33] compared the process and outcome of clinical tasks in an acute psychiatric unit using four different communication modes: in person, telephone, hands-free telephone, and a low-cost video-conferencing system (LCVC). Six doctors and six patients (three with schizophrenia and one with paranoid disorder) were included in the study. The authors report that the VC condition was positively received by both patients and doctors. However, some problems were observed. For instance, some patients found it irritating when the doctor leaned forward and only the top of his head was visible. One patient reportedly felt unable to talk about sexual delusions over the VC, although she felt comfortable discussing it in the other conditions.

Mannion and colleagues [34] presented results from a pilot project in which they used a PC-based VC system (384 kbps) to facilitate emergency consultations between patients on an Irish island and a psychiatrist on the mainland. Over an 8-month period, two patients diagnosed with schizophrenia were evaluated. The authors report that the patients were comfortable with the technology and stated that the system was not a barrier to the establishment of rapport. Additionally, all health professionals who used the link reportedly found it satisfactory. The authors concluded that the VC was acceptable and satisfactory for both patients and staff.

Stevens et al. [35] also conducted a pilot study of patient and clinician satisfaction with VC that included 19 patients with psychosis and 21 non-psychotic patients. Subjects were randomly assigned to either a VC or in person condition where they were assessed by psychiatrists during 90-minute unstructured interviews that were intended to generate Diagnostic and Statistical Manual of Mental Disorders, 3rd edition - revision (DSM-III-R) diagnoses and treatment recommendations. Following each interview, the participant and psychiatrist both completed the California Psychotherapy Alliance

Scale [36], a self-report scale to assess ability to work together and develop rapport and the Interview Satisfaction Scale, a scale created for the study designed to assess acceptability of the interview modality. There were no differences on the patient-rated and clinician-rated alliance scale or the patient-rated satisfaction scale between modalities. There was a significant difference on the therapist version of the satisfaction scale with the psychiatrists tending to rate the VC interviews less favorably than the in person interviews; however, overall satisfaction with VC was still positive.

Magaletta et al. [37] examined prison inmates' satisfaction with VC consultations. A total of 75 patients, 17 with diagnoses of 'Schizophrenia and Other Psychotic Disorders', completed at least 1 questionnaire assessing their satisfaction with receiving psychiatric consultation via VC. Patients reported satisfaction with the consultation process, more comfort with the process over time, and a willingness to return for follow-up. A majority of the participants (81%) rated treatment positively, reported that they would come back to be seen by a doctor using VC (83%) and would recommend VC consultations to other inmates (71%). When looking at satisfaction ratings by time point, the results indicated that the participants' perceptions of the VC consultations became more positive over time. Participants with thought disorders had positive perceptions of the VC consultations and reported a higher level of satisfaction compared to in person treatment than did a group of inmates with affective disorders. The authors provided two examples of patients with thought disorders. One patient had consistently expressed delusions of reference from the TV in his housing unit. Despite hesitation on the part of the authors to include this patient in a VC consultation, they proceeded and found the only comment he made was 'See, I told you the television talks to me!'. They concluded that the patient's delusional system was not altered as a result of treatment using VC and that although the use of VC did not exacerbate his delusion, it may have reinforced it. The second example involved a patient with schizophrenia who felt that seeing his picture on the screen (because of a picture-in-picture option where the patient sees a small image of himself in addition to the remote image) confirmed his preexisting delusion that he had an impostor, leading the authors to discontinue the use of picture-in-picture. Despite these interactions between the technology and the delusional systems of several patients, the authors expressed that the patients were still able to receive sound treatment. The article offered possible explanations for the positive perceptions presented by thought-disordered patients. One explanation is that thought-disordered individuals are overstimulated in social and interpersonal relationships and the 'distance' accorded by VC serves to reduce their anxiety and help them feel more comfortable. Further, the

structured and constrained nature of the VC environment also serves to lessen anxiety.

Mielonen et al. [38] conducted a study of inpatient care-planning consultations using VC with 14 patients with psychosis and their family members. Healthcare providers and patients and their relatives completed questionnaires of satisfaction and acceptance after each session. In all, 47% of the healthcare providers rated videoconferencing to be 'as good a form of consultation as a conventional meeting', 48% considered it to be 'almost as good', and only one person (4%) felt that it was notably inferior. The preference for VC was strong with most respondents preferring to have the next session conducted in the modality: 86% of the healthcare personnel, 84% of the patients and 92% of the relatives. The reduced need for traveling by the participants and the ease and speed of the consultations were cited as the most important reasons for preferring VC. Most of the respondents rated the content of the consultation and the interaction in the videoconference as excellent or good and the technical quality of the VC consultations as good or moderate.

In summary, most published reports show clearly that both patients and clinicians have high levels of acceptance and satisfaction with VC, often rating it similarly to in person, and in a number of cases rating it more favorably. There is some evidence that patient ratings of satisfaction with VC increase over time. Additionally, similar to findings with clinical interventions and assessment, higher bandwidth is associated with better outcome with satisfaction and acceptance.

## Clinical trials

While VC has been used widely with patients with psychosis in clinical settings, its use in clinical research with this population has not been extensively explored, but appears to be gaining acceptance. Clinical trials evaluating new medications for schizophrenia and other psychiatric disorders have been faced with an increasing rate of failed trials [39]. Factors associated with clinician assessment, such as expectancy bias, enrollment pressure bias, poor inter-rater reliability, and poor interview quality, have been hypothesized to play a role in this increasing rate [40]. The use of VC enables a potential solution to these problems, by facilitating the use of off-site expert centralized raters. These raters are linked to the various study sites through videoconferencing or teleconferencing, and remotely administer the primary outcome measure to study patients during their regularly scheduled study visit. The use of centralized raters in clinical trials addresses several potential weaknesses associated with clinician ratings described above. Inter-rater reliability is improved by simply reducing the sheer number of raters involved (for example, a 30-site multicenter trial that

employed 60 to 75 raters (that is, 2 or 3 raters per site) could be conducted with 8-10 centralized raters). Rigorous training and calibration procedures can be employed that are not logistically feasible with a larger group of raters at diffuse study sites. Enrollment pressure and bias are minimized, since centralized raters are divorced from the study site and blinded to the study visit number, study protocol, and entrance criteria. Blinding the rater to these factors also minimizes expectancy or other biases at later visits. Using a different rater each week minimizes the potentially confounding therapeutic impact of repeated assessment by the same clinician, as well as minimizing expectancy bias.

Two published clinical trials using centralized raters via videoconferencing were identified. Centralized raters were recently used in a large, phase II, multicenter trial evaluating a new antipsychotic medication for schizophrenia [41]. A total of 289 subjects from 35 sites were randomly assigned to 6 weeks of treatment with 1 of 2 doses of an experimental compound, active comparator (olanzapine), or placebo. Subjects were evaluated weekly using the PANSS by 1 of 18 centralized raters who were connected to the study site by high speed VC at 384 kbps. Different raters typically saw the patient at each visit. Raters were blinded to study visit and study protocol and were provided informant data. Data from the olanzapine and placebo arms were provided by the sponsor to examine the issue of the centralized raters' ability to detect a drug effect.

Centralized raters found a significant difference between olanzapine and placebo starting at week 1, and this difference continued to be significant throughout the study. At endpoint, the mean change for olanzapine-treated participants (14.4 points, SE = 2.43) was significantly greater than the mean change on placebo (2.95 points, SE = 2.43), $P < 0.001$. The mean effect size found at endpoint was 0.52. Internal consistency reliability was high, and remained high throughout the study. Scores at screening were normally distributed, and were not skewed towards the cutoff score, suggesting that little score inflation occurred. Overall, 1,993 remote PANSS assessments were completed by the 18 raters over the 13-month course of the study. No patient refused to be interviewed by VC, although some patients refused to participate in all of the study assessments. Of the 1,993 assessments, 2.2% experienced temporary interruption or an audio/visual quality issue. The issues were resolved and the interviews were completed. In 10 cases (0.3%) the interview could not be completed due to a technical issue and had to be rescheduled.

Centralized raters were also used for efficacy ratings in a randomized, double-blind, placebo-controlled, multicenter phase III trial of the safety and efficacy of three doses of paliperidone palmitate in adults with an acute

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

exacerbation of schizophrenia [42]. All subjects at US-based sites were evaluated by centralized raters using the PANSS, Personal and Social Performance Scale (PSP), and the Clinical Global Impression - Severity scale (CGI-S) and were connected to the study site by high speed VC at 384 kbps. The overall study had positive findings with each of the three doses of the drug demonstrating statistically significant improvement on the primary efficacy measure (PANSS total scores), and the two higher doses showing significant improvement with PSP and CGI-S scores. This study provides further evidence of the effectiveness of using VC as a tool for assessing participants in clinical trials. There has been rapid growth of adoption of centralized raters in clinical trials and there are currently several additional trials underway.

## Conclusions

Although there is still a paucity of controlled outcome research comparing VC to standard in person care, reports of assessment and treatment via VC have been overwhelmingly positive. Findings generally indicate that patient care via VC is equivalent to in person, but also offers numerous advantages. For example, reports indicate that the use of VC has led to a reduction in the need for patients and professionals to travel, a reduction in hospitalizations, and improvement in reaching patients in rural and difficult settings (for example, prisons), all leading to improved, more efficient care. There is little evidence that VC has a negative impact on rapport, although in some older studies comparing VC to in person, patients and clinicians preferred in person. This finding was generally attributed to poor video quality found with older technology. This preference is not evident in more recent research. In more recent studies [25,26], patients overwhelmingly preferred VC to in person.

Research and clinical work to date indicate that clinical rating scales, psychiatric interviews, and diagnostic assessments can be reliably conducted using VC and are generally equivalent to those performed in person. Continuing improvement in technology has mitigated many of the shortcomings found in older studies. For example, as reported in their small study, Salzman et al. [21] found that the only major source of disagreement on BPRS ratings between VC and in person was on patient self-neglect, which they attributed to difficulty in evaluating this construct with VC. However, Zarate et al. [23] found that ratings of negative symptoms were significantly improved in a high bandwidth condition as compared to a low bandwidth condition. These findings suggest that higher bandwidth and better quality equipment is associated with increased ability to observe negative symptoms and improved inter-rater reliability.

Additionally, higher bandwidth leads to higher rates of acceptance and satisfaction. As both of these studies were reported over a decade ago, the vastly improved picture quality of newer VC equipment, greater accessibility of broadband connectivity, and ability to zoom and scan has made this finding significantly less of an issue. Concluding their review and meta-analysis of the literature comparing psychiatric assessments via VC to in person, Hyler et al. [16] opined, 'over the next few years, we expect telepsychiatry to replace [in person] in certain research and clinical situations in which the advantages outweigh the disadvantages'.

Using VC with psychotic patients has historically been met with skepticism, and rightfully so. Concerns that hallmark symptoms of the disorder including hallucinations, suspiciousness, and delusions of reference would lead patients to reject speaking with someone on a television screen are understandable, but have simply not been borne out. The primary concerns identified by patients were generally related to poor picture or audio quality. Based on a comprehensive review of the literature, there is little evidence that persons with psychosis react negatively to VC or experience exacerbations of symptoms, including patients with specific delusions involving television or being monitored. To the contrary, there is evidence that VC affords some patients a higher degree of comfort in that the perceived distance of the interaction is less anxiety provoking and reduces overstimulation found in some in person interactions [43].

The use of videoconferencing to enable remote, centralized raters in clinical trials is growing. To date, over 30,000 unique rating scale assessments have been administered to over 5,000 patients, across a range of disorders, including mood, anxiety and psychotic disorders [44]. Although there are only two published studies on the use of centralized raters in schizophrenia [41], several other trials are completed or in progress, as well as studies in other psychotic disorders. Results so far have found the methodology well accepted by patients with psychotic disorders, and that centralized ratings using VC can be conducted reliably and effectively in psychosis. Results from ongoing trials will provide additional empirical data on the use of VC in schizophrenia, as well as other disorders.

Historically, a significant concern with the feasibility of VC has been cost [45]. Although this paper was not intended to address cost, it is worth noting that, as with other areas of technology, the cost of VC equipment and connectivity, once prohibitively expensive, continues to decline. For example, Mielonen et al. [38] found in their analysis of cost that at a rate of 20 patients per year, the cost of VC was lower than that of the conventional alternative of traveling, and at a higher rate resulted in significant savings. They concluded that VC

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

consultation is a cost-saving measure compared with the conventional methods requiring travel.

As noted in other literature reviews of telemedicine [46], limitations of the literature on videoconferencing and psychosis include small sample sizes, absence of control conditions, and reliance on descriptive research designs. As improvement in this technology is rapidly advancing, videoconferencing is becoming increasingly affordable, more feasible, and more widely accessible. These advances will facilitate more empirical research in this area and help guide the progress in this promising methodology.

## Additional material

**Additional file 1: Study characteristics**. Study characteristics of articles included in the review.

## Author details
[1]MedAvante Research Institute, Hamilton, NJ, USA. [2]Center for Psychological Consultation, Madison, Wisconsin, USA.

## Authors' contributions
IS conducted the literature review and drafted the manuscript. KK drafted sections of the manuscript. DO drafted sections of the manuscript. All authors read and approved the final manuscript.

## Competing interests
IRS, KAK and DAO are employees of MedAvante, Inc, which provides centralized ratings services via videoconferencing and rater training.

Received: 28 June 2010  Accepted: 18 April 2011
Published: 18 April 2011

## References
1.  Kobak KA, Kane JM, Thase ME, Nierenberg AA: Why do clinical trials fail? The problem of measurement error in clinical trials: time to test new paradigms? *J Clin Psychopharmacol* 2007, 27:1-5.
2.  Dongier M, Tempier R, Lalinec-Michaud M, Meunier D: Telepsychiatry: psychiatric consultation through two-way television. A controlled study. *Can J Psychiatry* 1986, 31:32-34.
3.  Hilty DM, Marks SL, Urness D, Yellowlees PM, Nesbitt TS: Clinical and educational telepsychiatry applications: a review. *Can J Psychiatry* 2004, 49:12-23.
4.  Hilty DM, Luo JS, Morache C, Marcelo DA, Nesbitt TS: Telepsychiatry: an overview for psychiatrists. *CNS Drugs* 2002, 16:527-548.
5.  Dwyer TF: Telepsychiatry: psychiatric consultation by interactive television. *Am J Psychiatry* 1973, 130:865-869.
6.  Graham MA: Telepsychiatry in appalachia. *Am Behav Sci* 1996, 39:602-615.
7.  Zaylor CL: An adult telepsychiatry clinic's growing pains: how to treat more than 200 patients in 7 locations. *Psychiatr Ann* 1999, 29:402-408.
8.  Zaylor C: Clinical outcomes in telepsychiatry. *J Telemed Telecare* 1999, 5(Suppl 1):S59-60.
9.  Doze S, Simpson J, Hailey D, Jacobs P: Evaluation of a telepsychiatry pilot project. *J Telemed Telecare* 1999, 5:38-46.
10.  D'Souza R: Telemedicine for intensive support of psychiatric inpatients admitted to local hospitals. *J Telemed Telecare* 2000, 6(Suppl 1):S26-28.
11.  Lukoff D, Liberman RP, Nuechterlein KH: Symptom monitoring in the rehabilitation of schizophrenic patients. *Schizophr Bull* 1986, 12:578-602.
12.  Kennedy C, Yellowlees P: The effectiveness of telepsychiatry measured using the Health of the Nation Outcome Scale and the Mental Health Inventory. *J Telemed Telecare* 2003, 9:12-16.
13.  Stein GS: Usefulness of the Health of the Nation Outcome Scales. *Br J Psychiatry* 1999, 174:375-377.
14.  Veit CT, Ware JE Jr: The structure of psychological distress and well-being in general populations. *J Consult Clin Psychol* 1983, 51:730-742.
15.  Pakyurek M, Yellowlees P, Hilty D: The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice? *Telemed J E Health* 16:289-292.
16.  Hyler SE, Gangure DP, Batchelder ST: Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. *CNS Spectr* 2005, 10:403-413.
17.  Yellowlees P: The use of telemedicine to perform psychiatric assessments under the Mental Health Act. *J Telemed Telecare* 1997, 3:224-226.
18.  Ball CJ, Scott N, McLaren PM, Watson JP: Preliminary evaluation of a low-cost videoconferencing (LCVC) system for remote cognitive testing of adult psychiatric patients. *Br J Clin Psychol* 1993, 32:303-307.
19.  Folstein MF, Folstein SE, McHugh PR: "Mini-mental state". A practical method for grading the cognitive state of patients for the clinician. *J Psychiatr Res* 1975, 12:189-198.
20.  Lachar D, Bailley SE, Rhoades HM, Espadas A, Aponte M, Cowan KA, Gummattira P, Kopecky CR, Wassef A: New subscales for an anchored version of the Brief Psychiatric Rating Scale: construction, reliability, and validity in acute psychiatric admissions. *Psychol Assess* 2001, 13:384-395.
21.  Salzman C, Orvin D, Hanson A, Kalinowski A: Patient evaluation through live video transmission. *Am J Psychiatry* 1996, 153:968.
22.  Baigent MF, Lloyd CJ, Kavanagh SJ, Ben-Tovin DI, Yellowlees PM, Kalucy RS, Bond MJ: Telepsychiatry: "tele" yes, but what about the "psychiatry"? *J Telemed Telecare* 1997, 3:3-5.
23.  Zarate CA Jr, Weinstock L, Cukor P, Morabito C, Leahy L, Burns C, Baer L: Applicability of telemedicine for assessing patients with schizophrenia: acceptance and reliability. *J Clin Psychiatry* 1997, 58:22-25.
24.  Andreasen NC: Methods for assessing positive and negative symptoms. *Mod Probl Pharmacopsychiatry* 1990, 24:73-88.
25.  Matsuura S, Hosaka T, Yukiyama T, Ogushi Y, Okada Y, Haruki Y, Nakamura M: Application of telepsychiatry: a preliminary study. *Psychiatry Clin Neurosci* 2000, 54:55-58.
26.  Chae YM, Park HJ, Cho JG, Hong GD, Cheon KA: The reliability and acceptability of telemedicine for patients with schizophrenia in Korea. *J Telemed Telecare* 2000, 6:83-90.
27.  Yoshino A, Shigemura J, Kobayashi Y, Nomura S, Shishikura K, Den R, Wakisaka H, Kamata S, Ashida H: Telepsychiatry: assessment of televideo psychiatric interview reliability with present- and next-generation internet infrastructures. *Acta Psychiatr Scand* 2001, 104:223-226.
28.  Lexcen FJ, Hawk GL, Herrick S, Blank MB: Use of video conferencing for psychiatric and forensic evaluations. *Psychiatr Serv* 2006, 57:713-715.
29.  Kobak KA, Opler MG, Engelhardt N: PANSS rater training using internet and videoconference: results from a pilot study. *Schizophr Res* 2007, 92:63-67.
30.  Lipsitz J, Kobak KA, Feiger A, Sikich D, Moroz G, Engelhardt N: The Rater Applied Performance Scale (RAPS): development and reliability. *Psychiatry Res* 2004, 127:147-155.
31.  American Telemedicine Association: *Practice Guidelines for Videoconferencing-Based Telemental Health* Washington, DC: American Telemedicine Association; 2009.
32.  Shore JH, Hilty DM, Yellowlees P: Emergency management guidelines for telepsychiatry. *Gen Hosp Psychiatry* 2007, 29:199-206.
33.  Ball CJ, McLaren PM, Summerfield AB, Lipsedge MS, Watson JP: A comparison of communication modes in adult psychiatry. *J Telemed Telecare* 1995, 1:22-26.
34.  Mannion L, Fahy TJ, Duffy C, Broderick M, Gethins E: Telepsychiatry: an island pilot project. *J Telemed Telecare* 1998, 4(Suppl 1):62-63.
35.  Stevens A, Doidge N, Goldbloom D, Voore P, Farewell J: Pilot study of televideo psychiatric assessments in an underserviced community. *Am J Psychiatry* 1999, 156:783-785.
36.  Barkham M, Agnew RM, Culverwell A: The California Psychotherapy Alliance Scales: a pilot study of dimensions and elements. *Br J Med Psychol* 1993, 66:157-165.
37.  Magaletta PR, Fagan TJ, Peyrot M: Telehealth in the federal bureau of prisons: Inmates' perceptions. *Prof Psychol Res Pract* 2000, 31:497-502.
38.  Mielonen ML, Ohinmaa A, Moring J, Isohanni M: Psychiatric inpatient care planning via telemedicine. *J Telemed Telecare* 2000, 6:152-157.

