# EXHIBIT E

*XAVIER BECERRA*
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public:  (916) 445-9555
Telephone:  (916) 210-7325
Facsimile:  (916) 324-5205
E-Mail:  Tyler.Heath@doj.ca.gov

August 1, 2018

Matthew A. Lopes, Jr.
Pannone Lopes Devereaux & O'Gara, LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI  02919

RE:     *Coleman v. Brown, et al.,*
        U.S.D.C., Eastern District of California, Case No. 2:90-cv-00520 KJM-DB (PC)

Dear Special Master Lopes:

        This letter is Defendants' response and objection to the Special Master's July 25, 2018 Draft Telepsychiatry Policy ("Draft Policy").  Although the Special Master states that "the framework for this draft policy was taken from the telepsychiatry policy previously provided to everyone by CDCR" (*see* July 25, 2018 email re Draft Telepsychiatry Policy), the Draft Policy adds significant changes to CDCR's telepsychiatry policy, some of which were never discussed or contemplated during the work group process.[1]  Unless substantive changes are made to fully address Defendants' objections, Defendants cannot accept the Draft Policy.

        Defendants object as a threshold matter that the Court's delegation of policymaking authority to the Special Master exceeds the powers allowed that office under Federal Rule of Civil Procedure 53, the Prison Litigation Reform Act ("PLRA"), and the Court's Order of Reference (ECF No. 640).  The role of the Special Master is to assist in developing a remedial plan and conduct fact-finding to monitor Defendants' progress in achieving that plan, not to draft Defendants' administrative policies.  (*Id.*)

        Even if the Court could delegate policymaking authority, the Special Master's Draft Policy places limitations and restrictions on CDCR's use of telepsychiatry at the Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient (EOP), crisis bed, and inpatient levels of care where there has been no finding that CDCR's current telepsychiatry policy is constitutionally deficient and therefore requires court intervention.  Defendants are not aware of any credible evidence, provided in the work group process or otherwise, that any

---

[1] Defendants incorporate by reference all correspondence exchanged between the parties in the work group process, including but not exclusive to Defendants' May 16, 2018 and May 25, 2018 letters, and Dr. Joseph Penn's report entitled "Telepsychiatry in Correctional Healthcare," and supporting literature.

Matthew A. Lopes, Jr.
August 1, 2018
Page 2

inmate-patient has been harmed as a result of the use of telepsychiatry.  In fact, overwhelming evidence supports CDCR's position that telepsychiatry is functionally and qualitatively equal to in-person psychiatric encounters.

CDCR's telepsychiatry policy, Attachment A, represents the considered judgment of CDCR's policy makers, administration, and clinicians.  That judgment, as well as CDCR's collective experience treating its mental health population, including their extensive use of telepsychiatry, is entitled to deference.  Indeed, since 2015, CDCR has provided over 70,000 telepsychiatry encounters to EOP inmates.[2]  Based on this experience, CDCR's policy represents the best practices for a system-wide telepsychiatry program that provides safe and adequate psychiatric care to inmate-patients at all levels of care.  The Special Master or his experts may disagree with the conclusions of CDCR's staff, but they are not entitled to substitute their judgment for that of Defendants.  In the absence of evidence that CDCR's use of telepsychiatry represents an ongoing constitutional violation, CDCR must have the discretion to develop and implement its telepsychiatry policy.

## I.    The Special Master Should Not Be Drafting Policies for the State of California and Its Agencies that Manage Everyday Operations.

Defendants negotiate policies and often adopt recommendations from the Special Master and his team as a result of those negotiations.  However, this does not mean that Defendants agree that the law permits the Special Master to draft policies for the State of California.  The Court's Order of Reference does not grant the Special Master the power to draft policy.  (*See* ECF No. 640.)[3]  Indeed, the Order specifically prohibits the Special Master and his staff from "interven[ing] in the administrative management" of Defendants' institutions, and states that the Special Master "shall not be empowered to direct defendants . . . to take or to refrain from taking any specific action to achieve compliance."  (*Id.* at 7:24-8:4.)  While the Order instructs the Special Master to "work with defendants and experts . . . to develop a remedial plan" that addresses constitutional violations found in the Court's September 13, 1995 Order, the Court did not find any violations relating to the use of telepsychiatry.  (*Id.* at 3:18-4:2; *see also* ECF No. 612.)  Nor is this a power that the Court *can* provide to the Special Master under Rule 53 or the PLRA.

The United States Supreme Court has consistently counseled that Courts must give deference to states and their agencies on issues of prison management.  *See Beard v. Banks*, 548 U.S. 521, 528 (2006); *Miller v. French*, 530 U.S. 327, 328 (2000) (explaining that "curbing the

---

[2] Such encounters include initial evaluations, routine follow-ups, consultations, Interdisciplinary Treatment Team (IDTT) meetings, and other interactions between the psychiatrist and inmate-patient.

[3] The Order grants the Special Master the powers only to conduct fact-finding and hold hearings with respect to Defendants' implementation of remedial measures (ECF No. 640 at 5:1-6:22, 7:8-15), to require the posting of notices in Defendants' institutions (*id.* at 6:23-26), and to retain staff (*id.* at 7:1-7).

Matthew A. Lopes, Jr.
August 1, 2018
Page 3

equitable discretion of district courts was one of the PLRA's principal objectives"). By
affirmatively requiring that the Special Master redraft CDCR's telepsychiatry policy, without
any evidence that CDCR's telepsychiatry policy violates inmate-patients' constitutional rights,
the Court has exceeded its authority and improperly substituted the judgment of the Special
Master for that of the Defendant state agencies. *See Gilmore v. California*, 220 F.3d 987, 991
(9th Cir. 2000) ("It is clear that Congress intended the PLRA to revive the hands-off doctrine,"
the former "rule of judicial quiescence" that the federal judiciary not be involved with the
problems of state-run prisons); *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir.
1997) ("Congress passed the PLRA in an effort, in part, to oust the federal judiciary from day-to-
day prison management."); *Ruiz v. Estelle*, 679 F.2d 1115, 1162 (5th Cir.), amended in part and
vacated in part, 688 F.2d 266 (5th Cir. 1982) (stating that "the powers of the court's appointed
agents should not intrude to an unnecessary extent on prison administration"); *Brown v. Plata*,
563 U.S. 493, 559 (2011) ("Neither the Receiver nor the Special Master was selected by
California to run its prisons, and the fact that they may be experts in the field of prison reform
does not justify the judicial imposition of their perspectives on the state.") (Scalia, J, dissenting.).

The Special Master's Draft Policy reflects a policy disagreement where the Special
Master has improperly substituted his experts' judgment for the judgment of CDCR and its
officials. The Draft Policy micromanages CDCR's operations to such a degree that it
specifically dictates where and how CDCR must allocate its on-site psychiatrists at the EOP level
of care before CDCR can even be permitted to use telepsychiatry. The Draft Policy also includes
undefined terms, like "last resort" and "emergency," and requires that CDCR meet a vaguely
defined good-faith standard to recruit and retain onsite psychiatrists before it may use
telepsychiatry at the CCCMS level of care. Such lack of clarity risks significant disruption of
CDCR's staffing and operation of its own mental health care system.

In short, the Draft Policy is precisely the sort of interference into CDCR's ability to run a
correctional system that courts are directed to avoid. *See, e.g., Westefer v. Neal*, 682 F.3d 679,
685 (7th Cir. 2012) ("To repeat, the PLRA requires that an injunction use the 'least intrusive
means necessary to correct the violation of the [f]ederal right.' Locking in specific deadlines—
even with hedging 'whenever possible' language—deprives prison administrators of the
operational flexibility to adjust procedures as future needs dictate and cannot be considered the
least intrusive means of correcting the due-process violation."). The Draft Policy should be
rejected on this ground alone.

## II.     The Restrictions Placed on the Use of Telepsychiatry are Not Supported by the Evidence or Constitutionally Required.

Defendants also object to the Draft Policy because it does not represent the least
restrictive means to cure an ongoing constitutional violation. Indeed, even an order adopting
CDCR's *own* proposed telepsychiatry policy would be inappropriate under the PLRA, because
CDCR's proposed policy was already above the constitutional minimum. *See, e.g., Westefer v.
Neal*, 682 F.3d at 686 (finding that court order adopting the Illinois Department of Corrections'
detailed due process policy went beyond the constitutional minimum and violated the PLRA's

Matthew A. Lopes, Jr.
August 1, 2018
Page 4

prohibition against judicial intervention in the day-to-day operations of prison systems).  CDCR originally submitted a telepsychiatry policy that it determined captures best practices for using telepsychiatry in its mental health program, including reasonable limitations on its use.

The Special Master's Draft Policy mandates limitations and restrictions that exceed what was included in CDCR's policy.  And since the Court intends the Draft Policy to be an addendum to the Program Guide, its adoption would represent new affirmative prospective injunctive relief in this action.  To order such relief under the PLRA, the Court must make specific findings based on the factual record to show that the restrictions imposed by the Special Master's Draft Policy are necessary to correct a current and ongoing constitutional violation and the least intrusive means by which to do so.  *Graves v. Arpaio*, 623 F.3d 1043, 1047–48 (9th Cir. 2010); *see also United States v. State of Mich.,* 940 F.2d 143, 159–60 (6th Cir. 1991) (district court lacked authority to impose additional requirements on remedial plan proposed by prison officials; state was entitled to develop and implement its own procedures "until it appears from affirmative proof that the plan and procedures result in a constitutional infringement").

There is no evidence in the record to support a finding that Defendants' proposed use of telepsychiatry would violate the Eighth Amendment.  While the Special Master's February 2017 report on CDCR's staffing plan included his recommendations (recommendations which were less restrictive than the currently contemplated Draft Policy), those recommendations were not based on any evidence that CDCR's telepsychiatry policy was a constitutionally infirm form of treatment for a particular patient population.  At most, the Special Master's report expressed a policy preference for on-site psychiatry; it did not find that telepsychiatry would violate inmates' constitutional rights.  But the Constitution does not require that CDCR institute forms of treatment that others might prefer, just that inmates receive adequate access to mental health care.  *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (finding that the Eighth Amendment does not require that prison officials provide the most desirable medical and mental health care; nor should judges simply "constitutionalize" the standards set forth by professional associations such as the American Medical Association or the American Public Health Association); *see also Bell v. Wolfish*, 441 U.S. 520, 543–544 n. 27 (1979) (draft recommendations of the Department of Justice are not determinative of constitutional requirements).

Regardless, the evidence in the record does not support a finding that telepsychiatry is less effective than in-person treatment as a means of delivering adequate mental health care.  The only purported evidence in the record against the use of telepsychiatry is the declaration of Plaintiffs' undisclosed expert, Dr. Pablo Stewart.[4]  The crux of Dr. Stewart's declaration is that there are an inadequate number of studies regarding telepsychiatry's use in the correctional setting.  To the contrary—Dr. Stewart's declaration relies on literature that uniformly finds

---

[4] As discussed more thoroughly below, Plaintiffs did not disclose Dr. Stewart as an expert before his surprise report was served on Defendants, despite Plaintiffs having previously requested sanctions on the ground that Defendants had not been transparent regarding their staffing consultants.  (*See* ECF No. 5764-1 at 11.)

Matthew A. Lopes, Jr.
August 1, 2018
Page 5

telepsychiatry as an effective alternative to in-person psychiatry encounters.  (*See* Section IX, below.)

      The evidentiary record overwhelmingly supports the use of telepsychiatry as a safe method of delivering care to CDCR's mentally ill population.[5]  To ensure the Special Master and Court have a complete record of Defendants' evidence thus far, Defendants identify below the court filings, letters, and other evidence they have submitted on the issue of telepsychiatry:

| | |
|---|---|
| 03/30/17 | Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan and supporting Declarations (ECF No. 5591); |
| 04/13/17 | Defendants' Reply to Plaintiffs' Objections and Request for Additional Relief Re: The Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan (ECF No. 5601); |
| 05/16/18 | Letter to Plaintiff's Regarding CDCR's Draft Telepsychiatry Policy (Attachment B); |
| 05/25/18 | Letter to Special Master Lopes Regarding CDCR's Draft Telepsychiatry Policy (Attachment B); |
| 07/06/18 | Letter to Special Master Lopes Regarding Dr. Joseph Penn's Report Regarding Telepsychiatry in Correctional Health Care and Dr. Penn's Report and Supporting Literature (Attachment C); and |
| 07/12/18 | Letter to Special Master Lopes Regarding Telepsychiatry and attached Scientific Literature (Attachment D). |

      Defendants have attached to this letter copies of those items that are not already in the Court's record.

---

[5] The Court's July 3, 2018 order cautioned the parties against raising objections and evidence previously rejected by the Court.  However, the Court has not previously or currently found that providing telepsychiatry to inmates at any specific level of care is a constitutional violation that justifies the restrictions set forth in the Special Master's Draft Policy.  The Special Master's 2017 report on CDCR's staffing plan did not find that the telepsychiatry policy was constitutionally deficient.  Rather, it sounded a cautionary note about the use of telepsychiatry for the EOP population and expressly noted that more observation was needed.  (ECF No. 5564 at 16.)

Matthew A. Lopes, Jr.
August 1, 2018
Page 6


The record includes the report of Dr. Joseph Penn, the Mental Health Director of the University of Texas Medical Branch (UTMB) Correctional Managed Care (CMC), who oversees mental health services to approximately 116,000 adult offenders housed within Texas Department of Criminal Justice (TDCJ) facilities.  Since implementing telepsychiatry, UTMB CMC has conducted over 400,000 psychiatrist-patient encounters.  ("Telepsychiatry in Correctional Healthcare," Penn, J., p. 8.)  Based on his extensive experience with telepsychiatry in the correctional setting, Dr. Penn opines that:

>Telepsychiatry has been successfully used to provide clinical services and educational initiatives in areas underserved by psychiatrists and other mental health care specialists. Telepsychiatry is an acceptable approach to providing high quality psychiatric services to correctional, residential, and community populations.  It increases access to care, enables specialty consultation, yields positive outcomes, allows reliable evaluation, and satisfies the requirements of both patients and providers.

*Id.,* at 4.

If the Draft Policy is implemented in its current form, Defendants are caught in a Catch-22.  The Court has ordered Defendants to hire a sufficient number of psychiatrists by October 2018 (ECF No. 5711), but the Special Master seeks to limit Defendants' ability to use telepsychiatry at the CCCMS and EOP levels of care, which is a barrier to CDCR's ability to hire and retain sufficient numbers of psychiatrists to meet the June 13, 2002 order (ECF No. 1383) under the ratios set forth in the 2009 staffing plan (ECF No. 3693).  The evidentiary record before the Special Master and the Court does not support the notion that the use of telepsychiatry leads to a constitutional violation, let alone that any of the limitations set forth in the Draft Policy are necessary to cure any such violation.  However, as discussed more fully below, the Draft Policy's limitations would have a material adverse effect on CDCR's ability to employ telepsychiatry, requiring the hiring of additional staff where such hiring may not be possible or would be inefficient, prohibiting the use of telepsychiatry for large classes of patients, denying the use of telepsychiatry in programs where an on-site practitioner is not available, and prohibiting the use of telepsychiatry at cell fronts even on an emergency basis – all without evidence to show that these limitations are narrowly tailored and necessary to correct an ongoing constitutional violation.

### III.    Defendants' Specific Objections to the Draft Policy.

Defendants specifically object to the following provisions in the Draft Policy because they lack evidentiary foundation and are not necessary to address any previously identified constitutional harm to any inmate or to cure any previously identified constitutional deficiency. In certain instances, the Draft Policy even exceeds the limitations dictated by the court in its July 3 order.

Matthew A. Lopes, Jr.
August 1, 2018
Page 7

- At page 3, the restriction that "At present, cell-front provision of telepsychiatry is not permitted";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the CCCMS level of care. If these efforts are unsuccessful, telepsychiatry is an acceptable alternative, consistent with the requirements described in other sections of this policy and procedure";

- At page 3, the limitation that "Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry";

- At page 3, the precondition that "At least 1.0 full-time on-site psychiatrist shall be assigned to each program and each unit within that program providing EOP level of care services within the institution. Programs providing an EOP level of care include Psychiatric Services Units, EOP Administrative Segregation Units, and mainline EOP programs. If an EOP program has more than one unit, each unit within that program will have at least one full-time on-site psychiatrist assigned to that unit";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure";

- At page 3, the restriction that "Telepsychiatry may not be used at the MHCB level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure."

- At page 3, the restriction that "Telepsychiatry may not be used at the PIP level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the PIP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via

Matthew A. Lopes, Jr.
August 1, 2018
Page 8

telepsychiatry consistent with the requirements described in other sections of this
policy and procedure";

- At page 4, the addition of EOP to the paragraphs labeled "EOP, MHCB and
  Psychiatric Inpatient Programs"; and

- At page 5, the deletion of the phrase "to the extent possible" before "so that
  others are not able to enter" in the paragraph labeled "Physical Environment."

**A.      The Special Master's Restrictions at the CCCMS Level of Care Go Beyond
          Not Just What Is Constitutionally Required, But Also His Prior
          Recommendations and the Court's July 3, 2018 order.**

The Special Master does not have the authority, under the law or the 1995 Order of
Reference in this case, to determine CDCR policy. (*See*, e.g., Order Ref., ECF No. 640.)  But
even assuming the Special Master has such authority, the Draft Policy goes beyond that which is
constitutionally required.  The Special Master's Draft Policy states that "Good faith efforts shall
be made to recruit and retain on-site psychiatrists to provide services at the CCCMS level of
care" and "[i]f these efforts are unsuccessful, telepsychiatry is an acceptable alternative . . ."
(Draft Policy at 3.)  This provision conditions the use of telepsychiatry at the CCCMS level on
CDCR first failing to recruit on-site psychiatrists.  But unless evidence supports a finding that
CDCR's use of telepsychiatry at the CCCMS level is unconstitutional, then any such
precondition is unnecessary.  The fact that CDCR may be unable to hire for on-site is irrelevant
to that ultimate determination.

Moreover, the prerequisite of unsuccessful recruitment moves the goalposts beyond the
Special Master's own prior recommendations and the Court's July 3, 2018 order.  The Special
Master's February 2017 report stated that "[f]or 3CMS level of care inmates, [telepsychiatry] is
an appropriate option with the requirement that the telepsychiatrist work on-site at least twice per
year at the designated institutions and more frequently if feasible."  (ECF No. 5564 at 16.)
Similarly, the Court's July 3, 2018 order stated that the "Special Master has clarified for the
court that his experts agree telepsychiatry may replace on-site psychiatry at the CCCMS level of
care so long as . . . (1) telepsychiatrists visit the institution at least twice a year; and (2)
defendants continue a good faith effort to recruit on-site psychiatrists for all institutions
providing a CCCMS level of care."  (ECF No. 5850 at 5.)  The order also stated that "defendants
shall proceed forthwith [with] full implementation of telepsychiatry at the CCCMS programs,
conditioned on biannual visits . . . and continued efforts by defendants to recruit on-site."  The
Court did not make CDCR's use of telepsychiatrists conditional on failed recruitment efforts.
And, the Court's order stated that it "may replace" on-site psychiatry, not that it is merely an
acceptable alternative.  (*Id.*)

The Draft Policy's requirement that efforts to hire on-site psychiatrists must fail before
telepsychiatry is used is also internally inconsistent with other parts of the Draft Policy.  The
Draft Policy, like CDCR's policy, states that "[t]he Telepsychiatry Program provides mental

Matthew A. Lopes, Jr.
August 1, 2018
Page 9

health services to the [CCCMS] level of care . . ." (Draft Policy at 1.)  The Special Master's
condition is contrary to that statement.  It is also inconsistent with the evidence, history of
telepsychiatry treatment at the CCCMS level of care, and scientific literature showing that
telepsychiatry is a safe and appropriate method of care.

Accordingly, this section of the Draft Policy should be redrafted to state that:
"Telepsychiatry may be utilized at the CCCMS level of care consistent with the requirements
described in other sections of this policy and procedure.  The Department will maintain efforts to
recruit and retain on-site psychiatrists at institutions that provide CCCMS care."

      **B.**    **The Special Master's Restrictions on Telepsychiatry at the EOP Level of
Care Are Inconsistent with His Prior Recommendations and Exceed Any
Prior Discussion of the Parties**.

With regard to the use of telepsychiatry at the EOP level of care, the Draft Policy states:

> Telepsychiatry may supplement on-site psychiatry at the EOP level
> of care but it should not replace on-site psychiatry.  At least 1.0
> full-time on-site psychiatrist shall be assigned to each program and
> each unit within that program providing EOP level of care services
> within the institution. Programs providing an EOP level of care
> include Psychiatric Services Units, EOP Administrative
> Segregation Units, and mainline EOP programs. If an EOP
> program has more than one unit, each unit within that program will
> have at least one full-time on-site psychiatrist assigned to that unit.
> Good faith efforts shall be made to recruit and retain on-site
> psychiatrists to provide services at the EOP level of care. If these
> good faith efforts are unsuccessful, psychiatric services may be
> supplemented via telepsychiatry consistent with the requirements
> described in other sections of this policy and procedure.

(Draft Policy at 3.)

This degree of micromanagement is not supported by evidence in the record that CDCR's
use of telepsychiatry will prevent inmates at the EOP level of care from obtaining adequate
access to mental-health care.  Indeed, the record shows that the opposite is true.  (*See*
"Telepsychiatry in Correctional Healthcare," Penn, J., p. 11 ["[I]t is clinically appropriate for
CDCR inmates who meet the program designation as an EOP patient to have their psychiatric
care delivered through telepsychiatry"].)

Moreover, even assuming an evidentiary finding that unrestricted use of telepsychiatry is
unconstitutional, by imposing the above limits and restrictions on its use at the EOP level of care,
the Draft Policy goes far beyond what is constitutionally required and seeks to manage CDCR's
allocation of its clinical resources at the granular level.

Matthew A. Lopes, Jr.
August 1, 2018
Page 10

1.     **The Requirement for One Full-Time On-Site EOP Psychiatrist Per Program, Per Unit Is Arbitrary, Confusing, and Overly Burdensome.**

At no time was the requirement of one on-site psychiatrist for each EOP program and/or unit raised or discussed by the Special Master or Plaintiffs.  Nothing in the Special Master's February 2017 report or recommendation suggested this was necessary for telepsychiatry to be a safe or constitutional mode of care for EOP inmate-patients.  The Special Master's February 2017 recommendation was limited to his statement that the efficacy for EOP inmate-patients "was not clear," "that a psychiatrist be on-site at least quarterly," and "additional data would need to be examined."  (ECF No. 5564 at 16.)  Similarly, nothing in any of the Court's orders addressing telepsychiatry hinted at a strict policy that required at least one on-site psychiatrist per program, per unit.  The Special Master never raised this issue in any work group, which the Court ordered the parties to engage in specifically to discuss and resolve CDCR's staffing issues.  Defendants were never given an opportunity to discuss the proposal or respond to it before it was included in the Draft Policy.

Also, the Draft Policy does not define the term "unit."  The meaning of this term is critically important to understanding the extent of the burden imposed by the Special Master's Draft Policy.  On July 30, 2018, Defendants asked the Special Master's team for a definition of "program" and "unit" under the Draft Policy.  The Special Master's team informed Defendants that they considered the term "program" to include the EOP mainline programs, EOP Administrative Segregation Unit hubs (ASU), or Psychiatric Services Units (PSU).  The Special Master's team did not provide a clear definition of "unit," which could reasonably be interpreted as an individual housing unit, a facility or yard, or perhaps an institution.

The requirement of one on-site psychiatry per program, per unit (be it an individual housing unit or yard) is arbitrary.  CDCR's institutions have varying numbers of programs and each of those individual programs may have a different number of buildings and the buildings often differ in patient capacity.  It is also possible that a mainline EOP program that takes up all or part of a specific facility or yard may include an EOP ASU or PSU program.  In short, the term "unit" is untethered to CDCR's actual operations.  The lack of clarity as to what constitutes a "unit", and the variance in how programs are set up at different institutions will lead to confusing and inconsistent staffing allocations, which this Court directed the parties to resolve with the Special Master's assistance through the work group process.

2     **The Requirement for One Full-Time On-Site EOP Psychiatrist Per Program, Per Unit Will Change the Way CDCR Allocates Mental Health Staff and Will Force Programs to Either Close or Not Provide Psychiatry Services.**

CDCR currently allocates staff based on patient population at the prison and the staffing ratios imposed by the 2009 Staffing Plan.  However, the Draft Policy upends that staffing model as it allocates positions in a way never contemplated by the 2009 Staffing Plan.  Based on the Draft Policy, CDCR may be forced to allocate additional staff beyond what is presently required

Matthew A. Lopes, Jr.
August 1, 2018
Page 11

depending on the number of "programs" and "units" at an institution, rather than the patient population. For example, in January 2018, Mule Creek State Prison was allocated a total of 6.25 psychiatry positions to services its EOP GP population. Should the policy be implemented as is and a "unit" be interpreted as a "housing unit," CDCR would have to hire 7 on-site psychiatrists to use telepsychiatry. This means that CDCR would have to allocate psychiatry positions above and beyond what is required per the 2009 staffing model.

The Draft Policy would also require CDCR to unnecessarily reallocate psychiatrists to each "program," which are defined as a mainline EOP, an ASU EOP hub, or a PSU. This reallocation will only worsen CDCR's psychiatry staffing situation because programs, such as ASU EOP hubs or a PSU, have smaller populations that do not make up a full psychiatry case load. Thus, many of the psychiatrists assigned to these smaller programs also serve other EOP programs or levels of care. For example, at California Healthcare Facility (CHCF), one full-time psychiatrist provides services to both the ASU EOP hub and part of the CCCMS population. Under the Draft Policy, that psychiatrist would have to be fully committed to the ASU EOP hub, with its census of approximately thirty-five, because the Draft Policy defines the ASU EOP hub as its own "program." This would result in overstaffing of the ASU EOP hubs which currently assign one psychiatrist to 64 patients. But because eight of the ten ASU EOP hubs have less than 64 patients, the draft policy world require CDCR to allocate more positions than needed to provide care under the 2009 staffing plan. Similarly, at the California Institution for Women, its mainline EOP and PSU are in the same building. But since the PSU is considered a separate program in the Draft Policy, it would need its own dedicated full time psychiatrist to provide services, despite currently having a population of five inmates.[6]

The Draft Policy's new EOP-focused guidelines are also likely to cause CDCR to cease providing treatment to EOP level inmates at certain institutions. At the July 30, 2018 workgroup, the Special Master's team clarified that if CDCR was not able to provide the required one full-time on-site psychiatrist for each program, the programs that did not have the on-site psychiatrists would not be permitted to provide telepsychiatry. This would effectively close those units to providing inmate care, which would be tantamount to a construction order, improperly requiring CDCR to build additional EOP space at other prisons. 18 U.S.C.A. § 3626(a)(1)(C). For example, should the Special Master's Draft Policy be implemented, the mainline EOP program on E Yard at CHCF – a medical facility – would no longer be able to use telepsychiatry to provide patient care because a full-time on-site psychiatrist is not assigned to that program. CDCR would be forced to either move over 400 patients to another Level II EOP program[7], pull an on-site psychiatrist from a higher level of care, such as an a MHCB or a PIP, to

_____

[6] PSUs are allocated psychiatrists at the same ratio as ASU EOP hubs.

[7] If the EOP inmates were transferred from CHCF, they would have to be housed in one of the six remaining Level II EOP institutions: California Men's Facility (CMF), Mule Creek State Prison (MCSP), Richard J. Donovan (RJD), California Substance Abuse Treatment Facility (SATF), San Quentin State Prison (SQ), or Valley State Prison (VSP). However, many of these institutions would face similar challenges as CHCF in that buildings or yards may be closed

Matthew A. Lopes, Jr.
August 1, 2018
Page 12

provide on-site services to the EOP population, or not provide psychiatry care to those patients, despite having the ability to provide effective care via telepsychiatry.

Moreover, there are several programs at various institutions that may face challenges similar to CHCF. Even those institutions that currently have the requisite one full-time, on-site psychiatrist per program, per unit, are only one extended absence away from being barred from providing psychiatry care. Should the one on-site psychiatrist retire, leave CDCR employment, or be re-allocated to service a different level of care, under the Draft Policy that institution would have to cease providing telepsychiatry care. Cessation of telepsychiatry services would serve as a significant disruption to patient care and will lead to constant closures of EOP programs, more reliance on telepsychiatry in the higher levels of care, and increased and unnecessary transfers of EOP patients across the state. In this regard, the Draft Policy would worsen CDCR's ability to recruit and retain psychologists and social workers. Shuttering an entire EOP program would lead to laying off every psychologist, social worker, recreational therapist, psychiatric technician, and support staff that provides services to that EOP program. CDCR would then have to build a new EOP program at another institution from scratch.

In short, the Draft Policy upends CDCR's 2009 Staffing Plan and drastically changes the way it allocates resources, while potentially placing inmate-patients in harm's way by denying them access to telepsychiatry.

3.    **CDCR's Enhanced Outpatient Level of Care is Neither Residential nor Synonymous with In-Patient Levels of Care**.

To the extent the Special Master's Draft Policy concludes that CDCR's EOP level-of-care program is purely residential or synonymous with inpatient care, that reliance has no factual foundation, is contradicted by the Program Guide, and ignores the real-world application and understanding of residential programs in the prison setting. Without allowing the parties to provide evidence or briefing, the Court's July 3, 2018 order erroneously stated that the EOP was residential and synonymous with inpatient care. Defendants intend to appeal the July 3 Order.

As discussed in Defendants' July 12, 2018 letter to the Special Master, the July 3, 2018 order stated that "Although EOP is labeled an outpatient program, outpatient is contextual and relative to inpatient programs within the MHSDS; moreover, the Revised Program Guide makes clear EOP is a residential program, synonymous with an inpatient setting. (ECF No. 5850 at 10.) In reaching its conclusion, the Court cited to the EOP's provision of separate housing, treatment and programming for inmate-patients "'whose mental illness precludes their placement and participation' in the general population." (*Id.*) That characterization represents an over reliance on the inmate's separate housing unit.

---

because CDCR could not hire one full-time on-site psychiatrist per program, per unit, as required by the Draft Policy.

Matthew A. Lopes, Jr.
August 1, 2018
Page 13

While it is true that EOP inmates are housed in designated living units at hub institutions, it is not the separate housing unit that characterizes the level of care, but the staffing and the amount and intensity of care provided. (Brizendine Decl. at ¶ 8.) As Defendants stated at the June 28, 2018 status conference, the separate unit for EOP inmates is a security measure for a potentially vulnerable population. (*See also id.*)

The Program Guide makes clear that CDCR's "[o]utpatient care is provided in an array of treatment levels and modalities including a day treatment program and an outpatient clinic of care." (Revised Program Guide, 12-1-1.) EOP is CDCR's "most intensive level of outpatient mental health care within the MHSDS." (*Id.* at 12-4-1; Brizendine Decl. at ¶ 6.) EOP is outpatient level of care where the patient can receive intensive mental health treatment, while pursuing their educational certifications and degrees. EOP inmates hold jobs and engage in various rehabilitation opportunities, but return to their housing unit at the end of their day. (Brizendine Decl. at ¶ 7.) Contrary to the separation concept reflected in the Draft Policy, draft policy, CDCR is working to integrate the EOP population into the broader inmate population and into the full array of programs and opportunities available to the larger inmate population. (*Id.* at ¶ 10.)

It is also incorrect to equate EOP level of care to inpatient care. CDCR provides inpatient care at the intermediate, acute, and crisis bed levels of care. (Revised Program Guide at 12-1-9, 12-5-1.) The inpatient level of care is a closed treatment environment where all treatment must be provided within the licensed unit, all medication must be by doctor order, and the unit provides 24-hour nursing care. (Brizendine Decl. at ¶ 13.) Overall, inpatient levels of care have higher acuity patients, more robust staffing levels, a hospital level treatment setting, and patients receive a greater amount of treatment. (*Id.* at ¶¶ 12-18.) EOP level patients are specifically excluded from the inpatient level of care because they are not so impaired that they require intensive 24-hour care. (*Id.* at 11; Revised Program Guide at 12-4-1.)

In addition to these practical differences between the EOP and inpatient care, inpatient mental health facilities must be licensed and meet specific licensing requirements. CDCR's inpatient care facilities are licensed under Title 22. (*Id.* at ¶ 14.) However, EOP units, as outpatient units, do not require licensure. (*Id.*) This is also different than some community residential treatment programs, which also require licensing. (*See* Cal. Welf. & Inst. Code § 5675 (requiring mental health rehabilitation centers be licensed by the State Department of Health Care Services))

The Special Master and his experts, based on their years of monitoring the system, are certainly aware of the vast differences between the EOP and inpatient levels of care. It was therefore surprising that the Draft Policy equates the levels of care and artificially places a blanket restriction on telepsychiatry for EOP patients.

Matthew A. Lopes, Jr.
August 1, 2018
Page 14

IV.    **The Special Master Team's Interpretation of "Last Resort or Emergency Situations" in the Restricting the Use of Telepsychiatry at the MHCB and Psychiatry Inpatient Programs (PIP) are Unreasonable.**

The Special Master's Draft Policy states that telepsychiatry may not be used at the MHCB and PIP levels of care except "as a last resort or in emergency situations." (Draft Policy at 3.) This language is consistent with the Court's July 3, 2018 order. However, the Special Master's Team's interpretation of what constitutes a "last resort or emergency situation" is unreasonable and would functionally close at least one MHCB.

On July 30, 2018, Defendants asked the Special Master's Team to define a "last resort or emergency." Dr. Metzner stated this was a legal question—in his opinion, however, whether a situation was an "emergency" depended on the length of time telepsychiatry must be used at an MHCB or PIP level of care. For example, the longer telepsychiatry is used, the less likely it could be considered an "emergency." Defendants specifically raised the question of the MHCB at High Desert State Prison, which has been serviced exclusively by telepsychiatry for several years. Dr. Metzner replied that, in his opinion, using telepsychiatry at an MCHB or PIP level of care for more than a few months would cause concern and alarm for both the Special Master's experts and Plaintiffs' counsel. Such an interpretation would functionally close the MHCB at High Desert, despite the fact that that MHCB is meeting most Program Guide requirements and has a lower 30-day re-admission rate than the state average.

The Special Master's interpretation would not only effectively close the High Desert MHCB, but it will also impact patient treatment at other MHCBs and PIPs that have limited on-site staff. For instance, Pelican Bay State Prison currently has only one on-site psychiatrist who provides service to the MHCB. Should that psychiatrist leave Pelican Bay, telepsychiatry will be the only available modality of providing psychiatry services to the Pelican Bay MCHB until a replacement can be located. Given the remote location of Pelican Bay, CDCR is likely to have a difficult time hiring a new psychiatrist for the MHCB within a couple of months. Thus, CDCR would again be forced to either close the Pelican Bay MHCB or deny psychiatry services to that population.

When CDCR does not have the psychiatry staff available to provide necessary on-site care, it should be able to use telepsychiatry as a "last resort." Where and when CDCR is unable to hire on-site staff, patients in the MHCBs and PIPs should be provided with appropriate psychiatric care, even if telepsychiatry is the only available modality. CDCR should not be forced to endanger patients by withholding telepsychiatric services when there is no alternative form of psychiatric care available.

V.    **The Special Master's Prohibition Against Cell-Front Telepsychiatry is Vague and Premature**.

The Special Master's Draft Policy deletes the sections in CDCR's policy that referenced cell-front telepsychiatry and inserted the statement that, "At present, cell-front provision of

Matthew A. Lopes, Jr.
August 1, 2018
Page 15

telepsychiatry is not permitted." (Draft Policy at 3.) Including an affirmative restriction in the policy is unnecessary, surplus, and premature.

Cell-front psychiatry visits are a reality in the correctional context and, in some circumstances, are the only means of providing a psychiatric appointment for an inmate-patient who refuses to exit his or her cell. Also, cell-front telepsychiatry can more promptly provide psychiatry services to inmate-patients when an in-person psychiatrist is not available to provide the needed care. (*See* Kuich Decl. Supp. Defs.' Resp. Special Master's Draft Telepsych. Policy at ¶¶ 10-11.) The Special Master's Draft Policy ignores these facts.

Moreover, the Special Master's February 2017 report did not contain any recommendations related to cell-front telepsychiatry and the Court has not made any findings related to its use. The Special Master's expert and Plaintiffs have observed one demonstration of cell-front telepsychiatry, but not under precise clinical conditions. These non-clinical conditions resulted in unrepresentative sound-quality during the demonstration. By contrast, CDCR's tests of this same equipment under clinical conditions have resulted in much better sound quality than what the Special Master's expert experienced at the demonstration. (*See id.* at ¶ 9.) Nevertheless, CDCR is looking at additional ways to address sound-quality concerns raised by the Special Master's expert, including procuring improved microphones to further improve the sound quality even under non-standard conditions.

The Court and the Special Master should not rule out the possibility of using cell-front telepsychiatry as CDCR works to improve the technology and the manner in which telepsychiatry is provided to inmate-patients at the cell front. Otherwise, CDCR will be prematurely prevented from continuing to develop the technology and practice.

**VI.    The *Plata* Receiver's Implementation of Telemedicine Supports CDCR's Use of Telepsychiatry**.

Telemedicine for non-mental health conditions offers strong support for CDCR's use of telepsychiatry. California Correctional Health Care Services (CCHCS), under the guidance of the Receiver, accepted and adopted an expansive telemedicine system over ten years ago. In 2008, the Receiver proposed "a significantly expanded telemedicine program" because "[t]elemedicine is being used very effectively by prison health care systems around the country." (The Receiver's Turnaround Plan of Action at 34, June 6, 2008, ECF No. 35.) The aggressive expansion of telemedicine was part of the Receiver's "plan designed to correct constitutional deficiencies in California's prison health care system" and chosen as a priority of critical need. (*Id.* at 6.) The Court adopted the proposed plan, including the telemedicine expansion. (*Plata* Order, June 16, 2008, ECF No. 1245.)

The purpose of CCHCS's current telemedicine program is to provide "medical specialty, primary care, and other medical services" to inmates and "[i]mprove access to constitutionally adequate medical services utilizing telecommunications technology." Telemedicine Services Policy, 11.1.1 (Mar. 2015). "Telemedicine services shall be utilized by institutions ***whenever***

Matthew A. Lopes, Jr.
August 1, 2018
Page 16

*possible* to reduce custodial costs for specialty services delivered outside of the institution, increase community safety by reducing transports to outside facilities, and optimize availability of specialty care for institutions where specialists in the community are not readily accessible." *Id*. (emphasis added). The policy gives deference to clinicians and guides the institution to use telemedicine "when medically appropriate," rather than handcuffing the patient's doctor with blanket restrictions and exclusions. Telemedicine Services Policy, 11.1.2 (May 2015).

The telemedicine program and policies have resulted in an expansion from thirty specialists in four locations in Fiscal Year (FY) 2006-07 to two-hundred specialists in twenty-two locations in FY 2017-18, and an increase in specialty encounters from 14,577 in FY 2010-11 to 31,340 in FY 2017-2018. Overall, FY 2017-18 had almost 70,000 specialty and primary care telemedicine appointments. (*Id*.) In addition to primary care, telemedicine provides care to 28 different specialties including neurology, transgender, pulmonology, and cardiology. (*Id*.)

Before telemedicine, telepsychiatry was the original remote means of health-care delivery. Indeed, physicians were initially resistant to telemedicine because physical examinations are a typical part of non-mental-health medical care. Abrams, J. et. al., *Practical Issues in Delivery of Clinician-to-Patient Telemental Health in an Academic Medical Center*, Harv. Rev. Psychiatry, 25(3), 135 (May/June 2017). The scientific literature provided by the *Plata* parties states that physical examinations were a reason that telemedicine historically encountered more resistance in non-mental health fields than it did for mental health care, even in prison settings. *Id*; Glaser, M. et. al., *Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana*, Telemedicine & E-Health, 16(4), 472-479 (2010). However, telemedicine is now widely accepted and practiced nationwide, which provided the basis for the Receiver's plan to provide constitutional medical care to CDCR inmates. Thus, CDCR's use of remote healthcare, whether by a physician or psychiatrist, does not constitute a constitutional violation.

In short, the use of telemedicine by the Receiver supports CDCR's expanded use of telepsychiatry beyond the restrictions included in the Special Master's Draft Policy.

### VII.    Defendants' Objections to the Declaration of Non-Disclosed Expert Dr. Pablo Stewart.

In their July 12, 2018 letter to the Special Master, Plaintiffs submitted the declaration of Dr. Pablo Stewart to support their position regarding CDCR's use of telepsychiatry. However, Plaintiffs failed to disclose Dr. Stewart as an expert on telepsychiatry before July 12, 2018. Plaintiffs have taken the position that experts, regardless as to their purpose, must be disclosed in this case. Defendants have consistently disclosed their retention of consultants and experts and the purpose of those experts. Plaintiffs' non-disclosure of Dr. Stewart suggests an unacceptable double standard.

Matthew A. Lopes, Jr.
August 1, 2018
Page 17

Moreover, Dr. Stewart's report on CDCR's telepsychiatry program is not competent expert testimony and it should be rejected by the Special Master and excluded by the Court.[8] Most of Dr. Stewart's opinions on the limitations purportedly inherent in telepsychiatry, and CDCR's use of it in particular, are unsupported.

A.     **The Special Master Should Reject Dr. Stewart's Recommended Limits On CDCR's Telepsychiatry Program Because They Lack Foundation.**

Dr. Stewart opines that CDCR's use of telepsychiatry for seriously mentally-ill patients should be limited. (*See* Stewart Decl. at ¶¶ 15-22.) To support his position, Dr. Stewart speculates telepsychiatry may be inappropriate for high-needs inmates with delusions because those patients may incorporate the telepsychiatry equipment into their delusions. (*Id.* at ¶¶ 15-16.) Dr. Stewart, however, does not offer any professional study to support this fear and he does not attempt to link the worry to any particular event within his experience. (*Id.* at ¶¶ 15-16.)

The remaining bases that Dr. Stewart offers for the proposition that CDCR telepsychiatry should be limited to low-level patients are an anecdote from a seven-year-old study (some psychotic patients reported difficulty hearing doctors through their telepsychiatry units), and two CDCR suicide reports that do not describe telepsychiatry defects. The study—Grady & Singleton, *Telepsychiatry Coverage to a Rural Inpatient Psychiatric Unit*, Telemed. J. E. Health, (2011)—looked at whether short-term telepsychiatric coverage of a rural inpatient facility was possible using video-teleconference technology, concluding that it effectively provided staff. *Id.* at 605. Notably, nothing within the study suggests that telepsychiatry harmed patients or denied them as adequate treatment. *See id.*

Similarly, the suicides described by Dr. Stewart do not support the limitations for which he advocates. (*See* Stewart Decl. at ¶¶ 16-22.) Notably, the inmate-patient in the first suicide discussed by Dr. Stewart refused to be seen by telepsychiatry. (*See id.* at ¶ 18.) Dr. Stewart's analysis of both cases relies on issues of documentation and communication. But neither of those issues are specific to telepsychiatry as a mode of treatment. Contrary to Dr. Stewart's

_____

[8] Federal Rule of Evidence 702 provides that a qualified expert witness may offer opinion testimony where "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." These requirements ensure that the putative expert "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Expert opinions should be based on "facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Courts are not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Matthew A. Lopes, Jr.
August 1, 2018
Page 18

representations, the inmate suicides he discussions do not tell a story of telepsychiatry's inefficacy.

Because Dr. Stewart does not offer a sound foundation for his opinion that telepsychiatry should be limited to low-level patients and those not in crisis, his opinions should be excluded. *See* Fed. R. Evid. 703.

**B.    Dr. Stewart Misrepresents the State of the Professional Literature On High-Needs Patients.**

Dr. Stewart inaccurately represents that the professional literature concerning telepsychiatry for what he classifies as high-needs patients (EOP, inpatient, and those in crisis) merits caution. (*Id*. at ¶¶ 8-15.)  But a close reading of these studies show they mostly conclude that telepsychiatry is a safe and effective method of providing treatment, which is consistent with the scientific literature that the Defendants provided in their July 12, 2018 letter and prior filings.

In *An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees* (Psychiatry Serv., Farabee, et. al. (2016)), the authors' conclusion that telepsychiatry was an acceptable and effective approach to providing care to the population.  *Id*. at 562.  The *Usefulness of Telepsychiatry: A Critical Evaluation of Videoconferencing-Based Approaches*, (World J. Psychiatry, Chakrabarti, et al. (2015))—notes that telepsychiatry is no less effective than conventional psychiatry and that telepsychiatry may be incorporated into hybrid models of mental-health care.  *Id*. at 290.  In yet another study, the authors found that psychiatric interviews and diagnostic assessments could be reliably conducted through telepsychiatry and, that "[t]here is little evidence that patients with psychosis have difficulty with videoconferencing or experience any exacerbation of symptoms." *See* Sharp, et al., *The Use of Videoconferencing with Patients with Psychosis: a Review of the Literature*, Annals Gen. Psychiatry, 1, (2011).  And in *Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations* (Permanente J., Deslich, et. al, (2013)), the study concluded that "[t]elepsychiatry provided improved access to mental health services for inmates, and this increase in access is through the continuum of mental health care, which has been instrumental in increasing quality of care for inmates."  Dr. Stewart omitted the study's key conclusion that "[i]ncreasing access to mental health care for [inmates] through telepsychiatry may improve living conditions and safety inside correctional facilities.  Providers, facilities, state and federal governments can expect increased safety with utilization of telepsychiatry."

In short, the studies cited by Dr. Stewart do not support his position.  Instead, the literature discussed by Dr. Stewart suggests that if used conscientiously, telepsychiatry is a safe and effective means to supply psychiatric services to high-needs patients.

Matthew A. Lopes, Jr.
August 1, 2018
Page 19

C.    **The Special Master Should Reject Dr. Stewart's Opinions On CDCR's**
      **Use of Cell-Front Telepsychiatry Because They Lack Foundation.**

    Dr. Stewart further declares that telepsychiatry is inappropriate for cell-front
interventions and that it limits providers' ability to identify signs of medical or mental distress.
(*See* Stewart Decl. at ¶¶ 22-31, 35-37.)  These limitations are based on the purported
shortcomings of telepsychiatry equipment and the practice's "remote nature."  (*See*, *e.g.*, *id.* at ¶¶
23, 28, 31, 35.)  But Dr. Stewart provides no basis for that conclusion.  Nowhere in Dr. Stewart's
report does he describe his understanding of CDCR's particular telepsychiatry portals.  Dr.
Stewart does not state that he has ever observed CDCR's cell-front telepsychiatry technology or
a pilot of the technology.  This lack of foundation to Dr. Stewart's opinions undercuts his
concerns about connection quality (*id.* at ¶ 24) as well as his discussion of the purported
impediments to telepsychiatric diagnosis owing to limited or fixed frames of observation.  (*Id.* at
¶ 28.)

    Dr. Stewart's comments on telepsychiatric cell-front encounters also lack foundation.  He
suggests, for instance, that the noisiness of CDCR housing units will somehow interfere with
cell-front telepsychiatric interactions.  (*Id.* at ¶ 23.)  But CDCR does not anticipate the need for
cell-front telepsychiatry in conventional housing units, which is where EOP and lower level-of-
care inmates are housed.  Instead, virtually all cell-front telepsychiatric interventions would
occur in areas devoted to MHCB and the PIP.  Dr. Stewart appears unaware that MHCB and PIP
units are typically much smaller and quieter than conventional housing units.  Moreover, the cell
fronts in MHCB and PIP units generally offer better visibility than conventional cell fronts.
Because Dr. Stewart expressed no understanding of the particulars of CDCR cell-front
telepsychiatry, his speculation about its technological limitations is not supported by relevant
facts.

    Because Dr. Stewart's opinions regarding the technological shortcomings of CDCR's
telepsychiatry program lack the foundation required for an expert opinion under Rule 703, the
Court should those opinions from evidence and reject his opinions on those matters.

D.    **Dr. Stewart is Not Qualified to Opine that CDCR Can Meet Its Staffing**
      **Needs Through Mere Patient Clustering.**

    The American Psychiatric Association notes that prisons lend themselves to
telepsychiatry, especially in rural areas "where access to psychiatric services is limited or
absent."  Metzner, Penn, et al., *Psychiatric Services in Correctional Facilities*, at 68, (2016).  Dr.
Stewart dismisses the APA's position, however, stating that difficulty in staffing is not an
argument for the clinical appropriateness of telepsychiatry.  (*See* Stewart Decl. at ¶ 8.)  He then
claims that CDCR can meet its staffing needs by "clustering programs" in prisons "close to large
urban centers," "where in-person psychiatrists can be hired."  (*Id.* at ¶¶ 8-9, 18.)  Dr. Stewart
does not purport to base these assertions on his personal knowledge.  (*See id.*)  And he does not
identify studies or other information indicating that CDCR could address its lack of staff
psychiatrists by further clustering patients.  (*See id.*)  Further, Dr. Stewart's is unqualified to

Matthew A. Lopes, Jr.
August 1, 2018
Page 20

opine on California labor dynamics.  For these reasons, Stewart's suggestion that CDCR can solve its staffing needs through further clustering is baseless and should be discounted.

Based on the above, the telepsychiatric limitations identified and recommended within Dr. Pablo Stewart's declaration lack foundation or are counter to the scientific literature.

## VIII.   Conclusion.

CDCR provided the Special Master and Plaintiffs with a telepsychiatry policy that represented its judgment of best practices for telepsychiatry in its system.  That policy was based on CDCR's extensive experience using telepsychiatry and supported by the scientific literature. The July 3, 2018 order and the Special Master's Draft Policy, however, added overly intrusive restrictions on CDCR's ability to use telepsychiatry to provide mental-health treatment to inmates who need it.  And the evidence does not show that these restrictions are necessary to remedy an existing constitutional violation caused by CDCR's telepsychiatry policy. Accordingly, the Court should reject the Special Master's Draft Policy and allow CDCR to implement its telepsychiatry policy under the guidance of the Special Master and his experts.

Sincerely,

*/s/ Tyler V. Heath*

TYLER V. HEATH
Deputy Attorney General

For     XAVIER BECERRA
Attorney General

TVH:

Attachments

cc:     Plaintiffs' Counsel

CF1997CS0003
13186943.docx

# Attachment A

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8:<br>PSYCHIATRY SERVICES | Revision Date(s): | NA |
| | Supersedes: | |
| 12.08.100<br>TELEPSYCHIATRY | Attachments: | Yes ☐ No ☒ |
| | Director Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists and/or psychiatric nurse practitioners (telepsychiatry providers) to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatry provider, the patient, and the patient's treatment team. Telepsychiatric services are part of California Department of Corrections and Rehabilitation's (CDCR's) Complete Care Model (CCM) of treatment that provides integrated medical and mental health provision of services. CCM is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. The Telepsychiatry Program provides mental health services to all levels of care. Telepsychiatric services are a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population. Onsite providers shall remain the preferred method of psychiatric care for Mental Health Crisis Beds (MHCB) and Psychiatric Inpatient Programs (PIP). To ensure continuity of care for patients within the program, telepsychiatry providers will work from CDCR hubs and strong preference will be given to assign telepsychiatry providers to caseloads within the same institution.

**Equipment**

The telepsychiatry providers shall be given the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, scanner/printer (can be individual and/or shared), and phone with access to an outside line.

- A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound-proofed, where possible.

- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists.

- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatry provider can be seen and heard clearly.

Cell front equipment shall be available in all institutions receiving telepsychiatry services.

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the providers' and patients' identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telepsychiatry contact, the telepsychiatry provider shall explain the treatment modality, including a description of the role of the telepresenter, a plan for response to interruption in services, conditions under which a referral made to in-person care.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatry provider participation in the Interdisciplinary Treatment Teams (IDTT) is an important part of the provision of psychiatric services. Consistent with the CCM, telepsychiatry providers shall participate in the receiving institutions' IDTT meetings. To facilitate telepsychiatry provider's participation in IDTTs, IDTT meetings that include a telepsychiatry provider shall be held in a location that is appropriately wired to allow for the telepsychiatry provider's full participation. Receiving institutions may be required to modify IDTT schedules to allow telepsychiatry providers to participate in the IDTT.

In addition to IDTT meetings, telepsychiatry providers shall participate to the same extent as onsite psychiatrists in all meetings and huddles relevant to the clinical care of their patients, in compliance with the CCM.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatry provider shall meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telepsychiatry services. A member from the treatment team may utilize brief, focused cell front discussions with the patient to determine the reasons for appointment refusals. The telepsychiatry provider may also request a consultation from an onsite provider if it is clinically determined that the patient must be seen immediately.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatric visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry. If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate onsite psychiatric treatment.

**Contraindications for Telepsychiatry**

Patients shall not be excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. If the telepsychiatry provider and Chief of Telepsychiatry determine that the patient needs to be seen by an onsite psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate onsite psychiatrist assigned. Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an onsite psychiatrist.

**Emergency Management**

If an emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatry provider shall immediately notify Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) as well as his/her direct telepsychiatry supervisor . The telepsychiatry provider shall coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to emergency triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

**Crisis Bed and Psychiatric Inpatient Programs**

No Psychiatric Nurse Practitioners (PNPs) shall be permitted to provide telepsychiatric services to MHCBs or PIPs.

In the event that a telepscyhiatrist is needed in an inpatient or crisis bed setting the telepsychiatrists shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings, in case conferences, and in coordinating patient care. Consistent with the CCM, onsite staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Telepsychiatrists shall be involved in treatment and discharge decisions.

Patients housed in a MHCB or PIP are often unable to leave their room due to presenting as a danger to self, a danger to others, or being gravely disabled. Therefore, clinical staff at the receiving institution shall assist telepsychiatrists with facilitating cell-side interactions as needed.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

Telepsychiatrists shall provide sign-out information to an available Institutional Psychiatrist on Duty to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telepsychiatry providers are responsible for maintaining relationships with members of the onsite treatment team by regularly communicating with them and by physically visiting receiving institutions. Telepsychiatry providers shall visit their assigned institution within 30 days of assignment. The frequency of follow-up visits shall be determined by the telepsychiatry provider's assigned level of care.  The telepsychiatry provider will spend at

least one full business day during each site visit at the facility, and attend meetings as described below:

| Level of Care | Frequency of Site visit |
|---|---|
| CCCMS | Biannually |
| EOP | Quarterly |
| MHCB | Quarterly* |
| PIP | Monthly |

*For MHCB, the telepsychiatrist shall visit the institution every 2 months for the first 6 months, then every 3 months thereafter

During each visit, the telepsychiatry providers shall participate in the IDTT, meet with necessary health care staff, and see patients face-to-face. In addition, telepsychiatry providers shall attempt to see as many patients face-to-face as possible.

**Physical Environment**

The patients' interview room/environment shall allow for both the telepsychiatry provider and the patient to be seen and heard clearly. The patient's and provider's camera shall be positioned with their faces clearly visible to each other, to the extent possible. The telepsychiatry provider shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatry provider can request assistance from the telepresenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatry provider), who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy, to the extent possible, so that others are not able to enter the provider's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the telepresenter should be seated closest to the door.

**Organizational Structure**

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telepsychiatry providers shall immediately notify their direct telepsychiatry supervisor, Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatry provider shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by onsite provider or rescheduling of appointments). Telepsychiatry providers may also be redirected to another telepsychiatry assignment when this occurs.

**Nonformulary Requests**

Nonformulary requests shall be made directly to the psychiatry leadership of the institutions served by telepsychiatry, unless otherwise determined by leadership. If there is no Chief Psychiatrist or Senior Psychiatrist Supervisor at the institution, nonformulary

requests shall be submitted to the telepsychiatry provider's direct supervisor.

**Jabber Account Login**

Operational need requires telepsychiatry providers to log into their Jabber telepsychiatry video accounts as soon as they arrive to work. They shall remain logged into Jabber throughout the day so that supervisors, colleagues, and institutional staff are able to communicate with the telepsychiatry provider via video calls during work hours. Telepsychiatry providers shall log out of Jabber immediately prior to leaving work.

**On-Call Coverage by Telepsychiatry**

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Inmate Medical Services Policies and Procedures (IMSP&P), Headquarters' Mental Health Policy and applicable bargaining unit Memorandums of Understanding.

Telepsychiatry providers are not required to travel to the institution where they are providing on-call coverage. Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider). This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

**Responsibilities**    The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatry provider.

- A dedicated and appropriately clinically trained telepresenter who presents the patient from the originating site to the telepsychiatry provider, and is responsible for providing clinical support and coordination. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Telepresenters shall be assigned from position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician, medical technical assistant, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, social worker, psychologist, psychiatrist, or physician. When the telepresenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment.

- A backup telepresenter when the primary telepresenter is on leave or unavailable.

- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.

- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.

- A contact list of important names and numbers for the institution. This includes, but is not limited, to the following:

1. Laboratory
2. Pharmacy
3. Nursing station(s)
4. Housing unit(s)
5. Primary Clinician(s)
6. Medical Provider(s)
7. Mental Health Supervisor(s)
8. Chief of Mental Health
9. Chief Psychiatrist or Senior Psychiatrist Supervisor
10. IT Department
11. Scheduler
12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.

- Caseload assignments and scheduled appointments for the telepsychiatry provider.

- The maintenance of telemedicine connectivity between institutions and providers.

- Ensuring that telepsychiatry providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.

- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.

- Organized tours for the telepsychiatry providers during their initial visits to the institution.

- Developing onsite clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatry providers.

- Onsite staff that may conduct and/or facilitate cell front visits when a telepsychiatry provider or the treatment team expresses a need for a cell front visit.

- A Local Operating Procedures (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.

- Routine system tests to ensure that equipment is safe, operational, and secure

| Purpose | This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines. Telepsychiatry providers shall conduct care |

consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatry providers are provided with the appropriate equipment and resources.
2. Telepsychiatry providers participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their patients.
3. Onsite staff and members of the treatment team communicate with the telepsychiatry provider any important patient issues and concerns related to patient care.
4. Telepsychiatry providers have access to all necessary clinical information via the health record.
5. Patients are not excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
6. Telepsychiatry provider completes all documentation in the health record by the close of each business day.
7. Provider and patient identity are verified at the beginning of a mental health treatment videoconference.
8. Telepsychiatry providers visit their receiving institutions as directed by policy.
9. Nonformulary requests are made directly to the psychiatry leadership of the institutions served by telepsychiatry providers, unless otherwise determined by leadership.
10. Telepsychiatry providers remain logged into Jabber throughout the work day.
11. Ongoing mandatory trainings for all telepsychiatry providers.
12. Telepsychiatry providers are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution… | then… |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is revised as necessary. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements. Ensure the LOP is revised as necessary. |

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

# Attachment B

**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I Street
P. O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7318
E-Mail Address: Elise.Thorn@doj.ca.gov

May 25, 2018

*Via Electronic Mail*

Matthew A. Lopes, Jr., Esq.
Coleman Special Master
Pannone Lopes Deveraux & West LLC
317 Iron Horse Way, Suite 301
Providence, RI 02908
MLopes@pldlaw.com

Lisa Ells, Esq.
Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld LLP
50 Fremont Street, 19th Floor
San Francisco, CA 94105-2235
lells@rbgg.com
tnolan@rbgg.com

RE:    *Coleman, et al. v. Brown, et al.*
       U.S. District Court, Eastern District of California, Case No. 2:90-cv-520 KJM-DB (PC)

Dear Matt, Lisa, and Tom:

This letter responds to Plaintiffs' May 21, 2018 request that Defendants identify areas of continued disagreement regarding CDCR's telepsychiatry policy and provide the reasoning for Defendants' position. Defendants agree that the parties have made considerable progress towards a final agreement on CDCR's proposed telepsychiatry policy and Defendants appreciate Plaintiffs' enumeration of the agreements reached through the staffing workgroups.

However, Plaintiffs continue to mischaracterize CDCR's position in a number of ways—most significantly by claiming that CDCR proposes the "virtually unlimited use of telepsychiatry in CDCR." The telepsychiatry policy continues to provide multiple safeguards that protect the needs of patients, as well as address the specific concerns of the Special Master and Court. For example, the policy provides procedures to safely address patient refusals, the treatment of patients where telepsychiatry may be contraindicated, and patients requiring emergency mental health services. CDCR has also agreed that onsite providers shall remain the preferred method of psychiatric care for patients at the Mental Health Crisis Bed (MHCB), Acute Psychiatric Program, and Intermediate Care Facility levels of care.

Matthew A. Lopes, Jr., Esq.
Lisa Ells, Esq.
Thomas Nolan, Esq.
May 25, 2018
Page 2

A.    **Neither the Court Nor the Special Master Have Prohibited CDCR's Onsite Psychiatrists from Moving to Telepsychiatry Positions.**

Defendants agree that the Special Master's monitoring should continue to include the telepsychiatry program.  Plaintiffs take the position, however, that the Special Master should further closely monitor telepsychiatry "to ensure that on-site clinicians are not permitted to migrate to telepsychiatry offices."  (Pls.' Letter at 3.)  Defendants do not agree that onsite psychiatrists are restricted from taking a position with CDCR as a telepsychiatrist.[1]  And all indicators show that the ability to place telepsychiatrists at an institution not only addresses staffing vacancies, but also improves retention, because the telepsychiatrists relieve excessive workloads, making everyone's job more manageable.  Indeed, CDCR believes that future monitoring and reporting will prove that onsite provider vacancies are not adversely impacted by hiring telepsychiatrists.  Defendants' monthly psychiatry vacancy reports will also support this fact.

B.    **Other Areas of Disagreement and Clarification.**

Defendants articulated their positions on each of the four remaining areas of disagreement in their attached May 16, 2018 letter to Lisa Ells and Tom Nolan.  Defendants will not restate those positions in full here, but will correct various misstatements set forth in Plaintiffs' May 21, 2018 letter.

First, Plaintiffs contend that CDCR's policy fails to incorporate the Court's requirements that telepsychiatry should supplement but not replace on-site psychiatry.  (Pls.' Letter at 3-4.)  This is inaccurate.  CDCR's telepsychiatry policy and its May 17, 2018 *Proposals to Achieve a More Efficient and Effective Mental Health Services Delivery System with Adjustments to Unneeded Psychiatry Positions*, clarify that CDCR plans to continue to use telepsychiatry to supplement its onsite psychiatry staff.  Black's Law Dictionary defines the word "supplemental" as "that which is added to a thing to complete it."  The word "supplement" means "something that completes or makes an addition."  On the other hand, a substitute is defined as "one who or that which stands in the place of another" or "to put or use in the place of another."  *See* Merriam Webster's Collegiate Dictionary (10th Ed. 1993).  Specifically, telepsychiatrists complete CDCR's psychiatric staffing requirements and supplement its on-site mental health program staff.  CDCR is neither discontinuing its use of onsite providers, nor replacing onsite providers with telepsychiatrists.  On a system-wide basis, telepsychiatrists are filling vacant positions to *supplement* CDCR's full complement of psychiatric staff.[2]

---

[1] Indeed, such a prohibition would likely violate public policy.  *See, e.g.,* Cal. Bus. & Prof. Code § 16600 ("every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void").

[2] Plaintiffs continue to condition their agreement that telepsychiatry may be used to treat patients at the Enhanced Outpatient level of care (EOP) on the satisfaction of two requirements:  1) a good-faith showing that CDCR is unable to hire a sufficient number of onsite psychiatrists, and 2) demonstration that a majority of the positions for the EOP program are filled by onsite psychiatry.  (Pls.' Letter at 7.)  Neither of these requirements are set forth in the Special Master's recommendations or the Court's October 10, 2017 Order.  Moreover, the conditions present difficult practical issues, such as how and under what standard the good-faith requirement would be met, and who

Matthew A. Lopes, Jr., Esq.
Lisa Ells, Esq.
Thomas Nolan, Esq.
May 25, 2018
Page 3

Second, Plaintiffs want CDCR's policy to state that "[t]elepsychiatry is not appropriate for the MHCB level of care except as a last resort or in emergency situations when an on-site psychiatrist is not available." (Pls.' Letter at 4.)  But CDCR has already agreed to state a preference to use onsite providers for patients at the MHCB, Acute Psychiatric Program, and Intermediate Care Facility levels of care.  The current policy further provides safeguards for treatment where telepsychiatry is contraindicated, as well as actions that must be taken in emergency situations.  In sum, the policy already operationalizes the Court's instructions in its October 10 Order.  As for Plaintiffs' further insistence on the insertion of language that "[t]elepsychiatry should not be a frontline approach for psychiatric services for inmates with the most intensive or emergent needs," CDCR continues to strongly object on the ground that the meaning of the term "frontline approach" is ambiguous.  As such, the insertion of that term in CDCR's policy does not assist CDCR's clinicians and only invites confusion.  Given the current safeguards in the policy and the lack of evidence to support Plaintiffs' proposed ban, CDCR's revised policy language should be approved.

Finally, the last two areas of disagreement identified in Plaintiffs' letter concern the use of telepsychiatry for cell-front visits and the use of Psychiatric Nurse Practitioners to provide telepsychiatry services.  As stated in Defendants' May 16 letter, resolution of these issues is pending a review of cell-front telepsychiatry and CDCR's Psychiatric Nurse Practitioner policy.  Casting these issues as disagreements is premature.

**C.    CDCR's Telepsychiatry Policy Complies with the October 10, 2017 Order.**

Defendants disagree with Plaintiffs' expansive interpretation of the October 10 Order.  Defendants agree that the Court ordered the parties to develop a revised telepsychiatry policy, based on the Special Master's recommendations.  But those mandates do not change the character of the Special Master's recommendations, or render them edicts or categorical bans on the use of telepsychiatry as a primary treatment method for patients at any level of care.  Instead, the Special Master found that telepsychiatry may be used with certain limitations for every level of care.

The Special Master found that telepsychiatry is an appropriate option for the delivery of care to the CCCMS population, provided that telepsychiatrists work onsite at least twice per year at the designated institutions and more frequently if feasible.  (Order at 21.)  For the EOP level of care, the Special Master recommended additional observation and data gathering in order to assess telepsychiatry.  (*Id.* (citing Report at 16).)  He did not recommend that telepsychiatry should be categorically disfavored for all EOP patients.  And CDCR's policy appropriately accounts for those patients for whom telepsychiatry is contraindicated or refused.  The Special Master also found and recommended that telepsychiatry may be appropriate for the MHCB level of care as a last resort or in emergency situations when an on-site psychiatrist is not available. (*Id.*)

---

would enforce the good-faith standard.  The conditions also fail to account for normal staff turnover and fluctuations in hiring.  Finally, the conditions seek to impose legal obligations not required by the Eighth Amendment.

Matthew A. Lopes, Jr., Esq.
Lisa Ells, Esq.
Thomas Nolan, Esq.
May 25, 2018
Page 4

      Defendants referred to the Special Master's past monitoring of telepsychiatry to highlight that Plaintiffs still cannot point to any evidence of negative outcomes for patient treatment attributable to telepsychiatry.  While Plaintiffs posit that "[face-to-face, in-person clinical contacts] is more therapeutic in the context of CDCR's prisons than remote treatment by video-phone" (Pls.' Letter at 2), they cite no evidence or literature to support this claim.  And while Defendants recognize that Plaintiffs cite to a handful of complaints regarding privacy and continuity of care reported in both the 26th and 27th Round Monitoring reports, those reported incidents are anecdotal and do not represent the experience of the telepsychiatry treatment provided system-wide.   The complaints do not demonstrate the modality of treatment resulted in insufficient care.  The 26th and 27th Round reports do not identify any instance where telepsychiatry was used and a patient decompensated or was in fact harmed as a result of treatment using telepsychiatry.

      The quality of telepsychiatry has improved dramatically in recent years and its use for the majority of the MHSDS patient population is clinically indicated and successful.  Defendants look forward to working with the Special Master and Plaintiffs' counsel to reach an agreeable telepsychiatry policy.

                     Sincerely,

                     */s/ Elise Thorn*

                     Elise Owens Thorn
                     Deputy Attorney General

           For     XAVIER BECERRA
                     Attorney General

Attachment A

**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I Street
P. O. Box 944255
Sacramento, CA 94244-2550
Telephone: (916) 210-7318
E-Mail Address: Elise.Thorn@doj.ca.gov

May 16, 2018

*Via Electronic Mail*

Lisa Ells, Esq.
Thomas Nolan, Esq.
Rosen Bien Galvan & Grunfeld LLP
50 Fremont Street, 19th Floor
San Francisco, CA 94105-2235
tnolan@rbgg.com

RE:     *Coleman*, et al. v. *Brown*, et al.
        U.S. District Court, Eastern District of California, Case No. 2:90-cv-520 KJM-DB (PC)

Dear Lisa and Tom:

      This responds to your May 14, 2018 request that Defendants put in writing their position regarding the Court's October 10, 2017 order as it relates to telepsychiatry.

      The relevant provision of the order states:

> Under the guidance of the Special Master, defendants **shall develop an addendum** to the Revised Program Guide to govern the use of telepsychiatry and the extent to which telepsychiatrists may provide mental health services in place of on-site psychiatrists. Telepsychiatry should serve as a supplement, rather than a substitute, for on-site psychiatry and should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists. The Special Master's recommendations concerning the use of telepsychiatry, as clarified by this order, **shall** form the basis of that addendum, **subject to modification as appropriate as a result of ongoing monitoring of defendants' telepsychiatry program**. The addendum **shall** be developed and finalized with the guidance of the Special Master and his experts, and with input from plaintiffs' counsel at the discretion of the Special Master.

(October 10, 2017 Order, ECF No. 5711, at 30 (emphasis added).) While the order mandates that Defendants develop an addendum under the guidance of the Special Master, and that the Special Master's recommendations shall form the basis of the addendum, the Court's language limiting the scope of telepsychiatry is not mandatory. The order makes clear that the Special Master's recommendations are permissive instructions, "subject to modification as appropriate as a result of ongoing monitoring of defendants' telepsychiatry program." (*Id.*)

Lisa Ells, Esq.
Thomas Nolan, Esq.
May 16, 2018
Page 2

If the Court intended to mandate the actual terms of Defendants' policy, then its order would have explicitly stated that "telepsychiatry **shall** serve as a supplement, rather than a substitute, for on-site psychiatry and **shall** only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists." Instead, the Court left it to Defendants and the Special Master to develop an addendum based on what the evidence demonstrates about the efficacy of telepsychiatry. And as Defendants have repeatedly pointed out, all the available evidence shows that telepsychiatry is equally as effective as other forms of care. (*See* Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and Implementation of Defendants' Staffing Plan, ECF No. 5591 at 3 - 7.)

Both the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan (Special Master's 2017 Staffing Report, ECF No. 5564) and the October 10 order evidence an intent to develop a policy that allows for the use of telepsychiatry at all levels of care under appropriate conditions. This aligns with the American Psychiatry Association, which recognizes telepsychiatry as an empirically effective delivery system:

> Telemedicine in psychiatry, using video conferencing, is a validated and effective practice of medicine that increases access to care. The American Psychiatric Association supports the use of telemedicine as a legitimate component of a mental health delivery system to the extent that its use is in the best interest of the patient and is in compliance with the APA policies on medical ethics and confidentiality.

(https://www.psychiatry.org/psychiatrists/practice/telepsychiatry.)

Moreover, the Receiver's Office in *Plata, et al. v. Brown, Jr., et al.*, has found that telemedicine, as a delivery model, "has proved successful through providing medical services to hard-to-recruit, remote locations and increased job satisfaction and retention." (*See*, e.g, *Plata, et al. v. Brown, Jr., et al.*, Case No. C01-1351-JST, ECF No. 3008, p. 14.) Thus, telepsychiatry is not only a legitimate delivery system of care, but a means for alleviating the problems CDCR faces in hiring and retaining medical providers.

On the other hand, Plaintiffs have not provided evidence, anecdotal or otherwise, that CDCR's use of telepsychiatry harms *Coleman* class members. While some inmates may complain about treatment using video, the majority of class members accept treatment through telepsychiatry. The October 10 order likewise does not cite to any instance of inadequate treatment or poor patient outcomes caused by using telepsychiatry. To the contrary, the Court gives credence to the Special Master's monitoring of telepsychiatry and the conclusion of his experts concerning its efficacy. (Order at 22-23.)

In the *Twenty-Sixth Round Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols* (*Twenty-Sixth Round Monitoring Report*, ECF No. 5439), the Special Master reported that "the observed use of the telepsychiatry process by Interdisciplinary Treatment Teams (IDTTs) was found satisfactory as a viable option in the absence of live psychiatrists at the institutions." (*Id.* at 18.)

Lisa Ells, Esq.
Thomas Nolan, Esq.
May 16, 2018
Page 3

The *Twenty-Sixth Round Monitoring Report* also included the Special Master team's observation of seven institutions where telepsychiatry was provided. There were no negative reports attributable to telepsychiatry, including at the following institutions: California Health Care Facility (*Twenty-Sixth Round Monitoring Report* at 160 and 169); Pelican Bay State Prison (*Id.* at 186); High Desert State Prison (*Id.* at 190); Mule Creek State Prison (*Id.* at 215); California State Prison-Corcoran (*Id.* at 295); the California Substance Abuse Treatment Facility (*Id.* at 320); and the California Correctional Institution (*Id.* at 450-451). The *Twenty-Sixth Round Monitoring Report* also included reviews of seven inmates who received telepsychiatry treatment. As with the institution-wide reporting, the Special Master did not report any negative results attributed to the use of telepsychiatry. (*Id.* at 590, 591-92, 593, 597, 661, 703, and 704.)

The lack of negative outcomes is not surprising given the expanded use and acceptance of telemedicine. As Defendants pointed out in their response to the Special Master's 2017 Staffing Report, the research demonstrates that telepsychiatry is as effective as in-person psychiatry in most applications. (ECF No. 5591 (citing Golding Decl. at ¶ 2).) The American Psychiatric Association has stated that telepsychiatry is as effective as in-person care, and a survey of telepsychiatry studies found the "interventions delivered *via* telepsychiatry and [in-person care] resulted in similar treatment outcomes." (ECF No. 5591-1 at 16.)

Plaintiffs' insistence that CDCR's telepsychiatry policy must state that "[o]nsite providers shall remain the preferred method of psychiatric care for the entire mental health population and "[t]elepsychiatry should not be a frontline approach for psychiatric services for inmates with the most intensive or emergent needs," is not required by the staffing order and inserts ambiguity into the policy. The Special Master's positive monitoring and reporting on telepsychiatry, rather, supports Defendants' position.

Plaintiffs' request to limit telepsychiatry via a blanket preference for onsite psychiatry for all levels of care is based on language at page 21 of the October 10 order, which in turn cites and relies on recommendations from the Special Master. But the Special Master's recommendations and the October 10 order indicate that telepsychiatry may be used to treat patients at all levels of care under certain conditions. For example, the Special Master found and recommended that CDCR could use telepsychiatry to deliver care to the CCCMS population. The Court adopted the Special Master's recommendation. The only limitation for use of telepsychiatry for the CCCMS population is that telepsychiatrists work onsite at least twice per year at the designated institutions and more frequently, if feasible.

For inmates at the EOP level of care, the Special Master was unwilling to recommend the "permanent use of telepsychiatry" because he had yet to assess its adequacy. The Court cited the Special Master's report, which left the use of telepsychiatry for EOP patients unresolved: "[t]he Special Master's experts observed EOP inmates receiving treatment using telepsychiatry and it appeared to function properly, but additional data would need to be examined before further expansion for EOP inmates could be endorsed." (*See* Special Master's Report on Staffing at 16.) There has been no finding or recommendation that telepsychiatry should be prohibited for EOP patients nor is there an order precluding its use for the EOP population.

To the extent that the Special Master's experts are reconsidering any previously-stated acceptance of the use of telepsychiatry to treat the EOP population, Defendants object to this

Lisa Ells, Esq.
Thomas Nolan, Esq.
May 16, 2018
Page 4

change in position.  Specifically, Defendants object to the characterization of patients at the EOP level of care as anything other than "outpatient" for purposes of staffing and for the scope of services required under the Program Guide.  While the Special Master's experts may have referred to the EOP program as "residential" in the past, the Program Guide and CDCR's policies and procedures treat the EOP level of care very differently than inpatient programs such as the MHCB and the Psychiatric Inpatient Programs.  Defendants recognize that the October 10 order, which cites to the Special Master's *Twenty-Sixth Round Monitoring Report*, indicates there should be some limits on the use of telepsychiatry for patients above the CCCMS level of care: telepsychiatry is "primarily an option for treatment of inmates at the 3CMS level of care, and a less desirable option for inmates at higher levels of care."  (Order at 22.)  But that language is tempered by the order's acknowledgment that additional monitoring of the telepsychiatry program is needed and the lack of negative outcomes for the EOP population due to telepsychiatry.

Finally, Plaintiffs propose language that "telepsychiatry should not be a frontline approach for psychiatric services for inmates with the most intensive or emergent needs."  This insertion is unnecessary, as the proposed policy already reflects that there is a preference for use of onsite providers for inpatient and crisis bed levels of care.  Plaintiffs' proposed additional language does not clarify that point and may confuse staff in the field, given the undefined and ambiguous term "frontline approach."  Plaintiffs' proposed language is also not appropriate for the policy as it refers to "inmates with the most intensive or emergent needs."  Presumably that would only apply to crisis bed and acute level of care patients, but on its face, the language is subject to varying interpretation.

The current version of the telepsychiatry policy sufficiently provides for the limits and safeguards required by the October 10 order without hindering CDCR's use of telepsychiatry.  And without any evidence disputing telepscyhiatry's efficacy as a delivery model of care, the policy should not include language that could be used to limit its application at the EOP and CCCMS levels of care.

Defendants look forward to Plaintiffs' letter regarding Defendants' revised telepsychiatry policy.

Sincerely,

*/s/ Elise Thorn*

Elise Owens Thorn
Deputy Attorney General

For    XAVIER BECERRA
Attorney General

cc:  Matthew A. Lopes, Jr.

# Attachment C

**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



1300 I Street
P. O. Box 944255
Sacramento, CA 94244-2550
Telephone: (619) 738-9549
E-Mail Address: andrew.gibson@doj.ca.gov

July 6, 2018

*Via Electronic Mail*

Matthew A. Lopes, Jr., Esq.
Office of the Special Master
Pannone, Lopes, Devereaux & O'Gara LLC
Northwoods Office Park, Suite 215 N
1301 Atwood Avenue
Johnston, RI 02919

RE:     *Coleman*, *et al. v. Brown*, *et al.*
        U.S. District Court, Eastern District of California, Case No. 2:90-cv-520 KJM-DB (PC)

Dear Special Master Lopes:

        To assist your preparation of a final proposed telepsychiatry policy in this matter, you requested that the parties provide you with their final positions on telepsychiatry, along with any supporting literature or reports. You requested that the parties complete their submissions by July 12, 2018. Accordingly, Defendants produce for your consideration the enclosed report entitled *Telepsychiatry in Correctional Healthcare,* prepared by Dr. Joseph Penn.[1] (*See* **CDCR 001-016**.) We have also enclosed the literature and studies Dr. Penn referenced and relied on when preparing his report (**CDCR 017–365**), as follows:

        1)      Bashur RL, Shannon BW, Smith BR, et al. The Empirical Foundations of
        Telemedicine Interventions for Chronic Disease Management. *Telemedicine and e-
        Health*, 2014;20:769-800 (**CDCR 018-49**);

        2)      Stec B, Coustasse A. Benefits and Constraints of Telepsychiatry Utilization in the
        United States. Business and Health Administration Association Annual Conference
        2012. Available at http://mds.marshall.edu/mgmt_faculty/60 (**CDCR 051-58**);

        3)      Brecht RM, Gray CL, Peterson C, et al. The University of Texas Medical Branch
        – Texas Department of Criminal Justice Telemedicine Project: Findings from The First
        Year of Operation. *Telemedicine Journal*.1996;2(1):25-35 (**CDCR 060-72**);

---

[1] Defendants retained Dr. Joseph Penn, like they retained their staffing consultants, to help them address the Court's October 10, 2017 staffing order. We reserve any and all rights with respect to Dr. Penn's report and opinions under Rule 26 of the Federal Rules of Civil Procedure.

Matthew A. Lopes, Jr., Esq.
July 6, 2018
Page 2

4)    Brodey BB, Claypoole KH, Motto J, et al. Satisfaction of Forensic Psychiatric Patients with Remote Telepsychiatry Evaluation. *Psychiatric Services*. 2000;51(10):1305-7 (**CDCR 074-76**);

5)    Deslich S, Stec B, Tomlin S, et al. Telepsychiatry in the 21st Century: Transforming Healthcare with Technology. *Perspectives in Health Information Management*. 2013;10(Summer). Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3709879/(**CDCR 078-94**);

6)    US Department of Justice, Office of Justice Programs, National Institute of Justice: Telemedicine Can Reduce Correctional Health Care Costs: An Evaluation of a Prison Telemedicine Network. (1999) Available at https://www.ncjrs.gov/pdffiles1/175040.pdf (**CDCR 096-171**);

7)    Dorsey ER, Topol EJ. State of Telehealth. *New England Journal of Medicine* 2016;375:1-2 (**CDCR 173-80**);

8)    Galli R, Keith JC, McKenzie K, et al. TelEmergency: A Novel System for Delivering Emergency Care to Rural Hospitals. *Annals of Emergency Medicine*. 2008;51:275-84 (**CDCR 182-91**);

9)    Glaser M, Winchell T, Plant P, et al. Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana. *Telemedicine Journal and e-Health*. 2010;16(4):472-9 (**CDCR 193-200**);

10)    Yellowlees PM, Hilty DM, Mucic D: "Global/World Wide Telehealth: International Perspectives of Telepsychiatry and the Future." *In Key Issues in e-Mental Health*. Eds Mucic D, Hilty DM, Springer Publishing, pp. 233-250, 2015 (**CDCR 202-13**);

11)    Hilty DM, Ferrer DC, Parish MB, et al. The Effectiveness of Telemental Health: A 2013 Review. *Telemed J E Health* 2013;(19):444-454 (**CDCR 215-25**);

12)    Hilty DM, Yellowlees PM, Parish MB, et al. Telepsychiatry: Effective, Evidence-Based and at a Tipping Point in Healthcare Delivery. *Psych Clin N Amer* 2015;38(3):559-592 (**CDCR 227-60**);

Matthew A. Lopes, Jr., Esq.
July 6, 2018
Page 3

13)    Larsen D, Stamm BH, Davis K, et al. Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers. *Telemedicine Journal and e-Health*. 2004;(10, Suppl. 2): S81-90 (**CDCR 262-72**);

14)    Morgan RD, Patrick AR, Magellatta PR, Does the Use of Telemental Health Alter the Treatment Experience? Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities. *Journal of Consulting and Clinical Psychology*. 2008;76(1):158-162 (**CDCR 274-78**);

15)    Myers K, vander Stoep A, Zhou C, et al. Effectiveness of a Telehealth Service Delivery Model for Treating Attention-Deficit Hyperactivity Disorder: Results of a Community-Based Randomized Controlled Trial. *J Amer Asso Child Adolesc Psychiatry* 2015;54(4):263-74 (**CDCR 280-304**);

16)    O'Reilly R, Bishop J, Maddox K, Hutchison L, et al.  Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results From a Randomized Controlled Equivalence Trial. *Psychiatric Services* 58:836-843, 2007 (**CDCR 306-13**);

17)    US Department of Justice, Federal Bureau of Prisons, Program Statement, Subject: Psychiatric Services, 2005; OPI: HSD/PSY, Number P6340.04, dated 1/15/05. Available at https://www.bop.gov/policy/progstat/6340_004.pdf  (**CDCR 315-30**);

18)    Rayman RB. 1992, Telemedicine: Military Applications.  *Aviation, Space, and Environmental Medicine*. 1992;63(2):135-7 (**CDCR 332-35**);

19)    Shore JH. Telepsychiatry: Videoconferencing in the Delivery of Psychiatric Care. *American Journal of Psychiatry*. 2013;170:256-62 (**CDCR 337-43**);

20)    National Commission on Correctional Health Care, Position Statement, "Use of Telemedicine Technology in Correctional Facilities," *Journal of Correctional Health Care*, Volume 6, Issue 1 (1998, reprinted due to an error in 1999) (**CDCR 345-53**); and

21)  Zollo S, Kienzle M, Loeffelholz P, et al. Telemedicine to Iowa's Correctional Facilities: Initial Clinical Experience and Assessment of Program Costs. *Telemedicine Journal*. 1999;5(3):293-301 (**CDCR 355-65**).

Matthew A. Lopes, Jr., Esq.
July 6, 2018
Page 4

Please note that the three following references in Dr. Penn's report are copyrighted and cannot be reproduced: (1) National Commission on Correctional Health Care. *Standards for Health Services in Prisons*. 2018, p. 156; (2) National Commission on Correctional Health Care. *Standards for Mental Health Services in Correctional Facilities*. 2015, pages 76-79; and (3) Trestman, RL (Chair), Metzner JL, Penn JV, et al. *Psychiatric Services in Correctional Facilities: Third Edition*. A Work Group Report of the American Psychiatric Association. American Psychiatric Publishing. 2015.

Finally, the report's references to the American Psychiatric Association can be found at:

https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/evidence-base;

https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/practice-guidelines; and

https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/telepsychiatry-toolkit-home

Defendants continue to collect material responsive to your request and will submit their final position on telepsychiatry, along with additional supporting materials, by the July 12, 2018 deadline.

Sincerely,

*/s/ Andrew Gibson*

Andrew M. Gibson
Deputy Attorney General

For    XAVIER BECERRA
Attorney General

Enclosure

cc:    Plaintiffs' counsel

# Telepsychiatry in Correctional Healthcare

The following report is provided by:

Joseph V. Penn, MD, CCHP, FAPA

Director, Mental Health Services, UTMB CMC, Conroe, Texas

Clinical Professor, Department of Psychiatry, UTMB, Galveston, Texas

Diplomate, American Board of Psychiatry and Neurology (ABPN)

Triple Board Certified in General Adult, Child and Adolescent and Forensic Psychiatry

**Purpose**

The purpose of this report is to provide the following:

1) A summary of current scientific and clinical literature regarding telepsychiatry, specifically the merits of telepsychiatry in correctional and "free world" community settings,

2) A focused overview regarding the use of telepsychiatry within state correctional settings in the United States,

3) A brief summary of my extensive experience in evaluating, diagnosing, and treating complicated incarcerated adult and juvenile patients via telepsychiatry, and my administrative role and direct involvement in the use and expansion of telepsychiatry for different incarcerated patient populations across a variety of correctional settings.

**Professional Opinions**

I render the following opinions to a reasonable degree of medical, psychiatric, and scientific certainty:

1) Telepsychiatry is a standard, widely accepted, and effective method of providing psychiatric evaluation and treatment for all mentally ill patients and is generally no less effective or therapeutic than face-to-face treatment.

2) Telepsychiatry is a standard, widely accepted, and effective method of psychiatric evaluation and treatment delivery system for individuals in residential treatment, both within correctional and non-correctional patient populations.

1

**Training and Qualifications**

My training and qualifications are detailed in my C.V. and will not be repeated here.  By way of brief review, subsequent to medical school, I pursued specialty training in general, child and adolescent and forensic psychiatry. I have achieved board certification in all three specialties.  I also have had my certification as a Certified Correctional Health Professional (CCHP) since 2004.  I have also maintained ongoing communication with other individuals who provide direct clinical, administrative, and consultative work within correctional settings across the United States and internationally.  I have dedicated my twenty-year career to the psychiatric care of patients within correctional settings.

I have been the Mental Health Director of the University of Texas Medical Branch (UTMB) Correctional Managed Care (CMC), a university-based correctional health care system since February 2008.  In this capacity, I oversee the provision of psychiatric and mental health services to approximately 116,000 (80%) adult offenders housed within Texas Department of Criminal Justice (TDCJ) facilities. I also manage the psychiatric services to approximately 1500 youthful offenders housed statewide within secure residential facilities and halfway houses in the Texas Juvenile Justice Department (TJJD). I also oversee the delivery of telepsychiatry services to the patients detained in the Bexar and Victoria county jails.

I routinely attend and present at correctional healthcare conferences and serve on several committees for the National Commission on Correctional Health Care (NCCHC) and the American Correctional Association (ACA).  I served on the two most recent NCCHC task forces that revised the NCCHC standards for jails and prisons.  I have participated in various American Psychiatric Association (APA), American Academy of Psychiatry and the Law (AAPL), and American Academy of Child and Adolescent Psychiatry (AACAP) committees and work groups that focused on adult and juvenile correctional health best practices, development of correctional standards, and position statements.  I consult nationally regarding the provision of psychiatric and mental health care to jails, prisons, and other correctional settings, and have been qualified and rendered testimony at depositions and trials as an expert witness.

Due to my work experience and career focus on correctional psychiatry, I am uniquely qualified to render opinions regarding the provision of psychiatric services in correctional settings, including opinions concerning the effectiveness of telepsychiatry when compared to in-person psychiatric services.

2

CDCR _002

**Historical Uses of Telemedicine and the Need for Telepsychiatry**

Historically, the earliest and most widespread uses of telemedicine have included practice settings such as the military, rural locations, and prisons (Dorsey et al. 2016, Rayman 1992, Galli et al. 2008).  Telemedicine has been used to evaluate and monitor chronic diseases such as hypertension, diabetes, and asthma. Telemedicine is particularly useful for patients who are homebound, have limited mobility or transportation, or are living in rural areas without ready access to specialists.  (Bashur et al. 2014)

Correctional systems, especially prisons, are the ideal setting for the use of telemedicine for a variety of reasons.  According to *Psychiatric Services in Correctional Facilities: Third Edition.* American Psychiatric Association (2015):

> "Telepsychiatry supplements onsite psychiatry services in many correctional settings.  Many state medical boards endorse the use of telemedicine and telepsychiatry and have promulgated rules on the practice of telemedicine and telepsychiatry and grant limited telemedicine licenses.  The American Telemedicine Association and several mental health professional groups have developed practice guidelines for telepsychiatry."

> "Correctional settings lend themselves well to telepsychiatry use.  Often these facilities are in rural communities where access to psychiatric services is limited or absent."

Providing consistent quality psychiatric treatment to the growing number of offenders with mental illness has been a significant challenge for most correctional systems.  Most prison systems have difficulty retaining the number of on-site psychiatrists required to meet the needs of the mental health population. Telepsychiatry has been demonstrated to improve access to mental health care in correctional environments.

The struggle to find competent psychiatrists and the increased access requirements created by an expanding mental health population, were the primary drivers behind the creation of a comprehensive state-wide telepsychiatry program for Texas state offenders.  The telepsychiatry program has resulted in improved access and a more equitable distribution of mental health resources.  UTMB CMC's use of telepsychiatry has become an exemplary model of service delivery within state correctional systems, and is being aggressively pursued by many correctional systems.

3

**Benefits of Telepsychiatry and Evidence to Support Its Expanded Use**

Telepsychiatry has been successfully used to provide clinical services and educational initiatives in areas underserved by psychiatrists and other mental health care specialists. Telepsychiatry is an acceptable approach to providing high quality psychiatric services to correctional, residential, and community populations. It increases access to care, enables specialty consultation, yields positive outcomes, allows reliable evaluation, and satisfies the requirements of both patients and providers.

According to the American Psychiatric Association (2018), there is ample evidence to support the use of telepsychiatry:

"Telepsychiatry's evidence base is substantial and satisfaction is extremely high among patients, psychiatrists and other professionals."

"Its effectiveness is comparable to in-person care in terms of therapeutic engagement, quality of care, validity/reliability of assessment, and clinical outcomes. There are two types of study design: head-to-head comparison or non-inferiority (i.e., as good as)."

"The evidence base is formidable for children, adolescents and adults regarding assessment (diagnostic, cognitive, other) and treatment (medication, therapy)."
"Preliminary studies in geriatric patients and across cultures are positive. Indeed, it may facilitate cultural, ethnic and language matching between patients and providers."

"The experience other mental health clinicians using telemedicine (i.e., telemental health), is consistent with, and further substantiates the diagnostic, therapeutic and outcome evidence base."

"Care models that have good evidence include direct care, consultation to primary care and collaborative care. It is being studied specifically, now, as a way to leverage psychiatric expertise in stepped and integrated care models, too."

"There are a few populations in which it may be preferable to in-person care (e.g., autism spectrum, severe anxiety disorders, and geriatric patients with physical limitations, those with significant geographical obstacles)."

4

"Telepsychiatrists adjust clinical care in a few ways to make it as personal as in-person care. First, they may project a little more in terms of gestures, just as if one is giving a presentation to a large group. Second, it helps to check-in to see how the patient is experiencing it. Third, verbal communication may replace handshakes, handing a tissue box and such. Finally, if a particular examination item is less facile at a distance, another staff or accompanying person can help."

Empirical research and published data have demonstrated that telepsychiatry is successfully being utilized for a variety of clinical services and educational initiatives. Numerous health care organizations such as the Veterans Administration have been using telemedicine and telepsychiatry for many years to provide emergency medicine, critical care, surgical consultation, and psychiatry services. Many well-respected national and international academic medical centers including the University of Texas Medical Branch, (Galveston), Texas Tech Health Sciences Center (Lubbock), Columbia University (New York), University of Washington (Seattle), University of California, Davis (Sacramento); Medical Center of Georgia (Augusta), Wake Forrest University School of Medicine (Winston-Salem, NC), East Carolina University, (Greenville, NC), Emory University (Atlanta, GA), University of Colorado, (Denver), University of South Carolina (Charleston), the Veteran Administration Capitol Network Mental Illness Research Education and Clinical Center (Baltimore, MD), the University of Toronto, are routinely using telepsychiatry to provide quality care to the patients they serve.

The clinical efficacy of telemedicine and telepsychiatry has also been demonstrated in different practice settings in the US, including academic medical and rural settings – these include family practice, pediatrics, child and adolescent psychiatry, general adult psychiatry, VA mental health outpatients, American Indian and Alaska Native Programs, geriatric, pediatric dental, obstetrical, and pediatric ophthalmology. More importantly, telemedicine and telepsychiatry have an established exemplary history of use in the correctional setting. Specifically, telepsychiatry has been demonstrated to successfully deliver services to incarcerated adolescents and adults with a wide range of mental health diagnoses.

**Acceptance and Standard Use of Telepsychiatry in the US and Worldwide**

Telepsychiatry is not unique to Texas or the United States. It has been utilized effectively and studied internationally, including Canada, United Kingdom, Spain, Finland, Norway, Australia, Israel, and China. For example, researchers from the University of Alberta, Canada, found the following results:

5

"The availability of telepsychiatry led to an estimated cost saving of $210 per consultation for patients who would otherwise have had to travel. From the patient's perspective, telepsychiatry was an acceptable technique in the management of mental health difficulties that both increased access to services and produced cost savings."

In terms of cost, most reports indicate that correctional telemedicine programs are cost effective over time (National Institute of Justice, 1999; Zollo et al., 1999). The cost of the equipment is frequently reported as the initial start-up barrier to implementation. Other barriers include resistance from healthcare providers and lack of technical expertise (Larsen et al., 2004). However, after full implementation, Telepsychiatry allows for better management of physician costs and reduces exposure to the more expensive secondary labor market.

**Acceptance of Telepsychiatry within "Free World" Community and Correctional Settings Nationally**

Telepsychiatry is accepted as a standard vehicle for evaluation and treatment of mental health patients in the "free world" community as evidenced by recent "Telepsychiatry Practice Guidelines (2018)" developed and promulgated by the American Psychiatric Association (APA). Due to the increased utilization of telepsychiatry nationally, the APA has released a Telepsychiatry Toolkit developed by the APA Work Group on Telepsychiatry. The Telepsychiatry Toolkit is available to all APA members. It is described as "an evolving resource for members who want to learn about the various aspects of telepsychiatry, including clinical, training, and policy considerations. As new topics emerge, more resources and information will be added to this toolkit. The toolkit uses leading psychiatrists to cover topics such as history, training, practice/clinical, reimbursement, and legal issues associated with telepsychiatry practice.

The National Commission on Correctional Health Care (NCCHC) adopted a position statement, "Use of Telemedicine Technology in Correctional Facilities," in 1997, and it was published in the Spring 1998 *Journal of Correctional Health Care*. The position statement noted that the use of telemedicine "affords correctional facilities many opportunities for reducing operational costs associated with providing health care to confined individuals." The position statement also clarified, "Regardless of the type and combination of technologies used to provide medical care, the basic principles governing the physician/patient relationship must remain intact." Issues of patient consent, documentation and storage of information, and correctional health care professional licensing, training and education were paramount.

6

According to *Psychiatric Services in Correctional Facilities: Third Edition*. American Psychiatric Association (2015):

> "Telepsychiatry is becoming a more accepted practice in correctional settings and in the community as the shortage of psychiatrists increases. Greater comfort by correctional mental health professionals with this technology increases accessibility of expeditious services for patients."

> "Telepsychiatry sessions are scheduled like other sessions with mental health professionals. The equipment may be used for other purposes in the clinic, so scheduling should be coordinated. If the facility uses stationary videoconferencing equipment, placement near the medical or psychiatric clinic areas in an office that provides sound privacy facilitates clinical access.

A Texas Tech University Department of Psychology article published in the February 2008 Journal of Consultation and Clinical Psychology found:

> "No significant differences in inmates' perception of the work alliance with a mental health professional, post session mood (internal feeling state), or overall satisfaction with services when tele-mental health and face-to-face modalities were compared within each type of mental health service."

**Development of a Statewide Telepsychiatry Network TDCJ Facilities**

UTMB-CMC has provided medical, dental, and mental health care to TDCJ state prisoners since 1994. Recognizing early on the challenges of trying to recruit and retain psychiatrists to practice within TDCJ facilities, UTMB-CMC developed a long-term telepsychiatry strategy for the provision of services to mentally ill TDCJ patients. The strategy involved moving all outpatient psychiatric care from a face-to-face modality to telepsychiatric service. UTMB CMC created a series of Hub facilities that were located in major urban centers such as Houston and Austin. The Hub facilities are simply retail office space that has been modified into multiple telepsychiatric studios. Recruiting qualified psychiatrists to this non-prison environment improved the organization's success dramatically, and within 12 months eliminated a 25% psychiatry vacancy rate. All existing outpatient psychiatrist vacancies were filled with full time state employees.

The new delivery model delivered the anticipated outcomes. All TDCJ facilities achieved and have maintained accreditation by the American Correctional Association (ACA).

7

CMC has been able to meet all psychiatric access metrics as specified in its contract with TDCJ. As of May 2018, UTMB CMC has provided over 400,000 telepsychiatry encounters since the inception of the program.

On-site psychiatric services are limited to crisis management, inpatient diagnostics and evaluations, and inpatient treatment-track patients admitted to one of three mental health behavioral health centers statewide. Although onsite psychiatric services are the primary modality in these settings, telepsychiatry has been successfully utilized, when clinically indicated, to supplement on-site psychiatric services at all of these facilities. Psychiatric providers also see certain non-ambulatory offender patients on-site in regional medical facilities, infirmaries, and assisted living facilities when clinically necessary.

UTMB CMC has seen a significant increase (50%) in the number of qualified applicants for telepsychiatry positions as compared to the past when only on-site psychiatric positions were available. Telepsychiatry hubs in metropolitan locations have been shown to be preferred locations to work as opposed to the prison clinics. The hubs allow the telepsychiatrist the opportunity to professionally consult with other psychiatric colleagues thereby reducing isolation and professional burn-out. Overall there is a high degree of job satisfaction with the CMC telepsychiatrist as compared to the historic on-site model. The quality of care has improved substantially due to reduced turnover and improved access to care for all patients. The hubs also allow for significantly improved coverage during psychiatrists' scheduled or unscheduled leave or vacation, improving patient access and psychiatrist job satisfaction.

UTMB CMC utilizes telepsychiatry for all outpatient TDCJ facilities as the primary service delivery mode. Facilities that are easily amenable to telepsychiatry, due to the reduced security level, include state jails, intake/transfer facilities, and minimum or medium intuitional division facilities. In spite of physical plant and offender movement/transportation challenges, we have successfully implemented the use of telepsychiatry to provide psychiatric services in maximum or high-security facilities. This has required increased coordination among mental health, medical, and security departments.

Telepsychiatry clinics are operated in the same manner as if the providers were on-site: qualified mental health or other health care professionals with knowledge of the patient participate in all sessions, facilitating the flow of pertinent information to and from the psychiatric provider. Between clinics, the psychiatric provider is available by phone or e-mail for consultation, medication orders and other routine as well as urgent referrals.

8

In the event of a technical issue or unforeseeable event that impacts a particular facility, a psychiatrist may travel to facilities to see patients on-site as the need arises.

As of June 4, 2018, all outpatient TDCJ facilities in the UTMB sector are receiving telepsychiatry services exclusively. This strategy utilizes telepsychiatry in most outpatient facilities statewide while maintaining a sufficient amount of on-site psychiatric coverage to serve cover the inpatient psychiatric facilities. All providers of telepsychiatry are familiar with on-site facility operations and are available to travel to facilities as necessary to see patients in person.

**Patient Satisfaction, Patient Safety and Adverse/Negative Patient Outcomes**

According to *Psychiatric Services in Correctional Facilities: Third Edition.* American Psychiatric Association (2015):

> "Studies have shown that patients who receive psychiatric services via teleconferencing have had no negative consequences and quickly adapt to the technology.

Although published studies comparing satisfaction with telepsychiatry visits versus face-to-face encounters are limited, all have concurred that telemedicine was equal to or the same as face-to-face encounters (Brodey et al., 2000, Glaser et al., 2010, Brecht et al. 1996, Morgan et al., 2008). A Canadian study (O'Reilly et al., 2007) that compared a variety of clinical outcomes after psychiatric consultation of a sample of 495 community-based outpatients who were randomly assigned to be examined face to face or by telepsychiatry, "Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results from a Randomized Controlled Equivalence Trial," revealed the following results:

> "Psychiatric consultation and follow-up delivered by telepsychiatry produced clinical outcomes that were equivalent to those achieved when the service was provided face to face. Patients in the two groups expressed similar levels of satisfaction with service. An analysis limited to the cost of providing the clinical service indicated that telepsychiatry was as least 10% less expensive per patient than service provided face to face."

The researchers concluded the following:

> "Psychiatric consultation and short-term follow-up can be as effective when delivered by telepsychiatry as when provided face to face..."

9

CDCR _009

Telepsychiatry is utilized to improve access to care and continuity of care and improve patient safety. According to *Psychiatric Services in Correctional Facilities: Third Edition.* American Psychiatric Association (2015):

> "Another use of telepsychiatry is observation of a patient during afterhours crises or for suspected medication side effects (involuntary movements are used later in the text as an example). Using remote visualization may avoid the costs associated with emergency transportation."

I performed a PubMed search on 6/3/18 using the search engine items, "negative patient outcomes, telepsychiatry, and telemedicine" and similarly, "adverse patient outcomes, telepsychiatry, and telemedicine" and found no articles or references to the search terms. I am not aware of any adverse or negative patient outcomes utilizing telepsychiatry within the UTMB CMC mental health system. I have presented on the use of telepsychiatry at national correctional meetings and have discussed the use of telepsychiatry with other community and correctional psychiatrists nationally and internationally, and I do not recall anyone describing a single instance of adverse or negative patient events or outcomes related to telepsychiatry.

Thus far, there is no evidence that telepsychiatry has any absolute exclusion criteria or contraindications for any specific psychiatric diagnoses or treatment (Shore 2013). In prisons across the US, the most widely used application for telemedicine is the provision of psychiatric care (Stec, et al. 2012; and Deslich, et al. 2013). The US Department of Justice released a report on the evaluation of a prison telemedicine network in March 1999 (U.S. Department of Justice 1999). The evaluation "demonstrated convincingly that after telemedicine was established within the Federal Bureau of Prisons (FBOP), it was widely embraced by officials and prisoners." Further the evaluation established that a correctional agency such as the BOP can add telepsychiatry services to its healthcare program with the expectation that taxpayer dollars will not be wasted and, if anything, substantial savings associated with the new technology may be realized. Thus, in addition to state prisons, telepsychiatry is also widely used in the FBOP (Program Statement re: Psychiatric Services, U.S. Department of Justice Federal Bureau of Prisons, 2005; and personal communication, J Penn with Dr. Donald Lewis, Chief of Psychiatry, Central Office, BOP).

I have performed specialized psychiatric evaluations and have rendered treatment to TDCJ state prisoners via telepsychiatry. In the course of these evaluations a majority of the patients have expressed to me their preference to be evaluated via telepsychiatry.

10

They appreciate the convenience and consistency of the care provided through telepsychiatry. They expressed no concerns about talking to the psychiatrist over the monitor, and in fact, some patients felt it was preferred to a face-to-face encounter.

**Concerns Regarding "Residential" Designation of State Prisoners**

Concerns have been raised that telepsychiatry, while being a useful evaluation and treatment modality for outpatients, will not satisfy the evaluation and treatment requirements of CDCR state prisoners who are in the Enhanced Outpatient Program (EOP). It has been suggested that the clinical needs of EOP patients are more consistent with patients typically found in residential treatment programs. Such patients may require a higher level of care and have more clinical needs which may necessitate a greater need for face-to-face psychiatric evaluations.

Based on my background, training, and review of CDCR policies, procedures and other materials, it is my professional opinion that it is clinically appropriate for CDCR inmates who meet the program designation as an EOP patient to have their psychiatric care delivered through telepsychiatry. As noted below, it would always be the psychiatrist's clinical prerogative to request psychiatric care to be done in an inpatient setting or face to face.

According to *Psychiatric Services in Correctional Facilities: Third Edition*. American Psychiatric Association (2015):

> "Psychiatrists and other mental health staff need selection criteria to ensure the appropriateness of patients for videoconferencing (telepsychiatry) services. Patients who are acutely psychotic or paranoid may have difficulty being seen remotely and may be unable to give consent to participate in this treatment modality."

Also, according to *Psychiatric Services in Correctional Facilities: Third Edition*. American Psychiatric Association (2015) in the section, "Levels of Care:"

> "Mental health services are generally provided in a continuum of treatment settings or levels of care. These levels of care include outpatient, residential, crisis intervention, infirmary, and inpatient services. Outpatient treatment is the least intensive level. Patients live in a general population housing unit with other inmates, many of whom do not need psychiatric care. Residential treatment programs are more intensive and usually exist in dedicated housing. As with similar programs in the community, residential treatment is provided for patients with chronic and serious

11

mental illness who do not require acute care but do need enhanced services. These designated housing units provide a therapeutic environment for those patients who may not function adequately in the general population."

"Crisis intervention includes supervised stabilization and/or diagnostic assessment, often in an infirmary setting, and short-term counseling. A psychiatric inpatient program is the most intensive level of care…"

Within the UTMB CMC mental health program there are several specialized residential treatment programs for TDCJ state prisoners. The following are some examples:

1. Developmental Disabilities Program (DDP) for males: TDCJ Hodge Unit, Rusk, Texas (This is a specialized mental health residential diagnostic and treatment program for individuals with intellectual and adaptive functioning impairments)

2. DDP for females: TDCJ Crain Unit, Valley Satellite, Gatesville, Texas (identical mission to the male DDP program)

3. Substance Abuse Felony Punishment Facility (SAFPF) / In-Prison Therapeutic Community (IPTC) programs for males and females: several TDCJ facilities, statewide. (Described earlier in this report)

4. Mental Health Therapeutic Diversion Program (MHTDP): There are two specialized mental health treatment programs for offenders previously assigned to restrictive housing formerly known as administrative segregation "ad seg." These treatment programs help these offenders achieve the optimal level of functioning in a therapeutic diversion residential setting, so they can successfully transition into a less restrictive (non "ad seg") housing assignment. TDCJ Hughes Unit, Gatesville, Texas, and TDCJ Michael Unit, Tennessee Colony, Texas

5. Chronic Mentally Ill (CMI) Inpatient and Outpatient Treatment Programs. Located within the following units: TDCJ Hughes Unit, Gatesville, Texas, and TDCJ Michael Unit, Tennessee Colony, Texas, and the PAMIO program, TDCJ Clements Unit, Amarillo, Texas (described earlier in this report). The CMI program is a specialized residential treatment program for individuals with serious mental illnesses who require specialized treatment to improve their active involvement in psychotropic medication compliance, attention to activities

12

of daily living, with a goal to reduce crisis management admissions/off-site transfers, disciplinary infractions, and to improve their general level of functioning.

The majority of psychiatric evaluation, treatment, and consultative services for all of the above specialized "residential" treatment programs based at TDCJ facilities are currently delivered via telepsychiatry.   In addition, when we have experienced challenges in recruiting and retaining on-site psychiatrists at the Skyview inpatient mental health facility in Rusk, Texas, CMC has routinely provided supplemental psychiatric evaluation and treatment services via telepsychiatry to inpatient state prisoners who are in the crisis management, diagnostic and evaluation, and other treatment tracks.

**Conclusions**:

I have served in my role as the Director of Mental Health Services for UTMB CMC for over 10 years.  I have personally overseen the growth and expansion of telepsychiatry within the TDCJ healthcare system.  I have utilized this modality to evaluate, diagnose, and treat the complex mental health pathology of adult TDCJ state offenders as well as juveniles incarcerated in the TJJD residential facilities.  It is my professional opinion that telepsychiatry is an effective and established mode of care delivery.  Telepsychiatry is comparable if not superior to face-to-face psychiatric encounters.  Telepsychiatry has been demonstrated to have a high degree of both patient and provider satisfaction.  The use of telepsychiatry has been critical to UTMB CMC maintaining its contractual requirements in providing timely access to psychiatric care.

There is great potential for using telepsychiatry to expand access to mental health services to correctional populations. Correctional telepsychiatry is a distinctly more attractive practice opportunity than working behind prison walls.  It provides correctional systems the opportunity to hire the best and the brightest psychiatrists, rather than struggle with vacancies and the use of agency providers.  It is the psychiatrist who creates the quality proposition for care delivery rather than the location of the provider and patient.  Without the use of this technology, UTMB CMC would not be able to recruit and retain qualified psychiatrists to deliver the requisite psychiatric services to the mental health populations of TDCJ, TJJD, and the county jails it serves.

In conclusion, based on my administrative acumen and clinical experiences in providing direct patient care, it is my professional opinion that telepsychiatry is, at a minimum, equivalent to onsite psychiatric care, if not a significant improvement over the traditional face-to-face methodology.

13

**References**

American Psychiatric Association. Washington, D.C.
Available at: https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/evidence-base
https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/practice-guidelines
https://www.psychiatry.org/psychiatrists/practice/telepsychiatry/telepsychiatry-toolkit-home

Bashur RL, Shannon BW, Smith BR, et al. The Empirical Foundations of Telemedicine Interventions for Chronic Disease Management. *Telemedicine and e-Health*, 2014;20:769-800.

Brecht RM, Gray CL, Peterson C, et al. The University of Texas Medical Branch – Texas Department of Criminal Justice Telemedicine Project: Findings from The First Year of Operation. *Telemedicine Journal*.1996;2(1):25-35.

Brodey BB, Claypoole KH, Motto J, et al. Satisfaction of Forensic Psychiatric Patients with Remote Telepsychiatry Evaluation. *Psychiatric Services*. 2000;51(10):1305-7.

Deslich S, Stec B, Tomlin S, et al. Telepsychiatry in the 21st Century: Transforming Healthcare with Technology. *Perspectives in Health Information Management*. 2013;10(Summer).
Available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3709879/

Dorsey ER, Topol EJ. State of Telehealth. *New England Journal of Medicine* 2016;375:1-2.

Galli R, Keith JC, McKenzie K, et al. TelEmergency: A Novel System for Delivering Emergency Care to Rural Hospitals. *Annals of Emergency Medicine*. 2008;51:275-84.

Glaser M, Winchell T, Plant P, et al. Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana. *Telemedicine Journal and e-Health*. 2010;16(4):472-9.

Hilty DM, Ferrer DC, Parish MB, et al. The Effectiveness of Telemental Health: A 2013 Review. *Telemed J E Health* 2013;(19):444-454.

14

Hilty DM, Yellowlees PM, Parish MB, et al. Telepsychiatry: Effective, Evidence-Based and At a Tipping Point in Healthcare Delivery. *Psych Clin N Amer* 2015;38(3):559-592.

Larsen D, Stamm BH, Davis K, et al. Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers. *Telemedicine Journal and e-Health*. 2004;(10, Suppl. 2): S81-90.

Morgan RD, Patrick AR, Magellatta PR, Does the Use of Telemental Health Alter the Treatment Experience? Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities. *Journal of Consulting and Clinical Psychology*. 2008;76(1):158-162.

Morgan, R. D., Patrick, A. R., & Magaletta, P. R. Does the Use of Telemental Health Alter the Treatment Experience? Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities. *Journal of Consulting and Clinical Psychology,* 2008;76(1), 158-162.

Myers K, vander Stoep A, Zhou C, et al. Effectiveness of a Telehealth Service Delivery Model for Treating
Attention-Deficit Hyperactivity Disorder: Results of a Community-Based Randomized Controlled Trial. *J Amer Asso Child Adolesc Psychiatry* 2015;54(4):263-74.

National Commission on Correctional Health Care. *Standards for Health Services in Prisons*. 2018, p. 156

National Commission on Correctional Health Care. *Standards for Mental Health Services in Correctional Facilities*. 2015, pages 76-79

National Commission on Correctional Health Care, Position Statement, "Use of Telemedicine Technology in Correctional Facilities," *Journal of Correctional Health Care*, Volume 6, Issue 1 (1998, reprinted due to an error in 1999).

National Institute of Justice. Telemedicine Can Reduce Correctional Health Care Costs: An Evaluation of a Prison Telemedicine Network. Report no. NCJ 175040, Washington DC: US Department of Justice, 1999.

O'Reilly R, Bishop J, Maddox K, Hutchison L, et al. Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results From a Randomized Controlled Equivalence Trial. *Psychiatric Services* 58:836-843, 2007.

15

Rayman RB. 1992, Telemedicine: Military Applications. *Aviation, Space, and Environmental Medicine*. 1992;63(2):135-7.

Shore JH. Telepsychiatry: Videoconferencing in the Delivery of Psychiatric Care. *American Journal of Psychiatry*. 2013;170:256-62.

Stec B, Coustasse A. Benefits and Constraints of Telepsychiatry Utilization in the United States. Business and Health Administration Association Annual Conference 2012. Available at http://mds.marshall.edu/mgmt_faculty/60

Trestman, RL (Chair), Metzner JL, Penn JV, et al. Psychiatric Services in Correctional Facilities: Third Edition. A Work Group Report of the American Psychiatric Association. American Psychiatric Publishing. 2015

US Department of Justice, Office of Justice Programs, National Institute of Justice: Telemedicine Can Reduce Correctional Health Care Costs: An Evaluation of a Prison Telemedicine Network. (1999) Available at https://www.ncjrs.gov/pdffiles1/175040.pdf

US Department of Justice, Federal Bureau of Prisons, Program Statement, Subject: Psychiatric Services, 2005; OPI: HSD/PSY, Number P6340.04, dated 1/15/05. Available at https://www.bop.gov/policy/progstat/6340_004.pdf

Yellowlees PM, Hilty DM, Mucic D: "Global/World Wide Telehealth: International Perspectives of Telepsychiatry and the Future." *In Key Issues in e-Mental Health*. Eds Mucic D, Hilty DM, Springer Publishing, pp. 233-250, 2015

Zollo S, Kienzle M, Loeffelholz P, et al. Telemedicine to Iowa's Correctional Facilities: Initial Clinical Experience and Assessment of Program Costs. *Telemedicine Journal*. 1999;5(3):293-301.

CDCR _016

# ATTACHMENT 1

CDCR _017

# Original Research

## The Empirical Foundations of Telemedicine Interventions for Chronic Disease Management

Rashid L. Bashshur, PhD,[1] Gary W. Shannon, PhD,[2] and Brian R. Smith, MS[1]

Contributing Authors: Dale C. Alverson, MD,[3] Nina Antoniotti, PhD, RN,[4] William G. Barsan, MD,[5] Noura Bashshur, MHSA,[1] Edward M. Brown, MD,[6] Molly J. Coye, MD,[7] Charles R. Doarn, MBA,[8] Stewart Ferguson, PhD,[9] Jim Grigsby, PhD,[10] Elizabeth A. Krupinski, PhD,[11] Joseph C. Kvedar, MD,[12] Jonathan Linkous, MPA,[13] Ronald C. Merrell, MD,[14] Thomas Nesbitt, MD,[15] Ronald Poropatich, MD,[16] Karen S. Rheuban, MD,[17] Jay H. Sanders, MD,[18] Andrew R. Watson, MD,[16] Ronald S. Weinstein, MD,[11] and Peter Yellowlees, MD[15]

[1]E-Health Center, University of Michigan Health System, Ann Arbor, Michigan.
[2]Department of Geography, University of Kentucky, Lexington, Kentucky.
[3]University of New Mexico, Albuquerque, New Mexico.
[4]Marshfield Clinic, Marshfield, Wisconsin.
[5]University of Michigan Health System, Ann Arbor, Michigan.
[6]Ontario Telemedicine Network, Toronto, Ontario, Canada.
[7]University of California at Los Angeles, Los Angeles, California.
[8]Family and Community Medicine, University of Cincinnati, Cincinnati, Ohio.
[9]Alaska Native Tribal Health Consortium, Anchorage, Alaska.
[10]University of Colorado Denver, Denver, Colorado.
[11]University of Arizona, Tucson, Arizona.
[12]Partners Health Care, Harvard University, Cambridge, Massachusetts.
[13]American Telemedicine Association, Washington, D.C.
[14]Virginia Commonwealth University, Richmond, Virginia.
[15]University of California Davis, Sacramento, California.
[16]University of Pittsburgh Medical Center, Pittsburgh, Pennsylvania.
[17]University of Virginia, Charlottesville, Virginia.
[18]The Global Telemedicine Group, McLean, Virginia.

## Abstract

*The telemedicine intervention in chronic disease management promises to involve patients in their own care, provides continuous monitoring by their healthcare providers, identifies early symptoms, and responds promptly to exacerbations in their illnesses. This review set out to establish the evidence from the available literature on the impact of telemedicine for the management of three chronic diseases: congestive heart failure, stroke, and chronic obstructive pulmonary disease. By design, the review focuses on a limited set of representative chronic diseases because of their current and increasing importance relative to their prevalence, associated morbidity, mortality, and cost. Furthermore, these three diseases are amenable to timely interventions and secondary prevention through telemonitoring. The preponderance of evidence from studies using rigorous research methods points to beneficial results from telemonitoring in its various manifestations, albeit with a few exceptions. Generally, the benefits include reductions in use of service: hospital admissions/readmissions, length of hospital stay, and emergency department visits typically declined. It is important that there often were reductions in mortality. Few studies reported neutral or mixed findings.*

Key words: *telemedicine, telehealth, telemonitoring, evidence, chronic disease, telestroke, telepulmonology*

## Introduction and Overview

This report provides an analysis of the extant scientific evidence concerning the impact of telemedicine on three critical issues in healthcare—access, quality, and cost—with a focus on chronic disease management. We begin with a cursory review of these issues in the United States, followed by a brief discussion of the history and promise of telemedicine in addressing them. Subsequently, the focus turns to a review of the available evidence from rigorous empirical studies regarding the effects of telemedicine in the management of chronic diseases, specifically, congestive heart failure (CHF), stroke, and chronic obstructive pulmonary disease (COPD). Finally, we turn our attention to the economics of telemedicine.

The reasons for our focus on the management of chronic diseases are twofold. (1) The vast number of published research articles dealing with the wide variety of telemedicine applications and the need to reach a conclusion regarding the available evidence render an all-inclusive approach rather impractical. More important is that a voluminous report may not add a commensurate amount of information that would alter the conclusions reached by a focused approach. (2) Chronic disease is highly prevalent, is predicted to increase substantially in the foreseeable future, and is costly and potentially manageable via telemedicine.

For convenience and clarity, we use "telemedicine" as an inclusive term throughout this report to refer to the delivery of healthcare via information and communication technology (ICT). As such, it includes "telehealth," "e-health," "mobile health" (m-health), and "connected health."

DOI: 10.1089/tmj.2014.9981    © MARY ANN LIEBERT, INC. • VOL. 20    NO. 9 • SEPTEMBER 2014    TELEMEDICINE and e-HEALTH 769

CDCR_018

**BASHSHUR ET AL.**

Beyond the Patient Protection and Affordable Care Act, a wide range of reforms is necessary to address intransigent problems in healthcare delivery in the United States and worldwide. These include inequities in the availability and access to health services for significant segments of the population, inefficiencies in the prevailing modes of healthcare delivery and financing, uneven distribution of quality, escalating cost, and the prevalence of adverse lifestyles that tend to exacerbate these problems. Concurrently, dramatic advances in the capabilities of ICT and its expanding vital role in all sectors of modern society present a compelling case for a thorough examination of the underlying evidence and its appropriate deployment in healthcare. Indeed, the use of ICT in healthcare lags behind in comparison with other sectors in society, including commerce, education, transportation, entertainment, and finance. It is time to examine the empirical evidence regarding the effectiveness and efficiency of ICT in the health sector for lessons learned and for optimal deployment of these systems.

## The Differentials in Access, Quality, and Cost

Differences in *access* to care reflect economic, geographic, and functional as well as social, cultural, and psychological factors. Whereas the Affordable Care Act was implemented mostly to relieve the economic burden of medical care access for those currently without insurance or underinsured, there remain sizeable segments of the population (including the insured) with limited access to care by virtue of where they live and work or having chronic health problems that require continual care and attention. Residents of rural and isolated areas are frequently faced with limited medical resources within reasonable driving distance/time, whereas many residents of the inner city have limited access to medical resources for economic reasons. It is important that a large and growing segment of the population suffers from chronic diseases and can benefit from improved spatial–temporal access to health resources while trying to manage their health as best they can in their own homes.[1]

Concern with *quality* dates back more than a century. For example, in 1847, a resolution was passed at the first national meeting of the American Medical Association to determine the quality of "practitioners of medicine in respective states…."[2] A subsequent report[3] from Virginia pointed out an alarming number of practitioners "who practice without any authority whatever" and those "who do not pretend to have devoted one hour to the study of the profession." However, the drastic reforms in medical education and professional licensing at the turn of the 20th century had the unintended effect of decreasing physician supply substantially, especially in rural areas and among minority populations. We have yet to fully rectify that problem. It is interesting that, at the time, some[4,5] have suggested that the "alleged shortage" of physicians would soon be resolved by a new technology…the automobile. This has not materialized because the problems were vastly more complex than mere transportation.

Differences in the distribution of good-quality healthcare largely reflect the discrepancy between the locations of medical resources at various levels of expertise *vis-à-vis* the location of patients who need their care. Physicians tend to locate in urban areas because the educational system reinforces specialization, and the availability of advanced technology at tertiary-care centers acts as a further attraction. A long-standing consensus among students of the field points to an optimal ratio of 1:1 for specialist to generalist.[6] Instead, it is about 3:1. In 2012, in total, 878,194 physicians with an active license were practicing in the United States.[7] Of these, 657,208 (76.5%) were certified by a specialty board, and 216,352 (23.5%) were not. For many, specialization narrows the scope of practice to specific body organs, diseases, or age and gender groups, hence the tendency to locate specialty practices in large urban areas with large populations from which to draw their patients.

Concern with medical care *cost* inflation (typically expressed as a percentage of gross domestic product) dates back to the 1960s, when it was around 5%. It is now close to 18%. As many have observed, the health system in the United States is on a nonsustainable course unless significant changes are introduced to deliver care more efficiently and effectively. Indeed, without appropriate innovative structural changes, we may soon be faced with the dilemma of either maintaining substantial inequities in access to care by virtue of residential location, socioeconomic status, and health need or not being able to afford the system we have. The basic problem was brought about by a combination of factors, including the following:

1. The *demographic composition* of the population is changing. A long-term trend of low birth rates and longer life expectancy has resulted in a larger proportion of the population in older age groups. This segment of the population experiences more chronic illness, which entails increased costs.

2. Advances in *medical science, technology, and interventions* have led to the development of more sophisticated diagnostic tools, life-saving interventions, medications, and devices. Although contributing to improved health status, this has fueled inflationary trends in healthcare.

3. *Advances in ICT* have heightened public awareness and health sophistication (with greater public awareness of behavioral risk factors, ready access to sources of health information, and an active and extensive lay referral system), thereby increasing demand for medical care.

4. Finally, *system fragmentation, discontinuities* in patient care, and serious *inefficiencies* in the financing and delivery of care as well as the prevalence of *unhealthy lifestyles* have all exacerbated the problem, especially among those suffering from chronic illness.

Hence, the focus of this article is on the capabilities of health ICT not only in extending the reach of clinical resources to serve a widely dispersed and underserved patient population, but, more importantly, in improving the efficiency, effectiveness, coordination, and continuity of care with active patient participation in the management of chronic illness.

As a prelude to the discussion of the integral role of telemedicine in modern healthcare delivery in general and chronic disease management in particular, we begin with a brief account of telemedicine's long history. This demonstrates the centrality of long distance communication in medicine and in human experience. At the same time, it provides a stark reminder of the remarkable and steady progress in the underlying technology of telemedicine.

CDCR _019

## Brief History of Telemedicine

The use of long distance communications for medical purposes extends into antiquity. (For a more complete history, see Bashshur and Shannon.[8]) For example, among aboriginal peoples of Australia "message sticks" carried by runners, sometimes more than 70 miles, brought information pertaining to tribal gatherings (friendly and hostile), disease and deaths.[9] Medicine "in absentia" was practiced in the 17th century common era as patients sent urine samples to distant physicians who, in turn, provided diagnoses based on uroscopy charts patterned after those used by the ancient Greeks.[10] In return, local physicians and their patients received a "prescription-by-post" containing detailed instructions on regimen.[11] Our major focus here, however, is on the use of electronic communication providing medical care at a distance. We begin, therefore, with the telegraph.

During the American Civil War, the need to identify the location and movement of troops led to the development of the Signal Corps, which relied heavily on the telegraph. The Corps was established in 1862 and became operational in 1863 under the direction of Major Albert Myer, a surgeon and medical officer in the Union Army. In addition to the original intent of the Corps, he used the telegraph to request medical supplies and coordinate the transport of patients.[12] Anecdotal justification for use of the telephone in distant diagnosis can be found in an early report in The Lancet in 1879.[13] A mother, convinced her baby had the "croup," called the infant's grandmother…who, in turn telephoned the family doctor at midnight "to tell him the terrible news." The physician telephoned the mother and asked her to "lift the child to the telephone and let me hear it cough." Subsequently, he declared: "That is not the croup," advising the mother, child, and grandmother to stay in bed, whereupon "the trio settled down happily for the night."

Willem Einthoven (1860–1927), a Dutch physician and inventor, demonstrated the use of the telephone for diagnostic purposes in 1905. He combined his improved galvanometer with the emerging telephone technology to transmit heart sounds from a hospital to his laboratory—a distance of 0.9 mile—and referred to the product as a "telecardiogram." Einthoven is credited with the first use of the prefix "tele" in a medical context that appeared in an article published in 1906.[14]

In 1910, British (but Chicago-born) Sidney G. Brown discovered a diagnostic function for the telephone while looking for a solution to the rapid degradation of telephone signals over distances of more than 20 miles. He developed a "repeater, amplifier, and receivers allowing clear articulation (of telephone) transmission of up to and more than fifty miles."[15] Subsequently, he demonstrated his invention at several hospitals in London. It is important that Brown concluded "this trial proved that it is now possible for a specialist, say, in London, to examine a patient, say, in the country, stethoscopically, and to arrive at a correct diagnosis."[15] Also in 1910, in New York, cardiologists Walter James and Horatio Williams described their experience with the transmission of electrocardiograms (ECGs) for a wide range of cardiac issues, including hypertrophy, ectopics, and fibrillations: "We have the wards of Presbyterian Hospital connected with the laboratory by a system of wiring which permits the taking of any patient's electrocardiogram without removing him from his bed."[16]

In 1920, the concept of using telecommunications for medical purposes was put into practice in Norway.[17] Bergen's Haukeland Hospital established a radio service to provide clinical support for ships at sea, including urgent surgical operations.[18] By the end of the 1920s, several Western European countries with substantial maritime operations had established similar radio services to provide medical consultation, diagnosis, and clinical and surgical mentoring for ships at sea.[19] The Italian maritime program, begun in 1935, continues to be operational today.

In 1948, Austin Cooley, a telecommunications inventor who played a major role in the development of the facsimile machine, developed a system for "long-distance roentgenographic facsimile via commercial telephone wires or radio." In 1950, Gershon-Cohen, a radiologist, and Cooley[20] described their experience transmitting X-ray images over wire or radio circuits, referring to this system as "'telognosis'…a 'condensation' of three terms, to wit, teleo, roentgen, and diagnosis." They used the system routinely over a distance of some 28 miles. In one instance,[20] Philadelphia physicians at Albert Einstein Medical Center successfully identified a large bowel obstruction of a "prominent" citizen in Chester County, which was treated locally. This was followed by Albert Jutras, a radiologist in Montreal who demonstrated in a 1957 publication the feasibility of transmitting radiographic images via coaxial cable between the Hotel-Dieu and the Jean-Talon Hospitals, about 5 miles apart; Jutras and Duckett[21] presaged "asynchronous" telemedicine by suggesting "the use of video tapes would be an indispensable tool adjunct." Jutras introduced the term "telefluoroscopy" for the transmission of radiologic images via coaxial cable. Both Jutras' term and that of Cooley and Gershon-Cohen did not achieve much "traction" and were soon forgotten. At about the same time at the University of Nebraska, Wittson and Dutton[22] experimented with the use of bidirectional closed-circuit television in psychiatry for medical education and training and later to conduct group therapy sessions "at a distance." Telemedicine came of age during the 1970s. The first prototype telemedicine program was established in 1968 in Boston, linking the Medical Station at Logan International Airport with Massachusetts General Hospital. This was followed by several exploratory projects funded by the federal government (including the Department of Health, Education and Welfare, the National Science Foundation, the National Library of Medicine, the Office of Economic Opportunity, and the Regional Medical Program) as well as the National Aeronautics and Space Administration's terrestrial telemedicine test beds in Alaska and Arizona and its use of telemetry in early human space flight.

Today, telemedicine can be found in every state of the union and almost every country in the world. However, in the United States it continues to be encumbered by policies that are no longer functional, especially those related to the rules and requirements for reimbursement and interstate licensure and practice.

## Prerequisites for Definitive Evaluation of Telemedicine

Despite voluminous research in this field, investigators have yet to reach consensus on a set of requirements for valid evaluation in

**BASHSHUR ET AL.**

telemedicine as well as healthcare in general. (For a detailed discussion of these issues, see Bashshur et al.[23]) Certainly, choice of study design and sample design, measurement tools, and analytic methodology are central. However, there are also variations in the settings, choice of study populations (in terms of illness severity and other parameters), and program implementation that may have significant implications for interpreting the findings. These can be grouped into three major issues: fidelity, maturation, and bundling. The issue of "fidelity" pertains to the intervention itself. A valid evaluation depends on assessing the intervention in a "full fidelity mode," that is, at an appropriate setting with the optimal level of strength and integrity. Telemedicine interventions vary by clinical application (type and range of services offered), technological configuration (telephone, video, cameras, scopes, sensors, and other devices; automated and manual), transmission mode (synchronous and/or asynchronous), and health manpower mix (physicians, nurses, therapists, managers, and engineers), as well as organizational structures and protocols. All have implications on what hypotheses can or cannot be demonstrated in a given research study. Without fidelity, we may not be able to attribute outcomes to interventions in any definitive manner. The second prerequisite is "maturation." This pertains to the timing of the implementation/adoption process and the point in the maturation process at which the assessment takes place. Included is the function of the "learning curve" necessary for the integration of personnel, technology, and patients to achieve maximum efficiency. It is difficult to determine the point along the learning curve of a program's road to maturity. Additionally, telemedicine has evolved as an "innovation bundle" consisting of various configurations of technology, human resources, service populations, clinical applications, and organizational structures. Each of these components may have independent effects on access, quality, and/or cost. However, it is often difficult to separate the specific effects of each component in a scientific study because the components are rarely taken into account in the design of studies, and the statistical power associated with small samples does not usually permit reliable subgroup analysis.

## Telemedicine and Chronic Disease Management

The justification for the wider deployment of telemedicine stems from an ever-expanding and complex body of empirical evidence, albeit not always based on rigorous methodology, which attests to its potential in addressing the seemingly intransigent problems of inequitable access to care, uneven distribution of quality of care, and healthcare cost inflation. This is particularly notable in the case of chronic disease management. Chronic diseases—such as heart disease, stroke, cancer, diabetes, pulmonary disease, and arthritis—"are among the most common, costly, and preventable of all health problems in the U.S."[24] Almost 50% of all adults have at least one chronic illness. Approximately 70% of all deaths in the United States are from chronic diseases, and an estimated 50% of all deaths are from heart disease, cancer, and stroke. Increasing percentages (over 7%) of U.S. children and adolescents have a chronic disease condition. In terms of cost, approximately 75% of all healthcare expenditures are spent on chronic illness. Thus, an intervention that (1)

promises to involve patients in their own care, (2) provides continuous monitoring by their healthcare providers, and (3) identifies early symptoms and responds promptly to exacerbations in their illnesses must be seriously considered and carefully assessed.

As with any other technology-based application, telemedicine has costs and benefits. The costs include the necessary investment in technology, human resources, and organizational development. Over time, however, equipment and connectivity costs have declined substantially, whereas the capabilities have expanded at a phenomenal rate. When properly, implemented telemedicine can enhance care coordination across various providers, ensure continuity of care regardless of site, and enable on-site triage and prompt referral when needed. Patients can receive appropriate and timely care from an appropriate provider, whether locally or when determined to be suitable at tertiary-care centers, as indicated by their condition. Patients in remote or medically underserved locations can have ready access to clinical resources and can be monitored in their home environment. In many instances, telemedicine obviates the cost and time of travel to seek medical services while providing diagnostic expertise normally available in tertiary-care centers. New models of accountable care organizations and the patient-centered "medical home" also can incorporate telemedicine services to improve their efficiency and effectiveness.

Within the current healthcare system, which is weighted heavily toward acute care, the traditional model of care for those with chronic health conditions can be aptly described as a "revolving door" arrangement whereby patients are seen in a physician's office, and future appointments for return visits are scheduled at fixed "arbitrary time intervals," based, at least in part, on physician availability.[25] Exacerbations in illness that occur in between appointments are handled mostly by referral to the emergency room or urgent treatment center. This arrangement is clinically and economically ineffective. In most instances, the need for medical attention generally and among patients with chronic illness in particular, cannot, *a priori*, be determined with any accuracy. Hence, the formal and arbitrary scheduling of return visits at fixed dates and times cannot be synchronized to match the timing when patients need care, resulting in costly emergency room usage.

In 1997, it was observed that "available evidence suggests that chronically ill patients receive limited assistance from their providers in their efforts to maintain function and quality of life as they cope with their illness."[26] To address this problem, and while acknowledging barriers in adopting it in its entirety, in 2002 Bodenheimer et al.[27] proposed an "optimal" chronic care model for use as an universally applicable guide to improve outcomes for individuals living with chronic illness. Initially, implementation of the model required reorganizing the care system, typically through a staff-model managed-care plan. However, the same model was considered useful as a guide for revisions at a number of integrated delivery systems that included, at minimum, a hospital, office practice, and home care in the same system. As posited, the model predicted improvement in six interrelated components (including self-management support, clinical information systems, delivery system redesign, decision support, healthcare organization, and community resources) in which informed, activated patients interact with prepared, proactive care teams.

CDCR _021

In this model, the care system would be responsible for developing patient registries and using them to ensure timely preventive and maintenance services. Because the basic premise is to activate patients in managing their own health, the model must ensure that they are capable of self-care. The successful implementation of the model would ultimately depend on the effective use of information technology.[28]

## Telemonitoring

Telemonitoring or monitoring patients at a distance (also called telehome care or home telecare—although telemonitoring now extends far beyond the home) is a component of a larger chronic care model that includes disease management and care coordination, in which patients assume a greater role in managing their health, while having ready access to their providers who have up-to-date information on various parameters of their health. It includes the collection of clinical data from the patient and the transmission, processing, and management of such data by a healthcare provider through an interface system. As such, it represents an innovative paradigm for the medical management of chronic illness, which aims at providing "appropriate care at the appropriate time and place in the most appropriate manner."[25] The major pillars of telemonitoring include patient-centered care, the medical home, and shared decision making. When optimally implemented, patients are electronically connected with their usual sources of medical care, and teams of providers (nurses, physicians, and therapists) monitor critical parameters (generally via sophisticated computer and algorithm-based decision tools) affecting their health and well-being and provide them with relevant advice, information, and follow-up care. Under this system, patients would have:

- An electronic device that monitors and reports relevant data to a provider team on a prespecified set of relevant vital signs and other disease-specific parameters
- Relevant educational materials tailored to the individual patient concerning medication management, symptom recognition, especially when indicative of worsening conditions that require action, as well as lifestyle preventive measures to improve their health and well-being (such as proper diet, smoking cessation, exercise, and moderate alcohol consumption)
- Ready access to their personal health records, including long-term trends in their functional status, symptoms, and benchmarks
- Tools for participating in shared decision making together with their providers and explicit guidance on the appropriate use of service, such as when symptoms warrant a visit to the emergency room or hospitalization, as well as when their conditions do not warrant emergency care or hospitalization
- Ready access to medical advice when they have questions or concerns

The preceding discussions were designed to provide a comprehensive context for the subsequent analysis of the evidence pertaining to telemedicine's role in chronic disease management. We now turn to a review and analysis of the evidence.

## The Review Process

This review is based on a systematic process for the selection of relevant literature on the impact of telemedicine for the management of three chronic diseases: CHF, stroke, and COPD. By design, the review focuses on a limited set of representative chronic diseases because of their current and increasing importance relative to their prevalence, associated morbidity, mortality, and cost. Furthermore, these three diseases are amenable to timely interventions and secondary prevention through telemonitoring. In each instance, we provide a brief explanation of the disease entity as well as essential information on its epidemiology and cost, as an appropriate context for the search for evidence from the scientific literature. As mentioned earlier, a separate section addresses the issue of cost.

The review process entailed four steps: (1) a comprehensive search for all publications using key terms such as "telemedicine," "telehealth," "telemonitoring," and each of the three chronic diseases to identify the universe of publications available during 2000–early 2014; (2) a paring down of this list to research articles only; (3) a review of the abstracts of the research publications to determine their eligibility for inclusion in the final list, using the two criteria of (a) robust research design and (b) sample size of 150 or more; and (4) a review of complete manuscripts of all publications in the final list. In a few instances, where a special case could be made for their inclusion in the analysis, we included studies with samples of fewer than 150 cases. In addition, we reviewed the list of references in each of these publications to identify articles that should be added to the final list. With the exception of two studies from Germany, our search was limited to publications from all countries where we could obtain an English version.

Because the studies did not use a standard methodological protocol, their respective findings and conclusions must be viewed from the perspective of the specific methodological features that were used, including research design, sample size, specific attributes of the intervention itself, and the population studied. We tried to reduce these variations by selecting only randomized clinical trials (RCTs) or designs approximating an RCT and by limiting our analysis to studies that had an adequate sample size for reliability and statistical power.

The methodologies used varied from one study to the next. They differed in terms of the manner in which clinical and utilization data were captured, transferred, processed, and stored (e.g., automated or manual, machine captured or patient reported over time, with or without trend displays, provider-only accessed or shared with the patient), human health resources used (e.g., doctors, nurses, or combinations of both), the content of the intervention (e.g., medication management, education, support), the protocols for frequency (e.g., daily, weekly, monthly, etc.) and duration (e.g., from 1 month to 5 years or more), and technology (e.g., telephone, video, automated and manual devices).

There was also some variation in the outcomes measured. The majority of studies focused on hospitalization and mortality as primary outcomes. Stroke studies, however, focused on event timing from onset of symptoms to diagnostic tests to treatment, as will be explained later. Hospitalization included all-cause and disease-

CDCR_022

specific hospital admissions, re-hospitalization, and length of hospital stay. Mortality was typically treated as resulting from any cause. Some studies focused on other outcomes, such as symptom severity, physiological status, functional performance, quality of life, and health knowledge. As far as we can determine, no study differentiated between appropriate and inappropriate use of service (e.g., appropriate hospitalization or appropriate use of the emergency department), and no studies addressed the cause of mortality.

## CHF

CHF is a chronic, progressive condition in which the heart muscle is unable to pump sufficient blood to meet the body's need for oxygen and nutrients. Blood is responsible for transport of materials and waste products throughout the body, carrying oxygen from and carbon dioxide to the lungs, nutrients from the digestive system or storage sites to tissues that require them, and waste products from tissues to the liver for detoxification and to the kidneys for disposal. When the heart muscle is weakened or stiffened, it compensates by enlarging, developing more heart muscle or pumping faster. The body also tries to compensate by narrowing blood vessels and diverting blood away from less important tissues to maintain the flow to more vital organs.[29]

Cardiologists usually classify patients with heart failure according to the severity of their symptoms and their eligibility for various levels of treatment. However, there are several different classifications, and serious concerns have been expressed about their validity. According to current recommendations, a diagnosis of CHF requires typical symptoms and signs together with evidence of abnormal cardiac structure or function.[30] In 1994, the New York Heart Association (NYHA) developed an updated functional capacity/objective assessment in four classes: no objective evidence of cardiovascular disease (I) or objective evidence of minimal (II), moderate (III), or severe (IV) cardiovascular disease, coupled with limitations in physical activity.[31]

In 2005, the American College of Cardiology and the American Heart Association published a combined functional/objective CHF classification combining the NYHA functional categories with more precise stages of heart failure. Patients in Stages A and B do not have heart failure but have risk factors that predispose them to the development of heart failure. Patients in Stage C comprise the majority of patients with heart failure—those who have current or past symptoms of heart failure associated with underlying structural heart disease. Patients in Stage D have refractory heart failure and may be eligible for specialized, advanced treatments.[32]

## CHF EPIDEMIOLOGY[a]

In 2001, He et al.[37] observed that "during the past several decades, the incidence of and mortality from coronary heart disease have been continuously declining. In contrast, the incidence of and mortality from CHF have been increasing and have become important public health

and clinical problems." Crude prevalence estimates show that in 2010, 6.6 million or 2.8% of U.S. adults older than 18 years of age had CHF.[38] Based on data from the Framingham Health Study, the incidence of CHF approached 10 per 1,000 of those over 65 years of age in 2002.[39]

The incidence of CHF varies considerably among racial/ethnic groups, with a larger percentage of black males having CHF compared with white males. Although the overall incidence is lower in females than in males, the rate in black females tends to be higher than that of while females. Annual incidence rates for heart failure "events" per 1,000 population for white men is approximately 15 cases for those 65–70 years of age, 32 cases for those 75–84 years of age, and 65 cases for those older than 85 years of age. For black men in the same age groups, the rates are approximately 17, 26, and 51 cases per 1,000, respectively. For white women in the same age groups, the respective rates are 8, 20, and 46, whereas for black women in the same age groups, the respective rates are 14, 26, and 44. Although survival rates after CHF diagnosis have improved, overall mortality remains high. It is estimated that approximately 50% of people diagnosed with heart failure will die within 5 years.[40]

## CHF COST

Heart failure is a growing public health problem in the United States, with high morbidity and mortality rates and frequent hospital admissions. In 2005, it was the primary reason for an estimated 12–15 million office visits and 6.5 million hospital days. In the Medicare population, CHF is the leading cause for hospitalization, accounting for more than 1 million admissions per year.[34] In 2010, the annual cost of heart failure for the nation was estimated at $39 billion.[41] This includes the cost of medical services, medications, and missed days of work. The percentage of heart failure costs in relation to total costs for cardiovascular disease has increased from approximately 24% to 37%. The largest percentage of costs is associated with hospital care (60%), followed by nursing home care (13%), home healthcare and medication (9% each), and physicians (7%).[42] In 2009, the number of hospitalizations per 10,000 population was 34.8 for persons 45–64 years of age and 197.5 for persons 65 years of age and older.[42]

## CHF TELEMONITORING

CHF is not only a source of difficulty for patients and their families, but also a serious public health burden for society. CHF patients suffer from a poor quality of life coupled with short life expectancy. The high mortality rate associated with CHF emphasizes the need to identify modifiable risk factors and develop effective, efficient, timely, and cost-efficient strategies for the management of CHF in the general population. The essential element of telemonitoring is the reliance on information technology for connecting patients and providers in a coordinated system of care, described earlier. Telemonitoring figures prominently as an efficient and effective model in the management of CHF.

## EVIDENCE OF THE IMPACT OF TELEMONITORING FOR PATIENTS WITH CHF

Our literature search for telemonitoring and CHF yielded an initial total of 436 publications. Of these, only 19 met the criteria for inclusion

---

[a]For a more complete review of CHF epidemiology, see Mahmood and Wang,[33] Rathi and Deedwania,[34] Zarrinkoub et al.,[35] and Wong and Felker.[36]

CDCR _023

in the final analysis. In addition, we encountered 35 literature reviews and 1 review of reviews. We did not include the literature reviews in our analysis because our inclusion criteria excluded several studies that were included in these reviews. Significant numbers of the studies in our analysis were not limited to heart failure, and they included other chronic diseases, although not consistently the same set.

This report is based on the findings from the select set of 19 studies (shown in *Table 1*), dating from 2000 to 2013 in 10 countries (the United States, the United Kingdom, Canada, Germany, France, Belgium, The Netherlands, Italy, China, and Argentina). Forty-seven percent of these studies were conducted in the United States.

As a prelude to the report of the findings from these studies, it is important to point out again significant methodological issues that may have a direct bearing on their findings. With four exceptions, these studies used the RCT research design. Three of the four exceptions used a case control design in which cases in the intervention group were matched prospectively or retrospectively to create a control or comparison group. One large study in the United Kingdom used "cluster randomization" in which whole groups of patients were randomized on the basis of their usual sources of care. This method does not assure the same level of randomization as individual case randomization.

Sample sizes of the studies included here ranged from a low of 160 to a high of 17,025. The most critical problem in interpreting the findings has to do with the variation along several different dimensions in which the intervention was applied. From one study to another, the intervention varied by technology, provider mix, frequency, and duration as well as the illness severity in patient populations. From a technology standpoint, they used a variety of devices and various configurations of telephone, videoconferencing, and automated devices. Staffing varied from nurses using telephones to visiting nurses who conducted home visits to physicians. The frequency of monitoring was typically daily but varied from twice daily to every 3 weeks. The duration of observations varied from a low of 3 months to 26 months, typically 12 months. Patient populations varied from young and middle-aged adults (18 years of age and over) to older adults (65+ years of age) to the elderly (75+ years of age). Some studies selected only patients classified as I or II (mildly impaired) on the NYHA scale, whereas some selected only Classes III and IV (moderately to seriously impaired). One study selected older adults with multiple health issues. Moreover, some interventions included educational content and/or medication management, and some were limited to reporting of vital signs and responses to standard inquiries. Hence, generalization across studies is neither simple nor straightforward.

We paid particular attention to findings pertaining to the effects of telemonitoring on cost-intensive phases of medical care, including emergency department visits, hospital admissions (for CHF only and for all causes), and length of hospital stay. We also paid special attention to health outcomes, typically measured in terms of mortality. Where reported, satisfaction with service and quality of life are also included in our discussion of findings. As it turned out, some studies investigated the effects of telemonitoring on several chronic diseases simultaneously, including CHF. When this occurred, we reported their findings in one place only.

## THE OBSERVED EFFECTS OF CHF TELEMONITORING

One of the earlier landmark studies was conducted in California at Kaiser Permanente in the late 1990s (published in 2000) by Johnston et al.[43] It was based on a quasi-experimental design, and it evaluated the effects of a videoconferencing system that "allowed nurses and patients to interact in real-time."[43] Both intervention and control groups received home visits and telephone contact by nurses. The study reported no differences in quality indicators (medication compliance, knowledge of disease, and ability for self-care), patient satisfaction, or use of service. However, the study reported significant differences in direct cost between the intervention and control groups ($1,167 versus $1,830) as well as total cost ($1,948 versus $2,674). (These figures are based on 1997 dollars and do not include the cost of home health services.)

In 2002, another study in California (RCT, $n = 358$: intervention group, $n = 130$; usual care group, $n = 228$) investigated the effects of a nurse case management telephone intervention on resource use among patients with CHF.[44] Outcome measures included hospital admissions and re-admissions, length of stay, emergency department visits, and inpatient costs as well as patient satisfaction. The findings from this study demonstrated that telephonic case management provided by registered nurses using decision support software during the early months following a heart failure hospitalization was associated with significant cost savings (lower re-hospitalization rates and use of other resources). As well, patients reported being satisfied with the intervention, which proved useful in addressing predictors associated with CHF hospitalization, such as poor adherence to medication regimens and to dietary recommendations, and insufficient knowledge of symptoms of worsening illness. Heart failure hospitalizations in the intervention group were significantly lower at 3 months (45.7%) and at 6 months (47.8%). "There was no evidence of cost shifting to the outpatient setting."[44] In addition, both heart failure–related hospital days and multiple re-admissions were significantly lower in the intervention group at 6 months. The authors concluded that telephonic case management in the early months following CHF is more effective than standard pharmaceutical therapy and other case management strategies.

Also in 2002 (published in 2003), investigators from several universities in the United States conducted a multicenter RCT ($n = 280$) to evaluate the effects of daily weight monitoring and symptom reporting among "advanced" heart failure patients (NYHA Classes III and IV) using the AlereNet system for a 6-month period.[45] Although the use of the AlereNet system was associated with a 56.2% reduction in mortality, it did not increase hospitalization. The intervention group experienced greater improvement in all quality of life measures, but the differences were not statistically significant. The unique feature of this study was the strict adherence to "aggressive guideline-driven heart failure care" by cardiologists with heart failure expertise. The authors explained that "heart failure hospitalizations may not be a failing of the patient's own personal heart failure

CDCR_024

**BASSHUR ET AL.**

## Table 1. Methodology and Findings Pertaining to Congestive Heart Failure

| LITERATURE SOURCE | | | METHODOLOGY | | | | FINDINGS[a] | | | | | |
| | | | | | | | HOSPITALIZATION | | | | | |
| REFERENCE | DATE | COUNTRY | DESIGN | SIZE (N) | DURATION (MONTHS) | TECHNOLOGY | ADMIT | LOS | ED | MORTALITY | QUALITY | COMMENTS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Johnston et al.[43] | 2000 | United States | QE | 212 | 17 | T, VTC | ↓ | ↓ | NM | NM | O | Cost savings |
| Riegel et al.[44] | 2002 | United States | RCT | 358 | 6 | T | ↓ | ↓ | ↑ | NM | NM | Inpatient HF costs 45.5% lower at 6 months; nurse used decision support software. |
| Goldberg et al.[45] | 2003 | United States | RCT | 280 | 6 | T, HTM | O | O | O | ↓ | ↑ | NYHA Class III (75%), IV (25%) |
| Cleland et al.[46] | 2005 | Germany, United Kingdom, and The Netherlands | RCT | 426 | 8 | T | O | O | ↑ | ↓ | NM | Usual care control group mortality was 45%. |
| | | | | | | HTM | O | ↓ | ↑ | ↓ | NM | |
| Woodend et al.[47] | 2008 | Canada | RCT | 249 | 3/6/12 | T, VTC | ↓ | ↓ | O | NM | NM | 3 months of VTC with nurse intervention |
| Darkins et al.[48] | 2008 | United States | OS | 17,025 | 53 | T, VTC, HTM | ↓ | ↓ | NM | NM | NM | 25.9% utilization reduction |
| Dendale et al.[49] | 2012 | Belgium | CRCT | 160 | 6 | HTM, T | ↓ | ↓ | NM | ↓ | NM | TM increases collaboration |
| Ferrante et al.[50] | 2010 | Argentina | RCT | 1,518 | 36 | T | ↓ | NM | NM | O | ↑ | T coaching to improve diet, weight, edema, and exercise |
| Weintraub et al.[51] | 2010 | United States | RCT | 188 | 3 | T, HTM | ↓ | ↓ | O | ↓ | O | NYHA Class II and III patients |
| Chaudhry et al.[52] | 2010 | United States | RCT | 1,653 | 6 | T, HTM | O | O | O | O | O | Participation waned to 55%. |
| Giordano et al.[53] | 2011 | Italy | RCT | 358 | 96 | HTM, NC | ↑ | NM | O | NM | ↑ | Number patients on beta-blockers decreased. |
| Koehler et al.[54] | 2011 | Germany | RCT | 710 | 26 | HTM | O | O | O | O | NM | NYHA Class II and III; physician led |
| Landolina et al.[55] | 2012 | Italy | RCT | 200 | 16 | T, VTC, HTM | O | ↓ | ↓ | NM | ↑ | Fewer visits with TM and increased efficiency |
| Chen et al.[56] | 2010 | China | QE | 550 | 6 | T | ↓ | ↓ | ↓ | NM | O | Overall lower total cost |
| Boyne et al.[57] | 2012 | The Netherlands | RCT | 382 | 12 | T, HTM | ↓ | NM | NM | O | NM | Decrease in contact with specialized nurses |
| Steventon et al.[58] | 2012 | United Kingdom | CRCT | 3,230 | 12 | T, HTM | ↓ | ↓ | ↓ | ↓ | NM | Better patient management of CHF and clinical decisions |
| Baker et al.[59] | 2011 | United States | QE | 1,767 | 24 | T, HTM | NM | NM | NM | ↓ | NM | Savings of 7.7–13.3% |
| Baker et al.[60] | 2013 | United States | QE | 1,767 | 24 | HTM | ↓ | O | O | ↓ | NM | High impact on outcomes |
| Takahashi et al.[61] | 2012 | United States | RCT | 205 | 12 | VTC | O | O | O | ↑ | O | Older and sicker patients |

[a]Arrows indicate direction of change: increased (↑) or decreased (↓).

CHF, congestive heart failure; CRCT, cluster randomized trial; ED, emergency department; HF, heart failure; HTM, home telemonitoring; LOS, length of stay; NM, not measured; NYHA, New York Health Association; O, neutral outcome; OS, observational study; QE, quasi-experimental; RCT, randomized controlled trial; T, telephone; VTC, video teleconference.

CDCR _025

care regimen…but rather a manifestation of their progressively advanced disease state."[45] They also pointed out that restricting the study to patients with advanced heart failure (NYHA Classes III and IV) left unanswered the question of the effectiveness of the intervention among those with moderate or mild heart failure.

Only three studies meeting our criteria for inclusion in this analysis were conducted between 2005 and 2010, whereas 13 were conducted from 2010 to 2013. A Trans-European (United Kingdom, Germany, and the Netherlands) RCT ($n=426$) was conducted among 200 subjects at high risk for hospital re-admission and death.[46] It compared three modalities: (1) telemonitoring (twice daily with automated measurement), (2) nurse telephone support, and (3) usual care for patients who were at high risk for hospitalization. The main comparison of interest was between telemonitoring and nurse telephone support. The study was conducted at 12 main and 4 satellite hospitals in three countries, and it followed a uniform protocol for data collection. After 8 months, the number of hospital admissions was similar between the telemonitoring and telephone support groups, whereas length of hospital stay was reduced by 6 days in the telemonitoring group. Patients randomly assigned to the usual care group had higher 1-year mortality (45%) compared with the nurse telephone support (17%) and those receiving telemonitoring (29%).

In 2008, an RCT ($n=249$) was conducted in Ontario, Canada involving cardiac patients at high risk of hospital re-admission (NYHA Class II or higher CHF; Canadian Cardiovascular Society Class I or II angina).[47] The intervention consisted of 3 months of videoconferencing with a nurse, daily transmission of weight and blood pressure, and periodic transmission of the 12-lead ECG. Within 48 hours of discharge, a technician set up the monitoring equipment in patients' homes and trained them on their use. Weekly videoconferences over standard telephone lines were held with a nurse, during which time the patient's progress was assessed and self-care education was provided. Data from electronic weight scales, blood pressure, and ECG machines were transmitted via telephone lines to a central station at the Heart Institute housing the patient's electronic record. After 3 months of observation, telemonitoring resulted in reductions of 51% in hospital admissions and of 61% in length of stay but no effect on re-admissions. After 1 year, hospital admission rates were reduced by 45% in the intervention group, as well as a reduction of 21% in length of stay. Similar trends were observed in fewer emergency department and outpatient cardiologist visits. Although the rates in utilization of service declined over 1 year, the differences between the intervention and control groups remained significant.

A 2008 Veteran's Health Administration (VHA) case report[48] provided a trend analysis for a cohort of 17,925 patients with chronic conditions between July 2003 and December 2007. It was during this period that the VHA introduced a national home telehealth program: Care Coordination/Home Telehealth (CCHT). The purpose of the intervention was to coordinate care for Veteran patients with chronic conditions in order to avoid unnecessary admission to long-term institutional care. The chronic conditions included CHF, diabetes mellitus, hypertension, posttraumatic stress disorder, COPD, and depression. The program was necessitated by changes in the demographic characteristics of the Veteran population and, more specifically, the need for the VHA to increase its non-institutional care services by 100% over its 2007 level in providing care for an estimated 110,000 non-institutional care patients in 2011. Now a routine non-institutional care service, the CCHT involves the use of home telehealth and disease management technologies as adjuncts to the VHA's existing health information technology infrastructure. The CCHT provides a range of interventions, and decisions are made as to which one is best suited for each individual patient. These include videophones, messaging devices, biometric devices, digital cameras, and telemonitoring devices. Twenty-five percent of the CCHT caseload were composed of CHF patients only; another 33.3% had multiple conditions. Hospital admission data were collected for CCHT patients during the year prior to enrollment in the CCHT program and compared with data collected 6 months after enrollment. The overall cohort reduction was 19.7%. However, the percentage decrease for CHF patients was 25.9%. The major conclusion from the VHA assessment was that "the CCHT is a practical and cost-effective means of caring for populations of patients with chronic disease that is acceptable to both patients and clinicians."[48]

Acknowledging the need for an extensive reorganization of the healthcare system in Belgium to prevent unnecessary re-hospitalization, an RCT ($n=160$) was conducted among male CHF patients discharged from seven hospitals to assess the effects of a telemonitoring intervention on re-hospitalization and mortality rates among patients with severe heart failure. The study was conducted in 2010 and published in 2012.[49] The intervention group was assigned to telemonitoring-facilitated collaboration between their general practitioner (GP) and heart failure clinics. Upon discharge from the hospital, patients in both intervention and control groups received a standard education course on heart failure and were instructed on how to use an electronic body weight scale, a blood pressure monitoring device, and a cell phone. In addition, the intervention group was given automated telemonitoring devices that reported body weight, blood pressure, and heart rate each morning at a fixed time. The scale and sphygmomanometer were connected to a dedicated cell phone, which automatically forwarded the results to a central computer programmed to alert both the primary care physician and the heart failure clinic via automatic e-mail alerts. This system limited calls that fell outside prescribed parameters. The total number of days lost to hospitalization, death, or dialysis among CHF patients was significantly lower for the intervention group compared with the usual care group (13 days versus 30 days, $p=0.02$). Similarly, during the study period, hospital admission rates for heart failure per patient were significantly lower (0.24 versus 0.42) for the telemonitoring cohort.

In contrast to studies using smaller samples, shorter follow-up, and sicker patients, a large sample study ($n=1,518$ recruited from 51 participating health centers), with a longer duration (1½- and 3-year follow-up) and generally stable patients, was conducted in Argentina.[50] It was aimed at assessing the effects of a telephone intervention on improving patient education and compliance and subsequently on hospitalization and death. The study compared a centralized regular telephone intervention with usual care for

CDCR_026

outpatients with stable, chronic heart failure. Patients in the intervention group received an explanatory booklet and were followed up via telephone by specialized nurses. The intervention objectives were to improve dietary and treatment compliance, to promote exercise, to regularly monitor symptoms, weight, and edema, and to promote early visits if signs of deterioration were detected. All patients were called every 14 days (a total of four times) after randomization. Subsequent call frequency was adjusted on the basis of case severity and compliance. In other words, those with severe conditions and who were less compliant were contacted more frequently. Under supervision of a cardiologist, nurses were allowed to make short-term changes in diuretics and suggest unscheduled visits to the cardiologist. Control group subjects continued treatment with their cardiologists in the usual manner. A significant difference between the two groups was observed with regard to hospitalization: 16.7% of patients in the intervention group and 22.3% in the control group had an admission for heart failure, but there was no significant effect on mortality. One year later, 22.9% of the intervention group and 29% of the control group had been admitted to the hospital. Three years later, 28.9% of the intervention group and 35.1% of the control group had been admitted. Moreover, patients who scored high on three compliance indicators (diet, weight, and medication) had lower risk events. The study authors observed that a "simple, nurse-based telephone intervention was associated with a clear clinical benefit for patients with CHF one and three years after the intervention stopped."[50]

A 2009 (published in 2010) U.S.-based multicenter RCT ($n = 188$) investigated the effects of automated home monitoring and telephonic disease management.[51] Patients in the intervention group received an automated home monitoring system, whereas those in the control group received "Specialized Primary and Networked Care in Heart Failure." The end point was hospitalization within 90 days. Patients in the intervention group had fewer hospitalizations compared with their counterparts.

In 2010, a U.S. large multi-institution RCT ($n = 1,653$) investigated the effects of telemonitoring using the Pharos Tel-Assurance system for patients with heart failure on hospital re-admission for any reason or death within 6 months of enrollment.[52] Secondary outcomes included hospitalization for heart failure, length of hospital stay, and number of hospitalizations in 6 months. All patients (in both intervention and control groups) received educational materials and a weight scale. Also, all patients were told to contact their clinicians directly with any urgent concern. Hence, this was a comparison between two robust treatments, and the data for the intervention group were self-reported by patients using an interactive voice recognition system. The participation rate (adherence to the intervention) started at 90.2% in the first week but dropped to 55.1% by week 26. By the final week of the 6-month study, "only 55% of the patients were still using the system at least three times a week."[52] It is not surprising that the authors concluded that their "telemonitoring strategy failed to provide a benefit over usual care" with respect to hospitalization and mortality. They did not report any cost data.

Another long-duration (8-year) study ($n = 358$) was conducted in Italy.[53] It investigated the effects of weekly nurse telephone tele-

monitoring and physician follow-up only when needed. Data were gathered prospectively over a period of 8 years following the intervention. The findings suggest improvements in clinical, functional, and quality of life measures as well as lower hospital re-admissions for cardiovascular reasons.

A single-site RCT ($n = 710$) involving medium-severity CHF patients was conducted in Germany in 2011.[54] The telemedical management was led by physicians, and the median follow-up was 26 months (minimum, 12 months). The intervention consisted of portable devices for ECG, blood pressure, and body weight measurement, which were connected to a personal digital assistant with cell phone transmission. The study population consisted of adults 18 years of age or older with NYHA Class II or III (Classes I and IV were excluded). Among patients assigned to the intervention group, 81% provided at least 70% of their daily data transfers. Hence, about 20% did not participate, and of those who participated, 30% did not comply with daily transmission of monitoring data. The results were mostly neutral—showing no statistically significant differences in mortality or other event-based outcomes. Overall results suggest that physician-led telemedical management "was not associated with a reduction in all-cause mortality."[54] However, fewer hospitalizations were observed in the intervention group compared with the control group (14.7% versus 16.5%).

In 2008–2009 (published in 2012), Italian researchers conducted a multicenter RCT ($n = 200$) to investigate the effects of remote monitoring on emergency room visits for CHF patients with implantable cardioverter defibrillators (ICDs).[55] They compared remote monitoring with standard patient management consisting of scheduled visits and patient response to audible ICD alerts. The primary end point was the rate of emergency department or urgent in-office visits for heart failure, arrhythmias, or ICD-related events. The intervention consisted of implanting heart failure patients with a wireless-transmission-enabled ICD/cardiac resynchronization therapy endowed with specific diagnostic features (remote arm/home monitor), thereby increasing efficiency compared with the standard management protocol (standard arm). A significant difference in emergency department/urgent in-office visits between the groups was documented. Of a total of 192 visits, 75 were made in the "remote arm" group and 117 in the "standard arm" group. Compared with standard management, remote monitoring was significantly associated with a reduction of emergency department/urgent in-office visits for episodes of heart failure worsening. The authors noted that in addition to reductions in emergency room visits, there was an overall increase in the efficient use of healthcare providers and improved quality of care. But, quality of care was not expressed in quantitative terms.

Similar findings were reported from a 2010 study in China in which 550 heart failure patients were randomized to an intervention consisting of nursing telephone consultations versus a control group receiving the usual standard of care.[56] After 6 months, the intervention group had a significantly lower all-cause admission rate, a shorter all-case hospital stay (8 days fewer per patient), and overall lower total cost.

A multicenter RCT ($n = 382$) was conducted in The Netherlands in 2012 to ascertain the effects of telemonitoring on heart failure

CDCR _027

hospitalization over a 1-year follow-up period.[57] The intervention group received a liquid crystal display device with four keys connected to a landline phone, but there was no automatic transfer of vital signs. Information on heart rate and blood pressure for both intervention and control groups was collected during regular clinic visits. The intervention group had daily preset dialogues regarding symptoms, knowledge, and behavior. Although telemonitoring had no impact on initial CHF hospitalization, it was found to reduce heart failure re-admissions and to decrease contact with specialized nurses.

A large study ($n = 3,230$ from 179 sites in three areas in England) investigated the impact of remote exchange of data via a range of devices and monitoring systems for patients with CHF, COPD, and diabetes.[58] This was a "cluster randomized trial," which means randomization was done by clusters (or clinics) rather than individuals, and it used a relatively costly intervention for the electronic exchange of information between patients and providers. During the 12-month clinical trial period, patients in the intervention group were significantly less likely to be hospitalized (odds ratio of 0.82) and significantly less likely to die, compared with patients in the control clusters. Although the investigators recognized the potential for selection bias because of group rather than individual randomization, they tried to match groups by practice size, disease prevalence, and other characteristics. The study concluded that the telemedicine intervention could serve several purposes: namely, to help patients manage chronic disease better, to change patients' perceptions as to when they need to seek additional support, and to assist professionals' decisions regarding when to refer or admit patients.

The findings from a large study ($n = 1,767$) of Medicare beneficiaries reported significant savings among patients who used the Health Buddy program in 2011.[59] The intervention accounted for 7.7–13.3% savings per person per quarter as well as "noticeable change in health outcomes."[59] The mortality rate in the second year of observation was 2.5% lower in the intervention group. It is important to note that these findings were based on a retrospective matched cohort design that relied heavily on "intent to treat," necessitated by the low level of participation in the intervention. Only 37% of those assigned to the intervention group actually agreed to participate. A later analysis of data on the same population ($n = 1,767$) focused on mortality, hospital admissions, and emergency department visits.[60] After 2 years, patients using the Health Buddy program had a 15% reduction in mortality risk and an 18% reduction in quarterly hospital admissions. The strongest effects were observed on admissions among COPD patients and on mortality among CHF patients and among those labeled as "engaged."

A U.S. RCT ($n = 205$) (published in 2012) reported an increase in mortality and no impact on use of service among the intervention group.[61] The intervention group received the Intel Health Guide, a high-end device with videoconferencing and peripheral attachments. Patients performed daily sessions to assess symptoms and biometric measurements, which were relayed asynchronously to a nursing station. A registered nurse monitored data and communicated with patients (approximately 100 patients, which corresponds to the total number of patients in the intervention group) by phone or video when

alerts were triggered. The usual care group had access to primary and specialty care, telephonic nursing care, urgent care, and emergency department services. The decision triage was made by the nurse with decision support assistance from an electronic medical record. The results showed no difference between the two groups in terms of hospitalization or emergency department visits, but mortality (causes unknown) was higher in the telemonitoring group (14.7% versus 3.9%).

Because this was the only study in our review that reported the intervention group experiencing higher mortality than the control group, a closer examination of the methodology of this study may provide a better understanding of the results. The study population consisted of elderly patients with multiple health issues, putting them in the top 10% on the Elder Risk Assessment Index—an electronic database used to assess risk for hospitalization and comorbidities (stroke, dementia, heart disease, diabetes, and COPD). The average age of study participants was 80.3 years. Also, baseline comparison between the intervention and control groups revealed slightly lower mental health scores for the intervention group. During the 12-month study, 26 patients (25.5%) of the intervention group dropped out, which represented 15 deaths and 11 withdrawals. This compares with only 12 who dropped out from the usual care group (11.7%), representing four deaths and eight withdrawals. The analysis was made on the basis of the entire original groups in the study using the intent-to-treat method. In other words, utilization and mortality data were imputed for those who died or dropped out. The authors concluded that mortality experience of patients in the intervention group was consistent with "previous experience." No information was provided on the timing or the causes of death in the two groups, and there was no analysis of potential bias that may have been introduced as a result of nonparticipation.

An invited commentary by Wilson[62] sheds further light on the environment where the study was conducted, indicating that the study group was composed of "highly educated and affluent residents of Olmsted County, Minnesota, that may not benefit from telehealth because such patients are highly activated and engaged in their own health at baseline." He cautioned against either a dismissal or a negative indictment of telemedicine as a potentially useful technology and pointed out that "the effectiveness of telehealth programs would be mediated by an array of patient, physician, and larger health system factors, as well as by factors related to the details of the implementation of the telehealth program."[62] It is also important to consider the metrics for evaluation. The focus on hospitalization and emergency visits would ignore other outcomes, such as healthcare spending, outpatient visits, and quality of life.

## Stroke (Cerebrovascular Disease)[b]

Stroke is the fourth leading cause of death in the United States and is the leading cause of brain damage. Often referred to as

---

[b]Information on stroke was compiled several sources, including the American Heart Association/American Stroke Association,[63] the National Institute of Neurological Disorders and Stroke,[64] and Go et al.[65]

CDCR _028

**BASHSHUR ET AL.**

cerebrovascular accident, a stroke occurs when the blood supply to part of the brain is suddenly occluded or when a blood vessel in the brain bursts (or ruptures), causing damage to the brain. When part of the brain cannot get the necessary blood and oxygen it needs, the affected brain cells die. Stroke can be caused by a clot obstructing the flow of blood to the brain (ischemic stroke), bleeding within the brain (spontaneous intracerebral hemorrhage), or rupture of a weakened blood vessel around the brain (subarachnoid hemorrhage). A transient ischemic attack (TIA), or "mini stroke," is a temporary neurologic deficit that resolves leaving no residual damage.

Ischemic stroke accounts for about 83–87% of all cases, whereas hemorrhagic stroke accounts for about 13–17% of stroke cases. The majority of the latter are intracerebral hemorrhage, a devastating condition frequently resulting in a 30-day mortality of up to 50%. Smaller numbers of hemorrhagic strokes are caused by subarachnoid hemorrhage. These typically result from rupture of intracranial aneurysm or arteriovenous malformations, head trauma, or clotting disorders (include use of anticoagulant medications). It is estimated that between 1.5% to 5% of the general population have or will develop a cerebral aneurysm. About 3–5 million people in the United States have cerebral aneurysms, but most do not have any symptoms. Between 0.5% and 3% of people with a brain aneurysm may suffer from bleeding. Brain aneurysms differ considerably in size, shape, and location, but they are especially likely to be found in the anterior or posterior communicating arteries or the internal carotids.

A TIA can last minutes to hours. It occurs when the blood supply to part of the brain is briefly interrupted, and it is a risk factor for subsequent stroke. A TIA is generally thought to be caused by a clot. The primary difference between a stroke and TIA is that the blockage in TIA is temporary, although in some cases there may be some injury to brain tissue. In the earliest stages of ischemic neurologic deficit, there is no way to tell if the individual is experiencing a TIA or a major stroke.

A stroke mimic is a condition that can present similarly to ischemic stroke and may give a false-positive diagnosis of stroke. When it occurs, a patient initially diagnosed with stroke ultimately gets an alternate diagnosis, including seizure, conversion disorder, or encephalopathy. Hence, it is important to understand the role of telestroke in differentiating mimics from actual stroke.

Stroke can produce a wide range of neurological deficits that can significantly alter quality of life. A common disability that results from stroke is paralysis on one side of the body, which can be complete (hemiplegia) or partial (hemiparesis). Stroke may also cause problems with thinking, awareness, attention, learning, judgment, sensation, and memory. Stroke survivors often have problems understanding or using speech. A stroke can lead to emotional problems such as difficulty controlling one's emotions or inappropriate expressions of emotions. Depression is common. Stroke survivors may also experience numbness or strange sensations.

Fewer people are dying of stroke today. The age-adjusted stroke mortality rate has decreased 70% since 1950 and 33% since 1996. However, as the population ages, further advances are needed to keep pace.[66] It remains a leading cause of disability in the United States.[67]

## STROKE EPIDEMIOLOGY[c]

Stroke kills approximately 130,000 Americans each year, accounting for 1 out of every 19 deaths.[d] On average, one American dies from stroke every 4 minutes. Between 2007 and 2010, an estimated 6.8 million American ≥20 years of age have had a stroke (extrapolated to 2010 from National Health and Nutrition Examination Survey 2007–2010 data) and were living with its impact every day. During this period the overall stroke prevalence was an estimated 2.8%.[65]

Considered a precursor to symptomatic stroke and progressive brain damage, silent cerebral infarction is a brain lesion presumably resulting from vascular occlusion found incidentally by magnetic resonance imaging.[69] The prevalence of silent cerebral infarction is estimated to range from 6% to 28% of the population, with higher prevalence associated with increasing age and varying with ethnicity, sex, and risk factor profile.[70]

Based on the latest available data, on average, every 40 seconds, someone in the United States has a stroke.[65] In a national cohort study, the prevalence of at least one stroke-related symptom among those free of a prior diagnosis of stroke or TIA and older than 45 years of age was approximately 18%.[71] Projections indicate that an additional 3.4 million people ≥18 years of age will have had a stroke by 2030, a 20.5% increase in prevalence from 2012. The highest projected increase (29%) is expected to occur among Hispanic men.[72]

The data on stroke prevalence are unclear. However, there is general agreement that women have a higher prevalence rate at all ages, whereas men have a higher death rate due to stroke.[65,73]

In total, 27,744 participants in a national "Reasons for Geographic and Racial Differences in Stroke (REGARDS) Study" were followed up for 4.4 years between 2003 and 2010. In this cohort, the overall age- and sex-adjusted black/white incidence ratio was 1.51, but for those 45–54 years of age it was 4.02. However, the black/white incidence ratio for those ≥85 years of age declined to 0.86.[71] In a population-based stroke surveillance study (2000–2010),[74] significant ethnic disparities in stroke rates for people in the 45–59-year-old and 60–74-year-old age groups persisted (but not in for people >75 years of age) despite significant declines in ischemic stroke rates between Mexican Americans and non-Hispanic whites ≥60 years of age.

---

[c]Although based on findings reported in the current literature, the stroke prevalence and incidence estimates presented here are based on a considerable number of diverse study populations, in terms of sample size, geographic setting, and time period. The reader should, therefore, exercise caution in extending and/or assigning validity/accuracy to the estimates presented *vis-à-vis* current populations and subpopulations. For a more comprehensive review, the reader is referred to Go et al.[65]

[d]In fact, treatment of stroke has risen to a cross-national goal as stated in the World Health Organization's Helsingborg Declaration of 2006. One of the goals for 2015 pertained to the organization of stroke services and specifically stated that "a system be established to incorporate new achievements into stroke care."[68]

CDCR _029

## STROKE RISK FACTORS

More than 20 "leading" risk factors have been associated with stroke, including controllable medical risk factors and lifestyle risk factors, as well as uncontrollable risk factors.[75] Medical risk factors include atrial fibrillation, diabetes, high blood pressure, and chronic kidney disease. Lifestyle factors include smoking, physical inactivity, and obesity. Moreover, a documented parental ischemic stroke by the age of 65 years was associated with a threefold increase in ischemic stroke risk among their offspring, even after adjusting for other known stroke risk factors.

## STROKE COSTS

Stroke is a major cause of death and long-term disability with potentially enormous emotional and socioeconomic results for patients, their families, and health services. In spite of the high cost burden, only limited numbers of recent studies have focused on stroke-related costs in the United States.[76] These costs have been estimated at about $36.5 billion annually, including the cost of healthcare services, medications, and lost productivity.[65] Lifetime costs per stroke patient were estimated at between $59,800 and $230,000.[77] Brown et al.[78] at the University of Michigan (published in 2006) projected U.S. costs of ischemic stroke from 2005 to 2050 (in 2005 dollars) to be approximately $2.2 trillion: $1.52 trillion for non-Hispanic whites, $313 billion for Hispanics, and $379 billion for African Americans.[79] Assuming a 3% yearly inflation from 2008, total direct and indirect costs of stroke in the United States was projected to be $108 billion in 2025.[79] Based on the National Inpatient Sample, hospitalization costs for ischemic stroke patients in the United States treated with intravenous thrombolysis were assessed from 2001 to 2008.[80] Median hospital costs in 2008 dollars were $14,102 (interquartile range, $9,987–20,819) for patients with good outcome, $18,856 (interquartile range, $13,145–30,423) for patients with severe disability, and $19,129 (interquartile range, $11,966–30,781) for patients with in-hospital mortality. Average 2008 Medicare payments were $10,098 for intravenous thrombolysis without complication and $13,835 for intravenous thrombolysis with major complication.

## TELESTROKE

The term "telestroke" was introduced in the published literature in 1999[81] as an ICT-based solution to overcome the shortage of stroke expertise in many areas of the country. It came after the introduction of thrombolytic treatment with intravenous tissue plasminogen activator (tPA) (approved by the Food and Drug Administration in 1996) and reflected the urgent need to increase its appropriate administration during the "golden hour," initially set at 3 hours after the onset of symptoms and now extended to 4.5 hours. The timely administration of tPA increases the probability of a favorable outcome substantially, with an odds ratio of 2.55 in comparison with no treatment. However, this requires strict adherence to explicit protocols and close supervision by a stroke specialist. Because tPA dissolves the clot causing the stroke, it can also cause bleeding into the brain or other serious bleeding that may lead to death. Indeed, if tPA is administered in cases of hemorrhagic stroke or stroke mimics, it can be fatal or cause severe disability.

Stroke presents a very different kind of health problem when compared with heart failure. The onset of stroke is sudden and often unexpected. Its prompt and accurate diagnosis and treatment can produce optimal outcomes, both short term and long term. Hence, the critical variables in the intervention are based on timing: from onset of symptoms to proper diagnosis, to initiation of appropriate treatment, to transfer of patients, as indicated in each case. A crucial initial step is a computed tomography (CT) scan of the brain to determine whether the stroke is ischemic (about 87% of cases) or hemorrhagic (about 13% overall: 10% intracerebral and 3% subarachnoid [that is, between the pia and arachnoid membranes that surround the central nervous system]). The clinical protocols for these conditions are well established even though their implementation may not be uniform. Ischemic stroke may be treated by tPA, while balancing the risks and the benefits as they pertain to the characteristics of individual patients. Hemorrhagic stroke may require more complex interventions, including surgery.

Some stroke patients may be successfully treated in their local community hospital under remote supervision by a stroke specialist without being transferred to a stroke center. Some may have intravenous tPA treatment started on-site before being transferred (also referred to as "drip and ship"), and some may require prompt transfer to a stroke center for extensive interventions. Telestroke is often practiced within established hub-and-spoke networks. More recently, with the availability of more bandwidth and security arrangements (such as operating within protected virtual private networks), the Internet has been used as a more inclusive and much broader network for stroke treatment.

Because of the differences between heart failure and stroke, the focus and methodology for assessing the effects of telestroke vary considerably from those of telemonitoring for heart failure. Whereas telemonitoring of heart failure typically provides long-term support and ongoing service to help patients maintain an optimal level of health and functioning for the remainder of their lives, including patient-specific medication regimen and healthy lifestyle, telestroke systems typically consist of prompt interventions aimed at optimal treatment. Telestroke is based on an explicit evidence-based protocol for the timely administration of thrombolytic treatment, when indicated, and the transfer of patients requiring more intensive interventions.

Telestroke systems typically consist of networks wherein community and rural hospitals are electronically linked with medical centers containing stroke expertise. In some instances, tPA is administered on-site with supervision by the remote stroke specialist. When patients present complex conditions that require critical care or surgical or arterial interventions, they are transferred to tertiary-care centers. If patients experience a worsening of symptoms after tPA, a CT scan of the brain and cessation of the medication are indicated, and the patient would be transferred to a stroke center.

## THE SEARCH FOR EVIDENCE

Using the terms telemedicine/telehealth and stroke, our initial literature search yielded 422 publications. The four-step review process described earlier in the section on CHF resulted in a final list of 21 publications for full review (Table 2). The selection criteria for

## Table 2. Methodology and Findings Pertaining to Stroke

| | | | | | | | FINDINGS | | |
|---|---|---|---|---|---|---|---|---|---|
| LITERATURE SOURCE | | | METHODOLOGY | | | | | | |
| REFERENCE | DATE | COUNTRY | DESIGN | SIZE (N) | DURATION (MONTHS) | TELEMEDICINE TECHNOLOGY | FEASIBILITY AND RELIABILITY | EVENT TIMING[a] | HEALTH OUTCOMES[b] | COMMENTS |
| Khan et al.[82] | 2010 | Canada | PCC | 210 | 24 | T | Yes | ↑ | 0 | No difference between T and VTC |
| | | | | | | VTC | | ↑ | | |
| Gonzalez et al.[83] | 2011 | United States | PCC | 960 | NR | CVP | Yes | ↓ | 0 | 38 seconds longer than bedside |
| Demaerschalk et al.[84] | 2012 | United States | PCC | 100 | NR | Network | Yes | NM | 0 | NIHSS: 8 high, 6 moderate, 1 poor agreement (ataxia) |
| Allibert et al.[85] | 2012 | France | RCC | 161 | 72 | VTC | Yes | NM | 0 | LOS shorter |
| Pervez et al.[86] | 2010 | United States | RR | 296 | 3/6 | T, VTC | Yes | ↑ | 0 | "Drip and ship" is safe/effective; spoke patients less severe |
| Spokoyny et al.[87] | 2014 | United States | RCT | 261 | NR | T, VTC | Yes | NM | ↑ | Telestroke evaluation of head CT scans for acute tPA assessments is reliable. |
| Demaerschalk et al.[88] | 2012 | United States | 2 RCTs | 276 | 3 | T, VTC | VTC better | ↑ | VTC>T | VTC higher sensitivity than phone |
| Handschu et al.[89] | 2008 | Germany | PCC | 151 | 12 | T, VTC | Yes | VTC↓; T↑ | ↑ | Exam times (VTC, 49.8 minutes/T, 27.2 minutes) |
| Puetz et al.[90] | 2012 | Germany | PCC | 536 | NR | Network | Yes | NM | ↑ | Stroke neurologists can reliably interpret CT scans. |
| Müller et al.[91] | 2006 | Germany | PCC/RCC | 299 | 24 | VTC | Yes | NM | ↑ | All quality indicators improved; LOS lower |
| Audebert et al.[92] | 2009 | Germany | NR | 267 | 3 | VTC | Yes | ↑ | 0 | Acceptance high and stable |
| Pedragosa et al.[93] | 2009 | Spain | RCC/PCC | 201 | 12 | VTC | Yes | ↑ | ↑ | Telemedicine allowed 38% (from 17%) neurologist evaluation |
| Nagao et al.[94] | 2012 | Australia | RR | 275 | 12 | VTC | Yes | ↑ | 0 | Telestroke faster, safe, reliable |
| Sairanen et al.[95] | 2011 | Finland | PCC | 985 | 24 | VTC | Yes | ↑ | 0 | On-site versus telestroke similar results |
| Rudd et al.[96] | 2014 | United Kingdom | RCC | 2,922 | 36 | T | Yes | T ↓ | 0 | In-person 65 minutes, T 73 minutes |
| Bruno et al.[97] | 2013 | United States | RR | 889 | 20 | VTC | Yes | ↑ | ↑ | Registration delay (median 39 minutes) |
| Pedragosa et al.[98] | 2012 | Spain | PCC | 119 | 24 | VTC | ↑ Endovascular treatment | ↑ | ↑ | Saved time in endovascular treatment |
| Walter et al.[99] | 2012 | Germany | RCT | 100 | Stopped at 100 patients | MSU | MSU feasible/reliable | ↑ | 0 | Timing improved |
| Audebert et al.[100] | 2009 | United Kingdom | PCC | 3,060 | 12/24 | VTC | Yes | ↑ | ↑ | Long-term benefit for acute stroke patients |
| Theiss et al.[101] | 2013 | Germany | LS | 1,152 | 48 | VTC | Yes | ↑ | ↑ | Increased teleconsultations and 45% increase in protocol conformity |
| Switzer et al.[102] | 2013 | United States | PCC | 1,112 | 60 | VTC | Yes | ↑ | ↑ | Spoke hospitals more effectively used |

[a]Arrows indicate direction of change: faster or increased use (↑) or slower or decreased use (↓).

[b]Arrows indicate direction of change: improved (↑) or declined (↓).

CT, computed tomography; CVP, cellular videophone; LS, longitudinal study; MSU, mobile stroke unit with computed tomography scanner; NIHSS, National Institutes of Health Stroke Scale; NM, not measured; NR, nonrandomized; O, neutral outcome; PCC, prospective case control; RCC, retrospective case control; RCT, randomized controlled trial; RR, retrospective review; T, telephone; t-PA, tissue plasminogen activator; VTC, video teleconference.

CDCR _031

telestroke studies had to be adapted because the RCT requirement could not be met in most cases. Stroke studies do not readily lend themselves to case randomization and prospective observation or blinding for clinical and ethical reasons. Because the relative efficacy and safety of the clinical protocols are well established, denying appropriate treatment for patients in the control group would not be justified.

There are, however, other methodological options that enable reliable and valid assessment of the effects of telestroke under these conditions. These methodologies include variations of the case control study design, where cases in the intervention group are matched either prospectively or retrospectively to create the control group. Such quasi-experimental designs have the unique advantage of ready access to large samples, they are substantially less costly than RCTs, and they do not violate any potential ethical rules in informed consent. The typical statistical measure of effect in the case control design is usually given as an odds ratio (i.e., the effect of telestroke, given the alternative).

The telestroke evidence presented here covers the period from 2005 through the spring of 2014. Unless otherwise noted, our analysis of the findings is limited to studies during this period with a minimum sample size of 150 and a robust research design (typically case–control quasi-experimental design).

The findings can be grouped into three sets: (1) feasibility and reliability of telestroke, (2) intermediate outcomes: event timing in the care process (time lapse between onset of symptoms, diagnostic tests and treatment), and (3) health outcomes and cost. As mentioned earlier, the findings from studies that incorporated more than one chronic condition are discussed only once.

*Feasibility and reliability.* Initially, we report the findings from six studies (three from the United States and one each from Canada, France, and Germany) that investigated the feasibility and/or reliability of telestroke. In 2010, a study reported on a 2-year experience with 210 patients with acute stroke who were referred to the telestroke program serving remote hospitals in Alberta, Canada.[82] Telephone and video were both used in connecting the remote sites to the University of Alberta Hospital. Over a 2-year period, 77% of patients in the video group received thrombolysis versus 45% in the telephone group. Over 21% of patients were treated with tPA at their local hospital. The authors concluded that telestroke is not only feasible, but it can also significantly reduce the need to transfer patients. Furthermore, the study suggests the value of visual information.

A 2011 study tested the feasibility and reliability of using a videophone to assess compliance with the National Institutes of Health Stroke Scale (NIHSS) in patients with acute stroke before they were admitted to the hospital.[83] A cellular videophone with two-way audio and one-way video was used to connect patients from the originating site. In total, 480 paired comparisons by 40 physicians were generated to assess the feasibility and reliability of the videophone *vis-à-vis* bedside stroke management. Performing the NIHSS over videophone took 38 seconds longer than the bedside examination, but it was equally reliable.

A somewhat similar study in 2012 compared the reliability of a video smartphone (i.e., Apple [Cupertino, CA] iPhone® 4) with bedside

observation for assessing NIHSS in acute stroke patients and reported similar results.[84] One hundred consecutive patients 30–96 years of age presenting at the Mayo Clinic with a suspected stroke were observed at the bedside and via video (which captured verbal responses, actions, and body expressions). Of these, 46.8% had a final diagnosis of ischemic stroke, 8.7% of transient ischemic attack, 7.5% of hemorrhagic stroke, and 36.1% of stroke mimics; 0.96% of the diagnoses were uncertain. Among ischemic alert patients, 14.1% received tPA, 3.5% received tPA plus intra-arterial treatments, and 4.0% received intra-arterial treatment only. The authors concluded that the iPhone was a "very reliable tool for stroke telemedicine."[84] Moreover, physicians were highly satisfied with the iPhone in this context.

In 2012, a French study compared the efficacy and safety of thrombolytic treatment of ischemic stroke at a distant hospital via telemedicine.[85] A retrospective analysis of 161 patients over a 6-year period compared the experience of a university hospital versus a remote hospital via telemedicine. No significant differences were observed between the two settings.

In another study, data were abstracted from patient records to ascertain the feasibility and safety of telestroke services provided in a regional network. The complications and outcomes of 296 patients with acute ischemic stroke were compared with those receiving tPA treatment using "drip and ship" treatment and those treated at the regional stroke center.[86] Patients at the "spoke hospital" were younger with fewer severe symptoms. The outcomes of the two groups were similar. Among survivors, length of stay among spoke hospital patients was shorter. However, these differences may be explained by the selectivity of the two groups.

A somewhat different methodology was used in a pooled analysis of data from Arizona and California.[87] The data were derived from prospective, randomized, outcome-blinded studies comparing telemedicine/teleradiology with telephone-only consultations. Inter-observer reliability was ascertained between the hub vascular neurologist (telemedicine arm) and the spoke radiologist (telephone arm) regarding contraindications for tPA, hemorrhage, tumor, hyperdense artery, acute stroke, prior stroke, and ischemic changes. There was substantial agreement (over 94% for all measures) between vascular neurologists and radiologists at spoke sites. This study demonstrated that telestroke evaluation of head CT scans for acute tPA assessments is reliable. Furthermore, pooled analysis from the same trials and based on a total of 276 patients reported that correct thrombolysis eligibility decisions were more often made by use of telemedicine services versus other modalities (96% telemedicine, 83% telephone) with an odds ratio of 4.2. Administration of tPA was also higher in telemedicine compared with telephone-only consultations (26% versus 24%), but there was no statistically significant difference in post-thrombolysis hemorrhage.[88] This analysis concluded that telemedicine (i.e., video) significantly improved correct decision making for acute ischemic stroke as compared with telephone. The study authors concluded that "poor sensitivity of telephone determination of thrombolysis eligibility suggests that telephone assessments may result in stroke consultants ruling out patients who should have been treated with tPA."[88] Similar findings

CDCR_032

**BASHSHUR ET AL.**

regarding the poor sensitivity of the telephone compared with video were reported in an earlier (published in 2008) study in Germany.[89]

Similarly, in a 2012 German study, the reliability of brain CT evaluation by telestroke neurologist was confirmed.[90] Two neuro-radiologists re-examined all CT scans for 536 patients who were initially assessed by stroke neurologists. The neuroradiologists detected discrepant findings in 8% of the cases, but only 1.7% were rated as clinically relevant. One patient had evidence of intracranial hemorrhage, but it was not clear whether that patient received tPA. The authors concluded that "stroke neurologists can reliably interpret the cerebral CT scan of patients with clinically suspected acute ischemic stroke in telemedicine in real time."[90]

*Intermediate outcomes: event timing.* A large number of studies focused on the critical time intervals from onset of symptoms, to CT scan of the brain, to treatment and/or transfer, but not always on the same intervals. We report here on seven such studies that met the inclusion criteria for our review. None of these studies utilized an RCT design for the reasons explained earlier.

A study conducted in Germany in 2006 investigated the quality of procedures related to stroke diagnosis and treatment at community hospitals via telemedicine (or telestroke) before ($n = 299$) and after implementation of telestroke ($n = 305$).[91] More patients were transferred after than before telestroke (10.3% versus 1.3%) to acute care hospitals, but all indicators of quality improved, including cerebral imaging (from 56.5% to 96.4%), speech therapy (from 0% to 58.8%), and occupational therapy (from 0% to 33.4%). One year after admission, mortality declined from 18.9% to 17.2%, respectively, whereas 10.2% and 6.1%, respectively, were living in institutions. The authors published another report later[92] based on the same experience and reported high levels of satisfaction among clinicians related to video quality, time consumption, and medical relevance.

Another trend analysis was conducted in Spain using baseline data for 201 cases in 2006 and 198 cases in 2007 after the activation of the telestroke program.[93] Telestroke consisted of videoconferencing between the patients at a community hospital and the stroke experts at a tertiary-care center. Specialists also had access to neuroimaging scans via the Picture Archiving and Communication System. The historical comparisons pre- and post-telestroke intervention reveal an increase in thrombolytic treatment of 4.5%, a decrease in the interval between onset of symptoms and thrombolytic treatment from 210 minutes to 162 minutes, and a reduction in between-hospital patient transfers.

An Australian study gathered baseline data on 145 patients in the first or control year and on 130 patients in the second or telestroke year.[94] Of 145 in the control group, 36 were eligible for tPA, whereas 54 of 130 were eligible for tPA in the intervention group. Of those eligible, 8 patients received thrombolysis in the intervention group, whereas none in the control group received the treatment. Time lapse between arrival and CT scan was similar in both groups, but the use of a telestroke intervention reduced unnecessary patient transfers and enabled physicians promptly to identify patients requiring urgent neurosurgical interventions.

A prospective cohort study in Finland, conducted from 2007 to 2009 (published in 2011), compared thrombolysis rates at five

community hospitals ($n = 106$) via telestroke with those appearing in person at the emergency room at the hub hospital ($n = 985$).[95] Among those patients with whom telestroke was used, 57.5% had thrombolytic treatment (a two- to threefold increase). Time to tPA treatment (onset to treatment time) was 120 minutes, and length of consultation was 25 minutes when it led to thrombolysis and 15 minutes if it did not. Patients treated with tPA at the community hospitals via telestroke had similar outcomes as those treated at the hub hospital.

A more recently published (in 2014) study in the United Kingdom used a retrospective case series design to assess the efficacy and safety of thrombolysis treatment via telephone-based telestroke.[96] This study was based on a sample of 2,922 patients who were given tPA between 2007 and 2010. Of these, 192 were treated with tPA after an assessment by a remote specialist. The median "door-to-needle" time was 8 minutes faster in the group that was seen in person (65 minutes versus 73 minutes by telephone), but no differences were observed in neurological outcomes or instance of hemorrhage.

A retrospective record review was conducted in Georgia on 889 telestroke consultations involving 115 patients treated with tPA during a 20-month period (2011–2012).[97] The authors calculated the time elapsed between emergency department arrival and registration, start of specialist consultation, CT scan, and thrombolytic recommendation and initiation. The most conspicuous delay occurred during registration (median of 39 minutes). However, the median time from emergency department arrival to thrombolysis initiation was 88 minutes. The main benefit of telestroke was to shorten the time from emergency department arrival to thrombolysis. Overall, thrombolysis was initiated within 60 minutes from arrival to the emergency room and was administered to 13% of the patients.

A prospective analysis of 119 patients demonstrated the benefits of telemedicine for patients with acute stroke presenting at community hospitals in Spain (published in 2012).[98] This study focused on the effects of telemedicine in terms of receiving endovascular treatment (as contrasted with thrombolytic treatment). The telemedicine intervention consisted of an interactive videoconferencing system that enabled stroke experts to perform their assessments based on vital signs, interview, and physical examination. A 2-year analysis of patients receiving urgent endovascular recanalization procedures showed that telemedicine patients were more likely to receive such treatment than non-telemedicine patients (20.5% versus 16.4%). This system saved time in the initiation of interventional therapy, as well as the necessary processing of informed consent and preparation of the interventional team before the patients' arrival at the regional stroke center.

Although the vast majority of telestroke studies relied on quasi-experimental designs, mostly by necessity, in 2012 a rare RCT, conducted in Germany, compared diagnosis and treatment of stroke patients in a mobile stroke unit versus in-hospital.[99] Randomization was by week, alternating between experimental and control groups, and was not masked for patients or investigators. The mobile units were equipped with a CT scanner, laboratory, and telemedicine equipment. The study was terminated after interim analysis of 100 cases because it met prespecified criteria for termination (i.e., the benefits were obvious). The median time from alarm to therapy decision decreased

from 76 minutes to 35 minutes. Similar gains were observed regarding times from alarm to CT scan, to end of laboratory analysis, and to start of intravenous thrombolysis. Differences in neurological outcomes between the two groups at 7 days were not statistically significant.

*Health outcomes and cost.* Three large-scale studies investigated health outcomes. In 2009, a prospective nonrandomized study compared a network of five community hospitals with telestroke services with five matched community hospitals without telestroke, involving all patients ($n = 3,060$) with consecutive ischemic or hemorrhagic stroke admitted between 2003 and 2005.[100] This German study measured the effects of telestroke on death, institutional care, and disability. Of 3,060 patients, 1,938 were in the intervention group, and 1,122 were in the control group. Follow-up rates were high: 97.2% for 12 months and 95.7% after 30 months for death and dependency. The authors found that death and dependency were significantly lower in the intervention group and that these differences held across the two follow-up times. Moreover, these differences remained when the authors controlled for age, gender, living with a partner, severity of the stroke, and co-morbidities. The most significant finding was the long-term reduction in death and disability for those receiving telestroke services.

Another long-term longitudinal study was conducted in Germany from 2006 to 2009.[101] Over a period of 4 years, the number of tele-consultations increased from 49 in 2006 (technical and organizational proof-of-concept phase) to 177 in 2007 (implementation stage) and 577 in 2009, with a total of 1,152 consultations during the study period. Clinical data were gathered from a nationwide network consisting of 11 hospitals (six primary-care NeuroNet hospitals and five tertiary-care stroke centers). In addition, five primary-care hospitals were used as controls (matched by bed size, departments of internal medicine, and distance to specialized stroke centers). The hospitals in the control group benefited from the same management system with educational content and peer review but had no telestroke capability. The NeuroNet concept involved the use of tele-medicine (a) to transfer knowledge from stroke centers to primary-care hospitals, (b) to implement a standardized stroke protocol, and (c) to provide continuing medical education and peer review in stroke. Over the course of the study, the use of thrombolytic therapy increased by 4.8% in NeuroNet hospitals while mortality risk decreased by approximately 29% compared with control hospitals. Between 2006 and 2009, ischemic stroke mortality decreased in all three hospital cohorts. During the implementation stage (2007 and 2008), both NeuroNet and control hospitals had nearly identical mortality declines (from 10.5% to 7.5% and 10% and 7.5%, respectively). Treatment with tPA in NeuroNet hospitals increased by 1.6% per year, reaching 5.8% after 4 years. Conformity with protocols for stroke coding (a process variable) also increased by 45% in NeuroNet hospitals and by 18% in control hospitals. The authors concluded that "NeuroNet has substantially contributed to improving stroke care…and yielded benefits even in stroke centers."[101]

In 2012 (published in 2013), the cost-effectiveness of telestroke networks in the management of acute ischemic stroke was assessed from the perspective of a hub-and-spoke hospital network.[102] Over a 7-year period, data from two hub-and-spoke networks (each having one hub and seven spokes, as a typical telestroke network)—Georgia Health Sciences University and the Mayo Clinic—were used to compare costs and effectiveness with and without a telestroke network. The authors developed a decision-analytic model to compare the costs and effectiveness of the telestroke network. This model traced the critical decision points in the care process for ischemic stroke patients presenting at a telestroke network and those without, including both hub and spoke sites. Outcome measures included teleconsultation rates, thrombolysis treatment, endovascular therapies, and patient transfers from spoke to hub hospital. The analysis started with an annual 1,112 patients with ischemic stroke presenting at emergency departments in the network. The model predicted 114 fewer patients would be admitted to the hub each year for those in a network and that 16 additional patients would be admitted to each spoke hospital without a network. About 45 additional patients would be treated with tPA, and 20 more with endovascular stroke therapy, in the telestroke network. The cost savings estimate averaged $358,435 annually in the telestroke network and increased over time for patients treated during the first year from $234,836 at the end of Year 1 to $393,712 at the end of 5 years. Each spoke hospital would save $109,080 per year, whereas the hub hospital would bear a positive cost of $405,804 per year. The authors estimated that cost sharing between hub and spoke hospitals would result in cost savings of $44,804 annually for 5 years. Sensitivity analysis revealed robust overall results. Cost savings were estimated to increase with increases in the number of spoke hospitals. Cost saving estimates for 5 years ranged from $8,974 with no spoke hospitals to $2,400,000 for 40 spoke hospitals. In other model scenarios, estimates of cost savings ranged from $159,718 to $1,359,500 per year from a network perspective.

## COPD

COPD is an umbrella term for a group of progressive, debilitating respiratory conditions characterized by difficulty breathing, lung airflow limitations, cough, and other symptoms.[e] Although there is no consensus on the definition of COPD,[104] the Global Initiative for Chronic Obstructive Lung Disease (GOLD) guidelines define it as "a

---

[e]The GOLD COPD definition excludes emphasis on "emphysema" and "chronic bronchitis" that have been used in "many previous definitions."[103] The 2014 update states that "emphysema, or destruction of the gas-ex-changing surfaces of the lung (alveoli) is a pathological term that is often (but incorrectly) used clinically and describes only one of several structural abnormalities present in patients with COPD. And, chronic bronchitis, or the presence of cough and sputum production for at least 3 months in each of two consecutive years, remains a clinically and epidemiologically useful term. However, it is important to recognize that chronic cough and sputum production (i.e., chronic bronchitis) is an independent disease entity that may precede or follow the development of airflow limitation and may be associated with development and/or acceleration of fixed airflow limitation. (Further)…Chronic bronchitis also exists in patients with normal spirometry."[103,p.2]

CDCR _034

common preventable and treatable disease,…characterized by persistent airflow limitation that is usually progressive and associated with an enhanced chronic inflammatory response in the airways and lungs to noxious particles or gases."[103] Exacerbations and comorbidities contribute to the overall severity and the quality in life in individual patients. As the incidence of COPD increases, so does the burden on health services.[105]

An exacerbation of COPD is an acute event characterized by a worsening of respiratory symptoms beyond normal day-to-day variation, typically requiring changes in medication and possibly hospitalization.[106–108] Variable decrease in pulmonary function and the occurrence of tachypnea (excessively rapid breathing) are typical in acute exacerbations.[103] COPD exacerbations are especially important because they adversely affect quality of life, take weeks to resolve, accelerate decline in lung function, and potentially lead to death. In addition, they are associated with high healthcare cost.

## COPD EPIDEMIOLOGY

COPD is a major cause of disability and death throughout the world, estimated to affect about 10% of the population.[109] In the United States, COPD is the primary contributor to mortality caused by chronic lower respiratory diseases, which became the third leading cause of death in 2008 and retained that position in 2010, accounting for 5.6% (138,080 deaths) of all deaths.[110,111]

The true prevalence data for COPD in the population is difficult to obtain. Only two sources—the National Health Information Survey and the Behavioral Risk Factor Surveillance System—gather information on COPD. Both sources use an all-inclusive question in their surveys that includes emphysema and chronic bronchitis, and data are self-reported. The Behavioral Risk Factor Surveillance System estimated 14.7 million adults (defined as ≥ 18 years of age), or 6.2% of this population, had COPD (including chronic bronchitis and emphysema) in 2011, whereas the National Health Information Survey estimated 12.7 million (or 5.5%).[112]

In 2011, the age-adjusted prevalence for adults was 6.5% (approximately 13.7 million).[113] Hispanics were less likely than whites and blacks to report having COPD (4.0% compared with 6.3% and 6.1%, respectively). Women were more likely to report having COPD than men (6.7% versus 5.2%). People without a high school education had a prevalence rate of 9.5% compared with 6.8% for those who completed high school and 4.6% of those who completed some college. Prevalence rates were much higher (20.9%) among those unable to work compared with the unemployed (7.8%), retired (7.6%), homemakers or students (4.9%), or employed (3.8%). A considerably higher percentage of current smokers reported having COPD (13.3%) than former smokers (6.8%) or those who never smoked (2.8%).[110] There was considerable geographic variation in respondents reporting physician-diagnosed COPD (including chronic bronchitis and emphysema): Kentucky (10.1%), Alabama (9.9%), Indiana (8.9%), and West Virginia (8.8%) were the states with the highest reported incidence of COPD, whereas states with the lowest rates included Minnesota (4.1%), Utah, Washington, and North Dakota (4.5%).

## COPD COST

During the period from 1979 to 2001, data from the National Hospital Discharge Survey estimated a total of approximately 45 million (8.5% of all hospitalizations in adults >25 years of age) discharges were for patients with COPD. Of these, about 36 million discharges (79%) occurred with COPD as a secondary diagnosis, and 9.8 million (20.8%) occurred with COPD as the primary diagnosis.[114] In 2008, the estimated direct economic cost of COPD and asthma was $53.7 billion. These costs included prescription medicines ($20.4 billion), visits to outpatient clinics or office-based providers ($13.2 billion), hospital inpatient stays ($13.1 billion), home healthcare ($4.0 billion), and emergency department visits ($3.1 billion).[113] In 2010, 133,575 deaths were attributable to COPD. During the same year, there were 10.3 million (498.4 per 10,000 population) physician office visits, 1.5 million (72.0 per 10,000) emergency department visits, and 699,000 (32.2 per 10,000) hospital discharges for COPD.[113]

## TELEPULMONOLOGY

Patients with COPD often experience exacerbations in their symptoms that may require hospitalization. Frequent monitoring is indicated to evaluate their lung function and to assist in managing their health. Telepulmonology is designed to serve that purpose, and it consists primarily of two activities: (1) telespirometry for remote measurement of lung function (volume of air inhaled and exhaled), initially to diagnose COPD and periodically to ascertain clinical status, and (2) teleconsultations between primary care providers (physicians and nurses) and pulmonary specialists for the care and treatment of patients at remote sites. The goal of teleconsultation is to provide ready access to expert consultants in areas lacking these resources and also to reduce unnecessary hospitalization. Telepulmonology can be designed as an ongoing remote monitoring of COPD in similar fashion to telemonitoring of CHF.

## Evidence of the Impact of Telepulmonology

As with the other two chronic diseases, our review of the evidence for telepulmonology is focused primarily on the period from 2005 through 2013. Our initial search identified 172 studies. Of these, 17 were included in the final analysis. Here again, our analysis is limited to robust studies with adequate sample size. COPD is similar to CHF in terms of its long-term chronic nature that exacerbates with time, its amenability to treatment, and the feasibility of conducting clinical trials. Hence, the majority of the studies reported here were based on RCTs. Most of these studies were focused on COPD, but a few incorporated more than one of the three chronic disease entities in this report. Hence, we tried to include each study only once. Deviations from this rule are noted explicitly, and the discussion in repeated cases is very limited. As with telestroke findings, those from COPD studies are grouped into three clusters of outcomes, but with a slight variation in headings specific to COPD: (1) feasibility and acceptance of telepulmonology, (2) use of service, and (3) health outcomes and cost (Table 3).

CDCR _035

## Table 3. Methodology and Findings Pertaining to Chronic Obstructive Pulmonary Disease

| LITERATURE SOURCE | | | METHODOLOGY | | | | FINDINGS | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| REFERENCE | DATE | COUNTRY | DESIGN | SIZE (N) | DURATION | TELEMEDICINE TECHNOLOGY | FEASIBILITY AND RELIABILITY | USE OF SERVICE | HEALTH OUTCOMES | COMMENTS |
| Raza et al.[115] | 2009 | United States | RCC/PCC | 314 | 7 years | VTC | Yes | 8% required in-person visits | NM | Patient travel avoided; patient satisfied |
| Bonavia et al.[116] | 2009 | Italy | OS | 937 | 2 years | TS via T | Yes | NM | 0 | High GP acceptance of TS |
| Averame et al.[117] | 2009 | Italy | OS/PCC | 638 | NR | TS via T | Yes | NM | TS used in diagnosis and airway management | Encourages testing of smokers without symptoms |
| Bernocchi et al.[118] | 2012 | Italy | OS | 474 | 6/12 months | T, POx | Yes | NM | HPS | Growing need for home management |
| Whitten and Mickus[119] | 2007 | United States | RCT | 161 | 11 weeks | VTC | Yes | NM | HPS | Small n |
| Vitacca et al.[120] | 2009 | Italy | RCT | 240 | 1 year | T, POx | Yes | −36% hospitalizations; −65% GP calls | −71% acute exacerbations; telemedicine greater care advantage | Overall costs 33% less with telemedicine |
| Vitacca et al.[121] | 2010 | Italy | OS | 396 | 5 years | NC, POx | Yes | Nurse time increased; MD time decreased | – | 39% cost savings |
| Dinesen et al.[122] | 2012 | Denmark | RCT | 111 | 10 months | WTM, VTC | Yes | Lower hospitalization | – | Small sample size |
| Sorknaes et al.[123] | 2013 | Denmark | RCT | 266 | 26 weeks | VTC | Yes | 0 | 1 week of teleconsultations post-AECOPD, no effect | Patients had ECOPD; only 1 week of telesupport |
| Sorknaes et al.[124] | 2011 | Denmark | NRCT | 100 | 28 days | VTC | Yes | NM | HPS | VTC showed protective factor |
| Pinnock et al.[125] | 2013 | United States | RCT | 256 | 12 months | HTM | Yes | Not effective with ECOPD | 0 | Speculates positive results of other studies due to clinical service |
| Strickland et al.[126] | 2011 | Canada | CNRA | 409 | 6 months | VTC | Yes | Reduced and delayed re-admissions/LOS | QoL up | Lower re-admission rate (12% versus 22%) |
| de Toledo et al.[127] | 2006 | Spain | RCT | 157 | 1 year | Call center,Web, HTM, VTC | Yes | Lower number of re-admissions | – | Value in integrated telemedicine case management |
| Gellis et al.[128] | 2012 | United States | RCT | 102 | 12 months | T, HTM | Yes | – | Health, social functioning, depression, ER visits all improved | LOS not significant at 12 months |
| Pedone et al.[129] | 2013 | Italy | RCT | 100 | 9 months | POx, T, wristband vitals monitor | Yes | LOS longer for intervention group | Med use, hospitalization, exacerbation risk all lower | Vitals collected every 3 hours |
| Cardozo and Steinberg[130] | 2010 | United States | OS | 851 | 60 days | HTM (embedded in EMR) | Yes | Positive telemedicine benefit for hospitalization, ER visits | Improved survival | Re-hospitalization rate 13.9% and ER visits 29% (versus national rates of 56.4% and 45%, respectively) |
| Thijssing et al.[131] | 2013 | The Netherlands | OS | 1,958 | 3.5 years | TS | Yes | Physical referrals reduced 27% | TPC increased pulmonologists' referrals 18% where needed | Unneeded referrals reduced 68% |

AECOPD, acute exacerbated chronic obstructive pulmonary disease; CNRA, comparative nonrandomized analysis; ECOPD, exacerbated chronic obstructive pulmonary disease; EMR, electronic medical record; ER, emergency room; GP, general practitioner; HPS, high patient satisfaction; HTM, home telemonitoring; LOS, length of stay; NM, not measured; NR, not reported; NRCT, nonrandomized controlled trial; O, neutral outcome; OS, observational study; PCC, prospective case control; POx, pulse oximeter; QoL, quality of life; RCC, retrospective case control; T, telephone; TPC, telepulmonary consultations; TS, telespirometry; VTC, video teleconference; WTM, wireless telemonitoring.

CDCR _036

**BASHSHUR ET AL.**

## FEASIBILITY AND ACCEPTANCE

One of the earlier studies (published in 2009) was observational, and it described a pulmonary telemedicine model at a Veterans Affairs hospital in Milwaukee, WI.[115] In total, 314 patients received telemedicine consultations for abnormal radiology (38%), COPD (26%), and dyspnea or shortness of breath (13%). Physical examinations were conducted mostly by telemedicine nurses or respiratory therapists (90% of the cases). Telemedicine consultations resulted in changes in patient management in 41% of the cases, and only 8% required an in-person visit. In addition, over the 5-year period of the study, telepulmonology saved patients over an estimated 294,000 miles of travel, thereby reducing carbon footprint. The authors reported that this intervention was not only feasible from a technical perspective but also improved access to subspecialty care. Moreover, patients were satisfied with their telemedicine experience.

Telespirometry has been investigated for its potential in assisting GPs in managing their patients with COPD. In 2009, an Italian study of 937 GPs who, over a 2-year period, received the results of telespirometry performed on over 20,000 patients (conducted by patients with tracings sent by telephone).[116] Data indicated that 70% of the tests met the criteria for good or partial compliance in performing the procedure, allowing abnormalities to be detected in 40% of the tracings. Only 9.2% could not be evaluated. Overall, the authors concluded that telespirometry was well accepted by these Italian GPs.

A somewhat similar study was conducted by the same authors (published in 2009),[117] wherein 638 GPs were trained to perform telespirometry on four sets of subjects: (1) smokers and ex-smokers without respiratory symptoms, (2) patients with respiratory symptoms but not diagnosed, (3) patients diagnosed with asthma, and (4) patients diagnosed with COPD. All traces were interpreted by specialists. In addition to confirming the feasibility of telespirometry in a primary care setting, this study challenged the strategy of denying spirometry for individuals without respiratory symptoms—if they were smokers. The authors argued that the finding of airflow obstruction from spirometry may be used as a deterrent against smoking. At the same time, a significant proportion (23%) of patients already diagnosed with COPD had normal spirometric values.

The experience of a regional network in Lombardy, Italy, demonstrated the feasibility and patient acceptance of telemedicine for managing heart failure and COPD (published in 2012).[118] In total, 474 patients with COPD received remote consultations. More than 95% of patients were satisfied with the service, and 98% were satisfied with the nurse-tutor.

Patient perceptions of a home telemedicine program for COPD and CHF patients were compared with those of a control group receiving usual care.[119] No significant differences were observed between patients in the intervention group and those in the control group with regard to perceptions of health and well-being. However, the small sample size for patients with COPD (28 of 161 patients in the study) precludes any generalization regarding COPD.

## EFFECTS OF TELEPULMONOLOGY ON USE OF SERVICE

Two reports were published from one program in Italy, labeled as "Tele-assistance in COPD."[120,121] The first was an RCT of 240 patients allocated to either an intervention or a control group and observed over a 1-year period,[120] and the second was an observational study of 396 patients over a 5-year period.[121]

In the first study, in total, 866 patients were discharged from the respiratory unit, but only 240 met the selection criteria for the clinical trial. Although patients with worsening symptoms had a significantly higher number of re-hospitalizations, as would be expected, the results from the RCT revealed no significant differences in mortality between the control and intervention groups. However, compared with the control group, those in the intervention group experienced fewer hospitalizations (−36%), urgent calls to the GPs (−65%), and acute exacerbations (−71%). Cost savings were estimated at 33% per patient after discounting the cost of the telepulmonology system. Of interest also is that these benefits were still significant among patients suffering from chronic respiratory failure who were on oxygen or home ventilators.

The second article was based on an observational study over a 5-year period (2004–2009) of patients with chronic respiratory failure. It reported on trends over time among those having the telemedicine intervention, as well as effects on staff activity and salary cost. The trend data showed a shifting in costs, with an overall decrease in physician time and an increase in nurse time, thereby resulting in cost savings of 39%.

Somewhat similar findings were reported in 2012 from a Danish RCT ($n=111$) that investigated the use telemedicine for COPD.[122] Patients were recruited from a health center, a general practice, and a pulmonary hospital ward. Both intervention and control groups were observed over a 10-month period. The intervention group had a lower hospital admission rate compared with the control group (0.49 versus 1.17). Other outcome measures were not statistically significant, likely because of a small sample size.

A more recent (published in 2013) RCT ($n=266$) in Denmark investigated the effect of daily teleconsultations for 1 week between specialized nurses and patients who had severe COPD and had been discharged from the hospital after an exacerbation.[123] Patients in both the intervention and control groups were offered outpatient clinic consultations with a nurse at 4- and 12-week intervals. The intervention group was offered daily consultations by video for about 7 days (range, 5–9 days) that included, when indicated, smoking cessation, physical training, and rehabilitation followed by telephone consultations. The study found no significant differences between the two groups with regard to mortality or hospital re-admissions. The authors concluded that the limited (1-week) teleconsultations between hospital-based nurses and patients with severe COPD did not significantly reduce readmissions or affect mortality. Yet, different findings were reported by the same senior author (with different co-authors) about 1 year earlier.[124] This was an interventional study in which all patients were consecutively assigned to the intervention or control group on the basis of the municipality of their residence. Very similar protocols were used. Here, the authors found that

CDCR _037

videoconferencing was significantly related to reductions in early readmission (16% in the intervention group versus 30% in the control group).

A 2013 study of a multicenter RCT ($n = 256$) conducted over a 12-month period among individuals with a history of hospitalizations, however, did not find that videoconferencing postponed hospital admissions or improved the quality of patients' lives.[125] The intervention consisted of daily patient responses entered on a touchscreen device to questions about symptoms and use of treatment and oxygen saturation. The study was focused on investigating the effects of telemonitoring technology. The intervention and control groups were both provided with the same clinical care (i.e., a written management plan, antibiotics, and steroids). The study concluded that among patients "with a history of admission for exacerbations of COPD, telemonitoring was not effective in postponing admissions and did not improve patients' quality of life."[125] The investigators speculated that the positive effects of telemonitoring reported in earlier studies may have been due to enhancements of clinical service in the telemonitoring group.

## HEALTH OUTCOMES AND COST

A Canadian comparative nonrandomized analysis was conducted on a group of 147 COPD patients who participated in an 8-week pulmonary rehabilitation program via telemedicine and a group of 262 patients who received the same educational content via a standard outpatient hospital-based program.[126] Both groups had similar improvements in quality of life and exercise capacity, and these results were sustained over a period of 6 months. The authors concluded that telehealth rehabilitation was "an effective tool for increasing COPD pulmonary rehabilitation services."[126]

In 2006, an RCT ($n = 157$) conducted in Spain investigated the effects of an integrated telemedicine system on hospital re-admission rates and mortality.[127] The telemedicine service consisted of a call center, an application server, and an educational server, all connected to the patients' homes. The application server included three different applications: a Web-based Patient Management Module, a telemonitoring module, and a home visit server. Care was coordinated by a specialized nurse (case manager) and involved a specialist and other professionals. Both groups received a single educational session and a single home visit. Patients in the control group did not have access to the call center. The authors found that the integration of telemedicine with case management "increased the number of patients who were not readmitted (51% intervention versus 33% control), is acceptable to professionals, and involves low installation and exploitation [utilization] costs."[127]

The following two studies had samples fewer than our suggested standard of 150 cases. Nonetheless, they are included here because of some unique features. A small RCT ($n = 102$) involving both heart failure and COPD patients was conducted in 2012.[128] The technology included a small table-top in-home monitor and a central station located at the home health agency. Data were transmitted via a telephone line through a secure link. The intervention group had better health outcomes (general health, social functioning, and re-

duction in depression). Additionally, they had fewer visits to the emergency department and a general trend of fewer hospital days (but the number of days hospitalized did not reach significance at 12 months).

Another small RCT ($n = 100$) from Italy investigated the effects of telemonitoring on respiratory outcomes in an elderly population (65 years of age and older).[129] The intervention group received a wristband with sensors for heart rate, physical activity, near-body temperature, and galvanic skin response. The wristband was also connected to a pulse oximeter. A cellular telephone received and transmitted the data to a monitoring system. The system performed measurements every 3 hours. Data were gathered automatically, but the patient had to wear and turn on the wristband. A sound reminded the patient to wear the pulse oximeter when the measures were to be collected. After 9 months, the intervention group had a lower rate of exacerbations requiring change in medication and hospitalization (incidence rates of 28% versus 42% per year) and a 33% reduced risk of exacerbation. However, the average length of stay in the intervention group was longer, suggesting that the threshold for hospitalization was lower in the control group.

Two observational studies may be worth reporting here, primarily because of their large samples. The first documented the results of a home-based case management telemedicine program for COPD over a 2-month period ($n = 851$) in Michigan.[130] Although not definitive, the findings suggest some positive benefits from telemedicine in terms of hospitalization, emergency visits, and mortality. The second observational study was conducted in The Netherlands ($n = 1,958$) and assessed the effect of telepulmonology on quality and efficiency of care.[131] All GPs in The Netherlands who had a spirometer and computer access were eligible to use telepulmonology and were linked with pulmonologists. Over a 3½-year period, 158 GPs consulted with 32 pulmonologists in this national Web-based system, generating 1958 teleconsultations for 1,828 patients (ranging in age from 6 to 91 years). Of these, 23% of patients were diagnosed with COPD. The majority of the consultations (69%) asked for advice. Eighteen percent of the telepulmonology consultations resulted in a physical referral of patients who would not have been referred without this system. When asked whether the teleconsultation with the pulmonologist was helpful, only 4% of GPs gave a negative answer. About one-third (31%) of the telepulmonology patients were referred for direct care services, and 68% of these consultations actually prevented a referral.

## Cost Studies

The initial literature search yielded for cost studies yielded 499 articles. Of these, 14 were used in the final analysis. Although several studies cited above included some economic data, typically in terms of use of service (hospitalization, emergency department visits, etc.), we include here a special section on studies that focused on economic analysis. The methods include cost-benefit analysis, cost-effectiveness analysis, cost minimization analysis, and return on investment. Because telemedicine research cost analysis does not adhere consistently to these traditional methodologies, we include a brief explanation for each:

CDCR _038

- Cost-benefit analysis is based on converting all inputs and benefits (or outputs) into monetary terms as a basis for comparing the merits of two or more programs, interventions, or projects. It provides a concrete basis for determining whether the benefits of a given intervention (or policy) outweigh its cost. The main impediment in using cost-benefit analysis in healthcare is the difficulty of achieving consensus on translating benefits such as years of life or disability into dollar amounts.
- On the other hand, in cost-effectiveness analysis the costs are monetary, whereas the outcomes are non-monetary. It can provide a comparison of the relative costs of two interventions for achieving the same result, such as a medical visit or a given state of health.
- Cost utility analysis is a particular type of cost-effectiveness analysis that uses quality-adjusted life years as an outcome.
- Cost minimization analysis (or cost saving analysis) is concerned with finding the least costly alternative to producing a medical visit or an episode of care, assuming health outcome is the same.
- Finally, return on investment divides the total monetary benefit by initial investment and subsequent cost, expressed as a percentage or ratio. However, return on investment may include non-monetary benefits that may be difficult to quantify, such as contribution to public service, enhanced reputation, and client satisfaction.[132] Downstream revenue from enhanced reputation can be measured in quantitative terms, but it is often difficult to trace. Nonetheless, despite the inherent importance of return on investment to health systems or private investors, we did not find robust return on investment studies for this report.

It should also be pointed out that the cost studies reviewed here were not all based on a single perspective. They assumed a societal perspective, a health system perspective, or a payer perspective.

Although not included in this review, there is also a substantial research literature on telemedicine costs in various settings (primary care, healthcare networks, etc.). Examples include psychiatry[133] (including depression[134–136] and dementia[137]), dermatology,[138–144] sleep apnea,[145] orthopedics,[146] nephrology,[147] diabetes,[148–152] cancer,[153–155] otolaryngology,[156] lifestyle (smoking, diet, obesity[157]), tuberculosis,[158] high-risk pregnancy,[159] intensive care,[160] and neonatal care,[161] as well as other applications.

The following analysis is based on 14 cost studies (*Table 4*) dealing with one or more of the target chronic diseases in this article and is organized on the basis of the particular cost method used in the study.

## THE EVIDENCE RELATED TO COST

Three studies that investigated cost-effectiveness of heart failure telemonitoring, telestroke, or a combination of chronic diseases were reviewed earlier and will not be repeated here. In chronological order, these were the Veterans Affairs CCHT program for Veterans with chronic conditions by Darkins et al.[48] (published in 2008), the Tel-Assistance program for COPD by Vitacca et al.[120] (published in 2009), and the Georgia/Mayo Clinic hub-and-spoke networks serving is-

chemic stroke patients by Switzer et al.[102] (published in 2013). All three studies reported positive findings regarding the cost-effectiveness of the respective telemedicine interventions. The findings were not uniformly positive, however. A British study by Henderson et al.[162] (published in 2013) reported neutral findings.

## COST–BENEFIT ANALYSIS

Only two of the cost studies meeting the criteria for inclusion (i.e., having a focus on CHF, stroke, and/or COPD) used variants of cost-benefit analysis. The first was discussed in two publications from a telecardiology project in the State of Minas Gerais in Brazil (published in 2011 and 2012) and consisted of a cost-benefit analysis of conducting an ECG via telemedicine versus in-person.[163,164] The authors calculated the opportunity cost of transportation, food, and wage loss, as well as the specific charges for the ECG and consultation with a specialist.[163] Input costs included wages, equipment, implementation, maintenance, and assessment. The cost estimate for transmitting ECG tracings together with a consultation with a cardiologist was 28.92 R\$ (Brazilian Reals, equivalent to about \$13 U.S.), compared with a range of 30.91–54.58 R\$ (equivalent to \$13.90–24.54 U.S.) for a patient referral to have the ECG in another city. A year later, another report from the same project[164] showed substantial savings in travel costs. Over a 5-year period, the investment of \$9,000,000 U.S. resulted in over twice the savings (\$20,081,840 U.S.) for the public health system.

In 2012, a matched-pair analysis (essentially a case–control study) of 281 program participants receiving an intervention consisting of a decreasing intensity of nurse-supervised telephone calls were compared with a control group of 843 cases (a ratio of 1:3) matched on demographics and morbidity status.[165] In the intervention group, patients were encouraged to perform self-measurements (blood pressure, pulse, weight) via portable devices, and they received a mobile phone to transmit the data to the clinic if a telephone was not already available in the household. Monetized cost data for the two groups (including medication, hospitalization, therapeutic aids, total treatment, and mortality) were compared over a 1-year period. Although the intervention group had up to a 25% reduction in total cost, patients with mild symptoms and slight limitation—NYHA Class II—had the most gains. More severe classes (III and IV) had a slight cost advantage. Overall, patients in the intervention group "experienced a reduced number of hospital stays, optimized medical therapy, [achieved a] better quality of life, and [had] a reduction in mortality."[165]

## COST–EFFECTIVENESS ANALYSIS

In total, six studies met the criteria for inclusion based on the use of a cost-effectiveness analysis. In 2008, a large RCT ($n = 1,069$) U.S. study investigated the cost-effectiveness and health outcomes of telephonic disease management for heart failure.[166] Patients were enrolled for a period of 18 months and randomized into three groups: usual care, disease management, and augmented disease management. All patients were assigned a disease manager, a registered nurse who provided education and medication management. Those

CDCR _039

## Table 4. Methodology and Findings Pertaining to Cost

| LITERATURE SOURCE | | | METHODOLOGY | | | | FINDINGS | | |
|---|---|---|---|---|---|---|---|---|---|
| REFERENCE | DATE | COUNTRY | DESIGN | SIZE (N) | DURATION (MONTHS) | TECHNOLOGY | COST BENEFIT | COST-EFFECTIVENESS | COMMENTS |
| Henderson et al.[162] | 2013 | United Kingdom | CRCT | 965 | 12 | T, HTM | – | Neutral | Neutral to equivocal findings for QALY and cost |
| Andrade et al.[163] | 2011 | Brazil | CBA | 82 towns | 18 | ECG | – | HTM, 28.92R$ (versus 31–55R$) | Cost calculation: travel, food, lost wages, ECG charges |
| Alkmim et al.[164] | 2012 | Brazil | OS | 825,349 ECGs | 60 | ECG | Cost ($9M); savings ($20M) | – | 2× health system cost benefit |
| Sohn et al.[165] | 2012 | Germany | PCC | 1,124 | 12 | Cell phone | 25% cost reduction | – | Decreasing intensity of nurse calls; QoL up, hospital stays/mortality down, NYHA Class II–IV gains |
| Smith et al.[166] | 2008 | United States | RCT | 1,069 | 18 | T | – | Telemedicine effective but costly | – |
| Elliot et al.[167] | 2008 | United Kingdom | RCT | 500 | 1 | T | – | Lower costs after 2 months | Pharmacy/medications compliance, fewer adverse events |
| Salvador et al.[168] | 2008 | Spain | NRP | 108 | 12 | Internet monitoring | – | Hospital visits lower, QoL higher | Reduced oral anticoagulant therapy management costs |
| Datta et al.[169] | 2010 | United States | RCT | 588 | 24 | T | – | No significant differences | Called for 1 week, then every 2 months for 24 months; nurse BP management |
| Wennberg et al.[170] | 2010 | United States | RCT | 174,120 | 12 | T | – | 10.1% admission cost reduction | Lower medications/scripts $ cost (3.6%); telehealth coaching (costs, self-care, behavior, etc); program cost <$2.00/person/month |
| Minetaki et al.[171] | 2011 | Japan | CBA | 408 | 48 | T, HTM | – | – | Frequency/duration of telemedicine decreased use of output services, travel, worsening patient symptoms |
| Brunetti et al.[172] | 2014 | Italy | CA | 109,750 | 12 | ICD/ECG triage | – | – | Cost savings of €8.10–38.50/case |
| Calo et al.[173] | 2013 | Italy | RCT | 233 | 12 | T, HTM | – | – | HTM, hospital visits/LOS shorter (47 minutes versus 86 minutes); HTM savings: $51/patient/year for hospitals, $190/patient/year for patients |
| Zanaboni et al.[174] | 2013 | Italy | RCT | 200 | 16 | ICD | – | No health system cost savings | Significant remote patient cost reduction; 0.065 QALY gain |
| Chen et al.[175] | 2013 | Taiwan | QE | 141 | 6/6 | T | – | 48% cost decrease (from $937 to $492/month) | CHF telemedicine service, hospital admissions/stay down; no difference in ER visits |

BP, blood pressure; CA, cost analysis; CBA, cost benefit analysis; ICD, implantable cardiac defibrillator; CHF, congestive heart failure; CRCT, cluster randomized trial; ECG, electrocardiogram; HTM, home telemonitoring; ICD, implantable cardiac defibrillator; NC, nurse calls by telephone; NRP, nonrandomized prospective study; NYHA, New York Heart Association; OS, observational study; PCC, prospective case control; QE, quasi-experimental; QoL, quality of life; QALY, quality-adjusted life year; RCT, randomized controlled trial; SR, self-reporting; T, telephone.

CDCR _040

**BASHSHUR ET AL.**

in the augmented disease management group also received devices for self-monitoring (electronic blood pressure monitor, pulse oximeter, and a wristwatch activity monitor). However, data for the two intervention groups (disease management and augmented disease management) were combined in a pooled analysis because their outcomes were similar. Of the original sample, 30% did not complete the study, missed one or more visits, were lost to follow-up, or died. An "intent-to-treat" methodology was used to estimate cost and survival data for the entire sample. The resulting difference in total costs between the two disease management groups and the usual care group could be almost entirely attributed to the costs of the intervention itself. At the same time, the analysis showed significant survival advantage among the combined intervention groups (79.4 days) compared with all patients (17.4 days). Even those in the intervention groups who were acutely ill (NYHA Classes III and IV) had survival of 47.7 days. There was also evidence that patients in the non-augmented disease management group received more care, with higher costs for emergency room visits, hospital admissions, outpatient visits, and drugs. The authors concluded that although the invention was effective, it was also costly to implement.

An RCT ($n = 500$) conducted in the United Kingdom assessed the cost-effectiveness of a telephonic pharmacy intervention on compliance with prescribed medications.[167] After a 4-week follow-up, patients receiving telephone calls from the pharmacist were more likely to comply with their medication regimen and also experienced fewer medication-related adverse events. After 2 months, the same group had lower costs.

A nonrandomized pilot study in Spain ($n = 108$) compared an Internet-based monitoring intervention with usual care for patients on oral anticoagulant therapy (typically prescribed for heart failure).[168] The measurement for calibrating the optimal dose was standardized by the World Health Organization in 1983 as the International Normalized Ratio (INR) to minimize adverse effects of anticoagulant therapy. The INRs were similar between the intervention and control groups. However, quality of life measures were higher and outpatient visits were substantially lower in the intervention group compared with the control group.

In 2010, an RCT at the Durham, NC Veterans Affairs Medical Center ($n = 588$) evaluated the economic effects of telephone calls by nurses in a program designed to improve blood pressure control among hypertensive primary care patients.[169] The nurses used educational scripts and tailored algorithms to fit individual patient needs. Telephone calls were initially made 1 week after randomization and subsequently every 2 months for 24 months. Patients in the control group were also contacted at 6 and 24 months by their primary care provider. The direct and indirect costs of the two modalities were calculated, and the total cost difference between the two groups was not statistically significant.

In the same year, a very large U.S.-based RCT ($n = 174,120$) investigated the economic effects of a telephone-based care management intervention on medical costs and healthcare resource use.[170] Health coaches contacted patients with high-cost chronic conditions to instruct them about shared decision making, self-care, and be-

havioral change. Patients were randomly assigned to telephonic case management plus enhanced support (coaching) or only telephonic case management. A 10.1% reduction in annual hospital admissions accounted for the majority of the cost savings for patients in the group that received enhanced support. They also had 3.6% lower medical and prescription drug costs.

In 2011, matched panel data of medical expenditures for 408 residents in Fukushima Prefecture, Japan, were analyzed to ascertain the cost effects of e-health in relation to the duration and frequency of the intervention.[171] Investigators found that the frequency and duration of e-health use decreased travel expenses and the use of outpatient services by preventing exacerbation of symptoms.

In the remainder of this section, we report on four studies that were published in 2013–2014: three from Italy and one from Taiwan. The Italian studies focused on cost implications of ECG triage and implantable ICDs. The first was a cost analysis from the perspective of a regional healthcare system.[172] It was based on the costs incurred by all patients who called the local emergency service in 2012 and had a pre-hospital triage for those with suspected acute cardiac disease ($n = 109,750$). The pre-hospital ECGs were read by a remote cardiologist. Cost savings were calculated by subtracting the cost of the pre-hospital triage. The cost for a single ECG/consultation was €16.70 ($22.70 U.S.), compared with a regional rate list of €24.80–55.20 ($33.81–75.25 U.S.) for emergency department charges. Hence, the telemedicine consultation resulted in cost savings of €8.10–38.50 ($11.04–52.48 U.S.) per case.

The second was an RCT ($n = 233$) comparing the costs of remote monitoring of implantable defibrillators with those of conventional in-hospital quarterly follow-ups over a 12-month period.[173] Costs were calculated for patients and providers separately, excluding the cost of the device. Patients in the remote monitoring group were scheduled for one in-hospital visit per year unless more visits are indicated by device alarms or the patient's clinical status. Patients in the remote monitoring group had fewer hospital admissions and substantially shorter duration of follow-up visits compared with the control group (47 minutes versus 86 minutes). The authors concluded that if the costs of the device and service were not charged to patients or providers, patients could save $190 by using remote monitoring, and hospitals could save an additional $51 per patient per year.

Another cost analysis of implantable defibrillators was based on an RCT ($n = 200$).[174] Patients with implantable defibrillators with wireless transmission were randomized between remote monitoring and conventional care and were followed up for 16 months. No significant cost savings for the healthcare system were observed, but there was a significant reduction in cost for patients. Also, patients in the remote arm gained 0.065 quality-adjusted life-years compared with those in the standard arm. A cost savings of €888.10 ($1,210.66 U.S.) was realized per patient over the 16-month study period.

Finally, a 2013 quasi-experimental study in Taiwan investigated the clinical outcomes and cost-effectiveness of a telemedicine service for older adults with cardiovascular diseases.[175] This study followed a single group pre–post design. In total, 141 consecutive patients with cardiovascular disease were recruited. Of these, 93 were 65 years of

CDCR _041

age or older, and 48 were younger than 65 years. The intervention included real-time transmission of biometric measures, telephone exchanges for communication and health promotion, and full-time case managers and cardiologists. The telemedicine intervention resulted in significant reductions in all-case admission rates and hospital stays, an increase in outpatient visits, and no difference in emergency visits. The total cost of all-cause healthcare (comparing costs 6 months before and 6 months after the intervention) decreased by 48%: from $937 to $491.52 per month.

## Summary and Conclusions

This article assessed the evidence concerning the effects of telemedicine on healthcare quality, access, and costs *vis-à-vis* three of the leading causes of death in the United States: CHF, stroke, and COPD. Conclusions were based on a systematic review of the professional literature published from 2000 to early 2014, selected on the basis of scientific merit. Of the studies that met the minimum criteria for inclusion, 19 dealt with CHF, 21 with stroke, and 17 with COPD. An additional set of 14 studies investigated cost.

### CONTEXTUAL AND METHODOLOGICAL ISSUES

A careful review of the published literature reveals significant variations in the methodologies used as well as the outcomes measured. These include research design and sample size, as well as the specific attributes of the intervention itself, such as technological configuration, provider mix, patient mix, program content, frequency, and duration. The technologies used ranged from telephones (including smartphones) to videoconferencing, from manual to automated data entry, from point-to-point connections to dedicated networks to the Internet, and from autonomous equipment to wearable or implantable devices, some with remote diagnostic capabilities. Some systems linked patients with providers, whereas others linked providers with other providers. For stroke in particular, some included specially equipped emergency mobile units.

Other significant aspects of the various telemedicine interventions included the types of providers and patients. For instance, nurses, registered nurses, and specialized nurses were, in most instances, the "front line" managers/contact persons regardless of the level of technology used. And, where required, technicians set up remote monitoring equipment in patients' homes and trained patients in their use. In two instances,[54,96] remote telemonitoring cases were managed by specialist physicians. The patient populations varied in age, severity of illness, comorbidity, and location. Finally, issues of program fidelity, maturation, and bundling add another layer of complications that may be important to consider. The variations from one study to another significantly constrain our ability to draw conclusions that can be generalized. At the same time, it must be recognized that a homogeneous telemedicine landscape now or in the future is beyond reasonable expectation. Indeed, we might anticipate even greater diversity as the implementation of telemedicine matures. Therefore, the heterogeneity of telemedicine applications reviewed here does provide a window into telemedicine's impact across the complex "real world" of current programs designed to manage

chronic illnesses, as well as the specific application configurations that had positive impacts. Because of these variations, the findings and conclusions must be viewed from the perspective of the methodology used in each study. Nonetheless, there are significant areas of agreement on several dimensions.

### THE EVIDENCE

The preponderance of evidence from studies using rigorous research methods points to beneficial results from telemonitoring in its various manifestations, albeit with a few exceptions. Generally, the benefits include reductions in use of service: hospital admissions/re-admissions, length of hospital stay, and emergency department visits typically declined. It is important that there often were reductions in mortality (decreases ranging from 15% to 56%). Some studies reported neutral or mixed findings. For example, there may have been no decrease in hospital admissions, but a reduced length of stay or a corresponding increase in outpatient visits. Some investigators reported little change in health services utilization but reductions in mortality. One study[61] reported an increase in mortality among frail elderly patients but no increase in use of services. These findings and explanations for them are reported in detail in the main body of the report. In totality, however, the findings provide useful insight and notable trends in telemedicine interventions in the management of three major chronic diseases.

The implications of the evidence can be summarized at several levels of generality. At the most general level, the telemedicine intervention in chronic disease management consists of a set of inputs and outputs. Telemedicine changes the inputs of the traditional medical care process. Patients consequently are engaged in managing their own health in an increased number of phases of the care process. They are encouraged to adopt healthy lifestyles and to manage their medications, and they are provided with coordinated remote and local continuous care management. The capacity for early intervention and rapid response associated with telemedicine, plus empowered, educated, and engaged patients, can have significant effects on the outputs. Costs frequently are reduced by avoiding unnecessary services. Moreover, the costly complications of chronic illness may be reduced, yielding improved health outcomes among more informed patients, who are more likely to engage in positive health behaviors and to adhere more closely to prescribed medical regimens and self-care guidelines. In brief, the extent to which the inputs in the care process are changed is likely to have a direct bearing on the nature and magnitude of changes in outputs.

At the second lower level of generality, there are five notable interactions between aspects of the intervention and observed findings from the studies:

1. *The technological configuration*. The type and complexity of the technology can have an independent effect on the outcomes under investigation. For example, in telestroke, visual clues and the ability to interact virtually with the patient, together with neuroimaging to assess the appropriateness of administering tPA, provided significant information to the

CDCR _042

**BASHSHUR ET AL.**

consultant in making a diagnosis and in guiding the care process from a distance. Telephone-only discussions were less effective. However, the technology has been evolving rapidly, and it may be the case that advances in mobile telephony with high-resolution video and audio connectivity will result in increased telephone utility. Wearable sensors, implantable devices, and smartphones have produced demonstrable efficiencies in the delivery of service. These are less cumbersome for older patients with multiple health issues and are likely to provide more reliable information than patient self-reporting.

2. *Patient mix.* When highly skewed toward a sicker patient population, such patient characteristics as age, severity of illness, and comorbidities can mask the true effects of the telemedicine intervention in a way that is less likely when telemedicine is used with a healthier group of patients, without complex comorbidities. Frail elderly patients suffering from several serious chronic illnesses are not likely to use or benefit from this technology as it has thus far been implemented.

    In addition to a generational difference, many patients lack the necessary manual dexterity, patience, or inclination to rely on devices to manage their deteriorating health unless, of course, these devices are totally unobtrusive and simple to operate. It may be, however, that telemedicine could be beneficial to geriatricians and others who specialize in treating the elderly, allowing them to organize the treatment of complex patients with multiple diagnoses, to improve their management at times of care transitions[176] (see also Chugh et al.[177]), and possibly to facilitate their understanding and adherence to discharge instructions.

    If the sampling frame is diverse, randomization of subjects cannot fully rectify the problem, especially when investigators attempt to impute values of missing data for nonparticipants and dropouts, as sometimes occurs when an "intent-to-treat" analysis is used. For example, imputing utilization data after patients die or drop out of a study is at best an imperfect interpolation, based on the highly questionable assumption that values are missing entirely at random.

3. *Patient engagement.* A related phenomenon pertains to the level and intensity of patient participation in the intervention. One large study[59] suggested that "patient engagement" had a significant effect in terms of use of service and cost. Obviously, the true effects of the intervention can be manifest only when it is administered in full fidelity.

4. *Provider mix.* Whereas nurses served as the "front line professional" in the vast majority of studies, they were not assigned the same level of responsibility in decision making. It seems that they performed best when an explicit protocol including software was followed. In one instance,[54] where physicians were in control of the telemedicine intervention, more patients in the intervention group were hospitalized than those in the control group.

5. *Truncated comparison.* Some studies enhanced the services available to the control group–normally referred to as "usual care"–in order to isolate the specific effects of the technological

component *per se*, by providing patients ready access to nurses and physicians on demand and giving them weight scales and other devices, in other words, equating the experimental and control groups in every way except for electronic connectivity. This ignores the fact that, under normal conditions (outside of participating in a study), patients would not have these additional benefits. Although this approach may enable a more targeted testing of specific hypotheses regarding telecommunications, it is not an appropriate control for a "bundled" innovation that serves as a substitute for in-person care in an integrated system.

At a more detailed "fine-grained" level, the main body of this article provided the key findings from each of the studies that met the minimal inclusion criteria concerning the effects of telemonitoring among persons with CHF, stroke, or COPD. An empirical assessment of these findings reveals significant concurrence on positive effects *vis-à-vis* the following: (1) process of care (early detection, timely initiation of treatment, prompt referral and follow-up, and accurate measurement and diagnosis); (2) intermediate outcomes (reductions in hospitalization, re-hospitalization, length of hospital stay, and emergency department visits); and (3) ultimate outcomes (improved symptoms, reduced disability, and reduced mortality/increased longevity as well as increased satisfaction). The empirical assessment is based on the direction and weight of the evidence.

The extant data provide strong support for the contention that telemonitoring of patients with CHF is likely to reduce mortality and morbidity. The evidence is even stronger for the cost-effectiveness of telemedicine interventions among persons with these chronic illnesses. Significant associations have been found between telemedicine and reduced hospital admissions, shorter length of stays, and reductions in emergency department visits. Hence, it may be reasonably inferred that cost savings and health benefits would accrue to both patients and providers from this intervention.

Significant reductions in "death and dependency" were associated with telestroke interventions for persons suffering a stroke. Support for this general conclusion derives from studies assessing event timing from onset of symptoms, to diagnostic tests, to initiation of thrombolytic treatment when indicated, and to referral when necessary. Telestroke programs demonstrated accuracy in diagnosing ischemic versus hemorrhagic stroke and in reducing time to definitive treatment. Also impressive were the wide range and combinations of telemedicine technologies used that uniformly resulted in improvements in the diagnosis and management of stroke. It is important that these improvements were obtained across a wide variety of settings involving patients in remote communities. Studies focusing specifically on "cost-effectiveness" were limited. Nevertheless, annual cost savings to hub-and-spoke hospital networks were identified. More timely remote identification of stroke type and simultaneous reduction of time to treatment are associated with reduced cost to both patient and provider, coupled with better health outcomes and improved quality of life for patients.

The major issue addressed in assessing telemedicine's impact on the treatment of COPD focused on predicting, anticipating, preventing, and

CDCR _043

managing exacerbations in patients' conditions. Although amenable to treatment, these conditions adversely affect quality of life. A significant decline in pulmonary function increases the risk of mortality, and its management is costly. The major telemedicine intervention for COPD is telespirometry (remote testing for lung function) along with monitoring of heart rate, physical activity, and oxygen saturation. Perhaps in part because of the nature of COPD, few studies incorporated mortality as an end point. It is important, however, that telemedicine interventions were found to reduce acute exacerbations requiring change in medications, hospitalizations, and re-admissions. Additionally, telemedicine intervention was associated with improved rehabilitation and a decreased need for urgent care from pulmonologists or the patients' own GPs.

A FINAL COMMENT

With the wider dissemination of telemonitoring, we can expect more patients with serious chronic illnesses to survive longer and to enjoy better quality of life than in the pre-telemedicine era. Of course, in this case, the law of "unintended consequences" may come into play. Delaying mortality for older adults, as they live longer, is likely to lead to increased use of health services, especially over the long run. Nonetheless, the high cost of acute episodic care will be reduced through timely intervention and substitution, and patients may be more likely to avoid risky behaviors, thereby lowering overall healthcare expenditures.

## Executive Summary

Concern with issues of inequitable access, uneven distribution of quality, and cost inflation in healthcare has long historical roots. Yet, the various policies and programs aimed at redressing them since the beginning of the 20th century have met with limited success, as manifest in their continuity and, in some instances, exacerbation. Although there is no consensus on the most effective approaches to address these problems, there is universal agreement regarding their serious implications for the health, well-being, and productivity of large segments of the population, as well as the threat to the public purse.

Advanced applications in ICT in healthcare (referred to here as telemedicine) were developed and tested with an eye to improve healthcare access and quality while attempting to contain cost inflation. This technology has opened new vistas in connectivity, clinical and shared decision making, system integration, and patient empowerment, as well as organizational and operational efficiency. Indeed, the need for the wider deployment of telemedicine systems (also referred to as telehealth, e-health, mobile health, and connected health) stems from a large and ever-expanding body of empirical evidence that attests to their merit in addressing the issues of healthcare access, quality, and cost. This is particularly notable in the case of chronic diseases, which are leading causes of death, illness, disability, and diminished quality of life. Together they also make up the largest contributor to healthcare costs. It is estimated that over 50% of all adults have at least one chronic illness. It is important that these diseases are amenable to telemedicine intervention.

A careful review of the published literature on telemedicine management of three chronic diseases (CHF, stroke, and COPD) reveals inconsistencies in methodologies used and variations in out-

comes measured. We tried to reduce such variations by selecting only RCTs or designs approximating an RCT and a minimal sample of 150 cases (with a few exceptions, which are noted). A separate section is devoted to cost studies. Because the studies did not use a standard methodological protocol, their respective findings and conclusions must be viewed from the perspective of the design features that were used, including research design, sample size, and the specific attributes of the intervention itself, such as technological configuration, provider mix, patient mix, program content, frequency, and duration of the intervention. There were also variations in the measures of outcome. Findings are presented in terms of the reported empirical evidence on health outcomes, use of service, and cost.

FINDINGS RELATED TO HEALTH OUTCOMES

Among CHF patients, telemonitoring was significantly associated with reductions in mortality ranging from 15% to 56% compared with patients undergoing "usual" care. In only one study[61] was mortality higher among the telemonitoring group. However, this exception may be accounted for by the fact that the study population was composed of a very elderly and severely sick patient population and other methodological issues. Conclusions from several studies indicate "noticeable change (improvement) in health outcomes," "fewer episodes of health worsening," "improved quality of life," and "general improvement in clinical, functional, and quality of life status." In one robust study,[54] no significant differences were observed between the intervention and control groups in terms of mortality and morbidity. Telemonitoring offers lesser benefits for elderly patients with multiple health problems, especially when those in "usual care" have ready access to appropriate care.

Telestroke provides an inherent advantage for stroke patients who do not have ready access to stroke specialists. Prompt diagnosis, initiation of treatment, supervision, and referral (when indicated) are critical for a successful outcome, given a potentially debilitating, if not fatal, disease. Except for the telephone-only intervention (with poor sensitivity compared with video), the various modalities of telestroke have been demonstrated to reduce mortality in the range of 25% during the first year after the event.

Only three COPD studies measured mortality outcomes. Two RCT studies reported neutral findings, but one of these studies followed up patients for only 1 week.[123] An observational study found "some positive benefits vis-à-vis COPD mortality" 2 months after discharge from the hospital.[130] Likely positive effects of telepulmonology include fewer exacerbations in the disease and improvements in quality of life and exercise capacity.

FINDINGS RELATED TO USE OF SERVICE

The majority of studies of telemonitoring for all three chronic diseases reported lower hospital admissions and re-admissions, length of stay, and emergency department visits. There were notable exceptions, but in those instances the effects of telemonitoring were neutral. One study[121] found telepulmonology to result in cost shifting in the outpatient setting (i.e., a decrease in demand for pulmonologists and an increase in demand for nurses).

**BASHSHUR ET AL.**

## FINDINGS RELATED TO COST

The economic effects of telemonitoring have been measured or examined in two ways: (1) changes in rates or volumes of hospital admissions, re-admissions, length of stay, and/or emergency department visits and (2) cost-benefit analysis and cost-effectiveness analysis of telemonitoring in terms of specified outcomes. In both instances and with few exceptions, the evidence supports the economic benefits of telemonitoring compared with usual care among patients with CHF, stroke, and COPD.

## Conclusions

There is an ever-growing and complex body of empirical evidence that attests to the potential of telemedicine for addressing problems of access to care, quality of care, and healthcare costs in the management of the three chronic diseases chosen for this review. Despite some inconsistencies in methodologies, the preponderance of the evidence produced by telemonitoring studies points to significant trends in reducing hospitalization and emergency department visits and preventing and/or limiting illness severity and episodes, resulting in improved health outcomes. It is hoped that this evidence would be useful for policymakers, researchers, program developers, providers, payers, and the public at large.

## Acknowledgements

The Alliance for Connected Health provided partial support for the work leading to this publication in the form of an unrestricted grant.

## Disclosure Statement

J.S. is an employee of The Global Telemedicine Group. No competing financial interests exist for any of the other authors.

REFERENCES

1. Bodenheimer T, Chen E, Bennett HD. Confronting the growing burden of chronic disease: Can the U.S. health care workforce do the job? *Health Aff (Millwood)* 2009;28:64–74.

2. *Trans Am Med Assoc* 1848;1:101–133.

3. Johnson C, Conway J, Talliaferro H. Report on the number of practitioners in Virginia. *Trans Am Med Assoc* 1848;1:359–364.

4. Lyon E. Further data on the alleged lack of physicians and distribution of irregular practitioners. *JAMA* 1923;80:718.

5. Smith H, Warnshuis F. The distribution of physicians in relation to population—A statistical survey and study covering ten years (1913–1924). *J Mich Med Soc* 1926;25:89–94.

6. Carroll A. Too few physicians doesn't necessarily mean too many specialists. June 16, 2013. news@JAMA. Available at http://theincidentaleconomist.com/wordpress/jama-forum-too-few-generalist-physicians-doesnt-necessarily-mean-too-many-specialists (last accessed May 1, 2014).

7. Young A, Chaudhry H, Thomas J, et al. A census of actively licensed physicians in the United States, 2012. *J Med Reg* 2013;99:11–24.

8. Bashshur R, Shannon G. *History of telemedicine: Evolution, context and transformation.* New Rochelle, NY: Mary Ann Liebert, Inc., 2009.

9. Howitt A. *The native tribes of South-Eastern Australia.* New York: MacMillan and Company, 1904.

10. Fine L. Circle of urine glasses: Art of uroscopy. *Am J Nephrol* 1986;6:307–311.

11. Wild W. Doctor-patient correspondence in eighteenth-century Britain: A change in rhetoric and relationship. *Stud Eighteenth Century Culture* 2000;29:47–64.

12. Jepsen T. *My sisters telegraphic: Women in the telegraph office, 1846–1950.* Athens, OH: Ohio University Press, 2000.

13. Letter to the editor. *Lancet* 1879;(Nov).

14. Einthoven W. Het telecardiogram [The telecardiogram]. *Ned Tijd Geenesk* 1906;6:307–311.

15. Brown SG. A telephone relay. *J Inst Electr Eng* 1910;45:590–601.

16. James W, Williams H. The electrocardiogram in clinical medicine. *Am J Med Sci* 1910;140:408–421, 644–669.

17. Rafto T. *Telegrafverkets historie: 1855–1955.* Bergen, Norway: John Griegs Boktr, 1955.

18. Elford DR. Telemedicine in northern Norway. *J Telemed Telecare* 1997;3:1–22.

19. Goethe WHG. Medical care on ships without a doctor—Radio medical advice. In: *Handbook of nautical medicine.* Berlin: Springer, 1984:53–65.

20. Gershon-Cohen J, Cooley AG. Telognosis, three year experience with diagnosis by telephone-transmitted roentgenograms. *Radiology* 1950;55:582–587.

21. Jutras A, Duckett G. Distant radiodiagnosis; telefluoroscopy & cineflurorography. *Union Med Canada* 1957;86:1284–1289.

22. Wittson CL, Dutton R. A new tool in psychiatric education. *Mental Hosp* 1955;11:35–38.

23. Bashshur R, Shannon G, Sapci H. Telemedicine evaluation. *Telemed J E Health* 2005;11:296–316.

24. Chronic disease prevention and health promotion. Available at www.CDC.gov/chronicdisease/overview/index.htm (last accessed March 25, 2014).

25. Woolliscroft J, Koelling TM. Redesigning the management of chronic illness. *Telemed J E Health* 2004;10:118–121.

26. Wagner EH. Managed care and chronic illness: Health services research needs. *Health Serv Res* 1997;32:702.

27. Bodenheimer T, Wagner EH, Grumbach K. Improving primary care for patients with chronic illness. *JAMA* 2002;288:1775–1779.

28. Coleman K, et al. Evidence on the chronic care model in the new millennium. *Health Aff (Millwood)* 2009;28:75–85.

29. American Heart Association. About heart failure. Available at www.heart.org/HEARTORG/Conditions/HeartFailure/AboutHeartFailure/About-Heart-Failure_UCM_002044_Article.jsp (last accessed February 15, 2014).

30. McMurray J, Adamopoulos S, Arker S, et al. ESC guidelines for the diagnosis and treatment of acute and chronic heart failure 2012. *Eur J Heart Fail* 2012;14:803–869.

31. American Heart Association. Classification of functional capacity and objective assessment. Available at https://my.americanheart.org/professional/StatementsGuidelines/ByPublicationDate/PreviousYears/Classification-of-Functional-Capacity-and-Objective-Assessment_UCM_423811_Article.jsp (last accessed February 22, 2014).

32. Horsley L. ACC and AHA update on chronic heart failure guidelines. *Am Fam Physician* 2010;81:654–665.

33. Mahmood SS, Wang TJ. The epidemiology of congestive heart failure: Contributions from the Framingham Heart Study. *Global Heart* 2013;8:77–82.

34. Rathi S, Deedwania PC. The epidemiology and pathophysiology of heart failure. *Med Clin North Am* 2012;96:881–890.

35. Zarrinkoub R, Wettermark B, Wändell P, Mejhert M, Szulkin R, Ljunggren G, Kahan T. The epidemiology of heart failure, based on data for 2.1 million inhabitants in Sweden. *Eur J Heart Fail* 2013;15:995–1002.

36. Wong YW, Felker GM. Etiology and overview of heart failure. In: Krum H, von Lueder T, eds. *Advances in heart failure management.* London: Future Medicine, Ltd., 2012;6–17.

**CDCR _045**

37. He J, Ogden L, Bazzano L, et al. Risk factors for congestive heart failure in U.S. men and women (NHANES1 Epidemiologic Follow-up Study). *Arch Intern Med* 2001;161:996–1002.

38. Heidenreich P, Trogdon J, Khavjou O, et al. Forecasting the future of cardiovascular disease in the United States: A policy statement from the American Heart Association. *Circulation* 2011;123:933–944.

39. Lloyd-Jones D, Larson M, Leip E, et al. Lifetime risk for developing congestive heart failure: The Framingham Heart Study. *Circulation* 2002;106:3068–3072.

40. Go AS, Mozaffarian D, Roger VL, et al. Heart disease and stroke statistics—2013 update: A report from the American Heart Association. *Circulation* 2013;127:e6–e245.

41. Lloyd-Jones D, Adams R, Brown T, et al. Heart disease and stroke statistics—2010 update: A report from the American Heart Association. *Circulation* 2012;121:e46–e215.

42. *Morbidity and mortality: 2012 chart book on cardiovascular and lung diseases.* Bethesda, MD: National Heart Lung and Blood Institute, **2012.**

43. Johnston B, Wheeler L, Deuser J, et al. Outcomes of the Kaiser Permanente tele-home health research project. *Arch Fam Med* 2000;9:40–45.

44. Riegel B, Carlson B, Kopp C, et al. Effect of a standardized case-management telephone intervention on resource use in patients with chronic heart failure. *Arch Intern Med* **2002;**162:705–712.

45. Goldberg LR, Piette, JD, Walsh, MN, et al. Randomized trial of a daily electronic home monitoring system in patients with advanced heart failure: The Weight Monitoring in Heart Failure (WHARF) trial. *Am Heart J* 2003;146:705–712.

46. Cleland JG, Louis, AA, Rigby, AS, et al. Noninvasive home telemonitoring for patients with heart failure at high risk of recurrent admission and death: The Trans-European Network-Home-Care Management System (TEN-HMS) study. *J Am Coll Cardiol* 2005;45:1654–1664.

47. Woodend AK, Sharrard H, Fraser M, et al. Telehome monitoring in patients with cardiac disease who are at high risk of readmission. *Heart Lung* **2008;**37:36–45.

48. Darkins A, Ryan P, Kobb R, et al. Care coordination/home telehealth: The systematic implementation of health informatics, home telehealth, and disease management to support the care of veteran patients with chronic conditions. *Telemed J E Health* 2008;14:1118–1126.

49. Dendale P, De Keulenaer G, Troisfontaines P, et al. Effect of a telemonitoring-facilitated collaboration between general practitioner and heart failure clinic on mortality and rehospitalization rates in severe heart failure: The TEMA-HF 1 (TElemonitoring in the MAnagement of Heart Failure) study. *Eur J Heart Fail* **2012;**14:333–340.

50. Ferrante D, Varini S, Macchia A, et al. Long-term results after a telephone intervention in chronic heart failure: DIAL (randomized trial of phone intervention in chronic heart failure) follow-up. *J Am Coll Cardiol* 2010;56:372–378.

51. Weintraub A, Gregory D, Patel A, et al. A multicenter randomized controlled evaluation of automated home monitoring and telephonic disease management in patients recently hospitalized for congestive heart failure: The SPAN-CHF II trial. *J Card Fail* 2010;16:285–292.

52. Chaudhry SI, Mattera JA, Curtis JP, et al. Telemonitoring in patients with heart failure. *N Engl J Med* **2010;**363:2301–2309.

53. Giordano A, Zanelli E, Scalvini S. Home-based telemanagement in chronic heart failure: An 8-year single site experience. *J Telemed Telecare* 2011;17:382–386.

54. Koehler F, Winkler S, Shieber M, et al. Impact of remote telemedical management on mortality and hospitalizations in ambulatory patients with chronic heart failure. *Circulation* 2011;123:1873–1880.

55. Landolina M, Perego G, Lunati M, et al. Remote monitoring reduces healthcare use and improves quality of care in heart failure patients with implantable defibrillators: The evolution of management strategies of heart failure patients with implantable defibrillators (EVOLVO) study. *Circulation* **2012;**125:2985–2992.

56. Chen YH, Ho YL, Huang HC, et al. Assessment of the clinical outcomes and cost-effectiveness of the management of systolic heart failure in Chinese patients using a home-based intervention. *J Int Med Res* **2010;**38:242–252.

57. Boyne JJ, Vrijhoef HJ, Crijns HJ, et al. Tailored telemonitoring in patients with heart failure: Results of a multicentre randomized controlled trial. *Eur J Heart Fail* **2012;**14:791–801.

58. Steventon A, Bardsley M, Billings J, et al. Effect of telehealth on use of secondary care and mortality: Findings from the Whole System Demonstrator cluster randomised trial. *BMJ* 2012;344:e3874.

59. Baker LC, Johnson SJ, Macaulay D, et al. Integrated telehealth and care management program for Medicare beneficiaries with chronic conditions linked to savings. *Health Aff (Millwood)* 2011;30:1689–1697.

60. Baker LC, Macaulay L, Sorg R, Diener M, et al. Effects of care management and telehealth: A longitudinal analysis using Medicare data. *J Am Geriatr Soc* 2013;61:1560–1567.

61. Takahashi P, Pecina J, Upatising B, et al. A randomized controlled trial of telemonitoring in older adults with multiple health issues to prevent hospitalizations and emergency department visits. *Arch Intern Med* **2012;**172:773–780.

62. Wilson S. Another sobering result for home telehealth—And where we might go next. *Arch Intern Med* **2012;**172:779–780.

63. American Heart Association/American Stroke Association. About stroke. **2012.** Available at www.strokeassociation.org/STROKEORG/AboutStroke/About-Stroke_UCM_308529_SubHomePage.jsp (last accessed February 25, 2014).

64. National Institute of Neurological Disorders and Stroke. NINDS stroke information page. **2014.** Available at www.ninds.nih.gov/disorders/stroke/stroke.htm (last accessed February 25, 2014).

65. Go AS, Mozaffarian D, Roger VL, et al. Heart disease and stroke statistics—2014 update: A report from the American Heart Association. *Circulation* 2014;129:e28–e292.

66. National Institutes of Health. Stroke fact sheet. 2010. Available at http://report.nih.gov/nihfactsheets/Pdfs/Stroke(NINDS).pdf (last accessed April 21, 2014).

67. Murphy SL, Xu J, Kochanek KD. Deaths: Final data for 2010. *Natl Vital Stat Rep* 2013;61(4):1–118.

68. Kjellstrom T, Norrving B, Shatchukute A, eds. Helsingborg Declaration 2006 on European Stroke Strategies. *Cerebrovasc Dis* 2007;23:229–241.

69. Das R, Seshadri S, Beiser A, et al. Prevalence and correlates of silent cerebral infarcts in the Framingham Offspring study. *Stroke* 2008;39:2929–2935.

70. Vermeer W, Longstreth W, Koudstaal P. Silent brain infarcts: A systematic review. *Lancet Neurol* 2007;6:611–619.

71. Howard V, Kleindorfer D, Judd S, et al. Disparities in stroke incidence contribution to disparities in stroke mortality. *Ann Neurol* 2011;69:619–627.

72. Ovbiagele B, Goldstein L, Higashida R, et al. Forecasting the future of stroke in the United States: A policy statement from the American Heart Association and American Stroke Association. *Stroke* 2013;44:2361–2375.

73. Seshadri S, Beiser A, Kelly-Hayes M, et al. The lifetime risk of stroke: Estimates from the Framingham Study. *Stroke* 2006;37:345–350.

74. Morgenstern L, Smith M, Lisabeth L, et al. Excess stroke in Mexican American compared with non-Hispanic whites: The Brain Attack Surveillance in Corpus Christi Project. *Am J Epidemiol* 2004;160:376–383.

75. National Stroke Association. Am I at risk for stroke: Stroke risk factors. Available at www.stroke.org/site/PageServer?pagename=risk (last accessed March 2, 2014).

76. Demaerschalk BM, Hwang HM, Leung G. US cost burden of ischemic stroke: A systematic literature review. *Am J Manag Care* 2010;16:525–533.

77. Caro J, Huybrechts K, Duschesne I. Management patterns and costs of acute ischemic stroke: An international study. *Stroke* 2003;31:582–590.

78. Brown DL, Boden-Albala B, Langa KM, et al. Projected costs of ischemic stroke in the United States. *Neurology* 2006;67:1390–1395.

CDCR _046

**BASHSHUR ET AL.**

79. Partridge M. Costs of ischemic stroke projected to rise. Physicians Practice. **2006.** Available at www.physicianspractice.com (last accessed April 24, 2014).

80. Brinjikji W, Rabinstein A, Cloft H. Hospitalization costs for acute ischemic stroke patients treated with intravenous thrombolysis in the United States are substantially higher than Medicare payments. *Stroke* 2012;43:1131–1133.

81. Levine SR, Gorman M. "Telestroke": The application of telemedicine for stroke. *Stroke* 1999;30:464–469.

82. Khan K, Shuaib A, Whittaker T, et al. Telestroke in Northern Alberta: A two year experience with remote hospitals. *Can J Neurol Sci* 2010;37:808–813.

83. Gonzalez M, Hanna N, Rodrigo M, et al. Reliability of prehospital real-time cellular video phone in assessing the simplified National Institutes of Health Stroke Scale in patients with acute stroke: A novel telemedicine technology. *Stroke* 2011;42:1522–1527.

84. Demaerschalk B, Vegunta S, Vargas B, et al. Reliability of real-time video smartphone for assessing National Institutes of Health Stroke Scale scores in acute stroke patients. *Stroke* 2012;43:3271–3277.

85. Allibert R, Ziegler F, Bataillard M, Gomes C, Jary A, Moulin T. Telemedicine and fibrinolysis in France-Comte [in French]. *Rev Neurol (Paris)* 2012;168:40–48.

86. Pervez MA, Silva G, Masrur S, et al. Remote supervision of IV-tPA for acute ischemic stroke by telemedicine and telephone prior to a regional stroke center is feasible and safe. *Stroke* 2010;41:e18–e24.

87. Spokoyny I, Raman R, Ernstrom K, et al. Pooled assessment of computed tomography interpretation by vascular neurologists in the STRokE DOC Telestroke Network. *J Stroke Cerebrovasc Dis* 2014;23:511–515.

88. Demaerschalk B, Roman R, Enstrom K, et al. Efficacy of telemedicine for stroke: Pooled analysis of the stroke team remote evaluation using a digital observation camera (STRoKE DOC) Arizona telestroke trials. *Telemed J E Health* 2012;18:230–237.

89. Handschu R, Scibor M, Willaszek B, et al. Telemedicine in acute stroke, remote video-examination compared to simple telephone consultation. *J Neurol* 2008;255:1792–1797.

90. Puetz V, Bodechtel U, Gerber C, et al. Reliability of brain CT evaluation by stroke neurologists in telemedicine. *Neurology* 2012;80:332–338.

91. Muller H, Nimmrichter B, Schenkel J, et al. Improvement in stroke care in a non-urban community hospital—Quality of procedures before and after participating in a telemedical stroke network [in German]. *Dtsch Med Wochenschr* 2006;131:1309–1314.

92. Audebert H, Tietz V, Boy S, et al. Acceptance of telemedicine for acute stroke care. The German Project TEMPiS [in German]. *Nervenarzt* 2009;80:184–189.

93. Pedragosa A, Alvarez-Sabin J, Molina C, et al. Impact of a telemedicine system on acute stroke care in a community hospital. *J Telemed Telecare* 2009;15:260–263.

94. Nagao KJ, Koschel A, Haines HM, et al. Rural Victorian Telestroke project. *Intern Med J* 2012;42:1088–1095.

95. Sairanen T, Soinila S, Nikkanen M, et al. Two years of Finnish telestroke thrombolysis at spokes equal to that at the hub. *Neurology* 2011;76.13:1145–1152.

96. Rudd M, Rodgers H, Curless R, et al. Remote specialist assessment for intravenous thrombolysis of acute ischaemic stroke by telephone. *Emerg Med J* 2014;29:704–708.

97. Bruno A, Lanning K, Gross H, et al. Timeliness of intravenous thrombolysis via telestroke in Georgia. *Stroke* 2013;44:2620–2622.

98. Pedragosa A, Alvarez-Sabin J, Rubiera M. Impact of telemedicine on acute management of stroke patients undergoing endovascular procedures. *Cerebrovasc Dis* 2012;34:436–442.

99. Walter S, Kostopoulos P, Haass A, et al. Diagnosis and treatment of patients with stroke in a mobile stroke unit versus in hospital: A randomized controlled trial. *Lancet Neurol* 2012;11:397–404.

100. Audebert H, Schultes K, Tietz V, et al. Long-term effects of specialized stroke care with telemedicine support in community hospitals on behalf of the Telemedical Project for Integrative Stroke Care (TEMPiS). *Stroke* 2009;40:902–908.

101. Theiss S, Gunzel F, Storm A, et al. Using routine data for quality assessment in NeuroNet telestroke care. *J Stroke Cerebrovasc Dis* 2013;22:984–990.

102. Switzer J, Demaerschalk B, Xie J, et al. Cost effectiveness of hub-and-spoke telestroke networks for the management of acute ischemic stroke from the hospitals' perspectives. *Circ Cardiovasc Qual Outcomes* 2013;6:18–26.

103. GOLD. *Global strategy for the diagnosis, management and prevention of chronic obstructive pulmonary disease. NHLBI/WHO Workshop Report, April 2001.* NIH publication no. 2701:1–100. Bethesda, MD: National Heart, Lung and Blood Institute, updated **2014.**

104. Caramori G, Adcock I, Papi A. Clinical definition of COPD exacerbations and classification of their severity. *South Med J* 2009;102:277–282.

105. Donaldson G, Wedzicha J. COPD exacerbations 1: Epidemiology. *Thorax* 2006;61:164–168.

106. Rodriguez-Roisin R. Toward a consensus definition for COPD exacerbations. *Chest* 2000;117(5 Suppl 2):398S–401S.

107. Burge S, Wedzicha JH. COPD exacerbations: Definitions and classifications. *Eur Respir J Suppl* 2003;41:46s–53s.

108. Celli B, Barnes P. Exacerbations of chronic obstructive pulmonary disease. *Eur Respir J* 2007;29:1224–1238.

109. Rabe K, Hurd S, Anzueto A, et al. Global strategy for the diagnosis, management, and prevention of chronic obstructive pulmonary disease: GOLD executive summary. *Am J Respir Crit Care Med* 2007;176:532–555.

110. Centers for Disease Control and Prevention. Chronic obstructive pulmonary disease among adults—United States, 2011. *MMWR Morb Mortal Wkly Rep* 2012;61:938–951.

111. Centers for Disease Control and Prevention. QuickStats: Number of deaths from 10 leading causes—National vital statistics system, United States, 2010. *MMWR Morb Mortal Wkly Rep* 2013;62:155.

112. American Lung Association. *Trends in COPD (chronic bronchitis and emphysema): Morbidity and mortality.* Washington, DC: American Lung Association, Epidemiology and Statistics Unit, Research and Education Division, **2013.**

113. Ford E, Croft J, Mannino D, et al. COPD surveillance—United States, 1999–2011. *Chest* 2013;144:284–305.

114. Holguin F, Folk E, Redd SC, Mannino DM. Comorbidity and mortality in COPD-related hospitalizations in the United States, 1979 to 2001. *Chest* 2005;128:2005–2011.

115. Raza T, Joshi M, Shapira RM, Agha Z. Pulmonary telemedicine—A model to access the subspecialist services in underserved rural areas. *Int J Med Inform* 2009;78:53–59.

116. Bonavia M, Averame G, Canonica W, et al. Feasibility and validation of telespirometry in general practice: The Italian Alliance study. *Respir Med* 2009;103:1732–1737.

117. Averame G, Bonavia M, Ferri P, et al. Office spirometry can improve the diagnosis of obstructive airway disease in primary care setting. *Respir Med* 2009;103:866–872.

118. Bernocchi P, Scalvini S. Tridico C, et al. Healthcare continuity from hospital to territory in Lombardy: TELEMACO project. *Am J Manag Care* 2012;18:e101–e108.

119. Whitten P, Mickus M. Home telecare for COPD/CHF patients: Outcomes and perceptions. *J Telemed Telecare* 2007;13:69–73.

120. Vitacca M, Bianchi L, Guerra A, et al. Tele-assistance in chronic respiratory failure patients: A randomized clinical trial. *Eur Respir J* 2009;33:411–418.

121. Vitacca M, Bazza A, Bianchi L, et al. Tele-assistance in chronic respiratory failure: Patients' characterization and staff workload of 5-year activity. *Telemed J E Health* 2010;16:299–305.

**CDCR _047**

122. Dinesen B, Haesum L, Sorensen N, et al. Using preventive home monitoring to reduce hospital admission rates and reduce costs: A case study of telehealth among chronic obstructive pulmonary disease patients. *J Telemed Telecare* **2012;**18:221–225.

123. Sorknaes A, Bech M, Madsen H, et al. The effect of real-time teleconsultations between hospital-based nurses and patients with severe COPD discharged after an exacerbation. *J Telemed Telecare* **2013;**19:466–474.

124. Sorknaes A, Madsen M, Hallas J, et al. Nurse tele-consultation with discharged COPD patients reduce early readmission—An interventional study. *Clin Respir J* **2011;**5:26–34.

125. Pinnock H, Hanley J, McCloughan L, et al. Effectiveness of telemonitoring integrated into existing clinical services on hospital admission for exacerbation of chronic obstructive pulmonary disease: Researcher blind, multicentre, randomised controlled trial. *BMJ* **2013;**347:f6070.

126. Strickland M, Jourdain T, Wong E, et al. Using telehealth technology to deliver pulmonary rehabilitation to patients with chronic obstructive pulmonary disease. *Can Respir J* **2011;**18:216–220.

127. de Toledo P, Jiménez S, del Pozo F, Roca J, Alonso A, Hernandez C. Telemedicine experience for chronic care in COPD. *IEEE Trans Inf Technol Biomed* 2006;10:567–573.

128. Gellis Z, Kenaley B, McGinty J, et al. Outcomes of a telehealth intervention for homebound older adults with heart of chronic respiratory failure: A randomized controlled trial. *Gerontologist* **2012;**52:541–552.

129. Pedone C, Chiurco D, Scarlata S, et al. Efficacy of multiparametric telemonitoring on respiratory outcomes in elderly people with COPD: A randomized controlled trial. *BMC Health Serv Res* **2013;**13:82.

130. Cardozo L, Steinberg J. Telemedicine for recently discharged older patients. *Telemed J E Health* **2010;**16:49–55.

131. Thijssing L, Van Der Heijen J, Chavannes N, et al. Telepulmonology: Effect on quality and efficiency of care. *Respir Med* **2014;**108:314–318.

132. Reardon T. Research findings and strategies for assessing telemedicine costs. *Telemed J E Health* **2005;**11:348–368.

133. Rabinowitz T, Murphy KM, Amour JL, Ricci MA, Caputo MP, Newhouse PA. Benefits of a telepsychiatry consultation service for rural nursing home residents. *Telemed J E Health* **2010;**16:34–40.

134. Simon GE, VonKorff M, Rutter C, Wagner E. Randomised trial of monitoring, feedback, and management of care by telephone to improve treatment of depression in primary care. *BMJ* **2000;**320:550.

135. Pyne JM, Fortney JC, Tripathi SP, Maciejewski ML, Edlund MJ, Williams DK. Cost-effectiveness analysis of a rural telemedicine collaborative care intervention for depression. *Arch Gen Psychiatry* **2010;**67:812–821.

136. Lokkerbol J, Adema D, Cuijpers P, Reynolds CF 3rd, Schulz R, Weehuizen R, Smit F. Improving the cost-effectiveness of a healthcare system for depressive disorders by implementing telemedicine: A health economic modeling study. *Am J Geriatr Psychiatry* **2014;**22:253–262.

137. Wray LO, Shulan MD, Toseland RW, Freeman KE, Vásquez BE, Gao J. The effect of telephone support groups on costs of care for veterans with dementia. *Gerontologist* 2010;50:623–631.

138. Moreno-Ramirez D, Ferrandiz L, Ruiz-de-Casas A, Nieto-Garcia A, Moreno-Alvarez P, Galdeano R, Camacho FM. Economic evaluation of a store-and-forward teledermatology system for skin cancer patients. *J Telemed Telecare* **2009;**15:40–45.

139. Ferrándiz L, Moreno-Ramírez D, Ruiz-de-Casas A, Nieto-García A, Moreno-Álvarez P, Galdeano R, Camacho FM. An economic analysis of presurgical teledermatology in patients with nonmelanoma skin cancer [in Spanish]. *Actas Dermosifiliogr* 2008;99:795–802.

140. Ng MF, Stevenson JH. Diagnostic value and cost-effectiveness of good quality digital images accompanying electronic referrals for suspected skin malignancies. *Ann Plast Surg* 2011;66:377–380.

141. van Os-Medendorp H, Koffijberg H, Eland-de Kok PCM, van der Zalm A, de Bruin-Weller MS, Pasmans SGMA, et al. E-health in caring for patients with atopic dermatitis: A randomized controlled cost-effectiveness study of internet-guided monitoring and online self-management training. *Br J Dermatol* **2012;**166:1060–1068.

142. Bergmo TS. A cost-minimization analysis of a realtime teledermatology service in northern Norway. *J Telemed Telecare* **2000;**6:273–277.

143. Armstrong AW, Dorer DJ, Lugn NE, Kvedar JC. Economic evaluation of interactive teledermatology compared with conventional care. *Telemed J E Health* **2007;**13:91–99.

144. Pak HS, Datta SK, Triplett CA, Lindquist JH, Grambow SC, Whited JD. Cost minimization analysis of a store-and-forward teledermatology consult system. *Telemed J E Health* **2009;**15:160–165.

145. Pelletier-Fleury N, Gagnadoux F, Philippe C, Rakotonanahary D, Lanoé JL, Fleury B. A cost-minimization study of telemedicine. *Int J Technol Assess Health Care* 2001;17:604–611.

146. Harno K, Arajärvi E, Paavola T, Carlson C, Viikinkoski P. Clinical effectiveness and cost analysis of patient referral by videoconferencing in orthopaedics. *J Telemed Telecare* **2001;**7:219–225.

147. Mark DA, Fitzmaurice GJ, Haughey KA, O'Donnell ME, Harty JC. Assessment of the quality of care and financial impact of a virtual renal clinic compared with the traditional outpatient service model. *Int J Clin Pract* **2011;**65:1100–1107.

148. Fischer HH, Eisert SL, Everhart RM, Durfee MJ, Moore SL, Soria S, et al. Nurse-run, telephone-based outreach to improve lipids in people with diabetes. *Am J Manag Care* **2012;**18:77–84.

149. Eakin EG, Reeves MM, Marshall AL, Dunstan DW, Graves N, Healy GN, et al. Living Well with Diabetes: A randomized controlled trial of a telephone-delivered intervention for maintenance of weight loss, physical activity and glycaemic control in adults with type 2 diabetes. *BMC Public Health* **2010;**10:452.

150. Kesavadev J, Shankar A, Pillai PBS, Krishnan G, Jothydev S. Cost-effective use of telemedicine and self-monitoring of blood glucose via Diabetes Tele Management System (DTMS) to achieve target glycosylated hemoglobin values without serious symptomatic hypoglycemia in 1,000 subjects with type 2 diabetes mellitus—A retrospective study. *Diabetes Technol Ther* **2012;**14:772–776.

151. Eminović N, Dijkgraaf MG, Berghout RM, Prins AH, Bindels PJ, de Keizer NF. A cost minimisation analysis in teledermatology: Model-based approach. *BMC Health Serv Res* **2010;**10:251.

152. Salzsieder E, Augstein P. The TeleDiabetes Management System: Translation from research to eHealth application. *J Diabetes Sci Technol* **2011;**5:13–22.

153. Hitt WC, Low G, Bird TM, Ott R. Telemedical cervical cancer screening to bridge Medicaid service care gap for rural women. *Telemed J E Health* **2013;**19:403–408.

154. Kimman ML, Dirksen CD, Voogd AC, Falger P, Gijsen BCM, Thuring M, et al. Economic evaluation of four follow-up strategies after curative treatment for breast cancer: Results of an RCT. *Eur J Cancer* **2011;**47:1175–1185.

155. Thaker DA, Monypenny R, Olver I, Sabesan S. Cost savings from a telemedicine model of care in northern Queensland, Australia. *Med J Aust* **2013;**1994:414–417.

156. Xu CQ, Smith AC, Scuffham PA, Wootton R. A cost minimisation analysis of a telepaediatric otolaryngology service. *BMC Health Serv Res* 2008;8:30.

157. Joo NS, Park YW, Park KH, Kim CW, Kim BT. Cost-effectiveness of a community-based obesity control programme. *J Telemed Telecare* **2010;**16:63–67.

158. Wade VA, Karnon J, Eliott JA, Hiller JE. Home videophones improve direct observation in tuberculosis treatment: A mixed methods evaluation. *PLoS One* **2012;**7:e50155.

159. Buysse H, De Moor G, Van Maele G, Baert E, Thienpont G, Temmerman M. Cost-effectiveness of telemonitoring for high-risk pregnant women. *Int J Med Inform* 2008;77:470–476.

CDCR _048

**BASHSHUR ET AL.**

160. Lilly CM, McLaughlin JM, Zhao H, Baker SP, Cody S, Irwin RS. A multicenter study of ICU telemedicine reengineering of adult critical care. *Chest* **2014**;145:500–507.

161. Isetta V, Lopez-Agustina C, Lopez-Bernal E, Amat M, Vila M, Valls C, et al. Cost-effectiveness of a new internet-based monitoring tool for neonatal post-discharge home care. *J Med Internet Res* **2013**;15:e38.

162. Henderson C, Knapp M, Fernandez JL, et al. Cost effectiveness of telehealth for patients with long term conditions (Whole System Demonstrator telehealth questionnaire study): Nested economic evaluation in a pragmatic, cluster randomized control trial. *BMJ* **2013**;346:1–19.

163. Andrade M, Maia A, Cardoso C, et al. Cost-benefit of the telecardiology service in the state of Minas Gerais: Minas Telecardio Project [in English, Portuguese]. *Arq Bras Cardiol* **2011**;97:307–316.

164. Alkmim M, Figueira R, Marcolino M. Improving patient access to specialized health care: The telehealth network of Minas Gerais, Brazil. *Bull World Health Organ* **2012**;90:373–378.

165. Sohn S, Helms TM, Pelleter JT, et al. Costs and benefits of personalized healthcare for patients with chronic heart failure in the care and education program "Telemedicine for the Heart." *Telemed J E Health* **2012**;18:198–204.

166. Smith B, Hughes-Cromwick P, Forkner E, et al. Cost-effectiveness of telephonic disease management in heart failure. *Am J Manag Care* **2008**;14:106–115.

167. Elliot R, Barber N, Clifford S, et al. The cost effectiveness of a telephone-based pharmacy advisory service to improve adherence to newly prescribed medicines. *Pharm World Sci* **2008**;30:17–23.

168. Salvador C, Ruiz-Sanchez A, Gonzalez de Mingo M, et al. Evaluation of a telemedicine-based service for the follow-up and monitoring of patients treated with oral anticoagulant therapy. *IEEE Trans Inf Technol Biomed* **2008**;12:696–706.

169. Datta S, Oddone E, Olsen M, et al. Economic analysis of a tailored behavioral intervention to improve blood pressure control for primary care patients. *Am Heart J* **2010**;160:257–263.

170. Wennberg DE, Marr A, Lang L, O'Malley S, Bennett G. A randomized trial of a telephone care-management strategy. *N Engl J Med* **2010**;363:1245–1255.

171. Minetaki K, Akematsu Y, Tsuji M. Effect of e-health on medical expenditures of outpatients with lifestyle-related diseases. *Telemed J E Health* **2011**;17:591–595.

172. Brunetti N, Dellegrottaglie G, Lapriore C, et al. Prehospital telemedicine electrocardiogram triage for a regional public emergency medical service: Is it worth it? A preliminary cost analysis. *Clin Cardiol* **2014**;37:140–145.

173. Calo L, Gargao A, De Ruvo E, et al. Economic impact of remote monitoring on ordinary follow-up of implantable cardioverter defibrillators as compared with conventional in-hospital visits. A single center prospective randomized study. *J Interv Card Electrophysiol* **2013**;37:69–78.

174. Zanaboni P, Landolina M, Marzegalli, et al. Cost-utility analysis of the EVOLVO study on remote monitoring for heart failure patients with implantable defibrillators: Randomized controlled trial. *J Med Internet Res* **2013**;15:e106.

175. Chen YH, Lin YH, Hung CS, et al. Clinical outcomes and cost-effectiveness of a synchronous telehealth service for seniors and nonseniors with cardiovascular diseases: Quasi-experimental study. *J Med Internet Res* **2013**;15:e87.

176. Coleman EA, Parry C, Chalmers S, et al. The care transitions intervention: Results of a randomized controlled trial. *Arch Intern Med* **2006**;166:1822–1828.

177. Chugh A, Williams MV, Grigsby J, et al. Better transitions: Improving comprehension of discharge instructions. *Front Health Serv Manage* **2009**;25:11–32.

Address correspondence to:
*Rashid L. Bashshur, PhD*
*Senior Advisor for e-Health*
*University of Michigan Health System*
*300 North Ingalls, SPC 5402*
*Ann Arbor, MI 48109-5402*

*E-mail:* bashshur@med.umich.edu

*Received:* May 28, 2014
*Accepted:* May 28, 2014

**CDCR _049**

# ATTACHMENT 2

CDCR _050

**Marshall University**
**Marshall Digital Scholar**

Management Faculty Research                    Management, Marketing and MIS

3-1-2012

# Benefits and Constraints of Telepsychiatry Utilization in the United States

Bruce A. Stec
*Marshall University*

Alberto Coustasse
*Marshall University*, coustassehen@marshall.edu

Follow this and additional works at: http://mds.marshall.edu/mgmt_faculty

Part of the Health and Medical Administration Commons, Health Information Technology Commons, and the Psychiatry and Psychology Commons

## Recommended Citation

Stec, B. and Coustasse, A. Benefits and constraints of telepsychiatry utilization in the United States. Business and Health Administration Association Annual Conference 2012. Paper presented at the Business and Health Administration Association (BHAA) Annual Conference 2012, at the 48th Annual Midwest Business Administration Association International Conference. Chicago, Illinois. Mar 2012.

This Conference Proceeding is brought to you for free and open access by the Management, Marketing and MIS at Marshall Digital Scholar. It has been accepted for inclusion in Management Faculty Research by an authorized administrator of Marshall Digital Scholar. For more information, please contact zhangj@marshall.edu.

# BENEFITS AND CONSTRAINTS OF TELEPSYCHIATRY UTILIZATION IN THE UNITED STATES

*Bruce Stec, Marshall University*
*Alberto Coustasse, Marshall University*

## ABSTRACT

This article describes the benefits and constraints of utilizing telemedicine primarily focusing on the field of psychiatry in the United States with the current system of healthcare. The utilization of telemedicine in the field of psychiatry is believed to provide better access, quality and care to the patients who necessitate psychiatric care in their overall medical care. Telemedicine has been a successfully integrated program into psychiatric facilities reaching rural, prisons or city facilities based on that it has increased the volume of patients in which physicians can reach out to and diagnose, as well as treat patients with limitations in his or her mobility.

*Keywords:* Telepsychiatry, Telemedicine, cost, savings inmates, mobility

## INTRODUCTION

Telemedicine has been defined as the intervention of telecommunication device diagnosis and the overall care of patients that are separated by a distance. This enables practitioners from far away to recommend treatment of difficult or rare cases all over the country (Managed Care Glossary, 2010). Telemedicine uses technological devices that include but are not limited to voice, video, robotic, and remote access technology to diagnose and treat individuals over a given area (Chang, Mayo & Omery, 2001).

Patients who use these medical services can receive an evaluation, diagnosis, treatment, consultation, and education about their condition (Smith, Benskin, Armsfield, Stillman & Caffery, 2000). In recent years, there has been an ever-growing trend of patients that would benefit from at-home medical services. These beneficiaries of care commonly suffer from asthma, cardiac conditions, diabetes and/or psychological disorders (Chang, et. al, 2001). With a high prevalence of landline phone service as well as cellular based phones in use in the United States, this form of treatment in psychology has a great use in telemedicine (Smith, et. al, 2000).

Telemedicine first originated in the field of psychiatry and has been greatly utilized for years. Due to the structured nature and limited access to patients regularly, the fields of radiology and pathology are considered mature as this follows along with their discipline in medicine. In these fields, researchers have shown further positive advancements in quality and structure (Nesbitt, Hilty, Kvenneth & Siefkin, 2000).

Telemedicine focusing on psychiatric care holds a great importance in healthcare as it has given an increased number of patients access to care (Watcher, 2002). A patient's location is particularly important as this depicts the amount of access to this type of medical care. Individuals who reside in rural areas of the country are now being offered this specialty care while being more cost effective than the typical in-clinic care (Shore & Manson, 2005). Access to psychiatric care is not always limited to geographic area alone. School systems have begun to use counseling services for school-aged children while they are on their school's campus. It has been estimated that around 15% of school-aged children suffer from some kind of mental illness that would benefit from psychiatric services and employing this genre of care in this particular manner has proved to be cost efficient as the school system pays for psychiatric care on an as-needed basis (Myers, Valentine & Melzer, 2007).

Since telemedicine uses a video-conferencing system, patients have the ability to receive similar consultations and prescriptions as their in-person counterparts (Myers, et. al, 2007). In order for patients to be written prescriptions, they must be consulted by a providing psychiatrist. Services that utilize telemedicine-based

**CDCR _052**

systems allow easier application of psychiatric services (Young & Ireson, 2003). Using telemedicine in the field of psychiatry has the potential to be both cost and structurally efficient due to the diminished requirement of fixed cost necessary for everyday operation. Remote monitoring of patients allowed practitioners to check-in with their patients more often due to the increased ease of observation (American Telemedicine Association, 2011).

One major issue that arises with the implementation of telepsychiatry is the start-up cost of establishing clinics that have up-to-date electronics (Ghodse, 2004). These clinics must have the capabilities of interoperability between the practitioners systems and the patients. A common solution to this problem is to use an intermediary between the systems that converts the necessary signals so that transmission can occur (Shore, et. al, 2005). Additionally, copious amounts of regulations currently exist both federally and at the state level that create barriers for the transmission of medically related material across phone or internet air waves (Watcher, 2002).

This article describes the benefits and constraints of utilizing telemedicine primarily focusing on the field of psychiatry in the United States (U.S.) with the current system of healthcare. The utilization of telemedicine in the field of psychiatry is believed to provide better access, quality and care to the patients who necessitate psychiatric care in their overall medical care.

The purpose of this research was to analyze the quality of care with the utilization of telemedicine in psychiatric care as well as its potential cost-saving benefits to both the payers and patients in healthcare.

## METHODOLOGY

A literature review was performed by utilizing compiled findings published within the past 10 years. Twenty five (25) scholarly sources were used due to the relevancy to the integration and use of telepsychiatry in the United States. It covered both benefits and constrains of telepsychiatry. When completing the online search, the following phrases were used and combined to narrow the search criteria: Telemedicine, OR Telemedicine "AND" psychiatry, OR psychology, OR psychiatric. The articles that were chosen were peer-reviewed journal articles or peer-reviewed magazine selections. All of the relevant research that was used came from the electronic database Ebscohost, PubMed and Google Scholar.

This literature review based examination of the usage of telemedical intervention in psychiatric care aimed to be systematic in nature. Articles were reviewed and determined to have inclusion criteria if the material gave a fair and just determination on the topic of telemedicine with a particular focus on psychiatric care. Many articles were eliminated from the search regarding specific medical intervention techniques pertaining to telemedicine intervention in psychiatry article analysis. Also, articles that were not written in English were subject to elimination. While attempting to stay current in research, all articles that were older than 12 years were immediately eliminated from the search. All literature research was conducted by BS and validated by AC.

## RESULTS

In this form of telemedicine, many antagonists have objected to this non-traditional medical care. Fundamentalists believe that medical care cannot be adequately given unless the patient receives an exam in person (Wootton, 2001). To counteract this belief, studies have been initiated where telemedicine is used. These studies have examined the percentage of time when a physician has given the correct diagnosis vs. when the doctor has not. In one study that examined psychiatric care for rural individuals, it was found that only one to two percent of the patients received a wrong diagnosis when telemedicine was used (Singh, Arya & Peters, 2007). In most cases, psychiatrists believe that diagnosing a subject in person is necessary for a successful diagnosis. The reason for that is due to the fact that during a test-trial, patients were re-tested for diagnostic validity while meeting with them in person, and it was proven that only around 67% of patients received a proper diagnosis (Salander & Henricksson, 2005).

The study was conducted with early and crude technology by today's standards because of a lack of an internet connection and proper interactive equipment (Saldanha, Chaundhry, Pawer & Sivastav, 2007). In 2007, Singh, et. al, established a strict methodology using current patient accessible hardware and software to evaluate where telepsychiatry stands in terms of diagnosable validity. The researchers found that 83% patients who were diagnosed via the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) through the use of telepsychiatry were correctly diagnosed. This study was beneficial in showing that the validity of diagnosis in

telepsychiatry due to the advances of telecommunication devices. The researchers expected that further advancements in technology would only increase the validity of non-contact diagnosis in psychiatric care (Singh, et. al, 2007).

Minimum technological requirements must be met in order to be able to receive adequate care. This field of medicine makes it necessary for patients and psychiatrist to have more direct interaction with one another due to the evaluation methods that are used by psychiatrist in today's medical field. To support live-feeds in video and sound must be completed via internet based cameras, microphones and strong broadband connections by both parties involved (Wootton, 2001). Additionally, the patient needs a connection at the physician's desired rate so that they can view the picture in a non-interrupted manner. Telemedicine in psychiatric care allowed patients to keep their feeling of independence and autonomy by performing at-home medical services (Pandian, 2007).

Patients who have a high satisfaction rate in their medical treatment were more apt to stick to their prescribed medical treatments (Rubin & Peyrot, 2001). In 1996, clinicians at The University of Kentucky conducted a study with 43 adolescents and their families for psychiatric evaluation in rural areas within the state. These patients were previously evaluated and were deemed to require psychiatric care. Of those patients who were evaluated, it was found that 98% of respondents acknowledged that the utilization of telemedicine based services for their psychiatric care were equally if not more beneficial than the classic consultation method (Akechi, 2001).

Patients who use Telemedicine services benefit from the increased level of access of services that they can receive. In rural areas, telepsychiatry can increase the level of quality care in their facilities since the advent of videoconferencing (Rubin, et. al, 2001). Since the 1990's, the cost of the necessary technology has decreased to a level where most patients can afford to have the equipment at home. In rural healthcare settings, access to proper specialist care can be very rare. With this rarity, an increase in the overall cost of the services performed by the specialist escalates (Akechi, 2001). Services rendered in this manner have dropped the overall cost of care by 10% per patient in addition to increasing their access to this specialized care (O'Reilly, et. al, 2007).

Specialized services in psychiatric care, such as biofeedback have been growing in popularity as a treatment for various psychological problems. Biofeedback allows individuals to learn how to change physiological activities in order to recover their health and performance (Association for Applied Psychophysiology and Biofeedback, 2008). Practitioners who use this medical equipment have attempted to teach the patients through the analysis of their own body processes to overcome psychological and/or physiological body processes. The typical required equipment includes and ElectroMyoGraphy (EMG), ElectroEncephaloGram (EEG), Skin Conductance Level (SCL) and a Heart Rate Variability monitor (HRV), (Kall, 2011). Individuals who benefit from this type of medical treatment include depression, anxiety, obsessive-compulsive disorder or stress generally benefit greatly from this type of therapy (Association for Applied Psychophysiology and Biofeedback, 2008). Once a patient has learned to control the previously irrepressible, involuntary or habitually controlled behaviors then they can use this form of treatment to control their diseases. Consistent treatments may be required for some patients to overcome their problems (Kall, 2011). Since there is a large cost to purchase the required machinery, specialized clinics have been established to act as rural health clinics where patients can go to receive help without being forced to purchase the equipment themselves (Kall, 2001). In 2001, it was estimated that this equipment would cost around $20,000 to $100,000 with trained personnel utilizing the more expensive equipment but it saved an estimated 10%-12% of the overall cost to payers (Folen, James, Earles & Andrasik, 2001).

Ethical standards for the use of telepsychiatry services need to be adhered to protect not only the patient but the provider as well (Lee, 2010). This modality would not be an appropriate measure due to safety concerns and the fear of self-harm. For instance, if a patient requires immediate care due to a potential suicide risk where instantaneous care is required to stop a patient's harmful actions, medical care may not be able to reach them in time to cease the act (Lee, 2010). For cases where immediate action is a must, the exact location must be known so that emergency officials may assist the individual. One way to obtain this is by running the Internet Protocol (IP) number through a specialized application that searches and locates an individual. However, this has proved to be increasingly difficult for individuals who are using mobile 3G/4G connections as this cellular based service is difficult to trace (Folen, et. al, 2001).

**Negative Aspects of Utilization**

Patients who have received this form of therapy from their practitioners also run the risk of misunderstanding the instructions given by a practitioner. During regular consultations, practitioners and patients encountered a great deal of non-verbal communication between one another (Lee, 2010). Some of this communication is lost with this form of therapy potentially hindering the experience that a patient receives from his or her practitioner. Even though most people who use this type of medical intervention will be using teleconferencing with video and audio support, cameras and microphones are not always an equivalent substitute (Haberworth, Parr, Bradley, Morgan-Fleming & Gee, 2008).

With the increased levels of interconnectivity between people, specialists should fear the possibility of patients gaining access to their personal information. This information can include cellular phone number(s), home addresses, children's information, or other personal information that could be deemed as intrusive if known by a patient (Rainie, 2009). Practitioners must be aware of any personal information that has been published on the Internet by either themselves or by someone else. Providers must follow the ethical guidelines set by the American Medical Association (AMA) on what type of information is allowed to be published as well as the relationships that can form between client and practitioner on social networking sites for example (Haberworth et. al., 2008). This information could be damaging to the practitioner and or patient and compromise not only the trust between them, but the professionalism as well. Additionally, patients who feel as though their practitioner has "failed" them in their required medical services may retaliate against the provider directly with the newly gained knowledge (Rainie, 2009).

**Telepsychiatry in Prisons**

The prison system is the ideal setting for telemedicine for many reasons. Although there is a major cost involved in establishing a telemedicine system in any setting, in prison, the benefits can be seen immediately. Since the prison is either run by the federal or state government and has its own budget, the prison itself can contract the telemedicine provider (Magaletta, Fagan & Peyrot, 2000).The initial savings to the prison can include the decrease in transportation costs from moving the inmate to the healthcare facility. Another plus to adding telemedicine is the increase in provider security. Not having to physically treat an inmate ensures that there is no physical danger to the physician and this also decreases the risk to the prison security and thereby the patient themselves. By not having to transport an inmate to an exterior healthcare facility, the prison would see immediate savings in transport costs as well as man hour cost by not having to send guards with the patient. Traditionally, physicians have also been reluctant to allow inmates to be treated at their private facilities. By adding telemedicine services, this is no longer an issue. A provider can feel free to treat a patient without the worry of their security or the security of their facility and their other patients. Nationally, psychiatric care is the most utilized health service through telemedicine services in prisons (Magaletta, Fagan & Peyrot, 2000).

Confidentiality in this mode of healthcare can be one of the most important concerns that both practitioners and patients have to cope with. The utilization of the telemedicine methods for patients runs the risk of leaving a "digital paper trail" behind allowing unwanted people from viewing this personal information (Wasler, McLain & Kellar, 2009). Additionally, practitioners may record the therapy session unknowingly to the patient, which has the potential to be accessed at a later date without the knowledge of the patient (Chaimberlin, 2010). Other breaches in confidentiality include poor security of transcribed medical information, improperly storing video or voice of the session, spyware or malware on the practitioners or patients' computer, and hackers who break into the systems (Chaimberlin, 2010).

## DISCUSSION

The integration of telemedicine in psychiatric care in the United States has had a beneficial impact on patient care in multiple ways. Its implementation helped to counter the prejudice against medical diagnosis in any way but in person, i.e. a patient had to be physically present with a physician for treatment. The utilization of video and sound through computers via broadband has altered the way psychiatric patients interact with their physicians. Those people that did not believe physicians could, or should, diagnose psychiatric patients without seeing him or her face-to-face hindered many patients from ever being treated. Those individuals that could not go to a treatment center based on their lack of mobility, funds or both, were not being looked after by physicians, and therefore

suffered through their illness. Since telemedicine was utilized in psychiatric hospitals, the success rate has shown personnel in the medical field that it can be a dependent system in which to diagnosis patients that cannot get to the proper physician or facility.

The most important aspect of telemedicine have been how those patients who were unable to be treated are now given a sense of freedom, confidence and understanding in their psychiatric illness(s). When patients are satisfied with their level of care, they are more apt to follow treatment procedure and thus, get better, or at the very least acquire good care. Also, because technology has become a more affordable commodity in society today vs. even a decade ago, the majority of patients are able to connect to his or her physician by using their own equipment at home.

Telemedicine has not only affected patients, but psychiatric facilities as well. Rural psychiatric care centers used to limit themselves on their ability to interact with larger, often times more sufficient facilities due to the fact that they were isolated. However, telemedicine has opened up an easier transport service of interaction between physicians in various facilities because now they can use video or messaging to swap information. The initial cost of the equipment used can be high- up to 100,000- but since the cost over time saves personnel by as much as 12%, telemedicine has become a useful tool and practice (Mair, Haycox & Williams, 2000).

The detail in which is being implemented currently has been a great help to psychiatric patients as well. Attaining the ability to show patients how to perform techniques of care like activities in which to overcome psychological issues has greatly reduced the stress, anxiety, depression, and other unnaturally prolonged behaviors in patients (Nelson, Barnard & Cain, 2003). Patients who are suffering at home also obtain care that, although may raise ethical flags, allows medical personnel to retrieve them if he or she is rendered immobile. Even through emergencies like suicidal threats, medical personnel can locate the patient by using the Internet Protocol number (Folen, et. al, 2001).

Whether the ethnical battle will be resolved or not, the realization is that telemedicine saves lives, especially in regard to psychiatric patients who often times need to connect with a physician face-to-face.

## CONCLUSION

Telemedicine has been a successfully integrated program into psychiatric facilities at levels whether that is rural or city based on the fact that it increases the volume of patients in which physicians can reach out to and diagnose as well as help those who are inept in his or her mobility. Although, initially costly, the overall benefits that are associated with telemedicine is worth the funding for all psychiatric facilities across the country.

## REFERENCES

Akechi, T. (2001). *Suicidal Ideation in Unrespectable Lung Cancer Patients. In The Academy of Psychosomatic Medicine.* Retrieved April 2011 from http://psy.psychiatryonline.org/cgi/content/full/42/2/165.

American Telemedicine Association. (2011). *What Is Telemedicine & Telehealth?* Retrieved March 2011 from http://www.americantelemed.org/files/public/abouttelemedicine/What_Is_Telemedicine.pdf.

Association for Applied Psychophysiology and Biofeedback. (2008). *What is Biofeedback?* Retrieved February 2011 from http://www.aapb.org/.

Chamberlin, J. (2010). The Digital Shift. *American Psychological Association*, *41*(5), 46-47. Retrieved February 2011 from http://www.apa.org/monitor/2010/05/slc-digital.aspx.

Chang, B. L., Mayo, A., & Omery, A. (2001). Consumer Satisfaction with Telehealth Advice-nursing. *MEDINFO*, *10*, 1435-1439. Retrieved March 2011 from http://www.ncbi.nlm.nih.gov/pubmed/11604963.

Folen, R. A., James, L. C., Earl, J. E., & Andrasik, F. (2001). Biofeedback Via Telehealth: A New Frontier for Applied Psychophysiolog. *Applied Psychophysiology and Biofeedback, 26(3)*, 195-204. Retrieved January 2011

from
http://digitalcommons.unl.edu/cgi/viewcontent.cgi?article=1015&context=usarmyresearch&seiredir=1#search=%22
minimum+technological+requirements+for+telemedicine+psychology.

Ghodse, H. (2004). Psychiatry for Tomorrow's Doctors: Undergraduate Medical Education. In *International
Psychiatry*. Retrieved April 2011 from http://www.rcpsych.ac.uk/pdf/ip3.pdf.

Haberstroh, S., Parr, G., Bradley, L., Morgan-Fleming, B., & Gee, R. (2008). Facilitating Online Counseling:
Perspectives From Counselors in Training. *Journal of Counseling & Development*, *86*(4), 460-470. Retrieved March
2011 from
http://aca.metapress.com/app/home/contribution.asp?referrer=parent&backto=issue,9,14;journal,10,45;linkingpublic
ationresults,1:112973,1.

Kall, R. (2011). Biofeedback Basics. Retrieved March 2011 from
http://www.futurehealth.org/biofeedback__definition.htm.

Lee, S. (2010). Contemporary Issues of Ethical E-Therapy. *Journal of Ethics in Mental Health*, *5*(*1*), 1-5. Retrieved
February 2011 from
http://www.jemh.ca/issues/v5n1/documents/JEMH_Vol5_No1_Contemporary_Issues_of_Ethical_E-Therapy.pdf.

Mair, F. S., & Williams, T. (2000). A Review of Telemedicine and Cost-Effectiveness Studies. In *Journal of
Telemedicine and Telecare*. Retrieved May 2011 from http://jtt.rsmjournals.com/cgi/content/abstract/6/suppl_1/38.

Managed Care Glossary (2010).  *In Plexis Healthcare Systems*. Retrieved March 2011 from
http://www.plexisweb.com/glossary/t.html.

Magaletta, P.R., Fagan, T.J. & Peyrot, M.F. (2000). Telehealth in the federal bureau of prisons:  inmates'
perceptions.  *Professional Psychology, 31(5),* 497-502.

Myers, K. M., Valentine, J. M., & Melzer, S. M. (2007). Feasibility, Acceptability, and Sustainability of
Telepsychiatry for Children and Adolescents. *Psychiatry Services; American Psychiatric Association*, *58(11)*, 1493-
1496.
.
Nelson, E., Barnard, M., & Cain, S. (2003). Treating Childhood Depression over Videoconferencing. *Telemedicine
Journal and E-Health*. Retrieved May 2011 from
http://www.hawaii.edu/hivandaids/Treating_Childhood_Depression_over_Videoconferencing.pdf.

Nesbitt, T. S., Hilty, D. H., Kuenneth, C. A., & Siefkin, A. (2000). Development of a telemedicine program: A
review of 1,000 videoconferencing consultations. *West Journal of Medicine*, *173(3)*, 169-174.

O'Reilly, R., Bishop, J., Maddox, K., Hutchinson, L., Fishman, M., & Takhar, J. (2007). Is Telepsychiatry
Equivalent to Face-to-Face Psychiatry? Results From a Randomized Controlled Equivalence Trial. *Psychiatric
Services*, *58*(6), 836-843. Retrieved March  2011 from http://www.ps.psychiatryonline.org/cgi/reprint/58/6/836.

Pandian, P. S. (2007). Store and Forward Applications in Telemedicine.  *Journal of Networks*, *2(6)*, 58-65.

Pattichis, C. S., Kyriacou, E., Voskarides, S., Pattichis, M. S., Istepanian, R., & Schizas, C. N. (2002). Wireless
Telemedicine Systems: An Overview. *IEEE Antennas & Propagation Magazine, 44(2)*, 143-153.

Rainie, L. (2009). *The Rise of the E-Patient*. Retrieved March 2011 from
http://www.pewinternet.org/Presentations/2009/40-h erise-of-the-e-patient.asp.

Rubin, R. R., & Peyrot, M. (2001). *Psychological Issues and Treatment for People with Diabetes. In Journal of
Clinical Pyschology*. Retrieved April 2011 from http://onlinelibrary.wiley.com/doi/10.1002/jclp.1041/abstract.

Salander, P., & Henriksson, R. (2005). Severely Diseased Lung Cancer P. *An International Journal for Lung Cancer Patients Narrate the Importance of being Included in a Helping Relationship*. Retrieved April 2011 from http://www.lungcancerjournal.info/article/S0169-5002(05)00280-1/abstract.

Saldanha, D., Chaudhury, S., Pawar, A. A., & Srivastav, R. K. (2007). Reduction in Drug Prescription using Biofeedback Relaxation in Neurotic and Psychosomatic Disorder. *Biofeed back Relaxation in Neurotic and Psychosomatic disorder*,*63*(4), 315-317. Retrieved May 2011 from http://medind.nic.in/maa/t07/i4/maat07i4p315.pdf.

Singh, S. P., Arya, D., & Peters, T. (2007). Accuracy of telepsychiatric assessment of new routine outpatient referrals [Electronic version]. *BioMed Psychiatry*, *7*(55), 1-13.

Shore, J. H., & Manson, S. M. (2005). A Developmental Model for Rural Telepsychiatry. *Psychiatr Serv; American Psychiatric Association*, *56*, 976-980.

Smith, A. C., Bensink, M., Armfield, N., Stillman, J., & Caffery, L. (2005). Telemedicine and Rural Health Care Applications. *Journal of Postgraduate Medicine*, 51(4), 286-293. Retrieved February 2011 from http://www.jpgmonline.com/article.asp?issn=00223859;year=2005;volume=51;issue=4;spage=286;epage=293;aulast=Smith.

Wasler, A. L., McLain, M., & Kellar, K. (2009). Telepsychology: To Phone or Not to Phone. *The Psychogram: Virginia Psychological Association*, *34*(4). Retrieved March 2011from http://www.centerforethicalpractice.org/ethical-legal-resources/practice-resources/resources-electronic-technology-tele-therapy/2583-2/.

Watcher, M. (2002). Information Technologies for Transforming Healthcare. In *New England Journal of Medicine*. Retrieved April 2011 from http://www.psu.edu/islandsofautomation.

Wootton, R. (2001). Recent Advances: Telemedicine. *British Medical Journal*, *323*, 557-560. Retrieved January 24, 2011, from http://www.bmj.com/cgi/reprint/323/7312/557.

Young, T. L., & Ireson, C. (2003). Effectiveness of School-Based Telehealth Care in Urban and Rural Elementary Schools. *Official Journal of the American Academy of Pediatrics*. Retrieved April 2011from http://www.piecingthepuzzletogether.com/downloads/telehealth%20in%20schools%20for%20screening%5B1%5D.pdf.

Bruce Stec, MS
Lewis College of Business
Marshall University Graduate College
100 Angus E. Peyton Drive
South Charleston, WV 25303


Alberto Coustasse, DrPH, MD, MBA
Associate Professor, Lewis College of Business
Marshall University Graduate College
100 Angus E. Peyton Drive
South Charleston, WV 25303

# ATTACHMENT 3

CDCR _059

TELEMEDICINE JOURNAL
Volume 2, Number 1, 1996
Mary Ann Liebert, Inc.

No mention of telepsychiatry

# The University of Texas Medical Branch–
# Texas Department of Criminal Justice Telemedicine
# Project: Findings from the First Year of Operation

ROBERT M. BRECHT, Ph.D., CHARLES L. GRAY, M.P.H., CASEY PETERSON,
and BENITA YOUNGBLOOD

## ABSTRACT

Background: The University of Texas Medical Branch (UTMB) and Texas Tech Health Science Center (TTHSC) are responsible for providing health care for approximately 130,000 inmates of the Texas Department of Criminal Justice through a health maintenance organization (HMO). Telemedicine was considered a way to solve some of the problems presented.

Objectives: To develop approaches to patient care, technology, support systems, evaluation, and uses of the system for applications other than patient care as part of the first stage of implementation.

Methods: Four prison delivery unit models were utilized. After a pilot study, the first patients were seen from October 1994 to November 1995, when 1715 consults were conducted in 18 scheduled specialty telemedicine clinics. Patients and providers were surveyed by interviews and questionnaires for their views on this form of providing care.

Results: Ninety-five per cent of the telemedicine consults saved one or more trips to UTMB for outpatient specialty appointments. User surveys indicated a high degree of satisfaction on the part of patients, presenters, and specialty consultants.

Conclusions: Preliminary review of the data indicated favorable care outcomes, and initial economic analyses suggested that telemedicine is likely to be cost-effective in this environment. The project will be continued.

## INTRODUCTION

WITH A TOTAL OF 104 UNITS and a capacity to house 133,000 regular prison inmates and state jail confinees, the Texas Department of Criminal Justice (TDCJ) system is one of the largest incarceration systems in the Western world. In view of the fact that the U.S. prison population is growing at a rate of between 8% and 9% per year, the State of Texas is completing a $1.5 billion dollar expansion program that will provide a total capacity of 146,000 beds in early 1996, representing about a 50% increase in capacity since the beginning of 1995. New prison units are located in rural areas throughout the state and tend to be located far from medical referral centers where tertiary care is normally available.

The University of Texas Medical Branch at Galveston, Galveston, TX

CDCR _060

BRECHT ET AL.

In an effort to contain rising health care costs within this rapidly growing system, the Texas legislature established a Correctional Managed Health Care Plan in 1993 as a health maintenance organization (HMO) for inmates in its prison system. The HMO provides all inmate health services except mental health and substance abuse programs. The TDCJ has a contractual agreement with The University of Texas Medical Branch (UTMB) and Texas Tech Health Science Center (TTHSC) to provide health care services for the prison units located in their assigned territory on a capitated basis (Fig. 1). The UTMB is responsible for health care services, including all primary and specialty care services and encompassing outpatient, inpatient, and ancillary services, for approximately 80% of the prison population.

The UTMB operates the state's only tertiary-care prison hospital to which inmates travel from around the state for both inpatient and outpatient specialty services. A second tertiary-care hospital, to be operated by TTHSC, is being opened.

### RATIONALE FOR PRISON TELEMEDICINE

Whereas other segments of American society, such as Native Americans and veterans, have entitlements to government-funded health care through treaties or special legislation, prison inmates constitute the only group with a constitutional right to health care. Moreover, in Texas, the settlement of the *Ruiz v. Texas* (*Ruiz et al. v. Collins et al.*; Civil Action No. H-78-987) lawsuit in federal court guarantees inmate access to primary-care services at their unit and access to specialty-care services consistent with community standards. Most prison units are located in rural areas, a long distance from UTMB on Galveston Island in the Gulf of Mexico or TTHSC in Lubbock in west Texas. Some inmates travel as far as 850 miles for a specialty clinic appointment, with the average travel distance estimated at between 200 and 300 miles one way to reach the Galveston clinics. In addition to the cost of travel, public safety is an important consideration. Indeed, the transportation of inmates outside of prison walls is a serious security risk.

During a 3-month telemedicine pilot demonstration feasibility project from December 1992 to March 1993, 437 consultations were completed. Informal data from this demonstration revealed high levels of satisfaction with telemedicine among inmates and providers. On the basis of this finding, it was decided to utilize a multiphase plan to introduce telemedicine as an integral part of the prison health care delivery system.

### PHASE ONE GOALS

Phase One consisted of program development and research. Although a great deal had been learned during the earlier 3-month pilot demonstration project, as well as from the experiences of other telemedicine projects, there was still much to be learned and planned before a full-scale telemedicine program could be developed and deployed. The goal of Phase One, therefore, was to identify and develop approaches necessary to achieve an optimally efficient and effective telemedicine program for the State Correctional System. Five topical areas were investigated: patient care, technology, support systems, evaluation, and non-clinical applications. Although we did not expect to obtain answers to all questions under each topic, it was considered necessary to identify the important questions at this stage of development in order to define the central issues that will face the program in the long run.

In patient care, the following questions were considered important:

- Does clinical effectiveness in telemedicine differ among specialties? If so, which specialties would be more effective?
- How should patients be selected for telemedicine service? What are the criteria for patient selection?
- What issues or problems would arise with regard to patient records and documentation?
- What protocols should be developed for specialty consultations, triage, and follow-up?
- What credentials and educational and skill

CRIMINAL JUSTICE TELEMEDICINE PROJECT                                   27



FIG. 1.   Territory assigned to UTMB and location of prisons served. Approximate distances between Galveston and
Huntsville = 105 miles; Beaumont = 133 miles; Tennessee Colony = 150 miles.

CDCR _062

BRECHT ET AL.

levels would be required of presenters in telemedicine encounters?

Questions for technology included:

- What kind of equipment and technical systems would be required at the patient and consultant sites?
- What medical peripherals would be required for the clinical services to be provided?
- What is required to integrate telemedicine into the broader corrections health care system?
- How should the network configuration be designed for maximum effectiveness and efficiency?

Questions for operational support for high-volume telemedicine included:

- Which of the delivery models (as described later) would be most appropriate for this program?
- What are the requirements for scheduling and transporting patients to telemedicine sites?
- How would telemedicine influence the normal transportation requirements?
- What level of technical support would be necessary to implement telemedicine?
- What are the training requirements: what type of training, who should be trained, and how much training would be necessary?
- What operational support problems might arise?

Evaluation questions included:

- How are health outcomes, economic impact, and user satisfaction to be measured?

Questions for non-clinical uses of the equipment included the following:

- What other non-medical applications would be appropriate?
- How should the hardware and network be configured to facilitate these other applications?

## PROJECT DESIGN

The project design is described here in terms of the models of delivery and medical specialties that were utilized, as well as the equipment.

### Delivery Models

Four delivery models were investigated.

**Model One.** Inmate patients are transported from 18 different prison home units to a regional prison medical facility, where they are housed in transient cells and are seen by UTMB specialists via telemedicine. This model produces the highest volume of patients seen via telemedicine but still involves transportation and overnight stays for inmates in transient cells. However, this model saves a 292-mile round trip to Galveston and reduces the number of overnight stays in transient cells. It also reduces crowding at the UTMB facility. The regional prison medical facility also acts as a consultant node for other prison units for certain clinics (e.g., podiatry).

**Model Two.** Inmates only from the immediately surrounding units, those within a radius of approximately 5 miles, are brought to a regional prison medical facility. Because of the proximity to the telemedicine unit, inmates are seen and returned to their home units the same day, requiring no use of transient cells and providing minimal disruption of the inmates' routines.

**Model Three.** Inmate patients are seen only from their home unit, a 2600-bed prison unit equipped with a 17-bed skilled-nursing infirmary. This arrangement requires no transportation, and it allows inmates to become familiar with the telemedicine facility before their consultations.

**Model Four.** Model Four is similar to Model Three in that inmates are seen only from their home unit, except that it is a 1200-bed prison unit with only ambulatory-care facilities located within it.

### Medical Specialties

During this stage, telemedicine clinics were scheduled for 18 specialty and subspecialty services (Table 1). The scheduling frequency and

CDCR _063

CRIMINAL JUSTICE TELEMEDICINE PROJECT                                    29

TABLE 1.    TOTAL PATIENT CONSULTATIONS,
October 1994–October 1995

| Specialty Clinic | Patients Seen |
|---|---|
| Cardiology | 49 |
| Dermatology | 52 |
| ENT | 2 |
| General medicine | 262 |
| General orthopedics | 149 |
| General surgery | 480 |
| GI medicine | 103 |
| Hematology | 8 |
| Infectious disease | 113 |
| Neurology | 74 |
| Ophthalmology | 16 |
| Ortho–foot | 130 |
| Ortho–hand | 183 |
| Pulmonary | 14 |
| Rheumatology | 6 |
| Thoracic surgery | 1 |
| Urology | 10 |
| Vascular surgery | 63 |
| Total | 1715 |

length of clinics were based on referral numbers. Clinics could be added or eliminated on the basis of the availability of providers and referral needs.

*Technology*

The UTMB sought vendor partners to help develop the appropriate telemedicine technology to meet the health care needs of the prison population. The plan was to develop hardware and software for an integrated solution that would allow the consultant workstation to have the core technology. The equipment for the Phase One developmental portion of the project included the Compression Labs, Inc. Radiance System and Digital Equipment Corporation's (DEC) *AccessMed* Software. The patient node equipment consists of the Radiance system with the DEC workstation, four cameras (a single-chip room camera, a three-chip patient camera with 16-to-1 zoom lens, a document camera, a scope camera that interfaces with an otoscope and ophthalmoscope), and a digital stethoscope. The consultant node consists of the same equipment but without the patient and scope cameras and associated medical peripherals except for the stethoscope pick-up. The consultant node is capable of selecting all four patient node cameras.

It also is able to capture or import images and annotate them by mark-up, keyboard text, or audio recording. The resulting image and annotation are stored as part of that particular patient consultation within the software's multimedia database.

The project utilizes dedicated T1 terrestrial lines and a multiconferencing unit (MCU) that allows all five sites to conduct project user and other multisite meetings.

**EVALUATION PLAN**

The evaluation of this stage of the project involved examination of medical outcomes, economic impact, and user satisfaction.

*Medical Outcomes*

A retrospective analysis of patient records is under way to examine initial encounters (first consultation for an individual patient for a given medical condition) among the telemedicine appointments in the database, 4 to 6 months after the telemedicine encounter. Four-point rating scales were constructed based on the patient's need for any subsequent care related to the novel medical problem. The ratings were 4 points for novel telemedicine encounters with no follow-up necessary, 3 points for a UTMB novel encounter with follow-up via telemedicine, 2 points for a novel telemedicine encounter with one or more telemedicine follow-ups, 1 point for a novel telemedicine encounter with subsequent transport to UTMB, and 0 points for novel telemedicine encounter with two or more follow-ups, one or more of which required transportation to UTMB.

*Economic Impact*

The economic impact of this program was assessed on the basis of two questions: (1) does telemedicine save the corrections health care system money? and (2) does it add value to current operations by improving communications between care providers and allowing other applications (e.g., administrative, management, training) to take place that had not previously occurred? The corrections system bears the entire cost of transporting the patients for health

**CDCR _064**

care services, more so than any other system that reimburses travel expenses and the loss of wages during travel. Examples of other such systems include the military, Indian Health Service, Veterans Affairs, and Medicaid programs in some states.

The return on investment was assessed on the basis of the capital and operational costs in relation to the total cost of transportation, both direct and indirect. Transportation cost includes not only gasoline and guards but also purchasing, storing, and maintaining the vehicles utilized for transportation; security manpower used for preparing inmates for transportation and processing them at stops along the way; building and operating transient cells; scheduling inmates for transportation; rescheduling both clinic appointments and transportation for clinic no-shows; loss of medical compliance, which often occurs during transport; processing of grievances filed by inmates because of events taking place during transportation; loss of inmate industrial production time; and rescheduling educational and substance abuse counseling sessions.

## User Satisfaction

A survey of user satisfaction was conducted. Only telemedicine encounters with all three surveys (patient, presenter, and consultant) are utilized in the results. A total of 585 inmates were interviewed by clerks at the telemedicine units immediately after their telemedicine appointment. Only 1.1% refused to be interviewed. In addition, questionnaires were completed by both presenters and specialty consultants. Most of the questions utilized a Likert Scale of 1 to 5, ranging from most satisfied to most dissatisfied. Patients were asked about being informed as to what to expect from the encounter, whether they thought their medical needs were met, and their comfort with the consultant and presenter, as well as their preference for telemedicine or an in-person appointment. Presenters, who typically were physician assistants, were questioned regarding technical failures, perceived comfort level of the patient, appropriateness of telemedicine for the medical problem, ability to present the patient, and the type of transportation (such as by chain bus, van, wheelchair van, or ambulance) that would be required for a face-to-face appointment. Consultants were asked to assess the usefulness of telemedicine for diagnosis and treatment, the appropriateness of telemedicine for the medical problem, the adequacy of the technology, technical failures, and trips saved by virtue of telemedicine use.

## RESULTS

### Clinic Information

The project goal of 100 scheduled telemedicine consultations per week has yet to be achieved for three principal reasons: (1) failures in the transportation scheduling process so that inmates scheduled for appointments are not transported; (2) a drop in the central referral pool because of utilization review implementation in the referral process; and (3) cancellation of clinics because of the lack of available specialists. It is expected that the intended volume will be attained as new clinics and telemedicine sites are added and as other Phase Two plans are implemented. Teleophthalmology is undergoing outcome analysis before full-scale implementation. In addition, planning has begun to add scheduled oral surgery and obstetrics/gynecology clinics. A consultant node is also being added to UTMB's Trauma Center to provide emergency-care triage before transfer to local community emergency rooms.

Compared with low-volume clinics, high-volume telemedicine clinics create a unique set of issues. For instance, there is no time to sterilize instruments exposed to bodily fluids when 15 patients are waiting to be seen. Other telemedicine programs have not run into this kind of problem because, typically, they do not have several patients from one location waiting to be seen during the same clinic session.

The project utilizes physician extenders extensively. One goal of an HMO is to conduct telemedicine consultations as cost effectively as possible. Utilization of physician extenders as presenters is less costly and better emulates conventional medicine, which does not normally entail the presence of two physicians with the patient during a specialty consultation.

Physician assistants have been the primary presenters, followed in frequency by primary-care physicians and nurses.

The equipment was installed in September 1994, and the first patients were seen in October from three of the four sites. Full scheduling began in November, and the fourth site was added at that time. From that time to October 31, 1995, 1715 consults were completed in 18 different specialty and subspecialty telemedicine clinics (see Table 1). The ENT clinic was cancelled because of the lack of appropriate medical peripherals. Dermatology and infectious disease clinics were suspended for a time during the course of Phase One because of the limited availability of physicians. Dermatology consults were done as a store-and-forward clinic. Ophthalmology uses a different workstation with a digital camera connected to a slit lamp and fundus camera to capture still images and transmit them over a 128-kbps ISDN line. This service was added at the very end of Phase One.

*Medical Outcomes*

For the sake of the analysis, the optimal outcome of a novel telemedicine encounter was defined as one which allowed the on-site physician or physician extender to provide all necessary treatment without the need to transport the patient to Galveston or to provide additional follow-up from Galveston via telemedicine. This scenario was rated as 4 on a 0-to-4 scale. The other end of the scale (0) was defined as a novel telemedicine encounter that did not save a trip to Galveston and needed two or more specialty appointments, one of which took place in Galveston. The preliminary analysis of 130 encounters indicated an overall score of 3.64 for these telemedicine encounters. This good result is supported by user perceptions of both patients and consultants. These results are preliminary, and a more thorough analysis of medical outcomes will be reported at a future date.

*Economic Impact*

Based on experiences with Phase One, it is believed that high-volume telemedicine care can be delivered at a cost ranging from $40 to $70 per consultation, including technology, network, support personnel, and other operational costs. This cost is substantially less than the real costs of transporting inmates to Hospital Galveston's specialty clinics. This figure can be achieved when telemedicine is done in volume and when the technology and network costs are shared with other, non–health-care applications.

The rough estimate of the current costs to transport a prisoner for medical care in Texas is $180 to $200, including direct manpower and vehicle expense to process and transport a single prisoner to a specialty clinic in Galveston. However, this figure excludes all of the overhead and other costs discussed earlier in this paper. It is difficult to estimate the indirect costs. The estimates of "total" costs range from several hundred dollars to as much as several thousand dollars per patient visit, depending on where the patient is treated, how far he or she travels, the mode of travel, the number of escort guards needed, and whether around-the-clock security is needed at the treatment facility.

On the basis of data provided by the specialty consultants at the time of the telemedicine consultation, 95% of the consultations saved at least one trip to the Hospital Galveston specialty clinics (Fig. 2). Another significant cost savings potential is the utilization of telemedicine to provide night and weekend patient triage before transfer to a local community emergency department.

During Phase One, the total operating costs for project staff, technology support, communications, equipment leasing, and operations were approximately $29,000 per month. At peak volumes of slightly more than 200 consults per month, this represented a prorated patient consult cost of approximately $140 when all costs were allocated to consults alone. If operating costs were also allocated to administrative functions, clinical case management, HMO management, and training conferences, this figure would drop to as little as $60 per patient consult during some months.

The business case for correctional telemedicine is strong and will get stronger as more violent offenders are incarcerated and as equipment and network costs continue to decline. Add to this avoidance of the public safety risks

CDCR _066



**FIG. 2.** Number of potential transfers to Galveston avoided through use of telemedicine in 576 consults.

of moving inmates, and it seems clear that telemedicine will become an integral part of prison health care delivery.

*User Satisfaction*

Phase One provided strong indications that the technology was clinically effective and that patients, presenters, and consultants tended to be satisfied with it in this setting. Seven of ten inmates preferred telemedicine to face-to-face encounters (Fig. 3). Another 14.2% had no preference, and only 16.8% preferred a face-to-face appointment to telemedicine. In terms of comfort, 17.1% felt more comfortable with telemedicine than with face-to-face encounters, and 55.6% felt equally comfortable in either setting with the consultant and the technology. A majority of the patients, or 67.7%, felt that their medical needs were met better or as well with telemedicine as through face-to-face contact with the consultants.

Remote care providers doing the patient presentations felt that telemedicine technology was "completely" or "mostly" adequate for presenting the medical problem for 98.7% of the telemedicine consultations (Fig. 4). As for consultants' assessments, they felt that tele-

medicine was equal to face-to-face encounters for diagnosis in 71.5% of the consultations and equal to face-to-face for creating a treatment plan in 72% of the telemedicine consultations, and they felt the quality of telemedicine completely satisfied or met most of their needs for 98.1% of the consultations (Fig. 5).

## PHASE TWO PLANS

On the basis of the findings and analysis of the first year's operations, the following recommendations were made for planning Phase II.

*Use the Local Hub Delivery Model*

Until the costs of high-quality, 30-fps, compressed video and associated hardware and networks are reduced, the optimal delivery model for high-end telemedicine is the local hub model. This model better allows for home unit ownership than does the regional hub model, eliminates most of the transportation problems, eliminates the need for transient cells, and still provides the needed patient volumes.

CDCR _067

CRIMINAL JUSTICE TELEMEDICINE PROJECT                                                    33

*Implement a Distributive Scheduling System*

Phase Two will move from a centralized scheduling system to a system whereby the regional medical directors and home unit providers will select patients for telemedicine clinic slots, utilizing specific selection criteria developed by the specialty clinics.

*Add Other Applications*

Significant cost sharing can be obtained by placing local telemedicine hubs in alignment with the managed-care regional human resources, management, and training offices. Hence, the system will be used for formal and informal continuing professional education activities, other administrative purposes, and sharing with non-medical corrections components. Other state agencies that conduct business at correctional facilities will be invited to share the costs and use the network for their own purposes.

*Shift from Dedicated to Shared Networks*

The Texas Department of Information Resources is in the process of implementing a statewide ISDN network that will have bandwidth-on-demand capabilities between network hub sites. The system is tariffed at a fixed cost for a certain amount of bandwidth hours and also permits dedicated intra-LATA local loops from the state hub for $130 per line per month. The result is a significant (50% or greater) reduction of network costs from the dedicated T1 network. At the time of this writing, one of the remote telemedicine sites is being shifted to the new state-sponsored network.

*Shift from Fee-for-Service to Managed-Care Approach*

The UTMB's contract with the TDCJ is a fully capitated HMO. The goal of such an HMO is to eliminate inappropriate referrals and to provide more care by home unit or regional prison medical providers. In an HMO environment, telemedicine must contribute to meeting this goal. Phase One provided scheduled specialty clinics to replace on-site specialty clinics. This approach enabled the prison system and the HMO to recapture some specialty care that would normally go to community providers, save the transportation costs associated with



FIG. 3.  Patient preferences in regard to telemedicine versus face-to-face consults (N = 576).

CDCR _068

34                                                                    BRECHT ET AL.



FIG. 4.    Remote presenters' assessment of adequacy of telemedicine for presenting patients (N = 538).

moving an inmate for outpatient specialty care, and reduce the impact on Hospital Galveston staff (security and patient-care) and facilities, which are operating at maximum capacity. Phase Two will complement these scheduled specialty clinics by adding mechanisms to support greater care at remote prison health units and to provide utilization review and triage services.

Greater care at remote prison health units will be facilitated by the addition of greater opportunities for specialist-to-provider interactions to better manage patients located in home units or at centers created to manage specific medical problems, thereby reducing referrals to Galveston. By having more provider-to-specialist consults, care may be moved outward from the specialty referral center. Care will be supported or supervised via telemedicine from Galveston.

Another change is to utilize telemedicine for triage and utilization review in the referral process. The prison system spends considerable amounts of money for medical services in community emergency departments. The problem is compounded during off hours, nights, and weekends, because often, there is no physician on site when the inmate is transported to



FIG. 5.    Consultants' assessment of telemedicine quality (N = 585).

CDCR _069

CRIMINAL JUSTICE TELEMEDICINE PROJECT                                                35

the emergency room. Plans are being implemented for UTMB's trauma center to triage the patient and help decide whether the patient needs to be transported to the community emergency room. The utilization review process requires all requests for referrals to go through the regional medical directors for approval. Phase Two will provide opportunities for the regional medical directors to interact with specialists to decide whether there is a need for referral.

*Transition to Standard Operating Environment*

The key to the long-term success of telemedicine is shifting it into the organization's standard operating environment. Phase Two will do away with separate telemedicine clinics and incorporate telemedicine into UTMB's on-site specialty clinics. The on-site clinic staff will move from one examination room, where a patient can actually be touched, to another, "virtual," examination room tied to examination rooms throughout the state of Texas. The same clinic support staff and specialists will provide care to patients in virtual examination rooms just as in any on-site examination room during that clinic. The present on-site clinic support staff and care providers will be utilized and "dedicated" telemedicine staff eliminated. Incorporating telemedicine into on-site clinics and making it part of the institutional culture should pay dividends in other ways besides cost savings and efficiency. Telemedicine will become an integral part of the health care delivery system at UTMB.

# ACKNOWLEDGMENTS

The authors wish to acknowledge Tom Tinstman, Kent Dickerson, Rosemary Haney, Rosemary Hanicak, N. A. Mackwani, Larry Johnson, Harry Carswell, Marcy Goodrum, Jake Angelo, Eric Headlee, and Sam Davis for their efforts to make this project a success. The authors also wish to acknowledge the support of Joanna Broder and John Quinn of AT&T and Lynne Leon of Compression Labs, Inc.

# BIBLIOGRAPHY

Bashshur RL. On the definition and evaluation of telemedicine. *Telemed J* 1995;1:19–30.

Bashshur RL, Armstrong PA. Telemedicine: a new mode for the delivery of health care. *Inquiry* 1976;13:233–244

Brecht RM. Texas prison system utilizes telemedicine for inmate health care. *Teleconference Magazine* 1995; 14(1):15–17

Brecht RM, Johnson L. Implementation of telemedicine into the Texas prison system (abstract). *Telemed J* 1995;1(2):170

Perednia D, Allen A. Telemedicine technology and clinical applications. *JAMA* 1995;483–488

Sanders JH, Bashshur RL. Challenges to the implementation of telemedicine. *Telemed J* 1995;1:115–123

Tin4T, McCaughan WT. Telemedicine in rural correctional facilities: programs of The University of Texas Medical Branch in Galveston and Texas Tech University Health Sciences Center. *Texas J Rural Health* 1995;14:70–77

Address reprint requests to:
*Robert M. Brecht, Ph.D.*
*International Telemedicine Center, Inc.*
*7550 Fannin, Suite 150*
*Houston, TX 77054-1991*

**CDCR _070**

**This article has been cited by:**

1. Javeed Siddiqui, Thomas Herchline, Summerpal Kahlon, Kay J. Moyer, John D. Scott, Brian R. Wood, Jeremy Young. 2017. Infectious Diseases Society of America Position Statement on Telehealth and Telemedicine as Applied to the Practice of Infectious Diseases. *Clinical Infectious Diseases* **64**:3, 237-242. [CrossRef]

2. Jeremy Young, Melissa Badowski. 2017. Telehealth: Increasing Access to High Quality Care by Expanding the Role of Technology in Correctional Medicine. *Journal of Clinical Medicine* **6**:2, 20. [CrossRef]

3. Maria R. Gualano, Fabrizio Bert, Violetta Andriolo, Marco Grosso, Davide Minniti, Roberta Siliquini. 2016. Use of telemedicine in the European penitentiaries: current scenario and best practices. *The European Journal of Public Health* ckw145. [CrossRef]

4. Bashiri Maryam, Greenfield L. John Jr., Oliveto Alison. 2016. Telemedicine Interest for Routine Follow-Up Care Among Neurology Patients in Arkansas. *Telemedicine and e-Health* **22**:6, 514-518. [Abstract] [Full Text HTML] [Full Text PDF] [Full Text PDF with Links]

5. Meredith A Achey, Christopher A Beck, Denise B Beran, Cynthia M Boyd, Peter N Schmidt, Allison W Willis, Sara S Riggare, Richard B Simone, Kevin M Biglan, E Ray Dorsey. 2014. Virtual house calls for Parkinson disease (Connect.Parkinson): study protocol for a randomized, controlled trial. *Trials* **15**:1. . [CrossRef]

6. P. Simon. 2014. La télésurveillance médicale des patients atteints de maladies chroniques au domicile. 1) Les enseignements des grandes études internationales. *European Research in Telemedicine / La Recherche Européenne en Télémédecine* **3**:2, 85-93. [CrossRef]

7. Mahesh C. Patel, Jeremy D. Young. 2014. Delivering HIV subspecialty care in prisons utilizing telemedicine. *Disease-a-Month* **60**:5, 196-200. [CrossRef]

8. Shubhajit Roy Chowdhury, Dipankar Chakrabarti, Hiranmay Saha. 2009. Medical Diagnosis Using Adaptive Perceptive Particle Swarm Optimization and Its Hardware Realization using Field Programmable Gate Array. *Journal of Medical Systems* **33**:6, 447-465. [CrossRef]

9. Shubhajit Roy Chowdhury, Dipankar Chakrabarti, Hiranmay Saha. 2008. FPGA realization of a smart processing system for clinical diagnostic applications using pipelined datapath architectures. *Microprocessors and Microsystems* **32**:2, 107-120. [CrossRef]

10. Dr. Cheryl Reed, Ralph Burr, Ted Melcer. 2004. Navy Telemedicine: A Review of Current and Emerging Research Models. *Telemedicine Journal and e-Health* **10**:3, 343-356. [Abstract] [Full Text PDF] [Full Text PDF with Links]

11. Roger Watson, Anne Stimpson, Tony Hostick. 2004. Prison health care: a review of the literature. *International Journal of Nursing Studies* **41**:2, 119-128. [CrossRef]

12. Pamela Whitten, Jill Rowe-Adjibogoun. 2004. Researching Health Communication Technology Intervention Projects: The Challenge of Achieving Utilization Levels Sufficient for Evaluation. *Journal of Technology in Human Services* **22**:2, 1-16. [CrossRef]

13. John H. Burton, Michael R. Baumann, Tommy Maoz, Jay R. Bradshaw, Joanne E. Lebrun. 2003. ENDOTRACHEAL INTUBATION IN A RURAL EMS STATE: PROCEDURE

UTILIZATION AND IMPACT OF SKILLS MAINTENANCE GUIDELINES. *Prehospital Emergency Care* **7**:3, 352-356. [CrossRef]

14. 2002. References. *Journal of Telemedicine and Telecare* **8**:1_suppl, 29-30. [CrossRef]

15. Tracy L. Williams, Carl R. May, Aneez Esmail. 2001. Limitations of Patient Satisfaction Studies in Telehealthcare: A Systematic Review of the Literature. *Telemedicine Journal and e-Health* **7**:4, 293-316. [Abstract] [Full Text PDF] [Full Text PDF with Links]

16. Carl May, Nicola T Ellis. 2001. When protocols fail: technical evaluation, biomedical knowledge, and the social production of 'facts' about a telemedicine clinic. *Social Science & Medicine* **53**:8, 989-1002. [CrossRef]

17. Carl May, Linda Gask, Theresa Atkinson, Nicola Ellis, Frances Mair, Aneez Esmail. 2001. Resisting and promoting new technologies in clinical practice: the case of telepsychiatry. *Social Science & Medicine* **52**:12, 1889-1901. [CrossRef]

18. C. Zaylor, E.-L. Nelson, D. J. Cook. 2001. Clinical Outcomes in a Prison Telepsychiatry Clinic. *Journal of Telemedicine and Telecare* **7**:1 Suppl, 47-49. [CrossRef]

19. Arushi Sinha. 2000. An Overview of Telemedicine: The Virtual Gaze of Health Care in the Next Century. *Medical Anthropology Quarterly* **14**:3, 291-309. [CrossRef]

20. F S Mair, A Haycox, C May, T Williams. 2000. A review of telemedicine cost-effectiveness studies. *Journal of Telemedicine and Telecare* **6**:1_suppl, 38-40. [CrossRef]

21. Stefan Håkansson, Carin Gavelin. 2000. What do we really know about the cost-effectiveness of telemedicine?. *Journal of Telemedicine and Telecare* **6**:1_suppl, 133-136. [CrossRef]

22. Susan Zollo, Michael Kienzle, Paul Loeffelholz, Susan Sebille. 1999. Telemedicine to Iowa's Correctional Facilities: Initial Clinical Experience and Assessment of Program Costs. *Telemedicine Journal* **5**:3, 291-301. [Abstract] [Full Text PDF] [Full Text PDF with Links]

23. Helen K. Li. 1999. Telemedicine and Ophthalmology. *Survey of Ophthalmology* **44**:1, 61-72. [CrossRef]

24. 1998. Simulation Methodology for Estimating Financial Effects of Telemedicine in West Virginia. *Telemedicine Journal* **4**:2, 125-144. [Abstract] [Full Text PDF] [Full Text PDF with Links]

25. 1998. Cost-Minimization Analysis: A Follow-Up Study of a Telemedicine Program. *Telemedicine Journal* **4**:4, 323-327. [Citation] [Full Text PDF] [Full Text PDF with Links]

26. J.W. TurnerThe integration of new communication technologies to form virtual organizations: a case study of a prison telemedicine program 188-190. [CrossRef]

# ATTACHMENT 4

CDCR _073

# Satisfaction of Forensic Psychiatric Patients With Remote Telepsychiatric Evaluation

**Benjamin B. Brodey, M.D., M.P.H.**
**Keith H. Claypoole, Ph.D.**
**Jeffrey Motto, R.N., M.A.**
**Robert G. Arias, Ph.D.**
**Richard Goss, M.D., M.P.H.**

**The level of satisfaction with telepsychiatry evaluations was determined in a sample of 43 forensic psychiatric patient inmates in a large urban jail. A forensic psychiatrist interviewed 20 patients in person, the other 23 remotely via interactive video. Demographic characteristics, physical health status, and psychiatric symptom severity on the Global Severity Index of the Brief Symptom Inventory were comparable in the two groups. Patient satisfaction with the evaluations was moderately high for patients in both groups, with no significant differences between them. (*Psychiatric Services* 51:1305–1307, 2000)**

According to a recent publication from the U.S. Department of Justice, more than 10 percent of the total prison population are mentally ill (1). Correctional facilities find it difficult either to arrange for clinicians to visit mentally ill inmates or to transport inmates for routine mental health care (2). Telepsychiatry—the use of telemedicine technology for delivering psychiatric services—potentially eliminates these obstacles.

Recent investigations have strongly supported telepsychiatry's efficiency, cost-effectiveness, and high diagnostic reliability (3–5). It offers a possible solution to the problem of the "grossly unequal geographic distribution of health care manpower and resources" (6). However, less is known about patients' perceptions of the telepsychiatric approach compared with traditional, in-person psychiatric consultations.

The primary objective of this study was to compare satisfaction levels of forensic psychiatric patients receiving remotely conducted psychiatric evaluations with those of forensic psychiatric patients receiving similar but in-person evaluations.

## Methods

The study was conducted during June, July, and August 1997 with 43 forensic psychiatric patient inmates from the general population of the King County Correctional Facility, a large urban jail in Seattle. The patients ranged in age from 20 to 57. Medications had not been prescribed for 12 patients (28 percent). Of those who were on medications, 15 (48 percent) were taking antidepressants, 12 (39 percent) mood stabilizers, seven (23 percent) antipsychotics, and four (13 percent) anxiolytics. Some patients were taking more than one medication.

On alternating weeks over a ten-week period, evaluations were performed either by remote interactive video or in person. Twenty patients participated in an in-person evaluation; the other 23 underwent a remote evaluation. The same psychiatrist interviewed all subjects to minimize variance between treatment conditions. One additional patient, who declined the remote evaluation, preferred to be evaluated in person; the results of this evaluation were excluded from the study.

The remote evaluations were conducted using a V-Tel work station running on a personal computer. This real-time interactive audio and video system was transmitted at 384 kilobytes per second. Patients viewed the evaluating psychiatrist on a 13-inch color monitor. At the remote hospital site, Virginia Mason Medical Center in Seattle, the evaluating psychiatrist viewed each patient on a 27-inch monitor with a picture-in-a-picture feature, which provided a full-body image of the patient.

As a measure of comparability of cases and severity of psychiatric symptomatology, the Brief Symptom Inventory was administered to each patient in written format before the evaluation. This survey instrument contains 53 psychiatric symptom–related questions rated on a scale of 0 to 4. From these scores, a Global Sever-

*Dr. Brodey is clinical assistant professor in the department of psychiatry and behavioral sciences and Dr. Goss is clinical assistant professor in the department of medicine at the University of Washington Medical School. Dr. Claypoole is with the University of Hawaii and the Hawaii Department of Health in Kuaii. Mr. Motto is telemedicine coordinator at the Virginia Mason Medical Center in Seattle. Dr. Arias is a postdoctoral fellow in neuropsychology in the department of behavioral medicine and psychiatry at West Virginia University School of Medicine. Address correspondences to Dr. Brodey at 4558 Fourth Avenue, N.E., Seattle, Washington 98105-4813 (e-mail, brodey @u.washington.edu).*

CDCR_074

*Table 1*

Characteristics and satisfaction ratings of 43 forensic psychiatric patients evaluated by telepsychiatry or in-person interviews

| Characteristic or rating[1] | Telepsychiatry evaluation (N=23) | | In-person evaluation (N=20) | |
|---|---|---|---|---|
| | Mean | SD | Mean | SD |
| Age in years | 36.3 | 9.3 | 31.8 | 9.6 |
| Global Severity Index | 1 | .3 | .9 | .2 |
| General rating of physical health[2] | 3.3 | 1.2 | 2.8 | .9 |
| Satisfaction | | | | |
|   Time spent with evaluator | 3.4 | 1.3 | 3.4 | 1.1 |
|   Explanation of evaluation | 3.3 | 1.2 | 3.8 | 1.1 |
|   Technical skill of evaluator | 3.7 | 1.1 | 3.8 | 1.2 |
|   Interpersonal skill of evaluator | 3.9 | 1.2 | 3.8 | 1.2 |
|   Would recommend evaluator | | | | |
|     to others | 3.0 | .8 | 2.9 | .9 |
|   Overall satisfaction | 3.5 | 1.9 | 3.5 | 1.1 |

[1] No significant differences between the two groups were found.

[2] This item and the subsequent six satisfaction questions are based on the Health Outcomes Institute Treatment Satisfaction Rating Scale; ratings range from 1, poor, to 5, excellent.

ity Index (GSI), a measure that has demonstrated high reliability in classifying overall psychiatric symptom severity (7), was calculated.

Immediately after either a remote or an in-person evaluation, each subject completed a visit-specific patient satisfaction survey called the Group Health Association of America Consumer Satisfaction Survey (8). This structured outpatient questionnaire examines a subject's perception of the evaluator and overall satisfaction level with the evaluation. It includes one question rating general health.

Two-way analysis of variance was used to evaluate differences between the two groups in age, general physical health ratings, the GSI, and the scores on the six patient-acceptance and patient-satisfaction questions. Data were presented as means and standard deviations, and comparisons with a probability level of less than .05 were considered statistically significant.

## Results

As Table 1 shows, GSI scores, gender, age, and ratings of self-reported general physical health were all comparable for the two groups. The range of GSI scores was .67 to 1.47 for the remote group and .67 to 1.28 for the in-person group. Neither set of GSI scores contained outliers or indicated severe psychiatric symptoms. The mean GSI scores of the patients evaluated remotely (1.01±.26) and those evaluated in person (.93±.19) were comparable to published norms of the average psychiatric outpatient population (mean for males=1.15; mean for females=1.35) (7). Furthermore, they were well above the average GSI for nonpatients (mean for males =.18; mean for females =.24).

The two groups rated their overall level of satisfaction with the psychiatric evaluation nearly identically; ratings averaged midway between good and very good. The overall mean group differences in responses to the questions were uniformly less than .5 on a 1-to-5 scale. The in-person group tended to rate the psychiatrist's explanation as better than the remote group did, although the difference was not significant. The question "Would you recommend this evaluator to your family and friends?" received the lowest rating (least satisfaction) of all six satisfaction questions for both groups.

## Discussion

The results indicate that the remote interviews were generally acceptable to patients. Of the 24 patients asked to participate in the study, only one declined. This is important because patients were offered the remote interviews in the course of routine care without any incentives. They were told that they had the opportunity to receive an in-person interview if they did not wish to participate in the remote interview. It is possible that the novelty of being on television increased patient interest, but whether such feelings will have lasting effects on acceptability cannot be predicted.

Satisfaction rates did not differ significantly between the two types of evaluation. Compared with the in-person group, the group interviewed remotely tended to rate the psychiatrist's explanation of the evaluation somewhat lower, although the two groups showed no differences in their perception of the psychiatrist's professional or technical skill. Despite relatively high satisfaction scores, both groups indicated that they would not highly recommend the psychiatrist to a family member or friend. It is possible that this result is due to their status as incarcerated inmates.

An additional finding of the study is that despite the relatively slow transmission speed of the remote interviews, the interviewing psychiatrist felt comfortable with his ability to diagnose remotely. This result suggests that clinicians who gain expertise in telepsychiatry will be able to use the medium to diagnose patients effectively. It also suggests that the utility of telepsychiatry may be applicable to large groups of patients who are underserved by mental health specialists, particularly psychiatrists.

With the increasing size of the inmate population, including the large proportion of inmates with mental illness, our findings may help to support the integration of telepsychiatry into underserved jail and prison populations. Continued evaluation of the reliability and suitability of telepsychiatry in psychiatric evaluation is needed, along with a determination of the circumstances and populations in which it can be used most effectively without compromising the quality of psychiatric care.

The study results should be interpreted with caution. Although particular care was taken in maintaining a natural sample selection, it was not practically possible to obtain a perfectly randomized match between the two groups. The results may not be generalizable to other psychiatric inmate patient populations or to those who exhibit more severe psychiatric disturbances. ♦

CDCR_N075

Case 2:90-cv-00520-KJM-SCR    Document 5873-5    Filed 08/03/18    Page 119 of 563

## Acknowledgments

This project was made possible by the support of the King County Department of Health and the Virginia Mason Medical Center. The authors thank Wayne Katon, M.D., who provided advice on methodologic issues.

## References

1. Ditton P: Mental Health and Treatment of Inmates and Probationers. Edited by Dorsey T, Hester T. Washington, DC, Bureau of Justice Statistics, July 1999

2. Baer L, Cukor P, Coyle JT: Telepsychiatry: application of telemedicine to psychiatry, in Telemedicine: Theory and Practice. Edited by Bashshur RL, Sanders JH, Shannon GW. Springfield, Ill, Thomas, 1997

3. Ruskin PE, Reed S, Kumar R, et al: Reliability and acceptability of psychiatric diagnoses via telecommunication and audiovisual technology. Psychiatric Services 49:1086–1088, 1998

4. Baigent MF, Lloyd CJ, Kavanagh SJ, et al: Telepsychiatry: "tele" yes, but what about the "psychiatry"? Journal of Telemedicine and Telecare 3:3–5, 1997

5. Baer L, Cukor P, Jenike MA, et al: Pilot study of telemedicine for patients with obsessive-compulsive disorder. American Journal of Psychiatry 152:1383–1385, 1995

6. Preston J, Brown FW, Hartley B: Using telemedicine to improve health care in distant areas. Hospital and Community Psychiatry 43:25–32, 1992

7. Boulet J, Boss MW: Reliability and validity of the Brief Symptom Inventory. Psychological Assessment 3:433–437, 1991

8. Davies AR, Ware JE: GHAA Consumer Satisfaction Survey and User's Manual. Washington, DC, Group Health Association of America, 1991

9. Rubin HR, Gandek B, Rogers W, et al: Patients' ratings of outpatient visits in different practice settings. JAMA 270:835–840, 1993

10. Ware JE, Hays RD: Methods for measuring patient satisfaction. Medical Care 26:393–402, 1988

CDCR _078

# ATTACHMENT 5

CDCR _077

# Telepsychiatry in the 21st Century: Transforming Healthcare with Technology

*by Stacie Deslich, MS; Bruce Stec, MS; Shane Tomblin, PhD; and Alberto Coustasse, DrPH, MD, MBA*

## Abstract

This article describes the benefits and constraints of telemedicine, focusing primarily on the field of psychiatry in the United States with the current system of healthcare. Telepsychiatry is believed to provide better access and higher-quality care to patients who need psychiatric care and cost savings to providers of such care. Telemedicine has been successfully integrated into psychiatric facilities reaching rural areas, prisons, and urban facilities. It has increased the volume of patients that physicians can reach and diagnose, as well as allowing them to treat patients with limitations in mobility. While telepsychiatry has been shown to be beneficial, this technology does have some limitations. Concerns about reimbursement, licensure, privacy, security, patient safety, and interoperability have been identified and present current challenges that providers using telepsychiatry must overcome in order to provide the most effective patient care. As more insurance companies start to reimburse for telepsychiatry treatments at the same rate as for face-to-face visits, this evolving medical field has the potential to grow exponentially.

**Keywords:** telepsychiatry, telemedicine, cost, prisons, mobility

## Introduction

Telemedicine has been defined as the intervention of a telecommunication device in the diagnosis and the overall care of patients that are separated from providers by a distance.[1] Telemedicine has been used to facilitate diagnosis, referral, monitoring, medical information interchange, and interventions to offset higher costs associated with hard-to-access patients.[2] This technology enables distant practitioners to recommend treatment of difficult or rare cases all over the country. Telemedicine uses technological modalities that include but are not limited to voice, video, robotic, and remote-access technology to diagnose and treat individuals and allows patients and physicians to interact via teleconferencing software, Internet connections, or even telephones.[3]

Patients who use these medical services can receive evaluation, diagnosis, treatment, consultation, and education about their condition.[4, 5] In recent years, there has been an ever-growing population of patients that would benefit from telemedicine for at-home medical services. These patients commonly have asthma, cardiac conditions, diabetes, or psychological disorders.[6, 7] With a big network of landline phone service as well as cellular phones in use in the United States, this form of treatment has far-reaching potential in mental health services.[8] Telemedicine can link a patient at home to a physician in an office, or a physician to another physician, or a patient in a remote office to a physician's office. Any number of such configurations are applicable. Telemedicine can be as flexible as the practitioner or patient may need it to be.[9]

2
*Perspectives in Health Information Management*, Summer 2013

Telemedicine first originated in the field of psychiatry and has been greatly utilized in this field for years, with the initial use at the Nebraska Psychiatric Institute in 1959.[10] Telemedicine focusing on psychiatric care holds great promise in healthcare as it has given an increased number of patients access to care.[11] Access to psychiatric care is not always limited by geographic area alone. School systems have begun to use counseling services for school-aged children while they are on their school's campus. It has been estimated that around 15 percent of school-aged children experience some mental illness and would benefit from psychiatric services.[12] Employing telepsychiatry in this particular manner has proved to be cost efficient as the school system pays for psychiatric care on an as-needed basis.[13]

Using telemedicine in the field of psychiatry has the potential to be both cost effective and structurally efficient due to the diminished fixed costs necessary for everyday operation. Remote monitoring of patients has allowed practitioners to check in with their patients more often because of the increased ease of observation.[14]

One issue that arises with the implementation of telepsychiatry is the start-up cost of establishing clinics with up-to-date electronics.[15] These clinics must provide interoperability between practitioners' and patients' systems. A common solution to this problem has been to use an intermediary between the systems that converts the necessary signals so that transmission can occur.[16] The goal of interfacing the transmitted data and creating an interoperable system is to allow for the use of various mediums that integrate to one final product. This integration creates an environment where multiple applications and systems can exchange information fluently to enrich the overall patient/practitioner experience.[17] Additionally, many regulations currently exist both federally and at the state level that have created barriers for the utilization of telemedicine.[18] The regulations have created barriers because there is no single, exhaustive group of federal laws governing telemedicine. This lack of federal regulation has allowed each state to have different laws; thus, providing telemedicine services across states has proved difficult at best.[19]

This article describes the benefits and constraints of utilizing telemedicine, primarily focusing on the field of psychiatry within the current healthcare system in the United States. The purpose of this research was to review the quality of care, patient access, and cost savings associated with the utilization of telemedicine in psychiatric care and identify its benefits and constraints.

## Methodology

A literature review compiled findings published within the past 12 years. Sixty scholarly sources were used to assess the use of telepsychiatry in the United States. For the online search, the following search terms were used and combined to narrow the search criteria: *telemedicine*, *telepsychiatry*, *psychiatry*, *psychology*, *psychiatric*, and *prisons*. Subsequent reading within the search results revealed that *telemental health* was also a suitable search term, and this term was subsequently utilized in an expanded search of relevant journal databases. The chosen references were academic peer-reviewed journal articles or health information technology (HIT) practitioner literature, mostly from online sources. All of the relevant research that was used came from the electronic database EBSCOhost (including CINAHL [Cumulative Index to Nursing and Allied Health], MEDLINE, psycARTICLES, psycINFO, Health Source: Consumer Edition, and Health Source: Nursing/Academic Edition), PubMed, Google Scholar, or the American Telemedicine Association website.

References were reviewed and were determined to satisfy the inclusion criteria if the material provided accurate and reliable information about telemedicine with a particular focus on psychiatric care. Only articles that were written in English were included for review. In an attempt to stay current in research, all articles that were older than 12 years (starting from 2000) were eliminated from the search.

## Results

The results presented were extracted from journal articles, case studies, and websites from diverse sources to illustrate several aspects of psychiatric telemedicine that should be considered, such as quality of care, access, cost, technology, and constraints.

CDCR _079

*Quality of Care*

Many opponents have objected to this nontraditional type of medical care, primarily because it was believed that medical care cannot be adequately given unless the patient receives an exam in person.[20, 21] To address this concern, research on the utilization of telemedicine has examined the percentage of times when a physician has given the correct diagnosis versus when the doctor has not. In one study that investigated psychiatric care for rural individuals, it was found that only 1 to 2 percent of the patients received a wrong diagnosis when using telepsychiatry.[22] These authors established an ethics committee that approved strict methodology using current patient-accessible hardware and software, such as personal computers and videoconferencing hardware and software, to evaluate the validity of diagnosing mental disorders via telepsychiatry. A total of 37 patients were reviewed for this particular study, and all completed the intended assessments. The researchers found that 83 percent of patients who were diagnosed per the *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)* through the use of telepsychiatry were correctly diagnosed. This study was beneficial in showing the accuracy of diagnosis in telepsychiatry due to advances in technology and telecommunication devices. The researchers expected that further advancements in technology could increase the validity of noncontact diagnosis in psychiatric care.[23]

In addition to providing opportunities for practitioners to make appropriate diagnoses, telepsychiatry has had other positive effects on the continuity of care. For example, Grady and Singleton found that telepsychiatry could effectively be used by psychiatrists to provide coverage for peers who were on vacation or otherwise unable to attend to their patients in an inpatient psychiatric unit of a rural hospital.[24] This coverage maintained continuity and quality of care for patients when their treating psychiatrist was unavailable.

Other studies have supported the use of telepsychiatry when compared to face-to-face interactions for mental health treatment.[25–27] Ongoing randomized clinical trials have continued to explore the impact of telepsychiatry on quality of care through its effectiveness versus face-to-face psychiatric treatment. It has been hypothesized that telepsychiatry will continue to be found equivalent to face-to-face treatment.[28]

Telepsychiatry has been shown to be effective in maintaining quality of care across several different populations. For example, telepsychiatry has been an effective treatment option with children and adolescents.[29, 30] Rabinowitz et al. found evidence that telepsychiatry could be used to positively impact quality of care for the nursing home population.[31] Other studies have supported the use of telepsychiatry to provide quality behavioral health care to college students, rural residents, veterans, immigrants, and incarcerated individuals.[32–37]

*Access*

Telepsychiatry has demonstrated significant potential to increase access to mental health treatment for several populations who, in the past, may have lacked appropriate care. Barriers to mental health treatment have included geographic distances, high treatment costs, transportation difficulties, and time limitations.[38]

Research has supported the use of telepsychiatry to increase access to care for rural residents. Myers et al. examined a telepsychiatry program implemented as a means to reach rural communities in the northwestern United States. Using one central hub and seven remote sites, this program was found to be an acceptable means of treatment that increased access to mental health providers for children and adolescents in rural areas.[39]

Telepsychiatry has also been used to increase access to care for college students, particularly in rural areas. Researchers found that telepsychiatry increased access to effective, appropriate psychiatric care for students on campus, with minimal disruption to students' daily activities.[40] Inmates in correctional facilities are also an underserved population needing appropriate behavioral health treatment. Access to psychiatric treatment in correctional facilities is minimal.[41] As a significant number of incarcerated individuals have diagnosable mental diseases, effective treatment is imperative in efforts to prevent recidivism. Telepsychiatry has been found to be a viable option for reaching this population in a safe and secure manner.[42] The use of telepsychiatry in prisons is explored further in this article.

*Cost*

The effect of telepsychiatry on treatment costs has been examined with mixed results.[43] Rural areas have appeared to reap significant benefits in the reduction of costs for providing psychiatric treatment via telepsychiatry.[44, 45] In fact, Spaulding et al. found that the implementation of telepsychiatry reduced costs by more than 70 percent.[46] Other studies have found a 40 percent reduction in costs of providing psychiatric services via telepsychiatry versus face-to-face treatment.[47] Rabinowitz et al. likewise found a substantial savings, around $30,000, for 278 telepsychiatry visits to nursing home residents.[48]

Not all research has supported such impressive reduction in costs. One study found that, over the course of a year, telepsychiatry cost more than face-to-face treatment, per hour.[49] Clearly, further research is needed to obtain consistent results. (See Table 1.)

*Technology*

Psychiatry, as a subset of mental health services, has always relied on a relatively high degree of patient-provider interaction. Specifically, given that psychiatry often involves psychopharmacological treatment and analysis of nonverbal cues, it is necessary for patients and psychiatrists to have direct interaction because of the evaluation methods used by psychiatrists in today's medical field.[50] Thus, technologies providing mental health services at a distance must provide requisite levels of personal interaction to ensure the necessary quality and type of care. Because of this requirement, telepsychiatry has tended to rely on interactive audiovisual conferencing systems over high-bandwidth networks[51] with a typical telepsychiatry system including a video camera, a microphone, speakers, a headset, and one or two monitors at each end of the system.[52]

Table 2 summarizes the technologies and technological variables noted and discussed within the telepsychiatry literature. Hardware and software listed and described in the literature consist of technologies that are used to capture, encode, transmit, and receive data, audio, and video signals during sessions. The modes of transmission detailed are technologies that have served as or are emerging as channels for sending and receiving session data, audio, and video. The items listed as variables are attributes of the technologies that can support or even adversely affect a telepsychiatry session (see Table 2).

*Bandwidth* refers to the amount of data and information that can be transmitted or received; audio and video signals require a great deal of bandwidth. Because bandwidth is limited, technology is used to compress the signals. Thus, the main enabling component of a telepsychiatry system is the coder/decoder, or codec.[53] The codec serves two functions: encoding audio and video for transmission as well as decoding for reception and playback of received audio and video, and synchronization of the audio and video. A codec is required at both the patient and provider ends of the system. A codec can be a separate device, but as technology has improved, PC-based codecs have emerged. As network usage has increased, proprietary codecs have been replaced by standardized codecs aimed at maximizing interoperability of systems created by different manufacturers.[54]

Earlier, more expensive telepsychiatry systems used secure, point-to-point network connections, either as full or fractional T1 or Integrated Services Digital Network (ISDN) circuits. In recent years, the rapid diffusion and decreasing cost of Internet and Ethernet networks has led to the development of videoconferencing systems that can work over Internet Protocol (IP) networks.[55] While point-to-point systems are secure, security is a concern if a telepsychiatry application uses IP networks,[56] and steps must be taken to secure it. The use of encrypted codecs or the setup of a virtual private network (VPN) and/or virtual local area networks (VLANs) decreases the risk of security breaches. The main advantage of IP networks is that they can be shared by multiple applications, such as Internet, e-mail, and local area networks (LANs), assuming that encryption is used.[57]

Responding to the demands for and opportunities presented by highly interactive systems for telepsychiatry over IP networks, companies have developed high-end audiovisual systems. In particular, Polycom, Inc., has been very successful in this area.[58] Polycom provides standards-based audio- and

*Telepsychiatry in the 21ˢᵗ Century: Transforming Healthcare with Technology*

videoconferencing systems, referred to as unified communications systems, that address the needs of both patients and providers. For patient access, a battery-powered, mobile cart can be taken to the patient within a healthcare facility and can support wireless communications as well as access to PC applications. For providers, systems exist that provide desktop videoconferencing and simultaneous access to other computer-based applications such as the electronic health record (EHR). They also provide for sharing of data and information with patient teams. The South Carolina Department of Mental Health has used Polycom systems to link physicians' offices to patient rooms in participating hospitals.[59] Mearian has pointed out that appropriate levels of encryption, along with freely available, low-cost hardware such as webcams, are helping bring telepsychiatry into widespread use.[60] The author described telepsychiatric systems that can be pieced together using videoconferencing software utilizing secure encryption and webcams. A connection that is considered highly secure can be achieved using a 256-bit Advanced Encryption Standard (AES) algorithm. The software and webcams are placed at the doctor's site and at a satellite office near the patient's home. The decrease in cost and increase in availability have been noted since the 1990s and have reached a level where many patients can afford to have the equipment at home. In fact, the cost of videoconferencing equipment has decreased by about 30 percent, enabling providers to set up a telepsychiatric practice without unreasonable start-up costs.[61]

Some key variables to consider in the setup of telepsychiatry systems have been the speed of transmission, the transmission method, and audio and picture quality.[62] Transmission speed is measured in kilobits per second (Kbps), with typical setups transmitting at between 128 Kbps and 512 Kbps. Transmission over land-based lines, such as phone lines and fiber-optic cables, is common, with fiber-optic cables less prevalent in rural areas. Such transmission can involve a delay (latency) of 0.5 to 1.0 seconds. The higher the transmission rate, the closer to "live" the session can become. Satellite transmission can be used but will almost always incur a delay of 0.5 to 1.0 seconds. Even microwave transmission can be used (within line of sight), but it is prone to interference from poor weather conditions. Although it is important, not many studies have reported on audio quality. Video quality has been the subject of comment and is measured in frames per second.[63] This measure refers to how often the picture is refreshed during transmission and how closely it will approximate a real-time image. These issues, along with security, are also important considerations for IP network–based telepsychiatry. Latency, poor image quality, and other possible quality problems experienced over IP networks can hamper or prevent proper diagnosis. For example, Myers and Cain caution that lower frame rates can produce flickering images, which can hamper assessments of abnormal movements and affective expression.[64]

Another aspect to consider in telepsychiatry is the rapid advancement in technology, as image quality and transmission speed are improving every day. It is likely that the same telepsychiatry interventions with better technologies will improve the current results.[65] Myers and Cain have suggested that the increasing availability of encryption protocols to ensure compliance with Health Insurance Portability and Accountability Act (HIPAA) regulations will result in IP networks being the preferred setup for telepsychiatric applications.[66] Finally, the acceptance of existing and emerging systems and applications is driven, at least in part, by the willingness of insurance companies and the Centers for Medicare and Medicaid Services (CMS) to reimburse providers for teleconsultations.[67]

With the new technologies available to providers, there is concern that efficacy of treatment or quality of care may suffer. As previously noted, several studies have found no difference in outcomes or patient satisfaction between patients receiving psychiatric services in a traditional, face-to-face manner and those using telepsychiatric services.[68–70] Thus, it appears that providers can confidently use telepsychiatry to effectively treat most mental illnesses.

*Constraints*

*Reimbursement for Telemedicine and Telepsychiatry*

Reimbursement may be seen as a barrier to the implementation of telemedicine in general. CMS, the Veterans Health Administration (VHA), and some third-party payers agree that telemedicine is a cost-effective choice for some types of medical care. CMS and the VHA have systems that allow them to bill and reimburse for services rendered by telemedicine technology. For example, both have suggested that providers should use the same Current Procedural Terminology (CPT) codes used in a typical in-office

consultation and add the Healthcare Common Procedure Coding System (HCPCS) modifier to show that services were provided using technology.[71] However, Medicare does limit reimbursement to only specific CPT codes, certain types of providers, and patients who are physically located in a nonmetropolitan service area or a rural area with a health professional shortage.[72] Reimbursement for telemedicine services under Medicaid must follow federal requirements, but states have been encouraged to be innovative in creating payment methods for telemedicine services. For example, providers at the distant site may be reimbursed by the state, and the originating site may receive a facility fee. Add-on costs such as technical support, transmission charges, and equipment can be included in the fee-for-service rate or reimbursed as an administrative cost.[73]

Medicare, Medicaid, and an increasing number of third-party payers have begun reimbursing for telepsychiatry treatment and consults under certain conditions.[74] Outpatient mental health facilities are now included as originating sites under Medicare. Private payers and state Medicaid programs have expanded payment for telepsychiatry services,[75] with each payer developing its own policies in the absence of state regulations. However, reimbursement is generally limited by private payers and CMS. As more insurance companies start to reimburse for telepsychiatry treatments at the same rate as for face-to-face visits, this evolving medical field has the potential to grow exponentially.[76]

## *Licensure across United States*

Under the current regulations in the United States, health providers are required to obtain multiple state licenses and adhere to diverse state medical practice rules. This approach is deficient when applied to telemedicine and telepsychiatry because, with the advent of the Internet and modern HIT developments, differences in space and time are nearly meaningless.[77] Researchers have suggested a voluntary, regional geographic approach to be established by jurisdictions already demonstrating a commonality of interests, such as through the Southern Governors' Association or the Western Governors' Association. Other stakeholders take a much stronger position requesting a massive overhaul of the US medical licensure system, arguing that the US military and the Veterans Affairs (VA) Department have already acted to fix licensure barriers.[78]

## *Patient Safety, Security, and Confidentiality*

Patients who have received therapy via telepsychiatry from their practitioners have run the risk of misunderstanding the instructions given by providers. During regular consultations, providers and patients engaged in a great deal of nonverbal communication.[79] Some of this communication can be transformed with telepsychiatry, decreasing the perceived value of the interaction between the patient and provider. Although most people who have used telepsychiatry use teleconferencing with video and audio support, cameras and microphones are not always identified as an equivalent substitute for face-to-face interaction; however, much research supports the use of telepsychiatry as being equivalent to face-to-face treatment.[80]

Telepsychiatry would not be an appropriate measure if safety is compromised or self-harm is imminent. It has been shown, however, that telepsychiatry has been effectively used to assess for suicidal threat, and, depending on the patient/provider relationship, patient safety contracts can be formed to prevent self-harm until further intervention is rendered.[81] Because little research was discovered on the topic, further studies would be beneficial in determining the impact of assessing threats of self-harm.

As with any therapeutic relationship, providers must follow the ethical guidelines set by the American Medical Association regarding the relationships that can form between client and practitioner on social networking sites, for example.[82] This information can be damaging to the practitioner and compromise not only the trust in the patient-physician relationship but the provider's professionalism as well.

Confidentiality in this mode of healthcare is one of the most important concerns providers must address. The utilization of telemedicine for patients runs the risk of leaving a "digital paper trail," allowing unwanted people to access personal information.[83] Other breaches in confidentiality include poor security of transcribed medical information, improper storage of video or voice recordings of the session, spyware or malware on the practitioner's or patient's computer, and hackers who break into the systems.[84]

**CDCR _083**

*Telepsychiatry in the 21st Century: Transforming Healthcare with Technology*

Ethical standards for the use of telepsychiatry must be followed for the protection of both the patient and the provider. Patient confidentiality and informed consent are paramount to effective mental health services, and providers must ensure that both are attained and maintained.[85]

A continued concern for the utilization of virtual medicine is the overall safety of the patient's health and personal information. Unfortunately, despite the many advances in protecting patient privacy, there are many who wish to breach the confidentiality of those simply seeking help. Researchers have advocated that adding an organizational policy for employees to uphold the privacy of patient information would be a key element for safety.[86, 87] Additionally, it was believed that adding an electronic record of access with this policy would thwart the attempts of employees looking to negatively impact a patient's well-being. However, in recent years much advancement in the security and protection of patients has been achieved. For instance, implementing a protocol based on cryptographic technology and/or the application of biometrics enhances the safety of patient information.[88]

In addition to privacy concerns, the ownership of and responsibility for the record of interaction of a telepsychiatry session has been called into question. In some cases, facilities may have arrangements with outside consultants, but the records ultimately belong to the facility. In some arrangements, the episode of care is actually owned by the psychiatrist's office, in which case the records are owned by the provider.[89] In many states, the basic rule of medical ownership is established by statute, and medical records in most cases are the property of the hospital psychiatrist or provider that maintains and possesses the records.[90, 91] Patients have the right to access health information, even mental health records, but with the exclusion of psychotherapy notes granted by the HIPAA Privacy Rule, federal law governing health information, and state law.[92] Thus, the responsibility for securing the record lies mostly with providers.

## Telepsychiatry in Prisons

One concern with telepsychiatry is discovering how the technology and theory will play out in real-life applications. Much research is available to answer the applicability question, particularly in the area of corrections. The corrections environment provides an exceptional microcosm in which to study telepsychiatry. Participants are plentiful and the environment is controlled, yet many potential difficulties of implementing telepsychiatry are the same in correctional facilities as in the community. For example, confidentiality, security of the data, ownership of the record of treatment, and licensure to practice, as well as reimbursement difficulties, affect telepsychiatry providers in correctional facilities just as they affect providers in the community. Further, telepsychiatry is an up-and-coming area in corrections, and significant current research has been performed. Thus, a closer examination of the available research about telepsychiatry in corrections was performed.

The prison system is the ideal setting for telepsychiatry for many reasons. Although establishing a telemedicine system is costly in any setting, in prison the benefits can be seen immediately. Since many prisons are operated by the federal or state government, the prison administration or government can contract with the telemedicine provider.[93, 94] The initial savings to the prison can include the decrease in transportation costs from moving the inmate from incarceration to the healthcare facility, and public safety and security can also increase with fewer inmates being transported outside the correctional facility.[95] An additional benefit to utilizing telepsychiatry in prisons is the increase in provider security. Traditionally, providers have been reluctant to allow inmates to be treated in their private facilities. By adding telemedicine services, a provider can treat a patient without worrying about their security or the security of their facility and their other patients.[96]

Several states have successfully incorporated telemedicine, and telepsychiatry in particular, into their correctional facilities. Ohio, Texas, Arizona, and Georgia have telepsychiatry programs that exemplify its distinct advantages in the correctional setting.[97, 98]

The Ohio State University Medical Center in Columbus, Ohio, currently contracts with state correctional facilities throughout Ohio to provide telemedicine programs, including telepsychiatry. This program serves more than 4,000 inmates each year, providing appropriate psychiatric care to inmates housed within the Ohio state correctional program.[99]

8                                                                                    *Perspectives in Health Information Management, Summer 2013*

Similarly, in Texas, the University of Texas Medical Branch (UTMB) and Texas Tech University have provided telemedicine and telepsychiatry to 80 percent of the state's inmate population, around 130,000 inmates. The program, in service since the 1990s, has grown to be one of the largest telemedicine programs worldwide, providing telepsychiatry services to inmates in correctional facilities at the county, state, and federal levels.[100] The occurrence of Hurricane Ike has led to significant shortages of staff and funding for this program.[101] UTMB is currently working to secure adequate funding to continue the program.[102]

The Arizona Telemedicine Program, a joint venture of the Arizona State Legislature and the Arizona Health Sciences Center, collaborated with the Arizona Regional Behavioral Health Authority to provide telepsychiatric services throughout rural Arizona.[103] This program has worked with St. Mary's Hospital and the University of Arizona in Tucson to provide telemedicine services to the Arizona Department of Corrections. Together with the University Medical Center and Maricopa Medical Center, the Arizona Telemedicine Program has served all 10 rural prisons in Arizona via telemedicine.[104] This has substantially improved relations between inmates and correctional services, as well as providing cost savings of more than $1,000,000.[105] Inmates filed fewer grievances because their healthcare needs were met more efficiently due to telemedicine. The decrease in paperwork and person-hours for grievance procedures, along with the decrease in transportation costs, led to a savings of more than $1,000,000 for the state of Arizona.[106]

In Georgia, around 70 percent of the telemedicine visits provided each month to inmates were psychiatric. According to Georgia prison officials, the lack of interpersonal intimacy in telepsychiatry might actually have encouraged more inmates to seek psychiatric care.[107] In Georgia's correctional facilities, the Augusta Correctional and Medical Institute is central to providing telemedicine to five Georgia prisons.[108]

Many states have recognized the advantages of telemedicine and telepsychiatry in correctional settings and have taken steps toward implementing far-reaching telepsychiatric programs throughout their correctional facilities. Twenty-five correctional systems in the United States currently use some form of telemedicine, and 80 percent of those systems use telepsychiatry.[109]

## Discussion

The use of telemedicine in psychiatric care in the United States has had a beneficial impact on patient care in multiple ways. Its implementation has helped to counter the prejudice against medical diagnosis done via telemedicine. The utilization of video and audio transmission through computers via broadband and ISDN has altered the way psychiatric patients interact with their providers.

A significant benefit of telemedicine has been in giving patients who were previously unable to be treated a sense of freedom, confidence, and understanding of their psychiatric illness. When patients are satisfied with their level of care, they are more apt to follow treatment procedures and thus recover or at the very least acquire good care. Also, because technology has become more affordable in society today versus even a decade ago, the majority of patients are able to connect to their physician by using their own equipment at home.

Telemedicine appears to be on the forefront of healthcare in corrections, with telepsychiatry leading the way. The introduction of telepsychiatry in several correctional facilities across the United States has led to decreased spending and greater access to psychiatric services for inmates.

This literature review was limited by the restrictions in the search strategy used, and researchers' and publication bias may have affected the availability and quality of the research material identified during the search. Further, while much research exists about telepsychiatry in general, and a significant number of studies have examined telepsychiatry, the vast majority of those studies have examined practitioner acceptance or utilization and efficacy rather than costs and benefits or increasing access to effective care.

Telepsychiatry has the ability to show patients how to perform therapeutic techniques to overcome psychological difficulties such as stress, anxiety, and depression.[110, 111] Further, telepsychiatry has been

shown to reach populations such as veterans, the elderly, students, and rural residents. This greatly increases access to appropriate mental health care, with significantly decreased costs. While telepsychiatry has been shown to be beneficial, this technology does have some constraints. Concerns about reimbursement, licensure, privacy, security, patient safety, and interoperability have been identified and present current challenges that providers using telepsychiatry must overcome to provide the most effective patient care. Finally, despite the surprisingly long history of telepsychiatry, its potential and impact are still in the relatively early stages of understanding. With the decreasing costs of available systems and the wider availability of increasingly secure technologies, psychiatrists and patients may find this mode of service more acceptable. The reliable high-speed IP networks that are beginning to form the technological backbone of telepsychiatry are still limited in their reach, being clustered mostly around urban and suburban areas and less prevalent in the rural areas that telepsychiatry could benefit the most.

## Conclusion

Telemedicine has been shown to be an effective, cost-efficient alternative to traditional psychiatric services that increases patient access to providers. Telepsychiatry is at the forefront of technological advances in the mental health field and has the potential to greatly benefit patients and providers. Further research will be instrumental in continuing to measure benefits and constraints in this field.

Stacie Deslich, MS, is an alumni of the College of Business at Marshall University, Graduate College in South Charleston, WV.

Bruce Stec, MS, is an alumni of the College of Business at Marshall University, Graduate College in South Charleston, WV.

Shane Tomblin, PhD, is an Associate Professor of Management Information Systems in the College of Business at Marshall University in Huntington, WV.

Alberto Coustasse, DrPH, MD, MBA, is an Associate Professor in the College of Business at Marshall University, Graduate College in South Charleston, WV.

# Notes

1.    Kuo, G. M., J. D. Ma, K. C. Lee, and P. E. Bourne. "Telemedicine, Genomics and Personalized Medicine: Synergies and Challenges." *Current Pharmacogenomics and Personalized Medicine* 9, no. 1 (2011): 6–13.

2.    Hill, R., M. Luptak, R. Rupper, B. Bair, C. Peterson, N. Dailey, and B. Hicken. "Review of Veteran's Health Administration Telemedicine Interventions." *American Journal of Managed Care* 16 (2010): 302–10.

3.    American Telemedicine Association. "Telemedicine Defined." Available at http://www.americantelemed.org/i4a/pages/index.cfm?pageid=3333 (accessed April 6, 2012).

4.    Smith, A. C., M. Bensink, N. Armfield, J. Stillman, and L. Caffery. "Telemedicine and Rural Health Care Applications." *Journal of Postgraduate Medicine* 51, no. 4 (2005): 286–93.

5.    Kuo, G. M., J. D. Ma, K. C. Lee, and P. E. Bourne. "Telemedicine, Genomics and Personalized Medicine: Synergies and Challenges."

6.    Chang, B. L., A. Mayo, and A. Omery. "Consumer Satisfaction with Telehealth Advice: Nursing." *MEDINFO* 10 (2001): 1435–39. Available at http://www.ncbi.nlm.nih.gov/pubmed/11604963 (accessed March 27, 2011).

7.    De Almeida, J. P., A. C. Pinto, J. Pereira, S. Pinto, and M. de Carvalho. "Implementation of a Wireless Device for Real-Time Telemedical Assistance of Home-Ventilated Amyotrophic Lateral Sclerosis Patients: A Feasibility Study." *Telemedicine and e-Health* 16, no. 8 (2010): 883–88.

8.    Godleski, L., J. E. Nieves, A. Darkins, and L. Lehmann. "VA Telemental Health: Suicide Assessment." *Behavioral Sciences and the Law* 26 (2008): 271–86.

9.    AMD Global Telemedicine. "Telemedicine Applications." 2012. http://www.amdtelemedicine.com/telemedicine-applications.html (accessed September 22, 2012).

10.    Hyler, S. E., and D. P. Gangure. "Technological Advances in Telepsychiatry." *Primary Psychiatry* 9, no. 9 (2002): 24–28.

11.    Leonard, S. "The Development and Evaluation of a Telepsychiatry Service for Prisoners." *Journal of Psychiatric and Mental Health Nursing* 11 (2004): 461–68.

12.    Myers, K., J. Valentine, R. Morganthaler, and S. Melzer. "Telepsychiatry with Incarcerated Youth." *Journal of Adolescent Health* 38, no. 6 (2006): 643–48.

13.    Myers, K. M., J. M. Valentine, and S. M. Melzer. "Feasibility, Acceptability, and Sustainability of Telepsychiatry for Children and Adolescents." *Psychiatry Services* 58, no. 11 (2007): 1493–96.

14.    American Telemedicine Association. *What Is Telemedicine & Telehealth?* 2011. http://www.americantelemed.org/files/public/abouttelemedicine/What_Is_Telemedicine.pdf (accessed October 1, 2012).

15.    Ghodse, H. "Psychiatry for Tomorrow's Doctors: Undergraduate Medical Education." *International Psychiatry* 3, no. 1 (2004): 1–2. Available at http://www.rcpsych.ac.uk/pdf/ip3.pdf (accessed February 29, 2012).

16.    Shore, J. H., and S. M. Manson. "A Developmental Model for Rural Telepsychiatry." *Psychiatric Services* 56 (2005): 976–80.

17.    Vergari, F., T. Salmon, A. D'Elia, L. Roffia, G. Zamagni, and C. Lamberti. "An Integrated Framework to Achieve Interoperability in Person-centric Health Management." *International Journal of Telemedicine and Applications* 2011, no. 549282 (2011): 1–10.

18.    Bureau of National Affairs. "Teleconference Brings Hot Topics to the Front Burner." National Conference on Teleconferencing and Information Technology, Arlington, VA, November 16, 2007.

19.    Anderson, J. "Social, Ethical, and Legal Barriers to E-health." *International Journal of Medical Informatics* 75, no. 5 (2007): 480–83.

20.    Wootton, R. "Recent Advances: Telemedicine." *British Medical Journal* 323, no. 7312 (2001): 557–60.

21.    Buck, S. "Nine Human Factors Contributing to the User Acceptance of Telemedicine Applications: A Cognitive-Emotional Approach." *Journal of Telemedicine and Telecare* 15, no. 2 (2009): 55–58.

22.    Singh, S. P., D. Arya, and T. Peters. "Accuracy of Telepsychiatric Assessment of New Routine Outpatient Referrals." *BioMed Psychiatry* 7, no. 55 (2007): 1–13.

23.    Ibid.

24.    Grady, B., and M. Singleton. "Telepsychiatry 'Coverage' to a Rural Inpatient Psychiatric Unit." *Telemedicine and e-Health* 17, no. 8 (2011): 603–8.

25.    De Las Cuevas, C., M. T. Arrendondo, M. F. Cabrera, H. Sulzenbacher, and U. Meise. "Randomized Clinical Trial of Telepsychiatry through Videoconferencing versus Face-to-Face Conventional Psychiatric Treatment." *Telemedicine and e-Health* 12, no. 3 (2006): 341–50.

26.    Matusitz, J., and G. Breen. "Telemedicine: Its Effects on Health Communication." *Health Communication* 21, no. 1 (2007): 73–83.

27.    Garcia-Lizana, F., and I. Munoz-Mayorga. "What about Telepsychiatry? A Systematic Review." *Primary Care Companion to the Journal of Clinical Psychiatry* 12, no. 2 (2010).

28.    Egede, L. E., C. B. Frueh, L. K. Richardson, R. Acierno, P. D. Mauldin, and R. G. Knapp. "Rationale and Design: Telepsychology Service Delivery for Depressed Elderly Veterans." *Trials* 10, no. 22 (2009): 1–14.

29.    Paing, W. W., R. A. Weller, B. Welsh, T. Foster, J. M. Birnkrant, and E. B. Weller. "Telemedicine in Children and Adolescents." *Current Psychiatry Report* 11, no. 2 (2009): 114–19.

30.    Myers, K. M., J. M. Valentine, and S. M. Melzer. "Child and Adolescent Telepsychiatry: Utilization and Satisfaction." *Telemedicine and e-Health* 14, no. 2 (2008): 131–37.

31.    Rabinowitz, T., K. M. Murphy, J. L. Amour, M. A. Ricci, M. P. Caputo, and P. A. Newhouse. "Benefits of a Telepsychiatry Consultation Service for Rural Nursing Home Residents." *Telemedicine and e-Health* 16, no. 1 (2010): 34–40.

32.    Khasanshina, E. V., W. L. Wolfe, E. N. Emerson, and M. E. Stachura. "Counseling Center-based Telemental Health for Students at a Rural University." *Telemedicine and e-Health* 14, no. 1 (2008): 35–41.

33.    Modai, I., M. Jabarin, R. Kurs, P. Barak, I. Hanan, and L. Kitain. "Cost Effectiveness, Safety, and Satisfaction with Video Telepsychiatry versus Face-to-Face Care in Ambulatory Settings." *Telemedicine and e-Health* 12, no. 5 (2006): 515–20.

34.    Norman, S. "The Use of Telemedicine in Psychiatry." *Journal of Psychiatric and Mental Health Nursing* 13, no. 1 (2006): 771–77.

35.    Frueh, B. C., J. Monnier, E. Yim, A. L. Grubaugh, M. B. Hamner, and R. G. Knapp. "A Randomized Trial of Telepsychiatry for Post-Traumatic Stress Disorder." *Journal of Telemedicine and Telecare* 13, no. 3 (2007): 142–47.

36.    Mucic, D. "International Telepsychiatry: A Study of Patient Acceptability." *Journal of Telemedicine and Telecare* 14, no. 5 (2008): 241–43.

37.    Mucic, D. "Transcultural Telepsychiatry and Its Impact on Patient Satisfaction." *Journal of Telemedicine and Telecare* 16, no. 5 (2010): 237–42.

38.    Mohr, D. C. "Telemental Health: Reflections on How to Move the Field Forward." *Clinical Psychology: Science and Practice* 16, no. 1 (2009): 343–47.

*Perspectives in Health Information Management,* Summer 2013

39.     Myers, K. M., A. V. Stoep, C. A. McCarty, J. B. Klein, N. B. Palmer, J. R. Geyer, et al. "Child and Adolescent Telepsychiatry: Variations in Utilization, Referral Patterns, and Practice Trends." *Journal of Telemedicine and Telecare* 16, no. 1 (2010): 128–33.

40.     Khasanshina, E. V., W. L. Wolfe, E. N. Emerson, and M. E. Stachura. "Counseling Center-based Telemental Health for Students at a Rural University."

41.     Gramlich, J. "States Expand Videoconferencing in Prisons." *Stateline*, May 12, 2009. Available at http://www.stateline.org/live/details/story?contentId=399298 (accessed February 5, 2012).

42.     Saleem, Y., M. H. Taylor, and N. Khalifa. "Forensic Telepsychiatry in the United Kingdom." *Behavioral Sciences and the Law* 26, no. 3 (2008): 333–44.

43.     McGinty, K. L., S. A. Saeed, S. C. Simmons, and Y. Yildirim. "Telepsychiatry and e-Mental Health Services: Potential for Improving Access to Mental Health Care." *Psychiatric Quarterly* 77, no. 1 (2006): 335–42.

44.     Grady, B. J. "A Comparative Cost Analysis of an Integrated Military Telemental Healthcare Service." *Telemedicine and e-Health* 8, no. 3 (2002): 293–300.

45.     Norman, S. "The Use of Telemedicine in Psychiatry."

46.     Spaulding, R., N. Belz, S. DeLurgio, and A. R. Williams. "Cost Savings of Telemedicine Utilization for Child Psychiatry in a Rural Kansas Community." *Telemedicine and e-Health* 16, no. 8 (2010): 867–71.

47.     Doolittle, G. C., A. O. Spaulding, and A. R. Williams. "The Decreasing Cost of Telemedicine and Telehealth." *Telemedicine and e-Health* 17, no. 9 (2011): 671–75.

48.     Rabinowitz, T., K. M. Murphy, J. L. Amour, M. A. Ricci, M. P. Caputo, and P. A. Newhouse. "Benefits of a Telepsychiatry Consultation Service for Rural Nursing Home Residents."

49.     Modai, I., M. Jabarin, R. Kurs, P. Barak, I. Hanan, and L. Kitain. "Cost Effectiveness, Safety, and Satisfaction with Video Telepsychiatry versus Face-to-Face Care in Ambulatory Settings."

50.     Leonard, S. "The Development and Evaluation of a Telepsychiatry Service for Prisoners."

51.     Hilty, D. M., J. S. Luo, C. Morache, D. A. Marcelo, and T. S. Nesbitt. "Telepsychiatry: An Overview for Psychiatrists." *CNS Drugs* 16, no. 8 (2002): 527–48.

52.     McGinty, K. L., S. A. Saeed, S. C. Simmons, and Y. Yildirim. "Telepsychiatry and e-Mental Health Services: Potential for Improving Access to Mental Health Care."

53.     Ibid.

54.     Gantenbein, R. E., and B. J. Robinson. "Decoding CODECs." *Journal of Telemedicine and Telecare* 14, no. 2 (2008): 59–61.

55.     McGinty, K. L., S. A. Saeed, S. C. Simmons, and Y. Yildirim. "Telepsychiatry and e-Mental Health Services: Potential for Improving Access to Mental Health Care."

56.     Richardson, L. K., B. C. Frueh, A. L. Grubaugh, L. Egede, and J. D. Elhai. "Current Directions in Videoconferencing Tele-Mental Health Research." *Clinical Psychology* 16, no. 3 (2009): 323–38. Available at http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2758653/pdf/nihms114612.pdf (accessed September 13, 2012).

57.     McGinty, K. L., S. A. Saeed, S. C. Simmons, and Y. Yildirim. "Telepsychiatry and e-Mental Health Services: Potential for Improving Access to Mental Health Care."

58.     Spyglass Consulting Group. *Telepsychiatry Solutions White Paper.* 2012. Available at http://www.polycom.com/global/documents/whitepapers/telepsychiatry.pdf (accessed September 24, 2012).

CDCR _089

59.     Polycom (2012). "Polycom Solutions Help South Carolina Department of Mental Health." Available at http://www.polycom.com/company/news/press-releases/2012/201209100.html

60.     Mearian,  L. "Web-based Counseling—Telepsychiatry—Is Taking Off." *Computerworld*. February 9, 2012. Available at http://www.computerworld.com/s/article/9224091/Web_based_counseling_Telepsychiatry_is_taking_off?taxonomyId=132&pageNumber=1 (accessed October 3, 2012).

61.     Kanapaux, W. "Telepsychiatry's Untapped Potential: When Will It Pay to Deliver?" *Psychiatric Times* 22, no. 1 (2005): 4–6.

62.     Hilty, D. M., J. S. Luo, C. Morache, D. A. Marcelo, and T. S. Nesbitt. "Telepsychiatry: An Overview for Psychiatrists."

63.     Nesbitt, T. S., D. H. Hilty, C. A. Kuenneth, and A. Siefkin. "Development of a Telemedicine Program: A Review of 1,000 Videoconferencing Consultations." *West Journal of Medicine* 173, no. 3 (2000): 169–74.

64.     Myers, K., and S. Cain. "Practice Parameter for Telepsychiatry with Children and Adolescents." *Journal of the American Academy of Child and Adolescent Psychiatry* 47, no. 12 (2008): 1468–83.

65.     Garcia-Lizana, F., and I. Munoz-Mayorga. "What about Telepsychiatry? A Systematic Review

66.     Myers, K., and S. Cain. "Practice Parameter for Telepsychiatry with Children and Adolescents."

67.     Spyglass Consulting Group. *Telepsychiatry Solutions White Paper*.

68.     O'Reilly, R., J. Bishop, K. Maddox, L. Hutchinson, M. Fishman, and J. Takhar. "Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results from a Randomized Controlled Equivalence Trial." *Psychiatric Services* 58, no. 6 (2007): 836–43.

69.     Greene, C. J., L. A. Morland, A. Macdonald, B. C. Frueh, K. M. Grubbs, and C. S. Rosen. "How Does Tele-Mental Health Affect Group Therapy Process? Secondary Analysis of a Noninferiority Trial." *Journal of Consulting and Clinical Psychology* 78, no. 5 (2010): 746–50.

70.     Morland, L. A., A. K. Hynes, M. Mackintosh, P. A. Resick, and K. M. Chard. "Group Cognitive Procession Therapy Delivered to Veterans via Telehealth: A Pilot Cohort." *Journal of Traumatic Stress* 24, no. 4 (2011): 465–69.

71.     Centers for Medicare and Medicaid Services (CMS). *CMS Manual System: Pub 100-04 Medicare Claims Processing*. 2011. Available at http://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R2354CP.pdf (accessed October 2, 2012).

72.     Kang, H., D. Mahoney, H. Hoenig, V. Hirth, P. Bonato, I. Hajjar, and L. Lipsitz. "In Situ Monitoring of Health in Older Adults: Technologies and Issues." *Journal of the American Geriatrics Society* 58, no. 8 (2010): 1579–86.

73.     Centers for Medicare and Medicaid Services. "Telemedicine." 2011. Available at http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Delivery-Systems/Telemedicine.html (accessed December 2, 2011).

74.     Secure Telehealth. "Medicare Reimburses for Telepsychiatry." 2011. Available at http://www.securetelehealth.com/medicare-reimbursement.html (accessed October 5, 2012).

75.     Secure Telehealth. "Medicaid Reimburses for Telepsychiatry in 40 States." Available at http://www.securetelehealth.com/medicaid-reimbursement.html (accessed October 5, 2012).

76.     Mearian,  L. "Web-based Counseling—Telepsychiatry—Is Taking Off."

77.     Cwiek, M. A., A. Rafiq, A. Qamar, C. Tobey, and R. C. Merell. "Telemedicine Licensure in the United States: The Need for a Cooperative Regional Approach." *Telemedicine and e-Health* 13, no. 2 (2007): 141–47.

78.    American Telemedicine Association. "Removing Medical Licensure Barriers: Increasing Consumer Choice, Improving Safety and Cutting Costs for Patients across America." Available at http://media.americantelemed.org/licensurewebsite/ (accessed October 5, 2012).

79.    Lee, S. "Contemporary Issues of Ethical E-Therapy." *Journal of Ethics in Mental Health* 5, no. 1 (2010): 1–5.

80.    Haberstroh, S., G. Parr, L. Bradley, B. Morgan-Fleming, and R. Gee. "Facilitating Online Counseling: Perspectives from Counselors in Training." *Journal of Counseling and Development* 86, no. 4 (2008): 460–70.

81.    Jong, M. "Managing Suicides Via Video Conferencing in a Remote Northern Community in Canada." *International Journal of Circumpolar Health* 63, no. 4 (2004): 422-428.

82.    Haberstroh, S., G. Parr, L. Bradley, B. Morgan-Fleming, and R. Gee. "Facilitating Online Counseling: Perspectives from Counselors in Training."

83.    Wasler, A. L., M. McLain, and K. Kellar. "Telepsychology: To Phone or Not to Phone." *Psychogram: Virginia Psychological Association* 34, no. 4 (2009). Available at http://www.centerforethicalpractice.org/ethical-legal-resources/practice-resources/resources-electronic-technology-tele-therapy/2583-2/ (accessed March 23, 2011).

84.    Chamberlin, J. "The Digital Shift." *Monitor on Psychology* 41, no. 5 (2010): 46–47. Available at http://www.apa.org/monitor/2010/05/slc-digital.aspx (accessed February 22, 2011).

85.    Jones, R. M., S. Leonard, and L. Birmingham. "Setting Up a Telepsychiatry Service." *Psychiatric Bulletin* 301 (2006): 464–67.

86.    Paul, D. L., K. E. Pearlson, and R. R. McDaniel Jr. "Assessing Technological Barriers to Telemedicine: Technology-Management Implications." *IEEE Transactions on Engineering Management* 40, no. 3 (1999): 279–88. Available at http://www.ic.uff.br/~celio/classes/mmnets/slides/Paul99.pdf  (accessed September 12, 2012).

87.    McGinty, K. L., S. A. Saeed, S. C. Simmons, and Y. Yildirim. "Telepsychiatry and e-Mental Health Services: Potential for Improving Access to Mental Health Care."

88.    Zaidan, B. B., A. A. Zaidan, and M. L. Mat Kiah. "Impact of Data Privacy and Confidentiality on Developing Applications: A Review Participates Opinion and Expert Review." *International Journal of Pharmacology* 7, no. 3 (2011): 1–6. Available at http://docsdrive.com/pdfs/ansinet/ijp/0000/29455-29455.pdf (accessed September 12, 2012).

89.    Stanberry, B. "Legal and Ethical Aspects of Telemedicine." *Journal of Telemedicine and Telecare* 12, no . 4 (2006): 166–75.

90.    "Records Property of Hospitals; Access; Not Public Records; Funding for Medical Record Requests." *Tennessee Code Annotated*, 1997. 68-11-304(a)(1).

91.    Stearns, P. V. "Access to and Cost of Reproduction of Patient Medical Records: A Comparison of State Laws." *Journal of Legal Medicine* 21, no. 1 (2000): 79–108.

92.    Roach, W. H., R. C. Hoban, B. M. Broccolo, A. B. Roath, and A. P. Blanchard. *Medical Records and the Law*. Sudbury, MA: Jones and Bartlett, 2006, pp. 111–14.

93.    Magaletta, P. R., T. J. Fagan, and M. F. Peyrot. "Telehealth in the Federal Bureau of Prisons: Inmates' Perceptions." *Professional Psychology* 31, no. 5 (2000): 497–502.

94.    Saleem, Y., M. H. Taylor, and N. Khalifa. "Forensic Telepsychiatry in the United Kingdom."

95.    Manfredi, L., J. Shupe, and S. L. Batki. "Rural Jail Telepsychiatry: A Pilot Feasibility Study." *Telemedicine and e-Health* 11, no. 5 (2005): 574–81.

96.    Emerson, R.  "Telehealth in Corrections." Paper presented at the Maine Corrections Alternatives Advisory Committee meeting, Augusta, ME, December 21, 2005. Available at http://www.maine.gov/corrections/caac/agenda/CAACAgenda21Dec05.doc (accessed December 12, 2011).

97.     Gramlich, J. "States Expand Videoconferencing in Prisons."
98.     Emerson, R.  "Telehealth in Corrections."
99.     Ohio Department of Rehabilitation and Correction. "Telemedicine." 2006. Available at http://www.drc.ohio.gov/web/telemed.htm (accessed February 5, 2012).
100.    S. Shelton, personal communication, June 11, 2012.
101.    Texas Civil Rights Project. *"A Thin Line": The Texas Prison Healthcare Crisis and the Secret Death Penalty.* 2011. Available at http://www.texascivilrightsproject.org/?p=2737 (accessed February 4, 2012).
102.    S. Shelton, personal communication, June 11, 2012.
103.    Hincapie, A., T. L. Warholak, and E. P. Armstrong. *Socioeconomic Impact of Mandated Health Coverage for Telemedicine in the State of Arizona.* Arizona Center for Rural Health. November 1, 2011. Available at
http://crh.arizona.edu/sites/crh.arizona.edu/files/Telemedicine%20Report%20V12Ana-1.pdf
(accessed February 4, 2012).
104.    Ibid.
105.    Arizona Telemedicine Program. "Prison Telemedicine Promotes Public Safety in Arizona." Available at http://www.telemedicine.arizona.edu/app/press-releases/Prison%20Telemedicine%20Promotes%20Public%20Safety%20in%20Arizona
(accessed October 2, 2012).
106.    Ibid.
107.    Gramlich, J. "States Expand Videoconferencing in Prisons."
108.    Venable, S. S. "A Call to Action: Georgia Must Adopt New Standard of Care, Licensure, Reimbursement, and Privacy Laws for Telemedicine." *Emory Law Journal* 54, no. 2 (2005): 1183–218.
109.    Gramlich, J. "States Expand Videoconferencing in Prisons."
110.    Nelson, E., M. Barnard, and S. Cain. "Treating Childhood Depression over Videoconferencing." *Telemedicine and e-Health* 9, no. 1 (2003): 49–55. Available at http://www.hawaii.edu/hivandaids/Treating_Childhood_Depression_over_Videoconferencing.pdf (accessed May 2, 2011).
111.    Ruskin, P. E., M. Silver-Aylaian, M. A. Kling, S. A. Reed, D. D. Bradham, J. R. Hebel, et al. "Treatment Outcomes in Depression: Comparison of Remote Treatment through Telepsychiatry to In-Person Treatment." *American Journal of Psychiatry* 161, no. 8 (2004): 1471–76.

16 *Perspectives in Health Information Management*, Summer 2013

**Table 1**

Studies Examining Cost for Providing Telepsychiatry versus Face-to-Face Treatment

| Author | Sample Size | Population | Setting | Design | Outcome |
|---|---|---|---|---|---|
| Modai et al. (2006)[a] | 81 | Adults | Ambulatory settings | Cross-sectional | Telepsychiatry cost more per hour than face-to-face treatment. |
| Rabinowitz et al. (2010)[b] | 278 | Older adults | Rural nursing home | Cross-sectional | Utilization of telepsychiatry led to a savings of $30,000. |
| Spaulding et al. (2010)[c] | 257 | Children | Rural outpatient | Cross-sectional | Utilization of telepsychiatry led to a 70 percent reduction in costs. |
| Doolittle, Spaulding, and Williams (2011)[d] | 6,178 | Adults | Rural outpatient | Longitudinal | Utilization of telepsychiatry led to a 40 percent reduction in costs. |

[a] Modai, I., M. Jabarin, R. Kurs, P. Barak, I. Hanan, and L. Kitain. "Cost Effectiveness, Safety, and Satisfaction with Video Telepsychiatry versus Face-to-Face Care in Ambulatory Settings." *Telemedicine and e-Health* 12, no. 5 (2006): 515–20.

[b] Rabinowitz, T., K. M. Murphy, J. L. Amour, M. A. Ricci, M. P. Caputo, and P. A. Newhouse. "Benefits of a Telepsychiatry Consultation Service for Rural Nursing Home Residents." *Telemedicine and e-Health* 16, no. 1 (2010): 34–40.

[c] Spaulding, R., N. Belz, S. DeLurgio, and A. R. Williams. "Cost Savings of Telemedicine Utilization for Child Psychiatry in a Rural Kansas Community." *Telemedicine and e-Health* 16, no. 8 (2010): 867–71.

[d] Doolittle, G. C., A. O. Spaulding, and A. R. Williams. "The Decreasing Cost of Telemedicine and Telehealth." *Telemedicine and e-Health* 17, no. 9 (2011): 671–75.

*Telepsychiatry in the 21st Century: Transforming Healthcare with Technology*

**Table 2**

Telepsychiatry Technology and Variables Used in a Treatment Session

| Technology | Description |
|---|---|
| *Hardware* | |
| camera/webcam | Used to capture images for transmission to and from both ends of a session. |
| speakers/headphones | Used to deliver audio at both ends of a session. |
| monitor | Used to deliver video images at both ends of a session. |
| microphone | Used to capture audio for transmission to and from both ends of a session. |
| *Software* | |
| videoconferencing | Software that coordinates the capture, transmission, and playback of audio and video |
| encryption | Algorithms designed to specially encode signals to prevent interception of audio, video, and other data during transmission |
| codec | Software that encodes, compresses, decodes, and synchronizes audio and video signals. Most prevailing codecs are compliant with standards. |
| other | Note-taking software, electronic health records, etc. Not part of the videoconferencing software, but able to be used in conjunction with it. |
| *Network* | |
| ISDN (Integrated Services Digital Network) | Able to integrate and transmit audio, video, and data. Low- to high-speed, secure, point-to-point transmission. |
| T1 | Multichannel telecommunication lines providing point-to-point, secure transmission |
| satellite | Channel utilizing satellite for signal transmission |
| microwave | Encoding of signals in microwave band |
| Internet Protocol (IP) network | Widely used network (Internet/web) utilizing protocol for transmission over public networks |
| *Variables* | |
| transmission speed | The rate at which signals and data can be transmitted. Measured in kilobits per second (Kbps). |
| video quality | Measured as the number of frames per second (FPS) and refers to the refresh rate of the video picture. |
| encryption algorithm | The software that is used to encrypt the audio, video, and other data sent during transmission. Common, public encryption standards use 128-bit to 256-bit encryption. |
| bandwidth | The amount of data (audio, video, etc.) that can be transmitted |

# ATTACHMENT 6

CDCR _095

# Telemedicine

## Can Reduce Correctional Health Care Costs:

### An Evaluation of a Prison Telemedicine Network



Research Report

CDCR _096

**U.S. Department of Justice**
**Office of Justice Programs**
810 Seventh Street N.W.
Washington, DC 20531

**Janet Reno**
*Attorney General*

**Raymond C. Fisher**
*Associate Attorney General*

**Laurie Robinson**
*Assistant Attorney General*

**Noël Brennan**
*Deputy Assistant Attorney General*

**Jeremy Travis**
*Director, National Institute of Justice*

| **Office of Justice Programs** | **National Institute of Justice** |
| **World Wide Web Site** | **World Wide Web Site** |
| *http://www.ojp.usdoj.gov* | *http://www.ojp.usdoj.gov/nij* |

# Telemedicine Can Reduce Correctional Health Care Costs:

## An Evaluation of a Prison Telemedicine Network



**Prepared by:**
Abt Associates Inc.


**For the:**
Joint Program Steering Group
Office of Science and Technology
National Institute of Justice

Douglas C. McDonald, Ph.D.
Andrea Hassol
Kenneth Carlson
Jeffrey McCullough
Elizabeth Fournier
Jennifer Yap

*March 1999*


*NCJ 175040*

**CDCR _098**



Jerem    ra  is
*i ecto*

Peter    acci  P
*o  a    ana e*

is  rogram  as su  orte  u  er a  ar   um er    J    O  to  t ssociates  c   t e   atio a    stitute of Justice  Office of Justice Programs       e artme t of Justice  i  i gs a  co  c usio  s of t e  researc   re  orte   ere are t  ose of t  e aut  ors a    o  ot  ecessari   ref ect t e  officia   ositio  or  o icies of t e       e artme t of Justice

e National Institute of Justice is a co    onent of t e   ffice of Justice   o  a s    ic  also inclu  es t  e  u eau of Justice   ssistance  t e   u eau of Justice   tatistics  t e   ffice of Ju  enile Justice an    elin uenc  e ention an  t e   ffice fo   icti s of   i  e

# *Foreword*



Medical science changes quickly. Evening news broadcasts inform us regularly about newer and better drugs, new diseases, better ways to scan the body, foods to avoid or consume, and more. The methods for delivering medical treatment are changing, too: It is no longer necessary for the two parties involved in a medical encounter, a patient and a health care provider, to be in the same location simultaneously. The telephone has enabled doctors to practice limited aspects of medicine over vast distances without travel, a benefit of great importance to persons in remote areas. With further advances in digital and communications technologies, the number of health care applications that can be administered remotely is increasing rapidly. Today's telecommunications infrastructure of satellites, the Internet, and telephone wires, coupled with advances in the ability to capture, store, transmit, and display electronic representations of medical information, allow doctors to do many things remotely that they have traditionally done in person.

Because the problems associated with traveling to deliver or receive medical care are substantial, *telemedicine*, loosely defined as the remote delivery of health care via telecommunications, is a concept that is rapidly becoming a practical method of health care delivery. Suppose people in Florida could visit the Mayo Clinic in Rochester, Minnesota, without leaving their home State? Suppose an American sailor on an aircraft carrier in the Mediterranean could be treated onboard by doctors at Bethesda Naval Hospital without leaving the ship? What if x-rays taken at a rural clinic in Colorado could be transferred electronically to an urban medical center in Denver for immediate diagnosis by a radiologist? These are not medical fantasies; rather,

they are technology applications currently in practice worldwide.

America has many disturbing health care problems, among them cost and access. Estimates from 1996 are that Americans spend approximately 14 percent of their annual earnings on health care, up 4.4 percent from 1995. The U.S. Department of Health and Human Services estimates that approximately 24 percent of Americans live in rural areas with limited access to health care services. For obvious reasons, many in the health care profession need to know if telemedicine's advantages could offer solutions to these two vexing health care problems.

Prisons are in some respects a microcosm of American society, and thus telemedicine offers prison managers a viable means of addressing the issues of cost and access to specialists. Prison officials are required by the constitution of the United States to provide health care for prisoners. Health care costs for prisoners are increasing, just as costs of medical care in free society are increasing. Prison population demographics show a trend toward older offenders who are serving longer sentences and who have greater health care needs. Furthermore, prisons are often located in remote geographic areas where access to health care specialists is difficult to arrange. Providing specialized medical attention may entail an expensive trip outside the secure perimeter for the prisoner, or a time-consuming and expensive visit to the prison by specialists.

Telemedicine is promising for prison use in a number of ways. This technological innovation is seen as a possible solution to rising health care costs, which can compose 20 percent or more of total prison operating costs.

It also offers additional security advantages, since some prisoners may use outside medical trips to attempt escape. The use of telemedicine provides medical advantages for prisoners that should help to create more tranquil and manageable prison environments. Difficult medical cases that could take months to resolve under normal circumstances can be treated more quickly because the pool of specialists is larger and more accessible.

The Federal Bureau of Prisons' (BOP's) interest in telemedicine began some years back after a dramatic escape attempt occurred when an inmate from the Federal Penitentiary at Lewisburg, Pennsylvania, was on an escorted medical trip to a local hospital. An escort officer was murdered during the incident, making the event especially tragic and the need to do something to protect escort staff more salient. BOP considered adding telemedicine to its health care regime, but at the time, telemedicine equipment and communication costs were prohibitively high. BOP elected instead to make significant improvements to escort security procedures.

BOP's interest in telemedicine continued, however, and officials noticed that costs were falling and technology was improving. But officials were reluctant to make a wholesale change without compelling evidence that a new approach could replace conventional medicine at a reasonable cost. There were no scientific investigations to consult to help them make a decision.

The U.S. Departments of Defense (DoD) and Justice (DOJ) have a preexisting agreement to jointly develop and demonstrate emerging technologies of mutual interest to both law enforcement and the military. The National Institute of Justice (NIJ) is DOJ's lead agency,

while the Defense Advanced Research Projects Agency (DARPA) is the lead agency for DoD. NIJ and DARPA determined that a demonstration of telemedicine technology in Federal prisons would have relevance to State and local prisons and to military operations. They agreed to jointly sponsor and manage the demonstration through a special program team, the Joint Program Steering Group (JPSG).

To develop and implement this program, JPSG assigned the Department of the Navy's Space and Naval Warfare Systems Command (SPAWAR) Center in Charleston, South Carolina, as the technical agent. Through an existing SPAWAR Systems Center services contract, Tracor Systems Technologies, Inc., was awarded a delivery order to design, procure, install, and evaluate a telemedicine system. Tracor subsequently issued a subcontract to Abt Associates Inc. to evaluate the telemedicine demonstration.

BOP agreed to participate in the demonstration by allowing the modification of medical practices in three Federal prisons in Pennsylvania and one prison medical center in Kentucky to accommodate a telemedicine network. The remote sites in the network are linked to the Department of Veterans Affairs (VA) Medical Center in Lexington, Kentucky, where VA specialists provide medical services to BOP at a cost that is generally lower than could be obtained in communities near the prisons. The reimbursement BOP pays the VA is "unsubsidized," hence the VA receives an amount for services that offsets the total amount the VA actually pays for doctors, including fringe benefits. Fees for communications and equipment also are unsubsidized. The absence of subsidies is very important because it means that projected savings resulting from this

telemedicine arrangement translate into *actual* savings for taxpayers—not a shift in cost from one part of government to another.

The evaluation that follows demonstrates convincingly that, after telemedicine was established within the prisons, it was widely embraced by officials and prisoners. Further, the evaluation establishes that a correctional agency such as BOP can add telemedicine to its medical program with the expectation that taxpayer dollars will not be wasted and, if anything, substantial savings associated with the new technology may be realized. At the moment, BOP continues to practice telemedicine, and more than 1,600 consultations have occurred since the network was established. The network has been transitioned smoothly from the JPSG project team to BOP, and utilization levels remain stable. The evaluation that follows will help BOP and State, local, and military entities determine what future role telemedicine might play in their health care delivery systems. NIJ will release subsequent reports and documents from JPSG's Biomedical Technology Program to provide guidance on implementing a telemedicine network.

## Many Thanks

Douglas McDonald and his colleagues at Abt Associates Inc. conducted this evaluation. Some of the people who made the demonstration possible may not have contributed directly to the Abt evaluation, and hence they escaped notice in the Acknowledgments section of this report. We want to make sure these people receive the recognition they deserve.

Several people in BOP's Health Services Division (HSD) contributed significantly to the demonstration. Senior Deputy Assistant Director Ron Waldron has had a longstanding interest in testing telemedicine in prisons, and his assistance and support were crucial to the success of the project. HSD's Health Care Specialist, Rad Clark, worked diligently to see that the necessary agreements were in place. We also want to thank Assistant Director and Chief Medical Officer Kenneth Moritsugu and BOP Director Kathleen Hawk-Sawyer for providing their support as well as access to health care resources underscoring the importance of the demonstration. In BOP's Contracts Division, Chief Contracting Officer Craig Unger, his staff, and Contracts Specialist Vernon Smith provided valuable assistance.

Wardens at the telemedicine remote sites provided the leadership that was necessary for the technology to take hold. They were Jim Holland (USP-Allenwood), J.D. Lamer (USP-Lewisburg), Marge Harding (FCI-Allenwood), and Art Beeler (USMC-Lexington). Jim Holland was especially helpful and a true champion of telemedicine. Art Beeler deserves special thanks for sharing the services of his medical personnel with other institutions and for recommending the Lexington VA hospital as a hub site. Also at the Lexington Federal Medical Center, Chief of Medicine Richard Ramirez, Chief Psychiatrist John Eisenbach, and Psychiatrist Luis Morales deserve recognition for their assistance.

At the VA Medical Center in Lexington, Kentucky, Helen Cornish, Director, and William Hogerty, Special Assistant to the Director, deserve recognition for having the vision to enter into this challenging partnership

with the other agencies; their support throughout the demonstration was invaluable. The many fine VA physicians who provided consultant services should also be mentioned. Foremost among them are Drs. Herbert Kaufer, Margaret Terhune, Malkanthie McCormick, Craig Chasen, and Charles Zimmermann.

The demonstration produced many deliverables, but none of greater significance than the evaluation that follows. Abt Associates Inc. prepared the report. We are indebted to them for their excellent work.

Finally, we wish to thank the implementation team—an amalgam of persons from various organizations. Eddie Broyles from SPAWAR Systems Center, Charleston, South Carolina, was Senior Systems Engineer and Technical Agent for this demonstration; he was responsible for management of project funding and overall implementation, including management of the prime contract. Herman Walker, Project Engineer with Tracor Systems Technologies, Inc., was responsible for executing the contract with SPAWAR. Under his direction, Tracor provided nearly all of the services necessary to procure, install, and evaluate a telemedicine network. He was responsible for the daily implementation and problem solving associated with a project of this size and for management of various Tracor employees and subcontracts. Tracor employees Roddy Traxler and John Smith assisted him. Tracor consultants Allan Turner and Jordana Bernard performed many important duties in the areas of program development and implementation, training, evaluation, equipment selection, report development, and liaison. Finally, from Systems Planning Corporation, Chris Tillery helped with project funding and preparing documents and agreements necessary for interagency coordination.

**Peter L. Nacci, Ph.D.**
*Program Manager, Biomedical Technology Program*
*Co-Chairman, Joint Program Steering Group*
*National Institute of Justice and Defense Advanced Research Projects Agency*

# *Acknowledgments*



We are especially grateful to personnel in the program offices in several agencies for their support and assistance. These include:

- Peter Nacci, Ph.D., Co-Chairman of the Joint Program Steering Group (JPSG) and Program Manager, who provides overall direction for the telemedicine demonstration program and several other programs administered by JPSG.

- Eddie Broyles, Senior Project Engineer, SPAWAR Systems Center, Charleston, South Carolina, responsible for technical agent assignment.

- Herman Walker, Project Engineer, Tracor Systems Technologies, Inc., responsible for administration of the prime contract.

In addition, Jordana Bernard, biomedical engineering consultant, and Allan Turner, D.P.A., criminal justice management consultant, both subcontractors to Tracor, have assisted in a variety of ways by providing input concerning development, implementation, and operation of the demonstration project. We are also grateful to a number of Tracor staff at each demonstration site, all of whom have provided us with some of the data required for our study. These include Sharon Turk at VAMC Lexington, Steve Brown at USP-Allenwood, Annette Klebon at USP-Lewisburg, and Kathi Ramirez at FMC-Lexington. The individuals identified above represent a broad range of skills that have contributed to the success of this project.

The Bureau of Prisons, within the U.S. Department of Justice, provided demonstration sites. Many Bureau staff members have been closely involved in the evaluation and have provided various types of assistance to our evaluation team. These include Ronald Waldron, Ph.D., Senior Deputy Assistant Director; Kenneth Moritsugu, M.D., Assistant Director; Rad Clark, Health Services Specialist; and Robert Falter, Ph.D., Chief of Budget and Management—all in the Health Services Division. Staff in the Office of Research and Evaluation, including analysts Christopher Innes; A.J. Iwaszko; Nancy Miller; and Chief Gerald Gaes, Ph.D., provided valuable assistance.

At each of the Federal prisons, we have relied on the assistance of the health services administrators: Ron Laino at USP-Allenwood; Arnold T. Reyes at USP-Lewisburg; Gerry Payne at FMC-Lexington; LPN Deb Kraut at FCI-Allenwood; and Ralph Ritter, former health services administrator at FCI-Allenwood. Carla Easton, medical records administrator at FMC-Lexington, also assisted. We are grateful for the cooperation of these individuals and others at the prisons who facilitated our evaluation.

x

# *Table of Contents*

*Summary* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *xiii*

*Chapter 1: The Telemedicine Demonstration* . . . . . . . . . . *1*

The Demonstration's Rationale . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Implementing the Demonstration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Chapter 2: Changes in Utilization of Specialists*
  *After Implementing Telemedicine* . . . . . . . . . . . . . . . . *9*

Teleconsultations Substituted for and Supplemented Conventional, In-Prison Consultations . . . 10

Telemedicine Reduced External Visits to Specialists . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Telemedicine Averted Costly Transfers to Federal Medical Centers . . . . . . . . . . . . . . . . . 17

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Chapter 3: Estimated Costs and Savings of an*
  *Operational Telemedicine Configuration* . . . . . . . . . . . *21*

Implications of These Findings for Expanding Telemedicine to Other Prisons . . . . . . . . . . . . 25

*Chapter 4: Other Benefits of Telemedicine* . . . . . . . . . *27*

Shorter Waiting Times . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Quality of Specialists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Access to New Specialists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Acts of Violence and Use of Force . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Appendix A: Measures and Data* . . . . . . . . . . . . . . . . . . *33*

Internal Specialist Encounters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

External Specialist Encounters Averted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Psychiatric Transfers Averted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Telemedicine Encounters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Waiting Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Incidents and Grievances . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Descriptive Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Appendix B: Cost Estimation Model* . . . . . . . . . . . . . . . . *41*

Capital Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fixed Operating Costs of Telemedicine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Transfers to Federal Medical Centers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

External Consultations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Cost of Direct Internal and Telemedical Consultations . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Appendix C: Data Tables* . . . . . . . . . . . . . . . . . . . . . . . *47*

*Appendix D: Cost of the Telemedicine Demonstration* . . . *57*

Costs per Encounter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Appendix E: Operational Telemedicine System—Acquisition
and Installation Costs* ........................ *63*

## Figures

Figure 1.1 Number of Telemedicine Consultations for All Specialties Combined,
per Month and by Facility, 9/96–12/97 ............................................. 6

Figure 1.2 Number of Telemedicine Consultations for All Four Prisons Combined, per
Month and by Specialty, 9/96–12/97 ............................................ 7

Figure 2.1 Number of Conventional In-Prison and Telemedicine Consultations for
Four Specialties in All Pennsylvania Prisons, 10/95–12/97 ........................ 11

Figure 2.2 Number of Conventional In-Prison and Telemedicine Consultations for
Four Specialties at USP-Lewisburg, 10/95–12/97 .................................. 12

Figure 2.3 Number of Conventional In-Prison and Telemedicine Consultations for
Four Specialties at USP-Allenwood, 10/95–12/97 ................................. 12

Figure 2.4 Number of Conventional In-Prison and Telemedicine Consultations for
Four Specialties at FCI-Allenwood, 10/95–12/97 .................................. 13

Figure 2.5 Average Number of Conventional and Telemedical Consultations per
Month and by Specialty, Before and During Demonstration ........................ 14

## Tables

Table 2.1 Savings Accrued From Averting Transfers to Federal Medical Centers ............... 18

Table 3.1 Comparison of Average Monthly Cost and Savings of an Operational Telemedicine
System and Conventional Care (Based on 100 Internal Specialist Consultations) ............. 24

Table 4.1 Average Waiting Time Between Referral and Initial Consultation
With a Specialist, Before and After Introduction of Telemedicine, by Specialty ............... 29

Table C.1 Number of Telemedicine Encounters per Month, by Specialty and Facility ........... 48

Table C.2 Number of Conventional, In-Prison Specialist Encounters per Month in Three
Pennsylvania Prisons During the Predemonstration Period (Principal Specialties Only) ........ 50

Table C.3 Number of Conventional, In-Prison Specialist Encounters per Month in Three
Pennsylvania Prisons During the Demonstration Period (Principal Specialties Only) .......... 51

Table C.4 Conventional, In-Prison Specialist Consultations: Medical and Indirect Expenditures at
Three Pennsylvania Prisons During the Predemonstration Period (Principal Specialties Only) ... 52

Table C.5. Conventional, In-Prison Specialist Consultations: Medical and Indirect Expenditures
at Three Pennsylvania Prisons During the Demonstration Period (Principal Specialties Only) ... 53

Table C.6 Estimated Costs of Bus Transportation From FCI-Allenwood to USP-Allenwood
for Telemedical Consultations During the Demonstration Period ........................ 54

Table C.7 Estimated (Weighted) Average per-Inmate Costs of Air Transfer From Three Pennsylvania
Prisons for Psychiatric Purposes During the Demonstration and Predemonstration Periods ..... 54

Table C.8 Estimated Average per-Encounter Cost of External Specialist Consultations at Three
Pennsylvania Prisons by Cost Element, During the Demonstration and Predemonstration Periods .. 55

Table C.9 External Consultations: Estimated Average per-Encounter Indirect Costs for
Administrative Staff Only ....................................................... 55

Table D.1 Fixed Monthly Costs of the Telemedicine Demonstration ........................ 58

Table D.2 Variable per-Encounter Costs Associated With the Telemedicine Demonstration ........ 59

Table D.3 Comparison of Average Monthly Costs of the Demonstration Telemedicine System
and Conventional Care (Based on 100 Internal Specialist Encounters) ..................... 60

Table E.1 Amortization of Capital Investment .......................................... 65

CDCR _108

# *Summary*



Between September 1996 and December 1996, a leased telemedicine network was installed to serve four Federal prisons. One suite, located in the penitentiary, served inmates at both the United States Penitentiary and the Federal Correctional Institution in Allenwood, Pennsylvania; another served inmates at the United States Penitentiary in Lewisburg, Pennsylvania; and a third served inmates at the Federal Medical Center (a prison health care facility) in Lexington, Kentucky. All of these sites were networked for telemedicine with the Department of Veterans Affairs Medical Center, also in Lexington. The VA and Federal Medical Centers in Lexington served as the hubs in this network, providing specialist physicians and other health care practitioners for remote (telemedical) consultations with prisoners in the three Pennsylvania prisons. These telemedical consultations were conducted during the period September 1996 through December 1997.

The purpose of this demonstration was to test the feasibility of remote telemedical consultations in prisons and to estimate the financial impacts of implementing telemedicine in other prison systems. Abt Associates Inc. was contracted to evaluate the demonstration and estimate the costs and savings associated with the use of telemedicine in these selected prisons.

As in most Federal prisons, medical care in the Pennsylvania prisons was traditionally delivered through a combination of four types of providers:

- Routine primary care was largely the responsibility of prison employees. Telemedicine was not intended to substitute for any of these encounters.

- Specialty care was provided in regularly scheduled, in-person clinics for which the prisons entered into annual contracts with local specialists.

- Inmates requiring other less common specialties or hospital care were transported outside the prison to nearby health care facilities (usually hospitals).

- Some inmates who needed more extensive care were transported to a Bureau of Prisons (BOP) Federal Medical Center— by air charter, if necessary.

During the demonstration, a fifth mode of care—remote encounters with specialists via telemedicine—was added to determine whether the prisons could use telemedicine to overcome local problems in accessing needed specialists and improve security by averting travel outside the prison walls. The demonstration was also designed to supply data on costs and utilization to support a decision about whether and where to implement telemedicine in other prisons.

To evaluate this demonstration, Abt Associates staff analyzed data extracted from BOP management information and accounting systems, data collected by telemedicine site coordinators, additional cost data developed by the Bureau and by the telemedicine prime contractor (Tracor Systems Technologies, Inc.), and anecdotal data collected by interviews with health services administrators and clinicians involved in the demonstration. Analysis revealed that:

- Telemedicine was adopted quickly and used frequently in several medical specialty areas. By the end of the demonstration, 1,321 teleconsultations had been conducted.

■ Physicians reported that telemedical consultations were effective substitutes for direct, in-person consultations in some specialties (e.g., psychiatry and dermatology), but less than adequate in others (e.g., cardiology and orthopedics). Consequently, a nearly complete substitution of telemedicine for in-person psychiatric care took place quickly. Telemedical consultations were also used routinely for dermatology and orthopedics, although conventional consultations in these specialties continued. Telemedical consultations were used with several other types of specialties, but relatively infrequently.

■ About 35 trips to local specialists were avoided by the use of telemedicine during the entire demonstration. Because most trips to local specialists are for care that includes invasive tests and procedures or specialized equipment that cannot be brought into the prison, telemedical consultations were rarely seen as appropriate substitutes for such trips.

■ The use of telemedicine averted 13–14 transfers by air charter to a Federal Medical Center. Nearly all of these transfers would have been for psychiatric reasons. The availability and skill levels of prison psychiatrists at FMC-Lexington contributed to better management of psychiatric patients at the demonstration prisons. These prisoners would have been transferred to the psychiatric wards at MCFP-Springfield had telemedical services not been available.

■ The projected total costs and savings of an operational telemedicine system were estimated using the experience on costs and utilization patterns gained in the demonstration. We applied these data to assumptions about purchase and installation costs of a purchased, rather than leased, system (as was used in this demonstration) and found telemedicine much less costly than conventional BOP practice. The average cost of a telemedicine consultation would be $71 if slightly different telemedicine equipment were purchased rather than leased, if the telemedicine coordinators' tasks were taken over by BOP employees, if Integrated Services Digital Network (ISDN) lines replaced the switch 56 service used in the demonstration, if the two Lexington hubs were consolidated into one, and if the number of air transfers and local trips out were averted as observed in the demonstration. Even if part-time telemedical coordinator staff were added, the average cost of a teleconsultation in these conditions would be about the same as a conventional, in-prison consultation.

■ In an operational telemedicine system so designed, the savings generated by approximately 1,544 encounters would equal the purchase cost of the telemedicine equipment. The demonstration produced about 100 encounters per month; therefore, the initial cost of equipment would be recovered in approximately 15 months, with monthly savings of about $14,200 thereafter. If all capital costs are included, the time to recover the costs is still less than 2 years.

■ If telemedical systems were deployed to prisons that experience at least as many air transfers to Federal Medical Centers and trips out to local specialists as were observed in the demonstration prisons, and if the systems were similar to the one described above, telemedicine could reap substantial savings. In prisons that lack such numbers of air transfers and trips out, the average cost of telemedicine

would be approximately equivalent to conventional, in-prison consultations.

- Telemedicine also improved some indicators of the quality of care available to prisoners. The time between a prisoner's referral to a specialist and an actual consultation with the specialist declined in the demonstration prisons; probably specialists were more frequently available by telemedicine. The enhanced communications system also enabled the Pennsylvania prisons to obtain services in at least one specialty not available locally: infectious disease expertise for the care of HIV-positive prisoners. Even in fields in which specialists were locally available, telemedicine provided access to doctors with more experience in the treatment of prisoners.

- Prison administrators in the project hypothesized that the prisons were calmer, with fewer incidents of violence because of the improved psychiatric care available through telemedicine. There were fewer assaults at FCI-Allenwood and USP-Allenwood after the demonstration began than in the previous year. However, we are unable to draw any consistent conclusions about the value of telemedicine in improving the social climate of the demonstration prisons.

We conclude that savings are most likely to result when frequent, individual transfers via air charter are avoided and when in-prison consultations are replaced by telemedicine consultations. Cost savings from trips averted to nearby medical facilities are more modest.

CDCR _112

# Chapter 1:

## The Telemedicine Demonstration



In September 1996, a telemedicine suite was opened at the U.S. Penitentiary at Allenwood, Pennsylvania, with telecommunications linkages to the Department of Veterans Affairs Medical Center (VAMC) in Lexington, Kentucky. The telemedicine suite was designed to serve inmates at this prison and at the adjacent Federal Correctional Institution (FCI) at Allenwood. Four months later, in January 1997, a second suite was opened at the U.S. Penitentiary at Lewisburg, Pennsylvania. Telemedicine equipment was also installed during the closing days of 1996 in the Federal Bureau of Prisons' (BOP's) Federal Medical Center (FMC) in Lexington, Kentucky.

In this network, all four prisons served as remote sites, meaning that prisoners and health care providers there would initiate requests for services from the providers of telemedical specialist services at the hub site. VAMC was designated the major hub for this network, and planners secured agreements with VAMC's administrators to provide physicians in several specialties thought suited to telemedicine and the needs of the remote sites. In addition to serving as a remote site, the FMC at Lexington was also designated a minor hub, as it was to provide telepsychiatry services to the other three remote prisons.[1]

The principal objective of the demonstration was to test the feasibility of using a sophisticated array of telemedicine equipment for remote specialty consultations and develop data from which to project the impact of telemedicine on health care spending for a prison population. Ancillary objectives of the demonstration were to:

- Reduce security risks associated with taking prisoners to community-based providers outside the prison walls for treatment or diagnoses.

- Provide access to specialists of a kind and quality not available locally.

- Reduce delays in prisoners' access to medical specialists.

The demonstration was jointly sponsored by the U.S. Departments of Defense (DoD) and Justice (DOJ) and managed by a steering group, the Joint Program Steering Group (JPSG). JPSG is staffed by both departments and managed by two lead agencies, the National Institute of Justice (NIJ) and the Defense Advanced Research Project Agency (DARPA). NIJ's objective in supporting the project was to provide information useful for State and local corrections, in addition to assisting BOP, its sister agency. DoD's research and development (R&D) community (DARPA among them) developed telemedicine and enabling communications technologies. DoD's objectives in supporting the project were greater than testing the utility of technology derived from its R&D community. DoD requires the same kind of access to medical information from remote areas, both in war and in operations other than war (such as providing humanitarian relief, giving disaster assistance, or detaining large groups of foreign nationals), as is available domestically. DoD also maintains a system of prisons and jails for incarceration of military law violators and many hospitals serving active military personnel and their families.

---

[1] A dietician at FMC-Lexington also used the system for group instruction.

CDCR _114

USP-Lewisburg is a maximum-security prison that was built in 1932 in what remains a rural area. It housed a daily average of 1,349 male prisoners during FY 1997.

USP-Allenwood is newer, having opened in 1993 near White Deer, Pennsylvania. The average daily population at this facility was 1,037 maximum-security male prisoners during FY 1997.

FCI-Allenwood, which also opened in 1993, is located on the same BOP campus as USP-Allenwood. On any given day during FY 1997, it held an average of 1,100 low- and medium-security prisoners. Prisoners at the FCI are transported to the USP-Allenwood for telemedicine sessions.

The Federal Medical Center at Lexington, Kentucky, had operated as a Federal correctional institution since 1974 but was converted to a Federal Medical Center in 1991. This facility accepts patients, many of whom require specialized health care, from institutions in the Federal prison system. Its particular mission is to provide care to medium- and minimum-security prisoners with chronic illnesses. During FY 1997, the center's average daily population was 1,450. Most were men, but the FMC also houses a small number of female prisoners.

The Department of Veterans Affairs (VA) operates a network of hospitals for veterans and their dependents. The VA is interested in developing telemedicine capabilities to serve veterans in rural locations and provide remote consultant services to other public health care entities.

No single demonstration could successfully serve all the interests of such a diverse group of public agencies. However, the evaluation below has been structured to provide information that should be useful to BOP, State and local corrections, DoD, and the VA.

The technology used in this demonstration is standard, commercially available equipment, and although skill is required to operate it, physician assistants can readily gain proficiency. A physician is not required at the remote location. Consequently, a single specialist can serve a number of remote locations, and each remote location has access to all the specialists in the network.

## The Demonstration's Rationale

Telemedical capabilities in prisons and other settings offer the prospect of expanding access to health care providers. Information about persons who need treatment and/or diagnostic services can be transmitted rapidly to physicians or other health care providers located in other parts of the world. The information so communicated can be as limited as a written report of laboratory tests. The information also can be as complex as a digitized x-ray image or a real-time, high-resolution video conference during which a physician sitting thousands of miles away sees a patient on a video screen and images produced by a wide variety of diagnostic devices, including ultrasound and optical fiber probes. Specialists can also remotely direct general physicians in the treatment of patients so presented.

Telemedicine's ability to broaden the supply of health care providers has the potential to

overcome some of the barriers to effective prison health care that result from the structure of the American health care industry. This industry is characterized by a high degree of physician specialization, which results in patient care being provided by a number of different primary care physicians and specialists, all of whom may not be associated with formal organizations or networks. Physician specialization has significant implications. First, the accessibility of specialist care is exceedingly limited in thinly populated regions of the country (where many prisons are located). Whereas the practice of an individual primary care physician requires a population base of between 3,000 and 5,000 people to support it, the population required to support certain types of specialists is much larger. Indeed, for some specialties, the required base exceeds the populations of many large urban centers. Second, in regions where specialists are rare, those who do exist acquire monopolistic powers over consumers. The ability of patient/consumers, or those who purchase services on their behalf, to negotiate the fees paid for services or the conditions under which they are delivered is correspondingly diminished.

If, by virtue of installing telemedical communications equipment, a remotely located health care provider can communicate directly with specialists located elsewhere, the consumer's leverage in the marketplace becomes greater. Consumers are no longer limited to the locally available medical care. More advantageous pricing may be available in this broader and, it is hoped, more competitive marketplace. If patients or those who manage their care actually use less costly specialists via the telemedicine network with sufficient frequency, in place of higher priced local providers, reductions in health care expenditures might be obtained.

These savings come at a substantial price, however, as the needed equipment and telecommunications charges can be quite costly.

A few State prison systems have installed telemedicine systems, and many others are evaluating the decision to use them. BOP had been considering the use of telemedicine but was unable to assess its merits because there was no reliable basis for estimating the cost of the system or whether it would meet prisoners' needs. This demonstration was primarily intended to supply the missing information to support that decision and develop a model for estimating the cost of telemedicine under different assumptions about costs and utilization. The costs of technology change rapidly. During the 2 years between the planning of this demonstration and its evaluation, the costs of the telemedicine equipment and communications services used for the demonstration fell significantly. Therefore, any future implementation will face cost conditions different from (and generally more favorable than) past experience. This report is intended to help prison administrators in Federal, State, or local governments assess the fiscal impact of implementing telemedicine in their correctional organizations.

It is certainly possible that telemedicine is not always cost effective but that other important benefits are obtained. For example, the availability of additional—and different—specialists through the telemedicine network may make needed care more accessible to patients and may lower the security risks associated with transporting prisoners out of prison.

Accessibility is of special significance in prisons. The Federal courts have ruled that prisoners in all correctional facilities—local, State, or Federal—have a constitutionally protected

right to similar levels of health care as are available to citizens not imprisoned. Failing to provide that access places departments of correction at substantial risk of lawsuits and court-ordered mandates. Where accessibility to health care providers is limited because of geography or other barriers, telemedical capabilities may facilitate better care. Even if the provision of this telemedicine capacity is costly, the benefits of improved access may be judged to outweigh the costs.

## Implementing the Demonstration

Demonstration project planners chose this constellation of facilities and medical centers in part because administrators in each were interested in the project and were willing to host a test site. Because nonmonetary benefits, including better security, were important, the demonstration was run in high-security prisons where inmate transfers pose the greatest threat. FMC-Lexington has some specialists on staff who were available to prison health care providers in the three remote sites. VAMC also offers a deep pool of medical specialists. Because both are Federal agencies, services were available at cost, acquisition was simplified, and legal obstacles were eliminated.

To accommodate the equipment and the special needs of the demonstration, physical space in the Lewisburg and Allenwood penitentiaries and in FMC-Lexington and VAMC had to be renovated.

Telemedicine suites were created, soundproofing and air-conditioning were installed, and dedicated telecommunications lines were brought into the suites. At each of the four sites, a full-time telemedicine coordinator was hired to operate the equipment and perform tasks associated with the demonstration, such as scheduling sessions, keeping records, and collecting data. These telemedicine coordinators were employed by Tracor Systems Technologies, Inc., the firm that implemented and operated the demonstration. Indeed, all the equipment, installation, and facility renovation costs were covered entirely by the demonstration project's funds. As a result, the cost perceived by the prisons was lower than the actual cost—a fact that made the telemedicine demonstration appealing and encouraged its utilization.

Each of the three Pennsylvania prisons began using telemedicine services as soon as they became operational and quickly integrated them into the provision of health care in the prisons. As time progressed, the frequency of use increased. Between September and December 1996, before the USP-Lewisburg suite became operational, 21 to 52 telemedicine encounters occurred each month (see table C.1 in appendix C). Numbers climbed higher during the first 4 months of full-scale implementation (January through April 1997), reaching 116 per month in April. From April onward, the total number of encounters ranged between 90 and 122 per month. Figure 1.1 shows the month-to-month frequency of telemedicine consultations at each of the four remote prisons throughout the demonstration period.

By the end of the demonstration, a total of 1,321 teleconsultations had been conducted. USP-Lewisburg had used telemedicine the most, with a total of 485 teleconsultations. The total volume throughout the entire period was slightly lower at USP-Allenwood (427 teleconsultations) and at FCI-Allenwood (281).

**Figure 1.1**    umber of Telemedicine Consultations for All Specialties Combined, per Month and by Facility, 9 9  12 97



FMC-Lexington did not become an active remote site until later in the demonstration (February 1997). By the end of December 1997, FMC inmates had received only 128 telemedicine consultations from VAMC specialists. Health services administrators at FMC-Lexington chose to continue existing practices for specialist consultations. The facility's budget for medical care is much larger than the budgets at the three Pennsylvania prisons, reflecting its mission as a medical center. A rich network of consulting specialists was already in place, and administrators were averse to disrupting it for the purposes of testing telemedicine. Consequently, FMC activity as a *remote* site focused on podiatry, a specialty not available there prior to the demonstration. FMC operated as an active *hub* site, however, and the FMC psychiatrists and dietician provided many specialist consultations to Pennsylvania prisoners.

Telemedicine consultations were more frequent in some specialties than others. From the beginning, it was apparent that psychiatric services would be the specialty most commonly used in the prisons (see figure 1.2). At USP-Lewisburg, 54 percent of consultations were with a psychiatrist, as were 65 percent of USP-Allenwood's consultations and 83 percent of FCI-Allenwood's. FMC-Lexington served as the hub for psychiatry and hence received no remote psychiatry consultations. (See table C.1 in appendix C for the monthly telemedicine frequencies by specialty and by prison.)

By the end of the demonstration, 772 remote psychiatric consultations had been held, 58

CDCR _118



Figure 1.2   umber of Telemedicine Consultations for All Four Prisons Combined, per Month and by Specialty,
9 9   12 97

percent of the total. Dermatologists accounted for 176 consultations (13 percent) and orthopedic specialists accounted for 141 (11 percent). The remaining consultations were with podiatrists (62); infectious disease specialists (20); pulmonary specialists (12); cardiologists (18); ear, nose, and throat specialists (16); gastroenterology specialists (9); and neurologists (11). In addition, the telemedicine system was used for consultations with a dietician located at FMC-Lexington (84 teleconsultations, or 6 percent of the total).

Judging from the frequency of telemedicine consultations alone, the project demonstrates that health care clinicians in the prisons found the technology a useful way to deliver a wide variety of specialty medical services. (Health care providers found telemedicine to be more feasible for certain types of specialty consultations than others, as discussed in chapter 2). This quick start and heavy utilization resulted from the extensive planning and needs assessment that preceded selection and installation of the equipment; in addition, the inclusion of full-time telemedicine site coordinators eased the scheduling, paperwork, and inconvenience problems that have plagued many other telemedicine programs. A number of nonprison telemedicine demonstrations have been considerably less successful in realizing such high utilization so soon after being implemented.[2]

———————
[2] Studies by Abt Associates Inc. of all rural telemedicine programs in the United States, including several that have prison sites, did not find comparable levels of utilization following implementation. See Hassol, Andrea, Gary Gaumer, Carol Irvin, Dena Puskin, Carole Mintzer, and Jim Grigsby, "Rural Applications of Telemedicine," *Telemedicine Journal* 3 (3) (1997):215–225.

# Chapter 2:

## Changes in Utilization of Specialists After Implementing Telemedicine



The telemedicine demonstration was implemented principally to reduce the number of prisoners seeing local consulting specialists who come into the prisons and to reduce the number of prisoners taken outside to see specialists. Shortly after the demonstration began, it became apparent that teleconsultations had reduced the number of prisoners being transferred to Federal Medical Centers for consultations and treatment. If teleconsultations were substituted for such conventional consultations in sufficient numbers, would the costs associated with these conventional practices decline to the point of offsetting the cost of adding telemedicine resources? This chapter examines the effect on the conventional practices of specialist consultation in the three Pennsylvania prisons, where nearly all the remote encounters occurred.

## Teleconsultations Substituted for and Supplemented Conventional, In-Prison Consultations

Telemedicine consultations completely replaced conventional consultations in some specialties, but substituted for few, if any, conventional consultations in others. This yielded an overall increase in consultations provided by a combination of conventional and remote specialists.

Figure 2.1 shows *trends in* the numbers of monthly consultations provided conventionally by specialists visiting the three Pennsylvania prisons prior to the initiation of telemedicine and afterwards, the number of telemedicine consultations each month after the demonstration began, and the total combined volume of both telemedicine and conventional, in-prison consultations.[1]

These counts of conventional, in-prison consultations are limited to those for which specialties could be identified in the BOP automated medical data files (the Sensitive Medical Data, SMD): psychiatry, dermatology, orthopedics, and cardiology. These specialties accounted for 84 percent of all teleconsultations. For purposes of comparing conventional and telemedicine consultations, all other specialties were excluded from the monthly counts of conventional in-prison and remote consultations.

As figure 2.1 shows, total consultations (conventional plus telemedicine) increased during the demonstration period, due to a combination of reduced conventional consultations and additional telemedical consultations. The change happened quickly. During the last 2 months of the demonstration, telemedicine consultations (and, therefore, all consultations) increased still further, although this pattern was not uniform at all remote sites. The numbers of conventional, in-prison consultations at USP-Lewisburg declined from March through December 1996 (see figure 2.2), the months before telemedicine became available.

When telemedicine became available in January 1997, it rapidly became the dominant form of specialty consultation, and the combination of telemedicine and some remaining conventional consultations provided about as

---

[1] The curves shown in figures 2.1 through 2.4 do not precisely indicate the numbers of different consultations in each month, but are smoothed to represent trends better. For actual numbers of consultations, see tables C.1–C.3 in appendix C.



Figure 2.3 Number of In-Prison and Telemedicine Consultations, Four Specialties,
All Pennsylvania Prisons, 10 95  12 97

ote  Based on data in tables C.1, C.2, and C.3 in appendix C.

many encounters as had been delivered by conventional medicine alone in 1996.[2]

At USP-Allenwood, the frequency of conventional, in-prison specialist consultations had been increasing for a few months prior to the introduction of telemedicine. This trend eased, but the addition of telemedicine resulted in an overall increase in total consultations (see figure 2.3).

At FCI-Allenwood, there were fewer conventional, in-prison consultations during the year preceding the demonstration than at the other prisons. These consultations, which had been largely with psychiatrists, quickly dropped to zero when telemedicine was initiated

and were replaced with an equal number of telepsychiatry consultations (see figure 2.4). Conventional consultations then increased slightly, largely in cardiology—probably because more inmates needed cardiology services during the demonstration period. There appeared to be a complete substitution of telepsychiatry for conventional psychiatry, but little substitution of telecardiology for conventional cardiology.

Lewisburg would be expected to report higher numbers for specialist encounters because it has a larger primary population than the other two prisons. During the 12-month period preceding the demonstration, the average daily population was about 1,500, compared with

---

[2] Lewisburg's use of telemedicine in some months was severely restricted because of security problems unrelated to telemedicine.

**Figure 2.2** umber of Conventional In-Prison and Telemedicine Consultations for Four Specialties at USP-Lewisburg, 10 95  12 97



ote  Based on data in tables C.1, C.2, and C.3 in appendix C.

**Figure 2.3** umber of Conventional In-Prison and Telemedicine Consultations for Four Specialties at USP-Allenwood, 10 95  12 97



ote  Based on data in tables C.1, C.2, and C.3 in appendix C.

**Figure 2.4** umber of Conventional In-Prison and Telemedicine Consultations for Four Specialties at FCI-Allenwood, 10 95 -12 97



ote  Based on data in tables C.1, C.2, and C.3 in appendix C.

about 1,000 at USP-Allenwood and about 1,100 at FCI-Allenwood. If the level of medical need was the same at each of the three facilities, and if the ratio of demand to services provided inside the prisons was the same, Lewisburg would be expected to experience about 50 percent more encounters each month with specialists. Indeed, Lewisburg had about 50 percent more consultations than USP-Allenwood, but FCI-Allenwood had very few consultations.[3]

The effects of telemedicine on conventional, in-prison consultations were less significant at FMC-Lexington. As the earlier figure 1.1 indicates, the facility did not begin to function as a remote site until late in the demonstration

period. Half of the teleconsultations were with a remote podiatrist. Because SMD data do not indicate conventional encounters with podiatrists, utilization trends before and after telemedicine's implementation could not be tracked. Because so few other types of telemedical consultations occurred between FMC-Lexington and specialists at VAMC, before-and-after trends were not mapped.

These differences in utilization rates may have reflected differences in the frequency with which specialist clinics were held in each of the prisons. For example, USP-Lewisburg brought in an orthopedist approximately twice per month before the demonstration began, while the Allenwood facilities each held

_____
[3] The inconvenience of transporting inmates from FCI to USP for telemedicine may have contributed to the reluctance to use telemedicine.

**Figure 2.5** Average number of Conventional and Telemedical Consultations per Month and by Specialty Before and During Demonstration



Note: During refers to the period following full implementation (January 1997) of telemedicine at all three Pennsylvania prisons.

orthopedic sessions once every 2 months. USP-Lewisburg held eight dermatology clinics during the year preceding the demonstration, while USP-Allenwood held only one. There may have been differences in the morbidity in the populations at each of the three facilities, but other factors probably accounted for the different frequency of scheduled clinics:

■ Administrative decisions to allocate budgets for care differently.

■ Decisions to provide a greater proportion of care internally by staff physicians rather than consulting specialists.

■ Difficulties in obtaining services from consultants willing to work inside the prisons.

■ Differing reliance on specialists working in nearby hospitals.

For example, administrators at FCI-Allenwood reported that although they could have made good use of dermatology and cardiology services on a quarterly basis, they could not afford these specialists at local market rates. Therefore, FCI-Allenwood relied on primary care staff to handle dermatology cases and took small numbers of prisoners to cardiologists outside the prison walls when necessary.

The mix of telemedicine and conventional, in-prison consultations differed not only among the various institutions, but also among different specialties. Telemedicine virtually replaced the conventional prison specialist in psychiatry; in the three other specialties tracked unambiguously over time, the total volume of consultations *increased* (see figure 2.5).

Figure 2.5 compares the average *monthly* numbers of conventional consultations during

the year preceding the demonstration ("Before") with the numbers of conventional and telemedicine consultations during the demonstration ("During").

At all prisons, use of consulting psychiatrists coming into the prisons virtually ended with the introduction of telemedicine technology. The few such encounters reported during the telemedicine demonstration period occurred largely during the first weeks—perhaps because they were already scheduled. (See tables C.1 and C.2 in appendix C for the monthly utilization of telemedicine by specialty.) Prison staff in all three facilities reported being very satisfied with the psychiatrists located at FMC-Lexington, who served as the remote specialists for all psychiatric telemedicine encounters. Indeed, they were more satisfied with the quality of these psychiatric services than those delivered previously by the local consulting psychiatrist.[4]

At USP-Lewisburg, the number of psychiatric encounters was about the same before and during the demonstration; what changed was the technology for conducting them. In the predemonstration period, there was an average of 22 consultations per month with the visiting psychiatrist. Following the introduction of telemedicine, there were 22 per month, but all were provided by telemedicine. In the other two facilities, the introduction of telemedicine appears to have *increased* the total number of psychiatric encounters. At USP-Allenwood, for example, the total number grew from 6.5 per month prior to telemedicine's implementation to 17 per month during the demonstration period. At FCI-Allenwood, the increase was less dramatic but nonetheless an increase: from 11 per month to 15 per month. Again, this may have resulted from

the perceived quality and competence of the remote psychiatrist, compared with his local counterpart, although changes in prisoners' needs for care cannot be ruled out.

Telemedicine also substituted for in-prison consultations with dermatologists. An average of 6 dermatology consultations per month during the predemonstration period increased to 14 per month during the demonstration. Seventy-seven percent of the dermatology consultations during the demonstration period were provided via telemedicine.

Telemedicine also substituted for orthopedic consultations in all facilities, but conventional, in-prison orthopedic consultations also continued. Lewisburg averaged 19 monthly orthopedic consultations during the predemonstration period, and 16 per month during the demonstration—with 23 percent of the encounters during the demonstration provided remotely. At USP-Allenwood, the total number of orthopedic encounters increased from 3 to 16 per month, on average, with 20 percent of these provided remotely. (The increase in conventional orthopedic consultations was reportedly due in part to a new orthopedist who had a practice of ordering more followup visits.) At FCI-Allenwood, the number of monthly orthopedic encounters remained small (an average of three per month throughout the entire period); 28 percent during the demonstration period were provided remotely.

Very few (18) telemedicine consultations were held with cardiologists. These consultations were for patients with coronary artery disease or valvular heart disease and for secondary prevention, such as chest pain. During the year prior to the demonstration, there were very few in-prison consultations with visiting

---

[4] Despite the near cessation of in-prison psychiatric consultations, prison administrators did not cancel contracts with local specialists because they did not want to dislocate those relationships entirely; this demonstration was being tested for only 12 months, with no guarantee that telemedicine would continue to be available afterwards.

cardiologists. These numbers are too small to base any inference about substitution rates. They indicate, however, that telemedical consultations were considered feasible in at least some proportion of the cases.

## Telemedicine Reduced External Visits to Specialists

*Telemedicine averted about 35 trips for inmates to see local specialists outside prison walls, for a savings of approximately $27,500.*

During the 11 months prior to telemedicine's implementation, Lewisburg inmates were taken out of the prison 419 times to meet with local specialists, either in their offices or in a community hospital (called external consultations because they occurred outside the prison walls). There were also 119 external consultations for USP-Allenwood inmates and 160 for FCI-Allenwood inmates.[5] With this volume of external consultations, each of which requires extensive and costly security measures, one hope for the demonstration was that fewer inmates would need to be taken outside the prison to see local specialists after telemedical capabilities became available.

At the end of each telemedicine consultation, prison staff were asked what would have happened had telemedicine not been available. In most cases, staff reported that the inmate would have eventually seen a visiting specialist; in a few cases, either an external consultation or a transfer to FMC was thought to have been avoided. Whenever it was suggested that one of these costly events was avoided, the health services administrator for the prison was asked to review the case and verify that an external consultation (or a transfer) would have occurred without the telemedicine session. Prison staff identified a total of 35 external consultations that were avoided by using the telemedicine system, all among inmates of USP-Lewisburg.[6]

The savings produced by avoiding such external consultations was calculated by identifying a set of comparable external consultations during the 11 months before the demonstration period that could reasonably have been attempted with telemedicine and by pricing the various components of these events (see appendixes A and C for discussions of these data). The average cost of external consultations during this period is estimated at $788.[7] This figure included medical care expenses averaging $320, administrative expenses averaging $197, and security/escort costs averaging $271 per consultation. In summary, for the 35 avoided external consultations, the total savings during the entire demonstration period is estimated to be $27,580.

---

[5] Because FMC-Lexington used telemedicine in only a few specialties for which it otherwise would never approve external visits to specialists (e.g., podiatry), reductions in these external visits were not expected or sought.

[6] The frequency of external consultations experienced at the three Pennsylvania prisons was higher during the demonstration period than during the 11 months prior to telemedicine's implementation. These differences reflect normal variation in numbers of cases requiring trips to hospitals or to specialists based there and should not be attributed to any effect of telemedicine on the utilization of these external resources. Furthermore, the rates of using consulting specialists prior to the implementation of telemedicine cannot be viewed as characterizing "normal" or "appropriate" levels of demand. For example, the penitentiaries were "locked down" for some periods of time; contracts with consulting physicians were not in force for part of the year; and primary care staff may have chosen to treat patients they would have otherwise preferred to send to specialists.

[7] This calculation does not recognize some "hidden" costs associated with external consultations, such as additional staff time and the use of government vehicles and equipment for medical trips. In addition to the staff listed in the appendix tables, each trip involves unit clerical staff and receiving and discharge staff. The analysis also leaves out costs associated with the vehicles, including specialized handicap-equipped vehicles with motorized chair lifts. Considering these costs would slightly increase the advantage of telemedicine.

CDCR _127

Why were so few of these costly consultations replaced by telemedical ones? To explore the reasons for this, the research team discussed lists of all external consultations with prison clinical staff and learned that the majority of them were for care that cannot be provided remotely. Emergency and trauma care, surgery, invasive tests and procedures, or care requiring special (nonmobile) equipment all necessitate transporting inmates outside the prison to specialists in hospital outpatient departments or in their own offices. USP-Lewisburg had the most external consultations and, hence, the most opportunity to reduce them. Telemedicine did not avert any external consultations at either of the Allenwood facilities, in the opinion of the health service administrators at those two prisons. Had the mix of prisoners or the decision rules been different, the number of external consultations and their distribution among the prisons might have differed from what was observed. These events therefore introduce an element of uncertainty into cost calculations.

## Telemedicine Averted Costly Transfers to Federal Medical Centers

*The use of telemedicine appears to have averted 13 to 14 costly air transfers to Federal Medical Centers from the three Pennsylvania prisons, thereby saving about $59,000. All but one of these avoided transfers were psychiatric patients who would have been airlifted to MCFP-Springfield.*

Two methods were used to estimate the number of transfers that would have occurred in the absence of telemedicine. One was to consider each telemedicine session and ask, "What would have happened without this telemedicine session?" Health services administrators in each of the three prisons answered this question for every teleconsultation performed. The resulting tally showed 13 averted transfers: 11 at USP-Lewisburg, 1 at FCI-Allenwood, and 1 at USP-Allenwood. A second estimation method was to use BOP data on inmate movements from prisons to FMCs and to calculate differences between the 11 months preceding the demonstration and the months during the demonstration period. This exercise found 14 fewer air transfers of psychiatric patients during the demonstration period for all three demonstration prisons in Pennsylvania combined. The two methods therefore suggest that between 13 and 14 air transfers to FMCs were averted by telemedicine during the demonstration period.

The prisons were reportedly able to avoid emergency air transfers for psychiatric reasons because the level of ongoing prisoner care with telemedicine was reportedly higher. The availability of psychiatrists at FMC-Lexington, via telemedicine, and their expertise were thought to result in more effective medication and monitoring of prisoners suffering from psychiatric illnesses. With prisoners thus stabilized and monitored, crises were avoided. When prisoners became agitated, they had quick access to the remote psychiatrist, who was able to "talk them down," thereby sidetracking a downward spiral and averting a transfer to the psychiatric ward at MCFP-Springfield.

Furthermore, the rates of utilizing consulting specialists prior to the implementation of telemedicine cannot be viewed as "normal"

**Table 2.1** Savings Accrued From Averting Transfers to Federal Medical Centers

| | Before Demonstration: Transfers/Year | After Demonstration: Transfers/Year | Difference (Averted Transfers) | $/Transfer | Total Savings |
|---|---|---|---|---|---|
| USP-Allenwood | .70 | 5.25 | 3.45 | 3, 71 | 12, 5 |
| FCI-Allenwood | 7. 0 | 3.00 | 4. 0 | 4,102 | 1 , 9 |
| USP-Lewisburg | 12.00 | .00 | .00 | 4, 00 | 27, 00 |
| All Prisons | 2 .30 | 14.25 | 14.05 | 4,209 | 59,134 |

Weighted average of savings.

due to lockdowns at the penitentiaries, contractual issues with local physicians, and treatment decisions.

To estimate the financial savings incurred by these averted transfers, records were examined from the predemonstration and demonstration periods for inmates who were transferred to Federal Medical Centers. That is, the research team analyzed cost data for transfers that *actually* occurred and applied the average of these expenditures to the estimated number of transfers that were averted. The cost of transfers included air charter and flight crew, correctional officers accompanying the inmate (and returning), an armed lieutenant, a medical assistant, and chase and lead car escorts. The cost for air transfers to FMCs averaged $4,600 from USP-Lewisburg, $4,102 from FCI-Allenwood, and $3,671 from USP-Allenwood. (No instances of averted transfers were observed among the inmates at FMC-Lexington.)

On the basis of these estimated unit costs and the estimated number of transfers that did not occur as a result of having telemedical capacity at each of the three Pennsylvania prisons, BOP saved $59,134 in air transport costs (see table 2.1, which shows savings associated with averted air transfers to FMCs, using the second method of estimation).

Maintaining an inmate at an FMC costs more than maintaining the same inmate at a USP: approximately $51,136 per year at MCFP-Springfield, compared with $22,898 for the same number of days at USP-Lewisburg, $22,688 at USP-Allenwood, and $18,203 at FCI-Allenwood. The *marginal* cost of housing 14 more prisoners at FMC-Springfield would be less than this average per-inmate cost would suggest, however. This is because the facility could probably have absorbed 14 additional prisoners at little or no significant increase in cost. Therefore, no credit was imputed to telemedicine for reduced housing costs for these prisoners in the calculations. However, if telemedicine was implemented more widely throughout BOP, the decrease in the number of averted bed/days at FMCs would become substantially larger, and the marginal savings from averted FMC housing costs might produce noticeable savings as the FMCs downsized accordingly.

Some BOP administrators suggested that the budgetary consolidation of funds available for outside medical care with those for inside care (which happened just as the telemedicine demonstration was beginning) might have altered the way prisons resorted to transfers of inmates. That is, a reduction in transfers may have resulted from this policy change, rather than from telemedicine itself. If so, this

CDCR _129

change should have been consistent across all BOP facilities (although in the Northeastern region, where the demonstration prisons are located, administrators did not implement this change as fully as in other regions). To test this hypothesis, data for psychiatric and medical transfers from four other USPs lacking telemedicine were examined to determine if there was a similar pattern of transfer during the same two time periods. The research team observed a large *increase* in psychiatric transfers from three of the four and a *decrease* in medical transfers at the four comparison prisons as well as at the three demonstration prisons. The team concluded that the budget policy changes had no consistent impact on the use of transfers to Federal Medical Centers and, therefore, that the estimated reduction in transfers at the demonstration prisons was the result of implementing telemedicine.

## Summary

The research team estimated that the use of telemedicine averted a small but costly number of emergency air transfers to Federal Medical Centers and a small (and less costly) number of visits to nearby specialist physicians located beyond the demonstration prisons' walls. The majority of telemedical consultations were conducted either in lieu of a conventional, in-prison consultation or, in some undetermined numbers, in place of no consultation at all with specialists. Overall, the total numbers of specialist consultations, both telemedical and conventional, increased during the demonstration period, relative to the 12 preceding months.

# *Chapter 3:*

## *Estimated Costs and Savings of an Operational Telemedicine Configuration*



During its entire operation, the demonstration spent almost $778,000 to provide 1,321 telemedicine consultations. If this entire amount were assigned to the cost of clinical care, telemedicine would appear to have cost an average of $589 per encounter. In contrast, conventional, in-prison consultations cost an average of approximately $108 each. (See appendix D for an analysis of the actual costs of the demonstration.) This comparison distorts the actual costs of telemedicine, however. Many costs were incurred to set up and evaluate the demonstration. Moreover, the $589 cost per encounter does not reflect savings in transfers and external consultations that telemedicine's use produced, which were estimated at $7,200 per month. This chapter presents a summary of the costs and savings that would result if telemedicine technology and the associated staff were operationally deployed. In addition, the implications of study findings are considered for the expansion of telemedicine to other prisons in the Federal system, and the data required to apply a similar model to State prison systems are discussed.

A telemedicine system implemented for operational rather than demonstration purposes would be configured differently from the one observed in this study. (Refer to appendix E for additional information on the cost and configuration of the operational telemedicine system.)

- BOP would purchase, rather than lease, the telemedicine equipment.

- Lewisburg and Allenwood would each be equipped with a room camera; patient camera; monitor; and the communications equipment and software necessary for real-time, interactive video conferencing ($64,500 each), plus a digital stethoscope ($3,225) and an intraoral camera ($5,375).[1]

- The ratio of hubs to remotes would be optimized to maximize use of the telemedicine hardware, bringing the largest cost savings. The demonstration used two hubs because of the location of consulting specialists, but the equipment at each location could have accommodated a larger volume of encounters. The hub would be equipped with video conferencing capabilities similar to those in the prisons, but without the patient and intraoral cameras.

- Video conferencing communications would operate over four Integrated Services Digital Network (ISDN) lines per spoke. The entire network would operate at a cost of $840 per month, including amortization of $1,832 installation costs, plus $0.60 to $0.80 per-minute long-distance ISDN charges.[2]

To project the costs that would result from this configuration, the team developed a model of the total cost and savings of telemedicine. The model groups costs into two categories:

- **Equipment:** The purchase price of telemedicine equipment is amortized over its projected useful life. The fixed monthly

---

[1] These costs were current in January 1998. Considerable advances in technology are continuing, resulting in significant cost reductions in telemedicine equipment. Persons considering telemedicine should research the market for the latest products that meet their needs and provide the most value per dollar spent.

[2] Typical communication bandwidth for teleconsultations was 336 KB (1/4T1) using switch 56 service. The greatest bandwidth is needed when additional inputs, such as the electronic stethoscope, are used—hence the fourth ISDN line.

CDCR _132

costs of ISDN communications equipment (and a monthly share of its installation cost) are included in the equipment category. This category also includes several small capital expenses, such as training and remodeling costs. (Appendix B provides a detailed definition of each component.)

- **Personnel and communications:** These costs vary directly with utilization, primarily payments to specialists and video conferencing line charges.

The demonstration incurred a third category of cost—payments to the demonstration site coordinators—that is assumed to be zero for purposes of projecting the cost of an operational system. As an alternative assumption, calculations of the cost using part-time (20 hours per week) and full-time site coordinators were also made. The effects of these assumptions are discussed below.

Offsetting the costs of equipment, personnel, and communications are two major savings:

- Averted external consultations.

- Averted air transfers to Federal Medical Centers.

In addition to the configuration assumptions described, model calculations reflect several assumptions about utilization:

- The telemedicine system would be utilized at the rate of 100 patient encounters per month that replaced conventional consultations in the prisons, approximately the average observed during the months when the demonstration system was fully operational.

- All encounters provided by telemedicine would have been provided conventionally

had telemedicine not been available. In other words, any costs associated with increased frequency of care resulting from telemedicine are excluded from the calculations.

- The operational system would avert external consultations and transfers to FMCs at the same monthly rate as that observed in the demonstration period. This would contribute four additional telemedical consultations each month, making the monthly total of patient encounters 104. (Some prisons had much larger numbers of referrals to FMCs than the ones in this demonstration. Savings at these institutions may be greater than those shown here.)

- Each averted external consultation or transfer would be replaced by a single telemedical encounter.

Table 3.1 shows that under these assumptions, the direct costs for specialist encounters (principally payments to the specialists and video conferencing line charges) would be distinctly lower using telemedicine than they were with conventional technology. The major savings, however, are associated with transporting inmates outside the prison walls.

It is also assumed that the numbers of averted external consultations and air transportations would be equivalent to those observed in the demonstration. Consequently, the substantial savings associated with these averted events ($7,200 a month) would continue to accrue to the benefit of telemedicine at any level of utilization. These savings alone more than cover the cost of operation of the hypothetical system, even without considering the cost of conventional encounters. This has an important implication: These savings may be fixed and relatively independent of the volume of telemedical sessions. That is, the assumption

**Table 3.1** Comparison of Average Monthly Cost and Savings of an Operational Telemedicine System and Conventional Care, Based on 100 Internal Specialist Encounters

|  | Number of Events per Month | Cost per Month | Total Monthly Cost | Average Cost per Encounter |
|---|---|---|---|---|
| **Operational Telemedicine** | | | | |
| Equipment | A | 3,445 | | |
| Coordinators | A | 0 | | |
| Consultations | 104 | 3,913 | | |
| Total Cost | | | 7,359 | 71 |
| **Conventional Care** | | | | |
| Consultations Inside the Prison | 100 | 10,400 | | |
| Avoidable External Consultations | 2.43 | 2,274 | | |
| Avoidable Transfers to FMCs | 1.17 | 4,928 | | |
| Total Cost | | | 17,002 | 173 |

Note: This calculation *assumes* that all 100 monthly telemedicine consultations would be provided conventionally in the absence of telemedicine. This one-to-one substitution did not occur in the demonstration. Chapter 2 shows that fewer consultations were actually provided before telemedicine became available.

is made that triage procedures in operation during the telemedical session would bring prisoners into telemedicine who needed immediate consultations. The research team assumed that the number of such encounters would continue, regardless of the number of patients seen for less urgent complaints.

Because the major costs (equipment) and savings (transfers and external consultations) are unaffected by the number of encounters, savings from telemedicine do not depend greatly on utilization levels. At the observed level of 104 patients per month, telemedicine produces an average savings of $102 per patient ($35 for the cost of conventional care, plus $67 saved in averted transfers and external consultations).[3] A 20-percent increase or decrease in utilization would affect this net savings by less than 10 percent.

Excluding the costs of equipment but including savings on transfers and external consultations, each telemedical encounter saves an average of $142. At this rate, 1,544 encounters would save an amount equal to the purchase cost of the telemedicine equipment. Including other capital costs (installation and training) would increase the required number of encounters to 2,368. The demonstration produced about 100 encounters per month, so the initial cost of the equipment would have been recovered in just over 15 months, and the total capital costs (equipment, installation, and training) in less than 2 years, with monthly savings of $14,200 after that.

The scenario envisioned here assumes that regular prison health care staff assume responsibility for telemedicine coordination. Whether this can be done at no additional cost is open to question. If telemedicine was established permanently rather than on a demonstration basis, and if the data collection tasks associated with this evaluation were eliminated, the labor required to coordinate telemedical activities would diminish. Whether existing BOP staff could absorb these activities without additional hiring was not determined. However, even if part-time telemedicine coordinators were retained at the same hourly rate that prevailed during the demonstration, the

---

[3] At equipment costs current in August 1998, telemedicine encounters would cost an average of $64 each, bringing the savings to $109 per encounter. Total capital cost (equipment, installation, and training) would be recovered in 16 months.

per-encounter cost of telemedicine would be competitive with the cost of a conventional in-prison consultation. A half-time coordinator would cost about $43 per encounter (at the rate of 100 telemedicine encounters per month). Deducting this cost from the net savings associated with telemedicine—approximately $102—still makes telemedicine less costly than conventional practice. The full cost of the coordinator could be absorbed without increasing the net cost of medical care over that now provided by the Bureau.[4]

## Implications of These Findings for Expanding Telemedicine to Other Prisons

Prisons in this hypothetical telemedicine system would operate at substantial savings (about $102 per encounter), because they would otherwise charter aircraft to transfer prisoners to Federal Medical Centers for psychiatric care and consultation and take prisoners to specialists outside the institutions. The research team did not examine how many other Federal prisons follow these practices in the quantities observed here. The team's analysis of transfer patterns at other U.S. penitentiaries, however, shows that some—Leavenworth and Lompoc, for example—experience high transfer rates of psychiatric patients. Telemedicine systems in these prisons might be especially cost effective, assuming that they were configured similarly to the hypothetical system described earlier.

Where air charter transfers and external consultations are rare, the telemedicine system

envisioned here would still be competitive with conventional practice. Even if no air transfers or external consultations were averted, the estimated $71 average cost per telemedical consultation still compares favorably to the average cost of a conventional in-prison specialist consultation ($108). Unit costs of telemedicine (excluding savings from external consultations and air transfers to FMCs) would not reach the level of conventional care until utilization fell to fewer than 50 patients per month.

Although the team expected to find that telemedicine's benefits were highly dependent on the nature of the local market for consulting specialists, these benefits may be less sensitive to market conditions than anticipated. Analysis of contracts with specialist providers in a number of different Federal prisons indicates that the variation in compensation rates is quite narrow. In some regions, however, the availability of specialists at any price is limited. Telemedicine offers these prisons the ability to access such needed specialists. In addition, local market conditions may change in the future. Telemedicine offers access to specialists at government wages—through arrangements with VA facilities, for example, which may be more stable than those in the open market.

State and local correctional authorities rarely transport inmates great distances for medical care. Thus the largest single-cost saving in this analysis—the averted transfers to FMCs—would have no counterpart in many jurisdictions. To determine whether these results could be applied to State and local correctional institutions, researchers would first have to determine whether other structural savings

---

[4] This assumes that the rate of averting external consultations and air transportations to FMCs continues at the same levels as observed during the demonstration.

that would take the place of unique BOP practices could be identified. In the absence of such savings, the decision to implement telemedicine would turn on a comparison of unit costs of conventional care with unit costs of telemedical encounters. For this purpose, the costs reported here probably closely approximate the costs that another jurisdiction would face. Telemedicine, therefore, may save taxpayer dollars in systems hoping to reduce medical costs by averting prisoners' visits to local communities. However, the greatest savings would occur in correctional systems using air charters for individual medical trips over long distances.

# *Chapter 4:*

## *Other Benefits of Telemedicine*



A variety of suggested nonmonetary impacts of prison telemedicine were investigated during this evaluation. These include:

- Fewer security risks for transfers and external consultations.

- Shorter waiting times (or reduced delays) to see specialists.

- Access to better quality specialists and to specialty care not previously available.

- Fewer acts of inmate aggression, or use of force by guards, due to improved mental health services.

- Fewer grievances about health care or mental health care.

## Shorter Waiting Times

In the absence of telemedical capacity, inmates who need to see specialists typically experience delays because specialists enter the prisons on a scheduled, periodic basis rather than as needed. (This is not the case with the most acutely ill patients, who are taken to local providers or are transferred to FMCs on short notice.) By adding telemedicine to the local supply of visiting specialists, more physicians become available, and waiting times can be shortened, absent any countervailing increases in demand.

In this demonstration, the impact of telemedicine on waiting time could not be observed directly because prison staff did not maintain lists of waiting patients. An electronic record was created in the electronic SENTRY file for each waiting inmate, but when inmates saw the specialist, the record was overwritten with information about the visit. Both referral date and visit date are needed to calculate waiting times; the only surviving record of referral date was an inmate's paper medical record.

To measure waiting times, several hundred initial encounters between an inmate and a specialist were identified during the year preceding the demonstration and the demonstration period. Paper medical records of these inmates were searched for dates of referral to specialists. Most records were unavailable because many inmates had moved out of the system or to another prison by the time of data collection, and their paper records went with them or had been archived. Inmates needing extensive medical or mental health care were transferred to FMCs, for example, and these were among the records no longer available for the waiting-time analysis. Thus the team was not able to observe waiting times for the patients of most clinical concern. Ultimately, researchers were able to calculate waiting time for a total of 150 initial encounters during the year preceding the demonstration period and 165 initial encounters during the first half of the demonstration period. The inability to find records for transferred or released inmates may have biased the comparison, although the direction and extent of that bias is difficult to discern.

Across all specialties examined, the average waiting time to see a specialist was 99 days prior to telemedicine and 23 days after telemedicine was introduced, for those encounters the team was able to measure (see table 4.1). The greatest declines were in orthopedics and dermatology.

It is safe to attribute this improvement to telemedicine. The telemedicine demonstration was implemented frequently with clinics in several specialties, at reduced cost to the prisons. Increasing the frequency with which

| Specialty (All Prisons) | Before: Internal Consultations | Before: Average Waiting Time (Days) | Demonstration: Internal & Telemedicine Consultations | Demonstration: Average Waiting Time (Days) |
|---|---|---|---|---|
| Orthopedics | 85 | 116 | 27 | 45 |
| Psychiatry | 39 | 17 | 98 | 10 |
| Dermatology | 25 | 166 | 40 | 44 |
| All Specialties | 149 | 99* | 165 | 234* |

* Weighted average.

specialists are available would naturally decrease waiting times. This effect could also have been achieved by increasing the frequency of local specialists' visits without relying upon telemedicine technology. There was no "supply constraint" on increasing use of local doctors, as the health services administrators at the three prisons agreed that their local visiting specialists would probably have been willing to come into the prisons more often. However, the prisons had to pay for the full cost of these visits by local specialists, but only for part of the telemedicine consultations. This no doubt created a special incentive to rely on remote sessions instead, and to do so frequently.

## Quality of Specialists

In addition to more frequent specialist sessions and shorter waiting times, telemedicine offered prisons the opportunity to select physicians who would not otherwise be available. This feature could bring new and/or better quality care to the inmates.

All three health services administrators at the Pennsylvania prisons agreed that the quality of psychiatric care was much improved with telemedicine. As a result, they either discontinued, or said that they intend to discontinue, contracts with local psychiatrists. The remote

psychiatrists reportedly offered several advantages:

- They were bilingual, a clear advantage when consulting with Spanish-speaking inmates.

- They were available by telephone as needed to revise medication orders.

- They were available via telemedicine on a weekly basis, and more often if needed.

- They reportedly had better medication management skills than did local psychiatrists under contract with the prisons.

## Access to New Specialists

Some new clinicians not previously available to the prisons began to provide care via telemedicine. For example, HIV-positive inmates were previously cared for by prison staff physicians who did not have specialized training in infectious diseases. Because the standard of care in the community is to have specialists caring for HIV-positive patients, this pattern of care by general practitioners was not optimal. Through telemedicine, an infectious disease specialist became available and patients were able to receive the best care

available "anywhere in the Bureau," in the opinion of at least one prison health services administrator.

In addition to the infectious disease specialist, dietary counseling was provided much more frequently than in the past. The three Pennsylvania prisons rarely made use of dieticians for counseling of hypertensive and diabetic patients. Because a dietician already on BOP's staff was available via telemedicine at FMC-Lexington, the prisons made use of her skills and believed that their chronic care patients were getting better care as a result.

## Acts of Violence and Use of Force

Some observers have hypothesized that the prisons were calmer, with fewer incidents of violence, because of the improved psychiatric care available through telemedicine. To test this hypothesis, the Bureau's research division provided the research team with counts of incidents or acts of aggression (assaults) by inmates against either inmates or correctional officers—for the year preceding the demonstration and for the demonstration period—for each of the three Pennsylvania prisons.[1] Incident rates were compared using the monthly prison census as the denominator to account for differences in the size of the populations at each prison.

Major disturbances occurred in the prisons during a few months in the year preceding the demonstration and in the demonstration period. After removing the effect of these unusual months, a pattern emerges. At the two Allenwood facilities, but not at USP-Lewisburg, there were significantly fewer acts of aggression per inmate-month during the demonstration period than in the preceding year.[2] The decline began before the demonstration was implemented but continued during the demonstration period.

Similarly, researchers obtained counts of incidents in which correctional officers used force to subdue an inmate or defuse a situation. These two measures—assaults and use of force—may at times be counting the same incident in two ways (once from the perspective of the guard and again from the perspective of the inmate), while at other times they indicate different events. At USP-Allenwood and FCI-Allenwood, use of force began declining well before the demonstration began—6 months before at FCI-Allenwood—and the new lower level continued throughout the demonstration. A new warden began service at FCI-Allenwood several months before the demonstration began, and her new practices regarding use of force may have contributed to the decline that was observed at that prison. In contrast, use of force increased slightly at USP-Lewisburg.

The research team concludes, with a 20-percent chance of measurement error, that fewer assaults occurred at the two Allenwood prisons after the demonstration began than in the prior year. It is possible that this decline was related to improved psychiatric care at the prisons, but it may also have been due to a combination of other factors that the team did not attempt to identify. Researchers also

---

[1] There were few homicides or suicides in any of the prisons—too few upon which to base any conclusion.

[2] Rather than the usual precision level of 0.05 or 0.10 (that is, a 5- to 10-percent chance that a finding happened due to chance alone), the research team chose a 0.20 precision level for this analysis. With small numbers of very important events, the team believes it is appropriate to accept more risk of measurement error to be able to observe a change over time.

CDCR _140

conclude that although use of force by guards declined at the Allenwood prisons, the decline preceded telemedicine by several months and was probably unrelated. Because neither pattern was observed at USP-Lewisburg, the team is unable to draw any consistent conclusion about the value of telemedicine or telepsychiatry in improving the social climate of the demonstration prisons.

## Grievances

Inmates can file grievances about many different aspects of prison services and can file them at the institutional, regional, or national levels. Grievances could therefore be considered a measure of patient satisfaction. Data were obtained from BOP on all new grievances filed each month during the year preceding the demonstration and during the demonstration period, and grievances about medical and mental health care were analyzed. Researchers were interested in testing two competing hypotheses: that patient satisfaction improved with telemedicine, leading to fewer grievances; or that patient satisfaction deteriorated with telemedicine, leading to more grievances.

The data indicate that although inmates complained about many aspects of prison life, they did not file many grievances about their medical or mental health services. No statistically significant difference was found in the rate of grievances filed during the demonstration and during the preceding 12 months.

## Summary

Low-cost telemedicine sessions offered frequently reduced waiting times for all specialties analyzed. It is possible that the same reduction in waiting time could have been achieved with local in-person physicians, but the individual prisons had little incentive to do so.

At least one important new specialty is now available to inmates via telemedicine to which they would otherwise not have access: infectious disease expertise for care of HIV-positive inmates.

Aggressive acts by inmates seem to have declined at two demonstration prisons coincident with the introduction of telemedicine, but not at the third. Use of force by officers began to decline at the same two prisons well before telemedicine began but did not decline at the third. It cannot be concluded, therefore, that there was a consistent "calming" effect due to improved psychiatric care via telemedicine.

There were no significant changes in the number of grievances filed about medical or mental health care.

# Appendix A:

## Measures and Data



This section of the report describes the key measures used and the sources of data. The array of conventional health care services used by the prisons and the new services offered via telemedicine are defined and described.

## Internal Specialist Encounters

Specialist physicians, generally working under contract to the Bureau of Prisons, periodically come into prisons to provide care to inmates. For this report, such contacts between a specialist and a patient are termed "internal specialist encounters"; the session during which a group of patients is seen by a specialist inside the prison is termed a "clinic."

Service utilization is characterized not by type of diagnosis but rather by the specialty of the consulting specialist. This is done for several reasons: The Bureau's automated medical data system—the Sensitive Medical Data (SMD)—is not reliable at the diagnosis level; there were insufficient numbers of encounters in any diagnosis category to support analyses at this level; and the costs for internal specialty clinics vary by specialist rather than by the type of case he or she treats.

The Bureau's SENTRY data system collects information on many events in an inmate's incarceration, including health care events. Every visit to a health professional, whether a Bureau employee, a consulting specialist, or a community hospital, is recorded. These paper records are then entered into a computerized database, which forms the SMD system. Although prisons do not enter data in exactly the same way, the contents of each SMD record generally include the following information:

- The date and time of the medical encounter.

- The type of clinician seen (physician, physician assistant, nurse practitioner, visiting specialist, external specialist).

- An International Classification of Diseases, 9th Revision (ICD–9) code classifying the medical condition involved.

Identifying the consulting physician's specialty required some data analysis and inference because this information is not recorded in the SMD. By grouping ICD–9 codes, it is possible to infer the specialty of a consulting physician. Generally, if more than one ICD–9 code is indicated on the form, prison staff create separate records for each ICD–9 code rather than entering multiple ICD–9 codes in one record. For internal specialist encounters, the visiting specialist always sees more than one patient in a clinic. By grouping records chronologically and then by inmate identification number, the type of specialist consulting and the number of encounters (that is, the number of individual inmates seen) can be inferred. Medical records occasionally are needed for definitive inferences about the specialty of a visiting physician.

This report focuses on four specialties: psychiatry, orthopedics, dermatology, and cardiology. These specialties were selected for the following reasons:

- They can be identified in the SMD—some clinical sessions (for example, dietary counseling) were not recorded prior to the telemedicine demonstration, and others (for example, podiatry) cannot be extracted from SMD as a defined specialty.

- Each of the four specialties is being provided under contract with a visiting

specialist by one or more of the demonstration prisons.

■ These four specialties are being offered using telemedicine, which might be expected to alter the patterns of internal encounters in these specialties.

Clinical staff employed at each prison also provide care, which can generally be categorized as primary care (although some facilities employ psychiatrists). Care provided by BOP employee clinicians was not analyzed for several reasons. First, SMD data are unreliable for clinician type; encounters with physician assistants cannot reliably be distinguished from encounters with physicians. Second, physician assistants run regular group sessions with inmates with chronic care problems—for example, hypertension counseling with cardiac patients. These appear in the SMD as individual encounters and not as the group sessions they really are; therefore, individual encounters between employee clinicians and patients cannot reliably be counted. Finally, these visits with staff clinicians are for primary care and occasionally result in referrals to specialists, including remote specialists. The primary care encounters are a prelude to specialist care, not a substitute for it. (Primary care is not being offered telemedically.) For all of these reasons, the analysis omits analysis of care provided by Bureau-employed clinicians.

## Internal Specialist Encounters: Costs

Data source: Specialist contracts and bills.

**Physician fees.** Each prison contracts with specialists who come into the prison to see inmates; the specialties vary among prisons but include psychiatry, orthopedics, dermatology, and cardiology. Care that requires a specialist physician not employed by the Bureau at that prison and that can be provided inside the prison is nearly always handled by these visiting specialists. Contracts are generally negotiated on a per-clinic basis, with broad guidelines about the duration of each clinic (for example, 2–4 hours per clinic). That is, the specialist is paid a flat fee for each prison visit. The negotiated fees charged by specialists at the studied prisons were obtained. For purposes of determining the physician-fee portion of each patient's care, the flat, per-clinic rate a specialist has negotiated divided by the number of patients seen during each clinic was used.

**Other.** Other costs associated with internal specialist encounters are not as readily measured. These include pulling medical records and refiling them afterward and the costs of a physician assistant who accompanies the specialist during all encounters and follows through on all physician orders. The largest component of these costs is the physician assistant's time. Physician assistant and administrative costs did not change between baseline and intervention periods and have essentially equivalent counterpart costs for telemedicine clinics when a physician assistant presents each case to the remote specialist.

## External Specialist Encounters Averted

Data source: Telemedicine encounter forms.

Site coordinators collected data during each telemedicine encounter. One item asked what would have happened in the absence of telemedicine. This information was supplied by the physician assistant presenting the case and verified later by the health services

administrator or assistant administrator. In some cases, patients would have been sent to a local specialist in the community. In these cases, telemedicine was substituting one-for-one for an external encounter and was counted as an averted external consultation.

## Averted External Specialist Encounters: Costs

Data sources: Invoices and other financial records at each prison and administrative cost analysis conducted by Ronald Waldron and Al Turner.

The cost of external encounters was computed as the estimated cost of the specialist medical care, security, and other administrative costs incurred when an inmate goes outside the prison to a local health care provider. Assembling these costs required a set of cases to examine. External encounters in the year preceding the demonstration that might have been appropriate for telemedicine were identified. For each of these, several cost elements were collected.

**Security/escort.** At the Allenwood prisons, guards accompanying inmates on trips to local physicians are always paid time-and-a-half overtime; these overtime charges were obtained from the finance office of each prison for all external encounters of interest. At Lewisburg, staff are assigned to escort duty as regular employees (that is, no overtime); the average number of hours per trip and the number and Government Service levels of guards (average salary and benefits) were calculated to estimate security escort costs. A physician assistant always accompanies the inmate on external specialist encounters, and the cost of this individual (average hourly salary and benefits) was included.

**Medical care.** These data are taken directly from invoices and payments for each external specialist encounter.

**Other.** Mr. Waldron and Mr. Turner conducted a cost analysis at USP-Florence, Colorado, to calculate the time involved in processing an external specialist encounter, reviewing security needs, approvals, etc. The time and cost they calculated per external encounter are applied here to all such encounters, at all prisons.

With these data, an average cost of external encounters was estimated and applied to the number of directly avoided external encounters, to estimate total savings associated with such averted consultations.

## Psychiatric Transfers Averted

Data source: SENTRY Admissions and Release Status (ARS) data.

When an inmate requires extensive care and cannot be maintained in the general population of the prison, he or she is usually transferred to one of several Federal Medical Centers. Inmates travel to the FMC by bus or air via the U.S. Marshals Service or by chartered aircraft. The latter is the method most commonly used for transfers of maximum-security inmates with psychiatric problems.

Every time an inmate's designation is changed (that is, when he or she moves from one location to another), prison staff create an entry in the ARS portion of SENTRY. Some movements occur from one unit to another within a prison; others occur from one facility to another. For this demonstration, it became apparent almost immediately that transfers of

psychiatric patients to FMCs were declining, as telemedicine improved the psychiatric care being provided in the prisons. Psychiatric transfers were therefore the focus of this analysis.

Bureau programmers supplied the research team with a file listing all inmates who had spent any time at demonstration or comparison prisons during the year preceding the demonstration and during the demonstration itself, and their ARS records for these periods. From these a chronology of events was created for each inmate, and transfers of inmates from a prison to an FMC were identified. ARS coding allowed identification of those transfers to FMCs for psychiatric care. The ARS coding also permitted distinction among transport modes.

## Psychiatric Transfers Averted: Costs

Data source: Airbills and escort costs from prison financial records.

There are several cost elements for transfers to FMCs.

**Air charter.** At the demonstration prisons, air charter bills and security escort costs were collected for each psychiatric transfer to an FMC. Each flight was round-trip because the plane and crew needed to return. If two inmates were being transferred on the same flight for psychiatric care, the cost was distributed evenly between the two cases; thus a flight with two inmates had half the cost per inmate as a flight with one inmate. Some inmates remain at the FMC for a long time and others return to their initial prison or are relocated to another facility. These returns or relocations happen in a variety of less costly ways (commonly by bus) and are not included in the costs of transfers.

**Security/escort.** Each flight, in addition to the aircrew, includes an array of guards and a physician assistant. Actual costs for all of these participants were included where records existed; for transfers lacking data, an average based on the existing data was used.

**Other.** Finally, because a transfer also involves considerable review and approval by prison officials, these costs for transfers were included, as were costs for external encounters (see above), in the calculation of unit costs.

## Telemedicine Encounters

Data source: Encounter data collected by telemedicine site coordinators.

As stated previously, telemedicine site coordinators collected and entered a variety of information for each telemedicine encounter. These data included the following information:

- Date and time of each patient's telemedicine encounter, including time begun and time concluded.

- Specialty of the consulting physician.

- Likely action if the telemedicine encounter had not occurred (that is, the health service administrator's judgment about what alternative care would have been provided).

- Subsequent care required (namely, the specialist's orders for patient care).

Monthly downloads of electronic encounter forms provided these data.

## Telemedicine Encounters: Costs

Unit costs of telemedicine encounters contain many elements.

**Physician reimbursement.** The Department of Veterans Affairs negotiated an hourly reimbursement rate for specialists providing care telemedically. The rate reflected the *actual* cost to the VA of a physician's salary plus expenses. The duration of each encounter in minutes was multiplied by the per-minute cost of the relevant specialist. For telepsychiatry encounters, where Bureau-employed psychiatrists at FMC-Lexington were providing care, psychiatrists' salaries, fringe benefits, and bonus payments were calculated at the hourly and per-minute level.

**Equipment, personnel, and telecommunications costs.** Tracor Systems Technologies, Inc., supplied costs of equipment leases, personnel (for example, site coordinators), and communications. These costs included hub and remote costs because both were necessary for each telemedicine encounter. These costs were calculated for each site at the hourly and per-minute level and multiplied by the duration of each telemedicine encounter.

**Security/escort.** Inmates from FCI-Allenwood were transported to USP-Allenwood for telemedicine sessions. This involved the same security and approval process as an external specialist encounter, although the escort array was minimized because the necessary guards on the transport bus were moving a number of inmates at the same time.

**Other.** A physician assistant accompanied each patient during an encounter, as was done for internal specialist encounters, and performed other tasks such as pulling and refiling medical records.

## Waiting Time

Data sources: SMD, paper records, and telemedicine data.

Waiting time was calculated as the interval between the date of a referral to a specialist and the date the patient-specialist encounter actually occurred. For the period preceding the demonstration, SMD data were used to identify the first encounter between an inmate and a given type of specialist (for example, an orthopedist). Because data extended 6 months prior to this baseline period, the first encounter could be determined with some precision. SMD does not contain a field for referral date, but the consult referral form in an inmate's medical record has a space for the referral date. This was the source used to identify referral dates for the predemonstration period, from which the interval between referral and first encounter was calculated.

Only waiting times for the *first* encounter between an inmate and a specialist were computed because specialists often order followup visits on specific dates—for example, to return for followup in 3 weeks. The research team did not have access to all of these orders to see if they were followed, but it would be incorrect to label that 3-week wait as a delay, for it may be the proper interval between encounters. By focusing instead on the time to the *first* encounter, a more accurate representation of the accessibility of specialist services is obtained. Intervals between referral and

*external* encounters were not computed because there were very few telemedicine-substitutable external encounters to consider, and many of those medical records were no longer available.

Inmates relocate often within BOP prisons, and their medical records travel with them. By the time the research team arrived to look through medical records, a year had passed since the start of the predemonstration period and many medical records were no longer available. For those records that could be found, the referral date was entered on some but not all forms. There were very few observations for many specialties at each prison. Only a few specialties at each prison had sufficient data for the predemonstration period to warrant a comparison with the demonstration period. The data presented are for those specialties for which calculated waiting time was based on more than a handful of cases. During the demonstration period, some internal encounters continued; their referral dates were collected and waiting times calculated in this same manner.

For telemedicine encounters, researchers initially planned to use the same approach: relying on medical records as the source for referral dates. When the research team realized how problematic this strategy was proving to be for the internal encounter referral dates, the telemedicine site coordinators began collecting referral dates on the telemedicine encounter forms. This referral date was used to calculate waiting time for the first encounter between a remote specialist and an inmate.

# Incidents and Grievances

BOP data were obtained on the following:

- Monthly counts, by prison, of incidents in which inmates assaulted other inmates or corrections officers and whether a weapon was used.

- Monthly counts, by prison, of uses of force by corrections officers.

- Monthly counts, by prison, of homicides and suicides.

- Monthly counts, by prison, of grievances filed complaining about medical or mental health care.

- The monthly census for each prison.

All of these measures were obtained for both the predemonstration and demonstration periods. Rates were created using facility census figures, and differences in rates between the predemonstration and the demonstration periods were tested.

# Descriptive Information

To assist in the interpretation of the data obtained, prison staff were interviewed to discuss the following matters:

- Context of conventional health services delivery at each prison, in the predemonstration and demonstration periods.

- Inadequate or inefficient practices in the predemonstration period that were potentially amenable to improvement via telemedicine.

- Barriers to effective use of the telemedicine network, as configured for this demonstration.

- Clinical feasibility for various specialties.

- Other constraints that affected the cost-effectiveness of the demonstration.

# Appendix B:

## Cost Estimation
## Model



A simulation model was developed to estimate the costs of telemedicine and conventional care under various scenarios, both observed and hypothetical, and to distinguish the effects of changes in utilization patterns from different equipment and operations costs of telemedicine. That is, the model accurately reproduces the observed monthly operating costs of the telemedicine demonstration. In addition, by changing model assumptions, it shows how costs would vary with different telemedical equipment and personnel, different prices for resources, and different numbers of patients seen by telemedicine.

Costs per patient are estimated separately for telemedicine and conventional care. The relative costs of telemedicine and conventional care are assessed by comparing one model estimate of the cost per patient encounter of conventional care absent telemedicine with another estimate for per-encounter costs of telemedicine. Finally, a third model estimate of per-encounter telemedicine costs might be obtained if telemedicine were implemented in the same three Pennsylvania prisons on a permanent, rather than experimental, basis. The general model is expressed by equation B.1.

The equations exclude several costs of medical care that are the same in the two systems. Only care that differs between telemedicine and conventional care is modeled. The equation does not explicitly mention a time period because it is valid for any consistently defined accounting period. The costs discussed in this report are allocated monthly, unless otherwise stated.

Each term in this equation is explained in the sections that follow.

## Capital Costs

Capital costs are counted only for telemedicine because the other capital investments required for conventional consultations remain unchanged after the introduction of telemedicine. The equation for capital costs converts fixed investments into monthly values by depreciation. (See equation B.2.)

This substantially exceeds the cost anticipated for any larger scale use of telemedicine. Of the available alternative values for this cost, researchers chose the lowest—that proposed by the vendor for renewal of the lease after the initial commitment period has expired—because it most nearly represents the long-term cost of a large-scale implementation of telemedicine in many prisons.

These elements reflect costs that telemedicine imposes on the system even before the first patient sees a specialist. The largest of these fixed costs is the monthly lease for the telemedicine equipment itself. Telemedicine equipment for the demonstration was leased but could have been purchased. The model is used to estimate costs for equipment lease and then separately for equipment purchase, to test the impact of these different strategies for securing costly equipment. During the 15

| **Equation B.1** | | | | | |
|---|---|---|---|---|---|
| cost per patient | amorti ed capital costs | operating costs | cost of transfers to Cs | cost of e ternal consultations | cost of internal consultations |
| | patients | | | | |

**Equation B.2**

amorti ed capital costs    installation depreciated over 20 years    e uipment depreciated over 10 years    or    e uipment leases    fi tures depreciated over 10 years    training depreciated over 5 years

months of the demonstration period, $356,047 was paid to lease the equipment used for the demonstration.

Had this not been an experimental demonstration of telemedicine, the equipment could have been purchased for approximately $73,000 per site. When the model is used to simulate telemedicine with purchased equipment, the initial investment is translated into a monthly cost by straight-line depreciation over a 10-year useful life.[1]

## Fixed Operating Costs of Telemedicine

Fixed operating costs include those incurred by the site regardless of the volume of medical care delivered, as distinct from those that increase directly with each encounter. Fixed operating costs are expressed by equation B.3.

These operating costs are counted only for telemedicine, not for conventional care, because they remain unchanged by the introduction of telemedicine. Data on these costs were supplied directly by Tracor Systems Technologies, Inc., which also supplied

assumptions about how the costs might change in actual use as opposed to this experimental demonstration.

## Transfers to Federal Medical Centers

When prisoners are transferred to Federal Medical Centers for psychiatric care, the costs of transportation and security for the transfer are included. The incremental cost of housing prisoners at the relatively more expensive medical center, rather than in ordinary prisons, is measured but not included. These transfers occurred under both telemedicine and conventional care, although there were fewer under telemedicine. The total costs of all transfers of psychiatric patients are therefore counted in equations for both conventional and telemedicine consultations. (See equation B.4.)

In the basic model, the per diem costs at Federal Medical Centers are assumed to be zero. That is, no additional housing costs at FMCs, as opposed to U.S. penitentiaries, are included.

**Equation B.3**

operating costs    site operating costs    voice telephone    personnel costs

---

[1] In this and other accounting assumptions, the standards of OMB circular A–76 were followed.



**Equation B.4**

$$\text{cost of transfers to } C_s \qquad \text{number of patients transferred} \quad * \quad \left( \text{cost of transfer} \qquad \text{difference in per diem costs} \quad * \quad \text{length of stay in } C \right)$$

## External Consultations

Trips to local hospitals are treated similarly, except for reliance on reports from the prisons that identified telemedicine patients who would otherwise have been sent to a hospital. In the conventional care cost equation, patients who visit specialists in the local community are charged the full cost of an external consultation. Because it is assumed that all of these external consultations are averted by telemedicine, each external consultation in the telemedicine equation is replaced by the estimated telemedicine cost for the appropriate specialty. (See equation B.5.)

## Cost of Direct Internal and Telemedical Consultations

The capital and operating costs associated with both conventional and telemedicine consultations must be paid regardless of the number of specialist encounters once telemedicine is introduced. The costs of in-prison or telemedical specialist consultations, however, are paid only when a patient sees a specialist directly or remotely. Both telemedicine and conventional medicine must pay specialists.

Telemedicine specialists are paid by the hour, and specialist costs for telemedicine are calculated on the basis of average length of telemedicine sessions. Conventional, in-prison specialists are paid each time they enter the prison, regardless of how many patients they see. With data on the number of patients seen by each specialist each time they come to the prison, an average physician cost per conventional care patient encounter was calculated.

Telemedicine incurs additional costs for the telecommunications line, which again varies by the length of each call; these costs are accounted for by the hour. Also included are small costs for the physician assistants who present the case to the remote specialist and for correctional officers who escort patients from FCI-Allenwood to USP-Allenwood for teleconsultations.

The costs that accrue to each conventional internal or telemedical consultation between a specialist and an inmate are represented in equation B.6.

The last two terms in this equation are zero for conventional care because communication and extra personnel costs exist only for telemedicine consultations.



**Equation B.5**

$$\text{cost of e ternal consultations} \qquad \text{number of e ternal consultations} \quad * \quad \left( \text{cost of transfer} \qquad \text{cost of medical care} \right)$$

**Equation B.6**

| cost of internal or telemedical consultations | number of patients | * | ( | specialist costs | telemedicine communications costs | telemedicine personnel costs | ) |

# *Appendix C:*

## *Data Tables*



**Table C.1** Number of Telemedicine Encounters per Month, by Specialty and Facility*

| Specialty | Facility | Number of Patients | | | | | | | | | | | | | | | | Total | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1996 | | | | 1997 | | | | | | | | | | | | | |
| | | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | | |
| **Podiatry** | Lexington | | | | | | | 4 | | 6 | | 7 | 11 | 15 | 9 | 10 | | 62 | |
| | *Specialty Subtotal* | | | | | | | *4* | | *6* | | *7* | *11* | *15* | *9* | *10* | | *62* | 4.69 |
| **Orthopedics** | FCI-Allenwood | | | | | 3 | | | 4 | | | | 7 | | | | | 14 | |
| | USP-Allenwood | | 4 | 10 | 6 | | 2 | | | | 9 | 4 | 11 | | | | 4 | 50 | |
| | Lewisburg | | | 4 | | | 6 | 3 | 4 | 4 | 2 | 3 | 2 | 6 | | 3 | 6 | 43 | |
| | Lexington | | | | 3 | | 2 | 5 | 5 | 3 | 4 | 5 | | | | 4 | 3 | 34 | |
| | *Specialty Subtotal* | | *4* | *14* | *9* | *3* | *10* | *8* | *13* | *7* | *15* | *12* | *20* | *6* | | *7* | *13* | *141* | 10.67 |
| **Dermatology** | FCI-Allenwood | 2 | 1 | 1 | 1 | 5 | 3 | | | | | 6 | | | 2 | | | 21 | |
| | USP-Allenwood | | 4 | 4 | 4 | 3 | 3 | | 2 | 4 | 3 | 5 | 4 | 3 | 2 | 4 | 5 | 50 | |
| | Lewisburg | | | | | | | 4 | 4 | 5 | 9 | 16 | 14 | 3 | 7 | 9 | 16 | 87 | |
| | Lexington | | | | | | | | | 5 | | | 4 | 4 | | 5 | | 18 | |
| | *Specialty Subtotal* | *2* | *5* | *5* | *5* | *8* | *6* | *4* | *6* | *14* | *12* | *27* | *22* | *10* | *11* | *18* | *21* | *176* | 13.32 |
| **Infectious Diseases** | FCI-Allenwood | | | | | | | 4 | 4 | | | | | | | | | 8 | |
| | USP-Allenwood | | | | | | | 1 | | 2 | | | 4 | | | 3 | 2 | 12 | |
| | *Specialty Subtotal* | | | | | | | *5* | *4* | *2* | | | *4* | | | *3* | *2* | *20* | 1.51 |
| **Pulmonology** | FCI-Allenwood | | | | | | | | 3 | | | | | | | | | 3 | |
| | USP-Allenwood | | | | | | | | | 1 | | | | | | | | 1 | |
| | Lexington | | | | | | | | | | 3 | | | | 3 | 2 | | 8 | |
| | *Specialty Subtotal* | | | | | | | | *3* | *1* | *3* | | | | *3* | *2* | | *12* | 0.91 |
| **Cardiology** | USP-Allenwood | | | | | | | | | 1 | | 1 | 1 | 1 | | | 1 | 5 | |
| | Lewisburg | | | | | | | | | | | 1 | | | | 3 | 3 | 8 | |
| | Lexington | | | | | | | | | | | 2 | | | | | 3 | 5 | |
| | *Specialty Subtotal* | | | | | | | | | *1* | | *4* | *1* | *1* | | *3* | *4* | *18* | 1.36 |

CDCR _156

**Table C.1  Number of Telemedicine Encounters per Month, by Specialty and Facility\* Continued**

| Specialty | Facility | 1996 | | | | 1997 | | | | | | | | | | | | Total | Percent |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | | |
| Gastroenterology | USP-Allenwood | | | | | | | | | | | | | | | 1 | | 1 | |
| | Lewisburg | | | | | | | | | 1 | | 5 | | | | 1 | | 7 | |
| | Lexington | | | | | | | | | | | | | | | | 1 | 1 | |
| | *Specialty Subtotal* | | | | | | | | | *1* | | *5* | | | | *2* | *1* | *9* | 0.68 |
| Ear, Nose, & Throat | Lewisburg | | | | | | | | 1 | | | 2 | 4 | | 3 | 3 | 3 | 16 | |
| | *Specialty Subtotal* | | | | | | | | *1* | | | *2* | *4* | | *3* | *3* | *3* | *16* | 1.21 |
| Neurology | Lewisburg | | | | | | | | | 1 | | | | 3 | 1 | 3 | 3 | 11 | |
| | *Specialty Subtotal* | | | | | | | | | *1* | | | | *3* | *1* | *3* | *3* | *11* | 0.83 |
| Psychiatry | FCI-Allenwood | 8 | 10 | 17 | 9 | 12 | 15 | 18 | 17 | 15 | 6 | 20 | 13 | 17 | 32 | 8 | 17 | 234 | |
| | USP-Allenwood | 11 | 21 | 16 | 9 | 22 | 16 | 20 | 27 | 11 | 15 | 7 | 19 | 24 | 17 | 16 | 27 | 278 | |
| | Lewisburg | | | | | 5 | 20 | 13 | 31 | 22 | 29 | 26 | 24 | 23 | 23 | 21 | 23 | 260 | |
| | *Specialty Subtotal* | *19* | *31* | *33* | *18* | *39* | *51* | *51* | *75* | *48* | *50* | *53* | *56* | *64* | *72* | *45* | *67* | *772* | 58.44 |
| Dietary | FCI-Allenwood | | | | | | | | | | 1 | | | | | | | 1 | |
| | USP-Allenwood | | | | | | | 6 | | 7 | | | 5 | 4 | 4 | 4 | | 30 | |
| | Lewisburg | | | | | | | 11 | 10 | 8 | 9 | 5 | 7 | | | | 3 | 53 | |
| | *Specialty Subtotal* | | | | | | | *17* | *10* | *15* | *10* | *5* | *12* | *4* | *4* | *4* | *3* | *84* | 6.36 |
| | Monthly Totals | 21 | 40 | 52 | 32 | 50 | 67 | 89 | 116 | 96 | 90 | 115 | 122 | 111 | 103 | 100 | 117 | 1,321 | |

Source  Tracor Systems Technologies, Inc.

\*The facilities not listed under a particular specialty received no telemedicine services for that specialty during the demonstration period.

**Table C.2**  Number of Conventional, In Prison Specialist encounters per month in Three Pennsylvania Prisons During the Predemonstration Period Principal Specialties Only *

| Specialty | Facility | 1995 | | | 1996 | | | | | | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | |
| **All Specialties** | FCI-Allenwood | 8 | 10 | 17 | 17 | 8 | 17 | 6 | 19 | 17 | 17 | 13 | 149 |
| | USP-Allenwood | | | 8 | 1 | | 5 | 3 | 4 | 39 | 19 | 30 | 109 |
| | Lewisburg | 30 | 18 | 23 | 69 | 65 | 87 | 73 | 69 | 20 | 51 | 37 | 542 |
| | *Specialty Subtotal* | *38* | *28* | *48* | *87* | *73* | *109* | *82* | *92* | *76* | *87* | *80* | *800* |
| **Cardiology** | USP-Allenwood | | | | 1 | | | 3 | 4 | | | | 8 |
| | *Specialty Subtotal* | | | | *1* | | | *3* | *4* | | | | *8* |
| **Psychiatry** | FCI-Allenwood | 8 | 10 | 9 | 7 | 8 | 17 | 6 | 12 | 17 | 17 | 6 | 117 |
| | USP-Allenwood | | | 8 | | | | | | 26 | 16 | 19 | 69 |
| | Lewisburg | 30 | 4 | 10 | 42 | 48 | 51 | 46 | 23 | 3 | 11 | | 268 |
| | *Specialty Subtotal* | *38* | *14* | *27* | *49* | *56* | *68* | *52* | *35* | *46* | *44* | *25* | *454* |
| **Orthopedics** | FCI-Allenwood | | | | 10 | | 5 | | 7 | | 3 | 7 | 32 |
| | USP-Allenwood | | | 8 | | | | | | 13 | | 11 | 32 |
| | Lewisburg | | 14 | 13 | 27 | 12 | 24 | 16 | 26 | 17 | 27 | 33 | 209 |
| | *Specialty Subtotal* | | *14* | *21* | *37* | *12* | *29* | *16* | *33* | *30* | *30* | *51* | *273* |
| **Dermatology** | Lewisburg | | | | | 5 | 12 | 11 | 20 | | 13 | 4 | 65 |
| | *Specialty Subtotal* | | | | | *5* | *12* | *11* | *20* | | *13* | *4* | *65* |

Number of Patients

Sources  Computed from Bureau of Prisons Sensitive  Medical Data and inmate medical records.

*The facilities not listed under a particular specialty received no conventional consultations for that specialty during the predemonstration period.

CDCR _158

**Table C.3** umber of Conventional, In Prison Specialist ncounters per onth in Three Pennsylvania Prisons During the Demonstration Period Principal Specialties Only *

| Specialty | Facility | Number of Patients | | | | | | | | | | | | | | | | Total |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 1996 | | | | 1997 | | | | | | | | | | | | |
| | | Sept. | Oct. | Nov. | Dec. | Jan. | Feb. | Mar. | Apr. | May | June | July | Aug. | Sept. | Oct. | Nov. | Dec. | |
| **All Specialties** | FCI-Allenwood | 21 | 14 | 9 | | 20 | 13 | 30 | 18 | | 12 | | 7 | 11 | 14 | 28 | 9 | 48 |
| | USP-Allenwood | 27 | 26 | 23 | | 28 | 16 | 23 | 16 | 4 | 22 | 21 | 12 | 7 | 16 | 3 | 29 | 245 |
| | Lewisburg | 32 | | 4 | 25 | | | | | | | | 29 | | | | | 276 |
| | *Specialty Subtotal* | *80* | *40* | *36* | *25* | *48* | *29* | *53* | *34* | *4* | *34* | *21* | *48* | *18* | *30* | *31* | *38* | *569* |
| **Cardiology** | USP-Allenwood | | | | | | | | | | 4 | | | | | | 5 | 9 |
| | Lewisburg | | | | | | | | | | | | | | | | 6 | 6 |
| | *Specialty Subtotal* | | | | | | | | | | *4* | | | | | | *11* | *15* |
| **Psychiatry** | FCI-Allenwood | 13 | | | | | | | | | | | | | | | | 13 |
| | USP-Allenwood | 9 | | 7 | | | | | | | | | | | | | | 16 |
| | Lewisburg | | | | | 2 | | | | | | | 6 | | | | | 8 |
| | *Specialty Subtotal* | *22* | | *7* | | *2* | | | | | | | *6* | | | | | *37* |
| **Orthopedics** | FCI-Allenwood | 8 | 14 | 9 | | 20 | 13 | 30 | 18 | | 8 | | 7 | 11 | 14 | 28 | 4 | 35 |
| | USP-Allenwood | 15 | 14 | 14 | | 26 | 16 | 16 | 16 | | 22 | 17 | 12 | | 16 | 3 | 13 | 215 |
| | Lewisburg | 24 | | 4 | 25 | | | | | | | | 17 | | | | | 204 |
| | *Specialty Subtotal* | *47* | *28* | *27* | *25* | *46* | *29* | *46* | *34* | | *30* | *17* | *36* | *11* | *30* | *31* | *17* | *454* |
| **Dermatology** | USP-Allenwood | 3 | | 2 | | | | | | 4 | | 4 | | 7 | | | | 5 |
| | Lewisburg | 8 | 12 | | | | | 7 | | | | | 6 | | | | 10 | 58 |
| | *Specialty Subtotal* | *11* | *12* | *2* | *0* | *0* | *0* | *7* | *0* | *4* | *0* | *4* | *6* | *7* | *0* | *0* | *10* | *63* |

Sources  Computed from Bureau of Prisons Sensitive  edical Data and inmate medical records.

*The facilities not listed under a particular specialty received no conventional consultations for that specialty during the demonstration period.

**Table C.4** Conventional, In Prison Specialist Consultations [M]edical and Indirect [Ex]penditures at Three Pennsylvania Prisons During the Predemonstration Period  Principal Specialties Only

| Prison | Specialty | Average Clinics per Month | Other Cost per Clinic | Medical Cost per Clinic | Sum of Encounters | Average Encounters per Month | Average Encounters per Clinic | Total Cost per Clinic* | Average Cost per Encounter |
|---|---|---|---|---|---|---|---|---|---|
| USP-Lewisburg | Psychology | 2.00 | 180.15 | 360.00 | 267 | 22.25 | 11.13 | 540.15 | 48.55 |
| | Orthopedics | 1.58 | 180.15 | 1,500.00 | 209 | 17.42 | 11.00 | 1,680.15 | 152.74 |
| | Dermatology | 0.58 | 180.15 | 1,140.00 | 65 | 5.42 | 9.29 | 1,320.15 | 142.17 |
| USP-Allenwood | Cardiology | 0.25 | 180.15 | 750.00 | 8 | 0.67 | 2.67 | 930.15 | 348.81 |
| | Psychology | 0.42 | 180.15 | 400.00 | 69 | 5.75 | 13.80 | 580.15 | 42.04 |
| | Orthopedics | 0.33 | 180.15 | 1,400.00 | 32 | 2.67 | 8.00 | 1,580.15 | 197.52 |
| | Dermatology | 0.00 | 180.15 | 1,500.00 | 0 | A | A | 1,680.15 | A |
| FCI-Allenwood | Psychology | 1.17 | 180.15 | 600.00 | 117 | 9.75 | 8.36 | 780.15 | 93.35 |
| | Orthopedics | 0.33 | 180.15 | 1,200.00 | 32 | 2.67 | 8.00 | 1,380.15 | 172.52 |
| All Facilities | Cardiology | 0.25 | 180.15 | 750.00 | 8 | 0.67 | 2.67 | 930.15 | 348.81 |
| | Psychology | 3.58 | 180.15 | 442.79 | 453 | 37.75 | 10.53 | 622.94 | 59.13 |
| | Orthopedics | 2.25 | 180.15 | 1,440.74 | 273 | 22.75 | 10.11 | 1,620.89 | 160.31 |
| | Dermatology | 0.58 | 180.15 | 1,140.00 | 65 | 5.42 | 9.29 | 1,320.15 | 142.17 |

Sources  Computed from Bureau of Prisons Sensitive [M]edical Data, billing records, inmate medical records, interviews with prison staff, and Bureau wage data for the Pennsylvania region.

*Total cost per clinic  [m]edical and other  changed between the predemonstration and demonstration time periods for conventional, in prison specialist consultations. These changes were relatively small. There were, however, large changes over time in cost per conventional encounter, primarily caused by changes in the number of inmates per clinic. Specialists are paid a flat fee per clinic, regardless of the number of patients seen. The number of patients per clinic during the demonstration period increased in cardiology and orthopedics, low ering the cost per inmate. Conversely, the number of patients per clinic during the demonstration period decreased for dermatology and psychiatry, increasing the cost per inmate.

**Table C.5** Conventional, In Prison Specialist Consultations [M]edical and Indirect [Ex]penditures at Three Pennsylvania Prisons During the Demonstration Period Principal Specialties Only

| Specialty | Prison | Number of Clinics | Other Cost per Clinic | Medical Cost per Clinic | Sum of Encounters | Average Encounters per Month | Average Encounters per Clinic | Total Cost per Clinic* | Average Cost per Encounter |
|---|---|---|---|---|---|---|---|---|---|
| **USP-Lewisburg** | Psychology | 2 | 180.15 | 360.00 | 8 | 0.67 | 4.00 | 540.15 | 135.04 |
| | Orthopedics | 17 | 180.15 | 1,600.00 | 186 | 15.50 | 10.94 | 1,780.15 | 162.72 |
| | Dermatology | 7 | 180.15 | 1,200.00 | 46 | 3.83 | 6.57 | 1,380.15 | 210.02 |
| **USP-Allenwood** | Cardiology | 2 | 180.15 | 500.00 | 9 | 0.60 | 4.50 | 680.15 | 151.14 |
| | Psychology | 2 | 180.15 | 475.00 | 16 | 1.07 | 8.00 | 655.15 | 81.89 |
| | Orthopedics | 18 | 180.15 | 1,400.00 | 215 | 14.33 | 11.94 | 1,580.15 | 132.29 |
| | Dermatology | 2 | 180.15 | 1,500.00 | 5 | 0.33 | 2.50 | 1,680.15 | 672.06 |
| **FCI-Allenwood** | Psychology | 2 | 180.15 | 600.00 | 13 | 0.87 | 6.50 | 780.15 | 120.02 |
| | Orthopedics | 5 | 180.15 | 1,400.00 | 35 | 2.33 | 7.00 | 1,580.15 | 225.74 |
| **All Facilities** | Cardiology | 2 | 180.15 | 500.00 | 9 | 0.60 | 4.50 | 680.15 | 151.14 |
| | Psychology | 6 | 180.15 | 478.33 | 37 | 2.60 | 6.17 | 658.48 | 106.78 |
| | Orthopedics | 40 | 180.15 | 1,485.00 | 436 | 32.17 | 10.90 | 1,665.15 | 152.77 |
| | Dermatology | 9 | 180.15 | 1,266.67 | 51 | 4.17 | 5.67 | 1,446.82 | 255.32 |

Sources  Computed from Bureau of Prisons Sensitive  [M]edical Data, billing records, inmate medical records, interviews with prison staff, and Bureau wage data for the Pennsylvania region.

*Total cost per clinic  [m]edical and other  changed between the predemonstration and demonstration time periods for conventional, in prison specialist consultations. These changes were relatively small. There were, however, large changes over time in cost per conventional encounter, primarily caused by changes in the number of inmates per clinic. Specialists are paid a flat fee per clinic, regardless of the number of patients seen. The number of patients per clinic during the demonstration period increased in cardiology and orthopedics, low ering the cost per inmate. Conversely, the number of patients per clinic during the demonstration period decreased for dermatology and psychiatry, increasing the cost per inmate.

**Table C.6**  stimated Costs of Bus Transportation  rom  CI Allenwood to  SP Allenwood for Telemedical Consultations During the Demonstration Period

| Staff Type | Salary Grade | Hours per Session | Rate Without Fringe | Fringe Rate | Average Costs[1] |
|---|---|---|---|---|---|
| Officer | S 7 | 4 | 13.82 | 5.87 | 106.44 |
| Officer | S 8 | 4 | 15.32 | 6.51 | 117.97 |
| Average Cost per Clinic | A | A | A | A | 112.20 |
| Average Monthly Cost[2] | A | A | A | A | 561.02 |

Source  Bureau of Prisons  wage data, interviews with prison staff.

[1]  Average cost per hour is e ual to 1.5 times rate without fringe plus the fringe rate, averaged across staff types  S 7 and  S 8 .

[2]  Average monthly cost assumes five bus trips per month.

**Table C.7**  stimated  Weighted  Average per Inmate Costs of Air Transfer  rom Three Pennsylvania Prisons for Psychiatric Purposes During the Demonstration and Predemonstration Periods

| Prison | FCI-Allenwood | USP-Allenwood | USP-Lewisburg | Average* |
|---|---|---|---|---|
| Air Cost | 3,134.96 | 2,729.52 | 3,401.00 | 3,127.43 |
| Escort Cost | 770.09 | 744.57 | 1,002.42 | 897.37 |
| Indirect Costs per Inmate | 196.85 | 196.85 | 196.85 | 196.85 |
| Average Cost per Psych Transfer | 4,101.90 | 3,670.94 | 4,600.27 | 4,221.65 |

Source  Air transfer billing records.

*These costs are weighted by the number of air transfers from each prison. Costs of transfers from  CI Allenwood were estimated on the basis of cost data from the other two prisons.

CDCR _162

**Table C.8**  stimated Average per  ncounter Cost of   ternal Specialist Consultations at Three Pennsylvania Prisons by Cost  lement, During the Demonstration and Predemonstration Periods

| | Medical Expenditure per Encounter[1] | Security Expenditures per Encounter[2] | Indirect Expenditures per Encounter[3] | Total Expenditures per Encounter |
|---|---|---|---|---|
| **Expenditures** | 319.57 | 271.36 | 196.85 | 787.78 |

Source  Billing records for e ternal consultations occurring during predemonstration period that were identified by prison staff as being li ely candidates for telemedicine.

[1]  A weighted average, by specialty, of medical costs. These figures are drawn directly from the Pennsylvania prisons billing records.
[2]  Based on interviews with prison security staff at the three Pennsylvania prisons as well as BOP wage data from the western Pennsylvania region.
[3]  See table C.9.

**Table C.9**   ternal Consultations   stimated Average per  ncounter Indirect Costs for Administrative Staff Only

| Staff Type | Salary Grade | Hours per Inmate | Rate* (No Overtime) | Cost per Inmate |
|---|---|---|---|---|
| **Medical Records Technician** | S 7 | 2.0000 | 19.09 | 38.18 |
| **Health Services Administrator** | S 13 | 0.8750 | 40.30 | 35.26 |
| **Unit Manager** | S 12 | 0.6250 | 34.96 | 21.85 |
| **Central Inmate Monitoring Coordinator** | S 12 | 0.6250 | 34.96 | 21.85 |
| **Special Investigative Agent** | S 13 | 0.6250 | 41.58 | 25.99 |
| **Chief Correctional Supervisor** | S 13 | 0.6250 | 41.58 | 25.99 |
| **Associate Warden** | S 14 | 0.2915 | 49.16 | 14.33 |
| **Warden** | S S 1 | 0.2083 | 64.32 | 13.40 |
| **Total** | | | | **$196.85** |

Source  Based on estimates developed by Dr. Ronald Waldron and Al Turner, using   SP   lorence data, and on data developed by Abt Associates Inc. in interviews with prison staff.

*Rates are an average of all salary levels in each   S range.

# Appendix D:

## Cost of the Telemedicine Demonstration



The total cost of establishing and using telemedicine capabilities at the four demonstration sites was approximately $778,000 for 16 months of operation.[1] This included the equipment and its installation costs, salaries of dedicated telemedicine coordination staff, an estimate of the value of labor contributed by BOP employees, payments to consulting specialists at FMC-Lexington and the VA Medical Center in Lexington, and the cost of the communications line carrying the telemedicine sessions. Some of these costs, however, were associated with gathering data for the evaluation and for other nonclinical purposes (see below). These latter costs were estimated and excluded from the calculation of costs attributable to health care alone.

For purposes of analysis, fixed monthly costs associated with the telemedicine demonstration were distinguished from per-patient costs that varied according to the volume of usage. That is, the telemedicine demonstration imposed some costs on the system even before the first patient saw a specialist (see table D.1). The largest cost was the monthly lease for the telemedicine equipment itself. During 1997, the equipment lease for the four-site network averaged nearly $25,000 per month, 90 percent of which was charged to the demonstration's clinical care.[2] In addition, the demonstration incurred about $1,400 each month in other site operating costs.[3] Fixed plant, equipment, and training costs for the demonstration were $23,664 per month, after allowing for nonclinical uses of the telemedicine resources.

Telemedicine coordinators were hired for each site. At Lewisburg and Allenwood, these coordinators worked 40-hour weeks. The coordinators at the hub medical centers each worked an average of 35 hours per week. After making several adjustments to pay rates and hours billed, it was estimated that staff spent 68 percent of their time for telemedicine coordination, at a cost of $10,939 across the network.[4]

The demonstration incurred additional costs associated with each discrete encounter that were not fixed (see table D.2). Most of these costs depended on the length of the encounter. Data recorded during telemedicine sessions were used to compute the average length of each encounter for each specialty. Across all specialties, encounters lasted an average of about 15 minutes per patient. Most of the per-patient cost of an encounter was for the communications lines, which averaged $4.85 per minute, or $70 per encounter. The demonstration arranged advantageous billing rates with VAMC in Lexington so that the average cost of a specialist over all telemedicine consultations

**Table D.1**  Fixed Monthly Costs of the Telemedicine Demonstration

|  |  |  |
|---|---|---|
| Equipment Lease |  | 22,381 |
| Site Operating Costs |  | 1,283 |
|    Amortized Installation | 455 |  |
|    Amortized Training | 295 |  |
|    Voice Telephone | 266 |  |
|    Other Site Operating Costs | 266 |  |
| Telemedicine Coordinator |  | 10,939 |
| **Total Fixed Costs per Month** |  | **$34,603** |

[1] Tracor Systems Technologies, Inc., supplied cost data.

[2] The research team excluded 10 percent because the equipment was sometimes used for other purposes.

[3] These include installation costs of various kinds that were amortized over a 20-year life, office equipment that was amortized over a 10-year life, and training amortized over 5 years. The procedures of OMB Circular A–76 were followed in these calculations. The same 10-percent discount for other nonclinical uses was applied to these site operating costs.

[4] These employees spent some of their time in duties associated with evaluating the demonstration, rather than running it; the research team deducted 8 hours per week for the coordinators at the remote sites and 3 hours per week for the hub coordinators from the time charged to the demonstration,

was only $74 per hour. At this rate, specialists cost an average of $18 per-patient encounter.

Besides the specialist, a physician assistant was used to present the patient, and correctional officers were needed for escort security; these employees cost $6 and $4 per patient, respectively.

| Table D.2 ariable per ncounter Costs Associated With the Telemedicine Demonstration | | |
|---|---|---|
| Communication Charges | | 70 |
| Personnel Costs | | 28 |
| Specialist | 18 | |
| Physician Assistant Presenter | 6 | |
| Correctional Officer scorts | 4 | |
| **Total per-Encounter Costs** | | **$98** |

## Costs per Encounter

During 1997, telemedicine sessions averaged $431 per patient or encounter. Offsetting this cost were savings associated with expensive external consultations and air transports to Federal Medical Centers that did not occur as a result of telemedicine's use.[5] If telemedical encounters were always substitutes for these more costly events, telemedicine would have reduced expenditures for specialist care substantially.

Most telemedical encounters were not used in lieu of these relatively rare types of consultations and treatment, however. Instead, a proportion was conducted in place of a conventional in-prison consultation with a visiting specialist. Other patients would not have seen any specialist at all if the new technology had not been available at little or no cost to the prisons. Each time telemedical consultations were used as substitutes for conventional, internal (that is, in-prison) consultations with specialists during the demonstration, the

Bureau avoided approximately $108 in direct payments to physicians.[6] To avoid spending $108 for these consultations, however, the demonstration spent about $431, on average, for each telemedicine encounter.

When telemedicine resources were used for patients who would not have seen a specialist otherwise, no savings at all would have accrued to offset even a fraction of telemedicine's costs. Because the proportion of telemedicine patients who would not have seen a specialist at all in the absence of the telemedicine resources cannot be estimated, the total savings and, thus, the net costs of telemedicine cannot be estimated with complete precision. In the best case, however, assuming that *all* patients would have been seen by a consulting physician inside or outside the prison (that is, in a local hospital or transferred to a Federal Medical Center), the net cost of each telemedicine encounter would have been approximately $267.[7]

---

[5] Health services administrators report that telemedicine averted an average of 2.8 trips to local hospitals each month for prisoners to see specialists. At 1996 average costs, these trips would have cost the Bureau of Prisons $2,200 per month, all of which is saved by telemedicine. Transfers of psychiatric patients to FMCs declined from 2.2 per month in the pre-demonstration period to 1.2 per month in the demonstration period. The associated savings of such averted transfers averaged $5,900 per month. This calculation ignores the possibility that housing these prisoners at FMCs costs more than incarcerating them at their regular prison. The average daily cost of incarcerating patients at FMC-Springfield is $140, compared with an average of $62 per day at the three prisons in this demonstration. If it is assumed that telemedicine saved 30 days of incarceration at FMCs, then this would increase the savings of averted transfers by about $2,323 each.

[6] Internal consultations during the predemonstration period averaged this amount. The prisons also incurred various other costs associated with internal consultations, but most of these significant costs were also incurred when specialists were accessed remotely, using the telemedicine capacity. For this reason, these common costs were not counted for either conventional or telemedical practice.

[7] This assumes that 35 would have gone to local hospitals, 13–14 would have been transferred to an FMC, and all of the remaining encounters would have been conducted by consulting specialists inside the prisons, in the conventional manner. Researchers assume that these averted internal consultations would have produced savings of $108 each.

The reasons for these significant cost differences are apparent in table D.3. This table compares monthly costs and associated savings for 100 telemedical consultations that replaced internal consultations plus 4 telemedicine consultations that replaced trips to specialists outside the prisons or transfer to Federal Medical Centers. This was close to the 97 consultations that the demonstration experienced during the April–December 1997 period.

What made this telemedicine demonstration costly was the expenditure for the communication lines, leased equipment, installation, and telemedicine coordinator—approximately $34,600 per month.[8] These accounted for 78 percent of telemedicine's monthly costs, and all were fixed, not dependent on the number of patients seen.

Other costs associated with telemedical consultations were about the same as costs that would have been incurred for conventional in-prison consultations: approximately $9,800 per month, compared with $10,800 per month for conventional consultations (see table 3.1). Payments to physicians were much lower in the telemedicine demonstration. For example, during 1995–96, prior to the demonstration, psychiatrists were paid an average of $61 per encounter for in-prison consultations. Once the demonstration began, telemedical consultations with remote psychiatrists were available at a cost of $17 each.[9] Payments to other types of specialists were similarly lower during the demonstration—less than $25 per encounter, on average. Prior to the demonstration, these prisons were paying substantially higher per-encounter costs, ranging between $160 for

**Table D.3** Comparison of Average    onthly Costs of the Demonstration Telemedicine System and Conventional Care  Based on 100 Internal Specialist    ncounters

| | Number of Events per Month | Cost per Month | Total Monthly Cost | Average Cost per Encounter |
|---|---|---|---|---|
| **Operational Telemedicine** | | | | |
| uipment | A | 23,693 | | |
| Coordinators | A | 10,939 | | |
| Consultations | 104 | 10,229 | | |
| Total Cost | | | 44,861 | 431 |
| **Conventional Care** | | | | |
| Consultations Inside the Prison | 100 | 10,800 | | |
| Avoidable    ternal Consultations | 2.83 | 2,274 | | |
| Avoidable Transfers to    Cs | 1.17 | 4,928 | | |
| Total Cost | | | 18,002 | 173 |

ote  This calculation assumes that all 100 monthly telemedicine consultations would be provided conventionally in the absence of telemedicine. This one to one substitution did not occur in the demonstration. Chapter 2 shows that fewer consultations were actually provided before telemedicine became available.

---

[8] As discussed in chapter 2, discounts were applied for nonclinical uses of the equipment and staff time.

[9] Although the hourly rate of the remote psychiatrist was $67, the average consultation lasted only about 15 minutes.

**CDCR _167**

an orthopedist or dermatologist to $350 for a cardiologist.[10]

Despite these significantly lower payments to specialists who consulted remotely, telemedical consultations incurred other high costs, apart from the equipment and fixed personnel costs. Physician assistants billed some portion of their time to presenting the patients (averaging $6 per encounter), as did correctional officers who escorted inmates from FCI-Allenwood to the telemedicine suite at USP-Allenwood ($4 per encounter). What overwhelmed all these expenditures were payments for using the communications lines. Each encounter incurred $70, on average, for the communications lines.[11]

Given such high fixed costs of equipment and the high per-minute costs of communications lines, telemedicine was far more costly than the preexisting practices of consulting specialists. Even counting estimated savings of $2,300 per month for averted external consultations and an estimated $4,900 per month saved as a result of averting air transfers, the net cost of each telemedical encounter after the startup phase of demonstration was about $267 more than a conventional in-prison consultation with a visiting specialist. Such cost was incurred because this was a demonstration, not an operational system configured to minimize unnecessary costs. In the operational system projected for the Bureau of Prisons operation, the average cost per consultation is dramatically reduced to $71 per encounter.

---

[10] These specialists were engaged at favorable rates between $72 and $100 per hour, and telemedical sessions for all types of specialists other than psychiatrists averaged 15–20 minutes.

[11] The demonstration used communications lines for 314 hours of telemedical communications, at an estimated total cost of $91,000.

# *Appendix E:*

## *Operational Telemedicine System— Acquisition and Installation Costs*

The information collected during the telemedicine demonstration period allowed relatively accurate values for telemedicine costs and benefits to be calculated. If an operational rather than demonstrational deployment of telemedicine is considered, what would be the cost to acquire and install the telemedicine network?

The research team makes the following assumptions about the telemedicine system, its installation, and its configuration of the telemedicine network:

- The telemedicine system must provide capabilities to support the same medical specialties used during the demonstration phase. The telemedicine equipment will be purchased, rather than leased. The telemedicine operational systems will provide all needed computational, display, and communication equipment. The remote system will also have a room camera, patient camera, intraoral camera, and digital stethoscope. The hub system will contain all provisions of the remote, except for the patient and intraoral cameras.

- The cost of installing telemedicine systems can vary widely, depending on the modifications and/or additions required at each facility. Because a "typical" installation could not be defined, researchers used the installation cost for the demonstration as the guideline for the operational system installation. This probably yields an excessively high installation cost because four systems were installed for the demonstration, and other tasks (for example, building a holding cell at USP-Allenwood for FCI inmates) were performed that would not normally be required.

- The telemedicine network will consist of two remote systems and one hub system. This is similar to USP-Allenwood and USP-Lewisburg as remotes and the VA Medical Center as the hub. For this network, we assume use of ISDN (4 Basic Rate Interface) rather than switch 56, as was used during the demonstration.

Under these assumptions, the research team estimates telemedicine equipment and related costs of $3,446 per month. This total consists of $1,457 in site operating costs, less a 10-percent discount for other nontelemedicine uses of the equipment, plus $2,372 as the monthly amortization of the equipment purchase price, again with a 10-percent discount. The site operating costs consist of $97,000 in installation costs, amortized by straight-line depreciation over 20 years (except that equipment, fixtures, and freight are amortized over 10 years), plus training, amortized over 5 years. The principal remaining component of site operating cost is long-distance voice telephone charges (averaging $328 per month).

Equipment charges reflect the amortized monthly value of $73,000 ($510) in each of three sites. In addition, the ISDN connection requires $1,800 in one-time installation costs, which adds $15 to the monthly cost when amortized over 10 years.

**Table E.1** Amortization of Capital Investment

| | Cost | Timeframe (years) | Salvage Value | Amortized Monthly Cost |
|---|---|---|---|---|
| **Installation (3 Systems)** | | | | |
| Labor | $21,270 | 20 | | $89 |
| Travel | $13,464 | 20 | | $56 |
| Equipment | $11,572 | 10 | $1,875 | $81 |
| Material | $20,594 | 20 | | $86 |
| Rental | $7,358 | 20 | | $31 |
| Fixtures | $21,135 | 10 | $3,424 | $148 |
| Freight | $1,883 | 10 | | $16 |
| Total Installation Cost | $97,277 | – | | $507 |
| | | | | |
| **Training** | $19,674 | 5 | | $328 |
| | | | | |
| **Equipment (1 System)** | | | | |
| Baseline Telemedicine System | $64,500 | 10 | $10,440 | $450 |
| Digital Stethoscope | $3,225 | 10 | $522 | $23 |
| Intraoral Camera | $5,375 | 10 | $871 | $38 |
| Total Equipment Cost | $73,100 | | $11,833 | $511 |
| | | | | |
| **Communications** | | | | |
| ISDN | $1,800 | 10 | | $15 |

# ATTACHMENT 7

CDCR _172

The NEW ENGLAND JOURNAL of MEDICINE

---

REVIEW ARTICLE

---

Edward W. Campion, M.D., *Editor*

# State of Telehealth

E. Ray Dorsey, M.D., M.B.A., and Eric J. Topol, M.D.

From the Department of Neurology and the Center for Human Experimental Therapeutics, University of Rochester Medical Center, Rochester, NY (E.R.D.); and the Scripps Translational Science Institute and the Scripps Research Institute, La Jolla, CA (E.J.T.). Address reprint requests to Dr. Dorsey at the University of Rochester Medical Center, 265 Crittenden Blvd., CU 420694, Rochester, NY 14642, or at ray .dorsey@chet.rochester.edu.

N Engl J Med 2016;375:154-61.
DOI: 10.1056/NEJMra1601705
*Copyright © 2016 Massachusetts Medical Society.*

TELEHEALTH IS THE PROVISION OF HEALTH CARE REMOTELY BY MEANS OF a variety of telecommunication tools, including telephones, smartphones, and mobile wireless devices, with or without a video connection. Telehealth is growing rapidly and has the potential to transform the delivery of health care for millions of persons. Although several reviews have examined the historical use and effects of telehealth,[1-3] few articles have characterized its current status. Here we examine the trends of telehealth, its limitations, and the possibilities for future adoption.

## CURRENT TRENDS

Three trends, all linked, are currently shaping telehealth. The first is the transformation of the application of telehealth from increasing access to health care to providing convenience and eventually reducing cost. The second is the expansion of telehealth from addressing acute conditions to also addressing episodic and chronic conditions. The third is the migration of telehealth from hospitals and satellite clinics to the home and mobile devices.

From the perspective of patients, the fundamental aim of telehealth is to increase access to care,[4] and as such, it has historically increased access to health care for conditions[5] and populations for which care was otherwise not available. Among the early and enduring applications of telehealth have been programs to provide care to persons in the military, prisons, and rural locations.[6] In addition to increasing access, the Internet is enabling the convenient delivery of health care,[7-9] as it has done for travel, retail, and finance. Numerous organizations, from academic health centers to startups, now offer low-cost virtual visits (less than $50 per visit) around the clock for the "most common, most irritating, most inconvenient" conditions.[10] By contrast, it takes an average of 20 days[11] to secure a 20-minute appointment with a physician that with travel and wait time consumes 2 hours.[12] Given the greater interest in bending the cost curve, telehealth may increasingly deliver intensive services to the 20% of persons who account for 80% of health care expenditures.[13] As articulated by the U.S. Senate Committee on Finance, "Traditionally telehealth has been viewed as a tool to improve access to services, but interest is growing to see if telehealth has the potential to reduce health care costs."[14]

Just as the motivation for telehealth is expanding, so are its applications. The earliest applications for telehealth were for acute conditions, such as trauma and stroke.[15] In 1999, "telestroke," the provision of acute stroke care from a remote neurologist to a patient in an emergency department, was introduced to increase access to a highly effective, time-sensitive fibrinolytic therapy (tissue plasminogen activator).[15] In just 15 years, telestroke became mainstream, and the largest care provider for patients with stroke in the country is now not a major medical center but a telemedicine company.[16]

More recently, telehealth has expanded, by means of diverse care models that

---

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR 173

include school visits by medical assistants,[17] video calls,[10] telephone calls,[7] and online algorithms,[9] to include care for episodic conditions, such as sinusitis.[7] With the notable exception of mental health,[18] telehealth applications to chronic conditions have historically been limited primarily to generally asynchronous monitoring (e.g., text messages) or telephone support. For example, a 2012 review[1] showed that among 141 randomized, controlled trials of telehealth interventions for chronic conditions, only 10 incorporated video-conferencing with a clinician. Despite this limited evidence base, interest in telehealth is rising rapidly for many chronic conditions,[10] which affect 140 million persons in the United States and account for 80% of health care expenditures.[19] Future models[20] will build on the predominantly conversational version of today to one that includes rich data transfer from remote monitoring[1] (with the use of wearable sensors and mobile diagnostic systems, such as electrocardiograms),[21] education of patients,[20] and frequent virtual and in-person visits from physicians, nurses, therapists, and social workers.

The third telehealth trend is the migration of care away from medical institutions. Initial telehealth applications delivered care to patients in institutions such as hospitals[15] and satellite clinics,[6] which frequently required expensive technological systems and on-site clinical or technical support. With increasingly available broadband and portable diagnostic technologies, telehealth is rapidly moving to the home. For persons with chronic conditions, including the 2 million elderly persons who are essentially homebound,[22] the patient-centered medical home will increasingly be the patient's home.[23] With the use of video visits in the ambulance or at home, even care for acute conditions such as stroke[24] and pneumonia[25] is moving from the emergency department to the doorstep or bedroom. Providing health care to persons in retail clinics or homes[10] and over the telephone[7] mirrors the trend in banking, in which automated teller machines and the Internet moved services from the bank lobby to mobile devices.

### REIMBURSEMENT

Limited reimbursement is constraining the widespread use of telehealth. Insurance coverage for telehealth is fragmented but increasingly common. A total of 29 states (which is double the number from 3 years ago) now have telehealth parity laws requiring that private insurers cover telehealth services to the extent that they cover in-person care.[26] In addition, 48 state Medicaid programs, each with its own restrictions, cover telehealth services.[26] The real laggard is Medicare, which generally reimburses for telehealth services only in clinical facilities that are in areas in which there is a shortage of health professionals.[27] In 2012, Medicare spent $5 million — less than 0.001% of its expenditures — on telehealth services.[28] The implicit concern is that the coverage of telehealth will lead to excess use,[29] but physician visits are relatively inexpensive as compared with emergency department visits and hospitalizations. For example, among Medicare beneficiaries with Parkinson's disease, more frequent visits to a neurologist are associated with lower rates of hospitalization and lower overall health care expenditures.[30] Moreover, the price of current telehealth visits is on par with employee copayments in many health plans, and some studies suggest that telehealth visits can reduce costs[9,31] owing to lower rates of use of diagnostic testing.

Organizations that integrate the financing and delivery of health care, such as Kaiser Permanente,[32] the Department of Defense, and the Department of Veterans Affairs, cover and often encourage the use of telehealth to improve health and reduce costs. The result, as shown in Kaiser Permanente of Northern California, is indeed more visits[32] but in a structure that seeks to minimize overall health care expenditures. The widespread adoption of telehealth in these systems is strong empirical evidence for its value. The rise of bundled payments[33] and accountable care organizations provides an opportunity for further experimentation with telehealth for defined conditions and populations. For example, bundled payments for elective surgeries could enable the remote delivery of follow-up care without the need for third-party reimbursement.

Countries with single-payer health insurance (e.g., Canada[6]) or organizations that are financially at risk for health care costs (e.g., prisons[34] and employers that stand to lose money if health care costs are high and to benefit financially if costs are low) are also large adopters of telehealth. Increasingly, telehealth startups are targeting large self-insured employers with services ranging from video visits to online care programs that include remote monitoring, education, and health coach-

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR  174

The NEW ENGLAND JOURNAL of MEDICINE

es.[32] For employers, these new, relatively inexpensive but largely unproven care models could provide low-risk opportunities to see whether they can reduce health care costs and improve employees' health.

Beyond traditional fee-for-service providers and those that are financially at risk, other models are emerging. One model is a contractual agreement between remote providers in areas where patients are located and central sites where expertise lies. This model has been applied extensively to mental health, "teleICUs" (coverage of intensive care units by a remote team of nurses and physicians), and telestroke[35] and can be extended to other areas of health care in which clinicians (e.g., geriatricians) are scarce and clinical demand (e.g., nursing homes[36] and continuing-care communities) is high.

With the growth of high-deductible plans, self-pay is an increasingly common model for services aimed directly at consumers. The principal limitation of this model is the difficulty in acquiring a sufficiently large customer base, which has led many telehealth providers to market their services to employers or other groups that represent large numbers of consumers. Other new models will emerge that are tailored to the specific service, population, and prevailing economic incentives. In the absence of political action, only traditional Medicare beneficiaries will be excluded from the benefits of telehealth that now increasingly extend to the commercially insured, Medicaid beneficiaries, military personnel, prisoners, and veterans.

## ADDITIONAL LIMITATIONS

In addition to reimbursement, many clinical, legal, and social barriers remain (Table 1). The clinical barriers include the quality of the patient–physician relationship,[40] the quality of the examination, and the quality of care. The remote nature of telehealth visits has the potential to undermine the quality of the patient–physician interaction in several ways. First, the ability to engender trust is more difficult remotely than in person. Second, many telehealth encounters are with clinicians with whom the patient has not already established a relationship. These encounters can increase the fragmentation of health care, lead to inappropriate care (e.g., excessive use of broad-spectrum antibiotic agents),[41] and open the door for potential abuse (e.g., overprescribing of narcotics). The frag-

mentation could lead to conflicting recommendations from disconnected clinicians, create shallow patient–physician relationships that are based on transactions, and undermine efforts to integrate care. Third, the limited familiarity with the telehealth clinician could mask the quality of the remote clinician or the variability in the qualifications among remote clinicians.[42]

Moreover, the quality of the remote physical examination is clearly inferior to the quality of an in-person examination. Consequently, initial telehealth applications focused on conditions for which the physical examination is absent (e.g., teleradiology), less important (e.g., mental health), or principally assessed visually (e.g., dermatology). The limitations of remote examinations can be substantial. For example, the absence of touch makes remote assessment of some conditions, such as an acute abdomen (e.g., appendicitis), very difficult. In addition, subtle features (e.g., eye movements in patients with multiple sclerosis) and core features (e.g., pedal edema in patients with congestive heart failure) of common conditions are difficult to assess or monitor remotely. Although peripheral devices (e.g., a wireless blood-pressure cuff) are increasingly available to assist with examinations, the success of such assessments often depends on the presence of a trained assistant, which will be less common as telehealth is used in the home or over mobile devices.

To justify broader adoption and coverage by insurers, studies of telehealth, especially those that are focused on delivery of care, need to show that remote care can improve health outcomes. Rigorous randomized, controlled trials of telehealth interventions that show improvements in care or health have been few[18,43,44] and in many cases have failed to show benefit.[45,46] In addition to those related to study design, limitations include outdated interventions, an asymmetric flow of information, and the limited role of clinicians. Because of the long cycle time in research, many published studies of telehealth have investigated outdated technologies, such as the use of a telephone keypad to answer health questions.[47] Similarly, numerous studies of remote monitoring capture but do not share patient data, which leaves patients[1,47] with limited ability to engage in self-care. Finally, studies of telehealth have generally had limited involvement of clinicians, including physicians, in actual care delivery,[1,48] especially

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR  175

**Table 1.** Limitations of Telehealth and Potential Solutions.

| Limitation | Potential Solution |
|---|---|
| **Reimbursement** | |
| Limited and fragmented insurance coverage of telehealth | Increase evidence base (especially with rigorously designed studies) for the ability of telehealth to improve access or care at a reasonable cost |
| Potential for excess health care utilization | Show the ability of telehealth to reduce utilization of expensive in-person services (e.g., emergency department visits) over the short term; account for full economic value of telehealth, including costs borne by patients, families, and facilities[37]; acknowledge the limitations of and limited evidence base for current care models; expand commercial insurance coverage through additional state telehealth parity laws; adopt policies to expand Medicare coverage of telehealth; set flexible limits on the utilization of high-cost remote services |
| **Clinical issues** | |
| Lower quality of patient–physician relationship, physical examination, and care with remote visits than with in-person visits | Could combine remote care with in-person care, including traditional house calls; implement low-cost, user-friendly peripheral devices to facilitate remote clinical assessments (e.g., vital signs) |
| Potential for abuse (e.g., overprescribing of narcotics) | Require initial in-person visit for the prescription of high-risk medications or limit remote prescribing of them |
| Fragmentation of care among multiple providers | Create alternative telehealth care models within integrated delivery systems; develop and use interchangeable electronic health records to facilitate sharing of information among diverse providers |
| Legal issues, such as state licensure laws, need for credentialing at multiple sites, and liability concerns | Accelerate implementation of the Interstate Medical Licensure Compact[38]; enact federal legislation, such as the TELE-MED Act of 2015,[39] to enable Medicare participating providers to provide services to any Medicare beneficiary; streamline credentialing process at remote sites by allowing reliance on privileging decisions at hub sites; inform patients about limitations of and alternatives to telehealth and obtain consent |
| Social issues, such as differential access to telecommunications technologies based on social and geographic factors, resulting in many underserved populations | Increase broadband access nationally; provide underserved persons with smartphones or related technologies to increase access to care; conduct dedicated outreach and provide technical support to persons with limited access or familiarity with new technologies |

with patients with whom they have an existing relationship.

Legal barriers, including state licensure and practice laws, credentialing, and liability concerns, also limit the use of telehealth. Like many health care professionals, physicians generally have to be licensed in the state in which the patient is located when medical services are rendered. This requirement leaves many patients unable to access remote care even from their own physician simply because they live across a state border. Although the Federation of State Medical Boards put forth an Interstate Medical Licensure Compact in 2014 to facilitate the licensure of physicians in multiple states,[38] the effect of the Compact on increasing the access to care has been limited to date. Moreover, states differ with regard to which services (e.g., prescribing medications) physicians can provide over the Internet. Texas, for example, generally requires that patients first see a physician in person before a telehealth consultation can take place.[49] In addition, the need for credentialing and processing privileges at multiple remote sites further hinders the application of telehealth. Finally, malpractice concerns hang over new ways of delivering care.[50]

Perhaps the biggest limitation of telehealth is social. The digital divide,[51] the differential access to telecommunications technologies on the basis of geographic and social factors, is a major barrier to the adoption of telehealth. For example, persons who are older, who live in rural areas, and who have lower incomes, less education, or more chronic conditions are all less likely to have Internet access than those who are younger, who live in urban areas, and who have higher incomes, more education, and fewer chronic conditions.[52,53] The digital divide is especially apparent among the elderly; only 58% of persons older than 65 years of age use the Internet — one of the lowest percentages of any single group.[54] Relatively few studies have included diverse populations, and a recent

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR   176

*The* NEW ENGLAND JOURNAL *of* MEDICINE

study that did was plagued by low adherence to the intervention.[55] Combined with the burden of chronic conditions among older U.S. residents, the digital divide undermines the fundamental aim of telehealth to increase access to care for those in greatest need.

Many of these limitations are addressable (Table 1). On the clinical front, the potential for inappropriate applications of telehealth can be reduced by requiring in-person evaluations for selected conditions or treatments. Combining telehealth with in-person care, especially after a diagnosis has been made, could help address limitations in the examination and could be valuable for managing chronic conditions. If insurers are to be encouraged to expand coverage, studies will need to show that at a minimum, telehealth does not increase costs substantially or that any cost increase is offset by cost reductions (e.g., in hospitalizations) in the short term.

Although telehealth models clearly require more validation, the shortcomings[56] of current care should not be forgotten. In addition, the standard for patient-centered care is not a clinic appointment in which patients come to see their physicians in their clinical environments but rather a house call,[57] in which physicians come to see patients in their homes. When examined from that lens, the benefits, limitations, and trade-offs inherent in telehealth and traditional care are more apparent.

The legal (including reimbursement) barriers will require policy solutions driven by the public to whom the disproportionate benefits of telehealth, especially access and convenience, accrue. On the licensure front, the TELE-MED Act of 2015 would enable a Medicare provider to provide telehealth services to a Medicare beneficiary in any state.[39] Such legislation may be more likely to accelerate the removal of barriers than would the actions of state licensing boards, which may be less motivated to increase access to clinicians even within their own states.[49] Although the digital divide is narrowing,[54] it needs to be bridged.[58] Policies, such as the National Broadband Plan from the Federal Communications Commission,[59] and other initiatives, such as providing smartphones to persons in need,[60] will be essential to ensure that the current disparities in care are not amplified by differential access to the next generation of care delivery.[35]

## FUTURE ADOPTION

Despite financial disincentives and substantial barriers, telehealth continues to grow and is likely to spread over the next decade. The increasing number of reimbursement models will provide fertile ground for the growth of telehealth. Social factors may be even more important as familiarity with the Internet and its role in health continues to increase. Families with children who have rare conditions or substantial disabilities will seek technological solutions to improve their children's care and health. In addition, the breakup of the extended family, the increased mobility of the nuclear family, and the strong desire of older persons to remain in their own homes[61] will result in geographically separated children caring for a growing number of aging parents. These technologically savvy children will increasingly demand solutions that enable them to care for their parents, monitor their health, and connect to their parents' clinicians conveniently.

Evidence abounds for the proximity of a "tipping point"[62] in telehealth, in which adoption moves beyond early adopters, who are focused on the technology, to the majority, who are focused on pragmatic applications. In 2014, the Department of Veterans Affairs had more than 2 million telehealth visits.[63] Kaiser Permanente of Northern California predicts that in 2016 it will have more virtual (e-mail, telephone, and video) visits than in-person visits.[32] To date, these visits have resulted in high satisfaction from patients and clinicians and in some cases have been part of integrated care efforts that have improved health outcomes.[32] By 2020, the Mayo Clinic plans to serve 200 million patients, many of them from outside the United States and most of them remotely.[64]

The increased activity is an overdue investment in improving the delivery of health care. Out of every $100 spent on health care, less than 30 cents is devoted to improving the way care is delivered.[65] Among 22 industries, health systems rank 19th and private insurers rank last in their investment in innovation.[65] Consequently, over the past generation, health care trailed only construction among 18 industries in productivity gains.[66] Because of the potential of technology to transform health care, venture capital funding in digital health has nearly quadrupled, from $1.1 billion in 2011 to $4.3 billion in 2015.[67]

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR 177

The increased activity and funding reflect the futurist Ray Kurzweil's "law of accelerating returns."[68] This tenet holds that "technological change advances (at least) exponentially, not linearly . . . (and that as) a particular evolutionary process becomes more effective, greater resources are deployed toward the further progress of that process." In genetics, the cost of sequencing has declined dramatically, resulting in exponential advances in our understanding[20]; telehealth with its falling telecommunication costs is poised for similar advancement.

The future is likely to bring greater and more rapid technological advances,[20] opportunities for academic health centers to expand their reach, and changes to the nature of medical care. In the near term, many advances will probably be linked to smartphones, which 90% of the world population will have by 2020.[69] The increasingly sophisticated sensors and growing number of peripheral assessments may enable smartphones to monitor a person's health passively, facilitate diagnosis, and connect patients to clinicians when needed. The ability to exchange patient-generated real-world data, including data from sensors, laboratories, and imaging, with the doctor during or in advance of a telehealth visit may enhance the value of such interactions. However, with these capabilities will come heightened privacy concerns.[20] In addition, unintended consequences, such as an overreliance on technology to monitor health or an excessive use of unproven technology for profit, curiosity, or "idolatry" (worship of technology)[70] may also emerge.

Telehealth can also enable academic health centers to expand their reach across all their missions.[71] With the growing global burden of chronic conditions and the continued maldistribution of physicians, academic health centers can use telehealth to reach many clinicians[71] and persons domestically and globally. Just as universities have made efforts to increase access to education by means of online courses[72] and other efforts, their widely recognized medical centers and enormous human capital are poised to increase access to health care. Such efforts could expand and even integrate many of the health services that are currently provided by academic health centers. The reputations of these academic health centers could be especially helpful for engendering trust in patients who may receive care from clinicians whom they have not actually met. However, as in other industries, incumbents are susceptible to disruption from smaller, entrepreneurial providers who may seek to aggregate expertise across multiple centers, address conditions, or serve needs (e.g., convenience) that have not been well addressed by major health centers.

The growth of telehealth over the next decade and beyond will have profound implications for health care delivery and medicine. The provision of care at a distance could help address longstanding concerns about the distribution and number of physicians[35] and provide greater flexibility to both patients and clinicians with respect to their location and availability. The migration of care from hospitals and clinics to the home and smartphones may also eventually decrease the demand for clinic space, a trend that is occurring in other sectors of the economy (e.g., retail) affected by the Internet. The nature of a patient "visit" will also change because telehealth will not seek to replicate traditional office visits but rather capitalize on its unique strengths to define new care paradigms that improve health.[35] For example, rather than periodic, highly structured in-clinic encounters, visits may be shorter and more frequent and may occur by means of multiple communication methods with diverse providers.

The patient–physician relationship is likely to evolve as physicians care for patients at greater distances, often in conjunction with remote clinicians. Such remote care may place a greater demand on ensuring personalized care and may even require more travel on the part of clinicians to ensure that proper relationships are developed and maintained over distance and time. Finally, the training of future clinicians on the use of telehealth is only in its earliest stages.[73]

Telehealth can expand the reach of medicine. Historically, the health care that has been received by a person has been a function of who a person is (e.g., with respect to age, sex, class, race, and creed) and where he or she lives, thus leading to profound social and geographic inequities. Increasingly, with the narrowing of the digital divide and the ubiquity of smartphones, telehealth can enable more people to receive care.

Disclosure forms provided by the authors are available with the full text of this article at NEJM.org.

We thank William Zhu, B.A., for editorial assistance with an earlier version of the manuscript.

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR   178

*The* NEW ENGLAND JOURNAL *of* MEDICINE

**REFERENCES**

**1.** Wootton R. Twenty years of telemedicine in chronic disease management — an evidence synthesis. J Telemed Telecare 2012;18:211-20.

**2.** McLean S, Sheikh A, Cresswell K, et al. The impact of telehealthcare on the quality and safety of care: a systematic overview. PLoS ONE 2013;8(8):e71238.

**3.** Ekeland AG, Bowes A, Flottorp S. Effectiveness of telemedicine: a systematic review of reviews. Int J Med Inform 2010; 79:736-71.

**4.** Bashshur RL, Shannon GW. History of telemedicine: evolution, context, and transformation. New Rochelle, NY: Mary Ann Liebert, 2009.

**5.** Rayman RB. Telemedicine: military applications. Aviat Space Environ Med 1992;63:135-7.

**6.** Brown EM. The Ontario Telemedicine Network: a case report. Telemed J E Health 2013;19:373-6.

**7.** Uscher-Pines L, Mehrotra A. Analysis of Teladoc use seems to indicate expanded access to care for patients without prior connection to a provider. Health Aff (Millwood) 2014;33:258-64.

**8.** Mehrotra A. The convenience revolution for treatment of low-acuity conditions. JAMA 2013;310:35-6.

**9.** Courneya PT, Palattao KJ, Gallagher JM. HealthPartners' online clinic for simple conditions delivers savings of $88 per episode and high patient approval. Health Aff (Millwood) 2013;32:385-92.

**10.** Daschle T, Dorsey ER. The return of the house call. Ann Intern Med 2015;162: 587-8.

**11.** Physician appointment wait times and Medicaid and Medicare acceptance rates. Irving, TX: Merritt Hawkins, 2014 (http://www.merritthawkins.com/uploadedFiles/MerrittHawkings/Surveys/mha2014 waitsurvPDF.pdf).

**12.** Ray KN, Chari AV, Engberg J, Bertolet M, Mehrotra A. Disparities in time spent seeking medical care in the United States. JAMA Intern Med 2015;175:1983-6.

**13.** NIHCM Foundation. Health care's big spenders: the characteristics behind the curve. January 2016 (http://www.nihcm .org/topics/cost-quality/health-cares -big-spenders-chart-story).

**14.** United States Senate Committee on Finance. Bipartisan chronic care working group policy options document. December 2015 (http://www.finance.senate.gov/imo/media/doc/CCWG%20Policy%20 Options%20Paper1.pdf).

**15.** Levine SR, Gorman M. "Telestroke": the application of telemedicine for stroke. Stroke 1999;30:464-9.

**16.** Specialists On Call oversees its 10,000th tPA administration to an acute stroke patient. Business Wire. December 2, 2015 (http://www.businesswire.com/news/home/20151202006018/en/Specialists

-Call-Oversees-10000th-tPA-Administration -Acute).

**17.** McConnochie KM, Wood NE, Kitzman HJ, Herendeen NE, Roy J, Roghmann KJ. Telemedicine reduces absence resulting from illness in urban child care: evaluation of an innovation. Pediatrics 2005;115:1273-82.

**18.** Brenes GA, Danhauer SC, Lyles MF, Hogan PE, Miller ME. Telephone-delivered cognitive behavioral therapy and telephone-delivered nondirective supportive therapy for rural older adults with generalized anxiety disorder: a randomized clinical trial. JAMA Psychiatry 2015;72: 1012-20.

**19.** Anderson G. Chronic care: making the case for ongoing care. Princeton, NJ: Robert Wood Johnson Foundation, 2010 (http://www.rwjf.org/content/dam/farm/reports/reports/2010/rwjf54583).

**20.** Topol E. The patient will see you now: the future of medicine is in your hands. New York: Basic Books, 2015.

**21.** Topol EJ, Steinhubl SR, Torkamani A. Digital medical tools and sensors. JAMA 2015;313:353-4.

**22.** Ornstein KA, Leff B, Covinsky KE, et al. Epidemiology of the homebound population in the United States. JAMA Intern Med 2015;175:1180-6.

**23.** Herendeen N, Deshpande P. Telemedicine and the patient-centered medical home. Pediatr Ann 2014;43(2):e28-32.

**24.** Itrat A, Taqui A, Cerejo R, et al. Telemedicine in prehospital stroke evaluation and thrombolysis: taking stroke treatment to the doorstep. JAMA Neurol 2016; 73:162-8.

**25.** Summerfelt WT, Sulo S, Robinson A, Chess D, Catanzano K. Scalable hospital at home with virtual physician visits: pilot study. Am J Manag Care 2015;21:675-84.

**26.** Thomas L, Capistrant G. State telemedicine gaps analysis: coverage & reimbursement. Washington, DC: American Telemedicine Association, 2015 (http://www.americantelemed.org/docs/default -source/policy/50-state-telemedicine -gaps-analysis---coverage-and -reimbursement.pdf?sfvrsn=6).

**27.** Greenstein S, McDevitt R. Evidence of a modest price decline in US broadband services. Inf Econ Policy 2011;23:200-11.

**28.** Neufeld JD, Doarn CR. Telemedicine spending by Medicare: a snapshot from 2012. Telemed J E Health 2015;21:686-93.

**29.** Monegain B. Telemedicine market to soar past $30B. Healthcare IT News. August 4, 2015 (http://www.healthcareitnews .com/news/telemedicine-poised-grow -big-time).

**30.** Willis AW, Schootman M, Tran R, et al. Neurologist-associated reduction in PD-related hospitalizations and health care expenditures. Neurology 2012;79: 1774-80.

**31.** Noel HC, Vogel DC, Erdos JJ, Cornwall D, Levin F. Home telehealth reduces healthcare costs. Telemed J E Health 2004;10:170-83.

**32.** Pearl R. Kaiser Permanente Northern California: current experiences with internet, mobile, and video technologies. Health Aff (Millwood) 2014;33:251-7.

**33.** Landi H. CMS grants more flexibility for telemedicine services under bundled payment model for joint replacements. Healthcare Informatics. November 18, 2015 (http://www.healthcare-informatics .com/news-item/cms-grants-more -flexibility-telemedicine-services-under -bundled-payment-model-joint).

**34.** The Pew Charitable Trusts, MacArthur Foundation. Managing prison health care spending. October 2013 (http://www .pewtrusts.org/~/media/legacy/uploadedfiles/pcs_assets/2014/pctcorrectionshealthcarebrief050814pdf .pdf).

**35.** Schwamm LH. Telehealth: seven strategies to successfully implement disruptive technology and transform health care. Health Aff (Millwood) 2014;33:200-6.

**36.** Grabowski DC, O'Malley AJ. Use of telemedicine can reduce hospitalizations of nursing home residents and generate savings for Medicare. Health Aff (Millwood) 2014;33:244-50.

**37.** Asch DA. The hidden economics of telemedicine. Ann Intern Med 2015;163: 801-2.

**38.** Chaudhry HJ, Robin LA, Fish EM, Polk DH, Gifford JD. Improving access and mobility — the Interstate Medical Licensure Compact. N Engl J Med 2015;372: 1581-3.

**39.** 114th Congress (2015-2016). H.R.3081 — TELE-MED Act of 2015 (https://www .congress.gov/bill/114th-congress/house /bill/3081).

**40.** Wachter RM. The digital doctor: hope, hype, and harm at the dawn of medicine's computer age. New York: McGraw-Hill Education, 2015.

**41.** Uscher-Pines L, Mulcahy A, Cowling D, Hunter G, Burns R, Mehrotra A. Antibiotic prescribing for acute respiratory infections in direct-to-consumer telemedicine visits. JAMA Intern Med 2015;175: 1234-5.

**42.** Lilly CM, Fisher KA, Ries M, et al. A national ICU telemedicine survey: validation and results. Chest 2012;142:40-7.

**43.** Campbell AN, Nunes EV, Matthews AG, et al. Internet-delivered treatment for substance abuse: a multisite randomized controlled trial. Am J Psychiatry 2014;171: 683-90.

**44.** Kroenke K, Krebs EE, Wu J, Yu Z, Chumbler NR, Bair MJ. Telecare collaborative management of chronic pain in primary care: a randomized clinical trial. JAMA 2014;312:240-8.

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR   179

STATE OF TELEHEALTH

**45.** Cartwright M, Hirani SP, Rixon L, et al. Effect of telehealth on quality of life and psychological outcomes over 12 months (Whole Systems Demonstrator telehealth questionnaire study): nested study of patient reported outcomes in a pragmatic, cluster randomised controlled trial. BMJ 2013;346:f653.

**46.** Dhalla IA, O'Brien T, Morra D, et al. Effect of a postdischarge virtual ward on readmission or death for high-risk patients: a randomized clinical trial. JAMA 2014;312:1305-12.

**47.** Chaudhry SI, Mattera JA, Curtis JP, et al. Telemonitoring in patients with heart failure. N Engl J Med 2010;363:2301-9.

**48.** Gammon D, Berntsen GK, Koricho AT, Sygna K, Ruland C. The chronic care model and technological research and innovation: a scoping review at the crossroads. J Med Internet Res 2015;17(2):e25.

**49.** Goodnough A. Texas medical panel votes to limit telemedicine practices in state. New York Times. April 10, 2015:A9 (http://www.nytimes.com/2015/04/11/us/texas-medical-panel-votes-to-limit-telemedicine-practices-in-state.html?_r=0).

**50.** Center for Connected Health Policy. Common legal barriers (http://cchpca.org/common-legal-barriers).

**51.** Norris P. Digital divide: civic engagement, information poverty, and the Internet worldwide. New York: Cambridge University Press, 2001.

**52.** Rainie L. Digital divides 2015. Washington, DC: Pew Research Center: Internet, Science & Tech. September 22, 2015 (http://www.pewinternet.org/2015/09/22/digital-divides-2015/).

**53.** Fox S, Purcell K. Chronic disease and the internet. Washington, DC: Pew Internet & American Life Project. March 24, 2010 (http://www.pewinternet.org/files/old-media/Files/Reports/2010/PIP_Chronic_Disease_with_topline.pdf).

**54.** Perrin A, Duggan M. Americans' internet access: 2000-2015. Washington, DC: Pew Research Center: Internet, Science & Tech. June 26, 2015 (http://www.pewinternet.org/2015/06/26/americans-internet-access-2000-2015/).

**55.** Ong MK, Romano PS, Edgington S, et al. Effectiveness of remote patient monitoring after discharge of hospitalized patients with heart failure: the Better Effectiveness After Transition-Heart Failure (BEAT-HF) randomized clinical trial. JAMA Intern Med 2016;176:310-8.

**56.** Committee on Quality of Health Care in America, Institute of Medicine. Crossing the quality chasm: a new health system for the 21st century. Washington, DC: National Academies Press, 2001.

**57.** Leff B, Burton JR. The future history of home care and physician house calls in the United States. J Gerontol A Biol Sci Med Sci 2001;56:M603-8.

**58.** Servon LJ. Bridging the digital divide: technology, community, and public policy. Malden, MA: Blackwell Publishing, 2002.

**59.** 2015 Broadband progress report. Washington, DC: Federal Communications Commission. February 4, 2015 (https://www.fcc.gov/reports-research/reports/broadband-progress-reports/2015-broadband-progress-report).

**60.** Miller CC. Fighting homelessness, one smartphone at a time. New York Times. April 14, 2015 (http://www.nytimes.com/2015/04/15/upshot/fighting-homelessness-one-smartphone-at-a-time.html?_r=1).

**61.** Levitz J. Communities struggle to care for elderly, alone at home: more people age at home, raising demand for support services. Wall Street Journal. September 25, 2015 (http://www.wsj.com/articles/communities-struggle-to-care-for-elderly-alone-at-home-1443193481).

**62.** Gladwell M. The tipping point: how little things can make a big difference. Boston: Little, Brown, 2000.

**63.** VA poised to ramp up telehealth in 2015. mHealthNews. December 23, 2014 (http://www.mhealthnews.com/news/va-poised-ramp-telehealth-2015).

**64.** Larsen E, Diamond D. Why Mayo Clinic's CEO wants to serve 200 million patients — and how he plans to do it. The Advisory Board Company. July 23, 2014 (https://www.advisory.com/daily-briefing/2014/07/23/lessons-from-the-c-suite-mayo-clinic).

**65.** Moses H III, Matheson DH, Cairns-Smith S, George BP, Palisch C, Dorsey ER. The anatomy of medical research: US and international comparisons. JAMA 2015;313:174-89.

**66.** Buescher B, Viguerie P. How US healthcare companies can thrive amid disruption. McKinsey & Company. June 2014 (http://www.mckinsey.com/insights/health_systems_and_services/how_us_healthcare_companies_can_thrive_amid_disruption).

**67.** Wang T, King E, Perman M, Tecco H. Digital health funding: 2015 year in review. Rock Health. 2016 (http://rockhealth.com/reports/digital-health-funding-2015-year-in-review/).

**68.** Kurzweil R. The singularity is near: when humans transcend biology. New York: Viking, 2005.

**69.** Woods B. By 2020, 90% of world's population aged over 6 will have a mobile phone: report. The Next Web. 2014 (http://thenextweb.com/insider/2014/11/18/2020-90-worlds-population-aged-6-will-mobile-phone-report/#gref).

**70.** Leff B, Finucane TE. Gizmo idolatry. JAMA 2008;299:1830-2.

**71.** Arora S, Thornton K, Murata G, et al. Outcomes of treatment for hepatitis C virus infection by primary care providers. N Engl J Med 2011;364:2199-207.

**72.** Pappano L. The Year of the MOOC. New York Times. November 2, 2012 (http://www.nytimes.com/2012/11/04/education/edlife/massive-open-online-courses-are-multiplying-at-a-rapid-pace.html).

**73.** Moore MA, Coffman M, Jetty A, Petterson S, Bazemore A. Only 15% of FPs report using telehealth; training and lack of reimbursement are top barriers. Am Fam Physician 2016;93:101.

*Copyright © 2016 Massachusetts Medical Society.*

POSTING PRESENTATIONS FROM MEDICAL MEETINGS ONLINE
Online posting of an audio or video recording of an oral presentation at a medical meeting, with selected slides from the presentation, is not considered prior publication. Authors should feel free to call or send e-mail to the *Journal*'s Editorial Offices if there are any questions about this policy.

The New England Journal of Medicine
Downloaded from nejm.org at UT MEDICAL BRANCH AT GALVESTON on January 24, 2018. For personal use only. No other uses without permission.
Copyright © 2016 Massachusetts Medical Society. All rights reserved.

CDCR    180

# ATTACHMENT 8

CDCR _181

CLINICAL PRACTICE AND PATIENT SAFETY/CONCEPTS

# TelEmergency: A Novel System for Delivering Emergency Care to Rural Hospitals

Robert Galli, MD
John C. Keith, MD
Kendall McKenzie, MD
Gregory S. Hall, CNE
Kristi Henderson, MSN

From the Department of Emergency Medicine, University of Mississippi Medical Center, Jackson MS.

Providing rural emergency medical care is often difficult because of limited resources and a scarcity of medical providers, including physicians trained in emergency medicine. Telemedicine offers promise for improving the quality of care in rural areas, but previous models were not well designed to provide affordable care to unstable or potentially unstable patients. The TelEmergency program was developed to overcome these limitations by providing quality, affordable medical care to patients in rural emergency departments (EDs) using specially trained nurse practitioners linked in real time by telemedicine with their collaborating physicians at the University of Mississippi Medical Center Adult Emergency Department. Since its inception in October 2003, the TelEmergency program has evaluated and treated more than 40,000 patients in 11 rural EDs throughout Mississippi, with a high degree of satisfaction from patients and hospital administrators. This article details the development and implementation of this system and describes the patient population that has been evaluated. [Ann Emerg Med. 2008;51:275-284.]

0196-0644/$-see front matter
Copyright © 2008 by the American College of Emergency Physicians.
doi:10.1016/j.annemergmed.2007.04.025

## INTRODUCTION

Providing quality emergency care in rural areas is a common problem in the United States. Although the hourly census of patients who present at smaller rural emergency departments (EDs) is typically lower compared with that of urban EDs, the acuity of individual patients can be high. The difficulties in caring for these higher-acuity patients is compounded by limited medical resources and a lack of training in emergency medicine by many health care providers staffing rural EDs.[1-3]

Although a residency-trained, board-certified emergency physician is considered the gold standard when an ED is staffed, rural EDs frequently are unable to attract such individuals and in some instances any physicians whatsoever.[1-3] Many rural EDs in our state are staffed by individuals who vary in training from board-certified internists and family practitioners to physicians who are either currently in residency or have left postgraduate medical education without completing any residency at all. In an effort to overcome this physician shortage and decrease costs, some facilities in our state began to staff their EDs with nurse practitioners alone, without physicians present in the hospital.

In Mississippi, nurse practitioners are allowed to practice medicine independently if they are within 15 miles of their collaborating physician. Despite this requirement, we observed through coordinating intrafacility transfers that often the collaborating physicians were not available to assist in patient care in a timely fashion, if they were available at all. Many critically ill ED patients were thus being treated by a nurse practitioner with inadequate training and experience, without readily available physician backup. This situation was far from ideal for the patients and the nurse practitioners who were forced to practice outside the scope of their training and licensure.

Telemedicine offers promise for improving the quality of care in rural areas, but previous models were not well designed to provide affordable care to unstable or potentially unstable patients. Previous models relied on physician-to-physician consultation, usually required the presence of a subspecialist to provide the consultation, and in emergency medicine lacked Current Procedural Terminology codes for telemedicine providers to bill for their services.[4,5] The TelEmergency program was developed to overcome these limitations by using specially trained nurse practitioners, linked in real time by telemedicine with their collaborating physicians at the University of Mississippi Medical Center Adult Emergency Department (UMMCAED). Between October 2003 and October 2006, the TelEmergency program has evaluated approximately 40,000 patients in rural EDs in Mississippi.

CDCR _182

## Nurse Practitioners

In the TelEmergency model, nurse practitioners and collaborating TelEmergency physicians treat ED patients at multiple geographically distant sites. Nurse practitioners were chosen rather than physician assistants or other midlevel practitioners because of the availability of nurse practitioners and the familiarity with nurse practitioners of hospitals and patients in our state. With the cooperation of the Mississippi State Board of Medical Licensure and the Mississippi Board of Nursing, we obtained a waiver allowing nurse practitioners who participated in our pilot program to collaborate with physicians who were more than 15 miles away by using a telemedicine link.

The nurse practitioners recruited were required to have specific qualifications. These include a master's degree in nursing from an accredited institution (National League for Nursing or Commission on Collegiate Nursing Education), certification as a family nurse practitioner with a current unrestricted license (registered nurse and nurse practitioner) to practice in the United States and eligibility for licensure in Mississippi, current basic cardiac life support, advanced cardiac life support, and pediatric advanced life support and completion of the Mississippi Nurse's Association Controlled Substance Workshop. We gave preference to nurse practitioners who had completed 1 year of clinical experience as a nurse practitioner and those who held a second certification as acute care nurse practitioner. If the nurse practitioner was not dually certified, we recommend registration into an acute care nurse practitioner post-master's program.

We designed an educational program specifically for the TelEmergency nurse practitioners. It consists of approximately 40 hours of continuing medical education on topics believed to be critical to the evaluation, diagnosis, and treatment of ED patients, combined with clinical and procedural training. A list of the lecture topics is given in Figure 1. The TelEmergency nurse practitioners are required to complete 4 examinations based on the lectures and case presentations from a required text before completion of their clinical rotation.

The clinical training consists of clinical hours in the UMMCAED and various skill laboratories, including a cadaver laboratory. The clinical hours vary from a minimum of 135 hours to approximately 200 clinical hours and must include at least 100 patient encounters under the supervision of attending emergency physicians at the University of Mississippi Medical Center Adult Emergency Department. At the end of the clinical and skill laboratory rotation, TelEmergency nurse practitioners are required to document the patient log, as well as the procedure log given in Figure 2.

All TelEmergency nurse practitioners must also obtain a Drug Enforcement Agency certificate and meet privileges and credentialing requirements at the hospitals in which they are to be employed. In addition, TelEmergency nurse practitioners are required to meet continuing education requirements, including attending quarterly performance improvement and educational "update" conferences, and to document the performance of a

| Approach to the ED patient |
| --- |
| Chest pain |
| Syncope |
| Hypertensive emergencies |
| Acute coronary syndromes |
| EKG Interpretation |
| C-spine trauma |
| Head trauma |
| Abdominal and blunt trauma |
| Penetrating trauma |
| Extremity trauma |
| Open injuries to the hand |
| Antiarrhythmics |
| Advanced cardiac life support drugs |
| Fibrinolytics |
| Intubation drugs |
| Stroke |
| Acute dyspnea |
| Obstetric emergencies |
| Acute abdominal pain |
| Acute gastrointestinal bleeding |
| Adult febrile patients |
| Pediatric febrile patients |
| Telemedicine equipment |
| Acute complications of diabetes |
| Anaphylaxis |
| The swollen and painful joint |
| Advanced airway management |
| Headache |
| Controlled substances |
| Seizures |
| Altered mental status |
| Wheezing |
| Advanced trauma life support |
| The poisoned patient |
| Electronic medical recordkeeping |

**Figure 1.** TelEmergency didactic lecture series.

requisite number of selected clinical procedures to continue to remain active in the TelEmergency program.

Of the 34 TelEmergency nurse practitioners who have completed the requisite training, 27 have maintained the required continuing education and procedural documentation. Of these 27, a total of 23 are actively participating in the TelEmergency program at site hospitals, which gives us an ongoing retention rate of 68% during the past 28 months.

## Collaborating Physicians

The TelEmergency program is an extension of UMMCAED, and all collaborating physicians are either faculty or senior residents at UMMCAED. The University of Mississippi

Arterial blood sampling (3)
Defibrillation/cardioversion (2)
Needle decompression (1)
Venous access, femoral (3)
Venous access, external jugular (1)
Dislocation reduction (1)
Closed fracture splinting (1)
Intubations, adult (5)
Intubations, pediatric (5)
Laceration repair (3)
Adult medical resuscitation (3)
Adult trauma resuscitation (3)

**Figure 2.** Nurse practitioner procedural requirements.

Medical Center Adult Emergency Department is an urban teaching ED, with an annual census of approximately 65,000 visits. Dedicated collaborating physician coverage for the TelEmergency program is provided 16 hours a day. Fifty percent of the dedicated collaborating physician coverage is provided by UMMCAED attending physicians and 50% by senior (postgraduate year 3 or postgraduate year 4) emergency medicine residents, with attending physician backup. Postgraduate year 3 and postgraduate year 4 residents participate in TelEmergency rotations of 4 and 6 weeks, respectively, as part of their residency training, whereas emergency medicine faculty members cover on average 2 TelEmergency shifts per month. Before covering any TelEmergency shifts, all collaborating physicians undergo an orientation session that familiarizes them with the use of the TelEmergency cameras and monitors, as well as the specific capacities and limitations of the participating hospitals and EDs.

TelEmergency coverage consists of 2 8-hour shifts, between 10 AM and 2 AM. Between 2 AM and 10 AM, a senior emergency medicine resident or faculty member who also has clinical responsibilities in the ED provides coverage because TelEmergency hourly census decreases considerably.

Collaborating physicians also perform performance improvement reviews on selected patient medical records during their TelEmergency shifts, which ensures familiarity with problem or potential problem cases and provides the collaborating physicians with an understanding of the overall TelEmergency system.

**Technology**

The technology used in the TelEmergency system was designed to create a system that was as simple as possible for the medical staff to use while still providing the necessary capabilities for the evaluation and treatment of ED patients. Several types of technologies were used to accomplish this goal.

Each remote hospital site uses Cisco 2600 Ethernet Router (Cisco Systems, San Jose, CA), interfacing with a full T-1 line,

which in turn runs to a 12-port Cisco Catalyst 2950 switch (Cisco Systems, San Jose, CA). The lines return to UMMCAED through a frame relay circuit into a Cisco 7204 Router (Cisco Systems, San Jose, CA), which then disperses the traffic into the UMMC gigabit backbone.

Remote sites use the Polycom ViewStation FX (Polycom, Inc., Pleasanton, CA) or the Sony PTZ camera (Sony Corporation, Minato-Kun Tokyo, Japan). We have a total of 22 cameras in the 10 EDs participating in the TelEmergency program. These cameras tie back into a Polycom MGC-50 bridge (Polycom, Inc., Pleasanton, CA) at University of Mississippi Medical Center. The TelEmergency nurse practitioner is able to connect the local camera into the bridge with a control pad, which is controlled by an AMX NI-2000 Room Control System (AMXLLC, Richardson, TX). When the TelEmergency nurse practitioner needs to consult UMMCAED for a new patient, he or she will use the touchpad to indicate to the physician that a consultation is needed.

At UMMCAED, the AMX control units tie back into an NI-4000 Room Control System (AMXLLC, Richardson, TX), and the control system ties into an AMX Modero Color Video Touch Panel (AMXLLC, Richardson, TX) and into 2 Polycom VS4000 cameras (Polycom, Inc., Pleasanton, CA). The touch panel allows the physician to move the cameras at both the near site and the far site. The touch panel also serves as a system to keep the calls prioritized that have arrived from the various TelEmergency nurse practitioners throughout the state. The queue is set up to list the calls from the various hospitals in the order in which they arrived, unless there is an emergency request from a TelEmergency nurse practitioner. All active patients are continuously displayed on a 60-inch Panasonic plasma screen, which allows the collaborating physicians at UMMCAED to continuously monitor the emergency departments at those remote sites.

When the physician is available for consultation, he or she presses the hospital's name on the touch panel. A point-to-point call is then executed through the AMX and Polycom equipment. Once in the point-to-point call, the physician has full control over the far camera and can carry on a normal conversation with the TelEmergency nurse practitioner and patient at the far hospital, as well as use the zoom and pan features to visually inspect a particular area of interest, such as a patient finding or a cardiac monitor.

Though our original intent was to view radiographs through the Polycom equipment, it became apparent that the image quality was insufficient for proper interpretation of the radiographs. After testing various radiograph digitizers, we decided on the Radlink LaserPro16 (Radlink, Inc., Redondo Beach, CA) and have been satisfied with the results.

The average cost for a remote site using 2 patient rooms set up for TelEmergency consultation is $60,214 and for a remote site using 3 TelEmergency rooms, $63,868. The cost of equipment at the University of Mississippi Medical Center Adult Emergency Department as currently configured is

**CDCR _184**

$207,556. The up-front cost for equipment was subsidized by a grant from the Bower Foundation, and the TelEmergency program pays for any equipment upgrades and for all maintenance.

**Reimbursement**

A large barrier to effective telemedicine services in emergency medicine has been reimbursement. There was no federal Medicare reimbursement for telemedicine services until 1997. The Balanced Budget Act of 1997 directed the Health Care Financing Administration to make part B payments for professional consultations by telemedicine, but these rules were so restrictive that from April 1999 through December 2000 the Health Care Financing Administration paid only 235 total telemedicine claims.

Medicare expanded its payment for telemedicine services in 2001 after the passage of the Medicare, Medicaid, and SCHIP Benefits Improvement and Protection Act of 2000. Among other things, this act created CPT codes for office or outpatient visits, psychotherapy, and pharmacologic management, allowing for payment to a provider who furnishes telemedicine services at a distant site at the same rate that would have been paid if the service had been furnished without the use of a telecommunications system. It expanded the areas covered and removed the requirement for the practitioner requesting telemedicine service to be present.[6] This act expanded the reimbursement for telemedicine services, but it does not provide CPT codes for ED services. This lack of reimbursement was a major barrier in the creation of our TelEmergency system.

Because of the lack of CPT codes for ED services, we constructed our TelEmergency system to be reimbursed in a manner that to our knowledge is unique in telemedicine. The participating hospitals use the TelEmergency nurse practitioner and bill for the medical care provided by the TelEmergency nurse practitioner by using existing ED CPT codes. The participating hospital then pays the TelEmergency system an additional, set, hourly rate to collaborate with the TelEmergency nurse practitioner through the telemedicine linkage. The combined hourly rate, although greater than what is standard for nurse practitioners in our area, is less than the cost of staffing with on-site physicians. After discussion with the administrators of the participating hospitals, we estimate the hourly cost of staffing with physicians to be approximately US $100 per hour, or $72,000 for 24 hours of daily coverage in a 30-day month. As a general rule, none of the physicians available to these institutions have any specialized training in emergency medicine, and many have not completed any residency. To provide coverage using only nurse practitioners who do not participate in the TelEmergency program and therefore lack the additional training provided to the TelEmergency nurse practitioners, we estimate the rate at $50 per hour, or $38,000 per month. With our fee for collaboration currently at $20 per hour, the TelEmergency system would provide 24-hour ED coverage with a specially trained nurse practitioner, with real-time telemedicine backup provided by trained emergency practitioners, for approximately $53,000 per month. All telemedicine hardware is provided by the TelEmergency system, initially through a startup grant from the Bower Foundation. The only additional requirement is that the participating hospitals maintain a T-1 line to support the telemedicine connection. We believe this system allows for participating hospitals to provide a level of ED care that is at least similar, if not superior, to that provided to rural EDs by physician staffing services that use practitioners without formal training in emergency medicine while still realizing a significant cost savings.

**Participating Hospitals and EDs**

The creation of the TelEmergency model was instigated in part because of input from hospital administrators throughout our state. A major factor in the use of unsupervised nurse practitioners was the inadequate number of physicians available for staffing. Some of the hospitals currently participating in our program have a hospital staff consisting of only 2 primary care physicians. In these cases, the staff physicians were understandably reluctant to provide ED coverage in addition to their other clinical responsibilities, whereas nonstaff physicians were not available or were too expensive for such low-volume EDs. The characteristics of the communities served by the participating hospitals in the TelEmergency program are listed in Table 1. All participating hospitals are located in rural communities that range in population from 519 to 6,415, whereas the population of their home counties ranges from 8,488 to 38,041. The hospitals are on average 93 miles from the University of Mississippi Medical Center, with a range of 39 to 183 miles. Hospital characteristics are given in Table 2.

As in the participating hospitals, there is also variability in the EDs staffed by TelEmergency. This information is also given in Table 2. The EDs served by TelEmergency range from 2 to 6 beds, with an average of 3.6 beds. The average yearly ED census ranges from approximately 3,000 to 9,500, with a mean of 5,500. The total yearly census of the combined 10 hospitals is approximately 50,000. No participating hospital uses TelEmergency exclusively for ED coverage; rather, it is used to complement their existing physician coverage. On average, the EDs use TelEmergency for 281 hours a month, with a range from 71 to 505 hours per month. Ten of the 11 hospitals that have participated during the TelEmergency project remain involved in the program.

**Patient Evaluation Protocols**

Initially, all patients were required to be treated and evaluated by both a nurse practitioner and a collaborating physician, but this was unwieldy in the evaluation of nonurgent patients and increased the wait time for minor complaints. We created a set of protocols to identify patients whom the nurse practitioners could assess and treat primarily, as well as patients requiring immediate consultation and transfer. These criteria are listed in Figure 3A, B, and C.

**CDCR _185**

*Galli et al*                                                                                                    *TelEmergency for Rural Hospitals*

**Table 1.** Emergency department characteristics.

| Hospital Name | Mississippi Hospital Site | Town Population* | County Population* | Distance From UMC, Miles | UMC Primary Referral Center |
|---|---|---|---|---|---|
| Pioneer Community Hospital of Aberdeen | Aberdeen | 6,415 | 38,041 | 183 | No |
| Humphries Co. Hospital | Belzoni | 2,663 | 11,206 | 76 | No |
| UMC Lexington | Lexington | 2,025 | 21,609 | 60 | Yes |
| Quitman Co. Hospital | Marks | 1,551 | 10,177 | 167 | No |
| Franklin Co. Hospital | Meadville | 519 | 8,488 | 89 | No |
| Scott Regional Hospital | Morton | 3,482 | 28,423 | 39 | Yes |
| Claiborne Co. Hospital | Port Gibson | 1,840 | 11,831 | 77 | Yes |
| Prentiss Co. Regional Hospital | Prentiss | 1,158 | 13,962 | 62 | No |
| Perry Co. Hospital | Richton | 1,083 | 12,236 | 114 | No |
| Lawrence Co. Hospital | Monticello | 1,726 | 13258 | 66 | Yes |

*UMC,* University of Mississippi Medical Center.
*Source: US Census Bureau 2000.

**Table 2.** Hospital characteristics.

| Hospital Name | Start Date | End Date | Total Yearly ED Census | ED Beds | TelEmergency Cameras | Avg h/mo | Avg Patients/12-h Shift | Total 12-h Shifts | Total TelEmergency Patients |
|---|---|---|---|---|---|---|---|---|---|
| Pioneer Community Hospital–Aberdeen | 5/1/2005 | n/a | 3,700 | 2 | 1 | 71.9 | 5.8 | 40.5 | 234 |
| Humphreys County Memorial Hospital | 10/1/2003 | n/a | 5,600 | 4 | 3 | 321.0 | 4.1 | 702.3 | 2,900 |
| University Hospitals and Clinics, Holmes Co. | 10/1/2003 | n/a | n/a | 6 | 4 | 216.8 | 6.8 | 452.7 | 3,084 |
| Magee General Hospital | 3/1/2004 | 1/31/2005 | 7,500 | 5 | 1 | 165.1 | 13.1 | 151.4 | 1,976 |
| Quitman County Hospital | 10/1/2003 | n/a | n/a | 3 | 2 | 166.6 | 4.3 | 329.3 | 1,403 |
| Franklin County Memorial Hospital | 6/1/2005 | n/a | 7,800 | 2 | 1 | 90.3 | 8.1 | 36.0 | 292 |
| Lawrence County Hospital | 8/1/2004 | n/a | n/a | 3 | 2 | 505.6 | 9.9 | 633.3 | 6,266 |
| Scott Regional Hospital | 12/1/2003 | n/a | n/a | 4 | 3 | 117.7 | 12.9 | 222.1 | 2,869 |
| Claiborne County Hospital | 10/1/2003 | n/a | n/a | 3 | 2 | 268.3 | 5.2 | 580.8 | 3,036 |
| Jefferson Davis Community Hospital | 1/1/2005 | n/a | 8,400 | 2 | 1 | 301.3 | 7.8 | 233.0 | 1,818 |
| Perry County Hospital | 10/1/2003 | n/a | n/a | 3 | 2 | 281.1 | 4.6 | 610.4 | 2,819 |
| Average | | | | 3.4 | 2 | 227.7 | 7.5 | 362.8 | 2,427 |
| **Total** | | | | **37** | **22** | **2,505.6** | **82.6** | **3,991.7** | **26,697** |

Patients are divided into 3 categories: category 1 patients, who may be treated by the nurse practitioner alone; category 2 patients, who are treated in conjunction with the collaborating physician in a nonurgent period; and category 3 patients, who mandate immediate consultation with the collaborating physician and for whom expedited transfer to a facility offering a higher level of care is recommended. These categories were created with input from nurse practitioners and collaborating physicians in our system and are thought to be a reasonable compromise between nurse practitioner autonomy and collaborating physician oversight. The patients who are classified as category 1 are similar to those who are treated independently by nurse practitioners in the Fast Track at the University of Mississippi Medical Center Adult Emergency Department. These categories are meant to be used only as guidelines, and nurse practitioners are encouraged to involve the collaborating physician in the care of patients if there is any uncertainty about the most appropriate means of diagnosis and treatment.

**Patient Characteristics**

Between October 2003 and October 2006, the TelEmergency program grew from an initial 4 hospitals to a total of 10. During that period, the TelEmergency program evaluated more than 40,000 patients. Details of these patients are given in Table 3, whereas their diagnoses are given in Table 4.

Approximately two fifths (40.5%) of all patients were evaluated collaboratively by nurse practitioners and collaborating physicians, whereas 59.6% were treated independently by nurse practitioners. Overall, our patient population demonstrated a slight female predominance (54.8% female to 45.2% male patients). A majority (62.3%) of our patients were black, whereas 37% were white and less than 1% were of other ethnicity. The average age of the patients was 58 years, with a range from 0 months to 111 years. Pediatric patients (younger than 16 years) composed 23% of the patients, whereas 18% of patients were 65 years of age or older, with 11% being older than 75 years. The majority of patients (62%)

CDCR _186

Patients with the following complaints meet category I criteria and can be evaluated, treated, and referred by the nurse practitioner, without required consultation with University of Mississippi Medical Center:

- Abdominal pain: stable vitals, no significant physical examination findings, age <50 y
- Allergic reactions not associated with shortness of breath, wheezing, or hypotension
- Animal bites not involving the hand or face
- Cerumen removal
- Chronic peripheral vascular disease
- Conjunctivitis
- Constipation/diarrhea
- Contact dermatitis
- Dental pain
- Dizziness: vital signs stable, no significant physical examination findings, age <50 y
- Fatigue without associated symptoms
- Follow-up wound check, cast check, or suture removal
- Foreign body removal (uncomplicated and not involving the eye)
- Gastritis: suspected food poisoning, no associated dehydration with limited duration
- Gynecologic disorders: vaginitis, insignificant abnormalities in menstruation, cramps
- Hemorrhoids
- Hypertension that is asymptomatic and accompanied by a diastolic pressure of <120 mm Hg
- Incision and drainage of simple abscess not involving rectal area
- Intravenous hydration/antibiotics >8 y old
- Low back pain that is chronic and not associated with neurologic findings
- Migraines: patient states typical migraine, no new features, stable vital signs, afebrile, no significant physical examination findings, no trauma
- Minor burns
- Minor eye injury: corneal abrasion
- Minor lacerations or abrasions
- Nausea/vomiting
- Otitis media, otitis externa, ear pain >3 mo old
- Pharyngitis: no sign of abscess or airway compromise
- Pregnancy without bleeding, pain
- Prescription refills: nonnarcotic or controlled substance until next business day
- Puncture wounds not requiring exploration
- Sexually transmitted diseases, excluding PID
- Skin rashes, pruritus
- Sprains/strains
- Swollen lymph nodes
- Uncomplicated hepatitis or exposure to hepatitis
- Upper respiratory infection, congestion, cough, flu
- Urinary tract infections >6 mo old
- Work releases
- Wound care

Any of the above conditions with the presence of a complex medical history or at the discretion of the nurse practitioner may require consultation with the University of Mississippi Medical Center.

If the nurse practitioner consults with University of Mississippi Medical Center by telemedicine, proper notation should be documented in the patient's medical record stating that the consult was made, name of the physician, and their recommendations.

*PID,* Pelvic inflammatory disease.

**Figure 3A.** Category I (consultation not required).

Patients presenting to EDs with the following complaints require consultation with the University of Mississippi Medical Center ED physicians by telemedicine:

- Abdominal pain: all patients with acute pain or >50 y old
- Abnormal vitals signs: SBP <100 or >180 mm Hg, pulse rate <50 or >110 beats/min, RR >24 breaths/min, temperature >101.5°F
- Age <1 or >75 y (all patients!)
- Alcohol or drug withdrawals
- Allergic reaction with shortness of breath, wheezing, or hypotension
- Arrhythmias
- Bleeding: significant bleeding from any orifice
- Burns: any third-degree; second-degree of more than 10% total body surface; burns of the face, hands, feet, perineum; electrical injury; inhalation injury
- Chest pain: all patients
- Coma or change in mental status
- Complicated lacerations
- Drug overdose
- Fever, <6 mo old
- Fever and toxic appearance or of unknown origin, <1 y old
- Foreign body of the eye
- Fractures with vascular impairment or displacement
- Head trauma
- Headache associated with neurologic findings, fever, or meningeal signs
- Heat illnesses: hyperthermia, temperature >40.5°C (105°F); or hypothermia, temperature <35°C (95°F)
- Hypertension: diastolic blood pressure of ≥120 mm Hg, with or without symptoms
- Intravenous hydration/antibiotics in children <8 y old
- Neurologic deficits
- Pain management: chronic, oncologic
- Patient with complex medical history
- PID
- Postoperative-related problems
- Postpartum pelvic pain
- Pregnancy complications (ie, abdominal pain, bleeding, fever)
- Psychiatric patients with abnormal findings
- Puncture wounds requiring exploration
- Seizures
- Shock
- Shortness of breath
- Sickle cell crisis
- Testicular pain
- Upper abdominal pain not clearly of gastrointestinal origin (possible cardiac)
- Urinary tract infection/dysuria/hematuria in children <4 mo old
- Vaginal bleeding: saturation of full-size pad 1 or more per 2 h

Any symptom that the nurse practitioner is concerned about regardless of its presence on this list requires consultation with University of Mississippi Medical Center by telemedicine.

Any patient with the following test or laboratory ordered requires consultation with the University of Mississippi Medical Center by telemedicine: EKG, computed tomography scan, cardiac enzymes, lumbar puncture (if in the nurse practitioner's scope of practice), C-spine radiographs.

**Figure 3B.** Category II (consultation required).

*Galli et al*                                                                    *TelEmergency for Rural Hospitals*

Patients with the following complaints meet category III criteria and require emergency consult for stabilization and transfer. The nurse practitioners will consult with University of Mississippi Medical Center emergency physician on all patients presenting with the following conditions:

- Acute head injury
- Advanced airway management: intubation
- All resuscitations
- Burn management
- Dizziness with unstable vital signs
- Multisystem trauma evaluation and resuscitation
- Serious or complex medical emergencies
- Shock of any cause

Transfer of these patients should not be delayed because of the telemedicine consultation but should be used through the stabilization of these patients. Definitive treatment of these patients should not occur in the outlying EDs. Referral should be made to the closest appropriate facility able to provide the services needed.

The University of Mississippi Medical Center Helicopter transport service (AirCare) can be used as deemed appropriate by the University of Mississippi Medical Center TelEmergency physician on duty.

**Figure 3C.** Category III (consultation required and possible transfer).

were discharged directly from the ED at the TelEmergency participating site, compared with 18% who were admitted to the participating hospital and 18% who were transferred to other hospitals, including 7% to the University of Mississippi Medical Center. A small number of patients (0.05%) left before being seen, whereas 1% left against medical advice and 0.6% died while in the TelEmergency site ED.

The most common complaints (12.4%) were musculoskeletal, followed by abdominal pain/nausea and vomiting (11.7%), chest pain (10.7%), and upper respiratory infection (9.9%). In patients admitted to participating hospitals, the most common complaints were chest pain (34.2%) followed by asthma/chronic obstructive pulmonary disease (18.2%), diabetes/general medicine (15.4%), and abdominal pain/nausea and vomiting (10.7%). Upper respiratory infection and otitis media were complaints in more than 54% of pediatric patients. Trauma represented a relatively small percentage of our patients (6.2%).

**Performance Improvement**

The overriding goal of our performance improvement program is to ensure that patients receive appropriate treatment in a timely fashion. If the program is unsuccessful in achieving that goal, then all other measurements are meaningless. The TelEmergency program's performance improvement director reviews all cases involving complications from treatment, adverse drug reactions, and patient deaths monthly. Trends of missed intubations, negative outcomes, investigation requests (by collaborating physicians), and other indicators of education or skill needs were also continually monitored by the performance improvement director.

With the development of patient evaluation protocols, we thought that adherence to these protocols was an important

**Table 3A.** Patient characteristics.

| Dispositions | % |
|---|---|
| Admitted | 18.2 |
| Discharged | 62.1 |
| LBBS | 0.05 |
| Left AMA | 0.9 |
| Died in ED | 0.65 |
| Burn center | 0.03 |
| Transferred | 18.3 |
| Transferred to UMC | 5.9 |
| **Consultations** | |
| Nurse practitioner and collaborating physician | 40.5 |
| Nurse practitioner only | 59.5 |
| **Sex** | |
| Male | 45.2 |
| Female | 54.8 |
| **Race** | |
| Black | 62.32 |
| White | 36.98 |
| Hispanic | 0.66 |
| Native American | 0.04 |

*LBBS,* Left before being seen; *AMA,* against medical advice.

**Table 3B.** Patient disposition by age.

| Characteristics | Admit, % | Discharged, % | Transfer, % | Total, % |
|---|---|---|---|---|
| | 18 | 65 | 17 | |
| Mean age | 55.94 | 30.24 | 43.53 | 37.1 |
| <1 y | 12 | 69 | 19 | 1.8 |
| <36 mo | 10 | 81 | 9 | 11 |
| <16 y | 7 | 82 | 10 | 24.3 |
| 16–64 y | 48 | 60 | 61 | 58 |
| ≥65 y | 43 | 35 | 22 | 18 |
| >75 y | 46 | 33 | 21 | 10.0 |

outcome measurement to follow. A randomized medical record review of patients evaluated independently by the nurse practitioners has been instituted. Each quarter, 40 cases treated independently by nurse practitioners are reviewed by collaborating physicians. These charts are evaluated for:

1. adequate documentation appropriate for visit complaint
2. documentation of vital signs
3. appropriate treatment and documentation of patient response
4. documentation sufficient to support final diagnosis
5. appropriate referral and follow-up plan
6. documentation of patient education and outpatient instructions
7. controlled substance usage

Reviewed records are then returned to the nurse practitioner for review, with notations attached. Ongoing projects include medical record reviews for patients with specific diagnosis such as acute coronary syndromes, major trauma, and cardiac arrest.

**Patient Satisfaction**

In addition to ensuring quality patient care, we thought that ascertaining patient satisfaction with their experience with the

CDCR _188

**Table 4.** Ten most common patient complaint categories by age.

| Complaint categories | % |
|---|---|
| **All patients** | |
| Musculoskeletal | 12.40 |
| Abdominal pain/nausea vomiting | 11.75 |
| Chest pain | 10.75 |
| Upper respiratory infection | 9.94 |
| General medical/diabetes | 7.17 |
| Pulmonary/COPD/asthma | 7.13 |
| Trauma | 6.16 |
| Genitourinary/pregnancy | 5.52 |
| Ear | 4.30 |
| Headache | 3.68 |
| **Admitted patients** | |
| Chest pain | 34.26 |
| Pulmonary/COPD/asthma | 18.16 |
| General medical/diabetes | 15.37 |
| Abdominal pain/nausea vomiting | 10.74 |
| Congestive heart failure | 6.84 |
| Genitourinary/pregnancy | 3.97 |
| Neurologic/stroke/altered mental status | 3.09 |
| Musculoskeletal | 2.79 |
| Ear | 2.57 |
| Upper respiratory infection | 2.21 |
| **Patients <1 y old** | |
| Upper respiratory infection | 40.28 |
| Ear | 14.58 |
| Abdominal pain/nausea vomiting | 13.19 |
| Pulmonary/COPD/asthma | 10.42 |
| General medical/diabetes/electrolyte | 9.03 |
| Genitourinary/pregnancy | 4.86 |
| Dermatologic/rash | 3.47 |
| Throat | 1.39 |
| Eye | 1.39 |
| Trauma | 1.39 |
| **Patients >75 y old** | |
| Chest pain | 18.42 |
| General medical/diabetes/electrolyte | 16.15 |
| Abdominal pain/nausea vomiting | 14.02 |
| Musculoskeletal | 13.35 |
| Pulmonary/COPD/asthma | 11.48 |
| Congestive heart failure | 6.81 |
| Neurologic/stroke/altered mental status | 5.87 |
| Trauma | 5.07 |
| Genitourinary/pregnancy | 4.94 |
| Upper respiratory infection | 3.87 |

*COPD,* Chronic obstructive pulmonary disease.

TelEmergency program was important. To measure patient satisfaction, telemedicine patients were periodically surveyed during their visit. These surveys were completed by the patient or family member and returned at discharge. To date, a total of 434 responses have been received, representing 2% of TelEmergency patients.

In this survey, overall patient satisfaction with the TelEmergency program was very high, with 93.6% of patients stated they were comfortable or very comfortable with the system. A high percentage (98.7%) stated that they were able to communicate with the collaborating physician without difficulty. A majority (87.3%) believed that their care was as good as or better than they would have received with a physician alone. Overall, 91.2% of patients stated that they were more likely to come back to the rural ED because of TelEmergency, whereas 85.6% rated their overall care as good or excellent.

**Hospital Administrator Satisfaction**

Under the TelEmergency model, we are contracted by the participating hospitals to provide care for their patients, who then charge the patient or any second-party payers for the care we provided as contractors. Given the current financial climate, hospital administrators are interested in not only the quality of care and patient satisfaction but also the financial issues. We therefore created a questionnaire that addresses these issues, to be completed by hospital administrators. Eight of the 11 hospital administrators completed and returned the anonymous survey.

All administrators surveyed believe that the level of care has improved or remained the same in the ED. Seven of eight administrators (87.5%) think the TelEmergency program is cost equivalent or less expensive than their previous means of providing coverage for their EDs. The same proportion (87.5%) think that ED volume and admissions from the ED have increased. To date, 7 of 8 administrators surveyed have a favorable overall impression of the TelEmergency program.

A good indicator of participating hospital satisfaction can also be deduced by the fact that 7 of 8 hospitals that have participated in the program for greater than 1 year have elected to continue participating in the system. To date, we have had only 1 hospital that is no longer active in the TelEmergency system. In that case, a disagreement on the use of the TelEmergency nurse practitioner arose. Briefly, that hospital insisted on using the TelEmergency nurse practitioner with a local physician rather than the TelEmergency program serving as collaborating physician during regular business hours while using the TelEmergency program on nights and weekends. Such use was one of the primary motivations that led to the creation of the TelEmergency system and was diametrically opposed to the spirit of the program. In addition, this practice exposed the TelEmergency program and the TelEmergency nurse practitioner to unnecessary liability. TelEmergency service was therefore discontinued at that hospital.

**DISCUSSION**

The development of emergency medicine as a specialty has predominately occurred in relatively high-volume, high-acuity, urban EDs, which is reflected in the emergency medicine literature, in which the majority of published experience has originated in large urban centers. These centers are more likely to have diagnostic modalities such as computed tomography scanners and magnetic resonance imaging; specialists such as surgeons, cardiologists, and intensivists; and tools such as angiography, cardiac suites, and fluoroscopy that are generally

not routinely available in smaller rural EDs. Physicians working in these EDs are more likely to report American Board of Emergency Medicine certification and residency training than those working in rural EDs.[2]

Rural EDs face several disadvantages relative to urban EDs when it comes to patient care. The establishment of a diagnosis may be more difficult because of the absence of newer diagnostic modalities. Rural EDs often must delay treatment or use suboptimal treatments because of the lack of readily available consultants such as surgeons or interventional cardiologists. These disadvantages exist despite a similar number of admissions to critical care beds in rural EDs and urban EDs.[1] Rather than serving merely as "Band-Aid stations," rural EDs care for patients who are equally ill, with less manpower and fewer resources than their urban counterparts.[1]

One of the biggest difficulties rural EDs face is attracting and retaining skilled medical practitioners. Like other physicians, emergency physicians have a misdistribution based on population between rural and urban communities. Although 25% of the population of the United States lives in rural areas, only 15% of emergency physicians practice in rural communities.[1] Given the difficulties in staffing rural EDs with board-certified emergency physicians, it is widely acknowledged that other providers have a role in providing coverage. Possible providers include physicians who are not specifically trained in emergency medicine such as internists and family practitioners, as well as nonphysician providers such as nurse practitioners and physician assistants. In a joint policy statement, the American College of Emergency Physicians and the American Academy of Family Physicians acknowledge the role of the family physician in the provision of care in rural and remote areas[7]; however, the role of nonphysician providers was not addressed.

So-called midlevel practitioners have been involved in the treatment of ED patients for more than 25 years.[8] Nationwide, physician assistants are involved in 6.5% of visits, whereas nurse practitioners are involved in 1.8% of visits.[9] Visits associated with midlevel practitioners are similar to visits associated with physicians in ED care, diagnosis, and treatment.[10] Nearly 50% of EDs employ midlevel practitioners; however, it is unclear what percentage of EDs are staffed at times by a midlevel practitioner without a physician present.

Telemedicine uses technology to provide health care services to a patient located some distance from the health care provider. The original technology used to deliver real-time telemedicine was most likely the telephone, by which either a patient would interact directly with the physician or a practitioner evaluating a patient would discuss the patient over the telephone with a colleague or consultant. More recently, however, telemedicine has increasingly used advances in computer and networking technology to enable practitioners and patients to interact by using real-time audio and video. Telemedicine has been touted as a means to decrease health care disparities and to increase the fairness and equality of the distribution of services by increasing the access to health services, especially in remote areas.[11]

Although telemedicine offers great promise in improving patient care, progress has been limited because of a variety of issues, including the lack of efficacy data, high equipment and connection costs, and reimbursement.[6] We believe that the TelEmergency system that we have developed during the past 3 years goes a long way in overcoming these obstacles.

We believe that highly motivated nurse practitioners collaborating with experienced consulting physicians over an advanced teleconferencing system provides emergency care to patients in rural Mississippi that is similar in quality and more cost-effective than that delivered by physician staffing services. Although the criterion standard of emergency care remains hands-on delivery of care by a residency-trained, board-certified emergency physician, none of our participating hospitals are able to attract even 1 such physician because of geographic undesirability and financial limitations. Our system, although falling short of that ideal, nonetheless is a means of delivering care with real-time input from board-certified emergency physicians. In addition, it is a system with which patients and hospital administrators have expressed a high degree of satisfaction. Though further outcome study is necessary to ensure that we are meeting our goals in the quality of care we provide, we believe that our initial experience with the TelEmergency model has been a successful one and that it offers a potential of providing a feasible alternative to traditional staffing choices for rural EDs.

*Supervising editor:* Donald M. Yealy, MD

*Funding and support:* By *Annals* policy, all authors are required to disclose any and all commercial, financial, and other relationships in any way related to the subject of this article, that might create any potential conflict of interest. See the Manuscript Submission Agreement in this issue for examples of specific conflicts covered by this statement. The authors received no outside funding; however, the TelEmergency project itself did receive start up funding from The Bower Foundation and the Mississippi State Department of Health. This funding was for capitol expenditure for the initial purchase of video conferencing equipment and no portion of these funds were received by the authors or used in collection or analysis of data for this article.

*Publication dates:* Received for publication December 5, 2006. Revision received April 26, 2007. Accepted for publication April 27, 2007. Available online August 30, 2007.

*Address for reprints:* John Keith, MD, University of Mississippi Medical Center Emergency Medicine, 2014 Sherman Ave Unit 3, Evanston, IL 60201; 847-563-8355, fax 847-563-8355; E-mail john_keith@mac.com.

**REFERENCES**
1. Williams JM, Ehrlich PF, Prescott JE. Emergency medical care in rural America. *Ann Emerg Med.* 2001;38:323-327.
2. Wadman MC, Muelleman RL, Hall D, et al. Qualification discrepancies between urban and rural emergency department physicians. *J Emerg Med.* 2005;28:273-276.

CDCR _190

3. Moorhead JC, Gallery ME, Hirshkom C, et al. A study of the workforce in emergency medicine: 1999. *Ann Emerg Med.* 2002;40:3-15.
4. Roine R, Ohinmaa A, Hailey D. Assessing telemedicine: a systematic review of the literature. *CMAJ.* 2001;165:765-771.
5. Gutierrez G. Medicare, the internet, and the future of telemedicine. *Crit Care Med.* 2001;29(8 suppl):N144-N150.
6. Center for Medicare and Medicaid Services. *Chapter 15 Covered Medical and Other Heath Services: Medicare Benefit Policy Manual.* Available at http://www.cms.hhs.gov/manuals/Downloads/bp102c15.pdf. Accessed June 13, 2007.
7. American College of Emergency Physicians, American Academy of Family Physicians. AAFP-ACEP joint statement on emergency care [policy statement]. *Ann Emerg Med.* 2006;47:303.

8. US Congress, Office of Technology Assessment. *Nurse Practitioners, Physician Assistants, and Certified Nurse-Midwives: A Policy Analysis (Health Technology Study 37).* Washington, DC: US Government Printing Office; 1986. OTA-HCS-37.
9. Centers for Disease Control and Prevention. *National Hospital Ambulatory Medical Care Survey: 2003 Emergency Department Summary. Advance Data Number 358.*
10. Hooker RS, McCaig L. Emergency department uses of physician assistants and nurse practitioners: a national survey. *Am J Emerg Med.* 1996;14:245-249.
11. Roine R, Ohinmaa A, Hailey D. Assessing telemedicine: a systematic review of the literature. *CMAJ.* 2001;165:765-771.

## 2008
## Medical Toxicology
## MOC Assessment of
## Cognitive Expertise Examination

The American Board of Emergency Medicine (ABEM), the American Board of Pediatrics (ABP) and the American Board of Preventive Medicine (ABPM) will administer the MOC Assessment of Cognitive Expertise examination (formally known as the recertification examination) in Medical Toxicology on Wednesday, November 12, 2008. This examination will be administered at computer-delivered testing centers throughout the United States.

Physicians must complete the examination registration process with the board through which they received their initial certification in Medical Toxicology. Physicians certified by an American Board of Medical Specialties member board other than ABEM, ABP, and ABPM who attained Medical Toxicology certification through ABEM must register for this examination with ABEM.

Physicians certified in Medical Toxicology by ABEM may register for the 2008 Medical Toxicology MOC Assessment of Cognitive Expertise Examination beginning March 3, 2008, using EMCC Online. ABP and ABPM diplomates should contact their Boards for registration information.

**AMERICAN BOARD OF PEDIATRICS**

111 Silver Cedar Court
Chapel Hill, NC 27514
Telephone: 919.929.0461
Facsimile: 919.929.9255
www.abp.org

**AMERICAN BOARD OF PREVENTIVE MEDICINE**

330 South Wells Street
Suite 1018
Chicago, IL 60606
Telephone: 312.939.2276
Facsimile: 312.939.2218
www.abprevmed.org

**AMERICAN BOARD OF EMERGENCY MEDICINE**

3000 Coolidge Road
East Lansing, MI 48823
Telephone: 517.332.4800
Facsimile: 517.332.2234
www.abem.org

**CDCR _191**

# ATTACHMENT 9

CDCR _192

**ORIGINAL RESEARCH**

# Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana

Michelle Glaser, M.P.H.,[1] Tom Winchell, M.P.A.,[2]
Patty Plant, B.S.N., N.P., M.S.N.,[3] Wayne Wilbright, M.D., M.S.,[3]
Michael Kaiser, M.D.,[3] Michael K. Butler, M.D., M.H.A., C.P.E.,[3]
Matthew Goldshore, M.P.H.,[1] and Manya Magnus, Ph.D., M.P.H.[1]

[1]Department of Epidemiology and Biostatistics, The George
 Washington University School of Public Health and Health
 Services, Washington, DC.
[2]LSU Health Sciences Center, New Orleans, Louisiana.
[3]LSU Health Care Services Division, Baton Rouge, Louisiana.

## Abstract

Health information technology including telemedicine offers poten-
tial to improve patient care outcomes. As part of the response to
Hurricanes Katrina and Rita in 2005, the Louisiana State University
Health Care Services Division expanded its statewide telemedicine
program. The aim of this study was to evaluate provider satisfaction
and patient outcomes associated with telemedicine when used for the
administration of prisoner medical care. Providers completed a
survey following each patient encounter in real-time; questions were
adapted from standard satisfaction indices. Statistical methods in-
cluded uni-, bi-, and multivariable including ordinal regression
methods to characterize unadjusted and adjusted factors associated
with telemedicine use and provider satisfaction, and patient out-
comes. Data were collected between December 2007 and May 2008
and were analyzed using SAS and Stata. Out of 737 patient visits,
the majority of patients were African American (68.6%), men
(92.9%), seen for either infectious disease or mental health (46.2%
and 50.2%), with most surveys completed by a physician (63.1%).
Most telemedicine encounters were completed (92.8%), a treatment
plan was established (97.0%), the provider perceived that the

technology was adequate to conduct visit (93.4%), and a follow-up
telemedicine appointment was requested (90.8%). Most providers
were satisfied with telemedicine for the visit overall (87.0%), be-
lieved that telemedicine improved patient prognosis (88.2%), and
perceived that the patient was satisfied (83.0%). This study suggests
that telemedicine was an effective and accepted method of healthcare
provision.

**Key words:** *telemedicine, health information technology, outcomes
evaluation*

## Introduction

Telemedicine represents a unique opportunity to enhance healthcare delivery in situations where distance or travel challenges present barriers to specialty or other care. In-carcerated individuals represent a specific population where there may be benefits of telemedicine are accentuated; benefits may result from the elimination of need to travel great distances with security measures in place, halt regular clinics to accommodate prison patients, or provide specialty services to prisoners that would otherwise be unavailable.[1–4] Between transportation and extra guards, bringing a prisoner to a doctor's appointment can be ex-pensive and has potential to be dangerous. Telemedicine offers a way to decrease medical costs and improve care among incarcerated populations.[1–4]

The field of telemedicine, also known as telehealth, ranges from systematic phone contact between providers and patients for mental healthcare provision, to complex video visits with technological at-tachments to provide clinical assessments such as electrocardiogram (ECG) monitoring, otoscopes, dermatologic viewing, and more.[5–7] Uses of telemedicine include connecting prison populations to care as well as facilitating contact between providers and patients in rural

DOI: 10.1089/tmj.2009.0169

## SATISFACTION AND OUTCOMES ASSOCIATED WITH TELEMEDICINE IN PRISONS

areas where travel is a barrier to care. Multiple evaluations and reviews have been conducted in the use of telemedicine for provision of mental healthcare,[1,2,8-15] prison care,[16] HIV/AIDS care,[17-24] and dermatology,[25-28] among other disciplines. These consistently suggest an increasing acceptance of telemedicine as well as efficacy of the technology toward patient care improvements. Adolescent mental healthcare in detention centers and other settings has been shown to be particularly responsive to the use of telemedicine technology.[2,13,15]

In response to Hurricanes Katrina and Rita in 2005, Louisiana State University (LSU) Health Care Services Division enhanced and expanded its telemedicine program to facilitate continuity of care between clinics as well as respond to the unique needs of prisoner health. Over 48 video endpoints in 8 public medical centers and 13 prisons were created.[17,29] The initial set of services included HIV/AIDS care, mental health including juvenile services from detention centers, otolaryngology (ear, nose, and throat), dermatology, and neurology. At each prison telemedicine unit, self-contained carts were provided to link the prisoner patient with the provider. The equipment includes a primary video conferencing system (Polycom), with a secondary camera (AMD) used for dermatology and wound care appointments as either a hand held or tripod-mounted lens. A video monitor/television screen, with audio capabilities, is used for all clinical, administrative, and educational procedures that are part of the telemedicine encounter. An AMD/Welch Allyn otoscope and laryngoscope is used for the ear, nose, and throat appointments and the AMD 3700 Telephonic Stethoscope is used for the cardiology appointments. Additionally, there is a document camera capable of capturing, analog to digital conversion, and transmitting clinical images, radiographs, ECGs, and videos where digital copies do not exist.

In conjunction with the initial rollout in the prison health centers, an electronic provider survey was developed to capture the provider experiences. The aim of the survey was to obtain real-time satisfaction and outcomes data directly from providers at the time of telemedical care. Although multiple evaluations have supported telemedicine's association with patient and provider satisfaction and positive care outcomes in prison settings and the general population,[1,5,7,8,10,11,13,15,16,20,28,30,31] there remain gaps in telemedicine evaluation research, many stemming from difficulties in adequate response rate and reaching providers to gather data as well as sometimes minimal dissemination of results.

In a systematic review of the literature, one study found that between 1966 and 2005, 47 articles contained information on a complete technical evaluation of a telemedicine program and that only 3 of those used objective methods to complete the evaluation.[5] Challenges in obtaining real-time or near-real-time evaluation data regarding provider perceptions of the system, including information on satisfaction and patient outcomes, have been limited by poor response rates of providers or lengthy delays between point of service and data collection. For example, rural Canada[32] and Alaska[33] have telemedicine programs that reach citizens who are too remote from doctors and hospitals to receive medical treatment; however, the system has not yet published an extensive outcomes-based evaluation of its services. The Alaska Federal Health Care Access Network system has one of the country's oldest telemedicine systems, which was designed to overcome physical geographic barriers to care.[33] Despite the system's ability to generate system-based process evaluation data, satisfaction and outcomes data were collected by paper-based survey, resulting in a response rate of just 40%.[33]

Additional studies are needed to track real-time provider perception of prison system use of telemedicine and provider satisfaction with telemedicine, in conjunction with patient outcomes. Provider satisfaction with health information technology including telemedicine is a central component needed for adoption and implementation of any health information technology (HIT) to be successful.[34-39]

The aim of this study was to evaluate provider satisfaction and patient care outcomes associated with use of telemedicine in Louisiana prison clinics, using a method that captures real-time, electronically collected data.[17,29]

## Materials and Methods

In concert with a multidisciplinary team and based on a review of the existing literature, an electronic survey was developed that would be automatically presented to providers at the closure of each telemedicine visit. The survey contained five Likert questions regarding the provider's satisfaction with the telemedicine visit, perception of prognosis, and patient satisfaction with telemedicine, as well as six questions regarding patient outcome and disposition; questions are displayed in *Table 1*. The questions were adapted from other evaluations and literature, publicly available forms, reports, and publications.[32,33,40-43] Data obtained from all visits prison and nonprison between December 2007 and May 2008 were analyzed.

### ANALYSIS

Univariate and bivariate methods were used to characterize provider satisfaction and perception of telemedicine at each specific visit, and its association with patient disposition and visit outcomes. Responses on the questionnaire were first assessed for global associations with characteristics of the visit (location, clinic, and purpose)

CDCR _194

## Table 1. Evaluation Questions

| QUESTION | RESPONSE SET |
|---|---|
| Was this telemedicine visit completed? | Yes/No |
| If No to question above, why? | Telemed technology did not work |
| | Patient refused visit |
| | Patient no show |
| | Clinician unavailable |
| | Clinic or session cancelled |
| | Clinic or session occurred |
| Was the telemedicine technology adequate to conduct today's visit? | Yes/No |
| What information was not available but was needed to either make a diagnosis and/or treat the patient? | |
| Was a treatment plan established? | |
| What is the patient's disposition? | Inappropriate consultation—requires additional consult by referring clinician |
| | Patient needs to be seen at provider site |
| | Follow-up telemedicine encounter requested by provider |
| | Telemedicine encounter needs to be rescheduled |
| | Other |
| Based on your perception about today's telemedicine visit, clinical decision making was successfully accomplished? | Completely agree/agree/neutral/disagree/completely disagree |
| Based on your perception, today's telemedicine visit may have improved the patient's prognosis? | |
| Based on your perception about today's telemedicine visit, how satisfied are you today's telemedicine outcome? | Completely satisfied/generally satisfied/neutral/generally dissatisfied/completely dissatisfied |
| What is your perception about overall patient satisfaction with today's telemedicine visit? | |
| What is your perception about overall patient satisfaction with today's telemedicine visit? | |

and patients (age, race, and sex). Those found significantly associated were then assessed to ensure assumptions underlying ordinal regression were met; if they were, ordinal regression was used to model characteristics associated with agreement to the Likert statements. Logistic regression was used to model characteristics associated with completion of the visit, perception that technology was adequate for the visit, and whether a treatment plan was established. For all research questions, $\alpha$ was set to 0.05. Stata 9.0se was used for analysis.

All survey protocols and instrumentation were approved by the LSU Health Sciences Center and George Washington University Medical Center Institutional Review Boards.

## Results

As shown in *Table 2*, the majority of patients were men (92.9%), African American (68.6%), and over 18 years of age at the time of the visit (54.1%). Visits were nearly evenly split between mental health/

CDCR _195

## SATISFACTION AND OUTCOMES ASSOCIATED WITH TELEMEDICINE IN PRISONS

### Table 2. Characteristics of Patients and Visits, December 2007 to May 2008 ($n = 737$)

| | N (%) |
|---|---|
| **Sex** | |
| Female | 52 (7.1) |
| Male | 685 (92.9) |
| **Race** | |
| Black/African American | 401 (68.6) |
| White | 138 (23.6) |
| Other | 46 (6.2) |
| **Age (years)** | |
| <18 | 338 (45.9) |
| ≥18 | 399 (54.1) |
| **Visit type** | |
| Mental health/psychology | 371 (52.3) |
| HIV/infectious disease | 340 (46.1) |
| Dermatology/other | 26 (3.5) |
| **Degree of person completing survey** | |
| MD | 465 (63.1) |
| NP | 94 (12.8) |
| RN | 119 (16.2) |
| Other | 59 (8.0) |
| **Telemedicine visit completed** | |
| Yes | 684 (92.8) |
| No | 53 (7.2) |
| **If visit was not completed, reason ($n = 53$)** | |
| Patient refused visit | 25 (40.3) |
| Telemedicine technology did not work | 14 (22.6) |
| Patient no show | 13 (21.0) |
| Clinic or session cancelled | 10 (16.1) |
| **Technology adequate to conduct visit** | |
| Yes | 648 (93.4) |
| No | 46 (6.6) |
| **Treatment plan established** | |
| Yes | 715 (97.0) |
| No | 22 (3.0) |
| **Patient disposition** | |
| Follow-up telemedicine encounter requested | 660 (90.8) |
| Patient needs to be seen at provider site | 33 (4.5) |
| Telemedicine encounter needs to be rescheduled | 20 (2.8) |
| Return to referring clinician | 5 (0.7) |
| Other | 9 (1.2) |

psychology (52.3%) and HIV/infectious disease (46.1%). Physicians completed the majority of the survey (63.1%). The telemedicine visits were completed in 92.8% of the surveys, with 93.4% of respondents citing technology as adequate to complete the visits. In addition, 97.0% of respondents cited that they were able to establish a treatment plan during the visit. The vast majority of respondents requested a subsequent telemedicine visit for their patient's follow-up (90.8%).

As shown in *Table 3*, there was substantial agreement with statements indicating satisfaction with the telemedicine system: 88.2% completely agreed or agreed that the telemedicine visit may have improved the patient's prognosis, 89.4% completely agreed or agreed that clinical decision making was successfully accomplished with telemedicine visit, 83.6% were completely or generally satisfied with the telemedicine visit outcome, 82.2% completely or generally satisfied overall with telemedicine visit, and 83.0% perceived that the patient was completely or generally satisfied overall with telemedicine visit. Perception at the negative or far negative side of the spectrum was less than 8% for each of the five statements.

As shown in *Table 4*, after adjustment for all variables in the models, providers reported that they were less likely to complete a visit for patients <18 years (odds ratio [OR] 0.35 [95% confidence interval (CI) 0.13–0.96]), less likely to perceive that technology was adequate for patients <18 years (OR 0.26 [95% CI 0.07–0.09]), and more likely to establish a treatment plan for African American patients (OR 4.64 [95% CI 1.54–13.98]). After adjustment for all variables in the models, male sex was consistently and significantly associated with provider-perceived satisfaction with all facets of the system and achieved positive clinical outcomes, whereas age <18 was consistently and significantly associated with less satisfaction and agreement with the positive statements. For nearly all of the Likert statements, physicians closing out the visits and taking the surveys were more likely to relate dissatisfaction with the system than nonphysicians.

### Discussion

This study suggests that there was an overall high level of satisfaction with patient outcomes associated with the Louisiana statewide telemedicine system. For use in connecting prisoners to specialty care as well as linking locations to care where distance was a challenge to care delivery, telemedicine was an effective and accepted method of healthcare provision. Most visits were completed; telemedicine was requested for follow-up visits for the vast majority of patients when the technology was perceived as

Table 3. Provider Perception of Telemedicine and Patient Outcomes, December 2007 to May 2008 (n = 737)

| | N (%) |
|---|---|
| Based on your perception, today's telemedicine visit may have improved the patient's prognosis | |
| Completely agree | 279 (37.9) |
| Agree | 371 (50.3) |
| Neutral | 71 (9.6) |
| Disagree | 3 (0.4) |
| Completely disagree | 13 (1.8) |
| Based on your perception about today's telemedicine visit, clinical decision making was successfully accomplished | |
| Completely agree | 283 (38.8) |
| Agree | 369 (50.6) |
| Neutral | 62 (8.5) |
| Disagree | 2 (0.3) |
| Completely disagree | 13 (1.8) |
| Based on your perception about today's telemedicine visit, how satisfied are you with today's telemedicine outcome? | |
| Completely satisfied | 281 (38.1) |
| Generally satisfied | 335 (45.5) |
| Neutral | 65 (8.8) |
| Generally unsatisfied | 42 (5.7) |
| Completely unsatisfied | 14 (1.9) |
| Based on your perception, what is your overall satisfaction with the telemedicine system for this telemedicine visit? | |
| Completely satisfied | 283 (38.4) |
| Generally satisfied | 323 (43.8) |
| Neutral | 73 (9.9) |
| Generally unsatisfied | 44 (6.0) |
| Completely unsatisfied | 14 (1.9) |
| What is your perception about overall patient satisfaction with today's telemedicine visit? | |
| Completely satisfied | 267 (36.2) |
| Generally satisfied | 345 (46.8) |
| Neutral | 75 (10.2) |
| Generally unsatisfied | 37 (5.0) |
| Completely unsatisfied | 13 (1.8) |

adequate to meet the clinical needs of the patients. These results suggest that the providers are successfully using the telemedicine technology to treat prisoners using these methods in mental health/psychology and HIV/infectious disease. The type of appointment that resulted in the greatest challenges included mental health televisits for residents of juvenile detention centers. These patients were least likely to have their visits completed, and were more likely to have providers perceive that the technology was not adequate for the visit at hand. This may reflect the difficulties in treating this adolescent population in juvenile detention settings more than the telemedicine itself, but suggests that the technology should be carefully monitored for satisfactory outcomes among this population. This is contrary to the findings of other investigators[2,13,15] who found telemedicine to be successful with adolescents, including those in detention centers. Although women composed a very small proportion of the sample, our measures suggest that the providers perceived the use of telemedicine to be more satisfactory and with less satisfactory patient outcomes than that for their male counterparts. Future studies are needed among samples with more women to examine this more fully.

This study has several strengths and limitations. The survey was inserted into the telemedicine electronic interface that sets appointments and contains patient data as a part of the electronic close-out procedures, which ensured maximum participation among the providers; this increases the generalizability of the findings to the population of providers using the telemedicine program. The survey was developed by a multidisciplinary team and was evaluated by sentinel providers before launch, to ensure acceptability of the tool. During that period, however, the length of the survey was found to be too long and the final survey omits several questions that could have lent context or depth to the responses. Other than location, type of clinic, and the type of provider closing out the survey, few characteristics are available regarding the providers. Future studies may examine whether provider characteristics such as comfort with computers or technology are associated with satisfaction; if so, additional training may be provided to those most at risk of dissatisfaction with the system. Of particular interest may be differentiating frequent telemedicine users from occasional users. The relative impact of satisfaction with telemedicine may depend on how frequently the provider uses the technology, as well as how comfortable the patient is with the system. In addition, more information beyond demographic characteristics of the patients, such as diagnosis codes or other clinical information, would enrich our understanding of the relationship between telemedicine use in the prisons and provider satisfaction with evolving technologies. Additional research into the patient perspective of telemedicine and satisfaction with the system are needed. An additional limitation of the current cross-sectional study is the inability to track trends in satisfaction or utilization over a longer time frame. This temporal information would be helpful to see if as the providers become more accustomed to the telemedicine procedures, their levels of utilization or satisfaction

CDCR _197

SATISFACTION AND OUTCOMES ASSOCIATED WITH TELEMEDICINE IN PRISONS

Table 4. Adjusted[a] Characteristics Associated with Provider Satisfaction and Patient Outcomes, December 2007 to May 2008 (Odds Ratio [95% Confidence Interval]) ($n = 737$)

| | TELEMEDICINE VISIT COMPLETED | TREATMENT PLAN ESTABLISHED | TECHNOLOGY ADEQUATE FOR TODAY'S VISIT | IMPROVED PROGNOSIS[b] | CLINICAL DECISION MAKING FACILITATED[b] | SATISFIED WITH TODAY'S TELEMEDICINE OUTCOME[b] | SATISFIED WITH TELEMEDICINE SYSTEM[b] | PERCEPTION OF PATIENT SATISFACTION[b] |
|---|---|---|---|---|---|---|---|---|
| Patient sex | | | | | | | | |
| Male | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Female | 1.09 (0.24–4.97) | 0.34 (0.06–1.94) | 0.82 (0.23–2.94) | 0.41 (0.22–0.75)[c] | 0.49 (0.27–0.89)[d] | 0.38 (0.20–0.71)[c] | 0.35 (0.18–0.66)[c] | 0.40 (0.22–0.75)[c] |
| Patient race | | | | | | | | |
| Non–African American | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| African American | 1.27 (0.71–2.25) | 4.64 (1.54–13.98)[c] | 0.95 (0.52–1.75) | 1.10 (0.82–1.46) | 1.12 (0.87–1.56) | 1.08 (0.82–1.44) | 1.05 (0.79–1.39) | 1.25 (0.94–1.66) |
| Patient age (years) | | | | | | | | |
| ≥18 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| <18 | 0.35 (0.13–0.96)[d] | 0.15 (0.18–1.34) | 0.26 (0.07–0.90)[d] | 1.59 (1.06–2.39)[d] | 1.56 (1.03–2.35)[d] | 1.73 (1.16–2.59)[c] | 1.54 (1.03–2.29)[d] | 2.14 (1.43–3.20)[e] |
| Provider type | | | | | | | | |
| Nonphysician | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Physician | 1.01 (0.34–2.98) | 2.24 (0.27–20.61) | 2.73 (0.79–9.53) | 1.46 (0.97–2.20) | 1.87 (1.24–2.82)[c] | 1.64 (1.10–2.47)[d] | 1.89 (1.27–2.81)[c] | 1.61 (1.08–2.40)[d] |

[a]Adjusted for all other variables listed.
[b]OR > 1.0 indicates increasing disagreement with statement and dissatisfaction with system; OR < 1.0 indicates increasing agreement with statement and satisfaction with system.
[c]$p < 0.01$.
[d]$p < 0.05$.
[e]$p < 0.001$.

change. As the telemedicine system in Louisiana evolves, time-trend analyses can be conducted to see if there are trends in satisfaction and usage over time.

## Conclusions and Recommendations

Telemedicine is an integral part of the growing health information technology field. Telemedicine offers an immediate and real step toward improving the healthcare provided to prisoners in Louisiana as well as individuals needing specialty care between rural and urban locations. Providers are no longer inconvenienced by security measures and work interruptions experienced with face-to-face consultations with the prisoners, offering the potential for realization of cost savings over time as well as improved care for prisoners. Ongoing prospective evaluation of provider satisfaction and association between telemedicine usage and patient outcomes will enable system improvements over time. Future evaluations will explore changes over time and in provider and patient satisfaction with the technology as it broadens and is implemented elsewhere throughout the state.

## Acknowledgments

The authors wish to acknowledge the contribution of all providers, faculty, and staff engaging in this study as well as the patients seen, without whom this study would not have been possible. Michelle Glaser was a student at GWU at the time of her participation in this study. She is currently a CDC/CTSE Applied Epidemiology Fellow.

This study was funded in part by the LSU Health Care Services Division and the LSU Health Sciences Center.

## Disclosure Statement

No competing financial interests exist.

CDCR _198

## REFERENCES

1. Fox KC, Somes GW, Waters TM. Timeliness and access to healthcare services via telemedicine for adolescents in state correctional facilities. *J Adolesc Health* **2007;**41:161–167.

2. Fox KC, Whitt AL. Telemedicine can improve the health of youths in detention. *J Telemed Telecare* **2008;**14:275–276.

3. Goodale J, Menzel D, Hodgson G. High-tech prisons: Latest technologies drive cost savings and staff efficiencies. *Corrections Today* **2005;**67:78–81.

4. Watson W, Stimpson A, Hostick T. Prison health care: A review of the literature. *Int J Nurs Stud* **2004;**41:119–128.

5. Clarke M, Thiyagarajan CA. A systematic review of technical evaluation in telemedicine systems. *Telemed E Health* **2008;**14:170–183.

6. Field MJ. *A guide to assessing telecommunications in health care.* Washington, DC: National Academies Press, **1996.**

7. Mair F, Whitten P. Systematic review of studies of patient satisfaction with telemedicine. *Br Med J* **2000;**320:1517–1520.

8. Godleski L, Nieves JE, Darkins A, Lehmann L. VA telemental health: Suicide assessment. *Behav Sci Law* **2008;**26:271–286.

9. Yellowlees P, Marks S, Hilty D, Shore JH. Using e-health to enable culturally appropriate mental healthcare in rural areas. *Telemed J E Health* **2008;** 14:486–492.

10. Mitchell JE, Crosby RD, Wonderlich SA, Crow S, Lancaster K, Simonich H, Swan-Kremeier L, Lysne C, Myers TC. A randomized trial comparing the efficacy of cognitive-behavioral therapy for bulimia nervosa delivered via telemedicine versus face-to-face. *Behav Res Ther* **2008;**46:581–592.

11. Ross JT, TenHave T, Eakin AC, Difilippo S, Oslin DW. A randomized controlled trial of a close monitoring program for minor depression and distress. *J Gen Intern Med* **2008;**23:1379–1385.

12. Mozer E, Franklin B, Rose J. Psychotherapeutic intervention by telephone. *Clin Interv Aging* **2008;**3:391–396.

13. Cloutier P, Cappelli M, Glennie JE, Keresztes C. Mental health services for children and youth: A survey of physicians' knowledge, attitudes and use of telehealth services. *J Telemed Telecare* **2008;**14:98–101.

14. Yellowlees P, Burke MM, Marks SL, Hilty DM, Shore JH. Emergency telepsychiatry. *J Telemed Telecare* **2008;**14:277–281.

15. Myers KM, Valentine JM, Melzer SM. Child and adolescent telepsychiatry: Utilization and satisfaction. *Telemed J E Health* **2008;** 14:131–137.

16. Morgan RD, Patrick AR, Magaletta PR. Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities. *J Consult Clin Psychol* **2008;** 76:158–162.

17. Besch CL. Telemedicine improves access to care for HIV-infected prisoners. *HIV Clin* **2007;**19:4–5.

18. Zolfo M, Arnould L, Huyst V, Lynen L. Telemedicine for HIV/AIDS care in low resource settings. *Stud Health Technol Inform* **2005;**114:18–22.

19. Zolfo M, Lynen L, Dierckx J, Colebunders R. Remote consultations and HIV/AIDS continuing education in low-resource settings. *Int J Med Inform* **2006;**75: 633–637.

20. Danahar D. Louisiana update. Delta to explore new venues in 1999. *Fac Notes (New Orleans La)* **1999;**11:4.

21. Caceres C, Gomez EJ, Garcia F, Gatell JM, del Pozo F. An integral care telemedicine system for HIV/AIDS patients. *Int J Med Inform* **2006;**75:638–642.

22. Vazquez E. HIV treatment in prison. *Posit Aware* **2001;**12:32–34.

23. Mahoney MR, Khamarko K, Goldschmidt RH. Care of HIV-infected Latinos in the United States: A description of calls to the National HIV/AIDS Clinicians' Consultation Center. *J Assoc Nurses AIDS Care* **2008;**19:302–310.

24. Makulowich JS. AIDS and telemedicine. *AIDS Patient Care STDS* **1996;**10: 387–388.

25. Chanussot-Deprez C, Contreras-Ruiz J. Telemedicine in wound care. *Int Wound J* **2008;**5:651–654.

26. Wurm EM, Hofmann-Wellenhof R, Wurm R, Soyer HP. Telemedicine and teledermatology: Past, present and future. *J Dtsch Dermatol Ges* **2008;**6: 106–112.

27. Wurm EM, Campbell TM, Soyer HP. Teledermatology: How to start a new teaching and diagnostic era in medicine. *Dermatol Clin* **2008;** 26:295–300, vii.

28. Mofid M, Nesbitt T, Knuttel R. The other side of teledermatology: Patient preferences. *J Telemed Telecare* **2007;**13:246–250.

29. The Louisiana State University Health Care Services Division Medical Informatics and Telemdicine Program. Telemedicine Hardware. http://medinfo-telemed. lsuhsc.edu/ (last accessed April 4, 2010).

30. Harrison R, Macfarlane A, Murray E, Wallace P. Patients' perceptions of joint teleconsulations: A qualitative evaluation. *Health Expect* **2006;**9:81–90.

31. Love W. Patient and provider satisfaction with the use of telemedicine: Overview and rationale for cautious enthusiasm. *J Postgrad Med* **2005;**51: 294–300.

32. Nova Scotia Department of Health. Remote specialist consultation and continuing medical education pilot project. Halifax: The Department, 1997. Last accessed September 9, 2007.

33. University of Alaska Statewide Health Programs and University of Alaska Anchorage Center for Human Development. Evolution & summative evaluation of the Alaska Federal Health Care Access Network telemedicine project 2004. **2004.** http://www.alaska.edu/health/downloads/Telemed/AFHCAN.pdf (last accessed September 9, 2007).

34. Dagroso D, Williams PD, Chesney JD, Lee MM, Theoharis E, Enberg RN. Implementation of an obstetrics EMR module: Overcoming user dissatisfaction. *IJ Healthc Inf Manag* **2007;**21:87–94.

35. Adler KG, Edsall RL. Electronic health records: A user-satisfaction survey. *Fam Pract Manag* **2005;**12:45–54.

36. Joos D, Chen Q, Jirjis J, Johnson KB. An electronic medical record in primary care: Impact on satisfaction, work efficiency and clinic processes. *AMIA Annu Symp Proc* **2006;**2006:394–398.

37. Likourezos A, Chalfin DB, Murphy DG, Sommer B, Darcy K, Davidson SJ. Physician and nurse satisfaction with an electronic medical record system. *J Emerg Med* **2004;**27:419–424.

38. O'Connell RT, Cho C, Shah N, Brown K, Shiffman RN. Take Note(s): Differential EHR satisfaction with two implementations under one roof. *J Am Med Inform Assoc* **2004;**11:43–49.

CDCR _199

## SATISFACTION AND OUTCOMES ASSOCIATED WITH TELEMEDICINE IN PRISONS

39. Whitten P, Buis L, Mackert M. Factors impacting providers' perceptions regarding a midwestern university-based EMR. *Telemed J E Health* 2007;13:391–397.

40. McDonald WR. External evaluation of the California telemedicine and eHealth center (CTEC) network development grant: Bi-Annual Progress Report. 2007.

41. Rose D. Evaluation of the California telehealth and telemedicine center. In: Dennis & Rose Associates DRA Project Reports, June 2002, Vol. 2. http://www.cttonline.org/eval.html (last accessed April 2008).

42. Association AT. Kentucky Telecare, University of Kentucky Chandler Medical Center. Telemedicine Consultant Evaluation Form. http://www.americantelemed.org/news/forms.html (last accessed April 2008).

43. Network MT. Patient questionnaire. 2001.

Address correspondence to:
*Manya Magnus, Ph.D., M.P.H.*
*Department of Epidemiology and Biostatistics*
*The George Washington University School*
*of Public Health and Health Services*
*2100-W Pennsylvania Avenue, NW, Suite 807*
*Washington, DC 20037*

*E-mail:* sphmdm@gwumc.edu

*Received:* November 21, 2009
*Accepted:* December 24, 2009

CDCR _200

# ATTACHMENT 10

7/6/2018    Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR    Document 5873-5    Filed 08/03/18    Page 245 of 563



# Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future

e-Mental Health pp 233-249 | Cite as

- Peter M. Yellowlees  (1)
- Donald M. Hilty  (2) Email author (donho31226@gmail.com)
- Davor Mucic  (3)

1. Health Informatics Graduate Program, University of California, Davis Health System, , Sacramento, USA
2. Keck School of Medicine, University of Southern California, , Los Angeles, USA
3. The Little Prince Psychiatric Centre, , Copenhagen, Denmark

Chapter

- 1 Citations
- 9 Readers
- 1.1k Downloads

## Abstract

Telemedicine and Internet-enabled clinical systems are already widely available and are starting to have an impact on the doctor-patient relationship and will increasingly do this more in future. Research shows that online MH interventions are as effective as traditional face-to-face therapy for disorders such as depression and anxiety. We explore the impact of technology on the doctor-patient relationship as new technologies and clinical processes are applied to patient care (e.g., virtual patient advocates). In the future, we will likely change clinical processes, add models of care (e.g., hybrids), better apply new technologies to the underserved (e.g., cross-cultural populations), and have even newer technologies to size up.

## Keywords

Autism Spectrum Disorder    European Union    Cognitive Behavior Therapy    Machine Translation    Asylum Seeker
These keywords were added by machine and not by the authors. This process is experimental and the keywords may be updated as the learning algorithm improves.
Download chapter PDF



## 12.1 Introduction

Telemedicine and Internet-enabled clinical systems are already widely available and are starting to have an impact on the doctor-patient relationship and will increasingly do this more in future. Telemedicine consultations are now so common that they are undertaken on broadband Internet systems run in the cloud almost routinely, and professionals from all areas in mental health (MH) (from psychiatrists, psychologists, marriage and family therapists to career counselors) can now deliver e-therapy. Yellowlees and Nafiz [1] have described how MH resources and services available to patients at home or in the community may be provided through a multitude of Internet devices, ranging from computers to iPhones, including:

- Online/video/telephone-based patient support groups and Websites for health information

- Telepsychiatry consultations and e-mail/phone/instant messaging with physicians and other providers from fixed and mobile locations

CDCR _202

7/6/2018     Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR     Document 5873-5     Filed 08/03/18     Page 246 of 563

- Multimedia educational materials developed by patients and providers for both patient and provider education

- Scheduling systems, personal electronic health records, and tools for self-directed decision support and chronic disease management

Commercial Websites offering telepsychiatry services such as Healthlinknow.com not only offer information for both professionals and clients on how telepsychiatry works but also services like MH consultations for clients in larger cities and smaller remote communities, prisons, and clinics. Online cognitive behavior therapy (CBT) programs, such as fearfighter.com and "beating the blues" offer computer-aided CBT (CCBT) for a fraction of the cost of a traditional face-to-face therapy. Fearfighter is a Website designed to treat panic and phobia with multistep interventions and has full outcome measurement tracking and patient support in the form of e-mail interactions, secure messaging, and telephone interactions (fearfighter.com).

It is estimated that 70 % of Americans own smartphones and 50 % of adults have used their phone to look up health or medical information. There are numerous mood-tracking applications for cell phones now. These apps are generally either free or cost just a few dollars (generally \$2–\$10) and allow users to track their quality and amount of sleep, stress and mood behavioral triggers, general health, and most importantly their mood (ranging from depression, anxiety, stress, post-traumatic stress, brain injury, and many more). There are reminder alarms if you forget to check in and notepad features that allow users to journal each day. The T2 Mood Tracker (developed by the National Center for Telehealth and Technology) is a good example and allows users to pick and choose which symptoms apply to them as well as tracking their symptoms.

The following are sample comments by users of the T2 Mood Tracker application [1]:

> I have adult ADD, depression and GAD. The reminder feature is very helpful or I wouldn't remember to use it consistently. I like that I can track each of my issues separately, which helps me to notice which issues are giving me more trouble. This makes me feel a lot less anxious in itself, since part of the problem with managing mental issues is knowing which ones are the root symptoms, and which are symptoms of the root cause not being addressed.

This tool (T2 Mood Tracker) provides the tracking and journaling that so many psychologists and other MH providers encourage clients to use in order to really monitor their functioning. If used regularly, this app could be phenomenal in helping individuals to learn control over their own mind and body.

Developed by universities and experts in the field, there are also free self-help Websites for those seeking alleviation from symptoms of mental disorders. MoodGYM is an innovative, interactive Web program designed by researchers at the Centre for Mental Health Research at the Australian National University and is designed for the treatment of depression and anxiety [2]. Using flash diagrams and online exercises, MoodGYM teaches CBT to its 400,000 plus users – a proven treatment for depression as well as relaxation and meditation techniques. Research trials have shown that MoodGYM significantly reduces depression symptoms for its users, and the benefits have been shown to last for up to 12 months when compared to control groups [3, 4].

Research shows that online MH interventions are as effective as traditional face-to-face therapy for disorders such as depression and anxiety. For example, treatment outcomes are comparable with both face-to-face and online CBT in alleviating symptoms of panic disorder and agoraphobia. Based on a 30-month follow-up study for treatment of social phobia, research showed that the long-term effects of face-to-face delivered CBT was comparable to Internet-based treatment. In regard to depression, research shows that both CBT and psychoeducation obtained online can reduce symptoms of depression.

Telepsychiatry consultations are now well established with guidelines existing for both adult and child psychiatry and have been demonstrated to be diagnostically valid and show substantial patient satisfaction [5, 6]. Details of the evidence base for telepsychiatry and the telepsychiatry literature are provided elsewhere in this book.

This chapter will help the reader review trends in international e-mental healthcare: (1) the best of what is being done now with new technologies, (2) the application of new technologies to patient care (e.g., virtual patient advocates), and (3) how we will move forward with changes in clinical processes, models of care (e.g., hybrids), applying new developments to the underserved (e.g., cross-cultural populations), and sizing up even newer technologies over the next decade or two.

## 12.2 Impact on the Doctor-Patient Relationship

It has been described how on a typical day a military psychologist might provide an hour of therapy to a patient struggling with anxiety in Guam, another hour to a client in Japan experiencing post-traumatic stress disorder, and a third hour to a soldier in his home state of Hawaii who might be dealing with depression [1]. All of this therapy is provided from an office at Tripler Army Medical Center in Honolulu, but only one of the sessions is done face-to-face.

The doctor-patient relationship is central to the general practice of medicine, but it is especially important in psychiatry and other MH care fields because it plays a prominent role in the therapeutic process. In his book *The Doctor, His Patient and the Illness*, Balint described the doctor-patient relationship as a process involving three stages: the collection of symptoms from the patient (including the physical and mental state exams), a diagnostic evaluation, and seeking mutual agreement on a management plan.

Psychiatrists have been described as having three potential roles in the doctor-patient relationship – that of authority, facilitator, or partner. In the authority role, the psychiatrist makes all the decisions for the patient – this role is becoming less common although some patients still prefer to be told what to do and not to have major input into the decision-making process. In the facilitator role, the psychiatrist guides his or her patients to appropriate information that will help the patient make informed treatment choices. Finally, in the partner role, the psychiatrist assists with research into therapeutic options and information analysis but the patient is often the primary researcher. Ultimately, in the partner role, the patient makes their own decisions and this is often described as patient-focused care.

7/6/2018     Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR     Document 5873-5     Filed 08/03/18     Page 247 of 563

With the advent of videoconferencing, e-mail, and instant messaging, the relationship of the doctor-patient has undoubtedly changed, however, as Andersson has written, "Emerging evidence across trials clearly suggests that the computer cannot totally replace human contact" [7]. In-person consultations will remain the core of most psychiatrist-patient relationships but the Internet is becoming a major component of most health consultations and will continue to change the way that psychiatrists and other MH professionals work. Initially, patients may have a traditional face-to-face visit but this might be followed with video visits such as online therapy and psychoeducation with in-person visits occurring as needed so that increasing numbers of patients and doctors now have what Yellowlees has described as a hybrid relationship.

With the use of e-therapy using videoconferencing, e-mail, or telephone/texting or messaging, it is vital that both practitioners and clients understand and appreciate the limited nature of this medium and practitioners need to:

- Assess if the client is suitable for online treatment, taking into consideration if the client is in immediate crisis, is engaged in active suicidal ideation or if there are other serious concerns such as domestic violence or severe drug use

- Have back-up resources in place to address urgent issues

- Educate clients and provide informed consent

- Assess the suitability of clients and work within ethical parameters

E-therapy has numerous benefits, such as the convenience of undergoing treatment in the privacy of your home versus having to drive to see a mental healthcare provider. It allows patients and practitioners to bypass time and geographical boundaries, allowing access to mental healthcare for those with limited mobility or for people who live in remote locations. And although in-person therapy is considered the gold standard, researchers are discovering that online treatments can be as effective and therapeutic but this is not to say that there are no opposing opinions and certain issues that still need addressing.

One issue with online therapy is the artificial distance created between the doctor and the client, and researchers have argued that this can have both positive and negative consequences. The clinical limitations of distance involve lack of visual and auditory cues, body language, and spontaneous clarification (if communication is via e-mail or text), which can be very important in some instances in therapy. However, with treatments of disorders that have a potential element of shame, stigma or embarrassment, such as post-traumatic stress disorder, eating disorders, or for those struggling with social anxiety, the prospect of receiving treatment from a distance can be appealing [7]. Researchers have hypothesized that online counseling may create a sense of disinhibition where clients feel more comfortable discussing sensitive topics online compared with a traditional in-person setting [8]. Dr. Fishkind, a psychiatrist based out of Texas has written:

> We've had over 60,000 patient encounters...only six have been refused to be seen via teleconferencing...when it comes to mental health issues and the difficult things you need to talk about in a crisis, a lot of patients feel it's less threatening and easier to be open and communicative via telemedicine.

In the treatment of children and adolescents, the authors have argued that in certain cases telepsychiatry might be a superior method of psychiatric assessment than face-to-face consultations [9]. They discussed five case studies, one of which is the following:

> A 15-year old girl was referred for a consultation by her primary care provider, and she agreed to individual face-to-face therapy for the first time after her first telepsychiatry consultation. Despite multiple attempts in the past, she had declined to do so. The girl stated that she felt more comfortable in front of a monitor than with "a real psychiatrist." Both the girl and her mother reported that in the past she had refused to open up. After the telepsychiatry session, an appointment with a local psychologist was secured for individual therapy. At 2-month follow up, the girl reported improvement with her energy level, sleep, and social motivation. She had been meeting with her therapist consistently every week since the initial consultation with us.

An adolescent psychiatrist who treats adolescents Virginia, was noted to say that:

> [Patients] feel great about seeing me on the television and they actually become more animated when they see me that way, especially kids with anxiety issues. They do very well with telemedicine [1].

Distance (when e-mail is utilized as a medium) also allows for a "zone of reflection," which has been described as a slowing down of the therapy process which allows both parties to pay close attention to their own thoughts and feelings while still engaged in a dialogue [10]. The author also suggested that some clients might also be more comfortable expressing themselves in writing and the process of writing itself can be therapeutic and encourage insight [10].

Numerous ethical and legal questions have been raised as the healthcare field advances increasingly towards using the Internet routinely for clinical mental healthcare, including:

- The practicalities of the use of e-mail in the doctor-patient relationship

- State licensing and credentialing concerns if therapist and client are in different states

- Confidentiality and privacy for both patients and providers

7/6/2018          Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR          Document 5873-5          Filed 08/03/18          Page 248 of 563

- The right of providers to not be always available to patients and to have appropriate downtime and work-life balance

In order to ensure confidentiality and privacy, practitioners need to utilize safeguards such as firewalls and password protection, but even with these precautions a misdirected e-mail to an unintended recipient increases liability exposure for the psychiatrist. A possible solution to this could be the use of encryption technology. An encrypted e-mail has an unintelligible sequence of characters that can only be unscrambled with a decryption key from the sender (the psychiatrist in this example).

Although many of the American Psychological Association ethics code apply to online therapy, such as informed consent, doing no harm, and competence to practice, Deborah Baker, JD, past director for prescriptive authority and regulatory affairs in APA's Practice Directorate has been quoted as saying "...*technology is pushing ahead at a rapid pace, psychology licensing laws have not yet caught up. All health and mental health-care professions are wrestling with many of the same issues*".

The locus of power in healthcare is shifting as we move to this future of increasing amounts of care delivered online in one form or another. Instead of the doctor having full control of the patients' needs, a consumerist model has emerged in which patients and their doctors are partners in managing the patients' care. The age of the "Industrial Age Medicine" has been replaced by the new model of the "Information Age Care" as envisioned by Ferguson and Smith. In this new information age, the relationships of healthcare practitioners and their patients are increasingly developing into collaborative partnerships as patients have more control over their healthcare needs than ever before.

The Industry Council Chairman for the American Telemedicine Association has predicted that telemedicine will continue to grow as demands for real-time remote delivery systems grow across the healthcare spectrum. The mental healthcare field needs to seize this opportunity, as this is clearly where the future of healthcare is headed.

We have described how mental healthcare is changing and moving forward in most clinical environments, certainly in Western Countries, and how it is becoming more patient-centric and consumer-focused. But what about the role of those who support patients – their families, friends, and anyone else who might be what has typically been described in the past as a patient advocate. Someone who works with patients to ensure that they receive the best possible care, understands the decisions they have to make, and frequently guides patients through our sometimes highly complicated health system.

## 12.3 Patient Advocacy and Virtual Reality in the Present and Future

In a future of increasingly online healthcare, the patient will require assistance in a series of novel ways. Currently such assistance is delivered by in-person patient advocates but in future these roles will be taken over or supplemented by what has been described as a virtual patient advocates (VPA) [11]. An encouraging advancement in technology, the VPA is a computerized, animated character (often referred to as an avatar) designed to integrate best practices from provider-patient communication theory. It emulates face-to-face conversation complete with non-verbal communication such as gaze, posture, and hand gestures. The authors have described a study conducted at Boston Medical Center using a VPA called the Gabby System, which showed that some of the study participants preferred talking to the VPA rather than interacting with a real person [11]. One explanation for this could be that the study demographic was comprised of young women who were "digital natives" and had never known a world without the Internet. Additional studies on how older populations of patients feel about using avatars as patient advocates are necessary because there may be less enthusiasm for this form of support amongst patients not familiar with virtual reality (VR) environments.

"Louise" is another VPA system designed as part of Boston Medical Center's Project RED, an initiative to improve and re-engineer hospital discharges while improving patient safety and reducing readmissions. Louise is designed to work with people who have limited computer skills. While it does take some initial nursing time to set up the use of this software program, it has been shown to reduce hospital utilization (readmission and emergency visits). An advantage of using a VPA is that the program avatar can potentially be accessed at the convenience of the patient from wherever he or she may be located and yet it can seem quite real, as if the patient is talking to an actual person. As Mucci has noted, "the virtual patient advocate is patient and kind, shows empathy and humor, has medical knowledge, and shows confidence. All of these things make her trustworthy to patients. They appreciate the private time they are allowed to listen and ask questions – and that they decide when they have had enough."

The same authors noted that the use of VPAs for children would be an interesting area of study. Children might find that interacting with a "virtual friend" is less threatening than dealing with an adult, especially if the avatar is also a child. Many children are accustomed to cartoon characters as well as avatars in video games so it might be a very natural transition from those characters to a VPA. The VPA could be tailored to explain things at the level of understanding that is appropriate for the child. It has been described how recent developments in clinical VR have taken the concept of the patient avatar, or VPA, one step further as is evidenced by a project developed by Rizzo et al. which they described the provider avatar [11]. The SimCoach project was developed to create virtual human support agents that can act as online guides and therapists and was designed to attract and engage military service members, veterans, and their significant others who might not be inclined to seek help from a live healthcare provider. These support agents are no longer at the level of a prop to add context or minimal faux interaction in a virtual world, they are designed to perceive and act in a 3D virtual world, engage in face-to-face spoken dialogues with real users (and other virtual humans) and in some cases, they are capable of exhibiting human-like emotional reactions. Rizzo and his team created SimSensei which took SimCoach to the next level and added cameras and Microsoft's Kinect sensor to observe and analyze face, gesture, and vocal parameters that help the agent better react to the patient's emotional state. The virtual therapist model as developed for the SimCoach and SimSensei projects could also be applied to the patient navigator role in future and opens up a whole new style of potentially automated clinical practice, and one where machine-based translation and interpretation programs, used across different languages, could potentially open up a global market.

Another example of the expansion of the VPA role is the creation of robot caregivers [11]. Many countries have begun investing in robot development and researchers in the USA are developing robot-caregiver prototypes. These caregiving robots would be different than the ones already commonly in use to assist in surgery or deliver medications – these robots are meant to be your friend and caregiver and have the potential to be helpful in the area of MH.

Case 2:90-cv-00520-KJM-SCR    Document 5873-5    Filed 08/03/18    Page 249 of 563

As the future of healthcare delivery unfolds, reimbursement is increasingly being tied to the efficiency and quality of care, and this will incentivize the use of computer-based technologies and processes such as Virtual Patient Advocates. In some instances, however, there is no substitute for in-person delivery of patient care and support. This is where a hybrid model of the Patient Advocate role may prove useful. When accompanying a patient to provider appointments or facilitating the relationship of the patient to the healthcare provider, being physically present is important. Using fixed and mobile devices as a tool to be "virtually physically present" may allow the Patient Advocate to become more versatile and to become accessible to remotely located patients. The role of patient advocate and the form that role takes – be it in-person, digital/online, avatar, or some hybrid model of these technologies – should be expressly tied to the patient population for which the role is employed [11]. As various studies have shown, some patient populations lend themselves better to one form of this role over another. There are, however, many viable forms a patient navigator/advocate role can take and there is a place for the online/virtual patient navigator role in the future of healthcare, and especially mental healthcare, and given that the VPA already exists, it will move into the area of VR systems where therapy is already being delivered.

### 12.3.1 VR Systems: Future Directions

One of the applications that is being increasingly widely adopted and used for mental healthcare education and clinical purposes is VR [12]. VR is the concept of being virtually but not physically at a specific place. Some VR platforms involve three-dimensional imaging and surround audio that make the user feel like in the real world. The user can go or do certain things that in real life might be difficult or impossible. Many companies have used virtual reality for games and entertainment and it has been used in flight simulation for teaching pilots how to fly without risking equipments and lives. Recently though, VR has been used in many other professional fields. For example, businesses are using VR applications to market their products, educators are using them for teaching and for public awareness, and doctors to communicate with and treat their patients.

One of the leading more popular VR applications is Second Life (www.secondlife.com (http://www.secondlife.com)). Second Life is a VR platform that is open to the public and can be accessed free of charge. Every user is given an avatar that can be customized to reflect one's own physical appearance or character. Avatars can walk, run, or fly from one island to another. Some can go shopping, visit museums, or even go on a date. It all depends on the user's preference and liking.

Another type of a VR platform is a fully immersive system. These fully immersive software systems give the user a full immersion in the VR environment. This can take place in a virtual cave, which could be a three-, four-, five-, or six-walled room with multiple projectors transmitting images on these walls. Some systems require a specific visual aid such as three-dimensional glasses while others can be used with only the naked eye. A similar concept of fully immersive VR environment is the use of specific glasses that have the three-dimensional screen inside the device. The price of these systems has reduced remarkably in recent years and it is now possible to buy a simple 3D device that connects with a smartphone which is inserted inside it so that the phone screen becomes the screen of the 3D device, for as little as $30US. These cheap and simple systems are increasingly being used to help patients who have simple phobias of spiders or heights as discussed below.

VR systems have already been described by Maghazil and Yellowlees as playing a role in treating patients with many conditions including but not limited to eating disorders, anxiety disorders, some autism spectrum disorders, stress management, pain management, strokes, brain injury, psychiatric disability, cognitive impairment, and dysfunctions of the central nervous system. Phobias and traumas can also be treated through VR exposure therapy (VRE). VRE has been proven to treat many patients by exposing them to visual and other sensory materials that represent the patient's feared object or traumatic event as previously experienced. Many phobias including social phobias, fear of heights and flying, claustrophobia and fear of spiders have been treated with VRE, and military organizations have started utilizing VRE for treating post-traumatic stress disorders (PTSD) and other combat-related disorders. The future is bright for the continued expansion of these approaches to treatment.

Second Life is an educational tool that has been used all around the world. To observe faculty teaching health informatics to groups of students attending a seminar on a private teaching area in Second Life, go to www.youtube.com (http://www.youtube.com) and put in the search terms "informatics" and "MHI214" and review a number of videos posted demonstrating how to teach groups of students on this platform. These films demonstrate well the wide range of avatars adapted and modified by the students and you will see Yellowlees communicating with spacemen, rabbits and highly sexualized versions of humans as part of his most unique looking student group. Many universities, colleges, libraries, and government bodies have adopted VR software for education and many instructors and educators prefer Second Life over other distant learning methods because it is more personal and provides more opportunity for creativity. Research conducted in the UK in 2007 showed that as early as that time over 80 % of United Kingdom's universities had developed teaching or learning tools in Second Life and that over 300 universities around the world were already teaching courses or performing research on this VR platform alone.

The benefits of using VR platforms for educational purposes in the medical field are obvious and it is likely that these games like environments will be increasingly popular and used in future. Health educators can target many audiences and ethnic groups to promote health awareness, and games, billboards, and videos are simple approaches that can target big audiences. Healthcare providers can also use these virtual environments to educate their patients about diseases or conditions they may acquire. Instead of flipping through a brochure or going through web pages, VR can offer important and beneficial sources of information with more appealing visual aids, especially in mobile environments.

## 12.4 Hybrid Care Models Through the Use of Multiple Technologies

The increasing numbers of practitioners using a hybrid approach to care, as described previously, is one of many variations on the theme of providing patient-centered care that is affordable, timely, and easy to access. An excellent example is the Seattle-based project run by Meyers and her colleagues who have employed multiple in-person and technological approaches to provide evidence-based assessment and treatment to children with ADHD living in several states in North West USA [13]. In this project, child psychiatrists both provide direct care and education online, patients see physicians, behaviorists, and psychiatrists online and in person, and the whole delivery platform for care and monitoring is online, but focused on primary care clinics, from where all therapy sessions are coordinated.

An innovative model of collaborative MH services has been implemented using multiple technologies and this is not only a new way to practice psychiatry, but is also likely to lead in many instances to lead to a new standard of practice, showing that telemedicine is versatile and will increasingly support and enable the implementation of specialized treatments where and when the patients need them. We know that most mental healthcare takes part in primary care across the world and that most patients with psychiatric disorders never see or are never evaluated

CDCR _206

7/6/2018      Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR     Document 5873-5     Filed 08/03/18     Page 250 of 563

by a psychiatrist; such versatile telehealth models help remedy this problem. Myers project has affirmed the contemporary view that psychiatrists may use technology to disseminate their skills (consulting, training, supervision) and develop innovative treatment programs that an interdisciplinary team (primary care providers, behavior therapists, community partners like teachers, family, care coordinators and psychiatrists) may efficiently deliver. We propose that the model of combined interventions should now become the new standard of practice in child psychiatry for treating children who have ADHD combined with other psychiatric disorders, whether the children live in rural or metropolitan areas.

One consideration is the development of a new standard of care. It has been suggested that this combination of hybrid clinical approaches as demonstrated by Myers and new collaborative research processes suggest that we should be able to move towards a new standard of care [14]. We need MH providers and others to attitudinally shift to hybrid models of in-person and technology-delivered care – many have headed that way already, including the Department of Veterans Affairs, the new younger generation of psychiatrists, and patients and families who will push us to move the e-care connection even further. We need a technology platform for care that integrates the best of stepped models of care, access to specialists, a continuum of e-service delivery options (e.g., e-mail/phone, [15]; asynchronous, [16]), interdisciplinary role definition (and cross-training), and training on shared MH models to improve our efficiency.

To accelerate the necessary attitudinal changes, the use of hybrid models of care should be taught in all psychiatric residency programs as well as within other disciplines and at medical and nursing schools. Then we will be able to work on quality improvement, sustainability, new approaches to collecting clinical outcome evidence that are not purely dependent on traditional randomized controlled trials, and the further integration of technology into daily practice to provide the context and the infrastructure for continuing discoveries in science and in psychiatry. In our own MH disciplines, we see the next steps being the further integration and implementation of algorithmically and evidence-driven care within this hybrid model and how we can learn to effectively use mobile technologies.

So, while all of this is exciting and interesting, how does it fit in with global MH services and the provision of cross-cultural internationalized care?

## 12.5 Applying Technology to Underserved Populations: Cross-cultural eMH and Trends in International Care

The aim of this key section is to build on the innovations described above and to understand how the issues that will impact national and international cross-cultural MH services learn how e-Mental Health (eMH) may improve the quality of care toward ethnic minorities worldwide including reducing of stigma that is very often culturally conditioned and obtain an insight into potential obstacles and suggested solutions for development of both national and international cross-cultural eMH services. While various eMH applications have been tested and developed over the last five to six decades, there are relatively few published reports describing the use of telepsychiatry in the provision of MH care to cross-cultural patients [16, 17, 18, 19].

The term "cross-cultural telepsychiatry" covers the delivery of culturally appropriate MH care from a distance in "real time" by the use of videoconferencing i.e., "synchronous telepsychiatry" and/or "asynchronous telepsychiatry" and/or the "store and forward" model, where we speak about a transmission of recorded clinical-related material, i.e., assessment, psychiatric interview/consultation between referring physicians and specialist) [20]. Equal access to MH services is a human right for both domestic and immigrant population in modern communities worldwide. However, due to geographical distances and other barriers, e.g., cultural, religious and linguistic, cross-cultural patient population face difficulties in access to MH professionals in a desired way.

eMH applications offer new possibilities for reducing disparities in access to relevant mental healthcare to most vulnerable patient groups, such as refugees, migrants, and asylum seekers worldwide. It has been reported that patients who face language barriers (i.e., refugees, asylum seekers, and migrants are less likely than others to have a usual source of medical care and who frequently receive preventive services at reduced rates have an increased risk of non-adherence to medications, are less likely than others to return for follow-up appointments after visits to the emergency room, and have higher rates of hospitalization and drug complications [21]. Language barriers are also likely to affect patients' trust in their providers.

Patients who do not speak the language of respective care providers have reported feelings of being discriminated against in clinical settings, whereas communicating with health professionals in a common language is associated with increased trust and confidence [22]. Several studies have found that language barriers are associated with lower rates of patient satisfaction and poor care delivery in comparison with care received by patients who speak the language of the care provider [23, 24].

Cross-cultural patient treatment within MH care demands a high standard of communication between the patient and the care provider, since linguistic, cultural, or even racial barriers may affect patient satisfaction. Cultural differences and language difficulties result in communication gaps where important nuances are either obscured or missed. In such a situation, both patients and professionals are often exposed to the "lost-in-translation syndrome." To take account of these problems, a number of telepsychiatry services have been established to increase the quality of mental healthcare for certain ethnic minorities.

Telemedicine provides operational and logistical efficiencies that enable medical interpreters to be more readily accessible to healthcare providers and is increasingly being used in hospitals and clinics via mobile carts, tablets, or smartphones. Compared with phone interpretation, videoconferencing enables interpreters to observe and interpret non-verbal cues for the provider [25], making interpreters more available with no need to travel between consultations. Videoconferencing has been successfully deployed in numerous organizations and has led to decreased delays and increased efficiency of interpreters, with one institution reportedly saving approximately $368,000 per year [26].

The use of technology services/applications described in this book have a potential to provide efficient and cost-effective opportunities to reach individuals and groups with poor service access despite geographically distances and/or national borders. However, when it comes to remote real-time eMH consultations via videoconferencing, there are only few studies describing international, cross-border studies and none involve developing countries [27]. A consulting psychiatrist was licensed in Australia, but living in New Zealand, provided care for two patients in a facility in Australia; one of the cases was a new consultation and the other was a follow-up [28]. A six-month trial of telepsychiatry tertiary care from South London to the island of Jersey reported five teleconsultations of a single second opinion and four case reviews [29]. International eMH and tele-education for Swedish medical students about cross-cultural issues in refugees with MH problems was conducted between

CDCR _207

Case 2:90-cv-00520-KJM-SCR          Document 5873-5          Filed 08/03/18          Page 251 of 563

Sweden, the USA, and Australia. There was one real patient at the American site and one simulated patient at the Australian site, with patient interviews by experts while medical students observed by videoconference and participated in the discussion [30]. Videoconferencing provided psychoanalytic clinical care and training to psychoanalytic candidates in China by US psychoanalysts, and this involved 40 psychoanalytic and 30 psychodynamic psychotherapies [31].

The most comprehensive international eMH service in the world was established in Denmark in mid-2006 as a part of cross-cultural telepsychiatry pilot-project launched by The Little Prince Psychiatric Centre located in Copenhagen [32, 33]. Due to lack of bilingual clinicians in Denmark, psychiatrists who spoke Arabic, Polish, Kurdish, and ex-Yugoslavian languages, but were physically located in Sweden, were employed to provide care due to their cross-cultural skills. Furthermore, bilingual psychiatrists not only have the selected skills but a detailed knowledge of the MH system in Scandinavia as well as knowledge about health systems in the patients' home countries. Over a period of 18 months, 31 patients (i.e., refugees, migrants, and asylum seekers) were assessed and treated via videoconferencing by providers who spoke the patients' own language. Videoconferencing equipment connected the Swedish Department of the Little Prince Psychiatric Centre with two hospitals, one asylum seekers' center and one social institution in Denmark. The distances from the Swedish station located in Malmö to the Danish telepsychiatry stations were from 140 to 300 km. Overall, high patient satisfaction was reported and minor disadvantages of eMH were offset by the fact that the doctors and the patients linguistically and culturally matched. The use of bilingual clinicians with a similar ethnic and cultural background to their patients compensates for the distance and lack of physical presence.

Experiences from projects over the last decade – described above and in  Chap. 5   (https://doi.org/10.1007/978-3-319-20852-7_5) – may pave the way for development of an International eMH Network within European Union (EU).

Clinical and scientific objectives and goals of such international telemental health service are to:

1. 1.

    Improve the mental healthcare across national boundaries by providing psychiatric consultations between countries within EU

2. 2.

    Develop international treatment teams with select skills (e.g., sign language and many foreign languages staff)

3. 3.

    Provide acute psychiatric assessments at a distance

4. 4.

    Establish a second opinion service and shared care service between MH professionals and general practitioners

5. 5.

    Improve discharge planning by involvement of clinicians with specialized skills and expertise

6. 6.

    Develop subsequent follow-up service via videoconferencing

7. 7.

    Increase access to child, adult, geriatric, forensic, and deaf services specialty staff

8. 8.

    Provide distance supervision and staff consultation

9. 9.

    Provide psychoeducation of patients' family members

10. 10.

    Improve distance learning via case conferencing and best practice demonstration across the national boundaries

11. 11.

    Create a database over cross-cultural and other select skills professionals within EU

CDCR _208

7/6/2018                    Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR        Document 5873-5        Filed 08/03/18        Page 252 of 563

The potential outcomes of the above are many:

1. 1.

   Increased access to specialized expertise (e.g., sign language and many foreign languages staff)

2. 2.

   Increased speed and accuracy of diagnosis and treatment that otherwise will be provided by translators

3. 3.

   Increased access to child, adult, geriatric, forensic, and deaf services specialty staff

4. 4.

   Increased continuity of care and professional contact

5. 5.

   Improved education of the stuff and psychoeducation of the patients and their family members

6. 6.

   Increased efficiency and effectiveness through improved performance

7. 7.

   Cost benefits as result of reduced staff and translator costs: travel time, staff time, decreased use of translators

8. 8.

   Reduced waiting time/waiting lists for the treatment due to increased access to respective resources

9. 9.

   Decrease in the number of inappropriate admissions and readmissions into the acute sector

While waiting for development of eMH services in a larger scale within EU, a MasterMind (*MA*nagement of MH di*S*orders Through advanc*E*d technology and se*R*vices – telehealth for the *MIND*) project was launched in March 2014 (ending in February 2017) [34]. Total investment of 14,000,000,00 EUR aims to result in a set of guidelines and a "toolbox" for the promotion and facilitation of implementation of a safe and effective eMH service across Europe with a primary focus on remote treatment of depression. The videoconferencing service will be used for creating a network between health professionals who can then support each other and share knowledge. Videoconferencing can be used for establishing a network from specialist to specialist, specialist to non-specialist. Furthermore, videoconferencing can be used for providing specialist treatment in areas where this service is scarce, e.g., rural areas. The aim is to provide the patients with more holistic and patient-centered care while ensuring that they have access to high-quality treatment in their immediate environment.

An alternative equally innovative, disruptive approach to providing international cross-cultural care is the use of language translation smartphone apps. These apps are potentially available any time with any patient, automatically interpreting language in speech-to-speech, text-to-speech, and speech-to-text modes. A combination of automated speech recognition (ASR, also known as text-to-speech or voice dictation) and machine translation (MT) technologies are already in use to translate Websites, generate subtitles in different languages in YouTube videos, and provide closed captions for simultaneous teleconferencing on Skype.

Google Translate is one of the more well-known apps available on Android, iOS, and the Web. ASR and MT technology vendor Nuance has been demonstrated in clinical settings [35]; others are creating non-commercial open source software [36]. Modern-day ASR and MT technologies also employ machine-learning algorithms to make interpretation more accurate over time; no longer will we see the sometimes bizarre language translations from traditional software that employs static linguistic rules.

## Conclusions

We have explored the impact of technology on the doctor-patient relationship as new technologies and clinical processes are applied to patient care (e.g., virtual patient advocates). These approaches will make the relationship more flexible and productive as it occurs across time and distance, no longer restricted to the clinic office.

CDCR _209

7/6/2018      Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR     Document 5873-5     Filed 08/03/18     Page 253 of 563

In the future, we will likely change clinical more processes, especially as virtual reality, synchronous, asynchronous, and mobile technologies combine, add models of care (e.g., hybrids), and better apply new technologies to the underserved (e.g., cross-cultural populations) all around the world. And on top of that we will undoubtedly have even newer technologies to size up – technologies and clinical processes that as of today have not even been dreamed of.

Aside with the development of new technological devices, we will hopefully see establishment of international services in order to exchange professional expertise as well as assess and even treat patients on distance via patients' respective mother tongue rather than via interpreters.

## References

1. Yellowlees PM, Nafiz N. The psychiatrist-patient relationship of the future: anytime, anywhere? Rev Psychiatry. 2010;18(2):96–102.
   Google Scholar (http://scholar.google.com/scholar_lookup?title=The%20psychiatrist-patient%20relationship%20of%20the%20future%3A%20anytime%2C%20anywhere%3F&author=PM.%20Yellowlees&author=N.%20Nafiz&journal=Rev%20Psychiatry&volume=18&issue=2&pages=96-102&publication_year=2010)

2. MoodGym. 7 Mar 2015. At: https://moodgym.anu.edu.au/welcome.

3. Christensen H, Griffiths K, Groves C, et al. Free range users and one hit wonders: community users of an internet-based cognitive behaviour therapy program. Aust N Z J Psychiatry. 2006;40(1):59–62.
   CrossRef (https://doi.org/10.1080/j.1440-1614.2006.01743.x)
   PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=16403040)
   Google Scholar (http://scholar.google.com/scholar_lookup?title=Free%20range%20users%20and%20one%20hit%20wonders%3A%20community%20users%20of%20an%20internet-based%20cognitive%20behaviour%20therapy%20program&author=H.%20Christensen&author=K.%20Griffiths&author=C.%20Groves&journal=Aust%20N%20Z%20J%20Psychiatry&volume=40&issue=1&pages=59-62&publication_year=2006)

4. Mackinnon A, Griffiths KM, Christensen H. Comparative randomised trial of online cognitive-behavioural therapy and an information website for depression: 12-months outcomes. Br J Psychiatry. 2008;192(2):130–4.
   CrossRef (https://doi.org/10.1192/bjp.bp.106.032078)
   PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=18245031)
   Google Scholar (http://scholar.google.com/scholar_lookup?title=Comparative%20randomised%20trial%20of%20online%20cognitive-behavioural%20therapy%20and%20an%20information%20website%20for%20depression%3A%2012-months%20outcomes&author=A.%20Mackinnon&author=KM.%20Griffiths&author=H.%20Christensen&journal=Br%20J%20Psychiatry&volume=192&issue=2&pages=130-4&publication_year=2008)

5. Neufeld JD, Bourgeois JA, Hilty DM, et al. The e-Mental Health Consult Service: providing enhanced primary care mental health services through telemedicine. Psychosomatics. 2007;48:135–41.
   CrossRef (https://doi.org/10.1176/appi.psy.48.2.135)
   PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=17329607)
   Google Scholar (http://scholar.google.com/scholar_lookup?title=The%20e-Mental%20Health%20Consult%20Service%3A%20providing%20enhanced%20primary%20care%20mental%20health%20services%20through%20telemedicine&author=JD.%20Neufeld&author=JA.%20Bourgeois&author=DM.%20Hilty&journal=Psychosomatics&volume=48&pages=135-41&publication_year=2007)

6. O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face to face psychiatry: results from a randomized controlled equivalence trial. Psychiatr Serv. 2007;258:836–43.
   CrossRef (https://doi.org/10.1176/ps.2007.58.6.836)
   Google Scholar (http://scholar.google.com/scholar_lookup?title=Is%20telepsychiatry%20equivalent%20to%20face%20to%20face%20psychiatry%3A%20results%20from%20a%20randomized%20controlled%20equivalence%20trial&author=R.%20O%E2%80%99Reilly&author=J.%20Bishop&author=K.%20Maddox&journal=Psychiatr%20Serv&volume=258&pages=836-43&publication_year=2007)

7. Andersson G, Carlbring P, Holmstrom A, et al. Internet-based self-help with therapist feedback and in vivo group exposure for social phobia: a randomized controlled trial. J Consult Clin Psychol. 2006;74(4):677–86.
   CrossRef (https://doi.org/10.1037/0022-006X.74.4.677)
   PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=16881775)
   Google Scholar (http://scholar.google.com/scholar_lookup?title=Internet-based%20self-help%20with%20therapist%20feedback%20and%20in%20vivo%20group%20exposure%20for%20social%20phobia%3A%20a%20randomized%20controlled%20trial&author=G.%20Andersson&author=P.%20Carlbring&author=A.%20Holmstrom&journal=J%20Consult%20Clin%20Psychol&volume=74&issue=4&pages=677-86&publication_year=2006)

8. Suler J. The psychology of cyberspace. CyberPsychology Behav. 2001;4:675–80.
   CrossRef (https://doi.org/10.1089/109493101753376614)
   Google Scholar (http://scholar.google.com/scholar_lookup?title=The%20psychology%20of%20cyberspace&author=J.%20Suler&journal=CyberPsychology%20Behav&volume=4&pages=675-80&publication_year=2001)

9. Pakyurek M, Yellowlees PM, Hilty DM. The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice? Tel J e-Health. 2010;16(3):289–92.
   CrossRef (https://doi.org/10.1089/tmj.2009.0130)
   Google Scholar (http://scholar.google.com/scholar_lookup?title=The%20child%20and%20adolescent%20telepsychiatry%20consultation%3A%20can%20it%20be%20a%20more%20effective%20clinical%20process%20for%20certain%20patients%20than%20conventional%20practice%3F&author=M.%20Pakyurek&author=PM.%20Yellowlees&author=DM.%20Hilty&journal=Tel%20J%20e-Health&volume=16&issue=3&pages=289-92&publication_year=2010)

10. Suler J. Psychotherapy in cyberspace: a 5 dimensional model of online and computer-mediated psychotherapy. CyberPsychology Behav. 2000;3(2):151–60.
    CrossRef (https://doi.org/10.1089/109493100315996)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Psychotherapy%20in%20cyberspace%3A%20a%205%20dimensional%20model%20of%20online%20and%20computer-mediated%20psychotherapy&author=J.%20Suler&journal=CyberPsychology%20Behav&volume=3&issue=2&pages=151-60&publication_year=2000)

11. Kent S, Yellowlees PM. The virtual patient advocate. J Telemed eHealth. 2015 [Epub ahead of print].

CDCR _210

7/6/2018     Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR   Document 5873-5   Filed 08/03/18   Page 254 of 563

Google Scholar (https://scholar.google.com/scholar?q=Kent%20S%2C%20Yellowlees%20PM.%20The%20virtual%20patient%20advocate.%20J%20Telemed%20eHealth.%202015%20%5BEpub%20ahead%20of%20print%5D.)

12. Maghazil A, Yellowlees PM. Novel approaches to clinical care in mental health: from asynchronous telepsychiatry to virtual reality. In: Lech M, Song I, Yellowlees PM, et al., editors. Mental health informatics. Berlin/Heidelberg: Springer; 2014.
Google Scholar (http://scholar.google.com/scholar_lookup?title=Novel%20approaches%20to%20clinical%20care%20in%20mental%20health%3A%20from%20asynchronous%20telepsychiatry%20to%20virtual%20reality&author=A.%20Maghazil&author=PM.%20Yellowlees&publication_year=2014)

13. Myers KM, Vander Stoep A, Zhou C, et al. Effectiveness of a telehealth service delivery model for treating attention-deficit hyperactivity disorder: results of a community-based randomized controlled trial. J Am Acad Child Adolesc Psychiatry. 2015;54:263–74, (in press).
CrossRef (https://doi.org/10.1016/j.jaac.2015.01.009)
PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=25791143)
Google Scholar (http://scholar.google.com/scholar_lookup?title=Effectiveness%20of%20a%20telehealth%20service%20delivery%20model%20for%20treating%20attention-deficit%20hyperactivity%20disorder%3A%20results%20of%20a%20community-based%20randomized%20controlled%20trial&author=KM.%20Myers&author=A.%20Vander%20Stoep&author=C.%20Zhou&journal=J%20Am%20Acad%20Child%20Adolesc%20Psychiatry&volume=54&pages=263-74&publication_year=2015)

14. Hilty DM, Yellowlees PM. Collaborative mental health services using multiple technologies – the new way to practice and a new standard of practice? J Amer Acad Child Adol Psychiatry. 2015;54(4):245–6.
Google Scholar (https://scholar.google.com/scholar?q=Hilty%20DM%2C%20Yellowlees%20PM.%20Collaborative%20mental%20health%20services%20using%20multiple%20technologies%20%E2%80%93%20the%20new%20way%20to%20practice%20and%20a%20new%20standard%20of%20practice%3F%20J%20Amer%20Acad%20Child%20Adol%20Psychiatry.%202015%3B54%284%29%3A245%E2%80%936.)

15. Hilty DM, Yellowlees PM, Cobb HC, et al. Models of telepsychiatric consultation-liaison service to rural primary care. Psychosomatics. 2006;47(2):152–7.
CrossRef (https://doi.org/10.1176/appi.psy.47.2.152)
PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=16508028)
Google Scholar (http://scholar.google.com/scholar_lookup?title=Models%20of%20telepsychiatric%20consultation-liaison%20service%20to%20rural%20primary%20care&author=DM.%20Hilty&author=PM.%20Yellowlees&author=HC.%20Cobb&journal=Psychosomatics&volume=47&issue=2&pages=152-7&publication_year=2006)

16. Yellowlees PM, Odor A, Burke MM, et al. A feasibility study of asynchronous telepsychiatry for psychiatric consultations. Psychiatr Serv. 2010;61(8):838–40.
CrossRef (https://doi.org/10.1176/ps.2010.61.8.838)
PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=20675845)
Google Scholar (http://scholar.google.com/scholar_lookup?title=A%20feasibility%20study%20of%20asynchronous%20telepsychiatry%20for%20psychiatric%20consultations&author=PM.%20Yellowlees&author=A.%20Odor&author=MM.%20Burke&journal=Psychiatr%20Serv&volume=61&issue=8&pages=838-40&publication_year=2010)

17. Sherrill WW, Crew L, Mayo RM, et al. Educational and health services innovation to improve care for rural Hispanic communities in the U.S. Educ Health (Abingdon). 2005;18:356–67.
CrossRef (https://doi.org/10.1080/13576280500312850)
Google Scholar (http://scholar.google.com/scholar_lookup?title=Educational%20and%20health%20services%20innovation%20to%20improve%20care%20for%20rural%20Hispanic%20communities%20in%20the%20U.S.&author=WW.%20Sherrill&author=L.%20Crew&author=RM.%20Mayo&journal=Educ%20Health%20%28Abingdon%29&volume=18&pages=356-67&publication_year=2005)

18. Shore J, Kaufmann LJ, Brooks E, et al. Review of American Indian veteran telemental health. Tel e-Health. 2012;18(2):87–94.
CrossRef (https://doi.org/10.1089/tmj.2011.0057)
Google Scholar (http://scholar.google.com/scholar_lookup?title=Review%20of%20American%20Indian%20veteran%20telemental%20health&author=J.%20Shore&author=LJ.%20Kaufmann&author=E.%20Brooks&journal=Tel%20e-Health&volume=18&issue=2&pages=87-94&publication_year=2012)

19. Yeung A, et al. A study of the effectiveness of telepsychiatry-based culturally sensitive collaborative treatment of depressed Chinese Americans. 2011;11:154.
PubMedCentral (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3190334)
CrossRef (https://doi.org/10.1186/1471-244X-11-154)
PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=21943315)
Google Scholar (http://scholar.google.com/scholar_lookup?title=A%20study%20of%20the%20effectiveness%20of%20telepsychiatry-based%20culturally%20sensitive%20collaborative%20treatment%20of%20depressed%20Chinese%20Americans&author=A.%20Yeung&journal=BMC%20Psychiatry&volume=11&pages=154&publication_year=2011)

20. Hilty DM, Ferrer DC, Parish MB, et al. The effectiveness of telemental health: a 2013 review. Telemed J E Health. 2013;19:444–54.
PubMedCentral (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3662387)
CrossRef (https://doi.org/10.1089/tmj.2013.0075)
PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=23697504)
Google Scholar (http://scholar.google.com/scholar_lookup?title=The%20effectiveness%20of%20telemental%20health%3A%20a%202013%20review&author=DM.%20Hilty&author=DC.%20Ferrer&author=MB.%20Parish&journal=Telemed%20J%20E%20Health&volume=19&pages=444-54&publication_year=2013)

21. Flores G. Language barriers to health care in the United States. N Engl J Med. 2006;355:229–31.
CrossRef (https://doi.org/10.1056/NEJMp058316)
PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=16855260)
Google Scholar (http://scholar.google.com/scholar_lookup?title=Language%20barriers%20to%20health%20care%20in%20the%20United%20States&author=G.%20Flores&journal=N%20Engl%20J%20Med&volume=355&pages=229-31&publication_year=2006)

22. Mutchler JE, Bacigalupe G, Coppin A, Gottlieb A. Language barriers surrounding medication use among older Latinos. J Cross Cult Gerontol. 2007;22:101–14.
CrossRef (https://doi.org/10.1007/s10823-006-9021-3)
PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=17136455)
Google Scholar (http://scholar.google.com/scholar_lookup?title=Language%20barriers%20surrounding%20medication%20use%20among%20older%20Latinos&author=JE.%20Mutchler&author

CDCR _211

7/6/2018     Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR    Document 5873-5    Filed 08/03/18    Page 255 of 563

=G.%20Bacigalupe&author=A.%20Coppin&author=A.%20Gottlieb&journal=J%20Cross%20Cult%20Gerontol&volume=22&pages=101-14&publication_year=2007)

23. Carrasquillo O, Orav EJ, Brennan TA, et al. Impact of language barriers on patient satisfaction in an emergency department. J Gen Intern Med. 1999;14:82–7.
    CrossRef (https://doi.org/10.1046/j.1525-1497.1999.00293.x)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=10051778)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Impact%20of%20language%20barriers%20on%20patient%20satisfaction%20in%20an%20emergency%20department&author=O.%20Carrasquillo&author=EJ.%20Orav&author=TA.%20Brennan&journal=J%20Gen%20Intern%20Med&volume=14&pages=82-7&publication_year=1999)

24. Sarver J, Baker DW. Effect of language barriers on follow-up appointments after an emergency department visit. J Gen Intern Med. 2000;15:256–64.
    PubMedCentral (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1495439)
    CrossRef (https://doi.org/10.1111/j.1525-1497.2000.06469.x)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=10760001)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Effect%20of%20language%20barriers%20on%20follow-up%20appointments%20after%20an%20emergency%20department%20visit&author=J.%20Sarver&author=DW.%20Baker&journal=J%20Gen%20Intern%20Med&volume=15&pages=256-64&publication_year=2000)

25. Nápoles AM, Santoyo-Olsson J, Karliner LS, O'Brien H, Gregorich SE, Pérez-Stable EJ. Clinician ratings of interpreter mediated visits in underserved primary care settings with ad hoc, in-person professional, and video conferencing modes. J Health Care Poor Underserved. 2010;21(1):301–17.
    PubMedCentral (http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3576468)
    CrossRef (https://doi.org/10.1353/hpu.0.0269)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=20173271)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Clinician%20ratings%20of%20interpreter%20mediated%20visits%20in%20underserved%20primary%20care%20settings%20with%20ad%20hoc%2C%20in-person%20professional%2C%20and%20video%20conferencing%20modes&author=AM.%20N%C3%A1poles&author=J.%20Santoyo-Olsson&author=LS.%20Karliner&author=H.%20O%E2%80%99Brien&author=SE.%20Gregorich&author=EJ.%20P%C3%A9rez-Stable&journal=J%20Health%20Care%20Poor%20Underserved&volume=21&issue=1&pages=301-17&publication_year=2010)

26. O'Neill DD, Anthony S, Laws M. Every language now. In: Berkowitz L, McCarthy C, editors. Innovation with information technologies in healthcare. London: Springer; 2013. p. 167–77. Accessed March 7, 2015. At: http://link.springer.com/10.1007/978-1-4471-4327-7_13
    (http://link.springer.com/10.1007/978-1-4471-4327-7_13)
    CrossRef (https://doi.org/10.1007/978-1-4471-4327-7_13)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Every%20language%20now&author=DD.%20O%E2%80%99Neill&author=S.%20Anthony&author=M.%20Laws&pages=167-77&publication_year=2013)

27. Jefee-Bahloul H, et al. Pilot assessment and survey of Syrian refugees' psychological stress and openness to referral for telepsychiatry (PASSPORT Study). Telemed J E Health. 2014;20(10):977–9.
    CrossRef (https://doi.org/10.1089/tmj.2013.0373)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=25188281)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Pilot%20assessment%20and%20survey%20of%20Syrian%20refugees%E2%80%99%20psychological%20stress%20and%20openness%20to%20referral%20for%20telepsychiatry%20%28PASSPORT%20Study%29&author=H.%20Jefee-Bahloul&journal=Telemed%20J%20E%20Health&volume=20&issue=10&pages=977-9&publication_year=2014)

28. Samuels A. International telepsychiatry: a link between New Zealand and Australia. Aust N Z J Psychiatry. 1999;33:284–6.
    CrossRef (https://doi.org/10.1080/0004867990062)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=10336233)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=International%20telepsychiatry%3A%20a%20link%20between%20New%20Zealand%20and%20Australia&author=A.%20Samuels&journal=Aust%20N%20Z%20J%20Psychiatry&volume=33&pages=284-6&publication_year=1999)

29. Harley J. Economic evaluation of a tertiary telepsychiatry service to an island. J Telemed Telecare. 2006;12(7):354–7.
    CrossRef (https://doi.org/10.1258/135763306778682378)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=17059652)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Economic%20evaluation%20of%20a%20tertiary%20telepsychiatry%20service%20to%20an%20island&author=J.%20Harley&journal=J%20Telemed%20Telecare&volume=12&issue=7&pages=354-7&publication_year=2006)

30. Ekblad S, Manicavasagar V, Silove D, et al. The use of international videoconferencing as a strategy for teaching medical students about transcultural psychiatry. Transcult Psychiatry. 2004;41:120–9.
    CrossRef (https://doi.org/10.1177/1363461504041357)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=15171210)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=The%20use%20of%20international%20videoconferencing%20as%20a%20strategy%20for%20teaching%20medical%20students%20about%20transcultural%20psychiatry&author=S.%20Ekblad&author=V.%20Manicavasagar&author=D.%20Silove&journal=Transcult%20Psychiatry&volume=41&pages=120-9&publication_year=2004)

31. Fishkin R, Fishkin L, Leli U, et al. Psychodynamic treatment, training, and supervision using internet-based technologies. J Am Acad Psychoanal Dyn Psychiatry. 2011;39:155–68.
    CrossRef (https://doi.org/10.1521/jaap.2011.39.1.155)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=21434749)
    Google Scholar (http://scholar.google.com/scholar_lookup?title=Psychodynamic%20treatment%2C%20training%2C%20and%20supervision%20using%20internet-based%20technologies&author=R.%20Fishkin&author=L.%20Fishkin&author=U.%20Leli&journal=J%20Am%20Acad%20Psychoanal%20Dyn%20Psychiatry&volume=39&pages=155-68&publication_year=2011)

32. Mucic D. International telepsychiatry: a study of patient acceptability. J Telemed Telecare. 2008;14:241–3.
    CrossRef (https://doi.org/10.1258/jtt.2008.080301)
    PubMed (http://www.ncbi.nlm.nih.gov/entrez/query.fcgi?cmd=Retrieve&db=PubMed&dopt=Abstract&list_uids=18632998)

7/6/2018　　　　Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future | SpringerLink

Case 2:90-cv-00520-KJM-SCR　　　Document 5873-5　　　Filed 08/03/18　　　Page 256 of 563

Google Scholar (http://scholar.google.com/scholar_lookup?
title=International%20telepsychiatry%3A%20a%20study%20of%20patient%20acceptability&author=D.%20Mucic&journal=J%20Tele
med%20Telecare&volume=14&pages=241-3&publication_year=2008)

33.　www.denlilleprins.org (http://www.denlilleprins.org)

34.　Mastermind. 28 Feb 2015. At http://www.southdenmark.com/showcases/terapi-hjemme-i-dagligstuen.aspx/
(http://www.southdenmark.com/showcases/terapi-hjemme-i-dagligstuen.aspx/).

35.　Seligman M, Dillinger M. Real-time multi-media translation for healthcare: a usability study. In: Summit MT, editor. XIII: the Thirteenth
Machine Translation Summit. Asia-Pacific Association for Machine Translation (AAMT). 2011. p. 595–602. March 7, 2015. At:
http://www.mt-archive.info/10/MTS-2011-Seligman.pdf (http://www.mt-archive.info/10/MTS-2011-Seligman.pdf).
Google Scholar (http://scholar.google.com/scholar_lookup?title=Real-time%20multi-
media%20translation%20for%20healthcare%3A%20a%20usability%20study&author=M.%20Seligman&author=M.%20Dillinger&pages
=595-602&publication_year=2011)

36.　Teixeira CSC. Multilingual systems, translation technology and their impact on the translator's profession. In: Neustein A, Markowitz JA,
editors. Where humans meet machines. New York: Springer; 2015. p. 300–9. http://link.springer.com/10.1007/978-1-4614-6934-6
(http://link.springer.com/10.1007/978-1-4614-6934-6).
Google Scholar (http://scholar.google.com/scholar_lookup?
title=Multilingual%20systems%2C%20translation%20technology%20and%20their%20impact%20on%20the%20translator%E2%80%9
9s%20profession&author=CSC.%20Teixeira&pages=300-9&publication_year=2015)

## Copyright information

© Springer International Publishing Switzerland 2016

## About this chapter

Cite this chapter as:
Yellowlees P.M., Hilty D.M., Mucic D. (2016) Global/Worldwide e-Mental Health: International and Futuristic Perspectives of Telepsychiatry and the Future. In: Mucic D., Hilty D. (eds)
e-Mental Health. Springer, Cham

- DOI (Digital Object Identifier) https://doi.org/10.1007/978-3-319-20852-7_12
- Publisher Name Springer, Cham
- Print ISBN 978-3-319-20851-0
- Online ISBN 978-3-319-20852-7
- eBook Packages Medicine

- Buy this book on publisher's site
- Reprints and Permissions

## Personalised recommendations

SPRINGER NATURE

© 2017 Springer Nature Switzerland AG. Part of Springer Nature.

Not logged in University of Texas System (3000186230) - University of Texas Medical Branch Galveston (8200420918) 129.109.243.195

# ATTACHMENT 11

CDCR _214

# The Effectiveness of Telemental Health: A 2013 Review

Donald M. Hilty, MD,[1] Daphne C. Ferrer, MD,[2]
Michelle Burke Parish, MA,[2] Barb Johnston, MSN,[3]
Edward J. Callahan, PhD,[4] and Peter M. Yellowlees, MD, MBBS[1,2]

[1]Department of Psychiatry and Behavioral Sciences, University of
California—Davis, Sacramento, California.
[2]Health Informatics Graduate Program, University of California—
Davis, Sacramento, California.
[3]HealthLinkNow, Sacramento, California.
[4]Department of Family and Community Medicine, University of
California—Davis, Sacramento, California.

## Abstract

*Introduction: The effectiveness of any new technology is typically measured in order to determine whether it successfully achieves equal or superior objectives over what is currently offered. Research in telemental health—in this article mainly referring to telepsychiatry and psychological services—has advanced rapidly since 2003, and a new effectiveness review is needed. Materials and Methods: The authors reviewed the published literature to synthesize information on what is and what is not effective related to telemental health. Terms for the search included, but were not limited to, telepsychiatry, effectiveness, mental health, e-health, videoconferencing, telemedicine, cost, access, and international. Results: Telemental health is effective for diagnosis and assessment across many populations (adult, child, geriatric, and ethnic) and for disorders in many settings (emergency, home health) and appears to be comparable to in-person care. In addition, this review has identified new models of care (i.e., collaborative care, asynchronous, mobile) with equally positive outcomes. Conclusions: Telemental health is effective and increases access to care. Future directions suggest the need for more research on service models, specific disorders, the issues relevant to culture and language, and cost.*

*Key words: telepsychiatry, effectiveness, telemental health, videoconferencing, telemedicine*

## Introduction

Telemental health, a use of telemedicine to provide mental health assessment and treatment at a distance, enters its sixth decade as a well-known practice in the medical field—it has increased access to care, and patients and providers are very satisfied with it for a wide variety of services.[1] In this article, we used the term "telemental health" to refer to telepsychiatry and other psychological services, as the term has been used in social science and other fields as well. The American Telemedicine Association (ATA) has published telemental health practice guidelines,[2] as has the American Association of Child and Adolescent Psychiatry.[3] A new generation of studies on telemedicine has replaced the "primary" view of telemental health as a new and different way of providing health services to a contemporary view that it is a vehicle for providing care that is here to stay. The studies supporting this contemporary view have examined the effectiveness of telemental health to answer the question "Is telemental health 'effective' to do 'what' for 'whom' and 'when' at this point in time, based on its evolution?"

Effectiveness implies that telemental health works. In telemedicine and telemental health, few authors have explicitly addressed effectiveness[4]; however, research appears to be changing this.[5] The underlying premise of being "effective" is the assurance that the chosen technology is specific to the objective of the service being offered.[6]

Effectiveness needs to be considered from the perspective of the patient, provider, program, community, and society as a whole. The only previous review of telemental health's effectiveness considered it effective in terms of providing access, improving basic outcomes, and being well-accepted.[4] Telemental health was judged to have broad utility for clinical disorders, facilitated empowerment of patients, and had good educational outcomes. Today, its effectiveness is better described in terms of the model of telepsychiatry used[7,8] and the population being served (e.g., rural, underserved, children).

This article discusses telemental health's effectiveness related to clinical care. There is a review of diagnostic (reliability/validity) or assessment processes, populations (child, geriatric, and ethnic), new models, settings (e.g., collaborative care, asynchronous, emergency, home health), mental health disorders, and cost-related and other outcomes. Recommendations for further effectiveness studies will be offered, and future directions for telemental health services will be discussed.

## Materials and Methods

A comprehensive review of the telepsychiatric literature was conducted in the MEDLINE, PubMed, PsychInfo, Embase, Science Citation Index, Social Sciences Citation Index, Telemedicine Information Exchange databases, Centre for Reviews and Dissemination, and The Cochrane Library Controlled Trial Registry databases for the period of July 2003 to March 2013. (The previous review[4] covered 1965 to June 2003). The *Journal of Telehealth and Telecare* was also manually searched for those years when it was not on MEDLINE. Key words included telepsychiatry, telemental, health, telecare, telemedicine, e-health, videoconferencing, effectiveness, efficacy, access, outcomes, satisfaction, quality of care, rural, mental health, cost, children/child, cultural/culture, geriatric, population, home health, medical home, emergency, face-to-face, in-person,

CDCR_215

reliability/validity, and international; the term "in-person" will be used rather than "face-to-face" in this article.

Article titles and abstracts were reviewed by the authors to see if they were applicable to the theme of effectiveness. Data on effectiveness appear in a wide range of range of case studies, case series, project descriptions, and program evaluations to more formal research trials.[5] Selected articles were pulled, and their references were reviewed to identify additional articles that may have been missed by the keyword search. In total, 755 articles were initially reviewed for this article, with 670 excluded because of little information/data on effectiveness. Although more reviews of the topic or related topics would have been interesting, 15 were chosen as most salient; this left 70 actual studies. Interventions like education, medication management, and most of the therapies were excluded by the words searched.

Effectiveness, overall, was determined on the basis of clinical parameters, the beneficial effects of a program or policy under optimal conditions of delivery, and other data under more real-world conditions.[9] This differs from evidence of efficacy ratings, which is traditionally organized as A (best) to F (least). A key component of effectiveness is feasibility and/or replicability or adaptation to other settings (also known as disseminability). Clinical research trials usually assess effectiveness compared with in-person service, preferably with a design that is randomized. Tips for program effectiveness[4] have been updated and are summarized in *Table 1*; this compilation, however, is not based on research or analysis of studies.

## Measures of Effectiveness

### DIAGNOSIS (VALIDITY AND RELIABILITY) AND ASSESSMENT (*TABLES 2* AND *3*)

Studies of telemental health's reliability and validity started with 128–384 kilobits per second (Kbps) and now occur at 384+Kbps; these of course do not apply to asynchronous and other telephonic options. Diagnoses have been made reliably, with good inter-rater reliability, for a wide range of psychiatric disorders in children, adolescents, and adults; less information is available on geriatric patients, but preliminary results are positive. Limitations have been largely overcome, including patients' difficulties in hearing, concentration, and attention; some rural areas that lack access because of line or satellite technology are more restrictive, but patients often travel to a nearby site.

A wide range of scales has been studied for adults and children/adolescents via videoconferencing, as reviewed by Yellowlees et al.[2] for the ATA and Richardson et al.[5] These include the Brief Psychiatric Rating Scale (BPRS), Scales for the Assessment of Negative and Positive Symptoms (SANS and SAPS, respectively), the Structured Clinical Interview for the Diagnostic and Statistical Manual (DSM) (SCID), Hamilton Depression Rating Scale (HDRS), Diagnostic Interview Schedule (DIS) (initially by telephone), the Abnormal Involuntary Movement Scale (AIMS), and the Yale Brown Obsessive Compulsive Scale (semistructured) (YBOCS). For children/adolescents, the DSM-IV, Schedule for the Assessment of Depression and Schizophrenia (K-SADS), and DIS (DISC) have been used. The Geriatric Depression Scale (GDS) and many neuropsychiatric scales like

the Mini-Mental Status Examination (MMSE), CAMCOG (neuropsychiatric test, computerized), National Adult Reading Test, Quick Test, and Adult Memory and Information Processing Battery are effective. The reliability and validity of asynchronous telepsychiatry has been shown using English and Spanish versions of the SCID and Mini-International Neuropsychiatric Interview (MINI).

## COMPARISON WITH IN-PERSON CARE

Since the last review,[4] studies have compared many parameters using traditional comparison and noninferiority studies.[5,10] Some have noted that with some populations (i.e., children and adolescents), telepsychiatry may be better than in-person services because of the novelty of the interaction, direction of the technology, the psychological and physical distance, and the authenticity of the family interaction.[11] Reports have also included reduced length of hospitalization,[12,13] better medication adherence,[12,14] symptom reduction of disorders,[12–15] and effective therapy such as using evidence-based treatments for posttraumatic stress disorder, including group cognitive processing.[16–18]

## SPECIFIC POPULATIONS: CHILD, GERIATRIC, AND THOSE OF CULTURE

The feasibility, acceptability, and sustainability of telemental health for children and adolescents have now been shown,[19,20] and it has been hypothesized that this approach may be better for some disorders, such as autism-spectrum patients, than in-person care.[11] A qualitative study of young people's perspectives on receiving telepsychiatric services revealed that the sessions were helpful, they felt a sense of personal choice during the consultation, and they generally liked the technology.[21] Attention-deficit hyperactivity disorder treatment by telepsychiatry[3,22–24] has been actively studied, and, once again, satisfaction is high among all parties in a variety of settings.[22,23]

Child research in telemental health has progressed into new areas[20] like randomized trials and Web-based data systems, with work from adults being replicated. Diagnosis appeared to be reliable in early studies,[25,26] demonstration of clinical improvement with the use of cognitive behavioral treatment for depression followed,[27] and then primary care patients treated by telemental health showed improvement in terms of depression and subscales of the Child Behavioral Check List.[28,29] Psychiatric consultation leads to newly diagnosed anxiety or mood disorders in almost one-third of patients seen and a change in the patient's medication for 82% of patients at initial assessment, 41% at Year 1, and 46% at Year 3.[30] Collaborative care for adolescent depression is under evaluation.[31]

In terms of geriatric services, the benefits of telepsychiatry are emerging from neuropsychiatric studies (see above) and a few clinical studies. Preliminary studies in nursing homes have mainly focused on depression or dementia, with telemental health evaluation judged as more facile and efficient in terms of the use of consultant time.[32] Assessment, cognitive intervention, and outcomes appear to be similar to in-person results.[32] Telepsychiatry to a rural geropsychiatric inpatient unit yielded positive results in terms of

CDCR _216

| Table 1. How to Evaluate the Effectiveness of Telemental Health |
| --- |
| Measures |
| Starting points |
| Case report, series, or mix of patients |
| Project or program description |
| Qualitative analysis: impressions, perceptions, or information to form additional questions |
| Cost, cost comparison, or cost offset, often of "direct" costs |
| Project or program evaluation, sometimes retrospective |
| Small(er) total $n$ |
| Micro- (e.g., one party) analysis |
| Some control of variance or limited interplay of variables |
| Cross-sectional analysis |
| Goals |
| Prospective, question-based |
| Comparison group |
| Study design "same as" or "equal to" |
| Noninferiority trials |
| Study design randomized controlled trial |
| Cost-effectiveness, -benefit analysis with computations of direct and indirect costs |
| Evaluation that "drives" the objectives and prospectively collected |
| Generally, large(r) total $n$ (but not always guarantee "good" study) |
| Micro- (all parties individually) and macro- (system-wide = patient, provider, clinic, health system, community, and other parties) analyses |
| Analysis of variance |
| Longitudinal analysis |
| Access |
| Increased access to care |
| Improved level of, or quality of, existing care |
| Specific to the need (e.g., consultation–liaison rather than management [only] to primary care) |
| Complements or integrates service delivery (or prevents use of more intensive or costly service) |
| Quality of care |
| Reliable/valid |
| Diagnosis and assessment |
| Detection of limitations and process to "control" for them is delineated |
| Improved level of, or quality of, existing care |

| Table 1.  continued |
| --- |
| Specific to the need (e.g., consultation–liaison rather than management [onl] to primary care) |
| Complements or integrates service delivery (or prevents use of more intensive or costly service) |
| Population |
| Setting |
| Satisfaction and related intangibles (e.g., empowerment) |
| Costs |
| Technology |
| Adequate description of equipment, bandwidth, frames per second, and other parameters |
| Data on failures, problems (i.e., reliability) |
| Time, effort, and other "hidden" costs of "new" technologies (e.g., asynchronous telepsychiatry) |
| Administration |
| Feasibility |
| Level of coordination to initiate, maintain, and financially support |

satisfaction compared with in-person care[34] and in a 5-year study of patients referred for evaluation of potential cognitive impairment, 55%, 14%, and 12% had Alzheimer's disease, another psychiatric illness, or mild cognitive impairment, respectively.[35]

Ethnicity, culture, and language issues affect health,[36] and there is often inadequate access to specialists[37]—inroads to patient needs and preferences that can be met by telemental health are progressing. A recent study of nearly 40 rural health clinics compared impressions of 25 primary care providers (PCPs) and 32 staff impressions of factors important to care: using providers who value differences (5.4 and 7.0, respectively), quality of the provider's care (4.9 and 7.0, respectively), access to care in general (4.5 and 7.0, respectively), and availability of trained interpreters for use with patients (4.4 and 7.0, respectively).[38] Others are studying the specific needs of Hispanics/Latinos,[37,39,40] Asians,[41] Native Americans,[35,43,44] Eastern Europeans,[44] and those using sign language[45]—all using telepsychiatry for service provision. With patients of different cultural backgrounds, using the patients' primary language allows for a more comfortable atmosphere where they may express their genuine feelings and emotions.

## SUMMARY OF OUTCOMES FOR AGE/POPULATION AND SPECIFIC DISORDERS (TABLE 2)

Results are encouraging, overall. Videoconferencing appears to be as effective as in-person care for most parameters, such as feasibility, outcomes, age, and satisfaction with a single assessment and consultation or follow-up use. Illnesses studied have been depression,[9,15,31] posttraumatic stress disorder,[16–18] substance use,[46] and developmental disabilities.[30]

CDCR _217

**Table 2. Summary of Clinical/Outcome Studies by Population (Age)**

| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
|---|---|---|---|---|---|
| Geriatric | | | | | |
| Lyketsos et al. (2001) | NAP | Geriatric outpatients | NS | United States | Video reduced "unneeded" hospitalizations. |
| Poon et al.[33] (2005) | 22 | Geriatric dementia patients | 1.5 Mb | China | Significant, comparable cognitive improvement in video and in-person; high satisfaction; feasible assessment, intervention, and outcomes |
| Rabinowitz et al.[32] (2010) | 106 | Nursing home residents | 384 | United States | Reduced travel time, fuel costs, physician travel time, personnel costs |
| Weiner et al.[35] (2011) | 85 | Adult and geriatric dementia patients | NS | United States | Feasible alternative to face-to-face care in patients with cognitive disorders who live in remote areas |
| Adult | | | | | |
| Graham et al. (1996) | 39 | Adult outpatients | 768 | United States | Video reduced "unneeded" hospitalizations. |
| Zaylor et al. (1999) | 49 | Adult depressed or schizoaffective outpatients | 128 | United States | Video equals in-person in GAF scores at 6-month follow-up. |
| Hunkeler et al. (2000) | 302 | Adult primary care outpatients | NS | United States | Video by nurses improved depressive symptoms and functioning and had high satisfaction versus in-person. |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384 | United States | Depression outcomes video and in-person equal, as were adherence, satisfaction, cost |
| Manfredi et al.[74] (2005) | 15 | Adult inmates | 384 | United States | Feasibility from an urban university to rural jail; less need for inmate transport |
| Sorvaniemi et al.[59] (2005) | 60 | Adult emergency patients | 384 | Finland | Minor technical problems occurred; assessment and satisfaction fine |
| Modai et al.[76] (2006) | 24/15 | Adult outpatients | NS | Israel | Video greater than in-person cost per service and more hospitalization cost (less available per usual care) |
| Urness et al.[75] (2006) | 39 | Adult outpatients | 384 | Canada | Video less than in-person for encouragement; improved outcomes for both |
| O'Reilly et al.[13] (2007) | 495 | Adult outpatients | 384 | Canada | Video equal to in-person in outcomes, satisfaction; 10% less expensive per video |
| Yellowlees et al.[53] (2010) | 60 | Non-emergency adult patients | NAP | United States | First ATP to demonstrate feasibility |
| Pediatric | | | | | |
| Nelson et al.[27] (2003) | 28 | Children | 128 | United States | Video equals in-person in reducing depression over 8 weeks; satisfaction high, but 15/100 consultations had an issue with technology. |
| Greenberg et al.[77] (2006) | NS | Children | NS | Canada | Video experiences positive; family caretakers and service providers frustrated with limitations of the video |
| Myers et al.[78] (2006) | 115 | Adolescents, incarcerated | 384 | United States | 80% of youth successfully prescribed medications, and they expressed confidence with the psychiatrist's recommendations; youth expressed concerns about privacy. |
| Myers et al.[23] (2010) | 172 | Children and adolescents | 384 | United States | Parents' satisfaction higher with school-aged children and lower with adolescents; adherence high for return appointments |
| Pakyurek et al.[12] (2010) | NAV | Children/adolescents in primary care | NS | United States | Video might actually be superior to in-person for consultation. |

(continued)

**HILTY ET AL.**

**Table 2. Summary of Clinical/Outcome Studies by Population (Age)** *continued*

| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
|---|---|---|---|---|---|
| Lau et al.[79] (2011) | 45 | Children and adolescents | NS | United States | Video reaches a variety of children, with consultants providing diagnostic clarification and modifying treatment |
| Jacob et al.[80] (2012) | 15 | Child outpatients | NS | United States | Patient satisfaction was high, and PCPs found recommendations helpful; outcomes pending on follow-up |
| *All ages* | | | | | |
| De Las Cuevas et al.[14] (2006) | 130 | All ages—outpatients | 384–768 | Spain | Video equals in-person, including those in remote areas with limited resources |
| *Depression* | | | | | |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384 | United States | Video equals in-person for adherence, patient satisfaction, and cost. |
| Fortney et al.[15] (2007) | 177 | Adult outpatients | NS | United States | Video can help adapt collaborative care model in small PC clinics, and symptoms improved more rapidly in intervention group versus usual-care group. |
| Moreno et al.[37] (2012) | 167 | Adult patients | NS | United States | Video may close gap in access to culturally and linguistically congruent specialists; improves depression severity, functional ability, and quality of life |
| Fortney et al.[9] (2013) | 364 | Adult patients | NS | United States | Video collaborative care group had greater reductions in severity than usual-care group. |
| *PTSD* | | | | | |
| Frueh et al.[18] (2007) | 38 | Adult male Veterans | 384/NS | United States | Video equals in-person in clinical outcomes and satisfaction at 3-month follow-up; video less comfort versus in-person in talking with therapist post-treatment and had worse treatment adherence |
| Morland et al.[17] (2010) | 125 | Adult male Veterans | 384/NS | United States | Video CBGT for PTSD-related anger is feasible for rural/remote Veterans, with reduced anger. |
| Germain et al.[81] (2009) | 48 | Adult patients | NS | Canada | Video equals in-person in reducing PTSD over 16–25 weeks |
| *Substance abuse* | | | | | |
| Frueh et al.[46] (2005) | 14 | Adult male outpatients | 384/NS | United States | Video had good attendance, comparable attrition, and high satisfaction. |
| *Developmental disability* | | | | | |
| Szeftel et al.[30] (2012) | 45 | Adolescents | NS | United States | Video led to changed Axis I psychiatric diagnosis (excluding developmental disorders) 70%, and changed medication 82% of patients initially, 41% at 1 year, and 46% at 3 years; video helped PCPs with recommendations for developmental disabilities. |
| *Panic disorder* | | | | | |
| Bouchard et al.[82] (2004) | 21 | Adults | 384/NS | Canada | Video 81% of patients panic-free post-treatment and 91% at 6-month follow up via CBT |
| *Hispanic* | | | | | |
| Moreno et al.[37] (2012) | 167 | Adult patients | NS | United States | Video lessens depression severity, raises functional ability and quality of life, and improves access to culturally and linguistically congruent specialists. |
| Chong et al.[40] (2012) | 167 | Adult patients | NS | United States | Video is acceptable to low-income depressed Hispanic patients, but its feasibility is questionable. |
| Yellowlees et al.[55] (2013) | 127 | English- and Spanish-speaking patients | NS | United States | ATP equal for English- and Spanish-speaking patients |

(continued)

**CDCR _219**

| Table 2. Summary of Clinical/Outcome Studies by Population (Age) continued | | | | | |
|---|---|---|---|---|---|
| TOPIC, STUDY | N | PATIENT POPULATION | KBS | LOCATION | COMMENT(S) |
| American Indian | | | | | |
| Shore et al.[43] (2008) | 53 | Male adult patients | NS | United States | Video equals in-person assessment, interaction, and satisfaction; comfort level high and culturally accepted |
| European | | | | | |
| Mucic[44] (2010) | 61 | Adult outpatients | 2Mbit (Denmark) 10Mbit (Sweden) | Denmark | Video improved access, reduced waiting time, and reduced travel to see bilingual psychiatrists; high satisfaction video preferred via "mother tongue" rather than interpreter-assisted care |
| Asian | | | | | |
| Ye et al.[41] (2012) | 19 | Adult outpatients | NS | United States | Primary language facilitates expression of feelings, emotional discomfort, or social stressors. |
| Sign language | | | | | |
| Lopez et al.[45] (2004) | 1 | Adult female, deaf since birth | NS | United States | Video communication was fine with ASL interpreter, and psychiatric symptoms improved. |

Those studies before 2003 are not referenced in this regular article since it is not a review; name and year of those not referenced are given in Hilty et al.[4] (2003).
ASL, American Sign Language; ATP, asynchronous telepsychiatry; CBT, cognitive behavioral treatment; NAP, not applicable; NAV, not available; NS, not specified; PC, primary care; PCP, primary care provider; PTSD, posttraumatic stress disorder.

## MODELS AND SETTINGS OF TELEMENTAL SERVICES

*Consultation to primary care versus management.* Past studies showed positive outcomes for patients when using a consultation model of care into primary care sites. Specialists changed the diagnosis and medications in 91% and 57% of cases, respectively, with primary care interventions led to clinical improvements in 56% of cases.[1] Provider knowledge, skills, and complexity of questions improve over time,[47] particularly in rural PCPs.[48] The most intensive model of consultation to primary care is collaborative care, which has now been more formally applied to telemedicine[9,15,31] with encouraging results. The virtual collaborative care team was able to produce better outcomes than the traditional "gold standard" methodology of primary care psychiatry.[9]

Models of care have been thoroughly studied and well articulated.[7] Examples are:

1. Randomized controlled trial for depression in adults, using disease management and telepsychiatric consultation versus usual care over 12 months.[49]
2. Phone and e-mail physician-to-provider consultation system for adults and children with developmental disabilities, using a 24-h warm-line.[50]
3. An integrated program of mental health screening, therapy on site, and telepsychiatric consultation (phone, e-mail, or video), with continuing medical education and training on screening questionnaires.[28,29]
4. Cultural consultation to rural primary care using telemedicine.[38]

5. Disaster response to a bioterrorism attack was evaluated as feasible in terms of training and consultations.[51]
6. Collaborative care via telepsychiatry is co-provision of medication for primary care patients by the telepsychiatrist and PCP in rural communities, based on the earlier models of in-person care to achieve national standards of antidepressant prescriptions.[9,52] This model is often integrated with stepped models of care, which, similar to the above, use "less intensive or expensive interventions" first; then if patients fail to improve, "step it up" to more intensive services.
7. Asynchronous telepsychiatry (ATP) to primary care (described below) is feasible and helpful (described below).[53,54]

*ATP.* ATP services, formerly known as store-and-forward services, have been demonstrated to be feasible, valid, and reliable in English- and Spanish-speaking patients in primary care.[53–55] Asynchronous telemedicine is used in radiology, dermatology, ophthalmology, cardiology, and pathology, and it is now available in psychiatry, where it may also facilitate the "medical home," a patient-centered approach that supports the PCP to improve patient care and health.[56]

ATP works at the patient end via taping a videorecording of local providers and patients, use of a basic questionnaire, and uploading of videos and patient histories for a remote psychiatrist for review in a Health Insurance Portability and Accountability Act (HIPAA)-adherent manner.[57] He or she evaluates the information, diagnoses the patient, and makes two or three treatment recommendations in a report. ATP is specifically designed for patients who can be primarily managed in primary care, but could offer the

CDCR_220

**Table 3. Summary of Telemental Health Cost Studies: Since 1998**

| COST | N | PATIENTS | KBPS/ FRAMES | LOCALE | COMMENTS |
|------|---|----------|--------------|--------|----------|
| Mielonen (1998) | 14 | Adult inpatients | NS | Finland | Savings in healthcare costs, reduction in travel, and ease and speed of consultation |
| Trott (1998) | 50 | Adult and child outpatients | NS | Australia | Substantial savings in healthcare costs from reduction in traveling and patient transfers |
| Alessi (1999) | NAV | Adult forensic inpatients | NAV/NAV | United States | Video is cost-effective. |
| Doze (1999) | 90 | Adults | 336–384/NS | Alberta | Costs break even at 7.6 consultations. |
| Simpson (2001) | 379 | Adult outpatients | 128–384 | Canada | Costs break even at 224 consultations/year; less if used for administration, too |
| Elford (2001) | 30 | Children and parents | 336 | Newfoundland, Canada | Cost $400 per consultation via video or by patient traveling |
| Hailey (2002) | NAP | Adults | NAP/NAP | United States | Reduced costs to rural patients |
| Edwards et al.[83] (2003) | 518 | Adults and children | | United States | Video saved $400/consultation versus in-person |
| Jong[68] (2004) | 71 | NS | NS | Canada | Video saved $2,000/consultation versus in-person and saved government $140,088 in 2003. |
| Ruskin et al.[16] (2004) | 119 | Adult Veterans | 384/NS | United States | Video greater than in-person unless psychiatrist traveled >22 miles away, and the productivity (increasing number of patients/day) minimized costs. |
| Cluver et al.[63] (2005) | 10 | Adult outpatients | NS | United States | In-home portable video works but costly for the average person |
| Persaud et al.[69] (2005) | 215 | Adults | NS | Canada | Video versus in-person of equal cost, overall, as patient costs more for in-person literal consultation $240–$1,048 (Canadian $) versus telehealth $17–$70, but from societal perspective, video costs more at $1,736–$28,084 versus in-person $325–$1,133. |
| Harley[84] (2006) | 11 | Adults | 128 | United Kingdom | Video in rural areas costs 4 times less than in-person, once a threshold of 5–6 episodes per year is completed. |
| Modai et al.[76] (2006) | 24/15 | Adult outpatients | NS | Israel | Operational video costs greater than in-person, particularly if resulted in hospitalization (223.7% higher); video costs of sessions 32% higher unless travel included (then only 10.6% higher) |
| O'Reilly et al.[13] (2007) | 495 | Adult outpatients | 384/NS | Canada | Video 10% less expensive per patient than service provided in-person |
| Shore et al.[42] (2007) | 53 | Adults | 384/NAP | United States | Video costs lower than in-person |
| Smith et al.[66] (2007) | 1,499 | Children | NS | Australia | Video cost about $600/consultation versus $1,000+ in-person |
| Spaulding et al.[67] (2010) | 257 | Children/adolescents | 384+? | United States | Video cost $168/consult more but only $31 if travel costs included |
| Rabinowitz et al.[32] (2010) | 106 | Nursing home residents | 384/NS | United States | Reduced travel time, fuel costs, physician travel time, personnel costs |
| Pyne et al.[85] (2010) | 395 | Adult outpatients | NS | United States | Video $85,634/QALY for collaborative care |
| Butler and Yellowlees[54] (2012) | 125 | Adult primary care patients | ATP[5] | United States | ATP and video fixed costs $7,000 and $20,000, respectively, and per consultation ATP was $68.18, video was $107.50, and in-person $96.36; this means ATP is most cost-effective at 249 consultations/year. |

Those studies before 2003 are not referenced in this regular article since it is not a review; name and year of those not referenced are given in Hilty et al.[4] (2003).

ATP, asynchronous telepsychiatry; KBPS, kilobits per second; NAP, not applicable; NAV, not available; NS, not specified; QALY, quality-adjusted life years.

CDCR _221

opportunity for PCPs to collaborate with psychiatrists to provide specialized care, and it is less costly than video and usual care.[53]

*Emergency room telepsychiatry.* Telepsychiatry emergency services have been slow to develop in psychiatry compared with neurology (e.g., stroke), obstetrics (e.g., fetal monitoring), and other clinical areas. This is surprising despite the consultation models used and the long delays before mental health evaluation may occur on site. The effectiveness of emergency telepsychiatric consultations has rarely been studied; however, one study of patients with mainly depression, bipolar disorder, and schizophrenia revealed that 65% were discharged, 16% were admitted, and 19% were transferred.[58] This study, which examined eight programs, found that most rated themselves as moderately successful (3/5 or 4/5, with 5 best) and patients and emergency physicians rated services at 4.4/5. The same was found in another study.[59] Guidelines on how to be effective in providing emergency telepsychiatry need to be evaluated.[60,61]

*Medical home, home health, and other mobile technology methods.* These services are in development and need to be better studied, although costs are dramatically decreasing. The patient-centered medical home is a concept founded on the presence of inadequate treatment in primary care and/or an inability to access needed services.[56] The patient-centered medical home allows telepsychiatric input at home, still under the general purview of the PCP, and it has been shown to improve patient care and health.[62] Desk-mounted video systems offer great convenience for therapy to cancer patients to avoid travel, but the cost used to be prohibitive for most consumers.[63] Internet-based video technology via personal computers and mobile devices must be HIPAA-adherent. Use of these technologies is increasingly becoming available and will support the move of telepsychiatry to the home, such as programs that are now being implemented by the Veterans Health Administration.[64]

## ACCESS TO CARE

Access appears to have been greatly increased, based on the recent decade's research—with a few exceptions. Patients may have less travel, absence from work, and time waiting, more clinical choice and control, and better outcomes, as summarized previously.[4] Satisfaction, generally, with services is so high that it *de facto* precludes study. Rarely do patients report a less satisfactory interaction than by videoconferencing than in-person. A few access-to-care issues remain unresolved for patients: (1) privacy and confidentiality where some patients prefer services delivered from elsewhere (e.g., living on a reservation or wanting total anonymity for personal reasons), (2) cultural and language nuances related to telemental healthcare, and (3) inadequate payment for indigent, rural, and other underserved patients. PCPs and communities are generally happy to "keep" their patients locally for continuity of care.

## COST ISSUES AND IMPLICATIONS

Ideally, costs should be considered for patients, clinics, providers, and society at large—with both direct and indirect costs accounted for. Direct costs include equipment, installation of lines, and other supplies. Fixed costs also include the rental cost of lines, salary and wages, and administrative expenses. Variable costs include data transmission costs, fees for service, and maintenance and upgrades of equipment. Costs may also include projections for travel, transfers in emergencies, waiting times, and more "appropriate" use of other services or, more globally, by rural towns retaining dollars that would have been otherwise lost to suburban centers upon referral.

With regard to cost, there is benefit to delineate between differing types of cost analyses.[65] The cost-offset model, which implies treating mental conditions may reduce other health costs, is widely used. Cost-minimization analysis implies the same effectiveness model, but different (lower) costs. Cost-effectiveness assesses intervention costs versus alternative expenditures; a subtype is cost-utility analysis, which includes data on health-related quality-of-life measures (i.e., quality-adjusted life-years). Cost-benefit analysis values all outcomes by translating them into economic terms to the degree possible and is particularly important when an intervention appears far too expensive at face value (or cross section) but not longitudinally (e.g., a transplant helps someone live and work an additional 50 years; this calculation gets into quality of life-years analysis).

Cost studies have differences in data sought, their collection, and how they are analyzed (*Table 3*). Videoconferencing may be cost-effective if someone does not have to travel or transfers as "expensive" services are avoided. Savings may be shown versus in-person with high consultation rates (e.g., 1,500 consultations total),[66] "break-even" or other thresholds used (e.g., number of consultations/year), or when the patient's travel, time, and food are included.[66,67] A break-even analysis is highly specific to a program, with a range of consultations needed, from 7 to 774 depending on methods of calculation.[66] A comparison of ATP, video, and in-person showed fixed costs were $7,000 for ATP and $20,000 for regular video, and the cost per consultation was $68.18 for ATP, $107.50 for videoconferencing, and $96.36 in-person; this means ATP is most cost-effective at 249 consultations/year.[54] Governments have been tabulating savings, too,[68,69] and an economic evaluation of telehealth data collection with rural populations has been completed.[70]

## Conclusions, Implications, and Recommendations for Future Research

Today, telemental health services are unquestionably effective in most regards, although more analysis is needed. They are effective for diagnosis and assessment, across many populations (adult, child, geriatric, and ethnic), and in disorders in many settings (emergency, home health), are comparable to in-person care, and complement other services in primary care. Overall, better evaluation with formal measures (i.e., randomized trials, lack of inferiority designs) and analysis of variance to predictors of outcomes are necessary. Studies need to be focused on areas where there is currently a relative paucity of information, such as anxiety, substance use, and psychotic and other disorders.

CDCR_222

**HILTY ET AL.**

A key area the integration of telepsychiatric models like collaborative care into services in primary care settings. The fact that it worked better than usual models is a key step—it may change our decision-making about how to best do things in the future. Web-based data management[37,71,72] will facilitate services, as can stepped models of care. For example, a new stepped model might have low tier physician-to-provider phone or e-mail consultation followed by ATP, then therapies, and finally videoconferencing.

A plan for assessment and care for patients with ethnic, cultural, and language issues is essential.[54,73] Scientific and policy questions from this discussion include:

- What tools, methods, and measures are needed to assess the patients, providers, and health systems?
- What are the intersections of culture, sociodemographic, geography, and technology in health?
- Will patients' disorder, racial or ethnic identity, or other factors determine whether e-mental health or in-person care is more effective?
- What is the most cost-effective and feasible way to provide language/interpreting support?

Limitations of this article include that it is not a systematic, fully longitudinal review of the literature. Second, the scope was limited to exclude specifics on medication management, the therapies (largely), and other treatments. Furthermore, not all findings apply to all locales or settings therein. Fourth, the landscape of healthcare is rapidly changing, with consumer/patient use of technology—the field will be hard pressed to keep up. Finally, plans that offer the most "adaptability" or "flexibility" of telemental services—beyond this article's scope—will afford the most opportunities for improvement.

## Acknowledgments

We thank the American Telemedicine Association Mental Health Interest Group; the University of California, Davis Center for Health and Technology, Department of Psychiatry and Behavioral Sciences and Health Informatics Graduate Group; telemedicine and telepsychiatry pioneers, authors, organizational leaders, and innovators; and the American Telemedicine Association.

## Disclosure Statement

No competing financial interests exist.

REFERENCES

1. Hilty DM, Marks SL, Urness D, et al. Clinical and educational applications of telepsychiatry: A review. *Can J Psychiatry* 2004;49:12–23.

2. Yellowlees PM, Shore J, Roberts L. Practice guidelines for videoconferencing-based telemental health, American Telemedicine Association. *Telemed J E Health* 2010;16:1074–1089.

3. AACAP practice parameter for telepsychiatry with children and adolescents. *J Am Acad Child Adolesc Psychiatry* 2007;47:1468–1483.

4. Hilty DM, Liu W, Marks SL, et al. Effectiveness of telepsychiatry: A brief review. *Can Psychiatry Assoc Bull* 2003;(Oct):10–17.

5. Richardson LK, Frueh BC, Grubaugh AL, et al. Current directions in videoconferencing tele-mental health research. *Clin Psychol (New York)* 2009;16:323–328.

6. Morland LA, Greene CJ, Rosen C, et al. Issues in the design of a randomized noninferiority clinical trial of telemental health psychotherapy for rural combat veterans with PTSD. *Contemp Clin Trials* 2009;30:513–522.

7. World Health Organization. *Telemedicine opportunities and developments in member states. Results of the second global survey on eHealth.* Geneva: WHO Press, 2011.

8. Hilty DM, Yellowlees, PM, Cobb HC, et al. Models of telepsychiatric consultation-liaison service to rural primary care. *Psychosomatics* 2006;47: 152–157.

9. Fortney JC, Pyne JM, Mouden SP, et al. Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: A pragmatic randomized comparative effectiveness trial. *Am J Psychiatry* 2013;170:414–425.

10. Flay BR, Biglan A, Boruch RF, et al. Standards of evidence: Criteria for efficacy, effectiveness and dissemination. *Prev Sci* 2005. Available at www.ebppc .hawaii.edu/Resources/Standards%20of%20Evidence%5B1%5D.pdf (last accessed February 1, 2013).

11. Morland LA, Greene CJ, Rosen C, et al. Issues in the design of a randomized noninferiority clinical trial of telemental health psychotherapy for rural veterans with PTSD. *Contemp Clin Trials* 2009;30:513–252.

12. Pakyurek M, Yellowlees PM, Hilty DM. The child and adolescent telepsychiatry consultation: Can it be a more effective clinical process for certain patients than conventional practice? *Telemed J E Health* 2010;16:289–292.

13. O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face to face psychiatry: Results from a randomized controlled equivalence trial. *Psychiatr Serv* 2007;58:836–843.

14. De Las Cuevas C, Arrendondo MT, Cabrera MF, et al. Randomized controlled trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. *Telemed J E Health* 2006;12:341–350.

15. Fortney JC, Pyne JM, Edlund MJ, et al. A randomized trial of telemedicine-based collaborative care for depression. *J Gen Intern Med* 2007;22:1086–1093.

16. Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: Comparison of remote treatment through telepsychiatry to in-person treatment. *Am J Psychiatry* 2004;161:1471–1476.

17. Morland LA, Greene CJ, Rosen CS, et al. Telemedicine for anger management therapy in a rural population of combat veterans with posttraumatic stress disorder: A randomized noninferiority trial. *J Clin Psychiatry* 2010;71: 855–863.

18. Frueh BC, Monnier J, Yim E, et al. Randomized trial for post-traumatic stress disorder. *J Telemed Telecare* 2007;13:142–147.

19. Morland LA, Hynes AK, Mackintosh MA, et al. Group cognitive processing therapy delivered to veterans via telehealth: A pilot cohort. *J Trauma Stress* 2011;24:465–469.

20. Myers KM, Valentine JM, Melzer SM. Feasibility, acceptability, and sustainability of telepsychiatry for children and adolescents. *Psychiatr Serv* 2007;58: 1493–1496.

21. Myers KM, Palmer NB, Geyer JR. Research in child and adolescent telemental health. *Child Adolesc Psychiatr Clin North Am* 2011;20:155–171.

22. Boydell K, Volpe T, Pignatello A. A qualitative study of young people's perspectives on receiving psychiatric services via televideo. *J Can Assoc Child Adolesc Psychiatry* 2010;19:5–11.

23. Myers KM, Vander Stoep A, McCarty CA, et al. Child and adolescent telepsychiatry: Variations in utilization, referral patterns and practice trends. *J Telemed Telecare* 2010;16:128–133.

24. Palmer NB, Myers KM, Vander Stoep A, et al. Attention-deficit/hyperactivity disorder and telemental health. *Curr Psychiatry Rep* 2010;12:409–417.

CDCR _223

25. Pesamaa L, Ebeling H, Kuusimaki ML, et al. Videoconferencing in child and adolescent telepsychiatry: A systematic review of the literature. *J Telemed Telecare* 2004;10:187–192.

26. Elford R, White H, Bowering R, et al. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *J Telemed Telecare* 2000;6:73–82.

27. Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. *Telemed J E Health* 2003;9:49–55.

28. Neufeld JD, Bourgeois JA, Hilty DM, et al. The e-Mental Health Consult Service: Providing enhanced primary care mental health services through telemedicine. *Psychosomatics* 2007;48:135–141.

29. Yellowlees PM, Hilty DM, Marks SL, et al. A retrospective analysis of child and adolescent e-mental health. *J Am Acad Child Adolesc Psychiatry* 2008;47:1–5.

30. Szeftel R, Federico C, Hakak R, et al. Improved access to mental health evaluation for patients with developmental disabilities using telepsychiatry. *J Telemed Telecare* 2012;18:317–321.

31. Richardson L, McCauley E, Katon W. Collaborative care for adolescent depression: A pilot study. *Gen Hosp Psychiatry* 2009;31:36–45.

32. Rabinowitz T, Murphy K, Amour JL, et al. Benefits of a telepsychiatry consultation service for rural nursing home residents. *Telemed J E Health* 2010;16:34–40.

33. Poon P, Hui E, Dai D, et al. Cognitive intervention for community-dwelling older persons with memory problems: Telemedicine versus face-to-face treatment. *Int J Geriatr Psychiatry* 2005;20:285–286.

34. Holden D, Dew E. Telemedicine in a rural gero-psychiatric inpatient unit: Comparison of perception/satisfaction to onsite psychiatric care. *Telemed J E Health* 2008;14:381–384.

35. Weiner M, Rossetti H, Harrah K. Videoconference diagnosis and management of Choctaw Indian dementia patients. *Alzheimers Dement* 2011;7:562–566.

36. Chapter 4. Mental health care for American Indians and Alaska Natives. In: Office of the Surgeon General (US); Center for Mental Health Services (US); National Institute of Mental Health (US). *Mental Health: Culture, Race, and Ethnicity: A Supplement to Mental Health: A Report of the Surgeon General.* Rockville, MD: Substance Abuse and Mental Health Services Administration (US); 2001. Available at www.ncbi.nlm.nih.gov/books/NBK44242/ (last accessed February 1, 2013).

37. Moreno FA, Chong J, Dumbauld J, et al. Use of standard webcam and internet equipment for telepsychiatry treatment of depression among underserved Hispanics. *Psychiatr Serv* 2012;63:1213–1217.

38. Hilty DM, Lim RF, Koike AK, et al. Planning for telepsychiatric consultation: A needs assessment for cultural and language services at rural sites in California. *J Rural Ment Health* 2013 (submitted for publication).

39. Nieves J, Stack KM. Hispanics and telepsychiatry. *Psychiatr Serv* 2007;58:877–878.

40. Chong J, Moreno FA. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. *Telemed J E Health* 2012;18:297–304.

41. Ye J, Shim R, Lukaszewski T, Yun K, et al. Telepsychiatry services for Korean immigrants. *Telemed J E Health* 2012;18:797–802.

42. Shore JH, Savin D, Orton H, et al. Diagnostic reliability of telepsychiatry in American Indian veterans. *Am J Psychiatry* 2007;164:115–118.

43. Shore JH, Brooks E, Savin D, Orton H, Grigsby J, Manson S. Acceptability of telepsychiatry in American Indians. *Telemed J E Health* 2008;14:461–466.

44. Mucic D. Transcultural telepsychiatry and its impact on patient satisfaction. *J Telemed Telecare* 2010;16:237–242.

45. Lopez AM, Cruz M, Lazarus S, et al. Use of American sign language in telepsychiatry consultation. *Telemed J E Health* 2004;10:389–391.

46. Frueh BC, Henderson S, Myrick H. Telehealth service delivery for persons with alcoholism. *J Telemed Telecare* 2005;11:372–375.

47. Hilty DM, Yellowlees PM, Nesbitt TS. Evolution of telepsychiatry to rural sites: Change over time in types of referral and PCP knowledge, skill, and satisfaction. *Gen Hosp Psychiatry* 2006;28:367–373.

48. Hilty DM, Nesbitt TS, Kuenneth TA, et al. Telepsychiatric consultation to primary care: Rural vs. suburban needs, utilization and provider satisfaction. *J Rural Health* 2007;23:163–165.

49. Hilty DM, Marks SL, Wiegeland JE, et al. A randomized controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. *Psychiatry* 2007;4:58–65.

50. Hilty DM, Ingraham RL, Yang RP, et al. Multispecialty phone and email consultation to primary care providers for patients with developmental disabilities in rural California. *Telemed J E Health* 2004;10:413–421.

51. Ayers K, Yellowlees P. Mental health considerations during a pandemic influenza outbreak. *Internet J Rescue Disaster Med* 2009;9(1). doi: 10.5580/1481.

52. Katon W, Von Korff M, Lin E, et al. Collaborative management to achieve depression treatment guidelines. *J Clin Psychiatry* 1997;58(Suppl 1):20–24.

53. Yellowlees PM, Odor A, Burke MM, et al. A feasibility study of asynchronous telepsychiatry for psychiatric consultations. *Psychiatr Serv* 2010;61:838–840.

54. Butler TN, Yellowlees P. Cost analysis of store-and-forward telepsychiatry as a consultation model for primary care. *Telemed J E Health* 2012;18:74–77.

55. Yellowlees PM, Odor A, Patrice K, et al. Transcultural psychiatry made simple—Asynchronous telepsychiatry as an approach to providing culturally relevant care. *Telemed J E Health* 2013;19:259–264.

56. Rosenthal TC. The medical home: Growing evidence to support a new approach to primary care. *J Am Board Fam Med* 2008;21:427–440.

57. Yellowlees PM, Odor A, Patrice K, et al. PsychVACS: A system for asynchronous telepsychiatry. *Telemed J E Health* 2011;17:299–303.

58. Williams M, Pfeffee M, Boyle, et al. Telepsychiatry in the emergency department: Overview and case studies. California HealthCare Foundation. 2010. Available at www.chcf.org/publications/2009/12/telepsychiatry-in-the-emergency-department-overview-and-case-studies (last accessed last February 1, 2013).

59. Sorvaniemi M, Ojanen E, Santamäki O. Telepsychiatry in emergency consultations: A follow-up study of sixty patients. *Telemed J E Health* 2005;11:439–441.

60. Shore JH, Hilty DM, Yellowlees PM. Emergency management guidelines for telepsychiatry. *Gen Hosp Psychiatry* 2007;29:199–206.

61. Yellowlees PM, Burke MM, Marks SL, et al. Emergency telepsychiatry. *J Telemed Telecare* 2008;14:277–281.

62. Hollingsworth JM, Saint S, Hayward RA, et al. Specialty care and the patient-centered medical home. *Med Care* 2011;49:4–9.

63. Cluver JS, Schuyler D, Frueh BC, et al. Remote psychotherapy for terminally ill cancer patients. *J Telemed Telecare* 2005;11:157–159.

64. Shore P. VISN 21 Home Based Telemental Health Pilot Project Program. Veteran's Health Administration. Portland, OR, 2011. Available at http://conference.avapl.org/pubs/2012%20Conference%20Presentations/Home%20Based%20Telemental%20Health.pdf (last accessed February 1, 2013).

65. Weinstein MC, Stason WB. Foundations of cost-effectiveness analysis for health and medical practices. *N Engl J Med* 1977;296:716–721.

66. Smith AC, Scuffham P, Wootten R. The costs and potential savings of a novel telepaediatric service in Queensland. *BMC Health Serv Res* 2007;7:35.

67. Spaulding R, Belz N, DeLurgio S, et al. Cost savings of telemedicine utilization for child psychiatry in a rural Kansas community. *Telemed J E Health* 2010;16:867–871.

68. Jong M. Managing suicides via videoconferencing in a remote northern community in Canada. *Int J Circumpolar Health* 2004;63:422–428.

69. Persaud DD, Jreige S, Skedgel C, et al. An incremental cost analysis of telehealth in Nova Scotia from a societal perspective. *J Telemed Telecare* 2005;11:77–84.

CDCR _224

**HILTY ET AL.**

70. Shore JH, Brooks E, Savin DM, et al. An economic evaluation of telehealth data collection with rural populations. *Psychiatr Serv* 2007;58:830–835.

71. Unutzer J, Choi Y, Cook IA, et al. A web-based data management system to improve care for depression in a multicenter clinical trial. *Psychiatr Serv* 2002;53:671–678.

72. Geyer J, Myers K, Vander Stoep A, et al. Implementing a low-cost web-based clinical trial management system for community studies: A case study. *Clin Trials* 2011;8:634–644.

73. Yellowlees PM, Marks SL, Hilty DM, et al. Using e-health to enable culturally appropriate mental health care in rural areas. *Telemed J E Health* 2008;14: 486–492.

74. Manfredi L, Shupe J, Batki S. Rural jail telepsychiatry: A pilot feasibility study. *Telemed J E Health* 2005;11:574–577.

75. Urness D, Wass M, Gordon A, et al. Client acceptability and quality of life— Telepsychiatry compared to in-person consultation. *J Telemed Telecare* 2006;12:251–254.

76. Modai I, Jabarin M, Kurs R, et al. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. *Telemed J E Health* 2006;12:515–520.

77. Greenberg N, Boydell K, Volpe T. Pediatric telepsychiatry in Ontario: Caregiver and service provider perspectives. *J Behav Health Sci Res* 2006;33:105–111.

78. Myers K, Valentine J, Morganthaler R, Melzer S. Telepsychiatry with incarcerated youth. *J Adolesc Health* 2006;38:643–648.

79. Lau ME, Way BB, Fremont WP. Assessment of SUNY Upstate Medical University's child telepsychiatry consultation program. *Int J Psychiatry Med* 2011;42:93–104.

80. Jacob MK, Larson JC, Craighead WE. Establishing a telepsychiatry consultation practice in rural Georgia for primary care physicians: A feasibility report. *Clin Pediatr (Phila)* 2012;51:1041–1047.

81. Germain V, Marchand A, Bouchard, et al. Effectiveness of cognitive behavioural therapy administered by videoconference for posttraumatic stress disorder. *Cogn Behav Ther* 2009;38:42–53.

82. Bouchard S, Paquin B, Payeur R, et al. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. *Telemed J E Health* 2004;10:13–25.

83. Edwards MA, Patel AC. Telemedicine in the state of Maine: A model for growth driven by rural needs. *Telemed J E Health* 2003;9:25–39.

84. Harley J. Economic evaluation of a tertiary telepsychiatry service to an island. *J Telemed Telecare* 2006;12:354–357.

85. Pyne JM, Fortney JC, Tripathi SP, Maciejewski ML, Edlund MJ, Williams K. Cost-effectiveness analysis of a rural telemedicine collaborative care intervention for depression. *Arch Gen Psychiatry* 2010;67:812–821.

Address correspondence to:
*Donald M. Hilty, MD*
*Department of Psychiatry and Behavioral Sciences*
*University of California—Davis*
*2230 Stockton Boulevard*
*Sacramento, CA 95817*

*E-mail:* dmhilty@ucdavis.edu

*Received:* March 14, 2013
*Revised:* April 9, 2013
*Accepted:* April 10, 2013

CDCR _225

# ATTACHMENT 12

CDCR _226

# Telepsychiatry



## Effective, Evidence-Based, and at a Tipping Point in Health Care Delivery?

Donald Hilty, MD[a,*], Peter M. Yellowlees, MBBS, MD[b], Michelle B. Parrish, MA[c], Steven Chan, MD, MBA[d]

### KEYWORDS

- Telepsychiatry • Telemedicine • Models • Integrated and stepped care
- Effectiveness

### KEY POINTS

- Telepsychiatry is effective compared with in-person care for adults and many populations, disorders, and settings.
- Telepsychiatry adds versatility to clinical practice and new models of care, if applied judiciously and incrementally.
- Good telepsychiatric care depends on time-tested principles of good patient-doctor engagement, the therapeutic relationship, communication, bio-psycho-socio-cultural treatment, and integrated care.
- Participants in care, particularly patients, feel empowered through technology and inform us of virtual care options for the future.

## INTRODUCTION

Telepsychiatry is at a "tipping point" and, after more than 50 years of slow clinical implementation around the world, is finally being widely introduced. This article helps the reader to (1) learn and be able to apply the evidence base on telepsychiatry to

Disclosures: The authors have no financial conflict of interest.
[a] Psychiatry & Behavioral Sciences, Telehealth, USC Care Health System, Keck School of Medicine, University of Southern California, 2250 Alcazar Street, CSC Suite 2200, Los Angeles, CA 90033, USA; [b] Psychiatry & Behavioral Sciences, Health Informatics Graduate Program, University of California, Davis School of Medicine and Health System, 2450 48th Street, Suite 2800, Sacramento, CA 95817, USA; [c] Telepsychiatry and Health Informatics, University of California, Davis School of Medicine & Health System, 2450 48th Street Suite 2800, Sacramento, CA 95817, USA; [d] Department of Psychiatry & Behavioral Sciences, University of California, Davis School of Medicine & Health System, 2150 Stockton Boulevard, Sacramento, CA 95817, USA
* Corresponding author.
E-mail address: hilty@usc.edu

Psychiatr Clin N Am 38 (2015) 559–592
http://dx.doi.org/10.1016/j.psc.2015.05.006                 psych.theclinics.com
0193-953X/15/$ – see front matter © 2015 Elsevier Inc. All rights reserved.

CDCR _227

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

clinical practice; (2) adjust or change current systems of care as they implement tele-psychiatry (eg, how to use technology, get paid, and adhere to legal issues), and (3) compare telepsychiatric models of care to in-person care for different ages, disorders, and bio-psycho-socio-cultural treatment modalities. The article uses a clinical vignette to illustrate the objectives.

## HOW CAN THE EVIDENCE BASE FOR TELEPSYCHIATRY TO CLINICAL PRACTICE BE APPLIED?

Patient-centered health care confronts us with a question about how to deliver quality, affordable, and timely care in a variety of settings,[1] without stigma and with sensitivity to culture and diversity.[2,3] Technology and empowerment have been linked for some time,[4] and patients have been very satisfied with telemental health (TMH) care. Systems are trying to increase clinical operating efficiency by integrating care and providing care at multiple points of service[5] and use it to leverage interdisciplinary team members' clinical, administrative, and other care coordination expertise.[6] The World Health Organization, too, is surveying telemedicine opportunities and developments in member states.[7]

Evaluation of telepsychiatry TMH has gone through 3 phases.[3] First, TMH was found to be effective in terms of increasing access to care, acceptance, and good educational outcomes.[3] Second, it was noted to be valid and reliable compared with in-person services.[8] In addition to comparison (or as good as) studies, telepsychiatric outcomes are not inferior to in-person care (ie, noninferiority studies).[9] Third, frameworks are being used to approach complex themes like costs and models.[8,10,11]

Most clinicians, administrators, and other leaders want to ensure good care, do it ethically, and be remunerated. Time-tested quality care in psychiatry is mostly attributed to the patient-doctor engagement, the therapeutic relationship, shared decision-making, the role of stories and narratives, and biopsychosocial treatment.[12] As for technology as an innovation, folks accept "innovation represents a potential efficacy in solving a perceived need or problem."[13] Systems of care and their leaders are moving fast now with traditional video/synchronous telepsychiatry (STP), novel (eg, asynchronous or asynchronous telepsychiatry [ATP], social media), and emerging (eg, Web- and mobile/wireless-based) models.

---

CLINICAL VIGNETTE

### Identification Info

*A 14-year-old Latino American boy was struggling in school, in social situations, and at home. Parents attributed this to "ADD." He had a 9-year-old sister, a 7-year-old brother, and a 3-year-old brother. They lived in small rural community of 12,000 with a small K-12 school, one private and one public health clinic juxtaposed, and one adult mental health (MH) therapist (social worker for adults).*

### History of Present Illness and Referral

*The boy was born in Mexico, and his father and mother immigrated 10 and 6 years earlier, respectively. A public health nurse with 25 years of experience supported the physician ordering the consultation, because the pediatrician was not sure how to proceed. "It seems like attention deficit hyperactivity disorder (ADHD), but I am not sure as there may be some depression, too," according to the brief consultation request faxed to the academic center 100 miles away. The concerning events had been focused in these 2 areas: (1) inattention, poor follow-up on homework, being seen as "hyperactive" in class, and (2) "moody," "angry," and making comments like "I might as well be dead."*

---

**CDCR _228**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

### Consultation and Technology

*The telemedicine consultation used a unit with transmission speeds at 384 kilobits per second (KBPS) and far-end camera control for the provider of an academic health center. Payment for the visit was only through Medicaid/Medicare, which did not cover the true costs.*

### Evaluation

*A 90-minute telepsychiatric consultation was completed by a general telepsychiatrist; child psychiatrists were not available. The interview was in stages: the child, mother, and 2 older siblings; the child; the mother; and all parties. Findings included some mood change (probably depression), no imminent suicidal ideation, disruptive behavior linked to teen-father issues (discipline, absence of the father for truck-driving work), and some decent relationships with peers; no clear use of substances or conduct disordered behavior.*

## TELEPSYCHIATRY IS EFFECTIVE

For specifics of evaluating outcomes, there are 3 main resources in the literature. The first resource is the American Telemedicine Association (ATA) TMH expert consensus that produced a lexicon for outcomes in the following areas: patient satisfaction (ie, access, distance to service, use of), provider satisfaction, process of care (eg, no-shows, coordination, completion of treatment), communication (eg, rapport), reliability/validity (eg, assessment, treatment vs in-person), specific disorder measures (eg, symptoms), cost (ie, length of service, travel, hardware and software), and other administrative factors (eg, facility management, team staffing).[10] Second, another resource looks in-depth at clinical, cost, program evaluation, and other areas of TMH care—the focus is on how to prioritize, make decisions, and implement program change based on iterative feedback.[11] Finally, a review on effectiveness systematically describes patient outcomes, models of care, and how to adjust TMH to different populations and settings.[3]

### Clinical Outcome Evidence

More information is available over the last decade to compare TMH services with in-person care (Table 1). Telemedicine simulates real-time experiences in terms of audio and video quality at 384+ KBPS. Comparison and noninferiority studies show TMH is as good as in-person care in terms of diagnosis and treatment.[9] Reports include less length of hospitalization,[14,15] more medication use,[14,16] symptom reduction of disorders,[14,16] and therapy judged as evidence-based for posttraumatic stress disorder (PTSD).[17,18]

Child telepsychiatry research is now beyond feasibility, acceptability, and good initial outcomes.[19] For some populations (eg, autism spectrum patients), it might be better than in-person care (Table 2).[20] ADHD is being treated as synchronous and asynchronous collaborative care partly using Web-based data systems.[21]

Geriatric data are emerging, but more studies are needed in medicine and TMH.[22] Obstacles include access to service, functional challenges, primary care provider (PCP) attitudes, and lack of psychiatrists,[23] and perhaps what could be called a lack of nursing home "ownership" by any one provider to formalize a clinical approach. Nursing home TMH studies have been effective in terms of informal measures, mainly focusing on depression or dementia, with evaluation more facile and more efficient use of consultant time; some would have gotten no service otherwise.[24] Assessment, cognitive intervention, and outcomes have been similar to in-person and a new

**CDCR _229**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

562  Hilty et al

**Table 1**
Summary of clinical/outcome studies by population age, disorder, or culture

| Study | N | Patients | KBPS/Frames | Location | Comments |
|---|---|---|---|---|---|
| *Geriatric* | | | | | |
| Lyketsos et al, 2001 | NAP | Geriatric outpatients | NS | USA | Video reduced "unneeded" hospitalizations |
| Poon et al, 2005 | 22 | Geriatric dementia patients | 1.5 Mb | China | Significant, comparable cognitive improvement in video and in-person; high satisfaction; feasible assessment, intervention, and outcomes |
| Rabinowitz et al, 2010 | 106 | Nursing home residents | 384 | USA | Reduced travel time, fuel costs, physician travel time, personnel costs |
| Weiner et al, 2011 | 85 | Adult and geriatric dementia patients | NS | USA | Feasible alternative to face-to-face care in patients with cognitive disorders who live in remote areas |
| *Adult* | | | | | |
| Graham et al, 1996 | 39 | Adult outpatients | 768 | USA | Video reduced "unneeded" hospitalizations |
| Zaylor et al, 1999 | 49 | Adult depressed or schizoaffective outpatients | 128 | USA | Video equals in-person in GAF scores at 6-mo follow-up |
| Hunkeler et al, 2000 | 302 | Adult primary care outpatients | NS | USA | Video by nurses improved depressive symptoms, functioning, and had high satisfaction vs in-person |
| Ruskin et al, 2004 | 119 | Adult veterans | 384 | USA | Depression outcomes video and in-person equal as were adherence, satisfaction, cost |
| Manfredi et al, 2005 | 15 | Adult inmates | 384 | USA | Feasibility from an urban university to rural jail; less need for inmate transport |
| Sorvaniemi et al, 2005 | 60 | Adult emergency patients | 384 | Finland | Minor technical problems occurred Assessment and satisfaction fine |
| Modai et al, 2006 | 24/15 | Adult outpatients | NS | Israel | Video > in-person cost per service and more hospitalization cost (less available per usual care) |

CDCR_230

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| | | | | | |
|---|---|---|---|---|---|
| Urness et al, 2006 | 39 | Adult outpatients | 384 | Canada | Video < in-person for encouragement; improved outcomes for both |
| O'Reilly et al, 2007 | 495 | Adult outpatients | 384 | Canada | Video equal to in-person in outcomes; Satisfaction: 10% less expensive per video |
| Yellowlees et al, 2011 | 60 | Nonemergency adult patients | NAP | USA | First ATP to demonstrate feasibility |
| *All ages* | | | | | |
| De Las Cuevas et al, 2006 | 130 | All ages: outpatients | 384–768 | Spain | Video equals in-person, including those in remote areas with limited resources |
| *Depression* | | | | | |
| Ruskin et al, 2004 | 119 | Adult veterans | 384 | USA | Video equals in-person for adherence, patient satisfaction, and cost |
| Fortney et al, 2007 | 177 | Adult outpatients | NS | USA | Video can help adapt collaborative care model in small primary care clinics and symptoms improved more rapidly in intervention group vs usual care group |
| Moreno et al, 2012 | 167 | Adult patients | NS | USA | Video may close gap in access to culturally and linguistically congruent specialists; improves depression severity, functional ability, and quality of life |
| Fortney et al, 2013 | 364 | Adult patients | NS | USA | Video collaborative care group > reductions in severity than usual care |
| Titov et al, 2011 | 37 | Adult patients | 384+/Internet | USA | Depression reduction at 3-mo follow-up after 8 weekly CBT sessions |
| Johnston et al, 2013 | 129 | Adult patients | 384+/Internet | USA | Both sole diagnosis and those with comorbid disorders had significant symptom reduction by CBT |
| *Posttraumatic stress disorder or panic disorder* | | | | | |
| Bouchard et al, 2004 | 21 | Adults, panic disorder | 384/NS | Canada | Video 81% of patients panic-free posttreatment and 91% at 6-mo follow-up via CBT |

(continued on next page)

CDCR_231

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

564    Hilty et al

**Table 1**
**(continued)**

| Study | N | Patients | KBPS/Frames | Location | Comments |
|---|---|---|---|---|---|
| Frueh et al, 2007 | 38 | Adult male veterans, PTSD | 384/NS | USA | Video equals in-person in clinical outcomes and satisfaction at 3 mo follow-up<br>Video < comfort vs in-person in talking with therapist posttreatment and had worse treatment adherence |
| Morland et al, 2010 | 125 | Adult male veterans, PTSD | 384/NS | USA | Video CBGT for PTSD-related anger is feasible for rural/remote veterans, with reduced anger |
| Germain et al, 2009 | 48 | Adult patients, PTSD | NS | Canada | Video equals in-person in reducing PTSD over 16–25 wk |
| Hedman et al, 2014 | 570 | Adult patients | 384+ | Sweden | Video CBT over 6 wk significantly improved symptoms |
| Fortney et al, 2015 | 296 | Adult patients in VA community clinics, PTSD | 384+ | USA | Cognitive processing therapy for the treatment group > usual care group over 12-mo follow-up |
| *Substance abuse* | | | | | |
| Frueh et al, 2005 | 14 | Adult male outpatients | 384/NS | USA | Video had good attendance, comparable attrition, and high satisfaction |
| *Developmental disability* | | | | | |
| Szeftel et al, 2012 | 45 | Adolescents | NS | USA | Video led to changed Axis I psychiatric diagnosis (excluding developmental disorders) 70%, and changed medication 82% of patients initially, 41% at 1 y and 46% at 3 y<br>Video helped PCPs with recommendations for developmental disabilities |

CDCR_232

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

CDCR_233

| Study | N | Population | Bandwidth | Country | Findings |
|---|---|---|---|---|---|
| *Hispanic* | | | | | |
| Moreno et al, 2012 | 167 | Adult patients | NS | USA | Video lessens depression severity and raises functional ability and quality of life; improves access to culturally and linguistically congruent specialists |
| Chong et al, 2012 | 167 | Adult patients | NS | USA | Video acceptable to low-income depressed Hispanic patients, but its feasibility is questionable |
| Yellowlees et al, 2013 | 127 | English- and Spanish-speaking patients | NS | USA | ATP equal for English- and Spanish-speaking patients |
| *American Indian* | | | | | |
| Shore et al, 2008 | 53 | Male adult patients | NS | USA | Video equals in-person assessment, interaction, and satisfaction; comfort level high and culturally accepted |
| *European* | | | | | |
| Mucic, 2010 | 61 | Adult outpatients | 2 Mbit (Denmark) 10 Mbit (Sweden) | Denmark | Video improved access, reduced waiting time, and reduced travel to see bilingual psychiatrists; high satisfaction. Video preferred via "mother tongue" rather than interpreter-assisted care |
| *Asian* | | | | | |
| Ye et al, 2012 | 19 | Adult outpatients | NS | USA | Primary language facilitates expression of feelings, emotional discomfort, or social stressors |
| *Sign language* | | | | | |
| Lopez et al, 2004 | 1 | Adult woman, deaf since birth | NS | USA | Video communication fine with American Sign Language interpreter and psychiatric symptoms improved |

*Abbreviations:* GAF, global assessment of function; NAP, not applicable.
*Data from* Refs.[2,14–18,21,24,65,118–142]

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

566    Hilty et al

**Table 2**
**Summary of clinical outcome studies for child and adolescent telemental health (not inclusive of satisfaction-only studies)**

| Citation | Design | Sample | Assessment | Findings |
|---|---|---|---|---|
| Blackmon et al, 1997 | Descriptive | 43 children, parents | Routine clinical | All children and 98% of parents report satisfaction equal to in-person care |
| Elford et al, 2000 | RCT | 25 children, various diagnoses | Diagnostic interviews | 96% concordance between video and in-person evaluations; no difference in satisfaction |
| Elford et al, 2001 | Descriptive | 23 children | Routine clinical | Diagnosis and treatment recommendation; equal to usual, in-person care |
| Glueckauf et al, 2002 | Modified RCT Pre vs post | 22 adolescents 36 parents | Issue-specific measures of family problems; Teen functioning (Social Skills Rating System); Working Alliance Inventory; Adherence to appointments | Improvement for problem severity and frequency in all conditions. Therapeutic alliance high; teens rated alliance lower for video |
| Nelson et al, 2003 | RCT | 28 children depression | Diagnostic interview and scale | Video = in-person for improvement of depressive symptoms in response to therapy |
| Myers et al, 2004 | Comparative | 159 youth (age 3–18) | Comparison of patients evaluated through TMH vs in-person in clinic | Video basically similar to in-person outpatients demographically, clinically, and by reimbursement; Video > "adverse case mix" |
| Greenberg, 2006 | Descriptive | NS children 35 PCPs and 12 caregivers | Not specified; Focus groups with PCPs, interviews with caregivers | PCP and caregiver satisfied with video; frustrated with limitations of local supports; Family caretakers and service providers frustrated with limitations of the video |
| Myers et al, 2006 | Descriptive | 115 incarcerated youth (age 14–18) | 11-item satisfaction survey | 80% successfully prescribed medications and expressed confidence in the psychiatrist by video; Youth expressed concerns about privacy |

CDCR_234

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018. For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| Study | Type | Sample | Measure | Results |
|---|---|---|---|---|
| Myers et al, 2007 | Descriptive | 172 patients (age 2–21) and 387 visits | 11-item provider/PCP satisfaction survey | Video to patients at 4 PCP sites: high satisfaction with services; pediatricians > family physicians |
| Bensink et al, 2008 | Descriptive | 8 youth Pediatric cancer | Feasibility and satisfaction ratings | Video (by phone) used to families with a child diagnosed with cancer: technically feasible and high parental satisfaction |
| Clawson et al, 2008 | Descriptive | 15 youth (age 8 mo to 10 y) | VC feasibility with pediatric feeding disorders | Video feasible and resulted in cost-savings |
| Fox, 2008 | Pre/post | 190 youth in juvenile detention | Goal Attainment Scale | Improvement in the rate of attainment of goals associated with family relations and personality/behavior |
| Morgan et al, 2008 | RCT | 27 parents, child age ≤25 mo | Video vs telephone for children with congenital heart disease, anxiety ratings | Video > phone for reducing parent anxiety enabling significantly greater clinical information than phone |
| Myers et al, 2008 | Descriptive | 172 patients, parental satisfaction | 12-item Parent Satisfaction Survey | Parents with school-aged children endorsed higher satisfaction than those with adolescents. Adherence high for return appointments |
| Shaikh et al, 2008 | Pre/post | 99 youth (age: 1–17) | Diagnostic assessment, weight measurement | Video consultations resulted in substantial changes/additions to diagnoses; subset with repeated consultations led to improved health behaviors (eg, weight maintenance or loss) |
| Wilkinson et al, 2008 | RCT | 16 youth (age not reported) | Children with cystic fibrosis, assessment of quality of life, anxiety, depression, service utilization | Video = in-person for quality of life, anxiety levels, depression levels, admissions to hospital or clinic attendances, general practitioner calls, or intravenous antibiotic use between the 2 groups |

(continued on next page)

CDCR_235

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

**Table 2**
**(continued)**

| Citation | Design | Sample | Assessment | Findings |
|---|---|---|---|---|
| Witmans et al, 2008 | Descriptive | 89 children sleep disorders | Sleep diary Childhood Sleep Habits Questionnaire Pediatric QOL Questionnaire Client Satisfaction Quest | Patients were very satisfied with the delivery of multidisciplinary pediatric sleep medicine services over video |
| Yellowlees, 2008 | Pre-/post | 41 children in rural primary care | CBCL | At 3-mo, improvements in the Affect and Oppositional Domains of the CBCL |
| Pakyurek et al, 2010 | Descriptive | 12 children, autism spectrum in primary care | Routine clinical | Video might actually be superior to in-person for consultation |
| Myers et al, 2010 | Descriptive | 701 patients, 190 PCPs | Collection of patient demographics, diagnoses, and utilization of services | Video feasible; psychiatrists adjust practice from in-person well |
| Lau et al, 2011 | Descriptive and advanced assessment | 45 children/adolescent | Patient characteristics, reason for consultation, and treatment recommendations | Video reaches a variety of children, with consultants providing diagnostic clarification and modifying treatment |
| Mulgrew et al, 2011 | Descriptive | 25 children pediatric obesity | Consulting providers' listening skills and ease of instruction to patients Comfort level of parents in discussing health concerns | Video = in-person for parent satisfaction between consultations for weight management |
| Stain, 2011 | Descriptive and RCT | 11 adolescents/young adults | Diagnostic Interview for Psychosis–Diagnostic Module | Strong correlation of assessments done in-person vs video |
| Storch et al, 2011 | RCT | 31 children and teenagers | Routine clinical and measures 1. ADIS-IV-CP 2. Clinician-admin. CY-BOCS 3. Clinical Global Impressions Scales (CGI) 4. Others: obsessive, anxiety, depression inventory | Video was superior to in-person on all primary outcome measures, higher % meeting remission. Consultants providing diagnostic clarification and modifying treatment |
| Himle et al, 2012 | RCT | 20 children, Tourette disorder or chronic motor tic disorder | Routine clinical assessment with Yale Global Tic Severity Scale; Parent Tic Questionnaire (Clinician Global Severity & Improvement Scales; CGI-S and CGI-I) | Both treatment delivery modalities resulted in significant tic reduction with no between group differences |

**CDCR_236**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| | | | | |
|---|---|---|---|---|
| Jacob et al, 2012 | Descriptive | 15 children (age 4–18; mean 9.73) | Routine clinical; 12-item Parent Satisfaction Survey | Patient satisfaction high and PCPs found recommendations helpful; outcomes pending on follow-up |
| Nelson et al, 2012 | Service utilization chart review | 22 children | Routine clinical | No factor inherent to the video delivery mechanism impeded adherence to national ADHD guidelines |
| Reese et al, 2012 | Pre-/post | 8 children; Asian | Routine clinical; ADHD | Families reported improved child behavior and decreased parent distress via video format of Group Triple P Positive Parenting Program |
| Szeftel et al, 2012 | Descriptive; Chart review | 45 patients; 31 ≤ 18 y old | Routine clinical-medication changes, frequency of patient appointments, diagnostic changes, symptom severity and improvement | Video led to changed Axis I psychiatric diagnosis (excluding developmental disorders) 70%, and changed medication 82% of patients initially, 41% at 1 y and 46% at 3 y; Video helped PCPs with recommendations for developmental disabilities |
| Heitzman-Powell et al, 2013 | Pre-/post | NS youth; 7 parents | OASIS training program; Problem Behavior Recording; Incidental Teaching Checklist | Parents increased their knowledge and self-reported implementation of behavioral strategies |
| Xie et al, 2013 | RCT | 22 children behavioral disorder | Routine clinical; Parent Child Relationship Questionnaire, Vanderbilt Assessment Scales, CGAS, CGIS | Parent training through video was as effective as in-person training and was well accepted by parents |
| Reese et al, 2013 | Descriptive and RCT | 21 children; 90% Caucasian | Autism Diagnostic Observation Schedule (ADOS), Module 1; Autism Diagnostic Interview-Revised (ADI-R); Parent satisfaction | No difference in reliability of diagnostic accuracy, ADOS observations, ratings for ADI-R parent report of symptoms, and parent satisfaction |

(continued on next page)

CDCR_237

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

570   Hilty et al

CDCR_238

**Table 2**
*(continued)*

| Citation | Design | Sample | Assessment | Findings |
|---|---|---|---|---|
| Davis et al, 2013 | Descriptive | 58 youth pediatric obesity | Body mass index<br>24-h dietary recall<br>ActiGraph - physical activity duration and intensity<br>CBCL<br>Behavioral Pediatrics Feeding Assessment Scale | Both groups showed improvements in body mass index, nutrition, and physical activity, and the groups did not differ significantly on primary outcomes |
| Freeman et al, 2013 | Descriptive | 71 youth, diabetes adherence | Baseline metabolic control<br>Conflict Behavior Questionnaire<br>Diabetes Responsibility and Family Conflict Scale–Parent and Youth<br>Working Alliance Inventory | No differences were found in therapeutic alliance between the groups |
| Hommel et al, 2013 | Descriptive | 9 youth, irritable bowel disease, adherence | Pill count<br>Pediatric Ulcerative Colitis Activity Index<br>Partial Harvey-Bradshaw Index<br>Feasibility Acceptability Questionnaire | Video improved adherence and cost-savings across patients |
| Lipana et al, 2013 | Descriptive | 243 youth, pediatric obesity | Review of medical records | Video > in-person in enhancing nutrition, increasing activity, and decreasing screen time |
| Rockhill et al, 2013 | RCT | 223 children with ADHD ± ODD ± Anxiety | Caregiver distress assessed with Patient Health Questionnaire-9, Parenting Stress Index, Caregiver Strain Questionnaire, Family Empowerment Scale | Parents of children with ADHD and a comorbid disorder had significantly more distress than those with ADHD alone |

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

CDCR_239

| | | | Behavioral intervention with child, facilitated by parent; OCD rating scale by parent | Child OCD symptoms and diagnoses declined; child global functioning improved |
|---|---|---|---|---|
| Comer et al, 2014 | Pre-/post | 5 children (age 4–8) | | |
| Myers et al, 2015 | RCT | 223 children with ADHD ± ODD ± anxiety | CBCL screening, DISC-IV diagnostic assessment, ADHD rating scales (inattention, hyperactivity, combined, ODD, role performance) and Columbia Impairment Scale | Caregivers reported significantly greater improvement for inattention, hyperactivity, combined ADHD, ODD, role performance for video vs those treated in primary care. Teachers reported significantly greater improvement in ODD and role performance for video group, too |
| Tse et al, 2015 | RCT subsample | 37 caregivers of children with ADHD ± ODD ± anxiety | CaBT delivered via CBCL screening, DISC-IV diagnostic assessment, ADHD rating scales (inattention, hyperactivity, combined, ODD, role performance) and Columbia Impairment Scale | Caregivers reported comparable improvements for children's outcomes whether CaBT video = in person; no improvement in caregivers' distress when CaBT provided through video |
| Rockhill et al, in press | Descriptive; telepsychiatrists in RCT | 223 children with ADHD ± ODD ± anxiety, the telepsychiatrists, and PCPs | Telepsychiatrists' adherence to guidelines-based care, ADHD outcomes by prescriber based on comorbidity status | Telepsychiatrists adhered to guideline-based care, used higher medication doses than PCPs, and their patients reached target of 50% reduction in ADHD symptoms more often than with PCPs |

Note: CaBT acronym is not standard, but created to avoid first glance confusion with cognitive behavioral therapy.
*Abbreviations:* ADIS-IV-C/P, Anxiety Disorders Interview Schedule-IV-Child/Parent Version; CaBT, caregiver behavioral training; CY-BOCS, Children's Yale-Brown Obsessive-Compulsive Scale; DISC, diagnostic interview schedule for children; NS, not specified; OCD, obsessive compulsive disorder; ODD, oppositional defiant disorder; QOL, quality of life; VC, videoconferencing.
*Data from* Refs.[20,21,62,114,137,143–179]

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

development is telemonitoring of depression in the home, which facilitates connectedness.[25]

Telepsychiatry has been studied in culturally diverse populations.[3,8,11] The culturally diverse populations include Hispanics/Latinos, Asians, Native American, Eastern Europeans, and other populations (eg, sign language). Language is a key factor, and a common practice is to use interpreters on-site, but sometimes relatives or untrained interpreters miscommunicate medical complaints[26] or de-emphasize information.[27] Ironically, telephone translation may be best when the perceived ethnicity of an interpreter (eg, Asian American) does not match the language spoken (eg, Spanish). Nurses, too, do a little better with concrete medical complaints than capturing the narrative or cultural metaphors.[28]

Special settings and populations also include involuntary, inpatient, and incarcerated—and those in emergency rooms—and adjustments may be needed to ensure quality of care, informed consent, and privacy. Preliminary guidelines for emergency telepsychiatry need to be evaluated[3,29] and a survey describing services of different programs.[30]

Cost and economic outcomes depend on the program and the measures used per a framework,[3] sites/settings (eg, rural),[31] service (eg, ATP as cost-effective),[32] or all of the above.[10] There are different types of cost analyses: cost-offset; cost-minimization; cost-effectiveness; and cost-benefit analysis. Cost studies have differences in data sought, its collection, and how it is analyzed. Savings may be shown versus in-person with high consultation rates, break-even, or other thresholds used (eg, number of consultations per year), or when patient's travel, time, and food are included.

### Application to the Clinical Vignette

1. Starting with the correct diagnosis enables specific treatment (first, a selection of psychotherapy instead of medications; second, if medication is needed, an antidepressant rather than a stimulant). In one study, specialists changed the diagnosis and medications in 91% and 57% of cases, respectively, which led to clinical improvements in 56% of cases.[33]
2. Furthermore, provider knowledge and skills improve over time,[34] particularly in rural PCPs,[35] so the impact is directly to the patient seen and indirectly to the population that the PCP serves.
3. Culturally sensitive treatment helps with patient engagement and outcomes, presumably.
4. Finally, a child and adolescent–trained therapist aligns better with teenage patients.

### Psychotherapy Evidence Base

The evidence base for therapy by TMH is growing. Initial studies focused on satisfaction, working alliance between the patient-provider, and communication changes,[3,36] and it seemed that no significant problems were arising once the technology bandwidth had increased.[3] Studies in adults generally involve patients with depression and anxiety—often military populations with PTSD—and these studies show comparative efficacy of TMH to in-person services (**Table 3**). Incidentally, a preliminary study on therapeutic alliance and attrition among participants receiving anger management group therapy showed that no significant differences, except a lower alliance with the telegroup leader than those in the in-person condition.[37] The core issues are the impact of technology, patient education, exploring the virtual connection,[38] and adjusting some behaviors (eg, handing a tissue box, sighing, pat on the shoulder, handshake) to verbal statements conveying the same thing (eg, empathy).[36]

**CDCR _240**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

**Table 3**
**Summary of clinical outcome studies for telemental health versus in-person psychotherapy (not including satisfaction-only studies)**

| Study | N | Sample | Intervention | Findings |
|---|---|---|---|---|
| Bastien et al, 2004 | 21 | Adults, panic disorder | CBT for PD delivered via TMH compared with in-person | Significant reduction in PD symptoms and increase in the number of PD-free patients at follow-up; equivalent to in-person |
| Grady & Melcer, 2005 | 81 | Active duty/retired personnel and adult family members | Retrospective review of TMH care compared with in-person | Improved patient adherence for both, but better follow-up adherence with TMH |
| Cluver et al, 2005 | 9 | Adults, terminally ill cancer, adjustment disorder or depression | Psychotherapy alternated between in-person and TMH | Therapy delivery mode made no difference in patient reports; TMH feasible |
| Frueh et al, 2007 | 38 | Adults, combat related PTSD | CBT for PTSD delivered via TMH compared with in-person | No significant differences in clinical outcomes for TMH vs in-person |
| Morgan et al, 2008 | 186 | Adult male inmates | Therapy for mood disorder and psychosis via TMH compared with in-person | No significant differences in inmates' satisfaction, postsession mood, or work alliance with the MH professional |
| Ertelt et al, 2008 | 128 | Adults, DSM-IV criteria for BN or eating disorder | CBT delivered for BN via TMH compared with in-person | Acceptable to participants and equivalent in outcome to therapy delivered in-person |
| Germain et al, 2009 | 48 | Adults, PTSD | CBT delivered via TMH compared with in-person | Significant decline in symptoms in both groups; effectiveness same |
| Germain et al, 2010 | 46 | Adults, PTSD | Therapeutic alliance via TMH compared with in-person | Equivalent in both groups on Working Alliance Inventory, Videoconference Telepresence Scale, and other measures |
| King et al, 2009 | 37 | Adults, opioid-agonist treatment | Addiction counseling delivered via TMH compared with in-person | No significant difference between assistance in both groups |

*(continued on next page)*

**CDCR _241**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| Table 3 (continued) | | | | |
|---|---|---|---|---|
| **Study** | **N** | **Sample** | **Intervention** | **Findings** |
| Marrone et al, 2009 | 116 | adults, BN | CBT delivered for BN via TMH compared with in-person | Reduction in binge eating at week 6 TMH and week 8 for in-person |
| Tuerk et al, 2010 | 47 | Adult veterans, PTSD | Prolonged exposure therapy via TMH compared with in-person comparison group | Statistically significant decreases in self-reported pathology for veterans TMH > in-person |
| Morland et al, 2010 | 125 | Adult male veterans, PTSD | CBT for anger management via TMH compared with in-person | TMH viable; does not compromise a therapist's ability to effectively structure & manage patient care |
| Gros et al, 2011 | 89 | Veterans, PTSD | Exposure therapy for trauma via telemedicine compared with in-person | Findings support the utility of TMH services to provide effective, evidence-based psychotherapies |
| Yuen et al, 2013 | 24 | Adults, social anxiety disorder | 12 sessions of weekly CBT for generalized social anxiety via TMH | Significant improvements in social anxiety, depression, disability, quality of life, and experiential avoidance |
| King et al, 2014 | 85 | Adults, substance use | Addiction counseling delivered via TMH compared with in-person | Similar rates of counseling attendance and drug-positive urinalysis results |
| Khatri et al, 2014 | 18 | Adults, depression and anxiety | CBT for depression anxiety via TMH compared with in-person | Pre-/postintervention scores for depression comparable in-person vs TMH |
| Fortney et al, 2015 | 133 | Veterans, PTSD | Collaborative care, therapy, psychiatry via TMH compared with in-person | Significant decrease in PTSD symptoms TMH > in-person at 6 and 12 mo. Participation in cognitive processing therapy predicted improvement |

*Abbreviations:* BN, bulimia nervosa; CBT, cognitive behavioral therapy; PD, panic disorder.
*Data from* Refs.[17,18,39–41,70,134,180–189]

**CDCR _242**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

Indeed, TMH sometimes is better,[39–41] which is similar to one child pilot study.[20] Guidelines for therapy by videoconferencing have been explored,[42] as have systematic reviews[43] and broadly defined e-therapy.[44]

## HOW CAN CURRENT SYSTEMS OF CARE BE CHANGED AND TELEPSYCHIATRY (EG, USE TECHNOLOGY, GET PAID, AND ADHERE TO REGULATORY ISSUES) BE SUCCESSFULLY IMPLEMENTED?

### Overview

The ATA adult guidelines[8] review scope, clinical applications, and clinical/administrative/technical procedures for practice. Assessments (ie, obtaining a history, mental status examination), treatments (eg, psychotherapy), and other factors such as cultural competency are described. Specific groups of patients, difficult settings (eg, emergency department TMH), and ethical considerations are reviewed. The American Association of Child and Adolescent Psychiatry has distributed a "Practice Parameter for Telepsychiatry with Children and Adolescents"[45] and Minimal Standards that focus on specific dimensions (eg, patient appropriateness, sites, therapeutic space, technology, how to select a model of care, and risk management).

### Organizational Leadership and Program Evaluation

Organizational leadership and program evaluation have become increasingly important to meet program, patient, provider, and externally driven (eg, Joint Commission)[46] needs; it is key to preserve the standard of care and use best practices. Assessment typically includes satisfaction, technology, cost, clinical measures, and process of care with an iterative feedback loop for quality improvement. Financial feasibility is assessed based on technical cost, patient volume, appointment adherence, payment model (eg, pay for time whether show or not), patient mix in terms of complexity, payer or payers mix, and other issues. Studies are now being conducted using economic modeling,[47,48] clinical encounter costing and data sets,[49] health care reform,[50] health care costs with changes in health risks among employers of all sizes,[51] and prototypes of existing health systems (eg, Veterans Affairs).[52]

### Technology

The key issue for many providers is determining whether to pick a telemedicine group or technology-only support system. Full commercial models hire clinicians and provide patient contracts, hardware, software, technical support, and business support (more costly). Business support provides the secure Web site with software and the clinician/group does the rest; security of the system is the central factor in this arrangement (less costly). The terms of service and level of equipment vary widely. A reasonable analogy for this is the difference between an in-person private, solo practice versus a group practice with organizational infrastructure. Generally, the more aspects of the TMH that providers feel comfortable managing, the less support they will need. Unanticipated events are now very infrequent, but planning ahead for disruption in connection is advisable (range from reboot, to phone alternative, to other).

The ATA Videoconferencing Guidelines[8] review organizations' technical responsibilities to ensure the equipment readiness, safety, effectiveness, security of data, connectivity, and compliance with legal/regulatory guidelines. Policies and procedures are recommended for a wide range of functions, including informed consent, privacy, clinical care, staff roles, evaluation/quality improvement, and education/training.

**CDCR _243**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018. For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

### Credentialing, Licensing, and Malpractice

Centers for Medicare & Medicaid Services (CMS) regulatory requirements include a mechanism for hospitals and critical access hospitals to use proxy credentialing, whose responsibility it is (eg, distance site), and written agreement requirements (eg, code series 42 CFR. (Code of Federal Regulations) 48X). Sometimes, privileging is required at the distant-site hospital providing the telemedicine services, and that has its own requirements. Finally, an organization must attend to telehealth standards, clinical guidelines, and other Joint Commission specifications on credentialing and privileging, environment of care, patient rights, confidentiality and privacy, training, and preparation. Other issues vary per location and population, like licensing (usually in the state where the patient is), definition of "in-person," informed consent, and scope of practice. Risk management issues related to telepsychiatry have been explored.[53]

### Reimbursement

A review of reimbursement in the United States notes that private payers have administrative rules regarding telehealth reimbursement that are barriers to services and reimbursement, and that some providers would benefit from being better informed about billing and coding for telehealth services and how to advocate for telehealth services reimbursement.[54] Key factors are the sites involved (eg, critical access hospital; federally qualified health center; rural health clinic), current procedural terminology (CPT) coding (usually same as in-person unless a rural site designation specifier is used), and ensuring an eligible practitioner (ie, medical doctor, nurse practitioner, social worker; registered nurse).

### Application to the Clinical Vignette

1. Technology support for care is from technology-only support to "wrap-around" support (including hiring, business, and other dimensions).
2. Clinicians must fully understand the legal and regulatory aspects of in-person care, learn the new specification for emerging technologies, and apply knowledge to unforeseen situations that may arise in clinical care (eg, patient's use of text or e-mail to signal life-threatening behavior).
3. Federal, state, private company, and other specifications are crucial to review to provide care and bill legally.
4. For clinic populations with indigent, high proportions of patients with minimal reimbursement by the payers, accommodations for remuneration are critical to enlist providers (eg, balancing a payer mix, contracts with rural hospital networks to reimburse providers whether time is used or not).

## MODELS OF CARE: THE E-CONTINUUM TOWARD INTEGRATED AND STEPPED CARE FOR DIFFERENT POPULATIONS, DISORDERS, AND TREATMENTS
### Models of Care: How to Select Them and Impact on Evaluation

A summary of TMH models of care reviewed the pros and cons of each model.[3,7,55]

### Low intensity

- Case review of diagnosis and follow-up after a discussion[56]
- Telepsychiatric consultation to primary care help to align PCPs' diagnosis or diagnoses and medication treatments,[33] with an indirect benefit over time of improving PCPs' knowledge and skills[34,35]
- In-person, telephone, or e-mail doctor-to-doctor "curbside" consultations may arise during patient care in day-to-day practice[57] and meet approximately 33%

**CDCR _244**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

of informational PCPs' needs "in-time."[58] Both telephone and face-to-face contacts occur; the former are purposeful and timely, and the latter are random and prone to delays. More recently, e-mail consultations that do not include patient evaluations are valuable, inexpensive, brief, and more readily available,[59] including a multispecialty phone and e-mail consultation system to PCPs for the care of adults and children with developmental disabilities.[60]

- Cultural consultation to rural primary care using telemedicine[61]

### Moderate intensity

- An integrated program of mental health screening, therapy on site, telepsychiatric consultation (phone, e-mail, or video), continuing medical education, and staff training on screening questionnaires has improved patient outcomes and site-based staff skills.[62]
- A randomized controlled trial (RCT) for depression in adults using disease management and telepsychiatric consultation versus usual care over a period of 12 months improved the care of both groups; the latter group benefited from the Hawthorne effect and providers' application of skills from the intervention group.[63]
- ATP is feasible, valid, reliable, and cost-effective in English- and Spanish-speaking patients in primary care.[2,32,61] (Similar methods are used in radiology, dermatology, ophthalmology, cardiology, and pathology.) One ATP model uses a basic questionnaire for screening by the provider of the patient, video capture of that interview, and uploading of patient histories for a remote psychiatrist to review in a HIPAA-adherent manner.[64]

### High intensity

- Collaborative care, which has now been more formally applied to telemedicine,[9,16,65] has encouraging results. The virtual collaborative care team was able to produce better outcomes than the traditional gold-standard methodology of primary care psychiatry.[65]
- Child collaborative care for children with ADHD at a distance used STP and ATP (ie, Web-based approaches for further training, data collection, and monitoring, which showed positive clinical outcomes).[21]

### Integrated Care

Integrated care and stepped care models provide efficient expertise to the point of service; TMH further enhances that. The core characteristics of integrated care are (1) responsibility, decision-making, and oversight of patient care; (2) colocation of services, both literally and virtually, that applies to both inpatient and outpatient sector care; (3–5) integrated funding, evaluation, and outcome measurement; (6) an e-platform; and (7) reimbursement, preferably aligned (eg, a capitated or sole Medicare population) rather than unaligned (ie, mixed populations). Stepped care models may be the most cost-effective models in the health system, where the effectiveness of the intervention is maximized by making the best use of resources adequately available at the right time.[66,67]

### Patient-Centered Medical Home

These services are in development and need to be better studied, although costs are dramatically decreasing. The patient-centered medical home (PCMH) is a concept founded on the presence of inadequate treatment in primary care and an inability to access needed services.[68] Under oversight of the PCP, PCMH allows telepsychiatric

**CDCR _245**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

input at home and has been shown to improve patient care and health,[69,70] including desk-mounted video systems convenient for patients with cancer to get therapy.

### Internet or Web-Based Care

Patients benefit from tools for self-directed habit, lifestyle or illness changes, prompts for appointments, and evidence-based treatments via the Internet (eg, anxiety disorders). "Fear Fighter," a computer-guided self-exposure approach to treat phobia/panic, fills a hole when qualified and trained therapists are scarce.[71] "PTSD Coach" is designed to help veterans learn about, manage symptoms, and augment MH interventions after trauma.[72] Recent patient-centered strategies that increase patient compliance are simple e-mail, telephone, or short messaging service (SMS) reminders that have been shown to be an effective way to support patient attendance to follow-up appointments.[73,74] Internet-based cognitive behavioral therapy (ICBT) interventions are as effective as traditional in-person care and a 30-month follow-up study for treatment of social phobia and panic disorder.[75,76] ICBT combined with monitoring by text messages (mobile CBT) and minimal therapist support by e-mail and telephone help prevent depression relapse.[77] Interestingly, a review of virtual reality reports it has been used in the treatment of many MH conditions, including eating disorders, autism spectrum disorders, pain management, and stroke.[78] Finally, a schizophrenic can create a virtual representation of the scary voices using an avatar, then work with a therapist in real time to manage the avatar speaking the voices.[79]

Caregivers, too, may benefit by the use of telecommunication technology. A review of Internet-based interventions for medical and MH disorders showed that approximately two-thirds of open or RCTs reduced stress and improved quality of life—at least significantly in terms of specific measured outcomes.[80] Family caregivers located in rural areas found e-health support to be beneficial in comparison with conventional caregiver support, by using interactive communities, bulletin board chatting, and therapy groups.[81] Patient populations included MH (dementia, schizophrenia, anorexia) and medical (older adults/aging, heart transplant, traumatic brain injury, hip fracture, cancer, stroke).[81] Caregivers' outcomes improved, and they are satisfied and comfortable with support services delivered by cell phones.[82]

### WHAT CAN BE LEARNED AND WHAT MUST BE CONTENDED WITH, IN TERMS OF EMERGING MODELS OF E-CARE AND COMMUNICATION?

The traditional models of care have been in-person, STP, and more recently, ATP; that is really only the beginning, and emerging models are sprouting quickly. In general, that is how technology affects basic clinical practice. Its impact on clinical boundaries, communication, and engagement has been under review.[83] The American Psychiatric Association has a guideline on e-prescribing.[84] The effect on professionalism and education and training of the next generations has been explored.[85]

Telepsychiatry can extend beyond videoconferencing modalities to other mechanisms, including the following:

- New digital communication from one user to another user using standard protocols: e-mail, SMS text messaging, multiple messaging service (MMS) messaging, instant messaging
- New digital communication from one user to another user using proprietary networks: Twitter direct messages, Facebook Messenger, Epic MyChart electronic medical record messaging, My HealtheVet electronic medical record messaging
- New social media communication platforms that transmit from one to many users: Internet forums, Facebook pages and profiles, Twitter streams

**CDCR _246**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

### Digital Communication—e-Mail, Messaging Services, Web Sites, and Online Profiles

Online digital information is an important source of information for today's online user. As of January 2014, 90% of adults have a cell phone and 58% have a smartphone.[86] In the public health space, 35% of US adults have gone online to research health information and learn from other patients' experiences.[87] Aside from entertainment purposes, those aged 13 to 54 years in the United States use most of their smartphone time to socialize and interact with others manage themselves, including their health, and research information.[88]

This finding has implications for psychiatrists. First, online messaging is required for providers caring for Medicare and Medicaid patients under federal electronic medical record guidelines as required by meaningful use stage 2 by 2014.[89] In fact, the government's financial incentives and penalties program requires more than 5% of unique patients to be sending secure messages to clinicians, thus incentivizing the use of messaging. Although the general public may use e-mail, SMS, and MMS, these do not, by default, provide HIPAA-compliant encryption.

There are also implications for patient-centered Googling and other Internet searches in which clinicians search for publicly available information about their patient. There are literature reports on how checking Facebook has helped resolve emergencies and aid in forensic psychiatric evaluations.[90] Psychiatrists, in general, should consider their intentions in searching for such information, whether it is for patient care purposes, what the effect may be, and the value or risk for treatment.[91] Indeed, the patient's best interests must be kept in mind.

### Social Media Communication

#### Advantages of social media

The modern psychiatrist can take advantage of, but also be cautious with, the use of social media by patients. All ages are using social media for a variety of applications, sense of being heard, consumer health social networking (CHSN), and other health complaints (eg, suicidal ideation).[92] Child and adolescent populations, also known as digital natives, are more adept at using social media, and multiple social media channels can assist in destigmatizing the conversation over mental health. Analogous to sexual health and high-risk behaviors, users may want a credible source of reliable information that is personalized and maintains their anonymity and confidentiality.[93] More treatments are being done by mobile phones.[94]

Social networks also enhance social connectedness. These modalities help boost social support for cancer survivors,[95] new mothers' well-being,[96] and older adult users and the elderly with family and friends.[97,98] Social networks also provide an access point for those reluctant to seek help in-person. For instance, 33% of soldiers unwilling to speak to an in-person counselor were willing to use technology-based social networks for mental health care.[99] Of young college students, 68% indicated they would use the Internet for mental health support, and 94% of participants with mental illnesses used social networking sites.[100] Finally, social networks also provide a modality for those who cannot access traditional mental health, such as those with mental illness in rural areas.[101]

#### Cautions about, and guidelines for, social media use

Preliminary guidelines discuss concerns about patient privacy, professional image, confidentiality, and defined expectations for use in general[102,103] and for social media.[104] Providers should consider the professional and ethical responsibilities for routes of communication, absences, or any other changes in accessibility in advance.

**CDCR _247**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

Guidelines for social media use generally include discussions with the patient in advance, as part of the informed consent process:

- Using e-mail, text, instant messaging, only for patients who maintain in-person follow-up
- Consider the pros and cons of gathering information about patients: intent, use, and implications
- Psychoeducation with online educational resources with patients: accuracy and reputable?
- Physician-produced blogs, microblogs, and comments: "pause before posting" and "step back" to consider what is conveyed to the public about the physician and the profession
- Digital venues for communicating with colleagues about patient care: ensure security/privacy and follow policies of institution

Many organizations have specifically made recommendations about professionalism and social media (eg, The American College of Physicians, Canadian Medical Association, and British Medical Association),[105,106] focusing on communication with patients, gathering information, online education, and other topics. Separation of personal and professional life is suggested,[107,108] if it can be done.[109] In fact, physicians should assume that one's private profile can be found. The *Journal of Medical Internet Research* provided guidelines based on a review of over 100 articles, Web sites, policies, and reports[110]:

- Maintain professionalism at all times—follow institutional policies, "assume that all information exchanged is public and posted in a medium no different than a newspaper," and maintain a disclaimer.
- Be authentic, have fun, and do not be afraid—"the only way to create meaningful relationships over social media is to be genuine."
- Ask for help—pay attention to "how people interact (eg, etiquette)" and "mimic the social media service and community's practices (so long as they are professional)."
- Focus, grab attention, engage, and take action—based on the Dragonfly model, social media users must "identify a single, concrete, and measurable goal for using social media"; "make others look at content by saying or posting something interesting"; "foster personal connections by discussing…interests with like-minded people"; and "enable and empower others."

"Friend" requests on sites like Facebook have resulted in decidedly mixed views: shall we engage or exercise caution?[111–113] If a provider engages patients with social media, the provider may consider having both a private and a professional account[112] for privacy and maintaining therapeutic boundaries. The provider may also consider how parties will interpret the "friend" connection and compare it to a true friendship, where a more equal exchange of private information and confidences would normally exist.[112] Even with private accounts, privacy settings may be insufficient to prevent certain elements from being visible publicly.

Requests for contact between visits (eg, texts, Facebook visits) are increasing because of the time spent online.[83] Asynchronous written or e-mail language does not have nuances with pitch modulations, changing volume, meaningful pauses, and accompanying body language; this may lead to misinterpretations and have unexpected consequences. E-mails should be sent during regular working hours to attend to expectation and boundary issues.[83]

Additional guidelines are available for addressing youth patients[114] and addressing privacy issues.[115] Additional ethics codes from the American Psychological

**CDCR _248**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

Association, American Counseling Association, and the American Psychiatric Association are available for mental health professionals on managing ethical concerns and avoid ethical violations.

### The future virtual presence for doctors

Leading physicians in the digital health space advocate for the profession and individual physicians to own their virtual presence. They recommend maintaining profiles for LinkedIn professional networking platform, Facebook social networking platform, Doximity physician communication platform, and Healthgrades physician rating network. In fact, maintaining an online presence is so important that leading institutions are implementing medical school curriculum in social media communication, patient engagement, and Wikipedia article management. Avoiding online media puts the health care practitioner at risk in allowing others to spread misinformation[85,86] and jeopardizing public health and safety.[87]

### Application to the Clinical Vignette

1. Models allow versatile care approaches.
2. TMH disseminates expertise "in-time" and in context to the patient and provider's needs.
3. Patient empowerment is enhanced by applying user-friendly, everyday technologies to health care: better access, more options, and a sense of confidence or self-efficacy (akin to what "good education" does for novice learners like medical students).

## DISCUSSION, CLINICAL VIGNETTE PART II, AND SUMMARY

Today, TMH services are unquestionably effective in most regards, although more analysis is needed. They are effective for diagnosis and assessment, across many populations (adult, child, geriatric, and ethnic), and in disorders in many settings (emergency, home health) are comparable to in-person care, and complement other services in primary care. Additional evaluation (ie, randomized trials, lack of inferiority designs) would be helpful for some treatments (eg, psychotherapy), populations (eg, child and adolescent, geriatric), disorders (eg, anxiety, substance use, psychotic), and settings (eg, emergency room, schools, home MH).

Several findings from the evidence base of studies are quite interesting. First, it is clear that TMH is a versatile way to increase access and empower patients, similarly when applied to systems of care it helps providers and administrators integrate care. Second, TMH can be done in a variety of e-models (e-mail, telephone, video, and other asynchronous options), and it can facilitate clinical care models (eg, collaborative care into services in primary care settings). Care more thoughtfully conducted, with attention to culture, diversity, and language "better" care at a distance nationally and internationally—this is now within reach.

It has been seen for some populations that it is easier or more conducive for some patients (eg, autism spectrum, home-based patients with anxiety),[20] and it may have distinct advantages to in-person care as evidenced by the therapy results.[39-41] The authors suggest 3 factors have a hand in this: (1) the extra preparation of TMH service (consent, discussions) may result in readiness for treatment; (2) the hands-on approach by the interdisciplinary team (eg, telemedicine coordinator, nurse, others) may enhance the therapeutic alliance; and (3) access to treatment, in general, and in-time may empower the patient.

Finally, although inconceivable to everyone in the 1990s, when systematic application and evaluation of TMH began, it may be a tipping point in which all the little things that

**CDCR _249**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

TMH makes possible start adding up, and changing the framework and approach to health care: as one moves from a new way to practice and a new standard of practice.[115] The major results of the Children's ADHD Telemental Health Treatment Study[19] show better dissemination of evidence-based treatments and new modalities of treatment of many psychiatric disorders delivered at a distance can be better disseminated— this would apply *even if* the patient is not particularly geographically isolated. A new way to practice is "hybrid models care," which uses in-person and technology-delivered care,[115,116] and by implication, multiple levels of technological complexity (ie, from low-intensity e-mail and phone to high intensity videoconferencing).

---

**CLINICAL VIGNETTE**

*Treatment Plan*

1. *Evaluation for ADHD with Conner's scales by parents and teacher were done 3 weeks later; the scores were at 68 (parent version; borderline) and 50 (teacher version; below diagnostic threshold). This was consistent with the clinician impression that ADHD was not the primary problem, which seemed localized to home.*

2. *Short-term therapy by a child psychiatry fellow, with supervision from faculty, was obtained (eg, 6 sessions over 12 weeks when father was in town); it was fortuitous that the fellow was Latino American, and she eagerly sought the opportunity for a brief therapy case in Spanish. The goals were to provide supportive therapy for depression, to engage father with the son's life (time together, more communication), and work on codiscipline by mother and father on key issues (ie, so father is not the "bad" person).*

3. *Culture and language integration: the telemedicine-based psychotherapy allowed the patient to speak in the primary language, which along with supervision on cultural themes per DSM-5[117] eliminated a communication issue as a reason for errant diagnosis. The use of the primary language also increases rapport, adds meaning, and allows full range of expression on sentimental themes.[27,28]*

*Follow-up: An immediate medication prescription may have been misfired on cases like this by a PCP. At 2-month follow-up, the patient's behavior and mood at home were better. There was an issue, though, with the patient's interest in texting the provider and bringing up her Facebook page. The main issues here are*

4. *The clinician should evaluate the impact of technology on clinical issues including, but not limited to, safety, boundaries, and professionalism—and spell out expectations and limitations during informed consent discussions and in accompanying documents.*

5. *The clinician should evaluate the need/preference for synchronous versus asynchronous modes of communication for the care participants—and should educate others before and as opportunities arise on such issues.*

---

## ACKNOWLEDGMENTS

American Telemedicine Association, the Mental Health Interest Group, the Department of Psychiatry and Behavioral Sciences at the University of Southern California, and the Department of Psychiatry and Behavioral Sciences at UC Davis are gratefully acknowledged.

## REFERENCES

1. Akinci F, Patel PM. Quality improvement in healthcare delivery utilizing the patient-centered medical home model. Hosp Top 2014;92(4):96–104.
2. Yellowlees PM, Odor A, Iosif A, et al. Transcultural psychiatry made simple: asynchronous telepsychiatry as an approach to providing culturally relevant care. Telemed J E Health 2013;19(4):1–6.

**CDCR _250**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

3. Hilty DM, Ferrer D, Callahan EJ, et al. The effectiveness of telemental health: a 2013 review. Telemed J E Health 2013;19(6):444–54.

4. Davis MH, Everett A, Kathol R, et al. American Psychiatric Association ad hoc work group report on the integration of psychiatry and primary care, 2011. Available at: http://naapimha.org/wordpress/media/Integration-of-Psychiatry-and-Primary-Care.pdf. Accessed April 1, 2015.

5. Yellowlees P. Your guide to E-Health: third millennium medicine on the internet. Queensland, Australia: University of Queensland PR; 2001.

6. Hilty DM, Green J, Nasatir-Hilty SE, et al. Mental healthcare to rural and other underserved primary care settings: benefits of telepsychiatry, integrated care, stepped care and interdisciplinary team models. J Nursing Care, in press.

7. World Health Organization. Telemedicine opportunities and developments in member states. Results of the second global survey on eHealth. Geneva (Switzerland): WHO Press; 2011.

8. Yellowlees PM, Shore JH, Roberts L, et al. Practice guidelines for videoconferencing-based telemental health. Telemed J E Health 2010;16(10): 1074–89.

9. Richardson L, McCauley E, Katon W. Collaborative care for adolescent depression: a pilot study. Gen Hosp Psychiatry 2009;31:36–45.

10. Shore JH, Mishkind MC, Bernard J, et al. A lexicon of assessment and outcome measures for telemental health. Telemed J E Health 2013;3:282–92.

11. Hilty DM, Yellowlees PM, Nasatir SE, et al. Program evaluation and practical, step-by-step program modification in telemental health. Behavioral telehealth series volume 1—clinical video conferencing: program development and practice. New York: Springer Press; 2014. p. 105–34.

12. Hilty DM, Srinivasan M, Xiong G, et al. Lessons from psychiatry and psychiatric education for medical learners and teachers. Int Rev Psychiatry 2013;25: 329–37.

13. Rogers EM. Diffusion of innovations. 4th edition. New York: Free Press; 1995.

14. O'Reilly R, Bishop J, Maddox K, et al. Is telepsychiatry equivalent to face to face psychiatry: results from a randomized controlled equivalence trial. Psychiatr Serv 2007;258:836–43.

15. De Las Cuevas C, Arrendondo MT, Cabrera MF, et al. Randomized controlled trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. Telemed J E Health 2006;12:341–50.

16. Fortney JC, Pyne JM, Edlund MJ, et al. A randomized trial of telemedicine-based collaborative care for depression. J Gen Intern Med 2007;22(8):1086–93.

17. Morland LA, Greene CJ, Rosen CS, et al. Telemedicine for anger management therapy in a rural population of combat veterans with posttraumatic stress disorder: a randomized noninferiority trial. J Clin Psychiatry 2010;71:855–63.

18. Frueh BC, Monnier J, Yim E, et al. Randomized trial for post-traumatic stress disorder. J Telemed Telecare 2007;13:142–7.

19. Myers KM, Palmer NB, Geyer JR. Research in child and adolescent telemental health. Child Adolesc Psychiatr Clin N Am 2011;20(1):155–71.

20. Pakyurek M, Yellowlees PM, Hilty DM. The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice? Telemed J E Health 2010;16(3):289–92.

21. Myers KM, Vander Stoep A, Zhou C, et al. Effectiveness of a telehealth service delivery model for treating attention-deficit hyperactivity disorder: results of a community-based randomized controlled trial. J Am Acad Child Adolesc Psychiatry 2015;54(4):263–74.

CDCR _251

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

22. Botsis T, Demiris G, Peterson S, et al. Home Telecare technologies for the elderly. J Telemed Telecare 2008;14:333–7.

23. Sheeran T, Dealy J, Rabinowitz T. Geriatric telemental health. In: Myers K, Turvey CL, editors. Telemental health. New York: Elsevier; 2013. p. 171–95.

24. Rabinowitz T, Murphy KM, Amour JL, et al. Benefits of a telepsychiatry consultation service for rural nursing home residents. Telemed J E Health 2010;16(1): 34–40.

25. Sheeran T, Rabinowitz T, Lotterman J, et al. Feasibility and impact of telemonitor-based depression care management for geriatric homecare patients. Telemed J E Health 2011;17:620–6.

26. Brooks TR. Pitfalls in communication with Hispanic and African-American patients: do translators help or harm? J Natl Med Assoc 1992;84(11):941.

27. Brua C. Role-blurring and ethical grey zones associated with lay interpreters: three case studies. Community Med 2008;5(1):73.

28. Elderkin-Thompson V, Silver RC, Waitzkin H. When nurses double as interpreters: a study of Spanish-speaking patients in a US primary care setting. Soc Sci Med 2001;52:1343–58.

29. Yellowlees PM, Burke MM, Marks SL, et al. Emergency telepsychiatry. J Telemed Telecare 2008;14:277–81.

30. Williams M, Pfeffee M, Boyle, et al. Telepsychiatry in the emergency department: Overview and case studies. California HealthCare Foundation, 2010. Available at: http://www.chcf.org/publications/2009/12/telepsychiatry-in-the-emergency-department-overview-and-case-studies. Accessed April 1, 2015.

31. Shore JH, Brooks E, Savin DM, et al. An economic evaluation of telehealth data collection with rural populations. Psychiatr Serv 2007;58(6):830–5.

32. Butler TN, Yellowlees P. Cost analysis of store-and-forward telepsychiatry as a consultation model for primary care. Telemed J E Health 2012;18(1):74–7.

33. Hilty DM, Marks SL, Urness D, et al. Clinical and educational applications of telepsychiatry: a review. Can J Psychiatry 2004;49(1):12–23.

34. Hilty DM, Yellowlees PM, Nesbitt TS. Evolution of telepsychiatry to rural sites: change over time in types of referral and PCP knowledge, skill, and satisfaction. Gen Hosp Psychiatry 2006;28(5):367–73.

35. Hilty DM, Nesbitt TS, Kuenneth TA, et al. Telepsychiatric consultation to primary care: rural vs. suburban needs, utilization and provider satisfaction. J Rural Health 2007;23(2):163–5.

36. Hilty DM, Nesbitt TS, Marks SL, et al. How telepsychiatry affects the doctor-patient relationship: communication, satisfaction, and additional clinically relevant issues. Prim Psychiatr 2002;9(9):29–34.

37. Greene CJ, Morland LA, Macdonald A, et al. How does tele-mental health affect group therapy process? Secondary analysis of a noninferiority trial. J Consult Clin Psychol 2010;78(5):746–50.

38. Glueck D. Establishing therapeutic rapport in telemental health. In: Myers K, Turvey CL, editors. Telemental health. New York: Elsevier; 2013. p. 29–46.

39. Grady BJ, Melcer T. A retrospective evaluation of TeleMental Healthcare services for remote military populations. Telemed J E Health 2005;11(5):551–8.

40. Tuerk PW, Yoder M, Ruggiero KJ, et al. A pilot study of prolonged exposure therapy for posttraumatic stress disorder delivered via telehealth technology. J Trauma Stress 2010;23(1):116–23.

41. Fortney JC, Pyne JM, Kimbrell TA, et al. Telemedicine-based collaborative care for posttraumatic stress disorder: a randomized clinical trial. JAMA Psychiatry 2015;72(1):58–67.

**CDCR _252**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

42. Nelson EL, Duncan AB, Lillis T. Special considerations for conducting psychotherapy via videoconferencing. In: Myers K, Turvey CL, editors. Telemental health: clinical, technical and administrative foundations for evidenced-based practice. San Francisco (CA): Elsevier; 2013. p. 295–314.

43. Backhaus A, Agha Z, Maglione ML, et al. Videoconferencing psychotherapy: a systematic review. Psychol Serv 2012;9(2):111–31.

44. Postel MG, de Haan HA, de Jong CA. E-Therapy for mental health problems: a systematic review. Telemed J E Health 2008;14(7):707–14.

45. Myers K, Cain S, Work Group on Quality Issues, American Academy of Child and Adolescent Psychiatry Staff. Practice Parameter for Telepsychiatry with Children and Adolescents. J Am Acad Child Adolesc Psychiatry 2008;47(12): 1468–83.

46. Joint Commission and Joint Commission International. Available at: http://www.jcrinc.com/. Accessed April 1, 2015.

47. Crane M. Exploring telehealth models. Med Econ 2014;91(14):17–20.

48. Mazzolini C. Telemedicine's next big leap. Med Econ 2013;90(20):64–6.

49. Barker G, McNeill KM, Krupinski EA, et al. Clinical encounters costing for telemedicine services. Telemed J E Health 2004;10(3):381–8.

50. Thompson S, Kohli R, Jones C, et al. Evaluating health care delivery reform initiatives in the face of "cost disease". Popul Health Manag 2015;18(1):6–14.

51. Musich S, White J, Hartley SK, et al. A more generalizable method to evaluate changes in health care costs with changes in health risks among employers of all sizes. Telemed J E Health 2014;17(5):297–305.

52. Grady B. A comparative cost analysis of an integrated military telemental healthcare service. Telemed J E Health 2002;8(3):293–300.

53. Cash C. Telepsychiatry and risk management. Innov Clin Neurosci 2011;8: 26–30.

54. Antoniotti NM, Drude KP, Rowe N. Private payer telehealth reimbursement in the United States. Telemed J E Health 2014;20(6):539–43.

55. Hilty DM, Yellowlees PM, Cobb HC, et al. Models of telepsychiatric consultation-liaison service to rural primary care. Psychosomatics 2006;47(2):152–7.

56. Dobbins ML, Roberts N, Vicari SK, et al. The consulting conference: a new model of collaboration for child psychiatry and primary care. Acad Psychiatry 2011;35:260–2.

57. Manian FA, Janssen DA. Curbside consultations. JAMA 1996;275:145–6.

58. Dee C, Blazek R. Information needs of the rural physician. A descriptive study. Bull Med Libr Assoc 1993;81:259–64.

59. Bergus GR, Sinift D, Randall CS, et al. Use of an e-mail curbside consultation service by family physicians. J Fam Pract 1998;47(5):357–60.

60. Hilty DM, Ingraham RL, Yang RP, et al. Multispecialty phone and email consultation to primary care providers for patients with developmental disabilities in rural California. Telemed J E Health 2004;10:413–21.

61. Yellowlees PM, Marks SL, Hilty DM, et al. Using e-health to enable culturally appropriate mental health care in rural areas. Telemed J E Health 2008;14(5): 486–92.

62. Yellowlees PM, Hilty DM, Marks SL, et al. A retrospective analysis of child and adolescent e-mental health. J Am Acad Child Adolesc Psychiatry 2008;47(1):1–5.

63. Hilty DM, Marks SL, Wegeland JE, et al. A randomized controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. Psychiatry 2007;4(2):58–65.

**CDCR _253**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

64. Yellowlees PM, Odor A, Patrice K, et al. PsychVACS: a system for asynchronous telepsychiatry. Telemed J E Health 2011;17(4):299–303.

65. Fortney JC, Pyne JM, Mouden SP, et al. Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: a pragmatic randomized comparative effectiveness trial. Am J Psychiatry 2013;170(4):414–25.

66. Haaga DA. Introduction to the special section on stepped care models in psychotherapy. J Consult Clin Psychol 2000;68:547–8.

67. van't Veer-Tazelaar N, van Marwijk H, van Oppen P, et al. Prevention of anxiety and depression in the age group of 75 years and over: a randomized controlled trial testing the feasibility and effectiveness of a generic stepped care program among elderly community residents at high risk of developing anxiety and depression versus usual care. BMC Public Health 2006;1:186.

68. Rosenthal TC. The medical home: growing evidence to support a new approach to primary care. J Am Board Fam Med 2008;21(5):427–40.

69. Hollingsworth JM, Saint S, Hayward RA, et al. Specialty care and the patient-centered medical home. Med Care 2011;49(1):4–9.

70. Cluver JS, Schuyler D, Frueh BC, et al. Remote psychotherapy for terminally ill cancer patients. J Telemed Telecare 2005;11:157–9.

71. Kenwright M, Liness S, Marks I, et al. Reducing demands on clinicians by offering computer-aided self-help for phobia/panic. Feasibility study. Br J Psychiatry 2001;179(5):456–9.

72. National Center for Telehealth and Technology. PTSD Coach [Internet]. PTSD Coach | t2health, 2013. Available at: http://www.t2.health.mil/apps/ptsd-coach. Accessed April 1, 2015.

73. Luxton DD, McCann RA, Bush NE, et al. mHealth for mental health: integrating smartphone technology in behavioral healthcare. Prof Psychol Res Pract 2011; 42(6):505–12.

74. Kunigiri G, Gajebasia N, Sallah D. Improving attendance in psychiatric outpatient clinics by using reminders. J Telemed Telecare 2014;20(8):464–7.

75. Carlbring P, Nordgren LB, Furmark T, et al. Long-term outcome of Internet-delivered cognitive-behavioural therapy for social phobia: a 30-month follow-up. Behav Res Ther 2009;47(10):848–50.

76. Kiropoulos LA, Klein B, Austin DW, et al. Is internet-based CBT for panic disorder and agoraphobia as effective as face-to-face CBT? J Anxiety Disord 2008;22(8):1273–84.

77. Kok G, Bockting C, Berger H, et al. Mobile cognitive therapy: adherence and acceptability of an online intervention in remitted recurrently depressed patients. Internet Interv 2014;1(2):65–73.

78. Yellowlees PM, Holloway KM, Parish MB. Therapy in virtual environments—clinical and ethical issues. Telemed J E Health 2012;18(7):558–64.

79. Leff J, Williams G, Huckvale M, et al. Avatar therapy for persecutory auditory hallucinations: what is and how does it work? Psychosis 2014;6(2):166–76.

80. Hu C, Kung S, Rummans TA, et al. Reducing caregiver stress with internet-based interventions: a systematic review of open-label and randomized controlled trials. J Am Med Inform Assoc 2015;22:e194–209.

81. Blusi M, Dalin R, Jong M, et al. The benefits of e-health support for older family caregivers in rural areas. J Telemed Telecare 2014;20(2):63–9.

82. Chi NC, Demiris G. A systematic review of telehealth tools and interventions to support family caregivers. J Telemed Telecare 2015;21(1):37–44.

83. Hilty DM, Belitsky R, Cohen MB, et al. Impact of the information age residency training: the impact of the generation gap. Acad Psychiatry 2015;39:104–7.

**CDCR _254**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

84. APA Electronic Prescribing Guideline. Available at: http://www.psych.org/ practice/managing-a-practice/electronic-prescribing. Accessed April 1, 2015.

85. DeJong SM, Benjamin S, Anzia JA, et al. Professionalism and the internet in psychiatry: what to teach and how to teach it. Acad Psychiatry 2012;36(5):356–62.

86. Pew Research Center; 2013. Internet survey. Available at: http://www. pewinternet.org/~/media//Files/Reports/PIP_HealthOnline.pdf or smart phone information http://www.pewinternet.org/data-trend/mobile/cell-phone-and-smart phone-ownership-demographics/. Accessed April 1, 2015.

87. Fox S, Maeve D. Health Online 2013. Available at: https://www.evernote.com/ shard/s277/nl/36107944/281a93a5-fc31-4de9-a1df-76cfc7d2d33f/. Accessed April 1, 2015.

88. How people really use mobile. Harv Bus Rev 2013;91(1):30–1.

89. HealthIT.gov. Meaningful Use Definition & Objectives. EHR Incentives & Certification. 2014. Available at: http://www.healthit.gov/providers-professionals/ meaningful-use-definition-objectives. Accessed April 1, 2015.

90. Mossman D, Farrell HM. Facebook: social networking meets professional duty. Current Psychiatry 2012;11(3). Available at: http://www.currentpsychiatry.com/ index.php?id=22661&tx_ttnews[tt_news]=176674. Accessed April 1, 2015.

91. Clinton BK, Silverman BC, Brendel DH. Patient-targeted Googling: the ethics of searching online for patient information. Harv Rev Psychiatry 2010;18(2): 103–12.

92. Hidy B, Porch E, Reed S, et al. Social networking and mental health. In: Myers K, Turvey CL, editors. Telemental health. New York: Elsevier; 2013. p. 367–95.

93. Yonker LM, Zan S, Scirica CV, et al. Friending teens: systematic review of social media in adolescent and young adult health care. J Med Internet Res 2015; 17(1):e4.

94. Seko Y, Kidd S, Wiljer D, et al. Youth mental health interventions via mobile phones: a scoping review. Cyberpsychol Behav Soc Netw 2014;17(9):591–602.

95. McLaughlin M, Nam Y, Gould J, et al. A videosharing social networking intervention for young adult cancer survivors. Comput Human Behav 2012;28(2):631–41.

96. McDaniel BT, Coyne SM, Holmes EK. New mothers and media use: associations between blogging, social networking, and maternal well-being. Matern Child Health J 2012;16(7):1509–17.

97. Sundar SS, Oeldorf-Hirsch A, Nussbaum J, et al. Retirees on Facebook: can online social networking enhance their health and wellness?. In: CHI'11 extended abstracts on human factors in computing systems. Scottsdale, AZ: ACM; 2011. p. 2287–92.

98. Hogeboom DL, McDermott RJ, Perrin KM, et al. Internet use and social networking among middle aged and older adults. Educ Gerontol 2010;36(2):93–111.

99. Wilson JA, Onorati K, Mishkind M, et al. Soldier attitudes about technology-based approaches to mental health care. Cyberpsychol Behav 2008;11(6): 767–9.

100. Horgan A, Sweeney J. Young students' use of the Internet for mental health information and support. J Psychiatr Ment Health Nurs 2010;17(2):117–23.

101. O'Dea B, Campbell A. Healthy connections: online social networks and their potential for peer support. Stud Health Technol Inform 2011;168:133–40.

102. Recupero P. E-mail and the psychiatrist-patient relationship. J Am Acad Psychiatry Law 2005;33:465–75.

103. Frankish K, Ryan C, Harris A. Psychiatry and online social media: potential, pitfalls and ethical guidelines for psychiatrists and trainees. Australas Psychiatry 2012;20:181–7.

**CDCR _255**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

104. Koh S, Cattell GM, Cochran DM, et al. Psychiatrists' use of electronic communication and social media and a proposed framework for future guidelines. J Psychiatr Pract 2013;19(3):254–63.

105. Farnan JM, Snyder Sulmasy L, Worster BK, et al. Online medical professionalism: patient and public relationships: policy statement from the American College of Physicians and the Federation of State Medical Boards. Ann Intern Med 2013;158(8):620–7.

106. American Medical Association. Opinion 9.124-Professionalism in the Use of Social Media. AMA Code of Medical Ethics 2011. Available at: http://www.ama-assn.org/ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion9124.page?. Accessed April 1, 2015.

107. Behnke S. Ethics in the age of the Internet. Mon Psychol 2008;39(7):74.

108. Canadian Medical Association. Social media and Canadian physicians - issues and rules of engagement. Available at: http://www.cma.ca.libproxy.usc.edu/socialmedia. Accessed March 15, 2015.

109. British Medical Association. Using social media: practical and ethical guidance for doctors and medical students. [2013-10-27]. Available at: http://www.medschools.ac.uk/SiteCollectionDocuments/social_media_guidance_may2011.pdf. Accessed March 15, 2015.

110. Grajales FJ, Sheps S, Ho K, et al. Social media: a review and tutorial of applications in medicine and health care. J Med Internet Res 2014;16(2):e13.

111. Mitchell KJ, Ybarra M. Social networking sites: finding a balance between their risks and benefits. Arch Pediatr Adolesc Med 2009;163(1):87–9.

112. Bishop M, Yellowlees P, Gates C, et al. Facebook goes to the doctor. New York: ACM Press; 2011. p. 13–20.

113. Camargo K, Grant R. Public health, science, and policy debate: being right is not enough. Am J Public Health 2015;105(2):232–5.

114. Regan H. The Disneyland measles outbreak likely came from overseas. Time 2015. Available at: http://time.com/3688914/disneyland-measles-outbreak-overseas/. Accessed 1 April 1, 2015.

115. Hilty DM, Yellowlees PM. Collaborative mental health services using multiple technologies – the new way to practice and a new standard of practice? J Am Acad Child Adolesc Psychiatry 2015;54(4):245–6.

116. Yellowlees PM, Nafiz N. The psychiatrist-patient relationship of the future: anytime, anywhere? Harv Rev Psychiatry 2010;18(2):96–102.

117. American Psychiatric Association. Diagnostic criteria from DSM-5. Via Table 1. Washington, DC: American Psychiatric Publishing; 2013.

118. Lyketsos C, Roques C, Hovanec L. Telemedicine use and reduction of psychiatric admissions from a long-term care facility. J Geriatr Psychiatry Neurol 2001;14:76–9.

119. Poon P, Hui E, Dai D, et al. Cognitive intervention for community-dwelling older persons with memory problems: telemedicine versus face-to-face treatment. Int J Geriatr Psychiatry 2005;20:285–6.

120. Weiner M, Rossetti H, Harrah K. Videoconference diagnosis and management of Choctaw Indian dementia patients. Alzheimers Dement 2011;7:562–6.

121. Graham MA. Telepsychiatry in Appalachia. Am Behav Sci 1996;39:602–15.

122. Zaylor C. Clinical outcomes in telepsychiatry. J Telemed Telecare 1999;5:59–60.

123. Hunkeler EM, Meresman JF, Hargreaves WA, et al. Efficacy of nurse telehealth care and peer support in augmenting treatment of depression in primary care. Arch Fam Med 2000;9:700–8.

**CDCR _256**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018. For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

124. Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in in-person treatment. Am J Psychiatry 2004;161:1471–6.

125. Manfredi L, Shupe J, Batki S. Rural jail telepsychiatry: a pilot feasibility study. Telemed J E Health 2005;11(5):574–7.

126. Sorvaniemi M, Ojanen E, Santamäki O. Telepsychiatry in emergency consultations: a follow-up study of sixty patients. Telemed J E Health 2005;11(4):439–41.

127. Modai I, Jabarin M, Kurs R, et al. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. Telemed J E Health 2006;12:515–20.

128. Urness D, Wass M, Gordon A, et al. Client acceptability and quality of life – telepsychiatry compared to in-person consultation. J Telemed Telecare 2006;12(5):251–4.

129. Yellowlees PM, Odor A, Burke MM, et al. A feasibility study of asynchronous telepsychiatry for psychiatric consultations. Psychiatr Serv 2010;61(8):838–40.

130. Moreno FA, Chong J, Dumbauld J, et al. Use of standard Webcam and Internet equipment for telepsychiatry treatment of depression among underserved Hispanics. Psychiatr Serv 2012;63(12):1213–7.

131. Titov N, Dear BF, Schwencke G, et al. Transdiagnostic internet treatment for anxiety and depression: a randomised controlled trial. Behav Res Ther 2011;49(8):441–52.

132. Johnston L, Titov N, Andrews G, et al. Comorbidity and internet-delivered transdiagnostic cognitive behavioural therapy for anxiety disorders. Cogn Behav Ther 2013;42(3):180–92.

133. Bouchard S, Paquin B, Payeur R, et al. Delivering cognitive-behavior therapy for panic disorder with agoraphobia in videoconference. Telemed J E Health 2004;10(1):13–25.

134. Germain V, Marchand A, Bouchard S, et al. Effectiveness of cognitive behavioural therapy administered by videoconference for posttraumatic stress disorder. Cogn Behav Ther 2009;38(1):42–53.

135. Hedman E, Ljótsson B, Rück C, et al. Effectiveness of internet-based cognitive behaviour therapy for panic disorder in routine psychiatric care. Acta Psychiatr Scand 2013;128(6):457–67.

136. Frueh BC, Henderson S, Myrick H. Telehealth service delivery for persons with alcoholism. J Telemed Telecare 2005;11(7):372–5.

137. Szeftel R, Federico C, Hakak R, et al. Improved access to mental health evaluation for patients with developmental disabilities using telepsychiatry. J Telemed Telecare 2012;18(6):317–21.

138. Chong J, Moreno FA. Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. Telemed J E Health 2012;18(4):297–304.

139. Shore JH, Brooks E, Savin D, et al. Acceptability of telepsychiatry in American Indians. Telemed J E Health 2008;14(5):461–6.

140. Mucic D. Transcultural telepsychiatry and its impact on patient satisfaction. J Telemed Telecare 2010;16(5):237–42.

141. Ye J, Shim R, Lukaszewski T, et al. Telepsychiatry services for Korean immigrants. Telemed J E Health 2012;18(10):797–802.

142. Lopez AM, Cruz M, Lazarus S, et al. Use of American sign language in telepsychiatry consultation. Via Table 2. Telemed J E Health 2004;10(3):389–91.

143. Blackmon LA, Kaak HO, Ranseen J. Consumer satisfaction with telemedicine child psychiatry consultation in rural Kentucky. Psychiatr Serv 1997;48:1464–6.

**CDCR _257**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

144. Elford R, White H, Bowering R, et al. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. J Telemed Telecare 2000;6:73–82.

145. Elford DR, White H, St John K, et al. A prospective satisfaction study and cost analysis of a pilot child telepsychiatry service in Newfoundland. J Telemed Telecare 2001;7:73–81.

146. Glueckauf RL, Fritz SP, Ecklund-Johnson EP, et al. Videoconferencing-based family counseling for rural teenagers with epilepsy: phase 1 findings. Rehabil Psychol 2002;47(1):49–72.

147. Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. Telemed J E Health 2003;9:49–55.

148. Myers KM, Sulzbacher S, Melzer SM. Telepsychiatry with children and adolescents: are patients comparable to those evaluated in usual outpatient care? Telemed J E Health 2004;10(3):278–85.

149. Greenberg N, Boydell K, Volpe T. Pediatric telepsychiatry in Ontario: caregiver and service provider perspectives. J Behav Health Serv Res 2006;33(1):105–11.

150. Myers K, Valentine J, Morganthaler R, et al. Telepsychiatry with incarcerated youth. J Adolesc Health 2006;38(6):643–8.

151. Myers KM, Valentine JM, Melzer SM. Feasibility, acceptability, and sustainability of telepsychiatry for children and adolescents. Psychiatr Serv 2007;58:1493–6.

152. Bensink M, Armfield N, Irving H, et al. A pilot study of videotelephone-based support for newly diagnosed paediatric oncology patients and their families. J Telemed Telecare 2008;14(6):315–21.

153. Clawson B, Selden M, Lacks M, et al. Complex pediatric feeding disorders: using teleconferencing technology to improve access to a treatment program. Pediatr Nurs 2008;34(3):213–6.

154. Fox KC, Conner P, McCullers E, et al. Effect of a behavioural health and specialty care telemedicine programme on goal attainment for youths in juvenile detention. J Telemed Telecare 2008;14(5):227–30.

155. Morgan GJ, Craig B, Grant B, et al. Home videoconferencing for patients with severe congenital heart disease following discharge. Congenit Heart Dis 2008;3(5):317–24.

156. Myers KM, Valentine JM, Melzer SM. Child and adolescent telepsychiatry: utilization and satisfaction. Telemed J E Health 2008;14(2):131–7.

157. Shaikh U, Cole SL, Marcin JP, et al. Clinical management and patient outcomes among children and adolescents receiving telemedicine consultations for obesity. Telemed J E Health 2008;14(5):434–40.

158. Wilkinson OM, Duncan-Skingle F, Pryor JA, et al. A feasibility study of home telemedicine for patients with cystic fibrosis awaiting transplantation. J Telemed Telecare 2008;14(4):182–5.

159. Witmans MB, Dick B, Good J, et al. Delivery of pediatric sleep services via telehealth: the Alberta experience and lessons learned. Behav Sleep Med 2008;6(4):207–19.

160. Myers KM, Vander Stoep A, McCarty CA, et al. Child and adolescent telepsychiatry: variations in utilization, referral patterns and practice trends. J Telemed Telecare 2010;16:128–33.

161. Lau ME, Way BB, Fremont WP. Assessment of SUNY Upstate Medical University's child telepsychiatry consultation program. Int J Psychiatry Med 2011;42(1):93–104.

162. Mulgrew KW, Shaikh U, Nettiksimmons J, et al. Comparison of parent satisfaction with care for childhood obesity delivered face-to-face and by telemedicine. Telemed J E Health 2011;17(5):383–7.

**CDCR _258**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018. For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

163. Stain HJ, Payne K, Thienel R, et al. The feasibility of videoconferencing for neuropsychological assessments of rural youth experiencing early psychosis. J Telemed Telecare 2011;17(6):328–31.

164. Storch EA, May JE, Wood JJ, et al. Multiple informant agreement on the anxiety disorders interview schedule in youth with autism spectrum disorders. J Child Adolesc Psychopharmacol 2012;22(4):292–9.

165. Himle MB, Freitag M, Walther M, et al. A randomized pilot trial comparing videoconference versus face-to-face delivery of behavior therapy for childhood tic disorders. Behav Res Ther 2012;50(9):565–70.

166. Jacob MK, Larson JC, Craighead WE. Establishing a telepsychiatry consultation practice in rural Georgia for primary care physicians: a feasibility report. Clin Pediatr (Phila) 2012;51(11):1041–7.

167. Nelson EL, Duncan AB, Peacock G, et al. Telemedicine and adherence to national guidelines for ADHD evaluation: a case study. Psychol Serv 2012;9(3):293–7.

168. Reese RJ, Slone NC, Soares N, et al. Telehealth for underserved families: an evidence-based parenting program. Psychol Serv 2012;9(3):320–2.

169. Heitzman-Powell LS, Buzhardt J, Rusinko LC, et al. Formative evaluation of an ABA outreach training program for parents of children with autism in remote areas. Focus Autism Developmental Disabilities 2013;29(1):23.

170. Xie Y, Dixon JF, Yee OM, et al. A study on the effectiveness of videoconferencing on teaching parent training skills to parents of children with ADHD. Telemed J E Health 2013;19(3):192–9.

171. Reese RM, Jamison R, Wendland M, et al. Evaluating interactive videoconferencing for assessing symptoms of autism. Telemed J E Health 2013;19(9):671–7.

172. Davis AM, Sampilo M, Gallagher KS, et al. Treating rural pediatric obesity through telemedicine: outcomes from a small randomized controlled trial. J Pediatr Psychol 2013;38(9):932–43.

173. Freeman KA, Duke DC, Harris MA. Behavioral health care for adolescents with poorly controlled diabetes via Skype: does working alliance remain intact? J Diabetes Sci Technol 2013;7(3):727–35.

174. Hommel KA, Greenley RN, Maddux MH, et al. Self-management in pediatric inflammatory bowel disease: a clinical report of the North American Society for Pediatric Gastroenterology, Hepatology, and Nutrition. J Pediatr Gastroenterol Nutr 2013;57(2):250–7.

175. Lipana LS, Bindal D, Nettiksimmons J, et al. Telemedicine and face-to-face care for pediatric obesity. Telemed J E Health 2013;19(10):806–8.

176. Rockhill C, Violette H, Vander Stoep A, et al. Caregivers' distress: youth with attention-deficit/hyperactivity disorder and comorbid disorders assessed via telemental health. J Child Adolesc Psychopharmacol 2013;23(6):379–85.

177. Comer JS, Furr JM, Cooper-Vince CE, et al. Internet-delivered, family-based treatment for early-onset OCD: a preliminary case series. J Clin Child Adolesc Psychol 2014;43(1):74–87.

178. Tse YJ, McCarty CA, Vander Stoep A, et al. Teletherapy delivery of caregiver behavior training for children with attention-deficit hyperactivity disorder. Telemed J E Health 2015;21(6):451–8.

179. Rockhill C, Violette H, Vander Stoep A, et al. Telepsychiatrists' adherence to guidelines-based care, ADHD outcomes by prescriber based on comorbidity status. Telemed J E Health, in press.

180. Bastien CH, Morin CM, Ouellet MC, et al. Cognitive-behavioral therapy for insomnia: comparison of individual therapy, group therapy, and telephone consultations. J Consult Clin Psychol 2004;72(4):653–9.

**CDCR _259**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

181. Morgan RD, Patrick AR, Magaletta PR. Does the use of telemental health alter the treatment experience? Inmates' perceptions of telemental health versus face-to-face treatment modalities. J Consult Clin Psychol 2008;76(1):158–62.

182. Ertelt TW, Crosby RD, Marino JM, et al. Therapeutic factors affecting the cognitive behavioral treatment of bulimia nervosa via telemedicine versus face-to-face delivery. Int J Eat Disord 2011;44(8):687–91.

183. Germain V, Marchand A, Bouchard S, et al. Assessment of the therapeutic alliance in face-to-face or videoconference treatment for posttraumatic stress disorder. Cyberpsychol Behav Soc Netw 2010;13(1):29–35.

184. King VL, Stoller KB, Kidorf M. Assessing the effectiveness of an Internet-based videoconferencing platform for delivering intensified substance abuse counseling. J Subst Abuse Treat 2009;36:331–8.

185. Marrone S, Mitchell JE, Crosby R, et al. Predictors of response to cognitive behavioral treatment for bulimia nervosa delivered via telemedicine versus face-to-face. Int J Eat Disord 2009;42(3):222–7.

186. Gros DF, Price M, Strachan M, et al. Behavioral activation and therapeutic exposure: an investigation of relative symptom changes in PTSD and depression during the course of integrated behavioral activation, situational exposure, and imaginal exposure techniques. Behav Modif 2012;36(4):580–99.

187. Yuen EK, Herbert JD, Forman EM, et al. Acceptance based behavior therapy for social anxiety disorder through videoconferencing. J Anxiety Disord 2013;27(4): 389–97.

188. King VL, Brooner RK, Peirce JM. A randomized trial of Web-based videoconferencing for substance abuse counseling. J Subst Abuse Treat 2014;46:36–42.

189. Khatri N, Marziali E, Tchernikov I, et al. Comparing telehealth-based and clinic-based group cognitive behavioral therapy for adults with depression and anxiety: a pilot study. Clin Interv Aging 2014;7(9):765–70.

**CDCR _260**

Downloaded for Anonymous User (n/a) at Moody Medical Library from ClinicalKey.com by Elsevier on July 04, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

# ATTACHMENT 13

TELEMEDICINE JOURNAL AND e-HEALTH
Volume 10, Supplement 2, 2004
© Mary Ann Liebert, Inc.

# Prison Telemedicine and Telehealth Utilization in the United States: State and Federal Perceptions of Benefits and Barriers

DEBRA LARSEN, Ph.D.,[1] B. HUDNALL STAMM, Ph.D.,[1] KELLY DAVIS, B.S.,[1]
and PHILLIP R. MAGALETTA, Ph.D.[2]

## ABSTRACT

Although national justice and technology associations have endorsed the utilization of telemedicine and telehealth, little is known about the current utilization of this technology across our nation's correctional facilities. Several voluntary registries and state Web sites exist, but only limited information on telemedicine utilization may be gleaned from these. The purpose of the present study was to fill this void by reporting the utilization patterns in telemedicine programs in state and federal correctional facilities throughout the United States. Using telephone-administered interviews, data were collected from all 50 states. Respondents were asked about utilization, benefits, and barriers to the use of technology in healthcare in state and federal correctional facilities. Slightly over half of state correctional institutions and 39% of federal institutions are using some sort of telehealth or telemedicine applications. The most common benefits cited were improved security, personnel safety, costs savings, and access to specialists. The most common barriers cited were costs of technology, resistance from medical personnel, lack of staff technical expertise, and difficulties coordinating services.

## INTRODUCTION

T HE USE OF TELEMEDICINE as a source of support for long-distance clinical health-related education, public health, and health administration appears to be a promising way to extend healthcare services to a variety of underserved populations, including correctional populations.

As correctional systems are not typically known for embracing technology or encouraging change, the fact that correctional facilities have successfully sought to apply telemedicine in the service of those who are incarcerated is notable. A growing literature by a number of larger, well-known prison telemedicine programs[1–8] provides results that encourage the use of telemedicine. Beyond these proscribed studies that deal with one or a few locations, the overall status of prison telemedicine in the United States is unclear. National health services utilization data on telemedicine programs within correctional facilities are available on a piecemeal basis (e.g., http://tie.telemed.org/,

[1]Institute of Rural Health at Idaho State University, Pocatello, Idaho.
[2]Federal Bureau of Prisons, Washington, D.C.
The contents of this article are the sole responsibility of the authors and do not necessarily represent the official views or policies of the Department of Health and Human Services, the Federal Bureau of Prisons, or the Department of Justice.

CDCR _262

http://www.corrections.com/links/viewlinks), and very few national reviews or statistics are available. The current project was designed to bridge this gap. Data were gathered from state and federal prison systems in an attempt to describe the current utilization level of telemedicine in correctional facilities as well as reported or perceived barriers and benefits that state officials may have observed in their attempts to implement prison telemedicine programs.

There are constellations of unique factors such as geographic remoteness, the volume of significant healthcare needs, high prevalence rates of mental illness, etc., that increase the utility of telemedicine in prisons compared to other settings.[9] As telemedicine technology and applications have developed over the past 4 decades, it has become clear that telemedicine is most useful when physical barriers (i.e., geographic distance, terrain, climate difficulties) make transportation and/or direct contact between patient and clinician difficult.[10] Numerous prisons are subject to these physical barriers because of their remote location, and access to specialist medical care is frequently restricted in terms of timeliness of care and the number of professionals available.[2]

The opportunity to use telehealth as a method to contain healthcare expenses provides another rationale for using it in prison settings. Cost containment for medical consultations is an obvious administrative concern since the medical domain is reported to constitute as much as 15% of state correctional budgets,[2] which translates into an average state corrections medical budget exceeding 74 million dollars annually.[11] A recent National Institute of Justice (NIJ)[7] report indicated that a conventional, face-to-face healthcare consultation for the correctional population has an average cost of $173 in comparison to telemedicine consultations estimated at $71 each.

Beyond the sheer volume of offenders (1,076,343 in state facilities and 124,540 in federal facilities)—who, compared to community estimates, have an above average number of chronic and serious healthcare and mental health needs[9,12–14]—a significant portion of medical expenses results from staffing associated with transporting prisoners into the community for medical consultations. Telemedicine consultations in prison settings would reduce the number of incidents requiring transportation of inmates to tertiary-care sites because of the ability of the consulting physician to screen patients remotely.[6,15] In addition, telemedicine can reduce travel costs by decreasing the need for specialists travel to remote prison locations in order to provide face-to-face consultations.[15]

Beyond the financial advantages, perhaps the most obvious benefits are increased security and safety for the community.[16] Security is increased as transportation of prisoners outside the prison facility's secure perimeter is obviated in telemedicine.[16]

Although barriers to prison telemedicine exist, they are similar to those found in implementing telemedicine in other settings. The obvious initial barrier is the cost of equipment, but this cost has decreased significantly during the past several years.[3,17,18] Many programs have addressed this barrier by seeking grant funding for initial start-up costs.[15] Other barriers include training of staff in the use of this technology, the availability of infrastructure (i.e., line capabilities available in the region), and the availability of physical space for a private consultation area within the prison where telemedicine is practiced.[7,19]

The NIJ report[7] supporting telemedicine as a viable option for many correctional facilities appears to represent the norm for this decade; telemedicine may be the delivery method of choice in correctional facilities.[7] It remains unclear, however, how this enthusiasm in the literature would translate into operational programs.

A 1997 survey reported that of the 50 state correctional systems 18 had active telemedicine programs.[2] That survey also indicated that 15 additional states planned to implement telemedicine programs.[2] Several years later a survey reported by Lowes[20] estimated that prison telemedicine accounted for 20% of all telehealth activities.

## MATERIALS AND METHODS

Telephone structured interviews were completed with personnel in U.S. federal and state departments of correction regarding the status

of telemedicine in adult prison systems. Because the information sought was related to program administration, funding sources, and cost-benefit issues on the state or federal level (e.g., not at individual correction facility sites), the administrative representatives for each state or federal program served as target respondents for the interview. Depending on what each department self-identified as appropriate, one or two employees were interviewed for each program. The respondents were identified by their respective departments as responsible for telecommunications, telemedicine, and/or medical service programs in their state or federal department of corrections. One hundred percent of states and the federal Bureau of Prisons were interviewed.

An eight-question structured interview was developed to assess current utilization of telemedicine, sources of funding, and perceived benefits and barriers (see Appendix). The interviewers, a postdoctoral fellow and a graduate research assistant, were trained to use a standardized procedure in conducting the interviews. This included face-to-face reviews of the specified ordering and wording (as scripted) of the interview and planned strategies for addressing respondents' questions or unsolicited information.

## RESULTS

### Locations

The data indicate that 52% of state department of corrections (26 states) are currently operating 34 telemedicine programs. The programs in these 26 states reach 415 facilities out of the total 1,384 existing adult state correctional facilities in the United States. Table 1 shows the number of facilities currently using telemedicine in each state, based in rural and urban locations. Urban locations are defined according to the U.S. Census Bureau's criterion of 50,000 or more inhabitants for urban/metropolitan designation. Any location with inhabitants of a lesser number was considered rural for the purposes of this interview.

TABLE 1.  LOCATIONS OF STATE PRISONS WITH TELEHEALTH PROGRAMS ($n$ = 26)

| States with prison telehealth programs (n = 26) | Number of facilities in urban locations | Number of facilities in rural locations |
|---|---|---|
| Alaska | 2 | 5 |
| Arizona | 3 | 5 |
| California | 6 | 19 |
| Colorado | 2 | 5 |
| Georgia | 2 | 9 |
| Illinois | 0 | 1 |
| Iowa | 1 | 7 |
| Kansas | 1 | 5 |
| Kentucky | 1 | 11 |
| Louisiana | 0 | 2 |
| Maine | 1 | 4 |
| Maryland | 2 | 3 |
| Massachusetts | 0 | 1 |
| Michigan | 4 | 12 |
| Mississippi | 0 | 1 |
| New York | 3 | 47 |
| North Carolina | 1 | 5 |
| North Dakota | 0 | 2 |
| Ohio | 21 | 12 |
| Oregon | 0 | 2 |
| Pennsylvania | 8 | 19 |
| Texas | 14 | 79 |
| Utah | 0 | 1 |
| Virginia | 0 | 8 |
| West Virginia | 0 | 1 |
| National totals | 73 | 268 |

Urban = population over 50,000; rural = population of less than 50,000.

TABLE 2. PERCENTAGE OF THE 26 EXISTING
STATE TELEMEDICINE PROGRAMS SERVING
VARIOUS CORRECTIONAL CUSTODY LEVELS

| Correctional custody level | Percentage of 26 state telemedicine programs |
|---|---|
| Maximum security | 88.5 |
| Medium security | 76.9 |
| Minimum security | 69.2 |
| Treatment program | 36.0 |
| Work release | 32.0 |
| Hospital | 32.0 |
| Jail | 30.8 |

### Correctional custody level

There were many correctional custody levels represented across the facilities interviewed. As noted in Table 2, "maximum security" populations are the most frequently targeted correctional custody level for telemedicine use by correctional programs.

### Financial support

Ninety-two percent of the state telemedicine programs are funded through regular, allocated state budgets. One program supplements state budget funding with billed services, and five programs are currently funded through grants. In terms of financial arrangements for technical services, 80.8% ($n = 21$) of state telemedicine programs use in-house services with all the equipment and services operated and maintained by state employees. The remaining 19.2% ($n = 5$) of telemedicine programs rely on private, contracted companies for equipment maintenance and technical services.

### Utilization data

As noted in Figure 1, the 26 states using telemedicine are distributed throughout the nation. Of the remaining 24 states, 20 of these are doing at least one type of non-medical videoconferencing. These videoconferencing data do not include any county level use. Hence, correctional videoconferencing applications may be happening on the county level but not captured by this state and federal interview if these activities are not in connection with state correction facilities. For example, in Idaho, several counties complete judicial proceedings by videoconferencing between jails and county courthouses. However, this current interview identified Idaho as one of the few states with



FIG. 1. Telemedicine and telecommunication utilization reported by state departments of correction. Reprinted with permission from B.H. Stamm, Institute of Rural Health, Idaho State University, Pocatello, ID.

TABLE 3.   NON-MEDICAL USES OF TELECOMMUNICATION IN CORRECTIONAL SETTINGS

| Non-medical telecommunication activity | State (n = 26) telemedicine programs | States (n = 24) without telemedicine programs | Total (n = 50) corrections departments |
|---|---|---|---|
| Administration/staff meetings | 20 (76.9%) | 14 (58.3%) | 34 (68.0%) |
| Judicial proceedings | 19 (73.0%) | 14 (58.3%) | 33 (66.0%) |
| Staff training/continuing education | 18 (69.2%) | 13 (50.0%) | 31 (62.0%) |
| Inmate education | 6 (23.1%) | 3 (12.5%) | 9 (18.0%) |
| Other[a] | 2 (7.7%) | 0 (0%) | 2 (4.0%) |
| 1 or more non-medical activity reported | 26 (100.0%) | 20 (83.3%) | 46 (96.0%) |

Data are number (%).
[a]Other services included inmate visitation programs and work interviews.

no videoconferencing since these activities do not include state correction facilities.

State departments of corrections reported that administrative/staff meetings and judicial proceedings are the most common non-medical remote activities for state programs, regardless of whether or not an active telemedicine program is in place (Table 3). As seen in Table 3, it appears that states with active telemedicine programs use telecommunications more frequently and for a greater variety of non-medical uses (i.e., work interviews, visitation programs), but this difference was not statistically significant.

Telemedicine utilization for the 26 existing programs has a clear pattern of use dominated by specialty-based medical and mental health consultations (Table 4). Consultations with specialized medical professionals were reported by 21 of the 26 programs (81.0%) with medical specialists defined as including all medical spe-

cialties (e.g., cardiology, radiology, dermatology, orthopedics, etc.) with the exception of psychiatry. Mental health consultations with a psychiatrist, psychologist, or therapist were reported by 19 of the 26 programs (73.1%). The medical uses reported as "other" included programs such as peer medical consultation (2/26; 7.7%) and human immunodeficiency virus, dialysis treatments, prenatal education, or dietary consultations (1/26; 3.8% each).

### Barriers to telemedicine programs

The most common barrier encountered by state telemedicine programs was the cost of equipment (Table 5). However, personnel factors including resistance from medical providers, staff technical expertise, and coordination of sites and services were mentioned nearly as often as cost.

TABLE 4.   TYPES OF SERVICES PROVIDED BY THE 26 STATE CORRECTIONS TELEMEDICINE PROGRAMS

| Type of service | Programs providing services |
|---|---|
| Medical specialist consultation | 21 (80.8%) |
| Mental healthcare | 19 (73.1%) |
| Primary medical care | 9 (34.6%) |
| Emergency medical triage | 3 (11.5%) |
| Dental | 2 (7.7%) |
| Other[a] | 5 (19.2%) |

Data are number (%).
[a]Other services included transitional care planning/peer consultation, dietary consults, prenatal education, dialysis, and human immunodeficiency virus care.

TABLE 5.   PERCENTAGE OF STATES REPORTING SPECIFIC PERCEIVED BARRIERS TO TELEMEDICINE UTILIZATION

| Barriers | Percentage |
|---|---|
| Cost of equipment | 50.0 |
| Resistance from medical providers | 46.2 |
| Lack of technical expertise for staff | 46.2 |
| Coordination of sites and services | 42.3 |
| Staffing problems | 34.6 |
| Inadequate technical infrastructure | 34.6 |
| Resistance from inmates | 19.2 |
| Cost of equipment maintenance | 15.4 |
| Resistance from security staff | 15.4 |
| Resistance from administrators | 15.4 |
| Other[a] | 15.4 |

[a]Other barriers include government processes that are time consuming; equipment location confidentiality/safety; budget revenues reduced; physician cancellations.

CDCR _266

LARSEN ET AL.

TABLE 6.  PERCENTAGE OF STATES REPORTING SPECIFIC
PERCEIVED BENEFITS TO TELEMEDICINE UTILIZATION

| Benefits | Percentage |
| --- | --- |
| Improved security for the community | 96.2 |
| Improved safety to security personnel | 88.5 |
| Cost savings | 84.6 |
| Availability of specialist consults | 80.8 |
| Reduced staffing demands | 73.1 |
| Improved medical response time | 69.2 |
| Shorter waiting lists | 69.2 |
| Improved quality of care | 65.4 |
| Reallocation of staff | 46.2 |
| Other benefits[a] | 15.4 |

[a]Other benefits include: increased compliance of inmates to treatment, especially dialysis; improved communication between administration and clinical staff; ability to have remote staff more involved in policy and meet regularly; increased education of staff and inmates; increased competence of staff; peer interaction with other professionals.

### Benefits of telemedicine programs

Of the benefits reported by states operating telemedicine programs, security for the prison staff and the community was reported most frequently (Table 6). However, the majority of programs reported cost savings as a significant advantage in telemedicine. Some programs kept detailed cost savings records specific to the telehealth program. Others estimated cost savings based on broader budgetary allocations required for medical/mental health service provision and inmate transportation costs. Both those who did and those who did not keep these records attributed the greatest cost savings to the reduced transportation of prisoners.

### Federal programs

Currently, 40 of the 102 federal correctional facilities in the United States have active telemedicine programs; all are funded through their regular federal budget allocations. Of these 40 programs, 37 are provided by in-house services, and the remaining three programs are provided by contracted private companies. All federal programs use telecommunications to provide the following services: primary medical care, specialist medical consultations, psychiatric mental healthcare, administrative/staff meetings, staff training/continuing education, and judicial proceedings. Plans are being implemented to provide telemedicine services in all 102 correctional facilities.

### CONCLUSIONS

Our results indicate that over half (26) of state departments of correction and slightly less than half of federal facilities currently have active telemedicine programs, representing an increase compared to previous studies. The fact that the majority of this growth has occurred during a 10-year period is remarkable. All four states reported using videoconferencing technology for non-medical purposes, a trend that points toward increased utilization. Many states, and the correctional facilities therein, have some of the necessary equipment in place for a telehealth system, providing a viable foundation for developing a system able to provide medical services in conjunction with the current non-medical uses.

The survey findings suggest that the cost–benefit equation is weighted more heavily toward safety than monetary costs alone. Although the facilities experience cost savings or "cost avoidance" by reducing the number of offsite inmate transports, the greatest benefit appears to be the increased safety to security personnel and to the community at large.

Consistent with the general trend toward difficulty in hiring and retaining medical personnel[13] in corrections, many states indicated experiencing difficulties with recruiting medical professionals who are willing to participate in telemedicine specifically. Provider resistance has been mentioned as a potential problem in the literature,[16,19,21] and some states offered anecdotal reasons for their own experience. For example, some facilities had problems with older physicians being unwilling to participate while the younger physicians who are more familiar with the technology were more willing to participate. Future research should consider the nature of this resistance as well as effective methods for ameliorating it.

Insufficient infrastructure was reported by a

number of states, a phenomenon specific to prisons located in rural settings. This was not surprising in view of the technological divide in rural areas in a variety of contexts.[10]

Overall, more benefits were reported more frequently than were barriers. In addition, concern with equipment costs may be based more on perception than fact given the declining costs over the last few years. Finally, as broadband becomes more available in rural areas, the ability to use telehealth effectively in rural corrections facilities, as has been seen in health facilities, may increase. If this happens, both inmates and corrections staff are likely to be pleased.[21]

## ACKNOWLEDGMENTS

This project is supported in part by grant 1 D1B TM 00042-01 from the Department of Health and Human Services Health Resources and Services Administration, Office for the Advancement of Telehealth.

## REFERENCES

1. Brunicardi BO. Financial analysis of savings from telemedicine in Ohio's prison system. *Telemed J* **1998;**4:49–54.

2. Gailiun M. Telemedicine takes off. *Corrections Today* **1997;**Feb:68–71.

3. McCue MJ, Hampton CL, Malloy W, Fisk KJ, Dixon L, Neece A. Financial analysis of telecardiology used in a correctional setting. *Telemed J e-Health* **2000;**6:385–391.

4. Mekhijian H, Warisse J, Gailium M, McCain T. An Ohio telemedicine system for prison inmates: A case report. *Telemed J* **1996;**2:17–24.

5. Mekhjian H, Turner JW, Gailiun M, McCain TA. Patient satisfaction with telemedicine in a prison environment. *J Telemed Telecare* **1999;**5:55–61.

6. National Institute of Justice. *Telemedicine can reduce correctional health care costs: an evaluation of a prison telemedicine network.* Report no. NCJ 175040. Washington, DC: U.S. Department of Justice, **1999.**

7. National Institute of Justice. *Implementing telemedicine in correctional facilities.* Report no. NCJ 190310. Washington, DC: U.S. Department of Justice, **2002.**

8. Zollo S, Kienzle M, Loeffelholz P, Sebille S. Telemedicine in Iowa's correctional facilities: initial clinical experience and assessment of program costs. *Telemed J* **1999;**5:291–301.

9. Ax RK, Fagan TJ, Holt SMB. Individuals with serious mental illnesses in prison: rural perspectives and issues. In: Stamm BH, ed. *Rural behavioral health care* Washington, DC: APA Books, **2003:** 203–216.

10. Stamm BH. Bridging the rural-urban divide with telehealth and telemedicine. In: Stamm BH, ed. *Behavioral healthcare in rural and frontier areas.* Washington, DC: APA Books, **2003:** 145–156.

11. Camp CG, Camp GM. *The corrections yearbook 2001: adult systems.* Middletown, CT: Criminal Justice Institute, **2002.**

12. Diamond PM, Wang EW, Holzer CE III, Thomas CR, Cruser DA. The prevalence of mental illness in prison: review and policy implications. *Admin Policy Mental Health* **2001;**29:21–40.

13. McDonald DC. Medical care in prisons. In: Tonry M, Petersilia J, eds. *Prisons.* Chicago: University of Chicago Press, **1999:**427–478.

14. Camp GK, Camp GM. *The 2001 corrections yearbook.* Middletown, CT: Criminal Justice Institute, Inc., **2001:** 12–72.

15. Bashshur RL. Telemedicine and health care. *Telemed J e-Health* **2002;**8:5–12.

16. Magaletta PR, Fagan TJ, Ax RK. Advancing psychology services through telehealth in the Federal Bureau of Prisons. *Profess Psychol Res Pract* **1998;**29:543–548.

17. Caramanis T. Editorial. *Telemedicine Today* **2002;** 8(1):10.

18. Zincone LH Jr, Doty E, Balch DC. Financial analysis of telemedicine in a prison system. *Telemed J* **1997;**3: 247–255.

19. Magaletta PR, Dennery C, Ax R. Telehealth: a future for correctional healthcare. In: S. Stojkovic, ed. *Managing special populations in jails and prisons.* Kingston, NJ: Civic Research Institute, **in press.**

20. Lowes R. Telemedicine. *Med Econ* **2001;**78(3):24.

21. Campbell JD, Harris KD, Hodge R. Introducing telemedicine to rural physicians and settings. *J Fam Pract* **2001;**50:419–424.

Address reprint requests to:
*B. Hudnall Stamm, Ph.D.*
*Institute of Rural Health*
*Idaho State University*
*Campus Box 8174*
*Pocatello, ID 83209*

*E-mail:* bhstamm@isu.edu

## APPENDIX:

## STRUCTURED INTERVIEW USED WITH DEPARTMENT OF CORRECTIONS REPRESENTATIVES

Do your adult correctional facilities use any type of telemedicine? ___yes ___no
If yes, go to #1. If no, complete only 4e, 4f, 4g, 4h, & 4i.

1.  Number of corrections facilities with access to telehealth/telemedicine programs _____
            What types of facilities are these: ____Min. Security Prison ____Max. Security Prison
            ____Work Release Program      ____Treatment Program      ____Hospital
            ____Jail                      ____Other_____
            ____# Urban (pop. 50,000+)    ____Rural (pop<50,000)

2.  Telehealth/telemedicine programs provided by: ____in-house/direct ____contracts ____both

3.  Number of contracted telehealth/telemedicine providers_____

Would you be willing to tell us what organizations you use as contractors?____yes ____no
(Note: We will find these through other public records if they do not know or will not tell us. The Telemedicine In-
formation Exchange [TIE] has most of them listed.)

| Organization | Contact Person | Phone | Address |
|---|---|---|---|
| | | | |

4. I am now going to read you a list of activities. I would like you to tell me if these activities
are provided by distance delivery or telecommunication in any of your facilities. For example,
I will ask if you provide adminstrative/staff meetings by telecommunication or distance deliv-
ery. Do you understand?

                                                            Use Telehealth/
                                                            distance delivery
a. Primary medical care (general practitioner)
b. Specialist medical consults (i.e., cardiology, radiology, orthopedics, etc.)
c. Mental healthcare: psychiatrist, psychologist, and/or therapy
d. Dental care
e. Administrative/staff meetings
f. Inmate educational opportunities (i.e., health ed., GED)
g. Staff training/continuing education
h. Judicial proceedings (i.e., court appearances, competency hearings)
i. Other_____

5. For your correctional facilities using telemedicine, is telemedicine funded by the following:
(yes/no)

_____grants      _____regular allocated budget      _____ billed services

other_____

6. Has having a telehealth/telemedicine program been beneficial in any of the following ways:

_____Improved quality of medical care      _____Improved quicker medical response time
_____Shorter waiting lists      ____ Availability of specialist consults
_____Improved security for the community      ____Improved safety to security personnel
_____Reduced staffing demands (overtime)      ____Reallocation of staff
_____Cost savings      Other_____
      _____

7. Which of the following barriers or difficulties have you encountered with using tele-health/telemedicine, if any?

_____Cost of equipment      _____Cost of equipment mainentance
_____Staffing problems      _____Lack of technical expertise for staff
_____Coordination of sites/services      _____Resistance from inmates
_____Resistance from administrators      _____Resistance from security staff
_____Resistance from medical providers      _____Insufficient technical infrastructure
_____Other_____

8. Is there anything else you would like to tell
us?



www.jpgmonline.com

# Patient and Provider Satisfaction with the Use of Telemedicine: Overview and Rationale for Cautious Enthusiasm

Whitten P, Love B[1]

Department of Communication, Beering Hall, Purdue University, West Lafayette, IN, USA
[1]School of Journalism, Michigan State University, East Lansing, MI, USA.

Correspondence:
B Love,
E-mail: lovebrad@msu.edu

## ABSTRACT

Telemedicine research addressing user satisfaction abounds in academic literature. Results from patient satisfaction studies indicate exceptionally high levels of perceived satisfaction, often above the rates of expected satisfaction for traditional forms of health delivery. Results from provider satisfaction studies are also generally quite positive; however, data from providers point to higher concerns with delivery barriers and challenges. Even though data from patient and provider satisfaction research suggests overwhelming optimism for this delivery modality, this paper urges cautious embracement of these results for several reasons. First, many of the studies exhibit serious methodological weaknesses related to design and data collection instruments. In addition, the construct of satisfaction is largely undefined and is not clear. Even recognizing these caveats, the results of the study do offer some evidence that patient satisfaction will not impede the deployment of telemedicine, but provider satisfaction merits additional study.

PubMed ID      : 16388172
J Postgrad Med 2005;51:294-300

KEY WORDS: Patient satisfaction, provider satisfaction, telemedicine, patient outcomes, healthcare costs

Telemedicine possesses the ability to bridge gaps and overcome barriers in a way unthinkable to traditional forms of healthcare. For more than 50 years, telecommunications technology has played a role in spreading medical care to previously unreachable populations.[1] Throughout telemedicine's bumpy start and deployment, researchers and practitioners have been concerned with user satisfaction,[2] a key challenge that still remains for today's healthcare organizations.[3] Insights supplied by patients and providers remain essential across the medical fields served by telemedine projects, especially as the number of these projects continues to incease at a dramatic rate. In fact, only four active telemedicine programs existed in 1990, but 10 years later, the number has jumped to an unquantifiable level.[4]

In general, investment in telemedicine by governments around the world spurred – and continues to spur – much of the growth. Infrastructure development and health alert networks in the United States are such a priority that the federal Departments of Agriculture, Commerce, Defense and Health and Human Services all offer government-provided grants to promote telemedicine applications.[5] In addition, varying entities in Norway, Spain, Sweden, Ireland, Greece, Germany and else-

where maintain programs to encourage the development of telemedicine.[6–10]

As the dramatic expansion of the last decade continues,[11] a better understanding of how satisfied patients and providers feel will become increasingly important.[12] A rapidly growing number of studies across several medical fields have demonstrated that the attitudes of patients play a significant role in health outcomes,[13,14] further stressing the need to understand satisfaction.

Most of the currently available research on satisfaction describes a situation where patients and providers express pleasure with health care delivered through telemedicine, even if that approval is sometimes offered with reservation. Additionally, the two groups tend to maintain different motivations for their opinions. However, much of the satisfaction that literature reports comes from studies that are not experimental in nature. The publications generally consist of small sample, descriptive feasibility studies or advice to other telemedicine providers.[15,16] Therefore, this body of work may not offer generalizable results.[17,18] Furthermore, the very meaning of satisfaction remains ill-defined at best, lacking the specific

2  4CM  K

View  publication stats

CDCR _272

# ATTACHMENT 14

CDCR _273

Journal of Consulting and Clinical Psychology
2008, Vol. , No. 1, 1 8  2

Copyright 2008 by the American Psychological Association
0022  00  /08/ 12.00  D I 10.10  /0022 00  . .1.1 8

BRIEF REPORT

# Does the Use of Telemental Health Alter the Treatment Experience? Inmates' Perceptions of Telemental Health Versus Face-to-Face Treatment Modalities

Robert D. Morgan and Amber N. Patrick
Texas Tech University

Philip R. Magaletta
Federal Bureau of Prisons

In corrections, where staffing limitations tax an overburdened mental health system, telemental health is an increasingly common mode of mental health service delivery. Although telemental health presents an efficient treatment modality for a spectrum of mental health services, it is imperative to study how this modality influences key elements of the treatment experience. In this study, the authors compared inmates' perceptions of the working alliance, postsession mood, and satisfaction with psychiatric and psychological mental health services delivered through 2 different modalities telemental health and face to face. Participants consisted of 18 inmates who received mental health services ( via telepsychology, 0 via face to face psychology, 0 via telepsychiatry, and 0 via face to face psychiatry). Results indicate no significant differences in inmates' perceptions of the working alliance with the mental health professional, postsession mood, or overall satisfaction with services when telemental health and face to face modalities were compared within each type of mental health service. Implications of these findings are presented.

*Keywords:* telemental health, offender, inmate and correctional mental health services

*Telemental health* is the use of a communication device for a real time service provision when the client and the provider are physically separated at the time the service is rendered (Vanden bos & Williams, 2000). Although there has been increased interest in telemental health (see Swansea, 200 ), there remains a paucity of research examining the impact of this service delivery modality on the therapeutic relationship. In fact, no randomized, controlled outcome studies examining the effectiveness of this method of service delivery have been conducted.

Given the significance of the therapeutic relationship to the process of change (Lambert, Shapiro, Bergin, 1 8 ), the degree to which this relationship is impacted by the service delivery modality must be examined. This necessity is supported by the finding that characteristics of the therapeutic relationship, such as working alliance (Raston, 1 0), positively correlate with treatment gains (see Horvath Bedi, 2002 Martin, Garske, Davis, 2000) and treatment satisfaction (Magaletta, Fagan, Peyrot, 2000). Thus, it is relevant to question the impact of service delivery modality on the therapeutic relationship. In other words, is the traditional face to face service delivery modality superior to nontraditional and innovative modalities aimed at increasing access to care

One setting that provides ample opportunity to study these issues is corrections. Several concerns salient in the correctional setting support the utility and highlight the advantages of delivering mental health services through telemental health. These concerns include service demands that challenge institutional resources (Magaletta, Fagan, A , 1 8). Moreover, inmates experience a larger number of psychological problems than the general public (Diamond, Wang, Holzer, Thomas, Cruser, 2001). Importantly, telemental health offers these inmates increased access to mental health care as well as increased security for psychologists (Pipkins, 1 ). Telemental health can also reduce the costs of transporting inmates from correctional to medical facilities, and it offers a broader range of mental health services an important consideration given the increasing mentally ill population in criminal justice settings without concomitant increases in staff resources or services (Manderscheid, Gravesande, Goldstrom, 2004). By using telemental health to link mentally ill inmates with specialty providers on a regular basis, the overall quality of care is improved (Magaletta et al., 1 8).

A recent review of correctional telemental health services (Ax et al., 200 ) revealed essentially two types of studies program evaluation and client satisfaction. Program evaluations consistently

Robert D. Morgan and Amber N. Patrick, Department of Psychology, Texas Tech University Philip R. Magaletta, Psychology Services Branch, Federal Bureau of Prisons, Washington, DC.

Robert D. Morgan and Amber N. Patrick contributed equally to this work and are listed alphabetically. The research contained in this document was coordinated in part by the Texas Department of Criminal Justice (Research Agreement 41  M0 ). The contents presented in this article reflect the views of the authors and do not necessarily reflect the policies or opinions of the Texas Department of Criminal Justice, the Department of Justice, or the Federal Bureau of Prisons. We wish to thank Daryl Kroner for consultation on the statistical analyses.

Correspondence concerning this article should be addressed to Robert D. Morgan, Department of Psychology, MS 20 1, Texas Tech University, Lubbock, TX  40 20 1. E mail robert.morgan ttu.edu

CDCR _274

revealed cost containment as a benefit and staff resistance as a drawbac . Evaluations of client satisfaction revealed that most clients are satisfied receiving services through this modality. Nev ertheless, little is  nown about the impact of telemental health as a modality for service delivery.  here remains a paucity of re search on inmates  perception of telemental health compared with traditional face to face service delivery, and  nowledge of how the modality of mental health service delivery impacts  ey elements of the treatment e  perience is needed (Krupins i et al., 200   uc er,  lfson,  imring,  oodman,  ienefeld, 200 ).

In this study, we e amined how telemental health impacts aspects of the therapeutic relationship, namely the wor ing alli ance as well as inmates  mood, satisfaction, and general attitudes and perceptions toward mental health services delivered via tele mental health.  iven previous findings, we hypothei ed that inmates receiving mental health services via telemental health would maintain a comparable wor ing alliance with the treatment provider, with similar possession responses regarding reactions to the session and satisfaction with their mental health service, com pared with a separate group of inmates who received mental health services via a traditional face to face modality.

## Method

### *art ants*

Participants consisted of 186 adult male inmates who received mental health services (either psychology or psychiatry) in an adult correctional institution. Of the 186 participants, 50 received face-to-face psychological services in a general population correctional facility, 36 received telemental health psychological services in a general population correctional facility,[1] 50 received face-to-face psychiatric services in a psychiatric prison, and 50 inmates re ceived telemental health psychiatric services in a general popula tion correctional facility. Note that participants represented in dependent samples such that they were not receiving duplicate services (i.e., psychology and psychiatry, or telemental health and face-to-face). The psychiatric prison housed mentally or physically ill inmates unable to function effectively in a general population facility. The general population facilities housed mentally ill and nonmentally ill offenders alike.

Although inmates reportedly suffered from a range of psychi atric disorders, the majority suffered from mood disorders (e.g., bipolar disorder, major depressive disorder; 74%) and schizophre nia or other psychotic disorders (19%). Notably, inmates receiving telemental health services versus face-to-face services did not differ diagnostically for those receiving psychological services, $\chi^2(2, N = 34) = 1.677, p = .43$, or psychiatric services, $\chi^2(2, N = 61) = 2.73, p = .255$.

The mean age of participants was 31.8 years ($SD = 9.4$). The sample was composed of primarily Caucasian (50%), African American (22.6%), and Hispanic (21.5%) participants. Participants reported an average of 10.89 years of education ($SD = 1.9$). Whereas 19.9% of participants were reportedly married/partnered, the majority of inmates (80.1%) denied current involvement in a romantic relationship (single/nonpartnered, separated, or di vorced). Participants were convicted of a variety of crimes (e.g., drug or alcohol offenses, murder, assault/battery, or robbery/theft), with 36% of inmates convicted of a violent crime and 58.6%

convicted of a nonviolent crime. Participants were serving a me dian sentence of 60 months, with 4 years being the modal sentence. At the time of this study, the inmate participants had served a median of 48 months and mode of 36 months of their adult life in prison and/or jail.

### Materials

The Client Satisfaction Questionnaire (CSQ-8; Larsen, Attkis son, Hargreaves, & Nguyen, 1979) is an eight-item, self-report measure, utilizing a 4-point Likert-type response scale to assess client satisfaction with mental health services. Initial measures of the CSQ-8 by Larsen et al. (1979) resulted in an alpha coefficient of .93, indicating good internal consistency. Furthermore, Larsen (1977) found an alpha coefficient of .92, again indicating high internal consistency. In addition, only one factor has consistently been yielded during factor analysis of the CSQ-8 (Gaston & Sabourin, 1992).

The Working Alliance Inventory (WAI; Horvath & Greenberg, 1989, 1994) is a 36-item questionnaire with three subscales used to assess different aspects of the working alliance. The three sub scales assess the following: (a) client and therapist agreement on the goals of therapy; (b) client and therapist agreement on how to reach the goals of therapy; and (c) the degree of confidence, trust, comfort, and acceptance between the therapist and client. The WAI has both client and therapist versions; however, only the client version was utilized in this study. On the WAI the client is asked—using a 7-point Likert-type scale ranging from 1 (*never*) to 7 (*always*)—to indicate which statements best describe his or her experience of the therapeutic alliance. The WAI has high internal consistency, with Cronbach's alpha ranging from .89 to .92 for the global measure and the three subscales (Horvath & Greenberg, 1989). In addition, the WAI has good convergent validity (see Horvath & Greenberg, 1989; Safran & Wallner, 1991).

The Session Evaluation Questionnaire (SEQ; Stiles, 1980; Stiles & Snow, 1984a, 1984b) was also used in this study. The SEQ measures two basic dimensions of participants' possession mood: positivity and arousal (Stiles & Snow, 1984b), which account for most of the mood variability in a variety of circumstances (Russell, 1978, 1979). The SEQ consists of 21 opposite adjective scales presented in a 7-point semantic differential format. The items are divided into two sections: session evaluation and possession mood. The stem "This session was" precedes the first 11 items for session evaluation; sample items include bad–good and safe– dangerous. The stem "Right now I feel" precedes the second 10 items for possession mood; sample items include happy–sad and angry–pleased. Factor analyses have supported the four-subscale structure of the SEQ, with good internal consistency for the four dimensions, with coefficient alphas ranging from .78 to .91 (Stiles & Snow, 1984a, 1984b).

### Procedure

Inmates were scheduled for a telemental health or face-to-face psychological or psychiatric mental health service session through

---

[1] The targeted number of participants in the telemental health psychol ogy group was 50 inmates; however, because of an injury sustained by the participating therapist, the recruitment for this group was terminated pre maturely.

160                                                                                                                          BRIEF REPORTS

regular institutional operational procedures, and they were re-cruited for participation in this study at the conclusion of one of their sessions (i.e., inmates were recruited following one of their regularly scheduled follow-up sessions). Inmates were assigned to the modality (telemental health vs. face-to-face) available at their prison and for the service (psychology or psychiatry) that was considered clinically necessary. For purposes of this study, tele-mental health referred to videoconferencing via secure satellite connection. Each psychological services session lasted approximately 30 min and generally focused on issues of adjustment and mental health stability (e.g., issues of institutional adjustment, symptom management, coping skills). Each psychiatric services session lasted approximately 20 min and focused generally on issues of symptom management (e.g., psychotropic medication reviews). One psychologist with a master's of arts degree and one psychiatrist facilitated all psychological and psychiatric sessions, respectively. Sessions were randomly attended; thus, participants were evaluated at different phases in their treatment.

After completion of their mental health session (regardless of treatment modality), inmates were asked to volunteer their participation in a study that evaluated the quality of mental health services. The only selection criterion, other than partic-ipating in a mental health session, was that the inmate had to be able to read and write in English. No incentives were offered, and participants were recruited only once. If they declined, there was no subsequent chance to participate. Inmates who declined participation returned to their housing unit or work assignment. Inmates who agreed to participate were provided a standard consent form and questionnaire packet. Partici-pants were informed of the purpose and procedures of the study, were provided an opportunity to ask questions, and were then instructed to complete the consent form and all question-naires. Participation was limited to one session (i.e., inmates completed the instruments on one occasion). All procedures

were approved through the Institution Review Boards at the Texas Tech niversity, the Texas Tech niversity Health Sci-ences Center, and the research branch of the Texas epartment of Criminal ustice.

## Results

### Psyc olo y Services ele ental ealt vs ace to ace

*Preli inary analyses* Preliminary analyses assessed the de-mographic equivalence of inmates in the telemental health and face-to-face psychology services conditions. A series of indepen-dent $t$ tests and chi-square procedures resulted in no significant differences between groups on demographic variables ( $p > .05$).

*Pri ary analyses* A one-way multivariate analysis of vari-ance procedure resulted in no significant differences between inmates receiving telemental health or face-to-face psychology services for working alliance (development of goals, reaching goals, or quality of relationship), $\Lambda(3, 82) = 0.59$, $p = .62$. There was no significant difference between inmates' evaluation of their psychology session (i.e., session depth, smoothness, positivity, or arousal) as measured by the SEQ, $\Lambda(4, 81) = 0.97$, $p = .43$, regardless of the mechanism of service delivery. Finally, inmates receiving psychology services via telemental health were similarly satisfied with the service they received (e.g., quality, met needs, would recommend, general satisfaction) when compared with in-mates receiving psychology services via a traditional face-to-face delivery method, $\Lambda(8, 77) = 1.42$, $p = .20$. See Table 1 for descriptive statistics.

### Psyc iatry Services ele ental ealt vs ace to ace

*Preli inary analysis* A series of independent $t$ tests and chi-square procedures examined group differences in the psychiatric

Table 1
*Means and Standard Deviations or t e S and S or n ates eceivin ele ealt or ace to ace Mental ealt Services*

| Questionnaire | Psychological services | | Psychiatric services | |
| --- | --- | --- | --- | --- |
| | Telehealth ($n = 36$) | Face-to-face ($n = 50$) | Telehealth ($n = 50$) | Face-to-face ($n = 50$) |
| WAI: Total score | 61.61 (16.3) | 63.98 (16.73) | 55.5 (13.45) | 59.02 (14.52) |
| WAI: evelopment of goals | 21.67 (5.24) | 21.98 (5.6) | 18.96 (3.85) | 19.7 (4.48) |
| WAI: Reaching goals | 20.47 (5.71) | 21.54 (5.69) | 18.33 (5.3) | 20.2 (5.58) |
| WAI: Quality of relationship | 19.47 (6.2) | 20.46 (6.2) | 18.18 (5.54) | 19.08 (5.78) |
| SEQ: Session depth | 18.85 (5.42) | 20.78 (5.48) | 18.71 (5.31) | 20.69 (6.39) |
| SEQ: Session smoothness | 20.74 (6.08) | 21.16 (6.24) | 19.39 (6.26) | 21.75 (6.3) |
| SEQ: Positivity | 20.52 (6.52) | 20.62 (5.78) | 18.14 (6.26) | 19.37 (7.01) |
| SEQ: Arousal | 14.87 (2.75) | 15.59 (3.53) | 15.01 (4.08) | 14.68 (4.49) |
| CSQ-1: Quality of services | 2.94 (0.8) | 3.24 (0.87) | 2.78 (1.02) | 2.65 (0.97) |
| CSQ-2: Receive services you wanted | 2.94 (0.8) | 3.04 (0.83) | 2.71 (0.94) | 2.80 (0.81) |
| CSQ-3: Program met your needs | 2.64 (0.96) | 2.74 (1.01) | 2.65 (0.88) | 2.74 (0.88) |
| CSQ-4: Recommend our program | 3.14 (0.72) | 3.28 (0.78) | 2.88 (0.9) | 2.96 (0.95) |
| CSQ-5: Satisfied with amount of help you received | 2.81 (0.89) | 3.04 (0.9) | 2.76 (0.86) | 2.68 (0.84) |
| CSQ-6: Services helped you deal with problems | 3.06 (0.83) | 3.18 (0.87) | 2.76 (0.86) | 3.04 (0.81) |
| CSQ-7: Satisfied with services you received | 2.94 (0.83) | 3.08 (0.94) | 2.84 (0.8) | 2.82 (0.85) |
| CSQ-8: Seek help again from our program | 3.28 (0.78) | 3.24 (0.9) | 2.92 (0.86) | 3.04 (0.78) |

*Note* WAI = Working Alliance Inventory; SEQ = Session Evaluation Questionnaire; CSQ = Client Satisfaction Questionnaire.

conditions. Results indicate significant differences for age ($t = 2.786$, $p = .006$), educational history ($t = -2.156$, $p = .034$), years incarcerated ($t = 4.767$, $p < .001$), and months of mental health treatment ($t = 3.665$, $p < .001$). However, as age was the only variable to be significantly correlated ($p < .05$) with the dependent variables, it was the only demographic variable held as a covariate in subsequent analyses.

*Pri ary analysis*   A one-way multivariate analysis of covariance procedure resulted in no significant differences between inmates receiving telemental health or face-to-face psychiatric services for working alliance (development of goals, reaching goals, or quality of relationship), $\Lambda(3, 94) = 1.01$, $p = .39$. Similarly, there was no significant difference between inmates' evaluation of their psychiatry session (i.e., session depth, smoothness, positivity, or arousal), $\Lambda(4, 93) = 0.666$, $p = .61$, regardless of the mechanism of service delivery. Finally, inmates receiving psychiatric services via telemental health were similarly satisfied with the service they received (e.g., quality, met needs, would recommend, general satisfaction) when compared with inmates receiving psychiatric services via a traditional face-to-face delivery method, $\Lambda(8, 89) = 0.944$, $p = .49$. See Table 1 for descriptive statistics.

Power analyses were conducted for each of the primary analyses.  sing Stevens's (2002, p. 200) table for power of Hotelling's $T^2$, we found that power for the primary analysis was between .48 and .54, except for the psychology services satisfaction analysis, which approximated .80. Stevens interprets power below .50 as inadequate and .80 as adequate power.

## iscussion

The purpose of this study was to assess and compare inmates' perceptions of the therapeutic relationship, inmates' postsession mood, and their satisfaction with mental health services delivered through two different modalities: telemental health and face-to-face. As hypothesized, there were no significant differences between telemental health and face-to-face delivery modalities for perceptions of the therapeutic relationship, postsession mood, or general satisfaction with services. Furthermore, this lack of a statistically significant difference held regardless of the type of mental health service received (i.e., psychological or psychiatric).

Findings preliminarily suggest that the modality of treatment does not influence key elements of the treatment experience, positively or negatively, and is congruent with emerging literature of telemental health outcomes research (Nelson & Palsbo, 2006; O'Reilly et al., 2007). Interestingly, the neutral relationship of treatment modality was found regardless of the role of the relationship for each type of service delivered. Whether the relationship focused upon general mental health and coping (i.e., relationship as the change agent) or medication management (i.e., a biological change agent), the neutral effect was seen.

These results are encouraging, as telemental health appears to offer an efficient means of service delivery without a loss in the quality of the therapeutic relationship. Given the demand for mental health services in criminal justice settings (Beck, &  ar-uschak, 2001;  anderscheid et al., 2004;  ears, 2004) and other underserved areas, such as rural locations (Holzer, Goldsmith, & Ciarlo, 2000), telemental health affords opportunities to reach more clients without relocating service providers geographically or

importing them physically into the service setting. Thus, the option of developing these staff resources without paying for relocation costs (both monetary and personal for the provider) is a benefit for administrators, service providers, and the inmates in need of the services.

Results of this study are particularly encouraging for criminal justice systems. Telemental health transports information and data, not inmates. As such, it offers increased safety for service providers as well as increased security and decreased transportation costs for the criminal justice system. The use of telemental health, without negative impact on the therapeutic relationship, may also broaden the range of mental health services available to inmates. Additionally, the use of telemental health offers continuity of care for releasing inmates and represents a significant contribution from a public health perspective.

As with any naturalistic study, limitations of this study should be noted. With statistically nonsignificant results, issues of statistical power are a concern, and power for this study was limited by the small sample size and number of variables. Additionally, inmates were not randomly assigned to conditions, which may have introduced selection bias into the study. Among the bias suspected, inmates housed in the psychiatric prison likely suffered greater mental health impairment than did inmates housed in the general population facilities. Among the unknown bias, variance in sample characteristics, such as prior exposure to mental health services and problem severity, all remain possible.

Future studies should employ random assignment to ensure stability of these results across inmate samples as well as to offer generalizability of these results to other correctional populations (  rupinski et al., 2006). Future studies should also investigate the utility of telemental health with other female offenders, jail populations, youthful inmates, and federally incarcerated inmates. Future studies of this nature should also obtain data from clinicians, including their perceptions regarding the impact of telemental health on the therapeutic relationship.

Future research should also begin investigating outcome effectiveness of mental health services delivered via telemental health compared with face-to-face services. From a correctional perspective, administrators would want to know whether telemental health services resulted in reduced inmate disciplinary actions, decreased incidence of harm to self or others, and/or improved mental health functioning and symptom management compared with face-to-face services. Additionally, issues of service utilization should be examined. That is, does the availability of telemental health improve inmate service use, or does it create additional barriers  If there are barriers, are these differentially related to the inmates, the correctional system, and/or the treatment providers themselves

This study represented an empirical investigation from the field and clearly indicated that the modality used for providing mental health services (i.e., telemental health vs. face-to-face) did not negatively impact key elements of the treatment experience. Specifically, the therapeutic relationship with the mental health professional, postsession mood, or overall satisfaction with services received were not different between telemental health and face-to-face treatment modalities. Importantly for administrators, mental health service providers, and inmates alike, this neutral effect was observed across two different types of mental health services. Thus, these results highlight efficient and economical service delivery options for underserved populations (inmates) and possi-

CDCR _277

BRIEF REPORTS

bly to other underserved areas (rural geographic regions) without compromise to treatment integrity from the consumer's perspective.

## References

Ax, R. ., Fagan, T. ., agaletta, P. R., organ, R. ., Nussbaum, ., & White, T. W. (2007). Innovations in correctional assessment and treatment Special issue . *ri inal ustice and e avior* 893–905.

Beck, A. ., & aruschak, L. . (2001). *Mental ealt treat ent in prisons* (Bureau of ustice Statistics Special Report). Washington, C: .S. epartment of ustice.

iamond, P. ., Wang, E. W., Holzer, C. E., III, Thomas, C. R., & Cruser, . A. (2001). The prevalence of mental illness in prison: Review and policy implications. *d inistration and Policy in Mental ealt* 21–40.

Gaston, L. (1990). The concept of the alliance and its role in psychotherapy: Theoretical and empirical considerations. *Psyc ot erapy* 143–153.

Gaston, L., & Sabourin, S. (1992). Client satisfaction and social desirability in psychotherapy. *valuation Pro ra Plannin* (3), 227–231.

Hipkins, . H. (1997). Telemedicine in correctional systems. In R. L. Bashur, . H. Sanders, & G. W. Shannon (Eds.), *ele edicine eory and practice* (pp. 375–389). Springfield, IL: Charles C. Thomas.

Holzer, C. E., III, Goldsmith, H. F., & Ciarlo, . A. (2000). The availability of health and mental health providers by population density. *ournal o t e as in ton cade y o Sciences* 25–33.

Horvath, A. O., & Bedi, R. P. (2002). The alliance. In . C. Norcross (Ed.), *Psyc ot erapy relations ips t at wor erapists contri utions and responsiveness to patients* (pp. 37–69). New ork: Oxford niversity Press.

Horvath, A. O., & Greenberg, L. S. (1989). The development and validation of the Working Alliance Inventory. *ournal o ounselin Psyc ol o y* 223–233.

Horvath, A. O., & Greenberg, L. S. (1994). *e or in lliance eory researc and practice* New ork: Wiley.

rupinski, E., immick, S., Grigsby, ., ogel, G., Puskin, ., Speedie, S., et al. (2006). Research recommendations for the American Telemedicine Association. *ele edicine ournal ealt* (5), 579–589.

Lambert, . ., Shapiro, . A., & Bergin, A. E. (1986). The effectiveness of psychotherapy. In S. L. Garfield & A. E. Bergin (Eds.), *and oo o psyc ot erapy and e avior c an e* (3rd ed., pp.157–211). New ork: Wiley.

Larsen, . L. (1977). *n ancin client utili ation o co unity ental ealt outpatient services* npublished doctoral dissertation, niversity of ansas.

Larsen, . L., Attkisson, C. C., Hargreaves, W. A., & Nguyen, T. . (1979). Assessment of client/patient satisfaction: evelopment of a general scale. *valuation and Pro ra Plannin* 197–207.

agaletta, P. R., Fagan, T. ., & Ax, R. . (1998). Advancing psychology services through telemental health in the Federal Bureau of Prisons. *Pro essional Psyc olo y esearc Practice* 543–548.

agaletta, P. R., Fagan, T. ., & Peyrot, . F. (2000). Telemental health in the Federal Bureau of Prisons: Inmates' perceptions. *Pro essional Psyc olo y esearc Practice* 497–502.

anderscheid, R. W., Gravesande, A., & Goldstrom, I. . (2004). Growth of mental health services in state and adult correctional facilities, 1988–2000. *Psyc iatric Services* 869–872.

artin, . ., Garske, . P., & avis, . . (2000). Relation of the therapeutic alliance with outcome and other variables: A meta-analytic review. *ournal o onsultin and linical Psyc olo y* 438–450.

ears, . (2004). ental health needs and services in the criminal justice system. *ouston ournal o ealt aw and Policy* 255–284.

Nelson, E., & Palsbo, S. (2006). Challenges in telemedicine equivalence studies. *valuation and Pro ra Plannin* 419–425.

O'Reilly, R., Bishop, ., addox, ., Hutchinson, L., Fisman, ., & Takhar, . (2007). Is telepsychiatry equivalent to face-to-face psychiatry Results form a randomized controlled equivalence trial. *Psyc iatric Services* 836–843.

Russell, . A. (1978). Evidence of convergent validity on dimensions of affect. *ournal o Personality and Social Psyc olo y* 1152–1168.

Russell, . A. (1979). Affective space is bipolar. *ournal o Personality and Social Psyc olo y* 345–356.

Safran, . ., & Wallner, L. . (1991). The relative predictive validity of two therapeutic alliance measures in cognitive therapy. *Psyc olo ical ssess ent ournal o onsultin and linical Psyc olo y* 188–195.

Stevens, . P. (2002). *pplied ultivariate statistics or t e social sciences* (4th ed.). ahwah, N : Erlbaum.

Stiles, W. B. (1980). easurement of the impact of psychotherapy sessions. *ournal o onsultin and linical Psyc olo y* 176–185.

Stiles, W. B., & Snow, . S. (1984a). Counseling session impact as viewed by novice counselors and their clients. *ournal o ounselin Psyc ol o y* 3–12.

Stiles, W. B., & Snow, . S. (1984b). imensions of psychotherapy session impact across sessions and across clients. *ritis ournal o linical Psyc olo y* 59–63.

Swansea, N. S. (2006). The use of telemedicine in psychiatry. *ournal o Psyc iatric and Mental ealt Nursin* 771–777.

Tucker, W., Olfson, ., Simring, S., Goodman, W., & Bienefeld, S. (2006). A pilot survey of inmate preferences for on-site, visiting consultant, and telemedicine psychiatric services. *NS Spectru s* (10), 783–787.

andenBos, G. R., & Williams, S. (2000). The Internet versus the telephone: What is telemental health, anyway *Pro essional Psyc olo y esearc Practice* 490–492.

Received April 19, 2007
Revision received October 15, 2007
Accepted October 17, 2007 ∎

# ATTACHMENT 15

**HHS Public Access**
Author manuscript
*J Cad ild dolesc Psyc iatry*. Author manuscript; available in P C 2016 April 01.

Published in final edited form as:
*J Cad ild dolesc Psyc iatry*. 2015 April ; 54(4): 263–274. doi:10.1016/j.jaac.2015.01.009.

# Effectiveness of a Telehealth Service Delivery Model for Treating Attention-Deficit/Hyperactivity Disorder: A Community-Based Randomized Controlled Trial

**Kathleen Myers, MD, MPH, MS**, **Ann Vander Stoep, PhD**, **Chuan Zhou, PhD**, **Carolyn A. McCarty, PhD**, and **Wayne Katon, MD**

Drs. Myers, Vander Stoep, Zhou, McCarty, and Katon are with the University of Washington School of Medicine, Seattle. Drs. Vander Stoep and Zhou are also with the School of Public Health at the University of Washington. Drs. Myers, Vander Stoep, Zhou and McCarty are also with the Seattle Children's Research Institute.

## Abstract

**Objective**—To test the effectiveness of a telehealth service delivery model for the treatment of children with attention-deficit/hyperactivity disorder (A H ) that provided pharmacological treatment and caregiver behavior training.

**Method**—The Children's A H Telemental Health Treatment Study (CATTS) was a randomized controlled trial with 223 children referred by 88 primary care providers (PCPs) in 7 communities. Children randomized to the experimental telehealth service model received 6 sessions over 22 weeks of combined pharmacotherapy, delivered by child psychiatrists through videoconferencing, and caregiver behavior training, provided in person by community therapists who were supervised remotely. Children randomized to the control service delivery model received treatment with their PCPs augmented with a telepsychiatry consultation. Outcomes were diagnostic criteria for A H and oppositional defiant disorder (O ) and role performance on the anderbilt A H Rating Scale ( A RS) completed by caregivers ( A RS-Caregivers) and teachers ( A RS-Teachers) and impairment on the Columbia Impairment Scale-Parent ersion (CIS-P). easures were completed at 5 assessments over 25 weeks.

**Results**—Children in both service models improved. Children assigned to the telehealth service model improved significantly more than children in the augmented primary care arm for A RS-Caregiver criteria for inattention ($\chi^2$ 4 19.47, p .001), hyperactivity ($\chi^2$ 4 11.91, p 0.02), combined A H ($\chi^2$ 4 14.90, p 0.005), O ($\chi^2$ 4 10.05, p 0.04), nd A RS-Caregiver role performance ($\chi^2$ 4 12.40, p 0.01) nd CIS-P impairment ($\chi^2$ 4 20.52, p .001). For the A RS-Teacher diagnostic criteria, children in the telehealth service model had significantly

2015 American Academy of Child and Adolescent Psychiatry.

Correspondence to athleen yers, , PH , S, Seattle Children's Research Institute, PO Box 5371, 4800 Sand Point Way, NE, Seattle WA 98105; athleen.myers seattlechildrens.org.

**Publisher's Disclaimer:** This is a P F file of an unedited manuscript that has been accepted for publication. As a service to our customers we are providing this early version of the manuscript. The manuscript will undergo copyediting, typesetting, and review of the resulting proof before it is published in its final citable form. Please note that during the production process errors may be discovered which could affect the content, and all legal disclaimers that apply to the journal pertain.

rs. hou, cCarty, and aton report no biomedical financial interests or potential conflicts of interest.

more improvement in hyperactivity ($\chi^2$ 4 11.28, p0.02) nd ombined A H ($\chi^2$ 4 9.72, p 0.045).

**Conclusion**—The CATTS trial demonstrated the effectiveness of a telehealth service model to treat A H in communities with limited access to specialty mental health services.

**Clinical trial registration information**—Children's Attention eficit isorder With Hyperactivity (A H ) Telemental Health Treatment Study; http://clinicaltrials.gov; NCT00830700.

### Keywords

Telepsychiatry; telehealth with children; telemental health with children; telehealth for A H ; mental health treatment for children in rural communities

## Introduction

Children who live outside of metropolitan areas experience disproportionately poor access to the expert mental health workforce and to evidence-based mental health treatment.[1–5] Federal mandates have promoted the use of technology to address such disparities. The American Recovery and Reinvestment Act (ARRA, February 17, 2009; http://www.recovery.gov/arra/About/Pages/The Act.aspx) mphasized the use of information technologies to improve healthcare delivery, and the Patient Protection and Affordable Care Act (ACA; Public Law 111-148; arch 23, 2010; http://www.hhs.gov/strategic-plan/goal1.html) pecifically proposed the meaningful use of telehealth technologies to improve health care and population health for all citizens. The Health Resources and Services Administration (HRSA) defines telehealth as "The use of electronic information and telecommunications technologies to support and promote long-distance clinical health care, patient and professional health-related education, public health, and health administration (http://www.hrsa.gov/ruralhealth/about/telehealth/glossary.html). When telehealth relies on synchronous (interactive) technologies, such as videoconferencing or telephony to deliver medical care to patients, the Center for edicare and edicaid (C S; (http://www.cms.gov/Telemedicine/) uss the term "telemedicine"; and when that care specifically involves mental health or psychiatric services, the terms "telemental health" (T H) and "telepsychiatry," respectively, are generally used.[6] Asynchronous, or delayed, telehealth technologies promote the dissemination of evidence-based care by viewing recordings of clinical care or sharing information through the use of patient portals, websites, and social media.

In sponse to federal mandates,[7] telehealth programs have developed rapidly across the country, but the evidence base supporting their effectiveness is emerging gradually. Several studies have shown that synchronous T H that delivers services directly to children is feasible and acceptable to primary care providers (PCPs),[8–9] prents,[10] and youth,[11] and that T H can be used reliably to establish diagnoses.[12–13] A few preliminary studies have suggested that care provided through synchronous telehealth is effective in improving outcomes for children with mental health conditions, but these studies are limited by pre- to post-intervention study designs and/or very small samples.[14–17] Asynchronous telehealth

CDCR _281

yers et al.                                                                                                    Page 3

technologies show promise for training clinicians in the delivery of evidence-based mental health care. One study examined the impact of technology on improving pediatricians' adherence to guideline-based care for the assessment and treatment of children with attention-deficit/hyperactivity disorder (A H ).[18] Pediatric practices were randomized to a quality improvement model, including a Web-based A H registry to track patients' care and to manage data collected from standardized rating scales versus practice as usual. The intervention group significantly improved their adherence to guideline-based care, sustained these gains over six months, and showed further continuous quality improvements at two years.[19]

To bring telehealth service delivery models for children into mainstream mental healthcare, additional well-designed effectiveness studies are needed. A H is a disorder that is well suited to test the effectiveness of telehealth service models, as it is a prevalent, impairing, and treatable condition with well-established treatment guidelines. [20–22] ost children with A H living in non-metropolitan areas are treated by their PCPs,[23] for whom the delivery of mpirically supported mental health care continues to be challenging,[24–26] particularly as most children with A H described in community studies have comorbid mental health conditions.[27–29] Telehealth can provide access to the expert mental health workforce to assist PCPs and patients with low mental health service capacity.[6–7; 30–33] Within this context, we present findings from a community-based effectiveness trial designed to determine whether children who received treatment through a telehealth service model demonstrated better outcomes than children who received treatment in primary care augmented with a single telepsychiatry consultation.

## METHODS

### Study Design

The Children's A H Telehealth Treatment Study (CATTS) was a community-based randomized controlled trial (RCT) that compared the effects of two service delivery models on outcomes for children with A H . The RCT was approved by the institutional review board of eattle Children's Research Institute and monitored by a data safety and monitoring board. The methodology for the trial has been described in detail elsewhere [34–35] and is summarized below.

### Study Sample and Setting

Between November 2009 and August 2012, we recruited children (5.5 to 12 years old) from the practices of PCPs in seven underserved communities distributed over a 40,000 square mile geographic area that spanned from western to central Washington and north central Washington to north central Oregon. Any PCP practicing in proximity to the study sites could refer children with possible A H to the trial regardless of whether they had participated in our telepsychiatry service.[36] All study services were provided at community clinics that had high bandwidth videoconferencing connections (384 kbits/sec to 1.0 B/sec). Sites included outreach clinics of Seattle Children's Hospital (SCH) (n  4), an SCH-affiliated specialty clinic (n  1), a large pediatric practice (n  1), and a frontier community mental health center (n  1). Children were eligible if they met diagnostic criteria for A H ,

*cad  ild  dolesc Psyc iatry*. Author manuscript; available in P  C 2016 April 01.

yers et al.                                                                                                            Page 4

were between ages 5.5 and 12.9 years, resided with English-speaking caregivers, and were enrolled in school Exclusionary criteria included being in state custody, unavailability of the legal guardian, or having medical, developmental, or psychiatric disorders that required interventions beyond the scope of the study. Based on experience in our telepsychiatry clinic.[36] we anticipated that PCPs would refer mainly children with A H and comorbid mental health conditions to the trial.

**Procedures**

Clinical eligibility was determined in a three-step process. We reviewed records submitted by rferring PCPs to determine exclusionary conditions. Caregivers then completed the Child Behavior Checklist (CBCL)[37] onine. If the CBCL A H diagnostic subscale T-score was 65, the child was eligible for recruitment. Caregivers then met in person at the community clinic with a CATTS therapist who administered informed consent and three modules of the Computerized iagnostic Interview Schedule for Children based on the *DSM* 20 (C ISC-I ) [38] to confirm that the child had a diagnosis of A H during the past month and to establish the presence of comorbid generalized anxiety disorder (GA ) and/or oppositional defiant disorder (O ). Consistent with prior approaches,[29, 39] to establish baseline comorbid disorders, we considered an anxiety disorder (A ) present if caregivers endorsed criteria of the C ISC-I module for GA or if the child's T-score on the CBCL *DSM* -Oriented Anxiety Problem Subscale was 70. Similarly, we considered O present if the child met diagnostic criteria on the C ISC-I O module or if the child's T-score on the CBCL *DSM* -Oriented Oppositional- efiant Problems Subscale was 70.

Children were then administered assent; caregivers and teachers completed a baseline assessment.

We carried out block randomization with stratification by age group (5.5–9.9 vs. 10.0–12.9 years) and site (n 7). A statistician generated a set of random numbers with an allocation ratio of 1:1 for assignment to one of two service models: 1) the CATTS telehealth service delivery model and 2) the primary care service delivery model with teleconsultation. The statistician used the random numbers to prepare a logbook with assignments listed in consecutive order.[34] Participants and clinicians were not blinded to intervention assignment, but teachers and research assistants who managed data collection were blinded.

Caregivers and teachers completed follow-up assessments online at four time points: 4, 10, 19, nd 25 eeks post-randomization.[34] The 25-week assessment was timed to be administered three weeks after the final treatment session. The same caregiver completed each assessment and designated one teacher to complete all teacher assessments. However, because enrollment occurred throughout the year, some children advanced to the next grade or moved lassrooms during the trial. Thus, for 14% of participants in each arm, two teachers were identified to complete assessments. Of the five research assessments, caregivers completed a mean of 4.8 0.7 and teachers completed a mean of 3.3 0.7 assessments; 91.0% and 94.7% of caregivers in the CATTS telehealth service delivery model and augmented primary care arms, respectively, completed at least four assessments. The Consolidated Standards of Reporting Trials (CONSORT) diagram is shown in Figure 1.

*cad ild dolesc Psyc iatry*. Author manuscript; available in P C 2016 April 01.

**Interventions: CATTS Telehealth Service Delivery and Augmented Primary Care**

The CATTS trial adopted a telehealth service delivery model appropriate for time-limited collaboration with PCPs, focusing on reduction of children's ADHD-related symptoms and improved caregiver management of children's behaviors. The telehealth service delivery model utilized both synchronous and asynchronous technologies. We used videoconferencing to provide children with the scarce resource of child psychiatrists who were located at Seattle Children's Hospital. We used multiple asynchronous telehealth technologies to train master's-level community therapists in an evidence-based caregiver behavior training intervention for children with ADHD.[40, 41] Trained therapists would then serve as an enduring resource for communities. The two service-delivery arms are summarized below. [34, 40]

**CATTS Telehealth Service Delivery—**The CATTS telehealth service delivery provided six sessions spaced three to four weeks apart over 22 weeks consisting of combined pharmacotherapy and caregiver behavior training. Our decision to provide combined treatment was based on findings of high rates of comorbid psychiatric conditions, particularly oppositional defiant behaviors and anxiety symptoms, among community samples of children with ADHD,[27–29] and on the increasing expectation for PCPs to manage routine cases of ADHD in their practices.[18, 23–26] Empirical evidence [29, 42–43] and the practice guidelines for ADHD [21–22] indicate that a combined treatment model yields optimal outcomes for children with ADHD and comorbid oppositional defiant behaviors and anxiety symptoms.

**Telepsychiatry—**The principal investigator ( . .) developed a manual to train the child psychiatrists to deliver evidence-based pharmacological care for ADHD through videoconferencing. Each of the six sessions included pharmacotherapy based on the five ADHD algorithms in the Texas Children's Medication Algorithm Project (TCMAP) [44] and a session-specific module of psychoeducation based on the neurobiology of ADHD.[45] The modules included: 1) Role of Medication in ADHD Treatment; 2) Central Nervous System (CNS) Involvement: ADHD Symptoms and Treatment Focus; 3) CNS Involvement: The Prefrontal Cortex and Executive Functioning; 4) Conditions Comorbid with ADHD; 5) Long Term Course and Potential Consequences of ADHD; 6) Review and Implications for the Individual Child.

**Caregiver Behavior Training—**The study's research psychologist (C. .) developed and recorded a series of behavior training sessions for caregivers.[40] Master's-trained community therapists hired for the study accessed the digitized recordings through a secure website, discussed the training cases with the psychologist, and practiced the intervention with two volunteer families. They then provided the caregiver behavior training in person.

The caregiver behavior training intervention and manual were developed based on key elements of evidence-based parent training programs for elementary school-aged children.[46–48] The manual included a description of the sequentially delivered core elements for each session with sample scripts for teaching skills to caregivers. The six modules included: 1) Understanding ADHD and Your Child: Understanding Antecedents and

CDCR _284

Consequences of Behavior; 2) School Advocacy; 3) Praising and Ignoring Skills; 4) Giving Clear Instructions and Follow-Through; 5a) Time-Out and Other Consequences (5.5–9 years old) and 5b) Point System for Behavior (10–12 years old); and 6) Putting It All Together. Therapists gave caregivers handouts and assigned skills to practice between sessions. ust prior  lte end of each telepsychiatry session, the community therapist joined the session at the patient site and transitioned to the caregiver behavior training. We conducted team meetings weekly with the therapists at their sites and staff at the research hub through videoconferencing. The psychologist carried out small group supervision via telephone. Between sessions, therapists exchanged documents with the research staff through an asynchronous Web portal; during sessions, they shared clinical data with the telepsychiatrists through a synchronous website. [34, 41]

**Primary Care Service Delivery Augmented With a Teleconsultation—**Children randomly assigned to the control condition remained in the care of their PCPs and received a single consultation with a telepsychiatrist, who shared treatment recommendations with the referring PCP. The telepsychiatrists were instructed to provide a comprehensive consultation consistent with their outpatient practice, including medication alternatives and any relevant recommendations for other mental health specialists and school programs. PCPs were not restricted from referring to other resources, including other services at Seattle Children's Hospital. We included an active control arm for several reasons. As telehealth programs develop, clinical, organizational, and financial stakeholders such as third party payers must decide whether to provide consultation to PCPs, a model that efficiently utilizes the expert mental health workforce, or to provide direct service to youth and families, a model that approximates parity with traditional mental health care. Comparing results of these two service delivery models would help stakeholders in their decision-making. As PCPs in non-metropolitan communities usually do not have the opportunity to participate in research,[49] we also thought that an active control arm would incentivize them to refer to the trial. Finally, as many of the participating communities had telepsychiatry services, we deemed that ethically we could not proscribe access to an established community resource.

In  bdt  ms, telepsychiatrists and therapists used checklists that outlined the essential treatment components to address during each session. All sessions were recorded, and sessions were randomly selected to rate the clinicians' coverage of these components. Telepsychiatrists and therapists showed high fidelity to their protocols.[34–35, 40]

## Outcome Measures

The outcomes were caregiver- and teacher-rated improvement in A H -related symptoms and behaviors, role performance, and functional impairment across the 25-week follow-up period (http://clinicaltrials.gov/show/NTC00830700). A H , O , and role performance were assessed with the anderbilt A H Rating Scales ( A RS) by caregivers ( A RS-Caregivers) and teachers ( A RS-Teachers).[50] The A RS scales include subscales of inattention (9 items), hyperactivity/impulsivity (9 items), oppositional defiant behaviors (8 items), and role performance related to academic, classroom, and interpersonal functioning (8 tems). A RS diagnosis-based items are based upon the *DSM* [20] criteria for A H and are rated on a 4-point Likert scale. The A RS shows a 2-factor model of inattention

CDCR _285

and hyperactivity/impulsivity consistent with a diagnosis of ADHD and has demonstrated solid psychometric properties.[51–52] In the CATTS trial, the concurrent validity of the item total of the ARS-Caregiver and the ADHD symptom scores on the CDISC-IV was high (r .79). We scored the ARS forms using their diagnosis-based algorithms for inattention, hyperactivity, combined ADHD, and ODD, thereby producing binary outcomes (diagnosis yes/no). The continuous role performance scale was scored by summing the item severity ratings.

The child's level of functional impairment was assessed with the Columbia Impairment Scale, Parent-Report Version (CIS-P).[53] The CIS-P has 13 items that tap impairment across domains of interpersonal relations, psychopathology, schoolwork or job, and use of leisure time and map onto a one-dimensional factor. Its reported internal consistency reliability and validity are very good.[53] In the CATTS trial, internal consistency at baseline was high (Chronbach's alpha .84). The CIS-P is scored by summing the item severity ratings.

**Statistical Analysis**

We conducted intention-to-treat analyses. To evaluate the robustness of the randomization, we tested whether there were differences in demographic characteristics and baseline clinical status using chi-square test of proportions for diagnostic/binary variables and T-test for continuous variables. We found the number of comorbid conditions was unbalanced between the two arms and, therefore, controlled for comorbidity in subsequent regression analyses.

To test overall intervention effects, we applied Wald Chi-square tests to determine whether all four interaction terms were zero simultaneously or whether significantly more improvement in one arm occurred at least once during the four assessments. Then we evaluated individual interaction coefficients to determine when the significant differences occurred during the longitudinal assessments.[54]

In the longitudinal data analyses, we applied logistic mixed effects models to the binary outcomes and linear mixed effects models to the continuous outcomes. A patient-specific random intercept was included in all models to account for the within-subject correlations due to repeated assessments. In the mixed effects models, we included main effects for treatment arms, time (week of assessment), comorbid conditions, and interaction terms between treatment arms and time. We modeled time as a discrete predictor with five levels corresponding to baseline, week 4, 10, 19, and 25. Then we evaluated the coefficients on the interaction terms to capture the differences in rates of improvement from baseline to each follow-up assessment between the two study arms. The coefficient on the main group effect tested differences between study arms at baseline. The coefficients on the main time effect tested the differences between each follow-up assessment and baseline for the augmented primary care arm. The coefficients on the group-by-time interaction tested whether children in the CATTS telehealth service delivery achieved more improvement from baseline than children in the augmented primary care arm. For these binary outcomes, the odds ratio estimates on the interaction terms or their logarithmic transformations provide adjusted effect size estimates.[55]

*Acad Child Adolesc Psychiatry*. Author manuscript; available in PMC 2016 April 01.

For the continuous outcomes measuring functioning, we reported beta coefficients from linear mixed effects models. In addition, we reported Cohen's d based on between-study arm comparisons of within-individual changes in scale scores from baseline to 25-week follow-up.  In study such as ours, where adjustments are warranted for uneven distribution of confounding variables across study arms and for features of the study design (longitudinal, nested structure), the Cohen's d statistic provides a rough indication of effect size.

Analyses were conducted using Stata 12.1.[56] We set the significance level at 0.05, a priori.

## RESULTS

### Participants, Engagement, and Characteristics of the Study Arms

Eighty-eight PCPs made successful referrals to the trial. The sample consisted of 223 children with mean age 9.25 (  2.0) years, predominantly of European/white ancestry (91.5%),  with a median annual family income of   35,000 to   75,000. Seventy-five percent of  hildren (n  168) had at least one comorbid disorder. Forty-two percent (n  93) met criteria for O    , and 6% (n  13) met criteria for A  ; 28% (n  62) met criteria for O     and A  .

Of the six possible sessions, participants randomized to the CATTS telehealth service delivery arm (n  111) attended an average of 5.2 (range 0 to 6) telepsychiatry sessions and an average of 5.1 (range 0 to 6) caregiver behavior training sessions. Of participants randomized to the augmented primary care arm (n  112), 94.6% attended their telepsychiatry consultation session.

As shown in Table 1, the demographic characteristics of children in the CATTS telehealth service delivery and augmented primary care arms were comparable with no statistically significant differences between the groups. Clinical characteristics were also well balanced with one exception. A higher proportion of children in the CATTS telehealth service delivery arm had A   H   with both comorbid disorders; therefore, we adjusted for comorbidity status (0,1, 2 comorbidities) in multivariate analyses.

### Caregiver-Rated Outcomes by Intervention Status

Figure 2 graphically shows the unadjusted proportions of participants in the CATTS telehealth service delivery and augmented primary care arms who met   A  RS-Caregiver-based diagnostic criteria at baseline and at 4, 10, 19, and 25-week follow-up. At baseline, participants in the two arms had similar occurrence of meeting    A  RS-Caregiver diagnostic criteria for inattention (intervention vs. control: 83% vs. 82%), hyperactivity (67%  vs  58%), ombined A  H  (60% vs. 52%), and O    (61% vs. 51%). Children in both  tudy arms improved over time. At 25 weeks, compared with children in the augmented primary care arm, lower proportions of children in the CATTS intervention arm met diagnostic criteria on the   A  RS-Caregiver: inattention (23% vs. 48%), hyperactivity (16% vs. 31%), combined A   H   (12% vs. 26), and O    (16% vs. 26%).

The steeper decline in the unadjusted proportions of children in the CATTS telehealth service delivery arm meeting diagnostic criteria shown in Figure 2 were formally tested.

*cad   ild   dolesc Psyc iatry*. Author manuscript; available in P  C 2016 April 01.

According to the tests of overall intervention effects, the CATTS telehealth service delivery arm demonstrated greater improvements at least once during follow-up assessment in all four ADHD-Caregiver diagnostic outcomes: inattention (Wald $\chi^2$ 19.47, df 4, p .001), hyperactivity/impulsivity (Wald $\chi^2$ 11.91, df 4, p 0.02), combined ADHD (Wald $\chi^2$ 14.90, df 4, p .005), and ODD (Wald $\chi^2$ 10.05, df 4, p 0.04).

Table 2 shows the course of the ADHD-caregiver ratings. The coefficients on the main time effect indicate the significant improvement for the augmented primary care arm, and the coefficients on the group-by-time interaction indicate the greater improvement for the CATTS telehealth service delivery arm, which were evident by week 10 for hyperactivity and combined ADHD, and by week 19 for inattention and ODD.

Functional improvements also differed by intervention status. At baseline, the average ADHD-Caregiver role performance scores were comparable between the CATTS telehealth service delivery and augmented primary care arms.

According to the tests of overall differences, children in the CATTS telehealth service delivery demonstrated significantly greater improvement from baseline to follow-up assessments in ADHD-Caregiver role performance (Wald $\chi^2$ 12.40, df 4, p 0.01) and CIS-P impairment scores (Wald $\chi^2$ 20.52, df 4, p .001). As noted in Table 3, these significant intervention differences were noted at 19 weeks for CIS-P impairment (12.80 6.95 vs 15.11 9.58, p .05) and at 25 weeks for ADHD-Caregiver role performance (2.96 0.67 vs 3.21 0.77, p .01). Looking at within-participant changes between baseline and 25-week follow-up, we estimated that the CATTS telehealth service delivery achieved an effect size of 0.38 (Cohen's d) on the ADHD-Caregiver rated role performance, and 0.44 on the CIS-P.

**Teacher-Rated Outcomes by Intervention Status**

Figure 3 graphically depicts the unadjusted proportions of participants in the CATTS telehealth service delivery and augmented primary care arms who met ADHD-Teacher-based diagnostic criteria at baseline and at 4-, 10-, 19-, and 25-week follow-up. At baseline, participants in the two arms had a similar occurrence of meeting ADHD-Teacher diagnostic criteria for inattention, hyperactivity, combined ADHD, and ODD, and both groups improved over time.

According to the tests of overall intervention effects, the ADHD-Teacher scores demonstrated significantly greater improvements at least once for the CATTS telehealth service delivery arm for hyperactivity (Wald $\chi^2$ 11.28, df 4, p 0.02) and total ADHD (Wald $\chi^2$ 9.72, df 4, p 0.045). As indicated in Table 2, results of logistic mixed effects regression models show that these intervention effects reflected significant differences only at week 10. There was no difference in outcomes between the intervention arms for inattention and ODD.

As shown in Table 3, results of linear mixed effects models indicate that improvements in ADHD-Teacher-reported role performance scores did not differ significantly between the two study arms. Evaluation of the within-subject changes between baseline and 25-week

CDCR _288

follow-up yields an estimated effect size of 0.37 (Cohen's d) for the CATTS telehealth service delivery arm, similar to caregiver-reported role performance.

We conducted sensitivity analyses with additional demographics (age, gender, and parental education) and site indicators in the models. There were no significant changes in the intervention effects estimates, consistent with the balance among these factors achieved in our randomization.

## DISCUSSION

The CATTS trial is the first community-based investigation testing the effectiveness of a telehealth service delivery model to improve mental health outcomes for children, and the only trial comparing a telehealth service delivery model with a primary care service model. The trial demonstrated that both the short-term CATTS telehealth service delivery and the augmented primary care treatment arms were associated with reductions in caregiver-reported A H and O diagnoses and improvement in role performance and impairment over 25 weeks, and that the telehealth service model performed better than the augmented primary care model. These results are broadly consistent with prior findings, that children with A H and comorbid disorders who were treated in person over a longer duration with a combined intervention improved more than those treated in primary care.[57] They support the "added value" of providing short-term expert care through telehealth over treatment in primary care.

For most measures, significant differences between the CATTS telehealth service delivery and the augmented primary care arms did not emerge until 10- to 19-weeks post-randomization, possibly reflecting the CATTS short-term intervention model with fewer and less frequent caregiver training sessions than delivered in prior trials conducted in person, or the lack of an initial washout and titration of medication to an individual optimal dose.[27, 28, 42, 48, 57–58] Alternatively, the single teleconsultation may have led PCPs to initiate successful treatment, consistent with other telehealth studies,[59–61] thereby delaying the emergence of differences between the treatment arms, but a teleconsultation may have been insufficient to sustain benefits, consistent with adult studies that have shown inadequate management of chronic conditions in primary care.[62–63] By the 10-week assessment, families had participated in three telepsychiatry and three caregiver behavior training sessions, and by the 19-week assessment, they had participated in 5 combined sessions. There may be a critical minimal number of sessions needed to detect group differences, and/or the caregiver training sessions may need to be conducted more closely together to detect differences over a shorter timeframe.

The more limited benefits for the CATTS intervention for teacher-rated outcomes reflect several factors. Behavioral treatments yield the largest effects in the setting in which they are implemented,[48, 58] and interventions provided directly to teachers have shown improved A H related behaviors per both teacher ratings and observations.[57, 64–65] The CATTS service delivery model may have benefitted with the addition of a school component in which teachers provided more frequent feedback during medication adjustment through an asynchronous website and received consultation regarding classroom behavior management

cad ild dolesc Psyc iatry. Author manuscript; available in P C 2016 April 01.

through videoconferencing.[65]    ethodological issues may have contributed to the teacher-reported outcomes. Eligibility was determined on the basis of caregiver ratings, but caregivers and teachers only correlate moderately in their descriptions of youth characteristics. Consistent with prior studies,[65, 67] teachers rated lower levels of A  H symptoms, O   , and role performance than caregivers on the same scales leaving less room for  mprovement over the course of the trial and attenuating observed effect sizes. Future work should consider both caregiver and teacher reports in determining study eligibility and use telehealth technologies to include teachers in intervention trials. Outcomes should include objective school outcomes measures, such as behavioral observations or homework completion.

There are several implications of the CATTS trial for future work. Investigators may be interested in determining the relative contributions of the pharmacologic and behavioral treatment components of the CATTS telehealth service delivery, particularly for subgroups of  hildren with A  H   , for example those with and without comorbid disorders or learning disabilities, or for families that have access to one but not both of the treatment components. Of note in the current study, children in the CATTS telehealth service delivery showed improvements in both A  H   symptoms, which may preferentially respond to pharmacologic interventions,[68–69] as well as O   , role performance, and impairment outcomes, which may preferentially respond to behavioral interventions. [70–71]

Sustainability of the two models is important to further development of telehealth programs. Increasingly, states are mandating coverage for telehealth,[72–73] and third party payers are reimbursing synchronous telehealth services [74–76]  u ing specific Current Procedural Terminology (CPT) codes.[77–78] Telepsychiatry appears to be reimbursed more predictably than teletherapies, particularly by federal and state programs.[74–76, 78] Further work to establish the effectiveness of delivering caregiver behavior training through videoconferencing will promote the sustainability of teletherapies that can help to reduce the burden  of  ental illness for families who are not well served by usual models of care.[79]

Telehealth is well poised to contribute to efforts by Accountable Care Organizations (ACOs) to provide mental health care to children living in underserved areas,[78] and future work should examine the cost to benefit of a range of telehealth models of care for A  H implemented at the population level[80] and determine the optimal mix of intervention components and number of sessions needed to effectively and efficiently improve children's mental health.

The CATTS trial had several limitations. The augmentation of primary care treatment with a teleconsultation may have yielded smaller group differences than would have been evident if we had used it as a treatment-as-usual control.    ethodological issues may have contributed to the teacher-reported outcomes. Compared to caregivers, teachers completed fewer assessments with inconsistency in teacher reporters for some children, which introduced greater variance for teacher-reported outcomes. Overall, the trial may have been underpowered to detect group differences for teacher-rated outcomes. The sample may have been biased by referral from PCPs who were willing to use telehealth services and/or who

*cad    ild   dolesc Psyc iatry.* A thor manuscript; available in P   C 2016 April 01.

CDCR _290

referred children with more complicated symptomatology, and by the exclusion of children with complex medical, developmental, and psychiatric disorders.

## Acknowledgments

The design and conduct of the study; collection, management, analysis, and interpretation of the data; and preparation of the manuscript was supported by funding from the National Institute of ental Health (NI H; 1R01 H081997 and R01 H081997-04S1). Funding for pilot data was provided by the niversity of Washington Institute of Translational Health Sciences Small Pilot Project Grant program (566821); the niversity of Washington Royalty Research Fund program (65-4020); and the American Academy of Child and Adolescent Psychiatry Abramson Fund (506200020101).

r. hou served as the statistical expert for this research.

The authors wish to thank all of the families who participated in the Children's A H Telemental Health Treatment Study. They are grateful to the staff and therapists from the Seattle Children's Research Institute who worked with the families and helped to bring the study to completion: Heather iolette, Ph ; Gina im, BA; Sarah Grover, BS; ane oltracht, BA; uet uhn Tse, BA; essica Garcia, BA; Laura Aviles, SW; Aloma Burrows, ed; Lila Waldron, S; Corrie Piper, FT; and oan Arrasmith, Ed. A special thanks to elly Thompson, SW, from the niversity of Washington.

isclosure: r. yers has received research funding from the Seattle Children's Research Institute (Intramural). She is an editor of Telemental Health: Clinical, Technical, and Administrative Foundations for Evidence-Based Practice, published by Elsevier, and Child and Adolescent Psychiatry: The Essentials, published by Lippincott, Williams, and Wilkins. r. ander Stoep has received research funding from the National Institutes of Health, Fogarty International Center; the S epartment of Education, National Center for Education Research, Institute of Education Sciences; the on Loeb Family Foundation; the evelopmental Pathways Project: oung Adult Study; and NI H.

## REFERENCES

1. olzer, CE.; Goldsmith, HF.; Ciarlo, A. ental Health, nited States. HHS Publication No, (S A) 99-3285. Washington, C: Superintendent of ocuments, .S. Government Printing Office; 1998. Eects of rural-urban county type on the availability of health and mental health care providers. Chapter 16.

2. Thomas CR, Holzer CE 3rd. The continuing shortage of child and adolescent psychiatrists. Am Acad Child Adolesc Psychiatry. 2006; 45(9):1023–1031. Pub ed: 16840879

3. uskie School of Public Service, Research and Policy Brief. Rural Children on't Receive the ental Health Care They Need. aine Rural Health Research Center. http://muskie.usm.maine.edu/ Publications/rural/pb39/Rural-Children- ental-Health-Services.pdf. Published 2009.

4. iller, EC.; Coburn, AF.; Loux, SL.; Hoffman, C.; cBride, T . Health insurance coverage in rural America. (No. 4093). Washington, C: The aiser Commission on edicaid and the ninsured, niversity of Southern aine; 2003.

5. Burns B, Cotello E , Angola A, et al. Children's mental health service use across service sectors. Health Affairs. 1995; 14(3):147–159. Pub ed: 7498888

6. ellowlees P , Shore , Roberts L. Practice Guidelines for ideoconferencing-Based Telemental Health – October 2009. Telemedicine and e-Health. 2010; 16(10):1074–1089. Pub ed: 21186991

7. Institute of edicine. The Role of Telehealth in an Evolving Health Care Environment: Workshop Summary. The National Academies Press; website. http://www.nap.edu/catalog.php record id 13466, Published 2012. Accessed ecember 30, 2014

8. Elford R, White H, St ohn , addigan B, Ghandi , Bowering R. A prospective satisfaction study and cost analysis of a pilot child telepsychiatry service in Newfoundland. Telemed Telecare. 2001; 7(2)73–81. uB ed: 11331044

9. yers , alentine , elzer S . Feasibility, acceptability, and sustainability of telepsychiatry for hildren and adolescents. Psychiatr Serv. 2007; 58(11):1493–1496. Pub ed: 17978264

10. yers , alentine , elzer S . Child and adolescent telepsychiatry: utilization and satisfaction. Telemed E Health. 2008; 14:131–137. Pub ed: 18361702

cad ild dolesc Psyc iatry. Author manuscript; available in P C 2016 April 01.

CDCR _291

yers et al.                                                                                                    Page 13

11. Boyd L  , olpe T, Pignatiello A. A qualitative study of young people s perspectives on receiving psychiatric services via televideo.  Can Acad Child Adolesc Psychiatry. 2010; 19:5–11. Pub ed: 20119561

12. Iford R, White H, Bowering R, et al. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing.  Telemed Telecare. 2000; 6(2):73–82. Pub ed: 10824374

13. Rese R  , amison R, Wendland  , Fleming  , Braun  , Turek . Evaluating interactive videoconferencing for assessing symptoms of autism. Telemed E Health. 2013; 19(9):671–677. Pub ed: 23870046

14. ellowlees P  , Hilty  , arks SL, Neufeld , Bourgeois A. A retrospective analysis of a child and adolescent e ental Health program.  Am Acad Child Adolesc Psychiatry. 2008; 47(1):103–107. uB ed: 18174831

15. Rese R , Slone NC, Soares N, Sprang R. Telehealth for underserved families: an evidence-based parenting program. Psychol Serv. 2012; 9(3):320–322. Pub ed: 22867126

16. Nlson E, Barnard  , Cain S. Treating childhood depression over teleconferencing. Telemed E Health. 2003; 9:49–55. Pub ed: 12699607

17. ie , ixon F, ee O , et al. A study on the effectiveness of videoconferencing on teaching parent training skills to parents of children with A H . Telemed E Health. 2013; 19(3):1–8. Pub ed: 23316687

18. Estein N, Langberg  , Lichtenstein P , et al. Attention-deficit/hyperactivity disorder outcomes for hildren treated in community-based pediatric settings. Arch Pediatr Adolesc ed. 2010; 164(2):160–165. uB ed: 20124145

19. Estein N, Langberg  , Lichtenstein P , olb RC, Stark L . Sustained improvement in pediatrician's A H practice behaviors in the context of a community-based quality improvement initiative. Children's Health Care. 2010; 39:296–311.

20. American Psychiatric Association. iagnostic and Statistical anual of ental isorders. 4th ed. Washington, C: American Psychiatric Association; 1994.

21. Sbcommittee on Attention- eficit/Hyperactivity isorder. Steering Committee on Quality Improvement and anagement. A H : clinical practice guideline for the diagnosis, evaluation, and treatment of attention-deficit/hyperactivity disorder in children and adolescents. Pediatrics. 2011; 128(5):1007–1022. uB ed: 22003063

22. American Academy of Child and Adolescent Psychiatry. Practice parameter for the assessment and treatment of children and adolescents with attention-deficit/hyperactivity disorder.  Am Acad Child Adolesc Psychiatry. 2007; 46(7):894–921. Pub ed: 17581453

23. American Academy of Pediatrics. Committee on Psychosocial Aspects of Child and Family Health. The new morbidity revisited: a renewed commitment to the psychosocial aspects of pediatric care. Pediatrics. 2001; 108(5):1227–1230. Pub ed: 11694709

24. Bwer T , autone A, anz PH, Frye L, Blum N . anaging attention-deficit hyperactivity disorder in primary care:a systematic analysis of roles and challenges. Pediatrics. 2008; 121(1):e65–e72. Pub ed: 18166546

25. napp CA, Hinojosa , Baron-Lee , Fernandez-Baca , Hinojosa R, Thompson L. Factors associated with a medical home among children with attention-deficit hyperactivity disorder. aternal Child Health . 2012; 16(9):1771–1778.

26. Eslie L , Weckerly , Plemmons , Landsverk , Eastman S. Implementing the American Academy of Pediatrics attention-deficit/hyperactivity disorder diagnostic guidelines in primary care settings. Pediatrics. 2004; 114:129–140. Pub ed: 15231919

27. olko , Campo , ilbourne A , Hart , Sakolsky , Wisniewski S. Collaboration care outcomes for pediatric behavior health problems: A cluster randomized trial. Pediatrics. 2014; 133:e981–e992. Pub ed: 24664093

28. Torell L. The Community Parent Education program (COPE). Treatment effects in a clinical and a community sample. Clin Child Psychol Psychiatry. 2009; 14(3):373–387. Pub ed: 19515754

29. ensen PS, Hinshaw SP, raemer HC, et al. A H comorbidity findings from the TA study: comparing comorbid subgroups.  Am Acad Child Adolesc Psychiatry. 2001; 40(2):147–158. Pub ed: 11211363

CDCR _292

30.  nited States Public Health Service Office of the Surgeon General.  ental Health: A Report of the
     Surgeon General. Rockville,   :   epartment of Health and Human Services,   S Public Health
     Service; 1999.

31.  Bam RA, Epstein  N,  elleher  . Healthcare reform, quality, and technology: A  H  as a case
     study. Curr Psychiatry Rep. 2013; 15(7):369–375.  Pub  ed: 23712720

32.  lealth Resources and Services Administration.  Accessed  ecember 30, 2014 Health Information
     Technology: TeleHealth.   S  epartment of Health and Human Services website. http://
     www.hrsa.gov/healthit/toolbox/RuralHealthITtoolbox/Telehealth

33.  Cnters for  edicare and  edicaid.  Accessed  ecember 30, 2014 Telemedicine.  edicaid
     website. http://www.medicaid.gov/  edicaid-CHIP-Program-Information/By-Topics/  elivery-
     Systems/Telemedicine.html

34.   ander Stoep A,  yers  .  ethodology for conducting the Children  s Attention-deficit
      Hyperactivity  isorder Telemental Health Treatment Study in multiple underserved communities.
      Clin Trials. 2013; 10(6):949–958.  Pub  ed: 23897950

35.   yers  ,  ander Stoep A, Lobdell C. Feasibility of conducting a randomized controlled trial of
      telemental health with children diagnosed with attention-deficit/hyperactivity disorder in
      underserved communities.  Child Adolesc Psychopharmacol. 2013; 23(6):372–378.  Pub  ed:
      23952183

36.   yers  ,  ander Stoep A,  cCarty CA, et al. Child and adolescent telepsychiatry: variations in
      utilization, referral patterns and practice trends.  Telemed Telecare. 2010; 16(3):128–133.
      Pub  ed: 20197356

37.  Achenbach, T  .; Rescorla, LA.  anual for the ASEBA School-Age Forms and Profiles.
      Burlington,  T:  niversity of  ermont, Research Center for Children,  outh, and Families; 2001.

38.  Baffer  , Fisher P,  ulcan  , et al. The NI  H  iagnostic Interview Schedule for Children
      ersion 2.3 (  ISC-2.3): description, acceptability, prevalence rates, and performance in the
      ECA Study.  ethods for the Epidemiology of Child and Adolescent  ental  isorders Study.
      Am Acad Child Adolesc Psychiatry. 1996; 35(7):865–877.  Pub  ed: 8768346

39.  lewczyk C  , Garland AF, Hurlburt  S, Gearity  , Hough RL. Comparing  ISC-I  and clinician
      diagnoses among youths receiving public mental health services.  Am Acad Child Adolesc
      Psychiatry. 2003; 42(3):349–356.  Pub  ed: 12595789

40.   cCarty CA,  ander Stoep A,  iolette H,  yers  . Interventions developed for psychiatric and
      behavioral treatment in the children  s  A  H  Telemental Health Treatment Study  epub online
      ahead of print  . Child Fam Studies. 2014  ay.

41.  Ciyer  ,  yers  ,  ander Stoep A,  cCarty C, Palmer N,  eSalvo A. Implementing a low-cost
      web-based clinical trial management system for community studies: a case study. Clin Trials.
      2011;  8(5)634–644.  uB  ed: 21813582

42.  lajewicz-Hefley A, Carlson  S. A meta-analysis of combined treatments for children diagnosed
      with A  H  . Attention  is. 2007; 10(3):239–250.

43.  Band  T, Hawk LW, Bubnik  , Shiels  , Pelham WE, Waxmonsky  G. Improving working
      memory in children with attention-deficit/hyperactivity disorder: the separate and combined
      effects of incentives and stimulant medication.  Abnorm Child Psychol. 2012; 40(7):1193–1207.
       Pub  ed: 22477205

44.  lbszka SR, Crismon  L, Hughes CW, et al. Texas Consensus Conference Panel on
      Pharmacotherapy of Childhood Attention  eficit Hyperactivity  isorder. The Texas Children  s
       edication Algorithm Project: revision of the algorithm for pharmacotherapy of attention-deficit/
      hyperactivity disorder.  Am Acad Child Adolesc Psychiatry. 2006; 45(6):642–657.  Pub  ed:
      16721314

45.  Sahl, S  . Stahl  s Essential Psychopharmacology: Neuroscientific Basis and Practical
      Applications. 3rd ed. New  ork: Cambridge  niversity Press; 2008.

46.   c  ahon, R  .; Forehand, R. Helping the Noncompliant Child, Second Edition: Family-Based
      Treatment for Oppositional Behavior. New  ork: The Guilford Press; 2003.

47.  Brkely, RA. Attention-  eficit Hyperactivity  isorder, Third Edition: A Handbook for  iagnosis
      and Treatment. 3rd Edition. New  ork: The Guilford Press; 2006.

*cad   ild  dolesc Psyc iatry.*  Author manuscript; available in P  C 2016 April 01.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

48. Fabiano G, Pelham W, Coles E, Gnagy E, Chronis-Tuscano A, O Connor B. A meta-analysis of behavioral treatments for attention-deficit/hyperactivity disorder. Clin Psychol Rev. 2009; 29(2): 129–140. PubMed: 19131150

49. Baquet CR, Commiskey P, Mullins C, Mishra SI. Recruitment and participation in clinical trials: Socio-demograpic rural/urban, and health care access predictors. Cancer Detect Prev. 2006; 30(1): 24–33. PubMed: 16495020

50. Jellinek, M.; Patel, B.; Froehle, M., editors. Bright Futures in Practice: Mental Health—Volume II. Tool Kit. Arlington, VA: National Center for Education in Maternal and Child Health; 2002. No. II

51. Wolraich M, Lambert W, Doffing M, Bickman L, Simmons T, Worley K. Psychometric properties of the Vanderbilt A H Diagnostic Parent Rating Scale in a referred population. Pediatr Psychol. 2003; 28(8):559–567. Pub ed: 14602846

52. Wolraich M, Bard D, Neas B, Doffing M, Beck L. The psychometric properties of the Vanderbilt Attention-Deficit Hyperactivity Disorder Diagnostic Teacher Rating Scale in a community population. Dev Behav Pediatr. 2013; 34(2):83–93. Pub ed: 23363973

53. Bird HR, Shaffer D, Fisher P, Gould MS. The Columbia Impairment Scale: pilot findings on a measure of global impairment for children and adolescents. Int Methods Psychiatr Res. 1993; 3(3):167–176.

54. Fitzmaurice, G.; Laird, N.; Ware, J. Applied Longitudinal Analysis (Wiley Series in Probability and Statistics). Hoboken, N J: John Wiley and Sons, Wiley-Interscience; 2004. Chapters 11 and 12.

55. Feiss, L. Measures of effect size for categorical data. In: Cooper, H.; Hedges, L., editors. The Handbook of Research Synthesis. New York: Russell Sage Foundation; 1994. p. 245-260.

56. Stata Statistical Software: Release 12. computer program. College Station, T: StataCorp LP; 2011.

57. The MTA Cooperative Group. A 14-month randomized clinical trial of treatment strategies for attention-deficit/hyperactivity disorder. Arch Gen Psychiatry. 1999; 56(12):1073–1086. Pub ed: 10591283

58. Chronis A, Chacko A, Fabiano GA, Wymbs BT, Pelham WE Jr. Enhancements to the behavioral parent training paradigm for families of children with A H: review and future directions. Clin Child Fam Psychol Rev. 2004; 7(1):1–27. Pub ed: 15119686

59. Greenberg N, Boydell K, Volpe T. Pediatric telepsychiatry in Ontario: Caregiver and service provider perspectives. Behav Health Sci Res. 2006; 33(1):105–111.

60. Blu E, Way BB, Freemont WP. Assessment of S N pstate Medical University's child telepsychiatry consultation program. Int Psychiatry ed. 2011; 42:93–104. Pub ed: 22372027

61. Hilty, Jellowlees P, Nesbitt TS. Evolution of telepsychiatry to rural sites: changes over time in types of referral and in primary care providers knowledge, skills and satisfaction. General Hospital Psychiatry. 2006; 28(5):367–373. Pub ed: 16950370

62. Eaton W, Russo, Lin EH, et al. Diabetes and poor disease control: is comorbid depression associated with poor medication adherence or lack of treatment intensification Psychosom ed. 2009; 71:965–972. PubMed: 19834047

63. Solomon H, Bitton A, Katz N, Radner H, Brown E, Fraenkel L. Review: Treat to target in rheumatoid arthritis: Fact, fiction or hypothesis Arthritis Rheumatol. 2014; 4(66):775–782. Pub ed: 24757129

64. Fabiano GA, Pujnovic R, Pelham WE, et al. Enhancing the effectiveness of special education programming for children with attention deficit hyperactivity disorder using a daily report card. Shool Psychol Rev. 2010; 39(2):219–239.

65. ikami A, Griggs S, Lerner, et al. A randomized trial of a classroom intervention to increase peers' social inclusion of children with attention-deficit/hyperactivity disorder. Cons1t Clin Psychol. 2013; 81(1):100–112.

66. Grady B, Lever N, Cunningham, Stephan S. Telepsychiatry and school mental health. Child Adolesc Psychiatr Clin N Am. 2011; 20(1):81–94. Pub ed: 21092914

67. Lavigne, ulcan, LeBailly SA, Binns H. Can parent reports serve as proxy for teacher ratings in medication management of attention-deficit hyperactivity disorder evel Behav Pediatrics. 2012; 33(4):336–342.

cad ild dolesc Psyc iatry. Author manuscript; available in P C 2016 April 01.

yers et al.

68. Czerniak S , Sikoglu E , ing A, et al. Areas of the brain modulated by single-dose methylphenidate treatment in youth with A H during task-based f RI: A systematic review. Harvard Rev Psychiatry. 2013; 21(3):151–162.

69. Shulz P, Fan , Bedard A, et al. Common and unique therapeutic mechanisms of stimulant and nonstimulant treatments for attention-deficit/hyperactivity disorder. Arch Gen Psychiatry. 2012; 69(9):952–961. uB ed: 22945622

70. Evans SW, Owens S, Bunford N. Evidence-based psychosocial treatments for children and adolescents with attention-deficit/hyperactivity disorder. Clin Child Adolesc Psychol. 2014; 43(4):527–551. uB ed: 24245813

71. aley , van der Oord S, Ferrin , et al. Behavioral interventions in attentiondeficit/ hyperactivity disorder: A meta-analyses of randomized controlled trials across multiple outcome domains. Am Acad Child Adolesc Psychiatry. 2014; 53(8):835–847. Pub ed: 25062591

72. State Telemedicine Policy Center. State Telemedicine Gaps Analysis. American Telemedicine Association website. http://www.americantelemed.org/policy/state-telemedicine-policy Published 2012.

73. American Psychological Association: Telehealth 50-State Review. 2013b Retrieved from http://www.apapracticecentral.org/advocacy/state/telehealth-slides.pdf Published October 2013.

74. American Telemedicine Association. Telemedicine and Telehealth Services: Reimbursement. http://www.americantelemed.org/docs/default-source/policy/medicare-payment-of-telemedicine-and-telehealth-services.pdf. Published anuary 2013.

75. Center for edicare and edicaid Services. Accessed ecember 29, 2014 Telehealth. C S website. http://www.cms.gov/ edicare/ edicare-General-Information/Telehealth/index.html. odified anuary 2014.

76. ccessed ecember 29, 2014 eeping America Healthy. edicaid website. http://www.medicaid.gov/ edicaid-CHIP-Program-Information/By-Topics/ elivery-Systems/Telemedicine.html.

77. American edical Association. CPT 2015 Standard Codebook. Chicago: American edical Association; 2014.

78. Center for edicare and edicaid Services (C S). Accessed ecember 30, 2014 Accountable Care Organizations. http://www.cms.gov/ edicare/ edicare-Fee-for-Service-Payment/ACO/index.html. odified anuary 2015.

79. azdin AE, Blas S. Rebooting psychotherapy research and practice to reduce the burden of mental illness. Perspectives Psychol Sci. 2011; 6(1):21–37.

80. oepsell T , atzick F, Rivara FP. Estimating the population impact of preventive interventions from randomized trials. Am Prev ed. 2011; 40(2):191–198. Pub ed: 21238868

81. Georgetown niversity Health Policy Institute. Center for Children and Families. website. http://ccf.georgetown.edu/.

82. Health Reform: Children's Health Coverage: edicaid, CHIP and the ACA. The Henry . aiser Family Foundation. website. http://kff.org/health-reform/issue-brief/childrens-health-coverage-medicaid-chip-and-the-aca/. Published arch 2014.

*cad ild dolesc Psyc iatry*. Author manuscript; available in P C 2016 April 01.

CDCR _295

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**CLINICAL GUIDANCE**

- The CATTS trial supports the effectiveness of treating children with A   H using telehealth.

- A direct telehealth service model offers undeserved communities potential parity with metropolitan communities in accessing guideline-based interventions.

- An augmented primary care model may optimally redistribute the child psychiatry workforce and support PCPs' efforts to treat children's mental health disorders..

- Asynchronous telehealth technologies offer therapists an opportunity to upgrade their skills in treating children and to strengthen the child mental health workforce in underserved communities.

- Stakeholders who are considering telehealth should determine whether a short-term direct service model or an augmented primary care model best meets their community's needs and resources.[81–82]

- Child and adolescent psychiatrists interested in a telehealth practice should consider the evidence base for providing care through telehealth technologies, collaborative models for working with clinicians at the patient site, supports needed at both the provider and the patient sites, and financial models to sustain a successful practice.

*cad   ild  dolesc Psyc iatry*. Author manuscript; available in P   C 2016 April 01.

CDCR _296



**Figure 1.**

Consolidated Standards of Reporting Trials (CONSORT) diagram. Note: A  H
attention-deficit/hyperactivity disorder; CATTS   Children's A  H   Telemental Health
Treatment Study; CBCL    Child Behavior Checklist; C  ISC-I      Computerized
 iagnostic Interview Schedule for Children, Based on the *DSM*  ; PCP   primary care
providers.

**CDCR _297**

yers et al. Page 19



**Figure 2.**
Proportions (unadjusted) of children at each assessment meeting caregiver-reported diagnostic criteria on subscales of the    anderbilt Attention-    eficit/Hyperactivity    isorder (A   H   ) Rating Scale. Note: O        oppositional defiant disorder.

CDCR _298

yers et al.                                                                                                          Page 20



**Figure 3.**
Proportions (unadjusted) of children at each assessment meeting teacher-reported diagnostic
criteria on subscales of the   anderbilt Attention-  eficit/Hyperactivity    isorder (A  H   )
Rating Scale. Note: O        oppositional defiant disorder.

*cad   ild  dolesc Psyc iatry*. Author manuscript; available in P   C 2016 April 01.

CDCR _299

yers et al.

Page 21

**Table 1**

Sample emographic and Clinical Characteristics

| Demographic Variables | CATTS Telehealth Service Delivery (n=111) | Augmented Primary Care (n=112) |
|---|---|---|
| Child Age, (S ) | 9.2 (2.0) | 9.3 (2.0) |
| Child Gender, n (%) | | |
| ale | 76 (68.5) | 87 (77.7) |
| Female | 35 (31.5) | 23 (22.3) |
| Child Race, n (%) | | |
| White | 104 (93.7) | 100 (89.3) |
| Black | 1 (0.9) | 1 (0.9) |
| Asian | 0 (0) | 2 (1.8) |
| NH/PI | 0 (0) | 4 (3.6) |
| AI/AN | 4 (3.6) | 2 (2.7) |
| Other | 2 (1.8) | 2 (1.8) |
| Child Ethnicity, n (%) | | |
| Hispanic | 10 (9.0) | 19 (17.0) |
| Non-Hispanic | 101 (91.0) | 93 (83.0) |
| arital Status, n (%) | | |
| arried/Cohabitating | 76 (68.5) | 83 (74.8) |
| Other | 35 (31.5) | 28 (25.2) |
| Household Income, n (%) | | |
| 35k | 41 (36.9) | 36 (32.4) |
| 35k-75k | 28 (25.2) | 42 (37.8) |
| 75k-100k | 22 (19.8) | 13 (11.7) |
| 100k | 20 (18.0) | 20 (18.0) |
| **Comorbid Disorders, n (%)**[a] | | |
| A H alone | 20 (18.0) | 35 (31.3) |
| A H O | 44 (39.6) | 49 (43.8) |
| A H A | 7 (6.3) | 6 (5.4) |
| A H O A | 40 (36.0) | 22 (19.6) |
| **Clinical Measures** | | |
| **Caregiver Ratings** | | |
| anderbilt A H Rating Scale, iagnostic Scoring | | |

*cad ild dolesc Psyc iatry.* Author manuscript; available in P C 2016 April 01.

CDCR _300

yers et al.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

| Demographic Variables | CATTS Telehealth Service Delivery (n=111) | Augmented Primary Care (n=112) |
|---|---|---|
| ttention diagnosis, n (%) | 92 (83) | 92 (82) |
| yperactivity/Impulsivity diagnosis, n (%) | 74 (67) | 65 (58) |
| A -combined diagnosis, n (%) | 67 (60) | 58 (52) |
| O diagnosis, n (%) | 68 (61) | 57 (51) |
| easures of Functioning | | |
| A RS-Role Performance Score, (sd) | 3.51 (0.59) | 3.52 (0.55) |
| CIS Functioning Score, (sd) | 24.71 (9.18) | 22.89 (8.95) |
| **Teacher Ratings** | | |
| anderbilt A H Rating Scale, iagnostic Scoring iagnostic Criteria per Algorithmic Scoring | | |
| ttention iagnosis, n (%) | 56 (50) | 64 (57) |
| yperactivity/Impulsivity diagnosis, n (%) | 42 (38) | 32 (29) |
| HA-combined iagnosis, n (%) | 26 (23) | 19 (17) |
| O iagnosis, n (%) | 34 (31) | 35 (31) |
| easure of Functioning | | |
| A RS-Role Performance Score, (S ) | 3.75 (0.72) | 3.90 (0.66) |

Note: A anxiety disorder; A H attention-deficit/hyperactivity disorder; AI/AN American Indian/Alaska Native; CATTS Children's A H Telemental Health Treatment Study; CIS-P Columbia Impairment Scale-Parent ersion; NH/PI Native Hawaiian/Pacific Islander; O oppositional defiant disorder; A RS anderbilt A H Rating Scales.

p 0.05

*cad ild dolesc Psyc iatry*. Author manuscript; available in P C 2016 April 01.

CDCR _301

Author Manuscript          Author Manuscript          Author Manuscript          Author Manuscript

**Table 2**

Treatment Outcomes: Meeting Diagnostic Criteria Based on Vanderbilt Attention-Deficit/Hyperactivity Disorder (ADHD) Rating Scales

| Caregiver Ratings (N = 223) | Inattention OR (95% CI) | Hyperactivity OR (95% CI) | ADHD-Combined OR (95% CI) | ODD OR (95% CI) |
|---|---|---|---|---|
| **Group** | | | | |
| Intervention vs. Control | .822 (0.276–2.446) | 1.354 (0.516–3.556) | 1.338 (0.552–3.244) | 1.220 (0.431–3.452) |
| **Time (in weeks)** | | | | |
| 4 | .228 (0.100–0.522) | .524 (0.252–1.092) | .471 (0.233–0.951) | .512 (0.232–1.129) |
| 10 | .085 (0.036–0.200) | .190 (0.087–0.412) | .185 (0.088–0.390) | .137 (0.058–0.324) |
| 19 | .059 (0.025–0.141) | .090 (0.039–0.206) | .100 (0.045–0.222) | .183 (0.079–0.427) |
| 25 | .058 (0.024–0.139) | .120 (0.053–0.272) | .149 (0.070–0.318) | .103 (0.042–0.251) |
| **Group × Time** | | | | |
| 1  4 | 1.410 (0.439–4.528) | .368 (0.128–1.058) | .486 (0.179–1.316) | .535 (0.172–1.658) |
| 1 10 | .604 (0.184–1.984) | .213 (0.069–0.664) | .296 (0.101–0.874) | .618 (0.186–2.051) |
| 1 19 | .211 (0.060–0.745) | .236 (0.070–0.794) | .149 (0.044–0.512) | .247 (0.072–0.853) |
| 1 25 | .140 (0.038–0.508) | .137 (0.040–0.466) | .132 (0.040–0.432) | .148 (0.039–0.562) |

| Teacher Ratings (n=149) | Inattention OR (95% CI) | Hyperactivity OR (95% CI) | ADHD-Combined OR (95% CI) | ODD OR (95% CI) |
|---|---|---|---|---|
| **Group** | | | | |
| Intervention vs. Control | .518 (0.174–1.542) | 2.135 (0.646–7.052) | 1.746 (.511–5.967) | .834 (0.239–2.908) |
| **Time (in weeks)** | | | | |
| 4 | .234 (0.096–0.568) | .614 (0.232–1.629) | .337 (0.117–0.968) | .841 (0.320–2.216) |
| 10 | .272 (0.114–0.649) | .785 (0.304–2.028) | .910 (0.315–2.628) | .354 (0.128–0.983) |
| 19 | .227 (0.095–0.541) | .164 (0.056–0.480) | .191 (0.060–0.608) | .179 (0.062–0.520) |
| 25 | .254 (0.101–0.637) | .171 (0.054–0.546) | .153 (0.046–0.510) | .332 (0.117–0.945) |
| **Group × Time** | | | | |
| 1  4 | 2.046 (0.568–7.373) | .699 (0.169–2.884) | .731 (0.173–3.084) | .490 (0.113–2.132) |
| 1 10 | .493 (0.133–1.822) | .073 (0.014–0.371) | .077 (0.013–0.451) | .673 (0.141–3.212) |

*cad ild dolesc Psyc iatry.* Author manuscript; available in P C 2016 April 01.

CDCR _302

yers et al.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

| Caregiver Ratings (N = 223) | Inattention OR (95% CI) | Hyperactivity OR (95% CI) | ADHD-Combined OR (95% CI) | ODD OR (95% CI) |
|---|---|---|---|---|
| 1 19 | .504 (0.136–1.863) | .749 (0.164–3.417) | .443 (0.087–2.267) | .441 (0.084–2.312) |
| 1 25 | .320 (0.079–1.300) | .311 (0.056–1.732) | .178 (0.027–1.174) | .108 (0.017–0.704) |

Note: Analyses per logistic mixed effects regression models; all models adjusted for baseline comorbid conditions; coefficients on the group × time interaction terms are the logarithmic ORs. Note: O

oppositional defiant disorder;  A  RS    anderbilt A  H   Rating Scale.

p 0.05;

p 0.01;

p 0.001

**CDCR _303**

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**TABLE 3**

Treatment Outcomes: Role Performance and Impairment Scale Scores

| | | | Caregiver VADRS-Role Performance Scale β (95% CI) (N=223) | Caregiver-Report CIS-P Scale β (95% CI) (N=223) | Teacher VADRS-Role Performance Scale β (95% CI) (n=149) |
|---|---|---|---|---|---|
| **Group** | | | | | |
| Intervention vs. Control | | | .052 ( .195 – .091) | .447 (1.617 – 2.512) | .159 ( .352 – .034) |
| **Time (in weeks)** | | | | | |
| | | 4 | .180 ( .274 – .085) | 4.555 ( 5.797 – 3.313) | .176 ( .278 – .074) |
| | | 10 | .245 ( .357 – .132) | 5.973 ( 7.419 – 4.529) | .253 ( .381 – .126) |
| | | 19 | .339 ( .447 – .232) | 7.040 ( 8.666 – 5.413) | .405 ( .543 – .267) |
| | | 25 | .317 ( .434 – .200) | 8.111 ( 9.720 – 6.502) | .245 ( .395 – .096) |
| **Group × Time** | | | | | |
| | 1 | 4 | .055 (.064 – .175) | 1.047 (.642 – 2.737) | .045 (.100 – .191) |
| | 1 | 10 | .023 (.135 – .182) | 1.386 ( 3.546 – .774) | .149 ( .349 – .050) |
| | 1 | 19 | .140 ( .306 – .025) | 3.593 ( 5.885 – 1.301) | .113 ( .318 – .092) |
| | 1 | 25 | .220 ( .389 – .051) | 3.678 ( 5.870 – 1.485) | .223 ( .462 – .016) |

Note: Analyses per linear mixed effects models; all models adjusted for baseline comorbid conditions. CIS-P    Columbia Impairment Scale, parent-report version; A RS    anderbilt Attention- eficit/Hyperactivity  isorder (A  H ) Rating Scale.

p   0.05;

p    0.01

CDCR _304

# ATTACHMENT 16

CDCR _305

# Is Telepsychiatry Equivalent to Face-to-Face Psychiatry? Results From a Randomized Controlled Equivalence Trial

Richard O'Reilly, M.B., F.R.C.P.C.
Joan Bishop, M.D., F.R.C.P.C.
Karen Maddox, R.N., M.A.
Lois Hutchinson, M.D., F.R.C.P.C.
Michael Fisman, M.B., F.R.C.P.C.
Jatinder Takhar, M.D., F.R.C.P.C.

_Objective:_ The use of interactive videoconferencing to provide psychiatric services to geographically remote regions, often referred to as telepsychiatry, has gained wide acceptance. However, it is not known whether clinical outcomes of telepsychiatry are as good as those achieved through face-to-face contact. This study compared a variety of clinical outcomes after psychiatric consultation and, where needed, brief follow-up for outpatients referred to a psychiatric clinic in Canada who were randomly assigned to be examined face to face or by telepsychiatry. _Methods:_ A total of 495 patients in Ontario, Canada, referred by their family physician for psychiatric consultation were randomly assigned to be examined face to face (N=254) or by telepsychiatry (N=241). The treating psychiatrists had the option of providing monthly follow-up appointments for up to four months. The study tested the equivalence of the two forms of service delivery on a variety of outcome measures. _Results:_ Psychiatric consultation and follow-up delivered by telepsychiatry produced clinical outcomes that were equivalent to those achieved when the service was provided face to face. Patients in the two groups expressed similar levels of satisfaction with service. An analysis limited to the cost of providing the clinical service indicated that telepsychiatry was at least 10% less expensive per patient than service provided face to face. _Conclusions:_ Psychiatric consultation and short-term follow-up can be as effective when delivered by telepsychiatry as when provided face to face. These findings do not necessarily mean that other types of mental health services, for example, various types of psychotherapy, are as effective when provided by telepsychiatry. (_Psychiatric Services_ 58:836–843, 2007)

The provision of psychiatric services to rural and geographically isolated regions challenges most health systems (1). Countries with shortages of psychiatrists find it inefficient for psychiatrists to travel long distances to see few patients in remote communities. Conversely, it is expensive and often not feasible for patients from remote regions to travel to urban centers for psychiatric care. Interactive videoconferencing, often called telepsychiatry, is a potential solution to this problem (2). However, the efficacy of telepsychiatry to provide clinical psychiatric services to distant communities has yet to be definitively established (3).

Researchers have established that telepsychiatry can provide a reliable diagnosis of common psychiatric disorders (4,5) and accurate assessments of cognitive (6), depressive (7), anxiety (7), and psychotic symptoms (8). However, the assessment of symptoms, such as emotional affect, that require visual observation of behavior appear less reliable (9), especially when using bandwidths of 128 kilobits per second or less (8,10).

The ultimate test of telepsychiatry is whether it can produce clinical outcomes that are at least equivalent to those achieved through face-to-face service. Two small studies examining clinical outcomes showed no statistically significant differences in outcomes between patients seen via

Dr. O'Reilly, Dr. Fisman, and Dr. Takhar are affiliated with the Department of Psychiatry, Regional Mental Health Care, St. Joseph's Health Care, P.O. Box 5532, Station B, 850 Highbury Ave. N., London, Ontario N6A 4H1, Canada (e-mail: richard.o'reilly@sjhc.london.on.ca). They are also with the Department of Psychiatry, University of Western Ontario, London, Ontario. Dr. Bishop is with the Department of Psychiatry, University of British Columbia, Vancouver, British Columbia. Ms. Maddox and Dr. Hutchinson are affiliated with the Department of Psychiatry, Thunder Bay Regional Health Sciences Centre, Thunder Bay, Ontario.

CDCR  306

telepsychiatry and those seen in person (11,12). In the only reported randomized controlled trial of telepsychiatry for adults, 119 U.S. veterans with depression were randomly assigned to six months of outpatient treatment in person or by telepsychiatry (13). They received medications, psychoeducation, and supportive counseling. No between-group differences were observed in depressive symptoms, adherence to appointments, adherence to medication regimens, dropout rates, or satisfaction levels. A second small (N=28) randomized controlled trial of telepsychiatry evaluating an eight-week course of cognitive-behavioral therapy for children reported "decreasing symptoms of childhood depression over videoconferencing at rates comparable to face-to-face" (14).

All published outcome studies, including the randomized controlled trial of adults with depression (13), used comparative methods rather than equivalence methods for the determination of sample size, analysis of data, and interpretation of results. Comparative studies often incorrectly conclude that a failure to detect a statistically significant difference in outcome implies "equivalence." However, the lack of a statistically significant difference does not mean equivalence (15,16). "While non-significant P values from tests of equality indicate that trial results have not conclusively established the superiority of an experimental regimen, these tests do not address the issue of equivalence which requires the use of confidence intervals" (17) and predetermined equivalence margins (15).

We overcame the limitation of previous telepsychiatry research using methods specially designed to test whether two interventions are equivalent. We describe a variety of clinical outcomes among outpatients with mixed psychiatric diagnoses referred by their family physician and randomly assigned to receive psychiatric consultation and short-term follow-up either in person or by telepsychiatry. We predicted that patients referred by their family physician for a psychiatric consultation and, if needed, short-term follow-up would have equivalent clinical outcomes regard-

less or whether they were seen via telepsychiatry or in person. We also predicted that telepsychiatry would be less expensive than in-person care.

## Methods
The research ethics committees of the University of Western Ontario and the Thunder Bay Regional Hospital reviewed and approved this study. All participants were provided with written and verbal information about the nature of the study and consented to take part.

### Study design
Participants were sampled from referrals to the psychiatric consultation clinic of the Thunder Bay Regional Hospital. We used a sample size calculation and analytical methods that are designed for equivalence trials (15). In this process, we start by prespecifying delta ($\Delta$), the absolute value of the difference that could be found between telepsychiatry and face-to-face care and still conclude that the two interventions are equivalent. This is called the equivalence margin and $-\Delta$ to $+\Delta$ is the range within which $\Delta$ can vary and still be of no clinical importance (15). Because our main interest is that telepsychiatry is not inferior to face-to-face care, we are concerned with the lower limit of this range ($-\Delta$), and in our analysis, we check whether the confidence interval (CI) for the difference between the groups on various outcome measures is less than $-\Delta$.

Sample size was determined for our primary outcome, the difference in proportions of patients moving from dysfunctional (case) to functional (noncase) status on the Brief Symptom Inventory (BSI) (18) four months after initial psychiatric consultation. We used expert clinical judgment (15) to choose the lower limit of the difference in proportions, which would still be consistent with clinical equivalence ($-\Delta=-.15$) (17). If the difference in improvement between intervention and control groups is less than this predetermined equivalence margin, the treatments would be considered equally effective or equivalent, even though one can never actually "prove" equivalence (19).

With alpha error of .05 (one sided)

and statistical power of 80%, we used the sample size formula from Jones and colleagues (15) for the one-sided case for comparison of proportions in equivalence trials, indicating a requirement of 138 patients per group, or 276 patients total.

We experienced a high loss to follow-up that required recruitment of more participants to achieve the full sample of completers. The first 42 patients were allocated to groups by flip of a coin, and block randomization (that is, using random numbers generated by computer algorithm in blocks of eight) was subsequently employed to control for any change of referral pattern over the 30-month duration of the study.

### Inclusion criteria
Patients were eligible if they were aged 18 to 65, from the Thunder Bay region (officially designated as an underserviced area for psychiatry), and referred by a family doctor to the psychiatric outpatient department of the local general hospital. Patients were excluded if their family doctor considered them incapable of consenting to the study or if the referral was primarily for a medico-legal or insurance assessment. All eligible patients received a letter explaining the nature of the study. Shortly afterward they were contacted by telephone by a research assistant, who is an experienced registered nurse. The research assistant answered questions about the study and, if the patient was willing to proceed, completed the BSI over the telephone. Only patients who had an initial BSI score in the dysfunctional range were randomly assigned to one of the study groups.

### Equipment
The interactive videoconference equipment consisted of a Polycom 512 View Station and a Sony Trinitron 68.5-centimeter diagonal screen. The connection was made by using three ISDN lines delivering a bandwidth of 384 kilobits per second.

### Clinical services
Participants in each arm of the study attended the Thunder Bay Regional Hospital for service. Four psychiatrists from London, Ontario, located

CDCR _307

837

approximately 1,500 kilometers from Thunder Bay, provided the service. They traveled by air to Thunder Bay to provide in-person service and connected via interactive videoconference from London for the telepsychiatry service. Each psychiatrist was assigned an equal number of participants in each arm of the study.

The clinical service provided in the study was modeled on the outpatient service already in use in Thunder Bay. The psychiatrists sent a handwritten form with recommendations to the family physician by facsimile within 48 hours of the initial assessment, followed by a full typed report. The psychiatrists decided, on the basis of clinical need, whether patients should return for follow-up visits. Patients could be seen within the protocol for up to four months after the initial assessment. When needed, follow-up visits were scheduled at monthly intervals for each group.

Treatment recommendations included medication management, psychoeducation, supportive counseling, and triage to other local services. In the vast majority of cases the prescription of medication, recommended by the psychiatrists, was undertaken by the family physician. This is typical of practice in underserviced areas where telepsychiatry would most often be used. However, the psychiatrists could prescribe directly when the need arose. The psychiatrists frequently referred patients to a short-term psychotherapy program, community-based case-management services, various self-help groups, and recreation programs. The psychiatrists were instructed to provide services in the same manner to participants in each group. As a check on the similarity of services provided to the two groups, the research assistant reviewed the handwritten forms filled out by the psychiatrist and collected data on whether medications or referrals to other community services were recommended.

### Research scales

The BSI is a 53-item self-report psychological symptom inventory with lower scores indicating fewer symptoms (18). The Global Severity Index (GSI) subscale of the BSI is calculated from the raw scores and is the most sensitive indicator of distress from psychiatric symptoms. Raw scores are converted into standardized T scores. The operational rule for classifying a patient as a "case" is if the respondent has a GSI score greater than or equal to a T score of 63 or if any two of the nine primary dimensions are greater than or equal to a T score of 63. When the individual is classified as a case he or she is in the dysfunctional range (20). The recommended brief standardized instructions were provided to the participant on the telephone for the screening contact and later in the mail for the four-month follow-up by the same trained research assistant.

On the initial assessment visit participants completed the Medical Outcomes Study Short Form (SF-36), a self-report health survey with 36 questions, which is suitable for self-administration or administration by a trained interviewer in person or by telephone (21). It yields an eight-scale profile of scores. For this study, the full SF-36 was administered even though we planned to use only the five-item mental health subscale, because this is the usual manner of scale completion. Scores on the mental health subscale range from 0 to 100, with higher scores indicating higher functioning. Because this study was done in Canada, we used the Canadian norm-based scores, which are standardized to 50 by using Canadian weights (22).

The Client Satisfaction Questionnaire (CSQ-8) is an eight-item self-report scale with brief written instructions. Scores range from 8 to 32, with higher scores indicating higher satisfaction (23–26).

At four months, the BSI, SF-36, and CSQ-8 were mailed to all participants with a stamped addressed return envelope. All scales included standardized instructions for self-report. Two further mailings were sent to noncompleters. In a pilot project for measuring outcomes for telepsychiatry, we found that the procedures for administration of the BSI and SF-36 on the telephone, in person, and in the mail yielded baseline and four-month scores with expected values and direction of change (27). Thus it was deemed to be valid to administer

the baseline BSI on the telephone and the four-month BSI via mail for this full study.

### Admissions

Psychiatric admissions to the Thunder Bay general hospital and the regional psychiatric hospital were noted for all participants. It was not possible to determine admissions to psychiatric units outside of the Thunder Bay region. However, the geographical location, 480 kilometers from the nearest alternative psychiatric unit, makes it unlikely that many patients were admitted elsewhere. There is no reason to believe that participants in either group would be more likely to leave the region.

### Costs

Details of fees paid to the psychiatrists and of reimbursement of expenses the psychiatrists incurred (on the basis of receipts) when traveling to and staying in Thunder Bay were collected throughout the study. ISDN line rental charges and per minute connection costs were available from telephone company monthly billing invoices. The capital cost of the videoconference equipment was depreciated over a five-year period. All participants attended the same office in the outpatient department of the distal site for clinical service. However, an additional office was used at the proximal site to house the videoconference equipment, and market rate rental for this office was added to the costs of telepsychiatry.

### Outcome variables

The primary outcome is the proportion of participants whose BSI score moved from dysfunctional to functional range (that is, the patient moved from being classified as a case to being classified as a noncase). The BSI was chosen because it measures overall distress from psychiatric symptoms, and distress is an important reason that patients seek help. Secondary outcome variables were the proportion of participants with any psychiatric admission during the 12 months after the initial assessment, change in scores on the GSI subscale of the BSI, change in scores on the mental health subscale of the SF-36 (21) standard-

**CDCR 308**

ized on a Canadian population (22), score on the CSQ-8 at four months, and cost of providing psychiatric assessment and follow-up.

*Analysis*

The two groups were compared on major baseline variables to check if the randomization worked. We used equivalence methods (15) to analyze outcome data for scores on the BSI, hospital admissions, scores on the GSI subscale of BSI, scores on the mental health subscale of SF-36, and scores on the CSQ-8.

*BSI.* We constructed a CI centered about the observed difference in proportions of participants moving from dysfunctional to functional status on the BSI from baseline to four months. Because the objective was to ensure that telepsychiatry is not inferior to in-person service, a lower one-sided 95% CI was constructed by using the method of Pagano and colleagues (28).

*Admissions.* For comparing proportions of participants in each group with at least one admission during the 12 months after initial consultation, we used methods suitable for testing equivalence of two proportions with the predetermined lower limit of the equivalence margin ($-\Delta = -.10$). Clinical consensus was that a difference of 10% or less was a conservative estimate, as decided by research team members in consultation with psychiatrist colleagues working in both clinical and research practice. We calculated cumulative hospital days for each group to help understand the results. We did not use mean number of admissions or days in the hospital, as we anticipated (and found) skewed data.

*GSI.* We also tested for equivalence of mean improvement in scores on the GSI, the BSI subscale, which is the most sensitive single indicator of distress (20). We used the lower limit of the predetermined equivalence margin ($-\Delta = -5$) to be conservative, because a difference in scores on the GSI of 7 is considered to be clinically significant (18,29).

*Mental health subscale of SF-36.* A 5-point variation in the score on the mental health subscale is considered the smallest clinically significant difference. To detect this, we needed

132 participants per group (30), which is compatible with the number for testing the primary outcome. We set the lower limit of the predetermined equivalence margin ($-\Delta$) at $-5$ and used SPSS to obtain the lower one-sided 95% CI centered around the observed difference in the mean improvement scores on the mental health subscale.

*CSQ-8.* We constructed a lower one-sided CI centered around observed differences in mean four-month scores using SPSS. The lower limit of the equivalence margin ($-\Delta$) was set at $-2$ by using clinical expertise to extrapolate from literature, such as the study by Gill and colleagues (31), who found a main effect when CSQ-8 scores varied from 3 to 4 points (22.4–26.4).

*Costs.* We calculated the average cost per patient by simply dividing the total cost per group by the number of patients randomly assigned to

that group. Because it was not possible to attribute costs to individual patients, standard deviations are not available. Because participants went to the same hospital for telepsychiatry and face-to-face services, they incurred no differences in expenses in either arm of the study.

**Results**

*Disposition and characteristics of patients*

The study was conducted between 2001 and 2004. Figure 1 depicts the enrollment, random assignment, and follow-up of study patients. Table 1 shows the baseline demographic and clinical characteristics of the two groups. There were no significant differences between the groups on baseline measures or on the measures of services provided. Completers and noncompleters in the two groups were similar, except that more com-

*Figure 1*

Enrollment and follow-up patterns of patients referred for psychiatric consultation



**Table 1**

Demographic and clinical characteristics of 495 patients referred for psychiatric consultation, by method of consultation

| Characteristic | Face to face (N=254) | | Telepsychiatry (N=241) | |
|---|---|---|---|---|
| | N | % | N | % |
| Age (years) | | | | |
| 18–24 | 47 | 19 | 30 | 12 |
| 25–34 | 55 | 22 | 65 | 27 |
| 35–44 | 88 | 35 | 84 | 35 |
| 45–54 | 48 | 19 | 38 | 16 |
| 55–65 | 16 | 6 | 24 | 10 |
| Sex | | | | |
| Male | 94 | 37 | 89 | 37 |
| Female | 160 | 63 | 152 | 63 |
| Marital status | | | | |
| Married | 88 | 35 | 81 | 34 |
| Widow | 1 | <1 | 2 | 1 |
| Single | 96 | 38 | 77 | 32 |
| Common law | 16 | 6 | 21 | 9 |
| Separated or divorced | 48 | 19 | 48 | 20 |
| Unknown[a] | 5 | 2 | 12 | 5 |
| Primary diagnosis | | | | |
| Depression | 138 | 54 | 138 | 57 |
| Bipolar disorder | 24 | 9 | 22 | 9 |
| Adjustment disorder | 21 | 8 | 12 | 5 |
| Other anxiety disorder | 20 | 8 | 16 | 7 |
| Psychosis | 11 | 4 | 4 | 2 |
| Alcohol or drug abuse or dependence | 8 | 3 | 7 | 3 |
| Posttraumatic stress disorder | 7 | 3 | 4 | 2 |
| Adult attention deficit disorder | 4 | 2 | 7 | 3 |
| Phobic disorder | 3 | 1 | 3 | 1 |
| Personality disorder | 3 | 1 | 1 | <1 |
| Eating disorder | 2 | 1 | 1 | <1 |
| Rule out somatic disorder | 2 | 1 | 2 | 1 |
| Obsessive compulsive disorder | 1 | <1 | 3 | 1 |
| Relationship problems | 1 | <1 | 1 | <1 |
| Other disorders | 1 | <1 | 3 | 1 |
| Missing[a] | 8 | 3 | 17 | 7 |
| Services provided[b] | | | | |
| Medications recommended | 230 | 93 | 210 | 94 |
| Community referral made | 119 | 48 | 119 | 53 |
| Baseline score on the Global Severity Index of the Brief Symptom Inventory (M±SD)[c] | 57.5±9.7 | | 57.6±10.1 | |

[a] When patients did not attend the initial assessment, diagnosis for all and marital status for most could not be assigned.

[b] Data available for 246 patients in the face-to-face group and 224 patients in the telepsychiatry group

[c] Possible scores range from 30 to 80, with higher scores indicating more distress.

pleters in both groups were married and noncompleters in the face-to-face group used more hospital days than completers, whereas in the telepsychiatry group, the opposite was true. These differences would not challenge our hypothesis.

*Clinical outcomes and hospital use*

Tables 2 and 3 show the results of equivalence testing for the primary and secondary outcome measures, using the predetermined equivalence margins. All results support the hypothesis that telepsychiatry produces equivalent outcomes to face-to-face care.

As expected, scores on the BSI (GSI subscale) and SF-36 (mental health subscale) showed that patients reported less distress from symptoms and improved mental health after the clinical intervention in both groups.

The levels of improvement were consistent with those considered to be clinically and socially relevant by the authors of these scales (18,29,30) and in the literature in which the BSI has been used to measure outcomes for patients similar to those in our trial (32). The CSQ-8 indicated a moderate degree of satisfaction (33). We conducted an intent-to-treat analysis for the proportion of participants hospitalized within 12 months from initial consultation, and this analysis showed equivalence between the two groups.

*Costs*

Table 4 shows that face-to-face services required travel and accommodation expenses for the psychiatrists that were unnecessary when using telepsychiatry. Face-to-face services also required larger fees for psychiatrists to compensate for travel time. These costs were greater than the technical costs of telepsychiatry. The average cost of telepsychiatry was 10% less per patient (16% less per visit) than the cost of in-person service.

**Discussion**

Using equivalence methods, we demonstrated that psychiatric consultation and short-term follow-up provided by telepsychiatry can produce clinical outcomes that are equivalent to those achieved when patients are assessed and followed in-person. On the primary outcome, approximately 20% of each group moved from a dysfunctional to functional rating. This is a modest proportion because we used a stringent test of effectiveness: the change from a positive psychiatric diagnosis to functional status, or a patient's moving from being a case to a noncase (20). The GSI baseline, four-month, and improvement scores were similar in magnitude to those found in a study of different types of psychotherapy for major depressive disorder (32). In addition, our finding of clinically significant improvements and equivalence in the primary outcome is supported by the analysis of the other outcomes, as measured by hospitalization and mean improvement in the GSI and mental health subscales.

The clinical service provided via

**CDCR   310**

*Table 2*

Follow-up results of rates of hospitalization and return to functional status among patients referred for psychiatric consultation, by method of consultation

| Measure | N | Proportion | Difference in proportion | Lower one-sided 95% CI for difference | Predetermined equivalence margin (−Δ)[a] |
|---|---|---|---|---|---|
| Return to functional score on the Brief Symptom Inventory by four months | | | | | |
| Face to face (N=148) | 29 | .20 | .02 | −.10 | −.15 |
| Telepsychiatry (N=138) | 30 | .22 | | | |
| Any hospitalization in a psychiatric unit in year after initial assessment | | | | | |
| Face to face (N=246) | 18 | .073 | .01 | −.03 | −.10 |
| Telepsychiatry (N=224) | 15 | .066 | | | |

[a] Δ represents the absolute value of the difference that could be found between telepsychiatry and face-to-face care and still conclude that the two interventions are equivalent. Because we are only interested in whether telepsychiatry is not inferior to face-to-face care, we used the lower limit (−Δ). If the difference in improvement between intervention and control groups is less than this predetermined equivalence margin, the treatments would be considered equally effective or equivalent.

telepsychiatry was less expensive than when it was provided in person. This finding coupled with the equivalent clinical outcomes suggests that telepsychiatry can be a cost-effective method for delivering psychiatric services. Our study provided services to a remote community, which required air travel and overnight stays. As noted elsewhere (34), the relative cost of telepsychiatry and in-person care is influenced by several factors, such as the distance traveled, volume of patients, and the type of technology. Therefore, the cost savings to the service provider in this study, may not

be realized in other settings. Furthermore, the costs in the study presented here were assessed solely from the perspective of the provider. In this study, the patients traveled to the Thunder Bay Regional Hospital irrespective of whether they received service in-person or via telepsychiatry, and therefore there is no reason that patients' travel expenses and time taken from work would differ. Other research has suggested that telepsychiatry, used under certain conditions, can reduce cost to service users (35).

A major strength of our study was

that it was conducted in a remote, underserviced area and thus replicated the conditions in which telepsychiatry is most likely to be used. We minimized exclusion criteria to ensure the inclusion of a broad range of patients, similar to the usual referrals from primary care physicians to psychiatrists.

However, the naturalistic nature of the service also produced limitations. Because of the broad inclusion criteria, we did not limit psychiatric care protocols to a carefully defined, diagnosis-specific, therapeutic intervention. Psychiatrists were instructed to provide the same type and level of

*Table 3*

Follow-up results on various measures among patients referred for psychiatric consultation, by method of consultation

| Measure | Baseline score | | Four-month score | | Improvement | | Difference in means | Lower one-sided 95% CI for difference | Predetermined equivalence margin (−Δ)[a] |
|---|---|---|---|---|---|---|---|---|---|
| | Mean | SD | Mean | SD | Mean | SD | | | |
| GSI[b] | | | | | | | | | |
| Face to face (N=148) | 56.5 | 10.1 | 49.7 | 13.3 | 6.9 | 9.1 | −.3 | −2.6 | −5.0 |
| Telepsychiatry (N=138) | 56.9 | 10.2 | 49.7 | 12.6 | 7.2 | 9.8 | | | |
| MH[c] | | | | | | | | | |
| Face to face (N=148) | 24 | 12.4 | 30.9 | 15.7 | 6.9 | 13.9 | −1.0 | −4.7 | −5.0 |
| Telepsychiatry (N=138) | 23.8 | 12.0 | 31.7 | 14.2 | 7.9 | 13.0 | | | |
| CSQ[d] | | | | | | | | | |
| Face to face (N=129) | — | — | 23.0 | 5.7 | — | — | .3 | −1.2 | −2.0 |
| Telepsychiatry (N=125) | — | — | 22.7 | 6 | — | — | | | |

[a] Δ represents the absolute value of the difference that could be found between telepsychiatry and face-to-face care and still conclude that the two interventions are equivalent. Because we are only interested in whether telepsychiatry is not inferior to face-to-face care, we used the lower limit (−Δ). If the difference in improvement between intervention and control groups is less than this predetermined equivalence margin, the treatments would be considered equally effective or equivalent.

[b] Global Severity Index of the Brief Symptom Inventory. Possible scores range from 30 to 80, with higher scores indicating more distress.

[c] Mental health subscale of the 36-item Medical Outcomes Study Short Form. Possible scores range from 0 to 100, with higher scores indicating higher functioning.

[d] Client Satisfaction Questionnaire. Possible scores range from 8 to 32, with higher scores indicating higher satisfaction.

CDCR _311

**Table 4**

Number of patients and visits and costs in U.S. dollars for psychiatric consultation among patients referred for psychiatric consultation, by method of consultation

| Variable | Face to face | Telepsychiatry |
|---|---|---|
| Payments to psychiatrists | $73,636 | $45,580 |
| Travel and accommodation for psychiatrists | $34,913 | $0 |
| Telephone connection costs for telepsychiatry | $0 | $22,665 |
| Equipment depreciation | $0 | $10,036 |
| Room rental cost for telepsychiatry in proximal site | $0 | $10,030 |
| Total costs | $108,549 | $88,311 |
| Number of patients | 246 | 224 |
| Number of visits | 344 | 333 |
| Average cost per patient | $439 | $394 |
| Average cost per visit | $315 | $265 |

service to patients seen in person and by telepsychiatry. Furthermore, data on services provided (Table 1) suggests that similar care was actually provided to both groups. However, it is still possible that there may have been subtle differences in the way patients in each group were managed.

A second limitation was the high rate of noncompletion of the four-month research scales. Although we continued to recruit patients until we had the required number of participants, only 58% of participants initially randomized to the groups completed these scales. As a result we were able to do only a per-protocol analysis on these outcomes. However, a per-protocol analysis is considered by many to be more important than an intent-to-treat analysis for equivalence trials (15). It is important to note that we were able to perform an intent-to-treat analysis on the risk of hospitalization in the year after consultation, for which we had full data, and this analysis also showed equivalence.

The low completion rate was probably influenced by the fact that consultation was available more quickly through the study than through regular local services and that most participants had ended their clinical contact a number of months before they were required to complete the final research scales. These factors likely contributed to the recruitment of a cohort of participants with low motivation to complete the research component of the intervention.

We did not measure satisfaction with the technical components of telepsychiatry as has been done in other studies. This would have been possible only for the telepsychiatry group. Rather, we used the opportunity provided by the randomized controlled trial to compare satisfaction with the clinical service provided to the two groups using a standard questionnaire, the CSQ-8. The results demonstrated equivalent levels of satisfaction in both face-to-face and telepsychiatry groups.

Ten percent of patients who were initially contacted refused participation in the study because of an unwillingness to use telepsychiatry. This figure is lower than the 33% of residents of a rural area of Iowa who said that they would be unwilling to use telepsychiatry if they needed mental health services (36). The higher rate in the Iowa study may be because the researchers surveyed a general community population rather than individuals referred for psychiatric assessment. Nevertheless, there appears to be a group of individuals who are averse to the use of telepsychiatry. Administrators developing telepsychiatry programs may need to maintain some parallel face-to-face service to meet the needs of this group.

## Conclusions

Our findings indicate that psychiatric consultation and short-term follow up provided by telepsychiatry can produce clinical outcomes that are equivalent to those achievable when patients are seen face to face.

In our setting telepsychiatry was less expensive than face-to-face service, although the relative cost of the two modes of service delivery is likely to be influenced by factors such as the distance between sites and service volume. It is important to recognize that we examined a single psychiatric service: psychiatric consultation and short-term follow-up. It is possible that telepsychiatry may not produce equivalent outcomes when used to deliver other mental health services, such as psychotherapy, which is more dependent on the therapist-patient relationship. Nevertheless, the findings are likely to encourage those who advocate a more widespread adoption of telepsychiatry to counter the shortage of psychiatrists in remote regions.

*Acknowledgments and disclosures*

This study was supported by grant R2354-A01 from the Ontario Mental Health Foundation and by NORTH Network. The authors thank Emmanuel Persad, M.B., for his helpful advice and assistance and Allan Donner, Ph.D., for his advice on statistics.

The authors report no competing interests.

## References

1. El-Guebaly N, Kingstone E, Rae-Grant Q, et al: The geographical distribution of psychiatrists in Canada: unmet needs and remedial strategies. Canadian Journal of Psychiatry 38:212–216, 1993

2. Brown FW: Rural telepsychiatry. Psychiatric Services 49:963–964, 1998

3. Monnier J, Knapp RG, Frueh BC: Recent advances in telepsychiatry: an updated review. Psychiatric Services 54:1604–1609, 2003

4. Ruskin PE, Reed S, Kumar R, et al: Reliability and acceptability of psychiatric diagnosis via telecommunication and audiovisual technology. Psychiatric Services 49:1086–1088, 1998

5. Elford R, White H, Bowering R, et al: A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. Journal of Telemedicine and Telecare 6:73–82, 2000

6. Ball CJ, Scott N, McLaren PM, et al: Preliminary evaluation of a low-cost video conferencing (LCVC) system for remote cognitive testing of adult psychiatric patients. British Journal of Clinical Psychology 32:303–307, 1993

7. Baer L, Cukor P, Jenike MA, et al: Pilot studies of telemedicine for patients with obsessive-compulsive disorder. American Journal of Psychiatry 152:1383–1385, 1995

8. Zarate CA Jr, Weinstock L, Cukor P, et al: Applicability of telemedicine for assessing

CDCR_312

and reliability. Journal of Clinical Psychiatry 58:22–25, 1997

9. Jones BN 3rd, Johnston D, Reboussin B, et al: Reliability of telepsychiatry assessments: subjective versus observational ratings. Journal of Geriatric Psychiatry and Neurology 14:66–71, 2001

10. Yoshino A, Shigemura J, Kobayashi Y, et al: Telepsychiatry: assessment of televideo psychiatric interview reliability with present- and next-generation internet infrastructures. Acta Psychiatrica Scandinavica 104:223–226, 2001

11. Zaylor C: Clinical outcomes in telepsychiatry. Journal of Telemedicine and Telecare 5(suppl 1):S59–S60, 1999

12. Kennedy C, Yellowlees P: The effectiveness of telepsychiatry measured using the Health of the Nation Outcome Scale and the Mental Health Inventory. Journal of Telemedicine and Telecare 9:12–16, 2003

13. Ruskin PE, Silver-Aylaian M, Kling MA, et al: Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. American Journal of Psychiatry 161:1471–1476, 2004

14. Nelson EL, Barnard M, Cain S: Treating childhood depression over videoconferencing. Telemedicine Journal and E-Health: The Official Journal of the American Telemedicine Association 9:49–55, 2003

15. Jones B, Jarvis P, Lewis JA, et al: Trials to assess equivalence: the importance of rigorous methods. British Medical Journal 313:36–39, 1996

16. Garrett AD: Therapeutic equivalence: fallacies and falsification. Statistics in Medicine 22:741–762, 2003

17. Fleming TR: Design and interpretation of equivalence trials. American Heart Journal 139:S171–S176, 2000

18. Piersma HL, Reaume WM, Boes JL: The

Brief Symptom Inventory (BSI) as an outcome measure for adult psychiatric inpatients. Journal of Clinical Psychology 50:555–563, 1994

19. Hauck WW, Anderson S: Some issues in the design and analysis of equivalence trials. Drug Information Journal 33:109–118, 1999

20. Derogatis LR: BSI Brief Symptom Inventory: Administration, Scoring, and Procedures Manual, 4th ed. Minneapolis, National Computer Systems, 1993

21. Ware JE Jr, Gandek B: Overview of the SF-36 Health Survey and the International Quality of Life Assessment (IQOLA) Project. Journal of Clinical Epidemiology 51:903–912, 1998

22. Hopman WM, Towheed T, Anastassiades T, et al: Canadian normative data for the SF-36 Health Survey: Canadian Multicentre Osteoporosis Study Research Group. Canadian Medical Association Journal 163:265–271, 2000

23. Larsen DL, Attkisson CC, Hargreaves WA, et al: Assessment of client/patient satisfaction: development of a general scale. Evaluation and Program Planning 2:197–207, 1979

24. Attkisson CC, Zwick R: The client satisfaction questionnaire: psychometric properties and correlations with service utilization and psychotherapy outcome. Evaluation and Program Planning 5:233–237, 1982

25. Attkisson CC, Greenfield TK: The UCSF Client Satisfaction Scales: I. the Client Satisfaction Questionnaire-8, in The Use of Psychological Testing for Treatment Planning and Outcomes Assessment, 2nd ed. Edited by Maruish MA. Mahwah, NJ, Lawrence Erlbaum Associates, 1999

26. Nguyen TD, Attkisson CC, Stegner BL: Assessment of patient satisfaction: development and refinement of a service evaluation questionnaire. Evaluation and Program Planning 6:299–313, 1983

27. Simpson J, Doze S, Urness D, et al: Client satisfaction in a feasibility study comparing face-to-face interviews with telepsychiatry. Journal of Telemedicine and Telecare 8:217–221, 2002

28. Pagano M, Gavreau K: Principles of Biostatistics. Belmont, Calif, Duxbury Press, 1993

29. Carscaddon DM, George M, Wells G: Rural community mental health consumer satisfaction and psychiatric symptoms. Community Mental Health Journal 26:309–318, 1990

30. Ware JE: SF-36 Health Survey Manual and Interpretation Guide. Boston, Health Institute, New England Medical Centre, 1993

31. Gill KJ, Pratt CW, Librera LA: The effects of consumer vs staff administration on the measurement of consumer satisfaction with psychiatric rehabilitation. Psychiatric Rehabilitation Journal 21:365–370, 1998

32. Beutler LE, Engle D, Mohr D, et al: Predictors of differential response to cognitive, experiential and self directed psychotherapeutic procedures. Journal of Consulting and Clinical Psychology 59:333–340, 1991

33. Greenwood N, Key A, Burns T, et al: Satisfaction with in-patient psychiatric services: relationship to patient and treatment factors. British Journal of Psychiatry 174:159–163, 1999

34. Hyler SE, Gangure DP: A review of the costs of telepsychiatry. Psychiatric Services 54:976–980, 2003

35. Simpson J, Doze S, Urness D, et al: Telepsychiatry as a routine service—the perspective of the patient. Journal of Telemedicine and Telecare 7:155–160, 2001

36. Rohland BM, Saleh SS, Rohrer JE, et al: Acceptability of telepsychiatry to a rural population. Psychiatric Services 51:672–674, 2000

# ATTACHMENT 17

CDCR _314

U.S. Department of Justice
Federal Bureau of Prisons

# Program Statement

**OPI:** HSD/PSY
**NUMBER:** P6340.04
**DATE:** 1/15/2005
**SUBJECT:** Psychiatric Services

1. **PURPOSE AND SCOPE.** To provide Psychiatric Services which address the physical, medical, psychological, social, vocational and rehabilitative needs of inmates in the Bureau's custody who suffer from mental illnesses and disorders. The Bureau provides essential, cost-effective, high-quality, and humane diagnostic and treatment services throughout the inmates' incarceration.

By doing so, we strive to improve the inmates' condition, enhance the process of ongoing recovery and reduce the chances of relapsing and/or re-offending. Psychiatric services provided to inmates improves the safety and security of institutions and communities.

- All psychiatric services within the Bureau will be provided in accordance with the Bureau's overall mission, goals, and policies, and specifically, as they are outlined in other Program Statements on the provision of health care.

- This Program Statement does not cover forensic services which are covered under the Program Statement on Institution Management of Mentally Ill Inmates.

2. **PROGRAM OBJECTIVES.** The expected results of this program are:

   a. Inmates in need of psychiatric services will be identified.

   b. Essential psychiatric diagnostic and treatment services will be available for all Bureau inmates.

   c. High-quality and cost-effective psychiatric services will be provided at all institutions where such services are rendered.

d.  Continuity of psychiatric care during incarceration and upon release will be enhanced.

3.  **DIRECTIVES REFERENCED**

> P5050.46  Compassionate Release, Procedures for Implementation of 18 U.S.C. §§ 3582/4205 (5/19/98)
> P5070.11  Study and Observation Report (12/31/97)
> P5212.07  Control Unit Programs (2/20/01)
> P5270.07  Inmate Discipline and Special Housing Units (12/29/87)
> P5310.12  Psychology Services Manual (8/13/93)
> P5310.13  Mentally Ill Inmates, Institution Management of (3/31/95)
> P5324.05  Suicide Prevention Program (3/1/04)
> P5566.05  Use of Force and Application of Restraints (7/25/96)
> P6010.01  Psychiatric Treatment and Medication, Administrative Safeguards for (9/21/95)
> P6027.01  Health Care Provider Credential Verifications, Privileges and Practice Agreement Program (1/15/05)
> P6090.01  Health Information Management (1/15/05)
> P6270.01  Medical Designations and Referral Services for Federal Prisoners (1/15/05)
> P6360.01  Pharmacy Services (1/15/05)
> P7331.04  Pretrial Inmates (1/31/03)

4.  **STANDARDS REFERENCED**

a.  American Correctional Association 4th Standards for Adult Correctional Institutions:  4-4347, 4-4368, 4-4369, 4-4370, 4-4371, 4-4372, 4-4374, 4-4376, 4-4381, 4-4382, 4-4384, 4-4392, 4-4397, 4-4399, 4-4400, 4-4401, 4-4404, 4-4405, and 4-4411

b.  American Correctional Association Standards for Adult Local Detention Facilities, 3rd Edition:  3-ALDF-4E-11, 3-ALDF-4E-12, 3-ALDF-4E-18, 3-ALDF-4E-32, 3-ALDF-4E-37, and 3-ALDF-4E-38

5.  **DEFINITIONS**

a.  **Behavior Therapy.**  A form of psychological treatment aimed at modifying behavior in a direction that improves a patient's mental health condition.  It includes specific methodology and technology used to bring about the behavior change.

b. **Competence to Give Informed Consent.** The inmate has an understanding of his/her diagnosis or condition, the treatment being offered, the potential risks, benefits and side-effects of treatment, especially serious ones, what to do in the event of such effects, the alternatives to the treatment being offered (including no treatment), and risks associated with the alternatives.

c. **Least Restrictive Clinical Interventions.** The minimum intervention necessary to control the situation including the use of non-physical interventions, as well as voluntary medication, voluntary special housing, seclusion, involuntary medications, and restraints.

d. **Mental Health Emergency.** For the purposes of the potential use of mental health seclusion or restraint, a mental health emergency is defined as a situation in which an inmate is suffering from a mental illness which creates an immediate threat of:

- Bodily harm toward self;
- Bodily harm toward others;
- Serious destruction of property which would immediately endanger self or others; or
- Serious disruption of the therapeutic milieu that places the inmate at risk of harm by others.

For the purposes of emergency medication, a mental health emergency includes all of the above situations, as well as a situation in which there is an immediate risk of extreme deterioration of functioning secondary to a psychiatric illness.

e. **Mental Health Restraint.** The direct application of physical force or device(s) to an inmate without his/her permission, to restrict his/her freedom of movement when a mental health emergency exists.

f. **Mental Health Unit.** The designated part of an institution which houses inmates with a mental health designation. This may include units providing the following kinds of services, as defined at the individual institution: inpatient, outpatient, forensic, diagnostic and observation, seclusion, administrative detention, disciplinary segregation, and other housing statuses as defined in the institution's policies and procedures.

g. **Psychiatric Medication.** Medication prescribed for the treatment of signs or symptoms of mental disorders or illnesses.

h. **Psychiatric Referral Center (PRC).** An institution (usually a Medical Referral Center (MRC)) which has as part of its mission the provision of inpatient psychiatric services.

i. **Seclusion.** Involuntary confinement of an inmate in a locked room when a mental health emergency exists.

6. **PSYCHIATRIC SERVICES AND ORGANIZATION.** Bureau Psychiatric Services are under the direction of the BOP Chief Psychiatrist. The Medical Director gives privileges to and supervises the BOP Chief Psychiatrist.

Psychiatric services are delivered at PRCs and non-PRC institutions through the services of staff and contract/consultant psychiatrists, other mental health care providers and allied health professionals.

a. **PRCs.** The Medical Director will designate the PRC's mission. PRCs provide a full range of psychiatric diagnostic and treatment services consistent with their missions.

- Psychiatric services at PRCs will be under the direction of the institution Chief of Psychiatry. Each Chief of Psychiatry will have a documented external peer review at least every two years.

- PRCs will seek and maintain accreditation by the Joint Commission for the Accreditation of Healthcare Organizations (JCAHO) under the appropriate behavioral health standards.

- PRCs will maintain accreditation by the American Correctional Association (ACA) in accordance with the missions the Medical Director assigned.

- Each PRC will establish an organizational plan designed to meet the needs of both the institution and the Bureau. The plan is subject to the Medical Director's approval.

b. **Other Institutions.** Ordinarily, psychiatric services at institutions other than PRCs will be under the Clinical Director's direction. When such institutions have more than one psychiatrist on staff, the Warden may select a Chief of Psychiatry with the Medical Director's approval.

- It is recommended that each institution not having a full-time psychiatrist or regular access to tele-psychiatry, contract for psychiatric services.

- Inmates with severe mental illness or who are severely developmentally disabled, will receive a mental health evaluation and, where appropriate, will be referred for placement in a facility or unit specifically designated for managing this type of individual.

7. **STAFFING.** PRCs will have an organized medical staff subject to medical bylaws consistent with JCAHO standards. Medical bylaws are subject to negotiation in accordance with the Master Agreement. Psychiatrists and licensed psychologists are eligible for membership on the medical staff and for all privileges within the scope of their licenses, including admitting and discharging privileges.

- All privileges are subject to the provisions outlined in the Program Statement on Health Care Provider Credential Verification, Privileges, and Practice Agreement Program.

The roles of other staff in the psychiatric program, such as social workers, mid-level practitioners, activity therapists, etc., will be determined by the institution organizational plan and approved by the Medical Director.

a. **Chief Psychiatrist.** The Warden will select the Chief Psychiatrist with the Medical Director's approval. The Medical Director will be the privileging authority for all Chiefs of Psychiatry. Privileging authority may be delegated to the BOP Chief Psychiatrist.

The Chief Psychiatrist has overall responsibility for the supervision and implementation of the psychiatric program. This responsibility includes:

- Supervising staff;
- Overseeing contract psychiatrists;
- Providing other supervisory duties as determined by the institution's organizational plan;
- Serving as a member of the institution Pharmacy and Therapeutics Committee, the Quality Improvement Program Committee, and other committees as determined by the needs of the institution and the Bureau; and
- Coordinating the in-house Continuing Professional Education (CPE) program for the psychiatrists and any other clinical staff he/she directly supervises.

The Chief Psychiatrist works closely with Social Work Services, Nursing Services, Psychology, and Correctional Services to address issues surrounding care and treatment of inmates with mental illnesses and disorders.  He/she will be actively involved in the education of staff in the:

- Recognition of signs and symptoms of mental illness;
- Management of the mentally ill inmate; and
- Risk management issues pertaining to working with the mentally ill.

b. **Staff Psychiatrist.**  Mental health care will be provided by individual professionals and/or by a multi-disciplinary team.  As a team member, the psychiatrist responsible for the psychiatric care being provided to the inmate will provide diagnostic and treatment services consistent with the field of psychiatry and Bureau policy and guidelines.

- The psychiatrist will manage those inmates with complex psychiatric conditions directly.  Complex conditions include, but are not limited to, those requiring multiple psychiatric medications, psychiatric illnesses complicated by medical conditions, psychiatric symptoms not responding to usual treatments, etc.

- The psychiatrist will consult with, provide training to, and mentor other team members and staff involved in the medical care, mental health care, or supervision of mentally ill inmates.

Psychiatrists who perform clinical services on an inpatient psychiatric unit have responsibility for coordinating the inmate's psychiatric and medical care while the inmate is an inpatient.

- Members of the Health Services Unit may provide medical care; however, responsibility for coordination and continuity of medical care lies with the psychiatrist assigned to the inmate.

8. **SERVICES**.  The exact nature of psychiatric services available at institutions will be based on the institution's mission as well as the staff and community psychiatric resources available at the institution (including tele-psychiatry).

- PRCs specified as forensic sites will provide forensic evaluations pursuant to 18 U.S.C. §§ 4241 - 4247.

CDCR _320

All institutions will provide the following services either
through medical and mental health care staff at the institution
or through consultation with community resources (the services
may be delivered by clinicians and staff other than
psychiatrists):

- Crisis intervention;
- Emergency services;
- Risk assessment for acts of self-harm or harm towards
  others;
- Mental health screening of inmates suffering from symptoms
  or behavioral disturbances indicative of possible mental
  illnesses or disorders;
- Detoxification from alcohol, benzodiazepines, and
  barbiturates;
- Diagnosis and treatment of mild to moderate mental illnesses
  such as non-psychotic major depression, anxiety disorders,
  or sleep disorders;
- Continuation of psychiatric treatment initiated at other
  institutions or prior to incarceration; and
- Monitoring of inmates on psychiatric medications for side-
  effects and drug interactions.

PRCs provide all services necessary to meet their mission
either on-site or through community resources.  At a minimum,
this includes:

- Complete diagnostic services; and
- Inpatient and outpatient psychiatric treatment services for
  the severely mentally ill.

9.   **EVALUATIONS**.  The Medical Director will provide guidance for
standards and formats for psychiatric evaluations.

a.  **Intake Screening.**  Staff performing intake screening will
assess and make appropriate referrals to a mental health
professional when an inmate:

- Has a mental health designation;
- Exhibits signs or symptoms consistent with a possible
  mental disorder; or
- Is on medication for treatment of a mental illness or
  disorder.

Screening will be of sufficient detail to determine appropriate
housing for the inmate until a thorough mental health evaluation
can be completed.

b. **Outpatient Evaluations.** Institutions will have a system in place by which inmates can be referred to a psychiatrist for a psychiatric evaluation. At non-PRCs this will generally be through Health Services or Psychology Services.

Inmates referred for psychiatric evaluation who have not received a psychological/mental health evaluation within the previous 30 days, will be seen within 14 days from the date of referral. Inmates who have received a psychological/mental health evaluation within the previous 30 days, will be seen in a timely manner consistent with the inmate's clinical needs.

- The evaluation will be consistent with ACA standards on mental health evaluations. Further guidance for the content and format for psychiatric evaluations will be provided by the Medical Director.

Inmates with a Mental Health designation who do not need inpatient treatment or refuse admission to an inpatient unit, will undergo a complete psychiatric evaluation by either a psychiatrist or a licensed psychologist.

- The psychiatric evaluation will occur within a clinically appropriate time frame, not to exceed 14 days from arrival.

- The evaluation will be consistent with ACA standards on mental health evaluations. Further guidance for the content and format for psychiatric evaluations will be provided by the Medical Director.

Some PRCs may designate an area of the Mental Health Unit as a "Diagnostic and Observation (D and O) Unit." The D and O unit is an outpatient unit with clearly established admission, transfer and discharge criteria, reasonable time frames for completion of psychiatric evaluations, and length of stays.

- These criteria are subject to the Medical Director's approval.

- All psychiatric treatment provided on the D and O Unit, other than emergency treatment, will be voluntary and with the inmate's informed consent.

c. **Inpatient Admissions.** Inmates will only be admitted to an inpatient unit after giving informed consent for admission or under an appropriate court order (see the Program Statements on Administrative Safeguards for Psychiatric Treatment and

Medication and Institution Management of Mentally Ill Inmates). PRCs will develop and implement admission and discharge criteria approved by the Medical Director.

   (1)   **Voluntary Admissions**

   - The inmate will be informed of his/her rights through the use of the Consent to Admission for Mental Health Treatment (BP-S801) form.

   - The informed consent for admission will be in a language understood by the inmate.

   - The completed form will be placed in the inmate's health record.

   Inmates admitted to an inpatient unit will undergo a psychiatric evaluation within 24 hours of admission. Either a psychiatrist or licensed psychologist with admitting privileges may perform this evaluation. A medical history and physical will be performed in accordance with local policy.

   (2)   **Involuntary Admissions**

   - Involuntary inpatient admission or treatment can occur only with a court order under 18 U.S.C. §§ 4241 - 4247.

   - 18 U.S.C. §§ 4241 - 4247 does not apply to un-sentenced Bureau of Immigration and Customs Enforcement (BICE), formerly the Immigration and Naturalization Service, detainees, un-sentenced prisoners in Bureau custody as a result of a court order, and state or territorial prisoners.

   - For those persons not covered by 18 U.S.C. §§ 4241 - 4247, the decision to admit or treat the person involuntarily must be made through an administrative hearing in accordance with <u>Vitek v. Jones</u>, 445 U.S. 480 (1980).

Pursuant to 10 U.S.C. § 876(b), military prisoners who are incompetent to stand trial or who have been found not guilty by reason of lack of mental responsibility may be committed to the custody of the Attorney General and are subject to the procedures authorized under 18 U.S.C. §§ 4241, 4243, and 4246. Similarly, under 18 U.S.C. § 4247(j), District of Columbia Code offenders are subject to commitment procedures specified under §§ 4245 and 4246.

d.  **Psychiatric Evaluation for Correctional Purposes.**  Inmates receiving an incident report and who are psychiatric inpatients, or whose mental status is questionable, will be referred to a psychiatrist or psychologist for an assessment regarding competency and responsibility.  The mental health clinician will use the same standards that apply in establishing competency and responsibility pursuant to 28 CFR 541.10(b)(6) (contained in the Program Statement on Inmate Discipline and Special Housing Units).

- It is strongly recommended that PRCs establish separate Special Housing Units (SHU) for inmates with mental illnesses or disorders that are physically distinct from the SHUs used to house general population inmates.

- Non-PRCs are encouraged to identify a specific area in SHU where inmates suffering from active symptoms of a mental illness and who require SHU placement can be housed.  These inmates are at increased risk of behaviors of self-harm or harm towards others.  The area chosen should facilitate frequent observation by and contact with staff.

- Whenever any inmate is transferred into a SHU, health care staff will be informed immediately and will provide assessment and review as indicated by local protocols established by the local health authority.

- A mental health professional must evaluate inmates being referred to a control unit.  Refer to the Program Statement on Control Unit Programs for requirements and the format of the evaluation.

10.  **TREATMENT**.  Psychiatric treatment, except in an emergency, will begin only after a psychiatric evaluation and plan have been completed.  Inmates who have received psychiatric evaluation and treatment services at another Bureau institution will have that treatment continued at the new institution pending further evaluation.

- Further guidance on psychiatric treatment will be provided by the Medical Director.

The timing and extent of the evaluation undertaken at the receiving institution will depend on several factors, including:

- Time elapsed since the last complete psychiatric evaluation;

- The comprehensiveness of the last complete psychiatric evaluation; and
- The inmate's clinical presentation.

Psychiatric treatment, regardless of the unit in which the inmate resides, will be voluntary except when:

- Treatment has been ordered by the court; or
- A mental health emergency exists.

Pretrial inmates and inmates committed by the court can be treated only under certain conditions and usually only after following procedures outlined in the Program Statements on Institution Management of Mentally Ill Inmates and Administrative Safeguards for Psychiatric Treatment and Medication.

   a. **Psychiatric Medication.**  Except in an emergency, informed consent will be obtained and documented prior to administering medication for psychiatric symptoms or conditions (refer to the Program Statement on Pharmacy Services).  Ordinarily, the prescribing physician will be responsible for obtaining the informed consent.

   Patient education for obtaining informed consent includes the following information:

- Symptoms of the illness;
- Potential benefits of treatment;
- Potential risks and side-effects (especially serious ones);
- Appropriate use of the medication;
- When to notify staff of problems;
- Consequences of noncompliance; and
- Alternative treatments, including no treatment, and associated risks.

   The inmate's competency to give informed consent will be assessed and documented on the corresponding "Consent to Use (name of medication)" form.  An informed consent form will be obtained when:

- A psychiatric medication is prescribed for which an informed consent has not previously been obtained;
- An inmate has previously given informed consent, but has been off the medication for at least a year;
- Clinical judgment deems that a new informed consent is appropriate because of a significant change in the inmate's clinical status; or

- An inmate on psychiatric medication is newly committed to the Bureau and does not have informed consent documented on any of the standard forms noted above.

Inmates on psychiatric medication will be monitored regularly in Chronic Care Clinics.  Noncompliance should not be the determining factor for exclusion from the Mental Health Chronic Care Clinic.  Inmates with mental illness present potentially important risk management issues.

- Inclusion in the Chronic Care Clinic should continue as long as the inmate has active symptoms of mental illness or is on psychiatric medication.

All institutions will have a system(s) in place for assuring continuity of care for all inmates receiving psychiatric treatment even if such treatment was started before incarceration at the current institution.

- Continuity of care is required from admission to transfer or discharge from the Bureau, including referral to community-based providers, when indicated.

- Such a system will include monitoring compliance with psychiatric medications and maintaining documented informed consent in the health record.

- At non-PRCs, timely notification of noncompliance will be made to the Clinical Director and other relevant mental health staff, such as the Chief of Psychology, staff psychiatrist, or contract psychiatrist.

- At PRCs, the treating psychiatrist and Chief Psychiatrist will be informed of any noncompliance issues.

b. **Electroconvulsive Therapy.**  Electroconvulsive therapy (ECT) will only be considered for inmates at PRCs, except in an extreme emergency.  Prior to administering any ECT, the Medical Director must approve the procedure in writing.

- Once it has been determined that ECT is an appropriate treatment for the inmate and the treatment has been approved, ECT will be performed in the community by a qualified consultant psychiatrist privileged to administer the treatment.

c.  **Behavior Therapy.**  Behavior therapy may be an appropriate treatment for certain conditions and inmates.  When this treatment modality is used, the institution will be in compliance with JCAHO Behavioral Health Care Standards.

- Painful stimuli will not be used as a mental health intervention.

d.  **Mental Retardation.**  Inmates who are considered mentally retarded will be thoroughly evaluated for their potential psychiatric needs.  Not all inmates with mental retardation require intensive psychiatric services.

- Placement at PRCs will be consistent with their clinical needs.

e.  **Dementia.**  Inmates with possible dementia will undergo a complete psychiatric and medical evaluation.  Those with moderately severe or severe dementia should be considered for a reduction in sentence/compassionate release. (Refer to the Program Statement on Compassionate Release.)

- Not all inmates with dementia will require placement at a PRC.  Designation and treatment will be consistent with their medical and psychiatric needs.

11.  **EMERGENCY TREATMENT**.  Interventions during a mental health emergency may include nonphysical interventions, voluntary medication, seclusion, involuntary medication, and/or restraint.

- The **least restrictive method** for controlling the situation will be employed and documented in the inmate health record.

a.  **Emergency Medication.**  Psychiatric medication may be administered in a mental health emergency only by order of the physician, and if the inmate is at immediate risk of:

- Bodily harm toward self;
- Bodily harm toward others;
- Serious destruction of property which would immediately endanger self or others;
- Serious disruption of the therapeutic milieu that places the inmate at risk of harm from others; or
- Extreme deterioration of functioning secondary to a psychiatric illness.

CDCR _327

Documentation of emergency medication administration will
include the following:

- Type of emergency;
- Interventions attempted and the result(s);
- Reason that less restrictive interventions were not
  used or were ineffective;
- When, where and how the medication is to be
  administered; and
- Assessment and monitoring of the inmate for adverse
  reactions and side-effects.

The inmate's treatment plan will be reviewed, and, if
necessary, revised, as soon as possible.

At non-PRCs, the Clinical Director will consult with the office
of the Medical Director within 24 hours of administering
emergency medication (excluding weekends and holidays).  The
Medical Director will provide guidance on further evaluation,
treatment, referral to a PRC, or other appropriate clinical
interventions.

Ordinarily, emergency treatment with psychiatric medications at
non-PRCs will not be continued for more than 72 hours without the
Medical Director's approval.

- Ordinarily, long-acting psychiatric medications such as
  Haldol Decanoate and Prolixin Decanoate will not be
  used in emergencies except at PRCs.

For guidance on emergency treatment of pretrial, pre-sentence,
and other forensic inmates, refer to the Program Statements on
Institution Management of Mentally Ill Inmates and Administrative
Safeguards for Psychiatric Treatment and Medication.

b.  **Seclusion.**  Seclusion may be an appropriate clinical
intervention during a mental health emergency.  All institutions
using mental health seclusion must have an Institution Supplement
consistent with JCAHO Behavioral Health Standards.

- The Institution Supplement will be negotiated in
  accordance with the Master Agreement after approval by
  the Medical Director.  (Refer to the Program Statement
  on Mental Health Seclusion and Restraints).

c.  **Restraints.**  Restraints may be an appropriate clinical
intervention during a mental health emergency.  In many cases,
the use of restraints during a mental health emergency may be
more restrictive than the use of emergency medication.   All

institutions using restraints will have an Institution Supplement
consistent with JCAHO Behavioral Health Standards and ACA
standards on the use of restraints.

- The Institution Supplement will be negotiated in
  accordance with the Master Agreement after approval by
  the Medical Director (see the Program Statement on
  Mental Health Seclusion and Restraints).

12. **DOCUMENTATION.** All documentation related to psychiatric
evaluations and treatment (inpatient, outpatient, and forensic)
will be available in the inmate's health record and the
requirements noted in the Program Statements on Patient Care and
Health Information Management will be adhered to.

- All psychiatric diagnoses will adhere to the nomenclature
  set forth in the most recent Diagnostic and Statistical
  Manual of Mental Disorders.

- All five Axes will be noted in the diagnosis section of the
  evaluation.

- The clinician performing the mental health evaluation will
  be responsible for documenting Axes I, II and V on the
  problem list of the inmate's health record. When the
  evaluation is completed via tele-psychiatry, or performed by
  a contract psychiatrist, the physician on the inmate's
  primary care provider team will be responsible for noting
  the diagnoses on the problem list.

Documentation of emergency interventions will include the
following:

- Type of emergency;
- Intervention(s) attempted and their result(s); and
- Reason that less restrictive interventions were not used or
  were ineffective.

If the emergency intervention includes medication, refer to
Section 11.a. If the intervention includes seclusion or
restraints, documentation will meet the requirements set forth in
the Program Statement on Mental Health Seclusion and Restraints.

- The Medical Director will provide additional guidance
  regarding documentation for psychiatric evaluation and
  treatment.

13.  **EDUCATION**.  The Bureau will provide regular professional
training opportunities for mental health care staff consistent
with their clinical duties and responsibilities.

PRCs are encouraged to provide training for medical and allied
health care professionals, including students.  They are also
encouraged to provide post-graduate training to residents and
fellows.

- Residency programs and fellowships may be established with
  the Medical Director's approval.


                              /s/
                    Harley G. Lappin
                    Director

CDCR _330

# ATTACHMENT 18

CDCR _331

Date:  July 5, 2018

TN:  **469467**

Call#:
Location:

Journal Title: **Aviation, space, and environmental medicine**
Volume: **63** Issue: **2**
Month/Year:  **1992**
Article Title:  **Telemedicine: military applications.**
Pages:**135-137**

This document was scanned for: **Leonard Pechacek**

Courtesy of:

**Moody Medical Library**
The University of Texas Medical Branch in Galveston

mml.docreq@utmb.edu
office:  409-772-2386 or 8748

 Health

Working together to work wonders."

**Notice:  This pdf will be automatically removed from our server after 30 days.**

## TECHNICAL NOTE

# Telemedicine: Military Applications

RUSSELL B. RAYMAN, M.D., M.P.H.

RAYMAN RB. *Telemedicine: military applications.* Aviat. Space
Environ. Med. 1992; 63:135–7.
Communications technology has enjoyed enormous growth in
recent years and should be fully exploited by the medical com-
munity. Its application as part of disaster response was well
demonstrated in the aftermath of the tragic earthquake in So-
viet Armenia in 1988. Besides disaster response, telemedicine
also has application for patient care, diagnostic imaging, and
training and education. This capability would be particularly
beneficial to the armed forces of many nations. If the communi-
cations equipment were portable, it could be well employed dur-
ing peacetime, yet easily deployed to the battlefield. Therefore,
armed forces should fully exploit telecommunications technol-
ogy for the practice of military medicine.

COMMUNICATIONS TECHNOLOGY has en-
joyed phenomenal growth in the past several de-
cades. What would have seemed "out of this world" in
the 1940's and 50's is today very much "down to
Earth," thanks to the space program which has
spawned commercial communication satellites, high
resolution cameras, image processors, and other sophis-
ticated communication paraphernalia. Much of the busi-
ness we conduct and the entertainment we enjoy de-
pend upon these modern telecommunications:
telephone calls, international television programming,
weather reports, and even news of the war in the Per-
sian Gulf, live. And in recent years, medicine has also
begun to take advantage of the new technology.

Use of telecommunications in the practice of medi-
cine is young, although not necessarily new. As far back
as 1964, psychiatric consultations were conducted in
Nebraska via two-way closed circuit television (1). In
1967, the Massachusetts General Hospital provided
consultations for employees and passengers at Logan
Airport in psychiatry, radiology, and dermatology (2).
Other successful applications since that time occurred
in anesthesiology, pediatrics, dental care, pathology,
and radiology (3–7).

A practitioner far from a large city can now consult
via telecommunications with specialists in distant med-
ical centers. Not only can patients be evaluated on cam-
era, but also special studies such as radiographs, CT
scans, ultrasound, and ECGs can be transmitted for dis-
cussion and interpretation. Consequently, the lone
practitioner no longer has to feel isolated when treating
a patient with a medical problem beyond his or her ex-
pertise.

In addition to routine patient consultation, telemedi-
cine has found application in disaster response. In De-
cember, 1988, a severe earthquake struck Soviet Arme-
nia, causing 150,000 casualties as well as widespread
damage. Through appropriate channels, NASA offered
aid to the Soviet Union in the form of consultation
through telemedicine communications with specialists
in the United States who could offer their services in
real time to the managing physicians in Soviet Armenia.
This offer was accepted by the Soviet government, al-
though it took about five months of governmental red
tape (both U.S. and U.S.S.R.) before the operation ac-
tually began. As a result, patients treated were in the
rehabilitative rather than the acute stages of injury. For
example, there were consultations with appropriate spe-
cialists for spinal cord injury, mutilative lesions of the
face, malunion and nonunion of fractures, and severe
mental illness.

A telecommunication system called Spacebridge to
Armenia was eventually deployed from the U.S. to the
U.S.S.R. and integrated with existing Soviet systems.
The components were a combination of land lines, in-
ternational and domestic satellites, and two Earth sta-
tions (one in Yerevan, the capital of Armenia, and the
other in Roaring Creek, PA) which linked Yerevan with
four U.S. medical centers* and NASA Headquarters in
Washington, DC. This network had the capacity to
transmit one-way color video (from Soviet Armenia to
the United States), two-way voice, and two-way fac-
simile. Broadcasts were scheduled for 4 h each day, 5 d

From Lockheed Engineering and Sciences Co., Washington, DC.
This manuscript was received for review in June 1991. The revised
manuscript was accepted for publication in July 1991.
Address reprint requests to Russell B. Rayman, M.D., M.P.H.,
who is Manager, Operational Medicine, Lockheed Engineering and
Sciences Co., 600 Maryland Ave., SW, Suite 600, Washington, DC
20024.

* Uniformed Services University of the Health Sciences. Bethesda,
MD; University of Maryland Institute of Emergency Medical Services
Systems, Baltimore; University of Texas Health Science Center.
Houston; Latter Day Saints Hospital/University of Utah, Salt Lake
City.

CDCR _333

per week from May through July, 1989. Prior to broadcasting, an agenda was prepared by Soviet and U.S. physicians so that both managing physicians (Soviet) and appropriate consulting physicians (American) were on the air together at prearranged times, in order for the Armenian physicians to present their patients. Although the U.S. physicians were not on television for the Soviets, their voice communication was in real time. In addition, both sides had the capability to send patient information and any other professional data via facsimile. Through this system, over a period of 3 months more than 200 patients were presented for consultations in all major specialty areas. In addition, many sessions were devoted to discussions such as public health and preventive medicine issues relevant to the disaster.

The results of Spacebridge to Armenia can never be quantified, in that much of the discussion and many of the points made during consultations on single patients really had application to many other patients with similar illness or injury. However, a general assessment can be made by several interesting findings. First, through these consultations, approximately 25% of the original diagnoses made by the Armenian managing physicians were changed. Likewise, the treatment as a result of these consultations, was altered in 24% of patients. Another interesting finding was that in 12% of cases, the interpretation of diagnostic studies was altered. Based on these and other data, the Soviet and U.S. participants felt that the Spacebridge to Armenia operation was highly successful and that it clearly demonstrated that physicians can practice medicine effectively, even over vast distances, through the media of modern telecommunications.

As the planning and execution of Spacebridge proceeded over many months, the participating physicians began to see unlimited possibilities for its use not only regionally, but globally as well. One clear application would be for the medical components of the armed forces.

With the armed forces scattered throughout the world, with many physicians in semi-remote or remote areas, as well as on board ships, and with the ever-present danger of disaster and war, medical telecommunications could have a number of useful applications in the practice of military medicine: on the battlefield, at disaster sites, for aircraft accident investigation, for peacetime patient care, and for training and education.

Telemedicine has never been tried on the battlefield during wartime. Perhaps an opportunity to deploy and test its utility was lost during the recent Persian Gulf War. It would have been instructive to have deployed a telemedicine system, even a very limited one, to a field hospital or possibly to a ship for use in the treatment of battle and non-battle injuries. Physicians in the theater could then have evaluated the system, graded its utility, and provided insight on ways to improve it for future use.

Nevertheless, consideration should be given to its use in future conflicts. Because of the technicalities of broadcasting (i.e., camera equipment, programming, etc.) telemedicine may have no place in forward areas (1st or 2nd echelon of care), although this shouldn't be entirely ruled out as technological advances continue to simplify and miniaturize communication equipment. At present, telemedicine would be most effective toward the rear at 3rd echelon medical facilities, which are close to the war zone yet far enough away from the chaos of front line operations. Here, physicians in a relatively calmer environment could consult with other physicians, possibly at 4th or even 5th echelon facilities. Telemedicine aboard hospital ships such as the *U.S.S. Mercy* or *Comfort* or in the sick bay of aircraft carriers is certainly another consideration.

Likewise, telemedicine has great potential for peacetime disasters, which was so well demonstrated in Armenia. For example, the military could be called in to help with mass casualty care in the event of a natural disaster, an aircraft accident, or even a terrorist attack. With the appropriate communication equipment and trained personnel, telemedicine could be part of any military disaster response team.

Another possible application for the military services would be for aircraft accident investigation. Frequently the flight surgeon assigned to an aircraft accident investigation board is relatively inexperienced. With a portable telecommunication system, the investigating flight surgeon could seek the advice of more experienced investigators located far from the site. For example, at the crash site the investigating flight surgeon on camera could discuss with a consultant the wreckage, the ejection seat, and other such relevant issues. Also, questions regarding injuries or cause of death could be reviewed with a forensic pathologist.

Such a system could be very useful to the military not only for wartime or for disasters, but for peacetime operations as well. For example, a telemedicine system could be designed linking several fixed military bases in outlying areas with more centrally-located regional hospitals or medical centers to be used for routine patient consultations. Primary care providers, with the patient in the room, could then easily communicate with other specialists. Consultants could see the patient, the physical examination, the lesion, and communicate with the managing physician (as well as with the patient). Further, images of radiographs, ECGs, specimens under the microscope, and other diagnostic studies could easily be transmitted to the medical center for interpretation. Broadcasts could be arranged perhaps once or twice per week with 1–2 h per broadcast. A schedule of patient presentations could be published in advance to ensure that the appropriate specialist is present in the studio at the appropriate time.

Continuing medical education is another application. For example, with so many physicians located far from medical centers and with limited travel funds, continuing medical education could be beamed to these physicians from the larger facilities. These could be formal courses or simply professional meetings that most hospitals have on a recurring basis. In addition to continuing medical education, this technology could also be used for professional military education as well.

Finally, military training such as battlefield medicine could be done very effectively with the use of telemedicine. Courses could be taught not only with didactic

CDCR _334

Case 2:90-cv-00520-KJM-SCR   Document 5873-5   Filed 08/03/18   Page 378 of 563

lecture material, but also by demonstrating invasive techniques. The system would also allow for two-way exchange between instructors and physician students.

Clearly, there are many applications for telemedicine in the military services. This technology should be carefully reviewed and exploited to the maximum for peacetime and wartime military operations.

The technicalities of the myriad communications systems for telemedicine operations is well beyond the purview of this article. Options include a number of modes for audiovisual and facsimile transmissions using international or domestic satellites, as well as land lines. The military services must choose the features that are most suitable (and within budget constraints). However, in general, it would be advisable to select a portable system that could link small medical treatment facilities in a given area with a medical center. Regular broadcasting could be scheduled for routine patient consultations, medical or professional military training, and continuing medical education. Then, should a war, a disaster, or an aircraft accident occur, the portable features would permit rapid deployment to the field. Further, communications technicians and physicians would already be experienced in telecommunications, thereby greatly facilitating equipment installation and medical operations.

A major lesson learned in the Armenian telemedicine experience was that its use in the practice of medicine does not come easily. It requires much pre-planning as well as training of physicians. As one gains experience in its day-to-day operations, patient consultations become much more efficient and effective. Therefore, the military services should adopt training programs in its use, possibly during residency training or in special courses for physicians. A good place to start would be at the Uniformed Services University School of the Health Sciences, where courses could be offered to medical students.

In summary, there have been great strides in communications technology which should not be lost by the military medical community. Telemedicine has much to offer to the armed forces for peacetime and wartime. If a portable system were used, it could link small medical facilities with larger facilities for routine consultation, training and education. And, should there be a need, it could be deployed to disaster sites as well as to the battlefield.

REFERENCES

1. Benschoter R. Multi-purpose television. Ann. N.Y. Acad. Sci. 1967; 142:471–8.
2. Cunningham N, Marshall C, Glazer E. Telemedicine in pediatric primary care. J.A.M.A. 1978; 240:2749–51.
3. Dwyer TF. Telepsychiatry: psychiatric consultation by interactive television. Am. J. Psychiatry 1973; 130:865–9.
4. Grundy BL, Crawford P, Jones PK, et al. Telemedicine in critical care: an experiment in health care delivery. J.A.C.E.P. 1977; 6:439–44.
5. James JJ, Fill W, Mangelsdorff AD, et al. Interpretation of radiographic images transmitted by satellite. Milit. Med. 1982; 147:288–95.
6. Southard TE, Pierce LJ. The application of digitized image transmission to forensic dentistry. Milit. Med. 1986; 151:413–5.
7. Weinstein RS, Bloom KJ, Rozek S. Telepathology and the networking of pathology diagnostic services. Arch. Pathol. Lab. Med. 1987; 111:646–52.

CDCR _335

# ATTACHMENT 19

CDCR _336

# Telepsychiatry: Videoconferencing in the Delivery of Psychiatric Care

**Jay H. Shore, M.D., M.P.H.**

The provision of psychiatric treatment via live interactive videoconferencing, frequently termed telepsychiatry, is a viable option for psychiatrists to provide care to individual patients, populations, and communities faced with limited access and to move the point of care delivery into patients' living environments. Psychiatric providers new to videoconferencing should not be intimidated by the technology or its encompassing logistics, but they do need to develop an awareness of the salient regulatory, administrative, and clinical issues that arise in the practice of videoconferencing-based telepsychiatry. This article provides an overview of the current evidence base in telepsychiatry and reviews administrative and clinical issues in videoconferencing-based treatment. These points are then highlighted in a case example.

*(Am J Psychiatry 2013; 170:256–262)*

The provision of psychiatric treatment via live interactive videoconferencing, frequently termed telepsychiatry, has been employed since the 1950s, but only in the past decade has it reached maturation and broad use as a treatment modality (1). A growing body of scientific evidence, coupled with burgeoning implementation, is demonstrating telepsychiatry's ability to bring care closer to patients and to increase the range and quality of available mental health services (2–8). The past decade has witnessed the extension of telepsychiatry services from larger institutional programs (e.g., the Department of Veterans Affairs, health maintenance organizations) where patients are seen within a clinic or hospital, often referred to as "clinically supervised settings," to use by individual psychiatrists treating patients directly in their homes, referred to as "clinically unsupervised settings" (9). This development has paralleled consumers' increasing familiarity with web-based videoconferencing platforms for social communication. The initial scientific literature on telepsychiatry focused on whether or not videoconferencing could be used for psychiatric treatments, which was answered affirmatively (7, 10, 11). This line of inquiry is currently evolving into a more nuanced attempt to understand the inherent strengths and weaknesses of videoconferencing for patient-provider interactions.

Understanding telepsychiatry's impact on clinical encounters is important for adaptation and modification of clinical processes to best tailor its use. Videoconferencing is currently a viable option for psychiatrists to provide care to individual patients, populations, and communities faced with limited access and to move the point of care delivery into patients' living environments. Psychiatric providers who are new to videoconferencing should not be intimidated by the technology or its encompassing logistics, but they do need to develop an awareness of the salient regulatory, administrative, and clinical issues that may arise in the practice of videoconferencing-based telepsychiatry. This article is intended to increase knowledge of and comfort with the clinical use of videoconferencing by providing an overview of the current evidence base in telepsychiatry and reviewing administrative and clinical practices, and illustrating these points in a case example. Key issues arising in clinically supervised and unsupervised settings are addressed. The distinction between these two settings is becoming increasingly important given the current and potential growth of videoconferencing in clinically unsupervised settings, such as the provision of direct in-home psychiatric care.

## Evidence Base Supporting Telepsychiatry

Although telepsychiatry has been discussed in the literature for more than half a century (1), the majority of publications on the topic have appeared in the past two decades. Initial articles demonstrated feasibility through program and case description, and outcome research and controlled trials have been published in the past decade (1–7, 10). Telepsychiatry has been shown to be feasible in a wide range of settings, across a complement of psychiatric treatments, in different ethnic groups and populations, and in all age ranges, from child to geriatric psychiatry (12). An increasing number of controlled trials are demonstrating the effectiveness and efficacy of telepsychiatry in specific treatments (e.g., anger management) as well as exploring wider benefits, such as cost savings associated with reduced travel, improved care coordination, and cost avoidance through early treatment (1–7, 10). While this evidence base overall has been supportive of telepsychiatry as a clinical tool, intriguing questions have

This article is featured in this month's AJP Audio and is an article that provides Clinical Guidance (p. 262)

CDCR_337

## Setting

"Ms. A" was seen by a psychiatrist who provides ongoing psychiatric consultation and treatment one half-day per week via telepsychiatry to a primary care clinic located in a rural area. The clinic is located 1,500 miles away from the psychiatrist, who is located in an urban area. The psychiatrist uses a desktop computer with an external camera to connect via a secure platform to a mobile videoconferencing cart in the primary care clinic. The cart, located in a private examination room, contains a 27-inch standard-definition television monitor with a full-remote-capability video camera and videoconferencing system. The clinic is located in a different state from the psychiatrist, who holds medical licenses in both his own state and that of the clinic. The psychiatrist has credentials in the health care system of which the clinic is a part, and he uses a remote electronic medical record for the clinic to document care provided via telepsychiatry.

## History (Obtained During the Initial Telepsychiatry Assessment)

Ms. A is a 31-year-old single white woman who has a 13-year-old daughter. She and her daughter live at the home of her mother and stepfather, who help with child care. The patient's family practice physician and the clinic social worker requested a telepsychiatric consultation on this patient after she presented to the local emergency department after an overdose attempt; the patient took aspirin and acetaminophen when she was intoxicated and experiencing overwhelming feelings of abandonment after breaking up with her boyfriend.

Ms. A grew up in the rural community where the clinic is located and where she currently lives. She experienced significant physical and emotional abuse by her biological father and witnessed him abusing her mother. Her parents separated when she was 6 years old, and her mother remarried when the patient was 9 years old and has remained with this husband since. Ms. A struggled with behavioral issues in her adolescence and became pregnant at age 17. She dropped out of school because of her pregnancy but completed a General Equivalency Diploma when she was in her early 20s. She then completed a 2-year degree in business administration at a community college and is currently an assistant manager at an auto parts store. During her 20s, she had a series of abusive relationships with men, and she was raped when she was in her mid-20s. She has been living with her mother and stepfather for the past 4 years.

Ms. A has had long-standing struggles with feelings of anxiety, hypervigilance, and chronic sleep problems, with intermittent nightmares. She was recently in a relationship whose breakup precipitated the suicide attempt. She reports that this was a nonabusive relationship and that the breakup was initiated by her boyfriend because of the patient's temper and "moodiness." Since the breakup she describes feelings of depression, low energy, and not wanting to leave the house. She denies

current substance abuse or psychiatric treatment. She had a previous overdose in her early 20s, precipitated by similar circumstances.

## Initial Telepsychiatry Session

The initial session with the psychiatrist was a 90-minute session conducted via videoconferencing. During the initial consent and orientation process, the psychiatrist asked whether Ms. A had any experience with videoconferencing. She reported that she had never had a medical appointment via videoconferencing but had participated in videoconferencing as part of some guest lectures she had attended while working on her degree at the community college. During the initial session, Ms. A described how she often feels nervous and uncomfortable with men whom she does not know. Although she denied regular alcohol use, she did concede that alcohol may have played a role in her suicide attempt. At that juncture, the psychiatrist noticed that the patient became quiet and slightly tearful. He zoomed the remote camera for a close-up of the patient's face to ascertain whether she was in fact crying, and she was. The psychiatrist commented that the patient appeared to be upset and asked what she was thinking about. The patient responded that she felt that she did not deserve to be happy and that she was unlovable and that was why her boyfriend abandoned her.

At the conclusion of the session, the psychiatrist's initial diagnostic impression was a diagnosis of PTSD and the need to rule out major depression, alcohol abuse, and potential cluster B traits. The psychiatrist shared his general impression with Ms. A and discussed concern about her current safety. The patient denied suicidal ideation. The psychiatrist discussed safety concerns with her, including ideation, intent, and the role alcohol played in her current and past attempts. He then discussed a safety plan with Ms. A, and she agreed both to contact the local hospital in the event of returned suicidal ideation with intent and to contact the psychiatrist via telephone. The clinic social worker was then brought into the videoconferencing session, and the treatment recommendations were discussed with both the social worker and the patient. These recommendations included beginning sertraline and prazosin to address symptoms of PTSD (with the prescription filled by telephone at a local pharmacy), coordination with the medical team, and having the social worker initiate supportive therapy focused on psychoeducation about trauma and trauma coping skills, and education about the relationship between substance abuse and trauma. The psychiatrist suggested that Ms. A bring her mother to the next session for further family education and collateral history.

At the conclusion of the first encounter, the psychiatrist inquired how Ms. A felt using videoconferencing. She replied that it was "a little weird" but that she felt more comfortable toward the end of the session. The psychiatrist asked how Ms. A felt about working with him given her report of feeling uncomfortable around men she did not know. She reported that she felt a little nervous but that

CDCR _338

videoconferencing made her feel safer since the psychiatrist was not in the room with her. The psychiatrist attempted to validate the patient's feelings by discussing with her the fact that most patients who are new to videoconferencing report initial feelings of awkwardness but rapidly become comfortable with the process as they gain experience with it. Once the patient left the session, the psychiatrist had the social worker remain in the room and gave a brief presentation of the case and discussed the next steps and the treatment plan.

**Follow-Up Telepsychiatry Sessions**
The psychiatrist continued to work with Ms. A, initially seeing her every 1–2 weeks by videoconference while initiating the medication regimen. The patient tolerated this regimen well and experienced a decrease in anxiety and improvement in mood and sleep. The psychiatrist invited Ms. A's mother for a family session focused on psychoeducation. The psychiatrist performed the same

basic orientation to telepsychiatry with the mother before reviewing signs, symptoms, and treatment for PTSD, depression, and alcohol abuse. During this session, the psychiatrist observed the patient's mother blaming the patient for her symptoms. The psychiatrist attempted to frame the patient's behavior in a medical model for the mother. After the session, the psychiatrist telephoned the clinic social worker, described the observed mother-daughter dynamic, and suggested family therapy along the model of family-focused therapy for chronic mental illness. In family-focused therapy, an evidenced-based therapy, the therapist meets the patient and a selected family member over a number of sessions focusing on relapse prevention training and skills training for communication and problem solving. The social worker provided ongoing supportive therapy with intermittent family sessions along these lines. The psychiatrist continued medication management and consultation with the social worker on the therapeutic aspects of the case.

been raised about the impact of videoconferencing on clinical processes. For example, a randomized controlled trial investigating the reliability of Structured Clinical Interview for DSM-III-R diagnoses in a sample of American Indian veterans showed high reliability across diagnoses between in-person and videoconferencing assessments, although reliability was higher for externalizing disorders (i.e., outward expressions of internal states) than for internalizing disorders (i.e., moods, feelings) [13]. The study suggested that clinicians should be particularly thoughtful and vigilant in screening for these problems during initial assessments. Other programmatic and case descriptions from the literature present examples in which patients with certain diagnoses (e.g., posttraumatic stress disorder [PTSD], Asperger's disorder) may prefer telepsychiatric over face-to-face assessments because of feelings of safety, control, and distance created in a telepsychiatric encounter [14]. Questions regarding the impact of telepsychiatry on clinical processes, therapeutic relationships, and treatment have been raised but not definitively addressed in the literature [2].

Meanwhile, as in other fields in medicine, clinical practice and implementation of telepsychiatry have outpaced the scientific evidence. This state of affairs may leave the individual provider with questions on how best to adapt and modify clinical style/process and treatments to fit the videoconferencing encounter. Fortunately, a rich clinical experience in telepsychiatry has contributed to the development of clinical training in tele-mental health as well as clinical guidelines from multiple organizations to help educate clinicians. Two recent examples of publicly available materials include the introductory online "Telemental Health Guide" (www.tmhguide.org; the site was developed at the University of Colorado Denver with support from the Center for Mental Health Services,

Substance Abuse and Mental Health Services Administration) and the American Telemedicine Association's "Practice Guidelines for Videoconferencing-Based Telemental Health" (15; available at www.americantelemed.org/i4a/pages/index.cfm?pageID=3311). These are some of several resources that provide further details related to the issues highlighted below.

## Administrative Issues in Telepsychiatry

A number of unique administrative issues arise in the context of telepsychiatry, among them licensure, credentialing, malpractice, technology, and the clinical setting in which care is delivered. Videoconferencing has the potential to facilitate treatment regardless of the patient's location, a feature that often raises jurisdictional issues of which providers need to be aware [16, 17]. With the exception of practitioners in federal health care systems (such as the Department of Veterans Affairs) and some consultations, a psychiatrist must hold a medical license in the state where the patient is located during a telepsychiatric encounter. Additional regulations in particular states may be applicable to physicians practicing telemedicine, such as the need for the presence of medical staff with the patient, written consent for the use of telemedicine, or requirements for face-to-face visits as part of telepsychiatric care. Payers (e.g., State Medicaid plans) and other licensing bodies (e.g., the Drug Enforcement Agency) may also have explicit rules that psychiatrists need to be knowledgeable of before beginning telepsychiatry.

Psychiatrists planning to begin telepsychiatry should inform their malpractice carriers of their specific involvement and make sure that there are no additional guidelines they need to follow or additional coverage they need to obtain. As in face-to-face visits, psychiatrists working within health care systems need to be appropriately

CDCR_339

credentialed in the setting where they are providing care, following the guidance of the appropriate oversight body. Generally, this requires that a psychiatrist be credentialed by each organization where the patient is located. A newer credentialing option, "privileging by proxy" for tele-health practice, has been established by the Center for Medicare and Medicaid Service; in this option, one hospital receiving tele-health services can credential a psychiatric provider by relying on the credentialing process of the hospital system in which the telepsychiatry service originates (18). Psychiatrists providing telepsychiatry services across health care systems need to have a clear understanding of the ownership of medical records, how records are shared between systems, and provider obligations for documenting and recording.

There are a number of accepted standards for minimal technical specifications and configuration of the environment in which videoconferencing occurs. A transmission speed of 384 kilobytes per second is generally considered the minimally acceptable bandwidth in videoconferencing in psychiatry (15). There is little guidance on the use of standard versus high-definition videoconferencing, although many advocate the use of the highest resolution available. Telepsychiatry conducted in the United States falls under the Health Insurance Portability and Accountability Act (HIPAA), which requires encryption of all electronic protected health information. Psychiatrists need to make sure that their videoconferencing system meets HIPAA requirements and is compliant with federal and state privacy requirements (15). Psychiatrists new to videoconferencing should review recommendations for the setup of the videoconferencing system and the room—room configuration, security, lighting, angle and distance of videoconferencing equipment, types of camera controls (including remote capability), and backdrops during the videoconferencing session (Figure 1; a more detailed description and interactive examples of room setup issues can be found at www.tmhguide.org).

Telepsychiatry services should have written protocols or procedures for the important administrative and clinical components of the telepsychiatry service. These protocols should address issues such as how patients obtain laboratory tests, schedule appointments, and receive prescriptions and how care coordination with a patient's other medical care providers is accomplished (15). Whether a patient is being seen in a clinically supervised or clinically unsupervised setting (Table 1) also has an impact on the administrative handling of safety issues, environmental setup, and type of videoconferencing to be used (web-based versus standing unit) (9). The bulk of the literature, guidelines, and clinical experience has been focused on telepsychiatry in clinically supervised settings, although there is an expanding literature describing work in clinically unsupervised settings. Guidelines on desktop videoconferencing are expected within the next year from the American Telemedicine Association.

**FIGURE 1. General Recommendations for Room Configuration for Videoconferencing[a]**

**Room Configuration**
- Privacy issues should be addressed for both the patient and psychiatrist rooms.
- Rooms should be of adequate size, with comfortable seating and accommodation.

**Room Presentation**
- Both rooms should have appropriate lighting so that patient and psychiatrist can see each other comfortably, without excessive shadows.
- The psychiatrist must be mindful of his or her backdrop.
  - Traditional recommendations include minimal distractions (bookshelves, office clutter) and using an optimizing color, such as blue, to minimize light reflection and absorption.
  - Some clinicians and programs advocate backdrops that better reflect the psychiatric treatment setting (e.g., a mountain scene for rural Western patients, a star quilt for American Indians from the Northern Plains).

**Comfort and Communication**
- The patient should be aware of and give consent for all parties present in both patient and psychiatrist rooms.
- Gaze angle (the angle between the patient camera and where the patient looks on the screen) should be minimized.

[a] Drawn from Yellowlees et al. (15) and "Telemental Health Guide" (www.tmhguide.org).

## Clinical Issues in Telepsychiatry

Psychiatry is an ideal fit with videoconferencing since, arguably, most psychiatric treatments can be translated to telepsychiatry. Telepsychiatry has no known absolute exclusion criteria or contraindications for any specific psychiatric diagnoses, treatments, or populations. Psychiatrists have wondered whether patients with ideas of reference or delusions involving technology, video, or televisions should not be treated over videoconferencing, but several case discussions (19, 20) have documented successful telepsychiatric treatment of such cases. The key appears to be working with patients with intact reality testing and the ability to separate delusions from clinical interactions. Others have raised concerns about working with patients with cognitive impairments or sensory deficits, but these can be addressed as in face-to-face encounters through the inclusion of caregivers in sessions, as well as the use of technologies to aid with visual or auditory impairments (21).

Before caring for any patients via videoconferencing, psychiatrists should develop an emergency protocol and procedures specific to each of the telepsychiatry services and environments in which they provide care, including local civil commitment laws and procedures. In developing these procedures, a psychiatrist will become familiar with the emergency psychiatric services available at the patient site and the processes and roles for collaborating to manage psychiatric emergencies (22). Conceptually, telepsychiatric emergency management has many similarities to dealing with a patient calling in crisis outside of an office

**TABLE 1. Considerations for Telepsychiatry in Clinically Supervised or Unsupervised Settings[a]**

| Clinically Supervised (e.g., Hospital, Outpatient Clinic) | Clinically Unsupervised (e.g., Remote Clinic, Home Setting) |
|---|---|
| *Patient selection* | |
| Local staff can support patient use of video system. | The ability to configure, use, and troubleshoot the system is basic. |
| Staff can aid in locomotion, communication with provider, scheduling, and follow-up. | A higher level of independence is required. |
| Service may be able to support medically compromised patients and intoxicated patients. | This setting is not appropriate for medically unstable or intoxicated patients. |
| Toleration of higher level of safety issues depending on patient site environment | Implementing appropriate screening and triage for safety issues may be difficult. |
| *Safety issues* | |
| Onsite staff is available to support emergencies. | Local emergency services and collaterals must be used. |
| *Environment* | |
| The room setup and environment are consistent and more controllable. | The psychiatrist must work with the patient to optimize the environment (e.g., lighting, room configuration, privacy). |
| *Technical issues* | |
| Consistency is maintained across visits. | Transmission quality is more variable. |
| Technical support is more likely to be available. | |

[a] Drawn from Luxton et al. (9) and Yellowlees et al. (15).

or clinic setting. Adhering to good psychiatric emergency management principles, regardless of the treatment modality, serves clinicians well. An issue specific to emergency management in telepsychiatry is the psychiatrist's perception of having less clinical control because of the distance from the patient. Although there are no data or experience indicating less control in these circumstances, telepsychiatry can shatter the illusion of control afforded in face-to-face encounters, potentially increasing the psychiatrist's anxiety while managing emergencies via videoconferencing. Providers should acknowledge this potential anxiety and actively manage it by following established protocols and procedures. Psychiatrists should also be aware that they may be able to tolerate stronger displays of affect or behavioral acting out in a telepsychiatry encounter because of the greater safety provided by not being in the room with the patient. While this may at times facilitate clinical processes, psychiatrists need to be sensitive to any potential behavior or affect near the end of the session that could affect staff or family members present at the patient site when the session has finished (22). Psychiatrists should make sure that both patients and staff at the point of care are familiar with emergency procedures and that staff have had appropriate training on procedures and techniques for managing emergencies.

Two other clinical issues of note in emergencies are intoxicated patients and attentiveness to firearms and other weapons. Although there are no published studies on this topic, clinical experience suggests that detecting when a patient is mildly intoxicated may be more difficult through videoconferencing than in person because of the lack of physical cues and smell. Psychiatrists should have a low threshold for inquiring about recent alcohol consumption, especially when working with patient populations at higher risk, such as those with substance use diagnoses. Those seeing patients in clinical settings should educate

patient site staff to alert the psychiatrist prior to a session for any signs of possible intoxication and follow appropriate procedures for dealing with intoxication. Since many telepsychiatry services involve urban providers working with rural populations where firearm ownership rates are higher, psychiatrists providing direct telepsychiatry into a home environment also need to consider the location and availability of weapons. As clinically indicated, psychiatrists should dialogue with patients about weapons, location, availability, and firearm safety issues, especially when working with patients who report suicidal or homicidal ideation. Additionally, psychiatrists should be cognizant of the importance of firearm ownership in certain populations (e.g., rural residents, veterans), particularly when discussing weapons management in the context of treatment, and consider involving family or community members in these discussions as appropriate. Psychiatrists should address these issues in ongoing dialogue with patients rather than in a single discussion or assessment (22).

Videoconferencing has a direct impact on communication styles and interactions. Providers using telepsychiatry need to be aware of this and appropriately adapt their clinical style and process. Psychiatrists should appreciate how they are coming across over the patient's video display. Important components include how the psychiatrist is framed in the video display, the patient's perception of where the psychiatrist's eyes are looking (eye contact), and any transmission delay affecting speech flow. A general recommendation for framing of the psychiatrist in the video picture is from the midchest to 6 inches above the head, with both shoulders/arms in the picture. Psychiatrists can use framing to set the tone of a session with closer framing (a head shot) increasing the feeling of contact or emphasis and farther framing (full torso) to create more of a feeling of distance or space. An example of this would be to use closer framing when conducting a therapeutic confrontation on

recent use of alcohol for a patient with a substance dependence diagnosis.

Gaze angle may be more difficult to control and is dependent on the location of the video display relative to the patient at the patient site. Even though the psychiatrist is looking directly into the video camera at the psychiatrist's site, depending on the location of the video display at the patient site, the provider may or may not be making direct eye contact with the patient. Gaze angle should be minimized (gaze angles less than 7 degrees are hardly noticeable [15]). Use of appropriate hand gestures and body movement can add dynamism to the presentation of the psychiatrist, but if these are excessive they can become distracting, and with lower bandwidth transmission speeds, they may cause motion artifact or blurring. Psychiatrists should utilize picture-in-picture or some other form of display during the telepsychiatry session so they are aware of what is being displayed on the patient's display and how they are coming across.

Most videoconferencing sessions have a small (<1/4 second) but perceptible transmission delay, and delays are greater with lower transmission speeds. It is important that the psychiatrist account for this in the flow and cadence of conversation so as not to interrupt and to allow the patient enough time to answer questions. The psychiatrist should be attentive to establishing a natural conversational course, which can be facilitated by increasing or decreasing the frequency of pauses in speech.

Finally, psychiatrists may need to adapt their style for telepsychiatry, increasing their energy and expressiveness to project over video and to overcome any potential feelings of distance or remoteness that might occur as a result of videoconferencing. Small talk related to checking in about the patient's environment and local events (e.g., weather, major news events at the patient's location) can also help facilitate feelings of connectedness in a clinical encounter. Psychiatrists conducting group treatment via telepsychiatry may need to be more assertive with the group process to foster a stronger group dynamic and to avoid becoming a remote lecturer to the participants at the patient site. This can be assisted by being conscious of the amount of "screen time" they are taking as the group leader and by inviting specific group members to comment (14).

Psychiatrists need to be mindful of patients' reactions to videoconferencing. It is wise to assess patients' previous experiences with, comfort with, and exposure to videoconferencing during the first telepsychiatric encounter. For patients with limited experience, continued education and inquiries regarding their level of comfort during the first and subsequent sessions allow identification and discussion of patients' reservations and concerns about videoconferencing. The majority of patients, even those with limited experience, adapt quickly to the use of videoconferencing and express satisfaction and comfort with telepsychiatry.

Patients and psychiatrists may experience more of a feeling of clinical remoteness and distance, particularly in early videoconferencing encounters (23). This perception often diminishes or disappears after a working alliance is established. In some cases this feeling can be of clinical benefit; for example, female victims of violence from male perpetrators may feel safer working with male providers via telepsychiatry and be able to discuss trauma-related symptoms more readily because of the feeling of distance and greater safety created by videoconferencing. From the psychiatrists' perspective, a trade-off for times when they feel less engaged over videoconferencing is an increase in observing ego during sessions, with greater insight into clinical processes and reactions. Because many telepsychiatry services work across multiple systems and organizations, psychiatrists should be mindful that patients can have additional transferences onto the psychiatrist based on the organizations, locations, and systems associated with a telepsychiatry clinic. This "system transference" should be directly addressed by the psychiatrist through a clear delineation of personal and organizational roles during the education/orientation phase of the treatment (14).

Additionally, the actual distance between patient and provider may help to facilitate feelings of confidentiality, since patients and psychiatrists may be less likely to encounter each other in a community setting, and videoconferencing into non-mental-health-affiliated locations (e.g., medical clinics, offices, homes) allows patients to receive psychiatric care without the potential stigma of visiting a mental health facility.

At the first meeting via telepsychiatry with a patient, prior to beginning the assessment, the psychiatrist should conduct a telepsychiatric orientation and consent process. This should involve the psychiatrist introducing him- or herself and identifying his or her location, organization, and certification. All parties present at both the patient's and the psychiatrist's sites should be introduced, and the psychiatrist should pan the camera around the room he or she is using so the patient can see who is present and be familiar with the psychiatrist's room setup. The psychiatrist then assesses a patient's past experience and knowledge of videoconferencing and provides information about the videoconferencing technical setup (video display, security). The psychiatrist should explain the organizations and staff involved in the clinic, emergency procedures for the clinic, the limits of confidentiality, how to interact and contact the psychiatrist outside of the clinic, and other logistical issues (laboratory tests, prescriptions). A review of the benefits and risks of telepsychiatry and alternatives (if any) should be conducted. At the end of this orientation, the psychiatrist should ask if the patient has any questions about these issues before beginning a clinical interview. A video sample that provides a brief overview of many of these elements is available at [http://www.youtube.com/watch?v=zWBJDj9owv0&feature=youtu.be]. The psychiatrist should monitor the patient's level of comfort during the session, and at the conclusion ask how the patient felt about using videoconferencing.

CDCR_342

The coming decade will see continued expansion and integration of videoconferencing in routine psychiatric practice. A growing body of evidence, information, and training is available for psychiatrists interested in adopting telepsychiatry into their clinical practices. Many psychiatric residency programs are beginning to develop and offer telepsychiatry training as part of psychiatric education (4, 24). These efforts and resources aid in the integration of videoconferencing as a routine component of psychiatric care benefiting patients through increased access to needed treatment.

Received Aug. 13, 2012; revision received Nov. 30, 2012; accepted Nov. 30, 2012 (doi: 10.1176/appi.ajp.2012.12081064). From the Department of Psychiatry, University of Colorado Denver, Aurora. Address correspondence to Dr. Shore (jay.shore@ucdenver.edu).

Dr. Shore reports no financial relationships with commercial interests.

The author thanks Mr. Mark Groth and Dr. Elizabeth Brooks for their participation in the production of the video clip and the American Telemedicine Association Telemental Health Special Interest Group for years of support, collaboration, and guidance in this subject area.

## References

1. Baer L, Elford DR, Cukor P: Telepsychiatry at forty: what have we learned? Harv Rev Psychiatry 1997; 5:7–17

2. Grady B, Myers KM, Nelson EL, Belz N, Bennett L, Carnahan L, Decker VB, Holden D, Perry G, Rosenthal L, Rowe N, Spaulding R, Turvey CL, White R, Voyles D; American Telemedicine Association Telemental Health Standards and Guidelines Working Group: Evidence-based practice for telemental health. Telemed J E Health 2011; 17:131–148

3. Chong J, Moreno F: Feasibility and acceptability of clinic-based telepsychiatry for low-income Hispanic primary care patients. Telemed J E Health 2012; 18:297–304

4. Chung-Do J, Helm S, Fukuda M, Alicata D, Nishimura S, Else I: Rural mental health: implications for telepsychiatry in clinical service, workforce development, and organizational capacity. Telemed J E Health 2012; 18:244–246

5. Frueh BC, Deitsch SE, Santos AB, Gold PB, Johnson MR, Meisler N, Magruder KM, Ballenger JC: Procedural and methodological issues in telepsychiatry research and program development. Psychiatr Serv 2000; 51:1522–1527

6. García-Lizana F, Muñoz-Mayorga I: What about telepsychiatry? A systematic review. Prim Care Companion J Clin Psychiatry 2010; 12 (doi: 10.4088/PCC.09m00831whi)

7. Hyler SE, Gangure DP, Batchelder ST: Can telepsychiatry replace in-person psychiatric assessments? A review and meta-analysis of comparison studies. CNS Spectr 2005; 10:403–413

8. Rowe N, Gibson S, Morley S, Krupinski EA: Ten-year experience of a private nonprofit telepsychiatry service. Telemed J E Health 2008; 14:1078–1086

9. Luxton DD, Sirotin AP, Mishkind MC: Safety of telemental healthcare delivered to clinically unsupervised settings: a systematic review. Telemed J E Health 2010; 16:705–711

10. De Las Cuevas C, Arredondo MT, Cabrera MF, Sulzenbacher H, Meise U: Randomized clinical trial of telepsychiatry through videoconference versus face-to-face conventional psychiatric treatment. Telemed J E Health 2006; 12:341–350

11. Frueh BC, Monnier J, Grubaugh AL, Elhai JD, Yim E, Knapp R: Therapist adherence and competence with manualized cognitive-behavioral therapy for PTSD delivered via videoconferencing technology. Behav Modif 2007; 31:856–866

12. Yellowlees P, Marks S, Hilty D, Shore JH: Using e-health to enable culturally appropriate mental healthcare in rural areas. Telemed J E Health 2008; 14:486–492

13. Shore JH, Savin D, Orton H, Beals J, Manson SM: Diagnostic reliability of telepsychiatry in American Indian veterans. Am J Psychiatry 2007; 164:115–118

14. Shore JH, Savin DM, Novins D, Manson SM: Cultural aspects of telepsychiatry. J Telemed Telecare 2006; 12:116–121

15. Yellowlees P, Shore J, Roberts L; American Telemedicine Association: Practice guidelines for videoconferencing-based telemental health: October 2009. Telemed J E Health 2010; 16:1074–1089

16. Shore JH, Bloom JD, Manson SM, Whitener RJ: Telepsychiatry with rural American Indians: issues in civil commitments. Behav Sci Law 2008; 26:287–300

17. Hyler SE, Gangure DP: Legal and ethical challenges in telepsychiatry. J Psychiatr Pract 2004; 10:272–276

18. Centers for Medicare and Medicaid Services: Revised Appendix A: Interpretive Guidelines for Hospitals, and Revised Appendix W, Interpretive Guidelines for Critical Access Hospitals (CAHs), in CMS Manual System, Publication 100-07 State Operations. Baltimore, Md, 2011.

19. Dausch BM, Miklowitz DJ, Nagamoto HT, Adler LE, Shore JH: Family-focused therapy via videoconferencing. J Telemed Telecare 2009; 15:211–214

20. Yellowlees P, Burke MM, Marks SL, Hilty DM, Shore JH: Emergency telepsychiatry. J Telemed Telecare 2008; 14:277–281

21. Rabinowitz T, Murphy KM, Amour JL, Ricci MA, Caputo MP, Newhouse PA: Benefits of a telepsychiatry consultation service for rural nursing home residents. Telemed J E Health 2010; 16:34–40

22. Shore JH, Hilty DM, Yellowlees P: Emergency management guidelines for telepsychiatry. Gen Hosp Psychiatry 2007; 29:199–206

23. Shore J, Kaufmann LJ, Brooks E, Bair B, Dailey N, Richardson WJ Jr, Floyd J, Lowe J, Nagamoto H, Phares R, Manson S: Review of American Indian veteran telemental health. Telemed J E Health 2012; 18:87–94

24. Shore JH, Thurman MT, Fujinami L, Brooks E, Nagamoto H: A resident, rural telepsychiatry service: training and improving care for rural populations. Acad Psychiatry 2011; 35:252–255

## Clinical Guidance: Telepsychiatry

The emotional distance imposed by videoconferencing can be offset by the psychiatrist's adoption of a more energetic, expressive style. Remote access may actually benefit patients with abuse histories or concerns about confidentiality. Technical recommendations by Shore include closer framing of the clinician to increase the feeling of contact, minimizing the clinician's gaze angle, and allowing for transmission delay. Telepsychiatry mandates a low threshold to inquire about alcohol consumption and special attention to safety for patients videoconferencing from their homes. An emergency plan and procedures for filling prescriptions and doing laboratory tests should be determined before meetings begin. The Center for Medicare and Medicaid Service has established "privileging by proxy" for telehealth practice, but some individual states and malpractice insurance carriers have additional requirements.

# ATTACHMENT 20

CDCR _344

National Commission on Correctional Health Care
Position Statement

Use of Telemedicine Technology in Correctional Facilities

Note: This position statement is being reprinted due to an error when it was published in the Spring 1998 *Journal of Correctional Health Care*.

## Introduction

The National Commission on Correctional Health Care is a not-for-profit organization whose board of directors is comprised of individuals named by 37 national professional associations. The Commission's primary purpose is to work toward improving health services in the nation's jails, prisons, and juvenile confinement facilities. Toward that end, the Commission produces and disseminates resource publications; provides technical assistance; offers a quality review program; conducts educational trainings and conferences; and offers a certification program for correctional health professionals. In addition, the Commission publishes health services standards and operates a voluntary accreditation program for institutions that meet these standards.

Occasionally, an issue arises that has not been addressed by the Commission's standards or has changed since the standards were last revised. One such issue is the use of telemedicine technology in correctional facilities. Accordingly, NCCHC has adopted the following position statement that, along with its published standards, may assist correctional facilities in designing their own procedures on this matter.

## Background

The concept of telemedicine refers to the use of electronic communication and information technologies ("telecommunications") to provide or support clinical care at a

CDCR _345

*Journal of Correctional Health Care*

distance.    The Joint Working Group on Telemedicine, an interagency working group of the Department of Health and Human Services, further defined telemedicine as:

The delivery and provision of health care and consultative services to individual patients and the transmission of information related to care, over distance, using telecommunications technologies, and, incorporating the following activities:

I.    Direct clinical, preventive, diagnostic, and therapeutic services and treatment, including procedures where a provider may be present with the patient, and clinical training and consultative clinical Grand Rounds, if used for decision making regarding the clinical care of a specific patient.

II.   Consultative and follow-up services.

III.  Remote monitoring, including the remote reading and interpretation of results of patient's procedures.

IV.   Rehabilitative services.

V.    Patient education provided in the context of delivering health care to individuals (United States Food and Drug Administration [USFDA], 1996).

    The application of telecommunications technology to facilitate health care delivery dates  back to the 1920s when radio was used to link public health physicians at shore stations with ships at sea to assist with medical emergencies.    In current application, telemedicine is the real time or near real time transfer of medical information between places of lesser and greater medical capability and expertise (Freeman, 1994).    In its simplest form, a nurse providing clinical advice over the telephone is telemedicine. Advanced applications include the use of fax, voice, satellite, digital

130

radio links, microwave technology, and even the internet to transfer still images and interactive compressed video.

Video conferencing in which physicians are at both ends of the transmission is perhaps the most common application for telemedicine technology. Also common is the transmission of x-rays electronically (O'Connor, 1996). Telemedicine technologies are being applied successfully to a wide variety of medical disciplines including radiology, pathology, neurology, cardiology, pediatrics, emergency medicine, and even mental health.

It is widely recognized that the greatest benefit of telemedicine is the ability to provide medical expertise to remote areas that might otherwise go without. Other potential benefits include enhanced access to the expertise of specialists, improved quality of care, reduced professional isolation for rural health care professionals, and in many cases, a reduction in overall costs.

Telemedicine has the power to facilitate the provision of medical care, including specialty care, to rural areas that may have a lower health care professional-to-population ratio. It also can shorten the diagnosis and treatment process by reducing the time required for patients to be seen by a succession of providers. Instead, specialists and general practitioners examine patients and discuss treatment options together. It is this collaborative environment on which supporters base their claims of improved quality of care. Additionally, telemedicine can reduce the duplication of services and overhead costs of providing care and has been found to reduce the isolation of health care professionals by facilitating peer contact for both patient consultations and continuing education.

Using these technologies, telemedicine can make a critical difference in rural areas where the distance between a patient and a health care specialist can be hundreds of miles. The same technologies also have been employed successfully at correctional facilities, with additional benefits to both the inmate population and surrounding communities.

*Journal of Correctional Health Care*

As an example, the most widely recognized cost saving benefit of the use of telemedicine comes from reducing the need for travel which, in the correctional arena, has broad implications. The need to transport an inmate outside the confines of a correctional facility can be a significant barrier to providing medical care. It is possible for one radiologist to service a number of locations using teleradiology. A specialist could provide direction to correctional health care staff, eliminating the need to admit an inmate. This is a significant benefit to the correctional industry as attracting and retaining talented health care professionals is a constant challenge.

For all of the benefits provided by telemedicine, there are still barriers to the use of its technologies. Regulatory issues (including interstate licensure, malpractice, patient confidentiality and FDA regulations), budget constraints, insufficient administrative support, and fear of the impact on the health care system are a few barriers encountered by correctional health care facilities that have implemented telemedicine technologies.

The issue foremost in the legal spotlight is the delivery of telemedicine services across state lines. Carefully defining and documenting the roles of practitioners in each consultation is vital. Licensure and telemedicine malpractice cases will most likely look to standards of care in the community where a patient was treated. It is expected that the physician licensed in that state will have the responsibility of framing consultations in the context of the appropriate state laws and applicable clinical guidelines.

Historically, funding for most telemedicine research has been provided by the federal government through grants. Over the years the availability of federal funds has fluctuated. Many of the telemedicine projects that continue today have received funding from a number of entities including the sponsoring health care facility, government agencies, phone companies, vendors, and private philanthropic organizations. Correctional facilities have always experienced difficulties in funding, and the purchase or leasing of even basic equipment may be unrealistic for some facilities. Working with universities and large medical research

CDCR _348

Use of Telemedicine Technology

facilities may provide correctional facilities opportunities for incorporating telemedicine into their health services.

## Position Statement

The use of telemedicine affords correctional facilities many opportunities for reducing operational costs associated with providing health care to confined individuals. Policies and procedures must clearly define the purpose and instances in which telemedicine may be used in a correctional facility. Regardless of the type and combination of technologies used to provide medical care, the basic principles governing the physician/patient relationship must remain intact.

This responsibility can be met in large part by ensuring that telemedicine policies and procedures comply with the National Commission on Correctional Health Care's *Standards for Health Services* that have been developed for prisons, jails and juvenile detention and confinement facilities. Particular attention should be given to the standards for *Policies and Procedures, Comprehensive Quality Improvement Program, Privacy of Care, Continuing Education for Qualified Health Services Personnel, Orientation Training for Health Service Staff, Initial Health Screening, Access to Health Care, Mental Health Evaluation, Health Record standards, Informed Consent, Right to Refuse Treatment* and *Medical Research.*

Compliance with the standards will provide the necessary foundation for the appropriate use of telemedicine in correctional facilities. Further attention must be paid to professional licensing regulations and interstate commerce laws, which may apply when telemedical consultations cross state boundaries.

1. Use of Telemedicine in Correctional Facilities

Policies should outline the circumstances under which the facility will allow confined individuals to be treated through the application of telemedicine. The policy should identify which health

133

**CDCR _349**

*Journal of Correctional Health Care*

professionals may assist with a telemedicine consultation and which types of cases are appropriate (and which are not) for telemedicine consultations. The ultimate responsibility for the patient and action taken as a result of the telemedicine consultation also should be defined by policy.

Back-up arrangements for urgent and emergent situations beyond the scope of the telemedicine system and the abilities of the remote-site personnel should be included in facility policies. Arrangements also should be made for "hands-on" evaluations and treatment for situations where the requirements of the physical examination exceed the capabilities of the remote-site personnel and/or when physical examination (palpitation of lymph nodes as an example) is an integral part of determining the proper course of patient care. Additionally, doctors should have a mechanism through which patients can be seen by appropriately-trained medical personnel when necessary.

Equipment standards should be addressed by written policy. The minimum acceptable technology standards should be clearly identified and issues such as transmission speed, resolution and audio quality should be clearly documented.

2. Patient Consent, Documentation and Storage of Information

Patients must consent to a telemedicine consultation just as they would to any face-to-face encounter with a physician. If the transmitted images will be recorded as part of the diagnostic or therapeutic process, the consent form should include discussion of the capture and use of the images. A facility's policy should address information ownership and how images or recordings will be maintained. Images and recordings should be considered part of the patient's medical record and should be kept for the same time period state law requires medical records to be kept. A note should be made in the patient's record indicating the availability and location of these recordings (AHIMA, 1995).

Policy should define what constitutes "adequate medical records" regarding telemedicine consultations (e.g., whether fax

134

Use of Telemedicine Technology

copies of medical records are acceptable for patient charts). Policy also should specify how patient medical records will be maintained, and in what form. Hard copy back-up of electronic records should be maintained and an emergency plan established in case of electronic system failure ("computer system crashes").

3. Licensing

Remote site and consultant personnel must be properly licensed. If the telemedicine consultation involves more than one state, personnel must be licensed in the transmitting and the receiving state(s).

4. Training and Education

Health care professionals in correctional facilities will require training in the use of the chosen technologies. This will not only involve initial training on the equipment, but continuing education as well. Involved professionals should stay current on the advances in the applications of telecommunications technology and external issues impacting its use.

*Adopted by the National Commission on Correctional Health Care Board of Directors on November 9, 1997.*

*Journal of Correctional Health Care*

## References

Brecht, R. M. (1997). Correctional telemedicine: An overview. In N. Neuberger (Ed.), *Telemedicine Sourcebook, 1998.* New York: Faulkner & Gray.

Freeman, T. (1994). Telemedicine and CHINS: Interviews with two experts. *Journal of American Health Information Management Association, 65*(8), 40-43.

Gonzales, W. (1996). Recommended principles for accrediting bodies: Setting of standards for access to care teleconsultations.

Gonzales, W. (1996, November). [Use of Telemedicine in Correctional Facilities]. In R. Hilton (Chair), *Minutes of the Policy and Standards Committee.* Conducted at the annual meeting of the National Commission on Correctional Health Care in Nashville, Tennessee.

Huston, J. L. M. (1996). Telemedical records: The weak link in telemedicine. *Journal of American Health Information Management Association, 67*(6), 69-71.

Kennedy, M. D. (1996). The strategic use of telecommunications: Lessons learned and the path ahead. *Telecommunications.*

Lorton, L., & Legler, J. D. (1996). A telemedicine trial. *Journal of American Health Information Management Association, 67*(4), 40-42.

O'Connor, K. (1996, July/August). Making distance smaller: Telemedicine technology is connecting patients with appropriate care. *Healthplan.*

**CDCR _352**

Use of Telemedicine Technology

Siwicki, B. (1996, September). Telemedicine live, via satellite. *Health Data Management*.

United States Department of Commerce, National Telecommunications and Information Administration (NTIA). (January 31, 1997). Telemedicine Report to Congress.

United States Food and Drug Administration. (July 11, 1996). Appended report on telemedicine-related activities of the Center for Devices and Radiological Health, FDA. Washington, DC.

137

**CDCR _353**

# ATTACHMENT 21

CDCR _354

TELEMEDICINE JOURNAL
Volume 5, Number 3, 1999
Mary Ann Liebert, Inc.

# Telemedicine to Iowa's Correctional Facilities: Initial Clinical Experience and Assessment of Program Costs

SUSAN ZOLLO, M.A.,[1] MICHAEL KIENZLE, M.D.,[2] PAUL LOEFFELHOLZ, M.D.,[3]
and SUSAN SEBILLE, M.S.[4]

## ABSTRACT

*Objective.* To evaluate the costs and benefits of a prison telemedicine program for the institutions involved and to assess early provider satisfaction.

*Materials and Methods.* A survey of primary care and consulting providers from four prisons and an academic tertiary care facility in Iowa was conducted during the first year of telemedicine service linked with the state's correctional facilities, from March, 1997 to February, 1998. Data were evaluated from 247 completed telemedicine encounters. Cost estimates were made for (1) 1997 cost data for the 4,396 Iowa prisoners who were transported to The University of Iowa Hospitals and Clinics (UIHC) for their health care, and (2) the equipment, circuitry, and personnel costs necessary on both ends of the network to provide comparable telemedicine service to remote patients and providers.

A formula for estimating the cost of implementing a telemedicine service is presented. It includes a projection for determining at what point the cost of the telemedicine visit approaches the average cost of an on-site visit (breakeven point). There was also a brief survey administered to presenting and consulting physicians to determine their overall satisfaction with the telemedicine system for diagnosis, treatment planning, and follow-up.

*Results.* The average cost to the prisons for an on-site inmate visit to the University of Iowa Hospitals and Clinics (UIHC) was $115 during our study period, from March 1997 to February 1998. Using a formula that specifies a number of fixed and variable costs for implementing telemedicine, we were able to determine that the breakeven point for Iowa's correctional facilities would require 275 teleconsultations per year, per site (total of 1,575 consultations a year). Given the higher equipment investment at the UIHC hub, the breakeven point would be around 2,000 teleconsultations annually. Cost studies did not include medical care, which is assumed to be relatively comparable for both on-site and telemedicine interactions. Overall, referring physicians expressed a higher rate of satisfaction with telemedicine than specialists (4.19 to 3.45, respectively, on a scale of 1 to 5—5 representing the highest ranking). Both consulting and referring physicians ranked the quality of transmission the highest among all questions regarding satisfaction with the telemedicine system.

*Conclusions.* No one should anticipate instantaneous cost-effectiveness with telemedicine. However, with careful planning, implementing a telemedicine program can be "cost-acceptable" initially. Telemedicine ultimately becomes cost-effective as the volume of teleconsults increases.

[1]Telemedicine Resource Center, The University of Iowa College of Medicine, Iowa City, Iowa; [2]Departments of Clinical Affairs & Biomedical Communications and Internal Medicine, National Laboratory for the Study of Rural Telemedicine, College of Medicine, The University of Iowa, Iowa City, Iowa; [3]Iowa Department of Corrections, Iowa Medical and Classification Center, Oakdale, Iowa; [4]Research and Evaluation Coordinator, Telemedicine Resource Center, The University of Iowa College of Medicine, Iowa City, Iowa.

CDCR _355

## INTRODUCTION

ACCORDING TO RECENT STATISTICS from the department of justice, there are 1,244,554 prisoners under Federal or State jurisdiction in the United States.[1] Due to lifestyle, economic, and demographic variables, many of these inmates experienced inadequate health care prior to entering prison.[2] Once incarcerated, the delivery of health services to prisoners is complicated by issues relating to security and the cost of transporting inmates to medical facilities.

The cost of providing outpatient care to prison populations has been estimated to be as high as $1,000 per inmate visit, including transportation and medical services.[3] These costs vary considerably depending on the distance between the health care facility and the prison, number of inmates traveling to receive medical care per trip, and the number and salaries of security officers and drivers involved.

In order to address concerns relating to prisoner transport and security, some states are exploring telemedicine as a mechanism for delivering health care services to correctional facilities. Several variables, including an increase in inmate populations, cost-containment issues, and concern for public safety have made telemedicine a promising health delivery system for many correctional facilities.[4] Telemedicine programs in Georgia, Colorado, Texas, North Carolina, Ohio, and Minnesota all began with teleconsultations to prison facilities.

## BACKGROUND

### The University of Iowa Hospital and Clinics

Located in Iowa City, Iowa, UIHC is the state's only tertiary health care center. The UIHC has 873 inpatient beds and serves patients and families from all of Iowa's 99 counties. From July 1, 1996 through June 30, 1997, there were 41,818 patient admissions and 581,446 ambulatory clinic visits to the UIHC. Specialized care is provided by more than 1,300 physicians and dentists; 1,500 professional nurses; and 4,700 other professional and support staff. Patient care is provided across 16 medical specialties in 251 specialty and sub-specialty ambulatory clinics.

### Iowa's Correctional Facilities

Currently, there are nine prisons in the state housing a total of 7,246 prisoners (Table 1). Iowa Department of Corrections (DOC) inmates have received inpatient and outpatient medical/surgical services at the UIHC since 1915, as mandated in Chapter 255 (section 28) of *The Code of Iowa:* "Medical and Surgical Treatment of Indigent Persons." Payment for health care services to Iowa's prisoners is supported by the Perkins Act, which directs the UIHC to be compensated from the state's general fund for costs associated with providing health care to Iowa's indigent populations. This compensation is currently in the form of a fixed appropriation set in advance of the fiscal year. The prison system is not limited to the number of inmates it can refer to the UIHC for care or by the costs inmates may incur.

In effect, Iowa's indigent care program equates to a bundled payment plan, eliminating the fee-for-service barrier that continues to inhibit the delivery of telemedicine services to the general population.[5] Ensuring physician participation is essentially a non-issue because health care providers employed by a state-mandated indigent care facility are required by law to provide medical services to the state's indigent patient population, including inmates from the state's correctional facilities.

*"The common denominator among prison telemedicine programs is the use of a centralized method of health care administration that negotiates and allocates global compensation for health care, including hospital costs, ancillary services, and physician services."*[6]

## RATIONALE FOR TELEMEDICINE TO IOWA'S CORRECTIONAL FACILITIES

Iowa's prison population has increased by more than two-and-a-half times in the last decade, growing from 2,800 inmates in 1987 to 7,246 in 1998. As Iowa's inmate population continues to expand, a greater number of residents from the state's correctional facilities are being

CDCR _356

EXPERIENCE AND COST OF TELEMEDICINE

TABLE 1.  PROFILE OF IOWA'S CORRECTIONAL FACILITIES

| Correctional Facility | Current Inmate Census | Date Connected to Telemedicine Network | Miles from UIHC | Inmates Evaluated Over Telemedicine During Study Period | Average Age of Telemedicine Patients | Male/Female Ratio |
|---|---|---|---|---|---|---|
| Iowa Medical and Classification Center, Oakdale[a] | 985 | March, 1997[a] | 5.9 | 167 | 37 yr 11 mos | 161/6 |
| Iowa State Penitentiary, Fort Madison[a] | 910 | March, 1997[a] | 88.3 | 79 | 36 yr 6 mos | 79/0 |
| Newton Correctional Facility, Newton[a] | 113 | January, 1998[a] | 82.1 | 27 | 36 yr | 27/0 |
| Clarinda Correctional Facility, Clarinda[a] | 1,002 | February, 1998[a] | 245.3 | 1 | 39 yr 7 mos | 1/0 |
| Fort Dodge Correctional Facility, Fort Dodge | 48[b] | July, 1998 | 195.8 | | | |
| Anamosa State Penitentiary, Anamosa | 1,304 | August, 1998 | 48 | | | |
| Iowa Correctional Institution for Women, Mitchellville | 499 | Fall, 1998 | 95.9 | | | |
| Mount Pleasant Correctional Facility, Mt. Pleasant | 944 | August, 1998 | 55 | | | |
| North Central Correctional Facility Rockwell City | 441 | Uses Fort Dodge Unit | 206.7 | | | |
| Total: | 7,246 | | | 274 | | |

[a]Connected to telemedicine network during study period, March 1997–February 1998.
[b]New facility.

seen at the UIHC. Since 1987, there have been 2,666 inmate admissions and 30,711 inmate clinic visits. The distance to UIHC from the correctional facilities ranges from 5 to 245 miles.

In 1989, Iowa began building the nation's first state-owned, statewide fiberoptic network, and in 1994 the Governor signed a bill allowing medical facilities to use the network for the provision of health care services. The Iowa Communication Network (ICN) now provides data, voice, and video service to all of Iowa's 99 counties. Utilizing two-way, full-motion (DS-3) technologies, this interactive network provides service to K–12 schools, higher education institutions, state and federal agencies, and hospitals and clinics throughout the state. It is anticipated that the total number of connected interactive video facilities in Iowa will soon reach 600.

Making use of the state's fiberoptic backbone and availability of ISDN technologies, the University of Iowa began its implementation of telemedicine services with a federal contract

from the National Library of Medicine (NLM) in 1994. A second contract from the NLM in 1996 allowed development and delivery of additional telemedicine services to rural hospitals and implementation of a multisite research and development telemedicine network, with the University of Iowa as the hub. The availability of the statewide fiberoptic infrastructure combined with strong fiscal support at the federal level has allowed Iowa to move to the forefront of telemedicine and telehealth activities. (For additional information, please visit our Web site: *http://telemed.medicine.uiowa.edu*)

Despite conditions conducive to telemedicine in Iowa, the state is faced with many of the same challenges that exist elsewhere in the country, not the least of which is reimbursement. The University of Iowa (UI) has been looking for ways to collect sufficient data to evaluate the efficacy and cost-effectiveness of telemedicine, while at the same time dealing with problems of motivating specialists to participate in a service for which they know reim-

bursement is extremely limited, if at all available. The DOC has been looking for ways to reduce costs without decreasing quality of inmate care. These two goals led to a collaborative effort between Iowa's DOC and UI to offer telemedicine specialty consults to inmates, collect outcomes data on the cost of using telecommunications to deliver clinical services, and evaluate the satisfaction of referring and consulting providers.

## PURPOSE OF THE STUDY

This analysis will provide information about the first year of telemedicine service to the state's correctional facilities and will present the costs and benefits of doing telemedicine from the perspective of both the referring and consulting facilities. Because by definition telemedicine involves an interaction between two or more facilities, satisfaction with service, costs, and benefits to both the hub and the spoke facilities were evaluated. The authors provide demographic and clinical data on the first 274 patient encounters; offer a detailed formula to determine annual costs of receiving and providing telemedicine services; and assess provider satisfaction on the part of both referring and consulting physicians.

## MATERIALS AND METHODS

The telecommunications network at UIHC makes use of both ISDN-PRI (Integrated Service Digital Network-Primary Rate Interface) linkages and the ICN to allow dial-up variable bandwidth connections between the remote facility and the UIHC for interactive teleconsultations. Typically, each compressed video session utilizes half of a T-1 circuit (twelve channels) for its transmission speed.

### Equipment

The University of Iowa currently utilizes TeleDoc 5000 video codec units (NEC America, Inc., Irving, TX) to transmit interactive teleconsultations. Each unit has two high-resolution television monitors: one displays the local image, the other allows the consulting physician and patient to interact visually and audibly in real time. A VHS videocassette recorder is included for optional video documentation of the encounter procedures. The two UIHC TeleDoc units are located in examining rooms of the UIHC's Emergency Treatment Center (ETC).

In addition to the TeleDoc 5000 system, digital diagnostic equipment is available to the referring physicians. This equipment includes a digital exam camera, electronic stethoscope, and radiologic light box.

## STUDY SAMPLE

### Clinical Specialties

Telemedicine between the UIHC and DOC began in March, 1997 with connections to the Oakdale and Fort Madison facilities. Based on a retrospective review of inmate visits for the preceding year, it was determined that the three most utilized specialties were orthopedics, dermatology, and internal medicine, and therefore these were the first three clinics made available to the DOC via telemedicine. Since the program's inception, five clinical specialties have been added, based on the needs of the state's inmate population. The rate of teleconsultations for each specialty was impacted by the dates each service became available and the number of prison sites connected at the time of analysis (Tables 1 and 2).

### Patient Profiles and Demographics

Demographic and diagnostic information was captured for the 274 prison telemedicine consultations performed, from March 4, 1997 through February 28, 1998. The average age of inmate telemedicine patients (predominantly male) was 37 years.

### Diagnostic Patterns

The *International Classification of Diseases, Ninth Revision* (ICD-9) codes, from primary diagnoses of inmates evaluated over the telemedicine system, are summarized into major diagnostic categories by frequency of presentation

EXPERIENCE AND COST OF TELEMEDICINE

TABLE 2.  NUMBER OF CONSULTS BY SPECIALTY (YEAR 1)

| Specialty Clinic | Date Service Began | No. of Consults (March 1997–February 1998) |
|---|---|---|
| Orthopedics | March, 1997 | 117 |
| Internal (general) medicine | March, 1997 | 82 |
| Dermatology | March, 1997 | 35 |
| Gastrointestinal | June, 1997 | 12 |
| Cardiology | March, 1997 | 11 |
| General urology | June, 1997 | 10 |
| Surgery | September, 1997 | 6 |
| Otolaryngology | November, 1997 | 1 |
| Total | | 274 |

(Table 3). These diagnostic categories were derived using the *1998 International Classification of Diseases, Ninth Revision, Clinical Modification, Fifth Edition*.[7] As expected, the diagnostic categories reflect the most frequently used specialties.

Consulting physicians also assigned evaluation and management (E/M) codes to each prison telemedicine visit. These codes are summarized in Table 4. Within each category, the complexity of physician service increases as the E/M code value increases.[8] Most visits are clustered in the low to mid-level codes, likely reflecting a case preselection process by the DOC.

Table 5 represents follow-up actions recommended by the consultant for patients evaluated via telemedicine in the first year. These categories were based on an analysis of the clinical summaries filed in each patient's chart by the consulting physicians. More than one action may have been noted for each patient visit.

## DISCUSSION

*Provider Satisfaction with the Telemedicine Service*

Due to the already significant institutional, state, and federal requirements for documenting quality health assurance procedures, a decision was made to keep the telemedicine evaluation form as concise as possible. A six-item questionnaire was therefore developed to eval-

TABLE 3.  DIAGNOSTIC FREQUENCY OF INMATES EVALUATED OVER TELEMEDICINE (BY ICD-9 CODES)

| Major Diagnostic Category | Frequency |
|---|---|
| Diseases of the musculoskeletal system and connective tissue | 76 |
| Diseases of the skin and subcutaneous tissue | 34 |
| Symptoms, signs, and ill-defined conditions | 24 |
| Supplementary classification of factors influencing health status and contact with health services | 23 |
| Diseases of the circulatory system | 21 |
| Diseases of the digestive system | 19 |
| Injury and poisoning | 18 |
| Infectious and parasitic diseases | 14 |
| Diseases of the genitourinary system | 13 |
| Endocrine, nutritional, and metabolic disease, and immunity disorders | 9 |
| Neoplasms | 8 |
| Congenital anomalies | 4 |
| Diseases of the nervous system and sense organs | 4 |
| Diseases of the respiratory system | 4 |
| Mental disorders | 2 |
| Diseases of the blood and blood-forming organs | 1 |
| Total | 274 |

TABLE 4.   E/M CODE FREQUENCY FOR
TELEMEDICINE CONSULTATIONS

|  | Code | Frequency |
|---|---|---|
| Established office visit | 99211 | 37 |
|  | 99212 | 33 |
|  | 99213 | 22 |
|  | 99214 | 7 |
|  | 99215 | 4 |
| Subtotal |  | 103 |
| New office visit | 99201 | 18 |
|  | 99202 | 26 |
|  | 99203 | 7 |
| Subtotal |  | 51 |
| Office/outpatient consultations | 99241 | 19 |
|  | 99242 | 29 |
|  | 99243 | 29 |
|  | 99244 | 11 |
|  | 99245 | 6 |
| Subtotal |  | 94 |
| Postoperative follow-up care | 99024 | 4 |
| No E/M code listed |  | 22 |
| Total |  | 274 |

uate the following outcomes for each telemedicine encounter:

- Usefulness for establishing a diagnosis
- Value in developing a treatment plan
- Appropriateness for specific medical conditions
- Quality of transmission
- Adequacy of telemedicine to complete the consultation
- Satisfaction with telemedicine equipment

For the 274 teleconsultations performed the first year of operation, (March 1997–February, 1998), 134 referral and 171 consultant satisfaction surveys were completed for a response rate of 54% and 62%, respectively.

For overall satisfaction using telemedicine, referring physicians scored gastrointestinal, urology, and surgery specialties the highest (all at 4.17 on a scale of 1 to 5, 5 representing the highest level of satisfaction.) For specialists, dermatology, cardiology, and internal medicine received the highest ranking for satisfaction with the telemedicine system (Table 6A). Dermatology received the highest score for consulting physicians (3.80), and the second highest score for referring physicians (4.16). The greatest discrepancy between primary care

providers and specialists may be seen in the ranking of GU services where referring physician satisfaction exceeded specialist satisfaction by a margin of 1.29 points (4.17 to 2.88). The variations in satisfaction by specialty have not yet been explored.

When comparing overall satisfaction with telemedicine, referring and consulting physicians both scored "quality of transmission" the highest (Table 6B). Interestingly, both groups also scored the usefulness of telemedicine for diagnosis the lowest. This apparent discrepancy might indicate that although physicians found the quality of transmission to be "excellent," there were other factors inhibiting the diagnostic process, such as the consulting physician's inability to palpate an abnormality, feel for lumps, or evaluate the temperature and hydration of a patient's skin. For overall adequacy of telemedicine to meet the needs of their patient population, providers at the prison averaged a 4.89 satisfaction score out of a 5.00. UIHC specialists' overall satisfaction with telemedicine scored a 3.65.

The level of satisfaction using telemedicine was higher among referring providers for every outcome evaluated in this study. These data were evaluated first by consultant and referring physician responses to the questions described previously and summarized in Table 6B. Using the same data, referring and consulting physician responses to the same questions were ranked by specialty (Table 6A) and

TABLE 5.   CATEGORIZATION OF ACTIONS
FOLLOWING TELEMEDICINE CONSULTATION

| Frequency | Action Category |
|---|---|
| 120 | Diagnostic procedure(s) ordered |
| 80 | Lab(s) ordered |
| 100 | Continued/unchanged medication |
| 63 | New medication ordered |
| 37 | Medication change/stoppage |
| 102 | Other therapy ordered |
| 28 | Surgical procedure(s) ordered |
| 22 | Non-surgical therapy ordered |
| 130 | Return to UIHC specialty clinic |
| 85 | Return to telemedicine |
| 56 | Return PRN |
| 7 | Schedule for hospitalization |

PRN, Pro re nata; UIHC, University of Iowa Hospital and Clinics.

EXPERIENCE AND COST OF TELEMEDICINE                                                  297

TABLE 6A.   COMPARISON OF CONSULTANT AND REFERRING
PHYSICIAN SATISFACTION WITH TELEMEDICINE BY SPECIALTY

|                   | Consultant (UIHC) | Referral (Prison) |
|-------------------|-------------------|-------------------|
| Cardiology        | 3.77              | 4.03              |
| Dermatology       | 3.80              | 4.16              |
| GI                | 3.72              | 4.17              |
| GU                | 2.88              | 4.17              |
| Internal medicine | 3.77              | 4.12              |
| Orthopedics       | 3.25              | 3.86              |
| Surgery           | 3.67              | 4.17              |

Response code: 1 = "poor," 5 = "excellent." GI, gas-
trointestinal; GU, genitourinary.

TABLE 6B.   COMPARISON OF CONSULTANT AND REFERRING PHYSICIAN SATISFACTION WITH TELEMEDICINE

|                                                  | Consultant (UIHC) | Referral (Prison) |
|--------------------------------------------------|-------------------|-------------------|
| Video consultation useful for diagnosis?         | 3.16              | 3.85              |
| Video consultation useful for treatment plan?    | 3.47              | 3.92              |
| Medical condition appropriate for telemedicine?  | 3.50              | 3.93              |
| Quality of transmission adequate?                | 3.65              | 4.89              |
| Consultation adequate for care?                  | 3.29              | 4.63              |
| Satisfied with equipment/consultation?           | 3.60              | 3.89              |

Response code: 1 = "poor," 5 = "excellent."

generally reflect results published elsewhere.[9] Our own previous (anecdotal) experience with telemedicine has shown us that discrepancies in satisfaction with telemedicine between primary care providers and specialists may be the result of: (1) referring provider testimony that, being present for the consultant's examination, provides enhanced communication with the specialist and an opportunity for a "learning experience" as a result of observing the consultation; and (2) the fact that, for the consultant, telemedicine may be initially perceived as yet another demand on a busy clinical, teaching, and research schedule without the benefit of accompanying financial incentives.

*Computing Annual Costs*

**On-site inmate visits.** Due to the variables in transporting a prisoner (number and salaries of escorts required to accompany the prisoners, distance between the hospital and the prison, modes of transportation, level of security required, etc.), cost studies comparing telemedicine to on-site visits have typically been difficult to establish, quantify, and compare.[10] The cost of transportation alone (transporting a single prisoner to the consulting facility) has been cited at $92.05 in Ohio,[11] $100 in Colorado,[12] $115 in Iowa,[13] $200 in Texas,[10] $206 in North Carolina,[14] and $216 in Virginia.[15]

Over the past decade, the cost of transporting and supervising prisoners who have traveled to Iowa City for their health care has been significant. Prisoners are transported in secured vehicles with two or more correctional officers providing transportation and security for each UIHC visit. As stated above, it has been estimated that it costs the State of Iowa an average of $115 to transport a prisoner to the UIHC, excluding the cost of medical care. These costs were computed by averaging costs for transportation and security for the 4,396 inmate visits to UIHC in 1997.

**Telemedicine inmate consultations.** Accurate cost projections for telemedicine are similarly complicated by several factors including fixed versus variable costs, difficulties predicting rates of utilization, and the need for added personnel. The formula presented in this report may prove useful to programs beginning cost projections to determine the economic viability of providing telemedicine to correctional facilities or to other hospitals. Medical costs are left

TABLE 7A. BREAK-EVEN POINT FOR UIHC: TELEMEDICINE
VS. ON-SITE VISIT (EXCLUDES MEDICAL CARE)

| Visit Type | Facilities Charge | | |
|---|---|---|---|
| On-site | $65 | | |

| Visit Type | Annual Cost of Equipment, Circuits, Personnel | Target No. of Teleconsults Per Year | On-site Visit/ Per Consult |
|---|---|---|---|
| Telemedicine | $133,622.72 | 2,000 | $66.81 |

TABLE 7B. BREAK-EVEN POINT FOR PRISONS: TELEMEDICINE VS. ON-SITE VISIT (EXCLUDES MEDICAL CARE)

| Visit Type | Transportation Per Inmate | Security Per Inmate | On-site Visit/ Per Inmate |
|---|---|---|---|
| On-site | $16.82 | $98.87 | $115.34 |

| Visit Type | Annual Operating Costs Per Prison | Projected (target) No. of Patients Per Site, Per Year | Teleconsult/Per Inmate |
|---|---|---|---|
| Telemedicine | $31,717.45 | 275 | $115.34 |

out of these formulae since it is assumed they will be relatively comparable for both on-site and telemedicine evaluations. Following the cost formula below, each variable is explained in some detail.

Circuit charges + Equipment + (Per-minute chgs × No. Minutes × No. Consults) + Personnel + Space/Facilities = Total cost

Cost per consultation = Total cost/No. of consults

**Circuit charges.** This is the fixed, line charge that an institution pays to a telecommunications carrier for providing service. A frequent transmission mode used for interactive video in telemedicine is ISDN-PRI. Although not yet available in some rural areas, a major advantage of this type of service is that it allows practitioners and other users of the system to determine the optimum rate of transmission up to a full T-1 line (24 channels.) Many facilities report using $\frac{1}{4}$ T-1 line for real time interactive video transmissions, although The University of Iowa typically uses $\frac{1}{2}$ T-1 line, or 12 channels. The fewer channels utilized the lower per-minute cost to the institution.

If the circuit is being used for other applications such as videoconferencing, distance education, professional development, administrative meetings, or training programs, consider what percentage of business on the circuit directly relates to telemedicine. If clinical consultations account for only half of the utilization of the video circuit, cost projections should reflect that percentage of use and additional cost/benefit studies should be generated for other types of applications.

**Equipment.** The UIHC cost study includes the following equipment, factoring in routine maintenance. This equipment will be required at each site unless otherwise indicated.

- Video unit and installation (codec, monitors, cameras, light boxes, and microphones)
- Diagnostic peripherals (digital stethoscope, otoscope, etc.) for the correctional institution or referring site
- Multiplexor and installation
- Additional capitalized equipment, including equipment and furnishings for the video room: (fax machine, computer, telephone line, desk at both sites, and examination furnishings for the referring site)

Ten percent of the total equipment costs should be factored in for maintenance. Divide the total equipment costs by 5 years of useful life (depreciation expectation), add 10% of the total equipment costs for maintenance, and the resulting figure will provide an annual telemedicine equipment cost.

**Per-minute charges × number of consults.** With an ISDN circuit, institutions will also be charged a per-minute cost for the actual duration of the consult, just as one would be charged for a long-distance phone call. For institutions that have not begun telemedicine service, estimates will need to be made of the number of teleconsults anticipated and the average time spent per consult over the course of a year. (The UIHC telemedicine coordinator reported an average of 10 minutes per consultation.) Multiply the average time per consult by the per-minute, per-channel costs that your telecommunications provider will charge for the cost of each "call." The contractual arrangements between the referring and consulting agencies should delineate who will pay for the per minute video call. For administrative and technical reasons, the UIHC placed the telemedicine video calls to the prisons during the first year of implementation.

**Personnel.** Two key positions in providing telemedicine services are a telemedicine coordinator and a telecommunications/technical expert. Depending on the size and complexity of the telemedicine program, an institution may allocate part or all of the level of effort for key personnel.

The UIHC cost study included 100% of salary and fringe benefits for both of the positions referred to above. The coordinator scheduled the consults, made sure the charts were available, requested that referring and consulting physicians fill out a satisfaction survey, ensured connections were made and equipment was in working order, scheduled training for physicians, and generally facilitated each interaction. The technical support person was responsible for troubleshooting equipment and networking problems. In our case, both of these positions have been full-time since the inception of the program, although the technical support person has a variety of other telecommunications responsibilities in addition to prison teleconsultations.

**Space/Facilities charges.** Most hospitals have a square footage formula to determine the cost to the department for space to conduct patient care duties. Added to this might be the costs of administrative data processing, financial management, and business office operating costs. If a comparison study is being made for on-site versus telemedicine visits, be sure to include this fee for both types of consultation.

**Total cost.** Adding all the charges delineated above will give an estimate of the annual cost of providing telemedicine services. If this overall cost is divided by the number of (actual or projected) patients evaluated by telemedicine, this will produce a cost-per-patient figure. This figure can then be compared to the cost of interacting with a patient on-site. Most hospitals have a formula for providing on-site and telemedicine consultations. For the UIHC, the total annual cost of providing telemedicine service for the first year of implementation was $133,622.72. Adjusting for 5% inflation, the UIHC would need to see 2,000 patients over telemedicine during the next fiscal year to reach the point where the cost of a telemedicine visit approaches the average cost of an on-site visit (breakeven point) (Table 7A).

*Comparison of Inmate On-site Visits to Telemedicine Consults: UIHC Experience*

The major costs for transporting a prisoner to UIHC involves transportation and security. In fiscal year (FY) 1997, 4,396 outpatient visits resulted in vehicles being on the road for 307,995 miles. At $0.24 a mile, the cost of transportation for FY 1997 totaled $73,919 or an average of $16.82 per visit for transportation.

Security officers spent 5,695 hours on the road for the 4,396 visits to UIHC during the same time frame, totaling $170,850. An average of two prisoners traveled to each UIHC visit, for a total of 2,198 trips. Each on-site prisoner consultation required, on average, 4 hours of officer supervision, totaling $263,760. The total security costs for the study period were $434,610.00 or $98.87 per visit.

The average cost to the prisons of a single, on-site prisoner visit to UIHC was: $16.82 (transportation), + $98.87 (security) = $115.34.

Using the formula described previously to compute the costs of circuits, equipment, and personnel, Iowa's correctional facilities would need to average 275 prison teleconsultations per year to reach the breakeven point (i.e., to approximate the average cost of the on-site visit, $115.34) (Table 7b). Obviously, as the number of consultations increases, the cost per session goes down.[16] If the Iowa DOC were to reach an average target of 275 telemedicine consultations a year per prison, there would be 2,475 inmate consultations taking place at the UIHC annually, slightly above the 2,000 annual teleconsultations required for the UIHC to reach its breakeven point. (275 teleconsults × 9 prisons = 2,475 UIHC teleconsults). Future analyses of the data will focus on a prison-by-prison evaluation to compute the distance in miles to the UIHC, the number of inmates based on current census data, and the salaries of security officers to determine the number of telemedicine consults for each prison to reach breakeven (versus the average number of tele-consults that the authors have shown here).

While many telemedicine prison studies have shown cost savings or cost avoidance from the point of view of their prisons, this study attempts to examine the cost of doing telemedicine from the perspective of both the referring and consulting facilities. Telemedicine is a collaborative interaction that requires costs and benefits to be evaluated from both perspectives. Costs associated with receiving and providing telemedicine services are not the same, and neither is the satisfaction with telemedicine comparable for referring and providing physicians. It is important to present both perspectives for an accurate assessment of telemedicine viability.

It should also be emphasized that, from a broader statewide perspective, telemedicine's relationship to the state's correctional facilities has the potential to benefit the state of Iowa and its taxpayers and citizens. Although the DOC and the UI do not always "think as one" in terms of strategies to achieve fiscal viability, it is anticipated that once the breakeven points have been surpassed for one or both, the cost savings, cost avoidance, and cost benefits will ultimately be reflected favorably in the bottom line of the state's annual operating budget.

## CONCLUSION

A careful cost assessment is essential before launching any new program. With telemedicine, no one should anticipate instantaneous cost effectiveness. With careful planning, implementing a telemedicine program can be initially "cost-acceptable", and, as the volume of teleconsults increases, ultimately cost-effective.

Furthermore, not all benefits of telemedicine can be measured in terms of the "bottom line." In the case of prisoners, security issues may be key in determining the cost and benefits of telemedicine to an institution. In addition to transportation, there are other "costs" associated with prisoner transport that cannot always be quantified in monetary terms, such as the safety risk to patients and families in specialty care facilities and the embarrassment of inmates who may be shackled and in chains.[17]

It should not be anticipated that hub and spoke hospitals will think as one, share the same bottom-line goals, or employ similar provider incentives when implementing a telemedicine service. Hub hospitals may require the installation of more costly equipment and salaries paid to academic medical staff will likely be higher than in smaller rural and community hospitals. Encouraging provider acceptance and physician participation is complicated by the fact that referring and consulting providers may be motivated by different variables. Referring physicians report benefits from enhanced communication with specialists, increased knowledge and skill levels, and access to the latest medical techniques and innovations. Consultants may be motivated to participate because of personal or professional research interests in technology, the opportunity to participate in the development of innovative health care delivery systems, and increased avenues for research and publication.

In evaluating telemedicine for the general population, the savings to patients and their families in cost, time, and travel may well rep-

CDCR _364

resent a competitive advantage to the institution that provides their patients with this service option. Additionally, there are other, less quantifiable benefits of telemedicine that need to be considered. For example, many consulting physicians report the advantage of having the referring physician or primary care provider available during the teleconsult to "present" the patient, while primary care providers report enhanced learning as a result of witnessing first hand the expertise of the consultant in patient management. Patients and providers alike note that telemedicine provides a more team-based approach to reaching patient management decisions than more traditional referrals, which are often marked by a lack of case management, poor or tardy communication between referring and consulting physicians, and patients and families who feel increasingly out of the decision-making loop about their own care. Telemedicine creates an interaction whereby the primary physician and consultant reach a decision in the presence of the patient. Finally, telemedicine offers the opportunity for tertiary care facilities to strengthen practice affiliations with smaller hospitals; allows physicians and other providers the opportunity to participate in "cutting edge" programs; encourages creative uses of networking for distance education and teleconferencing; and enhances the service profile of all hospitals involved.

## ACKNOWLEDGMENTS

The authors wish to acknowledge the contributions of the following University of Iowa staff: Stacey Cyphert, Assistant Vice President Statewide Health Services and Assistant Director, The University of Iowa Hospitals and Clinics; and Ruth Giesking, Telemedicine Coordinator Clinical Outreach Department, The University of Iowa Hospitals and Clinics.

## REFERENCES

1. U.S. Department of Justice. *Bureau of Justice Statistics. Summary Statistics.* [online] *http://www.ojp.usdoj.gov/bjs/pub/press/p97.pr*

2. Glaser JB, Greifinger RB: Correctional health care: a public health opportunity. *Ann Intern Med* **1993;** 18:139–145.

3. Norton S, Burdick AE, Phillips CM, Berman B: Teledermatology and underserved populations. *Arch Dermatol* **1997;**133:197–200.

4. Brunicardi BO: Financial analysis of savings from telemedicine in Ohio's prison system. *Telemedicine Journal* **1998;**4:49–54.

5. Sisk JE, Sanders JH: A proposed framework for economic evaluation of telemedicine. *Telemedicine Journal* **1998;**4:31–37.

6. Mekhjian HJ, Warisse M, Gailiun M, McCain T: An Ohio telemedicine system for prison inmates: a case report. *Telemedicine Journal* **1996;**2:17–24.

7. Speirs L: *International Classification of Diseases, Ninth Revision, Clinical Modification, Fifth Edition.* Salt Lake City, Utah: Medicode, Inc.; **1997**.

8. *1998 E/M Fast Finder, A Quick Reference Guide For E/M Coding.* Salt Lake City, Utah: Medicode, Inc.; **1997**.

9. Bashshur RL: Rethinking the evaluation and priorities in telemedicine. *Telemedicine Journal* **1998;**4:1–4.

10. Brecht RM, Gray CL, Peterson C, and Youngblood B: The University of Texas medical branch—Texas Department of Criminal Justice telemedicine project: findings from the first year of operation. *Telemedicine Journal* **1996;**2:25–35.

11. Brunicardi BO: Financial analysis of savings from telemedicine in Ohio's prison system. *Telemedicine Journal* **1998;**4:49–54.

12. Anonymous. November, 1995. "Prison telemedicine in Colorado." *Telemedicine Today;* **1995;**3:26–29.

13. Loeffelholz PL: Medical Director, Iowa Department of Corrections, Iowa Medical and Classification Center; Oakdale, Iowa. [Personal correspondence.] May 13, **1998**.

14. Zircon HL, Doty E, Balch DC: Financial analysis of telemedicine in a prison system. *Telemedicine Journal* **1997;**3:247–255.

15. McCue MJ, Mazmanian PE, Hamptom C, *et al:* The case of Powhatan Correctional Center/Virginia Department of Corrections and Virginia Commonwealth University/Medical College of Virginia. *Telemedicine Journal* **1997;**3:11–17.

16. McCue MJ, Mazmanian PE, Hampton CL, *et al:* Cost-minimization analysis: a follow-up study of a telemedicine program. *Telemedicine Journal* **1998;**4:323–327.

17. Mekhjian HJ, Gailiun WM, McCain T: An Ohio telemedicine system for prison inmates: a case report. *Telemedicine Journal* **1996;**2:17–24.

Address reprint requests to:
*Susan Zollo*
*Director Telemedicine Resource Center*
*211 HLHS*
*The University of Iowa*
*Iowa City, IA 52242*

CDCR _365

# Attachment D

*XAVIER BECERRA*
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public:  (916) 445-9555
Telephone:  (916) 210-7325
Facsimile:  (916) 324-5205
E-Mail:  Tyler.Heath@doj.ca.gov

July 12, 2018

Matthew A. Lopes, Jr.
Pannone Lopes Devereaux & O'Gara, LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI  02919

RE:     *Coleman v. Brown, et al.,*
        U.S.D.C., Eastern District of California, Case No. 2:90-cv-00520 KJM-DB (PC)

Dear Special Master Lopes:

On July 2, 2018, you asked the parties to submit their positions on CDCR's proposed use of telepsychiatry and any supporting information for their positions by July 12, 2018.  On July 3, 2018, the Court ordered the "Special Master to finalize a proposed telepsychiatry policy that is in his view consistent with the provisions of the October 10, 2017 order and the recommendations of his experts."  (Order at 6, July 3, 2018, ECF No. 5850.)[1]  The Court also ordered the Special Master to circulate his "proposal to the parties and obtain their responses."  (*Id.*)  After the Court's order, you clarified that by July 12 you wanted the parties to state whether their positions vis a vis telepsychiatry remain the same and to provide any additional information or research related to the provision of telepsychiatry.

Defendants' position on the scope and use of telepsychiatry remains unchanged from their May 16 and 25 letters, which are attached for your reference.  All the available evidence demonstrates that telepsychiatry is a safe and proven method of providing psychiatric care to inmate-patients, and is no less safe or effective than face-to-face encounters, particularly at the EOP and CCCMS levels of care.  No evidence has been presented that the use of telepsychiatry has harmed even a single CDCR patient.[2]  Accordingly, the limitations and safeguards already

---

[1] In the July 3 Order, the Court acknowledged that its October 10, 2017 Order "directed the Special Master to 'take all steps necessary to create a complete factual record for consideration and resolution of . . . 2. What role does and can telepsychiatry play, consistent with the Eighth Amendment, to aid in solving the psychiatrist staffing shortage?'"  (ECF No. 5850 at 1-2.)

[2] CDCR began using telepsychiatry at the EOP level of care in 2014.  As of 2015, eleven institutions utilized telepsychiatry to provide coverage to EOP inmate-patients.  From 2015 to date, CDCR has completed tens of thousands of telepsychiatry contacts with EOP inmate-patients.

included in Defendants' draft policy will ensure that the use of telepsychiatry is clinically appropriate.

Defendants provide the following additional information to the Special Master and his team to demonstrate that telepsychiatry is safe and effective when provided under CDCR's current draft telepsychiatry policy. Furthermore, in Defendants' view, characterizing the EOP program as a residential treatment program and equating it to an inpatient setting is inaccurate and inconsistent with the history and practice of the outpatient program. Such comparison does not justify placing limits on the use of telepsychiatry.

### A.     Telepsychiatry Is Appropriate for a Correctional Setting, Including the EOP Level of Care.

The only evidence currently in the record or submitted to the workgroup demonstrates that telepsychiatry is safe and effective in a correctional setting. On July 6, 2018, Defendants submitted the expert opinion of Dr. Joseph V. Penn, M.D., CCHP, FAPA, to supplement the record and directly respond to the Court's advice that Defendants offer additional evidence (*see* ECF No. 5850 at 6) to support their contention that the use of telepsychiatry should not be artificially limited.

Dr. Penn is an expert on the provision of mental health care in the largest correctional system in the United States. He has been the Mental Health Director of the University of Texas Medical Branch Correctional Managed Care since 2008. He oversees the provision of mental health care to 116,000 inmates in the Texas Department of Criminal Justice and 1,500 "youthful offenders." (Joseph V. Penn, M.D., CCHP, FAPA, Telepsychiatry in Correctional Healthcare (Penn Report) at 2.) Texas has an extensive history of providing telepsychiatry to its inmate population. As of May 2018, Texas had provided "over 400,000 telepsychiatry encounters since the inception of the program." (*Id.*)

As a psychiatrist and Director of Mental Health Services, Dr. Penn has personally overseen Texas's telepsychiatry program and its use "to evaluate, diagnose, and treat the complex mental pathologies" of adult and juvenile offenders. (*Id.* at 13.) Based on the breadth of his personal experience, and his extensive review of scientific literature and research on the use of telepsychiatry in both the public and correctional setting, Dr. Penn concludes that "telepsychiatry is an effective and established mode of care delivery" and is "comparable if not superior to face-to-face psychiatric encounters." (*Id.*) And, of the 400,000 telepsychiatry encounters in the Texas mental health system, he is not aware of any "adverse or negative" outcomes due to the use of telepsychiatry. (*Id.* at 10-11.)

The Court's July 3 order characterized the EOP level of care as residential. Although Defendants do not agree with that characterization (see Section C, *infra*) —particularly given that the Program Guide describes EOP treatment as "focused care for inmate-patients who do not require 24-hour inpatient care" (Revised Program Guide at 12-4-2)—the Court's order does not alter Dr. Penn's opinion, or the fact that telepsychiatry should be considered an appropriate method of treatment for the EOP population. Indeed, Texas provides treatment in a number of

residential specialized treatment programs.  (*Id.* at 12-13.)  The majority of the psychiatric services for the residential programs are provided by telepsychiatry.  (*Id.* at 13.)

In short, Dr. Penn's expert opinion supports Defendants' proposed use of telepsychiatry. Dr. Penn's opinion is based on lengthy experience in correctional mental health and first-hand knowledge of the efficacy of telepsychiatry in inmate mental health populations – including residential settings.  Defendants are unaware of any evidence to the contrary.  As such, this evidence will be particularly informative for the EOP level of care, for which the Special Master and his team indicated more time for observation was necessary.

**B.    Updated Scientific Literature On the Use and Effectiveness of Telepsychiatry.**

The scientific literature and research that the Defendants previously submitted to the Court evidences the accepted and safe use of telepsychiatry – especially given the dearth of scientific literature to the contrary and the absence of any evidence of patient harm based on the use of telepsychiatry at CDCR.  In response to the Special Master's request for additional information, Defendants submit the below scientific literature and research that has become available since Defendants' March 2017 response to the Special Master's Staffing Report.

The following articles are attached to this letter for the Special Master's review:

1.    Abrams, J. et. al. (May/June 2017).  Practical Issues in Delivery of Clinician-to-Patient Telemental Health in an Academic Medical Center.  *Harvard Review of Psychiatry*, *25*(3), 135-145.  (This article reviews the practical factors involved in creating a telepsychiatry system.  It concludes that there is no longer a question of whether telepsychiatry should be used, and focuses on how it can be best used to provide care.)

2.    Shore, J. et. al.  (Apr. 2018).  Best Practices in Videoconferencing-Based Telemental Health.  American Psychiatric Association and American Telemedicine Association, 1-10.  (Telepsychiatry has become an accepted tool in providing mental health and this document provides a guide on the best practices for providing telepsychiatry.)

3.    Goldbloom, D. & Gratzer, D. (2017).  Telepsychiatry 2.0.  *The Canadian J. of Psychiatry*, *62*(1), 68-689.  (This article acknowledges the efficacy of telepsychiatry and discusses ways to expand its use in Canada.)

4.    Hilty, D. M., et. al. (2018).  An Update on Telepsychiatry and How It Can Leverage Collaborative, Stepped, and Integrated Services to Primary Care. *Psychosomatics*, *59*, 227-250.  (This article acknowledges that there is sufficient evidence to support the practice of telepsychiatry and discusses how telepsychiatry can help increase access to integrated collaborative care.)

5.    American Academy of Child and Adolescent Psychiatry Committee on Telepsychiatry and AACAP Committee on Quality Issues (2017).  Clinical Update: Telepsychiatry with Children and Adolescents.  *J. Am. Acad. Child Adolesc Psychiatry*, *56*(10), 875-893.  (The AACAP recognizes telepsychiatry as an evidence-based treatment and presents procedures for conducting telepsychiatry.  It did not recommend any specific limitations for juvenile corrections.)

6.    Zheng, W., et. al. (2017). Treatment Outcome Comparison between Telepsychiatry and Face-to-face Buprenorphine MAT for Opioid Use Disorder: A 2-Year Retrospective Data Analysis.  *J. Addict. Med.*, *11*(2), 138-144.  (This study analyzed the efficacy of telepsychiatry in treating addictive disorders in patients receiving medication-assisted treatment and found that telepsychiatry was no less effective.)

7.    Labelle, B. et. al. (2018).  Characterizing the Use of Telepsychiatry for Patients with Opioid Use Disorder and Cooccurring Mental Health Disorders in Ontario, Canada.  *Int'l J. of Telemedicine and Applications*, 2018, 1-7.  (This article determined that telepsychiatry is increasingly being used to provide treatment to rural patients with substance abuse disorders.)

8.    Thomas, J., et al. (2018).  The Use of Telepsychiatry to Provide Cost-Efficient Care during Pediatric Mental Health Emergencies.  *Psychiatric Services*, *69*(2), 161-168.  (This article analyzed telepsychiatry emergency program delivered to adolescents and children.  It compared the outcomes to those from psychiatric care provided by ambulatory transport for in-person care.  It found that telepsychiatry care had shorter median emergency department stay times, improved clinical and operational efficient, and improved patient and family experience.)

9.    Roberts, N., et. al. (Oct. 2017).  Child and Adolescent Emergency and Urgent Mental Health Delivery Through Telepsychiatry:  12-Month Prospective Study.  *Telemedicine and e-HEALTH*, *23*(10), 842-846.  (This article analyzed children referred to telepsychiatry for urgent and emergent needs and found that patients reported a high level of satisfaction and did not result in statistically significant differences in outcomes.)

10.    Saeed, S. A., et. al. (2017) Training Residents in the Use of Telepsychiatry: Review of the Literature and a Proposed Elective, Oct. 2016.  *Psychiatry Quarterly*, *88*, 271-283.  (This article proposes implementing telepsychiatry into curriculum to improve clinical familiarity with the technology and its use, and ultimately provide expanded telepsychiatry services to patients in need.)

Notably, many of these articles assume that telepsychiatry is acceptable and safe.  The updated scientific literature presents specific findings that telepsychiatry is safe, effective, and

appropriate in a greater number of settings.  For example, the American Psychiatric Association and American Telemedicine Association's 2018 guidelines state that "[t]here are no absolute contraindications to patients being assessed or treated using telemental health." (Best Practices in Videoconferencing-Based Telemental Health at 6.)  In fact, the guidelines do not recommend any limitations specific to inmate psychiatric care.  (*Id.* at 8.)  Similarly, there are no contraindications for telepsychiatric care delivered to children, including in juvenile detention. (Clinical Update:  Telepsychiatry with Children and Adolescents at 883.)  And preliminary studies have shown that using telepsychiatry for children and adolescents in emergency and urgent situations has not resulted in a "significant difference in patient outcome" and "suggests that telepsychiatry may be suitable for urgent assessment . ."  (Child and Adolescent Emergency and Urgent Mental Health Delivery Through Telepsychiatry:  12-Month Prospective Study at 845.)  These reports show that telepsychiatry has been studied and found to be appropriate in a number of settings and for vulnerable classes of patients, for example, children with urgent and emergent needs.  The success of telepsychiatry in these additional populations is persuasive evidence of CDCR's ability to safely use it to provide timely, high-quality care to inmates in its levels of care with the limitations that exist in CDCR's draft policy.

### C.    The EOP is an Outpatient Level-of-Care.

At the June 28, 2018 status conference, the Court asked the parties whether the EOP level of care is properly characterized as a residential program.  Defendants objected to the characterization of it as anything other than an outpatient level of care. The Court's July 3, 2018 order stated that "Although EOP is labeled an outpatient program, outpatient is contextual and relative to inpatient programs within the MHSDS; moreover, the Revised Program Guide makes clear EOP is a residential program, synonymous with an inpatient setting.  (ECF No. 5850 at 10.) Defendants dispute the accuracy of this characterization.

The description of the EOP as a residential program appears to reference descriptions of the program in early Special Master reports, which stated that the EOP was akin to a residential program.  However, other early reports recognized that the EOP population was still a part of CDCR's overall outpatient program.  (*Second Report of the Special Master on Remedial Plans* at 2, 12; *First Report of the Special Master on Compliance* at 4.)  The qualifier "residential" did not change it to a different level of care.  It was, and is still, an outpatient program.  In fact, the Special Master referred to all of CDCR's facilities as the "residential mainstream" in his very first report. (*First Interim Progress Report of the Special Master* at 45.)  There has been little to no recent characterization of the EOP program as a residential program, much less as a rationale for imposing artificial limits on the use of telepsychiatry.

The program's "residential" label appears to be driven by the fact that EOP inmates "reside" in separate housing units.  All inmates confined in CDCR are essentially "residents" there, and there are other specialized segregated units such as Sensitive Needs Yards, Psychiatric Services Unit, indecent exposure units, and Administrative Segregation Units.  This characteristic alone does not warrant the conclusion that EOP is "residential" in a clinical sense, or synonymous to inpatient care.  Indeed, Plaintiffs' counsel have repeatedly argued that EOP inmates are entitled to privileges and freedom of movement not normally permitted in a

residential setting.  For example, unlike a traditional "residential" program, EOP inmates are generally allowed and encouraged to leave their unit to go to education programs, visitations, work assignments, group programming, and treatment outside of their housing unit.  The same is true for EOP inmates that go to the Correctional Treatment Centers for medical treatment.  They generally go to these services without escorts and are not isolated from other EOP or non-EOP inmates.

In addition, the fact that EOP inmates are housed in separate units is not strictly related to their treatment.  The units are not intended to be therapeutic in and of themselves.  As stated at the June 28 status conference, the separate unit is largely, although not exclusively, a security measure to help protect a potentially vulnerable population.  In most CDCR institutions, EOP treatment happens outside of the housing units and in designated mental health treatment areas.  The treatment generally happens in the same treatment areas where all inmates, including those in different levels of care, receive their mental health treatment.

EOP patients continue to be more integrated into the broader inmate population.  Patients participate in programming, education, and jobs alongside non-EOP inmates.  This growing integration is due to efforts by CDCR to make programs available to a broader spectrum of the population, in part, a consequence of the *Hecker* litigation.  At the same time, EOP inmates are becoming more integrated with the general population as CDCR shifts to non-designated facilities.  This initiative has already transitioned institutions that provide EOP treatment services to non-designated yards.  As a result, the EOP treatment programs, Sensitive Needs Yards (SNY), and General Population (GP) designations are "no longer be recognized or utilized for the purposes of housing."  (CDCR Memorandum, Statewide Non-Designated Enhanced Outpatient Program and Inpatient Program Treatment Initiative, Nov. 20, 2017.)  The inmates in the non-designated units "program together and comply with integrated housing expectations regardless of prior GP or SNY programming or level designations."  (*Id.*)

While the court's July 3 order states that the revised program guide contemplates EOP as a residential program synonymous with inpatient setting, both the language of the program guide and the experience of the program suggests otherwise.  In fact, in many places, the Program Guide confirms that the EOP is an outpatient program.  It states that CDCR's "[o]utpatient care is provided in an array of treatment levels and modalities including a day treatment program and an outpatient clinic of care."  (Revised Program Guide, 12-1-1.)  The CCCMS and EOP are these outpatient treatment levels.  Indeed, the Program Guide specifically defines the EOP as the "most intensive level of outpatient mental health care within the MHSDS."  (*Id.* at 12-4-1.)  And, while it is correct that the Program Guide does characterize the program as having a "separate housing unit . . . for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP)," providing an inmate with a designated housing unit is not akin to the care contemplated in an inpatient setting.

The EOP level of care is not synonymous to the inpatient or crisis bed level of care.  Defendants are unaware of any prior characterization of the EOP as inpatient care.  In fact, the Program Guide specifically excludes EOP inmates from inpatient care because they "are not so impaired as to require 24-hour inpatient care."  (Revised Program Guide, 12-4-1.)  Inpatient care

is available for "inmate-patients whose conditions cannot be successfully treated in the outpatient setting or in short-term MHCB placements." (*Id.* at 12-1-9.) There are significant differences between the EOP and inpatient care. For example, inpatient care facilities must be licensed under Title 22. (Program Guide, 12-5-1.) EOP units are not. Also, inpatient care includes 24-hour nursing care and 24-hour inpatient care. (*Id*. at 12-1-8, 12-6-7.) EOP units do not.

Inpatient care is meant for an entirely different type of inmate. Inmates referred to inpatient care are suffering more severe impairment or distress due to their mental illness. (*See Id*. at 12-1-8, 12-6-7.) Inmates in inpatient care receive far more frequent care from their psychiatrists than those patients in an outpatient program. The Acute Psychiatric Program (APP) and Intermediate Care Program (ICF) require a patient be seen by a physician once every 72 hours, and then weekly after the first month for programs with a California Department of Public Health Flex Program. APP and ICF patients must receive an Interdisciplinary Treatment Team (IDTT) in the first 72 hours of admission and again after seven days. After that, APP inmates receive weekly IDTTs and ICF inmates receive monthly IDTTs. The Mental Health Crisis Bed level of care is more intense with weekly IDTTs, psychiatry appointments every 72 hours, and daily clinical contacts. (Revised Program Guide at 12-5-11.) But, EOP inmates only receive an IDTT every 90 days, weekly clinical contacts, and a monthly psychiatry visit. (*Id*. at 12-4-8.) The above are just a few of the many differences. EOP is not synonymous to inpatient care.

Even assuming *arguendo* that EOP amounts to residential care, that label alone does not justify a limitation on the use of telepsychiatry. Defendants are unaware of any specific literature or patient outcome evidence that support the limiting of telepsychiatry on a class-wide basis for residential care. If Plaintiffs or the Special Master or his experts have literature or evidence of adverse patient outcomes, or any evidence to support their respective positions as to the appropriate scope of or limitations on telepsychiatry, Defendants request the immediate disclosure of those materials so that Defendants may review them before responding to the Special Master's recommendation on CDCR's telepsychiatry policy. No such material has been provided to date for discussion and analysis, despite regular workgroups on this topic and Defendants' requests.

As reflected in Defendants' prior submissions, the report from Dr. Penn, the foregoing discussion regarding the character of the EOP level of care, and the attached literature, telepsychiatry is an accepted, effective, and safe mode of delivering psychiatric services. And, as explained by Dr. Penn, its' use in correctional and residential settings is safe and effective.

/ / /

/ / /

/ / /

July 12, 2018
Page 8


      Defendants look forward to reviewing and commenting on the Special Master's draft policy.

                         Sincerely,

                         */s/ Tyler V. Heath*

                         TYLER V. HEATH
                         Deputy Attorney General

                For    XAVIER BECERRA
                         Attorney General

TVH:

cc:     Plaintiffs' Counsel

CF1997CS0003
33470509.docx



# PERSPECTIVES

# Practical Issues in Delivery of Clinician-to-Patient Telemental Health in an Academic Medical Center

Jessica Abrams, BA, Sarah Sossong, MPH, FACHE, Lee H. Schwamm, MD, Lauren Barsanti, MPH, Michael Carter, MBA, Naomi Kling, MA, Meghan Kotarski, MBA, Jaclyn Leddy, MBA, Benjamin Meller, BS, Marcy Simoni, MPH, Michael Sullivan, and Janet Wozniak, MD

Downloaded from https://journals.lww.com/hrpjournal by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IlQrHD3i3D0OdRyi7TvSFl4Cf3VC1y0abggQZXdgGj2MwlZLeI4Sys= on 07/03/2018

**Background:** In the age of online communication, psychiatric care can now be provided via videoconferencing technologies. While virtual visits as a part of telepsychiatry and telemental health provide a highly efficient and beneficial modality of care, the implementation of virtual visits requires attention to quality and safety issues. As practitioners continue to utilize this technology, issues of clinician licensing, treatment outcomes of virtual visits versus in-person visits, and cost offset require ongoing study.

**Methods:** This review provides an overview of the topics of technology, legal and regulatory issues, clinical issues, and cost savings as they relate to practicing psychiatry and psychology via virtual visits in an academic medical center. We review the telepsychiatry/telemental health effectiveness literature from 2013 to the present. Our literature searches used the following terms: telemental health effective, telepsychiatry effective, telepsychiatry efficacy, and telemental health efficacy. These searches produced 58 articles, reduced to 16 when including only articles that address effectiveness of clinician-to-patient services.

**Results:** The technological, legal, and regulatory issues vary from state to state and over time. The emerging research addressing diverse populations and disorders provides strong evidence for the effectiveness of telepsychiatry. Cost savings are difficult to precisely determine and depend on the scope of the cost and benefit measured.

**Conclusion:** Establishing a telepsychiatry program requires a comprehensive approach with up-to-date legal and technological considerations.

**Keywords:** technology, telemedicine/standards, telemental health, telepsychiatry, videoconferencing

Videoconferencing technology on phones, tablets, and computers has for some time generated enthusiasm for the delivery of psychiatric treatment above and beyond the standard face-to-face office visit. The common use of videoconferencing technology in everyday life to connect with family and friends, the utility of videoconferencing and other online media for business and educational activities, and the burden of finding and connecting with a mental health provider render videoconferencing technology appealing for both patients and providers. Two-way, real-time medical encounters using video technology are termed *telemedicine* by the Centers for Medicare & Medicaid Services.[1] Telemedicine, within the context of psychiatry, is termed *telepsychiatry* and generally includes psychology services (e.g., therapy). The term *telemental health* also refers to real-time provision of mental health services via video technology. While telepsychiatry and telemental health can sometimes refer to asynchronous encounters, the scope of this review is limited to synchronous consults between a clinician and patient via a video and audio connection. In this review, we will also refer to a telepsychiatry or telemental health clinical encounter via synchronous videoconferencing as a *virtual visit*.

While virtual visits have extended to many areas of medicine, psychiatric and psychological care appear particularly well suited to this modality because of the reduced requirement for physical examination.[2] Nonetheless, there are questions about how to ethically conduct such visits and whether all psychiatric patients or all psychiatric problems can be adequately and safely addressed via this new technology.[3,4] In an effort to answer these questions, guidelines have been created to assist programs and clinicians in the responsible, safe, and high-quality administration of services via virtual visits. The aim of this review is to synthesize the guidelines, present important considerations in the practice of telepsychiatry, and discuss issues of quality, treatment outcomes, and cost-benefit. Rather

From Massachusetts General Hospital, Boston, MA; Harvard Medical School (Dr. Wozniak).

Original manuscript received 10 August 2016; revised manuscript received 5 October 2016, accepted for publication subject to revision 8 November 2016; revised manuscript received 16 November 2016.

Correspondence: Janet Wozniak, MD, Child Psychiatry Service, Massachusetts General Hospital, Yawkey 6A, Boston, MA 02114. Email: jwozniak@partners.org

© 2017 President and Fellows of Harvard College

DOI: 10.1097/HRP.0000000000000142

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

than presenting a comprehensive guide for practicing tele-psychiatry or telemental health, we provide a review of the current issues involved in practicing telepsychiatry from the perspective of an academic medical center group—a review that should prove useful in considering the issues involved in starting a telepsychiatry program. With that aim in view, we address technological issues, legal and regulatory issues, clinical issues, and potential cost savings.

## TECHNOLOGY

### Privacy and Security

Any individual or organization interested in pursuing telepsy-chiatry or telemental health must first invest in a secure, Health Insurance Portability and Accountability Act (HIPAA)–compliant videoconferencing system (VC system), either through the development of its own technology or by using an outside vendor.[5] While applications such as Skype or FaceTime are encrypted services and use standard Internet connections, they are deficient in certain areas of privacy as-surance, as they are username based. When a patient is logged in to such applications, he or she can, in fact, directly call pro-viders, posing a significant privacy concern for the clinician who can be called at will by the patient and for the patient who can be called at will by the clinician, without the inter-face of a scheduled appointment time and virtual waiting room. Accordingly, these applications should not be used as the basis of virtual visits. HIPAA permits hospitals or clinics that are utilizing virtual visits to disclose health information to external telehealth service providers or technical personnel, who are considered "business associates."[6] In such cases, the organization pursuing telepsychiatry needs to establish busi-ness associate agreements with those external individuals, who are also subject to HIPAA.[7] The overarching guideline is that if a covered entity plans to leverage telehealth that in-cludes protected health information, then that entity is ulti-mately responsible for meeting, or for ensuring, the same privacy requirements as needed for an in-person visit (protecting the information and satisfying all privacy requirements under HIPAA). A business associate agreement establishes a con-tractual obligation, with the same liabilities, for business associates to meet the same HIPAA standards as the over-arching service provider.

### Work Flow

The selected VC system will require customization, software updates, and prompt technological support for both clini-cians and patients to facilitate the desired workflow of the practice. The selected VC system should successfully connect patients to the correct providers and also prevent patients from connecting to the provider directly. Some VC systems provide a "waiting room" function that allows the patient to connect and wait for the clinician to connect. While not ab-solutely necessary, this feature protects clinicians' privacy, accommodates clinicians who are delayed, and benefits pa-tients who "arrive" to visits early. In addition, this feature prevents other patients from calling and interrupting other sessions.

Providers need to be trained to offer basic technical trou-bleshooting in order to assist the less computer-literate patients in setting up a connection. Once the patient is connected, and during the first virtual visit, the clinician should obtain in-formed consent, including the standard information provided when initiating in-person care, but with the information spe-cific to virtual visits. It is important for providers to take note of both national and regional laws on obtaining informed consent—which often differ by state or region and may re-quire a written notation (which can be performed via elec-tronic services). Although consent needs to be obtained only once, the clinician should confirm, at the outset of every vir-tual visit, both his or her own identity (to the patient) and that of the patient, as well as record the patient's location for safety purposes. The note written after the clinical en-counter should indicate that the virtual visit was conducted via a HIPAA-compliant VC system.

Similar to in-person appointments, providers should set boundaries by clarifying the length of the virtual visit, which may vary for first consultations and follow-up care.[8] A desig-nated administrative support person may facilitate scheduling virtual visits (or, depending on the selected VC system, pa-tients may have the option to self-schedule). The administra-tor, or "telepsychiatry coordinator,"[9] may be helpful in orienting new patients to the technology and may also per-form test visits to ensure the quality of the audio and video connection.

### Billing and Reimbursement

Billing is one of the more complex issues for providers offer-ing virtual visits, though one that is improving relatively quickly due to telemedicine's demonstrated benefits and law-makers' interest in improving health care delivery. Still, in the current legal landscape, not all states have telemedicine parity laws, which require insurance companies to provide reim-bursement for telemedicine (as they would for in-person visits), and not all insurers reimburse for virtual visits. Ac-cordingly, providers must do additional due diligence to ensure billing compliance. For example, organizational procedures may include billing with additional telemedicine procedure codes, or not billing insurance at all. More and more states, however, are passing telemedicine parity laws that require private payers to reimburse for telemedicine ser-vices the same way that they would for in-person services.[10] The American Telemedicine Association (ATA) reports that 24 states currently have telemedicine parity laws and that 48 state Medicaid agencies have some coverage for telemedicine-provided services.[11] In Massachusetts, at least one insurance company has recently begun to reimburse for virtual visits and has recently expanded coverage under its payment policy to include longer psychotherapy visits.

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

The Centers for Medicare & Medicaid Services website currently states that Medicare pays for a limited number of Part B services furnished by a practitioner to an eligible beneficiary via a telecommunication system. These services include psychiatric diagnostic interviews, psychotherapy, and pharmacologic management, but the these services are covered only if the originating site is a rural Health Professional Shortage Area, outside of a Metropolitan Statistical Area.[12] Additionally, reimbursement varies with the type of services provided, geographic location, type of institution delivering the services, and type of health professional providing the services. In view of these intricacies, providers should research and establish compliant procedures for billing and reimbursement when providing telepsychiatry/telemental health consults.

## Videoconferencing Quality

One set of initial questions to address concerns the screens for viewing patients. Will they be portable on carts for flexibility of use? Installed on walls? Make use of existing laptop and desktop computer systems? Other considerations include the size and number of screens. A larger screen permits medical record viewing and note taking to occur on the same screen. Alternatively, two adjacent screens (especially if they are configured one above the other) can improve the simultaneous experiences of visiting the patient and recording the encounter, as eye contact can be more easily maintained. Other important considerations include the resolution of the camera and resolution of the screen display. In addition, clinicians should consider visual quality for viewing the patient—for example, the need to flexibly "zoom" or widen the view. It may sometimes be important to view the patient's whole body (not just face) or to expand the view to include the patient's room and individuals in the room (e.g., to see children playing or to view a whole family).[13] Technology for "screen sharing"— enabling provider and patient to look at laboratory tests or other documents together—is another useful feature of virtual visits that should be considered when selecting a VC system.[13] Independent of whether lab tests or documents will be shared during the visit, however, providers need to be able to review procedure or laboratory results via remote health record access or facsimile.[14] Finally, video technologies may allow taping or photographing of the session *at either end*. Such actions should be undertaken, however, only with the consent of both parties and with a clear understanding of the storage and use of taped sessions. Clinicians may wish to remind patients of this rule so that clinicians are not recorded without consent.

Regarding audio, clinicians should consider the quality and resolution of both the microphone and the speaker. The quality of the connection is key and should be without pause or interruption.[15] Unless the patient is seen at a health center/office rather than a private home (or is provided with a computer, camera, speakers, and microphone), the quality of audio reproduction on the patient's end needs to be carefully considered at the outset; it is difficult for the clinician to determine what adjustments can be made, at a distance, that will improve the quality of sound for the patient. Extraneous noise, such as from street traffic, hallway noise, or keyboards while typing notes, should be minimized.

The ATA has made specific recommendations for Internet-based software programs, which should provide service at a bandwidth of 384 kilobits/second or higher in both the downlink and uplink directions, and at a minimum of $640 \times 360$ resolution at 30 frames per second, achieving at least minimum quality for each user. These quality recommendations should accommodate most urban households, as approximately 91% of Americans have access to wired broadband speeds of at least 10 megabits/second (roughly 26 times as fast as the minimum suggested bandwidth), and 81% of Americans can access sufficiently fast mobile wireless broadband.[16] Pretesting the connection is advisable, and a backup plan with voice-based telephone contact should be available in the event of technology failure (although this contact may not be reimbursed by insurance companies).[3]

## Location of Connection

An important question to address is whether to set up the technology in a central location or to equip providers offsite. While virtual visits inherently provide more flexibility in conducting sessions, equipping providers offers even more. Both the clinician and the patient may be off-site, freeing up valuable hospital-based office space and providing opportunities for patients to access services on weekends or in morning/evening hours when clinicians may prefer to be at home. With this opportunity, however, come increased technology, quality, and safety issues. As a technical matter, the selected VC system must accommodate after-hours business practice. In addition, clinicians must be aware of the additional safety issues in providing virtual care.

Providers must be prepared to utilize emergency plans in the event that they are necessary, as patients will be in an unsupervised setting and without usual on-site staff who can conduct an emergency intervention.[17] Prescreening measures for suicidality can be useful in deciding whether virtual visits are an appropriate part of the treatment plan for any particular patient.[18] As a prerequisite of being connected for each virtual visit (for those who are deemed suitable for virtual care), patients need to specify to their provider at the time of the visit their exact location during the session. In that way, clinicians with urgent safety concerns, particularly concerns of harm to self or others, can dispatch an established emergency contact to check on the patient or even call in local police or ambulance services. The emergency contact, the *patient support person*,[3] should be an individual the patient has selected before beginning virtual visits. In addition to ensuring safety of the patient, obtaining location information protects clinicians on the issue of state licensure requirements. Patients should provide multiple phone numbers in the case of technology failure, and also the numbers of local family members or friends. This contact information is extremely helpful in the

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

event that clinicians need either to request the assistance of those individuals in the dispatching of local emergency services or to simply reach the patient if the online connection is lost.[18]

Safety should be continually evaluated throughout the session and at its conclusion, as therapy may unearth difficult issues for patients. Unlike an in-person visit, on-site staff cannot evaluate the patient before he or she leaves the site. Despite having an emergency protocol in place with the patient and his or her patient support person, the patient may refuse hospitalization, in which case, as with in-person care, involuntary hospitalization may be necessary.[3] Finally, at the conclusion of a course of care, the clinician should research and provide appropriate referrals for the patient in his or her community.[18]

Given that patients can conceivably connect from any location, they should be educated about personal privacy issues that can arise from connecting in public places or in rooms in their homes where other family members may congregate or hear their conversations. For safety purposes, it may be best to exclude patients for treatment via virtual visits if patients are concerned about the impact of family members' presence on their ability to share during their therapy sessions or if they are uncomfortable discussing difficult or traumatic issues through videoconferencing. Given that clinicians can also connect from any location, it is important for practitioners to be aware of and maintain their own privacy rules and to ensure that no other responsibilities might interrupt the visit (child or family care, for example, should be prohibited while working). Clinician dress codes should also be enforced during telepsychiatry virtual visits as part of workplace professionalism, even though the clinician may be working from home.

## LEGAL AND REGULATORY ISSUES

### Clinician Licensure

Telepsychiatry programs must take note of laws regulating physician and clinician licensure since each state maintains certain standards and licensure requirements for practicing telepsychiatry and telemental health care. Moreover, medical boards have recently imposed separate regulations for standard medical practice and telemedicine. Provision of virtual visits may first require an in-person visit before continuing care virtually.[11] This requirement is particularly relevant in the context of prescribing controlled substances. The Ryan Haight Online Pharmacy Consumer Protection Act of 2008[19] was enacted to regulate the illegal distribution and dispensing of controlled substances via the Internet. The act requires at least one in-person medical evaluation of the patient before legal prescription of a controlled substance.

Licensure of the clinician becomes a more complex issue in the case of connecting to a patient across state lines, as it is illegal to practice psychiatry without a state license in the location of practice (generally considered to be the location of the patient at the time of the service). The ATA reports that Alabama, Louisiana, Minnesota, Nevada, New Mexico, Ohio, Oregon, Tennessee, and Texas are the only states that currently extend a telemedicine license to out-of-state physicians.[11] Relaxing or facilitating the acquisition of medical and other licenses across state lines, creating interstate licenses or national licenses, and creating special telemedicine licenses expressly for the purpose of use in virtual visits are all future possibilities that would facilitate the growth of telehealth and telemedicine.[3,20] A national physician-licensure agreement is, in fact, being adopted in select states throughout the country—which has large implications for telepsychiatry practices in the states that have elected to participate. Nevertheless, it is recommended that providers, before initiating virtual visits, contact both their licensing boards and the licensing boards in patients' geographic locations (particularly if out of state).

### Credentialing

When establishing a telepsychiatry service, and for the purposes of credentialing, administrators must consider the site at which, and to which, the clinician is connecting. Credentialing is a process whereby a clinician is evaluated to provide certain services, most often by the organization that will bill for the services.[21] When clinicians are meeting with, or consulting on, patients at a distant location, those clinicians will require credentialing at that site. For clinicians working in academic medical centers who connect with patients who are located in their own homes, offices, or private space, credentialing at the clinicians' own centers is adequate.

### Malpractice Insurance

Telepsychiatry does not present a new clinical service but rather a mode of connection to deliver the service. Malpractice insurance should therefore generally cover this form of patient care and contact. Nevertheless, practitioners should alert malpractice insurance carriers of telepsychiatry services to ensure coverage, which may vary from carrier to carrier. In the event that a policy excludes telepsychiatry services from coverage, an insurance rider to supplemental insurance specifically for virtual visits may be obtained.[9]

## CLINICAL ISSUES

From a diagnostic standpoint, no particular patient population has been deemed inappropriate for telepsychiatry. An extensive review by Hilty and colleagues (2013)[22] thoroughly examined studies on telemental health care with children and adolescents,[23–29] adults,[30–34] and geriatric patients[35–37] from 2003 to 2013, and determined that all of these age groups are suitable for virtual visits. In addition, many specific disorders seem to be well suited for treatment via videoconferencing, including depression, PTSD, substance use, and developmental disabilities.[22] An abundance of literature in the last 15 years, including Hilty's review, has documented the viability of virtual visits for patients with diverse mental health concerns, for various types of therapy, and in remote

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

locations. Thus, the discussion of clinical topics in our review is limited to a literature search of articles published from 2013 to 2016 and the experience from our program at Massachusetts General Hospital.

We conducted a literature search by searching the following terms: telemental health effective, telepsychiatry effective, telepsychiatry efficacy, and telemental health efficacy. These searches produced 58 articles, reduced to 46 after omitting duplicates. As we were aiming to specifically examine the effectiveness of real-time clinician-to-patient services, articles were further eliminated if they were review articles or meta-analyses, focused on treatment modalities outside of synchronous videoconferencing, focused on provider satisfaction with telepsychiatry/telemental health videoconferencing, or studied telemental health consultations from one mental health professional to another (rather than from clinician-to-patient). This elimination process resulted in 16 articles (see Table 1). In addition to those 16 articles, we include in our discussion relevant guidance from ATA's Practice Guidelines for Video-Based Online Mental Health Services.[3]

## Patient Selection

Virtual visits are beneficial for many select patient groups. For example, patients who live in remote areas with limited access to mental health resources have already benefited from an array of telepsychiatry programs serving rural areas. Our program at Massachusetts General Hospital has seen virtual visits' utility for additional groups, including patients who are elderly, terminally ill, immune compromised, or bedridden, or who have mobility problems. We have also seen that patients who may feel stigmatized by entering a psychiatry office may prefer connecting with a clinician from the privacy of their own homes or offices. Additionally, we are exploring the possibility that virtual visits may be specifically well suited to treating hospital employees and colleagues referred via an Employee Assistance Program who may feel uncomfortable entering a psychiatry office within their workplaces.

Additional published experience on virtual visits for various patient populations since 2013 (see Table 1) includes the following: treatment of attention-deficit/hyperactivity disorder (ADHD) in children; treatment of posttraumatic stress disorder (PTSD) (even during actual deployment/in war zones); home-based, outpatient treatment of mild depression; exposure and ritual prevention for obsessive-compulsive disorder (OCD); treatment of deaf patients; and treatment of parolees.[38,39,41,42,44,47,48,50,51] The literature on patients with PTSD demonstrates that the effectiveness of virtual visits is not limited by the setting in which the patient is located, and provides hope for delivery of care in nontraditional settings (e.g., war zones). A report by Whealin and colleagues (2015),[45] however, found that veterans who screened positive for PTSD were significantly less likely than their peers without PTSD to report willingness to use an e-mental health modality (which, in this study, included real-time videoconferencing among other

Internet-based interventions). Therefore, while synchronous videoconferencing may be a viable and effective treatment for PTSD and create more access to treatment, its availability may not result in a larger percentage of veterans with PTSD receiving care. In regard to psychopharmacologic treatment with antipsychotic medications, Shore and colleagues (2015)[43] discuss that drug-induced movement disorders can effectively be monitored via virtual visits but caution that additional evidence and protocols for monitoring are needed on this topic.

The ATA's guidelines for video-based online mental health services highlight certain key features of patient selection. Regardless of the patient's clinical case, adequate organizational and cognitive ability to manage the computer settings and create a private space for the visit is essential. Some patients who lack the technical skills to adequately establish and maintain video connections may not be suitable for telepsychiatry. Patients' inability to navigate the technology negatively affects treatment outcomes, raises safety concerns, and prevents optimal engagement in care. This idea surfaced in our literature review; for example, Salomone and colleagues (2016)[52] found that parents who had more difficulty navigating the Internet and had lower self-efficacy were less likely to enroll in a parent-coaching intervention via virtual visits for autism spectrum disorders. Nevertheless, if a patient is motivated to take advantage of telepsychiatry but is not tech-savvy, a caregiver may be able to take up the slack. The ATA guidelines further advise clinicians to consider the role of substance abuse, past episodes of self-injurious or violent behavior, and the patient's history of cooperativeness in assessing a patient's ability to cooperate fully for this treatment modality. Patient cooperation is particularly critical for ensuring safety and adhering to guidelines.[3] As previously mentioned, a patient must be willing to report his or her exact location at the time of the visit in the event of needing to dispatch emergency services for suicidality or involuntary hospitalization.

## Establishing Rapport (Telepresenting)

Establishing a therapeutic alliance during telemental health practice appears to be possible and satisfactory for patients.[54,55] Clinicians should be aware, however, of the potential limitations associated with connecting over video and should also take into account any special inter-individual issues to ensure that they are able to develop and maintain rapport with patients in virtual visits. Especially when clinicians connect with patients from distinctly different geographic regions, which is a novel possibility with video-based services, cultural and language competence may become an issue and should be attended to thoughtfully.[3] Yeung and colleagues (2016)[53] illustrated an effective solution to this potential issue and developed a telepsychiatry intervention sensitive to the culture of Chinese immigrants with major depressive disorder. This culture-specific intervention improved treatment outcomes as evidenced by higher odds of responding

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

| Table 1 | | | |
|---|---|---|---|
| **Studies Reviewed** | | | |
| Author | n | Patient population | Comments |
| Goetter et al. (2014)[38] | 15 | Adults with OCD | Significant improvements in OCD symptoms with exposure and ritual-prevention therapy via videoconference |
| Morland et al. (2014)[39] | 61 Control: 64 | Rural residents with PTSD | Outcomes were comparable to in-person treatment (reductions in PTSD symptoms, plus high levels of therapeutic alliance, treatment compliance, and satisfaction) |
| Southard et al. (2014)[40] | 38 Control: 24 | Emergency room patients | Decreases in time elapsed before treatment, length of stay, and door-to-consult time for telemedicine group |
| Luxton et al. (2015)[41] | 10 | US military service members | Reduced posttraumatic stress symptom severity and depression symptoms, and high ratings of satisfaction for in-home videoconferencing |
| Pelton et al. (2015)[42] | 1 | Service member with acute stress disorder in a war zone | Service member showed significant improvements in symptoms over 10 sessions |
| Shore et al. (2015)[43] | N/A | Patients taking antipsychotic medications | Drug-induced movement disorders can effectively be monitored via telemedicine, but additional evidence and protocols for monitoring are needed |
| Tse et al. (2015)[44] | 12 Control: 25 | Families with children with ADHD | Comparable outcomes for children's ADHD-related behaviors and functioning; equivalent satisfaction with care; caregivers in the teletherapy group did not report improvement in their own distress |
| Whealin et al. (2015)[45] | 600 | Veterans | Veterans with PTSD less likely to report interest in using e–mental health modalities (one of which was real-time videoconferencing) than their peers without PTSD |
| Buntrock et al. (2016)[46] | 202 | Patients with subthreshold MDD | Web-based, guided self-help intervention (cognitive-behavioral therapy and problem-solving therapy) reduced the incidence of MDD |
| Crowe et al. (2016)[47] | 24 | Deaf patients | Treatment outcomes (coping abilities and psychiatric symptoms) for telepsychiatry were equal to in-person care |
| Farabee et al. (2016)[48] | 20 Control: 40 | Parolees | High satisfaction and no significant group differences in medication adherence or psychological functioning Telepsychiatry patients reported lower levels of therapeutic alliance at follow-up |
| Hulsbosch et al. (2016)[49] | 93 | Severe mental illness | Improved patient satisfaction in videoconferencing group but no differences in quality of life, loneliness, daily functioning, or meeting care expectations |
| Hungerbuehler et al. (2016)[50] | 53 Control: 54 | Mild depression | Better results for treatment outcomes and higher retention in videoconferencing group |
| Maieritsch et al. (2016)[51] | Not stated | Veterans with PTSD | Cognitive-processing therapy over videoconferencing was equal to in-person (measured by improved posttreatment measures) |
| Salomone & Maurizio Arduino (2016)[52] | 43 | Parents of children with autism spectrum disorder | Parents with worse Internet skills and lower self-efficacy, and those who reported lower levels of satisfaction with current services, were less likely to be willing to enroll in tele–parent coaching |
| Yeung et al. (2016)[53] | 97 Control: 93 | Chinese immigrants with MDD | Culturally sensitive videoconferencing improved treatment outcomes (odds of achieving response and remission, greater improvement over time) |
| ADHD, attention-deficit/hyperactivity disorder; MDD, major depressive disorder; OCD, obsessive-compulsive disorder; PTSD, posttraumatic stress disorder. | | | |

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

to treatment and achieving remission in the culturally sensitive treatment group.

**Effectiveness**

Several comprehensive reviews in recent years attest to the satisfaction of both patients and clinicians with virtual visits, the feasibility of conducting the visits, and the equivalence of treatment outcomes when comparing virtual visits and in-person visits.[56–59] Additional published literature on the topic of effectiveness since 2013 has supplemented this body of work with positive results of telepsychiatry consultative services in emergency departments and rural primary care settings, where psychiatric assessment is often an immediate or common concern, and staff with the relevant expertise might not be readily available. A telemental health evaluation program implemented at an emergency room was effective in reducing length of stay and door-to-consult times.[40] Median times to consult decreased to 2.6 hours (from 14.2 hours without telemedicine), and similar reductions in length of stay and door-to-consult times occurred. In addition, Buntrock and colleagues (2016)[46] demonstrated the use of virtual visits in the area of preventive care. When cognitive-behavioral and problem-solving therapy from an online trainer was provided in addition to access to usual care (by a primary care physician), the intervention reduced the incidence of major depressive disorder in a sample of subthreshold-level depressed patients. Hulbosch and colleagues (2016),[49] however, determined that adding virtual visits to their standard care did not contribute additional value in regard to improved functionality and quality of life for patients with severe mental illness. These equivocal findings call for more research on hybrid levels of care.

**COST SAVINGS**

The cost benefit of virtual visits is a question for ongoing study; emerging evidence suggests, however, both direct and indirect cost benefits for patients, clinicians, and society as a whole. Telepsychiatry can play a role in the effectiveness of treatment, and if a disorder is more effectively treated, costs are lower for the treatment of that disorder. Furthermore, if patients who would otherwise use expensive emergency services or medical services can be diverted through effective mental health treatment, then the improved access to care that telepsychiatry provides can result in reduced overall costs for those patients.

A review by Hyler and colleagues (2003)[60] concluded that in 7 of 12 studies reviewed, telepsychiatry was worth the cost. These authors concluded, however, that "when the alternative to telepsychiatry is no psychiatry, whether psychiatry is worth the cost will depend on the value placed on delivering psychiatric services at all."

Individuals directly benefit in cost from avoiding time off from work or school, as well as from not incurring costs of parking, gasoline, or public transport. Clinicians also benefit from transportation costs (if they provide virtual visits at home) and a decreased number of no-shows/cancellations. From the clinician and clinic-director standpoint, virtual visits may permit clinicians to see more patients each hour. Just as a text message is quicker to write than an email, and an email is quicker to write than a formal letter, the rules of social engagement over video are different from the etiquette required during an in-person visit with an individual who has waited in a stressful busy waiting room or has traveled hours to see the doctor. Especially for psychiatrists and psychologists who "room" their own patients, time is saved during virtual visits because patients do not need to be invited from the waiting room into the clinician's office. While psychopharmacologists may reap these benefits by seeing more patients per clinic day, psychologists who generally perform 45-minute visits may reap the benefit in more directed, efficient, and effective therapies. Psychologists may also have an opportunity to complete two or more visits per week treating a patient with an established treatment protocol, which would otherwise be too difficult for the patient if traveling to in-person visits.

From a public health services and taxpayer perspective, virtual visits can help avoid or manage emergencies, directly contributing to cost savings via lower utilization of psychiatric emergency rooms and psychiatric hospitals. In addition, if children receive useful mental health services, parents could experience improved psychological or medical health themselves (or vice versa). Cost savings also could occur in the areas of physical health because the psychiatric/psychological treatment may improve physical health or adherence to medical treatment.[61] Finally, the workforce benefits from fewer days/hour missed from school/work, and the environment even benefits a bit from the decrease in pollution resulting from fewer people in transit.

Costs savings for practices can be considered from various perspectives. One question is whether telepsychiatry can be self-sustaining through its own revenues and therefore pay for itself or make it worth the cost. Costs may include the cost of equipment, operation, and maintenance of the telepsychiatry system, salary of a coordinator, salary of a clinician, and other administrative costs. Many of these costs are fixed, so volume may make a difference in determining the cost-effectiveness of the service.

At the current time, few insurance companies reimburse for visits that do not occur face-to-face, and when they do, they often reimburse at a lower rate than for face-to-face visits. In a fee-for-service environment, the cost of telepsychiatry is a simple equation involving a weighing of the costs and the reimbursements. Many clinics and academic medical centers may be considering this simple cost-reimbursement ratio in considering whether to establish (or continue) telepsychiatry programs. This calculus is different, however, if an organization is acting as an accountable care organization. In that case, reimbursement is linked to both quality metrics and decreases in the total cost of care for a population of patients.

Reduction in utilization of expensive services creates a compelling argument for the use of telepsychiatry. Hilt and

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

colleagues (2015)[62] analyzed data from 229 televideo consults to caseworkers in Wyoming—which occurred in the context of discussing long-term inpatient or residential stays for children. A mean of three psychotherapy or psychosocial interventions per patient was recommended, and it was also recommended that 57% of the children either start or increase a medication. Hilt and colleagues reviewed placement histories and outpatient claims for the children six months after the consult occurred. Of 141 who had been planning to enter a long-term hospitalization, only 57 (40%) were actually admitted, resulting in a presumed savings of inpatient level costs for 84 children of about $1.6 million. These children, prior to televideo consults, would likely not have had a child psychiatry consultation. These authors concluded that adding an academic center–affiliated telemedicine child psychiatry evaluation resulted in 60% of children being diverted from expensive psychiatric residential treatment facilities. This amounted to a 1.82 to 1 return on investment. These savings were based on the assumption that all the children who were slated for inpatient stay would have gone without the televideo consult.

An important cost savings is the reduction of hospital readmissions, a seemingly simple outcome measure of significant financial impact. Koblauch and colleagues (2016)[63] identified eight studies that specifically addressed whether telepsychiatry reduces readmissions. Five lower-quality studies found positive outcomes regarding readmission, but three other studies, more methodologically sound, found no effect on readmission rates. Koblauch and colleagues concluded that no evidence supports the use of telepsychiatry to reduce readmissions. They suggested, however, that barriers to success in demonstrating positive findings included heterogeneity in patient selection (many different disorders, including schizophrenia, schizoaffective disorder, major depression, PTSD, bipolar disorder, and substance-related disorders), in treatment (screening, psychotherapy, medication supervision and management, urgent care, individual/group/family therapies), and in outcome measures (by definition, hospital readmission rates, but with varying degrees of rigor in the data analysis and application of statistics). Indeed, this degree of variability across telepsychiatry studies overall limits both direct comparisons between studies and the generalizability of findings.

More studies with independent reviewers, random assignment, matched controls, and objective outcome measures are required. Of course, cost savings to an institution is not the only consideration in starting a telepsychiatry program; improved access to care and improvement of other health outcomes are additional important considerations.

## DISCUSSION

There is no longer a question as to whether the virtual visit—as part of telepsychiatry and telemental health—can or should be a treatment option. The benefits of this model are obvious to both clinicians and patients, and outweigh obstacles to use. The question has now shifted from *if* we should use virtual visits to *how* we can best utilize videoteleconferencing systems and other technology to provide timely, effective, high-quality care to patients. Standards for clinician training, licensure considerations, and reimbursement models are evolving to keep pace with the demand for this modern form of clinician-patient connection. Nonetheless, any telepsychiatry program must be aware of, and prepare for, the quality and safety issues associated with using video technology to connect with patients from a distance.

A weakness of this overview is that we focus on clinician-to-patient connection in an academic medical center setting, with the consequence that our practical review does not generalize to all circumstances of establishing a telepsychiatry practice. Organizations that wish to create and maintain a telepsychiatry service should engage the assistance of clinical, legal, and technical advisers with expertise both in their geographic area and with the population they aim to serve. Readers should be aware that—especially in regard to issues relating to licensing, malpractice, billing, and technology—the field is in a stage of rapid change and that our references and current experience may not be relevant in the new environment.

While the literature documents the quality, reliability, safety, and efficacy of virtual visits, several research questions remain for study. In regard to clinical issues, are diagnoses made during initial virtual visits as accurate as during in-person visits? Moreover, what diagnoses are best suited to virtual visits, and what tools can be utilized to improve limitations in assessment? In addition to asking whether virtual visits are as effective as in-person visits, we need to ask why or how they are effective (or possibly even more effective) for psychotherapy and psychopharmacologic treatments. Virtual visits may improve diagnostic and treatment efficacy by encouraging participation of other family members who might otherwise not be able to attend in-office visits, and by allowing clinicians to better coordinate care than if the visit occurred in a clinician's office or a school office. Even play therapy with children can be possible over video connections; by observing a child draw, play with simple toys at a table, or interact with an adult under the direction of the treating/evaluating clinician. Virtual visits permit more flexibility in scheduling, such that frequent, short visits are feasible for the patient, which could be important for pharmacotherapy treatment, especially while titrating medication doses. More effective treatment may also result because the clinician performs the treatment "in" the patient's home, where many problems are actually occurring. This difference could be key for treating obsessive-compulsive rituals, which may occur more intensely at home, and also for assisting parents in "real time," given that clinicians who work with children and families can watch family interactions over video cameras and provide on-the-spot coaching to parents via in-ear microphones. Others who can take advantage of virtual visits include patients who may be averse to traveling for

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

psychological reasons (e.g., agoraphobia) and children or adults with autism disorder, who can be easily overwhelmed and stressed by changes in routine and by the intense sensory experiences of busy parking lots, hospital corridors, and waiting rooms.

Additional questions concern pharmacotherapy, especially in relation to the clinical appropriateness of prescribing controlled substances virtually. In late 2015, the ATA requested the Drug Enforcement Administration to open a special registration process allowing psychiatrists and physicians to prescribe controlled substances via telemedicine without the need for an in-person exam.[64] Whether the Ryan Haight Online Pharmacy Consumer Protection Act of 2008 is amended to accommodate this request, as well as the amendment's consequences for access to care, remains to be seen. Antipsychotic medications raise special issues. It is unclear, for example, whether certain side effects are more likely to be missed during virtual visits (e.g., skin changes/rashes, movement/tic disorders, weight gain, or changes in body habitus, gait, or posture). Amarendran and colleagues (2011)[65] report, however, that the Abnormal Involuntary Movement Scale can be performed effectively via virtual visits to assess patients who are being prescribed antipsychotic medications, though more such studies are needed to build clinician and patient confidence in this practice. More generally, the number of studies comparing virtual visits and in-person visits is small. While a double-blind study is impossible to perform, the use of raters blinded to the treatment type (virtual visit versus in-person visit) would improve the evidence base. Regarding issues of operations and technology, more research is needed to determine how best to structure a telepsychiatry service in an existing health care network and how best to ensure success over time. Finally, further studies are needed using advanced and generalizable methodologies to assess potential cost savings.

## SUMMARY

This overview of selected topics relating to practicing clinician-to-patient psychiatry and psychology via virtual visits in an academic medical center addresses practical considerations in establishing and maintaining a telemental health program. Our review of the effectiveness literature from 2013 to the present suggests that an expanding array of disorders can be managed effectively and safely with this modality. Because regulatory issues in telepsychiatry and telemental health vary from state to state and are changing rapidly over time, practitioners need to ensure ongoing compliance when creating or maintaining telepsychiatry programs. Cost savings, which are difficult to determine with precision, depend on the scope of the cost and benefit measured. We conclude that establishing a telepsychiatry program requires a comprehensive approach with up-to-date legal and technological considerations.

**Declaration of interest:** In 2015–16, Dr. Wozniak's spouse received royalties from UptoDate, consultation fees from Advance Medical, FlexPharma, and Merck, and research support from UCB Pharma and NeuroMetrix. Dr. Schwamm is a consultant to LifeImage, a privately held teleradiology startup company.

## REFERENCES

1. Telemedicine. N.d. https://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/telemedicine.html
2. Waugh M, Voyles D, Thomas MR. Telepsychiatry: benefits and costs in a changing health-care environment. Int Rev Psychiatry 2015;27:558–68.
3. Turvey C, Coleman M, Dennison O, et al. Practice guidelines for video-based online mental health services. Washington, DC: American Telemedicine Association, 2013.
4. Campbell R, O'Gorman J, Cernovsky ZZ. Reactions of psychiatric patients to telepsychiatry. Ment Illn 2015;7:6101.
5. Saeed SA, Anand V. Use of telepsychiatry in psychodynamic psychiatry. Psychodyn Psychiatry 2015;43:569–83.
6. Legal issues (privacy and contracting for services). N.d. http://www.telehealthresourcecenter.org/toolbox-module/legal-issues-privacy-and-contracting-services
7. Center for Connected Health Policy. Telehealth: HIPAA. http://cchpca.org/hipaa-0
8. Drum KB, Littleton HL. Therapeutic boundaries in telepsychology: unique issues and best practice recommendations. Prof Psychol Res Pr 2014;45:309–15.
9. Staffing and recruiting specialists. N.d. http://www.telehealthresourcecenter.org/toolbox-module/staffing-and-recruiting-specialists.
10. State Policy Resource Center. http://www.americantelemed.org/policy-page/state-policy-resource-center
11. Thomas L, Capistrant G. 50 state telemedicine gaps analysis physician practice standards & licensure. Washington, DC: American Telemedicine Association, 2016.
12. Centers for Medicare and Medicaid Services, Department of Health and Human Services. Telehealth Services. http://www.cms.gov/Medicare/Medicare-General-Information/Telehealth/
13. Crum KI, Comer JS. Using synchronous videoconferencing to deliver family-based mental healthcare. J Child Adolesc Psychopharmacol 2016;26:229–34.
14. Yellowlees P, Shore J, Roberts L; American Telehealth Association. Practice guidelines for videoconferencing-based telemental health. Washington, DC: American Telemedicine Association, 2009.
15. Chou T, Comer JS, Turvey CL, Karr A, Spargo G. Technological considerations for the delivery of real-time child telemental healthcare. J Child Adolesc Psychopharmacol 2016;26:192–7.
16. Office of Science and Technology Policy; National Economic Council. Four years of broadband growth. Washington, DC: White House, 2013. http://www.uvlsrpc.org/files/9213/7124/4261/wh201306-broadband_report_final.pdf
17. Luxton DD, Sirotin AP, Mishkind MC. Safety of telemental healthcare delivered to clinically unsupervised settings: a systematic review. Telemed J E Health 2010;16:705–11.
18. Luxton DD, O'Brien K, McCann RA, Mishkind MC. Home-based telemental healthcare safety planning: what you need to know. Telemed J E Health 2012;18:629–33.
19. Ryan Haight Online Pharmacy Consumer Protection Act of 2008, Pub. L. No. 110-425, 122 Stat. 4820 (2008).
20. Kramer GM, Luxton DD. Telemental health for children and adolescents: an overview of legal, regulatory, and risk management issues. J Child Adolesc Psychopharmacol 2016;26:198–203.
21. Credentialing and licensing. N.d. http://www.telehealthresourcecenter.org/toolbox-module/credentialing-and-licensing

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

22. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: a 2013 review. Telemed J E Health 2013;19:444–54.

23. Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. Telemed J E Health 2003;9:49–55.

24. Greenberg N, Boydell KM, Volpe T. Pediatric telepsychiatry in Ontario: caregiver and service provider perspectives. J Behav Health Serv Res 2006;33:105–11.

25. Myers K, Valentine J, Morganthaler R, Melzer S. Telepsychiatry with incarcerated youth. J Adolesc Health 2006;38:643–8.

26. Myers KM, Vander Stoep A, McCarty CA, et al. Child and adolescent telepsychiatry: variations in utilization, referral patterns and practice trends. J Telemed Telecare 2010;16:128–33.

27. Pakyurek M, Yellowlees P, Hilty D. The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice? Telemed J E Health 2010;16:289–92.

28. Lau ME, Way BB, Fremont WP. Assessment of Suny Upstate Medical University's child telepsychiatry consultation program. Int J Psychiatry Med 2011;42:93–104.

29. Jacob MK, Larson JC, Craighead WE. Establishing a telepsychiatry consultation practice in rural Georgia for primary care physicians: a feasibility report. Clin Pediatr (Phila) 2012; 51:1041–7.

30. Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. Am J Psychiatry 2004; 161:1471–6.

31. Manfredi L, Shupe J, Batki SL. Rural jail telepsychiatry: a pilot feasibility study. Telemed J E Health 2005;11:574–7.

32. Sorvaniemi M, Ojanen E, Santamaki O. Telepsychiatry in emergency consultations: a follow-up study of sixty patients. Telemed J E Health 2005;11:439–41.

33. Modai I, Jabarin M, Kurs R, Barak P, Hanan I, Kitain L. Cost effectiveness, safety, and satisfaction with video telepsychiatry versus face-to-face care in ambulatory settings. Telemed J E Health 2006;12:515–20.

34. Urness D, Wass M, Gordon A, Tian E, Bulger T. Client acceptability and quality of life—telepsychiatry compared to in-person consultation. J Telemed Telecare 2006;12:251–4.

35. Poon P, Hui E, Dai D, Kwok T, Woo J. Cognitive intervention for community-dwelling older persons with memory problems: telemedicine versus face-to-face treatment. Int J Geriatr Psychiatry 2005;20:285–6.

36. Rabinowitz T, Murphy KM, Amour JL, Ricci MA, Caputo MP, Newhouse PA. Benefits of a telepsychiatry consultation service for rural nursing home residents. Telemed J E Health 2010;16: 34–40.

37. Weiner MF, Rossetti HC, Harrah K. Videoconference diagnosis and management of Choctaw Indian dementia patients. Alzheimers Dement 2011;7:562–6.

38. Goetter EM, Herbert JD, Forman EM, Yuen EK, Thomas JG. An open trial of videoconference-mediated exposure and ritual prevention for obsessive-compulsive disorder. J Anxiety Disord 2014;28:460–2.

39. Morland LA, Mackintosh MA, Greene CJ, et al. Cognitive processing therapy for posttraumatic stress disorder delivered to rural veterans via telemental health: a randomized noninferiority clinical trial. J Clin Psychiatry 2014;75:470–6.

40. Southard EP, Neufeld JD, Laws S. Telemental health evaluations enhance access and efficiency in a critical access hospital emergency department. Telemed J E Health 2014;20:664–8.

41. Luxton DD, Pruitt LD, O'Brien K, Kramer G. An evaluation of the feasibility and safety of a home-based telemental health treatment for posttraumatic stress in the U.S. military. Telemed J E Health 2015;21:880–6.

42. Pelton D, Wangelin B, Tuerk P. Utilizing telehealth to support treatment of acute stress disorder in a theater of war: prolonged exposure via clinical videoconferencing. Telemed J E Health 2015;21:382–7.

43. Shore J, Vo A, Yellowlees P, et al. Antipsychotic-induced movement disorder: screening via telemental health. Telemed J E Health 2015;21:1027–9.

44. Tse YJ, McCarty CA, Stoep AV, Myers KM. Teletherapy delivery of caregiver behavior training for children with attention-deficit hyperactivity disorder. Telemed J E Health 2015;21: 451–8.

45. Whealin JM, Seibert-Hatalsky LA, Howell JW, Tsai J. E-mental health preferences of veterans with and without probable posttraumatic stress disorder. J Rehabil Res Dev 2015;52:725–38.

46. Buntrock C, Ebert DD, Lehr D, et al. Effect of a Web-based guided self-help intervention for prevention of major depression in adults with subthreshold depression: a randomized clinical trial. JAMA 2016;315:1854–63.

47. Crowe T, Jani S, Jani S, Jani N, Jani R. A pilot program in rural telepsychiatry for deaf and hard of hearing populations. Heliyon 2016;2:e00077.

48. Farabee D, Calhoun S, Veliz R. An experimental comparison of telepsychiatry and conventional psychiatry for parolees. Psychiatr Serv 2016;67:562–5.

49. Hulsbosch AM, Nugter MA, Tamis P, Kroon H. Videoconferencing in a mental health service in the Netherlands: a randomized controlled trial on patient satisfaction and clinical outcomes for outpatients with severe mental illness. J Telemed Telecare 2016 May 28 [Epub ahead of print].

50. Hungerbuehler I, Valiengo L, Loch AA, Rossler W, Gattaz WF. Home-based psychiatric outpatient care through videoconferencing for depression: a randomized controlled follow-up trial. JMIR Ment Health 2016;3:e36.

51. Maieritsch KP, Smith TL, Hessinger JD, Ahearn EP, Eickhoff JC, Zhao Q. Randomized controlled equivalence trial comparing videoconference and in person delivery of cognitive processing therapy for PTSD. J Telemed Telecare 2016;22:238–43.

52. Salomone E, Maurizio Arduino G. Parental attitudes to a telehealth parent coaching for autism spectrum disorder. J Telemed Telecare 2016 Apr 6 [Epub ahead of print].

53. Yeung A, Martinson MA, Baer L, et al. The effectiveness of telepsychiatry-based culturally sensitive collaborative treatment for depressed Chinese American immigrants: a randomized controlled trial. J Clin Psychiatry 2016;77:e996–1002.

54. Goldstein F, Glueck D. Developing rapport and therapeutic alliance during telemental health sessions with children and adolescents. J Child Adolesc Psychopharmacol 2016;26: 204–11.

55. Jenkins-Guarnieri MA, Pruitt LD, Luxton DD, Johnson K. Patient perceptions of telemental health: systematic review of direct comparisons to in-person psychotherapeutic treatments. Telemed J E Health 2015;21:652–60.

56. Hubley S, Lynch SB, Schneck C, Thomas M, Shore J. Review of key telepsychiatry outcomes. World J Psychiatry 2016;6: 269–82.

57. Cain S, Sharp S. Telepharmacotherapy for child and adolescent psychiatric patients. J Child Adolesc Psychopharmacol 2016;26: 221–8.

58. Salmoiraghi A, Hussain S. A systematic review of the use of telepsychiatry in acute settings. J Psychiatr Pract 2015;21: 389–93.

59. Bashshur RL, Shannon GW, Bashshur N, Yellowlees PM. The empirical evidence for telemedicine interventions in mental disorders. Telemed J E Health 2015 Dec 1 [Epub ahead of print].

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

60. Hyler SE, Gangure DP. A review of the costs of telepsychiatry. Psychiatr Serv 2003;54:976–80.

61. Chiles JA, Lambert MJ, Hatch AL. The impact of psychological interventions on medical cost offset: a meta-analytic review. Clinical Psychol Sci Pract 1999;6:204–20.

62. Hilt RJ, Barclay RP, Bush J, Stout B, Anderson N, Wignall JR. A statewide child telepsychiatry consult system yields desired health system changes and savings. Telemed J E Health 2015;21:533–7.

63. Koblauch H, Reinhardt SM, Lissau W, Jensen PL. The effect of telepsychiatric modalities on reduction of readmissions in psychiatric settings: a systematic review. J Telemed Telecare 2016 Sep 22 [Epub ahead of print].

64. Linkous JD. Proposed structure for telemedicine registration. Washington, DC: American Telemedicine Association, 2015.

65. Amarendran V, George A, Gersappe V, Krishnaswamy S, Warren C. The reliability of telepsychiatry for a neuropsychiatric assessment. Telemed J E Health 2011;17:223–5.

Copyright © 2017 President and Fellows of Harvard College. Unauthorized reproduction of this article is prohibited.

# Best Practices in Videoconferencing-Based Telemental Health (April 2018)



The American Psychiatric Association

*and*



The American Telemedicine Association

*© Copyright 2018, American Psychiatric Association, all rights reserved.*

**WRITING COMMITTEE:**

Jay H. Shore, MD, MPH, Peter Yellowlees MD, MBBS, Robert Caudill, MD, Barbara Johnston, MSN, Carolyn Turvey, PhD, Matthew Mishkind, PhD, Elizabeth Krupinski, PhD, Kathleen Myers, MD, MPH, Peter Shore, PsyD, Edward Kaftarian, MD, Donald Hilty, MD

**STAFF SUPPORT:**

Sabrina L. Smith (ATA), DrHA, Harry Mellon (ATA), Nathan Tatro, MA (APA), Michelle Dirst (APA)

**REVIEWERS:**

Telemental Health Special Interest Group [ATA], APA Committee on Telepsychiatry (APA), ATA Standards and Guidelines Committee Member [SG], ATA Staff [ATAS], APA Staff (APAS)

1                                    © Copyright 2018, American Psychiatric Association, all rights reserved.

# INTRODUCTION

This document represents a collaboration between the American Psychiatric Association (APA) and the American Telemedicine Association (ATA) to create a consolidated update of the previous APA and ATA official documents and resources in telemental health to provide a single guide on best practices in clinical videoconferencing in mental health. The APA is the main professional organization of psychiatrists and trainee psychiatrists in the United States, and the largest psychiatric organization in the world. The ATA, with members from throughout the United States and the world, is the principal organization bringing together telemedicine practitioners, healthcare institutions, government agencies, vendors and others involved in providing remote healthcare using telecommunications.

Telemental health in the form of interactive videoconferencing has become a critical tool in the delivery of mental health care. It has demonstrated its ability to increase access and quality of care, and in some settings to do so more effectively than treatment delivered in-person.

The APA and the ATA have recognized the importance of telemental health with each individual association undertaking efforts to educate and provide guidance to their members in the development, implementation, administration and provision of telemental health services. It is recommended that this guide be read in conjunction with the other APA and ATA resources that provide more detail.

| OFFICIAL APA AND ATA GUIDELINES, RESOURCES AND TELEMENTAL HEALTH TRAININGS | |
|---|---|
| **APA** | **ATA** |
| 1) APA Web-based Telepsychiatry Toolkit (2016)<br>2) Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry, Council on Law and Psychiatry (2014)<br>3) American Psychiatric Association. Telepsychiatry via Videoconferencing. (1998) | 4) Practice Guidelines for Telemental Health with Children and Adolescents (2017)<br>5) Telemental Health Resource Toolbox (2017)<br>6) Online Training for Video-Based Online Mental Health Service (2014)<br>7) A Lexicon of Assessment and Outcome Measures for Telemental health (2013)<br>8) Practice Guidelines for Video-Based Online Mental Health Service (2013)<br>9) Practice Guidelines for Videoconferencing-Based Telemental Health (2009)<br>10) Evidence-Based Practice for Telemental Health (2009) |

These guidelines focus on interactive videoconferencing-based mental health services (a.k.a., telemental health). The use of other technologies such as virtual reality, electronic mail, electronic health records, telephony, remote monitoring devices, chat rooms, or social networks

© Copyright 2018, American Psychiatric Association, all rights reserved.

are not a focus of this document except where these technologies interface with videoconferencing services.

The document was created by a joint writing committee drawn from the APA Committee on Telepsychiatry and the ATA Telemental Health Special Interest Group (TMH SIG). This document draws directly from ATA's three previous guidelines, selecting from key statements/guidelines, consolidating them across documents and then updating them where indicated. Following internal review processes within the APA and the ATA, the Board of Directors of the ATA and the Joint Reference Committee (JRC) of the APA, have given approval to its publication.

The reference list includes several detailed reviews providing justification and documentation of the scientific evidence supporting telemental health. Following ATA guideline writing convention, this document contains requirements, recommendations, or actions that are identified by text containing the keywords "**shall**," "**should**," or "**may**." "Shall" indicates that it is required whenever feasible and practical under local conditions. "Should" indicates an optimal recommended action that is particularly suitable, without mentioning or excluding others. "May" indicates additional points that may be considered to further optimize the telemental health care process.

It should be recognized that compliance with these recommendations will not guarantee accurate diagnoses or successful outcomes. The purpose of this guide is to assist providers in providing effective and safe medical care founded on expert consensus, research evidence, available resources, and patient needs.

This document is not meant to establish a legal standard of care.

## ADMINISTRATIVE CONSIDERATIONS

### A.  PROGRAM DEVELOPMENT

Providers or organizations delivering mental health services *should* conduct a telehealth needs assessment prior to initiating services. This needs assessment *should* include, at a minimum, the following components: program overview statement, services to be delivered, proposed patient population, provider resources, technology needs, staffing needs, quality and safety protocols, business and regulatory processes, space requirements, training needs, evaluation plan, and sustainability.

### B.  LEGAL AND REGULATORY ISSUES

#### 1)  Licensure and Malpractice

Health care services have been defined as delivered in the state where the patient is located. Providers of telemental health services *shall* comply with state licensure laws, which typically entail holding an active professional license issued by the state in which the patient is physically located during a telemental health session, and *shall* have appropriate malpractice coverage. Providers *shall* conduct their own due diligence to determine the type of licensure required, and ensure they are in compliance with state licensing board regulations. If providing care within a federal healthcare system (e.g., Department of Veterans Affairs, Department of Defense, Indian Health Service), providers *shall* follow the specific organization guidelines around licensure, which may allow for a single state licensure across multiple jurisdictions. Providers *may* utilize

2

© Copyright 2018, American Psychiatric Association, all rights reserved.

the interstate licensure compact or special telemedicine licensures offered by certain states provided they comply with all individual state licensure and program requirements.

### 2)  Scope of Practice

Providers or organizations offering telemental health services *shall* ensure that the standard of care delivered via telemedicine is equivalent to in-person care. Persons engaged in telemental health services *shall* be aware of their professional organization's positions on telemental health and incorporate the professional association standards and clinical practice guidelines whenever possible.   Providers in practice and trainees *should* stay current with evolving technologies, telemental health research findings, and policies.

### 3)  Prescribing

Providers *shall* be aware of both federal and state guidelines around the prescription of controlled substances, including the Ryan Haight Online Pharmacy Consumer Protection Act of 2008.  Providers *shall* comply with federal and state regulations around the prescription of controlled substances based on the setting, model of care, scope of practice and locations in which they are practicing and where the patient is located at the time of treatment.

### 4)  Informed Consent

Local, state, and national laws regarding verbal or written consent *shall* be followed. If written consent is required, then electronic signatures, assuming these are allowed in the relevant jurisdiction, may be used. The provider *shall* document the provision of consent in the medical record.

### 5)  Billing and Reimbursement

The patient *shall* be made aware of any and all  financial charges that may arise from the services to be provided prior to the commencement of initial services. Appropriate documentation and coding *should* be undertaken specifying when services are rendered via telemental health.

### C.   STANDARD OPERATING PROCEDURES/PROTOCOLS

Prior to initiating telemental health services, any organization or provider *shall* have in place a set of Standard Operating Procedures or Protocols that *should*  include (but are not limited to) the following administrative, clinical, and technical specifications:

- Roles, responsibilities (i.e., daytime and after-hours coverage), communication, and procedures around emergency issues.

- Agreements to assure licensing, credentialing, training, and authentication of practitioners as well as identity authentication of patients according to local, state, and national requirements.

- A systematic quality improvement and performance management process that complies with any organizational, regulatory, or accrediting, requirements for outcomes management.

© Copyright 2018, American Psychiatric Association, all rights reserved.

1) *Patient-Provider Identification*

All persons at both sites of the videoconference **shall** be identified to all participants at the beginning of a telemental health session**.** Permission from the patient **should not** be required if safety concerns mandate the presence of another individual or if the patient is being legally detained.

At the beginning of a video-based mental health treatment with a patient, the following information **shall** be verified and documented:

- The name and credentials of the provider and the name of the patient.

- The location(s) of the patient during the session.

- Immediate contact information for both provider and patient (phone, text message, or email), and contact information for other relevant support people, both professional and family.

- Expectations about contact between sessions shall be discussed and verified with the patient, including a discussion of emergency management between sessions.

2) *Emergencies*

i. **General Considerations**

Professionals **shall** maintain both technical and clinical competence in the management of mental health emergencies. Provisions for management of mental health emergencies **shall** be included in any telemental health procedure or protocol. Clinicians **shall** be familiar with local civil commitment regulations and **should** have arrangements to work with local staff to initiate/assist with civil commitments or other emergencies.

ii. **Clinically supervised settings**

Clinically supervised settings are patient locations where other medical or support staff are available in real-time to support the telemental health sessions. Emergency protocols **shall** be created with clear explanation of roles and responsibilities in emergency situations. These include determination of outside clinic hours emergency coverage and guidelines for determining when other staff and resources should be brought in to help manage emergency situations. Clinicians **shall** *b*e aware of safety issues with patients displaying strong affective or behavioral states upon conclusion of a session and how patients may then interact with remote site staff.

iii. **Clinically unsupervised settings**

In instances where the mental health provider is providing services to patients in settings without clinical staff immediately available:

- Providers **should** discuss the importance of having consistency in where the patient is located for sessions and knowing a patient's location at the time of care, as it impacts emergency management and local available resources.

4

*© Copyright 2018, American Psychiatric Association, all rights reserved.*

- As patients change locations, providers **shall** be aware of the impact of location on emergency management protocols. These include emergency regulations, resources (e.g., police, emergency rooms, crisis teams), and contacts.   These **should** be documented and available to providers.

- For treatment occurring in a setting where the patient is seen without access to clinical staff, the provider **should** consider the use of a "Patient Support Person" (PSP) as clinically indicated. A PSP is a family, friend or community member selected by the patient who could be called upon for support in the case of an emergency. The provider **may** contact the Patient Support Person to request assistance in evaluating the nature of emergency and/or initiating 9-1-1 from the patient's home.

- If a patient and/or a PSP will not cooperate in his or her own emergency management, providers **shall** be prepared to work with local emergency personnel in case the patient needs emergency services and/or involuntary hospitalization.

    3)  *Care Coordination*

With consent from the patient and in accordance with privacy guidelines, telemental health providers *should* arrange for appropriate and regular communication with other professionals and organizations involved in the care of the patient.

# TECHNICAL CONSIDERATIONS

## A.   VIDEOCONFERENCING PLATFORM REQUIREMENTS

Providers and organizations **should** select video conferencing applications that have the appropriate verification, confidentiality, and security parameters necessary to be properly utilized for this purpose. In the event of a technology breakdown, causing a disruption of the session, the professional shall have a backup plan in place (e.g., telephone access).  Telemental health **shall** provide services at a bandwidth and with sufficient resolutions to ensure the quality of the image and/or audio received is appropriate to the services being delivered.

## B.   INTEGRATION OF VIDEOCONFERENCING INTO OTHER TECHNOLOGY AND SYSTEMS

Organizations **shall** ensure the technical readiness of the telehealth equipment and the clinical environment. They **shall** have policies and procedures in place to ensure the physical security of telehealth equipment and the electronic security of data. Organizations **shall** ensure compliance with all relevant safety laws, regulations, and codes for technology and technical safety.

## Privacy, Security, HIPAA

For telemental health services provided within the United States, the United States Health Insurance Portability & Accountability Act (HIPAA) of 1996, and state privacy requirements, **shall** be followed at all times to protect patient privacy.  Privacy requirements in other countries **shall** be followed for telemental health services provided in those countries.

Patients receiving mental health and substance use disorder services are afforded a higher degree of patients' rights as well as organizational responsibilities (e.g., need for specific consent from patients to release information around substance use). Telemental health organizations

© Copyright 2018, American Psychiatric Association, all rights reserved.

*shall* be aware of these additional responsibilities and ensure that they are achieved. Telemental health organizations and providers *shall* determine processes for documentation, storage, and retrieval of telemental health records.

### C. PHYSICAL LOCATION/ROOM REQUIREMENTS

During a telemental health session, both locations *shall* be considered a patient examination room regardless of a room's intended use.  Providers *shall* ensure privacy so clinical discussion cannot be overheard by others outside of the room where the service is provided.  To the extent possible, the patient and provider cameras *should* be placed at the same elevation as the eyes with the face clearly visible to the other person.   The features of the physical environment for both *shall* be adjusted so the physical space, to the degree possible, maximizes lighting, comfort and ambiance.

When asynchronous telemental health consultations are occurring, the interviewer *should* be appropriately trained, and the digital recording of the interview *shall* be shared and stored in accordance with HIPAA regulations.

## CLINICAL CONSIDERATIONS

### C.   PATIENT AND SETTING SELECTION

There are no absolute contraindications to patients being assessed or treated using telemental health. The use of telemental health with any individual patient is at the discretion of the provider.  For clinically unsupervised settings (e.g., home, office) where support staff is not immediately available, providers *shall* consider appropriateness of fit for an individual patient. Provision of telemental health services in professionally unsupervised settings requires that the patient take a more active and cooperative role in the treatment process than would be the case for in-person locales. Patients need to be able to set up the videoconferencing system, maintain the appropriate computer/device settings, establish a private space, and cooperate for effective safety management. Factors to consider include:

- Providers *should* consider such things as patient's cognitive capacity, history regarding cooperativeness with treatment professionals, current and past difficulties with substance abuse, and history of violence or self-injurious behavior.

- Providers *shall* consider geographic distance to the nearest emergency medical facility, efficacy of patient's support system, and current medical status.

- The consent process *shall* include discussion of circumstances around session management so that if a patient can no longer be safely managed through distance technology, the patient is aware that services may be discontinued.

- Providers *should* consider whether there are any medical aspects of care that would require in-person examination including physical exams.  If the provider cannot manage the medical aspects for the patient without being able to conduct initial or recurrent physical exams, this shall be documented in the record, and arrangements *shall* be made to perform physical exams onsite as clinically indicated.

*© Copyright 2018, American Psychiatric Association, all rights reserved.*

### D.   MANAGEMENT OF HYBRID PATIENT-PROVIDER RELATIONSHIPS

Telemental health interviews can be conducted as part of a wider, in-person and online clinical relationship using multiple technologies by providers working individually or in teams. The telemental health interview can be an adjunct to periodic face-to-face in person contact or can be the only contact. It is typically supported by additional communications technologies such as faxed or emailed consultation information, patient portals, telephone, mobile devices, and electronic health records. Providers *should* have clear policies pertaining to communications with patients. These *should* describe the boundaries around ways in which patients can communicate with a provider, which content is appropriate to share over different technology platforms, anticipated response times, and how and when to contact a provider. Providers **should** identify clearly which platforms are acceptable for communication of an emergency and expected response times.  Providers *should* be attentive of the impact of different technology platforms on patient rapport and communication.  All modes of communication of personal health history *shall* be HIPAA compliant.

### E.   ETHICAL CONSIDERATIONS

Health professionals *shall* be responsible for maintaining the same level of professional and ethical discipline and clinical practice principles and guidelines as in person care in the delivery of care in telemental health, as well as additional telemental health related concerns such as consent processes, patient autonomy, and privacy.

### F.   CULTURAL ISSUES

Telemental health providers *should* be culturally competent to deliver services to the populations that they serve.  Providers *should* familiarize themselves with the cultures and environment where they are working and *may* use site visits and cultural facilitators to enhance their local knowledge when appropriate and practical. Providers *should* assess a patient's previous exposure, experience, and comfort with technology/video conferencing. They **shall** be aware of how this might impact initial telemental health interactions. Providers *should* conduct ongoing assessment of the patient's level of comfort with technology over the course of treatment.

### G.   SPECIFIC POPULATIONS AND SETTINGS

#### 1)   *Child/Adolescent Populations*

Telemental health procedures for the evaluation and treatment of youth *shall* follow the same guidelines presented for adults with modifications to consider the developmental status of youth such as motor functioning, speech and language capabilities, relatedness, and relevant regulatory issues. When working with younger children the environment *should* facilitate the assessment by providing an adequate room size, furniture arrangement, toys, and activities that allow the youth to engage with the accompanying parent, presenter, and provider and demonstrate age-appropriate skills.

Extended participation of family members or other relevant adults is typical of mental health treatment of children and adolescents. Providers *should* adhere to usual in-person practices for including relevant adults with appropriate modifications for delivering service through videoconferencing in the context of resources at the patient site. Extended participation *may* include a "presenter" w h o  *may* facilitate sessions (e.g., vital signs, assistance with rating

© Copyright 2018, American Psychiatric Association, all rights reserved.

scales, managing active children, assisting with any urgent interventions) Providers **should** consider how the presenter's involvement can affect service delivery (e.g., social familiarity with the family, perceived confidentiality, sharing information with other team members).

When telemental services are delivered outside of traditional clinic settings (e.g., schools) providers **should** work with staff to ensure safety, privacy, appropriate setting, and accommodations. This is particularly true if multiple staff participate in sessions. Appropriateness for telemental care **shall** consider safety of the youth, the availability of supportive adults, the mental health status of those adults, and ability of the site to respond to any urgent or emergent situations.

### 2) Forensic and Correctional

Providers **shall** be aware of systems issues in working in forensic and correctional settings and follow applicable standard consent around both treatment and evaluation in terms of patient's legal status and rights. Provider **shall** have clear site-specific protocols about working with patients and staff in forensic and correctional settings.

### 3) Geriatric

The geriatric patient often has multiple medical problems and the inclusion of family members **should** be undertaken as clinically appropriate and with the permission of the patient. Interviewing techniques **shall** be adapted for patients who may be cognitively impaired, find it difficult to adapt to the technology, or have visual or auditory impairment. Cognitive testing may be provided via videoconferencing but might need to be modified for use via video. Organizations administrating cognitive testing via videoconferencing **shall** be aware of the properties of the individual test instrument, how it may be impacted by videoconferencing, and any potentially needed modifications.

### 4) Military, Veteran and other federal populations

Providers **shall** be familiar with the federal and specific organizational structures and guidelines for patients related to the location of care. Providers **should** familiarize themselves with the culture of the patients (e.g., military cultural competency) and the organizational systems in which they practice.

### 5) Substance Use Disorder Treatment

Providers **shall** be aware of and comply with federal, state and local regulations around prescription of controlled substances involved in Substance Use Disorder treatment. Providers **shall** coordinate with onsite staff to provide appropriate standard of care including care coordination and monitoring of physiological parameters for monitoring of ongoing treatment as clinically indicated.

### 6) Inpatient and Residential Settings

Providers **should** work to integrate themselves into inpatient and residential care settings where they practice through virtual participation in administration and organizational meetings including clinical case staffing on a routine/regular basis. Remote providers **should** optimize use of patient site staff for help with telemental health consultations and case coordination as clinically indicated. Inpatient units should provide the telemental health provider with adequate

8

© Copyright 2018, American Psychiatric Association, all rights reserved.

access to patients, members of the interdisciplinary treatment team, and primary medical providers and nursing support when appropriate.

### 7) Primary Care Settings

Providers **should** be aware of best practice in leveraging telepsychiatry to support integrated care across a continuum of models including direct patient assessment, consultative models, (e.g., asynchronous) and team-based models of care. Providers practicing integrated care telepsychiatry should attend to the impact of virtual interactions on team processes, dynamics, and patient outcomes in the delivery of integrated care.

### 8) Rural

Providers **should** be familiar with the impact of rural environments on treatment including firearm ownership, kinship in small communities, local geographic barriers to care and general availability of healthcare resources.

# KEY REFERENCES

**Foundational Documents**

1. APA  Web-based Telemental health Toolkit (2016) https://www.psychiatry.org/psychiatrists/practice/telemental health
2. Recupero, P., & Fisher, J. C. E. (2014). Resource Document on Telemental health and Related Technologies in Clinical Psychiatry.
3. American Psychiatric Association. Telemental health via Videoconferencing. (1998)
4. Myers, K., Nelson, E. L., Rabinowitz, T., Hilty, D., Baker, D., Barnwell, S. S.,. & Comer, J. S. (2017). American Telemedicine Association Practice Guidelines for Telemental Health with Children and Adolescents. Telemedicine and e-Health.
5. Turvey C, Yellowlees P, Shore JH, Shore P. Delivering Online Video Based Mental Health Services. American Telemedicine Association Learning Center, 2014. (http://learn.americantelemed.org/diweb/catalog/item/id/241193;jsessionid=811FB256406248FFC1A45D3835DF3A99.worker1)
6. Turvey C, Coleman M, Dennison O, Drude K, Goldenson M, Hirsch P, Jueneman R, Kramer GM, Luxton DD, Maheu MM, Malik TS, Mishkind MC, Rabinowitz T, Roberts LJ, Sheeran T, Shore JH, Shore P, van Heeswyk F, Wregglesworth B, Yellowlees P, Zucker ML, Krupinski EA, Bernard J.(2013). ATA practice guidelines for video-based online mental health services.  Telemedicine Journal and E Health, 19(9),722-30. doi: 10.1089/tmj.2013.9989
7. American Telemedicine Association. (2013). Practice guidelines for video-based online mental health services. Washington, DC, USA.
8. Yellowlees, P., Shore, J., & Roberts, L. (2010). Practice guidelines for videoconferencing-based telemental health–October 2009. Telemedicine and e-Health, 16(10), 1074-1089.
9. Grady, B., Myers, K. M., Nelson, E. L., Belz, N., Bennett, L., Carnahan, L., ... & Rowe, N. (2011). Evidence-based practice for telemental health. Telemedicine and e-Health, 17(2), 131-148.

**Key Reviews and Updates**

10. Hubley, S., Lynch, S. B., Schneck, C., Thomas, M., & Shore, J. (2016). Review of key

© Copyright 2018, American Psychiatric Association, all rights reserved.

telemental health outcomes. World journal of psychiatry, 6(2), 269.

11. Bashshur, R. L., Shannon, G. W., Bashshur, N., & Yellowlees, P. M. (2016). The empirical evidence for telemedicine interventions in mental disorders. Telemedicine and e-Health, 22(2), 87-113.

12. Hilty, D. M., Ferrer, D. C., Parish, M. B., Johnston, B., Callahan, E. J., & Yellowlees, P. M. (2013). The effectiveness of telemental health. Telemedicine and e-Health, 19(6), 444-454

13. Shore, J. H. (2013). Telemental health: videoconferencing in the delivery of psychiatric care. American Journal of Psychiatry, 170(3), 256-262.

© Copyright 2018, American Psychiatric Association, all rights reserved.



*Editorial*

Association des psychiatres
du Canada

# Telepsychiatry 2.0

The Canadian Journal of Psychiatry /
La Revue Canadienne de Psychiatrie
2017, Vol. 62(10) 688-689
© The Author(s) 2017
Reprints and permission:
sagepub.com/journalsPermissions.nav
DOI: 10.1177/0706743717714469
TheCJP.ca | LaRCP.ca

$\bigcirc$SAGE

## David Goldbloom, MD[1] and David Gratzer, MD[2]

**Keywords**
access to care, telepsychiatry, e-mental health, telemental health, psychiatry

"Closed-circuit television has been introduced into the field of mental hygiene as a medium for the administration of therapy to a mass audience. The present evidence indicates that that the use of this type of television may promote the development of new and more effective methods for the treatment of the mentally ill."[1] This hopeful statement appeared at the beginning of a 1957 peer-reviewed paper. Four years later, the potential of telepsychiatry "as a means of extending mental health services to areas that are remote from psychiatric centers"[2] was described. Six decades later, where are we?

Serhal and colleagues[3] in this issue of the journal report a health services utilisation perspective on the provision of telepsychiatry in Ontario, characterising who provides it and who receives it. Although they tread on familiar ground, they make an important contribution: providing a Canadian perspective by looking at the state of telepsychiatry in Ontario and offering data to see if it has lived up to the potential of bridging barriers to access, especially for populations most in need. Serhal et al. find that it hasn't. Consider: of the more than 48,000 people in need of psychiatric care (defined by the authors as psychiatric or primary care within a year after a psychiatric hospitalisation), fewer than 1% saw a psychiatrist through telepsychiatry—and 39% saw no psychiatrist. We note the marked contrast with the United States, where telepsychiatry has been rapidly growing.[4]

What are the barriers to this long-established, evidence-supported method for psychiatric assessment and treatment? First is the participation of psychiatrists. In the Serhal et al.[3] study, it was surprising that only 7% of Ontario psychiatrists delivered care by televideo and that they were on average 50 years old. The irony: younger psychiatrists are generally very familiar with technology, and younger people are at ease with Skype, Facetime, and other forms of video communication.

Data from the 2014 National Physician Survey indicate that 24% of physicians in Ontario use telemedicine in their clinical practice.[5] Why does psychiatry, the least physical of the clinical specialties, lag so far behind? We would argue that there are perceived barriers and real barriers—but

addressing them should improve access and overcome the constraints of geographic maldistribution of psychiatrists.

A concern heard from some psychiatrists relates to the potential adverse impact of a telepsychiatry link on the important human connection that underlies the therapeutic alliance. This was addressed in an earlier study from the Centre for Addiction and Mental Health 20 years ago, a randomised trial of telepsychiatry versus in-person assessment[6] that was the second controlled study of this technology conducted in Canada.[7] There were no differences found in measures of therapeutic alliance or patient satisfaction—although physicians were less satisfied with telepsychiatry assessment but still positive.

Another concern may involve remuneration for valued work. But in Ontario, additional telepsychiatry billing codes beyond those already available for consultation exist currently and may incentivise psychiatrists to do this type of work; in addition, sessional funding exists in Ontario for telepsychiatry consultation to family health teams, which provides for indirect consultation and education—leveraging technology to provide virtual shared care and compensating psychiatrists appropriately for it.

And some may worry about risk management for a "new" technology. But the Canadian Medical Protective Association acknowledges the reality of telepsychiatry clinical practice and provides its own guidance.[8] While emphasis is placed heavily on the security of electronic communication, we believe that it is the consent to the process that is most important. When we speak with patients on the telephone, there is always the risk that someone at home is listening in on the upstairs extension! Patients in need are much more

---

[1] Department of Psychiatry, Centre for Addiction and Mental Health, University of Toronto, Toronto, Ontario
[2] Department of Psychiatry, Scarborough and Rouge Hospital, University of Toronto, Toronto, Ontario

**Corresponding Author:**
David Goldbloom, MD, 250 College Street, Toronto, ON M5T 1R8, Canada.
Email: David.goldbloom@camh.ca

concerned with access to care than with electronic security, and consent forms that acknowledge the limits to technology confidentiality are already available for email communication.

The article by Serhal et al.[3] provides hard data on underutilisation by providers and inadequate access by patients. How do we move forward?

We propose a 4-part plan:

*Meaningful integration into residency training*. If our trainees see this as a routine part of clinical care that they observe and deliver, they are hopefully more likely to integrate it into their own practice on graduation. This needs to involve more than the educational tourism of an afternoon spent observing telepsychiatry assessment. Training in telepsychiatry should be incorporated into the psychiatry residency experience. Indeed, detailed pedagogical documents reflect still-aspirational goals for such training.[9,10] But the experience of the first author of this editorial (D.S.G.), working in Canada's largest training program in psychiatry and providing regular telepsychiatry consultation for 20 years, is that resident observation and participation in this learning opportunity are minimal and haphazard.

*Recognition of the larger responsibilities of academic health sciences centres*. There is a disproportionate concentration of psychiatrists, both specialists and subspecialists, within the confines of these centres, and they typically have a mandate to share their expertise within their province beyond their immediate catchment area. Telepsychiatry provides an efficient and effective way to fulfill that mandate.

*Enhancement of existing technology*. At the Centre for Addiction and Mental Health (CAMH), telepsychiatry services are provided principally through televideo studios or portable televideo units; technology exists to make it accessible through the computers of every psychiatrist, removing another barrier. Returning to an earlier point: younger psychiatrists—who have statistically opted out of telepsychiatry—use technology with apps and iPhones, not studios and portable units.

*Better coordination of services*. Given the potential of telepsychiatry to bridge the geographic divide, a more thoughtful approach is needed, especially in light of the paucity of utilisation. This begs for a province-wide strategy that has defined clinical priorities, geographic rationales, and measured outcomes.

The authors of the 1957 article concluded, "Mentally ill patients will improve significantly in behavior patterns when given therapy by closed-circuit television."[1] Today, we have

the technology, the evidence, the experience, the educational guidelines, the remuneration, and the privacy protection. What else will it take to address the gaps so clearly identified by Serhal et al.[3]? Perhaps some leadership.

## Declaration of Conflicting Interests

The author(s) declared no potential conflicts of interest with respect to the research, authorship, and/or publication of this article.

## Funding

The author(s) received no financial support for the research, authorship, and/or publication of this article.

## References

1. Tucker H, Lewis RB, Martin GL, et al. Television therapy: effectiveness of closed-circuit television as a medium for therapy in the mentally ill. AMA Arch Neurol Psychiatry. 1957;77(1):57-69.
2. Wittson CL, Affleck DC, Johnson V. Two-way television in group therapy. Mental Hospitals. 1961;12:22-23.
3. Serhal E, Crawford A, Cheng J, et al. Implementation and utilization of Telepsychiatry in Ontario: a population-based study. Can J Psychiatry. 2017;62(10):716-725.
4. Mehrotra A, Huskamp HA, Souza J, et al. Rapid growth in mental health telemedicine use among rural medicare beneficiaries, wide variation across states. Health Affairs. 2017;35(5):909-917.
5. National Physician Survey. National Physician Survey, 2014. National results by province [cited Mar 12, 2017]. Available from: http://nationalphysiciansurvey.ca/wp-content/uploads/2014/10/2014-ByProvince-TelehealthTelemedicine-EN.pdf.
6. Stevens A, Doidge N, Goldbloom D, et al. Pilot study of televideo psychiatric assessments in an underserviced community. Am J Psychiatry. 1999;156(5):783-785.
7. Dongier M, Tempier R, Lalinec-Michaud M, Meunier D. Telepsychiatry: psychiatric consultation through two-way television—a controlled study. Can J Psychiatry. 1986;31(1):32-34.
8. Canadian Medical Protective Association (CMPA). [Internet]. 2014. Ottawa (Canada). [updated December 2014; cited 2017 May 29]. Available from: https://www.cmpa-acpm.ca/en/duties-andresponsibilities/-/asset_publisher/bFaUiyQG069N/content/medico-legal-aspects-of-providing-mental-healthcare-topatients.
9. Hilty DM, Crawford A, Teshima J, et al. A framework for telepsychiatric training and e-health: competency-based education, evaluation and implications. Int Rev Psychiatry. 2015;27(6):569-592.
10. Saeed SA, Johnson TL, Bagga M, et al. Training residents in the use of telepsychiatry: review of the literature and a proposed elective. Psychiatr Q. 2017;88(2):271-283.

*Psychosomatics 2018:59:227–250*     *© 2018 Academy of Consultation-Liaison Psychiatry. Published by Elsevier Inc. All rights reserved.*

# Original Research Report

# An Update on Telepsychiatry and How It Can Leverage Collaborative, Stepped, and Integrated Services to Primary Care



Donald M. Hilty, M.D., Terry Rabinowitz, M.D., D.D.S.,
Robert M. McCarron, D.O., David J. Katzelnick, M.D., Trina Chang, M.D., M.P.H.,
Amy M. Bauer, M.D., M.S., John Fortney, Ph.D.

**Introduction:** *In this era of patient-centered care, telepsychiatry (TP; video or synchronous) provides quality care with outcomes as good as in-person care, facilitates access to care, and leverages a wide range of treatments at a distance.* **Method:** *This conceptual review article explores TP as applied to newer models of care (e.g., collaborative, stepped, and integrated care).* **Results:** *The field of psychosomatic medicine (PSM) has developed clinical care models, educates interdisciplinary team members, and provides leadership to clinical teams. PSM is uniquely positioned to steer TP and implement other telebehavioral health care options (e.g., e-mail/telephone, psych/mental health apps) in the* *future in primary care. Together, PSM and TP provide versatility to health systems by enabling more patient points-of-entry, matching patient needs with provider skills, and helping providers work at the top of their licenses. TP and other technologies make collaborative, stepped, and integrated care less costly and more accessible.* **Conclusion:** *Effective health care delivery matches the intensity of the services to the needs of a patient population or clinic, standardizes interventions, and evaluates both process and clinical outcomes. More research is indicated on the application of TP and other technologies to these service delivery models.*

(Psychosomatics 2018; 59:227–250)

**Key words:** telepsychiatry, telemedicine, consultation, model, collaborative, stepped.

Received September 7, 2017; revised December 15, 2017; accepted December 18, 2017. From the Mental Health, Northern California, Veterans Administration Health Care System, Mather, CA; and Department of Psychiatry & Behavioral Sciences, UC Davis (D.M.H.), 10535 Hospital Way, Mather, CA 95655 (116/SAC); Departments of Psychiatry and Family Medicine, Burlington, Vermont; Division of Consultation Psychiatry and Psychosomatic Medicine, University of Vermont College of Medicine, Burlington, Vermont; and University of Vermont Medical Center (T.R.), Burlington, Vermont; Psychiatry & Behavioral Sciences and Department of Internal Medicine, University of California (R.M.M.), Irvine Health System, Irvine, CA; Department of Psychiatry and Division of Integrated Behavioral Health, Mayo Clinic (D.J.K.), Rochester, MN; Depression Clinical and Research Program, Massachusetts General Hospital, Boston, MA; and Department of Psychiatry, Harvard Medical School (T.C.), Boston, MA; Department of Psychiatry & Behavioral Sciences, the University of Washington, Seattle, WA; and Behavioral Health Integration Program (B.H.I.P.) and Washington State's Mental Health Integration Program (M.H.I.P.) (A.M.B.), Seattle, WA; Division of Population Health, Seattle, WA; and Department of Psychiatry & Behavioral Sciences, the University of Washington (J.F.), Seattle, WA. Send correspondence and reprint requests to Donald M. Hilty, M.D., Department of Psychiatry & Behavioral Sciences, UC Davis, 10535 Hospital Way, Mather, CA 95655 (116/SAC); e-mail: donh032612@gmail.com
© 2018 Academy of Consultation-Liaison Psychiatry. Published by Elsevier Inc. All rights reserved.

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

## INTRODUCTION

Patient-centered care (PCC) offers quality, affordable, and accessible/timely care, often as part of primary care medicine's delivery of behavioral health (BH) care to a majority of those suffering in the United States.[1] These populations have higher mortality rates owing to socioeconomic factors, chronic health conditions,[2] poor access to care, and higher suicide rates than their urban counterparts.[3] The popuation is increasingly culturally diverse.[4] Synchronous telepsychiatry (TP) or telebehavioral health (TBH) leverages care for diagnosis/assessment, consultation, and a range of treatments in many populations (e.g., adult, child, and geriatric), settings, and cultures.[5,6] TP outcomes are comparable to in-person care with a variety of models of care (i.e., collaborative care).[5,6]

Psychosomatic medicine (PSM)/consultation-liaison (C-L) psychiatry has many evidence-based approaches for care and education to primary care, including TP.[6] In addition to liaison-based education and continuing medical education for primary care providers (PCPs), PSM providers employed some of the first e-models of care, based on telephone- and e-mail curbside consultations.[7–9] TP consultation care,[5,10] collaborative care,[11–14] and asynchronous TP (ATP) care[15] models emerged and have significantly improved outcomes.[14] Hybrid care—combining in-person and TP care or TP with other technologies[16]—is increasing and referred to as "e-stepped care" and "e-integrated care."[8,17]

This article will focus on TP and TBH as applicable to PSM by reviewing the:

(1) Evidence base on the effectiveness, evaluation, and outcomes off/for TP,
(2) Use of TP in low-, moderate-, and high-intensity service delivery models tiered based on technology, specialty expertise/time, patient acuity, and the complexity of the service delivery model, and
(3) Clinical and health service delivery shifts in medicine, such as, collaborative, stepped, and integrated care for the medical home facilitated by TP and other TBH technologies.

## AN UPDATE ON TELEPSYCHIATRY'S (TP) EVIDENCE BASE AND ITS APPLICATION TO PCC

### Evaluation of TP

Evaluation of TP and TBH has gone through 3 phases.[5] First, TP was found to be effective in terms of increasing access to care, acceptance, and good educational outcomes.[5] Second, it was found to be valid and reliable of compared to in-person services[18,19] via noninferiority studies.[20] Third, the focus now is on cost analysis, integration into health care models and program evaluation for improvement (process of care, cost, communication, and other intangibles.[5,18,21] For program development, a developmental model of TP includes evaluation and emphasizes stages of needs identification, infrastructure survey, partnership organization, structure configuration, pilot implementation, and solidification.[5]

An organizing concept of TBHs impact is effectiveness, defined in Latin as "having the power to produce an effect … a decisive effect; efficient; as, … an effective … remedy."[5] Ideally, effectiveness should be considered for the client/patient, provider, program, community, and society. Descriptive studies—even those without structured evaluation, a small sample size, and no comparison group—provide valuable information to inform controlled studies (Table 1). TBH has shifted to randomized-controlled trials (RCTs), which better determine if a cause-effect relation exists between treatment and outcome, "wash out" any population bias and allow analysis with statistical tools. TBH has shifted to more and more RCTs, though qualitative studies still tend to be descriptive.

### Clinical Outcome Evidence

Telemedicine simulates real-time experiences in terms of audio and video quality at 384+ KBPS and comparison and noninferiority studies show TBH is as good as in-person care in terms of diagnosis and treatment.[5,20] TP studies report shorter length of hospitalization, increased medication adherence,[5,11] and improved outcomes for depression and

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

Hilty *et al.*

**TABLE 1.** Summary of Telepsychiatry (TP) and Telemental (TMH) Clinical/Outcome Studies Based on Age, Disorder, and Other Factors

| Citation (old to new) | Design | Sample | Assessment | Findings |
|---|---|---|---|---|
| *Geriatric* | | | | |
| Lyketsos et al. 2001 | Descriptive | NS | Unstructured evaluation; no comparison group (unless specified) | Video reduced "unneeded" hospitalizations |
| Rabinowitz et al. 2010 | Descriptive | 106 nursing home residents | Unstructured evaluation; no comparison group (unless specified) | Reduced travel time, fuel costs, physician travel time, and personnel costs |
| Weiner et al. 2011 | Descriptive | 85 adult and geriatric dementia patients | Unstructured evaluation; no comparison group (unless specified) | Feasible alternative to face-to-face care in patients with cognitive disorders who live in remote areas |
| *Adult* | | | | |
| Graham et al. 1996 | Descriptive | 39 adult outpatients | Unstructured evaluation; no comparison group (unless specified) | Video reduced "unneeded" hospitalizations |
| Zaylor et al. 1999 | Descriptive TP compared to in-person | 49 adult depressed or schizoaffective outpatients | Standard evaluation (unstructured) for TP and compared to same for in-person group; retrospective | Video equals in-person in Global Assessment of Function (GAF) scores at 6-mo follow-up |
| Hunkeler et al. 2000 | Descriptive | 302 adult primary care outpatients | Unstructured evaluation; no comparison group (unless specified) | Video by nurses improved depressive symptoms, functioning, and had high satisfaction vs. in-person |
| Ruskin et al. 2004 | Descriptive TP compared to in-person | 119 adult veterans | Standard evaluation (unstructured) for TP and compared to same for in-person group | Depression outcomes video and in-person equal, as were adherence, satisfaction, cost |
| Manfredi et al. 2005 | Descriptive | 15 adult inmates | Unstructured evaluation; no comparison group (unless specified) | Feasibility from an urban university to rural jail; less need for inmate transport |
| Sorvaniemi et al 2005 | Descriptive | 60 adult emergency patients | Unstructured evaluation; no comparison group (unless specified) | Minor technical problems occurred but assessment and satisfaction fine |
| Modai et al. 2006 | Descriptive TP compared to in-person | 24/15 adult outpatients | Standard evaluation (unstructured) for TP and compared to same for in-person group | Video > in-person cost per service and more hospitalization cost (less available per usual care) |
| Urness et al. 2006 | Descriptive TP compared to in-person | 39 adult outpatients | Standard evaluation (unstructured) for TP and compared to same for in-person group | Video < in-person for encouragement; improved outcomes for both |
| De la Cuevas et al. 2006 | RCT | 140 adults | Pharmacotherapy and cognitive-behavioral therapy (CBT) with Clinical Global Improvement (CGI) measure | Video equals in-person |
| O'Reilly et al. 2007 | Descriptive TP compared to in-person | 495 adult outpatients | Standard evaluation (unstructured) for TP and compared to same for in-person group | Video equal to in-person in outcomes, Satisfaction; 10% less expensive per video |
| Yellowlees et al. 2010 | Descriptive | 60 nonemergency adult patients | Unstructured evaluation; no comparison group (unless specified) | First asynchronous TP (ATP) to demonstrate feasibility |
| Yeung et al. 2016 | RCT | 190 Chinese Americans with depression | Culturally-sensitive collaborative treatment (T-CSCT) intervention vs. usual care with Hamilton Depression Rating Scale (HDRS), Quality of Life Enjoyment and Satisfaction Questionnaire (Q-LES-Q) and CGI measures over 12 mo | Response and remission were significantly greater for the T-CSCT |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

**TABLE 1** (*continued*)

| Citation (old to new) | Design | Sample | Assessment | Findings |
|---|---|---|---|---|
| *Child* | | | | |
| Nelson et al. 2003 | RCT | 38 urban school children | TP vs. in-person CBT for depression with Child Depression Inventory measure | Equivalent reductions of depression scores |
| Myers et al. 2006 | Descriptive | 115 incarcerated youth (age 14–18) | 11-item satisfaction survey | 80% successfully prescribed medications and they expressed confidence the psychiatrist by video<br>Youth expressed concerns about privacy |
| Myers et al. 2007 | Descriptive | 172 patients (age 2–21) and 387 visits | 11-item provider/primary care provider (PCP) satisfaction survey | Video to patients at 4 PCP sites; high satisfaction with services; pediatricians > family physicians |
| Fox 2008 | Prepost | 190 youth in juvenile detention | Goal Attainment Scale (GAS) | Improvement in the rate of attainment of goals associated with family relations and personality/behavior |
| Myers et al. 2008 | Descriptive | 172 patients with parental satisfaction | 12-item parent satisfaction survey | Parents' with school-aged children satisfaction higher than those with adolescents<br>Adherence high for return appointments |
| Yellowlees et al. 2008 | Pre/post | 41 children in rural primary care | Child Behavior Check List (CBCL) | At 3 mo, improvements in the affect and oppositional domains of the CBCL |
| Myers et al. 2010 | Descriptive | 701 patients, 190 PCPs | Collection of patient demographics, diagnoses, and utilization of services | Video feasible; psychiatrists adjust practice from in-person well |
| Pakyurek et al. 2010 | Descriptive | 12 children with autism-spectrum in primary care | Unstructured evaluation; no comparison group (unless specified) | Video might actually be superior to in-person for consultation |
| Lau et al. 2011 | Descriptive and advanced assessment | 45 children/ adolescent | Patient characteristics, reason for consultation, and treatment recommendations | Video reaches a variety of children, with consultants providing diagnostic clarification and modifying treatment |
| Stain 2011 | Descriptive and RCT | 11 adolescents/ young adults | Diagnostic interview for psychosis<br>Diagnostic module (DIP-DM) | Strong correlation of assessments done in-person vs. video |
| Storch et al. 2011 | RCT | 31 children and teenagers | Measures included the<br>1. ADIS-IV-C/P<br>2. Clinician-administered Yale-Brown Obsessive Compulsive Scale (CY-BOCS)<br>3. CGI Scale<br>4. Others: obsessive, anxiety, depression inventory | Video was superior to in-person on all primary outcome measures, higher % meeting remission.<br>Consultants providing diagnostic clarification and modifying treatment |
| Himle 2012 | RCT | 20 children with Tourette disorder or chronic motor tic disorder | Measures included the assessment with Yale Global Tic Severity Scale (YGTSS); Parent Tic Questionnaire (PTQ) and Clinician Global Severity & Improvement Scales (CGI-S and CGI-I) | Both treatment delivery modalities resulted in significant tic reduction with no between group differences |
| Nelson et al. 2012 | Service utilization chart review | 22 children | Unstructured evaluation; no comparison group (unless specified) | No factor inherent to the video delivery mechanism impeded adherence to national attention-deficit hyperactivity disorder (ADHD) guidelines |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| Study | Design | Sample | Measures | Results |
|---|---|---|---|---|
| Reese et al. 2012 | Pre/post | 8 children; Asian | Unstructured evaluation; no comparison group (unless specified) for ADHD | Families reported improved child behavior and decreased parent distress via video format of Group Triple P Positive Parenting Program |
| Szeftel et al. 2012 | Descriptive chart review | 45 patients; 31 < 18 y | Unstructured evaluation; no comparison group (unless specified)—medication changes, frequency of patient appointments, diagnostic changes, symptom severity, and improvement | Video led to changed axis I psychiatric diagnosis (excluding developmental disorders) 70%, and changed medication 82% of patients initially, 41% at 1 y and 46% at 3 y; Video helped PCPs with recommendations for developmental disabilities |
| Heitzman-Powell et al. 2013 | Prepost | NS youth not reported 7 Parents | Outcome and Assessment Information Set (OASIS) training program; Problem Behavior Recording (PBR); Incidental Teaching Checklist (ITC) | Parents increased their knowledge and self-reported implementation of behavioral strategies |
| Reese et al. 2013 | Descriptive and RCT | 21 children; 90% white | Autism Diagnostic Observation Schedule (ADOS)—Module 1; Autism Diagnostic Interview—Revised (ADI-R); Parent Satisfaction | No difference in reliability of diagnostic accuracy, ADOS observations, ratings for ADI-R parent report of symptoms, and parent satisfaction |
| Rockhill et al. 2013 | RCT | 223 children with ADHD + ODD + anxiety | Caregiver distress assessed with Patient Health Questionnaire-9, Parenting Stress Index, Caregiver Strain Questionnaire, Family Empowerment Measure included the Parent Child Relationship | Parents of children with ADHD and a comorbid disorder had significantly more distress than those with ADHD alone |
| Xie 2013 | RCT | 22 children behavioral disorder | Questionnaire (PCQ-CA), Vanderbilt Assessment Scales, Children's Global Assessment Scale (CGAS), Clinical Global Impressions-Severity (CGIS) | Parent training through video was as effective as in-person training and was well accepted by parents |
| Comer et al. 2014 | Pre/post | 5 children (age 4–8) | Behavioral intervention with child, facilitated by parent; obsessive compulsive disorder (OCD) rating scale by parent | Child OCD symptoms and diagnoses declined; child global functioning improved |
| Myers et al. 2015 | RCT | 223 children with ADHD + ODD + anxiety | CBCL screening, DISC-IV diagnostic assessment, ADHD rating scales (inattention, hyperactivity, combined, oppositional defiant disorder [ODD; role performance] and Columbia Impairment Scale | Caregivers reported significantly greater improvement for inattention, hyperactivity, combined ADHD, ODD, role performance for video vs. those treated in primary care; Teachers reported significantly greater improvement in ODD and role performance for video group, too |
| Tse et al. 2015 | RCT subsample | 37 caregivers of children with ADHD + ODD + anxiety | Caregiver Behavior Training (CaBT) delivered via: CBCL screening, DISC-IV diagnostic assessment, ADHD rating scales (inattention, hyperactivity, combined, ODD, role performance,) and Columbia Impairment Scale | Caregivers reported comparable improvements for children's outcomes whether CaBT video = in-person; no improvement in caregivers' distress when CaBT provided through video. |
| Rockhill et al. 2015 | Descriptive study of TP within a RCT | 223 children with ADHD + ODD + anxiety, the TPs and PCPs | TPs adherence to guidelines-based care. ADHD outcomes by prescriber based on comorbidity status | TPs adhered to guideline-based care, used higher medication doses than PCPs, and their patients reached target of 50% reduction in ADHD symptoms more often than with PCPs |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

**TABLE 1** (continued)

| Citation (old to new) | Design | Sample | Assessment | Findings |
|---|---|---|---|---|
| Van der Stoep et al. 2017 | RCT | Caregivers of 223 children with ADHD + ODD + anxiety | Augmented primary care (APC) of 6 TP and 6 behavioral management vs. 1 TP consultation with caregiver improvement scores on the PSI and CSQ | APC improved PHQ scores for caregivers and reduced child ADHD symptoms mediated the improvement |
| Roberts et al. 2017 | Prospective TP compared to an in-person group | 60 children and adolescents, many Aboriginal, in ED setting | Standard evaluation (unstructured) for TP and compared to same for in-person group | Video equals in-person, satisfaction high |
| *Depression* | | | | |
| Ruskin et al. 2004 | Descriptive TP compared to in-person | 119 adult veterans | Standard evaluation (unstructured) for TP and compared to same for in-person group; psychopharmacology treatment | Video equals in-person for adherence, patient satisfaction, and cost |
| Fortney et al. 2007 | RCT | 395 adult outpatients | Telemedicine Enhanced Antidepressant Management (TEAM) study vs. usual care | Video can help adapt collaborative care model in small PC clinics and symptoms improved more rapidly in intervention group vs. usual care group |
| Hilty et al. 2007 | RCT | 94 adults with depression | Semistructured assessment with Beck Depression Inventory-13 measure over 1 y as part of disease management program | Video equals in-person for adherence, patient satisfaction |
| Mitchell et al. 2008 | RCT | 128 adults | Bulimia nervosa patient with therapy intervention | Video equals in-person for abstinence from binge-eating episodes, purging episodes, and combined episodes |
| Chong et al. 2012 | RCT | 167 adults | Semistructured assessment with Patient Health Questionnaire measure in a community mental health center | Video equals in-person for adherence, patient satisfaction |
| Moreno et al. 2012 | Descriptive | 167 adult patients | Pharmacotherapy via TP + integrated primary care, with 7 visits with TP | Video may close gap in access to culturally and linguistically congruent specialists; improves depression severity, functional ability, and quality of life |
| Fortney et al. 2013 | RCT | 364 adult patients | Enhanced collaborative care in federally qualified health centers | Video collaborative care group > reductions in severity than usual care |
| *PTSD* | | | | |
| Frueh et al. 2007 | Descriptive TP compared to in-person | 38 adult male veterans | No other specific measures specified | Video equals in-person in clinical outcomes and satisfaction at 3 mo follow-up<br>Video < comfort vs. in-person in talking with therapist posttreatment and had worse treatment adherence |
| Morland et al. 2010 | RCT | 125 adult male veterans | Group CBT in a noninferiority trial with a State-Trait Anger Expression measure | Video CBT group (CBGT) for PTSD-related anger is feasible for rural/remote veterans, with reduced anger |
| Germain et al. 2009 | Descriptive TP compared to in-person | 48 adults | No other specific measures specified | Video equals in-person in reducing PTSD over 16-25 wk |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| Study | Type | N | Description | Findings |
|---|---|---|---|---|
| Fortney et al. 2015 | RCT | 265 adult veterans | Enhanced collaborative care with Posttraumatic Diagnostic Scale measure | Video better than in-person |
| Fortney et al. 2017 | RCT | 265 adult veterans | Telemedicine Outreach for PTSD (TOP) vs. usual care, evaluating cost-effectiveness based on quality-adjusted life years (QALYs) derived from the Short Form Health Survey for Veterans and Quality of Well-Being (QWB) | The TOP intervention was relatively expensive, with costs totaling $2029 per patient per year. Intervention costs were not offset by reductions in health care utilization costs, resulting in an incremental cost-effectiveness ratio of $185,565 per QALY |
| *Substance abuse* | | | | |
| Frueh et al. 2005 | Descriptive | 14 adult male outpatients | Unstructured evaluation; no comparison group (unless specified) | Video had good attendance, comparable attrition and high satisfaction |
| Zheng et al. 2017 | Descriptive chart review | 100 adult outpatients | Buprenorphine program over 2-y period | Video equivalent to in-person outcomes in terms of relapse and comorbid substance use |
| *Anxiety disorders* | | | | |
| Bouchard et al. 2004 | 21 | 21 adults | Panic disorder | Video 81% of patients panic-free posttreatment and 91% at 6-mo follow-up via CBT |
| Romijn et al. 2015 | RCT | 156 adults | Cost-effectiveness of blended vs. in-person CBT | Video equivalent to in-person |

ADHD = Attention Deficit Hyperactivity Disorder; APC = Augmented primary care; ATP = Asynchronous telepsychiatry; CBCL = Child Behavior Check List; CBT = cognitive-behavioral therapy; CGI = Clinical Global Improvement; CSCT = Culturally-sensitive collaborative treatment; CY-BOCS = Yale-Brown Obsessive Compulsive Scale; HDRS = Hamilton Depression Rating Scale; NS = not stated; OCD = obsessive-compulsive disorder; ODD = Oppositional Defiant Disorder; PCP = primary care physician; PHQ = Patient Health Questionnaire; PTSD = posttraumatic stress disorder; Q-LES-Q = Quality of Life Enjoyment and Satisfaction Questionnaire; RCT = randomized-controlled trials; TP = telepsychiatry.

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

**TABLE 2.** Abbreviated Telepsychiatric (TP) Competencies for Patient Care

| Area/topic | Novice/advanced beginner (e.g., advanced medical student/early resident) | Competent/proficient (e.g., advanced resident/graduating resident/faculty/ attending/interdisciplinary team member) | Expert (e.g., advanced faculty/attending/ interdisciplinary team member) |
|---|---|---|---|
| *Patient care* | | | |
| History-taking | Standard history | Informed consent for telehealth; Contextualized history (e.g., aware of geographic and cultural specificity) | Address informed consent problems; In-depth, well-paced, and concise interview |
| Engagement and interpersonal skills | Therapeutic alliance with trust and rapport | Identify and manage problem(s); Adjust interview to technology | Resolve problems and adjust assessment contextually |
| Assessment and physical examination | Stratify risk and protective factors based on epidemiology; Learn tools (e.g., MMSE) | Assess danger risk and adjust follow-up plan vs. in-person; Ensure full MSE or alternative | Synthesize information; Adjust tools contextually (e.g., substitute score item) |
| Management and treatment planning | Treatment plan based on who will do follow-up with others (e.g., PCP) | Administer tools with adjustments; Contextualize to patient and PCP; Awareness of care continuum; Medication recommendations (i.e., side effects) with PCP instructions to initiate, titrate, and augment; Follow-up with PCP by TP or phone | Teach on clinical MSE vs. in-person; Tailors recommendations to resources, culture, and patient preference; Engages patient and referring doctor; Select "best" mode: e-mail, telephone, or other (and if it changes the process); Refines medication recommendations |
| Documentation | Draft TP note hard copy or rudimentary EHR draft | Initial/revised draft with consultation model; complex EHR (e.g., Epic) | Balance findings/detail with plan; uses variety of documentation options |
| Privacy and confidentiality | Learn in-person basic regulations | Be aware of regulations; TP context; Cell HIPAA limitations | Practice within all standards; be aware of technology option limitations |
| *Communication* | | | |
| Communication | Clear communication with patient and professionals | Amplify communication based on TP | Trouble-shoot communication difficulties |
| Cultural, diversity and social determinants | Consider diversity of oneself and patients | Adjust to patient culture and preference; Check language fluency to confirm | Follow cultural formulation frameworks; Adjust interview, assessment, and care |
| Language/interpreter ability | Use the interpreter | Manage time and pick best option (e.g., professionals > staff and family) | Verbal and nonverbal dimensions |
| *Systems-base practice* | | | |
| Outreach to community | Participate and engage | Identify relevant resources and needs within community | Visit, establish, and maintain relationships; Integrate in-person and TP care events |
| Interprofessional education issues | Participate and experiences different roles | Work with IPE team and begin to teach within IPE framework | IPE provider and teacher; Support interdisciplinary team care |
| Care models | Grasp care provider vs. consultant role | Employ traditional referral (i.e., management), and consultation TP; Begin to learn collaborative care | Has facility with models of consultation, integrated, stepped, and hybrid care; practices with one that fits this context |
| Rural health | Learn about rural access, epidemiology, S, and other | Learn rural health basics | Practice and role model |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| | | | |
|---|---|---|---|
| Special populations | Learn differences (e.g., veterans, child/adolescent/parent/family, geriatric) | Recognize differences and adapts assessment and management approaches accordingly | Practice and role model |
| Licensure regulations for TP and model used | Learn in-person regulations and that states differ | Be aware that in-person and TP regulations may/may not differ | Practice within TP regulations state-to-state or within system (e.g., VA) |
| *Professionalism* | | | |
| Attitude | Learn/be open to technology | Openness to technology, IPE and consultation process | Lead in groups/teams |
| Integrity and ethical behavior | Demonstrate behavior with respect for others | Role model | Role model and give feedback |
| Scope | Become aware of scope issues | Practice within scope(s) | Provide feedback on scope and boundary issues; trouble-shoots problems |
| *Practice-based learning* | | | |
| Administration | Learn basics of in-person care | Be aware that in-person and telemedicine care have differences | Practice with adjustments to telemedicine care |
| Safety and quality improvement (QI) | Systematic assessment; learn how to participate in QI | Identify risks; apply QI information to cases and system | Adjust treatment plan; analyze QI options, selects and evaluates |
| Teaching and learning | Participates and contributes | Organize and further education | Provide context and steps for learning |
| *Knowledge* | Relevance, history | Relevance, history, and evidence-base | History, evid.-base, and clin. guidelines |
| *Technology* | | | |
| Adapt to technology | Project self 15% more by TP; realize nonverbal issues | Plan for differences, identify barriers, and put patient at ease | Additional ways to engage and express empathy |
| Remote site design | Observe | Identify problems and solutions; Add toys or furniture for child TP | Preplanning: iterative improvement; Modification based on care options |
| Technology operation | Microphone, camera, and other | Operate hardware, software, and accessories; basic trouble-shooting | Optimize components based on context and manage all trouble-shooting |

EHR = electronic health record; HIPAA = Health Insurance Portability and Accountability Act of 1996; IPE = interprofessional education; MMSE = Mini-Mental State Examination; MSE = mental state examination; PCP = primary care physician; QI = Quality Improvement; TP = telepsychiatry; VA = Veterans Administration.

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

**TABLE 3.  Continuum of In-Person and Telepsychiatric Models for Psychiatry and Primary Care Based on Clinical Outcomes, Team Member Roles, and Resource Allocation**

| Intensity tier | Model method | Model examples and features |
|---|---|---|
| High | TP collaborative care | vs. in-person care in terms of diagnosis and treatment of depression in children and adolescents[20]<br>Medication use for depression in children/adolescents and adults[11,20]<br>Adults with PTSD[12]<br>Children/adolescents with ADHD[16]<br>Federally qualified health center for pharmacotherapy and psychotherapy for depression[13]<br>See also Table 1 randomized-controlled trials (RCTs) |
| | RCT hybrid care: TP with other methods | Synchronous TP (STP) and ATP for children with ADHD, with parents and teachers, with screening using a checklist, a diagnostic assessment instrument, rating scales for inattention, hyperactivity, role performance, and other impairments[16] |
| | RCT disease management for depression | Improved TP and usual care outcomes over 12 mo; the latter group benefitted from the Hawthorne effect and providers' application of skills from the intervention group[10] |
| | Non-RCT, informal stepped care | Grant-funded e-MH service with a priori outcome evaluation with (1) 2-tiered triaging of patients with depression based on MH screening and TP consultation to, (2) therapy on site or initiation/change of antidepressant by PCP and (3) ongoing telepsychiatric consultation (by telephone, e-mail, or video) and (4) continuing medical education, and (5) staff retraining[31] |
| Mid | Initial ± follow-up TP consultation | The consultation care or consultation-liaison (CL) model increases capacity of MH services[7] with diagnostic assessment and medication changes in 91% and 57% of cases, respectively, leading to clinical improvements in 56% of cases[32]<br>PCP knowledge, skills, and complexity of questions improve over time,[7] particularly in rural PCPs[32] |
| | Adding a geriatric nurse practitioner (GNP) | Adding a geriatric nurse practitioner (GNP) to an outpatient diagnostic multidisciplinary facility for patients with cognitive disorders may improve the providers' concordance rate of the advice from the diagnostic facility and reduce subjective burden of the informal caregiver[33] |
| | Veterans Affairs TP | Geographically dispersed population; in 2012, VA MH providers conducted 340,842 interactive video encounters[34] |
| | Non-RCT child and adolescent program to boost MH services | Contract for child and adolescent MH screening, therapy on site, telepsychiatric consultation (phone, e-mail, or video), continuing medical education and staff training improved patient outcomes and site-based staff skills[35] |
| | Asynchronous telepsychiatry | This involves the PCP interviews a patient with video recording and sends the video with historical information for review by a distant psychiatrist; feasible, valid, reliable, and cost-effective in English and Spanish-speaking patients in primary care[15] |
| Low | In-person and telephone doctor-to-doctor "curbside" consultations | Meet approximately 33% of informational PCPs' needs "in-time"[6]<br>Part of collaborative care<br>Purposeful and timely |
| | Telephone or e-mail doctor-to-doctor "curbside" consultations | A multispecialty phone and e-mail consultation system to PCPs for the care of adults and children across specialties with developmental disabilities (Hilty et al. 2006a)[6]<br>Adults awaiting TP consultation as part of a disease management, as a way to accelerate care; a third did not need the TP[6,10]<br>Align PCPs' diagnoses and medication treatments [7,32]<br>Improve PCPs' knowledge and skills [7,32]<br>Improve nursing home TP care for depression or dementia, by making evaluation easier and more efficiently using consultant time.[12] Part of TP collaborative care[11–13] and integrated care[14] |
| | Oversight of PCP for PCMH | Improve patient care and health.[42] Desk-mounted video systems offer great convenience for therapy to cancer patients to avoid travel, but the cost used to be prohibitive for most consumers[42] |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

**TABLE 3. Continued**

| Intensity tier | Model method | Model examples and features |
|---|---|---|
| | Case review with PCPs | Case review of diagnosis and follow-up after a discussion helps change treatment plans and improves knowledge[36] |
| | | Videoconference "virtual grand rounds" are led by a team of MH specialists to review and discuss cases, by Specialty Care Access Network-Extension of Community Health care Outcomes (SCAN-ECHO) model at the University of New Mexico[37] |
| | One-time cultural consultation | Cultural consultation to rural primary in order to match patients and specialists by culture, ethnicity, and language[4] |
| | Distance neurocognitive assessment | Neurocognitive assessment via TP using a Spanish-language battery was comparable to in-person (IP) testing for rural Latino patients[38] |

ADHD = attention-deficit hyperactivity disorder; ATP = asynchronous TP; MH = mental health; PTSD = posttraumatic stress disorder; PCMH = patient-centered medical home; PCP = primary care provider; RCT = randomized controlled trials; TP = telepsychiatric; VA = Veteran's Administration.

posttraumatic stress disorder.[12,13] Guidelines for therapy based on systematic reviews[22] are being explored.[23]

TP is used across many populations. Child and adolescent TP research is now beyond feasibility and acceptability to TP collaborative care for patients with attention-deficit hyperactivity disorder[16] and caregivers.[24] It is effective. More geriatric data are emerging and TP is accepted by culturally-diverse populations with language matching and is often better than is available for in-person care, with interpreters suggested instead of family or informally trained staff.[4,5] More research is needed for inpatients, those who are incarcerated or in emergency rooms; adjustments may be needed to ensure quality of care, informed consent, and privacy.[5]

## TP Competencies

Those practicing TP as a PSM/C-L psychiatrist or to medical settings are strongly encouraged to reflect on adjusting in-person skill sets for care, education, and liaison roles. Competencies now exist for providers and these are becoming standard for TP electives in residency training (Table 2).[25] Social media/networking and psych apps competencies are are in progress,[9] as are general telemedicine competencies across specialties.[26] These are based on Accreditation Council of Graduate Medical Education domains and tiered at novice/advanced beginner, competent/proficient, and expert levels. In-person competencies for collaborative and integrated care services[27,28] are being further elaborated for TP in the

following domains: technical; assessment; relational and communication; collaborative and interprofessional; administration; medico-legal; community psychiatry and community-specific knowledge; cultural psychiatry; and health systems.[29,30]

## HISTORICAL MODELS OF TP CARE BASED ON HIGH, MODERATE, AND LOW INTENSITY OF RESOURCES

Models of TP care may be organized into low, moderate, or high-intensity levels of care based on intensity of care intervention, technology complexity, specialist time, patient acuity, and use of other resources,[8] as updated from a previous formulation (Table 4).[6] Services, models, and outcomes can be stratified by who is designated the primary service and the secondary consultant. The key is to match the need of the patient and PCP with the specialist's expertise to provide the maximal value added and most flexibility.

Consulting sites/consultants often offer only video services and distant sites' clinics and PCPs may only be aware of TP. This leads to adding on one-time TP consultation for a patient or a preference to use all of the TP consultant's time to manage only a few difficult cases. Despite the positives to these options short-term, it may be more effective and efficient clinically, administratively and financially to use a consultant who offers a "buffet" of models from which to choose. A good example may be combining case review or telephone/e-mail consultation doctor-to-doctor to build the relationship and video to cement it (e.g., have the PCP stop in to "see" it). Nonvideo

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

interventions are cheaper and may accelerate care (even obviate the need for) in lieu of video service.[8] Typical contracts buy out a percentage of TP consultant time (e.g., half day/10%) with an hourly rate for 4 hours of video per week; an alternative to have as much or more impact would be 2 hours video, 1 hour ATP, and 1 hour telephone/e-mail contacts.[8]

### High-Intensity TP Clinical Care or Service Interventions

These TP models involve extensive, ongoing collaboration between psychiatry (or BH) and primary care, as part of an ongoing grant, contract, or sustainable partnership (e.g., work within the same system of care). Examples (Table 3) are typically RCTs or intensive programs such as collaborative care for depression, posttraumatic stress disorder, and other disorders.[11–13, 20] hybrid care for child and adolescent attention-deficit hyperactivity disorder,[16] disease management,[10] and stepped care (screening, triage, brief therapy on site, PCP prompt to initiate/change antidepressant and TP consultation by telephone, e-mail, or video), coupled with ongoing continuing medical education and staff (re)training.[31]

### Moderate Intensity TP Service Interventions

This level of intervention may involve at least an initial (and sometimes in follow-up) synchronous TP (STP) consultation. It may require a contract, grant funding, or ongoing collaboration to augment clinical care with a range of technology-based options (e.g., telephone, e-mail, and video; an e-platform to facilitate ATP). Examples (Table 3) are treatment plan development (e.g., brief therapy),[7,32] adding a geriatric nurse practitioner,[33] geographically coordinated care services,[34] non-RCT child and adolescent service augmentation,[35] and a RCT of ATP, in which the PCP video records a brief patient interview and sends the video with historical information to a psychiatrist to review.[15]

### Low Intensity TP Care Service Interventions

This level of intervention typically does not often involve seeing patients directly, but it may involve regular contact and an ongoing relationship between a BH provider and 1 or more PCPs. Examples (Table 3) by

telephone, e-mail, or video are doctor-to-doctor "curbside" consultations,[6] oversight of a patient-centered medical home,[31] case reviews,[36] virtual video grand rounds on cases,[37] and neurocognitive assessment.[38]

### USING TP FOR COLLABORATIVE, STEPPED, AND INTEGRATED CARE TO SUPPORT THE MEDICAL HOME AND TELEBEHAVIORAL HEALTH CONTINUUM EXTENDING OPTIONS FOR CARE

There have been significant shifts in medicine that are facilitated by TP, including collaborative, stepped, and integrated care based on the medical home model. The "best" outcomes (e.g., patient symptom response or remission; population level) may require integration of PCC, value-based care and the models of care delivered by interdisciplinary teams via a range of in-person and technology-based interventions. Psychiatric clinicians are adapting to PCC and must learn a variety of models of care and systems (e.g., value-based care and accountable care organizations) that are driven by the Centers for Medicare and Medicaid Service and the Affordable Care Act. Physicians are a crucial leverage point between patients, systems, and insurance companies.

Physicians incorporate PCC themes in principle, somewhat handily, but may struggle to embrace the clinical and leadership aspects of value-based care, which along with team, interdisciplinary and technological shifts, are critical for its success.[39] Physicians focus on guidelines for quality and value-based care may measure adherence to those, but guidelines are often complex (i.e., outcome measurement), frequently incomplete (e.g., diverse populations and settings), and contradictory to use (e.g., a patient with 3+ chronic diseases).[40] Only 25% of guidelines incorporate patient participants and preference data in a systematic manner.[41]

### Medical Home

The patient-centered medical home uses a primary care philosophy to provide comprehensive and continuous medical care to patients to obtain maximal health outcomes.[42] Patient and family engagement is a critical, core feature, along with comprehensive, team-based, coordinated, accessible, quality, and safety components[43] The Model has been

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

Hilty *et al.*

**TABLE 4.** Continuum of In-Person and Telepsychiatric Models for Psychiatry and Primary Care Based on Clinical Outcomes, Team Member Roles, and Resource Allocation

| Tier | Model | Clinical features | Health care organization and administration (7 factors) | Outcome evaluation diabetes mellitus (DM) and depression (D) | Examples, literature and trends* |
|---|---|---|---|---|---|
| 4 | Integrated care (full) | Physician teamwork<br><br>Psychiatric, psychologist, or other evidence-based therapist (brief therapy)<br><br>SW medical and MH<br><br>Care coordinators or managers<br><br>Service continuum: inpatient, step-down/skilled, nursing/day treatment, and crises/ED<br><br>Consistent or frequent communication<br><br>Telepsychiatry (TP) naturally integrated as a piece onto overall system and team platform<br><br>Patient experiences the team > individual providers; seamless transitions between primary and specialty "sides" or components | System wide integration†<br>(A) Clinical responsibility and decision-making<br>(B) Colocation of services<br>(C) Integrated funding<br>(D) Integrated program evaluation<br>(E) Integrated outcome measurement<br>(F) E-platform with registry‡<br>(G) Reimbursement alignment‡<br>Administrative<br>Joint visits, integrated scheduling, and drop in visits<br>Phone management<br>Tracking/registry, EHR, and other systems<br>Meetings formal and informal to support model<br><br>Predetermined, population-based screening | Evidence-base:<br>Level II<br>Preliminary<br>Medical tracking:<br>Short-term (ST): HgA1c, diet, exercise, e-support group<br>Long-term (LT): same, plus feedback loops for changes, group options, CBT referral, and intensified medication or visit regimen<br><br>Psychiatric:<br>ST: PHQ, GAF, GAD-7, AUDIT<br><br>LT: PHQ, GAF, suicide rate<br><br>Other:<br>Functional improvement<br>Disability days<br>QOL adjusted | Some medical-psychiatric units (inpatient > outpatient)<br><br>Substance Abuse Mental Health Services Administration (SAMSHA)-Health Resources & Services Administration (HRSA) model |
| 4 | Stepped IBH Care (full)<br><br>On-site or virtual | Specialist management or consultation<br><br>Primary care providers (PCPs); MD or NP/PA directed MH care<br><br>BH consultant with evidence-based therapy (brief therapy)<br><br>SW: therapy, triage, and case management<br><br>Psychiatric education (case review, curbside, other)<br><br>Care coordinator or manager<br><br>Motivational interviewing and behavioral activation<br><br>Outreach for those not engaging in care<br><br>TP added with relative ease as a part of service delivery | 5/7 at best, but not always A, C, E, G? System wide or focused<br>Stepped care<br>+ Interdisciplinary team is better defined than partial integrated care team (as latter is more randomly done)<br>- Less integrated philosophy as slightly "added on"<br>Administrative<br>Integrated scheduling<br>Phone management<br>Meetings formal and informal to support model<br>Frequent or prn communication<br><br>Predetermined, population-based screening | Evidence-base:<br>Level II<br>Growing<br>Medical tracking:<br>Short-term (ST): HgA1c, diet, exercise, e-support group<br>Long-term (LT): same, plus feedback loops for changes, group options, CBT referral, and intensified medication or visit regimen<br><br>Psychiatric<br>ST: PHQ, GAF, GAD-7, AUDIT<br>LT: PHQ, GAF, suicide rate | Apil et al.,<br>Bot et al.,<br>Dozeman et al.,<br>Huijbregts et al.,<br>Seekles et al.<br>van't Veer-Tazelaar et al.<br><br>VU University, Amsterdam, Netherlands<br><br>Arayo et al., Chile<br>Davidson et al.,<br>Columbia University College of Physicians and Surgeons, USA<br><br>Ell et al., |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

**TABLE 4** (*continued*)

| Tier | Model | Clinical features | Health care organization and administration (7 factors) | Outcome evaluation diabetes mellitus (DM) and depression (D) | Examples, literature and trends* |
|---|---|---|---|---|---|
| | | Patient experiences the team > individual providers; seamless transitions between primary and specialty "sides" or components | | Other: Functional improvement? Disability days? QOL adjusted? | School of Social Work, University of Southern California, USA; Katon et al.; Unützer, et al.,; U. of Washington, USA; Katznick et al.,; Mayo Clinic Integrated Behavioral Health, USA; U. of Wisconsin at Madison, USA; Patel et al.,; India; Haaga et al., American University, USA; Hilty et al.; Neufeld et al.[31]; Yellowlees et al.,; University of California, Davis |
| 4 | Collaborative Care (full) On-site or virtual | Core members are PCPs, care managers, and psychiatric consultants; Brief, evidence-based therapies; Communication prn; some patient specific; Outreach for those not engaging in care; Orientation to collaborative care model; TP The primary vehicle for collaboration for distant rural sites; added to other sites with relative ease; A part of rather than a system requires effort; Patient experiences the team > individual providers | 3–5/7 (A–C ± F, G) at best, focused > system wide; Better medical outcomes overall measurement with SF-12/other; Administrative; Joint visits, integrated scheduling, and drop-in visits with therapist/care coordinator; Phone management; Education on health topics, courses for PCPs; Meetings informal and prn; TP training critical; clinical and communication know how also needed; Predetermined screening plan put into clinic and reinforced by consultant | Evidence-base: Level I–II; Substantial; Medical ± tracking: Short-term (ST): HgA1c, diet, exercise, e-support group?; Long-term (LT): same; group referral, intensified medication regimen, and other?; Psychiatric: ST: PHQ/BDI or SCL-20, GAF; prn clinician rated scale; LT: PHQ/other, GAF; Other: SF-12/other; Functional improvement? QOL adjusted? | Katon et al.; Unützer et al.; Fortney et al.; Richardson et al.[20]; U. of Washington Collaborative Care; Group Health Cooperative; Veteran's Affairs; Training for residents in integrated and collaborative care; Fellowship in PSM |
| 3.5 | Integrated care (partial): primary medical | Psychiatric, psychologist, or other evidence-based therapist (brief therapy); SW MH added on | 4/7 systematically at best, including B, D, E, F, and G? Unlikely A, C, E, and G, though, for many institutions | Evidence-base: Level II–III; Preliminary; Medical ± tracking: | |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

Hilty *et al.*

| # | Model | Features | Administrative | Evidence base / Measures | Examples / Programs |
|---|---|---|---|---|---|
| 3 | Collaborative care (partial) — Onsite or virtual | Care coordinators or managers helps with MH; Service continuum: inpatient, skilled nursing, and ED; Frequent or prn communication; Common EHR?; TP added with relative ease as a part of service delivery; Patient experiences the team and at other times, mainly individual providers | Administrative; Maintains philosophy and adjusts for limitations; Integrated scheduling; Phone management; E-assignments?; Meetings formal and informal to support model or strive for it | Short-term (ST): HgA1c, diet, exercise, Long-term (LT): same, group referral, intensified medication regimen, and other? Psychiatric: ST: PHQ, GAF; AUDIT? LT: PHQ Other: Functional improvement, Disability days QOL adjusted | University of Washington/Group Health Cooperative Child ADHD Program |
| | | Core members are PCPs, care managers, and psychiatric consultants; Brief evidence-based therapies; Communication prn; TP as above; Patient experiences the team and at other times, mainly individual providers | 2–3/7 at best; Administrative; Integrated scheduling; Phone management; Coupled Internet-based therapy for parents and patient assignments; Meetings prn; TP as above; Screening for specific patients or situations | Evidence-base: Level II-III Need more research Medical: Short-term (ST): HgA1c, diet, exercise, Long-term (LT): same, group referral, intensified medication regimen, and other? Psychiatric: ST: PHQ, GAF LT: PHQ, GAF Other: | |
| 2.5 | Psychiatric consultation care — Onsite or virtual; Cultural consultation | Core members are PCPs, care managers and psychiatric consultants; Collaboration and communication prn and facilitate referrals; TP is itself and also is the main vehicle for working with a specialist; Joint specialty consults: psychiatry and endocrinology; Patient experiences members of the team individually; Culture, ethnic, or language matching or all of these | Administrative; Drop in visits rare; More curbside phone and e-mail PCP-specialist consults; Education for PCPs prn; Meetings occasionally to make change or decision; TP training critical; Training essential on being a consultant to primary care and educational needs of PCPs; Joint dual specialty tele-visit (e.g., psychiatry and endocrinology) | Evidence-base: Level III-IV Need more research HgA1c, diet, exercise, Long-term (LT): same, group referral, intensified medication regimen Psychiatric: ST: prn unless a project is occurring LT: ditto Other | Many; UC Davis Telepsychiatry Program, 1996–2013; UC Davis Virtual Collaborative Care Program, 2013-; Many |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

**TABLE 4** (*continued*)

| Tier | Model | Clinical features | Health care organization and administration (7 factors) | Outcome evaluation diabetes mellitus (DM ) and depression (D) | Examples, literature and trends* |
|---|---|---|---|---|---|
| 2.5 | Asynchronous telepsychiatry (ATP) consultation | Clinical<br>Core members are PCPs and psychiatric consultants<br>Communication prn<br>Administrative<br>More curbside phone and e-mail<br>PCP-specialist consults<br>Education for PCPs prn<br>Meetings occasionally prn<br>Patient experiences members of the team individually<br>Culture, ethnic, or language matching or all of these | Administrative<br>More curbside phone and e-mail<br>PCP-specialist consults<br>Education for PCPs prn<br>Meetings prn<br>TP training critical<br>Training essential on being a consultant to primary care and educational needs of PCPs | Evidence-base:<br>Level II-III<br>Need more research<br>Medical:<br>Short-term (ST): HgA1c, diet, exercise,<br>Long-term (LT): same; group referral, intensified medication regimen<br>Psychiatric:<br>ST: prn unless a project is occurring<br>LT: ditto<br>Other: | UC Davis Psychiatry Programs<br>Few, but will increase over time, most likely |
| 2.5 | Behavioral Health (BH) Consultation On-site<br><br>Virtual | Clinical<br>Core members are PCPs, BH consultants, and care managers<br>"Warm" handoffs<br>Team huddles<br>PCP does meds (and rarely psychiatrist initially)<br>Administrative<br>Drop in visits rare<br>More curbside phone and e-mail<br>PCP-specialist consults<br>Education for PCPs prn<br>Meetings occasionally prn | | Evidence-base:<br>Level I-III since equal to in-person (e.g., CBT)<br>Medical:<br>Not applicable, except if clinician adds CBT<br>BH:<br>ST: prn unless a project is occurring<br>LT: ditto | Many |
| 2 | "Curbside" | Formal<br>Prolonged consultation (i.e., 38 min average by phone) program<br>Patient experiences members of the team individually<br>Informal<br>Synchronous (phone or in-person)<br>Asynchronous (e-mail) | | Evidence-base:<br>Level III-IV<br>Changes decision-making and high satisfaction as in—time<br>Medical:<br>Not applicable<br>Other:<br>Not applicable | Formal<br>UC Davis M.I.N.D. Institute PACTNET: multispecialty, 1997–2002<br>Many informal<br>UC Davis Telepsychiatry Program, 1996–2013 |
| 2 | Case Reviews or Virtual Grand Rounds | Communication in conference with interdisciplinary team | Administrative<br>Team-based learning on cases with application to other patients<br>Occasional educational presentations | Evidence-base:<br>Educational, if CME offered<br>Medical:<br>Not applicable | Southern Illinois University<br>SCAN-ECHO at U. New Mexico |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| 1.5 | Group education or one-time traditional evaluation | Primary team members are the care coordinator or manager, group educators, and prn BH clinician or psychiatrist | |
| 1 | Patient and caregiver health education | Options<br>Website information<br>Support/chat groups or "communities"<br>Formal educational materials<br>Sources of information from care coordinators, websites, or national organizations | General public<br>Disorder specific (e.g., mood)<br>Population specific (e.g., veterans)<br>Other? |

ADHD = attention-deficit hyperactivity disorder; AUDIT = Alcohol Use Disorders Identification Test; BDI = Beck Depression Inventory; CBT = cognitive-behavioral therapy; CME = continuing medical education; ED = emergency department; EHR = electronic health record; GAD = Generalized Anxiety Disorder; GAF = Global Assessment of Function; IBH = integrated behavioral health; MD = medical doctor; MH = mental health; NP/PA = nurse practitioner/physician assistant; PHQ = Patient Health Questionnaire; PSM = psychosomatic medicine; QOL = quality of life; SCAN-ECHO = Specialty Care Access Network-Extension of Community Health care Outcomes; SW = social work; ED = emergency department.

\* *Notes:* Model programs or descriptions are also provided, if they exist (scientist et al.); this refers not to a specific paper but to the work of individual investigators or teams. A reference number is provided if the author's work was summarized in the article; otherwise, the reader can search the scientist's/team's body of work.

† Health care organization and administration systems traditionally include 5 integrative care components: clinical responsibility and decision-making; colocation of services; integrated funding; integrated program evaluation; and integrated outcome measurement.

‡ We have added 2 more: an e-platform with a registry and other technologies; and reimbursement alignment with clinical system goals.

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

adapted to the integration of BH care into primary care.[44]

Tele-interventions to the home have focused on geriatric populations, mainly, with PSM playing a role RCTs for telehealth include: problem-solving for depression and disability[45]; nurse-based daily tele-monitoring of depressive symptoms and medication use for depression and self-efficacy[46]; and interventions for congestive heart failure with biometric and nonbiometric sensors for data management.

### Collaborative Care

Collaborative care is a systematic approach to the treatment of depression and anxiety in primary care settings that involves the integration of care managers and consultant psychiatrists, with PCP oversight; it has improved access to evidence-based BH treatments for patients.[47] Care managers (e.g., nurse or clinical social worker) conduct structured outreach encounters with patients—between visits to the PCP, a consulting psychiatrist, on-site therapists, and others—to engage patients, activate them, promote self-management, and treatment adherence. Practice-based measurement is facilitated by a population registry[14] and TP provides flexibility and access to core components at a distance.

TP collaborative care appears to have robust effect and this may be a population level[14]; the question is whether it can be practically disseminated or is generalizable.

### Stepped Care

Stepped care employ intensive interventions (e.g., psychiatrist time) when less intensive interventions prove to be insufficient for depression in primary care.[48–50] Guidelines from England and New Zealand describe components for managing common psychiatric illness, including depression and anxiety.[51] A review of 14 stepped care RCTs' study quality, interventions, and outcomes showed a moderate effect on depression,[50] and another of 5 databases and 10 RCTs showed better outcomes with stepped care prevention and treatment than care-as-usual.[52]

Only 1 study functioned as a TP stepped care model[31] as part of a larger research program.[10,35]

### Integrated Care

For integrated care, a team of primary care and BH clinicians work together with patients and families using a systematic and cost-effective approach to provide patient-centered experiences to address health behaviors, medical illness, life stressors and crises, mental illness, substance, and ineffective patterns of health care utilization. Models usually stratify patients in quadrants determined by the setting. In outpatient care, they are 4 quadrants: I, low systemic illness and psychiatric illness; II, low medical and high BH; III, low BH and high medical; and IV, high for both.[53,54] A psychiatrist as a consultant and BH case manager improve medical outcomes,[55,56] including patient functional ability,[57] fewer days disabled,[57] increased quality-adjusted life years, and increased adherence to medication.[57]

Medical inpatient units have a stronger PSM/C-L role for education and support and less formal collaborative care models. For the psychiatric outpatient and emergency settings, there has been little to no medical care integration. Good integration of dietetics/nutrition occurs within inpatient psychiatry unit. BH providers working in an integrated care model leverage skills through consultative and team-based roles to help others treat BH disorders. For patients seen, integrated care encounters typically are briefer and more problem-focused than traditional specialty BH encounters.

Confusion has occurred when the terms "integrated care" and "collaborative care" are used interchangeably, and when the integration refers to combining BH and substance services.

Regarding integrated care, surprisingly, technology has not been included and or evaluated/studied as a core component as suggested here. A TP integrated care model has been described, but not fully implemented or evaluated.[8,17] Modern information technologies can support integrate care pathways by patient empowerment and the monitoring of care provided by multidisciplinary teams, but a review of 24 projects from the European Innovation Partnership on Active and Healthy Ageing found that interventions vary and studies did not adequately set outcome and performance targets.[58]

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

**TABLE 5.** Telebehavioral Health Options for PSM/CL Psychiatry: Continuum From Internet Health Education, Self-Help, Social Media, Psychiatric/Behavioral Health Apps to Telepsychiatry

| Level | Source/entry | Initiator goals/aims | Questions and perspectives | Liabilities | PSM/CL angles |
|---|---|---|---|---|---|
| 1 | Website information | Health information: gain perspective, obtain standard, and updated info; Refer patients to options for cognitive (e.g., delirium) and somatic symptom disorders | Do I need more information? How should I approach the problem? What is out there? My doctor may know | Quality of information and lack of regulation; less of an issue if referred to site | Good marketing opportunity for PSM/CL to patients, families, and colleagues in medicine/surgery |
| 2 | Support/chat groups or "communities" | Patient: education; Caregivers: answers, tips, and perspectives on coping and supporting patients | What should I/we do or what are others doing? | Peer compatibility? Information quality | May help with adjustment to less common medical problems |
| 3 | Formal educational materials | Person/patient: education; Caregiver: education, supports, and advice; Clinician: continuing medical education (CME) | Can I improve myself this way? I need "sound" info; I can track how things do and document progress | Not as good as real interaction; May not fit some folks' learning style | Refer to PSM/CL sites by members or develop "approved" sites |
| 4 | Self-directed assessment | Person/patient: good habits, reflection tips; Caregiver: reflection tips, tools to assess loved ones; Clinician: tips on clinical care, options to refer patients | If I have limited resources, what can I accomplish? Should I take the next step in seeking help? Can my patients do some of this outside the office? | Not all problems can be self-assessed; Some illnesses affect our insight; Is it "really good," though? | PSM/CL clinicians can refer to regular sites or those with specifics |
| 5 | Self-care decision-making options | Person/patient/caregiver: additional options; change current plan; Clinician: skepticism unless known commodity | Should I take the next step in seeking help? Can my patients do some of this outside the office? | What if it depends on…should I do A or B? | Information on topics like the living will; Interdisciplinary team members may also like |
| 6 | Assisted self-care assessment and decision-making; deidentified | Person/patient/caregiver: empowering; Clinician: distributes my skills well? | Empowering and increased self-efficacy/confidence in next step? Impersonal | Make "bad" decisions owing to lack of context? Risky if dangerous? | Link with social work, hotline or clinic, if needed |
| 7 | Social media (SM) 1- or 2-way (inadvertent vs. purposeful) | Easy and convenient; Likely more convenient for 1 time use; Good option if both patient and clinician prefer | Can be a positive/negat vi ve for therapeutic alliance; Sets up patient's expectation for future response from clinician; Should establish do's and don'ts on SM use | Not HIPAA compliant; Busy PSM/CL clinicians may not have time and need to see if it is "value added" | Important to set expectations, limits and boundaries around time and content of matter |
| 8 | Asynchronous, between-session patient-clinician contact (e.g., mobile health with app or e-mail/text) | Person/patient/caregiver has minor question or needs a detail → e-mail/text; tracking symptoms → app; Clinician: e-mail/text is good for quick, simple advice; apps good for monitoring disorder; All: integrate information flow (e.g., apps, questionnaires, reports, surveys) into EHR | Convenient to reach the clinician or team member? Easier for teen patients, who prefer texting over calling? Build into the EHR for data-informed decisions; Is the contact/work flow private, documented, and billable? | Align 1–2 apps with 1–2 purposes to focus; E-mail/text: errors, miscommunication; HIPAA compliant? Some see as a value, but it takes extra time and may not be billable | Provide training for faculty and team; Mobile health has integrative power for PSM/CL; Need evidence-based app and evidence-based approach in using it |

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

| TABLE 5 (continued) | | | | | |
|---|---|---|---|---|---|
| Level | Source/entry | Initiator goals/aims | Questions and perspectives | Liabilities | PSM/C-L angles |
|  | Asynchronous, with formal e-platform for patient assessment and PCP-directed care | Clinic/PCPs setup operation with the psychiatrist at a distance | Do PCPs, medical assistants or other staff do the video screening | Need to ensure informed consent and HIPAA compliance | Reasonably efficient and if unsuccessful, proceed to in-person or TP care |
| 9 | Synchronous, traditional or TMH care | Person/patient: it really works and is much more convenient. Clinician: if patients like it, it is a good option | There is no shortcut to synchronous decision-making (patient-clinician; primary care-psychiatry) | It always has to be scheduled (and paid for) | A great option; not always needed owing to lesser, easier options |
| 10 | De facto hybrid care (synchronous and asynchronous technology) toward integrated care | Person/patient: we connect in different ways. Clinician: ad hoc to planned; I am "in" the patient's life | Is there a best way to do this? A multimodal approach | Requires discussion, prioritization and feedback/learning. Takes willingness to change, time and $ | Folks will shift if health care financing shifts? Paradigm shift is needed |

EHR = electronic health record; HIPAA = Health Insurance Portability and Accountability Act of 1996; PSM/C-L = psychosomatic medicine/consultation-liaison; PCP = primary care provider; TMH = telemental health.

## Analysis of the Application of TP to Collaborative, Stepped and Integrated Care Models, and Tiering Effect

Models of care may be organized with regard to clinical features, health care organization and administration (based on 7 factors), and outcome evaluation (Table 4). For the purpose of illustration, a case example of a patient with comorbid diabetes mellitus with depression was used. Health care organization and administration systems traditionally include 5 integrative care components: clinical responsibility and decision-making; colocation of services; integrated funding; integrated program evaluation; and integrated outcome measurement. We have added 2 more: an e-platform with a registry and other technologies and reimbursement alignment with clinical system goals. Model programs or descriptions are also provided, by including names of the individual investigators or teams.

Technology can leverage roles in a stepped, collaborative, or integrated care model. It is convenient if staff are physically colocated—part of that involves work with the PCP and planning next steps—but some of them and other professionals may be better leveraged at a distance. It is convenient if staff are physically colocated with the PCP, TP, or a manager for easy access to clinical supervision. Care managers encounters can be effectively conducted by telephone or secure messaging.[59] The addition of a teletherapist for evidence-based therapy to post-traumatic stress disorder patients mediated the intervention effect.[14]

## The New TBH Continuum of Services

Technology-based services exist on a continuum[9]—defined as "services and information delivered or enhanced through the Internet and related technologies"[60]—for patients/families/caregivers, interdisciplinary team members/PCPs, and psychiatrists (Table 5).[9] The range is: Internet information—self-help/support groups to psychoeducation classes—self-assessment and care (e.g., depressive disorder)—clinician professional education to informal online consultation online—informal asynchronous clinician communication (e.g., e-mail/text social media/networking)—purposeful asynchronous care coordination (e.g., e-mail/text, mobile health and apps, and ATP)—STP/video and hybrid models with

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

combinations to complementing in-person or TP services.[9] Many of these e-options could be used in PSM practice for primary care services and education, particularly mobile apps for self-help in dealing with anxiety disorders, well-being, and stress reduction; 69% of the US adult population track at least 1 health indicator, such as activity, weight, or symptoms.[61] Caregivers of loved ones with a major neurocognitive disorder and other psychiatric disorders use many options, too.[62]

## DISCUSSION

There are a variety of TP or TBH service delivery options available, but the key ingredients of a "good" model are fairly consistent: easy access, low cost, in-time help to the user (e.g., person, patient, and consultee), and meaningful outcomes. For that reason, 1 recent review strongly suggested that high-intensity models have substantially better outcomes; mid and low intensity models have many intangible benefits (e.g., building relationships, complementing in-person services by providing missing services) and appear more sustainable (Table 3). If one were to generalize according to effect and outcomes (Table 4), the following tiering is reasonable: level 4 (or top) quartile includes collaborative, stepped, and integrated care; level 3 includes the consultation care model and ATP; level 2 involves doctor/nurse practitioner-to-specialist consultations by telephone, e-mail, and other modes; and level 1 has the rest of the TBH options (Table 5).

Overall, the best researched model is collaborative care—it has population level impact but may not be feasible for all those interested in using TP—so in this era, model selection should be determined by patient-, provider-, clinic-, and system objectives and goals and based on specific outcomes and available resources. Since PSM has been burdened at times with inadequate general funding or reimbursement, financial issues are paramount. Cost offset arguments have been the main argument for justifying PSM services, but a spectrum of e-options may provide value at low cost if researched and found effective by RCTs within current or new models. In the meantime, 4 recommendations are clear and convincing:

(1) outcome targets and interventions should be standardized for measurement;

(2) a population health approach should be used to spread the specialty services to the greatest number of patients;

(3) low intensity and TBH services—if researched and effective—should be broadly embraced to help triage persons/patients to intensive services and to prevent illness;

(4) interdisciplinary teams should use video and other technologies to implement a variety of evidence-based psychological treatments[5] based on competencies;[63] and

(5) an e-platform may be needed for infrastructure and to stage various telecare options.

Our priorities are to improve health care access and quality by using service delivery models—so what are the bottom lines related to primary and BH care services? Though it may sound surprising, a department, clinic, or system should be employing technology to facilitate care—and if not—perhaps a consultation for a needs assessment is in line. Day-to-day effect is important, but overall, it is going to be defined at the population level.[14,36] The consultation care model has heuristic value, but limited effect on depressive disorder[64] and the TP version could hardly be expected to improve this, unless it is wielded in a different or more robust way. In planning stepped care and integrated care, TP is indicated and more research is indicated. The same is true with hybrid in-person and technology models or using 2 technologies in combination;[16] there are existing prototypes for mixed models.[65]

Limitations of this report are many, despite its capture of the existing evidence bases in TP, service delivery models, and PSM consultation models to primary care.

- First, this article cannot cover the breadth and depth of the existing database on TP, but it summarizes key findings. Indeed, not all studies could be discussed (e.g., Table 1) and had to be summarized.

- Second, the model intensity framework has heuristic value, but it is not based on empiric data nor has it gone through a Delphi consensus process; it is based on collaborative work with many primary care systems and input from health care delivery model experts.

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

- Third, more research is needed on TP stepped, integrated, and collaborative care and models particularly at the population level.[14]

## CONCLUSIONS

TP improves access to care, leverages a wide range of treatments at a distance, and provides outcomes, which are as good as in-person care. PSM psychiatrists have had significant affect with TP in terms of clinical, educational, and research outcomes. Based on existing evidence, TP collaborative care currently has more affect than other TP models; stepped and integrated care models need further evaluation. TBH technologies may complement current TP models (e.g., collaborative care) and be less expensive, and more flexible. The idea of low, moderate, and high-intensity interventions—based on technology, specialist time, and service delivery model—could benefit from more evaluation in terms of operational components and effect on care. An effective approach to care matches the intensity of the services to the needs of a patient population or clinic, standardizes interventions, and optimizes care based on an e-platform that facilitates different models of care.

*Acknowledgments: The late Wayne J. Katon, MD, Friend, Mentor, Leader, Ambassador, Researcher, Clinician, and Teacher.*

*Academy of Psychosomatic Medicine Telemental Health Interest Group.*

*American Telemedicine Association Telemental Health Interest Group.*

*UC Davis SOM Graduate Group of Informatics, Department of Psychiatry & Behavioral Sciences, and Center for Health and Technology.*

*University of Washington SOM, Department of Psychiatry & Behavioral Sciences, Global Health Program, and Telemedicine Department.*

*Disclosure: The authors disclosed no proprietary or commercial interest in any product mentioned or concept discussed in this article.*

**References**

1. Regier DA, Goldberg ID, Taube CA: The de facto US mental health services system. Arch Gen Psychiatry 1978; 46:971–982
2. Druss BG, Zhao L, Von Esenwein S, et al: Understanding excess mortality in persons with mental illness: 17-year follow up of a nationally representative US survey. Med Care 2011; 49:599–604
3. Rost K, Zhang M, Fortney J, et al: Rural-urban differences in depression treatment and suicidality. Med Care 1998; 36 (7):1098–1107
4. Hilty DM, Lim RF, Nasatir-Hilty SE, et al: Planning for telepsychiatric consultation: a needs assessment for cultural and language services at rural sites in California. J Rural Mental Health 2015; 39(3-4):153–161
5. Hilty DM, Ferrer D, Parish MB, et al: The effectiveness of telemental health: a 2013 review. Telemed J E-Health 2013; 19(6):444–454
6. Hilty DM, Yellowlees PM, Cobb HC, et al: Models of telepsychiatric consultation-liaison service to rural primary care. Psychosomatics 2006; 47(2):152–157
7. Hilty DM, Yellowlees PM, Nesbitt TS: Evolution of telepsychiatry to rural sites: change over time in types of referral and PCP knowledge, skill, and satisfaction. Gen Hosp Psychiatry 2006; 28(5):367–373
8. Hilty DM, Yellowlees PM, Parish MB, et al: Telepsychiatry: effective, evidence-based and at a tipping point in healthcare delivery. Psychiatr Clin North Am 2015; 38(3): 559–592

9. Hilty DM, Chan S, Torous J, et al: New frontiers in healthcare and technology: internet- and web-based mental options emerge to complement in-person and telepsychiatric care options. J Health Med Informatics 2015; 6(4):1–14
10. Hilty DM, Marks SL, Wegeland JE, et al: A randomized controlled trial of disease management modules, including telepsychiatric care, for depression in rural primary care. Psychiatry 2007; 4(2):58–65
11. Fortney JC, Pyne JM, Edlund MJ, et al: A randomized trial of telemedicine-based collaborative care for depression. J Gen Intern Med 2007; 22(8):1086–1093
12. Fortney JC, Kimbrell TA, Hudson TJ, et al: Pragmatic randomized trial of telemedicine based collaborative care for posttraumatic stress disorder. J Am Med Assoc Psychiatry 2015; 72(1):58–67
13. Fortney JC, Pyne JM, Mouden SP, et al: Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: a pragmatic randomized comparative effectiveness trial. Am J Psychiatry 2013; 170(4):414–425
14. Fortney J, Pyne JT, Turner E, et al: Telemedicine integration of mental health into rural primary care settings. Int Rev Psychiatry 2015; 27(6):525–539
15. Yellowlees PM, Odor A, Parish MB, et al: A feasibility study of asynchronous telepsychiatry for psychiatric consultations. Psych Serv 2010; 61(8):838–840
16. Myers K, vander Stoep A, Zhou C, et al: Effectiveness of a telehealth service delivery model for treating attention-

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

deficit hyperactivity disorder: results of a community-based randomized controlled trial. J Am Acad Child Adolesc Psychiatry 2015; 54(4):263–274

17. Hilty DM, Johnston B, McCarron RM: in Mucic D, Hilty DM, (ed) "How Telemental Health Adds to Traditional Outpatient and Newer Models of Integrated Care for Patients, Providers and Systems" in Key Issues in e-Mental Health.  New York, NY: Springer Publishing; 2015, pp. 129–150

18. American Telemedicine Association. ATA practice guidelines for video-based online mental health services. Telemed J E Health 2013; 19(9):722–730, http://dx.doi.org/10.1089/tmj.2013.9989

19. Myers KM, Nelson EL, Hilty DM, et al:  American Telemedicine Association: practice guideline for child and adolescent telemental health. Telemed J E Health 2017; 23 (10):779–804

20. Richardson LP, Ludman E, McCauley E, et al:  Collaborative care for adolescents with depression in primary care: a randomized clinical trial. J Am Med Assoc 2014; 27(8): 809–816 312

21. Shore JH, Mishkind MC, Bernard J, et al:  A Lexicon of assessment and outcome measures for telemental health. Telemed J E Health 2013; 3:282–292

22. Backhaus A, Agha Z, Maglione ML, et al:  Videoconferencing psychotherapy: a systematic review. Psychol Serv 2012; 9(2):111–131

23. Nelson EL, Duncan AB, Lillis T: Special Considerations for Conducting Psychotherapy via Videoconferencing. in Myers K, Turvey CL, (ed) Telemental Health: Clinical, Technical and Administrative Foundations for Evidenced-Based Practice. San Francisco, CA: Elsevier; 2013, pp. 295–314

24. Tse YJ, McCarty CA, Vander Stoep A, Myers KM: Teletherapy delivery of caregiver behavior training for children with attention-deficit hyperactivity disorder. Telemed J E-Health 2015; 21(6):451–458

25. Hilty DM, Crawford A, Teshima J, et al:  A framework for telepsychiatric training and e-health: competency-based education, evaluation and implications. Int Rev Psychiatry 2015; 27(6):569–592

26. Hilty DM, Doarn C, Armstrong A, et al: A Framework for Telemedicine Training and E-Health: Competency-Based Education, Evaluation and Implications, Short Course, American Telemedicine Association, Minneapolis, MN, 2016

27. Cowley D, Dunaway K, Forstein M, et al:  Teaching psychiatry residents to work at the interface of mental health and primary care. Acad Psychiatry 2014; 38(4):398–404

28. Ratzliff A, Norfleet K, Chan YF, et al:  Perceived educational needs of the integrated care psychiatric consultant. Acad Psychiatry 2015; 39(4):448–456

29. Sunderji N, Crawford A, Jovanovic M: Telepsychiatry in graduate medical education: a narrative review. Academic Psychiatry 2015; 39(1):55–62

30. Crawford A, Sunderji N, López J, et al:  Defining competencies for the practice of telepsychiatry through an assessment of resident learning needs. BMC Med Educ 2016; 16(1):1, http://dx.doi.org/10.1186/s12909-016-0529-0

31. Neufeld JD, Bourgeois JA, Hilty DM, et al:  The e-mental health consult service: providing enhanced primary care mental health services through telemedicine. Psychosomatics 2007; 48:135–141

32. Hilty DM, Nesbitt TS, Kuenneth TA, Cruz GM, Hales RE: Rural versus suburban primary care needs, utilization and satisfaction with telepsychiatric consultation. J Rural Health 2007; 23(2):163–165

33. Ament BH, Wolfs CA, Kempen GI, et al:  The benefit of a geriatric nurse practitioner in a multidisciplinary diagnostic service for people with cognitive disorders. BMC Res Notes 2015; 8:217, http://dx.doi.org/10.1186/s13104-015-1189-6

34. Deen TL, Godleski L, Fortney JC: A description of telemental health services provided by the Veterans Health Administration in 2006-2010. Psychiatr Serv 2012; 63: 1131–1133

35. Yellowlees PM, Hilty DM, Marks SL, et al:  A retrospective analysis of child and adolescent e-mental health. J Am Acad Child Adolesc Psychiatry 2008; 47(1):1–5

36. Dobbins ML, Roberts N, Vicari SK, et al:  The consulting conference: a new model of collaboration for child psychiatry and primary care. Acad Psychiatry 2011; 35:260–262

37. Arora S, Kalishman S, Dion D, et al:  Partnering urban academic medical centers and rural primary care clinicians to provide complex chronic disease care. Health Aff (Project Hope) 2011; 30:1176–1184

38. Vahia IV, Ng B, Camacho A, Cardenas V, et al:  Telepsychiatry for neurocognitive testing in older rural latino adults. Am J Geriatr Psychiatry 2015; 23(7):666–670

39. Lustig A, Ogden M, Brenner RW: The central role of physician leadership for driving change in value-based care environments. J Manag Care Spec Pharm 2016; 22(10): 1116–1122

40. Garber AM: Evidence-based guidelines as a foundation for performance incentives. Health Aff 2005; 24(1):174–179

41. Tseng EK, Hicks TK: Value based care and patient-centered care: divergent or complementary? Curr Hematol Malig Rep 2016; 11(4):303–307

42. Rosenthal TC: The medical home: growing evidence to support a new approach to primary care. J Am Board Fam Med 2008; 21(5):427–440

43. Cené CW, Johnson BH, Wells N, et al:  A narrative review of patient and family engagement: the "foundation" of the medical "home". Med Care 2016; 54(7):697–705, http://dx.doi.org/10.1097/MLR.0000000000000548 Review. PMID: 27111748

44. Unützer J, Schoenbaum M, Druss BG, Katon WJ: Transforming mental health care at the interface with general medicine: report for the presidents commission. Psychiatr Serv 2006; 57(1):37–47

45. Choi NG, Marti CN, Bruce ML, et al:  Six-month post-intervention depression and disability outcomes of in-home telehealth problem-solving therapy for depressed, low-income homebound older adults. Depress Anxiety 2014; 31(8):653–661

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

An Update on Telepsychiatry

46. Gellis ZD, Kenaley BL, Ten Have T: Integrated telehealth care for chronic illness and depression in geriatric home care patients: the Integrated Telehealth Education and Activation of Mood (I-TEAM) study. J Am Geriatr Soc 2014; 62(5):889–895

47. Katon W, Von Korff M, Lin E, et al: Collaborative management to achieve depression treatment guidelines. J Clin Psychiatry 1997; 58(Suppl 1):20–23

48. Katon W, Von Korff M, Lin E, et al: Stepped collaborative care for primary care patients with persistent symptoms of depression: a randomized trial. Arch Gen Psychiatry 1999; 56(12):1109–1115

49. Lin EH, VonKorff M, Russo J, et al: Can depression treatment in primary care reduce disability? A stepped care approach Arch Fam Med 2000; 9(10):1052–1058

50. van Straten A, Hill J, Richards DA, Cuijpers P: Stepped care treatment delivery for depression: a systematic review and meta-analysis. Psychol Med 2015; 45(2):231–246

51. NICE. NICE Clinical Guidelines 90 and 91 Depression: Treatment and Management of Depression in Adults, Including Adults With a Chronic Physical Health Problem 2009. Available from: http://www.nice.org.uk/nicemedia/live/12329/45890/45890.pdf. Accessed November 15, 2017

52. Ho FY, Yeung WF, Ng TH, Chan CS: The efficacy and cost-effectiveness of stepped care prevention and treatment for depressive and/or anxiety disorders: a systematic review and meta-analysis. Sci Rep 2016; 6:29281, http://dx.doi.org/10.1038/srep29281 PMID: 27377429

53. Davis MH, Everett A, Kathol R, et al: American Psychiatric Association Ad Hoc Work Group Report on the Integration of Psychiatry and Primary Care 2011 Available at: http://naapimha.org/wordpress/media/Integration-of-Psychiatry-and-Primary-Care.pdf. Accessed November 15, 2017

54. Hussain M, Seitz D: Integrated models of care for medical inpatients with psychiatric disorders: a systematic review. Psychosomatics 2014; 55(4):315–325

55. Dobscha SK, Corson K, Perrin NA, et al: Collaborative care for chronic pain in primary care. J Am Med Assoc 2009; 301:1242–1251

56. Unützer J, Katon W, Callahan CM, et al: Collaborative care management of late-life depression in the primary care setting. J Am Med Assoc 2002; 288:2836–2845

57. Simon GE, Katon WJ, Lin EHB, et al: Cost-effectiveness of systematic depression treatment among people with diabetes mellitus. Arch Gen Psychiatry 2007; 64(1):65–72

58. Vrijhoef HJ, de Belvis AG, de la Calle M, et al: IT-supported integrated care pathways for diabetes: a compilation and review of good practices. Int J Care Coord 2017; 20(1-2):26–40, http://dx.doi.org/10.1177/2053434517714427. Epub 2017 Jun 14. PMID: 28690856

59. Simon GE, Ludman EJ, Tutty S, Operskalski B, Von Korff M: Telephone psychotherapy and telephone care management for primary care patients starting antidepressant treatment: a randomized controlled trial. J Am Med A 2004; 292(8):935–942

60. Christensen H, Griffiths K, Evans K: E-Mental Health in Australia: Implications of the Internet and Related Technologies for Policy. Canberra: Commonwealth Department of Health and Ageing; 2002

61. Chan S, Torous J, Hinton L, Yellowlees P: Towards a framework for evaluating mobile mental health apps. Telemed J E-Health 2015; 21(12):1038–1041

62. Hu C, Kung S, Rummans TA, Clark MM, Lapid M: Reducing caregiver stress with internet-based interventions: a systematic review of open-label and randomized controlled trials. J Am Med Inform Assoc 2015; 22(e1):e194–e209

63. Cape J, Whittington C, Bower P: What is the role of consultation-liaison psychiatry in the management of depression in primary care? A systematic review and meta-analysis Gen Hosp Psychiatry 2010; 32:246–254

64. Zatzick D, Rivara F, Jurkovich G, et al: Enhancing the population impact of collaborative care interventions: mixed method development and implementation of stepped care targeting posttraumatic stress disorder and related comorbidities after acute trauma. Gen Hosp Psychiatry 2011; 33(2):123–134

65. Hilty DM, Maheu M, Drude K, et al: Telebehavioral health, telemental health, e-therapy and e-health competencies: the need for an interdisciplinary framework. J Technol Behav Sci. https://doi.org/10.1007/s41347-017-0036-0

Downloaded for Anonymous User (n/a) at Arrowhead Regional Medical Center from ClinicalKey.com by Elsevier on July 06, 2018.
For personal use only. No other uses without permission. Copyright ©2018. Elsevier Inc. All rights reserved.

# AACAP OFFICIAL ACTION

# Clinical Update: Telepsychiatry With Children and Adolescents



American Academy of Child and Adolescent Psychiatry (AACAP) Committee on Telepsychiatry and AACAP Committee on Quality Issues

This Clinical Update reviews the use of telepsychiatry to deliver psychiatric, mental health, and care coordination services to children and adolescents across settings as direct service and in collaboration with primary care providers or other clinicians. The update defines terms and presents the current status of telepsychiatry as a mode of health service delivery. The update presents procedures for conducting telepsychiatry services and optimizing the clinical experience.

**Key words:** telepsychiatry, telemental health, telemedicine, telehealth, e-health

J Am Acad Child Adolesc Psychiatry 2017;56(10):875–893.

The past 2 decades have brought new approaches to effective psychotherapies and pharmacotherapies for the 20% of the nation's youth diagnosed with psychiatric disorders.[1] More individuals are seeking care,[2] and the Patient Protection and Affordable Care Act[3] has broadened eligibility for mental health services.[3] However, most youth with psychiatric conditions do not receive any intervention.[4,5] These deficits in access to mental health care reflect the shortages of child and adolescent mental health specialists, a maldistribution of available specialists, the "aging-out effect" of the psychiatric workforce,[6-9] and insufficient funding to sustain a stable workforce for public mental health programs.[10,11] These access deficits disproportionately affect children and adolescents living outside major metropolitan areas and in inner-city communities.[8,12-15] New approaches to meeting this demand are needed.

Technology makes it possible to increase access to health care using real-time, interactive videoconferencing that allows clinicians and patients at different locations to interact as if meeting in the same room. When videoconferencing is used to deliver medical care, the term *telemedicine* is used, and when specifically used to deliver psychiatric care, the term *telepsychiatry* is used. Telepsychiatry requires little adaptation to provide care comparable to usual in-person care, because emphasis is on verbal communication, nonverbal communication, and clinical observations.

This flexibility has made telepsychiatry a reasonable alternative to office visits for patients who cannot readily access needed care and addresses the workforce shortage and maldistribution of child and adolescent psychiatrists.[16,17] Telepsychiatry extends the psychiatrist's reach across large geographic areas to youth in different community settings, including primary care offices, schools, daycare facilities, detention centers, and homes. As its usefulness is established, telepsychiatry is increasingly being used within smaller geographic areas to augment and improve the quality of care available to selected populations.

As various technical, interpersonal, and financial barriers to telepsychiatry fall, programs are proliferating across the country. Clinical guidance for telepsychiatry is needed to shape practice models, identify provider training needs, and ensure that the quality of care meets the standards of traditional in-person care.

This Clinical Update renews the prior American Academy of Child and Adolescent Psychiatry (AACAP) Practice Parameter for Telepsychiatry With Children and Adolescents[18] and responds to calls for further clinical guidance on this topic.[19] Because of the limited empirical evidence base, this update draws from child-specific telemental health research (Table 1),[20-60] guidelines for evidence-based psychotherapies,[61] the general telemental health evidence base,[62] and expertise of child and adolescent telepsychiatry providers.[23,35,41,63-71]

Telepsychiatry, like all telemedicine, is not a separate medical specialty. Products and services are part of a larger investment by health care institutions in information technology or delivery of clinical care. The telemedicine landscape is rapidly evolving. This Clinical Update provides a scaffold for integrating new technologies and evolving therapeutic interventions into a service delivery model for youth who are underserved by traditional models of care, for those who seek to augment their traditional sources of care, and for psychiatrists who seek to diversify their practices and improve the quality of their care. Modifications and updates will be needed as the field evolves.

## METHODOLOGY

A medical librarian conducted a systematic review of the literature in April 2016 and updated the search through March 2017. Searches were performed in the following databases—on the Ovid platform: Medline, PsycInfo, Cochrane Database of Systematic Reviews, and Cochrane Central Register of Controlled Trials; elsewhere: Embase, Web of Science, and the National Guideline Clearinghouse. Retrieval was limited to publication dates from January 2004


The Clinical Update series is discussed in an editorial by Drs. Heather J. Walter and Oscar G. Bukstein on page 811.


This article can be used to obtain continuing medical education (CME) at www.jaacap.org.

**TABLE 1**  Evidence-Base Supporting Child and Adolescent Telepsychiatry

| Citation | Sample | Assessment | Findings |
|---|---|---|---|
| **Randomized controlled trials** | | | |
| Nelson et al., 2003[20] | 28 youth (age 8—14 y; mean 10.3 y) with depression | diagnostic interview and scale | comparable improvement of depressive symptoms in response to therapy delivered in person or through ITV |
| Storch et al., 2011[21] | 31 youth (age 7—16 y; mean 11.1 y) with OCD | ADIS-IV-C/P, CY-BOCS, COIS, MASC, CDI, satisfaction with services | ITV was superior to in-person care on all primary outcome measurements, with significantly larger percentage of individuals in the ITV group meeting remission criteria |
| Himle et al., 2012[22] | 20 children (age 8—17 y) with Tourette's disorder or chronic motor tic disorder | YGTS, PTQ, CGI-S, CGI-I | youth in ITV and in-person service delivery modalities experienced significant tic decrease with no between-group differences |
| Myers et al., 2015[23] | 223 youth (age 5.5—12.9 y) with ADHD | DISC-IV, CBCL, VADPRS, VADTRS, CIS | caregivers reported improved inattention, hyperactivity, combined ADHD, ODD, role performance, and impairment; teachers reported improvement in ODD and role performance |
| Xie et al., 2013[24] | 22 children (age 6—14 y) with behavioral disorder | PCQ-CA, VADPRS, CGAS | parent training through ITV was as effective as in-person training and was well accepted by parents |
| Tse et al., 2015[25] | 38 children (age 5.5—12 y) with ADHD | VADRS, CIS, PSI, CSQ, PHQ-9, FES | parents of children with ADHD received parent training in person or through ITV; children in the 2 groups improved comparably; parents' distress did not change for those who received training through ITV |
| Comer et al., 2017[26] | children 3—5 y old with disruptive behaviors | K-DBDS, CGI-S CGI-I; CGAS, ECBI, CBCL, CSQ-8, TAI | children's behaviors improved comparably for PCIT and i-PCIT service models |
| **Pre-post or comparison studies** | | | |
| Glueckauf et al., 2002[27] | 22 adolescents (mean age 15.4 y; 100% Caucasian), 36 parents | SSRS, WAI, issue-specific measurements of family problems, adherence to treatment | improvement for problem severity and frequency in all conditions; therapeutic alliance high; teens rated alliance lower in ITV format |
| Fox et al., 2008[28] | 190 youth (age 12—19 y; mean 17 y) in juvenile detention | GAS | improvement in rate of attainment of goals associated with family relationships and personality and behavior |
| Yellowlees et al., 2008[29] | 41 children in e-mental health program | CBCL | retrospective assessment of 3-mo outcomes with a convenience sample found improvements in the Affect and Oppositional domains of CBCL |
| Reese et al., 2012[30] | 8 children (mean age 7.6 y; 12.5% Asian) | ADHD | families reported improved child behavior and decreased parent distress with ITV format of Group Triple P Positive Parenting Program |

**TABLE 1** Continued

| Citation | Sample | Assessment | Findings |
|---|---|---|---|
| Heitzman-Powell et al., 2013[31] | 7 parents; youth age not reported | OASIS training program | parents increased their knowledge and self-reported implementation of behavioral strategies |
| **Satisfaction studies** | | | |
| Blackmon et al., 1997[32] | 43 children (age 2–15 y; mean 9 y) | 12-item telemedicine consultation evaluation | all children and 98% of parents reported satisfaction equal to in-person care |
| Elford et al., 2001[33] | 30 children (age 4–16 y; mean 13 y) | satisfaction questionnaire | showed high satisfaction of children, teens, parents, and psychiatrists with ITV |
| Kopel et al., 2001[34] | 136; article does not specify age but refers to participants as "young persons" | satisfaction questionnaire | high satisfaction by families and rural health workers in New South Wales, Australia |
| Greenberg et al., 2006[35] | 35 PCPs, 12 caregivers; mean age of children 9.3 y | focus groups with PCPs, interviews with caregivers | PCP and caregiver satisfaction with telepsychiatry; frustration with limitations of local supports |
| Hilty et al., 2006[36] | 15 PCPs for children and adults; 400 patients (number of children not specified) | PCP Satisfaction Survey | PCP satisfaction was high and increased over time |
| Myers et al., 2007[37] | 172 patients (age 2–21 y) and 387 visits | 11-item Psychiatrist Satisfaction Survey | describes telepsychiatry services at 4 sites; high satisfaction of PCPs and reimbursement of services; pediatricians more satisfied than family physicians |
| Myers et al., 2008[38] | 172 patients (age 2–21 y) and 387 visits | 12-item Parent Satisfaction Survey | describes use of telepsychiatry by families and their high satisfaction with initial and return visits; less satisfied with care for adolescents than for younger children |
| Myers et al., 2010[39] | 701 patients (18% <7 y, 43% 7–12 y, 39% >12 y); 190 PCPs | collection of patient demographics and diagnoses | telepsychiatry with young people is feasible and acceptable |
| Pakyurek et al., 2010[40] | children and adolescents in primary care; 5 case studies | effectiveness of telepsychiatry in treating range of problems | video might actually be superior to in-person consultation |
| Lau et al., 2011[41] | 45 children and adolescents (age 3–17 y; mean 9.7 y) | description of patients referred for consultation, reason for consultation, treatment recommendations | ITV reached variety of children, with consultants providing diagnostic clarification and modifying treatment |
| Szeftel et al., 2012[42] | 45 patients, 31 <18 y old | retrospective chart review—medication changes, frequency of patient appointments, diagnostic changes, symptom severity and improvement | ITV led to changed Axis I psychiatric diagnosis (excluding developmental disorders) in 70% and changed medication in 82% of patients initially (41% at 1 y and 46% at 3 y); ITV helped PCPs with recommendations for developmental disabilities |
| **Descriptive and service usage** | | | |
| Myers et al., 2004[43] | 159 youth (age 3–18 y) | comparison of patients evaluated through ITV vs. in person | ITV patients were representative of usual outpatient population demographically, clinically, and by reimbursement; more "adverse case mix" for ITV sample |
| Myers et al., 2006[44] | 115 incarcerated youth (age 14–18 y) | 11-item satisfaction survey | described large series of incarcerated youth, including medication management |

**TABLE 1**  Continued

| Citation | Sample | Assessment | Findings |
|---|---|---|---|
| Jacob et al., 2012[45] | 15 children (age 4–18 y; mean 9.73 y) | 12-item Parent Satisfaction Survey | patient satisfaction high and PCPs found recommendations helpful; outcomes pending on follow-up |
| Nelson et al., 2012[46] | 22 youth (mean age 9.3 y) | chart review | no factor inherent to the ITV delivery mechanism impeded adherence to national ADHD guidelines |
| **Diagnostic validity** | | | |
| Elford et al., 2000[47] | 25 children (age 4–16 y) with various diagnoses | diagnostic interviews | 96% concordance between ITV and in-person evaluations; no differences in satisfaction |
| Stain et al., 2011[48] | 11 adolescents and young adults (age 14–30 y) | Diagnostic Interview for Psychosis | strong correlation of assessments done in person vs. ITV |
| Reese et al., 2013[49] | 21 children (age 3–5 y; 90% Caucasian) | ADOS Module 1, ADI-R, parent satisfaction | no difference in reliability of diagnostic accuracy, ADOS observations, ratings for ADI-R parent report of symptoms, and parent satisfaction between ITV and in-person groups |
| **Chart review** | | | |
| Marcin et al., 2005[50] | 223 patients (age 6 mo–84 y; mean 33 y; SD 19 y) including psychiatry and other specialties | chart review | teleconsultation resulted in changes in diagnosis and treatment and was associated with clinical improvement |
| Boydell et al., 2007[51] | 100 children and adolescents (age 2–17 y; mean 11 y) | chart review and interviews with case managers | pros and cons of adherence |
| **Psychosomatic pediatrics interventions** | | | |
| Bensink et al., 2007[52] | 8 youth (inclusion criteria for age is 2–18 y, but no specified age range or mean age for actual sample) | cost-minimization analysis, structured interviews | using ITV over videophone to families with a child diagnosed with cancer, the study noted technical feasibility and high parental satisfaction |
| Clawson et al., 2008[53] | 15 youth (age 8 mo–10 y) | family satisfaction, costs to family, psychiatrist satisfaction, clinical outcomes | ITV was feasible with the pediatric feeding disorder population and resulted in cost savings |
| Shaikh et al., 2008[54] | 99 youth (age 1–17 y) | retrospective review of patient medical records | ITV consultations resulted in substantial changes and additions to diagnoses; for a subset of patients, repeated ITV consultations led to improved health behaviors, weight maintenance, and/or weight loss |
| Witmans et al., 2008[55] | 89 children (age 1–18 y; mean 7.5 y) | sleep diary, childhood sleep habits, PQoL, client satisfaction | patients were very satisfied with the delivery of multidisciplinary pediatric sleep medicine services over ITV |
| Mulgrew et al., 2011[56] | 25 youth (age 4–11 y) | consulting psychiatrists' listening skills; ease of understanding instruction delivered to patients and their families; comfort level of parents in discussing health concerns | no significant difference in parent satisfaction between consultations for weight management delivered by ITV or in person |
| Davis et al., 2013[57] | 58 youth (age 5–11 y; mean 8.6 y) | BMI; 24-h dietary recall, ActiGraph, CBCL, Behavioral Pediatrics Feeding Assessment Scale | both groups showed improvements in BMI, nutrition, and physical activity, and groups did not differ significantly on primary outcomes |

**TABLE 1** Continued

| Citation | Sample | Assessment | Findings |
|---|---|---|---|
| Freeman et al., 2013[58] | 71 youth (ITV: mean age 15.2 y; in person: mean age 14.9 y) | baseline metabolic control, CBQ, Diabetes Responsibility and Family Conflict Scale, WAI | no differences were found in therapeutic alliance between groups |
| Hommel et al., 2013[59] | 9 youth (mean age 13.7 y) | pill count, PHBI, Pediatric Ulcerative Colitis Activity Index, Feasibility Acceptability Questionnaire | ITV approach resulted in improved adherence and cost-savings across patients |
| Lipana et al., 2013[60] | 243 youth (mean age 11 y) | review of medical records | using a nonrandomized design, the ITV group demonstrated more improvement than the in-person group in enhancing nutrition, increasing activity, and decreasing screen time |

Note: ADHD = attention-deficit/hyperactivity disorder; ADI-R = Autism Diagnostic Interview—Revised; ADIS-IV-C/P = Anxiety Disorders Interview Scale—DSM-IV—Parent and Child Versions; ADOS = Autism Diagnostic Observation Scale; BMI = body mass index; BPFAS = Behavioral Pediatrics Feeding Assessment Scale; CBCL = Child Behavior Checklist; CBQ = Conflict Behavior Questionnaire; CDI = Children's Depression Inventory; CGAS = Clinical Global Assessment Scale; CGH = Clinical Global Impressions of Improvement Scale; CGI-S = Clinical Global Impressions of Severity Scale; CIS = Columbia Impairment Scale; COIS = Child Obsessive Compulsive Impact Scale; CSQ = Caregiver Strain Questionnaire; CSQ-8: Client Satisfaction Questionnaire; CY-BOCS = Child Yale-Brown Obsessive Compulsive Scale; DISC-IV = Diagnostic Interview Scale for Children for DSM-IV; ECBI = Eyberg Child Behavior Inventory; FES = Family Empowerment Scale; GAS = Goal Attainment Scale; ITV = interactive televideo; K-DBDS = Kiddie Disruptive Behavior Disorders Schedule; MASC = Multi-dimensional Anxiety Scale for Children; OCD = obsessive-compulsive disorder; ODD = oppositional defiant disorder; PCIT = Parent-Child Interaction Therapy; PCP = primary care provider; PCQ-CA = Parent Child Relationship Questionnaire; PDD-NOS = pervasive developmental disorder, not otherwise specified; PHBI = Partial Harvey-Bradshaw Index; PHQ-9 = Patient Health Questionnaire—9 Items; PQoL = Pediatric Quality of Life; PSI = Parenting Stress Index; PTQ = Parent Tic Questionnaire; RCT = randomized controlled trial; SSRS = Social Skills Rating System (teen functioning); TAI = Therapy Attitude Inventory; VADPRS = Vanderbilt ADHD Parent Rating Scale; VADTRS = Vanderbilt ADHD Teacher Rating Scale; WAI = Working Alliance Inventory; YGTS = Yale Global Tic Severity Scale.

to March 2017, in the English language, and on human species. In Medline, PsycInfo, and Embase, appropriate Medical Subject Headings (MeSH), terms from the Thesaurus of Psychological Index Terms, and Emtree headings were used, respectively, in addition to text words, and the search strategy was adapted for other databases as appropriate. Terms searched were *telepsychiatry, telepsychology, telemental, telebehavioral medicine, teletherapy, telehealth, telepractice, telemedicine, video conferencing, remote consultation,* and *mental disorders.* The final 1,547 records screened after duplicates were removed included high-level studies such as meta-analyses (n = 146) and lower-level studies such as randomized controlled trials, intervention trials, pre-post interventions, case series, observational studies, and program descriptions (n = 1,346), as well as various expert opinions and experience (n = 55).

In addition to the systematic search, we included material from 3 other sources. We included book chapters from texts published by recognized leaders in telepsychiatry, particularly chapters addressing topics not well addressed in the research literature, such as ethics and cultural competence. Second, we retained several articles published before 2004 from the original Practice Parameter for Telepsychiatry With Children and Adolescents[18] because of their relevance to establishing a telepsychiatry practice. Third, we reviewed multiple websites. The most up-to-date information on telemedicine law, regulation, policy, models of care, prescribing, coding, and reimbursement are addressed on these dynamic websites. We also queried the telemental health special interest group of the American Telemedicine Association (ATA) and telemedicine clinicians at international and national centers regarding trending issues.

The evidence supporting telepsychiatry practice with adults greatly outweighs the evidence for practice with children and adolescents. Therefore, we included material gleaned from work with adults in diverse settings if deemed relevant to the feasibility, acceptability, sustainability, or effectiveness of telepsychiatry practice with youth.

The search methodology is depicted in Figure 1.

## DEFINITIONS

There is no clear definition of telehealth-related activities, and some agencies do not distinguish *telehealth* from *telemedicine.*[72-74] In this Clinical Update, we adhere to definitions from the Centers for Medicare and Medicaid Services (CMS). CMS defines *telehealth* as the use of telecommunications and information technology to provide access to health assessment, diagnosis, intervention, consultation, supervision, and information across distance.[75] The term *telehealth* describes a broad umbrella of services that involves telephones, facsimile machines, e-mail, and remote patient monitoring and interpretation. It does not necessarily meet the CMS definition of telemedicine.

The CMS notes that "for purposes of Medicaid, *telemedicine* seeks to improve a patient's health by permitting two-way, real-time interactive communication between the patient and the physician at the distant site. This electronic communication means the use of interactive telecommunications equipment that includes, at a minimum, audio and video equipment."[76] The CMS views telemedicine as a cost-effective alternative to the more traditional face-to-face method of care.[77,78]

**FIGURE 1**    Literature search flow diagram. Note: VTC = video teleconferencing.



When telemedicine is used to provide psychiatric and more general mental health services, the terms *telepsychiatry* and *telemental health* (TMH), respectively, are often used.[79,80] To optimize efficiency in terminology in this Clinical Update, we use the term *interactive televideo* (ITV) to encompass the broad range of clinical activities related to mental health services for children and adolescents delivered in real time through synchronous (2-way) interactions using video and audio electronic modalities. We reserve the specific terms *telepsychiatry, telemental health,* or *telemedicine* when referring, respectively, to psychiatric, mental health, or medical services rendered to children and adolescents through ITV.

Other terms and definitions relevant to this Clinical Update follow. A comprehensive glossary can be found at the ATA website.[81]

- *Applications or Platforms:* Technology used to provide videoconferencing, classified as standards based or consumer grade.[82,83]
- Standards-based applications and platforms, or "legacy hardware," offer the highest quality of audio and video and the most stable data connection. These proprietary, telephone-based systems transmit data over digital subscriber lines with high bandwidth ($\geq$1.5 Mb/s) over satellite or fiberoptic systems. These systems offer features such as the ability to zoom and pan and tilt cameras at the 2 sites and connect to multiple microphones and multiple monitor systems.
- Consumer-grade software platforms transmit data over the internet, and interface software runs on personal computers, tablets, and smartphones. When run off the

vendor's servers, this is referred to as *cloud-based computing.* Software vendors who advertise as telehealth solutions must provide appropriate software encryption and sign business associate agreements to comply with regulations of the Health Information Portability and Accountability Act (HIPAA).

- *Bandwidth:* Data that can travel through a communications network in a fixed period (expressed as kilobits per second). The higher the bandwidth, the more data that can be transmitted.
- *Broadband:* Transmission of signals in a frequency-modulated fashion over a segment of the total available bandwidth, permitting simultaneous transmission of messages.
- *CODEC:* Acronym for coder-decoder. A microchip that converts analog video and audio to digital and vice versa.
- *Frame and Frame Rate:* A video signal is composed of multiple still images, or frames. Their rate of display is determined by the bandwidth and quality of the camera and monitor. Broadcast-quality video used in most telepsychiatry work has 25 to 30 frames per second.
- *"Patient Site" (Patient's Location or Originating Site), "Psychiatrist Site" (Psychiatrist's Location or Distant Site):* Participants at each end of the ITV link. The CMS uses originating site for patient location and distant site for physician or psychiatrist location.
- *Telepresenter:* An individual located at the patient site who supports the patient and the psychiatrist. Telepresenters can include licensed professionals or allied health professionals depending on resources within the community.
- *Teletherapy:* Informally refers to any nonpharmacologic, psychotherapeutic interventions delivered through videoconferencing.
- *Young People or Youth:* Children and adolescents. If a section is specific to children or adolescents, we use that developmentally specific term.

## HISTORICAL REVIEW

As early as the 1920s, the potential for electronic media to influence people's health and health care was recognized with the launch of "The Radio Doctor."[84] Telephony added the ability for interactive, real-time, and personalized health care interactions between a physician and a patient. The first use of interactive video to deliver health care occurred at the University of Nebraska in 1959, when a closed-circuit television system was used for educational and medical purposes, mainly in psychiatry.[85] In 1973, the term *telepsychiatry* was first used to describe consultation services provided from the Massachusetts General Hospital to a medical site in Boston's Logan International Airport and the Bedford Veteran's Administration.[86] Shortly thereafter, telepsychiatry was reported with children and adolescents when the Mount Sinai School of Medicine connected to a child guidance clinic in East Harlem.[87] There was little further published activity until the 1990s, when internet and web-cam technologies

lowered financial and technical barriers to routine videoconferencing and the growth of telemedicine services.

The number of telepsychiatry programs and telepsychiatrists, particularly those serving children and adolescents, is unknown, but the growing options are evidenced by a simple search of the internet for "telepsychiatry jobs."

The ATA has captured the complex policy landscape of 50 states with 50 different telemedicine policies.[88] At this writing, their report indicates that at least 31 states have enacted telemedicine parity laws mandating commercial insurers to reimburse telemedicine services on par with in-person services. The CMS has established guidelines for telemedicine care and policies for reimbursement that include a small care coordination fee paid to the local site on a per-patient, per-month basis.[75,89,90] There is a national trend to approve statewide Medicaid coverage of telemedicine, instead of focusing solely on rural areas or designating a mileage requirement, and there is movement away from a clinical site "hub-and-spoke" model in favor of reaching patients in nontraditional service sites, such as schools (23 states and Washington, DC) or homes (40 states).[88] The Office for the Advancement of Telehealth funded the development of several regional Telehealth Resource Centers to provide assistance, education, and information to organizations and individuals who are providing, or interested in providing, health care at a distance.[91] The Patient Protection and Affordable Care Act has recommended telehealth technologies to improve access to and quality of care for underserved populations.[3] Innovative child and adolescent telepsychiatry programs are being integrated into the pediatric medical home model[92,93] and sited in diverse community settings, such as pediatric clinics,[39,41,68] community mental health centers,[43,94] urban daycare centers,[95] schools,[96,97] juvenile correctional settings,[44,98] and homes.[26,99,100] Telepsychiatry services have expanded beyond major medical and academic centers[37,41,101] to the private practice setting.[66,94] Psychiatrists can contract with a commercial vendor that provides a patient base and the practice infrastructure, or more enterprising psychiatrists might assume these activities in their private practice.[66]

## CLINICAL UPDATE

### Legal, Regulatory, and Ethical Issues

*Legal Issues.* The legal and regulatory process in medical practice is dynamic in response to scientific progress, medical research, new products and procedures, best practices per medical disciplines, and stakeholders' interests. Accordingly, state and federal agencies have started to scrutinize telepractice, largely in response to the epidemic of opioid drug abuse.[102] State regulations vary, are in flux, and might not be fully congruent with federal guidelines. Additional regulations might apply to international practice. As a result, it is not possible to provide a set of uniform regulations. Therefore, before initiating telepsychiatry services, psychiatrists should consult their state's laws and medical board guidelines and the Drug Enforcement Administration's (DEA) regulations,[102] particularly the

Office of Diversion Control regarding illicit pharmaceutical activities online.[103] Many professional liability and malpractice carriers cover telepsychiatry services but might require that their clients indicate services provided through ITV. Reimbursement of telepsychiatry services varies at the state level for Medicaid and commercial vendors[88] and at the federal level for Medicare coverage.[90,104,105] Germane issues that vary by state relate to licensure, parameters constituting the practice of medicine, definition of the doctor–patient relationship, and prescribing.[106]

National licensure and/or portability of licensure for telemedicine practice have been widely discussed for several years.[107] The recent launch of the Interstate Medical Licensure Compact will streamline the medical licensure process across states and support the expanded use of telemedicine.[108] As of this writing, 18 states have adopted the compact, and 8 additional states and the District of Columbia have introduced legislation in support of a pathway for license portability. If the patient site and psychiatrist site are located in different states, then full licensure in the 2 states is usually required. The requirement does not pertain to the state where the patient is residing but where the patient is receiving the intervention. Several states allow for limited licensure specific to providing services through ITV. These licenses have different restrictions to the scope and practice allowed but are usually more quickly obtained than a full license. A few states allow telepsychiatry services to be provided by a physician licensed in a neighboring state. Although most states allow consultations between physicians without reciprocal licensure, a few states require the consultant to be licensed in the state where the patient is located.[88] Some states allow for emergency telepsychiatry services without a license but with regulations on the extent and frequency of implementation.

Prospective telepsychiatry providers should assess other legislation. Some states mandate conditions of the clinical encounter or require that a telepsychiatrist maintain a physical practice location in that state. Some states require the patient to be evaluated and treated only in a state or federally operated clinic or hospital, or alternatively for a licensed health care professional to accompany the patient during the evaluation. Even if psychiatrists are licensed in a distant state, regulations could prohibit their participation in the civil commitment process. Regulatory and procedural guidelines regarding the mental health treatment of youth can vary by jurisdiction, including the reporting of child endangerment and the treatment of children in foster care and correctional settings.

Providing pharmacotherapy through ITV is a topic receiving national and state attention. Congress passed the Ryan Haight Online Pharmacy Consumer Protection Act of 2008 to expunge illegitimate online pharmacies that dispense controlled substances without appropriate patient contact and without physician oversight.[109] This act inadvertently caught legitimate medical and psychiatric practice in its broad net. It placed certain restrictions on "the practice of prescribing by means of the internet." Although the act specifically states that telemedicine is an exception to the act, it technically requires that prescribers conduct at least 1 in-person evaluation of the patient before prescribing a controlled substance through telemedicine. Alternatively, patients being treated by and located in a hospital or clinic registered with the DEA and in the presence of a DEA-registered practitioner can be prescribed a controlled substance during telemedicine. The letter of this legislation is difficult to follow and severely dilutes the value of telepsychiatry or any telemedicine-related practice. However, the DEA recently noted that it does not intend to interfere with the legitimate prescribing of controlled substances during telemedicine practice.[110] It has promised to promulgate further rules on telemedicine prescribing and to establish a special telemedicine registration. Unfortunately, these provisions have been left incomplete since 2008. Several states have enacted legislation to allow the prescribing of controlled substances during telemedicine practice, particularly for telepsychiatry. Psychiatrists should carefully review federal and state guidelines in establishing their telepsychiatry practice regarding the prescription of controlled substances and consider the best interests of their patients.

*Regulatory Issues.* Regulatory issues related to confidentiality, records management, and ethical standards governing telepsychiatry are the same as for in-person practice. They vary with the patient's site of service. Hospital-based clinics will be accustomed to maintaining charts and abiding by HIPAA regulations.[111] Some community sites have similar guidelines. For example, school-based health clinics must adhere to guidelines of the Family Educational Rights and Privacy Act (FERPA).[112] Other nonmedical clinics will require guidelines to ensure security of private medical information according to HIPAA rules. Telepsychiatry providers should check for federal and state regulations regarding their site of practice.

The Joint Commission on the Accreditation of Healthcare Organizations[113] and other accrediting agencies have established guidelines for medical specialties providing services through telemedicine. Two medical staff standards address telemedicine. One requires medical staff to recommend the clinical services provided by telemedicine providers and the other requires the telemedicine provider to be credentialed at the patient site. Reciprocity of credentialing has recently been authorized. Psychiatrists are encouraged to contact representatives from telemedicine departments, information technology, health information management systems, and information security for assistance. Other resources include the ATA,[114] the regional Telehealth Resource Centers,[91] and the Center for Telehealth and e-Health Law.[115] The CMS also provides guidelines regulating telehealth and telemedicine.[116,117]

*Ethical Issues.* Telepsychiatry practice should comply with the ethical guidelines for child and adolescent psychiatry provided in the AACAP Code of Ethics.[118] Guidelines specific to telepsychiatry with youth are evolving.[118,119] Psychiatrists should give particular attention to practices that might require special implementation, such as obtaining informed consent, preventing malfeasance, and ensuring confidentiality.

As in traditional in-person practice, psychiatrists should document informed consent for ambulatory care and should

determine whether separate consent is needed for delivering care through ITV. This requirement can vary by state or facility. Relevant forms are available online.

Steps to ensure privacy and data security are needed, especially when services are provided in nontraditional settings. Adhering to ethical care during telepsychiatry should be considered in the context of the community-based system of care principles.[120] Of particular relevance, patients and families should be informed of the practice of telepsychiatry, its benefits, and any risks that might be involved at the patient's site, such as equipment malfunction, familiarity with clinic staff, or steps needed to prevent malfeasance. These issues should be addressed by the psychiatrist before commencing services and ensure that the family wants to proceed with tele-psychiatric care.

## Needs Assessment and Model of Care

When planning to implement a child and adolescent telepsychiatry service, a needs assessment should be considered.[66,121,122] Many underserved communities allocate their mental health funds to the adult chronically mentally ill. A needs assessment conducted with stakeholders in the welfare of children and adolescents will identify communities that are likely to support telepsychiatry services for youth and telepsychiatry services that will complement existing services. Stakeholders and the psychiatrist can identify age groups, behavioral presentations, and interventions that are of highest priority for the community. They can determine the disorders that meet medical necessity criteria by third-party payers in the jurisdiction to ensure sustainability of the program.[88,90]

Child and adolescent psychiatrists should establish their model of care during contracting, which often begins with determining the site of care. Services can be delivered to traditional outpatient medical or psychiatric clinics,[92] clinics within nonmedical facilities such as schools,[97,123,124] juvenile justice programs,[98] or nonclinical settings such as the home.[26,99,100] The site of service will have implications for the model of care and operational procedures, such as staffing, patient selection, patient management, safety, and emergency planning. The model of care can range from direct care of patients to consultation with primary care providers (PCPs). In a direct care model, the psychiatrist is responsible for diagnosis and ongoing treatment. This model might be more common at nonmedical sites, such as mental health clinics or correctional facilities. In a consultation model, the psychiatrist evaluates the patient and makes treatment recommendations to the PCP, who maintains responsibility for patient care. This model might be more common at primary care offices. Although not well described in the child and adolescent literature, collaborative models in which the psychiatrist manages a population of patients with a PCP[125,126] are promising, particularly within the pediatric medical home.[93] Regardless of the model of care chosen, it is recommended that psychiatrists establish partnerships with stakeholders, facilitate communication with others involved in the youth's care (i.e., school staff,

primary care physicians, therapist), and determine their role within the youth's system of care.[120]

Once the site of service and model of care are determined, the psychiatrist should determine the flow of administrative tasks, such as obtaining consent forms, making referrals, and obtaining information from the schools. In most models, a dedicated staff person, the tele-presenter, is assigned these tasks.[66,94] The telepresenter's training and skills can vary, from nurses to case managers to patient advocates. The psychiatrist's role in defining the telepresenter's tasks, identifying the appropriate staff, and providing the optimal level of supervision should be discussed during contracting. Guidelines for this role are available from the ATA.[127]

Documentation for the telepsychiatry service provided should include the location of the patient and the psychiatrist at the time of service. If a shared electronic medical record is not used, then procedures are needed for securely maintaining copies of documentation at the originating (patient) and distant (physician or psychiatrist) sites. The psychiatrist should determine best procedures for providing prescriptions to patients consistent with the preferences of the patient site. Some sites send prescriptions to the site for distribution to patients, but other sites send prescriptions directly to families or pharmacies.

An important issue for partner sites is to note the psychiatrist's availability between sessions and specify staff to respond to patient calls and procedures to obtain medication refills. These tasks are often shared with the patient's PCP. Concisely written instructions with contact numbers will help families and staff to understand the process of tele-psychiatric care.

The psychiatrist and site staff should develop a comprehensive safety plan including protocols for managing urgent needs and emergencies, using local resources, and defining circumstances for involving the psychiatrist.[128] The psychiatrist and staff should establish concrete crisis plans with the patient and family and share the plan with the youth's PCP, therapist, and components of the youth's system of care.[129-131] Emergencies that occur between visits should be managed as for usual care. Psychiatrists should clearly indicate whether they are available for emergencies and, if so, provide patients and staff instructions for contacting them and the role of their PCP.

## Appropriateness of Potential Sites and Patients

There are no absolute contraindications for care delivered through ITV with youth, other than the youth or parent refusing services.[80] Similarly, there are limited criteria for determining patient appropriateness for telepsychiatric care. Some psychiatrists have suggested that telepsychiatry might be especially suited for adolescents who are familiar with the technology and might respond to the feeling of control allowed by ITV.[40,124]

Appropriateness is determined in part by weighing need versus resources. The psychiatrist should assess site appropriateness, including adequate space, visual and auditory privacy, and trained staff, to assist the youth in safely

engaging in the session alone and/or with the parent in the room.[18] If an appropriate site is not available, then the patient might need to be referred to in-person services, recognizing that might mean no psychiatric care. Patient appropriateness can vary by circumstances, such as a youth with depression living within a day's drive of a medical center versus a youth living in an Alaskan village accessible by air or boat, or a youth with a psychotic disorder living in a stressed family versus one living in a residential setting. Appropriateness is determined by the psychiatrist in relation to the referral question, patient's needs, developmental and diagnostic status, system of care, caregivers' abilities, and available alternatives, and the psychiatrist's perceived competence and availability of a collaborating PCP or other clinicians.[18] Determination of appropriateness also addresses interim care such as whether treatment should be stepped up to a higher level of care, to in-patient services or intensive community services, such as wrap-around programs.[120,132]

Parents might be diagnosed with psychiatric disorders, and their ability to supervise youth during sessions might be compromised. Therefore, the psychiatrist should assess the ability of the caregiver to contain the youth and to safely participate in sessions and follow treatment recommendations. If treatment is provided at home, then the psychiatrist should determine whether the parent is a sufficient authority figure to safely supervise care.

Patient appropriateness also considers community factors because psychiatrists often differ in race, ethnicity, or culture from the families they serve through telepsychiatry.[133] Because the psychiatrist will likely reside at a distance from the patient site, it might be difficult to become familiar with the community's values and resources.[134,135] A visit to the patient site might help to appreciate community values. Respectful and candid questions about these differences can help to determine an appropriate "match" between the site and the psychiatrist.[67,121] Staff at the site are a great source for helping the psychiatrist to bridge cultural "gaps."

Some relative contraindications for child and adolescent telepsychiatry services to consider include assessment in settings that are not considered neutral, such as a hostile home environment, settings without resources to contain a disruptive child, or settings without appropriate collaborating systems, especially when escalation of care is needed.

## Sustainability Issues

*Technology Choice.* The psychiatrist should choose a technology that is appropriate to the clinical work. The ATA recommends a bandwidth of at least 384 Kb/s[80] to facilitate detection of clinical details, such as abnormal movements, voice inflections, and subtle dynamic cues, such as changes in affect and relatedness. As noted in the Definitions section, there are 3 technology approaches: standards-based applications, consumer-grade applications, and mobile devices.[82,83]

Standards-based, or "legacy" hardware-based, systems provide the best overall clinical experience for bandwidth, connectedness, monitor resolution, and security, but also

have been difficult to implement because of their high upfront costs, relative immobility, infrastructure needs, and maintenance. Such systems are not feasible for clinics with few resources and supports or for the home.

To overcome barriers of legacy systems, many telepsychiatry programs are transitioning to HIPAA-compliant cloud videoconferencing. Users simply download an application or link to a website to join a session. Stakeholders can connect with each other through various devices, such as desktop computers, laptops, tablets, and smartphones.

Most video software clients are programmed to be firewall friendly. Sophisticated algorithms that monitor the network connection are incorporated into the software and automatically adjust the call quality based on the available bandwidth, so it works in suboptimal network conditions (e.g., Wi-Fi, 3G, and 4G). With hosted videoconferencing, the service provider manages the entire back-end information technology infrastructure, decreasing the need for on-site information technology staff. Many vendors offer flexible subscription plans, making it easy to start with a single account and expand as partner sites expand.

There is no evidence that the selected technology is related to treatment outcomes, and no guidelines exist to "match" devices to clinical needs or reimbursement. Psychiatrists should choose the platform that is appropriate to the clinical service, manageable by both sites, and financially sustainable. Psychiatrists also should have a backup plan should the technology system fail. This can include a second line or, more often, a telephone.

*Funding Source.* Various financial models are possible depending on whether the psychiatrist is providing contracted services, billing third-party payers per session, or some other revenue-generating and risk-sharing model.[66] Psychiatrists establishing services across a geographic area might consider cultivating partnerships with other agencies, collaborating with community organizations, working with state programs, and developing a shared vision with other stakeholders.[136] At the federal level, Medicaid and Medicare programs reimburse for specific mental health services. Billing and reimbursement for telepsychiatry services are based on Healthcare Common Procedure Coding System or *Common Procedural Terminology* (*CPT*) codes with a telemedicine modifier ("95") to indicate that services were provided using telemedicine technology.[104] To qualify for the use of modifier "95," it is required to use an interactive audio and video telecommunications system that permits real-time communication between the beneficiary at the originating sites (patient sites) and the provider at the distant site (physician or other qualified health care professional). The telehealth modifier cannot be used with the asynchronous (store and forward) technology.[104,105] The GT modifier "95" can be used for the services provided in *CPT* Appendix P, which include the following *CPT* codes of interest to psychiatrists: 990791, 90792, 90832, 90833, 90834, 90836, 90837, 90838, 90845, 90846, 90847, 90863, 99201, 99202, 99203, 99204, 99205, 99212, 99213, 99214, 99215, 99231, 99232, 99233, 99241, 99242, 99243, 99244, 99245, 99251, 99252, 99253, 99254, 99255, 99354, and 99355. Additional telemedicine codes could be forthcoming, because the

American Medical Association has convened a workgroup to consider codes specific to telemedicine practice. At the state level, telemedicine services are generally covered through Medicaid programs.[137]

As of February 2017, all states and the District of Columbia have reported providing some form of Medicaid reimbursement for telemedicine services.[88,89] Add-on costs such as technical support, transmission charges, and equipment often can be included in the fee-for-service rate or reimbursed as an administrative cost.[76,88,91,104]

Another avenue is for states to require private insurance plans to cover telehealth services. As of 2017, 35 states and the District of Columbia have reported parity requiring private insurance plans to cover telehealth services and 7 other states have proposed parity laws. Of note, these laws only require parity in coverage, not in payment.[88,89] Psychiatrists should check with individual insurance carriers to verify the accepted services and reimbursement rules. The ATA provides periodic analysis of service coverage and reimbursement guides by state.[88] Psychiatrists can find assistance in identifying funding sources at various federal, national, and private websites.[88,91,138,139]

## Creating a Therapeutic Virtual Space

The patient and psychiatrist sites should avoid small, poorly ventilated, dark, or noisy rooms. The room should be appropriate to the intervention to establish a therapeutic alliance. Psychotherapy sessions might warrant a comfortable but minimally decorated room to minimize distractions for the youth. Parent–child training can be facilitated with specific tools for the parent to use in giving clear instructions to the child. Diagnostic sessions can include developmentally appropriate implements, such as a desk and crayons to assess the child's fine motor skills, creativity, and attention span. A small selection of simple toys will help to determine the child's interpersonal and communication skills. Noisy, multiple-component, and messy toys should be avoided because the sensitive microphones will pick up the noise and compromise conversation.

The room should be large enough for at least 1 to 2 adults to be included on screen with the youth. Too large a room, such as a conference room, might allow the youth to wander and preclude maintaining a presence on screen. A medical examination room might overstimulate the youth and risk damage to equipment. One approach to ensure adequate room size and configuration is to communicate the specific room requirements to remote sites before clinical services commence, and then ask a staff member to send a picture while sitting in a chair approximately 8 feet from the camera, facing away from a window. Lighting is crucial so that the entire room can be easily visualized. Overhead fluorescent lights can cast shadows. Natural lighting can change during the day, interfering with the interactions.

"Telepsychiatry etiquette" includes all participants on camera at the 2 sites; if the camera span is too narrow to include all participants, each participant should be identified initially and then when speaking. Families must give permission for observers to be present at the psychiatrist's site.

Youth are dependent on their parents to access care, so the psychiatrist should establish a therapeutic alliance with the youth and the parent. This includes introducing and explaining telepsychiatry in developmentally appropriate terms. The youth and parents should feel that their perspectives are understood. Developing a therapeutic alliance can be challenging when working in person with children with developmental or disruptive behaviors or adolescents who feel alienated. The technology might add another challenge to establishing an alliance. The psychiatrist should ensure that bandwidth is adequate to transcend this challenge, so that visual, auditory, and interactional cues are adequate to understand the youth, convey empathy, respond fluidly, and show variability in emotional tones. Insufficient bandwidth interferes with developing a therapeutic alliance by producing pixilation, delay of the audio signal, and desynchrony of the video and audio signals. When psychiatrists are unsure of the patient's response based on visual cues, they should seek verbal confirmation of their observation and interpretation from the youth or accompanying adults.

Adequate bandwidth ensures high-resolution, synchronized transmission so that the psychiatrist can use real-time changes in visual and auditory cues to determine the youth's affective state, communication, and interpersonal relatedness. High-quality microphones, placed to pick up voices but not ambient noise, facilitate the development of rapport by transmitting a clear signal. Sound quality improves by softening hard surfaces, such as placing carpeting on the floor, draperies on the windows, and sound panels or textiles on the walls. A sound machine outside the room decreases interference from outside noise and increases auditory privacy.

Adequate bandwidth facilitates the accurate assessment of affect, speech, tremors, tics, fine motor control, and neuroleptic-induced abnormal movements. Administration of the Abnormal Involuntary Movement Scale through videoconferencing has shown reliability comparable to its administration in person.[140]

As mentioned earlier, cameras with pan, tilt, and zoom capabilities facilitate the development of a therapeutic alliance.[67,121] Control of the camera at the patient site assists in evaluating dysmorphology and developmental anomalies by zooming in on facial features and assessing motor and activity skills by following the patient around the room.

Assessing eye contact is an essential component of the developmental assessment of youth and is challenging during an ITV encounter because of placement of the camera above or below the monitor. The psychiatrist should determine whether the child's apparent decreased eye contact represents a technical limitation or clinical impairment and query the youth and parent about the ability to sustain eye contact. The psychiatrist can optimize the patient's experience of eye contact by alternating the gaze between the monitor and camera during the session. If the psychiatrist uses 2 monitors, one for the ITV interaction and one for the medical record, vertical placement of the monitors with the camera between them will force eye contact as the

psychiatrist alternately gazes between the 2 monitors and past the camera.[68]

The telepresenter at the patient site can facilitate development of a therapeutic alliance. The telepresenter should be organized and flexible in assisting with tasks during and between sessions, such as assisting with management of the youth, obtaining vital signs, ordering laboratory tests, requesting school records, and triaging medication refill requests. Telepresenters can help psychiatrists to learn about the community and share observations that might be difficult to see through the camera or after the session. However, in smaller communities, the telepresenter might be well known to the family, which can raise concerns about confidentiality and compromise the ability to develop a therapeutic alliance.

Building therapeutic alliances at the community level involves interacting with general psychiatrists, PCPs, local therapists, school personnel, and other families. Involving these stakeholders in appointments or having phone contact can help psychiatrists learn about their patients, feel connected to the community, and build confidence in referral sources.

### Telepsychiatry Evidence Base

The psychiatrist and patient sites should ensure that care delivered through ITV is consistent with established guidelines of care for child and adolescent psychiatry. Methods are needed to evaluate the care provided, including process variables (e.g., appointments kept or cancelled, satisfaction, relationship) to assess the service delivery,[106,141] participants' perspectives,[37,38,142] and outcome variables (e.g., syndromal recovery, symptom reduction, academic progress) to assess patients' progress.[23,51] Patient portals can be an inexpensive and easy approach to collecting rating scales and for providing psychoeducation materials and records from referring providers.[143] The current evidence base for telepsychiatry with youth is presented in Table 1.

*Pharmacologic Care.* Pharmacotherapy is one of the most frequently requested telepsychiatry services, although the evidence base supporting its effectiveness is limited.[144] Therefore, guidelines for pharmacotherapy with youth are extrapolated from systematic studies with adults[145,146] and youth[23,147] and descriptive reports with youth.[43,63]

A psychiatrist might provide pharmacotherapy through various models of care including direct service, consultation to a PCP, collaboration with midlevel mental health providers, or some combination of these. The psychiatrist should ensure that the infrastructure at the patient site supports the chosen model, establish processes that ensure effective communication between the patient and psychiatrist sites, maintain communication with other providers, guide medical record documentation, and maintain compliance with regulatory guidelines.[79,80,148] Any need to modify best practices to accommodate service delivery through ITV should be documented along with the rationale.

There are several logistical issues in establishing a telepharmacotherapy service.[63,67,149] Information sharing is best accomplished with a shared electronic medical record,

although other approaches that ensure confidentiality and security of data are used. The psychiatrist can address patient education and medication consent during the telepsychiatry encounter and can be assisted by the telepresenter.[63,67,94] Procedures are needed to share documentation of the session with the site and ideally with the PCP.

Procedures for prescribing noncontrolled medications include e-prescribing, calling prescriptions to the pharmacy, or sending hard copies to the family or pharmacy. Some programs prefer that prescriptions be sent to the patient site for their distribution to the family. As noted earlier, controlled medications, including Schedule II stimulants, have additional regulations under the Ryan Haight Online Pharmacy Consumer Protection Act of 2008.[109,150] Psychiatrists should become familiar with this federal legislation and state guidelines while awaiting clarification from the DEA.

Monitoring the effects of psychotropic medications and managing their side effects require procedures at the psychiatrist's and patient's sites to obtain vital signs, order laboratory tests, or conduct other assessments. Ideally, these tasks would be managed at the patient site, but some nonmedical sites might collaborate with a local medical clinic to assist with monitoring. Psychiatrists can assess abnormal movements through ITV with some minimal assistance from staff at the patient site.[140] Alternatively, local nursing staff can be trained in this assessment. A video is available from the Northern Arizona Regional Behavioral Health Association at www.rbha.net/presentations/ AIMSDemo/player.html. Rating scales can be made available for the psychiatrist to use in assessing treatment response.[62,143] If the psychiatrist's schedule does not accommodate unanticipated or increased visits, for example, to assess youth after the initiation of antidepressant medications,[151] then staff at either site can provide telephone, ITV, or in-person follow-up visits and communicate findings to the psychiatrist. Planning for unanticipated issues is a necessary component of pharmacotherapy. Psychiatrists and staff at the patient site should develop procedures for medication refills and reports of adverse medication effects.

*Psychotherapeutic Care.* Requests for psychotherapy services through ITV (teletherapy) for children and adolescents are increasing. Standard practice guidelines for adult psychotherapy should direct teletherapy[79,80] while awaiting formal guidelines with youth.

No specific theoretical orientation or approach for teletherapy has been indicated or contraindicated, and psychiatrists should adapt best practices and evidence-supported approaches from the in-person setting. Cognitive-behavioral approaches appear most common and relevant given their structure and skills-building focus. As in traditional treatment, best practices often include working alone with the youth and together with the parent. Telepresenters assist with managing the session, such as who participates and when, and take steps to ensure privacy. In home-based settings, it is important to acknowledge the parent's role in managing the session. Teletherapy requiring direct one-on-one interaction (e.g.,

play therapy) requires considerations for child characteristics and the setting. Behavioral interventions require coaching of parents in behavior training such as reinforcement or timeout strategies.

Information regarding the effectiveness of teletherapy is limited but growing.[69,152-156] Clinicians have shown high fidelity to manual-based interventions.[157,158] Reviews of treatment outcome studies have concluded that teletherapy is feasible, applicable to diverse populations, tolerable in different therapeutic formats, and acceptable to users with outcomes that are comparable to in-person treatment.[152,155]

Most teletherapy studies with young people are descriptive, indicating that teletherapy is feasible, acceptable, and well tolerated.[69,159] In 10 outcome studies ranging from feasibility trials to pre-post designs and a few randomized controlled trials, PCPs and families endorsed high levels of satisfaction with therapy.[20,46,65,69,160] Several randomized trials are noteworthy. Nelson et al[20] found comparable decreases for childhood depressive symptoms treated with 8 sessions of cognitive-behavioral therapy delivered through ITV versus in person. Storch et al.[21] found superior outcomes for youth diagnosed with obsessive-compulsive disorder who were treated through teletherapy compared with youth treated in person. Outcomes of the behavioral treatment of tics through ITV also appear comparable to in-person treatment.[22] Two pre- to post-intervention outcome studies have suggested the benefit of treatment delivered through ITV including behavior management training[24,25] and consultation to PCPs in the psychiatric care of young patients.[29] Five small randomized trials have demonstrated potential effectiveness of providing family or parenting interventions through ITV.[24,25,27,49,99]

*Consultation and Psychosomatic Care.* Teleconsultation to PCPs concerning mental health care of patients with medical illness is well established for adults.[36,62] Teleconsultation regarding the behavioral and mental health care of children with medical conditions[42,161] developmental disorders[42] and special needs[162] is emerging. The preliminary evidence supports the feasibility and acceptability of providing behavioral interventions through ITV for conditions such as feeding disorders[53] diabetes,[58,59] and obesity.[54,57,60] Given the paucity of child mental health specialists[4,12,13,163] and the development of the pediatric medical home[3,93,164] teleconsultation for psychosomatic medicine appears promising, but further experience is needed.

## Adaptation to Nonclinical Settings

There is a long tradition of moving mental health services out of the traditional clinic and into the community. A natural next step for telepsychiatry is to offer services to more naturalistic and ecologically valid settings—settings that are often more convenient for youth and their families and provide some assistance for staff involved in youths' care. Schools and correctional settings are the most common community settings in which services are provided, and services in the home are increasing. Psychiatrists should establish their model of care appropriate to the community setting and clarify their role to those involved in the child's care.

In community settings, patient privacy, security of information, and an appropriate sound-proof space are more difficult to regulate; also, medical personnel might not be available to obtain vital signs and provide medical monitoring. The psychiatrist should work with staff and family to determine a protocol to ensure that medical monitoring of medications occurs in a timely manner. As in other settings, the psychiatrist should determine how the patient receives medications, particularly controlled substances. In case of equipment failure, the psychiatrist should determine a procedure to ensure prompt patient contact (i.e., telephone contact with family or staff) and a plan for continuity of care.

In community settings, it is important that an emergency intervention protocol be established before initiating care and that all persons involved in the patient's care be informed. All documentation should be maintained at the psychiatrist site, and the psychiatrist should determine whether specific documentation also should be maintained at the patient site. Community settings will require guidelines to ensure security of private medical information.

*School-Based Telepsychiatry.* School-based mental health clinics provide services to more youth than outpatient clinics, with minimal disruption to classroom time or demands on the parent's workday.[165,166] In communities with limited access to mental health professionals, especially psychiatrists, school-based telepsychiatry can provide an array of services and allows the psychiatrist to be efficiently involved in student evaluation and multidisciplinary planning with school personnel.[96,120] School-based telepsychiatry services have demonstrated benefit for students and staff.[96,97,123,167]

The psychiatrist should obtain knowledge of school culture, define the model of care, and clarify the psychiatrist's role and expectations within the school system. Potential services include evaluations, collaborations with the youth's PCP, medication management, psychosocial interventions with students and families, evaluations for support services, and continuing education for staff and consultation on classroom-specific and general school issues.[97,168] When helping the school address an adverse event, such as the untimely death of a student or teacher, natural disaster, or violence, psychiatrists should provide services consistent with in-person consultations and standard protocols.

FERPA[112] specifies privacy rules for accessing student health information and applies to telepsychiatry. FERPA should guide determination of the infrastructure for telepsychiatry services, including privacy of the interview room, which can be challenging in overcrowded schools.[97] Staff accompanying the youth should have a mental health or medical background (i.e., school counselor or school nurse), and participating staff must be educated about protected health information. Documentation and records must be maintained in a private and secure location (e.g., nurses' station or counselor's office) and not be included in educational records.[169] Informed consent should consist of the legal guardian and the patient (if older than the age of

majority).[96,105,148] The consent process should be conducted by the psychiatrist with the patient and guardian in real time according to local, regional, and national laws[79] and in compliance with the minors' access to mental health services in the absence of parental knowledge and consent. The school clinician or nurse can assist in obtaining consents. If the model of care involves direct service, then the psychiatrist must determine whether the psychiatrist or PCP will provide prescriptions and how medications will be managed during the summer.

*Telepsychiatry in Juvenile Corrections.* Youth involved in the juvenile justice system experience psychiatric disorders at a rate far exceeding general population rates.[170] Correctional programs that lack access to psychiatric services are increasingly obtaining services through ITV.[98,171]

Similar to in-person correctional services, psychiatrists delivering services through ITV require knowledge of the legal process in the youth's jurisdiction, especially whether the patient's status is pre- or post-adjudication. This might require virtual meetings with the youth's legal counsel. The psychiatrist should clarify with the patient that he/she is subject to "dual agency" status, that is, responsible to serve the patient and to assist the facility. Then, the psychiatrist must clarify his/her role as a treating clinician or forensic examiner, that he/she is a mandated reporter regarding abuse, and that all information can be accessed by the court. The psychiatrist must work with legal counsel and the facility to obtain consent for services from the legal guardian and patient, which could require a videoconference depending on the facility's regulations.

Protecting confidentiality in correctional settings is challenging. A virtual tour of the site using a mobile device can be helpful to view the records room, examination room, or other relevant service-related space. Digital records management also should be clarified.

Occasional ITV meetings can help correctional staff to understand the needs of mentally ill juvenile offenders, such as the need for a suicide watch, protection from the general community, or monitoring medication side effects. The correctional setting might require staff to chaperone the youth during the sessions. Youth are often concerned about privacy and might be more comfortable if chaperoned by clinical staff rather than security staff. Added benefits are having 2 clinicians to model therapeutic techniques and to align staff, which is critical in the correctional setting.

*Home-Based Telepsychiatry.* Home-based telemental health has been safely and successfully implemented with adults with serious psychiatric disorders.[130] Preliminary work suggests that home-based teletherapy with youth and families is feasible, acceptable, and effective[99,100,149] and might be especially relevant for children who do not tolerate traveling outside the home or to provide continuity of care for families who relocate, such as military families. Using laptop computers and mobile devices in the home offers the potential to observe children's behaviors in their naturalistic setting and to develop interventions in the setting where they will be used.[26,100]

Before initiating home-based services, the psychiatrist should determine whether the family is appropriate for home-based care. Particular attention should be paid to privacy because it is difficult to find an isolated, sound-proof space where conversations are not overheard by others, intentionally or unintentionally. The psychiatrist should develop a safety plan[130] consisting of the physical location and address of the patient in case emergency services are required and consent regarding contact of community resources in case of an emergency. A written informed consent, specific to using home-based telepsychiatry, should be obtained. The psychiatrist should inform the patient's PCP of home-based services and elicit collaboration regarding monitoring the youth's status. Home-based telepsychiatry services should be avoided if there is a serious concern for patient safety and/or if the family does not consent to developing the safety plan. This assessment of appropriateness should be ongoing, because circumstances can change over time.

There are some relative contraindications for home-based telepsychiatry, including child custody assessments, forensic evaluations, investigating allegations of abuse or neglect, family therapy with a history of interpersonal violence in the family, and/or a volatile parent. The child might not feel free to be candid about his/her environment or circumstance. In the home environment, the psychiatrist will have less ability to redirect the situation should the parent become upset. Some children with developmental disorders might not tolerate the ITV platform.[26]

The patient and family should be given written information regarding the operation of equipment and how to address technical difficulties, because they will not have additional technical support available to them. A backup plan in case of technical difficulties is needed.

## Training in Telepsychiatry

Greater clarification and standardization of legal and regulatory issues and the increased availability of affordable consumer-grade ITV platforms have made it more reasonable for child and adolescent psychiatry residency programs to develop ITV programs based on established clinical and technical guidelines.[18,19,79] However, guidelines describing the use of ITV in curriculum development and adapting training and evaluation goals and objectives to meet the Accreditation Council for Graduate Medical Education (ACGME) Milestone competencies are limited, but increasing.

The goals of ITV training programs are multiple: address the growing demands for access to culturally sensitive psychiatric services and develop a workforce of child and adolescent psychiatrists and PCPs who are proficient with the use of creative technologies in meeting youths' mental health care needs. The objectives of the ITV training curriculum are to achieve the training competencies and capacity for trainee evaluation as described by the ACGME Milestone training competencies for child and adolescent psychiatry[172] that include psychiatric evaluation, medical knowledge, systems-based practice, practice-based learning and improvement, professionalism, and interpersonal and communication skills. In addition, the curriculum would

require evaluation of trainee competencies in the 6 focus areas of the ACGME Clinical Learning Environment Review Program[173]: patient safety, health care quality, clinical transitions, supervision, duty hours, and fatigue and professionalism.

Academic leadership representing the American Psychiatric Association, AACAP, and the ATA are developing standardized frameworks for ITV training programs to ensure that evidence-based outcome metrics support the teaching and evaluation guidelines of the ACGME.[174-176] Emerging ITV training programs have demonstrated that didactic teaching of residents, fellows, and students includes effective variations of clinical service learning protocols, integrating selected articles on telepsychiatric care, and a problem- and case-based learning curriculum that uses clinical vignettes to stimulate learning, critical appraisal, and guide the generation of clinical formulation and knowledge integration for all aspects of ITV training.[101,177-182] Godleski et al.[183] described a national ITV program for trainees in collaboration with the US Department of Veterans Affairs in which technology-enabled learning includes web-based training modules, ITV consultation simulation training, satellite broadcasts of live educational meetings, and teleconferenced evidence-based journal clubs. While awaiting a standardized framework for ITV training, child and adolescent residency programs should consider using these established teaching approaches to introduce trainees to telepsychiatry practice.

## CLINICAL UPDATE LIMITATIONS

The AACAP Clinical Updates are developed to assist psychiatrists in decision making. The information in this update is not intended to define the standard of care or guarantee successful treatment of individual patients, nor should the information be deemed inclusive of all proper methods of care or exclusive of other methods of care directed at obtaining the desired results. This Clinical Update does not usurp sound clinical judgment. The ultimate judgment regarding the care of a particular patient must be made by the clinician in light of all the circumstances, values, and preferences presented by the patient and his/her family, the diagnostic and treatment options available, and the accessible resources. &

This Clinical Update was developed by the AACAP Telepsychiatry Committee (TPC): Kathleen Myers, MD, MPH, MS, and David Pruitt, MD, Co-Chairs, and Ruby Agoha, MD, Daniel Alicata, MD, PhD, Patricio Fischman, MD, Nicole Gloff, MD, Dehra Glueck, MD, Felissa Goldstein, MD, Pamela Hoffman, MD, Daniel Lieberman, MD, Jennifer McWilliams, MD, MHCDS, Ujjwal Ramtekkar, MD, MPE, MBA, David Roth, MD, and Lloyda Williamson, MD; additional contributors Sharon Cain, MD, and Kristopher Kaliebe, MD; and the AACAP Committee on Quality Issues (CQI): Carol Rockhill, MD, PhD, MPH, Christopher Bellonci, MD, John Hamilton, MD, Munya Hayek, MD, Helene Keable, MD, Matthew Siegel, MD, Saundra Stock, MD, and Co-Chairs Oscar G. Bukstein, MD, MPH, and Heather J. Walter, MD, MPH.

AACAP Clinical Updates are developed by AACAP committees under the direction of the AACAP CQI, with review by representatives of multiple constituent groups including topic experts, AACAP members, other relevant AACAP committees, the AACAP Assembly of Regional Organizations, and the AACAP Council. Final approval for publishing Clinical Updates as an AACAP Official Action is conferred by the AACAP Council. The development process for Clinical Updates is described on the AACAP website (www.aacap.org).

The primary intended audience for AACAP Clinical Updates is child and adolescent psychiatrists; however, the information presented also could be useful for other medical or behavioral health clinicians.

The TPC acknowledges the following topic experts for their contributions to this update: L. Lee Carlisle, MD, Jonathan Comer, PhD, Donald Hilty, MD, and Eve-Lynn Nelson, PhD.

Jennifer Medicus, Stephanie Demian, Karen Ferguson, Bryan Shuy, and Emily Rohlffs served as the AACAP staff liaisons for the TPC and the CQI.

This Clinical Update was reviewed by AACAP members from September 2016 to October 2016.

From February 2017 to April 2017, this Clinical Update was reviewed by a consensus group convened by the CQI. Consensus group members and their constituent groups were Heather J. Walter, MD, MPH, Oscar G. Bukstein, MD, MPH, Carol Rockhill, MD, PhD, MPH, and Munya Hayek, MD (CQI); L. Lee Carlisle, MD (topic expert); D. Richard Martini, MD, Committee on Collaboration With Medical Professions, and Benjamin Shain, MD, Committee on Healthcare Access and Economics (AACAP committees); Vera Feuer, MD, and Kai-ping Wang, MD (Assembly of Regional Organizations); and Karen Pierce, MD, and Ian Chi Vo, MD (AACAP Council).

This Clinical Update was approved by the AACAP Council on May 18, 2017.

This Clinical Update is available at www.aacap.org.

Disclosures: During preparation of this Clinical Update, Kathleen Myers, MD, MPH, MS, and David Pruitt, MD, TPC Co-Chairs, and Heather J. Walter, MD, MPH, CQI Co-Chair, have had no financial relationships to disclose. Oscar G. Bukstein, MD, MPH, CQI Co-Chair, has had intellectual property with Routledge Press.

Correspondence to the AACAP Communications Department, 3615 Wisconsin Avenue, NW, Washington, DC 20016.

0890-8567/$36.00/©2017 American Academy of Child and Adolescent Psychiatry

http://dx.doi.org/10.1016/j.jaac.2017.07.008

## REFERENCES

1. Friedman R, Katz-Leavy J, Manderscheid R, Sondheimer DL. Prevalence of serious emotional disturbance in children and adolescents. In: Manderscheid RW, Sonnenschein MA, eds. Mental Health. Rockville, MD: Department of Health and Human Services; 1996.
2. Kessler RC, Berglund P, Demler O, Jin R, Merikangas KR, Walters EE. Lifetime prevalence and age-of-onset distributions of DSM-IV disorders in the National Comorbidity Survey Replication. Arch Gen Psychiatry. 2005;62:593-602.
3. Patient Protection and Affordable Care Act, Pub L No 111-148. In: United States Congress, ed. 42: US Department of Health and Human Services; 2010.
4. Thomas CR, Holzer CE III. The continuing shortage of child and adolescent psychiatrists. J Am Acad Child Adolesc Psychiatry. 2006;45: 1023-1031.
5. Merikangas KR, He JP, Burstein M, et al. Service utilization for lifetime mental disorders in U.S. adolescents: results of the National Comorbidity Survey-Adolescent Supplement (NCS-A). J Am Acad Child Adolesc Psychiatry. 2011;50:32-45.
6. American Medical Association. Physician Characteristics and Distribution in the U.S. Washington, DC: American Medical Association Press; 2010.
7. American Medical Association. AMA physician masterfile. http://www.ama-assn.org/ama/pub/about-ama/physician-data-resources/physician-masterfile.page. Accessed May 11, 2016.
8. Flaum M. Telemental health as a solution to the widening gap between supply and demand for mental health services. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical and Administrative Foundation for Evidence-Based Practice. London: Elsevier Insights; 2013:11-25.

9. Hyde PS. Report to Congress on the nation's substance abuse and mental health workforce issues. http://store.samhsa.gov/shin/content//PEP13-RTC-BHWORK/PEP13-RTC-BHWORK.pdf. Published 2013. Accessed March 1, 2017.

10. Glisson C, Schoenwald SK, Kelleher K, et al. Therapist turnover and new program sustainability in mental health clinics as a function of organizational culture, climate, and service structure. Adm Policy Ment Health. 2008;35:124-133.

11. Stirman SW, Kimberly J, Cook N, Calloway A, Castro F, Charns M. The sustainability of new programs and innovations: a review of the empirical literature and recommendations for future research. Implement Sci. 2012;7:1-19.

12. Robiner WN, Yozwiak JA. The psychology workforce: trials, trends and tending commons. National Register of Health Service Psychologists. https://www.nationalregister.org/pub/the-national-register-report-pub/spring-2013-issue/the-psychology-workforce-trials-trends-and-tending-the-commons/ Accessed March 1, 2017.

13. American Psychological AssociationMichalski D, Mulvey T, Kohout J. 2008 APA Survey of Psychology Health Service Providers. Washington, DC: American Psychological Association; 2008.

14. Lambert D, Ziller E, Lenardson JD. Rural Children Don't Receive the Mental Health Care They Need (Research & Policy Brief). Portland, ME: University of Southern Maine, Muskie School of Public Service, Maine Rural Health Research Center; 2009; https://muskie.usm.maine.edu/Publications/rural/pb39/Rural-Children-Mental-Health-Services.pdf. Accessed March 1, 2017.

15. Kazdin AE, Blase SL. Rebooting psychotherapy research and practice to reduce the burden of mental illness. Perspect Psychol Sci. 2011;6:21-37.

16. Broder E, Manson E, Boydell K, Teshima J. Use of telepsychiatry for child psychiatric issues: first 500 cases. Can Psych Assoc Bull. 2004;36:11-15.

17. Diamond JM, Bloch RM. Telepsychiatry assessments of child or adolescent behavior disorders: a review of evidence and issues. Telemed J E Health. 2010;16:712-716.

18. Myers KM, Cain S. Practice parameter for telepsychiatry with children and adolescents. J Am Acad Child Adolesc Psychiatry. 2008;47:1468-1483.

19. Hilty DM, Shoemaker EZ, Myers K, Snowdy CE, Yellowlees PM, Yager J. Need for and steps toward a clinical guideline for the telemental health care of children and adolescents. J Child Adolesc Psychopharmacol. 2016;26:283-295.

20. Nelson E, Barnard M, Cain S. Treating childhood depression over teleconferencing. Telemed J E Health. 2003;9:49-55.

21. Storch EA, Caporino NE, Morgan JR, et al. Preliminary investigation of web-camera delivered cognitive-behavioral therapy for youth with obsessive-compulsive disorder. Psychiatry Res. 2011;189:407-412.

22. Himle MB, Freitag M, Walther M, Franklin SA, Ely L, Woods DW. A randomized pilot trial comparing videoconference versus face-to-face delivery of behavior therapy for childhood tic disorders. Behav Res Ther. 2012;50:565-570.

23. Myers K, Vander Stoep A, Zhou C, McCarty CA, Katon W. Effectiveness of a telehealth service delivery model for treating attention-deficit/hyperactivity disorder: a community-based randomized controlled trial. J Am Acad Child Adolesc Psychiatry. 2015;54:263-274.

24. Xie Y, Dixon JF, Yee OM, et al. A study on the effectiveness of videoconferencing on teaching parent training skills to parents of children with ADHD. Telemed J E Health. 2013;19:192-199.

25. Tse YJ, McCarty CA, Stoep AV, Myers KM. Teletherapy delivery of caregiver behavior training for children with attention-deficit hyperactivity disorder. Telemed J E Health. 2015;21:451-458.

26. Comer JS, Furr JM, Miguel E et al. Remotely delivering real-time parent training to the home: an initial randomized trial of Internet-delivered Parent-Child Interaction Therapy (I-PCIT) [published online ahead of print June 26, 2017]. J Consult Clin Psychol. http://dx.doi.org/10.1037/ccp0000230.

27. Glueckauf RL, Fritz SP, Ecklund-Johnson EP, Liss HJ, Dages P, Carney P. Videoconferencing-based family counseling for rural teenagers with epilepsy: phase 1 findings. Rehabil Psychol. 2002;47:49-72.

28. Fox KC, Connor P, McCullers E, Waters T. Effect of a behavioural health and specialty care telemedicine programme on goal attainment for youths in juvenile detention. J Telemed Telecare. 2008;14:227-230.

29. Yellowlees PM, Hilty DM, Marks SL, Neufeld J, Bourgeois JA. A retrospective analysis of a child and adolescent eMental health program. J Am Acad Child Adolesc Psychiatry. 2008;47:103-107.

30. Reese RJ, Slone NC, Soares N, Sprang R. Telehealth for underserved families: an evidence-based parenting program. Psychol Serv. 2012;9:320-322.

31. Heitzman-Powell LS, Buzhardt J, Rusinko L, Miller T. Formative evaluation of an ABA outreach training program for parents of children with autism in remote areas. Focus Autism Other Dev Disabil. 2014;29:23-38.

32. Blackmon LA, Kaak HO, Ranseen J. Consumer satisfaction with telemedicine child psychiatry consultation in rural Kentucky. Psychiatr Serv. 1997;48:1464-1466.

33. Elford DR, White H, St John K, Maddigan B, Ghandi M, Bowering R. A prospective satisfaction study and cost analysis of a pilot child telepsychiatry service in Newfoundland. J Telemed Telecare. 2001;7:73-81.

34. Kopel H, Nunn K, Dossetor D. Evaluating satisfaction with a child and adolescent psychological telemedicine outreach service. J Telemed Telecare. 2001;7(suppl 2):35-40.

35. Greenberg N, Boydell KM, Volpe T. Pediatric telepsychiatry in Ontario: caregiver and service provider perspectives. J Behav Health Serv Res. 2006;33:105-111.

36. Hilty DM, Yellowlees PM, Cobb HC, Bourgeois JA, Neufeld JD, Nesbitt TS. Models of telepsychiatric consultation-liaison service to rural primary care. Psychosomatics. 2006;47:152-157.

37. Myers K, Valentine JM, Melzer SM. Feasibility, acceptability, and sustainability of telepsychiatry for children and adolescents. Psychiatr Serv. 2007;58:1493-1496.

38. Myers KM, Valentine JM, Melzer SM. Child and adolescent telepsychiatry: utilization and satisfaction. Telemed J E Health. 2008;14:131-137.

39. Myers KM, Vander Stoep A, McCarty CA, et al. Child and adolescent telepsychiatry: variations in utilization, referral patterns and practice trends. J Telemed Telecare. 2010;16:128-133.

40. Pakyurek M, Yellowlees P, Hilty D. The child and adolescent telepsychiatry consultation: can it be a more effective clinical process for certain patients than conventional practice? Telemed J E Health. 2010;16:289-292.

41. Lau ME, Way BB, Fremont WP. Assessment of SUNY Upstate Medical University's child telepsychiatry consultation program. Int J Psychiatry Med. 2011;42:93-104.

42. Szeftel R, Federico C, Hakak R, Szeftel Z, Jacobson M. Improved access to mental health evaluation for patients with developmental disabilities using telepsychiatry. J Telemed Telecare. 2012;18:317-321.

43. Myers KM, Sulzbacher S, Melzer SM. Telepsychiatry with children and adolescents: Are patients comparable to those evaluated in usual outpatient care? Telemed J E Health. 2004;10:278-285.

44. Myers KM, Valentine J, Morganthaler R, Melzer S. Telepsychiatry with incarcerated youth. J Adolesc Health. 2006;38:643-648.

45. Jacob MK, Larson JC, Craighead WE. Establishing a telepsychiatry consultation practice in rural Georgia for primary care physicians: a feasibility report. Clin Pediatr. 2012;51:1041-1047.

46. Nelson EL, Duncan AB, Peacock G, Bui T. Telemedicine and adherence to national guidelines for ADHD evaluation: a case study. Psychol Serv. 2012;9:293-297.

47. Elford R, White H, Bowering R, et al. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. J Telemed Telecare. 2000;6:73-82.

48. Stain HJ, Payne K, Thienel R, Michie P, Carr V, Kelly B. The feasibility of videoconferencing for neuropsychological assessments of rural youth experiencing early psychosis. J Telemed Telecare. 2011;17:328-331.

49. Reese RM, Jamison R, Wendland M, et al. Evaluating interactive videoconferencing for assessing symptoms of autism. Telemed J E Health. 2013;19:671-677.

50. Marcin JP, Nesbitt TS, Cole SL, et al. Changes in diagnosis, treatment, and clinical improvement among patients receiving telemedicine consultations. Telemed J E Health. 2005;11:36-43.

51. Boydell KM, Volpe T, Kertes A, Greenberg N. A review of the outcomes of the recommendations made during paediatric telepsychiatry consultations. J Telemed Telecare. 2007;13:277-281.

52. Bensink M, Wootton R, Irving H, et al. Investigating the cost-effectiveness of videotelephone based support for newly diagnosed paediatric oncology patients and their families: design of a randomised controlled trial. BMC Health Serv Res. 2007;5:7-38.

53. Clawson B, Selden M, Lacks M, Deaton AV, Hall B, Bach R. Complex pediatric feeding disorders: Using teleconferencing technology to improve access to a treatment program. Pediatr Nurs. 2008;34:213-216.

54. Shaikh U, Cole SL, Marcin JP, Nesbitt TS. Clinical management and patient outcomes among children and adolescents receiving telemedicine consultations for obesity. Telemed J E Health. 2008;14:434-440.

55. Witmans MB, Dick B, Good J, et al. Delivery of pediatric sleep services via telehealth: the Alberta experience and lessons learned. Behav Sleep Med. 2008;6:207-219.

56. Mulgrew KW, Shaikh U, Nettiksimmons J. Comparison of parent satisfaction with care for childhood obesity delivered face-to-face and by telemedicine. Telemed J E Health. 2011;17:383-387.

57. Davis AM, Sampilo M, Gallagher KS, Landrum Y, Malone B. Treating rural pediatric obesity through telemedicine: outcomes from a small randomized controlled trial. J Pediatr Psychol. 2013;38:932-943.

58. Freeman KA, Duke DC, Harris MA. Behavioral health care for adolescents with poorly controlled diabetes via Skype: does working alliance remain intact? J Diabetes Sci Technol. 2013;7:727-735.

59. Hommel KA, Hente E, Herzer M, Ingerski LM, Denson LA. Telehealth behavioral treatment for medication nonadherence: a pilot and feasibility study. Eur J Gastroenterol Hepatol. 2013;25:469-473.

60. Lipana LS, Bindal D, Nettiksimmons J, Shaikh U. Telemedicine and face-to-face care for pediatric obesity. Telemed J E Health. 2013;19:806-808.

61. Weisz JR, Kazdin AE. Evidence-Based Psychotherapies for Children and Adolescents. 2nd ed. New York: Guilford Press; 2010.

62. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: A 2013 review. Telemed J E Health. 2013;19:444-454.

63. Cain S, Sharp S. Telepharmacotherapy for children and adolescents. J Child Adolesc Psychopharmacol. 2016;26:221-228.

64. Carlisle LL. Child and adolescent telemental health. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical, and Administrative Foundation for Evidence-Based Practice. London: Elsevier Insights; 2013:197-221.

65. Duncan AB, Velasquez SE, Nelson EL. Using videoconferencing to provide psychological services to rural children and adolescents: a review and case example. J Clin Child Adolesc Psychol. 2014;43:115-127.

66. Glueck D. Business aspects of telemental health in private practice. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical, And Administrative Foundation for Evidence-Based Practice. London: Elsevier Insights; 2013:111-133.

67. Glueck D. Establishing therapeutic rapport in telepsychiatry practice. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical and Administrative Foundations for Evidence-Based Practice. London: Elsevier Insights; 2013:29-46.

68. Goldstein F, Myers K. Telemental health: a new collaboration for pediatricians and child psychiatrists. Pediatr Ann. 2014;43:79-84.

69. Nelson EL, Patton S. Using videoconferencing to deliver individual therapy and pediatric psychology interventions with children and adolescents. J Child Adolesc Psychopharmacol. 2016;26:212-220.

70. Pignatiello A, Teshima J, Boydell KM, Minden D, Volpe T, Braunberger PG. Child and youth telepsychiatry in rural and remote primary care. Child Adolesc Psychiatr Clin North Am. 2011; 20:13-28.

71. Cain S, Nelson EL, Myers K. Child and adolescent telepsychiatry. In: Dulcan MK, ed. Dulcan's Textbook of Child and Adolescent Psychiatry. Washington, DC: American Psychiatric Press; 2015:669-688.

72. American Telemedicine Association. http://americantelemed.org. Accessed March 11, 2017.

73. American Telemedicine Association. What is telemedicine? http://www.americantelemed.org/about-telemedicine/what-is-telemedicine. Accessed March 1, 2017.

74. US Department of Health and Human Services Health Resources and Services Administration (HRSA). Glossary and acronyms. http://www.hrsa.gov/healthit/toolbox/ruralhealthittoolbox/telehealth/glossary.html. Accessed March 1, 2017.

75. Centers for Medicare and Medicaid. Telemedicine. http://www.medicaid.gov/Medicaid-CHIP-Program-Information/By-Topics/Delivery-Systems/Telemedicine.html. Accessed March 1, 2017.

76. Centers for Medicare and Medicaid Services. Telemedicine. https://www.medicaid.gov/medicaid-chip-program-information/by-topics/delivery-systems/telemedicine.html. Published 2014. Accessed March 1, 2017.

77. Centers for Medicare and Medicaid Services. Medicare telehealth policy. In: CFR, ed 42: Office of the Federal Register Government Publishing Office; 2011.

78. Cornell University Law School. 42 CFR 410.78—telehealth services. https://www.law.cornell.edu/cfr/text/42/410.78. Accessed April 14, 2017.

79. Turvey C, Coleman M, Dennison O, et al. ATA practice guidelines for video-based online mental health services. Telemed J E Health. 2013;19:722-730.

80. Yellowlees P, Shore J, Roberts L. Practice guidelines for videoconferencing-based telemental health—October 2009. Telemed J E Health. 2010;16:1074-1089.

81. American Telemedicine Association. ATA telemedicine nomenclature. http://www.americantelemed.org/resources/nomenclature#.U6utCRdWSo. Published 2012. Accessed March 1, 2017.

82. Chou T, Comer JS, Turvey CL, Karr A, Spargo G. Technical considerations for the delivery of real-time child telemental health care. J Child Adolesc Psychopharmacol. 2016;26:192-197.

83. Spargo G, Karr A, Turvey CL. Technology options for the provision of mental health care through videoteleconferencing. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical and Administrative Foundation for Evidence-Based Practice. London: Elsevier; 2013: 135-151.

84. Gernsback H. The radio doctor—maybe! Radio News Magazine. 1924; 5:1406.

85. Wittson CL, Benschoter R. Two-way television: helping the medical center reach out. Am J Psychiatry. 1972;129:624-627.

86. Dwyer TF. Telepsychiatry: psychiatric consultation by interactive television. Am J Psychiatry. 1973;130:865-869.

87. Straker N, Mostyn P, Marshall C. The use of two-way TV in bringing mental health services to the inner city. Am J Psychiatry. 1976;133:1202-1205.

88. Thomas L, Capistrant G. 50 State Telemedicine Gaps Analysis: Coverage and Reimbursement. Washington DC: American Telemedicine Association; 2017; https://higherlogicdownload.s3-external-1.amazonaws.com/AMERICANTELEMED/2017%20NEW_50%20State%20Telehealth%20Gaps%20%20Analysis-Reimbursement_FINAL.pdf?AWSAccessKeyId=AKIAJH5D4I4FWRALBOUA&Expires=149188302 9&Signature=Uks7%2BMKdasWIDYjx0wxcno2vxkw%3D. Accessed March 1, 2017.

89. Center for Connected Health Policy. State telehealth policies and reimbursement schedules: a comprehensive plan for the 50 states and District of Columbia. In: Center NTPR; 2014. http://cchpca.org/sites/default/files/resources/Fifty%20State%20Medicaid%20Report.09.2014_1.pdf. Accessed April 10, 2017.

90. Center for Telemedicine Law. Telemedicine reimbursement report. http://www.hrsa.gov/healthit/telehealth/reimburse.pdf. Accessed March 20, 2017.

91. US Department of Health and Human Services; Telehealth Resource Centers. Health Resources and Services Administration (HRSA) Office for the advancement of telehealth. http://www.telehealthresourcecenter.org/. Accessed March 20, 2017.

92. Kriechman A, Bonham C. Telemental health in primary care. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical, and Administrative Foundation for Evidence-Based Practice. London: Elsevier Insights; 2013:155-170.

93. McWilliams JK. Integrating telemental healthcare with the patient-centered medical home model. J Child Adolesc Psychopharmacol. 2016;26:278-282.

94. Glueck DA. Telepsychiatry in private practice. Child Adolesc Psychiatr Clin North Am. 2011;20:1-11.

95. Spaulding R, Cain S, Sonnenschein K. Urban telepsychiatry: uncommon service for a common need. Child Adolesc Psychiatr Clin North Am. 2011;20:29-39.

96. Grady BJ, Lever N, Cunningham D, Stephan S. Telepsychiatry and school mental health. Child Adolesc Psychiatr Clin North Am. 2011; 20:81-94.

97. Stephan S, Lever N, Bernstein L, Edwards S, Pruitt D. Telemental health in schools. J Child Adolesc Psychopharmacol. 2016;26:266-272.

98. Kaliebe KE, Heneghan J, Kim TJ. Telepsychiatry in juvenile justice settings. Child Adolesc Psychiatr Clin North Am. 2011;20:113-123.

99. Comer JS, Furr JM, Cooper-Vince CE, et al. Internet-delivered, family-based treatment for early-onset OCD: a preliminary case series. J Clin Child Adolesc Psychol. 2014;43:74-87.

100. Comer JS, Furr JM, Cooper-Vince C, et al. Rationale and considerations for the internet-based delivery of parent-child interaction therapy. Cogn Behav Pract. 2015;22:302-316.

101. Alicata D, Schroepfer A, Unten T, et al. Telemental health training, team building, and workforce development in cultural context: the Hawai'i experience. J Child Adolesc Psychopharmacol. 2016;26:260-265.

102. Centers for Disease Control and Prevention. CDC grand rounds: prescription drug overdoses—a U.S. epidemic. MMWR Morb Mortal Wkly Rep. 2012;61:10-13.

103. United States Drug Enforcement Administration. http://www.dea.gov/index.shtml. Accessed March 1, 2017.

104. Centers for Medicare and Medicaid Services. Medicare Claims Processing Manual. Publication 100–04, Chapter 12, # 190. Baltimore, MD: Centers for Medicare and Medicaid Services; 2006.

105. Centers for Medicare and Medicaid Services. Medicare learning network catalogue, September 2016. https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/MLNCatalog.pdf. Accessed April 8, 2017

106. Kramer GM, Luxton DD. Telemental health for children and adolescents: an overview of legal, regulatory, and risk management issues. J Child Adolesc Psychopharmacol. 2016;26:198-203.

107. Cwiek MA, Rafiq A, Qamar A, Tobey C, Merrell RC. Telemedicine licensure in the United States: the need for a cooperative regional approach. Telemed J E Health. 2007;13:141-147.

108. Interstate Medical Licensure Compact. A faster pathway to medical licensure. https://imlcc.org/. Accessed April 14, 2017.

109. Ryan Haight Online Pharmacy Consumer Protection Act. In: L P, ed. No 110, HR 6353; 2008.

110. James Arnold, Chief, Liaison and Policy Section, Drug Enforcement Administration, United States Department of Justice. Telemedicine and the Controlled Substances Act. Presentation at the Short Course, 21st Annual Meeting of the American Telemedicine Association; Minneapolis, MN; May 2016.

111. US Department of Health and Human Services. Health information privacy: the Health Insurance Portability and Accountability Act (HIPAA) of 1996. http://www.hhs.gov/ocr/privacy/index.html. Accessed April 14, 2017.

112. US Department of Education. 20 USC §1232g; 34 CFR Part 99: Family Educational Rights and Privacy Act (FERPA). http://www2.ed.gov/policy/gen/guid/fpco/ferpa/index.html?src=rn. Accessed April 14, 2017.

113. Joint Commission on the Accreditation of Healthcare Organizations (JCAHO). http://www.jointcommission.org/about_us/about_the_joint_commission_main.aspx. Accessed March 1, 2017.

114. American Telemedicine Association. State Telemedicine Policy Center. http://www.americantelemed.org/policy/state-telemedicine-policy. Accessed May 11, 2016.

115. Robert J Waters Center for Telehealth and e-Health Law (CTeL). http://ctel.org/. Accessed April 7, 2017.

116. Centers for Medicare and Medicaid Services Telehealth. http://www.cms.gov/Medicare/Medicare-General-Information/Telehealth/index.html. Accessed March 1, 2017.

117. Centers for Medicare and Medicaid Services. Medicare Learning Network. Telehealth Services. https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/downloads/telehealthsrvcsfctsht.pdf. Accessed March 1, 2017

118. American Academy of Child and Adolescent Psychiatry. Code of Ethics. Washington, DC: American Academy of Child and Adolescent Psychiatry; 2014; http://www.aacap.org/App_Themes/AACAP/docs/about_us/transparency_portal/Code_Of_Ethics_2014.pdf. Accessed April 14, 2017.

119. Nelson EL, Davis K, Velasquez S. Ethical considerations in providing mental health services over videoconferencing in telepsychiatry. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical and Administrative Foundations for Evidence-Based Practice. London: Elsevier Insights; 2012:47-60.

120. Winters NC, Pumariga A; Work Group on Community Child and Adolescent Psychiatry, Work Group on Quality Issues. Practice parameter on child and adolescent mental health care in community systems of care. J Am Acad Child Adolesc Psychiatry. 2007;46:284-299.

121. Gloff N, Lenoue S, Novins D, Myers K. Telemental health for children and adolescents. Int Rev Psychiatry. 2015;27:512-524.

122. Shore JH, Manson SM. A developmental model for rural telepsychiatry. Psychiatr Serv. 2005;56:976-980.

123. Cunningham DL, Connors EH, Lever N, Stephan SH. Providers' perspectives: utilizing telepsychiatry in schools. Telemed J E Health. 2013; 19:794-799.

124. Grady B, Myers KM, Nelson EL, et al. Evidence-based practice for telemental health. Telemed J E Health. 2011;17:131-148.

125. Fortney JC, Pyne JM, Edlund MJ, et al. A randomized trial of telemedicine-based collaborative care for depression. J Gen Intern Med. 2007;22:1086-1093.

126. Fortney JC, Pyne JM, Mouden SB, et al. Practice-based versus telemedicine-based collaborative care for depression in rural federally qualified health centers: a pragmatic randomized comparative effectiveness trial. Am J Psychiatry. 2013;170:414-425.

127. American Telemedicine Association. Expert Consensus Recommendations for Videoconferencing-Based Telepresenting, November 2011. http://dev.americantelemed.org/docs/default-source/expert-consensus-recommendations-for-videoconferencing-based-telepresenting.pdf?sfvrsn=4. Accessed March 11, 2017.

128. Krupinski EA; American Telemedicine Association. Core operational guidelines for telehealth services involving provider-patient interactions. http://www.americantelemed.org/docs/default-source/standards/core-operational-guidelines-for-telehealth-services.pdf?sfvrsn=6. Published 2014. Accessed March 1, 2017.

129. Luxton DD, Sirotin AP, Mishkind MC. Safety of telemental healthcare delivered to clinically unsupervised settings: a systematic review. Telemed J E Health. 2010;16:705-711.

130. Luxton DD, O'Brien K, McCann RA, Mishkind MC. Home-based telemental healthcare safety planning: what you need to know. Telemed J E Health. 2012;18:629-633.

131. Shore JH, Hilty DM, Yellowlees P. Emergency management guidelines for telepsychiatry. Gen Hosp Psychiatry. 2007;29:199-206.

132. Bruns EJ, Pullmann MD, Sather A, Brinson RD, Ramey M. Effectiveness of wraparound versus case management for children and adolescents: results of a randomized study. Admin Policy Ment Health Ment Health Serv Res. 2015;42:309-322.

133. Savin D, Glueck DA, Chardavoyne J, Yager J, Novins DK. Bridging cultures: child psychiatry via videoconferencing. Child Adolesc Psychiatr Clin North Am. 2011;20:125-134.

134. Brooks E, Spargo G, Yellowlees P, O'Neil P, Shore J. Integrating culturally appropriate care into telemental health practice. In: Myers K, Turvey C, eds. Telemental Health: Clinical, Technical and Administrative Foundation for Evidence-Based Practice. London: Elsevier Insights; 2013:63-79.

135. Shore JH, Savin DM, Novins D, Manson SM. Cultural aspects of telepsychiatry. J Telemed Telecare. 2006;12:116-121.

136. Singh R, Mathiassen L, Stachura ME, Astapova EV. Sustainable rural telehealth innovation: a public health case study. Health Serv Res. 2010; 45:985-1004.

137. National Conference of Legislatures. State coverage for telehealth services. http://www.ncsl.org/research/health/state-coverage-for-telehealth-services.aspx. Accessed March 1, 2017.

138. AMD Global Telemedicine. Private payer reimbursement information directory. http://www.amdtelemedicine.com/telemedicine-resources/PrivatePayersByState.html. Accessed March 1, 2017.

139. Denison-Roberts CS. Telemedicine Program Funding and Sustainability Webinar. Presented at University of Kentucky College of Medicine and AMD Global Medicine; 2014.

140. Amarendran V, George A, Gersappe V, Krishnaswamy S, Warren C. The reliability of telepsychiatry for a neuropsychiatric assessment. Telemed J E Health. 2011;17:223-225.

141. Boydell KM, Greenberg N, Volpe T. Designing a framework for the evaluation of paediatric telepsychiatry: a participatory approach. J Telemed Telecare. 2004;10:165-169.

142. Boydell KM, Volpe T, Pignatiello A. A qualitative study of young people's perspectives on receiving psychiatric services via televideo. J Can Acad Child Adolesc Psychiatry. 2010;19:5-11.

143. Geyer J, Myers K, Vander Stoep A, McCarty C, Palmer N, DeSalvo A. Implementing a low-cost web-based clinical trial management system for community studies: a case study. Clin Trials. 2011;8:634-644.

144. Rockhill CM, Violette H, Vander Stoep A, Grover S, Myers K. Caregiver's distress: youth with ADHD and comorbid disorders assessed via telemental health. J Child Adolesc Psychopharmacol. 2013;23:379-385.

145. O'Reilly R, Bishop J, Maddox K, Hutchinson L, Fishman M, Takhar J. Is telepsychiatry equivalent to face-to-face psychiatry? Results from a randomized controlled equivalence trial. Psychiatr Serv. 2007;58:836-843.

146. Ruskin PE, Silver-Aylaian M, Kling MA, et al. Treatment outcomes in depression: comparison of remote treatment through telepsychiatry to in-person treatment. Am J Psychiatry. 2004;161:1471-1476.

147. Rockhill CM, Tse YJ, Fesinmeyer MD, Garcia J, Myers K. Medication strategies used in the Children's ADHD Telemental Health Treatment Study. J Child Adolesc Psychopharmacol. 2016;26:662-671.

148. Kramer GM, Mishkind MC, Luxton DD, Shore JH. Managing risk and protecting privacy in telemental health: an overview of legal, regulatory, and risk management issues. In: Myers K, Turvey C, eds. Telemental

Health: Clinical, Technical and Administrative Foundation for Evidence-Based Practice. London: Elsevier Insights; 2013:83-107.

149. Lieberman D, Myers K, Roth DE, Zekovic-Roth S. Designing and conducting a successful telepsychiatry program. Workshop presented at the 61st annual meeting of the American Academy of Child and Adolescent Psychiatry; San Diego, CA; 2014.

150. Drug Enforcement Agency Department of Justice; Office of Diversion Control. Electronic Prescriptions for Controlled Substances (EPCS). http://www.deadiversion.usdoj.gov/ecomm/e_rx/. Published 2009. Accessed July 29, 2016.

151. Bridge JA, Iyengar S, Salary CB, et al. Clinical response and risk for reported suicidal ideation and suicide attempts in pediatric antidepressant treatment: a meta-analysis of randomized controlled trials. JAMA. 2007;297:1683-1696.

152. Backhaus A, Agha Z, Maglione ML, et al. Videoconferencing psychotherapy: a systematic review. Psychol Serv. 2012;9:111-131.

153. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: a 2013 review. Telemed J E Health. 2013;19:444-454.

154. Frueh BC, Monnier J, Yim E, Grubaugh AL, Hamner MB, Knapp RG. A randomized trial of telepsychiatry for post-traumatic stress disorder. J Telemed Telecare. 2007;13:142-147.

155. Gros DF, Morland LA, Greene CJ, et al. Delivery of evidence-based psychotherapy via video telehealth. J Psychopathol Behav Assess. 2013;35:506-521.

156. Osenbach JE, O'Brien KM, Mishkind M, Smolenski DJ. Synchronous telehealth technologies in psychotherapy for depression: a meta-analysis. Depress Anxiety. 2013;30:1058-1067.

157. Frueh BC, Monnier J, Grubaugh AL, Elhai JD, Yim E, Knapp R. Therapist adherence and competence with manualized cognitive-behavioral therapy for PTSD delivered via videoconferencing technology. Behav Modif. 2007;31:856-866.

158. Morland LA, Greene CJ, Rosen CS, et al. Telemedicine for anger management therapy in a rural population of combat veterans with post-traumatic stress disorder: a randomized noninferiority trial. J Clin Psychiatry. 2010;71:855-863.

159. Nelson EL, Bui T. Rural telepsychology services for children and adolescents. J Clin Psychol. 2010;66:490-501.

160. Slone NC, Reese RJ, McClellan MJ. Telepsychology outcome research with children and adolescents: a review of the literature. Psychol Serv. 2012;9:272-292.

161. Van Allen J, Davis AM, Lassen S. The use of telemedicine in pediatric psychology: research review and current applications. Child Adolesc Psychiatr Clin North Am. 2011;20:55-66.

162. Karp W, Grigsby K, McSwiggan-Hardin M, et al. Use of telemedicine for children with special health care needs. Pediatrics. 2000;105:843-847.

163. Gabel S. Telepsychiatry, public mental health, and the workforce shortage in child and adolescent psychiatry. J Am Acad Child Adolesc Psychiatry. 2009;48:1127-1128.

164. Medicare Program; Medicare Shared Savings Program: Accountable Care Organizations. Final rule. Centers for Medicare & Medicaid Services (CMS), HHS. Fed Regist. 2015;80:32691-32845; https://www.federalregister.gov/articles/2015/06/09/2015-14005/medicare-program-medicare-shared-savings-program-accountable-care-organizations. Accessed March 1, 2017.

165. Burns BJ, Costello EJ, Angold A, et al. Children's mental health service use across service sectors. Health Aff (Millwood). 1995;14:147-159.

166. Rones M, Hoagwood K. School-based mental health services: a research review. Clin Child Fam Psychol Rev. 2000;3:223-241.

167. Grady B, Lever N, Cunningham D, Stephan S. Telepsychiatry and school mental health. Child Adolesc Psychiatr Clin North Am. 2011; 20:81-94.

168. Sanders K, Ramsey AT, Heitkamp R, Ogita S, Donney V. Lessons learned from the implementation of a school-based telepsychiatry enhancement program for students with special education needs. J Rural Com Psychol. 2012;E15.

169. Walter HJ, Berkovitz IH. Practice parameter for psychiatric consultation to schools. J Am Acad Child Adolesc Psychiatry. 2005;44: 1068-1083.

170. Teplin LA, Abram KM, McClelland GM, Dulcan MK, Mericle AA. Psychiatric disorders in youth in juvenile detention. Arch Gen Psychiatry. 2002;59:1133-1143.

171. Bastastini AB. Improving rehabilitative efforts for juvenile offenders through the use of telemental healthcare. J Child Adolesc Psychopharmacol. 2016;26:273-277.

172. Accreditation Council for Graduate Medical Education. The Child and Adolescent Psychiatry Milestone Project. http://www.acgme.org/Portals/0/PDFs/Milestones/ChildandAdolescentPsychiatryMilestones.pdf. Published 2015. Accessed March 20, 2017.

173. Accreditation Council for Graduate Medical Education. Clinical Learning Environment Review (CLER). http://www.acgme.org/What-We-Do/Initiatives/Clinical-Learning-Environment-Review-CLER. Published 2016. Accessed March 20, 2017.

174. Hilty DM, Crawford A, Teshima J, et al. A framework for telepsychiatric training and e-health: competency-based education, evaluation and implications. Int Rev Psychiatry. 2015;27:569-592.

175. Hilty DM, Yellowlees PM, Tuerk PW, et al. Program evaluation and modification: supporting pragmatic data-driven clinical videoconferencing (CV) services. In: Tuerk P, Shore P, eds. Clinical Videoconferencing in Telehealth: Program Development and Practice. New York: Springer; 2014:105-132.

176. Sunderji N, Crawford A, Jovanovic M. Telepsychiatry in graduate medical education: a narrative review. Acad Psychiatry. 2015;39:55-62.

177. Shore JH, Thurman MT, Fujinami L, Brooks E, Nagamoto H. A resident, rural telepsychiatry service: training and improving care for rural populations. Acad Psychiatry. 2011;35:252-255.

178. Chung-Do J, Helm S, Fukuda M, Alicata D, Nishimura S, Else I. Rural mental health: implications for telepsychiatry in clinical service, workforce development, and organizational capacity. Telemed J E Health. 2012;18:244-246.

179. Dzara K, Sarver J, Bennett JI, Basnet P. Resident and medical student viewpoints on their participation in a telepsychiatry rotation. Acad Psychiatry. 2013;37:214-216.

180. Ulzen T, Williamson L, Foster PP, Parris-Barnes K. The evolution of a community-based telepsychiatry program in rural Alabama: lessons learned—a brief report. Community Ment Health J. 2013;49:101-105.

181. Volpe T, Boydell KM, Pignatiello A. Attracting child psychiatrists to a televideo consultation service: the TeleLink experience. Int J Telemed Appl. 2013;2013:146858.

182. Teshima J, Hodgins M, Boydell KM, Pignatiello A. Resident evaluation of a required telepsychiatry clinical experience. Acad Psychiatry. 2016; 40:348-352.

183. Godleski L. A comprehensive national telemental health training program. Acad Psychiatry. 2012;36:408-410.

**HHS Public Access**
Author manuscript
*J Addict Med.* Author manuscript; available in PMC 2018 March 01.

Published in final edited form as:
*J Addict Med.* 2017 ; 11(2): 138–144. doi:10.1097/ADM.0000000000000287.

# Treatment Outcome Comparison between Telepsychiatry and Face-to-face Buprenorphine Medication-Assisted Treatment (MAT) for Opioid Use Disorder: A 2-Year Retrospective Data Analysis

**Wanhong Zheng, MD**,
Department of Behavioral Medicine and Psychiatry, School of Medicine, West Virginia University, Morgantown, West Virginia 26505

**Michael Nickasch, BS**,
Department of Behavioral Medicine and Psychiatry, School of Medicine, West Virginia University, Morgantown, West Virginia 26505

**Laura Lander, MSW**,
Department of Behavioral Medicine and Psychiatry, School of Medicine, West Virginia University, Morgantown, West Virginia 26505

**Sijin Wen, PhD**,
Department of Biostatistics, School of Public Health, West Virginia University, Morgantown, West Virginia 26505

**Minchan Xiao, PhD**,
Department of Biostatistics, School of Public Health, West Virginia University, Morgantown, West Virginia 26505

**Patrick Marshalek, MD**,
Department of Behavioral Medicine and Psychiatry, School of Medicine, West Virginia University, Morgantown, West Virginia 26505

**Ebony Dix, MD**, and
Department of Behavioral Medicine and Psychiatry, School of Medicine, West Virginia University, Morgantown, West Virginia 26505

**Carl Sullivan, MD**
Department of Behavioral Medicine and Psychiatry, School of Medicine, West Virginia University, Morgantown, West Virginia 26505

Corresponding Author: Wanhong Zheng MD, 930 Chestnut Ridge Road, Department of Behavioral Medicine and Psychiatry, School of Medicine, West Virginia University, Morgantown, West Virginia 26505, wzheng@hsc.wvu.edu, Tel: 304-293-8715, Fax: 304-293-8724.
Co-authors:
Michael Nickasch BS, msnickasch@mix.wvu.edu, Tel: 304-293-5323, Fax: 304-293-8724
Laura Lander MSW, llander@hsc.wvu.edu, Tel: 304-293-5323, Fax: 304-293-8724
Sijin Wen PhD, siwen@hsc.wvu.edu, Tel: 304-581-1971, Fax: 304-293-6685
Minchan Xiao PhD, xiaominchan@gmail.com, Tel: 304-581-1971, Fax: 304-293-6685
Patrick Marshalek MD, pmarshalek@hsc.wvu.edu, Tel: 304-293-5323, Fax: 304-293-8724
Ebony Dix MD, emdix@hsc.wvu.edu, Tel: 304-293-5323, Fax: 304-293-8724
Carl Sullivan MD, csullivan@hsc.wvu.edu, Tel: 304-293-5323, Fax: 304-293-8724

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Zheng et al.                                                                                                    Page 2

Author Manuscript

## Abstract

**Objectives**    To retrospectively review clinic records to assess the difference between face-to-face and telepsychiatry buprenorphine Medication-assisted treatment (MAT) programs for the treatment of opioid use disorder on three outcomes: additional substance use, average time to achieve 30 and 90 consecutive days of abstinence, and treatment retention rates at 90 and 365 days.

**Methods**    Medical records of patients (N 100) who were participating in telepsychiatry and in face-to-face group-based outpatient buprenorphine MAT programs were reviewed and assessed using descriptive statistical analysis.

**Results**    n omparison with the telepsychiatry MAT group, the face-to-face MAT group showed no significant difference in terms of additional substance use, time to 30 days (p 0.09) and 90 days of abstinence (p 0.22), or retention rates at 90 and 365 days (p 0.99).

**Conclusions**    We did not find any significant statistical difference between telepsychiatry buprenorphine MAT intervention through videoconference and face-to-face MAT treatment in our Comprehensive pioid Addiction Treatment (C AT) model for individuals diagnosed with pioid Use Disorder in terms of additional substance use, average time to 30 and 90 days of abstinence, and treatment retention rates.

**eywords**

buprenorphine; MAT; opioid use disorder; telepsychiatry; retention

## NTRODUCT ON

ver the past decades, opioid use disorder has become an epidemic health problem both in the United States and globally. Congruent with the peaking prevalence of this epidemic, the demand for Medication-assisted treatment (MAT) for opioid use disorder has risen sharply. n a span of 15 years from 1997 to 2011, opioid dependent Americans seeking MAT had increased by 900 (SAM SA, 2010; 2013). Despite national data projecting a prevalence of opioid use disorder in sums surpassing 5 million in the United States, only a fraction of this population (22 ) had received MAT from the years 2009 to 2013 (Rinaldo and Rinaldo, 2013; Alexander et al., 2015). While attributable etiologies behind poor treatment engagement are multifactorial, the reality of patient access limitations must be strongly considered, as 96 of all states in the US face a despairing gap between their opioid dependent population and their MAT capacity (Jones et al, 2015). The current waitlist for MAT at West Virginia University Chestnut Ridge Center (CRC) is more than 600 patients. While healthcare, legislative, and collaborative community efforts have produced progress in combating the opioid epidemic, the current state re uires novel solutions to improve access for patients seeking treatment.

pioid use disorder is a complex chronic health condition that often re uires long-term structured treatment and care. The success of treatment often relies on combination of specific pharmacological and psychosocial interventions that aim to reduce both illicit opioid use and its related harms, and to improve uality of life (World ealth rganization,

2009). Currently, methadone and buprenorphine are the only two opioid agonist medications approved by the Food and Drug Administration (FDA) for MAT of opioid use disorder.

Methadone is a full opioid agonist and has been used for opioid medication maintenance for many years (Dole and Nyswander, 1965; Mattick et al., 2009). Buprenorphine is a partial opioid agonist that was approved in 2002 by the FDA as a pharmacotherapy agent for the treatment of opioid use disorder in the United States (Fiellin et al., 2001; Food and Drug Administration, 2002). Buprenorphine is considered to be safer than methadone and e ually effective for maintenance treatment (Pinto et al., 2008; Amass et al., 2012; Salisbury et al., 2012;   ser et al., 2014). Treatment using buprenorphine was reported to have good retention rates, treatment adherence, and patient as well as provider satisfaction (Becker and Fiellin, 2006; Pinto et al., 2008; Strobbe et al., 2011). Unlike methadone clinics, which are typically housed in stand-alone facilities, buprenorphine treatment programs are office-based. This allows patients to have easier access to MAT.    owever, many individuals, especially those who live in rural areas, seek this treatment but have limited to no access to buprenorphine providers.

Telepsychiatry may present a promising way to deliver MAT to this population and expand access to care. Using new audio-video technology to remove the barriers of time and distance for individuals who are most in need of medical and health care services is not a new idea, yet it has become increasingly popular in recent years (Wilson and Maeder, 2015).    n he realm of psychiatry, diagnoses and treatment decisions are fre uently based on record review, patient interview, and observation, enabling telepsychiatry to  uickly evolve as an alternative to office visits for patients who do not have easy access to mental health services (Deslich et al., 2013; Ulzen et al., 2013). This could be a particularly attractive option for rural patients for whom face-to-face treatment access is limited. A recent published review of 70 studies found a wide consensus of e uivalence, and in some cases superiority, in terms of diagnosis, clinical outcomes, access to care, and patient satisfaction of telepsychiatry medicine when compared to in-person services (  ilty, 2013).   owever, data regarding the utility of telepsychiatry for MAT for opioid use disorder is very limited. To our knowledge, there have been no studies published regarding outcomes of telepsychiatry using buprenorphine in MAT.

This article reports data from a 2-year retrospective analysis comparing treatment outcomes between telepsychiatry and face-to-face MAT for opioid use disorder with buprenorphine. We introduce our outpatient Comprehensive   pioid Addiction Treatment (C  AT) model for opioid maintenance treatment and assess the difference between telepsychiatry MAT and face-to-face treatment in this setting. The purpose of this pilot study is to establish a groundwork of evidence surrounding telepsychiatry and its role as an alternative means of delivering substance use disorder treatment to those outpatients who live in rural areas with limited access to addiction treatment and services.

Zheng et al.                                                                                              Page 4

## METHODS

### Study Setting

This study was conducted at West Virginia University Department of Behavioral Medicine and Psychiatry CRC, one of the largest mental health service centers in West Virginia. The center provides opioid use disorder treatment through both face-to-face and telepsychiatry clinics by using an interdisciplinary team approach named the Comprehensive  pioid Addiction Treatment (C  AT) program.  t includes group-based medication management followed by substance use disorder focused group therapy at the same clinic visit. The group therapy content is not standardized, however all therapists use a CBT based therapeutic model incorporating psychoeducation regarding the disease of addiction, relapse prevention, and 12-step facilitation concepts. There were no efforts to ensure the e uivalence of group therapy at the two sites.  nitially, patients attend these treatment services weekly.  nce they have 90 days of abstinence and are actively involved in 12-step meetings as evidenced by having a 12- step sponsor, they begin to come every other week. After a year of abstinence from alcohol and any illicit drugs, they may attend treatment monthly.

Each patient signs an agreement before being enrolled in the C  AT clinic. A list of medications including selected controlled substances is disallowed for the purpose of buprenorphine maintenance treatment. All patients are re uired to attend a minimum of four 12-step meetings a week and submit to random urine drug screens. All urine drug tests are first done on site using enzyme immunoassay (E A) screening that allows for rapid results reporting. The provider gets the screening report immediately during the group time, and discusses the results with patients. Secondary analysis on the same specimen is performed with gas chromatography/mass spectrometry (  C/MS) testing methodology. This serves as confirmatory and provides identification and  uantification of the specific drugs present. The final results (if positive) are used to compare with patients  self-reports, and discussed in the following week s medication and therapy group session. To ensure treatment adherence, buprenorphine and its metabolite nor-buprenorphine must be present in the urine drug screen in order for a new prescription to be written.  f a patient has a positive urine drug screen, they may be re uired to attend more 12-step meetings, to increase individual therapy sessions, or to come back for more fre uent pill counts or urine drug screens. Sometimes, a patient in a bi-weekly group may be sent back to the weekly group if fre uent relapses occur. Patients can only be moved to a bi-weekly group after attaining 90 consecutive days of abstinence, completing the re uired number of 12-step meetings and obtaining a 12-step sponsor. Criteria for patient discharge include evidence of dishonesty, diversion, illegal activity on the premises or if a patient re uires a higher level of care. These circumstances are all clearly specified in the C  AT treatment agreement signed before patient enrolls in the program. Patients who discontinue the clinic for any reason can re-enroll after one month. The telepsychiatry program for MAT follows the same model, except that the psychiatrist delivers addiction assessment and care in a group setting through videoconferencing to patients who live in two rural southern West Virginia counties located 225 miles from CRC. Those patients receive their group therapy and random urine drug screenings through local community mental health facilities.

Author Manuscript Author Manuscript Author Manuscript Author Manuscript

Zheng et al.                                                                                                      Page 5

### Design

The study design is a retrospective chart review. Treatment information regularly recorded for all C AT patients includes current and previous buprenorphine formulation and dosage, abstinence time, random Urine Drug Screen results, peer support group meeting attendance, 12-step sponsorship status, etc. The two telepsychiatry sites in remote counties included in this study keep records of initial psychosocial intakes and therapy notes that include substance use and treatment history, psychosocial history, and therapy progress related information. We reviewed the notes from 01/01/2013 to 12/31/2014 and selected C AT clinic patients who were under the care of the same psychiatrist who provided medication management through both telepsychiatry and face-to-face method during the same study period. Those who enrolled after 10/01/2014 were excluded because they had not been in the treatment program for 90 days by the end of the study window time (12/31/2014) and therefore could not be used for 90 days abstinence or retention calculation. Patients included in the study received MAT services in weekly and biweekly groups at CRC or telepsychiatry sites. roup therapy at all locations had the same structure and goals. The treatment re uirements including meeting and therapy attendance followed the same agreement and policy. The group therapists were different for telepsychiatry and face-to-face treatment. roup therapy was face-to-face for both treatment groups. As this was a retrospective chart review of existing clinical data, the West Virginia University nstitutional Review Board approved this study and granted a waiver regarding the need to obtain informed consent and ealth nsurance Portability and Accountability Act authorization.

At the beginning of this study period the DSM V was still in use and some patients in the study were diagnosed with opioid dependence. Since that time, the DSM 5 has been approved. All patients were assessed to meet criteria for opioid use disorder and that diagnosis is the one referenced in this paper.

### Measures

Abstinence time was defined as days since last use of non-prescribed or illicit opioids or any prohibited drugs or alcohol. Drug use was based on both patient self-report and/or random urine drug screen test results. Though not specifically examined, it appears to the clinicians that patients reported more relapses than detected by urine drug screen tests.

Times to 30 and 90 days abstinence were defined as from the time each patient started the treatment program to the time each patient reached 30 and 90 consecutive days of abstinence time respectively.

Treatment retention was calculated at 90 and 365 days after the enrollment. The admission to treatment programs was on a rolling basis, which means that patients could be admitted anytime during the year. For this study, we reviewed the notes over two years. The retention rate was calculated as the percentage of patients who stayed in treatment over 90 or 365 days. With the study period ending on 12/31/2014, we excluded patients starting the program after 10/01/2014 for 90-day retention calculation and those starting after 01/01/2014 for the 365-day retention calculation. Some patients were discharged but then

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Zheng et al.                                                                                     Page 6

reenrolled during the study period; these were counted as separate cases for this study purpose.

## Statistical Analysis

The primary endpoints are the treatment outcomes measured in three parameters: rates of additional substance use, average time to get to first 30 and 90 consecutive days of abstinence, and retention rates at 90 and 365 days. For the continuous outcome of time to 90 consecutive days of abstinence with standard deviation of 35 days, our sample size in this study has 80   power to detect a difference of 20 days between two treatment groups using two-sided two-sample t-test. For the binary outcome of retention (yes or no), the same sample size has 80   power to detect a difference of 50   versus 78   retention rates between two treatment groups. Descriptive statistics were used to analyze the parameters being investigated, including mean with standard deviation and range for continuous variables such as time in days to 30 and 90 days of abstinence, and proportions or percentage for categorical variables. Wilcoxon rank sum test was used to assess telepsychiatry and face-to-face groups without normal distribution assumption. Chi-s uared test was applied to assess the observed difference in additional substance use and retention rates between the two groups.   eneralized estimating e uations (  EE) with a logit link were used to adjust for covariates for determining the association between treatment modality and retention measured as a binary outcome (yes/no). A p-value   0.05 implies the statistical significance in this study. Statistical calculations were performed using SAS 9.2 and R software, version R 3.1.3.

## Participants

A total of 100 patients were included in this study. Basic demographic and opioid use characteristics are presented in Table 1. There were several instances of missing data due to incomplete records.

## RESULTS

The demographics of two study populations are illustrated in Table 1. No statistical difference was detected between the telepsychiatry and face-to-face groups, exemplified by p values   .05 in each demographic metric examined.

Additional substance use is summarized in Figure 1. The telepsychiatry group percentage of those attaining 90 consecutive days of abstinence before 12/31/2014 is 49  , and 37   in the face-to-face group; Chi-s uared test (p   0.31) indicating no significant difference between the two groups. More than half of each group (51   of the telepsychiatry and 63   of the face-to-face group) was unable to attain 90 days of abstinence before 12/31/2014. Among those reaching 90 days of abstinence time, 10 (43  ) telepsychiatry patients and 6 (27  ) face-to-face patients did not use any additional substances while attending the weekly groups. 6 (13  ) patients from the telepsychiatry group and 4 (7  ) patients from the face-to-face group dropped out of program (mostly had no shows to groups) at an early treatment phase (some less than 1 week), before a possible relapse could be recorded. Additionally, comparison of the percentage of patients with 0, 1–2, or   3 relapses between the two groups

fails to show differences that were statistically significant (p   0.12). There is also no statistical difference (p   0.38) when comparing only those patients who attained 90 consecutive days of abstinence.  n both the telepsychiatry and face-to-face groups, the most common number of relapses was 1–2. Among telepsychiatry patients who eventually attained 90 consecutive days abstinent within the study window, it was almost e ually as common for patients to relapse 1–2 and   3 times. Comparatively overall, there were less face-to-face patients who had   3 relapses, but had more than two times the amount of patients relapsing 1–2 times in contrast to the telepsychiatry 90-day abstinence subgroup.   f note, there were several instances of repeat enrollment.  n the telepsychiatry group, one patient had two separate enrollments in the weekly group and counted twice (total 47 instead of 46), this patient did not advance past weekly group in two enrollments.  n the face-to-face group, five patients had two separate enrollments in the weekly group therefore counted twice (total 59 instead of 54). Among these five, only two advanced to the biweekly group on second attempt.

Table 2 illustrates the comparison of time to reach 30 and 90 days of abstinence between the two groups.  n the telepsychiatry group, it took patients a range of 30–70 days to reach 30 consecutive days of abstinence, whereas it took the patients in the face-to-face group 30–112 days.  n terms of time to reach 90 days of abstinence, telepsychiatry patients re uired 90–194 days, while face-to-face patients re uired 90–236 days. Neither of these differences were statistically significant, although at the .09 p value, the telepsychiatry group trended towards achieving clean time more  uickly. While the face-to-face group has a longer average time to 30 and 90 days of abstinence, the p value indicates that these differences are statistically insignificant.

  roup retention rates are presented in Tables 3 and 4. Table 3 illustrates the group comparison for 90-day retention.  t includes all patients enrolled before 10/01/2014, as patients enrolled after this date could not feasibly meet statistical inclusion for 90-day treatment retention by the end of the study window 12/31/2014. For this same reason, the 365-day retention comparison in Table 4 includes only patients enrolled before 01/01/2014. We also calculated 90-day retention for this subgroup.

For patients who could have potentially stayed in treatment for 90 days, both groups retained close to 50   of patients at 90 days. Between patients that started treatment before 01/01/2014, the retention rates at 90 days are comparable to the previous groups, 12/24 (50   telepsychiatry group) and 17/31 (54.9   face-to-face group), both consistently close to 50  . The retention rates at 365 days decreased to 10/24 (41.7   telepsychiatry group) and 11/31 (35.5   face-to-face group). This difference was not statistically significant between the two groups (p   0.99).  n the multivariate analysis of these retention rates, the fitted   EE logistic model indicates no statistically significant difference between the two groups (p 0.29 for 90 days and p   0.55 for 365 days), adjusting for all variables from Table 1 except for race since there is only one African-American in the telepsychiatry group. Furthermore, when examining only the patients staying more than 90 days, the proportionated retention rates increase to 83.3   (10/12) in the telepsychiatry group and 64.7   (11/17) in the face-to-face group. Chi-s uared test (p   0.49) shows no statistical difference.

Zheng et al.                                                                                                          Page 8

# D SCUSS ON

The results of this study show that there is no significant difference in terms of three different outcomes when comparing telepsychiatry and face-to-face modalities in MAT of opioid use disorder. n particular, retrospective analysis of patients enrolled in our C AT clinic failed to exemplify statistically significant differences in terms of demographics, additional substance usage, time to reach 30 and 90 consecutive days of abstinence, and patient retention rates at 90 and 365 days of treatment. From our data, it appears that in both groups, once a patient makes it past the early phase of treatment that they are much more likely to remain in treatment. Additionally, a possible trend was observed towards the telepsychiatry patients having slightly better outcomes in terms of time to reach 30 and 90 consecutive days of abstinence. With a larger sample size, we would be better able to assess if this translated into a significant difference.

Addressing the opioid epidemic and optimizing treatment for opioid use disorder remains a complex and multifaceted undertaking of great significance for patients, public health policy, and healthcare as a whole. With its high prevalence, chronic-relapsing nature, and broad implications (infectious disease, overdose mortality, and crime rates), a measurable strain is placed on local communities and healthcare systems, making opioid use disorder an essential target for continued research, and for the development of new and modification of existing evidence-based treatments. Conse uentially, practitioner adaptation has resulted in substantial variability between clinical practices of MAT for opioid use disorder. This creates a challenge in terms of data congruency and outcome measure (such as treatment retention rates and efficacy) compatibility across various clinical and research settings. Unfortunately, this study fails to address this challenge and lacks ability to draw inferences regarding efficacy, as a conse uence of the nature of our retrospective study design.

n a recent meta-analysis of retention rates in MAT for opioid use disorder consisting of 55 published (RCT and non-RCT) trials from years 2010–2015, the authors report a staggering overall variability in retention rates of 19–94 at 3 months (Timko et al., 2016). The authors extensive stratification of this study data by research design, treatment modality, and therapy modifiers clearly illustrates the broad spectrum of MAT in its current clinical form. Acknowledging a lack of study follow-up time for retention studies, the authors report an aggregate 6-month retention of 55 from non-RCT studies with buprenorphine/naloxone MAT with a psychosocial program and group cognitive behavioral therapy. nterestingly, with comparable practices of MAT to that of our study population, the retention statistics between our study and that of the stratified meta-analysis cohort share close resemblance.

The primary strength behind our study is that it presents pilot data on a patient population that has yet to be studied in terms of interventional delivery and associated outcomes through telepsychiatry when compared to its standard-of-care counterpart. n attempts to control for confounding, the study uses a standard delivery of MAT treatment by the same physician using the same MAT C AT model. While contributing noteworthy strength and validity to our study, it significantly restricts the sample size and statistical power, which is its primary weakness.  ur power analyses indicate that the sample size in this retrospective study may be too small to detect small differences between these two treatment groups and

that a larger prospective study should be used to confirm the result. We attempted to increase the length of the study period, but were ultimately restricted to two years due to limitations in medical record access. owever, when compared to the majority of published literature on MAT retention, our two-year analysis period adds to our study s strength. Alternatively, multiple time-to-recurrence analysis may be a better choice to study this population if the data had been available. Additionally, different therapists delivered the group services between study groups, so there was likely some variation in the delivery of group therapy. Furthermore, we must take into account the uni ue characteristics of the population studied. West Virginia faces the highest opioid-related mortality rates nationwide. This population represents a rural population, which differs from that of the general treatment population, with telepsychiatry patients being from even less populated counties. Conse uentially, it is important to recognize and acknowledge the possibility of unaccounted confounding in the study s findings as well as its generalizability to other populations and healthcare systems. Finally, another limitation of this study is the simplified measures of outcome. t should be noted that Recover is not simply sobriety (Schwarzlose et al., 2007). Additional components, such as employment, relationship and marriage, crime activity etc., are also particularly important to the recovering individual and to families and society. Unfortunately we did not collect data about these changes for the participants.

Nonetheless, in response to the lack of research in telepsychiatry outcomes in MAT, it is hoped that this pilot study will expand on the current state of research surrounding telepsychiatry as well as to underline the utility of telepsychiatry in the MAT setting for opioid use disorder. While sample size and statistical power are limited in this study, the novel application and pilot data serve as its primary strength in exemplifying similarity in some objective outcome metrics. The hope is that this study will open further avenues for research, funding, and practical application in increasing access of psychiatric services through telemedicine, specifically in terms of substance use treatment and to populations with limited access to healthcare.

## CONCLUS ON

ncreasing healthcare access and addressing healthcare disparities remains a top priority in this evolving age of medical practice, policy, and reform. Without uestion, the opioid epidemic demands priority and attention in terms of expanding research, practical solutions, increasing access, and improving treatment uality. Providing buprenorphine MAT for opioid use disorder patients can be done through either videoconference or face-to-face groups. Retrospective analysis of our Comprehensive pioid Addiction Treatment (C AT) model yielded no statistically significant differences in outcome measures between intervention modalities of telepsychiatry and face-to-face in terms of additional substance use, average time to reach 30 and 90 consecutive days of abstinence, and patient retention rates at 90 and 365 days into treatment.

## Acknowledgments

The authors thank Rhonda ebb, Takeshi amamoto and other Southern ighlands CM C staff, and Elizabeth Ashley Six-Workman, Tammy Feathers, Jordan Cunningham, and Ashman Dodd at the Chestnut Ridge Center for helping with data collection. Data analysis was conducted by Dr. Sijin Wen whose work was supported by the

National nstitute of eneral Medical Sciences of the National nstitutes of ealth under Award Number U54 M104942. The content is solely the responsibility of the authors and does not necessarily represent the official views of the National nstitutes of ealth.

## References

1. Alexander,  C.Frattaroli, S.,  ielen, AC., editors. The Prescription  pioid Epidemic: An Evidence-Based Approach. Baltimore, MD: Johns  pkins Bloomberg School of Public  ealth; 2015.

2. Amass L, Pukeleviciene V, Subata E, et al. A prospective, randomized, multicenter acceptability and safety study of direct buprenorphine/naloxone induction in heroin-dependent individuals. Addiction. 2012; 107(1):142–151.  bMed: 21749526

3. Becker WC, Fiellin DA. Provider satisfaction with office-based treatment of opioid dependence: a systematic review. Substance abuse. 2006; 26(1):15–22.

4. Deslich S, Stec B, Tomblin S, Coustasse A. Telepsychiatry in the 21st century: transforming healthcare with technology. Perspectives in  ealth nformation Management. 2013; 10(Summer):1f.

5. Dole VP, Nyswander M. A medical treatment for diacetylmorphine (heroin) addiction: a clinical trial with methadone hydrochloride. Journal of the American Medical Association. 1965; 193(8):646–650.  bMed: 14321530

6. Fiellin DA, Rosenheck RA,  osten TR.  ffice-based treatment for opioid dependence: reaching new patient populations. American Journal of Psychiatry. 2001; 158(8):1200–1204. PubMed: 11481150

7. Food and Drug Administration. Subutex and Suboxone  approved to treat opiate dependence. Postmarket Drug Safety  nformation for Patients and Providers.  ct 8.2002

8.  ilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ,  ellowlees PM. The effectiveness of telemental health: a 2013 review. Telemedicine and e- ealth. 2013; 19(6):444–454. PubMed: 23697504

9.  ser , Saxon AJ,  uang D, et al. Treatment retention among patients randomized to buprenorphine/naloxone compared to methadone in a multi-site trial. Addiction. 2014; 109(1):79–87.  bMed: 23961726

10. Jones CM, Campopiano M, Baldwin , McCance- atz E. National and state treatment need and capacity for opioid agonist medication-assisted treatment. American Journal of Public  ealth. 2015; 105(8)

11. Mattick RP, Breen C,  imber J, Davoli M. Methadone maintenance therapy versus no opioid replacement therapy for opioid dependence. Cochrane Database Systematic Reviews. 2009; 3(3)

12. Pinto , Rumball D, Maskrey V,  olland R. A pilot study for a randomized controlled and patient preference trial of buprenorphine versus methadone maintenance treatment in the management of opiate dependent patients. Journal of Substance Use. 2008; 13(2):73–82.

13. Rinaldo, S ., Rinaldo, DW. Report prepared for the American Society of Addiction Medicine. San Francisco, CA: The Avis  roup; 2013. Availability without accessibility  State Medicaid coverage and authorization re uirements for opioid dependence medications.

14. Salisbury AL, Coyle M ,  rady  E, et al. Fetal assessment before and after dosing with buprenorphine or methadone. Addiction. 2012; 107(S1):36–44. PubMed: 23106925

15. Schwarzlose J, et al. The Betty Ford nstitute Consensus Panel. Special Section: Defining and Measuring  Recovery . Special article  What is recovery  A working definition from the Betty Ford nstitute. Journal of Substance Abuse Treatment. 2007; 33:221–228. PubMed: 17889294

16. Strobbe S, Mathias L,  ibbons PW,  umenay E, Brower  J. Buprenorphine clinic for opioid maintenance therapy: program description, process measures, and patient satisfaction. Journal of Addictions Nursing. 2011; 22(1–2):8–12.

17. Substance Abuse and Mental  ealth Services Administration (SAM SA), Center for Behavioral  ealth Statistics and  uality. Discharges from Substance Abuse Treatment Services. Rockville, MD: SAM SA; 2010. Treatment Episode Data Set (TEDS): 2007. DAS S Ser.: S-51,  S Publ. No. (SMA) 10-4479

18. Substance Abuse and Mental  ealth Services Administration (SAM SA), Center for Behavioral  ealth Statistics and  uality. National Admissions to Substance Abuse Treatment Services.

Zheng et al. Page 11

Rockville, MD: SAM SA; 2013. Treatment Episode Data Set (TEDS): 2001–2011. B S S Ser. S-65, D S Publ. No. SMA 13-4772

19. Timko C, Schultz NR, Cucciare MA, Vittorio L, arrison-Diehn C. Retention in medication-assisted treatment for opiate dependence: A systematic review. Journal of addictive diseases. 2016; 35(1):22–35. PubMed: 26467975

20. Ulzen T, Williamson L, Foster PP, Parris-Barnes . The evolution of a community-based telepsychiatry program in rural Alabama: lessons learned a brief report. Community Mental ealth Journal. 2013; 49(1):101–105. PubMed: 22322325

21. Wilson LS, Maeder AJ. Recent directions in telemedicine: review of trends in research and practice. ealthcare informatics research. 2015; 21(4):213–222. PubMed: 26618026

22. World ealth rganization, Deptartment of Mental ealth Substance Abuse, nternational Narcotics Control Board, United Nations ffice on Drugs, Crime. uidelines for the psychosocially assisted pharmacological treatment of opioid dependence. Switzerland: W Press; 2009.



**Figure 1.**
Summary of Additional Substance Use

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Zheng et al.                                                                                          Page 13

**Table**

Participant Characteristics

| | e e    i r | F  e    e | ue |
|---|---|---|---|
| ge | 37.2  7.6 | 34.4  9.9 | 0.11 |
| e    er | | | 0.89 |
| e | 22 (47  ) | 24 (44  ) | |
| Fe    e | 24 (53  ) | 30 (56  ) | |
| e | | | 0.57 |
| ri    eri | 1 (2  ) | 2 (3.7  ) | |
| u    i | 45 (98  ) | 49 (90.7  ) | |
| er | 0 (0  ) | 1 (1.9  ) | |
| | 0 (0  ) | 2 (3.7  ) | |
| u    i | | | 0.99 |
| e    ig | 15 (33  ) | 17 (32  ) | |
| ig    r    e | 31 (48  ) | 32 (13  ) | |
| | 0 (0  ) | 5 (9  ) | |
| e | | | 0.99 |
| e | 43 (93  ) | 39 (72  ) | |
| e | 3 (7  ) | 10 (19  ) | |
| | 0 (0  ) | 5 (9  ) | |
| er    r i    i ri   i g  i | | | 0.9 |
| | 13 (28  ) | 17 (31  ) | |
| e | 33 (72  ) | 37 (69  ) | |
| e g    i i u e | | | 0.85 |
| | 43 (94  ) | 50 (93  ) | |
| | 2 (4  ) | 4 (7  ) | |
| | 1 (2  ) | 0 (0  ) | |

Zheng et al.

**Table 2**

Comparison of Time to 30-day and 90-day Abstinence between Telepsychiatry  roup and Face-to-face  roup

|  | e e   i  r | | F  e   e | |  |
| --- | --- | --- | --- | --- | --- |
|  | e  e i | ge | e  e i | ge |  |
| Time to 30 days | 35/30 (30, 70) | | 42/30 (30, 112) | | 0.09 |
| Time to 90 days | 106/90 (90, 194) | | 112/94 (90, 236) | | 0.22 |

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

**Table**

Comparison of 90-day Retention Rates between Telepsychiatry  roup and Face-to-face  roup for Patients
Enrolled Before 10/01/2014

| r u | e e | e re | | |
|---|---|---|---|---|
| Telepsychiatry | 23(48.9 ) | 24(51.1 ) | 47 | |
| Face-to-face | 30(50.8 ) | 29(49.2 ) | 59 | 0.99 |

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Zheng et al. Page 16

**Table**

Comparison of 90-day and 365-day Retention Rates between Telepsychiatry Group and Face-to-face Group for Patients Enrolled Before 01/01/2014

| r u | e | e ee | re | | |
|---|---|---|---|---|---|
| Telepsychiatry | 12 (50 ) | 2 (8.3 ) | 10 (41.7 ) | 24 | 0.99 |
| Face-to-face | 14 (45.1 ) | 6 (19.4 ) | 11 (35.5 ) | 31 | |

| ie | e i r gr | | | |
|---|---|---|---|---|
| Telepsychiatry | 2 (16.7 ) | 10 (83.3 ) | 12 | 0.49 |
| Face-to-face | 6 (35.3 ) | 11 (64.7 ) | 17 | |

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

Hindawi
International Journal of Telemedicine and Applications
Volume 2018, Article ID 7937610, 7 pages
https://doi.org/10.1155/2018/7937610



*Research Article*

# Characterizing the Use of Telepsychiatry for Patients with Opioid Use Disorder and Cooccurring Mental Health Disorders in Ontario, Canada

**Brittanie LaBelle,[1] Alexandra M. Franklyn,[1] Vicky PKH Nguyen,[1] Kathleen E. Anderson,[1] Joseph K. Eibl,[1] and David C. Marsh [1,2]**

[1]*Northern Ontario School of Medicine, 935 Ramsey Lake Rd., Sudbury, ON, Canada P3E 2C6*
[2]*Canadian Addiction Treatment Centers, 13291 Yonge St., Ste. 403., Richmond Hill, ON, Canada L4E 4L6*

Correspondence should be addressed to David C. Marsh; dmarsh@nosm.ca

Received 26 May 2017; Accepted 15 January 2018; Published 11 February 2018

Academic Editor: Malcolm Clarke

Copyright © 2018 Brittanie LaBelle et al. This is an open access article distributed under the Creative Commons Attribution License, which permits unrestricted use, distribution, and reproduction in any medium, provided the original work is properly cited.

Rural patients with opioid use disorder (OUD) face a variety of barriers when accessing opioid agonist therapy (OAT) and psychiatric services, due to the limited supply of physicians and the vast geographic area. The telemedicine allows for contact between patients and their physician—regardless of physical distance. *Objective*. We characterize the usage of telemedicine to deliver psychiatric services to patients with OUD in Ontario, as well as traits of treatment-seeking patients with opioid dependence and concurrent psychiatric disorders. *Methodology*. A retrospective cohort study was conducted using an administrative database for patients who received psychiatric services via telemedicine between 2008 and 2014 and who also had OUD. *Results*. We identified 9,077 patients with concurrent opioid use and other mental health disorders who had received psychiatric services via telemedicine from 2008 to 2014; 7,109 (78.3%) patients lived in Southern Ontario and 1,968 (21.7%) in Northern Ontario. Telemedicine was used more frequently to provide mental health services to patients residing in Northern Ontario than Southern Ontario. *Conclusion*. Telemedicine is increasingly being utilized throughout Ontario for delivering mental health treatment. There is an opportunity to increase access to psychiatric services for patients with opioid dependence and concurrent psychiatric disorders through the use of the telemedicine.

## 1. Introduction

Nonmedical use of prescription opioids is a major public health crisis across North America [1]. From 2010 to 2011, 6% of the adult population reported nonmedical prescription opioid use, making opioids the second most prevalent nonprescribed drug following cannabis. This rate becomes further inflated among high-school students (15%–20%) and in marginalized populations [2, 3]. In Canada alone, opioid use disorder (OUD) and opioid-related overdoses account for 12% of deaths in patients between the ages of 25 and 34 [4]. Furthermore, in Ontario, opioid-related overdoses are responsible for higher death rates than all other nonprescribed drugs combined [1, 5].

Methadone and buprenorphine are long-acting synthetic opioid agonists prescribed to treat OUD [6]. Health

Canada's Best Practice Guideline on Methadone Maintenance Treatment identifies opioid agonist therapy (OAT) with methadone or buprenorphine as key treatment and prevention strategies to manage OUD and its associated consequences [6]. OAT is associated with a reduction in the use of other substances, criminal activity, mortality, and risk behaviors for blood-borne pathogens [6]. Moreover, OAT leads to improvements in physical and mental health, social functioning, and quality of life among people with OUD [6].

In Ontario, patients who initiate OAT require supervised daily dosing of methadone or buprenorphine in a specialized addiction clinic, family physician's office, or pharmacy [7]. Patients residing in Northern Ontario face a variety of barriers when accessing these healthcare services, such as a lack of primary care physicians and the need to travel long distances to access care [7]. Considering the long-lasting

nature of OAT, patients are required to stay connected with healthcare providers over an extended period of time and, consequently, patients receiving OAT are even more affected by the barriers of living in Northern Ontario.

The barriers experienced by patients seeking OAT mirror those experienced by patients seeking psychiatric services in Northern Ontario. As of 2009, the overall psychiatrist supply in Ontario was 15.7 psychiatrists per 100,000 people [8]. Delivery of health care in Ontario is provided across fourteen Local Health Integration Networks (LHINs). Southern Ontario is comprised of LHIN 1–12, and Northern Ontario is comprised of LHIN 13-14. Of the fourteen LHINs, Northern Ontario LHINs are far below average; North Western Ontario (LHIN 14) had the third lowest psychiatrist supply (approximately 7 per 100,000) and North Eastern Ontario (LHIN 13) had the sixth lowest psychiatrist supply (approximately 8.5 per 100,000) [8]. This problem is compounded by the vast geographic landscape of Northern Ontario, where many communities are isolated from larger urban centers. This—combined with the chronic shortage of physicians—leaves many Northern Ontario mental health patients without access to treatment.

To address these barriers, the provincial government invested in the Ontario Telemedicine Network (OTN), which is now one of the largest telemedicine networks in the world [9]. Telemedicine allows for the exchange of health information between providers and their patients from various locations across the province through two-way secure videoconferencing [9, 10]. The Ministry of Health and Long-Term Care reports that 49% of total telemedicine activity is used to service Northern Ontario [9]. According to the OTN, mental health and addiction medicine accounted for 72% of total patients served by telemedicine from 2012 to 2013 [11].

With a high prevalence of mental health disorders and many patients' needs being unmet, more research is required to better understand how access to mental health treatment can be improved, particularly for those patients seeking treatment in geographically isolated regions. In this study, we characterize patients with mental health disorders and concurrent OUD who receive psychiatric services via OTN. We also quantify resource usage by region, with a focus on Northern Ontario versus Southern Ontario.

## 2. Methods

*2.1. Cohort Definition.* We conducted a retrospective cohort study of all patients with OUD (as defined by having been engaged in OAT at some point during the study period) who also received psychiatric services for a mental health diagnosis other than substance use disorder via telemedicine from 2008 to 2014. Patients were at least 15 years or older and were residents of Ontario. Due to the nature of data collection (primarily derived from physician billing data), undiagnosed patients were not captured.

*2.2. Data Sources.* Data was accessed through the Institute for Clinical and Evaluative Sciences (ICES) through the Data Access Services division. The Ontario Drug Benefit (ODB) database was used to identify all patients engaged in OAT and to determine their past medication use of methadone or buprenorphine. The ODB database contains detailed records of all prescriptions dispensed to Ontario residents eligible for public drug coverage. In Ontario, residents are eligible for public drug coverage if they are aged 65 or older, reside in a long-term care facility, are disabled, are receiving social benefits for income support, or have high prescription drug costs relative to their net household income. Health system utilization was identified using the Canadian Institute for Health Information (CIHI) and the National Ambulatory Care Reporting System, and hospital admissions were identified using the CIHI Discharge Abstract Database. All diagnosis information from physician visits was determined using billing data from the physician Ontario Health Insurance Plan (OHIP) database. OHIP covers physician services for all permanent residents of Ontario. We obtained patient location of residence and demographic information from the Ontario Registered Persons Database, which contains a unique entry for each resident who has ever received insured health services. Patient information was linked anonymously across databases using encrypted 10-digit health card numbers. The linking protocol has been described extensively elsewhere [12, 13] and is used routinely for health system research in Ontario [14–16].

*2.3. Telemedicine Definition.* Patients' data were irrevocably stripped of personal identifiers before being made available for analysis. Telemedicine care via the OTN was identified by physician OHIP billing codes, which are specific to telemedicine appointments. Patients were included in the observational cohort if they had received a psychiatric diagnosis between 2008 and 2014 (listed in Table 1) from a psychiatrist via OTN (billing codes listed in Table 1) and if they were also diagnosed with OUD, as defined by having engaged in OAT at some point during the study period. It is worth noting that the treatment of OUD may or may not have involved physician care by OTN for the purposes of this study. Only patient data files with attachment to one of the 14 LHINs in Ontario were included in the analysis to aid subcohort analysis.

*2.4. Methadone/Buprenorphine Subgroups.* Patients with OUD were identified as any patient with a prescription for methadone or buprenorphine for the treatment of OUD during the study window. Patients receiving methadone or buprenorphine for whom the cost of medication was covered by the patient through direct payment or through private insurance or federal government insured health benefits were not identifiable in the data set. Previous research has demonstrated that the vast majority of patients treated with OAT in Ontario utilize the Ontario Drug Benefit program and therefore would be included in this analysis [17]. All patients were at least 15 years or older (to exclude data entry errors for newborns; patients < 18 years of age accounted for <1% of cohort) and were eligible for public drug coverage through the ODB plan. In Ontario, methadone is dispensed exclusively in liquid formulation, with very few exceptions; therefore, patients prescribed methadone in a tablet formulation (with a medication possession ratio

TABLE 1: ICD-9 mental health classifications.

| |
|---|
| 291: alcoholic psychosis, delirium tremens, Korsakov's psychosis |
| 292: drug psychosis |
| 295: schizophrenia |
| 296: manic depressive psychosis, involutional melancholia |
| 297: paranoid states |
| 298: other psychoses |
| 300: anxiety neurosis, hysteria, neurasthenia, obsessive compulsive neurosis, reactive depression |
| 301: personality disorders (e.g., paranoid personality, schizoid personality, obsessive compulsive personality) |
| 302: sexual deviations |
| 303: alcoholism |
| 304: drug dependence, drug addiction |
| 305: tobacco abuse |
| 307: habit spasms, tics, stuttering, tension headaches, anorexia nervosa, sleep disorders, enuresis |
| 309: adjustment reaction |
| 311: depressive or other nonpsychotic disorders, not elsewhere classified |
| 313: behaviour disorders of childhood and adolescence |
| 314: hyperkinetic syndrome of childhood |

greater than 20% over a one-year period) were excluded due to the likelihood that methadone was being administered for chronic pain management, despite being coded for addiction therapy in the billing records. We also excluded patients with missing information regarding place of residence, age, or gender. For evaluation of response to OAT, all patients were followed from their date of OAT initiation to the date of treatment discontinuation (patient did not receive a prescription for methadone or buprenorphine within 30 days of their last prescription), death, one-year follow-up, or end of the study period (December 31st, 2014).

*2.5. Geographical Definition.* Patient's postal codes were used to determine location of residence. Ontario is divided into 14 health care planning areas called Local Health Integration Networks (LHINs) for administrative, funding, and planning purposes. For geographic comparisons, patient data files with attachment to the North East (LHIN 13) or North West LHINs (14) were included in the Northern Ontario group for analysis compared to the remaining LHINs for Southern Ontario.

*2.6. Costing.* In order to calculate costs of OTN, the following variables were considered: inpatient hospitalization, same day surgery, National Ambulatory Care Reporting System (visits to ED, dialysis clinics, and cancer clinics), ODB, rehabilitation, complex and continuing care cost, home care services, OHIP physician billing, OHIP lab billings, OHIP nonphysician billings, OHIP shadowing billings, Family Health Organization/Family Health Network physician capitation cost, long-term care cost, Ontario Mental Health Reporting System Metadata admissions to designated mental health beds, and assisted device costs.

*2.7. Analysis.* Descriptive statistics were summarized for baseline characteristics of patients, and standardized differences were used to compare characteristics between Northern Ontario and Southern Ontario patients. Standardized differences < 0.1 are generally not considered to be meaningful [18]. All statistical analyses were carried out using SPSS (V.22). We used ArcGIS to produce maps illustrating the distribution of telemedicine delivery and distance between patients and their provider for each LHIN. Geographic boundaries by LHIN were retrieved from Statistics Canada [19].

*2.8. Ethics Review.* This study was approved by the Research Ethics Board of Laurentian University, Sudbury, Ontario, and by Sunnybrook Hospital, Toronto, Ontario.

# 3. Results

From 2008 to 2014, we identified 9,077 publicly insured patients who had received OAT and who received a mental health diagnosis from a psychiatrist through telemedicine. Of these, 7,109 (78.3%) lived in Southern Ontario and 1,968 (21.7%) lived in Northern Ontario. Patient characteristics by geographic location are summarized in Table 3. When comparing patients residing in Northern Ontario to those in Southern Ontario, it was found that Northern Ontario contains a concurrent disorder patient cohort with higher percentage of females (52.74% versus 45.17%), less education (23% high school completion rate versus 27%), greater impoverishment (47.46% in lowest income quintile versus 42.90%), and less enrolment in primary care (46.70% versus 51.68%).

Telemedicine is used more frequently to deliver psychiatric services in Northern Ontario than Southern Ontario for patients with concurrent OUD (Figure 1). In fact, telemedicine accounts for 26% to 40% of all psychiatry delivery to patients with concurrent disorders living in Northern Ontario LHINs; this number ranges from 1% to 30% in Southern Ontario LHINs (Figure 1). Overall, when moving from Southeastern Ontario towards Northwestern Ontario, there



FIGURE 1: Percent of patients with concurrent disorders receiving psychiatric services via telemedicine.

| | | |
|---|---|---|
| <1% | 11%–15% | 26%–30% |
| 1%–5% | 16%–20% | 40% |
| 6%–10% | 21%–25% | |



| | | |
|---|---|---|
| <10 km | 41 km–60 km | 101 km–200 km |
| 10 km–20 km | 61 km–80 km | 200 km–400 km |
| 21 km–40 km | 80 km–100 km | >800 km |

FIGURE 2: Median distances (km) between the residence of patients receiving psychiatry via telemedicine and their provider.

is increased telemedicine usage for delivering psychiatry to patients with concurrent disorders.

Concurrent disorder patients residing in Northern Ontario live farther away from their physicians (Figure 2) (median distance 341 km; interquartile range 73 km–901 km) compared with patients residing in Southern Ontario (median distance 75 km; interquartile range 33 km–142 km) (Table 1). Moreover, patients live a greater distance from their psychiatrist when they are receiving their services through telemedicine. In fact, LHIN 14 has the largest median distance between patients receiving mental health services and their provider (median distance 900 km), followed by LHIN 11 (median distance 322 km), LHIN 2 (median distance 136 km), and LHIN 13 (median distance 122 km) (Figure 2). LHIN 7, Toronto Central, has a median distance of only 4 km between patients and psychiatrists when receiving psychiatric services via telemedicine and it also has less than 1% of its patients serviced by telemedicine.

The number of concurrent disorder patients receiving psychiatry via telemedicine has increased from 347 to 5,879 over a period of six years (Table 2). The mean cost per patient of delivering psychiatric services to patients via telemedicine has also increased during this period; therefore, the total cost to the health care system of using telemedicine for mental health services has increased as well. However, we are not able to describe the costs avoided through the provision of care by telemedicine compared to transportation of patients to see the psychiatrist in person within the data utilized for this analysis.

## 4. Discussion

In the present study, we found that patients with concurrent disorders receive psychiatric services via OTN more often than patients who do not have OUD. Overall, telemedicine is currently heavily utilized for psychiatric service delivery, particularly in Northern and rural regions of Ontario. Notably, OTN is utilized more frequently in the geographically dispersed regions of Northern Ontario.

In Ontario, opioid agonist therapy can be delivered remotely via telemedicine where the physician is remote and a nurse, pharmacist, or clinic staff interact with the patient and dispense observed or carried methadone or buprenorphine doses. While there are no set determinants where virtual addiction medicine clinics can be established, historically, Northern, rural, and remote regions were almost exclusively serviced by telemedicine [7]. More recently, virtual clinics are also being established in urban centers due to the enhanced

Table 2: Utilization of telemedicine for psychiatry and mean cost to the health care system.

| Year | Total number of patient visits | Number of unique patients | Mean ($\pm$ SD) cost to the system per patient |
|---|---|---|---|
| 2008 | 1,588 | 347 | 6,455.64 $\pm$ 11,268.20 |
| 2009 | 4,768 | 943 | 7,255.15 $\pm$ 12,189.21 |
| 2010 | 11,507 | 1,748 | 7,852.72 $\pm$ 12,868.25 |
| 2011 | 22,998 | 3,175 | 8,417.49 $\pm$ 13,189.38 |
| 2012 | 46,150 | 4,300 | 9,003.45 $\pm$ 15,719.65 |
| 2013 | 56,261 | 5,254 | 9,605.53 $\pm$ 17,107.52 |
| 2014 | 58,863 | 5,879 | - |

Table 3: Characteristics of patients receiving psychiatry via telemedicine by geographic location.

| Variable | Overall $N = 9,077$ | Southern Ontario $N = 7,109$ | Northern Ontario $N = 1,968$ |
|---|---|---|---|
| Age, yr | | | |
| Median (IQR) | 36 (29–45) | 36 (29–45) | 35 (28–44) |
| Gender, $N$ (%) | | | |
| Female | 4,249 (46.81%) | 3,211 (45.17%) | 1,038 (52.74%) |
| Male | 4,828 (53.19%) | 3,898 (54.83%) | 930 (47.26%) |
| Median (IQR) distance between patient residence and physician address (km) | 86 (36–262) | 75 (33–142) | 341 (73–901) |
| Median percentage of high school completion, % (IQR) | 26 (21–31) | 27 (22–32) | 23 (19–27) |
| Number enrolled in primary care, $N$ (%) | 4,593 (50.60%) | 3,674 (51.68%) | 919 (46.70%) |
| Income quintile, $N$ (%) | | | |
| Missing | 23 (0.25%) | 15 (0.21%) | 8 (0.41%) |
| 1 | 3,984 (43.89%) | 3,050 (42.90%) | 934 (47.46%) |
| 2 | 2,058 (22.67%) | 1,664 (23.41%) | 394 (20.02%) |
| 3 | 1,385 (15.26%) | 1,089 (15.32%) | 296 (15.04%) |
| 4 | 981 (10.81%) | 789 (11.10%) | 192 (9.76%) |
| 5 | 646 (7.12%) | 502 (7.06%) | 144 (7.32%) |

efficiency of allowing a single physician to service multiple clinic locations regardless of the clinic location or setting.

The heightened demand for telemedicine in isolated regions indicates a need to provide a model of care that overcomes geographical isolation. For this reason, telemedicine is particularly important in Northern Ontario, where there are geographic barriers to accessing services due to the uneven distribution of limited physician supply in a vast geographic area. Similar to patients enrolled in OAT [7], the concurrent disorder cohort residing in Northern Ontario live a greater median distance from their physicians than patients in Southern Ontario. To address this issue, telemedicine can provide a platform for physicians to provide psychiatric care to patients living further away with little to no travel for both the physician and patients.

We also found that the number of patients receiving psychiatry via telemedicine increased from 2008 to 2014. This can be explained by a number of factors, including the increased demand for psychiatry and the billing incentive [20] that is associated with providing treatment via telemedicine. The increase in OTN has resulted in better access to mental

health services—including OAT—throughout Northern and Southern Ontario and a decrease in travel time for patients [10, 21]. In addition, the Ontario Ministry of Health and Long-Term Care have reported that Northern travel costs have been reduced by an estimated $25,000,000 annually [9].

Telemedicine is a key solution for increasing access to mental health services for patients with concurrent disorders, particularly for those patients living in isolated regions. A recent review found not only that telemedicine increases access to psychiatric services, but that it is effective from the perspective of the patient, provider, program, and society as a whole [22]. Patients across diverse clinical populations and receiving a wide-range of services have reported high levels of satisfaction with telemedicine [23]. For example, Lindsay et al. (2015) reported that psychotherapy delivered via telemedicine has similar results as traditional in-person treatment with regard to treatment outcomes, therapeutic relationship, and retention [24]. Moreover, mental health services provided via telemedicine are clinically superior to reduced or no mental health services [23]. A recent study on treatment outcomes in OAT found that patients receiving

services via telemedicine had levels of substance use, time to abstinence, and treatment retention rates that were equal to patients receiving OAT face-to-face [25].

Altogether, as many as 55% of patients receiving OAT have a concurrent mental health disorder [26]. Importantly, without treatment that targets both OUD and other psychiatric symptoms, patients have higher rates of continued substance use and overdose, as well as decreased occupational functioning and quality of life [27–29]. Studies have demonstrated that telemedicine-delivered OAT for OUD is an effective treatment modality [20]; therefore, it is reasonable to conclude that telemedicine may also be an effective platform to coordinate mental health care and OAT for patients with concurrent mental health and OUD.

Our study has some limitations that should be noted. Using the data from ICES, we were able to obtain an accurate and complete picture of telemedicine usage for psychiatry delivery; however, because Ontario's publically funded drug benefit plan only covers patients aged 18–65 who are on social assistance, we did not capture patients whose methadone or buprenorphine medication cost was covered by the patient directly or through private insurance or federal government funded insured health benefits. Considering that this study only includes patients who are provincially insured, the lowest income quintiles may be inflated and, consequently, may not entirely represent the clinical population of patients with OUD and concurrent mental health diagnoses. We were also limited in capturing the true opioid dependent population, as only treatment-seeking patients would be captured in our definition. Patients were only included if they had received a prescription for methadone or buprenorphine within the timeframe; however, a patient with OUD who was not seeking treatment would not have met these criteria. Additionally, given the nature of secondary data, we were unable to evaluate the patient experience, including whether the patient was satisfied with OTN care that they received.

This study also has many strengths, one of which being its large sample size. With over 9,000 patients in our study, we were able to characterize the use of telemedicine to care for patients with OUD and concurrent mental health disorders, further contributing to the existing literature on telemedicine in Ontario. More specifically, we have focused our study on patients who are accessing psychiatry in Northern Ontario, an area that is not well studied. Given the psychiatrist shortage in this region of the province—and the common cooccurrence of OUD in this population—it is important to better understand how telemedicine is being utilized to provide psychiatric care to patients with concurrent disorders throughout the province. Patients in Northern Ontario are often faced with a variety of barriers when accessing treatment; understanding the utilization of telemedicine in this geographic area may enhance care for this patient population.

Telemedicine is increasingly being applied throughout Ontario for delivering mental health treatment to patients with concurrent disorders. Increasing the access to psychiatric care delivered via telemedicine may improve clinical outcomes for patients with OUD and concurrent psychiatric disorders. This is especially true of Northern and rural areas, where physician supply is limited. Future qualitative studies

may aid in measuring telemedicine care outcomes, including patient's perspective of whether OTN achieves the same results as face-to-face care.

The application of telemedicine-delivered mental health and addiction services are very well suited in rural and remote settings. In Ontario, virtual clinics are often employed to service remote communities and include some clinics operating on First Nation reserves in collaboration with the First Nation leadership. While the present study is based on the Ontario context, we believe the findings are generalizable due to high quality video conferencing options being widely available with broadband Internet. It is important to note that not all remote communities will have access to broadband service, and in those instances alternative models may be more appropriate.

## Conflicts of Interest

Dr. David Marsh maintains the following roles: Chief Medical Director at CATC, opioid agonist therapy provider, and Associate Dean of Community Engagement and Deputy Dean of the Northern Ontario School of Medicine. Dr. Marsh has no ownership stake in the CATC as a stipendiary employee. The authors do not foresee any conflicts of interest as data will be made freely available to the public and the CATC, and the universities have no ability to prevent publication and dissemination of knowledge.

## Acknowledgments

This study was funded by a Northern Ontario Academic Medicine Association grant and by the Canadian Observational Cohort Collaboration.

## References

[1] P. Madadi, D. Hildebrandt, A. E. Lauwers, and G. Koren, "Characteristics of Opioid-Users Whose Death Was Related to Opioid-Toxicity: A Population-Based Study in Ontario, Canada," *PLoS ONE*, vol. 8, no. 4, Article ID e60600, 2013.

[2] B. Fischer, A. Ialomiteanu, A. Boak, E. Adlaf, J. Rehm, and R. E. Mann, "Prevalence and key covariates of non-medical prescription opioid use among the general secondary student and adult populations in Ontario, Canada," *Drug and Alcohol Review*, vol. 32, no. 3, pp. 276–287, 2013.

[3] B. Brands, "Nonmedical use of opioid analgesics among Ontario students," *Can Fam Physician*, vol. 56, no. 3, pp. 256–262, 2010.

[4] T. Gomes, M. M. Mamdani, I. A. Dhalla, S. Cornish, J. M. Paterson, and D. N. Juurlink, "The burden of premature opioid-related mortality," *Addiction*, vol. 109, no. 9, pp. 1482–1488, 2014.

[5] O. o. t. C. C. o. Ontario, *Office of the Chief Coroner Report for 2009-2011*, Ministry of Community Safety and Correctional Services Toronto, 2012.

[6] B. Brands et al., *Best practicesmethadone maintenance treatment*, Health Canada, Ottawa, Canada, 2002.

[7] J. K. Eibl, T. Gomes, D. Martins et al., "Evaluating the Effectiveness of First-Time Methadone Maintenance Therapy Across Northern, Rural, and Urban Regions of Ontario, Canada," *Journal of Addiction Medicine*, vol. 9, no. 6, pp. 440–446, 2015.

International Journal of Telemedicine and Applications

7

[8] P. Kurdyak, *Universal coverage without universal access: a study of psychiatrist supply and practice patterns in Ontario. Open Med*, vol. 8, p. e87-99, 8(3, 2014.

[9] O. M. o. H. a. L.-T. Care, "Telemedicine - Improving access to care through technology," 2008, http://www.health.gov.on.ca/en/pro/programs/ecfa/action/primary/pri_telemedecine.aspx.

[10] T. Molfenter, M. Boyle, D. Holloway, and J. Zwick, "Trends in telemedicine use in addiction treatment," *Addiction science & clinical practice*, vol. 10, p. 14, 2015.

[11] S. Stein, *Mental Health Addictions... an OTN Overview*, Centre for Addiction and Mental Health, 2012.

[12] S. Hall, K. Schulze, P. Groome, W. Mackillop, and E. Holowaty, "Using cancer registry data for survival studies: The example of the Ontario Cancer Registry," *Journal of Clinical Epidemiology*, vol. 59, no. 1, pp. 67–76, 2006.

[13] A. R. Levy, "Coding accuracy of administrative drug claims in the Ontario Drug Benefit database," *Can J Clin Pharmacol*, vol. 10, no. 2, pp. 67–71, 2003.

[14] D. N. Juurlink, "Editorial: Proton pump inhibitors and clopidogrel: Putting the interaction in perspective," *Circulation*, vol. 120, no. 23, pp. 2310–2312, 2009.

[15] D. N. Juurlink, T. Gomes, L. L. Lipscombe, P. C. Austin, J. E. Hux, and M. M. Mamdani, "Adverse cardiovascular events during treatment with pioglitazone and rosiglitazone: population based cohort study," *British Medical Journal*, vol. 339, Article ID b2942, 2009.

[16] M. Mamdani, P. Rochon, D. N. Juurlink et al., "Effect of selective cyclooxygenase 2 inhibitors and naproxen on short-term risk of acute myocardial infarction in the elderly," *JAMA Internal Medicine*, vol. 163, no. 4, pp. 481–486, 2003.

[17] J. K. Eibl, K. Morin, E. Leinonen, and D. C. Marsh, "The state of opioid agonist therapy in canada 20 years after federal oversight," *The Canadian Journal of Psychiatry*, vol. 62, no. 7, pp. 444–450, 2017.

[18] M. Mamdani, K. Sykora, P. Li et al., "Reader's guide to critical appraisal of cohort studies: 2. assessing potential for confounding," *British Medical Journal*, vol. 330, no. 7497, pp. 960–962, 2005.

[19] LHIN, "Ontario's LHINs," http://www.lhins.on.ca.

[20] J. K. Eibl, J. Daiter, M. Varenbut, D. Pellegrini, and D. C. Marsh, "Evaluating the effectiveness of telehealth-delivered opioid agonist therapy across Ontario, Canada," *Drug and Alcohol Dependence*, vol. 156, p. e63, 2015.

[21] W. A. Hart, Report of the Methadone Maintenance Treatment Practices Task Force.

[22] D. M. Hilty, D. C. Ferrer, M. B. Parish, B. Johnston, E. J. Callahan, and P. M. Yellowlees, "The effectiveness of telemental health: A 2013 review," *Telemedicine and e-Health*, vol. 19, no. 6, pp. 444–454, 2013.

[23] L. K. Richardson, B. C. Frueh, A. L. Grubaugh, L. Egede, and J. D. Elhai, "Current directions in videoconferencing tele-mental health research," *Clinical Psychology: Science and Practice*, vol. 16, no. 3, pp. 323–338, 2009.

[24] J. A. Lindsay, M. R. Kauth, S. Hudson et al., "Implementation of Video Telehealth to Improve Access to Evidence-Based Psychotherapy for Posttraumatic Stress Disorder," *Telemedicine and e-Health*, vol. 21, no. 6, pp. 467–472, 2015.

[25] W. Zheng, M. Nickasch, L. Lander et al., "Treatment outcome comparison between telepsychiatry and face-to-face buprenorphine medication-assisted treatment for opioid use disorder: A 2-year retrospective data analysis," *Journal of Addiction Medicine*, vol. 11, no. 2, pp. 138–144, 2017.

[26] M. Krausz, P. Degkwitz, A. Kühne, and U. Verthein, "Comorbidity of opiate dependence and mental disorders," *Addictive Behaviors*, vol. 23, no. 6, pp. 767–783, 1998.

[27] J. S. Cacciola, A. I. Alterman, M. J. Rutherford, J. R. McKay, and F. D. Mulvaney, "The relationship of psychiatric comorbidity to treatment outcomes in methadone maintained patients," *Drug and Alcohol Dependence*, vol. 61, no. 3, pp. 271–280, 2001.

[28] K. L. Mills, M. Teesson, J. Ross, S. Darke, and M. Shanahan, "The costs and outcomes of treatment for opioid dependence associated with posttraumatic stress disorder," *Psychiatric Services*, vol. 56, no. 8, pp. 940–945, 2005.

[29] P. J. Carpentier, P. F. M. Krabbe, M. T. van Gogh, L. J. M. Knapen, J. K. Buitelaar, and C. A. J. de Jong, "Psychiatric comorbidity reduces quality of life in chronic methadone maintained patients," *American Journal on Addictions*, vol. 18, no. 6, pp. 470–480, 2009.























Journal of Engineering
The Scientific World Journal
International Journal of Rotating Machinery
Journal of Sensors
Advances in Multimedia
Advances in Civil Engineering
Hindawi
Submit your manuscripts at
www.hindawi.com
Journal of Control Science and Engineering
Journal of Robotics
Journal of Electrical and Computer Engineering
Advances in OptoElectronics
VLSI Design
International Journal of Navigation and Observation
Modelling & Simulation in Engineering
International Journal of Aerospace Engineering
International Journal of Chemical Engineering
International Journal of Antennas and Propagation
Active and Passive Electronic Components
Shock and Vibration
Advances in Acoustics and Vibration

# The Use of Telepsychiatry to Provide Cost-Efficient Care During Pediatric Mental Health Emergencies

John F. Thomas, Ph.D., Douglas K. Novins, M.D., Patrick W. Hosokawa, M.S., Christina A. Olson, M.D., Dru Hunter, L.C.S.W., Alison S. Brent, M.D., Gerard Frunzi, M.B.A., Anne M. Libby, Ph.D.

**Objective:** This study evaluated a videoconference-based psychiatric emergency consultation program (telepsychiatry) at geographically dispersed emergency department (ED) sites that are part of the network of care of an academic children's hospital system. The study compared program outcomes with those of usual care involving ambulance transport to the hospital for in-person psychiatric emergency consultation prior to disposition to inpatient care or discharge home.

**Methods:** This study compared process outcomes in a cross-sectional, pre-post design at five network-of-care sites before and after systemwide implementation of tele-psychiatry consultation in 2015. Clinical records on 494 pediatric psychiatric emergencies included ED length of stay, disposition/discharge, and hospital system charges. Satisfaction surveys regarding telepsychiatry consultations were completed by providers and parents or guardians.

**Results:** Compared with children who received usual care, children who received telepsychiatry consultations had significantly shorter median ED lengths of stay (5.5 hours and 8.3 hours, respectively, p<.001) and lower total patient charges ($3,493 and $8,611, p<.001). Providers and patient caregivers reported high satisfaction with overall accept-ability, effectiveness, and efficiency of telepsychiatry. No safety concerns were indicated based on readmissions within 72 hours in either treatment condition.

**Conclusions:** Measured by charges and time, telepsychiatry consultations for pediatric psychiatric emergencies were cost-efficient from a hospital system perspective compared with usual care consisting of ambulance transport for in-person consultation at a children's hospital main campus. Telepsychiatry also improved clinical and operational efficiency and patient and family experience, and it showed promise for increasing access to other specialized health care needs.

*Psychiatric Services 2018; 69:161–168; doi: 10.1176/appi.ps.201700140*

Each year, roughly 14% to 20% of children and adolescents experience a behavioral health issue (1), ranging from attention-deficit hyperactivity disorder to severe depression and suicidal or homicidal ideation. Because of shortages of psychiatrists (2) and other pediatric mental health professionals, local emergency department (ED) and urgent care providers are often the only available behavioral health resources (3). As a result, decisions about treatment are made by ED and urgent care providers or generalists directing care from hospital settings. The mismatch of care and need is associated with avoidable inpatient admissions, long wait times, or costly and potentially traumatic emergency medical service ambulance transfers (4) to locations providing specialized services. Because community behavioral care resources interact with overburdened emergency care systems (5), they are central to efforts to redesign policy and practice related to child mental health services (6–10).

Videoconference-based, synchronous psychiatric consultations ("telepsychiatry") have emerged as one solution for distant providers to access behavioral health expertise (11). The use of telepsychiatry to provide timely access to care has been well documented (11–13). Telehealth broadly has been identified as an avenue for increasing access to care, although whether it produces subsequent medical cost savings is unknown (14,15). Although community telepsychiatry for children and adolescents has been studied, the use of telepsychiatry emergency services for children has not been studied (16), and associated clinical and fiscal outcomes are unknown (13,16,17). This study compared process outcomes in a cross-sectional pre-post design at five pediatric ED and urgent care facilities sites before and after systemwide implementation of telepsychiatry consultation in 2015. Because economic evaluations often include multiple perspectives (13,18–22), telepsychiatry-associated financial charges and time efficiency were evaluated from the hospital system perspective and satisfaction was evaluated from the provider and parent or guardian perspectives.

## METHODS

### Setting

Children's Hospital Colorado (CHCO) consists of a central academic medical center (hereafter, CHCO Main) at the University of Colorado's Anschutz Medical Campus and a network of care comprising five pediatric ED and urgent care facilities (hereafter, network ED) in the greater Denver metropolitan area. Network ED locations are located between eight and 33 miles from CHCO Main, with average estimated travel times of 22 to 36 minutes. [A map of the area with estimated driving times between CHCO Main and the network ED locations is available as an online supplement to this article.] CHCO Main houses an ED with psychiatric emergency services provided 24/7 by a consultative team of behavioral health specialists, including pediatric psychiatrists and clinical social workers. Network ED sites do not staff in-house psychiatric consultants.

Operational data from network EDs indicate that behavioral health emergencies constituted almost 5% of all visits in 2013, more than twice the national average (23). In 2014, 92% of patients presenting to a network ED site with a mental health problem required emergency medical (ambulance) transfer to CHCO Main for in-person psychiatric emergency service evaluation; more than one-half of these patients were subsequently discharged home with outpatient behavioral health resources; wait times between admission to the network ED, transport to and discharge from CHCO Main were typically long, exceeding 12 hours for roughly one-third of these patients.

### Population

Inclusion criteria for telepsychiatric consultation at a network ED were broad: age under 18 years and presentation with a behavioral health complaint that was not immediately life threatening. Exclusion criteria were significant behavioral dyscontrol or complex medical comorbidities, including suicide attempts that required immediate medical treatment. Excluded patients were transferred to CHCO Main for usual care.

### Usual Care for Psychiatric Emergencies

Pediatric patients presenting with a behavioral health emergency at a network ED were evaluated by a physician, nurse practitioner, or physician assistant. If the ED provider determined a need for a psychiatric crisis evaluation, the patient was then transferred by ambulance to the central campus for evaluation by the CHCO Main psychiatric emergency service and subsequent disposition: admission to CHCO Main, admission to another psychiatric inpatient facility on the basis of bed availability and insurance authorization, or discharge home.

### Telepsychiatric Intervention for Psychiatric Emergencies

With the goal of reducing unnecessary patient transfers to CHCO Main, a synchronous telepsychiatry consultation model was implemented, linking patients at network EDs in real time with the centralized psychiatric emergency service staff instead of transporting them to CHCO Main for in-person consultation. The telepsychiatry intervention was progressively deployed during calendar year 2015 to one new network ED every four to six weeks from January to June.

Telepsychiatry implementation began with educational sessions that connected network ED staff to the CHCO Main psychiatric emergency service behavioral health team. Despite historical use of the usual care process, each network site had a unique work flow that was not coordinated with CHCO Main psychiatric emergency services. Work flows at each site were synchronized to create a new, comprehensive, and consistent algorithm that addressed equipment training, initiating consultations, diagnoses or presentations, troubleshooting, and potential consultation outcomes. A final systemwide work flow, described in the following sentences, was adopted. When eligible patients present to network EDs, the ED provider contacts the CHCO Main psychiatric emergency service behavioral health care team by phone to request a synchronous telepsychiatry consultation. The psychiatric emergency service team then secures a private consultation room at CHCO Main and sends a virtual meeting request via encrypted e-mail to the network location by using the hospital's software-based, HIPAA-compliant telehealth platform. At the network ED, the nursing staff secures a room for the patient, assesses vital signs, and ensures patient and staff safety before connecting the patient with the psychiatric emergency service team. At this point, a video-enabled cart is rolled into the patient room to begin the live, virtual encounter. The interaction includes the CHCO Main psychiatric emergency services provider (typically a licensed clinical social worker), the child or adolescent patient, a parent or guardian, and the network ED attending physician or advanced practice provider.

During the virtual consultation, the psychiatric emergency service team member performs a standard clinical interview consistent with the CHCO Main usual care, in-person protocol and consults with the team at CHCO Main to make a disposition decision. After the joint consultation is completed, each parent or guardian is asked (not required) to complete a satisfaction survey for program evaluation. [A flowchart illustrating the steps in the telehealth evaluation is available in the online supplement.]

### Data Collection

Patient encounter data were obtained from multiple sources. Each patient's electronic medical record was linked with an anonymous study unduplicated identifier to a case report form on a secure, encrypted, password-protected research database (RedCap). The psychiatric emergency service staff also abstracted specific text fields from encounter records into a de-identified version of the RedCap database. Billing data for facility charges came from the hospital finance office, and data for provider fees came from the faculty practice plan. Satisfaction data were obtained by using the

point-of-care surveys completed by parents or guardians and providers at CHCO Main and at ED network sites. This study was approved by the Colorado Multiple Institutional Review Board.

**Dependent Variables**

*ED/urgent care length of stay (LOS).* ED LOS was defined as the length of time from initial admission at a network ED to discharge disposition. This time was measured by using a time stamp in the electronic medical record and reported in hours as a median and an interquartile range (IQR).

*Discharge disposition.* Dispositions were measured by a mutually exclusive categorical variable with three possible pathways: path 1, admission to CHCO Main hospital; path 2, admission to another non-CHCO psychiatric facility when no beds were available at CHCO Main; and path 3, discharge home with referral for outpatient follow-up. Paths 1 and 2 were combined in analytic models into one disposition, inpatient admission, for comparison with path 3, discharge home.

*Costs, charges, and expenses.* Costs of emergency care were measured from the hospital system perspective. Because the true costs of production were unknown, they were approximated by using billed charges for any facility and provider services during the network ED–initiated encounter. Average patient transfer cost for ground ambulance transportation was obtained from ambulance provider charges to CHCO Main. Telepsychiatry consultation costs were approximated as a proportion of the operational expenses to the CHCO health care system for the behavioral health team and the technological telehealth infrastructure. Telepsychiatry operational cost included both fixed and variable costs for the year: fixed costs included capital expenditures incurred for the purchase of the equipment (including operational software and technology infrastructure), annualized for the equipment's applicable lifetime (13,20). Because the videoconference equipment was used for numerous other specialty care initiatives, psychiatric emergency service consultation expenses were prorated to the proportion of visits for psychiatric emergency service consultations as a ratio of all videoconference consultations. Variable costs included a prorated allocation of expenses for equipment maintenance, technicians, training, personnel wages, administrative support, and supplies (20). The 2015 operational cost for telepsychiatry was estimated at $222,800.

TABLE 1. Characteristics of 494 children and adolescents with an acute behavioral health condition who were admitted to emergency departments in 2015, by receipt of telepsychiatry consultation or usual care[a]

| Characteristic | Telepsychiatry (N=226) | | Usual care (N=268) | | |
|---|---|---|---|---|---|
| | N | % | N | % | p |
| Age (M±SD) | 13.1±2.7 | | 13.3±2.5 | | .288 |
| 1–6 | 5 | 2 | 2 | 1 | |
| 7–11 | 50 | 22 | 50 | 19 | |
| 12–15 | 135 | 60 | 174 | 65 | |
| 16–19 | 36 | 16 | 41 | 15 | |
| Gender | | | | | .205 |
| Male | 97 | 43 | 100 | 37 | |
| Female | 129 | 57 | 168 | 63 | |
| Race | | | | | .036 |
| Caucasian | 175 | 77 | 185 | 69 | |
| Other | 51 | 23 | 83 | 31 | |
| Insurance type | | | | | .055 |
| Private | 147 | 65 | 146 | 55 | |
| Public | 72 | 32 | 113 | 42 | |
| Self-pay/uninsured | 7 | 3 | 9 | 3 | |
| Chief complaint[b] | | | | | |
| Suicide intent with plan | 65 | 29 | 64 | 24 | .219 |
| Self-harm, no plan | 92 | 41 | 124 | 46 | .215 |
| Harm to others | 24 | 11 | 21 | 8 | .284 |
| Depression or anxiety | 32 | 14 | 40 | 15 | .810 |
| Hallucinations or delusions | 8 | 4 | 7 | 3 | .549 |
| Unknown | 5 | 2 | 10 | 4 | .327 |

[a] Usual care consisted of ambulance transfer for specialist consultation in person at Children's Hospital Colorado. The initial cohort consisted of 502 patients; three patients were excluded because the disposition could not be determined because of missing data, and five patients were excluded from the telepsychiatry arm because of technical failures during an attempted telemedicine visit, such as failed Internet connection, failed access to electronic medical records, or no video cart available for consultation. Means were compared by t tests, and proportions were compared by chi-square tests.

[b] Chief complaints are listed from most to least serious. If a patient had more than one chief complaint, the most serious complaint was considered the chief complaint.

*Satisfaction with telepsychiatry.* A survey to assess the experience of telepsychiatry consultation from the perspectives of the provider and of the parent or guardian was administered immediately following the network ED encounter with items rated on a Likert scale of agreement, with 5 indicating strongly agree and 1 indicating strongly disagree. Respondents included the pediatric patient's guardian, the network ED attending provider, and the CHCO Main–based psychiatric emergency services consultation provider. Surveys contained 14 questions from a previously validated telehealth satisfaction survey instrument (24). The surveys contained no identifiers (other than type of respondent [provider or parent/guardian]), and were administered on paper at the point of care, collected by hospital staff, and provided to study staff through the institutionwide e-mail system. Surveys were administered at each interaction and voluntarily completed. No incentives were provided to respondents for survey completion.

**Independent Variables**

Demographic variables included age in years at date of ED admission, gender, race-ethnicity (Caucasian or non-Caucasian), and insurance type (public [Medicaid, State

FIGURE 1. Disposition rates, emergency department (ED) length of stay, and charges associated with telepsychiatry emergency consultation and usual care among 494 children and adolescents with an acute behavioral health condition who were admitted to EDs in 2015[a]



[a] Five patients were excluded from analyses because of technical failures in the telemedicine arm. Technical failure was defined as an attempted telemedicine visit that was prevented by something affecting technical capabilities, such as Internet down, Epic system down, all carts in use, and problems with the terminal screen. Charges (in U.S. dollars) and wait time in hours are shown as medians and interquartile ranges (IQRs). LOS, length of stay from time of ED admission at network-of-care site to time of disposition (discharge or admission to inpatient [IP] care); CHCO, Children's Hospital Colorado

Children's Health Insurance Program, or Tricare], private [commercial], or uninsured [self-pay]). Clinical severity was defined as the chief complaint with the highest severity at admission to the network ED, with suicidal intent with plan considered the most severe, followed by harm to self without plan, harm to others, major depression/anxiety, hallucination/delusions, or other complaint not otherwise specified.

## Data Analysis
Descriptive bivariate and categorical variables for telepsychiatry and usual care were compared by using chi-square and Wilcoxon two-sample tests. ED LOS and charges were reported as medians with IQRs because of skewness. The likelihood of disposition to inpatient care compared with discharge home was modeled as a multivariable logistic regression adjusted for patient variables. Cost-efficiency estimated the difference in charges plotted against the difference in time saved for each path, using median values of usual care and telepsychiatry cases for comparison. Statistical analyses were conducted with SAS software, version 9.4.

## RESULTS
Table 1 describes the 494 pediatric patients who presented in 2015 at a network ED with a primary presenting complaint

of an acute behavioral health condition. In early 2015 before implementation, usual care was received by 268 patients (54%), and after implementation telepsychiatry consultation was received by 226 patients (46%). Patients in the two groups did not differ statistically by age, gender, insurance type, or severity of chief complaint at network ED admission; however, there was a significant preponderance of Caucasian patients who received telepsychiatry compared with the proportion of Caucasians who received usual care before telepsychiatry was available (77% versus 69%, p=.036).

A decision tree illustrates the distribution of patients who received telepsychiatry or usual care (Figure 1). For each care type, the figure reports the subsequent disposition of patients in any one of three pathways: path 1, admission to the CHCO Main inpatient psychiatric facility; path 2, admission to another inpatient facility if either a bed was unavailable at CHCO Main or the patient's insurance preferred admission to another inpatient facility; or path 3, discharge home with outpatient follow-up. Each node displays median and IQR charges to the hospital system and also median and IQR ED LOS.

Median charges for telepsychiatry patients were $3,493 per patient (IQR=$2,399–$7,905), significantly lower than the median charge for usual care, which was $8,611 (IQR= $4,643–$11,766) (p<.001). Charges associated with inpatient

pathways (admission to CHCO Main [path 1] or other facility [path 2]) did not differ statistically between telepsychiatry and usual care, with median charges of $22,092 per patient for telepsychiatry and $23,240 for usual care in path 1. Paths 1 and 2 terminal nodes included an ambulance transfer prior to inpatient admission and involved the most acutely ill patients. However, charges for path 3 differed significantly between telepsychiatry (median=$2,399, IQR $1,383–$3,117) and treatment as usual (median=$4,633, IQR=$3,592–$5,008) (p<.001), which included a transfer via ambulance.

The decision tree also describes LOS at network EDs in hours from time of network ED admission to time of final disposition. Overall LOS in the ED was significantly shorter for patients who received telepsychiatry (median=5.5 hours) compared with patients who received usual care (8.3 hours) (p<.001). LOS in the ED was significantly shorter among patients who were discharged home after telepsychiatry (4.3 hours) compared with patients who were discharged home after usual care (6.5 hours) (p<.001). Nearly 30% of telepsychiatry patients had ED LOS fewer than 4 hours compared with only 12% of patients who received usual care (p<.001) (data not reported). In terms of likelihood of disposition pathway, 42% of patients who received telepsychiatry were admitted directly as inpatients (21% to CHCO Main and 20% to another inpatient facility) compared with 56% of patients who received usual care (24% to CHCO and 31% to another facility), a significant difference (p<.001). In a multivariate framework, a logistic model found that after accounting for age group, race, clinical severity, gender, and insurance type, the likelihood of inpatient admission was significantly lower among patients who received telepsychiatry versus usual care (odds ratio=.59, 95% confidence interval=.40–.86, p<.001) [see online supplement].

To assess any safety signals for each type of care, cases of readmission to the network ED within 72 hours of discharge were measured. Among patients who received telepsychiatry emergency consultation, 85% had no return visit in the medical record in any interval compared with 90% of patients who received usual care, which was not a statistically significant difference [see online supplement]. No telepsychiatry patients, and only one usual care patient, returned to the network ED within 72 hours of discharge from the incident psychiatric emergency visit.

Figure 2 is a cost-efficiency plane (25) that illustrates the relationship between the incremental gains for telepsychiatry over usual care in terms of median charges and the absolute value efficiency (time in hours) in ED LOS. A plotted value on the positive vertical axis would indicate that telepsychiatry was more expensive than usual care, and a value on the positive horizontal axis would indicate that telepsychiatry saved more time (fewer hours) than usual care. Current usual care charges and efficiency are represented at the origin; therefore, savings to the hospital system for telepsychiatry relative to usual care are plotted on the vertical axis below the origin. Efficiency in ED LOS is plotted

**FIGURE 2.** Incremental median charges and time savings associated with usual care and telepsychiatry videoconference consultation among 494 children and adolescents with an acute behavioral health condition who were admitted to EDs in 2015, by disposition[a]



[a] Current usual care charges and efficiency are represented at the origin. Telepsychiatry resulted in lower charges and shorter ED LOS for all dispositions; therefore charges (vertical axis) and efficiency (horizontal axis) for each disposition are plotted in the lower right (southeast) quadrant. The upper left (northwest) quadrant is where costs are higher and efficiency is lower for the new program compared with usual care and is generally labeled as the "rejection" region for the new technology. The southeast quadrant is where costs are lower and efficiency is higher for the new program compared with usual care and is generally labeled as the "dominance," "acceptance," or "adoption" region for the new technology. CHCO, Children's Hospital Colorado; ED, emergency department

on the horizontal axis; improved efficiency of telepsychiatry over usual care is plotted to the right of the origin. For each pathway on the decision tree (Figure 1), telepsychiatry resulted in lower charges and shorter ED LOS; therefore incremental median change in each terminal node (paths 1–3, paths 1 and 2 [inpatient admission], and overall) is plotted in the lower right quadrant.

Table 2 reports mean satisfaction ratings for the 226 telepsychiatry consultations by parents or guardians (N=156, 69% response rate), network ED providers (N=160, 71% response rate), and CHCO Main psychiatric emergency service consultation providers (N=148, 65% response rate). The survey questions asked respondents to rate their agreement with statements about the telepsychiatry consultation in terms of overall acceptability, effectiveness, and efficiency and also allowed an open-ended write-in statement. With a 5-point rating scale (5, strong agreement; 4, somewhat agree; 3, neither agree nor disagree; 2, somewhat disagree; and 1, strong disagreement), average ratings by caregivers were above 4 (median=4.21–4.46), including reducing "inconvenience and unnecessary travel," "technology easy to use," and "would recommend it to others." In write-in statements, parents and guardians expressed appreciation for not having to travel to CHCO Main, and ED network providers frequently

USE OF TELEPSYCHIATRY DURING PEDIATRIC MENTAL HEALTH EMERGENCIES

**TABLE 2. Satisfaction among parents or guardians and providers with a synchronous telepsychiatry consultation program linking network EDs to the psychiatric emergency service at CHCO Main, by survey item[a]**

| | | | | Providers | | | | | |
| | Parents or guardians | | | Network EDs | | | CHCO Main | | |
| Item | N | M | SD | N | M | SD | N | M | SD |
|---|---|---|---|---|---|---|---|---|---|
| Overall acceptability | | | | | | | | | |
| Overall I felt comfortable using the technology | 156 | 4.42 | .74 | 152 | 4.21 | .99 | 143 | 3.40 | 1.18 |
| Technology easy to use for appointment | 156 | 4.42 | .72 | 148 | 4.36 | .66 | 141 | 3.96 | 0.77 |
| Ability to SEE and HEAR | 153 | 4.32 | .74 | 145 | 4.21 | .89 | 141 | 3.57 | .98 |
| Confident it meets needs/would use again | 154 | 4.29 | .83 | | | | | | |
| I will recommend use to others | 153 | 4.20 | .85 | | | | | | |
| Effectiveness | | | | | | | | | |
| Telehealth acceptable way to deliver health care | | | | 160 | 4.34 | .62 | 147 | 3.92 | .67 |
| Will use telehealth again with my patients | | | | 159 | 4.47 | .54 | 148 | 4.14 | .53 |
| Overall satisfied with quality of care I am able to provide to patients using telehealth | | | | 160 | 4.33 | .69 | 146 | 3.83 | .80 |
| Telemedicine provides value to health care I provide | | | | 158 | 4.41 | .65 | 147 | 3.79 | .79 |
| Today's telemedicine visit resulted in changes in care | | | | 153 | 4.16 | .85 | 140 | 3.84 | .82 |
| My patient obtains better access to health care | | | | 159 | 4.40 | .64 | 146 | 3.85 | .70 |
| Efficiency | | | | | | | | | |
| Reduced inconvenience of unnecessary travel | 156 | 4.42 | .74 | 159 | 4.45 | .73 | 147 | 4.21 | .75 |
| Reduced time missed from school/work | 150 | 4.28 | .80 | | | | | | |
| Reduced delays for next available appointment | 148 | 4.35 | .75 | | | | | | |

[a] CHCO Main, Children's Hospital Colorado academic medical center. ED, emergency department. Surveys were completed by the parent or guardian, the network ED attending provider, and the CHCO Main–based psychiatric emergency services consultation provider. Responses were rated as 1, strongly disagree; 3, neither agree nor disagree; or 5, strongly agree. Surveys were offered to all telemedicine families at discharge, but completion was voluntary. The average response rate per item was 68% for parents or guardians (maximum item response rate, 69%) and 67% for providers (maximum item response rate, 71%) out of a total of 226 possible responses per item.

commented that telepsychiatry "saved this family a transfer by ambulance."

## DISCUSSION

This study used a natural experiment in clinical redesign to study the impact of a telepsychiatry consultation model for pediatric psychiatric emergencies implemented by a large academic children's hospital and its geographically dispersed network sites. Over the year surrounding implementation, all signs indicated a successful clinical program: charges to patients were reduced, time (and therefore resources) was saved, caregivers and providers rated satisfaction high, and there were no safety signals based on readmission. Existing studies indicate that telepsychiatry can reduce travel, wait, and consultation time (26), which

is especially salient for patients with behavioral health complaints, who often use disproportionate amounts of resources and wait, on average, much longer than patients with nonbehavioral health complaints (27).

Despite growing evidence of positive process outcomes associated with telemedicine, it is unknown how telepsychiatry affects patient-physician relationships (28,29) or how to price a telemedicine implementation. The few controlled telehealth trials (30–32) demonstrate either substantially reduced costs or dramatically improved outcomes. This implementation showed that subsequent hospital system resource savings (lower charges) associated with telepsychiatry were large enough to offset the original capital investment after approximately 120 patients had used the service. Other sites that consider implementation would have different costs based on their existing infrastructure and operational capabilities and, therefore, a different "break even" volume.

Telepsychiatry synchronous video consultation reduced unnecessary transfers, saved time for patients and families, and reduced stress associated with ambulance transfer. Patients, parents or guardians, and network ED providers all rated the services high on satisfaction. This finding is similar to other studies in that patients rarely report a less satisfactory interaction by videoconferencing than in-person (24). Satisfaction scores for the behavioral health providers were more modest than those of the network ED providers, likely because they performed new additional telepsychiatry consultations in real time in addition to managing their standard workload and did so without additional staff resources. Point-of-care surveys showed that provider satisfaction was somewhat lower than patient satisfaction, consistent with existing research (24). In postprocess review interviews with members of the CHCO Main psychiatric emergency services team, it was clear that the work flow of the team was affected by this model of telepsychiatry perhaps more than any

network ED process. The team members' biggest concern was that a telepsychiatry-enabled clinical interview could limit their ability to build a patient-provider relationship or decrease their ability to make an accurate clinical judgment. Since the 2015 implementation, the number of telepsychiatry visits have doubled without objection, suggesting that with greater experience using telepsychiatry, providers have become more accepting of the technology and, perhaps, gained some reassurance about its effectiveness as well as its efficiency.

This study had limitations and strengths. One limitation was the short follow-up and single site, nonexperimental design: we observed care for one year in one health care system by using a nonrandomized intervention. Nevertheless, the observed implementation created a quasi-experimental design that allowed us to measure the effect of telepsychiatry by using time and intervention. Also, once a site had implemented telepsychiatry, there were nearly no exclusions governing its use, and therefore confounding by indication was minimized. Primary variables were utilization and charges, rather than clinical outcomes and true costs of care; however, outcomes were all positive and no safety concerns were indicated. A study strength was the use of multiple perspectives, including those of parents and guardians, ED providers, specialty psychiatric emergency services behavioral health providers, and the hospital system.

## CONCLUSIONS

This cost-efficiency analysis indicates that telepsychiatry is a dominant strategy over usual care for pediatric psychiatric emergency consultations presenting to an emergency department, meaning that it should be adopted because it saves resources (lower charges) and time (improved efficiency). The growth of telehealth over the next decade and beyond will have profound implications for health care delivery and medicine (16). This study demonstrated that telepsychiatry synchronous video consultation improved access to specialty health care services, thereby increasing system capacity and promoting the delivery of appropriate care in geographically dispersed settings.

### AUTHOR AND ARTICLE INFORMATION

Except for Ms. Hunter and Mr. Frunzi, the authors are with the University of Colorado School of Medicine, Aurora. Dr. Thomas and Dr. Novins are with the Department of Psychiatry, Mr. Hosokawa is with the Adult and Child Consortium for Outcomes Research and Dissemination Science, Dr. Olson and Dr. Brent are with the Department of Pediatrics, and Dr. Libby is with the Department of Emergency Medicine. Dr. Thomas and Dr. Olson are also with the Department of Telemedicine, where Ms. Hunter and Mr. Frunzi are affiliated, and Dr. Novins is also with the Pediatric Mental Health Institute, all at Children's Hospital Colorado, Aurora. Send correspondence to Dr. Libby (e-mail: anne.libby@ucdenver.edu).

The authors report no financial relationships with commercial interests.

Received March 20, 2017; revision received June 22, 2017; accepted August 3, 2017; published online October 15, 2017.

## REFERENCES

1. Grady BJ, Lever N, Cunningham D, et al: Telepsychiatry and school mental health. Child and Adolescent Psychiatric Clinics of North America 20:81–94, 2011

2. Shortage of child psychiatrists taking big toll (Associated Press). NBCNews.com, April 6, 2006. www.nbcnews.com/id/12190434/ns/health-childrens_health/t/shortage-child-psychiatrists-taking-big-toll

3. Masi R, Cooper J: Children's Mental Health: Facts for Policymakers. New York, National Center for Children in Poverty, 2006. http://www.nccp.org/publications/pub_687.html

4. Goh AY, Mok Q: Centralization of paediatric intensive care: are critically ill children appropriately referred to a regional centre? Intensive Care Medicine 27:730–735, 2001

5. Institute of Medicine: Hospital-based emergency care: at the breaking point. Washington, DC, National Academies, 2006

6. Burns BJ, Costello EJ, Angold A, et al: Children's mental health service use across service sectors. Health Affairs (Project Hope) 14:147–159, 1995

7. Kataoka SH, Zhang L, Wells KB: Unmet need for mental health care among US children: variation by ethnicity and insurance status. American Journal of Psychiatry 159:1548–1555, 2002

8. Leaf PJ, Alegria M, Cohen P, et al: Mental health service use in the community and schools: results from the four-community MECA Study. Journal of the American Academy of Child and Adolescent Psychiatry 35:889–897, 1996

9. Youngsters' Mental Health and Psychosocial Problems: What Are the Data? Los Angeles, Center for Mental Health in Schools, 2003

10. Stephan SH, Weist M, Kataoka S, et al: Transformation of children's mental health services: the role of school mental health. Psychiatric Services 58:1330–1338, 2007

11. Seidel RW, Kilgus MD: Agreement between telepsychiatry assessment and face-to-face assessment for emergency department psychiatry patients. Journal of Telemedicine and Telecare 20:59–62, 2014

12. Care of the Psychiatric Patient in the Emergency Department: A Review of the Literature. Irving, TX, American College of Emergency Physicians, 2014

13. Hilty DM, Ferrer DC, Parish MB, et al: The effectiveness of telemental health: a 2013 review. Telemedicine Journal and e-Health: 19:444–454, 2013

14. Dorsey ER, Topol EJ: State of telehealth. New England Journal of Medicine 375:154–161, 2016

15. Bipartisan Chronic Care Working Group Policy Options Document. Washington, DC, United States Senate, Committee on Finance, Dec 2015

16. Wootton R, Bloomer SE, Corbett R, et al: Multicentre randomised control trial comparing real time teledermatology with conventional outpatient dermatological care: societal cost-benefit analysis. BMJ (Clinical Research Ed) 320:1252–1256, 2000

17. Whitacre BE: Estimating the economic impact of telemedicine in a rural community. Agricultural and Resource Economics Review 40:172, 2011

18. Bishai DM, Ferris DG, Litaker MS: What is the least costly strategy to evaluate cervical abnormalities in rural women? Comparing telemedicine, local practitioners, and expert physicians. Medical Decision Making 23:463–470, 2003

19. Case SD, Case BG, Olfson M, et al: Length of stay of pediatric mental health emergency department visits in the United States. Journal of the American Academy of Child and Adolescent Psychiatry 50:1110–1119, 2011

20. Dávalos ME, French MT, Burdick AE, et al: Economic evaluation of telemedicine: review of the literature and research guidelines for benefit-cost analysis. Telemedicine Journal and e-Health 15:933–948, 2009

21. Persaud DD, Jreige S, Skedgel C, et al: An incremental cost analysis of telehealth in Nova Scotia from a societal perspective. Journal of Telemedicine and Telecare 11:77–84, 2005

22. Yang NH, Dharmar M, Yoo B-K, et al: Economic evaluation of pediatric telemedicine consultations to rural emergency departments. Medical Decision Making 35:773–783, 2015

23. Becker A, Peterson J, Sannar EM: Pediatric emergency behavioral health, suicidal behavior, and non-suicidal self-injury. Colorado Journal of Psychiatry and Psychology 1:84, 2015

24. Yip MP, Chang AM, Chan J, et al: Development of the Telemedicine Satisfaction Questionnaire to evaluate patient satisfaction with telemedicine: a preliminary study. Journal of Telemedicine and Telecare 9:46–50, 2003

25. Rawlins MD: Cost, effectiveness, and value: how to judge? JAMA 316:1447–1448, 2016

26. Baldwin L, Clarke M, Hands L, et al: The effect of telemedicine on consultation time. Journal of Telemedicine and Telecare 9(suppl 1): S71–S73, 2003

27. Baillargeon J, Thomas CR, Williams B, et al: Medical emergency department utilization patterns among uninsured patients with psychiatric disorders. Psychiatric Services 59:808–811, 2008

28. Wachter R: The Digital Doctor. New York, McGraw-Hill Education, 2015

29. Whitten P, Love B: Patient and provider satisfaction with the use of telemedicine: overview and rationale for cautious enthusiasm. Journal of Postgraduate Medicine 51:294–300, 2005

30. Brenes GA, Danhauer SC, Lyles MF, et al: Telephone-delivered cognitive behavioral therapy and telephone-delivered nondirective supportive therapy for rural older adults with generalized anxiety disorder: a randomized clinical trial. JAMA Psychiatry 72:1012–1020, 2015

31. Campbell AN, Nunes EV, Matthews AG, et al: Internet-delivered treatment for substance abuse: a multisite randomized controlled trial. American Journal of Psychiatry 171:683–690, 2014

32. Kroenke K, Krebs EE, Wu J, et al: Telecare collaborative management of chronic pain in primary care: a randomized clinical trial. JAMA 312:240–248, 2014

## Information for Contributors

*Psychiatric Services* uses a Web-based submission system, ScholarOne Manuscripts. Authors of research reports should submit their manuscripts for peer review at mc.manuscriptcentral.com/appi-ps.

Guidelines on preparing manuscripts for submission, a list of tips for uploading files to ScholarOne Manuscripts, and other information for contributors are available at the journal's Web site at ps.psychiatryonline.org/ps_authors_reviewers. Queries about the appropriateness of a submission and other editorial matters, as well as letters to the editor commenting on articles in recent issues of the journal, should be sent to the editorial office at psjournal@psych.org.

# Child and Adolescent Emergency and Urgent Mental Health Delivery Through Telepsychiatry: 12-Month Prospective Study

Nasreen Roberts, MBBS, MRCPsych, FRCPC,[1] Tina Hu, MSc,[2] Nicholas Axas, BSW, MSW,[3] and Leanne Repetti, RN[3]

[1]Division of Child and Adolescent Psychiatry, Department of Psychiatry, Queen's University Canada, Kingston, Ontario, Canada.

[2]Faculty of Medicine, University of Toronto, Toronto, Ontario, Canada.

[3]Hotel Dieu Hospital, Kingston, Ontario, Canada.

Downloaded by KAISER PERMANENTE MULTI-SITE ACCESS from www.liebertpub.com at 07/05/18. For personal use only.

## Abstract

*Background: The significant gap between children and adolescents presenting for emergency mental healthcare and the shortage of child and adolescent psychiatrists constitutes a major barrier to timely access for psychiatric assessment for rural and remote areas. Unlike remote areas, urban emergency departments have in-house psychiatric consultation. Telepsychiatry may be a solution to ensure the same service for remote areas. However, there is a paucity of studies on the use of telepsychiatry for child and adolescent emergency consults. Thus, the aim of our study was to (1) assess patient satisfaction with telepsychiatry and (2) compare clinical characteristics and outcome of telepsychiatry with face-to-face emergency child and adolescent assessments.*

*Methods: This is a prospective study of telepsychiatry emergency assessments of children and adolescents referred by emergency physicians. The comparison group was age- and gender-matched patients seen for face-to-face urgent assessments. Data were gathered on demographic and clinical variables. Telepsychiatry satisfaction was assessed using a questionnaire. Descriptive statistics and chi-square tests were used to assess group differences for each variable. Logistic regression was used to assess impact of the variables on outcome after the consult. A p value <0.05 was used to determine statistical significance.*

*Results: Sixty (n=60) assessments were conducted through telepsychiatry in 12 months. Among the telepsychiatry group, Aboriginal patients were over-represented (50% vs. 6.7%, p < 0.001), a higher proportion received a diagnosis of adjustment disorder (22% vs. 8.3%, p=0.004) or no diagnosis (27% vs. 6.7%, p=0.004) compared with controls. There*

*was no statistically significant difference between groups on other clinical variables. Patients reported a high degree of satisfaction with telepsychiatry.*

*Conclusions: Telepsychiatry is acceptable to patients and families for safe emergency assessment and follow-up, reducing unnecessary travel to urban centers. Longer time outcomes are needed to establish validity of telepsychiatry for emergency assessments.*

*Keywords: telemedicine, telepsychiatry, e-health, emergency medicine/teletrauma, behavioral health, pediatrics*

## Introduction

Most children and adolescents in Canada and the United States fail to receive adequate and timely mental health services. The prevalence of psychiatric disorders among children and adolescents in Canada ranges from 15% to 25% with only one in five receiving mental health services.[1] The plight of those living in remote communities is far worse because of the severe shortage of psychiatric expertise and mental health practitioners.[2] The gap in service is a function of a number of factors including (1) timely access and geographical distance from specialized services and (2) the perennial lack of an adequate number of child and adolescent psychiatrists for the number of children in need of services.[3]

The use of telepsychiatry for child and adolescent mental health issues represents an innovative approach to timely service delivery. Telepsychiatry may serve as a user-friendly, efficient, and cost-effective method of providing mental health services to rural and remote communities.[4–6] The Canadian Senate and the Canadian Academy of Child and Adolescent Psychiatry have approved telepsychiatry for consultation, education, and training.[7] However, there is limited research on telepsychiatry in children and adolescents, mostly consisting of case reports and project descriptions.

A review of the literature from 1996 to 2009 reported three studies that had comparison groups and only one treatment study. The authors concluded that despite the limitations of the existing evidence, there was no data suggesting negative

Downloaded by KAISER PERMANENTE MULTI-SITE ACCESS from www.liebertpub.com at 07/05/18. For personal use only.

outcomes and recommended further studies focusing on outcome.[8] Recently, a small feasibility study of telepsychiatry services for patients in a rural area in the United States examined parental satisfaction with a two-session model consisting of a psychiatric evaluation session and recommendation session, which was followed by provision of a treatment plan to the primary care provider. Results indicated high parental satisfaction with telepsychiatry.[9]

A Canadian study used videoconferencing for psychiatric consultation to enhance staff capacity in the diagnosis, formulation, and management of mental health problems among Nunavut children through delivery of regular professional-to-professional program consultations and continuing education seminars. The results showed that videoconferencing was an innovative and effective way of delivering specialized mental health services to professionals working in remote areas of Nunavut.[10] An Australian study evaluated a telepsychiatry program, Mental Health Emergency Care-Rural Access Program (MHEC-RAP), for emergency healthcare of remote communities, with 22% of the population served as children and adolescents. Results showed that availability of this program helped build confidence in emergency physicians to manage and care for emergency mental health patients locally. In addition, emergency physicians valued access to specialists who are able to conduct assessments and provide relevant and responsive advice for patients presenting with emergency mental health concerns. The experience of these providers before MHEC-RAP is consistent with what has been reported in other rural and remote populations, which suggests that similar programs could address limitations in access to specialist care and change the provision of emergency mental healthcare.[11]

Evidence from the aforementioned studies suggest that emergency physicians specifically could benefit from psychiatry consultation through telepsychiatry, as emergency physicians are the first-line contact for most mental health crises in children and adolescents, especially in rural and remote communities. Community agencies, including the local police, bring adolescents in crisis to the nearest emergency department (ED). ED physicians have to manage these patients without having adequate training for dealing with mental health problems and scarcity of community mental health resources such as walk in crisis clinics, which are available in larger urban centers.

Although there are some studies of successful telepsychiatry assessments and treatment by child psychiatrists,[12] and specific treatment for depression using cognitive-behavioral therapy in depressed adolescents,[13,14] there are no studies on delivering emergency mental healthcare through telepsychiatry, specifically for children and adolescents.

Additional research is needed specifically on the effectiveness of telepsychiatry in the ED setting.

We present the results of a 12-month prospective study of urgent telepsychiatry assessment and brief intervention for children and adolescents referred by emergency physicians, primary care physicians, from rural and remote communities in Eastern and Northern Ontario. The Child and Adolescent Mental Health Urgent Consult Clinic (CAMHUCC) acquired its own telepsychiatry suite, linked through the Ontario Telemedicine Network, allowing telepsychiatry assessment for patients and direct consultation to the ED physicians in remote emergency rooms and clinics within 24 h of patient presentation. The service model incorporates both provider- and patient-centered service.

The purpose of this study was to (1) examine physician and patient satisfaction with emergency psychiatric consult through telepsychiatry and (2) compare clinical characteristics and outcome of telepsychiatry emergency consults with face-to-face emergency consults of children and adolescents from rural and remote communities.

## Methods

The population consisted of children and adolescents under 18 years of age, who were assessed by the CAMHUCC at a university hospital from November 2015 to November 2016. The CAMHUCC team includes a full time child and adolescent psychiatrist, a social worker, and a nurse who provides urgent psychiatric assessment within 48 h for children and youth presenting to the ED, primary care physicians, school boards, and children's mental health agencies (CMHAs). When needed, brief intervention (4 weeks) for medication initiation and stabilization, individual and family crisis intervention, and behavior management are also provided. Assessments and interventions are conducted through face-to-face appointment for those who live locally or through telepsychiatry over the Ontario Telehealth Network (OTN), if located in rural or remote communities.

### STUDY SAMPLE

The sample for this study was derived from the 389 patients assessed by CAMHUCC in a 12-month period. The study group (SG) comprised 60 patients who were assessed through telepsychiatry and completed the telepsychiatry satisfaction questionnaire. The matched comparison group (MCG) consisted of 60 patients who had face-to-face assessment in the clinic over the same 12-month period.

### DATA COLLECTION

The clinic gathers information on the following variables: age, gender, referral source, reason for referral, special

**ROBERTS ET AL.**

Downloaded by KAISER PERMANENTE MULTI-SITE ACCESS from www.liebertpub.com at 07/05/18. For personal use only.

| Table 1. Patient Characteristics of Study Group and Matched Comparison Group | | | |
|---|---|---|---|
| | MCG ($n=60$) | SG ($n=60$) | OVERALL SAMPLE ($n=120$) |
| Aboriginal, % | 6.7 | 50* | 28 |
| Referral source, % | | | |
| Emergency physician | 63 | 62 | 63 |
| Primary care | 15 | 20 | 20 |
| School | 22 | 18 | 20 |
| Reason for referral, % | | | |
| Suicidal | 8.3 | 63 | 33 |
| Anxiety | 1.7 | 10 | 5.8 |
| Aggression | 47 | 22 | 34 |
| Other (Psychosis) | 43 | 5 | 24 |
| Family psychiatric history, % | 95 | 93 | 94 |
| ASPD | 75 | 53 | 64 |
| Mood disorders | 3.3 | 3.3 | 3.3 |
| Anxiety disorders | 1.7 | 3.3 | 2.5 |
| Psychotic disorders | 0 | 1.7 | 0.8 |
| Multiple diagnoses | 15 | 32 | 23 |
| IEP, % | 37 | 23 | 30 |
| Bullying, % | 50 | 33 | 42 |
| Substance use, % | | | |
| Alcohol | 3.3 | 9.6 | 6.2 |
| Marijuana | 13 | 12 | 12.5 |
| Polysubstance | 17 | 31 | 23 |
| Physical abuse, % | 13 | 12 | 13 |
| Sexual abuse, % | 17 | 15 | 16 |
| Past admission, % | 5.0 | 13 | 9.2 |
| Repeat admissions | 1.7 | 1.7 | 1.7 |
| Diagnosis, % | | | |
| No diagnosis | 6.7 | 27* | 17 |
| Adjustment disorder | 8.3 | 22* | 15 |
| ADD/ADHD/ODD/CD | 52* | 27 | 39 |
| Anxiety disorder | 25 | 13 | 19 |
| Mood disorder | 5.0 | 6.7 | 5.8 |
| Substance use disorder | 0 | 1.7 | 0.8 |
| Other | 3.3 | 3.3 | 3.3 |

| Table 1. *continued* | | | |
|---|---|---|---|
| | MCG ($n=60$) | SG ($n=60$) | OVERALL SAMPLE ($n=120$) |
| Outcome, % | | | |
| Brief follow-up | 62 | 43 | 53 |
| Referral to CMHA | 32 | 37 | 34 |
| Admission | 5.0 | 18 | 12 |
| Referral to internal OP | 1.7 | 1.7 | 1.7 |

*$p<0.01$.
ADD, attention deficit disorder; ADHD, attention deficit hyperactivity disorder; ASPD, antisocial personality disorder; CD, conduct disorder; CMHA, children's mental health agency; IEP, individualized education program; MCG, matched comparison group; ODD, oppositional defiant disorder; OP, child and adolescent outpatient clinics; SG, study group.

education at school, bullying, substance use, physical and/or sexual abuse, family history of mental health issues, previous admissions, diagnosis, and outcome after assessment. Outcomes included no further mental health services required, brief (up to 4 weeks) follow-up in CAMHUCC, referral to the local CMHA, referral to other outpatient clinics in the child and adolescent division, or hospital admission. All those who were assessed through telepsychiatry completed the satisfaction questionnaire provided by the OTN after the consults.

STATISTICAL ANALYSIS

All questionnaires and clinical data were anonymized before analysis. Descriptive statistics and chi-square tests were used to assess for differences between the two groups for each variable. Logistic regression was used to assess the impact of the variables on outcome after the consult. A $p$ value <0.05 was used to determine statistical significance. If several pairwise comparisons were used, a Bonferonni correction was applied. Statistical analysis was performed using IBM SPSS Statistics for Windows, Version 20.0 (IBM Corp., Armonk, NY).

## Results and Materials

Patient characteristics for the SG versus MCG are shown in *Table 1*. The average age of patients was 14±0.36 years and 67% were females. There was no significant difference between the two groups for referral source, reason for referral, family psychiatric history, special education program at school, bullying, substance use, physical abuse, sexual abuse, previous hospital admission, and outcome after the consult. Among the patients in the telepsychiatry group, there was a higher proportion of Aboriginal children and adolescents (50% vs. 6.7%, $p<0.001$), a higher proportion with no

© MARY ANN LIEBERT, INC.

Downloaded by KAISER PERMANENTE MULTI-SITE ACCESS from www.liebertpub.com at 07/05/18. For personal use only.

| Table 2. Telepsychiatry Patient Satisfaction Questionnaire Responses | |
|---|---|
| **STATEMENTS** | **LIKERT SCALE\* MEANS ± SD (n = 25)** |
| I was agreeable to have my assessment through telepsychiatry. | 4.38 ± 0.49 |
| It was no different to communicate than in person. | 3.88 ± 1.08 |
| The telepsychiatry equipment was user friendly. | 4.67 ± 0.48 |
| I knew that the assessment was confidential. | 4.58 ± 0.58 |
| I was satisfied with the quality of the picture. | 4.46 ± 0.59 |
| Telepsychiatry saved me and my family time and/or money. | 4.58 ± 0.65 |
| I would use telepsychiatry services again if needed. | 4.54 ± 0.66 |
| My telepsychiatry appointment was available within 48 h. | 4.17 ± 0.92 |
| I was comfortable with having my treatment on telepsychiatry | 4.17 ± 0.82 |
| I would rather have telepsychiatry than travel to the clinic in Kingston | 4.00 ± 1.22 |

\*Where 1, strongly disagree; 2, disagree; 3, neither agree nor disagree; 4, agree; 5, strongly agree.

SD, standard deviation.

assigned diagnosis (27% vs. 6.7%, $p = 0.004$), and a higher proportion diagnosed with adjustment disorder (22% vs. 8.3%, $p = 0.004$). A higher proportion of patients in the face-to-face group were diagnosed with attention deficit hyperactivity disorder (ADHD) and disruptive disorder than the telepsychiatry group (52% vs. 27%, $p = 0.004$). None of the variables were found to be significant predictors of patient outcome after the consult ($p > 0.05$ for all).

*Table 2* shows the results of the patient satisfaction questionnaire, completed by the SG. Overall, patients reported a high degree of satisfaction with the use of telepsychiatry and the majority stated they would use the service again in the future. Telepsychiatry was noted to be user friendly and helped save patient's family time and money by enabling the opportunity to access assessment without long distance travel.

## Discussion

Overall, results of our study suggest high patient and ED physician satisfaction with emergency consults through telepsychiatry, and the lack of significant difference in consultation outcome is encouraging. The results presented in our study are based on the first 12 months after the acquisition of a dedicated CAMHUCC telepsychiatry suite in 2015. Some of our results, such as the high patient and parent satisfaction with tele-

psychiatry, are similar to previous studies on nonurgent assessments.[6] Our study results differ from previous studies in that there was a significant difference between the face-to-face and telepsychiatry groups, where 50% of those assessed through telepsychiatry were of Aboriginal background. This difference can be explained by the catchment area of CAMHUCC, which serves the remote James Bay coastal communities.

One of these communities has been in the press since April 2016 for increased presentations for suicidality among children and adolescents.[15] In addition to this, our catchment area has a number of private group homes used by child protection services across the provinces to place hard-to-serve Aboriginal youth who have complex mental health histories. These group homes are mostly in rural areas, 1.5–3 h drive (each way) from our clinic. The second difference from previous studies was the difference between those not assigned a diagnosis in the telepsychiatry group: this may be because of an overall lower age range with a significant proportion less than age 12 who imitated older peers in the context of poor adult supervision and multiple psychosocial stressors in the telepsychiatry group compared with the face-to-face group. Another explanation may be the unreliability of collateral developmental history in telepsychiatry.

Lastly, there was a significant difference between the groups on the diagnosis of ADHD and disruptive disorder with the telepsychiatry group being under represented. This difference may be a function of the mentioned unreliability of collateral history, poor and sporadic school attendance, cultural factors, and child-rearing practices with acceptance of certain behaviors as within their cultural norms.

The lack of significant difference in patient outcome for the two groups in our study suggests that telepsychiatry may be suitable for urgent assessment; however, this result needs to be viewed with caution because of the small sample size and the short period to ascertain outcome. Larger sample size with longer duration for postconsult outcome may yield more reliable results. Although not statistically significant, the SG had more admissions to the hospital ward than the MCG. One explanation for this may be the combination of unavailability of CAMHUCC weekends and holidays and a lack of adequate resources to hold a patient for 24–48 h in the remote nursing station and ED. Another reason, specific to the northern communities, for transfer and admission, was the unavailability of a guardian for some of the SG patients and the refusal or inability of the patient to participate in the interview to allow for a diagnostic assessment.

The availability of a child and adolescent psychiatry team 7 days a week could address the weekend issue. Furthermore, ensuring the presence of a family member and a child and

**ROBERTS ET AL.**

Downloaded by KAISER PERMANENTE MULTI-SITE ACCESS from www.liebertpub.com at 07/05/18. For personal use only.

youth mental health worker, at the time of consult, would allow for a comprehensive assessment. In addition, the problems of consistent and regular access to, and patient/guardian agreement to receive service from their local mental health workers, require urgent attention from local health services, the Band councils, community leaders, and mental health agencies.

A larger study is underway to study the long-term outcomes after telepsychiatry urgent consults and brief interventions: nonetheless, at the time of submitting this article, there had been no suicides or other adverse outcomes in the SG. Our preliminary results suggest that telepsychiatry may be used successfully for emergency assessment and follow-up, reducing unnecessary travel to urban centers, and is associated with a high degree of patient satisfaction.

## Special Consideration

There are a number of special considerations if telepsychiatry is to be used for emergency and urgent assessments of children and adolescents. An essential consideration is the quick access to high-quality equipment capable of establishing a secure connection. Another important consideration is to replicate the face-to-face emergency consult conducted in urban EDs. This requires a child and adolescent psychiatrist who is, a) comfortable with telepsychiatry assessment and b) has flexibility in his or her schedule to accommodate urgent requests. Finally, emergency telepsychiatry requires a team experienced in emergency child and adolescent psychiatry, who have the knowledge to negotiate the system in cases where transfer for admission is needed.

The latter requires admitting privileges at the receiving hospital and familiarity with safety protocols for transfer; some patients can be transferred by the scheduled patient air shuttle with a parent or guardian while others may require the air ambulance.

## Acknowledgments

The authors would like to thank Dr. Robert Nesdole, PhD, of Queens University Department of Psychology for his advice on statistical methods.

## Disclosure Statement

The authors have no conflicts of interest or financial interests to declare.

### REFERENCES

1. Parker J, Steele M, Junek M, Morin L, Davidson S, Fleisher W, Yates T. *Child psychiatry in Canada: Physician resources position statement of the Canadian Academy of Child and Adolescent Psychiatry.* Ottawa, ON: Canadian Psychiatric Association, **2003.**

2. Broder E, Manson E, Boydell K, Teshima J. Use of telepsychiatry for child psychiatric issues: First 500 cases. *CPA Bulletin* 2004;36:11–15.

3. Gloff NE, LeNoue SR, Novins DK, Myers K. Telemental health for children and adolescents. *Int Rev Psychiatry* 2015;27:513–524.

4. Elford DR, White H, St John K, Maddigan B, Ghandi M, Bowering R. A prospective satisfaction study and cost analysis of a pilot child telepsychiatry service in Newfoundland. *J Telemed Telecare* 2001;7:73–81.

5. Persaud DD, Jreige S, Skedgel C, Finley J, Sargeant J, Hanlon N. An incremental cost analysis of telehealth in Nova Scotia from a societal perspective. *J Telemed Telecare* 2005;11:77–84.

6. Myers KM, Valentine JM, Melzer SM. Child and adolescent telepsychiatry: Utilization and satisfaction. *Telemed J E Health* 2008;14:131–137.

7. Kirby MJL, Keon WJ. Out of the shadows at last: Transforming mental health, mental illness and addiction services in Canada. Ottawa, ON: Standing Committee on Social Affairs, Science and Technology, **2006.**

8. Diamond JM, Bloch RM. Telepsychiatry assessments of child or adolescent behavior disorders: A review of evidence and issues. *Telemed J E Health* 2010;16:712–716.

9. Jacob MK, Larson JC, Craighead WE. Establishing a telepsychiatry consultation practice in rural Georgia for primary care physicians: A feasibility report. *Clin Pediatr (Phila)* 2012;51:1041–1047.

10. Volpe T, Boydell KM, Pignatiello A. Mental health services for Nunavut children and youth: Evaluating a telepsychiatry pilot project. *Rural Remote Health* 2014;14:2673.

11. Saurman E, Kirby SE, Lyle D. No longer 'flying blind': How access has changed emergency mental health care in rural and remote emergency departments, a qualitative study. *BMC Health Serv Res* 2015;15:156.

12. Elford R, White H, Bowering R, Ghandi A, Maddiggan B, St John K, House M, Harnett J, West R, Battcock A. A randomized, controlled trial of child psychiatric assessments conducted using videoconferencing. *J Telemed Telecare* 2000;6:73–82.

13. Pesämaa L, Ebeling H, Kuusimäki ML, Winblad I, Isohanni M, Moilanen I. Videoconferencing in child and adolescent telepsychiatry: A systematic review of the literature. *J Telemed Telecare* 2004;10:187–192.

14. Nelson EL, Barnard M, Cain S. Treating childhood depression over videoconferencing. *Telemed J E Health* 2003;9:49–55.

15. Roberts N, Axas N, Repetti L. Clinical characteristics and outcome of emergency department referrals for suicidal first nation children and adolescents from Northern Ontario: Preliminary report case report. *Int J Sch Cog Psychol* 2016;3:180.

Address correspondence to:
*Nasreen Roberts, MBBS, MRCPsych, FRCPC*
*Division of Child and Adolescent Psychiatry*
*Department of Psychiatry*
*Queen's University*
*166 Brock Street*
*Kingston, ON K7L5G2*
*Canada*

*E-mail:* robertsn@hdh.kari.net

*Received:* December 19, 2016
*Revised:* February 3, 2017
*Accepted:* February 6, 2017
*Online Publication Date:* April 20, 2017

© MARY ANN LIEBERT, INC.

Psychiatr Q (2017) 88:271–283
DOI 10.1007/s11126-016-9470-y



REVIEW ARTICLE

# Training Residents in the Use of Telepsychiatry: Review of the Literature and a Proposed Elective

Sy Atezaz Saeed[1] · Toni L. Johnson[2] · Mandeep Bagga[3] · Oliver Glass[3]

Published online: 28 October 2016
© Springer Science+Business Media New York 2016

**Abstract**  Many regions in the United States are deficient in mental health services, especially those in rural areas. As a result of these deficiencies, many patients in need of psychiatric services are often left untreated. Although it is clear that telepsychiatry has great potential in improving patient access to mental health care in areas where psychiatric services are deficient, the lack of familiarity with the technology and inadequate training are current barriers to expanding the use of telepsychiatry. A review of telepsychiatry, its clinical applications, and evidence-based literature regarding competencies in graduate medical education related to telepsychiatry are provided. An approach to implementing telepsychiatry into a curriculum is suggested. We also propose an elective clinical experience with resources for didactics or independent study that will enable residents to develop a knowledge base and competence in the practice of telepsychiatry.

**Keywords**  Telepsychiatry · Telehealth · Telemedicine · Accreditation Council for Graduate Medical Education (ACGME) · Health information technology (HIT) · Videoconferencing

 Sy Atezaz Saeed
saeeds@ecu.edu

1   Department of Psychiatry and Behavioral Medicine, Brody School of Medicine at East Carolina University, 600 Moye Blvd., Suite 4E-102, Greenville, NC 27834, USA

2   Department of Psychiatry and Behavioral Medicine, Psychiatric Outpatient Clinic, 905 Johns Hopkins Drive, Greenville, NC 27834, USA

3   Department of Psychiatry and Behavioral Medicine, Brody School of Medicine at East Carolina University, 905 Johns Hopkins Drive, Greenville, NC 27834, USA

 Springer

272                                                                    Psychiatr Q (2017) 88:271–283

## Introduction

Mental disorders are common. An estimated 26.2 % of Americans ages 18 and older (about 1 in 4) have a mental disorder in any one-year. However, the main burden of illness is concentrated in about 6 % who suffer from a serious mental illness [1]. Mental disorders are not only common, they are also associated with high levels of distress, disability, morbidity, and mortality. However, many states have scarcity of health and human services, especially in rural areas. Such disparities are particularly apparent in the area of mental health services [2]. Because of the scarcity of resources in rural areas, and areas of lower population density, many people with mental disorders do not have access to mental health services. This lack of access often forcees patients to travel long distances to obtain mental health services, or forgo such services altogether. Telepsychiatry is a demonstrated solution to address the problem of disparities in access to care. However, despite empirical evidence that demonstrates effectiveness of telepsychiatry, when compared to the care provided face-to-face, many psychiatrists are still not at ease with telepsychiatry. Including telepsychiatry in residency training curriculum can help increase the number of psychiatrists that will likely use it in caring for patients in rural and underserved communities. A recent review of use of telepsychiatry in graduate medical education concluded that there was a need for a more evidence-based approach to telepsychiatry training and that such a training, if done right, could not only improve clinical outcomes but also promote social accountability, cultural competence, and interprofessional care [3].

The body of literature that supports the assertion that utilizing telepsychiatry to provide mental health care has the potential to mitigate the workforce shortage that directly affects access to care, especially in remote and underserved areas, has been significant [4] and it continues to grow. Among the general application of telemedicine and telehealth, telepsychiatry has remained as one of the largest medical specialty uses for over a decade now [5, 6]. Telepsychiatry has been referred to by various terms including tele behavioral health, telemedicine, e-behavioral health, telemental health, e-care, telehealth, and telecare.

Health information technologies (HIT) continue to grow in numbers and many of them have the potential to enhance access to mental health care, as well as reduce disparities in use of services across groups in need. Such technologies are not limited to telepsychiatry and include use of Internet, smartphone programs or apps, and text messaging protocols. Utilizing such technologies can help solve the access problem and enable us to extend our clinical reach into underserved populations without significantly expanding our workforce [7].

In this paper we summarize benefits of using telepsychiatry, its clinical applications, relevant technology basics, and what competencies may be required for future psychiatrists with respect to telepsychiatry and technology. We review literature in the area of graduate medical education pertaining to telepsychiatry. We then discuss pedagogical approaches that will promote attainment of these competencies. Using an evidence-based approach, we conclude with proposing an elective that is likely to develop residents' competence to practice telepsychiatry.

## Telepsychiatry- Technology Basics

While telepsychiatry has been defined in various ways, live interactive two-way audio-video communication, often referred to as videoconferencing, is the modality that has become synonymous with telemedicine broadly, and telepsychiatry specifically for mental health care. With videoconferencing, a provider at a distant location evaluates and treats a patient at their


Springer

Case 2:90-cv-00520-KJM-SCR    Document 5873-5    Filed 08/03/18    Page 525 of 563

local clinical site via live and interactive audiovisual conferencing systems over high-bandwidth networks. A typical telepsychiatry setup includes a video camera, microphone, speakers (or headset), and one or two displays at each end of the system. Often, separate displays or a picture-in-picture (if one display) are used to enable participants to see both outgoing and incoming video. A pan-zoom-tilt control of video camera is preferred which allows the clinical provider to remotely control his/her view of the patient's site or locally control the view that is being transmitted to the patient. A vital component of this interactive telepsychiatry unit is the coder/decoder (also referred to as codec), which provides the requisite compression and decompression, and synchronization of audio and video signals and it is required at both the patient and consultant ends of the system. A coder/decoder can be a separate device or it can be personal computer-based.

Regarding connectivity, historically telepsychiatry applications have used point-to-point network connections, usually as full or fractional T-1 or Integrated Services Digital Network (ISDN) circuits. With the rapid diffusion of Internet and Ethernet networks, Internet Protocol (IP) has largely replaced these older point-to-point networks. When using IP networks security must be ensured. This can be done by using encrypted codecs or by setting up a virtual private network (VPN) and/or a virtual local area network (VLAN). With the security measures in place, the advantage of IP networks is that they can be shared by multiple applications, e.g. Internet access, e-mail, LAN, etc. This means that the telecommunications or network costs can be shared, or considered a sunk cost.

## Benefits of using Telepsychiatry

A growing body of literature suggests that use of telepsychiatry to provide mental health services has the potential to solve the workforce shortage problem that directly affects access to care, especially in remote and underserved areas [4, 8]. Telepsychiatry is not only effective and well accepted; it can also increase administrative efficiency while providing positive outcomes in most clinical settings [8].

Empirical evidence on the use and effectiveness of telepsychiatry services across the life span has been previously reviewed by our group [4] covering a time period of over half a century. In that review we noted that the evidence on effectiveness of telepsychiatry did not start to emerge until 2000 or later and was relatively weak. This literature began with descriptive articles that looked at acceptance, satisfaction, feasibility, and cost. There was then movement toward comparing telepsychiatry to services provided in-person. It hasn't been until more recent years that studies that provide the same treatment across the two modalities (telepsychiatry versus face-to-face) and measure clinical outcomes have emerged. However, in these studies the treatment tends to be very limited, usually medication management or a short course of CBT. Such studies show the outcomes to be generally similar as in treatment provided face-to-face and the acceptance of telepsychiatry to be generally good. Further, literature shows that if there are acceptance problems, it is usually the professional who is reluctant, not the patient or family. Usage is primarily in rural areas or jails, or with underserved subpopulations such as children. Our review also showed that while the state of the literature was generally not robust, there was more in psychiatry than other medical specialty areas, probably because of the greater reliance on the mental status examination and verbal communication as compared to a physical examination.

Hilty and colleagues also reviewed the published literature on effectiveness of telemental health compared to services provided face-to-face [9]. Their review suggested that telemental

 Springer

health was not only effective for diagnosis and assessment across many populations and for disorders in many settings (for example emergency, home health), but it also appeared to be comparable to care provided face-to-face.

Deslich and colleagues have summarized the benefits and constraints of using telepsychiatry within the current system of healthcare [10]. On the benefits side, telepsychiatry can provide better access and higher-quality care to patients in need of such care with the potential cost savings to providers. On the challenges and barriers side, reimbursement, licensure, privacy, security, patient safety, and interoperability have all been identified.

In addition to the direct benefits of telepsychiatry to patients and providers, other benefits have also been identified, including:

1. Improving access to mental health services can help reduce geographic and socioeconomic health disparities
2. Reducing the time and expenses associated with travel can also improve consumer compliance
3. Improved education of mental health professionals
4. Improved coordination of care across mental health system
5. Improvement in recruiting and retaining mental health professionals to work in underserved or rural areas [11–14].
6. Potential of reduction of stigma associated with receiving mental health services [15].

## Telepsychiatry Applications

Telepsychiatry can be used for diagnostic and therapeutic use across the age span. Common applications include diagnostic assessments; pre-hospitalization assessment and post-hospital follow-up care; medication management; psychotherapy; and consultation. Videoconferencing consultations can be used on routine as well as for crisis behavioral health cases using a "virtual" case management team. Points of delivery can include hospitals and their emergency departments, clinics, offices, homes, nursing homes, schools, and correction settings. Other uses of telepsychiatry include:

• Telehealth technologies can be used to restructure the implementation of training efforts, allowing the learning activity to originate from a variety of possible locations inside or outside the state. Designated trainers would not have to travel to multiple sites in order to deliver the desired training to multiple audiences. The provision of telehealth-facilitated training would also allow broader access to the training by the myriad of staff from varied institutions and minimize training related travel. Furthermore, telehealth-facilitated training can ensure that the subject matter is conveyed consistently from site to site, and questions and comments of the participants and their responses are communicated simultaneously to multiple audiences at the different training sites thus enriching the learning experience.
• The primary services needs of inpatients at most of the state mental health, developmental disabilities, and substance abuse facilities are usually met by facility staff. However, these patients often have co-morbidities or other health conditions that become manifest during their inpatient stay. It is often problematic, costly, and inefficient to provide other clinical services in a timely manner, either on site or by offsite transport. Many of such specialty consultation services are possible by telehealth/telemedicine.

 Springer

Psychiatr Q (2017) 88:271–283 275

- Many state institutions, such as correctional facilities or special needs schools, require mental health and other health services. Telepsychiatry/telehealth can be quite helpful in providing such services. This has been proven to be cost effective and educationally beneficial, as it has resulted in students remaining at the school and spending more time in the classroom, as they would have otherwise returned home.
- For the current system to work properly and efficiently there is a requirement for a seamless interface between the mental health professional, law enforcement and the judicial system. Commonly, law enforcement officials are responsible for the safety, care and sustenance of consumers in crisis, who often must be transported over great distances to facilities with receiving clinicians who have little or no information on the consumer en route. Other variables such as the changing mental status of the consumer, attitudes and cultural beliefs of the caregivers and drugs and/or alcohol consumed prior to the crisis further complicate the situation. Similar complications arise when law enforcement must interface with rural emergency departments when accompanying those recently apprehended or otherwise in custody that might have significant mental illness. Telepsychiatry and e-mental health systems could greatly improve the efficiency of these situations and improve public safety. Telehealth can also be used for commitment hearings, evaluation of competence, and forensic evaluations
- There is a great need to improve the quality of and access to mental health services in nursing homes and other extended care facilities. Residents' mental health conditions are often misdiagnosed (or underdiagnosed) and nursing staff are increasingly overburdened and inadequately trained to deal with mental health issues. Telepsychiatry and e-mental health services could improve the quality and efficiency of mental health services delivery. Furthermore, other clinical needs could be addressed by telehealth using the same infrastructure.
- The primary care physician is usually the principal gatekeeper for accessing the health care system. Many of the patients seen in the primary care setting have mental disorders, psychiatric co-morbidities, or psychogenic symptoms. Further confounding the problem are the primary care physician's limited mental health training and difficulty in referring patients for mental health services [16]. Therefore, primary care physicians often under diagnose mental health conditions, are unaware of developments in and protocols for pharmacotherapy, and struggle to appropriately refer their patients for external mental health services. There are several primary care applications for telepsychiatry and e-mental health, including training, tele-mentoring, teleconsultation, and care coordination.

## Review of Literature on Training Residents in the Use of Telepsychiatry

Currently, training in telepsychiatry is not a requirement for psychiatry residency programs in the United States, the UK, Canada, Australia, or New Zealand. Training in rural mental health is only required in Australia and New Zealand where telepsychiatry is recommended when available, however. Canada is increasing training requirements in telepsychiatry specifically to meet the mental health needs of marginalized populations and those living in rural and remote areas [3]. In the United States, there appears to be a clear practice gap between resident/ fellow interest in telepsychiatry and the didactic curriculum and clinical experiences offered in residency programs.

 Springer

A 2011 survey by Hoffman and Kane of 183 psychiatry residency programs in the United States found that very few programs offered a curriculum in telepsychiatry even though 72 % of the resident respondents were "interested" or "very interested" in telepsychiatry [17]. This was consistent with a similar response from residents in an earlier study by Glover and colleagues [18]. They surveyed 485 psychiatry residency and fellowship programs in the United States. More than two-thirds of the 283 respondents who completed the survey reported having an interest in telepsychiatry. Trainees viewed it as an important part of training although only 50 of the respondents reported having any clinical exposure to telepsychiatry. Over half of the respondents reported lack of any didactic teaching on telepsychiatry in their training programs. Not surprisingly, those who had some clinical exposure reported a higher interest level in telepsychiatry. Yet, the amount of exposure to pique interest was extremely modest with the majority of respondents reporting either a one-time encounter or less than 6 h of encounter time with several patients via telepsychiatry.

Unlike the Glover report, the Hoffman and Kane survey was sent to program directors and was limited by a low response rate of 25 %. Less than 50 % of responders stated residents in their program were involved in any telepsychiatry (either formal curriculum or informal clinical experience) and only 26 % reported having a formal curriculum in telepsychiatry. Like the Glover study however, those programs in rural areas were more likely to experience exposure to telepsychiatry. Of note, the vast majority of program directors reported an interest in receiving a sample curriculum in telepsychiatry.

Overall, it appears the majority of residents/ fellows as well as program directors in the United States are very interested in clinical telepsychiatry experiences and developing didactic curriculum despite the low percentages of programs currently doing this. Although the interest is apparent, the motivation for program directors to actually add telepsychiatry curriculum and clinical rotations or make any modifications to residency programs, is generally fueled by the Program Requirements outlined by the residency oversight organization, the Accreditation Council for Graduate Medical Education (ACGME). The current ACGME competencies for technology, in general, are very limited and focus mostly on the use of the electronic medical record (EMR). Competencies specifically for telemedicine/ telepsychiatry are not yet defined. There are no goals or objectives, nor any specific milestones to gauge a resident's level of competency in telepsychiatry knowledge or clinical abilities. There remains a great need for specific goals and objectives in curriculum development and also a method to assess the competency of trainees in the delivery of telepsychiatric services. This includes evaluating residents along a vast array of core competencies including clinical skills, technical knowledge, ethical understanding, forensic knowledge as well as inter-professional and communication skills.

Oesterheld and colleagues provide the details of a formal curriculum for training in telepsychiatry [19]. They identified necessary skills including technical skills, assessment skills and adaptation of skills to the telepsychiatry context. In a recent study by Sunderji and colleagues reviewing telepsychiatry in graduate medical education, only 20 peer-reviewed references which describe training psychiatry residents to deliver mental health care via real-time videoconferencing were identified. Of the 20 articles, none described a valid needs assessment of residents and only four defined learning objectives [3]. A needs assessment is, of course, necessary for the foundation of evidence-based curriculum development.

Crawford, Sunderji and colleagues completed a qualitative study to better assess the needs of resident learners in order to guide the development of telepsychiatry curriculum.

 Springer

Psychiatr Q (2017) 88:271–283    277

Their study focuses on the reflections of residents with an interest in telepsychiatry and experienced faculty members related to learning telepsychiatry at the University of Toronto. In addition to the basic skills identified years earlier by Oesterheld and colleagues, the curriculum developed by Crawford and colleagues included areas of practice such as collaborative and interprofessional skills, community psychiatry, cultural psychiatry, medico-legal aspects and systems-based practice skills [20]. These additions are better aligned with the competency framework of the ACGME in the United States. A comprehensive telepsychiatry clinical experience may include educating trainees in diagnostic assessment, consultation, psychopharmacologic management, and psychotherapy (individual, couple, or group) via video-conferencing. Specific considerations for demographic variations such as age (adult, child/adolescent), location/ settings (rural, urban, emergency department, nursing home, detention/ jail/ prison) and variation in language ability must also be considered.

Outside of the graduate medical education world, professional guidelines for telemedicine and telepsychiatry do exist. Recommendations that apply to all medical specialties include the AMA 2014 Practice Parameters for Telemedicine [21]. The report provides a summary of AMA's existing policies with respect to payment, clinical standards, licensure, and ethical guidance. The American Psychiatric Association (APA) Council on Psychiatry & Law published a resource document to discuss the role of internet in the practice of psychiatry, particularly when communicating with patients and the public [22]. While the document provides discussion to frequent questions asked regarding e-therapy, medical practice websites and e-mail, it did not have the intention of addressing detailed aspects of telepsychiatry delivery. The American Telemedicine Association developed practice guidelines on videoconferencing-based telemental health in October 2009 [23]. This was a consensus-based best-practice reference written as a summary of clinical experiences of experts in the practice of telepsychiatry.

Additionally, in 2013, the American Telemedicine Association developed practice guidelines for behavioral health professionals [24]. Practice parameters for telepsychiatry services for child and adolescent psychiatry were developed by the Work Group on Quality Issues, American Academy of Child and Adolescent Psychiatry [25]. Likewise, in 2013, the Telepsychology Task Force (TTF) put forward guidelines for telepsychology, which was then established by the American Psychological Association (APA), the Association of State and Provincial Psychology boards and the APA Insurance Trust [26]. The intention of the guidelines is to ensure that psychologists adhere to a certain standard when delivering their care through telepsychology. It was understood by the TTF that while telepsychology offers opportunities, this form of communication might also have its periods of difficulties. Attention must be paid to the key aspects of what makes telepsychology different from traditional provider to client/patient in-person care delivery.

## Suggested Guidelines for Graduation from Residency Training

Residency programs must take reasonable steps to ensure residents demonstrate competence with the telepsychiatry practice and express understanding of the potential impact of telepsychiatry services on patients or other healthcare professionals.

 Springer

Based on our review of the literature, as summarized above, we suggest the following guidelines for GME:

*Guideline 1*: Residents must demonstrate ethical and professional standards of care are met throughout the duration of the telepsychiatry services provided.

*Guideline 2*: Residents must ensure the identification, location and contact information of patient and provide own identification before the service proceeds.

*Guideline 3*: Resident must be aware of local emergency resources such as location of nearest hospital or emergency room capable of managing psychiatric emergencies in the location of the patient.

*Guideline 4*: Residents must be aware of other local professionals, institutions, agencies or demonstrate ability to coordinate such care with a team member in case a local referral is needed

*Guideline 5*: Residents must discuss contact methods and management of patient concerns in between appointments, how to handle emergencies, etc.

*Guideline 6*: Residents must demonstrate understanding of the applicable laws of where patient is located and regulations, as well as organizational requirements that govern informed consent, involuntary commitment, controlled substances and Tarasoff laws in telepsychiatry care delivery as well as relevant laws and regulations when providing telepsychiatry services to patients across jurisdictional and international borders.

*Guideline 7*: Residents must obtain and document informed consent and release of information processes that specifically addresses the unique concerns related to the telepsychiatry services provided and inform patients of the potentially increased risks to loss of confidentiality inherent in the use of the telecommunication technologies, if any.

*Guideline 8*: Residents must take reasonable steps to ensure that security measures are in place to protect private health data and information from unintended access or disclosure and maintain the confidentiality of the data and information.

*Guideline 9*: Residents should be competent with the culture of the population they are serving, which may or may not be similar to the resident's surrounding environment.

*Guideline 10*: Residents must be able to identify the time at which telepsychiatry services are no longer appropriate, and must be discontinued.

*Guideline 11*: Residents must consider the unique issues that may arise with test instruments and assessment approaches designed for in-person implementation when providing telepsychiatry services.

*Guideline 12*: Resident must document appropriately in the EMR (HER) and have a basic understanding of billing and payment for various telepsychiatry services.

## A Proposed Elective

Due to the ever-increasing importance of teletechnology in the field of psychiatry, new graduates are more than ever expected to be familiar with or at least be comfortable using these cutting edge tools in providing care to patients. In our current system, residency training typically lags behind commercial demand for skills. Therefore, due to the relative scarce use of telepsychiatry in residency training, no current standardized training protocols exist to guide training programs in preparing residents for future jobs in telepsychiatry. As a consequence of the limited training that graduates are receiving at this point, most commercial telepsychiatry providers have taken on the

 Springer

Case 2:90-cv-00520-KJM-SCR    Document 5873-5    Filed 08/03/18    Page 531 of 563

burden of training psychiatrists themselves. Most current telepsychiatry job postings state that "telepsychiatry experience" is beneficial but if not, any and all training necessary will be provided. Due to the rapid growth of the field and as telepsychiatry becomes more commonplace, eventually the burden of training will move away from the service sector to the training programs. Residents who do not receive training in telepsychiatry will be less competitive for these positions than those who do and consequently programs that do not offer any telepsychiatry experience may be seen as inferior by potential applicants.

Standardization of telepsychiatry education, at this point, will be difficult due to the limited prevalence of telepsychiatry programs in certain areas as well as the diverse patient population that is used to treat and evaluate. The most common current use of telepsychiatry is in the outpatient clinic, either through a consult system or primary provider system. However, telepsychiatry is continuing to expand into evaluating patients in emergency departments, consultation and liaison services, and even to conduct research. Telepsychiatry can also be used to treat patients across the life span. Each one of these uses of telepsychiatry comes with its own sets of unique challenges and risks, therefore training in each category would be ideal but most likely not feasible in the current market. It may be advisable to start the telepsychiatry training on an "elective" basis to allow interested residents to gain experience in a varying number of settings. Electives should be reserved for advanced placement residents as the elective should be more focused on learning the challenges and unique aspects of using technology to see patients rather than building interviewing skills or enhancing psychopharmacology knowledge. If possible, residents should be given the opportunity to rotate and see patients in the varying settings and at minimum in outpatient clinics and emergency departments, as these are the most predominant locations for telepsychiatry. Resident responsibility should start with shadowing current providers until residents can gain familiarity and comfort with the technology. Shadowing should progress towards more "hands on" patient care but with continued supervision from primary providers to assist with any technical difficulties that may arise. Complete independence with the patient interaction can be assigned, however should be limited as the primary objective of the elective should be, as previously stated, to gain knowledge and understanding of the telepsychiatry system itself and not to teach basic interviewing skill or pharmacology knowledge.

A collection of reading materials should be incorporated into the elective and time should be reserved to allow residents to review these materials. Readings should encompass medico-legal issues, ethical concerns, logistics, challenges unique to telepsychiatry and guidelines on industry standards. Materials should also be included to help residents become familiar with the current equipment that is available, the videoconferencing industry that provides products (e.g. Polycom, Cisco, Tanberg, Lifesize, Cloudvisit, etc.), and the current evidence base for telepsychiatry. Residents should also review on-line training modules that are provided by Northern Arizona Regional Behavioral Health Authority (NARBHA), a telemedicine network serving rural areas of Northern Arizona since 1996. The modules are available at the following link: http://www.rbha.net/TelepsychiatryBasics.html. It provides an on-line telepsychiatry basics seminar which is designed to help clinicians, administrators, and technical staff who are about to start, or who need information about starting and/or overseeing, a telemental health program. The training is divided into a clinical track and an administrative track. Topics offered in the clinical track include an overview of telemental health, best practices, psycho-dynamics, and use of interpretive services via videoconferencing. Residents should also be



encouraged to join the American Telemedicine Association as "student members", and if available familiarize themselves with the use of the InTouch videoconferencing robot.

An elective would include exposure to telepsychiatry in various clinical settings including emergency department, other acute crisis facilities, consult-liaison service, and outpatient clinics. Such an elective would also include didactics, opportunity for readings and familiarization with telepsych equipment, industry, research, etc. Table below provides a listing of some of the available resources for such an elective.

| Association | Title of Guideline | Year | Topics |
|---|---|---|---|
| American Psychological Associations | Guidelines for Telepsychology http://www.apa.org/practice/guidelines/telepsychology.aspx | 2013 | Discusses differences between classical providers and telehealth providers; Provides 8 guidelines for telepsychologists. |
| American Psychiatric Association | Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry https://www.psychiatry.org/psychiatrists/search-directories-databases/library-and-archive/resource-documents | 2014 | Discusses the role of internet in the practice of psychiatry; discusses frequently asked questions regarding e-therapy, medical practice websites and email; medico-legal issues and pitfall/common mistakes of telepsychiatry. |
| American Academy of Child and Adolescent Psychiatry | Practice Parameter for Telepsychiatry with Children and Adolescents http://www.jaacap.com/article/S0890-8567(08)60154-9/fulltext | 2008 | Discusses telepsychiatry with particular focus on C&A psychiatry: history, development, model of delivery, infrastructure, legal issues, management strategies, equipment, optimizing care, informed consent, location considerations, etiquette, and prescribing medications |
| American Telemedicine Association | Practice Guidelines for Video-Based Online Mental Health Services http://www.americantelemed.org/resources/telemedicine-practice-guidelines/telemedicine-practice-guidelines/practice-guidelines-for-video-based-online-mental-health-services#V5-LIusrJdg | 2013 | Generic guidelines covering basics of patient encounters in telepsychiatry such as identity verification, location verification, expectation setting, emergency protocols, medication and cultural competence, technology considerations |
| American Telemedicine Association | Practice Guidelines for VideoConferencing-Based TeleMental Health http://www.americantelemed.org/docs/default-source/standards/practice-guidelines-for-videoconferencing-based-telemental-health.pdf?sfvrsn=6 | 2009 | Creates guidelines for online mental health: initiation, patient appropriateness, informed consent, physical environment, communication and coordination, emergency management, medical issues, technology guidelines, administrative guidelines |

 Springer

Psychiatr Q (2017) 88:271–283 281

| Title of Textbook | Editor(s)/ Author(s) | Year | Topics |
| --- | --- | --- | --- |
| Telemental Health | Kathleen Myers, Carolyn Turvey | 2013 | Discusses the clinical, technical, and administrative foundations for the evidence-based practice of telepsychiatry. |
| Telepsychiatry & Telemental Health, An Issue of Child & Adol Psych Clinics of N. Am | Brian Grady, Eve-lynn Nelson | 2011 | Emphasizes use of telepsychiatry and telemental health to children and adolescents in various settings and with a variety of clinical approaches |
| Telepsychiatry and E-mental health | Amanda Oakley, Paul McLaren, Peter Yellowlees | 2009 | A comprehensive overview in the ways telemedicine can aid diagnosis and management. It includes experts' personal experiences |

## Conclusions

The potential for telepsychiatry to improve access to adequate mental health care is becoming more evident. While its continued advances are in progress, the current technology appears to be adequate for most clinical uses. There are numerous applications of telepsychiatry that are already defined and more are ripe for exploration. Barriers to implementation are primarily of the human variety and will require a combination of consumer, provider and governmental advocacy to overcome. Telepsychiatry can be effectively used to bridge mental health providers with the population that may not have access to such services due to various reasons. Aside from helping solve the access problem, use of telepsychiatry can also help with narrowing the gap between science and practice by system-level implementation of measurement-based, standardized, and evidence-based practices. The use of technology has brought down the costs of electronically delivered care besides making the communication easy and accessible. The advancement in technology over the years, has connected the majority of the American population and the Internet has had significant effect of increasing users' social networking.

The benefits of training residents in telepsychiatry include well-established and immediate results as well as probable, and yet, unseen positive impacts. Obtaining competency in telepsychiatry will better prepare residents for the job market of the future. For example, The Veterans Health Administration (VHA) has embraced telepsychiatry and plans to continue expansion of these services over the next several years. With the increasing demand for psychiatric services for increasingly diverse and mobile populations, it is in our best interest to train residents to provide this care without the limitations of geographic proximity. In fact, it has been speculated that telepsychiatry practice for marginalized and underserved populations during residency can promote a sense of responsibility for and interest in providing this type of care post-residency. Telepsychiatry also interfaces well with integrated care and the patient-centered focus of the medical home model which is the model of care for the future. Developing psychiatric leaders for the future who are knowledgeable and comfortable with technology within an integrated practice model will add stability to and protect the practice of psychiatry in the future.

 Springer

In summary, in order for telepsychiatry to reach its full potential in meeting the demands for mental health care in the United States, we will have to develop as well as improve upon graduate medical education curriculum and training. Telepsychiatry education and training will need to be integrated with and complementary to the existing requirements of post graduate medical education as outlined by the ACGME. Some requirements may require significant revision which can be an arduous process. We must begin with evidence-based didactic curriculum and teaching methods which can be used by a variety of residency programs. This framework must also allow for innovation within individual programs. Lastly, curricula must be accurately evaluated and continuously improved upon in order to understand the best methods to ensure resident competency in the practice of telepsychiatry.

**Compliance with Ethical Standards**  This article does not contain any studies with human participants or animals performed by any of the authors.

**Conflict of Interest**  The authors declare that they have no conflict of interest.

# References

1. Kessler RC, Chiu WT, Demler O, Walters EE. Prevalence, severity, and comorbidity of twelve-month DSM-IV disorders in the National Comorbidity Survey Replication (NCS-R). Archives of General Psychiatry, 2005; 62(6): 617–27.
2. *New freedom commission on mental health, subcommittee on rural issues: Background paper* (2004). No. DHHS Pub. No. SMA-04-3890). Rockville, MD.
3. Sunderji N, Crawford A, Jovanovic M. Telepsychiatry in graduate medical education: a narrative review. Acad Psychiatry. 2015; 39 (1): 55–62. Epub 2014 Aug 26.
4. Antonacci DJ, Bloch RM, Saeed, SA, Yildirim Y, Talley J. (2008). Empirical evidence on the use and effectiveness of telepsychiatry via videoconferencing: implications for forensic and correctional psychiatry. Behavioral Sciences and the Law: 26:253–269.
5. Grigsby, J., Rigby, M., Hiemstra, A., House, M., Olsson, S., & Whitten, P. (2002). Telemedicine/telehealth: an international perspective. The diffusion of telemedicine. Telemedicine Journal & E-Health, 8(1), 79–94.
6. Krupinski, E., Nypaver, M., Poropatich, R., Ellis, D., Safwat, R., & Sapci, H. (2002). Telemedicine/telehealth: an international perspective. Clinical applications in telemedicine/telehealth. Telemedicine Journal & E-Health, 8(1), 13–34.
7. Clarke G, Yarborough BJ. Evaluating the promise of health IT to enhance/expand the reach of mental health services. Gen Hosp Psychiatry. 2013; 35(4): 339–44. doi: 10.1016/j.genhosppsych.2013.03.013. Epub 2013 May 20.
8. Hilty D, Yellowlees PM, Parrish MB, Chan S. Telepsychiatry: effective, evidence-based, and at a tipping point in health care delivery? Psychiatr Clin North Am. 2015; 38(3): 559–92. doi: 10.1016/j.psc.2015.05.006. Epub 2015 Jul 2.
9. Hilty DM, Ferrer DC, Parish MB, Johnston B, Callahan EJ, Yellowlees PM. The effectiveness of telemental health: a 2013 review. Telemed J E Health. 2013;19(6):444–54. doi: 10.1089/tmj.2013.0075.
10. Deslich S, Stec B, Tomblin S, Coustasse A. Telepsychiatry in the 21(st) century: transforming healthcare with technology. Perspect Health Inf Manag. 2013 Summer; 10(Summer): 1 f. Published online 2013 Jul 1.
11. D'Souza R. A pilot study of an educational service for rural mental health practitioners in South Australia using telemedicine. Journal of Telemedicine and Telecare. 2000; 6 (S1): S187–9.
12. Haythornthwaite, S. Videoconferencing training for those working with at-risk young people in rural areas of Western Australia. Journal of Telemedicine and Telecare. 2002; 8 (S3): 29–33.
13. Redford, LJ, and LG Parkins. Interactive televideo and the internet in rural case management. Journal of Case Management. Winter 1997; 6(4): 151–7.
14. Stamm, BH. Clinical applications of telehealth in mental health care. Professional-Psychology: Research-and-Practice, 1998; 29(6), 536–542.



15. Farrell SP and CR McKinnon. Technology and rural mental health. *Archives of Psychiatric Nursing*. 2003; 17(1): 20–6.

16. Trude S, and JJ Stoddard. Referral gridlock: Primary care physicians and mental health services. *Journal of General Internal Medicine*. 2003; 18(6): 442–9.

17. Hoffman, P., & Kane, J. M. (2014). Telepsychiatry Education and Curriculum Development in Residency Training. *Acad Psychiatry Academic Psychiatry, 39*(1), 108–109.

18. Glover, J. A., Williams, E., Hazlett, L. J., & Campbell, N. (2013). Connecting to the future: telepsychiatry in postgraduate medical education. Telemedicine and E-Health, 19(6), 474–479.

19. Oesterheld, J. R., Travers, H. P., Kofoed, L., & Hacking, D. M. (1999). An introductory curriculum on telepsychiatry for psychiatric residents. Acad Psychiatry Academic Psychiatry, 23(3), 165–167.

20. Crawford, A., Sunderji, N., López, J., & Soklaridis, S. (2016). Defining competencies for the practice of telepsychiatry through an assessment of resident learning needs. *BMC Medical Education BMC Med Educ, 16*(1).

21. AMA Adopts Telemedicine Guidelines - OMW Health Law. (2014). Retrieved March 29, 2016, from http://omwhealthlaw.com/amaadoptstelemedicine/.

22. The American Psychiatric Association (APA) Council on Psychiatry & Law Resource Document on Telepsychiatry and Related Technologies in Clinical Psychiatry. Available at https://www.psychiatry.org/File%20Library/Psychiatrists/Directories/Library-and-Archive/resource_documents/Resource-2014-Telepsychiatry-Clinical-Psychiatry.pdf. Accessed 22 Apr 2016.

23. Yellowlees, P., Shore, J., & Roberts, L. (2010). Practice guidelines for videoconferencing based telemental health – October 2009. Telemedicine and E Health, 16(10), 1074–1089.

24. Turvey, C., Coleman, M., Dennison, O., Drude, K., Goldenson, M., Hirsch, P., Bernard, J. (2013). ATA practice guidelines for video-based online mental health services. Telemedicine and E-Health, 19(9), 722–730.

25. Myers, K., & Cain, S. (2008). Practice parameter for telepsychiatry with children and adolescents. *Journal of the American Academy of Child and Adolescent Psychiatry,* 47(12), 1468–1483.

26. American Psychological Association. (2016) Guidelines for the Practice of Telepsychology. Available at: http://www.apa.org/practice/guidelines/telepsychology.aspx. Accessed 22 Apr 2016

**Professor Sy Atezaz Saeed** , MD, MS, FACPsych has been serving as the Chairman of the Department of Psychiatry and Behavioral Medicine at the Brody School of Medicine, East Carolina University since 2004. He also serves as the Chief of Psychiatry for Vidant Health; the Director of the Center for Telepsychiatry at ECU; and as the Director of North Carolina Statewide Telepsychiatry Program (NC-STeP). Dr. Saeed is currently the Editor-in-Chief of the *Journal of Psychiatric Administration and Management* (JPAM).

**Toni Johnson** , M.D. is vice chair and the Director of Residency Training in the Department of Psychiatry and Behavioral Medicine at the Brody School of Medicine at East Carolina University.

**Mandeep Bagga** , M.D. served as the Chief Resident in the Department of Psychiatry and Behavioral Medicine, Brody School of Medicine at East Carolina University until his graduation from the program in June 2016.

**Oliver Glass** , M.D. is a 4th year Resident Physician in the Department of Psychiatry and Behavioral Medicine, Brody School of Medicine at East Carolina University.

 Springer

Psyc iatric  uarterly is a copyri  t of Sprin  er   017. All Ri   ts Reser  ed.

# Attachment E

# TELEMEDICINE SERVICES
## PROGRAM SUMMARY

### Introduction

At the direction of the Federal Receiver, as outlined in the 2008 "Federal Receiver's Turnaround Plan of Action," California Correctional Health Care Services (CCHCS) Telemedicine Services (TMS) has continued implementation, expansion, and improvement of telemedicine services, resulting in increased access to healthcare for our patient/inmate population, increased public safety, and a decreased patient/inmate off-site medical transportation cost.

CCHCS Telemedicine Services has experienced continual expansion and growth over the past several years, with fiscal year 2017-18 (July 2017 to June 2018) resulting in **almost 70,000 specialty and primary care telemedicine appointments.**

### TELEMEDICINE SPECIALTY SERVICES

### Telemedicine Specialty Services Resources

- Fiscal Year 2006-07: 30 specialists in 4 locations
- Fiscal Year 2017-18: 200 specialists in 22 locations

### Telemedicine Specialty Services Utilization Data

| Fiscal Year | Total Telemedicine Specialty Encounters |
|---|---|
| 2010-11 | 14,577 |
| 2011-12 | 19,013 |
| 2012-13 | 19,351 |
| 2013-14 | 20,452 |
| 2014-15 | 23,876 |
| 2015-16 | 25,590 |
| 2016-17 | 26,360 |
| 2017-18 | 31,340 |



## Telemedicine Specialties

CCHCS Telemedicine Services offers **28** different specialties, listed below:

| | |
|---|---|
| Allergy & Immunology | Neurosurgery |
| Cardiology | Ob/Gyn |
| Dermatology | Orthopedics |
| Dietary | Physical Med & Rehab |
| Endocrinology | Plastic and Reconstructive Surgery |
| ENT | Podiatry |
| Gastroenterology | Pulmonology |
| General Surgery | Radiation Oncology |
| Hematology/Oncology | Rheumatology |
| Hepatology | Thoracic Surgery |
| HIV | Transgender |
| Infectious Disease | Urology |
| Nephrology | Vascular Surgery |
| | Wound Care |
| Neurology | |

## TELEMEDICINE PRIMARY CARE SERVICES

### Primary Care Telemedicine Utilization

Primary care telemedicine has shown to be a great resource for institutions with recruitment and retention issues, and when providers are unavailable for long periods of time (military leave, sick leave, maternity leave, etc.)

| Fiscal Year | Number of Encounters |
|---|---|
| 2010-11 | 2881 |
| 2011-12 | 6900 |
| 2012-13 | 4716 |
| 2013-14 | 4434 |
| 2014-15 | 12,558 |
| 2015-16 | 27,446 |
| 2016-17 | 26,672 |
| 2017-18 | 37,895 |

### Additional Information

Should you have any questions or if Telemedicine Services can be of any assistance please feel free to contact Erika Sky, Erika.Sky@cdcr.ca.gov, 916.691-9490, Telemedicine Program Manager, or Michael Arca, Michael.Arca@cdcr.ca.gov, 916.691-9849, Chief Physician & Surgeon.

# Attachment F

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

| **VOLUME 11: TELEMEDICINE SERVICES** | Effecti e Date  01/ 00 |
|---|---|
| **CHAPTER 1: TELEMEDICINE SERVICES PROGRAM** | Re ision Date  0 / 015 |
| **11.1.1: TELEMEDICINE SERVICES POLICY** | Attac ments   es☐ No☒ |

## I. POLICY

T e California Correctional   ealt  Care Ser ices  CC  CS  s all maintain a Telemedicine Ser ices Pro ram  in California Department of Corrections and Re abilitation  CDCR institutions to pro ide care to t e patient population in accordance wit  applicable state law and Inmate Medical Ser ices Policies and Procedures.

Telemedicine ser ices s all be utili ed by institutions w ene er possible to reduce custodial costs for specialty ser ices deli ered outside of t e institution  increase community safety by reducin  transports to outside facilities  and optimi e a ailability of specialty care for institutions w ere specialists in t e community are not readily accessible.

Primary care telemedicine and ot er medical ser ices  e.  . dietary    I   s all be used as a resource for institutions wit  recruitment and retention issues and w en pro iders are una ailable  e.  . military lea e  sic  lea e  maternity lea e .

CC  CS Telemedicine Ser ices s all pro ide o ersi t to t e statewide Telemedicine Ser ices Pro ram and s all be responsible for pro ram sc edulin   uidance  auditin  reportin  and trainin .

T e Di ision of   ealt  Care Ser ices  Mental   ealt  Pro ram s all pro ide o ersi t for mental  ealt  telepsyc iatry ser ices.

## II. PURPOSE

To ensure t at Telemedicine Ser ices meet t e followin   uidelines
- Impro e patient access to constitutionally ade uate medical ser ices  utili in  telecommunications tec nolo y
- Pro ide medical specialty  primary care  and ot er medical ser ices  i.e. dietary ser ices  to t e patient population
- Standardi e t e deli ery of telemedicine ser ices  and
- Comply wit  le al and re ulatory re uirements related to telemedicine ser ices.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

## III. DEFINITIONS

**Telemedicine Services:** T rou    t e Telemedicine Pro ram  CC CS coordinates wit pri ate ealt care entities to pro ide specialty care ser ices usin  audio- isual tec nolo ies to California patients in CDCR institutions. T e Telemedicine Pro ram lin s  ealt  care pro iders and patients wit   i -definition cameras  electronic medical instruments  and o ice to en ance p ysicians  abilities to dia nose and connect wit  patients remotely.

**Telemedicine Services Program:** Pro ides clinical  administrati e and operational support and o ersi  t to Telemedicine Ser ices to statewide institutions.

## IV. RESPONSIBILITIES

T e C ief E ecuti e  fficer or desi nee at eac  CDCR institution s all ensure t at t e Telemedicine Ser ices Pro ram operates in accordance wit  applicable state law and Inmate Medical Ser ices Policies and Procedures.

## IV. REFERENCES

- Inmate Medical Ser ices Policies and Procedures   olume   Medical Ser ices
- Inmate Medical Ser ices Policies and Procedures   olume 5  Nursin  Ser ices
- Information Tec nolo y   usiness Continuity Disaster Reco ery Plan

# Attachment G

CALIFORNIA CORRECTIONAL
**HEALTH CARE SERVICES**

| VOLUME 11: TELEMEDICINE SERVICES | Effecti e Date  01/  00 |
|---|---|
| CHAPTER 1: TELEMEDICINE SERVICES PROGRAM | Re ision Date  05/ 015 |
| 11.1.2: TELEMEDICINE SPECIALTY SERVICES AND PRIMARY CARE PROCEDURE | Attac ments    es☐ No☒ |

## I. PROCEDURE OVERVIEW

T e ob ecti e of t is procedure is to establis  t e process for t e California Correctional  ealt  Care Ser ices  CC  CS  to pro ide operational o ersi  t and administrati e  uidance to t e field w en utili in  telemedicine ser ices for medical specialty and primary care to t e patient population.

Telemedicine Ser ices wor s closely wit  institutional  ealt  care staff to meet patient clinical dia nosis and treatment needs.

As a  eneral  uideline t e institution s ould direct specialty consultations  office  isits and follow-ups  w en medically appropriate  to telemedicine any time t e institution does not  a e medical specialists or consultants a ailable onsite to conduct t ose encounters. Telemedicine Ser ices may arran e for telemedicine specialty pro iders for t e institutions from a contracted pro ider or  ubsite CC  CS Telemedicine Ser ices  ead uarters re ional office  or anot er California Department of Corrections and Re abilitation  CDCR  institution.

IPAA  ealt  Insurance Portability and Accountability Act  compliance is re uired for all telemedicine ser ices and encounters  and all telemedicine encounters s all ad ere to patient confidentiality policies and procedures.

## II. DEFINITIONS

**Clinic Evaluation:** Post-telemedicine clinic documentation and data completed by t e institution Telemedicine Coordinator.

**Clinical Presenter (Patient Presenter):** A nurse  midle el pro ider  p ysician or ot er appropriate licensed  ealt  care pro ider trained in t e use of telemedicine e uipment w o is a ailable at t e ori inatin  site to present t e patient  mana e t e telemedicine perip erals and perform any  ands-on e ams to complete t e encounter successfully. T e role of t e Clinical Presenter may be interc an eable wit  t e Telemedicine Coordinator.

**Encounter:** A telemedicine appointment.

**Hub:** Site w ere t e p ysician or ot er licensed practitioner deli erin  t e ser ice is located  w en t e ser ice is pro ided  ia telecommunications system.  T ese ser ices are pro ided by a medical  roup p ysician or  roup of p ysicians includin  support staff w o may be responsible for t e coordination and administration of telemedicine ser ices at t e pro ider site.

**Originating Site:** Institutional location of t e patient w ere t e telemedicine ser ice is pro ided.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

**Telemedicine Coordinator:** A nurse or ot er licensed  ealt  care staff responsible for t e implementation  operation  and  monitorin   of t e telemedicine  pro ram  wit in t e institution. T e role of t e Telemedicine Coordinator may be interc an eable wit  t e Clinical Presenter.

## III. PROCEDURE DETAILS

### A. Program Operation and Administration

1. Telemedicine Ser ices

   T e CC CS Telemedicine Ser ices is responsible for statewide de elopment mana ement o  o rsi  t and e aluation of t e Telemedicine Pro ram. T is includes de elopment of referral  uidelines pro ram policies and procedures  data collection analysis  and  reportin    procurement   maintenance  and  repair  of  speciali ed telemedicine e uipment  trainin  on pro ram operation  coordinatin  ser ice deli ery t rou    arious ser ice sites  monitorin   field operations  as well as t e trainin  and support of telemedicine staff at t e institutions.

   T e Di ision of   ealt  Care Ser ices  Mental   ealt  Pro ram is responsible for o  o rseein  mental  ealt  telepsyc iatry ser ices.

 . Telemedicine Ser ices Pro iders

   Telemedicine ser ices are a ailable from a  ariety of pro iders and locations includin

   a. Specialty contracted  non-CDCR pro iders
      1  Telemedicine Ser ices utili es contracted e ternal pro iders to obtain t e specialty medical ser ices re uired by CDCR institutions.   ub pro iders are re uired to perform ser ices from medical offices meetin    IPAA confidentiality and protected  ealt  information standards and  uidelines.
         CDCR institutions t at  a e contracted  non-CDCR medical specialists pro ide ser ices onsite may also ser e as a  ubsite pro idin  ser ices to ot er institutions  ia telemedicine.
         Non-CDCR    ub pro iders  ma e   recommendations  re ardin    t e patients  care. T ese recommendations s all be re iewed by institutional primary care pro iders  PCP  for furt er action.
   b. Primary Care contracted  Re istry  non-CDCR pro iders
      Telemedicine Ser ices utili es contracted re istry pro iders w o p ysically report to   ead uarters or a CC CS desi nated re ional office and pro ide primary care telemedicine ser ices re uired by CDCR institutions.
   c. CDCR pro iders
      Telemedicine Ser ices utili es CDCR pro iders to obtain specialty or primary care telemedicine ser ices re uired by   ead uarters or CDCR institutions.

 . Contractin  for Ser ices

   a. Coordination of all contracted specialty telemedicine ser ices is facilitated t rou   Telemedicine Ser ices utili in  t e CC CS enterprise Preferred Pro ider  r ani ation contractor.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

  b. Coordination of Primary Care re istry pro iders is facilitated t rou Telemedicine Ser ices utili in  current re istry contractors and is billed to t e re uestin  institution at t e current ne otiated rate.

  c. In order to ensure coordinated ser ice deli ery indi idual institutions may not contract for telemedicine ser ices wit  any community pro ider  ospital uni ersity medical  roup or ot er entity.

. Institution Local  peratin  Procedures  L P

  a. Due to t e multiple inter-dependant relations ips in t e deli ery of telemedicine ser ices  L Ps de eloped by indi idual institutions for implementin  t e Telemedicine Ser ices Pro ram s all

   1 Comply wit  t e current *Telemedicine Services Inmate Medical Services Policy and Procedures*.

     e submitted to Telemedicine Ser ices for re iew and appro al prior to local implementation or distribution.

  b. Current and acti e L Ps s ould be re ised annually by t e institution and submitted to Telemedicine Ser ices at t e be innin  of eac  fiscal year  uly 1 .

5. Information tec nolo y  IT  staff s all ensure t e followin

  a. Functionality of telemedicine connecti ity between institutions and pro iders is maintained

  b. Contin ency plans are in place for a catastrop ic loss of primary data center connecti ity  if necessary.

. Institutional Telemedicine Coordinators

Eac  institution s all desi nate a nurse or ot er licensed  ealt  care staff as t e Telemedicine Coordinator to pro ide o erall ser ice coordination and administration of t e Telemedicine Pro ram at t at institution.  T e desi nated Telemedicine Coordinator  may also be desi nated as t e Clinical Presenter  is responsible for ensurin  t e followin

  a. Institutional needs and pro ider  aps are bein  communicated to Telemedicine Ser ices

  b. Any institution-specific procedures do not conflict wit  statewide *Telemedicine Services Inmate Medical Services Policy and Procedures*

  c. Any institution-specific procedures a e been re iewed and appro ed by Telemedicine Ser ices prior to implementation at t e institution

  d. Re uired reportin  e. . calendars statistics clinic e aluations  to Telemedicine Ser ices Pro ram

  e. Routine system tests are performed to ensure t at e uipment is safe  operational and secure

  f. Confirmation t at all necessary e uipment  includin  perip eral de ices and supplies for t e telemedicine encounter  are accessible

  . IT staff notification re ardin  any loss of telemedicine connecti ity in order for implementation of contin ency plans by IT staff

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

.   ac -up Clinical   Presenters   a e been identified and trained by Nursin
      leaders ip

i.   Telemedicine e uipment use or ser ice deli ery is properly coordinated wit
      Telemedicine Ser ices

.   Clinical follow-up wit  PCPs and case mana ement is sc eduled as re uired
      refer to *Inmate Medical Services Policies and Procedures, Volume 4, Medical
      Services)*

.   Consult notes and documents  enerated around encounters are routed to t e
      institution s Telemedicine Coordinator for re iew and distribution per local
      operatin  procedure

l.   Telemedicine Ser ices is informed of any foreseeable Clinical Presenter absences
      as soon as possible and a bac -up is identified

m.  *Armstrong Remedial Plan* re uirements and Court   rders for effecti e
      communication and accommodations are communicated to t e pro ider ac ie ed
      and documented for specialty contracted and Primary Care contracted re istry
      non-CDCR pro iders.  CDCR pro iders are re uired to document effecti e
      communication and accommodations for t eir encounters .

7.  Re uestin  Telemedicine Encounter Appointments - Specialty Ser ices

a.  T e institution s Telemedicine Coordinator s all contact Telemedicine Ser ices to
      obtain   encounter   appointments   by   sendin    a   Utili ation   Mana ement
      UM -appro ed  CDCR 7    P ysician Re uest for Ser ices  RFS   to
      Telemedicine Ser ices Sc edulin  staff.

b.  Telemedicine Ser ices Sc edulin  staff s all ma e t e re uested appointment and
      communicate t e sc edule wit  t e re uestin  institution.

c.  Telemedicine Ser ices s all notify t e institution wit in one 1  business day for
      ur ent RFSs and wit in fi e  5  business days for routine RFSs  if Telemedicine
      Ser ices is unable to accommodate t e recei ed RFS s  wit in t e re uired
      timeframes  refer to *Inmate Medical Services Policies and Procedures, Volume 4,
      Chapter 34.2, Utilization Management Medical Services Review Procedure* .

8.  Initiatin  Telemedicine Encounter Appointments - Primary Care

T e institution  enerates a  ducat list specific to t e yard w ere t e Telemedicine
Primary Care Pro ider is assi ned a minimum of t ree    to fi e  5  business days in
ad ance of t e clinic unless pre iously appro ed by t e Telemedicine Ser ices
Pro ram.

.  Telemedicine Coordinator Meetin s

Telemedicine Ser ices may  upon re uest  conduct teleconferences  or
telecommunications meetin s wit  Telemedicine Coordinators  Clinical Presenters
C ief E ecuti e   fficers  CE    C ief Support E ecuti es  C ief Medical
E ecuti es  CME   C ief P ysicians and Sur eons  P ysicians and Sur eons
P ysician Assistants  PA   Nurse Practitioners  NP   C ief Nurse E ecuti es  CNE
UM Nurses  Specialty Ser ices Nurses  Information Systems Analysts  and/or ot er
staff and sta e olders  as appropriate. T ese meetin s s all pro ide a forum for

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

information s arin and discussion and s all assist in t e standardi ation of ser ices and policies.

10. Pre-ser ice Meetin s

Prior to t e first telemedicine session of any specialty or primary care encounter Telemedicine Ser ices staff may sc edule trainin wit t e institution s Telemedicine Coordinator to test e uipment confirm access to clinical software and pro rams and re iew data collection and reportin procedures.

## B. Institutional Data Collection Process

1. T e institution s Telemedicine Coordinator is re uired to complete and submit to Telemedicine Ser ices by close of business day of t e sc eduled encounter t e electronic *Telemedicine Clinic Utilization & Evaluation Data Form* usin t e Telemedicine Sc edulin System Clinical E aluation website found at  ttp //tmss 8080/wor space/.

. A completed e aluation is re uired for eac clinic conducted ia telemedicine.

. Data re ardin t e clinic e . encounter durations patient refusals patient transfers custody issues is included in t e Clinic E aluations.

. Copies of CDCR 7 5 Refusal of E amination and/or Treatment s ould be forwarded to Telemedicine Ser ices.

5. en telemedicine ubsite ser ices are conducted by a CDCR p ysician or clinician copies of CDCR 7 5 Refusal of E amination and/or Treatment s all be forwarded to t e institution s ubsite.

## C. Clinical Procedures

1. Use of Clinical Presenters
   a. Clinical Presenter/Telemedicine Coordinator presents t e patient from t e ori inatin site to t e ubsite telemedicine ser ices pro ider and is responsible for clinical support at t e institution s site durin t e telemedicine encounter.
   b. T e Presenter may be a P ysician PA NP RN Licensed ocational Nurse or ot er appropriate licensed ealt care staff rtained to use telemedicine e uipment w o is a ailable at t e ori inatin site to present t e patient mana e t e telemedicine perip eral e amination instruments and perform any ands-on e ams to complete t e encounter successfully.
   **c.** Clinical presenters s all wor wit Telemedicine Ser ices staff and pro iders to meet indi idual trainin needs.

. Clinical Presenter C art Re iew Prior to Clinic Pre-Clinic
   a. Clinical information s all be at ered from t e CC CS electronic ealt record and ot er sources as needed e . . laboratory ima in p armacy by t e Telemedicine Coordinator or desi nated institution staff and uploaded to t e Telemedicine Ser ices secure IPAA-compliant web-based medical documents transfer system to be recei ed by t e identified ub desi nee.
   b. T e clinical information re uired for t e telemedicine appointment s all be sent to t e ubdesi nee a minimum of t ree business days prior to t e encounter.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

Any applicable additional clinical information obtained between the date sent and the encounter shall be sent to the hub site provider or designee immediately.

c. It is the responsibility of the receiving institution's Telemedicine Coordinator to review the health record prior to requesting an appointment and/or prior to the telemedicine appointment to ensure that all required testing and diagnostics have been conducted and that the results/reports have been sent to the hub provider prior to the encounter. Patients without the required work-up may not be seen until the necessary pre-work-up has been completed.

For initial encounters, medical information shall be obtained per clinical referral guidelines, including:

- CDCR 7___ Physician Request for Services.
- Health care provider's progress notes and orders supporting referral.
- Relevant laboratory studies, imaging studies and diagnostic results.
- Current medication profile and allergies.
- Any additional pertinent information.
- Effective communication accommodations shall be provided in accordance with the *Armstrong Remedial Plan* and related Court Orders.

For follow-up encounters, medical information shall be obtained on any subsequent consults, test results, diagnostic results, work-ups and physician's orders/recommendations requested as a result of previous encounter(s). The status of the patient's effective communication accommodations information shall be reviewed and effective communication shall be provided in accordance with the *Armstrong Remedial Plan* and related Court Orders.

d. All RFSs for specialty services require prior UM approval. Upon receipt of the RFS from the UM Coordinator, the Telemedicine Coordinator at the institution shall send the approved RFS to Telemedicine Services Scheduling within one (1) business day.

. Use of the Health Record

The originating institution shall have the health record available at the time of the patient's telemedicine encounter. The Clinical Presenter at the originating institution shall review the health record prior to the encounter and when necessary or at the hub provider's request shall provide additional information from the health record.

. Clinic Service Follow-up / Post-Clinic

The Telemedicine Coordinator, with assigned patient cases, is responsible for ensuring that patient care physician orders and physician's recommendations related to telemedicine encounters are carried out via institution processes. After all telemedicine encounters, the Clinical Presenter shall document in the progress notes the hub provider's name, date of the encounter, complete the CDCR approved effective communication documentation and note that the session was conducted via telemedicine.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

a. T e CDCR pro ider s all document in t e electronic  ealt  record as appropriate or complete t e CDC 7  1 P ysician s  rders  CDCR 7  0 Interdisciplinary Pro ress Notes  and any ot er CDCR appro ed forms and documents for t e patient. T ese documents are sent to t e institution t e same day  ia t e  IPAA-compliant web-based medical documents transfer system. T ese documents are considered ori inal  and follow t e institution s process for placement of encounter documentation into t e  ealt  record.

b. T e contracted non-CDCR  ub pro ider s all dictate a consultation and recommendations and submit t e documentation  ia t e  IPAA-compliant web-based medical documents transfer system wit in t ree  business days to t e institution s Telemedicine Coordinator at t e ori inatin  site. T ese are considered to be t e ori inal records and are routed per t e institution s process for placement into t e  ealt  record.

5. Telemedicine Appointment Refusals or Failure to Appear for Appointments
a. If a patient is a  no s ow  for a sc eduled telemedicine encounter t e Clinical Presenter s all contact
   1  T e  ousin unit super isor to ascertain t e reason for t e  no s ow  and record t e reason  i en in t e  ealt  record.
   T e PCP s all determine  as clinically indicated  w en t e patient s ould be resc eduled. If t e PCP determines t at t e patient does not need to be resc eduled for a clinical encounter t e PCP s all document t e reason in t e electronic  ealt  record as appropriate or on a CDCR 7  0 Interdisciplinary Pro ress Notes. T e CDCR 7  0 Interdisciplinary Pro ress Notes  s all be sent to t e institution t e same day  ia t e  IPAA-compliant web-based medical documents transfer system and follow t e institution s process for placement of encounter documentation into t e  ealt  record.

b. If t e patient  refuses  t e clinical encounter t e Clinical Presenter s all document t e reason in t e electronic  ealt  record as appropriate or complete a CDCR 7  0 Interdisciplinary Pro ress Notes  documentin  t e refusal and a CDCR 7   5 Refusal of E amination and/or Treatment. Refusals s all be filed in t e  ealt  record and a copy sent to Telemedicine Ser ices by t e Telemedicine Coordinator or t eir support staff.

c.   ile patients may refuse medical ser ices  t ey may not refuse based on t e modality of t e encounter  telemedicine .

 . Patient Consent for Telemedicine Encounters
California  usiness and Professions Code  Section   0.5   specifically e empts correctional patients from Section   0.5 re uirements for consent.

# CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES

### D. Technical Procedures

1. Initiating the Telemedicine Session

   The institution receiving telemedicine services shall be responsible for initiating the telemedicine session. However, should technical problems prohibit the session from occurring, the technical support staff shall assist the institution in establishing the telemedicine connection. If a problem occurs outside of a scheduled encounter the Telemedicine Coordinator, Clinical Presenter, or designated representative shall submit a Solution Center ticket and Headquarters Integrated Communication Technologies Unit Telemedicine IT shall be contacted by e-mail at cdcrcphcsittelemedsupport@cdcr.ca.gov. All telemedicine encounters shall be encrypted per CDCR specifications.

2. Technical Support

   Technical support is available from local IT staff at the institution through the Solution Center and Telemedicine IT. Equipment and network problems can be reported anytime by phone or e-mail. Urgent equipment and network problems on the day of the clinic should be directed immediately to Telemedicine IT.

## IV. REFERENCES

- California Business and Professions Code, Article 1, Section 2290.5 (a -
- Inmate Medical Services Policies and Procedures, Volume 4, Medical Services
- Inmate Medical Services Policies and Procedures, Volume 4, Chapter 2. Utilization Management Medical Services Review Procedure
- Inmate Medical Services Policies and Procedures, Volume 5, Nursing Services
- Information Technology Business Continuity Disaster Recovery Plan

May 2015                    Volume 11 Chapter 1.                    Page 8 of 8
**TELEMEDICINE SPECIALTY SERVICES AND PRIMARY CARE PROCEDURE**

# Attachment H

1  XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
 A C. RUSSELL  State  ar No. 1
Supervising Deputy Attorney General
ELISE    ENS T RN State  ar No. 1 5  1
ANDRE  M.  I S N State  ar No.         0
5  IAN MICHAEL ELLIS State  ar No. 80 5
T  IAS  . SN DER State  ar No.  8 0 5
T LER  . EAT State  ar No. 71 78
Deputy Attorney General
7  1 00I Street Suite 1 5
P.  o       55
8  Sacramento CA       - 550
Telep one   1   10-7 5
Fa   1     -5 05
E-mail Tyler. eat   do .ca. o
10  Attorneys for Defendants

11               IN THE UNITED STATES DISTRICT COURT

1             FOR THE EASTERN DISTRICT OF CALIFORNIA

1                   SACRAMENTO DIVISION

15

| RALPH COLEMAN, et al., | 0-c -005 0 K M-D   PC |
|---|---|
| Plaintiffs | **DECLARATION OF B. BRIZENDINE, PSY. D. IN SUPPORT OF DEFENDANTS' RESPONSE RE: SPECIAL MASTER'S DRAFT TELEPSYCHIATRY POLICY** |
| v. | |
| EDMUND G. BROWN JR., et al., | |
| Defendants. | Judge   The Honorable Kimberly . Mueller |

I  Brittany  Bri endine  declare

1.  I am the Assistant Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation  CDCR . I am competent to testify to the matters set forth in this declaration and if called upon to do so I would and could so testify. I make this declaration in support of Defendants' response to the Special Master's draft telepsychiatry policy.

1

.       I was appointed as t e Assistant Deputy Director of t e Statewide Mental   ealt
Pro ram in May   017. I am familiar wit  t e numerous and comple  policies and procedures t at
 o ern t e prison mental  ealt  care deli ery system. I am responsible for assistin  in t e
super ision and mana ement of t e mental  ealt  system s  ead uarters and re ional operations
and am familiar wit *Coleman* mandates. I started my wor  wit  t e prison mental  ealt  care
deli ery system in  008 as a staff psyc olo ist at California State Prison  Sacramento  w ere I
also wor ed in t e Mental   ealt  Crisis  ed unit  t e En anced   utpatient Pro ram
Administrati e Se re ation Unit  and t e Psyc iatric Ser ices Unit.  Prior to my current
appointment I ser ed as t e C ief E ecuti e   fficer  CE    of Salinas   alley State Prison  and
 a e ser ed as t e C ief of Mental   ealt  at Salinas   alley and t e California   ealt  Care
Facility.

.       efore I started wor in  for CDCR  I  eld a number of positions in t e community
pro idin  mental  ealt  care to indi iduals t ou   Kaiser Permanente Department of Psyc iatry
and t rou    se eral community mental  ealt  care centers.  At one suc  center  I pro ided direct
treatment for patients in t e Partial   ospitali ation Pro ram w ic  is a 5 day a wee  intensi e
pro ram desi ned as eit er a step down from inpatient  ospitali ation or to pre ent an a oidable
 ospitali ation.

.       As t e Assistant Deputy Director  and t rou   my prior positions wor in  in CDCR s
Mental   ealt  Statewide Deli ery System  M SDS   I  a e personal  nowled e of t e licensin
re uirements  care re uirements  p ysical settin s  and  arious elements for all of CDCR s le els
of care  w ic  include t e Correctional Clinical Case Mana ement System  CCCMS   t e
En anced   utpatient Pro ram  E P   Mental  ealt  Crisis  ed  MC     Intermediate Care
Facility  ICF   and Acute Psyc iatric Pro ram  APP .  I  a e personally wor ed in t e E P
Administrati e Se re ation Unit  and t e Psyc iatric Ser ices Unit  as well as in t e M C  .  I
 a e ser ed as an administrator for eac  le el of care  includin  as t e administrator for t e
lar est M C  in California  8 bed M C  at California  ealt  Care Facility .  As Salinas
 alley s CE   I ser ed as t e  irin  aut ority o er all  ealt  care w ic  includes medical

nursin  dental  mental  ealt   laboratory  p armacy  etc. includin  a medial inpatient unit   Correctional Treatment Center .

5.  ased on my personal  nowled e of and e perience wor in  in  CDCR s le els of care  as well as my e perience wor in  in t e community  CDCR s E  P le el of care is not an inpatient pro ram.

.   T e M  SDS Pro ram  uide describes t e E  P as an outpatient pro ram.  It states t at CDCR s  o utpatient care is pro ided in an array of treatment le els and modalities includin  a day treatment pro ram and an outpatient clinic of care.   Re ised Pro ram  uide 1 -1-1.  T e E  P le el of care is t e  most intensi e le el of outpatient mental  ealt  care wit in t e M  SDS.   *Id.* at 1 - -1.  It is for inmate-patients sufferin  from mental illness t at are stable and lar ely able to function on t eir own  but would benefit from  t e structure of a t erapeutic en ironment t at is less restricti e t an inpatient settin s.   *Id.* at 1 -1-8.  Inmate-patients can recei e treatment for t eir crisis symptoms  but only for t ose symptoms t at can be mana ed as  outpatient t erapy.   *Id.*  T e Pro ram  uide furt er states t at   t e  oal of t e E  P is to pro ide focused e aluation and treatment of mental  ealt  conditions w ic  are limitin  an inmate s ability to ad ust to a  P placement. T e o erall ob ecti e is to pro ide clinical inter ention to return t e indi idual to t e least restricti e clinical and custodial en ironment.   *Id.* at 1 - -1 .

7.   CDCR s E  P le el of care  as a number of c aracteristics t at distin uis  it from inpatient or residential treatment pro rams  includin  its staffin    ousin  and patient acuity. E  P pro ides an outpatient le el of care so t e patient can recei e intensi e mental  ealt treatment w ile pursuin  t eir educational certifications and de rees. E  P inmates  old obs and en a e in  arious re abilitation opportunities but  o ome to t eir  ousin  unit at t e end of t eir day.

8.   E  P inmate-patients are  oused in desi nated li in  units at  ub institutions. E  P   ousin  units  a e no special c aracteristics as compared to  eneral population  ousin  units  aside from inta e cells for administrati e se re ation units. Dependin  on t e institution t e patients may recei e treatment in or near t e  ousin  units. T e E  P separate  ousin  unit is

1  primarily meant as a security measure to  elp protect a potentially  ulnerable inmate-patient

population.

.    It is not t e separate  ousin  unit t at c aracteri es t e le el of care  but t e staffin

and amount and intensity of t e care pro ided to t e patient.  T e  E  P le el of care  as staffin

5  ratios t at were set by Defendants  Staffin  Plan  filed wit  t e Court on September  0  00 .

*See* ECF No.     .  T e staffin  re uirements are less robust t an t ose re uired at CDCR s

7   i er le els of care.

8    10.    T e E  P inmate population is also inte rated wit  t e ot er inmate populations.

CDCR  as wor ed wit  t e *Coleman* Special Master and Plaintiffs  counsel towards inte ration

10  of E  P inmate-patients into t e full array of pro rams and opportunities a ailable to patients and

11  into t e lar er inmate population.  T is includes pro idin  E  P inmates wit   obs  reli ious

1  ser ices  recreation time  education ser ices  self- elp and re abilitation pro rams t rou   t e

1  Department of Re abilitation  t e Community Resources Mana er  Inmate Leisure Time Acti ity

1    roups  and ot ers.  T e E  P inmate-patients may also  a e contact wit  ot er inmates durin

15  times of inmate mo ement or if t ey are at an institution t at pro ides some treatment to multiple

1  le els of care in t e same area.

17    11.    T e E  P is <u>not</u> a  ain to an inpatient le el of care.  Inpatient care is for  inmate-

18  patients w ose conditions cannot be successfully treated in t e outpatient settin  or in s ort-term

1  M  C  placements.    *Id.* at 1 -1- .  Inmates referred to inpatient care are sufferin  se ere

0  impairment or distress due to t eir mental illness e periencin  dan erous decompensation due to

1  t eir mental-illness  and/or may be at ris  of  armin  t emsel es or ot ers.  *See Id*. at 1 -1-8  1 -

5-1  1 - -7  Mental  ealt  Ser ices  Correctional Treatment Center  Psyc iatric Inpatient

Pro ram  Treatment Plannin  and Procedures  Referral and Admission Policy and Procedure

1 .11. 101 A .  T e Pro ram  uide specifically states t at inmate-patients at t e E  P le el of

5  care are not so impaired t at t ey re uire t e intensi e   - our patient care pro ided by inpatient

care.  Pro ram  uide at 1 - -1.

7    1 .    CDCR s M  SDS pro ides inpatient le el care at t e ICF  APP  and M  C s. M  C

8  and APP  bot  considered acute le el of care  pro ide care for  i er acuity le el inmate-patients

wit ICF le el of care desi ned enerally for less acute and lon er term inpatient care. T e inpatient le els of care a e i er acuity patients t an in t e outpatient le els of care more robust staffin le els i er intensity treatment settin s and pro ide more monitorin and care most specifically wit re ard to nursin care. Inpatient le els of care ta e place in a closed treatment en ironment w ere all treatment for t e patient must be wit in t e licensed unit all medications must be by doctor order and t e unit pro ides - our nursin care.

1 . All of CDCR s inpatient le els of care ot er t an t ose wit federal court wai ers must meet specific licensin re uirements under Title . Re ised Pro ram uide 1 -5-1. E P units are outpatient units not licensed and do not need to meet Title s licensin standards.

15. E P pro ides si nificantly less care t an t e M C and ot er inpatient le els of care. A si nificant distin uis in factor is t at it does not need to pro ide - our nursin care. Also ealt care staff is not posted in t e ousin units of outpatient pro rams on first watc e. . appro imately 10 00 p.m. to 00 a.m. . E P inmate-patients routinely meet wit an Interdisciplinary Treatment Team IDTT e ery 0 days wee ly clinical contacts and a mont ly psyc iatry isit. *Id.* at 1 - -8. . Comparati ely inpatient care re uires si nificantly more treatment. T e cornerstone of t at care is - our nursin care w ic includes an initial assessment at t e time of admission nursin care plans monitorin of itals and patients eatin and sleepin and nursin c ec s e ery fifteen minutes and/or t e use of a call system. At t e APP and ICF le els of care a patient must be seen by a p ysician once e ery 7 ours and t en wee ly after t e first mont if t e pro ram as a California Department of Public ealt Fle Pro ram. APP and ICF patients also must recei e an IDTT in t e first 7 ours of admission and a ain after se en days. After t at APP patients recei e wee ly IDTTs and ICF patients recei e mont ly IDTTs.

1 . T e care pro ided in t e M C is e en more en anced o er t e ot er le els of inpatient care. It re uires an initial IDTT wit in 7 ours followed by wee ly IDTTs psyc iatry appointments e ery 7 ours and daily clinical contacts by eit er a psyc iatrist or a psyc olo ist . Re ised Pro ram uide at 1 -5-11.

5

1    17.    Inpatients units include more robust staffin  for t eir more intense le el of treatment and  i  er acuity patients.    it  t e e ception of t e M  C  s t e inpatient ratios are not set by t e Defendants  00  Staffin  Model.

I declare under penalty of per ury t  at t e fore oin  is true and correct and t  at t  is

5    declaration was e ecuted on Au ust 1   018  at El      ro e  California.

7                            /s/ **Brittany Brizendine**
                             .   RI  ENDINE  Psy.D.

8    CF1   7CS000   / 1 18 1 7.doc

10

11

1

1

1

15

1

17

18

1

0

1

5

7

8

# Attachment I

1   XAVIER BECERRA
    Attorney General of California
    MONICA N. ANDERSON
    Senior Assistant Attorney General
    JAY C. RUSSELL State Bar No. 1
    Supervising Deputy Attorney General
    ELISE OWENS THORN State Bar No. 1 5 1
    ANDREW M. GIBSON State Bar No.        0
5   IAN MICHAEL ELLIS State Bar No. 80 5
    TOBIAS G. SNYDER State Bar No. 8 0 5
    TYLER V. HEATH State Bar No. 71 78
    Deputy Attorney General
7    1 00 I Street Suite 1 5
    P. O.      55
8   Sacramento CA      - 550
    Telephone   1  10-7 5
    Fax   1    -5 05
    E-mail Tyler.Heath@doj.ca.gov
10  *Attorneys for Defendants*

11              IN THE UNITED STATES DISTRICT COURT

1              FOR THE EASTERN DISTRICT OF CALIFORNIA

1                    SACRAMENTO DIVISION

1

15  **RALPH COLEMAN, et al.,**                  0-c -005 0 K M-D   PC

1                              Plaintiffs   **DECLARATION OF K. KUICH, M.D., IN**
                                            **SUPPORT OF DEFENDANTS'**
17              **v.**                       **RESPONSE RE: SPECIAL MASTER'S**
                                            **DRAFT TELEPSYCHIATRY POLICY**
18
                                            
1   **EDMUND G. BROWN JR., et al.,**
                                            Judge   The Honorable Kimberly J.
0                              Defendants.  Mueller

1

        I Kevin Kuich declare

        1.    I am the Chief Psychiatrist of Telepsychiatry for the California Department of

    Corrections and Rehabilitation CDCR . I have worked for CDCR since 01 and have held my

5   current position since late 017. I am competent to testify to the matters set forth in this

    declaration and if called upon to do so I would and could so testify. I make this declaration in

7   support of Defendants Response to the Special Master s Draft Telepsychiatry Policy.

8

                                            1

. I have been practicing psychiatry since [00] after I graduated from the University of Michigan Child Psychiatry Fellowship Program. I am board certified in general psychiatry with a specialty certification of Child and Adolescent Psychiatry. Before working at CDCR I practiced in outpatient clinics, inpatient units, community public services settings, academic settings, and health-management organizations.

. At CDCR I have worked at California Health Care Facility in their crisis-bed and outpatient units. I have also worked at headquarters as a senior psychiatrist specialist involved with administrative issues and various committees in support of the statewide mental-health program. As Chief Psychiatrist of Telepsychiatry my duties include managing or overseeing staff members at five hubs and ensuring that all aspects of telepsychiatry are implemented. I also assist in managing the statewide psychiatry program under auspices of the larger mental-health program.

. To expand the level of mental health care that CDCR can offer California inmates CDCR has spent significant time studying the use of telepsychiatry in correctional settings and creating our own system for implementing and expanding telepsychiatry in California correctional institutions. For example since 2015 CDCR has provided over 70,000 telepsychiatry contacts to inmates assigned to the Enhanced Outpatient level of care.

5. At the same time CDCR has been developing a mobile telepsychiatry module that would among other things allow the use of telepsychiatry at inmates' cell front for those inmates who are unable or unwilling to exit their cell for a telepsychiatry appointment.

. CDCR has developed a prototype cell-front telepsychiatry unit capable of being wheeled to an inmate's cell door by an operator allowing a telepsychiatry session to take place between an inmate in his cell and a remote psychiatrist.

7. The prototype cell-front telepsychiatry module consists of a mounted flat-screen monitor high-definition digital camera external speaker/microphone unit power storage unit wireless router and a computer with video conferencing software on a secured network. The system is mounted on a set of gimballed wheels and can hold about an hour and a half of charge. The speaker/microphone unit is designed to mount directly onto the cell door's food port so that

1    sound and microp one reception are directionally tar eted at t e cell s interior and in order to

maintain confidentiality of t e e c an e. A tele-presenter accompanies t e module and wears

  eadp ones t rou   w ic  t e psyc iatrist w o calls from  is or  er remote office can direct t e

operator to mo e t e module to c an e  iewin  an les into t e cell.

5         8.   I  a e been informed t at t e Special Master on  uly  5   018 issued a draft

telepsyc iatry policy t at would pro ibit t e use of cell-front telepsyc iatry at all le els of

7    mental- ealt  care  at present  presumably intendin  to restrict CDCR s use of telepsyc iatry

8    until furt er tec nolo ical impro ements are made.  I am unclear w at standards t at t e Special

Master team used to determine t e current cell-front tec nolo y to be inade uate.  Moreo er I

10   belie e t at t e restriction proposed by t e Special Master team on t e use of cell-front

11   telepsyc iatry would be a mista e and would diminis  patient care because t e alternati e to t e

1    cell-front tec nolo y is eit er t at t e patient is not seen or t at t ey are seen cell-front by

1    someone w o  as to s out into t e  ap in t e door bot  of w ic  are less effecti e t an t e

1    option proposed by CDCR.

15         .   ur tests of t e cell-front telepsyc iatry module s ow t at it would be a useful tool

1    t at would  elp CDCR treat patients w o  a e refused an out-of-cell telepsyc iatry appointment

17   in units w ere no on-site psyc iatrist is present.  Cell-front contacts are useful because t ey allow

18   direct contact between t e psyc iatrist and t e patient.  T e telepsyc iatrist is able to in uire w y

1    t e patient did not come to t e appointment and is able to assess w et er t e patient is in distress.

0    In t e e ent t at t e patient  as decompensated t e telepsyc iatrist is able to ta e appropriate

1    steps to ensure care is pro ided.

10.  T e arc itecture of prison cells presents a c allen e in re ard to acoustics  in

particular by creatin  ec oin  t at can interfere wit  t e practitioner s ability to  ear t e inmate

clearly.   owe er CDCR is wor in  to optimi e acoustics  and e en in its current state

5    clinicians w o  a e practiced wit  t e module are typically able to  ear and communicate wit

persons located wit in a cell.  T e module also  as t e added benefit of bein  less susceptible to

7    ea esdroppin   as t e spea er/microp one unit is directed specifically at t e interior of an

8    inmate s cell.

1        11.    i en CDCR s on oin  c allen es in staffin  psyc iatry positions  at present CDCR is not able to ensure t at e ery institution will always  a e an on-site psyc iatrist a ailable to pro ide cell-front treatment.  In suc  cases  t e c oice is not between t e telepsyc iatry module and on-site care  but rat er between telepsyc iatry and no treatment at all.  E en assumin  for t e

5    sa e of ar ument t at t e cell-front module is inferior to a li e on-site psyc iatrist at cell-front  it is still superior to a complete lac  of psyc iatric care.   arrin  t e use of telepsyc iatry at

7    inmates  cell-front would  a e t e effect of reducin  suc  care for inmates  not impro in  it.

8        1 . T is downside is particularly acute  because CDCR s e amination of literature   as found t at telepsyc iatry  as been utili ed effecti ely in a  ariety of comple  and remote settin s.

10        1 . For t ese reasons  I belie e t at bannin  cell-front telepsyc iatry would be a mista e.

11    A more appropriate approac  would be to e press a preference for on-site psyc iatry but allow

1    CDCR t e option of usin  cell-front telepsyc iatry wit  a mandate to continue impro in  t e

1    system s audio- isual capabilities.

1

        I declare t at t e fore oin  is true and correct.  E ecuted in El   ro e  California on  uly

15     1   018.

1                                            /s/ Kevin Kuich

17                                            Ke in Kuic    M.D.

18

1    CF1  7CS000

0    1  1858  .doc

1

5

7

8