XAVIER BECERRA, State Bar No. 118517
Attorney General of California
JAY C. RUSSELL, State Bar No. 122626
Supervising Deputy Attorney General
ELISE OWENS THORN, State Bar No. 145931
ANDREW M. GIBSON, State Bar No. 244330
TYLER V. HEATH, State Bar No. 271478
IAN MICHAEL ELLIS, State Bar No. 280254
TOBIAS G. SNYDER, State Bar No. 289095
Deputy Attorneys General
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-4426
  Fax:  (415) 703-5843
  E-mail:  Tobias.Snyder@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>　　　　　　　　　　　Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT ON THE PROPOSED TELEPSYCHIATRY POLICY ADDENDUM TO THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION MENTAL HEALTH SERVICES DELIVERY SYSTEM PROGRAM GUIDE** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................................1

DISCUSSION .................................................................................................................................2

    I.    Relevant Procedural History. ..................................................................................2

    II.    The Court's July 3, 2018 Order and the Special Master's Subsequent Telepsychiatry Proposal Improperly Intrude Into the Specifics of Defendants' Administration and Management. ..................................................3

        A.    The Court Lacks Authority to Dictate CDCR's Policy, Whether By Itself or Through Its Special Master ...........................................................3

        B.    The Court's July 3 Order and the Special Master's Proposed Telepsychiatry Policy Are Not Supported by Evidence of an Ongoing Constitutional Violation Arising from the Use of Telepsychiatry. ..........................................................................................5

    III.    The Special Master's Proposed Telepsychiatry Policy Is Objectionable. ...............8

        A.    The Proposed Telepsychiatry Policy Improperly Incorporates Legal Standards that Do Not Belong in Medical Practice Guidelines. ................8

        B.    The Proposed Telepsychiatry Policy's Language Limiting Telepsychiatry at the EOP Level Is Not Clear ............................................9

        C.    CDCR's EOP Level of Care is Neither Residential nor Synonymous with Inpatient Levels of Care. ............................................10

        D.    The Special Master Team's Interpretation of "Last Resort or Emergency Situations" in Restricting the Use of Telepsychiatry at the MHCB and PIP is Overly Restrictive. .................................................12

        E.    The Special Master's Prohibition on the Use of Cell-Front Telepsychiatry is Premature and Unnecessary. .......................................14

CONCLUSION ............................................................................................................................15

CERTIFICATION ........................................................................................................................15

i

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Beard v. Banks*
   548 U.S. 521 (2006) .................................................................................................... 3

*Bell v. Wolfish*
   441 U.S. 520 (1979) .................................................................................................... 6

*Brown v. Plata*
   563 U.S. 493 (2011) (Scalia, J., dissenting.) ............................................................... 4

*Gilmore v. California*
   220 F.3d 987 (9th Cir. 2000) ....................................................................................... 3

*Graves v. Arpaio*
   623 F.3d 1043 (9th Cir. 2010) ..................................................................................... 5

*Hoptowit v. Ray*
   682 F.2d 1237 (9th Cir. 1982) ..................................................................................... 6

*Inmates of Suffolk Cnty. Jail v. Rouse*
   129 F.3d 649 (1st Cir. 1997) ....................................................................................... 3

*Miller v. French*
   530 U.S. 327 (2000) .................................................................................................... 3

*Ruiz v. Estelle*
   679 F.2d 1115 (5th Cir.) .............................................................................................. 4

*United States v. State of Mich.*
   940 F.2d 143 (6th Cir. 1991) ....................................................................................... 5

*Westefer v. Neal*
   682 F.3d 679 (7th Cir. 2012) .................................................................................. 4, 5

**STATUTES**

United States Code, Title 18
   § 3626(f) ...................................................................................................................... 4

California Welfare & Institutions Code
   § 5675 ........................................................................................................................ 12

ii

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

# TABLE OF AUTHORITIES
**(continued)**

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment ................................................................................................1, 6, 12

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 53 ............................................................................................................................ 4
    Rule 53(c) ....................................................................................................................... 4

iii

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

# INTRODUCTION

On August 2, 2018, the Special Master filed his Report on the Proposed Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide, and his proposed telepsychiatry addendum to the Revised Program Guide (the "Proposed Telepsychiatry Policy") (ECF Nos. 5872, 5872-1). Defendants appreciate that the Special Master addressed some of Defendants' concerns regarding limitations placed on the California Department of Corrections and Rehabilitation's ("CDCR") ability to employ telepsychiatry at the Correctional Clinical Case Management System ("CCCMS") level of care. Nevertheless, the Proposed Telepsychiatry Policy remains objectionable.

