1  XAVIER BECERRA
   Attorney General of California
2  MONICA N. ANDERSON
   Senior Assistant Attorney General
3  JAY C. RUSSELL, State Bar No. 122626
   Supervising Deputy Attorney General
4  ELISE OWENS THORN, State Bar No. 145931
   ANDREW M. GIBSON, State Bar No. 244330
5  IAN MICHAEL ELLIS, State Bar No. 280254
   TOBIAS G. SNYDER, State Bar No. 289095
6  TYLER V. HEATH, State Bar No. 271478
   Deputy Attorney General
7   1300 I Street, Suite 125
    P.O. Box 944255
8   Sacramento, CA 94244-2550
    Telephone: (916) 210-7325
9   Fax: (916) 324-5205
    E-mail: Tyler.Heath@doj.ca.gov
10 *Attorneys for Defendants*

11              IN THE UNITED STATES DISTRICT COURT

12             FOR THE EASTERN DISTRICT OF CALIFORNIA

13                     SACRAMENTO DIVISION

14

15
   **RALPH COLEMAN, et al.,**                2:90-cv-00520 KJM-DB (PC)
16
                              Plaintiffs,    **DECLARATION OF K. KUICH, M.D., IN**
17                                           **SUPPORT OF DEFENDANTS'**
                                             **RESPONSE RE: SPECIAL MASTER'S**
           v.                                **DRAFT TELEPSYCHIATRY POLICY**
18

19 **EDMUND G. BROWN JR., et al.,**
                                             Judge:        The Honorable Kimberly J.
20                            Defendants.                   Mueller

21

22       I, Kevin Kuich, declare:

23        1.    I am the Chief Psychiatrist of Telepsychiatry for the California Department of

24 Corrections and Rehabilitation (CDCR).  I have worked for CDCR since 2013 and have held my

25 current position since late 2017.  I am competent to testify to the matters set forth in this

26 declaration and if called upon to do so, I would and could so testify.  I make this declaration in

27 support of Defendants' Response to the Special Master's Draft Telepsychiatry Policy.

28
                                              1

1    2.    I have been practicing psychiatry since 2004 after I graduated from the University of

2   Michigan Child Psychiatry Fellowship Program.  I am board certified in general psychiatry, with

3   a specialty certification of Child and Adolescent Psychiatry.  Before working at CDCR, I

4   practiced in outpatient clinics, inpatient units, community public services settings, academic

5   settings, and health-management organizations.

6    3.    At CDCR, I have worked at California Healthcare Facility in their crisis-bed and

7   outpatient units.  I have also worked at headquarters as a senior psychiatrist specialist involved

8   with administrative issues and various committees in support of the statewide mental-health

9   program.  As Chief Psychiatrist of Telepsychiatry, my duties include managing over sixty staff

10   members at five hubs and ensuring that all aspects of telepsychiatry are implemented.  I also

11   assist in managing the statewide psychiatry program under the auspices of the larger mental-

12   health program.

13    4.    To expand the level of mental health care that CDCR can offer California inmates,

14   CDCR has spent significant time studying the use of telepsychiatry in correctional settings and

15   creating our own system for implementing and expanding telepsychiatry in California

16   correctional institutions.  For example, since 2015, CDCR has provided over 70,000

17   telepsychiatry contacts to inmates assigned to the Enhanced Outpatient level of care.

18    5.    At the same time, CDCR has been developing a mobile telepsychiatry module that

19   would, among other things, allow the use of telepsychiatry at inmates' cell front for those inmates

20   who are unable or unwilling to exit their cell for a telepsychiatry appointment.

21    6.    CDCR has developed a prototype cell-front telepsychiatry unit capable of being

22   wheeled to an inmate's cell door by an operator, allowing a telepsychiatry session to take place

23   between an inmate in his cell and a remote psychiatrist.

24    7.    The prototype cell-front telepsychiatry module consists of a mounted flat-screen

25   monitor, high-definition digital camera, external speaker/microphone unit, power storage unit,

26   wireless router, and a computer with video conferencing software on a secured network.  The

27   system is mounted on a set of gimballed wheels, and can hold about an hour and a half of charge.

28   The speaker/microphone unit is designed to mount directly onto the cell door's food port, so that

2

1   sound and microphone reception are directionally targeted at the cell's interior and in order to

2   maintain confidentiality of the exchange.  A tele-presenter accompanies the module and wears

3   headphones through which the psychiatrist, who calls from his or her remote office, can direct the

4   operator to move the module to change viewing angles into the cell.

