XAVIER BECERRA, State Bar No. 118517
Attorney General of California
JAY C. RUSSELL, State Bar No. 122626
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
ANDREW M. GIBSON, State Bar No. 244330
TYLER V. HEATH, State Bar No. 271478
IAN MICHAEL ELLIS, State Bar No. 280254
TOBIAS G. SNYDER, State Bar No. 289095
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-4426
 Fax:  (415) 703-5843
 E-mail:  Tobias.Snyder@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| **RALPH COLEMAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**EDMUND G. BROWN JR., et al.,**<br><br>Defendants. | 2:90-cv-00520 KJM-DB (PC)<br><br>**DECLARATION OF KATHERINE TEBROCK IN SUPPORT OF DEFENDANTS' OBJECTIONS TO THE SPECIAL MASTER'S REPORT ON THE PROPOSED TELEPSYCHIATRY POLICY ADDENDUM TO THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION MENTAL HEALTH SERVICES DELIVERY SYSTEM PROGRAM GUIDE**<br><br>Judge:  The Honorable Kimberly J. Mueller |

I, Katherine Tebrock, declare:

   1.   I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify.  I make this declaration in support of Defendants' Objections to the Special Master's Report on the Proposed

1

Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide.

2. I was appointed as Deputy Director of the Statewide Mental Health Program in November 2015. I am familiar with the numerous and complex policies and procedures that govern the prison mental health care delivery system. I am also responsible for and supervise the mental health system's headquarters and regional teams, and am familiar with the *Coleman*-related mandates.

3. In the Special Master's Proposed Telepsychiatry Policy, it states that, "[o]n-site psychiatrists are required for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure." (ECF No. 5872-1 at 4.) The draft policy, however, never defined this new language—"consistent with the staffing ratios delineated in the 2009 Staff Plan"—nor did it define what a "program" is.

4. It is unclear how to apportion telepsychiatry with the 2009 staffing plan given the language in the Proposed Telepsychiatry Policy. The Proposed Telepsychiatry Policy language is subject to many conflicting interpretation and is likely to be misapplied unless further clarified. At best, it can be interpreted as only requiring one on-site psychiatrist per EOP institution; however, it can also be read to require only on-site psychiatrists to provide care to EOPs.

5. During workgroups the week of July 30, 2018, the Special Master team clarified that the Proposed Telepsychiatry Policy requires on-site psychiatry in the EOPs as a prerequisite for the use of telepsychiatry. CDCR objected to this precondition because it would effectively bar use of telepsychiatry in programs where there is no on-site psychiatrist present which would result in patients not receiving any psychiatric care despite CDCR's ability to provide it safely through telepsychiatry. As the purpose of telepsychaitry is to fill gaps in on-site staffing, it is illogical to require on-site staffing before you can use a replacement to on-site staffing. While the

2

Decl. of K. Tebrock in Supp. Defs.' Obj. to Proposed Telepsych. Policy  (2:90-cv-00520 KJM-DB (PC))

Special Master made an effort to accommodate CDCR's concerns regarding the precondition, the Proposed Telepsychiatry Policy did not cure the problem and remains objectionable.

6. As currently written, there would be immediate and real negative impacts to patient care if this policy is implemented. For instance, the mainline EOP on E Yard at CHCF—a medical facility—would no longer be able to use telepsychiatry to provide patient care because a full-time on-site psychiatrist is not assigned to that program. CDCR would be forced to either move over 400 patients to another Level II EOP program, pull an on-site psychiatrist from another care team on site, or provide no care to the patients while CDCR seeks to hire an on-site psychiatrist. Instead, CDCR can and should continue to provide appropriate and safe psychiatric care through the use of telepsychiatry.

7. Even some institutions that currently have one on-site psychiatrist per program may only be one extended absence away from being barred from providing psychiatry care. Should the on-site psychiatrist leave CDCR employment or be re-allocated to service a different level of care, under the Proposed Telepsychiatry Policy, that institution would have to cease providing care through telepsychiatry. Cessation of telepsychiatry services would serve as a significant disruption to patient care and could lead to closures of EOP programs resulting in unnecessary transfers of EOP patients to other institutions or more reliance on telepsychiatry in the higher levels of care. Moreover, the Proposed Telepsychiatry Policy could also negatively impact CDCR's ability to recruit and retain psychologists and social workers because moving EOP programs as described could potentially lead to a need to lay off other positions that provide services to EOP programs including, but not limited to, psychologists, social workers, recreational therapists, and psychiatric technicians. Moreover, moving EOP programs as described above could potentially lead to a need to lay off staff in other positions who provide services to EOP programs including, but not limited to, psychologists, social workers, recreational therapists, and psychiatric technicians.

8. Another requirement under the Proposed Telepsychiatry Policy that will interrupt the provision of psychiatry services is the requirement that telepsychiatry be used at higher levels of care only as a "last resort or emergency." On July 30, 2018, at the parties' workgroup meeting,

3

Decl. of K. Tebrock in Supp. Defs.' Obj. to Proposed Telepsych. Policy (2:90-cv-00520 KJM-DB (PC))

1  Defendants asked the Special Master's team to define a "last resort or emergency." The Special
2  Master's team stated this was a legal question and whether a situation was an "emergency"
3  depended on the length of time telepsychiatry must be used at an MHCB or PIP level of care. For
4  example, the longer telepsychiatry is used, the less likely it could be considered an "emergency."
5  Defendants specifically raised the question of the MHCB at High Desert State Prison, which has
6  been serviced exclusively by telepsychiatry for several years. Defendants were told that using
7  telepsychiatry at an MCHB or PIP level of care for more than a few months would cause concern
8  and alarm for both the Special Master's experts and Plaintiffs' counsel. Such an interpretation
9  would functionally close the MHCB at High Desert, despite the fact that the MHCB unit at High
10 Desert State Prison is meeting most Program Guide requirements and has a lower 30-day re-
11 admission rate than the state average.

12    9.    Under this analysis, the High Desert MHCB would have to be closed, and it will also
13 impact patient treatment at other MHCBs and PIPs that have limited onsite staff. For instance,
14 Pelican Bay State Prison currently has only one on-site psychiatrist who provides service to the
15 MHCB. Should that psychiatrist leave Pelican Bay, telepsychiatry will be the only available
16 modality of providing psychiatry services to the Pelican Bay MCHB until a replacement can be
17 located. Given the remote location of Pelican Bay, CDCR is likely to have a difficult time hiring a
18 new psychiatrist for the MHCB within a couple of months. Thus, CDCR would again be forced
19 to either close the Pelican Bay MHCB or deny psychiatry services to that population.

20    I declare under penalty of perjury under the laws of the United States of America that the
21 foregoing is true and correct. Executed in Elk Grove, California on August 13, 2018.

*/s/ Katherine Tebrock*
KATHERINE TEBROCK
Deputy Director, Statewide Mental Health Program

CF1997CS0003
42031778.docx

4

Decl. of K. Tebrock in Supp. Defs.' Obj. to Proposed Telepsych. Policy (2:90-cv-00520 KJM-DB (PC))