**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.,**
    **Plaintiffs,**

         **v.**                              **No. CIV. S-90-0250 KJM DB P**

**EDMUND G. BROWN, JR. et al.,**
    **Defendants.**

**SPECIAL MASTER'S MONITORING REPORT ON THE MENTAL HEALTH**
**INPATIENT CARE PROGRAMS FOR INMATES OF THE CALIFORNIA**
**DEPARTMENT OF CORRECTIONS AND REHABILITATION**

Matthew A. Lopes, Jr., Esq.
Special Master
PANNONE LOPES DEVEREAUX & O'GARA LLC
Northwoods Office Park, Suite 215-N
1301 Atwood Avenue
Johnston, RI 02908
(401) 824-5100
Fax: (401) 824-5123
August 30, 2018

# ACRONYMS and ABBREVIATIONS

| | |
|---|---|
| 3CMS: | Correctional Clinical Case Management System |
| ADL: | Activities of Daily Living |
| AIMS: | Abnormal Involuntary Movement Scale |
| ASH: | Atascadero State Hospital |
| BUM: | Bed Utilization Management |
| CC I: | Correctional Counselor I |
| CCWF: | Central California Women's Facility |
| CDCR: | California Department of Corrections and Rehabilitation |
| CHCF: | California Health Care Facility |
| CHCF-PIP: | California Health Care Facility Psychiatric Inpatient Program |
| CIW: | California Institution for Women |
| CIW-PIP: | California Institution for Women Psychiatric Inpatient Program |
| CMF: | California Medical Facility |
| CMF L1-PIP: | California Medical Facility L1 Psychiatric Inpatient Program |
| CMF-PIP: | California Medical Facility Psychiatric Inpatient Program |
| CMC: | California Men's Colony |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CSH: | Coalinga State Hospital |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/SAC: | California State Prison/Sacramento |
| CTC: | Correctional Treatment Center |
| DBT: | Dialectical Behavioral Therapy |
| DD: | Developmental Disability |
| DPS: | Discretionary Program Status |
| DSH: | Department of State Hospitals |

| | |
|---|---|
| EHRS: | Electronic Health Records System |
| EMRRC: | Emergency Medical Response Review Committee |
| EMS: | Emergency Medical System |
| EOP: | Enhanced Outpatient Program |
| FRC: | Facility Review Committee |
| FTE: | Full-Time Equivalent |
| GED: | General Equivalency Diploma |
| HAS: | Hospital Access System |
| HCITC: | High Custody Intermediate Treatment Center |
| HCPOP: | Health Care Placement Oversight Process |
| HS: | *Hora Somni*/Hour of Sleep |
| ICC: | Institutional Classification Committee |
| ICF: | Intermediate Care Facility |
| IDTT: | Interdisciplinary Treatment Team |
| IEX: | Indecent Exposure |
| IPOC: | Individual Plan of Care |
| KVSP: | Kern Valley State Prison |
| LVN: | Licensed Vocational Nurse |
| LRH: | Least Restrictive Housing |
| MAPP: | My Activity Participation Plan |
| MCSP: | Mule Creek State Prison |
| MDO: | Mentally Disordered Offender |
| MHCB: | Mental Health Crisis Bed |
| MHSDS: | Mental Health Services Delivery System |
| MOU: | Memorandum of Understanding |
| MTA: | Medical Technical Assistant |
| MVR: | Medication Variance Reporting |
| NCAT: | Non-Clinical Activity Tracking |

| | |
|---|---|
| NKSP: | North Kern State Prison |
| NOS: | Not Otherwise Specified |
| PaWSS: | Patient Wellness and Recovery Model Support System |
| PBSP: | Pelican Bay State Prison |
| PBST: | Positive Behavioral Support Team |
| PIP: | Psychiatric Inpatient Program |
| PRC: | Program Review Committee |
| PRN: | Take As Needed |
| PSH: | Patton State Hospital |
| PSSC: | Psychology Specialist Services Committee |
| PSU: | Psychiatric Services Unit |
| PTSD: | Post-Traumatic Stress Disorder |
| QIT: | Quality Improvement Team |
| RJD: | Richard J. Donovan Correctional Facility |
| RN: | Registered Nurse |
| RVR: | Rules Violation Report |
| SATF: | Substance Abuse Treatment Facility |
| SIR: | Serious Incident Report |
| SNF: | Skilled Nursing Facility |
| SOMS: | Strategic Offender Management System |
| SPC: | Suicide Prevention Committee |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ-PIP: | San Quentin Psychiatric Inpatient Program |
| SRN: | Senior Registered Nurse |
| SHU: | Security Housing Unit |
| SMTA: | Senior Medical Technical Assistant |
| SQ: | San Quentin State Prison |
| SRA: | Suicide Risk Assessment |

| | |
|---|---|
| SRASHE: | Suicide Risk Assessment and Self-Harm Evaluation |
| STAGE: | Steps Toward Accomplishment Growth and Education |
| STEP: | System to Encourage Progress |
| SVPP: | Salinas Valley Psychiatric Program |
| SVSP: | Salinas Valley State Prison |
| SVSP-PIP: | Salinas Valley State Prison Psychiatric Inpatient Program |
| TC: | Treatment Center |
| TC1: | Treatment Center 1 |
| TC2: | Treatment Center 2 |
| TCMP: | Transitional Case Management Program |
| TSI: | Therapeutic Strategies and Interventions Training |
| UCC: | Unit Classification Committee |
| VPP: | Vacaville Psychiatric Program |
| WaRMSS: | Wellness and Recovery Model Support System |
| WIC: | California Welfare and Institutions Code |

TABLE OF CONTENTS

**ACRONYMS and ABBREVIATIONS**                                            i

**INTRODUCTION**                                                          1

**PART I: UPDATE ON ACCESS TO MENTAL HEALTH INPATIENT CARE FOR
         CDCR INMATES**                                                  5

A. "Lift and Shift:" The Transfer of Responsibility to CDCR for Operation of Three DSH
   Inpatient Programs Which Treat *Coleman* Class Members                6

B. Activation of 70 Temporary Intermediate Care Beds at CMF L1-PIP       9

C. Areas of Focus: Issues Defendants Need to Address Regarding Inpatient Care   10

    1. Staffing Vacancies                                           10

    2. Referrals and Transfers                                       12

    3. Least Restrictive Housing Placements                          14

    4. Access to DSH Facilities                                      14

    5. Clinical Services and Treatment in Inpatient Programs: Treatment Planning,
       Group Therapy, and Individual Treatment                    19

**PART II: THE SPECIAL MASTER'S FINDINGS AT THE EIGHT INPATIENT PROGRAMS**
                                                                         21

A. STAFFING                                                              21

B. TREATMENT AND CLINICAL SERVICES                                       26

C. QUALITY OF CARE ISSUES IN IDTTS AND TREATMENT PLANNING IN THE
   INPATIENT CARE PROGRAMS                                               43

    1. Observed Inadequacies in the IDTT Process                     43

    2. Deficiencies in Treatment Planning                            45

    3. Deficiencies in Behavioral Plans                              47

D. PATIENT ACCESS TO TREATMENT                                           49

E. REFERRALS AND TRANSFERS                                               55

F. ADMISSIONS AND DISCHARGES                                             57

G. PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE                     60

H. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINTS             64

I. SUICIDE PREVENTION, EMERGENCY RESPONSE, AND THE DEATH REVIEW
   PROCESS                                                               66

J.  QUALITY MANAGEMENT AND UTILIZATION REVIEW 69

K.  PATIENT COMPLAINTS/PATIENT SATISFACTION 74

L.  *COLEMAN* POSTINGS 76

M.  LAUNDRY AND SUPPLY ISSUES 77

N.  VISITATION/PRIVILEGES/TELEPHONE ACCESS 78

O.  LAW LIBRARY ACCESS 80

P.  EDUCATION 81

**CONCLUSION** 82

APPENDIX A1: DSH-Atascadero 86

APPENDIX A2: DSH-Coalinga 108

APPENDIX A3: SVSP-PIP 129

APPENDIX A4: CMF-PIP 154

APPENDIX A5: CMF L1-PIP 184

APPENDIX A6: CHCF-PIP 203

APPENDIX A7: CIW-PIP 228

APPENDIX A8: SQ-PIP 243

APPENDIX B-1: DSH-Atascadero 263

APPENDIX B-2: DSH-Coalinga 277

APPENDIX B-3: SVSP-PIP 287

APPENDIX B-4: CMF-PIP 300

APPENDIX B-5: CMF L1-PIP 316

APPENDIX B-6: CHCF-PIP 323

APPENDIX B-7: CIW-PIP 329

APPENDIX B-8: SQ-PIP 342

# INTRODUCTION

This report encompasses the Special Master's full review of the inpatient mental health care programs that provide treatment to inmates in the California Department of Corrections and Rehabilitation (CDCR). All eight inpatient programs are covered in the report, including the six CDCR operated Psychiatric Inpatient Programs (PIPs)—California Health Care Facility Psychiatric Inpatient Program (CHCF-PIP), California Institution for Women Psychiatric Inpatient Program (CIW-PIP), California Medical Facility L1 Psychiatric Inpatient Program (CMF L1-PIP), California Medical Facility Psychiatric Inpatient Program (CMF-PIP), San Quentin Psychiatric Inpatient Program (SQ-PIP), Salinas Valley Psychiatric Inpatient Program (SVSP-PIP)—and the two Department of State Hospitals (DSH) programs located at Atascadero State Hospital (DSH-Atascadero) and Coalinga State Hospital (DSH-Coalinga). The monitor[1] conducted all inspections on-site[2] with each program receiving two to three day visits between November 1, 2017 and February 1, 2018.

The monitoring focus areas were:

A.      Staffing

B.      Treatment and Clinical Services

C.      Quality of Care Issues in IDTTs and Treatment Planning in the Inpatient Programs

D.      Patient Access to Treatment

---

[1] While collected data and findings in this report are the result of members of different monitoring teams, the various monitors are collectively referred to as 'the monitor." The Special Master's staff of mental health experts are collectively referred to as "the Special Master's expert."

[2] In the preceding report, CIW-PIP and DSH-Coalinga were monitored by means of paper review, i.e. the monitor and expert conducted their review by examination of documentation regarding the operations at these programs during the review period.

E.      Referrals and Transfers

F.      Admissions and Discharges

G.      Patient Disciplinary Process and the Use of Force

H.      Use of Observation Cells/Rooms, Seclusion, and Restraint

I.      Suicide Prevention, Emergency Response, and the Death Review
        Process

J.      Quality Management and Utilization Review

K.      Patient Complaints/Satisfaction

L.      *Coleman* Postings

M.      Laundry and Supply Issues

N.      Visitation/Privileges/Telephone Access

O.      Law Library Access

P.      Education

Following the format of the preceding inpatient report, this report is comprised of two major sections.  Part I provides an update on the state of access to mental health inpatient care for *Coleman* class members.  Subpart I (A) covers the transfer of responsibility to CDCR for operation of three DSH inpatient programs which treated *Coleman* class members.  Subpart I (B) provides an update on the activation of 70 temporary intermediate care beds at CMF L1-PIP. Subpart I (C) contains a discussion of five core areas—staffing vacancies, referrals and transfers, least restrictive housing (LRH) placements, access to DSH facilities, and clinical services and treatment in inpatient programs—which defendants must address to sustain any progress that has been achieved related to problems with access to and the provision of adequate mental health care for CDCR inmates.

Part II of this report contains the Special Master's summaries of his findings at the eight inpatient programs. The summaries are organized by focus area (i.e. items A through P listed above), and further grouped by common characteristics, i.e., (1) DSH-operated facilities: DSH-Atascadero and DSH-Coalinga; (2) the PIPs now under CDCR's operation as a result of Lift and Shift: SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP; and (3) the PIPs operated by CDCR prior to Lift and Shift: CIW-PIP and SQ-PIP.

The Special Master's individual summaries of his findings at each of the eight inpatient programs are provided in Appendices A1 - A8. His expert's clinical case reviews for each of the eight programs are found in Appendices B-1 - B-8.

On June 22, 2018, the Special Master provided the *Coleman* parties with a draft version of this report. In accordance with regular practice for the Special Master's compliance reports, the parties were given 30 days to submit to the Special Master any comments or objections to the draft report. In their written response, plaintiffs' counsel stated that the findings in the draft report supported the need for affirmative recommendations and requested the Special Master include in this report three recommendations for court orders. The Special Master acknowledges plaintiffs' request and their reasoning in support, and intends to address those concerns as part of the All-Parties Workgroup process and/or in *Coleman* Policy Meetings.

The first of plaintiffs' three recommendations was that DSH be required to report staffing levels consistently with their past reporting practices. In support of this recommendation, plaintiffs stated that defendants recently made two changes to the way they reported on staffing – they now reported staffing levels as ratios, rather than as vacancy rates, and only reported staffing levels for the *Coleman* class member population, rather than overall staffing levels for the entire hospital population, as they had done in the past. Plaintiffs asked that defendants be

required to provide any missing data retroactively, to aid in proper comparisons in future evaluations of staffing data.

The second of plaintiffs' three recommendations was twofold. Plaintiffs requested that defendants be required to: (1) correct deficiencies in documentation related to the provision of inpatient care in the PIPs and DSH programs, and (2) report monthly on the number of treatment hours scheduled, offered, attended, cancelled, and refused in inpatient programs in the same way that they are reported for CDCR Enhanced Outpatient Program (EOP) inmates. This recommendation reflects concerns related to the ability to effectively monitor whether class members are receiving adequate care while in the inpatient programs. In support of the first part of this recommendation, plaintiffs correctly point to several instances in the draft inpatient care report where the Special Master reported insufficient documentation in patients' medical records.

The third of plaintiffs' three recommendations related to defendants' LRH practices. Plaintiffs requested that defendants be required to (1) "improve their documentation of LRH reviews and re-evaluations," (2) "meet specific timeframes for evaluating and moving *Coleman* class members into their LRH designations," and (3) develop and "implement more specific criteria to ensure class members are being moved consistently to lower security housing." In support of these recommendations, plaintiffs correctly state that the draft inpatient report cites a need to fully integrate into treatment plans both a discussion of LRH and the development of treatment interventions to assist patients in reaching their LRH. Further, plaintiffs point to data indicating that since October 2017, the percentage of class members housed in higher security settings than required by their LRH has increased to 58 percent, its highest rate since measurement began. Plaintiffs assert that the LRH issue requires additional focused attention in

order to ensure the provision of meaningful treatment not limited by "excessive security-based restrictions."

Plaintiffs also requested that the Special Master add some clarifying language related to defendants' use of therapeutic treatment modules, which has been incorporated into this report. (*See infra* p. 33, 53, 54, 164, 170, and 171.)

Along with their comments to the draft report, plaintiffs provided data which pointed to an increase in the rejection and rescission rates for referrals to inpatient care following the July 1, 2017 implementation of Lift and Shift. The Special Master intends to closely examine those data trends as well as the reasons for rejections and rescissions as part of the All-Parties Workgroup process and/or *Coleman* policy meetings, and will issue his findings in either a stand-alone report or as part of his Twenty-Eighth Round Monitoring Report.

The CDCR defendants sent the Special Master suggested corrections, which are incorporated into this report. (*See infra* p. 9, 19, 30, 43, 59, 75, 76, 84, 134, 160, 186, 187, and 208.)

The Special Master made one addition to this report since it was submitted to the parties in draft form. (*See infra* p. 16 n.12.)

## PART I.

## UPDATE ON ACCESS TO MENTAL HEALTH INPATIENT CARE
## FOR CDCR INMATES

One major development which occurred since the filing of the May 25, 2016 Special Master's Monitoring Report on the Mental Health Inpatient Care Programs for Inmates of the California Department of Corrections and Rehabilitation ("2016 Inpatient Care Report"), (ECF

No. 5448)[3] was the transfer of administrative responsibility and control of the PIPs at Salinas Valley State Prison (SVSP), California Medical Facility (CMF), and California Health Care Facility (CHCF) from DSH to CDCR—referred to as "Lift and Shift"—on July 1, 2017. In another major development, acting through a waiver of state law authority granted by this Court on April 14, 2017, CDCR opened an additional 70-bed intermediate care facility in CMF's L1 Unit. ECF No. 5605. This report presents the findings of the Special Master's first monitoring review of the three PIPs located at SVSP, CMF, and CHCF, since the implementation of Lift and Shift—and of the CMF L1-PIP since its activation.

This update provides further details below regarding these two significant developments. The update also identifies several areas of focus that defendants should continue to address in order to sustain the progress that has been made in improving and streamlining the referral, acceptance, transfer, and admission of seriously mentally ill CDCR inmates to inpatient beds since the filing of the 2016 Inpatient Care Report—which must include consistent access for those inmates who meet clinical and custodial requirements for admission to DSH-Atascadero, DSH-Coalinga, and Patton State Hospital (PSH). In addition, the update highlights three treatment issues that require prioritized attention for providing adequate care to patients once admitted to an inpatient program: a) treatment planning, b) group therapy, and c) individual treatment.

A.      **"Lift and Shift:" The Transfer of Responsibility to CDCR for Operation of Three DSH Inpatient Programs Which Treat *Coleman* Class Members**

As the Special Master reported in his 2016 Inpatient Care Report, from August 2015 through February 2016, he and members of his team worked with CDCR and DSH—with input

---

[3] All Electronic Case Filing (ECF) citations are to the page number assigned by the court's ECF system.

from the plaintiffs—to develop a new Memorandum of Understanding (MOU). ECF No. 5448

p. 14-16. The new MOU was drafted with language designed to support the concept of Lift and

Shift. As the Special Master reported, "[t]he idea was to draft the language of the MOU so that

the relationship between the coordinated but independent CDCR and DSH inpatient care systems

would be re-defined and realigned in such a way that *CDCR, as well as DSH,* could acquire

responsibility for inpatient care of CDCR inmates that was delivered theretofore by DSH,

efficiently and seamlessly." *Id*. at 14. The DSH-run programs targeted for this shift of

responsibility were located at SVSP, CMF, and CHCF. The approach "was envisioned as a

permanent solution to the longstanding cycle of backed-up admissions of *Coleman* class

members into inpatient beds at DSH programs and the resulting surges of long waitlists for

patients who are so seriously mentally ill as to require inpatient care." *Id*. at 14-15.

The shift of responsibility from DSH to CDCR required the approval of the California

State Legislature before it could be implemented. ECF No. 5448 at 14. Although submitted for

inclusion in the Governor's 2016-2017 budget, it did not survive the winnowing process and was

not included in the approved budget that year. *Id*. at 16. As a result, the request for funds to

implement the Lift and Shift process was submitted for inclusion in the Governor's 2017-2018

budget and subsequently approved.

Legislative approval of Lift and Shift was a significant achievement in what had—up to

that point—been a years-long effort to bring the concept to fruition. To ensure its successful

implementation, the *Coleman* parties and the Special Master commenced a series of efforts

towards that objective. The Special Master's Twenty-Seventh Round Monitoring Report

provides further detail:

> From February to June 2017, the Special Master worked with both CDCR
> and DSH defendants on their joint "Lift and Shift" project that transferred

> responsibility and control from DSH to CDCR over acute and intermediate
> inpatient care facilities located within CDCR institutions. The Special Master
> fully participated in revising existing DSH policies and procedures related to
> inpatient care as well as pertinent parts of the Memorandum of Understanding
> between CDCR and DSH. The Special Master also assisted in developing new
> policies and procedures and training materials to implement Lift and Shift; his
> experts and monitors observed the training in several facilities. Plaintiffs provided
> input into all aspects of the Lift and Shift process.

ECF No. 5779 at 24-25.

On July 1, 2017, DSH, acting under authority granted through California's 2017/2018 State Budget, transferred responsibility and control over acute and intermediate inpatient care facilities located within CDCR institutions to CDCR. *Id.* 5779 at 24. This Lift and Shift process transferred 1,156 inpatient mental health treatment beds and 1,977.6 staffing positions from DSH to the responsibility of CDCR. *Id.* "The purpose of the transfer as announced in the budget was to streamline processes, reduce review periods, improve referral transfer timelines, and improve service delivery in acute and intermediate care provided by these facilities." *Id.*

Lift and Shift presented CDCR with the opportunity to develop and implement what the Special Master described in his 2016 Inpatient Care Report as "enduring strategies and policies that will create and sustain a regular and effective process of identifying those inmates in need of inpatient care, and who, once identified for such care, do not have to wait for long periods before actual placement into appropriate treatment programs." ECF No. 5448 at 24. With Lift and Shift, CDCR assumed direct responsibility for providing appropriate care to *Coleman* class members in the former DSH PIPs, as regulated by their LRH status, and the clinical services offered to them. (Similar responsibilities remained with DSH regarding the state hospitals that continued to provide care to *Coleman* class members, DSH-Atascadero, DSH-Coalinga, and Patton State Hospital.) During August and September 2017, the Special Master, accompanied by the parties, conducted LRH-focused tours of the PIPs at SVSP, CHCF, CMF and CIW. The

objective of these tours was "to monitor the implementation and application of the Least Restrictive Housing (LRH) designation after Lift and Shift, and to consult with CDCR regarding how the application of LRH in the PIPs impacted bed availability for acute and intermediate inpatient care throughout the system." ECF No. 5779 at 25. Upon completion of the tours, the Special Master met with defendants to discuss his initial findings and consult further regarding the application of the LRH designation. *Id*.

The Special Master is encouraged by the implementation of Lift and Shift, although the change is in its infancy. Any attempt to gauge its success at this time would be premature. As stated above, this report presents the findings of the Special Master's first monitoring review of the three PIPs located at SVSP, CMF, and CHCF, since the implementation of Lift and Shift.

**B.      Activation of 70 Temporary Intermediate Care Beds at CMF L1-PIP**

As stated above, on April 14, 2017, the court issued an order waiving state licensing requirements for 18 months from the date of the order that permitted the establishment of 70 temporary intermediate care beds, and two observation and restraint rooms in the L1 Unit at CMF. This was an "interim measure to expand intermediate care beds available to inmates requiring inpatient care." ECF No. 5779 at 26. The court indicated that it would consider extending the waiver for an additional 12 months on application of the parties. ECF No. 5605 at 4. CMF L1-PIP, while offering significantly more hours than other inpatient programs, had not reached the mandated 12 hours per week instituted by the court order at the time of the site visit. The primary obstacle discovered during the site visit related to space limitations in the CMF L1-PIP.

At the time of the writing of this report, the parties, under the guidance of the Special Master, had commenced discussion regarding the need for an extension of the waiver, and

anticipated submitting a timely application should the parties agree to filing a petition for an extension. Representatives of the parties and the Special Master's team conducted a tour of CMF L1-PIP on May 16, 2018 – May 17, 2018. The Special Master will make quarterly site visits to CMF L1-PIP and will report to the Court through his regular monitoring report.

## C.     Areas of Focus:  Issues Defendants Need to Address Regarding Inpatient Care

With the reconfiguration of inpatient care in CDCR following Lift and Shift, the current round of monitoring tours of the three former DSH inpatient programs and two state hospitals spotlighted specific areas of focus which remained ongoing regarding the provision of adequate inpatient care to the *Coleman* class; these focus areas—which need to be addressed by CDCR and DSH—are discussed in detail in Part II of this report. This update highlights below several core areas that defendants must address to ensure patients are provided with adequate care upon admission to inpatient programs.

### 1.     Staffing Vacancies

In its order dated October 10, 2017, the court reiterated that the "full implementation of defendants' staffing plans" is one of the necessary matters "to achieve compliance with the Constitution and thereby the end of federal court oversight." ECF No. 5711 at 1. As reported in detail in Part II (A) below, staffing vacancies in multiple disciplines across programs remained a significant impairment to providing appropriate care in inpatient settings. The Special Master's monitoring showed that all institutions did not consistently meet established staffing ratios in the various units, which impacted their capacity to provide care. Required treatment services were not consistently and timely provided across programs, notably individual contacts and appropriate individual assessments.

Pursuant to the October 10, 2017 court order, the parties and the Special Master have been conferring at least every 90 days through the All-Parties Workgroup process "to discuss the status of defendants' progress toward compliance with [the] order," as well as the steps the CDCR defendants are taking that are necessary "to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." *Id.* at 29-30.

As required by the October 10, 2017 court order, defendants are also developing policies under the guidance of the Special Master to govern the use of telepsychiatry that will regulate how telepsychiatrists "may provide mental health services in place of on-site psychiatrists." ECF No. 5711 at 30. In its order, the court emphasized that telepsychiatrists "should serve as a supplement, rather than a substitute, for on-site psychiatry and should only be used when institutions are unable to recruit psychiatrists or have short-term vacancies that cannot be filled by contract psychiatrists." *Id.* The court directed that the above, "subject to modification as appropriate as a result of ongoing monitoring of defendants' telepsychiatry program," shall form the basis of an addendum to the Revised Program Guide governing the use of telepsychiatry in CDCR. *Id.*

In the court's March 7, 2017 order adopting the 2016 Inpatient Care Report, DSH defendants were directed to "continue to work on their staffing plan for their inpatient programs that treat *Coleman* class members" and provide the Special Master with monthly updates on its implementation. ECF No. 5573 at 3. In an amendment to the March 7, 2017 order, the court's order of October 10, 2017 further directed DSH defendants to completely implement their staffing plan within one year from the date of the order. ECF No. 5711 at 30. This is also being

addressed through the All-Parties Workgroup process, with the Special Master's full expectation that the court-ordered deadline of October 10, 2018 will be timely met.

Initially, the court set a status conference for April 12, 2018, and a further status conference on October 11, 2018. *Id.* On February 5, 2018, the court issued an order vacating the April 12, 2018 status conference, indicating that it would be reset as appropriate. ECF No. 5774 at 4. The conference set for October 11, 2018 remains in place, prior to which the parties shall file a joint status report addressing, "as necessary, issues pertaining to enforcement of [the October 10, 2017] order and to durability of the staffing remedy. ECF No. 5711 at 31.

### 2. Referrals and Transfers

The court has clearly stated that the "absence of timely access to appropriate levels of care at every point in the system" is evidence of an ongoing constitutional violation. Order, entered April 5, 2013, (ECF No. 4539 at 46) (quoting *Brown*, 131 S. Ct. at 1931 [quoting report filed by Special Master in July 2009[4]]). "The relevant requirement [for assessing constitutional compliance] is defendants' constitutional obligation to provide `a system of ready access to adequate (mental health) care.'" *Id.* at 47, quoting *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982).

Defendants achieved substantial strides in timely transferring referred patients to acute and intermediate inpatient care during July 2017 through March 2018. Pursuant to the court order of June 8, 2017 (ECF No. 5631), directing the Special Master to "closely supervise" the *Coleman* parties' monthly review of exceptions to the timely transfer of patients referred to inpatient care, at the time of this writing, the All-Parties Workgroup continued to closely monitor adherence to transfer timelines and exceptions.

---

[4] Special Master's Twenty-First Round Monitoring Report, filed July 31, 2009. ECF No. 3638.

Data filed with the court during July 2017 through September 2017 covering census, waitlist, compliance, and exceptions to transfer within Program Guide timeframes, indicated that of 516 patients referred to intermediate care, one patient was not transferred within Program Guide timelines. For the same time period, 99 patients or 14 percent of 549 patients referred to acute care were not timely transferred. Two acute care patients were indicated to be within the exceptions to the Program Guide timeframes, as were 23 intermediate care referrals for the time period.[5]

For the time period of October 2017 through December 2017, all patients referred for transfer to acute and intermediate care were reported to have been transferred timely. During this time period, eight acute and two intermediate care referrals were determined to be within the exceptions.[6]

During January 2018 through March 2018, all referrals to acute and intermediate care were reported to have transferred within Program Guide timeframes. Two acute referrals and no intermediate care referrals were indicated to be within the exceptions.[7]

Defendants have reported consistent compliance with transfers of inmates to acute and intermediate care settings from September 13, 2017 through March 31, 2018.[8]

In order for defendants to sustain their progress in meeting transfer timelines, ongoing close internal supervision and effective data collection and reporting systems must remain in place. As observed in the Special Master's preceding report on inpatient care, if defendants cannot adhere to their own sustainable remedies to provide access to inpatient care without

---

[5] ECF No. 5664 at 19, ECF No. 5684 at 18, and ECF No. 5715 at 18.

[6] ECF No. 5731 at 18, ECF No. 5751 at 16, and ECF No. 5757 at 16.

[7] ECF No. 5789 at 16, ECF No. 5804 at 15, and ECF No. 5819 at 15.

[8] ECF No. 5817 at 2.

repeated court intervention, that failure "will remain the barrier between defendants and termination of court oversight of this matter." ECF No. 5448 at 40.

As indicated above, the All-Parties Workgroup will continue to monitor compliance with transfer timelines and their exceptions.

### 3. Least Restrictive Housing (LRH) Placements

Both CDCR and DSH's policies require patients that need inpatient treatment to be placed in the least restrictive setting based on their LRH designation. Under CDCR's LRH policy, patients in inpatient programs may only be treated in more restrictive housing than their LRH when specific defined clinical issues prevent them from being safely treated within their LRH designations. The interdisciplinary treatment teams (IDTTs) in both CDCR and DSH are responsible for developing a treatment plan to address any risk factors that prevent a patient from being safely treated within their LRH designation.

There were multiple patients placed outside their LRH in the various psychiatric inpatient programs. IDTTs across non-hospital programs should be consistent in addressing patients' LRH. There was also a need to be consistent in documenting the reasons for housing placements outside of LRH and making a determination as to their appropriateness, as well as an institutionalized process for reviewing and addressing the reasons patients are not in their LRH. Ongoing attention to patients' LRH before and after admission to inpatient care is necessary to providing appropriate care in the least restrictive setting, unless the placement is contraindicated for clinical and/or custodial reasons.

### 4. Access to DSH Facilities

In his 2016 Inpatient Care Report, the Special Master offered an extensive history of the problems regarding CDCR inmate access to inpatient care at DSH-Atascadero—problems which

had been identified dating back to the original court order of 1995,[9] and which have persisted through the writing of this report. ECF No. 5448 at 24-40. The Special Master concluded that finding "[a] lasting resolution to this problem will be one of the final major accomplishments required to conclude the remedial process." *Id*. at 24.

Providing timely access to DSH beds for all CDCR inmates who meet clinical and custodial requirements for placement at DSH-Atascadero, DSH-Coalinga, and PSH is essential to the remedial process in the *Coleman* case. Maintaining a system that facilitates patient movement through the various programs available to CDCR inmates is likely to prevent repeating the previous cycles of inpatient waitlists while providing appropriate care to patients at their least restrictive setting. History shows that when beds in DSH facilities are not being used for CDCR patients, the process of "timely admissions is upset and bed admissions throughout the [system] for CDCR inmates quickly become backed up, with surging waitlists." ECF No. 5448 at 36.

### a.     DSH-Atascadero and DSH-Coalinga

The court "has repeatedly ordered DSH to utilize the intermediate care beds at DSH-Atascadero to treat *Coleman* class members." *Id.* At 36. As the Special Master emphasized in his 2016 Inpatient Care Report, the "roller coaster of non-compliance with utilization of DSH-Atascadero beds must finally end, and the all too predictable cycle of court intervention must be broken." *Id.* At 39.

Reports filed with the court for July 2017 through September 2017 indicated that patients filled 70, 80, and 86 percent of *Coleman* class bed capacity at DSH-Atascadero. During the

---

[9] 912 F. Supp. 1282, 1309 (1995).

same time period, the reporting on DSH-Coalinga indicated that 96, 100, and 96 percent of *Coleman* class beds were filled on those dates.[10]

For October 2017 through December 2017, data for the reporting dates filed with the court showed that 89, 87, and 84 percent of *Coleman* class bed capacity at DSH-Atascadero was filled on the respective reporting dates. DSH-Coalinga *Coleman* class members filled 94, 100, and 94 percent of bed capacity on the same reporting dates.[11]

During January 2018 through March 2018, the reporting dates in the data filed with the court showed that the percentage of *Coleman* class patients in the designated beds at DSH-Atascadero were 74, 77, and 79 percent of capacity on those reporting dates.[12] At DSH-Coalinga, 98, 100, and 94 percent of *Coleman* beds were filled.[13]

---

[10] ECF No. 5664 at 8, ECF No. 5684 at 8, and ECF No. 5715 at 8.

[11] ECF No. 5731 at 8, ECF No. 5751 at 6, and ECF No. 5757 at 6.

[12] During April 2018 through July 2018, data for the reporting dates filed with the court showed the number of available beds at DSH-Atascadero were 61, 70, 93, and 101, respectively. ECF No. 5827 at 5, ECF No. 5837 at 5, ECF No. 5858 at 5, and ECF No. 5882 at 5.

[13] ECF No. 5789 at 6, ECF No. 5804 at 5, and ECF No. 5819 at 5.



**DSH-Atascadero Fill Rate**

256 Beds Available

| Month | Beds Occupied | Percentage |
|-------|---------------|------------|
| Jul-17 | 178 | 70% |
| Aug-17 | 206 | 80% |
| Sep-17 | 219 | 86% |
| Oct-17 | 229 | 89% |
| Nov-17 | 223 | 87% |
| Dec-17 | 216 | 84% |
| Jan-18 | 190 | 74% |
| Feb-18 | 196 | 77% |
| Mar-18 | 202 | 79% |

■ Total # of beds occupied



**DSH-Coalinga Fill Rate**

50 Beds Available

| Month | Beds Occupied | Percentage |
|-------|---------------|------------|
| Jul-17 | 48 | 96% |
| Aug-17 | 50 | 100% |
| Sep-17 | 48 | 96% |
| Oct-17 | 47 | 94% |
| Nov-17 | 50 | 100% |
| Dec-17 | 47 | 94% |
| Jan-18 | 49 | 98% |
| Feb-18 | 50 | 100% |
| Mar-18 | 47 | 94% |

■ Total # of beds occupied

As the data shows, while the beds at DSH-Coalinga were fully utilized, and bed utilization at DSH-Atascadero has remained higher than it has in the past, defendants were still not using the full capacity of DSH-Atascadero for *Coleman* class member patients.

**b.   Patton State Hospital**

PSH maintained 30 designated *Coleman* beds.  On the reporting dates filed with the court for July 2017 through September 2017, the number of *Coleman* patients in PSH were five, 11, and nine or 17, 37, and 30 percent of capacity.[14]  On the reporting dates filed for October 2017 through December 2017, the number of *Coleman* patients in PSH were 12, ten, and seven patients or 40, 33, and 23 percent of capacity.[15]  During January 2018 through March 2018, the number of *Coleman* patients in PSH were seven, 13, and 17 for the reporting dates or 23, 43, and 57 percent of capacity.[16]



The underutilization of bed capacity at PSH has a ripple effect on female access to inpatient care in CDCR, because it impacts bed availability at the CIW-PIP and access to mental

---

[14] ECF No. 5664 at 8, ECF No. 5684 at 8 and ECF No. 5715 at 8.

[15] ECF No. 5731 at 8, ECF No. 5751 at 6, and ECF No. 5757 at 6.

[16] ECF No. 5789 at 6, ECF No. 5804 at 5, and ECF No. 5819 at 5.

health crisis beds for women at both the California Institution for Women (CIW) and the Central California Women's Facility (CCWF). In order to address this growing problem, CDCR has submitted a preliminary plan to activate temporary mental health crisis beds (MHCBs) at CIW for consideration by the All-Parties Workgroup. Plans for increasing the utilization of double-celling in the MHCB at CCWF are also under consideration in the workgroup process.[17]

5. **Clinical Services and Treatment in Inpatient Programs: Treatment Planning, Group Therapy, and Individual Treatment**

As discussed in detail in this report, issues regarding individual treatment, group therapy and treatment planning, including behavioral planning persist in the inpatient care programs managed by both CDCR and DSH.

a. **Treatment Planning**

Across facilities, treatment planning, including the use of behavioral plans as appropriate, was found to be inadequate. CDCR should attend to remedying the absence of required documentation in treatment plans. Training and supervision designed to develop treatment interventions that are targeted to address issues for referral, consistent inclusion of treatment goals and progress in treatment plans, and modifying treatment objectives to address clinical changes in patients are matters that require prioritized attention in the inpatient programs. Additionally, discussion of LRH and development of treatment interventions to assist patients in reaching their LRH still need to be fully integrated into all treatment planning for patients not in their LRH.

Utilizing appropriate behavioral plans and interventions for all patients for whom it is clinically indicated should be prioritized in the inpatient programs, particularly in the higher

---

[17] The Special Master will tour PSH during his next round of inpatient care monitoring as part of his regular monitoring duties.

custody programs. Properly trained staff are required to develop individual behavioral plans that include evidence of the completion of a functional analysis, with positive reinforcers that are responsive to the targeted behavior—elements that are essential to effective behavioral planning.

### b. Group Therapy

Across programs, structured and unstructured out-of-cell activities were found wanting during site visits. Improving the system and quality of structured and unstructured out-of-cell activities is one of the outstanding issues that require the attention of CDCR and DSH. Offering adequate hours of appropriate core and non-core group activities, as a well as adequate hours of access to out-of-cell activities that meet the clinical needs of patients in the various inpatient programs, are priorities that need to be addressed by CDCR and DSH. Accurately tracking and reporting all structured and unstructured out-of-cell activities offered and received is a necessary step required to remedy the issues surrounding the most used treatment modality in the inpatient programs.

### c. Individual Treatment

Individual treatment was rarely offered or provided across inpatient programs, and where provided was either woefully inadequate, or not accurately tracked. Developing and implementing meaningful guidelines and training staff regarding the provision of adequate individual treatment must be addressed by CDCR and DSH. In addition, a system to accurately track and report the number of individual treatment hours offered and received needs to be instituted.

# PART II.

## THE SPECIAL MASTER'S FINDINGS AT THE
## EIGHT INPATIENT PROGRAMS

**A.**     **STAFFING**

### Background

As detailed in Part I above, following the submission of the 2016 Inpatient Care Report (ECF No. 5448), the court issued an order on March 8, 2017, directing DSH to continue working on their staffing plan in coordination with the development of CDCR's mental health staffing plan under the guidance of the Special Master. ECF No. 5573 at 3. In an October 10, 2017 order directing CDCR to implement its staffing plan by October 10, 2018, the court amended its March 8, 2017 order and directed DSH defendants to also complete the implementation of their staffing plan by October 10, 2018. ECF No. 5711 at 30. As previously stated, the Special Master continues to meet with DSH and CDCR defendants through the All-Parties Workgroup to re-evaluate the staffing plans of both defendants with the full expectation that the court's October 10, 2018 deadline will be met.

The designated staff-to-patient ratios for all inpatient facilities and programs remained unchanged at 1:15 for admissions and acute care units, and 1:35 for intermediate care units. These ratios were applicable to psychiatrists, psychologists, social workers, and rehabilitation therapists.

While the staff-to-patient ratios were all within established requirements at DSH-Coalinga, DSH-Atascadero exceeded the staff-to-patient ratios in its admissions unit and all treatment units. Both the SVSP-PIP and CMF-PIP failed to meet any of the required clinical staffing ratios for psychiatrists, psychologists, social workers, or rehabilitation therapists. At the time of the site visit, the CHCF-PIP met the staff-to-patient ratios, but would not be in

compliance if they were at full capacity with the current staffing numbers.  With the exception of psychiatry, the L1 Unit at CMF met the required ratios for the remaining clinical disciplines. The SQ-PIP met staff-to-patient ratios for all clinical disciplines, as did the CIW-PIP, with the exception of psychiatry at the acute care level.

1.      **DSH-Atascadero and DSH-Coalinga**

As of January 9, 2018, there were 196 *Coleman* class member patients at DSH-Atascadero, bringing the census to 74 percent of capacity for *Coleman* patients at the facility. Psychiatry vacancies continued to plague the facility at a rate of 63 percent, representing a slight decrease from the 68-percent vacancy rate reported in the preceding monitoring round.  The use of contractors reduced the functional vacancy rate to 25 percent.

At DSH-Atascadero, all psychologist and rehabilitation therapist positions were filled, while functional vacancy rates for social workers and psych techs were each at 13 percent. Registered nurses (RN) and senior psych techs reported higher vacancy rates of 25 percent and 22 percent respectively.

The admissions unit had a census of 31, which made compliance unachievable for psychiatry under the current staffing level with a designated clinician-to-patient ratio of 1:15. Psychology, social work, and rehabilitation therapy slightly exceeded the designated ratios at 1:15.5.   In the five intermediate care treatment units at DSH-Atascadero, all clinical disciplines were non-compliant with the designated 1:35 staff-to-patient ratio.  However, the cause of this problem was not new.  Each unit had a population ranging from 43 to 46 patients and the fixed number of clinical positions assigned to each unit would never be sufficient to meet the designated ratios for this number of patients, thus ensuring non-compliance.

As of January 4, 2018, the census at DSH-Coalinga was 50, which was the maximum capacity for *Coleman* class member patients at the facility. All clinical positions were filled, with the exception of psych techs, which had a vacancy rate of only six percent, with 29 of the 31 positions filled. All staff-to-patient ratios were within the established requirements of 1:35 for psychiatry, psychology, social work, and rehabilitation therapy. With an established staffing ratio of 1:8 for senior psych techs, psych techs and RN positions, DSH-Coalinga was actually staffed at a ratio of 1:6 in those disciplines.

## 2. SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

The SVSP-PIP reached 89 percent of its operational capacity at the time of the site visit with 219 of 246 beds filled. Psychiatry and social work each had vacancy rates of 20 percent while psychology and rehabilitation therapy reported no vacancies. Psych techs and RNs had the highest vacancy rates at 55 percent and 38 percent respectively. With an established staff-to-patient ratio of 1:25 for psychiatrists, psychologists, social workers, and rehabilitation therapists, SVSP-PIP did not fully meet the ratios for any of the disciplines.

Treatment Center 1 (TC1) had two psychiatrist positions, two psychologist positions, two social worker positions, and two rehabilitation therapist positions assigned to that unit; one of the two positions within each of those disciplines exceeded the established staff-to-patient ratios resulting in non-compliance for the unit. In Treatment Center 2 (TC2), both psychiatrists exceeded the staff-to-patient ratio, but each of the three psychologists, social workers, and rehabilitation therapists had caseloads that were compliant with established ratios.

In C5, no discipline met the established staff-to-patient ratio of 1:25. Psychiatry, psychology, social work, and rehabilitation therapy all had caseloads between 1:27 and 1:29. The non-compliance with staffing ratios was similar in C6 with the staff-to-patient ratio for

psychology, social work, and rehabilitation therapy between 1:27 and 1:29. The one full-time staff psychiatrist had a caseload of 39, while the part-time registry psychiatrist had a caseload of 17.

Of the 396 beds available for acute and intermediate care for *Coleman* class members at the CMF-PIP, 347, or 87.6 percent, were occupied at the time of the site visit. Psychiatry saw an appreciable increase in the vacancy rate since the preceding monitoring report, rising from eleven percent to 29 percent. Psychology and social work reported slight decreases in vacancy rates from 26 percent to 22.5 percent and 24 percent to 19 percent, respectively. Rehabilitation therapists and RNs had the lowest vacancy rates at seven percent and four percent.

Psychiatrists and psychologists met the established ratio of 1:15 in the acute care program with the exception of Unit P2, while social workers and rehabilitation therapists failed to meet the required ratio in both acute care units. The intermediate care program at CMF-PIP also reported varying compliance with clinician-to-patient ratios. The 1:35 staffing ratio was met in several units except Unit A3 where psychiatrist and psychologist ratios were non-compliant and Unit A2 where the staff-to-patient ratio was 1:42 for psychiatry.

CMF L1-PIP is a 70-bed unit that houses *Coleman* class members in need of intermediate care. At the time of the site visit, 64 beds were occupied, which represented 91 percent of the program's occupancy rate. There were no vacancies reported for psychologists, rehabilitation therapists or RNs. Psychiatry experienced the highest vacancy rate at 30 percent and there was a 20-percent vacancy rate for social workers. Psychiatry was the only clinical discipline in which the 1:35 staff-to-patient ratio was not met. The required ratio was met for psychologists, social workers and rehabilitation therapists.

On November 7, 2017, the CHCF-PIP housed 376 *Coleman* patients, with 199 at the acute care level and 177 at the intermediate care level, representing 75.8 percent of the total capacity. The psychiatry vacancy rate was 24.6 percent, which was a slight decrease from the 30-percent vacancy rate reported in the preceding monitoring report. The psychology vacancy rate continued its decline and decreased from 36 percent to 10.4 percent over the last two monitoring periods. Vacancy rates for social workers, rehabilitation therapists, and RNs all decreased since the preceding monitoring round, with reported vacancy rates of ten percent, 12.5 percent, and 10.4 percent respectively. CHCF-PIP reported that all units were staffed for an acute level of care at a staff-to-patient ratio of 1:15. At the time of the site visit, the established ratio was met by all clinical disciplines for the number of patients at the facility. However, as previously stated, if CHCF-PIP were operating at full capacity with its current staffing levels, the facility would exceed these ratios for psychiatry without additional staff.

### 3. CIW-PIP and SQ-PIP

As of November 1, 2017, the CIW-PIP census was 45, which represented 100 percent of capacity and included both acute and intermediate care patients. All psychiatry, psychology, social work, and recreation therapy positions were filled, as were all nursing and psych tech positions. All clinical disciplines met the staff-to-patient ratio for acute care of 1:15 and intermediate care of 1:35 with the exception of psychiatry, which exceeded the ratio for acute care at 1:22.

On January 30, 2018 the census at the SQ-PIP was 25, or 62 percent of capacity. The 40 flexible beds in the unit were used interchangeably for acute care, intermediate care, and MHCB condemned patients. The vacancy rate for psychiatry and psychology was zero, with all three psychiatrist positions and all three psychologist positions filled. All six RN positions were filled

as were all 18 psych tech positions. There was a 25-percent vacancy rate for social workers and recreation therapists, with three of the four positions filled in each discipline. At the time of the site visit, psychiatry, psychology, social work, and recreation therapy were all within the established staff-to-patient ratio of 1:15.

## B.     TREATMENT AND CLINICAL SERVICES

### 1.     DSH-Atascadero and DSH-Coalinga

#### a.     IDTTs

Audit results provided by DSH-Atascadero revealed good IDTT attendance by required disciplines, with psychiatrists and psychologists attending 98 percent of all scheduled IDTTs and social workers and rehabilitation therapists attending 100 percent. IDTT meetings observed during the site visit also proved well-attended by required disciplines. Initial IDTTs were completed within seven days of admission as required by policy 81 percent of the time.

Observed IDTT meetings at DSH-Atascadero reflected appropriate multidisciplinary input, with most treatment team members and patients participating in the discussions. IDTTs were facilitated by the psychiatrist and included discussion of treatment goals and progress, medication-related concerns, and current symptomatology. In Unit 32 IDTTs, treatment plans were displayed on an overhead projector, allowing visualization by all attendees. Unit 30's treatment team reported meeting with patients monthly and quarterly; the quarterly IDTT meetings were more comprehensive than the monthly IDTTs.

At DSH-Coalinga, a records review revealed significant issues with IDTTs and the treatment planning process, including poor attendance of required disciplines at IDTT meetings. Other notable concerns included inadequate treatment plans related to inaccurate and/or inconsistent diagnoses, as well as incomplete treatment plan sections. There were also problems

with documentation, as admission notes by psychiatrists, psychologists, and social workers were not always present in the record, and monthly progress notes by all required disciplines were often not present in the record.

DSH-Coalinga used the Positive Reinforcement Program whereby points were given to patients who exhibited positive behaviors; those points may then be redeemed for activities or items at the incentive store.   According to policy, this was required to be done in an individualized manner through the treatment planning process.  The process did not occur in any of the treatment teams observed during the site visit.

### b.  Group Therapy

At DSH-Atascadero, the data provided indicated that patients received a weekly average of 6.3 hours of group therapy and an additional 7.04 weekly hours of recreational groups, for a total average of 13.34 hours.

The facility continued to provide core and centralized groups to patients.  Core groups were facilitated by patients' treatment teams and held on patients' treatment units.  Centralized groups were facilitated by a variety of hospital staff and were conducted in other areas of the facility.  They were open to both *Coleman* class members and other patients.  Patients generally expressed high satisfaction with the groups offered, and interviewed inmates reported clinical benefits.  Based on discussions with staff, the number of groups offered to *Coleman* class member patients was driven more by staffing resources as opposed to individual treatment planning.

DSH-Coalinga offered core and supplemental treatment activities to patients.  Core groups were scheduled for four hours per day, Monday through Friday, and represented 37.5 percent of the treatment offered to patients, with a weekly average of 7.37 hours offered, and

4.68 hours attended. Interviewed patients cited multiple reasons for their lack of attendance, including over-sedation due to medications, conflicting medical appointments, and not finding the group to be personally meaningful. Patients also reported that groups were frequently cancelled.

Supplemental activities were offered on evenings and weekends and represented 62.1 percent of the treatment being provided; 58 percent were co-facilitated by rehabilitation therapists and/or behavior specialists.

Patients reported that more groups specific to their diagnoses would be useful.

<h3>c.     <u>Individual Treatment</u></h3>

Individual treatment was not routinely available at DSH-Atascadero. A weekly average of 0.1 hours of individual therapy was provided to patients. While patients reported that they did not have monthly individual clinical contacts with either a psychiatrist, psychologist, social worker, or rehabilitation therapist, they reported good access to these clinicians through the self-referral process. One-on-one contacts with social workers and rehabilitation therapists were also reported to be accessible on an as-needed basis.

At DSH-Coalinga, patients attended various treatment activities; 0.3 percent of the total hours attended were classified as individual therapy.

<h3>d.     <u>Psychiatric Services</u></h3>

Patients at DSH-Atascadero reported that initial weekly psychiatric contacts were provided during the first one to two months following admission. There were no problems reported related to receiving medications. An average of 12 patients received non-formulary psychotropic medications during the review period.

DSH-Coalinga reported that newly-admitted patients were provided with weekly psychiatric contacts during their first two months of hospitalization; psychiatry progress notes, however, were frequently not present in the health care record. Interviewed patients indicated general satisfaction with the telepsychiatry process and reported no complaints with its use.

The number of non-formulary medications prescribed during the review period ranged from two to nine per month. At the time of the site visit, two patients were receiving non-formulary medications. There were no continuity of medications issues reported by interviewed patients.

### e. Other Treatment Issues

#### i. Involuntary Medications (PC 2602)

DSH-Atascadero administered involuntary psychotropic medications to 56 patients on at least one occasion during the review period.

There were no PC 2602 petitions initiated or renewed by DSH-Coalinga during the review period. The number of patients administered involuntary medications ranged from two to ten per month. Three patients were receiving involuntary medications at the time of the site visit.

#### ii. Behavioral Management

There were no individual behavior plans initiated or in use at DSH-Atascadero during the review period, nor were there any *Coleman* class member patients with individual behavior plans at the time of the site visit.

DSH-Coalinga reported that no patients were on individual behavior plans during the review period.

## 2.    SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

### a.    IDTTs

SVSP-PIP did not track IDTT attendance of the various disciplines, however, staff reported that correctional counselors were not consistently attending IDTTs.  Despite a recent effort to facilitate correctional counselor attendance by rescheduling the meetings, a correctional counselor was not present at observed IDTTs held during the site visit.

Some positive observations noted during IDTTs included appropriate clinical interaction between the treatment team and the patient, reasonable discussion of treatment goals and the reasons for not placing patients at their LRH, and good attendance by all required disciplines—with the exception of correctional counselors, as previously stated.  Observed concerns included pre-meetings held prior to the start of some IDTTs where vital treatment issues were discussed outside of the patient's presence and were not revisited once the patient joined the meeting, and the incorporation of medication management activities into the IDTTs which should have occurred in an individual session with the psychiatrist.  Treatment team meetings would have greatly benefited from the presence of a correctional counselor, as multiple custody issues raised by patients were appropriate for a correctional counselor to address.

CMF-PIP did not provide information on IDTT attendance by the various disciplines; however, as at SVSP-PIP, staff reported that correctional counselors did not regularly attend IDTTs.  CMF-PIP was also unable to provide audit data related to timeliness of IDTTs, or produce reports on initial and most recent IDTT dates for current patients.

IDTTs were observed in the acute care program; with the exception of the correctional counselor, all required disciplines were present.  Treatment planning was not adequately focused upon, either being discussed very little, or not at all.

In the intermediate care program, a correctional counselor covered IDTTs in all four units of the high custody building.  In observed IDTTs in the Dialectical Behavior Therapy (DBT) unit, treatment teams were found to employ several strategies to engage patients in the process and appropriately addressed patients' treatment issues.  LRH was addressed; however, it was inconsistently documented in reviewed patient health care records.  In the high custody unit, observed IDTTs revealed significant clinical deficiencies.  Patients had not been seen by any treatment team member prior to IDTT, nor was any justifiable clinical rationale offered for not doing so; further, the psychiatrist was not engaged in the IDTT process.

At CMF L1-PIP, the required disciplines were in attendance at all IDTT meetings observed during the site visit.  There were appropriate discussions related to LRH, placement into groups based on clinical needs, and discharge planning, where applicable.

Similar to what was found at other PIPs, correctional counselors were not observed to be present during IDTTs at CHCF-PIP.  In the acute care units, some IDTTs were found to be adequately conducted, while others demonstrated areas of concern, such as limited team discussion—including the failure to regularly discuss treatment goals.  Further, issues such as current treatment plan, progress towards treatment goals, behavior necessary to attain new privileges, and the types of treatment which would occur until the time of the next scheduled IDTT were not discussed with patients.  Additionally, discussions related to LRH were cursory and the reasons for decisions were unclear.

The quality of IDTTs in the intermediate care program varied and collaborative treatment planning between clinical staff and patients was lacking.  There was little or no discussion of patients' progress in groups and many IDTTs lacked staff introductions, explanation of the IDTT to the patient at his functional level, progress in treatment, changes in symptoms and functioning

as well as current symptoms/functioning, LRH, patient referral to group including clinical appropriateness, and clinical preparation for discharge or transfer to another PIP.

### b. <u>Group Therapy</u>

At SVSP-PIP, data on the average number of hours that patients were offered and/or participated in weekly structured or unstructured out-of-cell activities was not accurately tracked. According to staff and patient interviews, sufficient hours of out-of-cell activities were not provided to patients, the hours offered being significantly lower than what was offered at the EOP level of care in CDCR prisons. Staffing shortages resulted in a lack of coverage for the provision of group therapy. A consequence of this lack of out-of-cell time was poor treatment planning due to the dearth of available treatment options. Puzzles and games were offered to patients at cell-front approximately three to four times per week in an attempt to mitigate the effect of this. While somewhat beneficial to patients, this did not equate to providing appropriate mental health care

During the site visit, two groups in C5 were observed. One group consisted of a music therapist showing music videos by patient request, the other involved the rehabilitation therapist reading affirmations, with patients subsequently participating in an unrelated art project. The monitor's expert observed that both groups would benefit from increased organization, structure, and supervision. Patients interviewed after observation of a music therapy group in TC1 indicated that approximately 20 percent of their groups were relevant to their specific issues. A problem-solving group conducted by a practicum student in TC2 was attended by 15 patients, the majority of whom were engaged the entire time.

Staff at CMF-PIP reported that the number of treatment hours provided to acute care patients during the review period was insufficient to meet the clinical needs of multiple patients.

Data from July through August 2017 showed that the average hours offered per patient, per week was 1.19, with an average of 0.62 hours per week delivered—significantly lower than what was offered at the EOP level of care. The facility had not been able to produce any additional treatment hours data since the transition to the Electronic Health Records System (EHRS) in September 2017.

Group therapies were provided in the dayrooms of the acute care housing units; due to clinical and security concerns, group participants were generally limited to six to eight patients. Of the six dayrooms scheduled for group therapy use during the site visit, just three had a structured therapeutic activity occurring as scheduled. Interviewed patients indicated that it took many weeks after admission to the acute care program before they were eligible for out-of-cell time in excess of one hour. The amount of out-of-cell treatment activities provided to acute care patients in CMF-PIP was inadequate, which was exacerbated for those with a Maximum Custody classification. CDCR reported during the site visit and subsequently in the workgroup process that the custody level of patients with a Maximum Custody classification required the use of therapeutic modules, which CMF-PIP did not have. In their comments to the draft report, plaintiffs indicated their strong objection "to any implication in the Draft Inpatient Report that a lack of therapeutic treatment modules, or cages, is a reasonable justification for failing to provide adequate mental health treatment." Plaintiffs also reiterated their objection to the use of "cages in any mental health program in Defendants' facilities, and particularly in the licensed inpatient programs." The Special Master will utilize the workgroup process to address the issue of the inadequate amount of out-of-cell treatment activities provided to acute care patients in CMF-PIP, including those with Maximum Custody classifications.

The lack of both adequate programming space within the housing units, and escort officers to accompany patients to available treatment space within O-Wing on the prison side, were the two major limiting factors for providing adequate hours of out-of-cell structured therapeutic activities in the acute care program.  Staffing issues and other unexpected events were also reported as frequently related to the cancellation of groups.

The intermediate care program provided treatment groups that were psychoeducational in nature and unstructured enrichment activities.  For both structured and unstructured activity combined, in July 2017, the intermediate care program averaged 4.68 hours scheduled, 4.21 offered and 1.85 delivered, with a refusal rate of 56 percent.  In August 2017, the average was 5.08 hours scheduled, 4.39 offered, and 2.00 delivered, with a refusal rate of 54 percent.  For structured treatment hours alone, in July 2017, 1.37 were scheduled, .86 offered, and .69 delivered.  In August 2017, 1.14 hours were scheduled, .58 offered, and .55 delivered.  As with the acute care program, the hours offered to intermediate care patients were significantly lower than what was offered at the EOP level of care.  Although CMF-PIP acknowledged that the intermediate care program was not providing adequate group treatment hours and not meeting the treatment needs of all its patients, it did not have any concrete plans for improving services at the time of the site visit.

With the exception of those with Maximum Custody status, patients in the CMF L1-PIP were provided with structured, semi-structured, and non-therapeutic activities; group sizes ranged from eight to 12 participants.  Space limitations resulted in nearly all structured treatment occurring on CMF's O-Wing, which required escort and supervision of patients to and from treatment.  Semi-structured groups and nontherapeutic activities were offered on the L1 unit.

Staff reported difficulty in providing and tracking the required 12 hours of out-of-cell activities; the manual tracking method indicated that patients were offered between nine to 11 hours per day.  Interviewed patients were pleased with the amount of out-of-cell time provided, however there were some complaints related to the need for group therapy sessions more directly related to their individualized needs.  According to staff and patient reports, there had been recent changes and improvements in group therapy offerings, allowing for more individualized therapy.  Nonetheless, some patients reported that group assignment was based upon their housing location and not their clinical needs.

CHCF-PIP was unable to provide reliable data on the provision of treatment hours to acute care patients.  However, preliminary data provided by CHCF-PIP suggested uneven provision of non-clinical activities across units and significant variation in the refusal rates reported for these activities.  An acute care group observed during the site visit was led by a recreation therapist; patients were engaged and clearly benefited from the group.

During the review period, a sample of 200 intermediate care patients, or 32 percent of the population, showed an average of 2.87 treatment hours scheduled per week—less than what was offered at the EOP level of care; six, or three percent of those patients had ten or more hours scheduled.  The facility did not have a formal audit process of groups or other structured activities.  Based on a review of the health care records, in the intermediate care program, patients were assigned to groups without sufficient documentation of consideration of their treatment needs and current mental health status.

The activity offerings in the intermediate care units varied greatly, with interviewed patients expressing a number of concerns regarding the variability of the unit schedule and resulting confusion.  It was noted during observed groups that some patients would have

benefitted from alternative group therapy placement.  Further, while a DSH directive required a secondary facilitator to maintain observation of a group, there appeared to be some confusion related to the exact role of the secondary facilitator, which, as observed during the site visit, resulted in some disruption to the group therapy process.

      c.        **Individual Treatment**

Since the implementation of the EHRS, SVSP-PIP patients had been assigned to a primary clinician (psychologist or social worker) who was supposed to meet with them at least once weekly in an out-of-cell setting.  Individual clinical contacts provided to patients were extremely limited, averaging 0.2 to 1.0 hours monthly, and therefore inadequate.

At the CMF-PIP, initial assessments were not always timely completed; this varied across disciplines.  Weekly individual psychology or social work contacts were provided in some cases, but were uncommon.

No data was provided regarding the number of hours of individual treatment provided to patients in the CMF L1-PIP.

CHCF-PIP did not provide data relative to timeliness and frequency of primary clinician or psychiatric contacts in the intermediate care program during the review period.  The provision of individual therapy at CHCF-PIP was unclear.  Interviewed patients reported limited individual contact and interviewed staff did not have a clear understanding of when to utilize individual contacts.  Individual treatment at CHCF-PIP needed significant improvement which could be accomplished through the development of meaningful guidelines for clinical staff.

### d.     Psychiatric Services

At SVSP-PIP, psychiatrists usually saw patients on a monthly basis; some were seen in individual sessions on a more frequent basis. There were no problems found with documentation of psychiatric contacts.

Intermediate and acute care patients at CMF-PIP saw psychiatrists regularly as scheduled. Telepsychiatry was used in one unit in the stand-alone high security intermediate care program. Although staff reported that the use of telepsychiatry was a pilot, they did not provide specific objectives to be measured beyond meeting contact mandates. CMF-PIP reported there was no plan to expand or make telepsychiatry permanent in its program.

In the CMF L1-PIP, psychiatrists prescribed medications, provided appropriate direct patient services, and offered patients the opportunity to discuss their individual psychiatric issues in regular one-to-one interviews. Patients in the CMF L1-PIP were seen by psychiatrists either in L1 or in CMF's O-Wing.

CHCF-PIP psychiatrists were required to provide weekly direct patient contact, however, staffing shortages negatively affected the provision of this care. Across units, psychiatry contacts varied, ranging from no scheduled time on four units to 12 one-hour increments on others. Notably, the two units with the greatest number of offered psychiatry contacts were provided through telepsychiatry.

### e.     Other Treatment Issues

#### i.     Involuntary Medications (PC 2602)

At the time of the site visit, there were 57 SVSP-PIP patients with PC 2602

orders; one had been extended pending a hearing. Due to the lack of sufficient staff during

evening hours, refused PC 2602 medications were ordered for daytime administration only.

Staff agreed to work to identify alternative measures to resolve the issue.

There were 24 PC 2602 petitions initiated at CMF-PIP during the review period.

Fourteen petitions were renewed and three petitions were denied.

There were no PC 2602 petitions initiated at CMF L1-PIP during the review period. Of

two requested PC 2602 renewals, one was granted and one denied.

At the time of the site visit, there were 88 patients with PC 2602 orders at CHCF-PIP.

ii.    **Behavioral Management**

At the SVSP-PIP, similar to findings from the preceding site visit, staff continued to

underutilize individual behavior plans and interventions when indicated. There were no

documented modifications observed in the health records regarding treatment plans, treatment

modalities, goals, or objectives to address concerning behavior in those instances where a

patient's identified problematic behavior did not change during the course of treatment.

Documented behavioral interventions designed to address identified problems and aid transfer to

a patient's LRH were not consistently found in patient health records. Core functioning and

stated behavioral interventions were also found to be inconsistently documented in health

records.

There was an increased use of individual behavior plans at CMF-PIP as compared to

previous site visits. Of the 13 requests for behavioral consultations or plans made during the

review period, 12 resulted in an individual behavior plan. By the time of the site visit, an

additional 12 requests had been made; three remained pending, eight resulted in plans, and two

resulted in consults only.

The reason for referral was unclear in most of the individual behavior plans reviewed, similarly, most contained no evidence that a functional analysis had been completed. As the functional analysis provides the foundation for an individual behavior plan, this missing element was cause for concern. An additional concerning finding was that multiple individual behavior plans used punishment rather than positive reinforcement to respond to the targeted behavior. During the site visit, staff was advised that outside expertise in behavior therapy and individual behavior plans would be helpful in assisting the CMF-PIP to remedy those deficiencies.

CMF L1-PIP staff reported that a plan was in place to hire a behavioral psychologist for the unit. There were no individual behavior plans implemented at the time of the site visit.

A multi-disciplinary Positive Behavior Support Team (PBST) at CHCF-PIP assisted treatment teams to develop and monitor behavioral guidelines for patients who were not responsive to treatment or engaged in behaviors that posed a high risk of violence. During the time period between July and October 2017, an average of 28 CHCF-PIP patients had behavioral guidelines. At the time of the site visit, six acute care patients and 21 intermediate care patients had active behavioral guidelines.

The monitor's expert made several observations related to the development of behavioral guidelines at CHCF-PIP. Many had similar components and did not include clear rationale for why specific interventions were chosen for each patient. They generally focused on staff interventions, suggesting a need for staff training. Additionally, collaboration with the patient was not clearly documented in the health care record. Of the six behavioral guidelines which included rewards for positive behavior, it was unclear whether the rewards were meaningful to the patient. Rewards must be contingent on the desired behavior, which should be clearly defined, observable and measurable. Although the PBST provided a solid foundation for

behavior interventions, behavioral guidelines were staff-focused rather than patient-focused. Staff reported that the implementation of EHRS had presented a challenge to documentation and monitoring of behavioral guidelines.

### 3. CIW-PIP and SQ-PIP

#### a. IDTTs

Initial and follow-up IDTTs in the CIW-PIP continued to be conducted in compliance with Program Guide timelines. Correctional counselor attendance at IDTTs was at 90 percent during the review period, with the exception of September 2017, when the attendance rate was 77 percent. LRH had been discussed in 75 percent of IDTTs since the indicator was added in September 2017.

In the SQ-PIP, the overall compliance rate for the timely conduct of routine IDTTs ranged from 88 to 92 percent during the review period; the data was not separated by level of care. Data on initial IDTTs was inconsistent. Observed IDTTs were noted to have good interdisciplinary discussion, treatment plans and goals were discussed, and team members were receptive to feedback. In addition, treatment team members actively used electronic databases to aid team discussion and treatment planning. A review of treatment plans however, conflicted with the IDTT observations reflecting a high quality of care. At times, clinical interventions were not specified, targets for treatment goals were not stated in objective behavioral terms, treatment plans were not modified when patients failed to respond to therapeutic efforts, and treatment plans did not identify primary treatment obstacles and functional deficits as problem areas. In some cases, however, progress notes indicated that substantial therapeutic intervention was occurring during individual sessions, despite treatment plans which indicated that little treatment was occurring.

### b.      Group Therapy

CIW-PIP reported an inability to track the number of out-of-cell structured and unstructured activities offered to patients on an average basis.  The data provided was not separated by group therapy hours offered, received, and refused.  Patients in the CIW-PIP were offered structured therapeutic activities based on an individualized treatment plan.  There were no problems with group cancellation.  Groups were described as helpful by interviewed patients, who also indicated a desire for access to additional groups.

In the SQ-PIP, acute care patients continued to be provided treatment in an individual setting rather than being offered group therapy.  During the review period, between 4.57 and 26.83 hours per week of individualized out-of-cell structured therapeutic activities were offered to acute care patients, with the average patient attending between 0.29 and 12.64 hours per week.

For intermediate care patients, an average of 12.66 hours of structured therapeutic activities were offered weekly, with an average of 8.78 hours attended.  Many intermediate care groups were cancelled during the site visit, due to a lack of attendance.  Staff reported that it became more difficult to place patients into appropriate groups as the population decreased.  This was made more difficult, in part, by the SQ-PIP's continued use of a fixed cohort system, whereby patients were assigned to cohort groups based on their clinical presentation and functional level.  This system seemed no longer viable as the population decreased.

### c.      Individual Treatment

At the CIW-PIP, the treatment programs for acute and intermediate care patients were similar.  All patients had access to individual sessions with primary clinicians on a weekly basis.  Individual psychiatry sessions were provided to acute care patients three times weekly and to intermediate care patients at least monthly.

Individual treatment data provided by SQ-PIP did not categorize the information by number of hours in each category and patient level of care.  According to the data provided, acute care patients attended 97 percent and intermediate care patients attended 77 percent of 216.4 individual treatment hours offered during the review period.

### d.     Psychiatric Services

Record reviews at CIW-PIP did not reveal any issues with psychiatric services during the review period.

SQ-PIP did not provide data on compliance with psychiatric service requirements for acute or intermediate care patients.

### e.     Other Treatment Issues

#### i.     Involuntary Medications (PC 2602)

CIW-PIP did not provide data on the number of PC 2602 petitions initiated, renewed, or pending during the review period.  At the time of the site visit, there were 16 patients with PC 2602 orders.

There was one PC 2602 petition initiated during the review period at SQ-PIP; 14 were renewed.  There were no issues with the management of involuntary medications at SQ-PIP during the review period.

#### ii.     Behavioral Management

CIW-PIP did not formally track which patients were receiving individual behavior plans.  Individual behavior plans were developed and reviewed through the IDTT process, ordinarily for patients on Discretionary Program Status (DPS), suicide watch and/or suicide precaution status.

There were four patients with active individual behavior plans at SQ-PIP at the time of the site visit. There were nine referrals for behavioral consultation, 11 for individual behavior plans, and four completed individual behavior plans during the review period. There had been a marked improvement in the behavioral assessment process at SQ-PIP since the preceding site visit. It was a structured, data-driven process, which included patient input. The assessment process was a combination of indirect assessment and descriptive analysis, with functional analyses used in several individual cases. Positive support individual behavior plans were written in clear terms that staff from any discipline could understand. The state purchasing system was found to present one challenge to obtaining individualized reinforcers for patients, as the items available for purchase were limited and the process could be time-consuming. According to SQ-PIP staff, patients had experienced meaningful clinical improvements following the implementation of individual behavior plans.

## C. QUALITY OF CARE ISSUES IN IDTTS AND TREATMENT PLANNING IN THE INPATIENT CARE PROGRAMS

### 1. Observed Inadequacies in the IDTT Process

As reported in Part II (B) above, although there were some instances in which the IDTT process was revealed to be working as intended, as found during the preceding monitoring round, multiple inadequacies remained.

One of the challenges following Lift and Shift was ensuring that correctional counselors attended IDTT meetings consistent with Program Guide requirements. However, during the monitoring round, observed IDTTs and staff reports revealed their attendance to be sporadic at best, with correctional counselors found to be regularly absent from IDTTs at SVSP-PIP, CMF-PIP, and CHCF-PIP.

Mirroring the findings from the Special Master's preceding report on inpatient care, IDTTs observed during the current monitoring round revealed several areas of concern. In IDTTs at DSH-Coalinga, SVSP-PIP, CMF-PIP, and CHCF-PIP, treatment team members failed to see patients prior to IDTTs and discussed vital treatment issues outside the patient's presence; treatment planning was inadequate; medication management issues were inappropriately incorporated into the IDTT process; and there was either inadequate focus on, or a complete lack of discussion of treatment planning, treatment goals, progress in groups, and/or behavior necessary to attain new privileges. At the SQ-PIP, although IDTT observations during the site visit reflected a high quality of care, a review of treatment plans conflicted with those observations.

The depth of the problems with IDTTs was highlighted through a clinical review of patient health care records. For example, in the records of Patient J (SVSP-PIP), there was a lack of documentation showing that important issues were addressed by the IDTT. Patient M's (CMF-PIP) master treatment plan was not completed properly; in addition, the IDTT failed to include the patient's impulsivity as a treatment target. Patient K's (CMF-PIP) IDTT did not indicate any action to facilitate the patient's placement in his LRH, and despite the patient's progress, did not recommend he be moved to his LRH. In the cases of Patient A, Patient B, Patient C, and Patient L (SVSP-PIP), there was inadequate discussion of LRH and no documentation of efforts to address identified problems. Further, for Patients A, B, and C (SVSP-PIP), poor treatment plan documentation prevented assessment of the adequacy of treatment planning.

Although Patient A (DSH-Coalinga) had been admitted to the facility for a little over two weeks, the treatment team had not developed a clear plan of treatment beyond medication

management.  The IDTT's treatment targets for Patient B (DSH-Coalinga) could not be determined due to the absence of a cohesive summary of the patient's care, progress, and plan from the record.  The psychiatrist and psychologist were not present at the initial treatment team meeting for Patient D (DSH-Coalinga); similarly, a treatment team meeting for Patient F (DSH-Coalinga) was conducted without the psychiatrist or social worker present.

When the treatment team for Patient J (SQ-PIP) changed, the new treatment team failed to build on prior treatment for identified problem areas.  Patient I's (SVSP-PIP) treatment team failed to revise treatment, treatment modalities, or IDTT goals when the patient showed no improvement.  The same was found for Patient K (SVSP-PIP), where despite the patient's lack of progress, the IDTT did not revise treatment goals and interventions.

### 2.    Deficiencies in Treatment Planning

The quality of treatment plans and treatment planning varied across programs. Significant problems were found in treatment plans for *Coleman* class members at DSH-Coalinga.  Treatment plans for Patients A, B, C, D and E (DSH-Coalinga) were either incomplete or otherwise deficient.  The treatment plan for Patient A (DSH-Coalinga) contained no documentation of treatment beyond medication management.  Patient B (DSH-Coalinga)'s initial treatment plan was not fully complete in all areas and subsequent treatment plans contained the exact same omissions.

In the cases of Patients C and D (DSH-Coalinga), treatment plans failed to address issues related to the patients' Gender Dysphoria diagnosis.  Especially concerning was the treatment plan for Patient D (DSH-Coalinga), who was provided a diagnosis of Schizophrenia instead of the diagnoses of Post-Traumatic Stress Disorder (PTSD) and Gender Dysphoria, both of which were listed in the referral and the admitting psychiatric diagnoses—no record documenting the

reason for the change was found during the record review.  The treatment plan also failed to address several issues specific to Patient D (DSH-Coalinga)'s referral.  Several sections of the treatment plan for Patient E (DSH-Coalinga) were marked "TBD" but were otherwise left blank, including the element entitled psychiatric and psychological—the same of which was found missing from treatment plans for Patients F and G (DSH-Coalinga).  The most recent treatment plan for Patient H (DSH-Coalinga) was vague regarding the patient's presenting problems and contained inconsistent objectives.

Treatment plan documentation for Patients A, B, and C (SVSP-PIP) was so deficient it was difficult to assess the adequacy of treatment planning, with problems including the failure to adequately document the patient's current functioning and interventions and poor documentation of individualized treatment planning.  For Patients I and K (SVSP-PIP), treatment remained unchanged despite a lack of patient improvement.

At CMF-PIP, the master treatment plan for Patient M (CMF-PIP) was not properly completed and specific treatment interventions were not documented.  Patient K (CMF-PIP)'s master treatment plan was also inadequate; it lacked a current assessment of the patient's functional level, did not contain some basic elements of treatment, and did not target his most problematic behaviors.  Copying and pasting from prior treatment plans was also a problem found in both cases.

A number of problems were found with the treatment planning for Patient J (SQ-PIP).  The treatment plan failed to adequately address the patient's ongoing lack of engagement with treatment, treatment goals were not stated in objective behavioral terms, and the treatment plan lacked appropriate treatment interventions for the patient's primary functional problems, among other notable deficiencies.

### 3. Deficiencies in Behavioral Plans

As outlined in Part II (B) above, the use of individual behavior plans and interventions varied across the inpatient programs. For example, the use of individual behavior plans had increased at CMF-PIP since the preceding site visit, while at the SVSP-PIP, individual behavior plans continued to be underutilized as a treatment modality for *Coleman* class member patients. Where individual behavior plans were in use, they were sometimes inadequate, e.g., including behavior guidelines that were staff-focused rather than patient-focused and missing key elements such as a completed functional analysis and clear rationale for chosen interventions, among other deficiencies.

There were no individual behavior plans in use during the review period and/or at the time of the site visit at DSH-Atascadero, DSH-Coalinga, or the CMF L1-PIP.

At the CMF-PIP, although there had been improvement in the utilization of individual behavior plans, a records review revealed multiple deficiencies in their development, indicating that improvement was still required in this area. In the case of Patient H (CMF-PIP), the plan addressed interventions more appropriately addressed through the treatment plan (e.g., medication adherence), used punishment rather than positive reinforcement to respond to targeted behavior, contained goals that were too large in number as well as unrealistic for the patient's functional level, and the target behavior was unclear. The individual behavior plan for Patient J (CMF-PIP) was also inadequate. There was no functional analysis completed; the plan did not address precursors to the problematic behavior, instead focusing on interventions after the behavior had occurred; and reinforcement for positive behavior was too infrequent to be effective. The individual behavior plan for Patient L (CMF-PIP) suffered from some of the same

aforementioned deficiencies, a functional analysis was not completed and goals were unrealistic for the patient's functional level.

There were also cases in which—although clinically indicated—behavioral plans were not used. A review of the record for Patient A (DSH-Coalinga) revealed that an individual behavior plan could have been effective in treating specific functional deficits. The record contained no evidence that an individual behavior plan had been considered for Patient A (SVSP-PIP) who was housed out of his LRH due to documented behavior problems. The same was found in the case of Patient B (SVSP-PIP), who was also housed out of his LRH. Similarly, although Patient L (SVSP-PIP) and Patient A (CHCF-PIP) had issues preventing transfer to LRH, there was no documentation in the record that an individual behavior plan had been considered. There were clinical indications that it would have been appropriate to consider the development of an individual behavior plan in the cases of Patients H and I (SVSP-PIP), the former of whom experienced a worsening of psychotic symptoms, deterioration in self-care, and poor treatment participation, while the latter showed no improvement in behavior, treatment participation, or mood.

In the case of Patient M (CMF-PIP), behavior resulting in increased custody status and more restrictive housing, which reportedly exacerbated the patient's suicidal thoughts and self-harming behaviors, was a clinical indication of the need for an individual behavior plan, yet none was developed. An individual behavior plan should have been developed for Patient B (SQ-PIP) after the individual treatment plan that had been implemented proved ineffective in increasing his participation in structured therapeutic activities.

D.     **PATIENT ACCESS TO TREATMENT**

The eight inpatient programs had various distinct policies and procedures concerning patient access to treatment.  The programs were composed of structured guidelines outlining expectations for patient behavior and treatment.  As patients fulfilled requirements, they progressed through the respective treatment programs and typically received additional treatment, programming, and greater access to privileges and property.

Although the inpatient programs had similar objectives, they historically lacked uniformity.  In its order adopting the Special Master's 2016 Inpatient Care Report, the court ordered DSH defendants to "develop within 90 days a plan for the creation of a consistent and uniform patient level system to be utilized across all of its inpatient programs that treat *Coleman* class members."  ECF No. 5573 at 3.  Prior to the issuance of the court's order, DSH defendants, with input from the Special Master's team of experts and monitors, developed a uniform patient level system for use at DSH-Atascadero and DSH-Coalinga, a completed draft of which was provided to the Special Master on January 30, 2017.

CDCR used the System to Encourage Progress (STEP) for treatment progression to promote patient advancement through their treatment programs for its PIPs at SVSP, CMF and CHCF.

At CIW-PIP and SQ-PIP, CDCR continued to use the Steps Toward Accomplishment Growth and Education (STAGE) system, which remained unchanged since the preceding reporting period.

1.     **DSH-Atascadero and DSH-Coalinga**

DSH-Atascadero utilized the Hospital Access System (HAS) to manage patient supervision, privileges and advancement through five distinct access levels.  The treatment

team decided a patient's HAS level, which specified where the patient could go within the hospital and any required supervision. No changes had been made to DSH-Atascadero's HAS since the preceding site visit.

DSH-Atascadero patients were admitted at Level 1, where they remained for at least seven days. At this Level, they were deemed to be high risk and, due to mental health factors, possibly unable to care for themselves. At Level 1, a staff escort was needed for patients to leave their assigned unit.

Although Level 2 patients could adhere to their own unit's rules, they required supervision while on other units. As such, Level 2 patients were able to go to group on their own but needed an escort to go to the gym, main courtyard, and other places.

At Level 3, patients typically modeled suitable behavior. They were permitted to go to three different locations within the hospital without having to check back in with their unit and were eligible for employment after 30 days. Level 3 patients could progress to Level 4 after 90 days. Patients at Level 4 were eligible for special destinations and privileges. At Level 5, patients received priority consideration for employment and were recommended for community placement.

DSH-Coalinga's HAS was delineated in Administrative Directive No. 558 (A.D. No. 558), which had been updated in November 2017. Following admission to the hospital, the treatment plan team assessed the patient toward granting him access to the hospital and to treatment services. The treatment plan team ascertained each patient's cognitive ability and level of functioning, evaluated his ability to control his behavior, adhere to rules and follow hospital policy and staff direction, preserve therapeutic relationships, and navigate safely to a destination. Patients who the treatment plan team felt did not pose a threat to themselves or to others and who

could safely navigate the hospital had to be provided with hospital access within seven days of this finding.

Once granted hospital access, DSH-Coalinga patients had to follow staff direction and unit and off-unit rules, and refrain from physical or verbal assaults and from acts of overfamiliarity. Patients who were given hospital access were also required to maintain personal hygiene, respect the rights of others, not possess contraband, or leave the unit without authorization, and refrain from interfering with staff in the performance of their duties, among other things. Any patient who violated any provision of A.D. No. 558 could have their hospital access restricted.

### 2. SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

Prior to the July 2017 implementation of Lift and Shift, DSH instituted the STEP system in the DSH-run programs housed at CDCR institutions. The STEP system had remained in place after Lift and Shift, and was in use during the site visits to SVSP-PIP, CMF-PIP, CMF L1-PIP and CHCF-PIP.

The STEP program was a system of treatment progression that sought to motivate patients to advance through their treatment program. It consisted of a structured system of guidelines that outlined patients' behavioral expectations and treatment and included distinct requirements that patients had to satisfy to advance through various STEPs. As patients demonstrated treatment program progress, they advanced clinically through the various STEP levels.

The STEP process began with Assessment and Orientation, where the patient was assessed and evaluated; the IDTT performed a clinical evaluation and there was a custody evaluation by the Institutional Classification Committee (ICC)/Unit Classification Committee

(UCC). There was also treatment planning during Assessment and Orientation, during which the patient was oriented to treatment expectations and program rules. The IDTT determined whether patients participated in solo and/or small group treatment activities. Patients were provided incentives and were allowed property as clinically indicated.

Following Assessment and Orientation, patients either transitioned to STEP 1 or STEP 2. Some patients with clinical and custodial factors indicating readiness to program with others could move directly from Assessment and Orientation to STEP 2. Otherwise, they were placed at STEP 1 when clinical and custodial factors reflected that the patient required a solo treatment program; in these cases, STEP 2 advancement required the patient to demonstrate successful participation in solo treatment at STEP 1, and resolution of any clinical and/or custodial factors that had previously precluded programming with others.

The objective of STEP 1 was to socialize patients and fully implement their treatment plans. At STEP 1, the patient's treatment plan determined whether his treatment activities included solo and/or group programming; based on treatment outcomes, the IDTT further determined the number and type of patient group activities. STEP 1 patients were typically expected to understand and focus on targeted problems, integrate into and safely participate in treatment activities, and properly communicate with staff and other patients. STEP 1 patients were also provided specific incentives, including in-cell recreation activities. Property was allowed as clinically indicated.

Progression from STEP 1 to STEP 2 required patient participation in 50 percent of treatment activities and adherence to STEP 1 requirements. Treatment expectations generally included patient participation in treatment activities, adhering to medications, progress toward fulfilling treatment goals, maintaining personal hygiene, appropriately interacting with others,

and following community rules, among other requirements.  There were also specific incentives for STEP 2 patients and property was allowed as clinically indicated.

Patients who attended 80 percent of treatment activities could advance to STEP 3.  However, in considering this advancement, the IDTT reviewed whether the patient had satisfied STEP 2 requirements and the prerequisites that the IDTT had established for such progression.

STEP 3 patients were required to comprehend their mental illness and actively engage in treatment.  In addition to satisfying the requirements that permitted advancement to STEP 3, the patient had to show treatment motivation, display positive leadership, meet any specific criteria that the IDTT established and be able to recover from behavioral and judgment lapses without significant disruption.  To remain at STEP 3, the patient had to attend 90 percent or more of treatment activities and be free of disciplinary issues.  STEP 3 patients were eligible for certain incentives and property was allowed.

At a minimum, the IDTT assessed the patient's STEP level at every meeting and addressed requirements to progress, which could include additional or modified requirements.  It also decided when there was a need to adjust a patient's STEP in those situations where the patient did not maintain the necessary criteria for his STEP level.  When this occurred, the IDTT met with the patient to address the reasons for any STEP adjustment and what the patient would have to do to return to the prior STEP.

The STEP programs included DPS, which was a temporary status where a patient was placed after there was a grave behavioral violation that necessitated increased security measures that would permit patient access to care and treatment in a secure environment.  A patient could be placed at DPS for clinical or safety reasons at any point.  There was also Maximum Custody status, which required that the patient remain under custody's direct supervision and control, and

which CMF-PIP has indicated could be accomplished by the use of a therapeutic treatment module or mechanical restraints.

3.    **CIW-PIP and SQ-PIP**

The CIW-PIP and SQ-PIP continued to utilize the STAGE level system during the review period.  The STAGE program was composed of several levels through which a patient was anticipated to progress during treatment.  Patient behavior could also result in the treatment team's reduction of the patient's STAGE level.

All new CIW-PIP admissions were placed on DPS during orientation and until the IDTT completed evaluations and approved the patient to program.  Patients admitted from a Security Housing Unit (SHU)/administrative segregation, Psychiatric Services Unit (PSU), or an institution other than CIW had to obtain ICC clearance before DPS could be discontinued.  DPS patients programmed individually in restraints, ate their meals in their cells and had limited possessions.

The CIW-PIP STAGE I patients attended treatment groups that the IDTT selected, and could eat in the dining room, attend group yard, and have visitors and telephone privileges. STAGE II patients received property and had access to the canteen, quarterly packages, and a PIP-issued radio.  STAGE III patients were allowed a PIP-issued television.

The SQ-PIP also used a STAGE system with four levels:  DPS, where the patient was assessed, and STAGEs 1, 2, and 3.  This STAGE system was effectively unchanged since the preceding monitoring round.

The SQ-PIP treatment program established structure and guidelines for STAGE levels 1 through 3 by incorporating a specific percentage of treatment participation into the three STAGEs; a patient had to maintain the required percentages for a minimum of 30 days.

However, treatment teams were also permitted to individualize expectations to allow for performance impairment limitations.

DPS patients could be placed in treatment activities as soon as 72 hours following admission and were placed at STAGE 1 following the ten-day treatment team meeting. The treatment team decided the various incentives that were offered to patients; however, policy did not delineate these incentives.

## E.     REFERRALS AND TRANSFERS

### 1.        DSH-Atascadero and DSH-Coalinga

During the review period, 156 *Coleman* class members were referred for transfer to DSH-Atascadero. Acceptance or rejection decisions were made within three days, per policy, in 81 percent of the cases. Two patients were rejected for non-clinical reasons. Bed assignments for accepted patients met Program Guide requirements in 88 percent of cases. Calculated from IDTT referral date to date of admission to DSH-Atascadero, 89 percent of *Coleman* class members transferred within 30 days, with an average length of time of 12 days. One admitted patient had complex medical needs, no patients were admitted from the SHU, and there were no delays in the referral or admission process due to either an involuntary medication issue or a *Vitek* hearing.

Thirty-five patients were referred and admitted to DSH-Coalinga during the review period. The average time from referral to admission was 22 days and ranged from nine to 63 days.

### 2.        SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

During the review period, 242 *Coleman* class members were referred to SVSP-PIP. Of those, 221 or 91 percent were accepted and three were rejected. Of the remaining 18, 12

referrals were rescinded, two patients were referred to acute level of care and four were re-endorsed for treatment at other PIPs.

CMF-PIP was unable to provide referral and transfer information, as the review period included data prior to Lift and Shift and that data was maintained by DSH's admission discharge unit.

Of the 104 patients referred to the CMF L1-PIP, 92, or 88 percent were accepted. Twelve referred patients were rejected—nine in relation to housing classification and three in relation to accessibility issues due to their disabilities. Three referrals were rescinded. Accepted patients transferred within 30 days at a rate of 99 percent.

At CHCF-PIP, there were 263 admissions to acute care and 47 admissions to intermediate care during the review period. Data was not presented in a format to facilitate accurate calculation of transfer timeframes.

3.      **CIW-PIP and SQ-PIP**

There were 34 referrals to the CIW-PIP, including 18 referrals to the acute care program and ten to the intermediate care program. In addition, four patients initially referred to the acute care program were subsequently admitted to the intermediate care program. There was one rescission and one rejection. CIW-PIP did not provide data regarding timeliness of transfers. Eleven patients were transferred to PSH during the review period.

All patients referred to the SQ-PIP were admitted; most admissions were from the intermediate care program. The acute care program census ranged from zero to three patients during the review period.

**F.       ADMISSIONS AND DISCHARGES**

   **1.          DSH-Atascadero and DSH-Coalinga**

In a change from the preceding review period, DSH-Atascadero leadership reported no longer admitting patients referred to an acute level of care.  The facility followed the referral and admission process in the MOU between CDCR and DSH regarding patients requiring intermediate care.  While DSH clinically accepted all patients, some continued to be rejected for security reasons.  During the site visit, 16 accepted patients were waitlisted; nine of them were timely admitted during the same week.

DSH-Atascadero discharged 137 patients during the review period.  The average length of stay was 344 days, with a range of seven to 1,064 days, and there was 100-percent compliance with clinician-to-clinician contact following patient discharge to CDCR.  At the time of the site-visit, there were 16 patients who were clinically discharged but physically remained at DSH-Atascadero; 11 had scheduled discharge dates.

For patients returning to CDCR, discharge planning began during IDTT, and during individual sessions with a social worker.  Discharge planning communication between DSH and CDCR was improving through the use of SharePoint and increased clinician-to-clinician contact.  Parole planning was initiated upon admission for patients within one year of their scheduled release, as well as for patients pending parole within 60 to 120 days.

At DSH-Coalinga, there were 35 patients referred during the review period; all were admitted.  Additional admissions data was provided for 27 of the patients.  According to the data provided, the time from receipt of the completed referral to admission ranged from four to 28 days, with an average of 13 days.  There was one outlier at 55 days.  The average time from acceptance to admission was 9.6 days, with a range of two to 22 days.

During the review period, DSH-Coalinga discharged 38 patients; 28 to EOP programs, four to acute care programs, two to other intermediate care programs, one to a Correctional Treatment Center (CTC), one to the Mentally Disordered Offender (MDO) program at DSH-Atascadero, and two paroled. The average length of stay from admission to clinical discharge was 196 days, from admission to physical discharge it was 201 days. The lengths of stay ranged from 14 to 754 days for clinical discharge and 23 to 756 days for physical discharge.

For patients within 90 days of parole, nine of ten received pre-release planning; seven also received services from the Transitional Case Management Program (TCMP).

2.      **SVSP-PIP, CMF-PIP, CMF L1-PIP, AND CHCF-PIP**

There were 221 admissions to the SVSP-PIP during the review period. There were 33 patients admitted through the *Vitek* process and nine patients had two or more admissions. ICC meetings within ten days of admission as required by policy occurred 98 percent of the time. There were 128 patients discharged from the SVSP-PIP during the review period; the average length of stay was 165.74 days.

CMF-PIP did not provide admissions data for the review period related to difficulty obtaining information post Lift and Shift. For patients housed in the CMF-PIP at the time of the site visit, the average length of stay was approximately 55 days for both Maximum Custody and non-Maximum Custody patients. The two months preceding the site visit saw a significant drop in the occupancy rate in the acute psychiatric program, resulting in approximately 30 unoccupied beds at the time of the site visit.

During the review period, there were 336 patients discharged from the CMF-PIP acute care program; the average length of stay was 77 days. Of those, 28 percent were discharged to an intermediate care program. Excluding five outliers ranging from 21 to 49 days, the average

number of administrative days after clinical discharge was four days; CMF-PIP did not provide reasons for delays.  There were 192 patients discharged from the intermediate care program; the average length of stay was 142 days.  Administrative days after clinical discharge averaged 3.4 days.

At the CMF L1-PIP, there were 92 patients admitted during the review period.  There were 29 patients discharged—15 to single cells and two to locked dorms at CMF-PIP, and two to unlocked dorms at DSH-Atascadero.  The remaining ten were discharged for various reasons, such as parole or transfer to a CDCR EOP program, among others.

During the review period, CHCF-PIP admitted 263 patients to acute care and 47 patients to intermediate care.  Of the 356 patients that were discharged, data was provided for 355.  The average length of stay after clinical discharge was 5.32 days; for 50 or 14 percent of patients it exceeded ten days.  The delays were cause for concern as there could be patients awaiting inpatient beds.

3.        **CIW-PIP and SQ-PIP**

CIW-PIP admitted 32 patients; 18 patients to the acute care program and 14 patients to the intermediate care program.  There were 34 patients discharged during the review period.  The average length of stay was 112.2 days.  Data was not provided relative to any administrative delays impacting transfers after clinical discharge.  In October 2017—prior to the site visit—two patients discharged to Patton State Hospital, continuing access to the facility for some CIW-PIP patients.

At the SQ-PIP, all referred patients were accepted and timely admitted at the time of the site visit.  Transfers from the SQ-PIP intermediate care program comprised most of the

admissions to the acute care program, the census of which generally ranged from zero to three patients.

There were nine patients discharged from the SQ-PIP during the review period. For acute care patients, the average length of stay was 17.41 days during the review period. At the time of the site visit, for intermediate care patients the average length of stay was 750.88 days.

## G. PATIENT DISCIPLINARY PROCESS AND THE USE OF FORCE

### Patient Disciplinary Process

As the Special Master noted in his preceding report on inpatient care, there were several modifications to the Rules Violation Report (RVR) policies and procedures following the filing of his January 30, 2015 RVR report. ECF No. 5448 at 107. During the preceding review period, the Special Master had been unable to examine the implementation of the new policies and procedures due to an extended timeframe for staff training and implementation. Subsequently as a result, the Special Master reported on implementation of the new RVR policies and procedures in his Twenty-Seventh Round Monitoring Report. ECF No. 5779 at 106-115.

#### 1. DSH-Atascadero and DSH-Coalinga

There were 18 RVRs issued at DSH-Atascadero during the review period. One of 18 mental health assessments recommended mitigation. Documentation related to RVR dispositions was unavailable for review.

During the review period, DSH-Coalinga issued 13 RVRs. The hospital had only recently begun retaining copies of RVR packets and seven were available for review. Reviewed mental health assessments did not reflect consideration of mental health factors where patients were found guilty. Hearing officers' reports were unavailable to determine whether RVR dispositions were compatible with mental health assessments.

DSH-Coalinga's RVR log was inaccurate.  The hospital also did not track issues such as consideration of the patient's mental illness toward penalty reduction where the patient was found guilty.  None of the DSH-Coalinga clinicians who completed mental health assessments had received training on completion of mental health assessments.

2.      **SVSP-PIP, CMF-PIP, CMF L1-PIP and CHCF-PIP**

SVSP-PIP provided data reflecting that 119 RVRs were issued during the review period. A total of 15 of 119 mental health assessment requests were timely sent by custody staff to mental health.  Clinicians timely completed and returned 96 percent of the assessments.  A reviewed sample of 18 RVR packets revealed one that recommended documenting the behavior in an alternate manner.  Two of 18 mental health assessments determined that patients' mental health contributed to the behaviors resulting in the RVRs.  One of 18 noted factors that the hearing officer should consider during penalty assessment.  SVSP-PIP custody officers regularly documented consideration of the mental health assessment.

SVSP-PIP reported that 90 percent or more of required custody staff received the annual inmate disciplinary process mental health assessment training; data for clinical staff was not provided.  All eligible SVSP-PIP clinicians were trained on the new RVR process that utilized EHRS to complete mental health assessments; 90 percent or more of correctional administrators, captains and lieutenants received the training, but only 81 percent of sergeants received it.

CMF-PIP issued 95 RVRs during the review period.  A review of a ten-percent sample found 90-percent compliance with timely requests for and subsequent completion of mental health assessments.   With one exception, CMF-PIP senior hearing officers indicated consideration of mental health input in all reviewed cases.  No reviewed cases recommended

documenting the case in an alternate manner.  Where mitigation occurred, senior hearing officers typically limited it to not reducing privileges, as notable credit forfeitures were imposed.

Excluding two new employees, CMF-PIP psychologists completed the four-hour mandatory RVR training, as did 93 percent of required custody staff.  Eighty-three percent of non-newly-employed psychologists had been trained on completing the mental health assessment through EHRS, as were 94 percent of required custody staff.

CMF L1-PIP issued 18 RVRs during the review period.  A sample review reflected custody officers' timely request of mental health assessments, but none were timely completed and returned by mental health.  Reviewed RVRs reflected hearing officers' consideration of mental health input.  In cases where the clinician requested mitigation, although a loss of privileges was imposed, significant loss of credit earnings was also administered as a penalty in guilty dispositions.

CHCF-PIP reported adjudicating 92 RVRs from July 1, 2017 through November 6, 2017.  Custody timely referred mental health assessments to clinicians, who timely completed and returned them.  One reviewed RVR indicated an alternate manner for resolution and proper review by the captain.  Senior hearing officers noted consideration of mental health assessments and there was penalty mitigation.

CHCF-PIP reported greater than 90-percent compliance for mental health staff training on the new mental health assessment process using EHRS, and 85.7 percent compliance for custody staff.

3.        **CIW-PIP and SQ-PIP**

Of the six RVRs issued at CIW-PIP during the review period, two were timely sent for completion of a mental health assessment.  Clinicians timely returned the assessment in four of

six cases.  None of the CIW-PIP mental health assessments recommended documenting the behavior in an alternate manner.  Five assessments indicated that patients' mental health contributed to the conduct resulting in the RVR and noted specific examples.  In all cases, clinicians provided specific recommendations as to penalty mitigation and custody documented consideration of the mental health assessment.  Mental health considerations led to the dismissal of one case and the reduction of charges in two others.

All seven RVRs issued to SQ-PIP patients were referred for an assessment; mental health was found to be a factor in the conduct underlying all of them.  Six of seven assessments recommended mitigation, but clinicians did not recommend documenting the behavior in an alternate manner.  Clinicians generally identified factors that hearing officers should consider during penalty assessment and hearing officers documented the consideration of clinical recommendations.

### Use of Force

**1.       DSH-Atascadero and DSH-Coalinga**

There were no use of force incidents or cell extractions at DSH-Atascadero or DSH-Coalinga during the review period.

**2.       SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

SVSP-PIP reported one controlled and nine immediate use of force incidents during the review period.  Review of the controlled use of force incident packet revealed that staff's actions complied with the use of force policy.  SVSP-PIP reported compliance for completion of annual use of force training by custody staff.  For medical technical assistants (MTAs), 83 percent completed the training; data was not provided for clinicians.

CMF-PIP reported ten immediate and eight controlled use of force incidents during the review period. For CMF-PIP custody staff, 97 percent were compliant with use of force training, while 40 percent of clinical staff were compliant. Data on use of force training for MTAs was not provided.

There were five immediate use of force incidents in the CMF L1-PIP. Reviewed incident reports found that all were compliant with the use of force policy.

There were no controlled use of force incidents at the CHCF-PIP from July 1, 2017 through September 2017; data for October 2017 was not reported. There were 20 immediate use of force incidents. Managerial reviews were comprehensive.

### 3. CIW-PIP and SQ-PIP

There were ten use of force incidents in the CIW-PIP, one controlled and nine immediate. A review of the controlled use of force incident packet and video revealed that required procedures were followed.

There were no controlled use of force incidents in the SQ-PIP and three immediate use of force incidents. All resulted in RVRs against patients.

## H. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

### 1. DSH-Atascadero and DSH-Coalinga

Generally, DSH-Atascadero demonstrated overall compliance with policies and procedures regarding restraints and seclusion. Occasional noncompliance in one month would be followed by significant improvements in subsequent months. At DSH-Atascadero, 11 patients were involved in 12 incidents of seclusion during the review period, with a range of 2.2 to 73.3 hours and an average duration of 22.4 hours. Restraints ranged from 1.3 to 38.8 hours, averaged 8.5 hours, and involved 28 patients over 56 episodes.

At DSH-Coalinga, one of nine seclusion episodes lasted more than three hours, and the single outlier lasted 24.42 hours. Of the nine restraints that occurred, six of them involved two patients. The length of time for restraints ranged in duration from .37 hours to 5.88 hours, with nine of the eleven episodes lasting less than two hours.

## 2. SVSP-PIP, CMF, CMF L1-PIP, and CHCF-PIP

At SVSP-PIP, there were 77 seclusion episodes involving 51 patients, ranging from 52 minutes to just over 228 hours during the review period. Documentation was challenging to find as a result of changes that occurred during Lift and Shift, however, nursing staff reported compliance with seclusion policies and no adverse patient outcomes. Only one incident of restraint which lasted seven hours and five minutes was reported.

CMF-PIP did not use observation or seclusion rooms. Four acute care patients required restraints, with three of the patients being restrained for less than 5.35 hours, with a range of 3.45 hours to 15.20 hours. CMF-PIP reported no incidents of restraint in the intermediate care program.

There were 30 seclusion placements at CMF L1-PIP during the review period, of which 22 involved one-to-one suicide monitoring. Many of the seclusion episodes reported involved the same patient. The longest duration for seclusion was eight days. CMF L1-PIP had two observation rooms with restraint beds; there had been no documented medical restraints since the unit's activation.

At the CHCF-PIP, there were 48 incidents of one-to-one observation that occurred during the review period. There were three incidents of restraint reported; the longest lasted approximately four hours and eleven minutes. Nursing documented monitoring all incidents.

3. **CIW-PIP and SQ-PIP**

CIW-PIP reported no patients were placed in seclusion during the review period, and only one patient was placed in restraint for a total of nine hours and 15 minutes. The restraint was appropriately documented.

At SQ-PIP, there were no incidents of seclusion or restraint reported during the review period.

## I. SUICIDE PREVENTION, EMERGENCY RESPONSE, AND THE DEATH REVIEW PROCESS

1. **DSH-Atascadero and DSH-Coalinga**

There were no suicides at DSH-Atascadero during the review period.

The suicide prevention process remained within the standard of care. A new focus of suicide prevention had been implemented emphasizing trauma informed care, and there were plans to expand implementation to other institutions. At DSH-Atascadero, a trauma consultation group was formed, which included psychologists, social workers, rehabilitation therapists and nursing, as were several groups for *Coleman* patients that focused on trauma-related issues.

A number of suicide prevention activities were undertaken at DSH-Atascadero by the Suicide Prevention Committee (SPC). Such efforts included a pilot in Program V to replace the current bedding with tear resistant bedding, modifications to certain physical structures, including stairwells, handicap grab rails, and toilet paper holders and rolls.

DSH-Atascadero emergency response remained unchanged since the preceding site visit. Basic life support training was provided to nursing and medical staff and first aid training was provided to all staff who had patient contact. A review of the emergency response drill schedule for the review period showed that corrective actions had been implemented for identified areas of deficiency.

There were no suicides at DSH-Coalinga during the review period. There was one suicide attempt, which was addressed properly by unit staff and no corrective action was deemed necessary.

DSH-Coalinga's Suicide Risk and Prevention Committee met twice during the reporting period. Reviewed minutes indicated that items frequently reviewed by the committee included risk and other factors associated with suicidal gestures and behaviors.

There were no deaths at DSH-Coalinga during the reporting period that required implementation of the death review process.

**2**.        **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

During the review period, there were no completed suicides at SVSP-PIP.

There were four suicide attempts and eleven aggressive acts to self.[18]  The SVSP-PIP collaborated with SVSP on suicide prevention. There was no SPRFIT coordinator position at SVSP-PIP. Staff indicated the position was needed to provide the necessary documentation and suicide prevention training required for the unit.

There were four emergency responses; all were handled timely.

No deaths occurred at SVSP-PIP during the review period.

There were no suicides in the CMF-PIP.

CMF-PIP staff reported Suicide Risk Assessment and Self-Harm Evaluations (SRASHEs) were completed within ten days of admission and upon discharge, but they were unable to generate compliance reports for review.

There were no events requiring emergency response which were responsive to acts of serious harm.

---

[18] "Aggressive acts to self" is the terminology used by SVSP-PIP.

A review of provided documents showed CMF L1-PIP was not in compliance with the requirement to complete SRASHEs within ten days of admission.

There were no suicides in the CMF L1-PIP during the review period.

No suicides occurred at CHCF-PIP. There were 16 incidents of suicidal behavior during the review period. CHCF-PIP did not track SRASHEs or conduct any audits regarding suicide prevention efforts.

**3**.        **CIW-PIP and SQ-PIP**

CIW-PIP demonstrated compliance with Program Guide requirements related to suicide prevention efforts. SRASHEs were timely completed for all patients. CIW-PIP established an internal process to review self-harming behaviors and/or suicide attempts. CIW's Suicide Prevention and Response Focused Improvement Team (SPRFIT) also reviewed serious suicide attempts. Of 30 incidents included in the self-harm log, three reflected suicide attempts.

All emergency responses at the CIW-PIP were reviewed by CIW's patient safety committee. No documentation regarding the occurrence of emergency drills was provided for review.

There were no deaths reported in the CIW-PIP during the review period.

No suicides occurred in the SQ-PIP during the review period. Nine incidents of self-harm were reported. A facility audit of SQ-PIP SRASHEs revealed compliance for all audit criteria. Suicide risk evaluations at the time of admission to the SQ-PIP were at 100-percent compliance. SPRFIT suicide prevention efforts encompassed all SQ institutional programs, including the SQ-PIP.

A review of minutes of the Emergency Medical Response Review Committee (EMRRC) indicated emergency drills occurred in compliance with policy.

There were no patient deaths in the SQ-PIP during the review period.

## J.     QUALITY MANAGEMENT AND UTILIZATION REVIEW

### 1.            DSH-Atascadero and DSH-Coalinga

In his 2016 Inpatient Care Report, the Special Master noted that "[t]he existing quality management mechanisms in place in the DSH programs were, on balance, found to be needed and useful." ECF No. 5448 at 82. However, those quality management processes—which still applied to DSH-Atascadero and DSH-Coalinga after Lift and Shift—did not equip them with the ability to diagnose and resolve on a lasting basis the problems with the quality of care delivered to *Coleman* class members. "In short, DSH's quality management structure was not found to be a continuous quality *improvement* structure." *Id*.

In its March 7, 2017 order adopting the 2016 Inpatient Care Report, the court directed DSH defendants, under the guidance and supervision of the Special Master, and with input from plaintiffs as appropriate, to "develop a plan within 90 days for the creation of a continuous quality improvement (CQI) process to be utilized in the DSH programs that treat *Coleman* class members." ECF No. 5573 at 3. In response to the court's order, DSH defendants—with the aforementioned input from the Special Master and plaintiffs—developed a CQI reporting format that included *Coleman* key indicators proposed by the Special Master's team of experts and monitors. Finalization and implementation of the proposed DSH CQI reporting format—submitted to the Special Master on September 1, 2017—remains pending.

DSH-Atascadero's quality management process remained largely unchanged during the review period, with the notable addition of key indicators regarding *Coleman* class members. The quality council committee met weekly and considered reports regarding risk management/utilization review, violence prevention, quality improvement, medication

management, emergency care, standards compliance, and program review.  Although over 63 audits were performed on at least an annual basis during 2017, the audits only reported results and did not include a description of the problem reviewed, methodology used, assessment of the results, or plans to address any identified deficiencies.  Effective quality improvement audit reports should include all these elements.

DSH-Atascadero continued to track various treatment-related activities through the Wellness and Recovery Model Support System (WaRMSS), which included key indicator data that triggered reports identifying patients who may require additional attention and/or intervention.  They also continued to use the Incident Management System to track all special incidents that adversely affected the safety, care, treatment, and rehabilitation of patients.

At DSH-Atascadero, the utilization management committee met monthly during the review period.  The committee reviewed all patients who had been hospitalized for 180 and 240 days and thereafter, every 30 days.  The risk management/utilization review committee also met monthly.  Medical risk management, treatment support, suicide prevention, facility review, violence prevention and intense case/preventative case analysis all either reported to or provided reports to this committee.  Meeting minutes revealed adequate summaries of reviewed items.

The structure of the quality improvement process at DSH-Coalinga was robust, although the actual quality improvement studies specific to the *Coleman* class members were problematic. The problems related directly to the format of the studies in that they were not stand-alone documents, and did not explicitly state the purpose, methodology, assessment of the results, or offer any remedial plans if any deficiencies were identified.

At DSH-Coalinga, the utilization review committee met regularly to oversee the review of the medical necessity for admissions, extended stays and services rendered.  The committee

consistently reviewed issues specific to *Coleman* class members, and the enhanced trigger review committee further examined issues specific to *Coleman* class members, although these results were most often "no recommendations."

**2**.    **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

As previously reported, on July 1, 2017, operation of the SVSP-PIP transitioned from DSH to CDCR during the process known as Lift and Shift.  Due to Lift and Shift and the implementation of EHRS—which was activated on September 12, 2017—the quality council committee experienced interruptions in its various activities during the review period; however, it continued to monitor various incident reports.  Following Lift and Shift, SVSP-PIP retained the fundamentals of the quality management/utilization review processes instituted by DSH; however, post Lift and Shift, the quality council committee functioned as a mental health subcommittee and reported directly to SVSP's quality management committee.  These transitions impacted the ability to collect and use data for audits and program evaluation during the review period.  Further, in preparation for EHRS activation, staff training during June and August 2017 impacted all programs at SVSP-PIP including quality management. SVSP-PIP did not provide utilization review data.

At the time of the site visit, SVSP-PIP's Standards and Compliance Office was drafting a local operating procedure for the quality and performance improvement program, expected to be completed by the end of January 2018 with training to follow.  SVSP-PIP staff reported that the role of the quality council committee and its policies and procedures would also be revised.  Going forward, the quality council committee would collect and review monthly reports from SVSP-PIP's clinical and administrative departments including performance goals and objectives.  Relevant reports would be elevated to the local quality management committee.

CMF-PIP's quality management steering committee met weekly during the review period. Due to training for Lift and Shift and EHRS, there were no quality improvement studies or audits regarding treatment programs in the acute or intermediate care programs during the review period.

At CMF-PIP, the utilization management committee reviewed all patients prior to acceptance by the admission and discharge unit. For the time period of July 1 to October 31, 2017, the CMF-PIP utilization management committee reviewed all 205 patients with lengths of stay of 30 days or longer in the acute care program, as well as all 42 patients with lengths of stay of 180 days or longer in the intermediate care program. There were significantly divergent results in discharge recommendations between the IDTTs and the utilization management committee. Staff acknowledged the need for additional training and dialog. During the review period, EHRS implementation and preparation also negatively impacted the completion of the continued stay forms, a vital component of the utilization management committee review.

The quality management for mental health services committee met monthly and covered both CMF L1-PIP and CMF-PIP. Additionally, the CMF L1-PIP management team met daily, and its executive management team met monthly. Both addressed issues of quality improvement as needed. There had been no audits conducted in the CMF L1-PIP since activation. Staff reported plans to develop performance measures; results would be displayed on the CDCR dashboard.

A weekly case consultation meeting that included all disciplines was the primary utilization review forum at CMF L1-PIP. During these weekly meetings patients' treatment and lengths of stay were reviewed.

At the time of the site visit, CHCF-PIP continued to utilize the DSH model for its quality management program.  The quality council committee, which met monthly, functioned as the overall quality management committee.  Various committees, including utilization management reported to the quality council committee.  A review of quality council committee meeting minutes reflected discussion of pertinent issues related to the delivery of care to *Coleman* class members.  CHCF-PIP utilized a Risk Management Program to track deficiencies and corrective action plans, track and monitor all serious incident reports, and report unusual occurrences to appropriate oversight agencies.

3.      **CIW-PIP and SQ-PIP**

The performance improvement system at CIW-PIP included the performance improvement subcommittee, a multi-disciplinary team of key clinical and custody administrators and supervisors, which met monthly.  Data reviewed by the performance improvement subcommittee included, but was not limited to, incident reports, root cause analysis reports, and various audits and quality improvement projects.

CIW-PIP's utilization review committee met monthly during the review period.  Agenda items included admission and discharge data, least restrictive housing, waitlist data, lengths of stay, transfers to PSH, and barriers to discharge.

At SQ-PIP, quality management was monitored through bi-weekly SQ-PIP subcommittee meetings.  During the review period, the SQ-PIP subcommittee chartered three quality improvement teams and two workgroups.  SQ-PIP staff discussed interventions, treatment plans and programmatic issues on a weekly basis.  Additionally, the local governing body, and the quality management, patient safety and bed utilization management committees—which also regularly discussed SQ-PIP issues—met monthly.  Verbal reports on the various audit focus

areas were provided to the appropriate committee during the monthly meetings. At the time of the site visit, key indicator reports had been conceptualized, but not yet successfully implemented.

## K.  PATIENT COMPLAINTS/PATIENT SATISFACTION

### 1.  DSH-Atascadero and DSH-Coalinga

During the review period, 57 *Coleman* patients housed at DSH-Atascadero filed a total of 136 complaints. Twice annually, DSH-Atascadero conducted patient surveys. The most recent Program V survey reflected patient satisfaction at 90 percent or higher for 11 of 13 inquiries, including patient safety and the respectful treatment of patients by staff. An observed community meeting similarly revealed positive patient comments about the hospital's treatment milieu and programming; patients reported very good clinical access, indicated that groups were therapeutic, and denied problems obtaining medications. Patients expressed concerns with inadequate access to the correctional counselor and an interest in greater educational opportunities and additional individual therapy.

Three DSH-Coalinga patients made a total of five complaints; the hospital reported that all were resolved. Sixteen of 38 patients discharged from DSH-Coalinga took part in a patient satisfaction survey. Their responses revealed that 94 percent strongly agreed that they felt safe and learned coping skills at the hospital, and that staff spent sufficient time with them. Moreover, 88 percent strongly agreed that they were appropriately referred to DSH-Coalinga and that staff urged their involvement in treatment planning. Patients also had positive comments about the hospital's program at an observed community meeting. Patients typically stated that core groups were beneficial and did not indicate complaints as to gym or yard access. With the exception of the correctional counselor, patients spoke positively about staff.

## 2.    SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

The SVSP-PIP reported 112 health care appeals.  Slightly more than one quarter were for mental health issues.  SVSP-PIP's various units typically had functioning patient councils.  A review of meeting minutes from patient councils indicated that they were typically a forum that provided patients with information.  Patient councils addressed patient questions and concerns about both treatment and non-treatment issues.  Staff responses included offering staff resolution, providing patients with necessary information or instructing them on how to obtain it, or indicating that the matter would be reviewed.

During the review period, CMF-PIP processed 137 CDCR 602 appeals.  Forty-two CMF-PIP acute care patients completed patient satisfaction surveys.  Eighty percent of respondents indicated feeling safe, but only 29 percent reported satisfaction with the current number of treatment groups.  Patients' responses also reflected dissatisfaction with offered leisure activities and learned skills.  In the CMF-PIP intermediate care program, 103 patients completed patient surveys; almost three quarters reported that treatment groups addressed their emotional or mental health issues.  However, interviewed patients typically reported receiving very little treatment and, in the intermediate care program, inadequate yard access.  Interviewed DBT patients were more positive about treatment, but also expressed a desire for more yard.

CMF L1-PIP staff and patients reported a major concern regarding the lack of an acceptable infrastructure to furnish televisions to STEP 3 patients.[19]  Patients also expressed concern as to their ability to receive personal property following admission, which staff confirmed.

---

[19] In their response to the draft report, defendants reported that the issue with infrastructure had since been resolved and patients who reach Step 3 now receive televisions.

CHCF-PIP patients filed 98 appeals during the review period, of which just under 50 percent were for complaints against staff. Quarterly satisfaction surveys by CHCF-PIP patients indicated issues with staff and insufficient out-of-cell time and treatment. Interviewed acute care CHCF-PIP patients also expressed concerns with insufficient out-of-cell time in addition to their property not following them after they left CDCR prisons. They further reported low staffing levels.

### 3. CIW-PIP and SQ-PIP

CIW-PIP patients did not file any CDCR Form 602 appeals during the review period.

SQ-PIP patients filed 13 grievances and completed annual surveys. Three of 20 surveyed areas attained a score of 85 percent or better, including patient awareness of their medications and being urged to participate in treatment planning. In addition, 60 percent or less of patients reported receiving needed treatment and that their concerns were heard by staff.

The officers of SQ-PIP's patient council met weekly to address matters for monthly community meetings, to which all patients were invited. There was also a quarterly multi-disciplinary meeting, which included the warden and mental health, nursing, medical, and custody staff, at which patient council officers presented issues.

## L. *COLEMAN* POSTINGS

### 1. DSH-Atascadero and DSH-Coalinga

With very limited exceptions, *Coleman* postings in English and Spanish were located in accessible areas in units housing *Coleman* class member patients at DSH-Atascadero and DSH-Coalinga.

2.          **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

Postings in English and Spanish were appropriately displayed in units housing *Coleman* patients at SVSP-PIP, CMF-PIP, CMF L1-PIP and CHCF-PIP.

3.          **CIW-PIP and SQ-PIP**

*Coleman* notices were properly posted in the CIW-PIP.  In the SQ-PIP, postings were available in English and Spanish, but could have been placed in a more prominent patient-accessible area.

**M.     LAUNDRY AND SUPPLY ISSUES**

1.          **DSH-Atascadero and DSH-Coalinga**

Laundry areas observed at DSH-Atascadero were clean and well-kept.  Some patients expressed concern that occasionally they received clothing in the wrong size or something was missing from their laundry.  A sufficient supply of personal grooming items were available on the units.

No concerns were noted with obtaining clean clothing or supplies at DSH-Coalinga.  In addition, khaki muumuus, and a variety of undergarments were available for patients with a diagnosis of gender dysphoria.

2.          **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

At SVSP-PIP, although a tour of housing units TC1 and TC2 revealed sufficient clothing, bed sheets, and other supplies such as shoes and soap, patients reported that laundry supplies were insufficient and laundered items did not smell clean.

Delayed deliveries from the offsite laundry facility caused intermittent problems in the CMF-PIP acute care program, while no laundry or supply issues were reported in the intermediate care program there.

Multiple problems were reported with the laundry at CMF L1-PIP which were remedied during the site visit. A laundry bag exchange system was implemented and included the one-to-one exchange of a patient's full complement of clothing on laundry day.

In interviews, patients on the intermediate care unit B6A at CHCF-PIP complained that laundry was returned to them stained and malodorous. There were no audits, reports or logs for laundry and supplies during the review period, nor were there any appeals filed regarding laundry.

### 3. <u>CIW-PIP and SQ-PIP</u>

At the CIW-PIP, a review of the minutes of the patient council meetings showed that issues reported regarding clothing and bed linens during the review period were documented as subsequently resolved.

A sufficient supply of laundry, including linens, smocks, jackets, blues and whites were available at the SQ-PIP. Ample supplies of personal grooming items were available on psych tech carts, with supplementary inventory in a stock room. Haircuts were provided at the SQ-PIP at least twice a month, often more frequently.

### N. <u>VISITATION/PRIVILEGES/TELEPHONE</u>

### 1. <u>DSH-Atascadero and DSH-Coalinga</u>

At DSH-Atascadero and DSH-Coalinga patients were entitled to daily visitation, unless there was a clinical, safety or security reason. From September through late December 2017 visitation at DSH-Atascadero was limited to non-contact visits due to incidents involving patient possession of contraband. There were no issues reported with visitation at DSH-Coalinga.

At DSH-Atascadero patients had daily access to telephones on all units, some patients complained about the cost to use them. Patients at DSH-Coalinga typically reported receiving their property upon arrival.

2.       **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

Patients at SVSP-PIP did not report any concerns about visitation or telephone use. Approved visits occurred on Thursday and Fridays. Patients were loaned crank radios when they were available.

Privileges and telephone use were not reported to be concerns during the review period or at the time of the site visit at the CMF-PIP.

CMF L1-PIP patients reported no issues with visitation and privileges. Access to telephones occurred without issue.

Appropriateness for visitation at CHCF-PIP was determined by IDTT. There were daily sign up logs for telephone use, which excluded Maximum Custody patients, who required IDTT approval, and agreement from the facility captain.

3.       **CIW-PIP and SQ-PIP**

CIW-PIP followed the same visitation policy as CIW, with the exception of patients on DPS. Telephone access was directly related to a patient's Stage level, though IDTT approval was required for patients on DPS status. The only complaints expressed by patients during interviews were regarding the food choices in the canteen and quarterly packages.

At the SQ-PIP, contact visits were available to all patients four days a week. Patients were allowed legal or attorney visits every day of the week. At the time of the site visit, there were no patients restricted from contact visits. Patients maintained the same privileges they had upon arrival in the SQ-PIP, unless subsequently restricted for clinical, safety or security reasons.

Patients enjoyed daily phone access and use of the day room, as well as personal electronic devices, such as TVs and headphones.

## O.  LAW LIBRARY ACCESS

### 1.  DSH-Atascadero and DSH-Coalinga

The law library at DSH-Atascadero was open Monday through Friday, and *Coleman* patients were welcome to use it.  Computers enabled with Lexis/Nexis gave patients access to various legal publications and other reference materials.  A typewriter was also available for patient use.

At DSH-Coalinga patients were entitled to use the law library three times a week for one hour.  Patients did not report any problems with access to the law library, though frustration was expressed regarding the challenges in using the computers without librarian assistance.

### 2.  SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP

Patients at SVSP-PIP were provided access to an online law library via computers available in the various SVSP-PIP housing units, including C5, C6, TC1, and TC2.  Patients reported the system was complicated to use and indicated there was limited assistance available.  Books on carts were observed in the housing units and available for patients to read.

The patients at the CMF-PIP conveyed no concerns about access to the law library.

A paging system was used at CMF L1-PIP to access library resources.  Patients were required to submit a request for information through institutional mail and the library staff would deliver the materials to patients' rooms.  No concerns with regards to the paging system were identified during the review period.

At CHCF-PIP, aside from a single appeal regarding law library access filed during the review period, no other concerns were expressed by patients.

3.      **CIW-PIP and SQ-PIP**

At CIW-PIP, patients were provided with instructions on how to access library services in the patient orientation handbook; no concerns regarding law library access were reported during the site visit.

The procedure for access to the law library was the same in the SQ-PIP as it was throughout SQ, although there was a separate policy issued for the PIP in December 2017. Neither staff nor patients interviewed were aware of the policy or the ability of PIP patients to have physical access to the law library once per week. In addition to law library access, there was a legal kiosk available to patients in the day room, though the kiosk was often broken.

**P.      EDUCATION**

1.      **DSH-Atascadero and DSH-Coalinga**

DSH-Atascadero was reorganizing the educational program throughout most of the period under review. As a result, limited and primarily General Equivalency Diploma (GED) classes, were available to patients. Staff reported that subsequent to the reorganization more substantive classes, such as math, reading, and writing would be offered.

DSH-Coalinga did not provide educational programming for patients.

2.      **SVSP-PIP, CMF-PIP, CMF L1-PIP, and CHCF-PIP**

The above programs did not provide education programming to patients.

3.      **CIW-PIP and SQ-PIP**

At CIW-PIP a patient's request and IDTT approval were necessary to partake in educational services. Patient participation in education was minimal and time was tracked manually, as EHRS was not capable.

While no patients at SQ-PIP were using educational services at the time of the site visit, education unit staff were available to assist patients. SQ-PIP staff indicated the lack of use of education services was related to the acuity of the mental health issues and the functional impairment of the current patient group

## **CONCLUSION**

As outlined in detail above, the time period between the filing of the Special Master's preceding inpatient care report in May 2016 and the writing of this report has been activity-filled for both the DSH and CDCR defendants, as well as the All-Parties Workgroup and the Special Master and his staff. A comprehensive list of completed project/activities was detailed in the Special Master's Twenty-Seventh Round Monitoring Report.[20]

---

[20] 1) Tested CDCR's CQIT at ten institutions; 2) Developed CDCR's staffing plan to address vacancies in mental health staffing; 3) Resolved the issue of timely calling "911" emergency following activation of the EMS at prisons; 4) Reached agreement to withdraw Recommendations 14, 15, and 16 from the Special Master's expert's initial suicide prevention practices report, "First Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation (CDCR)." ECF No. 5259.; 5) Developed the annual Suicide Report template; 6) Revised CDCR's response to suicide attempts by asphyxiation and hanging, and replacement of the cut-down tool; 7) Revised CDCR's Interdisciplinary Progress Note 5-day Follow-Up (CDCR MH 7230-B); 8) Revised CDCR's MHCB Discharge Custody Check Policy; 9) Revised the format/templates of defendants' census, waitlist, and trends reports to the court; 10) Revised and updated CDCR/DSH Memorandum of Understanding (MOU); 11) Revised/developed policies and procedures related to Lift and Shift prior to July 1, 2017; 12) Developed training material for Lift and Shift; 13) Attended Lift and Shift training at PIPs and provided feedback to CDCR; 14) Conducted focused monitoring tours regarding the application of LRH in the PIPs after Lift and Shift; 15) Assessed DSH telepsychiatry at PSH; 16) Activated temporary intermediate care beds in L1 at CMF; 17) Modified and activated medical isolation rooms into safe intermediate care beds at CHCF-PIP; 18) Revised "Mental Health Crisis Beds Privileges" policy; 19) Revised CDCR's policy regarding "Housing of Patients Pending Mental Health Crisis Bed"; 20) Activated RJD's Level II Dorm Complex; 21) Revised disciplinary policy regarding MHSDS treatment refusals; 22) Revised Work Group C and Privilege Group C policy; 23) Finalized and implemented CDCR's peer review process; 24) Developed and implemented the EOP and 3CMS review studies; 25) Developed the Custody and Mental Health Partnership Plan including training materials; 26) Revised policy regarding program access for MHSDS inmates; 27) Conducted three focused site visits at CSP/Sac; 28) Conducted focused RVR compliance assessment of 17 prisons; 29) Conducted focused Use of Force compliance assessment of 15 prisons; and 30) Resolved issues regarding PBSP Welfare/Security Checks. ECF No. 5779 at 143-145.

Those projects/activities which specifically relate to the provision of inpatient care include:

1. Revised the format/templates of defendants' census, waitlist, and trends reports to the court.

2. Revised and updated CDCR/DSH MOU.

3. Revised /developed policies and procedures related to Lift and Shift prior to July 1, 2017.

4. Developed training material for Lift and Shift.

5. Conducted focused monitoring tours regarding the application of LRH in the PIPs after Lift and Shift.

6. Activated temporary intermediate care beds at CMF L1-PIP.

7. Modified and activated medical isolation rooms into safe intermediate care beds at CHCF-PIP.

*Id.* at 144-145.

The work continues—a list of ongoing activities/projects in various stages of progress was also detailed in the Special Master's Twenty-Seventh Round Monitoring Report.[21]  Ongoing

---

[21] 1) Insert "pocket parts" into the Program Guide; 2) Reach agreement regarding exceptions to Program Guide timelines for transfers to inpatient program and develop proposed addendum to the Program Guide; 3) Reach agreement regarding exceptions to Program Guide timelines for transfers to MHCB and develop proposed addendum to the Program Guide; 4) Finalize CDCR's CQI report writing template and format; 5) Complete development and implementation of uniform level systems for DSH/CDCR; 6) Develop MHCB and EOP clustering plans; 7) Evaluate and provide feedback regarding the ongoing EOP review study and its outcomes; attend and provide feedback at scheduled institutional implementation and training; 8) Evaluate and provide feedback regarding the ongoing 3CMS study and its outcomes; attend and provide feedback at scheduled institutional implementation and training; 9) Attend to ongoing MHSDS bed activations; 10) Attend to CDCR's proposal to activate 100-person EOP dormitory at San Quentin; 11) Attend to CDCR's proposal to activate a non-designated Level IV EOP facility at CSP/LAC; 12) Attend to EOP Program issues: lengths of stay in segregation, transfer delays, tracking and reporting of 150-day case-by-case reviews, modified programming, and treatment refusals; 13) Complete CDCR and DSH staffing plans pursuant to court orders; 14) Complete and implement DSH's CQI process; 15) Implement Custody and Mental Health Partnership Plan in CDCR's institutions; 16) Attend scheduled collaborative culture training and provide feedback; 17) Attend to ongoing cultural issues and MHSDS delivery problems at CSP/Sac; 18) Attend to CDCR's proposal to activate an indecent exposure (IEX) Pilot Program at CSP/Corcoran; and 19) Attend to proposed "Family Intervention Behavior Management Plan" for IEX behavior.  ECF No. 5779 at 145-146.

activities of the All-Parties Workgroup relating to the provision of inpatient care include continued discussions of defendants' progress towards compliance with the staffing ratios in their 2009 staffing plan and the requirements of the court's October 10, 2017 order, consideration of defendants' plans to activate temporary MHCBs at CIW and increase utilization of double-celling in the MHCB at CCWF, and ongoing monitoring of compliance with inpatient care transfer timelines and their exceptions.

Current and ongoing activities of the DSH defendants include the court-ordered implementation of their staffing plan, finalization and implementation of the CQI process developed for use in the DSH programs that treat *Coleman* class members, and finalization and implementation of the uniform patient level system policy for DSH *Coleman* class member patients. Additionally, DSH defendants report that they have already begun efforts to address certain of the issues highlighted in the preliminary findings provided by the Special Master's team during the DSH-Atascadero and DSH-Coalinga exit conferences.[22]

In addition to those already mentioned in relation to the All-Parties Workgroup above, CDCR defendants' ongoing tasks also include developing and implementing a uniform behavioral incentive program for its PIPs, developing performance measures to be used in CMF L1-PIP quality management audits, addressing the obstacles to achieving compliance with the court-ordered provision of 12 hours per week out-of-cell time for *Coleman* class members housed in CMF L1-PIP, and attending to the focus areas presented in Part II (B) and Part II (C) of this report.

The Special Master will monitor and report on each of the projects/activities outlined above as part of his regular monitoring duties.

---

[22] Letter dated May 15, 2018 from Pam Ahlin, DSH Director to Matthew A. Lopes, Jr., Esq., Special Master.

As mentioned above and listed in further detail in the Special Master's Twenty-Seventh Round Monitoring Report, defendants are presently engaged in nearly 20 court-ordered projects and activities designed to advance them towards compliance.  ECF No. 5779 at 145-146.  Much of the work being performed by defendants is occurring simultaneously, which—as previous experience dictates—requires the full engagement of all of defendants' circumscribed resources.  Any additions to the work currently underway could have a negative impact on the progress being achieved; at this juncture, defendants' resources should not be diverted from full completion of the current projects.

In view of the all of the aforementioned, the Special Master offers no recommendations for further orders of the court at this time.

Respectfully Submitted,

_____/s/_____
Matthew A. Lopes, Jr., Esq.
Special Master

August 30, 2018

DSH-Atascadero

## I. SUMMARY OF THE FINDINGS

- At the time of the site visit, Program V, which included an admissions unit and five intermediate care units for *Coleman* patients, housed 89 percent of DSH-Atascadero's *Coleman* patients.

- Approximately one quarter of *Coleman* patients housed in an admissions unit were housed in Program V. Overall, 30 percent of Program V patients were non-*Coleman* patients.

- There was a 25-percent functional vacancy rate for psychiatry and nursing positions.

- There was a 13-percent functional vacancy rate for social work positions.

- Staff-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy were unmet in Program V's admissions unit and five intermediate care units.

- Required staff regularly attended scheduled IDTTs.

- All initial IDTTs were not completed within seven calendar days as required.

- Assigned treatment groups and group attendance were included in treatment plans; however, the corrected number of treatment group hours was not consistently documented in treatment plans.

- Treatment plans contained focus statements for each identified area of treatment with an objective that was measurable.

- Objectives with at least one approved intervention were usually in treatment plans.

- Treatment outcome expectations were documented in treatment plans.

- Discharge planning that included coping skills for return to CDCR was not completed for all patients.

- Observed IDTTs revealed appropriate interdisciplinary input.

- Patients received approximately 13 weekly hours of group.

- Individual therapy was not typically available, but patients reported good access to individual clinical contacts through self-referrals.

- No behavioral plans were initiated, or in use during the review period or at the time of the site visit.

- The facility continued to monitor and regulate patient privileges, movement, and supervision through the Hospital Access System.

- DSH-Atascadero reported compliance for patients' timely transfer to the facility.

- Seclusion and restraint audits generally revealed compliance with policy and procedures.

- DSH-Atascadero had a quality improvement process with numerous subcommittees that reported to the quality council.

- Patient survey audits conducted between January and April 2017 revealed overall patient satisfaction with Program V.

- With limited exception, *Coleman* postings were posted in English and Spanish in Program V housing units.

- During the latter part of the review period, patient visitation was restricted to non-contact visits following a contraband incident involving *Coleman* patients.

- Patients reported good law library access, but difficulty using the computers.

## II.    CENSUS

On January 9, 2018, DSH-Atascadero reported a total patient census of 1,155. On that date, 196 CDCR patients were at the institution pursuant to California Penal Code (PC) commitment number 2684 (*Coleman* class member patients or *Coleman* class members). DSH-Atascadero was required to designate 256 beds for *Coleman* class members, making the census 77 percent of capacity.

*Coleman* class member patients were typically housed in Program V, which had an admissions unit (Unit 13) and five intermediate care treatment units (Units 30, 31, 32, 33, and 34). Program V housed 175, or 89 percent of DSH-Atascadero's 196 *Coleman* class members, seven of whom were housed in Unit 13, and 168 were in one of the five intermediate care units.

Twenty-one *Coleman* class members were not housed in Program V.  Twenty were in admissions units that were not within Program V and one was in the medical unit.  Staff reported that newly-admitted patients were housed in particular admissions units based on bed availability; the lack of beds in Unit 13 led to the housing of *Coleman* class members in non-Program V admissions units.  Moreover, once a patient was housed in a certain admissions unit, the placement was not changed until the patient was transferred to an intermediate care unit.  As a result, during the site visit, only seven of 27 or 26 percent of *Coleman* class member patients housed in admissions units were housed in Program V's admissions unit.

In addition to housing 175 *Coleman* class member patients, Program V also housed 76 non-*Coleman* class members, for a total of 251 patients.  Program V beds occupied by non-*Coleman* class members included patients who were not guilty by reason of insanity (PC 1026) or who were incompetent to stand trial (PC 1370) and mentally disordered offenders (MDOs, PC 2962).  During the site visit, these patients accounted for 30 percent of Program V's patients.

No *Coleman* class members were placed in administrative isolation during the review period.

There were no LRH concerns for Program V as the intermediate care beds were unlocked dorms.

## III.  STAFFING

### 1.  Administrative, Clinical, and Correctional Staffing

Permanent staff filled all five of DSH-Atascadero's executive positions: executive director, clinical administrator, hospital administrator, nurse administrator, and medical director.  The chief psychiatrist position was filled.  Permanent staff also filled Program V's three management positions of program director, program assistant, and nursing coordinator.

Senior Psychiatrist:  The senior psychiatrist position had been vacant since 2011.

Psychiatrists:  Three of eight of Program V's full-time psychiatrist positions were filled by permanent staff, reflecting a 63-percent vacancy rate.  Contract staff decreased the number of vacancies to two, leaving a functional vacancy rate of 25 percent.  The institution did not use telepsychiatry.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  Positions for all eight psychologists were filled.

Supervising Social Worker:  The supervising social worker position was filled.

Social Workers:  Six of eight social work positions were filled, leaving a 25-percent vacancy rate.  Contract staff reduced vacancies by one, resulting in a functional vacancy rate of 13 percent.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was filled.

Rehabilitation Therapists:  All eight rehabilitation therapy positions were filled.

RNs:  For RN positions, 35 of 48 were filled, for a 27-percent vacancy rate.  The use of one contractor reduced the number of vacancies to 12, decreasing the functional vacancy rate to 25 percent.

Senior Psych Techs:  Of 18 senior psych tech positions, 14 were filled, for a 22-percent vacancy rate.

Psych Techs:   Of the 94 psych tech positions, 82 were filled, leaving a functional vacancy rate of 13 percent.

Unit Supervisors:  All six unit supervisor positions were filled.

Other:  Both positions for health service specialists were filled.

Correctional Staff:  DSH-Atascadero used Department of Police Services staff for security.  The Department of Police Services chief was under the supervision of both DSH and DSH-Atascadero and reported directly to the hospital administrator.

**2.  Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

At DSH-Atascadero, the designated clinician-to-patient ratio was 1:15 in the admissions unit and 1:35 in the intermediate care units.  These ratios covered psychiatrists, psychologists, social workers, and rehabilitation therapists.

During the site visit, Program V's admissions unit had a census of 31 patients.  Clinical staffing included one contract psychiatrist, two psychologists, two social workers, and two rehabilitation therapists.  The established psychiatry clinician-to-patient ratio was unmet at 1:31.  The clinician-to-patient ratios for psychology, social work and rehabilitation therapy were all at 1:15.5, slightly exceeding the established ratios for these disciplines.

In all five of Program V's intermediate care treatment units, the clinician-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy all exceeded the designated 1:35 clinician-to-patient ratio.  DSH-Atascadero assigned either one or 1.2 of each of these four clinical disciplines to each of the five intermediate care units, which respectively had a population of 43 or 46 patients.  For these total 20 positions (five each for psychiatry, psychology, social work and rehabilitation therapy) and based on whether there were one or 1.2 assigned clinicians and a patient census of 43 or 46, clinician-to-patient ratios ranged from 1:35.8 to 1:46; all exceeded the established 1:35 ratio.

**3.  Staff Training**

DSH-Atascadero provided staff training data for September 2017 that reflected the percentage of Program V mental health staff who were compliant with required trainings.  The

data indicated more than 90-percent compliance for all required trainings, including

Cardiopulmonary Resuscitation (CPR), Cultural Awareness, First Aid, Infection Control,

Medication Certification, Patient's Rights, Elder Abuse/Neglect, Pain Management, and

Therapeutic Strategies and Interventions (TSI), among others.

The institution also reported providing all new employees with a 90-minute suicide

prevention training.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.    Interdisciplinary Treatment Teams (IDTTs)

DSH-Atascadero presented treatment plan performance improvement audits for the

review period.

The audits indicated that psychiatrists and psychologists attended 98 percent of scheduled

treatment team meetings, while social workers and rehabilitation therapists attended all

scheduled IDTTs.

DSH-Atascadero reported compliance with completion of initial IDTTs within seven

calendar days of admissions at 81 percent.  Although current groups were listed as interventions

in the audited treatment plans at a rate of 95-percent compliance, the correct number of treatment

hours was 83-percent compliant.  The percentage of group attendance was included in 92 percent

of audited treatment plans.

The audit data showed that 92 percent of treatment plans contained focus statements

related to each identified area of treatment, and 98 percent of treatment plans included a focus

statement that had a written treatment objective.  Objectives were deemed measurable in 93

percent of the audited treatment plans, and 89 percent of audited treatment plans had at least one

approved intervention.  In 93 percent of audited treatment plans, treatment outcome expectations

were found to be listed.  Discharge planning for a patient's return to CDCR that included coping skills for the next setting were found in 87 percent of audited treatment plans.

Observed IDTT meetings on Unit 32 revealed attendance by the psychiatrist, psychologist, social worker, rehabilitation therapist, psych tech, and unit supervisor.  The psychiatrist facilitated the IDTT and most treatment team members and patients participated in the discussion.  IDTT meetings included discussion of treatment goals and progress, medication-related concerns, and current symptomatology.  An overhead projector displayed treatment plans, which allowed visualization by the patient and participants.

Observed IDTT meetings on Unit 30 reflected appropriate multidisciplinary input. Patients were present.  Unit 30's treatment team reported meeting with patients on a monthly basis, although the quarterly IDTT meetings were more comprehensive than the monthly IDTTs.

## 2.  **Group Therapy**

Patients reported that groups were substantive in content, therapeutic, and beneficial. Institutional data reflected that patients received a weekly average of 6.3 hours of group therapy and an additional 7.04 weekly hours of recreational groups, for a total weekly average of 13.34 hours during the review period.

Groups included core groups, which were facilitated by patients' treatment teams and held on patients' treatment units.  There were also centralized groups, which were open to PC 2684 patients and other patients, and were facilitated by a variety of hospital staff.  Centralized groups were conducted in other areas of the institution, including the music center, treatment mall, gymnasium, and outdoor courtyards.

The monitor's expert observed a DBT group that two psychologists facilitated.  This centralized group had eight participants and was conducted in the treatment mall.  All patients

actively participated and were provided with a workbook. Interviewed patients expressed significant satisfaction with the group and reported clinical benefits from the provided material.

In general, patient satisfaction with the program at DSH-Atascadero was high. Based on discussions with staff, the number of groups offered to patients in Program V was driven more by staffing resources in contrast to individual treatment planning.

### 3. Individual Treatment

Patients reported that individual treatment was not routinely available; this was confirmed by a review of the data provided. Patients averaged 0.1 weekly hours of individual therapy.

Most patients stated that they did not have monthly individual clinical contacts with either a psychiatrist, psychologist, social worker, or rehabilitation therapist. However, they reported good access to these clinicians via the self-referral process. Patients also described very good access to one-on-one contacts with social workers and rehabilitation specialists on an as needed basis.

### 4. Psychiatric Services

Most patients reported having initial weekly psychiatry contacts during the first one to two months following admission. Patients denied problems receiving medications. During the review period, an average of 12 patients received non-formulary psychotropic medications on a monthly basis.

### 5. Other Treatment Issues

#### A. Involuntary Medications (PC 2602)

Fifty-six patients were administered involuntary psychotropic medications on at least one occasion during the reporting period.

### B. Behavioral Management

An administrative directive regarding behavioral plan guidelines was completed in June 2017.  No behavioral plans were initiated or in use during the review period.  At the time of the site visit, no *Coleman* class member patients had behavioral treatment plans.

### C. Morning and End of Shift Meetings

During the site visit, the monitor's expert observed a morning "check-in" meeting with the patients in Unit 30.  Following the meeting, the patients were interviewed in a community-like setting.  With few exceptions, patients expressed satisfaction with DSH-Atascadero's treatment program, which they described as providing more programming than other CDCR inpatient units and as having better access to clinicians as compared to EOP programs.

## V.      PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages:  Standards and Procedures

DSH-Atascadero regulated patient privileges, movement, and supervision through the HAS, which oversaw patient advancement through five separate access levels.  No changes had been made to the HAS since the June 2015 site visit.

The treatment team determined a patient's level, which indicated the places where the patient could go within the institution and the amount of supervision.  Although improper behavior by a patient could result in a reduction in the patient's level, a reduction was not supposed to be punitive.

All patients were admitted to DSH-Atascadero at Level 1, the most restrictive level, and stayed there for a minimum of seven days.  Level 1 patients were viewed to be at a high risk for self-harm, violence, escape, criminal activity, and/or were recognized as lacking the ability to

take care of themselves due to their mental illness.  Level 1 patients required a staff escort to leave their assigned unit.

Level 2 patients were able to follow their own unit's rules, but required supervision when on another unit.  Neither Level 1 nor Level 2 patients were permitted to go to canteen, but they were permitted to access it by way of "store orders."  Level 2 patients could go to group on their own, but required an escort to go to the main courtyard or to the movies, as well as to the gym or to activities requiring a "leisure referral."

Patients at Level 3 continually exhibited appropriate behavior; they were thus allowed to go to three different locations within the institution without checking back in with their unit. Patients at Level 3 for a minimum of 30 days were eligible for employment.  After 90 days at Level 3, the patient could advance to Level 4.

Patients at Level 4 were eligible for special destinations and privileges.  Patients who were recommended for community placement were at Level 5.  At Level 5, additional privileges included priority consideration for employment and a monthly free breakfast.  Level 3, 4 and 5 patients could access any area identified on the approved hospital destination list; this included many areas within the institution.

At DSH-Atascadero, patients' access to property and privileges such as quarterly/annual packages, canteen, and patient funds, were not contingent on the patient's level.

## VI.    REFERRALS AND TRANSFERS

During the review period, CDCR referred 156 *Coleman* class member patients to DSH-Atascadero.  DSH-Atascadero accepted 154 of 156, or 99 percent of referred *Coleman* class member patients.  Two referrals were rejected for non-clinical reasons.

The institution complied with Program Guide requirements in 125 of 154, or 81 percent of cases for timely decisions regarding the acceptance or rejection of patients. For referrals where a decision to accept or reject was not made within three days, timeframes ranged from four to 15 days. DSH-Atascadero met the Program Guide requirement in 88 of 154, or 57 percent of cases for timely bed assignment following acceptance.

Compliance with the 30-day transfer timeframe for the 154 *Coleman* class member patients who were transferred to DSH-Atascadero was completed based on the time period between the "referral date" and the "date of admission" to DSH-Atascadero. This resulted in 137 of 154, or 89 percent of *Coleman* class member patients transferring to DSH-Atascadero within the required Program Guide timeframe. The average length of time from patient referral to admission to DSH-Atascadero was 12 days, with a range of two to 33 days. DSH headquarters staff reported the 30-day transfer time period was counted from the day the facility received the completed referral packet and not from the IDTT referral date.

One of the patients admitted to DSH-Atascadero had complex medical needs. None were admitted from the SHU. There were no delays in the referral process or with timely patient admissions due to either an involuntary medication issue or a *Vitek* hearing.

## VII.  ADMISSIONS AND DISCHARGES

### 1.  Admissions

DSH-Atascadero leadership reported that it was no longer admitting patients referred to the acute level of care, which was a change from the preceding review period.

DSH-Atascadero leadership also reported that it followed the referral and admission process in the MOU between CDCR and DSH regarding patients needing intermediate care. CDCR uploaded completed referral packets to SharePoint, which were then printed and

reviewed, and a decision to accept or reject the patient was made. Staff reported that the use of SharePoint increased the availability of information and facilitated communication for admissions and discharges. But staff voiced concern as to a lack of access to mental health assessments, RVRs, and any documentation that was indicative of behaviors that generated disciplinary actions in CDCR. DSH staff no longer had access to CDCR electronic health records and also lacked access to the Strategic Offender Management System (SOMS) to obtain information. It was further reported that DSH-Atascadero now clinically accepted all patients, which reviewed data affirmed, although patients could still be rejected for security reasons.

During the week of the site visit, the DSH-Atascadero waitlist indicated that 16 accepted patients were awaiting admission. The institution reported timely admitting nine of those patients during that same week. Although the remaining seven patients were scheduled for admission, the institution did not provide admissions dates for those patients upon request.

## 2. **Discharges**

DSH-Atascadero discharged 137 patients during the review period. The average length of stay was 344 days, with a range of seven to 1,064 days. There was 100-percent compliance with clinician-to-clinician contact following patient discharge to CDCR. There was one patient who was discharged to a community hospital and subsequently returned to CDCR; following his return, CDCR contacted the DSH-Atascadero medical director for discharge information.

At the time of the site visit, DSH-Atascadero housed 16 patients who had been clinically discharged but physically remained at the institution. Of those 16 patients, 11 had a scheduled discharge date; discharge dates for the remaining five were pending at the time of the site visit.

Staff reported that DSH-Atascadero initiated parole planning for patients who arrived at the institution within one year of their scheduled release. Patients pending parole also had threshold dates of 120 and 60 days for discharge planning. At the time of the site visit, 12 patients were within 120 days of institutional release and five were within 90 days. During the review period, there were 14 patients who at the time of their admission to DSH-Atascadero had 90 days or less until parole.

For patients who would be returning to CDCR, discharge planning began following admission to DSH-Atascadero. Discharge planning was addressed during quarterly IDTT meetings and through individual sessions with the social worker. Staff reported that the discharge process was improving due to SharePoint and increased clinician-to-clinician contact. DSH-Atascadero staff were contacting CDCR mental health supervisors to share case information that was subsequently passed along to CDCR clinicians. It was further reported that CDCR case managers followed up with DSH-Atascadero staff on several occasions when they needed additional information.

## VIII. PATIENT DISCIPLINARY PROCESS

There were 18 RVRs issued during the review period. Of those, ten or 56 percent resulted in a guilty finding, five were postponed pending district attorney review, two were pending additional reports, and one was screened out. All ten of the RVRs that resulted in a guilty finding were due to drug-related incidents.

DSH-Atascadero clinicians completed the mental health assessments. It was reported that only one of 18 mental health assessments recommended mitigation.

DSH-Atascadero collaborated with California Men's Colony (CMC) staff to conduct RVR hearings. As RVR hearings were not held at DSH-Atascadero, documentation concerning RVR dispositions was unavailable for review.

## IX.    USE OF FORCE

During the review period, there were no use of force incidents or cell extractions at DSH-Atascadero and no changes were made to the use of force policy.

## X.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS

During the review period, there were a total of 268 special incident reports. Of these, 104 or 39 percent were for acts of aggression, 42 or 16 percent were for medical reasons, 81 or 30 percent were for suicidal ideation/threat of self-harm and 41 or 15 percent were classified as other.

## XI.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

There were 11 patients involved in 12 seclusion incidents during the review period. The duration of seclusion ranged from 2.2 to 73.3 hours, with an average duration of 22.4 hours. There were also 56 episodes of restraint, involving 28 patients. The length of time patients were kept in restraints ranged from 1.3 to 38.8 hours and averaged 8.5 hours.

Facility audits relevant to the use of restraint and seclusion generally demonstrated compliance with policies and procedures. Areas that were noncompliant in one month significantly improved during the following months.

## XII.    SUICIDE PREVENTION

There were no completed suicides at DSH-Atascadero during the review period.

DSH-Atascadero's suicide prevention process remained within the standard of care. There was also a new focus of suicide prevention that emphasized trauma informed care. As a

history of trauma has been associated with increased suicidal ideation and behavior, DSH had increased staff training and there were plans to implement trauma informed care at other institutions. At DSH-Atascadero, these efforts included formation of a trauma consultation group that included psychologists, social workers, rehabilitation therapists, and nursing staff. There were also several groups for *Coleman* class member patients that focused on trauma-related issues.

The SPC met monthly and maintained meeting minutes. Reviewed minutes reflected several suicide prevention efforts. Among them, an ongoing pilot in Program V's Unit 31 sought to replace current bedding with tear-resistant bedding. Additional foci of the SPC included modifications to certain physical structures and matters, including stairwells, handicap grab rails, and toilet paper holders and rolls. An additional issue of consideration was an amended suicide risk assessment to inform clinical staff when to discontinue observation and seclusion of patients at acute risk for suicide/self-harm. The issue was discussed in the SPC, but was later determined to not be indicated.

The Joint Commission conducted a survey during July 2017, and several issues with the performance of the suicide risk assessment were noted. These hospital-wide issues included the lack of an annual assessment, lack of inclusion of protective factors in the Suicide Risk Assessment (SRA) and individualization of protective factors, and the failure to include identification of individual factors that increased risk and factors that mitigated the risk. The supervisory staff indicated that these omissions had been addressed, and healthcare records reviews did not identify these omissions during the site visit.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

The DSH-Atascadero emergency response was unchanged since the last visit. All staff who had patient contact received basic first aid training. All nursing and medical staff also received American Heart Association basic life support training. The facility continued to have a comprehensive performance improvement structure, which included hospital-wide emergency response drills. A schedule of the emergency drills was provided for the review period; areas of deficiency had been identified and corrective action implemented.

### 2. Death Review Process

There were no deaths at DSH-Atascadero since the preceding site visit. The Mortality Incident Review Committee was responsible for conducting a systematic, interdisciplinary review of any patient death at DSH-Atascadero.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

DSH-Atascadero had a complex quality improvement process involving multiple subcommittees that reported to the quality council. The most significant issue with the institution's quality improvement process was the format of audit reports. Although the reports indicated results, they did not describe the audit's purpose or methodology or assess the results and/or any planned actions based on the assessment; quality improvement audit reports should include all of these matters.

The quality council met weekly and had overall responsibility and ultimate accountability for the quality management program. The executive director determined membership on the quality council. Minutes from the August 1, 2017 meeting documented its review process, which included status updates of specific quality improvement items.

An organizational chart indicated the reporting structure from DSH-Atascadero departments and committees to the quality council.  The committees that reported to the quality council included, but were not limited to, risk management/utilization review, violence prevention, quality improvement, medication management, emergency care, standards compliance, and program review.

The utilization management committee met monthly.  It reviewed all patients once they had been hospitalized for 180 and 240 days and thereafter, every 30 days.

The risk management/utilization review committee also met monthly.  Medical risk management, treatment support, suicide prevention, facility review, violence prevention and intense case/preventative case analysis all either reported to or provided reports to this committee.  Meeting minutes provided adequate summaries of reviewed items.

During 2017, there were over 63 separate audits performed on at least an annual basis. Topics included, but were not limited to, hypertension, medical emergency response, nursing reassessments, nutrition care monitoring tools, measurable objectives for treatment plans, psychiatry discharge summaries, medication consents, hand hygiene, restraint and seclusion, treatment group observation forms and assessments for social worker admissions, suicide risk, violence risk, and rehabilitation therapy.

Audits were reviewed relevant to treatment planning.  However, these audits only demonstrated the results and did not include a description of the problem being reviewed, methodology used, assessment of the results, or plans in the context of the assessment.

The monitor's expert also reviewed audits specific to the use of restraint and seclusion during the review period.  Similar to the previously referenced treatment planning audits, these

audits only demonstrated compliance results and lacked the other elements (e.g., methodology, assessment of results, etc.) of a stand-alone report.

The WaRMSS continued to track various treatment-related activities.  It included key indicator data, which produced morning "trigger" reports that identified patients who might require additional attention and/or interventions.  The Incident Management System, which tracked all "special" incidents that adversely effected the safety, care, treatment and rehabilitation of patients, was unchanged from previous site visits.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Patients' rights advocates reported a procedure that allowed patients to file complaints and appeal the outcome of any findings.  All housing units reportedly contained forms to initiate a complaint, but complaints were accepted in many ways, including by voicemail and from family members.  It was reported that complaints were acknowledged within 48 hours and investigations completed within 30 days.

During the review period, a total of 318 patients made 774 complaints.  Of these, 57 *Coleman* class member patients made 136 or 18 percent of the complaints.  Of the total 774 complaints, the largest number were for staff attitudes and behavior (145), daily living issues (86), involuntary medications (79), legal concerns (75) and medical care and treatment (73). Patients described the grievance process to be slow and problematic.

DSH-Atascadero conducted patient survey audits twice annually; the report provided for Program V covered January through April 2017.  Overall, patient satisfaction exceeded 90 percent for 11 of 13 questions.  Among them, patients reported feeling safe and that staff treated them with respect and helped them when they were sick.  Patient satisfaction was below 90

percent in relation to having their rights explained to them while residing at the hospital and being educated about their medications.

Attendance at a community meeting on Unit 32 found patients to be very positive as to DSH-Atascadero's treatment environment and programming, especially in comparison to CDCR. They spoke positively regarding staff, reported very good access to clinicians, including the psychiatrist, and denied problems receiving medications. Patients reported that groups were therapeutic and substantive in content and offered variety. They indicated being out of their rooms during the day and having very good access to the dayroom, yard, gymnasium, and law library, as well as visitation. Approximately one third reported having jobs. They stated that there were no politics on the units or in the program, which they liked.

In addition to these positive comments, patients expressed some concerns. Among them, they reported insufficient access to correctional counselors and timely committee meetings. They expressed an interest in more individual therapy sessions and access to educational opportunities other than GED programs. They also complained about limited access to books and music and expressed significant concern with their ability to earn credits under Proposition 57 while at DSH-Atascadero.

## XVI. *COLEMAN* POSTINGS

With two exceptions, all Program V housing units contained current *Coleman* postings in English and Spanish; one unit only contained the English version of the posting and another had an outdated version. All but one non-Program V admissions unit that housed *Coleman* patients had *Coleman* postings.

## XVII. **LAUNDRY AND SUPPLY ISSUES**

Observed laundry and supply areas were clean and well kept.  All units contained a sufficient stock of toiletries, including shampoo, soap, toilet paper, and toothpaste and many had an overflow storage area for necessary supplies.  The amount of available surplus clothing or linens varied by unit, particularly as to available sizes and certain items, such as blankets and jackets.  It was also reported that in the rare instance when limited clothing was available on a particular unit, such as during a weekend or holiday, stock was available from elsewhere in the institution.

Laundry was cleaned off-site.  Laundry deliveries were typically twice weekly, but admissions units could receive laundry deliveries as often as four times weekly.

Some patients indicated concern with laundry services and reported that clothing items were occasionally missing from their laundry and that they received incorrect sizes.

## XVIII. **VISITATION/PRIVILEGES/TELEPHONE ACCESS**

Visitation was available for all DSH-Atascadero patients, absent safety or security concerns, daily from 8:15 a.m. to 1:45 p.m.  There was one large room for contact visitation, another for non-contact visitation, and two contact visitation rooms for attorney-client meetings.  Visitation had been limited to non-contact visits for several months beginning in late September 2017 due to contraband issues involving *Coleman* patients.  Contact visits had been reinstated in late December 2017.

All units contained telephones.  Staff reported that patients typically had access to telephones from 6:00 a.m. to 11:00 p.m.  Some patients complained about the cost of telephone use.

## XIX.   <u>LAW LIBRARY ACCESS</u>

Administrative Directive 602.2, which addressed law library access, among other issues, was updated effective September 2017.

The DSH-Atascadero law library was open from Monday to Friday, except holidays, from 8:30 a.m. to 11:30 a.m. and from 1:15 p.m. to 4:15 p.m., during which it was accessible to *Coleman* patients.  The library had a capacity of 15 patients and, providing other patients were not waiting, had no restrictions on the length of time that a patient could spend in the library. Two law library computers equipped with Lexis/Nexis enabled patients to access multiple legal publications and reference materials and case law.  Patients could check out books and other reading materials from the library and there was a typewriter for patient use.  Patients reported good access to the law library, but difficulty using its computers.

## XX.   <u>EDUCATION</u>

During the reporting period, a weekly average of 35 patients were scheduled for 80 weekly educational classes, which were typically limited to GED classes.  Of these scheduled classes, patients attended a weekly average of 44 sessions.  Classes typically met for two hours weekly.  However, only four patients were scheduled for five or more weekly hours of education, with only two of four attending any of these sessions; both attended between one and two weekly hours of educational programming.

DSH-Atascadero reported that from July through October 2017, it was reorganizing its educational programming and that only GED classes were being offered.  Following this reorganization, the institution would be able to provide more classes on math, reading, writing, and other subjects.

<u>APPENDIX A2</u>
DSH-Coalinga

**DSH-Coalinga**
January 4, 2018 – January 5, 2018

## I.   SUMMARY OF THE FINDINGS

- All staff-to-patient clinical ratios were within established requirements.

- A review of a random sample of records revealed significant issues with IDTTs and the treatment planning process.

- Patients were offered about 7.37 hours per week of core group therapy with an average of 4.68 hours attended per week.

- Core groups represented 38 percent of the treatment offered to patients with 62 percent of the treatment being provided via supplemental groups.

- Primary treatment concerns included a high no-show rate for core therapies and the limited number of structured therapeutic activities being offered to patients.

- Of the structured treatment groups provided, 58 percent were co-facilitated by rehabilitation therapists and/or behavior specialists.

- Individual psychotherapy represented 0.3 percent of the treatment attended.

- Patients conveyed general satisfaction with the telepsychiatry process.

- The average length of stay from patient admission to physical discharge was 201 days, with a range of stay of 23 to 756 days.

- The RVR log was not accurately maintained.

- None of the clinicians completing the mental health assessments, nor their supervisor had been trained to complete the mental health assessment.

- There were no cell extractions or use of force incidents during the review period.

- No class member suicides occurred at DSH-Coalinga during the review period; there were no serious or significant suicide attempts.

- Although the structure of the quality improvement process was robust, quality improvement audits did not explicitly state their purpose, methodology, assessment of the result, or a plan, if any.

- Patients were complementary of the program offered to them at DSH-Coalinga.

- *Coleman* postings in English and Spanish were posted in a patient-accessible showcase.

- Patients did not indicate any problems with laundry or with obtaining clean clothing or supplies.

- Patients reported typically having no issues with receiving their property upon arrival at DSH-Coalinga.

- Patients reported the law library computer was difficult to use without extensive librarian assistance, which was typically not available.

- DSH-Coalinga did not provide educational programming to patients.

## II.   **CENSUS**

DSH-Coalinga operated a 50-bed intermediate care unit that treated *Coleman* class members.  On January 4, 2018, DSH-Coalinga reported a census of 50 patients.  During the review period, the program's census averaged 48 patients weekly.

## III.   **STAFFING**

### 1.   **Administrative, Clinical, and Correctional Staffing**

As of January 3, 2018, DSH-Coalinga's executive director, clinical administrator, hospital administrator, medical director, program director, program assistant, and nursing coordinator positions were filled.

Senior Psychiatrists:  The two senior supervising psychiatrist positions were filled.

Psychiatrists:  The on-site psychiatry position and both telepsychiatry positions were filled.

Supervising Psychologist:  The supervising psychologist position was filled.

Psychologists:  All three psychologist positions were filled.

Supervising Social Worker:  The supervising social worker position was filled.

Social Workers:  Two of three social worker positions were filled.  A registry social worker provided additional coverage, reducing the functional vacancy rate to zero.

Supervising Rehabilitation Therapist:  The supervising rehabilitation therapist position was filled.

Rehabilitation Therapist:  Two of three rehabilitation therapist positions were filled for a 33-percent vacancy rate; a registry employee provided additional coverage, reducing the functional vacancy rate to zero.

Nursing Coordinator:  The nursing coordinator's position was filled.

Registered Nurses (RNs):  All seven RN positions were filled.

Senior Psych Techs:  All three senior psych tech positions were filled.

Psych Techs:  Of 31 psych tech positions, 29 were filled and two were vacant, for a six-percent vacancy rate.

Custody Staff:  The sergeant's position and all 11 police officer positions were filled.

**2.      Staff-to-Patient Ratios and Adequacy of Clinical Staffing**

All DSH-Coalinga staff-to-patient clinical ratios were within established requirements. Specifically, the staff-to-patient ratios for psychiatry, psychology, social work, and rehabilitation therapy were all 1:17, which were within the established 1:35 staff-to-patient ratios for these disciplines.  Senior psych techs, psych techs, and RN positions were all staffed at ratios of 1:6, which were within the established staffing ratios of 1:8 for these disciplines.

**3.      Staff Training**

DSH-Coalinga did not provide reports on attendance at staff training during the review period.

# IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

## 1.    Interdisciplinary Treatment Teams (IDTTs)

A review of a random sample of records revealed significant issues with IDTTs and the treatment planning process.  Noteworthy concerns included:  inadequate treatment plans due to inaccurate and/or inconsistent diagnoses; relevant sections of the treatment plan were often incomplete; treatment plans were often vague in relation to the patient's presenting symptoms; treatment planning meetings were often not attended by all required disciplines; admission notes by the psychiatrists, psychologists, and social workers were not always present in the record, and monthly progress notes by all required disciplines were often not present in the record.  In the records reviewed, nursing staff and rehabilitation therapists were the most consistent in documenting their clinical activities.

DSH-Coalinga used the Positive Reinforcement Program.  It was commonly referred to as the "by choice" system.  According to policy, this program was intended to support the recovery and wellness of patients through the planned use of reinforcing activities and items.  Points were given to patients who exhibited positive behaviors identified by the patient and his treatment team as important in the patient's recovery.  Those points may then be redeemed for activities or items at the incentive store.  According to policy, this was done in an individualized manner through the treatment planning process.  This process did not occur in any of the treatment teams observed during the site visit.

## 2.    Group Therapy

At the time of the site visit, DSH-Coalinga offered core and supplemental treatment activities.  Core treatment included any scheduled treatment activity that a patient was enrolled in as part of his treatment plan, or My Activity Participation Plan (MAPP).  Examples of core

treatment included groups such as, dialectical behavioral skills, breaking barriers, and cognitive enhancement.  Also included were groups not considered to be core treatment activities, such as creative writing, karaoke, and pet social therapy.  The amount of treatment hours presented were inclusive of all these groups.  Core group activities were scheduled for a total of four hours per day, Monday through Friday.  Supplemental treatment included voluntary activities that a patient could participate in at will.  Examples of supplementary activities included open gym time, yard time, movie night, and bingo.  Supplemental activities were offered on evenings and weekends.

On average, patients were offered approximately 7.37 hours per week of core group therapy with an average of 4.68 hours per week attended by each patient.  When queried, patients responded with multiple reasons for their lack of attendance, including over-sedation due to medications, conflicting appointments with medical, and not finding the group to be personally meaningful.  Patients also reported that groups were frequently cancelled.

Core groups represented 38 percent of the treatment offered to patients with 62 percent of the treatment being provided via supplemental groups.  Twenty-nine percent (or 16 of 55) of the groups had at least one facilitator who was identified as a clinician (e.g., licensed clinical social worker, psychologist).  Of the structured treatment groups provided, 58 percent were co-facilitated by rehabilitation therapists and/or behavior specialists.

During the site visit, a treatment group utilizing DBT was observed.  DBT is complex and technique-specific, requiring specialized training.  The minimum qualifications for this position include a bachelor's degree in any human services field and one year of experience implementing behavioral services.  The group was facilitated by two behavior specialists.  DSH-Coalinga supervisors could not verify that either facilitator had been trained in DBT techniques

or purpose.  Appropriate training in DBT techniques and purpose is essential to provide adequate DBT services to patients who need them.

Co-facilitating a treatment group requires specialized training and enhanced facilitation skills.  Two new staff that DSH-Coalinga could not verify had been trained in DBT techniques or purpose facilitating a clinical group with little clinical supervision was concerning; it would be more appropriate to have a licensed clinician as a co-facilitator with one behavioral specialist.  This would allow for proper mentoring and clinical supervision to develop the group facilitation skills of each behavior specialist.   DSH headquarters staff and the monitor's experts spoke with facility staff regarding the need for ongoing clinical supervision for the group.

Patients reported that it would be useful if there were more groups specific to their diagnoses.  Treatment groups facilitated by clinicians that focused on skill building within diagnostic categories and coping with symptoms would be clinically indicated and likely reduce future decompensation for most patients reviewed and/or observed.

### 3.      Individual Treatment

DSH-Coalinga reported that patients attended various treatment activities during the reporting period that included core group, supplemental group, work, and individual therapy, of which 0.3 percent of the total hours attended were classified as individual therapy.

### 4.      Psychiatric Services

DSH-Coalinga reported newly-admitted patients were seen on a weekly basis by a psychiatrist for the first eight weeks of their hospitalization.

Patients were interviewed specific to their experience with telepsychiatry being offered at DSH-Coalinga.  There were no complaints regarding its use.  Patients conveyed general satisfaction with the telepsychiatry process.

During the review period, the number of non-formulary medications prescribed ranged from two to nine per month. Only two patients were receiving non-formulary psychotropic medications at the time of the site visit. Patients did not report any continuity of medications issues during patient interviews. It was indicated that all newly-admitted patients were seen on a weekly basis by a psychiatrist for the first eight weeks of their hospitalization. However, weekly progress notes by the psychiatrist for the first eight weeks of hospitalization were frequently absent from the record.

## 5. Other Treatment Issues

### A. Involuntary Medications (PC 2602)

During the review period, the number of episodes of patients receiving involuntary medications on either an emergency or non-emergency basis ranged from two to ten per month. At the time of the site visit, three patients were receiving psychotropic medications on an involuntary non-emergency basis. One newly-admitted patient was receiving medications per a PC 2602 order. There were no PC 2602 petitions initiated or renewed by DSH-Coalinga during the review period.

### B. Behavioral Management

DSH-Coalinga reported that no patients were on individual behavioral plans during the review period.

## V. PATIENT ACCESS TO TREATMENT

### Patient, Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

During the reporting period and at the time of the site visit, DSH-Coalinga utilized the HAS to provide "adequate treatment in a safe and secure manner." The policy, Administrative Directive No. 558 (A.D. No. 558), was updated on November 14, 2017. The

HAS outlined the criteria for patients' hospital access, which covered access to treatment services. The treatment plan team was required to decide patient's access based on his safety and security and ability to traverse the hospital environment. The treatment plan team had to evaluate a patient's status and progress in determining if it was appropriate for him to have hospital access. In the event the treatment plan team failed to reach consensus, it was the responsibility of the unit supervisor to determine if the patient could have hospital access. The HAS was designed to be non-punitive. Implementation and monitoring the system, and reporting, was the responsibility of the program director. The unit supervisor or their designee issued badges and destination cards to patients.

In considering hospital access, the treatment plan team was required to evaluate each patient's "safety and security, institutional violence, pathology and degree of risk to safety and security" of the hospital before assigning hospital access. An initial assessment by the treatment plan team was required to permit hospital access following admission. A.D. No. 558 specified behaviors and activities that could lead to the denial of an access badge while a patient was on admissions. Exceptions were required to be reviewed by the program director and clinical administrator.

In its assessment prior to assigning a hospital access badge, the treatment plan team must evaluate and document in the treatment plan the patient's "current ability to follow rules, control behavior, maintain therapeutic relationships, and navigate safely to a destination."

The treatment plan team was required to make specific determinations regarding each patient's level of functioning and cognitive ability, recognizing that some patients might require prompting to obtain and maintain compliance, but were able to without incidents or resistance. The treatment plan team assessed whether since arrival the patient had followed staff direction,

hospital policy, and unit rules, and behaved in a manner that respected safety and security, as well as demonstrated his ability to be socially appropriate. A patient's personal hygiene and room care had to be at least "fair." If a newly-admitted patient was assessed not to be a risk to safety and security, he must be assigned hospital access within seven days after that determination.

For patients who were not expected to be out of the hospital before clinical discharge (e.g. out to court) for more than 90 days, the treatment plan team was mandated to consider the patient's hospital access prior to discharge. For these patients returning to the hospital, A.D. No. 558 provided for the reinstatement of their hospital access, unless there was a specific rationale for not allowing it; for example, there was a significant change in the patient's clinical condition.

Patients who were capable of safely navigating the hospital and did not pose a threat to themselves or others were granted hospital access. As part of the HAS, each patient had to agree to follow the rules of his unit as well as the off-unit rules. The patient also had to agree to follow staff direction and to refrain from physical or verbal assaults and adhere to a standard of non-violence. The HAS also had "Therapeutic Rules" that patients were required to agree to including not participating in acts of over familiarity with staff, nor staring or making inappropriate eye contact, or stalking staff.

Other criteria for hospital access included, but were not limited to, not possessing contraband, not leaving the unit without authorization, not inciting others to misbehave, not impeding staff as they carried out their duties, and not blocking the passage of others. In addition, patients had to maintain public health and not engage in unsanitary behavior. The patient also had to consent to respect the rights of others that included prohibiting verbal abuse; not engaging in provocative or intimidating behavior; refraining from theft or property damage;

not engaging in sexual contact or stalking others; and not using racial, sexual, or other slurs. A patient was also required to agree not to disrupt group meetings as well as not to extort money or property from others.

The hospital access of any patient observed violating any provision of A.D. No. 558 could be restricted. A patient's movement could also be restricted for medical reasons, and his hospital access would be placed on a "Medical Restriction."

The treatment plan team was required to review all incidents that resulted in the restriction of a patient's hospital access and document its findings and the status of the patient's level in his treatment plan and other specified hospital documents. The review was required to be completed by the next business day or sooner if appropriate, with or without the patient as clinically indicated. In its documentation, the treatment plan team was required to explain the reason for imposing the restriction and what the patient needed to do to regain his hospital access.

Where a patient declined to participate in the treatment plan team assessment of his hospital access, the treatment team and nursing staff were directed to continue to assess the patient's behavior regarding his safety and security risk and document the rationale to continue to restrict hospital access. A.D. No. 558 provided that under exceptional circumstances, the unit supervisor could direct the return of the patient's hospital access to him prior to review by the treatment plan team, which decision the unit supervisor must discuss with the treatment plan team the next business day.

In the event there was an exceptional risk to safety and security, such as an attempted escape, the commission of the crime, or a serious assault, staff could conduct extended periods of

observation.  In such cases, the treatment plan team was required to consult with program management.

## VI.    REFERRALS AND TRANSFERS

During the review period, all 35 patients who were referred to DSH-Coalinga were admitted.  The average time from CDCR's referral of the patient to admission to DSH-Coalinga was 22 days, with a range of nine to 63 days.

## VII.    ADMISSIONS AND DISCHARGES

### 1.    Admissions

During the review period, all 35 patients who were referred to DSH-Coalinga were admitted.  Of those 35 admitted patients, additional admissions data was provided for 27.  The average time from receipt of the completed referral by the Patient Management Unit to patient admission was 13 days, with a range of four to 28 days, and an outlier at 55 days.  The average time from acceptance of a patient to admission was 9.6 days, with a range of two to 22 days, and an outlier at 50 days.  There were seven direct admissions from CDCR facilities, as well as ten admissions from the CHCF-PIP, seven admissions from the CMF-PIP, and three admissions from the SVSP PIP.

During the review period, DSH-Coalinga admitted two patients who were within 90 days of parole at the time of admission, and one patient with complex medical needs who was subsequently discharged to an Outpatient Housing Unit bed.

### 2.    Discharges

During the review period DSH-Coalinga discharged 38 patients.  The average length of stay from patient admission to physical discharge was 201 days, with a range of stay from 23 to 756 days.  The average length of stay from admission to clinical discharge was 196 days, with a

range of stay from 14 to 754 days.  Twenty-eight of the discharged patients went to EOP programs, four were discharged to acute care programs, two were discharged to other intermediate care programs, one was discharged to the CTC, one was discharged to the MDO program at DSH-Atascadero, and two patients were paroled.  The dates of clinician-to-clinician contact were reported for three discharged patients.

During the review period, nine of ten patients who were within 90 days of parole received pre-release planning, while seven of ten received TCMP services.

On January 3, 2018, DSH-Coalinga housed one patient who had been clinically discharged on January 2, 2018, but physically remained at the institution.

## VIII.  PATIENT DISCIPLINARY PROCESS

There were 13 RVRs according to the RVR log.  Of the 13, one did not have a mental health assessment completed while the patient was at *DSH-Coalinga*; it was requested 17 days after the incident and was ultimately completed at a CDCR facility.  Of the 12 mental health assessments available for review, mental illness was found to be a contributing factor for the behavior in two cases, or 17 percent.  None found that any mental health factors should be considered in the disposition if the patient was found guilty and none of the offenses were eligible for SHU terms.  Not all of the hearing officers' reports were available to determine consistency with the mental health assessments in the disposition of the RVRs.  DSH-Coalinga reported they had not kept copies of RVR packets until very recently; therefore, only seven completed RVR packets were available for review.

The RVR log was not accurately maintained.  For instance, the log indicated none of the patients' mental health had been a contributing factor to the behavior underlying the RVR.  Yet, as stated above, it was determined that in two instances mental health was determined to be a

factor. The facility did not track any other items in the RVR process, such as whether the patient's mental illness should be considered in the disposition of the case to mitigate any penalties if found guilty.

None of the clinicians completing the mental health assessments, nor their supervisor, had been trained to complete the mental health assessment. An explanation offered by the DSH-Coalinga supervisor was the high turnover of clinical staff and the frequency with which the training would be required.

## IX.    USE OF FORCE

There were no cell extractions or use of force incidents during the review period.

## X.    UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

DSH-Coalinga reported a total of 95 serious incidents during the review period. Of this number, 46 were reported to be aggressive acts. They included aggressive acts towards other patients and staff. In addition, there were 24 acts of self-harm, including threats of suicide and suicide ideation. Reports also included indecent exposure, failure to follow policy, rule violations, and accidental falls, among others.

One allegation of patient neglect and one allegation of patient abuse was reported during the review period. The alleged incident of abuse occurred during August 2017. The patient informed the Prison Rights Advocate that he was physically assaulted by staff after he signed out a game system from the nursing station and was told not to return with it for two hours. The patient alleged that when he attempted to return the game ten minutes later, an altercation took place between he and the staff member. The alleged incident of neglect, which occurred during July 2017, was a report by a patient alleging he was assaulted by his peers, while staff members

watched.  This matter was referred to the Department of Police Services and the Department of Special Investigations.

**XI.**      **USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT**

During the review period, nine patients were placed in seclusion with all but one of the seclusion episodes lasting less than three hours.  One outlier lasted 24.42 hours.

There were 11 episodes of restraint use, with one inmate involved in four restraint episodes, and another inmate involved in two restraint episodes.  The duration of restraint ranged from .37 hours to 5.88 hours, with all but two restraint episodes lasting less than two hours.

An audit specific to the use of restraints during the review period was reviewed, which indicated 80-percent compliance during July 2017 and 100-percent compliance during each of the next four months.  Only one episode of restraint was reflected in July 2017.

**XII.**      **SUICIDE PREVENTION**

No class member suicides occurred at DSH-Coalinga during the review period.  The sole suicide attempt (scratch/cut to forearm with staple) reported occurred in October 2017 and required that the wound be cleaned and bandaged, no sutures necessary.  The institution determined this incident was handled appropriately by unit staff, therefore no Suicide Risk and Prevention Committee Review was deemed necessary or corrective action plan created.  Based on the local governing body report, no policies or procedures were modified because of the attempt.  The serious incident report indicated that staff addressed it appropriately.

DSH-Coalinga's Suicide Risk and Prevention Committee met two times during the reporting period, during August and October 2017.  Minutes for the August 24, 2017 meeting indicated that seven of the nine members were present.  According to the minutes, agenda items included the hospital's suicidal data for the prior 12 months and the risk and various other factors

that one might exhibit related to suicidal gestures and behaviors. The committee also reviewed an article, "Recent Advances in Differentiating Suicide Attempters from Suicidal Ideators" dated December 2016.

The October 26, 2017 minutes reported that five of the nine members were present. Agenda items included training on suicide prevention and assessment for psychology staff, collaboration regarding suicide prevention between psychiatry and psychology, and the article referenced above. As occurred during the August 2017 meeting, the committee discussed risk and other factors that a patient might exhibit related to suicidal gestures and behaviors. Listed tasks included training psychology staff and other disciplines regarding identifying suicide behaviors and triggers. The committee also indicated that it would continue to discuss the relevance and applicability of these issues to patients in a forensic hospital.

It was observed that the minutes for both months were one pagers that did not document the deliberations that occurred during the meetings.

## XIII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

During the reporting period, there were no serious or significant suicide attempts, or self-injuries that required emergency response, or deaths that required implementation of the death review process.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

The quality improvement system at DSH-Coalinga was known as the performance improvement program. The organizational structure for performance improvement consisted of an executive committee, which had overall responsibility and ultimate accountability for performance improvement. Membership was determined by the executive director and may include, but not be limited to the following positions:  executive director, hospital administrator,

clinical administrator, medical director, nurse administrator, and director of quality improvement.

The quality improvement department was responsible for collecting data, reviewing, and working with department managers/supervisors in developing ideas to facilitate change in areas that have been identified as requiring improvement. The quality improvement department provided oversight to ensure that all risk management data was entered (e.g., incidents, triggers, high risk indicators) into a facility-wide database, which was then used for quality improvement purposes.

A utilization review committee met on a regular basis to oversee the review of the medical necessity for admissions, extended stays, and services rendered. The committee addressed bed utilization, inefficient scheduling, and use of resources including radiology, laboratory, and referrals to external providers and hospitals. Patterns of care were identified and reviewed as appropriate. The utilization management committee was very active in reviewing issues specific to *Coleman* patients and almost always made specific recommendations as a result of such reviews.

The enhanced trigger review committee reviewed issues specific to *Coleman* patients although it was extremely common that "no recommendations" were made by the committee as a result of such reviews.

The structure of the quality improvement process was robust, although the actual quality improvement studies specific to the *Coleman* population were problematic. For example, the quality improvement studies specific to *Coleman* patients included the following: treatment hours being offered to and used by the patients, the use of seclusion, the quality of the groups being provided, and appropriate treatment planning. The problems with these studies were that

reports were not stand-alone documents and they did not explicitly state the purpose, methodology, assessment of the result, or a plan, if any.

The studies did state the results, but without explanation of the methodology used, it was not possible to accurately understand the findings. For example, the treatment group observation audit discussed below demonstrated almost 100-percent compliance with all measures audited, however it lacked information regarding the sample size used and whether the sample size was large enough to be statistically significant.

For the audit on treatment groups, discipline chiefs/supervisors (e.g., the chief of psychology, supervising psychiatric social worker) observed an unknown number of treatment groups for 17 audit items. The audit included items such as "timely start" to "facilitators' engagement of all group members" and "facilitator identifies and utilizes participant's strengths." Audits occurred monthly and results were always 100 percent, except for timeliness in July 2017 (80 percent).

It was observed that the factors measured in the audits were limited. Also, as stated above, it was problematic that there was no information regarding the methodology of the audits. For example, it was unknown how the observed treatment groups were selected, the sample size, which disciplines were observed, or any limitations to the audits, or other relevant information.

Analysis of the audit documents indicated that it would very likely benefit DSH-Coalinga to revise the audit tool to measure clinically meaningful items that addressed how the facilitator established, maintained, and achieved a goal(s) for the group session; how the facilitator maintained a consistent theoretical orientation throughout the group session; if the facilitator adhered to the session group materials and structure, deviating only when clinically indicated to

facilitate learning or group cohesion; and if participants spontaneously engaged with each other in a meaningful manner.

Revising the audit instrument was discussed with DSH-Coalinga's management team; they were receptive to feedback regarding the need to include sufficient information for all audits, data, and reports presented.

## XV.   PATIENT COMPLAINTS/PATIENT SATISFACTION

Of the 38 patients that DSH-Coalinga discharged during the reporting period, 16 or 42 percent participated in the patient satisfaction of care survey following discharge.  Of the remaining 22 patients, eight refused to participate, ten were clinically contraindicated to participate, one was discharged while out to medical, and three were emergently discharged.

In response to the survey, 94 percent of patients strongly agreed that they felt safe while at DSH-Coalinga, that staff spent enough time with them, that they learned coping skills at the institution that would help in their next placement setting, that staff provided them with information concerning the rules and expectations of the unit and program, and that they understood the benefits of their medications.  Further, 88 percent of patients reported strongly agreeing that they were appropriately referred to DSH-Coalinga, that staff encouraged them to participate in treatment planning, that they felt their preferences and input were incorporated into their treatment, and that they had enough time out of their room.

During the review period, there were a total of five patient complaints, involving three patients.  DSH-Coalinga reported resolving all five patient complaints and that two of the three patients had returned to CDCR.  At a community meeting held during the site visit, patients were very complementary of the program offered to them at DSH-Coalinga.  In general, they described the staff as being accessible, caring, and helpful, but reported that the assigned

correctional counselor was not.  Most of the patients described the core groups as being helpful to them.  The patients had no complaints about having access to the gymnasium and outdoor yards.  Patients spoke very highly of the food quality at DSH-Coalinga.

## XVI.  *COLEMAN* POSTINGS

*Coleman* postings in English and Spanish were posted in a patient-accessible showcase in the unit.

## XVII.  LAUNDRY AND SUPPLY ISSUES

Patients did not indicate any problems with laundry or with obtaining clean clothing or supplies.  DSH-Coalinga provided a copy of its guidelines for the proper handling of clean, infectious, or soiled linen and clothing.  It was reported that during the review period, there had not been any modifications or changes to practices, policies or procedures regarding patient laundry.  The institution also reported that it had khaki muumuus, and a variety of undergarments available for patients with a diagnosis of gender dysphoria.

## XVIII. VISITATION/PRIVILEGES/TELEPHONE ACCESS

DSH-Coalinga provided its policy concerning patient visitation, which had been revised in December 2017.  Absent safety or security concerns, patients were entitled to daily visitation, including holidays for up to five hours each day.  Patients did not indicate any problems with visitation.  Patients reported typically having no issues with receiving their property upon arrival at DSH-Coalinga.

## XIX.  LAW LIBRARY ACCESS

The law library at DSH-Coalinga had a legal collection of books and legal computers for patients' use.  DSH-Coalinga provided a copy of its policy regarding law library access.  This policy allowed patients to be escorted to the law library three times weekly for a one-hour

session, for a total of three weekly hours of library use.  Patients who had been granted Priority Legal User status to the law library reportedly received a minimum of four weekly hours of library access.  Interviewed patients reported typically receiving 45 minutes of law library use, three times weekly, but did not indicate any problems with access.  They reported, however, that the law library computer was difficult to use without extensive librarian assistance, which was typically not available.

## XX.   <u>EDUCATION</u>

DSH-Coalinga did not provide educational programming to patients.

SVSP-PIP

**SVSP-PIP**
December 19, 2017 – December 21, 2017

## I.      SUMMARY OF THE FINDINGS

- During the site visit, SVSP-PIP's census represented 89 percent of its operational capacity.

- Although most administrative positions were filled, SVSP-PIP reported notable staffing vacancies for psychiatrists, social workers, RNs, SMTAs, MTAs, psych techs, and clerical staff.

- At the time of the site visit, all four SVSP-PIP units were not meeting required clinical staffing ratios for psychiatry, psychology, social work, or rehabilitation therapy.

- Staff did not track IDTT meeting attendance by discipline.

- The lack of correctional counselor attendance at IDTTs, which was required, was a cause for major concern.

- SVSP-PIP did not provide accurate information regarding the average number of hours SVSP-PIP patients were offered and/or participated in weekly structured or unstructured out-of-cell activities. Patients reported, and staff confirmed, that SVSP-PIP did not provide sufficient out-of-cell structured and unstructured therapeutic activities.

- Observed groups ranged from excellent, with the active engagement of group participants, to lacking in structure and organization.

- Patients' individual clinical contacts were limited, averaging one hour or less monthly and generally occurred at cell-front.

- There were problems with medication administration including the crushing of *all* psychotropic medications and administering *hora somni* (HS) medications before 8:00 p.m.

- There was no unified leadership across disciplines on each unit, which made it difficult to address unit-wide issues with mental health treatment services. There was no assigned supervisor in each unit with the authority and responsibility to address and direct corrective actions across disciplines.

- SVSP-PIP did not track the length of time that each patient spent at each STEP.

- During the review period, 29 percent of admissions exceeded the applicable 30-day transfer timeline.

- The compliance rate for timely sending RVRs to clinicians for completion of a mental health assessment was 13 percent; 96 percent of mental health assessments were timely completed and returned to custody staff.

- Reviewed RVR mental health assessments typically did not indicate that mental health factors contributed to the behaviors charged. Custody usually documented consideration of the mental health assessment and in more than half of reviewed cases charges against patients were dismissed, reduced and/or there was penalty mitigation.

- All ten reviewed use of force incidents indicated compliance with use of force policy.

- SVSP-PIP did not have a SPRFIT coordinator position, a position that was necessary to adequately address ongoing suicide prevention matters.

- Patient council meeting minutes revealed numerous continuing but unresolved issues.

- All toured housing units contained *Coleman* postings displayed in patient-accessible areas.

- Patients expressed various complaints with laundry services, food, and receiving property, which staff typically confirmed.

- Patients did not indicate any concerns with the visitation policy.

- Although patients had online library access, they reported difficulty using this system without further assistance, which typically was unavailable.

## II. __CENSUS__

SVSP-PIP's 246-bed intermediate care facility comprised two stand-alone units, TC1 and TC2 that had single and multi-person cells and two 180 housing units on C Yard. TC1 had 32 single cells and 24 multi-person cells. TC2 had 54 single cells and 20 multi-person cells. C5 and C6 each had 58 single cells.

On December 19, 2017, the SVSP-PIP intermediate care program had a census of 219 patients, representing 89 percent of its operational capacity of 246 patients. There were 207 PC 2684 patients, ten PC 1370 patients and two patients had conservatorships.

The number of patients who were not appropriately placed in their LRH included 16 who had an LRH of unlocked dorms and 21 patients who had an LRH of locked dorms.

## III.    STAFFING

### 1.  Administrative, Clinical, and Correctional Staffing

As of December 19, 2017, the executive director and clinical administrator positions were both vacant, with staff serving in acting capacities.  Positions for the hospital administrator, assistant hospital administrator, chief psychiatrist, three program directors, and two program assistants were all filled.  Both nursing coordinator positions and five unit supervisor positions were also filled.  One of two chief psychologist positions was vacant.

Senior Psychiatrist:  The senior psychiatrist position was vacant.

Psychiatrists:  Four of ten staff psychiatrist positions were filled, leaving a 60-percent vacancy rate.  Additional coverage provided by three full-time equivalent (FTE) psychiatrists and one FTE telepsychiatrist reduced the psychiatry functional vacancy rate to 20 percent.

Senior Psychologist:  The senior psychologist position was vacant.

Psychologists:  All ten psychologist positions were filled.

Social Workers:  Seven of ten social worker positions were filled, for a 30-percent vacancy rate.  Registry provided one FTE social worker, reducing the functional vacancy rate to 20 percent.

Rehabilitation Therapists:  All ten rehabilitation therapist positions were filled.

Supervising Registered Nurses (SRNs):  Nine of 22 SRN positions were filled, for a 59-percent vacancy rate.  Two SRNs were on long term leave, resulting in a functional vacancy rate of 68 percent.

Registered Nurses (RNs):  Thirty of 50 allocated mental health RN positions were filled, leaving a 40-percent vacancy rate.  Additional coverage provided by one FTE RN reduced the functional vacancy rate to 38 percent.

Senior Medical Technical Assistants (SMTAs):  Eighteen of 30 SMTA positions were filled, for a 40-percent vacancy rate.  Two SMTAs were on long term leave, resulting in a 47-percent functional vacancy rate.

Medical Technical Assistants (MTAs):

 A total of 136 of 164.7 MTA positions were filled, leaving a 17-percent vacancy rate. Eleven MTAs were on long-term leave, resulting in a functional vacancy rate of 24 percent.

Senior Psych Techs:  Both senior psych tech positions were filled.

Psych Techs:  Twelve of 29 psych tech positions were filled, leaving a 59-percent vacancy rate.  Additional coverage provided by one FTE psych tech resulted in a functional vacancy rate of 55 percent.

Other Staff:  Twenty-three of 27 clerical positions were filled, for a 15-percent vacancy rate.  Three clerical staff on long-term leave resulted in a functional vacancy rate of 26 percent.

Additional coverage provided by registry staff included one FTE position for a licensed vocational nurse, certified nurse assistant, and medical assistant.

**2.  Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

The SVSP-PIP had an established ratio of 1:25 for psychiatrists, psychologists, social workers, and rehabilitation therapists.  At the time of the site visit, SVSP-PIP did not meet treatment ratios for any of the disciplines.

In TC1, the staff-to-patient ratios for the two psychiatrists, which included one telepsychiatrist, were 1:28 and 1:17.  SVSP-PIP reported that it was gradually increasing the telepsychiatrist's caseload.  The two psychologists had caseloads of 1:26 and 1:19.  The social worker had a caseload of 1:45, as the second social worker position was vacant.  Two rehabilitation therapists had caseloads of 1:27 and 1:18.

In TC2, the staff-to-patient ratios for the two psychiatrists were 1:31 and 1:30. However, it was reported that the recent hiring of another psychiatrist would allow for the re-distribution of patients among psychiatry consistent with established ratios. Each of the three psychologists, social workers and rehabilitation therapists had a caseload of 1:22, 1:20, and 1:19, respectively.

In C5, the staff-to-patient ratios for the two psychiatrists were 1:29 and 1:27. Both psychologists also had caseloads of 1:29 and 1:27. The recent hiring of a second social worker would result in both social workers having caseloads of 1:28. Both rehabilitation therapists each had caseloads of 1:28.

In C6, the staff psychiatrist had a caseload of 39 patients, while the registry psychiatrist who worked three days weekly had a caseload of 17. The staff-to-patient ratios for each of the two psychologists, social workers and rehabilitation therapists were 1:29 and 1:27.

One psychologist and one rehabilitation therapist were assigned to provide back-up coverage for several units.

### 3. Staff Training

SVSP-PIP reported offering non-custody new employee orientation, EHRS staff training, SMTA/MTA annual off post training, and social work department training. Monthly training schedules were provided for review; however, data on the percentage of mental health and custody staff who attended training was not provided.

## IV. TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1. Interdisciplinary Treatment Teams (IDTTs)

IDTT attendance of the various disciplines was not tracked. Staff reported that correctional counselors were not yet consistently attending IDTTs. None of the IDTTs observed during the site visit comprised all required disciplines.

The lack of a correctional counselor presence at IDTT meetings had been a cause for concern. In response, IDTTs were rescheduled to occur on Wednesdays in order to better facilitate correctional counselor attendance. However, despite this recent effort, a correctional counselor was not present at observed IDTTs held on the Wednesday during the site visit. Patients were generally present at IDTT meetings, but did not receive a copy of their treatment plans.

During the site visit, observed IDTTs for patients housed on TC1 revealed the attendance of all appropriate disciplines except for the correctional counselor. The IDTTs discussed patients' LRH and treatment plans. The MTAs present provided minimal input.

Several observed IDTT meetings held on TC2 reflected the attendance of all appropriate disciplines except for the psychologist and correctional counselor. Rehabilitation therapists, MTAs, and nurses provided appropriate feedback without prompting from the psychiatrist or social worker. The nurse also asked about medical issues and discussed appointments and follow-ups.

Other IDTTs that were observed on TC2 included a pre-meeting prior to patients' arrival, where the psychiatrist outlined his previous session with the patient covering his mood, behavior, medication, and other pertinent treatment information without indicating that it was clinically contraindicated to discuss these vital treatment issues outside the presence of the patient. These matters were not discussed further in the presence of the patients, who were asked to outline any concerns they had, and to rate their medications and treatment groups. Each patient's LRH was also discussed and he was asked to provide a reason for wanting to stay or be discharged. The treatment team did not discuss with the patients the purpose of the IDTT and their role in it, nor did they discuss the reasons for referral and how their treatment plans would address them. No

correctional counselors attended the IDTTs; the psychiatrist and social worker indicated that they would "look into" the multiple custody issues raised by patients during the IDTTs.

IDTTs observed on C5 showed appropriate clinical interaction between the treatment team and the patient and reasonable discussion of treatment goals and the reasons for not placing patients at their LRH.  However, one of the psychiatrists incorporated medication management activities into the team meeting, which should have occurred in a separate, private individual session.  Treatment teams on C5 would have benefited from the presence of a correctional counselor, who could have provided information and clarification as to LRH issues.  The MTAs who were present provided minimal input during one of the meetings.

## 2.  **Group Therapy**

SVSP-PIP did not accurately track data on the average number of hours that patients were offered and/or participated in weekly structured or unstructured out-of-cell activities.  Patient and staff interviews indicated that SVSP-PIP did not provide sufficient hours of out-of-cell structured and unstructured therapeutic activities to patients, indicating that the hours offered were significantly lower than what was offered at the EOP level of care in prisons.

SVSP-PIP reported no data regarding refusals for July and August 2017.  In September 2017, 64 patients refused 50 percent or more of offered treatment, and in October 2017, 54 patients refused 50 percent or more of offered treatment.  Patient refusal rates for groups offered during November and December 2017 ranged from approximately 30 to 50 percent.

Staffing shortages affecting nursing, psych techs, and MTAs resulted in lack of coverage for the provision of group therapy.  The severe lack of out-of-cell time afforded patients on C5 and C6 resulted in poor treatment planning due to the lack of treatment options available.  To mitigate against this lack of out-of-cell time, staff offered puzzles and games at cell-front

approximately three to four times per week, which, while beneficial to patients, was not a substitute for the provision of adequate mental health care.

Unstructured out-of-cell time had not been tracked since the implementation of the EHRS. The facility was awaiting the implementation of a new tracking system to address this area of deficiency.

A music therapy group was observed in housing unit TC1. The music therapist was excellent and all nine of the patients were actively engaged in the 75-minute session. Patients indicated however, that about 20 percent of their groups were relevant to their specific issues.

A problem-solving group conducted by a practicum student was observed on TC2. The group was attended by 15 patients and the majority were engaged the entire time. The discussion was thought-provoking and all patients were able to voice their opinions without judgment and looked forward to attending again. The clinician was well-prepared and professional. The group lasted one hour.

Two groups held in C5 were also observed. One, conducted by a music therapist, consisted of the therapist showing music videos requested by patients. The second group was also essentially unstructured and involved the rehabilitation therapist reading affirmations, with patients subsequently participating in an unrelated art project. Both groups would benefit from increased structure, supervision and organization.

### 3.  Individual Treatment

Since the implementation of the EHRS, SVSP-PIP patients had been assigned to a primary clinician who was either a social worker or psychologist. These clinicians were supposed to meet with their patients at least once weekly in an out-of-cell setting. MTAs were not present during the sessions unless there was a clinical indication for them to be.

Patients' individual clinical contacts were extremely limited and only averaged 0.2 to 1.0 hours monthly. Staff indicated that in housing unit TC1 individual clinical contacts occurred on a weekly basis, usually at cell-front due to correctional escort issues, and generally lasted ten to 15 minutes per session. Individual contacts in C5 and C6 were variable in frequency and at times also occurred at cell-front due to escort issues. Individual clinical contacts provided to patients in SVSP-PIP were inadequate.

### 4. <u>Psychiatric Services</u>

Patients were usually seen monthly by their psychiatrists, although some were seen more frequently in individual sessions. Documentation of psychiatric contacts was generally consistent, substantive and comprehensive.

As reported above, a psychiatrist incorporated a patient's medication management during the IDTTs rather than in a private, individual setting, which was not appropriate for the IDTT or patient medication management consultations.

### 5. <u>Other Treatment Issues</u>

The lack of a unified leadership across disciplines on each unit led to structural and chain of command issues in the various units. The unit supervisor was administratively in charge of the unit. The mental health clinical staff did not have unit supervisors; each of the mental health disciplines was supervised by the program-wide chief of their specific discipline. The SRN provided clinical supervision for nursing and reported to a chief nurse supervisor outside the SVSP-PIP and to two nurse coordinators. SMTAs supervised MTAs and some unit activities. Staff indicated that there were also different supervisors for different duties within nursing. Custody staff, such as correctional counselors assigned to the SVSP-PIP, also had their own supervisor and reporting hierarchy.

Multiple supervisors of the various providers made it difficult to address problem areas regarding unit-wide mental health treatment services. There was no designated person with the authority and responsibility in a unit to address and direct corrective actions across disciplines. Interviewed staff confirmed a convoluted reporting and supervision structure in the unit. These organizational issues were reviewed with key leadership members, as they clearly hampered the capacity to deliver adequate care in the various units at SVSP-PIP.

Staff reported that all psychotropic medications were crushed prior to being administered. The only rationale offered for this procedure appeared to be that it had always been the practice. Nursing staff estimated that the pill line took approximately twice as long as it would take to administer non-crushed psychotropic medications. Patients also voiced unhappiness about having their psychotropic medications always crushed. Psychotropic medications should be crushed only for administration purposes when clinically indicated, and must be individually ordered by psychiatry.

## A. Involuntary Medications (PC 2602)

On December 14, 2017, 57 patients had PC 2602 orders; all had been initiated or renewed and granted except for one, which had been extended pending a hearing. Reasons for the PC 2602 orders included 16 for grave disability, nine for danger to self, 19 for danger to others and 13 for multiple reasons. PC 2602 orders were initiated at SVSP for 27 patients, six were initiated at CHCF, three were initiated at CMF, and one each was initiated at CMC, California Rehabilitation Center, California State Prison, Los Angeles County (CSP/LAC), California State Prison, Sacramento (CSP/Sac), Kern Valley State Prison (KVSP), and Mule Creek State Prison (MCSP); 15 were left blank.

Refused PC 2602 medications were ordered for daytime administration only, rather than at HS. This practice resulted from a lack of sufficient staff during evening hours and reported increased difficulties for patient resistance because of their awareness of decreased evening staff. Regional staff agreed to work with local staff to identify alternative measures to address this issue.

### B. Behavioral Management

As was found and reported during the last tour of inpatient facilities, the PIP at SVSP continued to underutilize behavioral plans and interventions when indicated. There were instances where a patient's identified problematic behavior did not change during the course of treatment, however, there were no documented modifications observed in the health records regarding treatment plans, treatment modalities, goals, or objectives to address the concerning behavior. Even where a patient's disruptive or agitative behavior prohibited their placement in their LRH, health care records did not consistently include documented behavioral interventions designed to address the problems that were identified and aid transfer to a patient's LRH. Documentation of core functioning and stated behavioral interventions were not consistently found in health records.

## V. PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

At the time of the site visit, SVSP-PIP was using the STEP program that had been instituted by DSH prior to Lift and Shift on July 1, 2017. CDCR was in the process of developing and implementing a uniform behavioral incentive program for its PIPs, including SVSP-PIP, which had not been approved at the time of the site visit.

The STEP program at SVSP-PIP included a DPS, which policy described as an "individualized temporary status" where a patient was placed "following a serious behavioral infraction requiring heightened security measures that allows the patient access to care and treatment in a safe and controlled environment." A patient could be placed at DPS for clinical or safety reasons at any point in the program. There was also a Maximum Custody Status that required the patient to remain "under the direct supervision and control of the custody staff. Patients on Maximum Custody can only program in mechanical restraints or in the therapeutic treatment module."

Patients in SVSP-PIP began with Assessment and Orientation during which period they were closely observed and clinically evaluated by the IDTT. Patients remained at this level until classified by the ICC/UCC. In Assessment and Orientation, the patient was oriented to program rules and treatment expectations, as well as assessed and evaluated. Treatment planning was also completed at this time in the Master Treatment Conference. Patients could participate in solo and/or small group treatment activities, and were provided in-cell recreation activities, as approved by the IDTT. Property was allowed as provided for by Title 15 as clinically indicated. Assessment and Orientation status could not extend beyond the ICC and the Master Treatment Conference.

Prior to ICC/UCC action, non-Maximum Custody patients were permitted to participate in individual or small group activities without handcuffs for purposes of socialization, orientation, and evaluation. Where clinically indicated, the patient could be placed in a treatment module for these activities. In the Assessment and Orientation period, only patients admitted at Maximum Custody were placed in handcuffs pending review by the ICC to decide the patient's custody level, after which they could be released or retained at Maximum Custody.

At STEP 1, a patient was permitted to participate in treatment activities including solo and/or group programming according to their individualized treatment plan. In STEP 1, the IDTT identified the number and type of group activities according to the treatment outcome expectations based on the referral of the patient. The patient was expected to understand their targeted problems and to focus on them, as well as to become integrated into the treatment community, abide by the rules, safely participate in treatment activities, develop socialization skills, and interact appropriately with other patients and staff. Property was allowed as provided for by Title 15 as clinically indicated. STEP 1 patients were also provided specified incentives that included in-cell recreation activities and participation in game tournaments.

To advance to STEP 2, patients were required to participate in 50 percent of treatment activities and maintain the requirements of STEP 1. Treatment expectations also included participation in treatment activities outlined by the IDTT and maintenance of personal hygiene and room with minimal prompting, while respecting the properties of staff and other patients. Patients were also required to continue to maintain medication adherence and demonstrate progress toward achieving treatment objectives, while interacting and socializing appropriately with others and following community rules. Property was allowed as provided for by Title 15 as clinically indicated. In addition, the patient was expected to meet any other patient specific criteria required by the IDTT and documented in the patient's treatment plan. STEP 2 patients were also provided with specific incentives including handheld games and were eligible for holding the position of secretary in patient government.

For a patient to advance to STEP 3, he must attend 80 percent of treatment activities. The IDTT also considered the patient's adherence to the STEP 2 requirements discussed above, and whether he had met all the specific criteria for advancement designated by the IDTT.

At STEP 3, patients were required to be actively engaged in their treatment to understand their mental illness, develop additional coping skills and aftercare plans. To maintain STEP 3, the patient was required to attend 90 to 100 percent of their treatment activities and have no disciplinary issues. In addition to sustaining the requirements that were met to advance to STEP 3, the patient was required to have the skills to recover "from lapses in judgment/behavior without serious disruption," demonstrate motivation for treatment, and show positive leadership skills. The patient must also meet any specific criteria set by the IDTT. STEP 3 patients were provided incentives that included being eligible to co-facilitate groups with clinical staff and participate in weekly games and movie activities. Patients at STEP 3 who were placed on DPS could not return directly to STEP 3.

STEP 3 patients were also eligible to hold the position of president or vice president in patient government. Property was allowed as provided for by Title 15 as clinically indicated. A loaner television, one of the incentives in STEP 3, was not available at SVSP-PIP because it was not a dormitory setting.

Under the STEP program, the IDTT determined when a STEP adjustment was necessary in cases where the patient was not maintaining the criteria defined for his STEP. The IDTT was required to meet with the patient to discuss the reasons for the STEP adjustment and the criteria the patient would need to meet to return to their previously earned STEP. The discussion with the patient, the criteria to return to the earned STEP, and the decision of the IDTT must be documented in the medical record. The treatment plan must also be updated if necessary.

Minimally, the IDTT must review the patient's STEP level at each meeting and discuss any requirement for advancement, which would include any additional or modified requirements approved by the IDTT. When considering whether a patient might be ready to transition to a less

restrictive housing, level of care, or to be discharged to CDCR, a "patient's STEP level is not the sole determining factor."

Under the STEP program, in the event a patient was transferred to the same level of care at another inpatient program, the patient must retain the same STEP level previously earned following an assessment by the receiving IDTT, if there were no custody or behavioral reasons for placement at a different level. Where the IDTT determined that a patient must be placed at a different STEP level, the IDTT must document "the rationale for adjusting the STEP level at the criteria to progress through STEPs in the initial IDTT conference."

Under the STEP program, a STEP level report was required to be provided weekly following IDTTs to program management. During the review period, SVSP-PIP did not track the length of time that each patient was at a particular STEP. SVSP-PIP reported that due to EHRS transition, staff who had previously been tasked with tracking each patient's duration at each STEP was redirected to perform rounding functions. The institution reported implementation of a new process for patient tracking that would be in place in January 2018. The new procedure required all primary clinicians to report weekly to the program office such data for each patient on his/her assigned caseload.

During the site visit, there were no patients on Orientation and six patients on DPS. There were 17 patients on STEP 1 solo, 102 on STEP 1, 48 on STEP 2 and 43 on STEP 3. Three PC 1370 patients were on MAX custody status.

## VI.     REFERRALS AND TRANSFERS

During the review period, there were 242 referrals to the SVSP-PIP. Three patients were rejected; one of the rejections was subsequently referred to acute care. Eighteen other referred

patients were not admitted; 12 were rescinded, two patients were referred to acute care, and four others were re-endorsed to other PIPs.

## VII.     ADMISSIONS AND DISCHARGES

During the review period, there were 221 admissions.  Nine patients had two or more admissions and 33 were admitted through the *Vitek* process.  Following admission, the ten-day timeline for holding ICCs was met in 216 of 221 instances, reflecting 98-percent compliance. SVSP-PIP discharged 128 patients during the review period; the average length of stay was 165.74 days.  Tracking data on clinical contacts between SVSP-PIP and CDCR's prisons was not available for the review period following Lift and Shift.  SVSP-PIP reported that corrective measures were implemented effective December 11, 2017, where clinical contacts following discharge would be documented in a specific note labeled "clinician-to-clinician" contacts and tracked through EHRS.

## VIII.    PATIENT DISCIPLINARY PROCESS

There were 119 RVRs issued to SVSP-PIP patients during the review period.  During July 2017, 23 RVRs were issued, 37 were issued in August 2017, and 42 issued in September 2017.  Although data was provided for October 2017, it appeared incomplete, as it did not reflect RVRs after October 19.  Additional requested RVR data for October was not provided. According to the data provided, 17 RVRs were issued during October 2017.

Of the 119 RVRs, 111 were issued to patients while housed in the SVSP-PIP; 19 patients were housed in TC1, 35 in TC2, 40 in C5 and 17 in C6.  According to the data provided, 15 of 119 or 13 percent of RVRs were sent to mental health within two calendar days for completion of the mental health assessment as required by policy.  The data also indicated that 114 of 119 or

96 percent of mental health assessments were completed by clinicians and returned to custody staff within eight calendar days as required by policy.

The monitor reviewed 18 RVRs and mental health assessments. Of these, only one recommended documenting the behavior in an alternate manner. Two of 18 or 11 percent of mental health assessments indicated that patients' mental health symptoms contributed to the behaviors charged. Only one of 18 or six percent indicated any factors that the hearing officer should consider when assessing the penalty; 14 of the remaining 17 stated that the patient did not have any known mental health factors or developmental or adaptive functioning deficits that would have an adverse impact on assessing a penalty or affecting his stability; the remaining three assessments did not address this issue.

Custody documented consideration of the mental health assessment in 17 of 18 cases, or 94 percent of the time. Charges were dismissed, reduced and/or there was penalty mitigation in ten of 18 or 56 percent of cases, with five specifically citing mental health factors. There was no mitigation in eight cases.

Effective November 2017, CDCR discontinued using the paper mental health assessment process, replacing it with completion of the mental health assessment through EHRS; once complete, mental health assessment information was automatically transferred to SOMS. SVSP-PIP reported that all eligible clinicians received EHRS training on the new RVR process, as did 100 percent of correctional administrators and captains, 90 percent of lieutenants, and 81 percent of sergeants.

SVSP-PIP did not provide data on clinical staff receiving annual inmate disciplinary process mental health assessment training. SVSP-PIP reported that 100 percent of correctional

administrators and captains received the annual inmate disciplinary process mental health assessment training, as well as 93 percent of lieutenants and 95 percent of sergeants.

## IX.   USE OF FORCE

There were ten use of force incidents during the review period; one was controlled and nine were immediate.  The one controlled use of force incident took place in July 2017, while there was one immediate use of force incident in July, two in August 2017 and six in September 2017.

The controlled use of force incident occurred following a patient's cell extraction to administer PC 2602 medications and during which the patient committed a battery on a peace officer.  Review of the use of force incident packet indicated that staff's actions were in compliance with use of force policy, procedure and training, and that relevant procedures were followed.

SVSP-PIP reported 100-percent compliance for completion of annual use of force training by the warden, chief deputy warden, correctional administrators and captains.  Ninety-three percent of lieutenants received the training, as did 97 percent of sergeants and correctional officers, and 83 percent of MTAs.  No data was provided on annual use of force training for clinicians.

## X.   UNUSUAL OCCURRENCES/SERIOUS INCIDENTS

SVSP-PIP reported a total of 305 serious incidents and unusual occurrences for the review period.  There were 49 incidents in July 2017, of which 22 were aggressive patient behaviors, six were suicide/self-harm behaviors and 21 were "other" incidents.  For August 2017, the PIP reported 21 aggressive behaviors, 15 medical incidents, 19 suicide/self-harm behaviors and 30 "other" incidents, for a total of 85 incidents.  There were 95 incidents during

September 2017, but their nature was not further explained.  The institution reported 76 incidents in October 2017, of which there were 25 aggressive behaviors, ten medical incidents, 24 suicide/self-harm behaviors and 17 "other" incidents.

All serious incidents and unusual occurrences were to be reported to the Quality and Performance Improvement Program through the Standards and Compliance Committee; however, the program was new and not yet fully implemented.

## XI.  USE OF SECLUSION AND RESTRAINT

During the review period, there was one incident of restraint in August 2017, which lasted seven hours and five minutes.  There were also 77 episodes of seclusion involving 51 patients, ranging from 52 minutes to just over 228 hours.

In July 2017, there were nine seclusion incidents involving eight patients.  The length of time in seclusion ranged from 52 minutes to just over 48 hours.  In August 2017, there were 19 episodes of seclusion, involving ten patients.  The length of time in seclusion ranged from four hours and forty minutes to 87 hours and five minutes.

There were 24 episodes of seclusion involving 16 patients during September 2017, with the length of time in seclusion ranging from two hours and thirty minutes to 142 hours and 15 minutes.  During October 2017, there were 25 seclusion episodes involving 17 patients; the length of time ranged from three hours and 35 minutes to just over 228 hours.

The most recent seclusion and restraint policies and procedures were dated 2013 and 2014.  Due to changes resulting from lift and shift and the implementation of EHRS, paper data on patients in seclusion was difficult to find.  However, nursing staff reported that SVSP-PIP followed seclusion policies and there were no adverse patient outcomes while in seclusion.

## XII. SUICIDE PREVENTION

There were no suicides during the review period; there were four suicide attempts and eleven aggressive acts to self.[23]

Historically, the SVSP-PIP worked collaboratively with SVSP on suicide prevention efforts. However, the SVSP-PIP did not have a position for a SPRFIT coordinator and indicated that this position was necessary to adequately provide ongoing suicide prevention training, monthly reports, audits, and corrective action plans. It was further reported that SVSP's SPRFIT coordinator could not effectively perform these tasks for the SVSP-PIP.

The seven-hour suicide prevention training was received by 40 percent of psychology staff. The training was provided by the SVSP SPRFIT coordinator between September and December 2017. Remaining staff were scheduled to receive the training by March 2018.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

There were no reported deaths during the review period. There were four emergency responses related to a kitchen fire, a fire in a patient's cell, a chemical smell, and a false fire alarm. All incidents were handled timely.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

On July 1, 2017, the SVSP-PIP transitioned from DSH operation to being operated by CDCR. Among other matters, this resulted in a transition issue regarding the migration of various information technology programs, which impacted the ability to collect and use data for audits and program evaluation. Another major transition occurred on September 12, 2017, with the activation of EHRS, which had a significant negative impact on patient care in SVSP-PIP, notably, out-of-cell treatment hours. The preparation for EHRS included training of disciplines

---

[23] "Aggressive acts to self" is the terminology used by SVSP-PIP.

prior to the launch, often necessitating the removal of line staff from direct patient care, as well as the removal of multiple staff in all disciplines to provide training. Between June and August 2017, when EHRS training occurred, programs modification resulted in significantly lower out-of-cell treatment time for patients.

SVSP-PIP's Standards and Compliance Office was in the process of drafting a local operating procedure for the Quality and Performance Improvement Program, which was expected to be completed by the end of January 2018; training would follow.

The role of the quality council committee and its policies and procedures would also be revised; it would now collect and review monthly reports from SVSP-PIP's clinical and administrative departments and review performance goals and objectives. The process would also include elevating relevant reports to the local quality management committee.

The PIP's quality council committee essentially functioned as a mental health subcommittee and reported directly to SVSP's quality management committee. During the review period, the quality council committee's usual activities did not occur due to lift and shift and implementation of EHRS, but it nonetheless continued to monitor various incident reports.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

During the reporting period, there were 112 health care appeals, of which 29 were mental health appeals and three could have either been medical or mental health appeals. Mental health appeals belonged to the following categories: medication changes, removal from PC 2602 orders, complaints against MTAs and psych techs, requesting a lower level of care, and mental health treatment being stopped due to staff shortages. There were 24 appeals in July 2017, 24 in August 2017, 34 in September 2017, and 30 in October 2017.

SVSP-PIP had patient councils in its various units.  All patient council meetings at

SVSP-PIP were cancelled during September 2017 due to the implementation of EHRS.  The

patient councils in TC1 and TC2 met monthly during the review period, except for September

2017.  The patient council in C5 did not meet at any time during the review period and the

patient council for C6 met in August 2017 during the review period.

Provided minutes from patient council meetings showed that patient councils served as a

forum to provide information to the patients through their representatives on the council.  Patient

councils also attended to a variety of questions and concerns raised by patients seeking resolution

from staff.  Patient councils raised a wide variety of treatment and non-treatment issues.

Treatment issues included concerns regarding access to psychiatry and medical doctors to which

staff provided instructions on how to seek appointments.  Non-treatment issues covered by the

patient council included canteen, entertainment, recreation, use of personal appliances, access to

religious services, facility problems, property, delays crediting money orders to patients'

accounts, food issues, and library books.  The responses provided by staff varied.  In some cases

staff offered resolution, in other instances patients were provided the necessary information or

instructed on how to obtain the information.  In still other cases, staff responded that the matter

was currently under review or would be reviewed.

## XVI.  *COLEMAN* POSTINGS

All toured housing units in TC1, TC2, C5, and C6 contained *Coleman* postings in English

and Spanish, displayed in several patient-accessible areas.

## XVII.  LAUNDRY AND SUPPLY ISSUES

A tour of housing units TC1 and TC2 revealed adequate amounts of folded laundry,

including patient clothing and bed sheets, and other items, such as shoes and soap.  However,

some interviewed patients complained that their laundered clothing did not smell clean, of receiving an insufficient amount of laundry items, and/or that they often received the wrong size of clothing.  Some patients reported washing clothing in the sink of their cell or in the shower.

## XVIII. VISITATION/PRIVILEGES/TELEPHONE

In July 2016, visitation was expanded to include both contact and non-contact visits. Patient visitation occurred on Thursday and Friday between 8:30 a.m. and 3:00 p.m.  Visitation was held within the Facility D visiting room, which consisted of a large room for contact visits and smaller rooms for non-contact visits.

The process for visitation required an IDTT recommendation for a visit, including which type, contact or non-contact.  There was also a custody review as to whether the visit should be contact or non-contact.  The health care administrator reviewed the IDTT and custody recommendations and submitted a memorandum to the visitation department directing either contact or non-contact visitation.

Staff reported that typically between three and five patients had weekly visitors, so accommodating patient visitation was not difficult.  Interviewed patients did not report any problems or concerns with visitation.

Interviewed patients did not indicate any problems with telephone use. Loaner televisions were no longer provided to patients; however, crank radios were provided as available.

## XIX. LAW LIBRARY ACCESS

SVSP-PIP had six computers that provided access to an online law library in the various housing units; two computers in C6 provided access to patients housed in C5 and C6, while TC1 had three computers and TC2 had one computer.  However, patients reported that the system was

extremely difficult to use without further assistance from a librarian or library technical assistant, and there was very limited help available for patients to navigate the computers.

Housing tours also revealed the presence of various book carts which patients could read in the dayroom or take to their room.

Interviewed patients requested updated law library computers and more updated library books.

## I.   SUMMARY OF THE FINDINGS

- There were ongoing significant functional vacancies among treating staff at CMF-PIP.

- CMF-PIP did not meet required staff-to-patient ratios in all units.

- Clinical staff at CMF-PIP was not compliant with required use of force and suicide prevention training, which was attributed to conflicting mandatory training related to EHRS.

- Institutional culture issues, physical plant limitations, and staffing allocation and/or vacancies severely limited the ability of CMF-PIP to deliver adequate treatment, clinical services, and programming to patients.

- CMF-PIP did not consistently have all required attendees at IDTTs primarily because correctional counselors were not attending regularly.

- No data was provided regarding compliance with due dates for the completion of IDTTs and ICCs.

- IDTTs in the acute care program did not adequately focus on treatment plans and in several observed IDTT there was very little discussion regarding treatment plans.

- In some instances where least restrictive housing was addressed in IDTT, it was not documented in the medical records.

- Observed IDTTs in the high custody intermediate care program displayed significant deficiencies, including offering no justifiable rationale for not completing individual assessments prior to the IDTT, and not addressing release planning for a patient who had a known parole date.

- Treatment teams in the intermediate care program consistently completed master treatment plans but did not develop individual plans of care for their patients.

- Record reviews showed that treatment teams would likely benefit from more training regarding the development and documentation of appropriate individual treatment plans.

- Multiple interviewed patients reported that they received more structured therapeutic activities in EOP programs in the prisons than in the acute care program at CMF-PIP.

- The amount of out-of-cell structured therapeutic activities offered to acute care patients

were inadequate.

- The lack of adequate physical plant space in the acute care program and insufficient escort officers to accompany patients to available treatment space on another unit, was a major limiting factor in access to adequate hours of out-of-cell structured therapeutic activities.

- Out-of-cell time provided to Maximum Custody patients was inadequate.

- Unstructured activities provided the bulk of out-of-cell activities for intermediate care patients during the review period.

- CMF-PIP acknowledged that the intermediate care program was not providing adequate group treatment hours and not meeting the full treatment needs of all its patients.

- Required initial assessments of patients were not consistently completed timely.

- Patients were regularly seen by psychiatrists.

- Most behavior plans developed and reviewed at CMF-PIP were inadequate because the reason for referral was not clearly documented, there was no evidence that a functional analysis had been completed, nor had individualized salient reinforcers for patients been identified.

- The prevalent use of "cutting and pasting" in progress notes made it difficult to assess the clinical progress being made by patients during their course of treatment in the acute care program.

- CMF-PIP did not track patients' length of stay on solo programming status.

- CMF-PIP did not provide referral and transfer or admissions data for the review period.

- Clinical staff at CMF-PIP was not compliant with required use of force training, which was attributed to conflicting mandatory training related to EHRS.

- Custody staff was compliant with use of force training.

- CMF-PIP did not use observation or seclusion rooms.

- Presented audits demonstrated compliance with relevant elements of the restraint and seclusion policy in two of the four cases in the acute care program.

- There were no incidents of restraint reported in the intermediate care program during the

review period.

- There were no suicides reported in the CMF-PIP during the review period.

- CMF-PIP reported no deaths during the review period.

- There were no quality improvement studies and/or audits performed regarding the treatment programs within CMF-PIP during the review period.

- The recommendations of IDTTs at CMF-PIP and its utilization management committee differed significantly regarding the patients who were appropriate to be discharged from both acute and intermediate care.

## II.    CENSUS

On November 29, 2017, the CMF-PIP operated 396 beds: 218 in the acute care program, and 178 in the intermediate care program.  Of the 218 acute care beds, 184 or 84 percent were filled; 26 beds were unassigned and available; six beds were on hold; one bed was redlined; and one bed was held for a patient receiving treatment at an outside hospital.  In the intermediate care program, 91.5 percent, or 163 of 178 intermediate care beds were filled; 15 beds were unassigned and available.

During the review period, the average occupancy rate was approximately 90 percent.

As of December 4, 2017, 24 patients were housed above their LRH; 15 patients with lower LRHs were housed in single cells and nine patients with lower LRHs were housed in locked-dorm settings.  Documentation of the reasons for the housing placements were reviewed and found to be appropriate.

## III.    STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

On November 27, 2017, the executive director, chief psychiatrist, chief psychologist, hospital administrator, and nurse administrator positions were filled.  Four of the five program director positions, three of the four program assistant positions, and one of the two nursing

coordinator positions were filled.  The vacant program director, program assistant, and nursing coordinator positions were covered by staff in "acting" positions.  The clinical administrator position and the two health services specialist positions were vacant.

Senior Psychiatrists:  The two senior psychiatrist supervisor positions were filled.

Psychiatrists:  Sixteen of 28.1 staff established psychiatrist positions were filled for a vacancy rate of 43 percent.  Three on-site contractors and one telepsychiatrist were utilized resulting in a 29-percent functional vacancy rate in psychiatry.

During September 2017, CMF-PIP began using telepsychiatry in two units of the high custody intermediate care program.  Telepsychiatry was not used in the acute care program.

Senior Psychologists:  The two senior psychologist supervisor and three senior psychologist specialist positions were filled.

Psychologists:  Twenty of the 27.1 established staff psychologist positions were filled, leaving a 26-percent vacancy rate.  With the use of one FTE contractor, the functional vacancy rate was 22.5 percent.  The two psychology intern positions were filled.

Supervising Social Workers:  The two supervising psychiatric social worker positions were filled; however, one was covering as the acting program director.

Social Workers:  Twenty of the 27.1 clinical social workers were filled, resulting in a vacancy rate of 26 percent.  Two contract social workers provided additional coverage, resulting in a 19-percent functional vacancy rate.

Rehabilitation Therapists:  Twenty-five of the 27.1 rehabilitation therapist positions were filled, for a seven-percent vacancy rate.  No contractors were used.  The two student intern positions in this discipline were vacant.

Nurse Practitioners:  Two of the four established nurse practitioner positions were filled,

for a 50-percent vacancy rate.

Supervising Registered Nurses (SRNs):  Twenty of the 25.6 established SRN positions were filled; one was acting as the nurse coordinator and one retired annuitant covered an FTE position, for a functional vacancy rate of 22 percent.

Registered Nurses (RNs):  Sixty-seven of 76.2 established RN positions were filled; five contract RNs and one retired annuitant provided additional coverage, resulting in a functional vacancy rate of four percent.

Senior Medical Technical Assistants (SMTAs):  For SMTAs, 28 of 40.1 established positions were filled; however, one SMTA was providing services as the acting program assistant.  Three retired annuitants provided additional coverage, reducing the functional vacancy rate for SMTAs to 25 percent.

At the time of the site visit, no candidates had applied for vacant senior MTA positions.

Medical Technical Assistants (MTAs):  Of the 217.1 established MTA positions; 166 were filled, yielding a vacancy rate of 24 percent.  One contract certified nursing assistant and five LVNs provided coverage for vacant MTA positions.  Additionally, three retired annuitant MTAs provided additional coverage, resulting in a 19-percent functional vacancy rate for MTAs.

At the time of the site visit, 38 MTA candidates had applied for employment, and interviews were scheduled.

Psych Techs:  Six of the 33 psych tech positions were vacant, for a functional vacancy rate of 18 percent.

Correctional Staff:  CMF-PIP reported that all of its allocated correctional staff positions were filled.

**2.    Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

CMF-PIP met the required ratio of 1:15 in its acute care program for psychiatrists and psychologists except in Unit P2.  For social workers, the program did not meet the required staffing ratio in Units P2 and Q3 and did not meet the required ratio for rehabilitation therapists in Units P2 and S1.

In the intermediate care program, CMF-PIP met the staffing ratios of 1:35 for all disciplines in its several units except Unit A3 where both the psychiatrist and psychologist ratios were 1:38, and in A2, where the psychiatry ratio was 1:42.

**3.    Staff Training**

Post lift and shift, staff previously employed through DSH attended CDCR's annual block training.  Newly-hired staff were required to attend new employee orientation as a requisite to working in the CMF-PIP.   Staff reported that there was no specific training provided regarding the July 2017 revised suicide PIP policies including Referral and Admission, Discharge, Pre-Release Planning and Housing Review.

**IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING**

CMF-PIP continued to face significant problems in both its acute and intermediate care programs related to institutional cultural issues, physical plant issues, and staff—including custody, MTA, and mental health staff allocation and/or vacancy issues that severely limited its ability to deliver adequate treatment, clinical services, and programming to its patients.

**1.    Interdisciplinary Treatment Teams (IDTTs)**

Data on IDTT attendance by the various health care disciplines was not available.  Staff reported that correctional counselors did not regularly attend IDTTs, reportedly due to scheduling and/or allocation issues.

CMF-PIP was unable to produce on-demand reports for patients currently in the CMF-PIP that included initial and most recent IDTT and ICC dates, or provide audit data relative to timeliness of IDTTs and ICCs.

Acute Care Program

In the acute care program, IDTT conferences were held every seven days for each patient. IDTTs in the acute care program did not adequately focus on treatment plans.

The monitor's expert observed IDTTs on units P2 and Q2. In the unit P2 IDTT, a Correctional Counselor I (CC I) was not present, although all other members of the multidisciplinary team were in attendance. Both patients who appeared for the IDTT complained of very little out-of-cell time. One patient indicated that he had more out-of-cell time when he was in the SHU as compared to the acute care program. During the IDTT, a suicide risk assessment was performed; the psychiatrist also completed a medication review. Treatment plans were not discussed.

In the unit Q2 IDTT, all members of the IDTT, including a CC I, were present. There was very little discussion regarding the actual treatment plans.

Intermediate Care Program

CMF-PIP did not provide reliable data regarding IDTT attendance by required staff in its intermediate care program. A CC I covered all four units in the high custody building, rotating amongst the team.

Intermediate care program IDTTs were observed in the DBT unit (A3). LRH was addressed by the treatment teams; however, it was inconsistently documented in the medical records of patients in the unit that were reviewed. The IDTTs in A3 also employed several strategies to engage patients in the treatment team process. Staff printed out forms in large text

that patients would have in front of them at the table during IDTTs to aid their understanding. The A3 treatment teams were engaging with the patients and appropriately addressed their treatment issues.

In contrast, the IDTTs observed in the high custody unit displayed significant deficiencies on the part of clinical staff. No one on the team had seen any patient prior to IDTT as should have occurred. There was no justifiable clinical rationale offered for not meeting with patients prior to treatment team to complete individual assessments. The psychiatrist was not engaged in the IDTT process during the treatment team meeting. Release planning was not addressed in the IDTT for a patient who had a known parole date.

In general, treatment teams in the intermediate care program completed master treatment plans, but not individual plans of care. As a result, it was unclear what interventions were to be used to address the individual care of patients. Goals were not always appropriate to the patient's most immediate problematic behavior and were often not operationalized to address behavior. It was clear that treatment teams would likely benefit from more training on EHRS regarding the development and documentation of appropriate individual treatment plans.

## 2. **Group Therapy**

Staff reported that there were no formalized group therapy audits within the CMF-PIP during the review period.

### Acute Care Program

CMF-PIP reported that since the transition to the statewide EHRS on September 12, 2017 through the time of the site visit, the program had not been able to produce accurate data demonstrating the number of treatment hours offered to and received by acute care patients.

Staff reported that the number of treatment hours provided to acute care patients during the review period were very limited and were lower than the clinical needs of multiple patients.

Prior to September 2017, CMF-PIP utilized the Psychiatric and Wellness Support System (PaWSS) to document and report treatment hours. The data showed that from July 1, 2017 through August 31, 2017, the average hours offered per patient per week was 1.19 hours with an average of 0.62 hours per week delivered.

Each housing unit in the acute care program had a dayroom that functioned as a multipurpose room for treatment purposes, IDTTs, and unstructured dayroom time. Group therapies in the acute care program, which were provided in the dayrooms, were generally limited to six to eight patients due to a combination of clinical and security concerns. During the site visit, the monitor's expert visited six of the seven acute care program housing units when they were scheduled to provide group therapy. Three of the units had a structured therapeutic activity in the dayroom that involved six to eight patients occurring as scheduled. Two of the three groups were directed by a music therapist. The third group focused on the "ABCs of problem-solving". Inmates in all three groups were actively participating and appeared to be clearly benefiting.

One of the six dayrooms visited by the monitor's expert was being used for a new admission and was not available for group activity. On another unit, four patients were in the dayroom without the group leader due to his diversion to the unit with a "man down" alarm; no structured activity was occurring. There were no patients present and no activity occurring in the sixth dayroom listed on the schedule for group activity that the monitor's expert visited.

The monitor's expert interviewed four patients in a group setting who indicated that while they thought the acute care program was helpful, they received more structured therapeutic

activities in an EOP program in the prisons than in the acute care program. These patients indicated that it took many weeks after admission to the acute care program before they were eligible for more than one hour per day of out-of-cell time.

Analysis of all the information provided during the site visit indicated that the two major limiting factors for providing adequate hours of out-of-cell structured therapeutic activities in the acute care program were physical plant limitations (i.e., lack of adequate programming space within the housing units) and lack of escort officers to accompany patients to available treatment space within O-Wing on the prison side. In addition, staff reported that cancellation of groups was frequently related to staffing issues and other unexpected events.

Due to the very limited number of group hours offered to the average acute care patient per week, the monitor's expert did not assess issues related to patient refusals and/or cancelled groups. However, staff acknowledged that group therapy cancellations were not uncommon.

As reported above, the amount of out-of-cell structured therapeutic activities offered to acute care patients was woefully inadequate; which was exacerbated for patients with a Maximum Custody classification.

At the time of the site visit, there were 22 patients with Maximum Custody classification in the acute care program. Since the lift and shift was implemented on July 1, 2017, Maximum Custody patients had not been allowed out of their cells without being handcuffed. Maximum Custody patients had also not been allowed to participate in group therapies, which CMF-PIP indicated could be addressed by access to therapeutic modules; however, CMF-PIP had none. According to staff, therapeutic modules in CMF prison could only be used by CMF-PIP during evening hours because they were restricted to administrative segregation use during the daytime.

During the six weeks preceding the site visit, Maximum Custody patients had access to yard for two hours on a once per week basis. Non-Maximum Custody acute care program patients had access to yard for one hour per day. Depending on their privilege level, non-Maximum Custody acute care program patients were also allowed access to the dayroom for an hour per day. A much smaller number of acute care patients had access to out-of-cell time on a three-hour per day basis.

<u>Intermediate Care Program</u>

In the intermediate care program, treatment groups included those that were psychoeducational in nature, which were aimed at addressing core functional deficits in the patient population, and unstructured enrichment activities that had no structured objective or plan and included unstructured yard.

The group schedule was based on a 12-week cycle with one-week breaks between cycles; there was an occasional two-week break for holidays. Master group schedules were reassessed during those break periods and revised as necessary.

CMF-PIP provided complete PaWSS data for July and August 2017. The intermediate care program averaged the following hours per week with structured and unstructured activity combined: for July 2017: 4.68 scheduled, 4.21 offered and 1.85 delivered, for a refusal rate of 56 percent. For August 2017, the intermediate care program averaged the following hours of structured and unstructured activity per week: 5.08 scheduled, 4.39 offered, and 2.00 delivered, for a refusal rate of 54 percent.

Analysis of the data showed that structured treatment group and enrichment hours averaged the following per patient per week: July 2017 was 1.37 scheduled, .86 offered, and .69 delivered. August 2017 had 1.14 scheduled, .58 offered, and .55 delivered. These low hours

were reportedly due to staff training in preparation for EHRS; however, CMF-PIP did not produce information to demonstrate that structured therapeutic hours had significantly improved since that time. Unstructured activities clearly provided the bulk of out-of-cell activity for intermediate care patients during July and August 2017.

Document reviews showed that rehabilitation therapists in the intermediate care program were employing motivational interviewing techniques for those patients who were not engaging in treatment to assist them with finding motivation to attend treatment. This form of intervention had been shown to be more effective with some patients, compared to mere "encouragement" to attend groups.

CMF-PIP acknowledged that the intermediate care program was not providing adequate group treatment hours and not meeting the treatment needs of all its patients; however, it did not have any concrete plans for improving services in the acute or intermediate care programs at the time of the site visit.

Patients reported that they had inadequate access to recreation yard in the intermediate care program. Patients in the DBT unit wanted to have the same amount of yard as they would receive in prison.

### 3.     Individual Treatment

Records review indicated that initial assessments were not always completed timely. This varied across disciplines, although the psychiatrist typically completed an initial assessment. Weekly individual psychology or social work contacts were uncommon, although they were provided in some cases.

4.      **Psychiatric Services**

Psychiatrists saw patients regularly as scheduled in the acute and intermediate care programs.

Due to psychiatry shortages, telepsychiatry was used in one unit in the stand-alone high security intermediate care program.  CMF-PIP reported that it had no plan to expand or make telepsychiatry permanent in its program.  At the time of the site visit, CMF-PIP reported that the use of telepsychiatry was a pilot; however, staff did not provide the specific objectives that would be measured beyond meeting contact mandates (e.g., initial assessments, presence at treatment team) as would be expected in a pilot process.  Staff also indicated that the psychiatrist was present via telepsychiatry at IDTT.

5.      **Other Treatment Issues**

A.  **Involuntary Medications (PC 2602)**

During the review period, 24 PC 2602 petitions were initiated, including 16 emergent and eight non-emergent.  Fourteen petitions were renewed and three were denied; no reasons were given for the denials.

Four patients were not compliant with the PC 2602 process during the review period and force was used to gain compliance.

B.  **Behavioral Management**

Dialectical Behavior Therapy Unit

As reported above, CMF also maintained a DBT unit on A3, although some non-DBT patients were also housed there.  Observation and document reviews indicated that treatment provided on A3 adhered to the DBT model.

<u>Individual Behavior Plans</u>

Compared to previous site visits, there was an increased use of individual behavior plans at CMF-PIP.  During the review period, there were 13 requests for behavioral consultations or plans; 12 of the 13 resulted in a plan.  Since November 1, 2017, there had been an additional 12 requests; three of those remained pending, two resulted in consults only, and eight resulted in plans.

Although there was an increased use of individual behavior plans as stated above, most of the behavior plans reviewed showed that the reason for referral was unclear.  Similarly, for most of the plans, there was also no evidence that a functional analysis had been completed.  The functional analysis provides the foundation for a behavior plan, as it identifies points of possible intervention.

The absence of key elements necessary to useful behavior plans led to plans that did not consistently state behavioral goals in behavioral terms.  Moreover, to be effective, the behavior plans reviewed needed to focus on fewer behaviors to achieve patient success.  Effective behavior plans require objective, descriptive, observable, and measurable goals.  Basic behavioral treatment would include a plan that should focus on one target at a time until behavior or skill acquisition occurs.

It was very concerning that multiple behavior plans reviewed used punishment (such as restricting the patient to his room, denial of privilege or suspension from participation in unit activities) rather than positive reinforcement (i.e. specified salient reinforcers developed in the behavioral plan) to respond to the targeted behavior.

At the time of the site visit, it was observed that outside expertise in behavior therapy and individual behavior plans would be helpful in assisting the CMF-PIP to remedy the multiple

deficiencies described above.  CMF-PIP's management and CDCR's regional and headquarters staff were advised accordingly.

## C.  Morning and End-of-Shift Meetings

Structured daily shift report meetings were implemented on October 12, 2017.  The purpose of structured shift report was to plan the daily schedule to ensure as many unit activities were completed during the day as practicable.  The meetings were to be led by the SRN or designee with the SMTA and members of the unit treatment team.  Team members included psychiatrist, psychologist, social worker, rehabilitation therapist, registered nurse, psych tech, and MTAs.

The monitor's expert attended the afternoon shift report meeting on Unit P1, which was appropriately attended and involved a brief review of various patients on the unit.  A shift report was also observed on unit A3.  All unit staff at work that day were present.  It was an effective, concise meeting.  Attendees addressed new admissions, status updates, staffing absences or program interruptions, and also problem-solved regarding any treatment challenges identified.

## D.  Clinical Progress Notes

Documentation issues in clinical notes persisted predominantly related to the introduction of the EHRS.  There was also significant reliance on "cutting and pasting" from prior assessments and notes, which resulted in difficulty in determining the clinical progress being made by patients during their course of treatment in the acute care program.

## V.  PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

At the time of the site visit, CMF-PIP was using the STEP program that had been instituted by DSH prior to Lift and Shift on July 1, 2017.  CDCR was in the process of

developing and implementing a uniform behavioral incentive program for its PIPs, including CMF-PIP which had not been implemented at the time of the site visit.

Under CMF-PIP's STEP policy, the goal was to put in place a treatment progression system that enrolled all patients in the STEP program and was consistently applied to patients. Patients had to demonstrate progress in their treatment to advance clinically through the various STEP levels. On admission, patients were provided an orientation packet or handbook. The STEP policy required staff to participate in the program "by providing necessary observation, assessment, evaluation, guidance, counseling and documentation of the patient's progress to the STEP Program."

Acute Care Program

In the acute care program, newly admitted patients began with Assessment and Orientation, during which time clinical evaluation was completed by the IDTT, and custody evaluation by the ICC and/or UCC occurred. These evaluations were required to be done prior to the Initial Master Treatment Conference. During Assessment and Orientation, the patient was oriented to program rules and the expectations of his treatment program. The patient participated in solo and/or small group treatment activities, which were determined by the IDTT. After the patient was elevated to a STEP, he could be returned to Assessment and Orientation if he decompensated. Following Assessment and Orientation, the patient could transition to either STEP 1 or STEP 2 as decided by the IDTT.

After Assessment and Orientation, if the IDTT determined that clinical and custodial factors indicated the patient required solo programming, he was placed in STEP 1. Relatedly, the IDTT had to determine based on its evaluation if the patient needed to program with or without mechanical restraints or that the use of other security measures were required. In STEP

1, the IDTT was also required to design and document an individualized solo treatment program documented in each patient's treatment plan along with the criteria for advancement to STEP 2.

For advancement to STEP 2 from STEP 1, each patient had to demonstrate successfully participating in their solo treatment program as well as resolve any clinical and/or custodial factors that precluded programming with others as had been determined by the IDTT at the time of Assessment and Orientation.

During Assessment and Orientation, if the IDTT determined that its evaluation of the patient's clinical and custodial factors showed that he was ready to program with others, the patient was moved directly to STEP 2. In STEP 2, the IDTT was required to develop an individualized group treatment program documented in the patient's treatment plan. The IDTT also had to determine based on its evaluation if the patient needed to program with or without mechanical restraints or the use of other security measures.

The acute care STEP Program did not have specific incentives. As part of a patient's individualized treatment plan, the IDTT could determine what incentives, if any, would be appropriate for each patient.

Intermediate Care Program

Patients in CMF-PIP's intermediate care program also began with Assessment and Orientation, during which period they were closely observed and clinically evaluated by the IDTT. Patients remained at this level on orientation status until they were classified by the ICC/UCC. In Assessment and Orientation, the patient was oriented to program rules and treatment expectations, as well as assessed and evaluated. Treatment planning was also completed at this time in the Master Treatment Conference. Patients could participate in solo and/or small group treatment activities and were provided in-cell recreation activities as

approved by the IDTT.  Assessment and Orientation status did not extend beyond the ICC/UCC and the Master Treatment Conference.

Patients with Maximum Custody status were included in the STEP and were eligible for STEP incentives as indicated in their individual treatment plan.

At STEP 1, a patient was expected to participate in treatment activities including solo and/or group programming according to their individualized treatment plan.  The goal for patients in STEP 1 was to transition them into socialization and full implementation of their treatment plans.  STEP 1 patients were provided specified incentives that included in-cell recreation activities and participation in game tournaments, among others.

To advance to STEP 2, the patient was required to participate in 50 percent of his treatment activities.  Treatment expectations also included meeting patient-specific criteria for advancement to STEP 2 developed by the IDTT, as well as maintenance of personal hygiene and room cleanliness, while respecting the properties of staff and other patients.  The patient was also required to continue to maintain medication adherence as applicable and demonstrate progress toward achieving treatment objectives, while interacting and socializing appropriately with others and following community rules.

For a patient to advance to STEP 3, the patient must attend 80 percent of treatment activities and respect the rights and property of others.  At STEP 3, patients were required to be actively engaged in their treatment to understand their mental illness, and to develop additional coping skills and aftercare plans.  Incentives at STEP 3 included all incentives in STEP 1 and STEP 2, in addition, but not limited to, a state issued TV, check-out CD player, eligibility to participate in weekly games and in movie/treat activity, as well as eligibility to hold the position

of president and vice president on the patient council.  To maintain STEP 3, the patient was required to attend 90 to 100 percent of their treatment activities and have no disciplinary issues.

The STEP Program required that in the event a patient was transferred to the same level of care at another inpatient program, the patient must retain the same STEP level previously earned following an assessment by the receiving IDTT, if there were no custody or behavioral reasons for placement at a different level. Where the IDTT determined that a patient must be placed at a different STEP level, the IDTT must document "the rationale for adjusting the STEP level and the criteria to progress through STEPs in the initial IDTT conference."

CMF-PIP presented STEP data for November 17, 2017 for the intermediate care program.  This data did not reflect patient census at the time of the site visit.  According to the STEP data, on that date, there were seven patients in Assessment and Orientation.  Six patients had been in Assessment and Orientation for an average of four days.  There was one outlier who had been in Assessment and Orientation since October 11, 2017.  Staff indicated that the extended stay was because he had stopped cooperating with the assessment process soon after admission.

On November 17, 2017, there were 18 patients in STEP 1, the longest having remained in that STEP for 76 days (range 0 to 76 days; average of 15 days).  Forty-eight patients were in STEP 2, with the longest patient on that STEP having remained for 92 days.  Finally, there were 76 patients at STEP 3.

Analysis of the data indicated that this represented a reasonable distribution across the STEPs; the data analysis also indicated that most patients did not spend a significant amount of time at the lower STEP levels.

One limitation to the data provided was that it did not indicate for those patients at STEP 1 whether the patient had access to group treatment or was on solo programming. As this was an important piece related to access to care and was a clinical decision that could potentially affect advancement to STEP 2, tracking the number of patients and their length of stay on solo programing status would enable supervisors to monitor the use of solo programming and complete quality improvement action as necessary. This would also create capacity to utilize an objective indicator of progress because once a patient had progressed to group treatment in STEP 1, it could trigger the IDTT to specifically address his readiness for STEP 2.

## VI. REFERRALS AND TRANSFERS

CMF-PIP did not provide referral and transfer data. CMF-PIP staff reported that prior to Lift and Shift, DSH's admission discharge unit tracked referral, admission, and transfer data. CDCR assumed responsibility for the referral and transfer data at lift and shift, which was not available for the review period.

CMF-PIP reported that the intermediate care program rejected one patient referred from the acute care program due to his lack of stability and refusal of treatment for three foreign bodies. The referral was subsequently rescinded, and the patient remained in the acute care program.

## VII. ADMISSIONS AND DISCHARGES

### 1. Admissions

CMF-PIP did not provide admission data for the similar reasons as its failure to provide referral and transfer data.

The average length of stay for patients in acute care at the CMF-PIP at the time of the site visit was 56 days for non-Maximum Custody patients and 54 days for Maximum Custody

patients. During the two months preceding the site visit, the occupancy rate in the acute psychiatric program decreased meaningfully, resulting in approximately 30 unoccupied beds at the time of the site visit.

### 2. **Discharges**

During the review period, 336 patients discharged from CMF-PIP acute care, with an average length of stay of 77 days. The average number of administrative days after clinical discharge was four days (excluding five outliers ranging from 21 to 49 days). Reasons for administrative delays were not provided by CMF-PIP. Twenty-eight percent were discharged to an intermediate care program.

CMF-PIP's intermediate care program discharged 192 patients during the review period with an average length of stay of 142 days. The average number of administrative days after clinical discharge was 3.4 days (2.6 days average from dorms and 3.8 days average from high custody).

Clinician-to-clinician contact responsibilities changed during the review period to require the discharging institution to send an order to the receiving institution to initiate the contact. It became the responsibility of the receiving institution to initiate the clinician contact. Moving forward, the discharging institution must track compliance with sending the order and the receiving institution will be tasked with tracking the clinician contact. Staff reported that it was intended that the information flow would be documented and tracked in EHRS.

## VIII. **PATIENT DISCIPLINARY PROCESS**

During the review period, 95 RVRs were issued, including 85 in the acute care program and ten in the intermediate care program. The monitor reviewed a sample of ten percent. Timely requests by custody staff and completion and return of the mental health assessment were

compliant 90 percent of the time. There were no instances where an alternate manner of documentation was recommended, and clinicians made appropriate recommendations for consideration regarding penalties in multiple instances.

Senior hearing officers noted consideration of the mental health input in all except one case. Senior hearing officers also documented mitigation where it occurred. Where mitigation was noted, it was most often limited to not taking away privileges; however, significant credit forfeitures were imposed. It was very concerning that several senior hearing officers inappropriately referred to the patient's mental health status during the hearing itself, as opposed to his mental status at the time of the infraction, which was the required standard.

According to the data presented, 24 of the 26 psychologists in the CMF-PIP completed the four-hour mandatory RVR training. The remaining two were new employees scheduled to receive training in January 2018. Additionally, 20 of the 26 psychologists completed a one-hour webinar on completion of the mental health assessment through SOMS in November 2017. The six remaining psychologists were expected to complete training once it was uploaded onto the Lifeline intranet.

Ninety-three percent of required custody staff completed mandatory training on the disciplinary process. Further, 94 percent of hearing officers, senior hearing officers and chief disciplinary officers received the required on-the-job training pursuant to the October 9, 2017 memorandum regarding changes to the rules violation report mental health assessment process for strategic offender management system.

MTAs' RVR disciplinary process training was reported to have started during October 2017. CMF-PIP did not provide data documenting RVR disciplinary process training for MTAs.

## IX.  <u>USE OF FORCE</u>

CMF-PIP reported ten immediate and eight controlled use of force incidents during the review period.  These use of force incidents were not reviewed.

Forty percent of CMF-PIP clinical staff were compliant with use of force training.  Low compliance was attributed to mandatory attendance at EHRS training and the EHRS transition process.

Use of force training was completed by 97.3 percent of custody staff.

MTAs' use of force training was reported to have started during October 2017.  CMF-PIP did not provide data documenting use of force training for MTAs.

## X.  UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

CMF-PIP reported that there were a total of 353 incidents that occurred in the CMF-PIP for an average of 88 incidents per month over the four-month period.  There were nine incidents involving patient allegations of sexual abuse against another individual; seven of those originated from acute care and two from intermediate care.  Additionally, there was one incident of a patient alleging neglect against a transportation staff member over reckless driving.  None of the incidents resulted in patient injury and none required treatment related to the incident.

There were four incidents documented as suicide attempts, three did not require any treatment, while one required medical treatment (sutures).  In addition, there were two fall incidents in the intermediate care program resulting in patient injuries requiring medical treatment.

The data indicated that there were multiple incidents that required medical intervention at CMF.  A total of 23 incidents involved patients whose injury severities required medical treatment, with the majority of them requiring medical intervention as a result of complaints of

chest pain. Six of those occurred in intermediate care, while the remainder took place in the acute care program. There was also one seizure incident that occurred in the intermediate care program that resulted in the patient being hospitalized.

Patients' acts of self-harm continued to be a common occurrence in the CMF-PIP. All these incidents occurred in acute care with three of them resulting in patients sustaining injury requiring medical treatment. In addition, patients covering windows while attempting to self-harm was a frequent occurrence. Four were occurrences of foreign body insertions and ingestions that resulted in patient injuries requiring medical treatment. Two incidents occurred in the intermediate care program and two in the acute care program.

## XI.  USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

CMF-PIP did not use observation or seclusion rooms.

During the review period, four patients housed in the acute care program required restraints for mental health purposes. Audits demonstrated compliance with relevant elements of the restraint and seclusion policy and procedure ranging from 50 percent to 100 percent. The wide range was due to the small sample. The duration of time in restraints ranged from 3.45 hours to 15.20 hours, with three of the patients being restrained for less than 5.35 hours.

There were no incidents of restraint reported in the intermediate care program.

## XII.  SUICIDE PREVENTION

There were no suicides reported in the CMF-PIP during the review period.

At the time of the site visit, CMF-PIP reported it no longer had access to data generated through DSH's integrated suicide risk assessment forms that had been used until September 2017. Staff reported that since the activation of EHRS on September 12, 2017, CMF-PIP had

completed SRASHEs within ten days of admission and upon discharge but was unable to generate compliance reports at the time of the site visit.

CMF-PIP reported that 58 percent of clinical staff were current with suicide prevention training. Low compliance was attributed to mandatory attendance at EHRS training and the EHRS transition process.

Certified Nursing Assistant suicide prevention training classes started in November 2017 and were scheduled to run until the end of December 2017.

At the time of the site visit, 67 percent of MTAs had completed suicide prevention training.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

CMF-PIP participated in the CMF mass casualty drill held in October 2017.

There were no emergency responses that resulted in serious harm during the review period.

### 2. Death Review Process

CMF-PIP reported that there were no deaths during the reporting period. CMF-PIP collaborated with CMF on death reviews.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

CMF-PIP's quality management steering committee met weekly during the review period.

There were no quality improvement studies and/or audits regarding treatment programs performed within the acute or intermediate care programs during the review period.

There were no audits of IDTTs or treatment plans conducted during the review period. According to reports from CMF-PIP, this was due to training for lift and shift as well as preparation for and transition to the EHRS. Resources had been dedicated to data migration and focusing on correcting data flags or errors in the EHRS rather than quality improvement.

CMF-PIP reported that utilization management prospective reviews were conducted for all patients prior to acceptance into the CMF-PIP by the admission discharge unit.

For the period of July 1st to October 31, 2017, the CMF-PIP utilization management committee completed continued stay reviews for patients with a length of stay of 30 days or greater at the acute level of care, which comprised 205 patients, and 180 days or greater for the intermediate level of care comprising 42 patients.

Regarding the cases of acute care patients reviewed by the UMC, the UMC recommended discharge in nearly 80 percent of the cases, while the IDTT recommended discharge in just over 50 percent of the same cases. For intermediate care patient reviews, the UMC recommended discharge for approximately 67 percent of the cases reviewed, while the IDTT's recommended discharge rate was approximately 43 percent. CMF-PIP found that considering the significantly divergent results in recommendations between the IDTTs and the UMC, additional dialog and training would be beneficial. Additionally, CMF-PIP concluded that it would be very beneficial for leadership to distinctly define the missions of both the acute care and the intermediate care programs and to clearly communicate the mission statements to line staff. Staff reported that this was in process at the time of the site visit.

CMF-PIP reported that there were ongoing difficulties in completing the continued stay review forms, which were vital to a meaningful UMC review. During the review period this problem had been exacerbated by training, preparation and "go-live" activities related to CMF-

PIP's migration to the EHRS. To enhance accountability in this process, shortly before the site visit, CMF-PIP implemented new expectations for completion. Mental health primary clinicians were assigned the responsibility for completion of continued stay review forms for patients assigned to their caseloads.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

During the review period, CMF-PIP processed 137 CDCR 602 appeals, which were not analyzed during the site visit.

Forty-two patients in the acute care program completed patient satisfaction surveys during the review period. Eighty percent of the patients responding reported feeling safe in their units and 20 percent did not. Twenty-nine percent of patients were satisfied with the current amount of treatment groups provided and 71 percent were not. Patients' responses indicated that they were very dissatisfied with the amount of treatment groups provided, leisure activities offered, and skills learned in preparation for their next placement setting after leaving the program.

In the intermediate care program, 103 patients completed surveys. Patients' responses were predominantly favorable regarding treatment at 62 percent, while the remaining 38 percent were dissatisfied with the amount of treatment groups offered. As to whether treatment groups addressed their emotional or mental health issues, 72 percent believed they did and 38 percent responded they did not.

In patient interviews conducted during the site visit, patients reported that they had inadequate access to recreation yard in the intermediate care program and received very little treatment, except for patients in the DBT unit, who were much more positive about their

treatment.  As reported above, DBT patients expressed a desire for more yard time; they wanted to have the same amount of yard as they would receive in prison.

The acute care program did not have a formal patient council.  In the intermediate care program, patient council meetings occurred monthly.  Minutes of the patient council meetings were not reviewed.

## XVI.  *COLEMAN* POSTINGS

*Coleman* notices in both English and Spanish were posted in areas accessible by patients in all CMF-PIP units.

## XVII.  LAUNDRY AND SUPPLY ISSUES

There were no laundry or supply issues reported in the intermediate care program during the review period.  In the acute care program, there were intermittent issues with laundry supplies because of delayed deliveries from the offsite laundry facility.  CMF-PIP was addressing the issue and staff reported that a formal inventory and accountability system was developed.

## XVIII. VISITATION/PRIVILEGES/TELEPHONE ACCESS

CMF-PIP continued to use the DSH policy and procedures for visitation.  Maximum Custody patients were only allowed non-contact visits.  Access to visitation was determined by IDTT and the team must complete a visitation memorandum to be provided to the visiting sergeant, housing unit officer, and placed in the unit health record.  A correctional counselor must screen for enemy concerns as well.  Length of visits were limited to one hour for local visitors and two hours for visitors that traveled 250 miles or further.

Patients on one-to-one observation or suicide precautions were not allowed to participate in visitation.  All patients were mandated to submit to an unclothed body search in the patient's

cell upon return to the unit.  No issues regarding visitation were evident during the review period or at the time of the site visit.

Privileges, including personal property of patients, were governed by California Regulation Title 15 and decisions of the IDTT as clinically indicated.  No issues regarding privileges were evident during the review period or at the time of the site visit.

On January 13, 2017, the CMF-PIP acute care program updated the patient telephone procedures to indicate that telephone access should be available seven days a week.  Patient access must be approved by the treatment team; all legal calls were to be allowed.

Access to the telephone for the intermediate care program was described in the intermediate care program patient orientation program rules and expectations.  To make phone calls, patients must sign up the night prior to the phone call.  Phone calls were not allowed during patients' scheduled group times; calls were limited to 15 minutes.  No issues regarding telephone access were evident during the review period or at the time of the site visit.

## XIX.   LAW LIBRARY ACCESS

There were no issues raised regarding access to the law library during the review period or at the time of the site visit.

# APPENDIX A5
## CMF L1-PIP

## I.    SUMMARY OF THE FINDINGS

- At the time of the site visit, the census was at 91 percent of capacity.

- There were significant vacancies in psychiatry and social work at CMF L1-PIP.

- CMF L1-PIP met staffing ratios for psychologists, social workers, and rehabilitation therapists, but not for psychiatry.

- LRH, group placement, and discharge planning were appropriately discussed in observed IDTTs.

- Space limitations impacted CMF L1-PIP's ability to provide the court-ordered 12 hours of out-of-cell activities.

- Manual tracking methods indicated that CMF L1-PIP provided nine to eleven hours of out-of-cell activities per day.

- Staff reported a plan to implement a statewide electronic tracking program to track and report unstructured activities in the CMF L1-PIP.

- Patients reported satisfaction with the amount of out-of-cell time provided at CMF L1-PIP but indicated the need for more individualized group therapy sessions.

- Psychiatrists, psychologists, and social workers provided individual therapy to patients in CMF L1-PIP.

- Medication passes negatively impacted the provision of out-of-cell activities to all patients.

- No behavioral plans were implemented at CMF L1-PIP during the review period or at the time of the site visit.

- The program reported that it was unable to provide 12 hours of out-of-cell time to Maximum Custody patients.

- Due to its impact on the program, Maximum Custody patients were no longer admitted to CMF L1-PIP at the time of the site visit.

- Patients who were referred to the CMF L1-PIP were timely transferred into the program.

- Mental health assessments following RVRs were timely requested.

- Completed mental health assessments were not returned to custody within mandated time frames.

- Clinical recommendation regarding mitigation of punishment was limited to no loss of privileges.

- Significant loss of credit earnings was imposed on patients found guilty of rules violations.

- A total of five use of force incidents occurred in the CMF L1-PIP during the review period.

- CMF L1-PIP had not used medical restraints since activation.

- The CMF L1-PIP was not compliant with completing SRASHEs within ten days of admission as required.

- There were no significant emergency responses resulting in serious harm during the review period.

- No deaths had occurred in the CMF L1-PIP since activation.

- The primary utilization review forum at CMF L1-PIP was a weekly case consultation meeting that included all disciplines, which reviewed patients' treatment, including their lengths of stay.

- No audits had been conducted in the CMF L1-PIP since its activation.

- Nearly half of the patients in the CMF L1-PIP did not have their personal property because CDCR did not require transfer of property on admission into inpatient care.

## II.    **CENSUS**

On November 28, 2017, there were 64 patients in the CMF L1-PIP, which represented 91 percent of its capacity.

At the time of the site visit, seven patients were out of LRH for clinical reasons; three patients were out of LRH due to bed unavailability; and five patients were out of LRH for custody reasons. Reviews indicated that each placement out of LRH was justifiable.

### III.  STAFFING

#### 1.  Administrative, Clinical, and Correctional Staffing

The executive director, clinical director/chief psychiatrist, chief psychologist, program director, and program assistant positions were filled.  The one established senior psychiatrist supervisor position was vacant.

All established clerical positions were filled.

Psychiatrists:  All 2.5 established psychiatrist positions were vacant.  A total of 1.75 FTE contractors provided services, resulting in a 30-percent functional vacancy rate.

Psychologists:  The 2.5 established psychologist positions were filled.

Social Workers:  Two of the 2.5 established social worker positions were filled, for a 20-percent functional vacancy rate.

Rehabilitation Therapists:  All 2.5 established rehabilitation therapist positions were filled.

Supervising Registered Nurses (SRNs):  All four of the established SRN positions were filled.

Registered Nurses (RNs):  Of the 14 established RN positions, a total of eight state staff and seven FTE contractors provided services in the CMF L1-PIP, resulting in a functional vacancy rate of zero.

Senior Psych Techs:  One of 5.3 established senior psych tech positions were filled, resulting in an 81-percent functional vacancy rate.

Psych Techs:  Of 31.7 established psych tech positions, 18 were filled; two FTE contractors also provided services, resulting in a 37-percent functional vacancy rate.

Licensed Vocational Nurses (LVNs):  None of the six established LVN positions was

filled; two FTE contractor LVNs provided services in the CMF L1-PIP, resulting in a 66-percent functional vacancy rate.

Correctional Staff:  CMF L1-PIP reported that all of its allocated correctional staff positions were filled.

### 2.  Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

The CMF L1-PIP program met the staff to patient ratio of 1:35 for psychologists, social workers, and rehabilitation therapists, but did not meet the ratio for psychiatry.

### 3.  Staff Training

CMF L1-PIP reported that prior to activation, it provided PIP Orientation with TSI Training to all incoming administrators, clinicians, and custody staff.

During the review period, CMF L1-PIP provided additional TSI training to staff on September 20, 2017 and September 21, 2017.

## IV.  TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.  Interdisciplinary Treatment Teams (IDTTs)

The monitor's expert attended several IDTT meetings during the site visit.  The necessary participants were present at the meeting and used computers to access patients' healthcare records.  LRH was discussed for each patient during their IDTT.  One of the four patients discussed was not housed at his LRH; there was clinical justification provided for not placing him at his LRH.  There was also appropriate discussion regarding placement into groups based upon clinical indication.  Discharge planning was appropriately discussed for several of the individuals for whom discharge was approaching.

2. **Group Therapy**

Space limitations in the CMF L1-PIP resulted in nearly all structured treatment occurring on the CMF O-wing, which required escort and supervision of patients to and from treatment.

CMF L1-PIP's supervisory staff acknowledged difficulty in providing and tracking the court ordered 12 hours of out-of-cell activities required in the program. The most recent manual tracking method indicated that patients were offered between nine to 11 hours of out-of-cell activities per day.

Staff reported that CDCR's EHRS—which had been implemented in the CMF L1-PIP—would be used to track and report scheduled, offered, received, refused, and cancelled therapeutic activities weekly, for each patient. In addition, headquarters staff reported that plans were in place to implement a statewide electronic tracking program known as Non-Clinical Activity Tracking (NCAT) to track and report unstructured activities in the CMF L1-PIP.

CMF L1-PIP provided structured and semi-structured therapeutic activities, as well as nontherapeutic activities to patients. Group therapy was provided by nurses, psychiatric technicians, social workers, and psychologists. The expert attended several L-1 groups, including an activities of daily living (ADL) group, a self-care group, and a lifers group. Group sizes ranged from eight to 12 participants.

During the site visit, the monitor's expert attended group therapy sessions and interviewed patients and staff. Patients routinely reported that they were out-of-cell from approximately 6:00 a.m. to 9:00 p.m., and programming included yard, group therapy, individual sessions, and medication. They indicated that they were pleased with the amount of out-of-cell time, which compared favorably to other inpatient programs; however, there were some complaints regarding the need for more individualized group therapy sessions. The staff and

patients reported that there were recent changes and improvements in the group therapy offerings; a new group session had begun approximately two weeks prior to the site visit. Changes in group offerings were made at that time, allowing for more individualized therapy including a trauma group, lifers group, and stress management. Group sessions were also reported to have improved with greater organization, structure, and handouts. Despite this recent improvement, some patients reported that group therapy offerings were not sufficiently individualized, and group assignment was based upon their housing location and not clinical need.

All structured therapeutic groups were offered in CMF's O-1 unit, semi-structured groups and nontherapeutic activities were offered on the L-1 unit, which included recreation therapy yard and ADL group, as well unstructured out-of-cell time, such as open yard, open day room, and dining hall.

At the time of the site visit, groups were not provided to Maximum Custody patients in CMF L1-PIP.

**3. Individual Treatment**

Individual treatment sessions were provided by psychologists and social workers in offices in the CMF's O-1 unit.

No data was provided regarding the number of hours of individual treatment provided to CMF L1-PIP patients.

**4. Psychiatric Services**

Psychiatrists in the CMF L1-PIP provided appropriate direct patient services including assessments, evaluations and diagnoses of symptoms, as well as offered opportunities for patients to discuss their individual psychiatric issues in regular one-to-one interviews. They also

prescribed medications and medication management as needed to help re-stabilize patients' psychiatric conditions.  Psychiatrists saw patients either in L-1 or in CMF's O-1.

### 5.  Other Treatment Issues

#### A.  Involuntary Medications (PC 2602)

There were no involuntary medication petitions initiated during the review period.  Two renewals were processed, one was granted, and one was denied.  The unit had no use of force incidents related to involuntary medications during the review period.

#### B.  Behavioral Plans

At the time of the visit, no behavioral plans were implemented at CMF L1-PIP.  Staff reported that plans were underway to utilize a staffing vacancy to hire a behavioral psychologist for the unit.

#### C.  Morning and End of Shift Meetings

During the site visit, the monitor's expert observed a shift change meeting attended by the incoming and exiting clinical and custody staff.  There were appropriate discussions regarding patients who had been placed into seclusion/time-out, admissions, discharges, and bed holds, as well as incidents that had occurred on the unit.

#### D. Medication Management

Staff reported that medication passes in CMF L1-PIP negatively impacted the provision of out-of-cell activities to all patients, observing that medication passes lasted approximately 30 minutes to one hour four times per day.

During the site visit, noon medication pass was observed; this medication pass lasted for approximately 30 minutes.  Staff reported that the morning and evening medication passes generally lasted for approximately one hour.  Observations of the noon medication passes

revealed that patients were released one to two rooms at a time.  An officer was present at the medication room to observe direct observation therapy.  While patients were out of their cells for medications, all other activities were discontinued due to the small size of the unit and for safety reasons.  The supervisory staff also reported that an additional medication pass was performed briefly from the dayroom, in addition to the one from the medication window, to minimize the disruption of a single medication window pass.  The staff reported that this trial resulted in a chaotic and unsafe environment on the unit due to the increased movement and inability to monitor patient activities.  For this reason, the second medication dispensing site was discontinued.

## E. Maximum Custody Patients

CMF L1-PIP reported that when it opened, several Maximum Custody patients, as well as patients not cleared by ICC to program without handcuffs had been transferred into the unit. A total of 24 patients arrived at the institution during the review period with Maximum Custody status.  Documentation indicated that of the 24 cases, 21 or 88 percent of admitted patients appeared before the ICC within the ten days as mandated by departmental policy.  In all cases reviewed, the decision to either continue Maximum Custody or reduce the patient's custody status were appropriate.

Maximum Custody patients were unable to double cell; the unit was also unable to provide 12 hours of out-of-cell time for these patients.  Programming for Maximum Custody patients was limited to solo yard and/or dayroom.  Staff reported that they initially attempted to provide programming in therapeutic modules as an interim measure; however, this did not ameliorate the problems created by the presence of Maximum Custody patients, which negatively affected the programming of non-Maximum Custody patients in the unit.

CDCR subsequently decided that Maximum Custody patients would no longer be placed in the CMF L1-PIP. Patients who were Maximum Custody and already in CMF L1-PIP or became Maximum Custody during their hospitalization in CMF L1-PIP would be seen in treatment team to evaluate whether they continued to require intermediate care, and if so, would be referred to intermediate care programs with single cells.

Staff reported that patients who were changed to Maximum Custody status were transferred to the appropriate housing, either by expedited transfer on the same day (emergent cases), or through the normal Health Care Placement Oversight Process (HCPOP). Staff indicated that CMF L1-PIP also had an agreement with CMF-PIP for emergency transfers of Maximum Custody patients when indicated. For those patients who did not need emergent transfers, staff reported transfer generally occurred within one week.

## V.     PATIENT ACCESS TO CARE

### Patient Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

CMF L1-PIP's STEP program was a treatment progression program used to support and encourage patients in advancing through their treatment program. The STEP program permitted advancement clinically as a patient demonstrated progress in their treatment plan. Consistent with their treatment goals, the STEP provided a structured guideline system to patients that was expected to be fairly applied. The STEP program governed patients' behavioral expectations and treatment involvement and included specific requirements for moving through achievable STEPs. Central to the STEP program, it recognized and promoted "the responsible functioning of each patient."

All patients admitted to CMF L1-PIP were enrolled in the STEP level system. Staff was required to educate patients, and as appropriate family members, about the STEP Program. Each

patient was provided with the patient orientation packet or handbook that included the STEP Placement and Incentive Chart. Patients were required to be educated about the specific requirements for advancement through the STEP Program. Staff participation in the STEP program included patient observation, assessment, evaluation, guidance, counseling, and documenting patients' progress.

Patients admitted to CMF L1-PIP began with Assessment and Orientation during which period the IDTT was required to assess each patient's individual patient factors and interests, upon which his treatment was based. Patients remained on Orientation Status until their initial IDTT review. Patients admitted from an acute care program were expected to be immediately eligible for STEP 1 following their orientation to the program. Property was provided consistent with CDCR's regulatory requirements as approved by the IDTT.

At STEP 1, a patient was expected to participate in treatment activities including solo and/or group programming according to their individualized treatment plan. The goal for patients in STEP 1 was to transition them into socialization and full implementation of their treatment plans. STEP 1 patients' incentives and allowable property was provided according to the guidelines in the STEP Placement and Incentive Chart.

To advance to STEP 2, the patient was required to participate in 50 percent of his treatment activities for a duration of time that was determined by the IDTT, not to exceed 30 days. Treatment expectations also included meeting patient-specific criteria for advancement to STEP 2, developed by the IDTT and documented in the patient's treatment plan, as well as maintenance of personal hygiene and room cleanliness, while respecting the properties of staff and other patients. The patient was also required to continue to maintain medication adherence as applicable, and demonstrate progress toward achieving treatment objectives, while interacting

and socializing appropriately with others, and following community rules. Patients who demonstrated that they were ready to assume greater responsibility and who met the patient specific criteria developed by IDTT would advance to STEP 2. STEP 2 patients' incentives and allowable property was provided according to the guidelines in the STEP Placement and Incentive Chart.

For a patient to advance to STEP 3, the patient must attend 80 percent of treatment activities and respect the rights and property of others. The IDTT was required to develop patient-specific criteria documented in the patient's treatment plan that the patient must meet to advance. The IDTT could also consider the patient's maintenance of his personal hygiene and the cleanliness of his room, as well as his respect for the rights and property of both his peers and staff. Other considerations by the IDTT included medication adherence, the patient's demonstrated progress towards attaining his treatment objectives, and his attendance and participation in community meetings. Other factors to be considered by the IDTT included the patient's ability to interact and socialize appropriately with peers and staff, follow community rules, demonstrate motivation for treatment, as well as demonstrate the capacity to recover "from lapses in judgment/behavior without serious disruption."

At STEP 3, patients were required to be actively engaged in their treatment to understand their mental illness, and to develop additional coping skills and aftercare plans.

To maintain STEP 3, the patient was required to attend 90 to 100 percent of their treatment activities and have no disciplinary issues. The IDTT was required to develop patient-specific criteria documented in the patient's treatment plan that the patient must meet. When developing the patient-specific criteria, the IDTT may consider the patient's medication adherence, his personal hygiene, and the cleanliness of his room. The patient also had to show

respect for the rights and properties of peers and staff, demonstrate progress towards attaining his treatment objectives, and participate in community meetings. Other factors to be considered by the IDTT included the patient's ability to interact and socialize appropriately with peers and staff, follow the community rules, demonstrate motivation for treatment, show capacity to recover "from lapses in judgment/behavior without serious disruption," and demonstrate positive leadership skills among his peers.

STEP 3 patients' incentives and allowable property was provided according to the guidelines in the STEP Placement and Incentive Chart.

Under the STEP Program, the IDTT could determine that a STEP adjustment was necessary in cases where the patient was not maintaining the criteria defined for his STEP. The IDTT was required to meet with the patient to discuss the reasons for the STEP adjustment and the criteria the patient would need to meet to return to their previously earned step. The discussion with the patient, the criteria to return to the earned STEP, and the decision of the IDTT must be documented in the medical record. The treatment plan must also be updated if necessary.

Minimally, the IDTT had to review the patient's STEP level at each meeting and discuss any requirement for advancement, which would include any additional or modified requirements approved by the IDTT. When considering whether a patient might be ready to transition to a less restrictive housing, level of care, or to be discharged to CDCR, a "patient's STEP level was not the sole determining factor."

In the event a patient was transferred to the same level of care at another inpatient program, the patient must retain the same STEP level previously earned following an assessment by the receiving IDTT, if there were no custody or behavioral reasons for placement at a

different level.  Where the IDTT determined that a patient must be placed at a different STEP level, the IDTT must document "the rationale for adjusting the STEP level and the criteria to progress through STEPs in the initial IDTT conference."  For patients whose STEP levels had decreased, the IDTT had a responsibility for determining and providing them "with enhanced patient safety measures."

The STEP program mandated the IDTT to review each patient's STEP at their IDTT meeting, in addition to providing a STEP level report—at least weekly—to program management, which included the names and CDCR numbers of all patients, their current STEP, and length of time at that STEP.  The IDTT was also required to provide information regarding risk to the ICC/UCC to help inform any custody assessment and decision related to the use of custodial safety measures such as mechanical restraints.

## VI.    REFERRALS AND TRANSFERS

During the review period, 104 patients were referred to the CMF L1-PIP, of which 92 patients or 88 percent were accepted and transferred.  The data indicated that 91 of the 92 patients or 99 percent were transferred within 30 days of referral as required.  Twelve referred patients were rejected; nine because they were deemed clinically inappropriate for multi-cells or were Maximum Custody, and three patients were rejected due to issues of accessibility because of their disabilities. The referrals of three other patients were subsequently rescinded.

## VII.   ADMISSIONS AND DISCHARGES

### 1.  Admissions

There were 92 patients admitted into the CMF L1-PIP during the review period.

### 2. **Discharges**

Twenty-nine patients were discharged during the review period. Fifteen of them were discharged to single cells at the CMF-PIP, two patients were discharged to unlocked dorms at DSH-Atascadero, and two patients were discharged to locked dorms at the CMF-PIP. The remaining ten patients were discharged for multiple reasons including parole, assessment for crisis bed admission, and transfer to an EOP program, among others.

## VIII. **PATIENT DISCIPLINARY PROCESS**

CMF L1-PIP reported 18 RVRs during the review period. Seven or 39 percent of the 18 RVRs were issued to a single patient. A review of a sample of completed RVRs indicated that assessments were requested within time requirements by custody; however, none of the mental health assessments were returned to custody within established time requirements. Senior hearing officers noted the mental health input in the reviewed RVRs. In those cases where mitigation was requested by the clinician, loss of privileges was imposed; however, significant loss of credit earnings was also administered as a penalty in dispositions where the patient was found guilty.

## IX. **USE OF FORCE**

During the review period the institution reported five use of force incidents in CMF L1-PIP. All of the incidents were immediate uses of force, with no controlled use of force incidents reported. An analysis of each of the five incident reports indicated that all the incidents were compliant with the departmental use of force policy.

## X. **UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS**

CMF L1-PIP did not report any unusual occurrences, serious incidents, near misses, or sentinel events during the review period.

## XI.    USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

CMF L1-PIP had two observations rooms, which included a restraint bed in each room. Supervisory staff discussed their request to convert one of the patient rooms to an additional restraint and seclusion room.  There was no documented usage of medical restraints in the CMF L1-PIP since its activation.

Staff stated that while there had not been any use of restraints since the opening of the unit, the rooms had been used for seclusion, suicide monitoring, and "time-out" due to the need for some patients to have time away from their cells and roommates.

There were six seclusion placements during July 2017, of which three involved one-to-one suicide monitoring, and the remaining three were for other reasons.  There were 11 episodes during August 2017; all involved one-to-one suicide monitoring.  During September 2017, there were eight episodes of seclusion, four involved one-to-one suicide monitoring, with the remaining four for other reasons.  In October 2017, there were five seclusion episodes, four of which involved one-to-one suicide monitoring, and one for other reasons.  Many of the placements involved the same individuals.

The longest duration of seclusion placement was for eight days.  It was difficult to clearly determine the basis for the seclusion from review of the handwritten log; however, it appeared that this episode of seclusion was not suicide-related but appeared to be due to the need for time-out by the patient.

## XII.    SUICIDE PREVENTION

Document reviews showed that CMF L1-PIP was not compliant with the completion of SRASHEs within ten days of admission as required.

As reported above, CMF L1-PIP used its seclusion rooms for one-to-one suicide monitoring. For all patients not on suicide monitoring, nurses conducted unit rounds every 30 minutes.

## XIII. EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1. Emergency Response

There were no significant emergency responses resulting in serious harm during the review period. CMF L1-PIP participated in the CMF Mass Casualty Drill held in October 2017.

### 2. Death Review Process

There were no deaths in the CMF L1-PIP during the reporting period. In the event of a death, CMF L1-PIP would collaborate with CMF regarding the death review.

## XIV. QUALITY MANAGEMENT AND UTILIZATION REVIEW

It was reported that the quality management for mental health services committee, which covered both the CMF L1-PIP and the CMF-PIP, met monthly. Staff further reported that in addition, the CMF L1-PIP management team which met daily, and its executive management team which met monthly, addressed issues of quality improvement that might arise.

CMF L1-PIP's primary utilization review forum was a weekly case consultation meeting that included all disciplines, which was charged with reviewing patients' treatment, including their lengths of stay.

In addition, all admissions and discharges required approval by the program director and the executive director. The IDTT was also required to consider patients' continued stay in the program, level of care, and least restrictive housing status at each meeting as part of its utilization review.

No audits had been conducted in the CMF L1-PIP since its activation through the time of the site visit. Staff reported that performance measures for the CMF L1-PIP would be developed and the resulting data would be displayed on the CDCR dashboard.

## XV.   PATIENT COMPLAINTS/PATIENT SATISFACTION

One of the major concerns identified by patients and staff during the site visit was the absence of suitable infrastructure to provide televisions to patients who achieved STEP 3. Management staff indicated that televisions had been acquired for use in the CMF L1-PIP; however, the location of the cable outlet and electrical outlets required the procurement of additional cables and extension cords to allow for the televisions to be used. The staff stated that the cords had been ordered, were anticipated to be delivered within the two weeks after the site visit, and would be installed in the unit.

Another major concern expressed by patients and confirmed by staff was related to the delivery of patients' personal property after their admission. At the time of the site visit, approximately 50 percent of the patients had had their personal property delivered to them. CMF L1-PIP staff reported that they were not always successful getting patients' properties delivered from the sending institutions because current CDCR policy did not require a referring institution to send a patient's property following transfer to inpatient care as "Psych and Return" or "Medical and Return." Staff indicated that CDCR was reconsidering this policy.

## XVI.  *COLEMAN* POSTINGS

*Coleman* postings in both English and Spanish were posted in areas accessible by patients.

## XVII.  LAUNDRY AND SUPPLY ISSUES

Patients and staff reported multiple problems with laundry since the activation of the CMF L1-PIP, which were addressed and remedied by headquarters staff during the site visit.  A new laundry bag exchange system was implemented through which each patient received a full complement of clothing and bedding on admission, with one-to-one exchanges on laundry days throughout their stay.

## XVIII.  VISITATION/PRIVILEGES/TELEPHONE

CMF L1-PIP reported that visitation privileges were provided to the patients based on their privilege group and based on the evaluation and approval of their treatment team. Interviews with patients did not indicate any issues with visitation.

Patients' privileges in the CMF L1-PIP were also governed by their custody privilege group and based on their evaluation and decision of their treatment teams.  No issues with privileges were reported or observed during interviews with patients.

There were no issues regarding patients' access to telephone reported or observed in the CMF L1-PIP.

## XIX.  LAW LIBRARY ACCESS

The CMF L1-PIP provided law library access utilizing a paging system.  Under the paging system, patients were required to submit a request via institutional mail and the library staff would deliver the requested materials to their rooms.

There were no issues raised regarding access to the law library during the review period or at the time of the site visit.

# APPENDIX A6
CHCF-PIP

I.    **SUMMARY OF THE FINDINGS**

- Psychiatry vacancies at CHCF-PIP were significant.

- Functional vacancies for psychologists and social workers were ten percent.

- Functional vacancies for other clinical staff ranged between nine percent and 13 percent.

- CHCF-PIP met the clinical staff-to-patient ratios for its census during the time of the site visit but would not at full capacity.

- Observed IDTTs in the acute care program noticeably varied.

- Attention to LRH was not consistent in IDTTs across programs at CHCF-PIP.

- Treatment goals were not regularly discussed in IDTTs in the acute care program.

- The quality of IDTTs in the intermediate care program varied.

- Current treatment plan, treatment progress, behavior necessary to attain new privileges, or the types of treatment planned before the next IDTT were not consistently discussed with patients in the acute units.

- In the intermediate care program, collaborative treatment planning between clinical staff and patients was lacking.

- The absence of correctional counselors at IDTTs posed significant problems for CHCF-PIP.

- Tracking structured and unstructured therapeutic activities was problematic.

- CHCF-PIP provided fewer structured and unstructured therapeutic activities than a typical EOP in CDCR.

- Patients in both the acute and intermediate care programs did not have access to out-of-cell activities for significant periods of time.

- CHCF-PIP did not accurately track individual therapy sessions; however, multiple interviewed patients reported limited 1:1 contacts.

- Staff on some units apparently did not have a clear understanding of how to effectively utilize 1:1 contacts.

- CHCF-PIP had a multi-disciplinary PBST; however, there was clearly a need for further training, development, and implementation of behavioral plans.

- CHCF-PIP was utilizing the STEP Program of DSH until CDCR developed and implemented a uniform system-wide program for the PIPs.

- Patients admitted to the acute care program were transferred timely; however, no usable data was provided regarding transfers to the intermediate care program.

- CHCF-PIP did not meet timeframe for initial IDTTs following admission.

- No data was provided regarding compliance with timely ICCs.

- Multiple patients remained in beds following clinical discharge.

## II.    CENSUS

The CHCF-PIP operated 496 beds (excluding 18 isolation rooms); 235 acute care beds and 261 intermediate care beds.  Included in the 235 acute care beds were 87 beds converted from intermediate care to acute care beginning in July 2017.  On November 7, 2017, 199, or 85 percent of acute care beds were filled and 177, or 68 percent of intermediate beds were filled. Fifty-eight percent, or 102 patients were housed above their least restrictive housing designations, and there were 88 patients under PC 2602 involuntary medication orders.

## III.    STAFFING

### 1.    Administrative, Clinical, and Correctional Staffing

The executive management team included the executive director, hospital administrator, chief psychiatrist/medical director, clinical administrator, and the coordinator of nursing services.   While previously filled with staffing in acting roles, the executive director position was filled effective September 25, 2017, and the clinical administrator position was expected to be advertised by the end of November 2017.  The hospital administrator and the coordinator of

nursing services positions were filled.  The chief psychiatrist and chief psychologist positions were filled.  The chief psychiatrist started work six days prior to the site visit.

Senior Psychiatrists:  One of the two senior psychiatrist positions were filled.  No contractors covered the position leaving a 50-percent vacancy rate.

Psychiatrists:  Of the 33 staff psychiatrist positions, 17.65 were filled.  Contractor psychiatrists provided 5.25 FTE coverage and telepsychiatry provided an additional 2.0 FTE coverage resulting in 8.1 functional vacancies or a 24.6-percent functional vacancy rate.  Telepsychiatry was not utilized on the acute units.

Senior Psychologist Supervisors:  The 3.0 senior psychologist supervisor positions were filled.

Senior Psychologist Specialists:  The 2.0 senior psychologist specialist positions were filled.

Psychologists:  Twenty-six, or 89.6 percent, of the 29 psychologist positions were filled.  No contractors provided coverage for the vacancies.

Supervising Social Workers:  The two established supervising social worker positions were filled.

Social Workers:  Twenty-nine or 87.8 percent of the 33 social worker positions were filled.  Social worker contractors provided 0.75 FTE coverage during the review period for a functional vacancy rate of ten percent.

Supervising Rehabilitation Therapists:  Two of the three supervising rehabilitation therapist positions were filled.  No contractor coverage was utilized resulting in a vacancy rate of 33.3 percent.

Rehabilitation Therapists:  Twenty-seven of the 32 rehabilitation therapist positions were filled.  One FTE position was covered by contractor services for a functional vacancy rate of 12.5 percent.

Supervising Registered Nurses (SRNs):  Nineteen, or 87 percent, of the 23 supervising registered nurse positions were filled.  Registry was not used for this class.

Registered Nurses (RNs):  Of the 174 registered nurse positions, 153 were filled.  Three FTE positions were covered by registry staff, for a functional vacancy rate of 10.4 percent.

Senior Psych Techs:  Thirty-three of the 37 senior psych tech positions were filled, resulting in a vacancy rate of 10.9 percent.

Psych Techs:  Of the 379 psych tech positions, 344, or 90.7 percent, were filled.

Pre-Licensed Psych Techs:  All of the 14 pre-licensed psych tech positions were filled. The pre-licensed psych techs were in the process of completing school and had been hired in psych tech positions while they finished their hours and took their board examinations.  Upon successful completion, they would be shifted into licensed psych tech positions.  CHCF-PIP used this program as part of staff recruitment.

Medical Assistants (MAs):  Pursuant to a memorandum dated September 25, 2017, CHCF-PIP was authorized to fill 30 medical assistant positions on a limited term basis to support the psychiatrists.  There were no hires as of November 7, 2017.

Correctional Staff:  CHCF-PIP reported that there were not sufficient correctional counselors to attend required IDTTs.  The facility reported all other budgeted correctional positions were filled, but did not provide details.

2. **Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

Due to the swift flipping of units from intermediate care to acute care during the review period, CHCF-PIP staff reported that they staffed all disciplines for 1:15 in all units. Staffing ratios for clinical positions by discipline across all units, both intermediate and acute were, 1:14 for psychiatrists, 1:13 for psychologists, 1:12 for social workers, and 1:13 for rehabilitation therapists. It was observed however, that if CHCF-PIP was operating at full capacity of 496 beds, psychiatry ratios would not be compliant.

3. **Staff Training**

Clinical, and administrative staff working in the CHCF-PIP completed TSI training prior to working in the CHCF-PIP. Additionally, all staff completed the five-day new employee orientation specific to the CHCF-PIP within 60 days of employment.

Annual block training was also required, specifically including suicide prevention. As of November 7, 2017, over 90 percent of rehabilitation therapists, social workers, SRNs, and unit supervisors completed annual block training. Seventy percent of RNs completed block training. Fifty percent of psychiatrists, psychologists, senior psych techs, psych techs, and administrative staff were scheduled for completion within three months. Over 90 percent of CHCF-PIP staff were current with CPR training.

Additionally, 100 percent of clinical staff assigned to units converted from intermediate care to acute care received a one-hour conversion training including intermediate care versus acute care differences, STEP changes, acute unit programming, leisure/enrichment activities, acute unit patient room allowances, laundry/clothing/linen, ADL/grooming allowed items, dining room, and forms. Training included techniques dealing with a faster pace of service, including the heightened need for teamwork and patient communication.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

### 1.    Interdisciplinary Treatment Teams (IDTTs)

CHCF-PIP did not meet timeframes for initial IDTTs within 72 hours of admission during the review period.  Data revealed an average of 12.3 days for initial IDTT completion in the acute care program; dates were missing for 30 patients and were not included in the average.

In the intermediate care program, on average, initial IDTTs were completed in 6.4 days. This average however, included outliers of 114 days, 74 days, and 62 days.  Also, improvement was noted during the end of October 2017 and beginning of November 2017 with initial IDTTs completed within one to three days of admission.

In the acute care units, observed IDTTs showed variability; some were adequately conducted while others were characterized by a series of patient assessments conducted by the various disciplines during the IDTTs and limited team discussion.  While reportedly ordered, computer equipment was not always available in IDTTs.  Correctional counselor staff were not present during any of the observed IDTTs.

Also, in the acute care program, treatment goals were not regularly discussed and current treatment plan, progress toward reaching treatment goals, behavior necessary to attain new privileges, or the types of treatment which would occur until the time of the next scheduled IDTT were not discussed with patients.  Some IDTTs included discussion of a patient's movement to his LRH upon transfer to intermediate care; however, the discussion was cursory and the reasons for decisions were unclear.

In the intermediate care program, collaborative treatment planning between clinical staff and patients was lacking.  While quality of IDTTs varied, many lacked staff introductions, explanation of the IDTT to the patient in language that was useful to him, progress in treatment

since the previous IDTT, changes in symptoms and functioning since the last treatment plan as well as current symptoms/functioning, LRH, STEPS, patient referral to group including clinical appropriateness, and clinical preparation for discharge or transfer to another PIP.

There was little or no discussion of patient progress in groups during IDTTs.

It was observed that additional training and close supervision of IDTTs by supervising clinical staff in both the acute and intermediate care programs would be beneficial in remedying the problems discussed above.

## 2. <u>Group Therapy</u>

Reliable data concerning the provision of treatment hours to patients in the acute units was not available.

The facility provided the preliminary results of a new tracking system to monitor the provision of non-clinical hours such as yard, religious activities, communal dining, and library in acute care units. This preliminary data for November 1 through November 6, 2017 showed that groups were offered an average of 4.80 hours per patient; 28.6 percent were refused. This data suggested uneven provision of non-clinical activities across units as well as significant variation in the rate of refusal reported for these activities. The average number of hours delivered ranged from 2.27 hours average per patient (unit B2B) to 7.07 hours average per patient (unit A2A). Refusal rates ranged from 0.1 percent (Unit A2A) to 57.6 percent for unit B2A.

The monitor's experts observed a group led by a recreation therapist on the acute unit A2A. It was appropriately conducted with excellent engagement of the patients who clearly benefited from the group. At the end of the group, the patients expressed appreciation of the group, noting that the overall "calming" environment of the unit in general was helpful.

While CHCF-PIP tracked and provided data relative to average treatment hours per patient in the intermediate care program, they did not aggregate or separate the data between acute and intermediate care programs. Further, they did not have a formal audit process of groups or other structured activities. During the review period, a sample of 200 patients in intermediate care, or 32 percent of the population, revealed only an average of 2.87 treatment hours scheduled per week and only six, or three percent of those patients had ten or more hours scheduled.

The health care records indicated that multiple patients in the intermediate care program were assigned to groups without sufficient documentation of consideration of patients' treatment needs and current mental health status as well.

There was vast variability of activity offerings among units in intermediate care. Open leisure groups were offered Monday through Friday. Depending on the unit, the frequency ranged from one to five days weekly, and from once to twice a day depending on the unit. On the weekends, open leisure was offered on every unit several times on both days except B5B, where it was not on the schedule at all. During interviews, patients expressed many concerns regarding the variability of the unit schedule and resultant confusion and frustration.

Nursing staff facilitated interactive medically relevant groups during the weekends. Nurses who facilitated groups were provided with guidelines on content. The nursing group, however, was not documented by mental health staff on the activity schedule for all units. It was unclear if this was an oversight or if there was variability in the provision of these groups on the various units. The inclusion of these nursing groups on each unit's activity schedule would be beneficial by clearly showing the extent of therapeutic activities offered to patients in the various units.

START NOW groups, an evidence-informed group treatment model, were offered on all intermediate care units. This 32-session, psychologist-facilitated group integrated cognitive behavior therapy, motivational interviewing, dialectical behavior therapy, and trauma sensitive care. The monitor's expert observed a START NOW group attended by seven patients on B4A. While the group leader appropriately initiated interaction, overall, patients were minimally engaged. Further, the group leader discussed content in a manner that may have been too complex for the patients in attendance; a more basic method of discussion would have been more useful.

The monitor's expert also observed an overcoming trauma group attended by eight patients on intermediate care unit B6A. The group was not facilitated by the regular group leader who was delayed due to IDTT. The group started 15 minutes late, which was reportedly not unusual. Patients were engaged and attentive in the group and the facilitator provided appropriate group management; however, improvement was needed as there was little patient interaction.

The appropriate placement of patients in group therapy was an important function of the IDTT. During both of the observed groups, it was noted that some patients in attendance would have benefitted from alternative group therapy placement. Due to the functional level of some patients, they presented with disruptive behaviors that would have been better addressed in a group of similarly functioning patients or in other structured activities, such as recreational activities, until their level of functioning improved.

The monitor's expert also noted an additional staff member (a psych tech) present in both observed groups; a DSH directive required a secondary facilitator to maintain observation of the group (for example, through the window from the hallway), but was not required to remain in the

group room.  Staff reported that the psych tech's primary role was to observe and intervene if a patient engaged in problematic behavior.  A psych tech and a social worker attended the observed groups.  While neither participated, midway through the group, the social worker exited the room and shouted for a psych tech to cover the group.  This was very disruptive to the group therapy process.  Institutional management staff should clarify the appropriate role of the second staff member in the group therapy process.

Despite documentation of a full activity schedule, intermediate care patients on B4A reported they were out-of-cell for an hour each weekday and one to two hours during the weekends.  Patients reported that they were provided with yard access when specifically requested rather than through a regular schedule.  At the time of the site visit, patients reported that they had been provided yard "a few days ago;" however, the unit schedule indicated yard should have been offered at three different times the day prior.

CHCF-PIP did not utilize treatment modules, restart chairs, or treatment tables during the review period.

Issues requiring follow-up by facility and headquarters staff included the development of mechanisms to ensure the accurate reporting of clinical contacts, possible disparities across units in the frequency of clinician contacts, possible disparities among units with regard to the provision of non-clinical contacts, and an overall low level of reported clinical contacts. Additionally, scheduling and offering of adequate therapeutic activities with accompanying tracking and monitoring needed to be addressed.

### 3.    __Individual Treatment__

The provision of individual therapy at CHCF-PIP was unclear and inadequate. Interviewed staff did not have a clear understanding of when to utilize individual contacts.

Interviewed patients reported limited individual contact, some not having been seen from two to four weeks.  One patient group indicated they were told staff did not have "time" for 1:1 sessions.  Regional staff present during the site visit conducted targeted record review of some patients receiving acute care during that week-long period.  This record review, which was shared with the monitor's expert, indicated that while there appeared to be more individual primary clinician contacts than originally reported, they tended to cluster around IDTT dates.  This clustering of contacts was consistent with patient reports.

CHCF-PIP did not provide data relative to timeliness and frequency of primary clinician or psychiatric contacts in the intermediate care program during the review period.  Staff reported that pursuant to DSH administrative directive (Delivery of Treatment Groups) dated March 8, 2017, individual therapy incorporates "any therapeutic session where one clinician meets with one patient for more than fifteen (15) minutes."  Individual therapy sessions were "recurring and part of the patient's treatment plan" but there was no specific frequency required.   Individual therapy was distinguished from an individual clinical contact which was defined as a "brief unscheduled clinical contact where one clinician meets with one patient to address emergent issues."  The minimum number of individual sessions for patients in intermediate care was not provided except for psychiatry, who must provide weekly direct patient contact which may include group or individual sessions.  The expectations for individual therapy for CHCF-PIP intermediate care patients should be clearly delineated.

According to the intermediate care program activity schedule, social workers designated two to three hours of 1:1 time during the week for each unit.  There was large variability in 1:1 psychology time offered, ranging from one one-hour increment to ten one-hour increments across the work week.  Staff reported that psychologists provided 1:1 as needed and thus varied

by patient.  It was reported that some patients were seen several times a week, while others were

not seen at all.  Staff reported that the decision to offer 1:1 was made during IDTT.  However,

there was no discussion of the provision of 1:1 in observed IDTTs during the site visit, and

during one IDTT, a patient asked when he could meet with a psychologist and was told

"sometime next week."

It was clear that individual treatment at CHCF-PIP needed significant improvement

which could be accomplished through the development of meaningful guidelines for clinical

staff.

**4.**      **Psychiatric Services**

CHCF-PIP required psychiatrists to provide weekly direct patient contact which may

include group or individual sessions.  According to staff and patient reports, psychiatry staff

shortages negatively affected the provision of care in the CHCF-PIP.  Psychiatry contacts varied

across units, ranging from no scheduled time on four units (B5B, B6A, B7A, and B8B) to 12

one-hour increments on others.  Of note, the two units that offered the most psychiatry contacts

were offered by tele-psychiatry.  All ten hours of psychiatry services offered on B4B were

offered by tele-psychiatry, and ten of twelve hours on B3B were offered by tele-psychiatry.

**5.**      **Other Treatment Issues**

**A.  Involuntary Medications (PC 2602)**

There were 88 patients under PC 2602 involuntary medication orders at the time of the

review.  CHCF-PIP did not report any further information regarding PC 2602 patients.

**B.  Behavioral Management**

CHCF-PIP had a multi-disciplinary PBST that assisted treatment teams in developing and

monitoring behavioral guidelines for patients who engaged in behaviors that posed a high risk of

violence or suicide or were not responsive to treatment.  Behavioral guidelines were developed for patients by the PBST or the unit psychologist for acute or intermediate care patients.  The unit psychologist was responsible for coordinating the behavioral guidelines with unit staff.

From July 2017 through October 2017, an average of 28 patients had behavioral guidelines at CHCF-PIP.  During that same period, an average of 9.25 behavioral guidelines were discontinued or were for patients who were discharged from the CHCF-PIP.  PBST provided an average of 16 new or ongoing consultations between August 2017 and October 2017 which resulted in an average of ten new behavioral guidelines for the same timeframe.  It was observed that there were no plans for continuing behavioral guidelines developed in the CHCF-PIP upon discharge to CDCR, even where continuation would be clinically beneficial to the patient.

At the time of the site visit, there were six active behavioral guidelines for patients receiving acute level of care and 21 for patients on intermediate care units.  Documentation on all but one indicated "Do not allow the patient to see a copy of this plan."  While it was not clear from the documentation, staff reported that patients were made aware of the behavioral guideline.  It was observed that collaboration with the patient should be clearly documented in the patient's healthcare record.  Staff should re-consider applying "Do not allow the patient to see a copy of this plan," across the board and consider providing patients with a copy of their behavioral guideline unless justiciable clinical or safety concerns indicated otherwise.

Overall, the behavioral guidelines focused on staff interventions, which suggested a need for further staff training.  It is generally accepted that a well-trained staff that consistently responded to problematic behavior in a therapeutic manner could decrease problematic behavior and ultimately the need for behavior guidelines.   An important component of any treatment

intervention with a patient is that the intervention be individualized.  Many of the behavioral guidelines reviewed were not individualized and generally had similar components with no clear rationale for why specific interventions were chosen for each patient.  Of concern, two patients had nearly identical behavioral guidelines showing no signs of an individualized approach to each patient's particular needs.

A critical component to address behavior change is a comprehensive functional behavioral analysis that assesses the events in the environment that predict and maintain problem behavior.  It is important to gather data from all available sources including record review, and sources of data should be identified in the report and conceptualized as a whole when developing the clinical opinion for the hypothesis of the function of the behavior.  A key component is to obtain the baseline frequency of the behavior to facilitate the development of reasonable and measurable goals, which allows for ongoing assessment and ultimately discontinuation.

Of the 27 behavioral guidelines, only six had rewards or incentives included for positive behavior.  However, for each of these, it was unclear if rewards were meaningful to the patient. Rewards are a critical component to behavior change and are based on the learning principle that behaviors that are rewarded are more likely to be repeated.  The required behavior should be clearly defined, observable, and measurable; additionally, the reward must be contingent on the desired behavior.  Another concerning reward was therapeutic treatment sessions with a PBST psychologist to address coping skills and frustration tolerance.  This type of reward is not typically salient to psychiatric patients and there was no documentation to support that it was meaningful to this patient.

The PBST at CHCF-PIP provided a solid foundation for behavioral interventions. However, behavioral guidelines at CHCF-PIP were staff-focused as opposed to patient-focused.

Traditional behavior plans are designed to teach and reward positive behavior by including interventions that reinforce desired behaviors with rewards that are meaningful to the patient.

Staff reported that documentation and monitoring of the behavioral guideline was a challenge with EHRS.

### C. Morning and End of Shift Meetings

Change of shift meetings between custody, clinical nursing, and ancillary healthcare staff were conducted at every shift change in all acute and intermediate care units.

In the acute care program, a useful and well-conducted change of shift meeting was observed by one of the monitor's experts on unit 2B. Patients were discussed concisely with pertinent information transmitted to the incoming shift.

## V.   PATIENT ACCESS TO CARE

### Patient, Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

At the time of the site visit, CHCF-PIP was using the STEP program that had been instituted by DSH prior to lift and shift on July 1, 2017. CDCR was in the process of developing and implementing a uniform behavioral incentive program for its PIPs.

The STEP program at CHCF-PIP included a DPS level, which was described as an "individualized temporary status" where an inmate was placed "following a serious behavioral infraction requiring heightened security measures that allows the patient access to care and treatment in a safe and controlled environment." This status was used in both the acute and intermediate levels of care. There was also a Maximum Custody Status that required the patient to remain "under the direct supervision and control of the custody staff. Patients on Maximum Custody can only program in mechanical restraints or in the therapeutic treatment module."

In the acute care program, Assessment and Orientation was an evaluation stage that occurred upon admission and prior to the seven-day master treatment program. During this stage, clinical evaluation by the IDTT and custody evaluation by the ICC/UCC occurred, following which the patient transitioned to either STEP 1 or STEP 2.

Acute care patients were placed in STEP 1 following Assessment and Orientation if the IDTT determined that based on clinical and custodial factors, the patient required a solo treatment program. The IDTT was required to design an individualized treatment plan and document the patient's progress and criteria for advancement to STEP 2. Based on clinical and custodial risk factors, the IDTT determined if solo programming would occur with or without mechanical restraints.

A patient progressed to STEP 2 from either Assessment and Orientation or STEP 1. Movement to STEP 2 was determined based on clinical evaluation and custodial factors that indicated the patient was appropriate to program with others. The IDTT was required to develop an individualized group treatment program, as well as determine if group treatment would occur with or without mechanical restraints.

Patients in the intermediate care program begin on Assessment and Orientation during which they were closely observed and clinically evaluated by the IDTT and remained at this level until classified. During Assessment and Orientation, the patient was oriented to program rules and treatment expectations, could participate in solo and/or small group treatment activities, and were provided in-cell recreation activities, as approved by the IDTT. A patient may be returned to Assessment and Orientation if he decompensated. From Assessment and Orientation, a patient transitioned to either STEP 1 or STEP 2.

At STEP 1, a patient could participate in treatment activities that may include solo and/or group programming according to their individualized treatment plan. STEP 1 patients were also provided specific incentives. To advance to STEP 2, the patient must attend 50 percent of treatment activities, and meet any other patient-specific criteria required by the IDTT. STEP 2 patients were also provided with specific incentives including the state issued radio.

For a patient to advance to STEP 3, he must attend 80 percent of treatment activities and meet all specific criteria for advancement designated by his IDTT. At STEP 3, patients were required to be actively engaged in their treatment so as to understand their mental illness, develop additional coping skills and aftercare plans. To maintain STEP 3, the patient was required to attend 90 to 100 percent of his treatment activities and have no disciplinary issues. The patient also had to meet any specific criteria set by the IDTT. STEP 3 patients were provided incentives including a state issued television.

The IDTT was required to provide weekly STEP level reports. Monthly STEP level audits were required to be completed and reviewed in the clinical operations committee meetings.

According to the data provided regarding the STEP levels, Program I included units A2A, B7A, B7B, B8A, and B8B. On unit A2A, three patients were on Orientation/Assessment status; six patients were on cuff status, and 22 were on non-cuff status. On B7A, one patient was on DPS, six patients were on STEP 1, five patients were on STEP 2, and five were on STEP 3. On B7B, one patient was on DPS, one patient was Maximum Custody, one patient was on Solo, four patients were on STEP 1, three patients were on STEP 2, and nine patients were on STEP 3. On B8A, six patients were on Orientation/Assessment, six were on cuff status, and 16 were on

non-cuff status.  On B8B, eleven patients were on Orientation/Assessment, one was on cuff status, and 17 were on non-cuff status.

Program II data included units 302A, 302B, 303B, 304A, and 304B.  Unit 302A had one patient on DPS, two patients on STEP 1, four patients on STEP 2, and 13 patients on STEP 3.  Unit 302B had four patients on Orientation/Assessment and 18 patients on non-cuff status.  On Unit 303B, there was one patient on DPS, two patients on STEP 1, four patients on STEP 2, and 13 patients on STEP 3.  On Unit 304A, there was one patient on DPS, two patients on Orientation/Assessment, five patients on STEP 1, and 13 patients on STEP 3.  On Unit 304B, there was one patient on DPS, one patient on Orientation/Assessment, seven patients on STEP 1, one patient on STEP 2, and six patients on STEP 3.

Program III data for units B301B, B305A, B305B, B306A, and B306B was presented in a manner that did not allow for reliable calculation of the number of patients at each STEP level.

## VI.    REFERRALS AND TRANSFERS

Data provided by CHCF-PIP indicated that 311 patients were referred and 310 admitted.  There was one patient rejected due to medical reasons, specifically bed sores.  Referrals to acute care were timely admitted.  Data for intermediate care was not presented in a format to facilitate accurate calculation of timelines for intermediate care transfers.

## VII.    ADMISSIONS AND DISCHARGES

### 1.  Admissions

CHCF-PIP reported that 263 patients were admitted to acute care and 47 to intermediate care during the review period.

## 2. **Discharges**

CHCF-PIP discharged 356 patients; full data was provided for 355 patients. Patients waited an average of 5.32 days after clinical discharge before leaving the inpatient bed. Fifty of the discharges, or 14 percent, took longer than ten days after clinical discharge to leave the inpatient bed. CHCF-PIP did not provide reasons for these administrative days. These delays were concerning, considering patients could be awaiting inpatient beds.

## VIII. **PATIENT DISCIPLINARY PROCESS**

Staff reported no changes to the patient disciplinary process policy and procedures during the review period. CHCF-PIP reported greater than 90-percent compliance for mental health staff receiving training on the new mental health assessment process using EHRS, but only 85.7-percent compliance for custody staff receiving this training. Staff reported that any outstanding training was due to staff who had yet to complete their annual block training.

Documentation revealed 92 RVRs were adjudicated for patients in CHCF-PIP from July 1, 2017 through November 6, 2017. Mental health assessments were referred, completed, and returned timely. One of the reviewed samples noted alternate manner for resolution and was properly reviewed by the captain. Senior hearing officers noted consideration, and mitigation was also noted. On several assessments, the mental health clinicians continued to note that patients should be provided with mental health treatment and services, indicating that they were unclear of the penalties that could be assessed.

## IX. **USE OF FORCE**

There were no controlled use of force incidents from July 1, 2017 through September 2017. Data for October 2017 was not reported. There were 20 immediate uses of force during that same period, six in July, seven in August, and seven in September. There were no instances

reported where no force was used.  A review of the use of force CDCR Form 837s and Institutional Executive Review Committee documents revealed incidents largely involved resistive inmates during escorts.  The managerial reviews were comprehensive and in one example, the associate warden documented that particular staff members were not in compliance prior to and during the use of force.  Progressive discipline action was initiated for three officers. RVRs were issued for each use of force the monitor reviewed.

## X.  UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

There were 107 serious incident reports (SIRs) completed during the review period for aggressive acts for behaviors including swallowing objects, cutting/scratching themselves, and head banging.

## XI.  USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

With the implementation of EHRS, SRNs performed seclusion and restraint audits.  An audit tool was developed as well as a procedure and schedule for auditing which was scheduled to begin after the monitoring visit, during November 2017.

According to the restraint log, there were three incidents of restraint use during the review period.  All the incidents occurred during July 2017.  The longest duration of restraint lasted for approximately four hours and eleven minutes, and appropriate documentation regarding nursing monitoring was present for all incidents.

Information was provided in quality management documentation regarding 1:1 observation for July and August 2017.  There were 24 incidents of one-to-one observation that occurred for each month (July and August 2017).  No additional information was provided to determine the duration of observation, release criteria, or the reasons for monitoring.  The policy

regarding the use of observation cells, seclusion and restraints was provided, and it appeared to be clinically appropriate.

## XII.   SUICIDE PREVENTION

There were no completed suicides during the review period.  A log of unusual occurrences/serious incidents for the period noted 16 incidents of suicidal behavior and 57 incidents of aggressive acts (some to self and some to others) for the months of August and September 2017.  CHCF-PIP did not conduct audits regarding suicide prevention efforts, and there were no quality improvement teams chartered.  CHCF-PIP did not track SRASHEs.  According to policy, SRASHEs were completed at time of admission, discharge, and following an act of self-harm or a suicide attempt.

## XIII.   EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.   Emergency Response

Minutes were provided for the EMRRC.  The minutes reflected that the committee met consistently, and discussion included detailed evaluation of specific patient related emergency response.

### 2.   Death Review Process

CHCF-PIP had policies and procedures regarding the death of a patient, death records, and medical services as it related to the death review process, and emergency response.

## XIV.   QUALITY MANAGEMENT AND UTILIZATION REVIEW

CHCF-PIP had an active quality management program and continued to use DSH's model at the time of the site visit.

The CHCF-PIP used a Risk Management Program whose function was the tracking of deficiencies and corrective action plans, the tracking and monitoring of all SIRs, and the

reporting of unusual occurrences to the appropriate oversight agencies. This also involved participation in weekly program review committee (PRC) meetings, bi-weekly psychology specialist services committee (PSSC) meetings, quarterly ad-hoc facility review committee (FRC) meetings, as well as participation in various patient safety and review committees. Review of minutes indicated that the FRC met twice during the review period, the PSSC met at least monthly, and the PRCs met on an almost monthly basis.

No information was provided regarding the local governing body; however, the quality council committee functioned as the overall quality management committee at the facility. This committee met monthly; and the various committees, including the PRC, PSSC, risk management committees, FRC, utilization management, violence risk reduction, and suicide prevention committees all reported to this committee. Minutes were maintained and included information such as discussion of SIRs, one-to-one observation, staff injury, suicide attempts/threats and ideation, Joint Commission corrective action items, therapy delivered, LRH, access to care, and other pertinent clinical issues.

Minutes were also provided regarding the violence reduction/suicide prevention committee. There was documentation of a meeting that occurred on July 5, 2017 only. The minutes reflected discussion of EHRS roll-out, SIR reporting data, suicide in corrections training, and a SPRFIT update, which was tabled until the next meeting. No minutes of the local SPRFIT were located.

## XV.    PATIENT COMPLAINTS/PATIENT SATISFACTION

Patient satisfaction surveys were completed quarterly. Common themes among patients included issues with staff, lack of adequate out of room time, and insufficient treatment.

Acute care patients in Unit A2A who were interviewed by the monitor's expert following a group session, expressed significant frustration with the lack of out-of-cell time, as well as concerns about what they were issued at CHCF-PIP and their property left at the CDCR prisons. They noted that low staffing levels combined with the time-consuming nature of IDTTs limited the amount of time staff could spend with patients individually or in groups. They particularly complained about not being issued a toothbrush. They reported that a plastic comb was provided to each patient.

During the review period, patients filed 98 appeals. Forty-nine percent or 48 appeals were staff complaints; 35 were screened out/denied/cancelled.

## XVI.  *COLEMAN* POSTINGS

*Coleman* posters were present in all units at CHCF-PIP.

## XVII.  LAUNDRY AND SUPPLY ISSUES

There were no audits, reports, or logs for laundry and supplies during the review period. There were no appeals filed regarding laundry; however, when interviewed, patients on intermediate care unit B6A specifically focused on laundry services. Patients reported that laundry was returned to them dirty and malodorous ("smells like urine") and that their boxers were stained.

## XVIII. VISITATION/PRIVILEGES/TELEPHONE ACCESS

Visitation was determined by IDTT and was not related to a patient's STEP level in the acute or intermediate care programs. Each week, the program director forwarded a combined updated list of CHCF-PIP patients clinically eligible for contact visits to the Correctional Counselor II supervisor.

Telephone access was outlined in the Patient Orientation Handbook. Psych techs on the units provided daily sign-up logs to all patients, except Maximum Custody patients. Maximum Custody telephone access must be approved by IDTT and the facility captain. Telephone access increased during the review period with five extra slots available during weekdays and seven extra slots available during the weekends.

The statewide STEP policy and procedures were under review during the site visit and once implemented, both visitation and telephone access would be included.

## XIX.  LAW LIBRARY ACCESS

No issues were raised by patients during the site visit, and there was one appeal filed during the review period regarding access to law library.

CIW-PIP

**CIW-PIP**
November 1, 2017 – November 2, 2017

## I. SUMMARY OF THE FINDINGS

- In October 2017, the CIW-PIP overall staffing functional vacancy rate was ten percent.

- CIW-PIP met the intermediate and acute care staff-to-patient ratios for psychologists, clinical social workers, and recreation therapists.

- CIW-PIP met the intermediate care staff-to-patient ratio for psychiatrists but was not compliant with that ratio at the acute care level.

- Treatment provided at the CIW-PIP did not clearly distinguish between acute and intermediate levels of care.

- CIW-PIP was compliant with timelines for initial and follow-up IDTTs.

- Correctional counselors were not consistently present at IDTTs.

- SRASHEs were appropriately completed.

- LRH was discussed at 75 percent of IDTTs beginning in September 2017.

- Provided group therapy data did not track structured and unstructured activities offered, received, or refused for each patient.

- CIW-PIP reported that structured therapeutic activities provided to patients were individualized to meet clinical needs.

- Patients in intermediate and acute care had access to individualized weekly counseling sessions.

- CIW-PIP offered behavioral management support plans to its DPS patients and patients placed on suicide watch and/or suicide precaution status.

- Long stays on DPS did not occur at CIW-PIP during the review period.

- CIW-PIP did not report timeliness of transfers into its program.

- When required, ICCs were conducted timely.

- Appropriate procedures were followed in the single controlled use of force incident.

- CIW-PIP had a functional quality improvement system in place.

- There were no appeals (CDCR Form 602) filed during the review period.

- There were no laundry exchange problems reported for the review period; however, patients did raise issue with clothing supplies.

- Patients had access to the law library.

- Education was provided to CIW-PIP patients on request with approval of their IDTT.

## II.   CENSUS

On November 1, 2017, the CIW-PIP census was 45 patients, including 18 acute care patients and 27 intermediate care patients.

The average daily census between July and September 2017 was 42 patients.  There were 42 patients in the CIW-PIP during July with an average length of stay of 247.4.days.  In August, there were 44 patients with an average length of stay of 253.5 days, and in September, there were 41 patients with an average length of stay of 253 days.

## III.   STAFFING

### 1.   Administrative, Clinical, and Correctional Staffing

As of October 2017, the overall functional vacancy rate for the CIW-PIP was ten percent. The executive director and program director positions were filled; however, the program assistant position was vacant; other staff acted in this position.

Senior Psychiatrist:  The senior psychiatrist supervisor position was vacant.  A staff psychiatrist covered the senior psychiatrist supervisor duties, in addition to her assigned duties as a staff psychiatrist.

Psychiatrists:  The two staff psychiatrist positions were filled.

Senior Psychologist:  One FTE senior psychologist filled the 0.5 senior psychologist supervisor position.

Psychologists:  The two psychologist positions were filled.

Social Workers:  The four clinical social worker positions were filled.

Recreation Therapists:  All four recreation therapist positions were filled.

Nursing:  CIW-PIP reported that all its nursing positions were filled, but did not provide details.

Senior Psych Techs:  All six senior psych tech positions were filled.

Psych Techs:  All 32 psych tech positions were filled.

Correctional Staff:  CIW-PIP reported that all correctional positions were filled, but did not provide details.

**2.      Staff-to-Patient Ratios and the Adequacy of Clinical Staffing**

Staffing ratios for clinical positions by discipline were, 1:22 for psychiatrists, 1:15 for psychologists, 1:11 for social workers, and 1:11 for recreation therapists.  Psychiatry was within the intermediate care ratio of 1:35 but exceeded the 1:15 ratio for acute care.

Pre-doctoral psychology interns also provided care under the supervision of licensed psychologists.

**3.      Staff Training**

Over 90 percent of CIW-PIP staff completed the PIP orientation training, the mental health custody staff collaboration training, and the use of force training.  Additionally, 73 percent of the staff completed the two-day TSI training.  The four-hour TSI refresher class was completed by 62 percent of staff.  Several custody and mental health staff supervisors were

scheduled to attend "train the trainer" training which would facilitate the remainder of the line staff receiving training.

## IV.    TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

Reviewed medical records did not clearly distinguish between patients receiving an acute level of care from those receiving an intermediate level of care.  However, it appeared that a patient receiving an acute level of care generally had a higher security level, with their treatment focused on stabilization via medication management, in contrast to intermediate patients, whose treatment included medications, but focused more on psychosocial interventions.

### 1.    Interdisciplinary Treatment Teams (IDTTs)

CIW-PIP remained compliant with timeliness of initial and follow-up IDTTs.  During the review period, correctional counselors had an attendance rate of 90 percent, except in July when attendance was at 77 percent.  Since September 2017, when the indicator was added, LRH had been discussed in 75 percent of IDTTs.

### 2.    Group Therapy

Groups were provided in 11-week cycles and ranged from six to ten patients per group. Group therapy data provided by CIW-PIP did not distill individual hours of group therapy offered, received and refused.  Staff reported that they did not have the ability to track the number of out-of-cell structured and unstructured activities offered to CIW-PIP patients on an average basis.  However, they stated that the new EHRS would afford them the ability to track such data.  Staff reported that a significant number of patients were unable to tolerate participation in groups on a daily basis and preferred to isolate in their cell.

Staff indicated that structured therapeutic activities offered to patients were based on an individualized treatment plan, not the minimum number of hours to be offered to them.  Group

cancellation was not an issue at CIW-PIP; nine percent of groups were cancelled during the review period.

During the site visit, 19 patients were interviewed in a community therapy setting. In general, patients described the groups as helpful; however, they indicated a desire for access to additional groups on a daily basis. The master group offering list demonstrated a wide range of groups. In addition, nursing staff facilitated enrichment group offerings.

The monitor's expert observed portions of three different groups. Four to eight inmates attended each group. The groups were conducted by co-therapists in a competent manner and inmate participation was good.

The list of inmates refusing 50 percent or more of all treatment groups were reviewed, which included 11 patients during July 2017, ten patients during August 2017, and 11 patients during September 2017. Less than half of such patients were on the refusal list for two consecutive months. Staff described many of the patients as disorganized and clinically unstable.

3.     **Individual Treatment**

The treatment programs at CIW-PIP were not significantly different for acute care versus intermediate care patients. Both acute care and intermediate care patients had weekly access to individual counseling sessions with primary clinicians. Acute care patients were seen individually by a psychiatrist three times per week. Patients in the intermediate care program were seen individually by a psychiatrist at least monthly.

4.     **Psychiatric Services**

As reported above, psychiatry staffing did not meet the acute care patient ratio of 1:15. One of the two staff psychiatrists was also assigned to perform the duties of a senior psychiatrist.

Record reviews did not reveal any issues with psychiatric services. CIW-PIP did not use telepsychiatry.

### 5. Other Treatment Issues

#### A. Involuntary Medications (PC 2602)

Fifteen to 22 inmates per month received involuntary medications during the three months prior to the site visit. At the time of the site visit, 35.5 percent, or 16 patients, were under PC 2602 medication orders. CIW-PIP did not provide data relative to the number of petitions initiated, renewed, or pending during the review period. Further, CIW-PIP did not provide a list of patients who had been noncompliant with the PC 2602 process during the review period.

#### B. Behavioral Management

No formal tracking mechanism existed at the CIW-PIP specific to which patients were receiving behavioral support plans. However, behavioral support plans were typically developed with patients who were placed on DPS, suicide watch and/or suicide precaution status. Such plans were formulated and reviewed through the IDTTs process. Staff reported that beginning in October 2017, a formal review and standardization of statewide PIP policy was initiated that would include behavioral support plan issues.

#### C. Morning and End of Shift Meetings

Daily meetings were conducted in the CIW-PIP between custody, clinical, nursing, and ancillary healthcare staff during the morning and through the end of shift report process. Issues addressed during meetings included patients' behaviors, injuries, medical issues, relevant medication issues, and special statuses and special unit activities.

## V.   PATIENT ACCESS TO TREATMENT

### Patient, Orientation, Discretionary Program Status (DPS), and Stages: Standards and Procedures

All new admissions into the CIW-PIP were required to be placed on DPS until evaluations were completed and the patient was approved to program by the IDTT.  In addition, a patient admitted from a secured housing unit/administrative segregation, psychiatric services unit, or an institution other than CIW, must also receive clearance from the ICC before DPS could be discontinued.

Patients on DPS programmed individually in restraints.  It was not uncommon for approximately 20 percent of patients at CIW-PIP to be on DPS, which generally lasted about 11 days.  Long-term DPS was not an issue at CIW-PIP during the review period.

During July 2017, 31 patients were on DPS at some point during the month with an average duration on such status of 15 days.  During August 2017, 33 patients were on DPS for some period of time with an average duration of 13 days.  Twenty-eight patients were on DPS during September 2017, with an average duration of 11.9 days.  At the time of the site visit, 11 patients were on DPS.

The STAGE program was integral to treatment in the CIW-PIP.  The STAGE program consisted of several levels through which a patient was expected to advance during the course of her treatment.  There were also specific reasons provided for which a patient STAGE level could be reduced by the IDTT, which was generally related to the behavior of a patient.  The IDTT was expected to discuss the criteria for advancement in the progress of each patient during scheduled team conferences.  In the event a patient did not meet the criteria for advancement, the IDTT was required to explain the reasons and directly inform the patient of the action necessary for approval to advance to the next STAGE level.

As reported above, all patients admitted to the CIW-PIP were placed on DPS during orientation. In addition to the solo programming and use of restraints as discussed above, DPS patients had limited possessions and received their meals in their cells. Telephone privileges were subject to approval by the IDTT if clinically indicated.

At Stage I, the patient was approved to attend treatment groups identified by the IDTT, granted telephone privileges, could attend dining room and group yard, and participate in unit activities, as well as receive visitors according to CIW's visitation policy. Stage II patients received property, canteen, and quarterly package privileges. Each Stage II patient also received a PIP issued radio and had access to the unit's washer and dryer for her personal clothing. At Stage III patients were allowed a PIP-issued television.

## VI.   REFERRALS AND TRANSFERS

During the review period, there were 34 referrals to CIW, of which 18 were to the acute care program and ten to the intermediate care program. In addition, four patients initially referred to the CIW-PIP acute care program, were subsequently admitted to the intermediate care program. CIW-PIP did not provide data regarding timeliness of transfers. There was one rescission due to patient stabilization prior to admission, and one rejection due to the patient's continued assaults on staff and other patients.

Eleven patients were transferred to PSH during the review period. During the site visit, two patients with LRH suitable for transfer to PSH were housed out of their assigned LRH. One patient remained out of LRH due to swallowing objects and the other patient had a history of assaultive behavior over the past year and did not feel she could control her assaultive behavior.

## VII.  ADMISSIONS AND DISCHARGES

### 1.  Admissions

During the review period, there were 32 admissions to the CIW-PIP.  The 32 admissions included eight to acute care and four to intermediate care in July 2017; three to acute care and seven to intermediate care during August 2017; and, seven to acute care and three to intermediate care in September 2017.

Where required, ICCs occurred timely.

### 2.  Discharges

During the review period, there were 34 discharges from the CIW-PIP including 13 patients to PSH, seven patients to CIW EOP, 11 patients to CCWF, two paroled and one discharged to Ventura Youth Correctional Facility.  The average length of stay was 112.2 days.  CIW-PIP did not provide data relative to any administrative days beyond clinical discharge.  Following the review period and prior to the site visit, CIW discharged two patients to PSH in October 2017, which continued access to PSH for some CIW-PIP patients.

Additionally, three patients were discharged to CIW EOP, one to CIW PSU, one to CIW CTC Skilled Nursing Facility (SNF), two to CCWF, and one patient paroled.  Reasons for discharge included one patient transferred to her LRH, seven patients received maximum benefit, one patient MDO/paroled and one patient paroled.

CIW-PIP was 100-percent compliant with clinician-to-clinician contact upon discharge.

## VIII.  PATIENT DISCIPLINARY PROCESS

There were six RVRs issued to CIW-PIP patients during the review period.  Two of the six, or 33 percent were sent for completion of a mental health assessment within two calendar

days as required.  Four, or 66 percent were completed by mental health clinicians and returned to custody staff within eight calendar days as required.

None of the mental health assessments recommended documenting the behavior in an alternate manner.  Five of the mental health assessments noted that the patients' mental health symptoms contributed to the behaviors charged, and specific examples were provided.  Further, clinicians provided specific recommendations and rationales regarding assessment of penalties in each case.

Custody staff documented consideration of the mental health assessment in 100 percent of cases.  One case was dismissed due to mental health considerations, and in two additional cases the charges were reduced based on mental health considerations.

One patient received an RVR for battery on a peace officer due to spitting on an officer during the administration of a "medical" injection.  The clinician noted that the patient was experiencing auditory hallucinations and was "confused-evidence poor impulse control."  The senior hearing officer noted consideration of the mental health assessment; however, the patient was found guilty, assessed 121 days loss of credit, referred to the district attorney for felony prosecution and referred to ICC for a SHU term assessment.

In another case, the senior hearing officer noted consideration of the mental health assessment and the patient was assessed the lower end of the credit forfeiture schedule as a result.

## IX.    <u>USE OF FORCE</u>

There were ten use of force incidents during the review period, one controlled and nine immediate.  The monitor reviewed the controlled use of force incident packet and video.  All procedures were followed including implementation of a cool down period, cell-front

intervention by the psychiatrist, and medical staff review of any contraindications to chemical agent usage.

X.    **UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS**

CIW-PIP did not use SIRs, instead using the unusual occurrence log.  There were 33 incidents documented in the unusual occurrence log during the review period.  Incidents included administration of involuntary medication, possible medication overdose, head banging, uses of force and self-injurious behaviors.

There were 30 incidents included in the self-harm log, including three suicide attempts. If an incident of self-harm required more treatment than an RN assessment, it was also included in the unusual occurrence log and appropriate reports were completed.

XI.    **USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT**

There were no patients placed in seclusion during the review period.  One patient was placed in restraints for a total nine hours and 15 minutes.  CIW-PIP reported that the documentation regarding the use of restraint was appropriately completed.

XII.    **SUICIDE PREVENTION**

A review of the suicide prevention program within the CIW-PIP demonstrated compliance with Program Guide requirements.  Suicide risk evaluations were completed timely for all patients in the CIW-PIP who required them during the review period.

The suicide prevention program at CIW-PIP was part of the institutional CIW suicide prevention program, which was reviewed by the monitor's suicide prevention expert during his last site visit.  An internal process within the CIW-PIP was also established to review self-harming behaviors and/or suicide attempts by CIW-PIP patients, which averaged approximately 11 per month.  Serious suicide attempts were also reviewed through CIW's SPRFIT.

A review of monthly minutes of the SPRFIT revealed agenda items including Suicide Prevention Outreach Committee, staff training, SRASHE review by supervisors, self-injury log, wellness checks, Crisis Intervention Team log, alternative housing, corrective action plan items, and suicide attempt reviews. All CIW-PIP staff received yearly training specific to completion of suicide risk assessments.

## XIII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.  Emergency Response

CIW's patient safety committee was responsible for reviewing all emergency responses at the CIW-PIP. Review of provided documents indicated that emergency drills were required to be done by nursing staff quarterly. No documentation was provided regarding the occurrence of emergency drills in the CIW-PIP during the review period.

### 2.  Death Review Process

The patient safety committee also reviewed all death reviews. There were no deaths reported in the CIW-PIP during the review period.

## XIV.  QUALITY MANAGEMENT AND UTILIZATION REVIEW

A review of the minutes of monthly utilization review committee meetings revealed agenda items including, but not limited to, PIP utilization, least restrictive housing, wait list data, length of stay data, transfers to PSH, barriers to discharge, and admission/discharge data.

CIW-PIP had a performance improvement system in place at the time of the site visit. The CIW-PIP's performance improvement subcommittee was a multidisciplinary team that included key clinical and custody administrators and supervisors. The subcommittee met monthly and reviewed relevant data including incident reports, root cause analysis reports,

various audits, and quality improvement projects, as well as survey activities such as patient and staff satisfaction surveys specific to offered services.

## XV.　PATIENT COMPLAINTS/PATIENT SATISFACTION

CIW-PIP reported that there were no CDCR Form 602 inmate appeals filed by patients during the review period.

## XVI.　*COLEMAN* POSTINGS

*Coleman* notices were posted in the appropriate areas throughout the CIW-PIP.

## XVII.　LAUNDRY AND SUPPLY ISSUES

There were no changes to the laundry policy since the last review.  There were no problems reported with scheduled laundry exchange in the CIW-PIP.  Review of the minutes of the Patient Council meetings revealed that issues reported regarding clothing and bedlinens during the review period were documented as subsequently resolved in the minutes of October 2017.  CIW-PIP maintained a laundry count only for exchange in and out of the institution.

## XVIII.　VISITATION/PRIVILEGES/TELEPHONE ACCESS

Except for patients on DPS, CIW-PIP followed the same visitation policy as CIW.

During patient interviews, there were no complaints regarding privileges other than food choices at the canteen and quarterly packages.

There were no revisions of the telephone access policy during the review period and telephone access in the CIW-PIP was directly related to the patient's stage level.  While on DPS, telephone usage was allowed only through IDTT approval.  Stage I patients had access to one telephone call per week and additional access per IDTT approval.  Stage II patients were allowed access to telephone usage three times per week and additional access per IDTT approval.  Stage

III patients had open access to telephone usage per CDCR policy. All patients, regardless of STAGE level, had access to call the appeals coordinator/patients' rights advocate.

## XIX.   LAW LIBRARY ACCESS

No patients complained of law library access problems during the site visit. Patients were afforded access to law library services pursuant to Title 15 and the CDCR Department Operations Manual. Patients were provided with instructions on how to access law library services through the patient orientation handbook provided to each patient upon admission to the CIW-PIP.

## XX.   EDUCATION

Education was provided upon patient request and IDTT approval during the review period. Education hours were tracked manually as tracking was not possible through EHRS. A new web application, (NCAT) was being developed and was in labor negotiations stage at the time of the site visit. This program would reportedly capture education data.

Six patients participated in education during July and August 2017, and 11 patients participated in September 2017. Education hours were minimal, totaling 1.5 hours for all patients during July, 3.63 hours in August, and 5.95 hours during September. There were no cell-front or in-cell materials provided; the instructor was not allowed on the units. DPS inmates were not offered education services.

A GED preparation course was offered once a week in the dining room in the CIW-PIP. There was no blackboard, consequently, the instructor utilized papers on the wall. Patient participation was voluntary, and while the instructor was present for one hour, many patients reportedly left the class within minutes of arrival. Escort issues also decreased the amount of time with the patients. Interpreters were provided as necessary.

**I.     SUMMARY OF THE FINDINGS**

- At the time of the site visit, the SQ-PIP census was 25, or 62 percent of capacity, and all patients were at the intermediate level of care.

- Treatment plans reviewed did not reflect the same high quality of care observed in the IDTTs.

- Interventions and treatment targets were not always documented in treatment plans with associated treatment goals.

- The average intermediate care patient was offered 12.66 hours of structured therapeutic activities on a weekly basis and attended 8.78 hours.

- Thirty-six percent of intermediate care patients attended greater than ten hours per week of structured therapeutic activities and 68 percent attended greater than five hours per week of structured therapeutic activities.

- The average acute care patient during the review period was offered 4.57 to 26.83 hours per week of individualized out of cell structured therapeutic activities with the average patient attending 0.29 to 12.64 hours per week.

- The average length of stay for acute care patients were 17.41 days as compared to the average length of stay of 750.88 days for intermediate care patients.

- Significant improvements were made in the development of positive support behavior plans since the last monitoring visit.

- SQ-PIP staff noted meaningful clinical improvements in their patients following the implementation of behavior plans.

- Mental health was found to be a factor in the behavior underlying the RVRs for PIP patients. Notwithstanding, evaluators did not recommend that the behavior be documented in an alternate manner, even in lower level offenses.

- The privileges a patient had at the time he entered the PIP continued to be available to him, unless otherwise restricted.

- The policy allowing access to the law library was not well known by either staff or patients in the SQ-PIP.

## II.  CENSUS

The SQ-PIP served the condemned population.  There were 40 flexible beds, which could be used interchangeably for acute, intermediate care, and MHCB patients.  At the time of the site visit the census was 25, or 62 percent of capacity.  All patients were at the intermediate level of care.  The average length of stay was 750.88 days with a range of 20 to 1,208 days.

## III.  STAFFING

### 1.  Administrative, Clinical, and Correctional Staffing

The executive director, medical director, program director, and clinical director positions were filled, as was the program assistant position.  The clinical director was also functioning as a senior staff psychologist (acting) and as the behavior specialist.  The clinical director had been assigned these additional roles in August 2017 and had not carried a caseload since that time.

The chief psychiatrist position was filled.  SQ had three established chief psychologist positions, of which two were filled; the third position remained vacant at the direction of CDCR headquarters.

At the time of the visit, it was reported that one psychiatrist, one psychologist, and one social worker from SQ-PIP were temporarily reassigned to the EOP H Unit during its activation, due to the low census in the SQ-PIP.  This staff was to return to the SQ-PIP following the H Unit activation.

Senior Psychiatrist:  The senior psychiatrist position was filled.

Psychiatrists:  All three established staff psychiatrist positions were filled.

Supervising Senior Psychologist Specialists:  All three supervising senior psychologist positions were filled.

Senior Psychologist Specialists:  Six of seven senior psychologist specialist positions were filled, resulting in a 14-percent vacancy rate.

Psychologists:  All three established psychologist positions were filled.

Supervising Social Worker:  The supervising social worker position was vacant.

Social Workers:  Three of four established social worker positions were filled for a 25-percent vacancy rate.

Recreation Therapists:  Three of four established recreation therapist positions were filled for a 25-percent vacancy rate.

Registered Nurses (RNs):  All six established registered nurse positions were filled.

Licensed Vocational Nurse Positions (LVNs):  The five established licensed vocational nurse positions were filled.

Senior Psych Techs:  The seven established senior psych tech positions were filled.

Psych Techs:  All 18 established psych tech positions were filled.

Correctional Staff:  SQ-PIP had an assigned correctional counselor.  Two sergeant positions and all 38 custody officer positions were filled.

## 2.  Staff-to-Patient Ratios and the Adequacy of Clinical Staffing

The established maximum ratio in the SQ-PIP was 1:15 for treatment staff.  The staff-to-patient ratio in the SQ-PIP at the time of the site visit for psychiatry, psychology, social work, and recreation therapy were all within established ratios.

## 3.  Staff Training

SQ-PIP data indicated the following initial training was provided to staff during the review period:  CTC and TSI initial training and PIP orientation.  Annual CTC and TSI training was also provided.

# IV.   TREATMENT, CLINICAL SERVICES, AND PROGRAMMING

## 1.   Interdisciplinary Treatment Teams (IDTTs)

Compliance for routine IDTTs in the SQ-PIP, which did not separate acute and intermediate levels of care, was 88 percent for July and August, 91 percent for September and October, and 92 percent for November 2017.  Data on initial IDTTs in the SQ-PIP was inconsistent, often pertained only to MHCB patients, and did not always indicate the level of care for patients.

Timeliness compliance rates were artificially low – some of the untimely IDTTs noted in the reports had SQ-PIP patients labeled as MHCB patients and were tracking compliance based on MHCB timelines not PIP timelines.  Noncompliance with initial IDTT timeframes occurred during August and November 2017, but the results were skewed by a small number of admissions during each of those months.

In two IDTTs observed, the patients chose not to attend, however all required staff attendees were present and contributed meaningfully.  The patient was discussed at length as was his progress in treatment.  The treatment plan was discussed as were treatment goals.  Specific treatment group assignments were not discussed, but in the patient's absence, this was appropriate.  Each treatment team was able to answer questions regarding the specific treatment groups when queried.  Treatment team members knew the patients well, were able to discuss the patients' participation in treatment and functioning in the unit, as well as articulate goals for the next treatment period.  The treatment team members were also receptive to feedback.  The psychiatrist, correctional counselor, and senior psych tech all actively utilized available electronic databases.

When the patient did attend the IDTT there was very good interdisciplinary discussion prior to the patient arriving and while the patient was present. The treatment plan was discussed with the patient during the IDTT.

Inconsistent with observations at IDTTs, many of the treatment plans reviewed did not reflect the same high quality of care represented at observed IDTTs. There were times when the clinical interventions were not specified, and targets for treatment problems and goals were not stated in objective behavioral terms. Primary treatment obstacles and functional deficits were not identified as problem areas in the treatment plan. Treatment plans were not modified at times when patients were not responsive to therapeutic efforts.

In some cases where treatment plans suggested little treatment was occurring, review of progress notes indicated that substantial therapeutic intervention was occurring during individual sessions, particularly with the treating psychologist and psychiatrist. Some progress notes were quite detailed and documented methodical implementation of multiple therapeutic interventions. Those interventions and treatment targets needed to be documented in the treatment plan with associated treatment goals. Patient interviews provided support that individual sessions with treatment team members included specific treatment interventions that were beneficial to patients.

### 2. **Group Therapy**

Acute care patients were not offered group therapies, but were instead provided treatment in an individual setting. During the review period, the average acute care patient was offered between 4.57 and 26.83 hours per week of individualized out-of-cell structured therapeutic activities, with the average patient attendance between 0.29 and 12.64 hours per week.

During the site visit, many of the scheduled intermediate care treatment groups were canceled due to lack of attendance, or were attended by just one or two patients. One treatment activity observed had just one participant. The patient indicated that his treatment cohort had originally included eight patients but had been reduced to four patients. His group size was never larger than two patients, which was insufficient to form an actual clinical group.

Discussions with SQ-PIP clinical staff revealed that as the patient population decreased, it became more difficult to place patients into appropriate groups. In part this was exacerbated because the PIP continued to use a fixed cohort system. Patients continued to be assigned to cohort groups based on their clinical presentation and functional level.

The cohort assignment process allowed SQ-PIP to schedule increased amounts of treatment when the population was high, while still meeting the individual needs of the patient. As the population in the SQ-PIP decreased, the fixed clinical cohort system seemed no longer viable. A review of the assignment of cohorts may need to occur to allow for larger group sizes to continue. During the site visit, the monitor's expert discussed with staff the current process for assigning patients to group treatment and how to ensure group size was sufficient while accounting for refusals, with the goal that groups rarely fell below three patients. The monitor's expert also discussed with staff a process for reviewing groups following discharges to determine if the remaining patients needed to be reassigned to continue to meet clinical expectations regarding group sizes.

Statistics for the reporting period pertinent to group treatment hours were reviewed. On a weekly basis, the average intermediate care patient was offered 12.66 hours of structured therapeutic activities and attended 8.78 hours. Thirty-six percent of the intermediate care

patients attended greater than ten hours per week of structured therapeutic activities and 68 percent attended greater than five hours per week of structured therapeutic activities.

There were nine patients identified as "high refusers" at the time of the site visit. These patients were participating in less than 50 percent of their treatment. Four, or 44 percent of the high refuser patient records were reviewed and were typically found to be participating in less than 25 percent of their treatment, with at least two participating in five percent or less. Despite that, treatment plans for these patients had not been modified for long periods of time and not all had positive support behavior plans, though such plans were indicated. During a discussion with the program director and clinical director, they indicated their intention that all patients identified as "high refusers" would be evaluated as to appropriateness for behavior plans; however, they reported that the lack of resources limited the use of this time-consuming process.

Documentation was an area in need of improvement. Group progress notes included a generic statement at the beginning that was the same whether the patient attended the group or not. They were typically phrased as though the patient attended and participated. The lower portion of the group treatment form then contained additional information that would indicate if the patient had actually attended and participated. If the patient had not attended, the progress note was internally inconsistent. Since the primary modality of treatment at the SQ-PIP was group therapy, those progress notes were valuable sources of clinical information regarding patients' progress or lack thereof. The monitor's expert observed that providing tablets to each group facilitator would enable them to enter group progress notes contemporaneously with the group activities. This would allow for timely completion of required documentation and provide capability for entering clinically meaningful data. It was also observed that multiple staff cut and pasted information or used the auto-populate function to generate the identical phrase in the top

portion of the form, which raised questions regarding their accuracy. These issues were discussed with supervisory staff who indicated they would be addressed.

### 3. Individual Treatment

SQ-PIP provided data regarding all forms of individual treatment offered and attended during the review period including individual therapy, psychiatric contacts, and primary clinician contacts without distilling the number of hours in each category and by patients. Of the 216.4 hours of individual treatment offered to patients during the review period, acute patients attended 97 percent and intermediate patients attended 77 percent.

### 4. Psychiatric Services

Acute care patients were required to be assessed within 24 hours of admission by psychiatry and thereafter seen daily by his psychiatrist throughout his stay. SQ-PIP did not provide particular data regarding compliance with this requirement, noting that it was included within the individual treatment data discussed above.

SQ-PIP did not provide information regarding psychiatric service requirements for intermediate care patients or data regarding compliance with this requirement, noting that it was also included within the individual treatment data discussed above.

### 5. Other Treatment Issues

#### A. Involuntary Medications (PC 2602)

One PC 2602 petition was initiated during the reporting period. Fourteen PC 2602 petitions were renewed during the reporting period; of this number 12 were in the SQ-PIP at the time of the renewal hearing and two were previous SQ-PIP patients that were discharged prior to the hearing. No PC 2602 petitions were denied during the reporting period and one was withdrawn (a planned non-renewal). There were two patients on the involuntary medication

non-compliance list.  Involuntary medications at SQ-PIP were managed appropriately during the review period.

### B.  Behavioral Management

Beginning in August 2017, the clinical director also served as the behavioral specialist for the SQ-PIP.  During the reporting period, there were nine referrals for behavioral consultation, 11 referrals for behavior plans, and four completed behavior plans.  At the time of the site visit, there were four active behavior plans.  The behavioral specialist regularly reported to the mental health program PIP subcommittee, providing information on referrals, behavior plans, and completed analyses.

The behavioral assessment process had dramatically improved since the preceding site visit, beginning with a structured, data-driven referral process.  Structured assessments were utilized throughout the behavioral assessment process.  Patient input was regularly sought when the need for a behavioral plan was identified.  While the assessment process was generally referred to as a functional assessment, it was actually a combination of indirect assessment and descriptive analyses. The assessment process was generally referred to as a functional assessment, although it was actually a combination of indirect assessment and descriptive analysis.  In several individual cases, functional analyses were utilized.  Each type of functional behavioral assessment has advantages and disadvantages; a combined process is generally recommended, so the SQ-PIP should continue to utilize a combination of methods, incorporating functional analysis when feasible.

Positive support behavior plans were written from the patient perspective at a level that would be appropriate for staff from any discipline to comprehend.  They identified hypothesized precursors as well as the possible function of the behavior for the patient, in clear terms for staff.

Primary and secondary prevention methods were included with the behaviors postulated to increase and decrease. While behavior plans should not exceed one to two target behaviors, none of the SQ-PIP plans exceeded three target behaviors as the primary focus.

One of the challenges identified with behavior plans was obtaining individualized reinforcers for patients. There were numerous reasons for this, but one challenge was the state purchasing system. The items that a given patient finds especially reinforcing cannot always be purchased through the state purchasing process. That process can also be time-consuming which can be at odds with the need for timely implementation of an immediate reinforcement schedule.

Positive support behavior plans had made tremendous improvements since the last monitoring visit. These changes were in their infancy as SQ-PIP staff adjusted to a new referral process during the reporting period and the very recent implementation of behavior plans. Despite this, SQ-PIP staff noted meaningful clinical improvements in their patients following the implementation of behavior plans.

## V.     PATIENT ACCESS TO TREATMENT

### Patient Orientation, Discretionary Program Status (DPS), and Stages:  Standards and Procedures

The SQ-PIP continued to utilize the STAGE level system during the review period. The STAGE system remained virtually unchanged from the preceding monitoring period.

There remained four levels within the STAGE system: DPS, a non-punitive level with no program-wide restrictions which could last up to ten days and would allow for assessment of a new patient and STAGEs 1, 2, and 3 through which each patient could advance within the range of his own capabilities. While the policy allowed for treatment teams to individualize expectations to allow for functional impairment limitations, the treatment program also placed some parameters on STAGE levels 1 through 3 to establish standardization and structure.

Specifically, a percentage of treatment participation was incorporated into the STAGE levels (STAGE 1: zero to 35 percent, STAGE 2: 36 to 66 percent, STAGE 3: 67 to 100 percent) and the required percentage must be maintained for at least 30 days to demonstrate stable participation. Patients on DPS would be placed on STAGE 1 at the completion of the ten-day treatment team meeting. However, they may have been placed into some treatment activities as early as 72 hours after admission according to the program director. There were no property restrictions and patients would be provided with walk-alone yard until cleared by the ICC and treatment team for group yard. According to the program director, patients did not return to DPS.

The STAGE level system utilized incentives. These were not detailed in the policy, but reportedly included objects such as colored pencils, erasers, and other types of materials that a patient could use to manage stress and anxiety. According to program management, the treatment team determined the incentives that would be used for each patient.

## VI. ADMISSIONS AND DISCHARGES

### 1. Admissions

At the time of the site visit, all patients in the SQ-PIP were timely admitted. All referred patients were accepted. Most admissions to the acute care program were transferred from the intermediate care program and subsequently returned to the intermediate care program. The acute care census generally ranged from zero to three patients with the last acute care patient having been discharged two to three weeks prior to the site visit. The SQ-PIP referral review committee provided a multidisciplinary process for review of referrals to the SQ-PIP.

### 2. Discharges

During the review period, nine patients were discharged. Clinician-to-clinician contacts occurred on the day of discharge.

During the review period, the average length of stay for acute care patients was 17.41 days.  At the time of the site visit, the average length of stay for intermediate care patients was 750.88 days.

## VII.   PATIENT DISCIPLINARY PROCESS

Of seven RVRs issued to SQ-PIP patients during the review period, all were referred for a mental health assessment and mental health was determined to be a factor in the behavior underlying the RVRs.  Although six, or 86 percent of the mental health assessments recommended mitigation, clinicians did not recommend that the behavior be documented in an alternate manner, even in lower level offenses.  Clinicians did typically list factors for the hearing officer to consider in assessing a penalty.  However, if found guilty of an offense that could result in a SHU term, clinicians only recommended that patients retain access to treatment. The senior hearing officer documented consideration of the clinical recommendations in all instances.  All RVRs were adjudicated guilty and sanctions imposed, including a SHU term, loss of privileges, program review and loss of credit.

## VIII.   USE OF FORCE

There were no reports of controlled use of force in the SQ-PIP during the reporting period.  There were three immediate use of force incidents.  Of the three immediate use of force incidents, one was a cell extraction, necessary to intervene while a patient was cutting himself with a broken CD.  All three incidents of immediate use of force, resulted in RVRs against the patients for battery/assault or obstruction on a peace officer which occurred during the intervention.

## IX. UNUSUAL OCCURRENCES/SERIOUS INCIDENTS/NEAR MISSES/SENTINEL EVENTS

The 89 unusual occurrences that impacted patients during the review period, included self-injurious behaviors, acts or threats of violence towards others, assaults between patients, and unusual behaviors, such as boarding (covering up cell windows to obstruct view inside) or suspected substance abuse.

## X. USE OF OBSERVATION CELLS/ROOMS, SECLUSION, AND RESTRAINT

There were no incidences of seclusion or restraint during the review period.

## XI. SUICIDE PREVENTION

There were no suicides at the SQ-PIP during the reporting period.

The SPRFIT's suicide prevention efforts addressed all San Quentin State Prison (SQ) facility programs, including the SQ-PIP. Data provided specific to the SQ-PIP focused on training and audits. All staff were reported to have completed the facility in-service annual suicide prevention training, the seven-hour class, suicide risk assessment training for CDCR mental health clinicians, and safety planning. SQ-PIP staff attended SQ's mental health department SPRFIT events. During the review period, one statewide video-teleconference was conducted.

A facility chart audit of SRASHEs completed for the period July 1, 2017 through September 30, 2017 included four providers from the SQ-PIP. The performance indicator showed that 100 percent of the SQ-PIP SRASHEs met compliance for all audit criteria.

During the reporting period, there were nine incidents of self-harm in the SQ-PIP of which four involved the same patient. Six incidents resulted in minor or no apparent injury and three resulted in moderate injury (lacerations). Of the moderate incidents, one resulted in evaluation at an outside hospital.

Reports indicated 100-percent compliance with SRASHEs at the time of admission to the SQ-PIP. The monitor's expert discussed with staff tracking the completion of SRASHEs at all clinically indicated times (e.g., when patients express suicidal ideation, placement on or removal from suicide precautions) to monitor compliance at all points in time completion of SRASHEs where required.

## XII.  EMERGENCY RESPONSE AND THE DEATH REVIEW PROCESS

### 1.  Emergency Response

The EMRRC met at least monthly during the review period and had a quorum at each meeting. Emergency drills occurred in accordance with policy based on a review of the minutes from EMRRC; appropriate topics were reviewed during meetings. One patient was fittingly taken from the SQ-PIP to an outside medical facility due to self-injury and was returned post-treatment. The EMRRC appeared to function appropriately in relation to the SQ-PIP.

SQ had a facility-wide patient safety committee that met at least monthly during the reporting period. In July 2017, the committee focused on determining and formalizing its scope and purpose. The committee determined its function was to provide a standardized process for adverse/sentinel events and a structured process for evaluating and reporting emergency medical response incidents. No significant events were noted in the safety committee minutes except for a question regarding the ability to take patients to the treatment and triage area (TTA) for suturing or other procedures that could not occur in the SQ-PIP without first discharging patients, since it was not licensed for such procedures..

### 2.  Death Review Process

No patients from the SQ-PIP died during the review period. SQ-PIP was subject to the death review process of SQ.

# XIII.   QUALITY MANAGEMENT AND UTILIZATION REVIEW

Quality management was monitored through the SQ-PIP subcommittee meetings which were held bi-weekly.  During the review period, the SQ-PIP subcommittee chartered three quality improvement teams (QITs).  The seclusion and restraint QIT reviewed documentation issues related to the new electronic healthcare record.  The personality disorders QIT was chartered to establish a clinical curriculum for the more personality disordered patients.  The nursing observation levels QIT addressed the frequency of rounding on intermediate care patients.  The seclusion and restraint and nursing observation level QITs were completed with the final recommendations documented in a report.

In addition, the subcommittee chartered two work groups to address staff orientation, treatment planning, and communications.  There was also a root cause analysis, which addressed multiple incidences of self-harm that occurred simultaneously in the SQ-PIP, and one completed tracer survey for Joint Commission purposes that followed an incident of self-harm inflicted by a SQ-PIP patient.  The workgroup regarding treatment planning and communications completed its task and documented its findings in a report.

Interventions, treatment plans, and programmatic issues related to patient care were discussed weekly in the SQ-PIP by all available mental health, nursing, and custody staff.

SQ-PIP issues were also regularly discussed in other committee meetings including quality management committee, local governing body, patient care policy committee, mental health program subcommittee, and patient safety committee.

Committee meeting minutes of the SQ-PIP subcommittee, quality management committee, the local governing body, patient safety committee and the bed utilization management committee were reviewed.  Quorums were present and the minutes provided useful

summaries of the meetings that met on a regular basis.  These committees all met on a monthly basis except for the SQ-PIP subcommittee, which met biweekly.

Audits focused on the following areas: admission/discharge assessments & evaluation audit, and included attention to; behavior plans, employee performance appraisals and probation reports, IDTT content goal/services provided reconciliation, IDTT timeliness compliance, length of stay, medication errors, pharmacy storage, licensing – plans of correction, staff injuries, time in stage, Title 22 compliance, unusual occurrences, and suicide risk evaluation.  Audits were not necessarily held monthly, although verbal reports were provided monthly to the appropriate committee regarding the various areas.  Key indicator reports were conceptualized but not yet successfully implemented due to various issues being worked out at the central office level.

## XIV.  **PATIENT COMPLAINTS/PATIENT SATISFACTION**

There were thirteen grievances filed by patients in the SQ-PIP.  Of the 13, four were filed by the same patient and two were filed by MHCB patients.  Grievances related to the lack of access to the law library, requests for property or incentives, seeking new treatment team members, and objections to prescribed medications.

The patient surveys were completed once a year and included a period between March and September 2017.  Of the 20 areas surveyed, three areas achieved a score of 85 percent or better; these included patients who indicated awareness of the medications they were taking, patients were encouraged to participate in treatment planning, and staff explained things in a way patients understood.  Sixty percent or fewer patients endorsed the following two categories: receiving the treatment they needed in the PIP and staff listened carefully to their concerns. Findings in the satisfaction surveys were followed up in the SQ-PIP team meetings, SQ-PIP

mental health team meetings, SQ-PIP collaboration team meetings, and finally through improved results in subsequent surveys.

There were patient officers who met on a weekly basis in the SQ-PIP to discuss information/concerns and agenda items for monthly community meetings. All patients were invited to the community meetings to share information or issues with patient officers. On a quarterly basis the patient officers prepared an agenda to present at a multi-disciplinary meeting. The quarterly meeting often included the warden, mental health staff, nursing, medical, and custody. The patient group, with the assistance of staff, produced the minutes of the meeting.

The SQ-PIP had a patient advocate available. The advocate's role was to investigate complaints of abuse, unreasonable denial or punitive withholding of a guaranteed right. Advocates acted on behalf of patients who were unable to register a complaint because of their mental or physical condition.

## XV. *COLEMAN* POSTINGS

*Coleman* postings were found in English and Spanish in the SQ-PIP. Placement of the posters in an area more widely traveled by the patient population would be useful to *Coleman* class members.

## XVI. LAUNDRY AND SUPPLY ISSUES

The laundry service was managed by a private contractor throughout the institution, though it was actually laundered at California State Prison/Solano. The SQ-PIP generally had a sufficient supply of laundry, including linens, smocks, jackets, blues, and whites. A fresh set of whites were available to patients three times a week consistent with their shower schedule. Blues and linens were refreshed once a week. Generally extra articles of clothing were available in various sizes for emergencies, however, staff reported rare occasions when the patient had to

remain in their wet or soiled clothing until an appropriately sized replacement was located. During the site visit, several clothing carts with limited selections were out on the unit, however, the supply closets had sufficient supply. Laundry services were also provided for patients with personal articles of clothing through the canteen, yet patients rarely availed themselves of this service as personal articles of clothing often went missing. An ongoing issue was that clothing that left SQ in good condition was often replaced with torn and tattered pieces when returned.

The SQ-PIP had sufficient supplies of personal grooming items on psych tech carts, along with additional inventory in a stock room. Nursing and psych techs were primarily responsible for the distribution of personal grooming items. Most patients used electric razors, either a personal razor or one loaned to them by the facility. Staff reported a barber came to the unit to provide haircuts two to four times per month.

## XVII.  VISITATION/PRIVILEGES/TELEPHONE ACCESS

Absent clinical or security concerns, contact visits were available to all residents of the SQ-PIP. Similar to the rest of the institution, visits were allowed four days a week and lasted between four and five hours. No patients were restricted from contact visits at the time of the site visit. Attorney or legal visits were available every day of the week.

The privileges a patient had at the time he entered the SQ-PIP continued to be available to him, unless otherwise restricted. Daily phone access, use of the day room, and personal electronic devices, such as TVs and headphones were available to patients. Other incentives included upgraded grooming supplies, art supplies, books and other reading materials, CD players, and CDs.

# XVIII. <u>LAW LIBRARY ACCESS</u>

Based upon staff and patient interviews, it was clear that policy allowing access to the law library was not well known by either staff or patients at the time of the site visit. The procedure for accessing the law library was the same throughout the institution, but a policy specific to the SQ-PIP was issued in December 2017. Each patient was allowed one request per week to visit the law library. In addition, a legal kiosk was available in the day room for use by patients. The kiosk was often broken for weeks at a time, therefore it was not reliable. The library available to SQ-PIP patients was shared with the condemned unit and the alternative housing unit. The law library was the non-contact visiting area re-purposed for library space upon conclusion of visits each day. There was one desk at this location available for the librarian. Patients were placed in therapeutic modules and provided materials by the librarian.

# XIX. <u>EDUCATION</u>

The San Quentin education unit staff were available to assist SQ-PIP patients, though at the time of the visit, no one was utilizing the service. It was unclear that patients were aware that the use of educational services was an option for them. However, staff reported that educational services were not being sought at the time, due to the acuity of the mental health issues and the lower level functioning in the current patient group.

DSH-Atascadero
January 9, 2018 – January 11, 2018

**Patient A**

This patient was admitted to DSH-Atascadero on October 24, 2017.  The patient also had a history of inpatient treatment at CMF-PIP acute care from July 7, 2017 to October 24, 2017; he was subsequently transferred to DSH-Atascadero for intermediate care.  He was provided with a diagnosis of Schizophrenia.  He was prescribed aripiprazole, paroxetine and hydroxyzine.

The patient was originally transferred from the Substance Abuse Treatment Facility (SATF) MHCB to CMF acute care on July 7, 2017 due to psychotic symptoms, including response to auditory hallucinations, depressed mood, command auditory hallucinations, thought blocking and guardedness.  He reportedly reached maximum clinical benefit in the acute care program, with medication adherence, good ADLs and group participation; subsequently, he was transferred to DSH-Atascadero for intermediate care.

A SRA was completed on October 31, 2017.  Based upon the SRA, the patient was assessed with low risk for suicide and self-harm.  He reportedly had no history of suicide attempts or extensive self-injurious behaviors.  The assessment included an assessment of protective factors that may decrease the risk of suicide; this was an issue noted during the July 2017 DSH-Atascadero Joint Commission survey.  The Security/Escape Risk Assessment was also assessed as low.

The seven-day initial treatment plan dated October 31, 2017 was reviewed.  The plan noted that the patient was enrolled in eight hours of core treatment groups on the unit.  Treatment outcome expectations included medication adherence, decrease in psychotic symptoms, 75- to 80-percent group attendance, improved insight regarding his mental illness and developing coping skills to deal with depression and mood swings.

The subsequent monthly treatment plan was dated November 7, 2017.  The plan included the same treatment outcome expectations with little update regarding current functioning.

Nursing Weekly Progress Notes were reviewed.  The patient was transferred from the admission Unit 6 to treatment unit 30 on November 29, 2017.  Documentation indicated that the patient was adherent with prescribed medications and was involved in unit activities.  His behavior was described as calm and cooperative.

Weekly Psychiatric Progress Notes were also reviewed.  It was noted that the patient had significant weight gain in a short period of time, which was probably medication-related.  He was referred to the Taking Responsibility for Eating and Exercise Program.  He required no as needed (prn) or stat medications administered during the review period.  His medications were adjusted to address his weight gain.

There was documentation of social work contact on the day after admission and a 30-day Psychosocial Assessment on November 17, 2017.

<u>Findings</u>

The care provided to this patient appeared to be appropriate. He was followed weekly by the psychiatrist, and treatment goals appeared to be individualized; however, many portions of the treatment plan were repetitious. There was documentation of weekly nursing progress notes. There was also documentation of at least weekly clinical contacts with the psychiatrist. Initial assessments were completed by the necessary disciplines, and these evaluations were comprehensive and clinically relevant. Appropriate laboratory testing was conducted.

**Patient B**

This patient was admitted to DSH-Atascadero on November 6, 2017. He was provided with diagnoses of PTSD, Unspecified Depressive Disorder, Antisocial Personality Disorder, Amphetamine-type Substance Use Disorder, Opioid Use Disorder, and Cannabis Use Disorder. He was prescribed Abilify, Prozac, Cardura and Vistaril.

According to the initial psychiatric assessment, this patient had a history of treatment at the EOP and Correctional Clinical Case Management System (3CMS) levels of care in CDCR. He was admitted to the MHCB after swallowing razors and cutting his arm during May 2016. He returned to the MHCB during October 2017 when his daughter experienced mental health issues and was suicidal. He threatened to hang himself when told that he would be returned to KVSP. He was subsequently admitted to DSH-Atascadero for intermediate care.

An initial SRA was completed on December 13, 2017, which determined that the patient had moderate risk for suicide or self-harm at DSH-Atascadero. The SRA noted that past CDCR risk assessments deemed the patient with moderate acute and chronic suicide risk. The assessment included an assessment of protective factors that may decrease the risk of suicide; this was an issue noted during the DSH-Atascadero July 2017 Joint Commission survey. The Security/Escape Risk Assessment was also assessed as low.

Initial assessments were also completed by the rehabilitation therapist, social worker, psychologist and nursing staff. These assessments were comprehensive and clinically relevant.

The patient transferred from the admissions unit to treatment unit 32 on December 6, 2017. Progress notes indicated that he followed unit rules and routines; however, he was suspected of engaging in bartering and trading behaviors that were against unit and hospital rules. He actively participated in group activities.

The initial treatment plan dated November 14, 2017 noted the patient's history as well as his enrollment in six hours of treatment groups per week. Treatment outcome expectations included no suicidal ideation/behavior for at least 45 days, decrease in depression and anxiety and the development of new skills for coping with PTSD symptoms to allow functioning in the EOP. Subsequent plans included the same treatment outcome expectations, but also noted the patient's good functioning on the unit and his treatment participation. The most recent treatment plan

dated December 11, 2017 indicated that the patient was enrolled in 12 hours of treatment groups per week.

Progress notes by the psychologists indicated that the patient was seen weekly "due to moderate suicide risk". During these "check-ins" he was described as extremely motivated for treatment. He denied suicidal ideation and exhibited normal mood. On December 13, 2017, his SRA was updated, and his risk level was decreased to low. No documentation of this updated assessment was located in the healthcare record.

There was documentation of weekly psychiatric contact. Progress notes indicated that the patient had been stable since his admission and was actively involved in treatment.

Findings

The care provided to this patient appeared to be appropriate. He was followed weekly by the psychiatrist, and treatment goals appeared to be individualized; however, many portions of the plan were repetitious. There was documentation of weekly nursing progress notes. There was also documentation of at least weekly clinical contacts with the psychiatrist. Initial assessments were completed by the necessary disciplines, and these evaluations were comprehensive and clinically relevant. Appropriate laboratory testing was conducted.

**Patient C**

This patient was admitted to DSH-Atascadero on November 13, 2017 from SATF. He was admitted after exhibiting decompensation in the EOP unit with chronic depression, daily auditory hallucinations and inability to function in the EOP. He was provided with diagnoses of Schizoaffective Disorder, depressive type, Amphetamine-type Substance Use Disorder, Alcohol Use Disorder, Opioid Use Disorder, Cannabis Use Disorder and Antisocial Personality Disorder. He was prescribed mirtazapine, olanzapine, citalopram and hydroxyzine.

Progress notes indicated that the patient was isolative and withdrawn since his admission to DSH-Atascadero with lack of motivation to participate in treatment and clinical activities. He continued to have depressive symptoms. He gradually began engaging more in the milieu with improved interaction with staff and peers and attending groups. According to the monthly treatment plan, the patient was enrolled in ten hours of core treatment groups on the unit on December 13, 2017. Treatment outcome expectations in that treatment plan included decreasing depressive symptoms, not sleeping more than eight hours per day, finding the correct medication regime, attending groups consistently, attending yard and leisure activities. These treatment outcome expectations were unchanged from those outlined in the initial treatment plan dated November 22, 2017.

A SRA completed on November 20, 2017 assessed the patient with low risk for suicide while housed at DSH-Atascadero.

An Admission Psychological Assessment for Free-Standing Hospitals was completed by the psychologist on November 20, 2017. The Admission Psychiatric Assessment was completed by the psychiatrist on November 13, 2017. Initial assessments were also completed by the rehabilitation therapists, nursing and the social worker.

The patient was transferred from the admission unit to treatment Unit 32 on December 18, 2017. Documentation indicated that the patient attended groups without prompting. The most recent progress notes indicated that the patient remained with depressed mood, with some improvement in his auditory hallucinations. He reported that he learned that his mother had breast cancer. Although the patient requested an increase in his antidepressant medication, the psychiatrist noted the patient's propensity to request polypharmacy and a recent increase in antidepressant medication.

Findings

The care provided to this patient appeared to be appropriate. He was followed consistently by clinical staff with appropriate medication management. Treatment goals were individualized, but portions of the treatment plan were repetitious. There was documentation of weekly nursing progress notes. Initial assessments were completed by the necessary disciplines, and these evaluations were comprehensive and clinically relevant. Appropriate laboratory testing was conducted.

**Patient D**

This patient was admitted to DSH-Atascadero on October 31, 2017. He had a history of prior EOP treatment. He was initially referred to an MHCB, and then CHCF-PIP following a suicide attempt by cutting his wrist during August 2017.

The patient was provided with diagnoses of Schizoaffective Disorder, depressive type, Alcohol Use Disorder, Cannabis Use Disorder and Antisocial Personality Disorder. He was prescribed Prozac, Cogentin, mirtazapine, olanzapine, propranolol, valproic acid and perphenazine with intramuscular injections ordered in the event of medication refusal. The patient received his psychotropic medications by PC 2602 order due to dangerousness to self, which would expire on May 3, 2018.

A DSH Admission Psychiatric Evaluation was completed on October 31, 2017. At the time of this evaluation, his suicide and self-injurious risk was assessed as low. He was subsequently seen by the psychiatrist on the following dates: November 9, 2017, November 13, 2017, November 17, 2017, and November 30, 2017.

Initial assessments were completed by the rehabilitation therapist, nursing and the social worker. There was also documentation of weekly nursing contacts.

The seven-day initial treatment plan was dated November 9, 2017.  It noted that the patient was enrolled in seven hours of treatment groups.  Treatment outcome expectations included decrease in depression and suicidal ideation from daily to no more than weekly, decrease in daily auditory hallucinations and abstaining from self-injurious behavior, decrease in mood lability, increase in impulse control and increase in distress tolerance.  Psychiatric treatment goals included decrease in auditory hallucinations and depression while minimizing polypharmacy and side effects/adverse reactions.

The patient transferred to the treatment Unit 32 on December 21, 2017.  He reportedly followed unit rules, routine and milieu.  He was offered a minimum of ten hours per week of supplemental leisure activity hours, and the staff continued to encourage his participation.

Findings

The care provided to this patient appeared to be appropriate.  Initial evaluations were completed, and he was followed consistently by clinical staff.  Treatment goals were individualized.  There was, however, no documentation of psychiatric contact after the patient was transferred from the admissions to the treatment unit.  The appropriate laboratory testing was conducted, except for a valproic acid level which was not obtained; however, documentation by the psychiatrist explained this omission.

**Patient E**

This patient was admitted to DSH-Atascadero on September 18, 2017 from SVSP-PIP.  He was initially admitted to an MHCB on October 5, 2016 after cutting himself; this eventually led to admissions at DSH-Stockton[24] and subsequent transfer to Salinas Valley Psychiatric Program[25] (SVPP) on April 3, 2017.  The patient also had a prior history of treatment at DSH-Atascadero under PC1370 (incompetent to stand trial) from November 21, 2013 to March 26, 2014.

The patient had a significant history of five suicide attempts by cutting (neck and wrist) and by overdose on Seroquel; there was also mention in the healthcare record of a suicide attempt by hanging.  He was provided with diagnoses of Bipolar I Disorder, current or most recent episode depressed with psychotic features and Amphetamine-type Substance Use Disorder.  He was prescribed lithium, mirtazapine, amantadine and ziprasidone.

The Initial DSH treatment plan dated September 26, 2017 noted the reason for referral and treatment outcome expectations as expecting the patient to take 90 percent of prescribed psychotropic medications and to participate in at least 90 percent of mental health services, to decrease thoughts/urges to engage in self-injurious behavior to less than monthly and to obtain

---

[24] Prior to Lift and Shift, CHCF-PIP was known as DSH-Stockton.

[25] Prior to Lift and Shift, SVSP-PIP was known as SVPP.

75 percent improvement in self-reported depression and anxiety and observable agitation. His suicide/self-harm risk was assessed as low while at DSH-Atascadero, as was his violence risk.

The patient was seen by the psychiatrist on the following dates: September 28, 2017, October 2, 2017, October 18, 2017, November 7, 2017, November 14, 2017, and December 18, 2017. Progress notes indicated that the patient had some mild mood fluctuation while housed on the admissions unit; however, he generally remained stable and he was transferred to the treatment Unit 30 on or about November 7, 2017.

Treatment plans were completed monthly. An October 19, 2017 treatment plan noted that the patient was adherent with treatment on the admissions unit with good group attendance and "seldom" reported suicidal ideation. At that time, he was enrolled in six hours of treatment groups with 100-percent attendance. The subsequent treatment plan dated November 17, 2017, after the patient was transferred to the treatment unit, was essentially unchanged from the prior treatment plan, including the description of the patient's current functioning on the unit. The most recent treatment plan was also essentially unchanged; it did note that the patient was enrolled in eight hours of treatment groups and that his group attendance was at 95 percent. It appeared that the patient was doing well, but with some continued depressive symptoms.

Findings

The care provided to this patient appeared to be appropriate. He was followed consistently by clinical staff with appropriate medication management. Treatment goals were individualized; however, it should be noted that most of the plans contained essentially the same, repetitious information. There was documentation of weekly nursing progress notes. Initial assessments were completed by the necessary disciplines, and these evaluations were comprehensive and clinically relevant. Appropriate laboratory testing was conducted.

**Patient F**

This patient was admitted to DSH-Atascadero from CHCF-PIP acute care program on October 10, 2017. He was admitted due to psychotic symptoms including auditory hallucinations, persistent homicidal ideation and thoughts of self-harm with worsening depression and anger. He was provided with the following diagnoses: Borderline Personality Disorder, Alcohol Use Disorder, Amphetamine Use Disorder and Phencyclidine Use Disorder. He was prescribed mirtazapine, hydroxyzine, olanzapine, and Depakote.

The initial treatment plan dated October 17, 2017 documented treatment outcome expectations that included discontinuation of self-harm incidents, complete medication adherence and decrease in the intensity of suicidal and homicidal ideation to four out of ten for the next 180 days. An initial SRA determined that the patient posed moderate risk for self-harm/suicide while at DSH-Atascadero. His violence risk was assessed at low. He was enrolled in six hours of treatment groups.

The patient transferred from the admissions Unit 13 to treatment Unit 33 on November 22, 2017. At that time, he was enrolled in eight hours of treatment with two hours pending. The most recent treatment plan was dated November 28, 2017. The plan noted that the patient generally followed unit routine and adhered to rules, but that he required prompts to attend core treatment groups conducted on the unit.

The most recent progress notes indicated that the patient reported a recent increase in auditory hallucinations; he did not express suicidal or homicidal ideation. The psychiatrist noted on January 9, 2018 that the patient's depression and anxiety had increased compared to the previous month. At that time, Abilify was discontinued due to the side effect of akathisia, and olanzapine was prescribed.

<u>Findings</u>

The care provided to this patient was appropriate. He was followed consistently by clinical staff. He was followed at least monthly by the psychiatrist with appropriate medication management. Treatment goals were individualized; however, it was noted that most of the plans contained essentially the same, repetitious information. There was documentation of weekly nursing progress notes. Initial assessments were completed by the necessary disciplines, and these evaluations were comprehensive and clinically relevant. Appropriate laboratory testing was conducted.

**Patient G**

This 31-year-old male was transferred from the CMF-PIP to DSH-Atascadero on October 5, 2017. His history of present illness began around age 11, when he initially began experiencing visual hallucinations. He also reported the presence of chronic auditory hallucinations.

The DSH admission psychiatric evaluation was comprehensive. It appeared that the patient was transferred to DSH-Atascadero for treatment at his LRH and for intermediate level of care. The initial psychiatric assessment included a SRA. He was provided with admission diagnoses of Major Depressive Disorder, recurrent, severe with psychotic features, PTSD, and Alcohol Use Disorder, severe, in a controlled environment. A reasonable initial treatment plan was included in the initial psychiatric admission note.

Abnormal Involuntary Movement Scale (AIMS) testing was performed upon admission.

Weekly psychiatric progress notes were dated October 9, 2017, October 16, 2017, November 6, 2017 and November 16, 2017. Quarterly physician notes were dated November 16, 2017 and January 4, 2018. Monthly psychiatric contacts were also documented; the initial psychiatric progress note was dated December 6, 2017. The quality of these progress notes was good.

Nursing progress notes were present consistently. A 30-day psychosocial assessment was completed by the social worker, which was also comprehensive. The initial five-day psychosocial assessment was completed on October 9, 2017. The rehabilitation therapy

assessment, which was also comprehensive and clinically relevant, was completed on October 17, 2017. Subsequent rehabilitation therapy progress notes were dated November 6, 2017 and November 13, 2017. The admission psychological assessment, which was also comprehensive in nature, was completed on October 9, 2017. Psychology progress notes were dated December 27, 2017 and January 5, 2018.

The initial treatment plan was finalized on October 20, 2017. Diagnoses included in the treatment plan were consistent with the psychiatric admission assessment. All the appropriate disciplines were present at the treatment planning meeting. A November 29, 2017 updated treatment plan was reviewed. This treatment plan did not include revised interventions for elements of the treatment plan for which the status of the objective was listed as "not met." A progress note by the rehabilitation therapist addressed the patient's participation in assigned group treatments.

Findings

The mental health care provided to this patient was appropriate. All the relevant disciplines documented timely initial comprehensive assessments. Progress notes were most consistently written by the psychiatrist, rehabilitation therapist and nursing staff.

**Patient H**

This 25-year-old man was admitted to DSH-Atascadero on September 13, 2017 after transfer from DSH-Stockton, where he was provided with diagnoses of Major Depressive Disorder with psychotic features and Posttraumatic Stress Disorder. He was transferred from the acute treatment program at DSH-Stockton following an assessment that he had reached maximum medical benefit from the acute care program. The initial psychiatric examination and documentation were comprehensive and included a SRA, AIMS testing and a self-injurious behavior assessment.

Admission diagnoses included Major Depressive Disorder, recurrent with psychotic features, Posttraumatic Stress Disorder, Cannabis Use Disorder, moderate, in a controlled environment, Amphetamine-type Substance Use Disorder, severe, in a controlled environment and Alcohol Use Disorder, severe, in a controlled environment. The psychiatric admission diagnostic formulation and initial treatment plan were clinically appropriate.

Weekly psychiatric progress notes were dated September 20, 2017, September 25, 2017, October 11, 2017, October 18, 2017 and November 14, 2017 (this was a monthly/transfer psychiatric progress note). The September 20, 2017 psychiatric progress note documented the reasons for changing this patient's diagnosis from Major Depressive Disorder to Borderline Personality Disorder. Unfortunately, the content of the weekly progress notes was mainly cut and pasted from the previous weekly progress note.

Monthly psychiatry progress notes were also documented on October 18, 2017 and November 14, 2017. Psychiatric progress notes were not located in the healthcare record after November

14, 2017.

A 30-day psychosocial assessment was completed on October 2, 2017 by the social worker. Other social worker's notes were dated December 7, 2017 and December 14, 2017. Subsequent progress notes by the rehabilitation therapist were dated September 29, 2017, October 6, 2017, October 13, 2017, October 20, 2017, October 26, 2017 and December 18, 2017. These notes generally addressed treatment attendance. The diagnoses listed in these notes were not consistent with the change in diagnosis to Borderline Personality Disorder.

A vocational rehabilitation assessment was completed on December 14, 2017.

In the attendance tab of the healthcare record, there were finalized mall facilitator monthly progress notes present via a form, but some of these forms were incomplete.

RN progress notes were completed consistently.

The initial psychological assessment was completed on September 18, 2017. Subsequent progress notes by the psychologist were dated September 20, 2017, October 11, 2017, October 19, 2017, November 2, 2017, November 8, 2017, November 29, 2017, December 13, 2017 and January 4, 2018. The initial psychological assessment included very specific treatment recommendations, which appeared to have been implemented.

The seven-day initial treatment plan, which was dated October 2, 2017, was reviewed. The treatment plan included appropriate problems to be addressed with specific interventions. All members of the treatment team were present during the initial treatment plan meeting. Subsequent treatment plans were dated October 20, 2017 and November 1, 2017. They were essentially unchanged from previous treatment plans.

Findings

In general, this patient appeared to be receiving adequate treatment; however, there were documentation issues noted. Review of this healthcare record demonstrated concerns. Diagnoses among the disciplines were inconsistent. There was a lack of documentation of psychiatric contact since November 14, 2017. Additionally, weekly notes by the psychiatrist were commonly cut and pasted, almost in entirety, from the previous weekly note.

The patient was receiving individual therapy from the psychologist.

**Patient I**

This man was admitted to DSH-Atascadero on November 7, 2017. On October 18, 2017, he reportedly had recently become increasingly confused and disorganized. He began to demonstrate improvement after treatment with Zyprexa and Depakote. Despite this treatment; he

continued to be symptomatic, which resulted in transfer to DSH-Atascadero for continued evaluation, stabilization and treatment.

The admitting psychiatric examination report was comprehensive. He was provided with admission diagnoses of Schizoaffective Disorder, current episode manic and Alcohol Use Disorder, severe, in a controlled setting. The initial treatment plan included psychopharmacological interventions.

AIMS testing was completed upon admission.

Weekly psychiatric progress notes were present in the healthcare record for November 14, 2017, November 20, 2017 and December 5, 2017. These notes were, however, essentially cut and pasted from the initial weekly progress note.

A 30-day psychosocial assessment was completed by the social worker on November 22, 2017. Other social worker notes were dated November 8, 2017 and January 8, 2018.

The DSH admission nursing assessment was completed on November 7, 2017. Nursing progress notes were present in the healthcare record on at least a weekly basis. The acute/admission rehabilitation therapy progress note was completed on that same date. The admission psychological assessment form was completed on November 9, 2017.

The attendance record tab did not contain any documentation.

A December 6, 2017 finalized treatment plan was reviewed. The current status in the treatment plan indicated that this patient had been determined to meet MDO criteria. He was reportedly enrolled in six hours of treatment groups per week, and he attended 100 percent of the scheduled groups. The treatment plan was appropriate for this patient's clinical presentation.

Findings

This patient was receiving mental health services at the appropriate level of care in the intermediate care program. He would benefit from receiving more than six hours per week of structured therapeutic activity.

**Patient J**

This 30-year-old man was admitted to DSH-Atascadero on September 27, 2017. His chief complaint was "I think I'm here because of my paranoia." Previous hospitalizations included DSH-Vacaville and DSH-Atascadero (2016). The psychiatric examination report was comprehensive; although it was vague regarding the events leading to his current hospitalization.

The patient was provided with diagnoses of Schizophrenia, Cannabis Use Disorder, severe, in a controlled setting and Amphetamine Use Disorder, severe, in a controlled setting. The initial

psychopharmacological treatment plan included continuation of Haldol Decanoate and olanzapine.

Psychiatric progress notes indicated that the patient was seen by the psychiatrist on the following dates: October 3, 2017, October 4, 2017, October 13, 2017, October 17, 2017, October 24, 2017, October 26, 2017, November 7, 2017, and December 1, 2017.  In general, these notes were more individualized as compared to notes by psychiatrists reviewed in other DSH-Atascadero healthcare records, but significant cutting and pasting was apparent in the notes using the monthly/transfer psychiatric progress note forms.

Weekly nursing progress notes were generally present in the healthcare record, in addition to more frequent nursing notes.

The admission psychological assessment form was completed on September 29, 2017. Subsequent notes by the psychologist were dated December 26, 2017 and December 28, 2017. This assessment was comprehensive.

The 30-day psychosocial assessment was completed on October 12, 2017.  Other notes by the social worker indicated contacts on September 28, 2017, November 7, 2017, and December 21, 2017.

The 30-day rehabilitation therapy assessment was completed on October 2, 2017.  Other notes by the rehabilitation therapist were dated October 12, 2017, October 19, 2017, November 2, 2017, and November 21, 2017.

The attendance record tab in the healthcare record contained no documentation.

An October 11, 2017 finalized treatment plan was reviewed.  The psychiatrist was not in attendance at this treatment team meeting.  A November 16, 2017 treatment plan was reviewed, which was almost identical to previous treatment plans.  One problem in the earlier treatment plan was no longer present on the current treatment plan, without any explanation being provided.  The psychologist and nurse practitioner were also not present at the treatment team meeting.

The treatment plan indicated that this patient was enrolled in six hours of treatment groups.  For the period from September 10, 2017 to October 14, 2017, he attended 100 percent (one of one) of his enrolled treatment groups, which was inconsistent with the treatment plan statement that he was enrolled in six hours of treatment groups.

Findings

The mental health care provided to this patient appeared to be appropriate.  Initial assessments were completed timely and were comprehensive.  The content in the various psychiatrists' progress note forms and treatment planning forms was difficult to distinguish, because cutting

and pasting was widely used.  It was difficult to determine the patient's level of participation in structured activities based upon the information available.

**Patient K**

This 24-year-old man was admitted to DSH-Atascadero on September 6, 2017 from the CHCF-PIP with the chief complaint that he was "having a rough time when I showed up at Tehachapi." The reason for admission was to facilitate his out of cell time for at least two weeks and to decrease his agitation and impulsivity for a similar period of time.  His diagnoses included Schizophrenia and Alcohol Use Disorder.  A clinically appropriate psychopharmacological treatment plan was summarized.

Subsequent psychiatric progress notes were dated September 14, 2017, September 22, 2017, October 5, 2017, October 13, 2017, October 16, 2017, November 6, 2017, December 5, 2017, and January 1, 2018.  There was minimal use of cutting and pasting within these notes.

Nursing notes were written on a timely and consistent basis.

The admission psychological assessment was completed on September 13, 2017, which was comprehensive in nature.  Diagnoses were consistent with the psychiatric admission note.  Treatment recommendations were present, which were appropriately based on the diagnostic assessment.  Follow-up notes by the psychologist were dated September 14, 2017, October 5, 2017, October 17, 2017, and December 5, 2017.

The acute/admission rehabilitation therapy note was dated September 6, 2017 with follow-up notes documented on September 13, 2017, October 10, 2017, November 13, 2017, and December 4, 2017.  The December 2017 note indicated that this patient had been participating in 11 hours per week of supplemental activities during the past 90 days.

A vocational rehabilitation assessment was completed on December 11, 2017.  The patient was recommended for work placement in housekeeping up to 20 hours per week.

A 30-day psychosocial assessment was completed on September 14, 2017.  Other social worker notes were dated September 6, 2017, October 12, 2017, and December 7, 2017.  The psychiatrist and nursing staff were not present at the team meeting.  Treatment plan updates were dated October 5, 2017, October 20, 2017, and December 12, 2017.  All members of the treatment team were present at these meetings.  In general, these treatment plans were identical, even when the target dates for various objectives were not met.  Under such circumstances, the target date was changed, but there was no change in the treatment interventions.

<u>Findings</u>

The mental health care provided to this patient appeared to be appropriate.  The admission notes by the various disciplines were completed timely and were comprehensive.  The use of "cut and

pasting" only minimally occurred in psychiatric progress notes. The initial treatment plan was appropriate in content, but subsequent treatment plan reviews were little changed despite target dates not being met.

## Patient L

This 49-year-old man was admitted to DSH-Atascadero on August 16, 2017 with the chief complaint of needing help with depression and anxiety. He had been transferred from DSH-Stockton where he had been provided with a diagnosis of Schizoaffective Disorder, depressed type and treated with psychotropic medications. His diagnosis on admission was the same, with the addition of Alcohol Use Disorder, Amphetamine-type Substance Use Disorder and Cannabis Use Disorder being added. The initial psychopharmacological treatment plan included continuation of Risperdal, changing Effexor from the extended release formulation to immediate release formulation, continuing Vistaril and adding Thorazine on an as needed basis.

Subsequent notes by the psychiatrist were dated August 24, 2017, August 31, 2017, September 14, 2017, September 29, 2017, October 2, 2017, October 3, 2017, October 10, 2017, November 15, 2017, December 12, 2017, and January 10, 2018. The amount of cutting and pasting used in these progress notes ranged significantly from note to note.

Nursing notes were present on a consistent and timely basis.

Admission notes by the psychologist, social worker, and rehabilitation therapist were comprehensive and timely. Other notes by the psychologist were not located in the healthcare record. Follow-up notes by the rehabilitation therapist were dated August 31, 2017, September 7, 2017, September 13, 2017, September 21, 2017, September 28, 2017, October 11, 2017, and November 15, 2017. The November 15, 2017 note indicated that this patient had been participating in about 6.5 hours per week of supplemental activities during the previous 90 days.

Clinical social work progress notes were dated August 17, 2017, September 29, 2017, and December 1, 2017.

The attendance record tab in the healthcare record included monthly PSR mall facilitator monthly progress notes.

The August 30, 2017 treatment plan was clinically appropriate. The team meeting was attended by all of the core treatment members. Few changes were noted in subsequent treatment plans.

Findings

The mental health care provided to this patient appeared to be appropriate. The admission notes by the various disciplines were completed timely and were comprehensive. The initial treatment plan was appropriate in content; but subsequent treatment plan reviews were little changed, despite target dates not being met.

DSH-Coalinga
January 4, 2018 – January 5, 2018

**Patient A**

This healthcare record was reviewed to evaluate the provision of intermediate care treatment at DSH-Coalinga. The patient was admitted to DSH-Coalinga from CDCR on December 19, 2017, due to paranoia and lack of program participation. He was provided with diagnoses of Schizophrenia, Alcohol Use Disorder, moderate, in a controlled setting, Cannabis Use Disorder, severe, in a controlled setting and Amphetamine-type Substance Use Disorder, in a controlled setting. He was prescribed Haldol. The patient had an extensive mental health history in the community and in prison and had a prior DSH admission in 2015 for approximately four and one-half months. Treatment goals included exhibiting less paranoia and having more spontaneous social interactions and increasing insight regarding the need for continued mental health treatment. The SRA, completed on December 20, 2017, determined the suicide risk to be low.

On December 21, 2017 the psychology admission assessment noted that the patient had refused to leave his cell while at CDCR and reported anxiety around people. The patient reported auditory and visual hallucinations. On December 27, 2017 during the admission evaluation, the psychiatrist noted that the patient was responding to internal stimuli.

Interdisciplinary progress notes indicated that the patient had poor hygiene and required prompting to complete activities of daily living. He was described as occasionally disheveled, but was without negative behavioral issues. No information was available regarding group activity. This was likely due to the fact that the patient was admitted during the therapy group break week and documentation was printed and placed in the healthcare record monthly.

The seven-day treatment team document dated December 27, 2017 contained minimal information regarding treatment; instead, it stated that groups would be determined as more information was collected. The provision of treatment beyond medication management at the time of the monitoring visit was not documented in the treatment plan. No individual treatment was provided, in spite of the known lack of group treatment availability.

<u>Findings</u>

There was minimal documentation regarding treatment beyond medication management located in the healthcare record. It was inappropriate for the patient to have been admitted for 16 days without a clear plan of treatment beyond medication management. Although some of this was attributable to the work holidays and scheduled treatment break, individual therapy should have been at least temporarily provided to assist in the patient's transition while there was no scheduled group therapy and staff absences due to the holidays. Brief behavioral interventions could be effective with specific functional deficits and supportive therapy could have been initiated while a psychologist completed a functional assessment to identify antecedents to treatment refusal. This was particularly indicated, in light of the patient's clinical presentation and reason for referral. Based on the lack of available documentation, and failure to provide

individual therapy to assist the patient in adjusting to the hospital environment, care was inadequate.

**Patient B**

This healthcare record was reviewed to evaluate the provision of intermediate care treatment at DSH-Coalinga. The patient was admitted to DSH-Coalinga on May 24, 2017 from SVSP. All initial assessments were completed timely. He was provided with diagnoses of Major Depressive Disorder, single episode, moderate, without psychosis, Generalized Anxiety Disorder and Cannabis Use Disorder, moderate, in a controlled environment. The patient was prescribed hydroxyzine, oxcarbazepine, Vistaril and Trileptal. He was generally adherent with prescribed medications.

The patient was seen weekly by psychology for individual therapy during August and September 2017; however, documentation did not always correlate with the treatment plan. Additionally, the documentation indicated that the contacts may have been clinical check-ins, rather than therapeutic clinical sessions. The last individual therapy contact was dated September 13, 2017. No further contacts were documented, including required monthly psychology contacts, until December 6, 2017, when a termination of individual therapy note was written. It was unclear whether this reflected a healthcare records filing issue or missed clinical contacts. Management staff was unable to identify the cause of the lack of documentation during the monitoring visit.

The initial seven-day treatment plan was not fully completed in all areas, but it did include focus areas and specific treatment groups that were related to the reason for referral. The patient was referred because he could not function within the EOP setting, as exhibited by poor program adherence, severe anxiety and depression. The most recent treatment plan on December 19, 2017 noted treatment outcome expectations that were a combination of subjective and objective goals. Only some goals were related to the reason for referral. The psychiatric and psychological focus area contained old progress update information from September 2017 that had not been updated. The November 21, 2017 treatment plan was identical in areas of deficiency (e.g., outdated areas were exactly the same), and the previously strong areas contained the same information, suggesting that cut and pasting had occurred. There were multiple pages missing from several treatment plans in the healthcare record; October 2017 was missing the last page, while September 2017 had only one page filed.

The patient was not seen timely by psychiatry in accordance with policy. The patient was generally seen every three to four weeks by psychiatry.

Group therapy notes were reviewed for July, August, October, and December 2017. These group treatment notes all appeared to have been cut and pasted, as the narrative portions were identical across reporting periods, rendering the information uninformative. It should be noted that nursing and rehabilitation notes contained valuable information related to the patient's functioning and progress.

<u>Findings</u>

The documentation for this patient's care was incomplete, and when present, was frequently generic and repetitive. As a result, overall the documentation was not insightful as to the patient's progress beyond the medication issues being addressed monthly by the psychiatrist, daily matters with nursing, and areas noted by the rehabilitation therapist. Because there was no cohesive summary of the patient's care, progress, and plan, it could not be determined what the team had identified as current treatment targets based on the patient's current status and treatment progress. As a result of the documentation deficiencies, this patient's care appeared to be inadequate.

**Patient C**

This healthcare record was reviewed to evaluate the provision of intermediate care treatment at DSH-Coalinga. The patient was admitted to DSH-Coalinga on November 9, 2017 from the CMF-PIP acute care program. The patient was provided with diagnoses of Schizophrenia, Borderline Personality Disorder, Gender Dysphoria and Schizoaffective Disorder. The DSH-Coalinga admitting psychiatrist changed the diagnoses to Other Specified Schizophrenia Spectrum and Other Psychotic Disorder and Cannabis Use Disorder, mild, in controlled environment. No rationale was provided for eliminating the diagnosis of Gender Dysphoria at that time; however, subsequently this diagnosis was restored.

The patient was prescribed clozapine, olanzapine and venlafaxine. She was also prescribed oral estrogen. The patient had an extensive mental health history with multiple inpatient placements in the community and while incarcerated. The psychiatrist saw the patient weekly for seven weeks. Documentation was not located to verify that the patient was seen for the eighth week. Psychiatry notes addressed the patient's symptoms, concerns regarding her transgender status, psychiatric symptoms and medication side effects.

The initial SRA by the psychologist was unsigned and not completed timely; the admission evaluation and violence risk assessment were not completed at all or were not properly completed. All other admission assessments were completed timely. The patient had an extensive suicide history with multiple attempts secondary to delusions and repeated incidents of suicidal ideation. The SRA identified the patient as transgendered, despite the psychiatrist removing that diagnosis and not addressing this important issue.

The seven-day treatment plan on November 16, 2017 was not completed in entirety. It listed treatment groups such as beyond current events, walk and talk, and civility now; although beneficial, they were not clinically significant groups. The monthly treatment plan on December 7, 2017 indicated that the patient was not enrolled in many of his groups until November 17, 2017. There was no progress information provided at the December treatment team meeting regarding those groups. The patient had reportedly not attended any of his social skills groups, and his leisure and recreation (focus 10) had been cut and pasted from the initial treatment plan. Only the rehabilitation therapist had updated the progress notes appropriately.

There was a lack of documentation that the patient was seen monthly by psychology. The patient was seen at least monthly by the rehabilitation therapist and documentation of provided treatment was correlated with the treatment plan. The nursing documentation was comprehensive.

This patient was also observed during a treatment team during the monitoring visit. The treatment team discussed multiple treatment groups with the patient; the patient was apparently enrolled in and attended a significant number of treatment groups not reflected in the treatment plan or the healthcare record due to the lack of progress update notes in the December 2017 treatment plan. The treatment team was quite attentive to the patient's concerns regarding her unique needs and any safety concerns. While there was insufficient discussion in the treatment team regarding actual treatment beyond medications, it appeared that more treatment was provided than was reflected in the healthcare record.

Findings

The patient's treatment was not adequate based upon documentation prior to the January 2018 observed treatment team meeting. It appeared that the patient's Gender Dysphoria was not appropriately addressed upon admission and the treatment plans were not adequately developed. While it appeared that treatment improved, this patient would have benefitted from a comprehensive psychological evaluation including psychological testing for diagnostic clarification. Following completion of testing and diagnostic clarification, a comprehensive treatment plan should be developed that incorporated the patient's transgender status and needs. Once these elements of care have been provided, treatment for this patient would be adequate; however, at the time of the monitoring visit, she was not receiving adequate care based upon the documentation in the healthcare record.

**Patient D**

A November 16, 2017 mental health consult inpatient report was reviewed. The patient was housed in the CHCF MHCB. This consultation was requested due to repeated acts of self-injurious behavior and chronic suicidal thinking. The clinical team recommended transfer to the intermediate level of care.

This transgender (male to female) patient was admitted to DSH-Coalinga on December 22, 2017. Her chief complaint was "severe anxiety. Anxiety around people, around crowds. Feeling paranoid."

The history of present illness indicated that this patient reported severe flashbacks, insomnia, racing thoughts, mood lability, irritability, anxiety, paranoia and multiple hallucinations. Treatment with Invega was described as beneficial. Her history was significant for severe physical, sexual and emotional abuse by her mother and related family members. There was a history of 32 suicide attempts.

A comprehensive initial psychiatric assessment was documented. The diagnostic formulation and differential diagnosis included PTSD and Gender Dysphoria. The initial treatment plan included the use of Invega Sustenna, with Haldol and Ativan ordered on an as needed basis; in addition, supportive educational therapy groups and leisure activities were also included.

AIMS testing was performed upon admission.

On December 20, 2017, this patient's initial seven-day team meeting occurred.

A DSH SRA form was completed on December 26, 2017. Recommendations included update of the SRA monthly and/or as clinically indicated, regular treatment team meetings with the patient (i.e., possibly weekly for the subsequent month), identification of specific groups, treatment team assistance to the patient to structure her time, and scheduling groups and other activities when she could actively participate.

An admitting psychological admission note was not located in the healthcare record.

A December 28, 2017 treatment plan was reviewed. This treatment plan addressed issues relevant to her self-injurious behaviors and suicidal thinking, as well as her history of psychotic symptoms. It did not address issues related to her reported Gender Dysphoria or PTSD. The listed diagnosis in the treatment plan was Schizophrenia. The psychiatrist was not present at the treatment team meeting, but a covering psychologist was present.

Findings

The treatment plan was very problematic for the following reasons: The diagnosis of Schizophrenia was provided in contrast to the diagnoses of PTSD and Gender Dysphoria, which were the listed diagnoses in the DSH-Coalinga referral and the DSH-Coalinga admitting psychiatric diagnoses. No explanation was documented relevant to this discrepancy. The initial treatment team meeting was conducted without the team psychiatrist or psychologist present. The psychiatric admission note apparently was not reviewed. Lastly, the treatment plan did not address several issues specific to the reasons for this inmate's referral to DSH-Coalinga.

**Patient E**

This patient was admitted to DSH-Coalinga on November 22, 2017. He had a chronic history of self-injurious behaviors (over 200 incidents were noted), which were predominantly preceded by time on an EOP yard. The patient never exceeded 17 days on an EOP yard before engaging in cutting behaviors. The cutting behaviors were described by the patient as addictive.

A November 22, 2017 psychiatric admission evaluation report was reviewed. A history of three lethal suicide attempts was reported. The diagnostic formulation indicated that the patient's chronic self-injurious behavior occurred due to impulsivity related to poor coping and frustration

tolerance.  He was provided with diagnoses of Borderline Personality Disorder and Impulse Control Disorder NOS.  This patient may have benefitted from dialectical behavioral therapy.

A November 27, 2017 social work admission note was reviewed; no other social work progress notes were located in the healthcare record.

The November 29, 2017 report by the unit psychologist indicated that the patient's presentation was consistent with Borderline Personality Disorder and Impulse Control Disorder Not Otherwise Specified (NOS).  A cognitive behavioral approach was recommended.  No other notes written by a psychologist were located in the healthcare record.

A December 21, 2017 treatment plan was reviewed.  The November 29, 2017 SRA was summarized in this treatment plan.  Treatment plan interventions focused on cognitive behavioral interventions.  The sections in the treatment plan entitled psychiatric and psychological, dangerousness and impulsivity and substance abuse were all blank except for the notation "TBD."

On December 30, 2017, the patient was observed by DPS staff violating a no contact order by attempting to place a collect call to his ex-wife.  He was subsequently placed on an increased observation status that resulted in progress notes being written every two hours.  He previously was on enhanced observation status shortly following admission due to potential dangerousness to self.

Follow-up notes by the psychiatrist were dated weekly during December 2017.

Findings

The treatment plan was incomplete and, as a result, inadequate.  Notes by the social worker and psychologist were not present in the healthcare record since their initial admission notes.  Documentation by other clinical disciplines was timely and indicated frequent contacts.

**Patient F**

This patient was admitted to DSH-Coalinga on November 17, 2017.  A November 22, 2017 admission psychological assessment report was reviewed; it indicated that the patient was referred for treatment of ongoing auditory hallucinations that led to suicidal thinking.  During a past CMF hospitalization, the patient was provided with a diagnosis of Schizoaffective Disorder.  A history of past substance abuse was also noted.  Diagnoses included Schizoaffective Disorder, depressed type, Stimulant Use Disorder and Alcohol Dependence, moderate, in a controlled environment.

An admission note by a psychiatrist was not located in the healthcare record.

A December 13, 2017 treatment plan was reviewed; it was very problematic for the following reasons. Diagnoses in the treatment plan were inconsistent. Major Depressive Disorder was listed as a reason for psychotropic medication prescription; however, a nursing note immediately below this diagnosis indicated that the patient was prescribed psychiatric medications for Schizophrenia. Significant sections of the "focus" elements were missing with specific reference to focus 1 (psychiatric and psychological). The psychiatrist and social worker were not present at the treatment team meeting.

A November 22, 2017 DSH SRA form was completed by the psychologist. No other psychologist's notes since that time were located in the healthcare record.

No psychiatric notes were located in the healthcare record, with the exception of a January 3, 2018 note related to reassessment after an increase in Prozac.

Admission notes and other progress notes written by the rehabilitation therapist, nursing staff and social worker were reviewed. No follow-up progress notes by the social worker were located in the healthcare record.

Findings

Significant problems were present in the treatment plan as summarized above. Documentation by the social worker, psychologist and psychiatrist was problematic due to the lack of consistent documentation of clinical contact. The healthcare record did not document that adequate treatment was provided to this patient.

**Patient G**

This patient was admitted to DSH-Coalinga on November 16, 2017. The admission psychiatric evaluation indicated that his chief complaint was "I was sent here to be stabilized."

His history of present illness indicated that symptoms included irritability, pacing, decreased need for sleep, anxiety, psychomotor agitation, paranoia, and preoccupation with auditory hallucinations. The diagnostic formulation indicated that he met criteria for a diagnosis of Schizoaffective Disorder. The initial treatment plan included treatment with Depakote, Zyprexa and Haldol.

Psychiatry progress notes were reviewed for November 22 and November 30, 2017.

An admission note from a psychologist was not located in the healthcare record. A DSH SRA form was present, but was not completed.

A December 14, 2017 treatment plan was reviewed. The element of the treatment plan entitled psychiatric and psychological indicated that the objective was "to be determined." The treatment plan did indicate appropriate medications specific to the diagnosis of Schizoaffective Disorder,

bipolar type. The psychologist was not present at the treatment team meeting.

Notes written by nursing staff and the rehabilitation therapist were consistently present; no documentation by the social worker was located in the healthcare record.

<u>Findings</u>

The treatment plan was incomplete and inadequate. Admission notes and progress notes by the psychologist and social worker were not located in the healthcare record. The healthcare record did not document that adequate treatment was provided to this patient.

**Patient H**

This patient was admitted to DSH-Coalinga on June 26, 2007. The psychiatric admission note indicated that his presentation was consistent with the diagnoses of Major Depressive Disorder with anxious distress, Antisocial Personality Disorder, possible Intermittent Explosive Disorder and history of Attention Deficit Hyperactivity Disorder.

His healthcare was reviewed. The most recent treatment plan was dated December 26, 2017. Diagnoses listed were Major Depressive Disorder, recurrent episode, severe and Antisocial Personality Disorder. Focus 1 (psychiatric and psychological) of his treatment plan indicated that the patient "will increase insight into mental illness and current experiences and remain treatment compliant evidenced by attending over 70% of his groups and remaining on all medications until discharge." Regarding managing his mental illness, individual psychotherapy and medication education, the treatment plan indicated that "current progress is not available."

Regarding the above issues, another section of the treatment plan stated the following: "patient will be able to identify challenges to participating in over 85% of his groups and understand benefits of medication compliance in order to gain insight into his mental illness and current experiences that have affected depressive symptoms including suicidal ideation. Progress will be documented in monthly progress notes over the next 90 days." The above was directly cut and pasted from the November 22, 2017 treatment plan, which listed the target date for this objective being met on December 20, 2017. The most recent treatment plan did not address issues related to that target date not being met.

A DSH SRA form was completed by a psychologist on December 26, 2017. The previous SRA was completed on June 28, 2017. No other notes by the psychologist were located in the healthcare record.

The patient was followed consistently by the psychiatrist. Progress notes were also written by the social worker, nursing staff, and rehabilitation therapist.

<u>Findings</u>

The most recent treatment plan contained inconsistent objectives.  It was also vague regarding the patient's presenting problems.

Notes by the psychiatrist, social worker and rehabilitation therapists were written consistently; this was in contrast to documentation by the psychologist, which was deficient in the documentation of contacts.  The healthcare record did not document that adequate treatment was provided to this patient.

**Patient A**

This patient was housed in the C5 housing unit.  His healthcare record was reviewed to evaluate the mental health services provided and to determine why he was not housed at his LRH.  His LRH was locked dorm.

This patient was admitted to the SVSP-PIP on August 5, 2017 from SVSP.  He was provided with a diagnosis of Bipolar Affective Disorder; an additional diagnosis of Borderline Personality Disorder was also present in the healthcare record.  He was prescribed hydroxyzine, Tegretol and Lithium.

A treatment plan dated September 19, 2017 included the Mental Health Inpatient Housing Review; it noted that the LRH was locked dorm and that transfer to his LRH was deferred due to a documented pattern of agitation, disruptive and difficult to redirect behavior.  It also stated that the patient reported that when he was not taking his medications, he experienced mania, anxiety and anger. The treatment plan noted that the primary focus of treatment was the patient's mood instability.

A subsequent treatment plan dated October 20, 2017 noted that the patient was involved in a fight with another patient, resulting in his placement on DPS.  There was no mention of LRH in this treatment plan.  The following treatment plan dated November 14, 2017 (after the review period) included a discussion of the LRH that was duplicative of the September 19, 2017 Mental Health Inpatient Housing Review.

Progress notes indicated that the patient agreed to take selected medications, but refused to take antipsychotic medications.  He advanced through the Step program to Step 3 and his attendance in groups was above 90 percent.  The healthcare record also indicated that the patient requested discharge to EOP, as it offered more programming, groups and yard time.  A psychiatric discharge note dated December 19, 2017 indicated plans for discharge to an EOP.

<u>Findings</u>

The care provided to this patient was inadequate.  There was documentation that the provision of group and individual therapy was severely inadequate.  Discussion of LRH and the reason for not moving to LRH was also inadequate, as there was no documentation of efforts or interventions to address the problems identified.  Sadly, the treatment team indicated plans for discharge to an EOP, due to better provision of treatment in an EOP as compared to SVSP-PIP, an inpatient unit.

There was documentation of the appropriate laboratory testing for treatment with mood stabilizing medication.  A review of the healthcare record indicated the discontinuation of HS medication administration during September 2017 by the chief psychiatrist, reportedly due to nursing staffing limitations.  This was an issue of concern that was discussed with local and regional staff.

Additionally, as with other healthcare records reviewed, treatment plans included poor documentation of individualized treatment planning and repetitive documentation that did not

adequately document the patient's current functioning and interventions, making it difficult to discern whether appropriate treatment planning occurred.

**Patient B**

This patient was housed in the C5 housing unit. His healthcare record was reviewed to evaluate the mental health services provided and to determine why he was not housed at his LRH of locked dorm.

This patient transferred to the SVSP-PIP for intermediate care after he was transferred from CHCF-PIP acute care on October 27, 2017. The patient had a long history of psychosis, suicidal ideation and depression, with command auditory hallucinations and paranoid delusional thinking. He had multiple inpatient treatments at DSH, and multiple MHCB admissions. He had a history of numerous suicide attempts.

The patient was provided with a diagnosis of Schizoaffective Disorder, bipolar type. He was prescribed the following psychotropic medications: Risperdal Consta injection, Prozac, oral Risperdal, amitriptyline and Remeron. He received his psychotropic medications by PC 2602 order. The patient also had significant medical concerns, including liver cirrhosis, ascites, hypertension, diabetes and coronary artery disease. He utilized a walker for ambulation.

There was documentation that the patient was followed consistently by the psychiatrist and at least monthly for individual sessions by the psychologist. On October 29, 2017, he was placed into the observation room due to suicidal ideation with plans to cut himself. This observation was discontinued on the following day.

An initial SRASHE dated October 30, 2017 assessed the patient with high chronic and moderate acute risk for suicide.

A treatment plan dated November 7, 2017 noted the patient's history and his reluctance to program at SVSP-PIP or to take psychotropic medications. The treatment plan identified depression as the only mental health treatment intervention. A Mental Health Inpatient Housing Review noted the IDTT recommendation for unlocked dorm, but there was no discussion regarding preparation or transfer to the LRH.

Findings

The care provided to this patient was inadequate. There was insufficient group and individual therapy provided. Discussion of LRH and the reason for not moving to LRH was also inadequate, as there was no documentation of efforts or interventions to address the problems identified. Treatment planning also required improvement.

Additionally, as with other healthcare records reviewed, treatment plans included poor documentation of individualized treatment planning and repetitive documentation that did not adequately document the patient's current functioning and interventions, making it difficult to discern whether appropriate treatment planning occurred.

**Patient C**

This patient was housed in the C5 housing unit. His healthcare record was reviewed to evaluate the mental health services provided and why he was not housed at his LRH, which was unlocked dorm.

The patient was discharged from the CHCF-PIP acute care program on October 7, 2107 to CMF; however, he immediately was admitted to the CMF MHCB where he remained until October 31, 2017. The patient was admitted to the SVSP-PIP on October 31, 2017. He reportedly had three MHCB referrals in the past six months, due to intransigent depression with auditory hallucinations and suicidal ideation.

The patient was provided with diagnoses of Major Depressive Disorder, severe and Bereavement Reaction. He was prescribed atomoxetine, olanzapine, mirtazapine, and lithium. His medical history was significant for diabetes mellitus.

The treatment plan dated November 1, 2017 included the Mental Health Inpatient Housing Review, which indicated that the IDTT recommendation was for single cell. The reason for deferment of transfer to LRH was concern regarding victimization; the patient was noted to be depressed. Treatment goals focused on symptoms of depression.

The patient was released from orientation status on November 9, 2017 and was placed at Step 1. He was seen by the social worker at cell front on the same date, when he was reportedly anticipating participation in treatment activities. Subsequent progress notes indicated that he was actively involved in group therapy. He also participated in yard and dayroom.

He was seen by the psychiatrist on November 29, 2017, when he reported feeling better, but with continued intrusive auditory hallucinations and racing thoughts. At that time, his lithium and olanzapine were increased.

The most recent treatment plan was dated November 29, 2017; this plan was essentially identical to the prior treatment plan. It noted that the IDTT recommendation was for unlocked dorm, but there was no reason provided for deferment of transfer to the LRH.

Findings

The care provided to this patient was inadequate. He was provided with insufficient group and individual therapy. Additionally, as with other healthcare records reviewed, treatment plans included poor documentation of individualized treatment planning and repetitive documentation that did not adequately document the patient's current functioning and interventions, making it difficult to discern whether appropriate treatment planning occurred. There was also poor documentation of LRH transfer considerations and treatment interventions.

**Patient D**

This patient received mental health treatment at the 3CMS, EOP and MHCB levels of

care; he had seven MHCB admissions.  He also had a history of DSH treatment.  At his last MHCB admission during 2016, the patient presented with manic symptoms.  He was subsequently referred for intermediate inpatient care.

Psychiatric notes were written at least twice per month.  The patient was prescribed divalproex and lithium.  Due to potential kidney problems, he was closely followed by the psychiatrist.  He was provided with a diagnosis of Bipolar I Disorder, current or most recent episode manic, with mood-congruent psychotic features.

Progress notes were written at least weekly by the primary clinician.  On November 8, 2017, the patient was described as participating in full programming.  On November 15, 2017, he reported an interest in attending more groups and possibly having some visits.  He reported that his symptoms, specifically his impulsivity, had reduced significantly.  He denied other concerns, including suicidal or homicidal ideation.

The December 20, 2017 treatment plan included, as a goal, improved coping skills.  It noted the patient's improved insight.  The plan was for transfer to the LRH of unlocked dorms at DSH-Atascadero or DSH-Coalinga.  The Mental Health Inpatient Housing Review documented the IDTT recommendation of single cell.  The reason for deferment of transfer to LRH was the multiple incidents of assault on peers and staff.  The treatment team indicated the need for the patient to further integrate into the program before consideration of multi-cell placement.

During the IDTT on December 20, 2017, the treatment team discussed transfer to DSH-Atascadero or DSH-Coalinga with the patient as a result of his LRH.

Findings

This patient was being seen by his primary mental health clinician and psychiatrist timely; however, his treatment was inadequate due to the limited out-of-cell time offered.  He appeared to be appropriate for transfer to his LRH at either DSH-Atascadero or DSH-Coalinga.

**Patient E**

This patient was apparently admitted to SVSP-PIP intermediate care during June 2017 and was later transferred out to court for a period of time.  The monitor's expert attended his IDTT during the monitoring visit.

There was documentation of psychiatric contact on at least a monthly basis.  The most recent psychiatric progress note on December 19, 2017 indicated the renewal of the PC 2602 order during the previous week.  The patient reported a history of treatment with clozapine, but he discontinued the medication due to perceived side effects.  He was described as treatment resistant with a diagnosis of Schizophrenia.  The psychiatrist indicated that the patient would be a good candidate for treatment with clozapine; however, he required a long acting injectable medication due to medication nonadherence.

Primary clinician contacts were documented on November 9, 2017, November 17, 2017 and

December 8, 2017.  It appeared that the patient was out to court during October 2017.  The most recent progress note indicated that the patient was doing well; he exhibited word finding and slow speech, but his mood was euthymic and he denied suicidal or homicidal ideation.  His insight and judgment were described as poor.

<u>Findings</u>

It was very difficult to adequately assess this patient's course of treatment due to the structure of the healthcare record (electronic) and his apparent out to court time.  The expert attended his IDTT; the patient strongly stated that he wanted to continue solo programming and attend groups only while in a module due to his safety concerns.  Psychotic thinking was not grossly apparent.  His limited out of cell time was problematic from a treatment perspective and resulted in inadequate care.

**Patient F**

The healthcare record of this patient was reviewed to evaluate the care provided.  The patient was admitted to the SVSP-PIP on August 24, 2017 due to mood instability and psychosis.  Although the patient denied symptoms, he continued to exhibit symptoms of decompensation with poor participation in mental health services.  He was observed with catatonic and ritualistic behaviors, including placing his hands under water.  He also slept during the day and had difficulty with socialization.  He exhibited flat affect and poverty of thought.

The patient was provided with a diagnosis of Schizophrenia, catatonic type.  He was prescribed Haldol, Zyprexa, Zoloft and Remeron.  He had a history of head trauma after a fall from a ladder.  There was also documentation of a previous DSH referral for grave disability and catatonic-like behavior.

The seclusion and restraint log indicated that the patient was placed in seclusion on August 29, 2017 and August 31, 2017, and from September 6, 2017 to September 10, 2017.  The seclusion documentation for August and September 2017 was unavailable in the electronic healthcare record.

The master treatment team met monthly.  The patient had increased agitation due to his mother's impending surgery.  He was also reportedly nonadherent with Remeron treatment and requested other medication for insomnia.  He reportedly had increased attendance in yard and groups and had not experienced auditory hallucinations during the past six months; he also had no recurrent catatonia.

Documentation of primary clinician contacts did not occur weekly; in some instances, they occurred at greater than two-week intervals.  Documentation of psychiatric contacts was consistent and comprehensive.

The treatment team determined the appropriate LRH was single cell due to a history of aggression. The LRH recommendation was changed during November 2017 to a multi-person cell.

The clinical care provided to this patient appeared adequate; however, new treatment goals were not introduced, even after goals were met monthly. There were no documented discussions of the need to change or increase groups based on the patient's clinical presentation. Primary clinician contacts were not timely.

## Patient G

The healthcare record of this patient was reviewed to evaluate the care provided. The patient was admitted to the SVSP-PIP on April 3, 2017. The patient was referred from North Kern State Prison (NKSP) due to the inability to function at the EOP level of care. The patient presented with chronic symptoms of psychosis and preoccupation with internal stimuli, auditory and visual hallucinations, paranoia and poor hygiene. He had a significant history of suicide attempts, including wrist cutting in 2013, attempted hanging in 2015, attempted shooting and an overdose in 2016.

The patient was provided with a diagnosis of Psychotic Disorder NOS. He was prescribed Remeron, Abilify, and amantadine.

Since admission to the SVSP-PIP, the patient attended all groups and had no behavioral problems. Treatment goals included reduction of suicidal ideation and anger management.

The December 20, 2017 IDTT note indicated that the patient was encouraged to attend cognitive behavioral therapy for psychosis and to test coping skills by attending group and yard and through socialization. The team also indicated that the patient would benefit from assertiveness and social skills, relaxation and reality testing.

The IDTT determined the LRH was locked dorms due to lack of the patient's functional capabilities. The reason provided for deferment of transfer to the LRH was the "IP is still learning to manage symptoms via CBT [cognitive behavior therapy] for psychosis. Current treatment plan in action concerning hypervigilance." During the December 2017 IDTT, the team discussed transfer to a multi-person cell in TC1; the patient was agreeable with this transfer.

Findings

The mental health care provided to this patient appeared adequate. The primary clinician notes lacked clinical substance, but psychiatric notes were timely and substantive.

## Patient H

The healthcare record of this patient was reviewed as the patient was included in a list of patients on PC 2602 orders. This patient spoke very limited English, as this was his secondary language. He was provided with a diagnosis of Schizophrenia. He was prescribed olanzapine, Clozaril, Haldol, amantadine, benztropine, and Ativan.

The patient was referred from CMF to the SVSP-PIP on June 2, 2017 due to persistent psychotic symptoms. He had a history of multiple DSH referrals and an extensive history of violence, including multiple staff and psychiatric assaults. He had poor insight regarding his mental illness and a preoccupation with discontinuance of medications. The patient's symptoms, however, reportedly did not interfere with his activities of daily living. He was described as an unreliable historian.

The patient was heard singing loudly and yelling at night due to delusional thinking regarding his belief that a peer planned to murder him. During the September 2017 IDTT, these behaviors were discussed and the patient stated that he would attempt to refrain from this behavior; however, he remained afraid, especially at night.

The SRASHE, which was conducted on August 23, 2017, assessed the patient with moderate acute and chronic risk of suicide.

Treatment plan goals included decreasing delusional thinking. The safety plan stated that the patient had assaulted a peer twice, due to the belief that the peer would murder him; however, the plan did not note as risk factors/behavioral alert this history of assaultive behavior.

Another safety plan indicated that language interpretation services would be obtained to assist in assessment and diagnostic clarity.

The patient denied mental health issues and requested an interpreter. He was on solo programming due to his paranoia. On October 4, 2017 the patient removed another patient's glasses and attempted to stab him in his eye with a plastic spoon because he believed the patient would murder him. The note also stated that the patient believed that his Haldol dosage was too high and he cursed the psychiatrist. The patient was placed on DPS due to his assaultive behavior.

The treatment team recommended an LRH of single cell due to possible victimization.

During September and October 2017, psychiatric progress notes stated that the patient was programming fully and attending group, day room and yard. The psychiatrist also noted the patient's nightly fear of harm from other patients, which interfered with sleep. Amantadine was added for medication side effects. It was also noted that the patient attended few groups during November 2017.

On December 12, 2017, the patient continued to state that his medication was too strong. He remained with paranoid delusional thinking with disheveled appearance and an inability to effectively communicate with staff and other patients due to language barriers.

Findings

The care provided to this patient was inadequate. Documentation indicated that the patient had a worsening of his psychotic symptoms with poor attendance in groups during November and

December 2017 and deterioration in his self-care.   Although there was mention of obtaining an interpreter, the healthcare documentation did not indicate that this occurred.

**Patient I**

The healthcare record of this patient was reviewed to evaluate the care provided.  This patient was admitted to the SVSP-PIP on March 3, 2017; his presenting symptoms included social isolation and mood instability.  He had previous inpatient care; he was hospitalized at DSH-Stockton from October 2013 to August 2014 and was hospitalized at SVPP from December 2014 to September 2015.  The two previous DSH admissions were due to the patient's inability to program and to care of himself.

The patient was provided with a diagnosis of Schizophrenia Spectrum Disorder.  He was prescribed olanzapine.  He received his psychotropic medications by PC 2602 order; this order was reviewed and granted on September 27, 2017 due to grave disability.  He was classified as DD2.[26]

The patient had a history of violence, substance abuse, and poor insight regarding his mental illness.  No history of suicidal ideation or attempts were documented.  The patient expressed feelings of depression and anxiety regarding his incarceration, which affected his ability to socialize with peers.

The patient refused all out of cell activities with the exception of breakfast and lunch.  Documentation indicated that the patient spent most of his day sleeping or watching television in his cell.  He did not shower and he performed grooming in his cell.  The patient reported headaches; however, he refused to be seen for a medical evaluation.  He also appeared to be losing weight, but clinicians were unable to verify this as the patient refused a medical evaluation.  He also presented with anxiety, paranoia, poor socialization, and command auditory hallucinations.

A SRASHE conducted on September 6, 2017 assessed the patient with moderate chronic and low acute risk for suicide.

The safety plan included as safety measures the following: monitoring for safety, medication management, group therapy, social skill building, increased clinical contact, fostering therapeutic relationships, and the development of coping skills to monitor and regulate moods.

During September, October, November, and portions of December 2017, the patient attended few groups, but no IDTT meetings.  The psychiatrist increased the dosage of olanzapine.

The November 2017 IDTT note was unchanged from the prior two months.  The treatment team discussed the patient's discharge due to his lack of treatment participation; however, the team agreed to continue his hospitalization.

---

[26] DD2 (Developmental Disability 2) is a CDCR Adaptive Support Services category used to denote a patient's level of functioning and determine housing placement and services to be provided.

The mental health care provided to this patient was inadequate. The patient's behavior, treatment participation, and mood remained unchanged. Despite the lack of improvement, no change was documented in treatment, treatment modalities or IDTT goals. There also was no mention of solo programming or ways to reduce modified programming or to increase yard, showering or participation in therapeutic activities.

## Patient J

The healthcare record of this transgender patient was reviewed as her IDTT was observed during the site visit. She was admitted to the SVSP-PIP on February 7, 2017 due to grave disability with poor ADLs. The patient also reported auditory hallucinations.

The patient was provided with a diagnosis of Schizophrenia. She was prescribed olanzapine, mirtazapine, and hydroxyzine.

The patient had a significant history of suicidal behavior, with five suicide attempts by overdose and inhaling natural gas; the most recent attempt occurred by overdose of keep-on-person medications on February 21, 2016. The patient also had a history of childhood sexual assault, hepatitis C, poor impulse control, violence, substance abuse, and a long prison sentence for a sexual offense.

Documentation in the healthcare record noted the patient's family support and her positive outlook regarding future transition surgery and programming. The patient was described as developmentally disabled.

Safety plan interventions included medication management, relaxation techniques, visualization of pleasant imagery and groups to assist in managing psychotic symptoms. The patient was also provided substance abuse counseling with dialectal behavioral therapy to increase emotional regulation. A treatment goal was the management of hallucinations.

The patient had an LRH of single cell; the treatment team provided this LRH as the patient was believed to be at risk for victimization due to her age and transgender status.

The patient attended most groups during the review period. The patient participated in the IDTT that occurred on December 20, 2017. She reported that she wanted to complete her term in the county jail and had submitted an appeal. She reported continued auditory hallucinations but reported beneficial effect from medication treatment. It was decided that hospitalization would continue to address the ongoing auditory hallucinations.

Findings

The clinical care provided to this patient was inadequate. There was a lack of documentation that individual sessions occurred in a confidential setting and not at cell front. There was a lack

of documentation that important issues were addressed by the IDTT or in individual sessions. There was also a lack of documentation that the patient was provided treatment regarding minimizing victimization concerns.

## Patient K

The healthcare record of this patient was reviewed to evaluate the care provided. He was admitted to the SVSP-PIP on March 28, 2017. He was referred for intermediate care due to impulsivity, depressed mood and suicide ideation.

The patient had a significant history of suicide attempts; he reportedly had 30 to 40 attempts by various means, including cutting, head banging, overdose, and swallowing razors and foreign objects. It appeared that the death of his mother in 2011 resulted in anniversary-related depression and suicidal ideation. The patient was previously hospitalized at DSH-Atascadero and SVSP-PIP.

The patient was provided with a diagnosis of Schizophrenia. He was initially prescribed Haldol, ziprasidone, divalproex, benztropine, and diphenhydramine.

The patient was also described with developmental disability, poor coping skills, and impulsivity.

A master treatment team meeting was conducted on September 26, 2017. Treatment goals included decreased feelings of distress and hallucinations; interventions included rehabilitation therapy to improve anger management.

The patient had an LRH of multi-person cell provided by HCPOP. Prior to the December 2017 IDTT, the treatment team deferred transfer to the LRH due to the patient's inability to navigate a lower LRH due to functional capacity. During the December 2017 IDTT, the treatment team discussed the patient's placement in a multi-person cell and informed the patient to begin looking for a compatible cellmate.

The patient received his psychotropic medications by PC 2602 order. He requested treatment with Clozaril; however, he refused to allow laboratory studies, which eliminated treatment with this medication. This behavior was described as "self-sabotage" in the healthcare record.

During October 2017, the patient was placed on DPS as he was involved in a fight on the yard. The patient also reported suicidal ideation during a group session the same month. There was a lack of documentation of timely clinical follow-up after this incident.

The November and December 2017 clinical notes mirrored the October 2017 documentation in which the patient was preoccupied with the lack of family contact, upcoming holidays, the recent death of family members and money.

At the December 20, 2017 IDTT, the patient reported thoughts of harming an unspecified person. There was no discussion or documentation of change in goals or treatment interventions.

The mental health care provided to this patient was inadequate. Treatment goals and interventions were unchanged, despite lack of treatment progress. It appeared that individual contacts primarily occurred at cell front and were not timely. The documentation of group therapy did not indicate therapeutic benefit. A December 2017 note discussed possible referral to the CMF-PIP; however, there was no further documentation regarding this issue.

## Patient L

The healthcare record of this patient was reviewed to evaluate the care provided. The patient was admitted to the SVSP-PIP on July 31, 2017. He was referred for intermediate care due to depression, paranoid delusional thinking, suicidal ideation and self-injurious behaviors.

The patient was provided with a diagnosis of Schizoaffective Disorder, depressive type. He was prescribed olanzapine, paroxetine, haloperidol, benztropine, hydroxyzine, and diphenhydramine. The patient's history was significant for a head injury by stabbing during 2001; he required extensive rehabilitative therapy after this injury. He reportedly used PCP at age eight, was provided alcohol as an infant and had a severe history of childhood abuse and trauma. He reportedly had possible cognitive impairment, poor self-image, and psychotic symptoms after the stabbing.

The patient's most recent MHCB admission was triggered by a testicular cancer diagnosis, his daughter's suicide, and a pending RVR for fighting.

The IDTT recommended an LRH of single cell due to the patient's inability to navigate his environment due to low functioning capacity. The UCC was conducted during October 2017, when a recommendation for unlocked dorm was provided; this was consistent with the HCPOP recommendation.

During the interval from September to November 2017, the patient reported inconsistent clinical contacts with his primary clinician. He also expressed concern that he had not received information regarding the status of his property. Documentation also indicated that the patient was monitored on one-to-one suicide observation on six occasions. During this period, he also reportedly exhibited self-injurious behavior with cutting on several occasions, was found hiding under his bed and received an RVR for indecent exposure. He also expressed concern that he had lost a photograph of his daughter and he feared for the safety of his brother, who was housed in another housing unit at the facility.

The monitor's expert attended the December 2017 IDTT. During this meeting, the patient shared a poem that he wrote to his daughter who committed suicide. The patient's guilt regarding this incident was discussed, as was the cathartic benefit of writing the poem. The patient had been removed from DPS. The team, including the patient, agreed with continued intermediate care and existing goals.

<u>Findings</u>

The clinical care provided to this patient was inadequate.  There were no documented goals or interventions for the patient to transfer to his LRH.  Additionally, there was a lack of documentation of the assessment of current coping strategies to determine whether treatment changes were indicated.

**Patient A**

The plaintiffs' attorneys reported that this patient was admitted to an intermediate care single cell on June 5, 2017, despite a multi-person cell LRH, and was discharged on October 30, 2017 after a 147-day stay in a single cell. The patient's healthcare record was reviewed at the request of plaintiffs' attorneys to determine whether the treatment team had properly and regularly re-evaluated and documented the justification for continuing to house this patient out of his LRH designation.

Review of this patient's healthcare record indicated that he was admitted to the high custody intermediate treatment center (HCITC) on June 5, 2017 after a suicide attempt and suicidal ideation in which he swallowed part of his eye glasses. The patient reported that he was sent to an outside hospital where the object was surgically removed. He reported that his last suicide attempt occurred during March 2016. The patient reported that he was informed that he was being sent to the HCITC for further treatment.

The patient was admitted to CMF-PIP, acute S-2 on March 30, 2017 from the KVSP MHCB unit after swallowing a foreign body. He had a significant pattern of this behavior. On March 15, 2017, he underwent a procedure to remove three foreign bodies from his stomach using a snare. The ingested items were two toothbrushes, a paper clip and an ink pen; some of these items passed without surgery, but the hospital report stated that three items remained in his stomach. He told staff at the MHCB that this was a "suicide attempt to cause internal organ damage." The patient had a very long history of admissions to CDCR MHCB units and community hospitals because of similar behaviors. He was placed on a PC 2602 order due to danger to self, which expired on December 14, 2017. He was reportedly adherent with prescribed medications.

The patient was serving a 12-year term for robbery with the use of a firearm. This was his first prison term, but the patient reported that he was placed in juvenile hall at age ten for burglary. He was also placed in the California Youth Authority at age 14 for assault, where he remained for several years until he was 20 years old.

Although the patient denied membership in a gang, his offender information indicated that he was gang affiliated with the Bloods. He was classified as maximum custody and Level IV security level with 116 points. He had an RVR for an intentional IEX on March 4, 2016 to the person who was observing him for safety.

A September 7, 2017 violent risk assessment noted that the patient's history may have increased his impulsivity and risk of harming himself and others. He was described as lacking empathy toward others and as having difficulty with authority figures.

On September 27, 2017, the patient was seen by the treatment team for a mini treatment team conference following his return from an outside hospitalization related to swallowing a plastic fork on September 23, 2017. It should be noted that this was the second incident of verified foreign body ingestion, as the patient also swallowed the ear

pieces of his glasses on September 8, 2017. The patient denied this behavior being related to any desire to commit suicide. Due to his recent ingestion of a foreign body, the treatment team was evaluating the patient's treatment needs and plan and a discharge to the EOP level of care was contemplated. His current treatment included the use of cognitive behavioral therapy coping skills, including identifying challenging cognitive distortions and focusing/maintaining positive outlook/future orientation in order to decrease depression and suicidal ideation. He was encouraged to attend daily yard and psychoeducational groups, communicate with clinical, medical and custody staff, and consult with the treating psychiatrist when necessary for changes and modifications to medications.

An October 3, 2017 mini treatment plan note documented the patient's history of self-injurious behaviors and that he would be discharged if his swallowing behaviors continued. An October 26, 2017 discharge summary noted that the patient would be continued on the medications from S-2, which included Abilify Maintena 400 mg intramuscular injection every four weeks, Effexor ER 225 mg daily and lamotrigine 200 mg daily. The patient was adherent with prescribed medications and indicated that they were beneficial to him. The PC 2602 order remained in place.

The patient was provided with diagnoses that included Borderline Personality Disorder and Major Depressive Disorder, recurrent.

A LRH clinical review form was completed on July 11, 2017 and September 5, 2017. The assessment indicated that it was inappropriate for the patient to be moved to his LRH due to a documented pattern of agitation, disruption and difficulty redirecting his behavior.

Findings

The mental health care provided to this patient was appropriate and his LRH was appropriately assessed.

**Patient B**

The plaintiffs' attorneys reported that this patient was admitted to an intermediate care single cell on April 13, 2017, despite a multi-person cell LRH, and was discharged on October 3, 2017 after a 173-day stay in a single cell. This patient's healthcare record was reviewed at the request of the plaintiffs' attorneys to determine whether the treatment team had properly and regularly reevaluated and documented the justification for continuing to house him out of his LRH designation.

The patient was transferred to CMF-Vacaville Psychiatric Program (VPP)[27] (intermediate care) due to his continued decompensating state despite attempts for stabilization and increased medication adherence at the sending facility. There was a history of over 30 suicide attempts, with the last attempt occurring over a year earlier. Auditory hallucinations and paranoid thinking were present.

A September 29, 2017 IDTT note indicated that the patient was concerned that his sexual orientation was a topic of discussion among his peers resulting in harassment, bullying and fears for his safety. He reported continuous, low level auditory and visual hallucinations that he managed well with medication and coping skills. He had no behavioral incidents during the past several months. He indicated that one of the important parts of his treatment, in addition to medications and groups, had been the increased socialization that had since become problematic for him. The note further stated that the patient had achieved his treatment goals and appeared prepared to discharge to a lower level of care.

A September 29, 2017 psychiatric note indicated that the patient felt depressed; this was triggered by the other patients calling him, "transgender, homosexual ... as if I am something like a prostitute." This reportedly resulted in depression, low self-esteem, isolation, paranoia and the feeling of being unsafe around his peers on the tier. He requested discharge to MCSP where he felt supported by a transgender friend. He continued to report auditory and visual hallucinations, which were less bothersome and more easily distracted by reading or singing.

A September 29, 2017 discharge note indicated that since his admission, the patient had been medication adherent and had participated in groups and the therapeutic milieu. Approximately one month prior, the patient had exhibited decompensation with a worsening of his auditory hallucinations, which commanded him to harm himself. At that time, he was able to tell the staff about his issues and he asked them to remove his belongings as a safety precaution. Since then, he remained on DPS due to feeling unsafe to program without mechanical restraints, even though he reported that the command hallucinations were less bothersome. The patient had refused to program during the past two weeks due to harassment by another patient regarding his sexual orientation. The patient requested discharge to another intermediate care program or the EOP.

The note further stated that the patient's hallucinations remained unchanged; however, he was less bothered by them and utilized singing, reading and walking as coping skills. He had been taking care of his activities of daily living and no behavioral issues were reported.

The treatment team agreed that the patient would benefit more from being discharged to another facility where he felt safe and could continue receiving treatment.

---

[27] Prior to Lift and Shift, the CMF-PIP was known as CMF-VPP.

The patient was followed by the PBST and was provided with information regarding treatment adherence and appropriate behavior.

A September 29, 2017 SRASHE provided a comprehensive history of the patient's suicide history. He was assessed with moderate chronic and low acute risk at that time.

The patient had 75-percent attendance at recreational therapy groups when on Step 3, but regressed back to DPS at his request due to safety concerns. He stated that he would go to groups at the new institution, as there were other transgender patients there, and he would feel more comfortable.

He was provided with a diagnosis of Schizoaffective Disorder. His prescribed medications during his course of hospitalization included Clozaril, olanzapine, divalproex, Haldol, and Prolixin Decanoate.

An assessment relevant to LRH was not located in the healthcare record; however, the unit staff provided the following information. An April 18, 2017 chrono indicated that "today's ICC concludes that single cells are least restrictive housing appropriate" for this patient. Therefore, at that time, the P3 treatment team was under the impression that this patient was ineligible for placement in a multi-person or dorm setting. The P3 team continued to discuss at each monthly treatment team conference how the patient would clinically feel if housed in a dorm setting and the patient reported that he identified as transgender and felt safer in a single cell.

Subsequent to the CMF L-1 PIP multi-person cell program opening in July 2017, the P3 team was informed that this patient was actually multi-person cell eligible and was being considered for transfer. However, as of August 5, 2017, the patient had broken his television and swallowed four plastic pieces after reportedly hearing voices that were bothersome and telling him to "come home," which the patient interpreted to mean "death." On August 25, 2017, he reported feeling suicidal. The P3 treatment team subsequently assessed that he was not clinically appropriate for multi-person cell intermediate care transfer, as he required a safety cell.

This patient stabilized during the following month and again requested transfer back to EOP. He was described as very motivated for discharge on September 29, 2017, when he was discharged.

Findings

There was inadequate documentation of this patient's LRH assessment, but staff reported that the patient was assessed for his LRH.

**Patient C**

Plaintiffs' attorneys reported that this patient was admitted to an intermediate care single cell on August 9, 2017 despite an unlocked dorms LRH. He was discharged on October 21, 2017 after a 73-day stay in a single cell. Plaintiffs' attorneys requested a record review to determine

whether the treatment team had properly and regularly re-evaluated and documented the justification for continuing to house this patient out of his LRH designation.

The patient was discharged from DSH intermediate care on October 21, 2017; he was admitted following multiple incidents of suicidal ideation behaviors at CSP/LAC during March and April 2017. This resulted in transport to an outside hospital for further evaluation and treatment. The onset of suicidal behavior occurred after the patient was changed from the EOP to the 3CMS level of care. Information in the healthcare record indicated that the patient was vying for DSH placement. He reported an inconsistent history of suicide attempts and self-injurious behaviors.

A September 6, 2017 violent risk assessment report assessed the patient with low to moderate risk to engage in violence on the present unit.

An October 17, 2017 discharge note provided significant historic information. It indicated that the patient had been admitted on August 9, 2017 and was discharged on October 17, 2017 from the intermediate care level of care. He was admitted due to a suicide attempt. During his hospitalization, he was adherent with medications and participated in therapeutic groups. He had two behavioral incidents during his stay, but no self-harm incidents. The patient denied any hallucinations, delusional thinking or paranoia. He continued to verbalize that he had not benefitted from inpatient treatment and that he would prefer to go to EOP where he would receive more programming and have his medications monitored. The treatment team agreed that since the patient was unwilling to accept and participate in the treatment, he would benefit more from treatment at the EOP level of care.

The patient was provided with diagnoses of Bipolar Disorder and Major Depressive Disorder. He was prescribed Cogentin, oxcarbazepine, olanzapine, and Haldol on an as needed basis.

The treatment plan indicated that the patient was housed in a single cell due to a documented pattern of agitation, disruption, and difficult to redirect behavior. Such behaviors resulted in his placement on DPS and return to Step 1 on September 27, 2017.

Findings

The mental health care provided to this patient was appropriate and his LRH was appropriately assessed.

**Patient D**

This patient's healthcare record was reviewed at the request of plaintiffs' attorneys after they received a letter from him in October 2017 when he reported that he would be discharged from the CMF-PIP over his objections two days after he had attempted suicide. Plaintiffs' attorneys questioned whether the patient had been discharged; and if so, wanted to identify any concerns regarding this discharge.

A September 19, 2017 master treatment plan indicated that the patient attended 77 percent of his scheduled groups and participated in weekly individual sessions. The documentation also indicated that the patient had difficulty communicating his needs and focusing on a single goal. He indicated in the IDTT that he would like to focus on grief, sadness, depression, polysubstance abuse and hopelessness. The patient also requested psychoeducational groups. Although the patient participated in programing, it was questioned whether he had obtained maximum benefit from the program due to his current behavior. The treatment team recommended a change in his group schedule, continued individual therapy and that the patient remain at Step 2. Medication adherence was also encouraged, as he had refused medications since arriving in the program. The plan indicated that the patient would continue to be monitored for the next 30 days. The treatment plan also provided information regarding the patient's recent history, including the events that led to his MHCB admission and his history of assaultive behavior.

An October 17, 2017 treatment plan indicated that the patient presented with depressive symptoms; however, his symptoms seemed to wax and wane and his presentation was inconsistent. During his stay in the CMF-PIP, his group attendance and individual sessions were inconsistent. Specifically, it was noted that when he attended group, he appeared bored or fell asleep.

The patient was provided with a diagnosis of Major Depressive Disorder; a history of Antisocial Personality Disorder and a differential diagnosis of PTSD were also provided. He was prescribed Zoloft, Vistaril, and olanzapine on an as needed basis.

A subsequent October 17, 2017 note indicated that the patient took an overdose of Vistaril on that date. He reported to the nurse that he intentionally took four tablets of Vistaril that someone else had given him, but denied hoarding the drugs himself. When asked whether or not he had an intention to kill himself, he explained that "I am depressed, I just wanted to go to sleep and not wake up." Later during observation, the patient reported that he may have taken some heroin with his coffee and was feeling very sleepy. He was observed for five hours in the TTA, given 1.5 L of normal saline and 0.4 mg of Narcan. He became more alert and his blood pressure normalized.

In an October 18, 2017 note, the psychiatrist indicated that the patient was seen at cell front due to restricted programing. The patient reported having a crisis when he found out unexpectedly that he would be discharged; however, another possible reason could have been related to his alleged use of a prohibited substance. The patient stated that he needed Prozac to handle his increased stress; he reported having medication side effects from Zoloft. He denied current self-destructive thinking. He made a phone call to his lawyer, he said, to fight the planned discharge. After obtaining consent, Prozac was prescribed.

It appeared that by October 20, 2017, the plan to discharge the patient had been changed.

A November 15, 2017 four-month IDTT note documented the previous plan to discharge the patient from the CMF-PIP due to his reaching maximum benefit. In the preceding 30 days, the patient had reportedly continued to show stability, with group attendance above 90 percent and fewer problem behaviors noted. The note indicated that although fewer problem behaviors were exhibited, the primary clinician was unable to identify consistent symptoms for treatment. The primary clinician recommended psychological testing before discharge; the patient was informed of this testing.

Findings

This patient was not discharged for the reasons previously stated. The documentation relevant to the decision not to discharge him following his reported suicide attempt was poor.

**Patient E**

This patient was admitted to the CMF-PIP acute care program on September 14, 2017. The psychiatric admission note indicated that he was suicidal and cutting his wrist due to chronic back and shoulder pain. He also had no family support, hopelessness and anhedonia related to his chronic pain. He reported depression for the previous five to six months. He attempted to cut his wrist two weeks prior. The patient also reported auditory hallucinations, which were at times command in nature, telling him to attack custody officers and to throw food. He had paranoia related to custody officers.

This patient had a significant history of multiple suicide attempts and a history of polysubstance abuse. He was provided with a diagnosis of Schizophrenia. Seroquel was continued and the patient was initially placed on suicide precaution.

Suicide precaution was discontinued on the following day. On September 17, 2017, the patient was involved in an altercation with another patient.

A SRASHE was completed on September 21, 2017. His chronic suicide risk was assessed as high and his acute risk was assessed as moderate. A safety plan was outlined.

A September 28, 2017 psychiatric note indicated that the patient was feeling better and he reported that he would inform staff of suicidal intent. He was reportedly medication adherent. He indicated some auditory hallucination, but no command hallucinations. He stated that controlling his back pain would improve his depression.

A September 28, 2017 master treatment plan was developed. Problems identified included symptoms of Schizophrenia and chronic back pain. The patient attended yard on October 1, 2017 and attended a music therapy session on October 9, 2017.

An October 13, 2017 psychiatric note described similar symptoms and statements by the patient as the previous note dated September 28, 2017.

The patient was prescribed Buspar, hydroxyzine, Seroquel, and venlafaxine.

An October 13, 2017 IDTT note was reviewed; the treatment plan was essentially unchanged.

The patient again participated in music therapy on October 16, 2017. He was again seen by the psychiatrist on October 27 and October 31, 2017. A primary clinician note on October 31, 2017 indicated that the patient had continued hallucinations, which were not command in nature. He denied suicidal ideation or safety concerns, but expressed interest in admission to the intermediate care program. He reportedly consistently attended large groups, but frequently refused yard. The patient generally showered, but with periodic 'bird-bathing.'

The treatment plan of October 31, 2017 was changed from prior plans. Progress notes by the primary clinician and psychiatrist on November 22, 2017 were consistent with prior notes.

Findings

Only two progress notes were located in the healthcare record from admission to November 22, 2017 that indicated that the patient had been participating in group therapy; only one note indicated that he went to yard. This lack of being offered and/or participating in out-of-cell activities was inadequate for an acute care psychiatric program; it resulted in limitations not unlike a segregation unit.

**Patient F**

The October 17, 2017 psychiatric admission note provided information regarding the patient's history. He was readmitted to the CMF MHCB on September 26, 2017 due to suicidal ideation. He had been depressed as his son had died in a motor vehicle accident one to two month prior. Other stressors included chronic pain and difficulty adjusting to a new prison. He also reported auditory hallucinations. He was referred for acute care and stabilization.

The patient had a history of three suicide attempts, including jumping from a window, attempting to be shot by the police and overdosing. He also had a history of PIP placement at CMF from March 30, 2015 to December 31, 2015. The patient had reportedly been medication adherent.

An October 18, 2017 master treatment plan noted that the patient had been prescribed sertraline and Vistaril during his hospital stay; however, he refused sertraline approximately half of the time. He indicated that the medication was not helpful and he did not wish to take it early in the morning. He was willing to take paroxetine 20 mg in the evening as an alternative to the sertraline. Vistaril was continued on an as needed basis; Gabapentin was also prescribed.

Since his admission to the acute care program, the patient was seen by the psychiatrist on a

regular basis and by the treatment team. He went to yard on two occasions, on November 13, 2017 and November 23, 2017. Group therapies occurred on October 27, 2017 (cognitive behavioral therapy), November 3, 2017 (cognitive behavioral therapy, coping skills) and November 13, 2017 (art therapy).

The patient was observed by the expert during his November 29, 2017 IDTT. He complained that he received more out-of-cell time when he was housed in the SHU. He reported being scheduled for about four weekly groups, but stated that most of the groups were canceled; staff confirmed this comment.

Findings

The patient received inadequate treatment for an acute care psychiatric program due to the severe lack of out-of-cell activities and programming; this resulted in limitations not unlike a segregation unit.

**Patient G**

The September 20, 2017 acute care admission note provided information regarding the patient's history. He was initially admitted to the MHCB after being observed urinating on the floor; he also was not showering and was eating intermittently. The patient was also observed kicking and banging; he had paranoia regarding his family being murdered and had a fixation on Jesus. Of note, the patient was off his antipsychotic medications for some time prior to decompensation.

The patient had a history of inpatient and outpatient mental health treatment in the community in Los Angeles County, as well as multiple psychiatric holds when he was "off his medication and suicidal." He had been followed at the parole outpatient clinic, where he was provided with a diagnosis of Schizophrenia, paranoid type. He had a history of DSH treatment in 2010 and a history of substance abuse beginning in adolescence, including marijuana, methamphetamine, crack, and spice.

The patient reported hearing the voice of Jesus. He also had delusional thinking regarding the porters with infrared guns pointing at him. He was placed on a PC 2602 order during the MHCB admission. He was prescribed Cogentin, Effexor XR, fluphenazine, and metformin.

The patient was seen by the psychiatrist on a regular and timely basis. He participated in seven therapeutic groups during October 2017 and eight groups during November 2017.

His initial IDTT occurred on October 3, 2017.

Findings

It was encouraging that this patient received more group therapy than the average acute care patient; however, the number of groups offered to him was still inadequate for an acute care

psychiatric program.

**Patient H**

This case was selected for review as this intermediate care patient was identified as having an individualized behavioral plan. The patient was admitted to the CMF-PIP on August 4, 2017; he was referred for a multi-person cell placement. Upon arrival, staff determined that he required a single-cell placement due to verbalized threats to harm someone at CMF and paranoia toward others. He was then moved to single-cell housing.

According to the healthcare record, the patient had a history of approximately twenty inpatient hospitalizations characterized by chronically poor hygiene, difficulty with activities of daily living, poor treatment adherence, and an inability to engage in treatment. He was referred due to these issues and for problems with command hallucinations and suicidal ideation with a plan. The patient had a history of suicide attempts by hanging or cutting, with the most recent attempt in 2015 by cutting. He was on a PC 2602 order as a result of posing a danger to others; the order would expire on February 8, 2018.

The patient was provided with a diagnosis of Schizophrenia. He was prescribed Abilify Maintena 400 mg intramuscular injection every 28 days, valproic acid, Zyprexa, and oral Abilify.

The initial behavioral plan was reported in the behavior log developed by the PBST on August 24, 2017; however, according to the healthcare record, the document was actually completed on September 12, 2017. The plan was entitled "PBST Behavioral Guidelines" which was a more accurate title than behavioral plan, as it contained a significant amount of ancillary information that was cut and pasted from treatment team and intake notes; this was inconsistent with a concise description of the target behavior as well as a functional analysis. No baseline data appeared to have been collected regarding the target behavior, which was necessary for a functional assessment and in determining if the interventions had a positive impact on the target behavior.

There were also multiple short-term goals included in the guidelines; these goals were unrealistic for this patient due to his chronic mental illness and severely impaired functional level. A more clinically appropriate approach would focus on one target area, identify an achievable goal that would assist in patient and staff accomplishment and then expand the goals as indicated. The behavioral guidelines also addressed interventions that were more appropriately addressed through the treatment plan, such as medication adherence. These guidelines also directed staff to issue a rules violation report to the patient for any threatening behavior, regardless of whether that behavior was the result of psychotic symptoms. Such punitive interventions had no clinical foundation and were inappropriate. In addition, individual clinical contacts with the PBST were to be withheld if the patient made threats against staff. This was also an inappropriate intervention, as it would withhold treatment without a direct connection to the behavior. Even more importantly, behavioral reinforcers were more powerful for permanent behavioral change

than punishment, particularly when used effectively; however, the behavioral guidelines for this patient appeared heavily weighted toward punishment.

Findings

This patient was not effectively treated, as his behavioral plan was not adequately completed. There was no evidence that a functional analysis was completed. No baseline data of the target behavior was included in the guidelines; there were too many treatment goals and those goals were not stated in behaviorally specific and objective ways. The behavioral plan did not focus on behavioral interventions that would address the target behavior. In fact, it was unclear what the target behavior was. The behavioral plan needed to be revised.

**Patient I**

The healthcare record of this intermediate care patient was reviewed to evaluate the behavioral plan. The patient was classified as DD2. He was admitted to the CMF-PIP on September 29, 2017, according to a CMF log and his housing was high security, single cell. The healthcare record suggested that the patient had actually transferred to CMF from CHCF on September 19, 2017. According to the master treatment plan (last updated December 13, 2017), his LRH was locked dorm, but the treatment team indicated that he needed a single cell due to concerns regarding victimization, violence within the previous year and an inability to negotiate the complexities of a less structured program. Specifically, the team noted that the patient had allegedly engaged in violence toward nursing staff at DSH-Atascadero. The patient had initially been placed in a locked dorm unit, but he immediately began reporting thoughts of head banging or breaking a window, stating that he did not want to remain in the dorm setting. The treatment team convinced him to wait until a bed was available in the high custody unit. Once moved, the patient denied thoughts of hurting himself, hallucinations and suicidal and homicidal ideation. The reason for referral to inpatient care was to develop coping skills to minimize the head banging behavior.

The patient was provided with a diagnosis of Schizoaffective Disorder. He had a history of self-injurious behavior, particularly head banging. He was prescribed Benadryl, chlorpromazine, divalproex, and sertraline.

The October 12, 2017 behavioral plan did not include evidence that a functional analysis had been completed, but included interventions designed to prevent the head banging behavior and to teach appropriate limits. The effectiveness of this intervention without the functional analysis was unclear, but the PBST was monitoring and updating the plans. The patient was asked about enjoyable activities, in an effort to utilize positive reinforcement for appropriate behavior. The plan was updated on November 21, 2017; of note was documentation stating that the details of the plan should not be communicated to the patient. The specifics regarding what aspects of the plan that could not be communicated or why it should not be communicated to him were not provided. The patient had reportedly attributed his recent head banging behavior to a desire to obtain a housing change (from dorm to single cell) and to parole to ASH. This resulted in the

discontinuation of one of the behavioral interventions; this occurred without the addition of any new interventions, despite a lack of documentation of patient progress. In a subsequent update dated November 30, 2017, the PBST noted that the patient had engaged in self-injurious behavior; he stated that he did not like the high custody unit and would not stop head banging until he was moved to the acute level of care. Additional interventions were added, as were several more reinforcers.

Findings

This patient was adequately treated at the intermediate level of care. He was seen frequently by the treatment team and PBST, in part due to the behavioral plan and an effort to provide appropriate attention and reinforcement. Although the behavioral plan did not document a functional analysis, it included positive reinforcement and an attempt to intervene prior to the head banging occurrence.

**Patient J**

The healthcare record of this acute care patient was reviewed to evaluate the behavioral plan. It appeared that he was admitted to the CMF-PIP on September 19, 2017, from an MHCB, due to self-injurious behavior, with cutting. He was provided with a diagnosis of Schizoaffective Disorder. He was prescribed Benadryl, clozapine, Haldol, hydroxyzine, and mirtazapine.

The patient reported that he had only harmed himself due to safety concerns at his sending institution and denied further intent to harm himself in a safe environment. The patient was originally referred for intermediate care; however, he engaged in disruptive behavior on the intermediate care unit, with kicking and banging on his cell door as he requested additional medication. This behavior indicated the need for more acute stabilization and the patient was transferred to the acute care program. He was provided with some medications on an as needed basis, which staff documented as ineffective. The patient acknowledged that he engaged in this behavior as a result of perceived injustice in the prison environment. He was referred to PBST due to an escalation in banging, with head banging.

The behavioral plan did not document the completion of a functional analysis. The plan focused on interventions after the problematic behavior occurred, rather than identifying precursors and intervening preemptively. This plan further reinforced, rather than decreased, the problematic behavior. In addition, the plan relied heavily on as needed medications, despite the patient's known addictive history, drug-seeking behavior during inpatient admissions and the difficulty in receiving such medications once released to outpatient care. Reinforcement for positive behavior was not frequent enough to establish that behavior and it was unclear whether the plan included salient (meaningful) reinforcers for the patient. Initially, a schedule of frequent reinforcement should be developed in an effort to produce and maintain the positive behavior. Subsequently, an intermittent schedule of reinforcement can be used to ensure maintenance. The plan must also address the specific precursors to the problematic behavior.

This patient did not have an adequate behavioral plan. The plan should include a functional analysis that would identify precursors and reinforcers to the problem behavior. The PBST could then design interventions that would occur at the point of precursors or antecedents and prevent harm to the patient. There was also inadequate use of positive reinforcement and the target behavior was too vague.

The staff of the intermediate care program appropriately recognized the patient's instability and transferred him to the acute care unit. However, treatment was inadequate and ineffective; the patient received insufficient treatment and therapeutic interventions were not individualized.

## Patient K

The healthcare record of this intermediate care patient was reviewed as he remained on Assessment and Orientation status for 37 days, which was prolonged. His admission date was listed as October 11, 2017, but the healthcare record indicated that the patient was housed at CSP/Sac at that time. It appeared that his inpatient admission occurred on or about October 20, 2017. The patient was referred for intermediate inpatient care to increase his engagement with his treatment team, as he had refused all services at his sending EOP institution. Additionally, the intermediate care treatment team included the goal of assessing for a psychiatric diagnosis and grave disability. The patient initially refused medications; no medications were prescribed for daily administration, however, medications were ordered on an as needed basis so the medications were available "if they need to control any agitated behavior..." He was previously prescribed sertraline and ziprasidone.

A comprehensive psychological assessment during a prior DSH admission noted that the patient had borderline intellectual functioning, frequent dissociative experiences, and PTSD with dissociative symptoms. During this admission, he denied most symptoms, but acknowledged a history of auditory hallucinations. At the ten-day IDTT on October 20, 2017, the patient was unresponsive to most questions; he reported minimal depression and continued to state that he did not belong there and did not need medications. He refused his 30-day IDTT on November 15, 2017, but when seen at cell front, he mumbled incoherently. The patient reportedly ate his meals, but took an "exorbitant" amount of time to get out of bed. He last showered nine days prior and had allegedly only taken bird baths since. The treatment plan included the goal of treatment adherence for three months and successfully programming at a lower level of care. The LRH was addressed by the treatment team although the patient was housed at his LRH. While the treatment plan indicated that an individual plan of care (IPOC) was completed, it was not located in the healthcare record, making it difficult to assess actual interventions.

The treatment team never addressed the patient's Step level or provided a clinical rationale for maintaining the patient at Assessment and Orientation status. As an individualized behavioral plan was clearly indicated for this patient, the treatment team referred him to the PBST. The behavioral plan indicated that the patient had stopped participating in assessment around the time

of his admission.  The purpose of the plan was to create guidelines that would motivate the patient to be more active in treatment.  There were goals of medication adherence and attending 75 percent of showers.  These goals were too difficult for the patient to be successful and involved too many different behaviors for him.  A functional analysis that would have added data that could be used for goals and treatment targets was not done.  Completing a use functional analysis would have required observation in light of the patient's lack of cooperation.

As a result of inappropriate behavioral goals, the behavioral interventions were also problematic.  Salient reinforcers were not identified for use in the behavioral plan.  Finally, while the treatment team occasionally mentioned obtaining an involuntary medication order (PC 2602), there was a lack of documentation why this action was not pursued.  The patient's cell was dirty and unkempt; he had not showered or changed his clothes.  He also was not engaged in treatment and refused medications.  It was unclear if the patient was eating although he accepted a food tray.  The psychiatrist prescribed sertraline and ziprasidone, in the hope that the patient would accept the medications.

<u>Findings</u>

Although the patient was appropriately referred to the PBST and was appropriately maintained on Assessment and Orientation status, he remained on Assessment and Orientation status for a prolonged period of time and was not engaged in treatment.  The behavioral plan was inadequate and was unlikely to result in behavioral change.  No functional analysis was completed, leaving the plan without identified antecedents and salient reinforcers.  Consequently, appropriate interventions were not identified.  Rather than focusing on one behavior and allowing staff and the patient to experience success, multiple goals were selected and unrealistic goals were established.  This patient would better benefit from the use of successive approximation for treatment engagement.  This patient also should have been referred for a PC 2602 evaluation, as he appeared to meet multiple criteria.

**Patient L**

This case was reviewed as the expert observed the patient's intermediate care IDTT during the site visit.  The patient was initially housed in the CMF L1-PIP, but was transferred to the HCITC due to negative behavior.  It appeared that he was admitted to CMF for intermediate care during early August 2017 based on a note documenting a ten-day treatment team on August 18, 2017.  He was referred for inpatient care due to self-injurious behavior.  The patient reported that those thoughts were precipitated by placement in administrative segregation.

The August 18, 2017 master treatment plan was not properly completed.  As an example, the treatment team discussed the possibility of a diagnosis of Antisocial Personality Disorder.  This discussion occurred in the treatment plan section under protective factors; a diagnosis of Antisocial Personality Disorder would clearly not be a protective factor to reduce disciplinary infractions and segregation placement.  No IPOC was created but multiple goals were listed in the master treatment plan.  Those goals included not engaging in self-harming behaviors for 30

days, increasing treatment groups and learning one productive coping skill. The treatment goals were not sufficiently specified in behavioral terms, but were generally focused on the patient's primary problem areas. The patient's LRH was addressed; his LRH was multi-person cell, until he became maximum custody and was transferred to the HCITC. The treatment plan indicated that the patient would be seen weekly by his primary clinician; it appeared that those contacts occurred, but content was cut and pasted from prior notes and did not indicate what treatment interventions were utilized during treatment sessions. The weekly psychologist progress notes required improvement, as they consisted merely of a summary of historic information and other team member's documentation.

The patient was provided with a diagnosis of Bipolar I Disorder, most recent episode manic, with psychotic features; he had been prescribed Depakote, but it was discontinued due to weight gain. He received his psychotropic medications by a PC 2602 order. He was prescribed venlafaxine, Geodon, and mirtazapine. The patient continued to report frequent thoughts of harming himself. He also reported incidents of cutting himself.

Findings

Based on a review of the healthcare record, this patient received only medication management and did not receive indicated therapies. He did not receive adequate treatment.

This patient appeared to have feelings of hopelessness combined with depressive and psychotic symptoms that manifested in suicidal ideation and self-injurious behaviors. The treatment team recognized the treatment needs of the patient and provided him with weekly primary clinician contact; however, documentation of actual treatment during those sessions was lacking. This patient required appropriate treatment, as his behavior resulted in increased custody status and more restrictive housing which he reported exacerbated his suicidal thoughts and self-harming behaviors. While the IPOC was reportedly completed, it was not located and specific treatment interventions were also not documented. The treatment goals were generally acceptable, but required more behavioral specificity. In addition, the patient's impulsivity, which was negatively affected by his youth, brain development, and long sentence, should have been included as a treatment target.

CMF L1-PIP
November 28, 2017 – November 30, 2017

**Patient A**

This patient was housed in the CMF L1-PIP in a multi-person cell. The most recent treatment plan dated November 21, 2017 indicated that the patient's LRH was locked dorm. His healthcare record was reviewed to evaluate the mental health care provided and whether there was clinical justification for not placing him at his LRH.

The patient was provided with diagnoses of Bipolar I Disorder, PTSD and Amphetamine Abuse. He was prescribed Buspar, hydroxyzine, Prozac, Zyprexa, Lithium, and Trazodone.

The inmate was referred for inpatient treatment after a failed suicide attempt at Deuel Vocational Institution in June 2017, when he tied a noose around his neck. There was also indication that he was experiencing paranoid ideation and auditory hallucinations at that time. He was admitted to the CMF L1-PIP on July 10, 2017. He had a significant history of numerous suicide attempts. A SRASHE on July 7, 2017 assessed the patient with high chronic and moderate acute risk for suicide.

Progress notes indicated that the patient adjusted to the unit and he was an active participant in individual and group therapy. He did have some extensive dental issues that affected his participation at times. He was also followed consistently by the psychiatrist, who adjusted his medications as was clinically indicated.

Regarding LRH placement, documentation during early August 2017 (August 9 and 11, 2017) initially noted the patient's suicidal ideation and paranoia that prevented transfer to his LRH. At a subsequent evaluation on August 30, 2017, it noted that there were no clinical contraindications for the patient to receive treatment at his LRH; however, it was reported that he was programming well in the CMF L1-PIP and that he did not want to transfer to another program. There was no subsequent documentation noted regarding discussion of LRH preparation or transfer.

The most recent progress notes indicated that the patient was stable on medications and had progressed to Step 3.

Findings

This patient appeared to be receiving mental health services at the appropriate level of care and the care provided appeared to be clinically appropriate. The patient appeared to be stabilizing according to recent documentation.

There was poor documentation regarding the reasons why the patient was not transferred to his LRH and there was no documentation that his treatment team was working with him to encourage and support transfer to his LRH.

**Patient B**

This patient was housed in the CMF L1-PIP in a multi-person cell.  The patient's LRH was locked dorm.  His healthcare record was reviewed to evaluate the mental health care provided and whether there was clinical justification for not placing him at his LRH.

The patient was admitted to CMF-VPP on March 7, 2016 from CMC due to depression, auditory hallucinations and suicidal ideation.  He was admitted to the CMF L1-PIP on August 2, 2017, due to command auditory hallucinations with suicidal ideation and depression.  He had a long history of suicide attempts; some of these attempts were nearly lethal.  He was provided with diagnoses of Schizophrenia, paranoid type, Major Depressive Disorder, single episode and Other Substance Use Disorder.  He was prescribed Clozaril and Remeron.

A CDCR Patient Housing Decision Form dated August 11, 2017 noted that the IDTT did not recommend placement at his LRH due to suicidal ideation and paranoia.  A SRASHE completed on September 5, 2017 assessed the patient with moderate chronic and high acute risk of suicide.

Although the patient remained with command auditory hallucinations and paranoia, progress notes indicated that he had increasing participation in treatment activities.  He also actively participated in individual weekly therapy with his psychologist or the social worker.  Clozaril was adjusted to address continued psychotic symptoms.  The most recent progress notes indicated that the patient remained with significant auditory hallucinations and his medications were adjusted accordingly.

A review of the treatment plan dated October 11, 2017 noted improving treatment participation, but continued command auditory hallucinations.  Treatment goals were clinically appropriate.  The IDTT recommended multi-person cell (his LRH was locked dorm), as the patient was described as unable to negotiate the complexities of a less restrictive housing environment due to functional capacity.

Findings

The mental health care provided to this patient appeared to be appropriate.  Treatment planning was focused on addressing the patient's continued psychosis and functional capacity.  He was not placed at his LRH, but there was documentation that noted treatment attempts to increase socialization, decrease paranoia and decrease auditory hallucinations in an attempt for improved stabilization.  His placement out of his LRH was clinically appropriate.

**Patient C**

This patient was housed in the CMF L1-PIP in a multi-person cell.  The patient's LRH was locked dorm.  His healthcare record was reviewed to evaluate the mental health care provided and whether there was clinical justification for not placing him at his LRH.

This patient was provided with diagnoses of Major Depressive Disorder, recurrent, PTSD, Other Substance Use Disorder and Antisocial Personality Disorder. He also had significant medical concerns, including end-stage liver disease and chronic kidney disease. He was prescribed Remeron, Prazosin, Risperdal, sertraline and Vistaril.

The patient had a history of mental health treatment in CDCR at the 3CMS level of care. He was referred to the MHCB, and subsequently to DSH for acute care, after he presented with suicidal ideation, hopelessness due to medical concerns and depression. He also made threats to harm others and expressed fears of enemy concerns. He was discharged from acute care on March 20, 2017 and reportedly cut himself in the transportation van. He was subsequently referred again to DSH for acute care. After treatment there, he was referred to CMF-PIP for intermediate care and was later transferred to the CMF L1-PIP on August 28, 2017.

The patient was a gang dropout and this was believed to be the main trigger for his feelings of suicide.

An initial treatment plan dated August 28, 2017 noted the patient's history and indicated that although the CC I provided information that the LRH was locked dorm, the patient had historically demonstrated significant difficulty with celling with another individual. He experienced paranoia in large groups; his paranoia and impulsivity made him inappropriate for a locked dorm setting at that time.

A treatment plan dated September 25, 2017 noted that the IDTT recommendation was for multi-person cell, despite his LRH of locked dorm. It noted that the patient was unable to negotiate the complexities of a less restrictive housing environment due to functional capacity. The treatment team reported that the patient continued to exhibit symptoms of increased arousal, exaggerated startle response, anxiety and fleeting thoughts of homicidal ideation that would prevent housing in a dorm setting at that time. This issue was established as a goal for treatment.

The most recent progress notes indicated that the patient participated in group and individual therapy, but he experienced some complications of his medical condition and reported insomnia, which was addressed by the psychiatrist.

Findings

This patient received appropriate mental health care. Treatment planning addressed his current symptoms and the plan was amended to help to address issues preventing transfer to his LRH. There was also documentation regarding the reasons that the patient was not placed at his LRH.

**Patient D**

This patient was housed in the CMF L1-PIP in a multi-person cell, which was the patient's LRH. His healthcare record was reviewed to evaluate the mental health care provided. He was

provided with a diagnosis of Major Depressive Disorder, recurrent. He was prescribed Latuda, Remeron and Trileptal.

The patient was initially admitted to DSH-Stockton due to suicidal ideation without plan and increased depression and anxiety due to situational stressors. He was subsequently transferred to the CMF HCITC on June 28, 2017 for continued treatment.

He was transferred to the CMF L1-PIP on September 21, 2017 for further stabilization. The patient had a history of prior DSH hospitalizations at the acute and intermediate levels of care.

Progress notes indicated that the patient attended greater than 90 percent of his groups. A treatment plan dated October 16, 2017 noted that the patient was at his LRH (multi-person cell) and that he was unable to negotiate the complexities of a less restrictive housing environment due to functional capacity. His step was decreased to Step 2 due to behavior that led to the issuance of a CDCR Form-115 for spitting on staff.

The most recent psychiatric progress note on October 27, 2017 indicated that the patient remained with depression, but he was described as stable. Trileptal was increased at that time to address the patient's mood instability.

Findings

This patient was housed at his LRH. It appeared that the mental health care provided was clinically appropriate.

**Patient E**

This patient was housed in the CMF L1-PIP in a multi-person cell. The patient's LRH was locked dorm. His healthcare record was reviewed to evaluate the mental health care provided, and whether there was clinical justification for not placing him at his LRH.

He was initially admitted to the MHCB at NKSP during August 2016 due to grave disability with disorganized behavior and confusion, including removing his clothing, eating his feces and standing in urine. While in the MHCB, he exhibited catatonic-type symptoms. He was transferred to CMF-VPP for acute care on September 1, 2016 and was discharged to CMF L1-PIP for intermediate care on July 20, 2017.

The patient was provided with the following diagnoses: Schizophrenia, continuous with catatonia, Unspecified Neurocognitive Disorder and Stimulant Use Disorder, amphetamine-type substance. He also had a history of polydipsia during December 2016 with aspiration pneumonia and seizure. He was prescribed Clozaril, lamotrigine and Zoloft.

Progress notes indicated that the patient did not have repeated episodes of eating or smearing his feces since admission to the CMF L1-PIP. He attended meals in the dining area, occasionally

watched television in the dayroom and attended a few groups. He remained with poor activities of daily living and at times he smelled of feces. The staff noted the possibility of victimization for this patient.

The most recent treatment plan dated October 17, 2017 noted that the patient was attending yard and some of his groups; he had attended approximately half of his groups the month prior. He was advanced to Step 3 at that time. He remained with symptoms of catatonia with slowed movements and latency of response and speech. The IDTT indicated that he required more time at his current treatment setting for stabilization of psychotropic medications before consideration of transfer to his LRH, particularly in light of his history of coprophagia and poor hygiene. He was generally adherent with prescribed medications, but only with significant encouragement. His Clozaril dosage and administration was adjusted to maximize treatment adherence.

Findings

The care provided to this severely ill patient appeared to be appropriate. His medications were adjusted as was clinically appropriate and treatment planning was addressed at decreasing his positive and negative psychotic symptoms. Although he was not placed at his LRH, there was clinical rationale provided for his current placement and attempts were made for psychiatric stabilization.

**Patient F**

This patient was housed in the CMF L1-PIP in a multi-person cell. The patient's LRH was locked dorm. His healthcare record was reviewed to evaluate the mental health care provided and whether there was clinical justification for not placing him at his LRH.

The patient had a long history of mental health treatment and multiple DSH placements. He also had a history of involuntary medication treatment due to danger to self. He was admitted to the MHCB at CMF on April 17, 2017, after a significant suicide attempt by cutting, which was reportedly precipitated by a movie depicting suicide and his aunt's declining health. He was referred to the CMF L1-PIP due to continued passive suicidal ideation, depression, anhedonia and hopelessness.

The patient was provided with diagnoses of Major Depressive Disorder and PTSD. He was prescribed Prozac and olanzapine.

The most recent treatment plan dated October 16, 2017 noted that the patient continued to experience depression, hopelessness and ongoing suicidal ideation. He attended some groups, but not all, and did not attend yard. It also noted that the IDTT recommendation was for multi-person cell, as the patient was unable to negotiate the complexities of a less restrictive housing environment due to functional capacity. The plan further stated that the patient had difficulty being out around others. Leaving his cell was a challenge due to prison trauma; for these reasons, he was deemed not appropriate for a dorm setting.

The most recent psychiatric progress note dated October 31, 2017 indicated that the patient had improvement in his depressed affect and no recent suicidal ideation, with improved sleep, appetite, energy and motivation.

<u>Findings</u>

The care provided to this patient appeared to be appropriate.  There was also documentation regarding the clinical reasons for not placing him at his LRH.

CHCF-PIP
November 7, 2017 – November 9, 2018

**Patient A**

This patient was previously housed in the CHCF-PIP intermediate care program during September 2017. Reportedly despite his LRH of locked dorms and his initial HCPOP endorsement to CMF-VPP, he spent his entire lengthy intermediate care stay at CHCF. His healthcare record was reviewed at the request of plaintiffs' attorneys to determine whether he was regularly and appropriately reviewed by his IDTT to determine whether he was clinically appropriate for transfer to a less restrictive setting during his stay.

The patient was provided with a diagnosis of Bipolar Disorder, unspecified. He was prescribed mirtazapine, gabapentin, Haldol, and hydroxyzine. It appeared that the patient was housed at CHCF from December 2016 to September 8, 2017. He was originally admitted to CHCF from the CMF MHCB due to suicidal ideation with plan.

The Acute/Intermediate Care Facility (ICF) Master Treatment Plan dated July 25, 2017 indicated that the patient's LRH was for locked dorms. It indicated that the patient would be transferred to DSH once he met the criteria of decrease in anxiety, which reportedly had increased in the past several days due in part to a peer being placed on solo programming. A decrease in suicidal ideation was also noted; however, other notes indicated that there was no recent suicidal ideation. A subsequent Acute/ICF Master Treatment Plan dated August 22, 2017, which was written by the same social worker, included identical information as the previous plan including the reason for non-placement at LRH. The plan indicated that discharge paperwork was completed and that the patient was awaiting transportation. There was no documentation in the treatment plan that the issues that prevented transfer to LRH had been addressed.

A psychiatry note on July 28, 2017 indicated that the patient was receiving long term care in intermediate care. The note indicated that he was being referred for dormitory placement.

A psychology progress note dated August 17, 2017 indicated that the patient would be discharged to EOP.

A subsequent treatment plan dated September 18, 2017 indicated that the patient was housed at CMF where it appeared that he was admitted to the MHCB after presenting with suicidal ideation upon arrival to CMF.

Findings

Overall, it appeared that this patient received minimally adequate mental health care; however, there was a lack of documentation regarding the reason for the patient's long intermediate care hospitalization and lack of movement to his LRH. Although it appeared that the treatment team worked to address the identified symptoms of anxiety and suicidal ideation, treatment planning documentation did not adequately provide rationale regarding whether or not these symptoms were addressed, and how these symptoms prevented transfer to his LRH.

**Patient B**

This patient was previously housed in the CHCF-PIP intermediate care program. Reportedly despite his LRH of locked dorms and his initial HCPOP endorsement to CMF-VPP, he spent his entire lengthy intermediate care stay at CHCF. His healthcare record was reviewed at the request of the plaintiffs' attorneys to determine whether he was regularly and appropriately reviewed by his IDTT to determine whether he was clinically appropriate for transfer to a less restrictive setting during his stay.

An Acute/ICF Master Treatment Plan dated August 8, 2017 noted that the patient transferred to CHCF intermediate care from CHCF on February 11, 2017 due to inability to function in an EOP setting; this was due to anxiety, depression, paranoia and auditory hallucinations. He was provided with a diagnosis of Schizoaffective Disorder, bipolar type. The patient had a history of multiple MHCB admissions as well as DSH hospitalizations for mental incompetence, danger to self, psychosis (auditory hallucinations) and severe depression. The Mental Health Inpatient Housing Review noted that the IDTT recommendation was that the patient was not appropriate for less restrictive housing as he was "unable to negotiate the complexities of a less restrictive housing environment due to functional capacity." The plan then noted that the patient was approaching discharge to the EOP, which was a less restrictive housing environment than locked dorms.

During his hospital course, medication management included treatment with olanzapine, Zoloft, Buspar and fluoxetine. Although his suicidal symptoms appeared to resolve, he continued to report anxiety and exhibited depressive symptoms. His medications were adjusted as clinically indicated.

A subsequent Acute/ICF Master Treatment Plan dated September 7, 2017 noted that the LRH for the patient was unlocked dorms. The patient indicated a preference for continued treatment at the intermediate care level of care, and he reported ongoing anxiety and intermittent suicidal ideation. He was reportedly adherent with his prescribed psychotropic medications. The plan indicated that, despite the patient's subjective complaints, the clinical team noted that he had no objective observations of anxiety or self-injurious or aggressive behavior according to the unit staff. The clinical team indicated plans for discharge back to EOP as he did not meet criteria for inpatient psychiatric care.

Findings

This patient appeared to receive appropriate mental health care. He initially presented with symptoms of anxiety and suicidality which were improved with treatment. Although the decision to discharge to EOP appeared to be appropriate, there was poor treatment planning documentation regarding efforts to prepare and to transfer the patient to his LRH. The decision to not discharge to the LRH prior to EOP placement was not well-documented.

**Patient C**

This patient was previously housed in the CHCF-PIP intermediate care program. Reportedly despite his LRH of locked dorms and his initial HCPOP endorsement to CMF-VPP, he spent his entire intermediate care stay at CHCF. His healthcare record was reviewed at the request of the plaintiffs' attorneys to determine whether he was regularly and appropriately reviewed by his IDTT to determine whether he was clinically appropriate for transfer to a less restrictive setting during his stay.

The patient was referred to the CHCF-PIP for intermediate care on February 10, 2017 from SATF due to depression with auditory hallucinations, poor socialization, and inability to function in the EOP. He had a history of multiple MHCB admissions (four in the preceding six months). He also had an extensive history of substance use and suicidal ideation associated with this use.

He was provided with a diagnosis of Major Depressive Disorder, recurrent, severe with psychosis. He was prescribed Vistaril, Remeron and Effexor.

An Acute/ICF Master Treatment Plan dated August 22, 2017 was reviewed. A mini-IDTT was convened to discuss discharge to LRH. The Transfer/Discharge Planning section of the treatment plan noted that the patient would be "discharged to LRH-locked dorms".

A suicide risk assessment completed on August 24, 2017 assessed the patient with moderate chronic and low acute risk for suicide.

The most recent CHCF Acute/ICF Master Treatment Plan was dated September 7, 2017. The patient was provided with a diagnosis of Major Depression, recurrent, severe with psychosis. He had been prescribed Thorazine as needed, venlafaxine, mirtazapine, and hydroxyzine. He had discontinued his medications as he reported that they made his auditory hallucinations worse. At the time of the plan, he was not prescribed antipsychotic medications (at his request); however, he was agreeable to a trial of Thorazine as needed for his symptoms of suspiciousness and paranoia, which were described as baseline. His symptoms were described as stabilized, and he denied hopelessness and suicidal ideation at that time. The staff noted that the patient would require frequent monitoring and assessment due to his history of symptoms. The Mental Health Inpatient Housing Review indicated that the IDTT recommendation was for locked dorms, and that command hallucinations/internal stimuli were present that severely impacted functioning and resulted in behaviors that were violent and/or disruptive. It noted that the patient continued to respond to command hallucinations that caused him to yell and punch things that others did not see or hear, and these symptoms had been disruptive on the unit.

Psychiatric progress notes during August and September 2017 noted that the patient refused treatment with antipsychotic medication. It was also noted that he did not meet involuntary medication criteria. He exhibited excessive exercising and reported suspiciousness and paranoia. On September 7, 2017, he was assessed as functioning at baseline, and it was decided to discharge him. He was discharged to SATF.

<u>Findings</u>

It appeared that this patient received appropriate mental health care. He refused treatment with antipsychotic medications, which may have assisted in addressing his continued psychotic symptoms. Documentation indicated that plans were initially underway for discharge to LRH; however, ultimately it was decided to discharge to the EOP as the patient was described as functioning at his baseline.

**Patient D**

This patient was receiving treatment at the CHCF-PIP for intermediate care on the B6A unit. He was prescribed Depakote, Zyprexa and Vistaril. The diagnoses included in the most recent treatment plan were variable. Specifically, in the Problem section, formal diagnoses of Bipolar I Disorder and Adult Antisocial Disorder were documented. However, in the Diagnosis section, "acute anxiety" and "psychosis" were listed, which were symptoms rather than formal diagnoses. The patient's IDTT was observed during the monitoring visit; at that time, he presented with actively manic symptoms. His treatment plan was reviewed to assess documentation of treatment planning and the mental health care provided.

Treatment team discussion regarding whether the team was considering discharge or a transfer to DSH-Atascadero was ambiguous. During the IDTT, staff asked the patient if he was ready to "move to the next level of care," to which he responded "yes." Later during the IDTT, the patient was asked if he wanted to go to DSH-Atascadero. Aside from these queries, there was no further discussion with the patient about whether he would be discharged to CDCR or transferred to DSH-Atascadero. Review of IDTT documentation indicated that the patient was recommended for a transfer to locked dorms, which was his LRH. There was, however, no discussion documented that the patient was prepared for this transition, and transfer to a locked dorm facility was not discussed in the IDTT; DSH-Atascadero was an unlocked dorm hospital, which was lower than his LRH.

A discrepancy in the treatment plan was also noted during the healthcare record review. In a section indicated as "Risk Factors/Behavioral Alerts", there was documentation that the patient had not had a suicide attempt. However, in a section that referenced previous documentation, there was a report that the patient overdosed on 217 Tegretol 25 years prior.

Consistent with IDTT observations, documentation in the treatment plan did not provide a clear overview of changes in symptoms or functioning since the previous IDTT. There were missed opportunities to provide a comprehensive review of the patient's current mental status, such as documenting the patient's statements during IDTT.

Findings

Based on IDTT observation and the treatment plan review, this patient's care was inadequate. The IDTT did not specify the patient's diagnosis and treatment goals. Additionally, there was a lack of preparation for potential transfer to a higher level of care.

The documented outcome for this patient was a transfer to his LRH which was locked dorms; this was a positive outcome, but the process was poorly implemented. The discussion with the patient during the IDTT did not reference locked dorms as a possibility, but instead referenced transition to a lower level of care (i.e. EOP or 3CMS) or transfer to DSH-Atascadero, which was lower than his LRH. It was unclear why DSH-Atascadero was raised as a possible option as it was not his LRH. The patient did not present as clinically appropriate for an unlocked dorm. More importantly, the impending transfer to his LRH was not discussed with the patient. This lack of preparation could be destabilizing for any patient. Further, the diagnoses in the treatment plan needed clarification with documentation of supporting symptoms.

The inconsistency of documented suicide attempts was also an area of concern.

CIW-PIP
November 1, 2017 – November 2, 2017

**Patient A**

This healthcare record was reviewed to evaluate the care provided in the CIW-PIP in the intermediate care program during the review period. On June 28, 2016, this patient was admitted to an MHCB due to "danger to self". She was provided with a diagnosis of Schizophrenia, chronic paranoid type. She had an acute exacerbation of her symptoms at the time of admission. She was provided with additional diagnoses of Alcohol Dependence in a controlled environment, Amphetamine Dependence in a controlled environment, Marijuana Dependence and Schizoaffective Disorder, bipolar type.

A May 22, 2017 psychiatric note indicated that this patient was in the CIW-PIP intermediate care program. This was her third CIW-PIP hospitalization; she was admitted on September 22, 2016. She also had a history of treatment at Patton State Hospital. A history of batteries on other prisoners and staff was also noted. She was prescribed Clozaril. She reported attending her groups with no difficulties. Her psychiatric symptoms decreased after treatment with Clozaril.

A July 14, 2017 psych tech note indicated that this patient remained on modified STEP 3 status.

A July 18, 2017 primary clinician note reported that this patient was at STEP 2 with one group therapy per day. At that time, she was removed from DPS due to decreased aggressive thoughts toward other patients; however, her delusional thinking continued. The plan appeared to have included resuming DPS due to recent assaultive thinking. She was to be assessed biweekly for changes in her level of depression.

The psychiatrist noted on July 26, 2017 that this patient's primary symptom was the presence of auditory hallucinations. Her Clozaril was increased due to her refractory psychotic symptoms. Other medications included Invega Sustenna intramuscular injections for psychosis, Celexa for mood symptoms and Cogentin for extrapyramidal symptoms.

Progress notes indicated that this patient was continually encouraged by staff to participate with her plan of care, which included group therapies.

The psychiatrist documented on August 4, 2017 that the patient's clinical presentation was essentially unchanged. On September 13, 2017, Clozaril was again increased due to refractory psychosis, including increased paranoid thinking.

A September 21, 2017 progress note by the psychiatrist indicated that a special IDTT was conducted that day. A decrease in the patient's auditory hallucinations was noted and she reported having more energy since taking Clozaril. She also appeared to have more insight regarding the nature of her illness. She reportedly was unable to program with several patients due to prior assaultive behaviors with them. She had attended approximately 43 percent of her groups. Due to this low attendance rate, she was decreased to STEP 2 and her incentive program was restructured.

On September 27, 2017, the psychiatrist indicated that the patient's clinical condition was essentially unchanged. She was continued on her medications and she remained at STEP 2.

Her primary clinician performed a 90-day SRASHE update on September 29, 2017. She remained at STEP 2 with one group per day. She also continued treatment with Clozaril, which had been prescribed since March 7, 2017; this medication had improved her stability. She denied homicidal thinking at that time. Prior to the current admission, the patient was housed in the EOP administrative segregation unit at CCWF after assaulting custody staff and other patients in the EOP. This patient's chronic suicide risk was assessed to be moderate and her acute risk was determined to be low. The treatment plan included medication management and cognitive behavioral techniques to change her negative thoughts to positive ones.

Findings

This patient was receiving appropriate care at the CIW-PIP and the intermediate care program was the appropriate level of care. She was seen timely by both her psychiatrist and primary clinician. Her long length of stay was due to her refractory psychosis and recurrent assaultive behaviors. Her treatment plan appropriately targeted the symptoms that led to her current admission.

**Patient B**

This healthcare record was reviewed to evaluate the care provided in the CIW-PIP in the intermediate care program during the review period. This patient was transferred to CDCR for her current incarceration on March 1, 2017. She was initially admitted to the CCWF MHCB on May 11, 2017, after she presented with bizarre behavior. She was provided with a diagnosis of Schizophrenia, paranoid type, with a plan for referral to a higher level of care.

The patient had a history of a hospitalization at the Metropolitan State Hospital during 2009 after she was found to be incompetent to stand trial. She was admitted to the CIW-PIP from the CCWF MHCB on July 20, 2017, after being determined to be gravely disabled. She was referred to the CIW-PIP for a comprehensive treatment program with an emphasis on medication evaluation and management of her command auditory hallucinations and paranoia, as well as development of coping life skills.

The admitting diagnoses were chronic hepatitis C, history of syphilis, and Schizophrenia, paranoid type. Her prescribed medications included Abilify and benztropine.

Her history and physical examination was completed on July 24, 2017.

An IDTT was conducted on August 31, 2017, as a follow-up to her August 17, 2017 IDTT to reassess her DPS status. She had not attended any DPS groups and staff reported continued bizarre behaviors. She was seen at cell front when she indicated that she did not want to be removed from DPS. She was again encouraged to attend DPS groups. The plan was to continue her on DPS status until the next 30-day IDTT. Abilify Maintena 400 mg intramuscular injection every month was continued.

This patient fully participated in a group therapy session on September 7, 2017.

The psychiatrist on September 8, 2017 indicated that this patient continued to demonstrate psychotic symptoms with grandiose delusions and periods of selected mutism; however, her symptoms were improving. Her medications were continued unchanged at that time.

This patient was described at her September 12, 2017 IDTT as communicating by hand gestures, head nodding and writing things down on a piece of paper. She was able to follow commands and denied any current medical concerns.

The psychiatrist on September 13, 2017 reported that this patient was observed to have continued psychotic symptoms during the most recent IDTT. Her prior DPS status was described as essentially being self-imposed. It was discontinued on September 11, 2017 when she was placed on STEP 1 and in clinical groups. She continued to deny having any type of psychiatric disorder. Her diagnosis remained unchanged.

A September 19, 2017 progress note by the psychiatrist indicated that the patient was essentially denying that she was experiencing any psychiatric symptoms. Subsequently, little change was noted by the psychiatrist at the follow-up appointment on September 26, 2017. The social worker documented on September 29, 2017 that the patient wanted to move to STEP 2, which would be discussed at the IDTT that was scheduled to occur in one week.

She was seen on an intermittent basis by clinical social workers.

Findings

This patient was receiving appropriate mental health care. She was seen timely by her psychiatrist. It appeared that individual therapy sessions were provided by clinical social workers. The treatment plan was appropriate to her mental health needs.

**Patient C**

This healthcare record was reviewed to evaluate the care provided in the CIW-PIP in the intermediate care program during the review period. This patient was admitted to the CIW-PIP for intermediate care during February 2014. Her initial diagnosis was Schizoaffective Disorder.

A June 22, 2017 note by the psychiatrist indicated that this patient underwent a trial of Clozaril from May 1, 2017 to June 21, 2017 with good results. However, the Clozaril was subsequently discontinued due to her nonadherence with this medication. A long history of medication nonadherence was noted.

The patient reportedly displayed multiple episodes of rage since her admission to the CIW-PIP and she was hostile toward staff on multiple occasions, in addition to involvement in physical altercations with other patients on the unit.

A July 27, 2017 progress note by the psychiatrist indicated that the patient continued to demonstrate psychotic symptoms. Her medications included Invega Sustenna.

An August 4, 2017 progress note summarized the most recent IDTT.  The patient reported feeling better since restarting her medications and she had not recently exhibited aggressive behavior.  An August 4, 2017 progress note by the psychiatrist indicated that her diagnosis and medications were unchanged.  Her 30-day IDTT documented that she attended at least 75 percent of her treatment groups, which facilitated her move to STEP 3.

An August 28, 2017 discharge summary documented that the patient was initially admitted to the CIW-PIP on February 20, 2014.  Her long stay in the CIW-PIP was due to her labile mood and unstable psychosis.  She also had a history of aggression toward staff and demonstrated poor impulse control.  At the time of discharge, she was continued on Invega Sustenna after failing multiple trials of other psychotropic medications; however, she continued to exhibit religious and grandiose delusional beliefs.

This patient was subsequently administratively discharged on August 24, 2017, because she had been out to court for 15 days.  As per CIW-PIP policy, she was to be readmitted upon her return from court.  She did not return to the CIW-PIP until late October 2017.

Findings

This patient was receiving mental health services at the appropriate level of care in the intermediate care program.  She was seen by the psychiatrist timely.  Progress notes by the primary clinician during the review period were not located in the healthcare record; this may have been due to the patient's long-standing psychosis and long-term hospitalization.  However, such an issue should have been addressed in the IDTT documentation.

The patient's hospital course during the monitoring period was interrupted by her out to court status.  It was clearly appropriate for her to be readmitted to the CIW-PIP upon her return from court.

**Patient D**

This healthcare record was reviewed to evaluate the care provided in the CIW-PIP in the acute care program during the monitoring period.  This patient was referred due to ongoing psychotic symptoms, response to internal psychotic stimuli, paranoia, agitation, selected mutism, intermittent adherence with oral psychotropic medication and emitting a foul body odor.  She had a history of threatening her cellmates and physically assaulting a peace officer.  She was placed on a PC 2602 order for involuntary medications due to danger to others and grave disability.  Although the roster indicated that the patient was admitted to the CIW-PIP for acute care, the admission note indicated that she was actually admitted for intermediate care.

Admitting diagnoses included Schizoaffective Disorder and "acute psychosis". She was receiving medications by PC 2602; those medications included fluphenazine decanoate, olanzapine as needed, Seroquel as needed, and Ativan as needed.

A 30-day IDTT was conducted on July 6, 2017.  On July 20, 2017, a psychologist performed a SRASHE as she remained on suicide precautions.  She apparently was placed on suicide

precautions on July 18, 2017 due to self-injurious behavior. She was again seen by this psychologist on July 24, 2017. Her history of present illness included the following:

> Inmate is a 28-year-old female with serving a 50 year to life sentence for murder first in discharge of a firearm causing great bodily injury death. She arrived in the CDCR on 3/29/2017 from San Diego County Jail… . She was on a LPS conservatorship due to grave disability from 10/11/16 to 10/11/17. Inmate was referred to PIP for not responding to treatment even after two referrals to MHCB… . While at MHCB, patient was refusing showers. Her cell was filthy, and she refused six consecutive meals.

On July 27, 2017, the psychiatrist prescribed an Invega Sustenna intramuscular injection; olanzapine was increased and Cogentin was continued. Her diagnoses remained unchanged.

An August 1, 2017 30-day IDTT was reviewed. This patient was noted to have zero-percent group and dining attendance. Auditory hallucinations continued, which were aggressive in content. The patient indicated that she did not want to be around people and she did not think that the medications were helping her. Her medications were adjusted as previously summarized.

A weekly psych tech progress note was written on August 8, 2017. It indicated that the patient was consuming all of her meals, but she was not coming to the dining hall for meals. She attended yard and groups intermittently.

A primary clinician note on August 14, 2017 was reviewed. Improvement from admission was noted; however, the patient remained symptomatic. Her treatment plan was summarized.

The primary clinician performed the Columbia Suicide Severity Rating Scale specific to this patient on August 17, 2017. She was assessed with chronic moderate and acute risk for suicide.

The psychiatrist again assessed this patient on August 17, 2017 for medication management. Her Invega Sustenna was again increased.

A social worker met with the patient on August 23, 2017. She was again encouraged to attend treatment groups to help deal with her depression. This session was precipitated by the patient's request for an individual session with the social worker.

A 30-day IDTT occurred on August 29, 2017.

The primary clinician attempted to conduct an individual session with the patient on August 31, 2017, but the patient declined to meet with her. The patient continued to experience auditory hallucinations.

A weekly psych tech note on September 5, 2017 indicated that for the past three weeks, the patient was compliant with showers and was eating all of her meals.

The psychiatrist again met with the patient on September 11, 2017. Clinical improvement was noted; however, she remained psychotic. A 60-day SRASHE update was performed on September 15, 2017 and her chronic and acute suicide risk levels remained moderate. The psychiatrist decreased Invega Sustenna on September 15, 2017 due to side effects. The patient was reassessed by the psychiatrist again on September 19, 2017 for medication management purposes.

Findings

This patient was receiving mental health services at the appropriate level of care in the intermediate care program.

**Patient E**

This healthcare record was reviewed to evaluate the care provided in the CIW-PIP in the acute care program during the monitoring period. The patient was admitted to the CIW-PIP for acute care on DPS status on September 20, 2017 from the CCWF MHCB. She had been recovering from treatment at an outside hospital after swallowing tweezers and nail clippers during the evening of July 21, 2017; she denied that this incident was a suicide attempt. She continued to report her primary problems as depression and interpersonal issues. This was her fourth admission to the CIW-PIP. The admitting diagnoses and behaviors included systemic lupus erythematosus, Mood Disorder and self-injurious behaviors. Fluphenazine was prescribed.

The psychologist performed a SRASHE on September 20, 2017. This comprehensive suicide risk assessment determined the patient to be at high chronic risk and moderate acute risk for suicide. An appropriate safety treatment plan was formulated.

The psychiatrist again assessed this patient on September 22, 2017 for medication management. In addition to treatment with fluphenazine, she was also prescribed Buspar, Paxil and Trileptal. She was seen on the following day by another psychiatrist for follow-up.

Daily primary clinician contacts were documented by a social worker. The patient remained on suicide watch. Daily progress notes by a psychiatrist were also present. Therapeutic/intervention notes by various mental health clinicians were also present.

A comprehensive social work assessment report was completed on September 26, 2017, which provided a comprehensive summary of the patient's history. A special IDTT was conducted on September 25, 2017, which resulted in the patient's placement at the intermediate level of care. Medications were again readjusted. Her psychologist updated the initial mental health evaluation on September 29, 2017.

Findings

This patient was receiving appropriate treatment at the acute level of care during the early stages of her admission. Her change to the intermediate level of care was also appropriate.

**Patient F**

This healthcare record was reviewed to evaluate the care provided in the CIW-PIP in the acute care program during the monitoring period. The patient was transferred from CCWF to the CIW-PIP on August 25, 2017, following a suicide attempt by overdose. The patient had a history of command auditory hallucinations, assaultive behavior and substance abuse. Her psychotic symptoms reportedly improved after treatment with Zyprexa. The psychiatrist provided initial diagnoses that included Adjustment Disorder with mixed disturbance of emotions and conduct, Mood Disorder in conditions classified elsewhere and a seizure disorder. She was prescribed Zyprexa, sertraline and Vistaril.

A 72-hour IDTT was conducted on August 20, 2017. The documentation noted the patient's arrival to CCWF on May 27, 2017. She was serving a two-year sentence for corporal injury on a specific person resulting in a traumatic condition. Since her arrival to CCWF, she had received four RVRs of a violent nature, which appeared to all have been unprovoked. She was referred to the CIW-PIP due to the inability to function at the EOP level of care. Her presentation fluctuated in extremes; sometimes appearing stable, and at other times exhibiting symptoms of paranoia, impulsivity and aggressive acts towards others. She had also recently made a suicide attempt. Her attention to her activities of daily living was also inconsistent and required much prompting.

Documented treatment outcome expectations included emphasis on skills development to better manage mood and impulses to harm others and self. Specific treatment goals included elimination of impulsive repetitive thoughts of self-harm, harm to others and increased coping skills and insight into her mental illness.

A SRASHE was performed on August 28, 2017. The patient was assessed with moderate acute and chronic risk for suicide. An appropriate safety treatment plan was developed. On August 29, 2017, the patient remained on DPS status. An acute/ICF initial assessment was performed by a psychologist on August 31, 2017.

The psychiatrist again met with this patient on September 1, 2017. Her medications were reviewed, as was her treatment plan. Initial assessments by other clinicians were also documented in the healthcare record. Further medication review was performed by the psychiatrist on September 6, 2017.

A mini Master Treatment Plan was documented on September 7, 2017. The patient remained at STEP 1 of the program. Further follow-up by the psychiatrist occurred on September 11, 2017. She was again seen by a psychologist two days later. The psychologist indicated that the patient had been gradually adjusting to the program; however, she had broken the rules on several occasions. The psychiatrist documented on September 18, 2017 that Zyprexa would be increased due to continued psychotic symptoms.

A mental health RVR consultation was completed on September 20, 2017 related to a previous charge of assaulting a peace officer.

The patient was seen again by the psychiatrist on September 20, 2017 for medication

management.  Zyprexa was reduced due to lack of efficacy, with the plan to eventually discontinue this medication.  On September 25, 2017, Zyprexa was discontinued and Latuda was started; sertraline was also continued at that time.

A revised treatment plan was documented on September 25, 2017.  On September 28, 2017, the psychiatrist restarted Zyprexa.  A special IDTT was conducted on September 28, 2017.  This was precipitated by the patient throwing her radio and breaking it.  She was prescribed Haldol on an as needed basis for agitation.  Another SRASHE was completed on the following day.  Listed diagnoses included Schizophrenia, Substance Dependence and Personality Disorder NOS.

Findings

It was difficult to determine whether this patient was receiving acute or intermediate level of care; however, it appeared that she was receiving appropriate mental health treatment.  She was seen on a regular basis by the psychiatrist and periodically by a psychologist.  It was unclear whether she had been assigned a primary clinician.

**Patient G**

This patient was included in a listing of patients referred but not admitted to the CIW-PIP during the review period.  Her healthcare record was reviewed to evaluate the care provided and the appropriateness of non-admittance.

The patient was provided with a diagnosis of Bipolar 1 Disorder.  She was prescribed escitalopram, Zyprexa, oxcarbazepine and hydroxyzine as needed.  Zyprexa was discontinued on August 2, 2017 at the patient's request because she did not want to be included on the heat risk list during canteen.  The psychiatrist attempted to dissuade the patient but was unsuccessful.

The patient was referred to the CIW-PIP from the CIW EOP on July 7, 2017 due to multiple MHCB admissions over the previous six months, social isolation and cutting behaviors.  The Inpatient Referral Unit received the referral on July 11, 2017 and the referral was rejected without dispute on that date.

According to CIW-PIP staff, the patient was stable at the time of the referral and remained stable at the time of the monitoring visit.  The patient's goals prior to the referral were to reduce depressive moods, to increase socialization, to reduce anxiety and to understand at least two triggers causing cutting behaviors.  The cutting behaviors increased after the patient's daughter was involved in a recent car accident.

At an IDTT that occurred on October 27, 2017, the treatment team discussed the patient's improved socialization, group attendance and lack of MHCB admissions or cutting behaviors since June 2017.

This patient was not admitted to the CIW-PIP during the review period.

<u>Findings</u>

The care provided to this patient was adequate. She appeared to be receiving mental health services at the appropriate level of care and the referral rejection was appropriate at that time.

**Patient H**

This patient was included on a list of patients who received mental health treatment and had less than 90 days prior to parole. The patient was referred for inpatient care on August 9, 2017; she was admitted to the CIW-PIP on September 7, 2017 and she paroled on September 16, 2017.

The patient was provided with a diagnosis of Major Depressive Disorder, recurrent. She was prescribed Effexor, Lithium and Abilify; however, Abilify was discontinued on August 3, 2017 due to the patient's report of anxiety and agitation.

The patient was referred and admitted to the CIW-PIP after swallowing razors twice and paper clips on four separate occasions. The plan outlined in the healthcare record was for parole agents to accept the patient on the day of parole and to take her to a hospital for a California Welfare and Institutions Code (WIC) 5150 evaluation to determine if she needed continued psychiatric hospitalization. The patient was housed at her correct LRH.

The patient swallowed a paper clip on June 6, 2017 while housed at CCWF, experiencing a resulting esophageal tear. She underwent surgery and returned to the CCWF MHCB. On August 5, 2017, the patient informed staff that she had swallowed three paper clips; she was subsequently admitted to the MHCB and referred to the CIW-PIP on August 9, 2017.

Weekly treatment plan meetings were conducted on September 8, 2017 and September 14, 2017. The patient reported feelings of hopelessness and apathy and she was seen daily as she was monitored on suicide precautions.

As the patient's inpatient stay was brief, the September 14, 2017 goals of her treatment plan included maintenance of the patient's mood without delusions for an uneventful release to the probation officer, understanding the PIP rules, and understanding that she would parole on September 16, 2017 with a subsequent WIC 5150 evaluation.

The treatment team met with probation staff to discuss the patient's status and to ensure that the probation officer would immediately take the patient to a community hospital for a WIC 5150 evaluation on the day of release from prison.

<u>Findings</u>

The clinical care provided to this patient was adequate. The team collaborated with the probation officer to ensure understanding of the importance of having the patient evaluated immediately upon discharge.

**Patient I**

This patient's healthcare record was reviewed as she was included in a list of patients who were administratively discharged from the CIW-PIP. She was classified as DD2.

The patient was provided with a diagnosis of Schizoaffective Disorder. She was admitted to the CIW-PIP on March 3, 2017 from the MHCB due to "self-harm due to stress caused by interpersonal conflicts and boundary issues". She was prescribed olanzapine, haloperidol, hydroxyzine, divalproex, benztropine and fluoxetine. Her symptoms included labile mood, anxiety and impulsivity. She was housed at her appropriate LRH.

The patient had eight MHCB admissions in the six months prior to the March 3, 2017 CIW-PIP admission; she also had three prior CIW-PIP admissions. All MHCB admissions were due to suicidal ideation and self-injurious behavior by cutting and ingesting disinfectants.

The administrative discharge document noted the administrative discharge date as October 26, 2017 due to out to court status; conversely the EHRS listed the administrative discharge date as September 21, 2017. The discrepancy in the two dates was due to holding and releasing of the CIW-PIP bed. The bed was released on October 26, 2017 due to a long out to court stay.

The most recent treatment plan was dated September 6, 2017 and the latest SRASHE was performed on August 9, 2017. The treatment plan included the following goals: to reduce thoughts of self-harm, to reduce impulsivity and attention seeking behavior and to focus on her upcoming court dates. She was removed from DPS and advanced to STEP 1 but with some restrictions due to her threats and volatile behavior. The treatment plan did address the patient's developmental disability with instructions to the staff in assisting the patient in completing appeals, letter writing and prompting for social skills. The goals were measurable and prioritized the behaviors most stressful for the patient. The recent loss of the patient's foster care grandfather was also addressed in the treatment plan.

Findings

The mental health care provided to this patient appeared adequate. The patient's low functioning coupled with her mental illness and impulsivity made clinical treatment difficult, especially when the patient was out to court for long periods of time.

**Patient J**

This patient was included in a listing of patients referred but not admitted to the CIW-PIP during the review period. Her healthcare record was reviewed to evaluate the care provided and to determine the appropriateness of non-admittance.

The patient was provided with diagnoses of Bipolar II Disorder and PTSD. She was prescribed aripiprazole, divalproex, venlafaxine, prazosin and buspirone.

The patient was incarcerated due to lewd and lascivious acts with a child. She had a history of significant sexual abuse by her father and sister during her elementary school age years. At approximately age 16, she was provided with a diagnosis of Bipolar Disorder. During her incarceration, she was threatened and was constantly fearful due to her controlling offense.

The patient was referred by the CIW EOP treatment team to the CIW-PIP on July 17, 2017 due to continued cutting behaviors. The referral was received by the Inmate Referral Unit on July 21, 2017; however, the patient's LRH was appropriate for Patton State Hospital. The patient was seen in the Triage and Treatment Area on July 31, 2017 due to suicidal behavior of cutting her wrist. She was subsequently transferred to Patton State Hospital on August 1, 2017.

The patient was discharged from PSH to the CIW EOP on September 20, 2017. Five-day follow-up was conducted timely. The patient was receiving mental health services at the EOP level of care at the time of the monitoring visit during November 2017.

Findings

The care provided to this patient appeared to be appropriate. She was appropriately admitted to PSH and upon discharge was transferred to the CIW EOP. She appeared to be receiving mental health services at the appropriate level of care.

**Patient K**

The patient's healthcare record was reviewed to evaluate the mental health services provided in the CIW-PIP.

The patient was provided with a diagnosis of Schizoaffective Disorder. She was prescribed benztropine, perphenazine, buspirone and oxcarbazepine.

While in the county jail, the patient was evaluated and found to be incompetent to stand trial. She was subsequently transferred to Napa State Hospital on September 6, 2016; she returned to the county jail on April 27, 2017. The patient was received at the CCWF reception center from the county jail on June 14, 2017. She was placed into the EOP two days later.

The patient was placed into alternative housing on September 11, 2017 due to suicidal ideation; she had been admitted to the MHCB on six occasions since June 2017.

An IDTT was conducted on September 20, 2017 and the patient was admitted to the CIW-PIP for acute care on the following day. She was placed into the intermediate care program on October 4, 2017. She continued to receive services at the intermediate level of care at the time of the site visit.

The patient exhibited paranoia during the treatment team meeting and she was concerned that the questions asked by the team were an attempt to gather information to harm her or her family. She reported a long history of mental illness and improvement with medication management. Although the treatment team reported that the patient was medication adherent, she continued to

experience auditory and visual hallucinations. Her estimated parole date was December 7, 2017 or sooner due to time credits. The team also informed the patient that she would parole to Patton State Hospital as an MDO. The patient indicated that parole to PSH was acceptable to her.

The treatment goals focused on reducing self-harm, reducing delusions and targeting paranoia triggers.

<u>Findings</u>

The care provided to this patient appeared to be appropriate. She appeared to be receiving mental health services at the appropriate level of care at her LRH.

**Patient L**

This patient was included in a list of patients admitted to the CIW-PIP during the review period, but her level of care was changed at the time of admission. The patient was admitted to the CIW-PIP for intermediate level of care from CIW, but the original referral indicated the need for treatment at the acute level of care.

The patient was provided with diagnoses of Bipolar Disorder and Schizoaffective Disorder. She was prescribed haloperidol, risperidone and Invega. The patient had been housed in the CTC for treatment of Huntington's disease, and she was admitted to the MHCB on June 30, 2017 due to suicidal ideation related to her diagnosis. She was classified as DD2.

An IDTT was conducted on July 23, 2017. The patient was admitted to the CIW-PIP on August 22, 2017 and a PIP IDTT was conducted two days later. She was discharged from the CIW-PIP and transferred to the CIW CTC/SNF on October 18, 2017.

<u>Findings</u>

The care provided to this patient appeared to be appropriate. She appeared to be receiving mental health services at the appropriate level of care at her LRH.

APPENDIX B-8
SQ-PIP
January 30, 2018 – February 1, 2018

**Patient A**

This patient was included on the high refusers list. His healthcare record was reviewed to evaluate the care provided in the SQ-PIP.

This condemned patient was readmitted to the SQ-PIP for intermediate care on September 22, 2015. This hospitalization followed a hyponatremic event which led to a diagnosis of chronic adrenal insufficiency, with medical inpatient hospitalization at Marin General Hospital. The patient had received a trial of Haldol and administration of Ativan after an episode of catatonia. He was provided with diagnoses of Schizophrenia, catatonic type and Antisocial Personality Disorder.

The patient had multiple inpatient psychiatric hospitalizations, including state hospital and MHCBs. He had a history of receiving psychotropic medication involuntarily by *Keyhea* order from 2005 to 2006 and was on a PC 2602 order for involuntary medications since 2011 due to grave disability. This patient had multiple antipsychotic medication trials.

The patient's medical history was significant for adrenal insufficiency, atypical chest pain, right ankle pain, blindness of the left eye, hypothyroidism, pituitary adenoma, testosterone deficiency, and type 2 diabetes mellitus. The patient was prescribed a variety of medications for these conditions and was also prescribed Lamictal and Zyprexa.

A July 6, 2017 psychiatric progress note indicated that the patient was not taking his prescribed Zyprexa and wanted it discontinued. The patient remained with prominent and significant paranoia and persecutory delusions and the note indicated that he was receiving mental health services at the appropriate level of care in the SQ-PIP intermediate care program. Zyprexa and Lamictal were continued. The patient's prognosis was described as guarded.

The psychiatric assessment noted that the patient's laboratory studies suggested the presence of metabolic syndrome, which was likely due to the current antipsychotic regimen. The patient had significant adverse responses to various neuroleptics, including catatonia in the context of chronic adrenal insufficiency. The psychiatrist indicated that a change in the Zyprexa regimen would be considered with possible transition to long-acting antipsychotic medication for improved treatment adherence.

A July 7, 2017 monthly nursing summary note indicated that the patient declined to attend the group therapy sessions conducted in the SQ-PIP during the month, despite education of its importance to his treatment goals and plan. The patient attended yard occasionally during the month and was seen spending most of his time lying in bed in his cell. There were no self-injurious behaviors noted during the month and the patient denied suicidal or homicidal ideation.

Minimal clinical change was noted by the psychiatrist on July 13, 2017.

A July 13, 2017 primary clinician progress note indicated that the patient continued to demonstrate both positive and negative symptoms of Schizophrenia; however, his ability to relate to others and to participate in regular sessions had drastically improved. The plan outlined was for the patient to continue at STEP 1 due to his lack of treatment group participation and to continue weekly meetings with mental health clinicians to reinforce the positive behaviors identified in his treatment plan. The plan also included weekly meetings with the psychiatrist for psychoeducation and consultation pertaining to psychotropic medications and mental illness. Symptoms of psychosis would continue to be monitored and assessed.

The patient refused to attend his July 18, 2017 IDTT. He was seen by his primary clinician on July 21, 2017.

Weekly clinical contact with the psychiatrist was documented and medical progress notes were also consistently present in the healthcare record.

An August 25, 2017 weekly summary by nursing staff noted the patient's adherence with prescribed medications. He had good personal and environmental hygiene; however, he refused to allow vital signs or laboratory studies, or attend groups. The patient often was observed responding to internal stimuli and talking to himself, with perseveration regarding canteen, money and plots to kill him. He was encouraged to participate in all out-of-cell activities.

The August 31, 2017 psychiatric progress note documented improvement regarding symptoms of delusions and mood swings after treatment with Zyprexa and Lamictal.

Progress notes from September and October 2017 indicated little clinical change. The treatment plan continued the patient's level of care and the treatment team continued to work toward building rapport in hopes of motivating the patient to engage with the team and attend groups and yard.

A November 7, 2017 progress note by the primary clinician described the patient with very limited, poor engagement with others. He was withdrawn and he isolated in his cell; this behavior was believed to be baseline for this patient. His ADLs appeared adequate, but it was noted that he occasionally exhibited regression in his presentation.

The psychiatrist noted on November 10, 2017 that the patient continued to demonstrate psychotic symptoms. He continued to refuse groups and yard. He was reportedly adherent with prescribed medications and had no recent RVRs or custody problems.

An annual polypharmacy review process occurred on November 14, 2017 by the pharmacist.

Treatment plans were reviewed on a monthly basis. The January 2, 2018 treatment plan summary and formulation provided an accurate summary of the patient's progress in treatment and treatment goals and interventions.

The major change in the treatment plan as compared to prior treatment plans was the implementation of a behavioral plan.

Findings

This patient was receiving mental health services at the appropriate level of care. A behavioral plan was clinically indicated due to the patient's lack of participation in out-of-cell structured therapeutic activities.

**Patient B**

This patient was included on the high refusers list. His healthcare record was reviewed to evaluate the care provided at the SQ-PIP.

He was admitted to the SQ-PIP during October 2014. At the time of the monitoring visit, the patient was housed in the SQ-PIP intermediate care program at STEP 2.

The patient was provided with diagnoses of Major Depressive Disorder, recurrent without psychotic features, PTSD, Mood Disorder NOS and Antisocial Personality Disorder. However, the validity of these diagnoses was uncertain, as the patient was uncooperative with the clinical evaluation. The patient's medical history was significant for chronic lower back pain and gastroesophageal reflux disease. He was prescribed bupropion, clonazepam, diphenhydramine, gabapentin, olanzapine and prazosin.

A July 7, 2017 psychiatric progress note documented the patient's hospitalization in the SQ-PIP since October 6, 2014. Since admission, he was transferred to the acute care program on four occasions (on April 1, 2015 after a suicide attempt by cutting; June 25, 2016 after a suicide attempt by cutting; November 9, 2016 after substantial property damage; and most recently from February 6, 2017 to February 21, 2017 after a suicide attempt). At the time of the monitoring visit, the patient had been housed in the intermediate care program at STEP 2 since March 29, 2017.

This patient had a history of multiple serious suicide attempts. He received psychotropic medications involuntarily by a PC 2602 order that would expire on July 19, 2017. It was determined that the PC 2602 order would not be renewed, since the patient behaviorally stabilized as of February 2017 and was determined not to pose a danger to himself or others, and was not gravely disabled. The patient also understood the risks and benefits of medications and had the capacity to consent to medication treatment.

The patient had refused individual psychiatric visits since his treatment was assigned to the Humboldt Team in November 2016. He was cooperative with cell-front contacts, but the interactions with staff were superficial; he was unwilling to discuss his problems and symptoms. He was asked to consider plans for his psychiatric medications since the PC 2602 order was scheduled to expire.

On July 17, 2017 nursing staff reported that the patient exhibited no behavioral issues or problems. He was medication adherent. The healthcare record indicated that he had attended some groups; however, he continued to refuse vital signs and laboratory studies.

His primary clinician reported on July 23, 2017 that the patient would continue to be encouraged to work with Humboldt Team providers to work collectively toward his goal for discharge.

On July 25, 2017 this patient continued to refuse to leave his cell for an individual visit. The psychiatrist reported that the patient had stopped taking Zyprexa; he stated that he did not want this medication any longer. The patient stated that he continued to want to transition to East Block or the Adjustment Center. He made it clear that he would not talk to mental health staff in East Block or the Adjustment Center. The psychiatrist summarized the following information. The patient was behaviorally stable, but was uncooperative with the mental assessment and treatment in the SQ-PIP and desired discharge. He had been provided with multiple psychiatric diagnoses. He attended some groups and yard. Electrocardiograms and laboratory studies were ordered; however, the patient had not complied with this testing. The psychiatrist outlined the plan to discontinue Zyprexa due to the patient's refusal and to continue bupropion, diphenhydramine, gabapentin, and prazosin as ordered. The patient would remain in the intermediate care program at STEP 2.

Subsequent progress notes, which were written on a consistent basis, indicated very little clinical change.

During the review period, the treatment plan was reviewed monthly. IPOCs were clinically appropriate. Treatment plans' documented a very long history of psychiatric problems, which preceded the patient's current incarceration. A history of significant suicide attempts during the patient's incarceration was documented. A comprehensive history was documented in his treatment plans.

Subsequent IDTT documentation indicated that the patient continued to refuse to leave his cell for individual contacts and that his clinical presentation remained unchanged. He remained at STEP 2.

The primary clinician indicated on November 1, 2017 that the patient would continue to be encouraged to work with Humboldt Team providers to work collectively on his goal of discharge. He was referred to the suicide prevention coordinator for consultation as to the assessment of risk of self-harm and readiness for discharge.

The November 30, 2017 IDTT note indicated that the patient was not present at the IDTT and had declined to attend when approached at cell front. Due to his extreme distress when this social worker recently spoke to him, and his request that the team cease speaking to him unless it was an emergency, he was written a note inviting him to the IDTT. He read the note at cell front, made eye contact and politely responded "no thank you." His case was discussed in

absentia.

The note further indicated that the treatment team had conferred with the suicide prevention specialist and the supervisor to conduct a SRASHE and to provide recommendations regarding safety planning to move the patient toward discharge. It was noted that the team believed that the patient's continued SQ-PIP stay was more stressful than a source of support for him and the benefit of continued hospitalization was questionable.

During the monitoring visit, the expert attended a quasi-IDTT (i.e., a "mega") that involved this patient. The patient had requested such a meeting after discovering that his legal requests relevant to a Vitek proceeding several years ago had either been misplaced intentionally or unintentionally. The patient wanted to discuss his concerns regarding inadequate access to the law library and the reported unresponsiveness of the assigned patient advocate.

Staff confirmed significant issues related to law library access and the unresponsiveness of the patient advocate.

Findings

It was clearly difficult to form a therapeutic alliance with this patient. The current treatment plan appeared to be ineffective in increasing his participation in structured therapeutic activities. It was unclear why a behavioral treatment plan had not been developed as part of the treatment plan. It was also unclear whether continued hospitalization was clinically indicated. This patient's mental health issues were related to a longstanding personality disorder in contrast to a mental illness associated with psychotic features.

**Patient C**

This patient was admitted to the SQ-PIP on October 1, 2014 for treatment of psychosis. He transferred from East Block to the SQ-PIP for treatment of depression and psychosis, as he was not making sufficient progress in his treatment at the EOP level of care. The patient continued to experience persistent auditory hallucinations, confusion, poor care for his ADLs and social isolation. He received treatment in the intermediate care program.
The patient reported doing "okay" and indicated that recently he had not attended groups. The psychiatrist discussed the goals of improved group attendance and consistent showering.

A treatment plan dated July 8, 2017 provided the following diagnoses: Schizophrenia Spectrum Disorder, Alcohol Use Disorder, Cannabis Use Disorder, Methamphetamine Use Disorder, Cocaine Use Disorder, PCP Use Disorder, LSD Use Disorder and Antisocial Personality Disorder. The plan indicated that the patient would continue treatment in the intermediate care program with encouragement for participation in groups and recreational therapy.

The patient was prescribed Haldol and Effexor ER. His medical history was significant for

hypertension, non-insulin dependent diabetes mellitus, right hydrocele, gastroesophageal reflux disorder, a history of thrombocytopenia, neck and back pain and tardive dyskinesia of trunk and neck.

The July 12, 2017 treatment plan noted that the patient would remain at STEP 1, with the goal of group attendance at least five times per week. It also noted that the patient would have a capacity hearing for PC 2604 proceedings on July 18, 2017. Appropriate IPOCs were initiated.

At the court hearing on July 18, 2017, it was determined that the patient did not have the capacity to make an informed decision regarding the tests required for the medical workup of his hematuria.

The PC 2604 order was granted for a one-year period, during which an appointed individual (his brother) could make medical decisions for the patient.

An August 17, 2017 primary care progress note stated that the social worker had met with the patient to contact his mother and brother, who stated that the patient had not spoken with them in 30 years; this was in contrast to the patient's prior report that he regularly spoke with and saw his family. Information was reportedly provided to the patient by his family as to recent events and deaths. The patient was agreeable to continued contact with his family through writing and telephone calls.

Progress notes were written by the psychiatrist and primary care clinician on a consistent and timely basis.

The November 2017 treatment plan noted the patient's medication adherence, with goals of improved hygiene and socialization and decreased auditory hallucinations. He remained with poor insight and concentration. He required frequent reminders; however, this had improved. His medications were continued with plans for three showers and groups per week. He was maintained at STEP 2.

The patient was briefly interviewed at cell front during the site visit by the monitor's expert. He reported that he had been hospitalized in the SQ-PIP for three years and had been housed at SQ for 17 years. He preferred the SQ-PIP to his previous housing in the East Block. He was not interested in attending any more groups on a weekly basis.

<u>Findings</u>

This patient was receiving appropriate mental health care in the SQ-PIP intermediate care program. Unfortunately, the patient was very comfortable with attending only two groups per week, which was much less than was clinically indicated. The patient clearly had a chronic and persistent mental illness.

**Patient D**

The healthcare record of this patient was reviewed to evaluate his continued hospitalization in the SQ-PIP. This condemned patient had been housed at SQ since 1987. He had received mental health treatment since his arrival in the condemned unit. His history was significant for at least ten DSH hospitalizations between 1989 and 2009. He had received his psychotropic medications by a PC 2602 order intermittently from 1990 to 2005 and ongoing since 2006 for grave disability. He was referred to the SQ-PIP in 2014 for long-term treatment.

The patient had a long history of psychosis with auditory hallucinations and delusional thinking with paranoia. He also had a history of catatonia. He was provided with several psychotic diagnoses, including Schizophrenia, paranoid type and Schizoaffective Disorder.

The monitor's expert attended the bed utilization management committee review of this patient. At this meeting, it was noted that the patient's clinical presentation had changed little since his admission in 2014. The patient continued to require prompting to engage in ADLs and exhibited delusional thinking and other evidence of a thought disorder, including paucity of speech and thought blocking. Goals discussed included maintaining medication adherence, engaging in ADLs, improved organization and insight and reduction of negative symptoms with continued involvement in groups and yard. The bed utilization management committee recommended continued hospitalization.

The patient received involuntary psychiatric medication treatment by a PC 2602 order. He was prescribed oral Haldol concentrate and benztropine. The medication administration record documented medication adherence.

During the site visit, the expert briefly interviewed this patient at his cell. He was difficult to understand due to dysarthria. His speech was not linear and was characterized by loose associations and tangential thinking. He reported attending two groups per day as well as yard; this report was inconsistent with information present in his healthcare record. He had little insight regarding his mental illness.

Findings

This patient's presentation was consistent with the presence of a serious mental disorder, specifically Schizophrenia, chronic type. He remained in need of continued inpatient care at the intermediate level. The patient's care appeared to be appropriate.

**Patient E**

The healthcare record of this patient was reviewed to evaluate the care provided in the SQ-PIP. This condemned patient was admitted to the SQ-PIP intermediate care program directly from Receiving and Release. At the time of admission, he was intermittently mute, internally

preoccupied and appeared to be responding to auditory hallucinations. He was unable to provide history of his mental health treatment. The patient also had disorganized thinking and a disheveled appearance.

A November 6, 2017 psychiatric progress note documented improvement reported by nursing staff. The patient required less prompting for simple tasks, such as hygiene; he consistently took his medications and regularly attended groups. He remained with some delusional thinking. He also exhibited improved energy since treatment with Abilify.

The most recent treatment plan dated January 29, 2018 noted the patient's medication adherence. He was described as pleasant and friendly. He presented with psychosis, which was characterized by internal preoccupation, incoherence, loose speech and disorganized thinking. The patient also had difficulty maintaining his ADLs. Treatment goals were to reduce and stabilize psychotic symptoms and improve hygiene. The patient's poor insight and psychosis were noted as limiting factors in obtaining full treatment engagement.

The patient was prescribed Prozac, Abilify, Cogentin, Vistaril and Zyprexa. He was adherent with prescribed medications.

The expert briefly interviewed this patient at his cell during the monitoring visit. The patient reported being hospitalized in the SQ-PIP for three years. He stated that he liked the SQ-PIP because he was interested in "rehabilitation." He demonstrated little insight regarding his mental illness. He reported attending three to four groups per day, which appeared to be consistent with information in his healthcare record.

Findings

This patient was receiving appropriate mental health care in the SQ-PIP intermediate care program.

**Patient F**

This case was selected for review as the patient was identified as having an individualized behavioral plan. This condemned patient arrived at SQ in 1989. He had a longstanding history of paranoia, with the delusional belief that custody staff would harm him. The patient was identified during the original SQ-PIP activation assessment project and had remained in the SQ-PIP since October 2014. He was provided with diagnoses of Schizophrenia, paranoid type, Polysubstance Dependence and Antisocial Personality. He had well-established treatment refractory symptoms that included the aforementioned paranoid delusions and anxiety and auditory hallucinations. The patient refused to eat on occasion, which resulted in significant weight loss. The patient's reduction in food intake was linked to his delusions regarding custody staff and concerns that they had poisoned his food.

The patient was prescribed Haldol concentrate on a regular and as needed basis. He was administered them as needed during the previous month. He was also prescribed Paxil, trazodone and Zyprexa Zydis. A medication review on January 4, 2018 revealed that the patient had 100-percent adherence with routine medications.

This patient refused most clinical out-of-cell activities and typically refused yard. He also intermittently stopped eating or reduced his food intake due to his anxiety and/or delusional belief that custody had tampered with his food. It did not appear that the treatment plan had been appropriately modified prior to the referral for a behavioral consult and request for a behavioral plan. The treatment team modified treatment goals; the number of groups was increased from one to two weekly groups. Other actual interventions were not documented. It was difficult to determine the adequacy of treatment planning prior to the referral for a behavioral plan. The patient remained at STEP 2 throughout the reporting period due to his low clinical activity attendance and sporadic eating.

The patient had a brief episode of decompensation on December 29, 2017, when a lieutenant, who the patient was fearful of, worked in the unit. Following the assignment of that lieutenant, the patient scratched himself using his television plug and reported suicidal ideation. This resulted in placement on one-to-one suicide observation. He told the psychiatrist the following day that the behavior was a suicide attempt and that he would rather kill himself than allow custody to hang him. The patient believed that he had overheard custody discussing hanging or choking him. On December 31, 2017, the treatment team clinically moved the patient to acute status, although he remained in the same room. The lieutenant would complete his temporary assignment during the first week of January 2018 and the patient's anxiety lessened significantly in anticipation of that event. While on suicide precaution, the patient's property was removed. He was seen daily while at the acute level of care.

While the patient had improved during the course of his SQ-PIP hospitalization, with improvement in depression, self-injurious behavior and select disruptive behaviors, he continued to persistently utilize staff to soothe him. In addition, his delusional beliefs continued to negatively impact his ability to regularly consume food, function within the unit and achieve a functional level that would allow for discharge. As a result, a positive behavior support plan was completed; it was based on a thorough functional analysis and identified potential drivers or reinforcers of the behavior. As the positive behavior support plan appeared to have been implemented in January 2018, it was too soon to evaluate possible clinical effects.

<u>Findings</u>

This patient was adequately treated at the appropriate level of care. However, his treatment was not modified, despite the lack of progress for multiple months. It was a significant clinical improvement when the team chose to refer him for a behavioral consultation and behavioral plan; this was a critical aspect in determining that the patient was receiving adequate care at the time of the monitoring visit.

**Patient G**

This case was selected for review as the patient was identified as a frequent refuser of treatment services. The condemned patient arrived at SQ in 1990. He was a patient in the inpatient program that existed prior to activation of the SQ-PIP and was admitted to the SQ-PIP on October 1, 2014. He was provided with a diagnosis of Schizophrenia, disorganized type. The patient was described as malodorous at times, due to poor hygiene; he also exhibited impaired mobility due to the delusional belief that he had a computer in his brain that controlled his movements. The patient had received his psychotropic medications by involuntary medication order continuously since 1996, except for the period of 2000 to 2001 when he reportedly took medications voluntarily. He remained on a PC 2602 order at the time of the site visit. He was prescribed clozapine and Lamictal. The patient remained on STEP 1 due to his lack of engagement in treatment.

The most recent treatment plan dated January 23, 2018 summarized prior treatment plans. All treatment plans included only one mental health treatment target which was related to the patient's delusions. There was no treatment target related to the anxiety the patient experienced regarding urinary incontinence, despite documentation that it was a primary obstacle to treatment participation. The short-term treatment goal for delusions was to reduce feelings of distress and it used a subjective rating of distress, as this was an EHRS requirement. There were no objective behaviorally-based measures of distress utilized for the treatment target of delusions. The delusions were to be in "remission" for a period of three months in order to discharge the patient. This was an unrealistic goal, in light of the chronic nature of the patient's delusions. It would have been more appropriate to identify how the patient's delusions interfered with his observed daily functioning and to establish a functional level goal for discharge. For example, the team could set the following expectations for discharge: the patient will inform custody staff immediately when he needs new clothing due to his incontinence, he will shower whenever he experiences incontinence, and at least three times weekly he will participate in at least 50 percent of mental health treatment activities and 75 percent of medical treatment activities. There were no specific treatment interventions listed; interventions simply listed "individual, group, and recreation therapy."

This patient was eventually referred for a behavioral consultation and behavioral plan due to his passive resistance to escort, but this was primarily due to his treatment refusals and the hiding of his incontinence. The patient hid his soiled clothing rather than exchanging them for clean clothes. The undated positive behavioral support plan was designed to create incentives for the patient to engage in specific hygiene and health care tasks and mental health treatment activities. Based on reward tracking, it appeared that the behavioral plan was implemented in mid-January 2018. At the time of the monitoring visit, it appeared that only the points given were being tracked, not the reason they were given (what activity) or continued data tracking (measurement) of the target behaviors to be increased and decreased to monitor the plan's effectiveness.

Clinical documentation indicated that while the patient generally remained stable, but with significant negative symptoms, improvement was noted since implementation of the positive

support behavioral plan. The patient increased his shower frequency and he worked more frequently with medical staff. Baseline data indicated that the patient also increased showering in September 2017, before decreasing dramatically in subsequent months. No information was located explaining either the significant increase or subsequent decrease. That information would have been helpful, especially because it preceded the behavioral plan. There was no change in participation in clinical activities, despite the reinforcement schedule implemented as part of the positive support behavioral plan. If clinical activity continued to demonstrate no change, as part of the ongoing assessment of the behavioral plan, the reinforcers used for mental health activity should be reevaluated. Positive incentives may be insufficient to increase programming without eliminating the incentives that maintain the patient's negative symptoms. Despite the lack of improvement in clinical engagement, it should also be noted that the patient made contact with his family for the first time in 20 years, received a package from them and spoke on the phone with his mother. This was seen as a significant clinical improvement by the treatment team.

The patient was seen weekly by the social worker and psychologist. He was seen at least monthly by the psychiatrist. Progress notes indicated that they attempted to convince the patient to leave his cell for confidential contacts with refusals. When the patient attended his individual sessions, documentation indicated that they were generally therapeutic and appeared to be primarily focused on maintaining and building rapport.

Findings

This patient was receiving a significant amount of treatment. Despite that, treatment was not modified due to a lack of progress over multiple months of treatment during his hospitalization. That lack of treatment plan modification was concerning. A significant clinical improvement in the treatment was the treatment team referral for a positive support behavioral plan. As a result of the development and implementation of that plan, the treatment team documented recent improvements in select areas. It will be critical that those clinical gains are maintained and that the behavior plan was monitored for possible modification if it was ineffective in impacting the patient's engagement with mental health treatment providers and activities. This patient was at the appropriate level of care and was receiving adequate care at the time of the monitoring visit.

**Patient H**

This case was selected for review as the patient was identified as a frequent refuser of treatment services. This Stage 1 patient was admitted to the SQ-PIP on October 1, 2014. He was provided with diagnoses of Schizophrenia, undifferentiated type, Polysubstance Dependence and Antisocial Personality Disorder. The patient had previously received psychotropic medications by involuntary medication orders; the last order was in place during 2014 and was not renewed. The patient was prescribed clozapine. It should be noted that the psychiatrist had indicated in the most recent treatment plan on January 11, 2018 that the patient's clozapine blood level was in the low therapeutic range, but the patient would not agree to a higher dose. The psychiatrist

continued to urge the patient to accept a higher dose during routine visits, which occurred monthly at a minimum.

The patient had a history of paranoia, auditory and visual hallucinations, emotional volatility, hostility, aggressive behavior, suicidal behavior and delusional thinking with anorexia and an associated 60-pound weight loss due to his belief that his food was poisoned. After months of activity and engagement with providers, he became isolative, anxious, unkempt and withdrawn; the providers were unable to determine the precipitants for these periods of decompensation. The patient exhibited many of these negative symptoms during his hospitalization at the SQ-PIP. In spite of these symptoms, the treatment plan was not modified significantly over much of the review period beyond a recent medication change. The patient was eventually referred for a behavioral plan. The functional analysis appeared to have been nearly completed, but the plan had not been fully developed or implemented at the time of the monitoring visit.

This patient presented as an extremely challenging case. No salient reinforcers were identified by the treatment team, including the behavioral specialist. He did not typically engage with any staff. He began showering two to three times weekly after treatment with clozapine. Otherwise, the patient remained in his cell with no interest in engaging in any in-cell activity, including watching television or reading. He was passively resistant to engaging with staff in any manner, including in the functional assessment process. However, during the site visit, the patient cooperated with the monitor's expert for a brief interview.

The monitor's expert discussed this case with the SQ-PIP program director and clinical director to review additional behavioral interventions and ideas for future treatment settings or modalities, in light of the patient's acceptance of an interview with the expert and the chronic nature of the patient's negative symptoms. Staff was very responsive to provided recommendations.

Findings

This patient was severely mentally ill with a long, chronic course of debilitating mental illness. While his symptoms were described as waxing and waning over the years, no one in his treatment team identified any possible precipitants or reinforcers that might correlate with the decompensation and improvement observed. As a result, with the patient's ongoing reluctance to engage and respond to staff, it remained extremely difficult to identify effective treatment modalities or salient reinforcers. Despite these clinical challenges, the treatment team continued to focus on improving the patient's functional level by modifying medications and referring him for a positive support behavioral plan. At the time of the visit, the patient was still undergoing a functional analysis and development of the behavioral plan. The patient's medication regimen was closely monitored and he was consistently followed at least monthly. When the positive support behavioral plan was completed, it should be reflected in an updated treatment plan. As a result of the noted challenges and recent clinical interventions, this patient was receiving adequate care.

**Patient I**

This healthcare record was reviewed to evaluate the care provided in the SQ-PIP intermediate care program. The patient arrived to the condemned unit at SQ in 1979. He was referred to the SQ-PIP for improvement in anxiety and psychotic symptoms, including auditory hallucinations, paranoia and delusions, so he could function in East Block without constant distress. The patient was admitted to the SQ-PIP on April 4, 2016. He was provided with diagnoses of Anxiety Disorder and Delusional Disorder, persecutory type. He was prescribed Abilify, Remeron and Cogentin.

The patient's paranoia and delusions tended to focus on custody staff and fears that they were monitoring and attempting to harm him. He believed that a custody officer lived in the crawl space above his room in the SQ-PIP. Even after he was moved to another room due to maintenance, he reported to staff that the officer remained above him. The patient reported hearing the officer's movements, cell phone and radio above his room. This patient was also interviewed by the monitor's expert during the site visit, when he reported the same experiences. He also believed that his telephone calls to his brother had been interfered with by custody officers. Similar information was documented in the healthcare record.

Treatment plans since November 2017 indicated that the treatment goal of remission of delusions for three months had been met; based on available documentation and patient interview, this goal remained unmet. Lack of insight was also included as a treatment target in November 2017. The documentation of treatment interventions was unclear, but a review of progress notes indicated that the psychologist was appropriately using cognitive behavioral therapy techniques to address this treatment target. The patient's anxiety was also a focus of treatment and anxiety self-rankings varied significantly over the preceding year. Interventions for anxiety were unclear, but the progress notes suggested the provision of cognitive behavioral therapy by the treating psychologist.

The treatment plans required greater specificity in treatment target and interventions, with objective behavioral descriptions. At times, interventions appeared to be goals rather than actual interventions (e.g., reduce anxiety); interventions were often vague (e.g., therapist will address) and not phrased in clinical language (e.g., patients are taught to review paranoid/delusional thinking). The interventions were not stated as active speech in clinical terms. Interventions and goals were not distinguished and the person/discipline responsible for the intervention was not clearly indicated. The treatment plan also did not clearly indicate a diagnosis. The diagnosis was inferred from problem areas and from reviewing psychiatric notes. As provided diagnoses may vary among treatment team members, a clear diagnosis in the treatment plan would be beneficial in documenting diagnostic agreement.

<u>Findings</u>

This patient received adequate care. However, there remained some issues with documentation. The treatment plan required revision to allow for greater detail. This treatment team, particularly

the psychologist, documented individual contacts in exceptional detail, including the therapeutic aspects of those interactions.

**Patient J**

This healthcare record was reviewed to evaluate the care provided in the SQ-PIP intermediate care program.  This condemned patient was admitted to the SQ-PIP on October 1, 2014, at the time of activation.  The original referral was due to grave disability and lack of engagement with treatment, including individual sessions and refusing yard.  The patient arrived at SQ in 2000.  At the time of the site visit, the patient was reportedly at STEP 3, despite only having attended five structured groups in the prior 30 days per his most recent treatment team on January 16, 2018.  A review of progress notes intermittently listed the patient as STEP 3 and STEP 1, with no explanation of the discrepancy.  The patient's STEP level was ultimately unclear as a result.  He was provided with a diagnosis of Schizophrenia, paranoid type.  He was prescribed Haldol and benztropine.  The patient received his psychotropic medications by a PC 2602 order due to danger to others.

The patient reportedly had a history of paranoid delusions, bizarre thoughts, disorganization, tactile hallucinations and depressive symptoms.  When not medicated, he exhibited verbally aggressive and assaultive behavior toward staff.

The patient was assigned to a new treatment team in January 2018 and was seen by that team on January 16, 2018.  He was described as ambivalent about treatment, most likely due to his lack of insight regarding his mental illness.  This team established treatment goals that included ensuring 100-percent medication adherence, building rapport and increasing the patient's engagement with treatment to increase participation in treatment activities.  A note in the healthcare record indicated that the patient had a brain scan that identified patterns of abnormalities compatible with head injury, as he had reported a head injury secondary to a car accident as a child.  It was unclear if the brain scan results were verified.  The presence of such abnormalities would further complicate the diagnostic and treatment picture for this patient.

Treatment interventions for the goals listed above were either not listed or vague (e.g., listed as patient specific interventions).  However, review of progress notes suggested that the new treatment team appeared to be beginning anew with the patient, despite extensive documentation of his course of treatment, prior treatment plans and response to treatment.  It was unclear why the treatment team functioned as though this was a new patient, rather than a patient who had been receiving treatment at the SQ-PIP for more than three years.

The patient was seen weekly by his psychologist and social worker during the reporting period.  He was also seen weekly by his psychiatrist; there was no clinical rationale provided for this increased frequency of contact.  A review of the records suggested that this may have been due to the patient's cooperation with attending his psychiatric contacts.  A review of progress notes from prior treatment team members (e.g., social worker and psychologist) did not include documentation of therapeutic interventions during individual sessions.  Finally, documentation

indicated that the termination process with the prior psychiatrist was very poor.  It appeared that the patient was informed during the last contact that their treatment was ending.

Findings

This patient did not receive adequate care.  His treatment plan did not adequately address his ongoing lack of treatment engagement.  The plan also did not include appropriate treatment interventions for the primary functional problems, which were the patient's paranoia and delusional thoughts.  Treatment goals were not stated in objective behavioral terms and interventions were vague or nonexistent, even when the treatment team changed.  The patient had received care in the SQ-PIP for over three years, but his most recent treatment plan failed to utilize available data regarding past treatment interventions and response to treatment; instead it resembled a plan for a new admission.  While it was appropriate to include the establishment of rapport as a goal with the new treatment team, it was inappropriate to not build on prior treatment for the problem areas.  There was no documentation of clinical interventions in the sessions with the psychologist and social worker.  This patient would have benefitted from an updated treatment plan.