1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  JAY C. RUSSELL, State Bar No. 122626
   ADRIANO HRVATIN, State Bar No. 220909
3  Supervising Deputy Attorneys General
   ELISE OWENS THORN, State Bar No. 145931
4  ANDREW M. GIBSON, State Bar No. 244330
   TYLER V. HEATH, State Bar No. 271478
5  IAN MICHAEL ELLIS, State Bar No. 280254
   TOBIAS G. SNYDER, State Bar No. 289095
6  Deputy Attorneys General
    455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA  94102-7004
    Telephone:  (415) 510-4426
8  Fax:  (415) 703-5843
    E-mail:  Tobias.Snyder@doj.ca.gov
9  *Attorneys for Defendants*

10

IN THE UNITED STATES DISTRICT COURT

11

FOR THE EASTERN DISTRICT OF CALIFORNIA

12

SACRAMENTO DIVISION

13

14

15 | **RALPH COLEMAN, et al.,**

16 |                                Plaintiffs,

17 |              **v.**

18 | **EDMUND G. BROWN JR., et al.,**

19

20 |                                Defendants.

2:90-cv-00520 KJM-DB (PC)

**DEFENDANTS' SUPPLEMENT TO NOTICE OF FILED OBJECTIONS**

Judge:          The Honorable Kimberly J. Mueller

21

22

23          In response to the Court's August 28, 2018 Minute Order (ECF No. 5889), Defendants

24  submit this supplement to their August 24, 2018 Notice of Filed Objections (ECF No. 5888)

25  describing with specificity: (1) all changes made by the Special Master to his proposed draft

26  telepsychiatry policy in response to Defendants' August 1, 2018 objections; and (2) the

27  differences between Defendants' August 1, 2018 objections provided to the Special Master (ECF

28  No. 5873-5) and the August 13, 2018 objections filed with the Court (ECF No. 5879).

1

The parties were provided a copy of the Special Master's proposed draft telepsychiatry policy on July 25, 2018. On August 1, 2018, Defendants objected to the proposed draft. The Special Master did not circulate the revised proposed telepsychiatry policy to the parties prior to submission to the court on August 2, 2018.

## I.    THE CHANGES TO THE SPECIAL MASTER'S PROPOSED TELEPSYCHIATRY POLICY.

The Special Master made two changes to his telepsychiatry proposal between the draft circulated to the parties on July 25, 2018 (attached as Exhibit 1), and the version filed with the Court on August 2, 2018 (attached as Exhibit 2). Both changes are in the section titled "Telepsychiatry and Levels of Care" on page four of the proposed policy, addressing the requirements for use of telepsychiatry at the Correctional Clinical Case Management Services (CCCMS) and Enhanced Outpatient Program (EOP) levels of care. A blackline comparison reflecting these changes is set forth below:

**Telepsychiatry and Levels of Care**

**Correctional Clinical Case Management Services**

~~Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the CCCMS level of care. If these efforts are unsuccessful, telepsychiatry is an acceptable alternative, consistent with the requirements described in other sections of this policy and procedure.~~ Telepsychiatry may replace on-site psychiatry at the CCCMS level of care provided all other conditions pertaining to the CCCMS level of care contained within this policy are adhered to and good faith efforts to recruit on-site psychiatrists continue.

**Enhanced Outpatient Program**

Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry. ~~At least 1.0 full-time on-site psychiatrist shall be assigned to each program and each unit within that program providing EOP level of care services within the institution. Programs providing an EOP level of care include Psychiatric Services Units, EOP Administrative Segregation Units, and mainline EOP programs. If an EOP program has more than one unit, each unit within that program will have at least one full-time on-site psychiatrist assigned to that unit.~~ On-site psychiatrists are required for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

## II.    THE DIFFERENCES BETWEEN DEFENDANTS' AUGUST 13, 2018 OBJECTIONS AND AUGUST 1, 2018 LETTER.

Defendants' August 13, 2018 objections filed with the Court (the Objections, attached as Exhibit 3) differ from their August 1, 2018 letter to the Special Master (the Letter, attached as Exhibit 4) in the following ways:

1.    Defendants rewrote the introduction to the Objections, given the difference in format and venue between the documents—*i.e.*, that the Objections were filed with the Court under the Federal Rules of Civil Procedure.

2.    The Objections contain, at Section I, a discussion of the relevant procedural history that was not contained in the Letter.

3.    The arguments set forth separately in Sections I and II of the Letter were grouped into subsections under the same section of the Objections.  Section II(A) of the Objections, which addresses the Court and Special Master's power to manage administrative affairs, is substantially similar to Section I of the Letter.  Defendants, however, switched the order of the first two paragraphs and made minor word and stylistic changes throughout Section II(A) in the Objections.

4.    Section II(B) of the Objections, which argues that restrictions imposed on the use of telepsychiatry are not supported by the evidence, is substantially similar to Section II of the Letter.  However, Defendants made minor word and stylistic changes throughout Section II(B).  In addition, Defendants deleted several paragraphs describing portions of the record that were submitted alongside their Letter and were not submitted with the Objections; expanded their critique of a report submitted by Plaintiffs' undisclosed expert Dr. Pablo Stewart, including through a rebuttal declaration by Defendants' expert Dr. Joseph Penn that was not submitted with the Letter; and added a reference to a telepsychiatry cell-front demonstration attended by the Special Master's expert Dr. Jeffrey Metzner.

5.    The Objections do not contain the bulleted list of specifically objectionable policies contained at Section III of the Letter.

Defs.' Supp. to Notice of Filed Objections (2:90-cv-00520 KJM-DB (PC))

6.    Both Section III(A) of the Objections and Section III(A) of the Letter address the Special Master's proposed policy concerning the use of telepsychiatry at the CCCMS level of care.  However, the section in the Objections was rewritten to address the changes between the Special Master's July 25 draft proposed telepsychiatry policy and his August 2 final proposal filed with the Court—namely, that the Special Master removed the pre-requisite that CDCR attempt in good faith to hire on-site psychiatrists at the CCCMS level of care.

7.    Both Section III(B) of the Objections and Section III(B) of the Letter address the Special Master's proposed policy concerning the use of telepsychiatry at the EOP level of care. However, Section III(B) in the Objections was rewritten to address the changes between the Special Master's July 25 draft proposed telepsychiatry policy and his August 2 final proposal. Section III(B)(1) in the Letter was not included in the Objections given the changes to the proposed policy, although the argument made in that section is referenced in Section III(B) of the Objections.  Defendants view the EOP-related language in the final proposal to be even less clear than that contained in the draft proposal, and that argument is reflected in their Objections.

8.    Section III(C) of the Objections, which argues that the EOP level of care is not an in-patient or residential setting, is substantially similar to Section III(B)(2) of the Letter (though the argument was moved from being a subsection of Section III(B) in the Letter to a subsection of Section III in the Objections).  Defendants moved some sentences and made minor word and stylistic changes throughout Section III(C) of the Objections.

9.    Section III(D) of the Objections, which argues that the Special Master's interpretation of "last resort or emergency restrictions" is overly restrictive, is substantially similar to Section IV of the Letter (though it was moved from being a standalone section in the Letter to a subsection of Section III in the Objections).  Defendants moved some sentences and made minor word and stylistic changes throughout Section III(D) of the Objections.  Defendants also expanded their argument in Section III(D) with reference to the declaration of Katherine Tebrock, which was not submitted with the Letter.  This declaration was included with the Objections filed with the Court to satisfy the Federal Rules of Evidence.

10.    Section III(E) of the Objections, which argues that the Special Master's prohibition against cell-front telepsychiatry is unsupported and premature, is substantially similar to Section V of the Letter (though it was moved from being a standalone section in the Letter to a subsection of Section III in the Objections).  Defendants moved some sentences and made minor word and stylistic changes throughout Section III(E) of the Objections.  Defendants also expanded their argument regarding a telepsychiatry cell-front demonstration attended by the Special Master's expert Dr. Jeffrey Metzner, referencing a declaration by Dr. Kevin Kuich, whose declaration was revised from the version submitted with the Letter to include one additional paragraph describing the demonstration.

11.    The Objections omit Section VI of the Letter, which referenced the Receiver's findings in the separate *Plata* litigation supporting the use of telepsychiatry at CDCR.

12.    The Objections omit Section VII of the Letter, which discussed the declaration submitted by Plaintiffs' expert Dr. Pablo Stewart, including Defendants' objections to the declaration.  Section II(B) of the Objections, however, discussed the same subject matter as Section VII of the Letter and additionally referenced Dr. Joseph Penn's declaration regarding Dr. Stewart's declaration.

13.    The Objections' conclusion was rewritten.


Dated:  August 30, 2018                              Respectfully Submitted,

                                                     XAVIER BECERRA
                                                     Attorney General of California
                                                     ADRIANO HRVATIN
                                                     Supervising Deputy Attorney General



                                                     */s/ Tobias G. Snyder*
                                                     TOBIAS G. SNYDER
                                                     Deputy Attorney General
                                                     *Attorneys for Defendants*

CF1997CS0003
42039571.docx

5

Defs.' Supp. to Notice of Filed Objections (2:90-cv-00520 KJM-DB (PC))

# CERTIFICATE OF SERVICE

Case Name:    **Coleman v. Brown, et al.,**            No.    **2:90-cv-00520 KJM-DB (PC)**

I hereby certify that on <u>August 30, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## DEFENDANTS' SUPPLEMENT TO NOTICE OF FILED OBJECTIONS WITH EXHIBITS

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 30, 2018</u>, at San Francisco, California.

|  |  |
|---|---|
| R. Caoile | **/s/ R. Caoile** |
| Declarant | Signature |

CF1997CS0003
42040091.docx

# EXHIBIT 1

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8:<br>PSYCHIATRY SERVICES | Revision Date(s): | NA |
| | Supersedes: | |
| 12.08.100<br>TELEPSYCHIATRY | Attachments: | Yes    No ☒ |
| | Director Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists and/or psychiatric nurse practitioners (telepsychiatry providers) to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatry provider, the patient, and the patient's treatment team. Telepsychiatric services are part of California Department of Corrections and Rehabilitation's (CDCR's) Complete Care Model (CCM) of treatment that provides integrated medical and mental health provision of services. CCM is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telepsychiatric services, as stated in this policy and procedure, can be a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population.

The Telepsychiatry Program provides mental health services to the Correctional Clinical Case Management System (CCCMS) level of care and may, under specified circumstances outlined in this policy and procedure, be used for higher levels of mental health care. On-site providers shall remain the preferred method of psychiatric care for Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), and Psychiatric Inpatient Program (PIP) levels of care. To ensure continuity of care for patients within the program, telepsychiatry providers will work from CDCR hubs and strong preference will be given to assign telepsychiatry providers to caseloads within the same institution.

**Equipment**

The telepsychiatry providers shall be given the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, scanner/printer (can be individual and/or shared), and phone with access to an outside line.

- A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound-proofed, where possible.

- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists.

- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatry provider can be seen and heard clearly.

- Access to the Electronic Health Records System (EHRS)

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the provider's and patient's identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telepsychiatry contact, the telepsychiatry provider shall explain the treatment modality, including a description of the role of the tele-presenter, a plan for a response to interruption in services, and conditions under which a referral is made to in-person care.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatry provider participation in the Interdisciplinary Treatment Teams (IDTT) is an essential part of the provision of psychiatric services. Consistent with the CCM and the Program Guide, telepsychiatry providers shall participate in the receiving institution's IDTT meetings. To facilitate telepsychiatry provider's participation in IDTTs, IDTT meetings that include a telepsychiatry provider shall be held in a location that is appropriately wired to allow for the telepsychiatry provider's full participation when their patients are being reviewed. Receiving institutions may be required to modify IDTT schedules to allow telepsychiatry providers to participate in the IDTT with the primary clinician and required team members.

In addition to IDTT meetings, telepsychiatry providers shall participate to the same extent as on-site psychiatrists in all meetings and huddles relevant to the clinical care of their patients, in compliance with the CCM.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatry provider shall meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telepsychiatry services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. The telepsychiatry provider may also request a consultation from an on-site provider if it is clinically determined that the patient must be seen immediately.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatric visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry. If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate on-site psychiatric treatment.

**Contraindications for Telepsychiatry**

Patients shall not be entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. If the telepsychiatry provider and Chief of Telepsychiatry determine that the patient needs to be seen by an on-site psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate on-site psychiatrist assigned. Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an on-site psychiatrist.

At present, cell-front provision of telepsychiatry is not permitted.

**Telepsychiatry and Levels of Care**

**Correctional Clinical Case Management Services**

Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the CCCMS level of care. If these efforts are unsuccessful, telepsychiatry is an acceptable alternative, consistent with the requirements described in other sections of this policy and procedure.

**Enhanced Outpatient Program**

Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry.  At least 1.0 full-time on-site psychiatrist shall be assigned to each program and each unit within that program providing EOP level of care services within the institution. Programs providing an EOP level of care include Psychiatric Services Units, EOP Administrative Segregation Units, and mainline EOP programs. If an EOP program has more than one unit, each unit within that program will have at least one full-time on-site psychiatrist assigned to that unit. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

**Mental Health Crisis Bed**

Telepsychiatry may not be used at the MHCB level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

**Psychiatric Inpatient Program**

Telepsychiatry may not be used at the PIP level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the PIP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

### Emergency Management

If an emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatry provider shall immediately notify Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) as well as his/her direct telepsychiatry supervisor. The telepsychiatry provider shall coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

### EOP, MHCB and Psychiatric Inpatient Programs

No Psychiatric Nurse Practitioners (PNPs) shall be permitted to provide telepsychiatric services to inmates at the EOP, MHCB or PIP level of care.

In the event that a telepsychiatrist is needed in an EOP, MHCB or inpatient setting, the telepsychiatrist shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings and case conferences, and coordinate patient care. Consistent with the CCM and the Program Guide, on-site staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychiatrists, telepsychiatrists shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

Telepsychiatrists shall provide sign-out information to an available Institutional Psychiatrist on Duty to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

### Site Visits

Telepsychiatry providers are responsible for maintaining relationships with members of the on-site treatment team by regularly communicating with them and by physically visiting receiving institutions. Telepsychiatry providers shall visit their assigned institution within 30 days of assignment. The frequency of follow-up visits shall be determined by the telepsychiatry provider's assigned level of care.  The telepsychiatry provider will spend at least one full business day during each site visit at the facility, and attend meetings as described below:

| Level of Care | Frequency of Site visit |
|---------------|-------------------------|
| CCCMS | Biannually |
| EOP | Quarterly |
| MHCB | Quarterly* |
| PIP | Monthly |

*For MHCB, the telepsychiatrist shall visit the institution every 2 months for the first 6 months, then every 3 months thereafter

During each visit, the telepsychiatry providers shall participate in the IDTT, meet with necessary health care staff, and see patients face-to-face. In addition, telepsychiatry providers shall attempt to see as many patients face-to-face as possible.

**Physical Environment**

The patients' interview room/environment shall allow for both the telepsychiatry provider and the patient to be seen and heard clearly. The patient's and provider's camera shall be positioned with their faces clearly visible to each other. The telepsychiatry provider shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatry provider can request assistance from the telepresenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatry provider), who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy so that others are not able to enter the provider's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

**Organizational Structure**

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

**Workflow Interruptions**

In the event of technology or equipment failure, telepsychiatry providers shall immediately notify their direct telepsychiatry supervisor and Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatry provider shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by on-site provider or rescheduling of appointments). Telepsychiatry providers may also be redirected to another telepsychiatry assignment when this occurs.

**Non-Formulary Requests**

Non-formulary requests shall be made directly to the psychiatry leadership of the institutions served by telepsychiatry, unless otherwise determined by leadership. If there is no Chief Psychiatrist or Senior Psychiatrist Supervisor at the institution, non-formulary

requests shall be submitted to the telepsychiatry provider's direct supervisor.

