```
1                 IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF CALIFORNIA
2                BEFORE THE HONORABLE KIMBERLY J. MUELLER

3    RALPH COLEMAN, et al.,

4                     Plaintiffs,
     vs.                             Sacramento, California
5                                    No. 2:90-CV-0520
     EDMUND G. BROWN, JR.,           Tuesday, August 28, 2018
6    et al.,                         10:04 a.m.

7                     Defendants.
     _____/
8

9

10                          --oOo--
                  REPORTER'S TRANSCRIPT OF PROCEEDINGS
11                     RE: STATUS CONFERENCE
                            --oOo--
12

13   APPEARANCES:

14   For Plaintiffs:        ROSEN BIEN GALVAN & GRUNFELD LLP
                            LISA A. ELLS
15                          CARA E. TRAPANI
                            MICHAEL S. NUNEZ
16                          Attorneys at Law
                            50 Fremont Street, 19th Floor
17                          San Francisco, CA  94105

18   For the Defendants:    OFFICE OF THE ATTORNEY GENERAL
                            ANDREW GIBSON
19                          Attorney at Law
                            600 West Broadway, Suite 1800
20                          San Diego, CA  92101

21   (Appearances continued on page 2)

22   Official Reporter:     KACY PARKER BARAJAS
                            CSR No. 10915, RMR, CRR, CRC
23                          501 I Street
                            Sacramento, CA  95814
24                          kbarajas.csr@gmail.com

25   Proceedings recorded by mechanical stenography.  Transcript produced by
     computer-aided transcription.
```

```
 1   APPEARANCES (Continued):

 2   For the Defendants:        OFFICE OF THE ATTORNEY GENERAL
                                TYLER HEATH
 3                              JAY RUSSELL
                                ADRIANO HRVATIN
 4                              IAN ELLIS
                                Attorneys at Law
 5                              455 Golden Gate Avenue, Suite 11000
                                San Francisco, CA  94102
 6

 7
     For Defendant             OFFICE OF THE GOVERNOR
 8   Edmund G. Brown, Jr.:     EDMUND G. BROWN, JR.
                                GABRIEL SANCHEZ
 9                              Attorney at Law
                                Legal Affairs State Capitol
10                              Sacramento, CA  95814

11   For Defendant             CALIFORNIA DEPARTMENT OF CORRECTIONS &
     CDCR:                      REHABILITATION
12                              PATRICK R. McKINNEY, II
                                Attorney at Law
13                              1515 S Street, Suite 502-S
                                Sacramento, CA  95811
14
     Special Master:           PANNONE LOPES DEVEREAUX & O'GARA LLC
15                              MATTHEW A. LOPES, JR.
                                Attorney at Law
16                              1301 Atwood Avenue, Suite 215 N
                                Johnston, RI  02919
17

18                             --oOo--

19

20

21

22

23

24

25
```

1          SACRAMENTO, CALIFORNIA, TUESDAY, AUGUST 28, 2018, 10:04 AM

2                                --oOo--

3          THE CLERK:  Calling civil case 90-520 Coleman, et al.

4     versus Brown, et al.  This is on for status conference.

5          THE COURT:  All right.  Good morning.  Appearances and

6     then I'm going to ask for some clarification as to who is who.

7     But why don't you state the appearances of the people that are

8     appearing at counsel table.

9          MR. GIBSON:  Thank you, your Honor.  Andrew Gibson on

10    behalf of the defendants from the Attorney General's office.

11    Sitting next to me is Tyler Heath, also from the Attorney

12    General's office, Jay Russell from the Attorney General's

13    office, Adriano Hrvatin and Ian Ellis from the Attorney

14    General's office.

15         THE COURT:  All right.  Good morning.

16         MS. ELLS:  Good morning, your Honor.  Lisa Ells for

17    plaintiffs.  With me are Cara Trapani and Michael Nunez.

18         THE COURT:  All right.  Good morning to you all.  So

19    just so I'm clear, I had indicated my expectation that lead

20    counsel for defendants would appear.  Is that you, Mr. Gibson?

21         MR. GIBSON:  Yes, your Honor.

22         THE COURT:  All right.  And who was the person fully

23    authorized to speak on behalf of defendant Brown?

24         MR. GIBSON:  Your Honor, that is Gabriel Sanchez.

25    He's with the Governor's office.

1          THE COURT:  And is he present?

2          MR. GIBSON:  He is, your Honor.

3          THE COURT:  All right.  And where is he?

4          MR. SANCHEZ:  Right here, your Honor.

5          THE COURT:  All right.  Good morning, Mr. Sanchez.  Do

6    you wish to come forward to counsel table?

7          MR. SANCHEZ:  If you'd like.

8          THE COURT:  All right.  I think that makes sense.  And

9    then also for defendant Kernan?

10          MR. GIBSON:  That would be CDCR general counsel

11    Patrick McKinney.

12          THE COURT:  And is he also present?

13          MR. McKINNEY:  Good morning, your Honor.

14          THE COURT:  All right.  Good morning.  Why don't you

15    also come forward.  We can move a chair from the other side of

16    the room.  Ms. Shultz can help with that so you can all be

17    seated there.

18          All right.  Thank you for that.  Here's my agenda, and

19    there are a couple of questions I'll specifically ask

20    Mr. Sanchez and Mr. McKinney to weigh in on, but otherwise, to

21    the extent someone is most qualified to respond on either team,

22    that's the person I expect to respond to any question.

23          I want to just review with you what prompted the

24    hearing in the Court's mind.  I realize you may be trying to

25    read some tea leaves, and I'll just make fully clear why you're

1   here.  I want to lead towards a kind of reset with respect to

2   case management.  I have some thoughts, and that's where I

3   particularly want to hear if there's any reason for me not to

4   proceed in the way I'm contemplating.

5           I want to cover specifically the three areas covered

6   by appeals and next steps in those areas, and so that's, in

7   particular, an area where I'll have questions about why not.

8   I'm pretty certain I can proceed as I contemplate, but if not,

9   you can let me know if you think otherwise.  I want to review

10  staffing.  We're on track for a hearing in October,

11  October 11th.  I want to resolve the pending request regarding

12  discovery from the bench here this morning and generally talk

13  about how we keep that on track.  And then I just want to touch

14  briefly on other issues very briefly, transfer timelines,

15  MHCB's, custody collaboration, a report pending there as well

16  and program guide.

