UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | No. 2:90-cv-0520 KJM DB |
| Plaintiffs, | |
| v. | TENTATIVE RULINGS ON OBJECTIONS |
| EDMUND G. BROWN, JR., et al., | |
| Defendants. | |

As required by the court's July 3, 2018 order, ECF No. 5850, on August 2, 2018, the Special Master filed a Report on the Proposed Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide (Report). ECF Nos. 5872, 5873. The Report includes a final proposed telepsychiatry policy addendum to the Program Guide and the parties' responses thereto. *See* ECF No. 5850 at 7, 8. Defendants submitted objections to the Special Master in a letter dated August 1, 2018. ECF No. 5872-5. On August 13, 2018, defendants filed objections to the Special Master's Report, ECF No. 5879; thereafter, as required by minute orders, defendants have indicated that the order of priority for the objections in their August 1, 2018 letter is the order in which their objections are presented in the August 13, 2018 objections, and have clarified the differences between the August 1, 2018 and the August 13, 2018 objections. ECF Nos. 5888,

1

5895.  The court here provides its tentative rulings on defendants' specific objections and identifies issues for further discussion with counsel on September 7, 2018.

Defendants have, with their August 13, 2018 objections, submitted additional arguments and new evidence that were not presented to the Special Master during the development or the finalization of the policy.  *See* ECF No. 5895.  Specifically, defendants have:

- "[E]xpanded their critique of a report submitted by plaintiffs' undisclosed expert Dr. Pablo Stewart, including through a rebuttal declaration by Defendants' expert Dr. Joseph Penn that was not submitted with the Letter";
- "[A]dded a reference to a telepsychiatry cell-front demonstration attended by the Special Master's expert Dr. Jeffrey Metzner";
- Expanded their argument concerning the Special Master's interpretation of "last resort or emergency restrictions" to refer to a declaration of Katherine Tebrock not submitted to the Special Master;
- Added a revised declaration from Dr. Kevin Kuich containing an additional paragraph describing a telepsychiatry cell-front demonstration attended by Dr. Metzner.

*Id*. at 3-5.  It was the court's intention that the final proposed telepsychiatry policy would be considered on the record established before the Special Master and submitted to the court by him. *See* ECF No. 5711 at 6-7; *see also* ECF No. 5870 at 10:15-11:10.  Because the court intends to give provisional, rather than final, approval to the proposed telepsychiatry policy addendum, the court does not plan to consider at this time any evidence or argument not raised with the Special Master.  This decision is without prejudice to defendants' right to bring this evidence and their position to the attention of the Special Master over the course of the future monitoring of the provisional policy the court plans to order.  This decision would render moot plaintiffs' August 31, 2018 motion to strike, ECF No. 5898, which the court plans to deny without prejudice.

/////

/////

I. <u>Inclusion of "Good Faith" Recruitment Efforts in the Policy</u>

Defendants object to the requirement of "good faith efforts" to recruit and retain on-site psychiatrists continuing as a condition of the use of telepsychiatry at any level of mental health care. ECF No. 5879 at 5. The proposed final policy includes this requirement as a condition of the use of telepsychiatry to replace on-site psychiatry at the Correctional Clinical Case Management System (CCCMS) level of care and to supplement on-site psychiatry at any higher level of mental health care. *See* ECF No. 5872-1 at 4.

The Special Master's February 6, 2017 Staffing Report included an express determination that telepsychiatry should not relieve defendants "of their obligation to continue their efforts of recruiting full-time psychiatrists to work on-site at the facilities." ECF No. 5564 at 15-16. Consistent with the representation in their February 2015 staffing plan that they prefer "to use on-site psychiatry whenever possible", ECF No. 5269 at 9, the CDCR defendants did not object to this determination, *see* ECF No. 5591 at 5-9, and that expressed "preference" is now reflected in the proposed policy. *See* ECF No. 5872-1 at 2 ("On-site providers shall remain the preferred method of psychiatric care for Enhanced Outpatient Program (EOP), Mental Health Crisis Bed (MHCB), and Psychiatric Inpatient Program (PIP) levels of care."). In their objections to the Special Master's Staffing Report, defendants represent "[t]here is little risk, . . . , that telepsychiatry could replace on-site psychiatric services," ECF No. 5591 at 9, and therefore request they be permitted to use and expand their telepsychiatry program "without qualifications." *Id*. At the hearing in this court on June 28, 2018, the parties represented there was no dispute over the use of telepsychiatrists at the CCCMS level of care as long as the telepsychiatrists visit the institution at least twice a year and good-faith recruitment efforts continue. *See* ECF No. 5850 at 5.

