```
 1                IN THE UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF CALIFORNIA
 2            BEFORE THE HONORABLE KIMBERLY J. MUELLER


 3


 4      RALPH COLEMAN, et al.,


 5                     Plaintiffs,
        vs.                          Sacramento, California
 6                                   No. 2:90-CV-0520
        EDMUND G. BROWN, JR.,        Friday, September 7, 2018
 7      et al.,                      10:09 a.m.


 8                     Defendants.
        _____/
 9


10
                                     --oOo--
11

               REPORTER'S TRANSCRIPT OF PROCEEDINGS
12           RE: MOTION TO STRIKE AND STATUS CONFERENCE

13                                   --oOo--


14


15      APPEARANCES:

16      For Plaintiffs:         ROSEN BIEN GALVAN & GRUNFELD LLP
                                CARA E. TRAPANI
17                              ERNEST GALVAN
                                THOMAS NOLAN
18                              Attorneys at Law
                                50 Fremont Street, 19th Floor
19                              San Francisco, CA  94105

20      (Appearances continued on page 2.)

21
        Official Reporter:      KACY PARKER BARAJAS
22                              CSR No. 10915, RMR, CRR, CRC
                                501 I Street
23                              Sacramento, CA  95814
                                kbarajas.csr@gmail.com
24
        Proceedings recorded by mechanical stenography.  Transcript produced by
25      computer-aided transcription.
```

```
 1   APPEARANCES (Continued):

 2   For the Defendants:        OFFICE OF THE ATTORNEY GENERAL
                                JAY RUSSELL
 3                              TYLER HEATH
                                IAN ELLIS
 4                              Attorneys at Law
                                455 Golden Gate Avenue, Suite 11000
 5                              San Francisco, CA  94102

 6                              OFFICE OF THE ATTORNEY GENERAL
                                ELISE THORN
 7                              Attorney at Law
                                1300 I Street
 8                              Sacramento, CA  95814

 9   For California             CALIFORNIA DEPARTMENT OF CORRECTIONS &
     Dept. of Corrections       REHABILITATION
10   & Rehabilitation:          PATRICK R. McKINNEY, II
                                Attorney at Law
11                              1515 S Street, Suite 502-S
                                Sacramento, CA  95811
12
     Special Master:            PANNONE LOPES DEVEREAUX & O'GARA LLC
13                              MATTHEW A. LOPES, JR.
                                Attorney at Law
14                              1301 Atwood Avenue, Suite 215 N
                                Johnston, RI  02919
15

16                              --oOo--

17

18

19

20

21

22

23

24

25
```

1        SACRAMENTO, CALIFORNIA, FRIDAY, SEPTEMBER 7, 2018, 10:09 AM

2                               --oOo--

3             THE CLERK:  Calling civil case 90-520, Coleman et al.

4    versus Brown, et al.  This matter is on calendar for the

5    plaintiffs' motion to strike and for status conference.

6             THE COURT:  Good morning.  Appearances, please.

7             MR. RUSSELL:  Good morning, your Honor.  Jay Russell

8    for the defendants.  I have also with me Tyler Heath, Elise

9    Thorn, and Ian Ellis all from the Office of the Attorney

10   General.

11            THE COURT:  All right.  Good morning to you all.

12            MS. TRAPANI:  Good morning, your Honor.  Cara Trapani

13   for plaintiffs, and I have with me Ernest Galvan and

14   Thomas Nolan.

15            THE COURT:  All right.  Good morning to you all.  Does

16   Mr. McKinney want to come to counsel table?

17            MR. McKINNEY:  Certainly, your Honor.

18            THE COURT:  All right.  We've had you here once

19   before, and it served useful.

20            All right.  I really want to work through the specific

21   objections.  I issued some tentative rulings, but I'm happy to

22   hear whatever else you have to say based on that tentative; and

23   then I have a few additional questions.  I recognize Mr. Gibson

24   is not able to be here, but I felt it important to go ahead

25   given the timing overall.

4

1          So first on the inclusion of good faith recruitment

2     efforts in the policy, I had asked the parties to be prepared

3     to discuss whether a good faith recruitment requirement should

4     be written into any policy or contained in a separate order.

5     Who is prepared to address that?  First, for the defense?

6          MR. RUSSELL:  Well, I can speak to that, your Honor.

7          THE COURT:  All right.

8          MR. RUSSELL:  We submit that the staffing plan that

9     was essentially approved by the October 10th, 2007, order has

10    within it a requirement of good faith in seeking to hire and

11    retain staff, and that what we're working on here with regard

12    to the telepsychiatry policy is actually a policy that dictates

13    to the field how telepsychiatry services should be rendered

14    and -- or provided.  And so the concern is if there is a

15    directive to the hiring authorities of using good faith in

16    order to try to obtain and retain psychiatrists, that that

17    might somehow -- you know, it could just simply lead to

18    confusion.

19         The question would be, I can see in the field, is if

20    psychiatrists were not able to be hired, does that somehow mean

21    that the telepsychiatry policy is constitutionally infirm or is

22    not itself being operated in good faith.  So all of that leads

23    us to believe that the requirement of good faith should not

24    actually be within this policy.  It's already been addressed.

25         And most importantly, the good faith obligation really

1    is not tied to a constitutional obligation.  I mean, the

2    gravamen of this case is to not be deliberately indifferent to

3    the mental health needs of inmates, and good faith in hiring

4    really doesn't speak to that constitutional obligation.

5              THE COURT:  So not even a separate order required --

6              MR. RUSSELL:  We would submit not.

7              THE COURT:  -- because you're saying it would be

8    redundant?

9              MR. RUSSELL:  That's correct, your Honor.  And it

10   would be redundant, I think, of the defendants' overall

11   obligations in any event.  I mean, the defendants are required

12   to act in good faith, and so the question arises that it would

13   probably be one of fact as to whether or not they have done so

14   when they're trying to recruit and retain psychiatrists.

15             But, you know, as the Court -- you know, the Court

16   noted this in its tentative ruling that, you know, if good

17   faith efforts are not made or if good faith efforts are not

18   successful in hiring and retaining psychiatrists, does that

19   automatically make the telepsychiatry program itself

20   unconstitutional, and we would of course submit that it does

21   not.

22             THE COURT:  All right.  I'll hear from plaintiffs, and

23   we'll talk a bit more about the nature of the policy and the

24   process that has gotten us here.  I mean, the policy is being

25   contemplated as an addendum.  It's properly termed an addendum

1    to the program guide.  That's what's being proposed,

2    understood?

3              MR. RUSSELL:  We understand that, your Honor.  But

4    there's also been some indication from the Court, particularly

5    in past orders, that the state is ordered, as a matter of the

6    Court's prerogative, to comply with all provisions of that

7    program guide.  So it's essentially changed from being a

8    blueprint as to how the psychiatric program should be run

9    within the State of California.  It's changed into a mandate by

10   this Court to comply with every provision within its 300 --

11   over 300 pages.

12             THE COURT:  Well, hold that thought.  We're not going

13   to have that discussion in full here today.  We will when we

14   get to the program guide and the Court's review of its current

15   content.

16             And so for the plaintiffs, on the good faith

17   requirement?

18             MS. TRAPANI:  Yes.  Cara Trapani for plaintiffs.  Your

19   Honor, plaintiffs submit that the decades-long constitutional

20   violation in this case with respect to staffing is that there

21   have been constitutionally inadequate levels of staffing, and

22   it is well within the Court's authority here to issue orders

23   related to defendants' good faith efforts to continue hiring

24   and recruiting on-site psychiatrists.  And we would submit as

25   well that the October 10th order issued in 2017 had that

1    requirement written out, and we agree with defendants in that

2    instance that there are already requirements in the record

3    issued and ordered by you, and that remains law of the case to

4    this point.

