XAVIER BECERRA
Attorney General of California
MONICA N. ANDERSON
Senior Assistant Attorney General
JAY C. RUSSELL
ADRIANO HRVATIN
Supervising Deputy Attorneys General
ELISE OWENS THORN, State Bar No. 145931
ANDREW GIBSON, State Bar No. 244330
TYLER V. HEATH, State Bar No. 271478
IAN MICHAEL ELLIS, State Bar No. 280254
TOBIAS G. SNYDER, State Bar No. 289095
Deputy Attorneys General
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA  94244-2550
 Telephone:  (916) 324-4921
 Fax:  (916) 324-5205
 E-mail:  Elise.Thorn@doj.ca.gov
*Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., | 2:90-cv-00520 KJM-DB (PC) |
| Plaintiffs, | **DEFENDANTS' SEPARATE STATEMENT RE: DISPUTED LANGUAGE IN THE SPECIAL MASTER'S PROPOSED TELEPSYCHIATRY POLICY** |
| v. | |
| EDMUND G. BROWN JR., et al., | |
| Defendants. | |

## INTRODUCTION

On August 2, 2018, the Special Master filed a Report on his Proposed Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide. (ECF Nos. 5872, 5873.) The Special Master's proposed telepsychiatry policy imposed the following limitations on CDCR's ability to use telepschiatry to treat patients in the Enhanced Outpatient Programs: "Telepsychiatry may

1

supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry. On-site psychiatrists are required for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan." Defendants object to the requirement for an on-site psychiatrist as a pre-condition to use of telepsychiatry.[1]

On August 28, 2018, the Court directed the parties to appear on September 7, 2018 to address Defendants' objections to the Special Master's proposed telepsychiatry policy addendum to the Revised Program Guide. (ECF No. 5890.) At the September 7, 2018 hearing, the Court directed the parties to meet and confer to discuss alternative language to describe the use of telepsychiatry at the Enhanced Outpatient Program (EOP) level of care and to present proposed alternative language by the close of business on September 12, 2018. The Court thereafter issued an order providing that "[u]pon receipt of the parties' proposal re disputed language for the policy addendum, or separate statements re dispute, the matter will stand submitted." (ECF No. 5909.)

The parties and the Special Master's team met and conferred on September 11 and 12, 2018 to discuss alternative language to describe the use of telepsychiatry at the EOP level of care. The Special Master stated that the disputed language in his proposed policy prohibits the use of telepsychiatry to treat EOP patients at institutions that do not have sufficient on-site psychiatrists to provide EOP level of care under the 2009 staffing ratios. Following the discussion of Defendants' proposed language, the Special Master revealed, for the first time, that "supplement" means that CDCR must have at least half of their allocation on-site positions filled in order to use telepsychiatry. Plaintiffs stated that the language they proposed at the September 7, 2018 hearing would prohibit the use of telepsychiatry to treat EOP patients at institutions that do not have an on-site psychiatrist on staff assigned to provide care for each unit and each program that houses EOP patients (*e.g.*, EOP GP, EOP RC, and EOP ASU, and condemned). (ECF No. 5915, Tr. of Proceedings, 9/7/18, 14:22–15:2.) Plaintiffs agreed that the term "supplement" means that on-site psychiatry shall remain the primary modality of treatment.

---

[1] As set forth in this statement, Defendants have proposed alternative language as a compromised position. All statements are made subject to Defendants' rights to maintain their objections of record and without prejudice to their rights under pending appeals.

2

Defs.' Separate Stmt. (2:90-cv-00520 KJM-DB (PC))

The expansion of CDCR's telepsychiatry program is a key component of CDCR's 2017 staffing plan and efforts to sustain compliance with this Court's 2002 and 2017 orders on psychiatric staffing. Limiting CDCR's ability to use telepsychiatry for the EOP population will unnecessarily create a *de facto* barrier to CDCR's ability to staff its mental health care programs at the levels required by the 2002 staffing order. (ECF No. 1383.) The Special Master's proposed limitations assumes that CDCR's psychiatrists are fungible and ignores the harm to patients and staff caused by these limitations. Until the Court has made a finding that CDCR's use of telepsychiatry to deliver mental health care to EOP inmates has harmed patients, or is unconstitutional, the Court should not impose the Special Master's proposed limitations.

