DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California  94710-1916
Telephone:    (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California  94111-4805
Telephone:    (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
50 Fremont Street, 19th Floor
San Francisco, California  94105-2235
Telephone:    (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No. 2:90-CV-00520-KJM-DB |
| Plaintiffs, | **JOINT STATUS REPORT RE OCTOBER 11, 2018 STATUS CONFERENCE** |
| v. | |
| EDMUND G. BROWN, JR., et al., | Judge:   Hon. Kimberly J. Mueller |
| Defendants. | |

[3299052.2]

This Court's July 3, 2018 Order, ECF No. 5850 ("July 3 Order"), modified the Court's October 10, 2017 Order, ECF No. 5711 ("October 10 Order"), to require the parties to brief the following specific matters in a joint status report filed by September 14, 2018:

    a.   The status of defendants' Staffing Proposal; if full agreement has not been reached, remaining disputes shall be described and presented to the court consistent with the provisions of this order;

    b.   The status of implementation of the final telepsychiatry policy;

    c.   Whether defendants will timely achieve compliance with the October 10, 2017 order and, if not, why not;

    d.   If defendants will not timely achieve compliance, the parties' respective positions on enforcement; and

    e.   If defendants will timely achieve compliance, the parties' respective positions on durability of the staffing remedy, with due consideration given to the fact that the adequacy of telepsychiatry must be monitored for at least one year, and consideration of future projections of the size of the mental health population as well as what steps, if any, may be required to maintain staffing levels commensurate with that population.

ECF No. 5850 at 9; *see* ECF No. 5890 (extending deadline to file joint status report from September 7 to September 14, 2018).  Pursuant to the October 10 Order, "the joint status report shall also address the DSH defendants' progress toward compliance with paragraph 5 of this order," which requires "complete implementation of the DSH defendants' staffing plan within one year from the date of this order."  ECF No. 5711 at 30-31.  The parties address these issues below.

I.    **CDCR Defendants' Psychiatry Staffing Proposal**

In workgroup discussions overseen by the Special Master, the parties have agreed in principle to Defendants' revised staffing proposal, subject to Plaintiffs' reserved objections and ongoing monitoring.  Defendants circulated the most recent version of their proposal on August 24, 2018, which is attached at Exhibit 1.  The proposal, among other things, reduces psychiatry allocations at desert institutions; applies the CCCMS general population psychiatrist staffing ratio only to CCCMS patients who are prescribed psychotropic medication or require psychiatric care, rather than to the entire CCCMS

population; removes psychiatry positions allocated for crisis intervention on weekends and holidays and retains eight psychiatry positions for on-call coverage; modifies the psychiatry staffing allocation at reception centers for intake and screening based on intake population; and lowers the assumed frequency of psychiatry-patient contacts built into the CCCMS-GP and EOP-GP psychiatry staffing ratios.

At the September 10, 2018 workgroup, Plaintiffs asked Defendants to add some specific information to the revised proposal, to capture the parties' previous discussions and negotiated positions on the proposal. Defendants committed to making minor final adjustments to the proposal and recirculating the final proposal to the workgroup for discussion on September 17, 2018 or September 24, 2018.

In addition, the parties and Special Master have discussed, but have not come to a resolution regarding, the procedural vehicle through which the final staffing proposal will be presented to the Court. The parties anticipate further workgroup discussions, with input from the Special Master, regarding the manner of presentation. The parties intend to present to the Court the final proposed staffing proposal before the October 11, 2018 status conference.

## II.     Status of Implementation of Telepsychiatry Policy

In workgroups held on September 11 and 12, 2018, the parties met and conferred regarding the remaining disputed language in the Special Master's proposed telepsychiatry policy, as directed by the Court in its September 7, 2018 Minute Order, ECF No. 5909. The parties failed to reach agreement and filed separate statements with the Court on September 12, 2018, addressing their respective positions on the remaining disputed language. As of the filing of this status report, the Court has not approved the proposed telepsychiatry policy in any form.

The parties continue to discuss the specifics of DSH's telepsychiatry policies in the workgroup, overseen by the Special Master, and specifically anticipate further discussions at the September 17, 2018 workgroup.

## III.   Compliance with Staffing Ratios

The Court's October 10 Order directed CDCR Defendants to, "[w]ithin one year [of October 10, 2017] . . . take all steps necessary to come into complete compliance with the staffing ratios in their 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order."  ECF No. 5711 at 30.

CDCR expects that implementation of the proposed staffing plan will immediately lead to CDCR being at or above the staffing levels required in the Court's June 13, 2002 Order (ECF No. 1383), and therefore immediately bring CDCR into compliance with the October 10, 2017 Order.

The parties also continue to discuss DSH's staffing plan in the workgroup, which the Court ordered DSH to have implemented completely within one year of October 10, 2017.  *See* ECF No. 5711 at 30.  Specifically, the parties anticipate further discussions on DSH's staffing plan will take place, at least, during the September 17, 2018 workgroup.

## IV.   Parties' Respective Positions on Durability of the Staffing Remedy

Given CDCR's representation that it expects to complete compliance with the Court's orders requiring no more than 10% clinical staffing vacancies, the parties address below the durability of the current staffing remedy.

### A.   Plaintiffs' Position

Targeted or uniform compensation increases will still be necessary to effectuate a durable remedy to Defendants' decades-long staffing difficulties.  As Plaintiffs have documented thoroughly already, Defendants' affirmative decision to offer dramatically smaller pay increases to psychiatrists than to medical doctors in the most recent collective bargaining agreement, coupled with the recent gutting of the public service pension program, have resulted in compensation that is simply not competitive.  *See* Pls.' Objs. to Special Master Staffing Report and Nolan Decl., ECF Nos. 5590, 5590-1 (March 30, 2017).  Defendants have provided nothing in the workgroup process or otherwise that undermines that fundamental conclusion, or that establishes that increasing compensation would not help their chronic inability to hire and retain psychiatrists.

1    As such, this aspect of the staffing remedy is as yet unresolved, but if pursued could

2 still prove fruitful now or in the future.  The Special Master's labor economist will provide

3 an objective analysis as to whether Defendants' salary and compensation package is

4 sufficiently competitive to recruit and retain a sufficient number of psychiatrists in the

5 long-term, given the limited labor pool.  Additionally, the Special Master has expressed his

6 intent to meet with the California Department of Finance.  Plaintiffs anticipate devoting

7 substantial time and effort to addressing these issues through the workgroup process in the

8 coming months, including thorough consideration of Defendants' long-disclosed, but not

9 yet produced, salary expert report.

10    Plaintiffs also remain gravely concerned that the psychiatric inpatient programs

11 ("PIPs") in particular are in some cases egregiously and dangerously understaffed.  A

12 significant number of clinical staff left the PIPs following the lift and shift, and as of July

13 2018, for example (the most recent month for which data is available), the PIPs had the

14 following psychiatry staffing rates: CMF PIP - 48%; CHCF PIP - 62%; and SVSP PIP -

15 85%.  *See* ECF No. 5900 at 5.  The PIPs are meant to provide the highest levels of care

16 offered in CDCR's mental health services delivery system, so high vacancy rates in those

17 facilities will cause further problems downstream.  The high vacancies also suggest that

18 CDCR, even implementing its psychiatry staffing plan, may not have available the staff

19 necessary to adequately treat its highest-acuity patients in a sustainable manner.

20    In addition, CDCR's formal EOP review process, which the parties negotiated

21 extensively under the Special Master's guidance and this Court ultimately approved, has

22 not meaningfully reduced the EOP population to date, revealing instead that the vast

23 majority of class members at the EOP level of care are receiving the level of care best

24 suited to their needs, and that in fact a measurable proportion of the population requires a

25 higher level of care.  While the EOP population, which has been steadily growing since

26 2014 even as CDCR's overall population dropped precipitously, abruptly changed course

27 and began to drop in December 2017—and has continued to drop since then—the results

28 of the formal EOP review process to date do not fully account for the decline in the

[3299052 2]

number of EOP class members.  Plaintiffs therefore remain concerned that this sudden and sharp population decrease may not accurately reflect actual clinical need for the EOP level of care.  Accordingly, Plaintiffs anticipate that the EOP population will remain large well into the future, requiring a significant number of psychiatrists to provide adequate care.

Plaintiffs also have repeatedly raised within the workgroup and only just received, on the afternoon of the date of this filing, a written response from Defendants regarding the steps Defendants are taking outside the Court-ordered and carefully-negotiated formal EOP review process to artificially limit or shrink the size of the EOP population.  While Defendants maintain that staff have been directed to remove EOP patients from that level of care only if clinically indicated, Plaintiffs remain concerned about problematic messaging from headquarters that institution-level clinical staff have understood, as reported at a recent CQIT tour, to require the removal of headquarters-designated individuals from the EOP level of care, and that line staff may also feel pressure to avoid newly placing patients at the EOP level of care.  Plaintiffs have not yet received a satisfactory account of any informal EOP review processes that have been undertaken and that may be contributing to the acute drop in EOP numbers since December 2017. Ongoing close and careful monitoring of the EOP population to ensure Defendants are appropriately identifying and treating all class members needing that level of care will be necessary to assure that the staffing remedy is durable.  Defendants' long-term success in ensuring sufficient clinical staff to provide adequate care for the *Coleman* class consistent with this Court's orders cannot hinge on the under-identification of class member need for treatment.

**B.    Defendants' Position**

Defendants expect that, if the proposed staffing plan is adopted, Defendants will be able to sustain long-term compliance with the 2002 order and 2009 Staffing Plan, as adjusted.  Durability is expected in light of an improved utilization management, the

[3299052.2]

continuing EOP review process and stabilization of the EOP population[1], the expansion of fellowships, the use of psychiatric nurse practitioners at the CCCMS level, the implementation of parole and credit changes pursuant to Proposition 57[2] that will reduce the number of class members, and various measures designed to improve job satisfaction and retention.  Most importantly, the increased use of telepsychiatry continues to measurably improve both recruitment and retention of psychiatric staff, similar to the benefits realized by the *Plata* Receiver with respect to telemedicine.

