UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EDMUND G. BROWN, JR., et al.,<br><br>Defendants. | No. 2:90-cv-0520 KJM DB<br><br><br><br>ORDER |

The court held a hearing on September 7, 2018, to review defendants' objections to the proposed telepsychiatry policy addendum to the Program Guide[1] filed by the Special Master as required by the court's July 3, 2018 order. ECF Nos. 5872, 5873. Prior to hearing, the court issued tentative rulings on defendants' specific objections. ECF No. 5907. The tentative rulings identified specific items for the parties to address at hearing. *Id.* at 4, 5, 8, 9.

---

[1] The Mental Health Services Delivery System Program Guide, 2009 Revision, is the operative remedial plan in this action. *See Coleman v. Brown*, 938 F. Supp. 2d 955, 961 (E.D. Cal. 2013). It is called, variously, the Program Guide or the Revised Program Guide. Except where otherwise specified, references in this order to the "Program Guide" or the "Revised Program Guide" are to this document. On July 30, 2018, the Special Master filed a comprehensive Program Guide Update, ECF No. 5864, which is pending before this court for review and approval.

1

After consideration of the parties' positions and the record as relevant here, for the reasons explained below, the court finds defendants must be given an opportunity in the first instance to demonstrate why the expansion of telepsychiatry they seek to implement will satisfy their Eighth Amendment obligations. The court thus declines to issue any orders on the proposed telepsychiatry policy addendum itself at this time. Instead, the hearing set for October 2018 will be expanded to include an evidentiary hearing concerning defendants' proposed use of telepsychiatry. The hearing will continue to cover all matters identified in prior court orders, and defendants' compliance with paragraph 3 of the court's October 10, 2017 order is still required by the one-year deadline set in that order. To ensure sufficient time for the expanded agenda, the start of the hearing will be moved to October 15, 2018, at 1:00 p.m. and the hearing will continue day to day as necessary.

I.  BACKGROUND

The Eighth Amendment requires defendants to "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" *Coleman v. Wilson*, 912 F. Supp. 1282, 1306 (E.D. Cal. 1995) (internal citations omitted). In 1995, the court found California's prison system "significantly and chronically understaffed in the area of mental health care services." *Id*. at 1307. After twenty-three years of remedial effort, defendants are still running their prison mental health delivery system with unconstitutionally low staffing levels, in violation of long-standing orders of this court. *See* ECF No. 5711 at, *e.g.*, 2-3; *see also* ECF No. 5900 at 5 (Defendants' Monthly Psychiatry Vacancy Report for July 2018 showing twenty-seven percent vacancy rate among prison psychiatrists systemwide). On October 10, 2017, the court set a one-year deadline for defendants to come into compliance with those orders and meet necessary staffing levels. ECF No. 5711 at 30.

The October 10, 2017 order adopted in full the findings in the Special Master's February 6, 2017 Report on the Status of Mental Health Staffing and the Implementation of Defendants' Staffing Plan (Staffing Report), ECF No. 5564, and, with modifications, recommendations made by the Special Master in that Staffing Report. ECF No. 5711 at 29-30.

The Staffing Report reviews the long history of efforts to remediate unconstitutionally low staffing levels, ECF No. 5564 at 2-6, as does the October 10, 2017 order, ECF No. 5711 at 2-6.

In considering the recommendations made by the Special Master in the Staffing Report, the court previously determined that an addendum to the remedial plan in this action is necessary to guide defendants' use of telepsychiatry so that use will not exceed the limitations of the Eighth Amendment; in other words, clarity is required to ensure that telepsychiatry will be used in a way that avoids the provision of constitutionally inadequate mental health care to members of the plaintiff class. *Id.* at 23. The court tasked defendants with development of the addendum and ordered its timely completion to ensure defendants' full compliance with the staffing remedy by the one-year deadline set in the court's October 10, 2017 order. *Id*. Defendants did not complete the addendum on the schedule set by the court, so the court tasked the Special Master with finalizing a proposed addendum for submission to and review by the court to avoid further delay caused by defendants' misreading of the direction provided in this court's October 10, 2017 order. As the court previously has observed, defendants' not meeting the schedule for completion based on their reading of the court's order as "permissive," *see* ECF No. 5920 at 5, "border[ed] on the frivolous, given that the position defendants take now is substantially similar to the position they took in objections that have been effectively overruled by the court." ECF No. 5850 at 4. The court's direction to the Special Master to finalize a proposed addendum is consistent with his duties under the December 11, 1995 Order of Reference, ECF No. 640 to work with defendants and the Special Master's experts on development of the remedial plan in this action, ECF No. 640 at 3, and was followed by him in a manner consistent with that order. *See* ECF No. 5782, *passim*.

