# CDCR Mental Health System Report

## Some key issues detailed in the report

### The Resetting-The-Clock Strategy

Every time a mental health patient is transferred from one institution to another, CDCR resets the clock to the maximum Program Guide interval between psychiatry appointments. They use this Resetting The Clock strategy to deem as compliant appointments occurring later than the maximum interval the Program Guide permits (such as 170 days rather than 90 days at the CCC level of care). They reset the clock every time a patient is transferred, irrespective of when the patient last saw a psychiatrist. A CCC patient transferred more than once might not have another psychiatry appointment for eight months.

### Effect On CDCR's Reports To The Court

The 2017 and 2018 staffing reports to the court significantly overstate percent timeliness of psychiatric appointments.

### Effect On The Office Of The Special Master's Analysis

The Resetting The Clock strategy may have led the Office of the Special Master to conclude that psychiatry appointments are occurring in a more timely manner than is in fact the case. This is likely to have led to mistaken conclusions about psychiatry staffing needs.

See pages 4 13 of this CDCR Mental Health System Report for details.

i

1   **The Stretching-The-EOP-Maximum-Interval Strategy**

2   In their calculation of "timeliness" (percent patient weeks compliance), CDCR increased
3   the EOP interval between psychiatry appointments from 30 days to 45 days. With
4   rounding, the result was that in some cases CDCR deemed EOP psychiatry appointments
5   occurring nearly two months later to be compliant.

6   Effect On CDCR's Reports To The Court

7   The 2017 staffing report to the court significantly overstates percent patient weeks
8   timeliness.

9   Effect On The Office Of The Special Master's Analysis

10   The Stretching The EOP Maximum Interval strategy may have led the Office of the
11   Special Master to conclude that psychiatry appointments are occurring in a more timely
12   manner than is in fact the case. This is likely to have led mistaken conclusions about
13   psychiatry staffing needs.

14   See pages 13 16 of this CDCR Mental Health System Report for details.

15   **The Counting-On-Time-Appointments-As-Early Strategy**

16   In the 2018 staffing report to the court, to arrive at their figure of CCC appointments
17   being on average 2.6 days overdue, CDCR took an average of what they deemed late
18   appointments with what they deemed early appointments. If a psychiatrist ordered that a
19   CCC patient be seen a week later, and that patient was indeed seen a week later, instead
20   of counting that appointment as having been on time, CDCR counted that appointment
21   as having been 83 days early. If a psychiatrist ordered that a patient be seen a month later,

1   but the patient did not see a psychiatrist for two months, CDCR counted that

2   appointment as one month early rather than a month late as was actually the case. The on

3   average 2.6 days overdue figure significantly understates how late on average

4   appointments were occurring.

5   Effect On CDCR's Reports To The Court

6   The on average 2.6 days overdue figure CDCR gave in the 2018 staffing report significantly

7   understates how late on average appointments were occurring.

8   Effect On The Office Of The Special Master's Analysis

9   The Counting On Time Appointments As Early strategy may have given the Office of the

10  Special Master a mistaken impression of the degree to which patients are being seen on

11  time, and of psychiatric staffing needs.

12  See pages 38 40 of this CDCR Mental Health System Report for details.

## The Biasing-The-Sample Strategy (MAPIP)

14  In a caveat in small print in the 2017 staffing report to the court, CDCR stated that they

15  had eliminated three of the four mandatory MAPIP blood draws (baseline, three months,

16  and dose change related measurements) thus leaving only the annual measurement.

17  An "annual blood test" could mean (i) a blood test done a year after starting a medication

18  and then at yearly intervals thereafter, or it could mean (ii) one done within the first year

19  after starting a given medication and then at yearly intervals thereafter. But what it can't

20  reasonably be taken to mean is (iii) a blood test done within the first year after starting a

1   medication (as in (ii)) but only if the patient continued to be on the medication for a full

2   year.

3   In its calculation of compliance with mandatory annual blood draws, CDCR included the

4   data from some but not all patients who had blood tests done within a year of starting the

5   medication. It included the data from patients who remained on the medication for a full

6   year. It perversely excluded from the calculation data from those patients least likely to

7   have had the mandatory blood draw    those who had been taken off the medication

8   within a year after starting it. Such patients are less likely to have had the mandatory

9   blood draw because there was less time in which to get the blood draw done. By using a

10  biased sample, CDCR biased its measurement of whether needed measurements were

11  done or not. Thus, in its 2017 staffing report, CDCR significantly overstated the mental

12  health MAPIP compliance figure.

13  ### Effect On CDCR's Reports To The Court

14  In its 2017 staffing report, CDCR significantly overstated mental health MAPIP

15  compliance.

16  ### Effect On The Office Of The Special Master's Analysis

17  The Mental Health Dashboard (CDCR's self monitoring tool) and CDCR's report to the

18  court may have given the false impression that medication usage was being appropriately

19  monitored.

20  See pages 20  26 of this CDCR Mental Health System Report for details.

1    **The Pretend-It's-All-Done-By-The-Line-Staff Strategy**

2    The staffing ratios CDCR reported to the court in the 2018 staffing report are incorrect.

3    Sixty percent of psychiatric supervisors were seeing patients like line staff at least part

4    time, and in some cases full time. The work was being done by a larger ratio of

5    psychiatrists to patients than was reported, suggesting that fewer psychiatrists are needed

6    per patient than is in fact the case. We need our psychiatric supervisors to be organizing

7    care like they are supposed to be, not serving as line staff psychiatrists.


8    Effect On CDCR's Reports To The Court

9    CDCR's reported staffing ratios in the 2018 staffing report are misleading. The ratio of

10   psychiatrists doing the work to patients receiving the psychiatric care is higher than was

11   reported to the court.


12   Effect On The Office Of The Special Master's Analysis

13   More than the number of line staff reported would be needed to accomplish the results

14   achieved. The Pretend It's All Done By The Line Staff strategy may have led the Office of

15   the Special Master to conclude that there are fewer staff shortages than is actually the

16   case.


17   See pages 47 48 of this CDCR Mental Health System Report for details.


18   **The Count-Every-Encounter-As-An-Appointment Strategy**

19   The average number of EOP appointments per 30 days was lower than CDCR reported to

20   the court in the 2018 staffing report. CDCR counted as compliant appointments "wellness

21   checks" including brief encounters with patients in the prison yard surrounded by other

1   inmates, three minute non confidential cell side visits, and telepsychiatry "wellness

2   checks" in which an MA holds a laptop for a telepsychiatrist to try to talk to the patient

3   who is behind the solid metal cell door. In misleadingly counting all these wellness

4   checks as compliant appointments, CDCR thereby overstated its timeliness figures,

5   because without all these wellness check "appointments", intervals between

6   appointments would be greater. No reports about EOP timeliness were given to the court

7   in the 2018 staffing report. The average number of EOP appointments per 30 days gives no

8   measure of timeliness, including whether appointments occurred on time when

9   scheduled. And in any case the number of EOP appointments per 30 days was overstated

10  in the 2018 staffing report, meaning that actual appointment timeliness is even lower than

11  timeliness figures appearing on the Dashboard.

12  ## Effect On CDCR's Reports To The Court

13  The average number of EOP appointments per 30 days was lower than CDCR reported to

14  the court in the 2018 staffing report. That wellness checks were counted as proper

15  appointments means that the actual timeliness figures are even lower (less timely) than

16  reported.

17  ## Effect On The Office Of The Special Master's Analysis

18  The Count Every Encounter as an Appointment strategy may have led the Office of the

19  Special Master to draw false conclusions about whether EOP patients are being seen by

20  psychiatrists when they need to be seen.

21  See pages 45 46 of this CDCR Mental Health System Report for details.

**The Pretending-"All"-Means-"Fewer-Than-All" Strategy**

One of the best measurements of when a doctor thinks a patient should be seen is when the doctor has scheduled the patient to be seen. According to the CDCR Mental Health Dashboard, at the CCC level of care, statewide, an average of 95% of "all scheduled appointments" were "seen as scheduled". But the word "all" did not mean all. Instead, CDCR deemed fewer than all to be "all". CDCR excluded appointments not seen as scheduled due to patient refusal, patient no showed, scheduling error, etc. The actual percentage of appointments that occurred as scheduled was far lower than 95%. Were those groups of patients not excluded from "all", the average percentage of mental health appointments occurring as scheduled would have been about 46%. But the true figure is actually even lower than that because scheduled appointments that don't happen are in many cases simply moved to a later date as though they were never scheduled to occur before that later date.

In a system that is failing to get more than 50% of patients to their appointments, many more psychiatrists are needed than would be otherwise, because of the wasted time, the enormous work needed to try to find patients who did not come to their appointment, the excessive rescheduling and juggling needed, the need to try to see patients at odd hours, etc.

Effect On CDCR's Reports To The Court

In failing to mention that fewer than 50% of patients are being seen when psychiatrists schedule them to be seen, the CDCR staffing reports significantly understate how many psychiatrists are needed given how grossly inefficient the system is.

1    Effect On The Office Of The Special Master's Analysis

2    The Pretending "All" Means "Fewer Than All" strategy may have led the Office of the

3    Special Master to the erroneous conclusion that patients were being seen when the

4    psychiatrist thought they needed to be seen. In addition, the Office of the Special Master

5    may not have taken into account the greater number of psychiatrists needed in a system

6    as grossly inefficient as the CDCR one (which is failing to get more than 50% of patients

7    to their appointments).

8    See pages 26 37 of this CDCR Mental Health System Report for details.

9    **The Crazy-Algorithm Strategy**

10    The CDCR mental health computer algorithm generating compliance figures for

11    medication non compliant patients *seen* perversely creates the semblance of *greater*

12    compliance when *fewer* patients needing to be seen for medication non compliance are

13    *scheduled* to be seen. It counts appointments not scheduled as not being needed, it

14    counts refused appointments as completed appointments, and it double counts

15    appointments that occurred. In the CHCF report for August 2018, for example, the

16    Dashboard reported 100% compliance when in reality the compliance was only 3.6%.

17    Appointments for medication non compliance are one of a number of different types of

18    consultation appointments. Were the compliance figures for that kind of consultation

19    appointment accurately recorded, the compliance figures for "timely mental health

20    referrals" would be significantly lower. The Dashboard has significantly overstated

21    compliance with respect to timely mental health referrals.

1   Effect On CDCR's Reports To The Court

2   The number of psychiatrists CDCR suggests are needed fails to take into account that

3   CDCR's actual compliance with respect to needed psychiatric consultations occurring is

4   much lower than the Dashboard figures suggest.

5   Effect On The Office Of The Special Master's Analysis

6   Given that the algorithm creates such grossly false compliance figures, the Office of the

7   Special Master might decide that independent analysis is needed to check all Dashboard

8   data. The Crazy Algorithm strategy may have led the Office of the Special Master to

9   conclude that fewer psychiatrists are needed than is in fact the case.

10   See pages 48 52 of this CDCR Mental Health System Report for details.

11   **The Psychologists-Are-Physicians-Too Strategy**

12   Regardless of platitudes about the importance of including psychiatric physicians in

13   decision making, CDCR's actions are not consistent with such platitudes. CDCR

14   perversely deems the non medically trained *psychologist* rather than the psychiatrist (i.e.,

15   the medical doctor) to be the "primary clinician". There is not a single psychiatry

16   executive in CDCR. Psychologists wear name badges saying "Dr." and not specifying that

17   their doctorate is as a psychologist rather than a medical doctor. Indeed, a psychologist

18   has been listed as the "physician to call" in at least one CDCR mental health nursing

19   station. Psychologists in CDCR very often override psychiatrists' judgement and/or

20   medical orders, and the CDCR system effectively supports them in doing that rather than

21   discouraging it.

1   ████████████ signed a memo that gave psychologists the authority to overrule
2   psychiatric physicians' medical decisions about the medical safety of discharging
3   medically complicated patients from licensed hospitals. The memo said that the decision
4   to discharge is made by "the primary clinician or treatment team". The psychiatrist and
5   the psychologist are both members of the treatment team. The psychologist is the
6   "primary clinician". It logically follows that the memo is saying that in cases where the
7   psychiatrist and the psychologist disagree (and thus the treatment team can't reach a
8   decision), the psychologist rather than the psychiatrist makes the decision.

9   Giving psychologists the authority to overrule medical doctors' decisions with respect to
10  potentially medically complicated patients must be one of the most radical policy
11  decisions ever. Having no medical training, psychologists have no ability to evaluate
12  medical issues such as whether a patient's diabetes or high blood pressure is stable, or
13  whether there is toxicity from a psychiatric medication, or indeed whether psychiatric
14  medications are increasing or decreasing suicidal risk. Psychologists overruling medical
15  doctors even in emergency situations and about discharging medically complex patients
16  from hospitals has had a steep cost in terms of bad outcomes.

## Effect On The Office Of The Special Master's Analysis

18  The Office of the Special Master may be unaware of the degree to which poor outcomes
19  and have occurred because psychologists in CDCR overrule psychiatric medical doctors
20  even during emergency situations and discharges.

21  See pages 88 107 of this CDCR Mental Health System Report for details.

x

# CDCR Mental Health System Report

Suppose that in the California Department of Corrections, only 45% of Mental Health patients were seen by psychiatrists as scheduled. Suppose that 80% of those 45% were seen in a confidential office space. That would imply that just over a third of the total were seen appropriately confidentially and as scheduled. That is, they *would* have been being seen appropriately *if*, between appointments, consultation occurred in the event that they had stopped taking their medicines (which would have been unlikely in reality in the CDCR system) and *if* those patients who were seen as scheduled and confidentially were also seen *on time*. In the existing CDCR system that happens for some patients but not others.

A system in which a large majority of patients are not getting psychiatric care when scheduled or otherwise when they need it, and which is not set up in such a way that patients are brought to psychiatry appointments in confidential offices, but in which instead, the psychiatrist is expected to search the prison yard looking for patients or trying to communicate through a crack in the cell door and unable to look at the patient while speaking loudly to be heard through the crack in the door, is by no means conducive to good patient care. It might not be surprising to find high rates of hospitalization and suicide in such a poorly designed and run system.

In systems in which there is a focus on actively identifying and correcting problems, even serious problems can be fixed. Such systems can find ways of getting patients to confidential psychiatric medical appointments and other needed mental health appointments.

Making mistakes   even very serious mistakes   is part of the human condition. The question is whether the system is designed and managed in such a way that mistakes can

1    be learned from and issues corrected, or not. What is required for a system to be error

2    correcting is that information be accessible to those who could make a difference, rather

3    than restricting or denying access to the information needed to identify and correct

4    problems. Systems that deny access to vital information to those who need it thereby

5    actively prevent problems being solved. Those who may make mistakes should not be the

6    only ones to judge whether there has been an error.

7    The tragic picture painted above is not just a hypothetical. In fact, it is the reality in the

8    California Department of Corrections Mental Health system. Vital information has been

9    monopolized and its access restricted to a select group of mainly psychologists at

10   headquarters. This group has created a biased and inaccurately positive picture of what is

11   actually a troubled system of care. The ███████████ of Mental Health of the

12   California Department of Corrections have enforced this restriction of access to the

13   needed information. Those who most need to have access to this medical information are

14   the medical leaders in mental health   the psychiatric physicians   and those who review

15   our system of care. Yet the headquarters psychiatry leadership team and the Coleman

16   monitors and court have been denied access to this medical information. This has actively

17   prevented the normal medical error correction that would have prevented the very

18   serious problems we see in the field in CDCR.[i]

19   I, Michael Golding, M.D., CDCR Statewide Chief Psychiatrist, will document how the

20   attitude that information must be hidden away, controlled and interpreted by just a few

21   has cost the CDCR system dearly by preventing adequate care for a large majority of

22   CDCR mental health patients. The needed error correction has not happened, because

23   those few running the system are the only ones allowed to judge how things are going in

24   the system.

25   Patients need psychiatric medical care, yet in CDCR the provision of psychiatric medical

26   care is severely hindered by executive level decisions at headquarters and in the field. In

1   CDCR, psychologists and social workers are deemed to be the "primary clinicians", and

2   despite their lack of medical training they very often ignore psychiatrists' medical

3   judgement and sometimes override psychiatric physicians' medical orders.


4   Moreover, as a matter of policy at CDCR, non medically trained psychologists are

5   deemed to have independent medical privileges including admitting, discharging and

6   ordering restraints. *Pro forma*, there was (until very recently   see page 105) supposed to

7   be consultation and agreement from the treatment team including the psychiatric

8   physician, but frequently not only is there no consultation, non medically trained

9   personnel make medical decisions that override psychiatric medical doctors' orders. This

10  is so ingrained and pervasive in the culture and policy of CDCR that few but the

11  psychiatrists and other medical doctors appear to find it problematic.


12  In most CDCR institutions, psychiatrists are supervised by non medically trained

13  psychologists. Ostensibly, this supervision is administrative. However, in fact it is clinical

14  too. Psychologists and their administrative supervisors control medical information and

15  prevent it from getting to psychiatric physicians who need it to make medical decisions.

16  They also make determinations about what is or is not a medical issue, and sometimes

17  just boldly overrule physicians' orders, typically behaving as the clinical supervisors of

18  psychiatrists in most CDCR institutions. Our attempts to have psychiatrists report

19  clinically through a psychiatry chain have been stymied. In these circumstances, non

20  medically trained personnel decide what is a medical issue and consult physicians only if

21  in their own judgement a medical decision needs to be made.


22  There are perhaps about 30 executive level psychologists in CDCR, a half dozen dental

23  executives, dozens of general medical executives, regional medical executives, and dozens

24  of nursing executives, and corresponding numbers of administrative executives. Although

25  there are nearly 250 civil servant and contract psychiatric physicians statewide in the

26  system (more than the number of dentists and only 60 fewer than the approximately 310

1  general physicians and contractors), there is not a single psychiatry executive in all of the
2  California Department of Corrections (CDCR).

3  Those making the executive level decisions about mental health issues in the California
4  Department of Corrections Mental Health Program   psychologists and non medical
5  administrators   have no knowledge of psychiatric medicine, and they appear often
6  unwilling to take into account the medical knowledge of those of us who work in the
7  department. Their decisions have adversely affected patient care.

8  Whether in terms of seeming to lengthen court mandated compliance timeframes for
9  patients, not accurately reporting about measurements of court ordered psychiatric drug
10 monitoring, or not accurately reporting about whether scheduling, confidentiality of
11 appointments and medication consultation is occurring, there appears to be significant
12 bias in how the results are reported. The psychiatric leadership team is being denied
13 access to this information we need to create good patient care. On the other hand, the
14 leadership of the psychologists, mental health administrators, general medical physicians,
15 dentists, nurses, and medical administrators all have access to this information. Denying
16 our psychiatric physicians access to this medical information about our patients is itself a
17 medical decision, and it is being made by those with no qualification to make such
18 decisions and by those with an apparent propensity to report biased interpretations of the
19 data to the court, the Coleman Special Master, and our psychologists and psychiatrists.

**Lengthening EOP and CCC Timelines Beyond Court-Mandated Timelines**

21 If a psychiatric medical doctor writes a medical order that a given patient should have a
22 follow up appointment with a psychiatrist in a certain number of days, the CDCR medical
23 system *should* follow the doctor's order that the patient be seen again in that number of
24 days. Should, but doesn't. When a patient is transferred from one institution to another
25 within the CDCR system, any order for a follow up appointment with a psychiatric

14

1  medical doctor in a given number of days is automatically overridden without any

2  consultation with any medical doctor. That is how the system is designed.

3  Imagine a patient at what is called the CCC level of care, our lowest level of intensity of

4  mental health care. Assume the doctor has scheduled a follow up appointment with the

5  patient for, say, seven days later, because the patient needs to get blood drawn and the

6  doctor needs to review the lab test results. Suppose that the patient is then transferred to

7  a different location five days later. Were the doctor's order being followed, the patient

8  would be being seen by a psychiatrist two days after arrival at the new institution.

9  Nonetheless it is typical in the CDCR system for the admitting non medically trained

10  psychologist to override such a doctor's order and instead schedule the patient to see a

11  psychiatrist 90 days later, the court ordered *maximum* interval between appointments for

12  patients at this level of care.

13  When a psychologist overrides a physician's order, he or she is, in effect, determining

14  from his or her own assessment, whether a patient needs medical consultation or not, for

15  a given set of lab values and a given physical and psychological presentation. But that is

16  precisely beyond the scope of psychologists, since knowing what is a relevant medical

17  issue is something determined by physicians.[ii]

18  A given lab value in the normal range (yet rising) might be nothing to worry about, or in

19  some cases it can indicate very significant danger. For example, liver function studies

20  could go up after starting valproic acid, and while still being in the normal range when

21  rechecked, they might nevertheless be headed rapidly higher, indicating pending hepatic

22  failure from valproic acid toxicity. Just looking at whether a lab value is in the normal

23  range or not is insufficient. When the lab test numbers go up a bit at first, it could be a

24  lab error, or not clinically significant, or it could be dangerous. Because the medication is

25  needed the psychiatrist will not stop the medication without more information and so

26  orders a new blood level test and schedules a follow up appointment for seven days later.

1    But when the transferred from one institution to another the patient will typically be

2    scheduled to be seen around 90 days later by the psychologist at the CCC level of care,

3    effectively causing the patient to be evaluated 95 days later with such a rising lab value,

4    rather than the seven days later that the physician had ordered.


5    Note that the lab itself would not necessarily notify anyone either, because a *dangerously*

6    *increasing* lab value can be still *within the normal range* when checked.


7    In fact, this practice (psychologists rescheduling patients to be seen by a psychiatrist later

8    than the previous doctor who saw the patient had ordered) has been the norm for years,

9    and appears not to have been reported to the court. When patients switch institutions

10   within CDCR, a psychologist makes the determination of when a patient should be next

11   seen by a psychiatric physician, not the psychiatric physician who last assessed the

12   patient and made an independent medical determination of when the next

13   medical/psychiatric assessment should occur.


14   Suppose a psychiatrist in the CDCR system writes a medical order that a patient be seen

15   next 90 days later, the maximum interval allowed by the court for a patient at the CCC

16   level of care. Suppose that on day 80 the patient is transferred to a different CDCR

17   institution. The CDCR system again typically overrides the doctor's medical order that

18   the patient be seen on day 90.


19   The doctor ordered the patient to be seen back in 90 days, which would be ten days after

20   the patient has been transferred to the different CDCR institution. Instead of the patient

21   being seen ten days after transfer in accordance with the doctor's medical order, what

22   typically happens in CDCR is that a psychologist at the new institution creates a new

23   order, overriding the medical order of the doctor at the previous institution. Just like as

24   discussed with the rising lab value, the patient will typically be seen by a psychiatric

1   physician approximately 90 days *after arrival at the new institution, irrespective of what*

2   *the psychiatric medical doctor who last saw the patient has ordered.*

3   This is about 80 days later than the psychiatrist's medical order had said the patient

4   should be seen (about six months after the patient was seen last), and it is also about 80

5   days later than the court ordered maximum time between visits, a total of 170 days later.[iii]

6   This lengthening of intervals between psychiatric appointments allows patients to be seen

7   by a psychiatrist up to 100% later than the maximum court ordered Program Guide

8   intervals, though the quality managers consider such appointments to be compliant with

9   the intervals allowed by the court (e.g., 90 days at the CCC level of care).

10  This same assumption allows patients at the more intensely monitored EOP level of care

11  to be seen up to nearly 60 days after an appointment if the patient is transferred from one

12  institution to another, rather than just 30 days after an appointment, the court ordered

13  maximum for this level of care.

14  Actually, it can be *more* than 100% later. If a CCC patient is transferred multiple times,

15  there might well be an interval of nine months between one psychiatrist appointment and

16  another, yet despite that being six months more than the court mandated maximum

17  interval, CDCR counts that appointment as being compliant. They reset the clock each

18  and every time a patient is transferred from one institution to another.

19  During a recent quality management meeting that reaffirmed this stance, the

20  psychologists present plus the ████████████████ (a psychologist administrator) [iv]

21  and the ██████████████ (an additional administrator) plus several other

22  administrators and all the psychologists present and on the phone in that committee

23  meeting voted that it is fine to violate such medical orders, and indeed that it is fine to

24  violate the court order in that way, too. There are approximately 26 members of the

25  Quality Management Committee and approximately 17 of whom are psychologists who

1   report in a hierarchical relationship to each other. There are only two psychiatrists on the

2   committee and both voted that physicians' medical orders should not be overridden. I

3   asked the committee whether they thought the court monitor, Dr. Jeff Metzner, would

4   agree with countermanding physicians' medical orders and the court order in that way.

5   They laughed and said, "No".

6   I will show that this is part of a regular pattern in which executive administrators and

7   executive psychologists and quality management psychologists in CDCR appear to

8   discount expert medical opinion and make decisions allowing, and even mandating, non

9   medically trained individuals to override doctors' medical orders.

10   Please see the two email exchanges for patient ███ (see 2018 07 27 1634hrs). In this

11   case, a patient was transferred to another institution and if the psychiatrist's order had

12   been followed rather than the psychologist's order overriding the psychiatrist's order, a

13   psychiatrist would have seen the patient before the incident in which the inmate patient

14   attacked another inmate and seriously injured his eye.

15   Although this patient apparently had a psychotic illness, he was refusing the medication

16   he needed all along at the initial intake institution. It is possible that after transfer to the

17   new institution, a psychiatrist might well have been able to convince the patient to take

18   the medicine, or perhaps would have noticed enough paranoia or other psychosis to get

19   the patient to a crisis bed.

20   Patients who have been taking medication outside prison, as this patient apparently was,

21   sometimes have been doing so because of family or community support, or because they

22   have been getting injections of long acting medications at a mental health center in their

23   community.

1    In this case, apparently a doctor at the jail had managed to get him to take the medicine.

2    When taking medication, a patient may well become coherent, and then, due to their

3    coherence, paradoxically gain the ability to refuse medication when they switch settings,

4    such as when they come to prison to serve a sentence. Medico legally, such patients have

5    demonstrated improved capacity to make decisions about medication taking.

6    Thus, paradoxically, as patients enter our prison system at an intake institution and lose

7    the community support that has been encouraging the medication taking, the very fact of

8    their coherence due to previous medication compliance enables them to successfully

9    argue to the admitting physician that they do not need the medication (or they have a

10    right to refuse it because of their apparent capacity, though the physician might very

11    much want the patient to take it).

12    A patient's apparent coherence, coupled with loss of information as patients transfer care

13    from outside prison to care in prison, makes these times particularly dangerous for

14    patients. Finally, the good effects of the medication often last for several months after the

15    medication has been discontinued, *so the patient in fact does well off (without) medication*

16    for months, seeming to add to the argument that the medication was actually not needed.

17    It is at these times when patients are transferred from our intake institutions to other

18    institutions that our patients are most at risk. Yet our psychologists and administrators

19    voted that even in these situations, the admitting psychologist may override the medical

20    opinion of the physician at the intake institution with respect to when the patient should

21    be seen next after he or she transfers institutions.

22    In this case of patient      , a psychologist overruled the doctor's order and ordered that

23    the patient be seen later than the doctor had ordered, so the patient was not seen when

24    the psychiatric medical doctor had ordered.

1    In the case mentioned here (see 2018 07 27 1634hrs) the ████████████ at SATF,

2    unaware of many of our executive leadership's views and our two ██████████' views

3    that psychologists should typically override physicians' medical orders with respect to

4    when patients should be seen after patients transfer institutions, wrote:


5    "Hello Everyone,


6    This patient has not been seen since his arrival in May (2018) by one of our psychiatrists?

7    He has had a major incident that could be related to psychosis   he is currently not on an

8    antipsychotic. Why was the patient not seen?"


9    I had to explain to him that, "As I suspected, this patient according to the interpretation

10   of a quality management (QM) committee vote, did not need to be seen sooner." (see

11   2018 07 27 1634hrs)


12   The psychologist ordered a psychiatric appointment for the patient nearly three months

13   after his arrival in May, which would be some time in August, which had not yet passed. I

14   had to explain to this ████████████ that our psychiatrists want every patient who is

15   transferred from one institution to another to be assessed by a psychiatrist within 14 days

16   of transfer (and ideally it should be within a week), but that during the quality

17   management meeting our ████████████████ had said in front of the quality

18   management committee that that would negatively impact the workload of the

19   psychiatrists and so would be an issue to be reported to labor (i.e., the union). She

20   subsequently voted that CDCR should not follow physicians' orders for when patients

21   should be seen next.

1   Had the last physician's order been followed, patient ██████ would have been seen long

2   before the dangerous event (see 2018 07 30 0925hrs). But instead, a psychologist's order

3   was followed, overriding the doctor's order.


4   As Dr. ████████████ says, "*if the psychiatrist's order had been followed* to see the

5   psychotic patient, who was relatively recently off medications, the patient *would have*

6   *required an appointment by 6/24/18*, about a month after transferring to SATF" [emphasis

7   mine, MG] (and well before the incident on July 26, 2018) which itself was before the

8   August meeting in which our non medical psychologists and executive voted that this

9   type of patient be seen later than the psychiatrist (i.e., medical doctor) may have ordered.


10   Patient ██████ arrived at SATF on 5/29/18. Had this patient been seen within 14 days, that

11   would have been before the middle of June. Had this patient been seen when the

12   psychiatrist had ordered, that would have been in late June. Instead, the psychologist

13   ordered that the patient be seen in August. This August appointment violated both the

14   psychiatrist's medical order, and also the maximum interval between appointments

15   allowed by the court ordered mandate.


16   Dr. ███████ says, "His history.... suggest[s] a patient who requires more frequent

17   psychiatric intervention. Also concerning is the discontinuation of Zyprexa without

18   regular follow ups to evaluate for decompensation. He was seen by psychiatry on 3/29/18,

19   4/25/18, and 7/27/18." Only after the incident in which the patient injured another

20   patient's eye was a psychiatrist called to see the patient on 7/27/18. (see 2018 07 30

21   1002hrs)


22   The records made available to the Coleman court appear to me and my team to

23   consistently overestimate our compliance with court ordered timelines for just about

24   every mental health patient who transfers institutions. One hundred and seventy days is

25   not 90 days. Therefore, the so called "timeliness" measure of psychiatric appointments

1   overall has overstated our compliance. Furthermore, our leadership knows about this, as

2   the HQ psychiatry team has informed them.

3   This overstating of our compliance has not only occurred on the Dashboard (CDCR's self

4   monitoring tool). Compliance figures given to the Special Master, and apparently directly

5   to the court, appear to have overstated CDCR compliance in the 2018 staffing plan figures

6   (see 2018 08 23) and in the 2017 figures (see 2017 03 30).

