# EXHIBIT A
# (2017-03-22-x)

*3/22/17   Closing the rig*
*what notifying Heat*

**To:** Golding, Michael@CDCR
**Cc:** ███████ @CDCR
**Subject:** RE: ML EOP Psychiatry Rule Change Proposition

*no date Visible*

No we don't tell them about every change. Since they use our numbers I do let them know when we make a major change that has a significant impact. For example, the change we are making regarding 5 day follow ups. We can certainly change the rule back to 30 days if you believe that speaks more to the spirit of "monthly". The problem is and has always been that the Program Guide is not always written clearly – at least not as concretely as needed for computer rules. For example Does monthly mean once per month? Does it mean every 30 days?

Do you want us to change it back?

████████ Ph.D., CCHP
████████████████████

DHCS Mental Health Program
███████ (cell)
███████ (desk)

**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

---

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, March 22, 2017 3:01 PM
**To:** ███████ @CDCR
**Subject:** RE: ML EOP Psychiatry Rule Change Proposition

HI,

Thanks. I hope you are doing well.

My rules would be very different. I have no doubt the court experts would not agree with me!!

But thank you for letting us look at this. ████████ is reporting that even the 4th visit or so for an inmate is 45-days after the last visit, even if the patient does not move to another locations. If she is right about that, that does seem to very clearly violate the program guide. So check this out: If a psychiatrist sees somebody 7 weeks after their last appointment (three weeks after the program guide says for once monthly EOP visits), we will report to the court that the person is 6/7 or 86% compliant. Hmmm. That does not pass the sniff test. Three weeks late for mandatory monthly appointments and we are 86% compliant? That seems weird!!

I am more concerned that if we change a rule, and if that rule has a large impact on our numbers and what we report, we probably ought to let the court know. I am now wondering whether they have seen all of the updates that could have made *a significant change* in the way we report our numbers. Have we done a lot of this? It may be that this change has no real impact on the numbers. If so, then I get it. I just think that should be evaluated.

2

Has anything we are giving the court for staffing incorporated these new rules, without at least looking at how much the reporting will change the % compliance that we are telling the court? It started in December. For example we are looking at EOP Timely Compliance between 8/1/2016 and 1/31/2017 which would utilize the new rule (presumably) for two months.

By the way, this has nothing to do with my personal opinion! If it were up to me, I would group all CCC and EOP together and maybe separate inmates by level of violence, so that the non-violent can have access to safety (and create) a reason not to be violent. I personally would give clinicians far more choice about how frequently to see patients, etc. and judge outcomes (30 day readmission rates, rates of hospitalization, etc.) But it is not up to me.

Best,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

**From:** [redacted] @CDCR
**Sent:** Wednesday, March 22, 2017 2:14 PM
**To:** Golding, Michael@CDCR
**Cc:** [redacted] @CDCR
**Subject:** FW: ML EOP Psychiatry Rule Change Proposition

Here is the original request. Some of the issue is the computer is literal. PG says "Monthly". We previously translated that to every 30 days, since most months have around 30 days. Julie's email below though explains how the new rule actually can also meet that requirement. Let us know if you disagree and want it changed back. I thought I consulted with you on this (at least I should have). We always try to keep the rules as true to the PG rules as possible while also ensuring patient care is the focus.

[redacted], Ph.D., CCHP

DHCS Mental Health Program
[redacted] (cell)
[redacted] (desk)



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

*CONFIDENTIALITY NOTICE: This communication and contents may have sensitive, confidential and/or legally privileged information. Any unauthorized disclosure, distribution, or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.*

---

**From:** ▮▮ ▮▮ @CDCR
**Sent:** Wednesday, March 22, 2017 2:09 PM
**To:** ▮▮ ▮▮ @CDCR
**Subject:** Fwd: ML EOP Psychiatry Rule Change Proposition

Sent from my iPhone

Begin forwarded message:

> **From:** '▮▮ ▮▮ @CDCR" <▮▮ ▮ @cdcr.ca.gov>
> **Date:** December 5, 2016 at 1:57:15 PM PST
> **To:** "CDCR MHPolicyUnit@CDCR" <m_MHPolicyUnit@cdcr.ca.gov>
> **Cc:** '▮▮ ▮ @CDCR" <▮▮ ▮ @cdcr.ca.gov>, '▮▮ ▮ r@CDCR"
> <▮▮ ▮ @cdcr.ca.gov>, '▮▮ ▮ @CDCR" <▮▮ ▮ @cdcr.ca.gov>
> **Subject: ML EOP Psychiatry Rule Change Proposition**

Good Afternoon,

I would like to propose an update to the EOP Psychiatry rule. Per the Program Guide 12-4-9 a psychiatrist will see each EOP inmate patient monthly...We have found that the rule of once every 30 days makes it very difficult for the doctors to schedule their caseloads to be seen if they have time off, etc. Most doctors would like to continue continuity of care, therefore when they take a week off they would be able to schedule the inmates to be seen around that week and still remain compliant, without needing backup coverage. I spoke with Dr. Leidner and we discussed how the rule could be rewritten to still remain compliancy within the once a month rule.

Psychiatrist contact due within 45 days or within one calendar month of the previous contact, whichever is shorter.

An example:
If an inmate was seen on March 20th, then he would have to be seen by April 30th which would not exceed one month, or if an inmate was seen on the 1st of the month, then he would need to be seen by the 15th of the next month in order to be compliant with the once monthly rule.

The way the rule is written now, once every 30 days, actually makes for more than 12 contacts per year. An inmate seen on the 1st, would have to be seen on 30th of the same month.

With psychiatry retention so low here at CHCF, we are trying to find ways to make the job more appealing to the doctors and I think that with this small change in the verbage, it would help them to feel like we are trying to work for them and help make their jobs more manageable.

AGPA

CHCF Mental Health - CCHCS

pager
@cdcr.ca.gov



CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communication Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of this communication. Thank you.

# EXHIBIT B
# (2017-03-30)

Mental Health Staffing Compliance
2/23/2017

| SITES | Total Allocated January 2017 | Total Filled January 2017* | Precent Vacant January 2017** | Timely Psychiarty Contacts[1] (Access to Care Banner) 8/1/2016-1/31/2017*** | Psychiatrist Continuity of Care[2] (Quality of Care Banner) 8/1/2016-1/31/2017*** | MAPIP[3] (QM Dashboard-Pop Health Management) 8/1/2016-1/31/2017*** | MH Mission |
|---|---|---|---|---|---|---|---|
| ASP | 5.0 | 3.6 | 71% | 100% | N/A | 100% | CCCMS |
| CCI | 7.0 | 4.5 | 65% | 91% | N/A | 93% | CCCMS |
| CCWF | 12.0 | 7.5 | 63% | 97% | 99% | 92% | FEMALE |
| CHCF | 24.0 | 17.4 | 73% | 72% | 88% | 92% | MHCB/EOP/CCCMS |
| CIM | 12.0 | 10.5 | 88% | 99% | N/A | 95% | RC/CCCMS |
| CIW | 9.0 | 8.4 | 93% | 97% | 75% | 98% | FEMALE |
| CMC | 19.3 | 15.5 | 80% | 99% | 97% | 98% | MHCB/EOP/CCCMS |
| CMF | 17.0 | 13.7 | 81% | 99% | 89% | 97% | MHCB/EOP/CCCMS |
| COR | 14.5 | 9.6 | 66% | 84% | 58% | 98% | MHCB/EOP/CCCMS |
| CRC | 6.0 | 5.5 | 92% | 93% | N/A | 99% | CCCMS |
| CTF | 7.0 | 4.3 | 61% | 92% | N/A | 95% | CCCMS |
| DVI | 4.5 | 5.1 | 113% | 100% | N/A | 99% | RC/CCCMS |
| FSP | 3.0 | 3.4 | 112% | 97% | N/A | 96% | CCCMS |
| HDSP | 6.0 | 4.0 | 67% | 99% | N/A | 94% | CCCMS |
| KVSP | 9.0 | 4.2 | 47% | 88% | 59% | 95% | EOP/CCCMS |
| LAC | 13.0 | 8.6 | 66% | 86% | 55% | 89% | EOP/CCCMS |
| MCSP | 17.0 | 14.7 | 86% | 87% | 84% | 90% | EOP/CCCMS |
| NKSP | 11.0 | 7.0 | 64% | 98% | N/A | 93% | RC/CCCMS |
| PBSP | 4.0 | 3.0 | 76% | 86% | N/A | 92% | CCCMS |
| PVSP | 5.0 | 4.0 | 81% | 98% | N/A | 100% | CCCMS |
| RJD | 16.0 | 12.2 | 76% | 78% | 73% | 96% | EOP/CCCMS |
| SAC | 22.0 | 11.7 | 53% | 66% | 81% | 89% | MHCB/EOP/CCCMS |
| SATF | 17.0 | 9.0 | 53% | 95% | 93% | 96% | MHCB/EOP/CCCMS |
| SCC | 3.0 | 3.0 | 100% | 100% | N/A | 96% | CCCMS |
| SOL | 7.5 | 4.0 | 53% | 84% | N/A | 92% | CCCMS |
| SQ | 9.0 | 13.3 | 148% | 99% | 98% | 96% | RC/CCCMS |
| SVSP | 13.0 | 5.8 | 45% | 78% | 90% | 90% | EOP/CCCMS |
| VSP | 11.0 | 7.0 | 63% | 73% | 81% | 99% | EOP/CCCMS |
| WSP | 10.0 | 7.1 | 71% | 98% | N/A | 78% | RC/CCCMS |

**Footnote**

1 Percentage of patient-weeks during which patients were up-to-date on their required psychiatry contacts.

2 Percentage of psychiatrist contacts seen by the most frequent provider.
All psychiatry contacts seen in person during the 5 months before the start of the reporting period through the end of the reporting period (6 months total) for any patient who has been EOP in the same housing program at the same institution, without interruption, for the past six months.

3 Percentages in this column represent the average compliance for MAPIP Measures 1A-1G. These percentages do not capture MAPIP Measure 1A-1G that are baseline, 3 months or triggered by medication dose changes.

* Includes registry

** Percentage compliance < 90% highlighted in red

*** Percentage compliance > 90% highlighted in green

# EXHIBIT C
# (2017-03-5591-14)

1    clinical psychologists, psychiatrists, licensed social workers, and therapists (including registry

2    and supervisors). (Tebrock Decl. ¶ 10.) These staff serve patients in approximately 6,900

3    Enhanced Outpatient Program beds, 450 Mental Health Crisis Beds, and eighty-five Inpatient

4    Acute or Intermediate Care beds. (Tebrock Decl. ¶ 9.) Over the past year, inmates were seen

5    timely by their primary clinician ninety percent of the time, by their psychiatrist ninety percent of

6    the time, and by their treatment team ninety-eight percent of the time. (Tebrock Decl. ¶ 10.)

7         To ensure medication monitoring for its patients, CDCR uses a detailed monitoring tool

8    titled "Medication Administration Process Improvement Process." This tool facilitates necessary

9    and appropriate systemic monitoring of medication management, including blood levels, for the

10   following types of medication: (1) Antipsychotics; (2) Clozapine; (3) Mood Stabilizers, including

11   Carbamazepine, Depakote, and Lithium; and (4) Antidepressants. CDCR clinicians generally

12   maintain high levels of compliance, with most institutions achieving compliance above the

13   ninety-fifth percentile. (Tebrock Decl. ¶ 11, Exh. 1.) CDCR's systemic, statewide compliance

14   with its medication-administration measures totals ninety-six percent over the past twelve

15   months. (Id.)

16        CDCR clinicians, and particularly its psychiatrists, provide quality treatment at very high

17   compliance rates despite the current staffing vacancies. (Tebrock Decl. ¶ 8.) Eleven institutions

18   with staffing-vacancy rates under ninety percent achieved greater than ninety percent compliance

19   for psychiatry services. (Id. & Exh. 2.) For example, at Avenal State Prison, despite a twenty-

20   nine percent vacancy rate for psychiatrists, the clinical staff achieved a 100 percent compliance

21   rate for timely psychiatry contacts and medication management. (Id.) Similarly, the institution

22   with the highest staffing-vacancy rate for the period, Salinas Valley State Prison, with only 5.8 of

23   thirteen psychiatrist positions filled (a fifty-five percent vacancy rate), again showed satisfactory

24   mental health performance indicators in certain areas: ninety percent for psychiatry continuity of

25   care, ninety percent for medication management and seventy-eight percent for timely psychiatry

26   contacts. (Tebrock Decl. ¶ 8, Exh. 2.)

27        In describing vacancy rates, the Staffing Report mischaracterizes CDCR's staffing as

28   "static." (Staffing Report at p. 6.) In reality, over the past three years as the population requiring

12

# EXHIBIT D
# (2017-04-12-1316hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | @CDCR |
| **Sent:** | Wednesday, April 12, 2017 1:16 PM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | New EOP compliance rules |
| **Attachments:** | CHCF January 2017 compliance EOP.pdf |

4|12|17  

Hi Dr. Golding,

I have been reviewing Dashboard Psychiatrist Contact Timeframes compliance data, and ran across something that I thought would be of interest. As previously discussed, the EOP follow-up appointment timeframe was changed in December to "within 45 days or within one calendar month of the previous contact, whichever is shorter", rather than 30 days. I discovered in Dashboard that this means if someone is seen by the end of the following month, they are considered compliant. For example:

Patient A is seen 12/2/16 for a routine EOP psychiatry appointment. Current Due Dates states his next appointment is due by 1/16/17 (45 days later). The compliance checks are done every Sunday, so on 1/1/17, 1/8/17, 1/15/17, 1/22/17, and 1/29/17 the program checks to see if the psychiatry contact timeframe is still within compliance. Since the next appointment is due 1/16/17, the compliance checks on 1/1, 1/8, and 1/15 all state "Yes" for compliance. However, the compliance checks on 1/22 and 1/29 also state "Yes" for compliance, because it is not yet the end of "one calendar month", if you interpret that to mean the entire month of January. This means the compliance for this EOP patient would be 100%, despite going almost 2 months (from 12/2/16 to 1/31/17) without being seen by psychiatry.

Further, let's say this patient was seen on 12/2/16, and his next appointment was not until 2/3/17. The weekly compliance checks in December and January would all state "Yes" for compliance. The first compliance check in February is on Sunday, 2/5/17, so all of the weekly compliance checks in February and March will state "Yes" for compliance because they'll see he was seen on 2/3/17. This EOP patient was seen twice in four months, yet is listed as 100% compliant for all of those months.

Last note, since compliance is checked weekly, the longer you can stretch that compliance interval, the less impact being out of compliance will have. If you use a strict 30 day deadline, and are late in seeing the patient by 1 week, your compliance percentage will be 4/5 = **80%** (because you have 4 weeks of compliance, and 1 of non-compliance). If you stretch the interval of compliance to almost two months (e.g. from 12/2/16 to 1/31/17) like the compliance reports are currently doing, and again are late in seeing the patient by 1 week, your compliance percentage is now 9/10 = **90%** (because you have 9 weeks of compliance, and 1 of non-compliance).

Hopefully this all makes sense. I attached a compliance report for one of the yards at CHCF for the month of January, and highlighted the relevant entries to help clarify the above. Let me know if you have any questions.

**, MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation

Cell phone:

# EXHIBIT E
# (2017-05-11-1447hrs)



May 11, 2017   1

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Thursday, May 11, 2017 2:47 PM |
| **To:** | ███████████ @CDCR |
| **Cc:** | ███████████ @CDCR |
| **Subject:** | FW: EHRS MA question for ████ |

from what I understand there are powerplans that have all PG required appointments embedded in the business rules so the schedulers (OTs) schedule the appts within PG timelines. So a separate order to schedule an appt sounds like it may be a workaround and having a separate scheduling process puts the PG timelines at risk.

████

Hi ████

With all due respect, I think we should also loop in the psychiatrist, ████, as you suggest looping in the psychologist ███████████. I know you don't know ████ well, which is perhaps why you did not think of him.

No one knows more about psychiatry scheduling (using the EHRS) than ████. I know you don't know the history of the implementation of the EHRS and the effect it had on our psychiatry team, but there is quite a history. Psychiatrist don't practice as efficiently in CDCR because we utilized the CDCR model of psychologist as clinical-decision-maker and psychiatrist as consultant, when designing the EHRS for psychiatrists.

████ was placed under the leadership of psychologists and outnumbered in decision making by psychologist (as consultants and at HQ) 3-4 to 1 when deciding about multiple EHRS decisions involving psychiatric clinical practice in CDCR. ████ was forced to train psychiatrists on the EHRS (by himself!!) at 14 institutions, when psychologists had 5-6 people, medical physicians 5-6, nurses had many, etc. He stayed and worked nights, weekends and holidays. There are as many psychiatrists as medical physicians and somehow it was thought OK that psychiatrists should have one representative to cover the whole state. The EHRS leadership team for some reason had little interest in what our HQ psychiatrist (████) might want or need to help psychiatrists practice in the field or be trained.

████ fought valiantly and by himself to try to enable psychiatrists to have just a little bit of flexibility and efficiency in their EHRS practice, including in utilizing the scheduling functions. The fact that he didn't lose all his battles (I conjecture) will soon become more apparent, as I suspect the efficiency of psychiatrists (in numbers of patients seen per day) will not be as compromised (prelim data suggests) as the compromise in the efficiency of others. ████████ at some point seemed to get that there were problems with the EHRS arrangement and made and is making welcome changes. You are a very welcome change!

But you are new and I hope you will begin to see ████ as a brilliant, kind, talented, and underappreciated resource who can help people with EHRS questions. We have already begun imposing the CDCR psychologist-clinical leader/psychiatrist-consultant-model on DSH, as questions about the EHRS have come up. Even as DSH begins to follow the CDCR model and ████ is not the person who primarily is allowed to make decisions about EHRS psychiatry questions at DSH, perhaps you would be willing to loop ████ in just at HQ (as you loop ████ in), when HQ questions come up and psychologists are determining how psychiatrists will clinically use the EHRS.

Maybe even in the future, it will be relevant that ████ knows more about the psychiatric use of the EHRS than anyone else. [This comment is not directed at you, ████, I know you are aware of none of this! :-)] I actually think that if we start treating ████ as a psychiatric leader when it comes to the psychiatric use of the medical record, our inappropriate psychologist/psychiatrist model may not continue to infect DSH. We can change CDCR for the better and perhaps not damage (much) clinical practice at DSH if we can start at HQ.

1

May 11, 2017 ②

I hope this letter is not upsetting. I don't mean it to be. You have been wonderful (really). But there is much behind the angry refusal of all (100%) of our colleagues in the leadership meeting to allow the executive directors of DSH to come to leadership (CMH) meetings. They said explicitly (and you heard) that psychiatrists and other leaders at DSH and CDCR are not and will not be the top leaders of CDCR, so they can't come, while the psychologist (CMH's) can. I said nothing during the meeting.

The problem is that our leadership team is correct in their assessments of the current role of psychiatrists in CDCR. And they essentially explicitly admitted that they expect that the DSH leadership will not really be the leaders like the psychologist chiefs of mental health will, because they don't want the DSH executive directors at the CMH meeting. That's why DSH psychiatrists are so afraid of us. They know (very accurately) exactly what we are. Somehow DSH psychiatrists have been able to guess exactly what our leadership thinks, despite what we say to them in public!

Our leadership team may have made a *faux pas* in their public claims about psychiatry in CDCR and about how they see their DSH colleagues in the future. What they said did not look good (to me and you). But sometimes a *faux pas* occurs when people are caught in the act of telling the truth!

