# EXHIBIT T
# (CHCF-2018-07-ASAS)



Report

**Appointments seen as scheduled (ID: 204345)**

| Date Range | July |
| documents | Trendline | No |
| Colors | Green, Yellow, Red, Other |
| New page each group | No |

6/01/18

| DESCRIPTION | Percentage of all scheduled appointments that were seen. |
| DENOMINATOR | All scheduled appointments. |
| NUMERATOR | All apointments from the denominator that were completed as seen. |
| GREEN CUTOFF | 0.85 |
| RED CUTOFF | 0.75 |
| VALIDATION STATUS | Validated |
| SOURCE | EHRS |

Find | Next

ve Communication ved

**Mental Health Screens**

94% ▼
[18]

All MH Appointments at CHCF in month of July 98%

iatrist continuity of care

**MH documentation of consultation from medical staff**

0% ↔
(1)

**Treatment plans with satisfactory documentation**

67% ▲
(3)

Primary clinician continuity of care

Group tr setting

ge PHQ-9 Score (Beta)

.0 ▲
)

**MentalHealthKpisPopup - Report Viewer - Internet Explorer**

of 1 ▷ ▷▌ 100% ⌄ Find | Next

**Quick List: CHCF**
**Appointments seen as scheduled from 7/01/18 thru 7/31/18**
**Placement: ALL**
**Data last refreshed 8/13/2018 8:37:00 PM**

| | Measurements | Appts Seen as Scheduled | Compliance |
|---|---|---|---|
| Appointments seen as scheduled | 30805 | 30317 | 98% |
| ProviderUnavailable | | 0 | 0% |
| ModifiedProgram | | 0 | 0% |
| TechnicalDifficulties | | 0 | 0% |
| Seen | | 30317 | 98% |

ment Refused

**Appointments Cancelled Due to Custody**

1% ↔
(40,823)

**Appointments seen as scheduled**

98% ↔
(30,805)

clinical stays within ames

**MHCB physical discharges within timeframes**

95% ↔
(149)

⊟ Details

| Seen Reason | Placement | Inst | CDCR# | Name | Date | Appts Seen as Scheduled |
|---|---|---|---|---|---|---|
| ⊟ ModifiedProgram (123) | ML EOP | CHCF | | | 7/25/2018 1:00:00 PM | 0 |
| | ML EOP | CHCF | | | 7/3/2018 12:00:00 PM | 0 |
| | ML EOP | CHCF | | | 7/10/2018 12:00:00 PM | 0 |
| | ML EOP | CHCF | | | 7/17/2018 12:00:00 PM | 0 |
| | ML EOP | CHCF | | | 7/24/2018 12:00:00 PM | 0 |
| | ML EOP | CHCF | | | 7/31/2018 12:00:00 PM | 0 |

ferral resolved before it eceived

▲

**Seen/Refused MH appointment duration greater than 4 hours**

2 ▲
(2)

**MH referral date(s) in the future**

1 ↔
(1)

# EXHIBIT U
# (2018-07-02-1508hrs)

**Golding, Michael@CDCR**

July 2, 2018 ①

| | |
|---|---|
| From: | Golding, Michael@CDCR |
| Sent: | Monday, July 02, 2018 3:08 PM |
| To: | ████████@CDCR |
| Subject: | Power Plans EHRS |

Hi,

You seemed to make a decision mandating that Power Plans be used for scheduling and approved a memo to that effect (but are now maybe possibly agreeing to more discussion), apparently with no understanding at all of the opinion of the psychiatry leadership team, the psychiatry leader on the EHRS project, and virtually every psychiatrist across the state who has spoken with us and been polled -- not to mention failing to take into account the historical process by which the EHRS was built.

Our team and psychiatrists across the state have repeatedly objected over years to the Power Plan design. Our medical colleagues obviously would not use it because of its inefficiency, and we repeatedly expressed our objections even to you.

As you may recall, our exec team (against the express and repeatedly stated opinion of HQ psychiatrists) designed the workflows in ways that psychiatrists vigorously objected to – including mandating powerplans -- which is why you could think that they would be considered standard, in some bizarre meaning of that word. It's our standard only because psychiatrists, for years, have been denied multiple chances to make the EHRS more efficient for them.

In terms of going down rabbit holes, which you accused me of doing, please note that your making decisions (without any apparent concern about what your psychiatry team thought, while fully listening to your psychology execs) is a very good way of beginning to dig that hole. This pattern has become far more serious, with patient care issues with far greater siginificance than EHRS issues.

Our psychiatry team briefly had hope for improvement earlier this year when the court staffing case began to get focus. You began to take an interest in certain psychiatry issues (including EHRS issues) and seemed to direct our psychology team to allow changes in the EHRS to help psychiatrists. And there was even a little bit of response.

For example the psychiatry team since 2017 begged our psychology team to enable those psychiatrists who had recently been hired to see patients when they started working, rather than to have to pay them a full salary for a month or more because of no access to the electronic record system. Psychiatrists can't see patients without the EHRS "provisioning" because they need to be able to individually find information on patients, schedule, and document their work. We begged for two years to create a simple fix for this problem, but were repeatedly thwarted by our fully non-medical exec team and admins who thought this psychiatry need was low priority. Furthermore, denying patients a month of care is also problematic, in addition to financial concerns.

The psychology team put the new psychiatrists in their queue, creating massive waste of time and resources. I note that this waste occurred, for one of the most expensive human resources in our system, our physician psychiatrist. Though we had argued for a couple of years for that change to no avail, you put a stop to their ignoring us on that one issue.

But do note that even still your psychology team did not quite follow your directive (unless you changed it when I was not aware). They did not build a provisioning resource for more than one new psychiatrist at a time, as you and we requested, but built the resource for just one! So if a second new psychiatrist comes to an institution, he or she is out in the cold and not allowed to see patients for several weeks or a month, while we pay him and patients are not seen. But even a little something is someting and we were grateful.

1

You say that you reported to the court that there has been a priority put on trying to improve the experience for the psychiatric physician with the EHRS, just last month. But this is just not true. Multiple projects requested by psychiatrists are not being done. ~~Physician~~ ~~says~~ ~~July 13, 2018~~

_____ says the following:

We have had many instances of things not getting done, or occurring in a poor manner. This is nothing new.

1) When ____ asked us to go to CHCF PIP early after they started on the EHRS, _____ indicated he would be providing data flag data and other QM information for the discussion. Despite asking for that data, there was no response. The report was sent to ____ with clear indication that data was not made available to us.

2) A proposal for off-site telepsychiatry was advanced without thoughtful implementation, and sent out in announcements by the registry company to our telepsychiatry staff.

3) When I had asked ____ for data to better understand what Psychiatry is doing in the EHRS (orders fired, Order Rec completed, number of notes, etc), she facilitated a meeting with _____ me and her. It was agreed they could get the data and ____ was working on it. The data never came despite many asks. When discussed with ____ about 4 months later, she placed a request to CCHCS QM to compile the data. It sits in some queue somewhere, and no data has been made available.

4) We have had constant problems with psychiatrists sitting idle because MH Scheduling has not added them as a resource to be scheduled into. We were told there is a MH priority list, and this type of thing was not a priority. We were also told it takes on average 10 days to place someone as a scheduling resource. Just this morning I was asked by the MAT team why it has taken one month to get a new yard added for MAT scheduling at CIM.
   a. The "solution" was to have 2 or 3 people "share" a common schedule for a workday. This solution is confusing, as you can imagine.
   b. Although under the scrutiny of the court we were able to obtain the building of 1 generic scheduling resource per institution to avoid these resource delays, ____ and ____ agreed to build 4 additional generic resources. There is no timetable for that completion and it sits in another queue.

5) The recent (January 2018) survey to the field indicated a pervasive dissatisfaction with Powerplans and Powerforms. Scheduling complaints are extremely common. We have discussed in may forums, which have included ____ on the problems with powerplans and scheduling. Despite the concerns expressed for over 18 months, the relentless march toward powerplans and scheduling goes forward. I am not sure how many times it needs to be demonstrated this is a flawed approach, yet MH continues to double down on the process. This is not a scheduling process endorsed by Medical or Nursing.
   a. Although now fixed, we had problems with social workers and psychologists canceling out medical and lab order in powerplans.
   b. We continue to have problems with multiple open powerplans, and multiple open phases.
   c. It has been demonstrated an innumerable amount of times the number of clicks required to work with powerplans is inefficient relative to one-off orders.

6) When Psychiatry change requests were placed in the MH Solution Center ticket queue, they languished and were not addressed. It was promised they would be built by MH, but that never happened. Finally, in around late fall 2017 MH released the change requests to CERNER, who has been building them out. This in the context of MH somehow able to build items that were of interest and important to them.

7) The consolidation of power continues with the MH Change Management Committee, which has moved from a place to discuss changes to the MH EHRS process, to a group that votes whether to allow changes to move forward to be heard at CLAC in the form of an RFC. It is a committee that has a deficit of voting psychiatrists relative to psychologists. It is now impossible for psychiatry to advance something to CLAC (and heard by all the CCHCS disciplines) that would be unpopular with psychology.
   a. We witnessed this exact situation last week when in the MH QM meeting the two psychiatry voting members were outvoted in the agreement to disregard scheduling orders written by psychiatrists in the interest of the patient, over the interest of the program and data.

We have surveyed the psychiatrists and know how they want to work in the EHRS. It is not how they work currently. Given the continuing push for control, it would seem clear the intent is to engage psychiatrists when the court is looking,

July 12, 2018 ③

but otherwise disregard as has been the case for the last 2 decades. It has been very unsatisfying for psychiatry at all levels.

I (w) Hw

HQ Physician-Psychologist ▇▇▇ says ↑

Of interest recently, perhaps to counteract the tiny bit of pressure you placed on our psychologist/admin exec team a three or four months ago, they designed a committee composed exclusively of psychologists and admins (and one psychiatrist, ▇▇▇ to prevent what used to occur: Though our psychology team blocked virtually every (but not all) EHRS project that our psychiatrists have wanted, the psychiatrist ▇▇▇ used to be able to appeal to his nursing, medical, and administrative colleagues at CLAC (nursing and medical representatives). Sometimes as fellow medical providers, they could (with their political force) get some of the psychiatrist's EHRS needs met by our colleagues

But that loophole in which psychiatrists could sometimes make some progress was shot down by our exec psychologists. The completely non-medical exec team/administrative team easily outvotes the one physician (Dr. ▇▇▇) on the panel, which means that those who have historically and continually blocked progress with the EHRS -- making disastrous and inefficient design decisions for psychiatrists -- now fully control any attempt by psychiatric physicians to make a difference. We are no longer allowed to appeal to our CLAC (medical and nursing) colleagues, but cannot ask for anything unless our psychologists, with their proven hostility to medical workflows, first approve.

So psychiatrists continue to suffer from the incredible inefficiencies of the EHRS (some of which due to the CERNER design,,,, eg med reconcilliation) but much also due to the enforcement of exec psychology mandates on our physicians in mental health. It's been disastrous and that is perhaps one of the smaller of our problems (virtually all other avenues to improve psychiatric medical care of patients are also being currently thwarted, probably since the incident at the end of April which seemed to have inspired the exec psychology team to prevent the psychiatrists from caring for patients even more.)

I actually can give you several examples where your psychology team has voted to maintain and extend their right to specifically overrule direct medical orders for specific patient care written directly and explicitly in the chart. In discussion with very high ranking physicians in CCHCS, they claim what you are allowing and have for years (overruling physician's direct orders in the chart) is probably illegal (?) This too must stop.

Finally, you say that we are following what the psychiatry experts said. Obviously you either did not allow or did not encourage the psychiatry experts to ask your psychiatry team's opinion about essentially anything related to how psychiatry is practiced in CDCR (The ▇▇▇ was asked to give them a brief tour of a telepsych facility in which the purpose was to show them the facilities). The opinion of the experts therefore cannot take into account the information that the psychiatry leadership team knows about CDCR and its treatment of psychiatric patients.

You are fond of saying that we should discuss more in person what is said in e-mail messages. But I can point out to you that the topics we are supposed to discuss in e-mail, only occasionally get actually discussed. Perhaps that's why it is not in the front of your mind the very significant issues that are right now adversely affecting patient care, including perhaps the above-mentioned less important issues (??) that merely make psychiatrists miserable and inefficient in utilizing aspects of the EHRS.

