**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA**

**RALPH COLEMAN, et al.**
      **Plaintiffs,**

      **vs.**                                                    **No. CIV S-90-0520 KJM DB P**

**EDMUND G. BROWN JR., et al.**
      **Defendants.**

**SPECIAL MASTER'S REPORT ON
HIS EXPERT'S THIRD RE-AUDIT AND UPDATE OF SUICIDE PREVENTION
PRACTICES IN THE PRISONS OF THE CALIFORNIA DEPARTMENT OF
CORRECTIONS AND REHABILITATION**

This report by the *Coleman* Special Master accompanies his expert Lindsay M. Hayes'
Report, "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the
California Department of Corrections and Rehabilitation" (CDCR).  Mr. Hayes' report is a
follow-up to his third report to the Special Master and the Court on suicide prevention practices
in CDCR prisons, "The Second Re-Audit of Suicide Prevention Practices in the Prisons of the
California Department of Corrections and Rehabilitation," filed on September 7, 2017.  ECF No.
5396.  These reports are submitted as part of the Special Master's continuing review of
defendants' compliance with court-ordered remediation in this matter.

## BACKGROUND

On July 12, 2013, the *Coleman* Court issued an order directing the Special Master to
establish a Suicide Prevention Management Workgroup (SPMW) to address and resolve the
problem of elevated suicide rates among CDCR inmates.  ECF No. 4693.  After a series of
meetings, the SPMW determined that in order to accomplish their task, an expert assessment of

suicide prevention practices in CDCR prisons was required.  Consequently, the Special Master requested, and the Court approved, the appointment of Mr. Hayes as an expert.  ECF No. 4857.

Mr. Hayes is a Project Director of the National Center on Institutions and Alternatives and the foremost leading authority in the field of suicide prevention within jails, prisons, and juvenile facilities, having provided suicide prevention services to hundreds of local and state jurisdictions in all 50 states.  In addition to his work on the *Coleman* case, he has been appointed as a federal court monitor and as an expert to Special Masters/Court Monitors in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction.  Mr. Hayes has conducted the only five national studies of jail, prison, and juvenile suicide, and has authored more than 60 publications in the area of suicide prevention within jail, prison, and juvenile facilities.  (*See* Exhibit A, *curriculum vitae* Hayes.)

As part of the work with the SPMW, the Special Master directed Mr. Hayes to conduct a review of suicide prevention practices in CDCR prisons.  Mr. Hayes' initial audit began on November 12, 2013 and concluded on July 24, 2014, covering all 34 prisons.  His initial audit report, filed on January 14, 2015, contained 32 specific recommendations.  *See*, "An Audit of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation."  ECF No. 5259.  On February 3, 2015, the Court issued an order directing defendants to adopt the recommendations and directing the Special Master to provide an update to the Court on defendants' progress in their implementation.  ECF No. 5271.

Mr. Hayes' first re-audit began on February 4, 2015 and concluded on July 24, 2015, covering 18 prisons.  His second audit report was filed on January 13, 2016.  *See*, "A Re-Audit and Update on Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation."  ECF No. 5396.  At the time of the writing of the report,

discussion on three of the initial 32 recommendations had been postponed for six months and therefore remained unresolved as a result.[1]  The report recommended that defendants fully adopt all 32 specified recommendations contained in Mr. Hayes' initial audit report.  The report also recommended a re-audit of those prisons which chronically struggled with their suicide prevention programs, in addition to almost all prisons with MHCBs.  On April 4, 2016, the Court issued an order adopting the report in full.  ECF No. 5429.

Mr. Hayes' second re-audit began on February 23, 2016 and concluded on November 9, 2016, covering 23 prisons.  His third audit report, "The Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation," was filed on September 7, 2017.  ECF No. 5672.  By the time of the writing of the report, Mr. Hayes had determined that the three recommendations that remained unresolved were no longer warranted.  As a result, he recommended the recommendations be withdrawn and that the February 3, 2015 order adopting them be modified accordingly.  The report also recommended a further re-audit of those prisons which chronically struggled with their suicide prevention programs.

On January 25, 2018, the Court issued an order adopting the report in full.  ECF No. 5762.  The order adopted the recommendation to withdraw the three unresolved recommendations and deemed the February 3, 2015 order modified accordingly.  *Id*. at 3.  The Special Master was directed to provide the Court with an updated report on the status of

---

[1] Recommendation 14:  Any inmate discharged from suicide observation status and arriving in administrative segregation from either an MHCB or alternative housing should be initially housed in a suicide-resistant, retrofitted cell until such time as recommended by the mental health clinician as part of an individual treatment plan; Recommendation 15: Newly admitted administrative segregation inmates should not be considered protected from suicide risk by being double-celled.  They should be placed in suicide-resistant, retrofitted cells; Recommendation 16:  Based on current data indicating that risk of suicide in administrative segregation extends well beyond the first 72 hours there, CDCR, under the guidance of the Special Master, should study and determine a more appropriate and effective minimum length of stay in suicide-resistant retrofitted cells for newly admitted inmates.

defendants' continued implementation of the initial recommendations and the development of related corrective action plans. *Id.* at 4. The report filed herewith is submitted as an update to Mr. Hayes' September 7, 2017 report.

In addition to adopting the aforementioned recommendations, the Court also ordered that:

1. Within fourteen days from the date of this order defendants shall show cause in writing why the inadequate vent grates at CSP-Corcoran cannot be replaced within six months;

2. Within thirty days from the date of this order defendants shall provide to the Special Master and file with the court a detailed plan for completion of the necessary work at the California Institution for Men, including a schedule with a date certain for completion of the work, a description of every step necessary to complete the work, specific timetables by which each step shall be completed, the names and addresses of all persons responsible for approval and/or execution of each step of the work, and a timetable for certification to the Special Master of the action or actions taken and whether the renovations remain on schedule; and

3. Not less than thirty days from the date of this order defendants shall provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, so that the policy can be fully implemented by the time Mr. Hayes begins his next round of auditing in May 2018.

ECF No. 5762 at 4.

Defendants have complied with all three provisions of the Court's order as outlined above. On April 24, 2018, defendants notified the Special Master that the inadequate vent grates at CSP/Corcoran had been replaced. On September 27, 2018, defendants notified the Special Master that the MHCB unit renovations at CIM were complete. A revised SPRFIT policy memorandum was issued on February 2, 2018. Mr. Hayes provides a more detailed update on defendants' compliance on p. 7, 24, 60 n.21, and 93 n.22 of the attached report.

## THIRD RE-AUDIT REPORT OF CDCR SUICIDE PREVENTION PRACTICES

For his third re-audit, Mr. Hayes selected 23 prisons based upon their operation of MHCB units, his findings during previous audits of chronic struggles with their suicide prevention programs, their housing a significant population of *Coleman* class members, and/or the prison experiencing multiple suicides. As with Mr. Hayes' previous audits, his third re-audit consisted of both on-site institutional inspections and reviews of inmate suicide case files from the selected institutions. The third re-audit began on May 23, 2017 and concluded on February 15, 2018.

On August 27, 2018, Mr. Hayes' third re-audit report was distributed in draft form to the *Coleman* parties for comments and/or objections to be submitted to the Special Master no later than 30 days thereafter. On September 26, 2018, during an All-Parties Workgroup teleconference on an unrelated matter, defendants requested a seven-day extension of time within which to respond to the draft report. The Special Master granted defendants' request. On October 3, 2018, defendants submitted their comments and objections to the draft report.[2] On October 9, 2018, plaintiffs' counsel submitted their response to defendants' comments and objections to the draft report.[3] Plaintiffs' counsel did not submit objections to the draft report.

Parties' Responses to the Draft Report

Defendants' response to the draft report was related to the following three areas, (1) transition of suicide prevention monitoring to CDCR, (2) specific comments and objections to

---

[2] *See* Exhibit B, Letter dated October 3, 2018 from Nick Weber, Attorney, CDCR Office of Legal Affairs to Special Master Lopes. Certain of the exhibits included with defendants' letter contained privileged and/or confidential information; as such, Exhibit B is attached hereto without the attachments referenced within.

[3] *See* Exhibit C, Letter dated October 9, 2018 from Krista Stone-Manista, Plaintiffs' Counsel to Special Master Lopes and Nicholas Weber, Jerome Hessick, Melissa Bentz and Dillon Hockerson, CDCR Office of Legal Affairs. Certain of the exhibits included with plaintiffs' letter contained privileged and/or confidential information; as such, Exhibit C is attached hereto without the attachments referenced within.

the draft report, and (3) defendants' proposal to activate a temporary unlicensed 20-bed MHCB unit at R.J. Donovan Correctional Facility (RJD). In return, plaintiffs' reply to defendants' response to the draft report also addressed each of these three areas. The parties' responses, organized by topic, are discussed in further detail below.

<u>Transitioning Suicide Prevention Monitoring to CDCR</u>

Defendants open their response to the draft report with an assertion that the time is ripe to begin discussions on the transition of suicide prevention monitoring to CDCR. In support of this proposition, defendants state that the Continuous Quality Improvement Tool (CQIT) has been "successfully piloted and recently updated to include suicide prevention audit criteria."[4] Defendants maintain that through the Continuous Quality Improvement (CQI) process they can quickly assess and respond to deficiencies. Plaintiffs' assert that defendants have not yet demonstrated that they are ready to assume self-monitoring. Plaintiffs list several reasons in support of their position, including, but not limited to defendants' failure to produce timely institutional CQI reports, substantive omissions from said reports, and the lack of a connection between the CQI process and the suicide review process.

The Special Master rejects defendants' suggestion that they are ready to assume self-monitoring of suicide prevention practices as incredibly premature given the continued findings of problematic suicide prevention practices over the course of Mr. Hayes' audits, elevated suicide rates within CDCR prisons, and, perhaps most notably, the fact that the CQIT is still in the process of being tested and is nowhere near finalization, despite defendants' characterization to the contrary. In fact, subsequent to the observation of four recent CQI tours[5], Mr. Hayes

---

[4] *See* Exhibit B, p. 2.

[5] California State Prison/Los Angeles County (July 16-20, 2018), North Kern State Prison (August 27-29, 2018), R.J. Donovan Correctional Facility (September 24-28, 2018), and Salinas Valley State Prison (August 6-10, 2018).

provided defendants with additional recommendations to ensure that the 19-item suicide

prevention audit checklist would be incorporated into the process.  He was informed that any

changes would occur after completion of the current CQI audits scheduled for November 2018.

<u>Defendants' Specific Comments and Objections to the Draft Report</u>

Defendants' response contained an objection to additional corrective action plans (CAPs)

and other recommendations for corrective action, reasoning that they were unnecessary to cure

identified deficiencies.[6]  Plaintiffs disagree with this position, stating that "[y]ears of court

involvement, including the Court's January 25, 2018 Order requiring Defendants to implement

finally long-identified critical safety problems in the crisis beds at CIM, show the necessity of

enforceable court orders in these areas,"[7] and reiterating that defendants have not demonstrated

that they are ready to assume self-monitoring.

The Special Master strongly disagrees with defendants' assertion that additional CAPs

are unnecessary to cure identified deficiencies.  As described in Mr. Hayes' report, existing

CDCR CAPs have either not been fully implemented, or have been ineffective in resolving

ongoing suicide prevention deficiencies.  The report makes clear that most of the recommended

CAPs were not necessarily based upon new recommendations, but rather by CDCR's continuing

challenge of implementing and sustaining adequate suicide prevention practices.  Accordingly,

the recommendations for additional CAPs as set forth in the attached report remain unchanged.

---

[6] Specifically, defendants objected to CAPs and recommendations related to new intake cells in administrative segregation, alternative housing, safety planning, five-day clinical follow-up and custody welfare checks, suicide prevention training, CQIT, and reception center suicide prevention posters.

[7] *See* Exhibit C, p. 5.

Defendants' response also contained various requests for language revisions. To the extent that those requests were deemed appropriate, changes were incorporated into the report. (*See infra* p. 9, 11, 12, 23, 24, 26 n.10, and 37.)

Mr. Hayes made seven changes and/or additions to this report since it was submitted to the parties in draft form. (*See infra* p. 4, 15, 27, 28, 30, 36, and 38.)

RJD Crisis Bed Proposal

Defendants also object to Mr. Hayes' rejection of their proposal to build a temporary unlicensed 20-bed MHCB unit at RJD, asserting that their proposal is sound, and that Mr. Hayes failed to provide a reasonable basis to conclude the project was inadequate. In their reply, plaintiffs indicate their strong disagreement with this position, asserting that they share all the concerns Mr. Hayes expressed in the draft report regarding the proposed unlicensed unit.

