**The Third Re-Audit and Update of Suicide Prevention Practices
in the Prisons of the California Department of
Corrections and Rehabilitation**

Lindsay M. Hayes, M.S.
November 5, 2018

<u>**Executive Summary**</u>

## I.    <u>Introduction</u>

This report is submitted as an update to this reviewer's preceding report, "The Second Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation [CDCR]" (ECF No. 5672, filed September 7, 2017).  The preceding report covered this reviewer's findings from a second re-audit of suicide prevention practices at 23 selected CDCR prisons.  The report recommended that prisons which chronically struggled with their suicide prevention programs, as well as almost all prisons that contained Mental Health Crisis Bed (MHCB) units, undergo continued re-inspection, and that the defendants continue to work with the Special Master and Suicide Prevention Management Workgroup (SPMW) on outstanding initiatives previously committed to by CDCR.  On January 25, 2018, the *Coleman* court issued an order adopting the report in full (ECF No. 5762).

This report is the fourth on an audit of CDCR suicide prevention practices and covers this reviewer's recent re-audit at 23 selected CDCR prisons.  The on-site re-audit began on May 23, 2017 and concluded on February 15, 2018.  The details and methodology of the re-audit/review process are discussed in Part II, below.  Part III of this report contains a summary of this reviewer's findings during the re-audit, including a status update on defendants' progress in implementing prior recommendations as contained in this reviewer's initial audit report and the accompanying report by the Special Master (ECF No. 5258, filed January 14, 2015).  Part IV is this reviewer's inspection and findings regarding defendants' proposal to build temporary unlicensed MHCB units at the California Institution for Women (CIW) and the R.J. Donovan Correctional Facility (RJD).  Part V covers this reviewer's conclusion and recommendations. Lastly, Appendix A presents a prison-by-prison discussion of this reviewer's findings at each of the 23 re-audited prisons, together with summaries of CDCR Suicide Case Reviews of the 29 inmate suicides in those prisons during 2017.[1]

Finally, it should be noted that CDCR, its management team (including statewide mental health staff) and legal counsel, as well as local custody, medical, and mental health leadership at each of the prison facilities assessed during 2017-2018, continued to demonstrate full cooperation during this reviewer's suicide prevention assessment process.

---

[1]Although there was a total of 30 suicides within CDCR facilities during 2017, review of the inmate suicide that occurred in the California Correctional Center (CCC) in October 2017 was not included in this report because the CCC was not chosen for review during this most recent suicide prevention assessment.

II.    **Methodology**

      This reviewer's selection of 23 CDCR prisons for on-site re-auditing was based on a variety of reasons, including their operation of MHCB units, findings during previous audit(s) that their suicide prevention practices were chronically problematic, having a significant population of inmates on the Mental Health Services Delivery System (MHSDS) caseload, and/or the facility experiencing multiple inmate suicides. As in the previous audits, this reviewer's re-audit consisted of a two-day on-site examination of suicide practices at each of the prisons. There were two exceptions: California State Prison, Sacramento and California State Prison, Los Angeles County each necessitated three-day on-site examinations. The 23 re-audited prisons and the dates of their on-site assessments were:

1.     California State Prison, Sacramento (CSP/Sac):  May 23-25, 2017
2.     Wasco State Prison (WSP):  June 8-9, 2017
3.     California Institution for Women (CIW):  June 19-20, 2017
4.     California Institution for Men (CIM):  June 21-22, 2017
5.     Kern Valley State Prison (KVSP):  July 11-12, 2017
6.     North Kern State Prison (NKSP):  July 13-14, 2017
7.     Richard J. Donovan Correctional Facility (RJD):  July 25-26, 2017
8.     California Health Care Facility (CHCF):  August 8-9, 2017
9.     Mule Creek State Prison (MCSP):  August 10-11, 2017
10.    California State Prison, Solano (CSP/Solano):  August 23-24, 2017
11.    California State Prison, Corcoran (CSP/Corcoran):  October 10-11, 2017
12.    California Substance Abuse Treatment Facility (CSATF):  October 12-13, 2017
13.    High Desert State Prison (HDSP):  November 2-3, 2017
14.    California State Prison, Los Angeles County (CSP/LAC):  November 13-15, 2017
15.    California Correctional Institution (CCI):  November 16-17, 2017
16.    Deuel Vocational Institution (DVI):  December 5-6, 2017
17.    Central California Women's Facility (CCWF):  December 7-8, 2017
18.    San Quentin State Prison (SQ):  January 2-3, 2018
19.    California Medical Facility (CMF):  January 4-5, 2018
20.    California Men's Colony (CMC):  January 16-17, 2018
21.    Pleasant Valley State Prison (PVSP):  February 6-7, 2018
22.    Salinas Valley State Prison (SVSP):  February 8-9, 2018
23.    Pelican Bay State Prison (PBSP):  February 14-15, 2018

      At each site, this reviewer again examined the prison's performance with the following suicide prevention measurement tools:

- Thoroughness and degree of privacy afforded during the intake screening process
- Psych Tech (PT) practices in restrictive housing units
- MHCB practices, including verification of required observation of suicidal patients

- Use of suicide-resistant, retrofitted cells for MHCB patients and new intake inmates assigned to administrative segregation units
- Use of alternative housing for inmates awaiting transfer to MHCBs
- Suicide risk assessments for emergency mental health referrals and admittance/discharge from a MHCB/alternative housing
- Safety planning for suicidal inmates
- Appropriate follow-up services provided by clinical and custody staff to inmates discharged from a MHCB or alternative housing
- Custody rounds in restrictive housing units
- Emergency medical response equipment in housing units
- Compliance with suicide prevention training
- Review of meeting minutes of the local Suicide Prevention and Response Focused Improvement Teams (SPRFITs)

All inmate suicides which occurred during the review period in the 23 audited facilities were reviewed through examination of the inmates' health care records via Electronic Unit Health Records (eUHRs) or the Electronic Health Record System (EHRS), CDCR Suicide Reports, and Quality Improvement Plans (QIPs).

In addition, this reviewer and several other members of the *Coleman* Special Master team attended the CDCR Statewide Mental Health Program's three-day Suicide Prevention Summit from October 17-19, 2017, at which, this reviewer presented preliminary findings from this most recent suicide prevention audit. On January 18, 2018, the Special Master held a SPMW meeting with his experts, the parties, and CDCR management officials, to assist in effectuating defendants' implementation of the recommendations contained in this reviewer's prior audit reports.

Finally, pursuant to the *Coleman* court's January 25, 2018 order adopting this reviewer's preceding report, defendants were ordered to "continue to implement the remaining recommendations in the initial audit report and develop corrective action plans based upon deficiencies found in Mr. Hayes' most recent assessment." (ECF No. 5762 at 4.) The Special Master was directed to "provide an updated report to the court on the state of defendants' continued implementation of the initial recommendations and the development of related corrective action plans." (*Id.*) In response, during *Coleman* All-Parties Workgroup teleconference calls held by the Special Master on February 26, 2018 and April 9, 2018, defendants provided updates on anticipated corrective actions for several suicide prevention issues. On May 14, 2018, defendants provided this reviewer with an updated corrective action plan ("May 2018 CAP") for resolving suicide prevention deficiencies found in this reviewer's prior reports. Consistent with the court's order, this report provides an update on current suicide prevention practices within CDCR facilities and the status of current and anticipated corrective actions to resolving existing deficiencies.

## III.    Summary of Suicide Prevention Practices in CDCR Facilities

Although the current reassessment again found continued progress at varied speeds, certain problematic practices continued to fester. Significant improvement was found in the

areas of PT practices, use of alternative housing, and completion rates for annual suicide prevention block training of custody personnel. In addition, all 23 audited facilities had compliance rates of over 90 percent for custody checks in restrictive housing units via Guard One, but these high compliance rates were tempered by the fact that four inmates who committed suicide in restrictive housing units during 2017 were found to be in various states of rigor mortis and not observed at 30-minute intervals as required. High rates of compliance were also found in Cardiopulmonary Resuscitation (CPR)/Automated External Defibrillator (AED) training of custody and medical staff.

In the areas related to initial health screening, use of suicide-resistant cells for newly-admitted administrative segregation inmates, and completion of suicide risk assessments for emergency mental health referrals related to suicide risk, there were varying degrees of progress. The review found little improvement with safety planning and local SPRFIT practices. Lingering problems regarding suicide-resistant MHCBs necessitated involvement by the court. Results were also mixed within the areas related to clinically-ordered possessions and privileges for MHCB patients, whereas significant problems remained related to five-day clinical follow-up and custody welfare checks for patients discharged from MHCBs and alternative housing. Finally, a new and systemic deficiency was found, the failure of nursing staff to adequately observe suicidal patients in MHCBs at required 15-minute intervals in most of the audited facilities.

The failure of nursing staff to adequately observe suicidal MHCB patients was particularly concerning and, as indicated below, inadequate observation of these patients was found in 18 of 21 or 86 percent of the audited facilities. This finding includes two facilities in which this writer observed nursing staff falsifying observation forms. As the *Coleman* court warned defendants when adopting this reviewer's previous report on January 25, 2018 (ECF No. 5762), it was "deeply troubled" and "expects defendants will make clear to all staff that falsification of information required by court order is unacceptable." (ECF No. 5762 at 2-3).

The following provides (1) a brief summary of each of the main suicide prevention measurement tools and their relationship to this reviewer's original 29 recommendations,[2] (2) current findings related to CDCR's adoption and implementation of the recommendations and the reassessment of the 23 audited CDCR facilities, and (3) further recommendations for the remedy of outstanding deficiencies.

A)    **Initial Health Screening and Receiving and Release Unit Environment**

**Summary**:

The original recommendations focused upon two areas of intake screening in receiving and release (R&R) units: (1) the adequacy of the intake screening form and ensuring that all questions were asked during the process, and (2) the adequacy of inmate privacy and confidentiality during the process. The issue of intake screening form adequacy was related to

---

[2]This reviewer subsequently recommended the withdrawal of three of the original 32 recommendations (Recommendations 14, 15, and 16). (ECF No. 5672 at 7, 23.) The recommendation was adopted in the court's January 25, 2018 order (ECF No. 5762 at 3).

the presence of certain compound questions on the form, as well as the thoroughness of form completion by nursing staff.  The issue of privacy and confidentiality was related to the practice of the door to the nurse's office remaining open during the screening process and/or officers stationed inside the office or at the door.

**Current Findings**:

Although compound questions are no longer contained within the Intake Screening Form embedded in the new EHRS, there has been mixed progress in resolving privacy and confidentiality issues in the R&R units.  In the preceding assessment, 18 of 23 or 78 percent of audited facilities had adequate intake screening practices in their R&R units.  During the current assessment, previous problems found in five facilities (CIW, CSP/Corcoran, CSATF, KVSP and PVSP) had mostly been resolved.  However, issues of privacy and confidentiality remained at one facility (CSP/Corcoran) and were found at three *different* facilities (CCI, CMC, and RJD), while inadequate abbreviated screening practices were found at another facility (DVI).  For example, at CCI, there was no door to the nurse's office and the desk where the newly-admitted inmates were positioned was adjacent to a high-traffic area with other staff and inmates passing through, creating both excessive noise and the absence of privacy and confidentiality.  In the other three facilities, the door to the nurse's office remained open with an officer straddling the doorway.  At DVI, this reviewer observed a nurse failing to ask all of the mental health and suicide risk questions during the intake screening process.  When asked why all the questions were not asked, this reviewer was informed by the nurse that an "abbreviated" screening was completed if the county transfer form did not include any documentation of prior mental health or suicide history.  Such a response was problematic for several reasons: CDCR policy required that all questions be asked; an individual could certainly become suicidal following their county jail confinement and transfer to CDCR; and despite not asking all of the required questions, the nurse entered "no" to all mental health and suicide risk responses in the EHRS for the screened inmates observed by this reviewer.  In sum, 18 of 23 or 78 percent of audited facilities had adequate intake screening practices in their R&R units, the same level of compliance that was found during the previous assessment.

Defendants' May 2018 CAP indicated that a regional chief nursing executive (CNE) meeting had been held to resolve the issue of inadequate privacy and confidentiality.  The CNEs were instructed to monitor compliance with the CAP.  The status of the CAP was incorrectly marked "completed."  This CAP item should have been marked as "ongoing" rather than "completed" because there was no indication that any monitoring had been initiated to verify full correction of the problem.

**Recommendation**:

Aside from the development of CAPs for the five facilities (CCI, CMC, CSP/Corcoran, DVI, and RJD) referenced above, no further recommendations are offered related to this issue.  The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the defendants' CAP has sufficiently resolved the deficiencies.

B)      **Psych Tech Practices**

**Summary**:

According to the MHSDS *Program Guide* (*Program Guide*), PTs are required to conduct daily rounds in all administrative segregation units and weekly rounds in Security Housing Units (SHUs)/Psychiatric Services Units (PSUs) "to attend to the mental health needs of all inmates, with documentation of their observations for each MHSDS inmate recorded on a Psych Tech Daily Rounds Form." This reviewer's previous audits found inconsistent and problematic PT rounding in these units, ranging from "drive-by" rounds with little interaction with caseload inmates, to practices of PTs often completing the required forms following the completion of rounds rather than immediately following each inmate encounter as required by policy.

**Current Findings**:

This reviewer's current assessment found that all 23 audited facilities had adequate PT rounding practices in their restrictive housing units (administrative segregation, SHU, and PSU). PTs were consistently observed to be conversing with both MHSDS and non-MHSDS inmates, and correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Recommendation**:

No recommendations are offered related to this issue.

C)      **Suicide-Resistant MHCBs**

**Summary**:

Previous audits found that, although most MHCBs were suicide-resistant, some were not. Problems found in several MHCB units included rooms with square-shaped stainless-steel sinks protruding from the wall which could be used as attachment points for a noose and thus were conducive to suicide attempts by hanging. Other hazards included some rooms containing wall ventilation grates with holes that were larger than the industry standard 3/16-inch diameter, allowing for the possibility of being conducive to suicide attempts by hanging, as well as rooms with small gaps between the wall and window frame. Previous recommendations to CDCR included the development of a CAP for each facility that had hazards in its MHCB units.

**Current Findings**:

This reviewer's current assessment found that 18 of 21 or 86 percent of the audited facilities with MHCB units had suicide-resistant MHCBs. Problems at two facilities (CIM and CSP/Corcoran) have been long-standing.

First identified by this reviewer in 2013, all of the MHCB rooms at CIM continued to be hazardous and were not suicide-resistant.  In one wing, rooms had small gaps between the wall and window frame, faucet handles, and ventilation grates with large holes in the ceiling (although the ceilings were high and not within easy reach) that were conducive to suicide attempts by hanging.  In another wing, there were rooms with small gaps between the wall and window frame, faucet handles, exposed toilet chase piping, and ventilation grates with large holes in the ceiling that were conducive to suicide attempts by hanging.  A patient attempted suicide by hanging in one of the MHCB rooms on January 6, 2017.  At CSP/Corcoran, when the MHCB unit was temporarily closed for renovation in 2016, this reviewer inspected the unit and found that some rooms had wall ventilation grates containing holes that were in excess of 3/16-inch diameter, and there was not a pending work order to correct these hazards.

As a result of these long-standing MHCB safety concerns at CIM, the court ruled on January 25, 2018 that "[t]he ongoing existence of these conditions is unacceptable.  Good cause appearing, defendants will be directed to provide to the Special Master and file with the court a detailed plan for completion of all the necessary work at CIM…." (ECF No. 5762 at 2.)  On February 23, 2018, defendants submitted a plan to the court which included the planned start (March 5, 2018) and the planned completion (August 6, 2018) dates of the CIM renovation project.  Defendants have since filed monthly updates regarding the CIM project; as of the August 15, 2018 update, the renovation project was slightly behind schedule with an anticipated completion date now scheduled for September 21, 2018.

As a result of the MHCB safety concerns at CSP/Corcoran, the court's January 25, 2018 order directed that "[w]ithin 14 days from the date of this order defendants shall show cause in writing why the inadequate wall ventilation grates at CSP-Corcoran cannot be replaced within six months."  (ECF No. 5762 at 4).  On February 7, 2018, defendants submitted a plan to the court which indicated that the project would be completed within six months.  On February 22, 2018, defendants informed the Special Master that the 24-bed MHCB unit at CSP/Corcoran would be temporarily closed and that the renovation would commence by March 19, 2018, with estimated completion within three to four weeks.  On April 24, 2018, defendants notified the Special Master that the renovation project at CSP/Corcoran had been completed and that all MHCB unit beds were reactivated on April 24, 2018.

Finally, during the recent PBSP assessment, this reviewer was able to conduct a thorough inspection of each MHCB room due to a low census (i.e., one patient) at the time of the audit.  The inspection found a previously unidentified deficiency of wall and ceiling ventilation grates in each room having holes that were greater than the industry standard of 3/16 inches wide.  The MHCB rooms were otherwise suicide-resistant.

**Recommendation**:

CDCR should develop a work order for replacement of the wall and ceiling ventilation grates in the MHCB unit at PBSP.

7

**D)**    **Use of Suicide-Resistant Cells for Newly-Admitted Inmates in Administrative Segregation Units**

**Summary**:

Pursuant to CDCR policy, all inmates initially placed in administrative segregation in single-cells are required to be placed in cells that have been retrofitted to be suicide-resistant for the first 72 hours. This reviewer's previous audits found several problems regarding the housing of newly-admitted inmates in administrative segregation. Original recommendations offered to address these deficiencies included ensuring there were a sufficient number of suicide-resistant retrofitted cells to house newly-admitted inmates and enforcing existing policy requirements of only housing newly-admitted inmates in retrofitted cells (and re-housing other inmates into other cells).

**Current Findings**:

Although there has been both a reduction in the overall administrative segregation census population statewide, as well as further retrofitting of additional new intake cells, this reviewer's preceding assessment found that only 15 of 23 or 65 percent of the audited facilities had adequate practices regarding the placement of newly-admitted administrative segregation inmates in new intake cells. Problems continued during this most recent audit when only 13 of 23 or 57 percent of the audited facilities were found to have adequate practices. Problems found in ten facilities (CIM, CMF, CMC, CSATF, DVI, HDSP, KVSP, PVSP, SVSP, and WSP) included new intake inmates housed in unsafe, non-intake single cells during the first 72 hours of administrative segregation confinement. In most cases, inmates were placed in an unsafe cell because all new intake cells were occupied; in other cases, new intake cells were available, but custody staff had not appropriately relocated the inmates. In two facilities (WSP and DVI), cells identified for new intake inmates were not completely suicide-resistant.

The issue was particularly acute at DVI. The facility's administrative segregation unit housed general population (GP), 3CMS, and Enhanced Outpatient Program (EOP) inmates. The unit originally had five retrofitted new intake cells, but that number had been increased to 11 in the past year. However, the 11 new intake cells were not completely suicide-resistant. One cell had a gap between the bunk and wall, and all 11 cells had ventilation grates with holes in excess of 3/16-inch in diameter. In addition to these new intake cells not being completely suicide-resistant, this reviewer observed three new intake inmates in unsafe non-intake cells. This finding was problematic because two inmates who committed suicide in DVI's administrative segregation unit in October and November 2017 were not placed in suicide-resistant new intake cells upon admission as required. At another facility (CSP/LAC), a new intake inmate committed suicide in an unsafe non-intake cell in the EOP administrative segregation unit in August 2017 even though a suicide-resistant new intake cell was available for use at the time of admission.

Defendants' May 2018 CAP indicated that CDCR was in the process of developing a "methodology for determining appropriate number of intake cells [due March 2018]…Report in development to determine which cells intake inmates are placed in time frame [due September 2018]." The status of this CAP item was marked "in process."

Finally, a previous issue of administrative segregation cells in two facilities (CSP/Solano and WSP) containing frosted exterior window glazing that reduced natural light was resolved when CDCR's Division of Adult Institutions (DAI) decided that "safety and security reasons" prohibited the removal of the glazing material, and that MHSDS inmates would not be housed in administrative segregation cells that contained the glazing material.

**Recommendation**:

Similar to the previous assessment, CDCR should develop CAPs in each of the ten facilities identified above to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in new intake cells for the first 72 hours of administrative segregation confinement. Some of the CAPs may involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available.

### E)    Use of "Alternative Housing" for Suicidal Inmates

**Summary**:

According to the *Program Guide*, an inmate who meets the criteria for MHCB placement is required to be transferred to a crisis bed within 24 hours of referral. In the interim, as well as in those cases in which physical transfer does not occur within that time frame, the inmate is required to be placed in "alternative housing." The most recent policy enacted following issuance of the *Program Guide* relevant to alternative housing is Policy 12.05.301 ("Housing of Patients Pending Mental Health Crisis Bed Transfer"), revised October 15, 2015. The policy listed the following preferred locations for housing suicidal inmates pending transfer to an MHCB: Correctional Treatment Center (CTC) licensed medical beds; Outpatient Housing Unit (OHU); OHU overflow cells; Large holding cells with toilets; Large holding cells without toilets; Triage and Treatment Area (TTA) or other clinic physical exam room; Other unit-housing where complete and constant visibility can be maintained; and CTC holding cells.

This reviewer's previous assessments found that suicidal inmates placed in alternative housing were often placed in hazardous, unsafe cells and observed at intervals that varied between constant observation and 15-minute intervals. In addition, many suicidal inmates were housed in these locations for more than 24 hours and oftentimes not provided a bunk, instead having to sleep on a mattress on the floor thus increasing the possibility that an otherwise suicidal inmate would deny their suicidal ideation to avoid continued perceived punitive conditions. As a result, previous recommendations by this reviewer focused on requirements for suicide-resistant alternative housing and/or constant observation of inmates placed in hazardous,

unsafe alternative housing locations, as well as issuance of suicide-resistant bunks for any inmate housed in alternative housing for more than 24 hours.

Defendants agreed to implement the above recommendations and issued various directives indicating that all suicidal patients placed in alternative housing would be placed on continuous 1:1 observation until they were transferred to a MHCB, as well as provided portable suicide-resistant beds (referred to as "stack-a-bunks") in those locations that did not already have available bunks.

**Current Findings**:

With the exception of alternative housing lengths of stay in four facilities greatly exceeding 24 hours, previous deficiencies in this area have been corrected. This reviewer's preceding assessment found that 14 of 23 or only 61 percent of the audited facilities had adequate practices regarding the use of alternative housing for suicidal patients referred for MHCB placement. Significant problems found in nine facilities included use of Board of Parole Hearings (BPH) cells, some of which were dry cells (i.e., without sinks and toilets), as well as dry holding tanks and holding cages. All of these housing locations had no access or limited access to bunks, showers, and bathrooms.

During the most recent assessment, this reviewer did not observe any alternative housing inmates placed in BPH cells or any dry cells in the 23 audited facilities. In addition, the assessment found that most alternative housing placements occurred in either CTC licensed medical beds, GP housing unit cells, administrative segregation unit cells, TTA holding cells, or OHU cells. Inmates in alternative housing were provided beds and required to be observed on a continuous 1:1 basis (except in CMC where all cells were suicide-resistant because the location had been previously utilized as an unlicensed MHCB unit and inmates were required to be observed at 15-minute intervals).

Finally, the most recent assessment found that 18 of 22 or 82 percent of the audited facilities housed inmates in alternative housing for 24 hours or less, with nine facilities having an average length of stay of 16 hours or less. However, four facilities had average lengths of stay that far exceeded 24 hours: CIW at 67 hours, CCWF at 51 hours, RJD at 50 hours, and CSP/Corcoran at 35 hours. The overall length of stay in alternative housing for inmates in the 22 audited facilities was 23 hours.[3] This was a marked improvement from prior assessments which found a significant percentage of inmates placed in alternative housing well in excess of 24 hours.

**Recommendation**:

CDCR should develop CAPs in each of the four facilities (CIW, CCWF, CSP/Corcoran, and RJD) that continue to have alternative housing lengths of stay well in excess of 24 hours. In

---

[3]The overall average length of stay in alternative housing at CIM could not be calculated due to the unreliability of the reviewed data. As detailed later in this report, this reviewer examined several cases in which data indicated that inmates were held in alternative housing for "zero" time whereas observation sheets examined indicated that the inmates were actually held for 26 to 28 hours.

addition, a CAP should be developed at CIM to ensure the correct calculation of length of stay data in alternative housing of that facility.

### F)    Practices for Observing MHCB Patients

**Summary**:

Previous assessments by this reviewer found that, despite clear *Program Guide* requirements for two levels of observation (i.e., Suicide Watch requiring continuous 1:1 observation and Suicide Precaution requiring observation at staggered 15-minute intervals), some suicidal patients were being observed in MHCB units at 30- and 60-minute intervals under observational terms such as "psychiatric observation" or "crisis evaluation." In addition, inadequate practices were found in the timely completion of required "Suicide Watch/Suicide Precaution Record" observation forms by nursing staff, including the falsification of observation forms for patients on Suicide Precaution status. Recommendations were provided for CDCR to enforce *Program Guide* requirements utilizing only two levels of observation, to provide better guidance and consistent guidelines regarding an acceptable level of observation for non-suicidal patients housed in MHCB units, and to develop a process by which the observation of suicidal MHCB patients was audited on a regular basis.

**Current Findings**:

On March 15, 2016, CDCR issued a memorandum entitled "Level of Observation and Property for Patients in Mental Health Crisis Beds" requiring that for those MHCB patients who did not meet criteria for either Suicide Watch or Suicide Precaution, or who were no longer suicidal, orders were "not to be written for a frequency of more than twice an hour (30 minutes)," and that vague terms such as "psychiatric observation" or "behavioral observation" were not permitted. A more recent memorandum dated April 18, 2018 entitled "Reminder: Level of Observation for Patients in Mental Health Crisis Beds" specified that orders for observation of non-suicidal MHCB patients "shall not be written for a frequency less often than permitted by the program's licensing requirements."

This reviewer's most recent assessment found that observation levels of non-suicidal patients housed within all 21 facilities containing an MHCB unit were set at either 15- or 30-minute intervals. In addition, vague terms such as "psychiatric observation" or "behavioral observation" had been eliminated from most local operating procedures at these facilities.

However, the problem of non-compliance with required observation of suicidal patients had not been resolved and, in fact, had been exacerbated. CDCR's new EHRS easily allows for accurate verification of nursing rounds performed within MHCB units because the observation is recorded in real time when entered by the user and cannot be altered. During this assessment period, 16 facilities with MHCB units had implemented EHRS. At the remaining five facilities with MHCB units, nursing staff were still utilizing hard-copy Suicide Watch/Suicide Precaution Record forms to document the observation of patients on suicide observation status. As such, accuracy of observation rounds in non-EHRS facilities could only be verified through on-site observation of nursing rounds.

While on-site at the 16 facilities utilizing the EHRS, this reviewer was able to verify the accuracy of observation rounds of patients on Suicide Precaution status (and requiring observation at staggered 15-minute intervals) by reviewing each patient's EHRS chart. Typically, four patient charts were selected at each facility for nine-hour periods ranging from 12:00 a.m. through 8:59 a.m. The findings were problematic, with violations found in all 16 facilities—attributable to multiple nursing personnel during multiple days at each facility. Although three facilities (CMC, CSATF, and CSP/Sac) were found to have only minor problems, with chart reviews finding only a few observation checks (e.g., two or three per patient) that were in excess of required 15-minute intervals, with the longest gap between checks typically being less than 30 minutes—the remaining 13 facilities had significant problems. Many facilities typically had between ten and 14 observation checks that were in excess of the required 15-minute intervals during a nine-hour period. Some of the worst practices were found at CSP/LAC. The chart review found numerous observation checks (between eight and nine per patient) that were in excess of required 15-minute intervals in two of the four cases, with the longest gap between checks being 28 minutes. The violations in the other two cases were alarming. In one case, there were multiple time gaps including two and three hours (from 12:12 a.m. to 2:05 a.m. and then from 2:07 a.m. until 5:38 a.m. on one date). In the other case, there were multiple time gaps that included a five-hour period (12:19 a.m. until 5:28 a.m.) on one date. Later that morning, the patient was observed with a piece of cloth tied around his neck and had been last observed 24 minutes earlier.

In addition, this reviewer observed the falsification of observation forms in two (CIM and MCSP) of the five facilities that had not yet implemented EHRS. ***In sum, the most recent assessment found inadequate observation of suicidal MHCB patients in 18 of 21 or 86 percent of the audited facilities.***[4] Possible explanations for these systemic deficiencies include an inadequate number of nursing staff assigned to conduct observation rounds, inadequate number of laptop or desktop equipment to record observation rounds on a timely basis, inadequate training of nursing staff (with some believing that documentation could be recorded at a later time), and simply neglectful practices.

Defendants' May 2018 CAP indicated that "EHRS modification to trigger tasking of MH observation orders was built. This will trigger staggered rounding and allow determination of at what point the task was completed (real time). Training via webinar was conducted [in February 2018]. CQIT contains indicators to assess if rounding was staggered and if documentation occurred in real time. Regional mental health teams will audit to ensure entries are completed in real time by comparing task time and documentation time. CNA training on conducting suicide watch and suicide precaution." The status of this CAP item was marked "in process."

**Recommendation**:

---

[4] The 18 facilities were CCWF, CHCF, CIM, CIW, CMF, CMC, CSATF, CSP/LAC, CSP/Solano, CSP/Sac, HDSP, KVSP, MCSP, NKSP, PBSP, PVSP, SQ, and SVSP.

Deficiencies surrounding the observation of suicidal MHCB patients is both acute and potentially dangerous.  In addition to Continuous Quality Improvement (CQI) and regional mental health team audits, nursing supervisors at each facility containing a MHCB unit should conduct regular EHRS audits to ensure that suicidal patients are being consistently observed as required.  The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAP has sufficiently resolved the deficiencies.

### G)    MHCB Practices for Possessions and Privileges

**Summary**:

Previous assessments by this reviewer found disparate practices with regard to privileges provided to medical versus mental health patients within CTCs.  Whereas patients admitted into a CTC for medical purposes were generally eligible for recreation, visits, or telephone calls, such privileges were generally prohibited for MHCB patients.  Recommendations were provided for CDCR to develop a directive(s) regarding guidance on clothing and allowable privileges for both suicidal and non-suicidal MHCB patients.

CDCR subsequently issued several memoranda to address the issue.  One such memorandum, "Level of Observation and Property for Patients in Mental Health Crisis Beds" was issued on March 15, 2016.  The directive required that "all orders shall detail what specific items may be issued to a patient.  Staff shall ensure all patients are provided with the clothing, bedding and allowable items permitted at the patient's level of observation."

On June 23, 2016, CDCR issued a memorandum on MHCB privileges available to MHCB patients entitled "Mental Health Crisis Bed Privileges."  The directive stated that "IPs admitted to the MHCB may be authorized for out-of-cell activities when specifically approved by the MHCB IDTT."  Out-of-cell activities included, but were not limited to, dayroom, recreational activities, and yard.  These activities would be the responsibility of the recreation therapist (RT) assigned to each MHCB unit, and "custody staff may provide supervision for unstructured out-of-cell activity to include yard in dayroom."  In addition, the memorandum stated that MHCB patients were entitled to both telephone access and visiting privileges "unless specifically restricted by the MHCB IDTT."  In late 2016, the memorandum was revised on several occasions to strengthen authorizing language.  The final version of the "Mental Health Crisis Bed Privileges" memorandum was issued on February 14, 2017.  The memorandum reiterated that "the recreational therapist shall be responsible for facilitating all structured out-of-cell activity and is expected to remain with the IP during these activities."

**Current Findings**:

Although there has been improvement since the 2016 audit when only three of 21 or 14 percent of the audited facilities with MHCB units had adequate practices with regard to the issuance of clothing and privileges for patients, problems remained at many facilities.  During the most recent assessment, this reviewer found that only 12 of 21 or 57 percent of facilities with MHCB units had adequate practices regarding the issuance of clothing and privileges for patients.  Practices at the remaining nine facilities (CIM, CMF, CSP/Corcoran, CSATF,

CSP/Sac, CSP/Solano, PVSP, SVSP, and WSP) were problematic.  For example, at WSP, MHCB patients were not consistently receiving out-of-cell activities, including telephone calls and visits.  In fact, a local operating procedure (LOP) at the facility still indicated that MHCB patients on either Suicide Watch or Suicide Precaution status were not eligible for yard activities. In addition, there was a shortage of RT personnel at the facility, resulting in few opportunities for out-of-cell activities.  Although an RT at WSP informed this reviewer that MHCB patients received 30 minutes out of their rooms a few times each week in the yard or the program office, a records review suggested otherwise.  The records indicated that patients were given the option of either receiving yard or program office privileges, but not both.  In fact, most patients were not even given the option of recreating in the program office, rather the RT interacted with them cell-side.  There was little use of the yard.  In sum, except for the periodic opportunity to shower, this reviewer found that MHCB patients at WSP spent an inordinate amount of time confined in their rooms.

At CSP/Solano, there were multiple deficiencies found, including (1) a significant shortage of RT availability resulting in limited interaction with MHCB patients, (2) lack of a program room resulting in RT programming limited to board games either cell-side or in the therapeutic treatment module; (3) records indicated that none of nine patients had been offered yard consistent with CTC policy, there was documentation for only three of the patients being offered yard during their entire MHCB placement, and records indicated that no patients had been out into the yard during a recent four-day period; (4) custody staff reported that telephone and visiting privileges rarely occurred in the MHCB unit; (5) only four of nine patients had been offered showers consistent with policy; and (6) a patient not on suicide observation status and clinically ordered to receive "full-issue" clothing (shirt/pants or jumpsuit) observed wearing only a T-shirt, boxers, and a smock.

At CSP/Corcoran, there were also multiple deficiencies found, including (1) no patients on full-issue clothing status were issued either a uniform or shirt/pants because such clothing was not available in the MHCB unit, with this reviewer being informed by interdisciplinary treatment team (IDTT) members that safety smocks were issued to each patient for "privacy"; (2) multiple contradictory and/or incorrect orders that allowed for both issuance of a safety smock and "partial-issue" (i.e., shorts and t-shirt), orders to disallow both yard and telephone privileges without clinical justification for patients not on suicide observation status, and orders that incorrectly automatically denied yard privileges for patients on administrative segregation status; (3) limited RT availability resulting in patients only seen for approximately one hour every three days, and patients approved for out-of-room activities being forced to choose between the program office or yard; and (4) only approximately one third of MHCB patients approved for yard (with no administrative segregation patients ever approved), and non-administrative segregation patients not approved for telephone privileges.

Defendants' May 2018 CAP did *not* contain any proposed remedies to correct these deficiencies.  However, during the SPMW meeting on January 18, 2018 and the *Coleman* All-Parties Workgroup teleconference on April 9, 2018, CDCR officials suggested that a webinar would be held for MHCB clinicians to reiterate the requirement for granting possessions and privileges to MHCB based upon clinical judgment, and that consideration would be given to again reissuing the "Mental Health Crisis Bed Privileges" memoranda.  Defendants also

acknowledged that a shortage of RT personnel adversely affected the provision of out-of-cell activities even when ordered by the IDTT.

Although the final version of the "Mental Health Crisis Bed Privileges" memorandum issued on February 14, 2017 requires that "the recreational therapist shall be responsible for facilitating all structured out-of-cell activity and is expected to remain with the IP during these activities," this reviewer remains concerned about full patient access to out-of-cell activity in MHCB units with inadequate RT staffing. Further, although CDCR previously contended that "custody staff may provide supervision for unstructured out-of-cell activity to include yard and dayroom" in the absence of the RT, this reviewer continued to find this option was not consistently used during the most recent audits. Finally, given the frequent turnover of MHCB clinical personnel, this reviewer is also not convinced that re-training of such personnel through a webinar will adequately address the issue.

**Recommendation**:

MHCB supervisors in each of the nine facilities identified above should audit the possessions and privileges clinically-ordered to MHCB patients and report findings to the local SPRFIT committee until the issue is resolved. It is also recommended that CDCR develop a CAP for recruiting a sufficient number of RT staff that can be assigned to MHCB units or, in the interim, find additional non-RT staff to provide such services. Finally, the issue should be monitored again by this reviewer during a proposed reassessment to ensure that the issue has been resolved.

### H)    30-Minute Welfare Checks in Administrative Segregation, SHUs, PSUs, and Condemned Units

**Summary**:

CDCR's requirement that inmates housed in administrative segregation be observed at 30-minute intervals has been in place since 2006, with inmates housed in SHUs requiring the same level of observation since 2013. Documentation was historically recorded by handwritten housing logs. In 2014, CDCR implemented the Guard One system to electronically verify 30-minute welfare checks of all inmates in administrative segregation during the first 21 days of their stays. Via a memorandum issued on May 9, 2014, the policy was subsequently revised to extend use of the Guard One system to all inmates in administrative segregation units, SHUs, PSUs, and condemned units at staggered intervals not to exceed 35 minutes for the duration of their stays. This expansion was a significant and commendable policy change. Due to unique architectural features of the SHU at PBSP and complaints of excessive noise generated from Guard One, particularly during First Watch (10:00 p.m. to 6:00 a.m.), the parties agreed to a permanent policy specific to the SHU at PBSP allowing for Guard One observation at 60-minute intervals during First Watch. The permanent stipulation was approved by the *Coleman* court on September 1, 2016 (ECF No. 5487).

**Current Findings**:

This reviewer's most recent assessment found all 23 audited facilities had Guard One compliance rates of 90 percent or higher in administrative segregation, SHUs, and PSUs. This was an improvement from the preceding assessment which found four facilities with Guard One compliance below 90 percent. This high rate of compliance in all audited facilities was tempered by the fact that three facilities (CSP/Sac, CSP/LAC, and PBSP) experienced four inmate suicides in PSU and administrative segregation units during 2017 in which each decedent was found in rigor mortis despite completion of a timely Guard One check, indications that correctional staff did not adequately observe the interior of the cell to verify "a living, breathing inmate" as required by policy.

**Recommendation**:

No recommendations are offered related to this issue. Correctional officers are already trained in the current CDCR policy requirement to verify "a living, breathing inmate" during each Guard One round. In addition, violations of the policy found during a CDCR investigation of an inmate suicide results in a recommendation for a Quality Improvement Plan (QIP) during the Suicide Case Review process.

I)    **Suicide Risk Evaluations**

**Summary**:

This reviewer's previous assessments found that, although all emergency mental health referrals for reported suicide ideation (SI) and self-injurious behavior (SIB) resulted in an almost immediate response from mental health clinicians, these emergency referrals did not always result in completion of the required suicide risk evaluations (SREs) or Suicide Risk and Self-Harm Evaluation (SRASHE).[5] In addition, the quality of completed SREs was problematic. Previous recommendations included revision of the SRE mentoring program and better auditing of SRE quality on a monthly basis by local SPRFIT committees. Defendants previously agreed with this reviewer's assessments that the quality of completed SREs throughout CDCR was problematic and agreed to issue the "Revision to the Suicide Risk Evaluation Mentoring Program" memorandum, last revised on March 10, 2016, and the "Clarification of Suicide Risk Evaluation Training Requirements" memorandum, last revised on March 24, 2016. The memoranda included requirements for seven-hour SRE training every two years by clinical staff, and annual training for clinicians regularly assigned to a MHCB unit, and the auditing of at least one of a clinician's SREs every six months.

**Current Findings:**

This reviewer's most recent assessment found improvement in both the degrees of compliance with seven-hour SRE training and mentoring programs, as well as the completion of SREs and SRASHEs following an emergency mental health referral. The review found that 21 of 23 or 91 percent of audited facilities had compliance rates at 90 percent or more for either or both the seven-hour SRE training and the mentoring programs, including nine facilities having compliance rates above 90 percent for both programs. Only two facilities (CSP/Corcoran and

_____

[5]Of note, Suicide Risk and Self-Harm Evaluations (SRASHEs) have replaced SREs in the new EHRS.

CMF) had compliance rates below 90 percent for both training programs, an improvement from the preceding assessment when eight facilities were found to have compliance rates below 90 percent. For the current assessment, the overall rate of compliance for seven-hour SRE training in the 23 audited facilities was 90 percent, whereas the compliance rate for the SRE mentoring program in the same facilities was 85 percent.

In addition, 17 of 23 or 74 percent of the audited facilities had required SRE/SRASHEs completed for emergency mental health referrals for SI and SIB in 90 percent or more of sampled cases. In those six facilities (CMF, DVI, KVSP, CSP/LAC, NKSP, and PVSP) below 90 percent, compliance rates ranged from 76 to 85 percent. These findings are an improvement from the preceding assessment when only 11 of 23 or 48 percent of the audited facilities had completed SREs in 90 percent or more of the cases. With that said, however, completion of suicide risk assessments for inmates presenting as possible risks for suicide should be automatic, with compliance rates near or at 100 percent throughout CDCR—yet this issue continues to be problematic.

Defendants' May 2018 CAP stated that "[t]raining compliance is now provided to HQ by the institutions and reviewed monthly in SPRFIT. Institutions [that] consistently are not in compliance or [that] demonstrate downward trends will be required to develop CAPs in conjunction with the regional teams." With regard to completion of SRE/SRASHEs for emergency mental health referrals involving SI and SIB, the CAP stated that "SRE [t]imeliness is now reviewed monthly in SPRFIT. Institutions [that] consistently are not in compliance or demonstrate downward trends will be required to develop CAPs in conjunction with the regional teams." The status of these CAPs was marked ongoing.

**Recommendation**:

Develop CAPs for the six facilities outlined above that continue to struggle with completion of required SRE/SRASHEs for emergency mental health referrals involving SI and SIB. The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies.

### J)     Safety Planning for Suicidal Inmates

**Summary**:

This reviewer's previous assessments found that safety planning to reduce a MHCB patient's suicide risk was inconsistently observed during IDTT meetings, and the vast majority of treatment plans developed by MHCB clinicians for suicidal patients were grossly inadequate and often simply repeated *Program Guide* requirements (e.g., "discharge from MHCB, provide 5-Day Follow-Up by Primary Clinician (PC), provide daily rounds by the PT, and medication management"), rather than a specific plan to reduce the inmate's suicide risk. In addition, there was little concordance between safety planning strategies developed within the SRE/SRASHEs that justified the discharge from a MHCB unit and subsequent five-day follow-up progress notes written by clinicians to indicate that safety plan objectives were being addressed. Initial previous

recommendations included additional "safety planning" training for clinicians which became mandatory in 2016.

When this reviewer's preceding assessment found continuing, and even worsening, problems with adequate treatment planning, it was recommended that CDCR develop a process by which each safety plan contained within the discharging SRE/SRASHE of a patient released from a MHCB was reviewed by an SRE mentor at that facility. Without interfering with the physical and administrative discharge of the patient from the MHCB, any safety plan found to be deficient (i.e., not containing a reasonably specific strategy to reduce SI) should immediately be returned to the authoring clinician for revision.

Finally, during a presentation to CDCR's Suicide Prevention Summit held on October 18, 2017, this reviewer offered examples of both inadequate and adequate safety planning. An *inadequate* safety plan was narrative that: (1) simply recited Program Guide requirements, (2) recommended specific groups which were not available at the facility, (3) simply instructed the patient to report any future suicidal ideation to CDCR staff, and (4) simply deferred the safety plan to the transferring clinician. In contrast, an *adequate* safety plan: (1) addressed modifiable risk and protective factors and warning signs, (2) flowed directly from assessed level of care, (3) was specific and individualized, and (4) could be seen in five-day follow-up progress notes and subsequent notes of the transferring clinician.

**<u>Current Findings</u>**:

This reviewer's most recent assessment found continuing problems with adequate safety planning for SI in 20 of 21 or 95 percent of audited facilities with MHCB units. The only facility demonstrating consistently adequate safety planning was RJD. One example of such safety planning at RJD was the following:

> D/C to EOP LOC. Start MH 5-day follow-up procedures. Add up to 10+ hours of groups including life skills, conflict resolution and stress management. Add to high risk list for at least 14 days to monitor for transition to ASU and to EOP. Teach IP warning signs of stress (emotional, physical and psychological), as well as coping skills for stress, including breathing techniques/meditation, mindful drawing, encourage singing, puzzles for distraction, SMART goal setting, and techniques to manage worrying (such as create a 'worry' period). Teach coping skills to reduce impulsivity to reduce future 115s such as counting, breathing or distraction. Teach DBT distress tolerance skills to reduce possible distress from receiving 115, such as positive self-talk, engaging in activities, or prayer. Monitor and encourage regular contact with family/support system. Inmate has already been referred and accepted to DSH-ICF for further support.

The challenge at RJD (as well as at other audited facilities) was that, although clinicians demonstrated adequate safety planning, there were often problems with concordance between safety plans contained within discharging SRE/SRASHEs and safety plan summary sections contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR

18

MH-7230-B) forms.  For example, the safety plan contained on the first day of the 5-Day Follow-Up Progress Note for the above case stated the following:

> MH staff will continue 4 more days of follow-up, or more, as needed.  His dx now is adjustment DO with depressed mood.  He has no rx'd psychotropic meds now, that several rx'd medical meds.  He will continue taking them as rx'd and ask for meds' eval as needed.  He will be monitored by CO staff hourly while in Ad Seg.  He will get and use a pencil and puzzles as distractions from his reported boredom.  He will ask for additional help as needed.  He knows how to do so.

Although pockets of adequate safety planning by individual clinicians continued to be found in the other 20 audited facilities throughout the CDCR system, none of these facilities other than RJD demonstrated consistent safety planning.  Continued examples of poor safety planning included simply repeating *Program Guide* requirements, deferring the development of a specific safety plan to the outpatient clinician rather than the MHCB clinician developing a safety plan with the patient during their MHCB placement, and creating non-individualized safety plans by cutting and pasting the same narrative for multiple patients.  For example, at WSP, one MHCB clinician simply wrote a narrative in several safety plans that the patients "should identify at least 5 coping skills to decrease depression, anxiety, and impulsivity, promote successful prison incarceration with decreased ability of self-injurious behavior, identify at least 3 goals for his incarceration," thereby deferring the identification of appropriate coping skills to other clinicians.

At CSP/Corcoran, a MHCB clinician wrote the following in the safety plan section of the discharging SRASHE:

> I/P is already on a 5-day f/u and to continue daily PC contact to address s/s and monitor SI/HI.
> 1) Psychiatrist will prescribe and adjust medication as needed.
> 2) PC provide patient with Bible to read while in his cell.
> 3) PC will teach IP stress management and relaxation techniques to help decrease stress and anxiety that seem to be increasing SI.

In addition, the first day of the patient's Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form stated the following under safety plan: "If sxs increase, IP to contact staff/mental health staff immediately.  Continue with current tx. plan."

At HDSP, a MHCB clinician wrote the following in the safety plan section of the discharging SRASHE: "His prior safety plan/treatment plan focused on stabilizing his mood, developing goals for the future, and developing alternative strategies for relief besides cutting (self-harm).  The Pt currently states a safety plan is adequate for keeping him safe."  Such narrative failed to identify the specific "goals" and "strategies" contained within either the current or previous safety plan that was effective for the patient.

All of the above described examples were deficient because, contrary to CDCR's safety planning training, these safety plans did not (1) address modifiable risk and protective factors

and warning signs, (2) flow directly from assessed level of care, and (3) were not specific and individualized.

Further, this reviewer's most recent assessment also included observation of IDTT meetings within MHCB units. Although most meetings were found to be well-attended by mental health, medical, and custody staff, discussion regarding safety planning was often disjointed or non-existent. In one example from PVSP, the patient had been admitted into the MHCB for suicidal ideation with a plan ("to use razors to cut his wrist"). His diagnosis was Bipolar Disorder with depressed mood. The patient had stopped taking his psychotropic medication a few months earlier which resulted in increased depression and suicidal ideation. He was at the 3CMS level of care and had a previous MHCB admission during 2017. According to a recently completed SRASHE, the patient was assessed as having both a "moderate" chronic and acute risk for suicide based on risk factors that included a prior suicide attempt, family history of suicide, increased depression, and on-going auditory hallucinations. During the IDTT meeting observed by this reviewer, the patient was observed to be in "full-issue" clothing but had not been granted any privileges other than periodic showers. Although he denied any current suicidal ideation or auditory hallucinations, there was no discussion regarding safety planning.

Following the IDTT meeting, this reviewer asked the treatment team why the patient had not received consideration for any privileges during his 12-day MHCB stay. The PC replied that privileges had not been granted until that meeting because "he was still experiencing hallucinations." When this reviewer then asked if the patient was going to remain in the MHCB unit or referred to a higher level of care, the response was that the patient had been discharged to EOP level of care. Such a response was surprising since it was not discussed during the IDTT meeting.

With regard to safety plan training for mental health clinicians, the most recent assessment found that only 12 of 23 or 52 percent of the audited facilities had compliance rates of 90 percent or more. The overall rate of compliance for safety plan training in the 23 audited facilities was 80 percent.

Finally, with regard to this reviewer's previous recommendation that CDCR develop a process by which each safety plan contained within the discharging SRE/SRASHE of a patient released from a MHCB was reviewed by an SRE mentor at that facility, the recommendation was accepted by the defendants, but implementation was initially delayed. In April 2018, CDCR presented data from the Monthly MHCB Discharges Lists to this reviewer indicating that five facilities (CHCF, CMC, CMF, CSP/Corcoran, and CSP/Sac) had multiple MHCB discharges each day and it would be unduly burdensome and require additional staff to review every discharging SRASHE in these MHCB units. After careful consideration, the following corrective action was agreed to: (1) With the exception of CHCF, CMC, CMF, CSP/Corcoran, and CSP/Sac, MHCB clinicians in all other CDCR facilities would be required to have all SRASHEs reviewed by a mentor to ensure that each assessment contains an adequate safety plan for reducing future suicidal ideation; (2) At CHCF, CMC, CMF, CSP/Corcoran, and CSP/Sac, each MHCB clinician would be required to have at least one SRASHE reviewed by a mentor on a weekly basis to ensure that each assessment contains an adequate safety plan for reducing future suicidal ideation; and (3) At all facilities with an MHCB unit, the above safety plan review

process would continue until 90-percent compliance has been achieved and maintained as verified by quarterly audits.

Defendants' May 2018 CAP was revised accordingly to incorporate the auditing process for review of safety plans. The start date for the auditing process was not specified and was pending revision of the EHRS, issuance of a "memorandum with new instructions," and webinar-based training for MHCB supervisors or designees responsible for the auditing.

In sum, safety planning to reduce the suicide risk of patients discharged from MHCB units continues to be problematic throughout CDCR. As noted below in a forthcoming section of this report (Section O: Suicide Case Reviews), approximately 25 percent of the quality improvement plans resulting from inmate suicides during 2017 were in response to inadequate SRE/SRASHEs and safety planning.

Finally, this reviewer and other members of the Special Master's team attended a Safety Planning Webinar conference call with staff from the Clinical Support Unit of the CDCR's Division of Correctional Health Care Services on July 19, 2018. The purpose of the webinar was for CDCR to present a proposal that would allow clinicians a more reasonable and practical way to develop safety plans through a concept entitled Safety Planning Intervention (SPI).[6] Although the SPI would include a "My Safety Plan" template, each plan would be individualized to the patient's needs. Overall, the Special Master's team was impressed by the presentation and, with some revision, encouraged the Clinical Support Team to implement the SPI model.[7]

**<u>Recommendation</u>**:

Initiation of safety plan auditing by MHCB supervisors or designees should be expedited and a start date identified in the CAP. In addition, develop CAPs for safety plan training of mental health clinicians in the 11 facilities that were below 90-percent compliance. The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies.

---

[6]See Stanley, B. and Brown, G. (2012), "Safety Planning Intervention: A Brief Intervention to Mitigate Suicide Risk," *Cognitive and Behavioral Practice*, 19 (2012) 256-264.

[7]The revisions included ensuring that the "My Safety Plan" template would include instructions (and training) to ensure that the safety plan would be developed by both the patient and clinician, and not by the patient alone as currently written. In addition, the 7-step template needed to be enlarged to include a step for specific group(s) intervention. Further, Step 6 ("Making the Environment Safe") needed to be revised for clarification (or even deletion) to ensure that clinicians did not interpret this step to mean that the patient's cell would be made physically safe and/or means restrictions initiated in lieu of a MHCB referral for an otherwise suicidal patient. Finally, the Clinical Support Team proposed that definitions needed to be created for "low," "moderate," and "high" suicide risk to be incorporated into the SRASHE instructions, and that any patient assessed as being "low" acute suicide risk would not be required to have a safety plan developed (unless they were being discharged from a MHCB). The Special Master team supported this proposal with the stipulation that all patients discharged from an MHCB, regardless of risk level, would continue to be required to have a safety plan developed. The Clinical Support Team staff also suggested that there had been preliminary discussion within CDCR to revise the SRASHE template at some point in the future to include revision of the chronic and acute risk factor checklists. The Special Master team had concerns regarding substantial revision of the SRASHE but would defer any opinion until more information was made available.

**K)**    **MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks**

**Summary**:

Consistent with the need for continued safety planning of patients released from MHCB units and alternative housing to general population, administrative segregation, and other housing units, this reviewer's prior recommendations included strengthening existing procedures for follow-up assessments by mental health clinicians and welfare checks by custody staff. Defendants developed several memoranda and compliance forms to strengthen the follow-up process. In March 2016, the "Interdisciplinary Progress Note – 5-Day Follow-Up" CDCR MH-7230-B form was released in final format. The accompanying policy, entitled "Release of Revised 5-Day Follow-Up Form," was released on May 31, 2016. On January 27, 2016, CDCR released a joint memorandum from the Director of the Division of Adult Institutions (DAI) and Deputy Director of the Statewide Mental Health Program entitled "Revision of Mental Health Crisis Bed Discharge Custody Checks Policy." The policy required custody staff to observe an inmate at 30-minute intervals for a minimum of 24 hours following MHCB discharge. The policy also required that a clinician perform daily mental health assessments to determine whether the 30-minute discharge checks were necessary beyond the minimum 24-hour requirement (up to 72 hours), or whether the inmate required a referral back to a MHCB. On September 1, 2017, CDCR officials released a slightly revised memorandum to include inmates expressing SI and referred to, and discharged from, alternative housing "when clinically indicated."

**Current Findings**:

This reviewer's most recent assessment included an audit of both the "Interdisciplinary Progress Note-5-Day Follow-Up" (CDCR MH-7230-B) form process by clinical staff, as well as the "Discharge Custody Check Sheet" (CDCR MH-7497) form process by both clinical and custody staff. Overall, this reviewer found that clinicians (and nursing staff in their absence) almost consistently completed "Interdisciplinary Progress Note – 5-Day Follow-Up" (CDCR MH-7230-B) forms in all 23 audited facilities. However, similar to the chronic problem of safety planning found in all of the facilities that had MHCB units, this reviewer continued to find problems with concordance between the safety plans contained within discharging SRE/SRASHEs and the safety plan summary sections of the CDCR MH-7497 forms. Although some progress was noted, the safety plan summary sections of most forms simply recited *Program Guide* requirements or contained narrative that was inconsistent with the safety plan of the discharging SRE/SRASHE.

With regard to the discharge custody check process, a two-page "Discharge Custody Check Sheet" (CDCR MH-7497) form was required to be completed on any inmate released from a MHCB or alternative housing ("when clinically indicated") placement. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer's most recent assessment found that only three of 23 or 13 percent of the audited facilities had clinicians and custody personnel correctly complete both pages of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms in 90 percent or more of the cases. These three facilities were CCI, CCWF, and CMC. These findings were similar to those found during the preceding review in which only 15 percent of the facilities audited for compliance after mid-May 2016 had adequate practices for "discharge custody checks." During this most recent assessment, problems found in the remaining 20 facilities included clinicians not completing the first page; clinicians discontinuing custody checks in less than the required 24 hours; custody checks performed at 60-minute, rather than 30-minute intervals, large gaps in performed checks, and/or custody checks not being completed during the First Watch. The overall compliance rate for the correct completion of Page One by clinical staff was 67 percent, whereas the compliance rate for the correct completion of Page Two by custody staff was 77 percent. Finally, clinicians ordered discontinuation of 30-minute custody checks after the initial 24 hours in 48 percent of the cases, at 48 hours in 30 percent of the cases, and at 72 hours in 22 percent of the cases.

Defendants' May 2018 CAP stated: "Workgroup formed to develop a statewide template outlining the process, using CMC and SATF as models. This item will be monitored ongoing."

**Recommendation**:

Utilize the Defendants' May 2018 CAP for the "Discharge Custody Check Sheet" (CDCR MH-7497) form process in the 20 facilities identified above that were below 90-percent compliance. The issue should be monitored again by this reviewer during a proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies.

### L)    **Local SPRFITs**

**Summary**:

Each local SPRFIT is required to meet at least monthly and carry out various responsibilities including ensuring compliance with all CDCR suicide prevention policies and procedures, five-day clinical follow-ups, safety plans, etc. Previous assessments by this reviewer found that although the local SPRFIT concept was a valuable tool in CDCR's suicide prevention program, the process was not functioning as intended and needed to be rebooted. Most importantly, many of the deficiencies identified by this reviewer in each prison were easily observable and should not have been identified for the first time by a Special Master's expert and/or monitor, but rather by the local SPRFIT. Therefore, this reviewer's previous recommendation was for CDCR, under the guidance of the Special Master, to re-examine and revise its local SPRFIT model to make the local SPRFITs a more effective quality assurance/improvement tool. In February 2017, this reviewer's critique of a revised draft SPRFIT policy was submitted to CDCR.

**<u>Current Findings</u>**:

In both February 2016 and October 2017, CDCR's Statewide Mental Health Program held multiple-day Suicide Prevention Summits to further discuss refinement of the SPRFIT's role in overall suicide prevention efforts within the department.  All chiefs of mental health, wardens, local SPRFIT coordinators, and supervisory custody personnel from the Mental Health Compliance Team were invited to the meetings, among others, which were also attended by several members of the Special Master's team.

The court ruled on January 25, 2018 that "[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order."  (ECF No. 5762 at 3.)  On February 2, 2018, CDCR issued the "Enhancements to the Suicide Prevention and Response Focused Improvement Teams" memorandum that "clarifies, modifies, and establishes requirements and responsibilities."  The revised memorandum became effective on March 1, 2018 and contained 19 responsibilities that included, but were not limited to, monitoring suicide prevention training, treatment planning, and five-day follow-up compliance; conducting root cause analyses of suicides and serious suicide attempts; providing assistance and coordination for the activities of visiting Statewide Mental Health Program (SMHP) and DAI suicide case reviewers following an inmate suicide; conducting self-assessments related to compliance with suicide prevention items developed by the SMHP's Quality Improvement Unit; and maintaining a High Risk Management Program consistent with CDCR policies and procedures.

Because the above memorandum was issued subsequent to completion of this reviewer's most recent suicide assessment, compliance with the new responsibilities of the local SPRFITs was not audited.  With that said, this reviewer's most recent assessment continued to find few positive SPRFIT practices at each facility.  For example, the February 2, 2018 memorandum clarified attendance requirements, including mandatory members and establishment of a quorum.[8]  Had the memorandum been in effect at the time of the most recent facility assessments, only three facilities (CMC, RJD, and PBSP) would have met quorum requirements for the three consecutive monthly meetings that were reviewed.  Of note, however, although most local SPRFITs did not meet quorum requirements, a few, such as CIW, were quite active.  Review of SPRFIT meeting minutes at CIW reflected updated CAPs for continued suicide prevention deficiencies, as well as regular discussion regarding SRE/SRASHE audits, High Risk List, safety planning, Crisis Intervention Team, a planned Suicide Prevention Week, suicide prevention posters and brochures, and robust summaries of recent serious suicide attempts, among other issues.  In addition, each meeting (which was 90 minutes in length) allowed time for an inmate representative of the Suicide Prevention Outreach Committee to make a brief presentation.  Overall, however, SPRFIT monthly minutes in most of the 23 audited facilities were unremarkable and continued to collect more quantitative than qualitative data, with only a few establishing CAPs based upon this reviewer's previous assessments.

---

[8]According to *Program Guide* requirements for local SPRFITs (including the February 2, 2018 revision), a monthly meeting quorum consists of attendance of mandatory members (SPRFIT coordinator, chief psychiatrist, chief psychologist, supervising RN, senior PT or PT, correctional health services administrator, inpatient coordinator, and associate warden for health care access) or approved designees.

**Recommendation**:

No recommendations are offered related to this issue. The above described new local SPRFIT responsibilities should be monitored again by this reviewer during a proposed reassessment.

### M)     Suicide Prevention Training

**Summary**:

Previous assessments of both pre-service and annual suicide prevention block training, including the *Mental Health Services Delivery System Instructor Guide*, found some concerns regarding content, length of training, and low completion rates for non-custody staff. As a result, this reviewer initially made recommendations to expand the length and content of both the pre-service and annual training workshops to include the following topics: (1) self-injurious v. suicidal behavior and dealing effectively with inmates perceived to be manipulative, (2) identifying inmates at risk for suicide despite their denials of risk, (3) updated research on CDCR suicides, (4) identified problem areas and corrective actions from previous CDCR Suicide Reports, and (5) results of recent *Coleman* audits of suicide prevention practices. This reviewer made further recommendations that CDCR ensure that all custody and health care staff received both pre-service and annual suicide prevention training, and that the workshops were conducted by qualified mental health staff.

As previously reported, CDCR did not agree to expand the length of the pre-service suicide prevention curriculum beyond 2.5 hours of the eight-hour pre-service *Mental Health Services Delivery System Instructor Guide* curriculum. The curriculum was revised on several occasions to include the recommended topics, and then again following this reviewer's critique of a full-day workshop at the Basic Correctional Officers Academy Training on December 7, 2015.

In addition, the annual suicide prevention training curriculum has been revised on several occasions. This reviewer's preceding assessment recommended—based upon observations during several workshops that instructors were struggling to adequately present all of the PowerPoint slide material within the two-hour allotted time frame and often using different versions of the material—that CDCR should determine the adequate number of PowerPoint slides that can reasonably be covered in a two-hour format and ensure instructors utilize the same PowerPoint presentation.

**Current Findings**:

As offered in the preceding assessment, this reviewer most recently critiqued the eight-hour pre-service MHSDS training at the Basic Correctional Officers Academy in Galt on November 10, 2016. There were concerns about time management during the workshop, with only 110 minutes (and not the required 150 minutes, i.e., 2.5 hours) devoted to the topic of suicide prevention as required. In addition, only one of four role-playing scenarios was

presented during the suicide prevention section.  To date, this reviewer was informed that the suicide prevention section of the pre-service *Mental Health Services Delivery System Instructor Guide* curriculum has been again revised, but it has *not* been provided for review.  In addition, this reviewer has *not* been provided any scheduled dates to critique the revised full-day workshop at the Basic Correctional Officers Academy Training.  This reviewer continues to have concerns as to whether the critical topic of suicide prevention can be adequately presented within the currently allotted 2.5-hour time frame of the pre-service training curriculum.[9]

With regard to annual training, this reviewer's most recent assessments found that 22 of 23 or 96 percent of the audited facilities had compliance rates for annual suicide prevention block training of *custody* personnel that were at or above 90 percent, with the overall rate of compliance in these 23 facilities at 97 percent.[10]

However, compliance rates for annual suicide prevention block training of both medical and mental health staff remained very problematic.  The most recent assessment found that 14 of 23 or 61 percent of the audited facilities had compliance rates for annual suicide prevention block training of *medical* staff that were at or above 90 percent, with the overall rate of compliance in these 23 facilities at 87 percent.  The most recent assessment also found that 12 of 23 or 52 percent of the audited facilities had compliance rates for annual suicide prevention block training of *mental health* staff that were at or above 90 percent, with the overall rate of compliance in these 23 facilities at 85 percent.  Compliance rates for suicide prevention block training of medical and mental health staff were particularly anemic in three facilities (CMF, CSP/LAC, and CSP/Sac), where compliance ranged from a low of 36 percent to a high of 80 percent.

***Overall, only 10 of 23 or 43 percent of audited facilities were at or above 90 percent compliance for annual In-Service Training (IST) suicide prevention block training of both medical and mental health personnel.  During this reviewer's 2016 assessment, only 12 of 23 facilities had compliance rates at 90 percent or more.  As such, this issue continues to remain very problematic within CDCR.***

In addition, during the most recent assessment, this reviewer and colleagues observed 16 IST suicide prevention training workshops.  The strength of the IST workshops was the instructors, all mental health clinicians who competently presented the required material.  The instructors were enthusiastic and engaged with workshop participants.  However, problems observed during the workshops included presentation of varying revisions of Version 3.1 of the PowerPoint slides (ranging from 58 to 74 slides).[11]  The six case scenarios of suicidal inmates

---

[9]This reviewer was recently informed that the suicide prevention portion of the Basic Correctional Officers Academy Training was increased to four hours.  A revised curriculum is in development.

[10]Of note, the assessment also included compliance with CPR/AED training for both custody and medical personnel.  All of the 23 audited facilities had compliance rates for both custody and medical personnel that were at 90 percent or more, with custody personnel having an overall compliance rate of 96 percent and medical personnel having an overall compliance rate of 99 percent.

[11]Version 3.1 was approved May 2016 and last revised in December 2017.

were often either not presented or presented inadequately (e.g., the instructor choosing one case and presenting it in a large group; at one workshop, case scenarios were not distributed and participants broke into smaller groups and created their own case examples). Due to time constraints predominantly caused by excessive slides, instructors rushed through the slides, did not adequately present the case scenarios, and the post-test Knowledge Review either was not completed at all or completed quickly as a group. Suicide Prevention Participant Workbooks were rarely distributed during the workshops. Finally, each workshop generally had a small group of participants that sat toward the back of the classroom and were disengaged from the presentation, at times creating a distraction for the instructor.

In sum, the IST suicide prevention workshops were conducted by very competent and enthusiastic instructors, but the sessions were compromised by the amount of information forced into an allotted two-hour time period. In both February and October 2018, this reviewer provided a written critique of the most recent version of the IST suicide prevention PowerPoint slides to CDCR that included several specific recommendations for improvement.[12]

Defendants' May 2018 CAP provided a schedule for revision and approval of the revised IST suicide prevention training curriculum by various entities, including DAI, nursing leadership, CDCR's Office of Legal Affairs (OLA), and the Office of Training and Professional Development. The CAP was estimated to be completed by December 2018.

**Recommendation**:

---

[12]These recommendations included: (1) Slides 2.12 through 2.16 dealing with retrofitted new intake cells should be deleted. All correctional personnel that work in administrative segregation units should already know what a new intake cell looks like. The issue within CDCR is availability of new intake cells; (2) Slides 3.5 through 3.9 should also be deleted. If needed, 3.8 and 3.9 can be moved into a previous slide dealing with warning signs and risk factors; (3) Slide 4.4 regarding "denials of intent to self-harm" needs to be supplemented with additional slides that provide an overview of why suicidal inmates deny their suicidal intent; (4) Consider consolidating or reducing emergency response slides 5.3 through 5.8, while providing emphatic instruction that 911 needs to be called immediately and can be initiated by authorized non-medical personnel. In addition, a slide needs to be revised with new instructions that the cut-down tool is now in the emergency response bag and the entire bag should be brought to the emergency; (5) Slides 6.1 thru 6.4 regarding the Suicide Case Reviews need to be revised to change the intent. Most instructors who present these slides simply present them as a summary of good practices, rather than examples of deficiencies identified in Suicide Case Reviews. For example, in Slide 6.2, instead of the narrative being "bring the AED to the emergency scene and document its usage carefully," the slide should read: "A significant number of reviewed cases found that the AED was not brought to the scene and/or its use was not adequately documented"; (6) Slides need to be created that visually demonstrate the serious repercussions from staff deficiencies. For example, slides that show the number of staff that had been referred for investigation or other professional disciplinary action might be of interest to an otherwise non-interested participant. For example, staff had been referred for investigation or other professional disciplinary action for the following issues: failure to complete timely Guard One checks and/or 30-minute discharge custody checks, failure to complete timely rounds of MHCB patients, failure to take the inmate's suicide threat seriously, failure to enter the cell and/or initiate 911 notification in a timely manner, etc.; (7) Consideration for creating a few slides that provide summaries of several of the more egregious and preventable suicides that have recently occurred within CDCR facilities; and (8) Consideration for local instructors to create a few slides specific to their facility that provides a summary of recent *Coleman* and CQIT suicide prevention assessments. There was a general feeling that most line staff attending the IST workshops had little appreciation and/or knowledge of the suicide prevention audits.

CDCR should provide the revised pre-service *Mental Health Services Delivery System Instructor Guide* curriculum to this reviewer, as well as provide a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training.  In addition, CDCR should develop CAPs for annual suicide prevention training in the 13 facilities (CCI, CIW, CHCF, CMC, CMF, CSP/Corcoran, CSATF, DVI, HDSP, CSP/LAC, PBSP, RJD, and CSP/Sac) that were below 90-percent compliance for suicide prevention training for either medical and/or mental health personnel.  Finally, CDCR should incorporate this reviewer's recommended changes to the annual IST suicide prevention training curriculum that was previously forwarded in both February and October 2018.

### N)     Continuous Quality Improvement

**Summary**:

By order of the *Coleman* court (ECF No. 4232, filed August 30, 2012; ECF No. 4561, filed April 23, 2013; ECF No. 5092, filed March 3, 2014), defendants were directed to develop an improved quality improvement process by which CDCR could identify issues and improve its performance levels in the delivery of mental health care.  The result was the development of a Continuous Quality Improvement Tool (CQIT).  During the course of the SPMW process, CDCR agreed to incorporate this reviewer's suicide prevention audit checklist into its overall CQI process.  The checklist included 19 measures.[13]

**Current Findings**:

A review of CDCR's revised Continuous Quality Improvement On-Site Audit Guidebook, last revised on July 2, 2018, found it included many, but not all, of this reviewer's suicide prevention audit measures.  During SPMW and All-Parties Workgroup meetings in 2017-2018, CDCR consistently confirmed that the 19 suicide prevention audit measures would be incorporated into either the CQIT or other CQI processes.  To date, CDCR has not had the opportunity to produce a CQIT report that includes findings from all of these 19 suicide prevention audit measures.

Defendants' May 2018 CAP stated that "CDCR to work with [Office of the Special Master] on final report format, items are all added in the CQIT on-site tool.  All items related to timeliness are in the performance report.  Training items are not automated but are collected by our training unit and will be included in regional reports. New onsite items such as MHCB

---

[13]The 19 measures were: Observation of R&R intake screening, confirming screening completeness and privacy and confidentiality; Administrative segregation new intake inmates housed in retrofitted new intake cells for 72 hours; Clothing allowance for MHCB patients; Treatment/safety planning for suicidal ideation in MHCBs; Use of alternative housing; Annual suicide prevention training for custody staff; Five-day clinical and custody follow-ups for MHCB returns; Guard One compliance; PT rounds in administrative segregation, SHU, and PSU; Suicide-resistant design of MHCBs; Five-day clinical and custody follow-ups for alternative housing, DSH, and Psychiatric Inpatient Program (PIP) returns; SREs required for emergency mental health referrals/TTA Log for suicidal ideation; SREs required for admission/discharge in MHCB and alternative housing; Observation and Privileges for MHCB patients; Emergency response equipment in housing units; Annual suicide prevention training for medical and mental health staff; CPR training for medical staff; SRE Mentoring/Seven-hour SRE training and Safety Planning training for clinicians; and SPRFIT responsibilities.

privileges are in the on-site tool but are not yet coded. The findings will be included in the written regional report and on the list to be coded for quantitative information. All new onsite items will be completed by regional when onsite visits occur."

**Recommendation**:

The reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQIT-formatted report for each facility, and not in various "regional reports" as described in defendants' May 2018 CAP.

   **O)**    **Suicide Case Reviews**

**Summary**:

The MHSDS *Program Guide* provides detailed procedures in the event of an inmate death by suicide. Following a suicide, the Division of Correctional Health Care Services' (DCHCS) SPRFIT coordinator appoints a Suicide Reviewer to begin reviewing the case. The primary purpose for the suicide review is to try to understand how the death occurred, what was the precipitant(s) to the suicide, as well as any system failures that, once corrected, will allow the agency to improve the suicide prevention program. The Suicide Reviewer examines all relevant documentation in the case, including, but not limited to, the decedent's central file, health care record, and all relevant CDCR policies and procedures. The Suicide Reviewer is assisted by both a custody supervisor from the Mental Health Compliance Team (MHCT) and a Nurse Consultant Program Reviewer. The review also includes inspection of the decedent's cell and its contents, as well as interviews with select custody, medical, and mental health personnel, inmates, and family members of the decedent when appropriate. Within approximately 30 calendar days of the suicide, the Suicide Reviewer is required to complete a preliminary Suicide Report that contains relevant findings and recommendations, if any, for a quality improvement plan (QIP) regarding the suicide. The preliminary report is forwarded to the DCHCS SPRFIT Coordinator and the report is subsequently discussed at a Suicide Case Review subcommittee meeting. Members of the subcommittee include SMHP staff, DAI and nursing leadership, MHCT members, and OLA representative(s). In addition, leadership from the facility where the suicide occurred is represented at the meeting. Members of the Special Master's team are also invited to observe the process. Following the subcommittee meeting, the Suicide Report is finalized, and local facility leadership is required to implement any QIPs pursuant to a defined schedule.

**Current Findings**:

A considerable strength of the CDCR suicide prevention program is the Suicide Case Review process. Since at least June 2015, members of the Special Master's team have reviewed each preliminary Suicide Report and observed, as well as often participated in, the Suicide Case Review subcommittee meetings. Although members of the Special Master's team have provided critiques of individual preliminary reports that have resulted in some revision of those reports, overall, the Suicide Reports have been found to be not only very comprehensive but have

provided thoughtful and targeted QIPs for correcting deficiencies and improving suicide prevention practices.

During 2017, CDCR sustained 30 inmate suicides, with Suicide Reports developed in each case. These reports, in turn, generated approximately 193 QIPs, which are listed in the facility assessment sections in Appendix A of this report. The following list of categories encompassed approximately 144 of the QIPs:[14]

- Inadequate SRE/SRASHEs and/or Safety Plans: 36
- Missing mental health documentation: 25
- Nursing documentation (general): 21
- Delay in 911 activation: 16
- Delay in CPR initiation, cut-down kit retrieval, other: 16
- Level of clinical care errors: 9
- Psychiatric medication errors: 5
- Nursing errors during emergency response: 5
- Deficiencies in Guard One observation: 4
- Failure to place inmate in new intake cell: 3
- Inadequate housing of suicidal patient: 2
- Nursing observation of suicidal patient: 2

Of significance, 25 percent (36 of 144) of the QIPs listed above involved inadequate development of SRE/SRASHEs and/or safety plans.

**Recommendation**:

No recommendations are offered related to this issue.

**P)**    **Reception Center Suicides**

**Summary**:

During 2017, 30 percent (nine of 30) of the CDCR suicides occurred when inmates were on Reception Center (RC) status. The suicides occurred at the following RC facilities: SQ (two), WSP (three), and DVI (four). The number of RC suicides far exceeded those in recent prior years.

**Current Findings**:

As a result of the high number of RC suicides within the CDCR system during 2017, an RC Workgroup was initiated and has met periodically to study the issue. According to CDCR,

---

[14] Of the 193 reported QIPs, many were duplicative (e.g., multiple QIPs generated for custody and nursing staff based upon the same deficient emergency response, etc.), resulting in approximately 144 specific deficiencies requiring a QIP.

the workgroup was still gathering information, with plans to tour an RC facility in June 2018 and then issue recommendations in the future.

During this reviewer's most recent assessment, the mental health screening and diagnostic evaluation process within the RC facilities (CCWF, CIM, DVI, NKSP, SQ, and WSP) was observed.  In addition, select RC housing units were inspected to determine whether suicide prevention posters were located in visible locations.  Overall, this reviewer observed that all diagnostic clinicians conducted appropriate screenings in private offices that ensured both privacy and confidentiality.  With regard to the suicide prevention posters, pursuant to an earlier CDCR initiative to increase suicide prevention awareness system-wide by distributing posters to each CDCR facility, a memorandum to each facility's chief of mental health (CMH) dated April 21, 2014 stated that "posters should be visible throughout your institution, particularly where inmates congregate.  They can be mounted near canteens, clinics, dayrooms, housing units, workplaces, and Prison Industries Authority work areas."  Because the risk of suicide can be particularly acute to an inmate newly-admitted into CDCR, placement of suicide prevention posters in RC housing units should be considered a priority.  This reviewer found that there were inconsistent practices regarding the presence of posters within RC housing units in the toured facilities, ranging from posters found in each unit, posters that were not prominently displayed nor located in high-traffic areas, to an ill-informed decision to remove posters from bulletin boards to allow room for other important announcements.

In addition, this reviewer's review of a handful of cases involving RC inmates raised an issue regarding both the availability and review of county jail records by diagnostic and other mental health clinicians during the RC process.  In one case involving the subsequent suicide of an inmate at WSP in July 2017, the inmate was transferred to an MHCB the day after his RC admittance.  The suicide review found that MHCB clinicians did not have an opportunity to review the inmate's health care records from the county jail, presumably because the records were not available for review at the time of the inmate's MHCB placement.  The review also found that "policy and procedures for reviewing records received after evaluations have not been clearly identified or communicated."  As a result of this case, a CDCR headquarters QIP was developed and required that "HQ SPRFIT will evaluate the process used by clinicians when reviewing jail records.  Specifically, processes for reviewing jail records received after an evaluation will be addressed.  In addition, conditions that require further checks or an alert system will be explored."

In another case not resulting in suicide, this reviewer observed the mental health screening and diagnostic testing process at CCWF in which one particular RC inmate self-reported an extensive history of mental health and suicidal behavior.  Based upon the affirmative responses, the inmate was referred for further mental health evaluation.  Following the screening, when the clinician was asked if they routinely reviewed both the intake health screening form and any available discharge information from the county jail, the clinician responded by stating that they and their colleagues responsible for the initial mental health screening waited until the Mental Health Evaluation was completed before reviewing any previous records, including county jail records.[15]  This reviewer's concern with this clinician's response was twofold: first,

---

[15]This reviewer's subsequent examination of the available county jail records indicated that the inmate had attempted suicide by drug overdose approximately ten days prior to her arrival into CDCR, with a note indicating

the MHSDS *Program Guide* only required a Mental Health Evaluation ("psychological evaluation") to be completed if the inmate answered affirmatively to any mental health questions on the 31-item mental health screening form, and second, the *Program Guide* required the initial Mental Health Evaluation to be completed within "18 calendar days," although the process was historically completed earlier.  Under such a scenario, an inmate (not the one referenced above) who provided all "no" responses to the mental health screening would not be referred for completion of a Mental Health Evaluation and would not have either the initial intake screening form or available county jail records reviewed by a mental health clinician.  Of note, this reviewer's observation of the mental health screening and diagnostic testing process by another CCWF clinician found that the county jail records were reviewed during the process.

**Recommendation**:

It is strongly recommended that the RC Workgroup include the following during its deliberations:  (1) CAPs in each RC facility to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, nurse's offices where intake screening is administered, and pill call windows; (2) ensure review and distribution of the HQ SPRFIT memorandum regarding the results of the evaluation of "the process used by clinicians when reviewing jail records" as related to the WSP suicide in July 2017; (3) the necessity to provide direction to clinicians assigned to the RC diagnostic testing areas to ensure that they consistently review both the most recent initial intake screening forms and any available county jail records prior to and/or during completion of the 31-item mental health screening form; and (4) review Chapter 2 ("Reception Center Mental Health Assessment") of the MHSDS *Program Guide* to determine if unclear language regarding requirements for review of health care information from both county jails and prior CDCR confinements is in need of clarification.

## IV.    Defendants' Proposal to Build Temporary Unlicensed MHCB Beds at the California Institution for Women and the R.J. Donovan Correctional Facility

In an effort to create more temporary MHCB options in CDCR's southern region, as well as reduce the length of stay in alternative housing system-wide, defendants identified two facilities, California Institution for Women (CIW) and R.J. Donovan Correctional Facility (RJD) for the temporary use of unlicensed MHCBs.  At defendants' request, this reviewer and another member of the Special Master's team inspected both proposed locations on April 11, 2018.  Specifically, the proposed locations were the GP Walker A Unit at CIW and a portion of the 3CMS and GP administrative segregation unit in Building 7 at RJD.

---

that "she is depressed about being here but does not want to die.  Upset and emotional."  The county records also indicated she had been prescribed an antidepressant.  This reviewer's examination of the EHRS indicated that the inmate had recently been incarcerated at CIW and placed on suicide precautions.  In addition to the recent county jail suicide attempt, the inmate also had two recent suicide attempts by drug overdose in the community.  This information was available to, but not reviewed by, the mental health clinician at CCWF during the RC diagnostic testing.  Based upon this reviewer's findings, the inmate was subsequently referred for completion of a SRASHE which found a "high" chronic risk and "moderate" acute risk for suicide.  Following review of all available records, the clinician completing the SRASHE found "*more concerning from information gleaned was IP actually was minimizing history more than originally determined during the RC process.*"

The Walker A Unit at CIW is a one-story building with several wings, including an outpatient housing unit and GP programming and office space. The proposed 18-bed unlicensed MHCB unit would be located in a wing of the unit. To date, the 18-bed wing has already undergone significant renovation, including repainting of walls and ceiling in each cell, replacement of sink and toilet in each cell, and enlargement of exterior cell windows in each cell. Such enlargement included three vertical exterior windows in the cells, each window measuring approximately two-to-three feet in length. These windows provide a good amount of natural light into all cells. Remaining renovation would include replacement of wall ventilation grates with holes 3/16 in diameter in each cell, and installation of regular MHCB beds. The rooms were otherwise suicide-resistant. Although slightly smaller than regular licensed MHCB rooms, the cells would accommodate the new beds. In addition, the unit already contained two large rooms that would be utilized for IDTT meetings, group programming, and other multi-purpose reasons, including individual treatment. One cell would be converted into a nursing station in the center of the wing, with another cell converted into an observation/seclusion room. Offices for mental health clinicians would be located outside the MHCB unit in another wing of the Walker A Unit. A medical examination room would also be located on the unit, but medical providers would come onto the unit for most services. As proposed, the Unit courtyard would be converted into a yard and designated only for MHCB patients. The courtyard would be landscaped. An undetermined number of special management "walk-alone" yards would be installed for patients on maximum security/administrative segregation unit statuses.

As proposed, this reviewer found CDCR's proposal to convert CIW's Walker A Unit into a temporary unlicensed MHCB unit to be reasonable.

In stark contrast to the CIW proposal, defendants also proposed a temporary unlicensed MHCB unit within the Building 7 administrative segregation unit at RJD. The proposed 20 cells designated for MHCB patients would be located on the right side of the building. A chain-link fence would be the only separation between the administrative segregation section and the MHCB unit. As proposed, the administrative segregation section of the building would be downsized to reduce the opportunity of administrative segregation inmates having visual sightlines into the MHCB unit. However, as explained to the Special Master's team, there were no guarantees that an unforeseen increase in the administrative segregation population would negatively impact sight and sound separation, and thus MHCB treatment.

As proposed, ten cells on both the first and second tier would be designated as MHCB beds. Three cells on each tier (total of six) would be converted into clinical staff offices. One cell on the first tier would be designated as an observation/seclusion room. Two cells, one on each tier, would be converted into nursing stations. Two cells, one on each tier, would be converted into interview rooms for clinicians. Additional cells would be converted into property storage, medical supply, linen supply, and utility rooms.

As proposed, both therapeutic treatment modules (for patients on maximum-security/ administrative segregation statuses) and partition space (for patients on non-administrative segregation status) would be created in the open dayroom for out-of-cell programming. MHCB patients would be escorted outside the building to a conference room located in Building 6 (the administrative segregation unit for EOP inmates) for their IDTT meetings. Although scheduled

33

separately, the yard for MHCB patients would be the same as that designated for administrative segregation inmates in Building 6 (3CMS/GP) and Building 7 (EOP).  MHCB patients with medical needs/appointments would be escorted to the Health Care Treatment Building located on the opposite side of Building 6.  Contrary to regular licensed MHCB units where most services are provided internally, the anticipated increase in correctional officer responsibilities for escorting patients in and out of the proposed MHCB unit has not been presented to the Special Master's team.

This reviewer found the following significant concerns during the inspection and discussion (with CDCR headquarters and RJD officials) of the proposed unlicensed MHCB unit at RJD on April 11:

- Although all 20 cells would be retrofitted to be suicide-resistant (i.e., wall ventilation grates replaced; desk, stool, and wall cabinet units removed; anti-squirt slit faucets replaced, and bunks replaced with suicide-resistant beds), these cells would not be enlarged (because the building could not structurally withstand removal of more than one wall in the entire unit).  In addition, although there was a proffer during a subsequent conference call to install new cell doors with a larger window diameter, natural light would still be very limited.  The cells would remain dark, even with the offer to paint cement walls, ceilings, and floors.  In sum, *the 20 cells that comprise this proposed MHCB unit would simply resemble retrofitted new intake cells commonly found in administrative segregation units.*

- The floor size of each cell would be that of an administrative segregation cell and, as such, dramatically less than the traditional MHCB room found in licensed facilities.  Although initially informed that regular MHCB suicide-resistant beds would be installed in each cell, with these beds taking up considerable floor space leaving significantly reduced unencumbered space for patients to freely move about their cells, the Special Master's team was subsequently informed that MHCB suicide-resistant beds regularly found in licensed MHCB units would *not* fit in these cells.

- As noted above, two cells would be converted into clinical interview rooms.  In addition, two cells would be converted into nursing stations.  Given the fact that inmates freely converse through the ventilation grates and cell doors, even with clinical offices and interview rooms located at the end of each tier, privacy and confidentiality could still be compromised by the proposed location of these offices on each tier.

- CDCR/RJD representatives informed the Special Master's team that it would be very challenging to schedule adequate yard time for MHCB patients because they would be competing with administrative segregation inmates in Buildings 6 and 7 who are required to attend yard separately.  In addition, all MHCB patients (regardless of security classification level) would be required to be placed in the special management "walk-alone" yards because it is the *only* option available in the administrative segregation unit yard.

- There were no plans offered to install fencing/netting on second tier railing to eliminate the possibility of a suicidal patient jumping from the second tier in a suicide attempt.

This reviewer summarized the above serious concerns during an All-Parties Workgroup meeting on April 23, 2018. In addition, the Special Master's team had three other conference calls with CDCR's Statewide Mental Health Program leadership staff on May 1, June 7, and June 26, 2018. As noted above, defendants revised their proposal during these calls to include the painting of ceilings and walls in each cell, changing the cell doors to replicate new intake cell doors, and proposing an increase of out-of-cell time to compensate for the extremely reduced square footage of the cells compared to regular MHCB units. The latter proposal did not include specifics, such as the type of out-of-cell time offered, schedules, and anticipated staff resources necessary to accomplish increased out-of-cell time for 20 patients.

Following careful consideration of defendants' proposal, including on-site inspection of the administrative segregation unit at RJD and subsequent teleconference calls with Statewide Mental Health Program leadership staff, as well as a review of both the defendants' most recent letter to the *Coleman* Special Master dated July 30, 2018 and plaintiffs' letter in opposition to the proposal dated August 8, 2018, this reviewer's initial concerns remain unchanged. Despite the best efforts of the CDCR leadership team, the proposed MHCB unit within an administrative segregation unit at RJD would be stark and anti-therapeutic. Although cells would be retrofitted to be suicide-resistant, they would remain cold, dark, and contain limited floor space well below that of any licensed MHCB unit. They would simply resemble retrofitted new intake cells found in administrative segregation units. Confidential office space could be severely compromised. Availability for out-of-cell time, particularly yard, would also be extremely challenging. In sum, activation of defendants' proposal at RJD would result in deplorable conditions – unacceptable for class members needing an MHCB level of care.

As detailed later in this report, the temporary and unlicensed 20-bed Mental Health Outpatient Housing Unit (MHOHU) located at CSP/Sac has been problematic for many years. There appears to be universal agreement among both parties that the MHOHU should be closed. It would be this reviewer's opinion that a proposal to transfer similar problematic conditions historically seen within the MHOHU at CSP/Sac to RJD is simply not acceptable, and that another non-administrative segregation setting should be considered.

## V.    Conclusion and Recommendations

As stated in all of this reviewer's previous assessments, it continues to be noteworthy that CDCR, its management team (including statewide mental health staff) and legal counsel, as well as local custody, medical, and mental health leadership at each of the prison facilities assessed during 2017-2018, displayed total cooperation during this most recent suicide prevention assessment process. CDCR's implementation of this reviewer's initial recommendations, as well as the correction of existing and often chronic ongoing deficiencies, continues to progress at varying speeds.

As shown in the table below, there continued to be an increase in the number of inmate suicides in CDCR during 2017, a great source of distress for all parties in the *Coleman* case. As of December 27, 2017, CDCR housed 118,232 inmates (in-state within its institutions and camps) and experienced 30 inmate suicides, resulting in a suicide rate of 25.3 deaths per 100,000 inmates.[16]

**TABLE**
**AVERAGE DAILY POPULATION, OVERALL SUICIDES/RESTRICTIVE HOUSING SUICIDES, AND SUICIDE RATES WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION 2013 THROUGH 2017***

| Year | ADP[17] | All Suicides/Rate | Suicides in Restrictive Units/Percent[18] |
|------|------|------|------|
| 2013 | 122,896 | 31/25.2 | 15/48.3 |
| 2014 | 119,069 | 23/18.7 | 14/60.8 |
| 2015 | 116,467 | 23/19.7 | 9/39.1 |
| 2016 | 117,612 | 27/22.9 | 10/37.0 |
| 2017 | 118,232 | 30/25.3 | 11/36.6 |
| 2013-2017 | 594,276 | 134/22.5 | 59/44.0 |

*Source: California Department of Corrections and Rehabilitation

Caution should always be exercised when viewing the above data. Suicide rates are most meaningful when viewed over a sustained period of time and, as stated in this reviewer's earlier reports, although the total number of inmate suicides and the corresponding suicide rate in any prison system can be important indicators, they are not the sole barometer by which adequacy of suicide prevention practices should be measured. The best methodology for determining whether a correctional system has fully implemented its suicide prevention program continues to be (1) the assessment of suicide prevention practices within each prison, and (2) a review of each inmate suicide in relation to practices in the prison and determining its degree of preventability.

In conclusion, it is again recommended that CDCR continue their efforts to fully implement this reviewer's previous recommendations, as well as develop CAPs based upon deficiencies found in this most recent assessment. As shown below, ***most of these necessary corrective actions are not necessarily based upon new recommendations, but rather by CDCR's continuing challenge of implementing and sustaining adequate suicide prevention***

---

[16]By comparison, the suicide rate in state prison systems throughout the country was approximately 20 deaths per 100,000 inmates in 2014. See Noonan, M. (2016), *Mortality in State Prisons, 2001-2014 Statistical Tables*, Washington DC: US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics (BJS). As of August 2018, more recent BJS data was unavailable.

[17]As of midnight, last Wednesday of year, includes in-state CDCR institutions/camps only.

[18]Percent of suicides in administrative segregation, short-term restrictive housing, long-term restrictive housing, SHU, PSU, and Condemned units compared to total CDCR suicides.

*practices.* As such, CDCR should continue to cooperate with the Special Master and his experts through the SPMW process to:

- Develop CAPs for the intake screening process in the five facilities outlined above in Section III. A;

- Develop a work order for replacement of the wall and ceiling ventilation grates in the MHCB unit at PBSP;

- Develop CAPs in each of the ten facilities identified in Section III. D above to ensure that newly-arrived administrative segregation inmates assigned to single cells are placed in new intake cells for the first 72 hours of administrative segregation confinement. Some of the CAPs may involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-intake cells when new intake cells are available;

- Develop CAPs in each of the four facilities identified in Section III. E above that continue to have alternative housing length of stays well in excess of 24 hours. In addition, a CAP should be developed at CIM to ensure the correct calculation of length of stay data in alternative housing;

- In addition to CQI and regional mental health team audits, nursing supervisors at each facility containing a MHCB unit should conduct regular EHRS audits to ensure that suicidal patients are being consistently observed as required;

- MHCB supervisors in each of the nine facilities identified above in Section III. G should audit the possessions and privileges clinically ordered to MHCB patients and report findings to the local SPRFIT committee until the issue is resolved. It is also recommended that CDCR develop a CAP for recruiting a sufficient number of RT personnel that can be assigned to MHCB units or, in the alternative, find additional non-RT personnel to provide such services;

- Develop CAPs for the six facilities identified in Section III. I above that continue to struggle with completion of required SRE/SRASHEs for emergency mental health referrals involving SI and SIB;

- Initiation of safety plan auditing by MHCB supervisors or designees should be expedited and a start date identified in defendants' May 2018 CAP. In addition, CAPs should be developed for safety plan training of mental health clinicians in the 11 facilities identified above in Section III. J.

- Utilize the Defendants' May 2018 CAP for the "Discharge Custody Check Sheet" (CDCR MH-7497) form process in the 20 facilities identified above in Section III. K that were below 90-percent compliance;

- CDCR should provide the revised pre-service *Mental Health Services Delivery System Instructor Guide curriculum* to this reviewer, as well as provide a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training.  In addition, CDCR should develop CAPs for annual suicide prevention training in the 13 facilities identified above in Section III. M that were below 90-percent compliance for suicide prevention training for either medical and/or mental health staff.  Finally, CDCR should incorporate this reviewer's recommended changes to the annual IST suicide prevention training curriculum that was previously forwarded in February and October 2018;

- The reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQI-formatted report for each facility, and not in various "regional reports" as described in defendants' May 2018 CAP;

- The RC Workgroup should incorporate the following issues during its deliberations:  (1) CAPs in each RC facility to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, nurse's offices where intake screening is administered, and pill call windows; (2) ensure review and distribution of the HQ SPRFIT memorandum regarding the results of the evaluation of "the process used by clinicians when reviewing jail records" as related to the WSP suicide in July 2017; (3) the necessity to provide direction to clinicians assigned to the RC diagnostic testing areas to ensure that they consistently review both the most recent initial intake screening forms and any available county jail records prior to and/or during completion of the 31-item mental health screening form; and (4) review and revise Chapter 2 of the MHSDS *Program Guide* ("Reception Center Mental Health Assessment) and/or Program Guide revision to better clarify language regarding requirements for review of health care information from both county jails and prior CDCR confinements; and

- Defendants' May 2018 CAP should be revised accordingly to incorporate the recommendations contained within this assessment report.

Finally, as stated in previous reports by this reviewer, continuing re-inspection of select CDCR facilities which chronically struggle with their suicide prevention programs is recommended as it would allow for continued provision of technical assistance, a measurement of the sustainability of CDCR's corrective actions, and observation of the department's CQI process at individual facilities, leading to decreased future monitoring and hopefully continued reduction of inmate suicides throughout the prison system.

# APPENDIX A

**Findings and Summaries of CDCR Suicide Case Reviews at 23 Re-Audited Prisons During 2017-2018**

### 1)    California State Prison - Sacramento (CSP/Sac)

**Inspection**:  May 23-25, 2017 (previous suicide prevention audit was on April 4-5, 2016). CSP/Sac housed approximately 2,383 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on May 24, 2017.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, thus ensuring both privacy and confidentiality.

Daily PT rounds in the short-term restricted housing (STRH) unit and one of the PSUs were observed.  The PT rounds were performed appropriately, with Psych Tech Daily Rounds information entered into EHRS for each caseload inmate.  The documentation process was slowed by the recent implementation of EHRS (on May 9, 2017).

**Housing**:  CSP/Sac had two CTCs; CTC-1 had 15 MHCBs and CTC-2 had ten MHCBs.  This reviewer previously found that all patient rooms within CTC-1 and CTC-2 were suicide-resistant.

In addition, all cells in the 20-bed MHOHU (Mental Health Outpatient Housing Unit) were previously designated to provide temporary, unlicensed MHCB level of care.  Each cell was suicide-resistant, and had solid cement beds, ventilation grates, and light fixtures.  However, as previously reported in the November 2013 assessment, the environment of the MHOHU remained sterile.  Cells still appeared dirty and dark, and offered limited visibility of their interiors.  Further, although IDTT meetings were conducted in an area outside of the housing unit, there continued to be no clinician offices in the MHOHU, therefore, clinical assessments were regularly conducted at cell-front or in therapeutic modules in the MHOHU.  The modules were located adjacent to large industrial floor fans (i.e., swamp coolers).  Due to the excessive noise, this reviewer observed that clinicians and IPs had a great deal of difficulty hearing each other, negatively impacting the assessment process.  In addition, because both nursing and custody workstations were also located in the small high traffic dayroom area, adequate privacy, confidentiality, and programming were severely compromised.  As a result, many inmates refused out-of-cell clinical appointments in the modules.  Other observed deficiencies within the MHOHU will be discussed below.

There were nine designated new intake cells (114-120, 217-218) in the administrative segregation EOP unit (A-5) previously found to be suicide-resistant.[19]  In addition, there were nine designated new intake cells (100-108) in the STRH unit previously found to be suicide-resistant.  This reviewer did not observe any new intake inmates in non-new intake cells in the STRH unit during PT rounds.

---

[19]For purposes of this report, "new intake cells" refer to designated cells in administrative segregation units that are retrofitted to be suicide-resistant and house new intake inmates during the initial 72 hours of their confinement.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis and primarily found in the B-7 Unit. This reviewer was informed that the use of ZZ cells for inmates in alternative housing had ceased in November 2016. From February 24 through May 17, 2017, there were approximately 223 inmates placed in alternative housing, and all were provided beds and required to be observed on a continuous 1:1 basis. Due to a shortage in nursing staff, all inmates were being observed by custody staff. According to the available data, approximately 77 percent of inmates were discharged from alternative housing within 24 hours, with 18 percent of inmates held over 24 hours and five percent over 48 hours. The overall length of stay for all 223 inmates placed in alternative housing was 18 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs and MHOHU. In addition, patients not on suicide observation statuses were required to be observed at 30-minute intervals. Nursing staff were observed to be using the new EHRS to log observation rounds. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of three patients (SAC 1, SAC 2, and SAC 3) on Suicide Precaution status in CTC-1, CTC-2, and the MHOHU during a nine-hour period from 12:00 a.m. through 8:59 a.m. on May 23, 2017. The chart review found very few observation checks (i.e., two or three per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 25 minutes in one case (SAC 3).

In addition, although this reviewer did not observe any obvious problems with the issuance of possessions and privileges for patients assigned to CTC-1 and CTC-2, there were numerous problems found within the MHOHU. For example, although an RT was assigned to the MHOHU for 20 hours per week, the RT informed this reviewer that much of that time was devoted to "assessments," with only eight hours available for programming, resulting in most MHOHU patients locked down in their cells 24 hours a day (with the exception of occasional shower time). MHOHU patients were given the "choice" of either yard or therapeutic treatment modules (TTMs). As described above, use of these TTMs was problematic. Review of custody files for MHOHU patients indicated that access to the yard was rarely offered. Although telephone privileges were often recommended by clinicians, telephone usage was non-existent because the only telephone in the MHOHU dayroom had been deactivated since the unit opened in 2009. The RT rarely attended IDTT meetings.

Finally, a review of Guard One data for a recent 24-hour period found an overall combined 99-percent compliance rate with required checks not exceeding 35 minutes in STRH, administrative segregation EOP, and PSU-A.

Despite these high completion percentages, it was noteworthy that the inmate suicide (SAC 8) occurring in the PSU in June 2017 was found in rigor mortis despite completion of a timely Guard One check, an indication that correctional staff did not adequately observe the interior of the cell to verify "a living, breathing inmate" as required.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the Mental Health Tracking System (MHTS) from April 1 through May 8, 2017. This reviewer's sample eUHR review of 83 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in

96 percent (80 of 83) of the cases, a significant improvement from the 87 percent completion rate found during the 2016 assessment.

However, this reviewer examined 25 charts of patients recently discharged from the MHCB units. The sample findings were problematic. Of the 25 cases, two (eight percent) were missing discharging SREs. Of the remaining 23 cases, there was inconsistency ranging from adequate safety plans to a safety plan narrative that simply recited *Program Guide* requirements. An example (SAC 4) of an adequate safety plan of a CTC-2 patient was the following:

> A plan to reduce his overall suicide risk includes: 1) Continue to help pt. develop healthy lifestyle skills (sleep hygiene, appropriate exercise, spiritual activities, ongoing skill-building around reality testing and sx recognition) to promote maintenance of tx gains and to foster sense of self-efficacy in sx management. Because his past reported SAs occurred as a result of CAH and psychotic-related distress, the greater his sense of self-efficacy in managing these sxs, the less likely he may be to feel overwhelmed or hopeless when experiencing sx recurrence; 2) Pt expresses interest in further developing his reality testing and sx discernment/ recognition skills. Helping him to develop insight into his condition will likely aid in this area, as well as development of concrete specific reality-testing strategies; and 3) Help pt identify areas of hope and optimism in his life, CBT to help him challenge rigid and distorted negative beliefs appear useful.

Unfortunately, this thoughtful safety plan was offset by the fact that subsequent five-day clinical follow-up notes, as well as weekly PC progress notes, did not adequately reflect such safety planning efforts.

Further, safety planning developed by MHOHU clinicians was consistently inadequate. Similar to findings from the preceding assessment, at least one MHOHU clinician continued to use virtually the same safety plan template for three patients (SAC 5, SAC 6, and SAC 7):

> 1) IP will be released from MHCBU to EOP LOC.
> 2) He will receive weekly visits with a primary clinician.
> 3) Housing will include custody checks/monitoring q 30 mins.
> 4) He will receive weekly groups.
> 5) He will be released on a 5/8 day follow-up to monitor for reemergence of suicidal ideation or crisis.
> 6) He will receive an IDTT within 14 days.
> 7) IP will work with clinician to develop coping skills for anxiety, mood changes, and increased frustration tolerance.
> 8) It is recommended he work on managing frustration/anxiety and increase distress tolerance. Also, utilizing time in prison positively by learning new coping skills. Teach physical and mental activities that would increase self-esteem, positive coping, and positive thinking.

The above safety plan is simply a restatement of *Program Guide* requirements, as well as recommending that the patient "develop coping skills" without identifying any coping skills

(which should have been part of the patient's treatment during ten plus days of crisis bed placement).

In addition, this reviewer was able to observe the IDTT processes in both CTC-1 and CTC-2, and to a lesser degree, in MHOHU, on May 25, 2017. IDTTs observed in CTC-1 and CTC-2 were adequate, with good case presentations and active participation from most treatment team members. The IDTT process within the MHOHU was quite different, exemplified by an atmosphere of harsh attitudes toward patients by treatment team members, including a few unnecessary confrontational discussions.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 79 cases of inmates discharged from a MHCB or alternative housing placement that remained at CSP/Sac and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during March 1 through May 17, 2017. The review found that only 14 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Most of the custody checks were recommended for discontinuation after 24 hours by clinicians. In addition, only 42 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, whereas 58 percent of the forms were completed in excess of 30-minute intervals or completed in part or not at all. Due to the low percentage of Page One of the forms being completed, the percentage of custody checks discontinued by the clinician after 24 hours could not be determined.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: Similar to prior assessments, a review of three months of SPRFIT meeting minutes (February through April 2017) found that meetings consistently lacked all required mandatory members or designees and quorums were not reached in any of the months. The issue of "poor SPR-FIT meeting attendance" had been a monthly agenda item since 2012. With the exception of discussing continuing problems with adequate completion of Discharge Custody Check Sheets" (CDCR MH-7497), the meetings were otherwise unremarkable.

**Training**: According to training records, approximately 95 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 93 percent of custody staff had received annual suicide prevention block training during 2016, but only 65 percent of medical and 36 percent of mental health staff received comparable suicide prevention training during 2016. The completion percentages for annual training of medical and mental health staff continued to remain low. Finally, as of May 2017, only 69 percent of mental health clinicians

had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and only 78 percent had received safety plan training.

**Recent Suicides**:  CSP/Sac experienced one inmate suicide during the review period.  In that case (SAC 8), the inmate was found to have asphyxiated himself with a sheet in his PSU cell during the afternoon of June 19, 2017.  He was found in the state of rigor mortis.  The inmate entered CDCR for a third term on August 31, 2015 to serve a life sentence (with the possibility for parole) for first-degree murder (of his mother's boyfriend).  He was transferred to CSP/Sac on January 27, 2017.  The inmate incurred 11 rules violation reports (RVRs) during his almost two-year confinement, the most recent of which occurred on April 21, 2017 involving an assault on another inmate.  Of note, a subsequent mental health assessment found that there was an association between the behavior that triggered the RVR and the inmate's mental health issues.  The inmate was known to be gang-affiliated.  He was unmarried and had one teenage son.  The inmate had family support from both his grandparents and son, and most recently received a visit from his grandparents the day before his death.

The inmate had a difficult relationship with his parents and was primarily raised by his grandparents.  He had an extensive history of substance abuse and gang involvement as a teenager but did not have any known mental health issues or treatment in the community. During his two previous CDCR commitments, the inmate was treated at the 3CMS level of care within the MHSDS.  Upon entry into CDCR for the third term, he was initially treated for both depression and anxiety at the 3CMS level of care beginning in late September 2015.  The inmate was subsequently placed in a MHCB six times for suicidal ideation, severe mood swings, depression, anxiety, and long-term symptoms resulting from trauma.  He was elevated to the EOP level of care on April 25, 2016.  His most recent MHCB placement was from May 6 through June 12, 2017 for danger to self and grave disability.  Of note, the final day of his five-day clinical follow-up was scheduled for June 19, the day of his death.  The inmate had various diagnoses during his CDCR confinement and was most recently diagnosed with Schizoaffective Disorder (bipolar type), Substance Abuse Disorder, and Antisocial Personality Disorder.

The inmate had a history of suicidal ideation within CDCR, as well as a suicide attempt at the NKSP Reception Center in late 2015 and an overdose from various medications in April 2016. The majority of SREs determine his chronic risk as "moderate" and his acute risk as "low."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and other than chronic back pain, the inmate did not have any significant medical issues that could be viewed as contributory to his suicide.  However, as previously stated, the inmate had a visit with his grandparents the day before his death and they told a custody officer in a posthumous telephone interview that he had apologized to them for the problems he had caused and stated sometimes "he no longer wanted to be part of this world."  During interactions with staff and other inmates on a morning of his death, the inmate was observed to be calm, alert, and cooperative.  The CDCR reviewer theorized that the suicide might have been influenced by the inmate's "concerns regarding his role in the family.  Due to the fact that he murdered his mother's boyfriend, he was rejected by his mother and a number of his maternal family members.  Several documents provide insight into his feelings of profound guilt and having torn his family apart.  Although he found comfort

in a relationship with his paternal grandparents, who are now raising his son, he stated during numerous encounters that he felt sad for not being able to be the father he wanted to be while in prison."

The Suicide Report contained seven recommendations for corrective action through a QIP:

1) An area of concern involves the condition which the inmate was discovered. Based on reports submitted by responding staff, the inmate was discovered rigid, with signs of rigor mortis and displayed a pale and bluish face, bluish bruise/ discolored areas on his shoulders, upper torso, upper/lower back, arms and feet. Additionally, it was noted his neck was firm, eyes were bloodshot, and his jaw was firmly shut with substantial rigidity.

This calls into question the thoroughness of the Security/Welfare checks completed on Second Watch. Review of the Guard 1 'Rounds Tracker Summary' identifies all checks were completed. However, it appears the visual/physical observation of a living, breathing inmate, free from obvious injury as required did not occur.

2) Prior to the arrival of the Ambu bag, no rescue breaths were provided through the use of the CPR micro-shield which all custody staff are mandated to carry on their person in the event of a medical emergency requiring its use.

3) Staff initiating CPR was observed conducting chest compressions using one hand. Per CPR training, chest compressions shall be completed by placing the heel of one hand in the center of the chest on the breastbone, while placing the heel of the other hand directly on top of the first with fingers lifted or interlaced.

4) Per the CDCR 837s, staff discovering the inmate informed their partner the sergeant was needed in the unit. The staff member walked away in order to notify the sergeant their presence was needed in the unit via institutional radio. Upon arrival the sergeant was informed by staff of the unresponsive inmate leading to the sergeant instructing staff to retrieve the extraction gear. The sergeant observes the inmate unresponsive and makes a radio announcement approximately four minutes after discovery.

Sac's OP 139 'Emergency Medical Response System' identifies a custody first responder shall briefly evaluate the inmate and situation and summon the appropriate assistance by the most expeditious means available (e.g., personal alarm device, two-way radio, whistle, shouting or telephone).

Requesting the sergeant to report to the housing unit via radio is not a valid means of notifying necessary staff of the emergency.

5) Nursing Documentation, Multidisciplinary: 2/3/17, 2100-2135, no Suicide Watch observations documented.

6) Nursing Documentation, Nursing System Issue: 3/8/17, no PT Daily Rounds located in the eUHR.

7) Nursing Documentation, Nursing System Issue: 5/5/17, 1000-1540, no Suicide Watch documentation located in the eUHR.

## 2)    **Wasco State Prison (WSP)**

**Inspection**:  June 8-9, 2017 (previous suicide prevention audit on August 16-17, 2016).  WSP housed approximately 5,265 inmates at the time of the most recent on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during both the medical intake screening process and the mental health diagnostic testing in the RC on June 8. The nurse was using the most current version of the Initial Health Screening form (CDCR Form 7277) (revised July 2015), and was observed to be asking all of the required questions.  The door to the nurse's office was closed, with the officer stationed outside, thus ensuring both privacy and confidentiality.  The door to the RC psychologist's office was also closed and the clinician was observed to be conducting thorough assessments.  The psychologist was observed to have access to (and used) the Patient Health Information Portal during the process.

Daily PT rounds in the administrative segregation unit were observed on June 9.  The rounds were unremarkable, and both PTs were observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates, as well as appropriately interacting with non-caseload inmates.

**Housing**:  WSP had an 18-bed CTC, with six rooms designated as MHCBs.  A previously identified problem of several rooms not being suicide-resistant because of antiquated ADA grab bars (with openings between the bars and the walls that were conducive to suicide attempts by hanging) were corrected less than a month prior to this writer's assessment.

The administrative segregation unit had 14 cells identified for new intake inmates.  Although 12 of the cells had previously been retrofitted as suicide-resistant cells and found to be appropriate by this writer during previous assessments, two ADA cells (117-118) were recently designated for new intake inmates and not suicide-resistant.  These cells each contained two bunks, one of which was situated in front of the exterior window allowing for a gap that was conducive to a suicide attempt by hanging.  In addition, each of the cells had antiquated ADA grab bars that were not suicide-resistant.  (During the exit meeting on June 9, this reviewer was informed that the bunks situated in front of the exterior windows of cells 117-118 had been removed, and the ADA grab bars would be replaced in the near future.)  Further, this reviewer observed that all new intake inmates were in new intake cells.  Of note, a previous concern of exterior cell windows containing frosted screening that obscured natural light into the cell had been resolved with the screening removed from most exterior cell windows.  The facility had received a variance to allow for continued frosted screening on one section of the unit (Section A) due to continued gang signage by inmates.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was used regularly on a daily basis. Most inmates were housed in Unit B-2. From March 1 through May 31, 2017, there were approximately 179 inmates placed in alternative housing. According to available data, approximately 87 percent of inmates placed in alternative housing were released within 24 hours, with 13 percent held over 24 hours. Very few inmates were held in alternative housing over 30 hours. All inmates were provided beds and observed on a continuous 1:1 basis. The overall length of stay in alternative housing for these 179 inmates was approximately 15 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were required to be observed at 15-minute intervals by nursing staff. This reviewer was not able to verify the accuracy of observation rounds because WSP had not yet implemented EHRS at the time of the on-site assessment.

This reviewer was unable to observe any IDTT meetings in the MHCB unit because none were scheduled during this on-site assessment. During the previous assessment in August 2016, this reviewer had been informed by the IDTT that telephone calls and visits were not permitted in the MHCB unit, and that they were awaiting further direction from CDCR headquarters regarding the memorandum on "Mental Health Crisis Bed Privileges," which was issued on June 23, 2016. Yard privileges, however, were permitted and an RT was assigned to the CTC on a full-time basis.

Upon return to the facility in June 2017, this reviewer again found that MHCB patients were still not consistently receiving telephone calls and visits. In fact, a current Operational Procedure for the CTC (No. WSP-013) still indicated that MHCB patients on either Suicide Watch or Suicide Precaution status were not eligible for yard activities. In addition, a RT note dated April 18, 2017 regarding a patient's (WSP 1) request for a telephone call stated that "custody explained to I/P the protocol of not getting phone calls on MHCB. I/P refused session after learning this." This reviewer interviewed the RT assigned to the MHCB and found that only one of three current RT positions were filled at the facility and the RT was dividing time between the CTC, administrative segregation unit, and EOP program. As such, the RT spent only a few hours three times a week in the CTC. The RT further stated that most MHCB patients did not refuse yard when offered, although incorrectly stated that patients on Suicide Watch were not eligible for yard.

Further, although the RT stated that MHCB patients received 30 minutes out of their room a few times each week in the yard or the program office, a review of records suggested otherwise. For example, this reviewer examined the records of 15 patients who each spent approximately nine days in the MHCB during May 2017. The records indicated that patients were given the option of either receiving yard or program office privileges, not both. In fact, most patients were not even given the option of recreating in the program office, rather the RT interacted with them cell-side. Of the 151 patient days for these 15 patients during May, there were only 39 RT encounters, with 14 uses of the yard and 25 cell-side visits. In sum, except for the periodic opportunity to shower, this reviewer found that MHCB patients spent an inordinate amount of time confined in their rooms.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 99-percent compliance with the required checks that did not exceed 35-minute intervals. This was a significant improvement from the previous year in which only 88-percent compliance was found.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of December 1, 2016 through June 5, 2017. The reviewer also reviewed the TTA log for the same time period. The subsequent sample eUHR review of 41 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 90 percent (37 of 41) of the cases.

A review of 15 charts of patients discharged from the MHCB unit continued to reveal problematic safety planning. One clinician simply wrote a narrative in several safety plans that the patients' "should identify at least 5 coping skills to decrease depression, anxiety, and impulsivity, promote successful prison incarceration with decreased ability of self-injurious behavior, identify at least 3 goals for his incarceration" (see, for example, WSP 2 on May 11, 2017), thereby deferring the identification of appropriate coping skills to other clinicians. Other safety plans continued to be limited to reciting *Program Guide* requirements and/or safety plans not transferred from the discharging SRE onto the first page of the Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form.

Of note, inadequate safety planning was listed as a prominent deficiency in one of the recent WSP suicides (WSP 3).

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 136 cases of patients discharged from a MHCB or alternative housing placement that remained at WSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from March 1, 2017 through June 2, 2017. The review found that only 37 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, although it should be noted that clinicians had high compliance rates for accurate completion of Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms. Approximately 80 percent of the custody checks were recommended for discontinuation after 24 hours by clinicians. In addition, only 84 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, including approximately 16 percent of these cases involving checks not completed during the First Watch.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months (March through May 2017) of SPRFIT meeting minutes found that quorums were not reached in any of the months, with psychiatry staff not in attendance at any of the meetings.  Meeting minutes were very brief and otherwise unremarkable.

**Training**:  According to training records, both custody and nursing staff were at 100-percent compliance with current CPR certification.  In addition, 99 percent of custody staff, 91 percent of medical staff, and 91 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of June 2017, approximately 90 percent of mental health clinicians had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and only 84 percent had completed safety plan training.

**Recent Suicides**:  WSP experienced four inmate suicides during the review period.  In the ***first*** case (WSP 3), the inmate was found hanging from the top bunk of his general population cell by a sheet during the early morning of April 26, 2017.  The inmate entered CDCR through the RC at WSP for his first term on February 28, 2017 to serve a 15-year sentence for assault with a firearm.  The committing offense involved holding his wife and several members of her family hostage at gunpoint.  He did not have any RVRs during his brief confinement.  The inmate was not known to be gang-affiliated and was raised by his mother.  He experienced substance abuse as a teenager but did not report any mental health issues in the community.  He had no known juvenile arrest history.  At the time of the instant offense, the inmate was married and had a young adult daughter.  He did not have any visits or telephone calls during his brief confinement, although there was some letter correspondence from a few of his family members, including his mother.

During the RC assessment process, the inmate was diagnosed with Major Depressive Disorder, recurrent, severe with psychotic features.  He was initially placed at 3CMS level of care but elevated to EOP a few weeks later after presenting with tearfulness, racing thoughts, sleeping difficulties, and mild paranoia.  Records also indicated that the inmate sustained a very serious suicide attempt in the county jail on September 3, 2016, whereby he attempted suicide by tying a ligature around his neck and jumping off the second tier of a housing unit.  The attempt resulted in the inmate being comatose for six days.  He also self-reported another suicide attempt by drug overdose in 2015 following an arrest on domestic violence charges.

The inmate began refusing both group treatment and psychotropic medication shortly after his elevation to EOP on March 16, 2017.  He denied any current suicidal ideation during two separate SREs in February and March 2017 and was assessed as being "moderate" chronic and "low" acute risk for suicide on both occasions.  Apart from being served with divorce paperwork approximately two weeks prior to his suicide, the CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  Posthumous interviews with both staff and inmates indicated that the inmate was quiet and often kept to himself.  He did not have any significant medical issues that could be viewed as contributory to his death.

The Suicide Report contained three recommendations for corrective action through a QIP:

> 1) On February 28, 2017, the inmate was placed in the CCCMS program while simultaneously being referred for placement in an EOP level of care. When asked about this, senior mental health staff stated this placement and referral process was put in place because inexperienced clinicians frequently make inappropriate referrals and the process ensures appropriate placement referrals are made. However, this additional process is not discussed in the MHSDS *Program Guide* and may delay provision of EOP services and timelines meant for RC settings.

> 2) On March 14, 2017, a Suicide Risk Evaluation was completed that incorrectly identified the inmate as not being a participant in the MHSDS and contained an inadequate Safety Risk/Reduction Plan, stating only 'No imminent risk symptoms present during this evaluation.'

> 3) Activation of 911/Multisystem issue (Custody and Nursing): On April 26, 2017 at 0243 hours, the patient was found by custody to be hanging from his neck in his cell. 911 was not activated until 0307 when TTA RN called Hall ambulance to verify that call had been made. A 24-minute delay in activation of 911.

In the **_second_** case (WSP 4), the inmate was found hanging from the top bunk of his RC cell by a sheet during the late evening of June 20, 2017. The inmate entered CDCR through the RC at WSP for his first term on March 23, 2017 to serve a nine-year sentence for carjacking. He did not have any RVRs during his brief confinement. The inmate was not known to be gang-affiliated. He was not married and did not have any children. The inmate did not have any visits or telephone calls during his brief confinement, and had limited family contact, with no letter correspondence found in his cell.

According to limited available records, the inmate was raised with three other older siblings by an aunt who took guardianship when he was approximately six-months old. He was known to struggle in grade school and became involved with substance abuse at an early age. As an adult, a family member reported that he had been diagnosed with "borderline schizophrenia and depression," and periodically reported hearing "voices."

During the RC assessment process, the inmate was diagnosed with Mood Disorder NOS, with county jail records indicating a diagnosis of Schizoaffective Disorder. Psychotropic medication was ordered, and the inmate was placed at 3CMS level of care. He quickly refused any mental health treatment, including psychotropic medication. He denied any current or prior history of suicidal ideation or suicide attempts (although there was an unconfirmed report by a family member that he had attempted suicide in the community). The inmate refused to participate in the completion of an SRE.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant

medical issues that could be viewed as contributory to his death. Posthumous interviews with both staff and inmates indicated that the inmate was quiet and often kept to himself.

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) Activation of the Emergency Medical System (calling 911) did not take place until approximate 9 to 12 minutes into the emergency which caused significant delay inappropriate medical response.

> 2) Medication non-compliance/non-adherence chronos were submitted (on 3/29, 4/18, 5/3, 5/9, 5/10, and 5/16); however, the inmate was not seen by psychiatry until May 16, 2017. Medication non-compliance/non-adherence rules require the patient to be scheduled for an appointment with a psychiatrist within five days of the first refusal chrono. An appointment with a psychiatrist did not occur for approximately seven weeks following the first medication refusal by the inmate.

In the _**third**_ case (WSP 5), the inmate was found by his cellmate to be hanging from the top bunk of his sensitive needs yard (SNY) cell by a sheet during the afternoon of July 6, 2017. The inmate entered CDCR through the RC at WSP for his first term on March 24, 2017 to serve a two-year sentence for corporal injury (on his spouse). He had one RVR during his brief confinement, a battery on another inmate on May 13, 2017. He was not known to be gang-affiliated. The inmate had strong family support, including that of a fiancé. He also had a 7-month-old baby and 7-year-old stepson. The inmate did not have any visits or telephone calls during his brief confinement, but a significant number of cards and letters from his family were found in the cell.

According to available records, both the inmate and his brother were primarily raised by his mother, and all family members struggled with both substance abuse and mental illness. The inmate, however, completed high school, was named salutatorian (second-highest in class), and attended several colleges. He later became an avid bodybuilder and personal trainer, but his escalating use of drugs, particularly methamphetamine, resulted in numerous arrests. These records also indicated that the inmate had been hospitalized at least three times in the community for psychosis. In the county jail, he had received treatment for "anxiety, mood swings, and depression." For the most part, the inmate consistently denied any current or prior history of suicidal ideation or suicide attempts. The lone reference to a history of suicidal behavior was a self-report in May 2017 that he had a "5150 commitment related to a serious suicide attempt by hanging five years ago."

Within a day of arrival to WSP RC, the inmate was admitted into a MHCB at CHCF for grave disability following a custody mental health referral indicating that he "appears to be confused, he is not able to respond to directions, he had a hard time focusing, he can't think straight, he does not want to go to SNY, first time in prison for corporal injury on his spouse." During an evaluation for MHCB admission, the inmate endorsed auditory hallucinations and appeared both confused and highly disorganized. Although adequate documentation of his MHCB treatment was lacking, he was viewed as an unwilling participant and refused most of the programming, including his initial IDTT. He was discharged from the MHCB on April 7 at the EOP level of

care after being assessed as "psychiatrically stable" because he was able "to maintain activities of daily living, denying hallucinations, and denying suicidal and homicidal ideation." The inmate was returned to WSP to complete the RC process with a diagnosis of Psychotic Disorder NOS.

During the next few months, the inmate was frequently non-compliant with the psychotropic medication. He also refused several IDTTs, group sessions, and psychiatry appointments. However, the CDCR reviewer in this case found several inconsistencies in the documentation of the inmate's mental health treatment. For example, although the inmate's Treatment Plan completed on May 11, 2017 indicated that "I/P has been showing up to 1:1 sessions with PC in a cooperative manner……IP recently (as of last week) has stopped taking his psychotropic medication and has been programming adequately per PC's assessment and custody's assessment." The CDCR reviewer found the Treatment Plan contained "several contradictions and errors and does not summarize past mental health treatment (community hospitalizations, county jail or MHCB) or ongoing problems related to refusing treatment (groups and tele-psychiatry appointments)." During June 2017, the inmate continued to refuse most (25 of 27) group sessions but did meet regularly with his PC. In a progress note dated July 5, 2017, one day before the inmate's suicide, the clinician wrote, in part, that:

> I/P reported that he's doing okay. I/P expressed that he does not get phone calls and would like to speak with a counselor regarding if his father has passed away. I/P reported that he does not like attending group but would make an effort on attending. I/P expressed that no one directly told him that his father has passed away, but he heard it through the air vents. I/P reported sleeping six hours per night. I/P reported eating all of his meals. I/P reported that his cellmate can be annoying at times. I/P denied being victimized by other inmates. I/P reported being medication compliant but reported that he is going to stop taking his medication because he heard through the air vents that staff is feeding him estrogen. I/P expressed trying to distinguish reality from his hallucinations. I/P reported that he believes riots are caused by him. I/P denied feeling SI or HI. He expressed that he is not depressed, anxious, or manic. I/P denied having any questions from the clinician.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant medical issues that could be viewed as contributory to his death. However, the reviewer found that there were several identifiable contributory causes to his death, including continuing struggles with paranoia and auditory hallucinations. According to the reviewer:

> It is likely his paranoia, auditory hallucinations, and depression prevented any disclosure of suicidal thinking. While he appeared to have supportive family, there were indications he was unsettled about his life (recently asking for probation officer records and commenting to MHCB nursing staff that his situation and his life was 'bull....'). His perception of the status of his relationship with the victim (fiancé) is unknown, but he mentioned to mental health he received paperwork requesting child support.

Posthumous interviews with both staff and inmates indicated that the inmate was quiet and often kept to himself. However, his cellmate did indicate that he found the inmate lying on his bed with a ligature around his neck three or four days prior to his suicide. For unknown reasons, the cellmate never reported the incident to staff.

The Suicide Report contained nine recommendations for corrective action through a QIP:

    1) The Mental Health Evaluation was not completed per policy at WSP. The Brief Mental Health Evaluation submitted for the inmate's MHCB referral package did not include a review of records and was barely legible. The Mental Health Evaluation that was completed on April 12, 2017 was based on limited information because the inmate refused the interview and the evaluation did not include a summary of jail records, MHCB treatment or review of the 5-day follow-up or plan to rectify the incomplete evaluation.

    2) The SREs dated March 25 and April 12, 2017 were incomplete, inaccurate, and contained many inconsistencies. Subsequent documentation did not include a thorough review of records, provide further clarification or address the poor quality.

    3) The WSP Mental Health Treatment Plans were not adhered to or updated to reflect the inmate's individual risk factors or problems. Information contained in the Treatment Plans was inconsistent and at times inaccurate and did not include a thorough review of the records or summary of treatment progress.

    4) In review of his scheduled primary clinician appointments, there were several progress notes missing from the unit health record. The dates of the missing notes were the following: April 21, April 26, May 3, May 10, May 12, May 16, May 19, May 23, and May 24.

    5) The inmate refused four tele-psychiatry appointments (April 17, April 24, May 1, and June 5). Following his June 5 refusal his medication was stopped (Zoloft) without having any contact with the patient or documented consult with unit officers or primary clinician. There were also medication non-compliance referrals submitted by nursing staff (on May 3, May 10, and May 17). The May 11, 2017 Treatment Plan mentions medication non-compliance but does not discuss his tele-psychiatry refusals or discuss whether tele-psychiatry is appropriate for this patient.

    6) A Mental Health Evaluation was not completed at CHCF MHCB and the submitted IPE was lacking in several areas (did not include a review of the available records) and did not document any plan for additional follow-up to rectify the inadequate evaluation.

7) At CHCF MHCB, the SRE dated April 4, 2017 was incomplete and did not provide a summary or analysis of available information.

8) The CHCF MHCB Initial and discharge Treatment Plans and Discharge Summary were inadequate and did not include a summary of the treatment in the MHCB, clear analysis of the presenting or current problems or a review of available records.

9) When the inmate was admitted to CHCF MHCB in March 2017, jail records were not available for review. Policy and procedures for reviewing records received after evaluations have not been clearly identified or communicated.

In the ***fourth*** case (WSP 6), the inmate was found hanging from the top bunk of his general population cell by a sheet during the late evening of October 15, 2017. The inmate entered CDCR for his first term on August 15, 2016 to serve a six-year sentence for assault with a deadly weapon. He was transferred to WSP on October 25, 2016. The inmate received 15 RVRs during his 14-month confinement, the most recent of which occurred on September 14, 2017 involving possession of alcohol. Due to his increasing disciplinary record, the inmate was pending transfer to a Level IV facility at the time of his death. He was not known to be gang-affiliated. The inmate had the limited family support from his grandparents and two uncles who provided letter correspondence.

According to available records, the inmate was raised by his mother and several male companions during his early years. Of note, his father committed suicide when he was only 6 years old. His grandfather described the inmate's childhood as "dysfunctional at best." He was often physically abused by his step-father, and both drugs and alcohol were often used by his mother and her male companions in the home while he was growing up. His grandfather described him as a "lost soul." The inmate was single and never married, and although records indicated he had two children, the grandfather did not believe that such information was accurate. The inmate had a significant substance abuse history, as well as a lengthy history of arrests.

Records also indicated that the inmate had been diagnosed with Adjustment Disorder with Depressed Mood in July 2016 while confined in the county jail system. Those records also indicated a history of alcohol, methamphetamine, and heroin use, as well as two previous suicide attempts. The suicide attempts apparently occurred in the community, the last of which occurred at age 16 by drug overdose. Despite this information being documented in both the Initial Health Screening and Mental Health Screening interviews, both dated August 15, 2016 at CIM RC, as well as the mental health clinician noting that inmate's "adaptive functioning was fair/poor and that he had "continuing" mental health needs, the inmate was not considered for placement in the MHSDS. He never requested any mental health services while confined at either CIM or WSP.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any significant medical issues that could be viewed as contributory to his death. Posthumous interviews with both staff and inmates did not uncover any significant information. However, in a subsequent

interview with the inmate's grandfather, the CDCR reviewer noted that his grandson had "discussed concerns about his pending transfer to the Level IV institution in a letter received a few weeks prior to his suicide. He thought this may have contributed to the suicide, in addition to the remembering that his father (did commit suicide)."

Although the Suicide Report did not contain any recommendations for corrective action through a QIP, the report noted several mental health and custody concerns. The mental health concern was related to the inmate's mental health and suicide attempt history not resulting in further consideration for entry into the MHSDS, whereas the custody concerns were related to inadequate emergency responses to the suicide. According to the CDCR reviewer, "all of the concerns noted in this review have been addressed and action plans were implemented or completed."

### 3)  **California Institution for Women (CIW)**

**Inspection**: June 19-20, 2017 (previous suicide prevention audits on March 22-23, 2016 and January 25-26, 2017). CIW housed approximately 1,907 inmates at the time of the on-site assessment.

**Screening/Assessment**: The intake screening process within the R&R unit was not observed because there were not any new inmates admitted into the facility during the two-day assessment. In addition, this reviewer observed daily rounds by two PTs assigned to administrative segregation, SHU, and PSU on June 20, 2017. The rounds in both units were unremarkable and the two PTs were observed to be correctly entering Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**: CIW had a CTC with ten designated MHCBs. A previous deficiency of hazardous faucets and sharp-edged sinks had been corrected and all MHCB rooms were now reasonably suicide-resistant.

The administrative segregation unit contained seven retrofitted cells for inmates on new intake status. Due to a low census during the on-site inspection, this reviewer observed very few new intake inmates, and all were appropriately assigned to new intake cells.

Finally, the four "swing" medical beds (Rooms 7, 8, 9, and 11) in the CTC were primarily used as **alternative housing** cells to temporarily house inmates awaiting MHCB placement. The designated cells in the TTA and PSU could also be used for alternative housing. All inmates in alternative housing within the CTC were observed on a 1:1 basis and were furnished beds. Alternative housing continued to be used extensively at CIW. For the approximate six-week period from May 1, 2017 through June 20, 2017, there were 59 inmates placed in alternative housing, with only 20 percent discharged within 24 hours. The vast majority (80 percent) of inmates averaged approximately 79 hours in alternative housing, and the overall length of stay for all 59 inmates was 67 hours.

**Observation**: Both Suicide Precaution and Suicide Watch statuses were regularly used in the CTC for patients identified as being suicidal. In addition, inmates not on suicide observation

status were required to be observed at 15-minute intervals. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of five patients (CIW 1, CIW 2, CIW 3, CIW 4, and CIW 5) on Suicide Precaution status in the CTC during an eight-hour period from 12:00 a.m. through 7:59 a.m. on June 19, 2017. The chart review found several observation checks (between three and eight per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 86 minutes in one case (CIW 5). In another case (CIW 1), there were seven violations of 25-, 38-, 17-, 53-, 36-, 19-, and 22-minute gaps between the required 15-minute intervals. Violations in the five cases were committed by multiple nursing staff.

In addition, this reviewer observed the IDTT process in the MHCB on June 19-20, 2017 and found that there were sound practices regarding approval of both possessions and privileges to patients. MHCB patients were assigned clothing that was consistent with their level of observation. A full-time RT was assigned to the unit and there appeared to be full use of both the program office and yard for patients. This reviewer observed both a book cart and radio in the yard. There also appeared to be full use of both telephone and visiting privileges, a significant improvement from the previous assessment which had found confusion and uncertainty regarding such privileges afforded to MHCB patients.

Five IDTT meetings were observed in the CTC. Overall, good discussions regarding suicide risk and safety planning to reduce future recurrence of SI were observed, although most of the discussion regarding safety planning was initiated and/or prompted by the MHCB supervisor who was accompanying this reviewer.

Finally, a review of Guard One data for a recent 24-hour period found a combined 95-percent compliance with required checks not exceeding 35-minute intervals in administrative segregation, SHU, and PSU.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS and TTA log for the period of January 1 through May 31, 2017. A total of 40 emergency mental health referrals were randomly reviewed, with required SRASHEs completed in 93 percent (37 of 40) of the cases, an improvement from the preceding assessment when only 89 percent of reviewed cases had SRASHEs.

In addition, although this reviewer observed adequate discussion of safety planning during IDTT meetings in the MHCB, subsequent review of ten charts of patients discharged from the MHCB unit found uneven formulation of safety plans to reduce continued suicidal ideation. For example, one case (CIW 6) provided the following adequate safety plan:

> 1) IP will use letter writing with peer in community as a way to keep hopeful and will start first letter w/5 days and IP will share plan with PC.

> 2) PC will encourage IP to utilize journaling, with positive reframing, as a positive coping skill to reduce anxiety/emotional distress and decrease SIB.

56

3) PC will assist IP in utilizing MH staff when feeling depressed or urges to harm self.  PC will review co-pay and staff assistance process with IP at first contact to work with IP on steps needed to make contact with PC and/or MH staff as needed for emotional distress.

4) PC will work with IP on developing an exercise program that she can use during heat warnings to maintain physical activity as this is a source of positive relaxation as IP states that 'exercise walking keeps my anxiety under control.'

5) PC will provide assertive communication skills and boundary skills to help IP effectively verbalize needs related to self-care and setting limits with peers and family.

The above safety plan was offset by another case (CIW 7) in which the clinician used the following boilerplate safety plan on multiple patients discharged from the MHCB, as well as deferred much of the safety planning to the primary clinicians of discharged patients:

1) IP will be on a 5-day step down.

2) PC will encourage and educate IP on medication compliance issues.  PC will discuss the importance of compliance with medication in stabilizing mood which will assist IP in decreasing SI.

3) PC will explore with IP adaptive approaches to distressing situations in order to increase her ability to problem solve during times of stress which lead to a crisis state.

4) PC will provide anger management education and skill building to reduce aggressive BX toward self and others and decrease negative thoughts that may lead to self-harm.

5) PC will assist inmate in developing adaptive coping skills to cope with situational stressors (anniversary dates) that may lead her to endorse suicidal ideation, and to educate IP on grief/loss which will assist inmate in decreasing negative thoughts which can lead to SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 155 cases of patients discharged from a MHCB or alternative housing placement that remained at CIW and were not transferred to

administrative segregation (where observation at 30-minute intervals was required) from March 1 through May 31, 2017. The review found that 85 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 70 percent of the custody checks recommended for discontinuation after 24 hours by clinicians. In addition, only 75 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to checks completed at 60-minute intervals, gaps in documentation, and/or checks not completed during the First Watch.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months (March through May 2017) of SPRFIT meeting minutes found that, although there were between ten and 12 participants at each meeting, meetings consistently lacked all required mandatory members or designees and quorums were not reached in any of the months. With that said, the SPRFIT at CIW remained very active and meeting minutes reflected updated corrective action plans for continued suicide prevention deficiencies, as well as regular discussion regarding SRE review, High Risk List, safety planning, Crisis Intervention Team, a planned Suicide Prevention Week, suicide prevention posters and brochures, and robust summaries of recent serious suicide attempts, among other issues. In addition, each meeting (which was 90 minutes in length) allowed time for an inmate representative of the Suicide Prevention Outreach Committee to make a brief presentation.

**Training**: According to training records, 100 percent of custody staff and 94 percent of nursing staff were certified in CPR. In addition, 98 percent of custody, 80 percent of medical, and 76 percent of mental health staff had completed annual suicide prevention block training during 2016. Finally, as of June 2017, 95 percent of mental health clinicians had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**: CIW experienced one inmate suicide during the review period. In that case (CIW 8), the inmate was found hanging by another inmate from the bunk by a shoelace in her general population cell in the Fire Camp program during the early afternoon of August 23, 2017. The inmate entered the CDCR system on January 17, 2017 to serve a four-year sentence for burglary and stalking. She was transferred to CIW on March 29, 2017 and assigned to the Fire Camp. The inmate did not incur any RVRs during her confinement and was not gang-affiliated. She had telephone and letter correspondence with her mother, who she called on the morning of her suicide.

According to limited available records, the inmate was raised by her mother following the separation of her parents when she was a young girl. Her father subsequently died when she was 25-years-old. She was a high school graduate and reportedly obtained two college degrees, but the accuracy of such information could not be verified. The inmate had a history of substance abuse which was directly related to her instant offense. She had been in a 13-year relationship with the victim of the crime, and the two had one daughter approximately 10-years-old.

The inmate had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD) as a young child and diagnosed with both Depression and Bipolar Disorder beginning at age 14. She reported taking various psychotropic medication until 2013 when she lost her medical insurance and began using methamphetamine. Prior records also indicated several residential treatment programs for substance abuse, as well as reports of threatening suicide and engaging in self-injurious behavior while attending these residential programs. Shortly after entering CDCR, the inmate was placed in MHSDS at the 3CMS level of care on February 1, 2017 based upon "medical necessity" of being previously prescribed psychotropic medication. Several days later on February 6, 2017, she met with a psychiatrist, denied any current mental health symptoms and requested a discontinuation of current medication. She was diagnosed with Stimulant Use Disorder and Alcohol Use Disorder, moderate, "in a controlled environment," and recommended "continue therapy." The following week on February 15, the inmate was removed from the MHSDS, with no documented rationale for the removal. Although her prior history of self-injurious behavior in residential treatment was known to clinicians, the inmate continued to deny any current or prior suicidal ideation and behavior. There were no other documented reports of self-harm or suicide attempts, and no SREs were completed during her incarceration. On March 29, 2017, the inmate was transferred to the Fire Camp program.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and she did not have any significant medical issues that could be viewed as contributory to her death. Posthumous interviews with staff and inmates generally found they were all "shocked" by the suicide, although one inmate peer stated that the inmate had "seemed more down" in the days leading up to her death. Several un-mailed letters found in the inmate's cell also did not give any indication of her impending suicide. The inmate's mother, who conversed with her daughter by telephone the morning of her death, subsequently told the CDCR reviewer that she did not express any suicidal ideation during the call but appeared depressed and physically exhausted from the Camp program. Following discovery of her body on August 23, 2017, the following was written in ink on her left forearm: "I'm tired…too just done."

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) A MHPC initial assessment was conducted on February 1, 2017. This assessment reference a review of the POR and included some general statements about non-compliance with mental health treatment and psychiatric medication; however, the assessment omitted information pertaining to the inmate's prior self-harm, prior diagnosis and medication (since 14), and the progression of mental health symptoms since 2013.

> 2) A February 6, 2017 psychiatric note indicated the inmate's medication would be decreased and discontinued and she should 'continue therapy.' However, the inmate was removed from the MHSDS on February 15, 2017. There was no documentation of the rationale for the decision to promptly remove the inmate from the MHSDS.

### 4)     California Institution for Men (CIM)

**Inspection**:  June 21-22, 2017 (previous suicide prevention audit was on March 24-25, 2016).  CIM housed approximately 3,637 inmates at the time of the on-site assessment.

**Screening/Assessment**:  Due to scheduling conflicts, this reviewer was unable to observe both the R&R unit intake screening by nursing staff and 31-item mental health screening by a clinical psychologist during the RC process.  There were, however, no issues raised in this area during the preceding assessment.

Daily PT rounds in the administrative segregation unit (Palm Unit) were observed on June 22.  The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.  Of note, a STRH program had been activated in the Palm Unit subsequent to the preceding assessment.

**Housing**:  Two units of the CTC at CIM contained 34 MHCBs.  All of the MHCB rooms continued to be hazardous and were not suicide-resistant.  For example, Unit 1 had rooms with small gaps between the wall and window frame, faucet handles, and ventilation grates with large holes in the ceiling (although the ceilings were high and not within easy reach) that were conducive to suicide attempts by hanging.  Unit 4 also had rooms with small gaps between the wall and window frame, faucet handles, exposed toilet chase piping, and ventilation grates with large holes in the ceiling (although the ceilings were high and not within easy reach) that were conducive to suicide attempts by hanging.  In fact, a patient attempted suicide by hanging from one of the MHCB rooms on January 6, 2017.  Each MHCB contained suicide-resistant beds.

The above deficiencies were first reported by this reviewer during an assessment in December 2013.  During the March 2016 assessment, this reviewer was informed that although a work order request was initiated by CIM officials sometime in 2014, the final design of the project had not yet been approved.  Although the headquarters work order schedule for MHCB renovation previously examined by this reviewer did not contain reference to the CIM work, CDCR informed this reviewer that the anticipated start date would be December 2016.

During the most recent assessment on June 21, 2017, this reviewer was presented with a ten-page "Central Health Services Mental Health Crisis Bed (MHCB) Modification" plan dated December 21, 2016.  The document was unsigned and CIM officials were unable to give this reviewer any estimate as to when the MHCB renovation project would commence.[20]

In addition, this reviewer found that the Palm Unit contained 13 new intake cells that had been retrofitted to be suicide-resistant.  Although the unit had a low census, with only 78 inmates in

---

[20]On January 25, 2018, the *Coleman* court ruled that "The ongoing existence of these conditions is unacceptable.  Good cause appearing, and defendants will be directed to provide to the Special Master and file with the court a detailed plan for completion of all necessary work at CIM…"  ECF No. 5762 at 2.  On February 23, 2018, defendants submitted a plan to the court which included the planned start (March 5, 2018) and the planned completion (August 1, 2018) of the CIM renovation project.  ECF No. 5795.  On September 27, 2018, defendants notified the Special Master that the MHCB unit renovations at CIM were complete.

the 185-bed capacity unit, all of the new intake cells were occupied and this reviewer observed two new intake inmates housed in unsafe, non-new intake cells.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were used on almost a daily basis at CIM. Following this reviewer's previous finding in March 2016 that inmates on alternative housing status were often placed in TTA tanks and holding cages without access to water, toilets, or showers for extended periods of time, CDCR and CIM officials relocated alternative housing options to Cypress Hall in Facility B (the RC building), while still maintaining alternative housing in Cell 175 of the CTC and any available OHU room within the CTC. This reviewer was provided data indicating that there were approximately 40 inmates placed in alternative housing during the three-month period of March 18 through June 18, 2017. However, the average length of stay in alternative housing could *not* be calculated because of the unreliability of the data. For example, data indicated that one inmate (CIM 1) was held in alternative housing for "zero" time on May 30, 2017, whereas observation sheets examined by this reviewer indicated that the inmate was actually in alternative housing from 12:35 p.m. on May 30 through 2:15 p.m. on May 31, 2017, a period of almost 26 hours. In another case (CIM 2), the inmate was listed as being held in alternative housing for "zero" time on May 17, 2017, whereas observation sheets examined by this writer indicated that he was actually in alternative housing from 3:00 p.m. on May 17 through 7:15 p.m. on May 18, 2017, a period of approximately 28 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs. In addition, patients not on suicide observation status were required to be observed at 30-minute intervals. At the time of the on-site assessment, CIM had not yet implemented EHRS, and nursing staff were still utilizing Suicide Watch/Suicide Precaution Record forms to document the observation of patients on suicide observation status. Nursing staff still maintained a poor practice of keeping the observation forms on a clipboard in the nurse's office, and not located on the outside of each patient's room door. There were two patients on Suicide Precaution status in Station 4 of the MHCB on June 22, 2017. A regional representative of the CDCR Mental Health Compliance Team (MHCT) observed nursing rounds for these two patients for approximately 90 minutes. Although nursing staff documented on the Suicide Watch/Suicide Precaution Record forms that 15 checks were completed for both patients during this time period, the MHCT representative observed nursing staff only completing four checks on both patients during this period.

In addition, although this reviewer did not observe any obvious problems with the issuance of possessions and privileges for inmates in the MHCBs during the 2016 assessment, there were problematic practices found during the current assessment. This reviewer observed eight IDTT meetings in the MHCBs on both June 21-22, 2017 and found that patients were assigned clothing that was consistent with their level of observation. There was one full-time RT assigned to the CTC, but this individual was responsible for providing services to up to 34 MHCB patients and 38 OHU patients. During several IDTT meetings, patients were either not informed about yard and/or out-of-cell privileges, or in one case (CIM 3), informed that they were not eligible for yard because they were on RC status, but because "you are no longer on Suicide Precaution status, you're eligible for groups." Both instructions were incorrect. RC patients housed in the

MHCB were eligible for yard, and all patients, regardless of their suicide observation status, were eligible for groups, pursuant to the clinical judgment of IDTT members.

Observation of the eight IDTTs in the MHCBs showed mixed results. In some cases, there was adequate discussion regarding patients' current suicidal ideation and development of coping skills to reduce such ideation, and other cases in which suicide risk and safety planning were not discussed whatsoever. Two cases symbolize the uneven practices. In the first case (CIM 4), the patient had written out his safety plan goals the previous night, discussed them with the PC in the morning, and recited them during the IDTT meeting. The patient was discharged from the MHCB that day (June 22), and the safety plan outlined on the discharging SRE stated the following:

> Pt. is optimistic about moving to the CCCMS LOC. He stated that he is willing to actively participate in individual and group sessions. Pt. was motivated to create a safety plan that includes the following items that he believes will help him to cope with overwhelming emotions: reading, exercise, and using positive affirmations that will help him remember to remain hopeful.

> Pt. plans to decrease future conflict with staff, such as pending 115. He also plans to find someone at his new facility that he feels he can establish rapport. This person may be his PC, or someone in a CCCMS group, or an inmate or teacher within an education or work-related program.

> Pt. plans to focus on the positive aspects of his life and to start working on his upcoming parole and family difficulties from a solution-focused perspective, rather than problem focused.

In the second case (CIM 5), when asked during the IDTT what the triggers to his anxiety and suicidal ideation were, as well as coping skills previously discussed with his PC, the patient stated that he could not remember and appeared to be unfamiliar with the term "coping skills." Because neither the patient nor PC had previously written down any triggers or possible coping skills, the awkward interchange ended.

A review of Guard One data for a recent 24-hour period found a combined 91-percent compliance in the Palm Unit with required checks not exceeding 35 minutes.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of December 1, 2016 through June 15, 2017. In addition, the TTA log for a similar period was also reviewed. This reviewer's sample eUHR review of 50 emergency referrals for suicidal ideation/behavior found that clinical staff subsequently completed the required SREs in 92 percent (46 of 50) of the cases, a significant improvement from the 80-percent completion rate found during the preceding assessment.

However, similar to the uneven presentation observed during the IDTT meetings, this reviewer's examination of ten sample SREs of patients released from a MHCB during April through June

2017 found a mixture of adequate safety plan strategies to reduce SI with safety plan narrative that simply deferred identification of coping skills strategies to the receiving PC.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 38 cases of inmates discharged from a MHCB or alternative housing placement that remained at CIM and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during December 2016 through May 2017. The review found that only 79 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians. Of significance, approximately 71 percent of the custody checks were recommended for discontinuation by clinicians after the maximum allowable 72 hours. In addition, only 82 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to checks completed at 60-minute intervals, gaps in documentation, and/or checks not completed during the First Watch.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings, with consistent lack of attendance from the correctional health services administrator, associate warden for health care access, or their respective designees. The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, approximately 91 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 89 percent of custody staff, 97 percent of medical staff, and 99 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of June 2017, 94 percent of mental health clinicians had completed the SRE mentoring program, 83 percent had received the seven-hour SRE training, and 96 percent had completed safety plan training. For the most part, these completion rates for training were an improvement from the 2016 assessment.

**Recent Suicides**:  CIM did not experience any inmate suicides during the review period.

### 5)     Kern Valley State Prison (KVSP)

**Inspection**:  July 11-12, 2017 (previous suicide prevention audit was on February 23-24, 2016). KVSP housed approximately 3,642 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on July 11, 2017.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, the inmate was placed in a TTM, and an officer was stationed in the hallway.  Privacy and confidentiality were maintained.

In addition, this reviewer observed daily rounds by two PTs assigned to administrative segregation and STRH units on July 12, 2017.  The rounds in both units were unremarkable and the two PTs were observed to be correctly entering Psych Tech Daily Rounds information into EHRS for each caseload inmate.

**Housing**:  KVSP had a 20-bed CTC, with 12 designated MHCBs.  Previously identified hazards (square-shaped stainless-steel sinks protruding from the wall and ventilation grates with holes larger than the industry standard 3/16-inch diameter) were corrected in November 2016.

The two administrative segregation units (ASU-1, which housed EOP and 3CMS inmates and ASU-2, which housed GP inmates) contained 13 retrofitted cells for inmates on new intake status.  During the tour of ASU-2, which contained five retrofitted cells and were all occupied, this reviewer found that two new intake inmates were housed in unsafe, non-new intake cells.

Finally, **<u>alternative housing</u>** cells to temporarily house inmates awaiting MHCB placement were primarily found in ASU-1 and SNY units, as well as occasionally in other designated cells throughout the facility.  Alternative housing was used on a daily basis, and inmates were all furnished beds and observed on a 1:1 basis.  From April 1 through June 30, 2017, there were approximately 167 inmates placed in alternative housing, and the vast majority (83 percent) was released within 24 hours.  Few inmates were held in alternative housing over 48 hours.  The overall length of stay in alternative housing for these 167 inmates was 19 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at 30-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (<u>KVSP 1</u>, <u>KVSP 2</u>, <u>KVSP 3</u>, and <u>KVSP 4</u>) on Suicide Precaution status in the CTC during an eight-hour period from 12:00 a.m. through 7:59 a.m. on July 10 or July 11, 2017.  The chart review found numerous observation checks (i.e., between 11 and 12 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 66 minutes in one case (<u>KVSP 1</u>).  The following case (<u>KVSP 4</u>) exemplifies the significance of the problem:  There were 11 violations of 18-, 28-, 33-, 21-, 27-, 18-, 29-, 32-, 25-, 23-, and 18-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff.  This reviewer was subsequently informed by nursing staff that (as part of the issue, but certainly not a full explanation) there was a shortage of available laptops to enter observation rounds into EHRS, resulting in staff making handwritten notes and entering the information when a laptop became available.

A previous problem with patients being clothed in safety smocks while being observed at 30-minute intervals had been corrected, and all patients were observed to be appropriately clothed consistent with their level of risk.  An RT was assigned to the MHCB unit for 30 hours per week

and attempted to allow each patient yard privileges at least once a week (on Thursdays). In addition, custody staff assigned to the MHCB was available to provide yard during other days. Patients were said to be afforded both visitation and telephone privileges.

Three IDTT meetings were observed in the CTC. Overall, there was adequate discussion regarding suicide risk and safety planning to reduce future recurrence of SI in each case. However, as indicated below, the adequacy of safety planning discussed during IDTT meetings was not transferred into adequately written safety plans upon discharge from the MHCB.

Finally, a review of Guard One data for a recent 24-hour period found a combined 99-percent compliance in both ASU-1 and ASU-2 with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a list of emergency mental health referrals from the MHTS for the two-month period of May and June 2017. This reviewer's sample EHRS review of 21 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in only 76 percent (16 of 21) of the cases. Completion of SREs for inmates housed in alternative housing was also audited. The sample review found that required SREs were completed in 90 percent (73 of 81) of cases.

This reviewer examined a sample of ten SRE/SRASHEs from patients released from a MHCB between April and July 2017. Only two SRE/SRASHEs were adequate. Most of the remaining assessments were written by one particular clinician assigned to the CTC at the time. The following are the entire safety plans from this clinician for five patients discharged from the MHCB:

> KVSP 5: IP will return to previous level of care. It is recommended IP treatment plan should include effective communication, 5-day FU, 3-day custody FU.

> KVSP 6: Return to CCCMS, reinforcement of positive coping skills to manage stress. Weekly contact and groups while in Ad Seg for continuity of care. Psychoeducation on the importance of alerting staff before SIB of biting self.

> KVSP 7: Return to EOP for weekly therapy and groups. Psychoeducation for reinforcement of positive coping and CBT for challenging faulty thinking and management of AH.

> KVSP 8: Placed IP in MHSDS for treatment. Ongoing contact with clinician to discuss additional coping to manage reported anxiety/stress/paranoia. Continue medication regime.

> KVSP 9: EOP level of care, increase from CCCMS.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 207 cases of inmates discharged from a MHCB or alternative housing placement that remained at KVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through June 30, 2017. The review found that only 48 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 72 percent of the custody checks recommended for 48 hours or more by clinicians. In addition, only 79 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation and/or checks not completed during the First Watch.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu Bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings. The meeting minutes were otherwise unremarkable.

**Training**: According to training records, approximately 95 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 98 percent of custody staff, 92 percent of medical staff, and 93 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of June 2017, only 47 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and only 72 percent had completed safety plan training.

**Recent Suicides**: KVSP experienced one inmate suicide during the review period. In that case (KVSP 10), the inmate was found hanging from the top bunk by a sheet in his GP cell shortly before midnight on March 21, 2017. The inmate entered the CDCR system in February 2010 to serve a 77-year-to-life sentence for first-degree murder and attempted murder. He was transferred to KVSP in January 2013. The inmate incurred four RVRs during his confinement, the most recent of which occurred in April 2015 for possession of a controlled dangerous substance. He was not known to be gang-affiliated. The inmate had good support from family, including monthly visits from his grandmother, periodic visits from his mother, sister, and son; as well as letter correspondence.

According to available records, the inmate had a dysfunctional childhood, his father was in prison and he was raised initially by his mother, and then by his grandparents when his mother remarried, and he did not get along with the stepfather. The inmate was never married and was estranged from the mother of his 4-year-old son at the time of the instant offense. He had a history of substance abuse beginning at age 14 and his addiction escalated following two serious motorcycle accidents when he was 21.

The inmate did not have a history of any mental health treatment in the community. Upon entry into CDCR, the inmate answered affirmatively to several questions which triggered further mental health evaluation for a possible mood disorder. He was initially diagnosed with Polysubstance Dependence, Hallucinogen Persisting Perception Disorder, with a rule out of Bipolar Disorder. The inmate denied any current SI, and records indicating two prior suicide attempts in the community were unconfirmed. He was discharged from the MHSDS several months later in July 2010 when he refused further treatment and was found to be stable. The inmate's final contact with mental health staff occurred in January 2012 following a custody referral. He was found not to meet the criteria for MHSDS.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although he continued to suffer from severe chronic back and knee pain sustained from motorcycle accidents at age 21, these medical issues were not viewed as proximate causes of his death, but perhaps as contributory. In addition, there was information found in his cell after the suicide to indicate he might have accrued gambling and/or drug debts that he could not repay. In a suicide note found in the cell and addressed to his grandmother, the inmate wrote: "I'm sorry but I just can't do this anymore. I am sick of being a burden and I need to be free and see what comes next. I made it further than I ever thought I would. Thanks to your undying love and support."

The Suicide Report contained three recommendations for corrective action through a QIP:

> 1) While the check boxes on the SRAC (11/10/2010) and SRE (11/23/2011) were marked correctly and individualized risk factors appeared to be considered in the assessment of risk, the second pages containing the mental status exam, justification of risk, and safety planning/risk reduction were poorly completed on both evaluations. The suicide risk assessments contained inadequate case and risk formulation and safety planning/risk reduction. Further, despite improvements in policies, procedures and trainings, insufficient case/risk formulation and safety planning continues to be an ongoing statewide issue.

> 2) The CDCR 837s submitted by responding staff identifies a cut down kit was not taken to the scene of the emergency in its entirety.

> 3) Activation of the Emergency Medical System (calling 911) did not take place until approximately five minutes into the emergency which caused a delay in appropriate medical response.

### 6)    __North Kern State Prison (NKSP)__

**Inspection**: July 13-14, 2017 (previous suicide prevention audit was on February 25-26, 2016). NKSP housed approximately 4,583 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on July 13, 2017. The nurse was observed to be asking all of

the questions and correctly entered the information into the EHRS.  The 31-item mental health screening by a psychologist in the RC was also observed and found to be thorough.  Doors to both the nurse's and clinician's offices were closed during the processes, thus ensuring privacy and confidentiality.

Daily PT rounds in the administrative segregation unit (D-6) were observed on July 13.  The rounds were unremarkable, and the PT correctly entered the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  NKSP had a 16-bed CTC, with ten designated MHCBs.  A previously identified hazard of ventilation grates with holes larger than the industry standard 3/16-inch diameter were corrected prior to this current assessment in October 2016.

In addition, the administrative segregation unit (D-6) had a total of 13 new intake cells that had been retrofitted to be suicide-resistant.  This reviewer observed that all new intake inmates were correctly housed in new intake cells.

Finally, **alternative housing** cells continued to be designated in A-4 Unit to temporarily house suicidal patients prior to transfer to a MHCB, although some were occasionally held in the administrative segregation unit.  This reviewer observed two inmates on alternative housing status on July 13.  Both were being observed on a 1:1 basis and bunks were found in each cell.  During the three-month period of May 1 through July 10, 2017, there were approximately 101 inmates placed in alternative housing, with 91 percent released within 24 hours.  Only one inmate was held more than 48 hours.  The overall length of stay in alternative housing for the 101 inmates was 16 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were required to be observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (NKSP 1, NKSP 2, NKSP 3, and NKSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on July 13, 2017.  The chart review found numerous observation checks (between nine and 15 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 59 minutes in one case (NKSP 1).  The following case (NKSP 4) exemplified the significance of the problem:  There were nine violations of 18-, 17-, 16-, 19-, 17-, 23-, 37-, 32-, and 36-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff.

A previous problem with patients being clothed inconsistent with their level of suicide risk, as well as routinely denied telephone and visiting privileges, had been corrected.  An RT was assigned to the MHCB unit for 40 hours per week and utilized the yard on a daily basis.  Review of pertinent records indicated that telephone and visiting privileges were authorized, and yard was found to be offered to patients several times per week.

Five IDTT team meetings were observed in the CTC.  Overall, there was very uneven discussion regarding patients' current suicide risk and safety planning.  In one case (NKSP 5), the patient

was on Suicide Watch status and had been clothed in a safety smock for eight consecutive days without any explanation or discussion of his suicide risk. There was also no discussion regarding a possible psychiatric inpatient program (PIP) referral until outside reviewers raised the issue. In another case (NKSP 2), the patient had been in the CTC since June 29, 2017, a period of 16 days. He denied any suicidal ideation, had been given full-issue clothing for several days, but still complained of depression and requested to stay in the MHCB for another week. The request was granted, and he was subsequently discharged back to the yard (and not higher LOC) five days later on July 19, 2017, for a total length of stay of 20 days. His discharge safety plan is discussed below. In a third case (NKSP 1), the inmate was discharged during the observed IDTT team meeting on July 14 with no discussion regarding safety planning.

A review of Guard One data for a recent 24-hour period found 99-percent compliance with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a list of emergency mental health referrals from the MHTS for the period of January 1 through June 30, 2017. This reviewer's sample EHRS review of 42 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SREs in only 83 percent (35 of 42) of the cases. Completion of SREs for inmates housed in alternative housing was also audited. The sample review found that required SREs were completed in all (20 of 20) cases.

This reviewer examined a sample of 15 SREs from patients released from a MHCB between April and July 2017. Most of the safety plans contained in the discharging SREs were not adequate, with several written by the same clinician. The following safety plan was duplicated by this clinician in at least three cases (NKSP 1, NKSP 2, and NKSP 6) examined by this reviewer:

> Processing material pertaining to coping with long sentence and finding meaning to living effectively while incarcerated; increase functioning at a lower level of care through stability of mood. I/P will be able to control and self-sooth when in distress and will be able to name coping skills, e.g., walking away, taking deep breaths, talking to clinicians, and know when to apply these strategies prior to being placed in EOPS LOC. I/P is to be medication compliant 90% of the time. CBT interventions to address coping skills and include psychoeducational on importance of medication compliance and how to implement strategies that aid with tolerance of distressful affect in a healthy manner.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 205 cases of patients discharged from a MHCB or alternative housing placement that remained at NKSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1, 2017 through June 30, 2017. The review found that only 75 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 81 percent of the custody checks recommended for 48 hours or more by clinicians. In addition, only 85 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation during both First and Third Watch.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings. However, it was noteworthy that both the Warden and CEO were (not required members) active participants in each of the meetings. The meeting minutes were otherwise unremarkable.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, approximately 99 percent of custody staff, 97 percent of medical staff, and 90 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of June 2017, only 84 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and no clinicians were credited with completing safety plan training because adequate records were not kept.

**Recent Suicides**: NKSP did not experience any inmate suicides during the review period.

### 7)    Richard J. Donovan Correctional Facility (RJD)

**Inspection**: July 25-26, 2017 (previous suicide prevention audit was on October 25-26, 2016). RJD housed approximately 3,798 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed several new admissions during the intake screening process in the R&R unit on July 25, 2017. The nurse's office that was primarily utilized for intake screening had been renovated and enlarged the previous year, and had a large window to enhance visibility, as well as two options for egress. The nurse was observed to be asking all of the required questions and entering the information on a hard copy of the Initial Health Screening form. (Of note, RJD had not yet implemented EHRS at the time of the on-site assessment.) During the screening process in the primary nurse's office, the door remained closed, with an officer stationed in an outer room which served as another nurse's station. When there were multiple inmates to be processed, as there was on July 25, this reviewer observed that the outer room was also utilized to conduct intake screening. When both rooms were utilized, this reviewer observed an officer escort a second inmate through the outer room into the primary nurse's office during the screening process, thus interrupting the screening and compromising privacy and confidentiality. This practice could be corrected simply by requiring the escorting

70

officer to bypass the outer room and walk through a short corridor that connects to the primary nurse's office.

Daily PT rounds in the B-6 and B-7 administrative segregation units were observed on July 25. The rounds were unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms at cell-front on all caseload inmates.

**Housing**:  RJD had 12 MHCBs, as well as two swing beds.  All 14 rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.

Both administrative segregation units (B-6 and B-7) each contained 12 retrofitted new intake cells.  During inspection of each unit, this reviewer observed that all new intake inmates were housed in new intake cells.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was extensively used at RJD.  Most inmates were placed in the B-7 administrative segregation unit (which was used for both 3CMS and general population) but could also be housed in other designated locations.  On July 25, there were approximately 12 inmates on alternative housing status in B-7.  This reviewer was provided data that indicated 283 inmates were placed in alternative housing from April 6 through July 21, 2017.  The vast majority (74 percent) were housed over 24 hours, including approximately 29 percent held between 25 and 47 hours, 25 percent over 48 hours, and 20 percent over 72 hours.  All inmates were observed to be provided bunks and observed on a continuous 1:1 basis.  The overwhelming majority (90 percent) of inmates housed in alternative housing were later placed in a MHCB. The overall length of stay in alternative housing for these 283 inmates was 50 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff.  This reviewer was not able to verify the accuracy of observation rounds because RJD had not yet implemented EHRS at the time of the on-site assessment.

This reviewer observed four IDTT meetings in the MHCB unit on July 26.  The treatment team was well represented by mental health, medical, and custody staff.  Overall, there was very good discussion in most cases regarding current suicide risk and safety planning for those patients where SI was the primary concern.

A previous problem of non-suicidal patients not being given "full-issue" clothing had been resolved following the previous assessment, and all patients were observed to be appropriately clothed consistent with their level of suicide risk.  This reviewer did not observe any problems related to MHCB privileges, and observed a patient using the telephone during the inspection. RJD continued to demonstrate a very proactive yard program within the MHCB unit that included an enthusiastic full-time RT that tried to encourage patients to attend yard twice a week. Music, books, magazines, and photocopies of daily newspapers continued to be available to patients that attended yard.

71

A review of Guard One data for a recent 24-hour period found a combined 98-percent compliance in both B-6 and B-7 administrative segregation units with the required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period January 1 through June 30, 2017.  This reviewer's subsequent sample eUHR review of 40 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 93 percent (37 of 40) of the cases.

This reviewer examined a sample of ten SREs from patients released from a MHCB between May through July 2017.  Most contained an adequate safety plan for reducing SI.  For example, in one case (RJD 1), the safety plan stated the following:

> D/C to EOP LOC.  Start MH 5-day follow-up procedures.  Add up to 10+ hours of groups including life skills, conflict resolution and stress management.  Add to high risk list for at least 14 days to monitor for transition to ASU and to EOP. Teach IP warning signs of stress (emotional, physical and psychological), as well as coping skills for stress including breathing techniques/meditation, mindful drawing, encourage singing, puzzles for distraction, SMART goal setting, and techniques to manage worrying (such as create a 'worry' period).  Teach coping skills to reduce impulsivity to reduce future 115s such as counting, breathing or distraction.  Teach DBT distress tolerance skills to reduce possible distress from receiving 115, such as positive self-talk, engaging in activities, or prayer. Monitor and encourage regular contact with family/support system.  Inmate has already been referred and accepted to DSH-ICF for further support.

The challenge at RJD was that, although clinicians have continued to demonstrate adequate safety planning, there were often problems with concordance between safety plans contained within discharging SREs and safety plan summary sections contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms.  For example, the safety plan contained on the first day of the 5-Day Follow-Up Progress Note for the above case (RJD 1) stated the following:

> MH staff will continue 4 more days of follow-up, or more, as needed.  His dx now is adjustment DO with depressed mood.  He has no rx'd psychotropic meds now, that several rx'd medical meds.  He will continue taking them as rx'd and ask for meds' eval as needed.  He will be monitored by CO staff hourly while in Ad Seg. He will get and use a pencil and puzzles as distractions from his reported boredom.  He will ask for additional help as needed.  He knows how to do so.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be

continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 208 cases of inmates discharged from a MHCB or alternative housing placement that remained at RJD and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through June 30, 2017.  The review found that 78 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 75 percent of the custody checks recommended for the full 72 hours of observation.  In addition, 89 percent of the "custody checks" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes from April through June 2017 found that quorums were achieved during April and May.  In fact, the meetings averaged between 19 and 27 participants each month.  Meeting minutes included corrective action plans from this reviewer's previous assessment.

**Training**:  According to training records, 100 percent of both custody and nursing staff were currently certified in CPR.  In addition, 100 percent of custody staff, 79 percent of medical staff, and 93 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of June 2017, 97 percent of mental health clinicians had completed the SRE mentoring program, 96 percent received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  RJD experienced one inmate suicide during the review period.  In that case (RJD 2), the inmate was found hanging from the top bunk by a sheet in his SNY cell during the morning of May 3, 2017.  The inmate entered the CDCR system in November 2001 to serve a 16- year-to-life sentence for second-degree murder (which occurred at age 16).  He was transferred to RJD in April 2015.  The inmate incurred eight RVRs during his 16-year incarceration, the most recent of which occurred in 2013 for possession of dangerous contraband.  He was not known to be gang-affiliated but was placed in SNY in July 2010 after incurring drug debts.  The inmate had good support from family, including from his girlfriend and mother, who wrote letters to him several times per week and had regular telephone contact.

According to available records, the inmate had a dysfunctional childhood that included domestic violence between his parents.  His mother suffered from depression and had previously attempted suicide.  The inmate also experienced mental illness as a teenager, including hospitalization on two occasions for anxiety and depression.  Upon entry into CDCR in 2001, he was periodically seen by mental health staff, but not placed in the MHSDS until August 2010 (at 3CMS).  The inmate had been a victim of a stabbing a month earlier and began to have problems with sleeping, poor appetite, and social withdrawal.  He was initially diagnosed with Dysthymic Disorder.  During the next few years, the inmate continued to report depressed mood, anxiety,

and chronic pain secondary to the stabbing.  He also spent time preparing for his upcoming parole hearing.  In November 2015, the inmate appeared before the BPH and was denied parole consideration for three years.  Two months later on January 17, 2016, he was transferred to an outside hospital following a drug overdose.  Upon his return, documentation described his thought process as "scattered, paranoid, and he reported suicidal ideation with a wish to die, claiming he was severely depressed."  The inmate initially admitted, but subsequently denied, that the overdose was a suicide attempt.  (Previous records had also indicated that he attempted suicide by overdose at age 16.)  He was placed in a MHCB at CSP/Sac and continued to display bizarre behavior.  The inmate told a psychiatrist that he did not want to begin psychotropic medication because he was preparing for another parole hearing and believed he "might not parole if made EOP."

The inmate was later discharged from the MHCB in February 2016 and returned to RJD with a diagnosis of Psychotic Disorder Not Otherwise Specified (NOS) and Mood Disorder NOS, Rule-out Schizoaffective Disorder and Major Depressive Disorder, Recurrent with Psychotic Features, Amphetamine and Opiate Abuse.  Although prescribed psychotropic medication, the inmate refused to take it.  He continued to exhibit bizarre and delusional behavior, culminating in a detailed letter to the FBI in which he alleged that a mind control machine had been stolen from a local FBI office and placed on the grounds of RJD.  A recommendation to increase the inmate's level of care to EOP was considered, but ultimately rejected by the IDTT, citing that he remained able to maintain normal programming on the 3CMS yard.

The inmate last met with his PC on February 16, 2017, with the clinician noting that he had been stable and working on self-help packets.  The progress note stated that the plan was to continue treatment at 3CMS level of care and consider removal from MHSDS at the next IDTT if the inmate remained stable without medication, but, according to the CDCR reviewer in this case, "In terms of meeting treatment goals, the inmate's progress was mixed at best.  Although he did complete several take-home packets on self-help topics, including substance abuse, and did not attend/complete substance abuse groups, there was minimal evidence in the PC's documentation regarding any interventions to address his delusional thought process.  Instead, the PC opined 'it is probably counterproductive to confront his delusional thinking.'"

The CDCR reviewer did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although he continued to suffer chronic abdominal pain sustained from the 2010 stabbing, this medical issue was not viewed as a proximate cause of his death.  Posthumously reviewed telephone conversations between the inmate and his mother and girlfriend offered contrasting indications of his behavior.  For example, in January and February 2017, the inmate often expressed suicidal ideation and hopelessness during the telephone calls, whereas during April 2017, "his affect was calm and he did not seem to be stressed or agitated, and there was minimal evidence of delusional thought content" or suicidal ideation.  Of note, however, the inmate postponed his parole hearing on April 3 and updated his Death Notification list to include both his mother and sister on May 1, two days before his death.  The CDCR reviewer concluded that:

> It is not known why he chose to end his life, as he was actively making plans for the future; this included completing self-help treatment, making arrangements for

transitional housing, and arranging active employment opportunities. However, he also had absolutely no insight into his mental illness and did not actively use mental health services or psychotropic medication in a way that would actually benefit him. He believed mental illness was a stigma that would follow him and hinder his ability to be released from prison, which is a large part of why he refused psychiatric medication. Based on telephone calls recovered postmortem, it is likely the inmate's mother consulted with his attorney and shared her concerns about his delusional system and current mental state, which may have prompted his waiving his right to appear at the BPH scheduled for May 2017. What remains unclear is why the information about his suicidal thinking and psychiatric decompensation was not shared with the prison's mental health staff.

The Suicide Report contained seven recommendations for corrective action through a QIP:

1) Activation of the Emergency Medical System (calling 911) did not take place until approximately 10 minutes into the emergency which cause a significant delay in appropriate medical response. IMS P&P Chapter 12: Emergency Medical Response Instructions indicate that 'All Staff Have the Authority to Initiate a 911 Call for Emergency Medical Services (EMS).'

2) The documentation surrounding treatment planning on September 8, 2016 at RJD and treatment outcomes was insufficient and problematic.

3) The SRE completed on January 17, 2016 at RJD contained several errors and did not accurately incorporate chronic and acute risk factors. As a result, the formulation of risk appeared to have been underestimated.

4) HQ: A final post MHCB discharge SRE was due in February 2017. This SRE did not occur due to a due dates error so that clinician was unaware that an SRE was due at that time.

5) The SRE completed for the inmate at SAC on February 16, 2016 upon discharge from MHCB also did not accurately reflect true chronic and acute risk factors. Additionally, there were multiple concerns with the documented safety/risk reduction plan.

6) There was no mental health progress note from SAC on February 13, 2016 found in the eUHR chart, or data entry in MHTS reflecting a contact for that date. Per MHSDS *Program Guide*, Chapter 5 (15-5-13): In MHCB, "an inmate-patient's condition shall be assessed and monitored daily by the treating clinician, either a psychiatrist or a psychologist."

7) The inmate did not seek appropriate mental health treatment due to a misconception that his mental health issues might negatively impact his possible release from prison.

### 8)    **California Health Care Facility (CHCF)**

**Inspection**:  August 8-9, 2017 (previous suicide prevention audit was on September 1-2, 2016).
CHCF housed approximately 2,385 inmates at the time of the on-site assessment.

**Screening/Assessment**:  The intake screening process within the R&R unit was not observed
because there were not any new inmates admitted into the facility during the two-day
assessment.  Due to a scheduling conflict, daily PT rounds in the administrative segregation unit
could not be observed during the on-site assessment.

**Housing**:  CHCF had 98 MHCBs in housing units A1A, A1B, and A2B.  All were suicide-
resistant and did not contain any obvious protrusions which could be used in a hanging suicide
attempt.  The administrative segregation unit had eight retrofitted suicide-resistant cells
designated for new intake inmates.  During the inspection, this reviewer observed that all new
intake inmates were housed in new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and
awaiting MHCB placement were used on almost a daily basis at CHCF.  Various units were
utilized for alternative housing, including, but not limited to, D1A, D1B, 3CA, and E1A.  Each
inmate was provided a stack-a-bunk (when not assigned to a cell with a pre-existing bunk) and
observed on a continuous 1:1 basis.  From May 1 through July 30, 2017, there were
approximately 101 inmates placed in alternative housing, and the vast majority (81 percent) was
released within 24 hours.  Few inmates were held in alternative housing over 48 hours.  Most
were subsequently placed in a MHCB.  This reviewer also sampled 13 cases and verified that
each had required a SRE/SRASHE completed, an improvement from the previous assessment
when only 70 percent of SREs were completed.  The overall length of stay in alternative housing
for these 101 inmates was 19 hours.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were being used in the
MHCB units.  In addition, patients not on suicide observation status were observed at 15-minute
intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation
rounds by reviewing the EHRS charts of six patients (CHCF 1, CHCF 2, CHCF 3, CHCF 4,
CHCF 5, and CHCF 6) on Suicide Precaution status in the three MHCB units during an eight-
hour period from 12:00 a.m. through 7:59 a.m. on August 8, 2017.  The chart review found
numerous observation checks (i.e., between eight and 13 per patient) that were in excess of
required 15-minute intervals, with the longest gap between checks being 42 minutes in one case
(CHCF 2).  The following case (CHCF 4) exemplified the significance of the problem:  There
were 11 violations of 23-, 16-, 27-, 21-, 31-, 22-, 19-, 23-, 33-, 16-, and 16-minute gaps between
the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff in
all three MHCB units.  Of note, similar deficiencies in observation rounds by nursing staff were
found during the previous assessment when handwritten Suicide Watch/Suicide Precaution
Record observation forms were used.

During this reviewer's previous assessment in 2016, numerous deficiencies were observed
during the IDTT team meetings in all three MHCB units, including the quality of discussion
regarding each patient's current observation level and safety planning, confusion regarding

clothing and privilege allowance, and standing orders for Suicide Precaution status at ten-day intervals. This on-site assessment found significant improvement. This reviewer observed eight IDTT meetings in all three MHCB units on August 8-9. All of the observed IDTTs were well represented by custody, medical, and mental health staff. (RTs were not represented only because they were conducting groups at the time of the meetings.) Three of the eight IDTT meetings involved patients who were being discharged from the MHCB, and two of the three cases included an adequate discussion of safety planning for reducing SI. With one exception involving a team decision not to allow a patient whose mother died two weeks earlier a telephone call because "maximum custody precludes telephone use," there was good use of both clothing and privilege allowance privileges. In addition, standing orders for Suicide Precaution status at ten-day intervals were not found in any of the reviewed charts.

A review of Guard One data for a recent 24-hour period in the administrative segregation unit found 98-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from January 1 through July 31, 2017. This reviewer's sample EHRS review of 40 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 93 percent (37 of 40) of the cases. This was an improvement from the previous assessment when only 84 percent of SREs were completed.

This reviewer examined a sample of ten SREs from patients released from a MHCB between June and July 2017. Most of the safety plans to reduce SI in each SRE were very problematic. For example, the safety plan for a patient (CHCF 7) who had been placed in a MHCB for ten days was the following:

> Discharge to EOP; needs assistance to live in a dorm setting as a level II inmate, may have a diagnosable anxiety disorder; Initiate 5-day follow-up upon return to EOP.

The safety plan for another patient (CHCF 8) simply summarized *Program Guide* requirements (as well as misinterpreted other policies):

> 1) Patient will be placed on a 30-day Alert (for hoarding prescription meds) and monitor for any signs of OD
> 2) Patient will be returned to MHCB should he engage in or give any indications of SI, intent, plan
> 3) Patient will be discharged with a 30-day supply of mental health medications
> 4) Patient will be placed on a 5-day Suicide Precaution/Watch at sending institution to ensure patient stability
> 5) Patient will be seen by his PC x 1 per week at EOP LOC
> 6) Patient will participate and structured therapeutic groups x 10 per/week
> 7) Patient will be seen by psychiatry for medication monitoring and follow-up treatment

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 77 cases of patients discharged from a MHCB or alternative housing placement that remained at CHCF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January through June 2017. The review found that only 42 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most of the custody checks recommended for only 24 hours by clinicians. In addition, only 62 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the problems were related to clinicians either not initiating the 7497 process or failing to sign the forms which authorized discontinuation of the checks, and correctional officers either conducting checks at 60-minute intervals or failing to conduct checks for significant amounts of time.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (May through July 2017) found that quorums were reached in only one month (July). This reviewer was presented with recent memorandums from both the SPRFIT coordinator and CMH regarding corrective action plans from this reviewer's previous assessment. Meeting minutes were otherwise unremarkable.

**Training**: According to training records, 98 percent of custody staff and 100 percent of medical staff were currently certified in CPR. In addition, 93 percent of custody staff, 98 percent of medical staff, and only 86 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of July 2017, 87 percent of mental health clinicians had completed the SRE mentoring program, 90 percent had received the seven-hour SRE training, and only 80 percent had completed safety plan training.

**Recent Suicides**: CHCF did not experience any inmate suicides during the review period.

### 9)    Mule Creek State Prison (MCSP)

**Inspection**: August 10-11, 2017 (previous suicide prevention audit was on September 27-28, 2016). MCSP housed approximately 3,619 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on August 10. The nurse was observed to be asking all of the required questions and entering the information on a hard copy of the Initial Health Screening

form. (Of note, MCSP had not yet implemented EHRS at the time of the on-site assessment.) The door to the new nurse's office was closed, with the officer stationed outside providing security.

In addition, this reviewer observed daily PT rounds in the administrative segregation units (Buildings 12 and 13) on August 11. The rounds were unremarkable, and the PTs correctly completed a hard copy of the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**: MCSP had a ten-bed CTC, with eight designated MHCBs that were suicide-resistant and not containing any obvious protrusions which could be utilized in a hanging suicide attempt. Further, Building 12 (housing mostly administrative segregation EOP and some 3CMS inmates) had approximately 30 retrofitted suicide-resistant cells designated for new intake inmates, an increase of 14 new intake cells from the previous assessment. During inspection of this unit, all new intake inmates were appropriately housed in new intake cells, a significant improvement from several previous assessments. Building 13 (housing both administrative segregation 3CMS and general population inmates) no longer was utilized for new intake.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in Building 13, as well as other designated locations. Alternative housing was used on a daily basis at MCSP, and inmates were all furnished beds and observed on a 1:1 basis. From May 1 through July 31, 2017, there were approximately 154 inmates placed in alternative housing, and the overwhelming majority (94 percent) were released within 24 hours. The overall length of stay in alternative housing for these 154 inmates was 14 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB. In addition, patients not on suicide observation status were required to be observed at 30-minute intervals by nursing staff. At the time of the on-site assessment, MCSP had not yet implemented EHRS, and nursing staff were still utilizing Suicide Watch/Suicide Precaution Record forms to document the observation of patients on suicide observation status. Observation of MHCB patients was problematic. At approximately 8:08 a.m. on August 11, 2017, a colleague of this reviewer arrived at the MHCB and reviewed the Suicide Watch/Suicide Precaution Record forms of five patients (MCSP 1, MCSP 2, MCSP 3, MCSP 4, and MCSP 5) who were required to be observed at either 30-minute (MCSP 1 through MCSP 4) or 15-minute intervals (MCSP 5). Each observation form was located on the door of each MHCB room. The initial review at 8:08 a.m. found the last documented check for MCSP 1 had been at 6:50 a.m., a period of 78 minutes. The last documented check for MCSP 2, MCSP 3, and MCSP 4 had been at 7:20 a.m., a period of 48 minutes. The last documented check for MCSP 5, who was on Suicide Precaution status, was at 7:22 a.m., a period of 46 minutes. As this reviewer's colleague was exiting the MHCB unit at approximately 8:35 a.m., the same five Suicide Watch/Suicide Precaution Record forms were again reviewed and found to have been falsified with notations suggesting that checks were performed at 8:00 a.m. Similar problems with the correct documentation of observation rounds were also found during this reviewer's two previous assessments.

A previous problem of MHCB patients having to choose between an out-of-room activity of either yard or the program office had been corrected. An RT was assigned to the MHCB unit for 40 hours a week and utilized both the program office and yard for out-of-room activities. In addition, documentation indicated that patients were being offered both telephone and visiting privileges following their first IDTT meeting.

Three IDTT meetings were observed in the MHCB unit on August 10. The meetings were well attended by custody, medical, and mental health personnel. Two of the IDTTs involved complex cases in which safety planning was either not relevant or appropriate for discussion. The third case (MCSP 6), however, involved a patient who was admitted eight days earlier for suicidal ideation and grave disability, and the treatment team decided to discharge the patient without any discussion of a safety plan to reduce SI. The patient's subsequent discharging SRE dated August 10 contained the following safety plan that was not discussed during the IDTT:

> 1) IP should be closely monitored. IP is currently medication compliant and appears to have good insight to his medication needs.
>
> 2) IP was given a "coping card" to help remind him of coping skills he can use when he becomes upset. EOP PC should work with IP on expanding items on this card.
>
> 3) IP enjoys recreation activities both in and out of cell to help distract IP from negative thoughts/activity. EOP team should work with IP on expanding activities/protective factors.
>
> 4) IP has a long hx of trauma and substance abuse that he would benefit from processing in therapy sessions.
>
> Protective factors that mitigate risk include: family support-mother, hobbies (reading, writing, coloring, music), some insight, and is motivated for treatment.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation units found almost 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of February 1 through July 31, 2017. A subsequent sample eUHR review of 40 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in 95 percent (38 of 40) of cases.

This reviewer examined a sample of ten SREs for patients released from the MHCB between May and July 2017. In sum, although there were improvements from prior assessments in efforts to develop adequate safety plans, as well as examples of more consistent safety plan summaries contained within accompanying Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms, such efforts were collectively uneven in the sample documentation. For

example, the first day Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form for the above referenced case (MCSP 6), dated August 11, stated the following:

> IP stated he knows he can contact custody staff if he feels he may harm himself.
> He was informed that his IDTT was probably going to be next week Thursday.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 254 cases of inmates discharged from a MHCB or alternative housing placement that remained at MCSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through July 31, 2017. The review found that only 45 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most custody checks recommended for only 24 hours by clinicians. In addition, 85 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Problems found related to clinicians discontinuing the checks in less than the required 24 hours or failing to sign the forms which authorized discontinuation of the checks at 24 hours, and correctional officers failing to conduct checks for significant amounts of time.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings. Meeting minutes reflected reference to corrective action plans in response to this reviewer's previous assessment and were otherwise unremarkable.

**Training**: According to training records, 99 percent of custody staff and 94 percent of nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 96 percent of medical staff, and 97 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of July 2017, 100 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 96 percent had completed the safety plan training.

**Recent Suicides**: MCSP experienced two inmate suicides during the review period. In the _**first**_ case (MCSP 7), the inmate was found exsanguinated in his SNY cell during the late morning of June 28, 2017. He had entered the CDCR system (for a fifth term) on June 6, 2013 to serve a 98-year-to-life sentence for two counts of attempted robbery and dissuading a witness. The inmate was transferred to MCSP on June 26, 2015. He was subsequently placed in SNY for safety concerns relating to both drug debt and being a gang dropout. The inmate had two RVRs during

his confinement, the most recent of which occurred on March 29, 2017 and involved possession of alcohol. He had been married for 34 years and had four children and five grandchildren. The inmate had some family support, including irregular telephone calls with his wife and one daughter, but such calls ended approximately one week before his suicide.

According to available records, the inmate had a very traumatic childhood that included both physical and sexual abuse, as well as neglect. He was raised by a grandparent but became involved with both substance abuse and the criminal justice system at age 12. The inmate received mental health treatment during most of his earlier CDCR terms, and generally treated for depressive symptoms, mood swings, anger, and impulsivity. His diagnoses included Depressive Disorder NOS, Major Depressive Disorder, Recurrent and Bipolar Disorder. Prior CDCR terms also included multiple MHCB and Department of State Hospitals (DSH) placements. During his most recent confinement, the inmate was placed in a DSH-Acute Psychiatric Program (APP) from February through May 2014, followed by Intermediate Care Facility (ICF) treatment from May 2014 through June 2015 when he returned to MCSP at the EOP LOC. He remained in EOP until his death, with final diagnoses of Major Depressive Disorder, Recurrent, Moderate/ Mild, Polysubstance Dependence, in remission in a controlled environment, Borderline Personality Disorder, and Antisocial Personality Disorder.

The inmate had a significant history of suicidal behavior, which included a suicide attempt at age 15 when he attempted to shoot himself with a gun. At least five other suicide attempts occurred in the community and included cutting himself on the wrist, hanging himself in his home, and multiple medication overdoses. There were also unconfirmed reports of a suicide attempt by hanging in the county jail in 1996, as well as a serious suicide attempt at CSATF in February 2014 by severely lacerating himself on the neck, resulting in MHCB placement. The inmate's most recent SRE (dated January 19, 2017) assessed both his chronic and acute risk for suicide as being "moderate." Although placed on the MCSP's "High Risk List," such placement did not result in an increase in the frequency of mental health services.

Although the inmate had several medical problems, including a seizure disorder, Hepatitis C, and chronic neck and shoulder pain, these issues were not viewed by the CDCR reviewer in this case to be contributory to the suicide. However, the reviewer found several probable precipitants to the suicide, including notification to the inmate in December 2016 that some of his pain medication was being discontinued, notification from his wife in April 2017 that she was filing for divorce, and a brief telephone call with his daughter in mid-June 2017 when she informed him not to call anymore. According to the CDCR reviewer, "As he was closest to his estranged wife and daughter, their abandonment was likely paramount to his decision to end his life. He freely admitted that feelings of rejection had spurred prior suicidal attempts; it is a plausible conclusion this perceived abandonment on the part of his family coupled with illicit substance use, hopelessness over his life-term, and ongoing physical pain likely triggered his suicide."

The Suicide Report contained seven recommendations for corrective action through a QIP:

> 1) The primary clinician's weekly documentation in the form of SOAPE notes is problematic. Although the subjective and objective sections were properly updated weekly, the assessment, plan, and education sections were not

consistently updated after each submission. Rather, the assessment section contained only a diagnosis without an appropriate clinical assessment/evaluation of the presentation. Additionally, an overall review of the prior six months of weekly documentation showed almost no change in the plan and education sections, thus making it difficult to track what was being addressed in treatment, what interventions were being used, and the inmate's progress.

2) The SRE completed on January 19, 2017 is problematic as the PC checked 14 of 16 boxes under chronic risk, noted five previous serious suicide attempts, yet only found the inmate to have moderate chronic risk. The justification for choosing moderate risk (as opposed to high chronic) was not well developed on the second page, except to say that moderate risk was chosen due to his sentence and prior lethal suicide attempt in the past. Further, the safety/risk reduction plan section was underdeveloped and did not accurately incorporate his specific risk factors (which had led to prior attempts); these risk factors included perceived (or actual) abandonment by family members, substance use, and life-term without likelihood for parole.

3) The overall estimation of the inmate's suicide risk appears to have been underestimated given the early onset and severity of his prior suicide attempts. Despite this underestimation of risk, the inmate was placed on the High Risk List for suicide……a high risk log is to be maintained and presented for discussion by the SPRFIT; however, the LOP does not speak to the procedures and function of the HRL. It is unclear if his placement on this list provided additional resources or monitoring beyond his EOP LOC.

4) It is unclear why the inmate was not elevated for a higher LOC over the last three to six months of his life secondary to increase reports of SI, decreased programming, divorce papers resulting in feelings of abandonment, and possible reemergence of substance abuse.

5) On June 22, 2017, the inmate met with his PC and reported having "suicidal thoughts and morbid thinking," however a SRE was not provided. Per the Mental Health Services Delivery System *Program Guide*, Chapter (12-10-8), "When an inmate expresses current suicidal ideation, or make threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data. Documentation is achieved by conducting a standardized suicide risk evaluation SRE. Further, when an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRE, instead of completing a new SRE. In this instant, the inmate reported suicidal thoughts, and although he denied current intent or plan, there was no documentation in this note to indicate a SRE was considered or a more thorough suicide risk assessment was completed on this date. Additionally, the clinician did not document whether a specific change and suicide risk had occurred since the prior SRE had been completed in January 2017.

6) The SRE completed at SATF in February 2014, following a serious suicide attempt, was poorly completed. Multiple boxes in the various sections were left unchecked, and there were no details about the attempt, no mental status examination listed, no real estimation or justification of risk (outside of 'cut self using a razor - feels hopeless and helpless'), and minimal safety plan ('MHCB placement, minimize escalation'). Although this SRE was conducted in 2014, it is being identified as a concern due to the absence of critical information after a serious suicide attempt, and to alert SATF to review current SRE quality and procedures to ensure this issue has been remedied.

7) Activation of EMS (911) – (Custody and Nursing): On June 28, 2015, officer immediately observes the inmate unresponsive and covered in blood on the lower bunk. The officer immediately called a Code 1 medical response via institutional radio to Building 6, Cell 202, and requests the medical cart. At 1121 hours, TTA staff calls for an ambulance - a 6-minute delay in activation of 911…. Local Operations Plan consistent with the memorandum identified above should be established and readily available to ensure all staff is aware it is their responsibility to initiate a 911 call during a medical emergency.

In the _**second**_ case (MCSP 8), the inmate was found hanging from the upper bunk in his EOP cell by a sheet during the morning of September 20, 2017. The inmate entered the CDCR system for a second term in October 2009 to serve a 92-year-to-life sentence for attempted murder, inflicting great bodily harm involving domestic violence, assault with a deadly weapon, terrorist threat, and rape with force (of his girlfriend). He was transferred to MCSP in June 2017. The inmate had only one RVR during his eight-year confinement, occurring in April 2011 for possession of inmate manufactured alcohol. He was not known to be gang-affiliated. The inmate did not have any family support during his most recent CDCR confinement, and there was no record of either telephone calls or visits.

According to available information, the inmate, along with his brother and half-sister, was raised by both parents. His father was an alcoholic and died as a result of his excessive drinking. The inmate self-reported that he was a high school graduate, and also earned multiple undergraduate and graduate college degrees. He also reported being gainfully employed from 1970 through 1999 and worked in the environmental engineering field. The inmate was married three times and had a daughter with his third wife. That marriage was dissolved in 2006. He served in the Army from 1974 through 1976 and was deployed to Vietnam where he was the sole survivor of a helicopter crash which resulted in a coma for several days and numerous severe injuries. In 1991, he was diagnosed with depression, but was non-compliant with medication. The inmate would also later be diagnosed with Personality Disorder NOS with narcissistic and antisocial features, therefore, his education and employment histories would become suspect. The inmate began drinking alcohol at age 18 and described himself as a "functional alcoholic" as an adult. He did not have a juvenile arrest record, and his first involvement in the criminal justice system occurred in 2000 when he was arrested and subsequently sentenced for attempted murder. He served approximately eight years in CDCR, paroling in April 2008. He committed the instant offense the following month.

The inmate had a significant history of mental illness. In addition to previously being diagnosed with depression and treated for alcoholism on three occasions in the community, the inmate was placed in the MHSDS at the 3CMS level of care shortly after entering CDCR in November 2009. From April through July 2010, he was placed in DSH following a suicide attempt at RJD in March 2010. He was later elevated to EOP with a diagnosis of Mood Disorder NOS, Alcohol Dependence, and Personality Disorder NOS, with narcissistic and antisocial features. In April 2015, a diagnosis of Post-Traumatic Stress Disorder (PTSD) was added. During his IDTT meeting on May 5, 2016, the inmate reported that EOP is "what is keeping me alive at this point." The trauma treatment targeted his night terrors/nightmares, along with other PTSD symptoms. His most recent diagnoses were PTSD, chronic (provisional), Major Depressive Disorder, Recurrent, Moderate (provisional), and R/O Bipolar II, Depressed. Other than the suicide attempt at RJD in 2010, the inmate reported only one other suicide attempt by drug overdose while confined in the county jail. Although reporting ongoing, typically passive suicidal ideation throughout his confinement, the inmate denied any plan or intention of committing suicide. His last SRE, date unknown, listed his chronic risk for suicide as "high" and acute risk as "low."

The inmate last met with his psychiatrist on August 29, 2017 and while previously generally non-compliant with medication, due to an increase in nightmares, he agreed to restart some of the medication.

The inmate had significant medical problems including, but not limited to, emphysema, coronary artery disease, benign prostate hypertrophy, lower back pain, and suspected colon cancer. He was in the Disability Placement Program because of his mobility impairment and was issued Double Medical Equipment that included a back-brace support, cane, eyeglasses, oxygen concentrator, and walker. Due to his medical and mental health issues, the inmate was continuously arguing against both dorm and double-cell status and insisted on single-cell placement. (Of note, the inmate was removed from single-cell status sometime in July 2017 and temporarily had a cellmate but was housed alone at the time of his death.)

The CDCR reviewer in this case did not note any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, simply stating that "From the beginning of his incarceration, he maintained that death was preferable to life in prison. Although he did not make another suicide attempt, he continued to express suicidal ideation, generally passive in nature, throughout his incarceration until his death on September 20, 2017 by suicide."

The Suicide Report contained seven recommendations for corrective action through a QIP:

> 1) SVSP IDTTs were not held in January and July 2016 according to timelines. The Mental Health *Program Guide*, 2009 revision, states IDTTs for EOP participants are to be held every 90 days unless the patient is on a modified program, which requires an IDTT every 30 days.

2) Treatment plans completed at SVSP outlined the inmate's ongoing suicidal ideation, combined with depressive and PTSD symptoms with corresponding goals and treatment interventions. The recommendation for single cell status was documented. However, when the inmate transferred to MCSP, his treatment plan on August 1, 2017 omitted goals or interventions to address suicidal ideation. No rationale for this omission was documented.

3) At MCSP, the mental health screening did not acknowledge the long history of suicidal ideation and therefore did not prompt completion of an SRE upon his arrival. Mental health screening upon intake requires a thorough review of the mental health records.

4) At SVSP, psychiatric appointments were not scheduled according to timelines in July 2015, December 2015, May 2016, July and August 2016, and November and December 2016. Policy requires psychiatric appointments every 30 days or more frequently as needed.

5) The inmate's last three primary clinician visits were conducted cell front without a confidential setting being offered and declined. Meetings with patients are required to at least be offered a confidential setting.

6) Primary clinician appointments did not occur in accordance with policy. There was a missed primary clinician appointment in the weeks preceding his death. He was seen on September 1, 2017 and not seen again until September 12, 2017.

7) Multiple reports indicate when the inmate was cut down he fell backward striking his head on the stool in the cell, then striking his head on the cell floor. It should be noted that staff should do everything possible to try and relieve the pressure/inmate's weight when cutting down an inmate and support them to the ground.

### 10)    California State Prison-Solano (CSP/Solano)

**Inspection**: August 23-24, 2017 (previous suicide prevention audit was on May 26-27, 2016). CSP/Solano housed approximately 3,742 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on August 24. The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS. The nurse's office door was closed during the process, thus ensuring both privacy and confidentiality.

Daily PT rounds in administrative segregation (Building 10) were observed on August 23. The rounds were unremarkable, and the PT was observed to be correctly entering Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  CSP/Solano had nine MHCBs; each room was suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The administrative segregation unit (Building 10) contained a total of eight retrofitted new intake cells, with two additional cells renovated since the previous assessment.  This reviewer observed that all new intake inmates were housed in new intake cells as required.  However, it should be noted that many of the exterior cell windows still contained frosted screening that obscured natural light into the cell.  CDCR headquarters had ordered that such screening be removed in 2015.  The project had commenced on August 1, 2018 and was still ongoing during this on-site assessment.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was primarily found in Building 10 and continued to be used infrequently at the facility.  Because inmates were housed in the administrative segregation unit, all were furnished with bunks and required to be observed on a 1:1 basis.  From January 1 through July 31, 2017, only 29 inmates were placed in alternative housing, and the vast majority (83 percent) were released within 24 hours.  No inmates were held in alternative housing over 48 hours.  The total length of stay in alternative housing for these 29 inmates was 12 hours.  (A sample review of EHRS charts for inmates held in alternative housing found that required SRASHEs were completed in all cases.)

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on a suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on several sample days (i.e., August 19 for SOL 1, August 23 for SOL 2 and SOL 3, and August 15 for SOL 4).  The chart review found numerous observation checks (between eight and 15 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 115 minutes in one case (SOL 4).  The following case (SOL 1) exemplified the significance of the problem: There were 13 violations of 20-, 19-, 41-, 19-, 22-, 34-, 33-, 26-, 17-, 22-, 86-, 27-, and 62-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff during multiple days.  Due to the significant number of large gaps for all patients, this reviewer subsequently conversed with a nursing supervisor, as well as several CTC nurses, regarding the findings.  The nursing supervisor attempted to downplay the findings by suggesting that there might have been equipment failures in laptop equipment used by nursing staff and/or staff might have been performing the checks but the data was somehow not being recorded in real time; whereas the three RNs acknowledged that because CNA and PT staff were not assigned to the CTC, and because there were several medically-infirm patients in the unit, the RNs were not always able to observe patients on Suicide Precaution status at 15-minute intervals as required.

In addition, a previous problem with patients being clothed in safety smocks while being observed at 30-minute intervals, as well as patients not always being offered out-of-room activities and privileges, had not been corrected and was perhaps worsening.  There were multiple deficiencies.

*First*, in one case observed during an IDTT meeting on August 23, a patient (<u>SOL 1</u>) on full-issue status and required to be observed at 30-minute intervals (i.e., not on a suicide observation status) entered the room wearing a T-shirt, boxers, and a smock.

*Second*, the RT was only available to the CTC between ten and 16 hours per week.  A review of RT progress notes for the nine patients in the MHCB unit as of August 23, 2017 found that these patients were in the CTC for a combined 110 days, and only interacted with the RT for ten of those days.  The CTC did not have a program office, and a TTM was recently installed in the dayroom for "out-of-room" activities.  There was no television or DVD player to play movies, or a radio to play music.  RT programming was limited to board games either cell-side or in the TTM.  This reviewer was informed that the RT rarely attended IDTT meetings.

*Third*, a review of records indicated that none of nine patients had been offered yard consistent with CTC policy, and there was documentation for only three of the patients being offered yard during their entire MHCB placement.  The records also indicated that no patients had been out into the yard for at least four days.

*Fourth*, custody staff reported that telephone and visiting privileges rarely occurred in the MHCB unit.

*Fifth*, a review of records indicated that only four of nine patients had been offered showers consistent with policy.

Four IDTT meetings were observed on August 23-24.  Overall, with the exception of the RT, treatment teams were well represented by mental health, medical, and custody staff.  The IDTT meetings were uneven, and the PCs in each case made decisions (e.g., clothing and RT programming) with limited or no input from treatment team members.  The two cases observed on August 23 were particularly problematic.  In the first case (<u>SOL 3</u>), the patient had been admitted into the MHCB on August 15 for danger to self.  He had an extensive history of self-injurious behavior, and multiple MHCB and DSH admissions.  The patient still expressed suicidal ideation and was on Suicide Precaution status clothed in a smock.  The treatment team discussed a PIP referral but did not distinguish between APP and ICF.  Despite the patient's SI, there was no discussion regarding safety planning for coping skills to reduce the ideation.  The patient was offered a shower for the first time since his admission eight days earlier.

In the second case (<u>SOL 1</u>), the patient had been admitted into the MHCB on August 15 for suicidal ideation and auditory hallucinations.  He was currently not on any suicide observation status and was on full-issue status, but as indicated above, still clothed in a smock.  The patient had been generally uncooperative with treatment and had multiple prior MHCB and DSH admissions.  Unbeknownst to the PC, a psychiatrist had assessed the patient two days earlier on August 21 and recommended that he be discharged back to the EOP program at the next IDTT meeting (August 23).  Despite being admitted into the MHCB eight days earlier, the PC told the patient on August 23 that "we need to keep you a little bit longer and get to know you….Would you be okay being released on Monday?" (i.e., an additional five days).  There was no discussion regarding safety planning to reduce SI and, following the meeting, this reviewer intervened in an

attempt for the patient to receive his full-issue clothing, yard, shower, and books, none of which he had received since entering the MHCB unit eight days earlier.

Finally, a review of Guard One data for a recent 24-hour period in administrative segregation found 99-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of January 1 through July 31, 2017.  The TTA log for the same time period was also reviewed.  This reviewer's sample EHRS review of 40 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed required SRASHEs in 98 percent (39 of 40) of the cases, a significant improvement from the previous assessment when there was only 84-percent compliance.

This reviewer examined a sample of ten SRE/SRASHEs from patients released from a MHCB from May through August 2017.  The review found that although some safety plans contained within the SRE/SRASHEs were adequate, many were problematic, including the case (SOL 5) of a patient with a chronic risk for suicide rated as "moderate" based upon three suicide attempts in CDCR custody during the past few years.  Following a ten-day placement in the MHCB, the safety plan contained within the discharging SRE/SRASHE dated May 23, 2017 stated the following:

> Pt. is currently stable and reports he is not suicidal. He is being discharged at CCCMS LOC.  The expectation is that he will be moved quickly as he is a Solano inmate.  In the event that he is retained overnight he will continue to receive 24-hour nursing care, continued contact with clinicians and access to medical and dental depts.  Upon discharge he will be placed on 5-day follow-up with checks by custody officers.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate.  The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours.  The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of only 22 cases of inmates discharged from a MHCB or alternative housing placement that remained at CSP/Solano and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from January 1 through August 23, 2017.  The review found that only 45 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most custody checks recommended for 72 hours by clinicians.  In addition, only 32 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Problems found related to clinicians discontinuing the checks in less than the required 24 hours or failing to sign the forms which authorized

discontinuation of the checks at 24 hours, and correctional officers conducting checks at 60-minute, rather than the required 30-minute, intervals.

**Intervention**:  All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (April through June 2017) found that quorums were not achieved in any of the meetings.  Meeting minutes reflected reference to corrective action plans in response to this reviewer's previous assessment and were otherwise unremarkable and continued to be sparse.

**Training**:  According to training records, 100 percent of both custody and nursing staff were certified in CPR.  In addition, 100 percent of custody staff, 91 percent of medical staff, and 92 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of August 2017, 97 percent of mental health clinicians had completed the SRE mentoring program, 87 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**:  CSP/Solano experienced one inmate suicide during the review period.  In that case (SOL 6), the inmate was found hanging from the top bunk by his pants in his GP cell during the afternoon of March 19, 2017.  The inmate entered the CDCR system on November 16, 2015 to serve a seven-year and eight-month sentence for robbery.  He was transferred to CSP/Solano in May 2016.  The inmate incurred four RVRs during his confinement, the most recent of which occurred on October 18, 2016 and involved disrespect of a GED teacher.  The inmate was not known to be gang-affiliated.  He had strong family support that included weekly visits and daily telephone calls with his wife, as well as letter correspondence with his mother and other friends.  The inmate also had a 2-year-old daughter.

According to limited available records, the inmate had a very dysfunctional childhood that began by being born at CCWF to an incarcerated mother.  His father was also incarcerated and remained so for much of the inmate's life.  Although noted to be a poor historian, the inmate and his twin sister were initially raised by a relative; he was sexually abused at age 11.  The inmate became a ward of the state at age 13 and was subsequently diagnosed with Anxiety Disorder during placement in a group home.  He also had a lengthy juvenile arrest record and was incarcerated for much of his teenage years.  He began abusing drugs at age 11, and also attempted suicide by hanging that same year due to the sexual abuse he endured.  The inmate also reported that an uncle committed suicide.

Upon entry into CDCR, the inmate did not screen positive during the mental health screening portion of the RC process and was not initially referred to the MHSDS.  However, several months later in July 2016, he was seen by a mental health clinician after complaining of depression, irritability, and poor sleep.  The inmate was initially diagnosed with Adjustment Disorder.  Due to several deficiencies attributable to poor documentation, the inmate was not formally placed into the MHSDS until October 26, 2016 at 3CMS level of care.  Although prescribed medication, the inmate preferred to be treated with both individual and group therapy, and psychotropic medication was subsequently discontinued.  Apart from self-reporting a prior

suicide attempt at age 11, the inmate never expressed any suicidal ideation during his CDCR confinement. He was never provided with an SRE. The inmate was very active in mental health treatment, education classes, and work assignments.

Apart from one significant event that occurred during visitation with his wife several hours before his death, the CDCR reviewer in this case did not find any other specific precipitating factors that were known to staff indicating that this inmate was contemplating suicide, and there were no medical issues that were viewed as contributory to his death. Staff and other inmates interviewed did not offer any possible precipitating factors that led to the inmate's suicide, with most interviewed inmates stating that he worked hard on his programming and was deeply devoted to his wife and young daughter. Some of these inmates noted that he appeared very anxious to use the telephone after a visit with his wife on the morning of March 19, 2017, the day of his suicide.

According to the Investigative Services Unit (ISU) review of the suicide, there was an incident that occurred during the March 19 visit which resulted in the inmate handing his wife his wedding band. Staff in the visiting room reported to ISU that following the visit, the inmate asked staff to call his wife back, so he could retrieve his wedding ring. However, his wife had already exited the building. Later that same afternoon, the inmate telephoned his wife and, according to ISU staff who posthumously listened to the conversation, "repeatedly asked why she did not give the ring back to him prior to the end of the visit and asked that she return the ring the following weekend. She repeatedly responded that she would not visit him the following weekend but would return the ring at her next visit. As a conversation continued, he angrily threatened, numerous times, to commit suicide if she did not return the ring the following weekend." He committed suicide a few hours later. As offered by the CDCR reviewer, "The act of suicide appeared to be an impulsive response to the threat of his perceived dissolution of his family life, as there were no warning signs or indications of suicidal thoughts or contemplation prior to the day of his death."

The Suicide Report contained five recommendations for corrective action through a QIP:

> 1) There was no formal evaluation of suicide risk (e.g., a CDCR 7447 *Suicide Risk Evaluation*) conducted at the time of the initial intake evaluation on August 3, 2016, even though the clinician states an intention to complete an evaluation, and the intake evaluation completed in the EHRS on November 2, 2016 does not document an assessment of risk. A mention of a past suicide attempt and denial of current ideation or intent does not equate to an evaluation of potential for suicide. According to the 2009 MHSDS *Program Guide*, "The clinical assessment shall include… Evaluation of suicide and violence potential (p. 12-3-8). Further the suicide and self-harm section of the EHRS initial intake was incomplete.

> 2) Upon entering the CDCR, 7386 *Mental Health Evaluation* on August 3, 2016, which noted the inmate was being placed in the MHSDS as CCCMS LOC, no CDCR-128 MH3, *Mental Health Placement Chrono*, was completed, causing a delay in his placement into the MHSDS until October 26, 2016. Per the 2009

MHSDS *Program Guide*, "A 128 MH3 *Mental Health Placement Chrono* shall be produced with every change in level of care" (p. 12-3-1).

3) There was no CDCR 7448 *Informed Consent for Mental Health Care* in the record.  According to the 2009 MHSDS *Program Guide*, "Clinicians are responsible for informing inmate-patients of the limits of confidentiality, or ensuring that prior documentation in the UHR indicates that this disclosure has occurred prior to commencement of a clinical encounter.  CDCR 7448, *Informed Consent for Mental Health Care* shall be used for this purpose."

4) All clinical documentation by the PC lacked clinical detail pertaining to the inmate's current mental health status, presenting concerns and relevant historical information that would be necessary to conceptualize a clinical case, formulate a diagnosis, and develop an individualized treatment plan.  The PC failed to document mental status in several clinical encounters, which is standard practice for clinical care.  Further, there was no clinical rationale for the diagnosis assigned or a discussion regarding differential diagnoses, as required in the CDCR 7386 *Mental Health Evaluation*.  Finally, the initial treatment plan developed by the PC was not individualized and did not reflect treatment targeting the symptoms reported by the inmate.

5) Although staff requested an ambulance be called at 1632 hours, activation of the Emergency Medical System (Calling 911) did not take place until approximate 50 minutes into the emergency, which caused a significant delay in appropriate medical response….

## 11)   California State Prison - Corcoran (CSP/Corcoran)

**Inspection**:  October 10-11, 2017 (previous suicide prevention audit was June 21-22, 2016).  CSP/Corcoran housed approximately 3,157 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on October 11.  The nurse was observed to be asking all of the required questions and entering the information on a hard copy of the Initial Health Screening form.  (Of note, CSP/Corcoran had not yet implemented EHRS at the time of the on-site assessment.)  Privacy and confidentiality, however, remained compromised because the screening occurred with the door open and an officer posted inside the nurse's office.  The only difference between the current assessment and the assessment conducted by this reviewer in June 2016 was that at a TTM had been placed in the hallway.  However, for reasons that remained unclear, the TTM was not being utilized for intake screening and its placement remained unacceptable because it was still located in a non-confidential area of a hallway used by both staff and inmates.  A CAP for this issue had first been created in March 2016 and remained unresolved.  This issue could be resolved if the TTM was relocated inside the nurse's office or another room in the R&R unit and the door remained closed, with the officer posted outside.

Daily PT rounds were observed in two (of four) administrative segregation units (EOP administrative segregation and long-term restricted housing (LTRH)) on October 11.  The rounds were unremarkable, and the PTs correctly completed a hard copy of the Psych Tech Daily Rounds Form at cell-front for all caseload inmates.

**Housing**:  CSP/Corcoran had 24 MHCBs.  A previously identified deficiency of MHCB rooms with wall ventilation grates containing holes that were in excess of 3/16-inch diameter had not been corrected.[21]

Further, another previously identified deficiency of selected new intake cells in two administrative segregation units not being completely retrofitted as suicide-resistant was verified as corrected during this assessment.  There were six new intake cells (100-105) located in the STRH and ten new intake cells (124 through 128; 224 through 228) located in the EOP administrative segregation unit (3A04).  During inspection of both of these units, all new intake inmates were observed to be in new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in four designated OHU cells and a 20-cell section of the LTRH unit.  All cells used for alternative housing had beds, with inmates in OHU cells provided stack-a-bunks and required to be observed on a continuous 1:1 basis.  Alternative housing was used extensively at CSP/Corcoran.  From July 1 through September 30, 2017, there were approximately 431 inmates placed in alternative housing, with only 51 percent released within 24 hours, 29 percent released within 48 hours, 18 percent released within 72 hours, and the remaining two percent housed over 72 hours.  The average length of stay in alternative housing for these 431 inmates was 35 hours.

**Observation**:  Both Suicide Precaution and Suicide Watch statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer was not able to verify the accuracy of observation rounds because CSP/Corcoran had not yet "gone-live" with EHRS at the time of the on-site assessment.

Further, a previous problem with patients remaining clothed in safety smocks after being clinically approved for "full-issue" clothing, as well as patients not being timely approved for yard privileges and/or being forced to choose between an out-of-room activity and yard, had not been corrected. There were multiple deficiencies.

---

[21]On January 25, 2018, the court ruled that "[w]ithin 14 days from the date of this order defendants shall show cause in writing why the inadequate wall ventilation grates at CSP/Corcoran cannot be replaced within six months."  ECF No. 5762 at 4.  On February 7, 2018, defendants submitted a plan to the court which indicated that the project would be completed within six months.  ECF No. 5775.  On February 22, 2018, defendants informed the Special Master that the 24-bed MHCB unit at CSP/Corcoran would be temporarily closed and that the renovation would commence by March 19, 2018, with estimated completion within three to four weeks.  On April 24, 2018, defendants notified the Special Master that the renovation project at CSP/Corcoran had been completed and that all MHCB unit beds were reactivated on April 24, 2018.

*First*, no patients on full-issue clothing status were issued either a uniform or shirts and pants because such clothing was not available in the MHCB unit. As such, this reviewer was informed by IDTT members that safety smocks were issued to each patient for "privacy."

*Second*, review of Physician's Orders (CDCR 7221) forms found multiple contradictory orders. For example, it was not uncommon to see Orders that allowed for both issuance of a safety smock and "partial-issue" (i.e., shorts and T-shirt); there were orders to disallow both yard and telephone privileges without clinical justification for patients not on suicide observation status; as well as incorrectly automatically denying yard privileges for patients on administrative segregation status.

*Third*, there was only one RT assigned to the CTC for 24 MHCB patients, and that staff member informed this reviewer that one of those days was reserved for OHU medical patients. As such, the RT estimated that they were available to each MHCB patient for only one hour every three days. Due to the limited schedule, patients approved for out-of-room activities must choose either the program office or yard. This writer was also informed that the RT rarely attended IDTT meetings.

*Fourth*, a review of 22 records of patients who had been in the MHCB unit for at least 72 hours as of October 10, 2017 indicated that only seven had been approved for yard privileges. The records included an additional seven patients on administrative segregation status, all of whom had not been approved for yard. (This reviewer was informed that because of security concerns regarding a low roof line in the MHCB yard, a procedure had been developed requiring patients on maximum-security and administrative segregation status to be escorted to an administrative segregation unit yard. In practice, however, this was found not to be occurring on a regular basis.) In addition, non-administrative segregation patients were also not approved for telephone privileges.

In sum, most of the above deficiencies were identified by this reviewer in the initial 2014 assessment and remained very problematic.

Three IDTT meetings were observed on August 10 between two treatment teams. Both four-member IDTTs were comprised of a psychologist, psychiatrist, CC1, and PT. Of the three cases presented, only one demonstrated an adequate discussion of safety planning to reduce SI.

Finally, a review of Guard One data for a recent 24-hour period found a combined 99-percent compliance in the four administrative segregation units (GP, STRH, LTRH, and EOP) with required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period July 1 through October 10, 2017. A review of the TTA log for a similar period was also conducted. A sample eUHR review of 30 cases of emergency mental health referrals for suicidal ideation/behavior found that clinicians completed the required SREs in all of the cases.

This reviewer also examined a sample of ten SREs from patients released from a MHCB between July and October 2017. There was uneven consistency with discharging SREs containing adequate safety plans in the reviewed sample. Most documents simply deferred the development of safety plans to the yard clinicians. The following was an example (COR 1) of an inadequate safety plan:

> I/P is already on a 5-day f/u and to continue daily PC contact to address s/s and monitor SI/HI.
> 1) Psychiatrist will prescribe and adjust medication as needed.
> 2) PC provide patient with Bible to read while in his cell.
> 3) PC will teach IP stress management and relaxation techniques to help decrease stress and anxiety that seem to be increasing SI.

In addition, the first day of the patient's Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form stated the following under safety plan: "If sxs increase, IP to contact staff/mental health staff immediately. Continue with current tx. plan."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 160 cases of inmates discharged from either the MHCB unit or alternative housing that remained at CSP/Corcoran and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from mid-August through September 30, 2017. The review found that only 69 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with approximately 78 percent of the custody checks recommended for between 48 and 72 hours. In addition, only 60 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Problems found were related to clinicians failing to complete and/or sign the forms, and time gaps for correctional officers consistently conducting checks at 30-minute intervals.

**Intervention**: All reviewed housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (June through August 2017) found that quorums were not achieved in any of the meetings. However, it was noteworthy that there were between 13 and 16 participants at each monthly meeting. Meeting minutes included a robust case presentation during July but were otherwise unremarkable. This reviewer was also presented with a CAP based upon the previous suicide prevention assessment. Dated October 5, 2016, the CAP indicated several items were noted to be "completed," including confidentiality during intake screening; allowable possessions, property, and privileges for

MHCB patients; and safety planning for patients discharged from the MHCB. As indicated above, this CAP was incorrect because such issues remained problematic.

**Training**: According to training records, 79 percent of custody and 98 percent of nursing staff were currently certified in CPR. In addition, 96 percent of custody staff, 90 percent of medical staff, and 88 percent of mental health staff completed annual suicide prevention block training during 2016. Finally, as of September 2017, only 72 percent of mental health clinicians had completed the SRE mentoring program, only 78 percent had received the seven-hour SRE training, and only 74 percent had completed safety plan training. Similar low percentages for SRE training were found during the previous assessment.

**Recent Suicides**: CSP/Corcoran experienced two inmate suicides during the review period. In the _first_ case (COR 2), the inmate was found hanging from the bunk by a sheet in his EOP administrative segregation unit cell during the early morning of July 21, 2017. The inmate entered the CDCR system on September 14, 2007 to serve a life sentence (with the possibility of parole) for second-degree murder (of his best friend). He was transferred to CSP/Corcoran on April 24, 2017. The inmate had 15 RVRs during his confinement, including ten for assault. The last RVR occurred on June 4, 2017 for battery of an officer. The inmate was not known to be gang-affiliated. His family support was said to be exaggerated since he had not had any family contact since March 2016.

According to available documents, the inmate had a dysfunctional childhood and was raised by a mother who experienced significant substance abuse. His father was incarcerated for most of his young life. Records also indicated that the inmate was a victim of physical and emotional abuse by his mother, who died in 2009. He had severe anger control deficits as a young child, as well as significant involvement with the juvenile justice system for assaultive behavior. At age 13, he was hospitalized for fighting with his brother and attempting to hold his entire family hostage. He spent a significant amount of time in either foster care or group home environments. The inmate also had a significant history of substance abuse, and the instant offense, which involved the stabbing of his best friend, occurred while under the influence of drugs.

Other than being placed in two residential programs to treat his severe behavioral problems as a juvenile, the inmate did not have any other mental health treatment in the community. Upon entry into CDCR, he began to demonstrate delusional thinking shortly thereafter by refusing to eat and claiming that his food had been poisoned by custody staff. He was initially placed at the 3CMS level of care with diagnoses of Psychotic Disorder NOS, Antisocial Personality Disorder, and Traumatic Brain Injury (at age 7). His care was later elevated to EOP in August 2008, and he was later placed in DSH on two occasions (2008 and 2010) for inpatient treatment. Such delusional thinking triggered his refusal to eat, which correlated with a number of staff assaults. As a result, a conservatorship was initiated in December 2009. He lost a significant amount of weight between 2009 and early 2013 and had to be fed frequently for lengthy periods of time with a feeding tube. In July 2013, a PC 2602 (involuntary medication order) for danger to others was initiated, and the order was annually renewed by the court until his death. The inmate had two other APP placements in November 2012 and May 2016, as well as MHCB placements in April 2010, May 2012, August 2012, and April 2016, all for delusional behavior.

The inmate had a significant history of suicidal behavior, including two suicide attempts by overdosing while confined in a county juvenile detention facility. In 2005, he attempted suicide by cutting himself in a county jail. In 2007, he slit his wrist after self-reporting "depression." In 2012, he attempted to hang himself while housed in the SHU at CSP/Corcoran. He was later placed in a MHCB. The inmate had multiple SREs completed during his confinement, the last completed on May 3, 2017 and assessing his chronic risk for suicide as "high" and acute risk as "low."

In June 2017, following a staff assault, the inmate's PC opined that his psychotic symptoms and level of agitation appeared to be worsening. The inmate told the PC that he "heard voices every waking moment….You guys are poisoning me with food and water…. I have green stuff coming out of my ears, my urine and feces. I know you guys are trying to kill me. If I kill myself one day, I get back at you guys for poisoning me." The inmate's IDTT decided to retain him at the EOP level of care because "he was maintaining his activities of daily living and was medication compliant." However, the CDCR reviewer in this case found inconsistent clinical opinions about his level of care, ranging from the PC advocating another DSH referral based upon "his current level of functioning and delusional thoughts/beliefs," to a psychiatric note dated July 18, 2017 and stating that the inmate "would be better served at the CCCMS level of care, because he was not utilizing the therapeutic opportunities in EOP." The psychiatrist was also concerned that the inmate would be potentially assaultive to DSH staff. The inmate was seen by his PC on July 20, 2017, the day before his death. The progress note stated that he "denied having any mental illness, 'just an anger problem,' and stated that he wanted to get away from EOP and the psychiatrist, because he did not like being on medication. He went on to threaten both the PC and the psychiatrist with violence."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although he continued to suffer from several medical issues related to his refusal to eat for long periods of time due to his delusions, these issues were not viewed as proximate causes of his death.

The Suicide Report contained six recommendations for corrective action through a QIP:

    1) Two days after the inmate transferred from COR to SVSP, a SRE dated January 7, 2016 was performed. It appears the inmate's suicide history was not reviewed prior to this evaluation because his historical information was replaced by information belonging to a different inmate, whose name is mentioned in the "Estimate of Risk" section. The erroneous reporting in this SRE also contained documentation of a suicide attempt by overdose in 2015 that was made by another inmate. The two subsequent SREs (dated April 7, 2016 and April 14, 2016, at 9:45am) carried forth the same inaccurate historical information as contained in the SRE dated January 7, 2016, and with other inmate information.

    2) On July 5, 2017, the treatment team decided to retain the inmate in EOP, and not refer him to DSH, despite his lack of attendance in any structured out-of-cell activities, increased delusional symptoms, and increased anxiety/anger. Further, it noted, "he had no current MHCB admissions" and "he appears to be relatively

stable." However, clinical progress notes indicated the inmate's delusional system appeared to continue to worsen. The level of care justification is discrepant from the clinical progress documents within the file. On July 20, 2017, the inmate was seen by his PC. Documentation indicated the inmate would be retained at EOP level of care and work on reducing his paranoid ideation/delusions and improve his sense of reality. She added that the inmate would continue to "attend his 1:1 until being accepted to DSH." However, it does not appear that the IDTT had referred the inmate to DSH at that time. It is unclear if there was any intent to refer the inmate to DSH. The clinical documentation is inconsistent and the plan for the inmate's clinical care and interventions are unclear.

3) On July 18, 2017, a psychiatric note opined that the inmate would be better served at the CCCMS level of care because he was not utilizing the therapeutic opportunities in EOP. However, clinical documentation also indicated a worsening of delusional symptoms that may have contributed to his willingness to participate in mental health treatment. Lack of participation in treatment is not an adequate justification for lowering inmates' mental health level of care. It is unclear whether the clinical team considered his current mental health presentation and how it may have correlated with the inmate's unwillingness to attend EOP programming.

4) Activation of the Emergency Medical System (Calling 911) did not take place until approximately six minutes into the emergency which caused a significant delay in appropriate medical response. Although a request was made to activate 911 within one minute of discovery by the responding supervisor, the Watch Office did not initiate the 911 call as identified in Operational Procedure No. 1083.

5) On July 21, 2017, RN documented administrating 25 liters of oxygen via BVM (documentation error).

6) On July 21, 2017, Provider 2 (RN) gave a third dose of Narcan 0.8 mg IM in the TTA without a provider order.

In the **_second_** case (COR 3), the inmate was found hanging from a ventilation grate by a sheet in his STRH unit cell during the early afternoon of December 7, 2017. He had entered the CDCR system on August 27, 2015 to serve an unidentified sentence length for second-degree robbery. The inmate was 17-years-old at the time of the offense. He was transferred to CSP/Corcoran on August 31, 2016. The inmate had seven RVRs during his CDCR confinement, the most recent of which occurred on September 26, 2017 for possession of a dangerous weapon. He was known to be gang-affiliated. The inmate was a victim of a gang-related assault on November 17, 2015. (He would later be placed in SNY due to safety concerns shortly before his death.) Although his mother had previously thrown him out of the family home, he enjoyed good family support with her through telephone calls and letter correspondence, as well as occasional visits. The inmate was unmarried and had one young daughter.

98

The inmate was raised with three brothers and a sister by both parents but was self-described as "the black sheep of the family" as he was the only one involved in gangs and the criminal justice system (albeit limited). He had a long history of substance abuse, as well as a five-day hospitalization at age 15 for "for depression, agitation, and anxiety."

Upon entry into CDCR, the inmate self-reported having a history of depression, but denied any current suicidal ideation or prior suicidal behavior. On September 14, 2015, he was placed in the MHSDS at the 3CMS level of care for treatment of depression and substance abuse. His initial diagnosis was Depressive Disorder NOS. Several weeks later in October 2015, he was assessed by a psychiatrist and started on psychotropic medication "to treat symptoms of depression, chronic anger, ruminating thoughts, and sad mood." The inmate continued to be treated in the 3CMS program and remained stable enough that by March 2017 he requested to be removed from the MHSDS. The inmate's medication was eventually discontinued, and he remained stable for the next several months.

During an IDTT meeting on October 4, 2017, clinicians noted that the inmate had no history of suicidal thoughts or behavior, and although stable without medication, because he estimated his depressive symptoms at "four out of 10…..and agitation related to incarceration issues at seven out of 10," he "could benefit from continued treatment for depression using CBT techniques to help him learn to identify and modify cognitive distortions and use coping skills including emotion regulation, distress tolerance skills." The IDTT decided to retain the inmate in 3CMS pending a review of his mental health needs by the treatment team in six months. However, a few weeks later on October 23, 2017, a PT submitted an emergency mental health referral after the inmate stated that "I'm going to hurt myself." Although seen by a mental health clinician, the required SRE was not completed. During a follow-up appointment with a clinician two days later on October 25, the inmate denied any mental health distress or suicidal ideation, and the clinician noted that he "was motivated for treatment, as reflected by the fact he had recently completed at least four CBT workbooks."

During an IDTT meeting on November 21, 2017, the inmate was found to be stable and exhibiting no mental health symptoms and the team decided to discharge him from the MHSDS. However, approximately 20 minutes following his IDTT meeting, the inmate reported to custody staff that he needed SNY due to safety concerns. He was escorted to the STRH unit for further assessment. The following day (November 22), the inmate reported suicidal ideation and was seen by a clinician who concluded that "IP presented void of acute distress/crisis but is endorsing DTS with high likelihood of staff manipulation….Intermittently uncooperative evidence by being evasive with questions and potential for feigning symptoms for secondary gain to avoid process from mainline to SNY requiring STRH temporary placement." The inmate had admitted to the clinician that he wanted to bypass the STRH and obtain SNY status as soon as possible, as well as asking to return to the 3CMS program. The required SRE was completed and the inmate was referred to an MHCB due to his "adamant" report of suicidal ideation. He remained in the MHCB until December 3 when he was returned to the STRH unit. His diagnosis in the MHCB was revised to be Adjustment Disorder with Depressed Mood. His final SRE assessed both his chronic and acute risk for suicide as "low." The CDCR reviewer in this case subsequently found that the safety plan contained within the discharging SRE, as well as four days of

Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) forms, did not adequately reflect safety planning to reduce SI.

On December 4, 2017, three days before his suicide, the inmate was interviewed by a captain and stated, "he had heard rumors in the facility indicating he was considered to be in 'bad standings' with the Crips."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and there were no medical issues in his case that were viewed as proximate causes of his death. Although a suicide note was not found in his cell, the reviewer opined that the inmate "had frequently reported a connection between safety concerns, symptoms of depression, and suicidal ideation. The inmate's mood appeared to be substantially impacted by realistic fear reactions to external events, which he perceived to have a strong potential for impacting his safety. Additionally, the inmate indicated he feared not being able to be with his mother before she died of breast cancer. Finally, fear of potential future gang-related problems appears to be another plausible contributory factor."

The Suicide Report contained nine recommendations for corrective action through a QIP:

> 1) On October 23, 2017, a primary clinician interviewed the inmate, but did not perform a Suicide Risk Evaluation, although the psychiatric technician who made the emergency referral noted the inmate having reported, "I'm going to hurt myself." In the corresponding progress note, the clinician failed to adequately document the reason for this referral, sufficiently explore his statement of intended self-harm, or develop a safety plan to address intended self-harm.

> 2) The IDTT documented on the Mental Health Master Treatment Plan completed on November 21, 2017 recommended removal from MHSDS. However, the transfer/discharge planning section was empty, and the case formulation section and clinical summary were inadequate. During the performance of a "Danger to Self" Patient Level Outcome interview at the IDTT meeting, the inmate answered "somewhat often" to the question of how frequently he thought about suicide lately. In spite of this assessment, the clinician reported the inmate to be free of symptoms. The clinical rationale for discharge from MHSDS appeared to be based on symptom remission while medication-free for six months. However, an Individual Plan of Care (IPOC) for depressed mood was activated at this IDTT, which is inconsistent with his reports of remission and discharge from the MHSDS.

> 3) On November 22, 2017, a clinician interviewed the inmate in response to an emergency referral by ASU staff, because the inmate reported suicidal ideation. The clinician did not document the reason for conducting the interview in a non-confidential setting, where she posed a number of specific questions related to the inmate's reported safety concerns.

4) A progress note and SRASHE dated November 22, 2017 primarily focused on a diagnostic impression of manipulation and malingering. The clinician did not document the nexus between the inmate's safety concerns, depression, and his suicidal ideation, and minimized the present risk factors by focusing primarily on manipulation and malingering. Additionally, the assessing clinician omitted the Columbia Suicide Severity Rating Scale (C-SSRS), which led to the omission of important historical information related to the inmate's suicidal ideation.

5) Records show that the assessing mental health clinician for the November 22, 2017 evaluation did not complete the mandatory trainings: "Safety Planning Webinar" and "Differential Diagnosis of Complex Cases in Corrections." The clinician stated she was not aware of and had not been offered these trainings.

6) Records show that the mental health clinician who conducted the November 22, 2017 evaluation had not attended the C-SSRS training. However, the Statewide Mental Health Program (SMHP) had not yet placed the C-SSRS training on the list of mandatory trainings.

7) The documentation from the inmate's MHCB admission from November 22, 2017 through December 3, 2017 had a number of deficiencies.

8) The inmate was discharged from the MHCB on December 3, 2017. Four 5-Day follow-up evaluations were completed prior to his death (the inmate died on day five). On the 5-Day follow-up evaluations completed by a mental health clinician, the safety plans did not contain individualized treatment interventions targeting his triggers (i.e., safety concerns).

9) Activation of EMS (911): approximate 10-minute delay for EMS activation.

**12)    California Substance Abuse Treatment Facility (CSATF)**

**Inspection**: October 12-13, 2017 (previous suicide prevention audit on June 23-24, 2016). CSATF housed approximately 5,814 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the R&R unit on October 12, 2017. The nurse was observed to be asking all of the questions and correctly entering information into the EHRS. The door to the nurse's office remained closed, with officers stationed outside, thus ensuring both privacy and confidentiality. Of note, based upon this reviewer's previous recommendation, the intake screening process had been relocated to a former examination room (Room 103) that contained a TTM.

Daily PT rounds in the STRH unit were observed on October 13. The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**: CSATF had 20 MHCBs. A previously identified hazard (i.e., square-shaped stainless-steel sinks protruding from the wall) had been corrected with installation of stainless-steel triangle extensions. The rooms were now suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.

The facility had one administrative segregation unit (STRH), with GP inmates requiring administrative segregation transferred to CSP/Corcoran. The STRH unit contained nine new intake cells (100-108) that had been previously retrofitted to be suicide-resistant. Upon inspection, all of the new intake cells were full on October 13. However, the facility received eight new inmates the previous evening (October 12), resulting in several being placed in unsafe, non-intake cells. A custody supervisor informed this reviewer that the STRH unit exceeded its new intake cell capacity approximately every one to two weeks, and the supervisor had recommended that an additional three cells be retrofitted for new intake inmates. To date, the recommendation had not resulted in a work order.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was extensively used on a daily basis. Two holding cells in the CTC and designated cells in E-1 unit, formally administrative segregation, were primarily utilized for alternative housing. All inmates had beds, with those housed in the CTC holding cells provided stack-a-bunks and required to be observed on a 1:1 basis. From July 1 through October 9, 2017, there were 357 inmates housed in alternative housing, with the majority (53 percent) released within 24 hours. In addition, 34 percent of inmates were housed in alternative housing between 24 and 48 hours. The overall average length of stay in alternative housing for all 357 inmates was 24 hours. (Of note, a previous very problematic practice of handcuffing inmates to gurneys in two TTA examination rooms had been discontinued following this reviewer's preceding assessment.)

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were now required to be observed at 15-minute intervals by nursing staff, modifying a previous practice that allowed 60-minute rounds. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (CSATF 1, CSATF 2, CSATF 3, and CSATF 4) on Suicide Precaution status in the CTC for an eight-hour period from 12:00 a.m. through 7:59 a.m. on October 12, 2017. The chart review found a few observation checks that were in excess of the required 15-minute intervals for the four patients. In fact, there were no violations for cases CSATF 1 and CSATF 4, but six violations for CSATF 3 and nine violations for CSATF 2. Of note, the CNE informed this reviewer that nursing leadership had previously determined that there were not enough certified nursing assistant (CNA) staff assigned to the CTC in order to consistently complete observation of MHCB patients at 15-minute intervals. As a result, a determination was made that a staff-to-patient ratio of to 1:7 was required, and additional CNA staff were subsequently assigned to the MHCB unit.

A previous problem with patients being clothed in safety smocks or "partial-issue" clothing despite the fact they were not on suicide observation status had been corrected, as all patients were observed to be clothed consistent with their level of risk or lack thereof. In fact, this reviewer observed many MHCB patients in "full-issue" uniforms. The MHCB unit still did not have a RT, a problem found during the preceding assessment. As such, there was limited use of

both the program office and telephone access, but most patients were offered yard access that was provided by custody personnel upon their availability.

This reviewer observed five IDTT meetings on October 12, 2017. The treatment team was well represented by mental health, medical, and custody staff, and there were robust discussions observed during the meetings, with each averaging approximately 30 minutes in duration. However, although there was significant discussion (primarily between the PCs, CC I and patients) about an assortment of issues, ranging from the MHCB process, parole planning, GED classes and treatment groups, and milestone credits, there was little, if any, discussion regarding safety planning to reduce SI, particularly for the two patients who were being discharged from the MHCB that day. For example, in one of those cases (CSATF 1), the patient had been admitted into the MHCB unit nine days earlier for depressed mood, paranoia, bizarre delusions, and suicidal ideation. The patient was at EOP level of care and, although viewed as an unreliable historian regarding his history of suicidal behavior, he remained suicidal for most of his MHCB placement. During the IDTT meeting on October 12, the team decided to discharge the patient without any discussion of safety planning nor even any inquiry regarding current suicidal ideation. A subsequent review of the patient's discharging SRASHE included the following safety plan that was not discussed during the IDTT:

> 1) Psychiatrist will continue with medication evaluation and monitoring (100% medication compliance); 2) IP to learn three emotional regulation techniques such as deep breathing, thought stopping negative thoughts and replace with positive self-talk, and/or distractions like reading, journaling, writing letters, exercise, dayroom leisure activities over the next 30 days to improve mood to a 4/10 or better, decrease impulsivity as a way to prevent SI and MHCB admits; 3) PC to remind and encourage IP to engage in more solution-focused behavior such as identifying appropriate resources to problems (custody, medical, MH) and participating in EOP psychoeducational groups.

Finally, a review of Guard One data for a recent 24-hour period found 100-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently reviewed a listing of emergency mental health referrals from the MHTS for the period of April 1 through September 30, 2017. The TTA log for the same time period was also reviewed. This reviewer's sample EHRS review of 40 emergency mental health referrals for suicidal ideation/behavior found that mental health clinicians subsequently completed the required SRASHEs in 95 percent (38 of 40) of the cases. This was an improvement from the previous assessment when only an 89-percent compliance rate was found.

This reviewer examined a sample of ten SRASHEs from patients released from the MHCB unit from August through early October 2017. Although a few safety plans contained within the discharging SRASHEs were adequate, most did not include specific strategies to reduce future SI. For example, in one case (CSATF 5), the patient had been admitted into the MHCB unit 11 days earlier on September 29, 2017. He had at least three previous suicide attempts, as well as

multiple prior reports of suicidal ideation resulting in five MHCB admissions. The entirety of the safety plan section of the discharging SRASHE dated October 9, 2017 was the following:

> IP will contact clinician on yard to assist with problem-solving and verbalize feelings of distress in order to manage stressors effectively and avoid future SI.

In addition, the first day of the patient's Interdisciplinary Progress Note – 5-Day Follow-Up (CDCR MH-7230-B) form dated October 10, 2017 stated the following under safety plan: "1) increase drinking fluids during the day time, but not after 7pm, 2) Ask to talk to PC if SI symptoms increase, 3) Reading and watching some TV."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 454 cases of patients discharged from either the MHCB unit or alternative housing that remained at CSATF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during April through September 2017. The review found that 87 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority of the custody checks recommended for 48 hours by clinicians. In addition, 98 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. The few problems found included clinicians discontinuing custody checks in less than the required 24 hours, as well as some gaps in observation by custody personnel. Of note, all of the Discharge Custody Check Sheet (CDCR MH-7497) packets were found to be extremely well-organized.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (July through September 2017) found that quorums were only achieved during one month (September). Meeting minutes were otherwise unremarkable.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 97 percent of custody staff, 84 percent of medical staff, and 94 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of September 2017, 81 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and 76 percent had completed safety plan training.

**Recent Suicides**: CSATF did not experience any inmate suicides during the review period.

13)    **High Desert State Prison (HDSP)**

**Inspection**:  November 2-3, 2017 (previous suicide prevention audit was on November 8-9, 2016).  HDSP housed approximately 3,502 inmates at the time of the on-site assessment.

**Screening/Assessment**:  The intake screening process within the R&R unit was not observed because there were not any new inmates admitted into the facility during the two-day assessment.  Daily PT rounds in the STRH unit were observed on November 3.  The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**:  HDSP had ten MHCBs and all rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a hanging suicide attempt.  The STRH unit contained six retrofitted new intake cells (100-105) and had been relocated to Z-Unit.  During inspection of the unit, this reviewer observed several empty new intake cells, however, a new intake inmate who had arrived on November 1 was housed in an unsafe, non-new intake cell.  During the previous assessment, this reviewer had been informed that the facility received approval for renovation of approximately 17 additional new intake cells.  Because the STRH unit had since been relocated to Z-Unit, it was unclear if, or when, any additional new intake cells would be available.

Finally, **alternative housing** to temporarily house inmates identified as suicidal and awaiting MHCB placement was infrequently used at the facility.  From July 1 through October 30, 2017, only 58 inmates were housed in alternative housing, and all released within 24 hours.  An observation room (Room 11) in the CTC was primarily utilized for alternative housing and contained an MHCB bed; other designated CTC medical rooms or holding cells could also be utilized.  All inmates were provided stack-a-bunks in the CTC medical rooms/holding cells and observed on a continuous 1:1 basis.  The exact length of stay in alternative housing for these 58 inmates was unavailable but estimated to be 24 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on several sample days (i.e., November 2 for HDSP 1 and HDSP 2, August 8 for HDSP 3, and October 9 for HDSP 4).  The chart review found numerous observation checks (between two and ten per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 35 minutes in one case (HDSP 3).  The following case (HDSP 3) exemplified the extent of the problem:  There were five violations of 35-, 20-, 16-, 18-, and 23-minute gaps between the required 15-minute intervals.  Violations in the four cases were by multiple nursing staff during multiple days.

A previous problem with patients being clothed in both "partial-issue" and safety smocks had been corrected, and there were no problems observed regarding the issue of privileges within the MHCB unit.  There was a full-time RT assigned to the unit and patients were receiving out-of-room activities, including yard.  In fact, this reviewer observed two IDTT meetings in the MHCB

unit on November 2 and the PC had a uniquely good practice of going through both patients' CDCR 114-A Form and carefully explaining the privileges that they would be eligible for during their MHCB placement based upon clinical judgment. The treatment team was well represented by mental health, medical, and custody staff. The psychiatrist attended via tele-psychiatry. There was not much discussion in either case regarding safety planning, despite the fact that one patient (HDSP 1) was discharged from the MHCB unit during the IDTT meeting.

Finally, a review of Guard One data for a recent 24-hour period in the STRH unit found 100-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from April through October 2017. A sample EHRS review of 60 emergency mental health referrals for suicidal ideation/behavior revealed that clinicians completed the required SRASHEs in 90 percent (54 of 60) of the cases.

In addition, this reviewer examined a sample of ten SRASHEs from patients released from a MHCB from August through early November 2017. Although all of the SRASHEs mentioned safety planning to reduce SI, few offered specific strategies to reduce risk. For example, one case (HDSP 5) was representative of the problem. The clinician wrote the following in the safety plan section of the discharging SRASHE:

> His prior safety plan/treatment plan focused on stabilizing his mood, developing goals for the future, and developing alternative strategies for relief besides cutting (self-harm). The Pt currently states a safety plan is adequate for keeping him safe.

The above narrative failed to identify the specific "goals" and "strategies" contained within either the current or previous safety plan that was effective for the patient.

In contrast, although not discussed during the observed IDTT meeting, the safety plan for the patient (HDSP 1) discharged from the MHCB on November 2, 2017 was specific (albeit lengthy):

> Continue treatment for recent depression related to family issues. Work with patient in individual and group tx utilizing CBT to reduce depressive symptoms and increase coping skills regarding environmental stressors. He will continue to engage in positive coping, including regular exercise, phone calls with his family, religious practices, and reading. DSH discharge summary from 2013, pt reported that he copes by listening to music and it was recommended that the pt should not have KOP medication in significant quantities.
>
> A common stressor that has been documented as the source of the patient's suicidal ideation is being far away from his family and grief and loss. When the patient's father passes away the pt will likely struggle to maintain his positive coping skills and will require significant support from the mental health team. It may be helpful to start processing grief and loss to prepare the patient for future situations involving grief and loss.

106

Due to the patient's recent relocation to HDSP and recent MHCB discharge pt should be met with frequently over the next couple of weeks to ensure a smooth transition to EOP LOC. Pt should check in about continued phone calls with his family, and issues related to him receiving his property (specifically his radio, as this is a reported coping skill), and provide examples of his participation in positive coping skills, such as exercise, religious practices, and reading. Additionally, if pt begins to sell his property items this could indicate an increase in his suicidal ideation. Additionally, the pt should be considered for being clear for double cell due to MH symptoms.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 46 cases of patients discharged from a MHCB or alternative housing placement that remained at HDSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required) from March through October 2017. The review found that only 80 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with most of the custody checks recommended for only 24 hours by clinicians. In addition, only 67 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies found included clinicians discontinuing custody checks in less than the required 24 hours, as well as some gaps in observation by custody personnel.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (July through September 2017) found that quorums were not achieved in any of the meetings. The meeting minutes were otherwise unremarkable.

**Training**: According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 71 percent of medical staff, and 85 percent of mental health staff received annual suicide prevention block training during 2016. A similar low compliance rate for annual suicide prevention training by medical and mental health staff was found during all previous assessments. Finally, as of October 2017, 62 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**:  HDSP did not experience any inmate suicides during the review period.

### 14)    California State Prison - Los Angeles County (CSP/LAC)

**Inspection**:  November 13-15, 2017 (previous suicide prevention audit was on April 28-29, 2016).  CSP/LAC housed approximately 3,410 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on November 14, 2017.  The nurse was observed to be asking all of the questions and correctly entering information into the EHRS.  The door to the nurse's office remained closed, with officers stationed outside, thus ensuring both privacy and confidentiality.

Daily PT rounds in the STRH unit and EOP administrative segregation unit (D-5) were observed on November 14.  The rounds were unremarkable, and the PTs were observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS.

**Housing**:  CSP/LAC had a 16-bed CTC, with 12 rooms designated as MHCBs.  All MHCB rooms were found to be suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The STRH unit had 12 retrofitted cells for inmates on new intake status, with five of the cells added since the previous assessment.  The EOP administrative segregation unit (D-5) had eight retrofitted new intake cells, with two of the cells added since the preceding assessment.  During inspection of both units, this reviewer observed that all new intake inmates were in new intake cells.  Of note, however, a new intake inmate (LAC 1) committed suicide in an unsafe non-intake cell in the EOP administrative segregation unit on August 4, 2017.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were found in a variety of designated locations, including TTA wet holding cells within the CTC, the EOP administrative segregation unit (D-5), and the overflow administrative segregation unit (D-4).  This reviewer was informed that TTA dry cells were no longer utilized for alternative housing.  All inmates were furnished beds, with stack-a-bunks utilized in the TTA wet holding cells and required to be observed on a 1:1 basis.  From August 1 through November 8, 2017, there were 310 inmates placed in alternative housing, with the majority (63 percent) released within 24 hours.  In addition, approximately 14 percent of inmates were in alternative housing over 48 hours.  The overall length of stay in alternative housing for these 310 inmates was 26 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were *not* being observed at any interval by nursing staff.  As discussed below, such a practice was identified in the previous assessment and continued to be contrary to CDCR policy.

This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods

from 12:00 a.m. through 8:59 a.m. on several sample days (i.e., November 9 for LAC 2 and LAC 3, November 12 for LAC 4, and November 13 for LAC 5). The chart review found numerous observation checks (i.e., between eight and nine per patient) that were in excess of required 15-minute intervals for LAC 2 and LAC 3, with the longest gap between checks being 28 minutes. The violations in the other two cases were alarming. For example, in one case (LAC 4), there were multiple time gaps including two and three hours (from 12:12 a.m. to 2:05 a.m. and then from 2:07 a.m. until 5:38 a.m. on November 12. In the other case (LAC 5), there were multiple time gaps that included a five-hour period (12:19 a.m. until 5:28 a.m.) on November 13. Later that morning, the patient was observed with a piece of cloth tied around his neck at approximately 12:00 p.m. He had last been observed 24 minutes earlier at 11:36 a.m.

A previous problem with patients being clothed in both "partial-issue" clothing and safety smocks, as well as clinicians under the incorrect assumption that patients needed to be discontinued from a suicide observation level in order to be "eligible" for activities such as yard, telephone calls, and visits, had been corrected. Patients were observed to be appropriately clothed consistent with their level of suicide risk or lack thereof. In addition, an RT had been assigned to the MHCB unit the week prior to this reviewer's assessment for up to 12 hours per week and out-of-room activities, including yard, were beginning to be made available.

This reviewer observed nine IDTT meetings for MHCB patients on November 13 and 14. Although there was good representation from custody, medical, and mental health personnel, several problems were observed. *First*, of the 12 patients housed in the MHCB unit on November 14, only three were on either Suicide Watch or Suicide Precaution status. Although the LOP required that patients not on suicide observation status be observed at 30-minute intervals, the remaining nine patients were not being observed at all by nursing staff. IDTT members appeared unaware of this policy when it was reiterated by this reviewer, even though the issue had been identified in the previous assessment. *Second*, in at least one case (LAC 6), the patient was admitted to the MHCB on November 9, 2017 for suicidal ideation. Despite continuing to voice SI throughout his placement, he was discontinued from Suicide Precaution status two days later on November 11. During his IDTT meeting on November 13, the patient continued to express suicidal ideation, as well as experiencing auditory hallucinations "all the time telling him to kill himself," but still was not placed on Suicide Precaution status. *Third*, of the nine IDTT meetings observed, there was some discussion of safety planning in four cases, but not in the two cases in which both patients were released from the MHCB on November 14.

Finally, a review of Guard One data for a recent 24-hour period found 96-percent compliance with required checks not exceeding 35 minutes in the STRH unit and 97-percent compliance in administrative segregation EOP. Of note, however, CSP/LAC experienced a suicide in May 2017 in which the suicidal inmate (LAC 7) was placed in a STRH unit holding cell pending a mental health evaluation and left unobserved for over 60 minutes. On August 4, 2017, another inmate (LAC 1) committed suicide and his body was found in a state of rigor mortis in the EOP administrative segregation unit, an indication that Guard One checks were not completed as required. As detailed in the previous assessment, there were questionable Guard One practices involving an inmate who committed suicide in the STRH unit in April 2016.

*In sum, the multiple violations of required observation of MHCB patients on suicide precaution status, including cases involving gaps of two, three, and five-hour periods of time was extremely problematic at CSP/LAC and continued following this reviewer's November 2017 assessment.  In addition, there were 27 observation checks that were in excess of required 15-minute intervals during the 14 hours leading up to the suicide of a MHCB patient (LAC 8) on December 5, 2017.  Finally, high compliance rates for Guard One in the administrative segregation units were offset by continuing questionable Guard One practices related to two suicides that occurred in May and August 2017.*

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from May through November 10, 2017.  In addition, the TTA log for the same time period was also reviewed.  This reviewer's sample eUHR and EHRS review of 54 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRE/SRASHEs in only 85 percent (46 of 54) of the cases.

This reviewer examined a sample of ten SRE/SRASHEs from patients released from a MHCB between September and November 2017.  Although there was some progress noted in the quality of safety plans from previous assessments, most of the reviewed plans simply recommended that the patient identify coping skills and strategies to reduce SI with the receiving clinician.  For example, in one case (LAC 9) in which the patient was in the MHCB for ten days, and had a history of at least three suicide attempts and multiple MHCB placements, the safety plan contained within the discharging SRASHE stated the following:

> 1) IP to return EOP LOC w/5-day step down.
> 2) IP will have no self-reported and/or collateral self-reported incidents of SIB (cutting or hanging) over the next 90 days.
> 3) IP will identify 3 things that prevent him from harming himself and learn to focus on these things when he has thoughts of self-harm over the next 90 days. IP agreed to verbal safety plan and will notify custody if he is unable to control thoughts of self-harm or has intent or desire to harm himself.
> 4) IP will learn 2 strategies (e.g., journaling, letter writing) to start to process the death of his uncle and utilize the strategies at least once a day over the next 90 days.

In another case (LAC 10), a patient who had been in the MHCB for five days, had a "high" chronic risk for suicide, and had previously been on the facility's High-Risk List, had the following safety plan developed by another clinician:

> CBT/DBT model recommended to identify 1-2 effective coping skills to manage distress tolerance and reduce MHCB admits/crisis evaluations during PC contacts in the next 90 days.  IP to learn 3 new calming strategies to assist in managing anger response during 1:1 PC contacts in the next 90 days.  Identify at least 3 thoughts that trigger irritability within the next 90 days.  Reframe at least 3 negative thoughts that enhance agitation into a more neutral thought during each individual session over the next 90 days.  He has several protective factors

motivating his self-preservation such as getting his non-mental health needs met, family support including children in past suicide attempts that were situational specific, and more distant in time.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 319 cases of patients discharged from a MHCB or alternative housing placement that remained at CSP/LAC and were not transferred to the administrative segregation units (where observation at 30-minute intervals was required) from May through October 2017. The review found that 91 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (86 percent) of the custody checks recommended for the full 72 hours by clinicians. In addition, only 57 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies found were gaps in observation by custody personnel.

**Intervention**: Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (August through October 2017) found that quorums were not achieved in any of the meetings. The meeting minutes were otherwise unremarkable.

**Training**: According to training records, 82 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 93 percent of custody, 59 percent of medical, and 55 percent of mental health staff received annual suicide prevention block training during 2016. Similar low percentages of medical and mental health staff completing annual suicide prevention block training was found in the previous assessment. Finally, as of October 2017, only 50 percent of mental health clinicians had completed the SRE mentoring program, 99 percent had received the seven-hour SRE training, and 66 percent had completed safety plan training.

**Recent Suicides**: CSP/LAC experienced four inmate suicides during the reporting period. In the _**first**_ case (LAC 11), the inmate was found hanging from a ventilation grate by a bed sheet in his GP cell during the afternoon of March 26, 2017. He had entered the CDCR system on March 3, 2016 to serve a sentence of unidentified length for resisting/deterring an officer with threat of violence. He was transferred to CSP/LAC on March 16, 2017. The inmate had two RVRs during his confinement, one for fighting on February 28, 2017, and the second for sexual disorderly conduct on March 15, 2017. He was not known to be gang-affiliated. The inmate had

111

family support from both parents through letter correspondence, as well as regular visits from his mother. He was unmarried with an 18-month-old son.

According to available records, the inmate had a very dysfunctional childhood. His parents divorced when he was 6 years old, and as a result of child abuse, was removed from the home at age 13. He subsequently lived in foster care and group homes. The inmate had a history of substance abuse beginning in early childhood. He was also involved in both the juvenile and criminal justice systems. He served his first CDCR term from 2006 through 2013.

As a teenager, the inmate was diagnosed and treated for ADHD, Bipolar Disorder, and depression. He was reportedly hospitalized once for a suicide attempt by overdose in 2000. During his first CDCR term, the inmate was admitted to DSH in 2011 for depression, anxiety, hopelessness, and suicidal ideation, with a plan to stab himself in the neck. Prior to his second term, the inmate self-reported a suicide attempt in the county jail in 2015. Upon entry into CDCR for the second term, he was placed in the MHSDS at the 3CMS level of care with a diagnosis of Mood Disorder NOS and Antisocial Personality Disorder. The inmate also reported visual hallucinations. He admitted to having used illegal drugs in the past as well as in CDCR, and although not found to be psychotic, the connection between his drug use and past psychotic symptoms was implied in his mental health records. He was admitted into the MHCB on two occasions in December 2016 and February 2017. Both admissions were for suicidal ideation based upon the loss of his young son to adoption, recent death of his grandmother, anxiety related to his upcoming release, and for receiving an RVR for fighting. His diagnoses of Mood Disorder and Antisocial Personality Disorder remained unchanged.

Upon arrival to CSP/LAC in March 2017, the inmate was evaluated for admission into the MHCB on three occasions (March 17, March 21, and March 22), but never admitted. All three emergency mental health referrals were based on suicidal ideation, "fear that he would never make it out of prison alive," and stress about his son's adoption and recent death of his grandmother. The inmate had two SREs completed on March 22, 2017. According to the CDCR reviewer in this case:

> Documentation in the first assessment quoted the inmate as stating, 'I did something that put me at risk,' 'they are going to kill me,' 'I am a piece of shit, I am not safe,' 'If I go back to my cell I am going to jump off the tier or hang myself,' and 'I am going to kill myself because I'm going to die anyway.' A second SRE was performed and 1310 hrs. to determine the inmate's need for a higher level of care. Although the inmate was observed to have cut himself while waiting for assessment, an LPT had informed the crisis clinician that the inmate's wounds had been medically-cleared, and that they were 'superficial.' No documentation regarding a medical clearance by a physician can be found. The crisis clinician documented that the inmate had calmed down. The crisis clinician noted that the inmate's reason for cutting himself previously was aimed at getting a cell move, and that his move was in process….The crisis clinician noted the inmate denied all suicidality (intent, plan, and means).

According to the CDCR reviewer in this case, although the inmate did not have any medical issues that were viewed as contributory to his death, and he did not leave a suicide note, "Over the past month or so, the inmate had persistently expressed concerns for safety…. Engaged in self-harm behavior, made statements regarding his intent to end his life, and was observed to be acting erratically…. He did not leave an explanation of the reasoning to end his life. However, the fear of retaliation for his actions during an altercation, loss of his child through adoption, and his fear of failure upon his July 2017 release appeared to be plausible contributory factors."

The Suicide Report contained 11 recommendations for corrective action through a QIP:

> 1) Custody staff responding to this incident failed to respond with the appropriate cut-down kit, but rather the cut-down tool alone, while another officer responded with the Ambu bag.

> 2) The inmate was secured in the shower versus a holding cell in boxer shorts for a total of 5 hours and 25 minutes while awaiting a mental health assessment on March 22, 2017. LAC #511 identifies use of showers as holding cells is not recommended separate except for incidents where no other option is available or practical. In addition, if clothing is confiscated from the inmate, new clothing shall be issued, such as the jumpsuit.

> 3) An initial SRE performed at DVI-RC on March 8, 2016 marked 'no' for all chronic risk factors, except 'yes' for 'male.' All acute factors marked 'no,' except for 'recent cell change' and 'single cell status.' There was no reference to a review of the inmate's first clinical documentation and suicide assessments, which would have provided consistent reference to his chronic risk factors, including the suicide attempt. A second mental health evaluation on March 22, 2016 referenced his first term clinical documentation and placed the inmate in CCCMS due to his clinical treatment history. It is unclear if there were barriers with the chart, making the prior clinical documentation unavailable to the assessing clinician on March 8, 2016; however, the documents were available for reference on March 22, 2016 and the inclusion of the information prompted a CCCMS level of care recommendation.

> 4) Two SREs were completed on March 22, 2017. The PC completed the SRE at 1018 hours and noted 9 acute and 7 chronic factors; the suicide risk was estimated as moderate chronic and high acute. The second SRE was conducted three hours later, and reports indicated the inmate had cut his arm in the shower while awaiting the assessment. This SRE identified 6 chronic risk factors and no acute risk factors; the risk was estimated as moderate chronic and low acute risk for suicide. The top of this SRE had a written statement – 'treat as original as of 3/27/17.' The inmate was not referred for an MHCB admission and the safety plan indicated: 'I/P was educated to always contact any staff when in crisis and also safety planning reviewed during contact. Provided psychoeducation on working with PC on appropriate ways to advocate for needs w/out resorting to maladaptive bxs.' Per consultation with facility supervisors, the first SRE was

reportedly not available in the system at the time of the assessment. The progress note and SRE for the MHCB evaluation does not provide a clinical rationale for not recommending additional precautions or resources, or for not admitting the inmate to the MHCB. It is unclear whether the PC was consulted for this MHCB evaluation; however, the collaboration would have been useful given the discrepant presentations by the inmate.

5-11) Seven nursing care concerns were identified. The concerns are listed above and considered contributory to the death. (Three of these nursing concerns occurred at DVI, one occurred at CHCF, two occurred at CSP/Sac, and one occurred at CSP/LAC. All related to documentation and medication errors.)

In the **_second_** case (LAC 7), the inmate was found hanging from an unidentified fixture in a STRH holding cell during the early evening of May 18, 2017. He had entered the CDCR system on May 11, 2004 to serve a sentence of 40-years-to-life for second-degree murder. The inmate was transferred to CSP/LAC on March 15, 2012. He had 14 RVRs, most of which involved alcohol possession and threatening staff and other inmates. The most recent RVR occurred on May 6, 2017 and involved throwing feces and trash out of his cell, resulting in his STRH unit placement. The inmate was not known to be gang-affiliated. He had some family support, including irregular visits from his mother.

According to limited available records, the inmate had a dysfunctional childhood and was the oldest of seven children. His childhood included a history of physical abuse by family members and sexual abuse by a stranger. Both his father and a sister had involvement in the criminal justice system. There was also a significant family history of mental health problems. The inmate had a limited juvenile and adult criminal history. He had no known mental health history in the community. There were inconsistent reports about his marital status.

During the first ten years of his CDCR confinement, the inmate was in the MHSDS for brief periods of time including 2005 and 2009-2010. During both of these periods, episodes involving affective and psychotic symptoms were reported. He was initially diagnosed with Major Depressive Disorder, Severe with Psychotic Features in 2005, and was discharged from 3CMS in May 2010 with a diagnosis of Antisocial Personality Disorder. In April 2014, the inmate was referred to mental health after smearing feces on his body and around his cell. He re-entered the MHSDS at 3CMS level of care with a diagnosis of Psychotic Disorder NOS and subsequently had three MHCB placements that year for grave disability and suicidal ideation. He was often suspected of "malingering," and according to the CDCR reviewer in this case, "Secondary gain was suspected, with a motivation of attaining EOP placement rather than CCCMS level of care. He was seen as a low acute and low chronic risk for suicide."

On November 7, 2014, however, the inmate attempted suicide and was initially placed in an MHCB before being referred to DSH. From December 2014 through February 2015, he was placed in the DSH APP and ICF programs; from February through July 2015 he was in another DSH-ICF program. The inmate reported ongoing suicidal ideation throughout these DSH placements. His diagnoses were Mood Disorder, NOS, and Antisocial Personality Disorder. He returned to CDCR at the EOP level of care. In June 2016, he was again placed in an MHCB

114

after being sent to an outside hospital following an alleged suicide attempt by drug overdose. From late June 2016 until his death, the inmate was treated at the EOP level of care and had diagnoses of Anxiety Disorder, NOS, and Borderline Personality Disorder (that was revised in April 2017 to "Axis II Deferred").

On May 9, 2017, the inmate was again sent to an outside hospital after reporting that he ingested an unknown amount of Tylenol. Upon return to CSP/LAC the following day (May 10), he was seen by a crisis clinician and stated: "I go 0 to 100, I want to be able to control some of (my) problems." According to the CDCR reviewer, "He requested to see his prior clinician and to be referred to DSH. He refused to discuss why he was sent out to the hospital, saying he would only talk to his prior clinician about what occurred. The evaluating clinician opined that the inmate was appropriate to return to the STRH." The inmate was screened by another clinician upon entry into the STRH unit later that day (May 10), with the clinician noting: "The I/P has been having a hard time coping since his cousin has been transferred (sic, had not occurred yet) and has been engaging in maladaptive behaviors: smearing feces and 'going suicidal.'" He was not referred to an MHCB, although documentation erroneously indicated that he had been.

The following week on May 18, 2017, the inmate had an IDTT meeting in which the team offered a number of incentives, including receiving a television, a package, and retaining him in the MHSDS if he agreed to clean his cell, stop smearing feces and program appropriately. As summarized by the CDCR reviewer, almost immediately after the IDTT meeting:

> Clinical staff noted that "around 1650 hours," the inmate was overheard talking with custody staff, saying that he did not want to go back and clean the cell. He argued that his cousin had made him promise before he transferred not to clean the cell and as 'other inmates told him to leave it, to stand up to custody.' A short time later the inmate told staff present that he felt suicidal, concerned that he 'cannot keep his word' with both his IDTT team and with the other inmates. He told staff he had gone to his cell to start to clean it but was harassed by inmates for 'caving in.' He was seen as reporting feeling suicidal to remove himself from the situation. Clinical staff overheard the STRH sergeant state that the inmate was to be 'stripped out' and placed in a holding cell, with someone assigned to 'sit on him' until the crisis clinician evaluated him.

The inmate was left unobserved and subsequently committed suicide.

The CDCR reviewer found that the inmate's medical history was unremarkable and not contributory to his suicide. Interviews with several STRH inmates indicated that the suicide was not surprising. One inmate told the CDCR reviewer, "he was just tired… That he had 'had it with this.' He gave someone a number to call if he died….and he asked me to pray for him." Another inmate reported the inmate asked for his prayers, said "he wasn't feeling it, and was tired of living." As the CDCR reviewer concluded:

> The inmate's clinical presentation was very complex, and his behavior was rather provocative…. The inmate was seen at times as having no mental illness, or having only personality pathology, or only adjustment problems. His risk for

suicide was typically viewed to be low, despite considerable evidence of acute and chronic risk…. The suicide may represent that he had simply grown tired of living, or was distressed about his cousin transfer, or is facing harassment from other inmates, or was upset about not being able to return to his yard and program. Perhaps being in conflict between his agreement with this team and custody, and his agreement with his cousin and other inmates triggered the hanging. Whatever the combination of reasons, it is clear that his actual risk for suicide was often underestimated, and that leaving him unattended on May 18, 2017 was both unfortunate and not per policy.

The Suicide Report contained 25 recommendations for corrective action through a QIP:

1-7) The CDCR 837s submitted by responding staff identify numerous concerns as noted throughout the review which present as policy and procedure violations.

8-12) Five nursing care concerns were identified. The concerns are listed above and were considered contributory to the death.

13) Five mental health referrals were submitted regarding the inmate between April 21, 2014 and April 28, 2014 for behaviors including fecal smearing, mutism, visual hallucinations, and command auditory hallucinations. The referral on April 24, 2014 was elevated to an emergent status, and a second emergent referral was submitted on April 26, 2014. He was not seen until April 28, 2014 and then was found in no need for mental health follow-up (despite having been placed in CCCMS on April 22, 2014). Per the Mental Health Services Delivery System *Program Guide*, 2009 revision, "An inmate deemed to require an emergent (immediate) referral shall be maintained under continuous staff observation until evaluated by a licensed mental health clinician." Further, the clinical documentation on April 28, 2014 did not have a rationale for not recommending a mental health follow-up, despite his recent erratic behavior and change in LOC.

14) On April 21, 24, 26, and May 9, 21, 24, 2014, the inmate was observed smearing feces on his body and around his cell. He reported acting in this way in an effort to drive away 'foreign entities' and 'evil shadows.' Despite the severity of his behavior he was not referred for inpatient services until May 26, 2014. The clinical documentation during these encounters did not provide a clinical rationale for not referring the inmate to a higher level of care.

15) While in a MHCB at CHCF from May 27, 2014 to June 2014, the inmate smeared feces, was initially evasive about suicidal plans, and refused medications offered to him. Despite this presentation, no discussion of involuntary medications was found and there were no orders for psychiatric medications made. He returned to his facility with no psychiatric medications.

116

16) No SREs completed in 2014 documented an assessment of imminent risk factors. Chronic and acute risk appeared to be underestimated, and safety planning lacked in quality and continuity in these assessments.

17) Although it was mentioned in the DSH Psychiatric Discharge Summary (dated July 13, 2015) that the inmate reported a desire to jump to his death upon return to CDCR, a desire he reported over a number of months while at DSH, the treatment team at LAC did not document this information in the next treatment plan dated August 4, 2015, and the information was not included in the SREs completed in subsequent months.

18) SREs completed on July 13, 2015, July 20, 2015, and July 22, 2015 were administered by the same clinician, a clinician who used largely identical information in each evaluation (e.g., states, 'He doesn't hearing voices [sic]' in each SRE). The clinician ignored or was unaware of statements made in ASU pre-screening evaluations, screenings that indicated active suicidal planning and intent. Acute risk is underestimated on each occasion (as low chronic and low acute risk).

19) On December 23, 2015, the inmate requested to see a psychiatrist. Per documentation, he was not seen for this request as he declined a prior psychiatric appointment on December 16, 2015.

20) On June 4, 2016, the inmate reported taking 45-50 pills, type unknown. He was sent to an outside hospital, medically cleared, and returned. He was evaluated to be at low risk and low chronic risk, despite presenting with numerous imminent risk factors, and despite endorsing suicidal intent, planning, and desire to die. The action was deemed not to be a suicide attempt, though MHCB placement was made.

21) On April 13, 2017, the inmate was seen by a psychiatrist, five days after he threw feces on an officer's furniture and belongings. The psychiatrist described the inmate is experiencing 'an episode of nonspecific anxiety that appears to have resolved' and discontinued his medication (Paxil). This evaluation appears lacking in review of the inmate's history of mental illness and did not give rationale for not considering alternative medications.

22) Clinicians in the IDTT meetings on April 19, 2017 and May 18, 2017 did not document awareness of the inmate's prior suicidal crisis in October 2014, which was precipitated by a reduction in level of care (from EOP to CCCMS), or document knowledge of a prior suicide attempt (on November 7, 2014), in which he attempted to hang himself in a holding cell after hearing his level of care would not be increased back from CCCMS to EOP. Knowledge of these prior events may have led to his risk being managed differently in the days leading up to his death.

23) The inmate's actions on May 9, 2017 (overdose) appeared to have been significantly minimized. The evaluating clinician (on May 10, 2017) justified a rating of low acute risk despite the overdose and despite the inmate refusing to speak about the event to the clinician. Following the evaluation, the inmate answered pre-ASU screening questions with reports of distress and suicidal ideation, indicating that his risk had not dissipated.

24) An IDTT meeting was held on the day of the inmate's death to address fecal smearing. This documentation suggests that his participation in the MHSDS was somehow made contingent or related to him as contingent on his discontinuing fecal smearing, 'Patient will remain in the CCCMS program contingent on him programming and not retaliating against staff.' This is not a valid reason for discontinuing services per program policy.

25) Custody documentation stated that a mental health supervisor told the inmate, 'You're not suicidal' approximately one hour and 20 minutes prior to his death, 'and would relay this information to the on-call psychologist' (the crisis clinician). The statement may have been provocative to the inmate or increased his sense that he would be treated unfairly or dismissively.

In the ***third*** case (LAC 1), the inmate was found hanging from the ventilation grate by a sheet in his EOP administrative segregation unit cell during the morning of August 4, 2017. His body was found in the state of rigor mortis. He had entered the CDCR system on November 2, 2012 to serve a life sentence (with the possibility of parole) for first-degree murder with a firearm. The inmate was transferred to CSP/LAC on May 22, 2017. He had 6 RVRs, the most recent of which occurred on March 16, 2015 involving failure to return a library book. The inmate was known to be gang-affiliated. In May 2013, he was endorsed to the SNY due to expressed safety concerns. He had good family support, including letter correspondence, regular telephone calls, and occasional visits from his parents. The inmate was never married and did not have any children.

According to available records, the inmate was born and raised by his biological parents. He had four other siblings. The inmate would later confide to a mental health clinician that he molested one of his sisters as a teenager. He had a history of substance abuse and joined gangs at an early age "because he yearned to belong and 'to man up'." He did not have any prior history of arrests or convictions, and the instant offense involved the murder of a rival gang member when he was 17-years-old. He received some mental health treatment in the community during early adolescence for depression.

Upon entry into CDCR, the inmate did not endorse any mental health symptoms and was not initially placed in the MHSDS. However, on August 22, 2015, he was placed in administrative segregation for safety concerns and subsequently observed "ramming his head against the wall" and crying. He was placed in a MHCB and given the diagnoses of Adjustment Disorder with Mixed Anxiety and Depressed Mood, and Antisocial Personality Disorder. The admission note stated that: "He endorsed suicidal ideation passive. Anxiety/paranoia-large, depression-moderate, recent meth use (3 days prior), concerned about recent events of his safety and inmate's

discovering of his sex activity. Despondent over sentence and shame about SNY and sexual incident that's been recently known by others/cellmate." He was discharged from the MHCB on September 4, 2015. Approximately a month later on October 2, the inmate was observed to be making a ligature out of a sheet. He subsequently told a nurse that he was "ashamed of his situation as homosexual" and that "suicide may be a better alternative than being in prison." He was again placed in an MHCB and discharged on October 23, 2015 at the EOP level of care. His diagnoses were Adjustment Disorder, Methamphetamine-Induced Psychosis, Polysubstance Dependence, and Antisocial Personality Disorder.

The inmate was admitted into a MHCB for the third time on November 10, 2015. He reported that he had allegedly made a suicide attempt by jumping off his bunk but the ligature broke. According to MHCB documentation, the inmate "endorses purposelessness in face of life term, expects to go in front of the board in 19 years, but honestly believes he will likely commit suicide rather than serve out sentence." He was not referred to DSH because his mood and paranoia had stabilized, he was medication-compliant, and engaged in out-of-cell activities. The inmate was discharged from the MHCB on November 18, 2015 with diagnoses of Substance-Induced Mood Disorder, Adjustment Disorder, and Antisocial Personality Disorder. During most of 2016, medication compliance and EOP programming was viewed as inconsistent. His auditory hallucinations were thought to be drug-related. Themes of loneliness and isolation from his family reoccurred during clinical contacts, as did the questioning of his sexual identity. His substance abuse increased throughout the year.

On January 30, 2017, the inmate reported that he cut himself the previous week while using drugs, and a laceration was noted on his arm. He denied any current suicidal ideation and an SRE was not completed. During the next few months, the inmate's medications were adjusted due to his frequent non-compliance. In a progress note dated April 10, 2017, his PC wrote that "IP reports a low level of depression. IP shared that he recently had a visit from his father. IP shared that his father made a comment that insinuated he was to blame for his parents' divorce and other family problems." In a subsequent progress note dated April 24, his PC wrote that "IP reports anxiety due to finding out that he will be transferred to another institution. IP continues to struggle with substance abuse and recovery. He reports labile mood over the past week." On May 3, 2017, the inmate reported suicidal ideation over the previous weeks and months. An SRE was completed and both his chronic and acute risk for suicide was rated as moderate. The SRE did not contain a specific safety plan nor was the inmate referred to a MHCB.

Following his transfer to CSP/LAC on May 22, 2017, the inmate told a clinician that "I'm just checking it out….to be honest, if I don't like it here then I'll leave…taking it day by day." A subsequent Mental Health Evaluation dated June 2, 2017 noted that "IP appeared to have a history of reporting SI and making para-suicidal gestures in an attempt to manipulate his environment and fulfill certain needs/desires." During the next few months, the inmate appeared to adjust adequately to the facility, stating that he was now closer to his family. However, his drug abuse continued, and his attendance in both individual and group therapy was sporadic. The inmate attended his IDTT meeting on August 3, 2017, the day before his death, and the summary stated:

I/P stated the following: 'It doesn't really matter (CCCMS or EOP)….I don't think any of you care ……even if I told you (everything), you wouldn't care…..I think with the things I've done I don't deserve to live.' I/P appeared tearful at one point during the meeting.  Affect-dysphoric, irritable, restricted.

Shortly after the IDTT meeting, the inmate was placed in the EOP administrative segregation unit due to safety concerns.  He was not placed in a suicide-resistant new intake cell as required.  He committed suicide the following morning.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any serious medical issues that were deemed to be contributory to his death.  However, the CDCR reviewer opined that the inmate had been contemplating suicide for several years before his death:

The weight of his lengthy term, the knowledge he molested his sister, his participation in a murder, his struggle with addiction, and the shame or confusion about his sexuality became too much to tolerate.  He grew tired of prison and increasingly felt like a burden to his family.  Because his suicidal thinking and suicide risk appeared chronically high, revealing itself back in a 2015 progress note ('I think of everything from hanging myself to slicing my wrists to starvation.  I go down the list and weigh my options'), it appeared to take very little to make his final decision.

The Suicide Report contained four recommendations for corrective action through a QIP:

1) There was no SRE completed or any specifics about the safety plan mentioned during a January 30, 2017 contact with mental health staff (at COR).  This contact was the result of a referral from nursing about lacerations on his arms from a suicide attempt.  In the May 3, 2017 SRE, the inmate reported suicidal ideation in the past week and past few months, yet there was no individualized safety plan included in the SRE to address his risk factors, warning signs or suicidal ideation.  A suicide risk safety plan should include individualized items to reduce and manage suicidal ideation and risk factors.

2) Upon arrival at LAC, there was no SRE completed even though he reported suicidal ideation in the month before his transfer and had a suicide attempt in January 2017.  Per the 2009 Mental Health *Program Guide*, 'Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts,' a suicide risk assessment 'shall be completed.'  Given his history of suicide attempts, recently reported suicidal ideation in May 2017, and warning signs and risk factors, and comments during August 3, 2017 IDTT about not deserving to live, an SRE should have been completed.

120

3) The inmate was discovered alone in a non-retrofitted intake cell within 12 hours of his initial ASU placement. Records identified a retrofitted intake cell (D5-125) was vacant at the time of his ASU admission.

4) Based on reports submitted by responding staff, the inmate was discovered cold to the touch, had a rigid jaw and fingers, and purple/blue fingertips. This calls into question the thoroughness of the Security/Welfare checks completed initially on Second Watch and completed during First Watch on the unit. The officer who conducted the first two Guard 1 checks on Second Watch (0610 hours and 0640 hours) reports cell 231 did not have a door tag that would assist in identifying an inmate was assigned to the cell. The officer also reports he observed the sheet covering the window but was able to see two empty beds through a small space above the food port. Review of the Guard 1 'Rounds Tracker Summary' identifies all checks were completed. However, it appears the making of a visual/physical observation of a living, breathing inmate, free from obvious injury as required did not occur appropriately during either watch.

In the ***fourth*** case (LAC 8), the inmate was found hanging from the protective cover of the smoke detector by torn strips of a mattress in his MHCB room during the late evening of December 5, 2017. He had entered the CDCR system on February 29, 2000 to serve a life sentence (with the possibility of parole) for second-degree murder with enhancement for intentional discharge of a firearm causing great bodily injury/death. He was transferred to CSP/LAC on December 28, 2017. The inmate incurred 19 RVRs during his 17-year confinement, most recently for fighting on November 26, 2017. He had been gang-affiliated and sought SNY status in July 2012 after being a gang-dropout. He also spent considerable time in administrative segregation during 2016 and 2017 due to safety concerns over an accumulating drug debt. The inmate was unmarried and had a young son. He did not have any recent family support and had stopped communicating with his family a few years earlier because he did not want to be a burden to them any longer.

According to limited available records, the inmate was raised by his mother following the divorce of his parents when he was a young child. His father subsequently committed suicide. He had four siblings and was reportedly physically abused by his aunt and uncle. He began experiencing substance abuse as a teenager and reportedly overdosed on cocaine in 1996. He had numerous juvenile and adult arrests and convictions, and due to his illegal entry into the United States from South Vietnam, had an active Immigration and Customs Enforcement detainer.

The inmate did not have a history of mental health treatment in the community. However, when he entered the MHSDS system in December 2016 at the MHCB level of care for suicidal ideation, he reported to a clinician that he first started experiencing symptoms of depression and anxiety when immigrated to the United States at age 14. He also reported a suicide attempt as a teenager. The inmate's initial diagnoses in the MHCB were Depressive Disorder, NOS, and Psychotic Disorder, NOS (rule in/out). He was subsequently released from the MHCB on January 6, 2017 with a diagnosis of Major Depressive Disorder with Psychotic Features. He was also assessed to have both a "moderate" chronic and acute risk for suicide. However, three days

121

later on January 9, the inmate was again admitted into an MHCB for suicidal ideation and command auditory hallucinations telling him to hang himself. He also reported feeling distanced and disconnected from his family, as well as experiencing safety concerns due to drug debts. The inmate was also using methamphetamine on a regular basis during the previous two weeks. His diagnoses were revised to Substance-Induced Psychosis and Depressive Disorder, NOS. He was discharged at the EOP level of care on January 17, 2017.

From January 17 through May 18, 2017, the inmate received treatment in the EOP administrative segregation unit at CMC. He continued to report on-going passive suicidal ideation without a plan but remained relatively stable on his medication. On May 11, he was put up for transfer to a Level 4 facility and reported a few days later that he was actively suicidal with a plan he would not disclose. He was placed in a MHCB on May 18. While in the MHCB, the inmate was referred to a DSH-ICF program on May 30 and subsequently transferred to that program on June 22. He remained in the ICF program until November 16, 2017 when he was discharged to SVSP at EOP level of care. Although remaining medication-compliant in the ICF program, the inmate frequently refused any in-patient treatment groups, minimized his substance abuse issues, and had poor insight into his mental illness.

While awaiting transfer to CSP/LAC on November 28, 2017, the inmate superficially cut his right forearm because he was depressed and anxious over safety concerns related to the transfer. The required SRASHE was not completed and he was subsequently transferred and cleared for GP housing. Several days later on December 3, the inmate made suicidal statements to staff and superficially cut his right foot. A SRASHE was completed and he was placed in the MHCB. He told a clinician that "Wherever I go, they want to get me, it happened already here, I'm tire (sic) of running away." The inmate told a clinician the following day (December 4) that although he did not want to die, he was experiencing both depression and anxiety over fears that he would be attacked in the yard. His diagnoses were changed to Adjustment Disorder with Mixed Anxiety and Depressed Mood; Psychotic Disorder with Hallucinations. He was subsequently downgraded from Suicide Precaution status to 30-minute observation with "full-issue" clothing without any documented clinical rationale for the decision. Later that day, the inmate was found to be "braiding a towel" into a ligature and placed on Suicide Watch status, but the clinician inadvertently allowed the "full-issue" order to remain in effect, resulting in confusion amongst nursing staff. The following day (December 5), another clinician downgraded the level of observation to Suicide Precaution status, with the "full-issue" order remaining in effect. There was no progress note documenting the clinical rationale for the decision. The inmate was found hanging later that evening. During subsequent inspection of the cell, a razor blade was found which the inmate had apparently utilized to tear the mattress cover utilized in the hanging.

The CDCR reviewer in this case did not cite any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, other than the obvious fact that he was in the MHCB for suicidal ideation related to increased depression and anxiety surrounding his safety concerns. The reviewer suggested that:

> His cultural differences as a Vietnamese male further complicated his ability to gain insight into his mental illness and understanding how illicit substances further exacerbated his symptoms; it was not culturally sanctioned in his ethnic

group to reach out for mental health services or even to acknowledge a problem. His aloneness and isolation further escalated as time passed and he began to feel targeted for death by other inmates due to his mounting drug debts, and safety concerns as result of chronic substance abuse. Unfortunately, his inability to adequately express himself and his fears due to cultural background, often resulted in staff underestimating his expressed psychiatric symptoms or believing he was less than truthful about his cultural and perceived enemy concerns. In the end, these factors likely played a heavy role in his decision to end his life.

The Suicide Report contained 12 recommendations for corrective action through a QIP:

1) The MHCB discharge SRE conducted at COR on January 6, 2017 was very basic and non-descriptive. The inmate had been hospitalized in the MHCB for approximately three weeks and there was minimal information in the SRE to note hospital course. His chronic risk (8 of 16 factors positive) was noted to be low, which was notable as he averaged approximate 50% for both categories. Yet, there was minimal discussion in the justification/safety plan sections for various ratings outside of the basic listing of factors. Acute risk was noted as low because the inmate had denied current suicidal ideation and homicidal ideation and a current desire or wish to die. Minimal protective factors were noted (4 of 12). Additionally, there was no individualization or integration regarding specific triggers which might necessitate a return to MHCB.

2) A SRASHE completed on January 23, 2017 at CMC post-discharge from MHCB to ASU EOP was problematic as a contained no real justification of risk and no viable safety plan. The safety plan section contained a listing of chronic risk factors which were listed in the wrong section of the SRASHE, and were neither individualized nor integrated.

A second SRASHE completed by the same PC at CMC on April 19, 2017 also was not well conceptualized. On this SRASHE, the PC reduced risk level for both chronic and acute risk to low, without an adequate explanation for the change. Additionally, the safety plan section noted: 'see SRE' without further explanation.

A SRASHE completed on May 30, 2017 as part of the MHCB discharge at CMC was problematic. Some acute risk factors were missed (perception of loss of social support; safety concerns) and some protective factors were not documented correctly (family support; positive coping/conflict resolution; insight into problems). The risk factors/justification section largely focused on the inmate's prior self-harm in the community without adequately incorporating the multitude of acute and chronic risk factors in prison. Additionally, most of the information in the safety/treatment plan section would have been more accurately placed in the risk level/justification section. Outside of the referral to the ICF program, there was minimal information contained in the safety plan about how the

institution's mental health staff was managing the inmate's depression, anxiety, fear over drug debts, and feelings of isolation.

3) The SRASHE written November 21, 2017 at SVSP was missing multiple elements, including which acute and chronic risk factors the inmate had, plus protective factors were missing.  Additionally, both the justification of the risk and safety/treatment planning sections contained minimal documentation.  There was no integration of risk factors. The C-SSRS section was also not fully completed.

There was another SRASHE written by the same clinician on November 27, 2017 after the inmate had been involved in a fight with another patient.  This SRASHE was also problematic as the clinician missed numerous acute risk factors for the inmate, including recent depressive and psychotic symptoms, recent substance abuse, loss of social support, interpersonal isolation, receiving bad news (PIP discharge with pending transfer to Level 4 prison), and safety concerns.  Therefore, her conclusion of a low acute risk was largely underestimated.

4) The SRASHE completed on November 29, 2017 upon transferred to LAC was inadequate.  The listing of acute risk factors was missing in the document and the protective factors were overstated (e.g., family support, insight, and positive coping skills).  Additionally, there was minimal justification of risk outside a basic listing of factors without integration, and the safety/treatment plan section was underdeveloped.  There was no indication the clinician had received any of the records from the PIP hospitalization.  There was no mention of the fact the inmate had cut himself the day before, which could escalate his risk for suicide.

The pre-MHCB admission SRASHE completed on December 3, 2017 was problematic: the clinician listed multiple protective factors in the safety plan which were likely confused with another inmate; for example, including contact with a daughter and grandchildren (this inmate had a son he was not in contact with), and completing his GED (which he had already possessed).  The inmate's individualized risk factors, including his recent episodes of self-cutting and self-reported safety concerns, and the pre-discharge fight at SVSP were not well integrated in the justification of risk nor the safety/treatment plan.

5) No SRASHE was found in EHRS documentation for November 28, 2017 after the inmate superficially lacerated his right forearm before leaving SVSP. *Program Guide* 12-10-8 states: 'At minimum, a written suicide risk evaluation using a SRE shall be completed: every time an inmate has an individual face-to-face evaluation for suicidal ideation, gestures, threats, or attempts by a clinician trained to complete the SRE.'  Given the inmate had not previously evidenced cutting behavior during his time in CDCR, this noted a change from previous level of functioning so, at a minimum, a SRASHE should have been completed prior to the discharge by the senior psychiatrist involved.

6) Clinical documentation by the inmate's ASU EOP PC at CMC (January-May 2017) was frequently inadequate in that most of the clinician's progress notes did not contain complete mental status, nor a specific plan which noted weekly progress. Frequently, the plan/disposition in the note was to 'continue EOP.'

7) When the inmate arrived at LAC, his psychiatric medications (Remeron and Zyprexa) were not reconciled, resulting in no psychotropic medication prescribed from November 28-December 4 (day before hanging). The inmate did receive Remeron on December 5, but the Zyprexa had yet to be reordered for him and as a result it was not given. During this time period, mental health staff were inaccurately documenting that he was medication compliant, when in actuality he was not prescribed psychiatric medication for seven days.

8) LAC mental health documentation in MHCB was sparse and inadequate. The clinician who reduced the level of observation on December 4 from Suicide Precaution after less than 24 hours in MHCB did not specify the rationale for such a quick removal of precautions. The same afternoon, there was inadequate documentation for the reason the inmate was placed on Suicide Watch by the on-call psychiatrist (there is no mention of the inmate braiding a towel documented until the following day). Similarly, the level of observation was decreased to Suicide Precaution on December 5, and no rationale was provided for that reduction in level of observation either. For subsequent changes of orders, a new face sheet was not produced for the patient's door which could have incorrectly contributed to other staff giving the inmate access to privileges he did not have, including clothing and reading material which may have been used to partially block his door so that he could construct his noose. Given LAC went live in EHRS at the end of October 2017, the confusion around EHRS orders for Watch and Precaution could be part of a training issue.

9) During the course of the on-site review at LAC, it was determined the inmate was found in possession of a state-issued razor that appears to have been utilized to cut strips of material from the safety mattress used to construct the ligature.

10) LAC Suicide Watch/Suicide Precaution documentation inconsistent with orders or policy.

11) LAC/SVSP Inter-Facility and Intra-Facility Transfer Process: Failure to follow procedures: EHRS workflow 0100-031 for ambulatory R&R: a) Encounter at the sending institution was closed prior to transfer, b) Reconciliation of medications could not be done by Mental Health, c) Psychiatric medication not ordered at receiving institution for seven days (11/28/17 – 12/04/17: Patient without psychiatric medications for seven days).

12) LAC – Issues in EHRS with no Suicide Watch/Suicide Precaution orders. The reviewer was shown a copy of the orders page from the inmate's door, where the previous order had been crossed out and initialed by a MHCB psychologist

125

after the inmate was placed on Suicide Watch at 1555 hours by the on-call psychiatrist. However, the MHCB staff did not delete or alter the part of the order in EHRS which states: 'Patient to be given full issue unless otherwise specified in this order by the provider' when he was placed on Suicide Watch. This may have added to the confusion by all staff (custody, mental health and nursing alike) who may have been following doctors' orders that appeared contradictory.

### 15)    California Correctional Institution (CCI)

**Inspection**: November 16-17, 2017 (previous suicide prevention audit was on April 26-27, 2016). CCI housed approximately 3,849 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed a few new admissions during the intake screening process in the D-Yard Clinic on November 17, 2017. (Of note, R&R was conducted in several different yards/facilities at CCI.) The nurse was observed to be asking all of the questions and correctly entering information into the EHRS. However, there was no door to the nurse's office and the desk where the newly-admitted inmates were positioned was adjacent to a high-traffic area, with other staff and inmates passing through, creating both excessive noise and absence of privacy and confidentiality. This reviewer was informed that the nurse's offices in both the C-Yard Clinic and E-Yard Clinic also did not have doors. (During the preceding assessment, this reviewer observed new intake screening in the B-Yard Clinic and found that a TTM had been installed to ensure privacy and confidentiality, and the door to the nurse's office remained closed during the intake screening process.)

In addition, this reviewer observed daily rounds by a PT in the administrative segregation unit (B-8) on November 16. The unit housed GP, 3CMS and EOP inmates. The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for MHSDS inmates.

**Housing**: CCI had eight of its 16 OHU cells designated to temporarily house inmates with mental illness and/or requiring suicide observation. These OHU cells were designated as **alternative housing** and required 1:1 observation prior to transfer to a MHCB unit. The cells had either fixed beds or stack-a-bunks. In addition, as observed during the previous assessment, inmates awaiting transfer to an MHCB and housed in the OHU on 1:1 observation were not automatically placed in a safety smock. Rather, because they were required to be observed on a continuous 1:1 basis, pursuant to a LOP (Volume 12: Mental Health Services, Chapter 5.1: "Mental Health Crisis Bed Program, Alternative Housing-Mental Health"), each inmate was "provided with a safety mattress, sheets, safety blanket, state issued clothing, including pants, shirt, socks, underclothes, reading materials, hygiene items and a prescribed healthcare appliance as clinically indicated as per Policy 12.05.301." Such a policy and practice continued to be very commendable.

From August 1 through November 4, 2017, there were approximately 127 inmates placed in alternative housing, and the vast majority (87 percent) was released within 24 hours. Only a handful of inmates were housed over 48 hours, and the overall length of stay for the 127 inmates was 19 hours. Almost all inmates were subsequently transferred to a MHCB.

126

Finally, the B-8 administrative segregation unit still contained three retrofitted new intake cells (A103-A105). Although there were not any new intake inmates observed in unsafe non-intake cells, a custody supervisor informed this reviewer that the unit exceeded its new intake cell capacity approximately every one to two weeks, and that a recommendation had been made in November 2016 to create more retrofitted new intake cells. It was unclear if a work order had been generated regarding this recommendation.

This reviewer also found another problematic practice in the administrative segregation unit. Five cells (101 through 105) in B-Section did not contain any bunks. This reviewer was informed that the bunks were removed several years ago when the unit was used for the special management of SHU inmates. Currently, any inmate placed in these cells was not provided a bunk. These cells should be taken off-line until permanent bunks are installed.

**Observation**: Because CCI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB. No other levels of observation were permitted within the OHU. During the assessment, this reviewer only observed medical patients in the OHU.

Finally, a review of Guard One data for a recent 24-hour period found 98-percent compliance with the required checks not exceeding 35-minute intervals in the administrative segregation unit.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of September 1 through October 31, 2017. This reviewer's sample EHRS review of 60 emergency referrals for suicidal ideation/behavior found that clinical staff completed the required SRASHEs in 95 percent (57 of 60) of the cases.

This reviewer did not review discharging SRASHEs at CCI because the assessments were conducted by mental health clinicians at other MHCB facilities.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 51 cases of patients discharged from a MHCB or alternative housing placement that were returned or transferred to CCI and not transferred to the administrative segregation unit (where observation at 30-minute intervals was required) from May through October 2017. The review found that 94 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (73 percent) of the custody checks recommended for 48

hours by clinicians.  In addition, 92 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  Housing units toured by this reviewer all contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (August through October 2017) found that quorums were not achieved in any of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 91 percent of custody and 100 percent of nursing staff was currently certified in CPR.  In addition, approximately 98 percent of custody, 90 percent of medical, and 86 percent of mental health staff completed the annual suicide prevention block training during 2016.  Finally, as of October 2017, 100 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had completed the seven-hour SRE training program, and 88 percent had completed safety plan training.

**Recent Suicides**:  CCI experienced one inmate suicide during the review period.  In that case (CCI 1), the inmate was found exsanguinated in his SNY cell during at approximately noon on December 26, 2017.  The inmate had entered the CDCR system on January 21, 2004 to serve a 21-year and four-month sentence for carjacking and attempted robbery.  He was transferred to CCI on May 3, 2017.  Of note, the inmate was housed in a contracted California Out-of-State Correctional Facility from April 2009 through May 2017.  He had eight RVRs during his confinement, the most recent of which occurred on October 28, 2016 for battery on another inmate.  The inmate was known to be gang-affiliated and was placed in SNY in March 2013 after becoming a gang dropout.  He had a detainer from Immigration and Customs Enforcement and was expected to be deported upon his release from CDCR.  The inmate had good family support through letter correspondence with his parents and siblings.  He also had periodic visits, including one as recently as December 2, 2017 from his niece.  The inmate was unmarried and had a 14-year-old daughter.

According to limited available records, the inmate was the youngest of eight siblings and initially raised by both parents in Mexico.  He came to the United States in 1993 at the age of 12.  The inmate initially lived with one of his brothers but was living with an aunt at the time of arrest for the instant offense.  The inmate did not complete high school and was sporadically employed.  He had a history of substance abuse as a teenager but did not report or have a documented history of mental illness in the community.  Throughout his CDCR confinement, the inmate did not report any mental health issues and was not placed in the MHSDS.  He never threatened suicide nor reported any history of suicidal behavior.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have a significant medical history that was found to be contributory to his death.  Posthumous interviews with staff and inmates found that the inmate was quiet, well-liked, and did not give any indication that he was depressed or suicidal.  However, a few inmates opined that he had sporadically used illegal drugs and it was possible that these substances contributed to the suicide.

The Suicide Report did not contain any recommendations for corrective action through a QIP.

### 16)    Deuel Vocational Institution (DVI)

**Inspection**: December 5-6, 2017 (previous suicide prevention audit was on August 30-31, 2016). DVI housed approximately 2,202 inmates at the time of the on-site assessment.

**Screening/Assessment**: This reviewer observed two new admissions during the medical intake screening process in the RC on December 6. The nurse's office had been recently renovated, and the door was closed during the intake screening process with an officer stationed outside, thus ensuring both privacy and confidentiality. However, both intake screenings were problematic because the nurse did not ask all of the mental health and suicide risk questions on the "Initial Health Screening-Male" forms. Following the process, this reviewer conversed with the nurse and inquired why all of the questions were not asked to either inmate. The nurse responded by stating that an "abbreviated" screening was completed if the county transfer form did not include any documentation of prior mental health or suicide history. Such a response was problematic for several reasons, including the fact that CDCR policy required that all questions be asked; an individual could certainly become suicidal following their county jail confinement and transfer to CDCR; and despite not asking all of the required questions, the nurse entered "no" to all mental health and suicide risk responses in the EHRS for both inmates (DVI 1 and DVI 2).

The following day (December 6), this reviewer observed the mental health diagnostic testing in the RC on one case (DVI 3). The clinician completed an extremely thorough examination of the inmate who had entered DVI a week earlier on November 30. He self-reported being currently depressed, as well as being previously diagnosed with Bipolar and Schizoaffective Disorders, as well as ADHD. During a previous CDCR term, he had been treated at the EOP level of care. The inmate also had a history of five prior suicide attempts. He had also been suicidal in the county jail and placed on suicide precautions for ten days in August 2017. The inmate admitted to being suicidal when he first arrived at DVI on November 30, claiming that he had thoughts of jumping off the second tier of his housing unit. Although not currently suicidal on December 6, he admitted having fleeting thoughts of suicide during the past few days. The inmate also complained of auditory hallucinations. The clinician spent well over 90 minutes evaluating the inmate, completing the MH Screening Interview, SRASHE (finding both "high" chronic and acute risk for suicide), MH Consult Inpatient, and mental health primary clinician (MHPC) Initial Assessment forms. The inmate was subsequently referred to a MHCB.

The only major concern with the case was that the inmate had self-reported much of the above information during the intake screening process on November 30. Despite the abundance of such concerning information, he was not seen by a mental health clinician until December 6.

Finally, daily PT rounds in one of the administrative segregation units (L-1) were observed on December 5. The rounds were unremarkable, and the PT was observed to be correctly completing the Psych Tech Daily Rounds Forms and entering the information into the EHRS for MHSDS inmates. Of note, PT rounds were being performed twice a day following the most recent inmate suicide in the L-1 Unit in November 2017.

**Housing**:  DVI had 24 OHU rooms, ten of which were designated as **alternative housing** to temporarily house inmates with mental illness and/or requiring suicide observation.  Each of the rooms had a bunk and inmates were required to be under 1:1 observation prior to transfer to a MHCB.  On occasion, TTA cells were also designated for alternative housing.  From September 1 through November 30, 2017, there were approximately 128 inmates placed in alternative housing, with the vast majority (84 percent) released within 24 hours.  No inmates were housed over 48 hours, and the overall length of stay in alternative housing for these 128 inmates was 16 hours.

Finally, the administrative segregation unit (L-1) housed GP, 3CMS, and EOP inmates.  The unit originally had five retrofitted new intake cells, but that number had been increased to 11 in the past year.  However, the 11 new intake cells (138 through 148) were not completely suicide-resistant.  One cell (148) had a gap between the bunk and wall, and all 11 cells had ventilation grates with holes in excess of 3/16-inch in diameter.  In addition to these 11 new intake cells not being completely suicide-resistant, there were three new intake inmates observed in unsafe non-intake cells.  This finding was particularly problematic because two inmates (DVI 4 and DVI 5) who committed suicide in the administrative segregation unit in October and November 2017 were not placed in suicide-resistant new intake cells upon admission.

Of note, the other segregation unit (K-1) had been closed for renovation since spring 2016 and was scheduled to be reopened in early 2019.  The K-1 Unit had contained 27 retrofitted suicide-resistant cells for new intake inmates.

**Observation**:  Because DVI did not operate a MHCB unit, all suicidal inmates were required to be supervised on 1:1 observation until they were transferred to a MHCB.  As noted above, most inmates were housed in the OHU.  No other levels of observation were permitted within the OHU for suicidal inmates.

A review of Guard One data for a recent 24-hour period found almost 100-percent compliance in the L-1 administrative segregation unit with the required checks not exceeding 35-minute intervals.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS from September 1 through November 30, 2017.  This reviewer's sample EHRS review of 40 cases of emergency mental health referrals for suicidal ideation/behavior revealed that mental health clinicians completed the required SRASHEs in only 85 percent (34 of 40) of the cases.

In addition, this reviewer examined ten SRASHEs of inmates initially placed in alternative housing for suicidal ideation at DVI, but their MHCB referrals were subsequently rescinded.  The review found that many of the SRASHEs did not contain safety plans to reduce future SI.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 92 cases of patients discharged from a MHCB and alternative housing that returned or transferred to DVI and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from June 1 through November 30, 2017. The review found that 85 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the vast majority (75 percent) of the custody checks recommended for 48 hours by clinicians. In addition, 88 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies cited were related to clinicians not signing documentation and/or gaps in the observation by correctional staff.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (September through November 2017) found that quorums were only achieved in one of the meetings (November). Of note, the monthly meetings averaged between 20 and 26 participants. Meeting minutes were otherwise unremarkable.

**Training**: According to training records, 96 percent of custody staff and 97 percent of medical staff were currently certified in CPR. In addition, 98 percent of custody staff, 86 percent of medical staff, and 79 percent of mental health staff received annual suicide prevention block training during 2016. Finally, as of November 2017, 93 percent of all mental health clinicians had completed the SRE mentoring program, 74 percent had received the seven-hour SRE training, and 19 percent had completed safety plan training.

**Recent Suicides**: DVI experienced four inmate suicides during the review period. In the _**first**_ case (DVI 6), the inmate was found hanging from the window bar by a sheet in his RC-SNY cell during the late evening of March 12, 2017. The inmate entered the CDCR system through the RC at DVI on January 19, 2017 to serve a 24-year and eight-month sentence for rape, false imprisonment, and assault (of his girlfriend). During his 53-day confinement, he did not have any RVRs. The inmate was not known to be gang-affiliated. He was unmarried and had a 13-year-old daughter. There was evidence of family support through letter correspondence found in the inmate's cell. There were also two brief notes found in his cell allegedly from other inmates indicating possible extortion due to their knowledge of his commitment offense.

According to limited available records, the inmate was born in Mexico and raised by his parents until he illegally entered the United States in 2007 in search of employment. His mother died in 2014 and he did not have any contact with his father. There was no record of siblings. He denied any dependence on alcohol or illegal drugs. He did not have any prior criminal history. There were no records indicating that the inmate ever received mental health treatment in the

community.  Upon entry into the CDCR, the inmate screened negative for any mental health issues and was not placed into the MHSDS.  However, a mental health referral dated January 19, 2017 from the intake nurse indicating that the inmate "got sentenced to 24 years.  New commitment, feels depressed," was apparently misplaced and not available to the clinician completing the diagnostic testing the following day (January 20).

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death.  However, the reviewer noted that the inmate was possibly a victim of extortion from other inmates due to knowledge of his crime, and although it was not known if he succumbed to their demands, "the pressures of these threats likely aggravated the existing presence of his underlying despair.  The inmate did not leave a suicide note or any other insight into his final decision to end his life; although the overwhelming fear of his extensive sentence and the desperation for his safety are plausible contributory factors."

The Suicide Report contained one recommendation for corrective action through a QIP:

> 1) The mental health referral submitted on January 19, 2017 was not received by the mental health clinician. Mental health clinician had seen the inmate on January 20, 2017, but the session was not in response to the referral, rather the inmate was seen per the routine intake process.  The referral was determined 'completed' and closed in the system by an office technician who mistakenly associated the mental health session with the referral.  The office technician printed the mental health clinicians name on the 'received by' and the 'assigned to' line on the referral; therefore, it could be misinterpreted as a signature indicating the referral was complete and clinician have seen the inmate.

> While with the implementation of the EHRS on March 7, 2017, all health care referrals will follow an electronic process in which the referral is sent directly to a clinician, all referrals made by non-health care staff will continue to use a paper referral process.  All referrals will continue to be scanned into the EHRS and an office technician will assign the referral to the appropriate clinician.  It is important that all staff who are responsible for assigning referrals ensure they accurately identify themselves as a person who receive the referral and the mental health clinician assigned to the referral.

In the _**second**_ case (DVI 7), the inmate was found hanging from the ladder by a sheet in his RC-SNY cell a few minutes after midnight on April 19, 2017.  The inmate entered the CDCR system through the RC at DVI on March 10, 2017 to serve a three-year sentence for corporal injury to his girlfriend.  During his 40-day confinement, he did not have any RVRs.  The inmate was not known to be gang-affiliated.  He had family support through letter correspondence with his mother and girlfriend.  The inmate was unmarried and had four children from prior relationships.

According to limited available records, the inmate was born and raised by his parents until he was approximately 15-years-old when he left home in order to obtain a job and provide financial

support to his newborn baby. He became employed as a seasonal laborer. The inmate also began using illegal drugs on a daily basis as a teenager. He had limited juvenile and adult criminal histories. There were no records indicating that the inmate ever received mental health treatment in the community. Upon entry into the CDCR, he screened negative for any mental health issues and was not placed into the MHSDS. The inmate denied any current or prior history of suicidal ideation or behavior.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death. Of note, a cellmate interviewed following the suicide alleged that the inmate had attempted suicide on three occasions during his brief DVI confinement. Two of these alleged incidents were not known to CDCR staff; there was an allegation that the third alleged suicide attempt by cutting was known to custody staff but did not result in a mental health referral. This allegation was pending further investigation. Several items of property and suicide notes were found in the inmate's cell. According to the CDCR reviewer, "His property had various items with themes of death, regret, a sense of being a burden to his family, and anguish over his girlfriend. He wrote several goodbye letters found within his belongings. These letters suggested that he had been ruminating about finding the means to end his personal agony and guilt over the pain he felt he inflicted on others."

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) Custody staff responding to the incident failed to respond with the appropriate cut-down kit but rather the cut-down tool and Ambu bag. California Code of Regulations (CCR), Title 15, Section 3365 (c) states in part, "A cut-down kit shall be immediately assessable on each unit and shall be used by staff in case of an attempted suicide by hanging."

> 2) Custody staff responding to this incident failed to articulate whether or not the body weight of the inmate was supported prior to being cut down. The Suicide Prevention lesson plan explains emergency response procedures and expectations during medical emergencies. The primary objective is to preserve life and specifically states custody is to relieve tension and cut the noose above the knot.

In the ***third*** case (DVI 4), the inmate was found hanging from the ladder by a sheet in his RC-administrative segregation cell during the late evening of October 29, 2017. The inmate entered the CDCR system through the RC at DVI for a third term on September 19, 2017 to serve a one-year and four-month sentence for possession of a weapon by a felon. During his 41-day confinement, he did not have any RVRs. The inmate was not known to be gang-affiliated while in CDCR but was associated with gangs in the community. On October 27, 2017, he requested to be housed in protective housing due to safety concerns. The inmate was subsequently housed in the RC section of the administrative segregation unit. He was not placed in a suicide-resistant new intake cell. The level of family support, if any, was unknown. The inmate was unmarried and did not have any children.

According to limited available records, the inmate was born and raised by his parents in Laos until he was approximately 16-years-old when he immigrated to the United States.  His closest family members included a mother, two older brothers, a younger brother, and at least two sisters.  Available records suggested that he lived alone, did not complete high school, and was sporadically employed.  The inmate reported that he began using illegal drugs as an adult.  His criminal history began at age 19 and included two previous CDCR terms.  There were no records indicating that the inmate ever received mental health treatment in the community.  Upon entry into the CDCR, he screened negative for any mental health issues and was not placed into the MHSDS.  The inmate denied any current or prior history of suicidal ideation or behavior.  On October 25, 2017, however, the inmate answered, "a little" when asked by a PT completing the ASU Screening Questionnaire whether he was nervous, hopeless, restless or fidgety, depressed, everything was an effort, and worthless.  He was seen by a mental health clinician several hours later, denied any current suicidal ideation, presented with an adequate mental status, and assessed as not being in need of any further mental health services.  It was later determined that the clinician had not reviewed the ASU Screening Questionnaire.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death.  Two suicide notes, as well as a Health Care Services Request form, dated October 26 and reporting that he was depressed and needed to see a mental health clinician, were found in his cell.  The request form had not yet been submitted and, therefore, unknown to staff.  According to the CDCR reviewer, "information gathered during the course of this review suggests fear of his safety, his impending release to the community on December 13, 2017, and his fear of rejection by his family appeared to be plausible contributory factors to the inmate suicide."

The Suicide Report contained two recommendations for corrective action through a QIP:

> 1) In an ASU Screening Questionnaire performed by a psychiatric technician on October 25, 2017 at 0955 hours, the inmate, a non-participant in the MHSDS, stated that he felt nervous, hopeless, restless or fidgety, depressed, or worthless within the past 30 days.  At 1329 hours the same day, the inmate was interviewed by a mental health clinician who did not provide any documentation referencing the information contained in the ASU Screening Questionnaire, despite this information being readily available to the clinician in the Electronic Health Record System (EHRS).

> 2) Although not found to be a contributing factor to the suicide, a review of the SOMS identified that the inmate had not been housed in a retrofitted intake cell upon his initial placement in ASU.

In the **_fourth_** case (<u>DVI 5</u>), the inmate was found hanging from the ladder by a sheet in his administrative segregation unit cell during the evening of November 17, 2017. The inmate entered the CDCR system through the RC at DVI on September 20, 2017 to serve a 16-month sentence for evading or attempting to evade a peace officer.  During his 59-day confinement, he did not have any RVRs.  The inmate was known to be gang-affiliated.  He had family support

through letter correspondence with his mother and grandmother. The inmate was unmarried and had a 4-year-old daughter.

According to limited available records, the inmate and five siblings were raised by both his mother and grandmother. Information regarding his father was unknown. The inmate reported a history of substance abuse beginning at age 12. He had a minimal employment history. He had an extensive juvenile history and was in and out of juvenile facilities from ages 12 through 17. The inmate reported a childhood diagnosis of ADHD and inconsistently took medication until age 17. He did not report any other mental health treatment in the community.

Upon entry into CDCR, the inmate reported a prior suicide attempt by a heroin overdose in 2016. He denied any current thoughts of suicide but indicated to the intake nurse that he was "feeling down or depressed more than half the time in the last two weeks." The inmate received diagnostic testing two days later on September 22 and again reported some depression and the prior suicide attempt (subsequently telling another clinician the incident was accidental). As a result, he was referred for further mental health assessment. Several days later on September 27, another mental health clinician completed both a SRASHE and MHPC Initial Assessment. The SRASHE noted that the inmate had "fleeting thoughts of suicidal ideation within the past week," but he was not currently suicidal. The mental status exam portion of the initial assessment found that the inmate had poor memory, distraction, fair judgment, a tendency to minimize his problems, had the need for mental health treatment, and a below normal intelligence. He denied any current mental health issues, a desire to be on psychotropic medication, or willingness to participate in the MHSDS. The clinician's initial diagnosis was Intermittent Explosive Disorder, Polysubstance Dependence, and Antisocial Personality Disorder. The assessment noted that the inmate "denies any mental health issues and none were noted by this writer." He was not placed in the MHSDS.

On November 15, 2017, the inmate was placed in administrative segregation due to safety concerns based upon expectations that he would be harmed after dropping his gang-affiliation. In addition, he was also interviewed by his CC I that same day and expressed concerns that a previous juvenile arrest and conviction for child sexual assault would eventually be known to the inmate population. As a result, he requested SNY placement. Although initially double-celled in administrative segregation on November 15, the inmate was subsequently relocated to a single cell on November 17 following an investigation that determined his cellmate might be still gang-affiliated and a threat to him. The inmate was not placed in a suicide-resistant new intake cell and committed suicide several hours later.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and he did not have any medical issues which were felt contributory to his death. According to the CDCR reviewer, "One of the possible cumulative psychological triggers for the inmate suicide may have been his concern over the "R" suffix and the potential consequences that could result from his gang or the prison population as a whole. If discovered, this information may have put his safety in jeopardy. Specifically, the inmate may have been fearful that the cellmate he was briefly housed with in ASU, who was later identified to potentially not be serious about leaving his gang-affiliation,

communicated the reasoning why the inmate was requested protective custody (potential "R" suffix)."

The Suicide Report contained six recommendations for corrective action through a QIP:

1) In the MHPC MH Initial Assessment dated September 27, 2017, the inconsistencies in the inmate's prior reports of self-harm (accidental versus suicide attempt) were not documented. Because of a lack of clarity, the rationale for excluding the inmate from the MHSDS was not well formulated.

2) In performing the Suicide Risk Assessment/Self-Harm Evaluation (SRASHE) on September 27, 2017, there are a number of documentation deficits. The rationale for the estimation of acute and chronic suicide risk are not well documented.

3) There was an 8-minute delay of activating 911. The delay most likely did not change the patient outcome.

4) Per SOMS, the patient was transferred to ASU unit at 1156 on November 15, 2017. The ASU pre-placement screening was not performed until November 16, 2017 at 1002 per EHRS documentation. It was not clear if custody brought the patient to a health care staff for pre-placement screening prior to ASU placement.

5) It was not clear how the two PTs notified the custody officers when they visualized that the patient was hanging. The PT notes showed 'We immediately notified custody staffs and the COs responded right away, cut down the rope and CPR initiated.'

6) A policy memorandum issued October 30, 2015 entitled, Revised Administrative Segregation Unit Intake Cell Procedure states, 'Under this revised policy, when inmates are in their initial 72 hours of ASU placement and the cell partner subsequently moves out of the cell, ASU staff shall immediately make every effort to identify another compatible cell mate. If the inmate cannot be double-celled with a compatible cell mate, ASU staff shall place the inmate in an available ASU intake cell as soon as possible, but no later than eight hours after the cell partner has been moved from the cell.'

The inmate was discovered hanging in his assigned cell approximately three hours after the cell move had taken place. Although the inmate's movement was consistent with existing policy and procedures, this event prompts the review of existing policy to check to determine if modifications are necessary.

**17)**    **Central California Women's Facility (CCWF)**

**Inspection**: December 7-8, 2017 (previous suicide prevention audit was on May 10-11, 2016). CCWF housed approximately 2,952 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the RC on December 8.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality.

The mental health diagnostic testing in the RC was observed on both December 7 and December 8.  There were concerns raised during the mental health screening on December 7.  In the observed case (CCWF 1), the inmate had arrived at CCWF from the county jail on December 5, 2017.  The nurse had timely completed the "Intake Health Screening-Female" form on December 5 in which the inmate had reported a prior history of mental illness, including Anxiety Disorder and ADHD.  She denied any current depression, auditory hallucinations, suicidal ideation, or any prior history of suicidal behavior.  A mental health referral was not generated.  Two days later on December 7, the inmate was seen by a mental health clinician for completion of the 31-item mental health screening.  The inmate answered affirmatively to the following questions: "Have you ever made a suicide attempt?" (with the date of the attempt not solicited by the clinician), "Have there ever been a few weeks when you've felt like you were useless, or sinful, or guilty?," "Have you ever been involuntarily committed for psychiatric problems?," "Are you now or have you ever taken any kind of medication or drugs for psychiatric or emotional problems?," and "Are you now or have you ever taken any antidepressants?"  Based upon the affirmative responses to the mental health screening, the inmate was referred for further mental health evaluation.

This reviewer asked the clinician if they routinely reviewed both the intake health screening form and any available discharge information from the county jail.  The clinician responded by stating that they and their colleagues responsible for the initial mental health screening waited until the Mental Health Evaluation was completed before reviewing any previous records, including county jail records.  This reviewer's concern with the clinician's response was twofold: *first*, the MHSDS *Program Guide* only required a Mental Health Evaluation to be completed if the inmate answered affirmatively to any mental health questions on the 31-item mental health screening form, and *second*, the *Program Guide* required the initial Mental Health Evaluation to be completed within "18 calendar days," although the process was historically completed earlier.  Under such a scenario, an inmate (not the one referenced above) who provided all "no" responses to the mental health screening would not be referred for completion of a mental health evaluation and would not have either the initial intake screening form or available county jail records reviewed by a mental health clinician.

In the above case (CCWF 1), this reviewer's subsequent examination of the available county jail records indicated that the inmate had attempted suicide by drug overdose approximately ten days earlier on November 24, 2017, with a note indicating that "she is depressed about being here but does not want to die.  Upset and emotional."  The county records also indicated she had been prescribed an antidepressant.  This reviewer's examination of the EHRS indicated that the inmate

137

had previously been incarcerated at CIW and placed on suicide precautions in the MHCB in September 2017 for suicidal ideation. In addition to the November 2017 suicide attempt, the inmate also had two suicide attempts in March 2016 by drug overdose. This information was available to, but not reviewed by, the mental health clinician at CCWF during the RC diagnostic testing on December 7, 2017. Based upon this reviewer's findings, the inmate was subsequently referred for completion of a SRASHE on December 8 which found a "high" chronic risk and "moderate" acute risk for suicide. Following review of all available records, the clinician completing that assessment found "more concerning from information gleaned was IP actually was minimizing history more than originally" determined during the RC process.

This reviewer also observed the mental health diagnostic testing in the RC by another clinician on December 8. During this observed screening, the clinician did review the available county jail records.

In sum, it would appear that CCWF mental health leadership needs to provide direction to clinicians assigned to the RC diagnostic testing area to ensure that they consistently review both the most recent initial intake screening forms and any available county jail records prior to and/or during completion of the 31-item mental health screening form. In addition, review of Chapter 2 of the MHSDS *Program Guide* ("Reception Center Mental Health Assessment) found that there was unclear language regarding requirements for review of health care information from both county jails and prior CDCR confinements.

Finally, daily PT rounds in the administrative segregation unit (Building 504) were observed on December 8. Building 504 contained GP inmates, STRH, administrative segregation EOP, condemned unit, and alternative housing. The rounds were unremarkable, and the PT was observed to be correctly entering Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**: CCWF had a Skilled Nursing Facility (or CTC) with 12 designated MHCBs in eight rooms. At the time of the assessment, one room was off-line for repair. Previously identified hazards (i.e., square-shaped stainless-steel sinks and faucets with a horizontal slit known as "anti-squirt slits") had been replaced in the rooms that were now reasonably suicide-resistant. The administrative segregation unit (Building 504) contained four retrofitted suicide-resistant cells (128 thru 131) for inmates on new intake status. During this reviewer's tour of the unit, there were no new intake inmates housed in unsafe, non-new intake cells. Of note, three previous special management cells were converted into regular administrative segregation cells with standard bunks.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in Building 503 (RC housing), Building 504 (in the administrative segregation section), and A-73 (a holding cell in the CTC). As noted above, the three special management cells in Building 504 were no longer being utilized for either special management or alternative housing, correcting a previous problem. All inmates in alternative housing were observed on a 1:1 basis and furnished bunks. Alternative housing continued to be used extensively at CCWF, with more than three inmates on the status each day. From August 25 through December 5, 2017, there were 266 inmates placed in alternative housing, with only 43 percent discharged

within 24 hours.  Of the 57 percent of inmates who remained in alternative housing for more than 24 hours, a sizable number (i.e., 91 or approximately 34 percent of all inmates) were housed for 4.4 days or over 105 hours.  The overall length of stay in alternative housing for all 266 inmates was 51 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB.  In addition, patients not on suicide observation status were being observed at 15-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients on Suicide Precaution status in the MHCB unit during nine-hour periods from 12:00 a.m. through 8:59 a.m. on several sample days (November 16 for CCWF 2, December 1 for CCWF 3, December 6 for CCWF 4, and November 6 for CCWF 5).  The chart review found a few observation checks (between one and four per patient) that were in excess of required 15-minute intervals for all four patients, with the longest gap between checks being 38 minutes for CCWF 5.  Violations in the four cases were by multiple nursing staff.

A previous problem with clinicians not making daily determinations as to possessions and privileges afforded to MHCB patients had been corrected, and visits and telephone privileges were being approved based upon clinical determination.  With one exception, out-of-room privileges, including yard, were being afforded to MHCB patients.  The exception was patients on maximum-security or administrative segregation statuses did not have access to the program room in the unit.  This reviewer was informed that there was a pending work order to install a "Restart Chair" in the program room.  No timetable for the installation was provided.

This reviewer observed several IDTT meetings for MHCB patients on both December 7 and 8.  In the first case (CCWF 4) on December 7, the patient had been in the MHCB for eight days after being confined in alternative housing for an additional eight days.  She was at 3CMS level of care and had an extensive history of SI and SIB.  The patient had a diagnosis of Bipolar Disorder and had previously been treated at Patton State Hospital.  She had denied any suicidal ideation and had been medication compliant since her MHCB admission.  The IDTT was recommending the patient's discharge to EOP and she was concerned about how the new level of care would affect her upcoming parole board consideration.  There was adequate discussion regarding safety planning, including utilizing the patient's coping skills of reading, journaling and deep breathing exercises.  Finally, for purposes of transition, both the patient's current 3CMS clinician and newly assigned EOP clinician were at the IDTT meeting.  This was an excellent practice.

This reviewer subsequently examined the safety plan section of patient's discharging SRASHE.  Unfortunately, narrative in the safety plan was not consistent with the discussion of safety planning during the IDTT.  However, review of the first day of the patient's five-day follow-up progress note was consistent with the IDTT discussion and stated the following: "IP seen for Day 1 of 5-day follow-up and 30-minute custody checks were continued as patient continues to endorse symptoms of anxiety. IP denied current SI or HI.  Safety plan discussed the following: 1) IP will remain on 30-minute checks at this time; 2) IP will use coping skills including taking a shower, reading, and practice relaxation skills including deep breathing and shoulder shrugs to help cope with anxiety; 3) MHPC will provide IP with a journal to use in order to write her stories; and 4) IP will inform staff if she experiences SI."

The IDTT meeting observed on December 8 included different team participants from the previous day. The patient (<u>CCWF 6</u>) had been in the MHCB for 11 days after being confined in alternative housing for an additional seven days. She was at the 3CMS level of care and had a minor history of suicide ideation. Diagnosed with Bipolar Disorder, she denied any suicidal ideation and had been medication compliant since her MHCB admission. The patient had a history of volatile behavior and was observed wearing a spit mask during the meeting due to a previous incident of spitting on an officer during escort to administrative segregation. There was no discussion during the IDTT meeting regarding safety planning other than the lead clinician reemphasizing medication compliance to the patient. The patient was discharged to EOP level of care. This reviewer subsequently examined the safety plan section of patient's discharging SRASHE. The safety plan stated: "PC will work with IP to increase insight into medication compliance and how it directly affects functioning in the hopes of decreasing impulsivity. IP will be provided with education on thought records (increased awareness), different forms of relaxation, and other self-soothing techniques to employ and urges to self-harm or suicidal ideation emerge. IP will verbalize an understanding of how to contact MH staff in an emergency." Of concern was the fact that <u>none</u> of the above described safety plan was discussed during this patient's IDTT meeting on December 8.

Finally, a review of Guard One data for a recent 24-hour period within Building 504 found 100-percent compliance with the required checks not exceeding 35 minutes. It should be noted, however, that this level of compliance was not an accurate reflection of the overall level of observation of inmates housed in Building 504. As detailed in the previous assessments, Building 504 at CCWF was unique in that it housed the condemned unit containing 22 single cells. Seventeen of the cells were located within an enclosed program area on the first floor of the unit, with five cells located outside the enclosed program area. According to CCWF custody officials and staff, because condemned unit inmates had regular access to the enclosed program area outside their cells, but within the chain-link fenced area, Guard One rounds were not conducted except during the First Watch. A May 9, 2014 directive from the Director of the Division of Adult Institutions entitled, "Security/Welfare Check Procedure Utilizing the Guard One System to Supersede Administrative Segregation Unit Welfare Check and Security/Custody Rounds in Specialized Housing Procedures" supported such a practice by citing the "unique design and programs" of the enclosed condemned unit. In addition, five of the condemned unit cells remained outside of the enclosed program area and adjacent to other administrative segregation unit cells that were subject to Guard One surveillance. There continued to be no practical reasons why these five condemned unit cells should not be subject to Guard One surveillance.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of August through November 2017. This reviewer's sample EHRS review of 40 emergency mental health referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in 93 percent (37 of 40) of the cases, a significant improvement from the previous assessment in which the compliance rate was only 82 percent.

In addition, this reviewer examined a sample of ten SRASHEs from patients released from a MHCB between August and November 2017. Most of the safety plan sections of the SRASHEs did not adequately address specific strategies to reduce suicidal ideation. One case (CCWF 7) symbolic of the problem contained the following safety plan: "Discharge to 3CMS LOC with 5-day follow-up. Discuss coping skills for substance abuse, pending court case, family separation, and missing her children."

Ironically, in a case discussed above (CCWF 6), although the safety plan contained in the discharging SRASHE on December 8 was viewed to be inadequate (as well as never discussed with the patient during the IDTT), when the same patient was previously discharged from the MHCB on November 6, 2017, the safety plan was very reasonable:

> IP to work with RC 3CMS PC to continue practicing self-soothing skills, physical exercise - walking; deep belly breathing and thinking future positive-oriented thoughts, taking meds, not getting any more RVRs, thinking about paroling on 2/08/18, and starting SSI application process. To develop new skills to continue to stabilize mood, reduce hypomanic behavior.

> IP to work with RC MHPP by continuing her psych meds and being open about side effects and other issues as opposed to stop taking them which she did prior to MHCB admit.

> IP to work with CC1 on endorsement process in A yard and to consider resources - programs that can continue to stabilize her.

> MHCB PC reviewed safety plan with IP and discussed triggers to recent decompensation, including anger over conflicts with other IMs that have contributed to her acting-out by not taking meds, faulty thinking of 'trying to get back at others,' and not thinking of consequences. IP to implement above stated self-soothing skills when this happens.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 315 cases of patients discharged from a MHCB or alternative housing placement that remained at CCWF and not transferred to the administrative segregation unit (where observation at 30-minute intervals was required) from June through November 2017. The review found that 93 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with the majority (60 percent) of the custody checks recommended for only 24

hours by clinicians. In addition, 97 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (August through October 2017) found that quorums were not achieved in any of the meetings, ironically only because the senior PT or designee were not invited to participate. The meetings were consistently 90 minutes in length, but otherwise unremarkable.

**Training**: According to training records, approximately 91 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 93 percent of custody, 95 percent of medical, and 96 percent of mental health staff had received annual suicide prevention block training during 2016. Finally, as of November 2017, only 77 percent of mental health clinicians had completed the SRE mentoring program, 96 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.

**Recent Suicides**: CCWF experienced one inmate suicide during the reporting period. In that case (CCWF 8), the inmate was found hanging from the locker by a sheet in her administrative segregation cell during the late evening of October 28, 2017. The inmate was a transgender identified individual (biologically female and identifying as male) who entered CDCR for a second term on June 24, 2013 to serve a 13-year sentence for assault with a deadly weapon. (For purposes of this review, the inmate will be identified by their preferred pronoun.) He was transferred between CCWF and CIW various times during the second term, and most recently transferred back to CCWF on March 15, 2017. The inmate had a significant number of RVRs, approximately 60 during his confinement, including four that occurred in the last five months of his life and remained pending at the time of the suicide. These incidents included assaulting a nurse, destruction of state property, covering the cell window with cardboard, and refusing a housing transfer. He had approximately 21 administrative segregation placements as result of these RVRs. The inmate was not known to be gang-affiliated and was unmarried with a 14-year-old son. Family support was demonstrated by letter correspondence and occasional visits.

According to available records, the inmate and four sisters were raised by their parents, as well as by a grandmother for a period of time, in an unstable environment that included domestic violence and physical abuse by a stepfather. Both parents had substance abuse problems, and several family members had been involved in the criminal justice system. The inmate was sexually molested by his mother's friend at age 5, as well as by an uncle at age 8. The molestation continued until he was 15-years-old. As a result, he did poorly in school and began abusing illegal drugs. As a teenager, the inmate was rejected by his parents for his sexual orientation. His involvement in the criminal justice system began at age 18 when a series of robberies were committed under the influence of crack cocaine and methamphetamine.

The inmate had a significant history of mental illness, as well as self-harming behaviors that included cutting himself and head-banging beginning at age 8 and continuing into adulthood. He also had a long history of suicide attempts which started at age 8 with a drug overdose and

continued with other incidents including deep arm lacerations and two attempted suicides by hanging at age 18. The inmate reported three hospitalizations in the community for suicide attempts and psychosis. Upon entry into CDCR for the second term, the inmate was placed at 3CMS level of care and provided diagnoses of Adjustment Disorder with Anxiety and Depression, Bipolar Disorder, Antisocial Personality Disorder, Post-Traumatic Stress Disorder, Gender Dysphoria, and Borderline Personality Disorder.

In addition to the inmate's history of suicidal behavior in the community, he also attempted suicide on two occasions at CCWF during the first CDCR term. The inmate had approximately 11 MHCB placements beginning in February 2016 and ending in September 2017, with an initial placement in alternative housing for suicidal ideation and a subsequent MHCB rescission. As of September 22, 2017, he was assessed as having a 'moderate' chronic risk and "low" acute risk for suicide. The inmate was elevated to EOP level of care following the ninth MHCB placement due to increases in head-banging, depressive symptoms, hopelessness, tendency to isolate, and a decrease in baseline functioning. He was also placed in the PIP from July through September 2016. During the last year, the inmate rarely participated in group treatment, attending only ten of 78 treatment modules offered.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although experiencing several medical issues, they were not thought to be contributory to the death. However, the reviewer opined that the inmate's suicide was probably precipitated by both accumulating RVRs and the "toxic" long-term romantic relationship he had with another inmate in the administrative segregation unit which culminated in an argument shortly before the suicide on October 28, 2017.

The Suicide Report contained three recommendations for corrective action through a QIP:

1) The September 22, 2017 SRE was found to be deficient during the course of this review and by an audit performed at CCWF.

2) The primary officer's CDCR 837 states they visually observed cell 117 being covered up, blocking the view of staff. The primary officer ordered the inmate to take down the window covering with negative results as the inmate verbally stated 'no.' The officer reported leaving the immediate area of cell 117 to complete Guard One checks and returned 20 minutes later in an attempt to reestablish communication with the inmate.

3) During autopsy, 23 pills were found in the inmate's vaginal cavity.

### 18)   San Quentin State Prison (SQ)

**Inspection**: January 2-3, 2018 (previous suicide prevention audit was on September 29-30, 2016). SQ housed approximately 3,920 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed several new admissions during the medical intake screening process in the RC on January 3.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality.  This reviewer also observed the mental health diagnostic testing in the RC for two newly-admitted inmates on January 3.  Both screenings were thorough.

Daily PT rounds in administrative segregation (Carson Unit) were observed on January 2.  The rounds were unremarkable, and the PT was observed to be correctly entering information from the Psych Tech Daily Rounds Form into the EHRS for all caseload inmates.

**Housing**:  SQ had 40 PIP rooms for condemned inmates.  All non-condemned SQ patients requiring a crisis level of care were referred to outside MHCBs.  All PIP rooms were suicide-resistant and did not contain any obvious protrusions which could be used in a suicide attempt by hanging.

The administrative segregation (Carson) unit contained approximately 30 new intake cells on the first (1C8-1C22) and second (2C1-2C15) tiers.  All the new intake cells were retrofitted to be suicide-resistant.  Due to a low census, many of the new intake cells were empty and all new intake inmates were observed to be in new intake cells.

Finally, **<u>alternative housing</u>** to temporarily house inmates identified as suicidal and awaiting MHCB placement was found in either the ten licensed medical beds in the CTC, TTA cells, or various large holding cells scattered throughout the CTC building.  Alternative housing was used on a daily basis, and inmates were all furnished beds and observed on a 1:1 basis.  From April 1 through December 31, 2017, there were approximately 159 inmates placed in alternative housing and 96 percent were released within 24 hours.  The overall length of stay in alternative housing for all 159 inmates was 16 hours.

**Observation**:  All patients in the PIP at MHCB level of care were on either Suicide Precaution or Suicide Watch status.  All other PIP patients were under ICF level of care and observed at 60-minute intervals.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of three patients (<u>SQ 1</u>, <u>SQ 2</u>, and <u>SQ 3</u>) on Suicide Precaution status in the PIP during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 2, 2018.  The chart review found numerous observation checks (nine per patient) that were in excess of the required 15-minute intervals, with the longest gap between checks being 67 minutes in one case (<u>SQ 1</u>).  The following case (<u>SQ 2</u>) exemplifies the significance of the problem:  There were nine violations of 25-, 21-, 20-, 19-, 18-, 18-, 20-, 17-, and 32-minute gaps between the required 15-minute intervals.  Violations in the three cases were committed by multiple nursing staff.

This reviewer observed four IDTT meetings on January 2: two patients at MHCB level of care and two patients at ICF level of care.  All IDTT meetings were well represented by mental health, medical and custody staff.  Of note, the IDTT meetings for MHCB patients included representation of two outpatient psychologists from the Condemned Unit who were designated to the CTC for the sole purpose of participating in the IDTT for non-PIP patients.  During the IDTT meeting for MHCB patients, this reviewer observed that the two out-patient psychologists

dominated the sessions, with very little input solicited from other team members; whereas during the IDTT meetings for PIP patients, there was much more interaction amongst all team members. Despite this concern, this reviewer observed good safety plan discussion during the IDTT meetings for MHCB patients.

Finally, a review of Guard One data for a recent 24-hour period found a combined 93-percent compliance with required checks that did not exceed 35-minute intervals in the administrative segregation (Carson) and two condemned unit sections.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of July through October 2017. In addition, various TTA logs were also reviewed for the period of July through December 2017. This reviewer's sample EHRS review of 45 emergency mental health referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in 96 percent (43 of 45) of the cases. This finding was a significant improvement from the previous assessment in which only 88 percent of the SRASHEs were completed.

In addition, this reviewer examined a sample of eight SRASHEs from patients released from the MHCB level of care at the PIP or alternative housing between July and December 2017. In two cases (25 percent), the discharging assessments could not be found in the EHRS. Of the remaining six cases, the quality of the safety plans contained within the discharging SRASHEs ranged from adequate to problematic. Most of the safety plans were problematic, and simply contained recommendations to outpatient clinicians to assist the patients with development of safety planning. For example, in one case (SQ 1) that this reviewer observed during the IDTT on January 2 and found adequate discussion of safety planning, the narrative for the patient's safety plan contained within the discharging SRE dated January 3, 2017 stated: "Over the next 30 days (in outpatient), the IP will work with his PC 1:1 on a weekly basis to identify three triggers of his (substance) use and two replacement behaviors. He will also be enrolled in substance recovery group. Given the IP is currently being recommended for discharge from the MHCB, psycho-education centering on methods of contacting mental health should the need arise; he was receptive and indicated that he understood." In another case (SQ 4), the clinician utilized the same safety plan narrative for multiple patients: "The IP's Tx team will work with the IP to identify at least one coping skill to help him mitigate the experience of psychiatric distress over the next seven days. Furthermore, the IP will work with his treatment team to identify two areas of this treatment plan that he can more fully engage in MH program; this will be done in an effort to reduce barriers to progress."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 48 cases of patients discharged from a MHCB, alternative housing placement, or PIP and returned to mainline SQ and not transferred to administrative segregation or the condemned unit (where observation at 30-minute intervals was required) between June and December 2017.  The review found that 89 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 74 percent of the custody checks recommended for the maximum period of 72 hours.  In addition, only 74 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.  Of note, although these compliance levels were in need of improvement, they were substantially higher than this reviewer's previous assessment which found various problematic practices, including the fact that many "Discharge Custody Check Sheet" (CDCR MH-7497) forms could not be located and observations for all remaining cases were not occurring at the required 30-minute intervals.

**Intervention**:  All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (August through November 2017) found that quorums were not achieved in any of the meetings.  The meeting minutes were otherwise unremarkable.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR.  In addition, 99 percent of custody staff, 94 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2016.  Finally, as of December 2017, 96 percent of mental health clinicians had completed both the SRE mentoring program and seven-hour SRE training, and 97 percent had completed safety plan training.

**Recent Suicides**:  SQ experienced two inmate suicides during the review period.  In the **_first_** case (SQ 5), the inmate was found hanging from the bookshelf by a sheet in his administrative segregation unit cell during the evening of January 27, 2017.  He entered the CDCR system through SQ for the third time on November 16, 2016 to serve a six-year sentence for assault with force likely to produce great bodily harm.  The inmate did not incur any RVRs during his confinement and was not known to be gang-affiliated.  He was twice divorced and had three young children.  The inmate had limited family support through letter correspondence with his grandmother, but no visits or telephone calls during his approximate 73-day confinement.

According to available records, the inmate was primarily raised by his grandparents because his biological parents suffered from substance abuse.  He self-reported being emotionally and physically abused by his mother, as well as robbed at gun point and sexually assaulted by a stranger at age 16.  The inmate began using illegal drugs at age 17 and was placed in various drug treatment programs pursuant to court orders.  His previous CDCR terms covered 2001 through 2004, as well as 2014 through 2015.

During the inmate's prior CDCR terms, he did not self-report any mental health problems and was not placed in the MHSDS.  However, when provided initial mental health screening through the RC on November 16, 2016, he reported over 20 previous suicide attempts, as well as a

146

significant mental health history that included five psychiatric hospitalizations. He also reported a diagnosis of ADHD as a child. During a mental health evaluation on November 30, the inmate's previously reported 20 suicide attempts was revised to three prior suicide attempts, including exsanguination and hanging while confined in a county jail during 2013, as well as an attempted hanging in a county jail in 2014. (Although completed, an SRE that noted both chronic and acute risk for suicide as "moderate," was not entered into the inmate's medical chart.) The inmate also endorsed a number of symptoms, including poor sleep and appetite, paranoia, hallucinations, and racing thoughts. Based upon the fact that he did not disclose such information during prior CDCR confinements, the inmate was initially viewed as an unreliable historian. Nonetheless, on November 30, 2016, he was placed in the MHSDS at the 3CMS level of care with a diagnosis of Psychotic Disorder NOS, as well as prescribed psychotropic medication.

On January 21, 2017, the inmate was placed in the administrative segregation unit after being assaulted by three other inmates. When interviewed, he admitted to owing a drug-related debt but did not seek SNY placement. Several days later on January 25, the inmate was seen by his psychiatrist for a follow-up assessment, as well as by a newly assigned PC. He reported both current auditory and visual hallucinations and rated his level of depression as eight out of ten.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although the inmate had several medical issues, including chronic back pain, these issues were not thought to be contributory to his suicide. However, the reviewer opined that increasing complaints of auditory hallucinations, anxiety regarding loss of custody of one of his children, safety concerns related to the recent assault from three other inmates and being taunted by other administrative segregation inmates to commit suicide a few days prior to his death, were likely precipitants to his suicide.

The Suicide Report contained 11 recommendations for corrective action through a QIP.

> 1) On November 30, 2016, a Suicide Risk Evaluation was completed and sent to a reviewing clinician. The SRE was reviewed and returned to the clinician with comments and requests for edits. However, the completing clinician did not resubmit a revised SRE. Therefore, no SRE was available in the electronic health record until two days prior to the inmate's death.

> 2) On January 25, 2017, an IDTT was held without the inmate being present. He was seen after the IDTT was held, with a treatment plan completed after the IDTT had already occurred. This suggests that the IDTT meeting was held with little information known about him and without his input either in person or via evaluations from members of the IDTT. The reason for his refusal to participate in the IDTT was not reported on a CDCR 7230-MH as required by the MHSDS *Program Guide*, 2009 revision. Finally, it is unclear if the IDTT psychiatrist was aware of the concerns about the inmate's depression and psychotic agitation. These concerns were documented after the IDTT team meeting occurred. The psychiatrist met with him on January 25, 2017 (after the IDTT) but did not initiate treatment for depression or psychosis prior to the inmate's death.

3) On January 25, 2017 the inmate reported to his clinician (after the IDTT meeting) that he had been distressed due to child custody hearings and loss of his custodial/parental rights at the end of court hearings. These hearings occurred between February 2016 and April 2016. However, the protective factor 'children at home' was endorsed and 'has three young children in the community' was included in the risk formulation of the SRE. The same SRE appears to underestimate both chronic and acute risk, particularly as several imminent risk factors were present (substance abuse, anxiety, anger, recklessness, and mood changes), perhaps as a strength of protective factors was overestimated in the case.

4) On January 25, 2017, a mental health treatment plan was completed by IDTT in ASU. The treatment plan lists imminent risk factors and reports on the inmate's history of suicide attempts yet identifies only one problem for the treatment plan: psychotic symptoms. Psychotic symptoms are noted to cause him to engage in self-harm behaviors 'due to distress from AH.' However, the short-term goals listed for the inmate focus on decreasing depression.

5) On January 25, 2017, the inmate reported to a mental health clinician that he was being taunted and encouraged to harm himself by other inmates. There was no mental health documentation found regarding the inmate report and no documentation that report was shared with custody officers or psychiatric technicians in ASU, such as during morning huddles.

6) On January 26, 2017, a clinician observed the inmate in ICC and/or interviewed him after ICC. The note written by the clinician was inadequate regarding this clinical contact. The entire note states, 'ICC hearing on 01/26/2017. Patient reports mood as 'good.' He was smiling. Denied HI/SI.'

7) Per Departmental memorandum entitled, 'Multi-Powered Radio Loaner Program in Administrative Segregation,' dated January 22, 2014, upon completion of the administrative review, ASU inmates shall be given the opportunity to be issued a radio and ear-buds. Based on the documentation provided by the institution, SQ failed to adhere to this policy.

8-11) Four nursing concerns were identified. The nursing concerns were Narcan was administered twice without a physician's order, the SQ LOP for Loss of Consciousness was out of compliance, a PT incorrectly noted on the PT Daily Rounds form that the inmate was medication compliant on January 22, 2017, and the LVN did not complete the medication management referral after the inmate had refused his ADHD medication for three days.

In the _**second**_ case (SQ 6), the inmate jumped from the upper tier of his RC housing unit during the early evening of October 7, 2017. (Of note, the death was originally listed as suspicious and a possible homicide, but subsequently changed to a suicide.) He entered the CDCR system

through SQ on July 19, 2017 to serve a 25-year-to-life sentence for first-degree murder. The inmate did not have any RVRs and had no gang affiliation. He was married and had two children. Although still on RC status and not yet eligible for visits and telephone calls at the time of his death, the inmate had family support from his wife, children, and mother.

According to available records, the inmate was raised by both parents in Mexico and was physically abused by his alcoholic father. Because his family was poor, the inmate had dropped out of school and obtained various part-time jobs. As a teenager, he subsequently immigrated to the United States with a cousin and found various jobs. However, beginning at age 19, the inmate began abusing alcohol and cocaine which led to his involvement in the criminal justice system.

The inmate did not have any mental health treatment in the community but was treated for both depression and anxiety in the county jail following a suicide attempt by cutting in December 2016. Upon arrival to the SQ-RC, the inmate screened positive for mental health symptoms including auditory hallucinations, depression, and the prior suicide attempt. He denied any current suicidal ideation. The inmate was subsequently placed at the 3CMS level of care with diagnoses of Adjustment Disorder and Unspecified Anxiety and Depressive Disorders. Although the inmate was seen by two different psychiatrists on both July 19 and August 7, 2017, there were no psychiatric notes or assessments entered into the EHRS. Two months later on October 6, 2017 and two days before the suicide, he met with a psychiatrist who wrote a note that stated, in part, that the inmate "appeared alert and oriented with some signs of anxiety, no abnormal associations or pressured speech. He reported having constant auditory hallucinations…. Telling him his family had been killed and that he would be killed, though he showed no signs of responses to internal stimuli. His thought process appeared linear and goal directed."

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide, and although the inmate had several medical issues, they were not thought to be contributory to his death. According to the reviewer, "This review did not reach a clear explanation for the inmate suicide. Concerns about his safety, as he voiced in the weeks before his death, combined with the silence of inmates interviewed during this process and aspects of his fall from the tier raise questions about the circumstances surrounding his death and suggest the possibility he did not commit suicide."

The Suicide Report contained four recommendations for corrective action through a QIP:

> 1) On the day of his arrival at SQ, the inmate received an Initial Psychiatric Intake Assessment. No documentation of the assessment was found in his records and the psychiatrist had left the facility by the time the on-site review of the inmate suicide.

> A second psychiatric assessment was provided to the inmate on August 7, 2017. No documentation was found in his records describing the content of that contact. During the on-site death review, the psychiatrist produced copious handwritten notes detailing an extensive assessment.

2) The result of a Mental Health Screening interview found the inmate positive for suicide risk, but the urgent mental health consult was conducted two days after the screening, not within *Program Guide* timelines, which specify a 24-hour limit. No orders for the urgent consult were found in the EHRS.

3) The patient sustained a skull fracture with brain matter exposed and loss of blood from that site. No documentation from the emergency response indicated that bleeding control was initiated even after the patient regained a pulse or that the site was dressed with a sterile dressing.

4) Emergency Medical Services (EMS) was activated at 1925 hours according to nursing documentation. The ambulance did not arrive to the TTA until 1955 hours, 30 minutes from activation. Standard response time is less than 10 minutes.

### 19)    **California Medical Facility (CMF)**

**Inspection**: January 4-5, 2018 (previous suicide prevention audit was on May 24-25, 2016). CMF housed approximately 2,545 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on January 4, 2018.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The door to the nurse's office was closed during the process, thus ensuring privacy and confidentiality.

In addition, this reviewer had the opportunity to observe required daily rounds by a PT assigned to one (I-3) of the three administrative segregation units on January 5.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  CMF had 49 MHCBs located on two wings of the CTC.  All rooms continued to be suicide-resistant and furnished with suicide-resistant beds.  This reviewer inspected the three administrative segregation units (I-3, M-3, and Willis) and found that seven new intake cells had been retrofitted to be suicide-resistant.  The new intake cells in both the I-3 Unit and Willis Units were either at or below capacity on January 5, however, inspection of M-3 Unit found that both new intake cells were full and one new intake inmate was housed in a non-new intake cell.  A correctional supervisor informed this reviewer that the unit averaged three new intake inmates on a regular basis, and additional retrofitted new intake cells were needed.  There was no indication that a work order had been requested for any additional new intake cells.  The issue of new intake inmates placed in unsafe, non-new intake cells was previously raised during the 2014 and 2016 reviews and continued to be problematic.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were primarily found in MHCB observation cells.  Alternative housing was utilized on a daily basis, and inmates were all furnished beds and observed on a 1:1 basis.  From September 26 through December 22, 2017, there were 90 inmates placed in alternative housing, and all were discharged in approximately 24 hours.  The vast majority (88

percent) were transferred to a MHCB. The overall length of stay in alternative housing for these 90 inmates was 18 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of three patients (CMF 1, CMF 2, and CMF 3) on Suicide Precaution status in the CTC during the nine-hour period from 12:00 a.m. through 8:59 p.m. on January 3, 2018 (for CMF 1 and CMF 2) and January 5, 2018 (for CMF 3). The chart review found numerous observation checks (i.e., between 12 and 15 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 49 minutes in one case (CMF 2). The following case (CMF 3) exemplifies the significance of the problem: There were 13 violations of 19-, 20-, 31-, 22-, 20-, 21-, 21-, 43-, 29-, 16-, 18-, 18-, and 19-minute gaps between the required 15-minute intervals. Violations in these three cases were committed by multiple nursing staff. This reviewer was subsequently informed that a primary reason for this problem could be that one nursing aide was responsible for the observation of 20 to 25 patients.

With one exception, this reviewer observed that MHCB patients were clothed and received possessions and privileges consistent with their observation level. The exception was a patient (CMF 4) observed during the IDTT meeting on January 4 to be on "full-issue" clothing but had not received any privileges apparently due to a suicidal gesture two weeks earlier in which he briefly climbed on top of his sink. With the exception of the RT, all other IDTT members were unaware that the patient did not have any out-of-cell privileges. In addition, a random review of documentation pertaining to privileges found that, although most MHCB patients assigned to the B-Wing were routinely receiving yard and other out-of-cell privileges, there was little documentation that patients assigned to the A-Wing were routinely receiving yard privileges during the previous two weeks.

This reviewer observed seven IDTT meetings in the MHCB unit on January 4-5. Although the treatment teams were well represented by mental health, medical, and custody staff, discussion about safety planning for patients was very problematic. In one case (CMF 3), the patient had been admitted into the MHCB a few days earlier on January 2 for self-injurious behavior. Although denying any current suicidal ideation during the IDTT on Friday, January 5, there was no discussion regarding safety planning and the PC simply informed the patient that the team "will try to discharge you on Monday." In another case (CMF 5), the patient also had been admitted into the MHCB for suicidal ideation on January 2 and there was no discussion regarding safety planning either before or after the patient told the treatment team that he would not alert staff if he had "intent or a plan" to commit suicide.

Finally, a review of Guard One data for a recent 24-hour period in the three administrative segregation units found a combined 98-percent compliance rate with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the three-month period of September through December 2017. In addition, the TTA log for the same period was reviewed.

This reviewer's sample EHRS review of 48 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in only 79 percent (38 of 48) of the cases. A similar low compliance rate for SRE completion was found during the preceding assessment.

This reviewer also examined a sample of ten SRASHEs from patients released from a MHCB during October and December 2017. Most of the assessments were problematic with regard to adequate safety planning. For example, the safety plan section of the discharging SRASHE in one case (CMF 6) of a patient admitted to the MHCB for suicidal ideation and self-injurious behavior stated "Pt will return to EOP LOC and program. He will attend his 1:1 clinical sessions, 10 groups assigned to him, and engage in tx w/his designated psychiatrist. Pt will let his EOP team know when he is distressed and/or hearing AH or VH immediately so that he may be provided w/reminders about coping skills and ways to decrease his perpetual disturbances." In another case (CMF 7), the patient had a significant history of suicidal and self-injurious behavior, including eight previous suicide attempts and numerous self-injurious behaviors by cutting. The safety plan section of the discharging SRASHE simply stated: "I suggest that his long-term primary clinician develop a treatment objective and plan to replace his behavior of superficial cutting to relieve anxiety with an adaptive behavior to relieve anxiety."

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 98 cases of patients discharged from a MHCB or alternative housing placement that remained at CMF and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from June 30 through December 30, 2017. The review found that only 26 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with approximately 69 percent of the custody checks recommended for only 24 hours. In addition, only 67 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals, with problems related to gaps in documentation. Similar low compliance rates were found during the previous assessment.

**Intervention**: All housing units toured by this reviewer contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (October through December 2017) found that a quorum was only achieved in one month (November). The meeting minutes were otherwise unremarkable.

**Training**: According to training records, 97 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, approximately 96 percent of custody staff, 52

percent of medical staff, and 80 percent of mental health staff received annual suicide prevention block training during 2017.  Finally, as of December 2017, only 74 percent of mental health clinicians had completed the SRE mentoring program, only 51 percent had received the seven-hour SRE training, and 91 percent had completed safety plan training.  Similar low compliance rates for suicide prevention training by medical and mental health staff were found during the preceding assessment.

**Recent Suicides**:  CMF experienced two suicides during the review period.  In the ***first*** case (CMF 8), the inmate was found to have exsanguinated himself during the morning of March 21, 2017 in his GP cell.  He had also attempted to hang himself from a ventilation grate by a sheet.  The inmate entered the CDCR system on January 21, 2015 to serve a 22-year sentence for carjacking, burglary, and assault.  He was transferred to CMF a few months later on March 19, 2015.  The inmate incurred four RVRs during his confinement, the most recent of which occurred on December 28, 2016 for possession of morphine.  He was not known to be gang-affiliated.  The inmate had regular family support from his mother and sister, with several visits and over 50 telephone calls with family members over a three-month period leading to his death.

The inmate was born in Mexico and raised by his mother until age 12 when he immigrated to the United States to live with his father.  He began to experience substance abuse problem shortly thereafter.  The inmate dropped out of school and briefly worked in construction with his father.  He was arrested several times for offenses relating to his substance abuse.  The inmate did not report any history of mental illness in the community, although he did report at least two prior suicide attempts by hanging at age 17 or 18 that occurred under the influence of methamphetamine and were triggered by the breakup with his girlfriend.  At the time of his death, the inmate was single and did not have any children.

Upon arrival into CDCR, the inmate screened positive for mental health issues based upon a self-report of taking psychotropic medication for depression while confined in the county jail, as well as a history of suicide attempts.  He also complained of experiencing hallucinations when taking methamphetamine.  He was placed at the 3CMS level of care with diagnoses of Major Depressive Disorder, Psychotic Disorder NOS, and Polysubstance Dependence.  The inmate was a participant in the MHSDS and mostly compliant with medication.  He did not report any suicidal ideation or intent during his CDCR confinement and was rated at "moderate" chronic risk (due to his prior suicide attempts) and "low" acute risk for suicide on his only SRE completed in January 2015.

The inmate experienced several medical problems, the most important of which was chronic pain and headaches related to a gunshot wound to his skull that occurred during the instant offense in February 2014.  He often complained that the prescribed pain medication (Tylenol) was ineffective.  Eventually, the inmate underwent surgery on February 1, 2017 to remove the remaining bullet fragments in his skull.  The surgery was successful, but because the inmate committed suicide approximately six weeks later, it was unknown if he experienced a decrease in pain.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  However, the review found several

153

factors that might have been contributory to his death. For example, the inmate began to incur RVRs beginning in September 2016 related to drug possession. As a result, he lost his job and his points were increased, necessitating a pending transfer to a Level IV institution. Clinical notes in both December 2016 and March 2017 indicated an increase in depression and anxiety. The inmate also was thought to have incurred drug debts from a gang. Finally, the medical hold from his surgery was removed several days prior to his suicide, resulting in clearance for transfer to a Level IV facility.

The Suicide Report contained eight recommendations for corrective action through a QIP:

> 1) The CDCR 837s submitted by responding staff identifies approximately 30 minutes elapsed between the time the inmate was observed bleeding profusely in his cell and his arrival in the TTA.
>
> 2) Activation of the Emergency Medical System (calling 911) did not take place until approximately 35 minutes into the emergency, which caused a significant delay in appropriate medical response. Additionally, Local Operational Procedure (LOP) #8, as submitted by CMF, is outside of the Department's expectation that all staff have the responsibility and authority to call 911. LOP #8 identifies four classifications of employees who will make the determination a Code 3 ambulance is required. These positions in turn must contact the Watch Commander who is the designated contact to call 911. The steps create a potential for delay in providing adequate care.
>
> 3) During the autopsy a suicide note alleging staff misconduct was discovered among the contents of the inmate's stomach.
>
> 4-6) Three nursing concerns were identified. The concerns (relating to EMS activation and documentation during the emergency) were considered contributory to the death.
>
> 7) The primary mental health clinician did not document consideration of placement in a higher level of care despite the patient's report of higher levels of depression and anxiety during consultations in December 2016 and March 2017.
>
> 8) The treatment plan for the patient did not adequately address depression and anxiety in the frequency of intervention offered, or in adjusting the frequency of intervention, or in adjusting the targets of intervention, despite evidence that symptoms were increasing or at high levels.

In the ***second*** case (CMF 9), the inmate was found hanging from the ventilation grate by a piece of cloth in his MHCB room during the late afternoon of August 29, 2017. He was on Suicide Watch status (i.e., 1:1 observation) at the time of his death. The inmate entered the CDCR system on April 1, 2015 for his second term to serve a life sentence with eligibility for parole for murder. He was transferred to CMF on June 9, 2017 to enter the PIP. The inmate incurred 21 RVRs, many of which were for assaultive behavior. The most recent RVR occurred on August

8, 2017 and involved the assault of several medical technician assistants. In addition, two district attorney referrals for indecent exposure were pending at the time of the inmate's death. The inmate was known to be gang-affiliated. He had limited family support and received a visit from a family friend in April 2017. The inmate was unmarried and had three children from three different prior relationships.

According to available records, the inmate was raised in a very dysfunctional family. In fact, he was born to parents who were approximately 15-years-old. Both parents were involved in the criminal justice system and had histories of substance abuse. Records also indicated that the inmate had been neglected and physically abused by his mother, resulting in his placement, along with several siblings, in foster care. He subsequently became gang-affiliated, involved in the juvenile justice system, as well as experienced substance abuse.

The inmate had an extensive history of mental health treatment in the community for ADHD, Bipolar Disorder and Depressive Disorder. He was not consistently medication compliant in the community. Although he frequently expressed suicidal ideation and threatened suicide during an earlier confinement within the Department of Juvenile Justice, the inmate did not have a documented history of suicide attempts prior to CDCR confinement (although he self-reported two suicide attempts by hanging at ages 16 and 18). In addition, there was documentation to indicate that his brother and grandmother both committed suicide.

Upon entry into CDCR in April 2015, the inmate was placed at the 3CMS level of care with an initial diagnosis of Mood Disorder. Three months later on July 28, 2015, he was placed in an MHCB. Subsequent MHCB placements occurred in November 2015, May and June 2016, November and December 2016, and May and August 2017. The inmate was also treated at the PIP level of care on two occasions: from December 11, 2015 through May 16, 2016 and June 9, 2017 through August 10, 2017. He was elevated to EOP level of care in August 2015 and remained at that level when not in MHCB or PIP placements. The inmate's diagnoses were adjusted throughout his CDCR term, with the most recent diagnoses in August 2017 being Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, Mood Disorder NOS, and Antisocial Personality Disorder. He continued to be only sporadically compliant with his psychotropic medication.

According to the CDCR reviewer in this case, the inmate had a complex clinical presentation throughout his treatment in the MHSDS. According to the reviewer, "The clinical presentation from 2015 leading up to his death has common threads and themes throughout the duration of the treatment indicating his presentation did not appear to shift throughout his time in CDCR. DSH documentation from early 2016 indicated the inmate had a pattern of initially engaging in treatment, then becoming dissatisfied, disengaging from clinical staff, and making conditional threats of self-harm and harm to others."

The inmate did, however, have a significant history of self-injurious behavior throughout his CDCR confinement, including both May and June 2017 when he utilized pieces of safety mattresses, blankets, safety smocks, and shoelaces as ligatures in suicide gestures. He also ingested foreign objects (such as parts of an inhaler and sprinkler) and overdosed on drugs, often in front of staff, on at least four other occasions in November and December 2016 and May and

155

June 2017.  The inmate also cut his wrists on two occasions, one in front of staff, as well as placed a plastic bag over his head and ligature around his neck.  Several of these incidents of self-injurious behavior occurred within days of receiving an RVR and/or his anticipated transfer and/or discharge from an MHCB or PIP placement.

As one clinician noted in an SRE dated June 20, 2017 that would unfortunately become a premonition to the inmate's eventual death three months later:

> It appears Pt's behaviors are driven by personality pathology (impulsivity, mood lability, poor distress tolerance).  Feeling as though he is being ignored by staff or his perception that his needs are not being met are likely to elicit acts of self-harm.  Further, feelings of anger or distress are likely to increase risk of Pt engaging in impulsive acts of self-injurious behaviors…suggesting pt's risk will fluctuate rapidly with subtle changes in mood.  Self-harm may be planned, impulsive, fabricated and/or conducted in front of staff.  As Pt has a lengthy history of self-harm behaviors with varying motivations, it remains possible that he may one day lethally injure himself without intent to do so.

The inmate's last SRE was conducted on August 15, 2017 for purposes of an ICF referral.  The SRE was both inaccurate and incomplete, with acute risk of suicide estimated as "moderate" and the check box for chronic risk left blank.  Several risk factors were not listed, and there was no formulation of risk.  According to the CDCR reviewer, "The safety plan for this SRE included the referral to PIP and a lengthy list of broad treatment expectations."

Following the inmate's discharge from the PIP on August 10, 2017, he returned to CMF and was placed in the administrative segregation unit.  The following day (August 11), he threatened suicide and was placed in the MHCB.  Several days later on August 15, the treatment team recommended an ICF referral.  He remained in the MHCB pending the referral.  On August 29, the inmate was informed during his IDTT meeting that the ICF referral had been denied and that the treatment team was planning on discharging him back to administrative segregation.  Shortly thereafter, the inmate became very upset and threatened suicide, stating "I am going to hang myself."  Suicide Watch was ordered, but the inmate had already been returned to his room and refused to relinquish his clothing and other possessions.  Due to the inmate's history of assaultive behavior, correctional staff chose not to initiate use of force to retrieve the inmate's clothing and issue a safety smock.  Therefore, the 1:1 observation was initiated at approximately 10:30 a.m. with the inmate retaining his clothing and possessions.  Within minutes, he began to attempt to thread a piece of cloth through the ventilation grate in his MHCB room.  According to nursing notes, the inmate continued to periodically engage in this behavior over the next several hours in the presence of both nursing and correctional personnel.  At approximately 4:30 p.m., a nursing note reflected that the inmate was tying a piece of string from his blanket around his neck.  Correctional personnel were notified and attempted to speak with the inmate.  Approximately 20 minutes later at 4:50 p.m., an emergency response was initiated, and correctional and medical personnel entered the room.

As the inmate was on Suicide Watch at the time of his death, his obvious risk of suicide was known to various MHCB personnel. As stated by the CDCR reviewer in this case, "regardless of his varying motivations, whether intentional or impulsive, he remained a high risk for suicide….This incident does not appear to be a response to an intent to die, rather a means to stop his discharge to ASU. Although this dangerous behavior had previously served to be effective for him, it would prove to become a lethal means that ultimately led to his death by suicide." In addition, although the inmate had several medical issues, including difficulty walking caused by being shot in the leg during his commitment offense in March 2013, these issues were not felt to be contributory to his death.

The Suicide Report contained 23 recommendations for corrective action through a QIP:

1) The SREs conducted on December 21, 2017 and May 3, 2017 at SAC did not accurately contain risk formulation and adequate safety planning.

2) The SRE conducted on August 15, 2017 at CMF contained inadequate risk formulation and safety planning.

3) The inmate was admitted to the MHCB on May 3, 2017, referred to ICF on May 25, 2017, and admitted to the PIP on June 9, 2017. There was no documentation from SAC of an SRE completed for the MHCB discharge. Per policy, an SRE must be completed upon discharge from an MHCB.

4-9) There were numerous custody concerns based upon the Department's Use of Force policy, including the lack of immediate activation of an alarm and immediate use of reasonable force to enter the inmate's cell to prevent self-injury, allowance of clothing and other possessions for an inmate on Suicide Watch status, several discrepancies and conflicting information regarding timeline, lack of documentation and communication amongst staff throughout the day of the incident, and the fact the inmate tested positive for methamphetamine and amphetamines and uncertainty as to how the patient was able to obtain these illegal drugs.

10) Due to the layout of the MHCB cells, it is all but impossible to observe the area near the sink and vent from outside the cell. The only area with a clear view is right in front of the windows. The mirror placed on the ceiling of the cell distorts the objects in the cell, eliminates a clear view of blind spots. Lack of visual observation in the cells makes it a risk for inmates who are in crisis or on a 1:1 direct observation.

Additionally, the majority of documentation provided by CMF gives descriptive information regarding what is observed while outside the cell during the 1:1 observation. Based on the layout it is very difficult to have observed what is written in reports without having the cell door open. This brings into question the accuracy and integrity of the documentation provided.

157

11) Failure to activate EMS immediately was determined to be outside of CMF's Local Operational Procedure for Emergency Medical Response Review Policy and Procedure, Plan #8, revised January 2017.

12) A piece of no-tear safety blanket was utilized by the inmate to fashion the noose. The safety blanket found in the inmate's property was fully intact. Linen exchange was conducted on second watch the previous day and there was no documentation indicating the inmate exchanged and altered safety blanket.

13-23) There were numerous nursing concerns, including deficiencies in medication administration, nursing assessment, implementation of provider orders, appropriate nursing care, and related activation of emergency response.

## 20)    **California Men's Colony (CMC)**

**Inspection**: January 16-17, 2018 (previous suicide prevention audit on August 18-19, 2016). CMC housed approximately 4,023 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on January 17, 2018.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  However, the door to the nurse's office was open during the process, with an officer straddling the doorway, thus compromising privacy and confidentiality.  The nurse informed this reviewer that they were reluctant to have the door closed during intake screening of maximum-security and administrative segregation unit inmates.  Although this concern was certainly reasonable, a common solution implemented in other facilities would be to install a TTM in the nurse's office.

In addition, this reviewer observed daily PT rounds in the administrative segregation unit (Building 4) on January 16.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for all caseload inmates.  Of note, however, there were numerous complaints by inmates about the lack of radios on the unit (which did not have any electrical outlets).

**Housing**:  CMC had a 50-bed MHCB unit.  All the rooms continued to be suicide-resistant.  The administrative segregation unit contained 16 new intake cells that were retrofitted to be suicide-resistant.  During inspection of this unit, this reviewer observed that there were at least five new intake inmates housed in unsafe, non-new intake cells despite the fact that several new intake cells were empty.  Although this reviewer was informed that there had been a recent riot in C-Yard resulting in an influx of administrative segregation inmates, there was no reason for there to be any empty new intake cells.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement were found in Building 7, a location formally utilized as an interim unlicensed MHCB unit.  Alternative housing was used on a daily basis, and inmates were all furnished beds and observed at staggered 15-minute intervals (because all of the cells were previously found to be suicide-resistant when it was utilized as an unlicensed MHCB unit).

From October 1 through December 31, 2017, there were approximately 176 inmates placed in alternative housing, and the vast majority (98 percent) was released within 24 hours. Most (88 percent) were transferred to a MHCB. The overall length of stay in alternative housing for these 176 inmates was 12 hours.

**Observation**: Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit. In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff. This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (CMC 1, CMC 2, CMC 3, and CMC 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 13 (for CMC 1), January 15 (for CMC 2), January 16 (for CMC 3), and January 17 (for CMC 4). The chart review found only a few observation checks (i.e. between two and five per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 30 minutes in one case (CMC 1).

This reviewer observed nine IDTT meetings in both the A and B units of the MHCB unit on January 16 and 17. All patients were observed to be clothed and received possessions and privileges consistent with their respective observation levels. There were several RTs assigned to the MHCB unit, and yard and other out-of-cell activities were utilized seven days a week.

The IDTTs were well represented by mental health, medical, and custody staff. In fact, during IDTT meetings in B-Unit on January 17, the entire MHCB unit treatment team was in attendance, including multiple psychologists and psychiatrists. There were robust discussions in most cases regarding MHCB treatment and possible referrals to higher levels of care. The assigned CC I was active in attempting to problem-solve several cases of patients with custody issues. There was, however, uneven discussion of adequate safety planning for the three patients being considered for discharge from the MHCB. In one case (CMC 5), for example, the patient was admitted into the MHCB on January 5, 2018 for suicidal ideation and grave disability after setting a fire in his cell. Although consistently reporting suicidal ideation, he vacillated between stating the fire-setting was a suicide attempt and accident. He remained in the MHCB for 12 days and, during his IDTT meeting attended by this reviewer on January 17 (which resulted in his discharge to administrative segregation), there was limited discussion about safety planning other than to prepare the patient for the administrative segregation unit placement and encourage him to stay on his psychotropic medication. There was no discussion during the IDTT meeting about any strategies for reducing suicidal ideation nor did the resulting SRASHE contain a safety plan:

> No suicide ideation or history. Was started on injectable medication today and IDTT reinforced the need for continued compliance, as evidenced by recent decompensation when he did stop the medications. The thought of getting IP back into his work program to increase pride and self-esteem and to decrease distractions or disruptions of his symptoms (sic). It was also recommended today that should it become known that IP has not complied with his medication regime, that he be screened for the need of a higher level of care, based on recent events. IP was very cooperative with all suggestions by MH psychiatry. The MHA was completed by author of this treatment plan and it was clear to me that mental

health played a part in the action, that he would likely decompensate in segregated housing and that had IP been properly medicated, the behavior may not have occurred. I will ask my supervisor to review this case and suggest documenting the behavior in an alternative fashion.

Of note, review of the first day of the required Five-Day Follow-Up progress note dated January 18 did include some evidence of safety planning for this patient: "IP reports that he was not in contact with his children for an extended period of time, this may trigger SI. IP plans to cope by exercising, remaining med compliant, and talking to family. IP plans to contact PC or CO if he has plans to self-harm/if in mental health crisis."

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit found 98-percent compliance with the required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of July 1 through December 31, 2017. The TTA log for October and November 2017 was also reviewed. This reviewer's sample EHRS review of 49 emergency mental health referrals for suicidal ideation/behavior revealed that clinicians completed the required SRASHEs in 94 percent (46 of 49) of the cases.

This reviewer examined a sample of ten SRASHEs from patients released from a MHCB between October and December 2017. Overall, although there was uneven discussion of adequate safety planning to reduce suicidal ideation, many of the safety plans showed promise as exemplified by the following case (CMC 6):

> IP is being discharged to EOP LOC at this time by the treatment team. IP will be returning to CMC's ASU EOP HUB…..IP acknowledged he has a pattern of using Alt. Housing as a 'break' from ASU but has been working to increase his positive coping skills he can use when distressed which would help to avoid this pattern. IP reported the following triggers would cause him to consider suicide: feeling depressed, being in ASU, problems with family, when not given a canteen, when feeling paranoid…..IP is reporting that he will inform staff if he needs help and will tell staff if he becomes suicidal at any time. IP reported his current coping skills include: "counting to 10," talking to psychs, listening to music, watch TV, read, positive imagery, meditation, "having good thoughts," and writing. IP described his version of positive imagery (being at the beach, eating his favorite foods, etc.) which he plans to consider when distressed. IP reports future goals of paroling and re-entering the community. IP would like to increase his mindfulness skills when at his next treatment team/clinician. Treatment outcome should include identifying future positive coping skills IP can use in the ASU setting when distressed rather than to report suicidal ideation.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed.

A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 157 cases of patients discharged from a MHCB or alternative housing placement who remained at CMC and were not transferred to administrative segregation (where observation at 30-minute intervals was required) from July 1 through December 31, 2017. The review found that 93 percent had Page One "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with approximately 74 percent of the custody checks recommended for 24 hours by clinicians. In addition, 99 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**:  All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**:  A review of three months of SPRFIT meeting minutes (September through November 2017) found that quorums were achieved in all three meetings. Attendance averaged between 18 and 22 members. Meeting minutes were informative and included a robust case presentation each month.

**Training**:  According to training records, 99 percent of custody staff and 100 percent of nursing staff were currently certified in CPR. In addition, 99 percent of custody staff, 96 percent of medical staff, and 61 percent of mental health staff received annual suicide prevention block training during 2017. Finally, as of December 2017, 93 percent of mental health clinicians had completed the SRE mentoring program, 92 percent had received the seven-hour SRE training, and 95 percent had completed safety plan training.

**Recent Suicides**:  CMC did not experience any inmate suicides during the review period.

### 21)    Pleasant Valley State Prison (PVSP)

**Inspection**:  February 6-7, 2018 (previous suicide prevention audit on May 12-13, 2016).  PVSP housed approximately 3,182 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R unit on February 7, 2018. The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS. The nurse's office door was closed during the process, an officer was stationed in the hallway, and privacy and confidentiality were maintained.

In addition, this reviewer observed daily PT rounds in STRH unit on February 7. The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  PVSP had six MHCBs.  All the rooms continued to be suicide-resistant.  The STRH unit contained six new intake cells (100-105) that were retrofitted to be suicide-resistant.  During inspection of this unit, this reviewer observed that there were three new intake inmates housed in unsafe, non-new intake cells despite the fact that three new intake cells were empty.  The placement of new intake inmates in unsafe non-new intake cells was also found during the 2016 assessment.

Finally, **alternative housing** cells to temporarily house inmates identified as suicidal and awaiting MHCB placement was infrequently utilized at PVSP.  When utilized, inmates on alternative housing status were housed in either CTC medical beds or TTA cells.  Inmates were provided stack-a-bunks and observed on a 1:1 basis.  From June 1, 2017 through January 31, 2018, there were only 35 inmates placed in alternative housing, with the vast majority (88 percent) released within 24 hours.  Most were transferred to an MHCB.  The overall length of stay in alternative housing for these 35 inmates was 12 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 15-minute intervals by nursing staff.  This reviewer subsequently verified the accuracy of observation rounds by reviewing the EHRS charts of four patients (PVSP 1, PVSP 2, PVSP 3, and PVSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on January 23 (for PVSP 1), January 29 (for PVSP 2), and February 6 (for PVSP 3 and PVSP 4).  The chart review found numerous observation checks (i.e. between 11 and 14 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 55 minutes in one case (PVSP 1).  The following case (PVSP 2) exemplified the significance of the problem:  There were 12 violations of 47-, 29-, 40-, 47-, 25-, 23-, 34-, 18-, 30-, 19-, 18-, and 30-minute gaps between the required 15-minute intervals.  Violations in these four cases were committed by multiple nursing staff.

This reviewer observed two IDTT meetings in the MHCB unit on February 6.  Although the treatment team was well represented by mental health, medical, and custody staff, one of the discussed cases was very problematic.  In that case (PVSP 3), the patient had been admitted into the MHCB on January 26 for suicidal ideation with a plan ("to use razors to cut his wrist").  His diagnosis was Bipolar Disorder with depressed mood.  The patient had stopped taking his psychotropic medication a few months earlier which resulted in increased depression and suicidal ideation.  He was at the 3CMS level of care and had a previous MHCB admission during 2017.  According to a recently completed SRASHE, the patient was assessed as having both a "moderate" chronic and acute risk for suicide based on risk factors that included a prior suicide attempt, family history of suicide, increased depression, and ongoing auditory hallucinations.  During the IDTT meeting on February 6, the patient was observed to be in "full-issue" clothing but had not been granted any privileges other than periodic showers.  Although he denied any current suicidal ideation or auditory hallucinations, there was no discussion regarding safety planning.

Following the IDTT meeting, this reviewer asked the treatment team why the patient had not received consideration for any privileges during his 12-day MHCB stay.  The PC replied that

162

privileges had not been granted until today (February 6) because "he was still experiencing hallucinations." When this reviewer then asked if the patient was going to remain in the MHCB unit or referred to a higher level of care, the response was that the patient had just been discharged to EOP level of care. Such a response was surprising since it was not discussed during the IDTT meeting. Subsequent review of the patient's discharging SRASHE dated February 6, 2018 found the following safety plan:

> IP was educated and encouraged to participate in groups, and 1:1 individual therapy with his PC. Based on hx, when non-medication compliant, IP may experience an exacerbation of sxs of psychosis, depression, SI, anxiety and PI that become unmanageable for him, as he has previously exhibited poor coping skills in managing these sxs in the past. IP can benefit from participating in groups or classes to develop skills to help with medication compliance, distress tolerance, reality testing, and substance abuse issues. IP was encouraged to inform his PC if he experiences any, or an increase in any of the following: depression, anxiety, psychosis, and/or suicidality.

This safety plan was not only problematic, but never discussed during the February 6 IDTT meeting.

Subsequent review of ten records (including the "CDCR-114: Inmate Segregation Record" and daily "Order Requisition" forms") of patients discharged from the MHCB unit found that out-of-cell privileges (e.g., a dayroom or therapeutic module) were granted by the IDTT in only 50 percent of the cases. A related discussion with a MHCB custody supervisor revealed that although patients had been approved for dayroom or therapeutic module out-of-cell activity, the IDTT rarely approved yard privileges (even for non-administrative segregation patients). This reviewer's preceding assessment contained a lengthy discussion regarding the absence of possessions and privileges afforded to MHCB patients. To date, the problem had not been resolved, and PVSP still did not have an RT assigned to the MHCB unit, another deficiency found during the 2016 assessment.

Finally, a review of Guard One data for a recent 24-hour period in the STRH unit found 98-percent compliance with required checks that did not exceed 35-minute intervals.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of August 1, 2017 through January 31, 2018. This reviewer's sample EHRS review of 36 emergency mental health referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in only 81 percent (29 of 36) of the cases.

This reviewer also examined a sample of ten SRASHEs of patients released from the MHCB unit from November 2017 through January 2018. Similar to the 2016 assessment, development of safety plans for patients discharged from the MHCB unit continued to be problematic. For example, the discharging SRASHEs for three different patients (PVSP 5 and PVSP 6 on January 4, 2018, and PVSP 7 on January 25, 2018) by the same MHCB clinician contained the same safety plan:

Treatment plan will include IP's practice of effective coping and motivational strategies. Therapeutic interventions will include:

1. PC will continue empathetic support for IP. PC will meet with IP as scheduled/requested.
2. PC-led instruction and practice in the use of CBT-based hypothesis testing and reframing interventions addressing any recurrent negative automatic thoughts experienced by IP.
4. Referral to psychiatry if appropriate (IP is not currently prescribed psychiatric medications).
5. Ongoing evaluation by PC to determine appropriateness for reduction in LOC to least restrictive environment (non-MHSDS).

Of note, the above safety plans were miss-numbered in each case.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of ten cases of patients discharged from a MHCB unit or alternative housing placement who remained at PVSP and were not transferred to the STRH unit (where observation at 30-minute intervals was required) from August 1, 2017 through January 31, 2018. The review found that 70 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) completed correctly by mental health clinicians, with most of the custody checks recommended for only 24 hours by clinicians. In addition, 90 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (October through December 2017) found that a quorum was achieved in only one meeting (December). The meeting minutes were otherwise unremarkable.

**Training**: According to training records, 100 percent of both custody and nursing staff were currently certified in CPR. In addition, 100 percent of custody staff, 89 percent of medical staff, and 88 percent of mental health staff received annual suicide prevention block training during 2017. Finally, as of January 2018, 100 percent of mental health clinicians had completed the SRE mentoring program, 96 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

164

**Recent Suicides**:  PVSP did not experience any inmate suicides during the review period.

### 22)     Salinas Valley State Prison (SVSP)

**Inspection**:  February 8-9, 2018 (previous suicide prevention audit was on June 7-9, 2016).  SVSP housed approximately 3,523 inmates during the on-site assessment.

**Screening/Assessment**:  This reviewer observed a few new admissions during the intake screening process in the R&R Unit on February 9, 2018.  The nurse was observed to be asking all of the questions and correctly entering the information into the EHRS.  The nurse's office door was closed during the process, an officer was stationed in the hallway, and privacy and confidentiality were maintained.

In addition, this reviewer observed daily rounds in portions of the administrative segregation units (STRH, D-1, and D-8 [overflow]) on February 8.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.

**Housing**:  SVSP had a 22-bed CTC, with ten designated MHCBs.  All of the MHCB rooms were found to be suicide-resistant.  Following the previous assessment, triangle-shaped stainless-steel shelving was retrofitted to each side of the existing sinks so that any ligature would slide off during a suicide attempt.

The three administrative segregation units (STRH, D-1, and D-8 [over-flow]) had a total of 17 retrofitted new intake cells; nine in the STRH Unit (100-108); four in D-1 Unit (117-118, 217-218); and four in D-8 Unit (115-116, 215-216).  During inspection of the STRH Unit, this reviewer observed that all nine new intake cells were full and there were an additional four new intake inmates housed in unsafe, non-new intake cells.  In D-1, this reviewer did not observe any new intake inmates in unsafe, non-new intake cells.  In D-8, this reviewer observed two new intake inmates in unsafe, non-new intake cells despite the fact that one of the new intake cells was empty.  The placement of new intake inmates in unsafe non-new intake cells was also found during the preceding assessment.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in Facility D, Building 5 and TTA cells, as well as occasionally in other designated cells throughout the facility.  Alternative housing was used on a daily basis, and inmates were all provided beds and observed on a 1:1 basis.  From November 1, 2017 through January 31, 2018, there were approximately 266 inmates placed in alternative housing, and the vast majority (85 percent) was released within 24 hours.  The vast majority (88 percent) were also transferred to a MHCB.  The overall length of stay in alternative housing for these 266 inmates was 15 hours.  Of note, alternative housing practices at SVSP had dramatically improved since this reviewer's preceding assessment.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCBs.  All other patients not on a level of suicide observation were required to be observed at

staggered 30-minute intervals. This reviewer subsequently reviewed the accuracy of observation rounds by reviewing the EHRS charts of four patients (<u>SVSP 1</u>, <u>SVSP 2</u>, <u>SVSP 3</u>, and <u>SVSP 4</u>) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on December 29, 2017 (for <u>SVSP 1</u>), February 5, 2018 (for <u>SVSP 2</u>), February 7, 2018 (for <u>SVSP 3</u>), and February 8, 2018 (for <u>SVSP 4</u>). The chart review found numerous observation checks (i.e. between 13 and 17 per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 68 minutes in one case (<u>SVSP 1</u>). The following case (<u>SVSP 2</u>) exemplified the significance of the problem: There were 14 violations of 21-, 18-, 27-, 19-, 23-, 28-, 21-, 19-, 28-, 26-, 53-, 22-, 18-, and 16-minute gaps between the required 15-minute intervals. Violations in these four cases were by multiple nursing staff. One possible reason for these multiple violations was that nursing staff was documenting checks at only four intervals per hour.

Due to a low MHCB census, this reviewer was only able to observe two IDTT meetings during the on-site assessment. One meeting had to be postponed because the patient became agitated and uncooperative. The other meeting included a robust and interactive discussion by most treatment team members, but the case did not involve a patient eligible for discharge, therefore, there was not any meaningful discussion regarding safety planning. Review of records indicated that most patients were approved for shower, yard, and telephone privileges, but out-of-cell activities were very limited. There were multiple RTs providing coverage in the CTC that was divided among MHCB and medical patients. Although an FTE RT was not available exclusively for MHCB patients, a larger problem was the RTs had very little program space other than trying to schedule out-of-cell time in medical and mental health staff offices. In addition, the CTC yard did not have a "small management" module, therefore, patients on maximum-security and/or administrative segregation status were *never* provided access to the yard.

Finally, a review of Guard One data for a recent 24-hour period found 92-percent compliance with required checks not exceeding 35 minutes in the STRH unit, whereas the D-1 unit was at 98-percent compliance.

**Management/Treatment Planning**: This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of November 1, 2017 through January 31, 2018. This reviewer's sample EHRS review of 60 emergency referrals for suicidal ideation/behavior revealed that clinical staff completed the required SRASHEs in 95 percent (57 of 60) of the cases. This was an improvement from the preceding assessment.

This reviewer also examined a sample of ten SRASHEs from patients released from the MHCB unit during the period of November 2017 through January 2018. Many of the safety plan sections of these discharging SRASHEs contained some discussion regarding specific coping skills and strategies for reducing recurrence of suicidal ideation. One particular case (<u>SVSP 5</u>) contained the following noteworthy and comprehensive safety plan:

    1) Patient is discharged to the ICF LOC, while being housed in EOP-ASU
    pending placement. Upon arrival to EOP, patient will be seen on custody wellness
    checks and a 5-day clinical follow-up.

2) A Safety Planning card was established with and given to Pt which delineates the following:

- Pt's reason for living: hopes of getting a job one day and learning to read.
- People or things Pt can turn to:  I want to work in the kitchen and can talk to the workers.'
- The first person Pt contacts when feeling the stress is his clinician, though articulates ability to communicate to 'anyone' in an emergency.
- Ways Pt can cope include: breathing, art, increasing his activity, making sure he takes his medications.
- Warning signs Pt has identified include: 'feeling suicidal with a plan to hurt myself or if I can control the voices even after I have tried to distract for an hour.'

3) Patient is currently prescribed Remeron 30mg and Zyprexa 20mg with a PRN of Zyprexa 5mg. He continues to hear voices but noted improvement with medication and denies current side effects.  It is recommended that his future treatment team closely monitor auditory hallucinations and respond with medication as appropriate.

4) Treatment team recommends his PC follow-up with any possible classes to help him learn how to read.  He has expressed a desire to learn, saying the skill would help him when he paroles.  If program is available, Pt would benefit from daily support.

5)  Pt has identified that yoga and stretching has helped them in the past and motivates him to do more activity and would benefit from daily practice in his cell.

6) Patient has been educated on abdominal breathing while in MHCB and indicates that it helps him to distract from AH; it is recommended that his future PT continues to teach and reinforce daily use of breathing exercises.

7) It is recommended that his tx team continue to model, educate Pt on, and reinforce adaptive means of getting his needs met, include effective communication skills and changing cognitive distortions to include realistic expectations of others. He also has worked on art therapy, which has been effective in reducing distress from AH.

8) IP will let any staff member know immediately should he experience unmanageable SI.

Although review of the subsequent first day of the five-day follow-up assessments in these ten cases did not always find concordance with the safety plan narrative contained in the discharging

SRASHEs, there was demonstrated progress with safety planning compared to the preceding assessment. It was noteworthy that, effective July 31, 2017, a memorandum was issued by mental health leadership at SVSP that required "all safety plans as documented in the Suicide Risk Evaluation conducted on the date of the patient's clinical discharge from MHCB must be reviewed and *positively cleared/approved* by the MHCB Senior Psychologist, Supervisor or designee." As previously detailed in this report, such a directive became a system-wide requirement within CDCR in January 2018.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with documentation of 201 cases of inmates discharged from either the MHCB unit or alternative housing who remained at SVSP and were not transferred to administrative segregation (where observation at 30-minute intervals was required) during the months of July, August, November, and December 2017. The review found that only 50 percent had Page One of the "Discharge Custody Check Sheet" (MH-7497) forms completed correctly by mental health clinicians, with most custody checks recommended for 48 hours by clinicians. In addition, only 63 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Noted deficiencies were that either Page One of the forms was blank or custody checks were ordered for less than 24 hours, and correctional staff was not consistently completing checks during the First Watch.

Of note, although SVSP internal audits of the "Discharge Custody Check Sheet" (MH-7497) forms invariably reported higher compliance rates during monthly SPRFIT meeting minutes from November 2017 through January 2018, these audits were limited to the quantity of forms collected, and not the quality of documentation (with accompanying deficiencies). Similar low compliance rates were found during the 2016 assessment. Finally, as detailed below, problematic completion of the "Discharge Custody Check Sheet" (MH-7497) forms by both mental health and correctional personnel was a notable deficiency cited in a recent SVSP inmate suicide (SVSP 6) in December 2017.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (November 2017 through January 2018) found that quorums were not achieved in any of the meetings. The meeting minutes included a corrective action plan regarding this reviewer's previous assessment and were otherwise unremarkable.

**Training**: According to training records, approximately 99 percent of custody and 100 percent of nursing staff were currently certified in CPR. In addition, 99 percent of custody staff, 100

percent of medical staff, and 99 percent of mental health staff received annual suicide prevention block training during 2017.  Finally, as of January 2018, 100 percent of mental health clinicians had completed the SRE mentoring program, 83 percent had received the seven-hour SRE training, and only 75 percent had completed safety plan training.  Of note, compliance rates for annual suicide prevention block training of both medical and mental health personnel were significantly improved since the 2016 assessment.

**Recent Suicides**:  SVSP experienced one inmate suicide during the review period.  In that case (SVSP 6), the inmate was found hanging from the upper bunk by a sheet in his SNY cell during the late afternoon of December 9, 2017.  The inmate entered the CDCR system on February 27, 2009 to serve a 26-year sentence for multiple counts of rape with force, oral copulation with force, and use of a firearm.  He was transferred to and from SVSP on several occasions, most recently on December 7, 2017, two days before his death.  There were conflicting reports regarding any gang affiliation by the inmate.  He had seven RVRs, including battery on an inmate in January 2012 that resulted in conviction.  The inmate's most recent RVR occurred in August 2017 and involved alteration of state clothing.  He was never married and did not have any children, although the inmate had the family support of his father and stepmother through visits and telephone calls.

According to available records, the inmate was born and raised in Mexico.  His parents divorced when he was 5-years-old.  His mother left the family and he, along with three sisters, remained in the care of his father who eventually remarried. The inmate was viewed as an unreliable historian and entered the United States in 1998 or 2003 according to varying self-reports.  He did not complete high school and worked as a manual laborer.  The inmate began to abuse both alcohol and drugs at age 13, and his family had a history of substance abuse.  Prior to the instant offense, he had several arrests for non-violent offenses.  There was no record of the inmate receiving any mental health treatment in the community.

Upon his entry into CDCR, the inmate requested SNY status due to the instant offense.  In March 2011, the inmate was placed at the 3CMS level of care following reports of "mood instability, fighting with cellmates, dramatic outbursts, and tangential thinking/confusion."  His initial diagnoses were Depressive Disorder NOS (provisional) and Antisocial Personality Disorder.

The inmate was prescribed psychotropic medication, but he struggled with both medication compliance and group treatment.  In February 2012, the inmate complained of hearing voices telling him to hurt himself.  According to the completed SRE, he appeared confused, agitated, and disoriented.  Both his acute and chronic risk for suicide was noted to be "moderate," but he was not placed in an MHCB.  As time progressed, the inmate continued to endorse chronic depressive symptoms and "stress."  He noted the voices decreased when he consistently took his psychotropic medication.  The inmate remained relatively stable until 2016 when he stopped taking his medication and began having active mood and psychotic symptoms.  In July 2016, his level of care was elevated to EOP because his somatic delusions, auditory and visual hallucinations, paranoia, and anxiety intensified.  The inmate's diagnoses were revised to Schizoaffective Disorder, Depressive Type, R/O Bipolar Disorder, and Antisocial Personality Disorder.  Two months later in September 2016, he was transferred to SVSP and his level of care

169

was reduced back to 3CMS, although the reason for the level of care change was not clear from the records.  His diagnoses remained the same.

In March 2017, the inmate stopped taking his psychotropic medication.  He subsequently engaged in self-injurious behavior and was placed in an MHCB at CMF on April 2, 2017.  Both his chronic and acute risk for suicide was rated as "moderate."  The inmate did not report any prior history of suicidal behavior.  He was restarted on medication and remained mostly compliant.  The inmate was discharged back to SVSP at EOP level of care on April 12, 2017.  He remained stable during the next several months.  However, in October 2017, the inmate began refusing his psychotropic medication and by November reported he was eating and sleeping poorly due to increased auditory hallucinations and sexual urges.  On November 26, 2017, the inmate was admitted into an MHCB at CHCF after reporting auditory and visual hallucinations, depression, and suicidal ideation.  He was generally uncooperative during the placement and refused much of the treatment and afforded privileges.  The inmate remained psychotic during the ten-day MHCB stay and his diagnosis was revised to Schizoaffective Disorder, Manic Type.  His level of care was again elevated back to EOP.  As noted by the CDCR reviewer in this case, the discharging SRASHE completed on December 5, 2017 had several deficiencies, including an inadequate safety plan.

The inmate was discharged back to SVSP on December 7, 2017.  He was seen for the first day of his five-day follow-up assessment on December 8.  Although he denied any suicidal ideation, the Mental Health Crisis Bed Discharge Custody Check Sheet was not completed by the clinician.  The following day (December 9), when a clinician arrived on the housing unit to conduct another follow-up assessment, the inmate was found hanging in his cell.  The subsequent investigation also found that the required 30-minute custody checks were not consistently conducted as required.

Apart from the inmate being released from an MHCB a few days earlier, the CDCR reviewer in this case did not find any other specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide.  In addition, although the inmate had several medical problems, these issues were not thought to be contributory to his death.  A subsequent interview with a former cellmate revealed that the inmate had been acting in a bizarre manner (e.g., "talking to his mattress") since his return from the MHCB.  According to the CDCR reviewer, "By his own words, the inmate had reported to mental health staff he felt suicidal when the voices told him his family had died.  In the days leading up to his death, he admitted to staff he heard voices again telling him his family was dead.  It is plausible his auditory hallucinations had once again progressed to this point and he acted in an impulsive moment to try to end his distress."

The Suicide Report contained eight recommendations for corrective action through a QIP:

> 1) SVSP Mental Health:  Several months (June through November) of 2017 clinical progress notes by the inmate's primary clinician at SVSP were reviewed and found lacking in sufficient detail.

170

2) SVSP Mental Health PC:  The Mental Health Crisis Bed Discharge Custody Check Sheet (Form MH-7497) was not filled out by the mental health clinician. Training has already occurred with the local SPRFIT coordinator and the clinical staff to address the issue.

3) SVSP Mental Health:  Problematic SRE/SRASHE documentation was identified for the dates of April 17, 2017, July 12, 2017, and November 9, 2017.

4) CHCF Mental Health:  Problematic SRASHE dated December 5, 2017.

5) Custody:  The inmate was a Mental Health Crisis Bed Discharge from CHCF Stockton facility.  He was on a 5-day follow-up and required custodial checks at staggered intervals which should not be routine or pattern forming, and not to exceed 30 minutes.  Reviewing the custodial checks on the day of the incident, the last entry was at 1630 hours.  The next time an officer would see the inmate was at 1729 hours, which was the time of the incident.  A whole hour had passed since the welfare check was performed.

6) Nursing Assessment Provider 1: RN 1 did not assess patient for c/o dizziness as a side effect to his medication.  Documentation on top of 7362 reflects referral to medical and mental health.  There was no evidence to suggest patient was seen for this complaint.

7) Nursing Assessment Provider 2:  RN 2 did not assess patient for c/o feeling bad and wanting to see psychiatrist.  Patient wrote "Urgente" on top of the 7362.  There was no evidence to suggest patient was seen for this complaint.

8) There were multiple concerns with the MHCB in-patient stay at CHCF occurring on November 26, 2017-December 7, 2017 (involving multiple psychiatry and primary clinician deficiencies).

### 23)  **Pelican Bay State Prison (PBSP)**

**Inspection**: February 14-15, 2018 (previous suicide prevention audit was on September 14-16, 2016).  PBSP housed approximately 2,668 inmates at the time of the on-site assessment.

**Screening/Assessment**:  This reviewer did not have an opportunity to observe the intake screening process because there were no new admissions during the on-site assessment.  The preceding assessment did not find any problems during the intake screening process.

This reviewer observed daily PT rounds in the STRH and GP sections of the administrative segregation unit on February 14.  The rounds were unremarkable, and the PT was observed to be correctly entering the Psych Tech Daily Rounds information into the EHRS for each caseload inmate.  This reviewer also observed rounds by a psychologist assigned to SHU.  Of note, the PSU at the facility was closed, and the SHU program was reduced to nine housing units.

171

**Housing**:  PBSP had ten MHCBs.  Due to a low census (one patient), this reviewer was able to conduct a thorough inspection of each room.  The inspection revealed a previously unidentified deficiency of wall and ceiling ventilation grates in each room having holes that were greater than the industry standard of 3/16 inches wide or 16-mesh per square inch.  The current diameter of the ventilation grate holes was unsafe and should be replaced.  The MHCB rooms were otherwise suicide-resistant.

The administrative segregation units had 24 retrofitted suicide-resistant cells designated for new intake inmates, with 12 new intake cells designated in both the STRH and GP administrative segregation sections of the unit.  During inspection, this reviewer did not observe any new intake inmates housed in non-new intake cells.  In addition, three housing units in the SHU building of Facility C were designated for administrative segregation overflow.  There were no 3CMS inmates assigned to these units, nor were new intake inmates initially assigned to these overflow units.  Of note, however, there were numerous complaints by inmates assigned to the three overflow administrative segregation units in the SHU building about the lack of radios and extended period of time to receive property.  There were also complaints that, although there was book distribution in both the STRH and GP sections of the administrative segregation unit, there was little, if any, availability of books in the three overflow units.  PBSP leadership was made aware of these concerns.

Finally, **alternative housing** cells to temporarily house inmates awaiting MHCB placement were primarily found in either CTC medical rooms or observation rooms within the MHCB unit.  Alternative housing was utilized on a regular, but not daily, basis.  Inmates were provided stack-a-bunks (correcting a problem identified during the previous assessment) and observed on a 1:1 basis.  From November 12, 2017 through February 12, 2018, there were only 26 inmates placed in alternative housing, and all were released within 24 hours.  The vast majority (88 percent) were transferred to a MHCB.  The overall length of stay in alternative housing for these 26 inmates was 12 hours.

**Observation**:  Both Suicide Watch and Suicide Precaution statuses were being used in the MHCB unit.  In addition, patients not on suicide observation status were observed at 30-minute intervals by nursing staff.  This reviewer subsequently reviewed the accuracy of observation rounds by reviewing the EHRS charts of four patients (PBSP 1, PBSP 2, PBSP 3, and PBSP 4) on Suicide Precaution status in the CTC during a nine-hour period from 12:00 a.m. through 8:59 a.m. on December 17, 2017 (for PBSP 1), January 9, 2018 (for PBSP 2), February 2, 2018 (for PBSP 3), and February 11, 2018 (for PBSP 4).  The chart review found numerous observation checks (i.e. between two and ten per patient) that were in excess of required 15-minute intervals, with the longest gap between checks being 51 minutes in one case (PBSP 3).  The following case (PBSP 2) exemplified the significance of the problem:  There were eight violations of 16-, 24-, 32-, 34-, 50-, 31-, 22-, and 22-minute gaps between the required 15-minute intervals.  Violations in these four cases were by multiple nursing staff.

Due to a low MHCB census, this reviewer was not able to observe any IDTT meetings during the on-site assessment.  However, this reviewer was able to converse with several MHCB clinicians and was informed that a full-time RT was assigned to the unit and able to provide out-of-cell time of at least one to two hours to each patient, including availability of both yard and program

172

office.  In addition, this reviewer was informed that there was no longer confusion amongst IDTT members regarding possessions and privileges that could be approved for MHCB patients. However, given the significant deficiencies found during the preceding assessment, including inadequate discussions regarding safety planning, patients never being eligible for "full-issue" clothing, and confusion about, and restrictions placed upon, the issue of yard, telephone, and visiting privileges, any conclusions regarding the correction of these problems will be deferred until the next on-site assessment when various IDTT team meetings can be observed.

Finally, a review of Guard One data for a recent 24-hour period in the administrative segregation unit (housing both the STRH and GP administrative segregation sections) found 95 percent compliance with the required checks that did not exceed 35-minute intervals.  In addition, the combined compliance rate in the three administrative segregation overflow units located in the SHU building of Facility C was 94 percent.  A review of Guard One data for a recent 24-hour period in a few SHUs found compliance with the required checks that did not exceed 35-minute intervals during Second and Third Watches, and 60-minute intervals during the First Watch (pursuant to a stipulation approved by the court on September 1, 2016) (ECF No. 5487) was a combined 92 percent.  However, these high compliance rates are tempered by the fact that an inmate (PBSP 7) committed suicide in the GP section of the administrative segregation unit in March 2017 and found to be in the state of rigor mortis, a clear indication that Guard One rounds were not properly conducted.

**Management/Treatment Planning**:  This reviewer requested and subsequently received a listing of emergency mental health referrals from the MHTS for the period of August 12, 2017 through February 12, 2018.  This reviewer's subsequent sample EHRS review of 42 cases of emergency mental health referrals for suicidal ideation/behavior revealed by clinical staff completed the required SRASHEs in 93 percent (39 of 42) of the cases.  This was a significant improvement from the preceding assessment.

This reviewer examined a sample of ten SRASHEs from patients released from the MHCB unit between September 2017 and January 2018.  Although the safety plan narrative in all the assessments was lengthy, the safety plans did not consistently include specific strategies for reducing suicidal ideation.  For example, in one case (PBSP 5), the patient had a history of suicidal ideation and prior MHCB admissions.  The safety plan stated:  "Recommended out-patient intervention(s) include CBT to increase insight into cognitive distortions/thinking errors and how this triggers distorted decisions and poor self-care, by learning the 10 cognitive distortions and identifying 3 to begin interrupting when those thoughts occur, to practice daily; MI to explore IP commitment to change or choice to continue with repetitive destructive actions/choices/beliefs; use CBT to develop 3 new coping skills within the next 30 days that help to improve functioning and increase confidence."  In another case (PBSP 6), the same clinician developed the following safety plan for a patient with a "high" chronic risk for suicide: "Recommended out-patient intervention(s) is communication skills/problem-solving skills to express his concerns appropriately instead of reporting SI; psychoeducation on 2 relaxation techniques over 90 days to reduce anxiety; CBT to identify distorted thoughts associated with anxiety/SI; 2 mindfulness techniques to accept negative emotions/thoughts and 2 defusing techniques over 90 days to reduce impact of negative thoughts."

173

Instead of deferring the development of these techniques and strategies to outpatient clinicians, development of specific strategies to reduce suicidal ideation was the responsibility of the MHCB clinicians. Overall, although development of adequate safety plans was uneven, there was an improvement since the prior assessment.

Finally, the process by which inmates were provided "discharge custody checks" at 30-minute intervals following release from either a MHCB or alternative housing placement was reviewed. A two-page "Discharge Custody Check Sheet" (CDCR MH-7497) was required to be completed on each inmate. The first page contained "discharging information" that was completed daily by the mental health clinician when determining whether the 30-minute custody checks were to be continued up to 72 hours. The second page represented the "custody checks" form completed by custody staff.

This reviewer was presented with 22 cases of patients discharged from the MHCB unit or alternative housing placement who remained at PBSP and were not transferred to the administrative segregation unit or SHU (where observation at 30-minute intervals was required) from January 1, 2017 through February 10, 2018. The review found that only the 68 percent had Page One of the "Discharge Custody Check Sheet" (CDCR MH-7497) forms completed correctly by mental health clinicians, with almost all of the custody checks recommended for only 24 hours by clinicians. In addition, 95 percent of the "custody check" forms (Page Two) were completed correctly by correctional staff at 30-minute intervals. Most of the deficiencies in completion of the forms by mental health clinicians were attributable to recommending discontinuation of custody checks in less than the required 24 hours.

**Intervention**: All toured housing units contained an emergency response bag that included a micro-shield, Ambu bag, and cut-down tool.

**SPRFIT Meetings**: A review of three months of SPRFIT meeting minutes (November 2017 through January 2018) found that quorums were achieved in all of the meetings (although a Correctional Health Services Administrator was not in attendance at any of the meetings because the position was frozen). Meeting minutes were otherwise unremarkable. This reviewer observed the SPRFIT meeting on February 14, 2018.

**Training**: According to training records, 99 percent of both custody and nursing staff were currently certified in CPR. In addition, 96 percent of custody staff, 99 percent of medical staff, and 100 percent of mental health staff received annual suicide prevention block training during 2017. Finally, as of January 2018, 90 percent of mental health clinicians had completed the SRE mentoring program, 100 percent had received the seven-hour SRE training, and 100 percent had completed safety plan training.

**Recent Suicides**: PBSP experienced one inmate suicide during the review period. In that case (PBSP 7), the inmate was found hanging from a light fixture by a sheet in his administrative segregation cell during the morning of March 23, 2017. He was found in the state of rigor mortis. The inmate entered the CDCR system for a second term on January 29, 2015 to serve a six-year sentence for carjacking, with enhancements for use of a firearm. He was transferred to PBSP on May 7, 2015 and scheduled for parole in December 2017. The inmate incurred only

174

one RVR during his confinement, a battery on another inmate occurring on February 15, 2017. As a result of that incident, the inmate was placed in administrative segregation and remained there for safety concerns pending transfer to another prison. He was gang-affiliated, and the incident involved battery of a rival gang member. The inmate was never married and did not have any children. He enjoyed good family support that was reflected in letter correspondence, telephone calls, and visits.

According to limited available records, the inmate was raised by both parents and had three siblings. He was reportedly a good student in grade school but was subsequently expelled for drug use. He became gang affiliated at age 14 and soon accumulated a juvenile arrest record. He subsequently worked with his father in a variety of jobs but received a five-year prison term in 2009 for resisting arrest and evading a peace officer. He was paroled in August 2013. According to his sister, the inmate became employed again and doing well until he started using alcohol and methamphetamine. When using these substances, he would become paranoid, behavior that led to the instant offense in September 2014.

The inmate did not have any reported history of mental health treatment in the community and screened negative for any mental health symptoms upon entry into CDCR. He also did not have any history of suicidal behavior nor did he ever express any suicidal ideation during confinement.

The CDCR reviewer in this case did not find any specific precipitating factors that were known to staff indicating that the inmate was contemplating suicide. He did not have any medical issues that were thought to be contributory to his death. However, it was noted that "When the inmate attacked a rival gang member without permission (from the gang leader), he placed himself in a dangerous position with both the Northerners and the Southerners…. What actual information he might have received from the leadership of either gang is not known; however, it is possible that his life was being threatened by one or both gangs. In addition, his family may have been threatened with harm as well. Without a suicide note, the reason will never be known with any certainty."

The Suicide Report contained six recommendations for corrective action through a QIP:

> 1) The first area of concern involves the condition in which the inmate was discovered. Based on reports submitted by responding staff, the inmate was discovered rigid, with obvious signs of rigor mortis and he displayed blue lips, eyelids, fingers and toes. Vitals taken by medical staff at 0634 hours indicated the inmate was cool to the touch and had a body temperature of 82 degrees. This calls into question the thoroughness of the security/welfare checks completed initially on Second Watch and those completed during First Watch. Review of the Guard One 'Rounds Tracker Summary' identifies all checks were completed. However, it appears the making of a visual/physical observation of a living, breathing inmate, free of obvious injury as required did not occur appropriately during either Watch.

2) When the inmate was cut down, he fell to the floor.  Staff should do anything possible to try and relieve the pressure/weight when cutting down a victim and support them to the ground.  The Suicide Prevention Training provided by PBSP (Chapter V, Emergency Response to a Suicide Attempt, Section B, Emergency Responses, Responding to a Suicide), states in part, 'Relieve tension and cut the noose above the knot.'

3) Although a whistle was blown to summon assistance, officers did not have their Personal Alarm Device (PAD) on their persons during the incident. The officer yelled out for the control booth officer to activate his PAD, with no response.  The officer had to blow his whistle and run out to the rotunda to get the control booth officer's attention, causing a delay for both a custody and medical response to this emergency.  Per PBSP's post orders, a PAD is part of the Equipment/Proper Uniform to have while on duty.

4-6) Per the Nursing Review Summary, three nursing concerns were identified that requires follow-up (responding nurses initiated CPR after noting the patient had positive signs of rigor mortis, inadequate AED documentation, and delayed 911 activation).

## ACRONYMS and ABBREVIATIONS

3CMS:                    Correctional Clinical Case Manager System

ADHD:                    Attention Deficit Hyperactivity Disorder

AED:                     Automated External Defibrillator

AH:                      Auditory Hallucinations

Ambu bag:                Ambulatory Bag Used for CPR

APP:                     Acute Psychiatric Program

ASH:                     Atascadero State Hospital

ASU:                     Administrative Segregation Unit

BPH:                     Board of Parole Hearings

BVM:                     Big Valve Mask

CAH:                     Command Auditory Hallucinations

CAP:                     Corrective Action Plan

CBT:                     Cognitive Behavioral Therapy

CCCMS:                   Correctional Clinical Case Manager System

CC I:                    Correctional Counselor I

CCI:                     California Correctional Institution

CCR:                     California Code of Regulations

CCWF:                    Central California Women's Facility

CDCR:                    California Department of Corrections and Rehabilitation

CHCF:                    California Health Care Facility

CIM:                     California Institution for Men

CIW:                     California Institution for Women

| | |
|---|---|
| CMC: | California Men's Colony |
| CMF: | California Medical Facility |
| CMH: | Chief of Mental Health |
| CNE: | Chief Nursing Executive |
| CPR: | Cardiopulmonary Resuscitation |
| CQI: | Continuous Quality Improvement |
| CQIT: | Continuous Quality Improvement Tool |
| CSATF : | California Substance Abuse Treatment Facility |
| CSP/Corcoran: | California State Prison/Corcoran |
| CSP/LAC: | California State Prison/Los Angeles County |
| CSP/Sac: | California State Prison/Sacramento |
| CSP/Solano: | California State Prison/Solano |
| CTC: | Correctional Treatment Center |
| DAI: | Division of Adult Institutions |
| DBT: | Dialectical Behavioral Therapy |
| D/C: | Discharge |
| DCHCS: | Division of Correctional Health Care Services |
| DSH: | Department of State Hospitals |
| DVI: | Deuel Vocational Institution |
| EHRS: | Electronic Health Record System |
| EOP: | Enhanced Outpatient Program |
| eUHR: | Electronic Unit Health Record |
| GP: | General Population |

HDSP:             High Desert State Prison

HRL:              High-Risk List

ICC:              Institutional Classification Committee

ICF:              Intermediate Care Facility

IDTT:             Interdisciplinary Treatment Team

IM:               Intra-Muscular

IP or I/P:        Inmate Patient or Inmate/Patient

IPE:              Initial Psychiatric Evaluation

IPOC:             Individual Plan of Care

IST:              In-Service Training

ISU:              Investigative Services Unit

KVSP:             Kern Valley State Prison

LOC:              Level of Care

LOP:              Local Operating Procedure

LPT:              Licensed Psychiatric Technician

LTRH:             Long-Term Restricted Housing

LVN:              Licensed Vocational Nurse

MCSP:             Mule Creek State Prison

MH:               Mental Health

MHCB:             Mental Health Crisis Bed

MHCBU:            Mental Health Crisis Bed Unit

MHCT:             Mental Health Compliance Team

MHOHU:            Mental Health Outpatient Housing Unit

MHPC:          Mental Health Primary Clinician

MHPP:          Mental Health Psychiatric Provider

MHSDS:         Mental Health Services Delivery System

MHTS:          Mental Health Tracking System

NKSP:          North Kern State Prison

NOS:           Not Otherwise Specified

OHU:           Outpatient Housing Unit

OP:            Operating Procedure

PBSP:          Pelican Bay State Prison

PC:            Primary Clinician

PIP:           Psychiatric Inpatient Program

POR:           Probation Officer Report

PRN:           As Needed

PSU:           Psychiatric Services Unit

PT:            Psychiatric Technician or Psych Tech

PTSD:          Post-Traumatic Stress Disorder

PVSP:          Pleasant Valley State Prison

QIP:           Quality Improvement Plan

R&R:           Receiving and Release

RC:            Reception Center

RJD:           Richard J. Donovan Correctional Facility

RN:            Registered Nurse

R/O:           Rule Out

| | |
|---|---|
| RT: | Recreation Therapist |
| RVR: | Rules Violation Report |
| Rx: | Prescription |
| SHU: | Security Housing Unit |
| SI: | Suicidal Ideation |
| SIB: | Self-Injurious Behavior |
| SMHP: | Statewide Mental Health Program |
| SNY: | Sensitive Needs Yard |
| SOAPE: | Subjective Objective Assessment Plan Evaluation |
| SOMS: | Strategic Offender Management System |
| SPMW: | Suicide Prevention Management Workgroup |
| SPOC: | Suicide Prevention Outreach Committee |
| SPRFIT: | Suicide Prevention and Response Focused Improvement Team |
| SQ: | San Quentin State Prison |
| SRAC: | Suicide Risk Assessment Checklist |
| SRASHE: | Suicide Risk Assessment and Self-Harm Evaluation |
| SRE: | Suicide Risk Evaluation |
| STRH: | Short-Term Restricted Housing |
| SVSP: | Salinas Valley State Prison |
| Sx: | Symptoms |
| TTA: | Triage and Treatment Area |
| TTM: | Therapeutic Treatment Module |
| Tx: | Treatment |

UHR:                Unit Health Record

VH:                 Visual Hallucinations

WSP:                Wasco State Prison