1   XAVIER BECERRA
    Attorney General of California
2   MONICA N. ANDERSON
    Senior Assistant Attorney General
3   JAY C. RUSSELL, State Bar No. 122626
    ADRIANO HRVATIN, State Bar No. 220909
4   Supervising Deputy Attorneys General
    ELISE OWENS THORN, State Bar No. 145931
5   ANDREW M. GIBSON, State Bar No. 244330
    TOBIAS G. SNYDER, State Bar No. 289095
6   IAN M. ELLIS, State Bar No. 280254
    TYLER V. HEATH, State Bar No. 271478
7   Deputy Attorneys General
     1300 I Street, Suite 125
8    P.O. Box 944255
     Sacramento, CA 94244-2550
9    Telephone:  (916) 210-7325
     Fax:  (916) 324-5205
10   E-mail:  Tyler.Heath@doj.ca.gov
    Attorneys for Defendants

11                IN THE UNITED STATES DISTRICT COURT

12            FOR THE EASTERN DISTRICT OF CALIFORNIA

13                      SACRAMENTO DIVISION

14

15

| | |
|---|---|
| 16  **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| 17                          Plaintiffs, | **DECLARATION OF N. WEBER IN SUPPORT OF DEFENDANTS' OBJECTIONS TO THE RECOMMENDATIONS OF THE SPECIAL MASTER'S REPORT ON HIS EXPERT'S THIRD RE-AUDIT OF SUICIDE PREVENTION PRACTICES** |
| 18       **v.** | |
| 19  **EDMUND G. BROWN JR., et al.,** | |
| 20                          Defendants. | |
| 21 | |

22        I, Nicholas Weber, declare:

23        1.      I am an attorney with the Office of Legal Affairs for the California Department of

24   Corrections and Rehabilitation (CDCR).  I make this declaration in support of Defendants'

25   Objections to the Recommendations of the Special Master's Report on His Expert's Third Re-

26   Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of

27   Corrections and Rehabilitations.  I am competent to testify to the matters set forth in this

28   declaration and if called upon to do so, I would and could so testify.

                                        1

1    2.    On January 10, 2018, I sent by electronic mail a letter announcing that the 2018/2019

2    budget requested funding for additional Psychiatric Inpatient Beds and Mental Health Crisis Beds

3    (MHCB) at the California Institution for Women (CIW) and to allocate funds to move twenty

4    unlicensed crisis beds from California State Prison, Sacramento, to R.J. Donovan Correctional

5    Facility (RJD).  A true and correct copy of the January 10, 2018 letter is attached as Exhibit 1.

6    3.    On April 20, 2018, I sent a letter to Special Master Matthew Lopes and counsel for

7    *Coleman* Plaintiffs class, setting forth CDCR's response to concerns raised by the Special Master

8    and Plaintiffs following the tour of the proposed unlicensed crisis bed unit at R.J. Donovan

9    Correctional Facility.  This letter was ultimately submitted as an exhibit to my October 3, 2018

10    objections.  A true and correct copy of my letter is attached to my October 3, 2018 letter which is

11    submitted as Exhibit 2.  However, the final three exhibits to the letter are being redacted because

12    they are proposed floor plans of prison facilities and their release could represent a safety and

13    security risk if disclosed to the public.

14    4.    On July 30, 2018, I sent a letter to Special Master Matthew Lopes, setting forth

15    CDCR's justification for its proposal to open a temporary 20-bed Mental Health Crisis bed unit at

16    R.J. Donovan Correctional Facility (RJD).  This letter was ultimately submitted as an exhibit to

17    my October 3, 2018 objections.  A true and correct copy of that letter and the exhibits to the letter

18    are attached to my October 3, 2018 letter which is submitted as Exhibit 2.

19    5.    On October 3, 2018, I sent by electronic mail Defendants' comments and objections

20    to the Lindsay Hayes' draft report "The Third Re-Audit and Update of Suicide Prevention

21    Practices in the Prisons of the California Department of Corrections and Rehabilitation."  As

22    support for the positions stated in my October 3, 2018 letter, I attached a number of exhibits,

23    including a July 30, 2018 letter addressing the proposed temporary crisis bed at RJD with

24    exhibits, and an April 20, 2018 letter providing an update on the proposed temporary crisis beds

25    at RJD and CIW.  A true and correct copy of the October 3, 2018 letter, and the attached exhibits

26    are attached as Exhibit 2.

27    / / /

28    / / /

2

1      I declare under penalty of perjury under that the foregoing is true and correct.  Executed in

2 Sacramento, California on November 15, 2018.

3                                        */s/ Nicholas Weber*

                                NICHOLAS WEBER

4                                 Attorney

                                CDCR Office of Legal Affairs

5                                 *(original signature retained by attorney)*

6 CF1997CS0003 / 33658819.docx

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3

EXHIBIT 1

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



January 10, 2018

Special Master Lopes                          Michael Bien
Pannone Lopes Devereaux and O'Gara LLC        Rosen Bien Galvan and Grunfeld LLP
Northwoods Office Park, Suite 215N            50 Fremont Street, 19th Floor
1301 Atwood Avenue                            San Francisco, CA 94105
Johnston, RI 02919

*VIA EMAIL*

Dear Matty and Michael,

On January 10, 2018, the Governor issued his 2018/2019 Budget Summary
(http://www.ebudget.ca.gov/ ). The budget requests that the legislature approve funds to increase
inpatient bed capacity at the California Institution for Women. The requested funding would
allow Defendants to activate five additional Psychiatric Inpatient Beds and fifteen additional
Mental Health Crisis Beds at the California Institution for Women. Additionally, the budget
proposes to allocate funds to move twenty unlicensed crisis beds from California State Prison,
Sacramento, to R.J. Donovan Correctional Facility.

Defendants would like to discuss this proposal, including potential waivers of state law, with the
parties at their earliest convenience. Additionally, Defendants invite the Special Master team
and Plaintiffs to tour the space identified for inpatient units.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

cc: Co-counsel
Steve Fama
Lisa Ells

EXHIBIT 2

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



October 3, 2018

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Dear Special Master Lopes:

I write in response to Lindsay Hayes's draft report "The Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the California Department of Corrections and Rehabilitation" (Audit) provided to Defendants on August 27, 2018.  CDCR thanks Mr. Hayes for his suicide prevention audits and his recommendations, which have been adopted in their entirety by the California Department of Corrections and Rehabilitation (CDCR).

Over the past several years, CDCR has successfully developed and piloted its Continuous Quality Improvement Tool to conduct self-monitoring of CDCR's mental health programs.  More recently, CDCR has added suicide prevention indicators to the tool.  As discussed below, CDCR believes that the parties should soon begin discussions on transitioning suicide prevention monitoring to CDCR.

Also discussed below are CDCR's general and specific responses and objections to the Audit.  Additionally, CDCR objects to the finding that CDCR's proposed unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD) is unsuitable to provide patient care.  Mr. Hayes's opinion is based on hypothetical concerns – not monitoring of the activated unit.  CDCR should be permitted to activate the unit, subject to monitoring, to ensure that CDCR can provide ready access to crisis care for patients in southern California.

    I.    The Parties Should Discuss Transitioning Suicide Prevention Monitoring to CDCR

Since 2012, with input from the Special Master and Plaintiffs, CDCR has developed its own self-monitoring tool, the Continuous Quality Improvement Tool (CQIT).  CQIT has been successfully piloted and recently updated to include suicide prevention audit criteria.  Following the current round of CQIT audits, expected to be completed by November 2018, CDCR will release reports outlining the suicide prevention practices for the ten audited institutions.  Coupled with chart review audits, CDCR's suicide case reviews and headquarters' Suicide Prevention and Response Focused Improvement Teams (SPRFIT), CDCR is thoroughly analyzing its own

001

Special Master Lopes
October 3, 2018
Page 2

suicide prevention practices and is in the best position to assess its prevention practices and respond to identified deficiencies with corrective action.

