1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   ADRIANO HRVATIN, State Bar No. 220909
    Supervising Deputy Attorney General
3   ANDREW M. GIBSON, State Bar No. 244330
    Deputy Attorney General
4     600 West Broadway, Suite 1800
      San Diego, CA 92101
5   P.O. Box 85266
      San Diego, CA 92186-5266
6   Telephone:  (619) 738-9549
    Fax:  (619) 645-2581
7   E-mail:  Andrew.Gibson@doj.ca.gov
    *Attorneys for Defendants*

8

9               IN THE UNITED STATES DISTRICT COURT

10             FOR THE EASTERN DISTRICT OF CALIFORNIA

11                      SACRAMENTO DIVISION

12

13

14  **RALPH COLEMAN, et al.,**                    Case No. 2:90-cv-00520 KJM-DB (PC)

15                                  Plaintiffs,   **DEFENDANTS' RESPONSE TO THE COURTS' NOVEMBER 13, 2018 ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT APPOINT AN INDEPENDENT INVESTIGATOR IN THE EXERCISE OF ITS INHERENT AUTHORITY**

16          v.

17  **EDMUND G. BROWN JR., et al.,**

18                                  Defendants.   Judge:        The Honorable Kimberly J. Mueller

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

DISCUSSION ...................................................................................................................... 2

I.      The Contemplated Scope of the Independent Investigation Exceeds This
        Court's Inherent Authority. ...................................................................................... 2

II.     The Court's Reliance on Rule 706 Is Unjustified. .................................................. 5

III.    The Appointment of an Independent Extrajudicial Investigator Is
        Inconsistent with The Court's Past Practice, Prolongs This Case, and Is
        Grossly Unfair to Defendants .................................................................................. 6

        A.      Appointment of an Extrajudicial Independent Investigator is
                Inconsistent with Prior Practices by This Court .......................................... 7

        B.      The Proposed Appointment Will Significantly Prolong Any
                Progress in This Case. ................................................................................... 8

        C.      The Court May Not Authorize Inquiry into Attorney-Client
                Communications Without Due Process. ......................................................... 9

IV.     The PLRA Controls the Terms of Any Investigator's Appointment,
        Powers, and Compensation. ................................................................................... 10

V.      Defendants' Proposed Alternative Process. .......................................................... 12

        A.      Defendants' Position Has Been Consistent—the Court's Special
                Master Should Conduct Any Investigation. ................................................ 12

        B.      If The Special Master Is Unable or Unwilling to Conduct the
                Review and Investigation, Then the Review and Investigation of
                Dr. Golding's Allegations Are Properly Vested with the *Plata*
                Receiver or the Parties. ............................................................................... 15

        C.      Defendants' Proposed Process Is Fairer and Will Preserve Scarce
                Public and Judicial Resources. ................................................................... 16

CONCLUSION .................................................................................................................. 18

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ass'n of Mex. Am. Educators v. California*
  231 F.3d 572 (9th Cir. 2000)........................................................................6

*Benjamin v. Fraser*
  343 F.3d 35 (2d Cir. 2003).........................................................................11

*Chambers v. NASCO, Inc.*
  501 U.S. 32 (1991) ..................................................................................3, 4

*Cobell v. Norton*
  334 F.3d 1128 (D.C. Cir. 2003) ...............................................................2, 3, 4

*G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*
  671 F. Supp. 2d 1203 (D. Nev. 2009) ..........................................................5

*Hodge & Zweig*
  548 F.2d 1347 (1997)................................................................................9

*In re Napster, Inc. Copyright Litig.*
  479 F.3d 1078 (9th Cir. 2007)....................................................................9

*In re Richard Roe, Inc.*
  68 F.3d 38 (2d Cir. 1995)...........................................................................9

*NORML v. Mullen*
  828 F.2d 536 (9th Cir. 1987)......................................................................3

*Plata v. Schwarzenegger*
  603 F.3d 1088 (9th Cir. 2010)............................................................. *passim*

*Reilly v. United States*
  863 F.2d 149 (1st Cir. 1988).......................................................................6

*S.E.C. v. First Jersey Sec., Inc.*
  101 F.3d 1450 (2d Cir. 1996)......................................................................3

*United States v. Zolin*
  491 U.S. 554 (1989) ..................................................................................9

*Universal Oil Prod. Co. v. Root Ref. Co.*
  328 U.S. 575 (1946) ...........................................................................3, 4, 18

# TABLE OF AUTHORITIES
## (continued)

**Page**

**STATUTES**

Prison Litigation Reform Act, 42 U.S.C. 1997e, *et seq.* ........................................................ *passim*

United State Code, Title 18
  § 3006A ................................................................................................................. 11
  § 3626(f)(g)(8) ................................................................................................. 10, 11, 12

**CONSTITUTIONAL PROVISIONS**

United States Constitution
  Article III ................................................................................................................... 3

**COURT RULES**

Federal Rule of Evidence 501 ........................................................................................... 9

Federal Rule of Evidence 706 ...................................................................................... 1, 5, 6

**OTHER AUTHORITIES**

Monroe H. Freedman, *Our Constitutionalized Adversary System*, 1 Chapman Law
  Review 57 (1999) ........................................................................................................ 2

**INTRODUCTION**

The Court lacks the authority for its unprecedented proposal to appoint an "independent investigator" with wide-ranging, quasi-prosecutorial extrajudicial powers. The Court's role is to resolve disputes brought to it by the parties—but neither Plaintiffs' nor Dr. Golding's counsel have filed a pleading or motion concerning Dr. Golding's assertions. Similarly, the Court has not identified an order, judgment, or other decision that was obtained through fraud, which might invoke the Court's jurisdiction to oversee a proceeding for "fraud on the court." Rather, the Court bases its proposal on the uncorroborated, largely meritless fraud allegations of Dr. Golding that were not initially submitted to the Court, but instead sent to the *Plata* Receiver appointed to oversee medical care within the California Department of Corrections and Rehabilitation (CDCR). Federal courts are generally prohibited from investigating disputed factual issues outside the adversarial system contemplated by the Federal Rules of Civil Procedure and Evidence. Rather, it is the parties' obligation to bring issues to the court for resolution. It remains unclear why Dr. Golding's allegations are to be treated differently than similar allegations previously received by this Court.

