DONALD SPECTER – 083925
STEVEN FAMA – 099641
MARGOT MENDELSON – 268583
PRISON LAW OFFICE
1917 Fifth Street
Berkeley, California 94710-1916
Telephone: (510) 280-2621

CLAUDIA CENTER – 158255
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA, INC.
39 Drumm Street
San Francisco, California 94111-4805
Telephone: (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
Telephone: (415) 433-6830

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> EDMUND G. BROWN, JR., et al., <br><br> Defendants. | Case No. 2:90-CV-00520-KJM-DB <br><br> **PLAINTIFFS' RESPONSE TO NOVEMBER 13, 2018 ORDER TO SHOW CAUSE** <br><br> Judge: Hon. Kimberly J. Mueller |

# INTRODUCTION

On November 13, 2018, the Court ordered the parties to show cause, if any, why the Court should not appoint an independent investigator to investigate allegations in a report by the Statewide Chief Psychiatrist, Dr. Michael Golding ("Golding Report" or "Report") that pertain to fraud or intent to mislead the Court and/or the Special Master, and to file comments on the Court's proposed Order of Appointment.  Order, ECF No. 6002 at 8.[1] Plaintiffs fully agree with the Court's determination that the appointment of an independent investigator is warranted and necessary to closely examine the fraud allegations raised by Dr. Golding and the other related whistleblowers, both for the sake of the Court's integrity and to provide a common baseline from which the efforts to remediate the ongoing constitutional violations in this case can proceed.  There is no question that the Court has the inherent power to investigate these extremely serious allegations, presented in great detail by CDCR's top psychiatrist, which go to the very core of this case.

Additionally, while Plaintiffs generally agree with the content and structure of the proposed Order of Appointment, additional provisions refining the appropriate scope of investigation will ensure that the independent investigation results in a fair, thorough and robust examination of the potential fraud, and/or intentional presentation of false or misleading information (including, necessarily, misleading by omission)[2] to the Court or Special Master.  Additionally, Plaintiffs request that the Court expand the investigator's authorization to speak both with former CDCR employees and members of the Plaintiff

---

[1] The Court's show cause order makes clear it intends to revisit the other two tracks the Court has previously identified arising out of the Golding Report at some other time.  ECF. 6002 at 2.  Plaintiffs continue to believe, in particular, that a full review and audit of Defendants' existing data reporting mechanisms, is necessary before this case can proceed. Plaintiffs maintain that this project can be overseen by the Special Master with Plaintiffs' full participation, but that the Special Master will likely need additional staff with expertise in  health care data and reporting to complete an appropriate review.

[2] *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2000 (2016) (noting fraud "has long encompassed certain misrepresentations by omission," including a "representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter" (internal quotation marks omitted)).

class, both of whom may have relevant information not otherwise available to the investigator, and that the Court include an explicit prohibition on retaliation.

Plaintiffs comments below are limited to only those provisions of the proposed Order of Appointment that Plaintiffs contend need to be added or modified. For clarity, a redline version of the proposed Order of Appointment is attached as **Attachment A** to this Response.

## I. The Duties of the Independent Investigator Must Be Expanded to Ensure the Allegations of Fraud or Intentional Misconduct in the Golding Report Are Fully Examined.

Plaintiffs agree with each of the areas 1.a. through 1.g. listed in the proposed Order of Appointment regarding the scope of the investigation, ECF No. 6002-1 at 2-3,[3] but contend the Golding Report contains a number of additional serious allegations that must be examined before the Court and parties can move forward. As such, Plaintiffs have identified certain additions. In particular, Plaintiffs maintain that the independent investigator must examine the Golding Report's serious allegations that Defendants misled the Special Master regarding material aspects of its operations and policies that are not data related.

### A. Misrepresenting MAPIP Data.

The Golding Report asserts that Defendants manipulated their Medication Administration Process Improvement Process ("MAPIP") data, which measures psychiatric medication-administration protocols, in multiple ways in order to falsely represent their levels of compliance. These include (1) unilaterally determining that annual blood draws could occur at any time during the year, contrary to the MAPIP requirement that they occur between days 91 and 365 after medication start date, (2) counting only one of four mandatory blood draws when evaluating timeliness of laboratory tests, and (3) including in compliance numbers the blood test completion

---

[3] The page numbers in this Response, for documents filed in the Electronic Case Filing (ECF) system, are to the page numbers assigned by the ECF system.

percentage for only those patients who remained on a given medication for a full year. *See, e.g.*, Golding Report ECF No. 5988-1 at 30-35, 141-43, 146.

