1   XAVIER BECERRA, State Bar No. 118517
    Attorney General of California
2   JAY C. RUSSELL, State Bar No. 122626
    ADRIANO HRVATIN, State Bar No. 220909
3   Supervising Deputy Attorneys General
    ELISE OWENS THORN, State Bar No. 145931
4   ANDREW M. GIBSON, State Bar No. 244330
    TYLER V. HEATH, State Bar No. 271478
5   IAN MICHAEL ELLIS, State Bar No. 280254
    TOBIAS G. SNYDER, State Bar No. 289095
6   Deputy Attorneys General
      455 Golden Gate Avenue, Suite 11000
7     San Francisco, CA  94102-7004
      Telephone:  (415) 510-4426
8   Fax:  (415) 703-5843
      E-mail:  Tobias.Snyder@doj.ca.gov
9   *Attorneys for Defendants*

10

11                    IN THE UNITED STATES DISTRICT COURT

12                  FOR THE EASTERN DISTRICT OF CALIFORNIA

13                            SACRAMENTO DIVISION

14

| | |
|---|---|
| 15   **RALPH COLEMAN, et al.,** | 2:90-cv-00520 KJM-DB (PC) |
| 16                             Plaintiffs, | **DEFENDANTS' COMMENTS ON THE COURT'S PROPOSED ORDER OF** |
| 17            **v.** | **APPOINTMENT** |
| 18   **EDMUND G. BROWN JR., et al.,** | Judge:        The Honorable Kimberly J. Mueller |
| 19                             Defendants. | |
| 20 | |

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................................... 1

Discussion ........................................................................................................................ 2

     I.     Any Finding of Fraud on the Court Must Meet a High Legal Standard. ................ 2

     II.    CDCR's Mental Health Performance Report. ........................................................ 3

     III.   Dr. Golding's Allegations Are Narrow in Scope and Rebuttable. ......................... 6

            A.    Dr. Golding's Allegation That CDCR Resets Routine Psychiatric
                 Timelines Ignores That Those Timelines Have Always Been
                 Superseded by Other Timelines Upon Transfer. ........................................ 6

            B.    CDCR Appropriately Measures the Interval Between Psychiatry
                 Appointments for EOP Patients. ................................................................. 9

            C.    Dr. Golding Was Mistaken When He Claimed that Defendants
                 Combined CCCMS and EOP Data into One "Reporting Category." ....... 10

            D.    Defendants Have Not "Inflated Compliance Numbers" By Over-
                 Counting Psychiatry Contacts. ................................................................. 12

            E.     Defendants Have Not Misled the Court or Special Master
                 Regarding Missed Appointments. ............................................................ 13

                  1.     Appointments Seen as Scheduled. ............................................... 14

                  2.     The "Treatment Refused" and "Treatment Cancelled"
                       Indicators. ................................................................................... 16

            F.    Defendants Have Not Misled the Court Through the Alleged
                 Practice of Supervisors Having a Clinical Caseload. .............................. 17

            G.    Defendants Have Not Misrepresented Medical Non-Compliance
                 Figures. ..................................................................................................... 18

Conclusion ..................................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*In re Levander*
    180 F.3d 1114 (9th Cir. 1999)....................................................................................3

*In re Michelson*
    141 B.R. 715 (Bankr. E.D. Cal. 1992) ......................................................................3

*Pumphrey v. K.W. Thompson Tool Co.*
    62 F.3d 1128 (9th Cir. 1995)......................................................................................3

*United States v. Est. of Stonehill*
    660 F.3d 415 (9th Cir. 2011)................................................................................3, 20

*United States v. Sierra Pac. Indus., Inc.*
    862 F.3d 1157 ....................................................................................................3, 14, 17

**INTRODUCTION**

On October 3, 2018, the California Department of Corrections and Rehabilitation's (CDCR) Chief Psychiatrist, Dr. Michael Golding, submitted a document entitled "CDCR Mental Health System Report" to the Receiver appointed in *Plata v. Brown* to oversee medical care within California state correctional institutions.  Dr. Golding alleges, among other things, that CDCR has misrepresented data regarding its mental health program to the Court.  Only since October 18, 2018 have Defendants and their counsel been permitted to discuss Dr. Golding's allegations.  (*See* ECF No. 5973 at 3:15-19.)  Since that time, Defendants have reviewed documents and spoken with mental health staff on a voluntary basis to better understand and evaluate Dr. Golding's allegations.  Defendants have confirmed that no fraud on this Court has occurred.  (*See infra* Discussion.)

Not long after Plaintiffs' counsel submitted Dr. Golding's document, the Court determined that his unrebutted allegations "potentially implicate[] the accuracy of data and related information the court relies on to assess whether defendants are complying with court orders and progressing toward a durable remedy in this long running case," and began contemplating options to address Dr. Golding's allegations.  (ECF No. 5986 at 4:21-23.)  On November 13, 2018, the Court directed the parties to show cause why an "independent investigator" should not be appointed to examine whether Defendants committed fraud on the Court based on Dr. Golding's allegations.  (ECF No. 6002.)  The Court specifically invited the parties to "comment on all provisions of the proposed order."  (*Id.* at 8.)

The Proposed Order setting forth the Court's contemplated scope for its investigation authorizes an inquiry that vastly exceeds the Court's authority or what is necessary to verify that Defendants have not committed fraud or intentionally misled the Court or the Special Master.  (ECF No. 6002-1 (Proposed Order).)  The Court lists seven areas referenced in Dr. Golding's allegations as potential subjects for the proposed investigation.  Each of these areas relates to a performance indicator generated by CDCR's Mental Health Performance Report, which is further discussed below.  These allegations are actually far narrower in scope than implied by the length and rhetoric of Dr. Golding's "report."  (*See, infra,* Discussion.)  Defendants can confirm that, in

1

1   some cases, Dr. Golding's allegations regarding the content of certain data indicators are more or

2   less true, but the conclusions he draws are wrong because he misunderstands the Program Guide's

3   requirements, the actual purpose of the indicators, and other critical context.  In such cases,

4   further independent investigation is unnecessary.  Other allegations are simply incorrect, and

5   instead of implicating fraud, they reveal Dr. Golding's frequent misunderstanding of the Program

6   Guide requirements that govern specific data metrics; his mistaken belief that CDCR has failed to

7   comply with requirements that do not exist; his misunderstanding of how to access data that is

8   readily available to him, even after training; his confusion about what various metrics are

9   intended to measure; or his quickness to attribute nefarious intent to inadvertent error that can

10  occur (and be corrected) in a large, complex, and evolving system like CDCR's mental health

11  delivery system.  (*See, infra,* Discussion.)  None of this establishes an intent to defraud.  In

12  addition, Dr. Golding and the Court's Proposed Order fail to appreciate the extent to which the

13  Special Master has been kept informed of CDCR's data management practices, as these issues

14  can be disposed of through the process proposed in Defendants' concurrently filed response.

