1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
6  FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
7  39 Drumm Street
   San Francisco, California  94111-4805
8  Telephone:   (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

9

10 Attorneys for Plaintiffs

11                     UNITED STATES DISTRICT COURT

12                     EASTERN DISTRICT OF CALIFORNIA

13

14 RALPH COLEMAN, et al.,

15            Plaintiffs,

16        v.

17 EDMUND G. BROWN, JR., et al.,

18            Defendants.

Case No. 2:90-CV-00520-KJM-DB

**PLAINTIFFS' RESPONSE TO
DEFENDANTS' OBJECTIONS TO
THE RECOMMENDATIONS OF THE
SPECIAL MASTER'S REPORT ON
HIS EXPERT'S THIRD RE-AUDIT
AND UPDATE OF SUICIDE
PREVENTION PRACTICES IN THE
PRISONS OF THE CDCR**

Judge:   Hon. Kimberly J. Mueller

19

20

21

22

23

24

25

26

27

28

---

PLS.' RESPONSE TO DEFS.' OBJECTIONS TO RECOMMENDATIONS OF SPECIAL MASTER'S REPORT ON HIS
EXPERT'S 3D RE-AUDIT & UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CDCR

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

I. DEFENDANTS' PROPOSAL WOULD POSE A SUBSTANTIAL RISK OF SERIOUS HARM TO PATIENTS IN A SYSTEM ALREADY FAILING TO PREVENT SUICIDES ........................................................ 2

    A. The Special Master Correctly Concluded that Permitting Defendants to Open an Unlicensed MHCB Unit in an Operational RJD Segregation Unit would result in Deplorable, Anti-Therapeutic Conditions Unfit for Crisis Care. ...................................................... 4

    B. The Unsafe and Counter-Therapeutic Unit at RJD Must Also Be Considered in the Context of CDCR's Current Systemwide Suicide-Prevention Failures. .......................................................... 9

II. DEFENDANTS HAVE NOT SHOWN WHY THIS SEGREGATION UNIT WAS THEIR ONLY ALTERNATIVE, AND FAILED TO TAKE AVAILABLE STEPS TO AVOID THIS PROBLEM BY BUILDING SUFFICIENT LICENSED CRISIS BEDS ............................................. 11

III. DEFENDANTS CANNOT JUSTIFY THEIR DANGEROUS PROPOSAL BY PROMISING TO CLOSE THE UNLICENSED MENTAL HEALTH CRISIS BEDS AT CSP-SACRAMENTO ................................................... 13

IV. DEFENDANTS WAIVED THEIR OBJECTION REGARDING A SUICIDE AT SAN QUENTIN STATE PRISON...................................... 14

CONCLUSION................................................................................................. 15

CERTIFICATION ............................................................................................. 15

i

[3324085.6]

PLS.' RESPONSE TO DEFS.' OBJECTIONS TO RECOMMENDATIONS OF SPECIAL MASTER'S REPORT ON HIS EXPERT'S 3D RE-AUDIT & UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CDCR

**INTRODUCTION**

1    For the past eight months, Defendants have insisted on singularly pursuing their

2    dangerous proposal to open a temporary, unlicensed Mental Health Crisis Bed ("MHCB")

3    unit in an Administrative Segregation building at Richard J. Donovan State Prison

4    ("RJD"), despite uniform strong opposition from Plaintiffs and the Special Master,

5    including his Suicide Prevention Expert Lindsay Hayes. *See* Special Master's Report on

6    Third Re-Audit ("SM Report"), ECF No. 5993; The Third Re-Audit and Update of Suicide

7    Prevention Practices in the Prisons of the California Department of Corrections and

8    Rehabilitation ("Third Re-Audit"), ECF No. 5994. After extensive discussion of

9    Defendants' proposal and an in-person review of the unit by multiple members of his team,

10   including Mr. Hayes, the Special Master concluded that activation of the proposed unit

11   "would result in deplorable conditions unacceptable for class members needing an MHCB

12   level of care" and accordingly recommended that this Court reject the proposal. SM

13   Report at 8, 10.

14   Yet Defendants now object, arguing with nearly no evidentiary support that this

15   Court should ignore the very serious concerns relating to the administrative segregation

16   unit's stark physical plant, lack of adequate treatment space to ensure confidentiality,

17   failure to provide any plan to ensure adequate out-of-cell programming or yard, and lack of

18   any means to prevent suicides by jumping from the second tier, all of which are detailed at

19   length in the Third Re-Audit and adopted by the Special Master's accompanying report.

