1  DONALD SPECTER – 083925
   STEVEN FAMA – 099641
2  MARGOT MENDELSON – 268583
   PRISON LAW OFFICE
3  1917 Fifth Street
   Berkeley, California  94710-1916
4  Telephone:   (510) 280-2621

5  CLAUDIA CENTER – 158255
   AMERICAN CIVIL LIBERTIES UNION
6  FOUNDATION OF NORTHERN
   CALIFORNIA, INC.
7  39 Drumm Street
   San Francisco, California  94111-4805
8  Telephone:   (415) 621-2493

MICHAEL W. BIEN – 096891
JEFFREY L. BORNSTEIN – 099358
ERNEST GALVAN – 196065
THOMAS NOLAN – 169692
LISA ELLS – 243657
KRISTA STONE-MANISTA – 269083
JENNY S. YELIN – 273601
MICHAEL S. NUNEZ – 280535
JESSICA WINTER – 294237
MARC J. SHINN-KRANTZ – 312968
CARA E. TRAPANI – 313411
ROSEN BIEN
GALVAN & GRUNFELD LLP
101 Mission Street, Sixth Floor
San Francisco, California  94105-1738
Telephone:   (415) 433-6830

9

10  Attorneys for Plaintiffs

11                  UNITED STATES DISTRICT COURT

12                  EASTERN DISTRICT OF CALIFORNIA

13

14  RALPH COLEMAN, et al.,

15          Plaintiffs,

16      v.

17  EDMUND G. BROWN, JR., et al.,

18          Defendants.

19

20

21

Case No. 2:90-CV-00520-KJM-DB

**DECLARATION OF JENNY S. YELIN IN SUPPORT OF PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE RECOMMENDATIONS OF THE SPECIAL MASTER'S REPORT ON HIS EXPERT'S THIRD RE-AUDIT AND UPDATE OF SUICIDE PREVENTION PRACTICES IN THE PRISONS OF THE CDCR**

Judge:   Hon. Kimberly J. Mueller

22

23

24

25

26

27

28

[3325204.2]

I, Jenny S. Yelin, declare:

1.       I am an attorney duly admitted to practice before this Court.  I am an associate in the law firm of Rosen Bien Galvan & Grunfeld LLP, counsel of record for Plaintiffs.  I have personal knowledge of the facts set forth herein, and if called as a witness, I could competently so testify.  I make this Declaration in support of Plaintiffs' Response to Defendants' Objections to the Recommendations of the Special Master's Report on his Expert's Third Re-Audit and Update of Suicide Prevention Practices in the Prisons of the CDCR.

2.       The suicide rate for 2018 as of November 15, 2018, the date Defendants filed their Objections, is projected to be 24.8 deaths per 100,000 inmates.  The last time the suicide rate approached 25 per 100,000 inmates was in 2006, when the rate was 25.1.  *See* Report on Suicides Completed in the California Department of Corrections and Rehabilitation, January 1, 2014 – December 31, 2014 ("2014 Suicide Report"), March 29, 2016, ECF No. 5428 at 3.  Dylan Verner-Crist, a paralegal employed at my firm working under my direction and supervision, calculated the 2018 rate by using the methodology employed by the Special Master's experts in their 2014 Suicide Report.  *Id.* at 1-6.  In the report, the Special Master's experts give the CDCR suicide rates for the years 1999 through 2014, calculated by multiplying the number of suicides for the given year by 100,000 and then dividing this number by the total in-custody population as of June 30 of that same year.  *See id.* at 2.  Following this methodology, Mr. Verner-Crist used the total in-custody population figure reported in CDCR's Monthly Total Population Reports, *available at* https://www.cdcr.ca.gov/Reports_Research/Offender_Information_Services_Branch/Monthly/TPOP1A/TPOP1Ad1806.pdf.  Attached hereto as **Exhibit A** is a true and correct copy of the population report used in these calculations.  The total in-custody population as of June 30, 2018 was 129,417 inmates.

3.       To calculate the number of CDCR suicides per year, Mr. Verner-Crist used CDCR's Suicide Death Notifications, which Defendants regularly provide to Plaintiffs'

1

Counsel.  To obtain the projected suicide rate for 2018, Mr. Verner-Crist first divided the number of suicides by 318, the number of days that had elapsed in 2018 as of November 15, 2018.  He then multiplied the resulting number by 365, to find the projected rate of suicides for 2018.

4.      Mr. Verner-Crist used the same methodology to calculate the suicide rate per 100,000 inmates for Richard J. Donovan State Prison (RJD) for 2018, using the same CDCR Monthly Total Population Report to obtain the population of RJD on June 30, 2018 and the fact that there have been four suicides there since the beginning of 2018.  That rate is 117.3 suicides per 100,000 inmates as of November 15, 2018.

5.      I reviewed Defendants' Final Suicide Report dated October 17, 2018 for a class member I will refer to as Class Member X, who killed himself in July 2018 in the Administrative Segregation Unit in Building B7 at RJD.  The class member, who was CCCMS at the time of his death, committed suicide twenty-seven hours after arriving in the Unit.  Defendants provided Plaintiffs' counsel with this Report on October 17, 2018.

6.      I reviewed Defendants Final Suicide Report dated March 14, 2018 for a class member I will refer to as Class Member Y, who committed suicide in October 2017 by jumping from the third or fourth tier of a housing unit at San Quentin State Prison.   Class Member Y was CCCMS at the time of his death.  Defendants provided Plaintiffs' counsel with this Report on March 14, 2018.

7.      Attached hereto as **Exhibit B** is a true and correct copy of the California State Auditor's August 2017 report, California Department of Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides, Report 2016-131.  The Report is publicly available at https://www.auditor.ca.gov/pdfs/reports/2016-131.pdf.

8.      Attached as **Exhibit C** is a true and correct copy of an August 8, 2018 letter I sent to the Special Master, copying Defendants, regarding the proposed unlicensed MHCB unit at RJD.  That letter includes as its own Exhibit A letter dated March 16, 2018 from another lawyer at my firm, Krista Stone-Manista, to Defendants about the same proposal.

9.      Attached as **Exhibit D** is a true and correct copy of "An Update to the Future of California Corrections" from January 2016, publicly available on CDCR's website at https://www.cdcr.ca.gov/Blueprint-Update-2016/An-Update-to-the-Future-of-California-Corrections-January-2016.pdf.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration is executed at San Francisco, California this 26th day of November, 2018.


_/s/ Jenny S. Yelin_
Jenny S. Yelin

DECL. OF YELIN ISO PLS.' RESPONSE TO DEFS.' OBJECTIONS TO RECOMMENDATIONS OF SPECIAL MASTER'S
REPORT ON EXPERT'S 3D RE-AUDIT & UPDATE OF SUICIDE PREVENTION PRACTICES IN PRISONS OF CDCR

[3325204.2]

# Exhibit A

California Department of Corrections and Rehabilitation
Division of Internal Oversight and Research
Office of Research
July 1, 2018

MONTHLY REPORT OF POPULATION
AS OF MIDNIGHT June 30, 2018

TOTAL CDCR POPULATION

| | FELON/ OTHER #1 | CIVIL ADDICT | TOTAL | CHANGE SINCE 06/30/17 NO. | PCT. | *DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|---|---|
| A. TOTAL IN-CUSTODY/CRPP SUP | 129,417 | | 129,417 | -1,843 | -1.4 | | | |
| I.  IN-STATE | 126,572 | | 126,572 | -276 | -0.2 | | | |
| (MEN, Subtotal) | 120,666 | | 120,666 | -211 | -0.1 | | | |
| (WOMEN, Subtotal) | 5,906 | | 5,906 | -65 | -1.0 | | | |
| 1. INSTITUTIONS/CAMPS | 118,865 | | 118,865 | -243 | -0.2 | 89,763 | 132.4 | 122,205 |
| INSTITUTIONS | 115,263 | | 115,263 | -54 | -0.0 | 85,083 | 135.5 | 117,871 |
| CAMPS(CCC, CIW & SCC) | 3,602 | | 3,602 | -189 | -4.9 | 4,680 | 77.0 | 4,334 |
| 2. IN-STATE CONTRACT BEDS | 6,297 | | 6,297 | -231 | -3.5 | | | |
| CCF PRIVATE | 2,005 | | 2,005 | -55 | -2.6 | | | |
| CCF PUBLIC | 1,777 | | 1,777 | -3 | -0.1 | | | |
| PRISONER MOTHER PGM | 22 | | 22 | +2 | +10.0 | | | |
| CALIFORNIA CITY CF | 2,222 | | 2,222 | -171 | -7.1 | | | |
| FCRF(MCFARLAND) | 271 | | 271 | -4 | -1.4 | | | |
| 3. DSH STATE HOSPITALS | 232 | | 232 | +9 | +4.0 | | | |
| 4. CRPP SUPERVISION | 1,178 | | 1,178 | +189 | +19.1 | | | |
| ACP | 158 | | 158 | -16 | -9.1 | | | |
| CCTRP | 380 | | 380 | +67 | +21.4 | | | |
| MCRP | 611 | | 611 | +135 | +28.3 | | | |
| MEDICAL PAROLE | 29 | | 29 | +3 | +11.5 | | | |
| II. OUT OF STATE(COCF) | 2,845 | | 2,845 | -1,567 | -35.5 | | | |
| ARIZONA | 2,845 | | 2,845 | -295 | -9.3 | | | |
| B. PAROLE | 47,370 | | 47,370 | +2,109 | +4.6 | | | |
| COMMUNITY SUP(Active) | 45,406 | | 45,406 | +2,098 | +4.8 | | | |
| COOP CASES  (Active) #3 | 1,964 | | 1,964 | +11 | +0.5 | | | |
| C. NON-CDC JURISDICTION #4 | 1,011 | | 1,011 | -8 | -0.7 | | | |
| OTHER STATE/FED. INST. | 329 | | 329 | -8 | -2.3 | | | |
| OUT OF STATE PAROLE | 618 | | 618 | +48 | +8.4 | | | |
| OUT OF STATE PAL | 14 | | 14 | -4 | -22.2 | | | |
| CYA-W&IC 1731.5(c) | | | | | | | | |
| INSTITUTIONS #5 | 50 | | 50 | -44 | -46.8 | | | |
| D. OTHER POPULATIONS #6 | 5,779 | | 5,779 | +458 | +8.6 | | | |
| INMATES | | | | | | | | |
| OUT-TO-COURT, etc. | 1,273 | | 1,273 | +177 | +16.1 | | | |
| ESCAPED | 197 | | 197 | +1 | +0.5 | | | |
| PAROLEES (PAL/RAL) | 4,309 | | 4,309 | +280 | +6.9 | | | |
| TOTAL CDCR POPULATION | 183,577 | | 183,577 | +716 | +0.3 | | | |

CHANGE FROM LAST MONTH
| | | |
|---|---|---|
| A. TOTAL IN-CUSTODY | +98 | +98 |
| (MEN, Subtotal) | +58 | +58 |
| (WOMEN, Subtotal) | +40 | +40 |
| B. PAROLE | +132 | +132 |
| D. PAROLEES (PAL/RAL) | +56 | +56 |

This report contains the latest available reliable population figures from SOMS. They have been carefully audited, but are preliminary, and therefore subject to revision.

*CDCR has added 1,584 beds and corresponding administrative and health care support facilities at Mule Creek State Prison—792 beds on February 22, 2016 and an additional 792 beds on March 28, 2016. On December 12, 2016 an additional 792 beds were added to the RJ Donovan Correctional Facility. The parties in the Three-Judge Court proceeding are currently engaged in the court-ordered meet-and-confer process to reach an agreement on how such capacity should be counted.

Report #: SOMS-TPOP-1.

MONTHLY INSTITUTION/CAMPS POPULATION DETAIL                          MIDNIGHT June 30, 2018

| INSTITUTIONS/CAMPS | FELON/ OTHER | CIVIL ADDICT | TOTAL | DESIGN CAPACITY | PERCENT OCCUPIED | STAFFED CAPACITY |
|---|---|---|---|---|---|---|
| **MALE** | | | | | | |
| ASP  (Avenal SP) | 4,326 | | 4,326 | 2,920 | 148.2 | 4,370 |
| CAL  (Calipatria SP) | 3,618 | | 3,618 | 2,308 | 156.8 | 3,333 |
| CCC  (CA Correctional Center) | 4,711 | | 4,711 | 3,883 | 121.3 | 4,667 |
| CCI  (CA Correctional Institution) | 3,331 | | 3,331 | 2,783 | 119.7 | 4,120 |
| CEN  (Centinela SP) | 3,379 | | 3,379 | 2,308 | 146.4 | 3,333 |
| CHCF (CA Health Care Fac - Stockton) | 2,683 | | 2,683 | 2,951 | 90.9 | 2,951 |
| CIM  (CA Institution for Men) | 3,633 | | 3,633 | 2,976 | 122.1 | 4,186 |
| CMC  (CA Men's Colony) | 3,911 | | 3,911 | 3,838 | 101.9 | 4,379 |
| CMF  (CA Medical Fac) | 2,448 | | 2,448 | 2,361 | 103.7 | 2,789 |
| COR  (CA SP, Corcoran) | 3,199 | | 3,199 | 3,116 | 102.7 | 4,270 |
| CRC  (CA Rehabilitation Center) | 2,420 | | 2,420 | 2,491 | 97.1 | 3,210 |
| CTF  (Correctional Training Fac) | 5,310 | | 5,310 | 3,312 | 160.3 | 4,887 |
| CVSP (Chuckawalla Valley SP) | 2,946 | | 2,946 | 1,738 | 169.5 | 2,478 |
| DVI  (Deuel Vocational Institution) | 2,206 | | 2,206 | 1,681 | 131.2 | 2,353 |
| FOL  (Folsom SP) | 2,301 | | 2,301 | 2,066 | 111.4 | 2,895 |
| HDSP (High Desert SP) | 3,420 | | 3,420 | 2,324 | 147.2 | 3,361 |
| ISP  (Ironwood SP) | 2,904 | | 2,904 | 2,200 | 132.0 | 3,200 |
| KVSP (Kern Valley SP) | 3,526 | | 3,526 | 2,448 | 144.0 | 3,522 |
| LAC  (CA SP, Los Angeles County) | 3,122 | | 3,122 | 2,300 | 135.7 | 3,300 |
| MCSP (Mule Creek SP) | 4,301 | | 4,301 | 3,284 | 131.0 | 4,009 |
| NKSP (North Kern SP) | 4,310 | | 4,310 | 2,694 | 160.0 | 3,911 |
| PBSP (Pelican Bay SP) | 2,641 | | 2,641 | 2,380 | 111.0 | 3,250 |
| PVSP (Pleasant Valley SP) | 2,966 | | 2,966 | 2,308 | 128.5 | 3,333 |
| RJD  (RJ Donovan Correctional Fac) | 3,915 | | 3,915 | 2,992 | 130.8 | 3,942 |
| SAC  (CA SP, Sacramento) | 2,155 | | 2,155 | 1,828 | 117.9 | 2,449 |
| SATF (CA Substance Abuse Treat Fac) | 5,926 | | 5,926 | 3,424 | 173.1 | 5,111 |
| SCC  (Sierra Conservation Center) | 4,252 | | 4,252 | 3,936 | 108.0 | 4,660 |
| SOL  (CA SP, Solano) | 3,993 | | 3,993 | 2,610 | 153.0 | 3,882 |
| SQ   (San Quentin SP) | 4,134 | | 4,134 | 3,082 | 134.1 | 3,988 |
| SVSP (Salinas Valley SP) | 3,190 | | 3,190 | 2,452 | 130.1 | 3,409 |
| VSP  (Valley SP) | 3,487 | | 3,487 | 1,980 | 176.1 | 2,954 |
| WSP  (Wasco SP) | 5,030 | | 5,030 | 2,984 | 168.6 | 4,351 |
| **MALE TOTAL:** | 113,694 | | 113,694 | 85,958 | 132.3 | 116,853 |
| **FEMALE** | | | | | | |
| CCWF (Central CA Women's Fac) | 2,911 | | 2,911 | 2,004 | 145.3 | 2,966 |
| CIW  (CA Institution for Women) | 1,828 | | 1,828 | 1,398 | 130.8 | 1,856 |
| FOL  (Folsom SP) | 432 | | 432 | 403 | 107.2 | 530 |
| **FEMALE TOTAL:** | 5,171 | | 5,171 | 3,805 | 135.9 | 5,352 |
| **INSTITUTIONS/CAMPS TOTAL:** | 118,865 | | 118,865 | 89,763 | 132.4 | 122,205 |

California Department of Corrections and Rehabilitation
Division of Internal Oversight and Research
Office of Research
July 1, 2018

MONTHLY REPORT OF POPULATION
NOTES
AS OF MIDNIGHT June 30, 2018

#1  Felon/Other counts are safekeepers, federal cases and inmates from
    other states, felons, county diagnostic cases and Division of
    Juvenile Justice youths.

#3  Cooperative Cases are parolees from other states being supervised in
    California.

#4  Non-CDC Jurisdiction are California cases being confined in or paroled
    to other states or jurisdictions.

#5  Welfare and Institution Code (W&IC) 1731.5(c) covers persons under the
    age of 21 who were committed to CDCR, had their sentence amended,
    and were incarcerated at the Division of Juvenile Justice for housing
    and program participation.

#6  Other Population includes inmates temporarily out-to-court, inmates in
    hospitals, escapees, and parole and outpatient absconders.

# Exhibit B

*California*
State Auditor

August 2017














# California Department of Corrections and Rehabilitation

It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides

Report 2016-131



COMMITMENT
INTEGRITY
LEADERSHIP



**CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814



**916.445.0255** | TTY **916.445.0033**



For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline**:
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact* Margarita Fernández, Chief of Public Affairs, *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternate format reports available upon request | Permission is granted to reproduce reports



**Elaine M. Howle** State Auditor
**Doug Cordiner** Chief Deputy

August 17, 2017                                                                                          2016-131

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California  95814

Dear Governor and Legislative Leaders:

As requested by the Joint Legislative Audit Committee, the California State Auditor presents this audit report concerning the California Department of Corrections and Rehabilitation's (Corrections) policies, procedures, and practices for suicide prevention and reduction, with a particular emphasis on the recently elevated suicide rate at the California Institution for Women. Although female inmates account for about 4 percent of Corrections' total inmate population, they accounted for 11 percent of inmate suicides from 2014 through 2016. This report concludes that Corrections should provide increased oversight and leadership to ensure that prisons follow its policies related to suicide prevention and response.

We identified significant weaknesses in prisons' suicide prevention and response practices at the four prisons we reviewed. Specifically, we found that the prisons failed to complete some required evaluations to assess inmates' risk for suicide and those that the prisons did complete were often inadequate. The inadequacies included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent information about inmates to determine risk. Also, the prisons we reviewed did not properly monitor inmates who were at risk of committing suicide. For example, we found that staff were not staggering behavior checks or conducting checks in the required 15-minute intervals. Finally, we found that some staff members at the prisons we visited had not completed required trainings related to suicide prevention and response. These conditions may have contributed to elevated suicide and attempted suicide rates at California prisons.

Corrections also lacks assurance that prisons are implementing its policies to address serious issues. For many years, a court-appointed special master, working with Corrections to address inmate mental health care, identified many of the same issues we discuss in this report. In 2013 Corrections began developing an audit process to review prisons' compliance with its policies and procedures, including those it issued in response to the special master's reports; however, that process is still in development. In addition, Corrections could provide additional leadership to prisons regarding the communication of best practices related to suicide prevention efforts. Finally, Corrections' policies require it to complete a thorough review of a prison's compliance with policies and procedures following an inmate's suicide, but Corrections does not complete such reviews for suicide attempts. This hinders Corrections' ability to identify problems with a prison's compliance with crucial policies and procedures until after an inmate dies.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 13 of 158

## Selected Abbreviations Used in This Report

| | |
|---|---|
| CCWF | Central California Women's Facility |
| CIW | California Institution for Women |
| Corrections | California Department of Corrections and Rehabilitation |
| health care division | Corrections' Division of Health Care Services |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison, Sacramento |
| VSPW | Valley State Prison for Women |

# Contents

Summary   1

Introduction   7

Chapter 1
Prisons Have Not Followed Corrections' Policies When
Responding to Inmates Who Have Attempted or Are at
Risk of Attempting Suicide   17

Recommendations   37

Chapter 2
A Number of Factors Have Likely Contributed to High Rates
of Inmate Suicides and Suicide Attempts at CIW   39

Recommendations   49

Chapter 3
To Reduce Inmate Suicides and Attempts, Corrections Must
Strengthen Its Oversight and Demonstrate Greater Leadership   51

Recommendations   63

Appendix A
Rates of Inmate Suicides and Suicide Attempts in State Prisons
From 2012 Through 2016   67

Appendix B
Scope and Methodology   71

Response to the Audit
California Department of Corrections and Rehabilitation   75

Blank page inserted for reproduction purposes only.

# Summary

## Results in Brief

Despite the fact that the rates of inmate suicide in California's prisons has been higher on average than those of all U.S. state prisons for several years, the California Department of Corrections and Rehabilitation (Corrections) has failed to provide the leadership and oversight necessary to ensure that its prisons follow its policies related to inmate suicide prevention and response. Corrections is responsible for providing mental health services to its inmates who are unable to function within the usual correctional environment because of mental illness. However, from 2005 through 2013, the average suicide rate in Corrections' prisons was 22 per 100,000 inmates—substantially higher than the average rate of 15.66 per 100,000 in U.S. state prisons during the same period. Further, in recent years, the rates of female inmates who committed suicide while in Corrections' prisons have soared: from 2014 through 2016, female inmates made up only about 4 percent of Corrections' total inmate population, yet they accounted for about 11 percent of its inmate suicides. These statistics, combined with the significant deficiencies we identified when we reviewed suicide prevention and response practices at four prisons, raise questions regarding Corrections' leadership on this critical issue.

When we reviewed the California Institution for Women (CIW); California State Prison, Sacramento (SAC); Central California Women's Facility (CCWF); and Richard J. Donovan Correctional Facility (RJD), one area in which we identified significant weaknesses was the four prisons' evaluations of inmates' suicide risk. Specifically, for various reasons, including when inmates attempt suicide, express suicidal thoughts, or engage in self-harm, Corrections' policy requires that prison mental health staff (mental health staff) complete suicide risk evaluations (risk evaluations) to assess an inmate's risk for suicide. These risk evaluations are critical to successful suicide prevention because they help mental health staff identify inmates who are likely to attempt suicide and the treatments needed to prevent them from doing so. Nonetheless, over the past several years, court-appointed mental health experts have repeatedly notified Corrections of problems related to its risk evaluations. Further, when we examined risk evaluations for the 36 of 40 inmates we reviewed who required them, we found that the prisons failed to complete at least one required risk evaluation for 10 of the inmates and completed inadequate risk evaluations for 26 of the inmates. The inadequacies we noted included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent or incomplete information about the inmates to determine risk.

*Audit Highlights . . .*

*Our audit of Corrections' policies and practices for inmate suicide prevention and response highlight the following:*

» *The average suicide rate in Corrections' prisons was substantially higher than the average of U.S. state prisons.*

» *The rates of female inmates who committed suicide while in Corrections' prisons have soared in recent years.*

» *We found significant weaknesses in compliance with suicide prevention and response policies when we reviewed 40 files on inmates who committed or attempted suicide at four prisons.*

 • *Prisons failed to complete or completed inadequate risk evaluations for many of those inmates who required them.*

 • *Prisons did not complete or created inadequate treatment plans for some inmates—plans did not always specify medication dosage and frequency, treatment methods, provider information, or follow-up upon discharge.*

 • *Prisons did not properly monitor inmates who were at risk of committing suicide.*

» *Although Corrections has known about many of the issues related to suicide prevention and response policies and practices that we found for a number of years, it has not fully implemented processes to address the issues that have been raised.*

» *Corrections could take a more proactive leadership role in identifying programs or best practices and reviewing a prison's practices following an inmate's suicide attempt.*

In 2013 Corrections established a risk evaluation training, as well as a mentoring program to assess, every two years, whether mental health staff adequately completed risk evaluations and to provide training as needed. Corrections enhanced the mentoring program in 2016 by requiring prisons to audit mental health staff's risk evaluations twice each year and to have these staff undergo mentoring if they failed the audit; however, the results of our review demonstrate that this program has not resolved the problems. The failure may be due in part to Corrections allowing mental health staff to improperly complete significant sections of the risk evaluations and still pass Corrections' audit. According to Corrections' clinical support chief, Corrections does not expect perfection from its mental health staff. She also stated that despite their training, some mental health staff still do not know how to complete risk evaluations, and that others may rush when completing them because of their heavy workloads. Although Corrections has taken some steps to address these issues, the fact that the problems with the risk evaluations have continued shows that Corrections must increase its oversight.

Similarly, the prisons we reviewed failed to complete required treatment plans for some inmates and created inadequate treatment plans for others. Treatment plans are crucial to suicide prevention: based on the inmates' needs, they set goals for the inmates' treatment and determine the specific treatment methods mental health staff will use. State regulations and Corrections' policy require that prisons complete a plan for initial treatment (initial treatment plan) within 24 hours of an inmate's admission to a mental health crisis bed (crisis bed) and a more comprehensive plan within 72 hours of admission (72-hour treatment plan). Initial treatment plans are important because they prescribe treatment for the first few days of an inmate's crisis-bed stay. Nonetheless, when we reviewed the files of 26 inmates who required them, we found that CIW, CCWF, and RJD did not complete initial treatment plans for some inmates. Further, 25 inmates also required 72-hour treatment plans, but one prison did not complete such plans for two inmates. Finally, all 23 of the remaining 72-hour treatment plans we reviewed failed to meet the requirements outlined in state regulations. The most common problems we identified were that the plans did not specify medication dosage and frequency, treatment methods, the providers responsible for the treatments, or the follow-up treatments for the inmates who were discharged.

The four prisons also did not properly monitor inmates who were at risk of committing suicide. Corrections' policies require prisons to conduct staggered behavior checks at intervals not to exceed every 15 minutes of inmates who are at high risk of self-injury but not in immediate danger. However, when we reviewed records for 25 such inmates, we found that the prisons exceeded 15-minute

intervals for checks on 17 inmates, did not stagger checks for 19 inmates, and appeared to have prefilled or preprinted the forms documenting checks for eight inmates. Corrections said that a new electronic health record system that it is currently implementing systemwide will reduce some of these issues, as will a planned audit process that will include automated monitoring of these checks. Nevertheless, we still found problems with staff not staggering checks or conducting checks that exceeded intervals of 15 minutes at two prisons that implemented the new system, bringing into question whether it will fully resolve the problems we identified.

Taken as a whole, the types of compliance issues we identified at the four prisons we reviewed may have contributed to Corrections' continuing high suicide rates relative to those of prison systems in other states. In addition, a number of specific factors may have contributed to elevated suicide and suicide attempt rates among Corrections' female inmates. As we mention previously, the rate of suicide among female inmates has increased dramatically since 2014. This increase is especially pronounced at CIW, where six of the seven suicides by female inmates from 2014 through 2016 occurred. Officials at Corrections and CIW identified a number of reasons why the suicide rate at CIW may have increased during this period, including domestic violence in interpersonal relationships, drug involvement, and drug trafficking. Officials at CIW further cited a change in prison culture resulting from the conversion of Valley State Prison for Women to a men's institution and the subsequent transfer of high-security-level inmates to CIW.

In addition, we found that some staff members at CIW and the other prisons we visited had not completed required trainings related to suicide prevention and response. Corrections' policies require prison staff to participate in specific trainings on issues such as preventing suicide, assessing inmates' suicide risk, and developing treatment plans. However, when we reviewed records for 20 staff members at CIW, we found that the prison could not provide evidence that the staff members attended all required trainings. For example, the prison could not demonstrate that four of the 20 staff members attended annual required suicide prevention training in 2016. Further, Corrections' officials reported that not all staff members at the other three prisons received required trainings in 2016. Corrections' clinical support chief was unable to explain why these staff members had not participated in trainings as required. Instead, she stated that Corrections relies on the prisons' in-service training units to address clinical training noncompliance issues.

The ongoing nature of many of the problems we identified at the four prisons we reviewed is particularly troubling. A court-appointed special master has overseen many aspects of Corrections' provision

of mental health care since 1995. Since at least 1999, the special master has identified many of the same problems we found in our audit. In January 2015, the special master filed a report that was an audit of suicide prevention practices in each of the 35 prisons, which contained 32 recommendations. Corrections responded to the majority of these recommendations through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions. However, Corrections has not yet fully ensured prisons' compliance with changes resulting from the recommendations. According to Corrections, it began developing an audit process in 2013 to audit prisons' compliance with policies and procedures, but it has not yet completed that process nearly five years later, explaining that it continues to work on finalizing it with the special master. Absent such monitoring, Corrections lacks assurance that the prisons are addressing the serious problems the special master has identified.

Further, Corrections could take a more proactive leadership role in identifying programs and best practices that may help in preventing inmate suicide. For example, we identified best practices at one of the prisons we visited that we believe could benefit certain inmates at other prisons. Although Corrections recently conducted a suicide prevention summit with the chiefs of mental health and other prison leadership, at which it discussed best practices related to prisons' suicide prevention efforts, its documentation and dissemination of innovative programs and best practices related to suicide prevention has generally been limited. Similarly, Corrections has not conducted thorough reviews of the circumstances surrounding suicide attempts. Pursuant to its policies, the death of an inmate by suicide initiates an intensive review process in which Corrections identifies any problems with the prison's compliance with policies and procedures. It then issues a report containing recommendations to address those problems. However, Corrections requires no such review for suicide attempts. Corrections' clinical support chief explained that Corrections plans to implement a process for each prison to review a selection of its incidents of inmate self-harm; however, we question whether such reviews will be sufficiently impartial and critical. Without a thorough and unbiased review of the factors contributing to inmate suicide attempts, Corrections is hindered in its ability to identify potential problems with a prison's suicide prevention and response practices until after an inmate dies.

**Selected Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress toward meeting its goals related to the completion of suicide risk evaluations in a sufficient manner.

- Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

- The status of its efforts to ensure that all staff receive training related to suicide prevention and response.

- Its progress in implementing the recommendations made by the special master regarding inmate suicides and attempts. Corrections should also include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

- Its progress in identifying and implementing mental health programs at the prisons that may ameliorate risk factors associated with suicide.

*Corrections*

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

To ensure that prison staff conduct required checks of inmates on suicide precaution in a timely manner, Corrections should implement its automated process to monitor these checks in its electronic health record system by October 2017.

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should continue to explore programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison to identify for review at least one suicide attempt per year that occurred at that prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

## Agency Comments

Corrections stated it would address the specific recommendations in a corrective action plan within the timelines outlined in the report. We look forward to Corrections' 60-day response to our recommendations.

# Introduction

**Background**

The California Department of Corrections and Rehabilitation (Corrections) is responsible for protecting the public by safely and securely supervising adult and juvenile offenders, providing effective rehabilitation and treatment, and integrating offenders successfully into the community. It operates two adult women's prisons and 33 adult men's prisons across the State.[1] According to a report Corrections issued in 2017, 123,540 male inmates and 5,876 female inmates were incarcerated within its facilities as of December 31, 2016. Figure 1 on the following page shows the locations of Corrections' prisons and highlights the four prisons we selected for review during the course of our audit work.

Corrections is responsible for the provision of mental health care to all of its inmates, including receiving, evaluating, housing, treating, and referring those inmates who are unable to appropriately function within the constraints of the usual correctional environment because of mental illnesses. Its Division of Health Care Services (health care division) provides mental health services through its Mental Health Services Delivery System (mental health system), the mission of which is "to provide inmates with an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both [the inmates and prisons]." Corrections employs numerous individuals, such as psychiatrists, psychologists, social workers, and nurses, to provide mental health services to inmates (mental health staff). Prison staff may refer inmates to the prison's mental health program, or inmates may submit requests for services to the prison's mental health staff for their approval.

Despite the mental health services that Corrections provides, the rate at which its inmates commit suicide has generally been higher than the rates in most other states. Table 1 on page 9 shows the number of attempted suicides and suicides from 2012 through 2016 at the four prisons we reviewed, and Appendix A presents these data for all the State's prisons. According to a 2016 report by a mental health expert appointed by a U.S. district court, the average suicide rate in Corrections was 22 per 100,000 inmates from 2005 through 2013, significantly higher than the average rate of 15.66 per 100,000 inmates in U.S. state prisons during the same period. Although Corrections' 2014 inmate suicide rate of 16.97 per 100,000 inmates was lower than the 2014 rate of 20 per 100,000 inmates for all U.S. state prisons, Corrections' inmate suicide rates have been higher on average than those of U.S. state prisons since 1999.

---

[1] Corrections houses women within other facilities, including some medical facilities and a small facility at Folsom State Prison. In addition, Valley State Prison housed women before Corrections converted it to a men's facility in 2013.

**Figure 1**
**Map of Adult Correctional Institutions and the Four Prisons We Visited**



Source: Corrections.

The suicide rate of Corrections' male inmates remained relatively static from 2012 through 2016; however, the suicide rate of its female inmates increased. In 2012 female inmates accounted for about 5 percent of Corrections' inmate population and for 4 percent of its suicides. However, although female inmates made up about 4 percent of Corrections' inmate population from 2014 through 2016, they accounted for about 11 percent of the suicides. Almost all of the suicides during this period occurred at the California Institution for Women (CIW). In fact, concern about CIW's high suicide rate was the impetus for this audit.

**Table 1**
**Suicides and Suicide Attempts at the Four Prisons We Visited, From 2012 Through 2016**

|  | WOMEN'S PRISONS | | MEN'S PRISONS | |
|---|---|---|---|---|
|  | CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF) | CIW | RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD) | CALIFORNIA STATE PRISON, SACRAMENTO (SAC) |
| **2012** | | | | |
| Population* | 2,931 | 1,642 | 3,539 | 2,698 |
| Suicides | 0 | 1 | 0 | 1 |
| Attempts | 5 | 13 | 28 | 22 |
| **2013** | | | | |
| Population* | 3,531 | 2,082 | 3,364 | 2,246 |
| Suicides† | 0 | 1 | 3 | 1 |
| Attempts | 8 | 15 | 33 | 32 |
| **2014** | | | | |
| Population* | 3,648 | 2,005 | 3,070 | 2,218 |
| Suicides | 0 | 2 | 1 | 2 |
| Attempts | 6 | 15 | 22 | 11 |
| **2015** | | | | |
| Population* | 3,002 | 1,882 | 3,096 | 2,237 |
| Suicides† | 0 | 2 | 2 | 3 |
| Attempts | 11 | 34 | 51 | 12 |
| **2016** | | | | |
| Population* | 2,865 | 1,863 | 3,094 | 2,327 |
| Suicides† | 1 | 2 | 0 | 3 |
| Attempts | 25 | 24 | 59 | 8 |
| **Totals** | | | | |
| **Population*** | 3,195 | 1,895 | 3,233 | 2,345 |
| **Suicides†** | 1 | 8 | 6 | 10 |
| **Attempts** | 55 | 101 | 193 | 85 |

Sources: California State Auditor's analysis of Corrections' COMPSTAT metrics from 2012 through 2016, and the average daily population for each prison as reported by Corrections.