Sharp et al. Annals of General Psychiatry 2011, 10:14
http://www.annals-general-psychiatry.com/content/10/1/14

39.  Khan A, Kolts RL, Rapaport MH, Krishnan KR, Brodhead AE, Browns WA:
     Magnitude of placebo response and drug-placebo differences across
     psychiatric disorders. *Psychol Med* 2005, **35**:743-749.
40.  Kobak KA, Feiger AD, Lipsitz JD: Interview quality and signal detection in
     clinical trials. *Am J Psychiatry* 2005, **162**:628.
41.  Shen J, Kobak KA, Zhao Y, Alexander MM, Kane JM: Use of remote
     centralized raters via live 2-way video in a multicenter clinical trial for
     schizophrenia. *J Clin Psychopharmacol* 2008, **28**:691-693.
42.  Pandina GJ, Lindenmayer JP, Lull J, Lim P, Gopal S, Herben V, Kusumakar V,
     Yuen E, Palumbo J: A randomized, placebo-controlled study to assess the
     efficacy and safety of 3 doses of paliperidone palmitate in adults with
     acutely exacerbated schizophrenia. *J Clin Psychopharmacol* **30**:235-244.
43.  Magaletta P, Fagan T, Peyrot M: Telehealth in the Federal Bureau of
     Prisons: Inmates' perceptions. *Prof Psychol Res Pract* 2000, **31**:497-502.
44.  Detke MJ: Accelerating clinical drug development: better signal
     detection. *New Clinical Drug Evaluation Unit (NCDEU)* Hollywood, FL; 2009.
45.  Werner A, Anderson LE: Rural telepsychiatry is economically
     unsupportable: the Concorde crashes in a cornfield. *Psychiatr Serv* 1998,
     **49**:1287-1290.
46.  Williams TL, May CR, Esmail A: Limitations of patient satisfaction studies
     in telehealthcare: a systematic review of the literature. *Telemed J E Health*
     2001, **7**:293-316.

doi:10.1186/1744-859X-10-14
**Cite this article as:** Sharp *et al*: The use of videoconferencing with
patients with psychosis: a review of the literature. *Annals of General
Psychiatry* 2011 **10**:14.

**Submit your next manuscript to BioMed Central
and take full advantage of:**

• Convenient online submission

• Thorough peer review

• No space constraints or color figure charges

• Immediate publication on acceptance

• Inclusion in PubMed, CAS, Scopus and Google Scholar

• Research which is freely available for redistribution

Submit your manuscript at
www.biomedcentral.com/submit



ResearchGate

See discussions, stats, and author profiles for this publication at: https://www.researchgate.net/publication/6597648

# Diagnostic Reliability of Telepsychiatry in American Indian Veterans

**Article** *in* American Journal of Psychiatry · February 2007

DOI: 10.1176/appi.ajp.164.1.115 · Source: PubMed

CITATIONS
63

READS
52

**5 authors**, including:


Daniel Savin
University of Colorado

**20** PUBLICATIONS   **449** CITATIONS

SEE PROFILE


Janette Beals
University of Colorado

**140** PUBLICATIONS   **4,353** CITATIONS

SEE PROFILE


Spero Manson
University of Colorado

**248** PUBLICATIONS   **6,808** CITATIONS

SEE PROFILE

Some of the authors of this publication are also working on these related projects:

 AI-SUPERPFP View project

 NIA-RCMAR View project

All content following this page was uploaded by Daniel Savin on 20 October 2015.

The user has requested enhancement of the downloaded file.

Article

# Diagnostic Reliability of Telepsychiatry
# in American Indian Veterans

Jay H. Shore, M.D., M.P.H.

Daniel Savin, M.D.

Heather Orton, M.S.

Jan Beals, Ph.D.

Spero M. Manson, Ph.D.

**Objective:** This study examined the reliability of the Structured Clinical Interview for DSM-III-R (SCID) in the administration of psychiatric assessments by real-time videoconferencing compared to face-to-face assessment within a rural American Indian community.

**Method:** The SCID was administered to 53 male American Indian veterans who were randomly assigned over two separate occasions by different interviewers to face-to-face and real-time interactive videoconferencing within 2 weeks. Comparisons were made with prevalences, the McNemar test, and the kappa statistic.

**Results:** With the exception of past-year substance dependence and abuse/dependence combined, there were no significant differences between face-to-face and videoconference administration. The majority of kappas calculated (76%) indicated a good or fair level of agreement. Externalizing disorders tended to elicit greater concordance than internalizing disorders.

**Conclusions:** Overall, SCID assessment by live interactive videoconferencing did not differ significantly from face-to-face assessment in this population. Videoconferencing is a viable vehicle for clinical and research purposes.

*(Am J Psychiatry 2007; 164:115–118)*

Mental illness is among the most important health concerns facing American Indian communities today. Telepsychiatry, in the form of live interactive videoconferencing, has the potential to address many of the challenges of clinical service and research among rural American Indians (1). Although they have been encouraging, the handful of articles on American Indian telepsychiatry is limited to case reports and program descriptions (2–4). To our knowledge, no well-controlled studies exist regarding the impact of videoconferencing on psychiatric assessment and diagnosis in this special population. Several investigators have addressed the reliability, validity, and feasibility of administrating structured clinical interviews, including the Structured Clinical Interview for DSM (SCID), by means of interactive videoconferencing in other patient populations (5). The study most relevant to this report examined the reliability of SCID diagnoses of major depression, bipolar disorder, panic disorder, and alcohol dependence among 15 veterans assessed face-to-face and by means of videoconferencing (6).

Panic disorder had the greatest concordance; major depressive disorder, the least. Although these results were promising, this study was limited by its small size, its exclusion of posttraumatic stress disorder (PTSD) and other diagnoses, and its failure to consider how racial status may have affected diagnostic concordance.

Two large-scale studies have demonstrated that the SCID can be administered reliably and validly among American Indians, thus setting the stage for determining whether teleconferencing holds similar promise (7, 8).

The purpose of this study was to examine the reliability of the SCID in the administration of psychiatric assessments by means of real-time videoconferencing between an academic medical center and a rural American Indian community. We used an experimental design to randomly assign American Indian military veterans to both face-to-face and real-time interactive video conditions of SCID assessment on two separate occasions within a 2-week period. We hypothesized that diagnoses obtained through videoconferencing would agree with those acquired through face-to-face interviews.

## Method

This study was conducted among a rural Northern Plains American Indian reservation population that had participated in a previous study known as the American Indian Vietnam Veterans Project (8). When the present study was initiated, veterans from the previous study represented the best sample available of American Indians with a known prevalence of lifetime psychiatric disorders, including PTSD (8). The substantial prevalence of well-characterized cases of mental illness was critical to testing the reliability of the SCID in this manner. Bias due to respondents' prior familiarity with the SCID was minimized by the 8 years or more that had elapsed since the conclusion of the American Indian Vietnam Veterans Project.

A videoconferencing link (an integrated services digital network line, 1¼ T, 384K, with full remote capacity) was established between the American Indian Vietnam Veterans Project and a private room in the community's Tribal Veterans Center. Colorado Multiple Institutional Review Board approval, Health Insurance Portability and Accountability Act consent, and tribal approvals were obtained before the project's initiation, as well as written informed consent from each veteran. A power analysis indicated

TABLE 1. Prevalence Rates for Live and Telehealth Administration of the Structured Clinical Interview for DSM-III-R for Past Month, Past Year, and Lifetime Diagnoses for American Indian Veterans[a]

| | Past Month | | | | | | Past Year | | | | | |
| | Live | | Telehealth | | Percent Agreement | Kappa | Live | | Telehealth | | Percent Agreement | Kappa |
| Variable | N | % | N | % | | | N | % | N | % | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alcohol | | | | | | | | | | | | |
|   Abuse | 0 | 0.0 | 1 | 1.9 | 98.0 | [b] | 0 | 0.0 | 1 | 1.9 | 98.0 | [b] |
|   Dependence | 22 | 41.5 | 17 | 32.1 | 87.0 | 0.72 | 26 | 49.1 | 20 | 37.7 | 85.0 | 0.70 |
|   Abuse or dependence | 22 | 41.5 | 18 | 34.0 | 89.0 | 0.76 | 26 | 49.1 | 21 | 39.6 | 87.0 | 0.74 |
| Drug | | | | | | | | | | | | |
|   Abuse | 0 | 0.0 | 1 | 1.9 | 98.0 | [b] | 0 | 0.0 | 1 | 1.9 | 98.0 | [b] |
|   Dependence | 8 | 15.1 | 5 | 9.4 | 94.0 | 0.74 | 9 | 17.0 | 6 | 11.3 | 91.0 | 0.61 |
|   Abuse or dependence | 8 | 15.1 | 6 | 11.3 | 92.0 | 0.67 | 9 | 17.0 | 7 | 13.2 | 89.0 | 0.56 |
| All substances | | | | | | | | | | | | |
|   Abuse | 0 | 0.0 | 1 | 1.9 | 98.0 | [b] | 0 | 0.0 | 1 | 1.9 | 98.0 | [b] |
|   Dependence | 24 | 45.3 | 18 | 34.0 | 85.0 | 0.69 | 29 | 54.7 | 21[c] | 39.6 | 81.0 | 0.63 |
|   Abuse or dependence | 24 | 45.3 | 19 | 35.8 | 87.0 | 0.73 | 29 | 54.7 | 22[c] | 41.5 | 83.0 | 0.67 |
| Antisocial personality disorder | 6 | 11.3 | 6 | 11.3 | 100.0 | 1.00 | | | | | | |
| Externalizing disorders[d] | | | | | | 0.70 | | | | | | |
|   Major depression | 7 | 13.2 | 5 | 9.4 | 85.0 | 0.25 | 7 | 13.2 | 9 | 17.0 | 85.0 | 0.41 |
|     Minor depression symptoms met | 8 | 15.1 | 7 | 13.2 | 87.0 | 0.46 | | | | | | |
|   Dysthymia | 2 | 3.8 | 2 | 3.8 | 100.0 | 1.00 | | | | | | |
|   Generalized anxiety disorder | 1 | 1.9 | 1 | 1.9 | 100.0 | 1.00 | | | | | | |
| Anxious-misery disorders[e] | | | | | | 0.47 | | | | | | |
|   Panic (fear) | 5 | 9.4 | 5 | 9.4 | 89.0 | 0.34 | 5 | 9.4 | 6 | 11.3 | 87.0 | 0.29 |
| Internalizing disorders[f] | | | | | | 0.53 | | | | | | |
|   Posttraumatic stress disorder | 23 | 43.4 | 29 | 54.7 | 81.0 | 0.63 | 24 | 45.3 | 30 | 56.6 | 81.0 | 0.63 |

[a] The following disorders were not screened for with the SCID because of low prevalence: psychotic screening, simple phobia, somatization, somatoform pain disorder, hypochondriasis, undifferentiated somatoform disorder, anorexia nervosa, bulimia nervosa, and adjustment disorder.
[b] Not computed because of too many empty cells.
[c] Significant at p<0.01 (McNemar's test).
[d] Included alcohol dependence, drug dependence, and antisocial personality disorder.
[e] Included major depression, dysthymia, and generalized anxiety disorder.
[f] Included anxious-misery disorders and panic.

that 50 respondents tested twice would provide 80% power to detect the difference between kappas of 0.6 and 0.8 (9). A list of available participants was generated from the American Indian Vietnam Veterans Project sample.

In order to achieve adequate power, 20 additional Vietnam-era veterans were identified and recruited from the community. Of the 70 veterans approached, 60 (86%) agreed to participate, of whom 53 (76%) completed both interviews. Thirty-eight (72%) were drawn from the American Indian Vietnam Veterans Project sample. The participants were administered a version of the SCID for DSM-III-R that was modified for the American Indian Vietnam Veterans Project and further adapted in the American Indian Services Utilization, Psychiatric Epidemiology, Risk and Protective Factors Project (7). As in the American Indian Vietnam Veterans Project and the latter studies, several modules were eliminated from the SCID because of the low rate of the disorders in question (Table 1). Minor modifications of the SCID were made in the American Indian Vietnam Veterans Project to render some questions more culturally relevant. Two American Indian Vietnam Veterans Project psychiatrists were selected and trained to administer the SCID. Both had extensive experience working with American Indians and PTSD in cross-cultural settings. The interviewers were trained to administer the SCID in the same manner as in the American Indian Vietnam Veterans Project and the American Indian Services Utilization, Psychiatric Epidemiology, Risk and Protective Factors Project. Videotapes created specifically for the latter projects were used to assess interrater reliability, with an average kappa >0.80 obtained by both interviewers. Once enrolled, the participants were randomly assigned to one of two conditions: 1) a real-time interactive videoconference followed by a face-to-face interview or 2) a face-to-face interview followed by a real-time interactive videoconference. The paired SCIDs were to be completed within 2 weeks of each other (aver-

age time between interviews, 10.8 days). The face-to-face interviews were conducted at a private office in the community. For the real-time interactive videoconferencing, the participants were seen at the Tribal Veterans Program; the interviewer was located in Denver. Interviews took between approximately 80 and 90 minutes to complete in both conditions. No one else was present during the interviews.

The interviews were conducted in 2003, spanning 12 months, in four cohorts of approximately 10–15 participants each. Completed SCIDs were keyed into a computer; the resulting data were transformed into an SPSS file (10), cleaned, and organized in system files for analyses. In order to determine if the interview sequence had an effect on the diagnosis of disorders, a paired T test for dependent samples was performed; no significant difference was found. The prevalence of each diagnosis was calculated for both assessment modalities. In order to compare the proportion of participants with a particular diagnosis from the face-to-face session to the proportion from the videoconference session, McNemar's test for dependent data was used (11). Interrater reliability between the two administration modalities was assessed with the kappa statistic, which accounts for agreement that occurs by chance. Cutoff values suggested by Byrt (12) were used to classify kappa estimates as excellent (>0.92), good/very good (>0.6), and fair (>0.4). One limitation of the kappa statistic is that it tends to be underestimated when the true prevalence in the population of interest is low (13). Because the prevalence of several of the diagnoses was low in this population, the percent agreement was also calculated (13). An emerging pattern led to further examination of the kappas by diagnoses that can be classified as internalizing or externalizing disorders. Grouping diagnoses in these terms was informed by an analysis from the National Comorbidity Survey (14); kappa statistics were calculated for past month.

| | Lifetime | | | | |
| | Live | | Telehealth | | Percent | |
| N | % | N | % | Agreement | Kappa |
|---|---|---|---|---|---|
| 2 | 3.8 | 1 | 1.9 | 94.0 | –0.03 |
| 48 | 90.6 | 47 | 88.7 | 91.0 | 0.49 |
| 50 | 94.3 | 48 | 90.6 | 96.0 | 0.73 |
| 10 | 18.9 | 9 | 17.0 | 76.0 | 0.17 |
| 22 | 41.5 | 24 | 45.3 | 89.0 | 0.77 |
| 26 | 49.1 | 28 | 52.8 | 85.0 | 0.70 |
| 12 | 22.6 | 9 | 17.0 | 72.0 | 0.11 |
| 48 | 90.6 | 48 | 90.6 | 92.0 | 0.56 |
| 50 | 94.3 | 49 | 92.5 | 98.0 | 0.85 |
| 20 | 37.7 | 16 | 30.2 | 66.0 | 0.25 |
| 18 | 34.0 | 17 | 32.1 | 60.0 | 0.11 |
| 7 | 13.2 | 8 | 15.1 | 87.0 | 0.46 |
| 33 | 62.3 | 35 | 66.0 | 89.0 | 0.75 |

## Results

The sample was relatively homogenous. All subjects were American Indian male Vietnam-theater and -era veterans from a Northern Plains tribe. The mean and median age was 54 years (range=46–71). Ninety percent had been previously married, and 32% were currently married. Half of the sample (53%) had completed some form of higher education, and 30% had completed high school/the graduate educational development (GED) test or trade school. Table 1 presents the prevalence and reliabilities by diagnosis for the past month, the past year, and lifetime by modality. With the exception of past-year substance dependence and abuse/dependence combined, there were no significant differences in prevalence between the face-to-face and live interactive videoconferencing modalities. Percent agreement between modalities was greater than 80%, except for lifetime drug abuse (76%), lifetime substance abuse (72%), and lifetime major depressive disorder (66%). The majority (76%) of kappa statistics were classified as good agreement or fair agreement (greater than 0.6) (12). Externalizing disorders elicited a higher kappa (0.73) than internalizing disorders (0.53).

## Discussion

This is the first study, to our knowledge, to examine the diagnostic reliability of administering a structured clinical interview by means of videoconferencing to American Indians. We believe that it is also the largest reliability study of the administration of the SCID by these means and the first to examine the reliability for PTSD, substance abuse and dependence, generalized anxiety disorder, and antisocial personality disorder. Overall, with some notable exceptions, SCID assessments by videoconferencing did not differ significantly from those obtained in face-to-face interviews.

Our data indicate that, with the exception of PTSD, SCID assessments by videoconferencing with this population may more easily detect externalizing disorders. The criteria for externalizing disorders are more behavioral and less subjective by nature, possibly rendering these symptoms easier to elicit through this modality. It may be more difficult to engage individuals with internalizing disorders through videoconferencing and thus identify relevant symptoms. PTSD possibly represents a unique internalizing diagnosis, one in which the real-time interactive videoconferencing actually enhances symptom reporting (3).

This study has several limitations. The 2-week interval between interviews could have introduced symptom changes affecting the reliability of current diagnoses. The low prevalence of certain disorders precluded meaningful conclusions about diagnostic reliability. The high prevalence and comorbidity of most conditions may have complicated the diagnosis of any specific disorder. The ethnic homogeneity limits our ability to generalize these findings to other populations.

Despite its limitations, this study represents an important first step toward understanding the diagnostic reliability of administering important clinical tools such as the SCID among American Indian veterans. This is especially timely because clinical work along these lines is already in process (4). The next steps should include determining the impact of cultural factors on this technology and identifying additional clinical tools for telepsychiatric application and adaptations needed in clinical and research protocols to improve the reliability of telepsychiatric assessment.

The capacity of this technology must be better understood in order to bend it to our clinical and research needs, with American Indians as well as other rural minority populations to fulfill its promise of increasing both access and quality of care.

Received Nov. 2, 2005; revision received Feb. 1, 2006; accepted April 7, 2006. From the American Indian and Alaska Native Programs, University of Colorado Health Sciences Center. Address correspondence and reprint requests to Dr. Shore, American Indian and Alaska Native Programs, University of Colorado Health Sciences Center, Nighthorse Campbell Native Health Building, Mail Stop F800, P.O. Box 6508, Aurora, CO 80045-0508; jay.shore@uchsc.edu (e-mail).

All authors report no competing interests.

Supported by grants 1F32-MH-63527-01A1 (to Dr. Shore, principal investigator) and P60-MD-000507 (to Dr. Manson, principal investigator).

# References

1. Dixon Mar Y (ed): Promises to Keep: Public Health Policy for American Indians and Alaska Natives in the 21st Century. Washington, DC, American Public Health Association, 2001

2. Shore JH, Manson SM: A developmental model for rural telepsychiatry. Psychiatr Serv 2005; 56:976–980

3. Shore JH, Manson SM: The American Indian veteran and post-traumatic stress disorder: a telehealth assessment and formulation. Cult Med Psychiatry 2004; 28:231–243

4. Shore JH, Manson SM: Telepsychiatric care of American Indian veterans with post-traumatic stress disorder: bridging gaps in geography, organizations, and culture. Telemed J E-Health 2004; 10(suppl 2):64–69

5. Monnier J, Knapp RG, Frueh BC: Recent advances in telepsychiatry: an updated review. Psychiatr Serv 2003; 54:1604–1609

6. Ruskin PE, Reed S, Kumar R, Kling MA, Siegel E, Rosen M, Hauser P: Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. Psychiatr Serv 1998; 49:1086–1088

7. Beals J, Novins DK, Spicer P, Orton HD, Mitchell CM, Baron AE, Manson SM, Big Crow CK, Buchwald D, Chambers B, Christensen ML, Dillard DA, DuBray K, Espinoza PA, Flemming CM, Frederick AW, Gurley D, Jervis LL, Jim SM, Kaufman CE, Keane EM, Klein SA, Lee D, McNutly MC, Middlebrook DL, Moore LA, Nez TD, Norton IM, Randall CJ, Sam A, Shore JH, Simpson SG, Yazzie LL, the American Indian Services Utilization, Psychiatric Epidemiology, Risk and Protective Factors Project Team: Challenges in operationalizing the DSM-IV clinical significance criterion. Arch Gen Psychiatry 2004; 61:1197–1207

8. National Center for Post-Traumatic Stress Disorder and the National Center for American Indian and Alaska Native Mental Health Research: Matsunaga Vietnam Veterans Project. White River Junction, Vt, 1996

9. Hintze JL: Power Analysis and Sample Size (PASS) for Windows User's Guide. Kaysville, Utah, NCSS, 2000

10. Statistical Package for the Social Sciences. Chicago, SPSS, 2001

11. Rosner B: Fundamentals of Biostatistics. Pacific Grove, Calif, Duxbury, 2000

12. Byrt T: How good is agreement? Epidemiology 1996; 7:561

13. Szklo M, Nieto F: Epidemiology: Beyond the Basics. Gaithersburg, Md, Aspen, 2000

14. Krueger RF: The structure of common mental disorders. Arch Gen Psychiatry 1999; 56:921–926

View publication stats

# BMC Psychiatry

BioMed Central

Research article

Open Access

# Accuracy of telepsychiatric assessment of new routine outpatient referrals

## Surendra P Singh*[1], Dinesh Arya[2] and Trish Peters[3]

Address: [1]Wolverhampton City Primary Care Trust, Mental Health Directorate, Steps to Health, Showell Circus, Low Hill, Wolverhampton WV10 9TH; University of Wolverhampton, UK, [2]Hawkes Bay District Health Board, Hawkes Bay Hospital, Omahu Road, Private Bag 9014, Hastings, New Zealand and [3]Mental Health Unit, Suite 1, Napier Health Centre, Hawkes Bay District Health Board, 76 Wellselsey Road, PO Box 447, Napier, New Zealand

Email: Surendra P Singh* - spd@mediware.it; Dinesh Arya - Dinesh.Arya@hawkesbaydhb.govt.nz; Trish Peters - Trish.Peters@hawkesbaydhb.govt.nz

* Corresponding author

Published: 5 October 2007

BMC Psychiatry 2007, 7:55    doi:10.1186/1471-244X-7-55

This article is available from: http://www.biomedcentral.com/1471-244X/7/55

Received: 11 April 2007
Accepted: 5 October 2007

© 2007 Singh et al; licensee BioMed Central Ltd.