First, as a threshold matter, Defendants object to the Court and Special Master's specific efforts here to micromanage the daily operations of Defendants' institutions without ever establishing why doing so is necessary to correct a constitutional violation. It is blackletter law that courts must defer to the expertise and experience of state administrative agencies unless the court has found specific constitutional violations that must be corrected. Here, neither the Court nor the Special Master have found that Defendants' use of telepsychiatry represents an existing or imminent threat of violating the Eighth Amendment—at most, a dispute exists regarding best practices in the use of telepsychiatry. However, the Constitution does not mandate the use of best practices, only that the provision of care meet a constitutional threshold. Accordingly, the Special Master's recommendations, enforceable by court order, represent an impermissible intrusion into Defendants' ability to conduct their own affairs and are objectionable in their entirety.

Second, Defendants object to the Special Master's specific revisions to the telepsychiatry policy submitted by the CDCR during the parties' workgroups. In particular, Defendants' use of telepsychiatry at any level of care should not be conditioned on a finding or demonstration that CDCR has first made "good faith" efforts to hire on-site psychiatrists. While Defendants acknowledge and appreciate the revisions the Special Master made to his initial draft policy in response to Defendants' August 1, 2018 letter regarding the CCCMS level of care, imposing a "good faith" determination into the telepsychiatry policy is unnecessary and unjustified. The

1

Special Master and the Court have already approved CDCR's 2017 staffing plan, which sets forth CDCR's ongoing recruitment and retention practices. (ECF Nos. 5564, 5711.) "Good faith" recruitment efforts should therefore not be a condition for Defendants' use of the telepsychiatry. The constitutionality of telepsychiatry does not hinge on the status of CDCR's hiring efforts.

Third, Defendants object to the Special Master's proposed language regarding on-site hiring requirements for the Enhanced Outpatient Program ("EOP"). Again, Defendants appreciate the Special Master's efforts to reconcile the requirements for on-site psychiatrists with the actual staffing ratios for each program. However, even as revised, the Proposed Telepsychiatry Policy's language is unclear as to scope, and likely to require on-site psychiatry as a precondition to CDCR's use of telepsychiatry, thereby affecting CDCR's ability to treat inmates. Defendants also object to the characterization of EOP as a "residential" program.

Fourth, Defendants object to the overly restrictive "last resort" language that limits the use of telepsychiatry at the Mental Health Crisis Bed ("MHCB") and Psychiatry Inpatient Programs ("PIP") levels of care. The policy limitation imposes restrictions that may prevent CDCR from using telepsychiatry to treat patients in situations where no other option is reasonably available.

Finally, Defendants object to the Proposed Telepsychiatry Policy's blanket restriction on the use of cell-front telepsychiatry.

## DISCUSSION

### I. RELEVANT PROCEDURAL HISTORY.

On July 3, 2018, the Court issued an Order setting parameters for CDCR's use of telepsychiatry and directing the Special Master to "complete a final proposed telepsychiatry policy, circulate that proposed policy to the parties, obtain their responses, and file the proposed policy together with any responses from the parties." (ECF No. 5850 at 8:19-22.) Defendants have appealed this Order. (ECF No. 5867.)

Pursuant to the July 3 Order, the Special Master requested that the parties submit their "final" positions on the issue of telepsychiatry on July 12, 2018. (*See* ECF Nos. 5873-2, 5873-3.) On July 25, 2018, the Special Master circulated to the parties a proposed draft telepsychiatry policy. The parties and the Special Master's team discussed the Special Master's proposed

2

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

telepsychiatry policy during a July 30, 2018 All Parties Work Group Meeting. On July 31, 2018, Plaintiffs submitted their response to the July 25 draft policy. (*See* ECF No. 5873-4.) On August 1, 2018, Defendants submitted their response to the Special Master's draft policy. (*See* ECF No. 5873-5.) On August 2, 2018, the Special Master filed his report containing the Proposed Telepsychiatry Policy. (ECF Nos. 5872, 5872-1.) The Proposed Telepsychiatry Policy differs in certain respects from the July 25 draft policy that Defendants addressed in their August 1 response to the Special Master.

## II. THE COURT'S JULY 3, 2018 ORDER AND THE SPECIAL MASTER'S SUBSEQUENT TELEPSYCHIATRY PROPOSAL IMPROPERLY INTRUDE INTO THE SPECIFICS OF DEFENDANTS' ADMINISTRATION AND MANAGEMENT.