5          8.   I have been informed that the Special Master on July 25, 2018 issued a draft

6   telepsychiatry policy that would prohibit the use of cell-front telepsychiatry at all levels of

7   mental-health care "at present," presumably intending to restrict CDCR's use of telepsychiatry

8   until further technological improvements are made.  I am unclear what standards that the Special

9   Master team used to determine the current cell-front technology to be inadequate.  Moreover, I

10  believe that the restriction proposed by the Special Master team on the use of cell-front

11  telepsychiatry would be a mistake and would diminish patient care because the alternative to the

12  cell-front technology is either that the patient is not seen or that they are seen cell-front by

13  someone who has to shout into the gap in the door, both of which are less effective than the

14  option proposed by CDCR.

15         9.   Our tests of the cell-front telepsychiatry module show that it would be a useful tool

16  that would help CDCR treat patients who have refused an out-of-cell telepsychiatry appointment

17  in units where no on-site psychiatrist is present.  Cell-front contacts are useful because they allow

18  direct contact between the psychiatrist and the patient.  The telepsychiatrist is able to inquire why

19  the patient did not come to the appointment and is able to assess whether the patient is in distress.

20  In the event that the patient has decompensated, the telepsychiatrist is able to take appropriate

21  steps to ensure care is provided.

22         10.  The architecture of prison cells presents a challenge in regard to acoustics, in

23  particular by creating echoing that can interfere with the practitioner's ability to hear the inmate

24  clearly.  However, CDCR is working to optimize acoustics, and even in its current state,

25  clinicians who have practiced with the module are typically able to hear and communicate with

26  persons located within a cell.  The module also has the added benefit of being less susceptible to

27  eavesdropping, as the speaker/microphone unit is directed specifically at the interior of an

28  inmate's cell.

1    11. On July 11, 2018, representatives from the Special Master's team observed a

2  demonstration of cell-front telepsychiatry at California Health Care Facility.  An expert and a

3  monitor from the Special Master's team listened to the clinician side of the telepsychiatry

4  connection while three other observers were in the cell on the inmate-patient side.  This

5  demonstration was different from clinical conditions, in particular because the microphones

6  would pick up movements (i.e., sounds from moving clothes and shoes) and speech from multiple

7  people in the cell rather than just one, potentially making it difficult to parse an individual

8  conversation.  I understand that the Special Master team monitor and expert were in a room with

9  almost a dozen other observers whereas under normal conditions, the telepsychiatrist would be in

10  a private office using sophisticated speakers and microphones to have a confidential conversation

11  with a patient.  This demonstration, while useful for providing a general overview of the

12  technology, did not provide the same clinical experience, including sound quality, that occurs in a

13  normal telepsychiatirst interaction with a patient.  For these reasons, the demonstration should be

14  repeated under more typical conditions.

15    12. Given CDCR's ongoing challenges in staffing psychiatry positions, at present CDCR

16  is not able to ensure that every institution will always have an on-site psychiatrist available to

17  provide cell-front treatment.  In such cases, the choice is not between the telepsychiatry module

18  and on-site care, but rather between telepsychiatry and no treatment at all.  Even assuming for the

19  sake of argument that the cell-front module is inferior to a live on-site psychiatrist at cell-front, it

20  is still superior to a complete lack of psychiatric care.  Barring the use of telepsychiatry at

21  inmates' cell-front would have the effect of reducing such care for inmates, not improving it.

22    13. This downside is particularly acute, because CDCR's examination of literature has

23  found that telepsychiatry has been utilized effectively in a variety of complex and remote settings.

24    14. For these reasons, I believe that banning cell-front telepsychiatry would be a mistake.

25  A more appropriate approach would be to express a preference for on-site psychiatry but allow

26  CDCR the option of using cell-front telepsychiatry, with a mandate to continue improving the

27  system's audio-visual capabilities.

28

4

1        I declare that the foregoing is true and correct.  Executed in Elk Grove, California on

2    August 13, 2018.

3                                         */s/ Kevin Kuich*
                                     Kevin Kuich, M.D.

4

5    CF1997CS0003
    42031781.docx

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Decl. Kuich Supp. Defs.' Resp. Special Master's Draft Telepsych. Policy (2:90-cv-00520 KJM-DB (PC))