**Jabber Account Login**

Operational need requires telepsychiatry providers to log into their Jabber telepsychiatry video accounts as soon as they arrive to work. They shall remain logged into Jabber throughout the day so that supervisors, colleagues, and institutional staff are able to communicate with the telepsychiatry provider via video calls during work hours. Telepsychiatry providers shall log out of Jabber immediately prior to leaving work.

**On-Call Coverage by Telepsychiatry**

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Inmate Medical Services Policies and Procedures (IMSP&P), Headquarters' Mental Health Policy and applicable bargaining unit Memorandums of Understanding.

Telepsychiatry providers are not required to travel to the institution where they are providing on-call coverage. Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider). This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

**Responsibilities**   The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatry provider.

- A dedicated and appropriately clinically trained tele-presenter who presents the patient from the originating site to the telepsychiatry provider, and is responsible for providing clinical support and coordination. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Tele-presenters shall be assigned from position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician, medical technical assistant, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, social worker, psychologist, psychiatrist, or physician. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment.

- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.

- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.

- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.

- A contact list of important names and numbers for the institution. This includes, but is not limited, to the following:

1. Laboratory
2. Pharmacy
3. Nursing station(s)
4. Housing unit(s)
5. Primary Clinician(s)
6. Medical Provider(s)
7. Mental Health Supervisor(s)
8. Chief of Mental Health
9. Chief Psychiatrist or Senior Psychiatrist Supervisor
10. IT Department
11. Scheduler
12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.

- Caseload assignments and scheduled appointments for the telepsychiatry provider.

- The maintenance of telemedicine connectivity between institutions and providers.

- Ensuring that telepsychiatry providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.

- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.

- Organized tours for the telepsychiatry providers during their initial visits to the institution.

- Developing on-site clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatry providers.

- A Local Operating Procedure (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.

- Routine system tests to ensure that equipment is safe, operational, and secure

**Purpose**        This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines.  Telepsychiatry providers shall conduct care

consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatry providers are provided with the appropriate equipment and resources.
2. Telepsychiatry providers participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their patients.
3. On-site staff and members of the treatment team communicate with the telepsychiatry provider any important patient issues and concerns related to patient care.
4. Telepsychiatry providers have access to all necessary clinical information via the health record.
5. Telepsychiatry providers will communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are not entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
7. Telepsychiatry provider completes all documentation in the health record by the close of each business day.
8. Provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telepsychiatry providers visit their receiving institutions as directed by policy.
10. Non-formulary requests are made directly to the psychiatry leadership of the institutions served by telepsychiatry providers, unless otherwise determined by leadership.
11. Telepsychiatry providers remain logged into Jabber throughout the work day.
12. Ongoing mandatory trainings for all telepsychiatry providers.
13. Telepsychiatry providers are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution… | then… |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is revised as necessary. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements. Ensure the LOP is revised as necessary. |

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

# EXHIBIT 2

| VOLUME 12:<br>MENTAL HEALTH SERVICES | Effective Date: | |
|---|---|---|
| CHAPTER 8:<br>PSYCHIATRY SERVICES | Revision Date(s): | NA |
| | Supersedes: | |
| 12.08.100<br>TELEPSYCHIATRY | Attachments: | Yes    No ☒ |
| | Director Approval: | |

**Policy**

The Telepsychiatry Program enables psychiatrists and/or psychiatric nurse practitioners (telepsychiatry providers) to provide real-time psychiatric evaluations and treatment to patients by utilizing videoconferencing to facilitate live communication between the telepsychiatry provider, the patient, and the patient's treatment team. Telepsychiatric services are part of California Department of Corrections and Rehabilitation's (CDCR's) Complete Care Model (CCM) of treatment that provides integrated medical and mental health provision of services. CCM is designed to facilitate improved patient outcomes and thereby reduce the need for hospitalization and emergency services. Telepsychiatric services, as stated in this policy and procedure, can be a safe and efficient vehicle to provide psychiatric care to CDCR's mental health population.

The Telepsychiatry Program provides mental health services to the Correctional Clinical Case Management System (CCCMS) level of care and may, under specified circumstances outlined in this policy and procedure, be used for higher levels of mental health care. On-site providers shall remain the preferred method of psychiatric care for Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), and Psychiatric Inpatient Program (PIP) levels of care. To ensure continuity of care for patients within the program, telepsychiatry providers will work from CDCR hubs and strong preference will be given to assign telepsychiatry providers to caseloads within the same institution.

**Equipment**

The telepsychiatry providers shall be given the following equipment and resources:

- Computer, monitor, speaker, microphone, camera, scanner/printer (can be individual and/or shared), and phone with access to an outside line.

- A single, enclosed, and confidential office space with a door, desk, and chair. This office space will be sound-proofed, where possible.

- Computer access to all resources, or equivalent resources utilized by on-site psychiatrists.

- Internet access of sufficient speed and stability to allow a videoconference where patient and telepsychiatry provider can be seen and heard clearly.

- Access to the Electronic Health Records System (EHRS)

Case 2:90-cv-00520-KJM-DB   Document 5872-1   Filed 06/04/18   Page 3 of 9

**Professional and Patient Identity**

At the beginning of an initial appointment with a patient, the provider's and patient's identities shall be verified verbally and/or by showing their CDCR-issued photo identification card on the video screen. At the beginning of the patient's first telepsychiatry contact, the telepsychiatry provider shall explain the treatment modality, including a description of the role of the tele-presenter, a plan for a response to interruption in services, and conditions under which a referral is made to in-person care.

**Participation in Interdisciplinary Treatment Teams, Meetings, and Huddles**

Telepsychiatry provider participation in the Interdisciplinary Treatment Teams (IDTT) is an essential part of the provision of psychiatric services. Consistent with the CCM and the Program Guide, telepsychiatry providers shall participate in the receiving institution's IDTT meetings. To facilitate telepsychiatry provider's participation in IDTTs, IDTT meetings that include a telepsychiatry provider shall be held in a location that is appropriately wired to allow for the telepsychiatry provider's full participation when their patients are being reviewed. Receiving institutions may be required to modify IDTT schedules to allow telepsychiatry providers to participate in the IDTT with the primary clinician and required team members.

In addition to IDTT meetings, telepsychiatry providers shall participate to the same extent as on-site psychiatrists in all meetings and huddles relevant to the clinical care of their patients, in compliance with the CCM.

**Refusals**

If a patient refuses treatment via telepsychiatry, the patient's telepsychiatry provider shall meet with the other members of the patient's treatment team to consider mental health reasons, behavioral issues, custodial issues, and any other relevant factors to determine whether telepsychiatry is an appropriate delivery method for the patient. The treatment team shall work toward resolving any issues contributing to the patient's refusal of telepsychiatry services. A member from the treatment team may utilize brief, focused cell-front discussions with the patient to determine the reasons for appointment refusals. The telepsychiatry provider may also request a consultation from an on-site provider if it is clinically determined that the patient must be seen immediately.

If the treatment team has not been successful in resolving the patient's refusal of telepsychiatric visits, a formal IDTT meeting shall be convened. During this IDTT meeting, the treatment team shall develop a plan to address the reasons for the patient's refusals and contingency plans shall also be made to provide in-person psychiatric care to the patient.

If the treatment team concludes telepsychiatry is not an appropriate treatment modality for the patient because of refusals, the team shall report this finding to the Mental Health Leadership (Chief and/or Senior Psychiatrist and Chief of Mental Health) of the institution receiving telepsychiatry services as well as the Chief of Telepsychiatry. If it is determined that the patient is not appropriate for telepsychiatry, the Chief of Telepsychiatry will work with the Mental Health Leadership at the institution to ensure the patient has access to appropriate on-site psychiatric treatment.

### Contraindications for Telepsychiatry

Patients shall not be entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis. If the telepsychiatry provider and Chief of Telepsychiatry determine that the patient needs to be seen by an on-site psychiatrist, he or she will work with the Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) to make sure the patient has an appropriate on-site psychiatrist assigned. Similarly, if the treatment team thinks that telepsychiatry is not appropriate for a patient, the team will work with Mental Health Leadership to make sure that the patient is assigned to an on-site psychiatrist.

At present, cell-front provision of telepsychiatry is not permitted.

### Telepsychiatry and Levels of Care

### Correctional Clinical Case Management Services

Telepsychiatry may replace on-site psychiatry at the CCCMS level of care provided all other conditions pertaining to the CCCMS level of care contained within this policy are adhered to and good faith efforts to recruit on-site psychiatrists continue.

### Enhanced Outpatient Program

Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry.   On-site psychiatrists are required for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

### Mental Health Crisis Bed

Telepsychiatry may not be used at the MHCB level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

### Psychiatric Inpatient Program

Telepsychiatry may not be used at the PIP level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the PIP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

### Emergency Management

If an emergency arises during a telepsychiatry session (for example, a suicidal, violent or homicidal patient), the telepsychiatry provider shall immediately notify Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health) as well as his/her direct telepsychiatry supervisor. The telepsychiatry provider shall

coordinate with institutional Mental Health Leadership and follow local institutional protocol for managing such emergencies. This may include, but is not limited to, arrangements for the patient to be seen by an on-site psychiatrist, arrangements for safe holding, transport to an emergency triage area, communication with local emergency team members, and placing emergency orders for medications, etc.

**EOP, MHCB and Psychiatric Inpatient Programs**

No Psychiatric Nurse Practitioners (PNPs) shall be permitted to provide telepsychiatric services to inmates at the EOP, MHCB or PIP level of care.

In the event that a telepsychiatrist is needed in an EOP, MHCB or inpatient setting, the telepsychiatrist shall, to facilitate familiarity with the program and patients, participate in clinical staff meetings and case conferences, and coordinate patient care. Consistent with the CCM and the Program Guide, on-site staff shall ensure that the telepsychiatrist has the necessary and pertinent information about the patient and the unit for the ongoing assessment and treatment of the patient. Similar to on-site psychiatrists, telepsychiatrists shall be involved in treatment and discharge decisions.

In urgent cases when a patient requires seclusion and restraints, the nurse shall notify the telepsychiatrist, who may place orders remotely, as appropriate. All other elements of seclusion and restraint protocol shall follow existing policies and procedures and all applicable laws and regulations, including the need for a backup physician (psychiatrist or medical provider) who can physically examine the patient within the mandated timeframes. Emergency medications may be ordered by telepsychiatrists, as clinically appropriate.

Telepsychiatrists shall provide sign-out information to an available Institutional Psychiatrist on Duty to convey details regarding a new admission, to coordinate patient care tasks that require follow up during after-hours coverage, or if they anticipate specific patient concerns.

Telepsychiatrists and clinical staff, including nursing staff when needed, shall have access to each other to address patient needs.

**Site Visits**

Telepsychiatry providers are responsible for maintaining relationships with members of the on-site treatment team by regularly communicating with them and by physically visiting receiving institutions. Telepsychiatry providers shall visit their assigned institution within 30 days of assignment. The frequency of follow-up visits shall be determined by the telepsychiatry provider's assigned level of care. The telepsychiatry provider will spend at least one full business day during each site visit at the facility, and attend meetings as described below:

| Level of Care | Frequency of Site visit |
|---|---|
| CCCMS | Biannually |
| EOP | Quarterly |
| MHCB | Quarterly* |
| PIP | Monthly |

*For MHCB, the telepsychiatrist shall visit the institution every 2 months for the first 6 months, then every 3 months thereafter

During each visit, the telepsychiatry providers shall participate in the IDTT, meet with necessary health care staff, and see patients face-to-face. In addition, telepsychiatry providers shall attempt to see as many patients face-to-face as possible.

## Physical Environment

The patients' interview room/environment shall allow for both the telepsychiatry provider and the patient to be seen and heard clearly. The patient's and provider's camera shall be positioned with their faces clearly visible to each other. The telepsychiatry provider shall also be able to clearly see the patient's body to assess for any signs of movement disorders. When indicated, the telepsychiatry provider can request assistance from the telepresenter (an institutional staff member in an approved clinical classification who facilitates patient encounters with the telepsychiatry provider), who shall receive appropriate training on how to assess for such physical signs. The telepsychiatry administration and the institution receiving services shall ensure privacy so that others are not able to enter the provider's or patient's room accidently or overhear conversations from inside or outside the rooms. Seating and lighting should be adjusted to provide the clearest video and audio transmission, as well as to ensure the safety of the participants. Rooms for the telepsychiatrist and the patient will be appropriately sound-proofed, when possible, or alternative mechanisms will be utilized (for example, sound-cancelling devices) to ensure privacy. When possible, the tele-presenter should be seated closest to the door.

## Organizational Structure

All telepsychiatry staff report within the Telepsychiatry Program supervisory chain.

## Workflow Interruptions

In the event of technology or equipment failure, telepsychiatry providers shall immediately notify their direct telepsychiatry supervisor and Mental Health Leadership at the institution (Chief and/or Senior Psychiatrist and Chief of Mental Health), as well as the Integrated Communications Technology Unit. The telepsychiatry provider shall also make arrangements with institutional Mental Health Leadership to ensure appropriate patient coverage based on patient need (for example, coverage by on-site provider or rescheduling of appointments). Telepsychiatry providers may also be redirected to another telepsychiatry assignment when this occurs.

## Non-Formulary Requests

Non-formulary requests shall be made directly to the psychiatry leadership of the institutions served by telepsychiatry, unless otherwise determined by leadership. If there is no Chief Psychiatrist or Senior Psychiatrist Supervisor at the institution, non-formulary requests shall be submitted to the telepsychiatry provider's direct supervisor.

## Jabber Account Login

Operational need requires telepsychiatry providers to log into their Jabber telepsychiatry video accounts as soon as they arrive to work. They shall remain logged into Jabber throughout the day so that supervisors, colleagues, and institutional staff are able to communicate with the telepsychiatry provider via video calls during work hours. Telepsychiatry providers shall log out of Jabber immediately prior to leaving work.

**On-Call Coverage by Telepsychiatry**

The telepsychiatry team shall contribute to on-call coverage as assigned, and their provision of services shall be in accordance with California Correctional HealthCare System (CCHCS) Inmate Medical Services Policies and Procedures (IMSP&P), Headquarters' Mental Health Policy and applicable bargaining unit Memorandums of Understanding.

Telepsychiatry providers are not required to travel to the institution where they are providing on-call coverage. Therefore, institutions receiving on-call coverage from the Telepsychiatry Program shall provide a backup physician (psychiatrist or medical provider). This backup physician shall be within one hour of travel time to the facility in order to physically examine a patient if needed (for example, in the case of a patient who requires placement into seclusion or restraints).

**Responsibilities**   The receiving facility shall be responsible for providing the following:

- Timely access for patients to the telepsychiatry provider.

- A dedicated and appropriately clinically trained tele-presenter who presents the patient from the originating site to the telepsychiatry provider, and is responsible for providing clinical support and coordination. Responsibilities include, but are not limited to, reviewing the patient health record prior to the appointment and remaining with the patient during the appointment. Tele-presenters shall be assigned from position classifications in the following order of priority: medical assistant, certified nursing assistant, psychiatric technician, medical technical assistant, licensed vocational nurse, registered nurse, clinical nurse specialist, nurse practitioner, social worker, psychologist, psychiatrist, or physician. When the tele-presenter is a nurse practitioner, social worker, psychologist or physician, the clinical contact shall be considered a joint appointment.

- A backup tele-presenter when the primary tele-presenter is on leave or unavailable.

- Institutions receiving telepsychiatry services shall have appropriate clinical staff available, including Nursing when needed.

- Support staff responsible for scheduling appointments and processing clinical paperwork, as appropriate.