17          Generally, where I'm heading, and we can review this

18  at the end of our discussion, I think the timing is right to

19  beginning in early 2019 have regular quarterly statuses.  I've

20  questioned whether or not that was an appropriate thing to do

21  previously.  I proceeded more on an ad hoc basis.  But looking

22  at the landscape, I think the time is right, if not overdue,

23  for regular quarterly statuses.  So that's one plan I have.

24          So the hearing is prompted -- really it helped bring

25  some things into focus, but it's prompted by the most recent

1     appeal which it's not clear to me what the basis for the appeal

2     is, but it appears to be related to decisions I've made

3     regarding the telepsychiatry policy.  The Court's view, I've

4     said this in writing, I think I've said it from the bench

5     before, it seems to me there have been a series of appeals of

6     nonfinal decisions.  I have never taken the position I'm ousted

7     of jurisdiction by any of the appeals.  I've tried to exercise

8     discretion in not forging forward in areas where the Ninth

9     Circuit might trim my sails.  The more I review the record, the

10    more I'm pretty convinced I haven't issued final orders that

11    are properly appealable, if the circuit is properly advised as

12    to what I've done.

13            The hearing also is consistent with my desire to keep

14    this case on a glide path.  I said I think the first hearing I

15    had with you all, I see my role as containing a glide path

16    towards a smooth landing if we can possibly accomplish that,

17    and I think that possibility is coming into focus.  And in

18    doing that, I've tried to maintain consistency with the Court's

19    prior orders.  So there's obviously a long history here, but in

20    no event have I seen myself as making new orders.  I've seen

21    myself as clarifying what the Court has previously decided,

22    referencing the law of the case, clarifying discrete issues for

23    the parties when they have been unable to reach a resolution

24    through the essentially collaborative process the Court has

25    relied on the special master to supervise.

1          So it really was the most recent appeal that had the

2    effect of my reconsidering my approach because it appears to me

3    particularly with this most recent action by the defense -- by

4    the -- yeah, by the defendants, it seems to me there's not a

5    willingness to allow the Court's processes to play out.  I've

6    tried to put in place some orderly processes to allow

7    exhaustion of collaboration, refining of disputes that the

8    Court needs to resolve against the backdrop of the long record

9    here, and so in perspective, which I have now, the appeals to

10   me look like a series of rearguard actions to buy time perhaps.

11   Only you know.  And I have bought into those by refraining from

12   moving forward.

13          There's some benefits to my having done that, I think,

14   because the landscape is more clear now and mostly in a

15   positive way, but particularly because I don't think I'm ousted

16   of jurisdiction, that is why I think it's time to engage in a

17   reset and for me to get fully back in the saddle and try to

18   help move the case forward while recognizing all the real work

19   is being done under the special master's supervision.

20          Just to talk specifically about telepsychiatry, the

21   process I've laid out involves objections that I still have to

22   rule on.  I haven't ruled on them.  We're going to talk about a

23   time frame for my doing that.  And then once I rule on those,

24   then I will adopt a -- or approve a telepsychiatry policy.  It

25   will be -- I can't think it would be anything but provisional

1   approval subject to monitoring for 12 to 18 months.  And so

2   that's the process.  It still has to play itself out, and I see

3   no reason not to proceed at pace with that process, recognizing

4   it can dovetail with staffing issues.

5            So that just is putting on the table everything that

6   informs my decision to convene this status.  Now it's entirely

7   any party's right to appeal.  I don't take time to read what

8   you've submitted to the appellate court, but I think at this

9   point there's a pretty clear pattern of three appeals.  They've

10  bought time, but at the same time, there's never been a motion

11  to stay.  And I appreciate the defendants saying they're going

12  to work to comply with the Court's order, and that's where

13  there's significant progress, I think, if you look at the

14  trends.  And I want to hit on those today.

15           So I'm now going to turn to getting into the specifics

16  and how I contemplate moving forward.  But at this point, is

17  there anyone who sees a reason not to, as a general matter,

18  move forward setting quarterly statuses?  I would set the

19  agenda informed by the special master.  At the end of every

20  status there would be an other business so the parties could

21  let me know if they think there's something else I should hear

22  about.  There would be a status report submitted probably 30

23  days before for me to review your views on my agenda items.  Is

24  there any reason generally not to move forward with quarterly

25  statuses and generally subject to your hearing my specific

1   thoughts on the areas that may be covered by appeals in all the

2   key aspects of the case?  Mr. Gibson?

3          MR. GIBSON:  Your Honor, well, first of all, just to

4   respond to the Court's statements leading up to this.  We

5   appreciate the Court's interest in bringing this case to an

6   end, and our appeals are in no way an attempt to delay that or

7   to buy time for any reason.  We believe that those were filed

8   in the best interest of the defendants to protect themselves

9   from sanctions and from what we believed were final orders.

10  Notwithstanding that, we do appreciate the Court's intent to

11  bring this case to an end sooner rather than later, and we

12  don't have any objections to the court proceeding on a

13  quarterly basis for status conferences.

14         THE COURT:  All right.  Mr. Sanchez, for defendant

15  Brown?

16         MR. SANCHEZ:  Your Honor, I don't have much more to

17  add.  I would welcome, I think, the regular status conferences.

18  I think it would be beneficial to hear the Court's views and to

19  be able to address those things in a regular fashion.  I think

20  that will be helpful to all the parties.

21         THE COURT:  All right.  And Mr. McKinney, for

22  defendant Kernan?

23         MR. McKINNEY:  Yes, your Honor.  We agree with what

24  counsel said, and I think, as the Court knows, we were very

25  interested in having a regular status with the Court maybe a

1    year or two ago.  So we welcome this opportunity absolutely.

2            THE COURT:  All right.  Ms. Ells?

3            MS. ELLS:  We also think that it's a good idea to have

4    quarterly status conferences.  We agree with you that we don't

5    think any of the appeals have divested this Court of

6    jurisdiction.

7            THE COURT:  All right.  Then we'll talk about

8    quarterly statuses probably April, September, December, and we

9    might set the first one before we leave here today.  Let's just

10   talk about the three areas that might be covered by the appeals

11   while recognizing that no one takes the position that I'm

12   ousted of jurisdiction.

13           So here's my observation about the status of the

14   April 19th, 2017, order requiring compliance with program guide

15   and timelines for transfer to acute and intermediate inpatient

16   care.  While it is the case that it might have been a wakeup

17   call to defendants that despite their representation that they

18   were complying or could comply, they didn't for the first

19   several months.  I mean, that's clear.  But since

20   September 13th, 2017, my reading of the information that's

21   being provided to the Court is that the defendants have been in

22   full compliance since September 13th, 2017, so for almost a

23   year.