The objection defendants now interpose, that the good-faith recruitment effort requirement "remains a system-wide legal injunction that does not belong in a health care practice manual" raises a different issue: how does an on-going recruitment requirement intersect with the Eighth Amendment's requirement of constitutionally adequate care or, put another way, if telepsychiatrists provide constitutionally adequate mental health care why should defendants be

3

required to continue efforts to recruit on-site psychiatrists?[1] This is the first in a series of objections raised by defendants that can best be addressed by monitoring the implementation of telepsychiatry policy before it is finally approved. The on-going recruitment requirement is grounded in the opinion of the Special Master and his experts that telepsychiatry cannot and should not replace on-site psychiatry at any level of mental health care above the CCCMS level of care. On-going monitoring of CDCR's telepsychiatry program will provide additional evidence concerning the extent to which telepsychiatry may, consistent with the Eighth Amendment, supplement on-site psychiatric services to California's seriously mentally ill prisoners. It is clear, however, that defendants must continue a robust recruitment and retention program for prison psychiatrists even as they expand their use of telepsychiatry.

The parties shall be prepared to discuss at hearing whether the ongoing "good faith recruitment" requirement should be written into the telepsychiatry policy, or contained in a separate order of this court that accompanies provisional approval of the policy.

II. Limitation on Telepsychiatry at the EOP Level of Care

In relevant part, the proposed policy addendum contains the following description of use of telepsychiatry at the EOP level of care:

> Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry. On-site psychiatrists are required for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan.

ECF No. 5872-1 at 4. Defendants object to the second sentence as unclear. ECF No. 5879 at 13. Defendants explain that the previous iteration of the proposal required that they have "at least one on-site psychiatrist at 'each program and each unit within that program providing EOP level of care services within the institution' before it could use telepsychiatry at the EOP level of care."

/////

---

[1] The court is less persuaded by defendants' contention that this requirement does not belong in the policy that governs use of telepsychiatry because CDCR officials could not figure out how to both provide telepsychiatry and continue on-site psychiatrist recruitment efforts even though the two functions may be performed by different officials within CDCR. *See* ECF No. 5879 at 13.

4

*Id*. The current iteration was the Special Master's response to defendants' several objections to this proposed requirement. *Id*.

This objection, among others, exemplifies why the court believes it is important that a written addendum to the Program Guide governing use of telepsychiatry be developed. As required by the court's October 10, 2017 order, this aspect of the proposed telepsychiatry policy is grounded in the recommendation of the Special Master and his experts and adopted by this court that telepsychiatry must supplement, not replace, on-site psychiatry at the EOP level of care. *See*, *e.g.*, ECF No. 5711 at 21-23, 29-30. The first attempt to operationalize this principle was proposed as a requirement of at least one on-site psychiatrist and "each program and each unit within that program providing EOP level of care services" before telepsychiatry could be used. *See* ECF No. 5879 at 13. Faced with defendants' objections that staffing is not allocated by program and unit, the Special Master recommends that on-site psychiatrists be required "for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan." *Id*. Defendants contend this is unclear but provide no counterproposal that would achieve the underlying goal of at least one on-site psychiatrist for each institution that houses EOP inmates, with that on-site psychiatrist dedicated to the EOP program(s) and/or unit(s) at the institution and not to any other level of care that might be operating at the same institution.

The parties shall be prepared at the time of hearing to propose policy language that accurately defines this requirement consistent with the manner in which CDCR has operationalized the EOP staffing ratios in its 2009 Staffing Plan.