5           However, it would be helpful to reiterate those

6    requirements given the updated telepsychiatry proposal and the

7    ongoing monitoring functions that the special master will take

8    on moving forward.  However, we do agree that it would be

9    appropriate to include these good faith recruitment efforts

10   required in a separate order rather than in the policy

11   itself.

12          THE COURT:  All right.  Just so I'm clear, why would

13   there be a need for a separate order if it's essentially

14   redundant?  You said it would be helpful but not necessary?

15          MS. TRAPANI:  Not necessary, your Honor.  We do think

16   it is law of the case.  In the October 10th order, this Court

17   said that telepsychiatry should only be used when institutions

18   are unable to recruit psychiatrists or have short-term

19   vacancies that cannot be filled by contract psychiatrists.

20   However, if the Court were to make an order alongside

21   provisionally approving the telepsychiatry policy such that it

22   would direct the special master to focus on certain aspects of

23   monitoring, we believe that this would be an appropriate part

24   of the telepsychiatry program to monitor moving forward.

25          THE COURT:  All right.  And we'll talk about

1    monitoring in a bit.

2          All right.  That's helpful feedback.  On the

3    limitation on telepsychiatry at the EOP level of care, I asked

4    the parties to be prepared to propose language accurately

5    defining the requirement.

6          Who is going to respond to this, Mr. Russell?

7          MR. RUSSELL:  Yes, your Honor.  I know that the

8    Court's words are the requirement of having an on-site

9    psychiatrist.  The defendants did put forth a policy that

10   provides for the use of telepsychiatry, and the defendants

11   submit that there is not a need -- there's not a constitutional

12   need for an on-site psychiatrist to enhance the care that's

13   being provided within the EOP units.  We've had this discussion

14   in the work groups with the special master and his staff, and

15   the defendants remain confused, I mean, particularly with the

16   Court's language in the tentative ruling.  This tentative

17   ruling states that the underlying goal is to have at least one

18   on-site psychiatrist for each institution that houses EOP

19   inmates, and that psychiatrist would be dedicated to the EOP

20   program only.

21         We're not clear if what the Court is describing is

22   another position in addition to what's already been provided

23   for in the staffing plan.  We're not sure what the psychiatrist

24   would be doing.  There's been no indication -- I mean, there's

25   nothing within this record to date that shows that the

1   psychiatric care that is being provided via telepsychiatry

2   within the EOP units or otherwise has caused harm to the

3   inmates that are being treated, and so, you know, the question

4   is -- the initial question is is what is this new psychiatrist

5   going to be doing at the institution.

6           THE COURT:  Again, we'll talk a bit about the record

7   and burdens a little bit today, but do you have -- so you would

8   just refer me back to your original proposal for any

9   counterproposal?

10          MR. RUSSELL:  That's correct, your Honor.

11          THE COURT:  Where exactly?  Do you have a pincite for

12  me?

13          MR. RUSSELL:  Yes.  It is ECF 5873-5, and it's

14  attachment A that starts at page 23.

15          THE COURT:  All right.  And how many pages following?

16          MR. RUSSELL:  The proposed policy runs to --

17          THE COURT:  I'm talking about within that policy --

18          MR. RUSSELL:  Oh, I'm sorry.

19          THE COURT:  -- specifically.  So what would be your

20  counterproposal, even if it's renewing your original proposal

21  that addresses this issue?

22          MR. RUSSELL:  Well, our proposal would be that the

23  telepsychiatry program within the EOP facilities continue

24  operating as it has for the last several years.  You know,

25  there's -- as I said, there's been no harm that telepsychiatry

1    as a modality has caused any harm to the patients within those

2    units.  And we're just not quite sure what this new

3    psychiatrist would be doing.  Not -- you know, not to mention

4    for starters that this new position now essentially vitiates

5    the staffing plan that was approved by the Court in October of

6    2017.  CDCR might be required to hire up to 15 new

7    psychiatrists for each of the EOP programs that it runs.

8    That's not necessarily true right now.

9         There are on-site psychiatrists, but certainly for any

10   psychiatrist -- or excuse me -- for any EOP program that

11   doesn't have an on-site psychiatrist for the EOP program, by

12   this order, we presume that one would have to be ordered --

13   would have to be hired.

14        It also raises another issue as to what happens to the

15   EOP programs that are functioning right now using

16   telepsychiatry that do not have an on-site psychiatrist for

17   that program and --

18        THE COURT:  And remind me how many of those are there?

19        MR. RUSSELL:  There's at least two today.  So the

20   defendants ask, I mean, do those units have to be closed today?

21        THE COURT:  Well, we're going to talk about that,

22   particularly focusing on High Desert in a minute.

23        MR. RUSSELL:  Well, High Desert is the mental health

24   crisis bed unit.  I'm talking about the EOP units, your Honor.

25        THE COURT:  All right.  So where are the two EOP

1    units?

2         MR. RUSSELL:  Valley State Prison and Kern Valley

3    State Prison.

4         THE COURT:  All right.  Would you say -- I understand

5    there's a fight about the record that I should rely on here.

6    Your representation that there's no evidence of harm, if I were

7    to look at everything you want me to now, you're saying that

8    would back up your representation that there's sufficient

9    evidence available now to make a finding of no harm based on

10   current practices?

11        MR. RUSSELL:  Yes, your Honor.  The one --

12        THE COURT:  And that's with reliance on the Penn

13   declaration?

14        MR. RUSSELL:  I'm sorry?

15        THE COURT:  Is that in reliance on the Penn

16   declaration?

17        MR. RUSSELL:  Yes.  That's correct, your Honor.  For

18   example, Dr. Penn notes that the system with which he is most

19   familiar, the Texas correctional system, uses telepsychiatry

20   exclusively for all levels of care and that on-site

21   psychiatrists are retained for acute level, acute inpatient

22   levels of care.  The one --

23        THE COURT:  Well, let's assume we're talking about

24   inpatient.  Forget the quibble about semantics.  Is it

25   defendants' position that telepsychiatry alone is sufficient

1   for inpatient, and the record -- that there's a record now that

2   would allow me to find that?

3       MR. RUSSELL:  The defendants submit that the record

4   right now shows that telepsychiatry is sufficient to treat

5   patients in the enhanced outpatient program.

6       THE COURT:  And what about inpatient?

7       MR. RUSSELL:  Well, inpatient programs are the PIPs,

8   the psychiatrist inpatient program, and then Department of

9   State Hospitals.  And my understanding is is that although

10  telepsychiatry is used in those facilities, there is always --

11  at least right now, there is an on-site psychiatrist at each of

12  those facilities.  And that's stated within the state's

13  proposed telepsychiatry policy, and it expressly states that

14  on-site providers shall remain the preferred method of

15  psychiatric care for mental health crisis beds and psychiatric

16  inpatient programs, the programs that are actually operated by

17  CDCR.  I think that there's an analogous provision in

18  Department of State Hospitals' policies as well.

19      But what we're talking about are the EOP programs, the

20  enhanced outpatient programs.

21      THE COURT:  I understand that.

22      All right.  For the plaintiffs, who is speaking on

23  this point?