## I. THE REQUIREMENT FOR ON-SITE PROVIDERS IGNORES THE PURPOSE OF THE TELEPSYCHIATRY PROGRAM.

Prohibiting the use of telepsychiatry for the EOP population absent on-site providers staffed at the ratios required by the 2009 staffing plan, as the Special Master proposes, ignores the need to use telepsychiatry in the first instance and will have far-reaching negative implications and unjustly interfere with CDCR's ability to sustainably fill 90% or more of its allocated psychiatry positions.

During the parties' September 12, 2018 meet-and-confer session, the Special Master and Plaintiffs stated that the disputed language in the proposed policy requires CDCR to staff on-site psychiatrists at levels that comply with the ratios in the 2009 staffing plan. In other words, the Special Master opined that every EOP program must be fully staffed by on-site psychiatrists before CDCR may use telepsychiatry to treat patients at that program. But if CDCR could comply with the 2009 staffing ratios using on-site providers, it would not need to use telepsychiatry to fill vacancies. For programs with larger populations, CDCR would be required to have more than one psychiatrist on-site. As stated above, the Special Master confirmed that the proportion of allocated EOP psychiatrists that would need to be on-site is at least fifty percent. This is a new limitation—the condition was never discussed during the all-parties workgroups, the Special Master's reports on staffing, or in any of the Court's orders regarding telepsychiatry.

3

Defs.' Separate Stmt. (2:90-cv-00520 KJM-DB (PC))

And the condition is inconsistent with the rationale underlying the use of telepsychiatry—namely, to provide staffing to address on-site psychiatry vacancies.

Imposing a policy with the limits proposed on the use of telepsychiatry for patients housed in EOP units, even if "provisional," raises several administrative, staffing, and care-based concerns.[2] As stated in Section IV below, Defendants have proposed alternative language that may help address these concerns and that is consistent with the Court's September 6, 2018 tentative rulings. In addition, Defendants request the time and flexibility to work with the Special Master on the implementation of staffing changes that will be required should the Court require on-site psychiatry as a pre-condition to the use of telepsychiatry at the EOP level of care.

## II. THE RATIONALE FOR REQUIRING ON-SITE PROVIDERS IS INCONSISTENT WITH THE APPROVED PORTIONS OF THE PROPOSED POLICY.

In his August 2, 2018 report, the Special Master explained for the first time the rationale for imposing an institution-level requirement in the policy:

> On-site psychiatrists are required for each program providing EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan. **The rationale for this requirement was that in a residential treatment unit, the psychiatrist's role includes attention to the treatment milieu, team building, and other functions, which cannot be adequately accomplished by remote psychiatrists.**

(ECF No. 5872 at 9.)

During the September 11, 2018 meet-and-confer session, the Special Master's experts repeated this rationale for requiring an on-site psychiatrist for programs that use telepsychiatry. But the concerns underlying this rational were expressly addreessed by the parties in the workgroups and CDCR's proposed telepsychiatry policy. CDCR's proposed policy requires telepsychiatry providers to participate in the EOP treatment milieu through participation in the Interdisciplinary Treatment Teams, consultation with the treatment teams, and regular site visits to the institutions. It remains unclear what gap in the relationship between the telepsychiatrist

---

[2] *See* Declaration of Katherine Tebrock.

4

and the treatment team must be remedied by an on-site provider. There is also no explanation for why the concerns about the treatment milieu are not addressed by the requirements the parties negotiated expressly to address those same concerns.

Defendants dispute that the Special Master's 2017 report recommending limits on telepsychiatry and the Court's subsequent order that telepsychiatry should supplement, not replace, on-site psychiatrists were final orders upon which the parties could not deviate. Rather, the Court's order repeatedly uses the permissive term "should" and not "shall," and envisioned a meet and confer process amongst the parties and Special Master to negotiate CDCR's final telepsychiatry policy. Yet, even assuming the Court's order mandated the limits of CDCR's use of telepsychiatry at the EOP level of care, the new meaning attributed to the "supplement" language is inconsistent with the terms of the policy the parties negotiated and agreed to.