Plaintiffs insist that this Court explore dramatically increasing salaries, over and above the considerable increases that the State has already funded over the last decade. But their position reflects an ideological refusal to consider CDCR's actual experience and basic economics.  Indeed, Defendants intend to disclose by September 21, 2018, an expert report discussing the labor market for psychiatrists in California and the United States, and explaining why Plaintiffs' simple solution of increasing salaries is unlikely to prove effective at recruiting and retaining additional psychiatry staff.  CDCR's historical hiring and retention rates, when compared to the significant rate increases already implemented, demonstrate that even large salary premiums over statewide and national averages for employed psychiatrists have been ineffective at boosting CDCR's pool of employed psychiatrists.  CDCR has also not realized hiring increases from other forms of compensation enhancements – such as dual-appointment opportunities, cash-for-call,

---

[1] The "informal EOP review" cited by Plaintiffs is part of CDCR's continuing efforts ensure staff at institutions are properly documenting the reasons for a patient's level of care.  CDCR has included the Plaintiffs and the Special Master in every step of the EOP review process, has shared data regarding that process, and has discussed it in the workgroups.  CDCR has also been forthcoming in discussing this quality management measure when asked about in the workgroups, explaining on numerous occasions that the purpose is not to direct the institutions to change or remove a patient from the EOP level of care.  CDCR takes seriously its obligation to identify the proper level of care for all of its patients, whether that means moving them up or down the spectrum.  CDCR's clinicians are constantly reviewing patients' level of care in compliance with program guide requirements and objects to Plaintiffs' inference that the formal EOP process is the only time a patients' level of care can be reviewed for change by their clinical team or for quality management.

[2] Prop 57 substantially increased credit earning to virtually all EOP class members.

1   reimbursement for relocation expenses, and retention and merit-based salary increases –

2   which boost CDCR psychiatrists' potential compensation levels well above statewide and

3   national averages.  Similarly, increases in contract pay through a registry program have

4   been ineffectual at delivering sustained increases in psychiatrist full-time equivalents

5   ("FTEs").

6       Defendants maintain the position taken in their response to the Special Master's

7   Report on the Status of Mental Health Staffing and the Implementation of Defendants'

8   Staffing Plan (ECF Nos. 5591 and 5601) that salary adjustments or other forms of

9   monetary compensation will not enable CDCR to permanently and significantly increase

10  the size of the pool of psychiatrists that it employs.  CDCR already employs approximately

11  a significant percentage of all psychiatrists in California (5 percent), despite serving just a

12  tiny fraction of the state's population (less than 0.3 percent).   Numerous academic articles,

13  policy studies, and news sources have documented that the primary obstacle to further

14  hiring is an acute nationwide shortage of psychiatrists that is growing worse each year.

15  *Despite* sizeable increases in compensation over time, an insufficient number of physicians

16  have joined the ranks of practicing and employed psychiatrists.  Further, generalized

17  shortages create intense competition between psychiatrist employers and allow

18  psychiatrists to be selective about the positions that they accept or transfer to.

19      Relative to other employers of psychiatrists in California, CDCR already provides

20  highly competitive compensation and benefits, in many areas of the state far exceeding the

21  compensation and benefits package provided by other public and private sector employers.

22  Of all the initiatives that CDCR currently has in place or has implemented at some point in

23  the past, telepsychiatry is the sole program that has had measurable success in expanding

24  CDCR's pool of employed psychiatrists.  In addition, to improve retention, CDCR will

25  continue to implement measures—such as improvements to the Electronic Healthcare

26  Records System and reducing duties for institution psychiatrist on-call by providing on-

27  call telepsychiatry coverage—to improve psychiatrists' work conditions and environment.

28  Defendants are committed to discussing the various measures it has contemplated to

1 increase hiring and retention with Plaintiffs' counsel and the Special Master through the

2 workgroup process.

3 **V.      Additional Areas of Discussion**

4          At the August 28, 2018 hearing, the Court requested that the parties discuss whether

5 Defendants, working with the Special Master and Plaintiffs, could identify the specific

6 institutions that have consistent problems with recruitment and retention to help the Court

7 understand whether the programs with staffing challenges can be closed and moved to

8 institutions that do not have staffing challenges.  (8/28/18 Tr., ECF No. 5915, pp. 32:7-

9 33:5.)  The Court also encouraged the parties to discuss "proposals for reduction in

10 monitoring. . . [where] certain programs are being closed out, if the populations are no

11 longer persisting in certain locations," (*id.*, p. 33:13-16), which the Court agreed to

12 consider so long as "[there are] written details, exhaustion to meet and confer, [and] a

13 specific proposal that makes sense …."  (*id.*, p. 33:17-19.)

14     **A.      Movement of Patients to Institutions Without Staffing Challenges**

15          **1.      Plaintiffs' Position**

16          In response to the Court's request that the parties address whether there are certain

17 programs with ongoing staffing problems that could be "consolidat[ed] in locations where

18 the problems don't exist" (8/28/18 Tr., ECF No. 5915, p. 33:4), Plaintiffs submit that

19 should staffing shortages persist in particular programs despite Defendants' recent efforts,

20 it may be necessary to consider clustering or targeted further orders to ensure adequate

21 staffing for certain facets of the population.  Defendants submitted their positions

22 regarding clustering to Plaintiffs and the Special Master on June 5, 2018 and July 6, 2018.

23 Although the parties have preliminarily discussed Defendants' June 5, 2018 memorandum,

24 the workgroup has yet to fully address Defendants' analysis via the workgroup process.

25 The Special Master has indicated that he will include clustering as a topic for discussion at

26 upcoming workgroup meetings, and Plaintiffs would welcome the opportunity for more

27 substantial discussion regarding Defendants' positions.

28

2.      **Defendants' Position**

The parties have begun discussions regarding further clustering of patients in the MHSDS. On June 5, 2018 and July 6, 2018, CDCR provided Plaintiffs and the Special Master's team a written explanation of its position on further clustering the EOP and CCCMS populations.  (*See* attached Exhibit 2.)  In short, CDCR has determined that further clustering of the EOP populations is not a viable solution to resolve its staffing challenges due to the constraints placed on population management and timely transfers, the limited effect further clustering would have on staffing recruitment, the need for adequate office and treatment space at the institutions, and the adverse effects on staff morale and retention caused by housing the sickest patients together.   As discussed above, Defendants contend that the use of telepsychiatry, the continuing EOP review process and stabilization of the EOP population, the expansion of fellowships, the use of psychiatric nurse practitioners at the CCCMS level, and the implementation of parole and credit changes pursuant to Proposition 57 will assist in hiring and retention efforts.

B.      **Reduction of Court Oversight and Monitoring**

1.      **Plaintiffs' Position**

Plaintiffs are more than willing to discuss the possibility of reduced federal oversight with Defendants and the Special Master.  Based on the Court's comments at the August 28, 2018 status conference, Plaintiffs await a formal written proposal from Defendants and intend to meet and confer.  *See* 8/28/18 Tr., ECF 5915, at 33:17-19 (Aug. 28, 2018) (Court expressing willingness to entertain proposals for reduced monitoring so long as "[there are] written details, exhaustion to meet and confer, [and] a specific proposal that makes sense …."); *see also* Order, ECF No. 5852 at 8 (July 12, 2018) ("[A]ny plan for partial termination must be developed in the first instance as a proposal by the parties in consultation with the Special Master.").

2.      **Defendants' Position**

Defendants welcome the opportunity to discuss reducing Court oversight in this case and propose a discussion on the process for removing, in the near future, Court

1  oversight including, but not limited to: (1) Heat Plans; (2) the Desert Institutions[3]; (3)

2  Screenings and Referrals; (4) Mental Health Records/Forms; (5) Medication Management;

3  and (6) Involuntary Medication.  CDCR looks forward to the opportunity to discuss

4  reduction of monitoring with the Special Master in hopes of providing an update or

5  proposal at the December status conference.

6

7

8  DATED:  September 14, 2018          Respectfully submitted,

9                                                              ROSEN BIEN GALVAN & GRUNFELD LLP

10

11                                                     By:  */s/ Cara E. Trapani*

12                                                            Cara E. Trapani

13                                                     Attorneys for Plaintiffs

14

15  DATED:  September 14, 2018          Respectfully submitted,

16                                                              XAVIER BECERRA

17                                                              ATTORNEY GENERAL OF CALIFORNIA
                                                                DANIELLE F. O'BANNON

18                                                              SUPERVISING DEPUTY ATTORNEY
                                                                GENERAL

19

20

21                                                     By:  */s/ Tobias G. Snyder*

22                                                            Tobias G. Snyder
                                                              Deputy Attorney General

23                                                     Attorneys for Defendants

24

25

26

27  _____

28  [3] The desert institutions include California Conservation Center, Calipatria State Prison, Centinela State Prison, Chuckawalla Valley State Prison, and Ironwood State Prison.

# Exhibit 1

**ADJUSTMENTS TO THE 2009 STAFFING PLAN**

On October 10, 2017, the Court ordered the California Department of Corrections and Rehabilitation (CDCR) to "take all steps necessary to come into compliance with the staffing ratios in [the] 2009 Staffing Plan and the maximum ten percent vacancy rate required by the court's June 13, 2002 order." 10/10/2017 Staffing Order, ECF No. 5711 at 30. On February 15, 2018, the Court asked the parties to consider whether there are "any adjustments to the psychiatry staffing ratios that could be made to alleviate the psychiatrists staffing shortages without compromising the constitutionally required access to adequate mental health care." 2/15/2018 Order, ECF No. 5786 at 4.