On August 2, 2018, the Special Master submitted a finalized proposed telepsychiatry policy addendum and the parties' responses thereto. ECF Nos. 5872, 5873.[2] Since that time, the parties filed several additional documents, including supplemental statements

---

[2] The day before the Special Master filed his Report, defendants filed a Notice of Appeal from the July 3, 2018 order. ECF No. 5867. The basis for defendants' appeal is not apparent from the face of the notice. *See id*. at 1-2.

regarding disputed language, ECF Nos. 5920, 5921,[3] and the court filed its tentative rulings on specific objections to the proposed policy addendum, ECF No. 5907. As noted, the court held a hearing on September 7, 2018.

The court originally had intended to submit the proposed telepsychiatry policy addendum for resolution following the parties' filings on September 12, 2018. However, upon careful consideration of statements made at hearing, and based on a further review of the record, it appears to the court defendants may have proceeded further with the use of telepsychiatry than previously contemplated by the court or the Special Master. Indeed, it appears defendants may be working toward an attempted unilateral modification of the remedy in this action and a unilateral rewriting of prior court orders. Before the court's view of the use of telepsychiatry and defendants' implementation of that practice diverge further, defendants will be given an opportunity to prove the extent to which they may use telepsychiatry and still meet their Eighth Amendment obligation to provide adequate access to mental health care.

II. LEGAL STANDARDS

Modification of permanent injunctions and consent decrees "may be warranted when changed factual conditions make compliance with the decree substantially more onerous. Modification is also appropriate when a decree proves to be unworkable because of unforeseen obstacles, or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 384 (1992) (consent decree); *see also*, *e.g.*, *S.E.C. v. Coldicutt*, 258 F.3d 939 (9th Cir. 2001) (applying *Rufo* standard to request to terminate permanent injunction).

---

[3] To the extent the September 12, 2018 filings attribute to an opposing party or to the Special Master statements made during the course of meet and confer proceedings or Workgroup meetings, they are disregarded. Any party is free to represent its own position to this court, but attribution of positions to other individuals as a consequence of statements made during the course of problem-solving discussions in a meet and confer session is improper and threatens to undermine the value of the constructive working sessions that have borne so much fruit in this action, particularly in recent years.

4

The burden of proof is with a party seeking to modify the court's judgment. *See Rufo*, 502 U.S. at 384; *see also Horne v. Flores*, 557 U.S. 433, 447 (2009); *Gilmore v. People of the State of California*, 220 F.3d 987, 1007 (9th Cir. 2000). In this case involving prison conditions, the Prison Litigation Reform Act of 1995 (PLRA) requires that ongoing prospective injunctive relief "be narrowly drawn, extend no further than necessary to correct the harm the court finds requires the . . . relief, and be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2), (b). A party seeking modification of prospective injunctive relief in a prison conditions case has the burden specifically of showing that the existing order "exceeds what is necessary to correct an ongoing constitutional violation" and that the requested modification will correct that identified constitutional harm. *Graves v. Arpaio*, 623 F.3d 1043, 1048 (9th Cir. 2010); *see also Coleman v. Brown*, 938 F. Supp. 2d 955, 960 (E.D. Cal. 2013) (discussing burden of proof on termination motion brought by defendants under 18 U.S.C. § 3626(b)).

III. ANALYSIS

The constitutional requirement that guides remediation in this action is defendants' Eighth Amendment obligation to provide prison inmates with "access to adequate mental health care." *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995). To meet their constitutional obligation, defendants must, in relevant part, "employ mental health staff in 'sufficient numbers to identify and treat in an individualized manner those treatable inmates suffering from serious mental disorders.'" *Id.* at 1306 (internal citation omitted). The court noted that "[t]he constitutional requirement that defendants provide inmates with 'a system of ready access to adequate medical care,' means simply either ready access to physicians at each prison or 'reasonably speedy access' to outside physicians or facilities." *Id.* at 1308 (internal citation omitted). Moreover, the mental health staff must be competent to provide the necessary mental health care. *See id.* at 1308.

Significant and chronic understaffing of mental health care providers was a component of the Eighth Amendment violation identified in this action. *Id.* at 1307. Court-ordered relief has focused on having defendants develop and implement a series of plans and

5

protocols to remedy the identified constitutional violations. *See id*. at 1323. Complete remediation requires, in relevant part, employment of sufficient numbers of mental health staff and the provision of quality assurance to assure the competency of that staff. *Id*. at 1308.