7   The 2018 data (see 2018 08 23) says that routine CCCMS mainline patients are seen in a

8   94% "timely" way. "Timely" is not defined in this court report. If we use the percent

9   patient weeks compliant meaning of the word that our Quality Managers routinely use,

10  then "94%" refers to "94% patient weeks compliant" with routine CCCMS appointments.

11  For the 2017 (not 2018) report (case 2:90 cv 00520 KJM DB Document 5591, beginning on

12  line 4 of page 14 of 18) it says (see 2017 03 30 5591 14): "Over the past year, inmates were

13  seen timely by their primary clinician ninety percent of the time, by their psychiatrist

14  ninety percent of the time…"

15  Two of the ███████████ voted for continuing this practice of resetting the

16  appointment due date clock every time a patient is transferred from one CDCR institution

17  to another, and the other ███████████ knows about the vote and allowed it to stand (I

18  myself told her about it).

19  Our quality managers reset the clock for both of these levels of care when patients

20  transfer institutions. The 2017 staffing report combines CCC appointments and EOP

21  appointments. Thus, a patient who has been transferred from one institution to another

22  and only once, might well not have an appointment with a psychiatric medical doctor for

23  six months at the CCC level of care, and yet CDCR would report that as being a compliant

24  appointment having occurred within ninety days. Similarly, again for a patient who is

25  transferred just once at the EOP level of care, CDCR resets the clock and thus reports an

1   appointment happening up to two months after the patient saw a psychiatrist at the first

2   institution as being compliant with the one month court ordered maximum interval.

3   This resetting of the clock every time a patient is transferred thus misleadingly inflates

4   the compliance figures, such that it is not true that 94% of CCC appointments were

5   timely in 2018 as stated in the 2018 report (see 2018 08 23) and neither is it true that 90%

6   of CCC and EOP appointments were timely in 2017 as stated in the 2017 report (see 2017

7   03 30) to the court.

8   But CDCR does not only reset the clock every time a patient is transferred to a different

9   institution and report as compliant appointment intervals beyond the court ordered

10  maximum intervals, they also have in the recent past lengthened the maximum interval

11  they allow between appointments for patients remaining in one institution.

12  **Lengthening EOP Timelines by 50% More than Court-Ordered Maximums (even**

13  **with no transfer of institutions).**

14  The EOP level of care for mentally ill patients in our prisons is a more intense outpatient

15  level of care for those with more severe mental illness. For example, many patients with

16  schizophrenia are at the EOP level of care, not the CCC level, as are those who are more

17  frequently suicidal. As stated, the court mandates that EOP patients be seen at least every

18  month by a psychiatrist.

19  Around March and April of 2017, our headquarters psychiatry team noticed that all the

20  psychiatrists across the institutions seemed to be doing better in terms of seeing EOP

21  patients in a more timely way. (The difference between seeing patients "on time" and

22  "timely" is itself a fascinating story which I describe below.)

1   We discovered that in December 2016, our psychology QM colleagues had decided to
2   change what they would deem to be a compliant interval between appointments from the
3   court ordered one month maximum interval, to up to 45 days, without telling the
4   psychiatry leadership team or, it seems, the court. That made the psychiatrists' EOP
5   timeliness with appointments appear much more compliant than before. But it was just a
6   difference in the way the calculation was made.

7   It took the psychiatric leadership team from about December 2016 to March 2017 to figure
8   out what our executive psychologist/QM team had done or had allowed to be done. We
9   had to painstakingly look at chart after chart to discover how the reported information
10  had been changed, attempting to establish, first, if something had in fact changed, and if
11  so, how it had changed, and the implications of the change. We needed to understand
12  how the new methodology changed the medical interpretation of the compliance rates we
13  saw. Being "compliant", after the change, no longer meant the same thing it had meant
14  before the change. Please see the note from Dr. ████ describing the full implications
15  of her and our discovery. (see 2017 04 12 1316hrs)

16  It is interesting that our QM executive and psychologists seem to have overshot the mark
17  that even they were trying to achieve. Instead of deeming appointments to be compliant
18  at one and a half months (rather than the court mandated one month), they actually
19  managed to make certain types of the EOP appointment show as being compliant even at
20  nearly two months   nearly twice the maximum interval permitted by the court   if the
21  appointments were scheduled at particular times of the month. Dr. ████ shows how
22  an EOP patient could be seen twice in nearly four months and how our QM colleagues
23  reported that as compliant with EOP monthly time frames in which a minimum of four
24  (not two) appointments should have occurred (see 2017 04 12 1316hrs).

25  When we asked, the executive psychologist head of QM admitted that she had not told
26  the court. Her reasoning can be seen in her email from the end of March 2017 in which

1   she says, "No we don't tell them about every change. Since they use our numbers I do let
2   them know when we make a major change that has significant impact." (see 2017 03 22 x)

3   Apparently, our head of QM genuinely thought that changing an EOP time frame from
4   one month to 45 days would not have a significant impact; that is, she must have thought
5   that increasing allowable appointment intervals to 50% more than the maximum interval
6   permitted by the court, across a system with thousands of patients, would have no
7   significant impact on data reported to our physician psychiatrists and the courts.

8   This practice of unilaterally deciding that 45 days is the same as the court's mandated one
9   month went on from December 2016 until at least April 2017, when we discovered it and
10  demanded that they change it back. I told our senior executive about it. Finally, I wrote a
11  private message to her, letting her know that this was truly problematic. In fact it was
12  changed back because of this insistence.

13  Note again from CDCR's 2017 staffing report (see 2017 03 30) the column called "Timely
14  Psychiatry Contacts: (Access to Care Banner) 8/1/2016 1/31/2017". As discussed previously,
15  these figures are very likely mistaken because they allow appointments to occur at greater
16  intervals than Program Guide timeframes when patients transfer institutions. (Note also
17  that the figures lump together CCC and EOP. EOP timelines were included in these
18  figures. I will explain why this is relevant later.)

19  Given that the EOP calculation strategy was changed in December 2016 to allow
20  appointment frequencies beyond the court ordered maximum one month interval (to 45
21  60 days), it is very likely that the EOP appointments for December and January were
22  measured as compliant at from 45 days to 60 days, rather than the court mandated one
23  month, and that they were reported as compliant to the court. The compliance timeframe
24  was increased even if the patient was not transferred from one institution to another.

25

1   It is quite possible that the change made in December was retroactive for many months,

2   as many of these changes are, so it is entirely possible that all the EOP timeframes

3   (8/1/2016 1/31/2017) had been increased (not just 12/1/2016 01/31/2017) from the court

4   ordered maximum of one month, up to 1½ to two months. Thus, the numbers reported to

5   the court in 2017 are apparently mistaken for this reason as well. Someone should

6   carefully ask whether EOP timeframes were increased even for patients not being

7   transferred between institutions.

8   **Summary So Far**

9   I have now mentioned that in CDCR's reports to the court the percent patient weeks

10  compliance numbers appear better than the reality

11  1.  Because our quality management colleagues reset the clock when patients transfer

12      institutions, so the allowable time increased up to 100% over the court ordered

13      maximum intervals between psychiatry appointments.

14  2.  And for the EOP calculation strategy, even for patients remaining in a single

15      institution, CDCR Mental Health QM allowed a 50% (in certain cases up to 100%)

16      increase in timeframes they reported as being compliant for EOP patients, until the

17      psychiatry team managed to get this change reversed later in the year.

18  **Combining CCC And EOP Compliance Figures To Mask Poor EOP Compliance**

19  Note something else about the compliance timeframes (see 2017 03 30). Those reporting

20  to the court combined CCC and EOP patients. That is relevant because usually EOP

21  patients are much more difficult to see in a timely way, and CCC patients are far more

22  numerous, so the relative success with the CCC patients masks the relative lack of success

23  with the EOP patients when they are numerically combined. (See for example 2018 09 04

24  1830hrs.) Overall, for CDCR in June 2018, EOP "percent patient weeks compliance" with

26

1   timely appointments was reported to be only 83% (vs. 95% for CCC), while at CHCF, EOP

2   compliance was reported to be only 78% (vs. 85% for CCC). Combining the two thus

3   serves to obscure the poor EOP compliance.


4   Please also note both pages of document 2018 07 26 1053hrs. Notice that CDCR Quality

5   Managers eliminated a simple filter option which allowed one to distinguish for

6   institutions between "Timely Psychiatry Contacts" between CCC and EOP. It used to be

7   there, but sometime around May or June of 2018 (we are not sure when), this option was

8   eliminated. So when evaluating institutional timeliness at the CCC and EOP levels of care,

9   the report returns one timely indicator for CCC and EOP combined, the usually lower

10  EOP numbers masked by the higher CCC numbers.


11  Someone without computer skills looking for information about timeliness of EOP and

12  CCC psychiatry appointments and consults in individual institutions in 2018 would have

13  difficulty finding such information, because CDCR did not report individual timeliness

14  figures. Someone should ask why that filter disambiguating the timeliness of EOP and

15  CCC at institutions was removed. The question is especially relevant given that 2018 EOP

16  timeliness figures are for unknown reasons just not reported in the CDCR staffing report,

17  at all. Coleman monitors might have wished to directly check the Dashboard numbers to

18  see which institutions were reporting timely EOP contacts, but would have been thwarted

19  because the filter was removed. Someone should ask why that useful filter was hidden.


20  If one takes into account the biases already discussed, the EOP figures (2017 03 30),

21  would likely be significantly lower.

**More Medically-Urgent Appointments Not Counted As Being Late**

Finally, there is a third biasing error: CDCR won't count any appointments as being late, if they are

1. more medically urgent,

so

2. scheduled more frequently than existing Program Guide timeframes to provide adequate care.

When such an appointment is missed, as long the next appointment occurs within the *maximum* Program Guide interval, the missed appointment isn't counted as missed or late (see discussion of this later in this document).

**Misleadingly Good Numbers**

Utilizing

the reset the clock bias when transferring patients between institutions, plus

the increase the EOP time frame to 45 days bias (in 2017), plus

the more frequent than program guide appointment can't be late bias, plus

the counting appointments that were not appointments bias (discussed later), and plus

the combining more compliant and more numerous CCC patients with EOP appointments bias (in 2018), while

eliminating altogether the EOP's measurement of lateness in the 2018 staffing report,

made the data appear reasonably good in 2017 (see 2017 03 30), and in the 2018 staffing report (see 2018 08 23). But the figures as reported are simply incorrect.

28

1    The psychiatric leadership team could calculate precisely what the accurate figures would

2    be if we had access to the database, but our requests for access have been denied.[v]

3    As mentioned, there is no report of EOP timeliness in the 2018 staffing report to the

4    court, while we know that EOP "timeliness", as reported on the Dashboard but not to the

5    court, is both lower than the CCC value and itself biased for the reasons given above.

6    **The Implications For Psychiatry Staffing**

7    Whether patients are seen on time at the EOP level of care is relevant to determine

8    whether there is adequacy of psychiatric staffing. Alternatively, getting patients

9    successfully moved from their cell to the offices of psychiatrists to be seen, would also

10    enable timely contacts, even with no increase in staffing numbers.

11    If one examines the current Dashboard to try to understand the EOP timeliness, and if

12    the biases mentioned above were eliminated[vi], the 83% EOP *Dashboard* report (not

13    staffing report) for 2018 psychiatric appointment timeliness would be far lower than the

14    83% reported. For example, in June 2018 (see 2018 09 04 1830hrs), EOP timeliness was

15    reported as being 83%. The real figure would be far lower were the biases listed above

16    eliminated.

17    Low compliance figures would demonstrate either inadequate staffing or inadequate

18    organization such that patients are not being brought to their psychiatry appointments as

19    scheduled, on time and in confidential offices.

**Medication Monitoring Biases (also reported to court)**

Appropriate psychiatric care includes monitoring psychiatric medications, including checking patients' medication blood levels as appropriate, and measuring the potentially adverse effects of medications on organ function. The court has mandated a MAPIP protocol that includes keeping track of these measurements in a particular way.

My HQ psychiatry team and I have concerns about how CDCR was reporting our compliance with the MAPIP lab reporting metrics. We have raised these concerns with our HQ administrators (see 2018 01 16 1409hrs). These metrics report whether appropriate labs have been drawn and whether various physiological parameters (e.g., weight and blood pressure) are being obtained, so as to safely utilize medication. Before July 2018, the patients appeared to be doing better than we might have expected. If CDCR were reporting accurately the measuring of lab values for patients on psychotropic medications, we would expect the reported compliance to be lower than it was.

Ultimately, we found that only those patients who had been on the same class of medication for the last year were considered for inclusion in the compliance measure. And then, even if only one measurement was made in the year, as opposed to the multiple measurements actually required, CDCR Mental Health deemed that to be compliant with MAPIP requirements.

Patients who had switched medication classes (and thus required multiple measurements) were excluded from the analysis before June 2018. Those switching medication classes are precisely those most at risk of having problems with medications they are taking and so are precisely those patients who need the monitoring more.

1  Those patients who switch medications are more at risk because the explanation for the

2  switch is often that the medication was causing a side effect (so might not be at the right

3  level) or possibly the patient was not taking it or not taking it appropriately. In addition,

4  more medication switching may create more risk of toxicity because each drug class has

5  its own set of risks.

6  I have no doubt that programming at least one of the MAPIP recordings was difficult. For

7  example, measuring whether physicians checked a blood level when medication doses

8  were changed. Indeed, we are not measuring that at present because of that genuine

9  difficulty.

10  I also have no doubt that it can be very reasonable to start with something easy, so that

11  compliance can be easily achieved before moving on to something more difficult. For

12  example, as I show below, in effect, the original MAPIP measurements were considered to

13  be compliant if the physician had drawn only a single measurement in the year after the

14  medication was started.

15  For the patient to be included in the analysis, CDCR deemed that the physician *needed to*

16  *have a full 12 months* to obtain a single blood draw for analysis. (see 2018 07 03 m) If there

17  was not a full year in which to get the one blood draw done, because the medication was

18  changed to another one during in the year, then that patient's data was excluded in the

19  calculation of whether there was lab test compliance was with respect to either drug. So

20  those who needed the measurement most, and who were least likely to have the

21  measurement done, were not included in the MAPIP calculations.

22  By excluding all of these somewhat more difficult to make measurements because there

23  had been less than a full year in which to do the blood test, very high compliance rates

24  could be recorded, as reported to the court [case 2:90 cv 00520 KJM DB Document 5591

25  page 14 of 18, beginning line 7]. (see 2017 03 30 5591 14)

1  We appear to have been failing to report straightfowardly to the court for years that we
2  were not measuring compliance with any of the laboratory drug monitoring MAPIP
3  criteria in the case of patients statistically most likely to need it.

4  Note that from the Defendants' Response to the Special Master's Report on the Status of
5  Mental Health Staffing and the implementation of Defendants' staffing plan, from March
6  30, 2017, [case 2:90 cv 00520 KJM DB Document 5591 pg 14 of 18, beginning line 7], the
7  following:

8        To ensure medication monitoring for its patients, CDCR uses a detailed
9        monitoring tool titled "Medication Administration Process Improvement Process."
10        This tool facilitates necessary and appropriate systemic monitoring of medication
11        management, including blood levels, for the following types of medications: (1)
12        Antipsychotics; (2) Clozapine, (3) Mood Stabilizers, including Carbamazepine,
13        Depakote, and Lithium; and (4) Antidepressants. CDCR clinicians generally
14        maintain high levels of compliance, with most institutions achieving compliance
15        above the ninety fifth percentile. (Tebrock Decl. 11, Exh. 1.) CDCR's systemic,
16        statewide compliance with its medication administration measures totals ninety
17        six percent over the past twelve months.

18  In terms of using a "detailed monitoring tool" that facilitates "necessary and appropriate
19  monitoring" of medications and that "compliance with its medication administration
20  measures totals ninety six percent", it seems that this "detailed" analysis included only
21  one of the four court required blood draws, as specified earlier.

22  For many of the medications, CDCR already utilizes a lenient standard, requiring just four
23  blood draws due to difficulties in the prison population in getting compliant blood draws.
24  For example, the National Health Service of Britain suggests weekly monitoring of lithium
25  blood levels (see 2018 08 28) when a patient is being started on the medication. For

1   lithium and many other drugs, CDCR and MAPIP just require a baseline blood

2   measurement, a measurement at three months, a measurement when the dose is

3   changed, and an annual measurement ("annual" in CDCR means between three months

4   and 12 months).


5   There is a caveat about MAPIP in small print on the exhibit provided by CDCR (see 2017

6   03 30) which says: "Percentages in this column represent the average compliance for

7   MAPIP Measures 1A 1G. These measures do not capture MAPIP Measure 1A 1G that are

8   baseline, 3 months or triggered by medication dose change."


9   For "1A 1G", each letter refers to different drugs. This statement in smaller print at the

10  bottom of the page seems to be saying that for the drugs for which the measurements

11  were recorded, of the four required MAPIP blood draw measurements when a medication

12  is started, three of the four are not included in the compliance reports. They did not

13  include the "baseline requirement", the "3 month" requirement, or the requirement for

14  checking blood draws when "triggered by medication dose change".


15  But even with these caveats it's still not right.


16  The annual measurement is the fourth measurement. It is *defined* in the MAPIP protocols

17  as a measurement that occurs 91 days to 365 days after the start date (for example see

18  2018 09 04 1700hrs). Actually, before 2018, it was defined as anytime in the year after

19  starting the medication. (see 2018 07 03 m) After reading the above caveat, it is the only

20  measurement left to enable any of the compliance calculations to be made in the table

21  presented, because the caveat eliminates the other three mandatory blood draws in this

22  "detailed monitoring tool". But actually, that measurement wasn't being followed either,

23  as explained below.


33

1   Does the fact that CDCR is not doing and reporting most of the required measurements

2   explain how CDCR overall reports such high compliance numbers in the table? Does that

3   explain the reported, "high levels of compliance, with most institutions achieving

4   compliance above the ninety fifth percentile"?

5   Not fully.

6   What is not even hinted at in the report to the court is that in addition to skipping

7   measurements of three of the four required blood draws in all of the patients, some of the

8   patient data was eliminated entirely from the reported analysis, namely, that of patients

9   who were not on a given medication for an entire year. Those who were not on a

10   medication for an entire year are precisely those who are less likely to have had even one

11   measurement done, because there was less time in which to get the blood drawn.

12   By screening out eligible patients who did not have the very highest likelihood of having

13   just a single correct measurement done (out of multiple needed), and thus only in fact

14   including in the analysis a small proportion of the population that should have been

15   included, CDCR reported "detailed monitoring" and "high levels of compliance, with most

16   institutions achieving compliance above the ninety fifth percentile".

17   The MAPIP calculations have subsequently been updated and released this July 2018 to

18   somewhat more accurately reflect the actual court ordered MAPIP rules, although the

19   rules CDCR is following are still more lenient than the court rules.

20   This change in reporting has made a dramatic difference. Since the change, virtually all

21   the court ordered blood measures (including drug monitoring for antipsychotics, valproic

22   acid, lithium, and carbamazepine) have turned "non compliant" (all red, most below 75%)

34

1  statewide. Though we were utterly non compliant, the reports to the court in previous

2  years were that we were virtually completely green (above 90%).

3  Moreover, the court needs to still be aware that we are not actually measuring

4  compliance in accordance with important parts of the MAPIP criteria. For example, when

5  we change the dose of a given drug, new drug levels and new blood measurements to

6  check for organ toxicity need to be made.

7  The MAPIP blood measurements are still not being made in one important way. We

8  encourage our psychiatrists to do what is right and good. But we are not yet measuring

9  whether psychiatrists are getting blood drawn when doses of medications are being

10  changed that require a blood draw, even now, though that is a critical part of MAPIP. So

11  whatever low level of compliance we are reporting now, our actual compliance with court

12  mandated MAPIP measurements is even lower.

13  Unfortunately, errors in reporting whether appointments are timely and whether drug

14  monitoring has occurred are not the only errors CDCR has made which seem to create

15  bias in terms of over reporting compliance. There are significant problems with the

16  Dashboard as well.

17  **Missed Scheduled Appointments**

18  Our quality management psychology team has provided an easy way of discerning

19  whether appointments at given levels of care, across levels of care, at a given institution,

20  or across institutions, are on average being seen as scheduled.

21  Please see the Appointments Seen as Scheduled report about CHCF (see CHCF 2018 07

22  ASAS). This report describes mainline CCC patients scheduled to be seen in the mental

1   health program by psychologists, psychiatrists, and other mental health providers. The

2   claim, as written in the report, can be seen below (CHCF 2018 07 ASAS)

3   Denominator = *All scheduled appointments* [emphasis mine, MG]

4   Numerator = All appointments from the denominator that were completed as seen.

5   The quality management psychology team (or those who direct them) would seem to be

6   claiming, based on what they are reporting and saying, that their report is calculating the

7   percentage of "all scheduled appointments" that are seen at the entered level of care and

8   location. In the case illustrated (CHCF 2018 07 ASAS) it would appear that 98% of all

9   scheduled mainline ("ML") CCC appointments were seen as scheduled at CHCF in

10  February. That sounds pretty good.

11  Indeed, this is what our colleagues think when I have asked them to look at the report.

12  What should they think? That is what the report and all similar ones about different

13  institutions and contexts say is being measured.

14  The report from SAC about February 2018 says that 91% of patients came to their

15  appointments as scheduled. (see 2018 07 30 2057hrs).

16  There is a different way of getting the information, from which one can try to calculate

17  the same statistic. However, it requires exporting into an Excel spreadsheet the

18  information about each and every individual patient appointment that occurred that

19  matches the search criteria, then checking whether the appointment is marked as having

20  occurred as scheduled or not, grouping all those appointments (conceptually) together in

21  terms of which are alike and different, and then calculating what percentage of the total

22  number of appointments the grouped appointments comprise.

36

1    Dr. ▮▮▮▮▮ writes: "There is a report called "Appointments" that allows for searching a

2    specific institution (or all of CDCR), program, date range, and appointment type, and

3    getting a list of all appointments that meet the search criteria. For example, I searched

4    CDCR, ML CCCMS, psychiatrist contacts on 7/10/18 with all outcome types, and received

5    a table with 955 rows (954 patient appointments). I then changed the outcome type to

6    "cancelled", "refused", or "pending" (all of the outcome types except "completed"), and

7    received a table with 461 patient appointments. So on 7/10/18 in all of CDCR, the

8    percentage of scheduled psychiatry appointments that were missed was 48%, or to put it

9    in performance report terms, the percentage of Appointments seen as scheduled was 52%.

10   This doesn't include the appointments that were just rescheduled by schedulers without

11   marking them as cancelled, but there's no way to track that. However, this is definitely

12   not a quick or easy way to obtain appointment data." (see 2018 08 13 1450hrs)


13   Dr. ▮▮▮▮▮ is describing how she got a report about the percentage of psychiatry

14   appointments that had occurred (not including other mental health providers) for all

15   CCC appointments in CDCR on 7/10/18, by importing each individual appointment that

16   had occurred into an Excel spreadsheet and then making a calculation.


17   Unlike using the Appointments Seen as Scheduled Report (that is easy to use), it is

18   unlikely that Coleman monitors, Chief Psychiatrists, CEOs, etc. will be checking too

19   frequently (or at all) for whether appointments were seen as scheduled in their institution

20   using the methodology that involves exporting appointments into several thousand page

21   Excel spreadsheets, as Dr. ▮▮▮▮▮ describes.


22   But our team did. Using this complex non "quick or easy way to obtain appointment

23   data" for SAC for mainline CCC for all providers (for example psychiatrists, psychologists,

24   etc.) in February 2018, we found that only *22% of appointments were seen as scheduled.*

25   For the first page of hundreds of pages of Excel Spread Sheet printed out, see page 3 of

26   2018 08 22 0900hrs. But the Dashboard report (see page 2 of 2018 08 22 0900hrs) claim

37

1  was that 87% of "All Scheduled Appointments" were seen as scheduled in February of

2  2018 at SAC mainline CCC.

3  Clearly, 87% is not 22% at SAC (for all mental health providers at the CCC mainline level

4  of care in February). The psychiatry team suspects that the 22% figure is the more

5  accurate one, though the 87% figure is presented on the Dashboard, because the 22%

6  figure was calculated from a table with hundreds of rows, actually listing *all* of the

7  scheduled appointments, which we could count one by one, to see which scheduled

8  appointment were marked as completed or not.

9  One can do the same type of calculation for all of CDCR Mental Health CCC mainline

10  appointments statewide, not just for SAC. The CDCR Dashboard report claims that 95%

11  of all scheduled mental health appointments at the CCC mainline level of care, for all

12  provider types, were seen as scheduled in February (see page 1 of 2018 08 22 0900hrs).

13  But we looked at each appointment that occurred individually as well. The full analysis

14  for this would be too large to physically attach to this document, as it would require an

15  attachment of many hundreds of pages to list all 84,120 appointments. But this list could

16  be provided if there were an interest. Our team could downloade this list into an Excel

17  Spreadsheet to make the calculations. (For the first page of our Excel download, see page

18  4 of 2018 08 22 0900hrs.)

19  Whereas at SAC, 22% of patients were coming to appointments for social workers,

20  psychologists, psychiatrists, etc., statewide it appears CDCR (for all institutions) was

21  doing better, with 42% of appointments being seen as scheduled for all mental health

22  providers at the CCC level of care (35,642 appointments seen out of 84,120 total

23  appointments). But the Dashboard calculation is that 95% of patients are being seen as

24  scheduled statewide at the CCC level of care.

1    Ninety five percent is very different from 42% for all providers statewide at the CCC level

2    of care. Furthermore, the 42% seems to be more accurate, though the 95% figure is the

3    one published on the Dashboard.

4    These reports of scheduled appointments that are completed seem to report greater

5    compliance than is in fact the case. These inaccurate reports are easily accessible to the

6    Coleman monitors, our psychologists, our Chiefs of Mental Health and our psychiatrists,

7    to enable them to judge our scheduling system, and they appear to be grossly inaccurate.

8    Concerning the whole process, Dr. █████████ says:

9    "It is odd, and I don't understand why Appointments seen as scheduled is so high [using

10   the *Appointments Seen as Scheduled* report, MG]. When I drill down on Appointments

11   seen as scheduled, the only options it shows are Seen, ProviderUnavailable,

12   ModifiedProgram, and TechnicalDifficulties [I have attached a screenshot (see 2018 07

13   30 2057hrs)]. There are several other options to choose from when cancelling an

14   appointment [when one uses the EHRS system, MG], including IP (inmate patient) No

15   Showed, IP Refused, Scheduling Error, etc., so it appears they do not include any

16   appointments with those outcomes in the denominator. But that is so illogical I am

17   doubting myself." (see 2018 07 31 1346hrs)

18   So the overwhelming bulk of patients who do not come to appointments as scheduled

19   somehow don't count in a measure of patients who do not come to appointments seen as

20   scheduled. Those patients who would make the appointments seen as scheduled

21   percentage lower are not included in the measure, though the reports say "All Scheduled

22   Appointments". Those inmates who, for example, "refuse" or "no show" and in which

23   there are "scheduling errors", are somehow just eliminated in measurements of whether

24   scheduled appointments occur.

1   And even whether patients actually "refuse" or not to come to appointments is a very

2   complicated question, since we know that different prisons are considerably better or

3   worse at getting patients to appointments. Some patients undoubtedly do refuse, but

4   many don't, which is a separate but also a very interesting question worthy of exploration.

5   The report of the psychiatrist Dr. ███, whom I followed at SAC, is instructive (see

6   2018 07 18 R). He documents what we heard as we spoke to patients and it certainly

7   appears that at least several did not refuse, though they were documented as having

8   refused or moved to a different day (discussed below). So the data very likely over

9   estimates patient refusals as well, even if included in this measure.

10   But there are even more oddities in how the individual appointments are tabulated, even

11   when we evaluated each and every appointment in a tabulated form.

12   Dr. ███ says (see 2018 08 14 1340hrs): "Per Dr. ███ write up that you attached,

13   he had 11 patients scheduled to be seen on 7/9/18    4 came and were seen, 6 did not come

14   and were not seen, and 1 was out to court and was not seen. I have attached a screen shot

15   of the Appointments report for Dr. ███ on 7/9/18, which shows he only had 5

16   scheduled appointments, 4 of which were seen.

17   It appears that the scheduler[vii] moved the appointments that were not seen on 7/9/18 to

18   the schedule for 7/10/18, instead of marking them as refused on 7/9/18 and rescheduling

19   them. This is a huge problem for two reasons: 1) Those 6 appointments were NOT seen as

20   scheduled, so the Appointments seen as scheduled percentage should be 36% (4/11), but

21   by erasing any record of them from the 7/9/18 schedule, the Appointments seen as

22   scheduled reported percentage is, erroneously, 80% (4/5); and 2) Those 6 appointments

23   should have been marked as No Shows/Refusals, making the appointment refusal rate

24   55%, but since there were just moved to a different day, the reported refusal rate is 0%."

1   Schedulers should be labelling such appointments as "cancelled", "refused" or "no show",

2   but are instead simply moving the appointments to a later date in such a way that there is

3   no indication that there ever was an appointment on the original date. Thus, the

4   appointments occurring as scheduled figures even in our own calculation are

5   inaccurately high, because we have no way to identify cases in which appointments have

6   been moved to later dates without leaving a record of the original appointment dates.

7   Indeed, when I recently visited SAC in July 2018, Dr. ██████ and I listened (and I was in

8   disbelief) when the psychiatrists told us about this process and indeed explained those

9   who make appointments for them had recently been retrained to move appointments

10   exactly as described above. Obviously, this type of thing also creates questionable reports

11   to the Coleman monitors and our leadership.

12   Dr. ██████ continues (see 2018 08 15 1004hrs): "The only reasonable argument for

13   excluding some of the appointments from the denominator is that the system auto

14   cancels appointments when a patient has been moved to a different institution after their

15   appointment was scheduled but before their appointment occurred. If auto cancellations

16   are removed from the denominator, then the percentage of appointments seen as

17   scheduled becomes 46% [a 4% difference from 42%, for all mainline CCC in CDCR, MG].

18   However, as we previously discussed this figure does not account for all of the

19   appointments that should have been marked cancelled/refused/ no show but are simply

20   rescheduled to a different date [discussed above, MG]. If we were able to include those

21   cases, the appointments seen as scheduled would be even lower [than 46%, MG]."