There is also much behind the (per Dr▮▮▮▮) "nuclear reaction" of the CMH's when they heard the news that psychiatrists might be able to make independent clinical decisions about patient care in CDCR, because they no longer would answer to the psychologist CMH's who were empowered to make controversial clinical decisions about patient care. And there is much behind at least one CEO's insistence that there must be one decision maker (the Psychologist Chief of Mental Health), if there is a disagreement about issues, which frequently are clinical issues. Many CEOs and psychologists apparently don't understand the medical practice act, the law, or what good treatment of patients require.

But I am (now) really telling you that ▮▮▮ is good! Please consider ▮▮▮ when you have questions about how psychiatrists should be allowed to clinically use the EHRS. Consider looping him in. I say that not because psychologists can't ably represent psychiatrists. They can and have. There are many wonderful ones in CDCR who have fought very hard to enable psychiatrists and psychologists to mutually assist each other in caring for patients. But in this environment, some of them have not always done so. Just think about how a gentle and brilliant man like ▮▮▮ was treated by the HQ EHRS team last year and you'll get the idea.

I will loop ▮▮▮ into the discussion about scheduling for psychiatric patients in the EHRS, because he still happens to know the most about the issue, even if the psychiatrist is considered the consultant to the psychologist in how the psychiatrist will use the EHRS.

Thanks,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

2

*May 11, 2017 ③*

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

---

**From:** Golding, Michael@CDCR
**Sent:** Thursday, May 11, 2017 10:13 AM
**To:** ███████ ████/@CDCR
**Cc:** ████ █████@CDCR; ██████ ███████@CDCR
**Subject:** Re: EHRS MA question for ████

Hi,
I think there are medical practice act and licensing board considerations associated with not allowing psychiatrists to
have significant impact on deciding when appointments are made.
I am not a lawyer, but my guess is that it is illegal if it has happened. If the EHRS mental health leadership has suggested
that we now begin enforcing these types of determinations, I would be surprised Surely they have not!
Dr. ████ is pointing out that scheduling is a completely different issue (and mechanical process) than asking for
scheduling to occur, which is what psychiatrists (and their MA assistants need to do).
But if the EHRS leadership in mental health and our executives think psychiatrists should not be able to influence this
process of when patients should be seen; that is, if ████ attempts to allow psychiatrists to make suggestion to OT's
about when patients should be scheduled is misguided, please feel free to let me know.
At that point I think we would need to consult CDCR attorneys for further clarification.

Best,
Michael

Sent from my iPhone

On May 11, 2017, at 9:32 AM, ████████ ████/@CDCR <████ /████████@cdcr.ca.gov> wrote:

> I am thinking about the many PLO memos for SVSP regarding OTs deciding when to schedule the
> patients. Not good. I'm not an expert on ehrs but would assume the physician would need to send an
> order of what they want. ████ would know.
>
> Sent from my iPhone
>
> On May 11, 2017, at 9:18 AM, ████████ ██@CDCR <████████ @cdcr.ca.gov> wrote:
>
>> Hi Michael....from what I understand there are powerplans that have all PG required
>> appointments embedded in the business rules so the schedulers (OTs) schedule the
>> appts within PG timelines. So a separate order to schedule an appt sounds like it may
>> be a workaround and having a separate scheduling process puts the PG timelines at
>> risk. I am not an EHRS expert by any means....this is just my understanding.

3

The agreement with the development of the MA classification with CalHR and the State Personnel Board is that they will not do OT duties, including scheduling.  I hope this helps clarify.  Thx



$May\ 11, 2017$ ④

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, May 10, 2017 3:20 PM
**To:** ████████ @CDCR < ██████████ @cdcr.ca.gov>
**Cc:** ████████ @CDCR < ██████████ @cdcr.ca.gov>
**Subject:** FW: EHRS MA question for ████

Hi ████

I was not at the labor table with you so I want to clarify something about the agreement that our negotiators made for the nursing MA's that will help psychiatrists in certain ways.

Creating an order for someone to do scheduling (a completely separate EHRS process) is not considered scheduling, is it?

The MA should be able to do an order for scheduling (but not the scheduling), as directed by the psychiatrist? Right? Otherwise the psychiatrist has to do the orders needed to ask for scheduling, which is a waste of time for the psychiatrist.

It seems obvious to me, but I wanted to double check.

Thanks,
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

<image002.jpg>

**From:** ████████ @CDCR
**Sent:** Wednesday, May 10, 2017 3:02 PM
**To:** Golding, Michael@CDCR
**Subject:** EHRS MA question for ████

Hi Michael,

When you have a minute, would you be able to ask ████ about the details of the "MAs cannot schedule" negotiated in the labor agreement?  There are two separate processes, and I am trying to salvage one for our MAs.

4

Scheduling: As I am beginning to understand in the last 24 hours, MAs cannot actually schedule an appointment. I think this is what was referred to in the MA labor negotiations. That is fine.

*May 14, 2017* ⑤

**Ordering** a scheduling order: This is NOT scheduling, as the order is just a request to the scheduler to make an appointment. This is what we <u>want</u> to have the MAs be able to do on behalf of the Psychiatrists. I am flexible on whether they can write the order directly to the scheduler, or write the order for the Psychiatrists and have them co-sign the order.

For whatever reason, this is getting a lot of traction in the last 24 hours. I don't know why.

Thanks,

████

████████, M.D.
**Senior Psychiatrist, Specialist**
**Elk Grove - Headquarters**
California Correctional Health Care Services
California Department of Corrections and Rehabilitation
████████ desk
████@cdcr.ca.gov

<image003.jpg>

<image002.jpg>

**IMPORTANT WARNING:  This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED.  If you have received this message by error, please notify us immediately and destroy the related message.  You, the recipient are obligated to maintain it in a safe, secure and confidential manner.  Re-disclosure without appropriate patient consent or as permitted by law is prohibited.  Unauthorized disclosure or failure to maintain confidentiality could subject you to penalties described in Federal and State Law.**

# EXHIBIT F
# (2017-08-32R)

| CDCR# | MHPC Discharge Summary? | MHMD Discharge Summary? | Any indication that psychiatrist weighed in on discharge? | Prescribed meds? | Institution | Discharge medication order? | |
|---|---|---|---|---|---|---|---|
| ▮ | Yes (8/24/17) | No | **No.** MHMD progress note (8/24/17) states "Plan/Disposition: -Pt to be leaving soon. -Continue full issue and suicide precautions. -Retain in MHCB. -Follow up in 3-4 days or sooner if needed." | No | CHCF | N/A | |
| ▮ | Yes (8/21/17) | No | Yes. In Master Treatment Plan on day of discharge PC wrote "Psychiatry notified pt that psychiatric medications are available at CCCMS, if desired." Also, MHMD progress note two days prior to discharge stated patient was stable for discharge at next IDTT. | No | CHCF | N/A | |
| ▮ | Yes (8/21/17) | No | **No.** MHMD progress note (8/18/17) states "This man's affect was depressed and suicidal ideas were present." "Continue Zyprexa 40 mg by mouth daily at bedtime number to continue follow-up every 2-3 days." | Yes | CHCF | Yes, on 8/21/17 | |
| ▮ | Yes (8/10/17) | Yes (8/10/17) | Yes | Yes | CHCF | Unable to assess (encounter deleted) | |
| ▮ | Yes (8/29/17) | No | Yes. MHMD progress note (8/29/17) states "D/C to EOP." | Yes | CHCF | Yes, on 8/29/17 | |
| ▮ | Yes (9/3/17) | No | Yes. MHMD progress note (9/3/17) states "Will be discharged to EOP LOC at next idtt". | Yes | CHCF | Yes, on 9/3/17 | |
| ▮ | No | No | Yes. MHMD progress note (8/29/17) states "Continue current medication without change with the referral of the patient to EOP." | Yes | CHCF | Yes, on 8/28/17 | |
| ▮ | Yes (8/17/17) | No | Yes. MHMD progress note (8/15/17) states "Awaiting EOP discharge, continue MHCB for the interim." | Yes | CHCF | Yes, on 8/17/17 | |
| ▮ | No | Yes (8/30/17) | Yes | Yes | SAC | No | |
| ▮ | Yes (8/22/17) | Yes (8/22/17) | Yes | Yes | SAC | No | Psychiatrist wrote the discharge order |
| ▮ | No | Yes (9/12/17) | Yes | Yes | SAC | No | |
| ▮ | No | Yes (8/28/17) | Yes | Yes | SAC | Yes, on 8/30/17 | |
| ▮ | No | Yes (8/24/17) | Yes | Yes | SAC | No | |
| ▮ | No | Yes (9/5/17) | Yes | Yes | SAC | Yes, on 9/12/17 | |
| ▮ | No | Yes (8/30/17) | Yes | Yes | SAC | No | |
| ▮ | No | Yes (8/29/17) | Yes | Yes | SAC | No | Psychiatrist wrote the discharge order |

| | | | | |
|---|---|---|---|---|
| Yes (8/28/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | CMC | Yes, on 8/28/17 |
| Yes (8/24/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | CMC | Yes, on 8/24/17 |
| Yes (8/24/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | CMC | Yes, on 8/24/17 |
| Yes (8/29/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | CMC | Yes, on 8/29/17 |
| Yes (8/28/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | CMC | Yes, on 8/28/17 |
| Yes (8/28/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | CMC | Yes, on 8/28/17 |
| Yes (9/6/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | CMC | Yes, on 9/6/17 |
| Yes (8/22/17) | No | Yes. MHMD Progress Note (8/22/17) states "Discharge from CTC EOP Facility D PC2602 with 5-Day Follow Up" | Yes | CMC | Yes, on 8/22/17 |
| Yes (9/14/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | SVSP | No |
| Yes (9/20/17) | No | **No.** MH MTP states "The IDTT team is in agreement with discharging patient to EOP LOC", but the MHMD Progress Note (dated 9/20/17) does not mention discharging patient, and MHPC Discharge Summary does not mention psychiatry involvement. | Yes | SVSP | No |
| Yes (9/22/17) | No | Yes. MHMD progress note (9/22/17) states "Patient to be discharged to the yard." | Yes | SVSP | No |
| Yes (9/26/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | SVSP | No |
| Yes (9/26/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | SVSP | No |
| Yes (9/21/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | SVSP | No |
| Yes (9/22/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | SVSP | No |
| Yes (9/14/17) | No | **No.** No mention in MHPC Discharge Summary, MH Master Treatment Plan, or last MHMD Progress Note. | Yes | SVSP | No |

# EXHIBIT G
# (2017-09-05-1449hrs)

*Sept 5, 2017*

**Gonzalez, Melanie@CDCR** | *Discussion On Canning*

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Tuesday, September 05, 2017 2:49 PM |
| **To:** | ▮@CDCR; ▮@CDCR; ▮@CDCR; ▮CDCR |
| **Subject:** | FW▮ |
| **Attachments:** | image001.jpg |

Hi,

Please do not forward, copy, print, or discuss unless ethically or legally obligated.
The root cause analysis committee is (correctly) documenting that had the psychiatrist not discontinued the antipsychotics, the event may not have occurred. They go into detail about that. That does not argue that the psychiatrist should not have discontinued the medications.

But it is absolutely also correct to say that had the psychologist called the psychiatrist on a psychotic patient (who was documented to be repeatedly screaming over 4-hours), medications (forced or otherwise) might have saved her eye. They refuse to say that which I find problematic.

Best,
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**


**From:** Golding, Michael@CDCR
**Sent:** Tuesday, September 05, 2017 1:51 PM
**To:** ▮@CDCR
**Subject:** Fwd▮

Hi,

Conclusion: Please let me know your thoughts. We could begin a process of elevating these concerns, or we could try to manage important documentation and education locally.

1



Case 2:90-cv-00520-KJM-DB  Document 5988-2  Filed 01/31/18  Page 23 of 93

I am going to get more information from the CIW ██████████ Dr. ████ who has much to say about this case.

At this point, I think it's relatively simple. Some executive overseeing the root-cause-analysis committee actually needs to pursue further investigation or trust the existing documentation. The patient was grossly psychotic (religiously preoccupied) and screaming multiple times for four hours, as documented in the chart. Why nurses would somehow retrospectively not remember that (see Dr. ████████'s note below) is remarkable and worrisome.

A simple fix, consistent with the documentation in the chart, is to add a box to the root cause analysis chart saying that we might have prevented the enucleation had the psychiatrist been called about the (documented) many hours of screaming and documented grossly psychotic behavior.

The unwillingness of our psychologists to even consider that the enucleation might have been prevented (had the psychologist called the psychiatrist while admitting a documented screaming and psychotic patient) is quite concerning. This is true even if somehow the psychologist didn't tell the psychiatrist that the psychiatrist didn't need to be called because the patient wouldn't take the medicines.

It speaks to a much more global problem in CDCR about what the "full scope of practice of psychologists" (now being enabled also in our PIPs) in CDCR, means: For practical purposes, it seems to mean that certain psychologists will devalue or refuse to consider medical issues and so practice medicine without a license (by discharging and admitting patients without medical considerations). Of course this is dangerous for our patients.

Multiple of my team members (including me when I worked briefly at CHCF) know from personal experience that certain psychologists very much try to enable this unsafe practice. (I was personally instructed by a psychologist at CHCF to write discharge meds on a patient whom I didn't know. Worse, the psychologist writing the discharge knew absolutely nothing relevant about the patient he was discharging. And at the time and FAPP now, psychologists are the supervisors of psychiatrists.

I would like to get this particular ████████ case sorted out with a bit of education and documentation on the root cause analysis level) here locally at HQ. I think that's simpler.

But if not, I am getting convinced that a new unbiased evaluation of the events with ████████ needs to occur. Perhaps an HQ psychiatrist could insist with a new investigation. Or perhaps investigators outside of CDCR should be involved if we are unable to manage gathering relevant facts.

A psychiatrist was not involved with the investigation, while nurses and psychologists came to the conclusion that nurses and psychologists didn't need to call the psychiatrist.

Conclusion: Please let me know your thoughts. We could begin a process of elevating these concerns, or we could try to handle this locally.

I am going to get even more information from the CIW ██████████ Dr. ████. She knows a whole lot of factual information about this case.

Best,
Michael

Sept 5, 2017 3

Sent from my iPhone

Begin forwarded message:

> **From:** "Golding, Michael@CDCR" <<u>Michael.Golding@cdcr.ca.gov</u>>
> **Date:** September 5, 2017 at 12:38:53 PM PDT
> **To:** "███████@CDCR" <███████@cdcr.ca.gov>
> **Cc:** "███████@CDCR" <███████@cdcr.ca.gov>
> **Subject: Re** ████████
>
> Hi,
>
> Can you give me the name of the tech who documented the screaming nearly every 15-minutes that (according to Dr. ████████ discussion with nursing) did not occur.
>
> Could you also give me the name of the psychologist who allegedly said to you that there was no need to call the psychiatrist because the patient would not have taken meds?
>
> It's odd that they are reporting that the documented screaming wasn't occurring and that the psychologist whom (you say) told you that the psychiatrist wasn't called because the patient wouldn't take meds, somehow didn't actually say that.
>
> This is making me more and more curious.
>
> Best,
> Michael
>
>
> Sent from my iPhone
>
> On Sep 5, 2017, at 11:18 AM, ████████@CDCR <████████@cdcr.ca.gov> wrote:
>
>> Hi Michael,
>>
>> I've spoken with Mr. ████████ the chair of Patient Safety about your concerns. Given that there were no other reports of "screaming" and nursing is aware of the indications for notifying the psychiatrist on call, we have decided to not add the item you requested.  The final action plan is attached.
>>
>>
>> ████████, Ph.D., CCHP
>> Sr. Psychologist Specialist
>> Quality Management Program
>> Statewide Mental Health Program
>> California Correctional Health Care Services
>> Elk Grove, CA
>>
>> Cell: ████████
>> Office: ████████
>> Email: ████████@cdcr.ca.gov

CONFIDENTIALITY NOTICE: This communication and contents may have sensitive,confidential and/or legally privileged information  Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.



Sept 5, 2017 ④

<image001.jpg>

I may be missing it – I have a hard time pulling up the Suicide Watch documentation. I find several mentions of chanting – sometimes loud – but not screaming.

Is your concern that she was no intervention for agitation when she was first placed in Alt Housing? Could you explain?

███████████████, Ph.D., CCHP
Sr. Psychologist Specialist
Quality Management Program
Statewide Mental Health Program
California Correctional Health Care Services
Elk Grove, CA

Cell: ██████████
Office:
Email: ██████████@cdcr.ca.gov

CONFIDENTIALITY NOTICE: This communication and contents may have sensitive,confidential and/or legally privileged information  Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.

**From:** Golding, Michael@CDCR
**Sent:** Monday, August 28, 2017 5:54 PM
**To:** ██████████@CDCR <██████████@cdcr.ca.gov>
**Cc:** ██████████@CDCR <██████████@cdcr.ca.gov>
**Subject:** Re: RCA████████████████

No.
Actually it's documented that she was screaming just about every 15-minutes (by the 1:1).

Strange that that didn't make it into the document reporting the series of events in the 4-hours prior to her enucleating her eye.

Best,
Michael

Sent from my iPhone

Sept 5, 2017

5

On Aug 28, 2017, at 5:33 PM, ███████ :@CDCR
███████ @cdcr.ca.gov> wrote:

I would have to go back and read the chart again, but I don't
remember that being mentioned.  I do know she was
chanting in her cell prior to Alt Housing placement.


███████ , Ph.D., CCHP
Sr. Psychologist Specialist
Quality Management Program
Statewide Mental Health Program
California Correctional Health Care Services
Elk Grove, CA

Cell:       ███████
Office:
Email:      ███████  @cdcr.ca.gov

CONFIDENTIALITY NOTICE: This communication and contents may have
sensitive,confidential and/or legally privileged information  Any
unauthorized disclosure, distribution or action in reliance on the contents
of this communication is strictly prohibited and may be unlawful. If you
are not the intended recipient, please contact the sender and destroy all
events of this communication. For IT issues contact our Solutions Center
at 1-888-735-3470.

---

**From:** Golding, Michael@CDCR
**Sent:** Monday, August 28, 2017 5:03 PM
**To:** ███████ :@CDCR
**Subject:** FW: RCA ███████

Hi ███████
For some reason, the report does not mention that prior to the patient
pulling out her eye, she was said to be screaming repeatedly.

Why doesn't the report say that? Was she not screaming?

The report makes it sound like she was peaceful, refused to strip out,
and then all of a sudden pulled out her eye.  But my understanding is
that that is not what happened.

What am I missing?

Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

Sept 5, 2017

6

<image001.jpg>

**From:** Golding, Michael@CDCR
**Sent:** Monday, August 28, 2017 10:00 AM
**To:** ███████████@CDCR
**Subject:** RE: RCA█████████████

I am concerned about medication use, yes.

I am hoping to see the report.

Michael



**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

<image001.jpg>

**From:** ███████████@CDCR
**Sent:** Monday, August 28, 2017 9:54 AM
**To:** Golding, Michael@CDCR
**Subject:** RE: RCA█████████████

Do you have some concerns about it? One of their issues was that she was allowed to refuse meds at the RC. She had already stopped taking the meds she was on when she arrived (Dr. ████ had continued the jail's meds). The psychiatry intake was pretty thin but she stopped the meds because the patient had been refusing and said she did not want them. According the doc she did not appear psychotic at the time. When she got to CIW she saw ████ via telepsych and he did what I thought was his usual good job. Again, she did not appear floridly psychotic and he did not start her on meds, which she said she did not want. She then proceeded to decompensate very rapidly until the incident.

In my opinion it's hard not to be biased by such an awful event so I thought they were pretty harsh about allowing the patient to be off meds. They did note that the psychiatrists did not mention that the patient did not meet criteria for PC2602.