And my concerns are at this point far deeper than power plans, as are the concerns of our leadership team in psychiatry. I believe our concerns would be shared by many.

With Concern,
Michael

July 12, 2018
④

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

4

# EXHIBIT V
# (2018-07-03-m)

 **CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES** 

# MEMORANDUM

| Date | : | July 3, 2018 |
|------|---|--------------|
| To | : | All Healthcare Staff |
| From | : | Headquarters Mental Health |
| Subject | : | CCHCS Healthcare Dashboard Diagnostic Monitoring Methodology Change and Mental Health Registry Enhancements |

Beginning June 2018, the Diagnostic Monitoring measures on the Statewide Dashboard will adopt the new performance measurement methodology included in the new MAPIP Measure Summary. This update also aligns the Dashboard methodology with the current Psychotropic Medication Monitoring Requirements adopted by Mental Health in September 2015 (memo). Various additions and enhancements were also made to the Mental Health Registries to support Institutions in improving patient care following this performance measurement overhaul.

## Dashboard Methodology Explained

The new dashboard specification documents can be found here and will be added to the PDF version of the dashboard specifications in July. The old specification documents will be stored here for comparison purposes. Although there is some variation between each of the 41 dashboard measures, the table below gives a general overview of how the methodologies differ across most of these measures. As you will see, the new methodology will require a greater level of diligence to achieve higher performance scores on the dashboard.

| | Old Methodology | New Methodology |
|---|---|---|
| **Numerator** | All patients who received appropriate psychotropic monitoring screening / test within the past 12 months. | Received appropriate psychotropic monitoring screening / test within the compliance timeframe*:<br><br>*Baseline: Completed within 90 days before the medication start date and 14 days after<br>*3 Month: Completed between 15 and 90 days after the start date<br>*Annual: Completed between 91 and 365 days after the start date |
| **Denominator** | Only Patients prescribed the same psychotropic class of medication every month for the past 12 months. | Patients prescribed a psychotropic class of medication with a compliance date that came due* during the measurement period.<br><br>*Baseline: 14 days after the medication start date<br>*3 Month: 90 days after the medication start date<br>*Annual: 365 days after the medication start date |

*Patients are considered to be consistently on a psychotropic medication class (i.e. Antipsychotics, Lithium, etc.) as long as they do not have a gap of more than 45 days between prescriptions. Switching between different antipsychotic medications does not impact the medication start date.*

 **CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES** 

### Enhancements to the Mental Health Registries

In order to support improvement efforts in these new dashboard performance measures, the Mental Health registries have been updated with new fields, filter options, and alert rules. Institutions can now use these registries to proactively track and monitor patients with labs or charting requirements that are due soon and take action before falling out of compliance, effectively improving future performance.

MENTAL HEALTH – MASTER REGISTRY





The Mental Health Master Registry still exists as a tool for users to quickly find all patients in the Mental Health program at any institution. Users can then navigate to any Sub-Registry (i.e. Anti-Depressants, Clozapine, etc.) by simply clicking on the column header (outlined in yellow above). Three new data points were also added to the report (outlined in red above):

- **Expired Psych Meds**: Shows the count of a patient's psychotropic medication expired in the past 3 days or expiring in the next 3 days (hover for details).
- **Psych Med Admin Alert**: Displays a check mark if a patient missed any High Alert or PC2602 medication, 50% or more of administrations within the past 7 days, or 3 consecutive days of any one medication (Psychotropic Medications only- hover for details).
- **Psych Drug-Drug Alerts**: Displays the highest level of drug interaction, if one exists, between active psychotropic medications and any other active prescription. Users can hover over the interaction for more details or click to access the Drug-Drug Alerts report.

MENTAL HEALTH – SUB-REGISTRIES





All 6 of the Mental Health Sub-Registries will look and act similar to their prior versions but have significantly enhanced functionality outlined below. In addition, all flagging rules have been updated to match the new Diagnostic Monitoring performance measurement methodology.

 **CALIFORNIA CORRECTIONAL**
# HEALTH CARE SERVICES


| Description | Example |
|---|---|
| All Sub-Registries now include each patient's most recent Height, Weight, and Blood pressure |  |

Hovering over any flag in the registries will show the reason for the flag, the compliance interval (i.e. baseline, 3 month, annual), and the last date the lab / charting was completed.

New filter options allow users to quickly find all patients with a lab or charting requirement due within the next 30 days.



## ACCESS AND TRAINING

### REPORT ACCESS

Click _here_ to access the QM Portal Care Team Tools & Operational Reports page; you will find the enhanced Mental Health Registries under the "Behavioral Health" section. A Definitions document that provides detailed information about report features and data sources is linked on the top right corner of each registry.

### TRAINING

Quality Management will hold a training on the MAPIP Measure Summary and Mental health Registry updates at the next two QM Webinars (July 11th and 18th), held every Wednesday from 1-3 pm. Please click here for more details.

### Questions?

Please direct any questions to the appropriate group below:

Mental Health Policies and Procedures: MHPolicyUnit@cdcr.ca.gov
Data Issues: QMStaff@cdcr.ca.gov

# EXHIBIT W
# (2018-07-06-1016hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Friday, July 06, 2018 10:16 AM |
| **To:** | @CDCR |
| **Subject:** | Resolving the "Clearance" Issue |

*Why a psychatric medical Clearance order is needed.*

Hi,

Please don't feel that the issue of needing psychiatric/medical clearance (some prefer the words "risk benefit analysis") for discharge from licensed facilities would be resolved by mandating that psychiatrists fill out some new form in a treatment team or some new part of a treatment plan.

That understanding would misunderstand the problem.

The problem is that the incentive of the psychologist needs to change. That is what is different between our system and perhaps any other system. The psychologist has no incentive in our system to make sure the psychiatrist is involved in discharge decisions, other than to successfully mouth the words,

"It is a treatment team decision. The psychiatrist must be involved in discharge decisions".

Such words are cheap and meaningless as ▊▊▊ review shows, even though these words have been mouthed repeatedly. Yes these words have been mouthed, even by very powerful people in the mental health chain. But they have accomplished noting and would not be expected to accomplish anything, because they do not change the *incentive* for the psychologist, who currently have an incentive to discharge the patient frequently, without including the psychiatrist, unless they think that there is a psychiatric issue that should be addressed by the psychiatrist. You speak frequently about including psychiatrists, but that did not change that every single HQ psychologist in the room at a meeting voted on a recent issue that it was OK to countermand a physician's order about when a patient needs to be seen.

Whatever new "form" or new part of a treatment plan that you or I might mandate that the psychiatrist fill-out that would indicate medical clearance will not help. Because to be effective, that "form" must actually be tied to *an order* to nursing that gets the patient ready to go. ▊▊▊ solution is a form that actually is an order to nursing that it is OK to get the patient ready to go. That actually would work! If psychologists (essentially in charge of our patients in our program) needed the psychiatrist to evaluate a patient for medical clearance, before the order preparing the patient to leave went to nursing, that would in fact solve the problem.

Otherwise the psychologist will write the order that goes to nursing that gets the patient ready to go. Whatever we mandate that the psychiatrist fills out will not be filled *before the psychologist sends the order to nursing that gets the patient ready to leave*. Attempts to mandate that psychologists not send the order prior to the psychiatrist clearing the patient are equivalent to telling psychologists to include psychiatrists in discharge planning. The ▊▊▊ problem (psychiatrists not involved in discharge decisions) will persist. But, there will now just be some new mandate for the psychiatrist to fill out some new form.

Do you see that creating new mandatory forms does not change the incentive for the psychologist to include the psychiatrist? Yhat has lead and continues to lead to medical disaster.....

New mandatory forms (eg psychiatrist should write more in treatment plan) just kicks the "can" down the road. Actually much worse. (And it is a fascinating theoretical story about what can make government ineffective, which is being replayed with this very issue)

the leaders who mandate these paper solutions, without dealing with the underlying incentives, feel they have solved the problem and so no more work needs to be done. But the incentive (power) structure is the same so people (psychiatrists and psychologists) effectively do the same things.

Only the words have changed.                          7/6/18 2

But far worse, the leaders consider the problem solved. What actually happens then becomes the opposite of what the leader says, because the incentive does not change. So the leader has said, "I mandate X instead of Y". But what happens is "Y instead of X". And so those who report to the leader notice that the opposite of what the leader says should happens in fact happens, which has its own bad implications.

In this case -- because the incentive of the psychologist to include the psychiatrist in discharge decisions does not change -- mandating that psychiatrists fill out new forms now clearing patients, helps not at all in addressing the underlying problem. The underlying problem is that psychologists receive tremendous succor and support from their leadership in their belief that they should determine what is a medical issue; that is in this case, they are supported culturally in speaking with psychiatrists about discharge only when they decide that a medical issue is present. The record is very clear, regardless of what people say.

So the problem goes on and on and on, regardless of the leaders' pronouncements. Worse, the consequences of the problem go on and on. Until someone finally decides to do something more definitive.

*Allow the psychiatrist's clearance note to be an order that notifies nursing that the patient is ready to go.*

Then the psychologists will include the psychiatrists in discharged decisions. They will do so because their incentives have changed, not just because a pronouncement has been made.

Does this make sense at all to you? Perhaps I have not expressed this clearly.

Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water during California's drought at SaveOurWater.com**

# EXHIBIT X
# (2018-07-12-1000hrs)



*6 weeks Change Management*
*Compliance*
*does not take into account*
*For timelines*

*EHRS Committee*
*July 12, 2018   July 12, 2018*

**CALIFORNIA CORRECTIONAL**
**HEALTH CARE SERVICES**
MH CHANGE MANAGEMENT COMMITTEE

**Meeting Date:**     July 12, 2018
**Meeting Time:**     10:00 a.m. – 11:00 a.m.
**Location(s):**      Building G, G2-332
**Dial-In Number:**   877-402-9753
**Participant Code:** 7304543

| | INVITEES | WORKING TITLE | AREA/DISCIPLINE |
|---|---|---|---|
| ☐ | ████ | | Mental Health – Executive |
| ☐ | ████████ | ████████ | Mental Health – Executive |
| ☐ | ████ | | MH – Program Support |
| ☐ | ████ | Administrator | MH – Quality Management |
| ☐ | ████ | Administrator | MH – Region III |
| ☐ | ████ | Administrator | MH – Clinical Support |
| ☐ | | Administrator | MH – Region II |
| ☐ | ████ | Administrator | MH – Region IV |
| ☐ | ████ | Administrator | MH – Region I |
| ☐ | | Administrator | MH – Training & Operations |
| ☐ | | Special Asst. to the ████ | Mental Health – Executive |
| ☐ | Michael Golding | Chief Psychiatrist | MH – Psychiatry |
| ☐ | ████ | Chief Psychiatrist | |
| ☐ | ████ | Chief Psychologist | ████████ |
| ☐ | ████ | Chief Psychologist | ████████ |
| ☐ | ████ | Chief Psychologist | ████ |
| ☐ | ████ | Sr. Psychologist Specialist | ████████ |
| ☐ | ████ | SSM II | MH – Program Support |
| ☐ | ████ | SSM I | MH – Quality Management, IRU |
| ☐ | ████ | SSM I | MH – Program Support |
| ☐ | ████ | SSM I | MH – Program Support |
| ☐ | ████ | SSM I | MH – Program Support |
| ☐ | ████ | HPS I | MH – Quality Management |
| ☐ | ████ | SSA | MH – Quality Management, EHRS |

| Agenda # | Topic | Presenter |
|---|---|---|
| 1. | **Ticket #N/A – MH Notify HCPOP Send Order**<br>• Request: "Add two fields to order: reason for referral and prior MHI." | ████ |
| 2. | **Ticket #993983 – Add "UM Review" as reason option to the 7 and 30 day ICF/ACUTE MTP**<br>• Request: "Add "UM Review" as reason option to the 7 and 30 day ICF/ACUTE MTP" | ████ |

# EXHIBIT Y (2018-07-12-1442hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Thursday, July 12, 2018 2:42 PM |
| **To:** | @CDCR |
| **Subject:** | SAC Problems vs. Telepsych Cellside |

7/12/18    1

Hi,

We were hoping to expand the use of camera equipment to use cell-side to improve the safety of patient visits on-site, where much of the care is unsafe in multiple locations. Remarkably enough,  cell side visits on-site are often worse than cell-side visits when organized by telepsychiatry. Let me explain

Telepsychiatrists currently are making several cell-front visits using laptops and cameras to see patients who will not leave their cell or if custody is unable to bring them. That is going on right now and is often an improvement over the conditions that on-site psychiatrists face. Dr. ▮▮▮▮ should be told that we are using cell-front psychiatry. He asked whether we were using the specific camera we showed him yesterday and ▮▮ answered truthfully "No" (we are not using that set-up). But we are doing cell-front telepsychiatry using just the cameras that are attached to laptop computers in multiple settings. If we need to stop doing that, please let us know although I think in many circumstances it can improve patient safety given the context in which our psychiatrists practice.