The Special Master also shares the concerns expressed by Mr. Hayes in the attached report. The concept of a temporary MHCB unit at RJD has been discussed with defendants ad nauseam over the course of several months, both within and outside of the Workgroup process. Defendants' proposal has indeed received careful consideration.

As detailed in Mr. Hayes' report, an inspection of the proposed MHCB unit highlighted several significant concerns, all of which contributed to his professional opinion that activation of the unit would result in deplorable conditions unacceptable for class members needing an MHCB level of care. Defendants' latest objection sheds no new light on the issue. As a result, Mr. Hayes' position as memorialized in the attached report remains unchanged.

**RECOMMENDATIONS AND CONCLUSION**

On page 36 of his third re-audit report, Mr. Hayes recommends that defendants continue their efforts to fully implement his previous recommendations, as well as develop CAPs based

upon deficiencies found in his most recent assessment.[8]  The Special Master is in full agreement with Mr. Hayes' recommendations in this regard.

On page 38 of his third re-audit report, Mr. Hayes proposes a further re-audit of those prisons which chronically struggle with their suicide prevention programs.  This would (a) promote the continued provision of technical assistance related to efforts surrounding suicide prevention practices; (b) provide a means for measurement of the sustainability of defendants' corrective actions, and observation of CDCR's CQI process at individual facilities; and (c) facilitate movement towards decreased future monitoring, and possibly result in the continued reduction of the number of and rate of inmate suicides throughout CDCR prisons.  The Special Master agrees that a re-inspection of those prisons which continue to struggle with their suicide prevention practices is appropriate.  Accordingly, such further re-inspections will proceed forthwith to serve the interests listed above.

Although the amount and significance of the work that has been done by the SPMW and Mr. Hayes to reduce suicides in CDCR prisons has been considerable, it has not progressed rapidly enough, and is thus not far enough along, to consider the idea of self-monitoring by CDCR.  If defendants would put as much effort into complying with the Court's orders as they seem to do attempting to find a shortcut to the end of federal court oversight, undoubtedly progress in a variety of ongoing remedial efforts would be much further along.  It is approaching four years since defendants were first ordered to implement Mr. Hayes' initial recommendations, yet implementation remains incomplete and successive audits continue to find deficiencies as a result.  That there remains work to be done is inarguable; defendants should work on full implementation of the court-ordered recommendations without further delay.

---

[8] A complete list of the recommended CAPs is located on p. 37-38 of the third re-audit report.

In view of all of the foregoing, the Special Master requests:

(1) That the Court reject defendants' proposal to activate a temporary unlicensed 20-bed MHCB unit at RJD;

(2) That the Court order defendants to continue to implement the remaining 29 initial recommendations and develop corrective action plans based upon deficiencies found in Mr. Hayes' most recent assessment; and

(3) That the Court order the Special Master to provide an update report to the Court on the status of defendants' continued implementation of the initial recommendations and the development of related corrective action plans.

Respectfully submitted,

/s/

_____

Matthew A. Lopes, Jr., Esq.
Special Master

November 5, 2018

# EXHIBIT A

# VITAE

# LINDSAY M. HAYES

## PERSONAL INFORMATION

| | |
|---|---|
| **Office Address:** | 40 Lantern Lane |
| | Mansfield, Massachusetts 02048 |
| **Contact Information:** | (508) 337-8806 |
| | Lhayesta@msn.com |
| | www.ncianet.org/suicide-prevention |
| **Date of Birth:** | June 5, 1955 |
| **Marital Status:** | Married, four children |

## ACADEMIC BACKGROUND

Master of Science -- Administration of Justice (1978); The American University, Washington, D.C.

Bachelor of Arts -- Sociology (1977); Ithaca College, New York

## SUMMARY

Lindsay M. Hayes is a Project Director of the National Center on Institutions and Alternatives, with an office in Mansfield, Massachusetts. He is nationally recognized as an expert in the field of suicide prevention within jails, prisons and juvenile facilities. Mr. Hayes has been appointed as a Federal Court Monitor (and expert to special masters/monitors) in the monitoring of suicide prevention practices in several adult and juvenile correctional systems under court jurisdiction. He has served as a suicide prevention consultant to the U.S. Justice Department's Civil Rights Division (Special Litigation Section) and for the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security (Immigration and Customs Enforcement) in their investigations of conditions of confinement in both adult and juvenile correctional and detention facilities throughout the country. He also serves as an expert witness/consultant in inmate suicide litigation cases. Mr. Hayes also serves as a technical assistance consultant/expert by conducting training seminars, writing and revising suicide prevention policies, and assessing inmate and juvenile suicide prevention practices in various state and local jurisdictions throughout the country. He is regularly asked to critique and revise, when appropriate, the suicide prevention sections of national correctional health care standards.

Mr. Hayes has conducted the only five national studies of jail, prison, and juvenile suicide (*And Darkness Closes In... National Study of Jail Suicides* in 1981, *National Study of Jail Suicides: Seven Years Later* in 1988, *Prison Suicide: An Overview and Guide to Prevention* in 1995, *Juvenile Suicide in Confinement: A National Survey* in 2004, and *National Study of Jail Suicide: 20 Years Later* in 2010). The jail and prison suicide studies were conducted through contracts with the National Institute of Corrections (NIC), U.S. Justice Department; whereas the first national study of juvenile suicide in confinement was conducted through a contract with the Office of Juvenile Justice and Delinquency Prevention, U.S. Justice Department.

Mr. Hayes served as editor/project director of the *Jail Suicide/Mental Health Update*, a quarterly newsletter devoted to research, training, prevention, and litigation that was funded by NIC from 1986 thru 2008; and was a consulting editor and editorial board member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, as well as current editorial board member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, the official scientific journal of the International Association of Suicide Prevention. Mr. Hayes has authored over 100 publications in the area of suicide prevention within jail, prison and

juvenile facilities, including model training curricula on both juvenile and adult inmate suicide prevention. His *Training Curriculum and Program Guide on Suicide Detection and Prevention in Juvenile Detention/Correctional Facilities and Residential Programs: Instructor's Manual* was released in April 2013. His *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities: Instructor's Manual* was released in March 2016.

As a result of research, technical assistance, and expert witness consultant work in the area of suicide prevention in correctional facilities, Mr. Hayes has reviewed and/or examined over 3,500 cases of suicide in jail, prison, and juvenile facilities throughout the country during the past 38 years. Mr. Hayes was a past recipient of the National Commission on Correctional Health Care's Award of Excellence for outstanding contribution in the field of suicide prevention in correctional facilities. His work has been cited in the suicide prevention sections of various state and national correctional health care standards, as well as numerous suicide prevention training curricula.

## POSITIONS HELD

## National Center on Institutions and Alternatives (NCIA), Baltimore, Maryland (January 1978 to Present).

- **Federal Court Monitor for Suicide Prevention** (September 2004 to Present): *Coleman v. Brown (CA) et al* (2:90-cv-00520-LKK-DAD), serves as expert to Special Master in monitoring suicide prevention practices in the California Department of Corrections and Rehabilitation from October 2013 to Present; *United States v. Robertson County (TN) et al* (3:13-CV-00392), monitoring suicide prevention and mental health practices in the Robertson County Detention Center from February 2013 to November 2017; *United States v. State of Hawaii* (CV-08-00585-JMS-KSC), monitoring suicide prevention practices in the Oahu Community Correctional Center from July 2009 to June 2015; *United States v. King County (WA) et al* (CV-9-0059), monitoring use of force, suicide prevention, and medical care practices in the King County Correctional Facility from January 2009 to February 2012; *United States v. State of Mississippi* (3:03-CV-1354-HTW-JCS), monitoring suicide prevention practices in the state Division of Youth Services' facilities from February 2008 to May 2010; *United States v. State of Hawaii*, served as expert to Court Monitor in monitoring suicide prevention practices in the Hawaii Youth Correctional Facility from September 2006 to September 2010; *United States v. State of Arizona* (CV-04-1926-PHX-EHC), monitoring suicide prevention practices in the state Department of Juvenile Corrections' facilities from September 2004 to September 2007; *Campbell v. McGruder, et al* (District of Columbia), served as jail suicide prevention expert to Special Master, 1994 to 1997; *Jerry M. v. District of Columbia, et al*, served as juvenile suicide prevention expert to Special Master, 1989 to 1997, then periodically since 2005.

- **Consultant/Expert Witness** (June 1993 to Present) to the Special Litigation Section, as well as the Disability Rights Section, of the U.S. Justice Department's Civil Rights Division in its investigation of suicides and general conditions of confinement within jails, prisons, and juvenile facilities throughout the country.

- **Consultant/Expert Witness** (January 2014 to Present) to the Office of Civil Rights and Civil Liberties of the U.S. Department of Homeland Security in its investigation of suicides and general conditions of confinement within U.S. Immigration and Customs Enforcement facilities and contracted detention facilities throughout the country.

- **Technical Assistance Consultant/Expert Witness** (January 1983 to Present) providing specialized staff training and facility needs-assessment to jails, prisons, and juvenile facilities in suicide prevention. **Expert Witness** consultation and testimony provided in litigation concerning jail, prison, and juvenile suicide. Qualified as an expert in both state and federal court.

- **Technical Assistance Consultant** (June 1984 to 2012) to the National Institute of Corrections (NIC), U.S. Department of Justice for jail and prison suicide prevention. Also member of NIC's National Jail Suicide Prevention Task Force (1984-1985), an advisory board created to design strategies for reducing jail suicides nationwide.

- **Project Director/Principal Investigator** (September 2006 to February 2009) of the U.S. Justice Department (National Institute of Corrections) contract to conduct an updated national study of inmate suicides occurring in county and city jails, as well as police department lockup facilities during 2005-2006. Responsible for collection and analysis of suicide data, as well as development of recommendations to impact current practices and policies regarding programmatic intervention for identification of potential suicide victims. This contract encompassed a follow-up national study to that performed in both 1980 and 1986.

- **Project Director/Editor** (May 1989 to September 2008) of the *Jail Suicide/Mental Health Update*. This U.S. Justice Department (National Institute of Corrections) contract published a quarterly newsletter focused on two areas: 1) current research, litigation, training, and model programs in the field of jail suicide prevention; and 2) promoting information and technology transfer between local jurisdictions that desired to

implement or enhance jail-based mental health services. This project was a continuation of prior U.S. Justice Department grants (1986-1988).

- **Project Director/Principal Investigator** (August 1999 to December 2003) of a U.S. Justice Department, Office of Juvenile Justice and Delinquency Prevention contract to conduct the first national survey of juvenile suicide in confinement. During the contract period, the project determined the extent and distribution of juvenile suicides throughout the country, as well as developed a report (*Juvenile Suicide in Confinement: A National Survey*) for use by juvenile justice practitioners in expanding their knowledge base and in creating/revising policies and training curricula on suicide prevention.

- **Technical Assistance Manager** (September 1987 to September 1997) of NCIA's services to state and local government officials in identifying policies and programs to alleviate overcrowded prisons and jails. Systemic assessments provided counties in the following states: Alabama, Delaware, Georgia, Idaho, Maine, Maryland, Pennsylvania and Rhode Island. In addition, served as a consultant to U.S. Justice Department (National Institute of Corrections) in providing needs-assessment to jurisdictions which experience jail overcrowding. Qualified as an expert in federal court.

- **Project Director/Principal Investigator** (April 1993 to August 1994) of a U.S. Justice Department (National Institute of Corrections) contract to develop a monograph on prison suicide. The monograph (*Prison Suicide: An Overview and Guide to Prevention*) included an extensive literature review, examination of state and national standards for prison suicide prevention, analysis of prison suicide rates, case studies of effective prevention programs, and review of liability issues.

- **Project Director** (September 1990 to February 1991) of an NCIA research project to evaluate the effectiveness of the Intensive Parole Supervision Project, a joint venture of the U.S. Parole Commission and the U.S. Probation Office for the District of Maryland. The purpose of this five-month evaluation project was to assess the performance and goal achievement of the program during a two-year period, while providing Parole Commission officials with information useful to decision-making regarding program continuation, expansion and/or refinement, and allocation of resources.

- **Project Director/Principal Investigator** (September 1986 to February 1988) for the National Coordination of the Jail Suicide Prevention Information Task Force. This U.S. Justice Department (National Institute of Corrections) contract: 1) Conducted regional seminars on jail suicide prevention throughout the country; 2) Gathered information from each state on the incidence of jail suicide and related issues, including replication of NCIA's 1981 National Study of Jail Suicides; 3) Provided technical assistance to individual jails and others regarding jail suicide prevention while disseminating a quarterly newsletter (*Jail Suicide Update*) concerning timely developments in jail suicide prevention, litigation, training and special issues; and 4) Developed a model training manual on jail suicide prevention.