During the development of CQIT, the Special Master has monitored CDCR's suicide prevention practices. The most recent cycle of monitoring, now entering its sixth year, began in July 2013 when the Court ordered Defendants to "establish a suicide prevention/management work group . . . to work under the guidance of the Special Master to timely review suicide prevention measures, suicide deaths, and deaths deemed to be of undetermined cause." (ECF No. 4693 at 5-6.) There is currently no established end date for the workgroup or a plan to transition monitoring to CDCR.

By utilizing CQIT, which incorporates the compliance indicators developed by the Suicide Prevention and Management Workgroup and applied by Mr. Hayes during his audits, CDCR can quickly assess and respond to deficiencies by adjusting practices or modifying policies, as necessary. The CQIT process also memorializes its audit findings and recommendations in reports addressed to each institution. By combining CQIT, headquarters SPRFIT, and the suicide case review process, CDCR is positioned to provide strong suicide prevention oversight. CDCR invites a discussion about how best to transition monitoring these issues.

II.  Specific Objections and Comments

CDCR objects to additional Corrective Action Plans because they are unnecessary to cure deficiencies identified in the Audit. CDCR is responsive to deficiencies when they are identified and works to immediately remedy them. Outlined below are specific objections and requests for modification to the report. CDCR provides these objections and comments in addition to its general objection to additional corrective action plans.

A.  Use of Suicide-Resistant Cells for Newly-Admitted Inmates in Administrative Segregation Units (Pages 8-9)

The report states that CDCR should develop Corrective Action Plans (CAPs) to address deficiencies at ten institutions related to intake cell placement during the first seventy-two hours of segregation. (Audit at 9.) Specifically, the report recommends that "[s]ome of the CAPs will involve creating additional retrofitted new intake cells, ensuring that all currently identified new intake cells are suicide-resistant, and reinforcing the requirement that new intake inmates should not be placed in non-new intake cells when new intake cells are available."

Notwithstanding the Audit's findings, there has been no determination that new intake cells remedy the deficiencies found during the monitoring period. As the report notes, the segregation population has decreased statewide. And CDCR was found to be more compliant with intake cell requirements in prior rounds than in the current round. CDCR has also undertaken

Special Master Lopes
October 3, 2018
Page 3

improvements to remedy intake cell issues since the start of the last monitoring period. For instance, on September 17, 2017, CDCR directed the affected institutions to apply a standardized stencil to each intake cell that identifies them as such. All institutions complied with this requirement by October 27, 2017.

CDCR will independently assess whether new intake cells are required to remedy the issues at these institutions. However, until there has been such a determination, CDCR requests that the language at page nine be modified to read that "[s]ome of the CAPs will may involve creating additional retrofitted new intake cells . . . ." This language should also be reflected at the third bullet of page thirty-seven.

      B.  Use of "Alternative Housing" for Suicidal Inmates (Pages 9-10)

At page ten, the report recommends that CDCR "develop CAPs in each of the four facilities (CIW, CCWF, CSP/Corcoran, and RJD) that continue to have alternative housing lengths of stay well in excess of 24 hours."[1] Such a CAP is unnecessary, especially as applied to individual institutions. Crisis bed transfers are managed by headquarters, and their timeliness depends on statewide bed availability. There is nothing in the report to suggest that slower transfer times are the result of deficiencies at the local level.[2] Moreover, CDCR has already undertaken or proposed remedies to reduce the time patients wait to transfer to a crisis bed.

With respect to California Institution for Women (CIW) and Central California Women's Facility (CCWF), CDCR and Plaintiffs entered into a stipulated agreement to activate nineteen unlicensed beds at CIW to ensure quicker access to crisis beds for patients referred from CIW and CCWF. These beds are expected to be activated by year's end.

In addition, as discussed in CDCR's July 30, 2018 letter regarding its proposal to activate an unlicensed crisis bed unit at R.J. Donovan Correctional Facility (RJD), there are an insufficient number of crisis beds in southern California. (Exhibit A.) As a result, patients will often wait longer in the southern region because they must spend more time on transport vehicles heading to available beds, generally, in the central region. Accordingly, RJD's crisis bed wait times exceed those at other institutions. That is why CDCR is proposing to activate a twenty crisis-bed unit at RJD.[3]

Corcoran's noncompliance is tied to the inadequate number of crisis beds in southern California. Although Corcoran is in the central region, it has a relatively large crisis bed unit, and is often

---

[1] This recommendation is repeated at page thirty-seven, bullet four.
[2] While CDCR has undertaken measures at the local level aimed at improving transfers, further local fixes are unlikely to positively impact transfer timeframes at these four institutions given the need for female crisis beds and beds in the southern region, the lack of which impacts bed availability in the central region.
[3] That Mr. Hayes has rejected this proposal outright makes this particular CAP even more objectionable. This issue is discussed in more detail in section III, below.

Special Master Lopes
October 3, 2018
Page 4

used as overflow for patients from southern California.  Accommodating these patients can delay the time it takes for Corcoran patients to arrive in a crisis bed.  This issue further supports the need for additional crisis beds in southern California.

Accordingly, directing a CAP at these four institutions is unnecessary because crisis bed wait times are directly related to the availability of statewide beds, and not based on correctable local practices.  Further, since the availability of statewide beds is being addressed with additional beds at CIW, and potentially at RJD, the underlying issue is likely to be resolved in the  near future.

> C.  Practices for Observing MHCB Patients (Pages 11-13)

Page eleven of the report states, "the problem of falsification of observation forms of suicidal patients had not been resolved and, in fact, had been exacerbated.  This reviewer's preceding assessment found falsification of observation forms in 26 percent (six of 23) of the audited facilities."  It is unclear from the report which six institutions falsified forms.  Only California Institution for Men and Mule Creek State Prison are noted to have falsified form in the appendix.

As drafted, the report gives the impression that there is a systemwide issue with falsification of records.  However, the sentences and paragraph following the statement regarding falsification appear to discuss noncompliance with CDCR's frequency of rounding policy.  It is unclear whether falsification is at issue, or if the real issue is noncompliance with frequency of rounding policy[4].  If the issue is noncompliance with frequency of rounding, CDCR requests that the word "falsification" be struck at pages eleven and twelve and replaced with appropriate verbiage identifying the issue as one of "noncompliance with rounding policies."

If form falsification occurred, as alleged at page eleven, CDCR requests that Mr. Hayes specifically identify the six institutions alleged to have falsified forms, or that the compliance rate be adjusted to reflect the true number of institutions determined to have falsified records.  This information will provide an accurate picture of whether there is a systemwide issue, as opposed to a handful of staff who are not compliant with CDCR policy.

> D.  Safety Planning for Suicidal Inmates (Pages 17-21)

Mr. Hayes recommends that CDCR develop CAPs for safety plan training with a "proposed reassessment to ensure that the CAPs have sufficiently resolved the deficiencies."  (Audit at 21.)  CDCR is in the process of updating its safety planning process.  CDCR presented proposed changes to the Special Master team on July 19, 2018, and to Plaintiffs on September 5, 2018.

---

[4] The report notes that rounding noncompliance was found in over 86% of the institutions.  CDCR is addressing that issue via the use of regional monitoring, fixes to the Electronic Health Record System, training, and the use of CDCR's Continuous Quality Improvement Tool.

Special Master Lopes
October 3, 2018
Page 5

CDCR anticipates training the field on these changes in October 2018.  In light of the imminent change in practice, monitoring should be suspended until such time that CDCR can properly train and fully implement the new safety planning protocol statewide.  Otherwise, any reassessment would be based on outdated protocols.

> E.  MHCB and Alternative Housing Discharge and Efficacy of Five-Day Clinical Follow-Up and Custody Welfare Checks (Pages 22-23)

Mr. Hayes recommends that CDCR should "[d]evelop CAPs for the 'Discharge Custody Check Sheet' (CDCR MH-7497) form process in the 20 facilities identified above that were below 90-percent compliance."  (Audit at 23.)  The new CAP is redundant because CDCR already developed and implemented a CAP to address this issue in May 2018.  Instead of initiating a new CAP, CDCR should be allowed to complete implementation of its May 2018 CAP, followed by further assessment by the Special Master.