The Court's proposal for an expansive investigation is also unnecessary. As explained in detail in Defendants' accompanying response to the Court's proposed order, the seven areas of inquiry identified by the Court do not involve any intentionally misrepresented information to the Court or Special Master. Indeed, of these seven areas, most do not involve any misrepresentation whatsoever; only two issues involve a court-ordered requirement or Program Guide timeframe (issues (a) and (b)); two were never presented to the Court or the Special Master and therefore cannot constitute fraud on this Court (issues (f) and (g)); and at least three of the issues ((d), (e), and (f)) pertain to the discretion, training, and management of CDCR's psychiatrists. None of these warrant a broad independent investigation into "fraud on the court," nor would any investigation require specialized expertise that would justify the Court's extraordinary proposal under Federal Rule of Evidence 706. Dr. Golding's allegations are typical of the questions of fact and law that the parties, the Special Master, and the Court routinely handle in this case.

1

1    Additionally, the Court's proposal is grossly unfair to the state, and will invariably cause

2    delay in resolving this decades-old class action.  Under the Court's proposed order, and

3    notwithstanding the provisions of the Prison Litigation Reform Act (PLRA), 42 U.S.C. 1997e, *et*

4    *seq.,* Defendants alone will be required to compensate the investigator, even though it would be

5    Plaintiffs' burden to allege and prove fraud by a preponderance of the evidence in any other

6    litigation.  Moreover, identifying an investigator may take weeks or months, there is no time limit

7    for the investigation, and, in fact, the proposed order provides that the investigator submit a

8    "monthly invoice," suggesting that the Court does not intend a quick resolution.

9    To remedy the deficiencies in the Court's proposed procedure, Defendants request that the

10    Court review Defendants' accompanying response and determine whether any of the seven

11    identified issues remain outstanding.  If the Court determines any issue still requires resolution,

12    the Special Master or the Receiver are capable of conducting a focused, thorough, and quick

13    investigation.  Alternatively, after reviewing Defendants' response to the identified issues and

14    consistent with the adversarial system of justice, the Court could invite Plaintiffs to bring a

15    motion framing any outstanding issues that they believe are actionable and the parties can litigate.

16    Any of these procedures would not only be fairer to all parties, but would also save undue

17    expense of scarce judicial and public resources.

18    ## DISCUSSION

19    **I.    THE CONTEMPLATED SCOPE OF THE INDEPENDENT INVESTIGATION EXCEEDS THIS
         COURT'S INHERENT AUTHORITY.**

20

21    The Court's discussion of "Legal Standards" and proposed appointment of an independent

22    investigator ignores the broader context of the American adversarial system.  It is impermissible

23    for a court to appoint an investigator "charged with an investigative, quasi-inquisitorial, quasi-

24    prosecutorial role that is unknown to our adversarial system."  *Cobell v. Norton,* 334 F.3d 1128,

25    1142 (D.C. Cir. 2003).[1]  The prohibition on extrajudicial factual investigations like the one

26

27    [1] The adversarial system is the philosophy at the core of the American system of justice,
and requires the parties to present "conflicting views of fact and law to an impartial and relatively

28    passive arbiter, who decides which side wins what." Monroe H. Freedman, *Our
Constitutionalized Adversary System*, 1 Chapman Law Review 57 (1999).

2

Defs.' Resp. To The Courts' Nov. 13, 2018 OSC Why Court Should Not Appoint Independent Investigator
(2:90-CV-00520 KJM-DB (PC))

1    contemplated here is vital to "preserve for the court the appearance of impartiality." *S.E.C. v.*

2    *First Jersey Sec., Inc.*, 101 F.3d 1450, 1479 (2d Cir. 1996) ("we cannot conclude that the

3    investigation of past acts with a view to the recommendation of new charges is a judicial

4    function").  And while courts possess some degree of "inherent authority" to manage their own

5    affairs to achieve the orderly and expeditious disposition of cases, *Chambers v. NASCO, Inc.*, 501

6    U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)), these "inherent

7    powers must be exercised with restraint and discretion." *Id.* at 43-44 (citing *Roadway Express,*

8    *Inc. v. Piper*, 447 U.S. 752, 764 (1980)); *Cobell*, 334 F.3d at 1141 (D.C. Cir. 2003) ("A judicial

9    claim to an 'inherent power' is not to be indulged lightly, lest it excuse overreaching '[t]he

10   judicial Power' actually granted to federal courts by Article III of the Constitution of the United

11   States, and the customs and usages that inform the meaning of that phrase."); *Universal Oil Prod.*

12   *Co. v. Root Ref. Co.*, 328 U.S. 575, 580 (1946).  The Ninth Circuit, for example, has affirmed the

13   district court's inherent authority to appoint a special master where it was "necessary to fairly

14   enforce its injunction" in the face of credible evidence of defendants' continued violations. *See*

15   *NORML v. Mullen*, 828 F.2d 536, 543-44 (9th Cir. 1987).  And courts have inherent authority to

16   set aside judgments obtained through fraud "while adhering to the usual safeguards of adversary

17   proceedings." *Universal Oil Prod. Co.*, 328 U.S. at 580.

18       By contrast, a court may not appoint an agent that is "something like a party" and has an

19   "investigative, quasi-inquisitorial, quasi-prosecutorial role . . . ." *See, e.g., Cobell*, 334 F.3d at

20   1142.  In *Cobell*, the United States Court of Appeals for the District of Columbia vacated the

21   appointment of a court monitor imbued with broad investigatory powers that the court likened to

22   those of an Inspector General or roving federal court unknown to the American system of

23   adversarial justice. *Id*. at 1133, 1136, 1140-43 (recounting the monitor's charge to include review

24   all of the defendants' trust-reform activities, unrestrained ex parte communications, unfettered

25   access to any employees and information, and preparation of a report on its findings).