### B. Additional Methods of Misrepresenting Timeliness of Psychiatry Contacts for CCCMS and EOP Class Members.

The Golding Report documents numerous methods by which Defendants may have manipulated data reporting on timeliness of psychiatry contacts for CCCMS and EOP class members. The Court's proposed Order of Appointment notes many of these methods and cites pages referencing others. *See* ECF No. 6002-1 at 2. Other allegations falling into this category, however, were not included and should be. Additionally, given the fundamental importance of this compliance measure and the myriad ways in which Dr. Golding claims it has been manipulated, the Court should include catchall language making it clear that the independent investigator is tasked with fully exploring this key issue.

Specifically, the Order of Appointment should task the investigator with looking at the following potentially misleading or fraudulent compliance calculation methods identified by Dr. Golding, all of which had the effect of inflating Defendants' timeliness calculations: (i) the use of a percent-patient-weeks reporting method, (ii) averaging "early" days or weeks generated by this method with late days or weeks, and (iii) counting of psychiatry appointment due dates as the longest possible timeframe even where a psychiatrist determines, as a clinical matter, that the patient must be seen sooner as anticipated under the Program Guide[4], and (iv) excluding EOP patients held in "EOP overflow beds" due to EOP bed shortages from the timeliness metric altogether. *See, e.g.*, Golding Report ECF No. 5988-1 at 2-3, 22, 28, 47-57, ECF No. 5588-2 Exhibits D, III at 13-16; *see also, e.g.*, Exhibit D, ECF No. 5988-2 at 11 (describing how layering several of

---

[4] *See* Program Guide 12-3-2 through 12-3-3; 12-3-10 through 12-3-11 (CCCMS care, including frequency of treatment services, must be tailored to individual need, and requiring psychiatry evaluation at least every 90 days); Program Guide 12-4-8 through -9 (EOP treatment plans shall provide treatment consistent with the individual patient's needs, but cannot provide less than one psychiatry evaluation per month).

1  computational methods can result in 100% compliance even where an EOP patient is seen
2  twice in four months, and by using the percent-weeks method, a late appointment can
3  appear 90% compliant).

4  Expanding the scope of the independent investigator's inquiry into timeliness
5  calculations is particularly important because Defendants do not provide the Special
6  Master with access to underlying data and do not always explain how compiled data was
7  derived.  For example, Defendants' May 17, 2018 Psychiatry Staffing Proposal ("May 17
8  Proposal"), which was the cornerstone of months of workgroup discussions led by the
9  Special Master, relied heavily on psychiatry contact and timeliness data.  *See* Shinn-Krantz
10 Decl. ¶¶ 2-3.  Specifically, the report and certain attachments included data on desert
11 institution psychiatry contacts, and on CCCMS and EOP psychiatry contacts.  *See id.* ¶ 3-
12 8.  In particular, the proposal asserted statewide mainline "CCCMS patients receive an
13 average of 1.07 psychiatry contacts per every 90 days" and statewide mainline "EOP
14 inmates are being seen for routine contacts 0.94 times every 30 days" and attached charts
15 supporting both assertions.  *See id.* ¶¶ 7-8.  However, neither the May 17 Proposal nor its
16 attachments mention patient-weeks or any other methodology for deriving the data.  *See id.*
17 ¶¶ 3-8 .  The workgroup discussions based on this proposal culminated in a draft stipula-
18 tion regarding psychiatry staffing that Plaintiffs were days away from signing when the
19 Golding Report was released, as this Court has noted.  ECF No. 6002 at 6.  Versions of
20 several attachments to the May 17 Proposal were included as exhibits to the Golding
21 Report.  *See* Golding Report Exhibits VV and ZZ, ECF No. 5988-5 at 14, 15, 28.