15      In short, quasi-criminal independent investigation is required, and Defendants therefore

16  oppose the terms of the Court's Proposed Order and the appointment of an independent

17  investigator.  (*See* Defendants' concurrently filed Response to the Courts' November 13, 2018

18  Order to Show Cause Regarding a Proposed Process for Investigating Dr. Golding's Allegations

19  (OSC Response).).

20                              **DISCUSSION**

21  **I.    ANY FINDING OF FRAUD ON THE COURT MUST MEET A HIGH LEGAL STANDARD.**

22      The Court's Proposed Order seeks to empower an independent investigator to "investigat[e]

23  . . . whether defendants have committed fraud on the court or intentionally misled the court or the

24  Special Master" in relation to certain areas of alleged data reporting.  (ECF No. 6002-1 at 2:4-6.)

25  Fraud is a serious allegation, and fraud on the court is an extremely rare variant, yet the term has

26  been used loosely since Dr. Golding sent his allegations to the *Plata* Receiver. [1]  As a threshold

27  matter, a fraud on the court must involve an actual misrepresentation to the court, and is not

28  ─────────────────────
    [1] The word "fraud" does not appear in Dr. Golding's allegations.

2

Defs.' Objs. & Resp. Court's Nov. 13, 2018 Prop. Order (2:90-cv-00520 KJM-DB (PC))

implicated by mere policy disagreements about what data may be most relevant from a clinical or management perspective.  Furthermore, fraud on the court "must involve an unconscionable plan or scheme which is designed to improperly influence the court in its decision."  *United States v. Sierra Pac. Indus., Inc.*, 862 F.3d 1157, 1167-68 (9th Cir. 2017 (quoting *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1131 (9th Cir. 1995)).  It requires fraudulent intent, "which connotes either knowledge, including reckless disregard, of falsity or intentional omission of material information."  *In re Michelson*, 141 B.R. 715, 726 (Bankr. E.D. Cal. 1992).  "In determining whether fraud constitutes fraud on the court, the relevant inquiry is not whether fraudulent conduct 'prejudiced the opposing party,' but whether it 'harmed the integrity of the judicial process.'"  *Sierra Pac. Indus., Inc.*, 862 F.3d at 1167-68 (quoting *United States v. Est. of Stonehill*, 660 F.3d 415, 444 (9th Cir. 2011)).

In addition, the relevant misrepresentations must go "to the central issue in the case" and must "affect the outcome of the case."  *Sierra Pac. Indus., Inc.*, 862 F.3d at 1168 (quoting *Est. of Stonehill*, 660 F.3d at 45).  "In other words, the newly discovered misrepresentations must 'significantly change the picture already drawn by previously available evidence.'"  *Id.*  "Mere nondisclosure of evidence is typically not enough to constitute fraud on the court, and 'perjury by a party or witness, by itself, is not normally fraud on the court' unless it is 'so fundamental that it undermined the workings of the adversary process itself.'"  *Id.* (quoting *In re Levander*, 180 F.3d 1114, 1119 (9th Cir. 1999)).

Dr. Golding's allegations fall far short of establishing fraud on the Court, and the Court has not identified an order or decision where it believes it was in fact deceived related to an issue raised by Dr. Golding.

## II.   CDCR'S MENTAL HEALTH PERFORMANCE REPORT.

Although Dr. Golding's allegations often refer to data being "reported," in most cases he is not referring to any reporting to the Court or Special Master, but rather the manner in which CDCR's internal data management system "reports" performance metrics to users at CDCR.  These allegations reflect his criticism of the methods by which various performance indicators are generated by CDCR's internal systems.  Often, this simply reflects Dr. Golding's

3

1   misunderstanding of what the information is intended to provide, or his ignorance of separate

2   performance metrics or reports that would provide the information he seeks.

3       CDCR collects data regarding its mental health patients from a variety of sources.  From

4   2010 to 2017, this data came from the Mental Health Tracking System, which was developed as a

5   data entry tool to track clinical contacts, referrals, and other data points related to the provision of

6   mental health services.  (Leidner Decl. ¶ 5.)  Beginning in 2016, CDCR implemented the

7   Electronic Health Record System (EHRS).  (*Id*.)  Data from EHRS is combined with other

8   sources such as data received from the Department of State Hospitals and the Strategic Offender

9   Management System into a comprehensive database called the Health Care Data Warehouse.  (*Id.*

10   ¶ 6.)

11       CDCR clinicians and officials are able to generate reports from the information contained

12   in the Data Warehouse through an analysis tool called the Mental Health Performance Report

13   (Performance Report), which is accessible through a web interface on CDCR's intranet.  (Leidner

14   Decl. ¶¶ 6-7.)  The Performance Report includes a suite of over 150 reports, referred to as

15   performance report indicators or performance indicators, that can be queried on demand by

16   CDCR's mental health staff.  (*Id*. ¶¶ 7-8.)  The indicators are selected and defined by the

17   managers of the Statewide Mental Health Program.  (*Id*.)  Users can also request custom queries

18   be built by CDCR's quality management team using the Performance Report.  (*Id.* ¶ 16.)

19   CDCR's quality management team holds a weekly Ad Hoc Querying webinar during which

20   participants can make specific data requests or learn how to generate custom reports.  (*Id*.)

21   CDCR's Performance Reports are used to manage resources and patient care for the Statewide

22   Mental Health Program while also measuring the program's performance on selected mental

23   health policies, including requirements under the Mental Health Services Delivery System

24   Program Guide (Program Guide).  (*Id.* ¶¶ 6-7)

25       The selected Performance Report indicators that capture policy requirements were

26   developed beginning in 2012, with input from the Special Master and his team of experts.