20   Defendants' Objections to the Recommendations of the Special Master's Report on his

21   Expert's Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the

22   California Department of Corrections and Rehabilitation ("Defs' Objections"), Nov. 15,

23   2018, ECF No. 6007; *see also* Declaration of A. Ponciano in Support of Defendants'

24   Objections to the Special Master's Report on his Expert's Third Re-Audit of Suicide

25   Prevention Practices ("Ponciano Decl."), Nov. 15, 2018, ECF No. 6007-1; Third Re-Audit

26   at 34-35. It is Defendants' burden to show that their proposal to treat actively suicidal

27   patients requiring MHCB level of care—inpatient care required to be provided in a

1

[3324085.6]

1    licensed unit to patients experiencing "symptoms associated with [a mental health] crisis"

2    necessitating round-the-clock observation, monitoring, and treatment to achieve stabiliza-

3    tion, *see* Program Guide 12-5-1 to 12-5-2—in a harsh currently-operating segregation

4    building, without the protections of state licensing laws, can provide constitutionally

5    adequate care.  They have not done so.  Their paltry evidence fails to overcome the Special

6    Master's amply supported findings, which are entitled to great deference by the Court, and

7    their proposal is especially dubious given Defendants' persistently poor compliance with

8    suicide prevention policies and their very high rate of suicides.

9            Moreover, Defendants have never provided any evidence substantiating their

10   questionable claim that literally no other unit in the entire system presents a feasible

11   alternative worthy of consideration besides this exceedingly harsh, anti-therapeutic unit, or

12   a detailed analysis of their reasons for rejecting any such alternatives.  In any case,

13   Defendants could have avoided this acute MHCB shortage by taking seriously their

14   constitutional obligation to build sufficient licensed crisis beds from the start, when their

15   own bed plans forecast a shortage for years and Defendants nonetheless chose not to take

16   available steps to  expedite construction of their planned 100 Southern Region beds.

17           Finally, Defendants' objection regarding Mr. Hayes's finding regarding a suicide at

18   San Quentin should be overruled, as they failed to present that objection to the Special

19   Master in the first instance and in any event fail to present any explanation or evidence

20   substantiating their request.

21   **I.    DEFENDANTS' PROPOSAL WOULD POSE A SUBSTANTIAL RISK OF
         SERIOUS HARM TO PATIENTS IN A SYSTEM ALREADY FAILING TO**
22   **PREVENT SUICIDES**

23           Defendants correctly note that they are required to provide "constitutional

24   conditions of confinement to inmates" including "'access to adequate mental health care.'"

25   Defs' Objections at 2 (citing *Farmer v. Brennan*, 511 U.S. 825 (1994) and quoting

26   *Coleman v. Wilson*, 912 F. Supp. 1282, 1298 (E.D. Cal. 1995)).  Under *Farmer*, prison

27   officials are deliberately indifferent when "they act[] or fail[] to act despite [their]

28   knowledge of a substantial risk of serious harm."  511 U.S. at 842.  Given the Special

2

[3324085.6]

1  Master's and Mr. Hayes's well-supported opposition, as well as Defendants' persistently

2  poor track record complying with suicide prevention policies combined with their

3  currently astronomically-high suicide rate (including four suicides at RJD itself so far this

4  year), Defendants' efforts to press forward with the proposed RJD unit demonstrate a clear

5  disregard for a substantial risk of serious harm.

6       Defendants bear the burden of proving that this Court should take the extraordinary

7  step of affirmatively overriding state law, against the advice of the Special Master and his

8  expert and over the strong opposition of Plaintiffs, to permit indefinite operation of

9  unlicensed crisis beds in a harsh segregation unit, and that doing so would assist in

10  remediating the constitutional violations in this case.[1]  There is no question that they have

11  failed to sustain that burden, even after the Special Master team identified myriad

12  problems and gave Defendants multiple opportunities to address them.  Instead of taking

13  steps to study and address the concerns raised by the Special Master proactively (assuming

14  arguendo that is even possible), Defendants ask this Court to ignore the life-threatening

15  risks the Special Master and his experts identified and hope for the best.  Particularly when

16  considered against the backdrop of Defendants' outrageous and long-standing suicide

17  prevention failures, starkly illustrated by the highest suicide rate in over a decade,

18  Defendants' plan presents a clear risk that this Court cannot countenance.

[1] Defendants have never formally put their RJD proposal in front of the Court, which is the only entity with the authority to waive the relevant state licensing requirements and approve of a modification of the Program Guide, which specifies that MHCB units are by definition inpatient programs "located in [CDCR] institutions with facilities licensed as a Correctional Treatment Center (CTC), … General Acute Care Hospital (GACH), or Skilled Nursing Facility (SNF)."  Program Guide 12-5-1.  They have not filed a motion seeking to modify the Program Guide definition or to override the relevant licensing requirements, both of which clearly prohibit Defendants' proposed unit.  Defendants' present "objections" are both a procedurally improper vehicle to seek relief from these requirements and substantively insufficient to controvert the Special Master's findings and recommendation against the unit.  *See* Feb. 28, 2013 Order at 2 (the Court, not the Special Master, must determine whether Defendants' system satisfies the Constitution).