\* *Population* is based on Corrections' average daily population. The total represents the average of the five years' populations.

† The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC; however, we caution that these numbers may still not be accurate.

**Court-Ordered Oversight of Corrections' Mental Health Services**

As Figure 2 shows, federal courts have monitored Corrections'
delivery of mental health services to its inmates for over
two decades, as a result of a decision on a lawsuit that began in
1990—*Coleman v. Brown* (*Coleman*).[2] This federal class action
lawsuit alleged that Corrections failed to provide constitutionally
adequate mental health care to mentally ill inmates. The court
identified that Corrections had failed to provide timely access
to necessary care, which exacerbated inmates' suffering and
illnesses. In addition the court found that Corrections had an
inadequate screening system for mental illnesses, deficient
medical recordkeeping, improper administration of medication,
and insufficient staffing. In December 1995, the court in *Coleman*
appointed a special master to oversee and work with Corrections
to address the constitutional violations, monitor implementation of
court-ordered remedial plans, and submit reports on Corrections'
progress in implementing improvements. Over the next decade,
the special master submitted 15 reports to the court, which noted
that although Corrections had made some progress, it still had not
met its constitutional obligation to provide inmates with adequate
mental health care during that time. Further, the special master's
fifteenth report in January 2006 indicated a reversal in Corrections'
progress. Specifically, this report noted systemwide increases in
staffing vacancy rates and rates of inmate suicide.

In April 2001, another class action lawsuit, *Plata v. Brown* (*Plata*),
alleged constitutional violations in Corrections' delivery of medical
care to inmates that resulted in unnecessary pain, injury, and death.[3]
These violations included delays in or failure to provide access to
medical care, untimely responses to medical emergencies, and the
interference of custodial staff with the provision of medical care.
After the plaintiffs filed the lawsuit, they and Corrections agreed
that Corrections would implement certain policies and procedures
to improve its delivery of medical care, which the court entered as
an order in 2002. However, in 2005 the federal court determined
that Corrections had yet to ensure that its medical system met
constitutional standards. As a result, the court appointed a receiver
in February 2006 to provide leadership and executive management
of Corrections' medical health care delivery system. This
receivership is still in place.

---

[2]    When this case was filed, it was called *Coleman v. Wilson*.

[3]    When this case was filed, it was called *Plata v. Davis*.

**Figure 2**
**Timeline of Court-Ordered Oversight of Corrections**



**April 1990**
*Coleman*, a class action lawsuit, is filed, alleging constitutional violations due to lack of adequate mental health care.

**December 1995**
Court ordered a special master to develop a plan to address constitutional violations and monitor Corrections' implementation of the plan.

**September 1995**
Court rules in favor of plaintiff, stating Corrections' delivery of mental health care violated the Constitution.

**April 2001**
*Plata*, a class action lawsuit, is filed, alleging constitutional violations in Corrections' delivery of medical care to its inmates.

**January 2006**
Special master files reports, noting a reversal in Corrections' progress of its remedial efforts.

**February 2006**
Court appoints receiver to provide leadership and executive management of Corrections' medical health care delivery system.

**August 2009**
Court finds that Corrections' prison population reached a high of more than 170,000 inmates in October 2006. Court orders Corrections to reduce its prison population to 137.5 percent of capacity.

**January 2015**
Suicide expert files his completed audit on suicide prevention practices at Corrections' prisons, which results in 32 recommendations.

**November 2013**
Suicide expert begins his audit on Corrections' prisons.

**August 2016**
The Joint Legislative Audit Committee approves a request for the State Auditor to conduct an audit of Corrections' suicide prevention policies due to concerns related to the number of suicides at CIW.

**January 2016**
Suicide expert completes a follow-up audit on prisons' implementation of the recommendations.

SPECIAL MASTER OVERSEES CORRECTIONS' MENTAL HEALTH CARE DELIVERY (*Coleman*)

FEDERAL RECEIVERSHIP OVERSEES CORRECTIONS' MEDICAL CARE DELIVERY (*Plata*)

Sources: Reports from the special master's suicide expert in 2015 and 2016, court documents, and minutes of the California State Legislature's Joint Legislative Audit Committee.

Case 2:90-cv-00520-KJM-SCR   Document 6014-1   Filed 11/26/18   Page 27 of 158

In 2007 the courts in *Coleman* and *Plata* recommended that both cases be assigned to a three-judge panel to address prison overcrowding. In August 2009, the three-judge panel noted that in 2006—the same year that the *Coleman* special master's report noted a reversal in Corrections' delivery of mental health services and the court in *Plata* appointed the receiver—California's prison population reached a historic high of more than 170,000 inmates. This historic high led to unprecedented overcrowding of California's prisons. The three-judge panel found overcrowding to be the primary cause of many of the issues relating to inadequate mental health and medical care in California's prisons. Therefore, the three-judge panel ordered Corrections to develop a plan to reduce its prison population, which at that time was at about 190 percent of capacity, to 137.5 percent of capacity. In 2011 the Legislature passed various laws that realigned the criminal justice system, which reduced overcrowding by allowing for inmates who were not convicted of serious or violent crimes, or felonies requiring registration as a sex offender, to serve their sentences in county jails instead of state prisons.

Although these efforts resulted in the reduction of Corrections' inmate population, a March 2013 *Coleman* special master's report identified continuing inadequacies in Corrections' delivery of mental health services. The special master had repeatedly identified many of these inadequacies in earlier reports, such as Corrections' failure to enforce its own policies regarding the delivery of mental health services and the prisons' failure to provide adequate emergency responses to suicides. In response to the report, the court in *Coleman* ordered Corrections to establish a suicide prevention and management workgroup consisting of members of Corrections' clinical, custody, and administrative staff; experts appointed by the special master; and others. The workgroup engaged a nationally recognized suicide prevention expert (suicide expert) to conduct a review of the suicide prevention practices at each of Corrections' prisons. In January 2015, the suicide expert filed his report, which contained 32 recommendations to Corrections. The suicide expert issued an update to this report in January 2016, in which he evaluated Corrections' progress in implementing the recommendations through a review of 18 prisons. We discuss the suicide expert's report and update in Chapter 3.

**Suicide Prevention and Response**

As we mention earlier, the goal of Corrections' mental health system is to provide appropriate levels of mental health treatment to seriously mentally ill inmates in the least restrictive environment. As presented in Figure 3, Corrections provides escalating levels of mental health care to inmates, up to and including referrals to Department of State Hospitals' facilities if Corrections cannot meet inmates' mental health needs.

**Figure 3**
**Levels of Care in Corrections' Mental Health System**



**Inpatient Care**
Provides care at Department of State Hospitals' facilities for inmates whose conditions cannot be successfully treated in the outpatient setting or in short-term mental health crisis-bed (crisis bed) stays. Corrections provides this level of care for female inmates in the Psychiatric Inpatient Program at CIW.

**Crisis Beds**
Provides care to inmates with marked impairment and dysfunction requiring 24-hour nursing care, inmates who present a danger to others as a consequence of serious mental disorders, and inmates who present a danger to themselves for any reason.

**Enhanced Outpatient Program**
Provides care to inmates with mental disorders who would benefit from the structure of a therapeutic environment that is less restrictive than an inpatient setting and who do not require continuous nursing care. The program is located in a designated living unit at each prison.

**Correctional Clinical Case Management System**
Provides care to inmates whose conditions are relatively stable and whose symptoms are controlled or are in partial remission as a result of treatment.

Sources:  Corrections' 2009 *Mental Health Program Guide* (program guide) and *2014 Annual Accomplishments* report.
Note:  Not all institutions contain all levels of care.

---

**Terms Related to Inmate Suicide**

**Suicidal ideation:**  Thoughts of suicide or death. Such thoughts may be either specific or vague and may include the desire to be dead.

**Suicidal intent:**  The intention to deliberately end one's life.

**Self-harm without intent:**  An act of purposeful self-harm without suicidal intent.

**Suicide attempt:**  An act of purposeful self-harm with the intent to die.

**Suicide:**  An act of purposeful self-harm that causes or leads to one's own death.

Sources:  Corrections' 2009 program guide and suicide risk evaluation training documents.

---

A primary component of Corrections' mental health system is crisis intervention, which is treatment for rapid-onset or worsening symptoms of mental illness in inmates. Such symptoms may include thoughts of suicide. Corrections has identified factors that can lead inmates to experience mental health crises while in prison, including the loss of an existing support system outside of prison, the restrictions of incarceration, and fears of being unable to cope with the outside world upon release. Corrections' policy states that staff must refer inmates who are dangers to themselves to crisis beds, an inpatient treatment setting for inmates who have acute symptoms of serious mental disorders or are suffering from significant or life-threatening disabilities. If no crisis beds are available at a prison, staff must place an inmate in a temporary housing location in the prison—known as *alternative housing*—pending admission to a crisis bed. Under these circumstances, policy requires prisons to transfer an inmate to a crisis bed at another prison if the other prison can provide the same level of custody and security.

Corrections' policies outline specific steps prison staff must take when they become aware of inmates' suicidal ideation, suicidal intent, or self-harm, which the text box defines. If prison staff become aware of any of these conditions, Corrections' policy requires that they place inmates under observation until mental health staff can conduct a suicide risk evaluation (risk evaluation). As we discuss in Chapter 1, mental health staff use these evaluations to determine inmates' risk of suicide and to make specific recommendations regarding the level of care required.

Corrections also has a policy that prison staff must follow when staff discover inmates who are attempting suicide. When responding to a suicide attempt in progress, Corrections' policy requires prison staff to sound an alarm to summon additional personnel, respond appropriately when blood is present, neutralize any significant security threats to themselves or others, and initiate life-saving measures consistent with training. When medical personnel arrive, they take over responsibility for the medical treatment and life-saving measures.

Following the admission of inmates to crisis beds as a result of suicide attempts, ideation, or self-harm, prison staff must complete various steps in order to provide treatment. Figure 4 provides a summary of these steps. For example, while inmates are in crisis beds, prison staff must keep them under observation. Depending on whether inmates are in immediate danger, staff must either

maintain continuous visual contact with them or perform checks at staggered intervals not exceeding once every 15 minutes. Further, while inmates are in crisis beds, prison staff must complete treatment plans. According to Corrections' policies, crisis-bed stays are supposed to last for up to 10 days, although inmates may stay longer with the approval of a prison's chief of mental health.

**Figure 4**
**Corrections' Process for Inmates' Admission to and Discharge From Crisis Beds**



Sources:  Corrections' 2009 program guide and related policy memos.

Corrections has taken certain actions to ensure that the prisons comply with its policies and to identify additional ways to prevent inmate deaths due to suicide. For example, Corrections has established its own Suicide Prevention and Response Focused Improvement Team (suicide prevention team) and established suicide prevention teams at each prison. The purpose of these teams is to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. The suicide prevention teams at each prison are also responsible for monitoring and tracking all self-harm incidents, suicide attempts, and deaths, as well as reviewing the prison's policies to ensure consistency with Corrections' policies. According to Corrections' policies, these teams must be composed of certain prison staff representing multiple disciplines, such as the chief psychologist and chief psychiatrist, and must meet once per month.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 31 of 158

In addition, following each suicide, Corrections completes a review of the prison's compliance with policies and procedures, including examining the history of the inmate's mental health care while incarcerated and the prison's emergency response to the suicide. It describes the results of its review in a report (suicide report) that it provides to the prison. When warranted, Corrections makes recommendations to the prison to improve the quality of care and ensure compliance with its policies and procedures.

# Chapter 1

## PRISONS HAVE NOT FOLLOWED CORRECTIONS' POLICIES WHEN RESPONDING TO INMATES WHO HAVE ATTEMPTED OR ARE AT RISK OF ATTEMPTING SUICIDE

The four prisons we reviewed failed to consistently follow Corrections' policies for responding to, treating, and observing inmates who had attempted or were at risk of attempting suicide. For example, we found many instances in which prisons either did not perform or did not adequately complete required risk evaluations, even though mental health staff use these critical documents to determine the treatment inmates should receive. In addition, we identified numerous instances in which prisons did not include necessary information in inmates' treatment plans, potentially affecting the nature and timeliness of the care the inmates received. In fact, Corrections' reviews of inmate suicides and its own audits of the quality of both risk evaluations and treatment plans have found that prisons did not complete these documents to its required standards. Further, the four prisons may have placed inmates at risk of death by insufficiently monitoring them following suicide attempts, and some prisons failed to respond to suicide attempts in accordance with Corrections' policies.

### The Prisons We Reviewed Did Not Properly Evaluate Some Inmates' Suicide Risk

Risk evaluations are critical to successful suicide prevention because they help prisons identify inmates who are likely to attempt suicide and determine the treatments needed to prevent them from doing so. The proper completion of a risk evaluation can therefore be the difference between life or death for an inmate. Corrections' policies require that mental health staff complete risk evaluations under a number of circumstances, including when inmates have initial face-to-face evaluations for suicidal thoughts, threats, attempts, or self-harm, as well as before their discharge from crisis beds. When completing risk evaluations, mental health staff are to examine inmates' mental status and determine the presence or absence of chronic and acute risk factors for suicide. The text box includes examples of such risk factors. They must also review any protective factors that may mitigate inmates' risk of suicide, such as religious beliefs, family support, and participation

**Examples of Inmate Suicide Risk Factors**

Chronic risk factors

- History of suicide attempts
- History of emotional, physical, or sexual abuse
- Chronic pain problem
- Long or life sentence
- History of depressive or psychotic disorders
- History of certain mental illnesses
- History of substance abuse

Acute risk factors

- Suicidal thoughts
- Recent trauma
- Recent bad news
- Agitation or anger
- Hopelessness or helplessness
- Increasing interpersonal isolation
- Single cell placement

Sources:  Corrections' 2009 program guide and suicide risk evaluation form.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 33 of 158

in group activities. Finally, mental health staff must document whether inmates are at high, moderate, or low risk for suicide and make specific recommendations regarding the appropriate level of care. Mental health staff must also address how the treatment plan will be implemented and any required follow-up procedures.

*Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation.*

Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation. Specifically, for a selection of 40 inmates who attempted or committed suicide from 2014 through 2016, we reviewed the risk evaluations the prisons conducted just before or immediately following the suicide attempt or suicide, and the suicide reports Corrections completed following the suicides. We identified that the prisons should have completed risk evaluations for 36 of these 40 inmates. However, as Table 2 shows, 10 of the 36 inmates were missing at least one required risk evaluation. Although the four prisons offered a number of reasons for the missing risk evaluations, they generally agreed that they had failed to comply with Corrections' policies. For example, the chief of mental health of CCWF stated that risk evaluations are not always necessary for inmates discharged to a higher level of care because the receiving institutions will complete them on admission. However, she acknowledged that Corrections' policies require prisons to complete risk evaluations under these circumstances, and Corrections' clinical support chief affirmed that conducting risk evaluations on discharge to a higher level of care is helpful for continuity of care.

In addition to failing to complete certain risk evaluations, the four prisons completed inadequate risk evaluations for 26 of the 36 inmates we reviewed. Each of these 26 inmates received at least one inadequate risk evaluation, and 13 received more than one. The types of problems we identified varied. For example, mental health staff left blank sections of the risk evaluations for 10 inmates, including sections detailing their consideration of some risk factors and identifying whether the inmates had a desire or plan to die. These blank spaces suggest that the mental health staff may not have considered all relevant information when determining the likelihood of the inmates attempting suicide, which could have caused them to underestimate the inmates' suicide risk level.

Further, for 18 of the 36 inmates, mental health staff did not adequately justify their determinations of the inmates' suicide risk levels. Specifically, either they did not incorporate risk factors when justifying their determinations or they simply listed inmates' risk factors without considering their behaviors or symptoms. In some cases, mental health staff noted the presence of several risk factors and warning signs of imminent suicide risk, yet they still concluded that inmates were at low acute risk, which refers to short-term

fluctuations in inmates' risk of attempting suicide, without adequately documenting the rationale for their determinations. For example, one mental health staff member at SAC indicated that an inmate was at low acute risk for suicide, despite noting that he demonstrated five of the 10 warning signs of imminent suicide risk. The mental health staff member did not include any of these warning signs in the justification of risk, but rather noted that the inmate denied a desire to commit suicide. However, the mental health staff member also indicated that the inmate stated that talking about his suicidal ideation was difficult because he had no intention of ever going to a crisis bed. The inadequate justification for this inmate's risk determination suggests that the mental health staff member may not have considered all risk factors and therefore may have incorrectly estimated the inmate's risk of suicide—a problem that we found repeatedly in the risk evaluations we reviewed.

**Table 2**
**The Four Prisons We Reviewed Completed Inadequate Risk Evaluations**

| PRISON | NUMBER OF INMATES REVIEWED WHO REQUIRED ONE OR MORE RISK EVALUATIONS | NUMBER OF INMATES MISSING AT LEAST ONE REQUIRED RISK EVALUATION | NUMBER OF INMATES WITH ONE OR MORE INADEQUATE RISK EVALUATIONS |
|---|---|---|---|
| CCWF | 9 | 7 | 7 |
| CIW | 8 | 1 | 4 |
| RJD | 9 | 1 | 6 |
| SAC | 10 | 1 | 9 |
| Totals | 36 | 10 | 26 |

| PRISON | SPECIFIC PROBLEMS WITH THE RISK EVALUATIONS* (BY NUMBER OF INMATES) | | | |
|---|---|---|---|---|
| | SECTIONS IN RISK EVALUATION WERE BLANK | JUSTIFICATION OF RISK DETERMINATION WAS INCOMPLETE[†] | TREATMENT PLAN TO REDUCE RISK WAS MISSING OR INCOMPLETE[†] | STAFF USED INCONSISTENT OR INCOMPLETE INFORMATION ABOUT THE INMATE TO DETERMINE SUICIDE RISK |
| CCWF | 5 | 5 | 3 | 2 |
| CIW | 2 | 2 | 2 | 1 |
| RJD | 0 | 4 | 5 | 3 |
| SAC | 3 | 7 | 8 | 4 |
| Totals | 10 | 18 | 18 | 10 |

Sources:  California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and other Corrections' policies.

\* We present the number of inmates who had risk evaluations with the problem listed. Some inmates had multiple inadequate risk evaluations, and some had risk evaluations that had more than one of the problems listed.

† We determined whether the justifications and risk reduction plans in the risk evaluations were complete based on whether they contained all required elements named in Corrections' suicide risk evaluation audits and mentoring documents.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 35 of 158

The four prisons also failed to develop adequate plans for treatment within the risk evaluations for half of the inmates we reviewed. When completing risk evaluations, mental health staff must document treatments targeting modifiable risk factors, such as feelings of agitation, anger, or hopelessness. These treatments should be as specific as possible, leaving little room for misinterpretation or confusion. However, mental health staff failed to document such specific treatments in the risk evaluations for 18 of the 36 inmates we reviewed. For example, CIW's risk evaluation for an inmate that had just attempted suicide indicated that she demonstrated seven acute risk factors, including depression and agitation or anger. However, the mental health staff member did not prescribe treatment, noting only that the inmate should be observed and should continue her current medication. Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.

*Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.*

Further, for 10 of the inmates we reviewed, mental health staff completed risk evaluations based on inconsistent or incomplete information. For example, according to the suicide report Corrections completed following one inmate's suicide at SAC, mental health staff had completed for the inmate three different risk evaluations, which stated that he had certain protective factors in place to reduce his risk of suicide, including family support and good coping skills. However, a review of other documents in the inmate's file showed that he did not have these protective factors. Corrections stated in the suicide report that similarities among the three risk evaluations suggest that mental health staff copied the risk and protective factors from previous evaluations, resulting in an inaccurate picture of the inmate's mental health. Similarly, another one of Corrections' suicide reports stated that the final risk evaluation CIW completed before an inmate's suicide failed to note that she had a history of suicide attempts—a critical determinant of future suicide risk. According to the suicide report, the mental health staff member appeared to accept the inmate's denial of any prior suicide attempts and did not review the suicide attempt history documented in a previous risk evaluation.

Corrections offered some reasons for the prisons' failure to complete adequate risk evaluations. Specifically, its clinical support chief explained that mental health staff have heavy caseloads, which the four prisons we reviewed generally also indicated is a contributing factor. The clinical support chief stated that if prison management has not set clear expectations that suicide risk evaluations should be prioritized, mental health staff may rush to complete risk evaluations. She said prison management should help mental health staff by redirecting their workloads to allow

them to devote the necessary attention to complete adequate risk evaluations. She also stated that, despite existing training, mental health staff are still unsure of how to complete risk evaluations.

Despite its ability to point to reasons for deficiencies in risk evaluations, our review demonstrates that Corrections has not adequately addressed those factors, jeopardizing its ability to prevent inmate suicide attempts. In fact, for years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review. For example, a 2013 special master's report stated that for half of the suicide cases in 2011, prisons either did not complete risk evaluations or concluded that inmates had a low or "no appreciable" risk of suicide without adequate consideration of risk factors, past history, or medical records. Clinical experts that the special master engaged noted similar problems with risk evaluations each year through 2014, when they concluded that the prisons had either failed to conduct or had inadequately completed risk evaluations in almost 70 percent of the suicide cases that occurred that year. Further, beginning in November 2013 and continuing through July 2014, the suicide expert reviewed each prison's suicide prevention practices and found that mental health staff often did not complete required risk evaluations and that the quality of risk evaluations was frequently problematic. Specifically, the suicide expert's review of hundreds of risk evaluations found that many contained risk factors and protective factors that did not align with the mental health staff's assessments of the inmates' risk levels.

*For years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review.*

Although Corrections has taken actions in response to these findings, those actions have not resulted in significant change. For example, in 2013 Corrections issued policies requiring mental health staff to attend a seven-hour training and, every two years, undergo a mentoring program that focuses on administering risk evaluations. The mentoring program involves trained mentors observing mental health staff conducting one or more risk evaluations, assessing their skills, and when needed, providing training on the proper techniques for completing risk evaluations. However, as the reports cited demonstrate, neither the training nor the mentoring program ensured that mental health staff adequately completed risk evaluations. The suicide expert noted that mental health staff were required to complete only two risk evaluations under the supervision of a mentor and that they received no additional critiques until they had to undergo the mentoring program two years later. Based on his recommendations, Corrections modified its policy in early 2016 to, among other things, require that prisons audit risk evaluations for each mental health staff member twice each year, and to require that those who failed the audit repeat the mentoring program.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 37 of 158

Although we agree that this change was necessary to improve oversight of risk evaluations, room for further improvement in both the policy and its implementation remains. Specifically, Corrections' risk evaluation audits permit a degree of failure. Figure 5 shows the process prisons use when completing the audits to determine whether mental health staff members need additional mentoring. During the audit, program supervisors review seven items—which Table 3 lists—that must be in a risk evaluation. Corrections' policy requires that mental health staff correctly complete six of the seven items to pass the audit.

**Figure 5**
**Corrections' Process for Determining Whether Mental Health Staff Require Additional Mentoring on Completing Risk Evaluations**



Sources:  Corrections' health care division's March 15, 2016, memorandum revising its risk evaluation mentoring program and Corrections' instructions for completing the risk evaluation audit.

However, as a result, a mental health staff member could fail to complete an important section in a risk evaluation, such as detailing the inmate's history of suicide attempts or describing the risk reduction plan, and still pass. Corrections' clinical support chief said that Corrections does not require that mental health staff obtain 100 percent because it does not expect perfection and because if too many failed the audit, it would not have enough mentors to complete the necessary mentoring. She also identified all but one item in the audit—the identification of sources of information— as critical. Nevertheless, listing the sources of information is important to ensure that mental health staff are considering all critical sources of information when evaluating an inmate's risk factors. In response to our concerns, Corrections' clinical support chief explained that Corrections could make passing certain items within the audit mandatory. However, because of the importance of each section of the risk evaluation, we believe requiring mental health staff to adequately complete all sections is essential for reducing the risk of inmate suicide.

**Table 3**
**Items of a Risk Evaluation and Corrections' Corresponding Audit Criteria**

| RISK EVALUATION ITEM | RISK EVALUATION AUDIT CRITERIA | |
| --- | --- | --- |
| | AUDIT ITEM | DESCRIPTION |
| Check boxes indicating the presence or absence of chronic and acute suicide risk factors. | 1 | Are all risk factor boxes checked? |
| Check boxes indicating the presence or absence of protective factors that mitigate suicide risk. | 2 | Are all protective factor boxes checked? |
| Check box indicating whether inmate has a history of suicide attempts. | 3 | Is the item complete? |
| Include details of previous suicide attempts. | 4 | If the inmate has a history of suicide attempts, did the staff member detail those attempts? |
| Include the sources of information used to complete the risk evaluation, such as inmate interview, staff interview, or mental health file review. | 5 | Did the staff member document the sources of information used? |
| Describe the justification of risk determination. | 6 | Are both chronic and acute risk levels checked and justified in the narrative, citing the presence or absence of identified risk factors, protective factors, and warning signs? |
| Describe the safety/risk reduction plan. | 7 | Did the staff member incorporate the identified modifiable risk factors, protective factors, and warning signs into a risk reduction plan? |

Sources:  Corrections' risk evaluation form and its risk evaluation audit criteria.

Corrections has similarly set the bar too low for the percentage of prisons' risk evaluations that must pass the risk evaluation audit—90 percent—yet it has still struggled to meet its own standards. According to Corrections' mental health administrator for quality management and inpatient facilities (quality administrator), the prisons report to Corrections the percentage of mental health staff members who passed the risk evaluation audit each month. A June 2017 Corrections report shows that from December 1, 2016, through May 31, 2017, prisons reported that 71 percent of risk evaluations systemwide met the audit criteria. Although this is a marked improvement from the prisons' performance each in 2014 and 2015—Corrections' reports show that only 38 percent of the risk evaluations audited passed during that two-year period—it is still far below Corrections' established goal of 90 percent. However, even if Corrections achieved its goal, mental health staff would still have adequately completed only nine out of 10 risk evaluations. We believe that this is an unacceptable level of failure, given the potential consequences of deficient risk evaluations.

*Although prisons reported that 71 percent of risk evaluations systemwide met the audit criteria from December 1, 2016, through May 31, 2017, it is still far below Corrections' established goal of 90 percent.*

Corrections also sets its completion standards too low for the percentage of risk evaluations that each prison should complete on time. According to the quality administrator, Corrections uses an automated process to track the percentage of risk evaluations that each prison completes on time and requires prisons that score lower than 85 percent to develop an action plan for improvement. According to Corrections' reports, from December 1, 2016, through May 31, 2017, the prisons collectively achieved a score of 92 percent for being on time. The quality administrator said that it set the goal at 85 percent because that is a standard goal for health care processes. However, given that the timely completion of risk evaluations is critical to ensuring that inmates receive prompt and necessary treatment to reduce their risk of suicide, we believe Corrections should find it unacceptable for more than one in 10 inmates to not receive a risk evaluation on time.

Corrections could improve the quality of its risk evaluations by updating its electronic risk evaluation form. In our review of risk evaluations at RJD, we found that the prison had included prompts to aid the mental health staff member in completing the form. For example, in the section for documenting the treatment to reduce the inmate's risk, the prison included text instructing mental health staff to document treatment interventions for those risk factors that can be treated, which are referred to as *modifiable risk factors*. We found that this risk evaluation met all of the requirements of the risk evaluation audit. Although this was the only risk evaluation that we reviewed at RJD that contained these prompts, according to RJD's chief psychologist, the prison began including these prompts in early 2016 and she believed that they had contributed to an improvement in risk evaluations. Consistent with the chief's

statement, Corrections' risk evaluation audit reports showed that the percentage of RJD's risk evaluations that passed the audit increased from 77 percent in January 2016 to 100 percent in March 2017. Corrections' clinical support chief agreed that such prompts would be beneficial, and that Corrections could incorporate them into the risk evaluation forms in its electronic health record system.

### Prison Staff Failed to Establish Treatment Plans for Some Inmates, and the Plans They Established for Others Were Inadequate

According to the suicide expert, treatment planning is a critical element of any correctional system's suicide prevention program. A treatment plan is based on a comprehensive assessment of an inmate's physical, mental, emotional, and social needs and must include the goals of treatment and identify the treatment methods prison staff will use. State regulations and Corrections' policies require that the admitting staff develop a provisional diagnosis and a plan for initial treatment (initial treatment plan) within 24 hours of an inmate's admission to a crisis bed. In addition, state regulations and Corrections' policies require that an inmate's treatment team—which must include, at a minimum, a crisis-bed psychiatrist, a crisis-bed clinician, nursing staff, a correctional counselor, and the inmate if appropriate—complete a treatment plan within 72 hours of the inmate's admission to a crisis bed (72-hour treatment plan). The text box describes selected information state regulations require in a 72-hour treatment plan.

> **Selected Requirements for a 72-Hour Treatment Plan**
>
> • All mental health diagnoses.
>
> • Prescribed medication, dosage, and frequency of administration.
>
> • Treatment goals with interventions, actions toward improvement, and measurable objectives.
>
> • Treatment methods to be used, including the frequency of the methods and the persons or disciplines responsible for each method.
>
> • Goals for aftercare and a plan for post-discharge follow-up.
>
> Source: California Code of Regulations, Title 22, Section 79747.

Despite the importance of treatment plans, three of the four prisons we reviewed did not always comply with state regulations and Corrections' policy that require prison staff admitting inmates to crisis beds to develop an initial treatment plan within 24 hours. Corrections' policies state that this initial treatment plan should contain a provisional diagnosis and an initial plan for treatment. Although this is Corrections' only written requirement regarding initial treatment plans, its clinical support chief explained that she would expect an initial treatment plan to contain an admitting diagnosis, reason for admission, a description of symptoms, and immediate interventions to address those symptoms and target the reason for admission. However, mental health staff did not complete such plans for four of the 26 inmates who should have had them at the four prisons we reviewed. Because Corrections' policies state that inmates must be discharged from crisis beds within 10 days, unless otherwise approved for a longer stay, inmates

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 41 of 158

without initial treatment plans may not have a treatment plan for up to 30 percent of their stays in crisis beds—until the 72-hour treatment plan is complete.

In addition, one of the prisons we reviewed failed to comply with state regulations and Corrections' policies for completing 72-hour treatment plans. As Table 4 shows, we reviewed 25 files for inmates who attempted or committed suicide from 2014 through 2016 who should have had 72-hour treatment plans following their admission to crisis beds at the four prisons. We found that mental health staff completed 23 of these 72-hour treatment plans. However, CCWF's mental health staff did not complete a 72-hour treatment plan for two inmates, but rather completed a separate supplemental section, which does not serve as the 72-hour treatment plan. CCWF's chief of mental health acknowledged that when she assumed her position in mid-2015, mental health staff were not completing all sections of the 72-hour treatment plans. She could not provide an explanation for this deficiency because she was not familiar with the guidance mental health staff had received at that time; however, she stated that after she noticed the practice, she reminded mental health staff that they needed to complete all sections of the 72-hour treatment plans.

**Table 4**
**Problems With 72-Hour Treatment Plans at the Four Prisons We Reviewed**

| | PRISON | | | | |
|---|---|---|---|---|---|
| | CCWF | CIW* | RJD | SAC | TOTAL |
| **Number of inmates who...** | | | | | |
| ...should have had a 72-hour treatment plan | 9 | 7 | 5 | 4 | 25 |
| ...did not receive a 72-hour treatment plan | 2 | 0 | 0 | 0 | 2 |
| ...received a 72-hour treatment plan | 7 | 7 | 5 | 4 | 23 |
| **Missing or incomplete items on the treatment plans reviewed** | | | | | |
| Mental health diagnoses | 0 | 0 | 0 | 0 | 0 |
| Medication dosage and frequency | 1 | 4 | 4 | 3 | 12 |
| Treatment goals with interventions and measurable objectives | 1 | 0 | 0 | 2 | 3 |
| Treatment methods, including frequency and persons responsible for each method | 7 | 4 | 5 | 4 | 20 |
| Post-discharge follow-up plan | 5 | 5 | 3 | 4 | 17 |

Sources: California State Auditor's analysis of mental health records for selected inmates at each of the four prisons reviewed, Corrections' 2009 program guide, and California Code of Regulations Title 22, Section 79747.

\* Staff at CIW completed one treatment plan more than 72 hours after the inmate was admitted to a crisis bed.

Moreover, none of the 23 completed 72-hour treatment plans we reviewed were adequate based on the elements state regulations require. For example, many of the 72-hour treatment plans were missing either the treatment methods, the frequency at which the treatment methods should be completed, or who was responsible for administering the methods. Without this information, inmates may not receive necessary treatment from the correct providers at appropriate intervals. In addition, many of the 72-hour treatment plans we reviewed had missing or incomplete discharge follow-up plans. It is vital that the treatment teams begin planning for inmates' care following discharge from crisis beds as soon as possible because Corrections' policies state that crisis-bed stays should be 10 days or fewer, although crisis-bed stays may surpass 10 days with the approval of the prison's chief of mental health or a designee.

Further, some 72-hour treatment plans we reviewed had multiple deficiencies. For example, one 72-hour treatment plan at SAC—for an inmate admitted to a crisis bed after a suicide attempt in 2016—lacked specific treatment interventions, the frequency of treatment, and a discharge plan. Additionally, the prison's mental health staff left several other sections of this plan blank, such as a statement of the inmate's mental condition and descriptions of the long-term goals of the inmate and of the inmate's participation in the treatment planning process. When we inquired, prison officials at SAC stated that this treatment plan was not acceptable and that management would address the deficiencies with the mental health staff member.

Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion. For instance, a 1999 special master's monitoring report found that several treatment team meetings failed to develop realistic and meaningful 72-hour treatment plans at one prison. The same report noted that another prison did not hold any treatment team meetings in the crisis-bed unit. Further, a special master's review of inmate suicides that occurred in the second half of 2012 determined that the prisons had provided inadequate 72-hour treatment plans for about 33 percent of the inmates who committed suicide, while a similar special master's review of inmate suicides that occurred in 2014 found that this number had risen to over 65 percent. Finally, the suicide expert found continued problems with the adequacy of treatment planning for patients identified as suicidal at all 18 prisons that he reviewed in his 2016 report on suicide prevention practices.

*Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion.*

To address concerns related to treatment planning, Corrections stated that it implemented an internal audit of the quality of the 72-hour treatment plans beginning in September 2013. Every quarter, each prison must audit a random sample of 15 of its 72-hour treatment plans per institutional program, which includes

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 43 of 158

crisis beds. In these audits, the reviewers are instructed to examine 15 crucial aspects of the 72-hour treatment plans, including whether the interventions are measurable and specify frequency and duration, as well as whether the goals for the inmates are correlated to problems and interventions. According to Corrections' quality administrator, a plan must meet 13 of the 15 criteria in order for a treatment plan to pass the internal audit. She also stated that if the audits identify a systemic problem in a program or prison, the prison must work with Corrections' staff to create a corrective action plan that the prison must then submit to Corrections.