This is an Open Access article distributed under the terms of the Creative Commons Attribution License (http://creativecommons.org/licenses/by/2.0), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

## Abstract

**Background:** Studies on the feasibility of telepsychiatry tend to concentrate only on a subset of clinical parameters. In contrast, this study utilises data from a comprehensive assessment. The main objective of this study is to compare the accuracy of findings from telepsychiatry with those from face to face interviews.

**Method:** This is a primary, cross-sectional, single-cluster, balanced crossover, blind study involving new routine psychiatric referrals. Thirty-seven out of forty cases fulfilling the selection criteria went through a complete set of independent face to face and video assessments by the researchers who were blind to each other's findings.

**Results:** The accuracy ratio of the pooled results for DSM-IV diagnoses, risk assessment, non-drug and drug interventions were all above 0.76, and the combined overall accuracy ratio was 0.81. There were substantial intermethod agreements for Cohen's kappa on all the major components of evaluation except on the Risk Assessment Scale where there was only weak agreement.

**Conclusion:** Telepsychiatric assessment is a dependable method of assessment with a high degree of accuracy and substantial overall intermethod agreement when compared with standard face to face interview for new routine outpatient psychiatric referrals.

## Background

Verbal information and visual cues are major and primary ingredients of psychiatric assessment. The sounds and images transmitted through video-conferencing are equivalent to these two parameters respectively. Other factors such as empathy and rapport are also crucial and their influence on the outcome of assessment is well understood but not well quantified. The assumption that video-conferencing would provide results equivalent to those from face-to-face psychiatric interview is related to these corollaries and requires testing and quantification. Trust and confidence in using this technology can be greatly enhanced if this assumption is proved true. In view of rapid developments in hardware, wireless technology and data-transmission, psychiatric intervention through video-conferencing (telepsychiatry) can be an effective mode of service delivery, especially for remotely located population clusters.

Meeting mental health needs for remotely and sparsely populated communities has been a challenge to service providers due to various factors including resource constrains and difficulty in recruitment of mental health staff. Attempts have been made to address these concerns through the use of new and emerging technologies. When such new methods are used for clinical assessment, there is bound to be inherent uncertainties as to whether these new methods are as reliable, sensitive and accurate as existing methods of clinical assessment.

Although several studies [1-4] can be found on pilot projects and the feasibility of telepsychiatry, it seems that to date none have attempted to test a predetermined hypothesis for a complete set of clinical parameters in adult psychiatry. Earlier reviews [5-7] were complemented by evaluation of psychiatric assessment using the telephony system [8], video recording [9] and then video-conferencing [10,11]. A recent study [12] demonstrated usefulness of telepsychiatry as a valuable clinical and research tool. However, most of these studies focussed narrowly on the diagnostic aspect of psychiatric assessment. Other studies have attempted to deal with psychopathology [13,14], cost and feasibility [15,16], user satisfaction [3,17], acceptability [18] and psychological intervention [19,20]. The authors of this study failed to identify studies of reasonable quality on complete and comprehensive assessments of new psychiatric referrals in a general adult outpatient clinic.

This study attempts to detect the level of intermethod agreement between telepsychiatric assessment and face-to-face interview for routine new outpatient referrals to the general adult psychiatric unit. It is anticipated that there is a high level of agreement between conclusions drawn from psychiatric interviews through video-conferencing (V) and the standard method of face-to-face psychiatric assessment (S) for diagnosis, risk assessment and clinical intervention. This study aims to test this assumption.

## Methods
### Setting and participants
The study was conducted at Hawkes Bay Health Care, which provides a National Health Service to the Hawkes Bay and Chatham Island areas of New Zealand (NZ). The study was approved by the Hawkes Bay Ethics Committee, New Zealand. The sample consisted of consecutive new adult psychiatric referrals to the Napier Community Mental Health Team (NCMHT). They belonged to the 19 to 65 age group, were not under care of the NCMHT and had not received care for any mental health issue from this unit for a period of at least 6 months at the time of referral. Cases requiring urgent assessment or home visit were excluded.

In clinical practice, the outcome of the standard method of face-to-face assessment (S) is always supposed to be accurate. Accordingly, using method S as the gold standard, the results from V can be classified as 'accurate' if the outcome is identical to that from S for a given attribute, or as 'inaccurate' if there is disagreement between methods S and V. For the purpose of this study, the accuracy ratio (AR) is defined as the risk ratio (RR) between the accurate outcomes of video-assessment (V) and the results from face-to-face assessment (S). Assuming an AR of 0.95 or above for face-to-face assessment and results of video-assessment at a significance level of 0.05 and a power of 0.8, a sample size of 34 for each method would suffice to detect a difference of 15% or more between these two methods of assessment [21]. Accordingly, a sample of 40 participants based on single stage cluster sampling was considered to be adequate for this two-way, within subjects, crossed balanced design. The data derived from this study was also used for calculation of Cohen's kappa (CK) and its bootstrap confidence interval.

From the 40 consecutive new psychiatric referrals fulfilling above criteria, two cases declined to participate and one case could not be located. A written informed consent was obtained from all remaining 37 cases and they all went through their complete intended assessments. The referral period extended from 26 February 2001 to 15 May 2001 and the assessments were completed between 23 March 2001 and 17 May 2001.

### Assessment procedure
The assessment order for each method and for each psychiatrist was predetermined using a method of random allocation. The whole list was randomly divided into the two sub-lists, then participants were randomly allocated to have their first assessment either by researcher R1 or R2. The randomly selected half of the cases of each researcher (R1 and R2) had their first assessment by method S and the remaining half had their first assessment by method V. The second assessment (S or V as appropriate) of each individual case was subsequently completed by the other researcher (R1 or R2). The details of the randomisations and assessment procedures have been displayed in the Figure 1.

None of the researchers had prior experience of conducting formal telepsychiatric interviews for clinical care. Prior to initiating the research assessments, the researchers spent one session to familiarise with the equipment, and two sessions practising on known cases to evaluate and compare their findings in order to enhance their interrater agreement.

All face-to-face interviews were conducted at Hastings, while video assessment was carried out from Wairoa, 140

*BMC Psychiatry* 2007, **7**:55                                    http://www.biomedcentral.com/1471-244X/7/55



**Figure 1**
**The sample randomisation**. The numbers in the boxes are the serial numbers of the sample cases. Those crossed are drop-outs.

km away. All participants underwent both methods of assessment; each participant having one assessment on video by one psychiatrist and one face-to-face interview by the other psychiatrist. The interviewers utilised their own usual practice of clinical interview to resemble a standard outpatient setting.

The main confounding variables likely to influence the level of agreement are; bias between the researchers doing the assessments, duration of interview, use of interpreter, order-effect (effect on the second interview due to practice or residual memory from the first interview) and the time interval between the two methods of interview. The influence of such biases was minimised by adopting a crossover design and assigning an equal number of cases to each of the interviewing psychiatrists, to each interview meth-

ods, and to each order of assessments (S followed by V and V followed by S). The researchers were not aware of each others findings while assessing an individual participant. Both assessments for each participant were completed on the same date and each assessment lasted up to 60 minutes. If an interpreter was involved, he/she had to attend both sessions for that given case.

Video-Conferencing Units were available at Wairoa and Hastings. Both centres were equipped with a PictureTel Venue 2000 model 50 with 29 inch colour TV and were linked with a 384 KB (128 KB × 3) bandwidth ISDN line. Scanning and zooming of each of these video-conferencing units could be remotely controlled by the interviewer or by the interviewee. The Picture-in-picture (PIP) facility

*BMC Psychiatry* 2007, **7**:55                    http://www.biomedcentral.com/1471-244X/7/55

was not used on the interviewee side to prevent unnecessary distraction during the interview.

### Diagnostic tools, scales and data

Diagnoses on the DSM-IV axes were based on the method described in the Decision Trees for Differential Diagnosis of the Handbook [22] with assistance from the manual when required. A Risk Assessment Schedule (RAS) was adopted from the guidelines for assessment of risk factors identified by the NZ Ministry of Health [23]. This scale has not been tested for its reliability and validity and is included in the appendix for information [Appendix-I]. A List of Psychiatric Intervention (LIPI, Appendix-II) was developed to record options of admission/discharge/follow up, investigations, psychological intervention and community support. Primarily, this is a list of clinical decisions to select if applicable. The details of any pharmacological intervention were also recorded in a structured format.

The full diagnostic code for the DSM-IV-Axis-1, the presence or absence of diagnoses on Axis2 and Axis-3, the applicability or non-applicability of DSM-IV-Axis-4 questions and the score for DSM-IV-Axis-5 Global Assessment of Functioning (GAF) was recorded for each assessment. To confer uniformity, the numerical score of GAF was changed into ordinal type ranging from lower to high categories (A to E) based on a class interval method fulfilling the transformation criteria [24]. The RAS original scoring options of 'NIL' and 'LOW' were merged to 'low', and 'HIGH' and 'VERY HIGH' to 'serious'. This produced three distinct 'low', 'medium' and 'serious' risk categories for the purpose of statistical analysis. Possible responses for items of LIPI scale were dichotomous in nature excepting drug-related outcomes. Clinical decisions for investigations, psychological intervention and community support were summarised on a group wise basis. All medications were classified into nine types for eleven indications, resulting in five drug related initiatives.

Minor adjustments were made to present the data table in an n-by-n format as a pre-requisite for kappa calculation. One DSM-IV Axis-1 diagnosis of disorganised schizophrenia (V, 295.10) was changed to paranoid schizophrenia (295.30) giving a concordant entry; one case of cyclothymic disorder, (S, 301.13) was changed to bipolar disorder (296.56) giving a discordant entry; and one case of factitious disorder (V, 300.16) was changed to somatoform disorder (300.81) giving a concordant pair.

If the number of total diagnoses for a given case differed between methods of assessment, a category of 'NIL' was introduced to reflect the lack of identification of an equivalent diagnosis by the corresponding method. This led to the introduction of 2 concordant pairs and one discordant pair by the first method of adjustment and 3 discordant pairs arising from 'NIL' categories from the second method of adjustment. The resulting preponderance of discordant pairs over concordant pairs is likely to influence the interpretation against the research hypothesis, rather than in favour of it.

### Statistical evaluation

The test statistics of AR, Risk Difference (RD) and CK were calculated and summarised in accordance with methods described in the standard texts [24-26]. For the purpose of comparisons using AR and RD, an assumption is made that all outcomes from face-to-face assessment are 100% accurate. While using the asymptotic method of computation, some of the upper confidence interval of CK may exceed the permitted value of 1. Techniques like Bias Corrected Accelerated Bootstrap Confidence Interval (BCaCI) [27] and exact p estimate [28] have been advocated to resolve this paradox. Accordingly, this study applied non-parametric BCaCI methodology using 50,000 bootstrap samples with replacement.

The re-sampling was performed in a manner that retained the structural consistency of each subgroup. The techniques of bootstrapping and re-sampling are well established statistical methods and yet are little known in medical literature. The required software codes were developed for these models by the principal author (SPS) using R (version 2.4.1) [29] and were tested against other packages (SPSS, SAS and S-Plus) before data analysis. R is an open source statistical language software from the R Foundation of Statistical Computing, Vienna (ISBN 3-900051-07-0, 2006).

## Results

Of 37 participants, 20 were female and 17 male. Ethnically, there were 27 participants of European descent, 8 were of Maori origin and 2 were from other groups. Their ages ranged between 19.21 and 63.29 years; with an average age of 35.40 years and a standard deviation of 12.46 years.

The presence of statistical significance for the results of ARs in the Table 1 is based on two sided p value of 0.05 or less. The primary data from rows 1 to 30 in Table 1 and from rows 1 to 28 in Table 2 have been re-used to summarise in the remaining rows of their respective tables. This has invariably lead to multiple comparisons and interpretation of the results should reflect this limitation.

The ARs (Table 1) with nil variance (rows 6, 8, 10) were excluded from comparison due to the constant nature of observation data. The results with upper 95% confidence interval of AR>1 (rows 2, 3, 7, 11, 19, 24) were not treated as statistically significant due to the fact that the accuracy

*BMC Psychiatry* 2007, **7**:55     http://www.biomedcentral.com/1471-244X/7/55

**Table 1: Comparison of results of telepsychiatric assessments and face-to-face interviews**

| | Primary attributes and accuracy ① | Sample | | | Accuracy Ratio Statistics | | | | Risk Difference Statistics | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | A | I | Size | AR | LCI | UCI | p | RD | LCI | UCI | p |
| 01 | DSM-IV Axis 1 | 49 | 5 | 54 | 0.91 | 0.83 | 0.99 | 0.025 | -0.09 | -0.17 | -0.02 | 0.019 |
| 02 | DSM-IV Axis 2 | 34 | 3 | 37 | 0.92 | 0.84 | 1.01 | 0.083 | -0.08 | -0.17 | 0.01 | 0.071 |
| 03 | DSM-IV Axis 3 | 36 | 2 | 38 | 0.95 | 0.88 | 1.02 | 0.157 | -0.05 | -0.12 | 0.02 | 0.146 |
| 04 | DSM-IV Axis 4 Q1 | 31 | 6 | 37 | 0.84 | 0.73 | 0.97 | 0.014 | -0.16 | -0.28 | -0.04 | 0.007 |
| 05 | DSM-IV Axis 4 Q2 | 31 | 6 | 37 | 0.84 | 0.73 | 0.97 | 0.014 | -0.16 | -0.28 | -0.04 | 0.007 |
| 06 | DSM-IV Axis 4 Q3 | 37 | 0 | 37 | 1.00 | 1.00 | 1.00 | NA | 0.00 | 0.00 | 0.00 | NA |
| 07 | DSM-IV Axis 4 Q4 | 36 | 1 | 37 | 0.97 | 0.92 | 1.03 | 0.317 | -0.03 | -0.08 | 0.03 | 0.311 |
| 08 | DSM-IV Axis 4 Q5 | 37 | 0 | 37 | 1.00 | 1.00 | 1.00 | NA | 0.00 | 0.00 | 0.00 | NA |
| 09 | DSM-IV Axis 4 Q6 | 32 | 5 | 37 | 0.86 | 0.76 | 0.98 | 0.025 | -0.14 | -0.25 | -0.02 | 0.016 |
| 10 | DSM-IV Axis 4 Q7 | 37 | 0 | 37 | 1.00 | 1.00 | 1.00 | NA | 0.00 | 0.00 | 0.00 | NA |
| 11 | DSM-IV Axis 4 Q8 | 34 | 3 | 37 | 0.92 | 0.84 | 1.01 | 0.083 | -0.08 | -0.17 | 0.01 | 0.071 |
| 12 | DSM-IV Axis 4 Q9 | 1 | 36 | 37 | 0.03 | 0.00 | 0.19 | 0.000 | -0.97 | -1.03 | -0.92 | 0.000 |
| 13 | DSM-IV Axis 5 | 26 | 11 | 37 | 0.70 | 0.57 | 0.87 | 0.001 | -0.30 | -0.44 | -0.15 | 0.000 |
| 14 | Risk to Self Q1 | 27 | 10 | 37 | 0.73 | 0.60 | 0.89 | 0.002 | -0.27 | -0.41 | -0.13 | 0.000 |
| 15 | Risk to Self Q2 | 29 | 8 | 37 | 0.78 | 0.66 | 0.93 | 0.005 | -0.22 | -0.35 | -0.08 | 0.001 |
| 16 | Risk to Self Q3 | 28 | 9 | 37 | 0.76 | 0.63 | 0.91 | 0.003 | -0.24 | -0.38 | -0.10 | 0.001 |
| 17 | Risk to Self Q4 | 28 | 9 | 37 | 0.76 | 0.63 | 0.91 | 0.003 | -0.24 | -0.38 | -0.10 | 0.001 |
| 18 | Risk to Others Q1 | 28 | 9 | 37 | 0.76 | 0.63 | 0.91 | 0.003 | -0.24 | -0.38 | -0.10 | 0.001 |
| 19 | Risk to Others Q2 | 35 | 2 | 37 | 0.95 | 0.88 | 1.02 | 0.157 | -0.05 | -0.13 | 0.02 | 0.146 |
| 20 | Risk to Others Q3 | 33 | 4 | 37 | 0.89 | 0.80 | 1.00 | 0.046 | -0.11 | -0.21 | -0.01 | 0.034 |
| 21 | Risk to Others Q4 | 32 | 5 | 37 | 0.86 | 0.76 | 0.98 | 0.025 | -0.14 | -0.25 | -0.02 | 0.016 |
| 22 | Risk to Others Q5 | 33 | 4 | 37 | 0.89 | 0.80 | 1.00 | 0.046 | -0.11 | -0.21 | -0.01 | 0.034 |
| 23 | Risk to Others Q6 | 29 | 8 | 37 | 0.78 | 0.66 | 0.93 | 0.005 | -0.22 | -0.35 | -0.08 | 0.001 |
| 24 | Admit-Discharge-Follow-up | 34 | 3 | 37 | 0.92 | 0.84 | 1.01 | 0.083 | -0.08 | -0.17 | 0.01 | 0.071 |
| 25 | Investigations | 25 | 12 | 37 | 0.68 | 0.54 | 0.84 | 0.001 | -0.32 | -0.48 | -0.17 | 0.000 |
| 26 | Psychological Input | 26 | 11 | 37 | 0.70 | 0.57 | 0.87 | 0.001 | -0.30 | -0.44 | -0.15 | 0.000 |
| 27 | Community Support | 29 | 8 | 37 | 0.78 | 0.66 | 0.93 | 0.005 | -0.22 | -0.35 | -0.08 | 0.001 |
| 28 | Drug Type ③ | 64 | 11 | 75 | 0.85 | 0.78 | 0.94 | 0.001 | -0.15 | -0.23 | -0.07 | 0.000 |
| 29 | Drug Action ④ | 58 | 17 | 75 | 0.77 | 0.68 | 0.87 | 0.000 | -0.23 | -0.32 | -0.13 | 0.000 |
| 30 | Drug Indication ⑤ | 49 | 26 | 75 | 0.65 | 0.55 | 0.77 | 0.000 | -0.35 | -0.45 | -0.24 | 0.000 |
| **Main Attributes** | | | | | | | | | | | | |
| 31 | DSM-IV Axis 1 (1) ② | 49 | 5 | 54 | 0.91 | 0.83 | 0.99 | 0.025 | -0.09 | -0.17 | -0.02 | 0.019 |
| 32 | DSM-IV Axis 2 (2) | 34 | 3 | 37 | 0.92 | 0.84 | 1.01 | 0.083 | -0.08 | -0.17 | 0.01 | 0.071 |
| 33 | DSM-IV Axis 3 (3) | 36 | 2 | 38 | 0.95 | 0.88 | 1.02 | 0.157 | -0.05 | -0.12 | 0.02 | 0.146 |
| 34 | DSM-IV Axis 4 (4:12) | 276 | 57 | 333 | 0.83 | 0.79 | 0.87 | 0.000 | -0.17 | -0.21 | -0.13 | 0.000 |
| 35 | DSM-IV Axis 5 (13) | 26 | 11 | 37 | 0.70 | 0.57 | 0.87 | 0.001 | -0.30 | -0.44 | -0.15 | 0.000 |
| 36 | Risk to Self (14:17) | 112 | 36 | 148 | 0.76 | 0.69 | 0.83 | 0.000 | -0.24 | -0.31 | -0.17 | 0.000 |
| 37 | Risk to Others (18:23) | 190 | 32 | 222 | 0.86 | 0.81 | 0.90 | 0.000 | -0.14 | -0.19 | -0.10 | 0.000 |
| 38 | Admit-Discharge-Follow-up (24) | 34 | 3 | 37 | 0.92 | 0.84 | 1.01 | 0.083 | -0.08 | -0.17 | 0.01 | 0.071 |
| 39 | Investigations (25) | 25 | 12 | 37 | 0.68 | 0.54 | 0.84 | 0.001 | -0.32 | -0.48 | -0.17 | 0.000 |
| 40 | Psychological Input (26) | 26 | 11 | 37 | 0.70 | 0.57 | 0.87 | 0.001 | -0.30 | -0.44 | -0.15 | 0.000 |
| 41 | Community Support (27) | 29 | 8 | 37 | 0.78 | 0.66 | 0.93 | 0.005 | -0.22 | -0.35 | -0.08 | 0.001 |
| 42 | Drug Type (28) | 64 | 11 | 75 | 0.85 | 0.78 | 0.94 | 0.001 | -0.15 | -0.23 | -0.07 | 0.000 |
| 43 | Drug Action (29) | 58 | 17 | 75 | 0.77 | 0.68 | 0.87 | 0.000 | -0.23 | -0.32 | -0.13 | 0.000 |
| 44 | Drug Indication (30) | 49 | 26 | 75 | 0.65 | 0.55 | 0.77 | 0.000 | -0.35 | -0.45 | -0.24 | 0.000 |
| **Major Attributes** | | | | | | | | | | | | |
| 45 | DSM Diagnosis (1:13) | 421 | 78 | 499 | 0.84 | 0.81 | 0.88 | 0.000 | -0.16 | -0.19 | -0.12 | 0.000 |

*BMC Psychiatry* 2007, **7**:55                                        http://www.biomedcentral.com/1471-244X/7/55

**Table 1: Comparison of results of telepsychiatric assessments and face-to-face interviews** *(Continued)*

| 46 | Risks (14:23) | 302 | 68 | 370 | 0.82 | 0.78 | 0.86 | 0.000 | -0.18 | -0.22 | -0.14 | 0.000 |
| 47 | Non-Drug Intervention (24:27) | 114 | 34 | 148 | 0.77 | 0.71 | 0.84 | 0.000 | -0.23 | -0.30 | -0.16 | 0.000 |
| 48 | Drug Intervention (28:30) | 171 | 54 | 225 | 0.76 | 0.71 | 0.82 | 0.000 | -0.24 | -0.30 | -0.18 | 0.000 |

**Overall**

| 49 | **Overall Result (1:30)** | **10 08** | **23 4** | **1242** | **0.81** | **0.79** | **0.83** | **0.000** | **-0.19** | **-0.21** | **-0.17** | **0.000** |

① A: Accurate outcome, I: Inaccurate Outcome, AR: Accuracy Ratio (Risk Ratio), LCI: Lower 95% Confidence Interval, UCI: Upper 95% Confidence Interval, RD: Risk Difference when the sample statistics compared with Accuracy (Risk) of 1 for the face-to-face interview. All approximated p values are more than zero.