### A. The Court Lacks Authority to Dictate CDCR's Policy, Whether By Itself or Through Its Special Master.

The Court lacks power to dictate Defendants' administrative policy, under the Prison Litigation Reform Act ("PLRA") or otherwise, as the Court must avoid improperly intruding into the daily operations of an administrative agency unless it is necessary to correct an established constitutional violation. The United States Supreme Court has consistently counseled that courts must give deference to states and their agencies on issues of prison management. *See Beard v. Banks*, 548 U.S. 521, 528 (2006); *Miller v. French*, 530 U.S. 327, 328 (2000) (explaining that "curbing the equitable discretion of district courts was one of the PLRA's principal objectives"). By affirmatively requiring that the Special Master draft CDCR's telepsychiatry policy, without any evidence that CDCR's telepsychiatry policy violates inmate-patients' constitutional rights, the Court has exceeded its authority and improperly substituted the Special Master's judgment for CDCR's judgment. *See Gilmore v. California*, 220 F.3d 987, 991 (9th Cir. 2000) ("[i]t is clear that Congress intended the PLRA to revive the hands-off doctrine," the former "rule of judicial quiescence" that the federal judiciary not be involved with the problems of state-run prisons); *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997) ("Congress passed the PLRA in an effort, in part, to oust the federal judiciary from day-to-day prison management."); *Ruiz v. Estelle*, 679 F.2d 1115, 1162 (5th Cir.), *amended in part and vacated in part*, 688 F.2d 266 (5th Cir. 1982) (stating that "the powers of the court's appointed agents should not intrude to

an unnecessary extent on prison administration"); *Brown v. Plata*, 563 U.S. 493, 559 (2011) ("Neither the Receiver nor the Special Master was selected by California to run its prisons, and the fact that they may be experts in the field of prison reform does not justify the judicial imposition of their perspectives on the state.") (Scalia, J., dissenting.).

Indeed, the Court's Order of Reference itself appears to limit the Special Master's power to draft Defendants' operational policies. The Order of Reference specifically prohibits the Special Master and his staff from "interven[ing] in the administrative management" of Defendants' institutions," and states that the Special Master "shall not be empowered to direct defendants . . . to take or to refrain from taking any specific action to achieve compliance." (ECF No. 640 at 7:24-8:4.) While the Order of Reference instructs the Special Master to "work with defendants and experts . . . to develop a remedial plan" that addresses constitutional violations found in the Court's September 13, 1995 Order, the Court did not find any violations relating to Defendants' use of telepsychiatry. (*Id.* at 3:18-4:2; *see also* ECF No. 612.) And the authority to draft CDCR's policy is not one that the Court can delegate to the Special Master under Federal Rule of Civil Procedure 53 or the PLRA. *See* Fed. R. Civ. P. 53(c); 18 U.S.C. § 3626(f).

The Proposed Telepsychiatry Policy micromanages CDCR's operations by specifically dictating where and how CDCR must allocate its on-site psychiatrists at the EOP level of care before CDCR can even be permitted to use telepsychiatry. The Draft Policy also includes undefined terms, like "last resort" and "emergency," and requires that CDCR meet a vaguely defined "good faith" standard to recruit and retain on-site psychiatrists before it may use telepsychiatry at the EOP level of care. Such vague terms and requirements risk significant disruption of CDCR's staffing and operation of its own mental health care system.

In short, the Proposed Telepsychiatry Policy is precisely the sort of interference into CDCR's ability to run a correctional system that courts are directed to avoid. *See, e.g., Westefer v. Neal*, 682 F.3d 679, 685 (7th Cir. 2012) ("To repeat, the PLRA requires that an injunction use the 'least intrusive means necessary to correct the violation of the [f]ederal right.' Locking in specific deadlines—even with hedging 'whenever possible' language—deprives prison administrators of the operational flexibility to adjust procedures as future needs dictate and cannot

4

be considered the least intrusive means of correcting the due-process violation."). The Proposed Telepsychiatry Policy should be rejected on this ground alone.

### B. The Court's July 3 Order and the Special Master's Proposed Telepsychiatry Policy Are Not Supported by Evidence of an Ongoing Constitutional Violation Arising from the Use of Telepsychiatry.

The Special Master has monitored CDCR and co-defendant Department of State Hospitals' use of telepsychiatry for years and has made no findings of patient harm or inadequacy. Nor has this Court determined that the use of telepsychiatry is unconstitutional in any way.