- A contact list of important names and numbers for the institution. This includes, but is not limited, to the following:

  1. Laboratory
  2. Pharmacy
  3. Nursing station(s)
  4. Housing unit(s)
  5. Primary Clinician(s)
  6. Medical Provider(s)
  7. Mental Health Supervisor(s)
  8. Chief of Mental Health

9.  Chief Psychiatrist or Senior Psychiatrist Supervisor
10. IT Department
11. Scheduler
12. Medical Records Supervisor

- A confidential treatment space to facilitate patient encounters. This space shall include all equipment needed to facilitate the telepsychiatry encounter, including a computer, phone, scanner, printer, desk, and chair.

- Caseload assignments and scheduled appointments for the telepsychiatry provider.

- The maintenance of telemedicine connectivity between institutions and providers.

- Ensuring that telepsychiatry providers are appropriately privileged to provide clinical services to any licensed or inpatient units, when applicable.

- Audit reports for local compliance of items such as, but not limited to, Medication Administration Process Improvement Project (MAPIP) criteria and Effective Communication requirements.

- Organized tours for the telepsychiatry providers during their initial visits to the institution.

- Developing on-site clinical contingency plans and patient prioritization strategies to manage absences of telepsychiatry providers.

- A Local Operating Procedure (LOP) for Telepsychiatry shall be submitted to the Chief of Telepsychiatry, or designee, for review and approval prior to local distribution or implementation. Telepsychiatry services at an institution will not commence until an LOP for Telepsychiatry has been submitted and approved. Current and active LOPs shall be revised as necessary by the institution and submitted to the Chief of Telepsychiatry or designee. Any revisions of the LOP for Telepsychiatry shall be reviewed and approved by the Chief of Telepsychiatry or designee prior to implementation at the institution.

- Routine system tests to ensure that equipment is safe, operational, and secure

**Purpose**    This policy ensures services provided by the Telepsychiatry Program comply with CDCR's MHSDS Program Guidelines.  Telepsychiatry providers shall conduct care consistent with CDCR rules, regulations, policies, and local operating policies and procedures of the institution(s) to which they provide services.

**Compliance Indicators**

To be in compliance with this policy, the following requirements shall be met jointly by the Telepsychiatry Program and the institution receiving services:

1. Telepsychiatry providers are provided with the appropriate equipment and resources.
2. Telepsychiatry providers participate in the same manner as on-site psychiatrists in the receiving institutions' IDTTs and all meetings and huddles relevant to the clinical care of their patients.
3. On-site staff and members of the treatment team communicate with the telepsychiatry provider any important patient issues and concerns related to patient care.
4. Telepsychiatry providers have access to all necessary clinical information via the health record.
5. Telepsychiatry providers will communicate any important patient issues and concerns related to patient care to the on-site staff and members of the treatment team.
6. Patients are not entirely excluded from participation in the Telepsychiatry Program based solely on their level of care or their diagnosis.
7. Telepsychiatry provider completes all documentation in the health record by the close of each business day.
8. Provider and patient identity are verified at the beginning of a mental health treatment videoconference.
9. Telepsychiatry providers visit their receiving institutions as directed by policy.
10. Non-formulary requests are made directly to the psychiatry leadership of the institutions served by telepsychiatry providers, unless otherwise determined by leadership.
11. Telepsychiatry providers remain logged into Jabber throughout the work day.
12. Ongoing mandatory trainings for all telepsychiatry providers.
13. Telepsychiatry providers are privileged at each licensed or inpatient unit they serve.

**Action Required**

The following action is required for your institution to be in compliance with the new policy.

| If your institution... | then... |
|---|---|
| has a local operating procedure (LOP) | amend the current LOP to meet the new policy via an addendum within 30 days of the effective date valid until the next LOP revision date. Ensure the LOP is revised as necessary. |
| does not have an LOP | ensure that one is completed within 30 days of the effective date and create an LOP to meet the new policy requirements. Ensure the LOP is revised as necessary. |

**Questions**

If you have any questions or need any additional information related to this policy, you may contact the policy unit via e-mail at: CDCR MHPolicyUnit@cdcr.ca.gov.

# EXHIBIT 3



**XAVIER BECERRA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550

Public: (916) 445-9555
Telephone: (916) 210-7325
Facsimile: (916) 324-5205
E-Mail: Tyler.Heath@doj.ca.gov

August 1, 2018

Matthew A. Lopes, Jr.
Pannone Lopes Devereaux & O'Gara, LLC
Northwoods Office Park
1301 Atwood Avenue, Suite 215 N
Johnston, RI 02919

RE:  *Coleman v. Brown, et al.,*
U.S.D.C., Eastern District of California, Case No. 2:90-cv-00520 KJM-DB (PC)

Dear Special Master Lopes:

This letter is Defendants' response and objection to the Special Master's July 25, 2018 Draft Telepsychiatry Policy ("Draft Policy"). Although the Special Master states that "the framework for this draft policy was taken from the telepsychiatry policy previously provided to everyone by CDCR" (*see* July 25, 2018 email re Draft Telepsychiatry Policy), the Draft Policy adds significant changes to CDCR's telepsychiatry policy, some of which were never discussed or contemplated during the work group process.[1] Unless substantive changes are made to fully address Defendants' objections, Defendants cannot accept the Draft Policy.

Defendants object as a threshold matter that the Court's delegation of policymaking authority to the Special Master exceeds the powers allowed that office under Federal Rule of Civil Procedure 53, the Prison Litigation Reform Act ("PLRA"), and the Court's Order of Reference (ECF No. 640). The role of the Special Master is to assist in developing a remedial plan and conduct fact-finding to monitor Defendants' progress in achieving that plan, not to draft Defendants' administrative policies. (*Id.*)

Even if the Court could delegate policymaking authority, the Special Master's Draft Policy places limitations and restrictions on CDCR's use of telepsychiatry at the Correctional Clinical Case Management System (CCCMS), Enhanced Outpatient (EOP), crisis bed, and inpatient levels of care where there has been no finding that CDCR's current telepsychiatry policy is constitutionally deficient and therefore requires court intervention. Defendants are not aware of any credible evidence, provided in the work group process or otherwise, that any

---

[1] Defendants incorporate by reference all correspondence exchanged between the parties in the work group process, including but not exclusive to Defendants' May 16, 2018 and May 25, 2018 letters, and Dr. Joseph Penn's report entitled "Telepsychiatry in Correctional Healthcare," and supporting literature.

Matthew A. Lopes, Jr.
August 1, 2018
Page 2

inmate-patient has been harmed as a result of the use of telepsychiatry. In fact, overwhelming evidence supports CDCR's position that telepsychiatry is functionally and qualitatively equal to in-person psychiatric encounters.

CDCR's telepsychiatry policy, Attachment A, represents the considered judgment of CDCR's policy makers, administration, and clinicians. That judgment, as well as CDCR's collective experience treating its mental health population, including their extensive use of telepsychiatry, is entitled to deference. Indeed, since 2015, CDCR has provided over 70,000 telepsychiatry encounters to EOP inmates.[2] Based on this experience, CDCR's policy represents the best practices for a system-wide telepsychiatry program that provides safe and adequate psychiatric care to inmate-patients at all levels of care. The Special Master or his experts may disagree with the conclusions of CDCR's staff, but they are not entitled to substitute their judgment for that of Defendants. In the absence of evidence that CDCR's use of telepsychiatry represents an ongoing constitutional violation, CDCR must have the discretion to develop and implement its telepsychiatry policy.

## I.    The Special Master Should Not Be Drafting Policies for the State of California and Its Agencies that Manage Everyday Operations.

Defendants negotiate policies and often adopt recommendations from the Special Master and his team as a result of those negotiations. However, this does not mean that Defendants agree that the law permits the Special Master to draft policies for the State of California. The Court's Order of Reference does not grant the Special Master the power to draft policy. (*See* ECF No. 640.)[3] Indeed, the Order specifically prohibits the Special Master and his staff from "interven[ing] in the administrative management" of Defendants' institutions, and states that the Special Master "shall not be empowered to direct defendants . . . to take or to refrain from taking any specific action to achieve compliance." (*Id.* at 7:24-8:4.) While the Order instructs the Special Master to "work with defendants and experts . . . to develop a remedial plan" that addresses constitutional violations found in the Court's September 13, 1995 Order, the Court did not find any violations relating to the use of telepsychiatry. (*Id.* at 3:18-4:2; *see also* ECF No. 612.) Nor is this a power that the Court *can* provide to the Special Master under Rule 53 or the PLRA.

The United States Supreme Court has consistently counseled that Courts must give deference to states and their agencies on issues of prison management. *See Beard v. Banks*, 548 U.S. 521, 528 (2006); *Miller v. French*, 530 U.S. 327, 328 (2000) (explaining that "curbing the

---

[2] Such encounters include initial evaluations, routine follow-ups, consultations, Interdisciplinary Treatment Team (IDTT) meetings, and other interactions between the psychiatrist and inmate-patient.

[3] The Order grants the Special Master the powers only to conduct fact-finding and hold hearings with respect to Defendants' implementation of remedial measures (ECF No. 640 at 5:1-6:22, 7:8-15), to require the posting of notices in Defendants' institutions (*id.* at 6:23-26), and to retain staff (*id.* at 7:1-7).

Matthew A. Lopes, Jr.
August 1, 2018
Page 3

equitable discretion of district courts was one of the PLRA's principal objectives"). By affirmatively requiring that the Special Master redraft CDCR's telepsychiatry policy, without any evidence that CDCR's telepsychiatry policy violates inmate-patients' constitutional rights, the Court has exceeded its authority and improperly substituted the judgment of the Special Master for that of the Defendant state agencies. *See Gilmore v. California*, 220 F.3d 987, 991 (9th Cir. 2000) ("It is clear that Congress intended the PLRA to revive the hands-off doctrine," the former "rule of judicial quiescence" that the federal judiciary not be involved with the problems of state-run prisons); *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997) ("Congress passed the PLRA in an effort, in part, to oust the federal judiciary from day-to-day prison management."); *Ruiz v. Estelle*, 679 F.2d 1115, 1162 (5th Cir.), amended in part and vacated in part, 688 F.2d 266 (5th Cir. 1982) (stating that "the powers of the court's appointed agents should not intrude to an unnecessary extent on prison administration"); *Brown v. Plata*, 563 U.S. 493, 559 (2011) ("Neither the Receiver nor the Special Master was selected by California to run its prisons, and the fact that they may be experts in the field of prison reform does not justify the judicial imposition of their perspectives on the state.") (Scalia, J, dissenting.).

The Special Master's Draft Policy reflects a policy disagreement where the Special Master has improperly substituted his experts' judgment for the judgment of CDCR and its officials. The Draft Policy micromanages CDCR's operations to such a degree that it specifically dictates where and how CDCR must allocate its on-site psychiatrists at the EOP level of care before CDCR can even be permitted to use telepsychiatry. The Draft Policy also includes undefined terms, like "last resort" and "emergency," and requires that CDCR meet a vaguely defined good-faith standard to recruit and retain onsite psychiatrists before it may use telepsychiatry at the CCCMS level of care. Such lack of clarity risks significant disruption of CDCR's staffing and operation of its own mental health care system.

In short, the Draft Policy is precisely the sort of interference into CDCR's ability to run a correctional system that courts are directed to avoid. *See, e.g., Westefer v. Neal*, 682 F.3d 679, 685 (7th Cir. 2012) ("To repeat, the PLRA requires that an injunction use the 'least intrusive means necessary to correct the violation of the [f]ederal right.' Locking in specific deadlines—even with hedging 'whenever possible' language—deprives prison administrators of the operational flexibility to adjust procedures as future needs dictate and cannot be considered the least intrusive means of correcting the due-process violation."). The Draft Policy should be rejected on this ground alone.

### II.    The Restrictions Placed on the Use of Telepsychiatry are Not Supported by the Evidence or Constitutionally Required.

Defendants also object to the Draft Policy because it does not represent the least restrictive means to cure an ongoing constitutional violation. Indeed, even an order adopting CDCR's *own* proposed telepsychiatry policy would be inappropriate under the PLRA, because CDCR's proposed policy was already above the constitutional minimum. *See, e.g., Westefer v. Neal*, 682 F.3d at 686 (finding that court order adopting the Illinois Department of Corrections' detailed due process policy went beyond the constitutional minimum and violated the PLRA's

Matthew A. Lopes, Jr.
August 1, 2018
Page 4

prohibition against judicial intervention in the day-to-day operations of prison systems). CDCR originally submitted a telepsychiatry policy that it determined captures best practices for using telepsychiatry in its mental health program, including reasonable limitations on its use.

The Special Master's Draft Policy mandates limitations and restrictions that exceed what was included in CDCR's policy. And since the Court intends the Draft Policy to be an addendum to the Program Guide, its adoption would represent new affirmative prospective injunctive relief in this action. To order such relief under the PLRA, the Court must make specific findings based on the factual record to show that the restrictions imposed by the Special Master's Draft Policy are necessary to correct a current and ongoing constitutional violation and the least intrusive means by which to do so. *Graves v. Arpaio*, 623 F.3d 1043, 1047–48 (9th Cir. 2010); *see also United States v. State of Mich.,* 940 F.2d 143, 159–60 (6th Cir. 1991) (district court lacked authority to impose additional requirements on remedial plan proposed by prison officials; state was entitled to develop and implement its own procedures "until it appears from affirmative proof that the plan and procedures result in a constitutional infringement").

There is no evidence in the record to support a finding that Defendants' proposed use of telepsychiatry would violate the Eighth Amendment. While the Special Master's February 2017 report on CDCR's staffing plan included his recommendations (recommendations which were less restrictive than the currently contemplated Draft Policy), those recommendations were not based on any evidence that CDCR's telepsychiatry policy was a constitutionally infirm form of treatment for a particular patient population. At most, the Special Master's report expressed a policy preference for on-site psychiatry; it did not find that telepsychiatry would violate inmates' constitutional rights. But the Constitution does not require that CDCR institute forms of treatment that others might prefer, just that inmates receive adequate access to mental health care. *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (finding that the Eighth Amendment does not require that prison officials provide the most desirable medical and mental health care; nor should judges simply "constitutionalize" the standards set forth by professional associations such as the American Medical Association or the American Public Health Association); *see also Bell v. Wolfish*, 441 U.S. 520, 543–544 n. 27 (1979) (draft recommendations of the Department of Justice are not determinative of constitutional requirements).

Regardless, the evidence in the record does not support a finding that telepsychiatry is less effective than in-person treatment as a means of delivering adequate mental health care. The only purported evidence in the record against the use of telepsychiatry is the declaration of Plaintiffs' undisclosed expert, Dr. Pablo Stewart.[4] The crux of Dr. Stewart's declaration is that there are an inadequate number of studies regarding telepsychiatry's use in the correctional setting. To the contrary—Dr. Stewart's declaration relies on literature that uniformly finds

---

[4] As discussed more thoroughly below, Plaintiffs did not disclose Dr. Stewart as an expert before his surprise report was served on Defendants, despite Plaintiffs having previously requested sanctions on the ground that Defendants had not been transparent regarding their staffing consultants. (*See* ECF No. 5764-1 at 11.)

Matthew A. Lopes, Jr.
August 1, 2018
Page 5

telepsychiatry as an effective alternative to in-person psychiatry encounters.  (*See* Section IX, below.)

The evidentiary record overwhelmingly supports the use of telepsychiatry as a safe method of delivering care to CDCR's mentally ill population.[5]  To ensure the Special Master and Court have a complete record of Defendants' evidence thus far, Defendants identify below the court filings, letters, and other evidence they have submitted on the issue of telepsychiatry:

| | |
|---|---|
| 03/30/17 | Defendants' Response to the Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan and supporting Declarations (ECF No. 5591); |
| 04/13/17 | Defendants' Reply to Plaintiffs' Objections and Request for Additional Relief Re: The Special Master's Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan (ECF No. 5601); |
| 05/16/18 | Letter to Plaintiff's Regarding CDCR's Draft Telepsychiatry Policy (Attachment B); |
| 05/25/18 | Letter to Special Master Lopes Regarding CDCR's Draft Telepsychiatry Policy (Attachment B); |
| 07/06/18 | Letter to Special Master Lopes Regarding Dr. Joseph Penn's Report Regarding Telepsychiatry in Correctional Health Care and Dr. Penn's Report and Supporting Literature (Attachment C); and |
| 07/12/18 | Letter to Special Master Lopes Regarding Telepsychiatry and attached Scientific Literature (Attachment D). |

Defendants have attached to this letter copies of those items that are not already in the Court's record.