24           Is that -- Mr. Gibson, do you agree that's a fair

25   reading of the record?

1          MR. GIBSON:  Yes, your Honor, it is.  I just wanted to

2     make one clarification, if it wasn't clear previously.  The

3     defendants' position is that once an appeal is filed as to a

4     particular issue, the Court's jurisdiction is divested at that

5     time.  And we have put that in previous filings with regard to

6     the transfer timeline orders.

7          THE COURT:  Does that mean I can't ask you that

8     question?

9          MR. GIBSON:  No, your Honor, just a clarification.  I

10    just wanted to make sure it was on the record.

11         THE COURT:  So what's your answer to that question?

12         MR. GIBSON:  The answer is that, yes, your Honor,

13    since September of 2017 we have been in full compliance with

14    the transfer timelines to the inpatient level of care.

15         THE COURT:  Do you agree, Ms. Ells, or whoever on your

16    team is best to answer that question?

17         MS. ELLS:  Yes, your Honor.  We think that the Court's

18    action was warranted, and it has paid off.  Once again, once

19    attention was paid to the transfer timelines in a focused

20    fashion, defendants have come into compliance, and they've

21    sustained the compliance.  And we're very pleased to see that.

22         I will note though we have some remaining concerns in

23    that respect, and the primary one is that the ASH census is

24    plummeting again.  There are a hundred empty beds at ASH right

25    now, and that's more empty beds than there were when your

1    November 2015 OSC issued.  So we have significant concerns

2    about that.  The Coalinga census is also the lowest it's been

3    in a year, and the number of class members who are held in high

4    custody or higher custody, intermediate care programs above

5    what their least restrictive housing status is is also

6    extremely high at 58 percent.  I think it's the highest that

7    it's been in any of the reports right now.  So that includes 16

8    level 1 class members in the highest custody ICF settings that

9    CDCR runs, and we have a lot of concerns about that.  And you

10   know the history of this case teaches that when the ASH census

11   falls that other problems crop up.  And we've also been

12   informed by defendants recently that there is a sort of middle

13   tier in their range of custody beds for intermediate care.

14   There is a middle tier that is full, and there are people

15   waiting to get into that sort of category of beds even though

16   they are eligible to be in that category of beds.

17           So we continue to have a lot of concerns that the

18   system is not flowing like it should be.  So we're very pleased

19   that people are getting into intermediate and acute care beds

20   on time within the transfer timelines, but we remain concerned

21   that people are not being treated in the most appropriate

22   clinical setting for their needs.  And so we think that that is

23   a continuing issue of concern.  And we're also very concerned

24   about the quality of care inside these programs, as the special

25   master's most recent draft report documents, and which

1    defendants did not object to.  There are a lot of very serious

2    quality of care problems within the inpatient programs right

3    now.

4            THE COURT:  All right.  I have been advised by the

5    special master that the number of beds in use at Atascadero has

6    been dropping.  Here's my question.  I heard what you said,

7    Mr. Gibson, but it's really only the defense would say I

8    couldn't find the defendants in contempt.  The defense wouldn't

9    say I couldn't discharge the order to show cause.  I'm just

10   testing the bounds of your position.  Orders to show cause

11   are -- they are ways to get parties to focus on a question, and

12   then the hearing that follows an order to show cause, this is

13   why I believe an order to show cause is not a final order

14   because I never resolve the question of whether or not fines

15   would issue.

16           And so if I were to set -- suppose I set a status to

17   review the transfer timeline issue, set a status for December

18   of this year.  This is separate from the quarterly but focusing

19   on this very important issue which really, you know, the Court

20   can't countenance delay.  I don't know how many times I can say

21   that, but I can try to act accordingly, set a status in

22   December of 2018, at this point reset the hearing that I had

23   originally set for November 3rd of 2017, push that out to

24   September of 2019, so that by September of 2019 if defendants

25   stayed on track and there were full compliance with the

1   timelines addressing the plaintiffs' concerns, that would be

2   two years, and so there could be a strong argument for

3   durability, and that's what the Court's looking for.

4           And so it's theoretically possible.  You seem to not

5   want me to get there in any way, shape, or form, but it's

6   possible.  I'm not prejudging the question.  If there were

7   compliance from September 13th, 2017, through September 2019,

8   maybe I would discharge the order to show cause.  Would you say

9   I don't have the authority to do that if the appellate court

10  hasn't decided whatever you've asked it to decide?

11          MR. GIBSON:  Well, your Honor, I believe that if the

12  Court were to rescind the order upon which the appeal is based,

13  the appeal would be mooted.  That's our position.

14          THE COURT:  You know, what courts do is discharge

15  orders to show cause.  We do it a lot of the time.  I've done

16  it in this case.  I think most orders to show cause are

17  discharged, not all of them.  So that's my -- any reason

18  here -- and I'll ask Mr. Sanchez and McKinney the same

19  question -- any reason not to set a focused status on this

20  question to see if we can get to the bottom of what's going on

21  with ASH, whether or not it looks like durability is setting

22  in?  Any reason not to have a status in December 2018 and reset

23  the hearing I originally contemplated on November 3rd for

24  September 2019, again to resolve the order to show cause?  If

25  we hadn't heard from the appellate court, I think I could

1   discharge the order to show cause if I got there.  I might hold

2   off on a contempt finding, if I wanted to go there, just in an

3   exercise of discretion.  So any reason not to proceed in that

4   fashion on the transfer to acute and intermediate inpatient

5   care question?

6          MR. GIBSON:  Right, your Honor.  With regards to the

7   OSC, I believe you're correct.  You can act, you know, in terms

8   of when you discharge it or whatever timeline you put, that's

9   within your power.  However, the order itself, the hundred

10  percent compliance order, that is what is required under the

11  law.  That issue though is still up on appeal.  So I think that

12  is the -- that --

13         THE COURT:  Right.  But your problem is if I enforce

14  it and impose fines, right?

15         MR. GIBSON:  Of course, your Honor.

16         THE COURT:  And I haven't done that yet.  That's where

17  I think you've put the cart ahead of the horse.  If the circuit

18  disagrees, you know, I'm bound by what they do.  But any reason

19  not to do what I've just said, special status in December,

20  reset the OSC hearing with the possibility of discharge or

21  contempt?  You know, the contempt got the defendants'

22  attention.  And if really there's full durability and everyone

23  agrees by September of 2019, then it achieved its purpose,

24  right?

25         MR. GIBSON:  Yes.  And I would argue that a year of a

1    hundred percent compliance is certainly evidence of durability.