III. <u>EOP as Residential or Synonymous with Inpatient Care</u>

Defendants' third objection is to the finding in the court's July 3, 2018 order that "[a]lthough EOP is labeled an outpatient program, outpatient is contextual and relative to inpatient programs within the MHSDS; moreover, the Program Guide makes clear EOP is a residential program, synonymous with an inpatient setting." ECF No. 5879 at 14 (citing ECF No. 5850 at 10 [sic]). This language was not intended to, and does not, convey that EOP units provide inpatient hospital care or must meet state licensing requirements. Rather, the court's finding was made in the context of addressing appropriate limitations on the use of telepsychiatry

in the EOP setting, *see* ECF No. 5850 at 5-6, and differentiates the use of telepsychiatry at the EOP level of care from the use of telepsychiatry at the CCCMS level of care. The July 3, 2018 order references those portions of the Program Guide that describe EOP units as separate, specifically designated housing units for seriously mentally ill inmates who require the EOP level of care, whose mental illness acuity level precludes them from living or participating in the general prison population, and who require a higher level of psychiatric care than inmates at the CCCMS level of care. *See*, *e.g.*, Revised Program Guide at 12-4-1. The Program Guide update pending before the court contains policy directives reflecting efforts by defendants to allow some EOP inmates to have access to some programs in the general population. *See*, *e.g.*, ECF No. 5864-1 at 319-323. Defendants' objection that EOP is not "synonymous with an inpatient setting" in the broadest sense of that phrase is well-taken.

The key finding in the July 3, 2018 order is that EOP inmates are less able to function in the prison general population and need a higher level of mental health care than CCCMS inmates; therefore telepsychiatry should be relied on less for EOP inmates than for those at the CCCMS level of care. *See* ECF No. 5564 at 16 ("The higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment."); ECF No. 5711 at 29 (adopting in full findings in ECF No. 5564). The court's intention in directing defendants to develop a telepsychiatry policy addendum to the Program Guide was to define this difference in clear and precise terms. The ongoing dispute over the extent to which telepsychiatry may or may not be adequate for EOP inmates suggests that it will require monitoring the use of telepsychiatry at the EOP level of care to determine more precisely its adequacy as a treatment modality for inmates at this level of care. For this additional reason, the proposed telepsychiatry policy will be provisionally, rather than finally, approved at this time.

IV.     Restrictions on use of Telepsychiatry in MHCBs and PIPs

Consistent with this court's October 17, 2017 and July 3, 2018 orders, the proposed telepsychiatry policy addendum provides that telepsychiatry may not be used in mental health crisis beds (MHCBs) or psychiatric inpatient programs (PIPs) "except as a last resort or in emergency situations when an on-site psychiatrist is unavailable." ECF No. 5782-1 at 4.

6

Defendants asked the Special Master for clarification of the definition of "a last resort or . . . emergency situation." ECF No. 5879 at 16. According to defendants, he responded it was a legal question but that in his opinion the answer depended on the length of time telepsychiatry was required in either setting, with the longer the use the less likely it would be an "emergency" and that its use in these settings "for more than a few months would cause concern and alarm for both the Special Master's experts and Plaintiffs' counsel." *Id*. at 17.

Defendants object that this interpretation of "last resort or emergency" would "adversely impact" patient care. *Id*. For example, defendants say, it would require the closure of the MHCB unit at High Desert State Prison (High Desert), "which has been serviced exclusively by telepsychiatry for several years. . . ." ECF No. 5879 at 17. Defendants contend the MHCB unit at High Desert "is meeting most Program Guide requirements and has a lower 30-day re-admission rate than the state average." ECF No. 5879 at 17. Defendants also cite the MHCB unit at Pelican Bay State Prison (Pelican Bay), a remote location in Northern California, which currently has only one on-site prison psychiatrist; they contend telepsychiatry might be the only way to provide psychiatric services there for an extended period of time if the sole on-site psychiatrist leaves. *Id*.