24      MS. TRAPANI:  Your Honor, Cara Trapani for plaintiffs.

25  I'd like to first say that the minor provisional limits that

1    the Court has designated here to reduce the substantial risk of

2    harm, which is in the record based on the special master's

3    expertise and review of the telepsychiatry program, the

4    literature that was provided in support of Dr. Pablo Stewart's

5    expert report that we submitted to the special master and

6    Dr. Stewart's report itself are very narrow and nonintrusive

7    ways to place safety rails on this telepsychiatry program.  The

8    Court has allowed significant expansion of the telepsychiatry

9    program through the CCCMS program.  There is -- 80 percent of

10    the MHSDS population currently is CCCMS, and the limited

11    practical effect of these minor provisional limits are designed

12    to reduce the risk of harm which is evidenced in the record.

13          I'd also like to point out that the new Penn

14    declaration, which was submitted by defendants on August 13th

15    to this Court, explains clearly that Texas does not actually

16    use telepsychiatry as a replacement for on-site psychiatry in

17    its inpatient programs, and I think that's an important point

18    to establish here, as well as the fact that Dr. Penn did not

19    look at any treatment spaces or review any California

20    prisoners' or class members' mental health records in making

21    his opinions, whereas the special master has deep knowledge of

22    telepsychiatry nationwide and here in California, as does

23    Dr. Pablo Stewart.

24          THE COURT:  So is that a modification of your motion

25    to strike?

1        MS. TRAPANI:  That is not a modification of our motion

2    to strike, no.  We believe that there was ample time for the

3    defendants to provide this rebuttal report.  They had three

4    weeks after July 12th when we -- when the plaintiffs submitted

5    Dr. Stewart's report to the special master, to respond.  They

6    did not.

7        The Court's order on July 3rd was very clear that the

8    special master needed to have a full and complete factual

9    record before him to submit the special master's telepsychiatry

10   policy to the Court, and nothing in Dr. Penn's rebuttal report

11   could -- was not possible to have said before the defendants

12   submitted their report to the special master.

13       THE COURT:  All right.  Just looking at the proposed

14   language to which the defendants object.

15       MS. TRAPANI:  Yes, absolutely.

16       THE COURT:  And that second sentence in particular set

17   forth in my tentative rulings, page 4, lines 18 through 19.

18       MS. TRAPANI:  Yes, your Honor.

19       THE COURT:  Did you have alternative language?

20       MS. TRAPANI:  We do.  The proposed language that we

21   would offer is the following to replace the second sentence

22   that you're referring to:  At each institution providing EOP

23   level of care, at least one on-site psychiatrist must be

24   dedicated to the EOP  programs and/or units at the institution

25   in a manner consistent with the staffing ratios delineated in

1    the 2009 staffing plan, e.g., EOP GP, EOP RC, and EOP ASU and

2    condemned unit ratios.

3              THE COURT:  Have you had a chance to run that by the

4    defendants?

5              MS. TRAPANI:  We did not have a chance to run that by

6    the defendants given that the tentative came out yesterday.

7    However, we would be very open to discussing this proposed

8    language with the defendants.  We understand that defendants

9    are in the best position to understand their programs and to

10   understand what clarifications may be required to make this

11   point clear.

12             But your Honor, we also believe that -- we also submit

13   that the EOP yards that defendants referred to that do not

14   currently have on-site psychiatrists, we would submit that

15   defendants have not taken the full -- have not exhausted their

16   opportunities to hire on-site psychiatrists on those yards.  We

17   believe there are various options available at this point,

18   including increased compensation, rotating psychiatrists, and

19   we can get into that more when we discuss High Desert.

20             THE COURT:  All right.  So any reason not to ask the

21   parties to meet and confer about that specific proposed

22   language compared to whatever language you're pinpointing in

23   your initial proposal and let the Court know by sometime next

24   week if there's agreement on language?

25             MR. RUSSELL:  Well, the defendants could do that, your

1   Honor.  We're always willing to engage and meet and confer with

2   plaintiffs' counsel and the special master.  But again, I mean,

3   I feel compelled to reiterate that what we're doing is we are

4   adding further restrictions and changing the caseloads of

5   doctors and potentially placing obligations on the state to

6   hire more doctors, more M.D.'s, without a showing that the

7   program that's been in place for several years is

8   constitutionally infirm.

9          THE COURT:  Well, I know you want to go there, and we

10  will have a chance.  You will have a chance to fully develop

11  that position.  I have no doubt.  But isn't it safe to say here

12  that it's not whether or not telepsychiatry is being allowed,

13  and certainly it's an integral part of staffing, right?  I

14  mean, you can't separate the use of telepsychiatry from the

15  staffing remedy in this case.

16         MR. RUSSELL:  That is correct.

17         THE COURT:  And telepsychiatry has been allowed since

18  1999 at least without objection.  The fact is that the use of

19  telepsychiatry has been increasing at a rapid rate with respect

20  to the mental health population, which is separate,

21  particularly the inpatient populations.  Whatever is happening

22  in *Plata* has no -- it doesn't inform what we do here, right?

23         So there may be this increase in the use of

24  telepsychiatry generally that works for outpatient, but here we

25  have populations with serious mental health issues and large

1    populations of inpatient and an inpatient population, and

2    that's what we have to be thinking about given that at this

3    point the state's talking about approximately one-fourth of the

4    total number of psychiatrists being covered by telepsychiatry.

5    Is that right?

6         MR. RUSSELL:  I'm not sure about the percentage, your

7    Honor.  I don't know if it would be one-fourth or not.

8         THE COURT:  But you have to agree that there's a

9    material change in the delivery, the proposed delivery of

10   telepsychiatry based on the expansion that the state has

11   engaged in and the increased expansion it's planning on.

12   That's a material change since the first use of telepsychiatry.

13   And there's never -- there's never been a complete ban on

14   telepsychiatry, and that's not what the Court is contemplating.

15   It's talking about how do we tailor that use.  How do you

16   tailor that use given the constitutional rights of this

17   population.

18        That's what's going on here.  And I'm not shoving any

19   policy down your throat.  The policy that's before me started

20   with your policy.  What the Court has done here is, in its

21   effort to move as expeditiously as possible to get this case

22   resolved, I've simply asked for the special master's help to

23   get before me a draft.  I haven't delegated policy making to

24   the special master.  I'm trying to resolve the disputes that

25   the parties have not been able to resolve on their own and

1    based on prior decisions I've made that the defendants have not

2    appealed.

3         So really this is how do we get a draft addendum to

4    the program guide and then monitor it, recognizing changes, and

5    further tailor it before any final adoption.  That's what's

6    going on.  You can take a different position, but that's what

7    we're doing here.

8         So back to the language, I would ask that you meet and

9    confer and let me know if there is some agreement on

10   alternative language for a provisional policy to replace that

11   second sentence to which the defense is objecting.

12        MR. RUSSELL:  So that we're clear going forward, your

13   Honor, with the meet-and-confer process, anything that comes

14   out of that, we are changing the status quo, correct?

15        THE COURT:  You mean in terms of involvement of the

16   special master?

17        MR. RUSSELL:  No.  In terms of how telepsychiatry is

18   used in enhanced outpatient units.

19        THE COURT:  We're talking about a provisional policy

20   that will guide what happens over the next period of time with

21   monitoring by the special master that will inform the Court's

22   ultimate consideration and likely adoption of a final addendum

23   to the program guide.  That's what's going on.

24        MR. RUSSELL:  But the policy -- the policy is intended

25   to change what's happening in the field today.  I mean, so for

1  example, if the requirement, whether we were able to agree on

2  language or not, is that there does have to be an on-site

3  psychiatrist in any institution that operates an EOP facility

4  that that day Valley State Prison and Kern Valley State Prison

5  would have to close.