The Court has acknowledged that the term "should" could be read as either "obligatory" or "permissive." (ECF No. 5850 at 5, n.1.) Read as permissive, the October 2017 order provides that CDCR should use on-site psychiatrists where available and continue to follow the existing requirement to work in good faith to hire staff on-site. The requirement to use good-faith efforts to recruit and hire on-site staff, read together with CDCR's proposed policy[3], satisfied this issue. Reading the "supplement" language as a requirement that must be met before telepsychiatry services can be used at a given institution, creates a precondition to the use of telepsychiatry that did not exist prior to the parties' negotiations, and was not in fact ever discussed during the negotiations. This new requirement changes the status quo of the current policy and procedures for the use of telepsychiatry and creates a barrier to patients' access to mental health care, and if approved, will result in system within which patients will receive less care.

The Special Master's proposed language changes the focus of the term "supplement" from a system-wide requirement to an institution-by-institution requirement. Defendants always interpreted the term "supplement" to mean supplement at a system wide level, and argued repeatedly that CDCR was using telepsychiatry to supplement its on-site providers. As all of the

---

[3] CDCR's May 2017 draft policy is attached as an Exhibit to the Special Master's Report at ECF No. 5873.)

5

Defs.' Separate Stmt. (2:90-cv-00520 KJM-DB (PC))

other staffing issues are discussed at a system-wide level, and there was no mention of requiring an on-site psychiatrist at each institution as a pre-condition for using telepsychiatry, Defendants' understanding of the word "supplement" was reasonable, and was never challenged or corrected by the Special Master or Plaintiffs while negotiating the policy.

### III. PROHIBITING THE USE OF TELEPSYCHIATRY AT INSTITUTIONS WITHOUT AN ON-SITE PROVIDER WILL DEPRIVE PATIENTS OF READILY AVAILABLE MENTAL HEALTH CARE AND CAUSE STAFF TURNOVER.

The Special Master's requirement for an on-site psychiatrist at each institution dedicated to the EOP population at that institution has several administrative, staffing, and care-based concerns.

CDCR does not have unfettered discretion to simply reassign psychiatrists to treat EOP patients. (Tebrock Decl. ¶ 8.) Staffing assignments to different institutions and levels of care are limited by labor contracts. (*Id.*) While it may be possible to transfer on-site staff treating the Correctional Clinical Case Management System (CCCMS) level-of-care patients, there is no guarantee that the staff will agree and remain at CDCR. CDCR has real concerns that staff providing treatment at the CCCMS level of care will leave CDCR service if required to provide the more intensive EOP level of care. (Tebrock Decl. ¶ 10.) Moreover, given the severe shortage of psychiatrists in California and across the nation, it may not be possible to hire a new on-site psychiatrist. (*Id.*)

While the Court stated that it would not order the closure of EOP units at any institution, the implementation of even a provisional policy would require staffing changes that can not be easily reversed. Given the competitive climate for the pool of psychiatrists, it is not unreasonable to expect that CDCR would be incapable of re-hiring staff who leave as a result of this restructuring

### IV. CDCR'S PROPOSED ALTERNATIVE LANGUAGE AND REQUEST FOR FURTHER RELIEF.

As stated at the September 7, 2018 hearing, CDCR maintains that the language in its proposed telepsychiatry policy reflects CDCR clinicians' measured determination of the best practices for treating the EOP level of care via telepsychiatry. Any additional restrictive language

6

would be antithetical to CDCR's mandate to offer inmate-patients with ready access to constitutionally adequate mental health care.

Notwithstanding the foregoing, CDCR proposes the following alternative language that is consistent with the underlying goal identified by the Court in the Tentative Rulings on Objections (ECF No. 5907 at 5:14-17):

> Telepsychiatry may supplement on-site psychiatry at the EOP level of care but it should not replace on-site psychiatry. ~~On-site psychaitrists are required for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan.~~ At least o<u>ne on-site psychiatrist is required for each institution that houses EOP inmates, with that on-site psychiatrist dedicated to the EOP program(s) at the institution and not to any other level of care that might be operating at the same institution.</u>

Given the Court's assurance that the policy language is not intended to close programs or or affect staffing ratios, and Plaintiffs' assurance that they will work with Defendants to resolve operational issues, Defendants request that they be permitted to implement the provisional policy under the following conditions:

1. The parties and the Special Master acknowledge that the proposed policy is not intended to augment the staffing required under the 2009 Staffing Plan ratios; and

2. Subject to compliance with labor agreements and applicable memoranda of understanding, CDCR shall work with the Special Master to implement the on-site requirement within 90 days after the Court has adopted both the telepsychiatry policy and CDCR's Staffing Proposals.