On May 17, 2018, Defendants provided the Special Master and Plaintiffs with a plan to modify the 2009 Staffing Plan based on how psychiatry care is provided and correcting some of the underlying assumptions. Since that time, the parties have met and conferred and have reached an agreement with respect to the modifications. Those changes are outlined in more detail below.

> A. Reduce the Psychiatrist Allocation for Desert Institutions in Line with the Limited
>    Workload for the Small Population Temporarily Housed There

The 2009 Staffing Plan allocates 0.5 psychiatrists to each of the desert institutions. [1] 2009 Staffing Plan at 20. However, the workload, which takes into account the average contacts and contact duration for all five desert institutions, could easily be accomplished by half of a psychiatrist allocation.

In order to bring the allocation in line with the actual workload, CDCR will reduce the psychiatry allocation for all desert institutions to 0.5, and utilize telepsychiatry to provide services to all five desert institutions.

> B. Apply the Psychiatrist Staffing Ratio for the CCCMS General Population Only to the
>    Population Who are Prescribed Psychotropic Medication or Require Psychiatric Care

The Program Guide requires that "[e]ach CCCMS inmate-patient on psychiatric medication" "be reevaluated by a psychiatrist a minimum of every 90 days." Program Guide at 12-3-11. The 2009 Staffing Plan establishes a psychiatry staffing ratio for every CCCMS patient in the General Population (GP) who receives psychotropic medication. Despite the Program Guide requirement that only CCCMS inmates on medication should be seen for routine contacts, CDCR's practice has been to apply the ratio to the entire CCCMS population, including thousands of CCCMS patients who are not prescribed any psychiatric medication and who are not seeing a psychiatrist.

In order to avoid the over allocation of staff, CDCR will alter its prior practice and only provide psychiatry staffing for the following CCCMS inmates:

1. CCCMS inmates currently on psychotropic medication;
2. CCCMS inmates who have been at the CCCMS level of care for less than three months;

---

[1] California Conservation Center, Calipatria State Prison, Centinela State Prison, Chuckawalla Valley State Prison, and Ironwood State Prison.

3. CCCMS inmates who had previously been prescribed psychotropic medication, but have been off of the medication for less than six months; and

4. CCCMS inmates who, in the opinion of their treating psychiatrist, could benefit from medication but have refused medication.

The number of inmates in the first three categories can be identified using existing data. In order to identify the precise number of inmates who fall into the last category, CDCR has agreed to review the number of patients who refuse psychiatry contacts, refuse currently prescribed medication, and conduct a prospective study to determine how many inmates refuse an initial medication prescription. The prospective study is expected to have on-site and telepsychiatrists document any CCCMS patient who fits into the last category. The study will be conducted at a minimum of six institutions over a three month period. This adjustment does not alter the staffing ratio laid out in the 2009 Staffing Plan; rather, it correctly applies the staffing ratio to the CCCMS population that is in need of routine psychiatry services, while also ensuring adequate staff to provide services to patients who may soon be placed on psychotropic medication.

C.   Remove Psychiatry Positions Allocated for Crisis Intervention on Weekends and Holidays And Retain Eight Positions for On-Call Coverage

The 2009 Staffing Plan allocated 0.52 psychiatry positions at every institution to provide crisis intervention on weekends and holidays. CDCR will eliminate these positions as this allocation was never implemented as intended in the 2009 Staffing Plan. Weekend and holiday crisis intervention is covered by psychiatrist on-call. Since these positions do not carry a caseload, this is not an adjustment to the staffing ratios, but, rather, a removal of an unnecessary psychiatry allocation.[2]

Rather than completely eliminate all of the crisis intervention positions, CDCR will redirect eight positions to nighttime on-call psychiatry coverage via telepsychiatry.[3] CDCR will expand the pilot program it began in November 2017, which currently provides nighttime telepsychiatry coverage for six institutions, three days per week. Thus far, the program has been very successful. A local psychiatrist or medical doctor is still required to be on-call, in case an in-person examination of a patient is required overnight, which rarely occurs. Under CDCR's plan, on-call coverage via telepsychiatry will cover a large portion of the workload for the local on-call psychiatrist, which will likely increase retention.

D.   Modify the Psychiatry Allocation at Reception Centers (RC) for Intake and Screening Based on Intake Population And Adjust Biannually

The 2009 Staffing Plan includes positions to conduct the mental health screenings required for every new commitment and parole violator. A percentage of those screenings result in a need for a medication consultation by psychiatry. The staffing plan ratio applied to this population established

---

[2] CDCR has agreed to discuss implementation of the Crisis Intervention Teams at the upcoming policy meeting, currently scheduled for November 9, 2018.

[3] Once the eight on-call telepsychiatry positions have been filled, CDCR will reassess whether more on-call telepsychiatry coverage is necessary based on the volume of afterhours calls and what institutions take advantage of on-call telepsychiatry coverage.

13.5 positions for psychiatry intake and screening, which has not been adjusted since 2009. These positions were based on reception center intake data from 2009, but the psychiatry allocations have not been adjusted to reflect the significant reduction in reception center intake since that time.

In response, CDCR will adjust the currently fixed psychiatrist allocation for reception center intake and screening to reflect the current incoming population. To be clear, the adjustment does not change the underlying staffing ratio in any way and thus does not require a modification of the 2009 Staffing Plan. Rather, it ensures that the allocation is adjusted biannually based on current reception center intake population. Adjusting staffing allocation in response to population changes is consistent with the approach of the 2009 Staffing Plan and with CDCR's current practice in adjusting other population driven staffing allocations.[4]

### E.   Adjust the CCCMS Staffing Ratio to Allow for 1.25 Routine Contacts Every 90 Days

The 2009 Staffing Plan workload assumption for routine psychiatry contacts overstated the Program Guide requirement. The Program Guide requires that a patient on medication be seen every 90 days. Program Guide at 12-3-11. In contrast, the 2009 Staffing Plan assumes that each patient will be seen by a psychiatrist for routine contacts an average of 1.5 times every 90 days. 2009 Staffing Plan, Exhibit 10. The 2009 Staffing Plan separately accounts for urgent or emergent psychiatry referrals in between routine contacts as part of the ratio.

CDCR will revise the ratio of routine contact frequency from 1.5 to 1.25 contacts every 90 days. This reduction would not interfere with CDCR's commitment to providing more than the minimum treatment required by the Program Guide to CCCMS inmates who require more individualized treatment. This changed assumption would result in a ratio of 1:336, without accounting for relief.

### F.   Adjust the EOP Staffing Ratio to Allow for 1.25 Routine Contacts Every 30 Days

The 2009 Staffing Plan workload assumption applied to CCCMS routine contacts, as described above, was also applied to EOP routine contacts. 2009 Staffing Plan, Exhibit 10. Thus, while the Program Guide requires an EOP participant to be seen once every 30 days, the 2009 Staffing Plan assumes that each patient will be seen an average of 1.5 times every 30 days for routine contacts. The 2009 Staffing Plan separately accounts for urgent or emergent psychiatry referrals in between routine contacts as part of the ratio. *Id*. CDCR will revise the ratio to allow for routine psychiatry contacts 1.25 times every 30 days. The reduction of psychiatrist positions would not affect CDCR's ability to provide additional individualized group treatment, recreational therapy, or individual therapy, as these services are provided by classifications other than psychiatrists. This changed assumption would result in a ratio of 1:144 for EOP, without accounting for relief.

---

[4] The 2009 Staffing Plan assumed that out of every 100 new inmate arrivals at RCs, 15 to 16 inmates would need to be evaluated by psychiatrists. ECF No. 3693 at 13. At Plaintiffs' request, CDCR provided updated data regarding the number of psychiatry referrals per 100 newly arrived inmates. This data showed that from January 2018 through June 2018, 11.41 inmates were referred for psychiatry evaluations of every 100 new inmates who arrived at the RC.

# Exhibit 2

<u>Clustering</u>

On August 9, 2016, the Court ordered the California Department of Corrections and Rehabilitation (CDCR) to confer with the Special Master on strategies, "including but not limited to potential clustering of higher-acuity mentally ill inmates at those institutions where it has been shown that mental health staff can be more readily attracted and retained…."  ECF No. 5477 at 8.  In response to the Court's direction, CDCR implemented a bed plan that added Enhanced Outpatient Program (EOP) beds to institutions that already had functioning Enhanced Outpatient Programs, while closing beds at one hard to recruit location.  *See* CDCR January 1, 2017 Staffing Plan at 6-7.  CDCR also opined that overfilling an institution with higher acuity patients can negatively affect retention of staff and the mental health delivery system.  *Id*.

On October 10, 2017, the Court again addressed clustering and stated that "[i]f defendants choose to cluster programs to comply with this order [to meet the 90% court-ordered psychiatry fill rate], they will be required to work with the Special Master as they refine their clustering plan."  ECF No. 5711 at 26.  Thus, the court recognized that CDCR is in the best position to determine whether further clustering of the mental health population is warranted.

During the staffing workgroups established in response to the Court's October 2017 order, the Special Master requested CDCR consider additional clustering of class members and requested Defendants provide a written explanation of any position related thereto.  Discussed below are CDCR's positions on clustering patients in the EOP and Clinical Correctional Case Management System (CCCMS).

1. CDCR's Initiatives Are Reducing the EOP Population and Will Result in Natural Clustering

CDCR's regulations implementing Proposition 57 were certified for permanent adoption on May 1, 2018.  The regulations expand credit earning opportunities and create a parole process for nonviolent offenders.  As a result of Proposition 57 and CDCR's review of EOP patients to ensure they placed in the appropriate level of case, the EOP population has stabilized and is declining.  In 2018, the EOP population has declined by nearly 500 inmates, from a total population of 8,009 on January 2, 2018, to 7,512 on May 29, 2018.  Attachment A- EOP Population MIS Data.  This decline may be due, in part, to Proposition 57.  Between August 2017 and April 2018, 3,548 inmates in the Mental Health Services Delivery System (MHSDS) were released and earned credit authorized by Proposition 57 toward their advanced release date, including 635 EOP patients.  Attachment B- Releases from CDCR with MH and Prop 57.