Telepsychiatry was not in use in California's prisons at the time of the trial in this action, or when the remedial phase began in late 1995. *See* ECF No. 5269 (in report filed February 2, 2015, defendants reported that California Department of Corrections and Rehabilitation "established its Tele-Psychiatry Program almost 20 years ago."). The use of telepsychiatry was first reported to the court in a September 1998 report from the Special Master on staffing and the use of force. ECF No. 974 at 3. The Special Master reported that one of the "progressive concepts" defendants were developing to address staffing shortages was expansion of the "number of telemedicine sites, which provide through sophisticated visual telecommunications psychiatric consultation and services to facilities that, due to staffing vacancies or absences, need additional assistance." *Id*. at 2-3.[4] Five sites were identified as "telemedicine sites"; a planned addition of seven sites would bring that number up to twelve. *Id*. at 3. The use of telepsychiatry was supplementary, not in lieu of, on-site psychiatry. *See id*. at 2-3.

Although the use of telepsychiatry began in the late 1990s, its use was limited for years. *See* ECF No. 5439 at 30 (in Twenty-Sixth Round Monitoring Report, Special Master noted the concept of using telepsychiatry to alleviate psychiatric staffing shortages had first arisen almost two decades earlier, but that time had essentially "stood still" for 17 years on development of its use). Telepsychiatry is not referred to in the Revised Program Guide, nor is it referred to in defendants' 2009 Staffing Plan. *See* ECF No. 3693.

In 2014, due to ongoing unconstitutionally low staffing levels, the court ordered defendants to "revisit and, as appropriate, revise their existing mental health staffing plan in order

---

[4] In this early report, telepsychiatry was referred to as "telemedicine." ECF No. 974 at 3. "Telemedicine sites" were described as sites "which provide through sophisticated visual telecommunications psychiatric consultation and services to facilities that, due to staffing vacancies or absences, need additional assistance." *Id*. This service method is now referred to as telepsychiatry.

to . . . come into compliance" with the court's June 13, 2002 order concerning maximum mental health staff vacancy rates. ECF No. 5171 at 4. On February 2, 2015, defendants filed a report responsive to the court's order. ECF No. 5269. Defendants reported an increased reliance on telepsychiatry; specifically, defendants reported telepsychiatry was in use at nine prisons, operated from three "satellite offices" and that they employed 28 telepsychiatrists, including 26 full-time and two part-time. ECF No. 5269 at 9. In the nine months preceding the report, the California Department of Corrections and Rehabilitations (CDCR) had "hired, on average two new tele-psychiatrists each month," *id.,* increasing the number of telepsychiatrists employed by CDCR from 10 in early 2014 to 28 in early 2015. Defendants described the telepsychiatry program as follows:

> The program is managed from headquarters by a chief psychiatrist. An established senior psychiatrist position will aid the chief psychiatrist. As it is CDCR's preference to use on-site psychiatry whenever possible, when an institution is able to fill a position for an on-site psychiatrist, the tele-psychiatrist is moved elsewhere in favor of the on-site doctor.
>
> Tele-psychiatrists are able to treat patients at all levels of care at institutions where recruitment is more difficult or temporary staffing shortages require relief. Tele-psychiatry providers receive an orientation that includes shadowing other tele-psychiatrists, receiving training, and studying the Program Guide and current CDCR mental health policies and procedures. Tele-psychiatrists are assigned to an institution and receive a case load. Tele-psychiatrists visit their assigned institution at least twice per year, participate in mental health team meetings, and participate in patients' treatment team meetings. They also receive training with other psychiatrists at the nearest CDCR institution to their satellite office.
>
> Tele-psychiatrists offer an efficient and adequate medical model for treatment of patients. Patients are offered confidential, out of cell meetings with the tele-psychiatrists. When inmates ask to be seen cell-front, nursing or a case manager can place the tele-psychiatrist monitor and camera in front of the cell to facilitate the treatment session.

*Id*. at 9-10.

In response to defendants' report, plaintiffs objected "to the alleged absence of 'adequate policies and procedures governing the appropriate use of telepsychiatry.'" ECF No. 5307 at 3 (quoting ECF No. 5281 at 7). In an order filed May 18, 2015, the court found it "troubling" that "defendants apparently are broadening their reliance on telepsychiatry while the

7

development of positions and procedures for this method of care, and assessment of its adequacy, is ongoing . . . particularly because there may be class members not susceptible to this method of care." ECF No. 5307 at 5. The court directed the Special Master to report to the court on the status of defendants' implementation of the proposals in their February 2, 2015 report, including the telepsychiatry program, and to "include in that report such recommendations as may be necessary to address any ongoing mental health staffing deficiencies." *Id*. at 6; *see* also ECF No. 5377.