22   So it would appear that removing auto cancellations when a patient has been moved to a

23   different institution can in no way explain differences like 95% vs. 46% of CCC patients

24   seen as scheduled and 87% vs. 22% of CCC patients seen as scheduled at SAC. Likely the

25   figure is less than 46% because some of these appointments (vs. many of them?) are not

26   being recorded when they don't occur and are just being moved, as documented above.

1  So perhaps at the CCC level of care, conservatively, 40 45% of patients are being seen as
2  scheduled.

3  Dr. ███████ analysis of scheduled appointments that are seen vs. not seen, suggests
4  significant problems with the data portrayed on the Quality Management Dashboard as
5  well as highly significant and relevant clinical issues in getting care to patients. For
6  example, 22% of scheduled appointments were completed as scheduled at SAC in
7  February 2018. There are significant problems, even if one doesn't take into account the
8  appointments that did not occur as scheduled but of which we have no record, because
9  they were simply moved.

10 Moving patients to be seen at later time of the day, let alone another day (without
11 recording that this occurred) is itself problematic. For example, at SAC, when the patient
12 wasn't seen for a scheduled appointment in the morning, during my recent visit there, it
13 meant that the patient was not going to be seen in an office that morning.

14 Instead, in the afternoon, the psychiatrist would be roaming the yard looking for the
15 patient. The earlier appointment in the office did not occur as scheduled, or should be
16 recorded in some way as having not occurred, even if not recorded as "not seen as
17 scheduled". Yet it isn't recorded. This is a problem because failing to see the patient in the
18 morning is adding to the inefficiency of the system, because psychiatrists have to
19 reschedule patients to later in the day and then search to physically find them.

20 This is so even if the psychiatrist is ultimately able to find the patient somewhere on the
21 yard or in his cell and sees the patient on the day that he or she was originally scheduled.
22 In the case of seeing patients after a second attempt on the same day, it is true that the
23 appointment that occurs is still timely relative to when it was scheduled to occur; but the
24 appointment is nonetheless time wasting for the psychiatrist, at the least.

42

1   Taking into account that appointments are being moved and not counted as being

2   rescheduled, optimistically, then, less than 46%   perhaps 40  45% of patients   were seen

3   as scheduled, although this itself could be a major overstatement. The degree of error

4   depends on how widespread the practice is of training schedulers to move appointments

5   to a different day without recording a problem, let alone moving patients to be seen on

6   the same day without recording that any problem occurred. The latter is very common.


7   Imagine a CEO, Court officer, Special Master, Chief of Mental Health, Chief Psychiatrist

8   or anyone else who is working within our system trying to evaluate the health of our

9   system in terms of its ability to get patients seen as scheduled. Overall for CDCR,

10  according to the Dashboard, 95% of mainline scheduled CCC patient appointments are

11  said to occur as scheduled. Let's imagine an average institution that itself has the same

12  Dashboard average as the statewide average, i.e., 95% of mainline CCC patient

13  appointments are said to be occurring as scheduled.


14  Most leaders and line staff in our Department of Corrections, would guess that all is well

15  at that institution for those patients. There certainly could be improvements. But 95% is

16  pretty good.


17  In general, with a Dashboard that looks like that, people would think (and no doubt in

18  reality do think because that is the figure the Dashboard gives) that mental health

19  patients are getting seen, assuming they are being scheduled correctly. If mentally ill

20  patients are being seen as long as they are scheduled to be seen, there appears to be

21  nothing much to fix, so that leads to a lack of action to solve the problem that actually

22  does exist, of patients not actually being seen when they need to be seen. If this goes on

23  for years, with appointments appearing to be happening appropriately in the vast

24  majority of cases despite the fact that in reality, patients are not being seen when they

25  need to be seen, nothing gets fixed for years in terms of trying to get patients to

26  scheduled appointments.

43

1  Suppose, however, that we now tell the CEO, Court, Special Master, Chiefs of Mental
2  Health, Deputy Directors, Coleman psychiatrists and psychologists, CDCR Chief
3  Psychiatrists, and others interested in improving our system, that the actual percentage of
4  appointments occurring when scheduled is 40 45% not 95%, at the CCC level of care at
5  this institution and statewide.

6  The 40% 45% figure does appear to be a lot closer to the truth than the 95% figure
7  reported by QM, given the reports we ourselves have run. Indeed, our QM psychologists
8  are claiming a figure that is about 100% higher than what appears to be the case. [viii]

9  Surely about 40% 45% of all of our patients being brought to their psychologists' and
10 psychiatrists' CCC appointments is very different from 95% of appointments occurring as
11 scheduled. With a figure of 40% 45%, large numbers of patients are not being evaluated
12 when the psychiatrists and psychologists think they should be, enormous work has to be
13 done trying to find the patient cell side, fewer patients can be seen in the future because
14 the patients who have not been seen need to be rescheduled, extra work is needed,
15 patients are not getting treated when they are supposed to be and thus get worse, etc.

16 For a psychiatric physician or psychologist to be seeing patients at a given frequency
17 means that the patient has to be scheduled to be seen at least at that frequency. If only
18 40% 45% of scheduled appointments are occurring as scheduled, that means that the
19 clinician has to waste enormous amounts of time blocking off time in his or her schedule
20 for appointments not occurring as scheduled, and this destroys his or her efficiency.
21 Alternatively, if he or she schedules far more than the number that will be brought to try
22 to fill his or her schedule, in addition to the waste in resources planning for eventualities
23 that don't occur as others try to get these patients ready, when patients happen to be
24 brought as scheduled, then custody learns that mental health patient appointments will
25 not be occurring as scheduled, because of the unpredictability in psychologists' and
26 physicians' schedules. Officers then become less willing to bring patients in the future,

44

1  because they end up having to wait because patients are not being seen when their

2  appointments were scheduled to occur.

3  As they adapt to the fact that only 40% 45% of appointments occur as scheduled, less

4  than 50% of the resources are provided to bring patients. Furthermore, since custody

5  never knows which patient will not be available, for example because they have

6  conflicting appointments, then custody may well bring the patients in batches, since they

7  can't count on any given individual patient being seen as scheduled. Indeed, bringing

8  patients in batches happens, for example at SAC, though there is a Receiver's memo

9  saying that it shouldn't, because it discourages patients from coming.

10  And when patients are brought in batches, a far higher percentage of them don't want to

11  come, because they have to wait around to go to their appointments and to return from

12  their appointments. So the refusal rates from patients then goes up. Thus, a vicious circle

13  of inefficient patient care is created.

14  Indeed, we will see that in many environments, for example in the SAC EOP program

15  described later, the whole system has adapted to appointments not occurring as

16  scheduled, ensuring that it won't change without major effort. CDCR reports that 95% of

17  appointments are occurring as scheduled, when in fact half of that is occurring; and in

18  some environments (like SAC), less than a quarter (22%) of appointments appear to be

19  occurring as scheduled.

20  A straightforward presentation of the actual data with no over reporting of compliance

21  would enable important attention to be brought to one of the most critical psychiatric

22  issues: How do we get patients in a timely way in front of psychiatrists (and other mental

23  health professionals) in offices, so they can get treatment? How do we create psychiatric

24  and mental health clinics?

1   So instead of presenting biased reports of patients seen, timely or as scheduled, CDCR

2   could have been focused on knowing where the scheduled appointments were not

3   occurring, and devoting executive and other resources to solving the problem. There

4   could, for example, be a regional team of psychiatrists (reporting to psychiatrists so they

5   would be allowed to focus on precisely that problem) who could tour each institution to

6   try to identify and remove obstacles to creating appropriate clinics for psychiatric patients

7   to get care.

8   If the State does not want to hire more psychiatrists because they are expensive, or if the

9   State would have to raise psychiatric salaries to attract more psychiatrists, then surely

10  there should be a focus on using psychiatry resources efficiently, not least by utilizing a

11  clinic model allowing each psychiatrist to see many more patients per day, and by getting

12  patients to their psychiatry appointments.

13  The Statewide Dashboard combines results for Medical, Dental, and Mental Health. On

14  the Statewide Dashboard, but not on the Mental Health Dashboard, it explicitly says (see

15  2018 09 05 1700hrs) that the "Seen As Scheduled" measure "Excludes appointments not

16  seen as scheduled due to patient refusal or similar patient controlled factors, scheduling

17  error; patient transfer; lay in; out to court/medical; pending or "to be scheduled"

18  appointments; walk ins; and appointments scheduled to be seen during the reporting

19  period but not yet closed."

20  This seems similar to the caveat in MAPIP where virtually all of the needed

21  measurements were excluded. (see 2017 03 30)

22  But in addition, the Mental Health Dashboard *does not even say the above*. The mental

23  health Dashboard says that the denominator is "All Scheduled Appointments" which of

24  course *includes scheduled appointments in which patients refused services.* So people

46

1   looking at the mental health Dashboard would have no idea at all that they are in effect

2   being misled.

3   The purpose of measurement is to clarify and not obscure. Legitimate measurements of

4   whether patients are seen as scheduled are incredibly useful, because they would reveal

5   that in some of our institutions only 22% of patients are getting to mental health

6   appointments and that in most only about 40% 45% are at the CCC level of care. That

7   matters clinically and is significantly problematic (as examples later will show), but those

8   low figures have not been reported. Instead we see these rosy reports of compliance that

9   doctors and our leaders think mean that 95% of patients came to appointments and were

10  seen. But the measurements mean nothing like that at all.

11  This problem of over reporting compliance cannot help but raise concerns. Failing to

12  address the scheduling, and therefore the timing of appointments, prevents adequate

13  psychiatric care.

14  **Appointment Timeliness Revisited**

15  According to the Program Guide, at the EOP level of care, "A psychiatrist shall evaluate

16  each inmate patient at least monthly".

17  It does not say "shall evaluate each patient *monthly*", as it would have if monthly

18  appointments were all that were required. It says "shall evaluate" (are required to be

19  evaluated) "*at least* monthly", which implies that some patients are required to be

20  evaluated more frequently than monthly   those patients who need that care.

21  Yet in its percent patient weeks compliant timeliness figures, CDCR doesn't count a

22  psychiatry appointment as having been late (non compliant) unless it has occurred after

47

1 the maximum interval, i.e., one month at the EOP level of care. This is the case even

2 when a doctor has ordered that a patient be seen for a follow up seven days later but in

3 fact the patient has not been seen until 30 days later if an EOP patient, or 90 days later if

4 a CCC patient.

5 Therefore, all the percent patient weeks compliant numbers reported on the Dashboard

6 to our Coleman experts and CDCR leaders and clinicians and the court about timely

7 appointments appear to be inaccurate in the 2017 staffing report (see 2017 03 30 "Timely

8 Psychiatry Contacts" column) and in the 2018 staffing report (see 2018 08 23

9 "Compliance").

10 Suppose a patient is seen at the CCC level of care by a psychiatrist, and that the

11 psychiatrist orders a return visit in 30 days. Suppose that the patient is in fact seen 90

12 days after the initial appointment rather than in the 30 days ordered. That follow up

13 appointment is actually 60 days late. In its calculation of the average days overdue

14 figures, does CDCR count such an appointment as having occurred 60 days late, or does it

15 deem it not to be overdue at all? And overdue relative to what?

16 In its 2018 staffing report, CDCR claimed that appointments are an average of 2.6 days

17 overdue at the CCC level of care (see 2018 08 23). This figure is so much lower than I

18 would expect given my experience of CDCR, that it seems highly likely that CDCR is not

19 counting as overdue, appointments of the above sort, in which a CCC patient is seen even

20 60 days later than needed per the doctor's order. CDCR has never allowed psychiatric

21 physicians to analyze the data to be sure, but I am confident that this is the case. [ix]

22 When CDCR calculates its timely measure, "percent patient weeks compliant", it does

23 not take into account *when the physician ordered the patient to be seen* in determining

24 whether the appointment was late, as long as the patient was seen within the maximum

25 Program Guide interval. Given that CDCR ignored what the doctors ordered in

48

1    calculating their percent patient weeks compliant figure, it seems very likely that in their

2    calculation of how many days overdue appointments were, they were ignoring doctors'

3    orders with respect to when patients needed to be seen. The 2.6 days figure reported by

4    CDCR to the court is thus very likely falsely low. (see 2018 08 23)

5    Suppose a psychiatrist orders that a CCC patient be seen for a follow up appointment 30

6    days later, and that that patient is indeed seen 30 days later as ordered by the doctor. Is

7    such a follow up appointment occurring as scheduled on time, as any medical doctor

8    would argue, or can it be considered to have occurred early?

9    To arrive at such a low figure as 2.6 days overdue, CDCR must be counting as *early,*

10    appointments occurring earlier than at the court ordered *maximum* interval, including

11    those that occur sooner than the maximum interval *because the doctor has ordered that*

12    *the follow up appointment occur earlier,* i.e., because the patient *needs* to be seen sooner.

13    CDCR is probably also counting as *early,* appointments that actually occur *late* relative to

14    the doctor's medical order, if the follow up appointment occurs sooner than the court

15    ordered *maximum* interval.

16    This 2.6 days figure was presumably obtained by counting as late only appointments

17    occurring after the maximum court ordered interval, and counting as *early all*

18    appointments occurring before the maximum interval irrespective of when the doctor

19    ordered a follow up appointment to occur, and averaging out the figures. In reality, many

20    appointments are late, and many are very late indeed, and this 2.6 days figure seems to be

21    hiding that fact.

22    CDCR has argued that since psychiatrists are seeing their patients in a "timely" way, this

23    demonstrates that the number of psychiatrists is sufficient given CDCR's organizational

24    capacity to use a given number of psychiatrists. But in its calculations of late

25    appointments CDCR has not been counting as late many appointments occurring later

1    than the doctor had ordered, and nor has it been counting as late appointments occurring

2    after what is in some cases a very long time indeed, in cases in which the patient has been

3    transferred from one institution to another multiple times. So in fact there may be too

4    few psychiatrists given CDCR's current often inefficient use of the psychiatrists they have.

5    One can see in a simple calculation how CDCR could be counting late appointments as

6    late, even if using the exact CDCR "percent patient weeks compliant" model that our

7    psychology quality managers claim we should use. So even though the psychiatry team

8    thinks that we should (at least also) know the percentage of appointments that are seen

9    on time (though we will never be permitted to have that information unless outside

10   forces demand it), it is possible to use the CDCR method (which makes things appear

11   better) to get some information.

12   Suppose that a patient is seen at the CCC level of care and the psychiatrist orders the

13   patient to be seen four weeks later, but the patient is instead seen 11 weeks later. If CDCR

14   used the percent patient weeks compliant measure straightforwardly, they would report

15   such a patient appointment as being 4/11 weeks compliant or 36% weeks compliant,

16   because there were 11 weeks, and the first four weeks are compliant because the doctor

17   hasn't ordered the patient to be seen until 4 weeks later. So it is completely

18   mathematically possible, even using CDCR's percent patient weeks compliant

19   methodology, to take some of these lateness issues into account. It can be

20   straightforwardly done, as shown in this paragraph. But CDCR does not report such cases

21   as being late at all. The only appointments CDCR deems non compliant are those

22   occurring after the court ordered *maximum* intervals.

23   The failure to report this is therefore not due to CDCR's different way of calculating

24   lateness: they are just not applying the formula when patients are in fact seen late, in a

25   calculation of whether patients are seen late.

50

1    Even though the measure can be used to measure lateness, as demonstrated above, one

2    has to be careful with its use. This CDCR methodology is biased, and it is very easy for the

3    reader to misinterpret what is being reported.

4    To see why the CDCR measure of "percent patient weeks compliant" can give the

5    uninformed reader the wrong idea, consider Dr. █████ analysis of the differences

6    between percent on time appointments (which most people understand and the

7    psychiatry team wants) and "percent patient weeks compliant" appointments (the CDCR

8    measure). Note also that percent on time appointments will always give an equal or

9    lesser value than "percent patient weeks compliant". Dr. █████ writes:

10    "An Enhanced Outpatient Program (EOP) patient had a psychiatry appointment on

11    Monday 8/13/18, and their next appointment wasn't until Friday 9/21/18. They were due to

12    be seen by 9/12/18 (per Program Guide rules) so are 9 days late, but due to compliance

13    being measured by weeks, there are four weeks of compliance and one week of non

14    compliance, which is then reported as 80% compliant. If you have 100 patients, 50 of

15    whom are seen on time, and 50 of whom are seen late by one week, the reported Timely

16    Psychiatry Contacts compliance rate will be 90%. It would be very easy to think that the

17    90% compliance rate meant that 90% of the patients were seen on time, when in actuality

18    only 50% were." (see Appendix 1)

19    Given the example above, one can see why the mental health leadership (without external

20    pressure) will never allow calculations so we can see whether or when are patients are

21    being seen on time. The number could just be too low. Although our psychiatry team has

22    written a program elsewhere that would allow this analysis of our data, the █████

23    █████ has not allowed us to use it. If it were known that in many places 25% of our

24    patients were being seen on time, that would get executive level attention to fix the

25    problem (like SAC in which 22% of patients were seen as scheduled).

1    So whether one is seeing a patient on time or not has little to nothing to do with CDCR's

2    lateness measure called "percent patient weeks compliant".


3    Taking Dr. ██████ example even further, CDCR could report that psychiatrists are

4    being 90% "timely" with respect to psychiatric appointments (actually 90 percent patient

5    weeks compliant) and virtually never see a single patient on time. In fact, it is

6    mathematically possible for the report to say that appointments were "90% timely"

7    despite not a single appointment having occurred on time. And given that we are

8    reporting considerably lower than 90% "timely", in EOP patients being seen "timely", and

9    particularly given the biases in those very reports that I have previously mentioned, the

10   percentage of patients seen on time (rather than CDCR's "timely") could be very low

11   indeed.


12   Doctors will slowly increase medications in a particular time dependent way, while

13   monitoring results during pre determined time intervals. One can see, for example, that if

14   a psychiatrist sees patients to monitor medication titration on a prison ward in a "90%

15   weeks compliant" way, but only sees patients on time 15% of the time, that could, on

16   average, expose those patients to far more risk than if the patients are seen in a "90%

17   weeks compliant" way, and are seen on time 85% of the time.


18   Both of these are completely possible in our system. And our psychology quality

19   management team and the ██████████ won't let the psychiatry leadership team

20   (and apparently won't calculate themselves) which (if either) scenario applies in our

21   system. Our ██████████ disparaged our desire to check whether patients are being

22   seen late as "trying to parse the data". (see page 3 of 2018 05 23 2115hrs) The problem is

23   that this refusal to determine actual lateness and this refusal to allow us to look at this

24   issue adversely affects our ability to solve problems and improve patient care.

1   In the 2018 staffing report, it appears that CDCR didn't even attempt to report on whether

2   EOP appointments were seen using CDCR's "timely" measure. Instead, there is just a

3   report of frequency of appointments, which might appear to give a sense that CDCR is

4   reporting about EOP timeliness, but (see below) they are not (see 2018 09 01 0900hrs).

5   The report implicitly appears to be claiming that only 6915 EOP appointments per month

6   were needed in order for CDCR to be compliant with the Program Guide. And the claim

7   seems to be that 6501 contacts were occurring per 30 days (of the 6915 EOP appointments

8   that are alleged to have been needed? It is not defined). Using these figures CDCR reports

9   a ratio of (6510/6915) and a .94 "rate". I assume this means a "rate of compliance" with

10  (needed?) appointments, rather than a rate of time, but this is not defined.

11  Imagine for a moment that these figures are true. Indeed, imagine that CDCR is doing

12  even better than that. So perhaps 6915 EOP psychiatry appointments per month actually

13  occurred (an average of one every 30 days) out of 6915 appointments that were supposed

14  to have occurred.

15  According to the figure CDCR reported, 6915 appointments were needed. Hypothetically

16  assume that 6915 appointments occurred, rather than the reported 6501 appointments.

17  CDCR would then have reported a "rate" of 100%. But note that such a seemingly perfect

18  figure would also be perfectly consistent, mathematically, with 50% of the patients having

19  been seen within the 30 day maximum EOP interval *and 50% of patients being seen after*

20  *the 30 day maximum EOP interval*, since there is no obvious reason why the distribution

21  around a 30 day average period between actual appointments would not be about even.

22  And CDCR does not report whether patients are seen on time or late, and nor do they

23  even report patient percent weeks compliant in EOP, so one can't check. So a seemingly

24  perfect figure would also be perfectly consistent with 50% of patients being seen late.

25  If the distribution is not even, more than 50% of patients could have been seen late for

26  appointments or fewer than 50% could be. So how does that demonstrate adequacy of the

1   frequency of psychiatric appointments? It doesn't. The point is that the report says

2   nothing about that.


3   Now consider the number of EOP appointments that actually happened. According to the

4   report, that was 6501 appointments. The number of appointments CDCR claimed were

5   needed per month was 6915. But according to their report only 6501 appointments

6   actually occurred. If there are fewer appointments happening, then other things being

7   equal it follows that more appointments are occurring later than needed. So if CDCR were

8   reporting that 6915/6915 appointments had occurred, and 50% were late, then given the

9   smaller ratio CDCR reported, of 6501/6915, an even larger percentage than 50% of

10  appointments could have been late.


11  The numerator in the EOP report is that 6501 patients were seen on average per month by

12  psychiatrists. The denominator (6915) is defined as the EOP mainline population, but

13  then CDCR makes the inference (without specifying that they do) that each of those EOP

14  patients need to be seen just once a month. That would give a required number of

15  appointments per month as 6915. But in reality, many patients need to be seen earlier

16  than one month later, as the Program Guide clearly suggests, given the "at least" wording.

17  So that 6915 figure is too low. And in fact psychiatrists have often scheduled EOP patients

18  to be seen sooner than one month later.


19  Moreover, the 6501 figure is too high. CDCR was counting as fully compliant

20  appointments that we now are calling mere wellness checks. A wellness check could be,

21  for example, a three minute encounter in the prison yard surrounded by other inmates.

22  Or it could be a telepsychiatrist's MA using a laptop camera and microphone, and

23  attempting to communicate with a patient who is in the cell behind the solid metal cell

24  door, to ask a patient to come to the next appointment. And there are worse cell side

25  "appointments" in which it is just about impossible to communicate with the patient.

26  Those are not proper psychiatric medical appointments either. (see 2018 07 12 1442hrs)

1  If 6501 is too high, and 6915 is too low, the ratio (6501/6915 = 0.94), which is supposed to

2  be the rate of required compliance with appointments, is too high.

3  Suppose 20% of appointments were non confidential or otherwise inappropriate and

4  should be counted as "wellness checks", not psychiatric medical appointments. Then only

5  5201 compliant appointments occurred (0.8x6501). (see 2018 07 12 1442hrs)

6  The Program Guide says that EOP patients should be seen at least once per month.

7  Suppose that on average, EOP patients actually need to be seen by a psychiatrist five

8  times in four months, rather than just once a month (5/4=1.25). Then there should have

9  been 1.25 x6915 appointments, which is 8644 appointments.[x] The maximum possible ratio

10  given these generous assumptions, is 5201/8644, which is 60%. That is to say, even using

11  these generous assumptions, only 60% of required EOP appointments in fact occurred (as

12  opposed to the reported 94%). And that says nothing about whether or not any of those

13  appointments were on time.

14  Whether, as I generously assumed above, only 20% of the appointments were in fact cell

15  side "wellness checks", or 30%, or some other figure, that figure is not accurately recorded

16  or reported, as I will show later.

17  In the 2018 report to the court, no EOP timeliness figures were recorded. We know that

18  there are significant problems in terms of appointments occurring (or not) as scheduled.

19  We know that there are significant problems in terms of appointments occurring as

20  frequently as needed, and we know that many appointments are not happening in

21  confidential offices. We also know that the "timely" percent patient weeks compliant

22  figures are biased and inaccurate. Thus, CDCR has failed to provide to the court the

23  requisite information and the accurate figures needed for the court to be making an

24  assessment of the adequacy of psychiatric staffing.

55

1    Rates of suicide and 30 day readmission rates are reportedly high in CDCR. If patients are

2    not being seen when they need to be seen, that might well be a good explanation for

3    these elevated rates.

4    Note that the official Dashboard definition of "Timely Psychiatry Contacts" is "Number of

5    patient weeks included in denominator during which the patient was up to date on their

6    required Psychiatry contact. Contact requirements delineated in the Compliance Rules

7    grid." (see 2018 07 27 0926hrs)

8    But what is the meaning of *required*? As our quality management psychologists define it, a

9    required appointment has nothing to do with when the physician orders an appointment

10    to occur. Our psychologists are measuring *business* requirements, not *clinical* or Program

11    Guide requirements. So in its reports to psychiatrists and the court, CDCR's quality

12    management psychologists are not even measuring "percent patient weeks compliant"

13    with *required* psychiatry appointments, let alone whether these appointments are on

14    time. Instead our psychologists are actually measuring percent weeks compliance with

15    *maximum* court defined intervals, regardless of when physicians order patients to be

16    seen. (see 2018 07 27 0926hrs)

17    Finally, whatever "timeliness" is said to have been created by the line staff psychiatrists in

18    seeing patients, it was actually created by the line staff psychiatrists *plus the psychiatrist*

19    *supervisors*. Due to staffing shortages and/or inefficient organization and utilization of

20    psychiatry resources, 60% of supervisors in our system often see patients alongside line

21    staff. So to maintain the current timeliness of psychiatric appointments, everything else

22    being equal, a higher number of line staff psychiatrists would be required than has been

23    reported to the court as being needed.

24    Were CDCR to use psychiatrists efficiently by using a clinic model in which each

25    psychiatrist stays seated in an office and patients are brought to their appointments one

1   by one and on time, fewer psychiatrists would be needed than is the case in the current

2   very inefficient system in which many psychiatrists have to waste a lot of time trying to

3   find their patients.

4   A relative lack of patient access to care due to structural barriers to getting patients to

5   appointments (patients not seen as scheduled) creates a need for more physicians to try

6   to see the same patients, because they must try at odd hours, on multiple occasions, and

7   see patients in unusual and inefficient clinical situations. Given the scheduling numbers

8   seen so far, there is no reason to think that any of this is well organized in CDCR.

9   In addition to the biases previously mentioned, including:

10      1.  resetting the clock when patients transfer institutions to allow up to doubling of

11          Program Guide timeframes,

12      2.  arbitrarily increasing EOP timeframes from one month to 1.5 months in 2017 (even

13          with no patient transfers),

14      3.  not counting appointments scheduled more frequently than minimum Program

15          Guide Timelines (as appointments that could and frequently were missed and

16          late),

17      4.  counting what were actually mere wellness checks (e.g., cell side appointments

18          and cell side telepsychiatry appointments) as full appointments,

19   here are two additional sources of bias:

20      1.  Calling some mere wellness checks compliant appointments causes appointments

21          following those wellness checks to be mistakenly deemed to have been on time.

22      2.  Were the psychiatric work not being done by supervisors as well as line staff, more

23          of the appointments would be late.

57

1  **Medications Not Taken and Follow-up Appointments**

2  If a patient misses three days in a row of medication or if in a week the patient is 50%

3  non compliant with medications, or misses one dose of a critical medication, the

4  psychiatrist is supposed to schedule the patient to be seen for an appointment to review

5  medication or there needs to be some type of triage system in place to make sure those

6  who need an appointment have one, and at least some documentation of why those who

7  don't need an appointment don't need one. Patients who are medication non compliant

8  (not taking medications as prescribed) are flagged in "Huddle Reports".

9  Suppose there are 100 patients in a month who have missed their medications as defined

10 above. Now suppose that the psychiatrists schedule just ten of those 100 patients to be

11 seen, and further, that they only see nine of the ten appointments scheduled in that

12 month. One of the scheduled appointments does not occur for some reason.

13 What percentage of the patients who needed to be seen in consultation for medication

14 compliance were seen?

15 The straightforward answer is that 9/100 patients were seen and the organization is 9%

16 compliant with getting patients seen who missed their medications, unless there was

17 some reasonable explanation for why the other 91 patients did not need to be seen despite

18 being medication non compliant. But would the CDCR Dashboard have reported that 9%

19 of medication non compliant patients were seen? No. In this situation, it would have

20 reported that psychiatrists were a remarkable 90% (not 9%) compliant with seeing

21 patients who needed to be seen for medication non compliance.

22 In CDCR reports, only those mental health patients who are *scheduled* to be seen are

23 counted as *needing* to be seen. In this hypothetical example, ten patients were scheduled

1   to be seen and nine were seen. When we queried this issue, the QM leaders said that the

2   problem is with psychiatrists failing to schedule appointments for all the patients who

3   need to be seen for medication non compliance, and that were they doing so, all would

4   be well.

5   CDCR's logic is something like: if a medication non compliant patient isn't scheduled,

6   that patient isn't medication non compliant, or something like that. Actually, it's a bit

7   worse than that. Please see 2018 08 31 0242hrs for a precise recounting of how CDCR

8   reported 100% compliance with seeing patients at CHCF who needed to be seen given

9   medication refusals, when in reality the compliance was 3.6%. (see page 6 of 2018 08 31

10  0242hrs).

11  Basically, the computer algorithm that does this calculation

12      1.   counts appointments not scheduled as not being needed

13      2.   counts refused appointments as completed appointments

14      3.   double counts appointments that occurred

15  Apparently, there were 17 scheduled appointments, yet hundreds of patients needed some

16  type of appointment or there needed to be documentation of why the patient did not

17  need an appointment. So even assuming, totally unrealistically, that patients who were

18  not scheduled to see a psychiatrist were not medication non compliant, there still should

19  have been 17 appointments occurring as scheduled. Only 8 of those 17 occurred, so CDCR

20  should have reported that 8/17 (less than 50%) had compliant appointments, even if you

21  eliminate the hundreds of other appointments actually needed for medication non

22  compliance. But that didn't happen either.

23  They reduced the 17 scheduled appointments (using a computer algorithm) down to 12,

24  and increased the eight appointments that were actually seen, up to 12. One patient was

1    listed as needing to be seen but wasn't seen. His appointment was cancelled and there

2    was no note. So that leaves 16. Six more were cancelled, which somehow also made it so

3    they were no longer considered medication non compliant, so that reduced the reported

4    number of medication non compliant patients to ten.


5    One of the cancelled appointments was added back as a patient who needed to be seen,

6    so that made it 11. One appointment was counted twice, so now there were 12

7    appointments, while eight occurred.