████████████, Ph.D., CCHP
Sr. Psychologist Specialist
Quality Management Program
Statewide Mental Health Program

6

California Correctional Health Care Services
Elk Grove, CA

sept 5, 2017 8

Cell: ▮
Office: ▮
Email: ▮@cdcr.ca.gov

CONFIDENTIALITY NOTICE: This communication and contents may have sensitive,confidential and/or legally privileged information  Any unauthorized disclosure, distribution or action in reliance on the contents of this communication is strictly prohibited and may be unlawful. If you are not the intended recipient, please contact the sender and destroy all events of this communication. For IT issues contact our Solutions Center at 1-888-735-3470.

**From:** Golding, Michael@CDCR
**Sent:** Monday, August 28, 2017 9:38 AM
**To:** ▮ @CDCR < ▮@cdcr.ca.gov>
**Subject:** RE: RCA ▮

Let me know what Mr. ▮ says.
Thanks,
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov<image001.jpg>

7

# EXHIBIT H
# (2017-10-25-1156hrs)

*Oct 25)*
*2017 ①*   Dr. ██████  Resignation Note
& my comments to

**Golding, Michael@CDCR** ████████████████████

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Wednesday, October 25, 2017 11:56 AM |
| **To:** | ████████████ @CDCR |
| **Subject:** | FW: Absence from the Institution-████████████ |
| **Attachments:** | image001.jpg; ATT00001.htm; Absence from the Institution-████████ .pdf; ATT00002.htm |

Hi,

***Not an emergency. Read later, perhaps when you have time. The letter from the*** ████████ ***at CIW is interesting and listed below what I am saying.***

Our ████████████ at CIW has a very intense ability to get things done, which is favored by very few in our system and perhaps she is disliked by several others. She questions people a lot and speaks fervently. See her letter to me below which I think means she is quitting CIW to find multiple leadership options where her skills will be respected.

I guess that she is not going to be someone whom we will be able to keep because of her perhaps negative six month probation evaluation. My guess is that she will be ultimately failed on probation. So I expect she is going to leave to lead medical professionals and save lives elsewhere, rather than wait around to be failed, appeal in court, etc. That is my guess, but I am not sure.

I would say that in terms of organizing psychiatrists to take care of patients, she has been amazing. Remember Ms. ████████████████ the juvenile justice young woman who seemingly was so difficult to manage? As soon as she and her psychiatry team took care of her, the patient stabilized immediately. You heard nothing more. Multiple of the most notorious female patients were completely stabilized by her and her team (list provided upon request). She knows how to advise and organize her psychiatrists to appropriately and successfully treat patients, pharmacologically and otherwise. Her kind of leadership in suicidal patients (wanting Lithium, Clozapine, Depot neuroleptics in these patients, wanting consistent care by a therapist despite locations) of course is exactly what would stabilize patients.

Ability to get institutions to successfully treat patients is not what we value, if doing so means that others will be made upset. She is a physician in a setting in which we do not want that. She does insist on excellent care for the patients from her psychiatrists and others. In her short six month tenure, despite all odds, she and her team were beginning to stabilize the sickest female patients and if she had had any support, she would have followed through and cut suicides and readmissions.

She definitely made a start. I am going to be trying to get the types of interventions she recommends going (statewide) using our single PRN psychiatrist and aspects of the telepsych team to try to teach people how to do this

1. Create lists of patients who are frequently readmitted, perhaps females because the population is less,
2. These few frequently readmitted patients get temporary same-therapist-care regardless of their physical location for focused anti-suicidal treatment [using telepsychology if necessary and pilot with women]
3. Much more lithium/clozapine/depot neuroleptics for many of these patients and Depot Naltrexone for narcotics and EtOH abusers.

Like me, Dr. ████ knows that these ideas are battle tested and work, that other systems do it, we do not, and I think the 30-day crisis bed readmission rate at CIW is a whopping 30%. Dr. ████, if she had help, could make that stop and would have, with support. She obviously is doing far better than that in the PIP (albeit with far more time). If she had some influence over care in the MHCB, there would be a lot of focus on getting patients on long-acting meds, making sure that patients got consistent therapist follow-up at CIW (and even other female institutions) and all the things that she and I know work! Her influence is restricted to the PIP.

1.

Oct 25, 2017

Needless to say there has not been a single leader in mental health at CIW who has been fighting to get her the support staff to be able to look at these patients and engage in the type of local QM she recommends (from a psychiatric perspective) to save these patient's lives. What she recommends below actually works and has dozens of "supporting" studies --studies consistent with her conclusion.

I am almost sure that she is going to leave as she is not going to wait around for our system to fail her on probation. There are several patient's lives that were saved by her and her team and could be saved by her and her knowledge (and yes her demand that psychiatrists be involved in clinical decisions about patients when psychiatrists know what to do).

She will be gladly welcomed as a medical leader of psychiatric physicians in dozens of other places, if she has not been already.

Her note below is interesting.

Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water**
**during California's drought at**
**SaveOurWater.com**

---

**From:**  ▮▮▮▮▮▮ @CDCR
**Sent:** Tuesday, October 24, 2017 11:25 PM
**To:** Golding, Michael@CDCR
**Subject:** Fwd: Absence from the Institution- ▮▮▮▮▮▮▮▮

Dr. Golding,

I know you and I have spoken about the sustainability of my staying in the ▮▮▮▮▮▮▮ position at CIW.

Despite my optimism, work ethic and dedication to balancing leadership at CIW with the goal of integrating psychiatry firmly into the MH department, the challenges and resistance are so prominent (and overt), that I have grown more convinced that my position can only be a rubber stamp one. I still have no admin support despite having 17 direct reports. I don't even supervise those whose legal assessments (MDOs) that I must sign an affidavit for. I don't supervise the PC2602 coordinator. I'm not included in Coleman preparation or the new DSH transfer process. In short, I'm a rubber stamp ▮▮▮▮▮▮▮ .

2

Oct 25, 2017 3

If leadership at HQ, including ███████████████ or Dr. ████ are to inquire about why retention of psychiatrists continues to be a dilemma at CDCR, I would point to my failing example of trying to bring psychiatry to the table. How an institution with two inpatient psychiatric units doesn't value the input of a ████████ is rather baffling. After all, patients are not admitted to psychiatric hospitals for acute therapeutic interventions as none exists. CBT is the shortest therapeutic intervention with evidence of efficacy—it's highly structured and 12 week's long—yet we don't even offer this in any outpatient program let alone in our inpatient units.

For example, our MHCB has a readmission rate of 30%—chronically.

The currently action plan to address this only involves the psychologists (the CMH has unilaterally decided to remove all LCSW from the MHCB) reviewing treatment plans.

No UM review of medication optimization—ie are we utilizing evidenced based treatments such as Lithium for chronic SI, long acting injectables, which are shown to reduce hospitalization, pc2602s, clozapine, etc.). I review the CTC census with the psychiatrists weekly and do this as case reviews, but it hasn't been ever thought of before nor readily accepted as a concomitant action plan. Shocking actually given in the original Coleman vs Wilson, a key finding was under-utilization of involuntary medications.

Lastly, if you review the memo below, you will see just how deep the line in the sand has been drawn.

The Chief of Mental Health is a designation not a title. There are three Chiefs—two Chief Psychologists, one with the arbitrary designation of CMH, and a Chief Psychiatrist. Our ███ has already made my position equal in rank to the ███ ██████ who has the designation of ███.

When absent, the ███ Dr. ██████ has uniformly designated the other ████████████ as the ███ designee, despite our difference in rank. He doesn't even approach it somewhat fairly by switching between us.

Now in the absence of his ████████████, he has skipped over the other ███, me, and designated a Supervising Psychologist as his designee in his absence.

Personally, this doesn't offend me. However, more broadly, it represents the inhospitable environment that psychiatrists experience at CIW. Perhaps why I am the first ██████████ at CIW in five years. Perhaps why the most senior psychiatrist here has only been here 4.5 years.

His message to the staff is that psychiatry is separate and psychologists are favored. This isn't lost on my staff. Psychiatrists do not feel integrated, nor does their input seem valued, as evidenced by Dr. ██████ display of choosing a lower ranking psychologist as his designee when a ███ is present.

The CMH is a designation that either a psychiatrist or a psychologist can have. There is little justification to not choose his colleague, the ████████████ except to continue to divide.

Psychiatrists only stay in institutions where they feel invested, valued and heard. They have many other options. As we've discussed, I have other options. Ones that allow me to be effective in a leadership role, not just a rubber stamp. I'm not a "Mental Health Provider". I'm a physician who specializes in psychiatry. As such, I provide a natural bridge between Mental Health and Medical. This unique skill set, should be valued, not suppressed as we approach Joint Commission Accreditation.

I can and likely will find a position where my skills and license are maximized. CDCR will not be able to maintain quality psychiatrists unless they make a true effort to bring them not just to table, but empower them to have a voice.

Oct 25, 2017  4

The only benefit from doing so is that will improve patient care and outcomes. We are physicians, not "mental health providers who prescribe" and our skill set and large body of knowledge is under-utilized and under-valued by the current organizational chart where there are no supervising psychiatrist in any program—including the inpatient units. (Our MHCB has not had a Psychiatrist as a clinical director for years). There is no psychiatrist in a supervisory in a licensed inpatient psychiatric unit. It's run completely by therapists. That is incongruent with every community model, including other correctional settings. Hence, I'm not surprised at the high re-admission rates and high overflow utilization. Those who have spent at least four solid years admitting and discharging from inpatient units—psychiatrists—have no authority in managing MHCBs—at least at CIW. Those trained in therapy do.

In short, I thank you for your mentorship and support and hope you can understand should I choose to take a leadership opportunity elsewhere.

Best,

██

██████████ MD
██████████

California Dept. of Corrections
California Institution for Women
██████████

Begin forwarded message:



**From:** "██████████@CDCR" <██████████@cdcr.ca.gov>
**Date:** October 24, 2017 at 1:22:20 PM PDT
**To:** CDCR CCHCS CIW HealthCareStaff <CDCRCCHCSCIWHEALTHCARESTAFF@cdcr.ca.gov>
**Cc:** "██████████@CDCR" <██████████@cdcr.ca.gov>, "██████████@CDCR"
<██████████@cdcr.ca.gov>, "██████████@CDCR" <██████████@cdcr.ca.gov>, "██████████
@CDCR" <██████████@cdcr.ca.gov>, "██████████@CDCR" <██████████@cdcr.ca.gov>,
"██████████@CDCR" <██████████@cdcr.ca.gov>
**Subject: Absence from the Institution- Chief of Mental Health**

*Sent on Behalf of* ██████████*, MA, CCHP*

*California Institution for Women*

Please disseminate as appropriate to ensure awareness.



Administrative Assistant (A) to
██████████, MA, CCHP

California Institution for Women
██████████

# EXHIBIT I
# (2017-11-15-1143hrs)

*too 11/5/17 11:43 AM*

**Genetin, Arianna@CDCR**

**From:** Golding, Michael@CDCR
**Sent:** Wednesday, November 15, 2017 11:43 AM
**To:** ████████@CDCR
**Subject:** Fwd: Cases re liability

Please Print and give to me.
Do not forward.
Michael

Sent from my iPhone

Begin forwarded message:

**From:** "████████@CDCR" <████████@cdcr.ca.gov>
**Date:** November 15, 2017 at 10:08:58 AM PST
**To:** "████████@CDCR" ████@cdcr.ca.gov>, "████████@CDCR"
<████████@cdcr.ca.gov>
**Cc:** "████████@CDCR" <████████@cdcr.ca.gov>, "Golding,
Michael@CDCR" <Michael.Golding@cdcr.ca.gov>, "████████@CDCR"
████████@cdcr.ca.gov>
**Subject: Cases re liability**

All:
I write seeking a meeting with this group to discuss a meeting we at MH had with our field
psychiatry team re the scope of practice of psychiatrists and psychologists. I am going to change
the duties of the psychologists in the PIPs to allow them, with the IDTT, to make admissions and
discharge decisions. The psychologists at CIW and SQSP already do this but we need to adjust
processes at CHCF, CMF, and SVSP to be consistent across the state. There is considerable
concern from the psychiatry team at the new PIPs that they will be exposed to liability when a
psychologist makes a poor decision. They apparently referenced some 'case law' to support their
position but I am unaware of such case law. Can you do some research about whether there are
cases where a physician has been held responsible for the decision of an independently licensed
person (psychologist)? If so, I want to see what we can do to address their concerns. If the
concerns are not real, then I need to disabuse them of the notion. This may well come up st the
labor table too so I'd like to have something we can share publicly and with labor.

With the holidays, I assume it will be hard to meet next week but if you can do research in the
next couple of days, perhaps we can we a meeting on schedule within a week or so.

I've CC'd ████ here to coordinate schedules.
Thanks
█████

Sent from my iPhone

1

# EXHIBIT J
# (2017-11-21-1749hrs)

No 21, 2017   1

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Tuesday, November 21, 2017 5:49 PM |
| **To:** | ███████@CDCR |
| **Subject:** | Rec Therapy over Psychiatric Appointments |
| **Attachments:** | Psychiatry three hours per week allowed.pdf |

HI ███████ ,

Hope you had a nice vacation and are planning some fun for Thanksgiving.

You said something in a meeting with ███████ and me and I think you may not be aware of the ramifications of what you said. I know you didn't mean harm, but perhaps you may want to reconsider.

**Conclusion:** Your comment that psychiatrists should schedule patients around groups seems innocent enough. But it obligates sometimes very scarce resources (needed for patient transport) to be utilized to transport patients to groups, first, after which any remaining transportation resources can be utilized by psychiatrists to "schedule around" the groups. Your decision is therefore making a triage decision that groups are more important for patients than medical appointments with psychiatrists. These groups, for example RT groups, often involve patients watching television. So although you may not be aware of the consequences of your decision, your decision (and the decisions of your predecessors) continues to deny patients access to sometimes desperately needed medical services, when there are scarce patient transportation resources, which is all too common.

**What Your Decision Practically Means**
1. Denying that there will periodically or frequently be an inability to bring patients to see mental health providers in CDCR is simply denying reality. In those contexts in which the ability to transport patients is quite scarce, saying that psychiatrists should schedule appointments with patients around groups means taking and using finite resources to transport patients to groups, and therefore taking resources away from transporting patients to psychiatry appointments.
    a. Psychiatrists often just require 10-minutes from group time to see a patient, but they are forbidden by the psychology leadership in institutions from even 10 minutes with a patient if they are participating in a two hour Rec Therapy group. (see below).
    b. Thankfully, we have found brave psychology leaders who disobey HQ executive orders and local executive orders, because they want patients to get help.
2. Patients don't get medical care when psychiatric physicians think the patient really needs it.

**Effect on Psychiatrists:**
Our psychiatrists have been angry about these priorities for years and have recently been made very angry by our MH executive leadership's apparent renewal of this decision – independent of psychiatric opinion to the contrary -- for example at SAC and SVSP (details below).
They are mad about these choices because
1. they say they have been denied the right to care for patients,
2. they think their patients don't get the right care because of your predecessor's and the current executive mental health team's support of this decision,
3. they feel more than a bit devalued by the choices that the executive MH leadership team has made and makes
4. they recognize that your choices and similar decisions of your predecessors do precipitate morbidity in our patients, likely higher readmission rates, create an unwillingness of psychiatrists to work here, and probably have increased suicidality and suicides of our patients over the long term, even though that obviously is not your intent.

Nov 21, 2017  2

**Examples:**

1. SVSP PIP: I spoke with the scheduler (Ms.███, a nice woman) at SVSP PIP yesterday. She explained that custody has a certain amount of time that can be utilized to be able to bring patients to appointments. Given that time, she explained to me that she has been instructed to allow the following to occur over a week,
   a. To be "fair", she says
      1. Group hours can be used for individual appointments so every single mental health provider (listed below) has more hours with patients than psychiatrists
      2. Social Workers get 2 hours per week with patients individually and 4 hours of groups (6-hours of transportation resources)
      3. Psychologists get 2 hours per week with patients individually and 2 hours for groups (4-hours of transportation resources)
      4. Rec Therapists get 2-hours per week and 8-hours of group time (10-hours of transportation resources)
      5. Psychiatrists have only **2 hours PER WEEK** for individual private appointments with 35-70 psychiatrically hospitalized patients! Since psychiatrists have no allocated group time, they can't utilize that to try to see a few more patients in individual sessions!
   b. The scheduler says she tries to be especially nice to psychiatrist and grants them 3-hours (not two) per week to see patients in a private setting 1:1, but often this can't be arranged and it is not "fair" to others to grant so much time to physician psychiatrists
   c. Although the scheduler is a nice person, she has no idea how utterly bizarre it is to allocate 10 hours per week for a rec therapist to be allowed to pull patients for appointments and only give 2-hours per week for a psychiatrist.
   d. Please see the attached document which shows that Dr.███ a psychiatric physician at SVSP, has been allocated just 3-hours to see patients, over an entire week!! The scheduler said Dr.███ asked for a 4th hour per week to see patients, but had to be denied to be "fair". Even███ the otherwise excellent psychologist-executive director said that groups had to be prioritized over psychiatric appointments because ("the patients like groups")

2. SAC: I will be giving you a full report about SAC after I go there after Thanksgiving, But please note this: Even when SAC has failed EOP Hub certs because psychiatrists are not seeing enough patients and so we are in trouble with the courts
   a. Dr.███████, a senior psychologist at SAC nonetheless informed custody that groups take precedence over psychiatry appointments, including the ones that psychiatrists have determined to be medically essential. So
      ii. Psychiatric Patients were not seen appropriately or in a timely way at SAC
      iii. Her decisions contributed to failing EOP HUB certification (not following court mandates)
   b. This decision; that is, denying patients psychiatric care, was supported by the███████, a psychologist.
   c. So even when we are violating court mandates because patients haven't been seen by psychiatrists and therefore we didn't pass the EOP HUB CERT, it was still critical for the psychology leadership at SAC to intentionally prevent even short 10-minute appointments by psychiatrists, so as to triage patients into recreational therapy instead.

3. The HQ psychiatrists ███████, and I have all worked in CDCR institutions and been told that groups take priority over psychiatry appointments. We have ended up seeing patients cell-side, as psychiatrists do, because of the absence of custodial transport staff and because your decision (and that of your predecessors) prioritizes the use of transportation resources for recreation therapist appointments, rather than psychiatry appointments. I know I speak for virtually all psychiatrists in CDCR (and I would guess nationally) when I say that executive (non-medical) Mental Health Leadership should not be making these types of medical triage decisions. We are insulted and our patients are being hurt.

**Implications**

*May 21, 2017 3*

Patient care is suffering. I don't know if there are medico-legal implications of not allowing a psychiatrist who cares for 35-70 hospitalized patients (at SVSP) to only see them 3-hours per week, rather than cell-side. I also don't know about the medico-legal implications of medical triage decisions being made by non-medical people.

**I suggest**

1. Rescind this chronically stated but unwritten policy and allow us to send a memo saying that if there are any difficulties scheduling patients to see psychiatrists, psychiatric appointments take priority over group therapy, particularly by rec therapists.
2. At the next CMH meeting, get in front of the Chiefs of Mental Health and tell them that psychiatric appointments take priority over Rec Therapy appointments.
3. Speak with the medical executives and CEO's and let them know that the appointments of psychiatric physicians, like those of medical physicians, have priority over REC therapy appointments, even when psychology executives instruct them to prioritize Rec Therapy.

It would be a major victory for our mentally ill patients if we recognize the reality that there will be periodically or frequently a lack of resources to transport patients. In those contexts, visits with a psychiatric physician are more important than transporting patients, for example, to Rec Therapy to watch television.

Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

## Treatment Center 2 Winter 2017 (December 4th - February 23rd)

| Time | Room | MONDAY | ROOM | TUESDAY | Room | WEDNESDAY | Room | THURSDAY | Room | FRIDAY |
|------|------|--------|------|---------|------|-----------|------|----------|------|--------|
| | Dining | **Breakfast** | Dining | **Breakfast** | Dining | **Breakfast** | Dining | **Breakfast** | Dining | **Breakfast** |
| 8:00 | Group Rm 1 | SW 1:1- ▓ | IDT Rm | IDT'S Team A- | IDT Rm | IDT'S Team Games ▓ | IDT Rm | IDT'S Team B- ▓ | Group Rm 1 | RT 1:1's- ▓ |
| | Group Rm 2 | BIT 1:1's - ▓ | Group Rm 2 | RT 1:1's- ▓ | Group Rm 2 | Dr. ▓ 1st Hour Allowed / Psych Line -Dr. ▓ | Group Rm 2 | RT 1:1's- ▓ | Group Rm 1 Dr ▓ | 2nd Hour Allowed / Psych Line -Dr. Gaines |
| | Group Rm 3 | RT 1:1 ▓ | Exam Rm | Clozaril Lab/Assments | Exam Rm | Clozaril Lab/Assments | Group Rm 3 | RT 1:1's ▓ | Group Rm 3 | PsyD 1:1's - ▓ |
| | Exam Rm | Nursing Treatments | Exam Rm | Nursing Treatments | Exam Rm | Nursing Treatments | Exam Rm | Nursing Treatments | Exam Rm | Nursing Treatments |
| | IDT Rm | X | IDT Rm | IDT'S TEAM A | IDT Rm | IDT'S TEAM B | IDT Rm | IDT'S TEAM C | IDT Rm | G 3rd Hour Allowed / Psych Line -Dr ▓ |
| 9:00 | Group Rm 1 | Intro to Coping Skills - ▓ | Group Rm 1 | CBT Depression- ▓ | Group Rm 1 | Problem Solving - ▓ | Group Rm 1 | Cog.Therapy Psych Sxs - Kendis | Group Rm 1 | GROUP |
| | Group Rm 2 | APD - Woods | Group Rm 2 | X | Group Rm 2 | X | Group Rm 2 | Stress and Relaxation - ▓ | Group Rm 2 | Emotion Regulation - Mitchell |
| | Group Rm 3 | Poetry and Art Therapy- ▓ | Group Rm 3 | Anxiety, Panic, PTSD ▓ | Group Rm 3 | Open Art Studio ▓ | Group Rm 3 | CDCR-ICC | Group Rm 3 | Anger Management - ▓ |
| | Dining Rm | X | Exam Rm | Clozaril Lab/Assments | Exam Rm | Clozaril Lab/Assments | Dining Rm | X | Dining Rm | X |
| | IDT Rm | X | IDT Rm | IDT'S TEAM A | IDT Rm | IDT'S TEAM B | IDT Rm | IDT'S TEAM C | IDT Rm | SW 1:1's Anthony |
| 10:00 | Group Rm 1 | Intro to Coping Skills - ▓ | Group Rm 1 | CBT Depression- ▓ | Group Rm 1 | Mindful Meditation- ▓ | Group Rm 1 | Substance Abuse & Mental Illness - Kendis | Group Rm 1 | Empowerment thru Spirituality- ▓ |
| | Group Rm 2 | Emotion Regulation- ▓ | Group Rm 2 | GROUP | Group Rm 2 | PsyD 1:1's ▓ | Group Rm 2 | Stress and Relaxation - ▓ | Group Rm 2 | Problem Solving - ▓ |
| | Group Rm 3 | Poetry and Art Therapy - ▓ | Group Rm 3 | Anxiety, Panic, PTSD | Group Rm 3 | Open Art Studio ▓ | Group Rm 3 | CDCR-ICC | Group Rm 3 | GROUP |
| | Exam Rm | Med Line - Dr ▓ | Dining Rm | | Dining Rm | X | Dining Rm | X | Dining Rm | X |
| 11:00 | In-Cell | Lunch/Hot Water Pass | In-Cell | Lunch/Hot Water Pass | In-Cell | Lunch/Hot Water Pass | In-Cell | Lunch/Hot Water Pass | In-Cell | Lunch/Hot Water Pass |
| | Exam Rm | Med Line - Dr ▓ | Group Rm 1 | X | Group Rm 1 | X | Group Rm 1 | X | Group Rm 1 | X |
| 11:30- 13:30 | Yard | Yard All Patients   A-B- C-D | Yard | Yard All Patients   B-A- D-C | Yard | Yard All Patients   C- D-A-B | Yard | Yard All Patients   D- C-B-A | Yard | Yard All Patients A-B-C-D |
| 12:00 | Group Rm 1 | SW 1:1's- ▓ | Group Rm 1 | PsyD 1:1's ▓ | Group Rm 1 | SW 1:1- ▓ | Group Rm 1 | PsyD 1:1's ▓ | Group Rm 1 | CANTEEN DISTRIBUTION |
| | Group Rm 2 | RT 1:1's ▓ | Group Rm 2 | PsyD 1:1's - ▓ | Group Rm 2 | SW 1:1's ▓ | Group Rm 2 | PsyD 1:1's ▓ | Group Rm 2 | CANTEEN DISTRIBUTION |
| | Group Rm 3 | X | Group Rm 3 | X | Group Rm 3 | CME, UMC, MD meeting | Group Rm 3 | X | Group Rm 3 | X |
| **3rd Watch** | | | | | | | | | | |
| | Group Rm 1 | Drumming Group- ▓ | Group Rm 1 | Problem Solving ▓ | Group Rm 1 | Exercise - ▓ | Group Rm 1 | Social Skills thru Rec & Leisure - ▓ | Group Rm 1 | APD - ▓ |
| 1445- 1615 | Group Rm 2 | SW 1:1 ▓ | Group Rm 2 | SW 1:1's- ▓ | Group Rm 2 | SW 1:1's ▓ | Group Rm 2 | PsyD 1:1's ▓ | Group Rm 2 | PsyD 1:1 ▓ |

# EXHIBIT K
# (2017-12-04-1043hrs)

In enucleation case, nurse

called psychologist -- don't know
difference between psychiatrist &
psychologist & psychologist listed
as physicians

12/4/17 1

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | ████████ @CDCR |
| **Sent:** | Monday, December 04, 2017 10:43 AM |
| **To:** | Golding, Michael@CDCR |
| **Subject:** | FW: |

See below.

This is the psychologist who admitted Ms ████████ During the RCA, when I asked why the psychiatrists on call wasn't contacted, the officer indicated that he thought Dr. ████ was the psychiatrist. Apparently, nursing also thinks he's a physician.

Please note that our new identificaiton badges (CIW only) just state, Dr. ████ and the title. No degree or the title that the person is licensed under.

This is incongruent with California's health care provider identification code that was passed in 2009.

████████ MD
████████
California Institution for Women
California Dept. of Corrections
Cell: ████████

████████

**I CHECK EMAIL SEVERAL TIMES DURING THE DAY, HOWEVER AM NOT LOGGED IN AT ALL TIMES. IF THIS REQUIRES AN URGENT OR TIMELY RESPONSE, PLEASE CALL OR TEXT THE CELL NUMBER ABOVE.**

**From:** ████████ @CDCR
**Sent:** Monday, December 04, 2017 10:40 AM
**To:** ████████ @CDCR < ████████ @cdcr.ca.gov>
**Cc:** ████████ @CDCR < ████████ @cdcr.ca.gov>; ████████ @CDCR < ████████ @cdcr.ca.gov>
**Subject:**

Hello ████

I'm not sure who completes this daily list, but there is an error. ████████ is not a physician. He is a psychologist. ████
████ PhD.

All patients admitted have an MHMD who is informed on call of the admission and places orders in at the same time, thus there is always an admitting physician (MHMD) for each admission.

Thx.

D4172

# CONFIDENTIAL
# DECEMBER 3, 2017
## SACRAMENTO NOTIFIED / INITIAL AND TIME:
# CENSUS: 13

| RM | INMATE PATIENT NAME | CDC# | DOB | ADMIT DATE | ADM/T TIME | PHYSICIAN | TYPE of SVCS | LEVEL of CARE | DIAGNOSIS | FL |
|---|---|---|---|---|---|---|---|---|---|---|
| 1301 | VACANT | | | | | | | | | |
| 1302 | VACANT | | | | | | | | | |
| 1303 | | | | 02/20/15 | 18:20 | | MED | NON_ACUTE/ LONG TERM | FACTITIOUS PARAPLEGIA | |
| 1304 | VACANT | | | | | | | | | |
| 1305 | OBSERVATION CELL | | | | | | | | | |
| 1306 | OBSERVATION CELL | | | | | | | | | |
| 1307 | | | | 10/02/17 | 22:27 | | MED | ACUTE | MULTIPLE MYELOMA, ACT BBC KERATOSES, HCV, CHRONIC ITP, BPPV, PACEMAKER, GERD, HTN, CHRONIC LEUKOPENIA, ALLERGIC RHINITIS | OE |
| 1308 | | | | 10/18/17 | 12:07 | | MED | ACUTE | HUNTINGTONS DISEASE, DIFFICULTIES SWALLOWING | OE |
| 1309 | VACANT | | | | | | | | | |
| 1310 | | | | 12/2/17 | 2000 | | MH | ACUTE | DTS | |
| 1311 | VACANT | | | | | | | | | |
| 1312 | | | | 11/20/17 | 1846 | | MH | ACUTE | DTS | S4 |
| 1313 | | | | 12/01/17 | 1940 | | MH | ACUTE | DTS | S |
| 1314 | | | | 11/30/17 | 17:50 | | MH | ACUTE | DTS | S4 |
| 1315 | | | | 11/20/17 | 23:07 | | MH | ACUTE | DTS | S4 |
| 1316 | | | | 11/20/17 | 13:40 | | MH | ACUTE | DTS | S4 |
| 1317 | | | | 11/20/17 | 17:25 | | MH | ACUTE | DTS | S4 |
| 1318 | | | | 11/27/17 | 18:25 | | MH | ACUTE | DTS | S4 |
| 1319 | | | | 11/23/17 | 23:20 | | MH | ACUTE | DTS | S4 |
| 1320 | | | | 11/22/17 | 15:18 | | MH | ACUTE | DTS | S4 |

California Institution for Women
California Dept. of Corrections
Cell:

I CHECK EMAIL SEVERAL TIMES DURING THE DAY, HOWEVER AM NOT LOGGED IN AT ALL TIMES. IF THIS REQUIRES AN URGENT OR TIMELY RESPONSE, PLEASE CALL OR TEXT THE CELL NUMBER ABOVE.

# EXHIBIT L
# (2017-12-06-1748hrs)

HIPAA

Pts not brought at SAC

Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Wednesday, December 06, 2017 5:48 PM   12/6/17   1 |
| **To:** | ████████CDCR |
| **Cc:** | ████@CDCR |
| **Subject:** | FW: CSP-SAC and Diminished Psychiatry Contacts with Patients |
| **Attachments:** | Copy of Psychiatrist productivity.xlsx |

Hi ████

You asked me to investigate why psychiatrists at the California State Prison Sacramento (CSP-SAC) apparently are not documenting that they are seeing many patients. Your concern was that psychiatrists had decided not to see patients or perhaps there were other explanations. Given the paucity of patients seen, it was asked that I speak with the psychiatrists to try to encourage them to see more patients. This concern was particularly relevant at the time I was asked because SAC had just failed an Enhanced Outpatient (EOP) court mandated inspection which would have certified that the institution was able to appropriately care for Enhanced Outpatients (called an "EOP Hub Cert.")

**Conclusion:** The HQ psychiatry team found substantial barriers to psychiatrists being able to see patients at CSP-SAC. Although there may be issues with the motivation of psychiatrists, the problems at CSP-SAC are so grave and severe in terms of patient access to psychiatrists that the focus needs to be on fixing these institutional factors. We cannot ascertain particular problems with psychiatrist motivation, because the barriers to patient care seem so much greater. Even if for some reason a particular psychiatrist did not want to treat patients, that observation could not be measured when the institution will not allow the patient to be seen, regardless of the psychiatrist's motivation.

I think patients are in danger because of institutional and professional interference with the ability of psychiatric physicians to be able to care for patients and the HQ psychiatry team is very worried.

**Recommendations:**

1. Speak with the warden and high level HQ custody supervisors in order to encourage custodial staff to bring patients for psychiatric treatment.
2. Speak with relevant parties at HQ regarding the appointment priority hierarchy, and the need for psychiatry appointments to take precedence over groups (just like medical appointments do). In emergency situations (like at SAC), Mental Health leadership needs to be told that preventing even a 10-minute appointment with a psychiatrist (to make sure a recreation therapist has 120 rather than 110 minutes with a patient) is certainly immoral. Whether or not it is illegal is a different question. Certainly mental health leadership has been apprised of this situation, including again in this document. Patients should be prioritized and are placed at risk because of this behavior.
3. Educate psychiatrists and MAs about the importance of making sure there is a scheduling order placed for every appointment. This could be directed just at the psychiatrists who had the biggest difference between number of notes and number of appointments (Dr. ████ at 21, Dr. ████ at 13, Dr. ████ at 15, and Dr. ████ at 12), or at all psychiatrists. Likewise the MAs could be spoken to as a group, or the MA supervisor could be spoken with and asked to make sure the MAs all place scheduling orders appropriately.
4. Educate Dr. ████████ and MA ████████ that the psychiatrist must be the one to check patients in and out on the ambulatory organizer, or the MA will get credit for the appointment.
5. Attempt again to educate nursing that MA's paid for by mental health were supposed to help psychiatrists and they were not supposed be pulled away to help medical instead.
6. Allow psychiatrists to try to undo the damage done by the HQ Mental Health leadership in its EHRS design for psychiatrists. This will take time. We need to follow he workflow designed for medicine to restore productivity at SAC and elsewhere (no powerforms, VERY few powerplans, no checking patients in and out, using notes to track appointment compliance rather than check in/out). This is much more efficient than the workflow designed by mental health leadership for psychiatrists (lots of powerforms, lots of powerplans, immense

1

pressure for psychiatry to use even more powerplans than they already are, checking all patients in and out, using check in/out to track appointment compliance, etc.

7. Move psychiatric offices from hallways where patients and staff can observe patients, hear therapy, and read patient notes. The same accommodation that psychologists have (they are given actual offices), should be afforded to psychiatrists.

12|6|17   2

Introduction: The below document demonstrates that other disciplines and employees either actively or passively prevent psychiatrists from seeing patients at CSP-SAC. Furthermore, the Cerner system has markedly decreased the productivity of psychiatrists statewide, including at SAC. (see attached).

## Short List of Problems with evidence of these problem presented below the list:

1. Patients are not brought by custody to see psychiatrists

2. HQ mental health argued to incentivize patients to go to groups but not see psychiatric physicians, against the wishes of HQ psychiatrists. These incentives to go to group are working to decrease psychiatric visits.

3. When patients are in groups, custody is willing to bring patients to see psychiatrists, because the patients are already out of cells so easy to access. Psychiatrists have used these opportunities to ask for just 10-minutes with patients (out of say a 120-minute recreation therapy group). Custody has been willing to honor these requests of psychiatrists because the patients are easy to access, but local Mental Health leadership has been cracking down on these attempts to get patients psychiatric care, by successfully forbidding custody from bringing patients to see psychiatrists in these circumstances.

   The ██████ and senior psychologists do this because it might be that a patient could get a 10 minute discussion with a psychiatrist and a 110-minute discussion with a recreation therapist, instead of the recorded and mandated 120 minute visit with the recreation therapist. The 120-minute amount is monitored by the court and so the psychologists want this number to be accurate.

   Some non-psychiatric clinicians have disobeyed MH leadership to try to allow 10-minutes of psychiatric mental health care for patients every month or so to try to protect the patient's lives.

4. MA's that are supposed to help psychiatrists are pulled from psychiatrists by nurses to support medical practitioners because mental health care. So if choices need to be made, MA's (paid for by mental health) are taken from psychiatrists and used for medical care, decreasing the efficiency of the psychiatrist. HQ psychiatry warned of this, but HQ mental health leadership (at the time) argued that psychiatrists could not supervise these MA's and so nursing was given control of them, with exactly the expected problems.

5. Psychiatric offices should not be placed in hallways with access by patients and staff to the confidential conversations of psychiatrists with patients and access of patients and staff to the notes of psychiatrists.

6. The Cerner implementation for psychiatric physicians was designed almost entirely by MH leadership with no experience in medical management of patients, against the vigorous objections of HQ psychiatrists who claimed publically (at work) and repeatedly that the design would be disastrous. It has been. Not all of the decline in productivity is due to the faulty design decisions, but a good portion of it has been. Psychiatry's decrease from September 2015 to November 2017 is 65%, while general medical physicians have experienced declines in productivity of about 36%. (Analysis available upon request.) Those numbers pretty clearly demonstrate that the workflow followed by medicine (no powerforms, VERY few powerplans, no checking patients in and out, using notes to track appointment compliance rather than check in/out) is much more efficient than the workflow followed by mental health leadership for psychiatrists (lots of powerforms, lots of powerplans, with immense pressure for psychiatry to use even more powerplans than they already are, checking all patients in

2

and out, using check in/out to track appointment compliance). These numbers may be inaccurate, but they are derived from the same source that is being given to measure compliance for the courts and these are numbers being used to say that psychiatric productivity at SAC has fallen. The statewide graph (attached) should help provide context.

12/6/17  3

*The following information was gathered from interviews with custodial staff, general medical physicians, psychiatric physicians, nurses, and psychologists.*

CTC: Rare custody barriers; there are a couple COs who push back when asked to bring patients they feel will be a lot of work, but overall custody is very helpful. Office space is limited, and the times available for seeing patients are short (due to breakfast, pill line, lunch, change of shift – usually they can see patients from 7:30 – 10:30, and 11 – 1:30), but the psychiatrists denied any significant problems with office availability thanks to COs bringing patients promptly and the psychiatrists and psychologists working well together. There are lots of PC 2602s to do, which somewhat decreases ability to see many patients. Biggest complaint from two of the psychiatrists was how many trainings (SRE, Columbia scale, etc) they have to do. Overall the CTC psychiatrists feel things run smoothly.

MHCBU: "All 3 or 4 custody officers will put on their sunglasses and sleep. If you ask them for patients to be pulled they'll say 'oh, he won't come out'" without even attempting to get the patient. It was stated the psychologist has an office, but the psychiatrist does not have an office and has to sit in the hallway to see patients or do any work. He reported it's really noisy in the hallway, there is no privacy, and other prisoners can listen to the appointments and even see his computer/notes, if they are in a nearby cell. There are lots of PC 2602s.

PSU A1: Approximately 70% of patients do not show up for their scheduled appointment – 50-60% of those say that they did not attend their appointment because custody never came to pick them up. Custody is mostly helpful when directly asked to do something, although a few are resistant to helping out the psychiatrist. Dr. ████████ has forbidden patients from being taken out of groups to see the psychiatrist. The psychiatrist ends up seeing most patients cell-front, which can be time-consuming due to the psychiatrist needing to find them (the patient may be on the yard, in the law library, out to court, in group, or at a medical appointment). There are lots of PC 2602s. MAs come and go frequently – he has had 5 MAs since February – so he has to spend time to train them on expectations each time he gets a new one. Medical had priority over Psychiatry for MAs, so two of the five left because they were re-assigned to Medical.

PSU A2: Custody will pull patients when requested, unless the patient is in a group. He said Dr. ████████████ informed custody that groups take precedence over psychiatry appointments, and that patients are never to be taken out of a group for a psychiatry appointment. Overall custody is helpful. Patients frequently (~50%+) refuse to attend appointments, and must be seen cell-front, which can result in time spent tracking them down.