Telepsychiatrists don't like doing cell-front telepsychiatry, but they do it to try to take care of the patient. Better camera equipment and microphones, portable and stationary,  would improve the experience in the future. The excellent camera and reasonable microphone used in the crisis bed (that could be used elsewhere) can only be considered a "bad" or "worse" solution in the context of knowing what other alternatives there are. If it is bad, it is bad relative to what? Let me explain why even the laptop camera and cell-side visit can be much better for patient care than many of our onsite cell-side visits for psychiatrists.

My visit at SAC was interesting. Telepsych had to pull out of SAC a few years ago because we could not force the changes needed to make cell-side telepsychiatry even minimally safe there and we could not get patients brought to appointments.  Normally we can force the changes  so even cell-side telepsychiatry can sometimes be preferred, because we make the context of the cell-side visit safer. But we could not do that at SAC and so telepsych left.

On-site psychiatry at SAC, however, is also not practiced safely there.  If we could divert patients from EOP there to a different institution, we really should. I understand if there is no alternative. We have to do the best we can. But current psychiatric care there is just not acceptable at all. So I would much rather have a set-up like we had with the camera in the crisis bed at CHCF, than on-site care at SAC. Given the conditions at SAC, I don't believe that even our telepsych team could enforce a measure of safety at the institution. We tried before and failed.

The basic reason why telepsychiatry (even cell-side telepsychiatry) can often be better than onsite cell-side psychiatry – but certainly is not always or even most of the time better-- is this:  In other institutions in which cell-side visits occur telepsychiatrically, our telepsychiatry managers fight to get patients seen in an office and not cell-side.  And if the telepsychiatrists do have to go cell-side,
we
1.  insist on quiet conditions,
that
2.  the patient be found ahead of time (no searching around yards),
3.  an MA is there,
4.  a custody officer can open the food port for visualization if necessary with the camera, etc. and etc.

We were unable (and I suspect are) unable to insist that that occurs at SAC now and so telepsych left and should not come back unless drastic changes occur in the culture.

1

7/12/18 2

The SAC on-site psychiatrists schedule around 11-16 appointments *in the morning* hoping that a few patients will come to their clinic. When I was there two days ago, 3 of 11 patients showed up for one of the psychiatrists in the morning and 4/16 showed up for the other psychiatrist we shadowed. They are told by their administration to cancel out all appointments that don't come, which has the effect of not allowing a no-show rate to be calculated or known. So their numbers look like they're doing far better than they are.

After all, if 3/11 patients show up, but you cancel out the appointments for eight, then you record that 3/3 scheduled appointments came and your refusal rate is zero! If you investigate the data, it looks like the psychiatrist is not scheduling enough. LOL. The schedulers also reschedule the no shows, so it doesn't look like a cancellation or a no-show! The patient is seen "cell-side" so there is no record of the very low % of patients who did not come to clinic!! Makes it look far better than it is. Hmmm.

And we also can't calculate what must be a huge cell-side non-confidential rate given the QM team won't calculate that for us and the psychiatry team is not allowed to send (even read only) queries to the data base. So QM does not capture this horrible "no-show" rate at the clinic and we can't tell that most of the visits are cell-side! Hmmmm.

You have to be there to see it with your own eyes. You should go undercover with me!

The actual reality is that 65% to 80% of patients don't show and the psychiatrist's time is utterly wasted in the morning waiting for large numbers of patient who never come. Their time is also utterly wasted in the afternoon.

Keep reading.

At SAC after the morning, we spent maybe an hour running around the yard in (I believe) about 100- degree heat trying to find patients, with other patients/inmates running up to the doctor (closer to the door to the block) and with him sweating profusely with his heavy stab-vest on. I think the stab vest is critical. He and I were surrounded by inmates on the yard and toward the doorway with no custodial officer anywhere near us and multiple patients coming up to him.

As Dr.       says,
"Nothing has changed in 4-years".

She left SAC because of trying to find patients on the yard and being surrounded by inmates and it was unsafe. It was clearly very dangerous for the psychiatrist who tells me (modestly) that these conditions will affect psychiatry retention!!

For those appointments that occurred in the doorway (non-scheduled), the doc had no health history about them and tried to provide a medical intervention in 100 degree heat (actually just inside the cell-block door with many inmates around) for about 90-seconds in a patient he did not know and had no information about! Wow.

This type of on-site visit is the proper comparison in CDCR to a cell-side camera visit that is orchestrated by the telepsychiatry team. Our telepsychiatirst is in a comfortable location, has a patient in a fixed location, can see and hear the patient in the cell with a camera, can speak for 30-minutes, and has the patient's records. Cell side cameras, in the context of a telepsych team that is trying to protect the patient and improve the communication is far far better than what happens in-person at SAC, for example, as I think you can see.

Other cell-side interactions that occurred in person at SAC were actually *worse* as the day went on. We found no patients whom we were looking for on the yard, although the doc says he's learning where the patients hang out to better locate them in the future. But we looked at several locations around the yard and were unsuccessful. Then we went cell-side to try to see patients, but the conditions were much worse than the minute-appointments in the doorway between the block and the yard in which patients came up to the doctor. Many of the patients were not in their cells, either.

7/10/18  3

We were in a block with an incredibly loud air conditioner and the TV volume incredibly loud. Inmates were milling about wearing only a towel and yes I could see what the doctor meant about how easy it would be for an inmate to throw him off the upper tier. It would be utterly inappropriate for a female psychiatrist to have been there. Our female psychiatrist says that she is given 10-15 minutes to try to see her (she recalled) 7-cellside patients before shower time between 12:45 and 1:00). SO she is only guaranteed 15-minutes in the afternoon to see the patients before the showers begin. (It is not safe for any female non-custodial officer to be there with half-naked men wearing only a towel while the woman is easily surrounded. So I support her not going into the blocks with the nearly naked men. )Unfortunately, I thought I saw some inappropriate public activity going on when we arrived, given what I could visualize.

Our female doc doesn't go there during shower time and she shouldn't to protect her life, but her patients can't get care. As stated, she reports that she is given 15-minutes (between 12:45 and 1:00) to see her patients cell-side before the showering and she finds that ridiculous (I find it ridiculous and highly dangerous).

It's not much better for the patients of male psychiatric patients. When we went cell-side, multiple of the patients were not there and no one knew where they were. Because of the loud conditions (air conditioner and TV), the psychiatrist had to (almost) scream through the door so that the patients cellmate, and everyone around could clearly here. The questions could be no more psychiatric than "Are you going to kill yourself?", "Any side effects?", "Do you want more of the depression med or the voices med?"

To add to the experience, there was an "agitated" inmate on one of the blocks, so they (appropriately) forbade us from seeing all other patients housed on the block. The psychiatrist asks me what I would think if we had been there when the inmate became "agitated". I paused and considered.

What I saw at SAC was not even a primitive psychiatric interview nor was it psychiatric care. Our physicians were struggling. Their goal can only be to try to prevent the patient from toxic reactions to meds, and try to stop suicidality, while making the best guess they can about medications.

No amount of QM number manipulations (%-weeks compliant vs on-time appointments, cancelling out appointments so they are not recorded as no-shows, the QM team refusing to allow us to calculate % of visits that are cell-side, 30-50 IDTT's scheduled in 3-4 hours [and not allowing us to calculate how often that occurs], making it challenging to record and calculate non-confidential visits, etc.) can obscure what is straightforward and easy to see.

You can't provide medical care with no little to information standing cellside, and virtually screaming through a cell-door, no matter how many EOP reviews we are said to pass. If we pass when this is occurring, passing means nothing in terms of medical care.

Our number crunching is also bizarre and poorly done. The CCC psychiatrist was seeing patients cell-side frequently and never once (he said) recorded the visits as in non-confidential spaces (though we would not be allowed access to the data even if he did). The system defaults to recording visits as confidential so all his cell-side visits were recorded as confidential (even if we were allowed to make these calculations system-wide and investigate psychiatrist by psychiatrist, which we are not)

So even if we were allowed to know what the system calculates as the % of non-confidential appointments and no-show rates in clinics (not "cancellations"), we still would not have accurate data. The psychology EHRS-designers-for-psychiatrists will not allow us to create separate note "types" for confidential vs. non-confidential appointments, for example. That would be a straightforward solution (per Dr. █

Relative to the cart with the camera at CHCF, SAC with live psychiatrists is not a safe place for patients in the EOP setting. I recommend that the EOP patients be moved. If there is no alternative (no place for them to go), then we can only hope that very rapid changes occur. There are reasonable numbers of psychiatrists working there and the █

3

7/12/18   4

███ seems reasonable. Furthermore the psychiatrists are reasonably organized. They just don't have the executive might to force the type of changes that would allow them to practice medicine. It really would require a custodial solution (read below)

The problem is that custody is not moving patients to the appropriate psychiatric clinic in the morning at SAC, virtually at ●, and it is very convenient to say the patient refuses (although even that is recorded as a "cancellation" or a "rescheduled appointment"). Somehow they refuse ("Cancel") so much more at SAC! Patients are brought in batches rather than individually.

Solution:
The cultural incentives need to change.
If patients were

   1. brought to appointments

and

   2. If no-shows were tracked by custody

and

   3. If custody had to work with the physician on the cell-block to find and track patients who did not make it to clinic (so docs would not be trying to find paitents)

and

   4. If custody opened food ports (so docs don't spend their time virtually screaming through cracks in a door that might be the beginning of a solution.


To get patients to appointments

   A. Custody should get to know the patients better who refuse to come to appointments (that are recorded as "cancelled" [or are rescheduled so not even reported as "cancelled"]).
   B. It should be imperative at SAC (probably system-wide) that the officer recording the refusal fills out a relatively detailed report about the condition of the cell and the condition of the patient in the cell.
   C. For each patient that does not come, the custody officer should sit with the psychiatrist in the clinic area and review the patient with the psychiatrist, so the psychiatrist could learn more about the patient and his refusal.
   D. My guess is that as the custodial officer pays closer attention to the details of the mental health patient's confinement, by documenting about it and speaking to the psychiatrist, the custody officer will understand the patient.
   E. A far higher % of patients will come to appointments as soon as custody officers begin noticing the problem and having to carefully document about it each and every time patients do not come. If patients come, no documentation would be required because they could get care by the physician.


When cell-side visits must occur -- these are currently the norm at SAC
   A. A custody officer should be assigned to the psychiatrist on the ward and responsible for finding the patients that need to be seen in the afternoon.
   B. The custodial officers should be willing (if safe) to open food ports if the psychiatrist asks in the cell.
   C. For a few patients in the afternoon, (maybe 2-3 per day, the custodial officer should be able to open the cell and bring the patient to the block. I recommend a treatment module on each block. Since the patients will not come to the clinic, the custodial officer can help encourage the patient to see the psychiatrist in the TTM.
   D. The key is that the healthcare access officer needs heavy involvement in an utterly unacceptable situation.

When we have 25-minute treatment teams that Coleman observes, with select patients for the day of their arrival, of course the care looks reasonable. If you actually follow a real psychiatrist throughout the day (and we followed two), you understand quickly what medical danger is.