- **Project Director/Principal Investigator** (July 1980 to November 1981) for the National Study of Jail Suicides, the first effort to determine nationally the extent and distribution of suicides within jails and lockups. Responsible for collection and analysis of suicide data, as well as development of recommendations to impact current practices and policies regarding programmatic intervention for identification of potential suicide victims.

## Research Assistant/Juvenile Decarceration Project -- Joint Effort of NCIA and The American University, Washington, D.C. (January 1978 to December 1978).

- A one-year project for the study of policy implementation regarding deinstitutionalization services for delinquent youth (a four state study). Responsible for compiling research for the monograph -- *The Politics of Decarceration*.

## Administrative Assistant/Bergen County Courthouse, Hackensack, New Jersey (June 1977 to August 1977).

- Worked as an administrative assistant to the county court administrator and was responsible for conducting municipal court inspections. The purpose of these inspections was to correct any inadequacies in each of the (72) municipal courts, and to coordinate each court into a consistently run municipal court system.

**Youth Counselor/South Lansing Center, Lansing, New York**   (January 1977 to May  1977).

- The South Lansing Center was a New York State Division for Youth Title II Residential Treatment Facility.  Worked as a full-time intern in conjunction with Ithaca College.  Involved gaining knowledge of the treatment program as a whole and working with youth on a one-on-one basis.

**Administrative Assistant/Bergen County Jail Annex, Hackensack, New Jersey** (June 1976 to August 1976).

- Worked as an administrative assistant to the jail psychologist and assisted in interviewing, counseling    and screening individuals for the county's work-release program.

**SELECTED (STATE and NATIONAL) CONFERENCE PRESENTATIONS (excludes training and technical assistance consultation to individual jurisdictions)**

- U.S. Department of Homeland Security, Office of Civil Rights and Civil Liberties, Basic Principles and Components of a Suicide Prevention Program, Washington DC, May 2018;

- Washington Association of Sheriffs and Police Chiefs, Washington Counties Risk Pool, and the Washington Cities Insurance Authority, Jail Suicide Prevention and Liability Reduction Training Workshop, Seattle, WA, December 12, 2017;

- American Academy of Psychiatry and the Law, 48th Annual Meeting, Denver, CO, October 28, 2017;

- U.S. Department of Justice, National Institute of Corrections, State DOC Mental Health Directors Network Meeting, Grand Prairie, TX, June 2017;

- Correctional Service Canada, Round Table on Suicide Prevention, Assessment, and Management, Keynote Address, Moncton, New Brunswick, Canada, March 7-8, 2017;

- New Jersey County Wardens Association, 19th Annual Training Conference, Atlantic City, NJ, October 4, 2016;

- Performance-Based Standards (PbS) Learning Institute, 10th Annual State/Agency Coordinator Training, Boston, MA, August 5, 2016.

- National Commission on Correctional Health Care, National Conference on Correctional Health Care:

Pre-Conference Seminar, Las Vegas, NV, October 2018
Pre-Conference Seminar and Workshop, Chicago, Il, November 2017
Suicide Prevention Summit, Chicago, IL, August 2017
Pre-Conference Seminar, Atlanta, GA, April 2017
Mental Health Conference, Boston, MA, July 2016
Pre-Conference Seminar, Dallas, TX, October 2015
Pre-Conference Seminar, New Orleans, LA, April 2015
Pre-Conference Seminar, Nashville, TN, October 2013
Mental Health Conference, Las Vegas, NV, July 2013
Mental Health Conference, Chicago, IL, July 2012
Mental Health Conference, Las Vegas, NV, July 2011
Pre-Conference Seminar, Orlando, FL, November 2009
Mental Health Conference, Las Vegas, NV, July 2008
Mental Health Conference, Chicago, IL, July 2005
Pre-Conference Seminar, New Orleans, LA, November 2004
Mental Health Conference, Las Vegas, NV, July 2004
Workshop, Albuquerque, NM, November 2001
Workshop, St. Louis, MO, September 2000
Workshop, Fort Lauderdale, FL, November 1999
Workshop, Nashville, TN, October 1996
Workshop, Washington, DC, November 1995
Workshop, Chicago, IL, June 1995

- University of Houston Law Center, Police, Jails and Vulnerable People Symposium, Houston, TX, January 2016.

- North Dakota Center for Persons with Disabilities, Minot State University, Jail Suicide Prevention Seminars, Grand Forks and Bismarck, ND, March 2015.

- New York State Correctional Medical and Behavioral Healthcare System Conference, Albany, NY, December 9, 2014.

- Suicide Prevention in Juvenile Correctional Facilities, Webinar Presenter, Council of Juvenile Correctional Administrators (Braintree, MA), November 2014.

- National Partnership for Juvenile Services, 19th National Symposium on Juvenile Services, Louisville, KY, October 2013.

- North Dakota Children and Family Services Conference, Bismarck, ND, July 2013.

- U.S. Department of Justice, National Institute of Corrections, Chief Jail Inspectors' Network Meeting, Jail Suicide Prevention Workshop, Aurora, CO, July 2012.

- Tennessee Corrections Institute, Jail Issues Annual Conference, Keynote Address and Workshop Presentations, Nashville, TN, May 2012.

- Suicide Prevention in Juvenile Detention and Correctional Facilities, Webinar Presenter, Suicide Prevention Resource Center (Washington, DC) and Council of Juvenile Correctional Administrators (Braintree, MA), February and March 2012.

- Wisconsin Department of Justice and Wisconsin Department of Corrections, 17th Annual Jail Administrator's Conference, Plenary Session, Stevens Point, WI, November 2011.

- Association of Correctional Mental Health Administrators Annual Meeting, U.S. Department of Justice, National Institute of Corrections, Prison Jail Suicide Prevention Workshop, Aurora, CO, May 2011.

- U.S. Department of Justice, National Institute of Corrections, Large Jail Network Meeting, Jail Suicide Prevention Workshop, Aurora, CO, March 2011.

- New Mexico Association of Counties, Jail Suicide Prevention Workshops, Albuquerque and Las Cruces, NM, March 2011.

- Missouri Juvenile Justice Association Educational Conference, Lake of the Ozarks, MO, October 2009.

- Council of Juvenile Correctional Administrators, 2nd Annual Leadership Conference, Chicago, IL, October 2009.

- Academy of Correctional Professionals, Managing the Mentally Ill Through the Correctional System, Luncheon Speaker, Fairfax, VA - May 2009, Farmington, CT - June 2009, and Austin, TX - July 2009.

- Council of Juvenile Correctional Administrators, Seminar for New Directors, Tampa, FL, January 2009.

- American Correctional Association, 138th Congress of Correction, Health Care Professional Luncheon Speaker, New Orleans, LA, August 2008.

- Missouri Institute of Mental Health, Suicide in Jails and Prisons Conference, Keynote Address, Chesterfield, MO, August 2008.

- Florida Sheriffs Association, Annual Jail Conference, Sandestin, FL, December 2007.

- International Association of Suicide Prevention, Preventing Suicide Across the Life Span: Dreams and Realities Conference, Correctional Settings-Symposium, Killarney, Ireland, August 2007.

- Colorado Division of Youth Corrections, 4th Annual DYC Provider Training Conference, Breckenridge, CO, May 2007.

- New Mexico Association of Counties, Jail Suicide Prevention Workshops, Santa Fe and Las Cruces, NM, November 2006.

- OJJDP/ACA's National Juvenile Corrections and Detention Administrator's Forum, Pittsburgh, PA, May 2006.

- National Disability Rights Network, Annual Skills Building Conference, San Diego, CA, January 2006.

- Texas Juvenile Probation Commission, Behind Closed Doors: Liabilities, Issues and Trends in Juvenile Justice Facilities, Austin, TX, September 2005.

- National Center for Mental Health and Juvenile Justice, National Policy Academy on Improving Services for Youth with Mental Health and Co-Occurring Substance Abuse Disorders within the Juvenile Justice System, Bethesda, MD, September 2005.

- Connecticut Youth Suicide Advisory Board and Connecticut Clearinghouse, Suicide Prevention Promises and Practices: Focus on Youth, Rocky Hill, CT, May 2005.

- Wisconsin Department of Justice and Wisconsin Department of Corrections, Suicide Prevention in Jails, Wisconsin Dells, WI, April 2005.

- Massachusetts Department of Public Health, Suicide Prevention Across the Lifespan, 3rd Annual Suicide Prevention Conference, Worcester, MA, May 2004.

- Suicide Prevention Resource Center, Preventing Suicide in Regions VII and VIII: Communities Working Together to Implement the National Strategy for Suicide Prevention in the Prairies and Mountain West, Westminster, CO, October 2003.

- North Dakota Office of Management and Budget, Risk Management Division, Suicide Prevention in Correctional Facilities Workshop, Bismarck, ND, May 2003.

- Maine Department of Behavioral and Developmental Services, 2003 Crisis Clinician Conference, Keynote Address. Augusta, ME, March 2003.

- Texas Juvenile Probation Commission, Symposium on Juvenile Suicide Prevention and Intervention: Putting Children First, Austin, TX, March 2003.

- American Correctional Association, Winter Conference, Charlotte, NC, January 2003.

- Council of Juvenile Correctional Administrators, Mid-Winter Meeting, Charlotte, NC, January 2003.

- New York State Commission of Correction and Office of Mental Health, Correctional Medical and Mental Health Care Symposium, Sarasota Springs, NY, October 2002.

- University of Connecticut Health Center/Correctional Mental Health Conference, Suicide Prevention: Assessment and Management in a Correctional Environment, Farmington, CT, September 2002.

- American Correctional Health Services Association, Multidisciplinary Training Conference, Portland, OR, March 2002.

- MCP Hahnemann University, Behavioral Healthcare Education, 9th Annual Forensic Rights and Treatment Conference, Grantville, PA, November 2001.

- Maryland Governor's Interagency Workgroup on Youth Suicide Prevention, 13th Annual Suicide Prevention Conference, Baltimore, MD, October 2001.

- Florida Department of Corrections, 4th Annual Female Offender Focused Symposium, Orlando, FL, September 2001.

- U.S. Department of Justice, National Institute of Corrections, Prison Health Care: Suicide Prevention Workshop, Longmont, CO, June 2001.

- New York State Office of Mental Health, Best Practices Conference, Brooklyn, NY, June 2001.

- Office of Juvenile Justice and Delinquency Prevention (OJJDP) National Conference, Justice for Children: A Vision for the 21st Century, Washington, DC, December 2000.

- Indiana Sheriffs' Association and Indiana Department of Corrections, Jail Suicide Prevention Workshop, Indianapolis, IN, July 2000.

- OJJDP/ACA's 15th Annual National Juvenile Corrections and Detention Forum, Albuquerque, NM, May 2000.

- Governor's Summit - Correctional Health to Community Health: A Continuum of Prevention and Care for the Criminal Offender, Las Vegas, NV, April 2000.

- Ohio Community Forensic Association, Suicide and the Criminal Justice Population, Columbus, OH, March 2000.

- Hawaii Criminal Justice Association, 3rd Annual Conference, Keynote Address, Honolulu, HI, March 2000.

- Council of Juvenile Correctional Administrators, Western Regional Meeting, Tucson, AZ, November 1999.

- Florida Senate and House of Representatives, Committees on Corrections, Presentation on Suicide in Florida Prisons, Tallahassee, FL, January 1999.

- Open Society Institute, 1st National Conference on Death and Dying in Prisons and Jails, New York, NY, November 1998.

- Ohio Department of Mental Health, Office of Forensic Services, Unlocking the Barriers: Mental Health Services in Jails and Working with Law Enforcement Agencies, Cuyahoga Falls, OH, August 1998.

- Oregon Senate and House of Representatives, Senate Judiciary Crime and Civil Subcommittee and House Interim Committee on Judiciary, Presentation on Suicides in Hillcrest Youth Correctional Facility, Salem, OR, March 1998.

- Combined California Correctional Associations, Keys to Inmate Management Conference, Concord, CA, March 1998.

- Wood County Juvenile Detention Center, 1998 Ohio Regional Juvenile Suicide Awareness Seminar, Bowling Green, OH, March 1998.

- Netherlands Institute for the Study of Criminology and Law Enforcement, Leiden University, Leiden, The Netherlands, July 1997.