> F.  Local SPRFITs (Pages 23-25)

The report states at page twenty-four that "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy, the court ruled on January 25, 2018 that '[g]ood cause appearing, defendants will be directed to provide to the Special Master a local SPRFIT policy revised in accordance with Mr. Hayes' critique and the requirements of the Revised Program Guide, not later than thirty days from the date of this order.' (ECF No. 5762 at 3.)"

CDCR objects to the contention that CDCR has not acted timely to develop and implement revisions to its SPRFIT policy and requests that the Special Master strike the phrase "[d]ue to a perceived lack of urgency in finalizing the revised SPRFIT policy."  Over the past two-years, CDCR has developed and implemented countless initiatives resulting from the *Coleman* class action.  The Special Master's most recent report on inpatient care identifies forty-nine such initiatives. (See ECF no. 5894 at 89-90, fns. 20 and 21.)  This mischaracterization of CDCR's commitment to suicide prevention discounts the tremendous amount of work Defendants have accomplished in the last two years.

> G.  Suicide Prevention Training (Pages 25-28)

> > i.  Basic Correctional Officers Academy Training

Mr. Hayes reports that he is concerned about the "currently allotted 2.5 hour time frame" for pre-service training.  (Audit at 26.)  CDCR has expanded the Basic Correctional Officers Academy Training to four hours.  CDCR requests this sentence be struck or edited appropriately.

Special Master Lopes
October 3, 2018
Page 6

      ii.   Training Compliance Rates

For unexplained reasons, CDCR's forty-three percent compliance with in-service training is highlighted in both bold and italics on page twenty-six. Conversely, CDCR's 100-percent compliance with cardiopulmonary resuscitation (CPR) and automated external defibrillator (AED) training is relegated to a footnote on the same page. CDCR requests that the CPR and AED training compliance rates be moved to the body of the report.

      iii.   Recommendation

Mr. Hayes recommends that CDCR provide him with the revised pre-service *Mental Health Services Delivery System Instructor Guide* curriculum and a schedule of possible dates in which presentation of the revised curriculum can be observed at the Basic Correctional Officers Academy Training. (Audit at 27-28.) This recommendation is unnecessary.[5] CDCR provided this information to Mr. Hayes on August 23, 2018.

      H.   Continuous Quality Improvement Tool (Pages 28-29)

Mr. Hayes recommends that "[t]he reporting out of all of this reviewer's 19 suicide prevention audit measures should be encompassed in one final CQIT-formatted report for each facility, and not in various 'regional reports' as described in defendants' May 2018 CAP." (Audit at 29.) This recommendation is unnecessary[6] because these are reports of individual institutions, not "regional reports." The reference to "regional reports" in CDCR's CAP refers to the author of the CQIT reports, the leadership in CDCR's regional mental health offices. The regional chiefs and their staff conduct the CQIT audit and draft reports for each audited institution. CDCR is processing an overarching CQIT report that will aggregate the findings of the institution reports.

      I.   Reception Center Suicide Prevention Posters (Pages 30-32)

Mr. Hayes recommends a CAP "to ensure that suicide prevention posters are placed and maintained in visible locations in and around RC housing units, including, but not limited to, housing unit bulletin boards, [sic] nurse's offices where intake screening is administered, and pill call windows."[7] (Audit at 32.) While CDCR agrees that suicide posters should be placed in visible locations within Reception Centers, they cannot block visibility through windows or be placed outdoors. CDCR requests that the sentence include provisional language such as "when conditions allow."

---

[5] The recommendation is separately repeated as the last bullet on page thirty-seven.
[6] The recommendation is repeated at the first bullet of page thirty-eight.
[7] This recommendation is repeated at the second bullet of page thirty-eight.

Special Master Lopes
October 3, 2018
Page 7

III. CDCR Objects to Mr. Hayes's Rejection of the RJD Crisis Bed Proposal

To increase crisis bed capacity in the region where beds are most needed, CDCR proposed a temporary twenty crisis-bed unit at RJD pending construction of a permanent facility on site. This unit is especially important to ensure prompt access to crisis beds for the large number of patients housed in southern California. The need for additional crisis beds has also been recognized by the Court. On April 19, 2017, the court found that CDCR does "not presently have sufficient capacity to meet the need for MHCB level of care" and that the Eighth Amendment required perfect compliance with the twenty-four hour MHCB transfer timeframe. (*See* ECF 5610 at pages 11-12.)

As noted in CDCR's July 30, 2018 letter on this proposal, patients wait longer to access crisis beds in southern California than in any other region and, "each crisis bed in the southern region must provide services to twenty-five Enhanced Outpatient Program (EOP) patients while MHCBs in the central and northern regions provide services to fifteen and seventeen EOP patients, respectively." (Exhibit A at 2.) Mr. Hayes notes that transfer timeframes are not currently being met at RJD. (Audit at 10.) RJD, which houses over 2,300 mentally-ill inmates, but has only fourteen crisis beds, is the ideal location for additional beds.

Despite the need to timely transfer patients in crisis, Mr. Hayes rejected this common sense approach outright. Instead of rejecting CDCR's proposal, CDCR should fully activate the unit and only then should Mr. Hayes should monitor and opine on its adequacy.

    A. CDCR's RJD Crisis Bed Proposal is Sound and Will Ensure Crisis Bed Access for Patients in Southern California

CDCR toured the proposed site with Plaintiffs and Special Master in March 2018 and visited it separately with a member of the Special Master team and Mr. Hayes in April 2018. Following comments from Plaintiffs and the Special Master team, CDCR provided additional details on the project in a series of meetings. CDCR also detailed the RJD proposal in two letters provided to Plaintiffs and the Special Master in April and July 2018, which are attached to this letter as Exhibits A and B. The RJD proposal, which transfers funding and staff allocation from SAC's unlicensed crisis beds to RJD, was approved in the 2018 budget.

CDCR has carefully considered the placement of the RJD crisis-bed unit. CDCR proposes to convert one side of a housing unit to a crisis-bed unit which will contain patient cells, office and treatment space, observation and restraint rooms, nursing and medication rooms, and storage. While the proposed building currently shares space with an administrative segregation unit, that section will be reserved for overflow to minimize the administrative-segregation population. The units will be divided by a fence, and because it shares space with an administrative segregation unit, there will be no disruptions from the adjacent day-room.

Special Master Lopes
October 3, 2018
Page 8

The RJD cells will be similar in size to those approved at the California Medical Facility L1 unit, which successfully double cells patients in inpatient beds. RJD patients will be single celled and will each receive additional out of cell time, in part due to adjacent yard space. CDCR will ensure that the cells are suicide resistant.

CDCR will provide RJD with sufficient staffing to run a crisis bed unit. As noted above, CDCR plans to remove its unlicensed crisis bed unit at SAC and move all allocated staff and funding to RJD. The new RJD unit will be monitored regularly by headquarters and regional staff.

> B.  Rejecting the Proposal Outright is Improper

Mr. Hayes reports on at least a dozen items in his suicide-prevention audit to measure CDCR's compliance with its suicide-prevention policies. Yet the RJD proposal was rejected without analyzing the unit using under the same audit criteria. The Audit does not adequately explain why the proposal is rejected nor does it explain why concerns about the proposal's physical plant outweigh the transfer timeline concerns expressed by the Court. Mr. Hayes fails to provide a reasonable basis to conclude that the RJD project is inadequate.

Many of the current audit criteria and past audit reports focus on the operations of MHCBs. According to the draft report, Mr. Hayes audited the following crisis bed related items:

- Suicide-Resistant MHCBs (Audit at 6)
- Practices for observing MHCB Patients (*id.* at 11)
- MHCB Practices for Possessions and Privileges (*id.* at 13)
- Safety Planning for Suicidal Inmates (*id.* at 17)
- MHCB Discharge (*id.* at 22)
- Emergency medical response equipment in housing units (*id.* at 2)

Mr. Hayes takes issue with the proposed temporary MHCB unit at RJD, but those purported concerns have no foundation in the audit criteria. Under the proposal, RJD would follow the same observation, property, and privileges practices as any other approved CDCR crisis bed. Additionally, the same safety planning and discharge policies would apply. In sum, there is no evidence that the RJD unit, as proposed, would present a greater suicide risk as compared to other crisis bed units.