26       Here, the Court impermissibly proposes to use its inherent authority to appoint an

27   "independent" investigator with broad powers similar to those disallowed by the court in *Cobell*.

28   (*See* ECF No. 6002-1 at 3-7.)  In so doing, the Court relies on *Chambers* for the proposition that a

3

1    court has the power to conduct an independent investigation to determine whether it has been the

2    victim of fraud.  (*Id.* at 4.)  However, neither the Court in *Chambers* nor *Universal Oil Prod. Co.*,

3    upon which *Chambers* relies, ordered an independent <u>investigator</u>.  Rather, *Universal Oil Prod.*

4    *Co.* recognized the importance of the adversarial system when that court conducted an

5    "independent investigation," or what would be more accurately described as an evidentiary

6    hearing.  *See* 328 U.S. at 580 ("[I]f the rights of parties are to be adjudicated in such an

7    investigation, the usual safeguards of adversary proceedings must be observed.").  The Court's

8    proposal here would improperly supplant the role of the parties in the adversarial system and

9    place the Court and its investigator in the role of a party.  Again, Plaintiffs have not filed a motion

10   alleging fraud, and Plaintiffs and the Court have not identified an order or judgment upon which

11   either bases the claim that the Court was defrauded.  Instead, the Court proposes to appoint an

12   historically unprecedented investigator to replace Plaintiffs' role based on an unspecified

13   suspicion that the Court has been defrauded.[2]

14         In addition to being foreign to the adversarial system, the Court's proposal would

15   improperly endow its investigator with limitless access to Defendants and their employees and

16   counsel, unfettered power to engage in ex parte communications, and unrestricted access to any

17   of Defendants' files and papers the investigator deems pertinent to her or his charge.  (ECF No.

18   6002-1 at 3-4 & 6-7.)  Indeed, some of the proposed fraud investigator's powers would even

19   exceed those of the disallowed *Cobell* monitor (*see id.*, 334 F.3d at 1141-42), as this Court

20   proposes to endow the investigator with a staff (*see* ECF No. 6002-1 at 4-5), the apparent

21   authority to compel interviews (*see, e.g.,* ECF No. 6002-1 at 4 ("Defendants shall . . . arrange for

22   such interviews to be conducted under conditions satisfactory to the investigator")), and the

23   power not only to determine the facts, but to make *legal* findings as to whether Defendants

24   committed fraud.  (*See* ECF No. 6002-1 at 3; *see also* ECF No. 5998 at 6.)  These investigatory

25   powers are, like those rejected in *Cobell*, out of place in the framework of American adversary

26   justice.

27         [2] Dr. Golding's letter to the Receiver never uses the term "fraud."  Even if it had,
     Defendants' accompanying response to the Court's proposed order should dispel any notion that
28   Dr. Golding's allegations state a cause of action based on a misrepresentation.

1   Less drastic means of addressing Dr. Golding's allegations are available to the Court.  (*See*

2   Section IV, *infra*.)  For instance, the Court could, after reviewing Defendants' responses to Dr.

3   Golding's allegations (*see* Defendants' concurrently filed Objections and Response to the Court's

4   November 13, 2018 Proposed Order Regarding an Independent Investigation into the Golding

5   Allegations [Defs.' Resp. to Order re Allegations])—and with the Special Master's input—

6   resolve or substantially narrow many, if not all, of the seven issues outlined in the Court's

7   November 13, 2018 proposed order.  Alternatively, Plaintiffs could, as they have previously in

8   this litigation, file a motion so that any remaining issue can be litigated consistent with how this

9   Court has previously addressed unsubstantiated allegations of fraud—such as allegations raised in

10  2014 that Defendants intentionally withheld information about an inmate's death.  (*See* ECF Nos.

11  4982, 4992, 5034.)  This Court did not retain a "fraud investigator," but instead evaluated the

12  allegations through the traditional discovery, motion, and hearing procedures that form the

13  benchmarks of our adversarial system.  (*Id.*)

14  Accordingly, the appointment of an investigator with the sweeping powers proposed by the

15  Court is legally impermissible, inconsistent with the expectation of judicial restraint that limits

16  courts' use of their inherent powers, and will significantly compromise the Court's role as an

17  impartial adjudicator.

18  ## II.   THE COURT'S RELIANCE ON RULE 706 IS UNJUSTIFIED.

19  The Court proposes to appoint an investigator under its inherent authority "drawing on, as

20  appropriate, some of the procedures provided by Federal Rule of Evidence 706."  (ECF No. 6002

21  at 6.)  Among the procedures the Court intends to borrow from Rule 706 are those related to

22  investigator compensation.[3]  (*See* ECF No. 6002-1 at 7.)  The Court's reliance on Rule 706 is

23  misplaced.

24  Rule 706 concerns the appointment of technical expert witnesses in circumstances where

25  the matter before the court is exceedingly complex and beyond the court's skill.  *See* Fed. R.

26  Evid. 706; *see also, e.g., G.K. Las Vegas Ltd. P'ship v. Simon Prop. Grp., Inc.*, 671 F. Supp. 2d

---

27   [3] Importantly, the Court does not make its appointment under Rule 706 and is not,
therefore, acting under the authority of the rule when it determines that Defendants will
28  compensate the investigator.

5

1   1203, 1206 (D. Nev. 2009) (appointing independent computer forensic expert under Rule 706 to

2   conduct forensic examinations of computer equipment and collect evidence for resolution of

3   pretrial motions).  Appointment under the rule is appropriate only in "rare cases" requiring

4   "outside technical expertise." *Ass'n of Mex. Am. Educators v. California*, 231 F.3d 572, 590 (9th

5   Cir. 2000); *see also Reilly v. United States*, 863 F.2d 149, 156-57 (1st Cir. 1988) ("Appropriate

6   instances, we suspect, will be hen's-teeth rare.  The modality is, if not a last, a near-to-last resort,

7   to be engaged only where the trial court is faced with problems of unusual difficulty,

8   sophistication, and complexity, involving something well beyond the regular questions of fact and

9   law with which judges must routinely grapple.").