22 **C.  Non-Quantifiable Misrepresentations to the Special Master.**

23 The Golding Report alleges that Defendants misrepresented aspects of their mental
24 health practices and operations to the Special Master unrelated to compliance data, which
25 are not currently captured in the proposed Order of Appointment.  These include manipu-
26 lating conditions at institutions for tours by the Special Master's team, misrepresenting
27 information during workgroup meetings, and misleadingly omitting material information
28 in statements to Special Master team members.

For example, the Golding Report states that at the CCWF crisis bed unit, female patients in psychiatric crisis who are double-celled are routinely treated in non-confidential settings, but, when the Special Master's team arrives to conduct monitoring, those patients are individually escorted to a private space so that contacts are shown as occurring in a confidential environment in contravention of routine practice. *See, e.g.*, Golding Report ECF No. 5988-1 at 141. Similarly, exhibits to Dr. Golding's report suggests another institution schedules 25-minute-long IDTTs with carefully selected patients for observation by the Special Master, in contravention of normal practices which include scheduling 30-50 IDTTs for a 3-4 hour period (an average of between 5 and 6 minutes per IDTT). *See* Golding Report Exhibit Y, ECF No. 5988-3 at 21-22.

The Golding Report and its related exhibits allege that Defendants intentionally misled the Special Master team about the nature of their current, system-wide use of cell-front telepsychiatry throughout the system—even while the Special Master was tasked by the Court with opining on that exact issue. Defendants first told a member of the Special Master's team that Defendants were *not* using a particular cell-front telepsychiatry setup, while failing to disclose that they were routinely using different, and far worse, setups throughout the system. *See* Golding Report Exhibit Y, ECF No. 5988-3 at 19. Then Defendants failed to clarify this omission after Dr. Golding specifically raised it to a headquarters official the following day. *See id.*

The Golding Report also asserts Defendants failed to disclose to the Special Master and Plaintiffs during the workgroup negotiations over Defendants' proposed psychiatrist staffing reductions that its top psychiatrist estimated that at least 25 telepsychiatrists would be needed to provide night-time on-call coverage, even though Defendants represented to the workgroup that less than a third of that number would be sufficient. *See* Golding Report ECF No. 5988-1 at 127. In their May 17 Proposal, Defendants in fact proposed allocating only eight telepsychiatry positions to cover "all institutions, seven days per week," which would cover "virtually all nighttime consultations" and reduce onsite psychiatry demand to "nearly zero." *See* Shinn-Krantz Decl. ¶ 3, Exh. A at 5-6. This part

of the May 17 Proposal would have resulted in a net reduction of 9.6 out of a 17.6 positions previously allocated for crisis intervention. While this sort of representation is not captured in Dashboard data or any other regularly produced metric, it was material to analyzing Defendants' psychiatry staffing proposal.

The independent investigator should be tasked with examining misrepresentations of this sort from the Golding Report that do not appear in specific Dashboard metrics or other regular reporting.

### D. Misrepresenting Confidentiality Data.

The Golding Report asserts that confidentiality of psychiatric appointments—a basic and necessary element of psychiatry contacts—is tracked and reported in a manner that dramatically understates the true level of non-confidential patient contacts. As a result, for example, per Dr. Golding's report, institutions and units that routinely, and sometimes *always*, use non-confidential settings for psychiatrist contacts, including having a doctor yell through a slit in a cell door to the patient, fail to record that fact accurately and instead falsely report significant numbers of non-confidential contacts as confidential. *See, e.g.*, Golding Report ECF No. 5988-1 at 64-70, 78-79, 140-41, 148. Dr. Golding alleges that these problems were known to Defendants, and that efforts by his team to further investigate the compliance data on this front were intentionally impeded. *See* Golding Report Exhibit Y, ECF No. 5988-3 at 20-21; Exhibit AA, ECF No. 5988-4 at 27-28. The Special Master routinely relies on this data in his own monitoring and reporting to the Court. *See, e.g.*, 27th Round Report, ECF No. 5779 at 135-40.

### E. Misrepresenting Continuity of Care Data.

Dr. Golding claims that Defendants' Dashboard data regarding institutional and statewide continuity of psychiatry care grossly understate the level to which Defendants' practices interrupt care by excluding all patients except those who remain in the same unit of the same prison, at the same level of care, for six or more months, and who were seen in person by their psychiatrist. *See* Golding Report ECF No. 5988-1 at 121-22, Exs. JJ at 1, HHH at 1. This method of reporting excludes huge numbers of EOP class members,

including those who have had short crisis care admissions or who moved units within the same institution's EOP program, and thus does not truly report actual continuity of care.