27   (Ceballos Decl. ¶ 4.)  Additional performance indicators have since been developed by the Mental

28   Health Quality Management Committee.  (*Id*.)  These indicators, including the associated

4

1    methodology and rules applied to measure performance, are readily available to anyone who

2    accesses the Performance Reports, including CDCR psychiatrists and the *Coleman* Special

3    Master.  (*Id.*)  Many of the indicators are not routinely requested by the Special Master or shared

4    with the Court, but are used for internal management purposes.  (*Id.*)  CDCR has been open and

5    transparent with the Special Master and Plaintiffs regarding its performance data—many of the

6    methodologies that Dr. Golding describes as "perverse" have been fully presented and explained

7    to the Special Master's team.  Indeed, the Special Master's experts were involved in the

8    development of the indicators used in the Performance Reports, and CDCR has met with

9    Plaintiffs and the Special Master's team several times to explain the Performance Report

10   indicators and the manner in which the data is analyzed and reported.  (*Id.* ¶¶ 4-7.)

11        In 2015, the Special Master began using CDCR's data in the course of monitoring,

12   including accessing CDCR's Performance Reports in March 2015 and reviewing data from the

13   system-wide to the individual patient level.  (*Id.* ¶ 8.)  CDCR provided such data to the Special

14   Master during his Twenty-Sixth and Twenty-Seventh rounds of monitoring.  (*Id.* ¶ 9.)  In January

15   2018, the Special Master filed his latest comprehensive report on CDCR's mental health system,

16   referred to as the Twenty-Seventh Round Monitoring Report.  (ECF No. 5779.)  The Special

17   Master's team began gathering information for that report in mid-2016, which included site visits

18   to 24 CDCR institutions between May 2016 and January 2017, and extensive review of

19   documents provided by each institution.  (*Id.* at 9.)  Prior to that round of monitoring, the Special

20   Master submitted a document request for each of the 24 visits, and CDCR provided Performance

21   Report data and the methodology of the Performance Report indicators.  (Ceballos Decl. ¶¶ 9-10.)

22   By providing the data and methodology, the Special Master could compare that data against what

23   they observed while monitoring.  (*Id.*)  CDCR has made all of its data available, including patient

24   records and records containing the raw data on its mental health programs (*i.e.*, staffing numbers,

25   treatment offered, etc.).  (*Id.*)  CDCR has not withheld any data requested by the Special Master's

26   team.

27

28

1    **III.    DR. GOLDING'S ALLEGATIONS ARE NARROW IN SCOPE AND REBUTTABLE.**

2           As discussed below, Dr. Golding's allegations of data "fraud" are better understood as his

3    criticism of the methodology used by CDCR to analyze the data under the Performance Report

4    indicators.  Testing Defendants' explanations for each critique does not justify the Court's

5    proposal to appoint an investigator with quasi-prosecutorial powers, but could instead be more

6    efficiently accomplished by examining the methodologies used to generate the indicators,

7    surveying how (and if) these indicators have been represented to the Special Master or the Court,

8    and otherwise following the procedures outlined in Defendants' OSC Response.

9           **A.    Dr. Golding's Allegation That CDCR Resets Routine Psychiatric Timelines
            Ignores That Those Timelines Have Always Been Superseded by Other**
10          **Timelines Upon Transfer.**

11          The Court's first proposed area of inquiry, identified as issue (a), concerns Defendants'

12   alleged lengthening of routine psychiatric timelines by "(i) resetting the clock for such

13   appointments from the time of transfer rather than from the last completed appointment, (ii)

14   rescheduling such appointments at the maximum time allowed in the Program Guide, and (iii)

15   reporting compliance with Program Guide requirements using the reset timelines."  (ECF No.

16   6002-1 at 2:10-13.)  While CDCR's Performance Report can be characterized as "resetting the

17   clock" on routine contact timelines when a patient transfers institutions, the more accurate

18   framing is that CDCR considers transferred patients to have exited their existing recurring

19   appointment cycle and entered a new intake process.  Ultimately, Dr. Golding has raised a *policy*

20   concern regarding the possibility of gaps between routine psychiatry appointments and a patient's

21   initial post-transfer appointment.  That may be a legitimate policy question, but it does not

22   implicate fraud.

23          Under the Program Guide, patients at the Correctional Clinical Case Management System

24   (CCCMS) level of care on psychiatric medication are expected to be evaluated by a psychiatrist at

25   least once every 90 days.  (Program Guide at 12-3-11.)  Patients at the Enhanced Outpatient

26   Program (EOP) level of care must be evaluated by a psychiatrist "at least monthly."  (*Id*. at 12-4-

27   9.)  The Program Guide also sets timeframes for routine contacts for Primary Clinician and an

28   Interdisciplinary Treatment Team meeting (IDTT).  These appointments are considered "routine"

6

1    contacts, and occur on a recurring cycle.

2            When an inmate transfers to a new institution, the inmate enters a new clinical

3    environment with new caregivers.  Because this, in turn, triggers a new initial intake process, the

4    transfer also discontinues prior orders for routine psychiatric appointments, as well as prior

5    scheduled IDTTs and Primary Clinician contacts.  (Ceballos Decl. ¶ 11.)  In place of these, new

6    timeframes are placed for initial contacts with psychiatrists, primary clinicians, and IDTTs.  (*See*

7    Program Guide at 12-3-8 (setting the timeframe for initial Primary Clinician contacts for CCCMS

8    patients at ten working days after arrival).)  First, a nurse qualified to perform a mental health

9    assessment evaluates the patient and may immediately refer him to a psychiatrist if clinically

10   indicated.  (Inmate Medical Services Policy and Procedure, Volume 4, Chapter 3.2, Health Care

11   Transfer Procedure.)  Concurrently, a psychiatrist at the receiving institution must conduct a

12   medication reconciliation within 24 hours of a patient's arrival to ensure a continuity of

13   medication.  (*Id.*)  For Correctional Clinical Case Management System patients, the Primary

14   Clinician must meet with the patient within ten working days of arrival.  (Program Guide 12-3-8.)

15   Then, the patient, along with his Primary Clinician and psychiatrist, must attend an initial IDTT

16   meeting within 14 days of arrival (Program Guide 12-3-9 ("The IDTT is composed of, at a

17   minimum . . . Assigned Psychiatrist"), 12-3-10, 12-4-7).