[3324085.6]

A.    **The Special Master Correctly Concluded that Permitting Defendants to Open an Unlicensed MHCB Unit in an Operational RJD Segregation Unit would result in Deplorable, Anti-Therapeutic Conditions Unfit for Crisis Care.**

The Special Master's opinion and finding,[2] informed by his team's extensive consideration of Defendants' proposal over the course of almost eight months and in particular by Mr. Hayes's suicide prevention expertise, is that Defendants' proposed activation of an unlicensed MHCB unit in an operating RJD administrative segregation building "would result in deplorable conditions unacceptable for class members needing an MHCB level of care."  SM Report at 8.  Specifically, the Special Master's expert found, *inter alia*, that the unit would be dark, with cells not large enough to fit a MHCB suicide-resistant bed, with treatment space located such that patient confidentiality would likely be compromised, and with limited yard time held in special management "walk-alone" yards, or cages.  Third Re-Audit at 34.  Those findings and the concomitant recommendation that this Court reject Defendants' dangerous proposal are based on an in-person tour, multiple telephone conferences, and a review of  Defendants proposals to ameliorate the myriad serious concerns articulated at length in Mr. Hayes's report.  *Id.* at 35.

The Special Master's factual findings, adopted from and detailed in Mr. Hayes's accompanying expert report, may only be disregarded upon a showing of clear error.  *See* Order of Reference, Dec. 11, 1995, Docket No. 640, at 8 ("Pursuant to Fed. R. Civ. P. 53 (e) (2), the court shall accept the special master's findings of fact unless they are clearly erroneous").  There is no question Defendants cannot meet that burden.  Defendants present only the flimsiest of evidence, all of which has been considered and rejected by the Special Master already, in asking this Court not only to override the findings and recommendation of the Special Master, but also to affirmatively exercise its power to

---

[2] Defendants' singular focus in their objections on the Special Master's suicide prevention expert, Mr. Hayes, is misplaced.  It ignores the fact that multiple members of the Special Master team evaluated Defendants' proposal in great depth and the Special Master himself has adopted the findings in Mr. Hayes's report and officially recommended this Court reject Defendants' proposal.  SM Report at 8, 10; Third Re-Audit at 32, 35.

[3324085.6]

1  waive state law over the objection of Plaintiffs and against the advice of the Special Master

2  and his experts.  Their objections should be rejected out of hand.

3       Mr. Hayes presented a list of serious concerns supporting his conclusion that the

4  proposed unit would be "stark and anti-therapeutic," offering "deplorable conditions [that

5  are] unacceptable for class members needing an MHCB level of care."  Third Re-Audit at

6  34.[3]  Defendants' flimsy, non-clinical, non-expert evidence to the contrary does not suffice

7  to controvert the Special Master's recommendation against the unit, based on these

8  concerns and other input from his experts.

9       For instance, Defendants' response confirms that they have not undertaken any

10  serious analysis or review of the confidentiality concerns raised by the Special Master,

11  despite having almost eight months to do so.  *See* Third Re-Audit at 34.  The Special

12  Master adopted Mr. Hayes's finding, based on his extensive correctional experience and

13  first-hand observation of the unit, that individuals "freely converse through the ventilation

14  grates and cell doors," an issue of which CDCR is surely well aware.  *Id*.  Defendants have

15  not demonstrated that this is untrue or that there is anything special about the proposed

16  placement of the nursing and clinical rooms that would prevent sound from travelling.

17  Instead, Defendants offer only vague and conclusory assertions that they are "not aware of

18  issues with sound travelling" and do "not believe that inmates will able to hear treatments

19  that are being conducted several cells away."  Defs' Objections at 6; *see* Ponciano Decl.