These audits found varying levels of treatment plan quality from 2014 through 2016 at the four prisons we reviewed. According to Corrections' reports, its overall monthly rate of 72-hour treatment plans that met the audit criteria from 2014 through 2015 fluctuated between 0 percent and 67 percent, with no treatment plans meeting the audit criteria for 14 of these 24 months. According to the quality administrator, none of the audited plans met the criteria during these months because the audits were new and the standards were fairly high. In the second half of 2016, the overall monthly rate of treatment plans that met audit criteria fluctuated from 55 percent to 68 percent. However, in at least one month, all four prisons we reviewed had lower percentages of treatment plans that met the audit criteria than Corrections' overall rate. In fact, in July 2016, only 33 percent of SAC's audited treatment plans met the audit criteria. The quality administrator stated that the prisons have continued to struggle to pass the audits because Corrections had examined only the timeliness of 72-hour treatment plans before 2014. She explained that mental health staff should now be more aware of the standards as the result of several trainings. However, Corrections has had regulations in effect since 1996 that specify what a 72-hour treatment plan should include. Therefore, Corrections' mental health staff should have already been aware of these requirements.

As part of this audit, we were also requested to determine whether CIW allows inmates identified as suicidal to have access to inmate program activities or movements, such as yard time. The chief of mental health at CIW explained that it had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way. He further described that any records of yard privileges for inmates in crisis beds would have been maintained by a recreation therapist separate from the treatment plan; however, CIW was unable to provide these records for the six inmates we reviewed. Thus, we were unable to determine whether these inmates had access to privileges like yard time. As a result of our audit, CIW stated that it has verbally instructed staff to improve their

*It had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way.*

documentation regarding inmate privileges such as yard time by indicating in treatment plans whether inmates have access to such privileges or by justifying why the inmates do not. Furthermore, in response to the suicide expert's recommendation, Corrections updated its policies in June 2016 to allow inmates in crisis beds to have access to phone and visitation privileges equal to the privileges the inmates would have when not in a crisis bed—privileges which inmates in crisis beds at CIW were previously not allowed to have.

In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed. Specifically, in certain cases, inmates must await assignment to crisis beds because only a limited number of these beds are available. Corrections' policies require that inmates awaiting crisis beds be assigned to alternative housing, which is meant to be short-term and can include large holding cells or other housing where complete and constant visibility can be maintained. Inmates must be transferred out of alternative housing within 24 hours and, according to CCWF's chief of mental health, alternative housing should provide a crisis-bed level of care. Thus, we expected that inmates who remain in alternative housing for more than 24 hours would receive the same documentation of care as inmates in crisis beds, including initial and—if necessary—72-hour treatment plans. However, Corrections' clinical support chief for mental health stated that mental health staff complete treatment plans when inmates enter a new level of care and that alternative housing is a temporary placement rather than a level of care. She explained that completing treatment plans for inmates in alternative housing is not practical for various reasons, including that most alternative housing settings lack space to conduct confidential treatment plan meetings and not all members of the treatment team are required to see inmates in alternative housing. She also stated that inmates receive their standard medications while in alternative housing and that psychiatrists can order additional medication as necessary. Although these explanations appear to be reasonable, we remain concerned that Corrections has not always transferred inmates out of alternative housing within 24 hours.

For example, in a 2016 monitoring report, the special master found that 47 percent of CIW's alternative housing stays and 36 percent of RJD's alternative housing stays during the review period exceeded 24 hours. Our findings are similar to those of the special master. Specifically, 10 of 40 inmates we reviewed remained in alternative housing for more than 24 hours. For instance, one inmate was in alternative housing for approximately six days following a suicide attempt before being admitted to a crisis bed. Because she was discharged from the crisis bed about seven days after her admission, nearly half of her time at a crisis-bed level of care was spent in alternative housing. Of even greater concern,

*In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed.*

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 45 of 158

*Two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health.*

two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health. Both of these inmates committed suicide within two weeks of discharge from alternative housing.

In order to address the fact that some inmates spend more than 24 hours in alternative housing while waiting to transfer to a crisis bed, Corrections submitted a budget change proposal for the 2017–18 fiscal year, requesting the construction of 100 new crisis beds. It is Corrections' belief that adding additional crisis beds will help alleviate the issue of inmates spending more than 24 hours in alternative housing, because many of the inmates that spend more than 24 hours in alternative housing do so because no crisis beds are available. The Legislature approved Corrections' request for 100 new crisis beds in its 2017–18 budget. According to the deputy director of the statewide mental health program, the 100 crisis beds should be sufficient; however, sufficiency assumes that the needs of Corrections' inmate population will not change in ways that will require additional crisis beds. Also, Corrections has the ability to monitor alternative housing stays that exceed 24 hours as a part of its audit process, which we discuss in Chapter 3.

### Prison Staff Did Not Sufficiently Monitor At-Risk Inmates or Respond to Suicide Attempts as Corrections' Policies Require

At all four prisons we reviewed, we observed deficiencies in the prisons' efforts to monitor inmates who were at risk of committing suicide. Staff at each of the four prisons failed to appropriately observe inmates within the required time interval, giving inmates greater opportunities to injure themselves with potentially lethal results. Further, we found instances where prison staff prefilled observation logs and did not stagger the timing of checks. In addition, Corrections has determined that prison staff did not always respond appropriately upon discovering that inmates had attempted to commit suicide. Specifically, Corrections' reviews of inmate suicides found that prison staff sometimes failed to bring required life-saving equipment to the scene, did not appropriately relieve pressure on three hanged inmates' airways, and did not always promptly summon medical responders. Although Corrections agreed that these issues are problematic, it has only recently taken steps to address them.

***Prison Staff Did Not Always Monitor Inmates at High Risk of Suicide as Corrections' Policies Require***

Our review found that the four prisons have not always performed timely and appropriate checks of inmates placed on suicide precaution. As the text box shows, Corrections has established specific policies for monitoring inmates at risk of suicide, depending on whether they are in immediate danger of self-harm. Because suicide watch entails continuous, direct visual observation of inmates, we could not confirm through a review of watch logs whether this type of observation occurred. Instead, we focused our review on suicide precaution logs, which indicate when prison staff conducted their staggered behavior checks of inmates. Corrections' policy requires prison staff to stagger their behavior checks of inmates on suicide precaution in intervals not to exceed 15 minutes. According to the chief nursing executive at CCWF, the purpose of staggering behavior checks is to ensure that inmates are not able to anticipate when checks will occur and hurt themselves between checks. Nonetheless, the records for 19 out of 25 inmates we reviewed who were placed on suicide precaution indicated they did not always receive staggered behavior checks. Table 5 on the following page presents the problems we identified with suicide precaution checks at the four prisons we reviewed. When prison staff do not stagger the timing of their behavior checks of inmates on suicide precaution, they increase the risk that inmates will be able to injure themselves, perhaps fatally.

> ### Suicide Watch and Suicide Precaution
>
> When inmates are in crisis beds because of suicide risk and are in immediate danger of self-harm, they are placed on suicide watch, which entails the following:
>
> - They are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. All furniture is removed.
>
> - Staff must provide continuous, direct visual observation as well as nursing checks every 15 minutes.
>
> When inmates are in crisis beds because of a high risk of attempting self-harm but are not in immediate danger, they are placed on suicide precaution, which entails the following:
>
> - If they are at higher risk, they are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. If they are at lower risk, they are allowed certain clothing, reading and writing materials, and toiletries. Mental health staff must use their clinical judgment when allowing inmates access to these items.
>
> - Staff must conduct staggered behavior checks of the inmate in intervals not to exceed 15 minutes.
>
> Source: Corrections' 2009 program guide.

Table 5 on the following page shows that the prisons we reviewed did not always conduct suicide precaution behavior checks in a timely manner and that, for several inmates, prison staff prefilled or preprinted the observation logs. All four prisons exceeded the maximum requirement of 15-minute intervals between checks for some inmates, with several intervals at SAC and CCWF exceeding 20 minutes. In one particularly egregious example, prison staff at CCWF checked on an inmate on suicide precaution 90 times, but exceeded 15 minutes between checks more than 35 times, with one gap lasting longer than one hour. Further, we found that staff appeared to prefill times for checks on observation logs for eight of the 19 inmates on suicide precaution that we reviewed in prisons that used paper logs, rather than electronic logs. For example, we found several instances of logs with preprinted observation times for three inmates on suicide precaution who required staggered

Case 2:90-cv-00520-KJM-SCR     Document 6014-1     Filed 11/26/18     Page 47 of 158

checks. We also identified logs that listed observation times after inmates had been discharged, suggesting the logs were prefilled. This strongly suggests that staff may not have actually conducted visual observation at the times the logs indicate, and may not have conducted the observations at all.

**Table 5**
**Problems With Monitoring of Inmates on Suicide Precaution at the Four Prisons We Reviewed**

| PRISON | NUMBER OF INMATES OUT OF 10 ON SUICIDE PRECAUTION | INMATES ON SUICIDE PRECAUTION WHO DID NOT RECEIVE STAGGERED CHECKS | | INMATES ON SUICIDE PRECAUTION WHO RECEIVED CHECKS WITH INTERVALS GREATER THAN 15 MINUTES | | NUMBER OF INMATES WITH LOGS NOT COMPLETED APPROPRIATELY (I.E. PREFILLED OR PREPRINTED) | TOTAL NUMBER OF SUICIDE PRECAUTION RECORDS REVIEWED THAT HAD AT LEAST ONE OF THE ISSUES IDENTIFIED IN THIS TABLE |
|---|---|---|---|---|---|---|---|
| | | NUMBER | PERCENTAGE | NUMBER | PERCENTAGE | | |
| CCWF* | 7 | 6 | 86% | 6 | 86% | 2* | 7 |
| CIW* | 7 | 6 | 86 | 2 | 29 | 1* | 6 |
| RJD | 5 | 4 | 80 | 4 | 80 | 2 | 5 |
| SAC | 6 | 3 | 50 | 5 | 83 | 3 | 6 |
| Totals | 25 | 19 | 76% | 17 | 68% | 8 | 24 |

Sources:  California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and Corrections' other policies.

\* CCWF and CIW transitioned to an electronic health record system in October 2015, and suicide precaution checks are now recorded electronically in this system. Therefore, we could only test for prefilling/preprinting for four of the seven inmates on suicide precaution at CCWF and six of the seven inmates on suicide precaution at CIW.

Officials at the four prisons agreed that suicide precaution observations have been problematic. The chief of mental health at CCWF stated that checks might have been late or not appropriately staggered in the past because staff did not understand how to implement staggered checks. She also explained that staff shift changes can cause intervals between checks that exceed 15 minutes and that staff are sometimes unable to conduct checks at the required times because they are engaged with other inmates. Prison staff at SAC indicated that the prison used preprinted forms in the past to help nurses stagger their checks but stopped this practice after the suicide expert's 2015 report stated that they were inappropriate. Further, they explained that SAC now conducts spot checks of its suicide precaution logs.

Although prison officials indicated the implementation of Corrections' new electronic health record system should reduce some of the issues we found, we still identified problems in the prisons that have implemented the system. According to Corrections' January 2016 report titled *An Update to the Future of California Corrections*, the electronic health record system allows providers to more efficiently prescribe treatment, maintain or

strengthen continuity of care, work cohesively with other treatment team members, and monitor inmate progress. Both CCWF and CIW implemented the system in October 2015, whereas Corrections' remaining prisons are in various stages of transitioning to the new system, with Corrections estimating that all prisons will have implemented it by October 2017. Prison officials at CCWF and CIW indicated that the shift to the new system has improved compliance with their monitoring of suicidal inmates because providers can order the behavior checks and set when they are due. However, we still found instances in which staff did not stagger behavior checks after CIW and CCWF implemented the system, and the checks continued to occur at predictable intervals. Corrections' chief psychologist of quality management and informatics asserted that he believed it is difficult in practice for mental health staff to mentally track every patient they are monitoring and plan to stagger the behavior checks. The continued problems we observed with staggering behavior checks suggest that Corrections needs to increase training for mental health staff on how to properly stagger such checks.

Additionally, out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies. The policies require that prison staff regularly observe all inmates placed in certain housing units.[4] These checks, known as security welfare checks, should occur at staggered intervals twice an hour, with the intervals not exceeding 35 minutes. However, the security welfare check data show that SAC and RJD did not conduct these checks as required. For example, four of the 10 inmates we reviewed at SAC were in segregated housing units, yet none appeared to have received timely security welfare checks on the days they either committed or attempted to commit suicide. For one of these inmates, SAC could not provide any evidence demonstrating the welfare checks occurred at all. For another inmate, the security welfare check log shows some intervals between checks were longer than an hour on the day the inmate committed suicide. According to a Corrections' suicide report, when staff discovered the inmate's body, more than 50 minutes had elapsed since the last check. As these examples clearly show, when they do not check on inmates as required, prison staff may miss opportunities to prevent inmates from injuring themselves or attempting to commit suicide.

Although Corrections has recently taken steps to ensure that prisons comply with the suicide precaution and security welfare check policies, it is too soon to determine the effectiveness of

*Out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies.*

---

[4]   Inmates may be removed from a prison's general population and placed in segregated housing for various reasons, including that they pose an immediate threat to the safety of others.

these actions. In particular, the suicide expert recommended in his January 2015 report that Corrections enforce its policies regarding behavior checks at staggered intervals not to exceed 15 minutes between checks for inmates on suicide precaution. In response to this recommendation, Corrections issued a memorandum in March 2016 reiterating policies for inmates placed in crisis beds, including the requirements for observing inmates on suicide precaution. Additionally, Corrections' quality administrator explained that it is developing an audit process that it plans to implement statewide for reviewing prisons' compliance with its policies and procedures. Corrections' regional teams will conduct this process, and it will include a review of suicide precaution logs and security welfare check logs. We describe this audit process in more detail in Chapter 3. Further, she indicated that as part of this audit process, Corrections is developing automated monitoring of suicide precaution checks in its electronic health record system to ensure compliance with Corrections' policies. However, since Corrections has not yet finalized its development of the audit process, including the automated monitoring, it is too early to determine its effectiveness.

*We found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds.*

Finally, we found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds. Corrections' policies require mental health staff to assess and monitor on a daily basis the condition of inmates who are in crisis beds. According to the policies, mental health staff must document these daily contacts within 24 hours. However, four inmates we reviewed at CCWF, two inmates at RJD, and two inmates at CIW did not receive daily progress notes for at least one day while in crisis beds. Without these notes, prison staff are hindered in their ability to assess inmates' progress and determine whether they should be either discharged or referred to a higher level of care. For example, an inmate at CCWF spent over 20 days in a crisis bed before she was discharged—more than twice as long as Corrections' policies specify—yet she did not receive progress notes for several of the additional days. Had staff completed the daily progress notes, this inmate might have received the treatment she needed in a timelier manner. The chief of mental health at CCWF could not explain why staff did not make these progress notes. The quality administrator stated that Corrections does not currently monitor prisons' compliance with requirements for daily progress notes for inmates in crisis beds but is open to incorporating such monitoring into its audit process once all prisons have transitioned to the electronic health record system in October 2017.

*Corrections' Suicide Reports Are Not Always Timely and Have Identified Various Concerns Regarding Prisons' Compliance With Emergency Response Requirements*

One of the experts engaged by the special master noted that the suicide review process and the issuance of suicide reports on each inmate review is one of the strengths of Corrections' suicide prevention program. However, of the 16 suicide reports that we reviewed, Corrections completed nine later than the 60 days following a suicide that its policy requires. In two instances, Corrections took 137 days to complete a report—more than double the timeline established in its policies. Corrections' clinical support chief attributed two of the late reports to a shortage of resources caused by a large number of suicides that occurred over a short time frame, while she explained that several others were late due to the complexities of the necessary reviews. However, she stated that delays in completing a suicide report would not delay Corrections from informing a prison of an urgent problem that needed immediate attention; in such cases, while reviewers are still on-site, they would inform the prison of the issue. Nevertheless, we believe that it is critical that Corrections complete these reports as expeditiously as possible because they are a crucial tool for identifying problems with the prisons' clinical care and compliance with policies and procedures, including their emergency responses to suicides.

In fact, several suicide reports we reviewed identified that prison staff have not always complied with Corrections' requirements and state regulations for how to respond to suicide attempts. For instance, state regulations and Corrections' policy require that a cut-down kit be immediately accessible in each housing unit of a prison and that staff use the kit in cases of attempted hangings. The text box lists the cut-down kit's required contents—several of which can be used to provide life-support care or clear an obstruction to an airway—which Corrections has identified as being critical to saving the life of inmates who attempt suicide by hanging. However, of the 15 suicides by hanging that we reviewed, Corrections' suicide reports noted three instances in which responders did not indicate having or using all or part of a cut-down kit. For example, one suicide report found that prison staff immediately responding to the hanging did not use a resuscitator at the scene of the emergency. Rather, the report found that prison staff indicated the resuscitator was used after the inmate had been transported away from the scene of the emergency.

---

**Contents of a Cut-Down Kit**

A cut-down kit must be kept in a lockable metal box maintained within each housing unit and must contain the following:

- An inventory list affixed to the inside of the box door.

- One emergency cut-down tool.

- One single patient use resuscitator.

- One CPR mask.

- A minimum of 10 latex gloves.

- A disposable oral airway.

Source: Corrections' 2009 program guide.

Case 2:90-cv-00520-KJM-SCR     Document 6014-1     Filed 11/26/18     Page 51 of 158

Corrections offered several possible explanations for why prison staff may not have carried or used the entire kit when responding to suicide attempts. According to an associate warden for the Division of Adult Institutions' mental health compliance team (compliance team associate warden), staff who did not bring an entire cut-down kit may have had any missing items elsewhere on their persons or used their required training to perform the necessary life-saving measures. She also noted that the kits' storage locations in some units may have restricted staff's access to them. For example, she explained that some housing units store kits in secured control booths, even though the booth windows may not be large enough for the required metal boxes to pass through. According to the compliance team associate warden, this limitation has resulted in prisons using various bags, buckets, or other storage devices to store cut-down kits—all of which deviate from Corrections' policy that prisons store kits in lockable metal boxes.

Corrections is aware of the problems related to the storage of the cut-down kits and is in the process of taking steps to address them. Specifically, the clinical support chief for mental health indicated that Corrections had formed a workgroup to address keeping the kits in bags rather than boxes so that they could be more easily stored in secured areas. The compliance team associate warden also explained that her team is in the process of developing a memo to update Corrections' policies on when to use cut-down kits and how prison staff should maintain them. According to the compliance team associate warden, the memo will make some significant changes to Corrections' current policies, including requiring that prisons keep all cut-down kit items together in a durable bag and that prison staff bring the kits to suicide attempts by asphyxiation in addition to hangings. It will also emphasize that staff must transport the entire kit to the scene of an emergency. The compliance team associate warden expects that Corrections will finish and implement the memo by August or September 2017. Without such changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.

*Without changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.*

Corrections' suicide reports also note other issues with prisons' emergency response, and the suicide review process can result in changes to emergency response preparedness. For example, two suicide reports identified issues with the timing of summoning medical responders. Corrections addresses these types of issues by including recommendations in its suicide reports, which the prisons are responsible for implementing. Furthermore, Corrections' policy requires specific staff to follow up with prisons to ensure that they implement the recommendations. To address several issues related to their emergency responses, the prisons involved submitted to Corrections evidence that they had provided additional training

to their staff, which we believe is appropriate. In another example, three suicide reports identified concerns with staff not relieving pressure on an inmate's airway when the inmate was discovered hanging. However, CIW identified that prison staff involved in one of these incidents had most recently received suicide prevention training roughly six months before the suicide, but that the training did not provide specific instruction on relieving tension on the inmate's body by using a stable object for support. We find it concerning that Corrections omitted this critical information from this training, as its mental health policies have specified since 2009 that responding prison staff must relieve pressure on the inmate's airway. In 2016 Corrections updated its suicide prevention training to include instruction to support the inmate's airway. Corrections' clinical support chief stated that the information should have been included in previous versions of the training and that its omission was an oversight. She explained that the information was likely missing from previous versions of the training because when her team revised the training they focused on adding new issues rather than reviewing the training to ensure that all of the necessary information was included. She further explained that she was surprised to find that the information was missing, because the same team that assembled the 2009 program guide with Corrections' policies put together the training.

**Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

• Its progress toward meeting its goals related to the completion of risk evaluations in a sufficient manner.

• Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

*Corrections*

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

To ensure that it identifies inmates who are at risk of attempting suicide and determines the treatments needed to prevent them from doing so, Corrections should immediately reevaluate and revise its goals for the percentage of risk evaluations that mental health staff must complete on time and for the percentage of risk evaluations that must pass its risk evaluation audits. It should set revised goals that better take into consideration the importance of mental health staff completing adequate risk evaluations in a timely matter. Corrections should require prisons that perform below its revised goals to develop improvement plans.

To improve the quality of its risk evaluations, by December 2017 Corrections should develop and incorporate into its electronic risk evaluation form prompts to aid mental health staff in completing adequate risk evaluations that meet all audit criteria.

To minimize the number of inmates who spend more than 24 hours in alternative housing, Corrections should use the audit process it is developing to monitor the amount of time inmates spend in alternative housing and annually reassess its need for additional crisis beds.

To ensure that prisons document the privileges, such as yard time, that inmates receive while in a crisis bed, Corrections should immediately require prisons to develop and formalize policies to record on their treatment plans the privileges inmates are allowed and receive while in a crisis bed.

To ensure that prison staff conduct required checks of inmates placed on suicide precaution in a timely manner, Corrections should implement its automated process to monitor suicide precaution checks in its electronic health record system by the time it is implemented systemwide in October 2017. Further, Corrections should train staff on how to plan for and conduct staggered suicide precaution checks.

To monitor prisons' compliance with its requirement that inmates in crisis beds receive daily progress notes, Corrections should implement monitoring of these notes electronically into its audit process by the time the electronic health record system is in use systemwide in October 2017. Corrections should require prisons that are out of compliance to develop and implement quality improvement plans, and it should follow up on the prisons' implementation of those plans.

To ensure that prison staff appropriately respond to attempted suicides, Corrections should implement its proposed changes to its emergency response policies regarding cut-down kits by December 2017 and should include in its policies a method for monitoring prisons' compliance.

# Chapter 2

## A NUMBER OF FACTORS HAVE LIKELY CONTRIBUTED TO HIGH RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS AT CIW

From 2014 through 2016, the rates of inmate suicides and suicide attempts at CIW were significantly higher than the rates at either CCWF or Corrections' men's prisons. Staff at Corrections and CIW provided several reasons for CIW's elevated rates, including inmate drug involvement, domestic violence in interpersonal relationships between female inmates, and the transfer of additional inmates to CIW and CCWF following the conversion of a women's prison to a men's prison. Because suicide is the result of multiple factors, we believe many of these causes could have contributed to CIW's high rates of suicides and suicide attempts. In addition, we identified several factors that many of Corrections' prisons share in common that may influence rates of inmate suicides and suicide attempts. Specifically, Corrections has not established a means of ensuring that all staff receive required trainings related to suicide prevention and response, and as a result, some staff may not have the knowledge necessary to address inmates' mental health needs. Further, Corrections has struggled to fill certain mental health staff vacancies, particularly for psychiatrist positions. Finally, Corrections has not recently updated its staffing model to ensure that the prisons have adequate staff to meet their inmates' mental health needs.

### Corrections Has Identified Possible Causes for the High Suicide Rate at CIW

As the Introduction discusses, the rates of suicides and suicide attempts at women's prisons in California have increased over the last several years. After declining from 2012 through 2013, the rates of both suicides and attempted suicides at women's prisons rose dramatically, from 3.7 attempts and 0.35 suicides per 1,000 inmates in 2014 to 10.3 attempts and 0.63 suicides in 2016.

Further, as Table 6 on the following page shows, the rates of suicides and attempted suicides at women's prisons were significantly higher and less stable than the rates at other prisons in California during this same time period. Although the increase in female inmate suicides is dramatic, Corrections' clinical support chief noted that even one suicide can significantly affect the rate because of the small population of female inmates. However, she acknowledged that there have been more suicides among female inmates than she would have expected and she believes that California's rates are high in comparison to large prison systems in other states.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 55 of 158

**Table 6**
**Suicides and Attempted Suicides in Adult Prisons From 2012 Through 2016**

| | | INMATE POPULATION* TOTALS | ATTEMPTED SUICIDES | | SUICIDES | |
|---|---|---|---|---|---|---|
| | | | TOTALS | PER 1,000 INMATES | TOTALS[†] | PER 1,000 INMATES |
| 2012 | Women's prisons | 6,643 | 30 | 4.5 | 1 | 0.15 |
| | All other prisons[‡] | 119,633 | 322 | 2.7 | 24 | 0.20 |
| | All prisons | 126,276 | 352 | 2.8 | 25 | 0.20 |
| 2013 | Women's prisons | 5,627 | 23 | 4.1 | 1 | 0.18 |
| | All other prisons[‡] | 117,611 | 351 | 3.0 | 25 | 0.21 |
| | All prisons | 123,238 | 374 | 3.0 | 26 | 0.21 |
| 2014 | Women's prisons | 5,646 | 21 | 3.7 | 2 | 0.35 |
| | All other prisons[‡] | 117,006 | 344 | 2.9 | 18 | 0.15 |
| | All prisons | 122,652 | 365 | 3.0 | 20 | 0.16 |
| 2015 | Women's prisons | 4,887 | 45 | 9.2 | 2 | 0.41 |
| | All other prisons[‡] | 109,243 | 346 | 3.2 | 17 | 0.16 |
| | All prisons | 114,130 | 391 | 3.4 | 19 | 0.17 |
| 2016 | Women's prisons | 4,743 | 49 | 10.3 | 3 | 0.63 |
| | All other prisons[‡] | 114,938 | 370 | 3.2 | 23 | 0.20 |
| | All prisons | 119,681 | 419 | 3.5 | 26 | 0.22 |
| 5-YEAR TOTALS | Women's prisons | | 168 | | 9 | |
| | All other prisons[‡] | | 1,733 | | 107 | |
| | All prisons | | 1,901 | | 116 | |

Sources: California State Auditor's analysis of Corrections' COMPSTAT metrics and additional information on suicides provided by various prisons.

\* *Inmate population* is the average of the 12 months in each year.

† The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC that were not included in the COMPSTAT data; however, we caution that these numbers may still not be accurate.

‡ According to a COMPSTAT research program specialist, Corrections expresses its numbers in COMPSTAT by institution and not by gender. Thus, *Women's prisons* includes CCWF and CIW, as well as the former Valley State Prison for Women (VSPW) in 2012, and CCWF and CIW from 2013 through 2016. *All other prisons* comprises nearly all male inmates; however, it does include inmates in other facilities, including some that house both men and women, such as certain medical facilities, and Folsom State Prison, which has a small women's facility.

The clinical support chief offered three primary reasons for why the suicide rate at women's prisons has been high in recent years. First, she explained that unlike male inmates, female inmates tend to build family units within prisons, and Corrections has found that domestic violence can occur within these units. She believes that this domestic violence has contributed to the higher suicide rates at women's prisons. She stated that in order to address this issue, Corrections is planning to develop a curriculum regarding same-sex domestic violence for female inmates who receive mental health services.

The second reason the clinical support chief pointed to was drug involvement. Specifically, she explained that substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma. That trauma, combined with substance abuse, likely increases the risk of suicide. According to the clinical support chief, drugs or drug trafficking were involved in four of the six most recent suicides in women's prisons. She stated that in order to address this issue, Corrections is hoping to finalize a contract in the near future to establish a co-occurring disorders program at CIW and at other prisons. She explained that this program would be modeled on best practices that combine mental health issues with treatment for substance abuse.

Finally, the third reason she cited was that the realignment of prisons changed the composition of the inmate population in state prisons. In 2011 the Legislature passed various laws that realigned the criminal justice system by allowing inmates who were not convicted of serious or violent felonies, or felonies requiring registration as a sex offender, to serve their sentences in county jails rather than state prisons. She explained that as a consequence of realignment and lower-level offenders being sentenced to county jails, inmates who remain in state prisons generally have more severe behavioral issues and are more likely to have committed violent crimes. She also said that inmates who have committed violent crimes are potentially more likely to commit suicide because they have a history of using violence as a response to various situations, including self-directed violence. As a result, female inmates in the State's prisons may be more likely to make lethal suicide attempts.

These reasons, however, apply to all female inmates and do not necessarily explain the difference in the rates of suicides and attempts between CIW and CCWF, which are both women's prisons. As Table 1 in the Introduction shows, all but one of the suicides occurring from 2014 through 2016 at the two women's prisons we reviewed occurred at CIW. During this same period, there were also more suicide attempts at CIW than at CCWF, despite CIW's smaller inmate population. For example, there were 11 attempted suicides at CCWF in 2015, but 34 attempted suicides at CIW. We asked the clinical support chief why she thought the suicide and suicide attempt rates at CIW were higher than those at CCWF from 2014 through 2016 and she stated that she did not have any easy hypotheses for why the rates were higher at CIW. She additionally described that based on her understanding, the characteristics of the inmates at CIW and CCWF do not seem to differ significantly. Moreover, the Centers for Disease Control and Prevention has identified that suicidal behavior results from a combination of many factors—including genetic, developmental, environmental, psychological, social, and cultural factors—operating through diverse and complex pathways. It is therefore likely that there are many components to the cause for the difference in suicide and suicide attempt rates between CIW and CCWF.

*Substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma that, when combined with substance abuse, likely increases the risk of suicide.*

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 57 of 158

Prison officials at CIW, however, did identify one other explanation for why the suicide rate at CIW was elevated from 2014 through 2016: they attributed the increased suicide rate at CIW to the conversion of VSPW to a men's prison and the subsequent transfer of higher-security-level inmates to CIW than the prison was designed to house. Corrections converted VSPW to a men's prison due to the decline in the number of female inmates in state prisons following realignment. According to Corrections' acting associate warden of female offender programs and services, Corrections transferred about 970 inmates to CCWF and 400 inmates to CIW from VSPW from September 2012 through January 2013. Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units. The chief executive officer at CIW explained that CIW was not designed to house high-security-level offenders, and he agreed that the change in prison culture following the conversion of VSPW may have contributed to the increase in suicides and attempted suicides. We attempted to verify whether high-security-level inmates were transferred to CIW; however, Corrections' acting associate warden of female offender programs and services explained that Corrections does not have a historical breakdown of that information.

*Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units.*

Although Corrections acknowledged at the time that the conversion of VSPW to a men's prison might significantly affect CIW and CCWF, it did little to prepare those prisons. According to documentation Corrections provided, beginning in 2011, Corrections developed action plans for the conversion of VSPW and held meetings with certain stakeholders to discuss these plans. However, Corrections was unable to provide evidence of such a meeting occurring at CIW. Further, CIW officials were unable to recall the occurrence of such a meeting. Corrections distributed a memorandum in late August 2012 announcing the conversion of VSPW and the resulting transfer of its female inmates to CIW, CCWF, and certain other special programs beginning the next month. However, the memorandum lacked any details regarding the steps the prisons should take to prepare for the new inmates; instead, it simply stated that the support of the wardens in ensuring their prisons' assistance was appreciated. According to Corrections' acting associate warden of female offender programs and services, the wardens at each prison were responsible for preparing their staff for the conversion and the subsequent increases in their inmate populations. Both an associate warden at CIW and its chief executive officer confirmed that, beyond the standard preparations made for inmate transfers, they could not remember any special preparations or training that CIW provided for its staff.

The inmates who transferred from VSPW were not the majority of those attempting suicide at either CIW or CCWF. This supports CIW officials' perspective that there was a cultural change at the prison subsequent to the transfers. According to CIW, inmates who transferred from VSPW committed 8 percent of the suicides and suicide attempts at CIW from 2014 through 2016. Similarly, CCWF's data show inmates who transferred from VSPW committed 12 percent of the suicide attempts at CCWF during this period. CIW's chief executive officer stated that before the transfer of inmates from VSPW, he would have described CIW as a prison that had relatively few issues with inmates. He explained that he could no longer describe the prison in this way after the transfer because the inmates from VSPW brought with them a culture of substance abuse, illegal drug trading, and violence related to drug trafficking.

**CIW and Other Prisons Have Not Ensured That Their Staff Have Received Required Training on Suicide Prevention and Response**

As we describe in the previous section, Corrections and CIW were able to identify certain factors that are unique to CIW and CCWF and that may have contributed to CIW's high rates of suicides and suicide attempts. However, we identified additional factors that may increase the risk of inmate suicides and attempts at both men's and women's prisons throughout the State. One of these factors is Corrections' failure to ensure that prison staff receive required training related to suicide prevention and response. We believe this lack of training may have contributed to some of the problems we identify in Chapter 1.

Because effective suicide prevention and response at prisons requires a collective effort, staff that routinely interact with inmates should receive training on how to identify and help inmates at risk of suicide as well as on how to respond to suicide attempts. When staff fail to fulfill their duties as Corrections' policies require, it may result in the serious injury or death of inmates whose lives depend on both the quality and promptness of the interventions that staff provide. The Joint Legislative Audit Committee (Audit Committee) asked us to evaluate the adequacy of the mental health and suicide prevention training specifically for CIW staff, and we found that the prison did not ensure that its staff received the required trainings. We also identified similar attendance concerns at the three other prisons we reviewed, and we found that some trainings need improvement in terms of their content and delivery.

Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide. State regulations and Corrections' policies require each prison to ensure that all staff

*Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide.*

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 59 of 158

**Selected Training That Corrections Requires Related to Suicide Prevention and Response**

**Annual Suicide Prevention:** Provides staff with a basic understanding of suicide prevention and their roles when working in a prison. This training includes elements related to responding to suicide attempts.

**Risk Evaluation Mentoring Program:** Provides one-on-one training and mentoring on the administration of risk evaluations. Mentoring includes feedback on risk assessment, risk formulation, and crisis intervention skills.

**Risk Evaluation for Mental Health Staff:** Focuses on practical methods to improve the accuracy and reliability of risk assessments across staff and settings. This training is designed to complement the risk evaluation mentoring program.

**Safety/Treatment Planning Within Suicide Risk Assessment and Management:** Helps mental health staff know when and how to create adequate treatment/safety plans that contain specific actions mental health staff and inmates will undertake to reduce risk of suicide.

Sources: State regulations, Corrections' policies, 2016 lesson plans, and presentation slides for the listed trainings.

whose assignments routinely involve inmate contact complete various trainings related to suicide prevention and response. The text box lists some of these trainings. In addition, we reviewed a training on working with female offenders, which provides information and skills that support managing female inmates safely and effectively. However, when we reviewed training records for a selection of staff at CIW, we found that prison officials could not demonstrate whether some staff had attended certain trainings. Specifically, the in-service training manager at CIW could not demonstrate that four of the 20 staff members attended a required annual suicide prevention training during 2016. Further, of the 15 mental health staff we reviewed who were required to take the same course at CIW in 2015, the prison's documentation shows that only nine attended.