② Numbers in brackets represent index number of primary attributes serialised in the previous rows.

③ Drug Types- Atypical Antipsychotic, Mood Stabilizer, Tricyclic Antidepressant, Newer Antidepressant, Other Antidepressant, Benzodiazepine Group, Non-Benzodiazepine Anxiolytic, Anti-Parkinsonian, and 'No Medication'.

④ Drug related actions were grouped into 'New Prescription', 'Continuation of previously prescribed medication with no change', and 'Adjustment of previously prescribed medication'.

⑤ Drug Indications were categorised for Positive Psychotic Symptoms, Manic symptoms, Bipolar Disorder, Depression, Anxiety and Associated Symptoms, Drugs for Side Effects (e.g. Anti-parkinsonian), Hypnotics, and Use of Drugs' sedative effect for anxiety control and sleep.

**Table 2: Cohen's Kappa results of intermethod and interviewers assessments**

| SN | Primary Attributes | Size① | Group② | Standard vs Video | | | Interviewers | | |
|----|-------------------|-------|--------|----------|----------|----------|----------|----------|----------|
| | | | | CK③ | LCI④ | UCI④ | CK③ | LCI④ | UCI④ |
| 1 | DSM-IV Axis 1 | 54 | 26 | **0.90** | 0.28 | 1.00 | **0.90** | 0.33 | 1.00 |
| 2 | DSM-IV Axis 2 | 37 | 2 | 0.62 | -0.04 | 0.87 | **0.63** | 0.21 | 0.87 |
| 3 | DSM-IV Axis 3 | 38 | 2 | **0.84** | 0.49 | 0.93 | **0.84** | 0.49 | 0.93 |
| 4 | DSM-IV Axis 4 Q1 | 37 | 2 | **0.57** | 0.25 | 0.82 | **0.57** | 0.22 | 0.83 |
| 5 | DSM-IV Axis 4 Q2 | 37 | 2 | 0.17 | -0.11 | 0.72 | 0.18 | -0.09 | 0.68 |
| 6 | DSM-IV Axis 4 Q3 | 37 | 2 | **0.85** | 0.66 | 0.91 | **0.85** | 0.66 | 0.91 |
| 7 | DSM-IV Axis 4 Q4 | 37 | 2 | **0.87** | 0.65 | 0.94 | **0.87** | 0.65 | 0.94 |
| 8 | DSM-IV Axis 4 Q5 | 37 | 2 | **0.66** | NA | NA | **0.66** | NA | NA |
| 9 | DSM-IV Axis 4 Q6 | 37 | 2 | **0.55** | 0.18 | 0.84 | 0.54 | 0.13 | 0.84 |
| 10 | DSM-IV Axis 4 Q8 | 37 | 2 | 0.36 | -0.07 | 0.79 | 0.37 | -0.08 | 0.54 |
| 11 | DSM-IV Axis 5⑤ | 37 | 5 | **0.89** | 0.81 | 0.94 | **0.89** | 0.81 | 0.94 |
| 12 | Risk to self Q1⑤ | 37 | 3 | **0.66** | 0.39 | 0.86 | **0.65** | 0.39 | 0.86 |
| 13 | Risk to self Q2⑤ | 37 | 3 | **0.68** | 0.34 | 0.86 | **0.68** | 0.37 | 0.86 |
| 14 | Risk to self Q3⑤ | 37 | 3 | 0.55 | -0.11 | 0.73 | **0.55** | 0.22 | 0.80 |
| 15 | Risk to self Q4⑤ | 37 | 3 | 0.45 | -0.11 | 0.68 | **0.45** | 0.12 | 0.79 |
| 16 | Risk to others Q1⑤ | 37 | 3 | **0.62** | 0.27 | 0.86 | **0.62** | 0.27 | 0.86 |
| 17 | Risk to others Q2⑤ | 37 | 3 | **0.82** | 0.30 | 1.00 | **0.82** | 0.37 | 1.00 |
| 18 | Risk to others Q3⑤ | 37 | 2 | -0.04 | -0.10 | -0.03 | -0.04 | -0.10 | -0.03 |
| 19 | Risk to others Q4⑤ | 37 | 3 | 0.55 | -0.11 | 0.78 | 0.55 | -0.06 | 0.78 |
| 20 | Risk to others Q5⑤ | 37 | 2 | 0.44 | -0.07 | 0.84 | 0.44 | -0.06 | 0.84 |
| 21 | Risk to others Q6⑤ | 37 | 3 | 0.41 | -0.13 | 0.66 | 0.41 | -0.12 | 0.66 |
| 22 | Admit-Discharge-Follow up | 37 | 3 | **0.76** | 0.37 | 0.93 | **0.76** | 0.37 | 0.93 |

*BMC Psychiatry* 2007, **7**:55

**Table 2: Cohen's Kappa results of intermethod and interviewers assessments** *(Continued)*

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 23 | Investigations | 37 | 2 | **0.29** | -0.03 | 0.59 | 0.30 | -0.02 | 0.59 |
| 24 | Psychological Input | 37 | 2 | 0.16 | -0.17 | 0.53 | 0.18 | -0.12 | 0.54 |
| 25 | Community Support | 37 | 2 | **0.55** | 0.22 | 0.78 | **0.56** | 0.25 | 0.78 |
| 26 | Drug Type ⑥ | 75 | 9 | **0.83** | 0.61 | 0.90 | **0.82** | 0.52 | 0.90 |
| 27 | Drug Action ⑥ | 75 | 5 | **0.67** | 0.52 | 0.79 | **0.66** | 0.52 | 0.79 |
| 28 | Drug Indication ⑥ | 75 | 11 | **0.59** | 0.35 | 0.74 | **0.59** | 0.35 | 0.76 |
| **Main Attributes** | | | | | | | | | |
| 29 | DSM-IV Axis 1 (1) | 54 | 26 | **0.90** | 0.28 | 1.00 | **0.90** | 0.33 | 1.00 |
| 30 | DSM-IV Axis 2 (2) | 37 | 2 | 0.62 | -0.04 | 0.87 | 0.63 | 0.21 | 0.87 |
| 31 | DSM-IV Axis 3 (3) | 38 | 2 | **0.84** | 0.49 | 0.93 | **0.84** | 0.49 | 0.93 |
| 32 | DSM-IV Axis 4 (4:10) | 259 | 14 | **0.65** | 0.52 | 0.78 | **0.65** | 0.52 | 0.78 |
| 33 | DSM-IV Axis 5 (11) | 37 | 5 | **0.89** | 0.81 | 0.94 | **0.89** | 0.81 | 0.94 |
| 34 | Risk to self (12:15) | 148 | 12 | **0.61** | 0.48 | 0.75 | **0.61** | 0.48 | 0.75 |
| 35 | Risk to Others (16:21) | 222 | 16 | 0.05 | -0.01 | 0.11 | 0.05 | -0.01 | 0.11 |
| 36 | Admit-Discharge-Follow up (22) | 37 | 3 | **0.76** | 0.37 | 0.93 | **0.76** | 0.37 | 0.93 |
| 37 | Investigations (23) | 37 | 2 | **0.29** | -0.03 | 0.59 | 0.30 | -0.02 | 0.59 |
| 38 | Psychological Input (24) | 37 | 2 | 0.16 | -0.17 | 0.53 | 0.18 | -0.12 | 0.54 |
| 39 | Community Support (25) | 37 | 2 | **0.55** | 0.22 | 0.78 | **0.56** | 0.25 | 0.78 |
| 40 | Drug Type (26) | 75 | 9 | **0.83** | 0.61 | 0.90 | **0.82** | 0.52 | 0.90 |
| 41 | Drug Action (27) | 75 | 5 | **0.67** | 0.52 | 0.79 | **0.66** | 0.52 | 0.79 |
| 42 | Drug Indication (28) | 75 | 11 | **0.59** | 0.35 | 0.74 | **0.59** | 0.35 | 0.76 |
| **Major Attributes** | | | | | | | | | |
| 43 | DSM-IV (1:11) | 425 | 49 | **0.86** | 0.81 | 0.90 | **0.86** | 0.81 | 0.90 |
| 44 | Risks (12:21) | 370 | 28 | **0.14** | 0.08 | 0.19 | **0.14** | 0.09 | 0.19 |
| 45 | Non-Drug Intervention (22:25) | 148 | 9 | **0.49** | 0.35 | 0.64 | **0.49** | 0.35 | 0.64 |
| 46 | Drug Intervention (26:28) | 225 | 25 | **0.72** | 0.66 | 0.79 | **0.72** | 0.66 | 0.79 |
| **Overall** | | | | | | | | | |
| 47 | Overall Result (1:28) | 1168 | 111 | **0.60** | 0.57 | 0.63 | **0.60** | 0.57 | 0.63 |

① The column 'Size' constitutes the number of total sample points used for assessments.

② The column 'Group' stands for the number of total categories of results e.g. all diagnoses with Paranoid Schizophrenia will make one group.

③ CK: Cohen's Kappa values derived from 'n by n' table made from the Groups. The significant values (Lower CI more than 0) are printed in bold. The summary CK results in the rows from 29 to 47 are based on "Inverse Variance method" using CKs and variances from previous rows displayed in the brackets for the respective assessments.

④ 95% Lower & Upper Confidence Intervals (LCI and UCI) from the rows 1 to 28 are derived from non-parametric Bias Corrected Accelerated (BCa) variance from 50,000 bootstrap samples with replacement. The summary LCIs and UCIs in the rows from 29 to 47 are based on "Inverse Variance method" using CKs and original variances from previous rows are displayed in the brackets for the respective assessments.

⑤ Weighted Kappa using "square error weights" were computed for ordinal observations where applicable.

⑥ The definitions for Drug Type, Drug Action and Drug Indication are same as in the Table 1.

ratio cannot exceed a maximum value of 1. Using these criteria, all the remaining observations of the 'primary attributes' are both valid and statistically significant between 0.65 and 0.91 excepting one of the items (row 12) in Axis 4 of the DSM. The pooled ARs for the main attributes (rows 31, 34 to 37, and 39 to 44) and major

attributes (rows 45 to 48) are from 0.65 to 0.91 and from 0.76 to 0.84 respectively. The overall AR (row 49) for the combined assessments is 0.81.

The criteria described in the previous paragraph were also applied for RDs (Table 1). Accordingly, all the valid obser-

*BMC Psychiatry* 2007, **7**:55    http://www.biomedcentral.com/1471-244X/7/55

**Table 3:**

**RAS (Risk Assessment Schedule)**
Enter the <u>RISK</u> in terms of NIL, LOW, MEDIUM, HIGH & VERY HIGH Risk.

| MENTAL STATE (RAS – I) | N | L | M | H | V |
|---|---|---|---|---|---|
| **Behaviour** | | | | | |
| • Dangerous or threatening actions | N | L | M | H | V |
| • Verbal/non-verbal risks | N | L | M | H | V |
| • Deliberate self harm | N | L | M | H | V |
| • Aggression | N | L | M | H | V |
| **Affect** | | | | | |
| • Arousal, anger, hostility, irritability, suspiciousness, fear | N | L | M | H | V |
| • Low mood or elevated mood | N | L | M | H | V |
| **Cognition** | | | | | |
| • Fantasies of deliberate self harm or harm to others | N | L | M | H | V |
| • Persecutory thoughts, delusions | N | L | M | H | V |
| • External control | N | L | M | H | V |
| • Confusion | N | L | M | H | V |
| • Preoccupation, obsession, jealousy | N | L | M | H | V |
| • Control over-ride | N | L | M | H | V |
| • Cultural beliefs | N | L | M | H | V |
| **Perceptions** | | | | | |
| • Command hallucinations | N | L | M | H | V |
| • Misidentification | N | L | M | H | V |
| • Matakite | N | L | M | H | V |
| **ENVIRONMENTAL/CURRENT FACTORS (RAS – 2)** | N | L | M | H | V |
| **Immediate stressors** | | | | | |
| • Substance use, intoxication or withdrawal | N | L | M | H | V |
| • Relationships | N | L | M | H | V |
| • Presence or absence of support | N | L | M | H | V |
| • Absence of treatment, non compliance | N | L | M | H | V |
| • Persecution or threats from others | N | L | M | H | V |
| • Arrest or criminal charges | N | L | M | H | V |
| • Loss including death of a peer | N | L | M | H | V |
| • Cultural transgression | N | L | M | H | V |
| • Financial stress | N | L | M | H | V |
| **Access** | | | | | |
| • To weapons, pills, victims | N | L | M | H | V |
| **Situation** | | | | | |
| • Referral from Prison, Police, Secure Unit | N | L | M | H | V |
| **Individual's attitude** | | | | | |
| • Co-operation | N | L | M | H | V |
| • Refusal to co-operate or fear of compulsory treatment | N | L | M | H | V |
| **HISTORICAL INFORMATION (RAS-3)** | N | L | M | H | V |
| **Illness and incidents** | | | | | |
| • Patterns of illness – Chronic active, Neurological disorder, H/O Head injury | N | L | M | H | V |
| • Psychiatric history – Serious mental illness, Multiple diagnoses, Treatment under MHA | N | L | M | H | V |
| • History of incidents (and context) – Repeated antisocial behavior | N | L | M | H | V |
| • Treatment and outcomes – Compliance and response of treatment given in past | N | L | M | H | V |

*BMC Psychiatry* 2007, **7**:55                                    http://www.biomedcentral.com/1471-244X/7/55

**Table 3:** *(Continued)*

| | N | L | M | H | V |
|---|---|---|---|---|---|
| • Features of past crises – Pathological intoxication, Episodic dyscontrol, Cruelty to animals, Blackouts | N | L | M | H | V |
| • Personal history – Criminal charges, Previous offenses, Forensic involvement | N | L | M | H | V |
| **Personality** | | | | | |
| • Usual coping style – Loner, Displaced rage reaction, self mutilism, Impulsivity, denial, Blaming others | N | L | M | H | V |
| **Family background** | | | | | |
| • Demographics – Single, Male, Poor, Low educational and vocational success | N | L | M | H | V |
| • Culture – Tolerance to antisocial behavior, Reluctance to disclose, Shame & Guilt | N | L | M | H | V |
| • Dynamics – H/O Violence, Contact of violent gangs, Intrafamilial violence | N | L | M | H | V |

### OUTCOME OF RISK ASSESSMENT
(Use knowledge & Information gathered from RAS-1, 2 & 3)

| **RISK TO SELF** | **N** | **L** | **M** | **H** | **V** |
|---|---|---|---|---|---|
| 1. Safety (including suicidal acts, deliberate self harm) | N | L | M | H | V |
| 2. Health (incl. drug & alcohol abuse, physical & psychological harm) | N | L | M | H | V |
| 3. Self neglect and vulnerability (incl. exploitation, sexual abuse, violence from others) | N | L | M | H | V |
| 4. Quality of life (including dignity, social and financial status) | N | L | M | H | V |

| **RISK TO OTHERS** | **N** | **L** | **M** | **H** | **V** |
|---|---|---|---|---|---|
| 1. Violence (including emotional, sexual and physical violence) | | | | | |
| 2. Intimidation/threats | N | L | M | H | V |
| 3. Neglect/abuse of Dependants | N | L | M | H | V |
| 4. Stalking/harassment | N | L | M | H | V |
| 5. Reckless behavior (including driving)Property damage (including arson) | N | L | M | H | V |
| 6. Public nuisance | N | L | M | H | V |

vations excluding DSM-IV Axis 4 Q9, range between -0.35 and -0.09 and are statistically significant. There is an overall accuracy difference of -0.19, with 95% confidence interval between -0.21 and -0.17. This result supports a hypothesis that overall outcome of telepsychiatric assessment is about 19% inferior to face-to-face interview.

Table 2 has observation data about agreements between the two methods of interview and between the interviewing psychiatrists. There is trend to classify CK values ≤ 0 as poor, those from 0.01 to 0.20 as slight, from 0.21 to 0.40 as fair, from 0.41 to 0.60 as moderate, from 0.61 to 0.80 as substantial and from 0.81 to 1 as perfect [30]. From a total of 27 valid primary attributes (rows 1 to 28), 16 have moderate to substantial statistically significant intermethod BCa Kappa values. Similarly, 10 of 14 main attributes (rows 29 to 42) have agreements at moderate to substantial level.

The Kappa scores for intermethod agreement of DSM Axes (rows 29 to 33) varied from substantial (0.65) to perfect (0.90) excepting axis 2, where the result was not statistically significant. The agreement was perfect (0.86) for combined DSM categories (row 43). The overall Kappa

score for risk (row 44) was only slight, though it was substantial in respect of assessment of 'risk to self' (row 34). Agreement levels for investigations and psychological input (rows 23 and 24) were non-significant while that for Community Support (row 25) was moderate (0.55). There was moderate agreement (0.49) on non-drug intervention as a whole (row 45). Various components of Drug Treatment (rows 26 to 28) had agreement levels between high moderate (0.59) to perfect (0.83) with substantial rating (0.72) as a whole (row 46). Overall agreement between the telepsychiatric assessments and face-to-face interviews for the completed psychiatric assessments reached a downward approximated value of 0.60, hence it was substantial.

The interrater agreements between the two interviewing psychiatrists were very close and could not be differentiated from that of intermethod assessment. Their respective values do not differ more than 0.01, with a considerable degree of overlap between their confidence intervals. Accordingly, there is no significant difference between intermethod and interrater agreements and are equivalent to each other.

*BMC Psychiatry* 2007, **7**:55                    http://www.biomedcentral.com/1471-244X/7/55

**Table 4: LIST OF PSYCHIATRIC INTERVENTION (LIPI)**

**Admission/Discharge/Followup (LIPI-1):**
Admission
Discharge
Followup

**Investigations (LIPI-2):**
Haematological
Biochemical
Serum Level of Medication
ECG tests
EEG Examination
CT/NMRI/PET/Isotope/Ultrasound
IQ Assessment
Other biological test
Other Psychological Tests

**Psychological Intervention (LIPI-3):**
Investigation
Simple Explanations
Support & Advice
Self Help by Book
Self Help Group
Assertiveness Training
Anger Control
Domestic Skills Training
Budget Handling Training
Social Skill Training
Counselling
Marital Therapy
Divers ional Therapy
Relaxation Training
Paper bag Ventilation
Systemic Desensitisation
Biofeedback
Cognitive Behaviour Therapy
Psychotherapy
Family Therapy
Other

**Community Support (LIPI-4):**
**Intervention**
CPN visit to support patient
CPN visit to support family
Activity Therapy (Gym, sports etc)
Handling Bills and Finances
Helping in making Applications to other agencies
Outreach
Home Help
Meals on Wheels
Art & Work therapy (Art, wood, gardening)
Day Hospital for socialisation

**LIPI-5**: Information related to Drug Type, Action and Indication scored in different table

## Discussion

This study aims to establish whether conclusions drawn from telepsychiatric assessments are in agreement with those from the standard method of face-to-face assessment for new referrals in an outpatient clinic. Most new and old referrals to the Community Mental Health Teams in the UK and NZ are discussed in a multidisciplinary team setting. Application of DSM diagnostic criteria in NZ has gradually evolved into standard clinical practice and is becoming popular in the UK. The application of Decision Tree for diagnosis on Axis-1 of DSM-IV can be easily adopted without significant additional resources and training. The methodology adopted in this study emulates the real clinic situation; hence its findings are both applicable and relevant to day-to-day clinical practice.