As the authority cited in the preceding section cautions, courts may not intrude into the administrative management of a prison system unless it is necessary to correct an ongoing constitutional violation, and only then may a court correct the violation with the least restrictive, most narrowly tailored relief. And when the prison system itself has determined a set of guidelines that it believes to be best practices, a court may not mandate the imposition of those guidelines if they exceed the constitutional minimum. *See, e.g., Westefer,* 682 F.3d at 686 (finding that court order adopting the Illinois Department of Corrections' detailed due process policy went beyond the constitutional minimum and violated the PLRA's prohibition against judicial intervention in the day-to-day operations of prison systems). CDCR originally submitted a telepsychiatry policy that it determined captures best practices for using telepsychiatry in its mental health program, including reasonable limitations on its use. The Special Master's Proposed Telepsychiatry Policy mandates limitations and restrictions that exceed what was included in CDCR's policy. Because the Court intends the Proposed Telepsychiatry Policy to be an addendum to the Program Guide, its adoption would represent new affirmative prospective injunctive relief in this action. To order such relief under the PLRA, the Court must make specific findings based on the factual record to show that the restrictions imposed by the Special Master's Proposed Telepsychiatry Policy are necessary to correct a current and ongoing constitutional violation and the least intrusive means by which to do so. *Graves v. Arpaio*, 623 F.3d 1043, 1047–48 (9th Cir. 2010); *see also United States v. State of Mich.*, 940 F.2d 143, 159–60 (6th Cir. 1991) (district court lacked authority to impose additional requirements on remedial plan proposed by prison officials; state was entitled to develop and implement its own procedures

5

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

1  "until it appears from affirmative proof that the plan and procedures result in a constitutional
2  infringement").

3        The Special Master's February 2017 report on CDCR's staffing plan included his
4  recommendations on the scope of CDCR's use of telepsychiatry. Those recommendations were
5  less restrictive than the Proposed Telepsychiatry Policy, and were not based on any evidence that
6  CDCR's telepsychiatry policy was a *constitutionally infirm* form of treatment for a particular
7  patient population. At most, the Special Master's report expressed a policy preference for on-site
8  psychiatry. However, the Constitution does not require that CDCR institute forms of treatment
9  that others might prefer, only that inmates receive adequate access to mental health care.
10 *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (finding that the Eighth Amendment does
11 not require that prison officials provide the most desirable medical and mental health care; nor
12 should judges simply "constitutionalize" the standards set forth by professional associations such
13 as the American Medical Association or the American Public Health Association); *see also Bell v.*
14 *Wolfish*, 441 U.S. 520, 543–544 n.27 (1979) (draft recommendations of the Department of Justice
15 are not determinative of constitutional requirements).

16       There is no evidence in the record to support a finding that Defendants' proposed use of
17 telepsychiatry would violate the Eighth Amendment, or that the onerous restrictions in the Special
18 Master's Proposed Telepsychiatry Policy are necessary to meet constitutional standards. While
19 the Special Master attaches various party submissions to his August 2 report, the only evidence
20 explicitly cited in his report as justifying limits on the use of telepsychiatry is a brief, second-hand
21 description of a July 11, 2018 demonstration of a prototype *cell-front* telepsychiatry module at the
22 California Health Care Facility as providing poor hearing quality ("an echo"). (*See* ECF No.
23 5872 at 7.) But the use of *cell-front* telepsychiatry is only a subset of the system-wide use of
24 telepsychiatry, and any criticism of that delivery model does not pertain to the larger, established
25 telepsychiatry system. Also, this one-time demonstration did not comport with CDCR's own
26 testing, which found the module to present a promising avenue for increasing care. (*See*
27 Declaration of K. Kuich, M.D., in Support of Defendants' Response Re: Special Master's Draft
28 Telepsychiatry Policy ("Kuich Decl."), ¶ 8.) The Special Master's team's opinion that the

6

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

demonstration showed "that there were better options available at this time for cell-front encounters" (ECF No. 5872 at 8) does not establish that failing to use this "better option" would violate the Eight Amendment.

The Special Master also references—but does not explicitly rely on—a July 12, 2018 report by Plaintiffs' previously undisclosed expert Pablo Stewart. (ECF No. 5872 at 7.) Dr. Stewart opines that CDCR's use of telepsychiatry for seriously mentally ill patients should be limited. (*See* ECF No. 5873-4 at 11-49 ("Stewart Decl."), ¶¶ 15-22.) To support his position, Dr. Stewart speculates that telepsychiatry may be inappropriate for high-needs inmates with delusions because those patients may incorporate the telepsychiatry equipment into their delusions.[1] (*Id.* ¶¶ 15-16.) Dr. Stewart, however, does not offer any professional study to support his concern, and the existing literature does not establish any ceiling for the use of telepsychiatry based on the existence of a delusional disorder. (*See* Joseph Penn Declaration re: "Expert Report of Pablo Stewart, MD Regarding Defendants' Telepsychiatry Policy, Dated 7/12/18" filed herewith ("Penn Rebuttal Decl.") at 6-12, 14.)