---

[5] The Court's July 3, 2018 order cautioned the parties against raising objections and evidence previously rejected by the Court.  However, the Court has not previously or currently found that providing telepsychiatry to inmates at any specific level of care is a constitutional violation that justifies the restrictions set forth in the Special Master's Draft Policy.  The Special Master's 2017 report on CDCR's staffing plan did not find that the telepsychiatry policy was constitutionally deficient.  Rather, it sounded a cautionary note about the use of telepsychiatry for the EOP population and expressly noted that more observation was needed.  (ECF No. 5564 at 16.)

Matthew A. Lopes, Jr.
August 1, 2018
Page 6

The record includes the report of Dr. Joseph Penn, the Mental Health Director of the University of Texas Medical Branch (UTMB) Correctional Managed Care (CMC), who oversees mental health services to approximately 116,000 adult offenders housed within Texas Department of Criminal Justice (TDCJ) facilities. Since implementing telepsychiatry, UTMB CMC has conducted over 400,000 psychiatrist-patient encounters. ("Telepsychiatry in Correctional Healthcare," Penn, J., p. 8.) Based on his extensive experience with telepsychiatry in the correctional setting, Dr. Penn opines that:

> Telepsychiatry has been successfully used to provide clinical services and educational initiatives in areas underserved by psychiatrists and other mental health care specialists. Telepsychiatry is an acceptable approach to providing high quality psychiatric services to correctional, residential, and community populations. It increases access to care, enables specialty consultation, yields positive outcomes, allows reliable evaluation, and satisfies the requirements of both patients and providers.

*Id.,* at 4.

If the Draft Policy is implemented in its current form, Defendants are caught in a Catch-22. The Court has ordered Defendants to hire a sufficient number of psychiatrists by October 2018 (ECF No. 5711), but the Special Master seeks to limit Defendants' ability to use telepsychiatry at the CCCMS and EOP levels of care, which is a barrier to CDCR's ability to hire and retain sufficient numbers of psychiatrists to meet the June 13, 2002 order (ECF No. 1383) under the ratios set forth in the 2009 staffing plan (ECF No. 3693). The evidentiary record before the Special Master and the Court does not support the notion that the use of telepsychiatry leads to a constitutional violation, let alone that any of the limitations set forth in the Draft Policy are necessary to cure any such violation. However, as discussed more fully below, the Draft Policy's limitations would have a material adverse effect on CDCR's ability to employ telepsychiatry, requiring the hiring of additional staff where such hiring may not be possible or would be inefficient, prohibiting the use of telepsychiatry for large classes of patients, denying the use of telepsychiatry in programs where an on-site practitioner is not available, and prohibiting the use of telepsychiatry at cell fronts even on an emergency basis – all without evidence to show that these limitations are narrowly tailored and necessary to correct an ongoing constitutional violation.

### III.    Defendants' Specific Objections to the Draft Policy.

Defendants specifically object to the following provisions in the Draft Policy because they lack evidentiary foundation and are not necessary to address any previously identified constitutional harm to any inmate or to cure any previously identified constitutional deficiency. In certain instances, the Draft Policy even exceeds the limitations dictated by the court in its July 3 order.

Matthew A. Lopes, Jr.
August 1, 2018
Page 7

- At page 3, the restriction that "At present, cell-front provision of telepsychiatry is not permitted";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the CCCMS level of care.  If these efforts are unsuccessful, telepsychiatry is an acceptable alternative, consistent with the requirements described in other sections of this policy and procedure";

- At page 3, the limitation that "Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry";

- At page 3, the precondition that "At least 1.0 full-time on-site psychiatrist shall be assigned to each program and each unit within that program providing EOP level of care services within the institution. Programs providing an EOP level of care include Psychiatric Services Units, EOP Administrative Segregation Units, and mainline EOP programs. If an EOP program has more than one unit, each unit within that program will have at least one full-time on-site psychiatrist assigned to that unit";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure";

- At page 3, the restriction that "Telepsychiatry may not be used at the MHCB level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the MHCB level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure."

- At page 3, the restriction that "Telepsychiatry may not be used at the PIP level of care except as a last resort or in emergency situations when an on-site psychiatrist is unavailable";

- At page 3, the precondition that "Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the PIP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via

Matthew A. Lopes, Jr.
August 1, 2018
Page 8

telepsychiatry consistent with the requirements described in other sections of this
policy and procedure";

- At page 4, the addition of EOP to the paragraphs labeled "EOP, MHCB and
  Psychiatric Inpatient Programs"; and

- At page 5, the deletion of the phrase "to the extent possible" before "so that
  others are not able to enter" in the paragraph labeled "Physical Environment."

A.    **The Special Master's Restrictions at the CCCMS Level of Care Go Beyond
      Not Just What Is Constitutionally Required, But Also His Prior
      Recommendations and the Court's July 3, 2018 order.**

The Special Master does not have the authority, under the law or the 1995 Order of
Reference in this case, to determine CDCR policy.  (*See*, e.g., Order Ref., ECF No. 640.)  But
even assuming the Special Master has such authority, the Draft Policy goes beyond that which is
constitutionally required.  The Special Master's Draft Policy states that "Good faith efforts shall
be made to recruit and retain on-site psychiatrists to provide services at the CCCMS level of
care" and "[i]f these efforts are unsuccessful, telepsychiatry is an acceptable alternative . . ."
(Draft Policy at 3.)  This provision conditions the use of telepsychiatry at the CCCMS level on
CDCR first failing to recruit on-site psychiatrists.  But unless evidence supports a finding that
CDCR's use of telepsychiatry at the CCCMS level is unconstitutional, then any such
precondition is unnecessary.  The fact that CDCR may be unable to hire for on-site is irrelevant
to that ultimate determination.

Moreover, the prerequisite of unsuccessful recruitment moves the goalposts beyond the
Special Master's own prior recommendations and the Court's July 3, 2018 order.  The Special
Master's February 2017 report stated that "[f]or 3CMS level of care inmates, [telepsychiatry] is
an appropriate option with the requirement that the telepsychiatrist work on-site at least twice per
year at the designated institutions and more frequently if feasible."  (ECF No. 5564 at 16.)
Similarly, the Court's July 3, 2018 order stated that the "Special Master has clarified for the
court that his experts agree telepsychiatry may replace on-site psychiatry at the CCCMS level of
care so long as . . . (1) telepsychiatrists visit the institution at least twice a year; and (2)
defendants continue a good faith effort to recruit on-site psychiatrists for all institutions
providing a CCCMS level of care."  (ECF No. 5850 at 5.)  The order also stated that "defendants
shall proceed forthwith [with] full implementation of telepsychiatry at the CCCMS programs,
conditioned on biannual visits . . . and continued efforts by defendants to recruit on-site."  The
Court did not make CDCR's use of telepsychiatrists conditional on failed recruitment efforts.
And, the Court's order stated that it "may replace" on-site psychiatry, not that it is merely an
acceptable alternative.  (*Id.*)

The Draft Policy's requirement that efforts to hire on-site psychiatrists must fail before
telepsychiatry is used is also internally inconsistent with other parts of the Draft Policy.  The
Draft Policy, like CDCR's policy, states that "[t]he Telepsychiatry Program provides mental

Matthew A. Lopes, Jr.
August 1, 2018
Page 9

health services to the [CCCMS] level of care . . ." (Draft Policy at 1.) The Special Master's condition is contrary to that statement. It is also inconsistent with the evidence, history of telepsychiatry treatment at the CCCMS level of care, and scientific literature showing that telepsychiatry is a safe and appropriate method of care.

Accordingly, this section of the Draft Policy should be redrafted to state that: "Telepsychiatry may be utilized at the CCCMS level of care consistent with the requirements described in other sections of this policy and procedure. The Department will maintain efforts to recruit and retain on-site psychiatrists at institutions that provide CCCMS care."

> **B.  The Special Master's Restrictions on Telepsychiatry at the EOP Level of Care Are Inconsistent with His Prior Recommendations and Exceed Any Prior Discussion of the Parties**.

With regard to the use of telepsychiatry at the EOP level of care, the Draft Policy states:

> Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry. At least 1.0 full-time on-site psychiatrist shall be assigned to each program and each unit within that program providing EOP level of care services within the institution. Programs providing an EOP level of care include Psychiatric Services Units, EOP Administrative Segregation Units, and mainline EOP programs. If an EOP program has more than one unit, each unit within that program will have at least one full-time on-site psychiatrist assigned to that unit. Good faith efforts shall be made to recruit and retain on-site psychiatrists to provide services at the EOP level of care. If these good faith efforts are unsuccessful, psychiatric services may be supplemented via telepsychiatry consistent with the requirements described in other sections of this policy and procedure.

(Draft Policy at 3.)

This degree of micromanagement is not supported by evidence in the record that CDCR's use of telepsychiatry will prevent inmates at the EOP level of care from obtaining adequate access to mental-health care. Indeed, the record shows that the opposite is true. (*See* "Telepsychiatry in Correctional Healthcare," Penn, J., p. 11 ["[I]t is clinically appropriate for CDCR inmates who meet the program designation as an EOP patient to have their psychiatric care delivered through telepsychiatry"].)

Moreover, even assuming an evidentiary finding that unrestricted use of telepsychiatry is unconstitutional, by imposing the above limits and restrictions on its use at the EOP level of care, the Draft Policy goes far beyond what is constitutionally required and seeks to manage CDCR's allocation of its clinical resources at the granular level.

Matthew A. Lopes, Jr.
August 1, 2018
Page 10

1.  **The Requirement for One Full-Time On-Site EOP Psychiatrist Per Program, Per Unit Is Arbitrary, Confusing, and Overly Burdensome.**

At no time was the requirement of one on-site psychiatrist for each EOP program and/or unit raised or discussed by the Special Master or Plaintiffs.  Nothing in the Special Master's February 2017 report or recommendation suggested this was necessary for telepsychiatry to be a safe or constitutional mode of care for EOP inmate-patients.  The Special Master's February 2017 recommendation was limited to his statement that the efficacy for EOP inmate-patients "was not clear," "that a psychiatrist be on-site at least quarterly," and "additional data would need to be examined."  (ECF No. 5564 at 16.)  Similarly, nothing in any of the Court's orders addressing telepsychiatry hinted at a strict policy that required at least one on-site psychiatrist per program, per unit.  The Special Master never raised this issue in any work group, which the Court ordered the parties to engage in specifically to discuss and resolve CDCR's staffing issues.  Defendants were never given an opportunity to discuss the proposal or respond to it before it was included in the Draft Policy.

Also, the Draft Policy does not define the term "unit."  The meaning of this term is critically important to understanding the extent of the burden imposed by the Special Master's Draft Policy.  On July 30, 2018, Defendants asked the Special Master's team for a definition of "program" and "unit" under the Draft Policy.  The Special Master's team informed Defendants that they considered the term "program" to include the EOP mainline programs, EOP Administrative Segregation Unit hubs (ASU), or Psychiatric Services Units (PSU).  The Special Master's team did not provide a clear definition of "unit," which could reasonably be interpreted as an individual housing unit, a facility or yard, or perhaps an institution.

The requirement of one on-site psychiatry per program, per unit (be it an individual housing unit or yard) is arbitrary.  CDCR's institutions have varying numbers of programs and each of those individual programs may have a different number of buildings and the buildings often differ in patient capacity.  It is also possible that a mainline EOP program that takes up all or part of a specific facility or yard may include an EOP ASU or PSU program.  In short, the term "unit" is untethered to CDCR's actual operations.  The lack of clarity as to what constitutes a "unit", and the variance in how programs are set up at different institutions will lead to confusing and inconsistent staffing allocations, which this Court directed the parties to resolve with the Special Master's assistance through the work group process.

2  **The Requirement for One Full-Time On-Site EOP Psychiatrist Per Program, Per Unit Will Change the Way CDCR Allocates Mental Health Staff and Will Force Programs to Either Close or Not Provide Psychiatry Services.**

CDCR currently allocates staff based on patient population at the prison and the staffing ratios imposed by the 2009 Staffing Plan.  However, the Draft Policy upends that staffing model as it allocates positions in a way never contemplated by the 2009 Staffing Plan.  Based on the Draft Policy, CDCR may be forced to allocate additional staff beyond what is presently required

Matthew A. Lopes, Jr.
August 1, 2018
Page 11

depending on the number of "programs" and "units" at an institution, rather than the patient population. For example, in January 2018, Mule Creek State Prison was allocated a total of 6.25 psychiatry positions to services its EOP GP population. Should the policy be implemented as is and a "unit" be interpreted as a "housing unit," CDCR would have to hire 7 on-site psychiatrists to use telepsychiatry. This means that CDCR would have to allocate psychiatry positions above and beyond what is required per the 2009 staffing model.

The Draft Policy would also require CDCR to unnecessarily reallocate psychiatrists to each "program," which are defined as a mainline EOP, an ASU EOP hub, or a PSU. This reallocation will only worsen CDCR's psychiatry staffing situation because programs, such as ASU EOP hubs or a PSU, have smaller populations that do not make up a full psychiatry case load. Thus, many of the psychiatrists assigned to these smaller programs also serve other EOP programs or levels of care. For example, at California Healthcare Facility (CHCF), one full-time psychiatrist provides services to both the ASU EOP hub and part of the CCCMS population. Under the Draft Policy, that psychiatrist would have to be fully committed to the ASU EOP hub, with its census of approximately thirty-five, because the Draft Policy defines the ASU EOP hub as its own "program." This would result in overstaffing of the ASU EOP hubs which currently assign one psychiatrist to 64 patients. But because eight of the ten ASU EOP hubs have less than 64 patients, the draft policy world require CDCR to allocate more positions than needed to provide care under the 2009 staffing plan. Similarly, at the California Institution for Women, its mainline EOP and PSU are in the same building. But since the PSU is considered a separate program in the Draft Policy, it would need its own dedicated full time psychiatrist to provide services, despite currently having a population of five inmates.[6]

The Draft Policy's new EOP-focused guidelines are also likely to cause CDCR to cease providing treatment to EOP level inmates at certain institutions. At the July 30, 2018 workgroup, the Special Master's team clarified that if CDCR was not able to provide the required one full-time on-site psychiatrist for each program, the programs that did not have the on-site psychiatrists would not be permitted to provide telepsychiatry. This would effectively close those units to providing inmate care, which would be tantamount to a construction order, improperly requiring CDCR to build additional EOP space at other prisons. 18 U.S.C.A. § 3626(a)(1)(C). For example, should the Special Master's Draft Policy be implemented, the mainline EOP program on E Yard at CHCF – a medical facility – would no longer be able to use telepsychiatry to provide patient care because a full-time on-site psychiatrist is not assigned to that program. CDCR would be forced to either move over 400 patients to another Level II EOP program[7], pull an on-site psychiatrist from a higher level of care, such as an a MHCB or a PIP, to

---

[6] PSUs are allocated psychiatrists at the same ratio as ASU EOP hubs.

[7] If the EOP inmates were transferred from CHCF, they would have to be housed in one of the six remaining Level II EOP institutions: California Men's Facility (CMF), Mule Creek State Prison (MCSP), Richard J. Donovan (RJD), California Substance Abuse Treatment Facility (SATF), San Quentin State Prison (SQ), or Valley State Prison (VSP). However, many of these institutions would face similar challenges as CHCF in that buildings or yards may be closed

Matthew A. Lopes, Jr.
August 1, 2018
Page 12

provide on-site services to the EOP population, or not provide psychiatry care to those patients, despite having the ability to provide effective care via telepsychiatry.