2          THE COURT:  Well --

3          MR. GIBSON:  With regard to the OSC, your Honor,

4    pushing whatever deadline for the OSC, I believe if there's no

5    ultimate order as to compliance with the time frames, the

6    inpatient time frames, that's within your authority.  But any

7    act to enforce it pending the appeal, it's still our position

8    that you're divested of jurisdiction.

9          THE COURT:  Right.  All I've signaled in prior orders

10   is that I would refrain from a finding of contempt.  And so at

11   this point the benefit of having waited is you can see a

12   pattern.  And, you know, although it took several months, it

13   appears that that order did have the effect of focusing in a

14   way that has achieved compliance while recognizing the

15   potential caveat plaintiffs are raising.

16         So my plan is, unless Mr. Sanchez, Mr. McKinney, or

17   Ms. Ells persuades me otherwise, to set a special status in

18   December of this year and reset the hearing originally set for

19   November 3rd for September of 2019.

20         If in December 2018 you want to move for me to

21   discharge the order earlier than September of 2019, I'll

22   entertain that.  It would be subject to a joint status report

23   without the parties respective positions.  So any reason not to

24   proceed in that way, Mr. Sanchez?

25         MR. SANCHEZ:  No, your Honor.  I agree it is within

1    the Court's discretion to set a status conference to review the

2    order to show cause.  Just one point of clarification, from our

3    point of view, and this was in our appellate briefs, the final

4    determination that the state defendants have to achieve one

5    hundred percent compliance with the timelines we thought is

6    final and separate from whether there's enforceability.  And

7    we've seen case law that if defendants waited until a contempt

8    proceeding itself, any appeal from -- that flows from there

9    would only relate to contempt issued by the Court itself and

10   not the underlying substantive determination from a previous

11   order.  And that's why we felt we had to appeal from that

12   order.  That's the distinction we have been drawing.

13        But as far as the Court proceeding with review of the

14   order to show cause and whether it merits discharge, I don't

15   think the Court is -- I believe the Court has the discretion to

16   do that.  I agree.

17        THE COURT:  Mr. McKinney?

18        MR. McKINNEY:  Your Honor, I also agree that the Court

19   does have discretion to proceed as indicated.  I'd also like to

20   add a couple of points.  Although I don't think we can disagree

21   that the Court's order had impact, there were a number of other

22   things going on with the department including a transfer of

23   responsibility for the inpatient beds from the Department of

24   State Hospitals over to CDCR.  That took time to implement.  In

25   a system of this magnitude, it was going to take several months

1    in order for us to see the gains of that lift and shift and the

2    efficiencies that we were able to draw by taking over those

3    beds.  So I don't want to lose sight of the fact that the

4    department paid very close attention to this as well.  Our

5    director of mental health, the undersecretary of health care

6    are both here today, really paid close attention to what was

7    going on with the inpatient beds and assured that the fix was

8    put into place and is durable.  So I wanted to put that on the

9    record.

10           Also with respect to the Atascadero beds while, you

11   know, the plaintiff expresses those as concerns, this is a case

12   of constitutional dimension.  The fact that we're meeting the

13   timelines, I think that's where the Court's inquiry starts and

14   ends.

15           THE COURT:  All right.  Understood.  I don't need to

16   take any credit.  And I would say when I issued the order the

17   defendants said they could comply from the get go.  But I

18   recognize it's a complex system with lots of moving parts.

19   Really it's what can I do to provide the most constructive role

20   possible.  You all have Rule 11 obligations, so you're making

21   representations to the appellate court subject to your

22   obligations.  I don't question that.  Reasonable courts can

23   disagree, and I don't know that that order to show cause is

24   final until it's enforced with contempt.

25           Ms. Ells, any reason not to proceed with a December

1  2018 status, possible motion to discharge with a September 2019

2  outside date?

3          MS. ELLS:  No.  That sounds perfectly reasonable.

4          THE COURT:  All right.  So Ms. Shultz, is

5  December 14th available?

6          THE CLERK:  Yes, your Honor.

7          THE COURT:  All right.  So let's say December 14th of

8  2018 for a focused status on the issue of transfer to acute and

9  intermediate inpatient care, and we can say 10:00 a.m.  And

10 then in September of 2019 we could say September 13th, right?

11         THE CLERK:  Yes, your Honor.

12         THE COURT:  Which is exactly two years from the date

13 of coming into compliance.  So let's say September 13th of 2019

14 at 10:00 a.m.  The hearing could be vacated if all the issues

15 are resolved before then.

16         So then on the October 10th, 2017, order where I made

17 decisions about three issues related to the compliance with the

18 24-hour transfer timeline required by the program guide, also

19 in my view not final orders.  I suspended the deadline for

20 submission of an addendum covering exceptions and a plan to set

21 a deadline for compliance with the timeline.

22         Here my question is.  Is there any reason not to set

23 this issue -- to revive this issue and set it for hearing in

24 connection with now the first quarterly status in 2019 in

25 April?  Mr. Gibson?

1          MR. GIBSON:  I think our position remains the same as

2     to both appeals.  Your Honor is well within her discretion to

3     have status conferences regarding the OSC, to set them at a

4     date in the future, but the Court's jurisdiction is divested in

5     terms of enforcing the Court's order.

6          THE COURT:  This is the three -- I decided three

7     discrete issues.  The parties came to me.  They said I need to

8     resolve these issues and I obliged.

9          MR. GIBSON:  I apologize, your Honor.  Are you

10    referring to the MHCB?

11         THE COURT:  The 24-hour transfer timeline.

12         MR. GIBSON:  Yes.  Yes, your Honor.

13         THE COURT:  Yeah.

14         MR. GIBSON:  That issue, the full compliance with

15    24-hour MHCB transfer timeline you are divested.  It's

16    defendants' position you are divested of jurisdiction over that

17    issue because it's --

18         THE COURT:  So I can't have a status reviewing an

19    addendum for covering exceptions?

20         MR. GIBSON:  No.

21         THE COURT:  Can I have a status -- can I revive --

22    again, I've never said that I was divested of jurisdiction.  At

23    this point I'm not prepared to buy into delays when it seems to

24    me some of these issues can be -- you are resolving so many

25    issues, what we had talked about an addendum covering

1   exceptions to the 24-hour transfer timeline which would move

2   this issue forward in a meaningful way.  Are you saying I'm

3   divested of jurisdiction to have a status and revive the effort

4   to finalize an addendum?