Operating any MHCB unit exclusively with telepsychiatry for an extended period would appear to be an obvious violation of the spirit, if not the letter, of the court's order that telepsychiatry must be a supplement to, not a substitute for, on-site psychiatry at this level of mental health care. *See* ECF No. 5711 at 30; *see also* ECF No. 5850 at 6. It would also appear to violate the court's order that telepsychiatry is only permissible in MHCBs "'as a last resort or in emergency situations when an on-site psychiatrist is not available.'" ECF No. 5850 at 6 (quoting ECF No. 5711 at 21). Moreover, defendants' interpretation of "last resort or emergency situation", exemplified by the examples they provide, renders the phrase virtually meaningless. Merriam-Webster defines an emergency as "an unforeseen combination of circumstances or the resulting state that calls for immediate action" or "an urgent need for assistance or relief." https://www.merriam-webster.com/dictionary/emergency. "Last resort" is defined as "something done only if nothing else works." https://www.merriam-webster.com/dictionary/last%20resort.

7

Not including the desert institutions and CCC, defendants have twenty-seven other prison institutions, excluding Pelican Bay and High Desert, where they could provide MHCB care to inmates in mental health crisis if, as it now appears, the passage of time shows they are unable to recruit or retain even one on-site psychiatrist to work in an MHCB unit at High Desert.

Defendants are correct in one part of their argument: they cannot withhold psychiatric services to inmates because they are unable to recruit or retain adequate staff. However, the Eighth Amendment does not allow them to provide constitutionally inadequate psychiatric services because they are unwilling to relocate mental health programs to a location where adequate psychiatric staff can be recruited and retained. Defendants have sufficient information and experience to adequately assess whether they are operating MHCBs or PIPs in locations where they have consistently been unable to retain on-site psychiatrists or recruit replacements when on-site psychiatrists leave. This assessment, and consideration of available options, will be essential going forward and the prospect of a constructive adjustment appears good, in part because defendants have demonstrated an ability to flex inpatient beds at different locations to meet their constitutional obligations.

The court intends to provisionally approve the Special Master's proposed definition in this section of the proposed telepsychiatry policy. The parties will be directed to address at the hearing options available to defendants in lieu of operating MHCB units in prisons that have consistently failed to recruit and retain sufficient numbers of on-site psychiatrists.

V. Prohibition on Use of Cell-Front Telepsychiatry

In the July 3, 2018 order, the court requested the Special Master propose a resolution to the parties' dispute concerning the use of cell-front telepsychiatry. ECF No. 5850 at 6. The Special Master recommends the policy state that "[a]t present, cell-front provision of telepsychiatry is not permitted." ECF No. 5782-1 at 4. Defendants object, contending the affirmative restriction "is unnecessary, surplus, and premature." ECF No. 5879 at 18. Defendants appear to suggest that cell-front telepsychiatry is a reasonable and logical extension of cell-front psychiatry visits which, they argue, "are a reality in the correctional context and, in

some circumstances, are the only means of providing a psychiatric appointment for an inmate-patient who refuses to exist his or her cell." *Id*.

The proposed telepsychiatry policy contains specific provisions for handling inmate refusals to attend telepsychiatry appointments, which may include "brief, focused cell-front discussions" between the patient and a member of their treatment team. ECF No. 5872-1 at 3. The policy also contains a process for ensuring access to on-site psychiatric care for inmates who cannot be appropriately treated via telepsychiatry. *Id*.

At this point, it appears to the court there has been insufficient time and experience to resolve the question of whether cell-front telepsychiatry can serve as an acceptable modality. Still, the prohibition on its use while assessment of the myriad issues related to its adequacy and efficacy as a treatment modality is appropriate. The court intends to provisionally approve the proposed language, subject to amendment and approval of a final policy after future monitoring of defendants' telepsychiatry program subject to the policy provisionally approved.

VI. Other Issues

At hearing on September 7, 2018, the court anticipates having questions for counsel related to defendants' arguments regarding purported intrusion into the administrative regulatory and executive management arenas. The court also will seek the parties' input regarding the appropriate period of monitoring to follow provisional approval of a telepsychiatry policy.

DATED: September 5, 2018.

_____
UNITED STATES DISTRICT JUDGE