6         THE COURT:  Well, you're trying to put words in this

7  Court's mouth which has happened again recently.  I can't tell

8  you that will be the impact because there is a monitoring

9  provision, and we're going to talk about whether or not there

10  should be any carve-outs including with respect to High Desert.

11         So it's a provisional policy, and there will be

12  monitoring.  And the state has a burden here, I believe, and

13  we'll talk about whether or not you can meet that burden.  I

14  think the question is can you meet that burden by the end of

15  any monitoring period.  And I'll do my best to initially

16  articulate what that means during this hearing.  I'll put it in

17  writing.  And it may be that we have full-blown hearings 18 to

18  24 months down the road to look at whether or not the state has

19  met its burden given the material increase in the use of

20  telepsychiatry that has been going on and that the state

21  appears to be contemplating.

22         MS. TRAPANI:  Your Honor, if I may respond.

23  Plaintiffs' position is that this language that we're talking

24  about here with the EOP program requirement to have some

25  on-site psychiatrists is nothing new based on the Court's order

1    in October of last year where the Court clearly stated that

2    telepsychiatry at the EOP level of care was meant to supplement

3    but not replace on-site psychiatry.

4           This language that we are discussing now and that we

5    are happy to meet and confer with the defendants about is

6    operationalizing that law of the case that defendants had the

7    opportunity to appeal and did not.  There are no requirements

8    for new psychiatrists to be hired.  It's simply applying the

9    ratios to this provision of the policy as it is

10   operationalizing the Court's order.

11          THE COURT:  All right.  Well, meet and confer and let

12   me know if you have any agreement by next Wednesday the 12th by

13   the close of business, and you can keep the special master in

14   the loop.

15          MS. TRAPANI:  Yes, your Honor.

16          THE COURT:  Is there anything either party wishes to

17   say about EOP as residential or synonymous with inpatient care?

18   I understand the defendants not accepting the Court's

19   determination, but I don't know that there's more that needs to

20   be said at this point.  Mr. Russell?

21          MR. RUSSELL:  I mean, we would agree with the Court's

22   statement that our objection, defendants' objection that EOP,

23   enhanced outpatient, is not synonymous with an inpatient

24   setting is,  in its broadest sense, well taken.

25          You know, the enhanced outpatient program is used -- I

1    mean, it's turned into a semipermanent or permanent program for

2    the treatment of some of these inmates, and together with other

3    obligations that the state faces, particularly under the

4    Americans with Disabilities Act, we try to have these inmates

5    integrated into general population programs.  The units in

6    which they're housed are not for the milieu that you would find

7    in an inpatient program.  It's quite frankly primarily for

8    their protection in a correctional setting.  I mean, in that

9    regard, you could say that every single program in a prison is

10   inpatient because every single patient in the MHSDS is being

11   housed by the state.

12        But we would agree with the Court's language, if there

13   is an acknowledgment that enhanced outpatient is not an

14   inpatient program, particularly synonymous with the ones that

15   are run in the psychiatric inpatient programs or DSH programs,

16   we would agree with that.

17        THE COURT:  All right.  I mean, my clarification is on

18   page 5, lines 26 to 27.  Are you disagreeing with monitoring

19   being the appropriate way to fine tune telepsychiatry's

20   adequacy?

21        MR. RUSSELL:  No, your Honor.  I don't think we're

22   going to be able to get away from monitoring in this case for

23   the foreseeable future.

24        Again, I feel compelled to return to the argument that

25   I was making earlier is that we would agree that monitoring,

1    you know, vigorous monitoring would be appropriate.  It's been

2    done for the last 23 years.  As I said, it looks like it's

3    going to continue for the foreseeable future.  What we would

4    suggest is that the status quo be maintained and that what is

5    being done right now in the EOP units be monitored for its

6    efficacy.

7                THE COURT:  But you're defining the status quo with

8    reference to today.

9                MR. RUSSELL:  Right.

10               THE COURT:  Right?

11               MR. RUSSELL:  That's correct.

12               THE COURT:  And so you're asking -- you're not

13   acknowledging that there's been a significant -- a material

14   increase in the use of telepsychiatry in the recent past,

15   right?

16               MR. RUSSELL:  There has been, your Honor, throughout

17   the United States.

18               THE COURT:  So why isn't the status quo five years ago

19   with respect to telepsychiatry?  Why is it today?

20               MR. RUSSELL:  Because there's been no showing that the

21   modality of treatment has caused any harm.

22               THE COURT:  Right.  I understand that position.

23               Anything else to say on EOP as residential or

24   synonymous with inpatient care?

25               MS. TRAPANI:  Yes, your Honor.  Plaintiffs agree with

1   the formulation, as you described in your tentative ruling,

2   that the discussion about EOP as a residential unit or a level

3   of care within the MHSDS is meant to inform the way that

4   telepsychiatry is used in these units which are separate and

5   different from the traditional outpatient CCCMS level of care.

6   We also submit that the Court hasn't ordered the defendants to

7   necessarily do anything with respect to this finding, and we

8   think it's very appropriate to continue monitoring as the to

9   Court lays out in the tentative ruling.

10          THE COURT:  All right.  Moving on to restrictions in

11  MHCBs and PIPs, which we've already touched on, let's just

12  start with High Desert.  What's the plaintiffs' position on

13  High Desert?

14          MS. TRAPANI:  Yes, your Honor.  We agree that High

15  Desert is a focal point here.  However, we do not think that

16  the defendants have exhausted efforts to hire there, and we're

17  willing to leave this open as a possibility for further

18  exploration and discussion.

19          There are certainly more options available to the

20  defendants, and those could be offering bonuses, increasing

21  other kinds of compensation for psychiatrists to go and work

22  there on site, perhaps even rotating psychiatrists through High

23  Desert on an ongoing basis to treat the small MHCB population

24  that's housed there currently.  There's no preclusion -- the

25  Court's orders have not precluded defendants from operating

1    this MHCB through its orders up until this point, and our

2    position is that there have not been enough targeted efforts to

3    hire a psychiatrist at High Desert, MHCB specifically, up to

4    this point.  There's no evidence in the record that defendants

5    have made those efforts.

6          And I'd also like to point out that there are a

7    thousand CCCMS patients there who are being compared for by

8    telepsychiatrists.  This is giving the defendants wide latitude

9    to treat that large population.  The MHCB population is very

10   small, rarely utilized.  And there are only a few conditions

11   placed on the CCCMS population being treated by a

12   telepsychiatrist there through the biannual visits and good

13   faith recruitment efforts as laid out in the proposed policy.

14         I'd also like to point out that we disagree with the

15   statement that defendants made that High Desert is functioning

16   properly right now.  The most recent suicide risk second

17   re-audit that was filed by the special master's expert, Lindsay

18   Hayes, docket 5672 that was filed last year in September has

19   pointed out numerous deficiencies in the mental health care

20   being provided to patients in the High Desert MHCB including

21   poor safety planning and suicide risk evaluations, clinicians

22   and custody staff failing to follow safety protocols for

23   inmates there, and telepsychiatrists failing to attend any

24   SPRFIT meetings.

25         And those same deficiencies occurred again during the

1    third re-audit, which Lindsay Hayes has submitted a draft

2    report about recently last month.  And we would argue that

3    there are multiple deficiencies that are continuing at High

4    Desert State Prison MHCB.

5          I'd also like to point out that --

6          THE COURT:  Just so I understand your position on High

7    Desert, would plaintiffs ever take the position that the

8    MHCB unit would have to be closed if I provisionally approved

9    the proposed policy as proposed?