The second condition is based on Defendants' concern that implementation of the telepsychiatry policy and Staffing Proposals may require staff to move twice in a short amount of time (e.g. under the telepsychiatry order, staff may have to move yards, and then under the staffing adjustments, additional transfers will likely be necessary). Thus, waiting until both proposals are implemented will avoid confusion and difficulty for CDCR staff.

## CONCLUSION

CDCR proposed in its 2017 Staffing Plan to expand its telepsychiatry program to address

7

Defs.' Separate Stmt. (2:90-cv-00520 KJM-DB (PC))

staffing shortages. The Special Master approved the plan to expand telepsychiatry but recommended limits based on the concern that telepsychiatry should supplement rather that replace on-site psychiatrists. The Court gave Defendants one year to work with the Special Master and Plaintiffs to develop a policy based on the Special Master's recommendations. CDCR developed a policy to address the underlying rationale behind the requirement for on-site psychiatrists.

The Special Master now has proposed a policy that expands the requirement that telepsychiatry should supplement on-site psychiatry. The Special Master has placed a more onerous condition on CDCR's ability to use telepsychiatry by requiring CDCR to staff its EOP programs with the full complement of allocated positions on-site before it may assign telepsychiatrists to provide treatment in those units. This condition may nullify telepsychiatry as a treatment options for institutions that need it the most. CDCR's goal is to provide adequate mental health staffing to treat its patients. CDCR's telepsychiatry policy as originally developed is intended to meet that goal and should be adopted. Short of adopting CDCR's policy, CDCR has here proposed language and an implementation schedule that will satisfy its continuing need to use telepsychiatry and provide the Special Master with an opportunity to monitor the use of telepsychiatry as a means to deliver mental health care to class members.

Dated: September 12, 2018

Respectfully submitted,

XAVIER BECERRA
Attorney General of California
ADRIANO HRVATIN
Supervising Deputy Attorney General

By: Elise Owens Thorn

Deputy Attorney General
*Attorneys for Defendants*

8

Defs.' Separate Stmt. (2:90-cv-00520 KJM-DB (PC))

1  XAVIER BECERRA
   Attorney General of California
2  ADRIANO HRVATIN
   Supervising Deputy Attorney General
3  ELISE OWENS THORN, State Bar No. 145931
   ANDREW M. GIBSON, State Bar No. 244330
4  TYLER V. HEATH, State Bar No. 271478
   IAN MICHAEL ELLIS, State Bar No. 280254
5  TYLER V. HEATH, State Bar No. 271478
   Deputy Attorneys General
6    1300 I Street, Suite 125
     P.O. Box 944255
7    Sacramento, CA 94244-2550
     Telephone: (916) 210-7325
8    Fax: (916) 324-5205
     E-mail: Tyler.Heath@doj.ca.gov
9  *Attorneys for Defendants*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN JR., et al., <br><br> Defendants. | 2:90-cv-00520 KJM-DB (PC) <br><br> **DECLARATION OF KATHERINE TEBROCK REGARDING THE EFFECTS OF THE RESTRICTIONS TO TELEPSYCHIATRY IN THE COURT'S TENTATIVE RULINGS ON OBJECTIONS** <br><br> Judge: The Honorable Kimberly J. Mueller |

I, Katherine Tebrock, declare:

1. I am the Deputy Director of the Statewide Mental Health Program for the California Department of Corrections and Rehabilitation (CDCR). I am competent to testify to the matters set forth in this declaration and if called upon to do so, I would and could so testify. I make this declaration in support of Defendants' Response to the Special Master's Report on the Proposed Telepsychiatry Policy Addendum to the California Department of Corrections and Rehabilitation Mental Health Services Delivery System Program Guide.

1

Decl. of K. Tebrock (2:90-cv-00520 KJM-DB (PC))

2.     I was appointed as Deputy Director of the Statewide Mental Health Program in November 2015. I am familiar with the numerous and complex policies and procedures that govern the prison mental health care delivery system. I am also responsible for and supervise the mental health system's headquarters and regional teams, and am familiar with *Coleman* mandates. I previously served as Chief Deputy General Counsel of Policy with CDCR's Office of Legal Affairs, where my duties included management and oversight of the health care legal team, including the *Coleman* class action litigation.