As the EOP population continues to decrease CDCR will close EOP beds at institutions that are difficult to staff, when possible.  As explained in CDCR's June 1, 2018 letter, CDCR plans to close 96 EOP beds at Salinas Valley State Prison in August 2018, 150 EOP beds at California State Prison- Corcoran in September 2018, and 96 EOP beds at Kern Valley State Prison in October 2018.  Attachment C- June 2018 Mission Change Letter.  CDCR also proposes adding 100 EOP beds at San Quentin State Prison in January 2019, if needed.  *Id*.  This natural clustering will allow CDCR to group EOP inmates at institutions with higher staffing fill rates, as allowed by the population.

Although CDCR is willing to consider removing EOP beds from more difficult to staff institutions as the population decreases, limiting CDCR's ability to use beds at the current EOP institutions would negatively affect patient care if the population were to unexpectedly increase.  Removing EOP beds must be done thoughtfully in response to changes in the population and with enough preparation to ensure CDCR can provide alternative placements for inmates with difficult case factors.

2.   Further Clustering of the EOP Population is Unnecessary

CDCR already clusters its higher acuity patients.  Currently, CDCR houses EOP inmates at 15 of its 35 institutions, two of which house only female inmates.[1]  At the 13 male institutions, the percent of the inmate population in the MHSDS ranges from 30 percent to as high as almost 60 percent.  *See* Attachment D- Population by Institution and Attachment E- Mental Health Population by Institution.  At almost half of these institutions, the EOP population accounts for approximately 20 percent or more of the total population.[2]  *Id.*

Nevertheless, in response to the Special Master's request, CDCR has explored whether further clustering would improve staffing fill rates and has determined that it would not.  Further clustering of the EOP population is not necessary for three reasons.  First, EOP patients tend to require more time and attention of all staff, including that of mental health, custody, nursing, and medical.   EOP patients are more difficult to communicate with and often times have difficulty following the direction of staff.  Consequently, populating an institution with mostly EOP patients can increase the incidents of burnout and job dissatisfaction, and in-turn, lead to a higher rate of staff turn-over.  In this way, over-clustering achieves the opposite effect than was intended.   Second, further clustering the EOP population adversely impacts population management, including CDCR's ability to transfer inmates in a timely manner, as many *Coleman* class members have additional case factors, such as physical or developmental disabilities, or medical needs, which make them difficult to place.  Third, as history has shown, grouping high acuity inmates in geographically desirable locations does not guarantee that CDCR will be able to hire the staff to provide care to such a large, higher acuity population.

a.   Over-Clustering High Acuity Inmates Creates Unmanageable Stressors on Staff

Defendants recently retained consultants J. Allen and Associates to study CDCR's mental health staffing, including clustering.  The staffing consultants stated that "[c]lustering programs and services in facilities and geographic areas where the appropriate healthcare staff can be recruited and retained is a common

---

[1] CDCR houses EOP inmates at the following institutions: Central California Women's Facility (CCWF), California Health Care Facility (CHCF), California Institution for Women (CIW), California Men's Colony (CMC), California Medical Facility (CMF), California State Prison- Corcoran (COR), Kern Valley State Prison (KVSP), California State Prison- Los Angeles County (LAC), Mule Creek State Prison (MCSP), Richard J. Donovan Correctional Facility (RJD), California State Prison- Sacramento (SAC), California Substance Abuse Treatment Facility (SATF), San Quentin State Prison (SQ), Salinas Valley State Prison (SVSP), and Valley State Prison (VSP).

[2] Percent of total institution population made up of EOP inmates: CHCF – 23 percent; CMF – 20 percent; COR – 21 percent; LAC – 21 percent; RJD – 22 percent; and SAC – 30 percent.  *See* Attachment D- Population by Institution and Attachment E- Mental Health Population by Institution.

practice in larger prison health systems." "Assessment of the California Department of Corrections and Rehabilitation's Mental Health Staffing Plan", hereafter "Staffing Consultants' Report" at 33. Clustering typically leads to improved patient outcomes, but if not managed properly "can create more problems than it actually solves." *Id*. There is a limit to how many high acuity patients one facility can reasonably handle—if one facility has too many high acuity patients, "care processes begin to break down and staff experience burnout and become dissatisfied." *Id*. The staffing consultants found that CDCR's current approach to clustering the CCCMS and EOP population has been beneficial, but noted that the increase in the Mental Health population and the acuity of the inmates is beginning to affect staff morale and satisfaction. *Id*. at 33-34. This finding cautions against further clustering.

CDCR agrees with the consultants' position against further clustering the EOP and CCCMS populations. While CDCR has improved its staffing rates for psychologists and licensed clinical social workers, hiring and retaining psychiatrists remains a challenge. This challenge is especially prevalent at EOP institutions, many of which have historically struggled to hire and retain enough psychiatrists to meet the 90 percent fill rate. For example, since activation in 2014, CHCF and VSP have yet to have an average annual fill rate of above 60 percent. Attachment F- Psychiatrist EOP Vacancy History. Similarly, other institutions, such as COR, SAC, LAC, SATF, SVSP, and KVSP have not successfully achieved a psychiatry vacancy rate of less than 10 percent in the last few years. *Id*.

CDCR is concerned that further clustering of the EOP population will impede its ability to attract and retain quality mental health professionals, including psychiatrists, due to the reasons described by the staffing consultants. Given the current challenges CDCR faces in hiring and retaining psychiatrist, it would be unwise to add potential barriers to CDCR's ability to attract and recruit these mental health professionals. Moreover, initiatives other than clustering will effectively allow CDCR to hire and retain the necessary staff, such as the expansion of telepsychiatry and developing system efficiencies as described in CDCR's Psychiatry Staffing Proposal sent to the Special Master and Plaintiffs' counsel on May 17, 2018.

   b.   Further Limiting Institutions Where High Acuity Inmates May be Housed Will Adversely Affect Population Management

Clustering EOP inmates necessarily limits where they can be housed. Male EOP inmates are already clustered at 13 of the 33 institutions, and are therefore unable to be housed at almost two-thirds of the available adult male institutions. In addition, inmates' case factors—such as restrictions due to Valley Fever (Cocci), other medical needs, physical disabilities, enemy concerns, staff separations, and custody level—can significantly narrow that inmate's housing options and contribute to delays in transferring an inmate. Consequently, not all EOP inmates can be housed in any of the 15 designated institutions. Further clustering inmates in the MHSDS will have an ancillary impact on other class actions, such as *Clark* and *Armstrong*, as many inmates are cross-class members. *See* Attachment G- MHSDS Pop by Case Factor.

For example, a male EOP inmate with Level II custody points who is high risk medical can only be housed at CHCF, CMF, MCSP, or SATF. *See* Attachment H- Case Factors at Institutions. A male EOP inmate with Level III custody points and a disability that impacts placement can only be housed at three institutions:

3

MCSP, RJD, or SVSP. *Id.* A male EOP inmate with Level IV custody points who is on Clozapine can only be housed at COR, MCSP, or SAC. *Id.* Adding one additional case factor to the examples above, such as a Cocci restriction, enemy concerns, or a lower bunk/lower tier requirement would further limit the alternative institutions in which the inmate could be appropriately housed.

There are a sizeable number of *Coleman* class members who are in situations similar to those described above. Of the 7,551 EOP inmates, 2,496 are high risk medical, which means that one-third of the EOP population can be housed within 11 of the 15 EOP institutions, two of which house only female inmates.[3] Attachment G- MHSDS Pop by Case Factor. Restricting EOP placement at even one of these institutions would further limit the options for inmate placement, causing delays in regular transfers between institutions, transfers out of segregation, and transfers out of reception centers.

        c.    Further Clustering in Geographically Desirable Locations Does Not Guarantee CDCR's Ability to Actually Recruit

Of the 15 institutions that house EOP inmates, nine are located in large metropolitan or geographically desirable areas where most mental health professionals presumably reside: CHCF, CMF, MCSP, and SAC are located close to the Sacramento area; SVSP is located near Monterey; SQ is in the Bay Area; CMC is near San Luis Obispo; LAC is near the Los Angeles area; and RJD is located near San Diego. *See* Janet Coffman et al., *California's Current and Future Behavioral Health Workforce* (Feb. 12, 2018) at 22 (finding that there was a greater concentration of psychiatrists in the Greater Bay Area, Central Coast, Los Angeles, Sacramento Area, and San Diego Area than in other parts of the state), https://healthforce.ucsf.edu/publications/california-s-current-and-future-behavioral-health-workforce. CDCR has taken advantage of the location of these institutions by clustering approximately 70% of the EOP patients at these nine institutions.[4]

Despite the location of these institutions near urban settings, seven institutions (CHCF, MCSP, SAC, SVSP, SQ, LAC, and RJD) have a psychiatry vacancy rate greater than 10 percent.[5] *See* Defendants' Monthly Psychiatry Vacancy Report, ECF No. 5828 (May 15, 2018) at 5 and Attachment F- Psychiatrist

---

[3] These numbers are as of the end of April 2018.

[4] These institutions have a sizable EOP population: CHCF – 605; CMF – 464; MCSP – 697; SAC – 647; SVSP – 516; SQ – 168; CMC – 606; LAC – 675; and RJD – 877. Attachment E- Mental Health Population by Institution at 1.