In his Twenty-Sixth Round Monitoring Report, filed May 6, 2016, the Special Master reported that CDCR was then employing 37 full-time telepsychiatrists, and was "looking to expand this number." ECF No. 5439 at 30. Significantly, he reported that telepsychiatry "is primarily an option for treatment of inmates at the 3CMS[5] level of care, and a less desirable option for inmates at higher levels of care." *Id.* (footnote added). Defendants did not object to this finding. *See* ECF No. 5477 at 1. The Special Master recommended that he be required "to issue a stand-alone report on the status of mental health staffing and implementation of the defendants' staffing plan. . . ." ECF No. 5439 at 141. On August 9, 2016, the court ordered the Special Master to file the stand-alone report within one hundred twenty days. ECF No. 5477 at 9. The Special Master filed his Staffing Report on February 6, 2017, ECF No. 5564, after receiving an extension of time to account for the complexity of some staffing proposals presented by defendants as part of the ongoing compliance efforts. *See* ECF No. 5523 at 3-4; ECF No. 5530.

In the Staffing Report, the Special Master reported that by January 2017, defendants had expanded their use of telepsychiatry to 48 telepsychiatrists serving 18 prison institutions, and planned to increase the number of telepsychiatrists to 100 with the completion of additional office space in 2018. ECF No. 5564 at 15. As he also reported, telepsychiatry was and

---

[5] CDCR's Mental Health Services Delivery System (MHSDS) provides mental health services at different levels of care. *See* Revised Program Guide at, *e.g.*, 12-1-1, 12-1-5. 3CMS or CCCMS is the Correctional Clinical Case Management System and is the least restrictive level of mental health care, providing services to inmate-patients who, "[w]hile mentally disordered, . . . can function in the general population and do not require a clinically structured, therapeutic environment." Revised Program Guide at 12-1-7.

is an integral part of defendants' plan to remedy their unconstitutionally low mental health staffing levels. *See* ECF No. 5564 at 14-17. Plaintiffs objected to "the apparent proposed use of telepsychiatry at all levels of care with no limitations or parameters," *id*., and defendants in response "indicated that their preference was to use on-site psychiatrists whenever possible rather than telepsychiatrists." *Id*. The Special Master reported that his experts share defendants' view in this respect. *Id*.

The Staffing Report also included several specific findings, including: (1) telepsychiatry is a "viable method for delivery of mental health services" with parameters; (2) telepsychiatry should be a supplement to, not a substitute for, on-site psychiatrists; (3) "[t]elepsychiatry is not clinically desirable as a frontline approach to providing psychiatric services of inmates with the most intensive or emergent needs"; and (4) "[t]he higher the acuity of mental illness, the less telepsychiatry should be relied on as a permissible method of treatment." *Id*. at 15-16. The Special Master recommended "the continued expansion of the telepsychiatry program," *id*. at 17, but with the following caveats:

- "Telepsychiatry should serve as a supplement for on-site psychiatry, not as a substitute and should only be utilized when institutions are unable to recruit psychiatrists to work on-site."
- CDCR should be required to continue its recruitment effort[6] at all institutions.
- "The convenience of telepsychiatry should . . . not serve as a reason to allow on-site psychiatrists to migrate to the comfort of remote off-site offices. It cannot be emphasized enough that telepsychiatry should not replace on-site psychiatry."
- Telepsychiatry should not be a "frontline approach" for psychiatric services "for inmates with the most intensive or emergent needs."

---

[6] "Recruitment effort" refers to hiring on-site psychiatrists to fill vacancies in authorized psychiatrist positions throughout CDCR.

9

- For CCCMS level of care, telepsychiatry "is an appropriate option with the requirement that the telepsychiatrist work on-site at least twice per year at the designated institutions and more frequently if feasible."
- While not recommending permanent use of telepsychiatry at the EOP[7] level of care due to inadequate assessment of its efficacy, the Special Master does recommend "that a psychiatrist be on-site at least quarterly to treat EOP inmates, given the frequency of psychiatric contacts required by the Program Guide."
- Telepsychiatry is not appropriate for the MHCB[8] level of care except "as a last resort or in emergency situations when an on-site psychiatrist is not available."

ECF No. 5711 at 21 (quoting ECF No. 5564 at 15-17) (emphasis added in ECF No. 5711) (footnotes added).