8    Of those 12 appointments, two patients refused. They were counted as having been seen.

9    So instead of 8/12 patients having been seen, 10/12 patients were counted as having been

10   seen. Then one of the eight completed appointments was counted twice, so 11/12 patients

11   were counted as having been seen. Then one was counted as completed but was cancelled

12   and never seen. That added up to 12/12 patients having been seen.


13   So finally, though there were hundreds and hundreds of medication non compliant

14   patients, eight were seen, 12 were counted as having been seen, 12 were counted as having

15   needed to be seen, and the psychiatrists were then said to have been 100% compliant,

16   though actually they were less than 4% compliant. (see 2018 08 31 0242hrs)


17   An accurate report about this would give one real information. One might then conclude

18   that a complex triage system is needed to get the patients who need to be seen most,

19   seen. I don't think it is reasonable for our psychiatrists to be seeing hundreds of extra

20   appointments per month given their staffing. The problem is that psychiatrists don't have

21   enough hours in the day to get all the non compliant patients evaluated. How many of

22   these patients ended up in crisis beds, or suicidal, or violent, we will never know. No

23   doubt many of the patients could not have been seen given the psychiatric staffing that

24   we have. But that does not justify reporting less than 4% compliance as 100% compliance.

60

1    That argues for better triage systems, perhaps utilizing nursing staff and other

2    professional assistance.

3    *Apropos* of this type of situation, our Statewide ███████████████, Dr. ███████████,

4    quipped, "Why are we treating the scheduling rather than the patients?"

5    What's particularly odd about the way these calculations are done is that the more errors

6    that are made, the higher the compliance appears. The lower the proportion of patients

7    needing to be seen who are scheduled to be seen, the more compliant CDCR appears to

8    be per the reports, because it's easier to see fewer patients, and only those who are

9    scheduled count as needing to be seen. So the more the errors made by not scheduling

10    appointments, the easier it is to be "compliant", with less work needed. In addition,

11    Quality Management appear to deem refusals not to be a problem either: indeed, a refusal

12    not only eliminates the patient as needing to be seen, but credits the institution with

13    getting the patient seen. Compliance falsely appears higher if the institution manages to

14    have the patients refuse.

15    Dr. ████████ wrote:

16    "These appointments are only measured if the physician puts in a scheduling order for a

17    medication non compliance appointment. The appointments that are ordered are *far*

18    *more* likely to be completed. To accurately capture the percentage of medication non

19    compliant appointments that are occurring when they should, the denominator needs to

20    be the number of patients who are flagged as medication non compliant, and the

21    numerator needs to be the number of medication non compliant patients who are seen

22    within the specified Program Guide timeframe." (see 2018 09 19 report)

1    Critically, note from the CHCF report, that whether patients are seen when medication

2    non compliant, is part of the overall measure of whether all needed psychiatry

3    consultations are occurring. CDCR reported that 96% of all consultations occurred as

4    needed at CHCF. But because medication non compliance is part of that report and was

5    reported as being 100% compliant rather than 3.6% compliant, the overall figure of 96% is

6    too high. Indeed, Dr. ██████ calculated that a more accurate (if still too optimistic)

7    statement would be that 55% of psychiatric referral appointments occurred as needed.

8    (see page 6 of 2018 08 31 0242hrs)


9    **Refused and Cancelled Appointments**


10   **Treatment Cancelled**


11   Dr. ██████ says, "Instead of giving a straightforward percentage of the treatment that is

12   cancelled (e.g. if there are 100 appointments and 30 were cancelled, this indicator would

13   show 30%). The numerator is defined as "Number of patient weeks included in

14   denominator during which the following number of hours of treatment were cancelled:

15   More than 3 for ASU EOP Hub, PSU EOP, and ML EOP; More than 1.5 for RC EOP and

16   ASU EOP non Hub; More than 1.0 for SRH/LRH CCCMS." (see page 3 of 2018 08 15

17   1352hrs)


18   The reader could give us any number he or she wanted between say 1% and 50% and we

19   could subtly change numbers like "3", "1.5", and "1" to get that precise number as the

20   percentage of cancellations recorded. Therefore, as an absolute value, the reported

21   number 19% in this context is meaningless. Arbitrary numbers like "3", "1.5", and "1", with

22   arbitrary assignments to levels of care, could be changed to cause the "number of patient

23   weeks included in [the] denominator" to cause any overall percentage desired.

1   Measurements that are arbitrary are not useful because the definition can be changed to
2   create any value at all. We know from the scheduled appointments calculations that an
3   extremely high percentage of appointments are cancelled and refused. What CDCR
4   should report is what proportion of 100 appointments were cancelled or refused or both.

5   **Treatment Refused**

6   If there are 100 appointments and 40 are refused, then 40% are refused. Instead, CDCR
7   created a whole new definition (see below) that seems entirely unrelated to the (also
8   arbitrary) definition of percent treatment cancelled report above, to get the value
9   recorded to be 24%. (see page 3 of 2018 08 15 1352hrs)

10   The numerator is defined as:

11   "Number of patient weeks included in denominator during which over 50% of all offered
12   treatment was refused AND less than the following hours of treatment were attended:
13   less than 5 for ASU EOP Hub, PSU EOP, and ML EOP; less than 2.5 for RC EOP and ASU
14   EOP non hub; less than 1.0 for STRH CCCMS and LTRH CCCMS."

15   Why 50%? Why less than 5? Why less than 2.5? Why less than 1.0? Those are arbitrary
16   numbers chosen to get a particular result in terms of figures. Mathematically, if we varied
17   those numbers, the *reported* percentage of appointments refused would be totally
18   different. We know that huge percentages of the patients are said to refuse. It would be
19   useful to know that, and it would be useful to know where it happens, etc. But this
20   information is obscured using these arbitrary definitions and formulas.

1    **Expert Psychiatrists**

2    When CDCR hired outside expert psychiatrists to take a view about CDCR staffing levels,

3    the CDCR mental health leadership did not schedule the outside expert psychiatrists to

4    speak with the psychiatric leadership of CDCR about staffing. Had the outside expert

5    psychiatrists spoken to us, we could have told them some of the information in this

6    report, and their conclusions and recommendations would have presumably been very

7    different.

8    **Confidential Spaces**

9    Patient care is highly unlikely to be good in a given system without certain absolutely

10   basic necessities. One of those is, as we've seen, whether appointments are occurring

11   when the patients need to be seen, which can be measured by looking at whether

12   appointments are occurring on time relative to doctors' orders with respect to when

13   patients should be seen next.

14   Another basic necessity for good patient care is whether psychiatry appointments are

15   occurring in appropriate, confidential spaces, i.e., in a private room. That too would be

16   easy to measure. Did a given appointment occur in an office, confidentially, or *not*?

17   There are other critical issues for patient care that are less easy to measure, but those two

18   absolutely basic things could easily be measured accurately, and yet CDCR hasn't

19   provided even its psychiatry leadership with this vital information.

20   If we were accurately measuring whether psychiatry appointments are occurring in

21   confidential settings, like a clinic office, and particularly if we could see what was

64

1    happening ward by ward in the whole system, this would immediately highlight one of

2    the major barriers to good patient care there is in CDCR.

3    Not only should we be measuring and reporting each of those two things independently,

4    we should also be measuring and reporting, ward by ward, the proportion of

5    appointments occurring both on time as above AND in a confidential office. That

6    information is critical for improving patient care in the CDCR system.

7    This information would also enable CDCR to see where expensive psychiatry resources

8    are not being used efficiently in the system. In a system like CDCR, psychiatric

9    productivity is lower than it would be were the psychiatrists staying seated in clinic

10   offices seeing patients one after another rather than having to waste time trying to *find*

11   their patients. So in CDCR, more psychiatrists are needed per population than would be

12   needed were the system less inefficiently organized.

13   In many CDCR institutions, patients having an appointment with their psychiatrist are

14   often not brought to see their psychiatrist. The psychiatrist then has to go looking for the

15   patient, and usually ends up seeing the patient cell side or having a two minute

16   conversation on the yard. (See 2018 07 12 1442hrs, middle of the page starting, "My visit at

17   SAC was interesting." Also see previous report about SAC: 2017 12 06 1748hrs.)

18   Cell side visits often mean talking to patients through a slit in a pretty much solid metal

19   cell door that usually has a tiny window (which really can't be used when speaking to the

20   patient because of the location of the doctor's head when speaking through the slit). And

21   sometimes the doctor has to speak very loudly to be heard, due to extremely noisy

22   conditions. Several other patients and custodial officers can then hear what is supposed

23   to be a confidential conversation. And the cellmate who is usually also in the cell can

24   completely hear the conversation. In the SAC EOP "segregation" unit the air conditioner

25   and TV blare, so the psychiatrist sometimes needs to yell to be heard. This prevents

1   honest and open communication about patients' psychological states, prevents

2   neurological exams, and prevents building effective relationships with patients.

3   The CDCR electronic health record system has a number of significant design flaws that

4   could be corrected were there the will to do so. One of those flaws is that the system

5   defaults to categorizing the appointment type as being "confidential". It takes extra time

6   and several extra keystrokes to record that a given appointment did not in fact occur in a

7   confidential space, and many psychiatrists don't even know *how* to record that an

8   appointment did not occur in a confidential space.

9   For example, at the CCWF crisis bed facility, 100% of psychiatric appointments in May

10   2018 were recorded in the EHRS as having occurred in confidential spaces, yet according

11   to the psychiatrists on the ground, actually not a single one (except when Coleman

12   monitors were present) occurred in a confidential space. (see page 5 of 2018 08 01)

13   When I visited CCWF, the physicians and the nurse practitioner were unaware that it is

14   even possible to report the appointment type as "non confidential". Indeed, in my recent

15   tour to SAC, CHCF, Mule Creek, Valley State Prison, and CCWF, there was at least one

16   psychiatrist (and sometimes many) at each institution who didn't know how to record the

17   appointment as having been non confidential. (When I visited SATF and Corcoran, all the

18   psychiatrists I asked did seem to know how to record visits as having occurred in non

19   confidential spaces.)

20   Designing a system in such a way that lack of knowledge and random errors (such as

21   failing to take the extra time and keystrokes needed to record a visit as non confidential)

22   create a biased, inaccurate picture of what is actually happening, is clearly a mistake. It

23   would be very easy to remove this bias by having the system not default to one or the

24   other type but instead have the doctor simply specify which type it was as an

25   electronically required step in the recording of an appointment.

66

1   This is similar to the situation described in the scheduling section, in which the error of

2   *failing* to schedule consults creates the *semblance* of *greater* compliance with respect to

3   patients needing to be seen. The bigger the error in not scheduling patients for

4   medication non compliance or the bigger the error in forgetting to record visits as non

5   confidential, the greater the *reported*   but not actual   compliance. And it is not even

6   really psychiatrists simply forgetting: when people are in a rush, the need for extra

7   keystrokes makes accurate recording less likely. If you make it harder to record a bad

8   thing that actually happens, but easy to report a good thing, more good things will be

9   reported. It may be tempting to call this biased measuring and reporting of compliance a

10  mere training issue. But it is actually an EHRS QM system design issue.


11  It is difficult to get access to the information about whether the EHRS is recording visits

12  as occurring non confidentially. Our HQ psychiatry team recently figured out how to

13  obtain this information, but virtually no psychiatrists in the field or Chief Psychiatrists

14  knew how to when we asked them. To figure out whether the visits were confidential in a

15  given prison's segregation unit, for example, we had to painstakingly find and download

16  data for the institution to an Excel Spreadsheet and then perform a calculation on the

17  correct columns.


18  A simple Dashboard measurement in the quality management portal could

19  straightforwardly be programmed to report this EHRS measure.


20  In the CCWF crisis bed facility, women are double celled in four of the beds, but single

21  celled in four other beds. The psychiatrists and clinicians told us that when the Coleman

22  monitors come, the women who are double celled are individually escorted out into a

23  private space to make sure that their reviewers know that the patient would be seen in a

24  confidential space were the resources available. They also said that if they knew how to

25  record that they were not seeing the patient confidentially most of the time, they would

26  do so truthfully and honestly.

67

1   Nowhere in the institution, even in less critical patient care areas, were they recording

2   any patient visits as having been non confidential, including in the segregation unit in

3   which they told us that only 20% of the visits were confidential.

4   They said that they cannot normally pull the women from even the double cells, as they

5   lack the custodial resources and offices to do this. They said these women who are

6   double celled are never seen confidentially unless Coleman reviewers are there.

7   In the CHCF crisis bed unit (see report 2018 07 17 1722hrs), it is even worse than in the

8   CCWF crisis bed unit. Essentially *not a single follow up appointment is in a confidential*

9   *space*. At CCWF during morning rounds, the cell door is opened so the patient can be

10  seen and examined with custody present to ensure safety.

11  The issue is not just whether an appointment is confidential or not. Another issue is

12  whether or not the doctor can physically *see* the patient or not. At the CCWF crisis bed

13  facility, the psychiatrist walks into the cell so can see the patient and do a neurological

14  exam, but the appointments are not confidential. But at the CHCF crisis bed facility, the

15  appointments are neither confidential nor can the doctor even *see* the patient, so can't do

16  a neurological exam, can't see the patient's facial expressions, can't see the patient's

17  reactions to what the psychiatrist is saying, etc.

18  That the cell door is open at CCWF with appropriate custodial observation is hugely

19  clinically beneficial at CCWF and really seems to help them provide good care, because

20  patients can be briefly examined, their facial expressions can be immediately seen, and

21  patients are interviewed with the team able to clearly hear the patient. But at CHCF, the

22  door is not opened for the psychiatrists to see the patients. So 100% of the follow up visits

23  occur by communicating non confidentially through a slit in a closed cell door, the

24  doctor being unable to see the patient while talking (because to be heard the doctor has

1   to communicate through the crack in the door, whereas to see the patient the doctor

2   needs to look through the window, and it is not possible to do both simultaneously).

3   This dearth of custodial resources and offices for any follow up appointments has been

4   that way for years and when I myself briefly worked at CHCF nearly five years ago, I

5   encountered the same situation. Furthermore, the recreation therapists and psychologists

6   compete with the psychiatrists for common office space. Custody said that it allocates the

7   rooms on a first come first serve basis and that they give priority only to the initial

8   psychiatric visit, and essentially never for follow up appointments. Yet the CDCR QM

9   team designed the electronic system to categorize appointments as confidential by

10  default, and not to record the environment in which the care occurred[xi]. That information

11  is vital for creating an efficient, well organized system with good patient care.

12  The psychiatrists in the CHCF crisis bed unit do know how to record that a visit was non

13  confidential, and they told us that 100% of their visits are *non* confidential. Yet instead of

14  showing 0% of follow up routine appointments there as having been non confidential,

15  the QM electronic system nevertheless reported that 31% of them were confidential. This

16  inaccurately high compliance figure of 31% appears to have been caused by error

17  psychiatrists in a hurry failing to take the time to record visits as having been non

18  confidential. (see page 10 of 2018 08 01)

19  That is an example of how, in the CDCR system in several respects, more error creates the

20  false impression of more compliance. The more errors the psychiatrist makes, in not

21  doing the extra work needed to record patients as being seen in non confidential spaces,

22  or in failing to schedule patients to be seen for medication non compliance, the higher

23  the compliance *appears* to be, contrary to the reality. [xii]

24  Thus, the numbers reported by Quality Management about whether appointments were

25  timely, whether they occurred as scheduled, whether psychiatric consultations were being

1  made appropriately, or whether appointments were confidential, are inaccurate and can't

2  be replied upon.

3  To find out what was really going on, we HQ psychiatrists had to physically go to the

4  institutions, each of us following a different psychiatrist around for a whole work day to

5  see what was actually happening on the ground, in addition to talking to others there. We

6  have also tracked individual patients, and done other painstaking work to try to get the

7  information we need in order to improve the CDCR mental health system.

8  On a practical level, the psychiatrists at CHCF say that even if the office space were

9  plentiful at the crisis bed unit   which it is not at all   there would be nowhere near

10  enough custodial staff to physically bring patients to confidential office spaces given all

11  the disciplines competing to see patients at the same time. So CHCF psychiatrists,

12  essentially 100% of the time, have their crisis bed (non initial) appointments with patients

13  in a non confidential space, talking through a slit in the door and not really being able to

14  see the patient. These are not adequate medical appointments. (see 2018 07 17 1722hrs)

15  **The Importance of Recording the Environment of Care For Each Appointment**

16  If a given patient is using illicit drugs, what is the chance that, when asked by the

17  psychiatrist whether he or she is using illicit drugs, the patient is going to answer

18  truthfully, if custody is present? Currently, unless the physician states in the note the

19  environmental context in which the appointment occurred, those reviewing the chart

20  can't tell. That means that transmission of such important medical information doesn't

21  happen.

22  The recording of the environment of care is of critical importance, as we, the HQ

23  psychiatry team, have long argued. Our request that the system be made to require a

70

1    physician to select whether the appointment was behind a cell door, outside in a yard,

2    confidential, and other key variables, was denied: the psychiatry medical work flow is in

3    CDCR designed by non medically trained psychologists. So the environment in which

4    care is occurring is very difficult to discern unless one physically goes to the institution

5    and follows individual psychiatrists, as we did.

6    **Psychiatry Medical Opinion Ignored in the Design of EHRS QM**

7    When the EHRS system was being designed, we made many requests that were simply

8    ignored or overridden by those in charge. And now our psychology executive and █████

9    █████ have added a new committee, called the Change Management Committee

10   (2018 07 12 1000hrs). This committee is yet another obstacle blocking our ability to get

11   needed changes made. (see also 2018 06 18 1359hrs.)

12   Our psychologists and our █████████████ who vigorously supported the psychologists

13   in ignoring our many requests and objections with respect to the psychiatric workflow

14   they were designing, created a system that does not disambiguate names of the various

15   types of medical appointments, and have thereby denied our physicians and the court the

16   vital information needed for us to fix our CDCR mental health system.

17   It used to be that our psychiatric physicians could sometimes appeal to our general

18   medical and nursing colleagues on a committee called CLAC if overruled by the

19   psychology designers of the mental health and therefore psychiatric workflow using the

20   EHRS. (see 2018 07 02 1508hrs and 2017 05 11 1447hrs)[xiii] But now, with the advent of the

21   Change Management Committee, the psychologist run EHRS team (or those who direct

22   them) has clamped down further on our headquarters psychiatrists' ability to appeal to

23   our general medical and nursing colleagues in CLAC to try to design appropriate medical

24   workflows for our psychiatrists. Only if this Change Management Committee were to

1   approve one of our proposals would we HQ psychiatrists be allowed to speak with our

2   colleagues at CLAC to even propose it. (see 2018 06 18 1359hrs.)

3   This new Change Management Committee is ruled by almost the same executive

4   psychology team who run the QM committee, and some of those who are on this

5   committee report to the executive and Chief QM psychologists (2018 07 12 1000hrs). On

6   this committee there are 22 non medical personnel (including 12 psychologists) but just

7   two psychiatrists. We are simply out voted. We have no hope that our requests   for

8   example, that the EHRS require the recording of information about the environment of

9   care of each appointment   will be met in the foreseeable future.

10   To improve care in our system the psychiatric medical team needs to know whether

11   patients are being seen on time, as scheduled, in confidential spaces, and whether they

12   are seen when there are consults, when they miss their medications, and if there is

13   appropriate blood monitoring.

14   CDCR's reports (as mentioned above) tend to be very inaccurate except (now) the blood

15   monitoring. Our comments and requests about these overall processes have been

16   repeatedly ignored and rejected, and now the ███████████ have given those who

17   designed this bad EHRS QM system even more control, in the form of the Change

18   Management Committee.

19   The psychiatry leadership team needs access to the database in order to determine more

20   efficiently what is actually happening, so that we can know how to target our work in

21   trying to fix the CDCR mental health system. Although the QM psychologists have done a

22   few database searches for us, the ███████████ have denied us even read only access

23   to the database, asserting that psychiatrists "don't do QM". A psychiatrist who used to

24   work for the psychiatry leadership team was not allowed access to the databases until he

25   had left our team and was then later hired by the QM psychologists. Now he is sometimes

1   permitted to do a search for us, but only with the permission of the psychologists who

2   have created the data biases I am mentioning in this report. And that permission is

3   generally not forthcoming in practice despite their *saying* that they will do the searches

4   we want.

5   Our ███████████ say that our leadership psychiatric team doesn't need to be able to

6   query the database directly to answer medical questions about care. They say we can ask

7   the psychiatrists working on the psychologist run team. However, the psychiatrists

8   working for the psychologists are either unable to run the queries we have asked for, or

9   they have been told not to run the database queries we have requested, for example to

10   find real information about whether patients are being seen on time, as scheduled, in

11   confidential spaces, whether they are taking their medications as they are supposed to, or

12   anything else of medical significance.

13   Note that none of the discoveries of grossly biased reporting about data, violations of

14   court mandates for timely care, etc., were discovered by the psychiatrists who report to

15   the psychologists. There is a reason for that, and it has to do with who is supervising the

16   medical queries that they are allowed to make.

17   As I've said, our medical opinion with respect to what medical data we need to collect and

18   access is simply ignored. (see 2018 08 23 1207hrs[xiv], 2017 05 11 1447hrs, 2018 07 02

19   1508hrs) The question is, why *don't* they welcome logical and sensible input from

20   experienced expert medical doctors with deep knowledge of how mental health systems

21   should be organized for good patient care, and about what needs to be measured to

22   maximize error correction and efficiency in the system?

23   Although our non medical executives will certainly publicly *claim* that they are

24   endeavoring to create good psychiatry workflows, their actions tell a different story. I

25   have seen no evidence that our ███████████ have any intention of actually changing

73

1   the status quo in which psychiatric input is rejected, and non medically trained

2   psychologists have almost full control over the psychiatric workflows and the design of

3   the EHRS for psychiatrists (unless they run afoul of nursing or medical or dental

4   workflows), and have the authority to decide what medical information we need.

5   I have shown that the reports with respect to whether appointments have been seen on

6   time, whether consults are taking place, whether appointments are occurring as

7   scheduled, etc., can't be trusted.

8   The same should also be assumed to apply to whether CDCR will allow our psychiatric

9   physicians to create efficiencies for themselves in using the EHRS, or enable the EHRS to

10   capture information that is medically needed. Even if, for example, we want to search the

11   old patient information in the data warehouse to figure out what medications kept a

12   given patient out of the hospital and what did not, we are not permitted to do that, and

13   we can't get that information at all unless the psychologists decide that we do need the

14   information and prioritize that query.

15   Unfortunately, despite my requests, the psychiatry leadership team has not been

16   permitted to search databases for the five years that I have been with CDCR; nor have we

17   had any significant influence with respect to the input of the information into the EHRS

18   that we need to medically evaluate the environment in which psychiatric care is

19   occurring.

20   The same individuals are creating the data analysis and running the EHRS design and

21   determining their own errors, and the ▮▮▮▮▮▮▮▮ have vigorously supported their

22   monopolizing of information, preventing medical analysis and scrutiny of critical

23   information. This has effectively prevented appropriate error correction in the CDCR

24   mental health system.

1   As my colleague, Dr. ███, the psychiatrist in CDCR who knows most about how the

2   electronic health record is designed for psychiatrists, and most about the tactics of those

3   psychologists who created our workflows, wrote:


4   "We have surveyed the psychiatrists and know how they want to work in the EHRS. It is

5   not how they work currently. Given the continuing push for control [by psychologists and

6   administrators, MG], it would seem clear the intent is to engage psychiatrists when the

7   court is looking, but otherwise disregard as has been the case for the last 2 decades. It has

8   been very unsatisfying for psychiatry at all levels." (see pages 2 3 of 2018 07 02 1508hrs)


9   See also (2018 08 02 1232hrs) Dr. ███ description of a Change Management

10  Committee meeting in which those who vote about what our medical workflows will be

11  (many administrators) seem not even to know what they are voting about. They have no

12  medical background at all.


13  **Visits to Troubled Institutions**


14  Please see the reports on SAC and CHCF that our psychiatry team recently visited, and

15  the report from last year from the psychiatrists themselves at SAC, who were interviewed

16  by HQ psychiatrist Dr. ███. (See 2018 07 12 1442hrs, middle of the page starting "My

17  visit at SAC was interesting". Also see previous report about SAC: 2017 12 06 1748hrs; also

18  2017 11 21 1749hrs.)


19  Of interest, also see the report from SVSP where psychiatrists are essentially never able to

20  have confidential one to one (1:1) appointments. (see 2017 11 21 1749hrs). At SVSP,

21  psychiatrists have been allocated confidential office space for only three hours *per week* in

22  which to see all of their patients combined, for months at a time. Three hours in total, out

23  of a 40 hour work week.

1   In the schedule presented, the physician, Dr. ████, asked for an additional hour and

2   was given three hours, up one from the previous two. (see page 4 of 2017 11 21 1749hrs)

3   To repeat, psychiatrists were allowed to see patients in a confidential setting for a total of

4   two to three hours in an entire week, rather than seeing patients for perhaps six to seven

5   hours *per day* in a confidential setting, as some other psychiatrists can in CDCR (for

6   example at VSP), and which would be considered more normal.

7   The ████████████ of the SVSP PIP has more recently told me that psychiatrists may

8   now be able to see their patients in a confidential setting there for perhaps four hours per

9   week. The rest of the appointments have to be seen cell side at the SVSP psychiatric

10   inpatient program or patients need to be seen in treatment teams.

11   We have this information from SVSP despite not being allowed to electronically search

12   the database, create reports, or create EHRS non confidential note types to try to

13   understand these situations at SVSP and statewide. We have this information because we

14   were able to obtain a hard copy of the local patient schedule documenting how much

15   confidential office time the psychiatrist is given per week to see patients.

16   As can be seen on page 4 of 2017 11 21 1749hrs, custody and the schedulers granted

17   recreation therapists ten hours per week out of cell with patients per week, but the

18   psychiatrists were granted just three hours per *week*.

19   Although our senior executives and quality management psychologists have not allowed

20   us to directly access SAC EHRS information using queries to the database, or allowed us

21   to accurately get this information by designing the note types or workflow that would

22   capture the information, we can make some guesses by visiting the prison, watching what

23   happens, and talking to psychiatrists. Thus, we try to approximate what the data is.

76

1   For example, when we were last at SAC, three of 11 patients scheduled for one psychiatrist

2   came in the morning (in the Ad Seg unit) and four of 16 came for (EOP) appointments for

3   another psychiatrist and were thus seen in a confidential and almost appropriate space.

4   The space lacked computers so the psychiatrist could not get information about the

5   patient while talking to him, which would be deemed serious anywhere else, but given

6   how serious the other issues are at SAC, like access to care issues, it is, relatively

7   speaking, one of the more minor of the difficulties at SAC.

8   The psychiatrist's account of his day with me is helpful too, as it factually details the

9   various barriers he, Dr. ████, encountered (see 2018 07 18 R). If, as we estimate, overall,

10  CCC patients were seen as scheduled by mental health care providers only 22% of the

11  time (see pages 2 and 3 of 2018 08 22 0900hrs), rather than the 87% of the time reported,

12  that does not reflect well on the ability of the SAC MH program to organize care.

13  The psychiatrists at SAC know that custody will not, or will not be able to, bring patients

14  to scheduled appointments, so the psychiatrists request ahead of time that many patients

15  be brought (like 16 for a morning) in the hope that a few arrive. The psychiatrists

16  themselves guess that 75 80% of patients in Administrative Segregation are not initially

17  brought to clinics when the psychiatrists request that they come.

18  The reports from SAC (not SVSP), including what we ourselves saw when we visited,

19  allow us to estimate that custody does not bring more than 25% of patients to see

20  psychiatrists at the SAC EOP program. (Note: some patients do refuse, and custody can't

21  force them to come, although see my suggestion.) (see page 4 of 2018 07 12 1442hrs)

22  After an unproductive morning in which three quarters of patients are not brought to

23  their appointments, SAC psychiatrists spend the afternoon trying to find their morning

24  patients who did not make it in the morning, with no custodial help for the psychiatrist

25  to find the patient.

77

1    The psychiatrist says he is getting better at guessing where on the prison yard he might

2    find a given patient. It was about 100 degrees while we were out looking. The psychiatrists

3    run into other patients who surround them on the yard or in the buildings connecting to

4    the yard and try to consult the psychiatrist there, but again, on the yard the doctor has no

5    access to patients' information or medical history, and some of the patients are not on the

6    doctor's schedule for the day (so the doctor can't be prepared for these events by reading

7    a given patient's electronic chart beforehand).

8    It would be easy enough for psychiatrists to pull patients from groups to get a few

9    moments with them in a confidential space[xv], but headquarters administrators and local

10    psychology leaders in general forbid this   though we have seen some psychologists

11    willing to disobey HQ by allowing such psychiatric visits. (see 2017 11 21 1749hrs)

12    These doctor patient encounters in the yard were being counted as compliant psychiatric

13    appointments by our psychologists in charge of the QM program, or by those who

14    directed them to do so. Thus, misinformation has been given to psychiatrists at HQ and

15    all others who read these reports, including those who rely on these CDCR reports giving

16    the impression that patients are being appropriately cared for.

17    This type of situation is precisely why brief input of information (for example checkbox

18    input into a pop up window to allow the note to be finished) is critically needed to

19    understand the environmental context of appointments, rather than what happens in the

20    current system, which by default categorizes appointments as confidential and compliant.

21    Had the EHRS QM team met our request that the system record who was seen behind

22    closed and locked cell doors and in what other physical contexts, including appropriately

23    measuring the timing of care, the quality of care could be more objectively evaluated. But,

1.  1.  by not allowing a distinction in the data reported using appropriate note types and not designing or allowing the psychiatry team to design specific recording of information about the environment of care,

and

2.  by biasing input of data by having non confidential appointments defaulting to being categorized as being confidential,

and

3.  by eliminating patients who don't come to scheduled appointments in a calculation of the percentage of patients who come to scheduled appointments

and

4.  by varying the compliance rules for on time appointments when patients transfer institutions to prolong them and by not counting any physician's scheduled appointments (sooner than Program Guide max timelines) as late when they are late

and

5.  by not allowing easy access to data (biased or not) to distinguish between a confidential and non confidential appointment,

and

6.  by eliminating most of the patients who did not receive medication consultation for medication non compliance from calculations of who received medication consultation for non compliance

and

7.  by not allowing the leadership of our psychiatrist physicians in CDCR to utilize queries of the database to search for this critical medical information ourselves,

79

1   the quality management and electronic health record psychologists and the senior mental

2   health executives who have supported their decisions are painting a misleadingly positive

3   picture of patient care, and deeming what is actually inadequate care and poor

4   organization of care to be good care, and so preventing appropriate remedial action to be

5   taken to correct significant issues affecting patient care.