PSU B: They were 50% staffed in PSU B until October. No custody issues. The psychology supervisor, Dr. ████████, did not allow psychiatrists to pull patients from groups, but she was transferred to PSU A recently, so psychiatrists are now able to pull patients from groups. 90+% of the psychiatrist's patients refuse their 1:1 appointments, largely "because they don't want to be stuck in there for an hour or two" (custody transports patients in groups, so although the appointment with the psychiatrist may only be 10-15 minutes, they have to sit in the treatment center for 1-2 hours before or after the appointment waiting until custody transports the group back). The psychiatrist sees about 50% of her patients cell-side, due to them refusing both their 1:1 with her and their group. She no longer schedules appointments in advance, due to 90+% of them not coming, so all scheduling orders are placed in arrears by the MA, who places the order, schedules the appointment, and checks them in and out.

A3 EOP: Over 50% of patients do not show up for their scheduled appointments, which the psychiatrist believes is mostly due to them refusing, but could also be due to custody failing to bring them. He said custody is pleasant and helpful overall. He is able to pull patients out of groups without any push-back. He goes cell-front to see the patients that are not in group and that refuse their appointment, and has some difficulty tracking these patients down. There are a fair number of PC 2602s to do, which takes away from direct patient care time.

12|6|17    4

A5 Ad Seg EOP: One psychiatrist said "Custody won't bring any patients". He clarified that he has patients scheduled, they are ducated, but custody refuses to bring patients for any psychiatry appointments. He stated custody will bring patients for psychology 1:1 appointments, and for groups. He reported he tries to see his patients with the psychologist during the psychology appointment whenever possible, or pull them from group, but frequently ends up having to see patients cell-side. Often the patients aren't in their cell, and "custody says they don't know where [the inmate] is", so he has to go all over the yard trying to find his patients, which takes a significant amount of time. He noted that although he does pull patients from groups, it is "frowned on" to do so, and he has heard other psychiatrists have been told they are not allowed to do that by Dr. ████████ Another psychiatrist stated "I cannot see the patients in a confidential setting on the block", and explained that custody will not pull patients out of their cell for a psychiatry appointment, only for groups and psychology appointments. He noted he can only see patients in a confidential setting if he pulls them out of group to see him, and said that custody is cooperative with pulling patients out of groups for him. He sees most of his patients cell-front, and denied significant problems with tracking them down, as they are usually either in their cell or on the yard.

A6 EOP: "Custody is very rude and there are lots of problems. When psychiatrists try to see their patients they are told that they cannot bring the patient because it's yard time, shower time, they're not in their cells yet, or 'we have a shortage of staff and can't'. "If you schedule 6 patients, 1 or 2 will be brought, but the others won't because custody refuses." "Two psychiatrists have left SAC because of working in A6." He reported he ends up having to see most of his patients cell-side, but this takes a lot of time because there are 3 blocks, and "custody will often refuse to even open the block for you". If he is eventually let in to the block, often the patient isn't in his cell, so he then has to try to find out where the patient is.

A7 EOP: 75+% of patients refuse their appointment, especially if they are scheduled for yard at the same time. He tries to see the patients who refuse cell-side, but often can't find them, and spends a lot of time checking their cells, work, yard, groups, etc, which decreases the amount of time he has available for patient care. He reported there are lots of PC 2602s to do, and in order to complete the paperwork and hearings he often has to devote one full day per week to PC 2602s.

Scheduling:
        Most of the psychiatrists had more notes than scheduling orders, meaning they are forgetting to place the scheduling order in arrears or not communicating to the MA to place the scheduling order in arrears. On average, the psychiatrists had 5.7 more notes than scheduled appointments in September. We are assuming that scheduled appointments all had a note, and that all notes signified a face-to-face contact – both of which could be false assumptions (Andres Murillo is looking into this for me, but we don't have the results back yet).
        Dr. ████████ appears to have only seen 2 patients in September (based on scheduling orders), because her MA checks all cell-front appointments in and out for her. Because of this, the MA got credit for all of those appointments (n = 36), not Dr. ████

Recommendations:
    1. Speak with the warden and high level HQ custody supervisors in order to encourage custodial staff to bring patients for psychiatric treatment.
    2. Speak with relevant parties at HQ regarding the appointment priority hierarchy, and the need for psychiatry appointments to take precedence over groups (just like medical appointments do). In emergency situations (like at SAC), psychology leadership needs to be told that preventing even a 10-minute appointment with a psychiatrist (to make sure a recreation therapist has 120 rather than 110 minutes with a patient) is certainly immoral. Whether or not it is illegal is a different question. Certainly mental health leadership has been apprised of this situation, including again in this document. Patients should be prioritized and are placed at risk because of this behavior.
    3. Educate psychiatrists and MAs about the importance of making sure there is a scheduling order placed for every appointment. This could be directed just at the psychiatrists who had the biggest difference between

4

12/6/17 5

number of notes and number of appointments (Dr. ▮▮▮ at 21, Dr. ▮▮▮ at 13, Dr. ▮▮▮ at 15, and Dr. ▮▮ at 12), or at all psychiatrists. Likewise the MAs could be spoken to as a group, or the MA supervisor could be spoken with and asked to make sure the MAs all place scheduling orders appropriately.

4. Educate Dr. ▮▮▮▮ and MA ▮▮▮▮ cia that the psychiatrist must be the one to check patients in and out on the ambulatory organizer, or the MA will get credit for the appointment.

5. Attempt again to educate nursing that MA's paid for by mental health were supposed to help psychiatrists and they were not supposed be pulled away to help medical instead.

6. Allow psychiatrists to try to undo the damage done by HQ MH leadership in its EHRS design for psychiatrists. This will take time. We need to follow he workflow designed for medicine to restore productivity at SAC and elsewhere (no powerforms, VERY few powerplans, no checking patients in and out, using notes to track appointment compliance rather than check in/out). This is much more efficient than the workflow designed by mental health leadership for psychiatrists (lots of powerforms, lots of powerplans, immense pressure for psychiatry to use even more powerplans than they already are, checking all patients in and out, using check in/out to track appointment compliance, etc.

7. Move psychiatric offices from hallways where patients and staff can observe patients, hear therapy, and read patient notes. The same accommodation that psychologists have (they are given actual offices), should be afforded to psychiatrists.

**Conclusion:** The HQ psychiatry team found substantial barriers to psychiatrists being able to see patients at CSP-SAC. Although there may be issues with the motivation of psychiatrists, the problems at CSP-SAC are so grave and severe in terms of patient access to psychiatrists that the focus needs to be on fixing these institutional factors. We cannot ascertain particular problems with psychiatrist motivation, because the barriers to patient care seem so much greater. Even if for some reason a particular psychiatrist did not want to treat patients, that observation could not be measured when the institution will not allow the patient to be seen, regardless of the psychiatrist's motivation.
Best,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

12/6/17  6



Encounters per Psychiatrist

12/6/17  8



Feb-16  7.5
Jan-16  7.5
Dec-15  9
Nov-15  9.3
Oct-15  9.2
Sep-15  9.1
Aug-15  9
Jul-15  9.1
Jun-15  9.3
May-15  9.3
Apr-15  9.3
Mar-15  8.9
Feb-15  8.9

Statewide EHRS roll-out began

| Mar-16 | Apr-16 | May-16 | Jun-16 | Jul-16 | Aug-16 | Sep-16 | Oct-16 | Nov-16 | Dec-16 | Jan-17 | Feb-17 | Mar-17 |
|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|--------|
| 6.9 | 7 | 7 | 7.1 | 6.9 | 7.1 | 6.9 | 7 | 6.8 | 6.7 | 6.2 | 5.8 | 5.4 |

| Apr-17 | May-17 | Jun-17 | Jul-17 | Aug-17 | Sep-17 | Oct-17 | Nov-17 |
|--------|--------|--------|--------|--------|--------|--------|--------|
| 5.3 | 4.9 | 5 | 4.8 | 4.3 | 3.9 | 3.5 | 3.2 |

# EXHIBIT M
# (2017-12-11-1622hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| From: | ██████████@CDCR |
| Sent: | Monday, December 11, 2017 4:22 PM |
| To: | Golding, Michael@CDCR |
| Subject: | RCA Process for ██████████ |
| Attachments: | scanned notes ████ pdf, RCA.docx |

Dec 11, 2017   1

Dr. Golding,

I am writing you in the context of a significant and sentinel case both for CDCR and CIW, that of patient ██████████ ██████████ This patient self-enucleated her left eye while on a one: one, while in a holding cell in the TTA after being formally admitted to the our MHCB.

The context of my concerns are in regards to the associated RCA for this case however, I am not only writing as the ██ ██████████ but as a member of her treatment team and a committee member on the RCA.

Some important background, I became involved with ██████████ care from 4/21/17, the day following her admission to Riverside University Medical Center for evaluation of the affected orbit, which resulted in surgical debridement and prophylactic treatment to prevent an infectious process..

██████████, MD our ████ and I communicated daily with the treatment team, as well as the psychiatry consult service.  If you recall, a great deal of effort went into preparing for her transition back to CIW.  I was professionally encouraged by the degree of cooperation employed in the aftermath of this case.

I say this in regards to all staff—I sent several emails out highlighting the impressive collegiality and dedication of the staff—nursing and custody truly going above and beyond.  My own staff quietly raised the bar for all physicians, not just those at CDCR. This inmate required q8hr face to face MD evaluation for restraints—either hard or mittens, one point or five points, a physician can to come in to evaluate the patient and renew those orders. The psychiatrists did this for 27 days—voluntarily signing up for shifts without my having to assign a single shift. (The longer duration of restraints needed was given the use of mittens we employed to protect the intact eye until a therapeutic steady state was reached on her long acting injectable antipsychotic agent.)

Needless to say, she was stabilized under the expert clinical care provided by the PIP team, led by ██████████, MD and was one of the first patients to transfer to Patton under the newly implemented LRH process. She has returned from PSH, and has transitioned successfully to EOP level of care.

My intent in reviewing the aforementioned is not for a pat on the back.  We did our job. Nothing less should be expected of any team at any facility because nothing less would be expected for a patient in the community.

Rather, I highlight the above because this case is one that we should utilize to learn from. As you know, M & M (mortality and morbidity rounds are embedded in our medical training. We know that even the best intentioned physicians in hospitals with the highest accreditation standards are still capable of bad outcomes. We can't predict every possible variable.

As physicians, you know that we rely on Mortality and Morbidity (M& M) rounds to identify these variables. Our M & M process is based on the Socratic method of discussion and discovery. The aim is not to reverse the course of a series of events. And no 844 is signed by the one or two physicians involved.  The intent is greater. It's to allow the collective group to help understand the case in retrospect, piece by piece.  We walk away from M & M rounds all owning that case even if we didn't play a direct role.

I understand that CDCR is not an academic center or primarily a healthcare delivery system—and therefore such M & M rounds aren't part of the larger process.  The RCA is what most resembles this.

Therefore, I asked to be on the RCA committee for patien ██████████ because I sincerely believed that this was a case that needs careful review as there are lessons for all to walk away with.

Unfortunately, this was perhaps the most disappointing process I've been involved with at CDCR. I'm not sure I can call it a process. I can say that the process I've reviewed regarding RCA's at CDCR was not followed.

The initial RCA facilitator, ██████████ set the foundation for a strong beginning. The meetings were weekly. The discussions were robust and thorough. Then upon Ms. ██████████ transfer to CRC, the RCA's coordinator role was handed over to ██████████, PhD.

1

Dec 11, 2017   2

The committee met less consistently at that point and progress was hastened. At some point in mid July, Dr. ▮▮▮ sent out an email to the committee members that there would be a meeting—short notice given—to come up with the plan of action, fishbone, and to identify the root cause. Per the attached meeting minutes, all of this took place on 7/18/17. I was part of the committee but was on vacation when this was done. I was not involved in finalization of the root cause, plan of action, or the fishbone analysis. It was given to the ▮▮ to sign, then presumably submitted to headquarters per the meeting minutes.

At the minimum, the plan of action should have been presented to the Patient Safety Committee for review (not alteration) and to document in that committee that the RCA was completed according to the prescribed process. I invested two months into this RCA, then to have the PAC and Root Cause completed and approved and sent to HQ while I was on vacation is disappointing to say the least.

Myself and the leadership committee did receiv emails from Dr ▮▮▮ after a psychologist from headquarters and an RN came to CIW in August to review the RCA recommendations. Neither myself, nor any other member of the RCA committee were invited to the meeting. Our ▮▮, Dr. ▮▮r was not either. I did attend however, as the ▮▮ informed me about it.

I found the meeting to be odd in that I couldn't see where in the prescribed RCA process this step was delineated. In my opinion, the integrity of the RCA process in question. Dr. ▮▮▮ insisted that he did not want to tell CIW what to say on the RCA recs, however, to be mindful that these are looked at by lawyers, etc.

I find that extremely problematic. A representative from headquarters coming to tell select members of the leadership committee that the RCA recs on this case shouldn't suggest policy changes that will place undue pressure on CDCR.

Perhaps most disturbing, the following email was sent after the meeting by Dr. ▮▮▮:

**From:** ▮▮▮ @CDCR
**Sent:** Wednesday, August 23, 2017 1:21 PM
**To:** ▮▮▮ @CDCR < ▮▮▮ @cdcr.ca.gov>; ▮▮▮ @CDCR < ▮▮▮ @cdcr.ca.gov>; ▮▮▮ CDCR < ▮▮▮ @cdcr.ca.gov>; ▮▮▮ @CDCR < ▮▮▮ @cdcr.ca gov>
**Cc:** ▮▮▮ @CDCR < ▮▮▮ @cdcr.ca.gov>
**Subject** ▮▮▮ RCA Recommendations Form

For your review, here are the RCA recommendations as suggested by Dr. ▮▮▮ and Mr. ▮▮▮ during our meeting.
Could everyone review your items and let me know of any changes?
The first four recommendations apply to MHCB and its staff, and are under Dr. ▮▮▮.

Dr. ▮▮▮, the fifth recommendation is for you. I will also need an 844 once this training has been accomplished.

Perhaps most problematic in this is that I was an RCA committee member. Dr. ▮▮▮ made amendments to the PAC (that I never even agreed to—not sure which other committee members were also left out) based on recommendations from a psychologist from headquarters and didn't run by the RCA committee or the patient safety committee.

I opposed the recommendations, specifically the one assigned to me. I specifically informed Dr. ▮▮▮ at the ad hoc meeting that I will not recommend documentation review for the psychiatrists (at CCWF or anywhere) given we have a policy and process that addresses this, a peer review process for physician/psychiatrists that is spearheaded by HQ Telepsychiatry.
See below:

*Chief Psychiatrists view is discounted/not included*

**From:** ▮▮▮ @CDCR
**Sent:** Friday, September 15, 2017 4:36 PM
**To:** ▮▮▮ @CDCR < ▮▮▮ @cdcr.ca.gov>
**Cc:** ▮▮▮ @CDCR < ▮▮▮ @cdcr.ca.gov>; ▮▮▮ @CDCR < ▮▮▮ @cdcr.ca.gov>; ▮▮▮

@CDCR < @cdcr.ca.gov>; CDCR < @cdcr.ca.gov>;
@CDCR < @cdcr.ca.gov>

**Subject** revisions

Dec 11, 2017  3

Please see attached for my revisions.

Dr. , as I indicated when the HQ?/Regional reviewers came to give us feedback/review our initial findings, while I have issues with the way the medication discontinuation was documented, I was not going to make recommendations regarding documentation for the purposes of the RCA  given we have a HQ driven peer review process that is already in place to do that. There would be no utility in adding an additional recommendation.  We could add that Peer Review of documentation is followed for MHMDs to ensure documentation standards are met. That would work.

I did add some specific recommendations that address this in others ways (i.e. not changing level of care for six months after a psychotropic is discontinued) and documentation in the chart of the decision making process for the level of change.

I also made some edits to the timeline/sequence of events which are congruent with a review of the chart.

Thx

**From:** @CDCR
**Sent:** Monday, September 18, 2017 8:11 AM
**To:** @CDCR < @cdcr.ca.gov>
**Cc:** @CDCR < @cdcr.ca.gov>; @CDCR < @cdcr.ca.gov>;
@CDCR < @cdcr.ca.gov>; @CDCR < @cdcr.ca.gov>;
@CDCR <| @cdcr.ca.gov>
**Subject:** RE my revisions

Does this need to go to and ?

CIW already turned in revisions requested by Dr. and under their direction. I'm a little confused what we're doing at this point. Did HQ ask for further revisions?

**From**

**Good Morning,**

It appears that s recommendations are  focused on policy changes/revisions that need to be taken up by headquarters separate from this Event & subsequent RCA. Remembering that institutions don't control policy, we cannot encumber ourselves with an action plan that includes re-writing policy and care guidelines.

**I hope this helps. Thx**

J , MA, CCHP

I didn't realize the final had been submitted.  Miscommunication I guess.  I didn't completely understand that Mr. and Dr. we're here to suggest revisions. This is my first RCA.

The end seems a lot less clear than the beginning did. Perhaps I'll learn as I go along.

, MD

California Dept. of Corrections
California Institution for Women

Dec 11, 2017 4

On Sep 18, 2017,

My revision of the Event Description—my edits are in caps.
On 4/20/2017 at approx. 2330, I/P ▮▮▮▮▮▮▮ WHO WAS ADMITTED TO MHCB ALTHOUGH WAS HOUSED IN ALTERNATIVE HOUSING IN THE TTA, WAS INVOLVED IN A SENTINEL EVENT. APPROXIMATELY FOUR HOURS EARLIER, SHE HAD BBEEN EVALUATED AND DETERMINED TO BE GRAVELY DISABLED BY THE ON SITE PSYCHOLOGIST WHO PLACED ADMISSION, WATCH AND ISSUE ORDERS. SHE WAS ON 1:1 SUICIDE WATCH BY AN LVN AND WAS TO BE IN A STRONG GOWN, HOWEVER REFUSED TO COMPLY WITH ISSUE ORDERS. IT WAS DOCUMENTED THAT SHE WAS 'PSYCHOTIC' AT THE TIME OF ADMISSION. DOCUMENTATION FROM THE 1:1 OBSERVER NOTED 'SCREAMING' EVERY FIFTEEN MINUTES FOR MOST OF THE FOUR HOUR PERIOD. SHE DID NOT RECEIVE MEDICATIONS DURING THE FOUR HOUR PERIOD PRIOR TO THE EVENT. THE PSYCHIATRIST ON CALL WAS NOT CONTACTED BY NEITHER NURSING, THE ADMITTING PSYCHOLOGIST, OR CUSTODY.  AFTER TOUCHING HER EYE FOR SEVERAL SECONDS,  while in the supine position on the floor, the I/P used her left hand to enucleate her left eye.  The alarm was sounded and two correctional officers entered the cell.  The I/P was asked to relinquish the eye, however, she put the eye in her mouth and ingested it.  911 call was initiated. THE PSYCHIATRIST ON CALL WAS CONTACTED AFTER THE INCIDENT AND ORDERED AN EMERGENCY INJECTION OF ZYPREXA 10MG TO BE ADMINISTERED INTRAMUSCULARLY PRIOR TO TRANSPORT. I/P was then transported by ambulance code III to Riverside University Health Systems.

| Root Cause / Issue to be Addressed:  Extreme psychosis | | | |
|---|---|---|---|
| Summary of the Improvement Activity:  Training Refreshers for Staff | | | |
| Person Responsible for Implementation:  Dr. M. Hewitt, CMH, Chair, Mental Health Subcommittee | | Person Responsible for Monitoring/Reporting Results  Mental Health Subcommittee | |
| Action Step(s) | Responsible | Deadline | Comments/Status |
| • Mental Health Crisis Bed staff will be trained on writing appropriate Master Treatment Plans and MHCB admission (issue) orders; staff to be trained on IDTT. | MHCB Supervisor and MH QM Specialist | 9/30/2017 | • This will refresh staff on the MHCB admission process, including communicating with MHMD, Nursing and Custody at admission; safety issue; treatment planning; and IDTT. |
| • Mental Health Crisis Bed staff will be trained on DDP and interpreter use policy. | MHCB Supervisor and MH QM Specialist | 9/30/2017 | • Staff may always use assistance at their discretion regardless of IP's functional rating. |
| • Mental Health Crisis Bed staff will be trained on MHCB admission and alternative housing LOP and policy, INCLUDING CONTACT WITH PSYCHIATRIST ON CALL BY ADMITTING CLINICIAN. | MHCB Supervisor and MH QM Specialist | 9/30/2017 | • This will refresh staff on MHCB admission and alternative housing policy and procedure. |
| • Secondary trauma intervention will be provided for all staff involved in the incident. | MHCB Supervisor and MH QM Specialist | 9/30/2017 | • Staff present for such events may feel secondary trauma. |
| • RECOMMENDATION IS MADE TO DOCUMENT LEVEL OF CARE CHANGES AT RC (FROM EOP TO 3CMS OR 3CMS TO GP) IN THE CHART.  • RECOMMENDATION IS ALSO MADE TO REFERENCE REVIEW OF COUNTY RECORDS AT RC BY BOTH MHMD AND PC AT INITIAL CONTACT (AS PART OF INITIAL EVALUATION INTAKE FORM?)  • RECOMMENDATION IS MADE TO MAKE NO CHANGES TO LEVEL OF CARE FOR SIX MONTHS POST DISCONTINUATION OF PSYCHOTROPIC MEDICATIONS | HEAD QUARTERS MENTAL HEALTH LEADERSHIP | | • |
| • Restraint procedure will be reviewed by Nursing, recommendations will be submitted to HQ, and appropriate Nursing staff will be trained on new procedures, if any. | Chief Nursing Executive | 9/30/2017 | • CNV may wish to review and implement methods of patient restraint observed in use at community hospital where IP was treated. |
| Performance Objectives/Measures | | Date of Most Recent Data | Findings/Results Per Most Recent Data |
| • | | | • Baseline.  • Most Recent Findings: |
| • | | | • Baseline.  • Most Recent Findings: |

I expressed my concern about the direction of this RCA to our CME and our new ▮▮▮, Mr. ▮▮▮ both of whom acknowledged the undefined process which was reviewed in Patient Safety Committee.