# EXHIBIT Z
# (2018-07-17-1703hrs)

**Golding, Michael@CDCR**

From:     @CDCR
Sent:     Tuesday, July 17, 2018 5:03 PM
To:      Golding, Michael@CDCR
Subject:    hi from CHCF

*July 17, 2018*

Dr. Golding,

Nice to speak with you today. You asked me to write you regarding some specific comments I made today, so here is that:

It seems that certain types of decisions, including level-of-care changes, are made by the supervising psychologist in consult with the clinician (psychologist or social worker). In a setting like this, you must choose your battles, so I don't say anything. On a few occasions I did get frustrated because I felt strongly about certain cases and spoke up, expecting people to respect my view, but certain staff just argued against me. If I really felt I wasn't being heard, I could have just contacted the other facility involved to say that I disagreed with the team, but I would never do that. Even weirder is when they answer questions for custody regarding whether mental illness played a role in some infraction when going in front of a disciplinary board. This question almost always seems to involve a deep understanding of the role of medications in relation to their illness, and I'm trained in forensics and have been involved in answering questions like these for courts in several locations and internationally.

I've just gotten very good at biting my tongue for 90% of our meetings that are dominated by psychologists. It helps keep me humble, because in reality I'm trained in Johns Hopkins and Yale and have often had high level experiences or been directly involved in research related to the matter at hand. So if a social worker with no real mental health training is asked their opinion over mine, it just tells me that the system is more interested in other things than truth. Hope that's not too cynical or going to get me into trouble. I'm always interested in big picture and systems level thinking, so please let me know if I can be of service or if there are any unique opportunities in the future. Thank you.

*Psychiatrist at CHCF opines that his medical opinion seems less valuable than that of a social worker or psychologist.*

1

# EXHIBIT AA
# (2018-07-17-1722hrs)

## Golding, Michael@CDCR

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, July 17, 2018 5:22 PM
**To:** @CDCR
**Subject:** FW: CHCF Clinic Model

7/17/18  ①

Slight edit

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** Golding, Michael@CDCR
**Sent:** Tuesday, July 17, 2018 5:17 PM
**To:** @CDCR
**Subject:** CHCF Clinic Model

Hi,

Visit to CHCF on Tues 17th

, MD (Statewide and I (Michael Golding, MD Statewide Chief Psychiatrist CDCR) went to CHCF on Tuesday the 17th of July. We visited all yards and spoke with the 3-on site psychiatrists who were there today. Two of them work in the crisis bed and one works in Ad Seg EOP. We also spoke at length with The CHCF

**Clinic model:**
*Crisis Bed*
There is no clinic model in the crisis unit hospital beds. Custody will bring patients to seated psychiatrists for initial psychiatric appointments, but not follow-up visits which are all cell-side. There are 3 rooms which all the psychologists, social workers, and Rec Therapists compete for in order to have the privilege of being able to see patients confidentially. The two physicians in the crisis bed were clear that there was no pecking order for these room assignments. Rec therapists have as much priority as physician psychiatrists in claiming the rooms or claiming the custody officer's time. We combined the "first come first serve" model with custody.

1

7/17/18 ②

Practically, the absence of clinic space or a clinic model means that psychiatrists will attempt to see crisis bed patients for their initial appointment in a confidential space, but they attempt no follow-up appointments in a confidential setting given the office shortages.

Instead all follow-up appointments are cell-side. Given time constraints, Dr. ████ cannot use the shared room (that the Psychologists, Rec Therapists, and Psychiatrists compete for) in order to dictate notes. He says he needs to use Dragon (to dictate his notes), but he has no office and therefore when he leaves the competed-for-space there then is no quiet space where the computer can accurately process his voice. He notes that the occupational therapy supervisor has an office but thinks he should have one to be able to dictate his notes.

If he returns to his "office" (a chair at a table in an open room with many people seated and walking about), he does not have the quiet to dictate. Lack of office space is a constant.

Both psychiatrists said that their decision making was not adequately considered. Dr. ████ and Dr. ████ both expressed that often when they go to treatment teams, they find out that their patients are going to be discharged during treatment team, sometimes in the beginning of the team when it is announced or sometimes when the patient is told. Effectively the psychiatrists opinion is not considered in making many of the decisions for discharge and both psychiatrists say that their opinion has been overruled. Both asked who is ultimately in charge when discharge decisions are made. They both said that it seemed that the psychologists who made the discharge decisions were in charge and did not need to consider their medical opinion.

On the other hand, they said that if they vigorously objected, often but not always, the psychologists running the treatment team (and making the decisions) would change his or her mind. Nonetheless it was clear that many or most of the decisions about discharge were made by psychologists without consulting the psychiatrist and the decision was a *fait accompli* when the psychiatrist first heard about it in the treatment team.

The psychiatrists also thought that having just psychologists determine that a patient is medically appropriate for admission to the crisis bed hospital is problematic and dangerous. They say that the psychologists determine that it is OK for the patient to come to their hospital and the physician psychiatrist is not consulted. Dr. ████ (the ████ ████ said the admission team used to consult with her, but not anymore. She says that many patients are medically compromised and they hear about the problems after the patient has arrived, when some preparation would have been better.

Huddle in the AM takes about ½ hour. There are about two hours per day of treatment team meetings. Shower time is between 2:30 to 4:30. There is about an hour per day of groups that take the patient away. Huddle plus IDTT plus group takes between 8:00-11:00. Psychiatrists have between 11:00-2:30 to compete for the available rooms for the privilege of having confidential appointments with the patients. After 4:30 custody is usually not available so patients can only be seen cell-side. Psychiatrists usually use the time after 2:30 to do documentation.

### AdSeg EOP
We visited Ad Seg EOP. There is no clinic model present. The psychiatrist (Dr. ████ says that he is competing with the patients who are on grounds or in groups. Patients will not be brought to him in general but he says he has worked out how to see patients in the yard (standing up) and interacts with many of his patients that way. He also sees them cell-side. In terms of his ability to be involved with decisions about level of care change, he says that he tries to just agree with the decisions that the psychology leaders make (and they usually do not consult him). He says that he has hoped that when he does have a strong medical opinion about a particular patient (because of medication changes or instability) that at least at that point the psychology leadership would hear him out. But he says that the few times he has tried to change a level of care decision, the psychologist simply said, "No."

The Ad'seg psychiatrist frequently sees patients cell-side, but does not know how to record these appointments as non-confidential. The EHRS default-setting is that the appointment is confidential, so even if the psychiatry team were allowed to know the EHRS %'s of patients that are documented as being seen cell-side, since many of our psychiatrists

(including this one) do not know how to use the EHRS to record that, the appointments are recorded as confidential though they are not (there are simple fixes to make it easy to record this but these have not been allowed).

yard

7/17/18  3

No one shows up" (⬛⬛⬛⬛⬛⬛Dr.⬛⬛⬛. Doctors have to find the patients to treat them.

C-Yard: Dr.⬛⬛⬛noted that the general medical physician has a large independent office and then a room right next to it (a large exam room). Dr.⬛⬛⬛points out that none of the psychiatric physicians have anything like that. There are two spaces in which patients can be seen (if they were brought). Social Workers, Psychiatrists, and Psychologists compete to use those rooms, but Dr.⬛⬛⬛said that in general it has not been hard for the psychiatrist to gain access to these confidential spaces. Indeed when we were there, no one was in either of the spaces, so there appears to be space available. But per Dr.⬛⬛⬛the hard part on "C-yard" is "finding the patient" to be able to complete an appointment.

Some of the medical yards have 4-beds per dorm. It is hard for the psychiatrist to either get the patient to a room and the room itself is not confidential because of three other medical patients who are there.

Dr.⬛⬛⬛herself does have an MA assigned to her who helps her to accomplish her tasks. None of the admins assigned to the CMH in general are able to help her but she is very happy about the MA (we explained to her that MA's are not supposed to be used that way, but to assist the clinical staff. Instead, the admins helping the CMH are supposed to be shared with her which they are not.

Dr.⬛⬛⬛fills in for her psychiatrists and sees patients, like more than half (about 60%) of the Chiefs and Senior Supervisors across the state. There certainly is no clinic manager in any setting nor is there time or personnel available for Dr.⬛⬛⬛to try to arrange that coverage.

In short, there is no clinic structure at CHCF, psychiatrists struggle for confidential spaces which are frequently absent, and finding patients is a daily struggle. There is not much respect for medical decision-making by physician psychiatrists, but psychologists fill in with medically involved decisions by determining whether the medical context is safe for patients to be admitted in crisis beds hospitals, when medications are titrated sufficiently for patients to leave crisis bed hospitals, when levels of care should be changed in AdSeg. and throughout the hospital etc.

Michael

Michael Golding, M.D.
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

7/17/18
④

# EXHIBIT BB
# (2018-07-18-R)

The medical danger at SAC is bad.     Mid July a   (1)   7/18/18 Dr.

The below is the psychiatrists description of his day I spend with him. I eliminated the description of the previous day (much like the first) but I did not observe it so could not fill in details, like above.

Dr. ████ says,

Of note in the last year time there has been a stabbing on the yard, fights on the yard, and it is not uncommon for inmate patients to have manufactured weapons in their cells. Also on the prison block some inmate patients likely are walking around as they await their turn to use the shower, waiting to be escorted by custody, working as porters, etc. The blocks are also two tiered so there is always a risk that an inmate patient might throw a provider off the highest tier severe injuring or even killing a provider.

On Tuesday 07/10/2018 there were a total of 11 entirely different patients scheduled however 2 were moved to a different block and thus the actual patients scheduled to my care were 9 as the other 2 were now under the care of a different psychiatrist given the movement. Only 3 of the 9 came and were interviewed in the safety of the EOP clinic. The remaining 6 were attempted to be seen on the block in addition to the 6 remaining patients to be seen on the block from the previous day making the total of 12 cell side interviews. 5 (Five) █████████████████████████████

████████████████████████████████████████ of the 12 inmate patients on the C section of the block could not be interviewed because custody informed us that an agitated inmate patient ██████ was in section C and it would not be safe to enter as the door to section C was closed. The following is regarding the A and B section of the block. 1 (One) █████████████ was not in his cell to do the cell side interview. His cellmate reported that inmate ██████ was somewhere on the yard.

4 (Four) ██████████████████████████████████████████████████████ of the remaining 6 were interviewed cell side and 1 (One) █████████████ of the 6 was interviewed in the hallways as inmate patient called to me appearing mildly agitated requesting to be taken off his heat medications. Of note the patient was ██ refusing his other psychiatric medications as well. A brief interview was done in the hallway of the block. Of note, ██████████ reported the he left the EOP clinic this morning before his psychiatry appointment because he had a Telemedicine appointment at the same time. 1 (One) █████████████ of the remaining 6 was spoken to in the open section as he had finished showering and was walking back to his cell. ██████ reported that he did not come to his EOP clinic appointment because he was in severe pain secondary to his complications from his end stage liver disease and bilateral severe leg edema.

████████████ reported that he did not come to his EOP clinic appointment because he just recently saw his clinician (psychologist or social worker) and that the ducat he received must have been an error ████ reported and showed us that he only receive a single ducat for group noting "A EOP Trt Cntr Grp RM 2 MH" but did not receive a ducat for his psychiatry 1:1 appointment ███████████ reported that he had a legal visit at 7:30am that lasted approximately 45 minutes. He reports returning to the block but by this time the second group was already likely brought to the EOP clinic.

█████████████ is prescribed involuntary psychiatric medications under an active PC 2602 court order and was not able to articulate a clear reason why he did not come to his EOP clinic appointment. When pressured to clarify further the patient then reported that he thinks his cell door was not opened.

Of note, two other inmate patients who were not scheduled for today or yesterday ██████████████ ██████████ in different cells requested to speak to me to address their questions and needs. ████ seemed to commute better in Spanish but spoke some broken English.