- Institute for the Study and Treatment of Delinquency, 3rd International Conference on Deaths in Custody, Uxbridge, England, July 1997.

- National Juvenile Detention Association, 9th Annual National Juvenile Services Training Institute, Indianapolis, IN, June 1997.

- Sam Houston State University, Criminal Justice Center, 27th Annual Jail Management Conference, Huntsville, TX, October 1996.

- Oregon Jail Managers' Association, Bend, OR, August 1996.

- Ohio Department of Rehabilitation and Correction, Correctional Health Care Conference, Columbus, OH, May 1996.

- U.S. Department of the Army, U.S. Army Military Police Support Agency, Army Corrections Conference, Fort Belvoir, VA, December 1995.

- Centers for Disease Control and Prevention, National Violence Prevention Conference, Des Moines, IA, October 1995.

- Louisiana State University, School of Social Work, Office of Correctional Studies, Prison Suicide Prevention Workshop, Baton Rouge, LA, September 1994.

- Wisconsin Department of Corrections, Suicide Prevention in Detention Facilities Seminar, Wisconsin Dells, WI, September 1994.

- University of Virginia, Institute of Law,  Psychiatry and Public Policy, 26th Semi-Annual Forensic Symposium: Jails and Mental Health Services, Charlottesville, VA, May 1994.

- American Association of Suicidology, 27th Annual Conference, New York, NY, April 1994.

- Institute for the Study and Treatment of Delinquency, 2nd International Conference on Deaths in Custody, Cambridge, England, April 1994.

- National Association of State Mental Health Program Directors' Conference, St. Louis, MO, September 1993.

- Pennsylvania Prison Warden's Association, Jail Suicide Prevention Seminar, Bethlehem, PA, November 1992.

- Montana Sheriff's and Peace Officers' Association, 64th Annual Training Seminar, Billings, MT, June 1992.

- Iowa State Sheriffs' and Deputies' Association, First Annual 20-Hour Jail School, Ames, IA, February 1992.

- Institute for the Study and Treatment of Delinquency, Diamond Jubilee Conference -- Deaths in Custody, Canterbury, England, March 1991.

- Law Enforcement Television Network, Carrollton, TX, March 1990.

- American Jail Association, 8th Annual Training Conference, Hollywood, FL, April 1989.

- American Jail Association, 7th Annual Training Conference, Los Angeles, CA, April 1988.

- National Conference on Alcohol Countermeasures and Occupant Protection, Boston, MA, March 1988.

- American Correctional Association, Winter Conference, Phoenix, AZ, January 1988.

- American Association of Correctional Training Personnel and the Juvenile Justice Trainers Association, 3rd Annual National Correctional Trainers Conference, Pittsburgh, PA, October 1987.

- Police Foundation, Police Litigation Prevention Seminar, Chicago, IL, May 1987.

- University of Maine, Conference on Preventing Youth Suicides, Kennebunkport, ME, May 1987.

- Centers for Disease Control, 1987 Conference on Injury in America, Atlanta, GA, February 1987.

- Southeastern Psychological Association, 29th Annual Meeting, Atlanta, GA, March 1983.

- American Association of Suicidology, 16th Annual Conference, Dallas, TX, April 1983.

**PUBLICATIONS**

- "Suicide Prevention in Jails and Prisons," (with Jeffrey L. Metzner) in L. Gold and R. Frierson (Eds.), *Textbook of Suicide Assessment and Management*, 3rd Edition, Washington, DC: American Psychiatric Publishing, Inc., forthcoming 2019.

- "Controversial Issues in Suicide Prevention," *CorrectCare*, Spring 2017, 31 (2): 12-14.

- *Training Curriculum and Program Guide on Suicide Detection and Prevention in Jail and Prison Facilities: Instructor's Manual*, Mansfield, Massachusetts: National Center on Institutions and Alternatives, March 2016.

- "The Inherent Dangerousness of Telephone Cords in Jail Cells," *Correctional Law Reporter*, February/March 2014: 67, 78-79.

- "Suicide Prevention in Correctional Facilities: Reflections and Next Steps," *International Journal of Law and Psychiatry* 36 (2013): 188-194.

- *Training Curriculum and Program Guide on Suicide Detection and Prevention in Juvenile Detention/Correctional Facilities and Residential Programs: Instructor's Manual*, Mansfield, Massachusetts: National Center on Institutions and Alternatives, April 2013.

- "National Study of Jail Suicides: 20 Years Later," *Journal of Correctional Health Care*, 18 (3), 2012.

- "Suicide Prevention in Jails and Prisons," (with Jeffrey L. Metzner) in R. Simon and R. Hales (Eds.), *Textbook of Suicide Assessment and Management*, 2nd Edition, Washington, DC: American Psychiatric Publishing, Inc., 2012.

- *National Study of Jail Suicides: 20 Years Later*, Washington, DC: National Institute of Corrections, U.S. Department of Justice, April 2010.

- "Toward a Better Understanding of Suicide Prevention in Correctional Facilities," in C. Scott (Ed.), *Handbook of Correctional Mental Health*, 2nd Edition, Washington, DC, American Psychiatric Publishing, Inc., 2010.

- "Characteristics of Juvenile Suicide in Confinement," *Juvenile Justice Bulletin*, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, February 2009.

- "Juvenile Suicide in Confinement – Findings from the First National Survey," *Suicide and Life-Threatening Behavior*, 39 (4): 353-363, 2009.

- "Reducing Inmate Suicides Through the Mortality Review Process," in R. Greifinger (Ed.), *Public Health Behind Bars: From Prisons to Communities*, New York: Springer Science and Business Media, 2007.

- "Preventing Suicide in Jails and Prisons, Parts 1 and Parts 2: Recommendations from the International Association for Suicide Prevention Task Force on Suicide in Prisons," (with Marc Daigle, Anasseril Daniel, Greg Dear, Patrick Frottier, Ad Kerkhof, Norbert Konrad, Alison Liebling, and Marco Sarchiapone), *Crisis*, 28 (3): 113-130, 2007.

- *Preventing Suicide in Jails and Prisons* (with Marc Daigle, Anasseril Daniel, Greg Dear, Patrick Frottier, Ad Kerkhof, Norbert Konrad, Alison Liebling, and Marco Sarchiapone), Geneva, Switzerland, World Health Organization, 2007.

- "Suicide Prevention and Designing Saver Prison Cells," in G. Dear (Ed.), *Preventing Suicide and Other Self-Harm in Prison*, New York, NY: Palgrave MacMilllan, 2007.

- "Responding to Suicides in Custody: Review Processes," in G. Dear (Ed.), *Preventing Suicide and Other Self-Harm in Prison*, New York, NY: Palgrave MacMilllan, 2007.

- "Suicide Prevention in Jails and Prisons," (with Jeffrey L. Metzner) in R. Simon and R. Hales (Eds.), *Textbook of Suicide Assessment and Management*, Washington, DC: American Psychiatric Publishing, Inc., 2006.

- "Suicide Prevention in Correctional Facilities: An Overview," in M. Puisis (Ed.), *Clinical Practice in Correctional Medicine*, 2ⁿᵈ Edition, Philadelphia, PA: Mosby, Inc., 2006.

- "Suicide Prevention in Correctional Facilities," in C. Scott and J. Gerbasi (Eds.), *Handbook of Correctional Mental Health*, Washington, DC, American Psychiatric Publishing, Inc., 2005.

- "Juvenile Suicide in Confinement in the United States: Results from a National Survey," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 26 (3), 2005.

- "Demographic, Criminal, and Psychiatric Factors Related to Inmate Suicide," (with Eric Blaauw and Ad J.F.M. Kerkhof), *Suicide and Life-Threatening Behavior*, 35 (1), 2005.

- *Juvenile Suicide in Confinement: A National Survey*, Washington, DC: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention, February 2004.

- "A Framework for Preventing Suicides in Adult Correctional Facilities," (with Judith F. Cox) in B. Schwartz (Ed.), *Correctional Psychology: Practice, Programming and Administration*, Kingston, NJ: Civic Research Institute, 2003.

- "Prevention, Management, and Treatment of Offenders at Risk for Suicide," (with Andre Ivanoff) in J. Ashford et al (Eds.), *Treating Adult and Juvenile Offenders With Special Needs*, Washington, DC: American Psychological Association, 2001.

- "Jail Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 22 (1), 2001.

- "Suicide Prevention in Juvenile Facilities," *Juvenile Justice*, 7 (1), 2000.

- "Suicide in Adult Correctional Facilities: Key Ingredients to Prevention and Overcoming the Obstacles," *Journal of Law, Medicine & Ethics*, 27 (3), 1999.

- "Guide to Developing and Revising Suicide Prevention Protocols," in *Correctional Mental Health Care: Standards and Guidelines for Delivering Services*, Chicago, IL: National Commission on Correctional Health Care, 1999.

- "Was it Preventable?: The Comprehensive Review of Inmate Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 20 (4), 1999.

- *Suicide Prevention in Juvenile Correction and Detention Facilities: A Resource Guide*, South Easton, MA: Council of Juvenile Correctional Administrators, March 1999.

- "Inmate Suicide: A Look at Yesterday, Today and Tomorrow," *Correctional Mental Health Report*, 1 (1), 1999.

- "Another Preventable Jail Suicide: Part Two," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 20 (1), 1999.

- "Juvenile Suicide Prompts Closing of Facility," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 19 (2), 1998.

- "Suicide Prevention in Correctional Facilities: An Overview," in M. Puisis (Ed.), *Clinical Practice in Correctional Medicine*, St. Louis, MO: Mosby, Inc., 1998.

- "Jail Suicide: Preventing Future Casualties," in A. Liebling (Ed.), *Deaths of Offenders: The Hidden Side of Justice,* Winchester, England: Waterside Press, 1998.

- "From Chaos to Calm: One Jail System's Struggle with Suicide Prevention," *Behavioral Sciences and the Law*, 15, 399-413, 1997.

- "Jail Suicide and the Need for Debriefing," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

- "Book Review: *Deaths in Custody*," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

- "Another Preventable Jail Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (2), 1997.

- "State Standards and Suicide Prevention: A Lone Star," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (1), 1996.

- "Custodial Suicide: Overcoming the Obstacles to Prevention," in A. Liebling (Ed.), *Deaths in Custody: Caring for People at Risk*, London, England: Whiting and Birch, 1996.

- "National and State Standards for Prison Suicide Prevention: A Report Card," *Journal of Correctional Health Care*, 3 (1), 1996.

- "An Unusual Case of State-Assisted Prison Suicide," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 17 (2), 1996.

- "Prison Suicide: A Look at Rates and Prevention Policies," *Corrections Today*, 58 (2), February 1996.

- "Controversial Issues in Jail Suicide Prevention, Part 2: Use of Inmates to Conduct Suicide Watch," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (4), 1995.

- "Prison Suicide: An Overview and a Guide to Prevention," *The Prison Journal*, 75 (4), 1995.

- *Prison Suicide: An Overview and Guide to Prevention*, Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, 1995.

- "Controversial Issues in Jail Suicide Prevention," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (3), 1995.

- *Training Curriculum on Suicide Detection and Prevention in Jails and Lockups* (Second Edition), with Joseph R. Rowan, Mansfield, Massachusetts: National Center on Institutions and Alternatives, March 1995.

- "Prison Suicide: An Overview and Guide to Prevention (Parts 1, 2 and 3)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 16 (2), 1995, 16 (1), 1995, and 15 (4), 1994.

- "Jail Suicide in Mississippi," *Crisis: The Journal of  Crisis Intervention and Suicide Prevention*, 15 (3), 1994.

- "Book Review: *Deaths in Custody*," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (3), 1994.

- "Jail Suicide Prevention in the United States: An Overview of Yesterday, Today and Tomorrow," in A. Liebling and T. Ward (Eds.), *Deaths in Custody: International Perspectives*, London, England: Whiting and Birch, 1994.

- "Juvenile Suicide in Confinement: An Overview and Summary of One System's Approach," J*uvenile and Family Court Journal*, 45 (2), 1994.

- "Developing a Written Program for Jail Suicide Prevention," *Corrections Today*, 56 (2), April 1994.

- "Jail Suicide: Overcoming Obstacles to Prevention," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (2), 1994.

- "Youth Suicide in Custody: An Overview," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 15 (1), 1994.

- "Suicidal or Manipulative? -- Does it Really Matter," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 14 (4), 1993.

- "Jail Suicide -- Prevention Through Written Protocol (Parts 1 and 2)," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 14 (2), 1993, and 14 (1), 1993.