> C.  Mr. Hayes's Bases for Rejecting the Proposal Are Inconsistent with Past Suicide Prevention Findings and Recommendations and Ignore CDCR's Proposed Amendments.

Mr. Hayes agrees that the unit would be suicide resistant, which should satisfy the inquiry into suicide prevention. Yet, he objects to the proposed unit based on the physical plant and

Special Master Lopes
October 3, 2018
Page 9

hypothetical operational challenges. Mr. Hayes rejects the proposed physical plant of the crisis bed because, in his opinion, the cells would resemble suicide resistant *intake* cells. Mr. Hayes also attacks the cells as cold, dark, and with limited floor space well below any licensed MHCB unit. But CDCR presented remedies to address those concerns, all of which would provide cells with better natural light than many licensed crisis bed units, and with sufficient out-of-cell time to adjust for smaller foot-print in each cell.

In fact, and as mentioned previously, the proposed cells are similar in size to the unlicensed beds in California Medical Facility's L1 unit. However, unlike L1, RJD would not double cell patients, now or in the future. Like L1, CDCR proposes to remedy any square footage shortcomings with increased out-of-cell time. The RJD unit is located next to small management yards, typically used for segregation inmates. These yards can be used for crisis bed patients and will allow for increased out of cell time.

CDCR has also proposed to replace the cell doors with models that have larger windows and also proposed to replace light bulbs on the unit to provide more light. However, Mr. Hayes rejected these proposals as insufficient before ever seeing the doors or lights in place, or the impact of the larger windows on his stated concerns.

Also questionable is Mr. Hayes's rejection of the office and treatment space on the basis that sound easily travels between cells which are dozens of feet apart. The Audit states, "[g]iven the *fact* that inmates freely converse through the ventilation grates and cell doors, even with clinical offices and interview rooms located at the end of each tier, privacy and confidentiality could still be compromised by the proposed location of these offices on each tier." (Emphasis added.) This characterization of the unit and potential impact on confidentiality is exaggerated and hypothetical. It is true that inmates will loudly shout at their adjacent neighbor in an attempt to converse with one another. Yet, CDCR is unaware of any finding that sound travels so clearly that a patient in one cell can clearly overhear an individual clinical session several cells away. As noted in CDCR's July 30, 2018, letter, CDCR will examine whether individual sessions can be clearly heard several cells away and, if so, take corrective action to ensure confidentiality.

Mr. Hayes also rejects the proposed use of small management yards ignoring that this proposal has ample yard space and superior beds to the unit at SAC it will replace. There is no real risk that CDCR will be unable to ensure inmates have adequate out-of-cell time. CDCR should be permitted to activate the unit and illustrate that it can offer the out of cell time it committed to, much like it did with L1 wherein CDCR committed to offering twelve hours out of cell time each day.

Finally, Mr. Hayes opines that because the SAC unlicensed crisis bed is "problematic," CDCR should not close and move that program to RJD. This objection ignores the fact that the RJD

Special Master Lopes
October 3, 2018
Page 10

project is located in the part of the state where additional beds are needed and that, unlike SAC, the RJD project is time limited.  The unit is planned to remain open only until the approved and budgeted permanent crisis bed unit opens at RJD in 2022.

In sum, CDCR's proposal to open an unlicensed crisis-bed unit at RJD is sound and Mr. Hayes's contrary suggestion lacks foundation.  Accordingly, CDCR should be permitted to immediately open the unit and provide faster crisis bed access to patients in southern California.

Thank you for your consideration of these objections and comments.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

010

# EXHIBIT A

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



July 30, 2018

Special Master Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919

Special Master Lopes:

I write regarding the California Department of Corrections and Rehabilitation's (CDCR) proposal to activate an unlicensed Mental Health Crisis Bed (MHCB) unit at the R.J. Donovan Correctional Facility (RJD). CDCR first proposed Building B-7 for additional MHCBs in January 2018, shortly after the release of the Governor's proposed budget and toured it shortly thereafter with the Plaintiffs and Special Master's team. CDCR's goal in activating the RJD MHCB is to decrease wait times for patients referred to a crisis bed in southern California. Decreasing MHCB wait time has been a central focus of the parties and the court over the past eighteen months.

The RJD proposal calls for suicide resistant cells, with clinical and nursing located on the unit, in an institution that can attract staff to run the unit. While CDCR appreciates the Special Master and Plaintiffs' concerns about the nature of the unit, none of the concerns outweigh the immediate need for additional MHCBs in southern California. As the proposed unit will be safe and adequately staffed, there is no justifiable reason to reject CDCR's proposal for the temporary MHCBs. Without it, CDCR is unlikely to locate additional space in southern California prior to the late 2022 activation of the 100 inpatient bed project.[1] In the meantime, patients in southern California will continue to wait longer to be admitted to crisis beds.

    1.   The *Coleman* Court has found that CDCR has too Few Mental Health Crisis Beds.

Over the past year and a half, the court has issued orders aimed at improving wait times for patients referred to crisis beds. In the court's April 19, 2017, order, the court found that "full compliance with twenty-four hour timeline for transfer to MHCBs is required to satisfy the Eighth Amendment." (ECF no. 5610 at p. 11.) The court also found that data in the fall 2016 population projections suggested that "defendants do not presently have sufficient capacity to meet the need for MHCB level of care." (*Id.* at p. 12.) Accordingly, the court required that the Special Master convene a workgroup "to focus on outstanding issues related to compliance with the Program Guide timeline for transfer to MHCBs." (*Id.* at p. 13.)

---

[1] CDCR has considered whether other possible housing units in any other southern California male institutions would be more appropriate than the proposed space but currently proposed space at RJD is the best option to quickly activate a temporary crisis bed.

012

Special Master Lopes
Page 2

During the workgroups, CDCR presented data showing that wait times were highest in the southern region of crisis beds which was due in part to a lack of beds in that region. As explained in more detail below, patients in southern California wait longer for a crisis bed than patients in the other regions. This data was presented during the September 28, 2017, status conference. Following that status conference, the court issued another order and again found that CDCR had "too few MHCBs to meet" patient needs. (ECF no. 5710 at p. 17.)

While CDCR is in the process of constructing one hundred new inpatient and MHCBs in southern California, that activation of those beds is still years off.[2] In the meantime, in order to reduce wait times for patients housed in southern California who are referred to crisis beds, CDCR must activate the RJD MHCB project.

   2.  Wait Times for Patients in Southern California Continue to Trail Central and Northern California Regions.

Additional beds in the southern region are necessary in order to alleviate the higher average wait time for patients referred to crisis beds in that region. In late 2016, CDCR grouped institutions into three geographical regions in order to decrease MHCB referral wait times. (See Attachment A, current MHCB Region Map.) Following regionalization, average transfer times dropped dramatically in all regions.[3] (See also Exhibits B and C to CDCR's August 2, 2017, letter re MHCB data or ECF 5680-5 at 9-10, attached as Exhibit B.) However the southern region continued to trail the central and northern regions due to low numbers of MHCBs in that region. The population of mentally ill inmates in the southern region far outstrips the available crisis beds. For instance, each crisis bed in the southern region must provide services to twenty-five Enhanced Outpatient Program (EOP) patients while MHCBs in the central and northern regions provide services to fifteen and seventeen EOP patients, respectively.[4][5]

Because there are fewer MHCBs in southern California, patients will often wait longer in the southern region because they must spend more time on transport vehicles heading toward available beds, generally in the central region. The disparity in wait time is borne out in the average transfer time by region over the past twelve months. Since July 2017, the average hours to disposition[6] for the southern region is 20.95 hours while the central and northern regions

---

[2] CDCR plans to activate 50 inpatient beds at the California Institution for Men and 50 inpatient beds at RJD. The current expected activation date is fall 2022.

[3] Average wait time for internal admissions from January through June 2016 was 25.87 hours versus 13.92 hours in January through June 2017. For transfers, the average wait time from January through June 2016 was 41.33 hours versus 24.48 hours in January through June 2017.