10      Here, there is no special complexity or technical expertise justifying an appointment under,

11   or even drawing upon, Rule 706.  The seven issues identified in the Court's proposed order (*see*

12   ECF No. 6002-1 at 2-6) are well within the competence of the parties, the Special Master, and the

13   Court to understand and address.  As demonstrated by Defendants' concurrently filed response

14   (*see* Defs.' Resp. to Order re Allegations), the vast majority of the areas to be investigated have

15   straight-forward factual bases that can be reviewed and tested by the parties and this Court in a

16   traditional proceeding governed by the Federal Rules of Civil Procedure and the Federal Rules of

17   Evidence.  For example, the Court's second proposed area of inquiry, identified as issue (b), is

18   readily explained by reference to emails that show the process by which CDCR chose to measure

19   compliance with routine psychiatry contacts from every 30 days to every "45 days or within the

20   next calendar month, whichever is shorter," and then back again, all at the behest of CDCR

21   psychiatrists.  (*Id.* at 10-12.)  This requires no special expertise to understand.

22      In short, the expansive and untethered investigation the Court envisions through the

23   appointment of an independent investigator is not permissible under the Court's inherent

24   authority or Rule 706.

25   **III.   THE APPOINTMENT OF AN INDEPENDENT EXTRAJUDICIAL INVESTIGATOR IS
        INCONSISTENT WITH THE COURT'S PAST PRACTICE, PROLONGS THIS CASE, AND IS**
26   **GROSSLY UNFAIR TO DEFENDANTS.**

27      There is nothing unique about Dr. Golding's allegations that warrant the appointment of a

28   third-party investigator to conduct a sweeping extrajudicial investigation.  Such action is

6

1    inconsistent with this Court's prior practices, will lead to delay, and is fundamentally unfair to

2    Defendants.  Each day that passes without resolution of these issues is harming the ability of the

3    professionals within CDCR's Mental Health Program to conduct their duties.

4         **A.    Appointment of an Extrajudicial Independent Investigator is Inconsistent
               with Prior Practices by This Court.**

5

6         Dr. Golding's allegations are better resolved via the Special Master or the adversarial

7    process as has previously occurred in this case.  The Special Master has investigated numerous

8    allegations regarding misconduct on issues concerning *Coleman* compliance and *Coleman* class

9    members.  For instance, on April 11, 2013, Plaintiffs filed a motion for further relief to address

10   allegations by psychiatrists and Plaintiffs' counsel that *Coleman* class members on San Quentin

11   State Prison's death row, and in various Department of State Hospital (DSH) programs, were

12   being subjected to "serious harm" and denied "basic needs."  (ECF No. 4543.)  On July 11, 2013,

13   the Court granted Plaintiffs' motion, directing the Special Master to monitor and report to the

14   Court on issues related to inpatient care at the DSH programs which treat CDCR inmates, plus the

15   45-bed inpatient program at the California Institution for Women, which is run by CDCR.  (ECF

16   No. 4688.)  The Court also left to the Special Master's discretion the inclusion in his report of any

17   other matters which he determined required urgent court attention.  (*Id*. at 12.)  The Special

18   Master issued his report on September 24, 2013 (ECF 4830), and on November 13, 2013, the

19   Court adopted the Special Master's report and ordered Defendants to take specific actions in

20   response to the Special Master's findings. (ECF No. 4925.)

21        This Court has also resolved issues of alleged wrongdoing by a party through the

22   adversarial process.  On January 17, 2014, following the close of an evidentiary hearing on,

23   among other things, CDCR's use of force policy, Plaintiffs moved for a status conference

24   following allegations that Defendants withheld evidence relevant to that hearing.  (ECF No.

25   4982.)  The Court ordered Defendants to ensure that all related documents, information, and

26   communications were retained and preserved.  (ECF No. 4992.)  Following that conference, the

27   Court did not propose to retain an extrajudicial investigator, but instead opened discovery for a

28

1    period of thirty days.  The parties conducted discovery, took depositions, filed status reports, and

2    appeared again before the Court to resolve the issue.

3        The above are just two examples of how this Court routinely handles similar claims of

4    impropriety by the Defendants without recourse to an expensive and time-consuming

5    investigation.

6        **B.**    **The Proposed Appointment Will Significantly Prolong Any Progress in**
   **This Case.**

7

8        A newly retained investigator will have neither the historical knowledge of the case nor an

9    understanding of CDCR's Mental Health Services Delivery System, and would have to learn the

10   longstanding approved methodologies for tracking and reporting compliance.  The inevitable

11   delays in such a process are inconsistent with this Court's oft-stated desire to see the end of this

12   litigation.  (*See, e.g.*, ECF No. 5852 at 3 ("The court credits the Special Master's observation that

13   the time span covered by the Report "is quite likely the most productive 18 months we have

14   experienced in the course of the *Coleman* case," and looks forward to the same level of

15   productivity continuing apace." (internal citation omitted).)

16       As the Court stated at the November 5, 2018 status conference, its goal was to structure an

17   investigation so that "it is focused, it takes as little time as possible, while being complete and

18   gives the court what it needs."  (Nov. 5, 2018 Tr. 5:15-18.)  The Court's order departs from these

19   laudable goals in a number of significant ways.  First, forty-eight days have now passed since Dr.

20   Golding sent his document to the *Plata* Receiver, and had the Court authorized either the Special

21   Master or CDCR's Internal Affairs Division to investigate, an investigation would either be

22   complete or nearly complete.  The Court's order prolongs this process as it: (1) fails to identify a

23   proposed investigator, suggesting it may be several weeks or months before such individual or

24   firm is identified; (2) does not limit the time of the investigation; (3) provides that the investigator

25   will submit "a proposed monthly invoice," suggesting that the Court does not intend a quick

26   resolution of the investigation; and (4) refuses to appoint the Special Master, who could quickly

27   and most efficiently advise the Court whether he has somehow been misled.