### F. Failure to Disclose Unilateral Revisions to Operative Remedial Policies.

The Golding Report also discusses Defendants' development and issuance of a memo to the field issued by high-level administrators, regarding a change to the language in operative policy directives relating to discharges of patients from MHCBs. *See* Golding Report at 97-116, 117, 124-25; Exhibits F, W, PP, SS, FFF, GGG. That memo issued on September 18, 2018, and took effect October 15, 2018. *See* Exhibits FFF, GGG at 1, 4. Among other things, it expands those clinicians who are authorized to make discharge decisions—which are in fact discharges from licensed hospital settings—from psychiatrists to non-medically-trained psychologists. *Id.* In addition to that, however, the policy changes impacted at least three policy memos previously submitted to this Court as part of the Court-ordered, Special Master-overseen Program Guide Update project. *See* ECF No. 5844 (June 29, 2018), at pdf pages 13, 125-27, 131-34, 145-48 (referencing policies 12.05.601, 12.05.301, and 12.05.501). All of these policies were included in category one of the Program Guide update—i.e., those policies the parties and Special Master agreed should be included in the Program Guide update—and each had been the subject of close negotiation. *See id.* at 8 & App'x A.

Defendants' apparently unilateral formal modifications to these policies occurred without notice to Plaintiffs, the Special Master, or the Court, despite the Program Guide update being less than three months past finalization and submission to the Court, *see* ECF No. 5844, and less than two months past the Special Master's filing, directly in response to Court order, of the consolidated updated Program Guide, with appendixes, *see* ECF Nos. 5860 (July 20, 2018); 5864 (July 30, 2018). The investigator should examine whether Defendants failed to disclose this and other relevant policies or regulations that unilaterally modify existing remedial policies in this case without notice to the Court or Special Master.

### G. Failing to Disclose the Extent of Policies and Practices Empowering Non-Medically Trained Clinicians to Perform Psychiatrist Functions.

Dr. Golding details allegations of Defendants' extensive internal efforts to dilute the role of psychiatrists and concomitantly expand the role of psychologists within CDCR, including by authorizing non-medically trained psychologists to perform tasks in licensed hospital settings that are beyond of their scope of practice. *See* Golding Report at 13, 97-116, 117, 124-25, 131-32 & n.xxiv; Exhibits F, R, W, PP, SS, FFF, GGG. Dr. Golding maintains that Defendants knew, for instance, that authorizing non-medical clinical staff to perform medical tasks like admitting and discharging patients from licensed inpatient settings and ordering the use of seclusion and restraints violated licensing and professional standards, both of which reserve such tasks for physicians such as psychiatrists. *Id.* Dr. Golding further asserts that Defendants empowered psychologists and other non-medically trained clinical staff -- even unlicensed interns -- to override psychiatrists' medical orders and professional opinions at great risk and danger of harm to class members. *Id.* The investigator should examine the extent to which Defendants disclosed the scope of these changes, which Dr. Golding expressly links to numerous instances of patient harm, to the Special Master.

### H. Informal Workarounds and Institution-Level Manipulation.

The independent investigator should examine whether institutional leadership manipulate data or conditions for the purpose of improving the appearance of compliance, and/or whether Defendants knew of and failed to correct or disclose such manipulation. For example, the Golding Report asserts that for CSP-Sacramento, for July 2018, CDCR reported only one urgent psychiatrist consult referral, two emergent psychiatrist consult referrals, and three routine psychiatrist consult referrals, even though those numbers were exceptionally low for SAC's large mental health population and therefore obviously suspect. Golding Report ECF No. 5988-1 at 138-39. Similarly, mental health staff at North Kern State Prison (NKSP) reported a highly improbable single emergent psychiatrist referral consult for the same month. When headquarters staff inquired, NKSP staff

reported that they take steps to avoid generating such referrals in order to avoid requiring an on-call psychiatrist to complete a face-to-face examination within four hours as required by policy, and encourage non-psychiatry health care staff to informally discuss patient medication concerns with psychiatrists rather than referring patients for an in-person psychiatry appointment.  *See* Golding Report Exhibit BBB, ECF No. 5988-5 at 46-48.  In response, a headquarters official signaled clear approval without addressing whether evading data reporting improperly inflated compliance numbers.  *See id.*