18           While the Program Guide provides deadlines for a number of post-transfer events as

19   mentioned above, it is silent as to a specific timeframe for initial psychiatry contacts; thus, the

20   Performance Report measures whether the initial contact occurred within 90 days of arrival for

21   Correctional Clinical Case Management System patients, drawing from the timeline for routine

22   contacts.  (Leidner Decl. ¶¶ 20-21.)  CDCR tracks this first post-transfer appointment with a

23   psychiatrist as an "initial psychiatry contact."  (*Id.*)  A subcategory within the Timely Psychiatry

24   Contacts indicator specifically tracks timeliness for these "initial contacts" separately from

25   "routine contacts."  (*Id.*)

26           Contrary to Dr. Golding's assertions, the purpose of the "reset" is not to lengthen the

27   period between psychiatric appointments beyond the Program Guide requirements or to inflate

28   compliance data "reported" under the Timely Psychiatry Contact indicator.  Rather, it reflects the

                                                    7

1    fact that immediate post-transfer care is treated differently from routine appointments.[2]  Dr.

2    Golding's implication that patients languish for many months without a psychiatric contact is

3    inaccurate—as stated above, each patient is promptly seen and evaluated by nurses and clinicians

4    following their transfer.  Moreover, CDCR has been transparent with the Special Master about

5    this methodology, providing his team with timely initial psychiatric contact methodology dozens

6    of times during the most recent monitoring round.  For example, CDCR provided the Special

7    Master with the methodology for initial psychiatric contacts during the Twenty-Seventh Round of

8    Monitoring.  (Ceballos Decl. ¶ 10.)  For EOP patients, the initial psychiatry contact indicator

9    methodology states that a "[p]sychiatry contact is required at current institution *within 30*

10   *calendar days after last arrival*, program start or mhi."  (A similar indicator and rule for CCCMS

11   patients is set at 90 days.)  (*Id.*, Ex. 3.)  The notion that this practice exists to inflate contact

12   compliance numbers makes little sense, as only a small percentage of inmates transfer in any

13   given period and thus initial contacts that occur after transfer make up only a small portion of all

14   psychiatry contacts in the indicator.  (Leidner Decl. ¶ 23.)

15            Dr. Golding does not describe any misrepresentation regarding how timely psychiatry

16   contacts are calculated after a patient's transfer, and Defendants have not kept their post-transfer

17   policies secret from the Special Master.  Nor is any specialized expertise necessary to evaluate

18   Defendants' rebuttal.  (*See* OSC Response at § II.)  Consequently, the Court lacks any basis to

19   order an independent investigation of this allegation.  This issue can be resolved by examining the

20   indicators generated by the Performance Report, evaluating the methodologies and data provided

21   to the Special Master's team during the Twenty-Sixth and Twenty-Seventh Monitoring Rounds

22   and the Special Master's understanding of these metrics, and seeking the Court's determination of

23

24   _____

25            [2] Dr. Golding also implies that CDCR clinicians deliberately set post-transfer psychiatry
     contacts at the 90-day maximum.  This is incorrect; the vast majority of CCCMS patients receive
26   their initial post-transfer psychiatry appointment within 90 days of their last routine contact.
     (Leidner Decl. ¶ 23.)  However, because a small minority of patients might experience a longer
27   gap, in June 2018 CDCR began considering a shorter timeframe for the initial psychiatric
     contact—well before Dr. Golding published his allegations—even though it is not a requirement
28   in the Program Guide.  (Ceballos Decl. ¶ 13.)

1    whether or not Defendants' practice, as described above, is a reasonable interpretation of the

2    Program Guide and the Court's orders.

3         **B.    CDCR Appropriately Measures the Interval Between Psychiatry
                   Appointments For EOP Patients.**
4

5         The Court's second proposed area of inquiry, identified as issue (b), is Defendants' alleged

6    practice of "[u]nilaterally lengthening the interval between psychiatrist appointments for

7    Enhanced Outpatient Program inmate-patients and reporting compliance based on the extended

8    intervals." (ECF No. 6002-1 at 2:14-16.)  The Program Guide states, "Inmate-patients who

9    require Enhanced Outpatient Program (EOP) level of care . . . shall be evaluated by a psychiatrist

10   *at least monthly* regarding psychiatric medication issues." (Program Guide 12-2-8 (emphasis

11   added); *see also id.* at 12-4-9.)  Dr. Golding expressly acknowledges the Program Guide

12   timeframe at page 23 of his document—"[a]s stated, the court mandates that EOP patients be seen

13   at least every month by a psychiatrist"—but then erroneously states a compliance requirement of

14   30 days.  (ECF No. 5988-1 at ii & 23-26.)

15        The common definition of "monthly" is "occurring or appearing every month." (Merriam-

16   Webster Online - *https://www.merriam-webster.com/dictionary/monthly?src=search-dict-hed*

17   [viewed November 16, 2018].)  CDCR currently quantifies the requirement as requiring a routine

18   contact every 30 days for Enhanced Outpatient Program patients.  (Leidner Decl. ¶¶ 27-28.)  In

19   December 2016, psychiatrists at California Health Care Facility requested that the rule be

20   adjusted to improve continuity of care because psychiatrists were not always able to see their

21   assigned patients within 30 days due to periodic absences for vacations and weekends, thus

22   meaning the patient would have to be seen by another psychiatrist.  (*Id.* ¶ 27.)  CDCR changed

23   the definition of "monthly" from "within 30 days" to "once every calendar month, to never

24   exceed forty-five days between contact." (*Id.* ¶¶ 26-27, Ex. 5.)  Under this rule, an Enhanced

25   Outpatient Program patient would still need to be seen each calendar month, or twelve times per

26   year, to be listed as compliant in the Performance Report.  (*Id.*)

27        Dr. Golding mischaracterizes both the Program Guide's requirements and CDCR's short-

28   lived alternative compliance timeline.  Dr. Golding's allegation incorrectly states that his

                                              9

1  "psychologist colleagues" made this change, and omits that the requested change included the

2  "within one calendar month, whichever is shorter" clause.  Moreover, Dr. Golding inaccurately

3  alleges that this change was done in secret and was only discovered upon investigation by

4  members of the Headquarters Psychiatry team.  In reality, the change was noted in CDCR's

5  regular announcements of reporting adjustments and disclosed at the weekly management

6  reporting webinar.  (Leidner Decl. ¶ 30.)