20  ¶ 13.  The unsubstantiated "belie[f]" of one CDCR headquarters administrator that the

---

21  [3] Defendants' claim that Mr. Hayes should have analyzed only whether the proposed
22  unlicensed unit meets the specific audit criteria he reviews in his annual monitoring makes
    little sense.  The Special Master, with Defendants' full consent, requested Mr. Hayes be
23  added to his staff for the broad purpose of assisting with "the prevention of inmate suicides
    within" CDCR.  Memorandum In Support of Special Master's Request for the Appoint-
24  ment Of Additional Staff ("Memo") at 1, Oct. 1, 2013, ECF No. 4854.  While Mr. Hayes
    has completed several rounds of monitoring of Defendants' suicide prevention policies and
25  practices using particular audit criteria, nothing in the Special Master's request to add
    Mr. Hayes to his staff nor the Court's order granting it constrains Mr. Hayes to review only
26  those criteria in his work assisting CDCR to improve their suicide prevention procedures.
    *See* October 2, 2013 Order, ECF No. 4857 and Memo at 1-3.  Mr. Hayes's extensive
27  experience and expertise in suicide prevention certainly qualify him to opine as to the
    suitability of this proposed new unit.

28

[3324085.6]

1   segregation unit in question could offer sufficiently confidential treatment space—a basic

2   and critical component of crisis care—cannot possibly outweigh Mr. Hayes's professional

3   findings, based both on his expertise and first-hand observation of the planned space,

4   which were adopted by the Special Master.

5       If Defendants were serious about ensuring their proposal was safe and appropriate

6   for treating patients in crisis, they would have actually taken steps to evaluate and address

7   the Special Master's well-founded concerns rather than simply asking this Court to waive

8   licensing laws (over Plaintiffs' and the Special Master's vigorous objections) and risk class

9   member lives on the hope that the experts are wrong. *See* Defs' Objections at 6; Ponciano

10  Decl. ¶ 13 (noting Defendants had "offered" to study whether the proposed treatment space

11  is confidential in light of Mr. Hayes's articulated concern, "and, if necessary, take

12  corrective action," but had not actually done either).  Defendants' plan to open this

13  unlicensed crisis bed unit against the strong advice of the Special Master and his suicide

14  prevention expert, especially when Defendants had months of notice about the

15  confidentiality concerns but nonetheless chose not to conduct any study of the issue, is

16  exactly the type of substantial risk of serious harm the Constitution prohibits. *See Farmer*,

17  511 U.S. at 842.

18      Defendants' response is also insufficient to address concerns about the horrendous

19  physical plant of the proposed unit, featuring cells that are "cold, dark, and contain limited

20  floor space well below that of any licensed MHCB unit," and which the Special Master

21  and Mr. Hayes agree would result in "deplorable conditions unacceptable for class

22  members needing an MHCB level of care."  *See* SM Report at 8; *see also* Third Re-Audit

23  at 34.  There is no plan and, Defendants admit, no means by which to provide more natural

24  light, and Defendants' stop-gap solutions—fresh paint, lightbulbs, and larger interior door

25  windows (which themselves will open onto the segregation unit's anti-therapeutic, dark

26  dayroom including a chainlink fence dividing the patients in crisis from a regular,

27  functioning segregation unit)—amount to slapping lipstick on a pig.  *See* Ponciano Decl.

28  ¶ 10; Third Re-Audit at 34.  Defendants' proposed improvements will not transform small,

6

1    dark cells into therapeutic environments for patients in mental health crisis—they will still,

2    as Mr. Hayes found, "simply resemble retrofitted new intake cells commonly found in

3    administration units."  Third Re-Audit at 34.  Defendants admit there is also no fix for the

4    small size of the cells, which are not even sufficient to house standard MHCB suicide-

5    resistant beds.  *See id.*; Ponciano Decl. ¶ 11.

6         Defendants ask this Court to trust that they can and will sufficiently mitigate the

7    anti-therapeutic effect of housing suicidal class members in tiny, cold, harsh segregation

8    cells by offering additional out-of-cell time, similar to the temporary unit in L-1 at CMF.

9    *See* Ponciano Decl. ¶ 11.  But Defendants have never produced any plan or even basic

10   details on how they would do so.  *See* Third Re-Audit at 35 (noting Defendants' promise to

11   offer more out-of-cell time to mitigate the fundamentally anti-therapeutic physical plant,

12   but included no specifics, "such as the type of out-of-cell time offered, schedules, and

13   anticipated staff resources necessary to accomplish increased out-of-cell time for 20

14   patients").  Nor does it seem likely that Defendants could deliver on this hollow promise,

15   given that "CDCR/RJD representatives informed the Special Master's team it would be

16   very challenging to schedule adequate yard time" and existing correctional staff will

17   already be hard-pressed to accommodate the increased job responsibilities the proposed

18   unit would require, even without accounting for the promised enhanced programming.  *See*

19   Third Re-Audit at 34-35.  As CDCR's Statewide Chief Psychiatrist has explained at

20   length, lack of adequate correctional staff presents a severe impediment to mental health

21   treatment.  *See* Redacted CDCR Mental Health System Report, Dr. Michael Golding, Oct.