Moreover, some mental health staff at CIW did not attend a required training on conducting risk evaluations or receive mentoring. Corrections requires staff who will be evaluating whether inmates are at risk of suicide to attend a training on how to complete risk evaluations. We reviewed 10 psychologists, psychiatrists, or social workers who were required to attend this training within 180 days of hire; however, the documents the prison provided demonstrate that only six did so. Further, we found that CIW did not adequately audit risk evaluations for five of the 10 mental health staff we reviewed, and did not provide mentoring for two mental health staff that failed the audit. As Chapter 1 explains, the correct completion of risk evaluations is critical because they help mental health staff identify inmates who are likely to attempt suicide as well as the treatments needed to prevent them from doing so.

CIW provided several reasons for why it was unable to demonstrate that certain staff attended the required trainings. In particular, the in-service training manager explained that some of the staff simply did not attend the training. However, he also stated that before May 2015, CIW did not effectively track its training. Further, he explained that staff in the training units at CIW and other prisons do not always record attendance—which is demonstrated by a sign-in sheet—in Corrections' tracking system. He indicated that as a result, when staff transfer to CIW, CIW must directly contact the prisons at which they previously worked to determine if those prisons can provide the sign-in sheets for trainings. This situation could lead to staff missing required trainings. For example, CIW's in-service training manager stated that one staff member we

reviewed had received the required suicide prevention training at a different prison in 2016, but he could not provide documentation that the staff member had actually received this training.

Some of the problems we found are not unique to CIW: Corrections reported that not all staff at the prisons we reviewed received required trainings in 2016. For example, at SAC, about half of the required staff received training on the principles of safety planning for suicidal inmates. Attendance compliance at RJD, CIW, and CCWF was 72 percent, 83 percent, and 89 percent, respectively, with this training requirement, according to Corrections' reports. Staff attendance rates for the annual suicide prevention training ranged from 68 percent at CIW to 95 percent at CCWF. Staff attendance was similar for the suicide risk evaluation mentoring, with reported attendance rates ranging from 71 percent at SAC to 95 percent at CCWF. Corrections' clinical support chief stated that Corrections has not followed up with the prisons regarding the reasons for the low attendance rates. She explained that although the prisons provide Corrections with some staff attendance rates at trainings, Corrections does not request that they explain or justify those rates. Rather, she stated that Corrections relies on the prisons' in-service training units and chiefs of mental health to address training noncompliance issues. Lastly, although not a training on suicide prevention, a program regarding working with female offenders was offered in 2015 and 2016. CIW and CCWF reported average staff attendance rates of 74 percent and 91 percent, respectively, for this training.

This is not a new problem, nor is it isolated. In his 2016 report regarding selected prisons' suicide prevention practices, the suicide expert also identified concerns with staff attendance at required trainings in 2014. Specifically, he found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during the period he reviewed. He reported that 94 percent of custody staff, 69 percent of medical staff, and 63 percent of mental health staff received the annual suicide prevention training in the 18 prisons during 2014. He concluded that the compliance rates for training both medical and mental health staff remained problematic.

*The suicide expert found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during 2014.*

In addition, our review found that CIW's trainers themselves have missed required classes. Corrections requires that instructors teaching suicide prevention and risk evaluation trainings participate in specific train-the-trainer courses. Although both of CIW's instructors for the suicide prevention training and the instructor for the risk evaluation training attended the required courses, only one of five of its mentors had received the necessary training. Further, the two suicide prevention trainers taught several trainings before they were qualified to do so per Corrections' requirements. CIW's suicide prevention

Case 2:90-cv-00520-KJM-SCR     Document 6014-1     Filed 11/26/18     Page 61 of 158

team coordinator stated that she received training from Corrections and that she subsequently provided training to all mentors. She explained that she believed the training she provided was sufficient to fulfill the training requirements for mentors. However, the clinical support chief stated that all mental health staff are required to receive Corrections' training before mentoring other staff. She further explained that, at one point, Corrections allowed prisons to train their own mentors, but it discontinued this practice around 2013 after realizing the content was not always adequately communicated.

Unless Corrections ensures that its trainers have the knowledge and tools necessary to provide instruction in an engaging and effective manner, it reduces the effectiveness of its training about suicide prevention practices. In the suicide expert's January 2015 report, he stated that he attended the required one-hour suicide prevention trainings at seven prisons and that many were problematic. For example, the suicide expert noted that at one of the trainings, the instructor simply read the nearly 40 PowerPoint slides at a fairly quick pace, ending the presentation after about 25 minutes. The suicide expert pointed out that another training lasted roughly 40 minutes and that the only interaction between the instructor and the participants occurred when one participant asked about the length of the class. He also observed that one prison had only offered the suicide prevention training via DVD. If Corrections does not ensure that all trainers receive instruction on delivery, it risks its trainers poorly presenting information and failing to create meaningful discussions regarding the training topic, which significantly diminishes the value to those attending the training.

*We found that some of Corrections' suicide prevention trainings were missing required content.*

Additionally, we found that some of Corrections' suicide prevention trainings were missing required content. For example, Corrections' policies require that the annual suicide prevention and response training explain how to handle situations in which inmates with mental health concerns commit violations of prison rules. However, we did not find such content in the suicide prevention training from 2014 through 2016. Corrections offers a training that focuses on situations involving violations of prison rules, but that training is not offered to everyone whom Corrections requires to take the annual suicide prevention training. Corrections must also follow a 2015 court order requiring it to incorporate into its trainings certain topics that the suicide expert's January 2015 report outlines. The suicide expert recommended that Corrections expand the length and content of certain suicide prevention trainings by including various topics, such as dealing effectively with inmates perceived to be manipulative. Although the annual suicide prevention training, risk evaluation training, and a training aimed at helping staff improve the accuracy of diagnoses contained discussion of such perceptions, a webinar on treatment planning in risk evaluations did not. Without required content, Corrections' trainings will lack effectiveness in

preventing suicides and improving responses to attempted suicides. For example, if Corrections' staff assume inmates are expressing suicidal thoughts in order to obtain some benefit—in other words, are being manipulative—the staff may miss important warning signs of impending suicide attempts.

## Staff Vacancies Continue to Challenge Corrections' Ability to Provide Sufficient Mental Health Services to Inmates

For more than 20 years, Corrections has continued to struggle to fill key mental health position vacancies, creating the risk that it may not be able to adequately serve inmates in need of mental health services. In a May 2016 report, the special master recounts that the court in *Coleman* ruled in 1995 that Corrections was significantly and chronically understaffed in the area of mental health care services and did not have sufficient staff to treat the large numbers of mentally ill inmates in its custody. The special master reported that during the intervening 20 years, the proportion of Corrections' inmates requiring mental health care soared from less than 15 percent to 29 percent of the total inmate population, for a total of nearly 37,000 inmates requiring mental health care. In 2002 the court ordered Corrections to maintain a vacancy rate among psychiatrists, psychologists, and social workers of not more than 10 percent.

When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers—we found that vacancy rates were highest among psychiatrists. According to our analysis of Corrections' data, its prisons overall had a 31 percent vacancy rate for psychiatrists, 9 percent for psychologists, and 2 percent for social workers as of December 2016. Each of the four prisons we reviewed had vacancy rates below 10 percent for social workers and at or below 10 percent for psychologists. However, CCWF, RJD, and SAC have continued to struggle to fill psychiatrist positions, with vacancy rates of about 32 percent, 31 percent, and 44 percent, respectively. According to a March 2017 report from the National Council for Behavioral Health, there is a national shortage of psychiatrists. Only CIW had vacancy rates below 10 percent for all three classifications. When prisons do not maintain adequate mental health staff, their ability to provide quality mental health care to inmates can suffer. For example, according to the coordinator of SAC's suicide prevention team, a shortage of psychiatrists has a trickle-down effect because if inmates do not receive the proper medication, they may act out more and require additional attention or therapy, exacerbating mental health staff's already heavy workloads.

*When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers— we found that vacancy rates were highest among psychiatrists at 31 percent as of December 2016.*

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 63 of 158

Furthermore, the prisons' total authorized mental health positions may not be enough to fulfill inmates' needs. For example, CIW's chief of mental health stated that even when CIW's mental health positions are almost fully staffed, mental health staff still feel overwhelmed and do not have time to meet with inmates as often as they believe is needed. Similarly, the chief of mental health at CCWF stated that although workloads seem manageable based on Corrections' minimum requirements for mental health care, inmates sometimes require significantly more visits than the minimum required, effectively increasing staff workload. She explained that given the increased workload for suicide prevention, mental health staff may neglect routine but important tasks, such as completing follow-up suicide risk evaluations, to focus on urgent matters, such as responding to imminent suicide threats.

The staffing problems that these prisons noted are likely in part due to the fact that Corrections has not updated its staffing model since 2009. Specifically, the chiefs of mental health at both CIW and CCWF expressed the need for Corrections to revisit the staffing model it uses to determine the number of mental health staff needed per prison. For example, CCWF's chief of mental health indicated that the staffing ratios for women's prisons is 20 percent higher than staffing ratios for men's prisons in the model; however, this adjustment is not enough to compensate for the increased number of mental health crises and referrals that arise with the female inmate population. Corrections' associate director of policy and clinical support (associate director) acknowledged that Corrections has not revised the model since 2009, eight years ago. She explained that when calculating the number of staff needed per prison, the model does not take into account the following factors: gender; facility layout; security level; and number of inmates in each security level, excluding restricted housing. The associate director explained that she believes Corrections needs to revisit the 2009 staffing model to take into account some of these factors as well as Corrections' revised policies, recent court orders, the prisons' implementation of the new electronic health record system, and the prisons' adherence to requirements based on its current filled positions.

**Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- The status of its efforts to ensure that all mental health staff receive required training and mentoring related to suicide prevention and response.

- The status of its efforts to fill vacancies in its mental health treatment programs, especially its efforts to hire and retain psychiatrists.

*Corrections*

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should take the following actions:

- Implement its planned same-sex domestic violence curriculum by December 2017.

- Continue to explore additional programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that trainers and risk evaluation mentors at all prisons are able to train staff effectively, Corrections should immediately begin requiring prisons to report the percentage of their trainers and mentors who have received training on how to conduct training and mentoring. It should work with prisons to ensure that all trainers and mentors receive adequate training.

To maximize the value of its trainings related to suicide prevention and response, Corrections should ensure that starting in January 2018, its trainings include all content that the special master and its own policies require.

Case 2:90-cv-00520-KJM-SCR   Document 6014-1   Filed 11/26/18   Page 65 of 158

To ensure that it has enough staff to provide mental health services to all inmates who require care, Corrections should review and revise its mental health staffing model by August 2018.

# Chapter 3

## TO REDUCE INMATE SUICIDES AND ATTEMPTS, CORRECTIONS MUST STRENGTHEN ITS OVERSIGHT AND DEMONSTRATE GREATER LEADERSHIP

Corrections has struggled for decades to adequately provide mental health services to inmates. As a result, most of its efforts to reduce its inmate suicide rates in recent years have been in response to court-ordered oversight. For example, in response to the suicide expert's 2015 recommendations, it adopted a number of policies, implemented facility improvements, and improved its training. However, its policies are unlikely to have significant impact if it does not ensure that the prisons fully implement and adhere to them—which it has yet to do. Although Corrections stated it is developing an audit process to ensure that prisons comply with policies and procedures, it has known about their noncompliance for years, and it is uncertain as to when it will fully implement this process across all prisons. Similarly, Corrections created teams at each of the prisons to specifically focus on suicide prevention and response; however, it has not ensured that these teams consistently provide leadership on critical issues. In addition, Corrections has not always proactively sought opportunities to demonstrate leadership in regards to documenting and disseminating programs or best practices for preventing inmate suicide.

### Although Corrections Has Developed Policies and Training to Address Past Recommendations, It Has Not Ensured That Prisons Fully Implement These Changes

From November 2013 through July 2014, the suicide expert conducted a comprehensive audit of suicide prevention practices in each of Corrections' prisons. This audit resulted in a January 2015 report containing 32 recommendations. The court in *Coleman* subsequently ordered Corrections to work with the special master to develop strategies to implement these recommendations, and it also ordered the suicide expert to provide an updated report on Corrections' progress. The suicide expert completed this updated report in January 2016, in which he stated that Corrections had begun to implement corrective actions in response to his recommendations. Through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions, Corrections has now addressed the majority of the recommendations from the suicide expert's January 2015 report. Table 7 on the following page lists selected recommendations from the suicide expert's 2015 report to Corrections and Corrections' responses to those recommendations.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 67 of 158

**Table 7**
**Selected Recommendations From the Suicide Expert's 2015 Report**

| RECOMMENDATION | CORRECTIONS' ACTION IN RESPONSE TO RECOMMENDATION | DATE ACTION TAKEN | IS CORRECTIONS ENFORCING/MONITORING COMPLIANCE WITH THIS POLICY? |
|---|---|---|---|
| Corrections should revise its risk evaluation mentoring program to require ongoing mentoring throughout the year and audit mental health staff's risk evaluations on a regularly scheduled basis. | Issued memorandum to all prisons implementing a revised mentoring program and describing regular audits of risk evaluations. | March 2016 | **No.** Corrections tracks aggregate information the prisons report to monitor compliance, but does not follow up with the prisons. |
| Corrections should enforce its policy authorizing only two levels of observation for suicidal inmates: *suicide precaution* and *suicide watch*. | Issued memorandum to all prisons reiterating existing policy that the only two levels of observation are suicide precaution and suicide watch. | March 2016 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take action to correct inaccurate documentation on inmate suicide precaution observation forms. | Issued memorandum to all prisons reiterating existing policy regarding documentation on suicide precaution observation forms. | March 2015 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should enforce its policy of housing only newly admitted inmates in administrative segregation units in retrofitted suicide-resistant cells for their first 72 hours of admission to the prison. | Included reiteration of this policy in its annual suicide prevention training. | July 2015 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should ensure all crisis beds are suicide resistant. | Developed a schedule to begin retrofitting cells at identified prisons. | November 2015 | Corrections indicated one prison required extensive retrofitting and is still in progress. |
| Corrections should revise its policy so that all inmates discharged from a crisis bed or alternative housing, where they had been housed due to suicidal behavior, are observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. | Issued revised policy regarding checks of inmates discharged from crisis beds, and is working to finalize a policy regarding alternative housing. | January 2016 | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take corrective action to address inconsistencies between privileges allowed for patients in crisis beds. | Issued memo reiterating and clarifying policy regarding privileges for inmates in crisis beds. | June 2016 (revised February 2017) | **No.** Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |

Sources: The suicide expert's 2015 report, Corrections' memoranda, and interviews with Corrections' officials.

Several of the recommendations from the suicide expert's 2015 report directed Corrections to revise, examine, or enforce existing policies. Corrections addressed several of these recommendations by issuing memos to the prisons that either reiterate or revise policies. For example, Corrections' 2009 program guide states that custody staff must conduct hourly checks for the first 24 hours after discharge of inmates at risk of suicide who had been admitted to a crisis bed or alternative housing. However, the suicide expert recommended in his 2015 report that these checks occur at 30-minute intervals. In response to this recommendation, Corrections issued a memorandum in January 2016 requiring checks every 30 minutes for the first 24 hours that inmates are discharged from crisis beds.

Corrections is working to finalize a similar policy for inmates released from alternative housing. Further, Corrections made changes to its suicide prevention training and risk evaluation mentoring program.

However, Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations. For example, despite these policies, many of the problems we identify in Chapter 1 relate to the completion and quality of both risk evaluations and treatment plans. Further, these same issues have persisted for years: court-ordered reports by the special master dating back to 2002 identified similar concerns. In addition, Corrections has yet to ensure attendance at suicide prevention team meetings, as we describe later in this chapter. Further, as we show in Chapter 1, the monitoring it currently provides does not result in significant positive change at the prisons. Although revising policies and holding trainings are important parts of improving prisons' ability to prevent and respond to suicides, Corrections cannot ensure that prisons actually comply with its policies unless it provides adequate monitoring.

Corrections is still developing an audit process to, among other things, track implementation of several of the suicide expert's recommendations. According to Corrections' quality administrator, Corrections is integrating certain recommendations from the suicide expert's report into an audit process for conducting audits of prisons' compliance with policies and procedures. The portion of the audit process conducted on site at the prisons rates 12 broad areas—including treatment planning processes, suicide prevention and response to suicide, leadership, staffing, and quality management—on a scale ranging from *proficient* to *urgent concerns*. The resulting reports include specific recommendations.

We reviewed the report of a pilot audit that Corrections conducted of a certain prison and found that the audit was thorough and critical in its analysis of identified deficiencies. According to the report, the audit combined performance data, document reviews, patient and staff interviews, health care record reviews, and the regional teams' on-site observations of the prison's day-to-day operations. Our review suggests that the audit process may prove helpful as Corrections begins improving areas in which it has consistently struggled, particularly because it requires monitoring of several of the suicide expert's recommendations. For example, in response to one of the suicide prevention expert's recommendations, Corrections issued a memo to prisons in March 2016 that explicitly states that they can use only suicide watch or precaution levels of observation for suicidal inmates in crisis beds. According to the health care administrator in charge

*Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations.*

of quality control, Corrections added instructions on reviewing prisons' use of suicide watch and precaution to the audit process in response to the suicide expert's recommendations.

Nevertheless, the audit process has been in development for some time. According to Corrections' chief psychologist of the health care division, the court in *Coleman* indicated several times that Corrections needs to demonstrate that it has a full quality improvement system in place that includes processes for continually monitoring, enforcing, and improving its policies and procedures. She explained that, to comply with this requirement with the eventual goal of replacing the court's monitoring, Corrections began developing the audit process and expanded the role of its regional teams, who will be following it. Corrections' quality administrator stated that Corrections first began development of the audit process in 2013, that the regional teams have conducted several initial audits of selected prisons, and that they plan to continue developing the process for use systemwide in the future. However, the quality administrator indicated that Corrections has not established a concrete date for implementation of the audit process systemwide. Corrections' quality administrator stated that it is continuing to work collaboratively with the special master to finalize the audit process. Until Corrections fully implements the audit process systemwide, it lacks assurance as to whether its prisons are adhering to the policies it put in place to address several of the suicide expert's recommendations.

*Despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009.*

Additionally, despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009, creating the potential for confusion for the prisons that must implement those policies. Corrections' clinical support chief stated that it would have to coordinate any formal revision to the entire program guide with the special master. However, she explained that prisons can access all of Corrections' policy changes at a central location on its intranet. Further, in March 2017 the court in *Coleman* encouraged Corrections to update its program guide through the publication of addenda called "pocket parts." However, the fact that prison and mental health staff must refer both to the program guide and to any relevant update memos and addenda when determining how to implement policies, is inefficient and adds needless confusion to an already complex process.

Updating the program guide would also help Corrections to identify and correct inconsistencies within it. For example, the program guide states that inmates must not stay in crisis beds for more than 10 days without the approval of a high-ranking official. However, one part of the program guide states that approval must come from the chief of mental health or the appropriate designee,

whereas another part states that approval must come from the chief psychiatrist or the appropriate designee. These are different positions at the four prisons we reviewed. Although we did not identify specific concerns related to this discrepancy, it is further indicative of the need for Corrections to review and revise its program guide. When Corrections does not ensure that prisons are implementing policy changes appropriately or does not document its policies in a clear, organized, consistent, and consolidated fashion, it risks creating confusion and inconsistency in the treatment that prisons provide to inmates. According to Corrections' deputy director of the statewide mental health program, Corrections intends to incorporate appropriate portions of the program guide into state regulations, which will help strengthen Corrections' mental health system. She explained that Corrections has been working on memorializing the policies in regulations, but has yet to begin the formal process for promulgating the regulations and does not have a time frame for when it intends to begin this process.

## Corrections Has Not Ensured That Prisons' Suicide Prevention Teams Adequately Fulfill the Purposes for Which They Were Created

Although Corrections established a statewide suicide prevention team as well as suicide prevention teams at each of the prisons, it has not ensured that these teams exercise sufficient leadership to help prevent suicides. To reduce the risk of inmate suicides, Corrections' policies require the suicide prevention teams to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. Corrections' policies state that the statewide suicide prevention team and teams at each prison must meet at least monthly, and require that individuals in certain positions, as the text box shows, attend each meeting. However, only one of the four prisons we reviewed met Corrections' attendance requirements. Further, the suicide prevention teams often failed to discuss key issues that might enable the prisons to better prevent suicides.

Suicide prevention and response in California's prisons requires attention from multiple clinical disciplines. If required members are absent, they and the staff they supervise risk missing important information, and the suicide prevention team lacks the insight of the missing members. Nonetheless, only CCWF met attendance

---

**Required Membership of Suicide Prevention Teams**

Prisons:

- Suicide prevention team coordinator (chairperson)
- Chief psychiatrist*
- Chief psychologist*
- Supervising registered nurse
- Senior licensed psychiatric technician or licensed psychiatric technician
- Correctional health services administrator
- Department of State Hospitals' coordinator

Statewide:

- Suicide prevention team coordinator (chairperson)
- Chief psychiatrist
- Chief psychologist
- Nurse consultant
- Designated facility captain

Source:  Corrections' 2009 program guide.

\* A senior psychiatrist or senior psychologist attendance meets the quorum requirement in prisons without a chief psychiatrist or chief psychologist position.

requirements for its team in 2016. Although each of the four prisons we visited held monthly suicide prevention team meetings during 2016, the minutes of these team meetings at CIW, SAC, and RJD indicate that they did not meet attendance requirements for 11, 10, and eight monthly meetings, respectively, in 2016. We also found instances in which required suicide prevention team members missed several meetings. For example, at CIW the chief psychiatrist or a designee failed to attend eight of 12 meetings, and at SAC the supervising registered nurse missed six of 12 meetings.

These attendance issues have been brought to Corrections' attention before, and it has pointed to obstacles that make achieving a quorum challenging. For instance, the suicide expert stated in his 2016 report that he found that attendance by some required suicide prevention team members, particularly chief psychiatrists or their designees, was inconsistent at many prisons. Specifically, he explained that eight of the 18 suicide prevention teams he reviewed still fell short of attaining a quorum at their monthly meetings. Corrections' clinical support chief stated that prison staff have many competing demands, making it difficult for teams to coordinate schedules and added that Corrections overlooked the difficulties in assembling key participants in these meetings at the time leadership drafted the program guide. She further explained that some elements regarding suicide prevention team attendance are not clear, such as whether one individual may fill multiple roles and who may send designees. Nevertheless, we found that CCWF was able to meet the attendance requirements every month during 2016. CCWF's chief of mental health explained that its team plans several weeks in advance of a meeting to ensure that all required members can attend, reminds team members about the meeting during the week it is scheduled, and waits until all members are present before starting the meeting.

Further, the suicide expert raised concerns regarding whether the prisons' suicide prevention teams had fully met their responsibilities, some of which are listed in the text box. For instance, one of these responsibilities is ensuring each prison's implementation of and compliance with all of Corrections' policies and procedures relating to suicide prevention and response. However, in his 2016 report, the suicide expert found that the suicide prevention teams had not adequately monitored and evaluated the risk evaluations completed at their respective prisons. Specifically, the suicide expert stated that the prisons' suicide prevention teams were collecting only

---

**Selected Responsibilities of
Prisons' Suicide Prevention Teams**

- Ensure implementation of and compliance with all Corrections' policies and procedures relating to suicide prevention and response.

- Implement training related to suicide prevention and response.

- Update local operating procedures to ensure consistency with Corrections' policies regarding suicide prevention and response.

- Review all suicides and suicide attempts in response to which staff performed CPR or other medical procedures, as well as prison staff cell entry and cut-down procedures.

- Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths.

Source: Corrections' 2009 program guide.

quantitative but not qualitative monthly data on the completion of
risk evaluations. Moreover, in his 2015 report, the suicide expert
explained that he found that the prisons engaged in little discussion
of overall suicide prevention strategies during their meetings. He
commented that most meeting minutes reflected recitations of
certain monthly statistics, but included few meaningful discussions
about challenging cases or struggles with risk evaluations and
treatment planning. In his January 2016 report, he stated that he
found few positive changes in suicide prevention team practices at
the 18 prisons he reviewed.

We identified similar concerns when we reviewed the minutes for
the past three years of suicide prevention teams' meetings at the
four prisons we visited. Specifically, the teams often did not discuss
key issues, including self-harm incidents and the completion of risk
evaluations. CCWF's minutes indicate that the suicide prevention
team's reviews of attempted suicides were mostly narrations of
events or recitation of statistics rather than analytical discussions
focused on lessons learned and prevention. For example, its
May 2016 minutes describe that two inmates attempted suicide by
swallowing foreign objects, but the minutes do not indicate any
actions required or lessons learned as a result of these incidents. In
the same minutes, the team reported that the prison's mental health
staff had a 29 percent passing rate for risk evaluation audits, but the
minutes do not indicate that the team discussed what caused the low
passing rate and how they planned to improve staff performance.
Similarly, at RJD, discussions about mentoring and training prison
staff regarding the completion of risk evaluations largely focused
on quantitative data, such as attendance and completion rates.
Further, RJD's suicide prevention team minutes do not indicate that
discussions extended to the quality of the training or mentoring.
Without such discussions, the work of the suicide prevention teams
becomes more focused on reporting data rather than ensuring
compliance with Corrections' policies and procedures related to
suicide prevention and response.

### Corrections Has Not Ensured That It Reports Reliable Data on Inmate Suicide and Suicide Attempts

Corrections collects and reports data related to its operations using
an organizational management tool called COMPSTAT. Each
month Corrections publishes a statistical report detailing more
than 500 data points on its prisons' operations. According to the
COMPSTAT operations manager, Corrections' staff conduct a
quality control process that entails reviewing the data they receive
from prisons each month. She explained that staff look for outliers,
unexpected patterns, and system issues. In addition, she stated that
Corrections' staff meet with each prison's staff annually to discuss

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 73 of 158

the data in detail, which includes a joint annual review with the prison's leadership to discuss each line item in the annual report to ensure that the COMPSTAT numbers match the prison's numbers.

*We found discrepancies in the data related to COMPSTAT—Corrections' organizational management tool—that bring into question the data's accuracy.*

Nevertheless, we found discrepancies related to COMPSTAT's data that bring into question the data's accuracy. For example, for each of the four prisons we reviewed, we selected four months of COMPSTAT data from 2014 through 2016 and compared those months to the prisons' incident logs. We found that COMPSTAT reported a greater number of attempted suicides at CIW and suicides at CCWF than were recorded in their incident logs, and that it reported fewer attempts at SAC and RJD than were recorded in their respective logs. Further, when we reviewed suicide prevention team meeting minutes, incident reports, and other records, we found that COMPSTAT did not include suicides that occurred from 2013 through 2016 at three of the prisons we reviewed. Moreover, we were surprised to find that the special master's reports identify significantly more suicides from 2012 through 2015 than are recorded in COMPSTAT. For instance, COMPSTAT shows 18 suicides in 2015, while the suicide expert reported 24—a 33 percent difference.

Corrections' clinical support chief offered a number of explanations for the discrepancies we identified. She stated that the special master's reports used data from Corrections' mental health program on suicides in prisons, which she believes are accurate because it is this program that determines whether a death is a suicide. She explained that the numbers in COMPSTAT may be understated because they are based on prison staff's initial incident reports. She told us that the classification of incidents may not be accurate because an inmate may die from an attempted suicide days or weeks after the attempt occurs. Further, she noted that mental health staff have the opportunity to more thoroughly review the circumstances of incidents, which may cause them to reach different conclusions than the prison staff's initial incident reports reflect. In these instances, the clinical support chief indicated that the mental health program's data will reflect its staff assessment of the incident, but COMPSTAT may not. Specifically, she explained that prison staff are supposed to update this information in COMPSTAT by providing updated incident reports; however, she believes this step may not have always occurred given the understated suicide numbers in COMPSTAT.

The clinical support chief stated that she has previously raised these concerns with the COMPSTAT team, and the team was not resistant to adjusting its processes in order to present more accurate data. Because COMPSTAT represents Corrections' comprehensive source of data it makes readily available to the public on suicides and attempted suicides for each of its prisons, it must take steps

to ensure that the data are accurate. Otherwise, the public may draw incorrect conclusions about the rate of suicides and suicide attempts at a given prison or in the system as a whole.

## Corrections Can Increase Its Documentation and Dissemination to Prisons of Best Practices Related to Suicide Prevention

Although innovative programs and best practices related to inmate suicide prevention exist, Corrections could increase its efforts to document and disseminate this information to the prisons, and to monitor the success of programs or practices that could prove beneficial. For example, during our visit to RJD, we noted that it had implemented a program known as Striving to Achieve Rewards (STAR) that might benefit certain inmates at other prisons as well. RJD implemented STAR in August 2016 for inmates in its enhanced outpatient program, which provides care for mentally disordered inmates in a structured therapeutic environment that is less restrictive than inpatient care. According to a STAR pamphlet, the program's purpose is to improve inmate quality of life by creating a therapeutic community where inmates have many opportunities for positive experiences. STAR provides rewards to inmates for engaging in positive behavior, such as attending mental health groups and treating mental health staff and peers in a respectful manner. Over time, the inmates accumulate points that they can use for different levels of rewards, including participating in drama and book clubs and purchasing items, such as hygiene products, from the STAR store. RJD's chief psychologist stated that preliminary data, while not conclusive, have indicated that incidents of self-harm and rules violations have decreased since STAR began, even though RJD's inmate population has increased.

*RJD implemented a program that rewards positive behavior, such as attending mental health groups and treating staff and peers in a respectful manner. RJD stated that incidents of self-harm and rules violations have decreased since the program began.*

We also noted another program that RJD is in the process of developing that could prove useful for staff working in other prisons. Specifically, according to the program-related materials, workplace stress and job burnout are high among staff working in correctional settings. To better support its staff in managing its high-risk inmate population, RJD began developing a program named Helping Everyone Reach Objectives. The program's documentation indicates that RJD is designing a framework to provide additional resources and support to its multidisciplinary treatment teams who directly deal with inmate-patients. The program aims to ensure that RJD continues to provide high-quality care to its inmate population by providing staff with consultation and coaching, as well as fostering closer collaboration between all prison staff. According to RJD's chief psychologist, the prison had implemented aspects of the program with certain staff as of May 2017. It anticipates an increased rollout by the summer of 2017.

Corrections' clinical support chief agreed that RJD's programs are innovative and explained that implementing them on a systemwide basis might be useful at some prisons, depending on those prisons' missions, infrastructures, and security levels. Nevertheless, Corrections' documentation related to discussion and dissemination of innovative programs and best practices related to suicide prevention is limited. For example, the deputy director of Corrections' statewide mental health program stated that in February 2016, Corrections' mental health program held a summit regarding suicide prevention at its headquarters in Northern California. She explained that prison leadership, including prisons' suicide prevention team coordinators, chiefs of mental health, and selected wardens, attended the summit to discuss challenges with suicide prevention, share best practices, and identify additional initiatives that might help improve the suicide prevention efforts already in place. She noted that Corrections has a number of plans for implementing ideas such as increasing outreach to inmates both inside and outside of mental health care. However, she could not provide documentation of the best practices discussed or of the outcomes of the summit's discussions—she could only provide the agenda and a spreadsheet listing Corrections' suicide prevention team's July 2017 tasks and priorities, which indicated the suicide summit occurred and another one would be scheduled in the near future. She stated that Corrections is tentatively planning to hold another summit in October 2017, and acknowledged that holding these summits at least annually is a good idea. We believe such meetings should occur on an ongoing basis, not only to discuss and document best practices, but also to monitor their effectiveness. This approach would provide Corrections an opportunity to formally disseminate information regarding programs like those at RJD.

Additionally, Corrections' clinical support chief stated that it holds quarterly meetings at headquarters between the prisons' chiefs of mental health where informal discussion on best practices may occur. She further explained that the regional teams hold monthly calls for all prisons within their respective regions, which also allows for the sharing of ideas and best practices. However, because these discussions are not documented, the clinical support chief could not provide evidence of any best practices discussed. Because it has not documented the discussion of best practices during these meetings and calls, Corrections has likely missed opportunities to formally identify and disseminate innovative program ideas systemwide, as well as to evaluate the effectiveness of these practices.

**Corrections Could Do More to Assess Ways to Reduce Suicide Attempts**

Corrections' policies require that it review each suicide to determine whether staff complied with its policies and procedures, such as the prison's emergency response to the suicide, completion of suicide risk evaluations, and follow-up treatment after the inmate's discharge from a crisis bed prior to the suicide. The text box lists the specific information Corrections reviews. Corrections' policies require it to submit a report to the prison within 60 days of the inmate's death that includes recommended actions to address any problems it identified during its review and due dates for the prison to complete those actions. Prisons then have 90 days to submit documentation proving they have implemented the recommendations. According to Corrections' clinical support chief, Corrections established these timelines to ensure that it promptly identifies problems and that prisons take quick action to correct them.

> **Information Included in Corrections' Investigation of an Inmate Suicide**
>
> - Emergency response to the incident.
> - Medical autopsy and toxicology findings.
> - Inmate's background.
> - Inmate's ability to function in an institutional setting.
> - Inmate's mental health history.
> - Inmate's suicide attempt history.
> - Mental health care the inmate received while incarcerated.
> - Inmate's medical history.
> - Significant events preceding the suicide.
>
> Source: California State Auditor's analysis of Corrections' suicide report template.

The resulting reports are comprehensive enough to provide Corrections and its prisons with information critical to improving suicide prevention and response. Nonetheless, Corrections does not conduct similarly detailed reviews of the circumstances surrounding suicide attempts. As a result, it may not identify problems with clinical care or prisons' compliance with policies until those problems have contributed to an inmate's death. Although Corrections' policies require prisons to monitor and track suicide attempts, we do not believe Corrections requires sufficient detail in these reviews. Specifically, as of March 2017, its policies require that prisons' suicide prevention teams review the appropriateness of treatment plans for these inmates and the daily follow-up checks that mental health staff must complete for five days following the inmates' discharges from crisis beds. However, Corrections does not require prisons to review other important circumstances surrounding suicide attempts, such as the actions of staff responding to the incidents and the adequacy of the risk evaluations that mental health staff completed before the attempts.

One of the four prisons we reviewed has implemented policies requiring in-depth documented reviews of selected self-harm incidents, including suicide attempts, at its facility. Specifically, SAC implemented a policy requiring its suicide prevention coordinator and supervisors involved with crisis triage and inpatient care to identify self-harm incidents that might require detailed review, such as incidents where the inmates suffered serious bodily injury.

SAC prison officials explained that the suicide prevention team assigns mental health staff to conduct a review of the identified incident. According to a prison official at SAC, since 2008 the prison has completed roughly 450 of these self-harm reviews, but has performed a decreasing number because of increasing workloads and time constraints. We reviewed three of these reviews that the prison completed in 2016 and found that they generally included a thorough review of the inmates' mental health history, mental health status, and suicide risk. However, the reviews did not contain an examination of the adequacy of the inmates' previous risk evaluations or treatment plans, and were not as detailed or pointed in their criticism as Corrections' suicide review process.