The authors have taken all necessary precautions in dealing with anticipated results, some of which might be paradoxical or erroneous e.g. CK and AR exceeding a maximum permitted value of 1. Those results where AR>1 and with nil variance were excluded from further statistical interpretation. Though the number of studied cases was only 37, the numbers of sample points (as in 'Size' column of Table 1) for statistical calculation were large enough for meaningful interpretation. The issue of sample size in handling large number of diagnostic categories for CK was dealt with bootstrapping technique and non-parametric Bias Corrected Accelerated Bootstrap Confidence Interval. This approach enhances the statistical quality of the data analysis.

A previous study [5] evaluating twelve telepsychiatric and face-to-face assessments on multiple scales found a mean weighted kappa coefficient of 0.85. The interrater reliability for diagnosis between two psychiatrists in three different experimental conditions on 63 patients has been found to vary between 0.69 and 0.85 [6]. A review of telepsychiatry services in Australia concluded that this technology could be reliably used for treatment recommendations and diagnostic assessments [7]. A Canadian study involving child psychiatrists found that in 96% of cases, the diagnosis and treatment recommendations made via video-conferencing were identical to those made in face-to-face interviews [10]. Another study [8] using telecommunication and audiovisual technology found interrater diagnostic agreement of 0.70. Despite methodological differences, the results from the present study are consistent with the findings quoted above in this paragraph.

Interrater agreement among clinicians for video-taped face-to-face interviews has been noted to have a relatively lower CK value of 0.55 [9]. It is possible that the flexibility conferred by the ability to question the patient in real time in a face-to-face or video-conferencing interview is an advantage over videotape assessment and accounting for improved intermethod and interrater agreement.

In a field trial of DSM-III, the interrater reliability for face-to-face interviews for the major disorders varied between

*BMC Psychiatry* 2007, **7**:55    http://www.biomedcentral.com/1471-244X/7/55

kappa values of 0.28 to 0.92 [31] and an another study on ICD-10 also yielded a fair to good kappa values for the four-character diagnostic codes [32]. In comparison, the outcome of telepsychiatric assessments in the current study is at least similar to the interrater reliability of face-to-face interviews from these large field trials.

None of the primary studies quoted above tested inter-method agreement for a complete set of clinical parameters. Their sample size and statistical methodology are also limiting factors for satisfactory conclusions. In contrast, the present study employs suitable statistical methods for comprehensive outpatient assessment for multi-axial DSM-IV diagnosis, risk assessment, investigations, and treatment. As compared to standard method of face-to-face interviews, telepsychiatric assessments in this study have a high accuracy ratio (AR 0.81) and a substantial intermethod agreement (CK 0.60).

Although the kappa value of intermethod agreement for risk assessment is low, it would be premature to ascribe this to telepsychiatric assessment itself. A study on video-taped interviews of 30 patients attending emergency psychiatry service revealed interrater correlation coefficients of 0.32 and 0.44 for risks to self and others respectively [33]. Another study conducted in a comparable setting also found similar results and came with the observation that in some circumstances the level of disagreement was high enough to warrant concern [34]. In a prospective study for risk assessment on 161 inmates of a high risk forensic unit [35] the agreement level among psychiatrists for face-to-face interviews in absence of operational criteria was very poor (CK -0.006). The same study reported that this agreement can be greatly enhanced (CK 0.742) by application of operational criteria. The findings in the present study for risk assessment are comparable to these results. In addition, the lower base level of risk in routine outpatient clinics in comparison to emergency and forensic psychiatric units is likely to cause further decrement in the kappa level.

There is a paucity of research-based knowledge concerning levels of agreement for risk factors. Most of the scales currently used for risk-assessments have yet to have their reliability, validity and predictability ascertained. To establish agreement levels in statistical terms for uncommon risk elements (suicides and homicides etc.) would require an enormous sample which may not be feasible. Lack of a valid and reliable tool for risk assessment may produce erroneous results while uncertainty over the time frame (short-term, immediate and long-term) for risk anticipation may lead to inconsistencies in reporting and recording. The sort-term serious risk will probably be dealt with in the emergency system rather than through routine outpatient referrals and the long-term risks are

likely to have minimal influence on the decision making process while dealing with routine outpatient referrals.

The ability to reach an accurate DSM-IV-Axis-1 diagnosis through telepsychiatric assessment is perfect (CK 0.90) and accurate (AR 0.91). Arriving at a reasonable diagnostic impression is a pre-requisite of the medical recommendation for assessment or treatment under the Mental Health Act and this objective can be very well achieved through telepsychiatry. Another prerequisite under the act is to evaluate potential risks with input and information from various sources. Identification of risk related concerns direct from the interviewee constitutes only one component of this whole process. The referring agency usually indicates and expresses its concerns about risk elements and additional information are generally obtained on telephone from other sources such as clinicians and family members. With this in mind, low concordance on risk assessment may not necessarily be a limiting factor in the use of telepsychiatry for the purpose of Mental Health Act assessment.

## Conclusion

Telepsychiatry is a dependable mode of service delivery for diagnostic assessment and psychiatric intervention in routine new referrals. Its accuracy varies between 79% and 83% in comparison with face-to-face interview. There is also an overall substantial agreement between these two methods of psychiatric evaluation. Although there is potential for usage of telepsychiatry for the Mental Health Act assessment, this requires further research using more refined operational tools to enhance the low accuracy and agreement scores found in the present study. The accuracy of conclusions arrived at from telepsychiatric assessment is likely to improve in future with further advances in technology [36].

### Clinical implications

1. Allows telepsychiatric services to be made available to a geographically distant and inaccessible population where it is difficult and expensive to recruit mental health professionals.

2. Enhances confidence in use of telepsychiatry as an alternative mode of service delivery.

3. Increases scope of international research and collaboration in the practice of clinical psychiatry in different parts of the world.

### Limitations and solutions

1. Although the outcome of risk assessment was similar to other studies, the level of agreement for this parameter is significantly low. There is scope to overcome this deficit through usage of operational criteria [35]. On this subject,

*BMC Psychiatry* 2007, **7**:55                          http://www.biomedcentral.com/1471-244X/7/55

some of the scientifically unexplored topics such as tools for risk assessment, its reliability and predictive value require further research.

2. The study assumed that there is 100% concordance between clinical decisions amongst psychiatrists if they conduct face-to-face interviews. This is seldom the case. Further studies with an added component to detect over-all interrater agreement for face-to-face assessment will help in eliminating the need for this hypothetical 100% concordance rate.

3. There is an inherent problem in determining the sample size for CK for an unknown number of categories that may be encountered during a prospective research. This requires application of alternative statistical approaches. The current study has attempted to address some of these concerns through usage of resampling method and boot-strap confidence intervals.

## List of Abbreviations used

APA: American Psychiatric Association

AR: Accuracy Ratio

BCaCI: Bias Corrected Accelerated Bootstrap Confidence Interval

CK: Cohen's Kappa

DSMIV: Diagnostic and Statistical Manual of Mental Disorders – 4th edition

GAF: Global Assessment of Functioning

HBHB: Hawkes Bay Health Board, New Zealand

ICD: International Classification of Diseases

ISDN: Integrated Services Digital Network

KB: Kilo bits per second

LIPI: List of Psychiatric Intervention

LCI: Lower 95% Confidence Interval

NZ: New Zealand

NCMHT: Napier Community Mental Health Team

R: Open source statistical package similar to S-Plus [29]

R1: Researcher 1 – Surendra Singh

R2: Researcher 2 – Dinesh Arya

RAS: Risk Assessment Schedule

RD: Risk Ratio

RR: Relative Risk

S: Standard method of face to face psychiatric assessment

S-Plus: The statistics package built upon the S programming language

SAS: The Statistical Analysis System from SAS Institute

SPSS: The Statistical Package for the Social Sciences

SPS: Principal author S P Singh

UCI: Upper 95% Confidence Interval

UK: United Kingdom

V: Video-conferencing

## Competing interests

The author(s) declare that they have no competing interests.

## Authors' contributions

**Surendra P Singh**

Planning, design, resource arrangement, coordination, template design, clinical assessment, data collection, data entry, statistical consideration, data analysis, review, writing and submission.

**Dinesh Arya**

Consultation and suggestion; especially about risk assessment and elements of statistical consideration, clinical assessment and data collection.

**Trish Peters**

Randomisation, liaison, consenting and coordination with other researchers and participants.

All authors have read and approved the submitted manuscript.

## Appendix-I
Table 3

## Appendix-II
Table 4

*BMC Psychiatry* 2007, **7**:55                                          http://www.biomedcentral.com/1471-244X/7/55

## Acknowledgements
The research team acknowledges and is obliged for the work and support of Mrs Irene Tucker, Napier Community Mental Health Centre (HBHB), Ms Sybil Gibson, then General Manager, Mental Health Directorate (HBHB), and Mr Ken Mitchell, IT Department (HBHB). We are also thankful to Dr Noel Fernando, Clinical Director (HBHB), for his encouragement, support and supervision from conception to completion of this study.

## References
1.  Doze G, Simpson J, Hailey D, Jacobs P: **Evaluation of a telepsychiatry pilot project.** *J Telemed Telecare* 1999, **5**(1):38-46.
2.  Tang WK, Chiu H, Woo J, Hjelm M, Hui E: **Telepsychiatry in psychogeriatric service: a pilot study.** *Int J Geriatr Psychiatry* 2001, **16**(1):88-93.
3.  Bishop JE, O'Reilly RL, Maddox K, Hutchinson LJ: **Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry.** *J Telemed Telecare* 2002, **8**(4):217-221.
4.  Keresztes C, Shaw R, Raciborska D, Timpson J, McKenzie O, Johnson ME, Rae L, Campbell F, Suggashie A, Wassaykeesic T: **Evaluation of the Keewaytinook Okimakanak Telepsychiatry Pilot Project.** *Centre for Health Services and Policy Research, Queen's University* 2002.
5.  Bear D, Jacobson G, Aaronson S, Hanson A: **Telemedicine in psychiatry: Making the Dream Reality.** *Am J Psychiatry* 1997, **154**(6):884-885.
6.  Baigent MF, Lloyd CJ, Kavanagh SJ, Ben-Tovim DI, Yellowlees PM, Kalucy RS, Bond MJ: **Telepsychiatry: 'tele' yes, but what about the 'psychiatry'?** *J Telemed Telecare* 1997, **3**(Suppl 1):3-5.
7.  Hawker F, Kavanagh S, Yellowlees P, Kalucy RS: **Telepsychiatry in South Australia.** *J Telemed Telecare* 1998, **4**(4):187-194.
8.  Ruskin PE, Reed S, Kumar R, King MA, Siegel E, Rosen M, Hauser P: **Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology.** *Psychiatr Serv* 1998, **49**(8):1086-1088.
9.  Fuhrer R, Rouillon F, Lellouch J: **Diagnostic reliability among French psychiatrists using DSM-III criteria.** *Acta Psychiatr Scand* 1986, **73**(1):12-16.
10. Elford R, White H, Bowering R, Ghandi A, Maddiggan B, St John K, House M, Harnett J, West R, Battcock A: **A randomised controlled trial of child psychiatric assessments conducted using videoconferencing.** *J Telemed Telecare* 2000, **6**(2):73-82.
11. Zarate CA, Weinstock L, Cukor P, Morabito C, Leahy L, Burns C, Baer L: **Applicability of telemedicine for assessing patients with schizophrenia: acceptance and reliability.** *J Clin Psychiat* 1997, **58**(1):22-5.
12. Shore JH, Savin D, Orton H, Beals J, Manson SM: **Diagnostic Reliability of Telepsychiatry in American Indian Veterans.** *Am J Psychiatry* 2007, **164**:115-118.
13. Vittorio DL, Giulio B, Marco B, Andrea G, Maria G, Gabriele C: **New possibilities for psychiatric evaluations through web-based systems: A pilot study.** *Rivista di Psichiatria* 2005, **40**(5):300-306.
14. Giovanni S: **The puzzle of the Psychiatric Interview.** *Journal of Phenomenological Psychology* 2004, **35**(2):173-195.
15. Parednia DA, Allen A: **Telemedicine technology and clinical applications.** *JAMA* 1995, **273**:483-488.
16. Weinstein MC, (ed): *Cost-effectiveness in health and medicine* New York: Oxford University Press; 1996.
17. Blackmon LA, Kaak HO, Ranseen J: **Consumer satisfaction with telemedicine child psychiatry consultation in rural Kentucky.** *Psychiat Serv* 1997, **48**:1464-1466.
18. Chae YM, Park HJ, Cho JG, Hong GD, Cheon KA: **The reliability and acceptability of telemedicine for patients with schizophrenia in Korea.** *J Telemed Telecare* 2000, **6**(2):83-90.
19. Mielonen ML, Ohinmaa A, Moring J, Isohanni M: **The use of videoconferencing for telepsychiatry in Finland.** *J Telemed Telecare* 1998, **4**(3):125-131.
20. Bose U, McLaren P, Riley A, Mohammedali A: **The use of telepsychiatry in the brief counselling of non-psychotic patients from an inner-London general practice.** *J Teleme Telecare* 2001, **7**(Suppl 1):8-10.
21. Pocock SJ: **The pros and cons of noninferiority trials.** *Fundam Clin Pharmacol* 2003, **17**(4):483-490.
22. American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* 4th edition. Washington DC: APA; 2000.
23. Judson N: *Guidelines for clinical risk assessment and management in Mental Health Services* New Zealand: Ministry of Health; 1998.
24. Bishop YMM, Feinberg SE, Holland PW: *Discrete Multivariate Analysis, Theory and Practice* 1st edition. Massachusetts: MIT; 1975.
25. Fleiss JL: *Statistical Methods for Rates and Proportions* New York: John Wiley & Sons; 1981.
26. Sutton AJ, Abrams K, Jones DR, Sheldon TA, Song F: *Methods for Meta-Analysis in Medical Research* 1st edition. England: John Wiley & Sons Ltd; 2000.
27. Efron B, Tibshirani RJ: *An Introduction to the Bootstrap (Monograph on Statistics and Applied Probability)* New York: Chapman & Hall; 1993.
28. Ludbrook J: **Statistical technique for comparing measures and methods of measurement: A critical review.** *Clin Exp Pharmacol Physiol* 2002, **29**(7):527-536.
29. *R: A Language and Environment for Statistical Computing, Version 2.4.1. The R Foundation for Statistical Computing, Austria, Vienna: ISBN 3-900051-07-0* 2006 [http://CRAN.R-project.org/].
30. Landis JR, Koch GG: **The measurement of observer agreement for categorical data.** *Biometrics* 1977, **33**(1):159-174.
31. American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* 3rd edition. Washington DC: APA; 1980.
32. Sartorius N, Ustun TB, Korten A, Cooper JE, vanDrimmelen J: **Progress Toward Achieving a Common Language in Psychiatry, II: Results From the International Field Trials of the ICD-10 Diagnostic Criteria for Research for Mental and Behavioural Disorders.** *Am J Psychiatry* 1995, **152**(10):1427-1437.
33. Way BB, Allen MH, Mumpower JL, Stewart TR, Banks SM: **Interrater agreement among psychiatrists in psychiatry emergency assessment.** *Am J Psychiatry* 1998, **155**(10):1423-1428.
34. Gale TM, Woodward A, Hawley CJ, Jayes J, Sivakumaran T, Hansen G: **Risk assessment for people with mental health problems: A pilot study of reliability in working practice.** *Int J Psychiatry Clin Pract* 2002, **6**(2):73-81.
35. Brown CHC, Lloyd KR: **Comparing clinical risk assessments using operationalized criteria.** *Acta Psychiatr Scand* 2002, **412**(s412):148-151.
36. Yoshino A, Shigemura J, Kobayashi Y, Nomura S, Shishikura K, Den R, Wakisaka H, Kamata S, Ashida H: **Assessment of televideo psychiatric interview reliability with present and next generation internet infrastructures.** *Acta Psychiatr Scand* 2001, **104**(3):223-226.

## Pre-publication history
The pre-publication history for this paper can be accessed here:

http://www.biomedcentral.com/1471-244X/7/55/prepub

Publish with **BioMed Central** and every scientist can read your work free of charge

*"BioMed Central will be the most significant development for disseminating the results of biomedical research in our lifetime."*

Sir Paul Nurse, Cancer Research UK

Your research papers will be:

• available free of charge to the entire biomedical community

• peer reviewed and published immediately upon acceptance

• cited in PubMed and archived on PubMed Central

• yours — you keep the copyright

Submit your manuscript here:
http://www.biomedcentral.com/info/publishing_adv.asp





# Clinical outcomes in a prison telepsychiatry clinic

Charles Zaylor*, Eve-Lynn Nelson[†] and David J Cook[†]

*Lansing Correctional Facility, Kansas; [†]University of Kansas Medical Center, Kansas, USA

**Summary**

The effectiveness of a prison telepsychiatry service was evaluated from a user perspective. Forty-five inmates (41 male, 4 female) completed the Symptom Rating Checklist–90–Revised (SCL-90-R) on three occasions, once before the teleconsultation and twice during treatment. The psychiatrist completed the Clinical Global Impression Scale—Severity Index (CGI) after each teleconsultation. Forty-nine per cent of inmates were aged under 30 years, 24% were aged between 30 and 39 years, while 27% were aged over 40 years. The inmates' mean SCL-90-R scores decreased over time, indicating less psychiatric distress. The psychiatrist reported patient improvement over time as assessed by the CGI. Telepsychiatry is an effective means of delivering mental health services to the prison population.

## Introduction

Correctional institutions face not only an increase in population, but also a population with complex health needs. The US Bureau of Justice suggests that 16% of state prison inmates, 7% of federal inmates and 16% of inmates in local jails have a history of mental health difficulties[1]. In addition to mental illness before incarceration, some inmates experience adjustment reactions in relation to entering the jail environment, including depressive symptoms, anxiety symptoms and sleep difficulties.

Correctional facilities struggle to meet the legal demands of providing mental health services for inmates[2]. Although approximately one-third of inmates with mental illness in jails receive psychopharmacological intervention, many go without care. This not only reduces the quality of life of the inmate but is also a potential risk to other inmates and to staff, as there is an increased likelihood of aggression and rule violation among untreated inmates. It also affects the inmate's ability to function productively after release from incarceration.

Traditional solutions often involve transport of the inmate with mental illness to a medical or mental health centre. Transport is both costly, because of the need for guards, and carries the risk of escape. Thus, jails are beginning to test telemedicine as an alternative means of service delivery.

Telemedicine applications have been used in psychiatry for over 40 years[3]. They have been implemented in correctional facilities across medical specialties[4] and have been shown to be cost-effective[5]. The central research question in the present study was whether such care would be effective, from the perspective of both the provider and patient.

## Methods

The University of Kansas Medical Center was linked to a rural county jail over 160 km away using ISDN connections at 128 kbit/s and PC-based videoconferencing. The jail medical officers screened inmates for psychiatric consultation and booked appointments through the psychiatrist's secretary. Correctional officers attended the inmate's assessment and follow-up appointments. The psychiatrist provided both emergency consultation for inmates on suicide watch and long-term care for inmates with mental illness. The clinic began in August 1998 and evolved into a once-weekly scheduled clinic in addition to ad hoc consultations. From November 1999 to May 2000, 45 inmates completed the Symptom Rating Checklist–90–Revised (SCL-90-R) (see below) three times in two months: before meeting the psychiatrist and twice during treatment. The forms were administered by the medical officer at the jail and posted to the psychiatrist for scoring. The psychiatrist completed the Clinical Global Impression Scale—Severity Index (CGI) rating scale (see below) at each visit as part of his standard case records. The study addressed the following questions: on three occasions, once before the teleconsultation and twice during treatment.

(1) What are the characteristics of users of a correctional telepsychiatry practice?
(2) Does telepsychiatry lead to symptom improvement over time from the patient's perspective?
(3) Does telepsychiatry lead to symptom improvement over time from the clinician's perspective?