Dr. Stewart's opinion that telepsychiatry should be limited to low-level patients is based on an anecdote from a seven-year-old study (Stewart Decl. ¶ 23) and two CDCR suicide reports that do not show any harm or issues caused by telepsychiatry (*Id.* ¶¶ 44-58). Notably, nothing within the study cited by Dr. Stewart suggests that telepsychiatry harmed patients or denied patients adequate treatment. And the suicides referenced by Dr. Stewart do not support the limitations for which he advocates—indeed, the inmate-patient in the first suicide discussed by Dr. Stewart refused to be seen by telepsychiatry. (*See id.* ¶¶ 16-22.) Dr. Stewart's analysis of both cases relies on issues of documentation and communication. But neither of those issues are specific to telepsychiatry as a mode of treatment. Contrary to Dr. Stewart's representations, the inmate suicides he relies on do not present any evidentiary basis to show that telepsychiatry is ineffective.

---

[1] CDCR negotiated this same point with the Special Master and Plaintiffs when developing the policy. The draft policy includes language regarding contraindication for telepsychiatry.

7

Rather, the applicable literature and the experiences of numerous systems that use telepsychiatry in correctional and non-correctional settings show that "telepsychiatry has been demonstrated to successfully deliver services to incarcerated adolescents and adults with a wide range of mental health diagnoses." (Penn Rebuttal Decl. at 13.) Further, there are no national guidelines from any major institution that limit the use of telepsychiatry at higher levels of care. (*Id*. at 16.) No evidence, therefore, supports the proposition that telepsychiatry is any less effective than in-person psychiatrist encounters, let alone that telepsychiatry is an unconstitutional means of delivering mental health care to CDCR's inmate population.

Because neither the Court nor the Special Master has found that CDCR's telepsychiatry policy represents a violation of minimal constitutional standards in the delivery of mental health care, it is improper for the Court or the Special Master to override CDCR's policy and intrude into the specifics of CDCR's operational management.

### III.    THE SPECIAL MASTER'S PROPOSED TELEPSYCHIATRY POLICY IS OBJECTIONABLE.

#### A.    The Proposed Telepsychiatry Policy Improperly Incorporates Legal Standards that Do Not Belong in Medical Practice Guidelines.

As discussed in Defendants' August 1, 2018 submission (ECF No. 5873-5 at 9-10), the Special Master's initial draft policy conditioned the use of telepsychiatry at the CCCMS level on the failure of "good faith" efforts to recruit on-site psychiatrists. The final proposal relaxes this requirement, stating that "[t]elepsychiatry may replace on-site psychiatry at the CCCMS level of care provided all other conditions pertaining to the CCCMS level of care contained within this policy are adhered to and good faith efforts to recruit on-site psychiatrists continue." (ECF No. 5872-1 at 4.)

The requirement that "good faith efforts to recruit [CCCMS] on-site psychiatrists continue," while less onerous than the previous proposal, remains a system-wide legal injunction that does not belong in a health care practice manual. As stated above, CDCR's 2017 plan, which was approved by the Special Master and this Court, embodies those "good faith" efforts. (ECF No. 5564 and ECF No. 5711.) Whether telepsychiatry is appropriate at the CCCMS level depends solely on whether or not telepsychiatry provides at least the minimal constitutional level of care to

8

inmates at the CCCMS level, and not whether CDCR's "good faith" efforts to hire on-site psychiatrists continue.

Moreover, the Proposed Telepsychiatry Policy imposes higher conditions for the use of telepsychiatry at the EOP, MHCB and PIP levels, prohibiting the use of telepsychiatry *until* "good faith" efforts to recruit on-site psychiatrists are unsuccessful. (ECF No. 5872-1 at 3.) As with the CCCMS restriction, the fundamental problem remains: the Special Master has inserted a system-wide legal injunction into what is intended to be a practice guide for the provision of mental health care services. If the individuals managing and delivering telepsychiatry within an institution are providing constitutionally adequate care to patients for months, but separate CDCR officials stop recruiting on-site psychiatrists, does the previously acceptable care provided by the telepsychiatry program suddenly become constitutionally infirm?

The answer is that adequacy of telepsychiatry is not measured by the success or failure of CDCR to hire on-site psychiatrists. Defendants therefore object to the inclusion of a "good faith" recruitment standard anywhere within its telepsychiatry policy.