Moreover, there are several programs at various institutions that may face challenges similar to CHCF. Even those institutions that currently have the requisite one full-time, on-site psychiatrist per program, per unit, are only one extended absence away from being barred from providing psychiatry care. Should the one on-site psychiatrist retire, leave CDCR employment, or be re-allocated to service a different level of care, under the Draft Policy that institution would have to cease providing telepsychiatry care. Cessation of telepsychiatry services would serve as a significant disruption to patient care and will lead to constant closures of EOP programs, more reliance on telepsychiatry in the higher levels of care, and increased and unnecessary transfers of EOP patients across the state. In this regard, the Draft Policy would worsen CDCR's ability to recruit and retain psychologists and social workers. Shuttering an entire EOP program would lead to laying off every psychologist, social worker, recreational therapist, psychiatric technician, and support staff that provides services to that EOP program. CDCR would then have to build a new EOP program at another institution from scratch.

In short, the Draft Policy upends CDCR's 2009 Staffing Plan and drastically changes the way it allocates resources, while potentially placing inmate-patients in harm's way by denying them access to telepsychiatry.

### 3. CDCR's Enhanced Outpatient Level of Care is Neither Residential nor Synonymous with In-Patient Levels of Care.

To the extent the Special Master's Draft Policy concludes that CDCR's EOP level-of-care program is purely residential or synonymous with inpatient care, that reliance has no factual foundation, is contradicted by the Program Guide, and ignores the real-world application and understanding of residential programs in the prison setting. Without allowing the parties to provide evidence or briefing, the Court's July 3, 2018 order erroneously stated that the EOP was residential and synonymous with inpatient care. Defendants intend to appeal the July 3 Order.

As discussed in Defendants' July 12, 2018 letter to the Special Master, the July 3, 2018 order stated that "Although EOP is labeled an outpatient program, outpatient is contextual and relative to inpatient programs within the MHSDS; moreover, the Revised Program Guide makes clear EOP is a residential program, synonymous with an inpatient setting. (ECF No. 5850 at 10.) In reaching its conclusion, the Court cited to the EOP's provision of separate housing, treatment and programming for inmate-patients "'whose mental illness precludes their placement and participation' in the general population." (*Id.*) That characterization represents an over reliance on the inmate's separate housing unit.

---

because CDCR could not hire one full-time on-site psychiatrist per program, per unit, as required by the Draft Policy.

Matthew A. Lopes, Jr.
August 1, 2018
Page 13

While it is true that EOP inmates are housed in designated living units at hub institutions, it is not the separate housing unit that characterizes the level of care, but the staffing and the amount and intensity of care provided. (Brizendine Decl. at ¶ 8.) As Defendants stated at the June 28, 2018 status conference, the separate unit for EOP inmates is a security measure for a potentially vulnerable population. (*See also id.*)

The Program Guide makes clear that CDCR's "[o]utpatient care is provided in an array of treatment levels and modalities including a day treatment program and an outpatient clinic of care." (Revised Program Guide, 12-1-1.) EOP is CDCR's "most intensive level of outpatient mental health care within the MHSDS." (*Id.* at 12-4-1; Brizendine Decl. at ¶ 6.) EOP is outpatient level of care where the patient can receive intensive mental health treatment, while pursuing their educational certifications and degrees. EOP inmates hold jobs and engage in various rehabilitation opportunities, but return to their housing unit at the end of their day. (Brizendine Decl. at ¶ 7.) Contrary to the separation concept reflected in the Draft Policy, draft policy, CDCR is working to integrate the EOP population into the broader inmate population and into the full array of programs and opportunities available to the larger inmate population. (*Id.* at ¶ 10.)

It is also incorrect to equate EOP level of care to inpatient care. CDCR provides inpatient care at the intermediate, acute, and crisis bed levels of care. (Revised Program Guide at 12-1-9, 12-5-1.) The inpatient level of care is a closed treatment environment where all treatment must be provided within the licensed unit, all medication must be by doctor order, and the unit provides 24-hour nursing care. (Brizendine Decl. at ¶ 13.) Overall, inpatient levels of care have higher acuity patients, more robust staffing levels, a hospital level treatment setting, and patients receive a greater amount of treatment. (*Id.* at ¶¶ 12-18.) EOP level patients are specifically excluded from the inpatient level of care because they are not so impaired that they require intensive 24-hour care. (*Id.* at 11; Revised Program Guide at 12-4-1.)

In addition to these practical differences between the EOP and inpatient care, inpatient mental health facilities must be licensed and meet specific licensing requirements. CDCR's inpatient care facilities are licensed under Title 22. (*Id.* at ¶ 14.) However, EOP units, as outpatient units, do not require licensure. (*Id.*) This is also different than some community residential treatment programs, which also require licensing. (*See* Cal. Welf. & Inst. Code § 5675 (requiring mental health rehabilitation centers be licensed by the State Department of Health Care Services))

The Special Master and his experts, based on their years of monitoring the system, are certainly aware of the vast differences between the EOP and inpatient levels of care. It was therefore surprising that the Draft Policy equates the levels of care and artificially places a blanket restriction on telepsychiatry for EOP patients.

Matthew A. Lopes, Jr.
August 1, 2018
Page 14

IV.    **The Special Master Team's Interpretation of "Last Resort or Emergency Situations" in the Restricting the Use of Telepsychiatry at the MHCB and Psychiatry Inpatient Programs (PIP) are Unreasonable.**

The Special Master's Draft Policy states that telepsychiatry may not be used at the MHCB and PIP levels of care except "as a last resort or in emergency situations." (Draft Policy at 3.) This language is consistent with the Court's July 3, 2018 order. However, the Special Master's Team's interpretation of what constitutes a "last resort or emergency situation" is unreasonable and would functionally close at least one MHCB.

On July 30, 2018, Defendants asked the Special Master's Team to define a "last resort or emergency." Dr. Metzner stated this was a legal question—in his opinion, however, whether a situation was an "emergency" depended on the length of time telepsychiatry must be used at an MHCB or PIP level of care. For example, the longer telepsychiatry is used, the less likely it could be considered an "emergency." Defendants specifically raised the question of the MHCB at High Desert State Prison, which has been serviced exclusively by telepsychiatry for several years. Dr. Metzner replied that, in his opinion, using telepsychiatry at an MCHB or PIP level of care for more than a few months would cause concern and alarm for both the Special Master's experts and Plaintiffs' counsel. Such an interpretation would functionally close the MHCB at High Desert, despite the fact that that MHCB is meeting most Program Guide requirements and has a lower 30-day re-admission rate than the state average.

The Special Master's interpretation would not only effectively close the High Desert MHCB, but it will also impact patient treatment at other MHCBs and PIPs that have limited on-site staff. For instance, Pelican Bay State Prison currently has only one on-site psychiatrist who provides service to the MHCB. Should that psychiatrist leave Pelican Bay, telepsychiatry will be the only available modality of providing psychiatry services to the Pelican Bay MCHB until a replacement can be located. Given the remote location of Pelican Bay, CDCR is likely to have a difficult time hiring a new psychiatrist for the MHCB within a couple of months. Thus, CDCR would again be forced to either close the Pelican Bay MHCB or deny psychiatry services to that population.

When CDCR does not have the psychiatry staff available to provide necessary on-site care, it should be able to use telepsychiatry as a "last resort." Where and when CDCR is unable to hire on-site staff, patients in the MHCBs and PIPs should be provided with appropriate psychiatric care, even if telepsychiatry is the only available modality. CDCR should not be forced to endanger patients by withholding telepsychiatric services when there is no alternative form of psychiatric care available.

V.    **The Special Master's Prohibition Against Cell-Front Telepsychiatry is Vague and Premature**.

The Special Master's Draft Policy deletes the sections in CDCR's policy that referenced cell-front telepsychiatry and inserted the statement that, "At present, cell-front provision of

telepsychiatry is not permitted." (Draft Policy at 3.) Including an affirmative restriction in the policy is unnecessary, surplus, and premature.

Cell-front psychiatry visits are a reality in the correctional context and, in some circumstances, are the only means of providing a psychiatric appointment for an inmate-patient who refuses to exit his or her cell. Also, cell-front telepsychiatry can more promptly provide psychiatry services to inmate-patients when an in-person psychiatrist is not available to provide the needed care. (*See* Kuich Decl. Supp. Defs.' Resp. Special Master's Draft Telepsych. Policy at ¶¶ 10-11.) The Special Master's Draft Policy ignores these facts.

Moreover, the Special Master's February 2017 report did not contain any recommendations related to cell-front telepsychiatry and the Court has not made any findings related to its use. The Special Master's expert and Plaintiffs have observed one demonstration of cell-front telepsychiatry, but not under precise clinical conditions. These non-clinical conditions resulted in unrepresentative sound-quality during the demonstration. By contrast, CDCR's tests of this same equipment under clinical conditions have resulted in much better sound quality than what the Special Master's expert experienced at the demonstration. (*See id.* at ¶ 9.) Nevertheless, CDCR is looking at additional ways to address sound-quality concerns raised by the Special Master's expert, including procuring improved microphones to further improve the sound quality even under non-standard conditions.

The Court and the Special Master should not rule out the possibility of using cell-front telepsychiatry as CDCR works to improve the technology and the manner in which telepsychiatry is provided to inmate-patients at the cell front. Otherwise, CDCR will be prematurely prevented from continuing to develop the technology and practice.

**VI.    The *Plata* Receiver's Implementation of Telemedicine Supports CDCR's Use of Telepsychiatry**.

Telemedicine for non-mental health conditions offers strong support for CDCR's use of telepsychiatry. California Correctional Health Care Services (CCHCS), under the guidance of the Receiver, accepted and adopted an expansive telemedicine system over ten years ago. In 2008, the Receiver proposed "a significantly expanded telemedicine program" because "[t]elemedicine is being used very effectively by prison health care systems around the country." (The Receiver's Turnaround Plan of Action at 34, June 6, 2008, ECF No. 35.) The aggressive expansion of telemedicine was part of the Receiver's "plan designed to correct constitutional deficiencies in California's prison health care system" and chosen as a priority of critical need. (*Id.* at 6.) The Court adopted the proposed plan, including the telemedicine expansion. (*Plata* Order, June 16, 2008, ECF No. 1245.)

The purpose of CCHCS's current telemedicine program is to provide "medical specialty, primary care, and other medical services" to inmates and "[i]mprove access to constitutionally adequate medical services utilizing telecommunications technology." Telemedicine Services Policy, 11.1.1 (Mar. 2015). "Telemedicine services shall be utilized by institutions ***whenever***

Matthew A. Lopes, Jr.
August 1, 2018
Page 16

*possible* to reduce custodial costs for specialty services delivered outside of the institution, increase community safety by reducing transports to outside facilities, and optimize availability of specialty care for institutions where specialists in the community are not readily accessible." *Id*. (emphasis added). The policy gives deference to clinicians and guides the institution to use telemedicine "when medically appropriate," rather than handcuffing the patient's doctor with blanket restrictions and exclusions. Telemedicine Services Policy, 11.1.2 (May 2015).

The telemedicine program and policies have resulted in an expansion from thirty specialists in four locations in Fiscal Year (FY) 2006-07 to two-hundred specialists in twenty-two locations in FY 2017-18, and an increase in specialty encounters from 14,577 in FY 2010-11 to 31,340 in FY 2017-2018. Overall, FY 2017-18 had almost 70,000 specialty and primary care telemedicine appointments. (*Id*.) In addition to primary care, telemedicine provides care to 28 different specialties including neurology, transgender, pulmonology, and cardiology. (*Id*.)

Before telemedicine, telepsychiatry was the original remote means of health-care delivery. Indeed, physicians were initially resistant to telemedicine because physical examinations are a typical part of non-mental-health medical care. Abrams, J. et. al., *Practical Issues in Delivery of Clinician-to-Patient Telemental Health in an Academic Medical Center*, Harv. Rev. Psychiatry, 25(3), 135 (May/June 2017). The scientific literature provided by the *Plata* parties states that physical examinations were a reason that telemedicine historically encountered more resistance in non-mental health fields than it did for mental health care, even in prison settings. *Id*; Glaser, M. et. al., *Provider Satisfaction and Patient Outcomes Associated with a Statewide Prison Telemedicine Program in Louisiana*, Telemedicine & E-Health, 16(4), 472-479 (2010). However, telemedicine is now widely accepted and practiced nationwide, which provided the basis for the Receiver's plan to provide constitutional medical care to CDCR inmates. Thus, CDCR's use of remote healthcare, whether by a physician or psychiatrist, does not constitute a constitutional violation.

In short, the use of telemedicine by the Receiver supports CDCR's expanded use of telepsychiatry beyond the restrictions included in the Special Master's Draft Policy.

### VII. Defendants' Objections to the Declaration of Non-Disclosed Expert Dr. Pablo Stewart.

In their July 12, 2018 letter to the Special Master, Plaintiffs submitted the declaration of Dr. Pablo Stewart to support their position regarding CDCR's use of telepsychiatry. However, Plaintiffs failed to disclose Dr. Stewart as an expert on telepsychiatry before July 12, 2018. Plaintiffs have taken the position that experts, regardless as to their purpose, must be disclosed in this case. Defendants have consistently disclosed their retention of consultants and experts and the purpose of those experts. Plaintiffs' non-disclosure of Dr. Stewart suggests an unacceptable double standard.

Matthew A. Lopes, Jr.
August 1, 2018
Page 17

Moreover, Dr. Stewart's report on CDCR's telepsychiatry program is not competent expert testimony and it should be rejected by the Special Master and excluded by the Court.[8] Most of Dr. Stewart's opinions on the limitations purportedly inherent in telepsychiatry, and CDCR's use of it in particular, are unsupported.

A.    **The Special Master Should Reject Dr. Stewart's Recommended Limits On CDCR's Telepsychiatry Program Because They Lack Foundation.**

Dr. Stewart opines that CDCR's use of telepsychiatry for seriously mentally-ill patients should be limited. (*See* Stewart Decl. at ¶¶ 15-22.) To support his position, Dr. Stewart speculates telepsychiatry may be inappropriate for high-needs inmates with delusions because those patients may incorporate the telepsychiatry equipment into their delusions. (*Id.* at ¶¶ 15-16.) Dr. Stewart, however, does not offer any professional study to support this fear and he does not attempt to link the worry to any particular event within his experience. (*Id.* at ¶¶ 15-16.)

The remaining bases that Dr. Stewart offers for the proposition that CDCR telepsychiatry should be limited to low-level patients are an anecdote from a seven-year-old study (some psychotic patients reported difficulty hearing doctors through their telepsychiatry units), and two CDCR suicide reports that do not describe telepsychiatry defects. The study—Grady & Singleton, *Telepsychiatry Coverage to a Rural Inpatient Psychiatric Unit*, Telemed. J. E. Health, (2011)—looked at whether short-term telepsychiatric coverage of a rural inpatient facility was possible using video-teleconference technology, concluding that it effectively provided staff. *Id.* at 605. Notably, nothing within the study suggests that telepsychiatry harmed patients or denied them as adequate treatment. *See id.*

Similarly, the suicides described by Dr. Stewart do not support the limitations for which he advocates. (*See* Stewart Decl. at ¶¶ 16-22.) Notably, the inmate-patient in the first suicide discussed by Dr. Stewart refused to be seen by telepsychiatry. (*See id.* at ¶ 18.) Dr. Stewart's analysis of both cases relies on issues of documentation and communication. But neither of those issues are specific to telepsychiatry as a mode of treatment. Contrary to Dr. Stewart's

---

[8] Federal Rule of Evidence 702 provides that a qualified expert witness may offer opinion testimony where "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." These requirements ensure that the putative expert "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). Expert opinions should be based on "facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. Courts are not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

representations, the inmate suicides he discussions do not tell a story of telepsychiatry's inefficacy.