5          MR. GIBSON:  I'm sorry.  Sorry for the delay --

6   temporary delay.  We -- in general, we believe you're divested

7   of the issue, but as to that in particular, the addendum as to

8   exceptions that we will -- that we can move forward and discuss

9   it at a status conference and amongst the parties.

10          THE COURT:  All right.  Mr. Sanchez?

11          MR. SANCHEZ:  I would agree, your Honor.  I see the

12   addendum and the creation of the exceptions as creating the

13   circumstances by which a timeline might not be appropriate to

14   apply such as for a medical intervention or an inmate being out

15   to court, and that is a distinct issue in our view from the

16   underlying basis for the appeal which is whether the

17   constitution requires a one hundred percent compliance with the

18   24-hour transfer timeline for each individual case.  And so I

19   apologize for the roundabout answer, but I agree with our

20   counsel that the Court could proceed with the meet-and-confers

21   and the discussions to the creation of an addendum of

22   exceptions.

23          THE COURT:  Mr. McKinney?

24          MR. McKINNEY:  Yes.  I also agree.

25          THE COURT:  Ms. Ells?

1          MS. ELLS:  Our position on this is that the law is

2    very clear you have the full ability to enforce that order.

3    Enforcement orders are not -- there's no divestment as to

4    enforcement or existing orders when there is no stay, and of

5    course there is no stay.  So we think that you can enforce the

6    full scope of the MHCB order from October 10th, 2017.  As to

7    your particular question, we certainly agree that you can move

8    forward with a status conference regarding the addendum to

9    exceptions to the 24-hour transfer timeline.

10          THE COURT:  All right.  So that gives us a particular

11    reason to set the first quarterly status in 2019.  Let me just

12    ask.  The special master is present.  I'm just going to ask.

13    My proposal is April 12th of 2019.  Any reason not to set the

14    first quarterly status for that date, Mr. Lopes?

15          SPECIAL MASTER LOPES:  That's fine, your Honor.

16          THE COURT:  All right.  So the first quarterly status

17    April 12th of 2019, and the addendum covering exceptions to the

18    24-hour transfer timeline will be one of the agenda items, and

19    then the most recent appeal of the July 3rd, 2018, order simply

20    requiring the special master to prepare a proposed

21    telepsychiatry policy addendum to the program guide.

22          Here is my proposal.  And so again the question is any

23    reason I can't proceed in this fashion?  As I noted previously,

24    I contemplated receiving objections and ruling on them.  I have

25    asked the defendants to prioritize exceptions, and I've

1  received those prioritized exceptions along with their

2  observation that they take account of the fact that the special

3  master's ultimate proposal did consider and take account of

4  some of the objections provided to him.  My plan would be to

5  have a special set on September 7th in the afternoon of this

6  year to rule on the objections.  I will strive to issue written

7  tentatives resolving the objections.  And so the hearing on the

8  afternoon of the 7th, I would propose 1:30, would be a chance

9  for the parties to -- I wouldn't require anything in writing.

10  Part of the goal here is to streamline.  We could go through my

11  tentatives.  Parties could argue.  I'll resolve the objections

12  ultimately from the bench and either confirm tentatives or

13  revise them with a written confirmation.

14        Based on my resolution of objections, I would adopt

15  it -- I would approve a telepsychiatry policy provisionally, as

16  I said earlier, and then contemplate a period of monitoring.  I

17  think there's a lot happening in telepsychiatry.  The field is

18  evolving, so most likely give up to 18 months for a monitoring

19  of the policy at which point it could be revisited if

20  necessary.  So any reason not to proceed in that fashion with

21  regard to the telepsychiatry policy addendum, Mr. Gibson?

22        MR. GIBSON:  Yes, your Honor.  Unlike the transfer

23  timeline issue, which were subsets of the ultimate issue, I

24  believe that you -- this Court is divested of jurisdiction to

25  act further on the telepsychiatry policy issue.  It's

1   defendants' position that the July 3rd order was final in

2   regard to a number of issues that directed the special master

3   to create a telepsychiatry policy for CDCR.  Fundamentally, as

4   you've read in our objections, we believe that the Court's

5   delving in the administrative workings of CDCR is outside the

6   Court's authority under the law and the PLRA.

7           THE COURT:  I am aware of that objection.  I would

8   resolve that on the 7th.

9           MR. GIBSON:  I understand that, your Honor, but that

10  still is the subject of the appeal of the July 3rd order.

11  There were also findings of fact made in the July 3rd order

12  particular as to what the EOP population is or is not.  I think

13  in particular it was that the EOP is an inpatient -- it was a

14  residential program akin to inpatient was the finding of the

15  July 3rd order.  We believe that that finding is appealable

16  because we weren't given an opportunity to address it

17  previously.  It's not based on any facts, and it did influence

18  what ultimately came from the special master.  Also the

19  July 3rd order set parameters under which the special master's

20  proposed policy was to operate in finalizing a proposed policy

21  for CDCR.

22          THE COURT:  Proposed policy to be approved

23  provisionally subject to monitoring.  All right.  So you would

24  object to my proceeding with resolving the objections despite

25  the orderly process I set out allowing objections to ultimately

1   be resolved prior to the approval of any policy.  You would

2   object to that?

3         MR. GIBSON:  I believe this Court has been divested of

4   jurisdiction over that issue, yes, your Honor.

5         THE COURT:  All right.  Mr. Sanchez?

6         MR. SANCHEZ:  I would agree, your Honor.  I think at a

7   base where defendants object is the Court issuing an order that

8   imposes limitations on the use of telepsychiatry without any

9   findings that we're aware of that there was any constitutional

10   harm flowing from CDCR's current use of telepsychiatry.  So if

11   the Court were to proceed with adopting the special master's

12   recommendations or imposing certain limitations subject to a

13   different policy than what CDCR has created, I would agree that

14   the Court -- we believe the Court is divested of jurisdiction,

15   you know, from that process.

16         THE COURT:  If I were to proceed and go in the

17   direction of what you see as the worst case, if, right, isn't

18   that what you just said?

19         MR. SANCHEZ:  It's our understanding from reading the

20   July order that the Court had signaled it was going to impose

21   limitations on telepsychiatry, and that in and of itself, it's

22   the Court inserting itself into we don't -- the Court not

23   agreeing with CDCR's current policy and proposing that the

24   special master write a different one, that in and of itself we

25   think also flows, you know, from the appeal of the July order.

1    And I would just add --

2         THE COURT:  So you think the Court has predetermined

3    its ruling on any objections, and I'm going to just rubber

4    stamp overruled on any defense objection?