10         MS. TRAPANI:  As proposed, we -- as I started out

11   saying, we're willing to leave open the possibility that an

12   on-site psychiatrist could be hired there.

13         THE COURT:  Well, I'm trying to clarify your position.

14   I heard what you said.  Would you ever take the position that

15   if I adopted the proposed policy as proposed it would require

16   closure of the High Desert MHCB unit?

17         MS. TRAPANI:  Plaintiffs' position is that it would

18   require evaluation of whether there is an emergency situation

19   or a last resort going on at High Desert currently that would

20   require closure.  We would not ever want to advocate for, you

21   know, closure of the MHCB necessarily.  However, we don't think

22   that enough efforts have been spent to hire someone there, and

23   those are worth exploring before the unit would have to be

24   closed down.

25         THE COURT:  And is Pelican Bay in the same bucket, or

1    is it distinguishable?  It has one on-site psychiatrist at this

2    point.

3              MS. TRAPANI:  Yes.  Plaintiffs' position with respect

4    to Pelican Bay is that there is one on-site psychiatrist there

5    currently, and again defendants have not proven in the record

6    that they have done everything that they can do to hire

7    additional on-site psychiatrists at that location and frankly

8    throughout the state, and we believe that those are avenues

9    that are well worth pursuing.

10              THE COURT:  All right.

11              So Mr. Russell, you're the point person on all of

12    these issues?

13              MR. RUSSELL:  Yes, your Honor.

14              THE COURT:  Isn't there a sequent visit planned in

15    October to High Desert?

16              MR. RUSSELL:  I believe that's true, yes.

17              THE COURT:  Why not use that opportunity or whatever

18    could be scheduled in connection with that visit to take a

19    close look at what's happening with the MHCB unit at High

20    Desert?

21              MR. RUSSELL:  I would imagine that would be done,

22    sure.

23              THE COURT:  Looking specifically at the use of

24    telepsychiatry, not -- the Court could clarify provisional

25    approval of the policy doesn't mean closure, but there's a need

1    here to take a close look and, as part of monitoring, really

2    drill down and gather information/evidence with respect to

3    what's happening there.  Why wouldn't we do that?  Who are you

4    looking to?  I can ask that person to come forward.  Is that

5    Mr. Sanchez?

6           MR. RUSSELL:  No, no.  I was looking down at

7    Mr. McKinney, but that's okay.  You know, your Honor, I mean,

8    anything is preferable to closing the unit at this juncture,

9    and so if it's the Court's --

10          THE COURT:  The Court doesn't open and close units.  I

11   would clarify that the impact of the provisional approval of an

12   addendum to the program guide doesn't mean closure.  So

13   assuming I clarify that that's -- I'm not reaching down and

14   dictating what happens on the ground, why wouldn't we use this

15   upcoming visit as an opportunity to develop -- to develop a

16   record and tailor the remedy if that's what's required here?

17          MR. RUSSELL:  If that's what's required.  I mean, it's

18   part of what the special master does in this case.  I think

19   that that would be fine to continue -- you know, continue

20   monitoring efforts and specifically as to the use of

21   telepsychiatry in the mental health crisis unit at High Desert.

22          THE COURT:  Does anyone else want to weigh in on this?

23          Mr. McKinney, any reason not to take that approach

24   with respect to High Desert in particular?

25          MR. McKINNEY:  Your Honor, I think there is a

1    fundamental dispute here over --

2              THE COURT:  If you could pull the mic a little closer.

3              MR. McKINNEY:  I think there is a dispute over what

4    the Court and having the special master write this policy has

5    done.  We do view this as the Court reaching down and the

6    impact of this policy potentially resulting in the closure of

7    some of our units, and that creates ripple effects, right.

8    Susanville and Crescent City are located far away from other

9    prisons, and the language here on page 8 of the order that

10   treats, you know, 27 of our institutions as fungible and

11   available to provide mental health care, if we have to move --

12             THE COURT:  Are you referring to my tentative rulings?

13             MR. McKINNEY:  Yes, your Honor.

14             THE COURT:  Specifically, it's not an order.  It's a

15   tentative, okay?

16             MR. McKINNEY:  Understood.

17             THE COURT:  That's number one.

18             MR. McKINNEY:  I appreciate that.

19             THE COURT:  And I just said, in any order I can

20   clarify.  I'm not ordering closure.  That's not what's going on

21   here.  I realize you're reacting to what I'm doing to try to

22   move this along as if that is what I am doing.  That is not

23   what I'm doing here.  And the bulk of the policy is the

24   defendants' policy.

25             MR. McKINNEY:  I would take issue with that, your

1    Honor.  As written with the modifications, it has become the

2    policy of the special master and his experts.

3            We think a better pathway here would be for the Court

4    to implement defendants' policy which was developed through the

5    work groups.  We spent a lot of time, both parties with the

6    special master, his experts, working out policy disputes, and

7    that's where we are.  I think many of the Court's tentative

8    rulings are based on policy disputes between CDCR and the

9    special master's experts.

10           In that situation, we think the better course would be

11   for the Court to implement the defendants' policy subject that

12   to monitoring.  And if the monitoring shows that it's unsafe,

13   that there are in fact constitutional inadequacies, then we

14   move from there and we tailor the policy perhaps in the

15   directions that go closer to the current policy before the

16   Court.  We think that would be a much more acceptable and

17   appropriate pathway to implement a telepsychiatry policy.

18           So I think when Mr. Russell or counsel mentioned the

19   status quo, I think that status quo would be an implementation

20   of the defendants' policy.

21           THE COURT:  Do you agree that there's been a material

22   increase in the use of telepsychiatry such that the status quo

23   has shifted under the feet of this case?

24           MR. McKINNEY:  I think the status quo is constantly

25   shifting in this case.  The population has changed.  The way we

1  treat the patients has changed including increased use of

2  telepsychiatry, and I don't think the material change

3  constitutes enough for the Court to intervene as a matter of

4  constitutional law.  And again, I think by monitoring closely

5  our policy, we get to that point to understand whether the

6  increase in telepsychiatry does create problems that are of a

7  constitutional nature.

8          And I was a little puzzled by the Court's remarks

9  about *Plata* because we have seen the receiver and the *Plata*

10  court embrace telepsych -- telemedicine, excuse me and --

11          THE COURT:  Telemedicine, fair enough.

12          MR. McKINNEY:  Correct.

13          THE COURT:  For inpatient?  For inpatient mental

14  health?

15          MR. McKINNEY:  I can't speak to that, but the court

16  overall has allowed the increased use of telemedicine and --

17          THE COURT:  Not this Court.

18          MR. McKINNEY:  I'm talking about the *Plata* court,

19  correct.  And why such a divergence in either telephone or

20  video and telephone between medicine and psychiatry.  I don't

21  know that the literature necessarily bears that out.  In the

22  community, certainly the use of telephone and video phone for

23  psychiatry and other counseling appointments is heavily used.

24  So I think the literature bears that out.  So it's a little --

25  to us it's a little confusing why we have two federal courts

1   with such different divergent positions on this particular

2   issue.

3           THE COURT:  Doesn't that comment fail to acknowledge a

4   critical distinction between the populations here?  Have you

5   visited these units, Mr. McKinney?

6           MR. McKINNEY:  Absolutely, yes.

7           THE COURT:  There is a population that includes

8   acutely ill, mentally ill patients, and your suggestion is

9   there's no distinction to be drawn when considering the use of

10  telemedicine or telepsychiatry between a psychiatrically well

11  population and a psychiatrically ill population?