3.     I have reviewed the various iterations of the Special Master's telepsychiatry policy proposals, and I provided a declaration on August 13, 2018 regarding the impact those proposed policies would have on CDCR's ability to provide psychiatric care to its patients at its institutions.

4.     I have also reviewed the Court's September 6, 2018 Tentative Rulings on Objections and the restrictions those rulings place on CDCR's provision of telepsychiatry to inmates at the different levels of care in its Mental Health Statewide Delivery System. I also participated in the meet and confer ordered by this Court on September 7, 2018. Based on my knowledge of CDCR's present use of telepsychiatry and CDCR's allocation of on-site and telepsychiatrists at its institutions and mental health programs in those prisons, I believe that the restrictions stated in the Court's tentative rulings will negatively impact CDCR's ability to retain staff, and provide psychiatric care to its patients at all levels of care.

5.     CDCR has been providing telepsychiatry to inmates at the Enhanced Outpatient Program level of care since 2015. In that time, CDCR has provided thousands of encounters. I am not aware, nor has any CDCR telepsychiatrist informed me, that the telepsychiatry modality has resulted in systemic problems in the provision of psychiatric care. It has proven to be a safe and effective systemic way to provide psychiatric care to patients.

6.     The Special Master's August 2, 2018 draft policy states that on-site psychiatrists are "required 'for each program providing an EOP level of care consistent with the staffing ratios delineated in the 2009 Staffing Plan.'" The Court's tentative rulings state that the goal of the requirement is to have "at least one on-site psychiatrist for each institution that houses EOP

2

inmates, with that on-site psychiatrist dedicated to the EOP program(s) and/or unit(s) at the institution and not to any other level of care that might be operating at the same institution." (ECF No. 5907 at 5.)

7. CDCR currently has at least one on-site psychiatrist at every institution. However, not all of those on-site psychiatrists serve exclusively Enhanced Outpatient Program populations. At some institutions, these on-site psychiatrists service a higher level of care and at others they service a lower level of care, namely the Correctional Clinical Case Management System. The Court's tentative ruling raises several administrative, staffing, and care-based concerns.

8. While the answer to the Court's tentative rulings and policy would appear to be simple – reassigning psychiatrists from one program or institution to an Enhanced Outpatient Program that lacks an on-site psychiatrist – the reality of moving staff, who are free to leave their job at any time, is far more complex. The transfer of mental health staff between different institutions is limited by labor contracts. In some circumstances, staff transfers between levels of care are restricted as well.

9. Despite CDCR's ongoing efforts to hire on-site psychiatrists, Valley State Prison does not have any on-site psychiatrists dedicated to serving its Enhanced Outpatient Program patients. Valley State Prison does have one registry psychiatrist providing care on-site to the Correctional Clinical Case Management System population. But under the Special Master's draft policy and the Court's tentative rulings, CDCR would have to redirect its on-site registry psychiatrist to the Enhanced Outpatient Program to maintain any telepsychiatry presence in the unit. Valley State Prison currently has 372 Level II beds and a census of 339 patients. Level II Enhanced Outpatient Program beds have some of the highest demand in the system. Similar to Valley State Prison, Kern Valley State Prison's Enhanced Outpatient Program population is also served solely by telepsychiatry. Those institutions that currently have one on-site psychiatrist, are only one extended absence away from being barred from providing telepsychiatry care. Should the one on-site psychiatrist leave CDCR employment under the draft policy and the Court's tentative order, that institution would have to cease providing telepsychiatry care.

10. I am also concerned that psychiatrists providing treatment at the Correctional Clinical Case Management System level of care will leave CDCR service if required to provide Enhanced Outpatient Program level of care. Some psychiatric staff have informed CDCR's mental health administration they would consider leaving CDCR if forced to provide care to the Enhanced Outpatient Program level of care, even if the staff do not have to transfer to a different institution. Moreover, given the severe shortage of psychiatrists in California and across the nation, it may not be possible to hire a new on-site psychiatrist.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Elk Grove, California on September 12, 2018.

/s/ Katherine Tebrock
KATHERINE TEBROCK
Deputy Director, Statewide Mental Health Program

CF1997CS0003