[5] CCHCS has provided pay differentials for physicians and surgeons at some "hard-to-recruit" locations, including CHCF to assist in recruitment efforts. Per the 2018 TriAnnual Report, the pay differential was successful in recruiting staff at some institutions, but this was largely at the expense of other institutions. Receiver's TriAnnual Report, ECF No. 5769 (Feb. 1, 2018) at 15. Even with the pay differential, "five of the 12 institutions… were not able to attract hires even with the increase in pay." *Id.* Many of the institutions where physicians and surgeons received pay differentials were unable to hire enough civil service staff to reach 90 percent compliance, including CHCF, CMF, COR, KVSP, LAC, MCSP, SAC, SATF, and SVSP. *Id.* at Appendix 2. Overall, the Receiver found that providing a pay differential at "hard-to-recruit" institutions is not a sustainable solution. *Id.* at 15.

EOP Vacancy History.  In fact, only two of the 15 institutions that house EOP inmates, CMF and CMC, have a psychiatry vacancy rate below 10 percent.[6]  *Id.*

Further clustering EOP inmates in these locations is not likely to resolve CDCR's challenges in hiring and retaining psychiatrists in these areas.  Instead, to address the well-known and documented difficulties of hiring psychiatrists to work in prison settings, CDCR is expanding its telepsychiatry program.  Telepsychiatry will help with recruiting and retaining psychiatrists, while also allowing CDCR to provide inmates housed in all locations with access to the psychiatry services they require.  In its January 2017 Staffing Plan, CDCR proposed the expansion of its telepsychiatry program by opening additional telepsychiatry offices across the state, and increasing the telepsychiatry team to at least 100 positions.  The current plan estimates office space for 105 telepsychiatrists by the end of 2018.  In fact, telepsychiatry allows CDCR to open offices in desirable geographic locations where there are no institutions housing mentally ill class members, such as Santa Ana and Diamond Bar.

3.  Impact of Clustering the CCCMS Population

Although the Court orders specifically reference the possibility of clustering EOP inmates, CDCR has also carefully reviewed whether and how to cluster CCCMS inmates.  CDCR specifically assessed the Special Master's concerns regarding High Desert State Prison (HDSP) and also considered whether other institutions with high staffing vacancy rates could potentially be closed to the CCCMS population.

a.  High Desert State Prison

In previous clustering discussions, the Special Master has raised concerns regarding HDSP's remote location and CDCR's difficulty with recruiting and retaining psychiatrists to work at HDSP.  Despite these challenges, HDSP is a newer and well performing institution.   HDSP was constructed early 1990's with modern medical facilities and was designed to be ADA compliant.  Its closure to *Coleman* class members, especially those who are also *Armstrong* class members, would not be in their best interest.  As detailed below, HDSP is largely meeting the psychiatry Program Guide requirements, its Mental Health Crisis Beds (MHCBs) are generally used for internal admissions only, and suicide rates are low.  In addition, if HDSP were closed to CCCMS inmates, it would cause a strain on other Level IV institutions that house CCCMS patients.  Therefore, it would not be prudent to close the MHCB at HDSP or to close HDSP to CCCMS inmates.

i.  HDSP is Meeting Program Guide Requirements

Between May 1, 2017 and April 30, 2018, HDSP has been above 90 percent compliance in Program Guide required clinical contacts.  During this time period, HDSP was at 93 percent compliance for timely mental health referrals, 98 percent compliance for timely primary clinician contacts, and 99 percent compliance for timely psychiatry contacts and timely IDTTs.  Attachment I- HDSP Performance Report.  In addition, between October 1, 2017 and March 31, 2018, psychiatrists at HDSP attended 96 percent of

---

[6] As of May 7, 2018, CMF had a psychiatry fill rate of 96 percent and CMC had a psychiatry fill rate of 112 percent. *Id.*

the CCCMS IDTTs and 100 percent of the EOP IDTTs that occurred.  Attachment J- IDTT Staffing.  Accordingly, HDSP is providing timely access to care for the inmates housed at the institution.

ii.  HDSP MHCB Usage and 30-day Re-Admission Rates are Low

Currently, HDSP has 10 MHCBs, which are not typically at full capacity.  Between March 2017 and February 2018, the unit was 47 percent filled on average.  Attachment K-HDSP MHCB Usage.  These beds are used almost exclusively for internal admissions.  Between March 2017 and February 2018, all but 4 of the MHCB admissions were internal referrals.  Attachment L- HDSP MCHB Referral Disposition.  Of the inmates admitted to the HDSP MHCB between May 2017 and April 2018, 80 percent were not re-admitted to an MHCB or DSH program within 30 days.  Attachment I- HDSP Performance Report.  This exceeds the statewide rate over the same period of 77 percent.  Attachment M- Statewide MHCB Readmission Rate.  Given the performance indicators for the HDSP MHCB, it should not be closed to intake, especially if CCCMS inmates are housed at HDSP, as those inmates would have to be transferred to a different institution should they require admission to an MHCB, instead of being able to stay in the same location.

iii.  Suicide Rates at HDSP are Low

In 2017, there were no completed suicides at HDSP and there were three suicide attempts.  There has been one completed suicide in 2018; however, the inmate was not in the MHSDS at the time of his death.  As of May 1, 2018, there had been no suicide attempts for the year.

iv.  Closing HDSP Would Cause Strain on Other Institutions

The average CCCMS population at HDSP between March 2017 and February 2018 was 1,081 inmates.  Attachment N- HDSP CCCMS Census.  As of March 26, 2018, the CCCMS population at HDSP is down to 1,008 inmates.  Attachment E- Mental Health Population by Institution at 3.  If HDSP were closed to the CCCMS population, these Level III and Level IV inmates would have to be transferred to other comparable institutions.  This would be difficult, as many of the CCCMS inmates at HDSP are also *Armstrong* class members, which further limits where they may be appropriately housed.  If HDSP was closed to CCCMS inmates, those Level IV inmates currently housed at HDSP with disabilities which impact placement could only be transferred to the following institutions: KVSP, LAC, MCSP, RJD, SATF, and SVSP.[7]  Some of the Level IV CCCMS inmates at HDSP would not meet the criteria for housing at all of the six institutions listed above due to other case factors, such as DDP designation, Valley Fever (Cocci) restriction, high risk medical needs, or requiring placement in a 180-design yard.  Finally, increasing the MHSDS population at these institutions would put additional strain on staff, as none of the six institutions listed above have filled all of their allocated psychiatry positions.

---

[7] These six institutions already have sizable CCCMS populations:  KVSP – 884; LAC – 987; MCSP – 1483; RJD – 1446; SATF – 2006; and SVSP – 930.  Attachment E- Mental Health Population by Institution at 1.

> b. Other CCCMS Institutions

CDCR houses the current population of almost 29,000 CCCMS inmates at all institutions, except the desert institutions.[8] CDCR found that issues which result from clustering EOP inmates also exist in clustering CCCMS inmates. For example, CDCR looked at whether North Kern State Prison (NKSP) could be closed to CCCMS GP inmates due to its high staffing vacancy rate. However, many of the CCCMS inmates housed at NKSP have Cocci restrictions, are classified as high risk medical, or require lower bunk/lower tier housing. These case factors severely limit alternative housing options for these inmates. As with the EOP population, limiting the institutions that can house CCCMS inmates could affect transfer timelines. Further, as of March 26, 2018, there are 227 CCCMS inmates housed in the general population (GP) at NKSP. Attachment E- Mental Health Population by Institution at 3. The current staffing ratio for CCCMS GP inmates is one psychiatrist per 280 inmates. Therefore, even if CDCR were able to remove all CCCMS GP inmates from NKSP, that would net a reduction of approximately one psychiatry position. Such a restriction would impose a large burden for very little gain in helping CDCR comply in achieving a less than 10 percent vacancy rate, as required by the 2002 court order.

Additionally, there are only a few institutions that are in geographically desirable locations. Many of these institutions also house robust EOP populations, which are not fully staffed at present. Therefore, it is unlikely that increasing the CCCMS populations at institutions such as RJD or SAC would result in an ability to hire enough staff to provide services to an increased CCCMS and EOP population.[9]

> 4. Further Clustering Would be Tantamount to a Construction Order and Contrary to Previous Court Approved Plans

In order to cluster inmates in areas where there are larger pools of potential clinicians, the following conditions must exist: (1) an institution in a geographically desirable area for professionals, (2) staff willing to work in a prison environment, and (3) sufficient office and treatment space at the institution. When analyzing whether to cluster EOP and/or CCCMS inmates, CDCR recognized that there are few, if any, institutions in geographically desirable locations that have the requisite office and treatment space available to provide services to a larger mental health population.

Institutions that are located in geographically desirable areas include, California Institute for Men (CIM), California Rehabilitation Center (CRC), California Institute for Women (CIW), RJD, SQ, CMF, SAC, Folsom State Prison (FSP), CMC, LAC, and SOL. At present, many of these institutions lack office and/or treatment space to house a larger mental health population. For example, while CIM, CRC, and FSP are all well above the required 90 percent fill rate for psychiatrists, each has physical plant challenges that would cost the taxpayers millions of dollars to address before a larger mental health population could be housed in these locations. *See* Defendants' Monthly Psychiatry Vacancy Report, ECF No. 5828 (May

---

[8] The desert institutions are California Conservation Center, Calipatria State Prison, Centinela State Prison, Chuckawalla Valley State Prison, and Ironwood State Prison.

[9] These institutions already house large EOP and CCCMS populations: RJD – total of 2323 outpatient class members and SAC – total of 1268 outpatient class members. Attachment E- Mental Health Population by Institution at 1.

15, 2018) at 5.  Similarly, institutions, such as CMF and SOL currently lack office space and/or space to provide treatment to a larger EOP or CCCMS population.  At other institutions, such as at SQ, SAC, and RJD, the EOP or CCCMS population has recently been increased.  There are also current plans to increase the MHSDS beds in the near future at some institutions, such as at CIW.  Any further expansion of these programs would not only require additional construction, but would further tax staff at these institutions, as discussed above.