Defendants objected to the recommended limitations on telepsychiatry at the EOP and higher levels of care and presented evidence in support of those objections. *See* ECF No. 5711 at 21-22. The court resolved those objections in the October 10, 2017 order, finding "the evidence tendered by defendants is insufficient to demonstrate that use of telepsychiatry is appropriate for all Coleman class members at every level of care in the" Mental Health Services Delivery System (MHSDS). *Id*. Instead, and in part due to defendants' own reliance on the Special Master's review of their telepsychiatry program to support expansion of the program, the court held that "the Special Master's monitoring of CDCR's use of telepsychiatry and the

---

[7] EOP, the Enhanced Outpatient Program, provides a higher level of mental health care than CCCMS. It is designed for seriously mentally disordered inmates who are unable to function in the general prison population but do not require inpatient care or "continuous nursing care." Revised Program Guide at 12-1-8. EOP provides a structured "therapeutic environment that is less restrictive than inpatient settings"; the EOP units are "designated living unit[s]." *Id*.

[8] MHCBs are mental health crisis beds. They provide short-term inpatient care for seriously mentally ill inmates who are markedly impaired and dysfunctional as a result of their mental illness, require 24-hour nursing care, or are dangerous to others or themselves as a result of their mental illness. *See* Revised Program Guide at 12-1-8.

conclusions of his experts concerning its efficacy for class members based on that monitoring is more relevant to a determination of the appropriate use of telepsychiatry for members of the plaintiff class" than the studies presented by defendants through a declaration from the Chief Psychiatrist for the California Department of Corrections and Rehabilitation (CDCR), Michael Golding, M.D. *Id*. at 22-23. Defendants did not ask the court to reconsider this order, nor did they seek to appeal it.

Defendants now seek approval of language in a proposed telepsychiatry policy addendum that would, taken to its full extent, permit them to have one on-site psychiatrist dedicated to EOP patients at any institution housing these patients, no matter how large that population, and to meet the rest of their staffing obligations to those inmates with telepsychiatry. *See* ECF No. 5920 at 7. If implemented in full, defendants' proposal would represent a substantial modification of the staffing requirements of the court's original 1995 order in this case and the limited, supplemental role telepsychiatry has been allowed to play in the first twenty-some years of remedial efforts. Defendants' specific objections to the proposed telepsychiatry addendum, taken together with their counsel's statements at the September 7 hearing, have clarified for the court the correct posture of the proceedings in this case related to telepsychiatry. Because use of telepsychiatry is part of defendants' plan to remedy the Eighth Amendment violation in this case, it is not for the court to separately find, implicitly or otherwise, that defendants' expansion of its use, proposed or otherwise, violates the Eighth Amendment. Instead, defendants must prove that the changes they have effected, moving from limited use of telepsychiatry as a supplement to on-site psychiatry in the face of short-term staffing shortages, to the further expansion they appear to be implementing is consistent with the requirements of the Eighth Amendment. While the court may not order the state, over its objection, "to undertake a course of conduct not tailored to curing a constitution violation that has been adjudicated," *Rufo*, 502 U.S. at 389 (citing *Milliken v. Bradley*, 433 U.S. 267, 281 (1977)), defendants are not free to unilaterally make material modifications to the longstanding remedy in this action without meeting their burden of proof as described in this order.

/////

11

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. The hearing set for October 11, 2018 is CONTINUED to October 15, 2018 at 1:00 p.m. in Courtroom No. 3.

2. On or before September 28, 2018, the parties shall exchange a list of witnesses, a concise statement of each witness' proposed testimony, and a list of exhibits they intend to offer at hearing.

3. On or before October 8, 2018, the parties shall file a joint list of witnesses and exhibits to be presented at hearing.

4. Nothing in this order authorizes the parties to conduct discovery in connection with the evidentiary hearing. The court expects the parties to be fully transparent in the disclosures required by this order and will consider motions to strike any evidence or witness testimony that could not reasonably have been identified through the exchanges required by this order.

5. Nothing in this order changes the obligations imposed by the October 10, 2017 order, in particular the obligation of the CDCR defendants to, within one year from October 10, 2017, come into complete compliance with mental health staffing ratios and the maximum ten percent vacancy rate set by the court's June 13, 2002 order and the obligation of the Department of State Hospitals defendants to, within one year from October 10, 2017, complete implementation of the staffing plan for their inpatient programs that serve class members. *See* ECF Nos. 5711 at 30, 5573 at 3.

DATED: September 20, 2018.

_____
UNITED STATES DISTRICT JUDGE