6   When I visited SAC recently with the headquarters psychiatrist, Dr. ███, many of the

7   patients in the cell block were standing virtually naked in their towels as the psychiatrist

8   tried to briefly interview patients in and around the administrative segregation unit. I

9   followed a psychiatrist wearing a stab vest out into the yard in 100 degree temperatures to

10   try to locate patients for about an hour, because he had told me he had begun to learn

11   where patients hang out in the yard so he could be able to see them. There were no

12   custodial officers assigned to help the psychiatrists find the patients.

13   Psychiatrists should not be wandering in 100 degree heat in a stab vest to find dangerous

14   patients on the yard, trying to guess where patients might be, to try to prevent psychiatric

15   morbidity, manic episodes, psychosis or often to prevent death in these patients.

16   Dr. ███, who quit working there four years ago because patients (some level 4, our most

17   dangerous inmates) could not be seen in clinics, and because potentially dangerous

18   patients surrounded her on the yard, often with no custody in sight, commented,

19   "Nothing has changed in four years."

20   The female psychiatrist at SAC has been allocated 15 minutes in total in which to see

21   perhaps seven patients cell side (12:45PM to 1:00PM), after which it is shower time and

22   she can't see her patients anymore, because it is too dangerous for her to be among

23   dangerous inmates outside their cells while they stand around wearing only a towel.

24   Custody does not bring her patients in the morning, and she can't really see them in the

25   afternoon either: fifteen minutes is not enough time in which to see seven patients. This

80

1  is incredibly dangerous for the patients since they are getting just seconds to minutes of

2  psychiatric care.

3  Needless to say, this is not how other psychiatric clinics operate virtually anywhere in the

4  United States, and certainly the general medical clinics in the prison at SAC do not

5  operate this way. Only is it deemed appropriate to manage the *psychiatric* clinics this way

6  appropriate in the sense that CDCR is not measuring conditions that are medically

7  dangerous. Thus, CDCR is failing to create or report actionable information that would

8  allow us to fix the problem.

9  There was a Quality Management meeting a week after Dr. ███ and my visit to SAC

10  that illustrates how utterly uninformed the CDCR Mental Health Quality Management

11  group typically is. The 20 or so committee members literally applauded the alleged

12  psychiatry quality improvements at SAC, on the basis that the numbers looked good.

13  Perhaps few of those applauding had any idea that the so called "appointments" that they

14  were implicitly applauding included encounters in which the psychiatrist was having to

15  figure out the name of the patient while standing in a hallway surrounded by inmates.

16  Perhaps they were not aware that the good numbers they were applauding included

17  encounters in which a psychiatrist may have had one to two non confidential minutes to

18  see the patient while roaming the prison and yard trying to find his next patient in 100

19  degree heat. The majority (or all) in that room were probably also unaware that actually

20  only perhaps 22% of mental health patients were being seen as scheduled on the CCC

21  yards, since the Dashboard and those who calculate for them mislead them into thinking

22  that 90% were seen as scheduled.

23  After the round of applause, I tried to explain to those in the meeting that this was not

24  quality care worthy of applause and that the numbers they were applauding did not (to

25  put it kindly) accurately measure what they thought they measured. My strong

26  recommendation   my medical opinion   was that no new EOP patients be transferred

1   there (and many should be transferred away) until basic minimal standards of care are

2   met. They said they would record my ideas in the QM minutes. (Thursday July 26th, 2018)

3   As I wrote to the ███████████: You can't provide medical care with no little or no

4   information, standing cell side and virtually screaming through a cell door, no matter

5   how many EOP reviews we are said to pass. If we pass when this is occurring, passing

6   means nothing in terms of medical care.

7   Unfortunately, given their actions, it seems that our QM psychologists and senior

8   executives regard recording and analyzing where and when these inappropriate forms of

9   treatment occur to be unimportant, though they deny that when asked. Yet there is no

10  careful analysis of these problems at a statewide level. Moreover, their failure to do the

11  analysis themselves, and their denying us access and input into the EHRS that would

12  allow us to do this analysis, is telling. They *say* that the psychiatric leadership should feel

13  free to state their opinions and that information is provided to them and that their input

14  is welcome, but their *actions* tell a very different story.

15  This attitude of our psychology and administrative executives, both at HQ and in the

16  field, that psychologists and administrators can determine what is and is not actionable

17  medical information, as described above, and therefore what information psychiatric

18  physicians should be allowed to know and act upon, has direct and sometimes

19  devastating medical consequences. The psychologists' determination that SAC EOP (Seg

20  yards) were safe and good and improving for psychiatric medical practice, is particularly

21  problematic. It is concerning because conditions there are actually so dangerous.

22  Therefore, reporting that they are good and improving suggests either an inability to

23  evaluate what good care is, or deliberate indifference to woefully inadequate care.

**Patient X, Title 22, and the Proper Role of Psychologists**

Patient X is a woman who presented psychiatrically relatively well when she entered prison. But upon entry into the prison system she refused to take medication that she previously had been taking. The psychiatrist did not deem that he could force medications upon her given how well she presented. The patient was subsequently seen by another psychiatrist who also documented her apparently reasonable mental state off medications.

Arguably, in situations like this, longer transitions for patients at higher levels of care should be insisted upon when medication from the community is discontinued, even if the patient appears to have the legal right to discontinue medication because of presenting in a logical way.

The patient was transferred to a CCC level of care where she was to be followed, presumably because she was doing well as she left the reception center (anti psychotic medications take a while to work, but many times when they are, their good effects can sometimes last for a while after stopping taking them).

The patient was followed off medication in the prison mental health system at a CCC level of care and did well, per reports, for many weeks. But she did not stay well.

Four hours before a sentinel medical event in which the patient removed her eye and ate it, the patient had been evaluated by a psychologist who had found her to be gravely disabled and had written admission orders to the psychiatric crisis bed unit. These admission orders were being followed, except for the order for the patient to go to a crisis bed. At the time of the event, Patient X was in alternative housing in a non licensed TTA (like an urgent medical care center) despite the order for more intensive care.

The ███████████ version of events, many of which I have personally corroborated by reading the record, are as follows. (see 2017 12 11 1622hrs) I summarized the events both in an email to the head of medical quality management (see 2017 12 18 1934hrs) and to other senior executives in mental health (see 2017 09 05 1449hrs). The ███████ ████████ version of events, from a medical perspective, was unfortunately not made part of the report about the incident in the root cause analysis:

In the below text, the blue writing is ██████████████ Dr. ██████████████, and the black text in square brackets is mine:

"On 4/20/2017 I/P [Inmate Patient] X......, who was admitted to MHCB [mental health licensed hospital crisis bed], although was housed in the TTA [a non licensed medical acute unit], was involved in a sentinel event. Approximately 4 hours earlier, she had been evaluated and determined to be gravely disabled by the on site psychologist who placed admission, watch, and issue orders [admitted her, ordered how frequently she should be observed, and ordered the clothing she should wear].

She was on one to one suicide watch by an LVN [a licensed vocational nurse. This LVN was tasked with constantly observing her. MG] and was to be in a strong gown, however refused to comply with issue orders. It was documented that she was "psychotic" at the time of admission. Documentation from the one to one observer noted "screaming" every fifteen minutes for most of the four hour period. She did not receive medications during the four hour period prior to the event. The psychiatrist on call was not contacted by [either] nursing, the admitting psychologist, or custody. After touching her eye for several seconds, while in the supine position on the floor, the I/P used her left hand to enucleate her left eye [take out left eye]. The alarm was sounded and two correctional officers entered the cell. The I/P was asked to relinquish the eye, however, she put the eye in her mouth and ingested it......."

1   Dr. ███ was very concerned about several issues and wrote extensively about them. (see

2   2017 12 11 1622hrs) Her medical opinion was that the patient had given every indication

3   that the patient needed medications (forced if necessary); but that it was determined by

4   psychologists and nurses   including the patient safety committee which had no

5   psychiatrists on it   that there was no reason to mention the acute need for the

6   psychiatric medications (forced or otherwise) as having been a root cause of the

7   enucleation. It was determined that failure to provide medications was not a root cause of

8   the patient having removed her eye.

9   Multiple subsequent psychiatrists, including headquarters psychiatrists, who heard about

10   this event, agreed that medications and forced medications had been needed, but the

11   psychologist evaluating the patient did not call the psychiatrist. Furthermore, the

12   psychologists at CIW and the HQ psychologist evaluating the psychologist's action, and

13   the patient safety committee (with no psychiatric input), determined that failure to call

14   the psychiatrist had not been a root cause of the problem. For documentation of the

15   screaming, see 2018 08 10 1116hrs including the close up photo showing that what is

16   highlighted is the word "screaming" (page 3).

17   So failure to give emergency forced psychotropic medications in a newly hospitalized

18   patient was not a root cause of the problem, as determined by psychologists with no

19   medical training, while also ignoring the opinion of the ███████. The opinion of

20   the psychiatrist who was on call for this admission in which tragedy occurred was not

21   sought, though he had the most experience and training about the emergency need for

22   medicine in situations like this. The psychologist apparently determined that there was

23   not a medically relevant situation necessitating that the physician be called. And the

24   psychologists and administrators (and I believe nurses) at the institution determined that

25   it was reasonable not to make sure that such a patient got medications in that emergency

26   situation. And the patient safety committee at headquarters, with no psychiatrist

27   representative, agreed. (see 2017 09 05 1449hrs)

Psychiatrists on call in CDCR are called after hours to "reconcile medications" for patients being admitted. This is *not* someone (such as a psychologist) who has *interviewed* the patient, calling the doctor and giving the doctor information about the patient. What medication "reconciliation" amounts to is merely mechanically copying over medication orders from the previous unit that a patient was on. Indeed, this is now being done by pharmacists instead of physicians at some locations, and it will soon be done automatically by the computer system.

The point is that reconciling medications is routinely done as a mechanical process, with no knowledge about the patient, so cannot be considered a substitute for hearing about the patient in a conversation with someone who has *interviewed* the patient.

In this case of Patient X, formal medication reconciliation was initiated for the patient, but no relevant information was given to the on call covering psychiatrist *after the patient was interviewed by the psychologist* (or anyone else), and that was the major problem.

Virtually anywhere across the country, for a patient newly admitted to a hospital, if no general medical or psychiatric physician is available to interact on site with the patient, the social worker or nurse initially interviewing the patient will call the doctor and tell him or her about the patient.

Medical consultation is necessary even in the absence of a significant crisis, but it is even more necessary when a patient is known to be psychotic and decompensated.[xvi] This medical discussion with a physician (or sometimes a non physician provider like a nurse practitioner) is needed to determine whether the patient would benefit from medication (or forced medication) and also in order to determine in emergencies the potential medical causes of the agitation, which could involve the need to check further laboratory tests or perform medical evaluations (such as head CT scans, etc.).

1    But in this case, the psychologist interviewing the patient made the decision not to

2    consult the psychiatrist. According to Dr. ███, the ████████, the psychologist

3    gave as a reason for not having called the doctor, that he thought that the patient would

4    refuse to take medication. So with no medical training, the psychologist took it upon

5    himself to determine that there was no need for a medical work up, and he apparently

6    didn't even consider that the psychiatrist might think it necessary to force medications in

7    this case.

8    According to Dr. ███ (see page 6 of 2017 12 11 1622hrs), the psychologist did not even

9    have legal admitting privileges for the crisis bed unit. Moreover, despite this horrendous

10    event, licensing was not called, because the patient's physical location was in an

11    unlicensed TTA, though the orders (that were already being followed), specified that the

12    patient was to be admitted to a licensed facility (Mental Health Crisis Bed).

13    I am not an expert on the law. This patient had not made it to the licensed location in the

14    prison so perhaps licensing did not need to be called? Dr. ███, the ████████,

15    thought that part of the reason the patient did not make it to the licensed bed is that the

16    patient would not change her clothes into the appropriate gown for a crisis bed. The

17    order admitted the patient to a licensed bed, but the patient was not at the time in one.

18    Regardless, for a psychologist to make the medical decision not to call the psychiatrist

19    during an admission is apparently the norm at this crisis bed hospital unit. Indeed,

20    according to the former ████████, when she took call, she was repeatedly not

21    called by psychologists admitting patients to licensed crisis beds, and was only called

22    when psychologists were going to deny admission to a patient (to share potential liability

23    with the psychiatrist if something bad happened from failing to admit). (see page 6 of

24    2017 12 11 1622hrs)

1   So at this crisis bed unit that the judgement of the psychologist (about when a patient

2   would need medical attention during a crisis hospital admission) was deemed to be

3   adequate, and consultation with a psychiatric physician after a history is taken was

4   deemed not to be needed. And the assumption was that in general, the psychiatrist did

5   not need to be called when patients were interviewed at the crisis hospital (or in

6   alternative housing) en route to the hospital.


7   This again follows from the underlying assumption and contention of many of our

8   psychologists that their license gives them the ability to determine when

9   medical/psychiatric consultation or information is needed, even if a patient is being

10  admitted to a crisis hospital, is screaming (even for hours), and is gravely disabled, as

11  determined by the psychologist himself. This is the same attitude which denies the HQ

12  psychiatric leadership team access to medical information about the entire CDCR mental

13  health system.


14  The tragedy is that any competent psychiatric physician or general medical physician

15  would have medicated the patient, and likely the patient's eye would still be in her head

16  had that happened. It is the standard of care that medical evaluation occur in the case of

17  psychotic patients [xvii], which implies that physicians must be contacted in situations in

18  which patients are admitted to hospitals and are psychotic and agitated. Indeed, it is the

19  standard of care that physicians (or physician extenders like nurse practitioners) be

20  involved any time patients are admitted to licensed crisis or hospital facilities (see below,

21  title 22), even if patients do not appear to be psychotic and agitated. But it is clearly not

22  the standard of care at this unit and many others across CDCR.


23  Indeed title 22 and 15 clearly state that in licensed CTCs (which includes mental health

24  crisis bed hospitals)

1. "Psychiatrist means a person who is a licensed physician and surgeon in the state of California...." (79567)

2. "Psychiatric/psychological services means consultative services to inmate patients (79609) of a correctional treatment center" (79609)

3. Physician Services are services provided by the licensed physician responsible for the care of the inmate patient in the correctional treatment center (79599). And under 79599 Physician service includes, "determination of the appropriate level of care for each inmate patient."

Psychiatrists are the physicians (licensed physician and surgeon per title 22) taking care of these patients in these mental health CTCs (hospital crisis bed units). Our general medical physicians do not care for these patients, except occasionally as consultants. Psychiatric physicians decide when to consult their general medical colleagues if they deem that a general medical condition (like diabetes or hypertension) needs attention. So it is clear from title 22 that the psychiatric physician is considered the "licensed physician" (79567) and thus has overall medical responsibility to consult the right people and make the right decisions to keep the patient safe, when the system works correctly. The psychiatrist has the same set of responsibilities as any other type of physician would have in caring for a patient in a licensed correctional treatment center, whether its focus is on general medical care or on psychiatric medical care (according to title 22 and 15).

Thus, it seems clear from these rules that the psychologist services (79609), per title 22 and 15, are consultative to the patient and therefore cannot substitute for the physician's care. The physician (according to title 22) is not consultative to the patient. Instead, the physician is "responsible for the care of the inmate/patient" (79599).

So not only should the psychologist, as a patient consultant, be checking with the physician who is ultimately "responsible for the patient" (and even more so in a crisis admission to a hospital) the psychologist *must* do so, whether psychologists think they

89

1  can determine what is a medical issue or not. And this is relevant for a broader discussion

2  about this patient and many other issues throughout CDCR.


3  Perhaps even worse than this tragedy, the decisions of our local psychologists are made in

4  the context of a headquarters culture that precisely encourages these types of

5  irresponsible decisions to continue. An HQ representative of the statewide patient safety

6  committee (a psychologist) was assigned to help with the root cause analysis that was

7  being done at the institution, and was said to "make suggestions".


8  The ███████████ at the institution, and I, the Statewide Chief, insisted that one of

9  the key root causes of the disaster was the decision of the psychologist not to call the

10  psychiatrist, resulting in medications not being promptly administered. HQ psychiatrists

11  who reviewed the case also do not understand why the psychologists would not be calling

12  the psychiatrists for admission routinely, but especially in a case like this. And of course,

13  the ███████████ at CIW also could not understand why the psychologist would not

14  call the psychiatric physician.


15  Further, though it was the psychologist who interviewed the patient and therefore should

16  have called the psychiatrist, HQ psychiatry was surprised, too, that nursing staff did not

17  call the psychiatrist. The ███████████ discovered that custody thought the

18  psychologist was the physician, and the psychologist is even listed as the physician to call

19  by nursing staff in certain documentation. (see page 3 of 2017 12 04 1043hrs)


20  Two HQ psychologists (one of whom visited the institution for patient X) sit on the HQ

21  patient safety committee. We have asked that a psychiatrist sit on the committee, given

22  events like this, but our request was denied. Had psychiatric physicians been represented

23  on the safety committee, that might have allowed relevant psychiatric medical

24  information, and then our vote, to make a difference. But it was clearly determined, not

25  just in the institution, but at headquarters as well, that the psychologist's opinion about

1  what was a medical issue in this case was valid (for example, that the failure to call the

2  physician was not a root cause of the disaster when a patient was admitted to a

3  psychiatric hospital and also happened to be decompensated, psychotic, and screaming).

4  Such problems are likely to continue happening at this institution and more widely in

5  CDCR wherever this thinking occurs. It occurs because psychologists, supported by HQ

6  administrators and non medical senior executives, continue to allow psychologists to

7  determine what is or is not a medical issue. That is particularly dangerous in emergencies,

8  for example during admissions to psychiatric hospitals.

9  The ███████████, who advocated that it be recognized that the patient should have

10  been given medications, wrote about her experience working there in an email message

11  to me (for original see [xviii]). (see 2018 04 30 1244hrs) [The text in black in square brackets

12  is my own]:

13  "It had come to a point where the Supervising Psychologists in each program were by

14  proxy supervising the staff psychiatrist in that program. This was not a 'team based'

15  approach in providing care. The therapist was [deemed] the 'primary clinician' (formally

16  so, as the "PC" in the electronic medical record) and made all the important decisions,

17  without needing agreement from the psychiatrist. This was even the case during IDTTs

18  [treatment teams in which major clinical decisions are made]   the 'primary clinician' was

19  the person who presented the case, spoke to the patient, and the psychiatrist was asked

20  only to speak when it was about medications. I can attest to at least a hundred IDTT's I've

21  been a part of as the psychiatrist. And this was the only role I was expected to play   the

22  prescription writer."

1    The █████████ continues:

2    "At CIW, in the one year period that preceded my becoming the █████████, no

3    psychiatrist had attended the pharmacy and therapeutics committee meeting. [A

4    psychologist █████████ attended in the place of the █████████]. No

5    psychiatrist had attended Licensed Inpatient Committee meetings, Utilization

6    Management Committee, Quality Management Committee, and perhaps most

7    importantly, the Mental Health Subcommittee. This can all be confirmed via meeting

8    minutes, [although these committees all explicitly review the medical aspects of mental

9    health care]. Psychiatrists had not been involved, at all, in policy review for any of the

10   programs outside of the PIP [Psychiatric Inpatient Program], even in the MHCB [Mental

11   Health Crisis (hospital) Bed]. In fact, nobody knew who the Clinical Director of the

12   MHCB was when I became ████. I asked the ████ the ████ [█████████████████, a

13   non psychiatric physician], ████ [█████████████] and the ████ [Psychologist

14   Executive, █████████████]. The ████ thought it was the previous █████

15   █████ of the PIP, █████████, PsyD [psychologist] (it was not). Or perhaps it was the

16   new acting █████████ I had appointed for the PIP, █████████, MD (it was not).

17   The █████ thought it was the █████████████████ it was not, he was the █████

18   █████. Multiple policies in the MHCB refer to a "Clinical Director", yet lo and behold,

19   nobody knew who that person was.

20   Finally, the designated "█████████████", █████████ piped in and said that it

21   was the previous Supervising Psychologist, █████████, but unofficially. And currently, I

22   asked? Radio silence. Why is this problematic? Here was a licensed inpatient psychiatric

23   hospital, being solely run by psychologists, and had been for at least three years."

1   Dr. ███ continues, commenting on the local MHCB policy:

2   "One example is the enucleation [eye removal] case. A psychologist admitted the patient
3   to the MHCB, did not contact the psychiatrist on call, and for four hours, this severely
4   psychotic patient paced and was noted to be 'screaming', she refused to change into a
5   strong gown, and refused movement from the [unlicensed] TCU to the [licensed] MHCB.
6   She was not offered a single dose of an antipsychotic before enucleating her eye and
7   ingesting it. She only received a dose after the enucleation   which was when the
8   psychiatrist on call was notified.

9   To my shock and dismay, the ███████████ did not [note] that the policy
10  indicated that the psychologist must contact the psychiatrist when admitting. And that
11  notion [that nothing needed to be said to the psychiatrists] had been passed down to all
12  the staff, including the admitting psychologists who were told that the policy was to only
13  contact the psychiatrist when sending a patient back to their housing (that is not actually
14  in the policy). See local CIW Policy [see page 10 of 2017 12 11 1622hrs].

15  The ███ also wasn't aware that the admitting psychologist did not in fact have
16  admitting privileges at the MHCB, as none of the psychologists did. They only had
17  credentials to treat patients with therapy, not admit. That application process was
18  initiated by me after two years of psychologists admitting patients in a licensed
19  psychiatric hospital.

20  As a physician, I am well aware of what credentials and privileges are required for
21  admitting and treating and would not place a physician in a role without those being in
22  place. I know this because I have spent years training in hospitals. I am positive that the
23  psychologist who is the ███████████ has never worked in a free standing
24  hospital, psychiatric or otherwise. Nor has the other ███████████. This matters. As

93

1  physicians, we are trained largely in hospitals   we admit and discharge thousands of
2  times and we learn UM [utilization management] and QM via that process.

3  Yet this valuable skill set is completely disregarded at CDCR. Instead, there is a fiefdom of
4  power held together by a group who has been given more responsibility than their scope
5  would designate. The psychiatrists who encompass the broadest scope   all the
6  therapeutic modalities and the medical aspects of care   are relegated to being
7  prescription writers.

8  This is of course, related to CDCR's difficulty in maintaining psychiatrists   none of us
9  went to medical school and completed four to five years of residency to be a prescription
10  writer. Yet, perhaps more importantly, it affects the care provided to patients, as
11  evidenced by the one case illustrated in this letter (there are many more examples). All
12  patients, in particular inmates who are mentally ill, deserve the community standard of
13  care, which is a physician psychiatrist overseeing a department that provides psychiatric
14  care (which includes behavioral health). That standard is based on years of training and
15  licensure scope, not on hoarding of power." (see 2018 04 30 1244hrs)

16  In this CDCR culture that relegates psychiatric medical doctors to mere prescription
17  writing, perhaps it is not surprising that it was deemed unnecessary to get a medical
18  opinion in a case in which a psychotic patient was screaming for four hours. And it is not
19  surprising that a headquarters culture that allows psychologists to vote to allow
20  themselves to override physicians' orders (for when a patient should be seen next) and
21  has QM committee meetings applauding excellent quality care at SAC (without
22  recognizing that it was disastrous care) would also send a psychologist down to review
23  the process, and he and the committee (with no psychiatrists), would find it perfectly
24  acceptable for a psychologist to decide that failure to call the psychiatrist was not a root
25  cause of the problem, despite the opinion of the local ███████████, the Statewide
26  Chief Psychiatrist and the entire HQ psychiatry team.

94

1   The case of Patient X is tragic because the enucleation was likely preventable. This case

2   should be reopened and reviewed by the Coleman Special Master team or their designees,

3   as CDCR has not as yet developed the cultural knowledge (in many of its institutions or at

4   headquarters) needed to understand that medical decisions about acutely hospitalized

5   patients should be made by psychiatrists rather than non medically trained personnel,

6   and that clinicians should call the psychiatrist on call in such cases rather than failing to

7   consult the psychiatrist. It is important to learn from these tragedies and we will not do

8   so given the dangerous, medically inappropriate constraints CDCR imposes on

9   psychiatrists' access to information and analysis of psychiatric medical contexts in CDCR.

10   **Psychiatry Undermined and Sidelined**

11   For comparison with the case above, it is helpful to read the comments of a line staff

12   psychiatrist at a different institution (CHCF). Dr. ▆▆▆▆▆ comments are relevant to the

13   previous case (see 2018 07 17 1703hrs):

14   "It seems that certain types of decisions, including level of care changes, are made by the

15   supervising psychologist in consult with the clinician (psychologist or social worker). In a

16   setting like this, you must choose your battles, so I don't say anything. On a few occasions

17   I did get frustrated because I felt strongly about certain cases and spoke up, expecting

18   people to respect my view, but certain staff just argued against me. If I really felt I wasn't

19   being heard, I could have just contacted the other facility involved to say that I disagreed

20   with the team, but I would never do that. Even weirder is when they ask questions for

21   custody regarding whether mental illness played a role in some infraction when going in

22   front of a disciplinary board. This question almost always seems to involve a deep

23   understanding of the role of medications in relation to their illness, and I am trained in

24   forensics and have been involved in answering questions like these for courts in several

25   locations and internationally."

1    He continues:

2    "I've just gotten very good at biting my tongue for 90% of our meetings that are

3    dominated by psychologists. It helps keep me humble, because in reality I'm trained in

4    Johns Hopkins and Yale and have often had high level experiences or been directly

5    involved in research related to the matter at hand. So if a social worker with no real

6    mental health training is asked their opinion over mine, it just tells me that the system is

7    more interested in other things than truth. Hope that's not too cynical or going to get me

8    into trouble. I'm always interested in big picture and systems level thinking, so please let

9    me know if I can be of service or if there are any unique opportunities in the future."

10   Dr. ▆▆▆▆, ▆▆▆▆▆▆▆ at SATF, similarly describes how the psychologist who

11   supervised him (a former Chief of Mental Health) made an apparently incorrect clinical

12   determination and used her disagreement with his good judgement as part of her

13   argument to get him removed as a Probationary ▆▆▆▆▆▆. (see 2018 04 26

14   1257hrs)

15   Dr. ▆▆▆, the excellent ▆▆▆▆▆▆ at CIW when the enucleation case above

16   happened, stepped down from her position as probationary ▆▆▆▆▆▆ before her

17   reputation could be tarnished as her preliminary probationary report did not reflect her

18   excellent skills, hard work and commitment to excellent patient care. Neither the

19   Statewide Chief Psychiatrist nor any other psychiatrist has any input into decisions about

20   whether chief psychiatrists are deemed to be doing a good job. Dr. ▆▆▆ did not want to

21   have to report to subsequent employers that she had failed probation so she quit before

22   that happened. Please see my letter to our ▆▆▆▆▆▆ (see 2017 10 25 1156hrs) and

23   Dr. ▆▆▆ note to me (see page 2+ of 2017 10 25 1156hrs).

24   But ▆▆▆▆▆▆▆ at SATF, Dr. ▆▆, stayed and was failed on probation and forced out

25   of his position. He was demoted. But he fought the charges against him in court, and

1  won, and was then reinstated as the ██████████, with no need to report any failures

2  to future employers, because he had been exonerated in court.

3  He says in a message to me about evaluations of his clinical care:

4  "....I had another patient in crisis bed that I saw at the request of the staff who making a

5  gesture of putting something around his neck and trying to pull the ends with his hands

6  without completely encircling the neck. He wanted custody to go in. He had a law suit

7  going on charging excessive force and had a detached retina because of that. He was

8  hoping for custody to go in and get physical so that he could get the injury aggravated

9  and have a further case against CDCR. I told the custody and staff that there was no acute

10  danger to the patient and for custody not to go in but for staff to just keep a visual 1:1 on

11  him. The patient calmed down after custody did not go in and was ok and an aggravation

12  of his detached retina was avoided. An additional lawsuit on CDCR was also avoided. This

13  was the case you [Dr. Golding] were consulted on and you sided with me but these guys

14  nevertheless used it against me.

15  I was written up by the ████ [...] and told that I had not followed the rules. She also did

16  not like some of the views I had expressed earlier that a psychiatrist should weigh in

17  before a patient is discharged. She failed me on probation because of this and other

18  trumped up lies and fabrications. I sought a Skully hearing and won the case and retained

19  my ██████████ position." (see 2018 04 26 1257hrs)

20  **Psychologists Shouldn't Be Making Medical Decisions**

21  Note also Dr. ████ mention of discharges from (presumably) crisis beds. Crisis beds are

22  licensed mental health facilities which are designed to be short term crisis psychiatric

23  hospitals (stays are often less than ten days). In virtually every hospital across the country

1    and throughout California, patients do not leave hospitals without a medical doctor (such

2    as a psychiatric physician) determining that from a medical perspective, the patient is

3    safe to leave.

4    For example, a patient might have diabetes or hypertension as well as mental illness and

5    it is the psychiatric physician's job to either determine that these medical conditions are

6    stable prior to the patient leaving, or to get them stable, for example by consulting a

7    general medical physician. Moreover, psychiatric medications are frequently being

8    adjusted, medication levels need to be checked, and physical and certain predictable

9    mental side effects may need to be evaluated before a patient leaves hospital. Patients

10    should not leave a hospital unless some kind of medical clearance is given.

11    In California, unlike in most states, psychologists are apparently allowed by law to

12    discharge patients from hospitals. Our ████████████ has affirmed that, and is working

13    to extend the CDCR system of psychologists admitting and discharging to the

14    Department of State Hospital Programs inpatient programs for inmate patients that

15    CDCR recently took over. Psychiatrists currently admit and discharge patients from these

16    formerly DSH hospitals. It is particularly crucial that physicians (including psychiatric

17    physicians) at least medically determine that it is safe for a patient to leave the acute and

18    long term psychiatric hospital, as psychologists have no medical training at all and will

19    soon be making discharge decisions in formerly state psychiatric facilities about our

20    sickest psychiatrically ill patients who are also often medically sick. Getting

21    medical/psychiatric clearance before patients leave hospitals or some type of medical risk

22    benefit analysis is the standard of care in every hospital across the country. That is why it

23    is particularly poignant when Dr. ███ was attacked for saying, "a psychiatrist should

24    weigh in before a patient is discharged".

25    Given these issues, the HQ psychiatry team has argued that custody and transportation

26    should not be contacted (and the patient prepared to leave the hospital) unless the

1   psychiatric physician (at a minimum) has affirmatively medically/psychiatrically cleared

2   the patient.