**From:** ███████ @CDCR
**Sent:** Thursday, September 28, 2017 2:06 PM
**To:** ███████ @CDCR < ███████ @cdcr.ca.gov>
**Cc:** ███████ @CDCR ███████ @cdcr.ca.gov>
**Subject:** FV███████ my revisions

Dec 11,2017  5

██,

I have no idea what happened to this RCA. It started strong and then I have no idea where it went (Hq?) or what went—summary and recs?

I never saw what was sent up: timeline, summary, recs, in their entirety. I don't how this process works, but the process this one followed was circuitious at best.

I do think my edits to the timeline are signficant to the case.

**From:** ███████ @CDCR
**Sent:** Friday, September 29, 2017 2:37 PM
**To:** ███████ @CDCR < ███████ @cdcr.ca.gov>; ███████ CDCR ███████ @cdcr.ca.gov>
**Cc:** ███████ @CDCR ███████ @cdcr.ca.gov>; ███████ @CDCR < ███████ @cdcr.ca.gov>; ███████ @CDCR < ███████ @cdcr.ca.gov>
**Subject:** RE ███████ my revisions

Thanks Dr. █████. I am trying to piece these all together to understand our current process, the gaps, and how we can enhance it. I have asked for RCA packets on ███████ I have 3 of 4 (should have green Monday); I will schedule a meeting to cement a process as this was an action item from our September patient safety committee.

██

**From:** ███████ @CDCR
**Sent:** Thursday, September 28, 2017 2:13 PM
**To:** ███████ @CDCR < ███████ @cdcr.ca.gov>; ███████ @CDCR < ███████ @cdcr.ca.gov>
**Cc:** ███████ @CDCR < ███████ @cdcr.ca.gov>; ███████ @CDCR < ███████ @cdcr.ca.gov>; ███████ @CDCR < ███████ @cdcr.ca.gov>
**Subject:** RE ███████ my revisions

Dr ████,

Thanks for sharing. There were three or four RCAs on the Patient Safety agenda this past Friday and it was acknowledged that there is a gap in communicating findings and recommendations. What was reported at Patient Safety Committee was simpy the status of each RCA ie. 'closed', 'in monitoring phase' etc but again no details or clear acknowledgement of findings and/or recommendations so what we'd be monitoring without clearly assigning recommending of the RCA is anyone's guess.

Including a few other stakeholders.

███████, MD

<

Dec 11,2017 6

Additional Issues that were not included in the Root Cause, fishbone analysis or the recommended action items:

1. Please see the scanned fishbone (which I was not involved with although on the committee). I have written in what is missing.
2. Please see the scanned summary of events which has some amendments/edits I've made.

## Main missing components:

①

1. The psychologist, ████ who admitted ████ did not have admitting privileges in the CTC. He had treatment privileges only. This was discovered after I inquired about potential liability for this case by the on call psychiatrist or the CTC psychiatrist. I was informed by ████, the ████ that only the psychologist was liable because he was admitting under his license and admitting privileges. Yet lo and behold, Dr. ████ was not aware that admitting privileges are different that treatment ones. None of the psychologists who had been placing admission orders since I started in 2016 had actual admitting privileges to the CTC. This was discussed and confirmed in the RCA committee. I acquired the psychologists admitting application from San Quentin and presented that our Licensed Inpatient Committee who approved it. Subsequently, ████r, PsyD and the other 20+ psychologists who can treat in the CTC are now privileged to admit as well. A review of the files in Licensed Inpatient will confirm this.

2. ████, PsyD should have contacted the psychiatrist on call given the severity of this patient's illness— patients who are acutely psychotic are unpredictable, especially when they are new to CDCR and we do not have their historical record to review. However, had he reviewed the scanned documents from OC Jail readily available on Cerner, he would have seen that she had two admissions to their CTC for SI. When asked by me why he did not call the psychiatrist on call (we have a three person back-up system thus, one of us will ALWAYS answer). His response was that he thought she wouldn't take medication. He had not been told that it was required for him to contact the psychiatrist on call with the exception of when he is NOT going to admit. Thus to share the liability of sending somebody back to the yard was the only reason he was told to contact the psychiatrist on call. And indeed, I have and still do take call. I had taken been called by a psychologist for an admission, rather to inform me that someone was going out to the yard on a 5 day step down. Yes, nursing calls us to reconcile medications on admissions, but that is not the person who admitted the patient.

3. It's clear that Dr. ████s clinical judgment was poor—his documentation on the note is reflective of this— however an LOP is in place that would have prevented reliance on his clinical judgment alone. See attached. Neither the acting supervising psychologist in the MHCB at the time, ████ or ████ were aware of this LOP. Not a single psychologist was aware of it either. It was agreed in an ad hoc meeting that Dr. ████ would provide training on this LOP to his staff. I can get you the minutes. Indeed he did not. I have documentation from psycholgoists in the CTC who all confirmed that they were never informed of this LOP. I have heard the same from psychologists in other units who have admitting prviliges.

   I did provide the training and information to the five psychologists assigned to the CTC because it is our LOP.

   The culture is such, however, that only the on call psychiatrist is contacted when a psychologist admits a patient to the CTC. During the day, Dr. ████, the CTC psychiatrists reports that he has not been contacted by the admitting psychologists once in the last two years. Nursing informs him once the patient is admitted and needs medication review.



6

*Dec 1(,)2017* 7 ②

4. Based on feedback from the Licensed Inpatient ad hoc meeting where this training was agreed upon, I did revise the section on which provider can place which order. This was recently approved by the LGB. The indication for this was that nursing was asking the psychologists to place diet orders (those are medical orders) and psychologists had decided on their own that they could enter urine tox screens, which were acknowledged and collected by nursing. These are medical orders that a physician can only order, yet psychologists were doing them in the our CTC. Hence, me uenumerating their orders to make it clear for nursing.

5. What did not change, was the section that states the psychologist is to call/contact the psychiatrist when admitting. That LOP wasn't followed in this case or any other.

6. The process for this RCA, or any RCA, should have integrity if we expect staff to participate in it, but perhaps more importantly, if we are relying on this as the primary tool to review adverse cases. Another compelling misstep in this RCA had to do with the lack of respect for anonymity of the committee members in terms of their discussion. As you can see below, I had inquired in the RCA why the Dept of Health's licensing department had not been contacted given the patient had formally been admitted to a licensed unit. I understand that she was physically kept in the TTA in a holding tank because she refused to strip out and was not cooperative, but shouldn't we inquire from the Dept of Health as to what the policy regarding these complicated cases are (i.e. patient is formally admitted, but physically not on the licensed section of the unit) and adverse outcome occurs within five hours of her admission orders being entered? Wouldn't it be more judicious if we asked the Dept of Health for guidance on this in the event that our call to contact them (decision made by the CMH) was not the appropriate one? This case as passed, but there may be others. Dr. ▮▮▮▮ sent my question out on email to every member of the leadership team as well the HPMs, and others. That is not in keeping with maintaining anonymity of the committee members' questions/comments/discussion. Dr.▮▮▮▮ clearly points out that her concern is regarding placing CDCR's relationship with licensing in jeopardy therefore will rely on the CHSA. No definitive answer was ever given on this.

7. The blurring of lines at CDCR between providers has not helped our patients who deserve transparency when it comes to knowledge about their care providers' area of expertise and licensure. Our current system of referring to psychologists and psychiatrists both as "MH Providers" is problematic given our scope is not equal, our foundation of knowledge and practice are based on different disciplines and we are licensed by different Boards. Physicians, including psychiatrists, have the broadest scope of licensure as physician and surgeons. By referring to us and psychologists as "MH Providers", the assumption can be made that our scope is congruent, that we bring the same skills, knowledge and expertise to the table. That we're interchangeable. When I came on as the ▮▮▮▮▮▮▮, a psychologist was the Chair of the Clozapine Committee. I don't know what else to say other than, how does a system allow that?

Why are psychologists called 'clinicians', actually 'primary clinicians' when in the community, this term universally refers to physicians or Mid-Level Providers. Therapists are not referred to as clinicians. The use of this term is extremely misleading and further inflates the status of therapists as having more skills than they are licensed to have.

After all, everyone is called a 'Doctor' and even NOU's I read report that the psychologist on 'call' was contacted—when referring to the psychologist in house. See below and you will see that even inpatient Nursing doesn't know who is a physician and who isn't. ▮▮▮▮ PsyD is listed as the admitting physician for a patient on the CTC census form. He is not new, he has been here for 1.5 years and yet nursing staff still think he's a physician? When I asked the Sargeant who was on the RCA Committee for ▮▮▮▮ why the officer who

7

Dec 11, 2017 ③

watched the patient 'screaming' and obsessively reading the bible, chanting, etc—didn't contact the psychiatrist on call? He stated that the officer thought "Dr." ▓▓▓ was the psychiatrist. "

We recently got new ID badges that do not help.  They only add to the ambiguity of who is who.  The badges simply say, "Dr. X, psychiatrist" or in the case of ▓▓▓▓▓▓▓: "Dr. ▓▓▓▓▓▓▓▓▓▓▓▓. It's not clear to anyone whether he is a physician or a psychologist.

The Joint Commission does not specific requirements for IDs, except that one must be shown to enter and exit, HOWEVER, THEY REQUIRE THAT THE STATE LAW IS FOLLOWED IN EACH STATE.  We are not following our state's law on this, Business and Professional Code Division 2, Chapter 1, article 7.2, sections 680-680.5 (see below) which requires the professional license in 18 point font (i.e. clinical psychologist or physician).

Please let me know if you have any further questions. I will not be completing the recommended action item assigned to me by Dr. ▓▓▓▓▓▓ because I fundamentally oppose the way this RCA was conducted. I stated this in the last patient safety committee. Perhaps most tragically, if my recommendations had been submitted to headquarters for review—the suicide that occurred most recently at CIW may have been prevented. Note that I recommended maintaining level of care for six months post d/c of psychotropic medications in RC as well as documentation of LOC in notes in RC.  At least discussion of this with the RC may have prevented the LOC change even if the program guide had not changed.

An copy of this email is also attached. The 'scanned notes' are NOT pasted in this email. Please review those.

Best,

▓▓▓

From: ▓▓▓▓▓▓▓▓▓ @CDCR
Sent: Tuesday, July 25, 2017 12:55 PM
To: ▓▓▓▓▓▓ @CDCR < ▓▓▓▓▓▓ @cdcr.ca.gov>; ▓▓▓▓▓ @CDCR < ▓▓▓▓▓▓ @cdcr.ca.gov>; ▓▓▓▓▓ @CDCR < ▓▓▓▓▓ @cdcr.ca.gov>; ▓▓▓▓▓ @CDCR < ▓▓▓▓▓ @cdcr.ca.gov>; ▓▓▓▓ @CDCR < ▓▓▓▓ @cdcr.ca.gov>; ▓▓▓▓ @CDCR < ▓▓▓▓ @cdcr.ca.gov>; ▓▓▓▓ @CDCR < ▓▓▓. @cdcr.ca.gov>
Subject: Question about Licensing

Hello. I hope everyone is having a good day today.

I have a question about licensing in TTA/MHCB/CTC. This came up in an RCA as a question from Dr. ▓▓▓▓:

Background Info
- IP had a Sentinel Event while in #104 awaiting admission to MHCB
- The incident was not reported to MHCB Licensing because the IP was not admitted to MHCB yet; therefore reporting was not required

Question: Should we contact MHCB Licensing (to get their input on whether it's reportable) from even though it's not required?

Dec 11/2017 9

4,

On Jul 28, 2017, at 7:38 PM, ▮▮▮▮▮▮▮▮▮▮ @CDCR <▮▮▮▮▮▮▮▮▮▮ @cdcr.ca.gov> wrote:

Sorry, I was reviewing this and realized I missed a question.

Dr. ▮▮▮▮ I appreciate what you are saying. My feeling is there could be some impact to policy, licensing concerns, audits and the receivership, so that's why I'm deferring to ▮▮▮▮▮▮ and Mr. ▮▮▮▮. I'm leery of taking action that could affect our relationship with licensing or conflict with some policy or directive from HQ, so I'm trying to check with our CIW experts about that.

I did inquire into how to recall or amend a completed and submitted RCA, and learned we would need to reconvene the group and have a consensus on adding this recommendation. I'm open to doing that once we are clear on all the effects and interactions with our other disciplines and administration. We would have to do this sort of investigation before making this recommendation, anyway, because it reaches out of CIW to our licensing, and that could have an effect beyond the institution.

I'm looking forward to what ▮▮▮▮▮▮ can find out with her research. I love how we get these opportunities to learn every day at CDCR!

From: ▮▮▮▮▮▮ @CDCR
Sent: Thursday, July 27, 2017 10:35 AM
To: ▮▮▮▮▮▮ @CDCR <▮▮▮▮▮▮ @cdcr.ca.gov>; ▮▮▮▮▮▮ @CDCR
<▮▮▮▮▮▮ @cdcr.ca.gov>
Cc: ▮▮▮▮▮▮ @CDCR <▮▮▮▮▮▮ @cdcr.ca.gov>
Subject: RE: Question about Licensing

I agree that this issue is more complicated since orders were in place.   My understanding is that the patient was in alternative housing awaiting MHCB and had not been officially admitted, therefore would not be considered in the MHCB census on the date of the incident.  I'll do more in depth research to bring clarity to the issue and provide guidance should (or when) this situation arise again.

From: ▮▮▮▮▮▮ @CDCR
Sent: Thursday, July 27, 2017 10:02 AM
To: ▮▮▮▮▮▮ @CDCR <▮▮▮▮▮▮ @cdcr.ca.gov>; ▮▮▮▮▮▮ @CDCR
<▮▮▮▮▮▮ @cdcr.ca.gov>
Subject: Re: Question about Licensing

Dr. ▮▮▮▮▮▮ , Thank you.

I had actually already asked this question of Mr. ▮▮▮▮▮▮ and the CNE before my recommendation.  I'm sorry that wasn't clear.

I understand that the TTA is not licensed and therefor typically not reportable for sentinel events as those patients are not yet admitted to a licensed facility.  My question was that this was a patient was physically in the TTA but was actually admitted with orders in place. Ms. ▮▮▮▮, that is the question and perhaps you know the answer. The patient had admit orders in place. Therefor, the standard rule isn't as clear and thus it may help to discuss with licensing in lieu of assuming that it falls under the general rule.

9

Case 2:90-cv-00520-KJM-DB   Document 5988-2   Filed 10/31/18   Page 66 of *Dec 4, 2017   10*

**My recommendation stands as this is a complicated area of monitoring for us and clarity would be helpful.**

**Maybe the three of us can discuss briefly in person?**

_____, MD  _____

*Mandates Physician*

*Chapter 12 (CTC Inpatient Rights)*
*22 CCR 79 79*
*→ (3) To be fully*

CORRECTIONAL TREATMENT CENTER POLICIES AND PROCEDURES
VOLUME 13: MENTAL HEALTH

V13.6

## CHAPTER 6: Admission: Voluntary or Involuntary

| I. POLICY: | Inmate-patients shall be admitted only upon written or verbal order of a Psychiatrist or Psychologist who has admitting privileges |
|---|---|
| | No patient shall be admitted or accepted for care by a correctional treatment center except on the order of a physician (CT97) |
| | The Clinical Director shall maintain an updated list with the names and phone numbers of all authorized staff personnel designated to provide admission and treatment orders in case of emergencies |
| II. PERFORMED BY: | Psychiatrists & Psychologists who have admitting privileges. |
| III. PURPOSE: | To establish procedures to admit inmate-patients to the MHCB |
| IV. GENERAL INSTRUCTIONS: | 1. Only inmate-patients with admission orders will be admitted. |
| | 2. Admission orders and notes must include: |
| |   A. Reasons for admission and initial treatment plan |
| |   B. Admitting Diagnosis |
| |   C. Initial general orders, e.g., (suicide watch or precautions, psychological testing, request for medical records, etc.) |
| |   D. * Initial Medical orders e.g., (Laboratory, medications, diet, etc.) |
| |   E.    Mental status examination |
| |   F. * Pertinent systems review |
| |   G. * Brief physical examination including vital signs and pain assessment |
| |   H. * Evaluate available laboratory reports |
| |   **\* Must be performed by a Psychiatrist. Admitting Psychologists must contact a Psychiatrist for completion of admission process.** |
| V. PROCEDURE (SEE FLOW CHART SECTION FOR SPECIFICS): | 1. During regular working hours: |
| |   • An inmate-patient referred for admission shall be pre-screened and evaluated for admission by a Psychiatrist or Psychologist, or if unavailable by staff designated by the Clinical Director, who will also write admission orders. |
| | 2. After hours and holidays: |
| |   • Admission services are provided by the Psychiatrist on Call |

**ADMISSION TO CTC/MHCB FROM ADMINISTRATIVE SEGREGATION**
Inmate /patient meets criteria for CTC/MHCB admission (danger to self, danger to others, crisis intervention, decompensation in functioning)



*should call MD*

10

*Dec 11, 2017  11*

**Documentation that patient was in distress—'screaming' and reading her bible incessantly for the four hour period prior to the self-enculeation. Pt is documented as being 'hostile'. This is the 1:1 sitter's documentation.**

CONFIDENTIAL
## DECEMBER 3, 2017
SACRAMENTO NOTIFIED/ INITIAL AND TIME:

### CENSUS: *13*

| RM | INMATE PATIENT NAME | CDC# | DOB | ADMIT DATE | ADMIT TIME | PHYSICIAN | TYPE of SVCS | LEVEL of CARE | DIAGNOSIS | PLACEMENT STATUS | SOURCE OF ADMIT | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1301 | VACANT | | | | | | | | | | | |
| 1302 | VACANT | | | | | | | | | | | |
| 1303 | | | | 02/05/13 | 18 30 | | MED | W/A JAIL 13 \| 5pm 11 PM | PNEUMONIA PARAPLEGIA | MCA | CCMS | |
| 1304 | VACANT | | | | | | | | | | | |
| 1305 | OBSERVATION CELL | | | | | | | | | | | |
| 1306 | OBSERVATION CELL | | | | | | | | | | | |
| 1307 | | | | 10/03/17 | 22 37 | | MED | ACUTE | MULTIPLE MYELOMA, ACTIVE, HEMATOMA H/x CANCER, H/x BPH, PACEMAKER, HERO, H/x CHRONIC LEUKEMIA ALLERGY ROOT'G | MEDICAL CONSOLIDATION | CDCR-RUMS | |
| 1308 | | | | 10/18/17 | 12 07 | | MED | ACUTE | MAN HISTONE DISEASE DIFFUSE TISSUE SMALL CHAINS | MEDICAL CONSOLIDATION | CDC PO | |
| 1309 | VACANT | | | | | | | | | | | |
| 1310 | | | | 12/01/17 | 2005 | | MH | ACUTE | DTD | DSH | CDC CMS | |
| 1311 | VACANT | | | | | | | | | | | |
| 1312 | | | | 11/26/17 | 1646 | | MH | ACUTE | DTD | SP G MED | CMS CLA | |
| 1313 | | | | 12/01/17 | 1640 | | MH | ACUTE | DTD | SP G MED | CMS OCU | |
| 1314 | | | | 11/30/17 | 2130 | | MH | ACUTE | DTD | SP G MED | CMS OCU | |
| 1315 | | | | 11/29/17 | 23 07 | | MH | ACUTE | DTD | SP G MED | CMS OCU | |
| 1316 | | | | 11/29/17 | 13 40 | | MH | ACUTE | DTD | SP G MED | CMS CMS | |
| 1317 | | | | 11/29/17 | 17 25 | | MH | ACUTE | DTD | SP G MED | CMS CMS | |
| 1318 | | | | 11/27/17 | 18 25 | | MH | ACUTE | DTD | SP G MED | CMS OCU | |
| 1319 | | | | 11/03/17 | 23 20 | | MH | ACUTE | DTD | SP G MED | CMS OCU | |
| 1320 | | | | 11/23/17 | 13 15 | | MH | ACUTE | DTD | SP G MED | CMS CLA | |

**'DR' ████████ IS NOT A PHYSICIAN. HE IS A PSYCHOLOGIST—THE ONE WHO ADMITTED PATIENT**

*California.*
LEGISLATIVE INFORMATION

skip to content    home    accessibility    FAQ    feedback    login

P Quick Search:
Bill Number

Home    Bill Information    California Law    Publications    Other Resources    My Subscriptions    My Favorites

California Law >> >> Code Section

Code: Select Code ▾    Section:    Search ①

Code Search    Text Search

Up↑    << Previous    Next >>    cross-reference chaptered bills    PDF |    Add To My Favorites    Highlight

**BUSINESS AND PROFESSIONS CODE - BPC**

DIVISION 2. HEALING ARTS [500 - 4999.129] *( Division 2 enacted by Stats 1937 Ch 399 )*

CHAPTER 1. General Provisions [500 - 865.2] *( Chapter 1 enacted by Stats 1937 Ch 399 )*

ARTICLE 7.5. Health Care Practitioners [680 - 686] *( Article 7.5 added by Stats 1996 Ch 1013 Sec 1 )*

680. (a) Except as otherwise provided in this section, a health care practitioner shall disclose, while working, his or her name and practitioner's license status, as granted by this state, on a name tag in at least 18-point type. A health care practitioner in a practice or an office, whose license is prominently displayed, may opt to not wear a name tag. If a health care practitioner or a licensed clinical social worker is working in a psychiatric setting or in a setting that is not licensed by the state, the employing entity or agency shall have the discretion to make an exception from the name tag requirement for individual safety or therapeutic concerns. In the interest of public safety and consumer awareness, it shall be unlawful for any person to use the title "nurse" in reference to himself or herself and in any capacity, except for an individual who is a registered nurse or a licensed vocational nurse, or as otherwise provided in Section 2800. Nothing in this section shall prohibit a certified nurse assistant from using his or her title.

(b) Facilities licensed by the State Department of Social Services, the State Department of Public Health, or the State Department of Health Care Services shall develop and implement policies to ensure that health care practitioners providing care in those facilities are in compliance with subdivision (a). The State Department of Social Services, the State Department of Public Health, and the State Department of Health Care Services shall verify through periodic inspections that the policies required pursuant to subdivision (a) have been developed and implemented by the respective licensed facilities.

(c) For purposes of this article, "health care practitioner" means any person who engages in acts that are the subject of licensure or regulation under this division or under any initiative act referred to in this division.

*(Amended by Stats. 2013, Ch. 23, Sec. 1. Effective June 27, 2013.)*

California.
LEGISLATIVE INFORMATION

skip to content   home   accessibility   FAQ   feedback   login

Home   Bill Information   California Law   Publications   Other Resources   My Subscriptions   My Favorites

California Law >> >> Code Section

Code: Select Code ⬥   Section:          Search

Code Search    Text Search

up | << Previous   Next >>   cross-reference chaptered bills   PDF | Add To My Favorites

BUSINESS AND PROFESSIONS CODE - BPC
  DIVISION 2. HEALING ARTS [500 - 4999.129] ( Division 2 enacted by Stats. 1937, Ch. 399. )
    CHAPTER 1. General Provisions [500 - 865.2] ( Chapter 1 enacted by Stats. 1937, Ch. 399. )

ARTICLE 7.5. Health Care Practitioners [680 - 686] ( Article 7.5 added by Stats. 1998, Ch. 1013, Sec. 1. )

**680.** (a) Except as otherwise provided in this section, a health care practitioner shall disclose, while working, his or her name and practitioner's license status, as granted by this state, on a name tag in at least 18-point type. A health care practitioner in a practice or an office, whose license is prominently displayed, may opt to not wear a name tag. If a health care practitioner or a licensed clinical social worker is working in a psychiatric setting or in a setting that is not licensed by the state, the employing entity or agency shall have the discretion to make an exception from the name tag requirement for individual safety or therapeutic concerns. In the interest of public safety and consumer awareness, it shall be unlawful for any person to use the title "nurse" in reference to himself or herself and in any capacity, except for an individual who is a registered nurse or a licensed vocational nurse, or as otherwise provided in Section 2800. Nothing in this section shall prohibit a certified nurse assistant from using his or her title.

(b) Facilities licensed by the State Department of Social Services, the State Department of Public Health, or the State Department of Health Care Services shall develop and implement policies to ensure that health care practitioners providing care in these facilities are in compliance with subdivision (a). The State Department of Social Services, the State Department of Public Health, and the State Department of Health Care Services shall verify through periodic inspections that the policies required pursuant to subdivision (a) have been developed and implemented by the respective licensed facilities.

(c) For purposes of this article, "health care practitioner" means any person who engages in acts that are the subject of licensure or regulation under this division or under any initiative act referred to in this division.

(Amended by Stats. 2012, Ch. 23, Sec. 1. Effective June 27, 2013.)

**680.5.** (a) (1) A health care practitioner licensed under Division 2 (commencing with Section 500) shall communicate to a patient his or her name, state-granted practitioner license type, and highest level of academic degree, by one or both of the following methods:

(A) In writing at the patient's initial office visit.

(B) In a prominent display in an area visible to patients in his or her office.

(2) An individual licensed under Chapter 6 (commencing with Section 2700) or Chapter 9 (commencing with Section 4000) is not required to disclose the highest level of academic degree he or she holds.   all physicians

(b) A person licensed under Chapter 5 (commencing with Section 2000) or under the Osteopathic Act, who is certified by (1) an American Board of Medical Specialties member board, (2) a board or association with requirements equivalent to a board described in paragraph (1) approved by that person's medical licensing authority, or (3) a board or association with an Accreditation Council for Graduate Medical Education approved postgraduate training program that provides complete training in the person's specialty or subspecialty, shall disclose the name of the board or association by either method described in subdivision (a).

(c) A health care practitioner who chooses to disclose the information required by subdivisions (a) and (b) pursuant to subparagraph (A) of paragraph (1) of subdivision (a) shall present that information in at least 24-point type in the following format:

| HEALTH CARE PRACTITIONER INFORMATION |
| --- |
| 1. Name and license _____ |
| 2. Highest level of academic degree _____ |
| 3. Board certification (ABMS/MBC) _____ |

(d) This section shall not apply to the following health care practitioners:

(1) A person who provides professional medical services to enrollees of a health care service plan that exclusively contracts with a single medical group in a specific geographic area to provide or arrange for professional medical services for the enrollees of the plan.

(2) A person who works in a facility licensed under Section 1250 of the Health and Safety Code or in a clinical laboratory licensed under Section 1265.

(3) A person licensed under Chapter 3 (commencing with Section 1200), Chapter 7.5 (commencing with Section 3300), Chapter 8.3 (commencing with Section 3700), Chapter 11 (commencing with Section 4800), Chapter 13 (commencing with Section 4980), Chapter 14 (commencing with Section 4990.1), or Chapter 16 (commencing with Section 4999.10).

(e) A health care practitioner, who provides information regarding health care services on an Internet Web site that is directly controlled by that health care practitioner or his or her office personnel, shall prominently display on that Internet Web site the information required by this section.

(Amended by Stats. 2011, Ch. 381, Sec. 5. Effective January 1, 2012.)

## OUR DOM IS OUT OF DATE, NOT CONGRUENT WITH STATE LAW.
## OUR DOM:

*Dec 11, 2017 14*

**33020.12.4** Nameplate

*Revised October 19, 2009*

All uniform personnel and other personnel who have direct contact with inmates, e.g., teachers, counselors, cooks, nurses, etc., shall wear and clearly display a nameplate.

Nameplates shall be phenolic engraving stock, 3 inches long, by ¾ inch wide, by 3/32 inch thick, with white letters on black stock. The corners may be slightly rounded to protect the wearer's clothing. The name letter size shall be ¼ inch high and shall be composed of the first initial of the first name, followed by a space, followed by the entire last name, centered both top to bottom and side to side. Regulation nameplate shall be worn on the outer garment unless an exception is made by the Warden.

A cloth name label sewn onto the garment is an acceptable substitute for the plastic nameplate for those peace officers wearing jumpsuits, battle jackets, and rain gear. Cloth name labels shall adhere to the following specifications:

- The name label shall have the initial of the staff members first name, followed by a space, followed by the entire last name;
- The name label shall be secured (sewn) above the right breast pocket;
- The name label shall have yellow lettering;
- The background of the name label shall be green/olive;
- The name label shall have ½ inch letters and one-inch tape.

 

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**



, M.D.

**California Institution for Women**
**16756 Chino-Corona Road**
T:
F:
C:
E: @cdcr.ca.gov

I CHECK EMAIL SEVERAL TIMES DURING THE DAY, HOWEVER AM NOT LOGGED IN AT ALL TIMES. IF THIS REQUIRES AN URGENT OR TIMELY RESPONSE, PLEASE CALL OR TEXT THE CELL NUMBER ABOVE.

# EXHIBIT N
# (2018-01-16-1409hrs)

Reference MAPIP Teback nde

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Tuesday, January 16, 2018 2:09 PM |
| **To:** | @CDCR |
| **Cc:** | @CDCR; @CDCR |
| **Subject:** | MAPIP Dashboard Changes |

1|16|18  2:01 AM

### Conclusion

1. Nothing has changed in the Coleman-agreed MAPIP drug monitoring rules from 3-4 years ago.

2. Monitoring of some (but not all) of the 3-year old rules has now become automated due to the availability of the EHRS

3. Since these rules have become automated, more of the monitoring requirements are now enforced

4. In enforcing more of the rules, *most of the MAPIP dashboard will now turn from green to red.*

5. This (kindly stated) implies that the manual monitoring by nurses over the last 3-years has been inaccurate and the automatic monitoring has been inaccurate

6. What we have been telling Coleman about MAPIP compliance in our system has been false. We have not been mostly compliant, though we told them we mostly were.

7. Psychiatrists and institutional managers may be upset for a bit when the MAPIP dashboard turns red, until they fix these problems

### Apparent Facts:

1. MAPIP psychiatric drug monitoring standards were designed by our HQ psychiatry team, but with a lot of my input
   a. Coleman approved them 3-4 years ago
   b. For many (but not all) requirements, I selected some of the most lenient requirements from those of the Canadian system, the National Health Service in Britain, the American Psychiatric Association recommendations, etc. I did that because I understood that this was a prison setting. When there are many errors occurring, it is irrational to focus attention on those errors of possible lesser significance.

2. MAPIP parameters were being roughly (and apparently quite inaccurately) monitored automatically until the EHRS implementation, which has allowed more accurate data analysis, albeit an analysis that is still lacking in some rigor.
   a. The measurements were supposed to be monitored by a nursing manually for accuracy, using a tool that Karen Ray devised
   b. Our nursing staff manually performed spot checks and they appear to have dramatically missed major deficiencies made in drug-monitoring over the last several years, for some reason.

3. The MAPIP dashboard, given the more rigorously monitored requirements, will turn red soon. This indicates (probably) that for several years we have not been appropriately monitoring our psychiatrist's use of drugs
and
   We have been violating Coleman Mandates for this monitoring
   a. This may be problematic because the reports written by our administrators about this process have indicated the opposite
   b. It seems we have been utilizing wholly inaccurate data to draw conclusions
   c. Our psychiatrists may become perturbed with pressure placed on them because of the "red" dashboard and our institutional administrators may also become concerned

### Mitigating Factors:

4. Information has been hard to come by and it is difficult to know precisely what is going on
   a. Could it be that the psychiatrists are ordering the lab requirements but the institution is not successfully enabling the blood to be drawn?

1

      i. It is possible to monitor that, if we could get the data about when a drug test is ordered by the psychiatrist, but not done. This data is retrievable.

      ii. I have asked about retrieving the data, but it would take "3-weeks" for a programmer to make this information available

And

      iii. The QM team (with merit) believes that it is important that the institution gets the drug monitoring done and for the dashboard to indicate what it does (particularly if red), regardless of the reason why the monitoring is not occurring.

Therefore

      iv. the QM programmers will not be programming our computers to determine whether the problem is with the psychiatrist not ordering the lab or the institution not getting the blood draw done, when an order that is present.

  b. It's difficult to know whether the psychiatrist is not ordering the drug, the patient is refusing to have the blood draw, or for example shortages of staff make it difficult to arrange blood draws or whether the blood is not being drawn and evaluated for a variety of other reasons.

5. The EHRS may contribute to the problem

  a. In a paper system after an order is written, the nurse (or someone) must continually try to get the order done. For example if a patient refuses an ordered blood draw, the nurse would go back to the patient day after day to try to complete the order. Only when the nurse asks the doctor to discontinue the order, for example because a patient refuses for several days, will the nurse be able to stop trying

  b. The EHRS changes that. Now if a patient refuses a blood draw, all the nurse needs to do is check an electronic box that says the patient refused and the message (that the patient refused) is assumed delivered to the physician. Unless the physician then takes the initiative to order the blood draw again, no additional attempts will be made.

Therefore

  c. The EHRS can shift the onus of completing an order from the nurse to the doctor.

6. Institutions can improve the MAPIP dashboard problem

  a. When they focus on it, they will make sure that lab values are being done on psych patients more appropriately

  b. The silver lining is that by focusing on needed blood draws, this will cause the institution to focus on other psychiatric aspects of the patient, for example why does a particular patient refuse blood draws and could increased interaction with the patient help that.

Best,
Michael

$1|16|18$  2

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

1/16/18  3

# EXHIBIT O
# (2018-04-26-1257hrs)

From: ▮▮▮▮▮▮ @CDCR
Sent: Thursday, April 26, 2018 12:57 PM
To: Golding, Michael@CDCR
Subject: RE: Our Conversation

Having said what I said, I did want to provide you some observations.

The CEO's are generally like a weather vane and will swing in whatever direction the wind blows.

The Psychologists are not universally antagonistic. A few in the higher positions however are quite oppositional and hostile with psychiatrists.

The general run of the mill online psychologists and social workers are very respectful and work well with us. Those who aspire to higher supervisory positions may take cues from their current leaders and try to emulate them with a somewhat antagonistic attitude of oneupanmanship. An example is a psychologist on one of our EOP yards who was diagnosing a florid case of TD as a nervous tic and a mere mannerism and maintained that position even when I tried to explain that the man had TD because of a lengthy history of antipsychotic use.

I had another patient in crisis bed that I saw at the request of the staff who making a gesture of putting something around his neck and trying to pull the ends with his hands without completely encircling the neck. He wanted custody to go in. He had a law suit going on charging excessive force and had a detached retina because of that. He was hoping for custody to go in and get physical so that he could get the injury aggravated and have a further case against CDCR. I told the custody and staff that there was no acute danger to the patient and for custody not to go in but for staff to just keep a visual 1:1 on him. The patient calmed down after custody did not go in and was ok and an aggravation of his detached retina was avoided. An additional lawsuit on CDCR was also avoided. This was the case you were consulted on and you sided with me but these guys nevertheless used it against me.

I was written up the ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ and told that I had not followed the rules. She also did not like some of the views I had expressed earlier that a psychiatrist should weigh in before a patient is discharged. She failed me on probation because of this and other trumped up lies and fabrications. I sought a Skully hearing and won the case and retained my ▮▮▮▮▮▮▮ positon.

# EXHIBIT P
# (2018-04-30-1244hrs)

Dear Dr. Golding,

I am writing you, now several months post my departure as the ████████████ at CIW. As I've embarked on a new journey outside of corrections—the first time in five years—I have gained some perspective from which I can reflect more thoughtfully on my experience as the ████████████ at CIW.

My intent in sharing it with you has no bearing on my career, or my trajectory in any personal way, as I intentionally chose to resign to avoid engaging further in a battle that seemed to that have a pre-determined victor.

I have a new position in a system of care which reflects the standards by which healthcare is delivered with patient safety as a priority. At, Presbyterian Inter-Community Hospitals, Psychiatry exists right along side other departments that comprise medical care, such as surgery and primary care. There is no silo separating "mental health" and it's ambiguous "providers", "Chiefs of Mental Health" and "Clinicians" from primary care. Leadership is based on licensure scope, thus physicians lead every department, not just in Psychiatry where we are the medical director and Chair (there are only two Chiefs—Chief Medical Officers and they oversee every department, including Psychiatry) and therapists—LCSW and/or psychologists, fall under psychiatrists. Just as Nurse Practitioners do given their narrower scope of practice. This is equivalent to the structure in every other department. Psychiatry is a branch of medicine, it is not distinct or separate. Any behavioral and therapeutic modalities fall within it—that is well defined by the ACGME and the American Board of Psychiatry and Neurology. Psychiatry does not fall under an umbrella of 'mental health' or 'behavioral health' as those are not defined or credentialed by a given specialty board. Only Psychiatry is.

This is basic yet important fact underscores the community standard—from academic centers such as USC and UCLA to community based systems of care, such as Kaiser Permanente and PIH. Even in Los Angeles County—the largest county provider of 'mental health' services in the country with the largest jail system in the country (200,000 inmates rotate through LA County jails per year), the Department of Mental Health is now overseen by the Department of Health Services, under a physician, Dr. ████ and the Chief of the Department of Mental Health is a psychiatrist, Dr. ████████

Given my experience as a ████████████ at CIW, which was largely based on deviation from the community standard described above, I find it relevant to provide reflection, almost as an exit interview, as I hope it will aid in remedying deeply rooted problems which ultimately impact patient care.