5

# EXHIBIT CC
# (2018-07-26-1053hrs)

Golding, Michael@CDCR

7-26-18_1053hrs ☐ P P 1

| | |
|---|---|
| From: | ▬▬▬@CDCR |
| Sent: | Thursday, July 26, 2018 10:53 AM |
| To: | Golding, Michael@CDCR |
| Subject: | Performance Report |
| Attachments: | Performance Report 2.PNG; Performance Report on 7.26.18 no longer has Placement option.JPG; Timely Psychiatry Contacts 7.26.18.JPG |

Hi Michael,

I have attached a screenshot of the Performance Report from 5/2017, showing that 'Placement' (EOP, CCCMS, etc) used to be included in the filter options, and a screenshot of the Performance Report from 7/26/18, showing that 'Placement' is no longer an option. Placement options were ML EOP, CCCMS, ASU EOP, MHCB, etc, but I don't have an old screenshot showing these options. Now that 'Placement' is no longer an option, the 'Timely Psychiatry Contacts' indicator returns one percentage for the entire institution, making it impossible to determine what the percentage is for EOP versus CCCMS. Previously you could select 'EOP' under 'Placement', for example, and get the percentage specifically for EOP timely psychiatry contacts. In order to obtain this data now, the user would have to drilldown in Timely Psychiatry Contacts, and manually sort through the list of all appointments, week by week, to total up the compliance percentage for a particular level of care. I have attached a screenshot to try to explain this better, but please ask me to explain it if this doesn't make sense.

▬▬▬

▬▬▬ **MD**
Senior Psychiatrist, Specialist
Elk Grove - Headquarters
California Department of Corrections and Rehabilitation

Cell phone: ▬▬▬

P52

old op
5/11/2017



Venup
From
twe

No placement listed so can't tell whether EOP or

CCC

# EXHIBIT DD
# (2018-07-27-0926hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| From: | Golding, Michael@CDCR |
| Sent: | Friday, July 27, 2018 9:26 AM |
| To: | @CDCR |
| Cc: | @CDCR |
| Subject: | RE: Compliant Appointments |

July 27, 2018
9:26 AM

Yes.
Thank you.
That's what I thought.

Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

**From:** @CDCR
**Sent:** Friday, July 27, 2018 8:45 AM
**To:** Golding, Michael@CDCR
**Cc:** @CDCR
**Subject:** RE: Compliant Appointments

Exactly. The definition of Timely Psychiatry Contacts numerator is *"Number of patient-weeks included in denominator during which the patient was up-to-date on their required Psychiatrist contact. Contact requirements delineated in the Compliance Rules grid"*.

The Compliance Rules grid lists the program guide limits, so that CCC patient's appointments are compliant if they occur within 90 days (or even a little longer because of the way of checking by weeks), no matter when the psychiatrist scheduled them.

Yes, the scheduling order could be cancelled with no reason given and although there would still be a cancelled scheduling order visible in EHRS, it would not show up in any of QM's indicators (unless they decided to start looking at the number of cancelled scheduling orders). If the appointment was closed without the patient being seen, it would

1

ı reason – not brought by custody, patient refused, provider not available, etc – but you're right that this would
· whether the psychiatry contact is timely.

. Golding, Michael@CDCR
.nt: Friday, July 27, 2018 8:12 AM
**To:** ▮▮▮▮▮@CDCR < ▮▮▮▮▮@cdcr.ca.gov>
**Cc:** ▮▮▮▮@CDCR < ▮▮▮▮@cdcr.ca.gov>
**Subject: Compliant Appointments**

Hi,
Let's say a patient arrives at CCC and is referred to the psychiatric physician and seen on the day of arrival to CCC. The psychiatrist sees the patient and then schedules an appointment back in 10-days. Imagine that the appointment does not occur for some reason.

I don't think that missed appointment would not lower the %-weeks compliant number; that is it would not lower the "timely appointment" number, right?

So if the physician scheduled a patient who just arrived at CCC to be seen 10-days later, but the patient was not seen, the next appointment (say 80 days after the missed appointment) would not be considered lat (though it was 75-days late) because it is within program guide timelines (90 days from the last appointment).

Indeed, the 80 day later appointment would be considered "timely", because the patient was seen at least once within 90-days of their last appointment at a CCC level of care. So "timely appointments" does not in any way count missed appointments that are scheduled by physicians, if earlier than maximum program guide limits.

All appointments are considered timely, regardless of when the physician orders to see the person, as long as they are within maximum program guide time frames. Right?

So timely appointments have nothing to do with when physicians order patients to be seen, only whether we are following program guide timelines (and even then, it can be over and still be perfectly compliant in many scenarios, as I have illustrated elsewhere.)

So in those patients who are most likely to need to be seen (those who are scheduled earlier than mandated timelines), if the appointment was missed, "timely appointments" would not be changed.

If true, they are
1. Again ignoring the importance of a patient being seen on time when a physician orders that a patient be seen on time.
2. Creating a situation in which the reports of timely appointments are very likely falsely elevated, because all appointments scheduled before the maximum program guide timeframes cannot be considered non-compliant, so no missed appointments can be counted. There is a built in grace period for every physician scheduled appointment, because violating the maximum program guide timeframe is the only way of having the appointment count as "non-timely." At a CCC level of care, an appointment could be even 80 days late (after the scheduled appointment) and still be considered on time!

Here is a slightly different question:

Let's say the appointment is not seen that was scheduled to be seen by a psychiatric physician (in 10-days after arrival at CCC). If the appointments was closed out, presumably a reason would have to be given (or they cancel out the scheduled appointment and no reason need be given, right?) Cancelling out the appointment is possible and the worst option, because then *no record* is really visibly left of any error.

's say a reason is given (say, "not brought by custody"). This would be recorded merely as a failure to bring the
would not be reported that the patient's appointment was not on time, despite the physicians order. Right?
atient's appointments would still be recorded as "timely" despite missing the appointments that are the most
tant to make, the ones that are scheduled earlier than normal because there is a problem.

Thank you for thinking about this for me.

:-)

Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

# EXHIBIT EE
# (2018-07-27-1634hrs)

**Golding, Michael@CDCR**          7/27/18

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** 7/27/18 | Friday, July 27, 2018 4:34 PM |
| **To:** | @CDCR |
| **Cc:** | @CDCR;          @CDCR |
| **Subject:** | RE: Pt not seen by our MHMD since arrival in May |

Yes. As I suspected, this patient according to the interpretation of a QM committee vote, did not need to be seen sooner. The psychiatrist is scheduled to see the patient 3-months after his arrival in May at SATF, which would be some time in August, which has not yet passed.

Our two psychiatrists on the committee voted against this but there are 17 psychologists on the QM committee and there were about 8 there during this vote and they (and several administrators and the          and          voted that against what our psychiatrists wanted

1.  Patients transferred to new institutions should be seen within 14-days

Or

2.  If they would not allow that, they should be seen at a minimum when the physician ordered that they be seen next.

The psychiatrists clearly favored number "1", but we could not get "1" or "2".

Two          (the          and          ) also voted that it would be OK to override the physicians order when patients transfer.

I will ask Dr.          to find out when the last visit was at Wasco by a psychiatrist and what he ordered in terms of when the patient should be seen next..

Unfortunately, our psychologists voted that they can override when the physician psychiatrist says the patient needs to be seen next if the patient switches institutions. The reasoning is that we have a "referral based system."

That means that the psychologist decides when to refer a patient to see a psychiatrist, even if the previous psychiatrist made a determination that the patient needs to be seen earlier than the psychologist determines.

It's even a little worse than all that. Let's say a patient DOES NOT switch institutions and a psychiatrist orders that a patient be seen in 10-days. If the program guide would say that the maximal amount of time that the patient should be seen in is 70-days later (not 10 days later), then missing the physician-ordered time frame is NOT COUNTED AS LATE.

In other words, the physicians order in no way determines whether patients are considered to have been seen late or not! And when patients transfer institutions, they voted that they do not have to follow the physician's order. So those who need to be seen early and are most at risk, can be seen weeks later and still be thought to have a timely appointment.

Yes remarkable. Let's find out what the physician's order said for when the patient should be seen next if he had not transferred institutions. Given that he transferred institutions, I think he should have been seen within 14-days.

Best,
Michael

1

7/27/18  2

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

**From:** ▮▮▮▮▮@CDCR
**Sent:** Friday, July 27, 2018 3:34 PM
**To:** Golding, Michael@CDCR
**Cc:** ▮▮▮▮▮@CDCR; ▮▮▮▮▮▮@CDCR
**Subject:** RE: Pt not seen by our MHMD since arrival in May

Hi Michael,

He came from Wasco Reception Center to our CCCMS but the SATF nurse practitioner assigned to him in CCCMS is also assigned to cover EOP. The psychiatric coverage is therefore stretched thin.

▮▮▮ MD
▮▮▮▮▮

CSATF/SP Corcoran
Tel: 559-992-7100 Ext 7248
Cell 559-670-8029

**From:** Golding, Michael@CDCR
**Sent:** Friday, July 27, 2018 3:27 PM
**To:** ▮▮▮@CDCR <▮▮▮@cdcr.ca.gov>
**Cc:** ▮▮▮@CDCR <▮▮▮@cdcr.ca.gov>; ▮▮▮@CDCR <▮▮▮@cdcr.ca.gov>
**Subject:** FW: Pt not seen by our MHMD since arrival in May

Hi,
Is the patient in CCC or EOP?
There is a reason for my request and then I will answer.
Yes I am concerned.
Michael

7/27/18 3

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** █████@CDCR
**Sent:** Friday, July 27, 2018 3:14 PM
**To:** Golding, Michael@CDCR
**Subject:** Fwd: Pt not seen by our MHMD since arrival in May

███████, M.D.

███████ mobile

Sent from my iPhone
Kindly excuse any errant autocorrections and spelling errors.

Begin forwarded message:

**From:** "████████@CDCR" <████████@cdcr.ca.gov>
**Date:** July 27, 2018 at 12:04:01 PM PDT
**To:** "████████@CDCR" <████████@cdcr.ca.gov>, "████████@CDCR"
<████████@cdcr.ca.gov>
**Cc:** "████████@CDCR" <████████@cdcr.ca.gov>, "████████@CDCR"
<████████@cdcr.ca.gov>, "████████@CDCR" <████████@cdcr.ca.gov>, "████████
@CDCR" <████████@cdcr.ca.gov>, "████████"
<████████@cdcr.ca.gov>, CDCR CCHCS TelePsych Admin <TelePsych.Admin@cdcr.ca.gov>
**Subject:** Pt not seen by our MHMD since arrival in May

Hello Everyone,

This patient has not been seen since his arrival in May by one of our psychiatrists?

He has had a major incident that could be related to psychosis- he is currently not on an antipsychotic?

Why was this patient not seen?



# EXHIBIT FF
# (2018-07-30-0925hrs)

**Golding, Michael@CDCR**

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Monday, July 30, 2018 9:25 AM |
| **To:** | ▓▓▓▓▓@CDCR |
| **Subject:** | RE: Pt not seen by our MHMD since arrival in May |

Yes.
Exactly.
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** ▓▓▓▓▓@CDCR
**Sent:** Monday, July 30, 2018 9:23 AM
**To:** Golding, Michael@CDCR; ▓▓▓▓▓@CDCR
**Cc:** ▓▓▓▓▓@CDCR
**Subject:** RE: Pt not seen by our MHMD since arrival in May

▓▓▓▓▓ was scheduled for an appointment at Wasco on 5/25/18, but refused to see the psychiatrist when he came to the clinic. The psychiatrist's note is a single line: "inmate was placed on my schedule since he wanted to talk to the psychiatrist and after coming to the clinic he refused to see the psychiatrist , and went back , will need to be rescheduled again". His most recent completed psychiatry appointment was on 4/25/18, at which time the psychiatrist wrote "Return to clinic per CDCR guidelines for CCCMS level of care of 60 days." So if the psychiatrist's order had been followed, the patient would have required an appointment by 6/24/18, about a month after transferring to SATF.

**From:** Golding, Michael@CDCR
**Sent:** Friday, July 27, 2018 4:35 PM
**To:** ▓▓▓▓▓@CDCR < ▓▓▓▓▓@cdcr.ca.gov>
**Cc:** ▓▓▓▓▓@CDCR < ▓▓▓▓▓@cdcr.ca.gov>; ▓▓▓▓▓@CDCR < ▓▓▓▓▓@cdcr.ca.gov>
**Subject:** RE: Pt not seen by our MHMD since arrival in May

Yes. As I suspected, this patient according to the interpretation of a QM committee vote, did not need to be seen sooner. The psychiatrist is scheduled to see the patient 3-months after his arrival in May at SATF, which would be some time in August, which has not yet passed.