- "Can Jail Suicide Be Prevented?" *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 13 (2), 1992.

- "Jail Suicide -- An Overview of Yesterday," *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 13 (1), 1992; *Befrienders Worldwide*, Issue 40, July 1993.

- "Jail Suicide," *Montana Sheriff Magazine*, Summer 1992.

- "Ask the Experts," *American Academy of Psychiatry and the Law Newsletter*, 16 (1), April 1991.

- "National Study of Jail Suicides: Seven Years Later," *Psychiatric Quarterly*, 60 (1), Spring 1989.

- "National Study of Jail Suicides: Seven Years Later," *National Sheriff*, December-January 1989.

- "Jail Suicide Prevention: Research, Litigation and Training," *Issues in Correctional Training and Casework*, 4, October 1988; *Ohio Law Enforcement Training Bulletin*, March through June 1989.

- "Research and Training in Jail Suicide Prevention," *American Jails*, Fall 1988.

- *National Study of Jail Suicides: Seven Years Later*, with Joseph R. Rowan. Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988.

- *Training Curriculum on Suicide Detection and Prevention in Jails and Lockups*, with Joseph R. Rowan, Alexandria, Virginia: National Center on Institutions and Alternatives, February 1988.

- *Jail Suicide/Mental Health Update* (1986 to 2008)

  ➢ "The Tragic and Preventable Death of David Thomas," 17 (2), Fall 2008.
  ➢ "Looking Ahead Toward a Better Understanding of Suicide Prevention in Correctional Facilities," 17 (1), Summer 2008.
  ➢ "Liability for Custodial Suicide: A Look Back," 16 (4), Spring 2008.

➢ Special Issue on Preventing Suicides Through Prompt Emergency Response and Intervention," 16 (3), Winter 2008.
➢  "Treatment and Reentry Approaches for Offenders with Co-Occurring Disorders," (Editor), 16 (2), Fall 2007.
➢ "Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," 16 (1), Summer 2007.
➢ "The Tragic Life of Brenda Mombourquette," 15 (4), Spring 2007.
➢ "Model Suicide Prevention Programs: Part III," 15 (3), Winter 2006.
➢ "Was It Preventable?: The Comprehensive Review of an Inmate Suicide," 15 (2), Fall 2006.
➢ "Custodial Suicide: Yet Another Look," (Editor), 15 (1), Summer 2006.
➢ "The Tragic and Preventable Death of Maurice Shaw," 14 (4), Spring 2006.
➢ "Security and Mental Health Professionals Revisited: Still a (Too) Silent Relationship," (Editor), 14 (3), Winter 2005.
➢ "Model Suicide Prevention Programs: Part II," 14 (2), Fall 2005.
➢ "Model Suicide Prevention Programs: Part I," 14 (1), Summer 2005.
➢ "A Practitioner's Guide to Developing and Maintaining a Sound Suicide Prevention Policy," 13 (4), Spring 2005.
➢ "Jail Standards and Suicide Prevention: Another Look," 13 (3), Winter, 2004.
➢ "Special Issue: Juvenile Suicide in Confinement – Findings From the First National Study," 13 (2), Fall, 2004.
➢ "Special Issue: Inmate Suicide Litigation Redux," (Editor), 13 (1), Summer, 2004.
➢ "Innovations to Reduce Jail Suicide – A Kentucky Initiative," (Editor), 12 (4), Spring, 2004.
➢ "Suicide Prevention and 'Protrusion-Free' Design of Correctional Facilities," 12 (3), Fall, 2003.
➢ "Use of 'No-Harm Contracts and Other Controversial issues in Suicide Prevention," 12 (2), Summer 2003.
➢ "Criminalization of People with Mental Illnesses: The Role of Mental Health Courts in System Reform," (Editor), 12 (1), Spring 2003.
➢ "A Jail Cell, Two Deaths, and a Telephone Cord," 11 (4), Winter 2003.
➢ "Characteristics of Suicide Attempts in a Large Urban Jail System With an Established Suicide Prevention Program," (Editor), 11 (3), Fall, 2002.
➢ "Preventing, Managing, and Treating Suicidal Actions in High-Risk Offenders," 11 (2), Summer, 2002
➢ "Special Issue: The Evolving World of Jail Suicide Litigation," (Editor), 11 (1), Spring 2002
➢ "Factors in Prison Suicide: One Year Study in Texas," (Editor), 10 (4), Fall, 2001.
➢ "Special Issue: Preventing Suicides Through Prompt Intervention," 10 (3), Summer, 2001.
➢ "Suicide Prevention and Manipulative Behavior," 10 (2), Spring, 2001.
➢ "Jail Suicide Risk Despite Denial (Or When Actions Speak Louder Than Words)," 10 (1), Fall 2000.
➢ "Suicide Prevention Initiatives in a Large Statewide Department of Corrections: A Full-Court Press to Save Lives," (Editor), 9 (4), Summer 2000.
➢ "Correctional Suicide Prevention in the Year 2000 and Beyond," (Editor), 9 (3), Spring 2000.
➢ "Playing Catch-Up With the Jail Logs: Another Look," 9 (2), Fall 1999.
➢ "Special Issue: Suicide Prevention in Juvenile Facilities," 9 (1), Summer 1999.
➢ "Special Issue: The Uncertain World of Jail Suicide Litigation," (Editor), 8 (4), Spring 1999.
➢ "Were They Preventable?: The Comprehensive Review of Inmate Suicides, 8 (3), Winter 1999.
➢ "Model Suicide Prevention Programs: Part IV," 8 (2), Fall 1998.
➢ "Model Suicide Prevention Programs: Part III," 8 (1), Summer 1998.
➢ "Model Suicide Prevention Programs: Part II - Juvenile Facilities," 7 (4), Spring 1998.
➢ "Model Suicide Prevention Programs: Part I," 7 (3), Winter 1998.

➢ "Suicide Prevention Though Repeated Tragedy: One Jail System and the Lessons that were Learned," 7 (2), Fall 1997.
➢ "Special Issue: Critical Incident Stress Debriefing," (Editor), 7 (1), Summer 1997.
➢ "Jail Standards and Suicide Prevention: Another Look," 6 (4), Summer 1996.
➢ "Special Issue: Jail Suicide Litigation Redux," (Editor), 6 (3), Spring 1996.
➢ "Suicide Prevention in Juvenile Facilities: New Jersey's Experience," (Editor), 6 (2), Winter 1995.
➢ "Use of Inmates to Conduct Suicide Watch and Other Controversial Issues In Jail Suicide Prevention," 6 (1), Fall 1995.
➢ "U.S. Justice Department's Investigation of Jail Suicides in Mississippi: A Status Report," 5 (4), Spring 1994.
➢ "Special Focus on Mental Health Issues and Suicide Prevention," (Editor), 5 (3), Winter 1993.
➢ "Special Issue: Juvenile Suicide in Confinement: An Overview and Summary of One System's Approach," 5 (2), Fall 1993; *Correct Care*, 8 (1), February 1994.
➢ "Preventing Suicides Through Critical Administrative Review," 5 (1), Summer 1993.
➢ "Managing the Manipulative Inmate," 4 (4), Winter 1992.
➢ "Preventing Suicide Through Prompt Intervention," 4 (3), Fall 1992.
➢ "Liability for Custodial Suicide," (Editor), 4 (2), Summer 1992.
➢ "Trouble in Paradise: Jail Suicide on the Hawaiian Islands and a Police Department's Pro-Active Response," 4 (1), Spring 1992.
➢ "Model Suicide Prevention Programs - Part 4," 3 (4), Spring 1991.
➢ "Model Suicide Prevention Programs - Part 3," 3 (3), Winter 1990.
➢ "Model Suicide Prevention Programs - Part 2," 3 (2), Fall 1990.
➢ "Model Suicide Prevention Programs - Part 1," 3 (1), Summer 1990.
➢ "Notes from the Eleventh Circuit," 2 (4), Winter 1989.
➢ "Litigation Revisited," 2 (3), Fall 1989.
➢ "National Standards of Jail Suicide Prevention," 2 (2), Summer 1989.
➢ "Suicide Prevention in New York State," 2 (1), Spring 1989.
➢ "National Study of Jail Suicides: Seven Years Later," 1 (4), April 1988.
➢ "Training," 1 (3), Summer 1987.
➢ "Litigation," 1 (2), Spring 1987.
➢ "Jail Suicide Prevention Information Task Force," 1 (1), Winter 1986.

• "And Darkness Closes In... A National Study of Jail Suicides," *Criminal Justice and Behavior*, 10 (4), 1983.

• "Confining Wayward Youths: Notes on the Correctional Management of Juvenile Delinquents, with Robert Johnson, *Juvenile and Family Court Journal*, 32 (4), 1981.

• *And Darkness Closes In... A National Study of Jail Suicides*. Final Report to the National Institute of Corrections. Washington, D.C.: National Center on Institutions and Alternatives, October 1981.

## OTHER SIGNIFICANT DATA

- Advisory Panel Member, National Institute of Justice, *Reducing Morality in Correctional Facilities*, Rand Corporation, Arlington, VA, May 16-17, 2016.

- Task Force Member, U.S. Justice Department's Office of Justice Programs and Office of Juvenile Justice and Delinquency Prevention, Suicide Prevention Task Force for Youth in Contact with the Juvenile Justice System, Washington, DC, May 2011 to July 2013.

- Testimony before the Joint Committee on Mental Health and Substance Abuse and the Joint Committee on Public Safety and Homeland Security regarding *Suicide Prevention Practices Within the Massachusetts Department of Corrections*, State House, Boston, MA, May 1, 2007.

- Consulting Editor and Editorial Board Member of *Suicide and Life-Threatening Behavior*, the official scientific journal of the American Association of Suicidology, 2004 to 2010.

- Editorial Board Member of *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, the official scientific journal of the International Association of Suicide Prevention, 2004 to Present.

- Recipient of the National Commission on Correctional Health Care's B. Jaye Anno Award of Excellence in Communication for an outstanding contribution to the field of suicide prevention in correctional facilities, November 2001.

- Recipient of a Governor's Citation by the Governor of the State of Maryland for assistance in the implementation of revised suicide prevention policies in the state's juvenile institutions, October 2001.

- Principal Investigator, Evaluation of Suicide Prevention Policies and Practices at Bridgewater State Hospital, Massachusetts, 2000.

- Testimony before the House of Representatives Committee on Corrections regarding *Suicides in Florida Prisons*, State Capitol, Tallahassee, FL., January 9, 1999.

- Testimony before the House Interim Committee on Judiciary and the Senate Judiciary Crime and Civil Sub-Committee regarding *Suicide Prevention Practices at the Hillcrest Youth Correctional Facility*, State Capitol, Salem, OR, March 10, 1998.

- Suicide Prevention Consultant to the Council of Juvenile Correctional Administrators, 1998 to Present.

- Special Editor for series devoted to international perspective of jail suicides in *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 18 (4), 1997.

- Columnist to *Crisis: The Journal of Crisis Intervention and Suicide Prevention*, 1992 to 2005.

- Invited Lecturer, School of Justice, The American University, Washington, D.C., January 1985 to April 1990.

- Outstanding Alumnus, School of Justice, The American University, Washington, D.C., Spring 1985.

**SUICIDE PREVENTION SERVICES (staff training, program assessment/development and litigation consultation) PROVIDED TO HUNDREDS OF LOCAL AND STATE JURISDICTIONS IN THE FOLLOWING STATES:** Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington (State), West Virginia, Wisconsin, and Wyoming.

**Listings of training, technical assistance, and litigation consultation in suicide prevention furnished upon request.**

October 2018

# EXHIBIT B

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                                                        EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 3, 2018

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes:

I write in response to Lindsay Hayes's draft report "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (Audit) provided to Defendants on August 27, 2018. CDCR thanks Mr. Hayes for his suicide prevention audits and his recommendations, which have been adopted in their entirety by the California Department of Corrections and Rehabilitation (CDCR).

Over the past several years, CDCR has successfully developed and piloted its Continuous Quality Improvement Tool to conduct self-monitoring of CDCR's mental health programs. More recently, CDCR has added suicide prevention indicators to the tool. As discussed below, CDCR believes that the parties should soon begin discussions on transitioning suicide prevention monitoring to CDCR.

Also discussed below are CDCR's general and specific responses and objections to the Audit. Additionally, CDCR objects to the finding that CDCR's proposed unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD) is unsuitable to provide patient care. Mr. Hayes's opinion is based on hypothetical concerns – not monitoring of the activated unit. CDCR should be permitted to activate the unit, subject to monitoring, to ensure that CDCR can provide ready access to crisis care for patients in southern California.