[4] EOP population data was gathered from the May 2018 Coleman Reports package, enclosure 6(a), Mental Health Population by Institution.

[5] The disparity exists for all inmates in the Mental Health Services Delivery System in the southern region as well. Each southern region bed provides services to 101 patients in both EOP and the Correctional Clinical Case Management System (CCCMS) as compared with 81 and 65 for the central and northern regions respectively.

[6] Disposition is defined as when the referral is rescinded, internally admitted, or transferred. An internal admission disposition is the date and time the bed placement was made as indicated in Strategic Offenders Management System by the institution's control staff. A transfer disposition is the date and time the patient inmate left the referring institution as indicated in SOMS by the institutions control staff. A rescission disposition is the date and time the referral was rescinded as communicated by the referring institution via email to HCPOP.

disposed of referred cases within 14.8 and 9.56 hours respectively.[7]  Furthermore, during that same timeframe, the southern region disposed of 77.51% of referrals within twenty-four hours, while the central and northern regions disposed of 87.37% and 96.43% referrals within twenty-four hours respectively.

3.  The RJD MHCB Proposal is the Best Option to Quickly Add Beds in the Southern Region.

CDCR has identified adequate space and staff at RJD for a twenty-bed MHCB unit.  CDCR plans to shut down the unlicensed MHCB unit at California State Prison, Sacramento (SAC), and transfer necessary funding and staffing allocations to RJD.

The proposed unit is appropriate and should be approved for several reasons. The temporary beds would be located in the part of the state where beds are most needed.  The proposal includes confidential one on one treatment space on the unit.  Also, the unit will also have restraint and observations rooms, a medication room, nurses' station, and linen storage.  Finally, the RJD proposal offers adjacent yard space in the ASU's small management yards.

A.  Physical Space at RJD is Safe and Adequate.

The proposed MHCB unit will be located in a 270 design housing unit, currently designated for general population administrative segregation (ASU).  The plans call for a dividing fence between the MHCB side and the ASU side of the building.  CDCR will prioritize Building B-6 for general population ASU, while only overflowing ASU into Building B-7, where the MHCB is proposed, in order to keep ASU population to a minimum[8].  Despite its location in an ASU, the design for the RJD MHCB unit is safe and will be able to provide adequate crisis bed care.

In addition to restraint and observation rooms, medication room, nurses stations, and linen storage, the cells on the unit will be suicide resistant.  CDCR will ensure that the cells are retrofitted to include suicide resistant sinks, toilets, and air grates.  Furniture used in the cells will also be suicide resistant.

Although not the size of licensed crisis bed cells, the cells are slightly larger than the cells used in California Medical Facility's (CMF) L1 Psychiatric Inpatient Program.  Unlike L1, the cells at RJD will be single celled housing.[9]  While enlarging the cells on this unit is impossible due to building design, this problem is not unique to this particular housing unit.  With the exception of cross-top dorms in the infill facility, all other housing units at RJD are similar 270 design buildings.

---

[7] During the 2017 MHCB Workgroups, CDCR reported that southern region transfers occurred on average after 34.25 hours, versus 22.25 hours for central and 17.45 hours for northern regions.  (See ECF no. 5680-5 at 10.)

[8] Over the past six months, RJD has averaged a population of 55 inmates in its general population ASU.

[9] L1 cells are approximately 60 square feet.  RJD cells are eleven feet by six feet, and approximately 62 square feet when accounting for the toilet and sink.

CDCR will also upgrade each cell's door in order to add additional windows. This will allow for more light to enter the cell from the common area. While the walls and ceilings are made of concrete, not unlike other institutions, CDCR will paint the walls in order to brighten the unit.

### B. Programming and Out-of-Cell Time

Clinical and nursing offices will be located within the proposed MHCB in order to ensure that staff are always on the unit. One on one treatment will also occur in the housing unit by converting several cells to office and treatment space. Concerns were raised by the Plaintiffs and Special Master that sound may travel between the treatment rooms and the patient cells. However, these concerns are strictly hypothetical. CDCR will examine whether individual sessions can be clearly heard several cells away and, if so, take corrective action to ensure confidentiality. CDCR believes the treatment space will be located far enough away from celled housing to avoid sound traveling between locations.

CDCR will provide interdisciplinary treatment teams and group treatment in the adjacent building's institutional classification committee room. Dayroom will only be used for recreational therapy. While imperfect, the impact will be minimal as the acute nature of the unit will not often utilize groups. The fifty-bed unit under design will serve as a permanent remedy to this issue.

Patients in the RJD MHCB will receive fifteen hours out of cell time each week, including the time spent out of cell participating in structured mental health programming. RJD MHCB patients will have access to the small management yards adjacent to the ASU. Yard times will be separate from ASU yard.

### C. Staffing

RJD is an ideal location for this temporary MHCB unit as the facility has adequate staffing to absorb the additional beds. As reported in my April 20, 2018, letter, staffing on the MHCB unit will consist of:

- 1.4 control officer positions for each watch;
- 1.4 floor officer positions for second and third watches;
- 2.8 escort officer positions for second and third watches;
- 0.4 senior psychologist supervisor positions;
- 2.8 staff psychiatrist positions;
- 4.0 clinical psychologist positions;
- 0.5 clinical social worker positions; and,
- 2.4 Recreation Therapist positions.

Staff will be provided the necessary collaboration trainings and post orders for custody staff will be updated to reflect the unit's mission. Local custody and mental health leadership will be directly involved in providing oversight of the unit to ensure it is functioning in a collaborative manner.

Special Master Lopes
Page 5

     D.  Activation and Oversight

CDCR's statewide mental health program and leadership at the Division of Adult Institutions will ensure that the RJD unit provides a therapeutic environment by visiting the unit frequently following activation. The activation of the unit will be monitored via bi-weekly activation meetings chaired by a project manager at headquarters. These meetings will be attended by local, regional, and headquarters leadership.

     4.  Conclusion

The proposal for the MHCB at RJD will be safe, therapeutic, and overseen by headquarters and regional staff. The unit is no less safe than similar inpatient units that CDCR successfully operates, including those beds at SAC and CMF's L1. The space at RJD can be quickly activated to address a present need for additional beds. CDCR has looked at other space in southern California and has been unable to locate any housing units that can be converted to crisis beds in an adequate timeframe.

Since the proposed unit is safe and will provide adequate treatment space and staff, there is no justification for prohibiting CDCR from activating the unit, especially since the unit will be used to address a present need for additional crisis beds in southern California. Without this unit, it is unlikely additional space will be identified or activated in southern California prior to the completion of the 100 inpatient bed project currently slated for completion in late 2022. By rejecting this proposal, patients in southern California will continue to wait longer to receive crisis care than patients in central and northern California.

Accordingly, CDCR requests that the Special Master and Plaintiffs approve this project and stipulate to waive necessary state laws required for its prompt activation.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs


Cc: Lisa Ells
Co-Counsel

# EXHIBIT A



California Department of Corrections and Rehabilitation
California Correctional Health Care Services
Mental Health Crisis Bed Map

**Northern Region**

PBSP - Pelican Bay State Prison
HDSP - High Desert State Prison
FSP - Folsom State Prison
SAC - California State Prison, Sacramento
CCC - California Correctional Center
CMF - California Medical Facility
SOL - California State Prison, Solano
MCSP - Mule Creek State Prison
SQ - California State Prison, San Quentin

**Central Region**

CHCF - California Health Care Facility
SCC - Sierra Conservation Center
DVI - Deuel Vocational Institution
VSP - Valley State Prison
CTF - Correctional Training Facility
SVPS - Salinas Valley State Prison
PVSP - Pleasant Valley State Prison
ASP - Avenal State Prison
CMC - California Men's Colony
COR - California State Prison, Corcoran
SATF - Substance Abuse Treatment Facility
KVSP - Kern Valley State Prison
NKSP - North Kern State Prison
WSP - Wasco State Prison
CCI - California Correctional Institution