28

**C.    The Court May Not Authorize Inquiry into Attorney-Client Communications Without Due Process.**

The Court unnecessarily proposes to authorize the contemplated fraud investigator to "interview, on a confidential basis or otherwise, counsel for defendants and members of their staff," and to "engage in informal conferences with staff, employees, and appointees of the Office of the Attorney General," adding that the identified parties "shall cooperate with the investigator" and respond to his or her inquiries and requests.  (ECF No. 6002-1 at 4.)  This unlimited authority is not within the current Special Master's power, and is, in fact, improper and without legal precedent as it would give an investigator blanket access to information protected from disclosure by the attorney-client privilege, without even a threshold evidentiary showing that an exception to the privilege applies.  (*See generally* ECF No. 6002-1.)

"The attorney-client privilege is the oldest and arguably most fundamental of the common law privileges recognized under Federal Rule of Evidence 501."  *In re Napster, Inc. Copyright Litig.*, 479 F.3d 1078, 1090 (9th Cir. 2007), abrogated on other grounds by *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009).  On very rare occasions, the privileges afforded to attorney-client communications and attorney-work product may be breached under the so-called "crime-fraud exception."  *United States vs. Hodge & Zweig*, 548 F.2d 1347, 1355 (1997); *In re Richard Roe, Inc.*, 68 F.3d 38, 40 n.2 (2d Cir. 1995) ("Where, as here, the attorney-client privilege and the work product immunity substantially overlap, we see no reason to apply a different standard for attorney work product.") (citing *In re Grand Jury Proceedings*, 604 F.2d 798, 803 (3d Cir. 1979)).  But before these protections may be breached, however, the party asserting the privilege is owed procedural and evidentiary safeguards.  *See United States v. Zolin*, 491 U.S. 554, 572 (1989) (setting forth the process and evidentiary standard before *in camera* review of potentially privileged information); *In re Napster*, 497 F.3d at 1092-95 (setting forth the process and evidentiary standard before disclosure of potentially privileged information).  Neither the Court, nor the Court's investigative agents, may review information subject to a claim of privilege, even *in camera*, absent a threshold showing that the privilege does not apply.  *See Zolin*, 491 U.S. at 572.

9

1   The Court's proposed order permits the investigator unfettered authority to breach protected

2   attorney-client communications and attorney work product (*see generally* ECF No. 6002-1),

3   without even a single allegation by Dr. Golding against defense counsel or allowing fair

4   opportunity for Defendants to respond to Dr. Golding's allegations that the data is accurate.

5   Defendants maintain they have done nothing wrong, but the Court rejected Defendants' request to

6   address Dr. Golding's allegations.  (*See* ECF No. 5995.)  Essentially, the Court proposes to give

7   its investigator unlimited access to Defendants' attorney-client and work-product protected

8   information without affording Defendants the required procedural safeguards.  But due process

9   protects Defendants and their counsel from such an unprecedented intrusion into their

10   confidential communications and work-product.  Thus, should the Court move forward with the

11   appointment of an independent investigator despite Defendants' objections, the proposed order

12   must be revised to exclude any such intrusion of the attorney-client privilege and work-product

13   doctrines.

14   **IV.   THE PLRA CONTROLS THE TERMS OF ANY INVESTIGATOR'S APPOINTMENT, POWERS, AND COMPENSATION.**

15

16   For the reasons discussed above, the Court's proposal to appoint an extrajudicial

17   investigator is both impermissible and unnecessary.  Should the Court nevertheless continue, the

18   Court's proposed appointment cannot avoid the limits Congress placed on the appointments of

19   special masters under the PLRA.  (*See* ECF No. 5998 at 7:9-8:4.)  When compared to the powers

20   and duties of the current Special Master, the proposed investigator's terms and scope of

21   assignment place any such appointment squarely within the PLRA's special-master scheme.  *See*

22   18 U.S.C. § 3626(f), (g)(8).

23   Under the PLRA, a special master is defined as a person appointed under Rule 53 "or

24   pursuant to any inherent power of the court to exercise the powers of a master, *regardless of the*

25   *title or description given by the court*."  *Id*. at § 3626(g)(8) (emphasis added).  Any such

26   appointment is subject to various restrictions, including: (1) a mandatory appointment procedure

27   in which plaintiffs and defendants each nominate up to five special master candidates; (2) a ban

28   on ex parte communications; (3) a requirement that hearings and proposed findings are made on

10

1   the record; (4) a review of the appointment every six months; and (5) compensation set in

2   conformity with 18 U.S.C. § 3006A and paid by the Judiciary. *See id.* at § 3626(f).  To determine

3   whether an appointee, however titled, is a special master under the PLRA, courts compare the

4   powers bestowed by the order of appointment.  *See, e.g., Benjamin v. Fraser*, 343 F.3d 35, 45 (2d

5   Cir. 2003) (court monitors, as defined by their charge, are not special masters within the meaning

6   of the PLRA), abrogated in part on other grounds by *Caiozzo v. Koreman*, 581 F.3d 63, 70-72 (2d

7   Cir. 2009); *cf. Plata v. Schwarzenegger*, 603 F.3d 1088, 1094, 1096 & n.2 (9th Cir. 2010) (the

8   PLRA does not foreclose appointment of non-masters and the appointed receiver is not a special

9   master within the meaning of the PLRA).