## I. Clarification of Role of Citations to Golding Report.

A comprehensive accounting of each page on which Dr. Golding raises any given concern is impractical given the format and length of the Report and Exhibits, nor should the investigator be artificially limited in his or her inquiry by any failure to include each and every such reference.  Plaintiffs therefore propose that the Court include the final Order of Appointment the full text of footnote two from its Order to Show Cause:  "These citations are a representative, not an exhaustive, list of the Golding Report's allegations that either directly or inferentially suggest false or misleading information has been presented to the court and to the Special Master."  ECF No. 6002 at 3 n.2.

## II. The Powers of the Independent Investigator Should Be Modified to Ensure a Complete and Accurate Investigation that Can Uncover any Wrongdoing and/or Dispel Any Suspicions Arising from the Golding Report.

Plaintiffs generally agree with the Court's articulation of the appropriate powers to be provided to the independent investigator.  A few additional measures could help ensure the investigation is as robust, focused, and comprehensive as possible.

### A. The Independent Investigator Should Be Authorized to Speak with Former CDCR Employees, and the Order Should Provide a Mechanism to Allow Complaints from These Individuals to Be Directed to the Investigator.

Since the Golding Report was disclosed, numerous former CDCR psychiatrists and other affected employees have contacted this Court and Plaintiffs' counsel regarding the content of the Report.  Shinn-Krantz Decl. ¶ 9.  Some of these individuals have provided information that is directly related and pertinent to the allegations in the Golding Report.

The independent investigator should be empowered to receive, either directly or indirectly via the Court or Plaintiffs' counsel, and consider information provided from these former employees, including the ability to interview and review documents those individuals might provide to the extent the investigator deems them relevant.

### B. The Independent Investigator Should Be Authorized to Speak with Class Members in a Confidential Setting.

The independent investigator should also be empowered to interview class members as issues arise that could use their clarification or elucidation. While the proposed Order authorizes the investigator to review class members' records and other CDCR-maintained documentation, Dr. Golding's report gives reason to believe those records may not be accurate. Class members can provide information regarding, for instance, Defendants' actual practices as compared to their reported practices, such as their experiences with non-confidential psychiatry contacts, actual versus reported rates of refusals/cancellations, frequency of psychiatry contacts, etc.

It is important, however, that the investigator speak with class members only in confidential settings, without representatives or counsel for Defendants present, and that he or she disclose their role and explain the purpose of the interview. Plaintiffs have proposed language to this effect.

### C. The Court's Order Appointing the Independent Investigator Should Explicitly Prohibit Retaliation Based on Cooperation with the Investigator.

Any current employees who speak with the independent investigator, as well as any class members who do so, may be providing highly sensitive information and putting their jobs, mental health care, or even physical safety at risk by such disclosure. Accordingly, the Court's order appointing an investigator should prohibit, explicitly, any retaliation by CDCR officials or employees arising from current employees' and class members' disclosures to the investigator.

**D.  The Investigation's Scope Should Be Subject to Possible Expansion if *Either* the Allegations in the Golding Report *or* Evidence Found During the Investigation Warrants It.**

The Court's Proposed Order includes the following language: "The scope of the independent investigator's investigation may be expanded by order of this court at the request of the investigator, the Special Master, or any party, based on a showing that allegations of the Golding Report <u>and</u> evidence found during the investigation warrants such expansion." Proposed Order at 3.  Given the serious nature of the allegations in the Golding Report the scope of the investigation should be subject to expansion based on either the allegations the investigator identifies in the Golding Report as potentially misleading, *or* on evidence uncovered during the investigation.  The investigation should be as broad as necessary to uncover any material misrepresentations and/or to dispel any concerns that fraud or material misrepresentation has occurred.  Any concerns about overbreadth or infinite expansion of the investigation are obviated by the Court's gatekeeper role, as the Court must authorize any expansion before it can occur.

DATED: November 20, 2018         Respectfully submitted,

ROSEN BIEN GALVAN & GRUNFELD LLP

By: */s/ Jessica Winter*
       Jessica Winter

Attorneys for Plaintiffs