7      Although the "45-day or within one calendar month" rule is a reasonable interpretation of

8  the Program Guide's "monthly" definition, it was only in place for four months.  In April 2017, at

9  Dr. Golding's request, the rule was changed back to 30 days.  (ECF No. 5988-1, Ex. A).  Dr.

10  Golding acknowledges that the change was reversed in April 2017 in response to his demand—a

11  fact that cuts against the notion that there was any intent to mislead.  (*Id*. at 25:8-12.)  Once the

12  counting rule was changed back to 30 days, it was retroactively applied to CDCR's database.

13  (Leidner Decl. ¶ 28.)

14      Data incorporating the changed measurement was cited in one court filing: Defendants'

15  March 30, 2017 objections to the Special Master's Report on the Status of Mental Health Staffing

16  and the Implementation of Defendants' Staffing Plan.  (ECF No. 5591.)  However, the Court did

17  not rely on the information provided and instead adopted the Special Master's report in full.

18  (ECF No. 5771 at 30.)

19      For all of these reasons, this issue requires no further investigation or complex or technical

20  expertise to justify the type of extraordinary investigation proposed by the Court.  (*See* OSC

21  Response at § II.)  Nor does it constitute a misrepresentation or fraud on the Court.  At most, the

22  issue is a question of interpretation over the term "monthly" in the Program Guide, a question that

23  could be answered on current facts or, if necessary, could be the subject of further discussion and

24  possible clarification.  (ECF No. 6002 at 2:18-20.)

25  **C.    Dr. Golding Was Mistaken When He Claimed that Defendants Combined
         CCCMS and EOP Data Into One "Reporting Category."**

26

27      The Court's third proposed area of inquiry, issue (c), concerns Defendants' alleged

28  "[u]nilaterally combining CCCMS and EOP appointment compliance numbers into one reporting

10

1  category." (ECF No. 6002-1 at 2:17-18.) CDCR's Performance Report data has always been

2  available as an aggregate figure or can be broken out in a variety of ways including by level of

3  care, timeframe, housing program, and institution. CDCR has provided this data to the Court and

4  Special Master both in the aggregate and separately, when requested. Yet, Dr. Golding alleges

5  that CDCR deceptively combined Enhanced Outpatient Program and Correctional Clinical Case

6  Management System data regarding timely contacts to hide poorer performance among Enhanced

7  Outpatient Program patients. (Golding Allegations at 26:19-27:3.) Dr. Golding specifically

8  points to figures included with Defendants' objections to the Special Master's 2017 Staffing

9  Report. (*Id*. at 26:19.) Dr. Golding also claims that "[s]ometime around May or June 2018,"

10  CDCR "eliminated a simple filter option which allowed one to distinguish" between Enhanced

11  Outpatient Program and Correctional Clinical Case Management System when running data

12  reports on timeliness. (*Id*. at 27:4-11.)

13         Dr. Golding's allegations are not accurate. In the one exhibit to a filing where Dr.

14  Golding claims Defendants made a misrepresentation to the Court, Defendants reported "Timely

15  Psychiatry Contacts" by institution and *specifically identified which levels of care are housed at*

16  *each institution*. (ECF No. 5591-2 at 9.) Defendants never suggested that the data in the exhibit

17  was from a single level of care. In addition, there has never been a requirement in this litigation

18  that all performance indicators cited in court documents separate data by levels of care.

19         Dr. Golding also falsely alleges that CDCR has eliminated the ability to separate data by

20  level of care when running reports on timeliness. This is not accurate. The Performance Report

21  allows staff to retrieve data applying a variety of filters, including combining or separating by

22  level of care. (Leidner Decl. ¶ 36.) Moreover, while the process for a system user to

23  disaggregate the data changed in mid-2018, the information was always readily available by

24  merely selecting a button next to the overall indicator. (*Id*.) In fact, in July 2018, Dr. Golding

25  and a member of his team were specifically shown how to separate data by level of care using the

26  new interface. (Brizendine Decl. ¶ 6.)

27         Because there was no misrepresentation—a fact that can be confirmed by reading Exhibit

28  2 to Katherine Tebrock's March 30, 2017 declaration—the possibility of fraud in connection with

11

1    this allegation is legally impossible.  This Court thus has no factual basis upon which to order an

2    independent outside investigation in connection with this allegation.

3        **D.    Defendants Have Not "Inflated Compliance Numbers" By Over-Counting
             Psychiatry Contacts.**

4

5        The Court's fourth area of inquiry, identified as issue (d), is whether Defendants

6    "[u]nilaterally inflat[ed] compliance numbers by counting every encounter between a psychiatrist

7    and an inmate-patient as an appointment for purposes of measuring Program Guide timeline

8    compliance, without regard to whether the encounter was a psychiatry appointment or, e.g., a

9    wellness check or a cell-front attempt to communicate with an inmate patient."  (ECF No. 6002-1

10   at 2:19-23.)  The fundamental premise of Dr. Golding's allegation is flawed because he identifies

11   no Program Guide rule or Court order that defines a "psychiatry contact," nor any Program Guide

12   rule or court order that excludes short or non-confidential contacts from the definition of a

13   "psychiatry contact."

14       As a result, Dr. Golding fails to establish that data on timely psychiatry contacts that

15   includes short or non-confidential contacts is misleading or inaccurate.  Indeed, the length of a

16   particular contact is left up to the clinical discretion of each psychiatrist in their interactions with

17   their patients, and Dr. Golding provides no evidence that a short or non-confidential encounter

18   means that the psychiatrist was unable to assess the patient.  Dr. Golding seems to take issue with

19   the validity of certain contacts, but as Chief Psychiatrist, Dr. Golding himself is responsible for

20   training psychiatrists and to ensure that they properly characterize their encounters when

21   inputting data into the system.  (*See* Ceballos Decl. ¶ 15.)