22   31, 2018, ECF No. 5988-1 at 67-70, 77, 80, 126, 145 (detailing multiple examples of

23   limitations on custodial staff resources presenting an impediment to providing timely and

24   adequate mental health care to class members, including those in crisis beds).  That

25   Defendants do not even have a plan for assuring sufficient staff to provide adequate

26   treatment and programming alone provides a sufficient basis for the Special Master's

27   recommendation that this Court reject the proposal.

28         Indeed, even if Defendants do offer suicidal class member in this segregation unit

7

[3324085.6]

1    additional out-of-cell time, that time will itself be spent in extraordinarily harsh and

2    punitive conditions, further underscoring the unsuitability of the unit.  Defendants confirm

3    that they will only provide yard access to crisis bed patients in "small management

4    yards"—that is, large cages—regardless of those patient's individual security levels or

5    needs.  *See* Third Re-Audit at 34; Defs' Objections. at 5-6; Ponciano Decl. ¶ 11.  Similarly,

6    Defendants plan to fill the dayroom floor with cages where suicidal prisoners will spend

7    their out-of-cell time, adding to the inherently punitive nature of this proposed unlicensed

8    unit.  *See* Third Re-Audit at 33 (noting plan to install therapeutic modules on dayroom

9    floor).  Defendants' vague plan to have class members in mental health crisis escape their

10   anti-therapeutic segregation cells by spending time in indoor and outdoor cages

11   exacerbates the physical plant problems and compounds wholly unacceptable risk of

12   serious harm to class members.  Nor do Defendants provide any response at all to

13   Mr. Hayes's finding that CDCR has failed to present any plan to address "the anticipated

14   increase in correctional officer responsibilities for escorting patients in and out of the

15   proposed MHCB unit," including to the yard cages but also to IDTT meetings and medical

16   appointments.  Third Re-Audit at 34.

17        Finally, Defendants do not controvert Mr. Hayes's finding that there is no plan to

18   install fencing or netting on the second tier railing "to eliminate the possibility of a suicidal

19   patient jumping from the second tier in a suicide attempt."  Third Re-Audit at 35.  This is

20   not a hypothetical concern:  Just last year, a class member killed himself by jumping from

21   an upper tier of a CDCR housing unit.  *See* Declaration of Jenny S. Yelin in Support of

22   Plaintiffs' Response to Defendants' Objections to the Recommendations of the Special

23   Master's Report on his Expert's Third Re-Audit and Update of Suicide Prevention

24   Practices in the Prisons of CDCR ("Yelin Decl."), filed herewith, at ¶ 6 (in 2017 a CCCMS

25   class member committed suicide by jumping from the third or fourth tier of a prison

26   housing unit).  Yet CDCR has no plan whatsoever to mitigate this concern.

27        All of the concerns articulated in the Third Re-Audit and adopted by the Special

28   Master after extensive consideration of Defendants' proposal are factual findings to which

8

[3324085.6]

1  the Court must give significant deference.  *See* Order of Reference at 8.  None of the

2  findings are clearly erroneous, and Defendants' flimsy "evidence" most certainly do not

3  lead to a "definite and firm conviction that a mistake has been committed."  *Easley v.*

4  *Cromartie*, 532 U.S. 234, 242 (2001).  The Special Master's recommendation that the

5  Court reject Defendants' proposal should be adopted, because Defendants have not offered

6  nearly enough evidence to establish that their proposed efforts to remedy Mr. Hayes's

7  serious concerns will actually create a safe, therapeutic environment appropriate for

8  treating patients experiencing mental health crises.