Corrections plans to require prisons to complete more detailed reviews of suicide attempts. According to Corrections' clinical support chief, Corrections will require prisons to conduct detailed reviews of a selection of self-harm incidents where the inmate intended to die and there was serious bodily injury beginning in July 2017. She said that the prisons will need to review all of the same items that are included in the suicide reviews, except those that are not applicable, such as autopsy and toxicology reports, or those that would be inappropriate due to the need to protect inmate privacy, such as cellmate or peer interviews. However, even if Corrections requires prisons to be more detailed in their examination of self-harm incidents, prison staff are less likely to be as critical of their own processes as an external reviewer from Corrections might be. Corrections' clinical support chief stated that requiring Corrections to conduct such reviews at each prison could be resource intensive, but that pairing each prison with another, similar prison and having them review each other could help to ensure that the reviews are impartial. Absent an unbiased, thorough review of the factors contributing to inmate suicide attempts, Corrections may not identify potential problems with prisons' suicide prevention and response practices until after inmates have already died.

**Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

• Its progress in implementing the recommendations made by the special master's experts, the court-appointed suicide expert, and its own reviewers regarding inmate suicides and attempts. Corrections should include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

• Its progress in identifying and implementing mental health programs that may ameliorate risk factors associated with suicides at the prisons.

*Corrections*

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that prisons can easily access Corrections' current policies related to mental health, Corrections should ensure that its program guide is current and complete as it works to incorporate the program guide into regulations. Corrections should immediately begin working with federal court monitors to draft regulations.

To ensure that suicide prevention teams meet quorum requirements, Corrections should, starting January 2018, work with prisons that consistently fail to achieve a quorum to resolve issues that may be preventing the teams from having all required members present at meetings.

To eliminate confusion regarding suicide prevention team meeting attendance, Corrections should immediately update its program guide to clarify who is required to attend suicide prevention team meetings, which attendees may send designees, and the extent to which staff may fill multiple roles when meeting quorum requirements.

To ensure that suicide prevention teams exercise leadership at prisons, Corrections should immediately require them to use available information about critical factors—such as the number and nature of inmate self-harm incidents and the quality and compliance with the policy of risk evaluations and treatment plans—to identify systemic issues related to suicide prevention. Corrections should require the suicide prevention teams to assess lessons they can learn, create plans to resolve current issues, and prevent foreseeable problems in the future.

To provide the public and relevant stakeholders with accurate information on suicides and suicide attempts in its prisons, Corrections should immediately require prison staff to work with mental health staff to reconcile any discrepancies on suicides and suicide attempts before submitting numbers to the COMPSTAT unit.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison's suicide prevention team to identify for review at least one suicide attempt per year that occurred at its prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

We conducted this audit under the authority vested in the California State Auditor by Section 8543 et seq. of the California Government Code and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives specified in the Scope and Methodology section of the report. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

Date:            August 17, 2017

Staff:           Laura G. Kearney, Audit Principal
                 John Lewis, MPA
                 Fahad Ali, CFE
                 Amanda Millen, MBA
                 Alejandro Raygoza, MPA
                 Kelly Reed, MSCJ

Legal Counsel:   Heather Kendrick, Sr. Staff Counsel

For questions regarding the contents of this report, please contact
Margarita Fernández, Chief of Public Affairs, at 916.445.0255.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 81 of 158

Blank page inserted for reproduction purposes only.

# Appendix A

## RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS IN STATE PRISONS FROM 2012 THROUGH 2016

The Joint Legislative Audit Committee (Audit Committee) requested that we compare the rates of suicides and attempted suicides for male and female inmates in all state prisons from 2014 through 2016. In order to calculate these rates, we used data from Corrections' COMPSTAT system because it is the most comprehensive source of publicly reported data for the entire correctional system. Based on our analysis of COMPSTAT data, Table A beginning on the following page presents the rates and number of inmate suicides and suicide attempts at each state prison from 2012 through 2016. As we discuss in Chapter 3, the data from COMPSTAT on inmate suicides and attempted suicides are unreliable; however, they are also the most comprehensive, as well as being the data Corrections makes available to the public. Therefore, we present the data here but recommend in Chapter 3 that Corrections take steps to ensure its accuracy in the future.

**Table A**
**Suicides and Suicide Attempts in Each California Prison From 2012 Through 2016**

| | 2012 | | | | | 2013 | | | | |
| | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | |
| PRISON | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 |
|---|---|---|---|---|---|---|---|---|---|---|
| Avenal State Prison | 5,020 | 5 | 1.00 | 1 | 0.20 | 4,497 | 3 | 0.67 | 0 | 0.00 |
| California City Correctional Facility | — | — | — | — | — | — | — | — | — | — |
| California Correctional Center | 4,657 | 2 | 0.43 | 0 | 0.00 | 4,903 | 2 | 0.41 | 0 | 0.00 |
| California Correctional Institution | 4,643 | 5 | 1.08 | 1 | 0.22 | 4,572 | 5 | 1.09 | 1 | 0.22 |
| California Health Care Facility | — | — | — | — | — | — | — | — | — | — |
| California Institution for Men | 5,002 | 10 | 2.00 | 0 | 0.00 | 4,747 | 7 | 1.47 | 0 | 0.00 |
| *California Institution for Women* | *1,636* | *13* | *7.95* | *1* | *0.61* | *2,095* | *15* | *7.16* | *0* | *0.00* |
| California Medical Facility | 2,363 | 17 | 7.19 | 1 | 0.42 | 2,250 | 28 | 12.45 | 2 | 0.89 |
| California Men's Colony | 5,368 | 21 | 3.91 | 0 | 0.00 | 4,983 | 29 | 5.82 | 0 | 0.00 |
| California Rehabilitation Center | 3,694 | 1 | 0.27 | 0 | 0.00 | 3,434 | 1 | 0.29 | 0 | 0.00 |
| California State Prison, Corcoran | 4,626 | 20 | 4.32 | 1 | 0.22 | 4,410 | 16 | 3.63 | 1 | 0.23 |
| California State Prison, Los Angeles County | 3,848 | 13 | 3.38 | 0 | 0.00 | 3,723 | 7 | 1.88 | 1 | 0.27 |
| *California State Prison, Sacramento* | *2,693* | *22* | *8.17* | *1* | *0.37* | *2,233* | *32* | *14.33* | *1* | *0.45* |
| California State Prison, Solano | 4,313 | 4 | 0.93 | 1 | 0.23 | 4,007 | 2 | 0.50 | 0 | 0.00 |
| California Substance Abuse Treatment Facility and State Prison | 5,683 | 15 | 2.64 | 0 | 0.00 | 5,603 | 11 | 1.96 | 0 | 0.00 |
| California Training Facility, Soledad | 5,759 | 4 | 0.69 | 0 | 0.00 | 5,279 | 3 | 0.57 | 2 | 0.38 |
| Calipatria State Prison | 3,814 | 0 | 0.00 | 0 | 0.00 | 3,621 | 12 | 3.31 | 0 | 0.00 |
| Centinela State Prison | 3,659 | 2 | 0.55 | 1 | 0.27 | 3,025 | 1 | 0.33 | 0 | 0.00 |
| *Central California Women's Facility* | *2,934* | *5* | *1.70* | *0* | *0.00* | *3,532* | *8* | *2.27* | *0* | *0.00* |
| Chuckawalla Valley State Prison | 2,712 | 0 | 0.00 | 0 | 0.00 | 2,594 | 0 | 0.00 | 0 | 0.00 |
| Deuel Vocational Institution | 2,504 | 12 | 4.79 | 2 | 0.80 | 2,515 | 6 | 2.39 | 0 | 0.00 |
| Folsom State Prison | 2,840 | 2 | 0.70 | 3 | 1.06 | 3,017 | 4 | 1.33 | 3 | 0.99 |
| High Desert State Prison | 3,695 | 8 | 2.17 | 0 | 0.00 | 3,359 | 2 | 0.60 | 1 | 0.30 |
| Ironwood State Prison | 3,503 | 3 | 0.86 | 0 | 0.00 | 3,273 | 3 | 0.92 | 0 | 0.00 |
| Kern Valley State Prison | 4,108 | 10 | 2.43 | 0 | 0.00 | 3,728 | 20 | 5.36 | 1 | 0.27 |
| Mule Creek State Prison | 3,027 | 15 | 4.96 | 1 | 0.33 | 2,822 | 13 | 4.61 | 1 | 0.35 |
| North Kern State Prison | 4,680 | 8 | 1.71 | 0 | 0.00 | 4,761 | 14 | 2.94 | 1 | 0.21 |
| Pelican Bay State Prison | 3,091 | 11 | 3.56 | 0 | 0.00 | 2,785 | 17 | 6.10 | 0 | 0.00 |
| Pleasant Valley State Prison | 3,737 | 8 | 2.14 | 2 | 0.54 | 3,412 | 5 | 1.47 | 1 | 0.29 |
| *Richard J. Donovan Correctional Facility* | *3,537* | *28* | *7.92* | *0* | *0.00* | *3,355* | *33* | *9.84* | *3* | *0.89* |
| Sierra Conservation Center | 4,555 | 1 | 0.22 | 1 | 0.22 | 4,856 | 4 | 0.82 | 0 | 0.00 |
| San Quentin State Prison | 3,853 | 13 | 3.37 | 3 | 0.78 | 4,206 | 14 | 3.33 | 3 | 0.71 |
| Salinas Valley State Prison | 3,607 | 37 | 10.26 | 4 | 1.11 | 3,503 | 27 | 7.71 | 2 | 0.57 |
| Valley State Prison | 2,074 | 12 | 5.79 | 0 | 0.00 | 3,004 | 3 | 1.00 | 0 | 0.00 |
| Wasco State Prison | 5,043 | 25 | 4.96 | 1 | 0.20 | 5,134 | 27 | 5.26 | 1 | 0.19 |
| **Totals\*** | **126,276** | **352** | **2.79** | **25** | **0.20** | **123,238** | **374** | **3.03** | **25** | **0.20** |

Source: California State Auditor's analysis of Corrections' COMPSTAT metrics.

Notes: As we note in Chapter 3 on page 58, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. The numbers in this table are not adjusted; we present them as they appear in COMPSTAT.

Italicized rows represent the four prisons reviewed in this audit.

\* Because we calculated populations based on a 12-month average, annual population amounts may differ from the total prison populations due to rounding.

| | 2014 | | | | | 2015 | | | | | 2016 | | | |
| | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | |
| POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4,028 | 4 | 0.99 | 0 | 0.00 | 3,369 | 3 | 0.89 | 0 | 0.00 | 3,274 | 2 | 0.61 | 0 | 0.00 |
| 1,825 | 0 | 0.00 | 0 | 0.00 | — | — | — | — | — | 1,933 | 0 | 0.00 | 0 | 0.00 |
| 4,909 | 0 | 0.00 | 1 | 0.20 | 4,138 | 1 | 0.24 | 0 | 0.00 | 3,991 | 0 | 0.00 | 1 | 0.25 |
| 4,404 | 3 | 0.68 | 2 | 0.45 | 3,949 | 11 | 2.79 | 1 | 0.25 | 3,435 | 17 | 4.95 | 2 | 0.58 |
| 1,626 | 17 | 10.45 | 0 | 0.00 | — | — | — | — | — | 2,342 | 26 | 11.10 | 1 | 0.43 |
| 4,636 | 13 | 2.80 | 1 | 0.22 | 3,859 | 7 | 1.81 | 1 | 0.26 | 3,669 | 6 | 1.64 | 0 | 0.00 |
| *1,994* | *15* | *7.52* | *2* | *1.00* | *1,887* | *34* | *18.02* | *2* | *1.06* | *1,882* | *24* | *12.75* | *2* | *1.06* |
| 2,082 | 16 | 7.69 | 1 | 0.48 | 2,342 | 15 | 6.41 | 1 | 0.43 | 2,563 | 8 | 3.12 | 0 | 0.00 |
| 4,368 | 18 | 4.12 | 0 | 0.00 | 3,910 | 15 | 3.84 | 2 | 0.51 | 4,101 | 12 | 2.93 | 3 | 0.73 |
| 2,826 | 0 | 0.00 | 0 | 0.00 | 4,946 | 7 | 1.42 | 0 | 0.00 | 3,006 | 2 | 0.67 | 0 | 0.00 |
| 4,335 | 17 | 3.92 | 0 | 0.00 | 4,280 | 20 | 4.67 | 1 | 0.23 | 3,640 | 33 | 9.07 | 0 | 0.00 |
| 3,587 | 22 | 6.13 | 0 | 0.00 | 3,520 | 11 | 3.13 | 0 | 0.00 | 3,479 | 19 | 5.46 | 2 | 0.57 |
| *2,212* | *11* | *4.97* | *2* | *0.90* | *2,240* | *12* | *5.36* | *3* | *1.34* | *2,339* | *8* | *3.42* | *2* | *0.86* |
| 4,005 | 8 | 2.00 | 1 | 0.25 | 3,858 | 5 | 1.30 | 0 | 0.00 | 3,983 | 2 | 0.50 | 0 | 0.00 |
| 5,435 | 16 | 2.94 | 1 | 0.18 | 5,489 | 19 | 3.46 | 0 | 0.00 | 5,296 | 32 | 6.04 | 0 | 0.00 |
| 4,963 | 5 | 1.01 | 0 | 0.00 | 2,539 | 1 | 0.39 | 0 | 0.00 | 5,184 | 5 | 0.96 | 0 | 0.00 |
| 3,863 | 5 | 1.29 | 0 | 0.00 | 3,792 | 2 | 0.53 | 0 | 0.00 | 3,819 | 0 | 0.00 | 0 | 0.00 |
| 2,862 | 0 | 0.00 | 0 | 0.00 | 3,287 | 4 | 1.22 | 0 | 0.00 | 3,614 | 4 | 1.11 | 0 | 0.00 |
| *3,652* | *6* | *1.64* | *0* | *0.00* | *3,000* | *11* | *3.67* | *0* | *0.00* | *2,861* | *25* | *8.74* | *1* | *0.35* |
| 2,315 | 1 | 0.43 | 0 | 0.00 | 2,150 | 0 | 0.00 | 0 | 0.00 | 2,425 | 0 | 0.00 | 0 | 0.00 |
| 2,561 | 14 | 5.47 | 0 | 0.00 | 2,361 | 10 | 4.24 | 3 | 1.27 | 2,340 | 14 | 5.98 | 0 | 0.00 |
| 3,100 | 2 | 0.65 | 0 | 0.00 | 2,913 | 0 | 0.00 | 1 | 0.34 | 2,979 | 1 | 0.34 | 1 | 0.34 |
| 3,421 | 9 | 2.63 | 1 | 0.29 | 3,416 | 1 | 0.29 | 0 | 0.00 | 3,702 | 2 | 0.54 | 0 | 0.00 |
| 3,018 | 5 | 1.66 | 0 | 0.00 | 3,392 | 1 | 0.29 | 0 | 0.00 | 3,265 | 1 | 0.31 | 0 | 0.00 |
| 3,804 | 30 | 7.89 | 1 | 0.26 | 3,759 | 26 | 6.92 | 0 | 0.00 | 3,910 | 16 | 4.09 | 3 | 0.77 |
| 2,908 | 17 | 5.85 | 2 | 0.69 | 2,869 | 22 | 7.67 | 0 | 0.00 | 3,266 | 18 | 5.51 | 0 | 0.00 |
| 4,591 | 18 | 3.92 | 0 | 0.00 | 4,243 | 11 | 2.59 | 0 | 0.00 | 4,381 | 5 | 1.14 | 1 | 0.23 |
| 2,777 | 4 | 1.44 | 1 | 0.36 | 2,647 | 11 | 4.16 | 0 | 0.00 | 2,247 | 15 | 6.67 | 1 | 0.44 |
| 3,113 | 7 | 2.25 | 0 | 0.00 | 2,868 | 2 | 0.70 | 0 | 0.00 | 3,206 | 1 | 0.31 | 1 | 0.31 |
| *3,076* | *22* | *7.15* | *1* | *0.33* | *3,114* | *51* | *16.38* | *1* | *0.32* | *3,112* | *59* | *18.96* | *0* | *0.00* |
| 4,628 | 2 | 0.43 | 0 | 0.00 | 4,377 | 3 | 0.69 | 0 | 0.00 | 4,329 | 3 | 0.69 | 0 | 0.00 |
| 3,920 | 12 | 3.06 | 2 | 0.51 | 3,720 | 14 | 3.76 | 2 | 0.54 | 3,953 | 10 | 2.53 | 0 | 0.00 |
| 3,415 | 19 | 5.56 | 1 | 0.29 | 3,663 | 23 | 6.28 | 0 | 0.00 | 3,718 | 17 | 4.57 | 4 | 1.08 |
| 3,243 | 7 | 2.16 | 0 | 0.00 | 3,339 | 11 | 3.29 | 0 | 0.00 | 3,455 | 6 | 1.74 | 0 | 0.00 |
| 5,154 | 20 | 3.88 | 0 | 0.00 | 4,897 | 27 | 5.51 | 0 | 0.00 | 4,983 | 26 | 5.22 | 0 | 0.00 |
| 122,652 | 365 | 2.98 | 20 | 0.16 | 114,130 | 391 | 3.43 | 18 | 0.16 | 119,681 | 419 | 3.50 | 25 | 0.21 |

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 85 of 158

Blank page inserted for reproduction purposes only.

# Appendix B

## SCOPE AND METHODOLOGY

The Audit Committee directed the California State Auditor to perform an audit of Corrections' policies, procedures, and practices related to suicide prevention and reduction. We were directed to review the suicide and attempted suicide rates for male and female inmates in all state prisons; Corrections' policies and procedures for inmate suicide prevention and response, as well as their implementation; and CIW's implementation of Corrections' policies. We were also asked to determine areas in which Corrections could improve its mental health services, causes for CIW's high suicide rates, and the adequacy of mental health and suicide prevention training for CIW staff. Table B lists the objectives that the Audit Committee approved and summarizes the methods we used to address those objectives.

**Table B**
**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | We reviewed relevant state laws and regulations. |
| 2 | Evaluate Corrections' policies and procedures for inmate suicide prevention and response, including those related to instances when an inmate exhibits suicidal behavior. Determine whether such policies and procedures are implemented consistently throughout California's state prisons. | • We judgmentally selected three prisons to review in addition to CIW based on an analysis of the number of suicides and suicide attempts from 2014 through 2016 and of the prisons' missions: CCWF, RJD, and SAC.<br>• We obtained Corrections' policies and procedures for inmate suicide prevention and response. Further, we reviewed local operating procedures at each of the four prisons.<br>• We reviewed the *Coleman* special master monitoring reports, Corrections' suicide reports, and the suicide expert's audits to identify recommendations made to CIW, Corrections, and the other three prisons. We determined if the appropriate policies and procedures reflected those recommendations. We also interviewed relevant Corrections' staff for perspective on the implementation of these recommendations.<br>• We judgmentally selected 10 inmate suicides and suicide attempts from 2014 through 2016 from each of the four prisons. We reviewed the records for the 40 inmates' suicides and suicide attempts to determine if the prisons adhered to their local operating procedures and Corrections' policies and procedures on suicide prevention and response. We interviewed relevant staff at Corrections and at the prisons to obtain perspective on issues we found pertaining to these records. |
| 3 | For the most recent three-year period, compare the suicide and attempted suicide rates for male and female inmates in all state prisons. | • To better identify trends, we reviewed the five-year period from 2012 through 2016.<br>• We gathered Corrections' statistics on inmate suicides and suicide attempts from 2012 through 2016 for all California state prisons from Corrections' organizational management tool called COMPSTAT.<br>• We analyzed the COMPSTAT data to present the inmate suicide and suicide attempt rates by prison in Appendix A.<br>• We obtained perspective from Corrections' officials on any trends or inaccuracies that we observed and the methods Corrections used to gather and track these data.<br>• For Table 1 on page 9 and Table 6 on page 40, we adjusted the COMPSTAT data we present on suicides for the four prisons we reviewed based on documentation of suicides not recorded in COMPSTAT. In Table 1, we also adjusted the prison populations for the four prisons we reviewed based on average daily populations Corrections provided. In Appendix A, we did not adjust the COMPSTAT data as they are the data Corrections makes available to the public. |

*continued on next page . . .*

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 4   Identify areas where Corrections can improve its mental health services, particularly with respect to the safety and care for inmates needing mental health treatment. | • Using the results of the testing of policies and recommendations in Objective 2, we determined areas in which Corrections could improve its practices. We gathered perspective on these areas of improvement from relevant Corrections' staff.<br>• We reviewed the monthly meeting minutes for the statewide suicide prevention team and the suicide prevention teams at each of the four prisons for 2016 to determine the meeting attendees and the topics staff addressed.<br>• We interviewed Corrections' officials and reviewed available documentation to identify the methods used to discuss, document, and disseminate best practices to the prisons related to suicide prevention and response.<br>• We obtained Corrections' reports on position vacancy rates as of December 2016 for social workers, psychiatrists, and psychologists at the four prisons we reviewed and for Corrections as a whole.<br>• We interviewed key staff at the four prisons and Corrections' headquarters to gather perspective on staff vacancies. |
| 5   In reviewing the CIW do the following:<br><br>a.  Evaluate whether CIW appropriately implemented Corrections' suicide prevention policies. | The procedures we performed in Objective 2 also addressed this objective. |
| b.  Identify and analyze CIW's policies and procedures in the event of a suicide, including any ensuing investigation and communication with the deceased inmate's family during and after such investigation. | • The procedures we performed in Objective 2 also addressed this objective.<br>• We reviewed Corrections' procedures for communicating with a deceased inmate's family following a death.<br>• We reviewed records for six inmates who committed suicide from 2014 through 2016 and determined that CIW complied with Corrections' policies for communicating with a deceased inmate's family following a suicide. |
| c.  To the extent possible, identify the causes or factors contributing to the higher rates of suicide and suicide attempts at CIW, including any systemic problems or failures. | • We interviewed key Corrections' headquarters staff and CIW staff to gather their perspectives on the causes for the higher rates of suicide and suicide attempts at CIW from 2014 through 2016.<br>• We evaluated data from CIW and CCWF regarding the suicide attempts by inmates who transferred from VSPW.<br>• We reviewed Corrections' available documentation of the plan to convert VSPW to a men's prison.<br>• We interviewed officials at CIW and Corrections to determine if the conversion process accounted for the effect the transfer of inmates from VSPW would have on CIW. |
| d.  Identify and analyze CIW's policies and practices in the event that an inmate displays suicidal behavior. Evaluate CIW's ability to appropriately house and treat inmates identified as suicidal and determine whether CIW allows access to inmate program activities or movements such as yard time. | • The procedures we performed in Objective 2 for the 40 inmates' suicides and suicide attempts also addressed this objective.<br>• We reviewed CIW's policies and documentation for six inmates regarding access to yard time. |
| e.  Evaluate the adequacy of the mental health and suicide prevention training for CIW staff. | • From a list containing all employees at CIW, we randomly selected 20 CIW staff members and determined the percentage who received annual suicide prevention training in 2014, 2015, and 2016.<br>• From a list containing all mental health staff at CIW, we randomly selected 10 psychiatrists, psychologists, and social workers and determined how many received training on how to complete suicide risk evaluations and other trainings required for mental health staff.<br>• We reviewed several suicide prevention trainings that Corrections' staff received to determine if the trainings contained the content Corrections' policies require and any additional content the suicide expert had recommended.<br>• We obtained self-reported data on selected required trainings from CCWF, CIW, RJD, and SAC and identified instances of low compliance. |
| 6   Review and assess any other issues that are significant to the audit. | • We interviewed selected advocacy groups to identify their key concerns related to our audit scope.<br>• We addressed concerns related to delays in emergency response and monitoring inmates in Objective 2.<br>• We also addressed concerns related to identifying and disseminating best practices in Objective 4. |

Sources:  California State Auditor's analysis of the Audit Committee's audit request number 2016-131, planning documents, and analysis of information and documentation identified in the table column titled *Method*.

**Assessment of Data Reliability**

In performing this audit, we obtained data from Corrections'
COMPSTAT organizational management tool. The
U.S. Government Accountability Office, whose standards we are
statutorily required to follow, requires us to assess the sufficiency
and appropriateness of computer-processed information that
we use to support findings, conclusions, or recommendations.
Corrections' COMPSTAT tool provides monthly data to
stakeholders and the public on a variety of measures at each of
Corrections' prisons and other institutions. We used COMPSTAT
data to report on the number of suicides and attempted suicides
throughout California's adult prisons. We performed data-set
verification procedures and found no errors. Further, as reported
in Chapter 3, we assessed the accuracy and completeness of
COMPSTAT data by comparing the data on suicides and attempted
suicides for selected months to incident logs from the four prisons
we visited and identified several errors. We also compared the
number of suicides reported in COMPSTAT to those in reports
from the special master's suicide experts and found they did not
agree. Finally, during the course of our audit work, we identified
one suicide each at three of the four prisons we visited that was
not included in COMPSTAT. As a result, we determined that
COMPSTAT data are not sufficiently reliable for the purposes of
this audit. Nevertheless, we present these data in the report because
COMPSTAT is Corrections' comprehensive source of data available
on suicides and attempted suicides for each of its prisons, and it
contains data Corrections makes publicly available. We discuss our
findings in more detail in Chapter 3 and make a recommendation
for improving the data on page 64.

We also obtained summary data from Corrections on the rates at
which its employees attend various trainings. We tested selected
employees at CIW and determined they did not all attend required
trainings. We requested self-reported summary data from
Corrections for each of the four prisons we visited to determine
whether there was evidence at each prison to corroborate our
findings at CIW. Because the data corroborated our findings, we
determined it would be too resource-intensive to further test the
accuracy and completeness of the prisons' self-reported data.
Instead, we clearly attribute the data in the report to Corrections.

Case 2:90-cv-00520-KJM-SCR    Document 6014-1    Filed 11/26/18    Page 89 of 158

Blank page inserted for reproduction purposes only.

STATE OF CALIFORNIA —DEPARTMENT OF CORRECTIONS AND REHABILITATION                                  EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF THE SECRETARY**
P.O. Box 942883
Sacramento, CA 94283-0001

July 31, 2017

Ms. Elaine M. Howle, State Auditor
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA  95814

Dear Ms. Howle:

The California Department of Corrections and Rehabilitation (CDCR) submits this letter in response to the California State Auditor's (CSA) audit titled "California Department of Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides."

CDCR takes its responsibility to prevent inmate deaths by suicide very seriously and reviews each case carefully to allow it to continue to refine the suicide prevention program. Delivery of mental health services to CDCR inmates has improved overall, and CDCR continues to create a culture of focused improvement, oversight, and accountability in the area of suicide prevention both with staff and inmates. CDCR is committed to continuously evaluating and improving the performance and quality of the entire Mental Health Services Delivery System, including suicide prevention and response practices.

CDCR has made a great deal of progress implementing policies, training, and support for suicide prevention practices statewide, and acknowledges there is further progress to make. CDCR has completed or has in progress 58 initiatives, only 29 of which were recommendations from external suicide experts. For example, CDCR is nearing completion of a contract to provide substance abuse treatment specifically designed for individuals with mental health issues at the California Institution for Women (CIW) and other institutions; is developing a contract to address domestic violence for inmates in the mental health system in CDCR's women's institutions; has implemented the use of new suicide assessment tools and treatment protocols that reflect best practices in the field of suicidology; and provides increased mental health outreach to all inmates at CIW (including those who are not in the mental health system) by offering access to brief, solution-focused counseling.

CSA's report on CDCR's suicide prevention policies highlights areas where CDCR has already improved its practices, and where improvements continue to be made. CDCR will consider the recommendations made by the auditors to continue to improve upon its ongoing suicide prevention mission.

CDCR would like to thank CSA for their work on this report and will address the specific recommendations in a corrective action plan within the timelines outlined in the report.  If you have further questions, please contact me at (916) 323-6001.

Sincerely,

SCOTT KERNAN
Secretary

Exhibit C



ROSEN BIEN
GALVAN & GRUNFELD LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Jenny S. Yelin
Email: jyelin@rbgg.com

August 8, 2018

<u>VIA ELECTRONIC MAIL</u>

Special Master Matthew Lopes
Pannone Lopes Devereaux and O'Gara LLC
Northwoods Office Park, Suite 215N
1301 Atwood Avenue
Johnston, RI 02919-4946

Re:    *Coleman v. Brown*: Plaintiffs' Response to Defendants' Proposal to
Activate Unlicensed Mental Health Crisis Bed Unit in
Administrative Segregation Unit at RJD
<u>Our File No. 489-3</u>

Dear Special Master Lopes:

Plaintiffs strongly oppose Defendants' proposal to activate an unlicensed Mental
Health Crisis Bed (MHCB) unit in Building B-7 at the R.J. Donovan Correctional
Facility (RJD), which is currently used as a General Population Administrative
Segregation Unit (ASU), as described in Defendants' July 30, 2018 letter (the
"Proposal"). For the reasons set forth below, and given the grave concerns expressed by
the Special Master's suicide prevention expert, Lindsay Hayes, during the July 13, 2018
workgroup call, Plaintiffs object to the opening of a crisis unit within this unsuitable and
dilapidated ASU space. We urge CDCR to continue to seek alternative options for
temporary MHCBs in the Southern Region, or in one of the many prisons in the southern
part of the Central Region, while making all efforts to expedite construction of the 100
licensed beds at RJD and CIM that are currently in the design phase.

Plaintiffs appreciate that Defendants face challenges in timely meeting the high
demand for MHCB services, particularly in the Southern Region. Yet Defendants' claim
that their only options are to activate a mental health crisis unit in this punitive
segregation unit or do nothing until the 100 licensed beds are available in 2022 is
misleading and wrong.

Special Master Matthew Lopes
August 8, 2018
Page 2

First, Defendants had the option to expedite the construction of the 100 licensed beds, and chose not to do so. *See* Transcript of Sept. 28, 2017 hearing, 80:21-82:3 (Ms. Tebrock admitting that CDCR did not request to use design-build authority for 100 bed MHCB project, even though design-build can expedite "the time from design to opening and activating beds"). Moreover, CDCR's own bed planning studies have indicated the need for additional beds in the Southern Region since at least 2015, yet CDCR assured the Court as recently as September 2017 that it would be able to meet the demand for crisis beds without seeking licensing waivers. *See id.* at 55:3-54:2; 67:8-68:11. The current crisis bed shortage was entirely foreseeable and CDCR could have mitigated or prevented it by treating it with the urgency the situation warrants.[1]

Second, Defendants have provided no information or data to support their flat assertion that there is no alternative to the use of an ASU for ad-hoc, unlicensed MHCB space. Defendants' July 30 proposal claims, without elaboration, that "CDCR has considered whether other possible housing units in any other southern California male institutions would be more appropriate than the proposed space but currently proposed space at RJD is the best option to quickly activate a temporary crisis bed," and that "CDCR has looked at other space in southern California and has been unable to locate any housing units that can be converted to crisis beds in an adequate timeframe." *See* Proposal at 1 n.1, 5. But CDCR has never provided any information about which other units were considered, at which prisons, or on what grounds they were rejected. It is difficult for Plaintiffs to believe that Defendants could not find twenty beds in a unit in any one of the nine Southern Region prisons, or in any of the five Central Region prisons closely adjacent to CDCR's line demarking the Southern Region in Exhibit A to their letter, that would be more suitable given Plaintiffs' and the Special Master's expert's consistent feedback for the last eight months that the proposed unit at RJD is unsafe and anti-therapeutic. Instead, CDCR would have Plaintiffs simply believe that a segregation unit—long understood to be a place that contributes to mental health crises and decompensation—is the only possible place CDCR could put a temporary unit for resolution of those crises.

---

[1] It is also noteworthy that, as in other periods during this case when Defendants have failed to comply with MHCB and other inpatient transfer timelines, there has been a decrease in the population of *Coleman* patients at Atascadero State Hospital (ASH) in recent months. As of June 25, 2018, the population is only at 63% of maximum capacity. *See* ECF 5858, Defs' Census, Waitlist, and Transfer Timelines Compliance Reports for Inpatient Mental Health Care, Ex. A. Defendants should explain whether they have explored how they could reduce the shortage of MHCBs in the Southern Region by taking full advantage of the inpatient beds at ASH.

[3283477.4]

Special Master Matthew Lopes
August 8, 2018
Page 3

Even were Plaintiffs to credit Defendants' unsupported assertion that this is the only solution, as expressed in our March 16, 2018 letter following the tour of the proposed facility (attached hereto as **Exhibit A**), we strongly oppose the use of an ASU for a MHCB program. We cannot agree on behalf of our clients to request a waiver of state licensing regulations to permit use of this unit for this purpose. The inherent physical plant of a segregation unit – the small size of the stark concrete cells that Mr. Hayes reports cannot fit a suicide-resistant bed, the lack of natural light due to a single tiny exterior window that cannot be expanded, the proposed use of the unit's open dayroom floor for treatment without privacy, and the planned use of "small management yards" for outdoor time – equates to an environment that is counter-therapeutic and inappropriate for patients experiencing psychiatric crises.

These concerns are seriously amplified by Defendants' plan to split the physical unit, devoting only a portion to treating patients in mental health crisis while continuing to operate an administrative segregation unit in the rest of the unit. Defendants' plan to divide the ASU inmates and MHCB patients with a chain-link "dividing fence" provides no sound or visual separation. Proposal at 3. Most troublingly, Defendants admit they do not know whether their proposed treatment spaces would ensure confidentiality of patient-clinician interactions, even though Mr. Hayes expressed concern about the lack of auditory privacy months ago. *See id.* at 4. Defendants should not have proceeded without ensuring that sound transfer between the cells they plan to use for treatment space and those slated to house patients would not be an issue, as the Program Guide requires confidentiality of individual patient contacts. *See* Program Guide 12-1-12 (recognizing requirement to "ensure that confidentiality of inmate-patient communications with mental health clinicians is protected"). And even if there is adequate auditory privacy from treatment spaces to the cells, Defendants' Proposal does not address the impact of exposing individuals who are in mental health crisis to possible harassment through the open chain-link "fencing" from those housed in administrative segregation, or consider whether there are security and privacy concerns arising from the mere identification of who enters the crisis bed unit, and for how long they stay.

We cannot agree with the use of such a harsh, unsafe, and non-private environment for the treatment of patients in psychiatric crisis. There is ample evidence in the history of the case that severe, non-therapeutic environments like the one proposed by Defendants here can cause suicidal patients to recant their symptoms or not report them at all, or worse, can exacerbate class members' symptoms of suicidality and suffering. *See, e.g.*, July 21, 2011 Order, ECF No. 4044 at 4; ECF No. 5259 at 28 (Hayes Audit of Suicide Prevention Practices, Jan. 14, 2015); Expert Decl. of P. Stewart ISO Pls.' Opp. to Defs.' Motion to Terminate, ECF No. 4381, Mar. 14, 2013, ¶¶ 41-42, 394. Given CDCR's already extremely high suicide rate—currently on track to exceed 26 suicides per 100 inmates in 2018, above the already remarkably high suicide rate of 23 for 2017—

Special Master Matthew Lopes
August 8, 2018
Page 4

we simply cannot countenance a licensing waiver that is likely to place our clients' lives in danger, and that Mr. Hayes, the nation's foremost expert on suicide prevention, has deemed unacceptable as a setting for patients in crisis.