Correspondence: Dr Charles L Zaylor, 5101 West 129th Street, Leawood, Kansas 66209, USA (*Fax: +1 913 851 7658; Email: charleszaylor@yahoo.com*)

## Symptom Rating Checklist–90–Revised (SCL-90-R)

The SCL-90-R6 is a 90-item self-report symptom inventory. Each item is rated on a five-point scale of distress. There are nine primary symptom dimensions (somatization, obsessive–compulsive, interpersonal sensitivity, depression, anxiety, hostility, phobic anxiety, paranoid ideation, and psychoticism). For this study, the Positive Symptom Distress Index (PSDI) on the SCL-90-R was used as a measure of symptom change. The PSDI is calculated by adding the total number on the SCL-90-R and dividing this sum by the number of non-zero-rated symptoms.

## Clinical Global Impression Scale — Severity Index (CGI)

The CGI was completed by the psychiatrist at each consultation. It is a clinician-rated scale from 1 ('not at all ill') to 7 ('among the most extremely ill patients') that rates the patient's level of distress. This measure is used in psychopharmacological trials to measure symptom change[7].

# Results

Tables 1 and 2 summarize the demographic and diagnostic information for the patients. A one-way, within-subjects analysis of variance (ANOVA) was conducted, with the factor being the testing time (first test, second test or third test) and the dependent variable being the SCL-90-R global index, the PSDI. Note that lower PSDI scores reflect less distress. The results for the ANOVA indicated a significant time effect ($P < 0.05$). Follow-up polynomial contrasts indicated a significant linear effect, with means decreasing over time ($P < 0.05$). The first mean was 2.42 (SD 0.67), the second 2.21 (SD 0.69) and the third 2.07 (SD 0.72).

A one-way, within-subjects ANOVA was conducted with the factor being the consultation time (first, second or third

Table 1 Demographic details of the telepsychiatry patients ($n = 45$)

|  | n | % |
|---|---|---|
| *Age (years)* | | |
| Under 30 | 22 | 49 |
| 30–39 | 11 | 24 |
| 40 or above | 12 | 27 |
| *First time in jail?* | | |
| Yes | 4 | 9 |
| No | 41 | 91 |
| *Gender* | | |
| Female | 4 | 9 |
| Male | 41 | 91 |
| *Ethnicity* | | |
| Caucasian | 38 | 84 |
| African–American | 7 | 16 |

Table 2 Clinical details of the telepsychiatry patients ($n = 45$)

|  | n | % |
|---|---|---|
| *Diagnoses* | | |
| Major depressive disorder | 14 | 31 |
| Bipolar disorder | 3 | 7 |
| Schizoaffective disorder | 2 | 4 |
| Irritable hypomania | 1 | 2 |
| Schizophrenia | 2 | 4 |
| Post-traumatic stress disorder | 2 | 4 |
| Impulse control disorder | 3 | 7 |
| Drug-induced psychosis | 3 | 7 |
| Adjustment reaction | 10 | 22 |
| None | 1 | 2 |
| Substance dependence, abuse or withdrawal | 24 | 53 |
| *Medication prescribed at first visit?* | | |
| Yes | 39 | 87 |
| No | 6 | 13 |

consultation) and the dependent variable being the CGI rating. Note that lower CGI scores reflect less severe symptoms. The results for the ANOVA indicated a significant time effect ($P < 0.01$). Follow-up polynomial contrasts indicated a significant linear effect, with means decreasing over time ($P < 0.01$). The first mean was 3.06 (SD 1.43), the second 2.79 (SD 1.25) and the third 2.22 (SD 1.09).

# Discussion

The lessons learned in the present study address the research questions.

## The diagnostic profile and the rural jail population's need for psychiatric services

The diagnoses in the rural jail population studied were consistent with diagnoses seen in urban jail populations. The most common diagnoses were affective disorders (44%) and adjustment reactions (22%). Substance dependence, abuse or withdrawal was diagnosed in over half the consultations, which is consistent with the high proportion of drug use in other correctional settings. This suggests the need to ask inmates affective questions and substance abuse/dependence questions on intake. It also underscores the need to monitor inmates for adjustment reactions. Some adjustment to the jail setting is of course normal, but more intense reactions, such as mood lability, anxiety reactions and sleep problems, can be effectively managed by a psychiatrist.

## Patient-reported improvement with telepsychiatry services

The inmates reported lower scores over time on the SCL-90-R, reflecting less distress after receipt of telepsychiatry services. Future research may also monitor inmates over time to get an idea of the length of psychiatric treatment that best serves the

population. This continued research will help jail officials allocate funding for telepsychiatry patients.

## Psychiatrist-reported patient improvement with telepsychiatry services

The psychiatrist reported patient improvement on the CGI over time. The psychiatrist's rating of improvement also coincided with the patients' rating of improvement, validating the clinical impression that inmates respond the same to telemedicine services as to face-to-face services. Future research may address which patients show the greatest improvement over time and which therapeutic interventions are associated with improvement.

## Conclusion

This study supports the delivery of psychiatric services in a jail setting because care was effective from both the inmates' and the psychiatrist's perspective. The lessons learned support telemedicine as a feasible delivery method for mental health services. Future research goals include following inmates over

a longer period, monitoring whether psychiatric services reduce jail violence and rule violations overall, and determining psychiatric follow-up services as the inmates return to society.

## References

1 Ditton PM. *Mental Health and Treatment of Inmates and Probationers.* Bureau of Justice Statistics Special Report, NCJ 174463, 1999
2 Lamb HR, Weinberger LE. Persons with severe mental illness in jails and prisons: a review. *Psychiatric Services* 1998;**49**:483–92
3 Baer L, Elford R, Cukor P. Telepsychiatry at forty: what have we learned? *Harvard Review of Psychiatry* 1997;**5**:7–17
4 Brecht RM, Gray CL, Peterson C, Youngblood B. The University of Texas Medical Branch—Texas Department of Criminal Justice Telemedicine Project: findings from the first year of operation. *Telemedicine Journal* 1996;**2**:25–35
5 Zollo S, Kienkle M, Loeffelholz P, Sebille S. Telemedicine to Iowa's correctional facilities: initial clinical experience and assessment of program costs. *Telemedicine Journal* 1999;**5**:291–301
6 Derogatis LR. *SCL-90-R Administration, Scoring, and Procedures Manual—II.* Towson, MD: Clinical Psychometric Research, Inc., 1992
7 Guy W. *ECDEU Assessment Manual for Psychopharmacology, Revised.* Rockville, MD: US Department of Health and Human Services, 1976



# The potential for telemedicine to improve coronary heart disease services

Keith Clough*, Mike Mallinson† and Ian Jardine*

*Telemedicine Alliance and the Institute of Healthcare Management Telemedicine and Telecare Programme, Abingdon, UK; †Merck Sharp and Dohme Ltd, UK

**Summary**

The potential of telemedicine to improve services for patients suffering from coronary heart disease (CHD) was explored. Key issues surrounding the delivery of CHD services in London were identified, such as a shortage of skilled staff, the need for appropriate patient information and problems with waiting lists, particularly for diagnostic test results. Telemedicine has the potential to improve service delivery in each of these areas. It is unlikely that some of the targets for CHD service delivery set out by the Department of Health's National Service Frameworks can be met without the use of telemedicine.

## Introduction

Coronary heart disease (CHD) is a major cause of death and disability in England, as it is in most of the industrialized world. Its treatment has been accorded special priority by the Department of Health and it is the subject of one of the National Service Frameworks (NSFs)[1]. Services for CHD are

delivered in the primary-, secondary- and tertiary-care sectors, with some care services provided by social services.

A study was conducted by the Institute of Healthcare Management's Telemedicine and Telecare Programme team to identify the potential of telemedicine and telecare to improve services for patients with CHD. The work was one of a series of studies and workshops carried out by the team to explore the potential of telemedicine and telecare in specific localities or specialties to amplify the findings of their 1998 report[2]. The study was carried out in Hillingdon, to the west of London, where the resident population is reasonably close to the UK national average in terms of age structure, morbidity, social class and ethnicity. In addition to identifying the potential for

Correspondence: Keith Clough, 15 Sutton Wick Lane, Drayton, Abingdon, Oxon OX14 4HH, UK (*Fax: +44 12 3553 1144; Email: krc@telemedicinealliance.co.uk*)

# Telemedicine services to a county jail

Charles Zaylor*, Pamela Whitten† and Charles Kingsley†

*University of Kansas Medical Center; †Michigan State University, Michigan, USA

Correspondence: Dr Charles Zaylor, Depertment of Psychiatry, University of Kansas Medical Center, Kansas City, KS 66160-7341, USA
(*Fax: +1 517 588 3001; Email: czaylor@kumc.edu*)

**Summary**

Local and county jails rarely offer telepsychiatry services to their inmates. We have established a telepsychiatry pilot project between the Kansas University Medical Center and the Lyon County Jail in Emporia, Kansas. A total of 264 telepsychiatry consultations were conducted with jail inmates. Of these, 70 were initial evaluations and 194 were follow-up visits; only one inmate refused to be seen. Approximately one-third of all inmates were seen for psychiatric consultation within one week of their incarceration and 68% were seen within one month of incarceration. Among lessons learned during the first year of service were: the monthly demand for consultations was five times greater than projected; moderately to severely ill inmates with a broad range of psychiatric illness can be seen and treated effectively using videoconferencing; and the technology was accepted by the jail personnel and the inmates alike and integrated into the jail's routine in terms of the delivery of psychiatric care.

## Introduction

Telepsychiatry commonly uses videoconferencing to link a patient with a mental health provider. The use of telemedicine as a means of accessing psychiatric care has a history of more than four decades: Wittson *et al*. launched a telepsychiatry project in Omaha, Nebraska, in the 1950s[1]. State prisons in Texas and Ohio are actively providing psychiatric services via telemedicine. However, the use of telepsychiatry at correctional facilities other than those operated by a federal or state government is rare. The provision of psychiatric services to inmates of county and city jails is difficult and sometimes there are no such services, largely because jails are often located in rural areas where access to psychiatric services is in any case limited. In Kansas, a project was launched in 1998 to bring psychiatric services to a county jail located in south-eastern Kansas: the Lyon County Jail located in Emporia.

## The project

In 1997, the Department of Justice contacted the Kansas University Medical Center (KUMC) with an offer to fund a pilot telemedicine project in jails. We sent a letter to the sheriff of each county jail in Kansas to ascertain their interest in participating. The Lyon County Jail sheriff was the only one who responded to this letter within the required deadline. After a needs assessment, project planners from the KUMC and the jail determined that telepsychiatry was needed because of the jail's lack of access to mental health services. The jail had been accessing mental health services from the local community mental health centre; however, the demand in the general community for mental health services created long waiting periods for jail inmates.

The Department of Justice provided over $20,000 to purchase PC-based videoconferencing equipment for the jail and the psychiatrist, and to pay for the ISDN connections. Zydocron PC-based videoconferencing units with 17-inch (43 cm) monitors were used with transmission rates of 128 kbit/s. The clinic was located in a room within 5 m of the holding area in the jail. The only room modifications required were the installation of an ISDN line and the hanging of blue curtains on the wall facing the videoconferencing equipment.

Jail staff originally estimated that there would be four or five consultations a month, and anticipated that the service would be used most frequently outside normal clinic hours and at weekends. In response, we developed a protocol for accessing psychiatrists through KUMC's Crisis Stabilization Unit located in the hospital's emergency room. However, a decision was made to make the clinic available only during normal working hours, except in emergencies. It soon became apparent that the inmates' psychiatric needs could be met adequately

Downloaded from jtt.sagepub.com at SAGE Publications on June 21, 2016

during normal working hours. Because of the volume of consultations and follow-up visits, a weekly three-hour clinic was established. This scheduled clinic made more efficient use of the psychiatrist's and the jail officers' time. The appointments were scheduled directly through the psychiatrist's secretary.

## Utilization of the service

The true needs of the jail have become clearer since the inception of the project. Instead of four or five consultations a month, the clinic is now averaging 34 patient consultations a month, including both new evaluations and follow-up visits. The inmate's chart is created by and considered the property of KUMC. The original chart is kept in the outpatient clinic at KUMC and a copy of the progress notes is mailed to the jail, for storage in the inmate's medical file. The medical officers at the jail were designated as the contact people for the clinic and act as the liaison between the psychiatrist and the jail. Jail officers are present during the telepsychiatry clinic and inmates are advised of the limits of confidentiality. The inmates must also sign a consent form before being seen.

Inmates are seen for consultation as well as for ongoing care. One-third of the inmates have been seen only once for consultation and the other two-thirds were followed for up to eight months. A total of 264 telepsychiatry consultations have been conducted with Lyon County Jail inmates. Of these, 70 were initial evaluations and 194 were follow-up visits; only one inmate refused to be seen. Approximately one-third of all inmates were seen for psychiatric consultation within one week of their incarceration and 68% were seen within one month of incarceration. Of the consultations completed, 74% resulted in the recommendation that the inmate be placed on psychotropic medication. Men accounted for 89% of the consultations and women accounted for 11%. The average age of the inmates was 29 years.

The most common diagnosis on evaluation was major depression (20%), followed by bipolar disorder (15%) and psychotic disorders (15%). Impulse control disorder, adjustment disorder and drug-induced disorders accounted for the remaining 50%. A concomitant diagnosis of substance dependence was present for 61% of the inmates seen.

The telepsychiatry service has been well received by the inmates as demonstrated by their cooperation and compliance with treatment.

Jail personnel were interviewed in order to determine their perceptions of the strengths and weaknesses of the telepsychiatry clinic. The two

medical officers, three shift supervisors and the jail sheriff each participated in an individual interview consisting of 15 open-ended questions. All of the interviews took approximately 10 min. This resulted in 28 pages of data. Since the purpose of these interviews was a descriptive analysis, the data were simply placed into categories specific to each question and the tallies represent total responses rather than individual percentages.

The results of these interviews painted an overwhelmingly positive response to the telepsychiatry experience. The jail staff explained that they had two options for seeking psychiatric services. They could use a psychiatrist from the local community mental health centre or use telepsychiatry with the KUMC doctor. When asked how they decided which delivery method to use, 80% of the staff said that they usually based their decision on the modality that was the quickest in bringing the care to the inmate, namely telepsychiatry. For example, when an in-person visit was scheduled, additional security staff were required to transport the inmate to the community mental health centre. Tables 1 and 2 list the

**Table 1** Advantages and disadvantages of traditional psychiatric services for a community mental health centre

| Advantages | Disadvantages |
|---|---|
| Care is delivered face to face | Inmates must be transported outside of the facility for care, which requires additional resources (e.g. officers to travel with patient/inmate) |
| | Takes weeks to get a visit scheduled |
| | Takes too long to get medication |
| | Staff are not friendly |

**Table 2** Advantages and disadvantages of telepsychiatry

| Advantages | Disadvantages |
|---|---|
| Quicker access than traditional care | Many more inmates put on medication |
| Low security risk since patient/inmate remains in jail | |
| Equipment safe and secure | |
| Frees up staff to perform other roles | |
| Helps inmates with problems immediately | |
| Accurate diagnoses and care | |
| Reduces potential liability of jail | |
| Gets patients/inmates off costly suicide watch more quickly | |

Downloaded from jtt.sagepub.com at SAGE Publications on June 21, 2016

advantages and disadvantages for both delivery methods. One employee, for example, stated:

> I cannot say enough good things about telepsychiatry … it takes so much time and pressure off us as jail staff. It frees us up to take care of other things that need to be taken care of too, because once you have someone that is in need of mental health attention it could tie you and officers up for many, many hours. I would say that telepsych is the very best that we have.

All employees in the jail were told about the telepsychiatry project and most had some training on the equipment. All of the jail personnel knew what the telepsychiatry clinic was and what it could do, including the guards. The guards, according to those interviewed, as well as the entire jail personnel, appear to be pleased with the service. One staff member explained:

> I think they {jail personnel} were as frustrated as the rest of us with regular mental health care. You know, when you have somebody saying they're going to commit suicide and it takes two weeks before we get mental health personnel in here to visit with them one-on-one and find out whether they're actually serious about it or not everybody gets a little frustrated. And this {telepsychiatry} cuts the time down immensely and they all see that as a life saver.

Of the jail officers interviewed, 80% rated the inmates seen in the telepsychiatry clinic as mild to moderately ill. This perception was in accordance with the actual assessment of the inmates by the psychiatrist.

## Lessons learned

Various lessons were learned from the project. The initial needs of the jail were underestimated. There is a need for four to six new inmates to be seen for consultation each month and an additional 27–30 follow-up visits for inmates each month. Moderately to severely ill inmates with a broad range of psychiatric illness can be seen and treated using telemedicine. The technology has been accepted by the jail personnel and the inmates alike, and integrated into the jail's routine in terms of the delivery of psychiatric care. In addition, there have been several areas of cost saving for the jail because of the introduction of the clinic. These include inmates no longer needing to be transported outside the jail for evaluation and treatment, as well as inmates not having to be kept on suicide watch. Before the introduction of the telepsychiatry clinic, many of the inmates would have to be kept on suicide watch, which required the presence of additional officers, until a mental health professional could come to the jail to evaluate the inmate.

In conclusion, telepsychiatry appears to be a reasonable solution to the problem of limited access to psychiatric care that some rural jails experience.

## Reference
1  Wittson CL, Dutton R. A new tool in psychiatric education. *Mental Hospitals* 1956;7:11–14

Downloaded from jtt.sagepub.com at SAGE Publications on June 21, 2016

TELEMEDICINE JOURNAL
Volume 5, Number 3, 1999
Mary Ann Liebert, Inc.

# Telemedicine to Iowa's Correctional Facilities: Initial Clinical Experience and Assessment of Program Costs

SUSAN ZOLLO, M.A.,[1] MICHAEL KIENZLE, M.D.,[2] PAUL LOEFFELHOLZ, M.D.,[3]
and SUSAN SEBILLE, M.S.[4]

## ABSTRACT

*Objective.* To evaluate the costs and benefits of a prison telemedicine program for the institutions involved and to assess early provider satisfaction.

*Materials and Methods.* A survey of primary care and consulting providers from four prisons and an academic tertiary care facility in Iowa was conducted during the first year of telemedicine service linked with the state's correctional facilities, from March, 1997 to February, 1998. Data were evaluated from 247 completed telemedicine encounters. Cost estimates were made for (1) 1997 cost data for the 4,396 Iowa prisoners who were transported to The University of Iowa Hospitals and Clinics (UIHC) for their health care, and (2) the equipment, circuitry, and personnel costs necessary on both ends of the network to provide comparable telemedicine service to remote patients and providers.

A formula for estimating the cost of implementing a telemedicine service is presented. It includes a projection for determining at what point the cost of the telemedicine visit approaches the average cost of an on-site visit (breakeven point). There was also a brief survey administered to presenting and consulting physicians to determine their overall satisfaction with the telemedicine system for diagnosis, treatment planning, and follow-up.

*Results.* The average cost to the prisons for an on-site inmate visit to the University of Iowa Hospitals and Clinics (UIHC) was $115 during our study period, from March 1997 to February 1998. Using a formula that specifies a number of fixed and variable costs for implementing telemedicine, we were able to determine that the breakeven point for Iowa's correctional facilities would require 275 teleconsultations per year, per site (total of 1,575 consultations a year). Given the higher equipment investment at the UIHC hub, the breakeven point would be around 2,000 teleconsultations annually. Cost studies did not include medical care, which is assumed to be relatively comparable for both on-site and telemedicine interactions. Overall, referring physicians expressed a higher rate of satisfaction with telemedicine than specialists (4.19 to 3.45, respectively, on a scale of 1 to 5—5 representing the highest ranking). Both consulting and referring physicians ranked the quality of transmission the highest among all questions regarding satisfaction with the telemedicine system.

*Conclusions.* No one should anticipate instantaneous cost-effectiveness with telemedicine. However, with careful planning, implementing a telemedicine program can be "cost-acceptable" initially. Telemedicine ultimately becomes cost-effective as the volume of teleconsults increases.

[1]Telemedicine Resource Center, The University of Iowa College of Medicine, Iowa City, Iowa; [2]Departments of Clinical Affairs & Biomedical Communications and Internal Medicine, National Laboratory for the Study of Rural Telemedicine, College of Medicine, The University of Iowa, Iowa City, Iowa; [3]Iowa Department of Corrections, Iowa Medical and Classification Center, Oakdale, Iowa; [4]Research and Evaluation Coordinator, Telemedicine Resource Center, The University of Iowa College of Medicine, Iowa City, Iowa.

CDCR _355

## INTRODUCTION

Accordingly to recent statistics from the department of justice, there are 1,244,554 prisoners under Federal or State jurisdiction in the United States.[1] Due to lifestyle, economic, and demographic variables, many of these inmates experienced inadequate health care prior to entering prison.[2] Once incarcerated, the delivery of health services to prisoners is complicated by issues relating to security and the cost of transporting inmates to medical facilities.

The cost of providing outpatient care to prison populations has been estimated to be as high as $1,000 per inmate visit, including transportation and medical services.[3] These costs vary considerably depending on the distance between the health care facility and the prison, number of inmates traveling to receive medical care per trip, and the number and salaries of security officers and drivers involved.