### B. The Proposed Telepsychiatry Policy's Language Limiting Telepsychiatry at the EOP Level Is Not Clear.

The Special Master's initial proposed telepsychiatry policy circulated on July 25, 2018 would have required CDCR to staff at least one on-site psychiatrist at "each program and each unit within that program providing EOP level of care services within the institution" before it could use telepsychiatry at the EOP level. (*See* ECF No. 5873-5 at 10-13.) Defendants expressed serious concern that this requirement would upend Defendants' staffing plans, would be burdensome and untethered to any clinical purpose, require inefficient reallocations of clinical staff, and result in the loss of care to inmates if the on-site psychiatrist for an institution left or became unavailable. (*Id.*) The Special Master in response amended the proposal to state, "[o]n-site psychiatrists are required for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan." (ECF No. 5872-1 at 4.) The language in this provision remains unclear. The scope of the term "program" and the phrase "consistent with the staffing ratios delineated in the 2009 Staffing Plan" are not defined. Without knowing what the

9

Special Master intended with this language, the potential impact on staffing when implementing this policy is unclear.

As written, the language is subject to multiple conflicting interpretations. For instance, the language could be read to mean that only on-site psychiatry can provide services to EOP. Conversely, if read in conjuncture with the next two sentences regarding good faith hiring practices, the language could be read to mean no on-site psychiatrists are needed should CDCR be unable to hire on-site psychiatrists. Given the confusing language, CDCR will be unable to implement this policy in a consistent manner. (*See* Declaration of Katherine Tebrock in Support of Defendants' Objections to the Special Master's Report on the Proposed Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide ("Tebrock Decl.") ¶ 4.) Given the foregoing, Defendants object to the inclusion of language that will likely foster confusion and represents an unnecessary restriction on Defendants' ability to provide telepsychiatry services.

### C. CDCR's EOP Level of Care is Neither Residential nor Synonymous with Inpatient Levels of Care.

The Special Master's report, drawing from the Court's July 3 Order, treats the EOP program as a residential, inpatient program. (ECF No. 5850 at 5:21-6:1.) This conclusion has no factual foundation, is contradicted by the Program Guide, and ignores the real-world application and understanding of residential programs in the prison setting. Without allowing the parties to provide evidence or briefing, the Court's July 3 Order erroneously stated that the EOP was a residential program and synonymous with inpatient care.

The July 3 Order stated that "[a]lthough EOP is labeled an outpatient program, outpatient is contextual and relative to inpatient programs within the MHSDS; moreover, the Revised Program Guide makes clear EOP is a residential program, synonymous with an inpatient setting." (ECF No. 5850 at 10.) In reaching its conclusion, the Court cited to the EOP's provision of separate housing, treatment and programming for inmate-patients "'whose mental illness precludes their placement and participation' in the general population." (*Id.*) That characterization is misplaced because it focuses on the EOP inmates' conditions of confinement and housing, rather than on the

10

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

level of treatment they receive. While it is true that EOP inmates are housed in designated living units at hub institutions, it is not the separate housing unit that characterizes the level of care, but the staffing and the amount and intensity of care provided. (*See* Declaration of B. Brizendine, Psy. D. in Support of Defendants' Response Re: Special Master's Draft Telepsychiatry Policy ("Brizendine Decl.") ¶ 8.) As Defendants stated at the June 28, 2018 status conference, the separate unit for EOP inmates is a security measure for a potentially vulnerable population. (*Id.*)

The Program Guide makes clear that CDCR's "[o]utpatient care is provided in an array of treatment levels and modalities including a day treatment program and an outpatient clinic of care." (Revised Program Guide, 12-1-1.) EOP is CDCR's "most intensive level of outpatient mental health care within the MHSDS." (*Id.* at 12-4-1; Brizendine Decl. ¶ 6.) As the name Enhanced *Outpatient* Program indicates, EOP is an outpatient level of care where the patient can receive intensive mental health treatment, while participating in general population programing, such as educational certifications and degrees. EOP inmates also hold jobs and engage in various rehabilitation opportunities, but return to their housing unit at the end of their day. (Brizendine Decl. ¶ 7.) Contrary to the concept reflected in the July 3 Order and Proposed Telepsychiatry Policy that the EOP population is segregated as a residential treatment program, CDCR is working to integrate the EOP population into the broader inmate population and into the full array of programs and opportunities available to the larger inmate population. (*Id.* ¶ 10.)

Furthermore, the record does not support equating EOP level of care to inpatient care. CDCR provides inpatient care at the intermediate, acute, and crisis bed levels of care. (Revised Program Guide at 12-1-9, 12-5-1.) The inpatient level of care is a closed treatment environment where all treatment must be provided within the licensed unit, all medication must be by doctor order, and the unit provides 24-hour nursing care. (Brizendine Decl. ¶ 13.) Overall, inpatient levels of care have higher acuity patients, more robust staffing levels, a hospital level treatment setting, and patients receive a greater amount of treatment. (*Id.* ¶¶ 12-18.) EOP level patients are specifically excluded from the inpatient level of care because they are not so impaired that they require intensive 24-hour care. (*Id.* ¶ 11; Revised Program Guide at 12-4-1.)