Because Dr. Stewart does not offer a sound foundation for his opinion that telepsychiatry should be limited to low-level patients and those not in crisis, his opinions should be excluded. *See* Fed. R. Evid. 703.

### B.    Dr. Stewart Misrepresents the State of the Professional Literature On High-Needs Patients.

Dr. Stewart inaccurately represents that the professional literature concerning telepsychiatry for what he classifies as high-needs patients (EOP, inpatient, and those in crisis) merits caution. (*Id.* at ¶¶ 8-15.)  But a close reading of these studies show they mostly conclude that telepsychiatry is a safe and effective method of providing treatment, which is consistent with the scientific literature that the Defendants provided in their July 12, 2018 letter and prior filings.

In *An Experimental Comparison of Telepsychiatry and Conventional Psychiatry for Parolees* (Psychiatry Serv., Farabee, et. al. (2016)), the authors' conclusion that telepsychiatry was an acceptable and effective approach to providing care to the population. *Id.* at 562.  The *Usefulness of Telepsychiatry: A Critical Evaluation of Videoconferencing-Based Approaches*, (World J. Psychiatry, Chakrabarti, et al. (2015))—notes that telepsychiatry is no less effective than conventional psychiatry and that telepsychiatry may be incorporated into hybrid models of mental-health care. *Id.* at 290.  In yet another study, the authors found that psychiatric interviews and diagnostic assessments could be reliably conducted through telepsychiatry and, that "[t]here is little evidence that patients with psychosis have difficulty with videoconferencing or experience any exacerbation of symptoms." *See* Sharp, et al., *The Use of Videoconferencing with Patients with Psychosis: a Review of the Literature*, Annals Gen. Psychiatry, 1, (2011).  And in *Telepsychiatry in Correctional Facilities: Using Technology to Improve Access and Decrease Costs of Mental Health Care in Underserved Populations* (Permanente J., Deslich, et. al, (2013)), the study concluded that "[t]elepsychiatry provided improved access to mental health services for inmates, and this increase in access is through the continuum of mental health care, which has been instrumental in increasing quality of care for inmates."  Dr. Stewart omitted the study's key conclusion that "[i]ncreasing access to mental health care for [inmates] through telepsychiatry may improve living conditions and safety inside correctional facilities.  Providers, facilities, state and federal governments can expect increased safety with utilization of telepsychiatry."

In short, the studies cited by Dr. Stewart do not support his position.  Instead, the literature discussed by Dr. Stewart suggests that if used conscientiously, telepsychiatry is a safe and effective means to supply psychiatric services to high-needs patients.

Matthew A. Lopes, Jr.
August 1, 2018
Page 19

**C.    The Special Master Should Reject Dr. Stewart's Opinions On CDCR's
Use of Cell-Front Telepsychiatry Because They Lack Foundation.**

Dr. Stewart further declares that telepsychiatry is inappropriate for cell-front
interventions and that it limits providers' ability to identify signs of medical or mental distress.
(*See* Stewart Decl. at ¶¶ 22-31, 35-37.)  These limitations are based on the purported
shortcomings of telepsychiatry equipment and the practice's "remote nature."  (*See*, *e.g.*, *id.* at ¶¶
23, 28, 31, 35.)  But Dr. Stewart provides no basis for that conclusion.  Nowhere in Dr. Stewart's
report does he describe his understanding of CDCR's particular telepsychiatry portals.  Dr.
Stewart does not state that he has ever observed CDCR's cell-front telepsychiatry technology or
a pilot of the technology.  This lack of foundation to Dr. Stewart's opinions undercuts his
concerns about connection quality (*id.* at ¶ 24) as well as his discussion of the purported
impediments to telepsychiatric diagnosis owing to limited or fixed frames of observation.  (*Id.* at
¶ 28.)

Dr. Stewart's comments on telepsychiatric cell-front encounters also lack foundation.  He
suggests, for instance, that the noisiness of CDCR housing units will somehow interfere with
cell-front telepsychiatric interactions.  (*Id.* at ¶ 23.)  But CDCR does not anticipate the need for
cell-front telepsychiatry in conventional housing units, which is where EOP and lower level-of-
care inmates are housed.  Instead, virtually all cell-front telepsychiatric interventions would
occur in areas devoted to MHCB and the PIP.  Dr. Stewart appears unaware that MHCB and PIP
units are typically much smaller and quieter than conventional housing units.  Moreover, the cell
fronts in MHCB and PIP units generally offer better visibility than conventional cell fronts.
Because Dr. Stewart expressed no understanding of the particulars of CDCR cell-front
telepsychiatry, his speculation about its technological limitations is not supported by relevant
facts.

Because Dr. Stewart's opinions regarding the technological shortcomings of CDCR's
telepsychiatry program lack the foundation required for an expert opinion under Rule 703, the
Court should those opinions from evidence and reject his opinions on those matters.

**D.    Dr. Stewart is Not Qualified to Opine that CDCR Can Meet Its Staffing
Needs Through Mere Patient Clustering.**

The American Psychiatric Association notes that prisons lend themselves to
telepsychiatry, especially in rural areas "where access to psychiatric services is limited or
absent."  Metzner, Penn, et al., *Psychiatric Services in Correctional Facilities*, at 68, (2016).  Dr.
Stewart dismisses the APA's position, however, stating that difficulty in staffing is not an
argument for the clinical appropriateness of telepsychiatry.  (*See* Stewart Decl. at ¶ 8.)  He then
claims that CDCR can meet its staffing needs by "clustering programs" in prisons "close to large
urban centers," "where in-person psychiatrists can be hired."  (*Id.* at ¶¶ 8-9, 18.)  Dr. Stewart
does not purport to base these assertions on his personal knowledge.  (*See id.*)  And he does not
identify studies or other information indicating that CDCR could address its lack of staff
psychiatrists by further clustering patients.  (*See id.*)  Further, Dr. Stewart's is unqualified to

Matthew A. Lopes, Jr.
August 1, 2018
Page 20

opine on California labor dynamics. For these reasons, Stewart's suggestion that CDCR can solve its staffing needs through further clustering is baseless and should be discounted.

Based on the above, the telepsychiatric limitations identified and recommended within Dr. Pablo Stewart's declaration lack foundation or are counter to the scientific literature.

### VIII. Conclusion.

CDCR provided the Special Master and Plaintiffs with a telepsychiatry policy that represented its judgment of best practices for telepsychiatry in its system. That policy was based on CDCR's extensive experience using telepsychiatry and supported by the scientific literature. The July 3, 2018 order and the Special Master's Draft Policy, however, added overly intrusive restrictions on CDCR's ability to use telepsychiatry to provide mental-health treatment to inmates who need it. And the evidence does not show that these restrictions are necessary to remedy an existing constitutional violation caused by CDCR's telepsychiatry policy. Accordingly, the Court should reject the Special Master's Draft Policy and allow CDCR to implement its telepsychiatry policy under the guidance of the Special Master and his experts.

Sincerely,

*/s/ Tyler V. Heath*

TYLER V. HEATH
Deputy Attorney General

For    XAVIER BECERRA
Attorney General

TVH:

Attachments

cc:    Plaintiffs' Counsel

CF1997CS0003
13186943.docx

# EXHIBIT 4

1  XAVIER BECERRA, State Bar No. 118517
   Attorney General of California
2  JAY C. RUSSELL, State Bar No. 122626
   Supervising Deputy Attorney General
3  ELISE OWENS THORN, State Bar No. 145931
   ANDREW M. GIBSON, State Bar No. 244330
4  TYLER V. HEATH, State Bar No. 271478
   IAN MICHAEL ELLIS, State Bar No. 280254
5  TOBIAS G. SNYDER, State Bar No. 289095
   Deputy Attorneys General
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-4426
     Fax:  (415) 703-5843
8    E-mail:  Tobias.Snyder@doj.ca.gov
   *Attorneys for Defendants*

9

IN THE UNITED STATES DISTRICT COURT

10

FOR THE EASTERN DISTRICT OF CALIFORNIA

11

SACRAMENTO DIVISION

12

13

| | |
|---|---|
| 14 **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| 15 Plaintiffs, | **DEFENDANTS' OBJECTIONS TO THE** |
| | **SPECIAL MASTER'S REPORT ON THE** |
| 16 **v.** | **PROPOSED TELEPSYCHIATRY** |
| | **POLICY ADDENDUM TO THE** |
| 17 | **CALIFORNIA DEPARTMENT OF** |
| **EDMUND G. BROWN JR., et al.,** | **CORRECTIONS AND** |
| 18 | **REHABILITATION MENTAL HEALTH** |
| Defendants. | **SERVICES DELIVERY SYSTEM** |
| 19 | **PROGRAM GUIDE** |
| 20 | |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

DISCUSSION ..................................................................................................................... 2

    I.     Relevant Procedural History. ........................................................................ 2

    II.    The Court's July 3, 2018 Order and the Special Master's Subsequent
          Telepsychiatry Proposal Improperly Intrude Into the Specifics of
          Defendants' Administration and Management. ............................................ 3

         A.     The Court Lacks Authority to Dictate CDCR's Policy, Whether By
               Itself or Through Its Special Master ............................................... 3

         B.     The Court's July 3 Order and the Special Master's Proposed
               Telepsychiatry Policy Are Not Supported by Evidence of an
               Ongoing Constitutional Violation Arising from the Use of
               Telepsychiatry. ................................................................................ 5

    III.   The Special Master's Proposed Telepsychiatry Policy Is Objectionable. .............. 8

         A.     The Proposed Telepsychiatry Policy Improperly Incorporates Legal
               Standards that Do Not Belong in Medical Practice Guidelines. ................. 8

         B.     The Proposed Telepsychiatry Policy's Language Limiting
               Telepsychiatry at the EOP Level Is Not Clear. ............................................ 9

         C.     CDCR's EOP Level of Care is Neither Residential nor
               Synonymous with Inpatient Levels of Care. ............................................ 10

         D.     The Special Master Team's Interpretation of "Last Resort or
               Emergency Situations" in Restricting the Use of Telepsychiatry at
               the MHCB and PIP is Overly Restrictive. ............................................... 12

         E.     The Special Master's Prohibition on the Use of Cell-Front
               Telepsychiatry is Premature and Unnecessary. ....................................... 14

CONCLUSION .................................................................................................................. 15

CERTIFICATION .............................................................................................................. 15

i

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

1

## TABLE OF AUTHORITIES

2

**Page**

3

4

CASES

5

*Beard v. Banks*
        548 U.S. 521 (2006)..................................................................................... 3

6

7

*Bell v. Wolfish*
        441 U.S. 520 (1979)..................................................................................... 6

8

*Brown v. Plata*
        563 U.S. 493 (2011) (Scalia, J., dissenting.) ........................................... 4

9

10

*Gilmore v. California*
        220 F.3d 987 (9th Cir. 2000) ...................................................................... 3

11

*Graves v. Arpaio*
        623 F.3d 1043 (9th Cir. 2010) .................................................................... 5

12

13

*Hoptowit v. Ray*
        682 F.2d 1237 (9th Cir. 1982) .................................................................... 6

14

15

*Inmates of Suffolk Cnty. Jail v. Rouse*
        129 F.3d 649 (1st Cir. 1997) ...................................................................... 3

16

*Miller v. French*
        530 U.S. 327 (2000)..................................................................................... 3

17

18

*Ruiz v. Estelle*
        679 F.2d 1115 (5th Cir.)............................................................................. 4

19

20

*United States v. State of Mich.*
        940 F.2d 143 (6th Cir. 1991) ...................................................................... 5

21

22

*Westefer v. Neal*
        682 F.3d 679 (7th Cir. 2012) ................................................................. 4, 5

23

STATUTES

24

United States Code, Title 18
        § 3626(f)....................................................................................................... 4

25

26

California Welfare & Institutions Code
        § 5675......................................................................................................... 12

27

28

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Eighth Amendment ...................................................................................................1, 6, 12

**COURT RULES**

Federal Rules of Civil Procedure
    Rule 53 ............................................................................................................................ 4
    Rule 53(c) ........................................................................................................................ 4

# INTRODUCTION

On August 2, 2018, the Special Master filed his Report on the Proposed Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide, and his proposed telepsychiatry addendum to the Revised Program Guide (the "Proposed Telepsychiatry Policy") (ECF Nos. 5872, 5872-1). Defendants appreciate that the Special Master addressed some of Defendants' concerns regarding limitations placed on the California Department of Corrections and Rehabilitation's ("CDCR") ability to employ telepsychiatry at the Correctional Clinical Case Management System ("CCCMS") level of care. Nevertheless, the Proposed Telepsychiatry Policy remains objectionable.

First, as a threshold matter, Defendants object to the Court and Special Master's specific efforts here to micromanage the daily operations of Defendants' institutions without ever establishing why doing so is necessary to correct a constitutional violation. It is blackletter law that courts must defer to the expertise and experience of state administrative agencies unless the court has found specific constitutional violations that must be corrected. Here, neither the Court nor the Special Master have found that Defendants' use of telepsychiatry represents an existing or imminent threat of violating the Eighth Amendment—at most, a dispute exists regarding best practices in the use of telepsychiatry. However, the Constitution does not mandate the use of best practices, only that the provision of care meet a constitutional threshold. Accordingly, the Special Master's recommendations, enforceable by court order, represent an impermissible intrusion into Defendants' ability to conduct their own affairs and are objectionable in their entirety.

Second, Defendants object to the Special Master's specific revisions to the telepsychiatry policy submitted by the CDCR during the parties' workgroups. In particular, Defendants' use of telepsychiatry at any level of care should not be conditioned on a finding or demonstration that CDCR has first made "good faith" efforts to hire on-site psychiatrists. While Defendants acknowledge and appreciate the revisions the Special Master made to his initial draft policy in response to Defendants' August 1, 2018 letter regarding the CCCMS level of care, imposing a "good faith" determination into the telepsychiatry policy is unnecessary and unjustified. The

1

1    Special Master and the Court have already approved CDCR's 2017 staffing plan, which sets forth

2    CDCR's ongoing recruitment and retention practices.  (ECF Nos. 5564, 5711.)  "Good faith"

3    recruitment efforts should therefore not be a condition for Defendants' use of the telepsychiatry.

4    The constitutionality of telepsychiatry does not hinge on the status of CDCR's hiring efforts.

5         Third, Defendants object to the Special Master's proposed language regarding on-site hiring

6    requirements for the Enhanced Outpatient Program ("EOP").  Again, Defendants appreciate the

7    Special Master's efforts to reconcile the requirements for on-site psychiatrists with the actual

8    staffing ratios for each program.  However, even as revised, the Proposed Telepsychiatry Policy's

9    language is unclear as to scope, and likely to require on-site psychiatry as a precondition to

10   CDCR's use of telepsychiatry, thereby affecting CDCR's ability to treat inmates.  Defendants

11   also object to the characterization of EOP as a "residential" program.

12        Fourth, Defendants object to the overly restrictive "last resort" language that limits the use

13   of telepsychiatry at the Mental Health Crisis Bed ("MHCB") and Psychiatry Inpatient Programs

14   ("PIP") levels of care.  The policy limitation imposes restrictions that may prevent CDCR from

15   using telepsychiatry to treat patients in situations where no other option is reasonably available.

16        Finally, Defendants object to the Proposed Telepsychiatry Policy's blanket restriction on

17   the use of cell-front telepsychiatry.

# DISCUSSION

## I.    RELEVANT PROCEDURAL HISTORY.

20        On July 3, 2018, the Court issued an Order setting parameters for CDCR's use of

21   telepsychiatry and directing the Special Master to "complete a final proposed telepsychiatry

22   policy, circulate that proposed policy to the parties, obtain their responses, and file the proposed

23   policy together with any responses from the parties."  (ECF No. 5850 at 8:19-22.)  Defendants

24   have appealed this Order.  (ECF No. 5867.)