5         MR. SANCHEZ:  No, your Honor.  I certainly don't mean

6    to suggest that you're rubber stamping anything.  It just --

7    from our reading of the July 5th order, it seemed as if the

8    Court had signaled that it was -- that it had agreed that

9    limitations should be placed on telepsychiatry subject to the

10   special master elaborating on what those limitations should be.

11   And we did not find that there are findings to support that

12   precondition.  And so that is the basis for why we believe the

13   appeal was sought.  In the absence of any evidence of

14   constitutional harm, we think CDCR, the defendants, should be

15   allowed to proceed with its own telepsychiatry policy until

16   there are findings or something that warrants the Court's

17   intervention at that point.

18        THE COURT:  All right.  Mr. McKinney?

19        MR. McKINNEY:  Yes, your Honor.  I agree with what

20   counsel just stated, and to state it another way perhaps is

21   that our view is that the July 3rd order reflects a policy

22   dispute between -- that arose in the work groups between the

23   defendants and the special master and his experts, and under

24   those circumstances, it has to be the department's view on

25   policy that prevails absent a finding based on facts that our

1    proposed policy constitutes deliberate indifference under the

2    Eighth Amendment.

3            THE COURT:  All right.  Ms. Ells?

4            MS. ELLS:  So your Honor, obviously our position is

5    that it's a nonfinal order.  I think that is very clear, and we

6    will be moving to dismiss the appeal for lack of jurisdiction.

7    More importantly, what everyone seems to be forgetting is that

8    there is an order already in place that places limitations on

9    CDCR's, you know, desire to use telepsych for literally every

10   patient within the system no matter what their acuity level,

11   that is your October 10th, 2017, order that was not appealed

12   and that has not been stayed.  So the limitations that mostly

13   form the backbone of what the special master modified

14   defendants or proposed modification to defendants' policy, that

15   order already exists, and defendants are already ordered to

16   comply with it.  And that is law of the case, and I think that

17   fact has kind of gotten lost here.

18           So sort of irrespective of what defendants would like

19   to do with the July 3rd order, the October 10th, 2017, order

20   still stands.  And those restrictions are still something that

21   CDCR needs to comply with, whether or not they think that this

22   Court has jurisdiction as to revising their proposed policy

23   through the special master's recommendation or considering that

24   at all.

25           MR. GIBSON:  Your Honor, if I may?

1          THE COURT:  Mr. Gibson.

2          MR. GIBSON:  I think it's -- you know, you're talking

3    out of different sides of your face.  If the July 3rd's not a

4    final order, why would the October 2017 order be final?  It's

5    the same issue.  And I think the October order contemplated the

6    parties meeting and conferring on a telepsychiatry policy,

7    which the parties did, and that in July, after that process was

8    unsuccessful in reaching an agreement on a telepsychiatry

9    policy, that's when the Court set final parameters for the

10   telepsychiatry policy.  That's defendants' position.  The

11   July 3rd order is a final order.

12         The October order, as we've previously argued and the

13   Court discussed at the June 28th conference where you clarified

14   your order, correct, that was when we understood what the

15   Court's final order was going to be, and the July 3rd order was

16   that order.

17         THE COURT:  Well, you're putting words in my mouth,

18   but I can consider -- I mean, the defendants have submitted

19   objections.  They've prioritized their objections.  They didn't

20   decline to submit objections.  So my plan is to rule on the

21   objections.

22         MS. ELLS:  Your Honor, may I make one point about

23   those objections?

24         THE COURT:  You may.

25         MS. ELLS:  We are concerned that there was new

1    evidence submitted with those objections filed in this court

2    that had not been presented to the work group.  I think the

3    entire thrust of your -- the status conference on the 28th of

4    June as well as your July 3rd order is that you wanted the work

5    group to fully exhaust every factual dispute and basis for

6    concern and for that all to be presented to the special master

7    in advance of what was filed with this Court.  And the factual

8    record has been significantly expanded when it was filed in

9    this court, and plaintiffs have not had an opportunity to

10   respond.  The special master did not have an opportunity to

11   consider that when he submitted his recommendations and

12   proposed policy and what was supposed to be and ordered to be

13   the entire factual record for this dispute.  So we would

14   anticipate moving to strike that evidence.

15           THE COURT:  Can you get a focused -- a concise motion

16   to strike on file by Friday?

17           MS. ELLS:  Yes.

18           THE COURT:  All right.  So I'll allow that, and then

19   I'm setting a hearing for September 7th at 1:30 p.m.  That's

20   available, Ms. Shultz?

21           THE CLERK:  Yes, your Honor.  10:00 a.m. is also

22   available if you prefer an earlier time.

23           THE COURT:  Actually, so we have 10:00 a.m., so

24   September 7th at 10:00 a.m. for consideration of objections and

25   the motion to strike.

1              MR. GIBSON:  Your Honor, will we be given an

2      opportunity to oppose that motion to strike?  We believe that

3      there is sufficient grounds and the reason for any new

4      evidence, which we can always surmise because counsel hasn't

5      identified.

6              THE COURT:  You can get any opposition on file by

7      September 5th?

8              MR. GIBSON:  Yes, your Honor.

9              THE COURT:  And then replies can be argued at the

10     hearing.

11             All right.  Then on staffing, we're on track for

12     October 11th of 2018.  I'm maintaining that.  And the reason

13     I'm moving forward with telepsychiatry is I understand there

14     may be a clear overlap with staffing.  What I want to emphasize

15     here is one of the bright spots, if the defendants are correct,

16     I understand from the special master that the defendants are

17     projecting full implementation will bring them incredibly close

18     to the fill rate on staffing even without the use of

19     telepsychiatry.  Do I have that right?

20             MR. GIBSON:  Your Honor, the telepsychiatry will be --

21     will continue to be a facet of CDCR's mental health delivery

22     system, notwithstanding --

23             THE COURT:  But you're projecting compliance without

24     it; is that right?

25             MR. GIBSON:  Your Honor, we -- based on the tentative

1    agreement to the staffing proposals, the --

2                THE COURT:  The 2009?

3                MR. GIBSON:  Yeah.  Adjustments to the 2009 staffing

4    plan, CDCR right now projects that they will be above the 90

5    percent threshold for staffing for psychiatry statewide.

6                THE COURT:  So that's significant.  I recognize the

7    plaintiffs haven't had a chance to evaluate that, but still

8    that is worth noting and another reason to keep moving forward.