12          MR. McKINNEY:  There are absolute distinctions and --

13  for example, let's take a paranoid person in the community

14  would much rather engage with their mental health professional

15  without leaving their house.  So I think in some ways it more

16  beneficial to use these modalities as opposed to an in-person

17  contact when they don't want to leave.

18          MR. RUSSELL:  Your Honor, in that regard, I was

19  recently speaking with the receiver's staff.  One of the

20  treatment areas in which telemedicine is used is for gender

21  dysphoria and treatment of transgender inmates.  Now, I mean,

22  obviously the surgical procedures that are engaged in for the

23  transgender population are not done by telemedicine, but a lot

24  of the preceding care before hormone treatment is prescribed or

25  even sex reassignment surgery is prescribed is done via

```
 1    telemedicine.  Now --

 2              THE COURT:  Is that in an inpatient mental health

 3    context?

 4              MR. RUSSELL:  Well, if you go to -- yeah.  If you're

 5    going to have sex reassignment surgery, you will be an

 6    inpatient, yes.

 7              THE COURT:  In the mental health unit?

 8              MR. RUSSELL:  No, not in the mental health unit.

 9              THE COURT:  We're talking about inpatient mental

10    health, right?  That's the -- I'm confused.  The defense

11    doesn't seem to understand there's a subset of inmates that

12    have seriously -- we must be talking past each other.  There's

13    a subset of inmates that have serious mental health issues.

14              MR. RUSSELL:  Correct.

15              THE COURT:  Not including gender dysphoria.

16              MR. RUSSELL:  No.  That is correct, your Honor.  But I

17    mean if we -- again, looking at the information that was

18    submitted to the special master on August the 1st, you know, in

19    particular the Shore article from -- actually, it's from 2010

20    states that telepsychiatry is an appropriate modality across

21    all levels of treatment.  There's nothing that carves out, even

22    in this literature, an inpatient setting.

23              Now granted in an inpatient setting where you're in a

24    facility like, for example, Atascadero, you know, it's a

25    hospital, and so there are going to be numerous on-site staff.
```

1    There are numerous on-site staff as well at places like the EOP

2    units.  You know, there are social workers.  There are

3    caseworkers.  There are psychologists.  There's nurse

4    practitioners.  There's lot of people on site.  What we're

5    taking about are the psychiatrists, the M.D.'s that are part of

6    that necessary care.

7             MS. TRAPANI:  Your Honor, if I may respond?

8             THE COURT:  You may.

9             MS. TRAPANI:  Quickly, I'd like to just remind the

10   Court and defendants that there is evidence of risk of harm

11   here in the record in Dr. Stewart's expert report where he

12   discussed a suicide at a reception center in CDCR where the

13   chief of mental health of psychiatry at this reception center

14   barred telepsychiatrists from treating EOP patients with

15   telepsychiatry following the developments of that particular

16   suicide.

17            And returning back to the --

18            THE COURT:  There is an objection to that report, and

19   I need to resolve that, so I will.

20            MS. TRAPANI:  I understand that.

21            Returning to the point that started this discussion

22   about using telepsychiatry as a last resort or in emergency

23   situations in the MHCB units and in the psychiatric inpatient

24   units, the October 10th order had those same restrictions laid

25   out very clearly about using telepsychiatry as a last resort in

1    the mental health crisis beds.  This was fully litigated.  The

2    declaration by Ms. Katherine Tebrock that was submitted to the

3    special master and to this Court -- that was submitted to this

4    Court, not to the special master, on August 13th of this year

5    was very, very similar to the issues raised in the litigation

6    last year that were decided by this Court, and we believe that

7    that's law of the case here and needs to be respected as such.

8            THE COURT:  I understand that position.

9            So in terms of a period of monitoring, what are the

10   parties' positions on an appropriate period of monitoring,

11   assuming I approve some version of the proposed policy?

12   Mr. Russell?

13           MR. RUSSELL:  Your Honor, I would think that

14   monitoring of the efficacy of telemedicine -- excuse me -- of

15   telepsychiatry could be done as part of the other duties that

16   the special master engages in.  I mean, if -- I mean, I don't

17   see how that's going to be carved out of the remainder of the

18   special master's duties, but I mean, if we were looking at this

19   in an insular way, you know, I would -- I would say we could

20   return to the Court in six months and provide it an overview as

21   to the efficacy of that treatment.

22           THE COURT:  All right.

23           MS. TRAPANI:  Your Honor.

24           THE COURT:  Ms. Trapani?

25           MS. TRAPANI:  Uh-huh.  Plaintiffs submit that an

1   18-month period of monitoring would be appropriate here.   There

2   are numerous telepsychiatry hubs still under construction at

3   this point.   The most recent notice that plaintiffs received on

4   the status of that construction is that there are offices set

5   to be built through September of 2019, next year.   And

6   currently there's 49 offices still left to be built.   That's a

7   significant expansion from what we have now of 73 current

8   telepsychiatry offices.   And so given that there will be

9   ongoing construction of these offices through September of next

10   year, anything less than 18 months would not afford the special

11   master the opportunity to monitor the roll-out of the

12   telepsychiatry program in its full form.

13          THE COURT:   All right.   We've already touched on the

14   final question the Court had.   The defense's position is clear.

15   And I will, in an order following this hearing adopting

16   whatever policy I provisionally approve, explain what's going

17   on here from the Court's point of view.   I'm looking at a test

18   suggested by the Supreme Court's case of *Rufo*, and I -- that is

19   guiding my thinking about this.   I'm well aware of the limits

20   on the Court's authority.

21          I've said over and over I'm here to try to, you know,

22   bring this case to a soft landing.   Today does not give me that

23   hope, although it seems to me it should be entirely possible.

24   I think the defendants have to acknowledge, at least, you know,

25   silently that there has been a material change in their use of

1    telepsychiatry.  It doesn't mean they can't use it.  The

2    question is what's the tailored use as a part of the staffing

3    remedy in this case that satisfies constitutional standards.  A

4    modification is entirely permissible on a finding that

5    compliance with requirements previously imposed is

6    substantially more onerous, and the defense may get past that

7    part of the *Rufo* test, but the ultimate burden is on the

8    defendants to show the change that requires the modification.

9          I don't think that record is before the Court.  Even

10   if I took account of everything that's been filed, I think the

11   scientific understanding of what's happening with

12   telepsychiatry is evolving.  I don't think there's anything out

13   there that the defense can point to that indicates that

14   absolutely telepsychiatry can be used all the time in inpatient

15   settings.  I think a period of monitoring would actually

16   provide the defense an ability to meet its burden.  I don't

17   know that it could do that in six months based on what I've

18   heard, but I'll think about that.

19         I do think that the October visit to High Desert

20   provides an opportunity to study closely what's going on there,

21   and I will clarify in any order that I'm not -- I am not

22   directly or indirectly ordering closure of what's happening at

23   High Desert.  That's not what's going on here.  This is about

24   tailoring a remedy taking account of how telepsychiatry may be

25   used appropriately, but bearing in mind the critical

1   admonition, you know, first do no harm either as a court or as

2   a medical or psychiatric provider.

3          MR. RUSSELL:  Your Honor, in that regard, the one

4   thing that we did -- I think that we may have passed over here,

5   but I think it's very relevant to the Court's comments, is the

6   issue of cell front visits.

7          THE COURT:  Of what?

8          MR. RUSSELL:  Of cell front visits that the Court

9   talks about in its tentative ruling at pages 8 and 9.  We

10  didn't talk about that.

11         THE COURT:  I guess I thought you had been talking

12  about it, but feel free to tell me what else you have to say

13  about it.