Historically, federal courts have not been given the power to order a government entity that represents the public to spend money to build new prisons facilities.  *See Padgett v. Stein*, 406 F. Supp. 287, 303 (M.D. Pa. 1975); *Jones v. Wittenberg*, 29 Ohio Misc. 35 (N.D. Ohio 1971), aff'd sub nom. *Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972).  The Prison Litigation Reform Act provides, "[n]othing in this section shall be construed to authorize the courts, in exercising their remedial powers, to order the construction of prisons or the raising of taxes, or to repeal or detract from otherwise applicable limitations on the remedial powers of the courts."  18 U.S.C. § 3626(a)(1)(C).  Thus, the Court does not have the authority to order additional clustering of the population if such clustering would require construction of office and/or treatment space to accommodate the patient population.

Further clustering, as proposed by the Special Master, would also require CDCR to close some "hard-to-recruit" institutions to *Coleman* class members.  However, less than 10 years ago, after negotiation with Plaintiffs' counsel and the Special Master, CDCR filed a long-range bed plan with the Court, proposing to construct new beds, as well as office and treatment space, to accommodate the needs of the *Coleman* class.  *See* Defendants' Long Range Bed Plan, ECF No. 3724-2 (Nov. 6, 2009).  This plan included construction at several "hard-to-recruit" locations, such as CHCF, COR, SAC, and SVSP, none of which Plaintiffs or the Special Master objected to.  *Id.*  The plan was approved by the Court in January 2010.  Order, ECF No. 3761 (Jan 4, 2010).  If the Court were to now order CDCR to remove class members from these locations, after previously approving CDCR's construction plans, it would result in a massive waste of tax payer funds and would be contrary to the approval of the long-range bed plan.  As the MHSDS population increased, CDCR constructed new beds and the requisite office and treatment space to accommodate the needs of the growing population.  Now that the population is decreasing, CDCR should not be forced to abandon the construction done at "hard-to-recruit" institutions for the sake of clustering, as it is not a viable solution to CDCR's staffing challenges.

5.   Conclusion

For the reasons stated above, further clustering of patients in the MHSDS is not a viable solution to hiring or recruiting staff or to providing improved mental health care to patients.  CDCR has already clustered to a considerable degree.  As recognized by the staffing consultants and addressed in CDCR's previous staffing plans, further clustering would likely lead to staff burnout and job dissatisfaction, which would exacerbate CDCR's challenges in recruiting and retaining psychiatrists.  Limiting where patients can be housed will delay housing placements and potentially lead to a decline in overall patient care.  Further, there is no indication that further clustering of the MHSDS population would resolve the CDCR's staffing challenges.

Rather than over-clustering, CDCR recommends that the Special Master support CDCR's current proposal to expand the use of telepsychiatry, the continued implementation of its population review, and its ongoing efforts to improve the electronic health care record system.

<u>Clustering Addendum</u>

On June 5, 2018, the California Department of Corrections and Rehabilitation (CDCR) provided Plaintiffs and the Special Master's team a written explanation of its position on further clustering the Enhanced Outpatient Program (EOP) and Clinical Correctional Case Management System (CCCMS) populations.  In short, due to the constraints placed on population management and timely transfers, the limited effect further clustering would have on staffing recruitment, the need for adequate office and treatment space at the institutions, and the adverse effects on staff morale and retention, CDCR determined that even further clustering of the EOP populations is not a viable solution to resolve its staffing challenges. Following discussion of CDCR's clustering position on June 11, 2018, the Special Master asked CDCR to provide an analysis of why it cannot further cluster its EOP population in light of its ability to remove inmates susceptible to Valley Fever (Cocci) following the 2013 *Plata* Order.

On June 24, 2013, the Court in *Plata* ordered CDCR to adopt new criteria for excluding inmates from certain institutions who were more susceptible to Cocci.  *Plata v. Brown*, et al., No. C01-1351 TEH, 2013 WL 3200581 (N.D. Cal. June 23, 2014).  The *Plata* Court also ordered CDCR to transfer all inmates covered by the policy out of Avenal State Prison (ASP) and Pleasant Valley State Prison (PVSP) within 90 days of its order.  *Id*. at 14.  In response, CDCR successfully transferred 885 patients out of ASP and 813 patients out of PVSP.  Attachment A- Excerpt from Receiver's 25th Tri-Annual Report (January 31, 2014).

Discussed below is CDCR's analysis as to why further clustering the EOP and CCCMS population is distinguishable from the court-ordered requirement to apply Cocci restrictions at two Central Valley institutions.

    1.   Further Clustering of the EOP population

CDCR's ability to coordinate a single transfer out of ASP and PVSP for 1,698 inmates is distinguishable from its ability to further cluster the EOP population for several reasons.  First, inmates who were transferred from ASP and PVSP due to the *Plata* order could be transferred to any other institution in CDCR that was consistent with their case factors; this provided CDCR with considerable flexibility in determining appropriate inmate housing.  However, the EOP population is much more restricted in its housing options.  As CDCR already clusters its higher acuity patients, there are only 13 institutions at which male EOP inmates can be housed.  Therefore, restricting inmates from two cocci-restricted institutions is less onerous because inmates restricted from either of the two institutions can be placed in any of the remaining institutions.  By way of example, today a Level II inmate susceptible to Cocci II has the potential to be housed in 20 different institutions[1], while a Level II male EOP inmate has only

---

[1] A Level II inmate susceptible to Cocci II, barring any other case factors limiting placement, may be housed at the following institutions: California City Correctional Facility (CAC), California Conservation Center (CCC), California Correctional Institution (CCI), California Health Care Facility (CHCF), California Institute for Men (CIM), California Men's Colony (CMC), California Medical Facility (CMF), California Rehabilitation Center (CRC), Correctional Training Facility (CTF), Chuckawalla Valley State Prison (CVSP), Deuel Vocational Institution (DVI), Folsom State Prison (FOL), Mule Creek State Prison (MCSP), Pelican Bay State Prison (PBSP), Richard J. Donovan Correctional Facility (RJD), California Substance Abuse Treatment Facility (SATF), Sierra Conservation Center (SCC), California State Prison-Solano (SOL), Salinas Valley State Prison (SVSP), and Wasco State Prison (WSP).

seven institutions where he may be housed—and possibly fewer were EOP inmates to be further clustered.[2]

Second, inmates who are susceptible to Cocci (either I or II) do not require specialized treatment or programming, which makes transferring these inmates based solely on Cocci less restrictive.  Conversely, when housing EOP inmates, there are additional mandatory requirements including special housing, sufficient office space for mental health professionals, and appropriate treatment space for both individual and group treatment.  In response to the Plata order to remove Cocci II susceptible inmates out of ASP and PVSP, CDCR was able to remedy the situation by simply providing inmates with transportation, and moving them to almost any other institution.  CDCR cannot similarly remedy this situation by moving an EOP inmate from one institution to another.  CDCR must also ensure that the receiving institution has a functioning EOP population, with appropriate office and treatment space, and sufficient staff.

Third, inmates who fall within the exclusion criteria ordered by the *Plata* court are able to waive their exclusion from ASP and PVSP.  *Id*.  In fact, during the 2013 transfer of inmates, 649 inmates voluntarily waived the transfer and elected to stay at either ASP or PVSP.  *Id*.  There is no such waiver available for EOP inmates.  While CDCR does continue to transfer inmates who are found to be susceptible to Cocci from restricted institutions, the large majority of these inmates may still waive such limitations and can be housed at many more institutions than EOP inmates, as discussed above.

Fourth, there are far fewer inmates impacted by Cocci I (the more restrictive case factor of the two Cocci restrictions) than would be impacted by a further restriction of EOP institutions.  At the end of April 2018, there were 2,477 inmates susceptible to Cocci I, as compared to 7,551 EOP inmates. *See* Attachment B- Cocci Population and Attachment C- MHSDS Pop by Case Factor.  Despite this, an inmate who is susceptible to Cocci I may be housed at substantially more institutions than a male EOP inmate:

| Custody Level | Institutions Where Inmate May Be Housed (Cocci I)[3] | | | | | Institutions Where Inmate May Be Housed (EOP) | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Level I | CAL | CCC | CEN | CHCF | CIM | N/A | | | | |
| | CMF | CTF | CVSP | DVI | FOL | | | | | |
| | HDSP | ISP | LAC | MCSP | PBSP | | | | | |
| | RJD | SAC | SCC | SVSP | | | | | | |
| Level II | CCC | CHCF | CIM | CMF | CRC | CHCF | CMF | MCSP | RJD | SATF |
| | CTF | CVSP | DVI | FOL | MCSP | SQ | VSP | | | |
| | PBSP | RJD | SCC | SOL | SQ | | | | | |
| | VSP | | | | | | | | | |
| Level III | CCC | CEN | CHCF | CMF | DVI | CMC | COR | MCSP | RJD | SVSP |

[2] A Level II male EOP inmate, barring any other case factors limiting placement, may be housed at the following institutions: CHCF, CMF, MCSP, RJD, SATF, San Quentin State Prison (SQ), and Valley State Prison (VSP).

[3] Institutional acronyms not previously defined: CAL- Calipatria State Prison; CEN- Centinela State Prison; ISP- Ironwood State Prison; LAC- California State Prison- Los Angeles County; COR- California State Prison- Corcoran; and KVSP- Kern Valley State Prison.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | FOL HDSP ISP LAC MCSP RJD SCC SOL SVSP | | | | | | | | | |
| Level IV | CAL CEN CHCF HDSP LAC MCSP PBSP RJD SAC SVSP | | | | | COR KVSP LAC MCSP RJD SAC SVSP | | | | |

The chart above does not take into consideration any other case factors which may further restrict an inmate's placement, such as medical needs, physical disabilities, enemy concerns, and staff separations. As discussed in CDCR's position paper on clustering provide on June 5th, adding even one more case factor that impacts an inmate's housing options can significantly limit the number of institutions able to house that inmate.  *See* Attachment D- Case Factors Impacting Placement By Institution.  Therefore, restricting CDCR from housing EOP inmates at any of the remaining 13 institutions would significantly hinder the Departments ability to appropriately house inmates and transfer those inmates in a timely manner.