3   Our ██████████████ denied that request. The ████████ did not allow it

4   in practice, arguing at one point that it was a local institutional issue.


5   In reviewing 32 records (see 2017 08 32R), the HQ psychiatry team found that in about

6   50% of cases, there was neither an order in the chart for discharge by a psychiatrist nor an

7   explanation for why the patient should leave. This would be unheard of anywhere in the

8   country, where physicians (including psychiatric physicians) are involved with decisions

9   to discharge patients from psychiatric hospitals. They discharge and write notes. But in

10  these 50% of cases, neither was occurring.


11  In reviewing some of these discharges, we found that a psychologist had discharged the

12  patient without any documented agreement by a psychiatrist or any other medical doctor.

13  The lack of any medical explanation for why a patient should leave a crisis hospital occurs

14  in no other hospital outside CDCR that any of our HQ psychiatrists have ever heard of.

15  (see 2018 07 06 1016hrs)


16  Although not documented in the above list, at CCWF, a psychiatrist clearly states in a

17  note on the day of a patient's discharge (see page 15 and the last page of 2018 08 14

18  1100hrs) that the patient should not be discharged. But the unlicensed psychology intern

19  discharged the patient anyway (after documenting that she spoke with her supervisor,

20  another psychologist).


21  The psychiatrist involved explained in an interview with me that it is considered

22  imperative to get patients out of crisis beds in ten days given directives (I tried to change

23  his mind and asked that he fight that perception, though he feels the pressure can be

1    intense from headquarters[xix]). The psychiatrist told me that to properly plan to send a

2    patient for long term hospital care at a psychiatric inpatient unit hospital (rather than the

3    current crisis hospital), a plan has to be started perhaps on day three of the crisis hospital

4    stay, at the first treatment team. So a decision has to made to get the patient to long term

5    care then, before virtually any treatment has occurred. If the team guesses wrongly about

6    the need for long term care early on in the crisis hospital admission, as the psychiatrist

7    says happened in this case, day ten approaches and something must be done. His

8    preference was to wait and send the patient nonetheless to long term care, but the

9    psychology intern overruled his decision. The issue of not being late for transfer seemed

10    absolutely imperative.

11    The psychiatrist said that the team might be accused of mismanaging the patient if the

12    patient stays beyond the strongly suggested maximum amount of time the patient should

13    be there (ten days) to wait for a long term bed. The argument is that, had the referral

14    been made earlier, for example, at day three, it would have been easier to get the patient

15    to the long term bed by day ten, not after day ten. If one can't get the patient to the long

16    term bed by day ten, the reasoning goes in this crisis bed unit, the only alternative is to

17    discharge the patient to no hospital at all, which is what the psychiatrist says occurred in

18    this situation.

19    He reports that many psychologists seem to be intensely focused and pressured to get

20    patients out of the crisis bed by day ten, even if good discharge plans have not been

21    made. Finally, there is additional pressure to discharge the patient to the lowest level of

22    care possible, the CCC level of care, not the EOP level of care.

23    So the psychiatrist wrote in his note that the patient should not leave a protected hospital

24    setting (see pages 8 and 15 of 2018 08 14 1100hrs), but the unlicensed psychology intern

25    discharged the patient to the lowest level of care mental health care (CCC) possible, not

26    even the EOP level of care in which the patient would have got enhanced services.[xx]

1  Of interest, about a week before the hospital admission described above, the patient had

2  also been discharged from a crisis bed and was similarly sent to a CCC level of care.

3  Consistent with the policy that when patients transfer levels of care (and institutions) the

4  psychologist (or social worker) writes orders for the psychiatrist to see the patient back at

5  the latest court allowable date, the non medical clinician scheduled the patient to see the

6  psychiatrist 90 days later   this was a patient just discharged from the hospital   with the

7  lowest level of supportive care possible.

8  Put simply, a patient was just discharged from a psychiatric hospital and put at the lowest

9  level of follow up care, and orders were written on 7/13/18 by a psychiatric *social worker*,

10  for the patient to be seen *90 days* after just being released from a psychiatric hospital (the

11  community standard is one *week*).

12  The social worker determined when the next medical intervention was needed and

13  determined that the psychiatric visit should occur 90 days later. There was no physician

14  involved because the social worker or psychologist determines when the patient should

15  be seen next, hospitalization or not, medication adjustment or not, and the maximum

16  time is chosen.

17  And then the patient bounced back almost immediately into the hospital from CCC and

18  then was discharged by the psychology intern who met the patient once. This was against

19  the will of the psychiatrist who had seen the patient essentially every day for a week. The

20  psychology intern who saw the patient once and overruled the physician sent the patient

21  to the CCC level of care again with the rationale for lower level of care

22  ("MHLowerRationale") being, "Patient is assign(e [sic] to CCCMS."

23  After the second hospitalization and discharge to a CCC level of care a second time, the

24  patient was finally sent to EOP on 8/9. (see 2018 08 15 1333hrs)

1    One wonders how a psychology intern could really understand that when one rapidly

2    lowers a very powerful medication like olanzapine (which occurred), then starts an

3    antidepressant, that could be profoundly destabilizing in terms of increasing short term

4    risk of suicide, which is no doubt why the psychiatrist Dr. ███ wanted to make sure the

5    patient did not become agitated then suicidal in making those changes. So it is hard to

6    fathom how the psychology intern could make the medical decision that Dr. ███

7    knowledge and information just wasn't relevant or at least not relevant enough, and that

8    it was fine to overrule the physician and his judgement.

9    The psychiatrist saw the patient 7/23/18, 7/24, 7/25, 7/26, 7/27, 7/29, 7/30, 7/31, 8/1 and the

10    psychology post doc intern saw the patient once on 8/1/18 and discharged the patient,

11    against the explicit and documented advice of the psychiatric physician.

12    The psychiatrist wrote:

13    "As per team IP [inmate patient, MG] will be discharged back today to his yard. This

14    psychiatrist is recommending additional observation in view of his long Hx, long

15    sentence, residual depressive Sxs [symptoms] and the recent initiation of AD

16    [antidepressant] medication however this opinion *was felt to be unnecessary* [emphasis

17    mine, MG] by the other team members...." (see page 2 of 2018 08 14 1100hrs)

18    In contrast, the post doc psychology intern wrote:

19    "Met with patient for IDTT [the patient's treatment team, MG]. Introduced myself as

20    covering for his primary PC [PC= "Primary Clinician" which is almost always defined to be

21    the psychologist or social worker in CDCR]. Informed patient that after reviewing his

22    chart notes, emailing yard PC and speaking today with primary PC, there does not appear

1   to be a reason to continue to keep him after 1 days [sic]." (see page 2 of 2018 08 14

2   1100hrs)[xxi]


3   To summarize, (see 2018 08 14 1100hrs), the patient was admitted to the mental health

4   crisis bed (a licensed correctional treatment center) for suicidal thinking with plan. He

5   was clinically discharged on 8/1/18, despite the psychiatrist's strong objections.


6   Dr. ██████ says:


7   "Two significant issues to note: 1) The psychiatrist saw the patient every day of his

8   admission, with the exception of 7/28/18, whereas the patient was seen by 7 different

9   psychologists or social workers during his stay. The psychiatrist was the staff member

10   with the most knowledge and familiarity with the patient, but he was overruled regarding

11   the discharge; 2) The patient was discharged by a post doc psychology intern, on the day

12   she met the patient. The psychiatrist strongly disagreed with discharging the patient, but

13   the patient was still discharged. This clearly demonstrates that the unlicensed psychology

14   intern, and not the psychiatric physician, was the primary clinical decision maker." (see

15   page 1 of 2018 08 14 1100hrs)


16   Please now see 2018 07 26 0948hrs, which relates to a different case. In this situation, the

17   psychiatric physician finds out that her non hospitalized patient was not taking

18   medications and writes that the patient should be admitted to a crisis bed for evaluation

19   for 2602 (forced) medications, as she thought forced medications may well be

20   appropriate.


21   "I informed her (the psychologist) that this pt needed to be sent immediately to the Crisis

22   Bed for safety, stabilization and consideration for an emergent PC 2602, which cannot be

1  accomplished in ASU [administrative segregation unit]." (see page 4 of 2018 07 26

2  0948hrs)

3  The above quote means that the psychiatrist told the psychologist that the patient needed

4  to be sent from an outpatient prison housing unit to an inpatient unit for consideration of

5  emergency forced medications ("emergent PC2602"). The psychiatrist also says that this

6  emergency forced medications cannot be safely done in the patient's current outpatient

7  housing arrangement (an administrative segregation unit) and indeed forced medications

8  are essentially never done in CDCR in outpatient units.

9  But the psychology supervisor of the ASU deemed that this evaluation for forced

10 medications in a crisis bed was unnecessary. Thus, this psychologist supervisor made the

11 medical determination that forced medications were not needed and should not occur,

12 though a psychology supervisor has no medical training whatsoever to be making these

13 medical decisions about whether consideration of forced medication is relevant or the

14 consequences of not forcing medication. This decision by the psychologist is eerily similar

15 to the case of patient X, described earlier, in which the psychologist determined that

16 calling the psychiatrist for a possible forced medication order was not needed    but that

17 time, failure to call the psychiatrist had disastrous consequences. So the above is a case

18 where a psychiatrist clearly documents the need for immediate hospitalization for

19 medication related reasons, and the non medical psychologist overrules her, making the

20 medical decision that medication evaluation in a crisis bed is not needed.

21 In theory, level of care changes are always made by the IDTT, the patient's treatment

22 team, which should include the psychiatrist. Yet Dr. ██████ and Dr. ██████ and Dr.

23 ██████ (at CHCF) directly told Dr. ██████ and me during our recent visit in July 2018

24 and we hear the same from many psychiatrists across the state    that they are frequently

25 only told that the patient is being discharged (or that the level of care is being changed)

26 when the psychologist tells the patient in treatment teams. So the physician psychiatrist

1   is finding out that a discharge is going to occur when the patient is being told. Clearly no

2   consultation is seen as necessary with the psychiatric physician, except if the psychologist

3   determines that a psychiatric medical opinion is needed (and often that happens). But it

4   is the psychologist who determines whether there is a relevant medical situation present

5   which necessitates calling a psychiatric physician. As our psychiatric physicians

6   repeatedly say, CDCR seems to want to use them only for prescription writing.

7   At headquarters, while our psychologists and administrators have asked our psychiatrists

8   to interpret certain sorts of data, we are typically denied any kind of comprehensive

9   system level information about the quality of care that we are providing.

10   So strong is the culture of psychologists ignoring and even overruling psychiatric/medical

11   decision making in the California system that, as illustrated above in the case of the

12   patient who removed her eye and swallowed it, and in the discharge and admission

13   decisions illustrated, psychologists are willing to put in writing their decisions to overrule

14   the medical decisions of the psychiatric physician. As our head of Quality Management

15   puts it, "We have a referral based system to psychiatry."

16   This can now be clearly seen to be interpreted to mean that psychologists determine

17   when there are medical scenarios in which psychiatric physicians are needed.

18   This means that psychologists ask for the opinion of psychiatrists only if they deem it

19   necessary. Dr. ████, overruled by the psychology intern, phrases it this way in his

20   discharge note:

21   "This psychiatrist is recommending additional observation in view of his long Hx, long

22   sentence, residual depressive Sxs [symptoms] and the recent initiation of AD

1     [antidepressant] medication; however, this opinion *was felt to be unnecessary* [emphasis

2     mine, MG] by the other team members...." (see page 2 of 2018 08 14 1100hrs)

3     But the physician's medical opinion can only be unnecessary if the psychologist (or

4     psychology intern) determines which medical opinions *are* necessary. Which is to say, the

5     CDCR culture allows psychologists to determine what is a medical issue or not and to

6     consult a psychiatrist only when they deem a psychiatrist's medical opinion necessary. A

7     referral based system means that psychiatrists in CDCR are considered mere consultants

8     to psychologists. This occurs at HQ in which psychologists and our ██████████

9     determine that it is

10       1.   fine to overrule the medical opinion of the psychiatrist about when a patient

11          should be seen next when patients transfer institutions, as a matter of policy

12     and

13       2.   fine to determine that it is unnecessary to allow physicians to have access to

14          needed medical information for patient care from databases or fine to fail to

15          provide the information if they determine the physician does not need it to care

16          for the patients

17     and

18       3.   fine to determine the psychiatric medical workflow in the EHRS and what will be

19          needed information by psychiatrists to make good decisions (for example,

20          reasonably detailed information about the environment of care is not deemed

21          relevant based on what they have allowed to be designed)

22     And in the field it is

23       1.   fine for the psychologist in the crisis bed unit to determine that medical

24          consultation is not needed with newly admitted and screaming and psychotic

25          patients

1 and

2.   fine for the psychologist (even just a psychology intern) to determine that changing medications are not relevant in assessing risk for suicidality while discharging the patient, while the psychiatrist disagrees

and

3.   fine for the psychologist to determine that there is no need for consideration of forced medication in the crisis bed in a medication non compliant outpatient though the psychiatrist insists on it

and

4.   fine to make a decision that in a licensed hospital it is fine for a psychologist to order an aspirating patient into restraints, rather than calling a psychiatrist who might give forced medication instead, and that it's fine for the psychologist to write a restraints order without getting agreement from anyone with medical knowledge beforehand (discussed later).

When I (a psychiatric medical doctor) worked very briefly at CHCF in the crisis bed unit nearly five years ago, a psychologist (the patient's "primary clinician") said to me: "I am discharging patient X. I need you to write his medicines."

But when I asked about the condition of the patient, whom I had actually never seen before as I had just arrived at the institution, the psychologist could not or *would not* tell me why the patient was there, or how long he had been there, or what his diagnosis was, or what medical conditions he had, or what medications he was on, etc.

The psychologist told me merely that the patient seemed better and was not suicidal.

1    Needless to say, I could not agree to write the patient's discharge medications, because

2    neither the psychologist insisting that I do so, nor I, knew enough about the patient to

3    make such a decision at that time.


4    Having just moved to CDCR from a more standard correctional system elsewhere, in

5    which medical decision making mattered in situations like discharging medically and

6    psychiatrically ill patients from hospitals and in which it was not deemed to be the

7    psychologist's decision when a medical opinion is or is not necessary before discharging a

8    medically and psychiatrically sick patient from a hospital, I was surprised.


9    I was fully prepared to disobey the psychology supervisors who were telling me what to

10   do and to accept whatever consequences there would be. But they had so few

11   psychiatrists that they had to let me stay.


12   CDCR *says* that psychiatrists report to psychologists only *administratively*, not clinically.

13   However, in situations like I experienced above, in which your supervisor may be telling

14   you that a patient is going to discharged, it is very clear that the supervision is definitely

15   not just administrative. It is clinical.


16   The psychologists in many of our institutions are the *de facto* clinical supervisors of the

17   psychiatrists despite having no medical training to be supervising what a physician does

18   medically. But as illustrated in the above examples, they do it anyway. The conversation

19   detailed above, about me writing medications for a patient the psychologist was

20   discharging, was witnessed by fellow HQ psychiatrist Dr. █████████ .


21   When patients leave an inpatient/crisis hospital setting in environments in which

22   psychologists are ordering the discharges, I have argued that psychiatrists should

23   complete an order medically/psychiatrically clearing the patient, which then becomes the

108

precipitant to transportation being called to move the patient. Thus, the psychologist could make the decision to discharge the patient   hopefully in consultation with the treatment team   but no order for transport should occur unless and until the psychiatric/medical clearance precipitates it. Then a discharge (usually written by the psychologist) and the psychiatrist's medical clearance would enable the patient to leave. I also believe that in definitively establishing this very important medical/psychiatric clearance policy, it would help our non medical colleagues understand that they need to include the psychiatric physician not just in these discharge decisions but also in other decisions on a day to day basis.

Our psychologist ████████████████ has blocked this mandatory consideration of medical issues by physicians when patients leave hospitals and her boss opined that it was a local decision if institutions want to do this. She has in practice prevented this from occurring, thus implicitly leaving many of our psychologists to be medically in charge of many aspects of patients' care, though they have no training to do that.

To repeat:

Title 22 and 15 clearly state that in licensed CTC's (which includes mental health crisis bed hospitals)

1. "Psychiatrist means a person who is a *licensed physician and surgeon* in the state of California...." (79567)
2. "Psychiatric/psychological services means *consultative services* to inmate patients (79609) of a correctional treatment center" (79609)[xxii]
3. Physician Services are services provided by the licensed physician responsible for the care of the inmate patient in the correctional treatment center (79599). And under 79599 *Physician service includes, "determination of the appropriate level of care* for each inmate patient."

1  As stated previously, it is clear from title 22 that the psychiatric physician is considered

2  the "licensed physician" (79567) and as the licensed physician is said to have overall

3  medical responsibility to consult the right people and make the right decisions to keep

4  the patient safe, when the system works correctly.

5  Thus, it should be clear from these rules that since psychologist services (79609), per title

6  22, are consultative to the patient but the physician is "responsible" for the care of the

7  patient, psychologists cannot substitute their judgement for the physician's, because the

8  decision making capacity of the physician (according to title 22) enables him or her to be

9  "responsible for the care of the inmate/patient" (79599).

10  The appropriate "level of care", the determination of which is assigned to the physician,

11  includes whether patients should leave licensed crisis hospital beds, and go to the EOP

12  level of care or the CCC level of care. Title 22 is thus explicit that the physician must be

13  responsible for the patient to make sure he or she is at the right level of care.

14  Not only should the psychologist, as a patient consultant, be consulting the physician, the

15  psychologist must do so, whether psychologists think they can determine what is a

16  medical issue or not. Indeed, when a physician affirmatively denies that clearance and

17  argues that the patient must say, it would seem to be legally problematic for the

18  psychologist to overrule the physician's decisions in licensed hospitals, given title 22, yet

19  this happens frequently in CDCR.

20  Mandatory physician involvement with each discharge decision from a hospital would

21  seem not only to be straightforward and commonsense (and occurs in just about every

22  hospital any physician has ever been a part of), it also seems to be mandated by law. So it

23  is hard to figure out why our psychology executive directors and senior mental health

24  executives (all non medical) at HQ will simply not allow a medical/psychiatric clearance

1  order prior to transportation being called to enable the patient to leave the hospital and

2  be consistent with the law.

3  It strikes our psychiatry team as indifferent to patient medical care to not have a system

4  in place in which a physician (for example a psychiatric physician) makes sure the patient

5  is physically/medically/psychiatrically safe when a patient first enters and before the

6  patient leaves a licensed crisis hospital, when patients are frequently both medically and

7  psychologically sick in hospitals. And during discharge, mandatory orders for

8  medical/psychiatric clearance should be tied to transport orders, to prevent the patient

9  from physically leaving when the psychologist writes the discharge order as happened in

10  the example given above. The psychiatrist said no. The psychology intern said yes. And

11  the patient left.

12  When one of our senior administrative mental health executives asked me what I hoped

13  to accomplish by insisting that physicians provide medical/psychiatric clearance before

14  patients leave hospitals, I responded as follows:

15  "When a patient is leaving the hospital to go to somewhere other than another

16  hospital, someone medically qualified (a psychiatrist or other Medical Doctor) is

17  taking a view about and legally and ethically signing off on a number of issues: that

18  the medical situation including medical meds, psych meds, psychological condition,

19  physical condition, housing and social situation, are such that the patient can safely

20  leave hospital.

21  In CDCR mental health hospitals, discharge orders are currently typically being

22  written only by psychologists, not psychiatrists or other medical doctors.

1    Psychologists are not medically qualified to address all the relevant issues that must
2    be considered.

3    Therefore, if psychologists can discharge patients from hospitals, then the physician
4    giving "medical clearance" in our system must therefore be taking on the
5    responsibility for signing off on all the relevant issues mentioned above.

6    Either the phrase "medical clearance" must take into account all the relevant issues,
7    or the word "discharge" must. If in our CDCR system neither does, we are neither
8    following the law, nor behaving ethically.

9    By requiring psychiatric or other MD involvement in discharge decisions, I am hoping
10   to achieve legal and ethical discharges rather than illegal and unethical ones with all
11   their associated consequences."

12   Our non medical ███████████ wrote:

13   "I am going to change the duties of the psychologists in the PIPS [psychiatric inpatient
14   programs] to allow them, with the IDTT, to make admissions and discharge
15   decisions....There is considerable concern from the psychiatry team at the new PIPs that
16   they will be exposed to liability when a psychologist makes a poor decision". (see 2017 11
17   15 1143hrs)

18   She ignored the need for medical clearance in this message when medically sick patients
19   leave the hospital (seemingly required by title 22 since level of care changes are supposed
20   to be made by the physician, not the psychologist), and ignored that physicians might
21   need input into these "decisions" to make them safe, both in terms of writing policy about
22   them and in terms of trying to protect our patients. Indeed, what if a patient's diabetes

1   were not under control when psychologists make these "decisions" (79599)    that it is

2   important for her that psychologists make.


3   Until recently, it was a mantra that discharges are "treatment team decisions" by the

4   "IDTT"; that is, that decisions about discharge were in theory made by the psychologist

5   and psychiatrist and other members of the treatment team, together.


6   In addition, if it is really always a joint decision, then no one should have any objection to

7   a physician psychiatrist merely psychiatrically/medically clearing the patient (as an order

8   in the treatment team meeting just prior to discharge) before transportation is called to

9   enable the patient to leave the hospital. No one should have any objection to a mandatory

10  physician's clearance order, because surely the treatment team leading and primary

11  clinician psychologist already obtained agreement from the psychiatric physician during

12  treatment team prior to discharge of the patient, if it really were a joint "treatment team

13  decision", as our executive psychology leadership asserts with the ████████████.


14  If the psychiatric physician agreed (in a treatment team meeting) to a discharge, as

15  claimed, why can it be wrong for transport to only be enabled to come if a psychiatrist

16  takes one minute to write a medical/psychiatric clearance allowing transportation to

17  come, in that same treatment team meeting in which that psychiatrist's agreement

18  allegedly occurred?


19  This is logically true and thus our executive psychologists and non medical ██████

20  ████████ should have no trouble at all with psychiatric physicians

21  medically/psychiatrically clearing patients to leave hospitals, unless having a physician do

22  that is actually not what is wanted by the psychologists doing the discharges and unless

23  that is not what is wanted by our ██████████████ and those executive psychologists who

24  support the current process and thus will not allow mandatory medical clearances.

1    Please see my e mail to our ▮▮▮▮▮▮▮▮ 2018 07 06 1016hrs.

2    Recently, our Senior ▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮, released a memo saying the

3    following (see page 2, section c of 2018 09 18 memo):

4    "c. When patients are clinically discharged from crisis beds or inpatient beds, they shall

5    be moved from the bed to their assigned institution in an expeditious manner to ensure

6    bed availability for patients awaiting MHCB placement......."

7    Under "c", discharge is defined: "Clinical discharge means the primary clinician or

8    treatment team has determined that a patient requires a different level of care and

9    discharge orders are placed and the inmate/patient can be moved."

10    The primary clinician is deemed to be the psychologist in a short term (crisis bed)

11    hospital or an acute or intermediate hospital in CDCR.[xxiii] Moreover, the psychologist and

12    the psychiatrist are members of the treatment team as are others. Therefore, the language

13    that in hospitals and crisis beds discharges are authorized if the "primary clinician or the

14    treatment team has determined that a patient requires a different level of care and

15    discharge orders are placed and the inmate/patient can be moved" means:

16    1. The Psychologist (the primary clinician)

17    *or*

18    2. The psychologist and psychiatrist and others on the "treatment team"

19    *determine*

20    3. That a patient requires a different level of care and discharge orders are placed and the

21    inmate patient can be moved.

114

1   If the psychologist and psychiatrist disagree about discharge, it follows that the treatment

2   team haven't reached agreement so can't make the decision. Given that decision is to be

3   made by the treatment team *or* the psychologist, it follows that in the event that the

4   psychologist and the psychiatrist disagree, the person authorized to make the decision is

5   the psychologist rather than the psychiatrist. The psychiatrist is not authorized to make

6   the decision alone, whereas the psychologist is authorized to make the decision

7   independently of the treatment team.

8   Thus, logically, our ▮▮▮▮▮▮▮ has determined that in the event that the

9   psychologist and psychiatrist disagree about, for example, whether it is safe to discharge a

10   patient, it is the psychologist, not the psychiatrist, who is authorized to determine

11   whether or not a discharge should occur.

12   Thus, as a matter of logic and policy (by memo), our ▮▮▮▮▮▮▮ codified that non

13   medically trained clinicians in hospitals are permitted to overrule the medical decisions

14   of physicians.

15   This memo came out after more than a year of discussions with this ▮▮▮▮▮▮▮

16   about the importance of physicians being able to medically clear patients when they leave

17   hospitals (and also after a year of discussion about the importance of accepting physicians

18   making sure the unit is safe medically for a patient). Psychologists don't have the training

19   to understand when a mental status change may be due to lithium toxicity or even

20   recognize it, let alone when the patient has begun to aspirate so a further work up is

21   needed. Nor do they understand the medical and mental status effects of infections and

22   the myriad complex medical issues that plague our patients and change their mentation.

23   Yet in one bold stroke, she has determined that the non medical psychologist, not the

24   physician with years of medical training, is to determine whether a medical opinion is

25   needed before discharging a patient.

1  No doubt if asked about this, she will be say   and indeed has said (see 2018 09 18

2  1619hrs)   that it does not mean what has been said above. And that "the language in the

3  ... memo is not a change of the policy."

4  If it is indeed not a change of policy, that explains why psychologists in our system so

5  often override medical orders and appear to see no problem with discharging patients

6  from hospital beds against medical doctors' judgement.

7  **Creating Policy Obstacles to Clinical Decision-Making Has Consequences**

8  Increasingly, patients are committing suicide or attempting suicide as soon as they leave

9  CDCR mental health crisis beds.

10  This increase has occurred because there is increasing pressure to get patients out of

11  crisis beds to lower levels of care or to the inpatient hospital within ten days. If clinicians

12  have not filled out the requisite documentation for a prolonged higher level hospital stay

13  by day three of ten of the crisis bed stay, they fail to make the ten day limit for acceptance

14  and transfer into the higher level of hospital care, and thus have to discharge the patient

15  to a lower level of care prematurely, even if the patient is not ready. Dr. ███ case

16  earlier in this report is an example of this. (see pages 92 95 of this report)

17  In point of fact, a stay is allowed to go beyond ten days, but time consuming conferences

18  and paperwork must be completed to get approval, and time is short, so this policy is an

19  obstacle to good patient care, clinicians taking increased risks with patients and on day

20  nine or ten discharging them to a lower level of care because they did not correctly

21  anticipate a patient's needs on day three and get the necessary approval.

1  Furthermore, if the patient came from the lowest level of outpatient mental health care
2  (CCC), these patients are being returned to CCC, even after the hospitalization, rather
3  than the EOP level of care, to decrease the number of more expensive to care for EOP
4  patients. For example, the number of psychiatrists required per patient is higher at the
5  EOP level of care, so the mandatory number of psychiatrists is lower if the system can get
6  more patients discharged to the lowest levels of care.

7  The increasing suicidality could be corrected in the current system by:

8  1. encouraging more frequent referrals to higher levels of care at day three of crisis bed
9  admittance

10  2. insisting on psychiatric clearance of patients for discharge to lower levels care before
11  transport is contacted

12  3. making the paperwork far easier to fill out with less consultation needed to be allowed
13  to keep patients beyond day 10 in the crisis bed.

14  4. Detailed analysis needs to be done about suicidality coming out of crisis beds and
15  inpatient hospitals (attempts and completions) and data compiled. I have discussed crisis
16  beds. But since CDCR took over DSH, the DSH units are no longer full. They have
17  become more like segregation units because patients cannot get out of their cell.
18  Continuing analysis of 30 day readmission rates from these hospitals and from the crisis
19  beds, as well as rates of attempted suicide need to be done by unbiased reviewers, as the
20  current purveyors of this information have been demonstrated to give false reports.

# Conclusion

22  CDCR has a broken system of care because information is not accurately reported upon,
23  and reliable commonsensical action has not been taken. I have documented that patients
24  are not getting to appointments on schedule and in confidential spaces, that appropriate

1    consultation is not occurring, and worse, appropriate medical decision making by

2    psychiatric physicians has been overridden. I have documented that CDCR has prevented

3    errors from being fixed, and worse, CDCR has not allowed anyone to know that there has

4    been inaccurate reporting to the courts and to our leadership. Such knowledge would

5    allow problems to be identified so they can be fixed.

6    A prison mental health system needs to ensure that patients see their psychiatrists and

7    other mental health providers on schedule, on time and confidentially, in an office. CDCR

8    is not doing that, as has been demonstrated in this report.

9    If a mentally competent patient refuses to go to his or her appointment with the

10   psychiatrist, then, as happens with medical and dental appointment refusals in CDCR, the

11   patient should be ordered to walk to the psychiatrist and tell the doctor that he or she

12   doesn't want the appointment.

13   Failing that, a custodial representative should be required to carefully and to the best of

14   his or her ability document the patient's reason for refusing to go to the appointment,

15   and any other possible reasons that might be behind the refusal. The custodial

16   representative should also document the condition of the cell. The custodial

17   representative should then immediately go to talk to the physician him  or herself, and

18   have a personal conversation with the psychiatrist, in which together they create an

19   individual plan of action to make sure the patient does get to subsequent appointments.

20   It should be required that all of this be documented.

21   Cell side encounters should not be counted as appointments. They are at best wellness

22   checks. For proper medical care, patients need proper confidential medical appointments

23   in offices, when they need them, on time relative to doctors' medical scheduling orders.

24   Outcomes will continue to be poor (high numbers of suicides, suicide attempts,

25   rehospitalizations, patients' symptoms failing to improve, etc.) unless we have a mental

1  health system in which patients are actually seen, and unless we have a mental health
2  system in which there is accountability for actually getting patients seen properly.

3  If patients were being seen as scheduled, on time, in offices, and for an appropriate
4  amount of time, that would be evidence of adequacy of staffing, but only if the data is not
5  being distorted.

6  If a seriously mentally ill patient cannot or will not come out of his cell for an
7  appointment, the team responsible for that patient (see below), with a custodial officer,
8  should visit these very difficult patients together, like Assertive Community Treatment
9  (ACT) Teams do. The custodial officer is critical so that the door to the cell can be opened
10  safely if needed.