As you know, I viewed my promotion to ████████████ as a privilege. I took great pride in being entrusted with a leadership role at an institution—CDCR—that I believed in deserved whatever time, effort and challenges that were going to come my way as, in

the end, the goal was to improve inmate care.  I was optimistic, but cautiously so, as even the process of my becoming Chief had hinted at signs of a competitive, barrier-laden process suggestive of concern about shifts of power at an institution that had managed to not have a ███████████████ for over five years.

My reason for applying for the position was based on wanting to maintain the small, but incredibly competent and cohesive group of psychiatrists that I was a part of. It had come to a point where the Supervising Psychologists in each program were by proxy supervising the staff psychiatrist in that program.  There was not a 'team-based' approach in providing care. The therapist was donned the 'primary clinician' and made all the important decisions, without needing agreement from the psychiatrist, and even in the IDTTs—the 'primary clinician' was the person who presented the case, spoke to the patient, and the psychiatrist was asked only to speak when it was about medications.

At CIW, in the one year period that I was there prior to becoming ████ no psychiatrist had attended the pharmacy and therapeutics committee (a psychologist—████████ attended in the place of the ██████████████ ), no psychiatrist had attended Licensed Inpatient committee, UM, QM, and perhaps most importantly, the Mental Health Subcommittee. This can all be confirmed via meeting minutes.  Psychiatrists had not been involved, at all, in policy review for any of the programs outside of the PIP, even in the MHCB.  In fact, nobody knew who the Clinical Director of the MHCB was when I became ██████ I asked the ████, the ████, and the ████. The ████ thought it was the previous ████████████████ of the PIP, ██████████ (it was not) or perhaps the new ████████████ I had appointed for the PIP, ████████████ (it was not). The ████ thought it was the ████████████ it was not, he was the ████████████████.  Multiple policies in the MHCB refer to a "Clinical Director", yet lo and behold, nobody knew who that person was.

Finally, the ██████████████ piped in and said that it was the previous Supervising Psychologist, ████████████, but unofficially.  And currently? I guess there wasn't one. So here was a licensed inpatient psychiatric hospital that is solely run by psychologists, and has been for at least years. At the time of my departure, there was still no psychiatrist assigned as the clinical director. The ongoing rise in MHCB readmission rate of up to 40% did not surprise me one bit as psychologists were running an inpatient psychiatric hospital. Patients do not get admitted to psychiatric hospitals for acute therapy. No such therapy exists. The vast majority of these patients of stabilized via pharmacotherapy and a structured environment. Psychiatrists were never involved in the utilization management corrective action plan in addressing the high readmission rate—not once did anyone consider questions such as, did this patient stay compliant post transfer? If so, how many days before missing doses? Was this person's medications changed post discharge?  Was this patient recently seen by a psychiatrist and denied a medication? These are all issues that we the psychiatrist knew were driving readmissions, but there was no psychiatrist involved in leading the MHCB, thus we played no role in addressing it's problems.  I tried many times to highlight this, with ████████████ and ██████████████, the ████ and ████

respectively, in support, however it fell on deaf ears as the 'declared' ███████████ ████ made no move to include psychiatry in the MHCB beyond having a staff psychiatrist.

To make this even more non-sensical, the "███████████████████████████████████" of the PIP, a psychologist, reports to the ███████████████, also a psychologist as the supervising psychologist of the MHCB. Thus, the two licensed psychiatric hospitals are run completely by three psychologists. I had no role in either, except to fulfill the Clinical Director duties with ███████████ given her ongoing patient care duties.  I was never informed of when the Coleman auditors were visiting. I was never sent the list of documents that they were requesting. When I did once request documentation for myself and ███████████ to review in advance of a meeting, it was denied by the PIP's ███████████, Program Director (a licensed psychiatric technician) and they indicated that they were told to deny us the documents by Dr. ██████ (You have all the emails documenting this.)

I was not included in any emails about the PSH transfers that were to start last summer. In fact, ███████████ a Chief Psychologist and ███████████, a psychologist at headquarters were providing guidance on pc2602 to ███████████, who thankfully forwarded me the email, which is how I finally found out about the transfers and the comfort with which psychologists moved out of scope—into the pc2602 arena. They indeed provided inaccurate information which would have had detrimental effects without clarification.

The district ███████████ only included me in her weekly Chief's meeting once.  I was not aware of the Sustainability audit, not invited to the entrance even and only found out after seeing ███████████ in an IDTT. When I asked about this, she responded that sustainable process was not related to psychiatrists, thus I was not informed.

I was not included in an important meeting regarding DPS use in the PIP. One of the psychologists from the district noted this and asked me if I had missed the meeting. I simply responded, as usual, that I was not invited.

I believe you have copies of emails of the dozens upon dozens of important meetings that ███████████, ███████████ and ███████████ excluded me from. I had to scavenge for information, even before a Coleman visit, on my own. Often, the only person I had to help me was the ████ or the ████ Otherwise, I truly was all on my own.

This withholding of information was key in keeping me from becoming involved, having an impact and perhaps showing that a psychiatrist has relevance and a place in leading the department.

# EXHIBIT Q
# (2018-05-23-2115hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Wednesday, May 23, 2018 9:15 PM |
| **To:** | ▓▓▓▓▓@CDCR |
| **Subject:** | Re: 30-Day Compliant Appointments |

5/23/18  1

9:15 PM

Hi,
Thank you for your considering helping us get the data that we clinically need.
Best,
Michael

Sent from my iPhone

On May 23, 2018, at 8:58 PM, ▓▓▓▓▓▓▓@CDCR <▓▓▓▓▓▓@cdcr.ca.gov> wrote:

> I agree data and information is important. We have much work to do to improve the system,
> which I've asked that we focus on.  At the same time, we've already engaged, and will continue
> to engage, in a thoughtful open discussion of the data with all of the stakeholders.
>
> We have lots to discuss on June 5 when I get back to the office. I look forward to it.
>
> Sent from my iPhone
>
> On May 23, 2018, at 4:03 PM, Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
> wrote:
>
>> Hi,
>> Yes. I would add that it is important to know where the system is failing.
>>
>> For example, we don't know where appointments are not occurring on time in
>> confidential spaces throughout our system.
>>
>> Not sure precisely what you mean by parsing data? But if appointments are 88%
>> on time with a %-weeks compliance of 95%, that should provoke a radically
>> different clinical and managerial response than if appointments are 95% weeks
>> compliant and 20% on time. Do you see what I mean? The plan of correction
>> would be utterly different.
>> And both are entirely possible.
>>
>> Furthermore all of the corrective action plans would *also* be entirely different if
>> virtually every one of the appointments were in confidential spaces vs. if only
>> 20% were or 0% were, in certain locations. Yes, there are units in which all
>> patients are seen cell-side and not in offices. Data is invaluable to figuring out
>> physically where the problems are with confidential appointments and on-time
>> appointments. The absence of this information makes it hard to fix problems and
>> that hurts our patients.
>>
>> So I think you can see that to make clinical decisions and implement the right
>> corrective action plans, we need to know whether and where appointments are on

1

time and whether in confidential spaces — in at least most locations in our prison.

5/23/18 2

We have asked for that data for a long time and have not gotten it, as you know. I have now designed a way to get the data since the data team has apparently not had time to do it or perhaps for other reasons.

It is *clinically* necessary and my sense is that given your direction once again, this data will not be forthcoming or will be significantly delayed, but certainly I could be wrong.

I am hoping there can be a dual tract: 1. Fix what we can 2. Allow us the data we clinically need and have patiently asked for.

I want to note that several members of my team could easily have learned to write the queries to get the right information from our data bases, if the reason the data team did not look at the data is that they were too busy to help. Even I am now coding a bit.

But as you know, we were not permitted to learn to run queries because the HQ Psychiatry team was told that we did not do "QM". Thus valuable clinical information had been  and has been denied to the HQ Psychiatry team.

Now, a psychiatrist has been hired to work for the psychologist's data team and he is allowed to run queries, unlike our team of psychiatrists. But it is not obvious that his supervisors will allow him to help us get the data we need, either.

But I must ask anyway: I am wondering whether he ██████████ , a psychiatrist who now works for the HQ psychology/data team), might be allowed to write the code to get us access to on-time appointment %'s and % appointments and access to whether each of these appointments was in a confidential space?)

So I am hoping that in addition to your good suggestions, we also try to figure out the important clinical variables that I am mentioning.

And of course we can try to improve things as you ask and can work in a more general way, as well, and use the data we have. I will certainly try and do appreciate ██████ help.

Please note, we were able to move people more quickly out of crisis beds  in response to court orders because of the excellent work of many, but also because we had accurate knowledge of time lines. The data mattered there, too. We had to know when we were late and where the patients were! We need to similarly know for Psychiatry appointments whether they are late and where patients are being seen (Cell-Side or wherever).
The absence of this data really matters, now (obviously) in terms of trying to establish Psychiatry clinics, just like the correct data mattered when patients moved out of crisis beds.

Despite all this, your points are well taken and of course we will do our very best to get the right action taken, given what we know.

5/23/18  3

You are absolutely right that we can do better in a general sense. And thank you for involving ▓▓▓▓, the regionals, and a whole team to try to make a difference.

Best,
Michael

Sent from my iPhone

On May 23, 2018, at 2:42 PM, ▓▓▓▓▓▓▓▓@CDCR ▓▓▓▓▓▓▓▓@cdcr.ca.gov> wrote:

> While I understand your questions about compliance, I'd like to spend some time trying to manage the system a little more actively. We can do more to get better results. I sent you a note directing you and ▓▓▓▓ to immediately work on the actual management at our institutions. This needs to be a priority over trying to parse the data because today, I cant say we are managing our system in an optimal way. That should be our first priority.
>
> **From:** Golding, Michael@CDCR
> **Sent:** Wednesday, May 23, 2018 12:56 PM
> **To:** ▓▓▓▓▓▓@CDCR <▓▓▓▓▓▓▓▓@cdcr.ca.gov>
> **Subject:** Fwd: 30-Day Compliant Appointments
>
> Hi,
> Just trying to see whether I have represented the way we currently calculate timely appointments accurately.
>
> One way to do that is look at the same data (just a few hypothetical patients and it should not take more than 20-minutes) and see if we get the same answer when we analyze.
>
> If we can get the same answer, then we can move forward since everyone will understand what we are doing.
>
> If I have made a mistake in rendering the way in which ▓▓▓▓ and ▓▓▓▓ and the team are representing things, I will change what I am doing immediately to make sure I get their answers.
>
> Best,
> Michael

5/23/18  4

Sent from my iPhone

Begin forwarded message:

> **From:** "Golding, Michael@CDCR"
> <Michael.Golding@cdcr.ca.gov>
> **Date:** May 23, 2018 at 11:41:27 AM PDT
> **To:** " ▓▓▓▓ @CDCR"
> < ▓▓▓▓▓ @cdcr.ca.gov>, "
> ▓▓ @CDCR" < ▓▓▓▓▓ @cdcr.ca.gov>,
> " ▓▓ @CDCR"
> < ▓▓▓▓ @cdcr.ca.gov>, " ▓▓
> ▓▓ @CDCR" ▓▓▓▓ @cdcr.ca.gov>
> **Cc:** " ▓▓▓▓▓ @CDCR"
> < ▓▓▓▓ @cdcr.ca.gov>
> **Subject: 30-Day Compliant Appointments**

Hi,

Please consider the below as a representation of EOP appointments over nearly nine weeks, with patients becoming EOP at different times. I have also attached a word document, where it is much easier to see than in this message. There is an explanation below the box.

1.   Please evaluate (if you have a moment) the weeks compliant divided by total weeks at the end of the box below and let me know whether the algorithm I am using is calculating those numbers correctly.

2.   To calculate (a weighted average) of the whole table's appointments, one could add up all the numerators and divide by the sum of the denominators.

I am hoping that I can render your team's ideas about calculating % weeks-compliant as a measure of timely appointments. Then we

4

can compare the results to other ways looking at timely appointments like

1. %-on time appointments

2. %-days compliant

3. Any of the above with grace periods of varying lengths

5/23/18

5

Finally by varying the way the random appointments are generated, we can see when any of the 4-methods yield similar or different results. And we can think clinically about which measures relevant to psychiatric performance should be calculated as %-weeks compliant vs. %-on time appointments, and whether we should add grace periods

# EXHIBIT R
# (2018-06-01-1459hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Friday, June 01, 2018 2:59 PM |
| **To:** | ███████@CDCR; ██████ @CDCR |
| **Cc:** | ██████@CDCR; ██████@CDCR; ██████@CDCR; █████ |
| | ██████@CDCR; ██████@CDCR |
| **Subject:** | RE: Seclusion/Restraint Psychologist Role |

Hi,

Title 22 refers to many different types of institutions..
Hospitalized patients are often medically sick.

Nurses are available in hospitals in an emergency.

It is not appropriate to place medically compromised patients in physical restraints without at least brief medical clearance by a nurse.

Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** ██████████@CDCR
**Sent:** Friday, June 01, 2018 2:14 PM
**To:** ████████@CDCR
**Cc:** ████████@CDCR; Golding, Michael@CDCR; ████████I@CDCR; ████████I@CDCR
**Subject:** RE: Seclusion/Restraint Psychologist Role

We should use title 22 language

████████████, PsyD, MBA, CCHP-MH
████████r
Statewide Mental Health Program

1



iPhone
Office
@cdcr.ca.gov

**CONFIDENTIALITY NOTICE:** This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ▌ @CDCR
**Sent:** Friday, June 01, 2018 1:16 PM
**To:** ▌ @CDCR < ▌ @cdcr.ca.gov>
**Cc:** ▌ @CDCR ▌ @cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>; ▌ @CDCR < ▌ @cdcr.ca.gov>; ▌ @CDCR < ▌ cdcr.ca.gov>
**Subject:** RE: Seclusion/Restraint Psychologist Role

Here is the relevant part of Title 22 § 79801 and the policy with revised language per your request.

Clinical restraint and clinical seclusion shall only be used on a written or verbal order of a psychiatrist or clinical psychologist. Clinical restraint shall additionally require a physician's or physician's assistant's or a nurse practitioner's (operating under the supervision of a physician) written or verbal approval. The order shall include the reason for restraint or seclusion and the types of restraints. Under emergency circumstances clinical restraint or clinical seclusion may be applied and then an approval and/or an order must be obtained as soon as possible, but at least within one hour of application. Emergency circumstances exist when there is a sudden marked change in the inmate-patient's condition so that action is immediately necessary for the preservation of life or the prevention of serious bodily harm to the inmate-patient or others, and it is impractical to first obtain an order and approval. Telephone orders and approvals for clinical restraint and clinical seclusion shall be received only by licensed medical and mental health care staff, shall be recorded immediately in the inmate-patient's health record, and shall be signed within twenty-four (24) hours.

**From:** ▌ @CDCR
**Sent:** Friday, June 01, 2018 10:05 AM
**To:** ▌ @CDCR < ▌ @cdcr.ca.gov>; Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ▌ @CDCR < ▌ @cdcr.ca.gov>
**Subject:** RE: Seclusion/Restraint Psychologist Role

I don't like the language for statewide policy. We should allow local PIPs to prioritize as they will but I am not comfortable with the language below.

▌ , PsyD, MBA, CCHP-MH

Statewide Mental Health Program

iPhone
Office
@cdcr.ca.gov

2

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**From:** ████████ @CDCR
**Sent:** Friday, June 01, 2018 9:03 AM
**To:** Golding, Michael@CDCR <Michael.Golding@cdcr.ca.gov>
**Cc:** ████████ @CDCR < ████████ @cdcr.ca.gov>; ████████ @CDCR < ████████ @cdcr.ca.gov>
**Subject:** Seclusion/Restraint Psychologist Role

There continues to be strong opinions and debate about the language in our draft policy regarding psychologist's ordering of seclusion/restraint. The issue is the balance between initiating restraint quickly to stop serious SIB and ensuring that medical issues are properly considered. The language in the draft policy is:

Clinical restraints or seclusion require an order from a Psychiatrist or licensed Clinical Psychologist with appropriate privileges to order restraints or seclusion. Clinical psychologists may write orders for clinical restraints only when a Psychiatrist is not available and only after a brief medical clearance has been obtained from a physician. Clinical psychologist orders for clinical restraints require cosignature prior to intiation of restraint, by a physician, physician assistant or nurse practitioner (i.e. those operating under the supervision of a physician) with privileges (CCR Title 22, Section 79801 (b). The Psychiatrist shall make the final medical decision after considering the physical and psychological risks versus benefits of using seclusion and restraints. In situations where the Psychiatrist did not initiate the restraints, and disagrees with the decision to do so, the patient shall be removed from restraints or seclusion as soon as possible, but no later than 15 minutes, following the psychiatrist's communication of the determination.

Would you be comfortable with the following edits?

Clinical restraints or seclusion require an order from a Psychiatrist or licensed Clinical Psychologist with appropriate privileges to order restraints or seclusion. Clinical psychologists may write orders for clinical restraints only when a Psychiatrist is not available and only after a brief verbal medical clearance has been obtained from a physician or qualified nurse. The clinical psychologist shall document the name of the physician or qualified nurse who provided medical clearance for restraints. Clinical psychologist orders for clinical restraints require cosignature prior to as soon as possible, and within 15 minutes of initiation of restraint, by a physician, physician assistant or nurse practitioner (i.e. those operating under the supervision of a physician) with privileges (CCR Title 22, Section 79801 (b). The A Psychiatrist shall make the final medical decision about continuing restraints or seclusion, after considering the physical and psychological risks versus benefits of using seclusion and restraints. In situations where the Psychiatrist did not initiate the restraints, and disagrees with the decision to do so, the patient shall be removed from restraints or seclusion as soon as possible, but no later than 15 minutes, following the psychiatrist's communication of the determination.

I set up time to discuss with you at 3pm today if you are available. I have not confirmed that this language would be acceptable to others, but I think it will resolve some of the concerns raised yesterday about possibly delaying initiation of restraints. It will be a very rare circumstance when a psychologist would be the only one available to enter the order.

████████ , Ph.D., CCHP
████████

Division of Health Care Services

████████ Office

3



Cell
@cdcr.ca.gov

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**

*CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication. This e-mail is intended for CDCR usage only.  Unauthorized access or distribution is prohibited by all applicable laws.*

# EXHIBIT S
# (2018-06-18-1359hrs)

## Golding, Michael@CDCR

| | |
|---|---|
| **From:** | ██████████@CDCR |
| **Sent:** | Monday, June 18, 2018 1:59 PM |
| **To:** | ████@CDCR; ███ ███████@CDCR; Golding, Michael@CDCR; ████ |
| | ████@CDCR; ████@CDCR; ████@CDCR; |
| | ████@CDCR; ████@CDCR; ████@CDCR; █ |
| | ████@CDCR; ████@CDCR; ████@CDCR; |
| | ████@CDCR; ████@CDCR; ████@CDCR; |
| | ████@CDCR; ████@CDCR; ████@CDCR; |
| | ████@CDCR; ████@CDCR; ████@CDCR; ████@CDCR |
| **Subject:** | MH Change Management Committee - review process |

Hello All,

We received some clarification regarding the change management committee, which I am passing along. Per ████████ all change requests should come through the change management committee before we pursue an RFC. This helps ensure we make coordinated changes to the system.  We are going to work hard to ensure that no changes or processes are slowed by the committee. If you have an RFC, all that is needed is to submit a solution center ticket with "MH EHRS" at the beginning of it, and that gets it tracked and routed straight to our MH team.  If you find response times are slow or other performance issues, please notify John, and then me, immediately so we can ensure this doesn't occur.

Please let me know if you have any questions.

Thank You,

████████████, cchp, Ph.D.

███████████████████████
Statewide Mental Health Program
████████

1