Our two psychiatrists on the committee voted against this but there are 17 psychologists on the QM committee and there were about 8 there during this vote and they (and several administrators and the ████ and ████████ voted that against what our psychiatrists wanted

1. Patients transferred to new institutions should be seen within 14-days

Or

2. If they would not allow that, they should be seen at a minimum when the physician ordered that they be seen next,

The psychiatrists clearly favored number "1", but we could not get "1" or "2".

Two ████████ (the ████ and ████████████ also voted that it would be OK to override the physicians order when patients transfer.

I will ask Dr. ████ to find out when the last visit was at Wasco by a psychiatrist and what he ordered in terms of when the patient should be seen next..

Unfortunately, our psychologists voted that they can override when the physician psychiatrist says the patient needs to be seen next if the patient switches institutions. The reasoning is that we have a "referral based system."

That means that the psychologist decides when to refer a patient to see a psychiatrist, even if the previous psychiatrist made a determination that the patient needs to be seen earlier than the psychologist determines.

It's even a little worse than all that. Let's say a patient DOES NOT switch institutions and a psychiatrist orders that a patient be seen in 10-days. If the program guide would say that the maximal amount of time that the patient should be seen in is 70-days later (not 10 days later), then missing the physician-ordered time frame is NOT COUNTED AS LATE.

In other words, the physicians order in no way determines whether patients are considered to have been seen late or not! And when patients transfer institutions, they voted that they do not have to follow the physician's order. So those who need to be seen early and are most at risk, can be seen weeks later and still be thought to have a timely appointment.

Yes remarkable. Let's find out what the physician's order said for when the patient should be seen next if he had not transferred institutions. Given that he transferred institutions, I think he should have been seen within 14-days.

Best,
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Learn easy ways to save water
during California's drought at
SaveOurWater.com**

**From:** ███████ @CDCR
**Sent:** Friday, July 27, 2018 3:34 PM
**To:** Golding, Michael@CDCR
**Cc:** ███████ @CDCR; ███████ @CDCR
**Subject:** RE: Pt not seen by our MHMD since arrival in May

Hi Michael,

He came from Wasco Reception Center to our CCCMS but the SATF nurse practitioner assigned to him in CCCMS is also assigned to cover EOP. The psychiatric coverage is therefore stretched thin.

███ MD

CSATF/SP Corcoran
Tel: ███████
Cell ███████

**From:** Golding, Michael@CDCR
**Sent:** Friday, July 27, 2018 3:27 PM
**To:** ███████ @CDCR < ███████ @cdcr.ca.gov>
**Cc:** ███████ @CDCR < ███████ @cdcr.ca.gov>; ███████ @CDCR < ███████ @cdcr.ca.gov>
**Subject:** FW: Pt not seen by our MHMD since arrival in May

Hi,
Is the patient in CCC or EOP?
There is a reason for my request and then I will answer.
Yes I am concerned.
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

3



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

From: ███████@CDCR
Sent: Friday, July 27, 2018 3:14 PM
To: Golding, Michael@CDCR
Subject: Fwd: Pt not seen by our MHMD since arrival in May


██████, M.D.
████████ mobile

Sent from my iPhone
Kindly excuse any errant autocorrections and spelling errors.

Begin forwarded message:

> From: "██████@CDCR" <██████@cdcr.ca.gov>
> Date: July 27, 2018 at 12:04:01 PM PDT
> To: "████████@CDCR" <████████@cdcr.ca.gov>, "████████@CDCR"
> <████████@cdcr.ca.gov>
> Cc: "██████@CDCR" <██████@cdcr.ca.gov>, "████████@CDCR"
> <██████@cdcr.ca.gov>, "██████@CDCR" <██████@cdcr.ca.gov>, "██████@CDCR" <██████@cdcr.ca.gov>, "████████"
> <██████@cdcr.ca.gov>, CDCR CCHCS TelePsych Admin <TelePsych.Admin@cdcr.ca.gov>
> Subject: Pt not seen by our MHMD since arrival in May

> Hello Everyone,

> This patient has not been seen since his arrival in May by one of our psychiatrists?

> He has had a major incident that could be related to psychosis- he is currently not on an antipsychotic?

> Why was this patient not seen?



# EXHIBIT GG
# (2018-07-30-1002hrs)

7/30/18  1

**Golding, Michael@CDCR**

**From:**                           @CDCR
**Sent:**            Monday, July 30, 2018 10:02 AM
**To:**              Golding, Michael@CDCR
**Subject:**         RE: Pt not seen by our MHMD since arrival in May

⬛⬛⬛⬛ s a ⬛ year old ⬛ male with schizophrenia and PTSD who was transferred to Wasco on 3/26/18 from Los Angeles County jail, and then transferred from Wasco to SATF on 5/29/18. He has a history of CCCMS, EOP, MHCB (11/3/10, 4/12/01), and DSH (12/29/15) levels of care during a previous incarceration, and reportedly attempted suicide by shooting himself in the chest approximately 15 years ago. He was prescribed Zyprexa while in jail, but this was discontinued on 3/29/18 shortly after arriving at Wasco per patient request. On 7/26/18 he assaulted another inmate, resulting in a serious eye injury that necessitated sending the inmate to an outside hospital, and reported he had command auditory hallucinations to hit the inmate. Per Dr. ⬛ 7/27/18 note, the inmate reported "there is a conspiracy by the CO's to have the other inmates go at him. He felt that the peer that he attacked was part of this plan to harm him." Dr. ⬛ also noted "he became increasingly agitated while discussing this and refused to consider taking an antipsychotic medication". He has been prescribed Remeron and Vistaril since 3/29/18, and per the MAR he was compliant with them until 6/30/19, at which time he became intermittently compliant.

His history of EOP, MHCB and DSH suggest a patient who requires more frequent psychiatric intervention. Also concerning is the discontinuation of Zyprexa without regular follow-ups to evaluate for decompensation. He was seen by psychiatry on 3/29/18, 4/25/18, and 7/27/18.

**From:** Golding, Michael@CDCR
**Sent:** Monday, July 30, 2018 9:26 AM
**To:** ⬛⬛⬛@CDCR < ⬛⬛⬛⬛⬛@cdcr.ca.gov>
**Subject:** RE: Pt not seen by our MHMD since arrival in May

Yes.
Exactly.
Michael

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:** Gonzalez, Melanie@CDCR
**Sent:** Monday, July 30, 2018 9:23 AM
**To:** Golding, Michael@CDCR;          @CDCR
**Cc:**          @CDCR
**Subject:** RE: Pt not seen by our MHMD since arrival in May

7/30/18   2

_____ was scheduled for an appointment at Wasco on 5/25/18, but refused to see the psychiatrist when he came to the clinic. The psychiatrist's note is a single line: "inmate was placed on my schedule since he wanted to talk to the psychiatrist and after coming to the clinic he refused to see the psychiatrist , and went back , will need to be rescheduled again". His most recent completed psychiatry appointment was on 4/25/18, at which time the psychiatrist wrote "Return to clinic per CDCR guidelines for CCCMS level of care of 60 days." So if the psychiatrist's order had been followed, the patient would have required an appointment by 6/24/18, about a month after transferring to SATF.

**From:** Golding, Michael@CDCR
**Sent:** Friday, July 27, 2018 4:35 PM
**To:**          @CDCR <          @cdcr.ca.gov>
**Cc:**          @CDCR <          @cdcr.ca.gov>;          @CDCR <          @cdcr.ca.gov>
**Subject:** RE: Pt not seen by our MHMD since arrival in May

Yes. As I suspected, this patient according to the interpretation of a QM committee vote, did not need to be seen sooner. The psychiatrist is scheduled to see the patient 3-months after his arrival in May at SATF, which would be some time in August, which has not yet passed.

Our two psychiatrists on the committee voted against this but there are 17 psychologists on the QM committee and there were about 8 there during this vote and they (and several administrators and the          and _____ voted that against what our psychiatrists wanted
1. Patients transferred to new institutions should be seen within 14-days
Or
2. If they would not allow that, they should be seen at a minimum when the physician ordered that they be seen next.

The psychiatrists clearly favored number "1", but we could not get "1" or "2".

Two _____ (the          and _____ also voted that it would be OK to override the physicians order when patients transfer.

I will ask Dr. _____ to find out when the last visit was at Wasco by a psychiatrist and what he ordered in terms of when the patient should be seen next..

Unfortunately, our psychologists voted that they can override when the physician psychiatrist says the patient needs to be seen next if the patient switches institutions. The reasoning is that we have a "referral based system."

That means that the psychologist decides when to refer a patient to see a psychiatrist, even if the previous psychiatrist made a determination that the patient needs to be seen earlier than the psychologist determines.

It's even a little worse than all that. Let's say a patient DOES NOT switch institutions and a psychiatrist orders that a patient be seen in 10-days. If the program guide would say that the maximal amount of time that the patient should be seen in is 70-days later (not 10 days later), then missing the physician-ordered time frame is NOT COUNTED AS LATE.

In other words, the physicians order in no way determines whether patients are considered to have been seen late or not! And when patients transfer institutions, they voted that they do not have to follow the physician's order. So those who need to be seen early and are most at risk, can be seen weeks later and still be thought to have a timely appointment.

Yes remarkable. Let's find out what the physician's order said for when the patient should be seen next if he had not transferred institutions. Given that he transferred institutions, I think he should have been seen within 14-days.

Best,
Michael

7/30/18   3

**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov



**Save Our Water**

Learn easy ways to save water
during California's drought at
SaveOurWater.com

**From:**           @CDCR
**Sent:** Friday, July 27, 2018 3:34 PM
**To:** Golding, Michael@CDCR
**Cc:**           @CDCR;               @CDCR
**Subject:** RE: Pt not seen by our MHMD since arrival in May

Hi Michael,

He came from Wasco Reception Center to our CCCMS but the SATF nurse practitioner assigned to him in CCCMS is also assigned to cover EOP. The psychiatric coverage is therefore stretched thin.

           MD

CSATF/SP Corcoran
Tel:
Cell

3

7/30/18   4

**From:** Golding, Michael@CDCR
**Sent:** Friday, July 27, 2018 3:27 PM
**To:** ███████@CDCR <██████████@cdcr.ca.gov>
**Cc:** ████████@CDCR <████████@cdcr.ca.gov>;   ████████@CDCR <████████@cdcr.ca.gov>
**Subject:** FW: Pt not seen by our MHMD since arrival in May

Hi,
Is the patient in CCC or EOP?
There is a reason for my request and then I will answer.
Yes I am concerned.
Michael


**Michael Golding, M.D.**
Statewide Chief Psychiatrist
Mental Health Support Program
California Department of Corrections and Rehabilitation

Phone: 916.662.6541
Email: michael.golding@cdcr.ca.gov

## Save Our Water

**Learn easy ways to save water
during California's drought at
SaveOurWater.com**


**From:** ████████@CDCR
**Sent:** Friday, July 27, 2018 3:14 PM
**To:** Golding, Michael@CDCR
**Subject:** Fwd: Pt not seen by our MHMD since arrival in May



████████ M.D.
████████
████████ mobile

Sent from my iPhone
Kindly excuse any errant autocorrections and spelling errors.

Begin forwarded message:

> **From:** "████████@CDCR" <████████@cdcr.ca.gov>
> **Date:** July 27, 2018 at 12:04:01 PM PDT
> **To:** "████████@CDCR" <████████@cdcr.ca.gov>, "████████@CDCR"
> <████████@cdcr.ca.gov>

4

Cc: "▮▮▮▮▮@CDCR" <▮▮▮▮▮@cdcr.ca.gov>, "▮▮▮▮▮@CDCR"
<▮▮▮▮▮@cdcr.ca.gov>, "▮▮▮▮▮@CDCR" <▮▮▮▮▮@cdcr.ca.gov>, "▮▮▮▮▮
▮▮▮▮▮@CDCR" <▮▮▮▮▮@cdcr.ca.gov>, "▮▮▮▮▮
<▮▮▮▮▮@cdcr.ca.gov>, CDCR CCHCS TelePsych Admin <TelePsych.Admin@cdcr.ca.gov>

**Subject: Pt not seen by our MHMD since arrival in May**

Hello Everyone,

This patient has not been seen since his arrival in May by one of our psychiatrists?