    I.    The Parties Should Discuss Transitioning Suicide Prevention Monitoring to CDCR

Since 2012, with input from the Special Master and Plaintiffs, CDCR has developed its own self-monitoring tool, the Continuous Quality Improvement Tool (CQIT). CQIT has been successfully piloted and recently updated to include suicide prevention audit criteria. Following the current round of CQIT audits, expected to be completed by November 2018, CDCR will release reports outlining the suicide prevention practices for the ten audited institutions. Coupled with chart review audits, CDCR's suicide case reviews and headquarters' Suicide Prevention and Response Focused Improvement Teams (SPRFIT), CDCR is thoroughly analyzing its own

suicide prevention practices and is in the best position to assess its prevention practices and respond to identified deficiencies with corrective action.

During the development of CQIT, the Special Master has monitored CDCR's suicide prevention practices.  The most recent cycle of monitoring, now entering its sixth year, began in July 2013 when the Court ordered Defendants to "establish a suicide prevention/management work group . . . to work under the guidance of the Special Master to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause."  (ECF No. 4693 at 5-6.)  There is currently no established end date for the workgroup or a plan to transition monitoring to CDCR.

By utilizing CQIT, which incorporates the compliance indicators developed by the Suicide Prevention and Management Workgroup and applied by Mr. Hayes during his audits, CDCR can quickly assess and respond to deficiencies by adjusting practices or modifying policies, as necessary.  The CQIT process also memorializes its audit findings and recommendations in reports addressed to each institution.  By combining CQIT, headquarters SPRFIT, and the suicide case review process, CDCR is positioned to provide strong suicide prevention oversight. CDCR invites a discussion about how best to transition monitoring these issues.

## II.  Specific Objections and Comments

CDCR objects to additional Corrective Action Plans because they are unnecessary to cure deficiencies identified in the Audit.  CDCR is responsive to deficiencies when they are identified and works to immediately remedy them.  Outlined below are specific objections and requests for modification to the report.  CDCR provides these objections and comments in addition to its general objection to additional corrective action plans.

### A.  Use of Suicide-Resistant Cells for Newly-Admitted Inmates in Administrative Segregation Units (Pages 8-9)

The report states that CDCR should develop Corrective Action Plans (CAPs) to address deficiencies at ten institutions related to intake cell placement during the first seventy-two hours of segregation.  (Audit at 9).  Specifically, the report recommends that "[s]ome of the CAPs will involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available."

Notwithstanding the Audit's findings, there has been no determination that new intake cells remedy the deficiencies found during the monitoring period.  As the report notes, the segregation population has decreased statewide.  And CDCR was found to be more compliant with intake cell requirements in prior rounds than in the current round.  CDCR has also undertaken

Special Master Lopes
October 3, 2018
Page 3

improvements to remedy intake cell issues since the start of the last monitoring period.  For
instance, on September 17, 2017, CDCR directed the affected institutions to apply a standardized
stencil to each intake cell that identifies them as such.  All institutions complied with this
requirement by October 27, 2017.

CDCR will independently assess whether new intake cells are required to remedy the issues at
these institutions.  However, until there has been such a determination, CDCR requests that the
language at page nine be modified to read that "[s]ome of the CAPs will may involve creating
additional retrofitted new intake cells . . . ."  This language should also be reflected at the third
bullet of page thirty-seven.

> B.  Use of "Alternative Housing" for Suicidal Inmates (Pages 9-10)

At page ten, the report recommends that CDCR "develop CAPs in each of the four facilities
(CIW, CCWF, CSP/Corcoran, and RJD) that continue to have alternative housing lengths of stay
well in excess of 24 hours."[1]  Such a CAP is unnecessary, especially as applied to individual
institutions.  Crisis bed transfers are managed by headquarters, and their timeliness depends on
statewide bed availability.  There is nothing in the report to suggest that slower transfer times are
the result of deficiencies at the local level.[2]  Moreover, CDCR has already undertaken or
proposed remedies to reduce the time patients wait to transfer to a crisis bed.

With respect to California Institution for Women (CIW) and Central California Women's
Facility (CCWF), CDCR and Plaintiffs entered into a stipulated agreement to activate nineteen
unlicensed beds at CIW to ensure quicker access to crisis beds for patients referred from CIW
and CCWF.  These beds are expected to be activated by year's end.

In addition, as discussed in CDCR's July 30, 2018 letter regarding its proposal to activate an
unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD), there are an insufficient
number of crisis beds in southern California.  (Exhibit A.)  As a result, patients will often wait
longer in the southern region because they must spend more time on transport vehicles heading
to available beds, generally, in the central region.  Accordingly, RJD's crisis bed wait times
exceed those at other institutions.  That is why CDCR is proposing to activate a twenty crisis-bed
unit at RJD.[3]

Corcoran's noncompliance is tied to the inadequate number of crisis beds in southern California.
Although Corcoran is in the central region, it has a relatively large crisis bed unit, and is often

---

[1] This recommendation is repeated at page thirty-seven, bullet four.
[2] While CDCR has undertaken measures at the local level aimed at improving transfers, further local fixes are
unlikely to positively impact transfer timeframes at these four institutions given the need for female crisis beds and
beds in the southern region, the lack of which impacts bed availability in the central region.
[3] That Mr. Hayes has rejected this proposal outright makes this particular CAP even more objectionable.  This issue
is discussed in more detail in section III, below.

Special Master Lopes
October 3, 2018
Page 4

used as overflow for patients from southern California. Accommodating these patients can delay the time it takes for Corcoran patients to arrive in a crisis bed. This issue further supports the need for additional crisis beds in southern California.

Accordingly, directing a CAP at these four institutions is unnecessary because crisis bed wait times are directly related to the availability of statewide beds, and not based on correctable local practices. Further, since the availability of statewide beds is being addressed with additional beds at CIW, and potentially at RJD, the underlying issue is likely to be resolved in the near future.

   C. Practices for Observing MHCB Patients (Pages 11-13)

Page eleven of the report states, "the problem of falsification of observation forms of suicidal patients had not been resolved and, in fact, had been exacerbated. This reviewer's preceding assessment found falsification of observation forms in 26 percent (six of 23) of the audited facilities." It is unclear from the report which six institutions falsified forms. Only California Institution for Men and Mule Creek State Prison are noted to have falsified form in the appendix.

As drafted, the report gives the impression that there is a systemwide issue with falsification of records. However, the sentences and paragraph following the statement regarding falsification appear to discuss noncompliance with CDCR's frequency of rounding policy. It is unclear whether falsification is at issue, or if the real issue is noncompliance with frequency of rounding policy[4]. If the issue is noncompliance with frequency of rounding, CDCR requests that the word "falsification" be struck at pages eleven and twelve and replaced with appropriate verbiage identifying the issue as one of "noncompliance with rounding policies."

If form falsification occurred, as alleged at page eleven, CDCR requests that Mr. Hayes specifically identify the six institutions alleged to have falsified forms, or that the compliance rate be adjusted to reflect the true number of institutions determined to have falsified records. This information will provide an accurate picture of whether there is a systemwide issue, as opposed to a handful of staff who are not compliant with CDCR policy.

   D. Safety Planning for Suicidal Inmates (Pages 17-21)

Mr. Hayes recommends that CDCR develop CAPs for safety plan training with a "proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies." (Audit at 21.) CDCR is in the process of updating its safety planning process. CDCR presented proposed changes to the Special Master team on July 19, 2018, and to Plaintiffs on September 5, 2018.

---

[4] The report notes that rounding noncompliance was found in over 86% of the institutions. CDCR is addressing that issue via the use of regional monitoring, fixes to the Electronic Health Record System, training, and the use of CDCR's Continuous Quality Improvement Tool.

Special Master Lopes
October 3, 2018
Page 5

CDCR anticipates training the field on these changes in October 2018.  In light of the imminent change in practice, monitoring should be suspended until such time that CDCR can properly train and fully implement the new safety planning protocol statewide.  Otherwise, any reassessment would be based on outdated protocols.

> E.  MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical
> Follow-Up and Custody Welfare Checks (Pages 22-23)

Mr. Hayes recommends that CDCR should "[d]evelop CAPs for the 'Discharge Custody Check Sheet' (CDCR MH-7497) form process in the 20 facilities identified above that were below 90-percent compliance."  (Audit at 23.)  The new CAP is redundant because CDCR already developed and implemented a CAP to address this issue in May 2018.  Instead of initiating a new CAP, CDCR should be allowed to complete implementation of its May 2018 CAP, followed by further assessment by the Special Master.

> F.  Local SPRFITs (Pages 23-25)

The report states at page twenty-four that "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy, the court ruled on January 25, 2018 that '[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order.' (ECF No. 5762 at 3.)"

CDCR objects to the contention that CDCR has not acted timely to develop and implement revisions to its SPRFIT policy and requests that the Special Master strike the phrase "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy."  Over the past two-years, CDCR has developed and implemented countless initiatives resulting from the *Coleman* class action.  The Special Master's most recent report on inpatient care identifies forty-nine such initiatives. (See ECF no. 5894 at 89-90, fns. 20 and 21.)  This mischaracterization of CDCR's commitment to suicide prevention discounts the tremendous amount of work Defendants have accomplished in the last two years.

> G.  Suicide Prevention Training (Pages 25-28)

> > i.  Basic Correctional Officers Academy Training

Mr. Hayes reports that he is concerned about the "currently allotted 2.5 hour time frame" for pre-service training.  (Audit at 26.)  CDCR has expanded the Basic Correctional Officers Academy Training to four hours.  CDCR requests this sentence be struck or edited appropriately.

      ii.   Training Compliance Rates

For unexplained reasons, CDCR's forty-three percent compliance with in-service training is highlighted in both bold and italics on page twenty-six. Conversely, CDCR's 100-percent compliance with cardiopulmonary resuscitation (CPR) and automated external defibrillator (AED) training is relegated to a footnote on the same page. CDCR requests that the CPR and AED training compliance rates be moved to the body of the report.

      iii.   Recommendation

Mr. Hayes recommends that CDCR provide him with the revised pre-service *Mental Health Services Delivery System Instructor Guide* curriculum and a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training. (Audit at 27-28.) This recommendation is unnecessary.[5] CDCR provided this information to Mr. Hayes on August 23, 2018.

      H.  Continuous Quality Improvement Tool (Pages 28-29)

Mr. Hayes recommends that "[t]he reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQIT-formatted report for each facility, and not in various 'regional reports' as described in defendants' May 2018 CAP." (Audit at 29.) This recommendation is unnecessary[6] because these are reports of individual institutions, not "regional reports." The reference to "regional reports" in CDCR's CAP refers to the author of the CQIT reports, the leadership in CDCR's regional mental health offices. The regional chiefs and their staff conduct the CQIT audit and draft reports for each audited institution. CDCR is processing an overarching CQIT report that will aggregate the findings of the institution reports.

      I.  Reception Center Suicide Prevention Posters (Pages 30-32)

Mr. Hayes recommends a CAP "to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, [sic] nurse's offices where intake screening is administered, and pill call windows."[7] (Audit at 32.) While CDCR agrees that suicide posters should be placed in visible locations within Reception Centers, they cannot block visibility through windows or be placed outdoors. CDCR requests that the sentence include provisional language such as "when conditions allow."

---

[5] The recommendation is separately repeated as the last bullet on page thirty-seven.
[6] The recommendation is repeated at the first bullet of page thirty-eight.
[7] This recommendation is repeated at the second bullet of page thirty-eight.

Special Master Lopes
October 3, 2018
Page 7

III. CDCR Objects to Mr. Hayes's Rejection of the RJD Crisis Bed Proposal

To increase crisis bed capacity in the region where beds are most needed, CDCR proposed a temporary twenty crisis-bed unit at RJD pending construction of a permanent facility on site. This unit is especially important to ensure prompt access to crisis beds for the large number of patients housed in southern California. The need for additional crisis beds has also been recognized by the Court. On April 19, 2017, the court found that CDCR does "not presently have sufficient capacity to meet the need for MHCB level of care" and that the Eighth Amendment required perfect compliance with the twenty-four hour MHCB transfer timeframe. (*See* ECF 5610 at pages 11-12.)

As noted in CDCR's July 30, 2018 letter on this proposal, patients wait longer to access crisis beds in southern California than in any other region and, "each crisis bed in the southern region must provide services to twenty-five Enhanced Outpatient Program (EOP) patients while MHCBs in the central and northern regions provide services to fifteen and seventeen EOP patients, respectively." (Exhibit A at 2.) Mr. Hayes notes that transfer timeframes are not currently being met at RJD. (Audit at 10.) RJD, which houses over 2,300 mentally-ill inmates, but has only fourteen crisis beds, is the ideal location for additional beds.