**Southern Region**

CAC - California City Correctional Facility
LAC - California State Prison, Los Angeles County
CIM - California Institute for Men
ISP - Ironwood State Prison
CVSP - Chuckawalla Valley State Prison
CRC - California Rehabilitation Center
CEN - Centinela State Prison
CAL - Calipatria State Prison
RJD - RJ Donovan Correctional Facility

**Female Insitutions**

CCWF - Central California Women's Facility
CIW - California Institute for Women

# EXHIBIT B

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                                EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



August 2, 2017

VIA EMAIL ONLY

Lisa Ells                                              Special Master Lopes
Rosen Bien Galvan & Grunfeld LLP                       Pannone Lopes Devereaux and O'Gara LLC
50 Fremont Street, 19th Floor                          Northwoods Office Park, Suite 215N
San Francisco, CA 94105                                1301 Atwood Avenue
                                                       Johnston, RI 02919

RE: Plaintiffs' July 6, 2017 Letter and Defendants' July 21, 2017 Response

Special Master Lopes and Lisa:

Defendants write to follow up on our July 21, 2017 letter regarding Mental Health Crisis Bed proposals and provide additional data requested during the all parties' workgroup discussion on July 24, 2017.  Defendants look forward to continuing to engage in cooperative efforts to identify obstacles to full compliance with a 24-hour timeline for transfer of inmates to Mental Health Crisis Beds and possible solutions.

1.  Updates on Initiatives to Ensure Proper Bed Utilization of Mental Health Crisis Beds

In Defendant's April 7, 2017, Response to the Court's March 24, 2017, Order to Show Cause, Defendants outlined several initiatives undertaken in the last year to help ensure appropriate use of Mental Health Crisis Beds (MHCB).  Defendants also provided updates on those initiatives to Plaintiffs and the Special Master in their July 21 correspondence.  Additional information and updates are discussed below.

a.  Crisis Intervention Teams

Defendants will have Crisis Intervention Teams (CIT) at eleven institutions by fall 2017. Institutions most in need of crisis intervention teams are identified through a review of existing data on referral and rescission rates.  Thereafter, each institution is required to identify one staff member each from the mental health, nursing, and custody disciplines to provide after-hours coverage seven days per week.  If an institution does not already have staff currently assigned to cover after hours, headquarters has authorized mental health staff to take 13 hour shifts, three days per week.  If no volunteers are identified, mandated coverage or call backs will be implemented.

CIT training includes a two-hour in-class training and shadowing a Master Trainer working with patients identified as requiring evaluations for possible MHCB referrals.  Master Trainers are provided from the mental health, nursing, and custody disciplines.

RE: Mental Health Crisis Bed Proposal
Page 2

Crisis intervention teams have been activated at three institutions:  Salinas Valley State Prison (October 2016), California Institution for Women (January 2017), and California Health Care Facility (March 2017).  Defendants will activate Crisis Intervention Teams at eight more institutions by the end of September 2017:  Central California Women's' Facility (August 2017), California State Prison, Los Angeles County, (August 2017), California State Prison, Corcoran, (August 2017), R.J. Donovan Correctional Facility (August 2017), Wasco State Prison (September 2017), California State Prison, Sacramento (September 2017), Mule Creek State Prison (September 2017), and California Substance Abuse Treatment Facility (September 2017).

Attached as Exhibit A is a table showing historical referrals and rescissions in the California Institution for Women's (CIW) MHCBs from January 2015 through July 2017.  As indicated in Exhibit A, the CIT was implemented at CIW in January 2017 and demonstrates an overall reduction in the frequency of both referrals and rescissions post-CIT implementation as compared to previous years.  Prior to CIT implementation, the overall average number of referrals each month was 46.48, and rescissions comprised 12.5% of those referrals.  Post-CIT implementation, the overall average number of referrals each month has fallen to 34, with rescissions making up 7.8% of those referrals.

     b.  After Hours Staffing

CDCR has expanded its after-hours staffing at many institutions.  The goal of increasing after-hours staffing is to decrease the number of rescissions.  Data has shown that a significant number of after-hours referrals to crisis beds are made between 5:00 P.M. and 1:00 A.M.  The following staffing hours chart updates the chart included in Defendants' July 21 letter:

| Institution | On-Site Hours | Days Per Week |
| --- | --- | --- |
| ASP | 0700-1700 | 7 |
| CAL | 0730-1730 | 7 |
| CCC | 0700-1700 | 7 |
| CCI | 0800-1700 | 5 |
| CCWF | 0600-1800 | 5 |
|  | 0700-1700 | Sat/Sun |
| CEN | 0730-1730 | 7 |
| CHCF | 0700-1700 | 5 |
| CIM | 0700-2400 | 7 |
| CIW | 0700-2200 | 7 |
| CMC | 0700-1700 | 7 |
| CMF | 0700-2300 | 5 |
|  | 0700-1700 | Sat/Sun |
| COR | 0700-1700 | 5 |
| CRC | 0700-1700 | 5 |
| CTF | 0600-1800 | 5 |
|  | 0700-1700 | Sat/Sun |
| CVSP | 0630-1800 | 7 |
| FSP | 0800-1600 | 5 |
| HDSP | 0700-1700 | 7 |
| ISP | 0630-1800 | 7 |

RE: Mental Health Crisis Bed Proposal
Page 3

| | | |
|---|---|---|
| KVSP | 0700-1700 | 7 |
| | 0800-1800 | 5 |
| LAC | 0700-1700 | Sat/Sun/Mon |
| | 0700-2200 | Tue/Wed/Thur |
| | 0700-2000 | Fri |
| MCSP | 0600-2400 | Mon-Thur |
| | 0600-1700 | Fri |
| | 0700-1700 | Sat/Sun |
| NKSP | 0700-1700 | 7 |
| PBSP | 0700-1700 | Sat/Sun/Mon |
| | 0700-2200 | Tue-Fri |
| PVSP | 0700-1700 | 7 |
| RJD | 0700-2200 | 5 |
| | 0700-1700 | Sat/Sun |
| SAC | 0600-0100 | 7 |
| SATF | 0700-1700 | 7 |
| SCC | 0730-1730 | 5 |
| | 0800-1800 | Sat/Sun |
| SOL | 0700-1700 | 7 |
| SQ | 0600-2300 | M-Thur |
| | 0600-1900 | Fri |
| | 0700-1700 | Sat/Sun |
| SVSP | 0700-1700 | 5 |
| | 1000-2300 | 5 (CIT) |
| | 0700-1700 | Sat/Sun |
| | | MHCB Staff |
| VSP | 0700-1700 | 7 |
| WSP | 0700-1700 | 7 |

    c.   Clustering of Mental Health Crisis Beds & Transport Timelines

In December 2016, Defendants clustered their crisis beds into three regions.  In comparing the average time for inmates to be transferred to outside crisis beds from the time periods of January – June 2016 (prior to clustering) and January – June 2017 (subsequent to clustering), the average length of time (in hours) from referral to HCPOP bed assignment for all three regions decreased by 17.54 hours and the average length of time (in hours) from referral to disposition decreased by 16.85 hours.

For comparison, attached as Exhibits B and C are tables showing the average length of time from referral to disposition by region and type of admission for January through June of 2016 and January through June of 2017.

Attached as Exhibits D and E are data from the first week of June 2017, illustrating the difference between the length of time to place an inmate on a transport vehicle versus the length of time to place the inmate into the receiving institution's bed.  These exhibits show that the average transportation time from sending to receiving institution is approximately 4.12 hours, with a range of 0.94 hours to 9.14 hours.  It should be noted that the same trip between institutions can vary widely.  For example, transfers between RJD and LAC took anywhere from 4.68 to 9.14 hours due to traffic and other conditions.  Based on varying transportation times between institutions, the overall short duration of time the inmate spends being transported, and

022

RE: Mental Health Crisis Bed Proposal
Page 4

the fact that the inmate is safe during transportation, it appears appropriate to measure completion of a referral for an inmate-patient transferring to an outside mental health crisis bed to occur at the time the inmate-patient is placed in a transport vehicle.