10      Indeed, the powers of the investigator presented in the Court's proposed order (*see* ECF No.

11  6002-1 at 5-7) are borrowed, virtually word for word, from this Court's 1995 Order of Reference

12  outlining the case-specific duties and capacities of the present Special Master.  (*Compare* ECF

13  No. 6002-1 at 4-7 *with* ECF No. 640 at 5-7.)  For instance, the 1995 Order of Reference

14  appointing a Special Master provides the following powers:

15          To interview, on a confidential basis or otherwise, correctional staff, employees, and
            appointees of the CDC for the purpose of performing the investigator's duties under
16          this Order of Reference. Defendants shall provide suitable facilities and arrange for
            such interviews to be conducted under conditions satisfactory to the special master. In
17          addition, the special master may engage in informal conferences with CDC staff,
            employees, and appointees, and such persons shall cooperate with the special master
18          and respond to inquiries and requests related to the performance of his duties, including
            requests for compilation and communication of oral or written information.
19

20  (ECF No. 640 at 5:18-6:2.)

21      By comparison, the Court's November 13, 2018 proposed order of appointment gives the

22  appointee independent investigator identical powers:

23          To interview, on a confidential basis or otherwise, correctional staff, employees, and
            appointees of the California Department of Corrections and Rehabilitation (CDCR) for
24          the purpose of performing the investigator's duties under this order.  Defendants shall
            provide suitable facilities and arrange for such interviews to be conducted under
25          conditions satisfactory to the investigator. In addition, the investigator may engage in
            informal conferences with CDCR staff, employees, and appointees, and such persons
26          shall cooperate with the investigator and respond to inquires and requests related to the
            performance of the investigator's duties, including requests for compilation and
27          communication of oral or written information.

28

1   (ECF No. 6002-1 at 3-4.)

2          The identical powers delegated to the current Special Master and to the proposed

3   investigator prove that the proposed investigator is a special master subject to § 3626(f).[4]

4   Because the Court's proposed investigator, however termed, is a special master, the PLRA must

5   govern the appointment process, the investigator's powers, his or her term of service, and

6   compensation.  Consequently, the Court cannot require Defendants to pay for the proposed

7   investigator, his or her staff, or their actions—the Court must pay for these services as required by

8   the PLRA.

9   **V.    DEFENDANTS' PROPOSED ALTERNATIVE PROCESS.**

10          The Court accuses Defendants of "backtrack[ing] from their position that an independent

11   investigation is the preferred approach" out of a "desire to prevent any independent investigation

12   at the Court's behest."  (ECF No. 6002 at 3.)  This mischaracterizes Defendants' position, which

13   has consistently been that the Special Master could quickly and efficiently conduct a limited

14   factual investigation, and should do so after Defendants have had an opportunity to explain their

15   data reporting.  On the other hand, over the last six weeks, the Court has contemplated a variety

16   of alternative procedures, including an evidentiary hearing involving all parties, a hearing just

17   involving Dr. Golding's testimony, and an independent investigation.

18          **A.    Defendants' Position Has Been Consistent—the Court's Special Master**
            **Should Conduct Any Investigation.**

19

20          There is no dispute that Defendants' position is that the Special Master should evaluate Dr.

21   Golding's allegations.  Indeed, it was Defendants who brought Dr. Golding's allegations to the

22   Special Master's attention, not Dr. Golding and not Plaintiffs.  And at the October 10, 2018 status

23   conference shortly after Dr. Golding published his allegations, Defendants stated this position:

24          MR. GIBSON:  We believe that the special master, if given an
            opportunity and time to do so, can conduct a thorough
25          investigation of Dr. Golding's allegations, and then at that
            time, after that is done, where all the parties are fully
26

27   _____
     [4] Defendants expressly waived any challenge to the current Special Master's powers or
     compensation under the PLRA.  (*See* ECF No. 1054 at 3.)  Nothing about that waiver, however,
28   contemplates or applies to any newly-appointed special master.

12

1        informed and there's a factual basis to move forward, that
     Dr. Golding can then testify so that all parties are able to
2        fully participate in any kind of examination of Dr. Golding and
     the allegations that he's made.
3

4        THE COURT: So your proposal is the special master
     alone investigate?
5

6        MR. GIBSON: We believe the special master can conduct
     a thorough, independent, fair investigation of Dr. Golding's
7        allegations.  And we believe that he's -- he's an arm of the court.
     He's been a part of this case for over a decade. He
8        understands the ins and outs of what Dr. Golding is alleging,
     so he can get to the bottom of the issues very quickly.  I
9        would hope within the next 60 to 90 days, and then we can
     proceed at that time.
10

11  (Oct. 10, 2017 Tr. at 8:7-24.)

12      Then, at the October 22, 2018 status conference, Defendants stated, and the Court

13  recognized, that the question whether an investigation should take place, by whom, and scope of

14  any such investigation, remained unresolved:

15       MR. GIBSON:  … it was defendants' understanding that the
     issue as to whether or not there would be an investigation
16       and/or an evidentiary hearing was still up for further
     discussion.
17

18       So we were operating under that understanding, is that
     there would be an independent investigation by either the
19       special master or some other third party….

20       THE COURT:   I'm not planning on having any
21       independent investigation.

22  (*Id*. at 13:9-24.)

23       THE COURT:  Anything further, Mr. Gibson?
24

25       MR. GIBSON: No, Your Honor. Just that we would
     respond whenever the time is appropriate to plaintiffs'
26       position regarding an independent investigator and the scope
     and nature of that investigation.  But at this time, no, Your
27       Honor.

28       THE COURT: Yeah. I don't think we're there yet.  The

13

1         court will hear from Dr. Golding first, unless new information
2         comes to light that counsels otherwise.

3 (*Id*. at 45:11-19.)

4

5        But whatever the process (investigation or hearing), Defendants stated at the October 22,

6 2018 conference that the preliminary question for resolution should be whether Defendants' data

7 was actually reported incorrectly, and that any inquiry as to fraud would only take place after that

8 preliminary questions was answered:

9         MR. GIBSON: … So I think the first step is to determine whether or
        not -- what the data is reporting and whether or not the data

10         is accurate.  Then we can take those next steps afterwards.  If
        that investigation or evidentiary hearing or whatever the court

11         wants to identify it, determines that there was some inaccurate
        data, then the cause for that could be -- could help shape what

12         [a fraud on the court inquiry] will be.