22       Furthermore, contrary to Dr. Golding's assertion, short, non-confidential, or cell-side

23   encounters are not "hidden" in the overall timely contacts data.  CDCR's health records system

24   requires psychiatric staff to log the duration of encounters, whether the contact was confidential,

25   and whether it was performed cell-side.  (Leidner Decl. ¶ 31.)  Because CDCR's psychiatrists

26   enter information regarding encounter length and location, that data is easily available through the

27   Performance Report.  Indeed, during the Twenty-Seventh Monitoring Round, the Special

28   Master's team specifically requested data for each institution regarding "the total number of

12

1  psychiatric contacts that did not occur in a confidential setting" and "the number of contacts

2  conducted cell front."  This data was provided.  (Ceballos Decl. ¶ 9, Ex. 3.)  The EHRS data entry

3  system requires psychiatric staff to also indicate if the contact occurred in the yard, holding cell,

4  or other non-traditional locations, as well as provide an explanation as to why the contact

5  occurred in this setting.  (Ceballos Decl. ¶ 15, Ex. 4.)  The fact that CDCR requires psychiatrists

6  to enter data allowing the Performance Report to isolate short, non-confidential, or cell-side

7  psychiatry contacts shows that CDCR is not attempting to hide this information.[3]  Managers, such

8  as Dr. Golding, could then use this data to focus training or peer review.

9        The Special Master's team is aware that CDCR tracks and reports a small percentage of

10  short, non-confidential or cell-side encounters as psychiatry contacts or appointments.  Once

11  again, Dr. Golding suggests fraud based on what is actually a policy disagreement about how he

12  believes "timely psychiatry contacts" *should* be measured.  CDCR welcomes that policy

13  discussion, and invites input from the Special Master.  However, because Dr. Golding fails at the

14  threshold to establish the existence of anything resembling a "misrepresentation," this Court lacks

15  any basis to order an independent outside investigation in connection with this allegation.

16     **E.  Defendants Have Not Misled the Court or Special Master Regarding
           Missed Appointments.**

17

18        The fifth topic identified by the Court, issue (e), is Defendants' alleged "[m]anipulation of

19  the manner in which scheduled appointments and missed appointments are reported."  (ECF No.

20  6002-1 at 2:24-25.)  Dr. Golding alleges that: (1) the "Appointments Seen as Scheduled"

21  indicator fails to capture all missed appointments, and therefore inflates the extent to which

22  CDCR appears to be seeing patients as scheduled; and (2) CDCR employs a "crazy algorithm" to

23  calculate treatments missed or refused by patients.  Each allegation is addressed in turn.

24

---

25  [3] While this information was available to Dr. Golding, he chose not to access it.  Dr.
    Golding's allegations "generously" assume that 20% of psychiatry appointments were cell-side
    wellness checks, "or 30%, or some other figure."  (Golding Allegations at 55:14-16.)  CDCR's

26  data quality management team examined the actual data and found that only 5% of contacts were
    logged as lasting fewer than five minutes, 10% were logged as non-confidential, and 7% were

27  logged as cell-front encounters.  (Leidner Decl. ¶ 32.)  Only 1% of encounters were logged as
    cell-front encounters under five minutes, far below Dr. Golding's "generous" estimate of 20-30%.

28  (*Id.*)

13

Defs.' Objs. & Resp. Court's Nov. 13, 2018 Prop. Order (2:90-cv-00520 KJM-DB (PC))

1        **1.      Appointments Seen as Scheduled.**

2            As a threshold matter, the "Appointments Seen as Scheduled" indicator does not track any

3    Program Guide requirements, and the data generated by this indicator is not regularly provided to

4    the Court or Special Master.  This issue is therefore not appropriate for the contemplated

5    investigation because it cannot be considered an actionable misrepresentation to either the Court

6    or the Special Master.  *Sierra Pac. Indus.*, *Inc.*, 862 F.3d at 1167-68.

7            However, Dr. Golding is also incorrect on the merits.  This particular indicator is designed

8    to identify the percentage of appointments that are not completed *due to factors within CDCR's*

9    *control*—i.e., "provider unavailable," "lockdown," "modified program," and "technical

10   difficulties."  (Ceballos Decl. ¶ 14.)  This information helps CDCR ensure that institutions are

11   scheduling appointments on days and times where a provider is available, and to identify where

12   appointments are being scheduled inefficiently or are otherwise being unduly impacted by other

13   CDCR activities.  (*Id.*)  Thus, while Dr. Golding is correct about what the indicator excludes—

14   such as appointments that did not occur because of a patient no-show, patient refusal or other

15   errors—the limited scope of the indicator is by design to make the data more useful to CDCR

16   management, not to inflate numbers (especially given that Defendants do not regularly report

17   these numbers to the Court or Special Master).  (*Id.* ¶ 14.)

18           Dr. Golding correctly states that the definition for this indicator, viewable to users of the

19   Performance Report, was phrased in a way that suggested the metric covered all missed

20   appointments.  (Golding Allegations at 46-47.)  However, like other issues that may occur in any

21   system as complex as CDCR's data system, the error was isolated and inadvertent.  CDCR's

22   mental health program, as well as CDCR's medical program under the direction of the *Plata*

23   Receiver, maintains dashboards which include the management tool indicator for "Appointments

24   Seen as Scheduled."  CDCR previously used a different calculation method for this metric, but

25   sometime prior to October 2016, CDCR's data management team was directed to modify that

26   indicator to conform to a rule change implemented by California Correctional Health Care

27   Services focusing on appointments missed due to something within CDCR's control.  (Leidner

28   Decl. ¶ 39.)  CDCR changed the Mental Health Services Delivery System's Performance Report

14

1    indicator to match the change at California Correctional Health Care Services, but the description

2    of the indicator was not updated to reflect its narrower scope, and continued to imply that the

3    indicator reflected all appointments.  (*Id.*)

4          CDCR's data quality management team was unaware of the incorrect definition until after

5    Dr. Golding published his allegations.  (Leidner Decl. ¶ 38.)  Unfortunately, Dr. Golding never

6    raised this issue with the Mental Health Quality Management Team before he sent his allegations

7    to the *Plata* Receiver.  (*Id.*)  Had he done so, the definition would have been quickly revised.