9      **B.    The Unsafe and Counter-Therapeutic Unit at RJD Must Also Be**
              **Considered in the Context of CDCR's Current Systemwide Suicide-**
10             **Prevention Failures.**

11        Moreover, the Special Master's concerns about the proposed space must be viewed

12  against the backdrop of CDCR's inadequate compliance with suicide prevention measures

13  systemwide.  Mr. Hayes's Third Re-Audit concluded that "certain problematic practices

14  continued to fester," including "little improvement with safety planning and local SPRFIT

15  practices," "[l]ingering problems regarding suicide-resistant MHCBs necessitat[ing]

16  involvement by the court," and "a new and systemic deficiency[:]...the failure of nursing

17  staff to adequately observe suicidal patients in MHCBs at required 15-minute intervals in

18  most of the audited facilities."  Third Re-Audit at 4.  The Special Master's Report on the

19  Third Re-Audit similarly notes CDCR's systemic issues with suicide prevention, and

20  specifically rejects "defendants' suggestion that they are ready to assume self-monitoring

21  of suicide prevention practices as incredibly premature given the continued findings of

22  problematic suicide prevention practices over the course of Mr. Hayes's audits, elevated

23  suicide rates within CDCR prisons, and, perhaps most notably, the fact that the CQIT is

24  still in the process of being tested and is nowhere near finalization, despite defendants'

25  characterization to the contrary."  SM Report at 6.  The Report finds that "implementation

26  [of Mr. Hayes's recommendations] remains incomplete and successive audits continue to

27  find deficiencies as a result."  *Id.* at 9.  Notably, Defendants have not objected to any of

28  those findings or conclusions by Mr. Hayes and the Special Master, effectively conceding

[3324085.6]

1    the points.  *See* Defs' Objections.

2         Nor do the findings and recommendations of Mr. Hayes and the Special Master

3    stand in isolation.  An August 2017 report from the California State Auditor provides a

4    similarly grim assessment of CDCR's suicide prevention efforts, concluding that CDCR

5    has "failed to provide the leadership and oversight necessary to ensure that its prisons

6    follow its policies related to inmate suicide prevention and response," despite "know[ing]

7    about many of the issues related to suicide prevention and response policies and practices

8    … for a number of years."  *See* Yelin Decl. ¶ 7 and Ex. B at 1 ("California Department of

9    Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and Respond to

10   Inmate Suicides, Report 2016-131," California State Auditor).  The State Auditor

11   examined four prisons in CDCR, including RJD, and concluded all four displayed

12   "significant weaknesses in compliance with suicide prevention and response policies,"

13   including issues with risk evaluations, inadequate treatment planning, and failures to

14   monitor properly individuals at risk of committing suicide.  *Id.*

15        Most concerning, CDCR's suicide rate per 100,000 inmates was just shy of 25 as of

16   the date Defendants filed their objections, November 15, 2018, the highest rate in CDCR

17   since the height of overcrowding in 2006.  Yelin Decl. ¶ 2; Report on Suicides Completed

18   in the California Department of Corrections and Rehabilitation, January 1, 2014 –

19   December 31, 2014, March 29, 2016, ECF No. 5428 at 3 (suicide rate in 2006 was 25.1).

20   RJD *alone* has had four suicides so far this year, making its suicide rate per 100,000

21   inmates an astonishingly high 117.3 – utterly appalling for a single prison.  Yelin Decl.

22   ¶ 4.  In fact, one of the four 2018 RJD suicides occurred in segregated housing, in the exact

23   building (B7) in which Defendants propose to house acutely mentally-ill patients needing

24   crisis care, just twenty-seven hours after the individual arrived in the unit.  *Id.,* ¶ 5.  That

25   death underlines the inherent dangerousness of that setting, underscoring the conclusion

26   that Defendants' proposal—singularly focused on opening unlicensed crisis beds in a unit

27   where a class member recently killed himself, at a prison with a suicide rate almost 5 times

28   higher than even CDCR's staggeringly high suicide rate—unquestionably presents a

10

[3324085.6]

substantially risk of serious harm.  *Farmer*, 511 U.S. at 842.

**II.    DEFENDANTS HAVE NOT SHOWN WHY THIS SEGREGATION UNIT WAS THEIR ONLY ALTERNATIVE, AND FAILED TO TAKE AVAILABLE STEPS TO AVOID THIS PROBLEM BY BUILDING SUFFICIENT LICENSED CRISIS BEDS**