Defendants' stated intent to operate the unit on a "temporary" basis does nothing to alleviate our concerns, given that other unlicensed units ostensibly opened on a "temporary" basis continue to operate many years later, and CDCR continues to fail to plan to expand permanent bed capacity in a timely way and with any display of urgency around shutting down "temporary" units. *See, e.g.*, Order to Show Cause, Feb. 3, 2009, ECF No. 3505. Given that our acquiescence to a licensing waiver could well result in the indefinite use of the ASU space for crisis bed patients, we cannot stipulate to the waiver.

We urge the Special Master to recommend against approval of the project. We also urge Defendants to return to the drawing board with respect to their consideration of possible alternatives. We would welcome a collaborative and transparent process in which we are able to provide input, at an earlier stage, about other housing units that may serve to alleviate the serious need for additional crisis bed capacity in a safer and more humane environment.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jenny S. Yelin*

By:    Jenny S. Yelin

JSY:cg

cc:    *Coleman* Special Master Team          Elise Thorn
Co-Counsel                                Andrew Gibson
Jerome Hessick                            Tobias Snyder
Nick Weber                                Tyler Heath
Melissa Bentz                             Ian Ellis
Andrea Moon                               Katherine Tebrock
Jay Russell                               Christine Ciccotti
Adriano Hrvatin                           Joanna Mupanduki

# Exhibit A



**ROSEN BIEN
GALVAN & GRUNFELD** LLP

50 Fremont Street, 19th Floor
San Francisco, California 94105-2235
T: (415) 433-6830 ▪ F: (415) 433-7104
www.rbgg.com

Krista Stone-Manista
Email: kstone-manista@rbgg.com

March 16, 2018

VIA ELECTRONIC MAIL

Nick Weber
Andrea S. Moon
Melissa Bentz
Jerome Hessick
CDCR Office of Legal Affairs
P.O. Box 94283
Sacramento, CA 94283-0001
Nicholas.Weber@cdcr.ca.gov
Andrea.Moon@cdcr.ca.gov
Melissa.Bentz@cdcr.ca.gov
Jerome.Hessick@cdcr.ca.gov

      Re:    *Coleman v. Brown*: Plaintiffs' Comments Regarding Proposed Crisis and
               Inpatient Beds at CIW and RJD
               Our File No. 0489-03

Dear all:

      Plaintiffs write regarding our March 7, 2018 tour of the proposed sites for
additional crisis beds at CIW and RJD prisons. We appreciate the opportunity to tour the
two sites and for the information provided by Defendants about these proposals to date.
We also appreciate the input of the Special Master's team.

## I.    CIW MHCB and Inpatient Bed Proposal

      With respect to the proposed new program at CIW, we understand that Defendants
presently plan to add 15 mental health crisis beds and three beds that can be used for
inpatient psychiatric care. We understand that there are plans to retrofit or remedy
several of the concerning features that existed in the proposed space as we toured it on
March 7, including a general redesign of the shower area and retrofitting of certain grates
within each of the cells.

[3234576.1]

Nick Weber, Andrea S. Moon, Melissa Bentz, Jerome Hessick
March 16, 2018
Page 2

During the tour, I was very concerned that there did not seem to be a concrete plan to remedy or mitigate the serious blind spot that exists within each cell around the area of the toilet. During the tour, we observed that it is impossible to see a person standing at, or on, the in-cell toilet though the cell door's windows. As Defendants are well aware, there was a recent MHCB suicide which occurred in an in-cell blind spot. During the tour, we discussed that Defendants would develop a plan to mitigate these blind spots, and that the Special Master's suicide prevention expert, Lindsay Hayes, would be a part of further discussions about remedying these dangerous blind spots. Plaintiffs ask that Mr. Hayes have an opportunity to tour the CIW space and to advise Defendants on whether any proposals to remedy these blind spots are sufficient to ensure patient safety. Our agreement that Defendants should proceed with the opening of any unlicensed MHCBs or inpatient beds in the Walker Unit at CIW will depend on the adequacy of Defendants' plan to remedy these blind spots.

We are also concerned about the discussion during the tour regarding the need to glaze over those of the cell windows that overlook the parking lot. A major benefit of the proposed space as it currently exists is the abundant natural light, and we would object to any window glazing that substantially limits light in the cells or that makes it impossible for patients in crisis to observe the outdoors. We are open to further discussions about solutions to Defendants' stated security concerns, but would like this to be addressed in further proposals about the CIW space.

Finally, we understand that substantial retrofitting will occur if and when the legislature approves funding for this project, particularly to remedy the presently unsafe shower area and to install suicide-resistant grates within the cells. We also understand that the nursing station and other facilities will be built into present cells within the unit and that work will be done to build out treatment spaces in presently empty rooms. While we were generally impressed with the facilities at the time of the tour (but for the major concern about the blind spots described above), successful operation of this program will only be possible if these additional construction projects are completed in a satisfactory and safe way. Therefore, if this project proceeds, Plaintiffs ask to have another opportunity to review this space after it is fully built out before we agree to any stipulation that Defendants may operate this unit as an unlicensed MHCB/inpatient program.

## II.    RJD MHCB Cell Proposal

The RJD proposal to open twenty unlicensed MHCBs within an administrative segregation building was very preliminary at the time of our tour, and Plaintiffs have very grave concerns about it. It is our strong view that an administrative segregation building is not an appropriate place to operate a mental health crisis bed program, and that

Nick Weber, Andrea S. Moon, Melissa Bentz, Jerome Hessick
March 16, 2018
Page 3

Defendants' plan to continue to operate the building as an administrative segregation building even while it is being used as a mental health treatment area will present unsurmountable logistical, custodial, and healthcare issues.  While we share Defendants' view that additional crisis beds are desperately needed in the southern region, we strongly urge Defendants to devote their resources to exploring any other alternative options to this proposal.  Have Defendants exhausted all other available spaces at RJD, including in the new infill space?  Have Defendants exhausted options at other prisons in the southern region?

        While we are open to continuing conversations about the RJD proposal with Defendants, at this point it is difficult for us to imagine how it can be operated in a safe and therapeutic way.  We are also concerned about the impact that this proposal would have on RJD as a whole, and particularly on the EOP ASU program.  If Defendants intend to proceed with further development of the proposal to open crisis beds within an administrative segregation unit at RJD, Plaintiffs urge Defendants to develop further plans that will fully address the following types of issues which had barely begun to be explored at the time of the tour:  (1) How can treatment be provided within an operating administrative segregation building in a way that ensures confidentiality and safety for patients within the program, without undue security burdens?  (2) What treatment space will be available for the crisis bed program?  If the program will share the new EOP ASU treatment center, how will RJD ensure that there is adequate space and staff to meet these competing demands?  How does introducing these new demands affect Defendants' ability to provide services to the EOP ASU population?  (3) How can the harsh and counter-therapeutic milieu of the administrative segregation building be mitigated?  For example, can the physical condition of the cells be improved?  Can space be created for dayroom access other than on the floor of the building, which we would oppose as a dayroom for crisis bed patients?  Can the yard be improved such that crisis bed patients have yard options other than barren walk-alone cages?

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Nick Weber, Andrea S. Moon, Melissa Bentz, Jerome Hessick
March 16, 2018
Page 4


As with the CIW program, we hope that the Special Master's suicide prevention expert will review this program at a later stage of development, and we would ask to review the space again before agreeing to the opening of any crisis bed program there. At this point, we are very reluctant to so stipulate. But we appreciate the spirit of transparency in which this initial tour was conducted, and look forward to further productive conversations about how to ensure timely crisis bed access for Coleman class members.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Krista Stone-Manista*

By:    Krista Stone-Manista

KSM:cg
cc:    *Coleman* Special Master Lopes
       *Coleman* Special Master Team
       *Coleman* Deputy Attorneys General
       Co-Counsel

Exhibit D



# An Update to the Future of
# California Corrections

*January 2016*

This page intentionally blank to facilitate double-sided printing.

# Introduction

In April 2012, the Administration published the report "The Future of California Corrections: A Blueprint to Save Billions of Dollars, End Federal Oversight, and Improve the Prison System". This report was released in the wake of prison population reductions occurring after implementation of 2011 Public Safety Realignment. It was essential to catalogue both how the prison budget would be reduced and how the prisons would operate with a significantly reduced population. The report highlighted changing the inmate classification system to fit inmates into the most appropriate housing situations allowing for more rehabilitative services. It also introduced a new funding model—standardized staffing—for the prisons versus the previous workload adjustment model. Rehabilitation programs, reentry hubs and reentry services became the model of programming in the prisons.

The Blueprint was premised on the Administration asking the federal court to increase the proposed population cap from 137.5 to 145 percent. The Administration believed that a constitutional level of health care could be achieved with the population at 145 percent of design capacity. At the time of the Blueprint, population projections indicated that the state would be able to meet 145 percent of design capacity, thereby creating a durable solution.

Much has changed since the Blueprint was released.

The court maintained the population cap at 137.5 percent of design capacity. The spring 2013 prison population projections estimated the state would not meet the 137.5-percent target resulting in an immediate release of thousands of state inmates. Faced with that impending release, the Legislature passed and the Governor signed Chapter 310, Statutes of 2013 (SB 105), which authorized additional capacity measures, including sending inmates out-of-state on an involuntary basis, allowing a streamlined process for contracting for beds, and leasing the private California City Correctional Facility site. If the cap had been modified to 145 percent, the Department of Corrections and Rehabilitation would have been able to house an additional 6,000 inmates within the state prisons thereby reducing the need for out-of-state and in-state contract capacity.

The court ultimately agreed to a two-year extension, to February 2016, for the state to meet the population cap of 137.5 percent of design capacity. The court also ordered the state to implement specific population reduction measures to meet the population cap and put in place a compliance officer who has the authority to release inmates from state prison should the state not meet its target. The Department has implemented all of the population reduction measures ordered by the court and these measures have reduced the prison average daily population by approximately 4,000 inmates in 2015-16.

There have been other significant changes affecting the prison population beyond the court-ordered measures.

The Governor signed into law Chapter 312, Statutes of 2013 (SB 260), which established a youthful offender parole process allowing individuals who committed a crime while under the age of 18 for their controlling offense, to be eligible for earlier parole hearings before the Board of Parole Hearings.  Chapter 471, Statutes of 2015 (SB 261), expanded the eligible population to those youthful offenders who committed their controlling offense before the age of 23.  It is estimated these measures have the potential to reduce the annual average daily prison population by approximately 150 inmates.

In November 2014 the voters adopted Proposition 47, which reduced the classification of many drug and property crimes from felonies to misdemeanors and established a resentencing process for anyone who had served or was serving a sentence for these crimes. Proposition 47 is estimated to reduce the average daily inmate population by 4,712 inmates in 2015-16.

By May 2016, the state will reduce the out-of-state population to 4,900 and infill projects to add capacity should be on line.  However, the fall 2015 population projections continue to show a slight increase in the prison population.  For a variety of reasons outlined in this report, the state will need to maintain the out-of-state beds and continue to lease California City Correctional Facility beyond the 2016 calendar year.  No prison is proposed for closure in the near future.

Given the significant changes since the Blueprint was originally published, the Administration agreed to release a new report as part of the 2016-17 Governor's Budget that would identify a comprehensive plan for the state prison system.  Specifically, Chapter 26, Statutes of 2015 (SB 85), added Welfare and Institutions Code section 3313, which states:

"(a) The Department of Finance and the Department of Corrections and Rehabilitation shall release a report that provides an updated comprehensive plan for the state prison system, including a permanent solution to the decaying infrastructure of the California Rehabilitation Center.  The report shall be submitted with the Governor's 2016-17 Budget to the Assembly Committee on Appropriations, the Assembly Committee on Budget, the Senate Committee on Appropriations, the Senate Committee on Budget and Fiscal Review, and the Joint Legislative Budget Committee.

(b) The Legislature finds and declares that given the reduction in the prison population, further investment in building additional prisons is unnecessary at this time, and that the California Rehabilitation Center may be closed without jeopardizing the court-ordered prison cap."

This report is respectfully submitted to the Legislature in fulfillment of the requirement in Welfare and Institutions Code section 3313.

Section One of the report lays out the various commitments made in the Blueprint and the progress the Department has made in meeting those commitments.  Section Two includes an update on other departmental areas that were not addressed in the Blueprint.  Section Three lays out the current population and budget, how the population and budget differ from what was anticipated in the Blueprint, and how the population may continue to change.  Section Four describes the Department's challenges with population management and facilities and its plan to address the challenges.  Section Five outlines the Department's plan for operating the prison system in the coming years.

This page intentionally blank to facilitate double-sided printing.

# Section One: Original Blueprint

The Blueprint built upon sweeping changes to the state correctional system made by 2011 Public Safety Realignment.  Realignment legislation, Chapter 15, Statutes of 2011 (AB 109), was signed in April 2011, and implementation began in October 2011.  This landmark legislation was intended to ease prison crowding and reduce state spending on prisons.  In the first six months following the implementation of Realignment, the California Department of Corrections and Rehabilitation's inmate population dropped by more than 21,000 inmates.  The Blueprint assumed that the state would be able to successfully request an adjustment to the court-imposed population cap to 145 percent of design capacity, arguing that the Department would be able to provide constitutionally adequate health care at that level, and therefore the 137.5 percent cap was arbitrary and unnecessary.  The Blueprint laid out solutions to meet the 145-percent population cap and a plan to operationalize the budget and population reductions, consistent with the assumptions made with the passage of Realignment, to make the prison system safer and more efficient.

The Blueprint recognized that the Realignment legislation alone would not fully satisfy the Supreme Court's order or meet other challenges faced by the Department.  Consequently, the Blueprint outlined efforts to rehabilitate offenders to improve recidivism rates and outcomes, appropriately classify offenders for housing to increase access to rehabilitative programs, address staffing deficiencies to improve overall prison operations, and improve health care treatment space and capacity.  The Blueprint also detailed a proposal to return 9,500 inmates then housed out-of-state, a practice that began in 2006 in response to prison crowding.  Specifically, the Blueprint laid out the following goals:

1. Seek and obtain modification of the court order to raise the final benchmark to 145 percent of design capacity.

2. Return 9,500 inmates from out-of-state facilities.

3. Modify the inmate classification system to shift 17,000 inmates to housing with more access to programs.

4. Improve access to rehabilitative programming, placing 70 percent of the target population in programs consistent with identified needs.

5. Establish a system of standardized staffing.

6. Open the California Health Care Facility in Stockton and continue additional ongoing health care improvements.

7. Begin implementing recommendations regarding gang management.

The following outlines what has happened in each area since the Blueprint.

## Court Order

In November 2006, plaintiffs filed a motion to convene a three-judge court in the *Plata v. Brown* lawsuit under the 1996 Prison Litigation Reform Act, claiming that overcrowded conditions in California's prisons resulted in unconstitutional medical care. The second lawsuit joined in the three-judge court, *Coleman*, involves mental health services for inmates. Both lawsuits claim that care for inmates violates the Eighth Amendment of the U.S. Constitution, which prohibits cruel and unusual punishment of the incarcerated.

In 2007, a three-judge court was convened to address claims that crowding in the California state prisons results in unconstitutional medical and mental health care. In 2009, the three-judge court ordered the state to reduce its adult institution population to 137.5 percent of design capacity within two years, equivalent to a reduction of about 40,000 inmates. The state appealed this decision, but in 2011, the U.S. Supreme Court upheld the three-judge court's ruling.

The three-judge court issued another order in October 2012 requiring the state to develop two plans to reduce the prison population to 137.5 percent of design capacity by June 27, 2013 and December 27, 2013. The plans were submitted to the court on January 7, 2013, as ordered.

With the potential imminent release of inmates to meet the 137.5-percent cap, Chapter 310, Statutes of 2013 (SB 105), was enacted in September 2013 to provide additional capacity necessary to avoid such releases.

The Blueprint was developed based on the premise that the state would be successful in modifying the population cap to 145 percent of design capacity, and ultimately be able to end federal court oversight.  The court did not modify the court order, and instead granted a two-year extension, requiring the state to achieve 137.5 percent of design capacity by February 2016. As of December 9, 2015, the Department was at 136.0 percent of design capacity.  The February 10, 2014 order also required the Department to implement additional population reduction measures and appointed a compliance officer who has authority to release inmates if the Department fails to meet or maintain the final benchmark.

Specifically, the February 10, 2014 order required the Department to:

- Increase prospective credit earnings for non-violent second-strike inmates as well as minimum custody inmates

- Allow non-violent second-strike inmates who have reached 50 percent of their total sentence to be referred to the Board of Parole Hearings for parole consideration

- Parole inmates who have been granted release by the Board of Parole Hearings but have future parole dates

- Expand the Department's medical parole program

- Establish an elderly parole program

- Increase its use of reentry services and alternative custody programs

The court also reaffirmed that the Department would remain under the jurisdiction of the court for as long as necessary to continue compliance with the final benchmark of 137.5 percent of design capacity and establish a durable solution. The Department plans to continue the court-ordered population measures with an aim towards a durable solution that preserves public safety.

## Contract Facilities

### Out-of-State Facilities

In the Blueprint, numerous changes were assumed to impact the state prison population enough that all of the 9,500 inmates then housed at private out-of-state facilities could be returned to California by June 2016. The inmate population has not decreased by the levels projected in the Blueprint and the court retained the population cap at 137.5 percent of design capacity, rather than 145 percent. While the Department will reduce the out-of-state inmate population to 4,900 inmates by the end of 2015-16, it has not been able to bring all inmates back from private out-of-state contract facilities and still maintain compliance with the population cap.

### In-State Facilities

The Blueprint noted that the "implementation of classification changes will provide more flexibility to house offenders in non-celled environments." As a result, additional inmates could be housed in in-state contract facilities. To help reduce the institution population below 145 percent of design capacity, the Blueprint called for an increase from 600 in-state contract beds to 1,825 by December 2013.

The Department has increased the utilization of in-state contract beds above Blueprint levels. As of December 9, 2015, the private and public community correctional facilities and the California City Correctional Facility house approximately 5,821 inmates—an increase of 3,996 from Blueprint projections.

## Inmate Classification

Based on a 2011 review of its classification system, the Department committed in the Blueprint that it would "responsibly adjust the thresholds between the security levels and further refine which offenders require placement in celled housing and level IV prisons." More appropriately classifying and housing these offenders not only helps promote safety and security, but also allows more inmates opportunities to access rehabilitative programming. More specifically, the Blueprint aimed to shift 17,000 inmates to lower security levels, and set forth the following expectation:

> "The Department expects that by 2015 the new regulations will be fully implemented and over 9,500 male inmates will have moved from level IV to level III, and over 7,000 inmates will have moved from level III to level II. As a result, these male inmates will have increased access to rehabilitative programs and avoid the criminogenic influence associated with unnecessary over-classification, thereby aiding success upon release. This policy change will also reduce costs associated with construction and operation of celled housing and level IV male facilities."

The Department adopted new regulations to change the ranges of the classification placement score system to allow inmates with higher classification scores to be assigned to lower security levels compared to the previous ranges. Specifically, classification for level II was adjusted from a score range of 19-27 to a score range of 19-35; classification for level III was adjusted from a score range of 28-51 to a score range of 36-59; and classification for level IV was adjusted from a score range of 52 and above to a score range of 60 and above. These changes allow the Department to more efficiently manage its population by placing inmates in lower category beds, thereby providing maximum opportunity to inmates for programming and improving the Department's ability to safely and securely manage the prison population. All current inmates have been classified utilizing the new process.

The Office of the Inspector General evaluated the Department's progress on implementing the new classification system and found that, as of September 2015, the Department surpassed the Blueprint target and that classification score range changes affected 17,577 inmates whose placement score indicated a lower security housing level than prior to the classification score range change. These changes complement the Department's programming goals and help establish a foundation for program accessibility and expansions.

## Rehabilitative Programming

Prior to development of the Blueprint, the Department's budget for rehabilitative programming had seen large-scale reductions. Additionally, as a result of crowding, much of the physical space for programming had been utilized as housing space.  With the reduced inmate population, the Department committed to several goals related to increasing rehabilitative programs for adult inmates. Specifically, the Blueprint set forth the following commitment:

> "…increase the percentage of inmates served in rehabilitative programs to 70 percent of the department's target population prior to their release. In reaching this goal, the department will employ additional structured programs to address particular needs such as criminal thinking, anger management, and family relationships. The department will also establish reentry hubs to concentrate pre-release programs that prepare inmates about to return to their communities."

The Division of Rehabilitative Programs faced several challenges in meeting this goal, such as the transfer of inmates to out-of-state facilities, the Valley Fever exclusion at certain prisons, and the lengthy state contracting process.  In spite of these challenges, the Department has been able to increase the percentage of inmates served in rehabilitative programs to approximately 60 percent of the target population. The target population is comprised of offenders who, based on assessments, have a moderate-to-high risk to reoffend with a moderate-to-high criminogenic need for services.  The Department continues to improve programming access and opportunities to achieve the 70-percent goal.

The Department is working with the Office of the Inspector General to revise the counting rule for this goal to have it reflect a need that has been addressed by a sufficient amount of program participation. Currently a need is counted as met if an inmate spends only one day in a program: it would be more realistic to only count a need to have been met when an inmate has completed a larger portion of a program.  While this change may make it more difficult for the Department to achieve the 70-percent goal, it is a better assessment of offenders receiving services.

### Reentry and Programming Goals

Consistent with the Blueprint, the Department established reentry hubs at 13 facilities: Avenal State Prison; Central California Women's Facility; California Institution for Men; California Institution for Women; California Men's Colony; Correctional Training Facility; Chuckawalla Valley State Prison; Folsom Women's Facility; High Desert State Prison; Ironwood State Prison; California State Prison, Los Angeles County; Substance Abuse Treatment Facility; and Valley State Prison.  In addition, the 2014 Budget Act provided resources for the implementation

of reentry programming at four in-state contract facilities as well as the leased California City Correctional Facility. Reentry hubs provide programming that prepares offenders for transitioning into society upon their release, and is available to eligible inmates who are within four years of release. Programs include cognitive behavioral treatment program services such as substance use disorder treatment, criminal thinking, anger management, and family relationships. These facilities, along with all other institutions, offer academic and career technical education programs to allow inmates to obtain academic degrees and trade certifications. Inmates are also offered the Transitions Program, which provides them with job readiness, job search skills, and practical financial literacy to facilitate their successful reentry into the job market.

The Blueprint included the following improvements to rehabilitative programming:

- *Add 159 academic teachers over a two-year period*

  The Department hired all 159 academic teachers by June 30, 2015, and additionally added 5 teacher positions for the California City Correctional Facility.

- *Add 98 vocational instructors over a two-year period*

  The Department has filled 92 vocational instructor positions, while actively recruiting to fill the remaining positions in hard-to-fill locations.

- *Include substance use disorder treatment programs at each reentry hub*

  The Department added substance use disorder treatment programs at each reentry hub, four in-state contract facilities, and the California City Correctional Facility. The Department is also in the process of expanding substance use disorder treatment at ten additional prisons.

- *Add cognitive-behavioral treatment programs to address anger management, criminal thinking, and family relationships*

  The Department added these cognitive behavioral treatment programs at reentry hubs, including in-state contract facilities.

- *Expand the pre-employment Transitions Program to all reentry hubs*

  The Department expanded the Transitions Program to all reentry hubs.

In addition to the above commitments, the Department also expanded the Cal-ID program, which establishes a process for inmates who are being released to obtain a California State Identification Card, which is a critical aspect of success for inmates transitioning into the community. For example, a state-issued identification card is needed to enroll in Medi-Cal and obtain services. While the Cal-ID program was initially only available at reentry hubs, the Department has expanded this program to inmates in all state prisons as required by Chapter 607, Statutes of 2014 (SB 2308).

## Female Offenders

In addition to establishing reentry hubs at female institutions, the Blueprint made specific commitments related to female offender programs and services. Given the lower female inmate population due to Realignment, the Blueprint planned for the conversion of Valley State Prison for Women to a male facility, and for the activation of the Folsom Women's Facility. The Department implemented both of these changes. Through the use of contract beds and the female alternative custody programs, the Department has reduced the female prison population below 137.5 percent; to approximately 135.1 percent of design capacity as of December 9, 2015. The Department also increased access to programs and community services and implemented the court-ordered Enhanced Alternative Custody Program for the female population. Since the Blueprint, the Department added:

- *289 Enhanced Alternative Custody Program Beds*
    82 Beds in San Diego
    82 Beds in Santa Fe Springs (Los Angeles)
    75 Beds in Bakersfield (Kern)
    50 Beds in Stockton (San Joaquin) (expected to open in March 2016)
- *300 Female Correctional Reentry Facility Beds in McFarland (Kern)*

These programs are designed to provide female offenders with community support and necessary tools to assist them in successfully transitioning back into the community. The programs are focused on placing offenders in less restrictive environments to support family reunification.

## Standardized Staffing

In the Blueprint, the Department established a standardized staffing model at the adult institutions to achieve budgetary savings and improve efficiency in operations. Prior to standardized staffing, the Department's budget was adjusted on a 6-to-1 inmate-to-staff ratio based on changes in the inmate population—for every 6 inmates, the Department received or reduced the equivalent of one position. These staffing adjustments occurred even with minor fluctuations in population and resulted in staffing inconsistencies among adult institutions. Given the significant population reductions expected as a result of Realignment, using the Department's ratio-based adjustment would have resulted in a shortage of staff and prison operations would have been disrupted. The Blueprint recognized that a standardized methodology for budgeting and staffing the prison system was necessary to provide a staffing model that could respond to fluctuations in the population and allow for the safe and secure operation of housing units at each prison regardless of minor population changes. As stated in the Blueprint:

"The Department assembled a team of correctional experts to review the custody and non-custody positions in each prison. Standardized staffing recognizes the need for a specific staff complement based on the housing unit design and achieves savings while maintaining a safe prison environment. Standardized staffing does not address medical and custody staff associated with the delivery of medical services as those positions are undergoing a separate review by the Receiver. This effort provides a centralized management evaluation of all the positions based on each prison's physical plant design, inmate classification levels, perimeter security, inmate programming opportunities, and daily operational timelines (feeding, medication distribution, education). The staffing patterns are based on specific criteria that take into account specialized missions, such as security housing units and mental health treatment. By redistributing resources, standardized staffing will resolve historical variances."

The Office of the Inspector General was tasked with monitoring and reporting on the Department's compliance with various aspects of the Blueprint. In its March 2015 report related to standardized staffing, the Inspector General found that the Department complied with budgeted staffing levels at the prisons by July 2013. Additionally, the Inspector General reviewed custody staffing patterns and determined that the Department had a 100 percent adherence rate, indicating that the daily staffing patterns matched the standardized staffing plan at each institution. As a result, the Inspector General will no longer continue monitoring compliance with this aspect of the Blueprint.

## HEALTH CARE

The reduction in the inmate population and additional health care investments resulted in an improvement in the Department's ability to deliver quality health care. Therefore, the Department set several goals specific to the provision of health care in state prisons:

- *Revise the mental health bed plan to account for fewer inmates requiring mental health treatment.*

  The Department began implementing the planned mental health housing changes, but had to adjust the plan because the number of inmates requiring mental health treatment did not decrease at the levels anticipated in the Blueprint. In 2012-13, the average total inmate population requiring mental health treatment was approximately 33,600 (equivalent to 25 percent of the population), whereas in December 2015 the average total inmate population requiring mental health treatment was approximately 36,800 (29 percent). Although it is not exactly clear what is driving the increase in the number of inmates requiring mental health treatment, one potential reason is with fewer total inmates in prison and increased staff, the Department is better able

to assess, diagnose and respond to mental health treatment needs.  The Department has made many changes to accommodate the larger mental health population and continues to monitor housing needs and make adjustments as necessary.

- *Continue court-approved mental health treatment delivery program.*

  The Department continues to make strides in creating a stronger mental health care system and providing a constitutional level of care to inmates with mental illness.  The Department has focused efforts on clinical staffing, creation of a quality management system, suicide prevention, improving conditions of confinement for patients in segregated housing, reducing the number of use of force incidents, and identifying and appropriately moving inmates to higher levels of care.

- *Improve health care facilities to provide necessary infrastructure for the provision of efficient services, and renovate and open the California Health Care Facility in Stockton.*

  The State has long recognized the need to improve prison infrastructure, both in terms of adding beds for inmates with medical or mental health needs, as well as renovating medical, mental health, and dental clinic space.  Chapter 7, Statutes of 2007 (AB 900), referred to as the Public Safety and Offender Rehabilitation Services Act of 2007, set aside funding to provide construction and clinical upgrades for these beds.

  AB 900 funding was used to construct the California Health Care Facility in Stockton which opened in July 2013, and renovation of its annex was completed and the facility was activated in April 2014.  The California Health Care Facility consists of medical and mental health beds for inmates with complex medical and mental health needs, and its annex houses inmates with a lower level of health care needs, as well as inmate workers.  The facility is designed to house 2,951 inmates.

  AB 900 also included funding for the Health Care Facility Improvement Program to improve treatment and clinic space at the remaining institutions.  The Receiver developed a plan to improve treatment and clinic space at all institutions starting with construction at San Quentin in 2007.  However, the Health Care Facility Improvement Program did not include the California Rehabilitation Center, which was slated for closure at the time of the Blueprint.  The Department is well underway in the process of planning, designing, and constructing each prison project.  Completion of the Health Care Facility Improvement Program is scheduled for 2017-18.

- *Implement medical classification system for appropriate housing.*

  One of the broader health care initiatives that began in 2011 was the medical classification of inmates.  While all prisons are equipped to meet the health care

needs of the patient population, not all institutions (especially in remote locations) are able to access contract specialists in the community. As a result, inmates were provided with a housing designation based on their medical risk, and prisons were also assigned designations to allow for the placement of inmates in facilities that could best meet their medical needs. Inmates are classified based on various medical factors including, but not limited to: level of care, functional capacity, medical risk, nursing care acuity, and Valley Fever restrictions. Inmates are now generally designated to be low, medium or high risk, and prison facilities are designated as basic or intermediate. This allows the Department to more appropriately house and respond to inmate medical needs.

Over time, the Department anticipates the designation of facilities will require further change to recognize the varied needs of an aging prison population. While there are currently eleven prisons designated for inmates with "intermediate" medical needs, it may be necessary to expand this designation to additional prisons and further evaluate departmental needs.

- *Continue Office of the Inspector General medical inspection audits to monitor litigation compliance.*

The Receiver has worked closely with the Administration and other stakeholders to successfully address the vast majority of deficiencies identified by the court. As a result of that success, on March 10, 2015, the court issued an order that outlined the process for transitioning medical care from the Receivership back to the Department.

The March 10 order outlines a transition plan that is very similar to the successful model that resolved the dental lawsuit under *Perez v. Brown* by focusing on the transition of medical care back to the Department one prison at a time.

The Office of the Inspector General's role in the transition process is to provide an independent assessment of prison medical operations. The Office of the Inspector General completes a prison medical inspection that provides both a quantitative and qualitative assessment of a prison's health care performance and provides a rating of either proficient, adequate, or inadequate. After the assessment is completed, the Receiver considers the Office of the Inspector General's report, as well as data from the "Dashboard" published monthly by the Receiver and other monitoring tools. If the Receiver determines that an institution has achieved an acceptable level of health care delivery, he will execute a "revocable delegation of authority" to the Secretary of the Department to take over management of that institution's medical care. The Receiver's delegation will create a rebuttable presumption that medical care provided in the prison is constitutionally adequate. The Receiver delegated authority for Folsom State Prison in July 2015, and the Office of the Inspector

General is continuing inspections at other prisons.  The 2015 Budget Act provided the Office of Inspector General with the resources necessary to complete these initial reviews by June 2016, and annually thereafter.

To date, the Department has regained control of one prison and two areas of headquarter operations.  The state plans to continue addressing issues needed to expedite the transition of medical care back to the Department.

- *Work with Receiver to modify the medical delivery system to account for the reduced population and increase efficiencies to reduce inmate medical care costs.*

    As the population of the Department has changed in recent years, the needs of its patients have as well, with many requiring a more intense level of treatment and monitoring. The Department and the Receiver have worked to develop systems that meet these needs. Most recently, the Receiver started implementing the Electronic Health Record System.  The Electronic Health Record System allows providers access to needed information, provide treatment, maintain or strengthen continuity of care, work more cohesively with other treatment team members and monitor patient progress more efficiently. Experience with the first institutions of the roll-out has shown that initially the new Electronic Health Record System decreases productivity as clinicians learn the system and new work flows.  However, as clinicians become more familiar with utilizing the system, productivity increases and further efficiencies may be realized.  It is expected that the system will lead to better individualized care and a more robust health care system. As the needs of the patient population shift, and as the population ages, the Electronic Health Record System will provide data that will be useful in managing patient care. These data will be collected and employed when making future organizational decisions and the Electronic Health Record System is expected to lead to a more efficient and effective care model.

- *End oversight in the dental care class action litigation (Perez v. Brown)*

    The Department had been involved in litigation related to the provision of dental care, in *Perez v. Brown*. On May 1, 2006, the court certified the class for purposes of settlement and for the remedial phase of the litigation and issued its preliminary approval order as to the settlement. In August 2006, the Department and plaintiffs entered into a stipulated agreement that outlined the remediation necessary to obtain compliance, such as adequate staffing to deliver care, adequate and timely access to care and the proper environment for the delivery of care.  In August 2012, the parties agreed to terminate the case with the provision that certain construction for dental clinics be finished, which the Department anticipates will be completed in 2016.

SECTION ONE | ORIGINAL BLUEPRINT

## GANG MANAGEMENT

In the Blueprint, the Department committed to implementing recommendations from a 2007 study titled "Security Threat Group Identification and Management." The study recommended that the department employ several measures, including:

- Offer graduated housing and privileges as incentives for positive behavior, and impose consequences for gang-related behaviors.

- Offer a step-down program for inmates to work their way from a restricted program back to a general population setting.

- Provide support and education for inmates seeking to disengage from gangs.

- Employ a weighted point system to enhance the integrity of the gang validation process.

- Use segregated housing only for those gang associates and suspects who engage in additional serious disciplinary behavior.

- Offer programs designed to promote social values and behaviors in preparation for an inmate's return to the community.

The Blueprint estimated that, as a result of this effort, the Department would have a decreased need for segregated housing for gang members. As discussed further in Section 4, the Department has expanded on these efforts and is implementing broader reforms as part of the *Ashker v. Brown* settlement. These changes are resulting in thousands of segregated housing beds being converted to general population beds.

# Section Two: Update on Other Department Programs

## Board of Parole Hearings

There have been many changes to the Board's workload since 2011 Public Safety Realignment was enacted. The most significant change was the transferring of the state's parole revocation process from the Board to the state's trial court system. The Board previously handled approximately 6,000 revocation proceedings per month. The Board's main function now is to conduct parole suitability hearings for long-term inmates to determine if they should be released on parole. Prior to 2014, the Board conducted parole hearings only for indeterminately-sentenced inmates ("lifers"). As a result of changes in law and the three-judge court order, the Board now also conducts parole suitability hearings for certain determinately-sentenced inmates.