In order to address concerns relating to prisoner transport and security, some states are exploring telemedicine as a mechanism for delivering health care services to correctional facilities. Several variables, including an increase in inmate populations, cost-containment issues, and concern for public safety have made telemedicine a promising health delivery system for many correctional facilities.[4] Telemedicine programs in Georgia, Colorado, Texas, North Carolina, Ohio, and Minnesota all began with teleconsultations to prison facilities.

## BACKGROUND

### The University of Iowa Hospital and Clinics

Located in Iowa City, Iowa, UIHC is the state's only tertiary health care center. The UIHC has 873 inpatient beds and serves patients and families from all of Iowa's 99 counties. From July 1, 1996 through June 30, 1997, there were 41,818 patient admissions and 581,446 ambulatory clinic visits to the UIHC. Specialized care is provided by more than 1,300 physicians and dentists; 1,500 professional nurses; and 4,700 other professional and support staff. Patient care is provided across 16 medical specialties in 251 specialty and sub-specialty ambulatory clinics.

### Iowa's Correctional Facilities

Currently, there are nine prisons in the state housing a total of 7,246 prisoners (Table 1). Iowa Department of Corrections (DOC) inmates have received inpatient and outpatient medical/surgical services at the UIHC since 1915, as mandated in Chapter 255 (section 28) of *The Code of Iowa:* "Medical and Surgical Treatment of Indigent Persons." Payment for health care services to Iowa's prisoners is supported by the Perkins Act, which directs the UIHC to be compensated from the state's general fund for costs associated with providing health care to Iowa's indigent populations. This compensation is currently in the form of a fixed appropriation set in advance of the fiscal year. The prison system is not limited to the number of inmates it can refer to the UIHC for care or by the costs inmates may incur.

In effect, Iowa's indigent care program equates to a bundled payment plan, eliminating the fee-for-service barrier that continues to inhibit the delivery of telemedicine services to the general population.[5] Ensuring physician participation is essentially a non-issue because health care providers employed by a state-mandated indigent care facility are required by law to provide medical services to the state's indigent patient population, including inmates from the state's correctional facilities.

*"The common denominator among prison telemedicine programs is the use of a centralized method of health care administration that negotiates and allocates global compensation for health care, including hospital costs, ancillary services, and physician services."[6]*

## RATIONALE FOR TELEMEDICINE TO IOWA'S CORRECTIONAL FACILITIES

Iowa's prison population has increased by more than two-and-a-half times in the last decade, growing from 2,800 inmates in 1987 to 7,246 in 1998. As Iowa's inmate population continues to expand, a greater number of residents from the state's correctional facilities are being

EXPERIENCE AND COST OF TELEMEDICINE

TABLE 1. PROFILE OF IOWA'S CORRECTIONAL FACILITIES

| Correctional Facility | Current Inmate Census | Date Connected to Telemedicine Network | Miles from UIHC | Inmates Evaluated Over Telemedicine During Study Period | Average Age of Telemedicine Patients | Male/Female Ratio |
|---|---|---|---|---|---|---|
| Iowa Medical and Classification Center, Oakdale[a] | 985 | March, 1997[a] | 5.9 | 167 | 37 yr 11 mos | 161/6 |
| Iowa State Penitentiary, Fort Madison[a] | 910 | March, 1997[a] | 88.3 | 79 | 36 yr 6 mos | 79/0 |
| Newton Correctional Facility, Newton[a] | 113 | January, 1998[a] | 82.1 | 27 | 36 yr | 27/0 |
| Clarinda Correctional Facility, Clarinda[a] | 1,002 | February, 1998[a] | 245.3 | 1 | 39 yr 7 mos | 1/0 |
| Fort Dodge Correctional Facility, Fort Dodge | 48[b] | July, 1998 | 195.8 | | | |
| Anamosa State Penitentiary, Anamosa | 1,304 | August, 1998 | 48 | | | |
| Iowa Correctional Institution for Women, Mitchellville | 499 | Fall, 1998 | 95.9 | | | |
| Mount Pleasant Correctional Facility, Mt. Pleasant | 944 | August, 1998 | 55 | | | |
| North Central Correctional Facility Rockwell City | 441 | Uses Fort Dodge Unit | 206.7 | | | |
| Total: | 7,246 | | | 274 | | |

[a]Connected to telemedicine network during study period, March 1997–February 1998.
[b]New facility.

seen at the UIHC. Since 1987, there have been 2,666 inmate admissions and 30,711 inmate clinic visits. The distance to UIHC from the correctional facilities ranges from 5 to 245 miles.

In 1989, Iowa began building the nation's first state-owned, statewide fiberoptic network, and in 1994 the Governor signed a bill allowing medical facilities to use the network for the provision of health care services. The Iowa Communication Network (ICN) now provides data, voice, and video service to all of Iowa's 99 counties. Utilizing two-way, full-motion (DS-3) technologies, this interactive network provides service to K–12 schools, higher education institutions, state and federal agencies, and hospitals and clinics throughout the state. It is anticipated that the total number of connected interactive video facilities in Iowa will soon reach 600.

Making use of the state's fiberoptic backbone and availability of ISDN technologies, the University of Iowa began its implementation of telemedicine services with a federal contract

from the National Library of Medicine (NLM) in 1994. A second contract from the NLM in 1996 allowed development and delivery of additional telemedicine services to rural hospitals and implementation of a multisite research and development telemedicine network, with the University of Iowa as the hub. The availability of the statewide fiberoptic infrastructure combined with strong fiscal support at the federal level has allowed Iowa to move to the forefront of telemedicine and telehealth activities. (For additional information, please visit our Web site: *http://telemed.medicine.uiowa.edu*)

Despite conditions conducive to telemedicine in Iowa, the state is faced with many of the same challenges that exist elsewhere in the country, not the least of which is reimbursement. The University of Iowa (UI) has been looking for ways to collect sufficient data to evaluate the efficacy and cost-effectiveness of telemedicine, while at the same time dealing with problems of motivating specialists to participate in a service for which they know reim-

bursement is extremely limited, if at all available. The DOC has been looking for ways to reduce costs without decreasing quality of inmate care. These two goals led to a collaborative effort between Iowa's DOC and UI to offer telemedicine specialty consults to inmates, collect outcomes data on the cost of using telecommunications to deliver clinical services, and evaluate the satisfaction of referring and consulting providers.

## PURPOSE OF THE STUDY

This analysis will provide information about the first year of telemedicine service to the state's correctional facilities and will present the costs and benefits of doing telemedicine from the perspective of both the referring and consulting facilities. Because by definition telemedicine involves an interaction between two or more facilities, satisfaction with service, costs, and benefits to both the hub and the spoke facilities were evaluated. The authors provide demographic and clinical data on the first 274 patient encounters; offer a detailed formula to determine annual costs of receiving and providing telemedicine services; and assess provider satisfaction on the part of both referring and consulting physicians.

## MATERIALS AND METHODS

The telecommunications network at UIHC makes use of both ISDN-PRI (Integrated Service Digital Network-Primary Rate Interface) linkages and the ICN to allow dial-up variable bandwidth connections between the remote facility and the UIHC for interactive teleconsultations. Typically, each compressed video session utilizes half of a T-1 circuit (twelve channels) for its transmission speed.

### Equipment

The University of Iowa currently utilizes TeleDoc 5000 video codec units (NEC America, Inc., Irving, TX) to transmit interactive teleconsultations. Each unit has two high-resolution television monitors: one displays the local image, the other allows the consulting physician and patient to interact visually and audibly in real time. A VHS videocassette recorder is included for optional video documentation of the encounter procedures. The two UIHC TeleDoc units are located in examining rooms of the UIHC's Emergency Treatment Center (ETC).

In addition to the TeleDoc 5000 system, digital diagnostic equipment is available to the referring physicians. This equipment includes a digital exam camera, electronic stethoscope, and radiologic light box.

## STUDY SAMPLE

### Clinical Specialties

Telemedicine between the UIHC and DOC began in March, 1997 with connections to the Oakdale and Fort Madison facilities. Based on a retrospective review of inmate visits for the preceding year, it was determined that the three most utilized specialties were orthopedics, dermatology, and internal medicine, and therefore these were the first three clinics made available to the DOC via telemedicine. Since the program's inception, five clinical specialties have been added, based on the needs of the state's inmate population. The rate of teleconsultations for each specialty was impacted by the dates each service became available and the number of prison sites connected at the time of analysis (Tables 1 and 2).

### Patient Profiles and Demographics

Demographic and diagnostic information was captured for the 274 prison telemedicine consultations performed, from March 4, 1997 through February 28, 1998. The average age of inmate telemedicine patients (predominantly male) was 37 years.

### Diagnostic Patterns

The *International Classification of Diseases, Ninth Revision* (ICD-9) codes, from primary diagnoses of inmates evaluated over the telemedicine system, are summarized into major diagnostic categories by frequency of presentation

TABLE 2.  NUMBER OF CONSULTS BY SPECIALTY (YEAR 1)

| Specialty Clinic | Date Service Began | No. of Consults (March 1997–February 1998) |
|---|---|---|
| Orthopedics | March, 1997 | 117 |
| Internal (general) medicine | March, 1997 | 82 |
| Dermatology | March, 1997 | 35 |
| Gastrointestinal | June, 1997 | 12 |
| Cardiology | March, 1997 | 11 |
| General urology | June, 1997 | 10 |
| Surgery | September, 1997 | 6 |
| Otolaryngology | November, 1997 | 1 |
| Total | | 274 |

(Table 3). These diagnostic categories were derived using the *1998 International Classification of Diseases, Ninth Revision, Clinical Modification, Fifth Edition.*[7] As expected, the diagnostic categories reflect the most frequently used specialties.

Consulting physicians also assigned evaluation and management (E/M) codes to each prison telemedicine visit. These codes are summarized in Table 4. Within each category, the complexity of physician service increases as the E/M code value increases.[8] Most visits are clustered in the low to mid-level codes, likely reflecting a case preselection process by the DOC.

Table 5 represents follow-up actions recommended by the consultant for patients evaluated via telemedicine in the first year. These categories were based on an analysis of the clinical summaries filed in each patient's chart by the consulting physicians. More than one action may have been noted for each patient visit.

## DISCUSSION

### Provider Satisfaction with the Telemedicine Service

Due to the already significant institutional, state, and federal requirements for documenting quality health assurance procedures, a decision was made to keep the telemedicine evaluation form as concise as possible. A six-item questionnaire was therefore developed to eval-

TABLE 3.  DIAGNOSTIC FREQUENCY OF INMATES EVALUATED OVER TELEMEDICINE (BY ICD-9 CODES)

| Major Diagnostic Category | Frequency |
|---|---|
| Diseases of the musculoskeletal system and connective tissue | 76 |
| Diseases of the skin and subcutaneous tissue | 34 |
| Symptoms, signs, and ill-defined conditions | 24 |
| Supplementary classification of factors influencing health status and contact with health services | 23 |
| Diseases of the circulatory system | 21 |
| Diseases of the digestive system | 19 |
| Injury and poisoning | 18 |
| Infectious and parasitic diseases | 14 |
| Diseases of the genitourinary system | 13 |
| Endocrine, nutritional, and metabolic disease, and immunity disorders | 9 |
| Neoplasms | 8 |
| Congenital anomalies | 4 |
| Diseases of the nervous system and sense organs | 4 |
| Diseases of the respiratory system | 4 |
| Mental disorders | 2 |
| Diseases of the blood and blood-forming organs | 1 |
| Total | 274 |

TABLE 4.  E/M CODE FREQUENCY FOR
TELEMEDICINE CONSULTATIONS

|  | Code | Frequency |
|---|---|---|
| Established office visit | 99211 | 37 |
|  | 99212 | 33 |
|  | 99213 | 22 |
|  | 99214 | 7 |
|  | 99215 | 4 |
| Subtotal |  | 103 |
| New office visit | 99201 | 18 |
|  | 99202 | 26 |
|  | 99203 | 7 |
| Subtotal |  | 51 |
| Office/outpatient consultations | 99241 | 19 |
|  | 99242 | 29 |
|  | 99243 | 29 |
|  | 99244 | 11 |
|  | 99245 | 6 |
| Subtotal |  | 94 |
| Postoperative follow-up care | 99024 | 4 |
| No E/M code listed |  | 22 |
| Total |  | 274 |

uate the following outcomes for each telemedicine encounter:

- Usefulness for establishing a diagnosis
- Value in developing a treatment plan
- Appropriateness for specific medical conditions
- Quality of transmission
- Adequacy of telemedicine to complete the consultation
- Satisfaction with telemedicine equipment

For the 274 teleconsultations performed the first year of operation, (March 1997–February, 1998), 134 referral and 171 consultant satisfaction surveys were completed for a response rate of 54% and 62%, respectively.

For overall satisfaction using telemedicine, referring physicians scored gastrointestinal, urology, and surgery specialties the highest (all at 4.17 on a scale of 1 to 5, 5 representing the highest level of satisfaction.) For specialists, dermatology, cardiology, and internal medicine received the highest ranking for satisfaction with the telemedicine system (Table 6A). Dermatology received the highest score for consulting physicians (3.80), and the second highest score for referring physicians (4.16). The greatest discrepancy between primary care

providers and specialists may be seen in the ranking of GU services where referring physician satisfaction exceeded specialist satisfaction by a margin of 1.29 points (4.17 to 2.88). The variations in satisfaction by specialty have not yet been explored.

When comparing overall satisfaction with telemedicine, referring and consulting physicians both scored "quality of transmission" the highest (Table 6B). Interestingly, both groups also scored the usefulness of telemedicine for diagnosis the lowest. This apparent discrepancy might indicate that although physicians found the quality of transmission to be "excellent," there were other factors inhibiting the diagnostic process, such as the consulting physician's inability to palpate an abnormality, feel for lumps, or evaluate the temperature and hydration of a patient's skin. For overall adequacy of telemedicine to meet the needs of their patient population, providers at the prison averaged a 4.89 satisfaction score out of a 5.00. UIHC specialists' overall satisfaction with telemedicine scored 3.65.

The level of satisfaction using telemedicine was higher among referring providers for every outcome evaluated in this study. These data were evaluated first by consultant and referring physician responses to the questions described previously and summarized in Table 6B. Using the same data, referring and consulting physician responses to the same questions were ranked by specialty (Table 6A) and

TABLE 5.  CATEGORIZATION OF ACTIONS
FOLLOWING TELEMEDICINE CONSULTATION

| Frequency | Action Category |
|---|---|
| 120 | Diagnostic procedure(s) ordered |
| 80 | Lab(s) ordered |
| 100 | Continued/unchanged medication |
| 63 | New medication ordered |
| 37 | Medication change/stoppage |
| 102 | Other therapy ordered |
| 28 | Surgical procedure(s) ordered |
| 22 | Non-surgical therapy ordered |
| 130 | Return to UIHC specialty clinic |
| 85 | Return to telemedicine |
| 56 | Return PRN |
| 7 | Schedule for hospitalization |

PRN, Pro re nata; UIHC, University of Iowa Hospital and Clinics.

EXPERIENCE AND COST OF TELEMEDICINE

TABLE 6A. COMPARISON OF CONSULTANT AND REFERRING PHYSICIAN SATISFACTION WITH TELEMEDICINE BY SPECIALTY

|  | Consultant (UIHC) | Referral (Prison) |
|---|---|---|
| Cardiology | 3.77 | 4.03 |
| Dermatology | 3.80 | 4.16 |
| GI | 3.72 | 4.17 |
| GU | 2.88 | 4.17 |
| Internal medicine | 3.77 | 4.12 |
| Orthopedics | 3.25 | 3.86 |
| Surgery | 3.67 | 4.17 |

Response code: 1 = "poor," 5 = "excellent." GI, gastrointestinal; GU, genitourinary.

TABLE 6B. COMPARISON OF CONSULTANT AND REFERRING PHYSICIAN SATISFACTION WITH TELEMEDICINE

|  | Consultant (UIHC) | Referral (Prison) |
|---|---|---|
| Video consultation useful for diagnosis? | 3.16 | 3.85 |
| Video consultation useful for treatment plan? | 3.47 | 3.92 |
| Medical condition appropriate for telemedicine? | 3.50 | 3.93 |
| Quality of transmission adequate? | 3.65 | 4.89 |
| Consultation adequate for care? | 3.29 | 4.63 |
| Satisfied with equipment/consultation? | 3.60 | 3.89 |

Response code: 1 = "poor," 5 = "excellent."

generally reflect results published elsewhere.[9] Our own previous (anecdotal) experience with telemedicine has shown us that discrepancies in satisfaction with telemedicine between primary care providers and specialists may be the result of: (1) referring provider testimony that, being present for the consultant's examination, provides enhanced communication with the specialist and an opportunity for a "learning experience" as a result of observing the consultation; and (2) the fact that, for the consultant, telemedicine may be initially perceived as yet another demand on a busy clinical, teaching, and research schedule without the benefit of accompanying financial incentives.

*Computing Annual Costs*

**On-site inmate visits.** Due to the variables in transporting a prisoner (number and salaries of escorts required to accompany the prisoners, distance between the hospital and the prison, modes of transportation, level of security required, etc.), cost studies comparing telemedicine to on-site visits have typically been difficult to establish, quantify, and compare.[10] The cost of transportation alone (transporting a single prisoner to the consulting facility) has been cited at $92.05 in Ohio,[11] $100 in Colorado,[12] $115 in Iowa,[13] $200 in Texas,[10] $206 in North Carolina,[14] and $216 in Virginia.[15]

Over the past decade, the cost of transporting and supervising prisoners who have traveled to Iowa City for their health care has been significant. Prisoners are transported in secured vehicles with two or more correctional officers providing transportation and security for each UIHC visit. As stated above, it has been estimated that it costs the State of Iowa an average of $115 to transport a prisoner to the UIHC, excluding the cost of medical care. These costs were computed by averaging costs for transportation and security for the 4,396 inmate visits to UIHC in 1997.

**Telemedicine inmate consultations.** Accurate cost projections for telemedicine are similarly complicated by several factors including fixed versus variable costs, difficulties predicting rates of utilization, and the need for added personnel. The formula presented in this report may prove useful to programs beginning cost projections to determine the economic viability of providing telemedicine to correctional facilities or to other hospitals. Medical costs are left

TABLE 7A.  BREAK-EVEN POINT FOR UIHC: TELEMEDICINE
VS. ON-SITE VISIT (EXCLUDES MEDICAL CARE)

| Visit Type | Facilities Charge | | |
|---|---|---|---|
| On-site | $65 | | |

| Visit Type | Annual Cost of Equipment, Circuits, Personnel | Target No. of Teleconsults Per Year | On-site Visit/ Per Consult |
|---|---|---|---|
| Telemedicine | $133,622.72 | 2,000 | $66.81 |

TABLE 7B.  BREAK-EVEN POINT FOR PRISONS: TELEMEDICINE VS. ON-SITE VISIT (EXCLUDES MEDICAL CARE)

| Visit Type | Transportation Per Inmate | Security Per Inmate | On-site Visit/ Per Inmate |
|---|---|---|---|
| On-site | $16.82 | $98.87 | $115.34 |

| Visit Type | Annual Operating Costs Per Prison | Projected (target) No. of Patients Per Site, Per Year | Teleconsult/Per Inmate |
|---|---|---|---|
| Telemedicine | $31,717.45 | 275 | $115.34 |

out of these formulae since it is assumed they will be relatively comparable for both on-site and telemedicine evaluations. Following the cost formula below, each variable is explained in some detail.

Circuit charges + Equipment + (Per-minute chgs × No. Minutes × No. Consults) + Personnel + Space/Facilities = Total cost

Cost per consultation = Total cost/No. of consults

**Circuit charges.** This is the fixed, line charge that an institution pays to a telecommunications carrier for providing service. A frequent transmission mode used for interactive video in telemedicine is ISDN-PRI. Although not yet available in some rural areas, a major advantage of this type of service is that it allows practitioners and other users of the system to determine the optimum rate of transmission up to a full T-1 line (24 channels.) Many facilities report using $\frac{1}{4}$ T-1 line for real time interactive video transmissions, although The University of Iowa typically uses $\frac{1}{2}$ T-1 line, or 12 channels. The fewer channels utilized the lower per-minute cost to the institution.

If the circuit is being used for other applications such as videoconferencing, distance education, professional development, administrative meetings, or training programs, consider what percentage of business on the circuit directly relates to telemedicine. If clinical consultations account for only half of the utilization of the video circuit, cost projections should reflect that percentage of use and additional cost/benefit studies should be generated for other types of applications.

**Equipment.** The UIHC cost study includes the following equipment, factoring in routine maintenance. This equipment will be required at each site unless otherwise indicated.

- Video unit and installation (codec, monitors, cameras, light boxes, and microphones)
- Diagnostic peripherals (digital stethoscope, otoscope, etc.) for the correctional institution or referring site
- Multiplexor and installation
- Additional capitalized equipment, including equipment and furnishings for the video room: (fax machine, computer, telephone line, desk at both sites, and examination furnishings for the referring site)

EXPERIENCE AND COST OF TELEMEDICINE

Ten percent of the total equipment costs should be factored in for maintenance. Divide the total equipment costs by 5 years of useful life (depreciation expectation), add 10% of the total equipment costs for maintenance, and the resulting figure will provide an annual telemedicine equipment cost.