In addition to the practical differences between the EOP and inpatient levels of care, inpatient mental health facilities must be licensed and meet specific licensing requirements. CDCR's inpatient care facilities are licensed under Title 22. (Brizendine Decl. ¶ 14.) However, EOP units, as outpatient units, do not require licensure. (*Id*.) This is also different than community residential treatment programs, which also require licensing. (*See* Cal. Welf. & Inst. Code § 5675 (requiring mental health rehabilitation centers be licensed by the State Department of Health Care Services).) The Special Master and his experts, based on their years of monitoring the system, are certainly aware of the vast differences between the EOP and inpatient levels of care. It was therefore surprising that the July 3 Order finds the EOP level of care synonymous with the inpatient level of care, and that the Proposed Telepsychiatry Policy equates the two levels of care and artificially places a blanket restriction on telepsychiatry for EOP patients as if they were in inpatient care. In this regard, the Proposed Telepsychiatry Policy is objectionable.

### D. The Special Master's Team's Interpretation of "Last Resort or Emergency Situations" in Restricting the Use of Telepsychiatry at the MHCB and PIP is Overly Restrictive.

The Proposed Telepsychiatry Policy states that telepsychiatry may not be used at the MHCB and PIP levels of care except "as a last resort or in emergency situations." (ECF No. 5872-1 at 3.) This language is consistent with the Court's July 3 Order. However, the Special Master's team's interpretation of what constitutes a "last resort or emergency situation" would functionally close at least one MHCB, and likely others.[2]

On July 30, 2018, in response to the Special Master's initial draft proposal, Defendants asked the Special Master's Team to define a "last resort or emergency." (Tebrock Decl. ¶ 8.) (The Special Master's final proposal does not add any clarification of the definition.) Defendants were told this was a legal question—in his opinion, however, whether a situation was an

---

[2] In the Court's April 19, 2017 order, the Court found that "full compliance with twenty-four hour timeline for transfer to MHCBs is required to satisfy the Eighth Amendment." (ECF No. 5610 at 11.) The Court also found that data in the fall 2016 population projections suggested that "defendants do not presently have sufficient capacity to meet the need for MHCB level of care." (*Id*. at 12.) Following the September 28, 2017 status conference, the Court issued another order and again found that CDCR had "too few MHCBs to meet" patient needs. (ECF No. 5710 at 17.)

12

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

"emergency" depended on the length of time telepsychiatry must be used at an MHCB or PIP level of care. (*Id.*) For example, the longer telepsychiatry is used, the less likely it could be considered an "emergency." (*Id.*) In response, Defendants specifically raised the example of the MHCB at High Desert State Prison, which has been serviced exclusively by telepsychiatry for several years, but nevertheless met most Program Guide requirements. (*Id.*) Defendants were told that using telepsychiatry at an MCHB or PIP level of care for more than a few months would cause concern and alarm for both the Special Master's experts and Plaintiffs' counsel. (*Id.*) Such an interpretation would functionally close the MHCB at High Desert, despite the fact that that MHCB is meeting most Program Guide requirements and has a lower 30-day re-admission rate than the state average. (*Id.*)

If this interpretation holds, it will not only cause the closure of the High Desert MHCB, but it will also adversely impact patient treatment at other MHCBs and PIPs that have limited on-site staffing. (*Id.* ¶ 9.) For instance, Pelican Bay State Prison currently has only one on-site psychiatrist who provides service to the MHCB. Should that psychiatrist leave Pelican Bay, telepsychiatry will be the only available modality of providing psychiatry services to the Pelican Bay MCHB until a replacement can be located. (*Id.*) Given the remote location of Pelican Bay, CDCR is likely to have a difficult time hiring a new psychiatrist for the MHCB within a couple of months. (*Id.*) Thus, CDCR would again be forced to either close the Pelican Bay MHCB or deny psychiatry services to that population. (*Id.*) This, again, highlights the problems with attempting to incorporate a system-wide legal injunction into a medical policy guide intended to shape front-line care.

When CDCR does not have the psychiatry staff available to provide necessary on-site care, it should be able to use telepsychiatry as a "last resort." Where and when CDCR is unable to hire on-site staff, patients in the MHCBs and PIPs should be provided with appropriate psychiatric care, even if telepsychiatry is the only available modality. CDCR should not be forced to endanger patients by withholding telepsychiatric services simply because there has been an extended period without on-site psychiatric care available.