25        Pursuant to the July 3 Order, the Special Master requested that the parties submit their

26   "final" positions on the issue of telepsychiatry on July 12, 2018.  (*See* ECF Nos. 5873-2, 5873-3.)

27   On July 25, 2018, the Special Master circulated to the parties a proposed draft telepsychiatry

28   policy.  The parties and the Special Master's team discussed the Special Master's proposed

2

1    telepsychiatry policy during a July 30, 2018 All Parties Work Group Meeting.  On July 31, 2018,

2    Plaintiffs submitted their response to the July 25 draft policy.  (*See* ECF No. 5873-4.)  On August

3    1, 2018, Defendants submitted their response to the Special Master's draft policy.  (*See* ECF No.

4    5873-5.)  On August 2, 2018, the Special Master filed his report containing the Proposed

5    Telepsychiatry Policy.  (ECF Nos. 5872, 5872-1.)  The Proposed Telepsychiatry Policy differs in

6    certain respects from the July 25 draft policy that Defendants addressed in their August 1

7    response to the Special Master.

8    II.    THE COURT'S JULY 3, 2018 ORDER AND THE SPECIAL MASTER'S SUBSEQUENT
          TELEPSYCHIATRY PROPOSAL IMPROPERLY INTRUDE INTO THE SPECIFICS OF
9          DEFENDANTS' ADMINISTRATION AND MANAGEMENT.

          A.    The Court Lacks Authority to Dictate CDCR's Policy, Whether By Itself
10                or Through Its Special Master.

11

12        The Court lacks power to dictate Defendants' administrative policy, under the Prison

13   Litigation Reform Act ("PLRA") or otherwise, as the Court must avoid improperly intruding into

14   the daily operations of an administrative agency unless it is necessary to correct an established

15   constitutional violation.  The United States Supreme Court has consistently counseled that courts

16   must give deference to states and their agencies on issues of prison management.  *See Beard v.*

17   *Banks*, 548 U.S. 521, 528 (2006); *Miller v. French*, 530 U.S. 327, 328 (2000) (explaining that

18   "curbing the equitable discretion of district courts was one of the PLRA's principal objectives").

19   By affirmatively requiring that the Special Master draft CDCR's telepsychiatry policy, without

20   any evidence that CDCR's telepsychiatry policy violates inmate-patients' constitutional rights,

21   the Court has exceeded its authority and improperly substituted the Special Master's judgment for

22   CDCR's judgment.  *See Gilmore v. California*, 220 F.3d 987, 991 (9th Cir. 2000) ("[i]t is clear

23   that Congress intended the PLRA to revive the hands-off doctrine," the former "rule of judicial

24   quiescence" that the federal judiciary not be involved with the problems of state-run prisons);

25   *Inmates of Suffolk Cnty. Jail v. Rouse*, 129 F.3d 649, 655 (1st Cir. 1997) ("Congress passed the

26   PLRA in an effort, in part, to oust the federal judiciary from day-to-day prison management.");

27   *Ruiz v. Estelle*, 679 F.2d 1115, 1162 (5th Cir.), *amended in part and vacated in part*, 688 F.2d

28   266 (5th Cir. 1982) (stating that "the powers of the court's appointed agents should not intrude to

3

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

1   an unnecessary extent on prison administration"); *Brown v. Plata*, 563 U.S. 493, 559 (2011)

2   ("Neither the Receiver nor the Special Master was selected by California to run its prisons, and

3   the fact that they may be experts in the field of prison reform does not justify the judicial

4   imposition of their perspectives on the state.") (Scalia, J., dissenting.).

5          Indeed, the Court's Order of Reference itself appears to limit the Special Master's power to

6   draft Defendants' operational policies.  The Order of Reference specifically prohibits the Special

7   Master and his staff from "interven[ing] in the administrative management" of Defendants'

8   institutions," and states that the Special Master "shall not be empowered to direct defendants . . .

9   to take or to refrain from taking any specific action to achieve compliance."  (ECF No. 640 at

10  7:24-8:4.)  While the Order of Reference instructs the Special Master to "work with defendants

11  and experts . . . to develop a remedial plan" that addresses constitutional violations found in the

12  Court's September 13, 1995 Order, the Court did not find any violations relating to Defendants'

13  use of telepsychiatry.  (*Id*. at 3:18-4:2; *see also* ECF No. 612.)  And the authority to draft

14  CDCR's policy is not one that the Court can delegate to the Special Master under Federal Rule of

15  Civil Procedure 53 or the PLRA.  *See* Fed. R. Civ. P. 53(c); 18 U.S.C. § 3626(f).

16         The Proposed Telepsychiatry Policy micromanages CDCR's operations by specifically

17  dictating where and how CDCR must allocate its on-site psychiatrists at the EOP level of care

18  before CDCR can even be permitted to use telepsychiatry.  The Draft Policy also includes

19  undefined terms, like "last resort" and "emergency," and requires that CDCR meet a vaguely

20  defined "good faith" standard to recruit and retain on-site psychiatrists before it may use

21  telepsychiatry at the EOP level of care.  Such vague terms and requirements risk significant

22  disruption of CDCR's staffing and operation of its own mental health care system.

23         In short, the Proposed Telepsychiatry Policy is precisely the sort of interference into

24  CDCR's ability to run a correctional system that courts are directed to avoid.  *See, e.g., Westefer

25  v. Neal*, 682 F.3d 679, 685 (7th Cir. 2012) ("To repeat, the PLRA requires that an injunction use

26  the 'least intrusive means necessary to correct the violation of the [f]ederal right.'  Locking in

27  specific deadlines—even with hedging 'whenever possible' language—deprives prison

28  administrators of the operational flexibility to adjust procedures as future needs dictate and cannot

4

1   be considered the least intrusive means of correcting the due-process violation."). The Proposed

2   Telepsychiatry Policy should be rejected on this ground alone.

3       **B.    The Court's July 3 Order and the Special Master's Proposed**
               **Telepsychiatry Policy Are Not Supported by Evidence of an Ongoing**

4                  **Constitutional Violation Arising from the Use of Telepsychiatry.**

5       The Special Master has monitored CDCR and co-defendant Department of State Hospitals'

6   use of telepsychiatry for years and has made no findings of patient harm or inadequacy. Nor has

7   this Court determined that the use of telepsychiatry is unconstitutional in any way.

8       As the authority cited in the preceding section cautions, courts may not intrude into the

9   administrative management of a prison system unless it is necessary to correct an ongoing

10  constitutional violation, and only then may a court correct the violation with the least restrictive,

11  most narrowly tailored relief. And when the prison system itself has determined a set of

12  guidelines that it believes to be best practices, a court may not mandate the imposition of those

13  guidelines if they exceed the constitutional minimum. *See, e.g., Westefer,* 682 F.3d at 686

14  (finding that court order adopting the Illinois Department of Corrections' detailed due process

15  policy went beyond the constitutional minimum and violated the PLRA's prohibition against

16  judicial intervention in the day-to-day operations of prison systems). CDCR originally submitted

17  a telepsychiatry policy that it determined captures best practices for using telepsychiatry in its

18  mental health program, including reasonable limitations on its use. The Special Master's

19  Proposed Telepsychiatry Policy mandates limitations and restrictions that exceed what was

20  included in CDCR's policy. Because the Court intends the Proposed Telepsychiatry Policy to be

21  an addendum to the Program Guide, its adoption would represent new affirmative prospective

22  injunctive relief in this action. To order such relief under the PLRA, the Court must make

23  specific findings based on the factual record to show that the restrictions imposed by the Special

24  Master's Proposed Telepsychiatry Policy are necessary to correct a current and ongoing

25  constitutional violation and the least intrusive means by which to do so. *Graves v. Arpaio*, 623

26  F.3d 1043, 1047–48 (9th Cir. 2010); *see also United States v. State of Mich.*, 940 F.2d 143, 159–

27  60 (6th Cir. 1991) (district court lacked authority to impose additional requirements on remedial

28  plan proposed by prison officials; state was entitled to develop and implement its own procedures

5

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

1   "until it appears from affirmative proof that the plan and procedures result in a constitutional

2   infringement").

3        The Special Master's February 2017 report on CDCR's staffing plan included his

4   recommendations on the scope of CDCR's use of telepsychiatry. Those recommendations were

5   less restrictive than the Proposed Telepsychiatry Policy, and were not based on any evidence that

6   CDCR's telepsychiatry policy was a *constitutionally infirm* form of treatment for a particular

7   patient population. At most, the Special Master's report expressed a policy preference for on-site

8   psychiatry. However, the Constitution does not require that CDCR institute forms of treatment

9   that others might prefer, only that inmates receive adequate access to mental health care.

10  *Hoptowit v. Ray*, 682 F.2d 1237, 1253 (9th Cir. 1982) (finding that the Eighth Amendment does

11  not require that prison officials provide the most desirable medical and mental health care; nor

12  should judges simply "constitutionalize" the standards set forth by professional associations such

13  as the American Medical Association or the American Public Health Association); *see also Bell v.*

14  *Wolfish*, 441 U.S. 520, 543–544 n.27 (1979) (draft recommendations of the Department of Justice

15  are not determinative of constitutional requirements).

16       There is no evidence in the record to support a finding that Defendants' proposed use of

17  telepsychiatry would violate the Eighth Amendment, or that the onerous restrictions in the Special

18  Master's Proposed Telepsychiatry Policy are necessary to meet constitutional standards. While

19  the Special Master attaches various party submissions to his August 2 report, the only evidence

20  explicitly cited in his report as justifying limits on the use of telepsychiatry is a brief, second-hand

21  description of a July 11, 2018 demonstration of a prototype *cell-front* telepsychiatry module at the

22  California Health Care Facility as providing poor hearing quality ("an echo"). (*See* ECF No.

23  5872 at 7.) But the use of *cell-front* telepsychiatry is only a subset of the system-wide use of

24  telepsychiatry, and any criticism of that delivery model does not pertain to the larger, established

25  telepsychiatry system. Also, this one-time demonstration did not comport with CDCR's own

26  testing, which found the module to present a promising avenue for increasing care. (*See*

27  Declaration of K. Kuich, M.D., in Support of Defendants' Response Re: Special Master's Draft

28  Telepsychiatry Policy ("Kuich Decl."), ¶ 8.) The Special Master's team's opinion that the

6

1    demonstration showed "that there were better options available at this time for cell-front

2    encounters" (ECF No. 5872 at 8) does not establish that failing to use this "better option" would

3    violate the Eight Amendment.

4        The Special Master also references—but does not explicitly rely on—a July 12, 2018 report

5    by Plaintiffs' previously undisclosed expert Pablo Stewart.  (ECF No. 5872 at 7.)  Dr. Stewart

6    opines that CDCR's use of telepsychiatry for seriously mentally ill patients should be limited.

7    (*See* ECF No. 5873-4 at 11-49 ("Stewart Decl."), ¶¶ 15-22.)  To support his position, Dr. Stewart

8    speculates that telepsychiatry may be inappropriate for high-needs inmates with delusions

9    because those patients may incorporate the telepsychiatry equipment into their delusions.[1]  (*Id.* ¶¶

10    15-16.)  Dr. Stewart, however, does not offer any professional study to support his concern, and

11    the existing literature does not establish any ceiling for the use of telepsychiatry based on the

12    existence of a delusional disorder.  (*See* Joseph Penn Declaration re: "Expert Report of Pablo

13    Stewart, MD Regarding Defendants' Telepsychiatry Policy, Dated 7/12/18" filed herewith ("Penn

14    Rebuttal Decl.") at 6-12, 14.)

15        Dr. Stewart's opinion that telepsychiatry should be limited to low-level patients is based on

16    an anecdote from a seven-year-old study (Stewart Decl. ¶ 23) and two CDCR suicide reports that

17    do not show any harm or issues caused by telepsychiatry (*Id.* ¶¶ 44-58).  Notably, nothing within

18    the study cited by Dr. Stewart suggests that telepsychiatry harmed patients or denied patients

19    adequate treatment.  And the suicides referenced by Dr. Stewart do not support the limitations for

20    which he advocates—indeed, the inmate-patient in the first suicide discussed by Dr. Stewart

21    refused to be seen by telepsychiatry.  (*See id.* ¶¶ 16-22.)  Dr. Stewart's analysis of both cases

22    relies on issues of documentation and communication.  But neither of those issues are specific to

23    telepsychiatry as a mode of treatment.  Contrary to Dr. Stewart's representations, the inmate

24    suicides he relies on do not present any evidentiary basis to show that telepsychiatry is

25    ineffective.

26

27        [1] CDCR negotiated this same point with the Special Master and Plaintiffs when
developing the policy.  The draft policy includes language regarding contraindication for
28    telepsychiatry.

7

1    Rather, the applicable literature and the experiences of numerous systems that use

2    telepsychiatry in correctional and non-correctional settings show that "telepsychiatry has been

3    demonstrated to successfully deliver services to incarcerated adolescents and adults with a wide

4    range of mental health diagnoses." (Penn Rebuttal Decl. at 13.) Further, there are no national

5    guidelines from any major institution that limit the use of telepsychiatry at higher levels of care.

6    (*Id*. at 16.) No evidence, therefore, supports the proposition that telepsychiatry is any less

7    effective than in-person psychiatrist encounters, let alone that telepsychiatry is an unconstitutional

8    means of delivering mental health care to CDCR's inmate population.

9    Because neither the Court nor the Special Master has found that CDCR's telepsychiatry

10   policy represents a violation of minimal constitutional standards in the delivery of mental health

11   care, it is improper for the Court or the Special Master to override CDCR's policy and intrude

12   into the specifics of CDCR's operational management.

13   **III.    THE SPECIAL MASTER'S PROPOSED TELEPSYCHIATRY POLICY IS OBJECTIONABLE.**

14       **A.    The Proposed Telepsychiatry Policy Improperly Incorporates Legal
15          Standards that Do Not Belong in Medical Practice Guidelines.**

16   As discussed in Defendants' August 1, 2018 submission (ECF No. 5873-5 at 9-10), the

17   Special Master's initial draft policy conditioned the use of telepsychiatry at the CCCMS level on

18   the failure of "good faith" efforts to recruit on-site psychiatrists. The final proposal relaxes this

19   requirement, stating that "[t]elepsychiatry may replace on-site psychiatry at the CCCMS level of

20   care provided all other conditions pertaining to the CCCMS level of care contained within this

21   policy are adhered to and good faith efforts to recruit on-site psychiatrists continue." (ECF No.

22   5872-1 at 4.)

23   The requirement that "good faith efforts to recruit [CCCMS] on-site psychiatrists continue,"

24   while less onerous than the previous proposal, remains a system-wide legal injunction that does

25   not belong in a health care practice manual. As stated above, CDCR's 2017 plan, which was

26   approved by the Special Master and this Court, embodies those "good faith" efforts. (ECF No.

27   5564 and ECF No. 5711.) Whether telepsychiatry is appropriate at the CCCMS level depends

28   solely on whether or not telepsychiatry provides at least the minimal constitutional level of care to

8

1    inmates at the CCCMS level, and not whether CDCR's "good faith" efforts to hire on-site

2    psychiatrists continue.

3          Moreover, the Proposed Telepsychiatry Policy imposes higher conditions for the use of

4    telepsychiatry at the EOP, MHCB and PIP levels, prohibiting the use of telepsychiatry *until*

5    "good faith" efforts to recruit on-site psychiatrists are unsuccessful.  (ECF No. 5872-1 at 3.)  As

6    with the CCCMS restriction, the fundamental problem remains: the Special Master has inserted a

7    system-wide legal injunction into what is intended to be a practice guide for the provision of

8    mental health care services.  If the individuals managing and delivering telepsychiatry within an

9    institution are providing constitutionally adequate care to patients for months, but separate CDCR

10   officials stop recruiting on-site psychiatrists, does the previously acceptable care provided by the

11   telepsychiatry program suddenly become constitutionally infirm?