9    I understand there may be a proposal for adjustment of the

10   staffing ratios reflecting the 2009 plan, and we should put

11   that on the agenda for October 11th.  Can we do that, or do you

12   need more time, at least an update for the Court about the

13   status?

14               MR. GIBSON:  No, your Honor.  I'm hopeful we can reach

15   a final agreement long before October 11th.

16               THE COURT:  All right.  At least an update.  So add

17   that to the list of items to be covered in your joint status

18   report, and we'll talk about the due date for that joint status

19   report shortly.

20               I also understand the defendants are changing the

21   14-day timeline to transfer inmates -- change to 14 days the

22   timeline for transferring inmates out of five desert

23   institutions?

24               MR. GIBSON:  We are in the initial steps of agreeing

25   to that.

1          THE COURT:  There needs to be a written confirmation

2     and hopefully a confirmed agreement but --

3          MR. GIBSON:  Yes, your Honor.

4          THE COURT:  -- I will just note that is a very

5     constructive development.

6          MR. GIBSON:  Yes, your Honor.

7          THE COURT:  With respect to where there are festering

8     problems with staffing, I would like to add to the October 11th

9     discussion as well a discussion of whether or not -- can the

10    defendants working with the special master and plaintiffs

11    identify specifically where there are consistent problems with

12    recruitment and retention, drilling down and help the Court

13    understand is there a way to close out some programs and roll

14    them into the successful locations to resolve, again in a

15    constructive way, in a pragmatic way, the lingering problems?

16    So is there any reason not to add that to discussion on

17    October 11th and have the parties address that in a joint

18    status report?

19         MR. GIBSON:  No, your Honor.  If the Court is

20    referring to clustering, we've addressed that issue previously,

21    but we can address it again at the October 11th.

22         THE COURT:  Thinking about it, it's not requiring

23    clustering, although that certainly has conceptual appeal.

24    It's really looking at the other side of the coin.  Where are

25    the problems?  In the same way that you've narrowed issues and

1   solved problems in other areas, where are the specific

2   problems, and can they be resolved more easily than appears;

3   and is it by possibly eliminating certain programs and

4   consolidating in locations where the problems don't exist,

5   staffing problems?  I think it's something worth thinking

6   about.

7        So let's add a section in the joint report to me.  I

8   would ask the special master to also inform the Court if he has

9   thoughts along those lines.  But I'm not -- it's not renewing

10  clustering.  It's asking the question from a different angle

11  really, a more constructive, pragmatic angle.

12       And then finally with respect to reduction of

13  monitoring, I'm happy to listen to any proposals for reduction

14  in monitoring at the October 11th status.  If certain programs

15  are being closed out, if the populations are no longer

16  persisting in certain locations, does that lead to reduced

17  monitoring?  And if they're the written details, exhaustion to

18  meet and confer, a specific proposal that makes sense, I would

19  entertain that.

20       Just so it's clear, I think you know I've asked the

21  special master in his next monitoring report to not just tell

22  me open-ended monitoring is needed.  I'm putting pressure on

23  all of you.  I'm including my own special master.  I do think

24  the end is coming into sight here, and it's the more specific

25  we get, the more we drill down, the more we're able to take

1    things legitimately off the table, not just to reach a goal but

2    because in fact the issues have been resolved, that will get us

3    there.

4         Anything to say on these points Mr. Sanchez or

5    Mr. McKinney?

6         MR. SANCHEZ:  Your Honor, we welcome tackling those

7    issues and agree that it's ripe for discussion.

8         THE COURT:  Mr. McKinney?

9         MR. McKINNEY:  Your Honor, one thing I just wanted to

10   clarify for the record, and I may have misheard but the

11   department does currently employ approximately 60

12   telepsychiatrists statewide, so the policy we're discussing

13   would allow for an expansion and a codification of the policy,

14   but I did want to be clear that we do use telepsychiatry under

15   the guidance and with monitoring by the special master's

16   team.

17        THE COURT:  But is the projection of over 90 percent,

18   does that rely on some use of telepsychiatry?

19        MR. SANCHEZ:  Yes, your Honor.

20        MR. McKINNEY:  Yes.

21        THE COURT:  All right.

22        MR. SANCHEZ:  And so just to clarify, the complement

23   of telepsychiatrists are a crucial component of the --

24        THE COURT:  With some use.  It's without the proposed

25   policy approved, without any policy change, right?

1        MR. SANCHEZ:  Yes, your Honor.

2        MR. GIBSON:  The policy you're referring to is the

3   proposed telepsychiatry policy.

4        THE COURT:  Right.

5        MR. GIBSON:  Yes, your Honor.

6        THE COURT:  Right.  That was the point I meant to be

7   making.

8        MR. GIBSON:  And I believe, your Honor, even not to

9   condone it, to condone its passage, but the proposed policy,

10  whether or not it's implemented or not, would not have a

11  fundamental change as to the proposals and CDCR's meeting the

12  2002 90 percent threshold.

13       THE COURT:  That was the point I was getting at.

14       MR. GIBSON:  Uh-huh.

15       THE COURT:  Anything on this, Ms. Ells?

16       MS. ELLS:  No, your Honor.

17       THE COURT:  Finally, with respect to the October 11th,

18  I have reviewed the joint status report proposing a schedule

19  for discovery, and I certainly allowed that based on a request.

20  I think it initiated with Mr. Bien.  Upon reflection, having

21  heard an update from the special master, having heard from the

22  defendants on the 90 percent, and also noting that the special

23  master is planning to retain very shortly his own labor

24  economist, I just -- I'm not prepared to authorize the

25  discovery requested.  I think it would take the parties off on

1   one of these tangents, and it's just -- I don't think it's

2   needed.  I'll have a full factual record from the special

3   master by the time we meet in October, and there's just not

4   enough time for you to complete discovery and really focus any

5   issues that you identify from that.

6          And so again while noting I did allow you to propose a

7   schedule, I'm at this point denying the request for discovery.

8   It can be without prejudice if issues arise with respect to the

9   factual record, but I'm hopeful that that record and whatever

10  else we accomplish in October will moot the need.

11         In terms of the timing of the joint status report, I

12  am prepared to grant the request to move that to

13  September 14th.  So the joint status report may be filed on

14  September 14th, and I will accordingly bump the special

15  master's deadline for providing the factual record.

16         All right.  In terms of other issues, I think these

17  issues we can revisit at the quarterly statuses beginning in

18  April.  MHCBs will certainly be a hot topic.  I understand the

19  defendants may have something to report to me today on MHCBs;

20  is that right?