14         MR. RUSSELL:  Well, your Honor, it states here that

15  the Court has pointed out that as of now there's insufficient

16  time and experience to resolve the question as to whether cell

17  front telepsychiatry is an appropriate modality.

18         THE COURT:  Certainly to find that it is.

19         MR. RUSSELL:  Pardon?

20         THE COURT:  There's insufficient evidence to find that

21  it is an appropriate modality.

22         MR. RUSSELL:  That's correct.  But then the Court goes

23  on to adopt the proposed plan to ban.

24         THE COURT:  I haven't made any adoption.  These are

25  tentative rulings.

1    MR. RUSSELL:  Well, tentatively the Court has

2    indicated that it intends to provisionally approve the proposed

3    language.

4    THE COURT:  And that's tentative, and you're

5    suggesting I'm not listening to anything that is said today.

6    MR. RUSSELL:  Well, if it's -- we are concerned that

7    the order will be that it's banned, and then we can figure out

8    whether it's appropriate later.

9    THE COURT:  I understand that concern.

10   All right.  Did you have anything more to say about

11   cell front, Ms. Trapani?

12   MR. RUSSELL:  Not today unless the Court has any

13   questions, your Honor.

14   THE COURT:  Ms. Trapani?

15   MS. TRAPANI:  Our position on cell front

16   telepsychiatry remains the same as that that was submitted to

17   the special master, your Honor.  I personally witnessed the

18   demonstration of the cell front telepsychiatry technology at

19   CHCF in July, and it was very difficult to hear.  There were

20   issues described in the declaration that I submitted to the

21   special master.

22   And plaintiffs would submit that, you know, this

23   demonstration was well within their authority to prepare.  They

24   had a number of weeks to prepare, and unfortunately it resulted

25   in numerous deficiencies.  And we think it's appropriate at

1    this time for the special master to have included in his

2    proposed policy a statement regarding that those deficiencies

3    open, as you say, to further monitoring and further

4    demonstrations as the technology evolves.

5            THE COURT:  Well, so just help me understand the

6    defense.  Does the defense think that that demonstration went

7    swimmingly?

8            MR. RUSSELL:  No, not at all, your Honor.

9            THE COURT:  So given that demonstration, what would

10   suggest that cell site is appropriate going forward even during

11   a provisional period with monitoring?

12           MR. RUSSELL:  Well, cell front visits are essentially

13   not exclusively -- I don't want to be misunderstood, but they

14   are, for the most part, wellness checks.  They're the kind of

15   thing that occurs when a patient doesn't show up for an

16   appointment or that other people notice that they're acting

17   strangely, and so in some instances, not very many, but in some

18   instances what happens is the doctor says -- you know, the

19   telepsychiatrist says get a laptop.  I want to see what this

20   patient looks like.  I want to see what's going on.  And they

21   will get in communication with the patient, and the physician,

22   she'll say, what's going on with you today?  Well, I can't

23   sleep, or I'm sleeping too much.  Okay.  Then --

24           THE COURT:  This is through a slot in the door?

25           MR. RUSSELL:  Yeah, yeah.  And so I'm going to adjust

1    your Wellbutrin medication, or I'm going to adjust your Paxil.

2    You don't look very good right now.  What it is is it's a

3    continuity of care issue.

4             THE COURT:  And you always get the patient to come to

5    the front of the cell and look right at the screen and have

6    that discussion?

7             MR. RUSSELL:  If they can, if they will.  If not,

8    other things happen.  You know, people take action.  But this

9    is essentially analogous to what happens in the real world.  If

10   a patient doesn't show up for a psychiatrist visit at Kaiser,

11   the physician -- I mean, the good-acting physician, the one who

12   is not deliberately indifferent says get the patient on the

13   phone.  I want to find out why she didn't show up for her

14   appointment today.  And then talks to the patient and finds out

15   that the medications need to be adjusted.  That's what happens

16   in these.

17            THE COURT:  This is calling the patient at home?

18            MR. RUSSELL:  Pardon?

19            THE COURT:  Calling a patient at home?

20            MR. RUSSELL:  Yeah.

21            THE COURT:  And so this is -- they're essentially

22   calling a patient at home.  They're doing a wellness check in

23   the patient's cell to find out why the patient didn't show up

24   for their visit, why they have been described as acting oddly,

25   why their cell has all of a sudden become messy when they've

1     actually been very fastidious.

2            And so, you know, if they could use FaceTime on an

3     iPhone, they probably would do it.  But instead in many

4     instances what they do is they say, get a laptop.  It's not

5     perfect.  We'd like something better.  But I want to see what's

6     going on with this patient so that I can treat the patient.

7     The demonstration that was done --

8            THE COURT:  Aren't you describing what might be an

9     emergency situation?

10           MR. RUSSELL:  It could be.  It might be.  It may be

11    just an adjustment of medication.  It may just be somebody

12    saying, ah, I didn't feel like showing up today.

13           THE COURT:  So the defense doesn't recognize any need

14    to look at the total environment in which a communication is

15    occurring between a mentally ill inmate and a provider?

16           MR. RUSSELL:  No, your Honor.  And I think what you're

17    talking about is the demonstration that was made for the

18    special master's team.  What CDCR is attempting to do is

19    exactly what you said is try to make it a better system, try to

20    make it a little bit more confidential, a little bit more

21    available, and a little bit more, you know, communicative for

22    lack of a better way of putting it.

23           And apparently that didn't go so well at the first

24    rollout.  That should continue to be looked at.  But cell front

25    visits are happening right now.  They don't happen very often,

42

1   but they do happen.

2          THE COURT:  Cell front telepsychiatry visits.

3          MR. RUSSELL:  Correct.  Because telepsychiatrists are

4   concerned why a patient hasn't shown up for their appointment.

5   And so rather than being deliberately indifferent, what they do

6   is they ask somebody to get some kind of device into that cell

7   so that they can talk to the patient.  It doesn't happen very

8   often, but what this proposed policy will do is it will end

9   that.

10         THE COURT:  And the defense denies that there's any --

11  that those kind of interactions, if they're at all effective,

12  could worsen the situation?

13         MR. RUSSELL:  That would depend upon the individual

14  circumstance of the patient.  I mean, I guess it could.  It

15  could also ameliorate the situation if what's needed is an

16  adjustment of medication.  I mean, it depends upon each

17  individual instance.  I mean, if an inmate were to get agitated

18  because somebody tried to contact her or contact him via a cell

19  front telepsychiatry visit, I'm sure that that would be noted.

20          I mean, there are -- in the policy that I referenced

21  before that was submitted to the special master on I believe it

22  was May 21st, there are provisions for refusals of

23  telepsychiatry, options to telepsychiatry.  I mean, it's -- you

24  know, it's fully spelled out in the defendants' proposed

25  policy, and that circumstance would be covered by that, by the

1    defendants's proposed policy.  What's before the Court right

2    now, what the Court is contemplating is banning that.

3              THE COURT:  And if there are refusals, what's the

4    period of time until a three-dimensional provider shows up?

5              MR. RUSSELL:  Refusals are spelled out on -- it's

6    ECF 5873-5.  It's on page 24.  And it is the heading of

7    refusals.  I could read this into the record if the Court

8    prefers.

9              THE COURT:  I can check it but just summarize for me.

10   How does that play out if there's a refusal?

11             MR. RUSSELL:  If the patient refuses telepsychiatry,

12   the telepsychiatry provider meets with other members of the

13   treatment team to consider the reasons, the behavioral issues,

14   custody issues, and any other relevant factors to determine

15   whether telepsychiatry is appropriate.