As explained in its initial response on clustering, CDCR already clusters its EOP inmates and remains committed to clustering its most vulnerable populations.  However, CDCR is not supportive of further limitations of the EOP institutions.  CDCR's challenges in moving patients out of ASP and PVSP due to Cocci concerns is not comparable to the potential difficulties of further limiting the number of locations EOP patients can be housed.  Given the numerous case factors that limit inmate mobility and the already restricted housing options for EOP inmates, CDCR must maintain the maximum flexibility to transfer inmates to institutions where all of the inmate's needs can be met.

2. Clustering the CCCMS Population

The restriction of certain Plata class members from ASP and PVSP is also distinguishable from the restriction of CCCMS patients from one or more institutions.  While inmates susceptible to Cocci II and CCCMS inmates can be housed at almost all institutions[4], Cocci restrictions were not geared toward improving vacancy rates.  Instead, Cocci restrictions were put in place to avoid a public health outbreak. Staffing rates were neither taken into account when identifying the institutions from which Cocci-vulnerable inmates would be excluded, nor when identifying where to place the same inmates.  In order to have the intended impact on staffing, thousands of CCCMS inmates must be moved out of institutions with poor staffing rates, which is not feasible for the reasons mentioned in CDCR's previous clustering documents.  As such, the solution to Cocci concerns in *Plata* cannot be used to cure the staffing challenges at CDCR.

Although the August 9, 2016 order specifically refers to clustering "higher-acuity mentally ill inmates" at institutions where staff can be more readily attracted, CDCR's June 5th clustering explanation also reviewed whether to further cluster the CCCMS population.  Many of the issues which result from clustering EOP inmates also exist in clustering CCCMS, such as need for adequate office and treatment space and challenges with population management for those inmates with multiple restricting case factors.  Further, allowing CCCMS inmates to be housed at most institutions prevents mandatory

---

[4] Inmates susceptible to Cocci II are less restricted in the available housing options than CCCMS inmates.  Inmates susceptible to Cocci II are restricted from ASP and PVSP, while CCCMS are restricted from ISP, CVSP, CEN, CAL, CAC, and CCC.

transfer to a new yard or institution when the inmate moves into or departs from the CCCMS level of care.  The transfer of inmates to a new cell, yard, or institution can cause additional stress and discomfort for the inmate and disrupts the inmate's programming and treatment.  Thus, maintaining the inmate at his or her current institution when he or she enters or leaves the CCCMS level of care promotes continuity in the inmate's treatment and daily routine.  For these reasons and those reasons details in CDCR's June 5th correspondence regarding clustering, CDCR maintains that clustering the CCCMS population is not a viable solution to CDCR's psychiatry staffing challenges.

# Section 5: Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

**A.  CCHCS Activities related to the Court's June 24, 2013, Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at Pleasant Valley and Avenal State Prisons**

On June 24, 2013, the Court issued its Order Granting Plaintiffs' Motion for Relief Re: Valley Fever at PVSP and ASP ("Order") that, among other actions, requires the Receiver to present the response to the Order in the Tri-Annual report. On July 10, 2013, CCHCS formally requested the Centers for Disease Control (CDC) to examine the available epidemiologic data to assess if the risk based exclusionary policy should be expanded to include other groups, including those age greater than 55. CDC and the National Institute for Occupational Safety and Health (NIOSH) have completed their preliminary field assessments of the two institutions. CCHCS is awaiting the results of the CDC evaluation. The preliminary recommendations were received from the Health Hazard Evaluation from NIOSH on June 17, 2013, and largely concerned facility modifications which were referred to CDCR. The recommendations regarding education and training to employees working at PVSP and ASP are being evaluated for incorporation into existing workplace health and safety training.

We now await the NIOSH report on recommendations regarding reducing the risk of exposure to cocci indoors and guidelines on the use of respiratory protection for staff when outdoors. We also await the CDC report regarding the predicted impact of the use of the cocci skin test to exclude susceptible patient-inmates from highly endemic areas vs. our current strategy of exclusion based on risk factors.

Provider education on the diagnosis, treatment, and management of cocci infection was developed with input from the *Plata* Court Experts, Plaintiffs' expert, the public health community, and CCHCS' multidisciplinary continuing medical education group resulting in a comprehensive CCHCS cocci clinical guideline and a web based training utilizing the guideline; Training was completed for all physicians and nurses per the court order.

In response to the Receiver's policy, CDCR successfully transferred 885 patient-inmates out of ASP to appropriate intermediate institutions. Another 378 voluntarily waived; 29 others either paroled, were released or deceased. For PVSP, the department was successful in transferring 813 patient-inmates to appropriate intermediate institutions with 271 waivers and 36 others having paroled, released or deceased. All of this movement occurred by September 23, 2013.

There is ongoing surveillance for cocci; the number of cases is low this past fall, consistent with the drought conditions in California.  Training on surveillance and an addendum to the cocci care guide to formalize our surveillance and reporting for cocci are planned.

## Attachment B- Cocci Population

| | Dec-17 | Jan-18 | Feb-18 | Mar-18 | Apr-18 | May-18 | 6-MO AVG |
|---|---|---|---|---|---|---|---|
| Total In-Custody Population | 130,263 | 129,557 | 129,403 | 129,649 | 128,998 | 129,319 | 129,532 |
| Total In-State Population | 125,990 | 125,292 | 125,258 | 125,777 | 125,636 | 126,247 | 125,700 |
| COCCI1 Population | 2,412 | 2,412 | 2,442 | 2,482 | 2,473 | 2,477 | 2,450 |
| COCCI2 Population | 89,561 | 89,589 | 90,279 | 90,385 | 90,662 | 91,168 | 90,274 |

## Analysis of Primary Cross Over Factors Impacting Placement

### CCCMS

| | Total Pop | COCCI I | COCCI II | High Risk Medical | Clark | Armstrong Impacting* | Armstrong DLT |
|---|---|---|---|---|---|---|---|
| **Total Pop** | **28915** | **894** | **23260** | **4992** | **513** | **1674** | **919** |
| Level I | 2131 | 84 | 1764 | 312 | 21 | 86 | 64 |
| Level II | 12162 | 436 | 9989 | 2673 | 275 | 929 | 510 |
| Level III | 5399 | 146 | 4338 | 805 | 91 | 255 | 174 |
| Level IV | 7729 | 213 | 5927 | 1130 | 121 | 380 | 149 |
| Unclassified | 1494 | 15 | 1242 | 72 | 5 | 24 | 22 |

### EOP

| | Total Pop | COCCI I | COCCI II | High Risk Medical | Clark | Armstrong Impacting* | Armstrong DLT |
|---|---|---|---|---|---|---|---|
| **Total Pop** | **7551** | **257** | **6174** | **2496** | **631** | **599** | **250** |
| Level I | 374 | 17 | 310 | 124 | 28 | 16 | 13 |
| Level II | 2752 | 104 | 2274 | 919 | 301 | 299 | 118 |
| Level III | 1226 | 31 | 973 | 324 | 122 | 79 | 28 |
| Level IV | 3096 | 99 | 2532 | 1113 | 176 | 202 | 90 |
| Unclassified | 103 | 6 | 85 | 16 | 4 | 3 | 1 |

*Does not include DKD

## Analysis of Primary Cross Over Factors Impacting Placement

| Institution | Level | Current CCCMS Population | MH Operational Capacity at 100% | Current EOP Population | EOP Max Capacity | DDP | DPP | COCCI Restricted | Medical | Clozapine |
|---|---|---|---|---|---|---|---|---|---|---|
| ASP | II | 112 | 1100 | n/a | n/a | No | No | Yes 1/2 | No high risk | No |
|  | II SNY | 856 |  | n/a | n/a | No | No | Yes 1/2 | No high risk | No |
| CCI | I | 313 | 1850 | n/a | n/a | No | No | Yes 1 | No high risk | No |
|  | IISNY | 317 |  | n/a | n/a | No | No | Yes 1 | No high risk | No |
|  | IIISNY | 359 |  | n/a | n/a | No | No | Yes 1 | No high risk | No |
|  | IV180/SNY | 603 |  | n/a | n/a | No | No | Yes 1 | No high risk | No |
|  | ASU | 17 | n/a | 2 | n/a | No | No | Yes 1 | No high risk | No |
| CCWF | I | 97 | 1350 | 87 | 120 | Yes | Yes | No | No high risk | Yes |
|  | II | 353 |  |  |  | Yes | Yes | No | No high risk | Yes |
|  | III | 175 |  |  |  | Yes | Yes | No | No high risk | Yes |
|  | IV | 280 |  |  |  | Yes | Yes | No | No high risk | Yes |
|  | ASU EOP Hub | n/a | n/a | 11 | 10 | Yes | Yes | No | No high risk | No |
|  | ASU | 91 | n/a | n/a | n/a | Yes | Yes | No | No high risk | No |
| CHCF | II | 249 | 550 | 424 | 484 | Yes | Yes | No |  | No |
|  | ASU EOP Hub | n/a |  | 31 | 50 | Yes | Yes | No |  | No |
| CIM | I | 338 | 1050 | n/a | n/a | Yes | Yes | No |  | No |
|  | IISNY | 564 |  | n/a | n/a | Yes | Yes | No |  | No |
|  | ASU | 20 | n/a | 5 | n/a | Yes | Yes | No |  | No |
| CIW | I | 137 | 750 | 78 | 94 | No | No | No |  | Yes |
|  | II | 363 |  |  |  | No | No | No |  | Yes |
|  | III | 87 |  |  |  | No | No | No |  | Yes |
|  | ASU EOP Hub | n/a | n/a | 6 | 10 | Yes | Yes | No |  | Yes |
|  | PSU | n/a | n/a | 4 | 10 | Yes | Yes | No |  | Yes |
|  | SHU | 30 |  | n/a | n/a | Yes | Yes | No |  | No |
| CMC | I | 23 | 750 | n/a | n/a | Yes | No | Yes 1 |  | No |
|  | II | 316 |  | n/a | n/a | Yes | No | Yes 1 |  | No |
|  | III | 298 |  | 499 | 552 | Yes | No | Yes 1 |  | No |
|  | ASU EOP Hub | n/a |  | 69 | 100 | No | Yes | Yes 1 |  | Yes |
| CMF | II | 293 | 600 | 421 | 487 | Yes | Yes | No |  | Yes |
|  | III | 194 |  | n/a | n/a | Yes | Yes | No |  | Yes |
|  | ASU EOP Hub | n/a | n/a | 29 | 58 | Yes | Yes | No |  | Yes |
| COR | III | n/a | 1000 | 317 | 400 | Yes | No | Yes 1 |  | Yes |
|  | IIISNY | 183 |  | n/a | n/a | No | No | Yes 1 |  | Yes |
|  | IV270 | 198 |  | 234 | 400 | Yes | No | Yes 1 |  | Yes |
|  | IVSNY | 296 |  | n/a | n/a | No | No | Yes 1 |  | Yes |