11  QM should focus on basic, straightforward measurements that are accurately and
12  straightforwardly calculated. The approach should be that we measure those things that
13  actually determine good care, and the QM system should be transparent and open to
14  ideas for improvement, both in terms of what is measured, and in terms of how to
15  improve the system of mental health care itself. A good QM system is one that facilitates
16  error correction rather than hiding errors. Our approach should be more like that of
17  airline and air traffic control systems, which focus on actively identifying and learning
18  from mistakes without blaming or shaming anyone.

19  The EHRS needs to be programmed so that the psychiatrist and other clinicians can enter
20  into the chart the environment of care in which the appointment took place. A combined
21  measure of both whether appointments occurred on time, in an office, and for an
22  appropriate amount of time, should qualify an appointment as occurring in a compliant
23  way.

1   Low 30 day readmission rates and suicide rates in a population are in fact legitimate hard

2   outcome measurements demonstrating good quality care. Those institutions that do this

3   better (for a given mental health level and custodial level) should be studied and

4   emulated.

5   Rates of cancellation and refusal should be recorded as a simple percentage (for example,

6   number of cancelled appointments per patient per time). When a patient is scheduled to

7   be seen within a certain number of days and that appointment does not happen, that

8   appointment is late, and should be recorded as such. Labs and blood levels either

9   occurred when they were supposed to or they didn't, and need to be recorded that way.

10  The number of consultations requested, and the number of consults that occur as

11  scheduled, should be recorded straightforwardly. A simple triage system needs to be

12  established to deal with situations in which there are more consultations scheduled than

13  can occur at that time. For example, a nurse and a Supervising Psychiatrist could spend

14  one hour twice a week going through the list of medication non compliant patients

15  together, determining which patients should be seen first and which can wait (or in

16  which cases it would be appropriate for a nurse or psychologist to provide education,

17  rather than the psychiatrist).

18  None of the above QM measurements should be obscured from those who wish to

19  understand them. Thus, many people within and outside the mental health system within

20  CDCR should be able to run simple read only queries to assess the accuracy of what is

21  being reported. All queries being made should document both the query and the purpose

22  of that query: what question does the person running the query think the query might

23  help the person answer? The results of the query including an explanation of what was or

24  was not found should also be recorded. To facilitate error correction in the system, it

25  should be mandated that all this information about every query be easily available for

26  anyone in CDCR to read.

1   Continuity of care is key. Mentally ill patients more reliably get better when they are

2   under the care of the same reliable, caring doctor and treatment team over time, for the

3   following reasons. Doctors improve their care by learning how to treat patients. The first

4   choice of medicine is often suboptimal. Psychiatrists iteratively figure out which medicine

5   or combination of medications to give, by judging responses to preceding medications. A

6   single treatment team should take care of a given patient wherever the patient is in a

7   given institution, and transfers between institutions should be minimized.

8   Making a single team responsible for a given inmate would eliminate the patient

9   dumping that tends to happen in any system in which patient dumping can happen.

10  Systems in which it is possible to reduce one's workload or legal risk by transferring a

11  difficult patient from one's own care to someone else's thereby encourage a lot of

12  transferring (patient dumping). Such systems also tend to result in those looking after

13  patients at higher levels of care holding on to easy patients who don't really need to be

14  there, to avoid having to care for the new and potentially tougher patient that will replace

15  that easy patient. Systems having this flaw (like CDCR) tend to be very expensive both

16  financially and in terms of the care provided.

17  Both patient dumping and inappropriately keeping easy patients in higher levels of care

18  would be solved by a given inmate being assigned to a given treatment team, that

19  treatment team being responsible for the inmate's care irrespective of level of care

20  needed, or even if the inmate doesn't need treatment for mental health problems. That

21  would very quickly result in a reduction of the number of prisoners inappropriately

22  diagnosed as needing treatment, and it would very quickly result in those who do really

23  need treatment actually getting effective treatment. That is, it would do so if clinical staff

24  numbers in the institution were not cut as patients improve.

25  When you are responsible, and dumping is not an option, you get your patients better.

26  The way CDCR is currently set up, more and more inmates will be deemed to have mental

1  health issues, because staff naturally err on the side of referring inmates for mental health

2  diagnosis, not wanting to be blamed for failing to refer when it was needed. This is why,

3  no matter how hard we try to do better in the current system, the number of patients

4  needing higher levels of care never seems to diminish. Take away the incentives to refer

5  unnecessarily, to dump difficult patients, to hold on to easy patients, and make a given

6  team responsible for and accountable for a given set of inmates, and that will solve many

7  of the problems of the current system. Mental health teams will learn to treat patients

8  effectively, as happens outside CDCR, and the whole system will be vastly cheaper to run.

9  The other thing this would do would be to create real teams, with real teamwork. It

10  would create camaraderie. People work much more effectively and efficiently when they

11  feel valued and appreciated as they would in such teams.

12  In CDCR, I'm told we need armies of expensive therapists (do take a look at the ratio of

13  the number of psychologists to the number of patients in the CDCR system   it is

14  remarkably high). But in the real world outside CDCR, excellent patient care can be

15  achieved with fewer resources. Less expensive but still professional individuals like

16  vocational nurses, social workers and "qualified professionals", for example, can make

17  regular checks on patients (and report to psychiatrists regularly who are covering a panel

18  of patients throughout a prison). With regular reports about the health of patients by

19  professionals who are checking on them, the frequency and need for psychiatric visits can

20  be diminished as well.

21  Treatment and therapy should be practical (facilitating work, education, exercise, etc.) in

22  most settings, and only when patients have acquired the basic ability to function, should

23  therapy move on to exploring psychological issues like past relationships with parents,

24  etc. Excellent patient care is not necessarily expensive.

1   Large numbers of responsible adults from outside prison should (after having been

2   carefully oriented to prison rules and to boundaries and the strict limits of relationships

3   with prisoners) be able to visit and check on mentally ill patients. Senior citizens or

4   students of social work and psychology are excellent for this. Such a program could be

5   either on a voluntary basis or very inexpensive. The individuals checking on prisoners

6   should be given clear instructions with respect to what they should do (informing the

7   right person on staff) in the event that they think a given prisoner needs help. Such a

8   program would ease stretched resources.


9   Suicidal patients should not be isolated and should usually be able to stay in the same

10   institution and transported to the institution's own crisis bed unit, the same team taking

11   care of them at the outpatient level of care and when hospitalized.


12   Until we have a culture of excellence in which all or most psychiatrists in our system are

13   comfortable prescribing clozapine when it is indicated, for example, for patients with

14   dangerous life threatening suicidality/self mutilation/self injury associated with

15   personality compensation into psychosis, consultative pharmacologists (for example from

16   the Department of State Hospitals, called "PRN" psychiatrists) should be utilized for

17   consideration of the anti suicidal drug clozapine, with mandatory blood draws, to save

18   such patients' lives. There must be a statewide focus on getting our sickest patients on

19   clozapine with its demonstrated, proven ability to stop hospitalization rates (with proof

20   from Dr. ███████████ team even in CDCR). Clozapine is well known to decrease

21   suicidality in even the sickest mentally ill patients. Aggressive support for clozapine

22   clinics should be mandatory throughout CDCR to support those psychiatrists who

23   prescribe this often life saving medication for our sickest patients.


24   It is reported that in CDCR more than 100,000 inmates move more than 1,000,000 times

25   in a year. Mental health patients can't get better if they keep moving. Moving mentally ill

26   patients from one institution to another, or from one provider or treatment team to

1   another, is unsettling for them. All such moves mean the loss of their familiar

2   environment of care. It's a bit like moving a child to a different set of foster parents every

3   month. No matter how great each home and set of foster parents is, there is likely to be

4   trouble. Moving is stressful enough when it is voluntary and the person is mentally

5   healthy and not in the prison system, let alone when there are mental health problems

6   and it's involuntary and the person is in prison.

7   All this moving of mentally ill patients has been disastrous in CDCR, because, unlike in

8   the world outside CDCR, in CDCR information about the patient is in effect lost when a

9   patient is transferred from one institution to another. Outside CDCR, the patient's

10  existing doctor and the doctor at the hospital to which the patient is being transferred

11  talk to each other about the patient, so that the receiving psychiatrist knows about the

12  patient and can take into account what the previous psychiatrist has tried in terms of

13  treating the patient. Such conversations should be mandatory whenever there is a

14  transfer, whether from one institution to another, or from one psychiatrist and treatment

15  team to another.

16  Admissions should be done by psychiatric physicians and mental hospital units should be

17  cleared medically by psychiatrists as happens outside the CDCR system, and the

18  psychiatrist or treatment team sending the patient should call the psychiatrist who will be

19  admitting the patient to tell the receiving psychiatrist about the patient *before sending* the

20  patient. The psychiatrist poten tially admitting the patient needs to be sure that it would

21  be an appropriate admission before the patient is sent. When a nurse, psychologist or

22  social worker has interviewed an incoming patient, he or she should tell the psychiatrist

23  about the patient as happens outside CDCR.

24  Discharges from psychiatric hospitals should be done by psychiatrists, or at least should

25  never occur without a psychiatrist or other medical doctor having first medically cleared

26  the patient for discharge. The CDCR system would be medically much safer for patients if

1   transportation were not called unless and until the patient has been medically cleared for

2   discharge or transfer. And the psychiatrist must order the follow up care, for example

3   with a psychiatrist in a certain number of days, for a blood draw to occur in a certain

4   number of days, and with a therapist and nurse in a certain number of days.

5   Before a mentally ill patient leaves prison, there should be a video call connecting the

6   inmate patient and the clinicians from the prison with the clinicians the patient will be

7   being cared for in the community after leaving prison, so that the patient will feel

8   comfortable with his or her new providers.

9   Psychiatrists should be reporting to psychiatrists. Just as is the case for Medical, Dental

10   and Nursing reporting structures in CDCR, psychiatrists in the field should be reporting

11   to regional psychiatrists, who themselves should be reporting to the headquarters

12   psychiatry team.

13   Psychiatrists should play a significant role in the leadership of the mental health

14   department, given their greater knowledge and broader expertise. The current situation

15   with psychologists being in charge has clearly been a disaster. CDCR mental health must

16   have psychiatry executives. Currently there are zero, and none are considered eligible.

17   This is perverse and harmful.

18   Psychiatrists in the system should be hired by psychiatrists rather than by psychologists

19   who, in CDCR, appear to literally choose the candidates who will defer to them rather

20   than those who are the best. In CDCR (though not in other systems I have worked),

21   psychiatrists and other medical doctors are more likely to pick the best candidate than

22   psychologists are.

1   Psychiatrists should be clinically in charge of patient care individually and globally in

2   accordance with their legal obligations and greater clinical knowledge.

3   Psychiatry is a medical field and should be treated as such.

4   Hospitals should be run by doctors and those who listen to doctors' clinical opinions

5   about how things should be run. Reinventing the wheel with spokes missing and strange

6   additions, as CDCR has done, hasn't proved successful.

7   Basics before frills. Without the basics, frills are the icing on a mud pie. First get the

8   basics of safe patient care in place. Nothing works without that. Patients need to see their

9   doctor when the doctor says he or she needs to see them. Medical orders must be

10  followed. Medications, etc., must be administered as ordered. There must be handoffs.

11  There must be communication. Medical orders must not be given by psychologists.

12  Medical orders must not be overridden by custody or anyone else other than another

13  medical doctor. More vocational nurses, social workers and custody officers, fewer

14  psychologists.

15  The EHRS needs to be a lot easier and less time consuming to use. This won't happen

16  unless psychiatric physicians are involved in designing the workflow they use. There need

17  to be clinics where general medical physicians, psychiatric physicians, doctors, nurses,

18  and therapists comingle when they see patients. If that cannot exist given the current

19  physical structure of our institutions, at the very least psychiatric physicians should have

20  assigned offices in which they can see their patients, like other physicians do in CDCR.

21  The CDCR Department of Mental Health should offer regular psychiatric continuing

22  medical education and be staffed to do that, so that psychiatric continuing medical

1  education is offered at least monthly. These conferences should be for psychiatrists, but

2  they could be open for all too.

3  Telepsychiatry is a useful method of care. The telepsychiatrist must have the authority to

4  insist that care be provided by an onsite psychiatrist if in the telepsychiatrist's medical

5  judgement a given patient needs onsite care. For example, some patients need regular

6  physical exams to judge a neurological condition, and unless someone onsite is reliably

7  available to do those exams for the telepsychiatrist, the case may not be a good candidate

8  for telepsychiatry. Telepsychiatrists' medical judgement about whether or not particular

9  cases are appropriate for telepsychiatry must not be overruled. Telepsychiatrists should

10  operate from regional hubs in California so that appropriate supervision and training can

11  occur. Psychiatrists from, for example, Pensacola, Florida or somewhere in the United

12  States, have no idea the conditions in our prisons and it would have been disastrous for

13  that to have been allowed to proceed, as was attempted with even advertisements placed.

14  Enough telepsychiatry staff psychiatrists should work at night to fully cover all of our

15  institutions every night throughout the year. This cannot be done with the ten proposed

16  to the court. At least 25 are required.

17  When, following a doctor's medical judgement, a judge orders that a patient needs forced

18  medications, that should happen without delay. The current situation in CDCR in which

19  custodial officers sometimes refuse to facilitate the judge ordered forcing of the

20  medications on the grounds that to them the patient seems calm, is absolutely

21  unacceptable, medically dangerous, and should never happen. Medication forcing isn't

22  necessarily anything to do with a patient's visible level of agitation. Custody should be

23  mandated to facilitate such orders without delay.

24  We need to work to create a collaborative culture in which the different disciplines work

25  together rather than in opposition. When there is good collaboration between clinicians

127

1   and custody for example, patients get to their appointments, and thus get treated, and

2   thus get better, which makes life better not just for the patients themselves but for

3   clinicians and custody. Inmate patients left suffering, untreated, are much more likely to

4   act out than when they are being treated and stable. Having custodial officers individually

5   speak with the psychiatric physician when a patient won't come to an appointment is a

6   good way of beginning to create collaboration between those ultimately working together

7   to keep the public safe.

8   To combat illicit drug use in our system, instead of spending a fortune on medications

9   aimed at combatting such drug use, CDCR should take much more care to prevent illicit

10  drugs entering the prison system, and to prevent medication diversion. Careful drug

11  interdiction programs are needed and more of them. When patients are leaving prison,

12  there is an increased risk of narcotic overdose. Only at those times (and when patients in

13  prison frequently overdose), injectable (and very expensive) medications should be used

14  to decrease the risk of overdose. Moreover, self help drug recovery programs such as NA

15  and AA, and non religiously based programs such as SMART recovery, are virtually free,

16  are *effective*, and should be far more aggressively encouraged than they are in CDCR

17  currently. The absence of several varieties of self help groups for drug and alcohol abuse

18  in a prison is nearly an emergency.

19  None of CDCR's challenges are insurmountable.

20  I close with Dr. ████████ comments about his experiences working for CDCR. He is the

21  ████████████████ of the Salinas Valley Psychiatric Inpatient Program   formerly the

22  Department of State Hospital program that has now been taken over by the Department

23  of Corrections in the "Lift and Shift":

1    "Dear Dr. Golding,

2    I am writing to you in order to consolidate my thoughts about the
3    psychiatry/psychology problem in CDCR and to communicate them to you so that
4    you can best be informed in your position of great responsibility. In my experience
5    you have always been strongly supportive of a civilized, dignified and respectful
6    relationship with psychology. In writing this problem and even speaking of it, I find
7    myself not feeling completely comfortable doing so. Having worked with
8    psychologists for the 30 years since graduating from medical school in multiple
9    settings has given me quite an appreciation for the specialty as well as most of the
10   people in it.

11   However the culture I have discovered and experienced since the "Lift and Shift" has
12   rattled me and given me pause when I consider my future career if such an
13   environment is allowed to continue. I have always valued my collegial relationships
14   with psychologists over the years and continue to in the PIP. What causes me
15   significant dysphoria is the apparent attempt to have psychology be in a position of,
16   frankly, medical equality with psychiatrists as well as clinical authority over
17   psychiatry. This is anathema to me.

18   While psychologists receive a wide variety of training they fail to meet the standard of
19   medical training by a long shot of what physicians and psychiatrists receive. In fact,
20   psychiatrists have received far more widespread and in depth training overall than
21   psychologists particularly when you consider that very few if any of them would even
22   have the necessary prerequisites to take the MCAT, much less to go to medical
23   school. Despite this I have experienced and continue to experience them as valuable
24   members of the treatment teams as well as leadership. In the "real world" outside of
25   CDCR you will barely find one psychologist on staff of inpatient psychiatric programs
26   which is a reflection of their ability to perform in the setting.

1   Since the "Lift and Shift" was announced I have been apprehensive as a result of

2   knowing from both a personal as well as professional level that "things are different in

3   CDCR. Psychologists are in charge and using psychiatrists as mere consultants.

4   Psychologists run the teams, make the diagnoses and determine the direction of care

5   for the patients." These are things I have heard repeatedly from psychiatrists

6   numbered in the double digits over the years many of whom had previously worked

7   in CDCR and left for that very reason. Since the "Lift and Shift" we in SVSP PIP have

8   lost a total of 9 psychiatrists and each and every one of them has listed this

9   eventuality as one of the reasons for their departure from CDCR. I personally

10  experienced this 4 years ago when I applied, interviewed and was offered the position

11  of ███████████ for SVSP CDCR. I accepted but prior to a walk though tour I was

12  baited and switched.

13  Initially I was told during the interview that I would report to the CEO. Later an

14  administrative psychologist told me that I would report to the Chief Psychologist,

15  that psychiatrists were consultants, psychologists ran the teams, made the diagnosis

16  of the patients and we were expected to follow that. I was also told that psychiatrists

17  would have to get over the "sibling rivalry" with psychology in order to work in that

18  model. I was shocked but maintained my composure and began to query how that

19  might work as well as wondering out loud how they had managed to subvert the

20  community standard medical model as well as the rationale for it. Instead of being

21  given a professional answer to a reasonable question, the psychologist with whom I

22  was speaking became angry and told me I would just have to decide if I could do it or

23  not. I said okay and planned to take the tour the next day. The next morning I went

24  to my front door after the bell had rung and was handed a certified letter stating that

25  the offer had been rescinded because I had said that I could never work under a

26  psychologist. I had never said that or even implied it. I then tried to contact the

27  administrative psychologist and the ████ but was unprofessionally treated with no

1   response whatsoever. I then proceeded to apply here in SVSP DSH and remain here 4

2   years and 2 months until now.

3   I chose to stay here once the Lift and Shift occurred despite my apprehension

4   ignoring the advice of all of my psychiatrist colleagues because I love the work, the

5   challenge, the patients and the employees. However recent events have proven me

6   wrong as the further and constant creep of micromanagement particularly from

7   psychologists via policy meetings, CCATs for no good reason as well as important

8   meetings that occur that make and create important changes in the system not only

9   without my presence but also without the presence of any psychiatrist. I even had the

10  displeasure to have to participate in 3 CCATs over a 2 week period on one of our

11  patients who was in dire straits medically before I could get the proper physicians on

12  the phone in order to give direction about the proper LOC as well as care. Once that

13  happened we followed their direction and the patient suffered a perforated bowel

14  that very day. He could have easily died had that happened in the PIP while he was

15  sleeping.

16  My biggest fear is that this will/has become the new normal. A system of mental

17  health dominated by unqualified persons who do not know what they don't know,

18  cannot be told that as they perceive it as insulting and continue to make critical

19  decisions in that state of ignorance. I fear a disaster coming if this is allowed to come

20  to fruition. One wonders if psychologists in administration question whether this

21  structure and culture might be one huge part of why CDCR has not been able to get

22  out from under the Special Master. Frankly, since the Lift and Shift I believe that is

23  the exactly the reason why it has not occurred. Irrational, misinformed and ignorant

24  decisions are made one after another in rapid succession in a bullying manner.

25  Most recently there has arisen the issue of psychologists "scope of practice" including

26  admission, discharge, seclusion and even restraints, which it turns out is completely

131

1    de novo.[xxiv] It does not exist in their training or licensure requirements. There is no

2    basis for it in law, precedent or the wishes of stakeholders other than psychology.

3    This is all made up out of nothing by psychology to assist them in their economic

4    survival and hoped for ongoing dominance in CDCR. This has nothing to do with

5    what is best for patient care. Society and the law have over millennia decided that 3

6    classes of persons are allowed to take control over another human being's body under

7    certain circumstances. Those are law enforcement, nurses and physicians. That does

8    not included psychologists.


9    I had an occasion to talk with an administrative psychologist recently and informed

10   her of my thoughts and feelings about all of this. I told her that I would never take

11   clinical direction from a psychologist ever because they are not qualified to do so. She

12   became visibly angry and told me that basically I was wrong, psychologists and

13   psychiatrists are the same. In addition she said that psychiatrists should be beneath

14   psychologists because we are lazy, don't work as hard as psychologists, are not willing

15   to do the dirty work that psychologists are willing to do, behave poorly and are not

16   willing to discipline ourselves.


17   Stunned, I thought "this is prejudice...bigotry." I couldn't believe it and decided in the

18   moment that I would leave CDCR. Since then I have cooled and received sage advice

19   from multiple corners and have struggled to stay. This is important. It is a huge

20   problem. This culture is wrong and to run away is to flee doing the right thing. I

21   realize that staying and fighting involves risk for me. I was told by this same

22   psychologist that I should not think this way or express it otherwise I would not rise

23   in the system and people would not like me.


24   What she didn't know is that this is not important to me. What is important is the

25   right thing. I do not believe that psychologists have taken the Hippocratic Oath or

26   anything like it. This is very important to me and I take it very seriously. Above all, do

1    no harm. Allowing psychologists to succeed in this purely selfish and unnecessary

2    endeavor is to do real harm to the system and patients. It is highly likely that the

3    catastrophic patient outcomes will make the Coleman Commission stay longer not

4    leave sooner. There will be more conflict between the disciplines, not less. CDCR will

5    continue to have a psychiatrist retention problem, even worse than we do now.


6    I sincerely appreciate and support your efforts to improve the system for the benefit

7    of the patients we serve.


8    ████████████, M.D.

9    ███████████,

10   Psychiatric Inpatient Program

11   Salinas Valley State Prison

12   California Department of Corrections & Rehabilitation"

1  # Appendix 1

2  See 2018 08 15 1352hrs (screenshots of the Dashboard, with explanation of the errors).

# Appendix 2

(For this report including screenshots and other evidence, see 2018 09 04 1600hrs)

**Psychiatry Indicators and Biases**

**Timely Psychiatry Contacts**

1. Biases due to measurement:
    a. Measured in weeks, rather than on time versus late. This causes significant bias towards inflating compliance.
        i. E.g. an Enhanced Outpatient Program (EOP) patient had a psychiatry appointment on Monday, 8/13/18, and their next appointment wasn't until Friday, 9/21/18. They were due to be seen by 9/12/18 (per Program Guide rules), so are 9 days late, but due to compliance being measured by weeks, there are four weeks of compliance and one week of non compliance, which is then reported as 80% compliant. If you have 100 patients, 50 of whom are seen on time, and 50 of whom are seen late by one week, the reported Timely Psychiatry Contacts compliance rate will be 90%. It would be very easy to think that the 90% compliance rate meant that 90% of the patients were seen on time, when in actuality only 50% were.
    b. The clock resets when patients transfer.
        i. E.g. a Correctional Clinical Case Management System (CCCMS) patient had a psychiatry appointment on 3/5/18, and was due to been seen again by 6/3/18 (90 days later). However, the patient transferred to a different CCCMS institution on 5/25/18. Instead of requiring that the patient still be seen by 6/3/18 (to comply with the Program Guide

135

1     rules), and reporting it as late if it occurs after 6/3/18, this indicator
2     resets the clock to the date of transfer, and only reports the
3     appointment as late if it occurs more than 90 days after transfer. In
4     this example, the patient could go 172 days (from 3/5/18 to 8/23/18)
5     without seeing a psychiatrist, and still be counted as compliant.

6 c. Physician orders for follow ups prior to maximum time per Program Guide
7     are ignored by this indicator.

8     i. E.g. a CCCMS patient has a psychiatry appointment on 3/5/18, and
9     the psychiatrist is concerned about him, so orders a follow up
10     appointment for three weeks later. This appointment was scheduled
11     but cancelled due to custody, or was refused, or did not occur for any
12     number of reasons, and the patient was not seen again until 6/2/18.
13     This indicator counts that appointment as compliant, because it
14     occurred within 90 days, despite the appointment being 68 days late
15     based on the psychiatrist's clinical judgment, and order, that the
16     patient needed follow up within three weeks.

17 d. Sixty percent of psychiatry supervisors see patients (per our polling data),
18     due to staffing shortages. The compliance numbers in this indicator are
19     presented as having been obtained by line staff alone, and are used to
20     determine psychiatry staffing needs. This both results in an underestimate
21     of staffing needs, and in supervisors being unable to do necessary
22     supervisory work due to having to compensate for the line staff shortage.

23 e. In December 2016 the indicator was inexplicably changed to count EOP
24     appointments as timely if they occurred within 45 days of the prior
25     appointment, despite the Program Guide rule that EOP psychiatry
26     appointments must occur at least monthly. This significantly inflated the
27     compliance percentages statewide, and allowed for an inaccurately
28     favorable report to the court in March 2017. The indicator was not fixed
29     until this change was discovered by the psychiatry team in March 2017.

**Appointments seen as scheduled**

1. Biases due to measurement:
   a. The definition of this indicator states that it measures "All scheduled appointments", but in actuality it only includes appointments that are coded as Seen, Cancelled due to ProviderUnavailable, Cancelled due to ModifiedProgram, or Cancelled due to TechnicalDifficulties (see snip titled Appointments seen as scheduled). It excludes Refusals, No Shows, and all other cancelled appointments, which account for approximately half of all scheduled appointments.
      i. E.g. the Appointments seen as scheduled indicator reports that 95% of mainline CCCMS appointments in CDCR in February 2018 were seen as scheduled. (see attachment CDCR CCCMS appointments seen as scheduled) However, per the Appointments report, in February 2018 in mainline CCCMS, there were 84,120 mental health appointments, 35,642 of which were seen (see Excel spreadsheets titled CDCR CCCMS all appointments in February 2018 and CDCR CCCMS completed appointments in February 2018). Thus the percentage of appointments that were seen as scheduled was 42%, not 95%.

**Timely MH Referrals**

1. Biases due to measurement:
   a. Only measures the referrals that were ordered, not all of the referrals that occurred, *or should have occurred*. Ordered referrals are much more likely to be completed and done on time than are referrals that should have been ordered but weren't.

137

i. E.g. on 8/3/18 at CHCF, 225 patients were flagged as non compliant with their psychiatric medication (meaning they refused 50% or more of their psychiatric medication in a week, or refused three consecutive days of psychiatric medication, or refused one dose of a critical psychiatric medication). Each of these patients is supposed to be seen by a psychiatrist to discuss their medication non compliance within seven days, or within one day for refusal of a critical medication. However, during the entire month of August, there were only 17 medication non compliance appointments scheduled at CHCF   10 were seen, 7 were cancelled. The cancelled appointments were excluded from the Timely MH Referrals measurement, with the exception of one cancelled appointment that was counted as completed, despite never having occurred. Additionally, two refused appointments were counted as completed, and one seen appointment was counted twice, so the compliance was recorded as 12/12, or 100% for the month of August (see CHCF August Timely MH referrals screenshot). In actuality, 225 patients required follow up for medication non compliance on a single day in August, and only 8 patients (12 minus the appointment that was counted twice, minus the cancelled appointment that was counted as completed, and minus the two refused appointments) in the whole month of August had a completed medication non compliance consult. If we use these numbers (8 out of 225), the compliance percentage is 3.6%. However, if the entire month of August is included   not just a single day   this compliance percentage would be much lower.

ii. E.g. for the month of July at CSP Sacramento, there was one urgent MHMD consult, two emergent MHMD consults, and three routine MHMD consults (see snip titled SAC Timely MH referrals). It is unlikely that there were truly only three routine MHMD consults in

138

1      a month at an institution with such a large mental health
2      population. The far more likely scenario is that most routine MHMD
3      consults were "ordered" by psychologists or social workers via
4      stopping by the psychiatrist's desk, calling them on the phone, or
5      emailing them, rather than placing an official order (see email from
6      Dr. Golding titled "FW: MHMD emergent consults"). This prevents
7      an institution from having a low compliance rate despite insufficient
8      psychiatry staffing to complete these consults, because these
9      consults will not be measured by the indicator. Compare this to an
10     institution with sufficient psychiatry staffing    at San Quentin during
11     the same month there were 32 routine, 11 urgent, and one emergent
12     MHMD consults (see snip titled SQ Timely MH Referrals).

13   b. Excludes most cancelled appointments, and counts refusals as "completed".
14     As described in "Appointments seen as scheduled 1 a" above, all cancelled
15     appointments, except those coded as ProviderUnavailable,
16     TechnicalDifficulties, and ModifiedProgram are also excluded from this
17     indicator's calculations.

18   2. Biases due to lack of knowledge:

19   a. Many psychiatrists appear to not know about the medication non
20     compliance appointment order in EHRS, or are not aware of the
21     requirement to see patients who have been flagged for medication non
22     compliance. If all psychiatrists had this knowledge, and placed a medication
23     non compliance appointment order for every patient flagged as non
24     compliant, there would be thousands of medication non compliance
25     appointments statewide per month. Psychiatry staffing is not sufficient to
26     complete all, or even most, of these appointments, so the percentage of MH
27     referrals completed on time would significantly decrease.

3.  Biases due to random error:

    a.  Medication non compliance appointments may be ordered erroneously as a psychiatry follow up appointment, and thus not captured by this indicator. Also, as mentioned above, mental health referrals may be communicated to the requested provider verbally and an order never placed in EHRS, despite knowledge of the process and intention to place an order. In both of these examples the appointment is less likely to occur when there is no official order, due to a number of factors, including the increased likelihood of the provider forgetting, the provider having limited time and triaging some of these appointments as less important, and there being less pressure from supervisors on the provider to complete the appointment in a timely manner to improve the indicator results.

**Appointment confidentiality**

There is an indicator for "Group treatment in a confidential setting", but not for psychiatry appointment in a confidential setting. However, this is an important indicator of quality care, and should be one of the measured indicators. Currently, there is no easy way to determine the percentage of psychiatry appointments at a given institution or level of care that were confidential, but it is possible to use the Appointments report to check on whether individual appointments were recorded as confidential or non confidential, count all of the confidential appointments in the population of interest, then divide by the total number of appointments in order to get a percentage. This is time consuming, but more importantly it is inaccurate, due to the following biases.