He has had a major incident that could be related to psychosis- he is currently not on an antipsychotic?

Why was this patient not seen?

7/30/18 5

7/30/18   6



# EXHIBIT HH
# (2018-07-30-2057hrs)

## Quick List: SAC
## Appointments seen as scheduled from 2/01/18 thru 2/28/18
## Placement: ALL
## Data last refreshed 7/30/2018 8:57:00 PM

7/20/18 8:57 PM

| | Mea surements | Appts Seen as Scheduled ↕ | Compliance ↕ |
|---|---|---|---|
| Appointments seen as scheduled | 745319 | 678395 | 91% |
| ProviderUnavailable | | 0 | 0% |
| ModifiedProgram | | 0 | 0% |
| TechnicalDifficulties | | 0 | 0% |
| Seen | | 678395 | 91% |

⊞ **Details**

| Seen Reason | Placement ↕ | Inst ↕ | CDCR# ↕ | Name ↕ | Date ↕ | Appts Seen as ↕ Scheduled |
|---|---|---|---|---|---|---|
| ⊞ ModifiedProgram (2444) | | | | | | |
| ] ProviderUnavailable (63544) | | | | | | |
| ] TechnicalDifficulties (936) | | | | | | |

# EXHIBIT II
# (2018-07-31-1346hrs)

**From:** ▮▮▮▮▮▮▮▮ @CDCR
**Sent:** Tuesday, July 31, 2018 1:46 PM
**To:** Golding, Michael@CDCR
**Subject:** RE: SAC scheduling

It is odd, and I don't understand why Appointments seen as scheduled is so high. When I drill down on Appointments seen as scheduled, the only options it shows are Seen, ProviderUnavailable, ModifiedProgram, and TechnicalDifficulties (I have attached a screenshot). There are several other options to choose from when cancelling an appointment, including IP No Showed, IP Refused, Scheduling Error, etc, so it appears they do not include any appointments with those outcomes in the denominator. But that is so illogical that I'm doubting myself.

# EXHIBIT JJ
# (2018-08-01)

Aug 2018   1

Psychiatry QM

Timely Psychiatry Contacts – measured in weeks, only checked once a week on Sunday, clock resets when patient transfers, physician orders for follow-ups prior to maximum time per program guide are often ignored (especially if the patient transfers institutions).

> Routine
>
> Initial
>
> After transfer
>
> After leaving MHCB/PIP

> Medication non-compliance – these appointments are only measured if the physician puts in a scheduling order for a medication non-compliance appointment. The appointments that are ordered are *far* more likely to be completed. To accurately capture the percentage of medication non-compliance appointments that are occurring when they should, the denominator needs to be the number of patients who are flagged as medication non-compliant, and the numerator needs to be the number of medication non-compliant patients who are seen within the specified program guide timeframe.

Timely MH Referrals: Denominator = Number of Routine, Urgent, Emergent, Med Refusal, and RVR MHA referrals that either came due or were completed during the reporting period. Due dates determined using the timeframes delineated in the Compliance Rules grid.. This has the same problem as the appointments for medication non-compliance – the denominator is only capturing the referrals that were ordered, not all of the referrals that occurred. Unlike medication non-compliance appointments, there is not an easy way to make the denominator more accurate. Per the CLAC workflows for MH Consults, the staff member who wants the referral is supposed to put in an order (or submit an MH-5 if they do not have EHRS access), and then call the provider if it is an urgent or emergent consult. The scheduler is then supposed to schedule the consult in a timely fashion. If this always occurred, the denominator would be accurate, and the issue would then become the numerator (since it would be measuring the completed consults, which means the psychiatrist would have to have EHRS access, which is not possible outside of business hours), but there are clearly many consults occurring without an order.

> Emergent consult
>
> Urgent consult
>
> Routine consult

Psychiatrist continuity of care: "Percentage of psychiatrist contacts seen by the most frequent provider." Denominator = All psychiatry contacts seen in person during the 5 months before the start of the reporting period through the end of the reporting period (6 months total) for any patient who has been EOP in the same housing program at the same institution, without interruption, for the past six months.

Confidential vs. Non-confidential – this is not an indicator, but it is important to note that the check out screen defaults to confidential, so unless a psychiatrist knows how to change it to Non-confidential, and they take the time to change it, all appointments will be recorded as confidential.

|◁   ◁   1   of 1   ▷   ▷|   100%   ▽   [   ]   Find | Next   🔖 ▼   ⊙   🖨   🈁

## Quick List: SAC
## Appointments seen as scheduled from 2/01/18 thru 2/28/18
## Placement: ALL
## Data last refreshed 7/30/2018 8:57:00 PM



|  | Mea surements | Appts Seen as Scheduled ⇅ | Compliance ⇅ |
|---|---|---|---|
| Appointments seen as scheduled | 745319 | 678395 | 91% |
| ProviderUnavailable |  | 0 | 0% |
| ModifiedProgram |  | 0 | 0% |
| TechnicalDifficulties |  | 0 | 0% |
| Seen |  | 678395 | 91% |

⊞ **Details**

| Seen Reason | Placement ⇅ | Inst ⇅ | CDCR# ⇅ | Name ⇅ | Date ⇅ | Appts Seen as Scheduled ⇅ |
|---|---|---|---|---|---|---|
| ⊞ ModifiedProgram (2444) |  |  |  |  |  |  |
| ] ProviderUnavailable (63544) |  |  |  |  |  |  |
| ] TechnicalDifficulties (936) |  |  |  |  |  |  |

Aug 1, 2018 3

Appointments seen as scheduled – The denominator is "All scheduled appointments", and the numerator is "All appointments from the denominator that were completed as seen", but this may not be the case. The percentage for Appointments seen as scheduled is surprisingly high, and the drill down for this indicator only shows appointments that were Seen, Cancelled due to ProviderUnavailable, Cancelled due to ModifiedProgram, or Cancelled due to TechnicalDifficulties. It is unclear why IP Refusals, No Shows, and other cancelled appointments do not appear here. If these were included, the number would be far, far less.

Encounters Per Psychiatrist (on the Dashboard) – "Average number of patient encounters completed per psychiatrist per workday. Excludes encounters completed by Chief Psychiatrist." This number is extremely low, and doesn't match what we see in the field. Kevin said he has had meetings with Mike Selby and others to fix this indicator, because it is obviously inaccurate, but no changes have been implemented yet.

Non-Formulary by Psychiatrist

Diagnostic Monitoring: "Percentage of patients prescribed select high risk medications who received appropriate diagnostic monitoring consistent with clinical guidelines. This measure is a composite of 29 measures that assess whether patients on medications that meet specified high risk criteria are receiving appropriate monitoring. Data sources: Electronic Unit Health Record, Guardian Pharmacy Database, Quest Diagnostics Laboratory Database, Strategic Offender Management System. Is this MAPIP? If so, it is measuring a laughably small subset of patients. * The denominator for this indicator was 5 at SAC each month.*

Confidential vs. Non-Confidential

*Aug 1, 2018* 4

**SAC AdSeg EOP (includes ASU and ASUHub)**

May 1 to May 31

168 scheduled appointments

64 cancelled

104 completed

41 non-confidential (39%)

63 confidential (61%) — *No way! Virtually every pt is seen cellside.*

If broken down by initial and routine appointments:

66 initial appointments – 26 non-confidential, 40 confidential (61% confidential)

38 routine appointments – 15 non-confidential, 23 confidential (61% confidential)

(See Excel spreadsheet SAC AdSeg EOP Appointments May 2018)

Confidential vs. Non-Confidential

Aug 1, 2018

CCWF MHCB

May 1 to May 31

104 scheduled appointments

8 cancelled

96 completed

100% confidential → Every double-cell is non-confidential.

There were no non-confidential appointments.

(See Excel spreadsheet CCWF MHCB Appointments May 2018)

Referrals

Aug 1, 2018

6



The "Timely MH Referrals" report gives the percentage of scheduled referrals that are completed on time. It does not include MH referrals that occur without a scheduled referral, thus it does not provide a complete picture of what percentage of referrals are actually completed on time. It is highly likely that referrals that are scheduled are more likely to be completed on time, thus the reported percentage is overinflating compliance.

NKSP Psychiatrist sees 1 (one) person
and is 100% compliant.
But there are likely many more than
one person who needed to be seen!

All Med Non-compliance appointments at CHCF in May 2018
Aug 1, 2018 ⑦ ⑧ She was the only one who had any non-complient pts c meds (not true!)
Her ⑥ was

Case 2:90-cv-00520-KJM-DB   Document 5988-3   Filed 10/31/18   Page 69 of 87

| Inst | CDCR | IP Name | Appt MHI | Appt Date | Provider Name | Reason | Outcome Type | Status Reason | Detail | Confidential |
|------|------|---------|----------|-----------|---------------|--------|--------------|---------------|--------|--------------|
| CHCF | | | EOP | 5/1/2018 9:15:00 AM | | PSY_RX_NON-COMP | Cancelled | CancelledUnspecified | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/25/2018 11:43:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/23/2018 9:01:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/31/2018 12:58:00 PM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/17/2018 11:19:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/31/2018 12:24:00 PM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/7/2018 11:04:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/7/2018 8:56:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/31/2018 8:45:00 AM | | PSY_RX_NON-COMP | Cancelled | CancelledUnspecified | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/31/2018 12:05:00 PM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/23/2018 9:48:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/25/2018 9:19:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/1/2018 8:45:00 AM | | PSY_RX_NON-COMP | Cancelled | CancelledUnspecified | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/21/2018 8:02:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/1/2018 8:15:00 AM | | PSY_RX_NON-COMP | Cancelled | CancelledUnspecified | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/21/2018 10:57:00 AM | | PSY_RX_NON-COMP | Completed | Seen | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/21/2018 9:15:00 AM | | PSY_RX_NON-COMP | Cancelled | CancelledUnspecified | Med Non Adherence | 1 |
| CHCF | | | EOP | 5/21/2018 8:45:00 AM | | PSY_RX_NON-COMP | Cancelled | CancelledUnspecified | Med Non Adherence | 0 |
| CHCF | | | EOP | 5/21/2018 8:45:00 AM | | PSY_RX_NON-COMP | Refused | No Show | Med Non Adherence | 0 |





CALIFORNIA CORRECTIONAL
HEALTH CARE SERVICES

1100-072 Mental Health Consult On-Call Hours

Last Date Updated: 5/25/2016
Reviewed by: Integrated Meeting 5/26/2016
Approver: Clinical Leadership Advisory Committee
Sign-off Date: 6/6/2016

**All Staff**

**Psychologist / MHMD / Social Worker**

Start

Consult worthy event occurs

Emergent or Urgent?

Yes — Call on-call provider

No

Access to Cerner?

Yes — Initiate MH Consult Order (Emergent, Urgent or Routine)

No — Complete MHS consult form and route to MH → 2

Triggers orders to scheduling task

See scheduling workflow 1300-10

See MH Consult Business Hours 1100-071 On page connector #1 → 1

2 → Initiate MH Consult Order

Triggers orders to scheduling task

See scheduling workflow 1300-10

1 → On call provider comes in?

Yes — On-call provider sees patient

No

5 Day Follow Up? — Yes → See 5 Day Follow Up Workflow 1100-090

No

MHCB referral? — Yes → See MHCB Referral Workflow 1100-060 → Create MH Consult Note

No → End Page 189

Cerner

Mental Health

Confidential vs. Non-Confidential

CHCF MHCB

May 1 to May 31

459 scheduled appointments

24 cancelled

435 completed

Aug 1, 2018

TO

       242 non-confidential (56%)

       193 confidential (44%) — Impossible, 100% of followups are non-confidential!