Despite the need to timely transfer patients in crisis, Mr. Hayes rejected this common sense approach outright. Instead of rejecting CDCR's proposal, CDCR should fully activate the unit and only then should Mr. Hayes should monitor and opine on its adequacy.

> A. CDCR's RJD Crisis Bed Proposal is Sound and Will Ensure Crisis Bed Access for Patients in Southern California

CDCR toured the proposed site with Plaintiffs and Special Master in March 2018 and visited it separately with a member of the Special Master team and Mr. Hayes in April 2018. Following comments from Plaintiffs and the Special Master team, CDCR provided additional details on the project in a series of meetings. CDCR also detailed the RJD proposal in two letters provided to Plaintiffs and the Special Master in April and July 2018, which are attached to this letter as Exhibits A and B. The RJD proposal, which transfers funding and staff allocation from SAC's unlicensed crisis beds to RJD, was approved in the 2018 budget.

CDCR has carefully considered the placement of the RJD crisis-bed unit. CDCR proposes to convert one side of a housing unit to a crisis-bed unit which will contain patient cells, office and treatment space, observation and restraint rooms, nursing and medication rooms, and storage. While the proposed building currently shares space with an administrative segregation unit, that section will be reserved for overflow to minimize the administrative-segregation population. The units will be divided by a fence, and because it shares space with an administrative segregation unit, there will be no disruptions from the adjacent day-room.

Special Master Lopes
October 3, 2018
Page 8

The RJD cells will be similar in size to those approved at the California Medical Facility L1 unit, which successfully double cells patients in inpatient beds. RJD patients will be single celled and will each receive additional out of cell time, in part due to adjacent yard space. CDCR will ensure that the cells are suicide resistant.

CDCR will provide RJD with sufficient staffing to run a crisis bed unit. As noted above, CDCR plans to remove its unlicensed crisis bed unit at SAC and move all allocated staff and funding to RJD. The new RJD unit will be monitored regularly by headquarters and regional staff.

> B. Rejecting the Proposal Outright is Improper

Mr. Hayes reports on at least a dozen items in his suicide-prevention audit to measure CDCR's compliance with its suicide-prevention policies. Yet the RJD proposal was rejected without analyzing the unit using under the same audit criteria. The Audit does not adequately explain why the proposal is rejected nor does it explain why concerns about the proposal's physical plant outweigh the transfer timeline concerns expressed by the Court. Mr. Hayes fails to provide a reasonable basis to conclude that the RJD project is inadequate.

Many of the current audit criteria and past audit reports focus on the operations of MHCBs. According to the draft report, Mr. Hayes audited the following crisis bed related items:

- Suicide-Resistant MHCBs (Audit at 6)
- Practices for observing MHCB Patients (*id.* at 11)
- MHCB Practices for Possessions and Privileges (*id.* at 13)
- Safety Planning for Suicidal Inmates (*id.* at 17)
- MHCB Discharge (*id.* at 22)
- Emergency medical response equipment in housing units (*id.* at 2)

Mr. Hayes takes issue with the proposed temporary MHCB unit at RJD, but those purported concerns have no foundation in the audit criteria. Under the proposal, RJD would follow the same observation, property, and privileges practices as any other approved CDCR crisis bed. Additionally, the same safety planning and discharge policies would apply. In sum, there is no evidence that the RJD unit, as proposed, would present a greater suicide risk as compared to other crisis bed units.

> C. Mr. Hayes's Bases for Rejecting the Proposal Are Inconsistent with Past Suicide Prevention Findings and Recommendations and Ignore CDCR's Proposed Amendments.

Mr. Hayes agrees that the unit would be suicide resistant, which should satisfy the inquiry into suicide prevention. Yet, he objects to the proposed unit based on the physical plant and

Special Master Lopes
October 3, 2018
Page 9

hypothetical operational challenges.  Mr. Hayes rejects the proposed physical plant of the crisis
bed because, in his opinion, the cells would resemble suicide resistant *intake* cells.  Mr. Hayes
also attacks the cells as cold, dark, and with limited floor space well below any licensed MHCB
unit.  But CDCR presented remedies to address those concerns, all of which would provide cells
with better natural light than many licensed crisis bed units, and with sufficient out-of-cell time
to adjust for smaller foot-print in each cell.

In fact, and as mentioned previously, the proposed cells are similar in size to the unlicensed beds
in California Medical Facility's L1 unit.  However, unlike L1, RJD would not double cell
patients, now or in the future.  Like L1, CDCR proposes to remedy any square footage
shortcomings with increased out-of-cell time.  The RJD unit is located next to small management
yards, typically used for segregation inmates.  These yards can be used for crisis bed patients and
will allow for increased out of cell time.

CDCR has also proposed to replace the cell doors with models that have larger windows and also
proposed to replace light bulbs on the unit to provide more light.  However, Mr. Hayes rejected
these proposals as insufficient before ever seeing the doors or lights in place, or the impact of the
larger windows on his stated concerns.

Also questionable is Mr. Hayes's rejection of the office and treatment space on the basis that
sound easily travels between cells which are dozens of feet apart.  The Audit states, "[g]iven the
*fact* that inmates freely converse through the ventilation grates and cell doors, even with clinical
offices and interview rooms located at the end of each tier, privacy and confidentiality could still
be compromised by the proposed location of these offices on each tier."  (Emphasis added.)  This
characterization of the unit and potential impact on confidentiality is exaggerated and
hypothetical.  It is true that inmates will loudly shout at their adjacent neighbor in an attempt to
converse with one another.  Yet, CDCR is unaware of any finding that sound travels so clearly
that a patient in one cell can clearly overhear an individual clinical session several cells away.
As noted in CDCR's July 30, 2018, letter, CDCR will examine whether individual sessions can
be clearly heard several cells away and, if so, take corrective action to ensure confidentiality.

Mr. Hayes also rejects the proposed use of small management yards ignoring that this proposal
has ample yard space and superior beds to the unit at SAC it will replace.  There is no real risk
that CDCR will be unable to ensure inmates have adequate out-of-cell time.  CDCR should be
permitted to activate the unit and illustrate that it can offer the out of cell time it committed to,
much like it did with L1 wherein CDCR committed to offering twelve hours out of cell time each
day.

Finally, Mr. Hayes opines that because the SAC unlicensed crisis bed is "problematic," CDCR
should not close and move that program to RJD.  This objection ignores the fact that the RJD

Special Master Lopes
October 3, 2018
Page 10

project is located in the part of the state where additional beds are needed and that, unlike SAC, the RJD project is time limited. The unit is planned to remain open only until the approved and budgeted permanent crisis bed unit opens at RJD in 2022.

In sum, CDCR's proposal to open an unlicensed crisis-bed unit at RJD is sound and Mr. Hayes's contrary suggestion lacks foundation. Accordingly, CDCR should be permitted to immediately open the unit and provide faster crisis bed access to patients in southern California.

Thank you for your consideration of these objections and comments.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

# EXHIBIT C



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email: kstone-manista@rbgg.com

October 9, 2018

<u>VIA ELECTRONIC MAIL ONLY</u>

Nicholas Weber                    Matthew A. Lopes Jr.
Jerome Hessick                    *Coleman* Special Master
Melissa Bentz                     MLopes@pldolaw.com
Dillon Hockerson
CDCR Office of Legal Affairs
Nicholas.Weber@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Dillon.Hockerson@cdcr.ca.gov

Re:   *Coleman v. Brown*: Plaintiffs' Response to Defendants' "Comments and
      Objections" to Lindsay Hayes' August 27, 2018 Suicide Prevention Audit
      <u>Our File No. 489-3</u>

Dear All:

Plaintiffs write in response to Nick Weber's October 3, 2018 Letter ("Defendants'
Comments"), which set forth Defendants' "Comments and Objections" regarding
Lindsay Hayes's draft report "The Third Re-Audit and Update of Suicide Prevention
Practices in the Prisons of the California Department of Corrections and Rehabilitation"
("Draft Hayes Report"), itself dated August 27, 2018. Plaintiffs disagree with
Defendants' request to transition suicide prevention monitoring to CDCR, their proposal
to open a temporary, unlicensed crisis bed unit at Richard J. Donovan Correctional
Facility ("RJD"), despite Mr. Hayes's grave concerns, and their other "objections" to the
Draft Hayes Report.

## I.    CDCR Has Not Demonstrated that It Is Ready to Assume Self-Monitoring of Suicide Prevention

Plaintiffs appreciate the substantial time and energy that Defendants have
dedicated to the development of the Continuous Quality Improvement ("CQI") tool and

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 2

process, but disagree that CQI is yet ready to allow CDCR to "quickly assess and respond to deficiencies by adjusting practices or modifying policies, as necessary." Defendants' Comments at 2. As a general matter, "quickly" hardly describes the development of the CQI process to date, which has yet to produce a single timely, final institutional report. Before Plaintiffs or the Court can seriously entertain Defendants' requests for self-monitoring, Defendants must demonstrate that they can produce timely reports that identify key and emergent problems in an appropriate way. No final overall CQIT report was ever produced in connection with the 11 CQIT tours completed by Defendants in 2016. Defendants produced, belatedly, individual draft reports for single institutions, many months after each tour. The Special Master worked with Defendants on improving their reporting following these untimely reports, but no final revised reports were ever produced or reviewed by Plaintiffs, and no overarching report looking for patterns and trends system-wide was ever provided to Plaintiffs. *Cf.* Defendants' Comments at 6 (promising "an overarching CQIT report that will aggregate the findings of the institution reports," with no timeline for production of such). Even as to the individual reports, Defendants stated a goal for this year's tours that the reports would be issued within thirty days following each tour. Twelve weeks have now passed since Plaintiffs observed the first tour this year, at LAC, and nine weeks have passed since the SVSP CQI tour; Plaintiffs have not yet received any report for either.

Further, as will be discussed more fully in a forthcoming letter commenting on Plaintiffs' recent CQI tour observations, the tool and process remain critically deficient in other respects in addition to their lack of timeliness, many of which relate directly to suicide prevention efforts. The individual institution CQIT reports we have seen, while containing valuable and detailed information about mental health programs, often fail to highlight the most critical concerns and sometimes gloss over serious problems. The reports produced in 2016-2017 also had several serious omissions that were not remedied by amendments to the written materials. These include, but are not limited to, the fact that the process remains inadequate to ensure that class members housed where they should not be, such as EOP patients in a non-hub ASU, are appropriately monitored. This is of particular relevance to suicide prevention efforts because of historically high suicide rates in segregation units, and CDCR's failure to address this issue despite Plaintiffs' repeated comments about it casts into doubt the adequacy of the CQI process as a whole. Further, and again despite Plaintiffs' numerous comments on this issue, there is still no connection between the CQI process and the suicide review process, and no requirement that CQI reports include even a bare mention of suicides during a review period, much less any analysis thereof.

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 3

The CQI process is also, at present, inadequate to assume qualitative auditing of system inadequacies.  As just one example, the materials provided in connection with the recent CQI tours still do not require any substantive review of whether Guard One checks are actually being completed, despite ongoing problems with suicide victims who have been found in rigor mortis despite purportedly completed Guard One checks.  *See* Hayes Draft Report at 4.

With respect specifically to the quantitative suicide prevention measures audited by Mr. Hayes, Mr. Hayes' Draft Report noted that CDCR previously intended to capture data related to suicide-prevention training compliance in "regional reports," and recommended that all suicide-prevention measures instead by captured in one CQI report for each facility.  *See* Draft Hayes Report at 28-29.  It appears from the CQI Report Guide provided to Plaintiffs in connection with the recent tours that the institutional CQI reports will now capture this training data, but that at least some training-related measures are "not yet on report/coded."  Report Guide at 6-7.  It is difficult to credit CDCR's assertion that it is prepared to assume full responsibility for suicide-prevention monitoring when it has not even finished coding of data reporting.

Even had it done so, the recent revelations about alleged system-wide compliance data and reporting flaws and misinformation detailed in Dr. Michael Golding's October 3, 2018 report, and the need for a thorough investigation of the same, cast into serious doubt CDCR's ability to self-monitor in any area reliant on the collection of accurate data, including this one.  Simply put, now is not the time for Defendants to be asking the Special Master, Court or Plaintiffs to trust their transparency and reporting of complete and accurate compliance data, particularly with a suicide rate that continues to rival all-time highs for the system.

The record, particularly considered in light of the allegations in Dr. Golding's report, does not support the conclusion that CDCR is ready to assume monitoring either from a qualitative or a quantitative perspective.  Plaintiffs therefore stridently disagree with Defendants' assertion that "CDCR is positioned to provide strong suicide prevention oversight" and oppose their request to assume self-monitoring of this important issue. Defendants' Comments at 3.

## II.    Mr. Hayes' Rejection of the RJD Crisis Bed Proposal Is Merited and Well-Founded in His Extensive Expertise

Plaintiffs strongly disagree with Defendants' argument that, despite Mr. Hayes's grave concerns regarding the proposed temporary crisis bed project at RJD, it would be

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 4

appropriate to activate the unit now, and then allow for monitoring. Although we appreciate Defendants' desire to locate and activate additional crisis beds in the Southern Region, the current proposal to open an unlicensed crisis bed unit in a shared segregation unit at RJD is deeply misguided for the reasons we articulated in greater detail in our March 16, 2018 and August 8, 2018 letters. *See* Plaintiffs' August 8, 2018 letter, attaching March 16, 2018 letter, attached here as **Exhibit A**.

As Mr. Hayes concluded, after touring the proposed space, "subsequent teleconference calls with Statewide Mental Health Program leadership staff," and a review of the parties' correspondence on the issue, including Defendants' proposed modifications to their original plan, "activation of defendants' proposal at RJD would result in deplorable conditions—unacceptable for class members needing an MHCB level of care." Draft Hayes Report at 35. It is therefore completely inappropriate to suggest that the unit should be activated in direct contravention of Mr. Hayes's professional judgment as a foremost expert in suicide prevention, and Plaintiffs would strongly oppose any request to waive relevant licensing laws to permit this dangerous unit to open. Defendants' proposal amounts to a request that Plaintiffs and the Special Master countenance the use of real patients experiencing psychiatric crises as guinea pigs to test out whether the unit "present[s] a greater suicide risk as compared to other crisis bed units." Defendants' Comments at 8. Notably, Defendants have never responded to our inquiries regarding what alternatives, if any, they considered for temporary MHCBs in the Southern Region, seriously undermining their claim that the proposed unit at RJD was their only, or best, option.

We share all of the "significant concerns" Mr. Hayes expressed in his draft report regarding the proposed unlicensed unit, including the size of the cells, the minimal light, the lack of MHCB suicide-resistant beds, potential issues with client confidentiality due to noise transfer, the limited yard time and the use of "walk-alone" yards, the lack of a plan to install fencing on the second tier to eliminate suicide attempts by jumping, and his fundamental conclusion that the cells "simply resemble retrofitted new intake cells found in administrative segregation units." *See* Draft Hayes Report at 34-35. Defendants' letter does not address these serious concerns, except to argue that the cells are similar in size to those in California Medical Facility's L1 unit and that CDCR "proposes to remedy any square footage shortcomings" with an unspecified amount of "increased out-of-cell time." Defendants' Comments at 9. Regarding Mr. Hayes's patient confidentiality concerns, Defendants claim that they will take a wait and see approach and "take corrective action" if necessary; even assuming Defendants could and would properly ameliorate confidentiality problems, such an approach is highly inappropriate, as during the test period, severe breaches of clinician-patient confidentiality could occur, and class

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 5

members could be dissuaded from honestly reporting crisis symptoms, both of which are extremely dangerous. *Id.* Again, given CDCR's extremely high rate of suicide yet again this year, Plaintiffs are surprised Defendants have continued to support this misguided proposal rather than identifying an appropriate alternative, especially considering that Defendants' bed plans have projected crisis bed shortages for years and Defendants chose not to pursue alternatives to more quickly complete the planned crisis beds currently slated to activate in 2022.

Moreover, we do not believe that the issues raised by Mr. Hayes should be minimized because, as Defendants argue, "[t]he unit is planned to remain open only until the approved and budgeted permanent crisis bed unit opens at RJD in 2022." Defendants' Comments at 10. As we have previously stated, Defendants' track record in failing to close other "temporary" unlicensed units years after they were set to be phased out is poor, as is their track record in finishing planned construction projects on time. *See* Plaintiffs' August 8, 2018 letter at 4.

Mr. Hayes is a nationally recognized expert in suicide prevention practices, and he has clearly stated his professional opinion that Defendants' proposed unit at RJD is "unacceptable for class members needing an MHCB level of care." Draft Hayes Report at 35. Defendants' suicide rate is, for the second year in a row, on track to exceed twenty-four suicides per 100,000 inmates, and it is well-documented that the harsh conditions of administrative segregation units exacerbate suicidality—in 2017, the suicide rate for segregation units in CDCR was a horrifying 250 suicides per 100,000. *See* Plaintiffs' Letter re 2016 CDCR Suicides, Feb. 9. 2018, attached hereto as **Exhibit B** at 3. Defendants' proposal to "immediately open the unit" and then see if any problems arise, particularly with no plan in place to ensure confidentiality as required by the Program Guide, is reckless and likely to result in significant suffering and death.

## III.    Responses to Defendants' Specific Comments and Objections

As discussed above, Plaintiffs disagree that Defendants have demonstrated that they are prepared and ready to assume self-monitoring responsibilities, particularly for an area as sensitive and critical as suicide prevention. Plaintiffs also disagree with Defendants' comments and objections to the extent that they suggest that formal, monitored Corrective Action Plans ("CAPs") are unnecessary because Defendants promise they will fix problems on their own. Years of court involvement, including the Court's January 25, 2018 Order requiring Defendants to implement finally long-identified critical safety problems in the crisis beds at CIM, show the necessity of enforceable court orders in these areas. *See* Order, ECF No. 5762 at 2.

[3308291.2]

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 6

### A.    New Intake Cells

Defendants' assertion that there has been no "determination that new intake cells remedy the deficiencies found during the monitoring period" is confusing, given that Mr. Hayes specifically found that "[i]n most cases, inmates were placed in an unsafe cell because all new intake cells were occupied." Defendants' Comments at 2-3; *see* Hayes Report at 10. Clearly, where non-compliance with intake cell policies has been a problem over many rounds of auditing due to lack of adequate intake cell capacity, there is a need for additional intake cells. While Defendants state that they will "independently assess whether new intake cells are required to remedy the issues," they have never done so, to Plaintiffs' knowledge, despite multiple rounds of non-compliance in this area and prior promises to conduct such a review, including most recently a report promised last month that has not materialized. *See* Second Hayes Re-Audit, Sept. 7, 2017, ECF No. 5672, at 6 (finding that eight of 23 audited facilities housed people in non-intake cells during the first 72 hours of administrative segregation confinement); First Hayes Re-Audit, Jan. 13, 2016, ECF No. 5396, at 13 (finding that 11 of 17 audited facilities had unsafe intake cell facilities and/or practices, and noting that CDCR was developing a "management plan" regarding the placement of new intake cells, which apparently was never completed); Hayes Audit, Jan. 14, 2015, ECF No. 5259, at 15-17 (finding that not all people were housed appropriately in intake cells and recommending that CDCR ensure it had enough intake cells). To the extent Defendants' requested linguistic change is for the purpose of conducting an assessment to determine the necessity of new intake cells at any given institution before construction, Plaintiffs do not object, but do request that Defendants complete that overdue analysis promptly and share it with Mr. Hayes and Plaintiffs given the recurrent nature of this problem and that the highest level of suicide prevention measures in segregation units is a critical and urgent matter.

### B.    Alternative Housing Use at CIW, CCWF, COR, and RJD

Plaintiffs disagree that the forthcoming crisis beds at CIW will solve CDCR's failure to transfer female class members to crisis beds in a timely manner, and as discussed at length above, object to CDCR's continued reliance on its rejected proposal to create dangerous unlicensed beds in a segregation unit at RJD as an answer to its intractable crisis bed problem. *See* Defendants' Comments at 3-4. Plaintiffs concur with Mr. Hayes' recommendation that the four institutions that subject class members in crisis to the longest wait times in "alternative housing" be directed to review and, if necessary, remedy any institution-specific factors that contribute to those wait times. This issue merits more attention than Defendants' conclusory footnote that "further local fixes are

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 7

unlikely to positively impact transfer timeframes," particularly given how dramatically far outside the 24-hour time limit the four institutions in question fall, with ranges from 36 to 67 hours. *See id.* at 3 n.2; Draft Hayes Report at 10. Moreover, Defendants' claim that Southern Region bed shortages are the cause of RJD and COR's persistent failure to timely transfer patients in crisis fails to adequately explain why all of the other institutions in the area are compliant. Finally, if Defendants are correct that the problem is due to headquarters' mismanagement of crisis bed transfers, the solution would seem to be a headquarters-level CAP about improving timeliness of transfers in addition to review of institutional obstacles – not, as Defendants would have it, no review at all. *See id.* at 3-4.

### C.    Practices for Observing MHCB Patients

Plaintiffs strenuously object to Defendants' characterization of rampant, system-wide, and persistent findings, over several auditing rounds, of nursing staff falsification of observation of suicidal patients as "a handful of staff who are not compliant with CDCR policy." Defendants' Comments at 4; *see, e.g.,* Hayes Re-Audit, September 7, 2017, ECF No. 5672 at 11; Hayes Re-Audit, January 13, 2016, ECF No. 5396 at 28. This is hardly the kind of responsibility-taking leadership that would suggest that CDCR is prepared to assume self-monitoring.

Plaintiffs do not object to Defendants' request that the report provide additional specificity concerning whether there was widespread falsification of rounding documentation during this assessment round, or whether there are system-wide failures to comply with long-standing, and often reiterated, requirements in this area. In either event, this problem requires a more serious attitude, and response, than CDCR's attempt to dismiss it as a failure on the part of a "handful of staff."

### D.    Safety Planning for Suicidal Inmates

Given CDCR's assertion that the field will receive changes on safety planning updates in October 2018 – i.e., this month – there is no support for Defendants' request to suspend monitoring on this issue until some unspecified future date. Defendants' Comments at 4-5. This critical issue – a system-wide problem, as Mr. Hayes thoroughly and carefully documents – should continue to be monitored on the schedule he deems appropriate. *See* Draft Hayes Report at 17-21. Plaintiffs note that, despite multiple requests, Defendants have still not provided Plaintiffs with the proposed training materials for the new protocol in question, even though it is apparently in the midst of being rolled out.

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 8

### E.     MHCB and Alternative Housing Follow-Up and Welfare Checks

As Plaintiffs understand Mr. Hayes' report, the May 2018 CAP on this issue focused on the need for statewide improvements to the process for ensuring adequate custody welfare checks following crisis bed discharges.  *See* Draft Hayes Report at 23. There is therefore no redundancy in his recommendation for specific institutional CAPs at the 20 institutions with particularly low compliance in this area.  *See id.*  Given the vulnerability of these class members, it is difficult to understand why Defendants would object to improving institution-specific compliance with these requirements, as well as improving statewide compliance.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

[3308291.2]

Nicholas Weber, Jerome Hessick, Melissa Bentz
Dillon Hockerson
Matthew A. Lopes Jr.
October 9, 2018
Page 9

### F.     Defendants' Various Wordsmithing Requests Are Inappropriate

Defendants make various requests, in the guise of "objections," that the draft report be revised so as to be more flattering to Defendants.  These requests are inappropriate and do not merit a response from the Office of the Special Master.  As to the request that the draft report remove Mr. Hayes' description of Defendants' dilatory response regarding the revised SPRFIT policy in particular, *see* Defendants' Comments at 5, the Court found, in January 2018, that Defendants had not provided a revised policy in response to comments received from Mr. Hayes almost a year earlier, and sua sponte set a date certain by which Defendants would finally be  required to do so, *see* ECF No. 5762 at 2.  Defendants have no grounds on which to object to Mr. Hayes' accurate description of the Court's Order.  And Defendants' request that certain information be moved from a footnote into the text of the report is simply inappropriate nitpicking.  *See* Defendants' Comments at 6.   Plaintiffs do not object to Mr. Hayes making any factual revisions he sees fit to clarify any ambiguity or acknowledge developments after the date of the report if appropriate, however.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Krista Stone-Manista*

By:   Krista Stone-Manista


JSY:cg
cc: *Coleman* Co-Counsel
    *Coleman* Special Master team
    Jay Russell
    Andrew Gibson
    Elise Thorn
    Adriano Hrvatin

Tyler Heath
Tobias Snyder
Ian Ellis
Christine Ciccotti
Sean Rashkis
Joanna Mupanduki