Finally, attached as Exhibit F is a table showing the average time to disposition for internal and external transfers and the number of internal and external transfers conducted by each institution from March through June 2017.

    2.   Rescission Rates

Defendants supplied data in their July 21 letter on rescission rates and the impact of after-hours referrals. Attached as Exhibit G, is an excel table showing the number of referrals made both after (5:00 PM to 5:00 AM) and during peak hours (5:00 AM to 5:00 PM), as well as data on the number of rescissions that occur at each institution. The data shows that over a quarter of all after hours referrals are rescinded (1,882 in six months) versus only 9.3% of referrals (or 678 over six months) made during peak hours. Of the total number of rescissions, 73% are rescissions of referrals made after hours. Rescissions cause delays at the institutional level by removing clinicians from direct patient care in order to complete rescission paperwork. Rescissions also cause delays at the HQ level, leaving HCPOP unable to identify true needs for placement until all rescissions are removed from pending waitlists.

Defendants propose to address the high after hours rescission rate by requiring that clinical evaluations be completed in person before an inmate can be referred to a mental health crisis bed. While Defendants have increased after hours staff and are expanding Crisis Intervention Teams (see Section 1(a) and 1(b), *infra.*), Defendants propose that inmates who seek after hours care be kept in a safe location under one-to-one observation until a clinician conducts an in-person evaluation. Defendants propose that such an evaluation will be conducted no later than the next morning, and referral to a crisis bed will commence after the in-person evaluation if warranted.

    3.   Readmission Rates

Defendants provided data in their July 21 letter regarding readmission rates. Attached as Exhibit H is institutional readmission rate data for the second quarter of 2017. The data shows the percentage of crisis bed and Department of State Hospitals/Psychiatric Inpatient Program discharges that were *not* readmitted within 30 days. The statewide readmission rate for that quarter was 20%.

    4.   Long Lengths of Stay in Mental Health Crisis Beds

Attached as Exhibit I is inmate-level, clinical data regarding the fifteen inmates identified in Defendants' July 21 correspondence with current crisis bed stays beyond thirty days in response to plaintiffs' request at the all-parties workgroup on July 24, 2017.

As indicated in Defendants' July 21 letter noting inmates in crisis beds beyond sixty days, that data was based on Defendants' monthly psychiatric aging report which identified several inmates

who were out to court and not in a crisis bed, but remained on crisis bed status.  Of the eight inmates with the longest lengths of stay, one inmate was a SOMS coding error, one had a medical hold, one was chronically acutely and neurologically impaired and found inappropriate for acute or intermediate care, and five were out to court.  All but one of those inmates  have since been transferred out of the crisis beds.

### 5.  Female Transfers to Crisis Beds

CDCR continues to identify inmates custodially eligible for placement at Department of State Hospitals - Patton.  The following inmates are currently housed at DSH-Patton:



At CIW's Psychiatric Inpatient Program, two inmates (████████████ and ██████████ ████████), are custodially eligible for unlocked dorms.

### 6.  Plan To Address Inpatient Waitlists

CDCR is aware of the impact that inpatient beds have on Mental Health Crisis Bed waitlists.  In response to the current inpatient waitlist, CDCR has undertaken several steps to increase the flow through the inpatient beds.  First, CDCR has begun admitting patients to the acute and intermediate programs on weekends to avoid having a patient wait extra days for admission.  Second, CDCR is actively reviewing all inmates in the higher custody intermediate settings that are custodially eligible for unlocked dorms.  CDCR has directed its PIPs to begin referring nearly all of their unlocked dorm eligible inmates to their least restrictive housing.  Finally, CDCR has increased the census at CMF's L1 to 36 patients as of August 1, 2017.

////

///

//

/

RE: Mental Health Crisis Bed Proposal
Page 6

Defendants look forward to discussing the data and issues with Plaintiffs and the Special Master at our workgroup on August 4, 2017.


Sincerely,


*/s/ Andrea S. Moon*

ANDREA S. MOON
Attorney
Office of Legal Affairs

Attachment(s):
    A.  CIW CIT Data Sheet
    B.  MHCB Time Frames Drill Down Jan – Jun 2016
    C.  MHCB Time Frames Drill Down Jan – Jun 2017
    D.  MHCB Transport and Placement Averages 6-5 6-9
    E.  MHCB Transport and Placement Timeframes 6-5 6-9
    F.  MHCB Data Summary w capacity
    G.  MHCB Ref Dis Jan-June 2017 Pivot
    H.  2nd Q 2017 Readmission Rates by Inst.
    I.  15 Patients in MHCB Over 30 Days

cc:

Special Master Lopes
Michael Bien
Tom Nolan
Steve Fama
Co-Counsel

# EXHIBIT B

Case 2:90-cv-00520-KJM-DB   Document 6067-1   Filed 11/18/18   Page 33 of 46

| Referral Disposition | Transferred |
|---|---|

| Region | Ave Referral to HCPOP Bed Assignment | Ave Bed Assignment to Transportation | Ave Referral to Transportation | Referral Count |
|---|---|---|---|---|
| Southern (60 beds) | 30.56 | 6.97 | 37.48 | 583 |
| Northern (131 beds) | 30.23 | 11.57 | 41.76 | 338 |
| Central (236 beds) | 30.13 | 12.46 | 42.58 | 1683 |
| **Grand Total** | **30.24** | **11.12** | **41.33** | **2604** |

| Referral Disposition | Internally Admitted |
|---|---|

| Region | Ave Referral to HCPOP Bed Assignment | Ave Bed Assignment to Admission | Ave Referral to Admission | Referral Count |
|---|---|---|---|---|
| Southern (60 beds) | 46.11 | 5.37 | 29.52 | 344 |
| Northern (131 beds) | 36.34 | 4.00 | 21.54 | 550 |
| Central (236 beds) | 42.40 | 5.90 | 26.90 | 1084 |
| **Grand Total** | **41.75** | **5.34** | **25.87** | **1978** |

| Referral Disposition | Internally Admitted |
|---|---|

| Region | Ave Referral to HCPOP Bed Assignment | Ave Bed Assignment to Admission | Ave Referral to Admission | Referral Count |
|---|---|---|---|---|
| **Female (22 beds)** | | | | |
| CCWF | 70.50 | 8.56 | 45.74 | 84 |
| CIW | 59.34 | 3.34 | 43.61 | 226 |
| **Grand Total** | **61.51** | **4.35** | **44.19** | **310** |

Data Source: HEART

# EXHIBIT C

# MHCB REFERRALS RECEIVED BETWEEN JANUARY - JUNE 2017

| Referral Disposition | Transferred |
|---|---|

| Region | Ave Referral to HCPOP Bed Assignment | Ave  Bed Assignment to Transportation | Ave Referral to Transporation | Referral Count |
|---|---|---|---|---|
| Southern (60 beds) | 23.92 | 10.42 | 34.25 | 537 |
| Northern (131 beds) | 6.65 | 10.94 | 17.45 | 287 |
| Central (236 beds) | 9.72 | 12.72 | 22.25 | 1444 |
| **Grand Total** | **12.70** | **11.95** | **24.48** | **2268** |

| Referral Disposition | Internally Admitted |
|---|---|

| Region | Ave Referral to HCPOP Bed Assignment | Ave Bed Assignment to Admission | Ave Referral to Admission | Referral Count |
|---|---|---|---|---|
| Southern (60 beds) | 20.17 | 5.13 | 24.82 | 310 |
| Northern (131 beds) | 4.42 | 4.57 | 8.95 | 742 |
| Central (236 beds) | 9.20 | 5.21 | 14.20 | 1092 |
| **Grand Total** | **9.10** | **4.98** | **13.92** | **2144** |

| Referral Disposition | Internally Admitted |
|---|---|

| Region | Ave Referral to HCPOP Bed Assignment | Ave Bed Assignment to Admission | Ave Referral to Admission | Referral Count |
|---|---|---|---|---|
| **Female (22 beds)** | | | | |
| CCWF | 146.28 | 8.31 | 154.59 | 97 |
| CIW | 33.11 | 26.97 | 36.83 | 188 |
| **Grand Total** | **104.86** | **20.62** | **76.91** | **285** |

Data Source: HEART

# EXHIBIT B

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF LEGAL AFFAIRS**
Patrick R. McKinney II
General Counsel
P.O. Box 942883
Sacramento, CA 94283-0001



April 20, 2018

Special Master Lopes                           Krista-Stone Manista
Pannone Lopes Devereaux and O'Gara LLC         Rosen Bien Galvan and Grunfeld LLP
Northwoods Office Park, Suite 215N             50 Fremont Street, 19th Floor
1301 Atwood Avenue                             San Francisco, CA 94105
Johnston, RI 02919

*VIA EMAIL*

Dear Matty and Krista,

I write to provide an update on the California Department of Corrections and Rehabilitations' (CDCR) proposal to activate additional inpatient and crisis beds at the California Institution for Women and R.J. Donovan Correctional Facility. Following Plaintiffs' March 16, 2018, letter regarding these projects, CDCR toured the units with members of the Special Master team on April 11, 2018. Discussed below are updates on CDCR's plans to activate beds at these two institutions.

    1.   California Institution for Women

CDCR plans to activate Psychiatric Inpatient Program and Mental Health Crisis Beds (MHCB) at the California Institution for Women (CIW). Discussed below are CDCR's plans to mitigate the "blind spot" in the cells, address security concerns by frosting some windows, and the staffing and activation process for the unit.

        A.   "Blind Spot" in Cells

CDCR has ordered a Norix Duravision mirror and a Prison Industries Authority stainless steel mirror to test in each cell. The mirrors are expected to arrive in mid-May and CDCR will provide an update once the facility and custody staff have inspected, installed, and tested the mirrors.

        B.   Cell Window Frosting

As previously discussed, there are security and privacy risks with the outward and inward views of cells facing the parking lot. CDCR is committed to completing a cell by cell analysis of what security measures should be taken to mitigate that risk. For example, cells that have a clear view of the vehicles and license plates will have more frosting coverage of the window than the cells on that same side which do not. The solution to mitigate any security or privacy risks will not be a "one size fits all" solution. Each cell will be reviewed and the extent of any frosting or other window covering will be determined on a cell by cell basis.

Special Master Lopes
Krista Stone-Manista
Page 2

      C.  Floor Plans, Staffing, and Activation

Attached are the most recent floor plans for CIW's project.  (Exhibit A.)

CDCR will provide the following staff for the unit:

- 2.8 first watch officer positions;
- 5.2 second watch officer positions;
- 4.2 third watch officer positions;
- 0.4 senior psychologist supervisor positions;
- 2.8 staff psychiatrist positions;
- 4.0 clinical psychologist positions;
- 0.5 clinical social worker positions;
- 2.4 recreation therapist positions;
- 12.0 registered nurse positions;
- 8.4 psychiatric technician positions;
- 1.0 senior registered nurse II positions;
- 1.3 licensed vocational nurse positions;
- 0.8 senior psychiatric technician positions.

The activation of this unit will be closely monitored with bi-weekly, or weekly when necessary, activation meetings chaired by a project manager with headquarters leadership oversight.  Local leadership and stakeholders, regional staff, and headquarters leadership and stakeholders will all participate in these meetings.

      2.  R.J. Donovan Correctional Facility

CDCR plans to activate twenty MHCBs at R.J. Donovan Correctional Facility (RJD).  Discussed below are CDCR's response to concerns about location of the unit, therapeutic milieu, treatment locations, and staffing and activation plans.

      A.  Location of the RJD MHCB

CDCR understands the concerns raised by Plaintiffs and the Special Master team regarding the use of an administrative segregation unit for these temporary beds.  However, CDCR also believes there are many advantages to moving these temporary beds from California State Prison, Sacramento to RJD.

RJD offers advantages over the beds currently at California State Prison, Sacramento.  Two important advantages that RJD has over the beds at California State Prison, Sacramento, are that the beds will be located in a region where there is a need for additional beds and that the beds will be temporary as they will deactivate following activation of the fifty bed MHCB unit at RJD.  In addition:

032

Special Master Lopes
Krista Stone-Manista
Page 3

- Patients have access to small management yards and group recreation therapy on the unit;
- RJD provides temperature control within the unit;
- Individual confidential treatment sessions are provided on the unit, on both floors, instead of in the dining area which is the current practice at California State Prison, Sacramento;
- Available interdisciplinary treatment team and confidential clinical group space; and
- Restraint and observation rooms are available on the unit, as well as a medication room, nurses station, and linen storage, none of which are available on the unit at California State Prison, Sacramento.

B.  Therapeutic Milieu

CDCR is committed to providing a therapeutic environment.  The crisis bed side of the unit will be separated from the administrative segregation side by a chain link fence.  MHCB patients will have exclusive use over the entrance and exit doors for yard, treatment team, and group.

RJD has two general population administrative segregation units – buildings six and seven.  RJD has an average general population administrative segregation population of 120.  RJD will fill building six first with overflow placed in building seven, where the crisis bed is being placed. Administrative segregation inmates will be housed beginning in the opposite far side corner to prevent line of sight between MHCB patients and the administrative segregation inmates.  An assessment will be completed to identify which administrative segregation cells should not be used, with the exception of an urgent need, to ensure no line of sight.

All staff will be provided the necessary collaboration trainings and post orders for custody staff will be updated.  The unit will have clinical and nursing offices which will allow clinical staff to be on the unit at all times.  Local custody and mental health leadership will be directly involved in providing oversight of the unit to ensure it is functioning in a collaborative manner.  Finally, the Division of Adult Institutions and Statewide Mental Health Program are committed to ensuring that this unit provides a therapeutic environment and therefore will ensure more frequent visits by the regional lieutenants and clinicians.   Mental health headquarters administrators will attend activation meetings in person during the activation process.

C.  Treatment Locations

Confidential individual treatment will be provided in identified cells on the first and second floors of the MHCB unit.  Recreational therapy will be provided outdoors in the small management yards as well as on the dayroom floor.  The dayroom floor will be designed in order to provide recreational therapy to all MHCB patients.  The unit will have a clear and distinct separation of treatment areas for maximum custody patients and non-maximum custody patients by using partitions and signs.

Confidential group therapy can be provided in the institutional classification committee room in building six or in the Healthcare Treatment Building.   Treatment teams will meet in the

033

Special Master Lopes
Krista Stone-Manista
Page 4


institutional classification committee room in building six.  The temporary MHCB unit will not impact RJD's ability to provide required treatment to EOP ASU patients.

       D.  Floor Plans, Staffing, and Activation Plans

Attached are the most recent floor plans for RJD's project.  (Exhibits B and C.)  Minor revisions to the plan are ongoing and updates can be provided once the drawings are completed.

CDCR will provide the following staff for the unit:

- 1.4 control officer positions for each watch;
- 1.4 floor officer positions for second and third watches;
- 2.8 escort officer positions for second and third watches;
- 0.4 senior psychologist supervisor positions;
- 2.8 staff psychiatrist positions;
- 4.0 clinical psychologist positions;
- 0.5 clinical social worker positions; and,
- 2.4 Recreation Therapist positions.

Nursing staff information will be provided at a later date.

As stated above, the activation of this unit will be closely monitored through initial bi-weekly, or weekly when needed, activation meetings chaired by a project manager with headquarters leadership oversight.  Local leadership and stakeholders, regional staff, and headquarters leadership and stakeholders will all participate in these meetings.

CDCR continues to refine the proposal and will share additional information as it becomes available.


Sincerely,

*/s/ Nick Weber*

Nick Weber
Attorney
Office of Legal Affairs

# EXHIBIT A

Case 2:20-cv-00XXX-JLR-XXX    Document 50872    Filed 12/18/22    Page 42 of 46

# EXHIBIT B

Core 7 kW en x2SOLA.pdf 4/28 · Downloaded 9467-7 · Files 34:08:03 · Page 44 of 46

# EXHIBIT C

Downloaded from 2022-Jun-4325 · Downloaded 0467.2 · Print: 24.18631 · Page 45 at 46