13 (*Id*. at 32:8-14.)

14        Finally, at the most recent status conference on November 5, 2018, Defendants reiterated

15 their preference for the Special Master and his team to conduct the investigation:

16

17         MR. GIBSON:  …[W]e believe that the
        Court already has the investigator on staff which is the

18         special master.  The special master has the unique position to
        provide a quick resolution to any outstanding issues that

19         remain after defendants have an opportunity to respond.  He has
        lived in the case.  He understands the way that this data has

20         been created, the methodologies.  I think an outside
        investigator, for him or her or their team to get up to speed

21         will take a long time.  It will only prolong this.
        The order of reference provides the very thing that

22         this Court needs, which is confidential interviews of CDCR
        employees and officials.  The special master has a history of

23         conducting investigations into allegations by psychiatrists and
        inmate patients as to wrongdoing within CDCR.  The special

24         master conducts the investigations, prepares a report.  This is
        all that's happened in this case.  There's nothing different here

25         that defendants have heard as to why the special master or

26         members of his team can't perform this or whether or not the
        special master can hire additional help to conduct this

27         investigation.

28

14

Defs.' Resp. To The Courts' Nov. 13, 2018 OSC Why Court Should Not Appoint Independent Investigator
(2:90-CV-00520 KJM-DB (PC))

1    (Nov. 5, 2018 Tr. at 14:10-15:4.)

3          The Order of Reference (ECF No. 640) supports Defendants' position that the Special

4    Master is uniquely qualified to evaluate Dr. Golding's allegations.  For example, as noted above,

5    the Order of Reference already provides that the Special Master may interview CDCR staff and

6    inmates—confidentially or otherwise—and have access to all documents and data.[5]  And, as the

7    Court has recently noted, "the Special Master's opinions are informed and guided by a team of

8    nationally recognized experts in correctional mental health, many of whom have served in an

9    expert capacity for most of the twenty-three years this case has been in the remedial phase."

10   (ECF No. 5850 at 6.)  Finally, as also noted above, the Special Master has engaged in

11   investigations of facts numerous times before and is well suited to report back to the Court any

12   findings of wrongdoing, along with any recommendations.

13        **B.    If The Special Master Is Unable or Unwilling to Conduct the Review and
          Investigation, Then The Review and Investigation of Dr. Golding's
          Allegations Are Properly Vested with the *Plata* Receiver or the Parties.**

15        Defendants agreed to stay an investigation by CDCR's Internal Affairs Division—which

16   operates independently from all other CDCR programs, including the Mental Health Program—

17   because the Special Master was well-positioned to quickly and thoroughly analyze Dr. Golding's

18   concerns.  Defendants, however, never agreed to the type of sweeping, intrusive investigation the

19   Court now proposes, nor would they because the allegations do not justify it.  (*See* Defs.' Resp. to

20   Order re Allegations.)  If the Special Master is unable to conduct the inquiry, then Dr. Golding's

21   allegations should be referred to the Receiver as Dr. Golding intended when he transmitted his

22   allegations in the first instance.

23        Dr. Golding's allegations were reported as part of his duties as CDCR's Chief Psychiatrist

24   to the Receiver, who stands in the shoes of the Secretary for purposes of CDCR's medical care

25   system.  The *Plata* Court issued its Findings of Fact and Conclusion of Law Re Appointment of

26   Receiver on October 3, 2005, and signed the Order Appointing Receiver on February 14, 2006.

27   The court tasked the Receiver with executive management of the California prison health care

28        _____
          [5] Notably, the Order of Reference does not authorize the Special Master to intrude into
     attorney-client communications or attorney work-product.

1   delivery system, giving the Receiver the duty to control all functions of the medical delivery

2   component of the CDCR, including legal functions.  (*See Plata*, Case No. 3:01-cv-01351-TEH,

3   Order filed Feb. 14, 2006, at 2.)  That court also provided the Receiver with the powers necessary

4   to fulfill that duty, including the powers of the Secretary of CDCR as they relate to the medical

5   health care system.  (*Id.* at 4.)  Additionally, the court suspended the Secretary's exercise of those

6   powers for the duration of the receivership, but directed the Secretary to work closely with the

7   Receiver.  (*Id.*)

8          In Dr. Golding's October 3, 2018 email to Clark Kelso and the Receiver's Executive Staff, he

9   was acting as the Chief Psychiatrist communicating to those responsible for the development and

10  implementation of CDCR's medical delivery system, wherein he primarily relates his concerns

11  with the Mental Health Quality Management System, in general: and specifically, his requests

12  that (1) CDCR adopt a clinical model for psychiatry; (2) for additional resources such as a

13  regional structure for psychiatry; and (3) that psychiatrists report to psychiatrists rather than

14  psychologists.  Addressing these issues are a fundamental part of Dr. Golding's normal duties as

15  Chief Psychiatrist of CDCR, and he brought these concerns to the attention of the Receiver.

16         Accordingly, in the event the Special Master does not conduct the investigation, then the

17  decision of whether and how to investigate Dr. Golding's allegations properly belongs with the

18  Receiver.  The Receiver is better positioned than an "independent" appointment to review the

19  materials quickly and efficiently.

20         **C.     Defendants' Proposed Process Is Fairer and Will Preserve Scarce Public
                  and Judicial Resources.**

21

22         On October 5, 2018, Plaintiffs filed Dr. Golding's unverified allegations under seal, without

23  Dr. Golding's consent or Defendants' stipulation.  (ECF Nos. 5936 & 5937.)  The Court initially

24  sought testimony from Dr. Golding to assess his credibility but canceled the hearing after Dr.

25  Golding, having then retained counsel, filed a declaration attesting to the allegations.  (ECF No.

26  5988.)  To date, Dr. Golding's allegations remain unchallenged because the Court has prohibited

27  Defendants from addressing them.  (ECF No. 5995.)  At first, this Court prevented Defendants

28  and their counsel from even discussing Dr. Golding's allegations, barring defense counsel from

16

1   speaking with their own clients.  (ECF No. 5949 at 2 ("After consideration of the positions and

2   representations of all counsel, including counsel for Dr. Golding, the court issued a bench order

3   precluding defendants from conducting any investigation[.]")[6]  Then, once Defendants were

4   allowed to examine the allegations, speak with their counsel, and gain an understanding of how

5   they may have arisen, Defendants offered to supply the Court with responsive briefing; their

6   request was denied.  (ECF No. 5995.)  The Court now proposes to investigate *only* the

7   uncontested allegations of fraud without affording Defendants any of the safeguards due to them

8   under the rules of evidence.  (*See generally* ECF Nos. 6002, 6002-1.)  Under these circumstances,

9   Defendants question how the proposed investigative process can be objectively and impartially

10  conducted.

11      To remedy those concerns, and cure potential defects in the Court's proposed process,

12  Defendants propose the Court undertake the following steps:

13      (1)    The Court consider, with the Special Master's input, Defendants' concurrently filed

14  briefing responding to Dr. Golding's allegations identified in the Court's proposed order.  Doing

15  so will enable to the Court to resolve all or nearly all of Dr. Golding's allegations without a

16  burdensome, time-consuming, and costly investigation into purported "fraud."

17      (2)    If, upon consideration of Defendants' briefing, questions remain as to their conduct,

18  the Court instructs the Special Master[7] to investigate any remaining issues, as he has traditionally

19  done.  Any such investigation should be limited in scope so as to not improperly invade the

20  attorney-client relationship, and should be focused on auditing the parts of the monitoring and

21  reporting processes that remain at issue after complete information is provided to the Court by all

22  parties.  Defendants remain convinced that any investigation—more properly termed an audit—

23  should concern itself first with the accuracy and efficacy of monitoring and reporting.

24

25  [6] Defendants challenged that order in this Court (*see* ECF No. 5959) and separately sought
    relief on an emergency basis in the Ninth Circuit Court of Appeals given the unprecedented
    constraints imposed by the Court's order.

26  [7] If after reviewing Defendants' concurrently filed brief, the Court does not refer the
    outstanding issues to the current Special Master or the *Plata* Receiver for inquiry, and does not

27  allow the parties to litigate those issues in an evidentiary hearing, then proposed steps (2)-(4)
    should nevertheless be followed by any second special master the Court appoints under the

28  PLRA.

17

1   (3)   The Special Master prepares a report of his audit/investigation.  Such an investigation

2   and report would assist the Court and the parties with identifying any areas of needed

3   improvement or revision to the data, thereby enabling expeditious changes to CDCR's mental

4   health program.

5   (4)   If the Special Master's investigation reveals any bases for evaluating alleged fraud

6   concerns, those could then be addressed through focused briefing, supported by evidence

7   submitted under the Federal Rules of Evidence.  If necessary, the Court could thereafter hold an

8   evidentiary hearing, through which Defendants' due-process rights could be fully protected.  *See*

9   *Universal Oil Prod. Co.*, 328 U.S. at 580 ("[I]f the rights of parties are to be adjudicated in such

10   an investigation, the usual safeguards of adversary proceedings must be observed.").

11   If, after reviewing Defendants' response to the seven identified issues, the Court is still

12   unwilling to adopt the above suggested steps regarding the Special Master's involvement, then

13   Defendants request that the Court refer this matter for inquiry to the *Plata* Receiver, as Dr.

14   Golding initially intended.  Alternatively, if the Court is also unwilling to refer this matter to

15   either the Receiver, then after reviewing Defendants' response to the identified issues, the Court

16   should invite Plaintiffs to bring a motion framing any outstanding issue and the parties can litigate

17   the matter via briefing and a full evidentiary hearing.

18   Each of Defendants' above proposed procedures avoids the serious concerns arising from

19   the Court's proposed unbounded fraud investigation—including, but not exclusive to, an invasion

20   of the attorney-client relationship—while allowing for a full and expeditious inquiry into Dr.

21   Golding's allegations.  No part of Defendants' proposal is inconsistent with their initial position

22   concerning Dr. Golding's allegations, or this Court's previous handling of such allegations, and

23   any statements to the contrary are unfounded.

24   **CONCLUSION**

25   Based on the above, Defendants request that the Court reconsider its contemplated

26   investigation process and instead give due attention to Defendants' responses to Dr. Golding's

27   allegations.  To the extent this Court wishes to proceed with an investigation, however, it should

28   revise its proposal.  An extrajudicial, quasi-prosecutorial investigation is not only unnecessary but

18

1    beyond the Court's inherent authority.  For these reasons, the Court should not appoint an

2    "independent investigator," and should instead adopt Defendants' proposed procedure for

3    resolving Dr. Golding's allegations.

4

5    Dated:  November 20, 2018                          Respectfully Submitted,

6                                                       XAVIER BECERRA
                                                        Attorney General of California
7                                                       ADRIANO HRVATIN
                                                        Supervising Deputy Attorney General
8

9

10                                                      /s/ ANDREW M. GIBSON
                                                        ANDREW M. GIBSON
11                                                      Deputy Attorney General
                                                        *Attorneys for Defendants*
12
     CF1997CS0003
13   ah 11-20-2018 Final Defs Response (002).docx

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                  19

# CERTIFICATE OF SERVICE

Case Name:   **Coleman v. Brown, et al.,**          No.   **2:90-cv-00520 KJM-DB (PC)**

I hereby certify that on **November 20, 2018**, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANTS' RESPONSE TO THE COURTS' NOVEMBER 13, 2018 ORDER TO SHOW CAUSE WHY THE COURT SHOULD NOT APPOINT AN INDEPENDENT INVESTIGATOR IN THE EXERCISE OF ITS INHERENT AUTHORITY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **November 20, 2018**, at San Diego, California.

_____                    _____
E. Empero                                                  Declarant                                                     Signature

CF1997CS0003
71668530.docx