8    (*Id.*)  In any case, the definition was changed to match the counting rule during the week of

9    October 8, 2018, when it was first brought to the attention of the Mental Health Quality

10   Management Team.  (*Id.*)

11         Defendants' inadvertent mistake in failing to modify a description accessible to CDCR

12   employees cannot be the basis for an inquiry into fraud: the data from the "Appointments Seen as

13   ;Scheduled" indicator does not track any Program Guide requirements and is not regularly shared

14   with the Special Master or the Court.  While Dr. Golding "imagine[s]" that the Special Master

15   might view this indicator, he provides no facts showing that the Special Master ever did so.  (ECF

16   No. 5988-1 at 43; *see also id.* at viii [surmising that, if the Special Master had reviewed this

17   indicator, it "may have" led him to an "erroneous conclusion"].)  Defendants are aware of a single

18   instance when data from this indicator was provided to the Court—Defendants' draft proposed

19   staffing plan adjustments, sent to Plaintiffs and the Special Master earlier this year, included a

20   footnote stating "[a]ppointments occurred as scheduled [at the desert institutions] 98% to 100% of

21   the time over the same timeframe"; the proposal was thereafter attached as an exhibit to the

22   parties' June 21, 2018 joint status report regarding staffing issues as evidence of ongoing

23   negotiations between the parties.  (ECF No. 5841-2 at 4 n.5.)  The footnote was not significant to

24   Defendants' staffing proposal, and was deleted from subsequent drafts. Further, there is no

25   indication the Court relied or ruled on that proposal, let alone the specific footnote.  In fact, as

26   noted in the Court's Order to Show Cause, "plaintiffs have withdrawn from an agreement on

27   psychiatry staffing ratios . . . also, the staffing compliance hearing has been postponed."  (ECF

28   No. 6022 at 6.)

1    Ultimately, Dr. Golding's allegation raises, at best, a policy concern regarding the most

2    useful way to track missed appointments.  But investigating the contents of CDCR's internal

3    management tools is not an appropriate area of inquiry for the Court.[4]  There is no basis for the

4    Court to investigate issues related to CDCR's management tools that are not reported to the

5    Special Master or the Court, nor relied on by Defendants as evidence of compliance.  Nor does

6    this issue require any specialized technical expertise that would justify the extreme measure of

7    appointing an independent investigator at the state's expense.  (*See* OSC Response at § II.)

8         **2.    The "Treatment Refused" and "Treatment Cancelled" Indicators.**

9    Dr. Golding rejects as "arbitrary" CDCR's indicators reflecting treatments cancelled and

10   treatments refused, because they do not simply provide the percentage of treatment sessions that

11   are cancelled or refused.  Dr. Golding is incorrect.  Like "Appointments Seen as Scheduled," the

12   indicator does not track compliance with any Program Guide requirement and is not reported

13   externally, but rather is used internally by CDCR as an efficiency measure to identify whether

14   patients are missing—via refusal of patient or cancellation by the institution—a substantial

15   percentage of their treatment due to cancellations or refusals.  (Ceballos Decl. ¶ 16.)

16   Accordingly, this too is not an appropriate area of inquiry for the Court given that the indicators

17   were not reported to the Court or the Special Master and are not used to track compliance with the

18   Program Guide.  Defendants are not aware of any instance in which information from this

19   indicator has been shared with the Special Master or the Court, which means that even if the

20   indicator is confusing, no one has been misled, much less defrauded.

21   The indicator, however, is not arbitrary or misleading.  The numbers that Dr. Golding

22   believes are "arbitrary" are based on specific thresholds to measure whether patients refused more

23   than fifty percent of structured therapeutic treatment hours.  (Leidner Decl. ¶ 43.)  And the data

24   _____

25   [4] Dr. Golding also claims that any rescheduling of an appointment, whether directed by the provider or the patient, is a "problem."  Dr. Golding's discussion overstates the impact—he

26   incorrectly believes that appointments that have been moved are included as compliant when in fact they are automatically coded as canceled.  (ECF No. 5988-1 at 39-41.)  Dr. Golding's assertions ignore the realities faced by every medical provider, particularly in a large health care

27   system, where appointments are routinely rescheduled at no harm to any patient.  They also ignore that however CDCR measures this indicator, it does not affect the data relevant to

28   *Coleman*—whether psychiatry contacts occur within Program Guide timeframes.

16

1    Dr. Golding thinks is more appropriate—the total percentage of treatment refused and canceled—

2    is already available through a different indicator known as the "Tx_Hours" report.  (Leidner Decl.

3    ¶ 41, Ex. 13.)

4         As stated, there is no need for an expansive, months-long independent inquiry into this

5    issue.  With the exception of a single footnote in a draft document attached as an exhibit to a joint

6    status report, data from these indicators has not been shared with the Court or Special Master.

7    Under the authority discussed above, *e.g.*, *Sierra Pac. Indus.*, *Inc.*, 862 F.3d 1157 at 1167-68, that

8    is not sufficient to support a finding of fraud on the Court.

9         **F.    Defendants Have Not Misled the Court Through the Alleged Practice of**
                   **Supervisors Having a Clinical Caseload.**
10

11        The Court's sixth proposed area of inquiry, issue (f), is Defendants' alleged failure "to

12   report that psychiatric supervisors are or were also performing some or all the functions of staff

13   psychiatrists."  (ECF No. 6002-1 at 3:1-2.)  However, Defendants never claimed or asserted that

14   no psychiatry supervisors will ever perform the functions of line staff.  Although Dr. Golding

15   claims that 60% of psychiatric supervisors see patients alongside line staff, resulting in an

16   underestimate of the required number of psychiatrists, he provides no data to support his

17   assertion, does not specify the classification or level of care the supervisors are assigned to, and

18   makes no mention of how many patients are on these supervisor's caseloads.  Such information is

19   necessary if Dr. Golding wishes to imply some widespread deception, as in some cases

20   supervising psychiatrists are expected to carry a caseload under the 2009 Staffing Plan.  (*See* ECF

21   No. 3693 at 22.)

22        Dr. Golding also misunderstands the meaning of "staffing ratio" and the data provided to

23   support CDCR's proposal to reduce psychiatric staffing allocations.  According to Dr. Golding, to

24   maintain current performance while reducing supervisor caseloads, "a higher number of line staff

25   psychiatrists would be required than has been reported to the court as being needed."  (Golding

26   Allegations at 56:22-23.)  Dr. Golding therefore infers that "CDCR's reported staffing ratios in

27   the 2018 staffing report are misleading" as "[t]he ratio of psychiatrists doing the work to patients

28   receiving the psychiatric care is higher than was reported to the court."  (*Id*. at 5:9-11.)  But this is

17

1    not where "staffing ratios" come from.  "Staffing ratios" are not a statement of present workload,

2    they are an agreed-upon figure used to generate overall staffing goals based on the size of the

3    patient population.  The parties reached agreement on target staffing ratios that were outlined in

4    the 2009 Staffing Plan.  Those ratios include a relief factor that accounts for work done by

5    psychiatrists filling vacancies caused by illness, vacations, or staff turnover.  (*See* ECF No. 3693

6    (2009 Staffing Plan) at 22.)

7         Defendants' proposals for adjusting the 2009 Staffing Plan did not make any

8    representations regarding the per-capita workload currently being performed by CDCR

9    psychiatrists.  (*See* ECF No. 5841-2.)  The proposal referred to the ratios agreed upon for the

10    2009 Staffing Plan and proposed that these ratios be adjusted by revising the assumed average

11    monthly contacts for Enhanced Outpatient Program and Correctional Clinical Case Management

12    System patients downward to match Program Guide requirements—a revision that is not

13    impacted in any way by whether line staff or supervisors are currently providing care.  (*Id*. at 9-

14    10.)  No factual inquiry is required to address this allegation—Dr. Golding's misunderstanding of

15    the term "staffing ratio" can be determined by examining the document that purports to contain

16    the misleading "report."

17         **G.    Defendants Have Not Misrepresented Medical Non-Compliance Figures**

18         The Court's seventh proposed area of inquiry is Defendants' alleged "[m]anipulation [of]

19    the manner in which medication non-compliance is measured."  (ECF No. 6002-1 at 3:3-4.)  This

20    issue also does not require the extraordinary and broad investigation contemplated by the Court.

21         When a patient refuses to take psychiatric medication and the patient is deemed medication

22    non-compliant, a nurse will notify the patient's psychiatrist of the issue, who may order a

23    consultation which triggers the scheduling of an appointment to discuss the non-compliance if the

24    psychiatrist deems such an appointment necessary.  (*See* CCHCS Inmate Medical Services

25    Policies & Procedures 4.11.5, Medication Adherence Procedure, at 2-3, available at

26    https://cchcs.ca.gov/wp-content/uploads/sites/60/2017/08/IMSPP-v04-ch11.5.pdf [viewed Nov.

27    19, 2018].)  CDCR's compliance statistic for medication non-adherence relies on the initiation of

28    an "MH Med Non-Adherence" consultation in the patient's electronic medical record.  (Leidner

18

1   Decl. ¶ 46.)  This means that if a consultation is not created, no measurement is made.  (*Id.*)

2        Dr. Golding has two concerns with this indicator.  First, that it only accounts for scheduled

3   follow-up appointments, ignoring an allegedly greater number of non-compliant patients who are

4   never scheduled for a follow-up by their psychiatrists.  (Golding Allegations at 58:2-21.)  Second,

5   that it inflates compliance numbers by improperly including cancelled appointments.  (*Id.* at

6   59:11-60:12.)

7        Dr. Golding's first concern amounts to a difference of opinion on policy.  As discussed

8   above, this indicator does not measure timeliness with appointments that are not scheduled by the

9   psychiatrist, but Defendants have never suggested to the Special Master or Court that it does.

10  (Leidner Decl. ¶ 44.)  The decision whether or not to schedule a follow-up appointment with a

11  patient deemed medication non-compliant is left to the clinical discretion of the treating

12  psychiatrist, and there is no Program Guide requirement or Court order mandating that an

13  appointment be automatically scheduled to provide consultation to medication non-compliant

14  patients.  To the extent that Dr. Golding believes such referrals should be automatic, that is a

15  question of modifying the policy to require an automatic referral.  It is not, however, a question of

16  data reporting or fraud; indeed, Dr. Golding's allegations make clear that data regarding the total

17  number of medication non-compliant patients is readily available.  (*See* Golding Allegations at

18  60:13-24.)[5]

19        With respect to the indicator counting cancelled appointments, CDCR was unaware of this

20  issue within the data system until Dr. Golding notified the *Plata* Receiver.  (Leidner Decl. ¶ 47.)

21  Dr. Golding's allegations alerted CDCR's data team to an inadvertent software error that caused

22  cancelled appointments to be counted as late.  (*Id.*)  CDCR removed the cancelled appointments

23  from the indicator as soon as it became aware, once again demonstrating responsiveness to

24  requests for change.  (*Id.*)  As a result, CDCR's compliance with medication non-adherence

25  referrals actually increased—showing that the bug was not a deliberate attempt to inflate results

26  and could not have resulted in a fraud on the Court.  (*Id.* ¶ 49.)  This error in the indicator cannot

27

28  _____
        [5] Dr. Golding repeatedly speaks of "compliance" on this topic, yet does not identify any
    rule or policy outlining that requirement with which CDCR purportedly fails to comply.

1    be the basis for a finding of fraud, because Defendants could not have used something they knew

2    nothing about to intentionally harm the integrity of the judicial process.  *Est. of Stonehill*, 660

3    F.3d at 555 (internal citations omitted).  The element of knowing deceit is lacking here and fatal

4    to Dr. Golding's claim of fraud.

5                                                  **CONCLUSION**

6               Dr. Golding's allegations do not come close to meeting the exacting requirements for

7    stating a claim for fraud on the Court, and can be explained without employing an independent

8    investigator who knows nothing about this case.  Indeed, Defendants have found reasonable

9    explanations for each of Dr. Golding's allegations without *any* formal inquiry, relying entirely on

10   a handful of voluntary interviews, available documents, and a thorough review of Dr. Golding's

11   allegations and Program Guide requirements.  Defendants stand ready to respond to any further

12   areas of inquiry that may be identified by the Court or Plaintiffs.  For these reasons, Defendants

13   object to the Court's Proposed Order and request that the Court apply the alternative procedures

14   outlined in Defendants' OSC Response.

15

16

17   Dated:  November 20, 2018                          Respectfully Submitted,

18                                                       XAVIER BECERRA
                                                         Attorney General of California
19                                                       ADRIANO HRVATIN
                                                         Supervising Deputy Attorney General
20
                                                         */s/ Tobias G. Snyder*
21                                                       TOBIAS G. SNYDER
                                                         Deputy Attorney General
22                                                       *Attorneys for Defendants*

23   CF1997CS0003

24

25

26

27

28

Defs.' Objs. & Resp. Court's Nov. 13, 2018 Prop. Order (2:90-cv-00520 KJM-DB (PC))