Since Defendants first proposed the use of this totally unacceptable segregation space at RJD, Plaintiffs have asked repeatedly for information about the alternatives they explored, and their reasons for concluding no other unit could work.  *See* SM Report at Ex. B at 43-50 (Plaintiffs' October 9, 2018 letter); Yelin Decl., Ex. C (88-91 of PDF) (Plaintiffs' August 8, 2018 letter); Yelin Decl., Ex. C (93-96 of PDF) (Plaintiffs' March 16, 2018). Defendants have continually refused or failed to provide any such information, including in their formal response to Mr. Hayes's draft report.  *See* SM Report at Ex. B (Defendants' Response Letter of October 3, 2018).  Now, for the first time, Defendants offer very minimal information about the other alternative spaces in the Southern Region that they apparently "discussed" and rejected.  *See* Ponciano Decl. ¶ 6.  Yet other than providing the names of four institutions they apparently considered and stating in conclusory fashion that not a single unit in any of those prisons presents a feasible alternative to the very clearly unacceptable RJD proposal because of "availability of treatment space, ability to recruit and retain staffing, and the proximity to the patients most in need of crisis care," Defendants have still not provided any actual evidence or even explanation to show what their process was in evaluating these options or why those institutions do not even contain a single unit worthy of consideration to house the temporary unit. *Id.*

Defendants complain that "Mr. Hayes offers no alternative."  Defs' Objections at 6. But of course that is Defendants' job, not Mr. Hayes's.  *See Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014) (State is responsible for proffering alternative remedies that will adequately cure constitutional violations).  Moreover, Defendants, despite all of their complaints about Mr. Hayes's review of the proposed RJD unit, never provided Mr. Hayes with the opportunity to tour or even discuss any possible alternative locations and analyze

11

[3324085.6]

1  them side-by-side with the RJD space.  *See* Ponciano Decl. ¶ 4 (Mr. Hayes toured only the

2  RJD space).

3          Defendants have also never explained why they could not have used an alternative

4  space at RJD—other than the harsh setting of a high-custody administrative segregation

5  building—if it is true that it is easier to recruit staff there than at other Southern Region

6  institutions and it currently "has adequate staff to meet the needs of additional crisis bed

7  patients."  Ponciano Decl. ¶ 15.  Nor have they responded to Plaintiffs' inquiries about

8  whether they considered any institutions in the Central Region that are still geographically

9  close to the Southern Region, and why any such alternatives were rejected.  *See* Yelin

10  Decl., Ex. C (88-91 of PDF) (Plaintiffs' August 8, 2018 letter).

11          If Defendants cannot come up with an acceptable alternative anywhere in the

12  system to address this urgent need, after spending eight months insisting on this single

13  RJD segregation unit despite knowing that Mr. Hayes, the Special Master, and Plaintiffs

14  considered it a non-starter, the responsibility for identifying a viable alternative should be

15  ceded to the *Plata* Receiver.  The Receiver's experience overseeing the Health Care

16  Improvement Facilities Project over many years, and across every prison, renders him

17  more than capable of identifying appropriate space in the system and overseeing

18  appropriate renovations given Defendants' apparent concession that they cannot do so.

19  *See* Yelin Decl., Ex. D at 13, 38 ("An Update to the Future of California Corrections,"

20  January 2016); Notice of Filing of Receiver's Thirty-Ninth Tri-Annual Report, Oct. 1,

21  2018, ECF No. 5935 at 5-8.

22          Importantly, despite Defendants' protestations that they identified "no other viable

23  alternatives" for a temporary unlicensed MHCB unit despite their conclusion that

24  additional crisis beds are required to meet an urgent need for MHCB care in the Southern

25  Region "while CDCR completes construction of 100 additional crisis beds in southern

26  California," Defs' Objections at 2, 6, Defendants could have avoided this crisis altogether

27  in the first place if they had chosen to take steps in their control, as required by the

28  Constitution.  Defendants had the option to expedite construction of the 100 permanent,

12

[3324085.6]

1    licensed MHCBs, but elected not to do so, despite years of bed planning projections

2    informing them of the critical MHCB shortage.  Transcript of Sept. 28, 2017 hearing, ECF

3    No. 5707, at 55, 80-81; Order, Sept. 22, 2017, ECF No. 5689, at 3-4.  Defendants'

4    insistence on pressing ahead for the last eight months with this proposed unlicensed unit

5    over the strong opposition of the Special Master, including Mr. Hayes, and Plaintiffs is

6    therefore particularly galling, as they could have simply invested the proper resources

7    years ago to address the MHCB shortage with adequate, licensed facilities.

8    **III.  DEFENDANTS CANNOT JUSTIFY THEIR DANGEROUS PROPOSAL BY**
9    **PROMISING TO CLOSE THE UNLICENSED MENTAL HEALTH CRISIS**
     **BEDS AT CSP-SACRAMENTO**

10       Defendants attempt to justify their proposal by purporting to identify ways in which

11   the unit in the administrative segregation building in RJD would be superior to the existing

12   "temporary" unlicensed MHCB unit at California State Prison – Sacramento ("SAC").  *See*

13   Defs' Objections at 4.  Their Objections note that the proposal to open the unit at RJD

14   "also transfers funding and staff allocation from" the SAC unit, which would be

15   deactivated.  *Id.*  Defendants patently ignore this Court's order prohibiting them from

16   decommissioning any "currently operating temporary mental health program … unless

17   there is adequate alternative capacity to accommodate future need in that level of care," a

18   burden they make no effort to meet.  Order, June 15, 2012, ECF No. 4199, at 5; *see also*

19   Order, Dec. 9, 2016, ECF No. 5529, at 4 (citing 2012 Order).

20       The long history of the inadequate unlicensed MHCB unit at SAC is, if anything, a

21   cautionary tale against allowing Defendants to open yet another unlicensed unit under the

22   guise that it will be "temporary."  The twenty unlicensed beds at SAC were authorized in

23   2009.  *See* Order, Dec. 11, 2009, ECF No. 3748.  Defendants have promised this Court at

24   least since 2012 that the beds would be decommissioned as soon as there "is adequate

25   capacity to accommodate future need in that level of care."  *See* Defs' Ex Parte Request re

26   Revised Long-Range MH Bed Plan, ECF No. 4196, at Ex. 2, Page 3.  But as described

27   above, Defendants have repeatedly failed to adequately plan for such capacity, and the

28   SAC unlicensed beds remain in use almost a decade later despite "universal agreement

13

[3324085.6]

1   among both parties that the MHOHU should be closed." Third Re-Audit at 35. There is

2   no reason to believe that the experience with Defendants' newest proposed "temporary"

3   beds at RJD will be any different. Instead of replacing one unacceptable unlicensed unit

4   with another, Defendants should either develop an alternative proposal, or, if Defendants

5   continue to maintain that no other unit in the entire system will suffice, this Court should

6   request that the Receiver identify and activate an appropriate temporary unit as part of his

7   ongoing health care facility construction project, subject to the input and monitoring of the

8   Special Master.

9        For all of the reasons discussed more fully above, Defendants have failed to meet

10  their burden to show that the proposed unit is even remotely adequate, as they have

11  presented nothing more than conclusory responses and hypothetical measures to address

12  very grave concerns articulated by the Special Master and his suicide prevention expert

13  about the safety and appropriateness of the unit for serving a critically mentally-ill

14  population. The Court should therefore adopt the Special Master's recommendation that

15  the proposed unit be rejected.

16  **IV.    DEFENDANTS WAIVED THEIR OBJECTION REGARDING A SUICIDE**

17         **AT SAN QUENTIN STATE PRISON**

18        Defendants additionally request that the Third Re-Audit "be clarified with respect

19  to" an issue related to a suicide at San Quentin State Prison. *See* Defs' Objections at 7.

20  Defendants raised no objections to, and had no comments about, this issue in their

21  response to Mr. Hayes's draft report. *See* SM Report at Ex. B (Defendants' Response

22  Letter of October 3, 2018). The Court's Order of Reference to the Special Master makes

23  clear the Court "will entertain no objection to [any compliance report of the special master]

24  unless an identical objection was previously submitted to the special master in the form of

25  a specific written objection ...." Order of Reference at 8. By failing to timely object to

26  this portion of Mr. Hayes's report, Defendants have waived their objection. Moreover,

27  Defendants have not provided any evidence supporting their claim that Mr. Hayes's

28  finding regarding the suicide was clearly erroneous, or even explained with any

[3324085.6]

1  particularity the basis for their request so that Plaintiffs might respond on the merits. *Id.*

2  This objection should be rejected out of hand.

3  **CONCLUSION**

4      Plaintiffs respectfully request that the Court overrule Defendants' Objections to the

5  Recommendations of the Special Master's Report on Mr. Hayes's Third Re-Audit, and

6  adopt the Report and the Third Re-Audit as submitted.

7  **CERTIFICATION**

8      The undersigned counsel for the Plaintiffs certifies that she reviewed the following

9  relevant court orders: Dec. 11, 1995, Docket No. 640; Dec. 11, 2009, ECF No. 3748; June

10 15, 2012, ECF No. 4199; October 2, 2013, ECF No. 4857; Dec. 9, 2016, ECF No. 5529;

11 Sept. 22, 2017, ECF No. 5689.

12

13 DATED:  November 26, 2018          Respectfully submitted,

14                                    ROSEN BIEN GALVAN & GRUNFELD LLP

15                                    By:  */s/ Jenny S. Yelin*

16                                         Jenny S. Yelin

17                                    Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

[3324085.6]