As required by Chapter 312, Statutes of 2013 (SB 260), the Board of Parole Hearings implemented the Youth Offender Parole Program, which provides youth offender parole hearings for specified offenders who were convicted of a crime prior to their 18th birthday and sentenced to state prison. This program was further expanded by Chapter 471, Statutes of 2015 (SB 261), by increasing eligibility to those convicted of a crime committed before the age of 23. An inmate is eligible for a youth offender parole hearing during the 15th year of their sentence if they received a determinate sentence; 20th year if their controlling offense was less than 25 years to life; and during the 25th year if their controlling offense was 25 years to life. Inmates who were immediately eligible for a youth offender hearing when SB 260 took effect on January 1, 2014, were required to have their hearing by July 1, 2015. Those with an indeterminate sentence who were immediately eligible for a youth offender parole hearing on January 1, 2016, as a result of SB 261 are required to have their hearing completed by January 1, 2018. Determinately-sentenced offenders immediately eligible as a result of SB 261 are required to have their hearing before December 31, 2021. The Budget includes $3.7 million to implement the expanded Youth Offender Parole Program. Youthful offenders are eligible for parole consideration regardless of whether they are serving an indeterminate or determinate sentence.

The three-judge court order established the elderly parole program which allows inmates who are age 60 or older and who have served 25 years of continuous incarceration to be considered for parole at a parole suitability hearing. Offenders who are eligible for elderly parole are eligible for parole consideration regardless of whether they are serving an indeterminate or determinate sentence. The number of inmates who will be eligible for a hearing under the elderly parole program will increase significantly over the next ten years.

In 2015, the Board scheduled 5,300 hearings, 959 of which were for youthful offenders and 1,012 were for inmates eligible for elderly parole. Offenders sentenced to life without the possibility of parole or condemned inmates are not eligible to apply for youthful offender or elderly parole.

The federal court order also mandated that the state expand its process for placing permanently incapacitated inmates on medical parole and create a parole process for non-violent second-strike offenders. The Board began to conduct hearings under "expanded medical parole" in July of 2014. As of December 9, 2015, the Board has held 61 expanded medical parole hearings. The new parole process for non-violent second-strike offenders began January 1, 2015, and by the end of November 2015, 3,567 inmates were referred to the Board for review for parole under the new process and the Board approved 1,472 for release.

The Board has also implemented new processes required by Marsy's Law (as interpreted by the California Supreme Court in 2013 in *In re Vicks*) for the Board to advance an inmate's next parole hearing date if there is new information or a change in circumstances resulting in a substantial likelihood that additional incarceration is no longer necessary to protect public safety. As a result, the Board advanced parole hearing dates for 1,025 inmates in 2015.

In addition, inmates who were sentenced under the state's Three-Strikes Law (enacted in 1994) will begin to receive parole hearings in 2019, after having served their mandatory minimum of 25 years, as required by the Three-Strikes Law. Looking forward, the Board will continue its mission of protecting public safety with transparency and efficiency.

## Division of Juvenile Justice

Beginning in 2001, the Division of Juvenile Justice faced significant scrutiny for being overcrowded and having violence in its facilities. During that time, outside experts reviewed the Division's policies and procedures and conditions of confinement. The experts issued six reports on the following topics: education, sex behavior treatment, health care, mental health care, wards with disabilities, and the safety and welfare of the youth, finding major deficiencies in all of these areas. These reports were used in a lawsuit against the state in 2003 (*Farrell v. Brown*), which resulted in the state agreeing to a consent decree on the matter in 2004. These reports also became the basis of six remedial plans that the Division of Juvenile Justice has used to reform the state juvenile justice system.

Several legislative changes were implemented that dramatically reduced the Division of Juvenile Justice population from around 3,000 in 2005 to approximately 700 youth in the

system today.  The 2012 Budget Act ended juvenile parole effective July 1, 2013, changed the age of jurisdiction from 25 to 23, and implemented a new fee structure to charge counties $24,000 per year for each offender committed by a juvenile court to the Division of Juvenile Justice on or after July 1, 2012.

Concurrent with the decrease in the juvenile population, the Division worked diligently to not only meet the requirements of the remedial plans, but to completely reform itself in a sustainable manner.  The Department has been dismissed from all remedial areas except for mental health care and only three items of the safety and welfare remedial plan, which in the *Farrell* lawsuit is the largest remedial plan covering every aspect of safety and conditions of confinement for youth housed in the Division of the Juvenile Justice.  These dismissals indicate the court's recognition of the Department's ability to operate safe juvenile facilities in a responsible manner.

In addition to its actions under the *Farrell* lawsuit, the Department is also taking steps to revamp the Juvenile Parole Board.  The Board currently hears only discharge reviews which are conducted by one Commissioner and two Board Representatives.  By only participating in discharge reviews, the Board does not have other opportunities to familiarize themselves with the youth and better prepare the youth for discharge review.  To help address these issues, the Budget proposes statutory language to revamp the makeup of the Juvenile Parole Board.  Specifically, the language proposes to reduce the statutorily authorized number of Juvenile Parole Board Commissioners from five to three.  The other two Commissioners will be moved to hear adult matters.  The language also proposes to establish an Executive Director position to oversee operations of the Juvenile Parole Board.

In addition, the Department may seek other legislative changes to give the Juvenile Parole Board more opportunities to provide meaningful input in the discharge review process.

Today, the reformed Division of Juvenile Justice provides education and treatment to California's youth offenders who have the most serious criminal backgrounds and the most intensive treatment needs.  The framework for the Division's programs is the Integrated Behavior Treatment Model, which is a cognitive behavior approach to assessing, understanding and treating youth.  It is designed to reduce institutional violence and future criminal behavior by teaching anti-criminal attitudes and providing personal skills for youth to better manage their environment.  The Division provides academic and vocational education; treatment programs that address violent and criminogenic behavior, sex offender behavior, substance use disorders, and mental health; and medical care, while maintaining a safe and secure environment conducive to learning.

## Administration

### Succession Planning and Retention

Like most entities throughout state government, retention and succession planning has been an ongoing challenge for the Department.  Succession planning provides the ability to forecast future workforce needs and develop strategies to promote a talented, competent workforce, and to mitigate the loss of institutional knowledge through attrition.  The Department is currently underprepared for the impending retirement of highly skilled and experienced custody and technical supervisors, managers, and executives and previous efforts have not been robust enough to address the problem. The Department currently has 7,465 employees in supervisory, managerial and exempt classifications. Recent data show that approximately 74 percent of those employees will be at or reach retirement age in the next ten years.  Furthermore, of the 74 percent, approximately 71 percent of those employees will be at or will reach retirement age in the next five years.

To address this issue, the Department will work with other agencies to design staff development programs.  Specifically, the Department plans to create improved leadership training curricula which will enhance leadership skills and support continuous organizational development. The training will focus on executives as well as prepare employees for positions such as Warden and Superintendent.  This training is imperative to prepare the Department's supervisory and managerial staff to assume executive-level positions as more executives retire.  An effective succession management plan will help prepare staff to be successful future leaders.

### Correctional Officer Academy

The Department has made concerted efforts to recruit qualified correctional officer candidates to fill vacancies to enhance the safety of the institutions and the public.  The Department participated in approximately 400 recruiting events in 2015 and completed other hiring efforts utilizing promotional videos, advertisements, and outreach—particularly in communities where prison vacancies are difficult to fill. In addition, in 2015, the Department focused recruitment efforts on military veterans. The recruitment efforts contributed to the Department receiving 38,706 correctional officer applications in 2015.  Also in 2015, the Department's correctional officer academy was able to graduate 2,542 cadets for a graduation rate of 94 percent.

# SECTION THREE: INMATE POPULATION AND DEPARTMENT BUDGET

The Blueprint estimated substantial reductions to both the Department's adult inmate population and the departmental budget. Due to several complex factors, population and budget reductions did not materialize to the level estimated in the Blueprint. Further court orders ultimately defined the final population cap at 137.5 percent of design capacity and Chapter 310, Statutes of 2013 (SB 105), outlined the state's path to successfully reduce population below the cap. These court orders, legislative changes, and unanticipated population trends all impacted the Department's ability to meet the Blueprint population and budget estimates.

## CAPACITY AND POPULATION REDUCTION MEASURES

Prior to the February 2014 court order extending the deadline, the state was facing imminent and large-scale early releases to meet the 137.5-percent population cap. SB 105 was enacted in September 2013 as the state's solution to more expeditiously establish capacity and avoid early releases. SB 105 and the court-ordered population reduction measures had significant impacts on the inmate population and the Department's capacity.

### Senate Bill 105

SB 105 stated the following legislative intent:

> "The additional prison capacity and change to reduce prison population authorized by this act are immediate measures to avoid early release of inmates and allow the state to comply with the federal court order. This act will also provide time to develop additional thoughtful, balanced, and effective long-term solutions with input from the state's local government and justice partners who are still adjusting to the recent criminal justice reforms of Realignment. The long-term changes will build upon the transition of lower level offenders to local jurisdictions, the construction of new prison health care facilities, and improvements to existing health care facilities throughout the prison system."

This bill also mandated that the Department of Finance submit a report on the above directives by January 2015, which can be found here: http://www.dof.ca.gov/budget/historical/2015-16/documents/2015_SB-105_Report_revised.pdf. The bill authorized the below measures to allow the California Department of Corrections and Rehabilitation to immediately meet the mandates of the court-ordered population cap, but also sunset these provisions on December 31, 2016.

- *Private In-State Contract and Waivers*

  Authorizes the Secretary of the Department to enter into agreements with private entities to obtain secure housing capacity within the state, and for purposes of such contracts, waives all processes, regulations, and requirements, including state governmental reviews and approvals or third-party approvals required under statute to allow the Department to more swiftly establish such contracts.

- *Private Out-of-State Contracts and Waivers*

  Authorizes the Secretary of the Department to enter into agreements with private entities to obtain secure housing capacity outside of the state, and for purposes of such contracts, waives all processes, regulations, and requirements, including state governmental reviews and approvals or third-party approvals required under statute to allow the Department to more swiftly establish such contracts.

- *Consent for Out-of-State Transfers*

  Authorizes the Department to transfer an inmate to an out-of-state facility without the inmate's consent.  Absent this authority, inmates must consent to the transfer to an out-of-state facility.

- *Community Correctional Centers Contracts and Waivers*

  Authorizes the Secretary of the Department to enter into agreements for the transfer and placement of inmates in community correctional centers, and for purposes of such contracts, waives all processes, regulations, and requirements, including state governmental reviews and approvals or third-party approvals required under statute to allow the Department to more swiftly establish such contracts.

- *California Rehabilitation Center*

  Modifies uncodified language included in Chapter 42, Statutes of 2012 (SB 1022), that required the closure of the California Rehabilitation Center upon the completion of specified infill construction or by December 31, 2016, to suspend that requirement and only allow closure of that facility upon a determination by the California Department of Corrections and Rehabilitation and the Department of Finance that it can be closed.

## Three-Judge Court

On February 10, 2014, the three-judge court granted the state's request for a two-year extension of the deadline to meet the 137.5-percent population cap. The court ordered the state to comply with the population cap by February 28, 2016, and also ordered the state to

implement several population reduction measures. In implementing the below measures, the court waived all regulations and state laws that would impede their implementation, and as of the most recent status update to the court on December 15, 2015, these changes have impacted the population as noted below.

- *Increase credit earning for certain non-violent second-strike offenders and minimum custody inmates.*

  Non-violent, non-sex registrant second-strike offenders are authorized to earn credits at 33.3 percent rather than the 20 percent earning rate in current statute, and are also eligible to earn milestone credits.

  Additionally, certain minimum custody inmates who were previously earning day-for-day credits per statute are currently earning 2-for-1 credits. Since January 1, 2015, 2,684 inmates have had advanced releases from expanded 2-for-1 earnings. These credits are being applied prospectively to the 725 inmates who are currently eligible under this program.

- *Create and implement a new parole determination process for eligible non-violent second-strike offenders who have completed 50 percent of their sentence.*

  Eligible non-violent second-strike offenders who have served 50 percent of their total sentence are being referred to the Board of Parole Hearings for potential release. From January 1, 2015 through November 30, 2015, 3,567 eligible inmates were referred to the Board for review. The Board has approved 1,472 of those inmates for release.

- *Parole certain inmates serving indeterminate sentences who have already been granted parole but have future parole dates.*

  Inmates who have been granted parole by the Board of Parole Hearings but who have future release dates are being released after appropriate levels of review. This provision has subsequently been made permanent in Chapter 470, Statutes of 2015 (SB 230).

- *In consultation with the Receiver's Office, finalize and implement an expanded parole process for medically incapacitated inmates.*

  The Department works with the Receiver's Office to evaluate potential cases to refer to the Board of Parole Hearings for review under newly revised procedures that expand medical parole eligibility. The medical parole program under existing law limits eligibility to those inmates who are permanently medically incapacitated with a medical condition that renders them permanently unable to perform activities of basic daily living resulting in the inmate requiring 24-hour care.  Under the expanded medical parole program, inmates may qualify if they suffer from a significant and

permanent condition, disease, or syndrome, resulting in the inmate being physically or cognitively debilitated or incapacitated. The Board has held 61 hearings under the expanded criteria.

- *Finalize and implement a new parole process for certain elderly inmates.*

  Under the current court order, the Board of Parole Hearings is required to finalize and implement a new parole process for inmates who are 60 years of age or older and have served a minimum of 25 years of their sentence. The Board is currently scheduling inmates who are not already in the hearing cycle, as well as regularly hearing inmates who are in the cycle and are eligible under the provisions of elderly parole. From February 11, 2014 through November 30, 2015, the Board has held 1,028 hearings for inmates who are eligible for elderly parole, resulting in 275 grants of parole.

- *Pursue expansion of pilot reentry programs with additional counties and local communities.*

  The Department is required to pursue an expansion of pilot reentry programs with additional counties and local communities. To date, the Department has contracts to house 220 inmates in community reentry facilities. The Budget includes $32.1 million to continue the community reentry program and assumes a total of 680 beds by December 2016. Reentry programs link offenders to a range of community-based, rehabilitative services that assist with substance use disorders, mental health care, medical care, employment, education, housing, family reunification, and social support.

- *Implement an expanded alternative custody program for women.*

  The Department is required to implement an expanded alternative custody program for female inmates. The Department operates both the Alternative Custody Program and the court-ordered Enhanced Alternative Custody Program (also known as the Custody to Community Transitional Reentry Program). These programs allow eligible inmates to serve the end of their sentences in the community and provide various rehabilitative services to assist in successful reentry into society. Both programs are voluntary and require participants to apply. The original Alternative Custody Program, established by Chapter 644, Statutes of 2010 (SB 1266), is currently restricted to female offenders with non-serious and non-violent convictions. Alternative Custody Program participants can be placed on home detention, in a private treatment facility, or a parolee bed (if available), up to two years prior to their release. The Department is proposing to modify the time frame to one year and to expand the program to eligible male offenders to comply with the *Sassman v. Brown* lawsuit.

The court-ordered Enhanced Alternative Custody Program allows eligible female offenders with serious and violent convictions who are within two years of their release to serve the remainder of their sentence in a community reentry facility while receiving a range of rehabilitative services.  The Department has opened three new secure facilities under the court-ordered Enhanced Alternative Custody Program, with a fourth facility expected to open in the spring.

In addition to the population reduction measures, the court ordered that the Department remain under the jurisdiction of the court for as long as is necessary to demonstrate that compliance with the final benchmark of 137.5 percent of design capacity has been firmly established by the Department as durable. The Department has already attained the population reductions necessary to meet the February 28, 2016 deadline, but must continue to rely on the use of out-of-state and in-state contract beds to sustain compliance.  The Department continues to monitor and adjust the system-wide capacity and housing needs to maintain compliance.

## Current Capacity

The final population cap of 137.5 percent equates to an inmate population cap of 116,989, which includes the infill projects at Mule Creek State Prison and Richard J. Donovan Correctional Facility. The Department also has 4,680 fire camp beds that are not included in the prison capacity noted above.  The largest sources of occupied bed space, outside of the Department's adult institutions, is the use of 4,900 out-of-state contract beds, 4,115 in-state contract beds, and the leasing of 2,381 beds at California City Correctional Facility.

The Department's total adult inmate population as of December 9, 2015, was 127,468, of which 112,510 were housed in the Department's adult institutions, and the remaining 14,958 were housed in fire camps or contract beds. The December 9, 2015 institution population was 136.0 percent of design capacity, or 1,212 inmates below the 137.5-percent population cap based on currently constructed capacity.  While the activation of three infill facilities will add capacity of 3,267, fall 2015 population projections estimate the total inmate population will increase to 131,092 by June 2020, an increase of 3,624 inmates over the December 9, 2015 population.  Therefore, without further population reduction measures or capacity, the state will not be able to further reduce the use of contract beds, or close state-owned facilities.

## Inmate Population

Despite the impact of the court-ordered population reduction measures and Proposition 47, since the SB 105 Final Report, there have only been minor changes in the overall offender demographics of the prison system.  As reflected in Figure 1, on September 30, 2015, there were 103,397 inmates (80.2 percent of the total population) serving a sentence for a violent or serious crime.  An additional 16,811 inmates (13.1 percent of the total population) were serving a sentence for a non-serious, non-violent crime, but have a prior conviction for a violent or serious crime. In total, at least 93.3 percent of the prison population has a history of committing a violent or serious crime.  The remaining 6.7 percent (8,635) of inmates are in prison despite not having a current or prior serious or violent offense.

Nearly 26 percent of the prison population (33,020) is serving a sentence for assault/battery. The next highest proportion of inmates are serving terms for first degree murder, second degree murder, manslaughter, or vehicular manslaughter (21.3 percent, 27,326).

As of September 2015, there were approximately 37,000 state inmates (29 percent of the Department's population) with mental illness, approximately 1 percent had inpatient mental health needs and 28 percent had outpatient mental health needs.  The proportion of the inmate population with mental illness continues to grow.  In September 2012, there were 33,361 inmates with a mental illness.

Figure 1

**California Department of Corrections and Rehabilitation**
**Offender Demographics**

| Characteristics | 9/30/2015 | |
| --- | --- | --- |
| | Number | Percent |
| **Admission Status** | | |
| New Admission | 105,330 | 81.8% |
| Parole Violator-With New Term | 23,486 | 18.2% |
| Parole Violator-Retuned to Custody | 27 | 0.0% |
| **Sex Registrant** | | |
| No | 106,237 | 82.5% |
| Yes | 22,606 | 17.6% |
| **Serious/Violent** | | |
| No Current or Prior Serious/Violent | 8,635 | 6.7% |
| Current Serious/Violent, No Prior Serious/Violent | 68,859 | 53.4% |
| Prior Serious/Violent, No Current Serious/Violent | 16,811 | 13.1% |
| Current Serious/Violent and Prior Serious/Violent | 34,538 | 26.8% |
| **Sentence Type** | | |
| Determinate Sentencing Law | 55,505 | 43.1% |
| 3rd Striker | 6,966 | 5.4% |
| 2nd Striker | 33,118 | 25.7% |
| Lifer | 27,500 | 21.3% |
| Life Without Parole | 5,012 | 3.9% |
| Death Row | 742 | 0.6% |
| **Controlling Offense** | | |
| Crimes Against Persons | 100,873 | 78.3% |
| Property Crimes | 14,052 | 10.9% |
| Drug Crimes | 5,977 | 4.6% |
| Other Crimes | 7,941 | 6.2% |
| **Offense Group** | | |
| Murder 1st | 14,703 | 11.4% |
| Murder 2nd | 7,808 | 6.1% |
| Manslaughter | 4,097 | 3.2% |
| Vehicular Manslaughter | 718 | 0.6% |
| Robbery | 23,405 | 18.2% |
| Assault Deadly Weapon | 14,330 | 11.1% |
| Other Assault/Battery | 18,690 | 14.5% |
| Rape | 2,732 | 2.1% |
| Lewd Act With Child | 9,346 | 7.3% |
| Oral Copulation | 513 | 0.4% |
| Sodomy | 121 | 0.1% |
| Penetration With Object | 274 | 0.2% |
| Other Sex Offenses | 2,307 | 1.8% |
| Kidnapping | 1,829 | 1.4% |
| Burglary 1st | 7,073 | 5.5% |
| Burglary 2nd | 1,618 | 1.3% |
| Grand Theft | 761 | 0.6% |
| Petty Theft With Prior | 174 | 0.1% |
| Receiving Stolen Property | 774 | 0.6% |
| Vehicle Theft | 1,706 | 1.3% |
| Forgery/Fraud | 718 | 0.6% |
| Other Property Offenses | 1,228 | 1.0% |
| Possession of Controlled Substance | 1,437 | 1.1% |
| Possession of Controlled Substance For Sale | 3,119 | 2.4% |
| Sales of Controlled Substance, Etc. | 638 | 0.5% |
| Manufacturing Controlled Substance | 64 | 0.1% |
| Other Controlled Substance | 434 | 0.3% |
| Hashish Possession | 4 | 0.0% |
| Marijuana Possession For Sale | 173 | 0.1% |
| Marijuana Sales | 80 | 0.1% |
| Other Marijuana Offenses | 28 | 0.0% |
| Escape | 109 | 0.1% |
| Driving Under The Influence | 1,381 | 1.1% |
| Arson | 381 | 0.3% |
| Possession of Weapon | 3,723 | 2.9% |
| Other Offenses | 2,347 | 1.8% |

## Fall 2015 Population Projections

The fall 2015 population projections estimate that the adult inmate population will decrease gradually through June 30, 2016, when it is anticipated to reach 127,815. Specifically, from June 30, 2015 to June 30, 2016, the institution population is projected to decrease by 0.8 percent (1,085 inmates) followed by an increase of 1.4 percent (1,775 inmates) from June 30, 2016 to June 30, 2017 (see Figures 2 and 3). Between June 30, 2014 and June 30, 2016, it is estimated that the adult inmate population will have decreased by approximately 7,700 inmates. While there are many factors influencing population trends, this decrease was primarily driven by the implementation of the three-judge court-ordered population reduction measures and Proposition 47. It is currently estimated that these efforts had a combined effect of reducing the adult inmate average daily population by approximately 8,700 offenders in 2015-16.



Figure 2
**California Department of Corrections and Rehabilitation**
**Division of Adult Institutions**
**Adult Inmate Population Projections vs. Actuals**

At the time Proposition 47 passed, the Department was implementing other population reduction measures, most of which were court-ordered. Proposition 47 accelerated the scheduled release of many offenders and it is estimated that the 2015-16 average daily inmate population will be reduced by approximately 4,700 as a result of resentencing and avoided new admissions. Combined, Proposition 47 and these other measures reduced the average daily inmate population by approximately 8,700. Ultimately, the effects of the resentencing

component (retroactive impact) of Proposition 47 will no longer impact the average daily population as those inmates would have eventually reached their natural release date, but the impact of avoided commitments (prospective impact) is assumed to continue indefinitely and is currently estimated to reduce the average daily inmate population by about 3,500. The population impacts resulting from Proposition 47 will be further refined as more data become available.

Because a longer-term increase in court commitments is expected, the projected population is anticipated to increase in each of the next four years to 131,092 on June 30, 2020 (see Figure 3). Given the magnitude of recent changes ordered by the three-judge court and Proposition 47, and the potential for unknown future changes to the correctional system, projections beyond a two-year horizon should be interpreted with caution.

Figure 3

### Adult Inmate Population

| June 30 | Female | Male | Total | Percent Change |
|---|---|---|---|---|
| **Actual** | | | | |
| **2006** | 11,749 | 160,812 | 172,561 | |
| **2007** | 11,888 | 161,424 | 173,312 | 0.4% |
| **2008** | 11,392 | 159,581 | 170,973 | -1.3% |
| **2009** | 11,027 | 156,805 | 167,832 | -1.8% |
| **2010** | 10,096 | 155,721 | 165,817 | -1.2% |
| **2011** | 9,565 | 152,803 | 162,368 | -2.1% |
| **2012** | 6,409 | 128,829 | 135,238 | -16.7% |
| **2013** | 5,919 | 126,992 | 132,911 | -1.7% |
| **2014** | 6,216 | 129,268 | 135,484 | 1.9% |
| **2015** | 5,632 | 123,268 | 128,900 | -4.9% |
| **Projected** | | | | |
| **2016** | 5,501 | 122,314 | 127,815 | -0.8% |
| **2017** | 5,540 | 124,050 | 129,590 | 1.4% |
| **2018** | 5,542 | 124,899 | 130,441 | 0.7% |
| **2019** | 5,534 | 125,460 | 130,994 | 0.4% |
| **2020** | 5,519 | 125,573 | 131,092 | 0.1% |

## Department Budget

The Blueprint anticipated that as a result of Realignment and the additional changes made in the Blueprint, budgetary savings would be achieved. Cost avoidance was also anticipated, which included elimination of $4.1 billion in bond authority and avoiding the need to build new prisons. At the time of the Blueprint, it was expected that the Department's pre-Realignment operations would be reduced by $1.5 billion by 2015-16. However, it is important to note that the Blueprint did not estimate that the Department's budget would be $1.5 billion lower in 2015-16 than pre-Realignment. For example, it was always anticipated that the Department's budget would increase due to the activation of the California Health Care Facility which was not fully budgeted pre-Realignment. Additionally, it was assumed that the Department's budget would increase for employee compensation and employer retirement contributions. The Blueprint savings estimates were compared to functions already included in the Department's budget at the time of the Blueprint, not necessarily a projection of the Department's total budget into the future.

With the release of each Governor's Budget and May Revision, the Department of Finance completes multi-year forecasts. Department-specific General Fund forecasts do not include lease revenue debt service and Proposition 98 funding, or estimates for growth in employee compensation and retirement (lease revenue debt service, employee compensation, and retirement are estimated on a statewide basis). Prior to the implementation of Realignment and the Blueprint, the multi-year forecast for the Department of Corrections and Rehabilitation estimated $10.3 billion for 2016-17. After adjusting the forecast for the components excluded from the estimate—the 2016-17 budget for lease revenue debt service ($430.3 million) and Proposition 98 ($19.2 million), and increases in employee compensation and retirement since 2011-12 ($880 million)—the pre-Realignment forecast would have totaled $11.6 billion. The current 2016-17 Budget of $10.3 billion is $1.3 billion less than the pre-Realignment, pre-Blueprint multi-year forecast for the Department of Corrections and Rehabilitation.

Additionally, since 2012-13 the Department's General Fund budget has not increased at the same rate as other departments. As of the 2012 Budget Act, the Department accounted for 9.7 percent of total General Fund spending. As of the 2016-17 Budget, the Department accounts for 8.4 percent of total General Fund spending, a decrease of 1.3 percent.

The activation of the California Health Care Facility, employee compensation increases, and employer retirement contribution increases would not be considered examples of erosions to Blueprint savings, but there were direct erosions to savings estimates included in the Blueprint.

## Blueprint Population Projections

The Blueprint housing plan and budget savings estimates were based on population estimates that were understated by over 14,000 inmates.  Housing this unexpected population drove additional costs not factored into the Blueprint savings estimates.  On April 25, 2012, the adult inmate population was 137,761, of which 123,287 were housed in state prisons (154.8 percent of then design capacity). The spring 2012 population projections estimated the total inmate population would decrease to 133,768 by June 30, 2012, and 127,674 on June 30, 2013, and would continue to decrease to 123,862 inmates by June 30, 2017.  However, the actual population numbers deviated from those projections used in the Blueprint (see Figure 4).  The fall 2015 projections now estimate a total adult inmate population of 129,590 by June 30, 2017.  This is an increase of 5,728 inmates despite the implementation of the court-ordered population reduction measures and Proposition 47 that had a combined impact of approximately 8,700.



Figure 4
**Total Institution Population
June 30, 2011 - June 30, 2020**

## Capacity to Comply with Court-Ordered Cap

At the time of the Blueprint, the Department was housing approximately 9,500 offenders out-of-state and the Department's base budget included $318 million for up to 11,800 due to an estimated need pre-Realignment.  The Blueprint called for the elimination of the use of all out-of-state contract facilities by the end of 2015-16.  Additionally, the Blueprint estimated the Department would rely on 1,825 in-state contract beds to comply with the population cap.

Based on the Blueprint population projections, it was anticipated that the Department would not meet the court's final benchmark of 137.5 percent of design capacity by June 2013. However, alongside the numerous improvements detailed and anticipated by the Blueprint, it was assumed that the "additional measures proposed in this plan will allow the state to seek and obtain from the court a modification to raise the final benchmark to 145 percent of design capacity. Otherwise, alternatives such as continuing to house inmates out-of-state will have to be considered."

As previously discussed, the court did not amend the cap to 145 percent of design capacity. Based on the current institution design capacity of 82,707, the 145-percent population cap would have allowed the Department to house 119,925 offenders in state prisons, or 6,203 more offenders than the final 137.5-percent population cap.

Because the state was unable to house these 6,203 offenders in the Department's institutions and because population increased by 5,728 offenders over Blueprint projections for June 30, 2017, the state had to fund alternative capacity for 11,931 offenders.

The Budget includes a combined total of approximately $385 million in 2016-17 to house 4,115 inmates at in-state contract facilities, 4,900 at out-of-state contract facilities, and 2,381 at a leased facility in California City.  This is an increase of approximately $332 million over the amount estimated in the Blueprint for the housing of 1,825 offenders at in-state contract facilities.

### Budgetary Increases Since Publishing the Blueprint

Since publishing the Blueprint, there have been many comparisons between the Department's current budget and the Department's 2012-13 Budget.  The Budget is approximately $1.5 billion higher than the 2012 Budget Act.  While there have been many adjustments over this time period, most adjustments can be categorized into four main areas of budget growth (see Figure 5).

#### *Employee Compensation and Retirement*

Since the 2012 Budget Act, the Department's budget has increased by $835 million as a result of higher employee compensation and retirement costs.  During this time, employees in all bargaining units within the Department have received compensation increases.  Of the $835 million, $345 million is directly tied to increases in the employer contribution rates for retirement benefits for all positions.

### Capacity to Comply with Court-Ordered Population Cap

As previously discussed, the Budget includes approximately $385 million in 2016-17 to house 11,396 offenders in leased or in-state and out-of-state contract beds.  Additionally, the Budget includes $32.1 million for the community reentry program and $73 million to operate the infill sites.  In total, to increase capacity to comply with the court-ordered population cap, the Budget includes an increase of $250 million over the amount budgeted in the 2012 Budget Act.

### California Health Care Facility

The California Health Care Facility opened in July 2013, providing almost 2,600 healthcare beds, of which approximately 950 are licensed beds.  The 2012 Budget Act included approximately $16 million for pre-activation activities at the new facility.  Since that time, the Department's budget has increased by approximately $289 million to activate and operate the facility.

### Lease Revenue Debt Service

The Budget includes $430.3 million for the Department's Lease Revenue Debt Service.  This is an increase of approximately $170 million over the 2012 Budget Act.  This increase is primarily driven by the construction of the California Health Care Facility, Health Care Facility Improvement Projects, infill capacity as outlined in the Blueprint, and local criminal justice facility construction projects.



Figure 5
**California Department of Corrections and Rehabilitation
General Fund Budget Increases Since 2012-13**
(Dollars in Millions)

This page intentionally blank to facilitate double-sided printing.

# SECTION FOUR: FACILITIES AND POPULATION MANAGEMENT

Significant changes to the prison population over the last several years have changed how the Department evaluates and adapts to housing needs of the inmate population. The Department has a renewed need to monitor, evaluate, and shift housing and inmate placement as the inmate population demographics change. For example, as the lower security level inmate population continues to decline, such as those inmates eligible for fire camps and minimum support facilities, the proportion of serious and violent inmates continues to grow. The Department is also challenged by limiting inmate placements at Avenal and Pleasant Valley State Prisons to those who had previously been exposed to Valley Fever and thereby are least likely to contract the infection. The Department must continue to evaluate alternatives to typical inmate placements and change facility missions to maximize use of existing prisons. Further compounding these changing conditions is the division of inmates into sub-populations within designated security levels. Examples include the need for Sensitive Needs Yards and Enhanced Outpatient Program (a mental health designation) facilities, including Sensitive Needs Yard facilities designated exclusively for Enhanced Outpatient Program inmates. The increasing proportion of the population that is serious or violent and the continued growth of sub-populations that require dedicated housing are limiting housing placement options for the Department system-wide. The Department will continue to monitor these issues, and may consider future adjustments to accommodate these unique populations.

## POPULATION MANAGEMENT

The Department operates a prison system that is responsible for almost 130,000 inmates. In this environment, violence and gangs can be a significant issue, and the Department is always trying to mitigate these problems. The Department is implementing and evaluating programs that will help reduce violence and gang activity in prison and create an environment more conducive to rehabilitation.

### Inmate Classification

Appropriate housing designations are important in creating a secure, safe and efficient prison system. As discussed in Section One, the Department implemented changes to its inmate classification system and how it designates security levels, which allowed for a large shift of offenders to lower security levels with less restrictive housing and more rehabilitative and educational programming opportunities. To build upon the success created by the change to security level designations, the Department is evaluating further modifications to improve security and access to rehabilitative programs.

The Department is focusing on an inmate's custody designation.  A custody designation is a sub-designation to security level (i.e., I, II, III and IV) intended to adjust the security coverage required for an individual within a security level.  The custody designation can specify the type of bed (celled vs. dorm) and eligibility for certain jobs or programs. Although other reasons may be considered, an inmate is assigned to a particular custody designation based on the following factors:

- The inmate's total term

- The inmate's escape history

- Any active law enforcement felony holds

- Inmates with high notoriety or public interest

- Inmates with an identified management concern, which usually includes a threat to other inmates or the community, should an escape occur

- A finding of guilt for a serious, felony-level rules violation

The Department is considering revisions to existing regulations related to custody designations to allow more programming opportunities for those with lower supervision needs and shift focus to those inmates who pose the most significant risk of escape.

**Sensitive Needs Yards**

In the 1990s, the Department experienced significant spikes in violence amongst the inmate population.  A primary factor in the increased violence was the growth of prison gangs. Gang proliferation reached all prisons and into the community.  Inmates who were victims of attack, sex offenders, had drug debts, or seeking safety during their incarceration were placed in segregated housing for extended periods of time for their protection. Segregated housing is expensive to operate and limits inmate programming opportunities.  To counteract this problem, the Department created Sensitive Needs Yards, which are similar to general population yards except they only house inmates with protective custody needs.  The criteria for an inmate to be designated Sensitive Needs Yard was liberally applied to meet the Department's primary mission of safely housing its inmates.

The Sensitive Needs Yard population within the prisons has grown significantly and created a further bifurcated housing system that is expensive to operate and inconsistent with the operation of other prisons in the nation.  In June 2008 the Sensitive Needs Yard population was approximately 24,000 inmates, and has become the fastest growing population within the prison system, expanding to approximately 41,000 inmates today.  The Department is

continually changing facility missions throughout the system to address the growing Sensitive Needs Yard population and address other specialty needs of the inmate population.  For example, the Department can no longer just have a level II general population facility.  It now must create a level II general population facility and a level II SNY facility.  This problem becomes further exacerbated when facilities are limited by certain medical, mental health, and programming designations.  These housing limitations put a significant strain on the Department's ability to safely and effectively house the inmate population.

The Department plans to engage a variety of stakeholders to develop a long-term plan to mitigate the negative impacts of the Sensitive Needs Yard population and its continued growth while maintaining the safety benefits it was created to provide.  To improve the Department's population management efforts, it may need to consider stricter criteria to obtain a Sensitive Needs Yard designation, the removal of Sensitive Needs Yard designations for gang and violent behavior, and consider other measures that are effective with this population.

### Security Threat Group Regulations

The Department recently reached a settlement agreement in the *Ashker v. Brown* lawsuit related to conditions of confinement at Pelican Bay State Prison.  The final agreement moves the Department away from a system of indeterminate terms for segregated housing to a system that focuses on determinate terms for behavior-based violations.  In addition, the Department has made changes to its step-down program to allow inmates to transition from segregated housing into the general population more quickly than under previous policies.  While the Blueprint outlined initial steps that would potentially reduce the future need for segregated housing, these additional changes are projected to reduce the need for several thousand segregated housing beds, which will be converted into the appropriate housing security level as the changes occur.

The Budget includes a reduction of $28 million to account for these housing conversions.  To maintain public and institutional safety, the Budget includes $5.8 million for additional investigative staff to monitor gang activity in prisons as the new segregated housing policy changes are implemented.

### Facilities and Infrastructure

The three-judge court order requires the Department to limit the inmate population housed in its 34 prisons to 137.5 percent of design capacity by February 28, 2016.  While projections indicate the inmate population will grow in the coming years, the continuation of various population reduction measures, an infill bed expansion, maintaining existing

prison infrastructure, and by keeping in-state and out-of-state contract beds at current levels, the prison system is projected to remain below the population cap.  This plan is not without challenges as the Department continues to struggle to meet the unique needs of its population in aging and obsolete facilities.  However, since the Blueprint, a great deal of progress has been made in remedying long-standing infrastructure deficiencies in medical, mental health and dental care areas of the prisons.  Progress has also been made in improving accessibility for disabled inmates.  The Department is also expanding programming space at its reentry hubs to improve access to rehabilitative services.  This section details these accomplishments but also describes the Department's remaining facility and infrastructure challenges and how it intends to address them, as well as considering the continued use of in-state and out-of-state contract facilities, to maintain compliance with the court-ordered population cap.

## Improvements in Accessibility, Health Care, and Programming Space

Over the last several years, the Department has developed and implemented a number of facility improvement projects that when complete will provide greater accessibility, improve the delivery of health care, and create additional space to conduct rehabilitative programming.  The Department's Dental Improvement Program created additional space, improved sanitization and storage areas and provided new equipment at select prisons at a cost of approximately $20 million.  The Department also built a number of treatment and office buildings to serve the inmate population with mental health treatment needs, with the last of these projects completed in October 2015.  In addition to the construction of new mental health facilities, the Department collaborated with the Receiver to develop the Health Care Facility Improvement Program, a comprehensive program to build and/or renovate healthcare facilities at nearly every prison at an estimated cost of $850 million.  This program does not apply to the California Health Care Facility, San Quentin State Prison or the California Rehabilitation Center, but 23 prisons are in construction, 3 are in the bidding phase, and 5 are in the design phase.  The Department is also engaged in a multi-phase construction effort to improve accessibility at prisons housing disabled inmates to comply with the Americans with Disabilities Act and *Armstrong v. Brown*.  To expand programming space, the Department is acquiring modular facilities at its reentry-hub prisons.   All of these improvements are being made to enhance the usability of the Department's existing prisons by providing access to necessary services.

## Housing Capacity Breakdown

The Department houses its adult male offenders by security level, and within each prison, facilities are often further differentiated into special designations to provide housing that serves the population's needs (e.g.,Sensitive Needs Yards, certain mental health

designations).  Figure 6 reflects the Department's prison design capacity by level compared to the total projected inmate population on June 30, 2020.  If the population numbers in Figure 6 were compared exclusively to the Department's design capacity, the Department would have a large gap between the number of inmates that can be housed in its prisons at the 137.5-percent population cap compared to the total inmate population. The Department makes up for this gap primarily by housing inmates in fire camps, out-of state facilities, and in-state contract facilities.  Figure 6 also reflects the planned completion of three level II dormitory housing facilities at existing prisons that will be complete in 2016 and will add design capacity of 2,376 beds, some of which will be designated for certain inmate populations that require mental health treatment.

Figure 6
**Adult Inmate Population and Housing Capacity by Security Level**

| Security Level | Institution Design Capacity | June 30, 2020 Projected Population as of Fall of 2015 |
|---|---|---|
| I | 8,145 | 12,989 |
| II | 30,996 | 45,194 |
| III | 18,420 | 25,442 |
| IV | 14,148 | 27,885 |
| Reception Center | 6,573 | 11,617 |
| Special | 2,528 | 1,663 |
| Female | 3,485 | 5,519 |
| Condemned | 788 | 783 |
| **Total** | **85,083** | **131,092** |

## Maintaining System-wide Capacity

The Department's previous plans, as outlined in the Blueprint, had assumed the closure of the California Rehabilitation Center upon completion of three new infill dorm facilities and fully eliminating its use of out-of-state contract facilities.  The premise to be able to close the facility and end the use of out-of-state contract facilities was largely based on the idea the Department would have a population cap of 145 percent of design capacity and the total inmate population would be lower.  However, the three-judge court retained a population cap of 137.5 percent of design capacity, and even with the recent court-ordered population reduction measures and Proposition 47, the inmate population in 2015-16 is several thousand inmates higher than projected at the time of the Blueprint.  These factors prevent the Department from fully eliminating its use of out-of-state contract facilities and closing the California Rehabilitation Center.

As noted above, the Department uses many housing options to maintain compliance with the population cap.  The Department projects the total inmate population to be approximately 131,000 by June 30, 2019.  The Department's prison population cap is expected to be approximately 117,000, which leaves a gap of about 14,000 inmates that the Department must address to maintain compliance with the court-ordered population cap.  The Department plans to maintain compliance by housing inmates in approximately 4,900 out-of-state beds; 4,100 in-state contract beds; 3,500 fire camp beds; 2,300 California City Correctional Facility beds; 1,000 community reentry beds; and 300 Department of State Hospital beds.

Figure 6 illustrates that it is projected that the state cannot eliminate its use of contract or leased beds or close the California Rehabilitation Center and maintain compliance with the court-ordered population cap.

**California Rehabilitation Center**

The California Rehabilitation Center is a level II facility that currently houses approximately 2,800 inmates.  The need to maintain compliance with the prison population cap, and address the aging infrastructure of the facility led the Department to consider many options for the future of the California Rehabilitation Center.

Once it became clear the Department could not close the California Rehabilitation Center and maintain compliance with the population cap, it evaluated various options to construct or lease additional capacity to restore the approximate capacity loss that would occur upon closure of the California Rehabilitation Center.  The Department considered new construction to replace the lost capacity.  In considering construction to replace the lost capacity, the Department evaluated where additional housing could be located and what security levels would best meet its future needs.  While the California Rehabilitation Center is a level II facility, Figure 6 indicates that higher security level housing is in shorter supply than level II capacity.  Therefore, future capacity replacement or expansion will likely need to include celled capacity to address this shortfall.

The challenges of constructing new capacity and the need to sustain all current capacity to maintain compliance with the population cap led the Department to determine that it is most prudent to maintain the California Rehabilitation Center for the next few years.  While the closure of the California Rehabilitation Center remains a priority, the facility has been without any type of physical plant improvements for many years because of its planned closure.  The Budget includes a one-time augmentation of $6 million to address critical special repairs and deferred maintenance projects at the facility to allow the Department to continue its use.

The Administration will also engage the Receiver on a workable plan to address physical plant needs to improve health care access at the facility. The state will continue to monitor the total inmate population and compliance with the population cap to assess the earliest date when this facility can be closed.

### Out-of-State Contract Facilities

As mentioned above, the Department was unable to fully eliminate its use of out-of-state contract facilities as planned in the Blueprint, and absent building and/or leasing additional in-state capacity or further population reductions, the Department will need to maintain its current planned out-of-state population of approximately 4,900 to maintain compliance with the population cap. This population will be maintained at the two existing facilities—Arizona and Mississippi—that mainly house level III inmates. The Department will seek legislative authority to continue the use of out-of-state beds and the involuntary transfer process beyond December 31, 2016, which was the sunset date established in SB 105.

### California City Correctional Facility

To augment its capacity to maintain compliance with the court-ordered population cap, the Department received legislative authority in SB 105 to enter into a lease for the California City Correctional Facility. Although the facility is leased, the Department staffs and operates the facility similar to a state-owned prison. The facility houses approximately 2,300 level II inmates. The current lease is set to expire in December 2016, but to maintain compliance with the court-ordered population cap, the Department will negotiate a lease renewal for at least two years.

### In-State Contract Facilities

In addition to out-of-state facilities and the California City Correctional Facility, the Department also contracts with public and private in-state facilities to maintain compliance with the court-ordered population cap. These facilities house approximately 4,100 inmates, which are mainly level II beds. Continued use of these facilities is necessary to maintain compliance with the court-ordered population cap. The Department will seek legislative authority to continue the use of in-state contract beds beyond December 31, 2016, which was the sunset date established in SB 105.

### Evaluation of Infrastructure Needs

As is the case with the California Rehabilitation Center, the vast majority of the Department's facilities are over 30 years old and require major repairs and capital replacements to continue to operate effectively. Institutions continue to be challenged with emergency repairs, further

diverting resources away from maintaining and improving systems.   Some of the most acute facility-related failures experienced by the Department have occurred within the oldest prisons—those constructed between 1852 and 1965.  Over the years, the lack of consistent reinvestment in systems that have reached their useful age and the ongoing wear and tear by the inmate population have led to significant near-failures at these locations and pose substantial future risk of complete failure that could render all or portions of an entire prison unusable for an extended period of time. Any substantial facility failures would jeopardize the Department's ability to maintain compliance with the court-ordered population cap, and simultaneously cause crowding of other facilities that would have to absorb the population. As necessary repairs and replacements are deferred, the costs to remedy these deficiencies will likely increase.  Determining which facilities and system components warrant priority funding is challenging as many of the Department's prisons are aged and increasingly in disrepair.

To begin addressing this significant risk, the Department will develop a comprehensive approach for making targeted investments to improve facility conditions and to sustain the Department's capacity to maintain compliance with the court-ordered population cap. To do so, the Budget includes $5.4 million in 2016-17 to contract for a study evaluating the existing conditions at the original prisons and develop plans to either renovate or replace housing units, support spaces, and infrastructure components serving those facilities. This study will lead to the creation of a prioritized facility reinvestment plan for the Department's oldest prisons. The Department estimates that it would take approximately 18 months to complete the study.

To also help address the Department's infrastructure issues, the 2015-16 Budget includes $15 million for deferred maintenance projects and the 2016-17 Budget proposes an additional $55 million for this purpose.  The Department has identified over $1 billion in deferred maintenance projects.

# Section 5: Future Vision

As noted in previous sections and in the SB 105 report, the criminal justice and correctional system is ever changing.  The prison population can change due to practices at the local level. In addition, class action litigation often presents other challenges for the Department.  These factors and others make planning in precise detail difficult, but the Department is focused on establishing principles to guide its future and improve its operation and delivery of programs. This Section includes the Department's overarching vision for the coming years and also identifies a number of specific initiatives already underway.  The Department will continue to assess and shift strategies to meet the changing criminal justice environment, including evaluation of its organizational structure, in-prison and community programs and operational policies, culture, and effectiveness in meeting the demands of the California correctional system.

## Rehabilitative Programming

The Department's rehabilitative programs are critical to mitigating recidivist behavior by addressing the needs that led to criminal activity.  The Department's rehabilitative vision is to continue refining, enhancing, and implementing programs that address individual criminogenic needs, reduce recidivism, and transition offenders into contributing members of society. The Department's services include academic education, career technical education, cognitive behavioral treatment, substance use disorder treatment, reentry and other programs.

To measure the success of programs, the Department plans to evaluate in-custody and community programs for effectiveness, compliance with national best practices, and cost benefits.  To that end, the Department is currently developing an information technology solution to improve its ability to track offender specific outcomes.  These outcomes will help the Department track an offender's rehabilitative life cycle and begin implementing performance-based contracting for rehabilitative services, which help reduce recidivism. In addition, the Department is partnering with the Pew-MacArthur Results First Initiative to engage in a large scale evaluation of the programs offered to inmates and parolees to best identify which programs are cost-effective and successful, and to prioritize and expand on effective evidence-based programs based on this analysis.

In addition to internal departmental initiatives, the Department also plans to establish and expand relationships with local stakeholders to enhance rehabilitative programming.  The Department has started this collaboration by partnering with county probation departments on a limited scale for community programming and offender supervision activities.  Expansion of these partnerships to include Health and Human Services agencies and private entities will strengthen community networks to assist offenders.  This local collaboration is an ongoing goal of the Administration.

**In-Prison Programming**

The Department begins addressing an offender's path towards rehabilitation as soon as possible after the offender enters a prison by conducting an assessment at Reception Centers. To that end, the Department offers a broad array of in-prison programs which include academic and career technical education, cognitive behavioral treatment, volunteer-based programs, employment programs, and reentry services. The 13 prison reentry hubs target offenders who are within four years of release and have a moderate-to-high risk to reoffend and a moderate-to-high criminogenic need for services. The Blueprint established a goal to address at least one need prior to release for 70 percent of the target population.

As outlined in the Blueprint, reentry hubs provide services to the targeted population to prepare offenders for transition into society upon their release. Programs include cognitive behavioral treatment program services such as substance use disorder treatment, criminal thinking, anger management, and family relationships. Reentry hubs, along with all other institutions, offer academic and career technical education programs to allow inmates to obtain academic degrees and trade certifications. Inmates are also offered the Transitions Program, which provides them with job readiness, job search skills, and practical financial literacy to facilitate their successful reentry into the job market, and the Cal-ID program to assist inmates in obtaining a state-issued identification card. The Department will continue to assess the effectiveness of this approach and may consider modifying the current reentry-hub model if necessary.

*Education and Other Programs*

An inmate's education is a vital portion of their rehabilitation, and the Department offers adult basic education services, high school equivalency, and college-level courses. In addition, career technical education is available at all prisons with programs designed to provide a path to employment and a living wage.

**Academic Education**

The Department offers academic education with priority given to those with a criminogenic need for education. The Department's main academic focus is on increasing an inmate's reading ability to at least a ninth-grade level. As mentioned in Section One, the Department has been successful since the Blueprint in hiring additional academic teachers to expand educational services in prison. To continue improving education in prison, additional issues need to be addressed such as providing individually tailored education programming, reducing interruptions in learning due to movement between facilities, and improving offenders' familiarity with computer technology.

The Department also needs to keep up with technology advancements in the education field and the opportunities technology provides to enhance and expand education services in prison. The Department will continue to evaluate changes necessary to improve inmate education.

## Career Technical Education

The goal of career technical education is to provide offenders with a marketable trade that improves opportunities for employment upon release. The program targets inmates who are closer to release with a criminogenic need for employment services.  In addition to expanding career technical education programs as planned for in the Blueprint, the Department has also established dedicated funding for 12 career technical educational programs overseen by the Prison Industry Authority.  Although progress has been made, technology related issues are also challenging the career technical education program.  In November 2015, the Department became unable to provide certification for 26 percent of the career technical education programs because the certification exams must be completed online.  The Department has a technology solution that is currently going through the normal information technology review process and will be under consideration for implementation once complete.

## Prison Industry Authority

In addition to the traditional career technical education programs, the Department continues to utilize the valuable work programs overseen by the Prison Industry Authority which provide work opportunities for approximately 6,400 inmates in areas such as manufacturing, consumable service, and support functions, including warehouse and administration.  Since the Blueprint, the Prison Industry Authority, in conjunction with the Receiver, established a janitorial services program aimed at improving cleanliness in health care areas which has the added benefit of creating more inmate work opportunities and job opportunities upon release.

## Community College

College-level academics have been shown to have positive impacts on recidivism and improve offender reentry.  However, state law prevented community colleges from receiving payment for any courses not available to the general public—including for incarcerated individuals.  With mounting evidence about the benefits of inmate education, Chapter 695, Statutes of 2014 (SB 1391), allowed community colleges to receive payment for courses offered in prisons.  After its passage, the Department entered into an agreement with the California Community College Chancellor's Office to develop four pilot programs to provide inmate access to community college courses that lead to either careers or transfer to a four-year university.

The pilot districts of Antelope Valley, Chaffey, Los Rios, and Lassen were awarded $2 million to develop their inmate education programs with an emphasis on face-to-face instruction. Classes in these pilot districts will begin in late January 2016 and will each serve 21 to 30 inmates per semester.  Business and Business Entrepreneurship programs will be offered at Lancaster State Prison, California Institution for Women, Folsom's Women's Facility, and High Desert State Prison.

In addition to the pilot colleges, the change in state law made it easier for other local colleges to offer courses for inmates.  Currently, 14 community colleges offer inmate courses to approximately 7,500 inmates throughout the state.  These programs, including distance learning, offer inmates a variety of programs including general education, humanities, psychology, and business.

To further expand course offerings to inmates throughout the state, the California Community College Chancellor's Office hosted an Inmate and Reentry Education Summit in December 2015 in Northern California.  Over 245 participants from non-profit organizations, community colleges and the California Department of Corrections and Rehabilitation attended the event. The Chancellor's Office reports that 10 to 12 additional colleges are interested in creating inmate education programs. The Summit provided interested colleges with inmate education program best practices and planning information.  Additionally, the Summit included information to improve college services for recently released individuals on their campuses. The Chancellor's Office plans to host another summit in Southern California in the spring of 2016.

To help provide access to these new community college programs, the Budget includes $480,000 for custody staff to oversee evening college courses offered in prisons, similar to the security provided in other educational and career technical education programs. This augmentation will improve the safety of inmates and volunteer professors that provide instruction for in-prison college courses.

Many efforts are in the early stages of implementation and the Department plans to monitor and evaluate its success to guide future expansion of this important rehabilitative program.

### Arts-in-Corrections

In addition to educational programming, Arts-in-Corrections programs can have a positive impact on inmate behavior, provide incentives for participation in rehabilitative programs, and increase critical thinking, positive relationship building, and healthy behaviors.  The Department received $2 million in 2015-16 to establish the program, which is currently

available at 18 institutions.  It offers arts to offenders in many forms such as literacy, visual arts, performing arts, and media arts as well as drawing, painting, and sculpting.  The Department has found alternative means of programming makes for a safer and more successful rehabilitative environment.

**Innovative Programming Grants**

While a wide array of rehabilitative programming is offered, the Department is always seeking new and unique methods of evidence-based rehabilitation.  The institutions continue to coordinate with volunteer groups to offer innovative programs and services to provide additional programming options. The Department awarded approximately $5.5 million in Innovative Programming Grants to non-profit organizations or individuals to increase the volunteer base at underserved institutions.  This funding included $2.5 million in grants funded from fiscal year 2014-15, and an additional $3 million awarded in fiscal year 2015-16. These efforts further the Department's rehabilitative goals.

*Substance Use Disorder Treatment*

Providing offenders with access to substance use disorder treatment has a meaningful impact on reducing recidivism, and is a critical aspect of an inmate's rehabilitation.  Without addressing this need, all other aspects of the inmate's rehabilitation are impacted. According to the 2014 Outcome Evaluation Report by the Department's Office of Research, offenders who were assigned to an in-prison substance use disorder treatment and completed treatment while in the community had a recidivism rate of 20.9 percent compared to 55.6 percent for those who did not receive any substance use disorder treatment.  Because of these benefits, in addition to the planned reentry hub substance use disorder treatment programs, the Department also established substance use disorder treatment programs at four in-state contract facilities, and the California City Correctional Facility, and is in the process of establishing programs at 10 additional prisons.  The Budget includes $15.2 million to complete the expansion of substance use disorder treatment to the remaining 11 institutions.

*Transitional and Reentry Programming*

While addressing an inmate's rehabilitative needs during their period of incarceration is crucial, the Department must also be focused on providing an inmate with the programs and tools necessary to successfully transition back into society when they are released, and is taking steps to improve that process.  The reentry hub and target population concepts are focused on providing services and programs to those near release.  In addition, the Department is expanding alternative community placements for certain inmates near the end of their incarceration period.

**Cal-ID**

A key component of successful reentry includes access to services and employment.  To that end, since the Blueprint, the Department received $2.2 million to expand the Cal-ID program to all prisons.  The program provides inmates with a state-issued identification card upon release from prison.

**Community Reentry Program**

The Budget includes $32.1 million to continue the community reentry program.  Reentry programs link offenders to a range of community-based, rehabilitative services that assist with substance use disorders, mental health care, medical care, employment, education, housing, family reunification, and social support.  The program is voluntary and allows eligible male inmates committed to state prison to serve the end of their sentences in the community in lieu of confinement in state prison.  To date, the Department has contracts to house 220 inmates in community reentry facilities.  The Budget includes resources for a total of 680 beds in 2016-17 and proposes to increase the eligibility criteria from 120 days prior to release to 180 days.

The Department entered into contract with Butte County Probation to add a community reentry program that allows for eligible offenders to serve their last 120 days in the community.  This facility serves both offenders being released to parole as well as post-release community supervision.  The residential site and a county-run program with California Department of Corrections and Rehabilitation staff on-site provides reentry support by offering programs such as alcohol and drug recovery, employment, education, housing, family reunification and social support.

Local governments have sole control over land use, zoning, and permitting within their communities.  When local communities are reluctant to allow the siting of rehabilitative programs for offenders in the criminal justice system, it impacts state and local governments' ability to provide meaningful programs for this population. The Budget includes $25 million for incentive payments to local governments that approve, between January 1, 2016 and June 30, 2017, new long-term permits for hard-to-site facilities that improve public safety and support the criminal justice system through the provision of services such as substance use disorder treatment, mental health, and reentry programming.  The Administration will work with city and county stakeholders during the spring to develop an allocation methodology while also safeguarding existing permitted facilities.

**Alternative Custody Program**

The Budget also includes $3.3 million in 2015-16 and $6 million beginning in 2016-17 to comply with the *Sassman v. Brown* lawsuit, which requires the state to expand the existing female Alternative Custody Program to males.  Alternative custody participants can be placed on home detention or other available residential placement one year prior to their release.  Although the female Alternative Custody Program is currently available for inmates two years prior to their release, it will be modified to one year.  At this time, it is unclear how many males will ultimately qualify for an alternative placement.  Consequently, future budget adjustments may be necessary to capture the full impact of this program expansion.

Although much work has been done, the Department will continue to focus on ways to streamline access to benefits and services for offenders prior to release, strengthen family relationships in the reentry process, and monitor certain offender groups to tailor services and programs to their needs.

**California Leadership Academy**

The 2014 Budget Act provided an $865,000 planning grant for the California Leadership Academy.  The primary concept of the Academy is to provide an alternative housing and programming placement with the goal of reducing recidivism for 18 to 25 year old inmates. By avoiding placement in a prison setting the Academy aims to offer training, programs and opportunities so that younger offenders break the cycle of crime.  This concept offers a different approach in the operation of a custody environment.  A report from the planning grant is due on March 31, 2016.

**Sex Offender Treatment**

Many state prison inmates are incarcerated due to committing a crime that requires registration as a sex offender, and the Department recognizes that sex offender treatment in prison is needed to fully assist in an inmate's rehabilitation process. To that end, the Department has established a pilot program for in-prison sex offender treatment.  This program is designed for 80 participants and will be facilitated by clinical social workers at the Substance Abuse Treatment Facility.  The program is in early stages of implementation and will be evaluated at the conclusion of the pilot to determine if the program should be permanently adopted and expanded.

**Parolee Programming**

An offender's continued access to programming upon their release from state prison is a core component of assisting that offender with reintegration into society.  Research shows that community-based reentry programs are most effective if applied during the first 12 months

of release, when offenders are most likely to reoffend. In addition, after 2011 Public Safety Realignment, the parolee population remaining are those with the highest needs. As a result, the Department focuses on providing programs to the parole target population during the first year of release, which include services to address substance use disorder, housing, employment, education, and other needs. The Department has been successful at providing services to 70 percent of the target population in the community and continues to look for ways to improve and expand services provided in the community.

### Medi-Cal Substance Use Disorder Treatment

In addition to rehabilitative programming and other transitional services, access to health care upon release is crucial to offenders' success in the community. The Department of Health Care Services successfully negotiated the Drug Medi-Cal Organized Delivery System 1115 Waiver, which was approved by the Centers for Medicare and Medicaid Services on August 13, 2015. This is a five year, California-only, pilot program that will test a new model for the organized delivery of health care services for Medi-Cal eligible individuals with a substance use disorder. The Department is collaborating with the Department of Health Care Services and a variety of stakeholders to implement the new waiver and develop an integrated system of care for parolees that will address medical, mental health, and substance use disorder needs. The Department is estimated to have approximately 42,500 offenders on active parole in 2016-17 and approximately 85 percent of them will be Medi-Cal eligible.

### Local Collaboration

While many offenders released from state prison continue to remain under the jurisdiction of the Department during a period of parole, offenders can also be released to local supervision. Collaboration between the state and county probation departments and other local law enforcement agencies remains critical, and the Department is expanding relationships with local stakeholders to enhance rehabilitative programming, similar to efforts at the community reentry facility in Butte. After Realignment, the parole population significantly declined and many parole offices were closed, leaving the Department with fewer facilities to provide parolee programs. Since then, the Department has established ten co-located Day Reporting Centers to provide rehabilitative services to offenders released to both state parole and Post-Release Community Supervision. The co-located Day Reporting Centers provide services to county and state offenders in: Imperial, Riverside, San Bernardino, Santa Clara, Tehama, Yolo, Santa Barbara, Sacramento, Shasta, Monterey, Calaveras, and Butte.

### Parole Violation Programs

The parole violation decision making process has changed over recent years with the Department making a more concerted effort to exhaust remedial sanctions before seeking

incarceration for a parolee who violates a condition of parole.  Parolees who violate their conditions of parole often receive a remedial sanction to attend a community-based program for a mandated period of time.  The mandated period normally does not coincide with the length of time it takes to complete the community based-program.  Also, there are times that the parole violator may only require detoxification services instead of licensed residential treatment.  The placement of parole violators, who are not always part of the target population, into these community-based programs places a strain on the resources that were originally meant to assist offenders in the target population.  To address this issue, the Department will develop a parole violation pilot program within existing resources at three locations in 2016-17 which will include programming more tailored to a parole violator's needs.

## Long-Term Offenders

In recent years, the number of long-term offenders being released after serving lengthy periods of incarceration has steadily increased.  The Board of Parole Hearings indicates that approximately 80 percent of life-term offenders released to parole require or request transitional housing as part of their parole plans.  Furthermore, the needs of offenders incarcerated for long terms are unique and better served by programs tailored to their needs.  To better serve long-term offenders, the Budget includes $10 million for the following program expansions:

- Parolee Service Center Beds ($3.1 million)—Parolee Service Centers provide residential and support services that focus on employment, job search and placement training, substance use disorder education, stress management, victim awareness, computer supported literacy and life skills.  The Department will add 136 beds on a statewide basis for this purpose.

- In-Prison Long-Term Offender Program ($3.4 million, of which $2.1 million is one-time)—This voluntary in-prison reentry program that is designed specifically for long-term offenders, providing substance use disorder treatment, criminal thinking, anger management, family relationships, victim impact, denial management and employment readiness.  The Blueprint created this pilot program, and the Budget proposes to expand to an additional prison, which will increase the number of slots by approximately 1,700.

- Offender Mentor Certification Program ($423,000)—Long-term and life-term inmates who complete this voluntary ten-month program are trained and certified to become mentors for alcohol and drug counseling.  Upon completion, inmates are assigned as mentors and obtain 4,000 hours of work experience in substance use disorder treatment programs.  Once those hours are fulfilled, inmates are eligible to obtain a substance use

disorder counseling certification that can be used to gain employment upon release. This augmentation will enable the Department to train an additional 64 inmates annually.

- Pre-Employment Transitions Program ($3.1 million)—The Transitions Program offers employment preparation, teaching job-readiness, job search and prerequisite skills needed for the current job market. Participants learn about community resources and programs to help with transition and are linked to One-Stop Career Centers and social service agencies in their counties of residence. This program is currently available at all reentry hubs as planned for in the Blueprint and will be expanded to all prisons. The Department will discontinue the use of contractors for this program and will hire teachers to serve approximately 23,000 inmates annually.

The Department will also begin efforts to develop a program that provides six-month transitional housing in locations closest to the communities in which life-term inmates will be released. Offenders serving long terms in prison are often unprepared for reentering society due to changes in technology and day-to-day living advances. Transitional housing will assist these offenders to successfully reenter society. Additionally, the Department has taken steps to allow offenders placed in transitional housing immediate access to community leave passes, phones and visitation, and to place these parolees in an appropriate service or treatment program based on their needs assessment.

## SAFETY AND SECURITY

The safety and security of the Department's institutions is of paramount importance. Safe operation of the Department's facilities fosters a positive atmosphere that promotes rehabilitation. High programming facilities create better working conditions for staff and better living conditions for inmates. The Department is regularly challenged to maintain safe and secure prisons, and continues to refine and expand methods that improve the safety and security of the prisons to protect inmates, staff, and the public. The Department has made much progress in creating a safer environment and will continue its mission of enhancing security of the state prison system.

### Drug and Contraband Interdiction

A critical component of establishing a safer prison system is to reduce drug use, drug trafficking, and contraband within the institutions. The use of illicit drugs by inmates presents a serious threat to the safety and security of institutions. Drug trafficking causes many problems in a prison setting, including assaults, power struggles within the inmate population, underground economies, and reduced programming benefits and adherence. To provide a

safer environment that encourages the rehabilitation of inmates and supports their health, mental health, and educational opportunities, it is important that proactive steps be taken to limit the introduction of drugs and contraband in prisons.

The Department began a drug and contraband interdiction pilot program at 11 institutions beginning in 2014. The 11 institutions chosen for the interdiction program include those institutions with the highest amounts of confiscated illegal drugs and contraband and high levels of drug use. The pilot program is a comprehensive, multi-layered approach, focusing on all avenues of contraband interdiction in the institutions. The interdiction strategies include drug interdiction officers, x-ray machines at entrance areas, drug and contraband detection canines, ION mobility spectrometry technology, random drug urinalysis of inmates, video surveillance equipment in visiting rooms, and increased access to substance use disorder treatment for inmates found to be using drugs. The Department is also evaluating the use of different types of body scanning technology to improve interdiction efforts.

The 11 Drug and Contraband Interdiction Pilot Program Institutions include:

*Intensive:*

1. Calipatria State Prison
2. California State Prison, Los Angeles County
3. California State Prison, Solano

*Moderate:*

4. Central California Women's Facility
5. California State Prison, Centinela
6. California Institute for Men
7. High Desert State Prison
8. Kern Valley State Prison
9. California Substance Abuse Treatment Facility
10. Sierra Conservation Center
11. Salinas Valley State Prison

The Budget includes $7.9 million to continue and enhance efforts to reduce illegal drugs and contraband entering prisons. The expansion will enable the Department to search more staff, visitors and vendors entering these prisons on a daily basis, as well as packages received by these prisons. These efforts are intended to reduce inmate violence, increase safety for staff

Section Five | Future Vision

and inmates, and promote a drug-free rehabilitative environment. Additionally, these efforts complement the expansion of substance use disorder treatment to all prisons by allowing the Department to prioritize placement of inmates who test positive for illicit drug use into substance use disorder treatment programs. To help inform a potential future expansion of this program, the Department will contract with an independent entity for an interim report which analyzes and evaluates data collected by the institutions. The interim report will be completed by the end of 2015-16 and a final report will be provided in spring 2017.

### Safety and Security Technology

#### *Video Monitoring*

Video monitoring can be a successful deterrent to reducing illegal and negative behavior in prison, thus improving inmate and staff safety. The California City Correctional Facility and California Health Care Facility have video cameras throughout the prisons. The use of the technology at these facilities has proven effective in identifying and deterring illegal activity. Additionally, a video surveillance system is being installed at the three level II dormitory housing facilities being constructed at Mule Creek State Prison and Richard J. Donovan Correctional Facility. The Department is committed to evaluating the benefits of using video monitoring technology to improve the safety and security of all prisons, particularly level IV facilities.

#### *Managed Access System*

Over the last several years, the Department has rolled out cell phone blocking technology to 18 prisons to reduce illegal activity associated with cell phones. The Department has found that rapid changes in cell phone technology make blocking them incredibly challenging. To continue to expand to the remaining institutions and improve coverage at the existing facilities, the Department would need to make a substantial long-term investment in expensive upgrades to maintain the marginally effective system. Based on the lack of effectiveness and other more broad changes that would likely increase costs of the program, the Department has suspended further implementation of the technology to other prisons. The Department will continue to maintain the program at the prisons where the technology is being used. During this pause in implementation, the Department is evaluating technology to detect cell phones, instead of blocking, as a means to mitigate contraband cell phones. Cell phones in prison create considerable risk to institution security.

An Update to the Future of California Corrections

**Enhanced Programming Facilities**

In December 2013, the Department implemented Enhanced Program Facilities at select institutions ranging in security levels from level II general population to secure level IV facilities. These facilities are located at 12 different prisons throughout the state, including 9 male facilities and 3 female facilities. The intent is to cluster inmates who want to focus on rehabilitation and positive in-prison behavior by increasing programming opportunities and allowable inmate property. Inmates with documented behavior issues are reviewed through the classification process and sent to non-Enhanced Program Facilities. The Department intends to activate additional high programming facilities throughout the state by expanding to individual housing units until an entire facility (a group of housing units that share a yard) is positively programming. The Department will also evaluate its ability to sustain the program on secure level IV facilities, which have been the most challenging to implement thus far.

## Conclusion

Over the past five years, there has been a reduction in the prison population, and improvements have been made in the use of technology, prison safety, the delivery of health care, and growth in rehabilitative programs. But much work remains to be done. It is important to continue operating a safe and efficient prison system, and the continued training and development of staff is a critical component of that effort. Mitigating the introduction of contraband through interdiction strategies will further improve prison safety. Another key component is an environment where inmates can earn credits and other privileges for educational achievement and other rehabilitative programs. Inmates who participate in and complete rehabilitative programs are generally more successful, both in prison and in the community. Access to meaningful programs and services are important to an offender's success and lead to improved recidivism rates and safer prisons and communities. As such, the Administration is committed to making further investments in this area to best prepare inmates for reentering society. The Administration recognizes that the California Department of Corrections and Rehabilitation is a critical component of the overall criminal justice system, and must work collaboratively with all stakeholders to address the full spectrum of offenders' needs to achieve better public safety outcomes. To that end, the Administration will continue to engage with local partners and other stakeholders to evaluate performance and improve the array of in-prison and community-based programs that ultimately benefit offenders and public safety.