**Per-minute charges × number of consults.** With an ISDN circuit, institutions will also be charged a per-minute cost for the actual duration of the consult, just as one would be charged for a long-distance phone call. For institutions that have not begun telemedicine service, estimates will need to be made of the number of teleconsults anticipated and the average time spent per consult over the course of a year. (The UIHC telemedicine coordinator reported an average of 10 minutes per consultation.) Multiply the average time per consult by the per-minute, per-channel costs that your telecommunications provider will charge for the cost of each "call." The contractual arrangements between the referring and consulting agencies should delineate who will pay for the per minute video call. For administrative and technical reasons, the UIHC placed the telemedicine video calls to the prisons during the first year of implementation.

**Personnel.** Two key positions in providing telemedicine services are a telemedicine coordinator and a telecommunications/technical expert. Depending on the size and complexity of the telemedicine program, an institution may allocate part or all of the level of effort for key personnel.

The UIHC cost study included 100% of salary and fringe benefits for both of the positions referred to above. The coordinator scheduled the consults, made sure the charts were available, requested that referring and consulting physicians fill out a satisfaction survey, ensured connections were made and equipment was in working order, scheduled training for physicians, and generally facilitated each interaction. The technical support person was responsible for troubleshooting equipment and networking problems. In our case, both of these positions have been full-time since the inception of the program, although the technical support person has a variety of other telecommunications responsibilities in addition to prison teleconsultations.

**Space/Facilities charges.** Most hospitals have a square footage formula to determine the cost to the department for space to conduct patient care duties. Added to this might be the costs of administrative data processing, financial management, and business office operating costs. If a comparison study is being made for on-site versus telemedicine visits, be sure to include this fee for both types of consultation.

**Total cost.** Adding all the charges delineated above will give an estimate of the annual cost of providing telemedicine services. If this overall cost is divided by the number of (actual or projected) patients evaluated by telemedicine, this will produce a cost-per-patient figure. This figure can then be compared to the cost of interacting with a patient on-site. Most hospitals have a formula for providing on-site and telemedicine consultations. For the UIHC, the total annual cost of providing telemedicine service for the first year of implementation was $133,622.72. Adjusting for 5% inflation, the UIHC would need to see 2,000 patients over telemedicine during the next fiscal year to reach the point where the cost of a telemedicine visit approaches the average cost of an on-site visit (breakeven point) (Table 7A).

*Comparison of Inmate On-site Visits to Telemedicine Consults: UIHC Experience*

The major costs for transporting a prisoner to UIHC involves transportation and security. In fiscal year (FY) 1997, 4,396 outpatient visits resulted in vehicles being on the road for 307,995 miles. At $0.24 a mile, the cost of transportation for FY 1997 totaled $73,919 or an average of $16.82 per visit for transportation.

Security officers spent 5,695 hours on the road for the 4,396 visits to UIHC during the same time frame, totaling $170,850. An average of two prisoners traveled to each UIHC visit, for a total of 2,198 trips. Each on-site prisoner consultation required, on average, 4 hours of officer supervision. The total security costs for the study period were $434,610.00 or $98.87 per visit.

The average cost to the prisons of a single, on-site prisoner visit to UIHC was: $16.82 (transportation), + $98.87 (security) = $115.34.

Using the formula described previously to compute the costs of circuits, equipment, and personnel, Iowa's correctional facilities would need to average 275 prison teleconsultations per year to reach the breakeven point (i.e., to approximate the average cost of the on-site visit, $115.34) (Table 7b). Obviously, as the number of consultations increases, the cost per session goes down.[16] If the Iowa DOC were to reach an average target of 275 telemedicine consultations a year per prison, there would be 2,475 inmate consultations taking place at the UIHC annually, slightly above the 2,000 annual teleconsultations required for the UIHC to reach its breakeven point. (275 teleconsults × 9 prisons = 2,475 UIHC teleconsults). Future analyses of the data will focus on a prison-by-prison evaluation to compute the distance in miles to the UIHC, the number of inmates based on current census data, and the salaries of security officers to determine the number of telemedicine consults for each prison to reach breakeven (versus the average number of tele-consults that the authors have shown here).

While many telemedicine prison studies have shown cost savings or cost avoidance from the point of view of their prisons, this study attempts to examine the cost of doing telemedicine from the perspective of both the referring and consulting facilities. Telemedicine is a collaborative interaction that requires costs and benefits to be evaluated from both perspectives. Costs associated with receiving and providing telemedicine services are not the same, and neither is the satisfaction with telemedicine comparable for referring and providing physicians. It is important to present both perspectives for an accurate assessment of telemedicine viability.

It should also be emphasized that, from a broader statewide perspective, telemedicine's relationship to the state's correctional facilities has the potential to benefit the state of Iowa and its taxpayers and citizens. Although the DOC and the UI do not always "think as one" in terms of strategies to achieve fiscal viability, it is anticipated that once the breakeven points

have been surpassed for one or both, the cost savings, cost avoidance, and cost benefits will ultimately be reflected favorably in the bottom line of the state's annual operating budget.

## CONCLUSION

A careful cost assessment is essential before launching any new program. With telemedicine, no one should anticipate instantaneous cost effectiveness. With careful planning, implementing a telemedicine program can be initially "cost-acceptable", and, as the volume of teleconsults increases, ultimately cost-effective.

Furthermore, not all benefits of telemedicine can be measured in terms of the "bottom line." In the case of prisoners, security issues may be key in determining the cost and benefits of telemedicine to an institution. In addition to transportation, there are other "costs" associated with prisoner transport that cannot always be quantified in monetary terms, such as the safety risk to patients and families in specialty care facilities and the embarrassment of inmates who may be shackled and in chains.[17]

It should not be anticipated that hub and spoke hospitals will think as one, share the same bottom-line goals, or employ similar provider incentives when implementing a telemedicine service. Hub hospitals may require the installation of more costly equipment and salaries paid to academic medical staff will likely be higher than in smaller rural and community hospitals. Encouraging provider acceptance and physician participation is complicated by the fact that referring and consulting providers may be motivated by different variables. Referring physicians report benefits from enhanced communication with specialists, increased knowledge and skill levels, and access to the latest medical techniques and innovations. Consultants may be motivated to participate because of personal or professional research interests in technology, the opportunity to participate in the development of innovative health care delivery systems, and increased avenues for research and publication.

In evaluating telemedicine for the general population, the savings to patients and their families in cost, time, and travel may well rep-

resent a competitive advantage to the institution that provides their patients with this service option. Additionally, there are other, less quantifiable benefits of telemedicine that need to be considered. For example, many consulting physicians report the advantage of having the referring physician or primary care provider available during the teleconsult to "present" the patient, while primary care providers report enhanced learning as a result of witnessing first hand the expertise of the consultant in patient management. Patients and providers alike note that telemedicine provides a more team-based approach to reaching patient management decisions than more traditional referrals, which are often marked by a lack of case management, poor or tardy communication between referring and consulting physicians, and patients and families who feel increasingly out of the decision-making loop about their own care. Telemedicine creates an interaction whereby the primary physician and consultant reach a decision in the presence of the patient. Finally, telemedicine offers the opportunity for tertiary care facilities to strengthen practice affiliations with smaller hospitals; allows physicians and other providers the opportunity to participate in "cutting edge" programs; encourages creative uses of networking for distance education and teleconferencing; and enhances the service profile of all hospitals involved.

## ACKNOWLEDGMENTS

The authors wish to acknowledge the contributions of the following University of Iowa staff: Stacey Cyphert, Assistant Vice President Statewide Health Services and Assistant Director, The University of Iowa Hospitals and Clinics; and Ruth Giesking, Telemedicine Coordinator Clinical Outreach Department, The University of Iowa Hospitals and Clinics.

## REFERENCES

1. U.S. Department of Justice. *Bureau of Justice Statistics. Summary Statistics.* [online] *http://www.ojp.usdoj.gov/bjs/pub/press/p97.pr*

2. Glaser JB, Greifinger RB: Correctional health care: a public health opportunity. *Ann Intern Med* **1993;** 18:139–145.

3. Norton S, Burdick AE, Phillips CM, Berman B: Teledermatology and underserved populations. *Arch Dermatol* **1997;**133:197–200.

4. Brunicardi BO: Financial analysis of savings from telemedicine in Ohio's prison system. *Telemedicine Journal* **1998;**4:49–54.

5. Sisk JE, Sanders JH: A proposed framework for economic evaluation of telemedicine. *Telemedicine Journal* **1998;**4:31–37.

6. Mekhjian HJ, Warisse M, Gailiun M, McCain T: An Ohio telemedicine system for prison inmates: a case report. *Telemedicine Journal* **1996;**2:17–24.

7. Speirs L: *International Classification of Diseases, Ninth Revision, Clinical Modification, Fifth Edition.* Salt Lake City, Utah: Medicode, Inc.; **1997.**

8. *1998 E/M Fast Finder, A Quick Reference Guide For E/M Coding.* Salt Lake City, Utah: Medicode, Inc.; **1997.**

9. Bashshur RL: Rethinking the evaluation and priorities in telemedicine. *Telemedicine Journal* **1998;**4:1–4.

10. Brecht RM, Gray CL, Peterson C, and Youngblood B: The University of Texas medical branch—Texas Department of Criminal Justice telemedicine project: findings from the first year of operation. *Telemedicine Journal* **1996;**2:25–35.

11. Brunicardi BO: Financial analysis of savings from telemedicine in Ohio's prison system. *Telemedicine Journal* **1998;**4:49–54.

12. Anonymous. November, 1995. "Prison telemedicine in Colorado." *Telemedicine Today;* **1995;**3:26–29.

13. Loeffelholz PL: Medical Director, Iowa Department of Corrections, Iowa Medical and Classification Center; Oakdale, Iowa. [Personal correspondence.] May 13, **1998.**

14. Zircon HL, Doty E, Balch DC: Financial analysis of telemedicine in a prison system. *Telemedicine Journal* **1997;**3:247–255.

15. McCue MJ, Mazmanian PE, Hamptom C, *et al:* The case of Powhatan Correctional Center/Virginia Department of Corrections and Virginia Commonwealth University/Medical College of Virginia. *Telemedicine Journal* **1997;**3:11–17.

16. McCue MJ, Mazmanian PE, Hampton CL, *et al:* Cost-minimization analysis: a follow-up study of a telemedicine program. *Telemedicine Journal* **1998;**4:323–327.

17. Mekhjian HJ, Gailiun WM, McCain T: An Ohio telemedicine system for prison inmates: a case report. *Telemedicine Journal* **1996;**2:17–24.

Address reprint requests to:
*Susan Zollo*
*Director Telemedicine Resource Center*
*211 HLHS*
*The University of Iowa*
*Iowa City, IA 52242*

# EXHIBIT 2

1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California 94710-1916
4  Telephone:  (510) 280-2621

5  CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
6  FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
7  39 Drumm Street
   San Francisco, California 94111-4805
8  Telephone:  (415) 621-2493

   MICHAEL W. BIEN – 096891
   JEFFREY L. BORNSTEIN – 099358
   ERNEST GALVAN – 196065
   THOMAS NOLAN – 169692
   LISA ELLS – 243657
   KRISTA STONE-MANISTA – 269083
   JENNY S. YELIN – 273601
   MICHAEL S. NUNEZ – 280535
   JESSICA WINTER – 294237
   MARC J. SHINN-KRANTZ – 312968
   CARA E. TRAPANI – 313411
   ROSEN BIEN
   GALVAN & GRUNFELD LLP
   50 Fremont Street, 19th Floor
   San Francisco, California 94105-2235
   Telephone:  (415) 433-6830

9
10 Attorneys for Plaintiffs

11              UNITED STATES DISTRICT COURT

12            EASTERN DISTRICT OF CALIFORNIA

13

14 RALPH COLEMAN, et al.,

15          Plaintiffs,

16     v.

17 EDMUND G. BROWN, JR., et al.,

18          Defendants.

19

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF CARA TRAPANI IS SUPPORT OF PLAINTIFFS' COMMENTS ON SPECIAL MASTER'S PROPOSED TELEPSYCHIATRY POLICY**

Judge:  Hon. Kimberly J. Mueller

20

21

22

23

24

25

26

27

28

1      I, Cara Trapani, declare:

2      1.      I am an attorney duly admitted to practice before this Court.  I am an

3  associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for

4  Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a

5  witness, I could competently so testify.  I make this declaration in support of Plaintiffs'

6  Comments on the Special Master's July 25, 2018 Proposed Telepsychiatry Policy.

7      2.      On July 11, 2018, I attended a demonstration of the technology Defendants

8  have proposed to use to conduct cell-front telepsychiatry treatment at the California Health

9  Care Facility ("CHCF") in Stockton.  Experts from the Special Master team, Dr. Jeffrey

10  Metzner and Timothy Rougeaux, were also in attendance, as were representatives for

11  Defendants, including Drs. Michael Golding and Kevin Kuich, and their counsel.

12      3.      Dr. Kuich demonstrated the technology Defendants have represented they

13  plan to employ at all CDCR institutions to conduct cell-front telepsychiatry.  Dr. Kuich

14  stated that Defendants envision using cell-front telepsychiatry throughout the Mental

15  Health Services Delivery System, including in segregation and general population units, as

16  well as in a mental health crisis bed or inpatient setting.

17      4.      Dr. Kuich demonstrated the cell-front telepsychiatry technology Defendants

18  have proposed to use system-wide in CHCF's Psychiatric Inpatient Program ("PIP"), in

19  unit 4B which is an intermediate care facility.  The cell doors in this unit had three tall

20  rectangular windows, which, in my experience, provide greater visibility into and out of

21  the cell than most other doors I have observed or understand to exist in CDCR prisons.

22  The unit was also much quieter than other types of units I have typically observed in

23  touring CDCR facilities, especially administrative segregation units, which are much

24  louder and have a very different physical layout in addition to a different style of cell doors

25  affording far less visibility.

26      5.      Defendants provided us with a brochure showing the proposed telepsychiatry

27  technology, a true and correct copy of which is attached hereto as **Exhibit A**.  As depicted

28  in the brochure, the telepsychiatry cart containing the technology Defendants demonstrated

2

1  is about five feet tall with wheels and a wireless access point.  Defendants informed us that

2  each cart costs between $10,000 and $15,000.  The cart we observed had been retrofitted

3  by CDCR and contains a camera on top of a monitor, which staff would wheel up to the

4  mentally ill patient's cell door and position so that the camera and monitor are facing into

5  the cell.  The telepsychiatrist, who will interact with the prisoner from an offsite

6  telepschiatry hub office, can remotely zoom in or out on the camera, but cannot control the

7  position or angle of the camera.  To do that, the telepsychiatrist would have to describe

8  what he or she wished to view and then ask an on-site telepresenter to change the position

9  or angle of the camera.  The monitor displays a video image of the telepsychiatrist to the

10 patient through the cell door window.

11        6.      Defendants stated that they had modified the demonstrated

12 speaker/microphone system for use in CDCR.  As represented in "Step 3" in the brochure,

13 there is a large metal box with a microphone and speaker inside of it that staff would attach

14 to the outside of the cell door, against the food port opening.  *See* Ex. A at 2.  Defendants

15 informed us that this box only works for this particular style of door.  CDCR has numerous

16 types of doors, so a different model would have to be developed for each type of door if

17 the technology was expanded system-wide.

18        7.      We first observed the demonstrated technology from inside the cell, from the

19 vantage point of the patient.  It was very difficult to hear and understand the person

20 playing the role of the telepsychiatrist, in large part because the sound echoed inside the

21 cell.  Similarly, the person playing the role of the telepsychiatrist reported that they could

22 not hear or understand what was being said inside the cell when the person playing the

23 patient was speaking quietly.  While it was generally possible to see the video monitor

24 showing the telepsychiatrist from inside this particular cell, the cell door windows in this

25 PIP are much larger than ones I typically see inside other units at CDCR facilities, and I do

26 not think it would be possible to clearly see the telepsychiatrist on the monitor from inside

27 other cells with smaller or dirtier windows on their doors.

28        8.      In my experience, the vast majority of cells at CDCR facilities contain two

1  prisoners.  There is no question, based on the demonstration I observed, that another

2  prisoner inside the same cell as the patient receiving telepsychiatry services via

3  Defendants' proposed technology could see and hear everything conveyed by the

4  telepsychiatrist that the patient could see and hear, as well as what the patient was telling

5  the telepsychiatrist.  We did not test what could be heard from an adjacent cell to

6  determine what a prisoner housed next to the patient receiving cell-front telepsychiatry

7  services could hear.

8      9.     We next observed the demonstrated technology from an empty cell across

9  the hall, which was intended to demonstrate the vantage point of the telepsychiatrist in his

10  or her off-site hub office.  A CDCR representative played the role of a patient, speaking

11  from inside the same cell described above.  It was extremely difficult for me to hear

12  anything being said by that representative.  The ambient noise picked up by the

13  microphone and transmitted through the speaker was very loud and the speech of the

14  person inside the cell was distorted and drowned out by the same echo effect described

15  above.  As discussed, the unit where the cell-front technology was tested was much quieter

16  than I have typically observed CDCR units to be.  I am confident that the noise problems I

17  observed that interfered with my ability to understand what was being said by the pretend

18  patient from inside the PIP cell in this relatively quiet setting would be much worse in a

19  typical CDCR housing unit, and especially in segregated housing units which are

20  particularly cacophonous.

21      10.    It was also very difficult for me, from the perspective of the telepsychiatrist

22  who would be using this technology, to see inside the PIP cell, even with full control of the

23  camera.  There were many areas of the cell that could not be observed with Defendants'

24  technology, meaning it would be easy for the patient to step out of view of the

25  telepsychiatrist.

26      11.    I have participated in almost all of the workgroup sessions in which the

27  parties have discussed and negotiated the use of telepsychiatry in CDCR, and I have

28  reviewed detailed notes for any meeting I did not attend in person.  I have also reviewed all

[3283088.2]

1   of the documents Defendants have provided regarding telepsychiatry pursuant to the

2   workgroup process.  Defendants have never provided any proposed policy governing the

3   use of cell-front telepsychiatry or described any planned limitations upon the proposed use

4   of cell-front telepsychiatry in CDCR.

5          I declare under penalty of perjury under the laws of the United States of America

6   that the foregoing is true and correct, and that this declaration is executed at San Francisco,

7   California this 31st day of July, 2018.

8

9                                            */s/ Cara E. Trapani*
                                             Cara E. Trapani
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TRAPANI DECL. IN SUPPORT OF PLS.' COMMENTS ON SPECIAL MASTER'S PROPOSED
TELEPSYCHIATRY POLICY

[3283088.2]

# Exhibit A

# Wireless Cell-side Telepsychiatry

A Quick Guide to Setting Up Your Telepsychiatry Cart



## Having Problems Connecting?

For technical support, call the Solution Center at (209)467-2792

---

To reduce ambient noise from the outside hallway, turn off microphone 1 by doing the following:

1. From the remote, click the home button.

2. From the menu screen, navigate to: Settings -> Administrator settings -> Advanced configuration -> Audio -> Input -> Microphone 1

3. Set Mode to Off

   ☐ **Audio**
   DefaultVolume: 53
   ☐ Input
   ☐ HDMI 1
   ☐ Line 1
   ☐ Microphone 1
   ☐ EchoControl
   Level: 10
   Mode: Off

4. Check Microphone 2 Level set to 4

   ☐ **Input**
   ☐ HDMI 1
   ☐ Line 1
   ☐ Microphone 1
   ☐ Microphone 2
   ☐ EchoControl
   Level: 4
   Mode: On

# Step 1: Power up and go mobile



**Check power.** Turn on the Telepsych cart and unplug the power cord. Make sure you have enough battery power for your session. A full charge will normally last you at least 1.5 hours of mobile use. The cart will beep continuously once it reaches the critical



charge.

**Check wireless connection.** Make sure that the blue network cable is connected to the port with the 몸 symbol. Unplug the black network cable from the wall. Verify that the Wireless Access Point is lit blue. The upper-left of the screen should show the name of your cart without "not registered" message.

DSH_CHCF_Telepsych2

# Step 2: Connect the food port mount to the cart

**Connect Cables.** Secure your connections.



Connect cables labeled 1 (mic) and 2 (USB) to their corresponding ports in the back of the cart.





Connect cable 3 (speaker) to the "y" connector labeled 3 – speaker found underneath the cart platform. Connection your headset (cable 4) to the other "y" connector. *note: you may have to disconnect the onboard speaker to do this.

# Step 3: Position the Telepsych cart

**Lock cart in place.** Secure the cart in place by locking the wheels. Make sure to put at least 2 feet of clearance between the door and the cart.



**Secure the box.** Mount the box with the food port closed and slide the port cover open before starting the session.

**Make your adjustments.** Adjust your camera angles and speaker volumes as necessary.