### E. The Special Master's Prohibition on the Use of Cell-Front Telepsychiatry is Premature and Unnecessary.

The Special Master's Proposed Telepsychiatry Policy deletes the sections in CDCR's policy that referenced cell-front telepsychiatry and inserted the statement that, "[a]t present, cell-front provision of telepsychiatry is not permitted." (ECF No. 5872-1 at 3.) Including an affirmative restriction in the policy is unnecessary, surplus, and premature.

Cell-front psychiatry visits are a reality in the correctional context and, in some circumstances, are the only means of providing a psychiatric appointment for an inmate-patient who refuses to exit his or her cell. Also, cell-front telepsychiatry can more promptly provide psychiatry services to inmate-patients when an in-person psychiatrist is not available to provide the needed care. (*See* Kuich Decl. ¶¶ 10-11.) The Special Master's policy disregards these real-life benefits of cell-front telepsychiatry.

Moreover, in 2016, CDCR's telepsychiatry policy contemplated the use of cell-front telepsychiatry without comment from the Special Master, but now the Special Master prohibits its use based on his team's observation of a single prototype demonstration. Indeed, the Special Master's February 2017 report did not contain any recommendations restricting or preventing cell-front telepsychiatry and the Court has not made any findings related to its use. The Special Master's expert and Plaintiffs have observed one demonstration of cell-front telepsychiatry, and not under actual clinical conditions. The demonstration provided sound feedback that is not representative of the sound quality experienced in real-life cell-front sessions. (*See id.* ¶ 11.)

Specifically, the Special Master's expert and observer listened to the clinician side of the telepsychiatry connection while three other observers were in the cell on the inmate-patient side, meaning the microphones would pick up movements (i.e., sounds from moving clothes and shoes) and speech from multiple people in the cell rather than just the inmate-patient, potentially making it difficult to parse an individual conversation. (*See id.* ¶ 11.) Further, the Special Master's monitor and expert were in a room with almost a dozen other observers whereas under normal conditions, the telepsychiatrist would be in a private office using sophisticated speakers and microphones to have a confidential conversation with a patient. (*Id.*) By contrast, CDCR's

14

tests of this same equipment under clinical conditions have resulted in much better sound quality than what the Special Master's expert experienced at the demonstration.  (*See id*. ¶ 9.)  In both environments, however, the cell-front interaction offered superior sound quality and confidentially as compared to an in-person cell-front interaction where communication occurs using the gap between the door and the door frame.  Nevertheless, CDCR is looking at additional ways to address sound-quality concerns raised by the Special Master's expert, including procuring improved microphones to further improve the sound quality even under non-standard conditions.  (*Id.* ¶ 10.)

Accordingly, the Court and the Special Master should not ban, now or in the future, cell-front telepsychiatry as CDCR works to improve the technology and the manner in which telepsychiatry is provided to inmate-patients at the cell front.  An order precluding cell-front telepsychiatry will prematurely prevent CDCR from continuing to develop and perfect the technology and practice.

## CONCLUSION

Defendants acknowledge the Special Master's work in addressing their concerns with the Proposed Telepsychiatry Policy, and appreciate that the Special Master revised his initial draft proposal in response to Defendants' concerns.  However, Defendants object to the Special Master's revisions of CDCR's telepsychiatry plan in the Proposed Telepsychiatry Policy because it continues to represent an improper intrusion into Defendants' daily operations, is unsupported by any finding of a constitutional violation, and imposes restrictions and qualifications that will hamper CDCR's ability to provide mental health treatment under certain conditions.

## CERTIFICATION

The undersigned counsel for Defendants certifies that he reviewed the following relevant court orders: December 11, 1995 (ECF No. 640); April 19, 2017 (ECF No. 5610); October 10, 2017 (ECF No. 5710); November 6, 2017 (ECF No. 5726); December 15, 2017 (ECF No. 5750); April 10, 2018 (ECF No. 5816); May 31, 2018 (ECF No. 5832); July 12, 2018 (ECF No. 5852); and July 20, 2018 (ECF No. 5860).

15

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

| | |
|---|---|
| Dated: August 13, 2018 | Respectfully Submitted, |
| | XAVIER BECERRA<br>Attorney General of California<br>JAY C. RUSSELL<br>Supervising Deputy Attorney General |
| | */s/ Tobias G. Snyder*<br>TOBIAS G. SNYDER<br>Deputy Attorney General<br>*Attorneys for Defendants* |

CF1997CS0003
42031775.docx

16