12         The answer is that adequacy of telepsychiatry is not measured by the success or failure of

13   CDCR to hire on-site psychiatrists.  Defendants therefore object to the inclusion of a "good faith"

14   recruitment standard anywhere within its telepsychiatry policy.

15         **B.    The Proposed Telepsychiatry Policy's Language Limiting Telepsychiatry**
             **at the EOP Level Is Not Clear.**
16

17         The Special Master's initial proposed telepsychiatry policy circulated on July 25, 2018

18   would have required CDCR to staff at least one on-site psychiatrist at "each program and each

19   unit within that program providing EOP level of care services within the institution" before it

20   could use telepsychiatry at the EOP level.  (*See* ECF No. 5873-5 at 10-13.)  Defendants expressed

21   serious concern that this requirement would upend Defendants' staffing plans, would be

22   burdensome and untethered to any clinical purpose, require inefficient reallocations of clinical

23   staff, and result in the loss of care to inmates if the on-site psychiatrist for an institution left or

24   became unavailable.  (*Id.*)  The Special Master in response amended the proposal to state, "[o]n-

25   site psychiatrists are required for each program providing an EOP level of care consistent with the

26   staffing ratios delineated in the 2009 Staffing Plan."  (ECF No. 5872-1 at 4.)  The language in this

27   provision remains unclear.  The scope of the term "program" and the phrase "consistent with the

28   staffing ratios delineated in the 2009 Staffing Plan" are not defined.  Without knowing what the

9

1    Special Master intended with this language, the potential impact on staffing when implementing

2    this policy is unclear.

3        As written, the language is subject to multiple conflicting interpretations. For instance, the

4    language could be read to mean that only on-site psychiatry can provide services to EOP.

5    Conversely, if read in conjuncture with the next two sentences regarding good faith hiring

6    practices, the language could be read to mean no on-site psychiatrists are needed should CDCR

7    be unable to hire on-site psychiatrists. Given the confusing language, CDCR will be unable to

8    implement this policy in a consistent manner. (*See* Declaration of Katherine Tebrock in Support

9    of Defendants' Objections to the Special Master's Report on the Proposed Telepsychiatry Policy

10   Addendum to the California Department of Corrections and Rehabilitation Mental Health

11   Services Delivery System Program Guide ("Tebrock Decl.") ¶ 4.) Given the foregoing,

12   Defendants object to the inclusion of language that will likely foster confusion and represents an

13   unnecessary restriction on Defendants' ability to provide telepsychiatry services.

14       **C.    CDCR's EOP Level of Care is Neither Residential nor Synonymous with
               Inpatient Levels of Care.**

15

16       The Special Master's report, drawing from the Court's July 3 Order, treats the EOP

17   program as a residential, inpatient program. (ECF No. 5850 at 5:21-6:1.) This conclusion has no

18   factual foundation, is contradicted by the Program Guide, and ignores the real-world application

19   and understanding of residential programs in the prison setting. Without allowing the parties to

20   provide evidence or briefing, the Court's July 3 Order erroneously stated that the EOP was a

21   residential program and synonymous with inpatient care.

22       The July 3 Order stated that "[a]lthough EOP is labeled an outpatient program, outpatient is

23   contextual and relative to inpatient programs within the MHSDS; moreover, the Revised Program

24   Guide makes clear EOP is a residential program, synonymous with an inpatient setting." (ECF

25   No. 5850 at 10.) In reaching its conclusion, the Court cited to the EOP's provision of separate

26   housing, treatment and programming for inmate-patients "'whose mental illness precludes their

27   placement and participation' in the general population." (*Id.*) That characterization is misplaced

28   because it focuses on the EOP inmates' conditions of confinement and housing, rather than on the

                                            10

1  level of treatment they receive.  While it is true that EOP inmates are housed in designated living

2  units at hub institutions, it is not the separate housing unit that characterizes the level of care, but

3  the staffing and the amount and intensity of care provided.  (*See* Declaration of B. Brizendine,

4  Psy. D. in Support of Defendants' Response Re: Special Master's Draft Telepsychiatry Policy

5  ("Brizendine Decl.") ¶ 8.)  As Defendants stated at the June 28, 2018 status conference, the

6  separate unit for EOP inmates is a security measure for a potentially vulnerable population.  (*Id.*)

7      The Program Guide makes clear that CDCR's "[o]utpatient care is provided in an array of

8  treatment levels and modalities including a day treatment program and an outpatient clinic of

9  care." (Revised Program Guide, 12-1-1.)  EOP is CDCR's "most intensive level of outpatient

10  mental health care within the MHSDS." (*Id.* at 12-4-1; Brizendine Decl. ¶ 6.)  As the name

11  Enhanced *Outpatient* Program indicates, EOP is an outpatient level of care where the patient can

12  receive intensive mental health treatment, while participating in general population programing,

13  such as educational certifications and degrees.  EOP inmates also hold jobs and engage in various

14  rehabilitation opportunities, but return to their housing unit at the end of their day.  (Brizendine

15  Decl. ¶ 7.)  Contrary to the concept reflected in the July 3 Order and Proposed Telepsychiatry

16  Policy that the EOP population is segregated as a residential treatment program, CDCR is

17  working to integrate the EOP population into the broader inmate population and into the full array

18  of programs and opportunities available to the larger inmate population.  (*Id.* ¶ 10.)

19      Furthermore, the record does not support equating EOP level of care to inpatient care.

20  CDCR provides inpatient care at the intermediate, acute, and crisis bed levels of care.  (Revised

21  Program Guide at 12-1-9, 12-5-1.)  The inpatient level of care is a closed treatment environment

22  where all treatment must be provided within the licensed unit, all medication must be by doctor

23  order, and the unit provides 24-hour nursing care.  (Brizendine Decl. ¶ 13.)  Overall, inpatient

24  levels of care have higher acuity patients, more robust staffing levels, a hospital level treatment

25  setting, and patients receive a greater amount of treatment.  (*Id.* ¶¶ 12-18.)  EOP level patients are

26  specifically excluded from the inpatient level of care because they are not so impaired that they

27  require intensive 24-hour care.  (*Id.* ¶ 11; Revised Program Guide at 12-4-1.)

28

11

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))

1    In addition to the practical differences between the EOP and inpatient levels of care,

2   inpatient mental health facilities must be licensed and meet specific licensing requirements.

3   CDCR's inpatient care facilities are licensed under Title 22.  (Brizendine Decl. ¶ 14.)  However,

4   EOP units, as outpatient units, do not require licensure.  (*Id.*)  This is also different than

5   community residential treatment programs, which also require licensing.  (*See* Cal. Welf. & Inst.

6   Code § 5675 (requiring mental health rehabilitation centers be licensed by the State Department

7   of Health Care Services).)  The Special Master and his experts, based on their years of monitoring

8   the system, are certainly aware of the vast differences between the EOP and inpatient levels of

9   care.  It was therefore surprising that the July 3 Order finds the EOP level of care synonymous

10   with the inpatient level of care, and that the Proposed Telepsychiatry Policy equates the two

11   levels of care and artificially places a blanket restriction on telepsychiatry for EOP patients as if

12   they were in inpatient care.  In this regard, the Proposed Telepsychiatry Policy is objectionable.

13         **D.**   **The Special Master's Team's Interpretation of "Last Resort or Emergency**
14                **Situations" in Restricting the Use of Telepsychiatry at the MHCB and PIP**
                **is Overly Restrictive.**

15    The Proposed Telepsychiatry Policy states that telepsychiatry may not be used at the

16   MHCB and PIP levels of care except "as a last resort or in emergency situations."  (ECF No.

17   5872-1 at 3.)  This language is consistent with the Court's July 3 Order.  However, the Special

18   Master's team's interpretation of what constitutes a "last resort or emergency situation" would

19   functionally close at least one MHCB, and likely others.[2]

20    On July 30, 2018, in response to the Special Master's initial draft proposal, Defendants

21   asked the Special Master's Team to define a "last resort or emergency."  (Tebrock Decl. ¶ 8.)

22   (The Special Master's final proposal does not add any clarification of the definition.)  Defendants

23   were told this was a legal question—in his opinion, however, whether a situation was an

---

24       [2] In the Court's April 19, 2017 order, the Court found that "full compliance with twenty-
25   four hour timeline for transfer to MHCBs is required to satisfy the Eighth Amendment." (ECF
   No. 5610 at 11.)  The Court also found that data in the fall 2016 population projections suggested
26   that "defendants do not presently have sufficient capacity to meet the need for MHCB level of
   care." (*Id.* at 12.)  Following the September 28, 2017 status conference, the Court issued another
27   order and again found that CDCR had "too few MHCBs to meet" patient needs. (ECF No. 5710 at
   17.)

28

1   "emergency" depended on the length of time telepsychiatry must be used at an MHCB or PIP

2   level of care. (*Id.*) For example, the longer telepsychiatry is used, the less likely it could be

3   considered an "emergency." (*Id.*) In response, Defendants specifically raised the example of the

4   MHCB at High Desert State Prison, which has been serviced exclusively by telepsychiatry for

5   several years, but nevertheless met most Program Guide requirements. (*Id.*) Defendants were

6   told that using telepsychiatry at an MCHB or PIP level of care for more than a few months would

7   cause concern and alarm for both the Special Master's experts and Plaintiffs' counsel. (*Id.*) Such

8   an interpretation would functionally close the MHCB at High Desert, despite the fact that that

9   MHCB is meeting most Program Guide requirements and has a lower 30-day re-admission rate

10  than the state average. (*Id.*)

11        If this interpretation holds, it will not only cause the closure of the High Desert MHCB, but

12  it will also adversely impact patient treatment at other MHCBs and PIPs that have limited on-site

13  staffing. (*Id.* ¶ 9.) For instance, Pelican Bay State Prison currently has only one on-site

14  psychiatrist who provides service to the MHCB. Should that psychiatrist leave Pelican Bay,

15  telepsychiatry will be the only available modality of providing psychiatry services to the Pelican

16  Bay MCHB until a replacement can be located. (*Id.*) Given the remote location of Pelican Bay,

17  CDCR is likely to have a difficult time hiring a new psychiatrist for the MHCB within a couple of

18  months. (*Id.*) Thus, CDCR would again be forced to either close the Pelican Bay MHCB or deny

19  psychiatry services to that population. (*Id.*) This, again, highlights the problems with attempting

20  to incorporate a system-wide legal injunction into a medical policy guide intended to shape front-

21  line care.

22        When CDCR does not have the psychiatry staff available to provide necessary on-site care,

23  it should be able to use telepsychiatry as a "last resort." Where and when CDCR is unable to hire

24  on-site staff, patients in the MHCBs and PIPs should be provided with appropriate psychiatric

25  care, even if telepsychiatry is the only available modality. CDCR should not be forced to

26  endanger patients by withholding telepsychiatric services simply because there has been an

27  extended period without on-site psychiatric care available.

28

**E.  The Special Master's Prohibition on the Use of Cell-Front Telepsychiatry is Premature and Unnecessary.**

The Special Master's Proposed Telepsychiatry Policy deletes the sections in CDCR's policy that referenced cell-front telepsychiatry and inserted the statement that, "[a]t present, cell-front provision of telepsychiatry is not permitted." (ECF No. 5872-1 at 3.)  Including an affirmative restriction in the policy is unnecessary, surplus, and premature.

Cell-front psychiatry visits are a reality in the correctional context and, in some circumstances, are the only means of providing a psychiatric appointment for an inmate-patient who refuses to exit his or her cell.  Also, cell-front telepsychiatry can more promptly provide psychiatry services to inmate-patients when an in-person psychiatrist is not available to provide the needed care. (*See* Kuich Decl. ¶¶ 10-11.)  The Special Master's policy disregards these real-life benefits of cell-front telepsychiatry.

Moreover, in 2016, CDCR's telepsychiatry policy contemplated the use of cell-front telepsychiatry without comment from the Special Master, but now the Special Master prohibits its use based on his team's observation of a single prototype demonstration.  Indeed, the Special Master's February 2017 report did not contain any recommendations restricting or preventing cell-front telepsychiatry and the Court has not made any findings related to its use.  The Special Master's expert and Plaintiffs have observed one demonstration of cell-front telepsychiatry, and not under actual clinical conditions.  The demonstration provided sound feedback that is not representative of the sound quality experienced in real-life cell-front sessions.  (*See id.* ¶ 11.)

Specifically, the Special Master's expert and observer listened to the clinician side of the telepsychiatry connection while three other observers were in the cell on the inmate-patient side, meaning the microphones would pick up movements (i.e., sounds from moving clothes and shoes) and speech from multiple people in the cell rather than just the inmate-patient, potentially making it difficult to parse an individual conversation.  (*See id.* ¶ 11.)  Further, the Special Master's monitor and expert were in a room with almost a dozen other observers whereas under normal conditions, the telepsychiatrist would be in a private office using sophisticated speakers and microphones to have a confidential conversation with a patient.  (*Id.*)  By contrast, CDCR's

14

1    tests of this same equipment under clinical conditions have resulted in much better sound quality

2    than what the Special Master's expert experienced at the demonstration.  (*See id.* ¶ 9.)  In both

3    environments, however, the cell-front interaction offered superior sound quality and

4    confidentially as compared to an in-person cell-front interaction where communication occurs

5    using the gap between the door and the door frame.  Nevertheless, CDCR is looking at additional

6    ways to address sound-quality concerns raised by the Special Master's expert, including

7    procuring improved microphones to further improve the sound quality even under non-standard

8    conditions.  (*Id.* ¶ 10.)

9        Accordingly, the Court and the Special Master should not ban, now or in the future, cell-

10   front telepsychiatry as CDCR works to improve the technology and the manner in which

11   telepsychiatry is provided to inmate-patients at the cell front.  An order precluding cell-front

12   telepsychiatry will prematurely prevent CDCR from continuing to develop and perfect the

13   technology and practice.

14                                **CONCLUSION**

15       Defendants acknowledge the Special Master's work in addressing their concerns with the

16   Proposed Telepsychiatry Policy, and appreciate that the Special Master revised his initial draft

17   proposal in response to Defendants' concerns.  However, Defendants object to the Special

18   Master's revisions of CDCR's telepsychiatry plan in the Proposed Telepsychiatry Policy because

19   it continues to represent an improper intrusion into Defendants' daily operations, is unsupported

20   by any finding of a constitutional violation, and imposes restrictions and qualifications that will

21   hamper CDCR's ability to provide mental health treatment under certain conditions.

22                                **CERTIFICATION**

23       The undersigned counsel for Defendants certifies that he reviewed the following relevant

24   court orders: December 11, 1995 (ECF No. 640); April 19, 2017 (ECF No. 5610); October 10,

25   2017 (ECF No. 5710); November 6, 2017 (ECF No. 5726); December 15, 2017 (ECF No. 5750);

26   April 10, 2018 (ECF No. 5816); May 31, 2018 (ECF No. 5832); July 12, 2018 (ECF No. 5852);

27   and July 20, 2018 (ECF No. 5860).

28

1    Dated:  August 13, 2018                          Respectfully Submitted,

2                                                     XAVIER BECERRA
                                                      Attorney General of California
3                                                     JAY C. RUSSELL
                                                      Supervising Deputy Attorney General
4

5

6                                                     /s/ Tobias G. Snyder
                                                      TOBIAS G. SNYDER
7                                                     Deputy Attorney General
                                                      Attorneys for Defendants
8

9    CF1997CS0003
     42031775.docx
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Defs.' Objections to Special Master's Report on Proposed Telepsychiatry Policy
(2:90-cv-00520 KJM-DB (PC))