21         MR. GIBSON:  As to the what in particular, your Honor?

22  We're happy to update the Court on the status --

23         THE COURT:  Is there anything we haven't covered so

24  far?  Maybe we've already covered it.

25         MR. GIBSON:  Well, your Honor, I can update the Court

1    that in the last six months the transfer timelines have been

2    hovering close to 90 percent for the men, between 88 and 89

3    percent since April, so we are -- we believe we are complying

4    with our constitutional requirements to -- in terms of

5    transfers within the 24-hour timeline as to men.

6         We do recognize that, as to the female population,

7    there's work to be done, but the parties are working on a

8    stipulation hopefully filed shortly to waive licensing for the

9    CIW Walker facility that will open 15 more beds, which is

10   substantially more than the 22 we have now for mental health

11   crisis beds for women.

12        And I believe that will help relieve some of the

13   timeline issues that CDCR is having.  So both men and women I

14   believe by the end of the year will be close to 90 percent.

15        THE COURT:  All right.

16        MR. GIBSON:  And the Walker facility is supposed to

17   open at the end of the year.  So hopefully we can get some kind

18   of traction shortly thereafter.  So I believe defendants are

19   doing a great job both in the transfer timelines to the

20   inpatient level of care and the MHCBs.

21        THE COURT:  All right.  So another bright spot,

22   apparently, with significant progress at least.

23        MR. GIBSON:  Yes, your Honor.

24        THE COURT:  All right.  Anything to say on that,

25   Ms. Ells?

1        MS. ELLS:  Just one caveat which is that my

2   understanding is that defendants are measuring the 24-hour

3   timeline by not to include time on the bus, so that issue

4   remains.  That's my understanding, and I would appreciate it if

5   defendants correct me if I'm wrong.  So that issue remains out

6   there.  And my understanding is that most transfers are

7   external, so that may well impact how defendants' compliance

8   looks for the men.  The women remains abysmal, and we are

9   hopeful for some relief on that.  And we're negotiating a

10  temporary licensed unit with the defendants in that respect.

11       MR. GIBSON:  Your Honor, the numbers that I quoted

12  were from bed to bed, not bed to transport.

13       THE COURT:  All right.

14       MS. ELLS:  Great.  I'm pleased to hear that.

15       THE COURT:  I'll look for stipulation, and this is an

16  issue we will likely revisit at quarterly status.  We'll look

17  at population.  You know, is population flattening, what's

18  going on there, what bed needs, that's an item for quarterly

19  statuses.

20       Also just a reminder, I think you know that I'm

21  looking for a report on the status of implementation of the

22  custody collaboration plan by September 10th of 2018.  That's a

23  very important issue.  And we'll also calendar that for

24  discussion at a quarterly status.  Is there anything you want

25  me to know about that today, Mr. Gibson?

1          MR. GIBSON:  No, your Honor.

2          THE COURT:  Mr. Sanchez?

3          MR. SANCHEZ:  No, your Honor.

4          THE COURT:  Mr. McKinney?

5          MR. McKINNEY:  No, your Honor.

6          THE COURT:  Ms. Ells?

7          MS. ELLS:  No, your Honor.

8          THE COURT:  All right.  And if I didn't say it

9     previously, the program guide is pending with me, and I hope

10    soon to issue an order on the program guide.  The only thing

11    else I think we could do today is just go ahead and put on the

12    calendar the status conferences for September and December of

13    2019.  Have we done that yet?  We set one status for the reset

14    OSC hearing.  We set that for the 13th.  Why don't we just

15    expand that and have that also be a quarterly status.

16          MR. GIBSON:  Is that the one in December, your Honor?

17          THE COURT:  September 13th of 2019.  We already set

18    the April quarterly status.  So at this point let's say that

19    we'll attempt to cover whatever the Court wishes to on

20    September 13th both with regard to the transfer to acute and

21    intermediate inpatient care but also other issues.  If it turns

22    out we have more than we can do on the 13th, then I might

23    continue it to the 27th.  But at this point we'll just say the

24    13th is that hearing we've already set plus the second

25    quarterly status for 2019, and then the third quarterly status

1    for 2019 will be December 13th of 2019, both at 10:00 a.m.

2              That's all available, Ms. Shultz?

3              THE CLERK:  Yes, your Honor.

4              THE COURT:  All right.  We've accomplished what the

5    Court would like.  Is there anything, without opening the whole

6    can of worms, anything else anyone wants to tell me now before

7    we recess?  Mr. Gibson?

8              MR. GIBSON:  No, your Honor.  I just wanted one point

9    of clarification.  The Court has not adopted the parties'

10   proposed discovery schedule on the joint report?

11             THE COURT:  And I'm denying it.

12             MR. GIBSON:  In total?  Is that correct, your Honor?

13             THE COURT:  In total.

14             MR. GIBSON:  That's including the disclosure date,

15   correct?

16             THE COURT:  Correct.

17             MR. GIBSON:  Thank you, your Honor.

18             THE COURT:  So no discovery.  You have one extra week

19   for your joint status report.

20             MR. GIBSON:  Thank you, your Honor.  Defendants have

21   nothing further.

22             THE COURT:  Mr. Sanchez?

23             MR. SANCHEZ:  I would only add one point, your Honor.

24   I wanted to commend Special Master Lopes and his team on what I

25   thought was significant progress on the staffing discussions,

1   and it was very welcome to us that it was a collaborative

2   process.  It took some time, and there was a fair exchange and

3   robust exchange by DS, but at the end of the day we appreciate

4   the special master's leadership on this issue.

5               THE COURT:  All right.  For that reason alone, I'm

6   very glad you came forward to sit at counsel table.  So noted.

7               Mr. McKinney?

8               MR. McKINNEY:  I want to echo what Mr. Sanchez said.

9   I think we have found the work group process to be beneficial.

10  We do welcome the opportunity to work in small groups and to

11  work directly on issues.  I think what the Court has done today

12  is very positive from our perspective, so we appreciate that.

13              THE COURT:  All right.  Very good.

14              Ms. Ells?

15              MS. ELLS:  Nothing further, your Honor.

16              THE COURT:  All right.  Then we have our work cut out

17  for us.  I'll see you at the next date we set.  Thank you very

18  much.

19              THE CLERK:  Court is in recess.

20              (The proceedings adjourned at 11:06 a.m.)

21                          --oOo--

22  I certify that the foregoing is a correct transcript from the

23  record of proceedings in the above-entitled matter.

24                          /s/ Kacy Parker Barajas
                          _____
25                          KACY PARKER BARAJAS
                          CSR No. 10915, RMR, CRR, CRC