16             The treatment team works towards resolving issues.

17   The treatment -- someone from the treatment team may use brief,

18   focused cell front discussions with the patient to determine

19   the reasons for the refusal.  The telepsychiatrist may also

20   request a consultation from an on-site provider.

21             If the team is not successful in resolving the

22   refusal, then an IDTT is convened.  The IDTT then develops a

23   plan to address why the patient's refusing and contingency

24   plans to be made to provide for in-person psychiatric care.

25             THE COURT:  Is there an outside time limit by which in

1    person will be provided?

2            MR. RUSSELL:  It's not.  I don't see it here within

3    this -- right here in this policy.  But again, I would imagine

4    that, you know, if physicians are not being deliberately

5    indifferent, it's done with some degree of alacrity, but it's

6    not -- I don't see it spelled out here.

7            THE COURT:  All right.  I'll consider that language,

8    some degree of alacrity.

9            All right.  I have what I need.  Is there anything

10   else anyone would like to say at this point?

11           MR. RUSSELL:  Your Honor, I do want to go back to a

12   point that the Court made earlier when it stated that -- I

13   believe the Court's language is it's guided by *Rufo*.

14           THE COURT:  I said I'm looking to it to inform what

15   I'm doing here.

16           MR. RUSSELL:  I do want to point out that *Rufo*

17   concerned a consent decree.

18           THE COURT:  I know that.

19           MR. RUSSELL:  And what we were working under here is a

20   judgment that's subject to the restrictions of the Prison

21   Litigation Reform Act.

22           THE COURT:  I understand that.

23           MR. RUSSELL:  Distinctly different from *Rufo*.

24           THE COURT:  You don't think the *Rufo* test applies at

25   all?

1          MR. RUSSELL:  I'd have to look at it, your Honor.  I

2     don't know.

3          THE COURT:  Is there other case law you're thinking of

4     that you haven't pointed me to?  The more full discussion about

5     this I --

6          MR. RUSSELL:  I think the basic precept of the Prison

7     Litigation Reform Act is that any order that -- or any decree

8     that is placed upon a correctional system has to be the most

9     narrowly drawn, least-intrusive remedy that's available.  And

10    we have a more narrowly drawn, less-intrusive remedy that is

11    available here.  It's the state's plan that it submitted

12    regarding telepsychiatry back in May.  And what we would submit

13    is that that -- you know, in order to be able to monitor what's

14    going on, the state's plan should be put into effect, and then

15    we can monitor that.  I mean, right now it seems like it's

16    backwards that we're going to do something more intrusive and

17    less narrowly drawn and then see, well, maybe we can work

18    towards something that is less --

19         THE COURT:  That's assuming you accept your

20    identification of the status quo.

21         MR. RUSSELL:  Well, okay.

22         THE COURT:  And the status quo can shift.

23         MR. RUSSELL:  Yeah.  I mean, right.  50 years ago

24    things were done entirely differently.  I mean, psychiatry is

25    going to change, you know, if not on a daily basis, certainly

1    on a yearly basis.  I mean --

2         THE COURT:  The Court acknowledges that.  That's why I

3    think the monitoring -- something provisionally adopted with

4    monitoring will help tailor the remedy, at least by the time

5    the Court finally approves an addendum to the program guide

6    which is the way we've always -- long before this judge was

7    assigned this case, the program guide has been the remedial

8    plan, right?  I am accepting the case as it came to me.

9    There's a program guide that is the remedial plan, right?  I

10   think your response even now suggests to me the defense doesn't

11   really accept that at this point in time.

12        MR. RUSSELL:  The program guide is a guide for how the

13   mental health system operates within the State of California.

14        THE COURT:  Right.  And it's the defendants' plan, you

15   know, subject to a close process.

16        MR. RUSSELL:  At this juncture, your Honor, I don't

17   know if I could agree with that.  I do not believe that it's

18   the defendants' plan.  At least getting back to this instance,

19   the state does have a plan.

20        THE COURT:  We're talking about the addendum.

21        MR. RUSSELL:  Right.  The use of telepsychiatry,

22   that's correct, your Honor.  And so, you know, under the

23   PLRA for searching for the most narrowly drawn, least-intrusive

24   remedy, I would submit that what has been proposed by the state

25   in this instance, I mean, we've heard this from numerous

1    courts.  The state would never do more than what is barely

2    constitutionally required.  We disagree with that as well.  We

3    vehemently disagree with that.  But in this instance, the state

4    has at least put forth what it believes is a responsible and

5    workable telepsychiatry plan that should be implemented and

6    monitored.

7         THE COURT:  I understand that stated position.  We'll

8    revisit the program guide.  That's a big issue.  So sir, you

9    want to say something, Mr. Galvan.

10        MR. GALVAN:  Yes, your Honor, if I may respond on

11   *Rufo*.  On specifically the question of whether the PLRA

12   displaced *Rufo*, I think the Ninth Circuit in the *Gilmore* case

13   has already -- has spoken to whether the PLRA displaced the

14   preexisting law and the limits of injunctive relief, and I

15   think the Ninth Circuit was very clear that the PLRA codifies

16   existing law on injunctive relief.  It does not displace it.

17        So I think after *Gilmore* -- since *Gilmore* it's been

18   clear that *Rufo* and other cases involving limits on injunctive

19   relief still apply.  I don't think that the distinction between

20   a consent decree and an injunction really is material as to

21   *Rufo*.  I think that the *Rufo* test is still applied to any

22   equitable relief -- systemic equitable relief where the party

23   burdened by the relief wants a change in the relief based on

24   changed circumstances of fact or changes in law.

25        And I think it is the right lens to look at the

1   expansion of telepsychiatry and whether all of the things that

2   the defendants have talked about constitute a changed

3   circumstance that justifies modification of the October 2017

4   order and its requirements, and so I think *Rufo* is the right

5   lens to look at this through.

6           Not to say that the PLRA does not also apply.  PLRA

7   does apply, and the October order was necessary narrowly

8   tailored and the least restrictive.

9           As to the difference between the two policies and

10  whether the fact that the defendants' policy was offered by

11  them versus this modifications by the special master and

12  therefore the defendants is the most narrowly tailored, they're

13  missing the key part of the PLRA which is it's necessary,

14  narrowly tailored, least restrictive to correct the violation

15  of the federal right.

16          And so what the special master did is took their

17  policy, looked at the facts on the ground as to how things are

18  working in the system and made recommendations for very small

19  changes so that it would meet that standard, necessary,

20  narrowly tailored, least restrictive to correct the violation

21  of the federal right.

22          Now if they want to come in after the monitoring and

23  say, no, you have to bring it back to ours, then they'll have a

24  record to do that.  But I don't think they have -- I think the

25  Court is correct that they don't have that record now.

1          Thank you, your Honor.

2          THE COURT:  All right.  I have what I need.  So I'll

3    just look for any stipulation or joint statement setting forth

4    the parties' differing positions on that one sentence, and then

5    the matter will be submitted.

6          Thank you very much.  I'll look for that on the 12th,

7    close of business.

8          THE CLERK:  Court is adjourned.

9          (The proceedings adjourned at 11:21 a.m.)

10                         --oOo--

11   I certify that the foregoing is a correct transcript from the

12   record of proceedings in the above-entitled matter.

13                         /s/ Kacy Parker Barajas

14                         _____
                           KACY PARKER BARAJAS
15                         CSR No. 10915, RMR, CRR, CRC

16

17

18

19

20

21

22

23

24

25