Data as of 06/26/2018

Source:  DAI Population Management Unit
Strategic Offender Management System

## Analysis of Primary Cross Over Factors Impacting Placement

| Institution | Level | Current CCCMS Population | MH Operational Capacity at 100% | Current EOP Population | EOP Max Capacity | DDP | DPP | COCCI Restricted | Medical | Clozapine |
|---|---|---|---|---|---|---|---|---|---|---|
| COR (cont) | PHU | 5 | | | | Yes | Yes | Yes 1 | | Yes |
| | SHU | 83 | | | | Yes | Yes | Yes 1 | | Yes |
| | THU | 24 | | | | No | No | Yes 1 | | Yes |
| | ASU EOP Hub | 97 | n/a | 63 | 100 | | | | | |
| CRC | II | 567 | 1150 | n/a | n/a | No | No | No | No high risk | No |
| | IISNY | 371 | | n/a | n/a | No | No | No | No high risk | No |
| CTF | I | 427 | 1500 | n/a | n/a | No | No | No | No high risk | No |
| | II | 421 | | n/a | n/a | No | No | No | No high risk | No |
| | IISNY | 773 | | n/a | n/a | No | No | No | No high risk | No |
| DVI | II | 76 | 500 | n/a | n/a | No | No | No | No high risk | No |
| | III | 66 | | n/a | n/a | No | No | No | No high risk | No |
| | ASU | 17 | n/a | 6 | n/a | | | | | |
| FOL | II | 344 | 500 | n/a | n/a | No | No | No | No high risk | No |
| | III | 66 | | n/a | n/a | No | No | No | No high risk | No |
| FWF | Dorm | 189 | 150 | n/a | n/a | No | No | No | No high risk | No |
| HDSP | IISNY | 282 | 1050 | n/a | n/a | No | Yes | No | No high risk | No |
| | IV180 | 181 | | n/a | n/a | No | Yes | No | No high risk | No |
| | IV270/SNY | 431 | | n/a | n/a | No | Yes | No | No high risk | No |
| ISP | Dorm | 10 | 50 | n/a | n/a | No | No | No | No high risk | No |
| KVSP | IV180 | 196 | 900 | 158 | 256 | Yes | Yes | Yes 1 | No high risk | No |
| | IV180SNY | 705 | | n/a | n/a | No | Yes | Yes 1 | No high risk | No |
| | THU | 120 | | n/a | n/a | No | Yes | Yes 1 | No high risk | No |
| LAC | III | 94 | 1000 | n/a | n/a | No | Yes | No | | No |
| | IV270 | 309 | | 572 | 1000 | No | Yes | No | | No |
| | IV270NSY | 374 | | n/a | n/a | Yes | No | No | | No |
| | ASU EOP Hub | n/a | n/a | 76 | 100 | Yes | Yes | No | | No |
| MCSP | I | 33 | 1350 | n/a | n/a | No | No | No | | No |
| | II | n/a | | 250 | 264 | Yes | Yes | No | | Yes |
| | IISNY | 577 | | n/a | n/a | Yes | Yes | No | | Yes |
| | III | n/a | | 287 | 400 | Yes | Yes | No | | Yes |
| | IISNY | 445 | | n/a | n/a | Yes | Yes | No | | Yes |
| | IV270 | n/a | | 158 | 200 | Yes | Yes | No | | Yes |
| | IV270SNY | 441 | | n/a | n/a | Yes | Yes | No | | Yes |
| | ASU EOP Hub | n/a | | 48 | 50 | Yes | No | No | | Yes |
| | I | 59 | 1000 | n/a | n/a | No | No | Yes 1 | No high risk | No |

Source: DAI Population Management Unit
Strategic Offender Management System



## Analysis of Primary Cross Over Factors Impacting Placement

| Institution | Level | Current CCCMS Population | MH Operational Capacity at 100% | Current EOP Population | EOP Max Capacity | DDP | DPP | COCCI Restricted | Medical | Clozapine |
|---|---|---|---|---|---|---|---|---|---|---|
| NKSP | III | 238 | | n/a | n/a | No | No | Yes 1 | No high risk | Yes |
| | ASU | 16 | n/a | 1 | n/a | | | | | |
| PBSP | II | 89 | 300 | n/a | n/a | No | No | No | No high risk | No |
| | IV180 | 157 | | n/a | n/a | No | No | No | No high risk | No |
| PVSP | III | 35 | 700 | n/a | n/a | No | Yes | Yes 1/2 | No high risk | No |
| | IIISNY | 393 | | n/a | n/a | No | Yes | Yes 1/2 | No high risk | No |
| RJD | II | 429 | 1500 | 255 | 264 | Yes | Yes | No | | No |
| | III | 103 | | 239 | 400 | Yes | Yes | No | | No |
| | IIISNY | 414 | | 277 | n/a | Yes | No | No | | No |
| | IV270 | n/a | | n/a | 400 | Yes | Yes | No | | No |
| | IV270SNY | 427 | | n/a | n/a | Yes | Yes | No | | No |
| | ASU EOP Hub | n/a | | 53 | 63 | Yes | Yes | No | | No |
| SAC | IV180 | 358 | 500 | n/a | n/a | No | No | No | | Yes |
| | IV180 | n/a | n/a | 561 | 856 | Yes | No | No | | Yes |
| | PSU | n/a | n/a | 171 | 236 | Yes | Yes | No | | Yes |
| | ASU EOP Hub | n/a | n/a | 57 | 64 | Yes | Yes | No | | Yes |
| SATF | II | n/a | n/a | 616 | 660 | Yes | Yes | Yes 1 | | No |
| | IISNY | 798 | 2000 | n/a | n/a | Yes | Yes | Yes 1 | | No |
| | IIISNY | 341 | | n/a | n/a | Yes | Yes | Yes 1 | | No |
| | IV180 | 127 | | n/a | n/a | No | Yes | Yes 1 | | No |
| | IV270SNY | 472 | | n/a | n/a | Yes | Yes | Yes 1 | | No |
| SCC | II | 126 | 400 | n/a | n/a | No | No | No | No high risk | No |
| | IIISNY | 232 | | n/a | n/a | No | No | No | No high risk | No |
| | ASU | 3 | n/a | 1 | n/a | | | | | |
| SOL | II | 509 | 1000 | n/a | n/a | No | No | No | | No |
| | III | 347 | | n/a | n/a | No | No | No | | No |
| SQ | II | 780 | 1250 | 96 | 100 | No | No | No | No high risk | Yes |
| | DR | 141 | | 2 | 236 | Yes | Yes | No | | Yes |
| | ASU | 28 | n/a | 2 | n/a | | | | | |
| SVSP | III | n/a | n/a | 195 | 400 | Yes | Yes | No | No high risk | No |
| | IIISNY | 171 | | n/a | n/a | Yes | Yes | No | No high risk | No |
| | IV180 | 78 | 850 | 207 | 384 | Yes | Yes | No | No high risk | No |
| | IV180SNY | 210 | | n/a | n/a | Yes | Yes | No | No high risk | No |
| | IV270 | 235 | | n/a | n/a | Yes | Yes | No | No high risk | No |
| | ASU | n/a | n/a | 1 | n/a | | | | | |



Source: DAI Population Management Unit
Strategic Offender Management System

## Analysis of Primary Cross Over
## Factors Impacting Placement



| Institution | Level | Current CCCMS Population | MH Operational Capacity at 100% | Current EOP Population | EOP Max Capacity | DDP | DPP | COCCI Restricted | Medical | Clozapine |
|---|---|---|---|---|---|---|---|---|---|---|
| VSP | II | n/a | n/a | 337 | 372 | Yes | Yes | No | No high risk | Yes |
| | IISNY | 1163 | 1350 | n/a | n/a | No | Yes | No | No high risk | Yes |
| | ASU | 4 | N/A | 3 | n/a | | | | | |
| WSP | I | 140 | 1300 | n/a | n/a | No | No | Yes 1 | No high risk | No |
| | III | 204 | | n/a | n/a | No | No | Yes 1 | No high risk | No |
| | ASU | 30 | n/a | 5 | n/a | | | | | |

Source: DAI Population Management Unit
Strategic Offender Management System

Data as of 06/26/2018