1.  Biases due to measurement: In the Electronic Health Record System (EHRS), confidentiality is recorded in a drop down menu on the appointment check out screen. The default value is "Confidential", thus if the provider does not change this selection, all appointments are recorded as confidential. If an accurate

measure of confidentiality was desired, this drop down menu would default to NULL (no selection), and it would require the provider to change the selection to either confidential or non confidential.

2. Biases due to lack of knowledge: If a provider does not know how to record an appointment as non confidential, it is recorded as confidential (due to #1 above).

    a. E.g. in the MHCB at CCWF, the psychiatrists reported that all routine psychiatry appointments are conducted in the patient's cell, not in a confidential treatment room, thus 100% of the routine appointments are non confidential. All of the psychiatrists stated they did not know how to record an appointment as non confidential. Per the Appointments report, there were 96 completed psychiatry appointments in CCWF MHCB in May 2018, 100% of which were recorded as confidential.

3. Biases due to random error: Even if a provider knows how to record an appointment as non confidential, if they forget, or are in too much of a hurry, to change the drop down menu to non confidential, it is recorded as confidential.

    a. E.g. in the MHCB at CHCF, the psychiatrists reported that all routine psychiatry appointments are conducted cell front, not in a confidential treatment room, so 100% of the routine appointments are non confidential. All of the psychiatrists stated they knew how to record an appointment as non confidential. Per the Appointments report, there were 289 completed routine psychiatry appointments in CHCF MHCB in May 2018, 31% of which were recorded as confidential.

**Diagnostic Monitoring (Medication Administration Process Improvement Program)**

1. Biases due to measurement:

    a. Until June 2018, this indicator ONLY measured whether annual labs and tests were done. MAPIP guidelines mandate obtaining baseline, 3 month,

and annual labs for antipsychotics (except Clozapine) and mood stabilizers, obtaining labs within 14 days of increasing the dose of mood stabilizers, and obtaining baseline, 3 month, and annual weight/height and blood pressure for antipsychotics and Clozapine. However, until June 2018, the indicator monitoring compliance with these guidelines did not even measure whether baseline, 3 month, or dose increase labs and tests were done. It only checked to see if annual labs and tests were done, and reported 100% compliance if the annual lab draw and tests occurred (see Memorandum dated 7/3/2018).

    i. E.g. A patient is prescribed an antipsychotic, and has labs, a blood pressure measurement, and his weight obtained 8 months after starting the medication, but had no tests or labs done at baseline or 3 months. This indicator reports that this patient is 100% compliant with MAPIP, despite being only 33% compliant. This is very misleading, but more importantly it is *dangerous* and poor care. If his blood pressure is elevated, he is morbidly obese, and his fasting lipid levels are critically high at 8 months, we have no idea whether those problems were all present prior to starting the antipsychotic in which case we likely would not have started the medication   or occurred within the first few months after starting the medication in which case we would likely have stopped it after obtaining the 3 month test results. Failing to obtain these labs and tests can lead to permanent organ damage or death.

b. Until June 2018, it counted annual labs and tests as completed if the patient had the relevant labs and tests done at any point within a year of starting the medication. Since June 2018, it still counts annual labs and tests as completed if the patient had the relevant labs and tests done between 91 and 365 days after starting the medication. The baseline, 3 month, annual, and after dose increase criteria for obtaining labs and tests is not arbitrary.

1    It was created by physicians, per their clinical judgment of the minimum

2    monitoring necessary to maximize patient safety. Therefore, measuring

3    whether the required tests were done at any point within a year or at any

4    point from 91 to 365 days after starting the medication   not within limited

5    periods around the baseline, 3 month, annual, and dose increase time

6    points   is inappropriate, and leads to falsely elevated compliance.

7    c.   Until June 2018, it excluded patients who were not on the same medication

8    class for the whole year. This inflated MAPIP compliance, because these

9    patients were less likely to have had the required labs and tests, due to the

10   provider not having had an entire year during which to have ordered labs

11   and tests.

# Appendix 3

**Summary of Performance Report Errors**

Please see the CDCR Mental Health Performance Report from 5/1/18 to 5/31/18. (2018 08 15 1352hrs)

Timely MH Referrals "92%" (see page 1 of 2018 08 15 1352hrs)

This report is biased and reports over compliance. It only measures those referrals that are ordered and skips all referrals that are not ordered, but occurred, or *should have occurred* within a timeframe. "Timely Mental Health referrals" is a composite measure that includes multiple referral types, including referrals for consultations with psychiatrists when patients were non compliant with a certain percentage of their medications. At large institutions like CHCF there are hundreds of medication referrals that don't get seen in a month (see page 2 of 2018 09 04 1500hrs), though meet the policy criteria for needing to be seen (see Appendix 2 and also 2018 09 04 1600hrs).

If the referrals that were supposed to be seen as mandated by policy, and not just those referrals that were turned into orders were counted, the compliance percentages recorded would be dramatically lower for the composite measure of timely mental health referrals. Extremely conservatively estimating at CHCF, the timely MH referrals would be 55% (see page 2 of 2018 09 04 1500hrs), not 100% as reported. At other institutions, the overall performance percentage would also be significantly reduced and so would be nowhere near the markedly exaggerated 92% figure reported above. It's just an incorrect figure (with all of these, the psychiatry leadership team is not allowed to search the databases to report precisely, so we do what we can to determine whether our patients are getting the care they need). Psychiatrists are not seeing the consults they are supposed to see in the

1   timeframe they are supposed to see them, though it is falsely reported that they are ("92%

2   compliance"). It is very likely less than 50%. This report is grossly biased.

3   Appointment Cancelled Due to Custody "2%" (see page 1 of 2018 08 15 1352hrs)

4   In general, providers don't know why patients don't come to appointments and figuring

5   out whether custody was busy doing other important activities, rather than bringing

6   patients, is not something that is known by the provider when the patient does not come.

7   Arguably, many of the patients that did not make it to Dr. █████ (see 2018 07 18 R) at

8   SAC were cancelled due to custody, but recorded as patient refusals or no shows. The

9   patients were brought in batches and when patients missed what is called the "train"

10   (custody bringing a group over), the patient missed his appointment. Most appointments

11   are listed as "CancelledUnspecified", because the provider does not know or does not

12   select an outcome, which likely means this report very much underestimates the

13   appointments that did not come due to custodial reasons.

14   In fairness, it would be tough to design a measure which captures this, which is why it

15   does not make sense to have it on the Performance Report. It is not easily or accurately

16   measured, except that the default (not selecting it because of no knowledge of it) leads to

17   low reports of appointments being cancelled by custody, but the measurement actually

18   doesn't mean much unless there is a way to figure out the far higher percentage of

19   patients who were not brought because of custodial competing obligations. Our

20   scheduling system in the CDCR mental health system is so broken (only 40% 45% of

21   appointments occurring as scheduled   see the section beginning on page 35 about this),

22   that it is very inefficient for custody to devote large numbers of resources to get patients

23   to appointments, because often they can't determine which patients will be coming or not

24   or at which time (because patients are not seen as scheduled).

1    Diagnostic Monitoring "95%" (see page 1 of 2018 08 15 1352hrs)


2    That is not accurate, as explained in the section on drug monitoring. The MAPIP

3    methodology changed in July 2018, after this 95% was recorded in May 2018. The new

4    measure more accurately captures current MAPIP results for compliance in the 70% to

5    85% range, but doesn't measure whether psychiatrists are checking blood levels when

6    they change the dose of medications, which is the most difficult of the measurements to

7    get. Consequently, the figures being reported now are still likely reporting overly high

8    values. These values were wrong for years and falsely reported to the court in 2017.


9    Timely PC contacts "97%" (see page 1 of 2018 08 15 1352hrs)


10   This is too high because the clock resets when patients transfer institutions. It also is

11   potentially misleading for those who don't understand this calculation, if it is thought to

12   be a measure of whether patients are seen on time (zero percent of patients could be seen

13   on time for a 97% patient weeks compliant report). 97% is a "percent patient weeks

14   compliant" measure, which overestimates whether patients are seen on time. See 2018 09

15   04 1600hrs for a description of why that is so.


16   Timely Psychiatry Contacts "93%" (see page 1 of 2018 08 15 1352hrs)


17   This is incorrect for many reasons:

18   A. The clock resets when patients transfer institutions, so up to six months between

19   patient visits could be a compliant time frame in CCC (rather than three months) and up

20   to two months becomes a compliant time frame in EOP, rather than one month. If a

21   patient transferred institutions more than once, appointments up to nine months later

22   could be considered compliant. This bias led to false reports to the court in 2017 and 2018

23   in the staffing plan.

146

B. It measures percent patient weeks compliant (see above) which is an overestimate of whether patients are seen on time.

C. It conflates business rules with patient need for timely care. If the patient needs to be seen (say at the CCC level of care) and the physician orders the patient to return back urgently in one week   because the Program Guide and professional ethics require that patients be seen when they need to be seen   yet that patient is then seen eleven weeks late, the QM report will not count this appointment as even one day late. If the patient is seen more frequently than a mathematical minimum frequency, any patients who need to be seen more frequently than that to get at least adequate care will not be thought to have any late appointments, even if the needed appointment is critical. So this measure reports on whether patients are being seen on time, except if they urgently/more frequently need to be seen. Since all of these late appointments aren't counted for our thousands of patients, this measure is biased and falsely elevated. (This bias also inflated the numbers sent to the court in 2017 and 2018 in the staffing report.)


Note that both the measure of whether psychiatrists are seeing patients in consultation ("Timely Referrals" from others) and when they are supposed to medically (Timely Psychiatry Contacts)   within a minimal Program Guide determined frequency   are reported in a potentially significantly biased way. To the extent that there is inadequate psychiatry staffing (or inadequate ability to get patients to psychiatric clinics) these measures will be low and we don't know how low they are. The psychiatry team is not authorized to calculate these measures, so we can't precisely know where and when patients are getting inadequate care because they are not being seen when they need to be. To the extent that patients being seen when they need is a determinant of adequate psychiatric staffing and program organization, at the very best whether this is occurring is not known.

1   Appointments Seen as Scheduled "92%" (see page 2 of 2018 08 15 1352hrs)

2   Quoting Dr. ███████ :

3   "The denominator is defined as 'All scheduled appointments", however QM excludes all

4   cancelled appointments, except those cancelled due to ProviderUnavailable,

5   TechnicalDifficulties, or ModifiedProgram. Approximately half of all scheduled

6   appointments are cancelled due to a reason that is not included by this indicator (see

7   section on Appointments Seen as Scheduled in the body of this), which makes the true

8   Appointments Seen as scheduled percentage closer to 50%, not 90+%"

9   So to make this indicator right, approximately cut it in half or a bit more. So the indicator

10   is also grossly wrong. These values falsely report to our Coleman monitors about 2x the

11   actual value. We could actually fix institutions if knew that at SAC for example 22% of

12   patients were being seen as scheduled. We could focus on the problem, rather than doing

13   nothing because of the high reports.

14   Group Treatment (see page 3 of 2018 08 15 1352hrs)

15   This is an indicator for group treatment being conducted in a confidential setting, but not

16   for psychiatry appointments. Had they reported on that, the report would be biased. The

17   system defaults to counting appointments as confidential and thus when psychiatrists

18   don't know how to record the appointment as confidential (and even when they do and

19   are hurried) we have documented repeated biases and elevations. For example, in the

20   CCWF crisis bed, 100% of appointments are reported as being seen confidentially, but

21   actually none (0%) are.

1    Treatment Cancelled (page 3 of 2018 08 15 1352hrs)

2    Dr. ▮▮▮▮▮ says: "Instead of giving a straightforward percentage of the treatment that is

3    cancelled (e.g. if there are 100 appointments and 30 were cancelled, this indicator would

4    show 30%.) The numerator is defined as "Number of patient weeks included in the

5    denominator during which the following number of hours of treatment were cancelled.

6    More than 3 for ASU EOP Hub. PSU EOP, and ML EOP. More than 1.5 for RC EOP and

7    ASU EOP non Hub. More than 1.0 for SRH/LRH CCCMS."

8    With a sufficient number of convolutions in one's calculations one can make any number

9    become any other. As an absolute value, the number 19% in this context is absolutely

10    meaningless. The reason is that arbitrary numbers like "3", "1.5", and "1", with arbitrary

11    assignments to levels of care, could be changed to cause the "Number of Patient weeks

12    included during the denominator" to cause any overall percentage that is desired.

13    Measurements that are arbitrary are meaningless because the definition can be changed

14    to create any value at all. We know from the scheduled appointments that an extremely

15    high percentage of appointments are cancelled and refused. That answer (what number of

16    100 appointments were cancelled or refused or both) needs to be in the Treatment

17    Cancelled part of the Mental Health Performance Report.

18    Treatment Refused (page 3 of 2018 08 15 1352hrs)

19    If there are 100 appointments and 40 are refused, then 40% are refused. Instead, we get a

20    whole new set of arbitrary numbers (relative to the cancellation report above) to get the

21    value recorded to be "24%". There is more "Number of patient weeks" verbiage included,

22    but unlike the cancelled appointments, we get the new words, "50% of all offered

23    treatment was refused AND less than the following hours of treatment were attended. "5"

24    for ASU EOP Hub, PSU EOP, and ML EOP, less than "2.5" for RC EOP and ASU EOP non

25    hub, and "less than 1" for STRH CCCMS and LTRH CCCMS." With access to the

1   databases, our psychiatry team could make these percentages be anything by slightly

2   varying numbers like "50%", "2.5", "less than 1". We know that huge percentages of the

3   patients refuse. It would be good to know where that happens more and where less, etc.

4   But all of this is utterly obscured by a creative measurement system that allows any

5   number to be created as the so called measured result.


6   Our QM psychologists are creating the semblance of scientific measurement, but doing

7   nothing of the kind, with false, misleading, and arbitrary reports of numbers that

8   allegedly mean something in these reports.

---

[i] Note that the court has never been given a report as to whether our patients are seen on time. The court may be told about "patient percent weeks timeliness", but never the percent of patients who are seen on time. There is a reason for that which will be explained later in the report.

Suffice for now to say that our psychiatrists have developed an algorithm on a different platform for determining whether our patients are being seen on time. Were we permitted access to the database we could easily determine whether our patients are being seen for their appointments on time, etc., but unless an external reviewer with considerable power mandates that we be given that access, this information will continue to be denied us. We think the results would be quite helpful. But our psychologists and ███████████ determine what we are allowed to know. Underlying that problem is the fact that in CDCR psychologists with no medical training determine what is or is not medically relevant. This is a theme mentioned throughout this report.

ii Physicians determine what is a medial issue or not (and so do judges, after hearing relevant testimony from medical experts). Psychologists can't determine whether a set of labs or physical findings creates a relevant medical issue that requires attention, as they have no medical training.

iii There is a brief 15 minute "treatment team meeting" 14 days after a patient arrives at a new institution (which would nonetheless be late in the hypothetical situation in the body of this report, even if the treatment team visit counted as a psychiatric visit, which it doesn't). A group meets and a psychiatrist should be present, a psychologist or social worker is present, representatives who understand the custodial issues are present, and others come. This occurs so that the team (including the psychologist and other participants) can help to make plans for the patient. At this time the psychologist will have done a psychological assessment of the patient, but the patient will not have been seen by a psychiatrist.

The reason a psychiatrist should do an assessment before the day 14 treatment team or at least when the last physician who saw the patient ordered the patient to be seen, is precisely to figure out what the patient needs medically. During the physician ordered subsequent assessment (say because a lab is rising), the psychiatric physician should be reviewing the labs and medications, interviewing the patient, physically/neurologically examining the patient when necessary, and figuring out medically what the patient needs. None of that occurs in a 15 minute treatment team.

When a patient is transferred from one institution to another, the physician at the receiving institution doesn't know the patient. The point of a psychiatric intake assessment is not to get the kind of non specific, non medical assessment that a psychologist does when presenting the patient to a treatment team for a few minutes, otherwise psychological assessment and psychiatric medical assessment would be identical.

No general medical physician would consider a psychologist's assessment in a treatment team meeting to be relevant in determining whether there are medical issues. Nor does a psychiatrist, because psychologists cannot evaluate medical parameters like increasing liver function tests. But it is even harder for a psychiatric physician than it is for other medical doctors. The psychiatrist has to understand how changing medical parameters can affect psychological states. For example, initiation of lithium can damage the kidney, which can cause the lithium level to rise higher and higher because the lithium isn't being excreted by the kidney, which can damage the kidney even more. The ever higher lithium level can then cause mental status changes which may prevent a patient from hydrating properly and seeking medical attention to deal with the lithium toxicity. But to understand any of this, the psychiatrist needs to check the lab value and interview the patient. That's what a psychiatric assessment is.

The reason physicians should do assessments before treatment teams is so that they can know enough about the patient's medical condition *to participate* in the team to guide future treatment. A physician is not going to glean from a psychologist's psychosocial assessment (with the patient not even necessarily present at the treatment team) when a patient might need to be seen, which is why it is dangerous for psychologists to overrule medical doctors' orders with respect to when patients should net be assessed by a psychiatric physician.

Finally, as just mentioned, quite frequently *patients don't even come to treatment teams*. So the psychiatrist won't see the patient at all and thus *no assessment could possibly be made.*

If treatment teams substituted for psychiatric assessments, then we wouldn't need the psychiatric assessments, which the physician specifically ordered to occur at the time he or she ordered it to occur.

[iv] This same ███████████ told me that psychiatric physicians are not qualified ("in CDCR") to say that a psychiatric patient is medically OK for discharge from a crisis bed or acute psychiatric hospital. (Then who *is*?) Often a general medical physician will not see a patient for months in a long term hospital. If not the psychiatric physician, which physician *is* saying the patient is medically and psychiatrically safe to leave when he or she does? No one? In a sense the ███████████ appeared to be saying that neither psychiatric physicians nor psychologists can determine when a patient is medically appropriate for discharge, except that psychiatrists are physicians and make that decision every day in hospitals across the country.

[v] And we need this data to determine where institutions are having trouble getting patients seen on time so we can move, or advocate moving, additional organizational or staff resources to solve the medical problems of getting patients seen when they need to be.

[vi] The EOP extra bias   in which they increased the compliance timeframe from one month to 45 days   is no longer present in any calculations because the psychiatry team was able to get that change reversed.

[vii] In some institutions the psychiatrist always "closes" his or her appointments. But in institutions in which patient care is particularly difficult (see later report about my team's visit there), an OT or MA administratively helps to close out an appointment. Dr. ████████ is referring to that.

[viii] No doubt those defending this would claim that there is no problem. All that is being reported is shown in how the calculation is done. For example, they could say that they implicitly stated (in how the number was calculated) that refused appointments would [153] not be counted in the measurement of those who miss appointments, because it was not

included in the items said to be included in the calculation (in the screenshot, see 2018 07 30 2057hrs). But how many observers who have seen this Dashboard would think that a calculation that is said to report about whether "ALL" scheduled appointments occur, does not include multiple types of appointment that are in fact scheduled but don't occur. Using this reasoning, somehow, the refused but scheduled appointments are not the right type of "ALL scheduled appointments" to be counted.

The very best interpretation is that the report is very misleading. Whatever the explanation, one can be sure that virtually no one seeing a Dashboard report claiming that 95% of patients scheduled for appointments come to their appointments, would know that actually about 40 45% do. Since the purpose of measurement is to help people gain understanding of reality, the measurement reported fails in that domain, because it causes people to draw mistaken conclusions about what is occurring.

[ix] CDCR has never allowed psychiatric physicians to analyze the data to be sure, but I am confident that this is the case, because CDCR has never counted an appointment as late if it is ordered by a psychiatric physician to occur at a certain time and occurs late, but within the maximum CDCR court defined interval. Thus, in the situation of reporting "overdue" days to the court, CDCR would also very likely not allow such a physician ordered appointment to be considered to have occurred a certain number of days late, even when it was.

[x] Saying that on average an EOP patient needs to be seen five times in four months may seem arbitrary. But we could, given access to the database, make a better estimate by noting the interval that psychiatric physicians order for certain patients to be seen, when they are writing for patients to be seen more frequently than minimum Program Guide intervals. For example, patients who may have suicidal thinking, but with no intent or plan, are often scheduled by psychiatrists to be seen once or twice a week for several

weeks at the EOP level of care. Psychiatrists may be checking in on their patients while adjusting a medication or waiting for a medication to work, for example.

There is arbitrariness in my guess that an EOP patient may on average need to been 5 times over 4 months. But the CDCR assumption that patients require appointments only once a month at the EOP level of care is clearly mistaken given that some patients do need to be seen more frequently.

[xi] We, the psychiatry leadership team, wanted psychiatrists in the field to have to enter information about the context of a given appointment in a pop up note, but we were overruled by the psychology designers of the psychiatry workflows. Psychologists control both QM for psychiatrists and the design of the EHRS psychiatric workflow, and have not in general allowed psychiatric participation.

[xii] There are a few exceptions to this. When nurses schedule emergency consults *at night*, the psychiatrist may actually complete the work in the evening, but do not have access to the EHRS to document it. Also, routine appointments with psychiatrists need to be "opened" and "closed" which can be tedious. So more recurrent appointments occur than are said to have occurred. QM's assessment of psychiatric productivity has suggested, inaccurately, that psychiatrists were seeing only about 3.2 patients per day. (see 2018 09 24 productivity) The productivity measurement was thus biased and under reported psychiatric productivity. When counting treatment teams, our manual calculations show a very different number (around nine per day for our telepsychiatrists).

Overall the effect of the QM biases is such that it appears that psychiatrists are getting more work done than they are (better MAPIP compliance with monitoring meds, more confidential appointments, higher percentage of routine contacts seen timely, etc.) but are seeing very few patients per day, like 3.2 according to the Dashboard (see 2018 09 24 [155] productivity). This creates the false impression that the system has more psychiatrists

than are needed, as psychiatrists *appear* to see very few patients per day, and also *appear* to be fully compliant, especially with "timely" appointments. But as I have pointed out in a previous section, many actually late appointments are just not counted as late. For a discussion of late appointments due to prioritizing recreation therapy groups over psychiatry appointments, see 2017 11 21 1749hrs.

xiii Our psychology colleagues have insisted for years that psychiatrists use powerplans. Powerplans schedule recurring psychiatry appointments at a preset interval (approximately the maximum time allowed by the court). They thus discourage physicians from making appointments with patients any time sooner than the maximum court mandated intervals: see our ██████████████████ comment disparaging medical scheduling orders sooner than the maximum intervals as "workarounds". Our ██████████████████ responded that the Prisoner Law Office might not approve of "OTs [the schedulers] deciding when to schedule the patients." Our psychiatrists think these powerplans make them less likely to see patients on time because instead of scheduling an appointment after each visit, the psychiatrist has to remember when the powerplan is expiring on each individual patient (or find that information, which takes time). Also, appointments often need to occur sooner than the maximum Program Guide intervals. Powerplans are also very time consuming to use, requiring many more clicks. Our psychiatrists in fact use them less than 1% of the time for follow up appointments. We have sent surveys to our psychiatrists, and they very much dislike them because of their inefficiency.

Very recently, it was decided that CDCR will utilize a unified scheduling system for all disciplines, which caused our ██████████████ to finally call a halt to our psychologists' insistence that we use a scheduling tool that essentially is supposed to cause inflexible scheduling of our patients, usually at maximum Program Guide intervals for months in advance. Insisting on this seems most consistent with trying to force psychiatrists to 156 follow business rules rather than the clinical needs of the patient, as our psychiatrists

think it makes them less likely to see patients on time, because one can't tell when the powerplan scheduling has expired, unless by checking through orders.

[xiv] Our team notes that only very recently, as court hearings about staffing are about to happen, have there been some moves to change procedures in line with some of the many requests we have made that have been denied or ignored in some cases for years. All of our leadership team worries, however, that after the staffing decision (when there is less need to worry about vocal psychiatrists), things will return to normal (for example, lack of access of psychiatrists to quality management tools or electronic health record tools).

[xv] Patients get credits off their prison sentence by attending groups, but just a fraction off for attending psychiatry appointments, so they attend groups. Our team tried to prevent that asymmetry, but failed.

[xvi] See for example *How to stabilize an acutely psychotic patient*, Current Psychiatry, 2012 December; 11(12):10 16 Hannah E. Brown, MD

[xvii] Current Psychiatry, 2012 December; 11(12):10 16 Hannah E. Brown, MD

[xviii] [xviii] "It had come to a point where the Supervising Psychologists in each program were by proxy supervising the staff psychiatrist in that program. There was not a 'team based' approach in providing care. The therapist was donned the 'primary clinician' (formally so, as the "PC" in the EMR)    and made all the important decisions, without needing agreement from the psychiatrist. This was even the case during IDTTs    the 'primary clinician' was the person who presented the case, spoke to the patient, and the psychiatrist was asked only to speak when it was about medications. I can attest to at least a hundred IDTTS I've been a part of as the psychiatrist and this was the only role I was expected to play    the prescription writer.



At CIW, in the one year period that preceded by becoming becoming ████████, no psychiatrist had attended the pharmacy and therapeutics committee (a psychologist ████████ attended in the place of the ████████), no psychiatrist had attended Licensed Inpatient committee, UM, QM, and perhaps most importantly, the Mental Health Subcommittee. This can all be confirmed via meeting minutes. Psychiatrists had not been involved, at all, in policy review for any of the programs outside of the PIP (psychiatric inpatient program), even in the MHCB. In fact, nobody knew who the Clinical Director of the MHCB was when I became ████. I asked the ████, the ████ (████████, a non [psychiatric physician], ████ (████████) and the ████ (Psychologist Executive [████████]). The ████ thought it was the previous ████████, of the PIP, ████████, PsyD [psychologist] (it was not) or perhaps the new acting ████████ I had appointed for the PIP, ████████, MD (it was not). The ████ thought it was the ████████ it was not, he was the ████████ ████████. Multiple policies in the MHCB refer to a "Clinical Director", yet lo and behold, nobody knew who that person was.

Finally, the designated "████████", ████████ piped in and said that it was the previous Supervising Psychologist, ████████, but unofficially. And currently, I asked? Radio silence. Why is this problematic? Here was a licensed inpatient psychiatric hospital, being solely run by psychologists, and has been for at least three years."

[xix] HQ psychologists adamantly deny that they have insisted that patients leave after ten days or that the patients must go to particular levels of care.

[xx] Although the local psychiatrists and clinicians seem convinced that HQ psychologist reviewers are pressuring them, those HQ reviewers who would be responsible for such pressure deny it. Nonetheless as we tour the institutions, for whatever reason, the psychiatrists, psychologists and social workers feel intense pressure to discharge patients to the lowest levels of care at or before ten days.

[xxi] Psychiatric physicians can make mistakes, just as psychologists and others can, and they can make rational decisions that nonetheless lead to bad outcomes. If psychologists disagree with the psychiatric physician, they need to approach a psychiatrist's medical supervisor. This psychiatrist can then make the decision, write the medical/psychiatric clearance and document in the chart why the decision was made, if the supervisor disagrees. Though psychologists (no medical training) should be able to discharge patients apparently, given California law, a physician must clear the patient medically/psychiatrically for there to be appropriate discharges that take into account all of the relevant medical issues that patients have (Appropriate drug levels? Is the diabetes under control?, etc.)

[xxii] Title 22: 79609: "Psychiatrist/psychologist services means consultative services to inmate patients of a correctional treatment center including diagnostic psychological assessment and treatment. Primary services may also be provided to inmates not requiring admission to a licensed bed."

[xxiii] Some psychologists will claim that the psychiatric physician can be the "primary clinician" in CDCR. But the primary clinician has case management responsibilities and there are far more psychologists (and social workers) who take on this role in CDCR. The ratios of psychiatrist to patient would have to be radically adjusted to be equivalent to the high ratios of psychologists plus social workers to patients for psychiatrists to be able to take on the case management responsibilities of the "primary clinician". In the vast majority of cases in CDCR (and maybe all cases), it is the psychologist or social worker who is deemed the "primary clinician" and essentially never the psychiatrist.

[xxiv] Dr. ███ is referring to the push by our psychologists to be able to place patients in restraints without needing medical clearance prior to doing so, though the patient is in a licensed facility with 24 hour nursing coverage. Psychologists currently are allowed to do this in CDCR crisis beds, but not the former state psychiatric hospitals. Normally if no

physician is available, the nurse (who certainly has some medical training) can initiate the restraints and then call the physician, usually the psychiatric physician. Patients die frequently because of restraints. A person who has a tendency to aspirate (bring stomach contents into his lungs, for example) can die in restraints from this, and so there needs to be some type of medical assessment, even briefly by a nurse, that restraints would be better and safer than (for example) medication or forced medication.

But these are medical decisions. Currently in CDCR, as our policy works, psychologists with no medical training are allowed to overrule nurses who object to patients being placed in restraints. Dr. ████ is pointing out that psychologists have no training in this at all, or even any medical understanding of the implications of doing so in hospital settings with medically sick and vulnerable patients. Yet many are fighting to be able to do so without a physician determining that it is medically safe for them to order it. Dr. ████ appropriately finds this dangerous and absurd.

A final issue is that if psychologists can initiate restraints, the policy calls for the written order of the psychiatric physician (or psychiatric nurse practitioner) to cosign the emergency order of the psychologist. But if the physician disagrees with the emergency order of the psychologist, then he or she can't sign it, which thus violates the policy. Nurses, on the other hand can make a quick decision whether forced medications might be more appropriate in a patient who is aspirating (high risk of death in restraints because of bringing stomach contents into the lung), whereas psychologists have no training at all even to notice when patients are aspirating to take that into account. Making a quick decision whether shots or restraints is a better option is a medical decision. Restraints are a physical procedure that frequently kills patients and so requires utmost care in assessing medical risks and benefits. Psychologists have no training for that, yet in CDCR they have the authority to order restraints right now and the leadership is fighting to continue to allow psychologists to order patients to be put in restraints in[160]

the licensed crisis beds prior to medical clearance, and to extend that into the licensed inpatient facilities that CDCR recently took over.

A particular problem is that physicians don't want to be forced to sign a restraint order initiated by a psychologist, whether in an "emergency" or not. If CDCR deems that psychologists in hospital settings are medically qualified to decide that sometimes desperately medically ill patients should be in restraints, then physicians should not be forced to legitimize these decisions. Their orders should be unsigned by physicians. (see 2018 06 01 1459hrs)