If broken down by initial and routine appointments:

       146 initial appointments – 42 non-confidential, 104 confidential (71% confidential)

       289 routine appointments – 200 non-confidential, 89 confidential (31% confidential)

(See Excel spreadsheet CHCF MHCB Appointments May 2018)

# EXHIBIT KK
# (2018-08-01closeup1)

|◀   ◀   1   of 1   ▷   ▷|   100%   ✓   [        ]   Find | Next   🔲 ▾  ⊙  🖶  ▯



## Quick List: SAC
### Appointments seen as scheduled from 2/01/18 thru 2/28/18
### Placement: ALL
### Data last refreshed 7/30/2018 8:57:00 PM

|  | Mea surements | Appts Seen as Scheduled ⬍ | Compliance ⬍ |
|---|---|---|---|
| Appointments seen as scheduled | 745319 | 678395 | 91% |
| ProviderUnavailable |  | 0 | 0% |
| ModifiedProgram |  | 0 | 0% |
| TechnicalDifficulties |  | 0 | 0% |
| Seen |  | 678395 | 91% |

⊞ Details

| Seen Reason | Placement ⬍ | Inst ⬍ | CDCR# ⬍ | Name ⬍ | Date ⬍ | Appts Seen as Scheduled ⬍ |
|---|---|---|---|---|---|---|
| ⊞ ModifiedProgram (2444) |  |  |  |  |  |  |
| ] ProviderUnavailable (63544) |  |  |  |  |  |  |
| ] TechnicalDifficulties (936) |  |  |  |  |  |  |



Find | Next

## List: SAC
## eduled from 2/01/18 thru 2/28/18
## nent: ALL
## 7/30/2018 8:57:00 PM

| Mea surements | Appts Seen as Scheduled ⬍ | Compliance ⬍ |
|---|---|---|
| 745319 | 678395 | 91% |
|  | 0 | 0% |
|  | 0 | 0% |
|  | 0 | 0% |
|  | 678395 | 91% |

### ⊞ Details

| ⬍ CDCR# ⬍ | Name ⬍ | Date ⬍ | Appts Seen as Scheduled ⬍ |
|---|---|---|---|

# EXHIBIT LL
# (2018-08-01closeup2)

Referrals

Aug 1, 2018

6



The "Timely MH Referrals" report gives the percentage of scheduled referrals that are completed on time. It does not include MH referrals that occur without a scheduled referral, thus it does not provide a complete picture of what percentage of referrals are actually completed on time. It is highly likely that referrals that are scheduled are more likely to be completed on time, thus the reported percentage is overinflating compliance.

NKSP Psychiatrist sees 1 (one) person
and is 100% compliant.
But there were likely many more than
one person who needed to be seen!

Hom

July ▼

Menta:HeartMKpisPopup - Report Viewer - Internet Explorer

⏮ ◀ 1 of 1 ▶ ⏭ | 100% ▼ | | Find | Next | 🔍 ▾ ⬡ 🖨 🗎

## Quick List: NKSP
### Timely MH Referrals from 7/01/18 thru 7/26/18
### Placement: ALL
### Data last refreshed 7/25/2018 9:39:00 PM

| | Mea surements | Avg Time Overdue ⬍ | Compliance ⬍ |
|---|---|---|---|
| Timely MH Referrals | 561 | 0.4 | 84% |
| CompletedMHPCConsultRoutine in 5 WorkDays | 297 | 0.4 | 76% |
| CompletedMHMDConsultUrgent in 24 Hours | 55 | 1.8 | 91% |
| CompletedMHMDConsultRoutine in 5 WorkDays | 153 | 0.1 | 92% |
| CompletedMHPCConsultUrgent In 24 Hours | 30 | 0.2 | 97% |
| CompletedMHPCConsultEmergent in 4 Hours | 25 | 0.0 | 100% |
| CompletedMHMDConsultEmergent In 4 Hours | 1 | 0.0 | 100% |

⊟ Details



| Timeframe | Placement ⬍ | Inst ⬍ | CDCR# ⬍ | Name ⬍ | Date ⬍ | Time Overdue ⬍ | Det |
|---|---|---|---|---|---|---|---|
| ⊟ CompletedMHMDConsultEmergent in 4 Hours (1) | IN_TRANSIT | NKSP | | | | 0 | Initiated on Jul 19 201 2018 9:00PM. Compl 4:4( |
| ⊟ CompletedMHMDConsultRoutine in 5 WorkDays (153) | RC | NKSP | | | | 3 | Initiated on Jun 25 201 2018 11:59PM. Com 8:25 |
| | ML CCCMS | NKSP | | | | 2 | Initiated on Jun 26 201 2018 11:59PM. Com 8:50 |

# EXHIBIT MM
# (2018-08-02-1232hrs)

**Golding, Michael@CDCR**

*Aug 2, 2018 ①*

| | |
|---|---|
| **From:** | Golding, Michael@CDCR |
| **Sent:** | Thursday, August 02, 2018 12:32 PM |
| **To:** | ▓▓▓▓@CDCR |
| **Subject:** | Re: MH Change Management Committee |

*"Everyone" (or b/s)*
*Can determine physician*
*workflows except*
*"physicians"*

Hi,

The real problem is that those who know not much and psychologists can determine fully and completely psychiatric
workflows, though the two psychiatry voting members (you and I) do not have a chance.

Most work for the psychologists and/or are part of the psychology teams that design these things.

The workflows designed, in addition, continue to focus on "scheduling" so as to fit in their interesting  model that in
many circumstances, only that which a psychiatrist scheduled occurred, which leads to all the ways in which compliance
reports are biased, usually toward making us look better than we are doing.

It also allows our psychologists to continue to try to force our psychiatric physicians to use inefficient power plans and
forms which, in addition to being quiet inefficient, also try to mandate the time-frame in which psychiatrists see
patients.

Appointments are not even considered late -- or % weeks late — if a psychiatrist schedules it before the maximum
timeline and in fact the apppintment is actually (potentially months) late.

And of course our medical colleagues are not forced to use our power plans, nor nursing, nor dental.

This whole thing is just sad that we can't be allowed to interact efficiently because those who have little knowledge of
what physician workflows should be, determine physician workflows, and our physicians can not. It is remarkable,
despite our even polling our psychiatric physician colleagues to know how they think we can be more efficient, we still
cannot make these determinations.
Gosh.
Michael

Sent from my iPhone

On Aug 2, 2018, at 11:12 AM, ▓▓▓▓@CDCR <▓▓▓▓@cdcr.ca.gov> wrote:

> Hi Michael,
>
> Just relaying to you an interesting exchange I had today in the above noted meeting.
>
> It was confirmed that there is no quorum requirement for the meeting. Decisions are based on the
> number of members approving the change.
>
> We had a change request today to build an IPOC for the PIPs. It made sense to approve, but my concern
> was that Crystal Bender would be voting on this proposal. I asked her point blank if she could explain
> what an IPOC was, which she could not. My point to the committee was that we have members on the
> committee voting on things they do not understand. Other voting committee members who would
> similarly be likely unable to describe what an IPOC would be are:
>
> ▓▓▓▓▓▓

1





Since this is such a loose committee with unclear rules and is the gate keeper to move changes into the EHRS, I wanted to make it clear there is some concern about folks being capable of casting an informed vote, given that it seems that everyone has a vote.

Nothing for you to do.....just information.

Thanks,

**M.D.**

**Statewide Telepsychiatry Program**
**Mental Health Support Program**
**Elk Grove - Headquarters**
California Correctional Health Care Services
California Department of Corrections and Rehabilitation
desk
mobile
@cdcr.ca.gov

<image001.jpg>

**IMPORTANT WARNING:   This message is intended for the use of the person or entity to which it is addressed and may contain information that is privileged and confidential, the disclosure of which is governed by applicable law.  If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this information is STRICTLY PROHIBITED.  If you have received this message by error, please notify us immediately and destroy the related message.  You, the recipient are obligated to maintain it in a safe, secure and confidential manner.  Re-disclosure without appropriate patient consent or as permitted by law is prohibited.  Unauthorized disclosure or failure to maintain confidentiality could subject you to penalties described in Federal and State Law.**

# EXHIBIT NN (2018-08-10-1116hrs)



| | 04/20/17 23:32 PDT | 04/20/17 23:30 PDT | 04/20/17 23:15 PDT | 04/20/17 23:00 PDT | 04/20/17 22:45 PDT | 04/20/17 22:30 PDT | 04/20/17 22:15 PDT | 04/20/17 22:00 PDT | 04/20/17 21:45 PDT | 04/20/17 21:30 PDT | 04/20/17 21:15 PDT | 04/20/17 21:00 PDT | 04/20/17 20:45 PDT | 04/20/17 20:33 PDT | 04/20/17 20:30 PDT | 04/20/17 20:15 PDT | 04/20/17 19:46 PDT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | Yes | N |
| | | | | | | | | | | | | | | | | Yes | N |
| | | | | | | | | | | | | | | | | Yes | Y |
| | | | | | | | | | | | | | | | | Yes | Y |
| | | | | | | | | | | | | | | | | No | N |
| | | | | | | | | | | | | | | | | Yes | Y |
| | | | | | | | | | | | | | | | | Yes | Y |
| | | | | | | | | | | | | | | | | Yes | Y |
| | Suicide watc | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wa | Suicide wal | | Suicide wat | Suicide wat | |
| | | | | | | | | | | | | | | | | 04/20/17 20 | |
| | Other holdin | Other hold | Other holdi | Other holdi | Other holdi | Other hold | Other hold | Other hold | Other holdi | Other holdi | Other hold | Other hold | | | Other hold | Other holdi | |
| | TTA#104 | TTA#104 | TTA#104 | TTA#104 | TTA#104 | TTA#104 | TTA#104 | TTA#104 | TTA#104 | TTA #104 | TTA # 104 | TTA #104 | TTA# 104 | | 104 | TTA #104 | |
| | | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | Reading, S | | Reading, S | Sitting on f | |
| | Self injuriou | | | | | | | | | | | Hostile | | | Hostile | Hostile | |
| | | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming, | | Screaming, | Screaming, | |
| | | | | | | | I/P SINGING | | I/P coutinu | | Custord ca | | coutinues t | | I/P sitting o | I/P REFUSE | |
| | I/P started to | | Position ch | | | Position ch | | | | | | | | | | | |
| | | | I/P is singin | | | | | | | | | | | | | | |

| 04/20/17 23:30 PDT | 04/20/17 23:15 PDT | 04/20/17 23:00 PDT | 04/20/17 22:45 PDT | 04/20/17 22:30 PDT | 04/20/17 22:15 PD |
|---|---|---|---|---|---|
| uicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide wat | Suicide w |
| ther hold | Other holdi | Other holdi | Other holdi | Other hold | Other hol |
| A#104 | TTA#104 | TTA#104 | TTA#104 | TTA#104 | TTA#104 |
| ading, Si | Reading, Si | Reading, Si | Reading, Si | Reading, Si | Reading, |
| eaming, | Screaming, | Screaming, | Screaming, | Screaming, | Screaming |
| | | | | | I/P SINGIN |
| | Position cha | | | Position ch | |
| | I/P is singin | | | | |

# EXHIBIT OO
# (2018-08-13-1450hrs)

\>

\>> On Aug 13, 2018, at 2:50 PM,                        @CDCR <                        @cdcr.ca.gov> wrote:

\>>

\>> I can't find anything that combines all scheduled and missed appointments. I asked            (she works with          and                , and she said she doesn't know of any indicator or report that shows all scheduled and missed appointments, or even one just for refused appointments.

\>>

\>> There is a report called "Appointments" that allows for searching a specific institution (or all of CDCR), program, date range, and appointment type, and getting a list of all appointments that meet the search criteria. For example, I searched CDCR, ML CCCMS, psychiatrist contacts on 7/10/18 with all outcome types, and received a table with 955 rows (954 patient appointments). I then changed the outcome type to "cancelled", "refused", or "pending" (all of the outcome types except "completed"), and received a table with 461 patient appointments. So on 7/10/18 in all of CDCR, the percentage of scheduled psychiatry appointments that were missed was 48%, or to put it in performance report terms, the percentage of Appointments seen as scheduled was 52%. This doesn't include the appointments that were just rescheduled by schedulers without marking them as cancelled, but there's no way to track that. However, this is definitely not a quick or easy way to obtain appointment data.

\>>

\>>                    MD

\>> Senior Psychiatrist, Specialist

\>> Elk Grove - Headquarters

\>> California Department of Corrections and Rehabilitation

\>>

\>> Cell phone: